1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3

IN RE:                          Case No. 1:17-md-2804
4  NATIONAL PRESCRIPTION           Cleveland, Ohio
   OPIATE LITIGATION
5                                  October 5, 2021
   CASE TRACK THREE                8:59 A.M.
6

7

8                       - - - - -

9

                        **VOLUME 2**
10

11                      - - - - -

12

13        TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14        BEFORE THE HONORABLE DAN A. POLSTER,

15           UNITED STATES DISTRICT JUDGE,

16                   AND A JURY.

17

18                      - - - - -

19

20

21  Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                             7-189 U.S. Court House
22                           801 West Superior Avenue
                             Cleveland, Ohio  44113
23                           216-357-7087
                             Susan_Trischan@ohnd.uscourts.gov
24

25  Proceedings recorded by mechanical stenography;
    transcript produced by computer-aided transcription.

```
 1    APPEARANCES:
      For the Plaintiffs:          Peter H. Weinberger, Esq.
 2                                 Spangenberg, Shibley & Liber
                                   1001 Lakeside Avenue, Ste. 1700
 3                                 1900 East Ninth Street
                                   Cleveland, Ohio    44114
 4                                 216-696-3232

 5                                 W. Mark Lanier, Esq.
                                   Rachel Lanier, Esq.
 6                                 M. Michelle Carreras, Esq.
                                   Maria Fleming, Esq.
 7                                 The Lanier Law Firm
                                   6810 FM 1960 West
 8                                 Houston, Texas    77069
                                   813-659-5200
 9
                                   Frank L. Gallucci, III, Esq.
10                                 Plevin & Gallucci Company, LPA
                                   The Illuminating Building
11                                 Suite 2222
                                   55 Public Square
12                                 Cleveland, Ohio    44113
                                   216-861-0804
13
                                   Salvatore C. Badala, Esq.
14                                 Napoli Shkolnik
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York    10017
                                   212-397-1000
16
      For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
17                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
18                                 Alex Harris, Esq.
                                   Sharon Desh, Esq.
19                                 Bartlit Beck LLP
                                   54 West Hubbard Street, Ste.300
20                                 Chicago, Illinois    60654
                                   312-494-4400
21
      For CVS Defendants:          Graeme W. Bush, Esq.
22                                 Eric R. Delinsky, Esq.
                                   Alexandra W. Miller, Esq.
23                                 Paul B. Hynes, Jr., Esq.
                                   Zuckerman Spaeder - Washington
24                                 Suite 1000
                                   1800 M Street, NW
25                                 Washington, DC    20036
                                   202-778-1831
```

```
 1     For HBC/Giant Eagle
       Defendants:                   Robert M. Barnes, Esq.
 2                                   Scott D. Livingston, Esq.
                                     Marcus & Shapira
 3                                   35th Floor
                                     One Oxford Centre
 4                                   301 Grant Street
                                     Pittsburgh, PA   15219
 5                                   412-471-3490

 6                                   Diane P. Sullivan, Esq.
                                     Chantale Fiebig, Esq.
 7                                   Weil Gotshal & Manges
                                     Suite 600
 8                                   2001 M Street NW
                                     Washington, DC   20036
 9                                   202-682-7200

10     For Walmart Defendants:       John M. Majoras, Esq.
                                     Jones Day - Columbus
11                                   Suite 600
                                     325 John H. McConnell Blvd.
12                                   Columbus, Ohio   43215
                                     614-281-3835
13
                                     Tara A. Fumerton, Esq.
14                                   Tina M. Tabacchi, Esq.
                                     Jones Day - Chicago
15                                   Suite 3500
                                     77 West Wacker
16                                   Chicago, Illinois   60601
                                     312-782-3939
17

18     ALSO PRESENT:                 Special Master David Cohen

19
                                  - - - - -
20

21

22

23

24

25
```

1            TUESDAY, OCTOBER 5, 2021, 8:59 A.M.

2                  THE COURT:  Okay.  Please be seated.

3                  I think we were still waiting on one or two

4        jurors.

08:59:53  5                  I thought in addition to addressing what we

6        do with objections on depositions, I want to make sure we

7        deal expeditiously with any objections to documents that

8        either side is going to introduce.

9                  I seriously don't want to be interrupting

09:00:18 10       every witness and delaying this trial.  There may be a

11       whole lot of objections that people interpose that are

12       trivial or frivolous and should just be dropped.

13                  If you've got some real substantive ones,

14       I've got to figure out how we're going to -- how to deal

09:00:34 15       with them.  And it may be that the quickest thing is to

16       get -- is for each side to file a list of the documents

17       that you have serious objections to, and a one sentence

18       as to why, and I'll figure out -- and which witnesses

19       they are going to come in with, and Special Master Cohen

09:00:55 20       and I will figure out how to address them.

21                  That's the best suggestion I've got, unless

22       someone's got a better one.

23                  MR. LANIER:  Your Honor, Mark Lanier for

24       plaintiffs.

09:01:12 25                  I don't have -- I'm not sure this is

1      working.  Hello, hello?

2                      Your Honor, this is Mark Lanier.

3                      THE COURT:  Yes, I see, Mark.

4                      MR. LANIER:  Thank you:

09:01:29  5            THE COURT:  No.  I'm not being facetious.

6                      MR. LANIER:  Yes I know.

7                      And I don't mean to take this -- yes.  I

8      don't have a better idea, Your Honor, but in terms of

9      this morning, recognizing that I think there's about an

09:01:42 10    hour 40 or so left in opening, so I was thinking that

11     that might even happen before the break.

12                     And during the break, we'll move the TVs

13     and get set up for examination, and then I put Mr. Davis

14     on.  I'm thinking that it might be useful if I at least

09:01:57 15    indicate to the other side -- and I can do a list of

16     where I plan on starting with this witness.  I think it's

17     past the point where they could realistically, and I'll

18     just take them on their honor that they won't go out

19     there and start wood shedding him once I give them the

09:02:18 20    list of documents while I'm starting.

21                     But that would at least enable them, if we

22     need to during the break before we start direct -- I mean

23     cross, if they got something, they could throw it out

24     there and get us through the lunch hour and certainly

09:02:29 25    through maybe most of today.

1              I don't know if that helps or not.

2              THE COURT:  I don't know.

3              All this should have been done beforehand,

4    if there was any serious objections to documents.

09:02:38 5              I mean, I'm just going to, you know --

6              MR. DELINSKY:  Your Honor.

7              THE COURT:  Yes.

8              MR. DELINSKY:  We're mindful of Your

9    Honor's approach to this, but Mr. Lanier and I conferred

09:02:53 10    this morning and the settlements, the remaining

11    settlements, Your Honor, it appears may be an issue in

12    this examination.

13              That has been briefed.

14              THE COURT:  Well, here's my ruling.  If

09:03:18 15    there are substantial number of settlements in a

16    relatively short period of time, and they all relate to

17    the subject matter of this case, you can -- and the

18    witness is responsible enough that he or she would have

19    taken some action or should have taken some action, I'll

09:03:39 20    allow it in.  Okay.  If not, it doesn't come in.

21              If it's one or two over a long period, it's

22    not relevant to anything.  It's more prejudicial than

23    probative.  If you've got five or six or seven

24    against -- we'll just use, you know, CVS, and this is a

09:03:57 25    witness who had a position of responsibility to do

1    something and didn't, well you can cross-examine him on

2    it or examine him on it.  Okay?

3                    MR. DELINSKY:  But, Your Honor --

4                    THE COURT:  I've ruled.  That's it.  That's

09:04:13  5    the extrapolation from what I've written.

6                    MR. DELINSKY:  But, Your Honor, several of

7    the settlements that do not concern the same subject

8    matter --

9                    THE COURT:  If it's not directly related to

09:04:22 10    the subject matter of this, it's not relevant.

11                    I've already ruled on that.

12                    MR. DELINSKY:  Okay, Your Honor, and --

13                    THE COURT:  If it's something else, it

14    doesn't matter.  That's why -- that's why I didn't allow

09:04:32 15    Mr. Lanier to even refer to one in opening statement

16    because it didn't pertain to what this case is about.

17                    MR. DELINSKY:  Your Honor, okay.  That's

18    helpful, Your Honor.

19                    The other issue is in your ruling on

09:04:42 20    Friday, Your Honor drew a distinction between statements

21    that contain -- where the conduct is admitted and where

22    the conduct remains disputed.

23                    Am I fair in assuming that settlements

24    where the conduct remains disputed and it's settlement to

09:05:01 25    avoid litigation and dispute remain inadmissible?

1          THE COURT:  No, that's not what I said,

2     Mr. Delinsky.

3          I said if you've got four or five, some

4     substantial number in a reasonable period of time and the

09:05:12  5     time frame we're talking about and it relates to the

6     subject matter of this case, and you've got a witness

7     who's a responsible witness, well, it's fair to ask him,

8     well, I mean, here's the Government over and over again

9     telling you you're not fulfilling your responsibilities

09:05:27 10     under the CSA.  What, if anything, did you do?

11          That's a fair question.  Okay?  And I'll

12     allow that.

13          Whether it was, you know -- because, again,

14     it's direct evidence that the Government didn't think

09:05:40 15     that that defendant was complying with its obligations

16     under the CSA.  Settlement after settlement after

17     settlement.

18          At some point, you would think the company

19     would seriously consider changing what they're doing.

09:05:53 20     And if you've got a witness on there who's got some

21     responsibility, that's a fair question.

22          And what's relevant is what the company did

23     or didn't do in response to what the Government was

24     doing.

09:06:04 25          So that's why it's relevant.

1          MR. DELINSKY:  Okay.

2          THE COURT:  But again, it's got to -- it's

3     got to relate to the subject matter of this case.

4          If it's something else, it's not relevant.

09:06:13  5          MR. DELINSKY:  Your Honor, we respectfully

6     object to the ruling.

7          THE COURT:  Okay.

8          MR. DELINSKY:  I just want to make sure

9     we're preserved on the record --

09:06:21 10          THE COURT:  You're preserved.

11          As long as that's what we've got, it's

12     coming in.  The questions are allowed.

13          MR. DELINSKY:  Our objection's noted, Your

14     Honor.

09:06:32 15          THE COURT:  Okay.  All right.  So with

16     these documents, I'm -- you know, most of the objections

17     I don't care about and you don't care about.

18          I only want a list from each side of the

19     substantive, real serious objections you have to the

09:06:47 20     other side's documents, what they are, give me a list, I

21     guess in numerical order, and one sentence as to why you

22     think it shouldn't come in.

23          All right?  So I guess get it to me by the

24     beginning of court tomorrow, and I'll figure out, I'll

09:07:04 25     see how long the list is and figure out if I can just

 1   make rulings in advance or we'll have to deal with it on

 2   the fly.

 3                    And I'll just charge the time.  Maybe I'll

 4   just split the time I have to spend on it, if I've got to

09:07:17  5   use it during the jury time.

 6                    All right.  Do we have all the jurors now,

 7   Robert?

 8                    Yes, Mr. Stoffelmayr?

 9                    MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr

09:07:35 10   for Walgreen's.

11                    I just wanted to ask one favor, if I could,

12   and I'm probably not in a position to.

13                    Obviously yesterday I went a little bit

14   longer than I expected to, and we had --

09:07:44 15                    THE COURT:  That's all right.  I mean, I

16   wasn't going to cut you off in mid stream.

17                    MR. STOFFELMAYR:  I appreciate that very

18   much.  I felt badly that the jurors were not out of here

19   by 5:30.

09:07:56 20                    THE COURT:  Well, it was 5:35.  It was not

21   a big deal.

22                    MR. STOFFELMAYR:  Thank you.  I appreciate

23   that.

24                    Because I did go a little bit longer, we

09:08:04 25   had that technical fuss, I'm just hoping that Mr. Majoras

1    would relax if he needs a couple of extra minutes.  I

2    don't want that to be held against --

3                    THE COURT:  I'm not going to be hyper

4    technical over five minutes.  I don't want you to abuse

09:08:15  5    that, though.

6                    MR. STOFFELMAYR:  Of course.  We don't

7    intend to.  We know we have a challenge to share time and

8    we are committed to getting really, really good at that

9    before we're done here.

09:08:23 10                    THE COURT:  Okay.

11                    MR. STOFFELMAYR:  Thank you, Judge.

12                    THE COURT:  Robert, do we have them all?

13                    (Pause.)

14                    (Jury in.)

09:11:54 15                    THE COURT:  All right.  Good morning,

16    ladies and gentlemen.

17                    Please be seated.

18                    I hope you had a good evening.

19                    You'll recall when we broke,

09:12:01 20    Mr. Stoffelmayr had concluded the opening for Walgreen's

21    so we're now take up with the opening statements from the

22    other three defendants.

23                    So we have Mr. Delinsky.

24                    MR. DELINSKY:  Good morning, Judge Polster.

09:12:31 25                    THE COURT:  Good morning.

<u>OPENING STATEMENTS ON BEHALF OF CVS</u>

1

2          MR. DELINSKY:  Good morning, ladies and

3    gentlemen of the jury.

4          I appreciate the opportunity to speak to

09:12:39 5    you for a little while this morning, but before I start,

6    let me introduce myself.  I think we met in the selection

7    process.

8          My name is Eric Delinsky, and I represent

9    CVS.

09:12:54 10          Let me introduce the other lawyers who are

11   joining me in representing CVS.  This is my colleague,

12   Sasha Miller.  This is my colleague, Graeme Bush.

13          MR. BUSH:  Good morning.

14          THE COURT:  I'm not related to either one

09:13:11 15   of them.

16          And most importantly, this is Andrea

17   Zollett, who you met yesterday.

18          Ms. Zollett is a Vice President at CVS.

19   She's a senior counsel there.  She won't be with us every

09:13:26 20   day, but you will see her now and then throughout the

21   course of the trial, including today and tomorrow and

22   from time to time as the trial proceeds.

23          Before I do anything else, though, I do

24   just want to thank you.  Sometimes you can't say thank

09:13:45 25   you enough, and this is one of those trials where you

1    just can't say thank you enough.

2              Being a juror is hard, but it's really hard

3    when the trial's long, and it's really hard when you have

4    all these lawyers in the well of the courtroom and

09:14:04  5    they're all talking at you.

6              And it's particularly hard when we are

7    wearing masks and we have to distance.  It's a real hard

8    time to be a juror in a long trial.

9              We're mindful of the commitment this

09:14:17 10    requires of you.  We're mindful of the sacrifice to your

11    lives this requires of you.

12              And we're just grateful because it's

13    essential.  You'll hear it throughout this trial, but

14    thank you.  Thank you.

09:14:32 15              We all know CVS.  CVS runs pharmacies

16    throughout the country.  It runs almost 10,000 pharmacies

17    today in all 50 states.

18              This you may not know.  The first CVS

19    Pharmacy opened up back in the 60s in Rhode Island and

09:14:58 20    true to its roots, CVS has remained based in Rhode Island

21    all the way up through the present.  And you'll meet

22    witnesses who work in Rhode Island when there's not a

23    pandemic, of course.  You'll meet one this afternoon,

24    Mr. Tom Davis, who lives in Rhode Island and works in

09:15:17 25    Rhode Island.

1           But this case isn't about Rhode Island.

2    This case is about the CVS Pharmacies in Lake County and

3    in Trumbull County.  There's something funny here.  I

4    count 14 of them today.  I think Mr. Lanier said there

09:15:35  5    was 11.  I probably should say 11, but I know there's 14

6    and we'll walk through them really briefly.

7           The truth of the matter is that the numbers

8    sort of go up and down as stores open and close, but

9    today there are 14.  And I'm going to talk about the 14

09:15:49 10    pharmacies today.

11           Now, the claim against these 14 pharmacies

12    in this suit, it's unusual.  This isn't a claim where

13    someone's saying they got hurt by a pharmacy.  This is a

14    claim where entire communities, counties, are saying that

09:16:09 15    these pharmacies violated rights, interfered with rights

16    of the entire public at large.

17           So what does this mean for CVS?  For CVS,

18    the question is did these 14 pharmacies, by filling

19    prescriptions written by doctors, engage in conduct, in

09:16:41 20    misconduct so widespread that they violated, harmed,

21    interfered with the rights of the entire public at large

22    in Lake County and the entire public at large in Trumbull

23    County.

24           That's the question in this case.

09:17:02 25           And here's the answer the evidence will

 1    give us.  No.  Absolutely not.  And I'm going to circle

 2    back to this, I'm going to circle back to this point.

 3              Many of the points that Mr. Stoffelmayr

 4    discussed yesterday apply equally to CVS.  They're

 5    general points about how pharmacies work and what

 6    pharmacies, pharmacists do, and the rules that apply to

 7    them.

 8              They not only apply equally to CVS; they

 9    apply equally to all of us.  Okay?  And the goal here is

10    not to waste your time.  And as a matter of fact, Judge

11    Polster has put time limits on us.  So I'm not going to

12    repeat them.  I'm not going to repeat all those points.

13              But there's some points that are so

14    important to an understanding of this case that they do

15    bear very quick and fast repeating.

16              By the way, you're going to learn this

17    throughout the course of this trial.  I am terrible with

18    technology.  I'm not as talented at technology as

19    Mr. Lanier, and I already screwed it up.  So bear with me

20    one second.

21              Could you all hear me okay before?  I'm

22    sorry.  I didn't -- technology.  I forgot to turn it on.

23              So just some framing points.  Just some

24    framing points, and why I want to run through these with

25    you is because they begin to supply you and us with the

1    big picture we need to understand the evidence as we get

2    it in the case.

3                        And I just want to go through two of these

4    big picture framing points.

09:19:06   5            Point number one.  This case involves

6    medications, pain medications, that have been approved by

7    the U.S. Government.  They have been approved by the U.S.

8    Food & Drug Administration, the FDA.  They have been

9    approved by the FDA as safe and effective medications.

09:19:49  10   Approved by the Government, FDA approved.  I told you I

11   was going to be quick.

12                        Point number two.  Doctor-prescribed.  This

13   case involves the filling of prescriptions written by

14   doctors and other medical workers who are licensed to

09:20:09  15   write prescriptions.  This isn't a case about selling

16   pills in the parking lot or out the back door.  This is a

17   case about filling prescriptions.

18                        And one thing we know from the Government,

19   Mr. Stoffelmayr covered this, Mr. Lanier covered this,

09:20:28  20   the overwhelming majority of American physicians who

21   prescribe controlled substances, pain medication is a

22   controlled substance, do so for legitimate reasons.

23                        The overwhelming majority of American

24   physicians write prescriptions for legitimate reasons.

09:20:51  25            And it is the job, the core job of a

1    pharmacist to fill those legitimate prescriptions so that

2    patients get the medicine that their doctors have

3    determined they need.

4             As we listen to the evidence in this case,

5    we hear witnesses testify, we look at documents, I ask

6    that we keep these two points in mind.  It will round out

7    the full picture, they round out the big picture.

8             Now, let's go to CVS, and particularly the

9    14 CVS Pharmacies in Lake County -- I'm sorry -- in Lake

10   and Trumbull County.

11            I'm sure you all recognize this map of

12   Northeast Ohio.  Outlined in red is Lake County.  And

13   there's nine CVS Pharmacies there.

14            And you can see them and we're going to go

15   through them.  You may see, probably see the CVS insignia

16   heart on seven of them.  Then you see maybe what looks to

17   you to be the Target symbol.  We'll look at those, too.

18   There's actually two CVS Pharmacies in Targets in Lake

19   County.

20            Let's look at one.  We're going to look at

21   the one on Mentor Ave.

22            This pharmacy is on 904 Mentor Ave. in

23   Mentor and it's surprising looking.  It looks like your

24   everyday CVS pharmacy.  I'm sure you've seen them before.

25            This is what CVS calls the front store.

1    Okay.  That's where you get the snacks, batteries,

2    household goods, soap, shampoo, and what not.  Again, I'm

3    sure we've all been in them.

4                  And then you see the pharmacy.  And this,

5    the pharmacy, of course, is where all the pharmacists,

6    the pharmacy workers, this is where patients drop off

7    prescriptions and it's where pharmacists work on

8    prescriptions and it's where patients pick them up.

9                  This is the part of the store that this

10   case is about.

11                 Now, this Mentor Ave. pharmacy in Mentor.

12   It is and always has been regulated, overseen by the

13   State of Ohio and the Federal Government, the DEA.

14                 It is licensed and always has been

15   re-licensed by both the state and DEA, and it has a good

16   record with both.  Never has there been a finding by the

17   state, by DEA, by any other law enforcement agency that

18   this pharmacy in Mentor was filling illegitimate opioid

19   prescription after illegitimate opioid prescription as

20   the counties allege here.  Never.

21                 And let me stop here for a moment.

22                 Yesterday we heard a lot about data, and

23   I'm going to talk some about data.

24                 We heard Mr. Lanier talk about who gets

25   data and who doesn't get data.  He left out one party

1     that does get data:  Law enforcement, the State of Ohio,

2     the State Board of Pharmacy.

3                    It is stated on every opioid prescription

4     that the pharmacies -- that pharmacies in the State of

09:24:55  5     Ohio fill, and they'd be deviant, the state requires

6     pharmacies to give it to them, go back at least 13 years,

7     maybe it's 14 or 15, it's not more than 15, but at least

8     13 years.

9                    So the state law enforcement, the Board of

09:25:14 10    Pharmacy, has the data needed to try to see if there's

11    any issues and to identify issues if there are any.

12                    And this pharmacy, the state didn't

13    identify any issues.  None.

14                    Let me just introduce you to the rest of

09:25:36 15    the CVS Pharmacies in Lake County.  I'll come down here.

16    Am I crowding any of you?

17                    All right.  CVS is Willoughby, Willoughby

18    Hills, Painesville.  I'd just like to point out two in

19    particular is those Targets I talked about.  There's one

09:25:59 20    here in Willoughby and there's another one in Mentor.

21    It's right here in Mentor.  Starting right at the end of

22    2015, CVS started operating pharmacies inside Targets and

23    that's probably where we go from Mr. Lanier's number of

24    11 pharmacies to my number of 14, but they are your

09:26:20 25    standard CVS Pharmacies.

1         The bottom line of all these pharmacies is

2    the same.  It's the same.  All nine of these Lake County

3    CVS Pharmacies have been regulated and are regulated by

4    both the DEA and the state.  They always have been

09:26:44  5    licensed and re-licensed by both.  And they have a good

6    record with both.

7         Never has the State, the DEA or any law

8    enforcement agency determined or even suggested that any

9    of these pharmacies are filling opioid, illegitimate

09:27:06 10    opioid prescription after illegitimate opioid

11    prescription.

12         Let's go to Trumbull County.  If you could

13    probably see, Trumbull County is outlined in red and

14    there's now five CVS Pharmacies in Trumbull County.

09:27:20 15         I just want to point out where they are

16    here.  Do you see the gray, the dark gray tint right

17    there?  That's a pharmacy.  That's a CVS Pharmacy on

18    Elmwood Road in Warren, and it closed in 2012 so it

19    hasn't been operating in, what, nine years but we just

09:27:45 20    wanted to be complete so we're showing you that.

21         And, look, I want to just quickly go

22    through the CVS on Parkman Road in Warren.  Again,

23    standard CVS Pharmacy.  It looks like the one in Mentor.

24         The front store, the pharmacy.  No

09:28:05 25    surprises.  What we expected.

1           And there are photos of all five CVS

2      Pharmacies in Trumbull County.  And as you can see in

3      Niles, one of those pharmacies is a Target store, talking

4      about four ordinary CVSes and then the CVS Pharmacy in a

09:28:28  5      Target.

6           And again, all five of these pharmacies is

7      and always has been regulated by the State and the DEA,

8      always has been licensed and re-licensed by the State and

9      the DEA, all have a good record with both.

09:28:51 10           Never has any law enforcement agency ever

11      suggested that any of these five pharmacies were filling

12      illegitimate opioid prescription after illegitimate

13      opioid prescription as the counties allege here.

14           There was some discussion of a volume

09:29:17 15      yesterday, a volume.  How many pills did CVS and the

16      other pharmacies here dispense to patients?  Was it a

17      large number or was it a small number?  And I think

18      Mr. Lanier put up some handwritten figures, many millions

19      of pills.  And so I want to -- I want to talk about

09:29:44 20      volume a little bit, and I want to continue to supply you

21      with some cases of the big picture when I do.

22           But before I do that, I just need to

23      reiterate a point that Mr. Stoffelmayr made yesterday.

24      Pharmacies don't control volume.  Doctors do because

09:30:07 25      doctors are the ones who write prescriptions.

1    Pharmacists don't.  They receive the prescriptions.

2                    But still, let's -- let's talk about

3    volume.  I need to teach you, I don't know about all that

4    Egyptian history that we went over yesterday.  I just

09:30:27  5    don't know about it, but there's one word I do know about

6    which I want to explain before we go further with this,

7    and the word is "Noncontrolled medication."

8    "Noncontrolled medication."

9                    We've heard about controlled substances.

09:30:45  10    Those are obtained medications, opioid medications, among

11    others, that the DEA regulates.

12                    Noncontrolled medications are medications

13    that the Government, the DEA, does not regulate in the

14    same way because they are not deemed to carry the

09:31:10  15    same -- they're not as susceptible to being misused or

16    abused.

17                    So what are noncontrolled medications?

18    Allergy medicine, cholesterol medicine, heart medicine,

19    antibiotics, asthma medicine.  But that word is important

09:31:36  20    to keep in mind and understand.

21                    Now, going back to volume, this is the

22    volume that Mr. Lanier brushed on and these are the

23    number of prescriptions filled by CVS Pharmacies in the

24    two counties from 2006 to 2019.  That's the data that

09:31:59  25    spans that time frame, okay.  The Court's ordered years

1        of data and those are the years.

2                        And when you look at that, that way, you

3        know, it's a lot of prescriptions.  And it is a lot of

4        prescriptions.  It is.

09:32:12  5             But when you stand back and you look at it

6        in the larger context of each pharmacy, you begin to see

7        more parts of the picture.

8                        The red line are the amount of the

9        noncontrolled medications, blood pressure medications,

09:32:39 10      heart medicine, antibiotics and the like.

11                       And as you can see, these pharmacies are

12       filling, excuse me my language, way more of these

13       noncontrolled medications than the opioid medications.

14                       So plaintiffs will say why does this

09:33:02 15      matter?  Why does this matter?  This case is about

16       the -- this case is about the opioid medications.  But it

17       does matter.  Why does it matter?

18                       It matters because this provides context

19       for how pharmacies operate.  It matters because it shows

09:33:21 20      these pharmacies weren't pushing pain medicine.  It

21       matters because it shows that these pharmacies are doing

22       what pharmacies should do:  They're filling prescriptions

23       for the full range of medicine that the doctors say their

24       patients need.

09:33:47 25              That's why it matters.  It's a piece of the

1    big picture.

2                    This number is eight times -- or 18 times

3    more noncontrolled medications than the opioid

4    medications in the 14 pharmacies.

09:34:01  5                    This is another way of looking at the same

6    thing, ladies and gentlemen.  The only difference here,

7    the red is the noncontrolled medications and I just

8    wanted to show you that it increases over the years.

9    This is where it starts.  This is 2019 but -- so you can

09:34:38 10    see -- so you can see it's an increase and these

11    noncontrolled medications go up.

12                    Now, let's look at the opioid medications.

13    These are the opioid prescriptions filled at these 14

14    pharmacies.  And what you see here is that they increase

09:35:01 15    from 2006 until what looks like 2012, and then there's a

16    very, very sharp decrease in the number of opioid

17    prescriptions being filled by the CVS Pharmacies.

18                    All right?  And then when you pull back and

19    you look at them together, this is what you see.  And

09:35:26 20    it's the same story we've already talked about, the

21    noncontrolled medications are going up.  The opioid

22    medications -- and it's hard to see because it's so low

23    comparatively.  Go down, there's this much.  Again, just

24    a piece of the big picture that we need to consider as we

09:35:52 25    hear the evidence.

```
 1              One more and only one more graph or chart.

 2    Okay.  We talked about yesterday that some prescriptions

 3    for opioid medications are stronger than others.  Okay?

 4    Some are stronger than others.  Others are less potent.

 5    Okay?

 6              And what we did here is we looked at the

 7    variety of pharmacies in the counties and said, you know,

 8    how strong are the prescriptions that they're filling.

 9              And what we see is that pharmacies like

10    Champion and Overholt's.  Mr. Stoffelmayr talked about

11    Overholt's.  They are filling probably on average,

12    they're filling more potent pain medications.

13              And then CVS is at the lower end.  Now,

14    there's more pharmacies on this chart.  You'll see this

15    at the trial.  So there's even some more that -- and I

16    don't want to talk about them now but it's really close

17    to what we'll see, CVS is really at the low end, and as

18    you can see, even a Rite Aid, even pharmacies we all know

19    are on average at the median filling more potent opioid

20    prescriptions than CVS.

21              Why is this important?  Big picture.  Big

22    picture.

23              You will hear evidence of CVS's policies,

24    the policies -- and Mr. Lanier talked about policies --

25    the policies that CVS would put in place to guide its
```

1    pharmacists, the rules CVS has put in place.

2              But before we go there, I want to talk

3    about the law, because in candor, the policies just

4    restate what the law is and has been for 50 years.

09:38:14  5              We learned about the Controlled Substances

6    Act yesterday.  This law was enacted in 1971.  Here's one

7    of the laws that Mr. Lanier talked about yesterday but I

8    want to share with you, this is the response -- this is

9    the law that sets forth what pharmacists, a pharmacist's

09:38:39  10   responsibility is.

11              So really quick, what does it say?  "A

12   prescription to be effective must be issued for a

13   legitimate medical purpose."  Okay?  That's no high

14   definition.  Probably no surprises.

09:38:55  15              It then says, "The responsibility for

16   proper prescribing and dispensing is on the prescribing

17   practitioner."  Well, let me put that into plain

18   language.  The doctor, that's the prescribing

19   practitioner, the doctor.  So the responsibility for

09:39:16  20   proper prescribing is on the doctor.

21              Not surprising.  Makes sense.

22              Then it says, "A corresponding" -- right

23   here -- "a corresponding responsibility rests with the

24   pharmacist who fills the prescription."  A corresponding

09:39:47  25   responsibility rests with the pharmacist who fills it.

1          And then I'll summarize here because this

2     gets awfully legal.  At the bottom, it says the person

3     knowingly filling an illegitimate prescription, the

4     person knowingly filling the illegitimate prescription is

09:40:23  5     subject to penalties and violates the law.  Okay?

6          I'm about to go to CVS's policies on this,

7     but I want to stop and raise one issue.  The filter,

8     remember the filter with the Red Hots?  And Mr. Lanier

9     pulled them out, I think there were three in one, some

09:40:49 10     had more space than others, the sifters.  I don't know

11     what the right word is.

12          It was a powerful image, but it's not quite

13     right.  It was the wrong image.  And here's why.  The

14     filter in the practice of pharmacy isn't an inanimate

09:41:17 15     object.  It's not metal.  It's not plastic.  The law

16     tells us what it is, or more accurately who it is.  The

17     front line filter is the pharmacist.

18          CVS has 30,000 pharmacists throughout the

19     country; all licensed, all trained, all educated.  They

09:41:51 20     know their patients, they know their communities.

21     They're the ones, when somebody brings a prescription to

22     the pharmacy counter, who have to make the decision do I

23     provide this patient with the medicine their doctor says

24     they need or don't I.

09:42:10 25          And they do it based on their professional

207

1    judgment, exercising their responsibility, and that's

2    good judgment.  That is good judgment.

3                That's the first filter.  That's the filter

4    the law talks about.  That's the key part of the filter,

09:42:30  5    and you can't forget, and it's not inanimate.  It's not

6    metal; it's human, and it's judgment-based.  That's how

7    health care works in the United States.

8                CVS policies trace these rules.  This is a

9    CVS policy from 2010, eleven years ago.  What does it

09:42:56 10    say?  Do not fill a prescription -- this is CVS

11    instructing its pharmacists -- don't fill a prescription

12    if you believe it wasn't issued for a real medical

13    reason.  And this has been the policy through the years.

14                Let's go to another one in 2019.  The

09:43:12 15    language is a little different but the point is the same.

16    CVS Health expects decisions, supports decisions by

17    pharmacists to not fill prescriptions, to not fill them

18    if they believe or suspect the prescription wasn't

19    legitimate.

09:43:36 20                And CVS trains its pharmacists on the same

21    principle.

22                Here's an excerpt from 2017 training.

23    What's CVS saying here?  Pharmacists should not fill a

24    prescription if they have reason to doubt that the

09:43:50 25    practitioner has issued a prescription for a legitimate

1    medical purposes -- purpose.

2              This is CVS's policy.  This is CVS's

3    expectation.  This is CVS's rule:  Don't fill

4    prescriptions if you learn they're illegitimate.

09:44:12 5              I can't believe I actually brought an

6    iPhone.  The only reason is I want to make sure I'm not

7    going over my time.

8              How does CVS help its pharmacists, how does

9    it help carry out this responsibility?  And this,

09:44:56 10   Mr. Lanier stressed yesterday.  This is another area

11   where data, where data came up.

12             This is one of the main ways it helps.

13   RxConnect.  There's a few vocabulary words that we're

14   discussing today.  Noncontrolled medications and

09:45:15 15   RxConnect.  Okay.  This is another one to remember.

16             What is RxConnect?  RxConnect is the

17   computer system that CVS filled for its pharmacists.

18   They sit in the pharmacy and it's to help pharmacists

19   review prescriptions.  It's how they see them, and it's

09:45:35 20   where they approve or don't approve them.

21             It's how they print the label.  You have to

22   go through the system so if you don't go through the

23   system, you just can't fill a prescription.

24             And RxConnect is one of the main tools CVS

09:45:50 25   uses to help pharmacists.

1          And what's one of the ways -- one of the

2     things it does to help?  How does RxConnect help?  It

3     provides the pharmacists with patient data.  Patient

4     data.  We're back to data.  Okay?  And this is the center

5     of RxConnect.

6          RxConnect gives the pharmacist in real-time

7     two years of data on a patient, all the prescriptions

8     that that patient has filled at CVS and all the

9     information about it for two years.

10          Okay.  Combined with other information they

11     see, such as the patient's home address, the age of the

12     patient, where the doctors who write the prescriptions

13     are from, this gives -- this data gives the pharmacist

14     all of the information he or she needs to begin to

15     identify these potential red flags that Mr. Lanier has

16     talked about.

17          They can see is the patient driving from a

18     long distance, for instance, to fill a prescription?

19     Maybe that's a red flag, maybe not.

20          They can see is a patient getting

21     prescriptions for the same medication from other doctors?

22     They can see.  This data is not just for one CVS store

23     that's working on the prescriptions, it's from all the

24     CVS stores throughout the country so it provides a

25     boatload of information.

1           Mr. Lanier said this was the information

2      that a pharmacy needed to provide to its pharmacists to

3      help them, and he said the pharmacies didn't provide it.

4      The evidence will show CVS did provide it.  No doubt

09:47:53  5      about it.

6           Too little too late?  The evidence will

7      show that CVS has been providing this information to its

8      pharmacists for roughly two decades, two decades.

9           What else about RxConnect?  Doctor

09:48:31 10      validation.  RxConnect evolved and improved, and one of

11      the ways it improved was to incorporate a system, and

12      this happened around 2013 or so, whereby the licenses of

13      the doctor was checked in real-time.  CVS maintained a

14      database.

09:48:53 15           And if that license had been suspended or

16      revoked, the system then blocked, starting in 2013 or so,

17      maybe a little earlier, blocked the prescription,

18      couldn't be filled, no you can't fill it.

19           How else did RxConnect evolve?  The doctor

09:49:15 20      suspension program.  CVS puts a different name on it, but

21      CVS runs a program where it reviews doctors who it sees

22      maybe a potential concern with, and if it determines that

23      those concerns are more than potential, if it can't

24      achieve comfort with those concerns, CVS suspends those

09:49:45 25      doctors, suspends the prescriptions those doctors write

1      from all of its pharmacies, even though neither the State

2      nor the Federal Government has suspended them.

3                    They are still licensed but CVS says for

4      these doctors, that's not good enough, we're suspending

09:50:01  5      them, nevertheless.  And when CVS suspends a doctor,

6      RxConnect blocks it.  If a patient presents a

7      prescription from that doctor, it blocks it.

8                    How else does RxConnect help?  It gives the

9      patient alerts -- excuse me -- the pharmacist alerts, and

09:50:19 10      I won't go into the detail of those alerts.  This is an

11      example, not all of them.

12                    If a patient is trying to fill a

13      prescription too early.  It gives alerts if CVS has

14      determined that the prescription might be a forgery and

09:50:34 15      the pharmacist needs to examine it particularly closely

16      because of a forgery alert.  It gives the pharmacist an

17      alert if the dose of a pain medication exceeds certain

18      guidelines.  Oftentimes, that's perfectly okay because

19      there's a reason for it, but the alert just helps the

09:50:53 20      pharmacist know let me make inquiry here, let me make

21      sure that this is okay.

22                    So RxConnect, ladies and gentlemen, it does

23      a lot to help pharmacists.  And you'll hear a lot of

24      testimony about it.  You're going to hear about

09:51:14 25      additional programs CVS runs in this area as well and

1    additional technologies they use to try to identify the

2    small number of illegitimate criminal prescriptions that

3    people are trying to pass on to CVS.

4               You'll hear how CVS built a lot of these

09:51:35  5    prescriptions, a lot of these programs from scratch.  You

6    can't go out and buy them.  They built them.  Are they

7    perfect?  No, I'll be the first to tell you that they are

8    not perfect.  No program is perfect.  They work together

9    nicely, especially with other programs, but no program's

09:51:50 10    perfect.

11               But are they pretty cutting edge?  Yeah,

12    that's what the evidence will show.

13               And the evidence will show they provide

14    very real and meaningful assistance to the pharmacist.

09:52:03 15               Too little too late?  Too little too late?

16    The patient data goes back decades.  Some of these

17    programs, we're talking 2012, 2013 and later, it's

18    evolved.  CVS has tried to do better.

19               But, ladies and gentlemen, this case -- and

09:52:28 20    this is another piece of the big picture -- you can't

21    lose this in the shuffle -- this case is about today.

22               We've heard Judge Polster's opening

23    instruction.  The question is, is there an ongoing public

24    nuisance?  The public nuisance has to exist today.  So

09:52:51 25    something CVS did seven years ago, five years ago, three

1     years ago, two years ago, it matters.  It matters.

2                  They're going to yell at me so I have to

3     finish.

4                  I just told you some of the building

09:53:18  5     blocks, some of the pieces of the big picture that you

6     will hear.  Let me just talk about what you won't hear.

7                  You are not going to hear anyone from CVS

8     say that people aren't struggling and haven't struggled

9     with the misuse and abuse and addiction.

09:53:39 10                  You are not going to hear anybody from CVS

11     say that people haven't suffered.  People have struggled,

12     people have suffered, the families have suffered.  We're

13     all -- plaintiffs sometimes quibble with the words.  Is

14     anyone comfortable today saying epidemic in a way that's

09:54:08 15     not shorthand?  Not everyone.  But it's not about words,

16     it's not about the wording.  Everybody at CVS understands

17     and is dedicated to trying to help the problems of

18     addiction and abuse, and you're not going to hear

19     otherwise.

09:54:28 20                  What else won't you hear?  And I tried to

21     preview some of this.  You will not hear us say CVS is

22     perfect.  CVS isn't perfect.  Its pharmacists aren't

23     perfect.  It's not perfect.

24                  No one's perfect.  No person's perfect.  No

09:54:54 25     company's perfect, CVS included.

1          Now, the test in a legal case isn't

2     perfection.  The test here is whether CVS engaged in

3     conduct, misconduct, so widespread that it interfered

4     with the rights of the public at large.  The evidence

09:55:16  5     won't show that.

6          But that's not a question of perfection.

7          Before I sit down, let me address an issue

8     that Mr. Lanier raised.  Settlements with DEA.

9     Mr. Lanier talked about settlements that CVS entered with

09:55:45 10     its regulator, the Drug Enforcement Administration, and

11     the United States.

12          Yes, no doubt about it, no doubt about it,

13     the DEA is an active agency.  If it identifies an issue,

14     it pursues it.  Sometimes CVS agrees, sometimes it

09:56:12 15     doesn't.

16          But absolutely you're going to hear a lot

17     of testimony about settlements and we ask that you

18     listen.  We ask that you listen to the testimony about

19     them.

09:56:25 20          And let me leave you with one of the most

21     important points about them.  One of the settlements

22     Mr. Lanier told you about concerned two pharmacies and

23     four pharmacists in a county in Florida called Sanford.

24     It didn't concern Ohio.

09:56:59 25          The other settlement Mr. Lanier talked to

1    you about concerned certain pharmacies and their

2    pharmacists in Maryland.  It didn't concern Ohio.  It

3    didn't concern Ohio.  Did CVS take these seriously?  Yes.

4    You will hear testimony about that.

09:57:26  5            Listen to the testimony carefully and ask

6    yourself what's the conduct, where did it occur, and

7    when.

8            Before I sit down, I make a request.  As we

9    move through trial, we hear testimony, we look at

09:57:51 10   documents.  Please keep in mind the big picture, the big

11   picture, the whole picture, the complete picture.

12           FDA-approved medications.  FDA-approved

13   medications.  Doctor-prescribed.  Doctor-prescribed.  A

14   recognition that the vast majority of doctors write

09:58:22 15   prescriptions appropriately for legitimate medical

16   reasons, and the everyday CVS Pharmacies that operate in

17   Lake and Trumbull Counties, the full range of medicine

18   that they provide to their patients, and their record

19   with the State of Ohio and DEA.

09:58:48 20           No matter what the theory here is, the

21   legal theory -- and there's a few -- the full picture

22   will demonstrate that the nine CVS Pharmacies in Lake

23   County aren't harming the rights of the public at large.

24   The full picture will demonstrate that the five CVS

09:59:16 25   Pharmacies in Trumbull County are not harming the rights

1    of the public at large.  The full picture will

2    demonstrate that CVS is not a substantial cause of a

3    public nuisance.

4                I went on longer than I'd hoped.  I

09:59:36  5    apologize, but thank you.

6                THE COURT:  Thank you, Mr. Delinsky.

7                We now have the next defendant.

8                MS. SULLIVAN:  Yes, Your Honor, if I could

9    just get a minute to get things together.

09:59:56 10                THE COURT:  All right.

11                MS. SULLIVAN:  Thank you.

12                THE COURT:  This will be Ms. Sullivan.

13        OPENING STATEMENTS ON BEHALF OF GIANT EAGLE

14                MS. SULLIVAN:  Bear with me, I apologize.

10:00:29 15                Can you guys hear me?  Good morning,

16    everyone.  Thanks for being here today.  We met briefly

17    in jury selection.  I'm Diane, Diane Sullivan and I'm

18    here for the folks at Giant Eagle and I think you met

19    briefly my colleague, Chantale Fiebig.  She's my friend

10:00:55 20    and law partner.  You'll be hearing from Chantale as well

21    on behalf of the folks at Giant Eagle.

22                And with us yesterday and today is Emily

23    Mooney.

24                MS. MOONEY:  Hi.  Good morning.

10:01:08 25                MS. SULLIVAN:  She is one of the

1    pharmacists at Giant Eagle.  She works in the Painesville

2    Ohio Lake County pharmacy.

3                And Emily grew up in Lake County.  She has

4    worked for Giant Eagle for 16 years since she was in

5    college.  She studied hard, six years of pharmacy school.

6    She started as a pharmacy tech at Giant Eagle, trying to

7    learn the pharmacy business, dealing with data patient

8    information and entering it into the computer.  And she

9    loved it so much, she studied hard, six years of pharmacy

10    school, passed her license and became a Board Certified

11    pharmacist in the State of Ohio.

12                And she and her husband, Mike, have three

13    little girls.  She told me they're really excited about

14    Halloween, and they are raising their family in the Lake

15    County community where she grew up.

16                And Emily loves being a Giant Eagle

17    pharmacist.  She loves serving the people in the

18    community where she grew up, where her parents live,

19    where her extended family lives, where her classmates

20    are.  And she is the lead pharmacist at the Painesville

21    store.  She worked her way up to that.

22                And she supervises the other pharmacists

23    there.  Her name is on the license at that Painesville,

24    Ohio store.  And she loves being able to serve.  Many of

25    her patients are her former classmates, friends of

1   family, grandparents of some of her kids' classmates.

2   She loves being able to help the people in the community

3   where she grew up, answer their questions about their

4   prescriptions, their side effects, talking to them about

5   adverse effects and helping people in her local

6   community.

7            And Emily is here today and she was here

8   yesterday, and she'll be here a little bit during the

9   trial, but she is one of those essential workers these

10   days who will not be able to be here throughout the trial

11   because she's got to be working at the pharmacy making

12   sure people get medicines as we continue through this

13   pandemic.

14            But you'll see her a little bit, as much as

15   she can get here throughout the trial.

16            And Emily stands here on behalf of the

17   folks at Giant Eagle, and particularly on behalf of the

18   pharmacists at Giant Eagle in Lake and Trumbull County,

19   against whom they have made some of the most horrible

20   allegations that pharmacists and these stores, her store

21   is at the heart of this lawsuit, one of the stores at the

22   heart of this lawsuit, and they have made some painful

23   reputation-ruining allegations against these pharmacists,

24   that pharmacists like her who are doing their her best to

25   help their community, get medicines to them, answer their

1   questions, help their customers, that pharmacists like

2   her have caused the opioid epidemic, have addicted their

3   community, have ruined lives.

4              And you're going to get to decide whether

10:04:05 5   those horrible allegations are fair or not, whether

6   they're true, whether they're supported by the evidence.

7              And I think Mr. Lanier said in opening oh,

8   no, I'm not attacking Ms. Mooney. Well, of course he is.

9   You heard -- you saw him. He called her a gum ball

10:04:22 10  machine. All these pharmacists are dispensing opioids

11  like gum balls. They're not filtering out the opioids,

12  they're not doing their job with a red flag. You heard

13  him, very personal attacks on what he says was the last

14  line of defense.

10:04:36 15             And so she stands here for those people at

16  the Giant Eagle pharmacy who work so hard to try to do

17  good jobs for their communities.

18             And, you know, in this country, it's easy

19  to file lawsuits, right? It's easy to say all kinds of

10:04:51 20  things, make all kinds of allegations, throw mud in the

21  interests of winning lawsuits, but you're here to decide

22  whether those allegations are fair or not.

23             You've got to bring the evidence. You're

24  hear to decide whether they really have the evidence to

10:05:07 25  support those claims. And I submit to you, you saw it

1    yesterday, Lake and Trumbull County, they've hired a

2    really good lawyer.  Mr. Lanier is entertaining.  He's

3    going to keep things interesting.  You saw him yesterday.

4    He had props, he had Mesopotamian big vases, he had Red

10:05:28  5    Hots and Nerds, and flowers and a sifter, he had Amazon

6    Prime, he had Netflix and binge watching.

7                 But lawyer argument -- he even had Dorothy

8    of the Wizard of Oz, and the Tin Man, and the Cowardly

9    Lion.  But lawyer argument, lawyer props, good

10:05:45  10    showmanship, that's not evidence.  And I'm lucky enough

11    to get to hear all of you in jury selection.  We have a

12    lot of smart people on this jury, people who took an oath

13    to hold the plaintiffs to their burden of proof and be

14    skeptical.  Do they really have the evidence?

10:06:04  15                 And with all of that showmanship yesterday,

16    and some of you may have noticed this, they didn't talk

17    about -- he previewed his evidence, and maybe you were

18    waiting for it, but where was the evidence?  Where did he

19    talk about that there was any evidence that any of these

10:06:22  20    pharmacies, and certainly not Giant Eagle, dispensed

21    medicines that ended up on the streets in the illicit

22    market that hooked people and made them addicted and

23    caused harm?

24                 That evidence was missing.  There's going

10:06:37  25    to be a shocking absence of proof in this case.  There's

1   going to be a lot of, and you'll see it I suspect this

2   afternoon and during the week, there's going to be a lot

3   of bashing of the companies and these companies here,

4   when you get -- you got to produce billions of documents,

10:06:55  5   right?  In this case, billions of documents from the

6   companies that have been sued.  And the plaintiffs'

7   lawyers have done a good job.  They've culled through

8   those documents.  And I submit to you they're going to

9   cherry pick out documents to try to make the company look

10:07:09 10   as bad as possible.

11   And as CVS's lawyer has said, no company is

12   perfect just like no people are perfect.  And the law

13   doesn't require you to be perfect.  The Judge will

14   instruct you on the law at the end of the case.  The law

10:07:23 15   requires you to act reasonably overall, judge people

16   overall.

17   But you're going to see the lawyers trying

18   to, I submit, distract you, maybe make you mad at the

19   companies so that you don't notice that they don't have

10:07:35 20   the evidence, a shocking absence of evidence in a case

21   like this where they make these horrible allegations,

22   that there's any link, where is the evidence that any

23   medicines dispensed by Giant Eagle made it to the streets

24   to hook somebody on opioids?

10:07:51 25   That evidence is going to be missing.

1           And I suspect if they looked at all my

2    e-mails and texts or anything I said over the last 50

3    years, they could probably make me look bad, too, or

4    anybody, but you've got to judge people overall.

5           And the truth is, and no one at Giant Eagle

6    disagrees, opioid addiction is a horrible thing.  It has

7    ruined communities.  It's torn up families.  We've lost

8    too many, too young.  But none of the people, none of

9    those people who have lost family members, none of the

10   people addicted are suing here.  The people who brought

11   this lawsuit are politicians, the Lake and Trumbull

12   County Commissioners, the lawyers who get hired.

13          And you heard from Walgreen's lawyer

14   yesterday, a few years ago when they filed a big splash

15   lawsuit blaming people for the opioid crisis, when these

16   same plaintiff counties, Lake and Trumbull County, and

17   these same plaintiff lawyers filed a big splash lawsuit,

18   somebody said you read about it, these are the people

19   that they blamed for the opioid crisis.  This is who Lake

20   and Trumbull county sued.  Perdue Pharma saying they lied

21   to everybody, saying they that OxyContin wasn't addictive

22   and hooked everybody.

23          These other manufacturers of opioids, who

24   they say overly promoted and aggressively promoted, and

25   hoodwinked doctors into believing these medicines -- they

1    sued major distributors, Cardinal Health, McKesson,

2    distributors that moved 85 percent of the opioids across

3    this country to warehouses and pharmacies, saying they

4    didn't have the right Suspicious Order Monitoring

10:09:45  5    procedures under the Controlled Substances Act.

6                  They sued a bunch of bad doctors.  These

7    are the people that they, very publicly, when they

8    investigated, when they did their diligence, these

9    counties and lawyers said these are the folks who caused

10:09:59 10    the opioid crisis.

11                 They're saying that the pharmacies here --

12    well, these counties -- they're saying that pharmacies

13    here -- these counties and plaintiffs are the ones who

14    blame other people.

10:10:17 15                 And only years later, maybe as an

16    afterthought, blaming them, too, they sued these

17    pharmacies.

18                 Now, you heard Mr. Lanier who said

19    something, oh, well, we didn't see their documents; well,

10:10:31 20    they didn't see the documents of most of these companies.

21    They don't see them until they sue them.  You're going to

22    ask yourself at the end of the case what your common

23    sense tells you about that.

24                 And there are, and the plaintiffs agree

10:10:44 25    with many of these, there are actual well-established,

1    well-established causes of opioid addiction that are in

2    Government report after Government report, and many of

3    you already know about these, but I'll go through them

4    briefly.

5                   There are -- there's a big problem in this

6    country with drugs flowing through the borders and

7    flooding our streets with foreign drug cartels from

8    Mexico, Columbia, Bolivia, many of you have probably seen

9    or read about it, flooding our streets and addicting our

10   kids.  An established, confirmed cause of opioid

11   addiction.

12                   Local pharmacies, these pharmacies have

13   nothing to do with that.

14                   There are dug dealers taking these drugs

15   and trying to hook people, let's get new customers,

16   addicting people on the streets all over this country,

17   including in Lake and Trumbull Counties.

18                   Illegal drugs, illicitly manufactured

19   Fentanyl, heroin, these pharmacies had nothing to do with

20   that.

21                   We have the plaintiffs allege in their

22   original lawsuit still pending, we have aggressive

23   manufacturers, big Pharma, promoting opioids, lying about

24   the fact that they're not addictive.

25                   Oh, one of -- and that's the Perdue Pharma

1      and including Perdue Pharma who actually pled guilty to

2      the Government and agreed to pay a criminal fine because

3      kickbacks, conspiracies on the addiction problem of

4      OxyContin, big problem with the opioid crisis.

5                    And I skipped over one of the causes that

6      the Government -- this is the Drug Enforcement

7      Administration, the big federal agency in charge of

8      monitoring drugs -- they concluded in September of 2019

9      that it was this illicitly manufactured Fentanyl flooding

10     our streets that was the chief cause of the opioid

11     crisis.  That's the Federal Government.

12                   And you heard Walgreen's lawyer talk about

13     the problem with theft from medicine cabinets.  Some of

14     you in jury selection talked about the fact that you had

15     neck surgery or back surgery and you took a few and

16     didn't finish your prescriptions.  That's really common

17     in this country and people leave it in the medicine

18     cabinet and workers in the house or family members, you

19     know, there's some medicines, it's a big cause, as you

20     saw yesterday from some of the data that Walgreen's

21     lawyer presented on the opioid industry.

22                   And then we have the problems of

23     pharmacies, these independent pharmacies like Overholt's

24     that was shut down by the Government because they were

25     pill mills, and pill mills -- this is an example of

1    another pill mill, people are lined up, they know it's

2    easy to get opioids there.  Giant Eagle never looked like

3    that.  Giant Eagle is groceries.  At Giant Eagle stores,

4    their pharmacies are in grocery stores.  Most drug

5    addicts and criminals aren't walking through the grocery

6    store past grandma getting lettuce and milk and mom

7    pushing her cart getting Cheerios and Pop Tarts to go get

8    their drugs at the medicine counter.  Giant Eagle never

9    looked like that.

10              And another thing cited as a cause of the

11   opioid crisis was the fact that the FDA, the Federal

12   Government, approved many more opioids for pain relief.

13   There was a conclusion that pain in this country was

14   undertreated, that people were suffering needlessly and

15   so the FDA, over the last 20 years, just approved a lot

16   more opioids and doctors.  They started prescribing a ton

17   more opioids to manage pain, manage their patients' pain.

18              And you also heard that the Government,

19   Department of the Drug Enforcement Administration

20   increased by millions, they doubled the number of opioids

21   that they controlled because they know the problem with

22   addiction and crime.  The Federal Government controls how

23   much opioids are imported, how much opioids pills can be

24   manufactured in this country.  Well, they doubled the

25   amount by millions between 2010 and 2013 and then kept it

1   level until about 2016, another reason people cite for

2   the opioid epidemic.

3                    And I know some of you are in the business

4   of or have been in the business of treating people with

10:15:39   5   addiction, and there are some well-established

6   intractable causes of addiction:  Mental illness,

7   socioeconomic problems, child abuse, domestic abuse,

8   things that society has been trying to solve for a long

9   time, individual issues, genetic issues, people looking

10:16:02  10   to escape from some bad circumstances, these are things

11   that your local pharmacies had nothing to do with,

12   reasons that people are addicted that don't really have

13   to do with your local pharmacies.

14                    And because here in Ohio, there is a big

10:16:18  15   problem with opioid addiction, there was a Governor's

16   Task Force in 2010 with a whole bunch of experts listed

17   on that, that researched and investigated what's the

18   cause, what's the cause of this terrible problem in our

19   state, and they concluded that these were some of the

10:16:37  20   causes and many of the things we just talked about:

21   Overaggressive promoting by big Pharma, theft and

22   deception from medicine cabinets, pill mills, many of the

23   things we just talked about.

24                    What they never concluded in this big

10:16:54  25   investigation as to the cause of the opioid crisis here

1    in Ohio, including the Lake and Trumbull Counties, what

2    they never concluded, this independent board, they have

3    never concluded that pharmacies, pharmacies like Giant

4    Eagle, were the cause of the opioid crisis.

5              And you heard about how prescription

6    medicines get to patients.  It's really the doctors, and

7    you folks already knew that, but doctors are making their

8    own decisions.  It's the medical doctors that have the

9    medical training, that take medical histories from a

10    patient, that see the blood work and the diagnostic

11    things, they have the full picture of medication and they

12    are the ones that decide what's good for their patient or

13    not.  They have the full picture.

14              Pharmacists are not doctors.  They're

15    trained, they're health care professionals, but they're

16    not medical doctors.  They don't go to medical school.

17    And they have very limited information about a patient.

18              They're not allowed, there's HIPAA laws,

19    they are not allowed to see your medical records and your

20    pharmacist is not allowed to take a medical history and

21    see whether an opioid is appropriate for you or not.

22    That's the doctor's decision.  And they don't have the

23    right to examine you or do diagnostic testing.  They

24    rely, and you rely, on your medical doctor to decide

25    what's best for a patient.

1          And the American Medical Association,

2     that's the big association of doctors as many of you

3     probably know, in 2013 put out a big resolution that says

4     it's inappropriate, inappropriate for pharmacists to be

10:18:42  5     calling us about the medical rationale behind our

6     prescriptions.  You're not the doctor.  You're not

7     trained.  Don't be second-guessing us.  It's

8     inappropriate, pharmacists.  Don't be interfering with

9     the practice of medicine.  It puts patient's lives at

10:18:57  10     risk.

11          And patients don't want that either.  You

12     don't want your pharmacist, you go to your pharmacist,

13     you're in pain, to try to get a pain medicine that your

14     doctor says you need, you don't want the pharmacist to

10:19:08  15     say you know what; I'm not prescribing it.  I don't want

16     to get sued.  I don't want our company to get sued.  I'm

17     not going to prescribe it.

18          The doctors will say no, we're the ones

19     that decide this.  And so what's the pharmacists'

10:19:23  20     responsibility?

21          I think the plaintiffs put up a slide

22     paraphrasing this regulation, but he didn't show you in

23     opening the regulation.  Here's what the pharmacist's

24     duty is.  They're not supposed to knowingly fill a bogus

10:19:37  25     prescription.  If you see a prescription that's forged or

1    raises higher questions, and you know it's illegitimate,

2    the law says don't fill it.  Otherwise, the doctor's the

3    one who decides what a patient needs.  So don't be

4    overruling the doctors.

5               And that's basically what this lawsuit's

6    about, is these plaintiffs and the plaintiffs' lawyers

7    are second-guessing, years after the fact, the decisions

8    that the doctors made, second guessing that.  And you're

9    going to decide whether that's fair or not, whether

10   that's appropriate.

11              And saying that the pharmacist should have

12   said no, we're not giving you these pills again and again

13   and again, but that's not what the law says.  The law

14   says don't fill bogus prescriptions if you know they're

15   bogus; not second-guess a doctor.

16              And the Federal Government has said

17   that nearly every prescription, this is the Drug

18   Enforcement Administration, that nearly every

19   prescription issued by a physician in the United States

20   is for a legitimate medical reason, that nearly every

21   prescription a doctor writes is for a legitimate purpose;

22   it's not bogus so pharmacists should be filling it.

23              And you're going to hear the folks at Giant

24   Eagle did not fill some prescriptions because they

25   thought they were illegitimate.  Didn't fill.  But by and

1    large, the overwhelming number of prescriptions get

2    filled for this reason.  Most of them are legitimate,

3    nearly every, for the patients' needs.

4            I want to talk a little bit about Giant

10:21:16  5    Eagle -- a little bit more about Giant Eagle.  Giant

6    Eagle is different in this case.  They are a small guy.

7    We're not a national chain.  Giant Eagle doesn't have

8    thousands of stores across the country.

9            They have stores in West Virginia, Maryland

10:21:32  10    and Indiana, but most of their stores are here in Ohio

11    and in western Pennsylvania, in Northeastern Ohio and

12    western Pennsylvania.  And that's it.  They are nowhere

13    else in the country.

14            And so one of the things that -- that is

10:21:50  15    concerning to Giant Eagle in this case is to kind of get

16    lumped in with everybody else.  You heard the plaintiffs'

17    lawyer say yesterday well these pharmacies and these

18    pharmacies and I didn't want to object all the time but

19    I'm hoping you folks can sort of how Giant Eagle is

10:22:08  20    different.  When they put up a document for Walgreen's or

21    CVS -- say that's not Giant Eagle, that doesn't apply to

22    Giant Eagle.

23            For example, one of the things they put up

24    yesterday, plaintiffs' lawyers, was all of these Drug

10:22:23  25    Enforcement Administration settlements, Walgreen's and

1    CVS.  Giant Eagle has never had an issue, and this is

2    important, about not lumping people together.  Giant

3    Eagle has never once, not in Lake and Trumbull County and

4    not anywhere, had any settlements or drug enforcement

10:22:41  5    action by the DEA they can claim.

6             And so when they say these pharmacies did

7    something bad here, these pharmacies did something wrong,

8    say, well, you know what?  That's not Giant Eagle.

9    That's not fair that you lump these together.  And that

10:22:57  10    way, I won't have to keep objecting and interrupting

11    people and maybe some of you can loosen that for us and

12    say that's not Giant Eagle.

13             And Giant Eagle is a family company,

14    family-owned.  They have been in business for over a

10:23:10  15    hundred years.  They're still run by the next generation

16    of the same family.  And when you're a family company

17    your reputation, your good name, is critical to you.  And

18    that's why they're here.  They want a chance for you to

19    hear the evidence and defend ourselves against these

10:23:28  20    kinds of allegations.

21             Giant Eagle has been here for the people of

22    Ohio for over 80 years.  They have been in business for

23    over a hundred in Pennsylvania.  There was Giant Eagle

24    before there was automobiles.  When there were horses,

10:23:42  25    there were Giant Eagle stores, groceries and pharmacies.

1          And they've been here for the people of

2     Ohio for over 80 years, through the Great Depression,

3     through the unrest of the 60s, through the strife of the

4     last three years, through the pandemic.

10:23:59  5          They are grocery workers, they are

6     pharmacists, they are specialty workers here in the

7     community and when we needed them most, they are still

8     here today.

9          They are one of the biggest employers in

10:24:11 10    the State of Ohio.  They employ over 19,000 people.  And

11    by and large, I think you're going to see they're a good

12    company.  Not perfect.  And a lot of the other things

13    they talked about, about Giant Eagle -- I mean that they

14    talked about, about the other pharmacies don't apply to

10:24:30 15    Giant Eagle.

16          For example, they talked about time

17    efforts.  Oh, you have to fill a prescription in a

18    certain amount of time, you get paid more money on it.

19    Giant Eagle doesn't have time limits.  Take what you need

10:24:44 20    and they talk about profit, profit, profit.  That's why

21    companies they allege are cutting corners and pushing out

22    opioids.  Giant Eagle's main business is groceries.  They

23    are a grocery chain.  The pharmacy business is a very

24    small part of what they do.  And they try to do it right.

10:25:02 25          They have -- they had 14 stores, four

1    pharmacy stores in the grocery stores in Lake and

2    Trumbull County.  Two of them closed so they are down to

3    twelve stores in those communities, and they have their

4    own -- they have various procedures of how they hire and

10:25:27  5    how they train them.

6         They make sure that their pharmacists

7    attend pharmacy school obviously and go to good schools

8    and they train and supervise and support those

9    pharmacists at all levels of the company.

10:25:37  10         This is not required by law, but Giant

11    Eagle has pharmacists at every level in the company.

12    They have not only pharmacists on the ground at the store

13    but at the district level, at the higher level in the

14    corporation, they have pharmacists who will do spot

10:25:55  15    checks and audits and help train the other pharmacists so

16    they show them and make sure that the pharmacy is doing

17    records appropriately, prescribing appropriately, and

18    complying with Giant Eagle procedures and the law.

19         And they don't have to do it but they do.

10:26:10  20    They employ a former U.S. Attorney General law

21    enforcement -- from the U.S. Attorney General's Office,

22    an experienced person that helps them with security to

23    try to prevent thefts or diversion of drugs; again, not

24    required by law but they take extra precautions.

10:26:32  25         And Giant Eagle has other kinds of security

1    systems, cameras all over the pharmacies to keep their

2    controlled substances in a locked cabinet.  They do

3    counts every morning and at closing time, they are sure

4    it matches up with what they prescribed, and do their

10:26:50  5    level best to try to prevent diversion into the streets.

6                    And they report when there's a problem to

7    law enforcement and have law enforcement put people away.

8                    And on this issue of kind of lumping

9    everybody together, plaintiffs try to muddy up, I submit,

10:27:11  10    Giant Eagle in that way, yesterday they spent about

11    almost two-and-a-half hours talking to you all and they

12    put a lot of documents on the screen.  They only used one

13    Giant Eagle document, and it actually was a pretty good

14    document.  I want to show it to you if I could.

10:27:26  15                    Robert, if I could have the Elmo.

16                    So, see if I can make this work in a way

17    that you guys can see it.  I don't remember how to use

18    this.

19                    Okay.  This is Plaintiffs' Exhibit 20750,

10:27:50  20    and the plaintiffs' lawyer put this, it's the only Giant

21    Eagle document he -- all the other stuff was Walgreen's,

22    CVS, Walmart.  It's the only Giant Eagle document he put

23    up in an effort to talk about how the companies, you

24    know, violated the law.

10:28:05  25                    And what this document actually says is --

1    so Mr. Lanier, I think, showed you this page.  I know he

2    showed you this page.  And it talked about the opioid

3    crisis.  And Giant Eagle was talking to their people at

4    the company about the opioid crisis.

5                    And talked about the deaths and how many

6    Americans were abusing drugs, and that was a report, if

7    you'll turn to the previous page that you weren't shown,

8    it was actually parroting reporting on a report by the

9    Center for Disease Control.  I'm sorry.  That's not the

10   best, folks.

11                   And that's it, that's all he showed you.

12   He didn't show you any of the rest of the document.  But

13   the rest of the document shows what you hope a good

14   company would do in response to that kind of report.  It

15   talks about, "It's our responsibility, both as a health

16   care professional and as a company, to do all we can to

17   curb the misuse of prescription drugs."

18                   And it's talking about DEA efforts to

19   control the use of prescription drugs.  And then it

20   reminds everybody that we got a responsibility to

21   exercise sound professional judgment when determining

22   whether a prescription is bogus or not, essentially.

23                   And then it goes through pages and pages of

24   the due diligence that pharmacists should consider as

25   they're trying to fill a prescription to make sure you're

1    doing it right in compliance with the law.

2                He didn't show you the rest of that

3    document.  And then the final, the promise to support

4    that Giant Eagle tells all of its pharmacists, it's

10:29:43 5    written down in every pharmacy, if in your judgment you

6    don't want to fill a prescription, don't fill it, we'll

7    back you up 100 percent.

8                Thank you, Robert.  If I could go back.

9                I want to make sure I didn't put the

10:29:59 10   clicker over there.  Okay.  That's the only Giant Eagle

11   document, in the whole opening statement, only Giant

12   Eagle document he showed, and it actually showed Giant

13   Eagle in the light that I was speaking with you about,

14   that they are really pretty overall not perfect but a

10:30:18 15   really good company.

16               And you heard a lot about red flags.  I

17   think yesterday Mr. Lanier said red flag, red flag, means

18   stop.  Well, that's not right.  It means take a hard

19   look, make sure this prescription is legitimate, it's not

10:30:34 20   bogus.

21               And in fact, it doesn't mean don't

22   automatically fill it.  It means use your good judgment

23   and your knowledge, use your tools that are available for

24   you, you have patient information, you have -- the Board

10:30:46 25   of Ohio has reporting information that you could access

1    to see if that patient's got opioids from other doctors

2    in Ohio, and then -- oops, sorry -- and then the DEA's

3    pharmacist manual -- I had it here -- this is the Drug

4    Enforcement Administration's pharmacist manual that came

10:31:08   5    out with one in 2004, and this is the 2010 version.

6              And this is what the Federal Government

7    says are the kinds of things that would bring up red

8    flags but are the kinds of things that pharmacists should

9    consider in determining whether a prescription is bogus

10:31:27  10    or not illegitimate.

11              But every pharmacist at Giant Eagle knows

12    that's there.

13              But the truth is like every doctor doesn't

14    have to look at a manual doing surgery or a mechanic

10:31:43  15    doesn't have to look at a manual while he's fixing your

16    transmission.  People at pharmacy school know how to spot

17    illegitimate prescriptions.  They already know this

18    stuff.  They are trained on it.  They have experience.

19    They know what to look for.

10:31:57  20              And as the Federal Government said, these

21    kinds of concerns what they will say are red flags, they

22    may indicate that a prescription was not legitimate.  Not

23    that stop, don't fill it.  They may.

24              For example, the prescriber has one concern

10:32:13  25    and we have to think about whether to fill a prescription

1      in your judgment is that the prescriber writes

2      significantly more prescriptions or in larger quantities,

3      compared to other practitioners in the area.

4                    Okay.  The pharmacist says I know that

10:32:29    5      practice, they do way more surgeries than anyone else in

6      the area so it's okay to fill it, that makes sense to me.

7                    So it's the pharmacists' judgment and their

8      experience with the patient and the doctors that matter,

9      and that's what the pharmacist manual from the Government

10:32:44   10      says, that they may indicate but use your good judgment,

11      use your sound professional judgment, follow your common

12      sense.

13                    Not arbitrary.  There are no red flags

14      stop.  No, consider it.  Use your good judgment and

10:33:01   15      common sense and your knowledge of the patient, the

16      doctors, and the area.

17                    And this is -- this is what I was showing

18      you that Giant Eagle gives all their pharmacists this,

19      that after you perform your diligence and try to figure

10:33:24   20      out whether a prescription is legitimate or not, if you

21      don't want to fill it, don't fill it; we will support

22      that decision.  Nobody may try to coerce you in filling

23      prescriptions, and if they do, we're going to discipline

24      them.

10:33:37   25                    They stand behind their pharmacists.

1          Pharmacists, like Emily Mooney and her

2     colleagues that try to do the best they can to get

3     medicines to people, protect the community.  The last

4     thing they want to do is cause opioid addiction, hurt

10:33:58   5     people in the community where they're building their

6     family, raising their kids.

7          The Government has some tests as to whether

8     or not -- whether or not a pharmacy may be a problem, and

9     one of the things that the Government looks at is whether

10:34:20  10     or not a pharmacy is dispensing more than 20 percent of

11     controlled substances.

12          In other words, in addition to all the

13     other medicine, are more than 20 percent of the medicines

14     you're giving out, dispensing, are they opioids or

10:34:38  15     controlled substances?

16          And not cherry-picking.  I've included

17     every -- not I -- you'll see our expert who looked at the

18     data has included every Giant Eagle store in Lake and

19     Trumbull County and looked at the ratio between regular

10:34:56  20     medicine or noncontrolled substance medicines and opioids

21     or controlled substances.

22          And no Giant Eagle store is anywhere near

23     20 percent.  And it might be okay to be 20 percent if

24     you're maybe across from a cancer clinic or something,

10:35:09  25     but no Giant Eagle store is anywhere near 20 percent.

1    That's because most drug addicts and criminals don't go

2    to the grocery store next to toddlers and grandma to get

3    opioids.  They don't go there to get opioids.  It's not

4    that kind of store.

10:35:24  5                  And another test that the Government uses

6    is whether or not, and I think you heard a little bit

7    about this, whether or not they are doing a lot of cash

8    because criminals tend to operate in cash, they don't

9    want to be traced and they don't have insurance generally

10:35:40 10    when you're trying to hustle a prescription.

11                  Well, at Giant Eagle in their customer

12    base, almost everyone has insurance.  They're not doing a

13    lot of cash.  And the Government says if you're doing a

14    lot of cash, 20 percent, it's a red flag.  They're not

10:35:53 15    doing more than five and that's important because, one,

16    we're not getting the kinds of customers that are

17    tracking drugs in the streets or are addicted to opioids

18    by and large.

19                  And the other reason this is important, it

10:36:10 20    involves insurance companies.  We know insurance

21    companies don't want to pay for anything they don't have

22    to pay for.  And so if someone is getting multiple opioid

23    prescriptions, no way, we're not paying for that, you

24    already got one.  So with 95 percent of Giant Eagle's

10:36:29 25    business is insurance, to check on the fact that they:

1    Were not, not just a cause, a substantial cause, at large

2    of the opioid epidemic.

3         Another fact that makes Giant Eagle

4    different in this case is that not only didn't Giant

10:36:47  5    Eagle ever have any drug enforcement actions from the

6    Federal Government, you're going to hear that the State

7    Board of Ohio does random inspections of the pharmacies.

8    In other words, agents just show up unexpected to your

9    pharmacy and they cull through your records and see

10:37:04  10    whether you're doing something wrong, whether there's

11    illegal dispensing or you're making mistakes.

12         The Lake and Trumbull Giant Eagle

13    pharmacies were inspected during the time frame in this

14    case 88 times.  88 times.  70 or so times, no question at

10:37:25  15    all, clean inspection.  A couple of times, 20 or so, they

16    had questions.  They give you I think it's called a pink

17    slip.  You'll hear about it.  They give you notice that

18    we had questions about this and here's this issue and you

19    have two weeks to explain it or fix it.

10:37:40  20         Every single time Giant Eagle, satisfactory

21    inspection, 88 times.  Now, these are independent

22    inspectors.  Not people filing lawsuits, not paid experts

23    for lawsuits.  People that are doing their jobs trying to

24    protect the community.  And the people on the ground

10:37:57  25    looking at Giant Eagle said again and again you're doing

1     fine.

2                    And you're going to hear some of that

3     evidence, some of the testimony, that they had better

4     controls, more or better controls than required by law.

10:38:10   5     This is from the Board of Pharmacy.  Complied with Ohio

6     security and recordkeeping, complied with the law,

7     operated lawfully.

8                    Some testimony from a Government agent who

9     inspected Giant Eagle facilities you'll hear, he was

10:38:23  10     asked did you at any time believe that Giant Eagle was

11     itself violating any of the pharmacy rules and

12     regulations and causing diversion?  No.

13                    It's easy to bring high-priced experts in

14     to try to make a case, but I submit to you sometimes the

10:38:40  15     best witnesses are the ones that are not in the case.

16     Independent Government witnesses who are on the ground

17     looking at Giant Eagle trying to protect the citizens of

18     Ohio, finding that they complied with the law.

19                    Okay.  They have another claim against

10:39:00  20     Giant Eagle and the other pharmacies in this case, not

21     just they are claiming that our dispensing of the

22     pharmacy was a substantial cause of the opioid epidemic,

23     they're also claiming our distribution system was a

24     cause.

10:39:13  25                    And Giant Eagle again is different.

1    They're small-time.  Their distribution system, first of

2    all, no dispute, Giant Eagle dispensed no opioids before

3    2009, none at all.  They had no involvement in any

4    distribution before 2009.

5         But in 2009, I think you heard one of the

6    defendants in the case is HBC.  That's a Giant Eagle

7    company.  They were a distributor for Giant Eagle for

8    this time period, but they only distributed one drug, a

9    Hydrocodone combination, and that's the kind of stuff in

10   cough medicine and Vicodin.  They never distributed it.

11   No dispute.  HBC never distributed OxyContin, Fentanyl,

12   Morphine, high-powered opioids, only this low dose and

13   only a small percent of them.  And you'll hear the

14   evidence.  And they did that because it's popular.  It's

15   the low dose Vicodin cough syrup, it's a low dose opioid

16   and so they wanted to make sure they had a reliable

17   display chain, and so they did that for five years but

18   they had a closed system.

19        And what does that mean?  That Giant Eagle

20   only distributes to itself.  They didn't -- they didn't

21   send it anywhere else so there's going to be no evidence

22   that anything distributed by Giant Eagle got diverted

23   from the distribution system because they only sent it to

24   their own pharmacy and their pharmacists decided whether

25   a prescription was legitimate or not.

1            So this, this claim I would submit to you

2     is sort of a side show.  There's going to be no evidence

3     that the distribution had anything to do with diversion.

4     I think Mr. Lanier said oh, but they didn't have, Giant

10:40:55  5     Eagle before 2013, didn't have the Suspicious Order

6     Monitoring system.

7            Well, that's not true because they did.  In

8     fact, the DEA, again, not only does the State inspect

9     these pharmacies, the Drug Enforcement Administration

10:41:13 10     inspects the Distribution Center, and the DEA licensed

11     Giant Eagle, made sure they had a Hydrocodone combination

12     locked away behind, away from the other medicines and

13     people, bar coded, tracked it as they filled orders from

14     the pharmacies.  And as mentioned, never had a problem

10:41:34 15     with Giant Eagle, no enforcement actions against Giant

16     Eagle either for prescribing or for distribution.

17            And inspected Giant Eagle and the DEA found

18     that their recordkeeping, their Suspicious Order

19     Monitoring procedures were in compliance with the

10:41:53 20     Controlled Substances Act, that they did have a system

21     and they were in compliance.

22            Now, in 2000, I believe, '13, they told

23     Giant Eagle it would be a good idea for you to get an

24     automated threshold system and that means like if your

10:42:09 25     orders go over a certain amount, it might be unusual,

1    have it automated instead of what was happening was

2    people would question it and say this is way more than

3    this pharmacy usually orders, let's take a look at it and

4    make sure it makes sense.

10:42:24    5        So the DEA said get an automated.  They

6    never said that any system that Giant Eagle had was in

7    violation of the law.  They said the opposite, that they

8    had a system and it was in compliance.  You're going to

9    see that evidence.  We're going to put those reports into

10:42:42    10    evidence.

11        In fact, here's a statement from one of the

12    reports.  "No discrepancies, in full compliance with the

13    law."

14        That's the DEA.

10:42:53    15        So that's why when we sit here at Giant

16    Eagle, we say we had all these inspectors, the Federal

17    Government, the State Government, the DEA, the AG from

18    the state, several times from the Feds and they say we're

19    doing good, we're complying with the law, and then they

10:43:15    20    turn around and we're getting sued and saying we didn't

21    comply with the law.

22        And one of the charges -- the Judge is

23    going to give you a jury charge at the end of the case,

24    and it's going to have the law of the case in it.  And

10:43:25    25    one of the things in the Court's instructions is going to

1    be this provision, and the provision's going to say that

2    if there's conduct that's fully authorized by a statute,

3    ordinance or regulation, that can't be a public nuisance.

4    In other words, that's a full defense.

10:43:40   5         So if you find at the end of the case that,

6    in fact, that the Board of Pharmacy and the DEA found

7    again and again that Giant Eagle was complying with the

8    law, well, that's a full defense.

9         And so that's what you get to decide when

10:43:56  10   you see the inspections and hear the evidence; 92

11   Government inspections, no violations of the law.

12        Okay.  Almost, almost done.  I know it's

13   time for a break.

14        At the end of this case, you're going to,

10:44:10  15   hopefully if you get to the end, you will get a jury

16   verdict sheet where there will be questions for you to

17   answer when you render a verdict.  And these are the

18   questions.  I put up the one for Lake County but the one

19   for Trumbull is going to be the same and it's did Lake

10:44:27  20   County prove by the greater weight of the evidence that

21   the oversupply of legal prescription opioids and

22   diversion of those opioids into the illicit market

23   outside of appropriate medical channels is a public

24   nuisance in Lake County?  And did you prove by a greater

10:44:41  25   weight of the evidence that was the cause by Giant Eagle,

1    and the Judge will read you the instruction that says

2    cause means you have to find there's a substantial cause.

3    Not a little cause but a substantial cause, and I submit

4    to you, at the end of this case, you're not going to have

10:45:02  5    that proof.  You're just not going to have it.

6               You're not going to have any proof, witness

7    after witness, listen for it, they're not going to have

8    it, any proof that any prescription dispensed by Giant

9    Eagle was diverted to the illegal market on the streets

10:45:17 10   and hooked someone, let alone a substantial number of

11   people.  That evidence you're not going to have.

12              Substantial factor.

13              And what are they going to do instead?

14   Here's what you're going to see the plaintiffs' lawyers

10:45:33 15   do and I think they alluded to it yesterday.  They're

16   going to bring experts in, eight experts, who are going

17   to say, "I flagged some things, some sampling, that I

18   think, that I believe are suspicious," by some computer

19   model, "And, therefore, it's likely they were diverted to

10:45:55 20   the street."  That's what they are going to do.

21              I submit to you that's speculation.

22   Whether that's like a crystal ball reading, random

23   samplings that these look suspicious, and the test they

24   use is not the Government test.  You're going to see it's

10:46:10 25   a made for litigation test that the experts use in trying

1    to prove this case because they are looking for things

2    that don't exist, the hard data that prescriptions from

3    Giant Eagle made their way to the streets and hurt

4    people.

5                So they will do a mathematical formula and

6    speculation and they will do things like an arbitrary

7    test, things like Walgreen's lawyer was telling you;

8    well, anyone who is 25 miles that filled their

9    prescription 25 miles further than where they got it,

10   where it was prescribed, that's suspicious, likely to be

11   diverted.

12               Well you know everybody in Trumbull County

13   that went to the Cleveland Clinic, their experts are

14   going to say all those were diverted because you're more

15   than 25 miles.  That 25-mile test isn't a Government

16   test.  It's an arbitrary, made-for-litigation test.  And

17   there's going to be a lot of factors like that that they

18   use.

19               Somebody who fills two prescriptions in a

20   month for the same opioid, oh, suspicious, that's

21   diverted.  But then you look at the evidence,

22   overwhelming number of them are filling that prescription

23   two days, three days before the other one runs out.

24   Well, that's normal.  You don't want to run out of your

25   pain medication.  That doesn't mean it's diverted but

1     that's going to be the evidence.

2                   Speculation and made-up litigation tests.

3                   So at the end of this case, I submit to you

4     when you hold plaintiffs' evidence up to the light of

10:47:33  5     your common sense, it's not going to add up, it's not

6     going to make sense, it's not going to be supported by

7     the evidence.  As much as they are going to try to make

8     these companies look bad, at the end of the day, they are

9     not going to bring it, they are not going to bring you

10:47:49 10    any evidence that there's any link between any dispensing

11    by Giant Eagle or, frankly, any of these other pharmacies

12    and a substantial diversion to the street where those

13    pills from Giant Eagle helped a bunch of people on

14    opioids.

10:48:02 15                That evidence, that link, that causation,

16    they're not going to bring it.  They are going to bring a

17    whole bunch of witnesses.  Listen for that evidence.

18    Where is it?

19                   And as you're listening to this case, I

10:48:16 20    just ask that you keep a couple of things in mind.  Ask

21    yourself, and you're going to have so much information,

22    you know, it was confusing to me the first time I heard

23    it all but somebody in the medical field will probably

24    get it a little easier than I did but you have something

10:48:35 25    that will let you cut through a lot of that stuff and get

1    to the facts and the truth, and that's good old-fashioned

2    common sense.

3              And at the end of this case when you hold

4    the plaintiffs' allegations up to the light of your

10:48:48  5    common sense, they are not going to stand up.  They're

6    not going to make sense.  They're not going to be the

7    truth.

8              Ask yourself if Giant Eagle blames pharmacy

9    for the cause of the opioid crisis, why three or four

10:49:02 10    years ago when you made a big splash lawsuit, Lake and

11    Trumbull County, and plaintiffs' lawyers, and said we are

12    the people responsible for the opioid crisis, you didn't

13    sue it.  We were like an after-thought a couple years

14    later.

10:49:14 15              What's your common sense tell you about

16    that?  And ask yourself if you have all of these

17    high-priced, high powered experts, some of them famous,

18    why didn't you bring the evidence, why didn't you bring

19    the actual hard evidence linking anything Giant Eagle

10:49:34 20    dispensed and say it was diverted to the streets?  There

21    is no evidence.

22              And ask yourself if they are right and

23    Giant Eagle violated the law, why again and again people

24    who have real interest in this case, the people from the

10:49:47 25    Board of Pharmacy, people trying to do their jobs, the

1    federal agents who inspected Giant Eagle and Giant Eagle

2    and said you're complying with the law, the evidence in

3    this case and your common sense will get you the truth.

4    Your common sense will get you the truth.

5    10:50:02              I appreciate your patience with me this

6    morning.  I appreciate the chance to defend the good

7    folks at Giant Eagle.  And on behalf of those people, I

8    thank you not only for your patience but for your heroic,

9    heroic jury service.  And on behalf of Ms. Mooney and

10   10:50:22   Ms. Fiebig, I look forward to trying this case.

11              Thank you.

12              THE COURT:  All right.  Thank you,

13   Ms. Sullivan.

14              All right.  We'll take our midmorning

15   10:50:28   break, 15 minutes.  Usual admonitions apply and then

16   we'll pick up with Walmart's opening statement.

17              (Jury out.)

18              (Recess taken.)

19              THE COURT:  Mr. Majoras, how long do you

20   11:06:45   expect to take?

21              MR. MAJORAS:  I hope to keep it to 30

22   minutes, Your Honor.

23              THE COURT:  Okay.  Well, I said I wouldn't

24   be hyper technical, but I think the defendants have taken

25   11:06:55   almost exactly three hours, and I said I'd give a little

1    grace period.

2                  I'll give a 15-minute grace period to the

3    three hours, but anything beyond that, I'll charge to the

4    defendants' 57 hours.

11:07:07  5                  I think that's fair.

6                  MR. WEINBERGER:  Well, Your Honor, can I

7    address that for a moment?

8                  THE COURT:  I have.  All right.  So --

9                  MR. WEINBERGER:  Well, earlier, earlier

11:07:18 10   yesterday and today, you made several points regarding

11   the deposition designations and the exhibits.

12                  And you addressed that to both sides.  And

13   the subject of the length of opening statements was

14   subject of a hearing, and you allowed both sides, our

11:07:43 15   side two-and-a-half hours and the other side three hours.

16                  My point is we now have heard from three of

17   the defendants, and they have taken the full three hours.

18                  Now, they have to have had -- they have

19   coordinated their defenses.  I'm sure they have met about

11:08:00 20   the sequence of opening statements, and they have

21   violated --

22                  THE COURT:  All right.  Mr. Weinberger,

23   I've said what I've said.  All right?

24                  I'm going to penalize -- I'm going to give

11:08:12 25   the 15-minute grace period and then beyond that, it's

1    deducted from their 75 hours.  So if Mr. Majoras takes a

2    half hour, then they've used 15 minutes of their witness

3    time.

4                    MR. WEINBERGER:  But that doesn't

11:08:25  5    alleviate, Your Honor, with all due respect, the

6    unfairness in terms of the time frame and the amount of

7    time that the jury has been permitted or will be

8    permitted to hear from the defendants in response to the

9    plaintiffs' arguments.

11:08:35 10                    THE COURT:  A lot of it is repetitive,

11    okay, so I've ruled the way I've ruled.

12                    Okay.  Let's move on.  Let's bring in the

13    jury.

14                    MR. DELINSKY:  Your Honor.

11:08:46 15                    THE COURT:  I've moved on.  Okay?

16                    MR. DELINSKY:  One point.

17                    THE COURT:  I'm going to charge this to

18    you --

19                    MR. DELINSKY:  Your Honor, before Mr. Davis

11:08:57 20    goes to the settlements, I understand Your Honor to have

21    struck and declared inadmissible settlements for books

22    and records and loss reporting if we're not doing these

23    issues, but plaintiffs are going to attempt to offer

24    those and I'm trying to avoid --

11:09:10 25                    THE COURT:  I've already struck them.  All

255

1    right.  They're out.

2                  MR. DELINSKY:  Thank you, Your Honor.

3                  THE COURT:  Okay.  Let's bring in the jury,

4    please.

11:09:16  5                  (Jury in.)

6                  THE COURT:  Okay.  Please be seated.

7                  All right.  We'll now have Mr. Majoras for

8    Walmart.

9         OPENING STATEMENTS ON BEHALF OF WALMART

11:12:41 10                  MR. MAJORAS:  Thank you, Your Honor.

11                  Good morning, folks.  My name is John

12    Majoras.  I'm one of the lawyers for Walmart and if my

13    voice seems like it resonates, so if it's too loud for

14    you, someone do this and I'll be happy to turn it down,

11:12:56 15    but as you can see we've had some issues.

16                  I want to reintroduce you to the members of

17    my team who are working with me today.  My partner is

18    Tina Tabacchi, and Tara Fumerton, are also lawyers on my

19    team working for Walmart today, and we've brought with us

11:13:12 20    our representative from the company Mr. Roger Schultheis,

21    who again you met yesterday.

22                  Mr. Schultheis, to remind you, is the Vice

23    President of Health and Wellness at Walmart.  Health and

24    Wellness is the department that manages our pharmacies.

11:13:27 25    You'll actually going to hear from him as the trial goes

1    on.  We expect he's going to be a witness.

2              Mr. Schultheis' background is an

3    interesting background because it is actually very

4    similar to what many of people working in the Health and

5    Wellness part of Walmart do.  Mr. Schultheis started as a

6    pharmacist.  He was a staff pharmacist, first at another

7    location and then ultimately at some Walmart locations,

8    rose up through the ranks, became, got into management

9    and is now Vice President of Health and Wellness.

10             You'll hear from other Walmart witnesses

11   who have a similar background, both pharmacists at our

12   store and people who are in leadership.  That's going to

13   be important because one of the things you've heard,

14   plaintiffs want to say, is that Walmart as a company is

15   not paying attention to its pharmacists, has motivations

16   perhaps different than what a pharmacist wants to do in

17   executing their responsibilities.

18             People like Mr. Schultheis will tell you

19   otherwise and will make it very clear he understands what

20   it's like to be a pharmacist on the bench, as they call

21   it.  And likewise, some of our witnesses you will hear,

22   Suzanne Hiland in particular is someone you will hear,

23   has a very similar background.  It's important because

24   the pharmacy business to Walmart is important.

25             And having said that, you probably heard

1    the phrase, "Last but not least."  In this case, I

2    actually am least.  That's not something you're typically

3    proud of but perhaps surprisingly, Walmart is actually

4    one of the smallest, has one of the smallest presences in

5    Lake and Trumbull County of the pharmacies.  We have five

6    stores; three are in Lake County, two of them were in

7    Trumbull County.  So that's all the stores we've ever

8    had.

9                If you compare that to the other dispensers

10   in those two counties, it makes us look even smaller.

11   There's are over 300 licensed dispensers over time in

12   Lake and Trumbull County.  Walmart has five.

13               Compare them to the defendants in this

14   case, the parties in this case, more importantly, the

15   parties not in this case.  If you look, we saw some

16   information on this earlier, where if you look at just

17   the pharmacies that are here in this case, it represents

18   about 37.5 percent of the prescriptions of the opioids

19   dispensed in these two counties.  62-and-a-half are not

20   here.

21               Where is Walmart?  Walmart has about three

22   percent.  So if you look over the period of time that

23   this case involves, the amount of opioids that Walmart

24   has dispensed, each and every one of them with a

25   prescription written by a DEA-licensed doctor, represents

1    only about three percent of the opioids that have been in

2    Lake and Trumbull Counties.

3              Why is that important?  I think we've

4    already heard why it's important because you've heard us

11:16:16  5    talk about the substantial factor issue.  At the end of

6    this case, you're going to be asked to determine whether

7    each of the defendants is a substantial factor in the

8    harm that the plaintiffs are claiming.

9              Bear in mind what Walmart's position is

11:16:31 10    here.  It may surprise you a little bit.  Many of us know

11    Walmart is a store with a whole range of products, things

12    -- you can buy a lawnmower at Walmart, you can buy

13    groceries at Walmart.  You can buy any other number of

14    other products in Walmart, but our pharmacy business is a

11:16:49 15    relatively small part of our business.

16              You heard Mr. Lanier talk about that we

17    were trying to get people to walk by an buy other things

18    while they're waiting for the pharmacist, waiting for

19    prescriptions.  That's not Walmart.  Our pharmacy is at

11:17:02 20    the front of the store.

21              Mr. Schultheis will tell you it's for the

22    convenience of the customer.  Walmart is very confident,

23    you've probably seen it on television, Walmart is very

24    confident that the products we offer and the prices we

11:17:17 25    charge are attractive values for our customers.

1          We don't need our customers to drop off a

2     prescription and look around the store and see what else

3     they may want to buy.

4          Let's make a couple other comparisons to

5     see where Walmart is and one of the reasons for this is

6     when you say someone is small or someone is big or

7     someone is medium, you almost always have to ask compared

8     to what.  What am I comparing it to?  And in this case,

9     we've heard about some of the independent pharmacies,

10    particularly those in Trumbull County.

11         And if you look at what Walmart's

12    comparison is to those, those stores in particular, the

13    individual stores, and you saw some pictures of that over

14    the openings yesterday, those stores are considerably

15    higher in terms of the opioid prescriptions that they are

16    dispensing over time in this case.

17         One of the persons I should have introduced

18    you to is the person I call the magician, Mr. Ferry back

19    there in the corner and reads my mind --

20              THE COURT REPORTER:  I'm sorry?

21              MR. MAJORAS:  Mr. Feran, who reads my mind

22    and pops up a slide.

23         So if we look at this comparison here,

24    these are the three largest independents between these

25    two counties.  They both happen to be in Trumbull County,

1      as someone explained yesterday.  These pharmacies, three

2      largest account for 16.5 percent of all the opioids

3      dispensed in these two counties, just those stores in

4      Trumbull County.

11:18:50   5          All five Walmart stores, all five of our

6      stores combined, are three percent, a little over three

7      percent.  Again, that matters.  That matters in terms of

8      what you're going to be asked to talk about or what

9      you're going to be asked to decide in terms of what was a

11:19:08  10     substantial factor.

11          Go to our next slide.  If you look at

12     comparison in Trumbull County, these stores are just in

13     Trumbull County.  It's even more stark, the difference.

14          We have the two Walmart stores in Trumbull

11:19:24  15     County and we have the independents, they represent 26.7

16     percent of every opioid distributed in Trumbull County or

17     dispensed in Trumbull County.  Walmart is again a very

18     small 1.3 percent.

19          So why do I keep comparing those stores?

11:19:41  20     Why does that matter?

21          You've heard Mr. Lanier yesterday use the

22     phrase "mom and pops."  In fact, he used "mom and pops"

23     when he was talking about Walmart, somehow saying Walmart

24     has a bigger responsibility or any of these pharmacies

11:19:57  25     have a different responsibility than these small stores.

1    That's completely wrong.

2                    The pharmacy business is a serious

3    business.  There are health issues, there are

4    regulations, there are requirements.  The small stores, I

11:20:09  5    don't care whether you want to call yourself a mom and

6    pop or a family store, have exactly the same

7    responsibilities that the pharmacy chain stores have.

8                    So don't, don't try to distinguish well,

9    that's just a mom and pop as opposed to a Walmart.  They

11:20:25 10   have the same obligations, and you will see in the course

11   of this case that Walmart honored its obligations, its

12   legal obligations and the obligations when it decided to

13   operate a pharmacy business.

14                   As I mentioned, the pharmacy business is a

11:20:42 15   small part of the overall Walmart business but it's

16   something that Walmart takes very seriously.

17                   And when you talk about prorations, people

18   and pharmacists, people like corporations, corporations

19   just don't have decisions.  You're going to meet the

11:20:57 20   people that are involved in the Walmart pharmacy

21   business, both at the level of the stores, the individual

22   pharmacists working in the store, you will have Lori

23   Militello come in, she works in the Eastlake store in

24   Lake County for 23 years.

11:21:12 25                   And as I said, people like Roger will be

1    here to show the serious nature, the serious way in which

2    Walmart treats its pharmacy business.  It's not just an

3    after-thought.

4            So when I talk about the size of the store,

5    I'm really asking you to think about where does this fit

6    when we get into the substantial causation.

7            It's another thing to think about in this

8    case, and that is the plaintiffs are talking about a huge

9    problem.  They're not talking about simply prescription

10   opioids.  Everything I just showed you is about

11   prescription opioids.

12           The problem they're talking about is how to

13   solve the illegal Fentanyl, the heroin, clearly illegal

14   drugs and things that have nothing to do with Walmart or

15   any other pharmacy in this case.

16           So when you look at what they're going to

17   say is the cause of all that, you have to keep in mind

18   it's much broader than what -- the prescription opioids

19   that are dispensed by our stores.  When you look at what

20   they say the nuisance is in these two counties, you're

21   going to be asked to determine, when you look at that big

22   broad picture, where do these pharmacies fit, even if you

23   find there is a problem, the share of this much wider

24   problem, this much wider opioids in the market that

25   Walmart has is minuscule.

1          It's not three percent, it's not one

2     percent.  It's minuscule.

3          One of the things the plaintiffs are going

4     to have to do is connect the information, the evidence

11:22:47  5     that they will bring to you, they're going to say here is

6     what the pharmacy was doing, here is what Walmart was

7     doing, here's what one of the other pharmacies were

8     doing, how do we get from here to the problems they say

9     are on the street right now.

11:23:03 10          We will talk to first responders who have

11     to deal with addictions or overdose on the street.  How

12     do we get from a prescription leaving a store with a

13     doctor's order attached to it to what plaintiffs are

14     going to talk about is the harm here, and I'm going to

11:23:22 15     ask you to hold them to that burden.

16          It's important to all of the pharmacies

17     here, but I'm going to talk about my client, Walmart.

18     Our case is going to include our documents, our

19     information.

11:23:38 20          When the plaintiffs talk about pharmacies

21     or talk about the chain pharmacies, whatever they want to

22     say or characterize it, bear in mind they have an

23     obligation with each and every defendant here to bring

24     you the proof to demonstrate their case.

11:23:54 25          So a Walgreen's document doesn't equal a

1    Walmart document.  A Walmart document doesn't equal a

2    Giant Eagle document.  They have to pull all of this

3    together.

4                And at the end of the evidence when the

5    Judge instructs you, we don't believe they will do it

6    because we are very confident that what Walmart has done,

7    both at its distribution level and its dispensing level

8    it its pharmacies.

9                So let me talk just briefly about the

10   distribution.  You've heard Ms. Sullivan talk about that

11   before.  We're actually pretty similar in terms of for a

12   period of time up until 2018, we had effectively a

13   warehouse, we called it a Distribution Center, where the

14   opioids prescriptions, along with all the other

15   prescriptions that we issued, would be brought there and

16   then sent out to our store or individual stores.

17                One of the things the plaintiffs talked

18   about is whether there's a system to make sure any of

19   those is suspicious.  Why is someone ordering this

20   prescription or this set of medication at that particular

21   store?  And they talked about whether or not we had a

22   system in place.

23                We have a system in place and let this

24   build out.  Take a look at this as we go through it.  And

25   I'll tell you what it is.

 1          But not in detail.  Every line on this

 2    screen over a period of time represents the different

 3    things that Walmart Distribution Center was doing to look

 4    at the orders it was getting for the Walmart stores.  Of

 5    course all these stores were Walmart stores.  It was easy

 6    enough to pick up a phone and say, hey, why does this say

 7    ten bottles when normally it's one bottle and things of

 8    that nature.  We knew who our customers were.

 9          That's important when you hear about the

10    distribution system.  It's also important to see that

11    Walmart, over time, again at one point, our witnesses

12    will say this, at one point, these lines represent each

13    things Walmart did over the years.  You'll hear it

14    adjusted with technology.  You'll hear that it adjusted

15    with different people.  You'll also hear how closely

16    Walmart worked with the DEA and gave the DEA the

17    information that it worked and processed.

18          And again, the same thing I talked about

19    before, the plaintiffs have to connect it.  The

20    plaintiffs have to say we've got your order, this is a

21    problem, where did it go, what issue did it cause going

22    forward.

23          They're not going to be able to do that.

24          And the reason they're not going to be able

25    to do that is you will find that the system that Walmart

1    had in place, the people working at the Distribution

2    Center, and you'll hear from a witness who actually

3    designed the Distribution Center, had both safety in

4    mind, you'll hear about all the safety involved and also

11:26:39  5    had in mind the clear obligations of watching orders to

6    monitor them and make sure that they are being

7    appropriately sent out to stores that ordered them.

8            So let's look at another comparison.

9            This again, we talked about before Franklin

11:27:00 10   Pharmacy in Trumbull County.  These are Franklin

11   Pharmacy's orders over a period of 2005 to 2014.  That

12   little drugstore.  And these are massive orders as they

13   come in.  You might even remember, you saw a slide I

14   think yesterday where it talked about all of the

11:27:17 15   prescription opioids over time, and you saw it going up

16   over time and then it sort of plateauing, what the DEA

17   was allowing to be done.  It looks very similar to that.

18           You can see Walmart, what the nearest

19   Walmart store looks like in comparison.  When you think

11:27:35 20   about it, is there a problem with the pharmacy?  What

21   would I expect a pharmacy to look like that's doing its

22   job correctly?  What would I expect one that has a

23   problem to look like?  Keep in mind this slide and when

24   the comparisons are done with all the stores.

11:27:56 25           I'm going to turn now to the dispensing

1    side of the business, which is the true pharmacy side of

2    the business as opposed to the distribution.  The thing

3    you're going to hear most from Walmart witnesses and from

4    any witnesses is going to be professional judgment.  It's

11:28:11  5    a phrase that you're going to hear throughout this case.

6    It's a phrase that you're going to hear our pharmacists

7    use with great pride when they talk about work they do.

8              Well, professional judgment isn't regular

9    judgment.  We all make judgments every day.  What I

11:28:25 10   decided to wear today, how did I decide to drive to work

11   today.  Professional judgment is significantly more than

12   that.

13             Professional judgment relies on education,

14   it relies on training, it relies on experience, so when a

11:28:41 15   pharmacist has a patient in front of it, that pharmacist

16   can apply all of that to a decision of whether to fill or

17   not the prescription that that person is presenting.

18             And you'll hear our pharmacists talk about

19   that.  Especially surprising to me as I worked on this

11:28:55 20   case, I sort of always looked at pharmacists as people

21   that type on computers and maybe, maybe counting out

22   pills but the pharmacists take great pride knowing their

23   patients.  In particular, the patients that have the

24   biggest medical issues because they are the ones that are

11:29:09 25   coming back to the pharmacist on a regular basis.

1          The pharmacists know in many cases right

2     away that patient's history is, what that patient may be

3     dealing with in terms of medical conditions that that

4     patient has talked about.  That goes into a decision

11:29:25  5     about when and how to fill a prescription.

6          Of course it's beyond that, too.  You saw

7     Mr. Delinsky put up slides about the CVS computer system

8     that they use.  Walmart has one, too, has one called

9     Connexus, and you'll see one of our witnesses talk about,

11:29:43 10     she'll show you screenshots, the patient's name goes in,

11     the doctor's name goes in, all the drug information, all

12     the filling information that patient had over time.  This

13     is the information pharmacists look at.

14          So if you walk into a pharmacy again after

11:29:58 15     this case and you see a pharmacist typing on the

16     computer, you'll know what they are doing.  They will put

17     in information so that we have it and the computer system

18     pulls up the information so they have it available and

19     they can make a decision.  Is there some issue about this

11:30:13 20     prescription?  What do I know or don't know about this

21     prescription?

22          The other thing that we're going to hear is

23     the plaintiffs will bring in a paid expert and their paid

24     expert's going to say your system should have done this.

11:30:26 25     We've heard about a lot of red flags already.  Your

1      system should have talked about these red flags.  I have

2      a list of red flags here.

3                  Our pharmacists have been trained from the

4      day they walk out of pharmacy school that they have a

11:30:40  5      corresponding responsibility.  That's their obligation to

6      look at those prescriptions and make determinations as to

7      whether or not there's an issue.

8                  And you'll hear the pharmacist say

9      sometimes the issues can be resolved.  Sometimes it's a

11:30:52 10      matter of calling the doctor's office.  I've got a

11      patient here, they say they're your patient.  I have

12      concerns about that.  Can you give me some more

13      information?  That resolves the issue.

14                  Many times, as I said, they already know.

11:31:07 15      They know many of their patients and who the patient is

16      seeing and where the doctor may be.  They know where the

17      patient lives.  So when the plaintiffs talk about red

18      flags and indications that there might be an issue with

19      respect to a prescription, that's nothing new to us.

11:31:23 20                  It's something that over time, you look at,

21      over time you knew, and sometimes it's experience.  Just

22      remember, a lot of the issues involved in this case is

23      criminal conduct.  There are people trying to evade the

24      system, there are people trying to evade controls and you

11:31:40 25      have to adjust for that over time.

1          Whether you call it this red flag or that

2     red flag or twelve of them or 16 of them, whatever the

3     number is, listen to our pharmacists.  They'll talk about

4     that issue that sometimes a red flag is immediately

5     resolved.

6          They know whether someone is seeing a

7     doctor, someone else, they know the conditions of that

8     particular patient.  Every one involves professional

9     judgment.  "What is it that I'm seeing in front of me,

10    what is it I know from my experience, what is it I know

11    from this patient, do I need more information," is the

12    process we go through.

13         Now, the plaintiffs in their case, they're

14    going to bring in an expert who's going to say I've

15    designed this system.  It's not a system used anywhere.

16    It's something he did for litigation.

17         The issue is not can someone design a

18    better system.  You'll see over time that the Walmart

19    systems changed through meeting changing conditions that

20    the pharmacists see.  That's things that Mr. Schultheis

21    is looking at in his position.

22         You will also hear Suzanne Hiland, who is

23    also a pharmacist and Ms. Riogi, another witness you will

24    hear.  They know the information we need to get to the

25    pharmacists.  It changes over time, but fundamentally,

1    fundamentally, it's that pharmacist that has the

2    corresponding responsibility, that pharmacist with the

3    patient in front of them.

4                 The pharmacist isn't there to set social

11:33:17  5    policy.  It's not the pharmacist's job when you have a

6    prescription to decide we need more or less opioids or

7    opioids are good or bad.  The pharmacists aren't the

8    doctors.  They can't say I think I got better treatment

9    for this individual.

11:33:31 10                Plaintiffs talk about the last line of

11   defense as if the pharmacists are law enforcement.

12                There is absolutely -- it is absolutely

13   correct when someone walks out of a store with a bag of a

14   prescription, opioid prescription, that pharmacist signs

11:33:48 15   off with all the information available to her, him or

16   her, the experience that person has in being able to deal

17   with that.  No one will deny that, the fact that the

18   pharmacist seeks to embrace that by the testimony they

19   have.

11:34:03 20                But to say that they should be having the

21   role of law enforcement, they should be having the role

22   to decide if we have too many opioids, the DEA has

23   already said that.  We will talk about the DEA quota.

24   Every year the DEA decides how many is too many or too

11:34:18 25   little.  So when you hear about a lower supply, think

1       about that.

2                    So when the pharmacist has that person in

3       front of him or her, what is it that I know about that

4       person before I can decide whether or not to fill that

11:34:31  5       prescription.  Sometimes it's easy.  You know the person,

6       you know the background.  Sometimes it's not easy.

7       Sometimes you need more information and that's what the

8       pharmacists do.

9                    You can't design a program that does the

11:34:44 10       same as professional judgment.  We saw the little sand

11       box toys.  The sand box toys don't have judgment.  The

12       computer program doesn't have judgment.  It's important

13       for our pharmacists to look, and you'll hear the training

14       they have, they know how to look for issues that might

11:35:03 15       present a problem, but ultimately it's professional

16       judgment.

17                    When you hear that, a computer program has

18       done that, bear that in mind.  Look at what the

19       pharmacists are actually doing, look at what's required

11:35:14 20       of them.

21                    You've heard before already about this

22       25-mile.  Let me just put that in context.  This is one

23       of the things the expert does, the expert says if you

24       live 25 miles away from your doctor, that's a red flag,

11:35:28 25       boom, stop.

1        Well, look at this.  Everyone in Trumbull

2   County, if you go to a doctor in Cleveland, the Cleveland

3   Clinic, UH, MetroHealth, any of those, anyone in Trumbull

4   County, that person walks in the store, has a

5   prescription, I've got a doctor at the Cleveland Clinic,

6   pretty reputable operation, but behind the counter,

7   they're supposed to say whoa, whoa, whoa, I've got this

8   25-mile rule.  That's not the way pharmacy works, that's

9   not the way pharmacists work.

10        Pharmacists have an understanding of the

11   community.  They have an understanding who their clients

12   are.  They have an understanding of what the prescribers

13   do.  Is this someone who is typically seeing a cash

14   basis?  This is an oncologist because so many of the

15   prescriptions oncologists write can be pretty heavy duty

16   prescriptions because someone at the end of life dealing

17   with cancer often is dealing with a great amount of pain.

18        This isn't a small issue.  If you look at

19   what the plaintiffs did here, 33 percent, Mr. Catizone is

20   going to come in and he's going to say, you know, this is

21   a red flag on distance, I've identified 33 percent of

22   Walmart's prescriptions on 25 miles.

23        There's better ways to deal with these than

24   to simply have these bright line rules.  Our pharmacists

25   will tell you they're very aware if someone comes in to

1   their pharmacies from miles away.  I'm going to find out

2   why that is but likewise they're familiar with snow

3   birds.  We often have people go down to Florida who go

4   there for the winter, transfer their prescriptions down

11:37:07  5   there, same person over and over.  The pharmacist will

6   know right away.

7   One of the -- one of the things I'm going

8   to ask you to think about, also, is we all know, we've

9   all heard, everyone acknowledges opioid prescriptions are

11:37:23  10  legal.  They have a reason.  They're used for medicating

11  pain.

12  Doctors are prescribing them.  We've heard

13  99 percent, the numbers are extremely high, no one really

14  questions that the doctors are prescribing opioids for

11:37:41  15  the most part, and they are things that these patients

16  need.

17  There are going to be pharmacists and

18  pharmacies that are dispensing opioid medications.  What

19  should one look like?  Well, look at the policy.  Let's

11:37:55  20  look at the reality.  What are we seeing when we look at

21  these pharmacies?

22  We go to the next slide.  Ms. Sullivan

23  talked about this, but the DEA considers when looking at

24  the overall pharmacy, look at all of the prescriptions,

11:38:09  25  every prescription in that pharmacy, if the opioids

1    prescriptions or controlled substance prescriptions are

2    under 20 percent, that's probably what a pharmacy should

3    look like.  That's what a legitimate pharmacy should look

4    like.

11:38:22    5    These are the Walmart pharmacies in these

6    counties.  All five of them, the average is 10.4 percent.

7    Some a little bit lower.  Some are a little bit higher.

8    That's what we expect a pharmacy to look like.  That's

9    what we expect a pharmacy dealing with legitimate

11:38:44    10    prescriptions for opioids should look like.

11    Go to the next slide.  Again, let's do some

12    comparisons.  Plaintiffs said well, when they looked at

13    the data, they knew where the problem was or thought they

14    knew where the problem was.  They didn't look at this

11:38:59    15    data.  These are again the independent pharmacies and

16    this in particular, this slide was to an Oxycodone

17    product known as Oxy 80.  The 80 is the strength, a very,

18    very powerful opioid.  It's also very, very popular on

19    the street in terms of selling.

11:39:17    20    If you look these three stores in Trumbull

21    County, look at the amount of that product, just that

22    product that they are selling, 20 percent, 17 percent,

23    even down to 4 percent but then compare it to Walmart.

24    What's Walmart selling that super powerful opioid?  Well

11:39:35    25    under, under a half a percent.

1          Then if you look at them altogether,

2     altogether they're less than one percent or at most, one

3     percent.  And compare that to what's happening in

4     Trumbull County.

5          These are important comparisons.  It's

6     important to put it into context.  Five days ago, you

7     probably didn't know that much about opioids.  Probably

8     did not know that much about pharmacy or dispensing but

9     when you think about what is it I want a pharmacy to look

10    like, what do I want a responsible pharmacy in terms of

11    dispensing opioids to the right people and taking them

12    and making sure the prescriptions are the best we could

13    tell, as they should be, that's what we see, you see

14    Walmart.

15          There's a lot that some of my other

16    co-defendants said in their openings so I will not repeat

17    all of that.  That will make you happy.

18          There are a number of things, though, that

19    I really want you to keep in mind.

20          The first is connect the dots.  You heard

21    about it yesterday.  We do need to connect the dots, you

22    need to connect the dots and the plaintiffs need to give

23    you the evidence to connect the dots.

24          The evidence needs to be about each

25    defendant so that you can evaluate whether they gave you

1    the information to prove their case.  You'll be able to

2    hear our response.  It's not a matter of lumping it

3    together, it's not a matter of experts coming in and

4    saying we think there's a big problem with pharmacies.

5            What about each and every one of them, can

6    they identify the prescriptions, can they identify this

7    one is a problem, this one turned into this or turned

8    into that?

9            We saw yesterday the snowball effect, the

10   prescription was a snowball rolling down the hill with

11   skis sticking out of it, they need to do better than

12   that.

13           They need to connect it.  How do you get

14   from what you're going to hear about the pharmacies, what

15   you're going to hear about my pharmacies, and the effort

16   we're putting into our pharmacy business, to suddenly

17   first responders having to deal with people overdosing on

18   heroin, Fentanyl and some of the opioid products.

19           That's what we're asking you to do in this

20   case.  I've actually put together a list of things that

21   I'm hoping you focus on in this case.

22           Number one is where I starred Walmart's

23   small presence in this case.  You're being asked about

24   substantial cause, you're being asked about substantial

25   cause for a wide problem, much wider than prescription

1    opiates.

2              Listen for what you won't hear.  That's

3    what I'm talking about in terms of the evidence.  Are you

4    going to hear the specific evidence that links together

11:42:31  5    the harms that the plaintiffs are claiming about this

6    case?  And we are confident that at the end of this, when

7    you sit down and deliberate, you're going to conclude

8    that you do not have the evidence, you do not see the

9    evidence.

11:42:42 10              Walmart also is going to talk about

11    continually improved processes.  This time period, this

12    case goes over quite a few years.  We will talk about our

13    Connexus, our computer system, that's been around since

14    about 1999, I believe, but over time as Walmart, as

11:43:04 15    Mr. Schultheis will show you, we're continually improving

16    our process trying to meet the needs of the community and

17    trying to address the issues related to opioids.

18              And then, finally, we'll talk about this,

19    you've heard about this repeatedly but it's important,

11:43:17 20    plaintiffs are looking for blame in the wrong places.

21              Why is Walmart here?  Why are these other

22    pharmacies here?  Are they the problem?  We know we have

23    to have pharmacies dispensing these products.  Patients

24    have needs.

11:43:35 25              That individual patient who will stand in

1    front of the pharmacist has a need.  And we need that

2    person to be able to understand how to do their job so

3    that they can exercise their professional judgment and

4    make a determination about is this something that looks

11:43:48 5    like a legitimate medical need for this person.

6    Everything I've seen says yes, I'm going to fill it.

7              If I have questions, I'm going to raise

8    questions.  If I'm absolutely convinced it's not a valid

9    prescription or one that's not written for the right

11:44:02 10   purpose, I'm going to refuse to fill it.

11             And you'll hear that the management of

12   Walmart, the senior management of Walmart, consistently

13   advises its pharmacies and pharmacists, trains its

14   pharmacists that if you make a decision that you're not

11:44:15 15   going to fill a prescription, we've got your back.

16             It's not a business issue.  It's a safety

17   issue and it's allowing our pharmacists to do the job

18   they are trained to do and that they are educated to do.

19             Thank you for listening.  Thank you for

11:44:32 20   listening for the next number of weeks.

21             We appreciate that, I appreciate that, and

22   we appreciate the opportunity to learn more about the

23   Walmart pharmacies, learn more about the people and the

24   way they go about their job and make sure they have the

11:44:48 25   responsibilities that we all expect them to do.

1              Thank you.

2              THE COURT:  All right.  Thank you,

3    Mr. Majoras.

4              The plaintiffs may call their first

11:45:06 5    witness, please.

6              MR. LANIER:  Your Honor, the plaintiffs

7    would call, adversely, the CVS representative or CVS

8    employee, Mr. Tom Davis.

9              And, Your Honor, would you prefer me to

11:45:33 10   question at the podium?

11             THE COURT:  I think that will be best,

12   Mr. Lanier, so our Court Reporter can hear.

13             MR. LANIER:  Yes, sir.

14             MR. BUSH:  Robert, I think we agreed that

11:46:32 15   this thing will be moved.

16             THE COURT:  During the lunch hour.

17             MR. BUSH:  We can't see the witness.

18             THE COURT:  Well, we'll move it during the

19   lunch hour.

11:46:48 20             (Pause.)

21             MR. DELINSKY:  I'm sorry, Your Honor, I'm

22   sorry, ladies and gentlemen.  We got locked out.

23             THE COURT:  Okay.  That's okay.

24             All right.  Mr. Davis, just come up here,

11:47:02 25   please.  If you'd please raise your hand.

```
 1                        THOMAS DAVIS,
 2        of lawful age, a witness called by the Plaintiffs,
 3               being first duly sworn, was examined
 4                    and testified as follows:
 5                    THE COURT:  Okay.  And you may remove your
 6        mask while you're testifying, sir.
 7                    Thank you.
 8                    MR. LANIER:  May it please the Court.
 9                    May -- Rachel, Ms. Lanier, please approach
10        the witness and give him a box of exhibits.
11                    Thank you, Judge.
12                    Mr. Pitts, do I have an ability to use the
13        projector, please, sir?  Thank you.  Excellent.
14                    MR. DELINSKY:  Mr. Lanier, did we get the
15        exhibits as well?
16                    MR. LANIER:  Yes.
17                    May I approach the bench, Your Honor?
18                    THE COURT:  Okay.
19                    MR. LANIER:  This is a set for you, should
20        the need arise.
21                    I'll leave it with Mr. Pitts.
22                    All right.  Everybody ready?
23                    (Discussion had off the record.)
24                    MR. LANIER:  All right.
25
```

11:47:15  5
11:47:36 10
11:48:08 15
11:48:33 20
11:50:02 25

1          CROSS-EXAMINATION OF THOMAS DAVIS

2     BY MR. LANIER:

3     Q.    Housekeeping out of the way.

4                Mr. Davis, will you please tell the jury

5     your name.

6     A.    Thomas G. Davis.

7     Q.    All right.  Mr. Davis, I tried to find a fair

8     picture of you to use for my roadmap.

9                Did I do okay?

10    A.    That is a picture of myself, yes.

11    Q.    All right.  I've got the frustration of not being

12    able to read close with glasses on, so I have to take

13    them off to read.

14                But I can't see you once I take them off

15    and I can't see the screen so you'll have to excuse me

16    for the rudeness of going back and forth.  Okay?

17    A.    No worries.

18    Q.    All right.  Sir, I put a roadmap up here because I

19    want you, the Court, and the jury to understand sort of

20    the questions that I have for you and how they fall into

21    categories.

22                Fair?

23    A.    Yes.

24    Q.    And so the first thing we're going to do is, and

25    hopefully try to get this done before lunch, is look at

        1    just some personal information about you, what you do as

        2    a profession, what you do in CVS.

        3                  Okay?

        4    A.    Yes.

11:51:06  5    Q.    And we'll do that to help frame the rest of the

        6    questions I've got for you.

        7                  All right?

        8    A.    Um-hmm.  Yes.

        9    Q.    So I don't mean to be impertinent but I'm not going

11:51:18 10    to spend my time talking to you about your wife and kids

       11    and all that kind of stuff, if you have a wife and kids

       12    or husband and kids, I don't know, but I'm just going to

       13    be talking to you about the things that are relevant to

       14    this case for me.

11:51:30 15                  Okay?

       16    A.    Yes.

       17    Q.    All right.  And then the second stop on our road is

       18    going to be openings, and I want to talk to you about

       19    some of the things that have been said in the openings in

11:51:41 20    this case.

       21                  All right?

       22    A.    Yes.

       23    Q.    The third stop on our road is what I call just

       24    basics.  This is just things that I hope you and I can

11:51:52 25    agree on.

Davis - Cross/Lanier                284

1          All right?

2     A.    Yes.

3     Q.    And then the final thing that I've saved for the

4     last stop are problems at CVS.

11:52:00  5          And we'll look at those fairly directly.

6     Okay?

7     A.    Yes.

8     Q.    All right.  So with that, sir, let's start with the

9     personal information.

11:52:09 10          And the personal information I have for you

11    is pretty simple, really.  What I'd like to do is look at

12    it in these terms.  You have certain training that you

13    have brought to the job, correct?

14    A.    Yes.

11:52:26 15    Q.    And your training includes that of being a

16    pharmacist.

17          You actually went to pharmacy school and

18    you are a pharmacist, fair?

19    A.    Yes.

11:52:35 20    Q.    Not only were you a practicing pharmacist between

21    1991 and 1992, but you then took a job from '92 to '93

22    with the Rhode Island compliance and regulation or

23    regulatory authorities.

24          True?

11:52:55 25    A.    It's the Rhode Island Division of Drug Control.

Davis - Cross/Lanier

285

Q.    It's the Rhode Island Division of Drug Control,
fair.

I looked at your LinkedIn page.  Do you
keep up your LinkedIn page?

A.    I've created it.

Q.    Okay.  So it's your creation.

It is demo number 10 in your box, if you
need to see it, but I'll be putting it up here.

Do you recognize your LinkedIn page, Tom
Davis, Vice President, Pharmacy Professional Services at
CVS Health.

Do you recognize that?

A.    I do.

Q.    And in that, you mentioned that you were the Chief
of Compliance and Regulatory Section for the Rhode Island
Division of Drug Control from 1992 to 1993, right?

A.    Yes.  That was my title.

Q.    And you were responsible for leading the law
enforcement group responsible for all aspects of
pharmacy, pharmacist, drug wholesaler licensing and
discipline within the State of Rhode Island.

True?

A.    Yes.

Q.    All right.

MR. DELINSKY:  Your Honor, I'd just like to

Davis - Cross/Lanier                286

1      interrupt.

2                     We don't have the documents.  Walgreen's

3      counsel has been kind enough to hand them to us.

4                     THE COURT:  All right.  Let's move on.

11:54:23  5          We'll get it at lunch.  This is just his

6      CV.  I assume everyone has seen this.

7                     MR. LANIER:  Yeah, I don't think you and I

8      are fussing any of this stuff at all, are we?

9      BY MR. LANIER:

11:54:34 10    Q.    I mean that's what you did for a year, right?

11     A.    Yes.

12     Q.    And the Rhode Island statute in some ways mirrors

13     the federal statute when it comes to controlled

14     substances, doesn't it?

11:54:42 15    A.    Yes.

16     Q.    And then you went back into private practice and

17     worked as a pharmacist for a while from '93 to '95, fair?

18     A.    Yes, sir.

19     Q.    And at some point in time, you shifted over, and

11:54:57 20    since November of 2012 you've been the Vice President of

21     Pharmacy Professional Services at CVS.

22                     True?

23     A.    That's true.

24     Q.    Okay.  At least that's the way you put it in

11:55:14 25    LinkedIn.

1              Fair?

2     A.    Yes.

3     Q.    All right.  Good.

4              Now, that's the training that I think will

11:55:23 5     be relevant as we look at this case and I ask you

6     questions, which I expect to last the rest of today and a

7     little bit into tomorrow.

8              But that's the training, and then I'd like

9     to talk for a moment about the structure.  And by this, I

11:55:39 10    mean the structure of the company CVS where you work.

11             All right?

12    A.    Yes.

13    Q.    I saw a corporate chart that's got you, and it

14    looks like I counted 64, but I just put 60 plus because I

11:55:58 15    may not have counted right, but you've got over 60 people

16    that report to you through that chain.

17             Is that fair to say?

18    A.    That's fair to say.

19             It's approximately 64.

11:56:09 20    Q.    And that chart, if you want to pull it, but I'll

21    put it up here so everybody can see it, is Plaintiffs'

22    Exhibit 23318?

23             MR. LANIER:  And, Your Honor, do you want

24    us to move these into evidence contemporaneously or at

11:56:24 25    the end of the day?

```
 1              THE COURT:  Well, you can move them

 2    contemporaneously and we'll see if there's any objection

 3    at the end of the day.

 4              MR. LANIER:  All right.  Thank you, Your

 5    Honor.

 6              Plaintiffs would move into evidence

 7    Plaintiffs' Exhibit 23 --

 8              THE COURT:  I would assume that if you're

 9    identifying it, you're moving it in so that will save

10    time.

11              MR. LANIER:  Great.  And I've got an extra

12    copy if you all are having trouble locating them, but

13    this is the corporate tree.

14    BY MR. LANIER:

15    Q.    So, sir, if we put it up here and I'll Zoom out

16    initially, before we Zoom in, this is the corporate

17    structure within CVS in the pharmacy service,

18    Professional Services Department as of October, 2019.

19              Fair?

20    A.    Yes.

21    Q.    And if we Zoom in a little bit more, we're going to

22    see that's you at the top, Thomas Davis.

23              Right?

24    A.    Yes.

25    Q.    And the jury may get a chance to hear, also, I
```

1    understand, she'll be coming to testify, from Ms. Nicole

2    Harrington who is the Senior Director of Pharmacy

3    Services.

4                    Right?

11:57:26 5    A.    That's correct.  Yes.

6    Q.    And Ms. Harrington reports ultimately to you.

7                    You are her boss?

8    A.    Yes.

9    Q.    True?

11:57:34 10                   And may I ask, sir, and the jury may find

11   this helpful as well, who is your boss?  Who do you

12   report to?

13   A.    My boss, as we sit here today, is Ryan Rumbarger.

14   Q.    Can you spell his name for the Court Reporter,

11:57:49 15   please?

16   A.    Certainly.

17                   Ryan, R-Y-A-N, Rumbarger,

18   R-U-M-B-A-R-G-E-R.

19   Q.    And what is Mr. Rumbarger's job title?

11:58:04 20   A.    He is senior Vice President of Store Operation.

21   Q.    Is he also a pharmacist like you?

22   A.    Yes.

23   Q.    Okay.  Now, beyond that, and the note that Nicole

24   Harrington reports to you, I want to talk to you briefly

11:58:25 25   about your performance in your job.

1          I've had a chance to read through your

2   personnel file.  I'm sure you're familiar with it as

3   well.

4              Right?  I'm sorry?

11:58:44 5   A.    I'm sorry.  There was a question?

6   Q.    Yes.  Are you familiar with your personnel file?

7   A.    To some extent, yes.

8              MR. LANIER:  And I've, Your Honor, selected

9   out just a portion of it.  We're glad for the entire

11:58:57 10  exhibit to come into evidence.

11  Q.    But I want to show you, sir, Plaintiffs' Exhibit

12  23470, and I've got specifically Page 702 and following.

13              And it talks about some issues that you had

14  in 2000 -- in your 2016 year-end performance review.

11:59:17 15             Do you remember those?

16  A.    Not as I sit here today, no.

17  Q.    Well, let's start by looking at those issues.

18              All right.  Let's start by bragging on you

19  a little bit.  We'll do some of the positive ones.

11:59:37 20             MR. DELINSKY:  Mr. Lanier, what's the

21  number again?  I don't believe we have them.

22              MR. LANIER:  It is Plaintiffs' Exhibit

23  23470, and I'm looking at Page 701.  It's his 2016

24  year-end performance review.

11:59:54 25             MR. DELINSKY:  I don't believe we have it.

```
              1              They're in numerical order.
              2      A.    Do I have a copy that I can refer to?
              3      Q.    Yes, sir.  We can certainly give you a copy.
              4              THE COURT:  Look, I think we're going to
  12:00:20    5      take a lunch break and get this all straightened out
              6      because this is -- this is not going well for anyone.
              7              So, ladies and gentlemen, we'll take a
              8      break for lunch until 1:00 o'clock.
              9              Usual admonitions apply.
  12:00:35   10              Have a good break, and we'll see you at
             11      1:00.
             12              (Jury out.)
             13              MR. LANIER:  Your Honor?
             14              THE COURT:  All right, look.  This looks
  12:01:17   15      bad for everyone so get it fixed and also, please remove
             16      that.
             17              MR. LANIER:  The TV is gone.
             18              THE COURT:  TV monitor because it's
             19      blocking things.
  12:01:26   20              MR. LANIER:  Your Honor, I don't know how
             21      you would feel about this, so if you will instruct me,
             22      I'll see if this is in the realm of possibility but it's
             23      very easy for me to leave the boxes here with Rachel and
             24      as I pull up an exhibit, if you don't mind her
  12:01:42   25      approaching she can hand --
```

1          THE COURT:  That's fine.  That's fine.

2          But I want to make sure that defendants

3   know what you're using and they have them, either hard

4   copy or electronically.

12:01:52  5          I assume they can pull them all up, but it

6   just looks very unprofessional for everyone, and I, you

7   know, I'd rather not see that.

8          MR. LANIER:  All right.  Thank you, Judge.

9          (Luncheon recess taken.)

12:02:08 10          (Proceedings concluded at 12:02 p.m.)

11                    -  -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       TUESDAY, OCTOBER 5, 2021, 1:05 P.M.

2              THE COURT:  All right.  Please be seated,

3     ladies and gentlemen.

4              And, Mr. Davis, I want to remind you you're

13:07:13 5   still under oath from this morning.

6              MR. LANIER:  May it please the Court, ready

7     to go?

8              THE COURT:  Yes.

9              MR. LANIER:  All right.  Thank you.

13:07:27 10      CROSS-EXAMINATION OF THOMAS DAVIS (RESUMED)

11    BY MR. LANIER:

12    Q.   Good afternoon, ladies and gentlemen, counsel, and

13    Mr. Witness, Mr. Davis.

14              All right.  Mr. Davis, over the lunchtime I

13:07:39 15   streamlined a little bit.  I'm going to leave the

16    performance issues aside for now and I want to make one

17    last note on your personal chart and then we'll move to

18    the next stop.  Okay?

19    A.   Yes.

13:07:49 20   Q.   Now, what I did is I tried to -- let me blow it up

21    a little bit make it easier for all to read.

22              Your job responsibility as Vice President

23    for CVS is you are responsible for leading patient

24    safety, pharmacy quality, and the professional practice

13:08:10 25   standards for CVS and the pharmacy.

1           Right?

2      A.    That's generally correct.

3           I also have responsibility for Professional

4      Services' at Omnicare, long-term care, which is our

13:08:27 5   long-term care pharmacy.

6      Q.    Okay.  Great.  I just took this word-for-word off

7      of what you had on your LinkedIn page.

8           At least as far as this is concerned,

9      you're not fussing one way or the other.  This is a good

13:08:44 10  bit of your job.

11          Fair?

12     A.    Yes, sir.

13     Q.    And I say that because I want to ask you questions

14     today and into tomorrow likely about patient safety,

13:08:53 15  pharmacy quality, and professional practice standards for

16     CVS.

17          Do you understand that?

18     A.    Yes.

19     Q.    And you've got it in your brain.

13:09:05 20       I'm the lawyer for the people suing your

21     employer.  I'm on the other side from you in this case.

22          Right?

23     A.    Yes.

24     Q.    All right.  Now, in that regard, then, the roadmap,

13:09:17 25  we are cruising down the road.

          1                  We've done personal, and now I want to talk

          2       to you about some things that were said in opening.

          3                  Okay?

          4       A.    Yes.

13:09:26  5       Q.    Did you have a chance to hear any of the openings?

          6       A.    No, sir.

          7       Q.    All right.  Some of what was said in those

          8       openings, then, may be new to you so I'll do the best I

          9       can to help explain them to you as I ask you questions

13:09:40 10       about it.

         11                  All right?

         12       A.    Yes.

         13       Q.    There were four openings that were given in this

         14       case.

13:09:50 15                  Walgreen's gave the first one among the

         16       defendants.  I gave the first one.

         17                  Walgreen's, then CVS, then Giant Eagle,

         18       then Walmart.

         19                  You are familiar with all of those

13:10:00 20       companies and businesses, aren't you?

         21       A.    Yes, sir.

         22       Q.    Okay.  And you're here to testify for CVS; you

         23       can't testify for Walgreen's, right?

         24       A.    Correct.

13:10:13 25       Q.    Nor for Giant Eagle.

```
 1              True?

 2    A.    Correct.

 3    Q.    And you can't testify for Walmart either, though

 4    maybe some of your testimony will bleed into some of

13:10:23 5   their arguments.

 6              But you can only speak for your experience

 7    at CVS.

 8              Fair?

 9    A.    Yes, sir.

13:10:29 10  Q.    All right.  In that regard, I still want to start,

11    because I think the defendants to some degree coordinated

12    their openings, and so I want to start by talking

13    about --

14              MR. DELINSKY:  Excuse me, Mr. Lanier.

13:10:46 15              Judge, there's an awful lot of testifying

16    going on by counsel.

17              THE COURT:  Let's just pose a question.

18              MR. LANIER:  Thank you, Your Honor.

19    BY MR. LANIER:

13:10:56 20  Q.    Let's start with Dr. Franklin.

21              Do you know who Dr. Franklin is?

22    A.    No, sir.

23    Q.    The opening statement by the Walgreen's lawyer

24    talked about how another one is doctors who repeatedly

13:11:20 25   write the same prescription.
```

1          Now, when Dr. Franklin wrote the same

2     prescription over and over again, maybe that was a cause

3     for concern.  I'm not going to argue with that.  But,

4     "Other doctors who write the same prescription over and

13:11:34  5     over again are, for example, dentists."

6          You're familiar with the concept of people

7     writing the same prescription over and over again, aren't

8     you?

9     A.    Yes, sir.

13:11:46  10    Q.    And sometimes that can be an issue that is

11    reflective of diversion.

12              Fair?

13    A.    In certain circumstances, yes.

14    Q.    And sometimes it's not; it's reflective of the fact

13:12:01  15    they just do the same procedure every time.

16              Fair?

17    A.    Yes.

18    Q.    Now, the lawyer for Walgreen's went on to say "The

19    only reason he," this is that same gentleman -- "is not

13:12:18  20    in jail is there's a well-known pill mill doctor in the

21    area.  His name was Peter Franklin."

22              No connection as far as I know to Franklin

23    Pharmacy, never prosecuted because he was murdered by his

24    wife, but Dr. Peter Franklin, this well known pill mill

13:12:37  25    doctor, used to write prescriptions and he would write on

| | |
|---|---|
| 1 | them, "Fill only at Overholt's." |
| 2 | Do you see that? |
| 3 | A.    Yes, I see that. |
| 4 | Q.    Then it continued, "He didn't want his patients |
| 13:12:50 5 | showing up at Walgreen's or around these other |
| 6 | pharmacies"? |
| 7 | MR. DELINSKY:  Your Honor. |
| 8 | THE COURT:  Hold it.  Hold it. |
| 9 | Is there an objection? |
| 13:12:59 10 | MR. DELINSKY:  There is, Your Honor. |
| 11 | THE COURT:  Let's go with the headphones. |
| 12 | That's the way to do it. |
| 13 | (Proceedings at side-bar:) |
| 14 | MR. DELINSKY:  The objection -- can you |
| 13:13:25 15 | hear me, Your Honor? |
| 16 | THE COURT:  Yes. |
| 17 | MR. DELINSKY:  The objection is simply |
| 18 | Mr. Lanier is reading opening statements into the record. |
| 19 | He's free to ask questions to see |
| 13:13:33 20 | Mr. Davis's personal knowledge of any of these matters |
| 21 | but he can't simply recite opening statements. |
| 22 | THE COURT:  Well, he's got to -- he's got |
| 23 | to -- |
| 24 | MR. STOFFELMAYR:  We can't hear, Your |
| 13:13:58 25 | Honor. |

```
 1                MR. LANIER:  We can't hear.

 2                THE COURT:  Can everyone hear me now?

 3                All right.  Mr. Lanier, I'd like you to ask

 4      him questions without this reading sentences after

 5      sentences of opening statements.

 6                I think you could do that.

 7                If you want to ask him does he know that,

 8      fine.  Ask him -- if you want to ask him -- if you want

 9      to ask him if he knows Dr. Franklin, fine.  And I think

10      you can do that without reading sentences after sentences

11      of the opening statements.

12                Got it?

13                MR. LANIER:  Yes, sir.

14                (End of side-bar conference.)

15      BY MR. LANIER:

16      Q.    Sir, if there is a doctor who's a well known pill

17      mill doctor, would you expect your pharmacies, your CVS

18      Pharmacies, to be filling prescriptions by that pill mill

19      doctor?

20      A.    No, sir.

21      Q.    And if your pharmacy is filling prescriptions for

22      someone that's a well known pill-mill doctor in Lake and

23      Trumbull Counties, that's a problem, isn't it?

24      A.    Our pharmacists are required to only fill

25      prescriptions for controlled substances that are
```

1    legitimate.

2              So if they are knowingly filling a

3    prescription that is issued for a nonlegitimate medical

4    purpose, that would be a problem.

13:16:23  5    Q.    If they are filling prescriptions for a well-known

6    pill-mill doctor, that's a problem, isn't it?

7    A.    If they believe or know that the prescription that

8    they're presented with is issued for a nonlegitimate

9    medical purpose, then they are obligated to not fill that

13:16:45  10    prescription.

11    Q.    Is that a yes or a no?

12              I mean, is it a problem if they're filling

13    prescriptions for a well-known pill-mill doctor at your

14    CVS stores?

13:17:02  15    A.    If they know that the prescriptions that are

16    presented to them are not issued for a legitimate medical

17    purpose, then that would be a problem if they filled

18    them.

19    Q.    All right.  By the same -- by the same token, if

13:17:13  20    there's a pharmacy that gets shut down like the

21    Overholt's Pharmacy, and all of a sudden the customers

22    that were going to Overholt's start coming to your CVS

23    stores and getting their prescriptions filled there,

24    would that be a problem?

13:17:33  25    A.    Each prescription that is brought into CVS

1    Pharmacy, if it's for a controlled substance, the

2    pharmacist is required to exercise corresponding

3    responsibility on each and every script that comes to

4    them.

13:17:47  5           And in exercising that corresponding

6    responsibility, if they know or believe that the

7    prescription was not issued for a legitimate medical

8    purpose, they have an obligation to not fill that

9    prescription.

13:18:01  10   Q.    Would you expect in a smaller community, like the

11   counties at issue in this case, for your pharmacists to

12   be aware when a pharmacy like Overholt's loses its

13   license because it's filling poor prescriptions?

14          Would you expect your pharmacists to be up

13:18:20  15   on that?

16   A.    I would imagine in a small community, sir, as you

17   described, that that news would get around, yes.

18   Q.    And so then if all of a sudden the amount of

19   prescriptions that your pharmacies were filling increased

13:18:35  20   dramatically because you all were now filling the

21   Overholt's Pharmacy prescriptions, that should ring a

22   bell with someone in corporate.

23          Shouldn't it?

24   A.    Well, in our pharmacy store, leaders would

13:18:52  25   certainly be very aware.

                        We have a field management team that

supports all of our stores, and to the extent that a

store begins to get more prescriptions because another

one closed, they certainly would be aware of that.

Q.    By the same token, they would be aware not only of

that, but aware of why that store closed, if it were

something as dramatic as losing a license.

                        Fair?

A.    Well, again, as I said, yes, I'm sure they would

know.

Q.    All right.

A.    That news would get around.

Q.    Now, do the names Dr. Veres or Dr. Torres ring a

bell with you?

A.    No, sir, I can't say that I'm familiar with those

names.

                MR. LANIER:  Your Honor, I would offer

Plaintiffs' Exhibit 8480 at this point in time.

                MR. WEINBERGER:  Your Honor, would you like

us to arrange to deliver a copy of an exhibit and give it

to the witness?

                THE COURT:  I don't know what's going on.

                Are you showing this document to him?

                MR. LANIER:  I was offering -- I was

waiting to see if there's an objection before I put it on

1    the screen.

2                    THE COURT:  I assume all this has been

3    handled.

4                    I don't know what the document is, all

13:20:57  5    right?  Just put it on the screen.

6                    MR. LANIER:  Thank you, Judge.

7    BY MR. LANIER:

8    Q.   Sir, you're familiar with the form that I've put on

9    the screen, aren't you?

13:21:07 10    A.   Vaguely familiar with parts of the form.

11    Q.   Well, I mean, this is part of your arena of

12    authority at CVS, isn't it?

13    A.   What I can infer, sir, is that based on the title

14    on the top, that this is a report that likely came out of

13:21:37 15    our ethics line department.

16    Q.   Right.  And it's --

17    A.   Which I do not oversee so I'm not familiar with all

18    of their documents that they create.

19    Q.   Well, it's one of corresponding responsibility,

13:21:50 20    that's what the pharmacist has a legal obligation to do,

21    right?

22    A.   Yes.

23    Q.   And it's reporting suspicious activity by a

24    prescriber.

13:22:01 25                    Fair?

1    A.    I would agree, yes.

2                    MR. DELINSKY:  Objection, Your Honor.

3                    Foundation.  I believe Mr. Davis testified

4    he wasn't familiar with the document.

13:22:14  5                    THE COURT:  Well, you can ask if he

6    understands the -- overruled.

7    BY MR. LANIER:

8    Q.    And with due respect, sir, on Page 3, aren't you

9    the Thomas Davis that is listed as a participant on this

13:22:25 10   document who was a notified party?

11   A.    Yes.

12   Q.    So this, this is something that was brought to your

13   attention.

14                    Fair?

13:22:37 15   A.    Six years ago.

16   Q.    If you look at the details on Page 2, the caller is

17   reporting potential prescription fraud by Dr. Frank

18   Veres, who is an area doctor who writes medication

19   prescriptions with higher dosages.

13:23:06 20                    "This CVS location discovered the situation

21   today.  Dr. Veres has been asked to provide proper

22   documentation and he has refused to do so."

23                    Do you see that, sir?

24   A.    Yes.

13:23:23 25   Q.    Would you agree with me that in a situation like

1   this where the doctor refuses to provide proper

2   documentation, that your stores should not be filling

3   these prescriptions?

4   A.    Again, I cannot give you any specifics with respect

13:23:43 5   to the person that reported this particular case and

6   whether or not they did or did not fill a prescription

7   for this Dr. Veres.

8                 THE COURT:  Well, sir, that wasn't -- it

9   would go much better if you answer the question that was

13:23:59 10   asked.

11                 If you can't answer it yes or no, then just

12   say that but that wasn't the question asked.

13                 THE WITNESS:  Could you repeat the

14   question, please?

13:24:08 15                 MR. LANIER:  Yes, sir.

16   BY MR. LANIER:

17   Q.    In a situation like this where the physician

18   will -- "Refuses to provide proper documentation," your

19   store should not be filling that prescription.

13:24:34 20                 True?

21   A.    If the pharmacist filling the prescription

22   determines that that is information that's needed to

23   determine whether or not it's issued for a legitimate

24   medical purpose and they don't get that information,

13:24:53 25   then, yes, that would be true.

1    Q.   Well, I would -- is it fair to assume that if the

2    pharmacist is trying to get that documentation, that they

3    believe it might be important on a doctor who's been

4    reported for fraud?

13:25:12  5              MR. DELINSKY:  Objection.  Calls for

6    speculation.

7              THE COURT:  Overruled.

8    A.   I would assume that in that scenario, yes.

9    BY MR. LANIER:

13:25:18 10   Q.   All right.  So to put this on a timeline to make

11   sense of it for all of this, I'll call this a Dr. Veres

12   timeline.

13              Are you able to see that, sir?

14   A.   Yes.

13:25:26 15   Q.   And this ethics report, as you pointed out, was

16   December of 2015, correct?

17   A.   That appears to be correct, yes.

18   Q.   And he refused to give the information somewhere, I

19   assume, in that time range.

13:25:45 20              Does that seem right to you?

21              MR. DELINSKY:  Objection, Your Honor.

22              THE COURT:  Hold it.

23              Overruled.

24   A.   I'm not certain when, but presumably in that time

13:26:02 25   range.

1      BY MR. LANIER:

2      Q.    All right.  At this point I would set before you

3      Plaintiff's Exhibit Number --

4                    THE COURT:  Well, is that December, 2015 on

13:26:12  5      the document, Mr. Lanier?

6                    MR. LANIER:  Yes, Your Honor, it is.

7                    THE COURT:  All right.  That's fine.

8                    MR. LANIER:  The document itself shows that

9      it was opened on December 21st of 2015 -- let me, I

13:26:23  10      apologize, Judge -- opened on December 21st, 2015, and it

11      was last modified and closed January 12th of 2016.

12                    THE COURT:  Okay.  Thank you.

13      BY MR. LANIER:

14      Q.    So in that time frame would have been the

13:26:39  15      conversation, obviously, or they couldn't have

16      closed -- or the lack of a conversation, or they couldn't

17      have closed it.

18                    Fair?

19      A.    With respect to the ethics line component of that,

13:26:53  20      that would seem to be fair.

21                    I would note, though, that we have a

22      prescriber suspension program, and the most common

23      mechanism for a store pharmacist to escalate a concern

24      around a prescriber is to file an ethics line complaint

13:27:11  25      and then the information is then channeled to that

         1    prescriber suspension team program where they would then

         2    do an investigation.

         3    Q.   Well, this is not the first time Dr. Veres has been

         4    on CVS's radar screen.

13:27:27 5                 Did you know that?

         6    A.   Again, I have no independent recall regarding

         7    Dr. Veres.

         8    Q.   So there is a document that's been produced to us

         9    by CVS that is marked Plaintiffs' Exhibit 8472.

13:27:45 10                And this document is a long spreadsheet so

        11    I've got to kind of patch it together while I'm here, but

        12    are you familiar with this layout of this document?

        13                MR. DELINSKY:  And, Your Honor, while

        14    Mr. Davis looks at that, I believe he's testified he does

13:28:06 15   not have recall.

        16                Mr. Lanier can refresh his recollection.

        17                THE COURT:  That's what it said.

        18                He can look at this document.  If he has

        19    some recollection, he can testify.  If not, we'll have to

13:28:19 20   move on.

        21                MR. DELINSKY:  Thank you, Your Honor.

        22    BY MR. LANIER:

        23    Q.   So my question is, sir, are you familiar with the

        24    format of this document?

13:28:24 25   A.   No, sir.

1    Q.    Okay.  So you as the head of this division are not

2    familiar with the documents that first write up doctors

3    of concern?

4    A.    I have a very talented team of individuals that run

13:28:48  5    the day-to-day programs, sir.

6                 I am not conversant with, you know, every

7    spreadsheet or form that they may use.

8                 All I can tell you is that I've never seen

9    this document before.

13:29:03  10    Q.    All right.  I will put up, then, Plaintiffs'

11    Exhibit -- well, no, let me ask this first.

12                 Would it be significant to you, as you

13    assess how your company's handling this, to find out that

14    your company had already had Dr. Frank Veres on its radar

13:29:35  15    screen as early as 2013?

16                 Would that be important data?

17    A.    That is certainly information that we would take

18    into consideration, yes.

19    Q.    And by the same token, if in 2014 your company had

13:30:01  20    determined that Dr. Veres and Dr. Torres consistently put

21    out 70 to 80 percent of the store's Hydrocodone volume,

22    would that be important to you?

23                 MR. DELINSKY:  Your Honor, could I just

24    object to the hand drawings?

13:30:28  25                 None of this is in evidence.

1          THE COURT:  I agree.

2              Mr. Lanier, the witness hasn't said any of

3     this, so you can't keep -- you can --

4          MR. LANIER:  Okay.

13:30:40  5          THE COURT:  You can write or put some notes

6     as to maybe summarize what he says, but he hasn't said

7     any of that so you can't --

8          MR. LANIER:  All right.  I apologize,

9     Judge.

13:30:49 10          I'll try and do it as a question.

11          THE COURT:  Just cross it out because -- if

12     he says it, you can write it in.

13     BY MR. LANIER:

14     Q.    All right.  Sir, my question to you is this:  Would

13:30:59 15     it be important if in 2014 you got a report that 70 to 80

16     percent of a store's Hydrocodone volume was written by

17     Dr. Veres and Dr. Torres?

18     A.    I mean, obviously that would be important

19     information within the context of an investigation.

13:31:22 20     Q.    I'm going to put on the screen then Plaintiffs'

21     Exhibit 8408 and ask you if you are familiar with

22     Michelle Travassos who wrote this e-mail.

23          THE COURT:  What document is this, again?

24          MR. LANIER:  8408.

13:31:43 25          MR. DELINSKY:  Your Honor, I'd object.

1                I don't believe Mr. Davis, unless he's on

2        a -- yeah, Mr. Davis isn't on this e-mail.

3                        THE COURT:  Well, Mr. Lanier can show him

4        anything.

13:31:54  5                If he recognizes it, he can testify about

6        it.  If he doesn't, he'll have to move to another

7        document.

8                        But if he's familiar with it, the

9        context --

13:32:05  10                        MR. DELINSKY:  But, Your Honor, it's being

11        displayed in the meantime.

12        BY MR. LANIER:

13        Q.    My --

14                        THE COURT:  All right.  Mr. Lanier, you're

13:32:12  15        going to have to not put it on everyone else's screen.

16                        Just show it, because if you haven't shown

17        these documents to the witness before, then show it to

18        him only and no one else.

19        BY MR. LANIER:

13:32:24  20        Q.    My question, sir, is if you know Michelle

21        Travassos?

22        A.    Yes, I do.

23        Q.    Is she an appropriate person who would know whether

24        or not two doctors were contributing 70 to 80 percent of

13:32:37  25        the store's Hydrocodone volume?

|   |   |
|---|---|
| 1 | MR. DELINSKY:  Objection. |
| 2 | Calls for speculation. |
| 3 | THE COURT:  Yeah, sustained. |
| 4 | BY MR. LANIER: |
| 13:32:44  5 | Q.    Okay.  Does she report to you ultimately? |
| 6 | Is she in your organization chart below |
| 7 | you? |
| 8 | A.    She is. |
| 9 | Q.    Do you know what her job responsibilities are? |
| 13:32:52  10 | A.    I do. |
| 11 | Q.    Do her job responsibilities include being someone |
| 12 | who would be aware of whether or not two physicians were |
| 13 | contributing 70 to 80 percent of a store's Hydrocodone |
| 14 | volume? |
| 13:33:08  15 | A.    It's possible that in 2014 at that point in time, |
| 16 | she may have. |
| 17 | In her current role today, not necessarily. |
| 18 | Q.    When you were made aware of the Dr. Veres issues in |
| 19 | the 2015 document that we were looking at, December, |
| 13:33:32  20 | 2015, would it have been important to you to know whether |
| 21 | or not this doctor and one other had been responsible for |
| 22 | 70 to 80 percent of the prescriptions in one store for |
| 23 | Hydrocodone? |
| 24 | A.    Again, I don't have any independent recall of that |
| 13:33:55  25 | particular doctor -- document that you're citing, sir. |

1     Q.    But my question wasn't do you have the recall.

2                My question was would that be important

3     information for you when you're making the assessment and

4     you're being informed in 2015?

13:34:11 5     A.    Yes.  As part of any investigation, that

6     would -- that would be information that we would look at,

7     consider.

8     Q.    Is it typical for you, when you are alerted to a

9     problem like that, to continue to follow up and to

13:34:31 10    understand what else has been done with that problem?

11    A.    I would presume at this point that there -- that

12    this particular physician was, indeed, investigated by

13    our prescriber suspension program.

14                And towards that end, I don't have any

13:34:58 15    recall of this particular physician and what the -- what

16    the outcome was or was not.

17    Q.    Would it be typical for your people to inform you

18    of that investigation that they do after they put you on

19    notice about it?

13:35:17 20    A.    The -- Nicole Harrington and I review all of the

21    cases that are completed, in that time period all the

22    cases are completed of prescribers that are elevated for

23    review by our prescriber suspension program.

24                So we tended to see that information at the

13:35:44 25    very end.

```
          1   Q.    So if there is a time where there are documents

          2   that are put together for a review and an interview with

          3   Dr. Frank Veres, is that the kind of document that you

          4   would see?

13:36:06  5   A.    Our review would include any relevant information

          6   that came out of that investigation.

          7   Q.    Okay.  Would you consider it relevant information

          8   if someone looked for reviews of the doctor and gave your

          9   company and your company actually put into the form the

13:36:26 10   reviews that are present on this doctor?

         11             Would that be important?

         12   A.    That is some of the information that we look for as

         13   part of our investigation when we have a prescriber that

         14   we are looking at.

13:36:43 15   Q.    Okay.  So, for example, Plaintiffs' 8494, Your

         16   Honor, is one of these follow-up documents like that.

         17             Plaintiffs' 8494, which is the follow-up

         18   that I believe this witness has just said that he would

         19   be aware of.

13:37:11 20             THE COURT:  Well, why don't you show it to

         21   him first and see if he has any knowledge of it at all,

         22   without showing it to everyone else?

         23             MR. LANIER:  Okay.

         24   BY MR. LANIER:

13:37:19 25   Q.    Sir, do you have a copy of Plaintiffs' Exhibit 8494
```

1    in front of you?

2    A.    I do.

3              If I could have a moment to review it.

4              (Pause.)

13:38:33  5    Q.    Are you familiar, sir, with this type -- is this

6    the type of information you would have been shown and

7    privy to?

8    A.    I recognize the format, yes.

9    Q.    All right.  With that, then, Plaintiffs' Exhibit

13:38:47 10    8 --

11              MR. DELINSKY:  Wait.  Wait.

12              I believe Mr. Davis testified he recognized

13    the format; not this particular document.

14              THE COURT:  Well, you can show him, if he

13:38:56 15    recognizes the format.

16              So let's go.

17    BY MR. LANIER:

18    Q.    So, sir, this format is one that's got the box of

19    Mr. Veres, Dr. Veres, that talks about his practice and

13:39:10 20    it talks about his red flags.

21              Correct?

22    A.    Correct.

23    Q.    And this is something that would have been shown to

24    you or you surely would have this brought to your

13:39:22 25    attention once you are already on alert about this doctor

            1    from the month before.

            2                    Fair?

            3    A.    Yeah, I mean typically this would be the report

            4    format that we would use.

13:39:33    5                    I don't recall this particular prescriber,

            6    but this format, yes, I'm very familiar with.

            7    Q.    Could I see if this might --

            8                    THE COURT:  Is there a date on this

            9    document?

13:39:45   10                    MR. LANIER:  Yes, Your Honor.

           11                    This document is dated February, 2016.  So

           12    it's six weeks after the December 21st.

           13                    THE COURT:  Okay.

           14    BY MR. LANIER:

13:39:57   15    Q.    So within the framework of that, sir, I'd like to

           16    read you some of the more salient points to see if it

           17    brings up any memories, refreshes your recollection.

           18                    What does it mean "Hydrocodone Volume 99"?

           19                    Do you know?

13:40:22   20    A.    What page are you on?

           21    Q.    I'm on -- it's got a page number in the lower

           22    right-hand corner of nine.

           23    A.    I'm sorry.

           24                    Your question again, sir?

13:40:48   25    Q.    Yes.  Volume 99, does that mean he's in the top

1    99th percentile of people prescribing this?

2    A.    As I understand, it would be the 99th percentile,

3    yes.

4    Q.    Okay.  "Average red flags, 97."  That doesn't just

13:41:11  5    mean 97 red flags.  That means he's in the 97th

6    percentile of red flags?

7    A.    Actually I'm not -- I can't recall exactly what

8    that measurement measures.

9    Q.    Fair enough.

13:41:25  10         Cocktail, 95.  You're familiar with the

11    cocktail on opiates where you mix opiates with another

12    drug, right?

13    A.    Yes, sir.

14    Q.    And that 95, does that mean he's in the top 95th

13:41:44  15    percentile of writing those cocktails?

16    A.    He would have for -- yes, essentially for the

17    purposes of this report, he would have been, yes.

18    Q.    And it would have been brought to your attention

19    and you would have been on notice to the comments in the

13:42:01  20    Google reviews, which include that, "Everybody in town

21    who is hooked on pain and anxiety medicines are his

22    patients."

23         That would have been something you would

24    have been notified to, whether it's true or not, right?

13:42:15  25    A.    Yes.

1    Q.   The escalation details column at the bottom,

2    "Ethics line escalation, flagging for Hydrocodone volume,

3    share, average red flags, cocktail and sub drug group

4    share; concerned with the nature of the escalation as

13:42:46  5    well.  Recommend outreach."

6              Do you see that?

7    A.   Yes, I do.

8    Q.   Doesn't say, "Recommend quit filling this fellow's

9    prescriptions," does it?

13:42:57  10    A.   The way our program works, sir, is once a

11    prescriber is identified that we're going to investigate,

12    we gather as much information as we can, realizing that

13    we don't have all the tools that law enforcement has.

14              I mean, I certainly wish I could subpoena

13:43:16  15    their records, inspect their facilities, you know, put

16    in -- put in patients undercover, but they are doing

17    things I used to be able to do when I worked in law

18    enforcement, and I simply can't do that in the public

19    sector.

13:43:33  20              So our process was once a prescriber was

21    identified to us, we would gather whatever information we

22    could from public sources, combined with our own internal

23    analysis, and then we would ask or we do ask the

24    prescriber to submit to an interview.

13:43:52  25              Now, if the prescriber refuses to have an

1    interview with us, we automatically suspend their ability

2    to have prescriptions filled, controlled substance

3    scripts filled at all CVSes.

4         In this process here, this note indicates

13:44:11  5    that they were -- the next step would have been to have

6    an outreach with the prescriber and conduct an interview.

7    Q.   But, sir, if you're -- I want to dissect your

8    answer and talk about several aspects of it.

9         First, if you're suspicious of someone, you

13:44:29 10    can choose to report them to law enforcement, can't you?

11   A.   Yes.

12   Q.   But your stores and your business have a policy, or

13   did at the time, of not reporting these doctors to the

14   authorities.

13:44:44 15        True?

16   A.   That's not true.

17   Q.   So if Ms. Harrington has testified to that, or will

18   in here, you would disagree with her.

19        Is that right?

13:44:54 20   A.   Whenever we have suspended a prescriber, there are

21   a number of state Attorney General's that issue a

22   friendly subpoena to CVS and we provide them with the

23   names of the doctors that we have suspended.

24        Not all states do that, but some do.

13:45:13 25        Additionally, we've offered to give that

1    information to the drug enforcement agency, and they've

2    refused to take it.

3    Q.    Sir, are you testifying right now that in 2015 and

4    2016, your company had an internal policy that required

13:45:41  5    reporting and contacting the DEA when you suspend a

6    prescriber?

7    A.    We have offered that information to the Drug

8    Enforcement Administration, and they've refused to take

9    it.

13:45:54  10          We can't have a policy to give it to them

11    if they won't take it, sir.

12    Q.    Okay.  How do you -- how can you say that

13    they -- they refused to take it?

14    A.    Sir, in 2017, for example, the --

13:46:11  15    Q.    Let's stay in 2015, '16, please.

16          MR. DELINSKY:  Object.

17          THE COURT:  I'm going to allow him to

18    finish his answer.

19          You asked the question.

13:46:22  20          MR. LANIER:  Go ahead.

21          THE COURT:  So he can answer it.

22    A.    Mr. Lanier, in 2017 I was personally involved in a

23    meeting at DEA headquarters down in the

24    Virginia/Washington, D.C. area, where we offered again to

13:46:39  25    provide the agency with the information of doctors that

1    we have suspended.

2              I also recollect that that offer had been

3    made previously, although I was not involved in those

4    meetings.

13:46:56  5              Since that meeting in 2017, they have yet

6    to take us up on that offer.

7    Q.    So if we go back to 2015, August 13th of 2015,

8    would it be correct to say that there were no internal

9    policies that would require you all to contact the DEA

13:47:20  10   when you suspend a prescriber, true?

11   A.    Well, that -- that would be true, because they're

12   not willing to take the information, sir.

13   Q.    I'm sorry.  Say that again.

14   A.    I said that would be true.  There's no policy

13:47:40  15   because the DEA is not willing to take the information.

16   Q.    So that would be an appropriate -- you're not here

17   testifying as the DEA, are you?

18   A.    No, sir.

19              I am not here testifying as the DEA.

13:47:51  20   Q.    But it's your testimony that the DEA will receive

21   phone calls about suspended doctors who are suspended for

22   fraud, phone calls, e-mails, whatever, and that they will

23   refuse to take that information?

24              That's your testimony?

13:48:08  25              MR. DELINSKY:  Objection.

1    A.    No, sir, that's not what I said.

2    Q.    Okay.  So I go back to my original question.

3          How do you know -- well, first of all,

4    before you even suspend them, when you're investigating

13:48:19 5    these doctors, do you tell the DEA or the law enforcement

6    people about that?

7    A.    No, sir, because not every investigation proves to

8    be, you know, proves that we have a concern and we think

9    that the person is illegally prescribing.

13:48:39 10         There are people that escalate through,

11   that once we review their activity, we're able to satisfy

12   that there's a very legitimate reason for what we're

13   seeing in the data.

14         So, no, it's not a fait accompli that if

13:49:01 15   they are identified on our algorithm they're

16   automatically criminal, no.

17   Q.    No, whether they were worthy of investigation is my

18   question.

19         You think you only report them if you all

13:49:10 20   have determined they're criminals?

21   A.    Sir, once again, we have offered the information

22   available from our program, which is a voluntary program

23   that we developed to help be part of this broader

24   solution of getting ahead of pill-mill doctors, ahead of

13:49:37 25   law enforcement wherever we can, but it is by no means a

1    perfect system.

2                    We don't have all the tools that law

3    enforcement has, but we do our best, and we have offered

4    to share that information with the Drug Enforcement

13:49:51  5    Administration and other state AGs.  Some states take us

6    up on that offer.  Others don't.

7                    And in the case of the Drug Enforcement

8    Administration, they have never taken us up on that

9    offer.

13:50:02 10    Q.    All right.  Who have you -- who do you personally

11    know you all have offered this to?  Give me a name within

12    the DEA that said no.

13    A.    The administrator of the diversion group at the

14    time was at that meeting.

13:50:21 15                    I want to say his name, I forget his name,

16    it escapes me, because I think he was only in his role

17    for a short time.

18                    But we met with the head of the diversion

19    group and many other members of the DEA at that meeting.

13:50:39 20    Q.    And then -- and you tried to report Dr. Veres,

21    that's what you're saying?

22    A.    No, sir.

23    Q.    Okay.

24    A.    As I testified, I don't have any independent memory

13:50:54 25    of Dr. Veres.

1                  I'm trying to explain to you what our

2          process has been and what our intent has been to share

3          this information.

4          Q.    All right.  Let's bring this closer to present.

13:51:05  5                  2018, three years and months back, all

6          right, if your business is still filling prescriptions

7          with Dr. Veres and still trying to interview him, finally

8          get to interview him, would that interview have come to

9          your attention?

13:51:32 10          A.    I would, through our usual protocol, if the -- if

11         at that point in time, 2018, the team had made a

12         determination, a recommendation to suspend him, I would

13         have been made aware of that.

14                  That would have come to our review meeting.

13:51:51 15          Q.    But would the interview itself -- if you'll pull

16         out, please, Plaintiffs' Exhibit 23330, Ms. Fleming and

17         Ms. Lanier, please.  23330.

18                  I'd like to know if you're familiar with

19         this form, sir.

13:52:30 20                  Do you have it in front of you?

21         A.    Yes, I do.

22         Q.    Are you familiar with this form, these interview

23         notes?

24         A.    I'm familiar with the format.

13:52:37 25                  I don't have any recall of this particular

1    document, though.

2    Q.    Okay.  I'd ask, Your Honor, if I could see if

3    reading some of it refreshes his recollection?

4              THE COURT:  All right.  You can -- you can

13:52:52  5    read the document, sir, and don't show it until -- until

6    it refreshes his recollection.

7              So you can read it, and see if he remembers

8    anything about it.

9    BY MR. LANIER:

13:53:04 10    Q.    What I'd ask you to read to see if it might stand

11    out in your memory is on Page 2, specifically line item 3

12    and line item 9.

13              (Pause.)

14    A.    I've read them.

13:53:40 15    Q.    And does that ring a bell at all with you, sir?

16    A.    Not to this particular case, no, sir.

17    Q.    You -- so there's nothing about those lines that

18    stands out in such a way that it vaguely crosses your

19    recollection?

13:54:00 20    A.    Again, sir, as I've told you already, I have no

21    independent recollection of this particular prescriber.

22              It was a number of years ago.

23    Q.    Well, I understand you may not remember his name.

24              I was hoping, perhaps those facts would be

13:54:16 25    something where you remembered, oh, yeah, there was the

1    Ohio doctor who said what you've just read.

2                You have no memory of that, even not

3    associated with his name?

4    A.    No, sir.

13:54:28 5                I've read thousands of cases over the

6    years.  That doesn't ring a bell.

7    Q.    Okay.  If your company, though, if the people under

8    you have notification that doctors believe their own

9    pills are being diverted, is that something that should

13:54:47 10   be brought to your attention?

11   A.    That would be part of the interview process.

12                We are attempting to understand what the

13   physicians' practices are and the way they provide care

14   to their patients.

13:55:05 15   Q.    That wasn't my question, sir.

16   A.    But I'm doing my best to answer your question, sir.

17   Q.    My question was should that have been brought to

18   your attention?

19   A.    That would have been part of the interview and

13:55:15 20   contained in the report.

21   Q.    So would that have been brought to your attention?

22   A.    If it was in the report, we would have talked about

23   it at that point in time.

24   Q.    Well, is this part of the report that we're reading

13:55:26 25   here, the interview notes, 23330?

```
          1    A.    Yes, it is.

          2    Q.    So this would have been brought to your attention

          3    in the normal course of business.

          4              Fair?

13:55:35  5    A.    That's fair, yes.

          6              MR. DELINSKY:  Objection, Your Honor.

          7              I think there's some left-hand, right-hand

          8    going on here.

          9              Mr. Davis testifies that the report goes

13:55:44 10    into the decision to suspend.

         11              THE COURT:  I haven't seen the document.

         12              He said this document would have been

         13    brought to his attention.

         14              That's what I heard.

13:55:53 15              MR. LANIER:  Then with that, Your Honor,

         16    may I display the document?

         17              THE COURT:  Yes.

         18              MR. LANIER:  Thank you.

         19              MR. DELINSKY:  Objection, Your Honor.

13:56:02 20              THE COURT:  Overruled.

         21    BY MR. LANIER:

         22    Q.    Question number three.  How do you respond, and

         23    these are interviews of Dr. Veres.

         24              THE COURT:  Mr. Davis, is this a document

13:56:10 25    that reflects the suspension of a doctor?
```

1          THE WITNESS:  It indicates that he was cut

2     back so no, at this time in our process, I would not have

3     seen it.

4          THE COURT:  All right.  Then you

13:56:24  5     can't -- take it down, Mr. Lanier.

6     BY MR. LANIER:

7     Q.    You're saying when the decision is made not to

8     suspend, you're not involved in that decision?

9     A.    At that point in time, our current process is for

13:56:40 10     an internal group to review, and I review any

11     recommendations for a suspension.

12     Q.    So you would review if you all decided to suspend

13     him, but if the decision was made not to suspend him and

14     to keep filling his prescriptions, it doesn't come across

13:56:58 15     your radar screen, even under these circumstances.

16          Is that right?

17     A.    Nickie Harrington who is the leader of that team

18     reviews those cases directly with her team, and --

19     Q.    So if Ms. Harrington comes, she would be the right

13:57:13 20     person to testify about this information instead of you.

21          Fair?

22     A.    Fair.

23     Q.    All right.  Thank you.

24          Now, I go back to where we started with

13:57:26 25     this by looking at what was said by different people in

1    opening, and the next issue that I wanted to discuss with

2    you is whether or not the problem is one that's beyond

3    the limits of the county.

4              Do you understand what I mean when I say

13:57:39  5    that?

6              MR. DELINSKY:  Object to form.

7              Vague, Your Honor.

8              THE COURT:  Overruled.

9    A.   If you could repeat that, or clarify it, it might

13:57:53 10   be helpful.

11             MR. LANIER:  Yes.

12   BY MR. LANIER:

13   Q.   So diversion doesn't recognize a county line.

14             Is that fair to say?

13:58:11 15   A.   Yes, I think that's fair to say.

16   Q.   In other words, if I want to divert a pill and I'm

17   going to go to a pharmacy and get a prescription wrongly,

18   I'm not bound by the laws of nature to stay within the

19   county where I'm going to be selling or dealing the drug.

13:58:35 20             Fair?

21   A.   That's fair.

22   Q.   And surely, you all recognize that within the

23   company, don't you?

24   A.   Yes.

13:58:43 25   Q.   And you recognize it's not even bound by state

1    boundaries.

2                     True?

3    A.    Yes.

4    Q.    Do you know a gentleman by the name of Bill

13:59:07 5    Winsley?

6    A.    That name rings a bell.

7    Q.    If you will pull out, please, for the witness and

8    opposing counsel and His Honor Plaintiffs' 19738.

9                     Do you have that document in front of you,

13:59:59 10    sir?

11    A.    Yes, sir, I do.

12    Q.    I'll represent to you that --

13                     MR. DELINSKY:  Wait, Mr. Lanier.

14                     We don't yet --

14:00:06 15                     MR. LANIER:  Oh.

16                     (Pause.)

17                     MR. LANIER:  Here you go, Rachel.  Hand him

18    this one.

19    BY MR. LANIER:

14:00:29 20    Q.    Sir, do you have that document in front of you?

21    A.    Yes, sir, I do.

22    Q.    I'll make -- you can see on the front that it's

23    from Kevin Nicholson with NACDS.

24                     You are familiar with NACDS, true?

14:00:44 25    A.    Yes, sir.

1    Q.    You all are members of NACDS, right?

2    A.    Yes, sir.  That's correct.

3    Q.    And you personally have been involved with NACDS,

4    haven't you?

14:00:54 5    A.    Yes, sir.

6    Q.    And he has, Mr. Nicholson, do you know him

7    personally?

8    A.    Yes, I do.

9    Q.    He sent this out in 2012, and he sent it to a lot

14:01:05 10    of folks with Walgreen's and Walmart, but also within

11    CVS.

12              True?

13    A.    I'll take your word for it, sir, yes.

14              There's a lot of things there.

14:01:24 15    Q.    Brian Files, do you know him?

16    A.    Yeah, he doesn't work with us anymore, but I

17    remember him, yeah.

18    Q.    Eric Cartier?

19    A.    Yes.

14:01:35 20    Q.    Eric Douglas?

21    A.    Not so familiar with that person, no.

22    Q.    Papatya Tankut?

23    A.    Yes.

24    Q.    P-A-P-A-T-Y-A, T-A-N-K-U-T?

14:01:48 25    A.    Yes.

1    Q.    For the the Court Reporter.

2          In fact she reports to you, doesn't she?

3    A.    Oh, no, sir.  She's never reported to me.

4    Q.    Okay.  So Mr. Winsley gave this presentation that

14:02:03  5    was sent around to all of these different places on pain

6    clinics or pill-mills, what's a pharmacist to do.

7          Would you have been aware of this, sir?

8    A.    No, sir.  I've never seen this document before.

9    Q.    All right.  Did anybody within your company ever

14:02:21 10    make you aware of the concerns of an Ohio drug ring

11    bringing drugs up from Florida?

12    A.    Not that I can recall.

13    Q.    Have you ever attended a DEA pharmacy diversion

14    awareness conference?

14:02:50 15    A.    Could you repeat that?

16          Is it DEA?

17    Q.    Yes, sir.

18    A.    DEA pharmacy --

19    Q.    Awareness conference.  Diversion awareness

14:03:04 20    conference, have you ever attended one?

21          I can't hear you, I'm sorry.

22    A.    I'm thinking.  I've been to a lot of conferences.

23          I -- I don't recall going to a conference

24    by that name, sir.

14:03:23 25    Q.    Okay.  If an e-mail was sent out to all of the

1    pharmacists in Ohio telling them to contact the

2    authorities in the event they have a suspicion of

3    diversion, would you have known about that?

4                    MR. DELINSKY:  Your Honor, if that's from

14:03:45  5    this document, I'd just like to object on the grounds,

6    this document's dated several months before.

7                    THE COURT:  I'll overrule it.

8                    He can ask -- he can ask a question whether

9    it's in the document or not, so overruled.

14:04:00 10    A.    Mr. Lanier, could you please repeat the question?

11    BY MR. LANIER:

12    Q.    Yes, sir.

13                    Are you familiar with any e-mails that were

14    sent out state-wide to all registered pharmacists in the

14:04:11 15    2009, '10 time frame, urging them to contact the

16    authorities if they had questions about fraud in

17    prescriptions of controlled substances?

18    A.    No, sir.

19                    In that time frame, I would not be in a

14:04:28 20    position to have any knowledge on that.  I was in a

21    different job.

22    Q.    Okay.  All right.  Fair.

23                    Are you familiar at all with the document

24    that has been referenced by your counsel and others, by

14:04:49 25    CVS's counsel and others, that is called the Ohio

```
         1    Prescription Drug Abuse Task Force Final Report and

         2    Recommendations?

         3                    MR. DELINSKY:  Judge, I'd just like to note

         4    I did not mention that document.

14:05:05 5                    THE COURT:  Well, it was mentioned in

         6    opening statement, so are you familiar with the document,

         7    sir?

         8                    THE WITNESS:  No, sir.

         9    BY MR. LANIER:

14:05:21 10   Q.    Okay.  If the suggestion has been made that this

         11   case is about stores in the county, would you agree with

         12   me that diversion is bigger than any single county?

         13   A.    Yes, sir.

         14   Q.    And if we wanted to check for diversion, we ought

14:05:43 15   to be checking more than simply the stores in a county.

         16                    Fair?

         17   A.    Yes.  We would -- we've got multiple programs to

         18   detect and prevent diversion, and we run them in all

         19   10,000 or so of our stores across the country, sir.

14:06:03 20   Q.    Okay.  Now, if the suggestion was made in opening

         21   that opioids are safe and effective, you as a pharmacist,

         22   as well as the CVS man in your job, would you take issue

         23   with that?

         24   A.    All medications approved by the Food & Drug

14:06:30 25   Administration must be proven safe and effective in order
```

 1    to be marketed.

 2    Q.    Well, let's -- let's take a moment on that phrase.

 3              "Safe and effective" when used in a

 4    particular way?

 5              Are you saying there are no risks with

 6    drugs that are approved by the FDA?

 7    A.    No, sir, of course not.  I would never say that.

 8    Q.    Okay.  So safe and effective doesn't mean

 9    risk-free, does it?

10    A.    No, sir.

11              All -- any, any prescription medication has

12    potential risks.

13    Q.    And opiates, Hydrocodone since 2014 and Oxycodone

14    are what are known as Schedule II drugs, aren't they?

15    A.    Yes, sir.

16    Q.    And that means they have limited medical use?

17              MR. DELINSKY:  Objection.

18    Q.    But they --

19              MR. DELINSKY:  That misstates the statute,

20    Your Honor.

21              THE COURT:  Overruled.

22    Q.    But they have a high potential for abuse and

23    addiction.

24              True?

25    A.    Yes, sir.  That's the criteria to be placed in

 1    Schedule II.

 2    Q.    And so to speak of Oxycodone or Hydrocodone as safe

 3    and effective, it would be important to recognize that

 4    it's of limited medical use and it has a high potential

 14:07:52  5    for abuse and addiction.

 6                    Right?

 7    A.    Yes.

 8    Q.    Okay.  Similarly, it's been suggested to the jury

 9    that the CVS system that you all have to stop problems

 14:08:13 10    with opiates and the dispensing thereof, that it works.

 11                    Do you agree with that?

 12    A.    Yes, sir.

 13    Q.    Well, in fact, instead of working, it's been a

 14    substantial problem for your company, hasn't it?

 14:08:35 15    A.    Not to my knowledge, sir.

 16                    THE COURT:  Well, Mr. Lanier, he didn't say

 17    that, so --

 18                    MR. LANIER:  I'm going to try and make a

 19    list of CVS problems, Your Honor, and see if he'll agree

 14:08:50 20    with them or not.

 21                    That's --

 22                    THE COURT:  Well, he hasn't said there's

 23    any problems yet.

 24                    You've got to --

 14:08:56 25                    MR. LANIER:  All right.  Sir --

1           MR. BUSH:  And, Your Honor, there may be an

2    issue here with truth versus notice.

3           THE COURT:  All right.  I just -- I

4    didn't -- Mr. Lanier can't write CVS problems until the

14:09:07 5   witness says it.

6           So let's move on with a question, please.

7    BY MR. LANIER:

8    Q.   Sir, my question to you is do you believe there

9    have been problems with CVS's handling of opiates?

14:09:19 10  A.   No, sir.

11          We -- we are a company that is focused on

12   patient care and continuous quality improvement, and we

13   are certainly never going to be a hundred percent

14   perfect, but we certainly are dedicated towards

14:09:42 15  protecting the safety of our patients.

16   Q.   Okay.  So is it fair for me to write -- my

17   question, are there CVS problems, "No, sir," and you did

18   give an extended explanation.

19          Right?

14:09:56 20         MR. DELINSKY:  Objection, Your Honor.

21          THE COURT:  Overruled.

22   Q.   Are you tracking with me?

23   A.   Yes.

24   Q.   So here's what I'd like to do, I'd like to throw

14:10:08 25  out some things and have you comment on whether or not

1    you have -- if you see it as a problem.

2                    Okay?

3                    First of all, I referenced to the jury in

4    opening Plaintiffs' 8954, which is a settlement agreement

14:10:27 5    that was entered into between CVS and the Drug

6    Enforcement Administration.

7                    Are you familiar with this settlement

8    agreement?

9                    MR. DELINSKY:  Your Honor, the same 408 and

14:10:43 10    403 objections.

11                    THE COURT:  Overruled.

12                    What's the date of this one?

13                    MR. LANIER:  2015, Your Honor.  It's

14    Florida.

14:10:48 15                    THE COURT:  Overruled.

16    BY MR. LANIER:

17    Q.    Are you familiar with this, sir?

18    A.    I don't believe I've ever seen this form before,

19    this particular document.

14:10:58 20    Q.    Sir, this is in the wheelhouse of what you do,

21    though?

22                    You even have people negotiating these

23    agreements, don't you?

24    A.    Our attorneys and our legal department handle

14:11:15 25    settlements, sir.

                    1    Q.    Well, Nickie Harrington, you have complimented

                    2    before for negotiating down a settlement value.

                    3                    Haven't you?

                    4                    MR. DELINSKY:  Objection, Your Honor.

14:11:25    5                    THE COURT:  Overruled.

                    6    A.    Not that I can recall.

                    7    BY MR. LANIER:

                    8    Q.    Okay.  If -- all right.  In this settlement

                    9    agreement, are you familiar with your company

14:11:41 10    acknowledging that it has a corresponding responsibility

                   11    to dispense only those prescriptions that have been

                   12    issued for a legitimate medical purpose by an individual

                   13    practitioner acting in the usual course of professional

                   14    practice and that knowingly filling a prescription not in

14:12:00 15    the usual course of professional treatment or in

                   16    legitimate and authorized research subjects CVS to

                   17    penalties?

                   18                    Are you familiar with that?

                   19    A.    I'm just reading it, I mean it makes sense, right.

14:12:23 20    It says we're complying with the law.

                   21    Q.    Did your company also acknowledge that certain CVS

                   22    Pharmacy retail stores did dispense controlled substances

                   23    in a manner not fully consistent with their compliance

                   24    obligations under the CSA and its implementing

14:12:40 25    regulations?

```
 1              Did you know about that?

 2    A.    Yes, sir.

 3    Q.    So you knew that your company had been dispensing

 4    controlled substances in a manner not fully consistent,

 5    and in your mind that's not a problem.

 6              Is that what I'm to understand?

 7                   MR. DELINSKY:  Objection, Your Honor.

 8                   THE COURT:  It --

 9                   MR. DELINSKY:  It states the agreement

10    incorrectly.

11                   THE COURT:  It was a compound question.

12                   MR. LANIER:  All right.  I'll rephrase.

13                   THE COURT:  Break it down, please, just one

14    at a time.

15    BY MR. LANIER:

16    Q.    Sir, do you consider it a problem to dispense

17    certain controlled substances in a manner not fully

18    consistent with compliance obligations under the

19    Controlled Substances Act and its implementing

20    regulations?

21    A.    Yes, that would be a problem.

22    Q.    So is it fair to say that the CVS, at least in 2015

23    in Florida, admitted to a problem?

24    A.    In the case of two individual stores, yes.  They

25    admitted to a problem.
```

1              When I answered your question earlier, sir,

2       I was thinking about the full context of our entire

3       operation in the 10,000-plus stores that we operate

4       across the country.

14:14:09  5              And I do not believe that there are any

6       systemic problems.

7       Q.    All right.

8       A.    That was my testimony.

9       Q.    I will show you Plaintiffs' Exhibit 8955.

14:14:24  10             And this is another settlement agreement

11      dealing with Maryland in 2016.

12              Are you familiar with the agreement

13      settling the Maryland dispute in 2015?

14              MR. DELINSKY:  Your Honor, same 408, 403

14:14:43  15      objection.

16              THE COURT:  Overruled.

17              Mr. Lanier, you gave two dates.

18              First you said 2015 and then you said 2016.

19              MR. LANIER:  Apologize, Your Honor.

14:14:52  20             This is 2016.

21              THE COURT:  All right.

22              MR. DELINSKY:  And, Your Honor, that's the

23      date of the agreement; not the allegations.

24              The allegations are many years before.

14:15:02  25             THE COURT:  The agreement is dated February

 1    of 2016 so --

 2    BY MR. LANIER:

 3    Q.    And that's my question, sir.

 4              Are you familiar with the agreement entered

14:15:13  5    into in February of 2016 concerning Maryland?

 6    A.    I'm aware that there -- sir, that there is a

 7    settlement agreement.

 8              I have never read the agreement that's put

 9    before me so I don't profess to know all the details in

14:15:31  10    it.

11    Q.    And I won't ask you all of the details, but I'll

12    ask you are you familiar with this detail.

13              CVS Pharmacy retail stores, plural, in

14    Maryland, did dispense certain controlled substances in a

14:15:43  15    manner not fully consistent with their compliance

16    obligations under the CSA and its implementing

17    regulations by not conducting corresponding

18    responsibility when dispensing certain controlled

19    substances in some instances between 2008 and 2012?

14:16:04  20              Are you familiar with that agreement?

21    A.    I am familiar with the issue that's identified,

22    yes, sir.

23    Q.    And when you look at this, and I ask you has CVS

24    had problems, would you agree with me that you need to

14:16:29  25    add the Maryland stores?

```
          1    A.    If we're looking at individual stores, yes, you

          2    would add the Maryland stores.

          3    Q.    Yeah, we're looking at CVS Pharmacy retail stores

          4    in Maryland between 2008 and 2012.

14:16:47  5                    Would you agree with me there were problems

          6    there?

          7    A.    As indicated in the settlement agreement, there

          8    were issues.

          9    Q.    So is that a yes, you would agree with me that

14:17:02 10    there were problems there?

         11    A.    Yes.

         12    Q.    And those are the two that I spoke with the jury

         13    about in opening, but they're not the only two, are they?

         14    A.    They're not the only two what, sir?

14:17:23 15    Q.    Agreements that you have had with the Government

         16    over CVS's behavior.

         17                    True?

         18    A.    The -- there are other settlement agreements that

         19    the company has entered into.

14:17:37 20    Q.    So Plaintiffs' 10214, Your Honor, this is 2014 out

         21    of Texas.

         22                    You know about the Texas settlement issues,

         23    don't you?

         24    A.    I am familiar, yes.

14:18:03 25    Q.    And this is one where the company doesn't
```

1    necessarily agree with the findings, but agreed to settle

2    it anyway.

3              Right?

4    A.    I am not conversant, sir, with the terms of this

14:18:19  5    stipulated agreement that you've handed to me.

6    Q.    All right.  Without knowing all of the terms of it,

7    if you will look at Paragraph 7, the United States

8    contends it has certain civil claims against --

9              THE COURT:  You've asked him to look at it.

14:18:37 10              MR. LANIER:  Oh.

11              THE COURT:  So --

12    BY MR. LANIER:

13    Q.    Do you have Paragraph 7 in front of you?

14    A.    I'm reading it right now.

14:18:46 15              (Pause.)

16    A.    I've read it, sir.

17    Q.    Are you familiar with the claims made against your

18    company -- by the way, these agreements, these issues are

19    exactly what you're over within CVS, aren't they?

14:19:18 20    A.    These are all, in this particular settlement

21    agreement, this is dealing with license verification.

22              We have a different department that handles

23    that technology.  That doesn't fall within my group.

24    Q.    No, but your group is responsible for making sure

14:19:45 25    that only valid prescriptions are filled, right?

1    A.    Well, my group is responsible for supporting the

2    professional practice of pharmacy, and that would be part

3    of that, yes.

4    Q.    Right.  So the idea that eight separate CVS

14:19:58 5    Pharmacies filled 153 prescriptions for controlled

6    substances from a doctor whose registration was expired,

7    that's something that you should know about, isn't it?

8                   MR. DELINSKY:  Your Honor, objection.

9                   THE COURT:  Overruled.

14:20:14 10                   MR. BUSH:  These are --

11    A.    Mr. Lanier, what I can tell you is that when the

12    Government raises an issue like this, we take it very

13    seriously.

14                   THE COURT:  Hold on.

14:20:25 15                   Sir, you were simply asked is this

16    something you would have been apprised of or known of?

17                   THE WITNESS:  And that's what I'm about to

18    say, yes.

19    A.    It's brought to my attention and the attention of

14:20:39 20    my team well before any settlement it brought into place,

21    so, yes, we are made aware of that.

22                   And then we take swift action to remediate

23    any issues or make any enhancements that we need to.

24    BY MR. LANIER:

14:20:52 25    Q.    Would you agree with me, then, that if eight stores

1    were, indeed, filling prescriptions, 153, during a time

2    where the doctor's registration was expired, that would

3    be a problem, wouldn't it?

4    A.    That would be a problem, sir.

14:21:08  5              And in that time period, of the alleged

6    conduct, I actually wasn't in my role, but by the time I

7    did come into my role I know that the company had already

8    begun to make enhancements to the system that we use to

9    ensure that we can do a real-time license check on

14:21:30 10   prescribers.

11   Q.    Okay.

12   A.    Which would have remediated this issue.

13   Q.    And tell me if I've been fair to your testimony

14   where I've written this note because you may not be aware

14:21:40 15   of it, but your company did not agree with all of these

16   findings and so I put, "If the doctor's registration was

17   expired," then the Texas 2012 would be a problem.

18              Fair?

19   A.    If we had agreed, yes.  I mean if --

14:22:02 20   Q.    In other words, if the Government was right in what

21   y'all ultimately settled, then that would have been a

22   problem.

23              Fair?

24   A.    Well, I, as I understand it, we didn't admit or

14:22:14 25   deny the allegation, but nonetheless, we have always

```
 1    taken the view that if we have an opportunity to learn

 2    from feedback that we get from our customers or

 3    regulators or our own employees, we take that to heart

 4    and we look to improve our system, sir.

 5    Q.    Okay.  And you're also familiar with the settlement

 6    agreement that your company entered into in Rhode Island

 7    in 2015.

 8                    True?

 9                    MR. LANIER:  Your Honor, or Ms. Fleming,

10    it's Plaintiffs' 10212 and, Rachel, 10212.  Thank you.

11    BY MR. LANIER:

12    Q.    Do you have that agreement in front of you, sir?

13    A.    Yes, I do.

14    Q.    And I assume you are familiar with this agreement

15    which was entered into in 2015 in your home state of

16    Rhode Island?

17    A.    Can I have a moment to review the document?

18    Q.    Yes, sir.  If it helps you time-wise, the

19    allegations are indented on Page 3.

20                    (Pause.)

21                    MR. DELINSKY:  Your Honor, same 408, 403

22    objections.

23                    THE COURT:  It's noted.

24                    Thank you, Mr. Delinsky.

25    BY MR. LANIER:
```

1    Q.    Do you have that in front of you, sir?

2    A.    I'm reading it, yes.

3    Q.    Have you had a chance to look and to see those

4    three contentions by the U.S.?

14:24:19  5    A.    I'm reading the third one, sir.

6    Q.    I apologize for interrupting you.

7    A.    Yes, sir.

8    Q.    Sir, my question to you is this:  Are you familiar

9    with this settlement agreement that was entered into by

14:24:49 10    your company, whether you've read the actual document or

11    not?

12    A.    Yes, sir.

13    Q.    And so if we look at the three allegations that are

14    given on Page 3, the DEA investigation was one that

14:25:06 15    centered on filling prescriptions with invalid prescriber

16    DEA numbers.

17               Let's just pause there.

18               Is that a bad thing to do?

19    A.    Well, that certainly would be against the

14:25:24 20    regulation.

21    Q.    Excellent.  It's unlawful, fair to say, by your

22    understanding of the law.

23               Right?

24    A.    Correct.

14:25:33 25    Q.    Or under circumstances where the pharmacist filling

1    the prescription knew or had reason to know that the

2    prescription in question was invalid or unauthorized,

3    that would also be unlawful.

4              True?

14:25:51  5    A.    It's my understanding, yes.

6    Q.    Okay.  And this is -- these are allegations that

7    were settled by your company in Rhode Island in 2015.

8              True?

9    A.    Yeah, the -- the document seems to be signed in

14:26:27 10    August of 2015.

11    Q.    All right.  And if we wanted to keep going, we

12    could talk about Massachusetts, couldn't we?

13              You're familiar with the settlement

14    agreement out of Massachusetts, true?

14:26:43 15    A.    There is a settlement agreement in Massachusetts,

16    yes.

17              MR. LANIER:  And it is Plaintiffs' 10213,

18    please, Ms. Fleming, Ms. Lanier.

19    BY MR. LANIER:

14:27:19 20    Q.    Do you have Plaintiffs' Exhibit 10213, a settlement

21    agreement dealing with Massachusetts in front of you?

22    A.    Yes, I do, sir.

23              MR. DELINSKY:  Your Honor, same 408, 402

24    and 403 objections.

14:27:32 25              THE COURT:  That's noted.

1              Thank you.

2    Q.    Sir, you are familiar with these terms, aren't you,

3    or allegations?

4    A.    Yes, sir.

14:27:47  5    Q.    And we can see them on Paragraph E of the front

6    page.

7              "The United States contends that it has

8    certain civil claims against CVS arising from CVS having

9    filled the 523 forged opioid prescriptions listed in

14:28:10 10    Attachment A hereto."

11              Do you see that, sir?

12    A.    Yes, sir.

13    Q.    Now, that's unlawful if, indeed, that happened.

14              True?

14:28:20 15    A.    Well, the act of attempting to get a controlled

16    substance by subterfuge or deceit is certainly unlawful

17    on the part of the person passing the forged

18    prescription.

19              Our pharmacists do their very best to

14:28:41 20    identify criminal activity.

21    Q.    With due respect, sir, you don't know that to be

22    true, do you?

23              You don't have personal knowledge of all

24    10,000 stores, their pharmacists and what efforts they

14:28:53 25    give or don't give.

```
 1              Right?
 2    A.    Well, with all due respect, Mr. Lanier, I don't
 3    know it to not be true, also.
 4    Q.    But you're swearing to something based upon your
 5    personal knowledge, and when you take an oath and swear
 6    that everyone tries their best, I'm just probing you on
 7    that.
 8              You don't know that to be true, do you?
 9    A.    I believe that to be true.
10    Q.    Okay.  Please answer my question.
11              You don't know that to be true, do you?
12              THE COURT:  He did.  All right?
13              So let's move on, please.
14    BY MR. LANIER:
15    Q.    Do you think that the pharmacists in Florida were
16    doing their very best when they were unlawfully
17    distributing and dispensing prescriptions?
18              MR. DELINSKY:  Objection, Your Honor.
19              THE COURT:  Overruled.
20    A.    Mr. Lanier, I don't have any firsthand knowledge of
21    the pharmacists' activities.
22              Obviously, you know, there's a settlement
23    in place acknowledging that, you know, there were
24    problems in that store, and I -- I think, I just feel
25    terrible over that.
```

1          I mean, it's -- the system, you know, to

2    the best of our ability pharmacists are doing, you know,

3    the best job they can.

4          I can't speak to those pharmacists'

14:30:24 5    activities particularly, but clearly there was a problem

6    in those two stores.

7    Q.    But before we leave the 523 forged opioid

8    prescriptions listed in Attachment A, it would be useful

9    for me later if you'll look at Attachment A.

14:30:40 10          I want to ask you a question now.

11          MR. LANIER:  Your Honor, it's a little out

12    of context for when I'll use it later but if I could ask

13    it now, it would save time in the long run.

14    BY MR. LANIER:

14:30:51 15    Q.    Do you see those prescriptions, sir?

16    A.    I'm looking --

17          THE COURT:  Which document?

18          MR. LANIER:  Your Honor, to Plaintiffs'

19    10213.

14:31:02 20          THE COURT:  That's what I thought.

21          MR. LANIER:  The Massachusetts settlement

22    we're discussing right now.

23    A.    Yes, sir, I'm looking at Attachment A.

24    BY MR. LANIER:

14:31:11 25    Q.    And if you see Attachment A, the listing or

1    schedule of the forged prescriptions, these forged

2    prescriptions are not for 80 milligram doses, at least

3    the ones that are initially here that I'm highlighting,

4    they are all for that 15 milligram dose, the smaller

14:31:35  5    pills that are more easily taken.

6                      Aren't they?

7    A.    These, yes, the list I'm looking at here are 15

8    milligram tablets that you've highlighted.

9    Q.    And you know that to be the ones that are more

14:31:48 10    likely diverted, the 15 and the 30 milligram tablets; not

11    the 80s, true?

12    A.    I don't know.  That's not my impression, but --

13    Q.    Okay.  All right.  At least if the allegations are

14    true that your pharmacists were filling hundreds of

14:32:14 15    forged prescriptions, would you agree with me that that

16    would be a problem?

17    A.    If those allegations were true, all I can say is

18    that, again, our pharmacists are on the front line of

19    health care and they are doing their, in my opinion, I

14:32:37 20    believe, the very best they can to identify criminal

21    activity that is being brought into their local store by

22    people attempting to get medications with forged

23    prescriptions.

24    Q.    All right.

14:32:50 25    A.    And I think they're going to catch everyone they

Davis - Cross/Lanier

354

1       can, and is it going to be perfect, sir?  No.

2                   They're not -- I wish I could wave a magic

3       wand and have every pharmacist have the insight to know

4       when a criminal is walking into our stores but we just,

14:33:09 5       we don't have that ability, sir.

6       Q.    But you do have an ability to give your pharmacists

7       tools, don't you?

8       A.    Yes, sir, we do.

9       Q.    And you've had the ability to give your pharmacists

14:33:23 10      tools for as long as you've been at CVS in this role,

11      haven't you?

12      A.    We have continued to evolve our system, sir.

13      Q.    That wasn't my question, sir.

14                  Can you please answer me?

14:33:37 15      A.    Yes, we have the ability to give our pharmacists

16      tools.

17      Q.    And those rules -- those tools that you have an

18      ability to give have shifted over time; you've given more

19      tools to them.

14:33:53 20                  Fair?

21      A.    That's fair.

22                  We, as I indicated earlier, we have a

23      culture of continuous quality improvement and we continue

24      to evolve all of the tools and programs and systems that

14:34:07 25      we have.

1    Q.    I'm going to move on from these settlement

2    agreements right now, but just for purposes of my

3    questions at this point in time, is it safe for the jury

4    to assume that you hope the stores are doing a great job,

14:34:30  5    but sometimes they fail?

6                    Is that accurate?

7    A.    I would say that we do our utmost to support our

8    pharmacy teams and our front store teams to do the best

9    job possible in a compliant manner and highest degree of

14:34:52 10    customer service and safety.

11                   Will it always be perfect, sir?  No.  I

12    mean no, no system is perfect.

13    Q.    But if we go back, when you're testifying to this

14    knowledge, if we go back to Dr. Veres where I started

14:35:07 15    this conversation with you, and you don't even have any

16    recollection of any of the investigation that was done on

17    that.

18                   Do you?

19    A.    Well, sir, that was a number of years ago.

14:35:18 20                   I've seen thousands of cases, and I have

21    many, many responsibilities.

22                   I simply -- I can't remember everything,

23    sir, so I apologize if that disappoints you, but I'm only

24    human.

14:35:39 25    Q.    It's not a question of disappointing, sir, it's

1    just a matter of answering the questions.

2              So my question is simple.  When you say,

3    "We do a great job," you don't even know in detail the

4    work that was done in this county that's in the case with

14:35:53 5   Dr. Veres, do you?

6    A.    Sir, I don't think I've said that we've done a

7    great job.

8    Q.    Okay.  Thank you.

9              MR. LANIER:  Your Honor, at what time do

14:36:14 10  you take your afternoon break as I learn you?

11             THE COURT:  Well, I usually go until around

12   3:00, but, you know, so right around 3:00 o'clock when

13   there's a -- if you're still with this witness, if

14   there's a convenient place to stop, that would be good.

14:36:29 15            MR. LANIER:  Okay.  Then I'll keep, keep

16   going.

17   BY MR. LANIER:

18   Q.    Sir, as we were turning through the openings and I

19   was asking you about these questions, I wanted to ask you

14:36:41 20  about this next concept.

21             The issue of a store doing 18 times

22   noncontrolled drug sales, pharmaceutical sales, versus

23   controlled pharmaceutical sales.

24             Does that -- does that subject ring a bell

14:37:02 25  with you?  It might help if I show you the demonstrative

1    that Mr. Delinsky used in opening.  "Prescriptions filled

2    by CVS Pharmacies in Lake and Trumbull Counties 2006 to

3    2019."

4              Eighteen times more noncontrolled

14:37:26  5    medications than the opioid medications at issue.

6              Do you see that?

7    A.    Yes, sir, I see that.

8    Q.    Are you familiar with those types of metrics, and

9    that, that information?

14:37:39 10    A.    As a general concept, particularly in our store

11    monitoring program, we would look at the ratio of

12    opioid -- or not opioid but controlled substances to

13    noncontrolled substances.

14    Q.    Okay.  And within the framework of looking at that,

14:38:09 15    are these pretty standard numbers across all of your

16    stores, do you know?

17              Or if you don't know, just say you don't

18    know, but --

19    A.    I'm not certain what the average ratio would look

14:38:24 20    like today.

21    Q.    You are familiar with the concept of metrics within

22    the store, aren't you?

23    A.    Yes, sir.

24    Q.    And metrics include different measurements that

14:38:38 25    your company makes of how employees are performing as

1    well as perhaps inventory on other things.

2              Fair?

3    A.    That's fair.

4              Metrics are a way of measuring things.

14:38:52  5    Q.    So do your pharmacists have measurements taken or

6    made or maintained of how quickly they fill a

7    prescription?

8    A.    In our current operation today, there's a metric

9    called, "Ready when promised," which essentially shows

14:39:24 10    how often the prescription is ready when the patient

11    expects it to be ready.

12    Q.    But before today, if we go back, say, 2012, '13,

13    '14, '15, it was a different metric or policy within CVS,

14    wasn't it?

14:39:45 15    A.    That, I believe it would be, although I'm not

16    exactly conversant with what it would have been.

17              "Ready when promised," which is our

18    current, that strikes me it's probably within the last

19    four, five years or so.

14:40:05 20    Q.    Yeah.  Since this became an issue brought to at

21    least your attention in your performance review in 2016.

22              Right?

23    A.    No, sir.

24              I have no -- I'm not certain what you're

14:40:21 25    saying.

Davis - Cross/Lanier

359

Q.    This would have been after the "Chicago Tribune"
article where you were quoted?

A.    What would have been after that, sir?

Q.    Where the company moved to the "Ready when
promised" metric?

A.    I'm not certain of the timeline, if it was before
or after.

It's not -- it's not a program or metric
that my team administers.

Q.    Did pharmacists used to get assessed on how long
the wait time was for someone when they presented a
prescription?

A.    I'm not a hundred percent certain if they were or
were not, sir.

Q.    You don't know?

A.    Not with any certainty, sir.

Those operational metrics are led by our
pharmacy operations team, so I'm not --

Q.    But wouldn't they have relevance --

A.    The person --

Q.    Wouldn't they have relevance in your area?

A.    No, sir.

Q.    I mean, if a pharmacist has to get a prescription
out or is graded on getting a prescription out in 15
minutes, let's just say --

1    A.    Um-hmm.

2    Q.    -- and the pharmacist has to do 18 times more of

3    noncontrolled medications than they're doing of the

4    opiates, and that does not leave them time enough for the

14:41:58  5    opiate to really handle the prescriptions right, wouldn't

6    that be important to you?

7    A.    Sir, as a large organization, we're all focused on

8    compliance and safety, and we have different teams that

9    have expertise in different areas of our business.

14:42:20 10              We tend to be segmented that way, so the

11    folks that lead metrics and store management are a

12    separate team from mine, but at the end of the day, we're

13    all -- it's in our culture to be focused on patient

14    safety, compliance, and customer service.

14:42:42 15    Q.    But if it's important and it's in your

16    consciousness to be concerned, why do you not know

17    whether or not that time metric existed?

18    A.    Because, sir, we've got other -- other individuals,

19    other leaders that have deep expertise in that part of

14:43:00 20    our business, and I trust that they are well-suited to do

21    their jobs.

22    Q.    So if you believe that your pharmacists don't have

23    time to do their job right, even though that's your

24    responsibility, you don't interface with people on that;

14:43:22 25    you don't -- you don't have a say so, is that what I'm

         1    hearing?

         2    A.    Well, sir, we have a workforce management team that

         3    is part of our pharmacy operations team that focuses on

         4    all of the aspects of the amount of time it takes our

14:43:39 5    pharmacists and -- to fill a prescription safely and to

         6    fulfill their obligations.

         7                     So that team is focused on those issues.

         8    They wake up every day, they're expert in it, and they

         9    have that as their mission.

14:43:58 10   Q.    Well, I mean, but I -- that wasn't what I asked.

        11                     I asked do you have input into that safety

        12    aspect?

        13                     I'll take a step back.  Let me ask it this

        14    way.

14:44:11 15                    Do you agree it takes time for a pharmacist

        16    to properly sift through the red flags with an opiate

        17    prescription?

        18    A.    Yes.  I mean, it takes time for a pharmacist to

        19    fill a prescription, yes.

14:44:28 20   Q.    Well, not just fill a prescription.

        21                     I'm talking about an opiate prescription

        22    with red flags.

        23                     Right?

        24    A.    Right.  Yes.

14:44:35 25   Q.    That takes more time than it does to fill a Z-Pak

        1    for someone who needs an Z-Pak, doesn't it?

        2    A.   Yes, sir.

        3    Q.   It takes more time because you've got to resolve

        4    the red flags before you give the medicine.

14:44:51 5                   Right?

        6    A.   Yes, sir.

        7    Q.   And that's not something I made up, that's not

        8    something that's lawyers' talk, that's the simple fact.

        9                   If there are red flags on a controlled

14:45:02 10  substance, you need to resolve them before you let the

       11    drug go, right?

       12    A.   Yes, sir.

       13    Q.   And that's due diligence that has to be done by the

       14    pharmacist, correct?

14:45:13 15  A.   Yes, sir.

       16    Q.   And that takes time often, doesn't it?

       17    A.   Yes, sir.

       18    Q.   And so if the pharmacist is under an order to take

       19    all of those drugs that are making the company a lot of

14:45:25 20  money, and to get them out within 15 minutes, it might be

       21    very relevant to safety if that pharmacist doesn't have

       22    time to do the due diligence.

       23                   True?

       24    A.   Well, it's not our policy to have prescriptions

14:45:49 25  filled in 15 minutes.

1          And what I would say is that as part of our

2     workforce management team, we have highly skilled

3     industrial engineers that study the amount of time it

4     takes to fill a prescription.

14:46:03  5          And as part of that work, they're looking

6     at the amount of time it takes for, I think you said, a

7     Z-Pak versus the time it may take for a Schedule II drug,

8     such as Hydrocodone.

9          And they're building into that labor model

14:46:23 10     time to account for exercising corresponding

11     responsibility, and that includes the identification and

12     resolution of red flags.

13          Again, they are -- I can't do what they do.

14     They're very technical folks.  But I do trust that they

14:46:46 15     do a really good job in terms of comprehending the types

16     of scripts we fill.  And all of that information goes

17     into our schedules and the stores every week.

18          Again, they're very dedicated, very

19     talented people.  They have a very unique skill set.

14:47:13 20          MR. LANIER:  Your Honor, I object to the

21     nonresponsive answers.

22          THE COURT:  Well, he's answered.

23          Overruled.  You can ask another question.

24     BY MR. LANIER:

14:47:22 25     Q.   Sir, my question was pretty simple, I thought, and

1    that is isn't it true that it's important to safety that

2    your company, and I'm talking historically here, would

3    have given the pharmacists enough manpower and enough

4    time to do the proper due diligence for red flags?

5              That would be important to safety, wouldn't

6    it?

7    A.    Yes, sir, that would be important to safety, which

8    is why we have teams like our workforce management team

9    in place.

10   Q.    Well, that's not your team.

11             You don't do that work.

12   A.    Well, I'm talking ecumenically about our company.

13   Q.    Yeah, and I'm asking you about your work.

14             You don't know those documents for me to

15   ask you about them, do you?

16   A.    What documents, sir?

17   Q.    The documents on the time that the pharmacists have

18   and how they're measured and their end of the year

19   evaluations and when they were bonused and when they

20   weren't back in 2012 and '13 and '14.

21             Are you familiar with those documents?

22   A.    No, sir.

23   Q.    So is it safe, when you start saying that's why we

24   have this other team that does that, you don't know what

25   that other team was doing in those years, do you?

1    A.    I -- I've never had responsibility for that team.

2              I, to the best of my knowledge, they've

3    always existed and done the same work, but that's just my

4    understanding.

14:48:46  5    Q.    But when you're under oath and you're swearing that

6    this is true --

7    A.    Um-hmm.

8    Q.    -- you don't know if it's true or not because I

9    can't even ask you about the documents; you don't know

14:48:58 10   the documents, do you?

11   A.    Well, sir, I'm giving you my truthful answer as to

12   what I believe to be fact.

13   Q.    But there's a difference between what you believe

14   to be and what you know to be.

14:49:10 15             Do you understand the difference in those?

16   A.    Fair.

17   Q.    Okay.  And so as a pharmacist, you ought to know

18   that you have to do some things based upon knowledge and

19   not simply belief.

14:49:25 20             Right?

21   A.    True.

22   Q.    You may believe that every doctor, whoever writes a

23   prescription, is probably a good hearted soul and he or

24   she meant to write it and it's the right prescription.

14:49:39 25             You may believe that, but as a pharmacist

1    you have a duty to figure out if you're right, don't you?

2    A.    That's correct, sir.

3    Q.    So when you say "I believe the company would do

4    this" and "I believe the company does that," if you don't

14:49:53 5    know that to be true, maybe the jury ought to wait for

6    someone who can testify with knowledge.

7              Is that fair?

8    A.    I think it's -- sir, I'm giving you the most

9    truthful, God-honest testimony I can.

14:50:12 10             Some of the -- you're covering a wide range

11    of things.  You know, some of these things, you know, may

12    be my belief that that's how things have been done, and

13    if I shouldn't say "I believe" and I don't know,

14    certainly I can tell that other parts of this I do know,

14:50:31 15    but we're talking about a lot of different things.

16    Q.    Well, you're throwing in the "I believe" part.

17             I'm asking you about things that you know,

18    sir.

19             I'm not asking you to go there.  That's why

14:50:41 20    I'm saying you know for a fact that it is important for

21    safety that pharmacists have enough time to do their job

22    properly when they're dispensing controlled substances

23    like opiates, true?

24    A.    Yes.

14:50:56 25    Q.    Thank you.

1          And whether or not they have that time is

2    something you don't know, that's beyond your ambit of

3    knowledge.

4              Fair?

14:51:07  5    A.    True.

6    Q.    Have you seen, for example, the survey that was

7    done by the Ohio Boards of Pharmacy of how pharmacists

8    view their time here in Ohio and whether or not they have

9    enough time to do their jobs?

14:51:23 10              Are you familiar with that?

11   A.    I've not seen that, sir.

12              MR. DELINSKY:  Objection.

13              THE COURT:  Overruled.

14              He can answer if he's familiar with it.

14:51:31 15   A.    I've not seen that survey, sir.

16   BY MR. LANIER:

17   Q.    Would it be important to you from a perspective of

18   safety if, in fact, a study was done that indicated that

19   the chain pharmacies, the large chain pharmacies --

14:51:48 20              THE COURT:  Well, I'm going to sustain

21   that.

22              MR. LANIER:  All right.  That's fair.

23   BY MR. LANIER:

24   Q.    Okay.

14:52:02 25              MR. DELINSKY:  Mr. Lanier, would now be a

1    good time to break?

2                   MR. LANIER:  I don't make that call.

3                   That's the man in the black robe.

4                   Your Honor, I am moving to another subject

14:52:11  5    but it's all right --

6                   THE COURT:  All right.  If you're moving to

7    another subject, then it is a good time to take a break.

8                   MR. DELINSKY:  Thank you, Your Honor.

9                   Just wondering.

14:52:18 10                   THE COURT:  Oh, yeah.

11                   All right.  Ladies and gentlemen, we'll

12   take our mid-afternoon break.

13                   Usual admonitions and we'll pick up with

14   more testimony.

14:52:27 15                   Thank you.

16                   (Jury out.)

17                   (Recess taken.)

18                   MR. MAJORAS:  Your Honor, it's John

19   Majoras, I have one very minor to motion before the jury

15:12:56 20   comes out.

21                   THE COURT:  All right.

22                   MR. MAJORAS:  I think we have been

23   operating under this, but I would like to invoke the rule

24   about witnesses in the courtroom other than what we

15:13:04 25   discussed previously about company representatives.

1          THE COURT:  It's already been moved,

2     Mr. Majoras.

3          MR. MAJORAS:  I'm just putting it on the

4     record to be sure, Your Honor.

15:13:12   5          THE COURT:  All right.  That's what we're

6     doing.

7          MR. MAJORAS:  Thank you.

8          (Jury in.)

9          THE COURT:  Please be seated.

15:14:47  10          And you may continue.

11          MR. LANIER:  May it please the Court,

12     ladies and gentlemen.

13     BY MR. LANIER:

14     Q.   Okay.  Mr. Davis, all right, we're at the third

15:15:03  15     stop now.

16          We're going to talk about some basics and

17     see if you and I can agree on a few things.  All right?

18     A.   Yes, sir.

19     Q.   Now, as background to this, you came here from

15:15:18  20     Rhode Island to testify, right?

21     A.   Yes, sir.

22     Q.   And you knew that you would be the first witness in

23     the case.

24          True?

15:15:25  25     A.   True.

Davis - Cross/Lanier

370

Q.    And I would assume you knew the case was about diversion in two counties.

            True?

A.    True.

15:15:35  Q.    And at least the effects of the diversion in those counties, the diversion, as we already discussed, doesn't know county lines.

            Fair?

A.    Yes.

15:15:48  Q.    And you then knew at issue in this case would be those stores under your purview, right?

A.    Yes.

Q.    Did you, before you came here, bother to look into those stores to see whether or not they had had diversion 15:16:05 problems?

            MR. DELINSKY:  Objection, Your Honor.

            He --

            THE COURT:  Overruled.

A.    My -- I look at all of our programs at the 15:16:21 company-wide level, sir.

            THE COURT:  Well, Mr. Davis, you were asked a specific question.

            I think it could be yes or no.

            THE WITNESS:  What was the question again, 15:16:31 sir?

1    BY MR. LANIER:

2    Q.    Did you look at your individual stores in this case

3    to determine whether or not there had been any diversion?

4                    THE COURT:  You're saying individual

15:16:41  5    stores.  I thought you said in these two counties.

6                    MR. LANIER:  Yes, in these two counties,

7    I'm sorry, Your Honor.  Yes, that's exactly what I said.

8                    I've got it here.  Let me read it right

9    back, sir.

15:16:53  10    BY MR. LANIER:

11    Q.    Did you, before you came here, bother to look into

12    those stores in the counties to see whether or not they

13    had diversion problems?

14    A.    No, sir.

15:17:07  15    Q.    You certainly have the wherewithal to do it, don't

16    you?

17    A.    We have the wherewithal to look at our stores.

18                    I don't know that I have the wherewithal

19    to -- to get to the question around diversion, no.

15:17:31  20    Q.    Not we, sir.

21                    You have the ability to access the data in

22    these stores, don't you?

23    A.    No, not personally.

24                    I'd have somebody in my department do it.

15:17:44  25    Q.    Someone who reports to you, you could order "I need

1    this, that, and the other," and they would bring it to

2    you, wouldn't they?

3    A.    Yes.

4    Q.    Or e-mail it?

15:17:53  5    A.    Um-hmm.

6    Q.    And you did not do that in anticipation of

7    testifying, did you?

8    A.    No, sir.

9    Q.    So you had the ability, for example, to look to see

15:18:05 10    if there had been any doctors under investigation like

11    Dr. Veres or Dr. Torres, you had the ability to do that,

12    didn't you?

13    A.    I suppose I could have.

14    Q.    You don't have to suppose.

15:18:20 15            You know you could have, right?

16    A.    Yes.

17    Q.    I mean, you could have looked at the Dr. Veres

18    file, couldn't you?

19    A.    I didn't know that the Dr. Veres file existed, sir.

15:18:35 20    Q.    Well, we've already seen that you were informed

21    about it, but whether you remembered that or not, you had

22    the ability to say, "Give me files of any doctors that

23    have been under suspicion at these stores."

24            Didn't you?

15:18:49 25    A.    I could have, yes.

1    Q.    And you chose not to before you came out here to

2    testify.

3                  Fair?

4                  MR. DELINSKY:  Objection, Your Honor.

15:19:00  5    A.    I didn't choose not to.

6                  THE COURT:  Overruled.

7    A.    I didn't choose not do it.

8                  It just had not occurred to me.

9    BY MR. LANIER:

15:19:09  10    Q.    It did not occur to you when you're coming to

11    testify in a case about diversion in these two counties,

12    to look at the stores to see if there had been any

13    suspicious doctors?

14    A.    No.

15:19:33  15    Q.    Okay.  So let's look at the basics for a moment.

16                  I've tried to write a couple of true or

17    false questions here.  I want to just throw them out

18    there and see if you can answer them that way.

19                  There is an opioid epidemic in America and

15:19:50  20    in Ohio.

21                  Fair?

22    A.    Sir, I would say yes.  I've used that term in the

23    past and I know our company has used it in many

24    circumstances and, yes, I know that opioid abuse and

15:20:09  25    addiction is a devastating issue.

1    Q.    And you --

2    A.    It plagues our country.

3    Q.    And you know also even within these

4    counties -- wait, I'm assuming something.

15:20:25  5              Do you know whether or not opioid abuse and

6    the epidemic has affected the two counties in this case?

7    A.    I don't have any information specific to these two

8    counties, sir.

9    Q.    Okay.  All right.  Next basic.

15:20:44  10              Pharmacies are the last line of defense in

11    preventing illegitimate prescriptions from being

12    dispensed, true or false?

13    A.    True.  Pharmacies are the last line of defense in

14    the closed system of controlled substance controls.

15:21:06  15    Q.    And you've used some language that I used in

16    opening, but there is a closed system of registrants when

17    it comes to opiates.

18              Fair?

19    A.    Yes, sir.

15:21:17  20    Q.    Okay.  And then the third item on the basics,

21    during the time of your tenure at CVS, CVS was selling

22    prescription data to I.M.S.

23              True?

24    A.    I believe that's true.

15:21:45  25    Q.    And so much of the data that we were being told was

1    being accumulated by CVS, was actually being accumulated

2    to sell to I.M.S. in the past.

3                    True?

4    A.    I don't agree with your premise that the purpose

15:22:06  5    for holding our data was to sell to I.M.S., sir.

6    Q.    Well, that's not the only purpose.

7                    Y'all used it internally to figure out who

8    shops for what, didn't you?

9    A.    We use data to run our business, sir.

15:22:23  10    Q.    Which is to figure out who shops for what so that

11    you can target those people with marketing information.

12                    Fair?

13    A.    Well, I believe you're referring to our ExtraCare

14    program, which is a front store loyalty program.

15:22:53  15    Q.    All right.  And ExtraCare, that front store loyalty

16    program, was the one that accumulates the data about

17    whether I buy one kind of tissue or another one, right?

18    A.    I believe that's an accurate description of some of

19    the information that they look at in that program.

15:23:17  20    Q.    But within the pharmacy, y'all keep track of

21    who -- not only who's buying drugs with you, but which

22    doctors are writing those prescriptions.

23                    Don't you?

24    A.    Yes.

15:23:31  25    Q.    And over time, as your company has entered into

1    settlement agreements, your company has changed the data

2    that's available to the pharmacist, hasn't it?

3    A.    We have over time evolved our programs and our

4    systems and improved them, yes.

15:23:59  5    Q.    And so the pharmacists of today has much better

6    resources than the pharmacists of 10 years ago when it

7    comes to trying to determine and resolve red flags.

8                    True?

9    A.    In certain respects, that would be true.

15:24:27 10    Q.    And a red flag, so we're clear, a red flag does

11    mean stop, but it doesn't mean don't fill the

12    prescription; it means stop, inspect the flag, and

13    resolve it before you fill a prescription.

14                    Right?

15:24:46 15    A.    A red flag is an item that a pharmacist, when

16    they're exercising corresponding responsibility, will

17    consider.

18                    And to the extent that they see a red flag,

19    they will stop.  Their obligation is to do due diligence,

15:25:07 20    investigate, and then form a professional judgment as to

21    whether or not they should fill the prescription.

22    Q.    And that's part of resolving the red flags.

23                    Fair?

24    A.    Yes, sir.

15:25:19 25    Q.    And some red flags may be easily resolvable, and

1    some may be more difficult to resolve.

2                   True?

3    A.    I think that's true.

4    Q.    But you still try to resolve -- you still should

15:25:34  5    resolve every red flag.

6                   True?

7    A.    Yes.

8    Q.    So, for example, one red flag is distance, correct?

9    A.    That's a potential red flag.

15:25:50 10    Q.    And as a potential red flag, one of the issues that

11    we've looked at and our experts have looked at is a

12    distance of -- a number of different distances, but one

13    of them is 25 miles.

14                   You follow me?

15:26:07 15    A.    I understand what you're saying.

16    Q.    And if 25 miles is the distance between a reputable

17    world-famous medical clinic or hospital system and where

18    someone lives, if that exceeds 25 miles, that makes it an

19    easy red flag to resolve if the prescription came from

15:26:31 20    that medical clinic.

21                   Fair?

22    A.    Hypothetically in that circumstance, that -- I

23    presume that would be fair.

24    Q.    Yeah.  But you still would want to resolve the red

15:26:45 25    flag and see, for example, did the person go to the

1    Cleveland Clinic, which is over 25 miles away, to get

2    this medical treatment or prescription.

3                     That would be a way to resolve it.

4                     Fair?

15:26:58  5    A.    Right.  That would speak to the pharmacist's

6    knowledge of the patient, the prescriber, the therapy,

7    and the circumstance in which the prescription is

8    presented.  That's fair.

9    Q.    But by the same token, if someone's filling a

15:27:12 10   prescription from 150 miles away, with no real reference

11   point, that might have a whole different story in the red

12   flag.

13                     True?

14   A.    Yeah, contextually within a certain hypothetical,

15:27:31 15  yes.

16   Q.    Still doesn't mean that it's a diverted

17   prescription.

18                     It might still be valid, right?

19   A.    True.

15:27:37 20  Q.    Someone might be on vacation or visiting a

21   relative.

22                     Fair?

23   A.    That's fair, yes.

24   Q.    But you don't know until you resolve the red flag.

15:27:48 25                    True?

1    A.    Yes.

2    Q.    And your company should be resolving, pharmacists

3    historically should be resolving red flags, shouldn't

4    they?

15:28:00 5    A.    Our pharmacists are faced with exercising

6    corresponding responsibility when they fill scripts for

7    controlled substances and as part of that work, yes, they

8    need to identify any potential red flags and then resolve

9    them.

15:28:19 10              And then use the information to make a

11    professional judgment as to whether or not the

12    prescription should be filled.

13    Q.    But it's not just the pharmacists; the company, the

14    business, has a corresponding responsibility as well.

15:28:37 15              True?

16    A.    No, sir.

17    Q.    So you don't believe that the *Holiday* decision gave

18    that responsibility to the company as well?

19    A.    No, sir.

15:28:53 20    Q.    All right.  Have you read the *Holiday* decision?

21    A.    I've read the information that was published in the

22    Code of Federal Regulations.

23    Q.    Great.  We'll look at that together in a minute if

24    His Honor allows it, but right now, let me finish the

15:29:11 25    basics and we'll look at that under my last stop.  Okay?

Davis - Cross/Lanier

380

1          So one last basic.  This

2    ability -- no -- this responsibility to resolve red flags

3    before dispensing medicine goes back to the very

4    beginning of -- well, of the Controlled Substances Act,

15:29:40   5    doesn't it?

6    A.   Correct.  That responsibility, the corresponding

7    responsibility, is part of the Controlled Substances Act,

8    sir.  You're correct.

9    Q.   All right.  Now, I want to look at this area that

15:29:51  10    I've called CVS problems.

11          I know you've already said you don't see

12    any so that may not be the right word that you would use,

13    but I want the record to be clear that that's my word;

14    not yours.

15:30:03  15          Okay?

16    A.   Okay.

17    Q.   Let's start with that -- excuse me, Your Honor.

18    I'll turn around.

19          Let's start with that *Holiday* decision that

15:30:26  20    you said you had read.  And as we do so, I'd like to make

21    sure we're on the same page of what a dispenser's

22    obligations are.  Okay?

23          This is a slide I have made and shown to

24    the jury, but I want to know if you agree or disagree

15:30:44  25    with what I've said here.  Okay?

1          First, a dispenser must provide effective

2     controls and procedures to guard against diversion.

3          Do you agree or disagree?

4     A.    I believe a registrant holding a DEA registration

15:31:11  5     has to provide effective controls and procedures to guard

6     against diversion.

7     Q.    All right.  You've illustrated something that I

8     needed to add to the context of this that was in, and so

9     I want to make sure I've got it right.

15:31:23 10          We are talking here about registrants in

11    the closed system, so these are registrant pharmacies

12    talking about controlled substances.

13          Are you tracking with me so far?

14    A.    Yep.

15:31:41 15    Q.    All right.  Then do you agree or disagree as

16    registrants in the closed system, that dispensers must

17    provide effective controls and procedures to guard

18    against diversion?

19    A.    Yes.

15:32:01 20    Q.    Do you agree that dispensers, and these are

21    registrant dispensers, must exercise corresponding

22    responsibility?

23    A.    No.

24          The pharmacist must exercise corresponding

15:32:28 25    responsibility.

1    Q.    So you believe it's just the pharmacist; not the

2    pharmacy.

3                   Is that what you're saying?

4    A.    Correct.

15:32:36  5    Q.    And your basis for that is what?

6                   You're not testifying as a lawyer.  You're

7    not a lawyer, right?

8    A.    Right.

9    Q.    And you're certainly not testifying as a Judge.

15:32:50 10    That's a gimme, right?

11    A.    Right.

12    Q.    Not that he ever testifies.  He decrees.

13                   But you're not -- you're not in a position

14    to give us a legal explanation.  You're just saying

15:33:03 15    that's your practical understanding.

16                   Is that fair?

17    A.    Look, yes, I'm not an attorney.

18                   I'm giving you my understanding, and I

19    think your question was what's the basis.  It would be

15:33:20 20    the -- for corresponding responsibility, it would be the

21    Controlled Substances Act.

22                   For the first question that you asked, what

23    I think about registrants, I think about my own state of

24    Rhode Island where the controlled substance registration

15:33:35 25    is issued to the pharmacist registrant as well as the

1    pharmacy license.

2                    So that, that's my perspective on using

3    that word.

4    Q.    Okay.  But you understand from your work that for

15:33:49 5    the DEA, for the U.S. registration under the Controlled

6    Substances Act, it's not simply a pharmacist who must be

7    registered, but it's the pharmacy as well.

8                    Do you understand that?

9    A.    Yes, sir.

15:34:04 10   Q.    And so CVS has registered their pharmacies with the

11   DEA, right?

12   A.    Yes, sir.

13   Q.    Okay.  Now, three, do you believe or would you

14   agree, I should say, that registrant dispensers should

15:34:23 15   or, no, must, excuse me, provide executable tools to

16   pharmacists; for example, red flag education, training,

17   tools, et cetera?

18   A.    I can't think of -- again, I'm not an attorney,

19   sir.

15:34:52 20                   With that concept, I -- I'm struggling to

21   place where that may be a requirement.

22   Q.    Okay.  So you're in a position to say, "I don't

23   know" or "No," which would you --

24   A.    I would say I don't know.

15:35:07 25   Q.    Okay.  Thank you, sir.

1              Now, I'd like us to look at some of the red

2    flags that I have spoken of previously to the jury, and

3    I'd like to know if you agree with these.

4              Do you agree that doctor shopping is a red

15:35:30  5    flag?

6    A.    It's a potential red flag, yes.

7    Q.    So when you say, "Potential red flag," are you

8    saying that if someone is doctor shopping, maybe it's

9    something the pharmacist should be concerned about and

15:35:48 10    maybe it's not, or is it always going to be a red flag

11    that the pharmacist should address?

12    A.    Well, what I'm -- what I'm thinking when you asked

13    me that question, sir, is we do have patients that

14    legitimately see different doctors, they go from one

15:36:08 15    specialist to another, so, you know, as part of

16    corresponding responsibility, the pharmacist will look at

17    that and they'll need to attempt to determine whether or

18    not it's doctor shopping or if this is a patient that,

19    you know, has gone from one specialist or prescriber to

15:36:29 20    another.

21              So it's potentially, but it's not always.

22    Q.    Maybe would you agree with the idea that it's a red

23    flag that should draw the pharmacist's attention, and

24    before the pharmacist dispenses, the pharmacist should

15:36:47 25    resolve the red flag?

1    A.    Yes, sir.  Yeah.

2    Q.    Okay.  So by red flag, what I'm referencing is

3    simply that, something that requires the pharmacist to do

4    due diligence before they fill the prescription and

15:36:58  5    resolve it.

6              Okay?

7    A.    That's -- that's fair.

8    Q.    In that sense, you would agree doctor shopping is a

9    red flag; it's just one that can be resolved?

15:37:07 10   A.    Yeah.  It -- said that way, it makes sense, yes.

11   Q.    Okay.  Thank you.

12             And by the same token, days' supply, where

13   you're getting more supplies than the days when you

14   should be taking the medicine, that's a red flag that

15:37:23 15   maybe gets resolved upon investigation, maybe it doesn't.

16             Fair?

17   A.    Yes.  It's a potential red flag.

18   Q.    All right.  And when you say potential, that's your

19   way of adding a word to say that it's not unresolvable;

15:37:40 20   it's one that should be addressed, but if it's resolved

21   through due diligence, then everything's fine.

22             Is that what I'm understanding?

23   A.    Well, in certain cases, so if pharmacists

24   knows -- let's say the physician calls and they say a

15:38:00 25   particular patient, I've got to increase the dose of her

1    medication, and that's going to require more -- a greater

2    days' supply and then the pharmacist has that knowledge.

3    The days' supply wouldn't be a red flag in that case,

4    see.

15:38:17  5    Q.    So?

6    A.    That's my explanation for it.

7    Q.    Then the days' supply has already been cleared by

8    the doctor, no red flag.

9              If it's brand new, it's a red flag and

15:38:28 10    needs to get cleared before the prescription's filled.

11              Fair?

12    A.    Fair.

13    Q.    Prescribing patterns.

14              If you see a doctor who's got prescribing

15:38:41 15    patterns that set off alarms, would you agree that that's

16    a red flag that should be resolved before you just fill

17    the prescription?

18    A.    Certainly if a -- if a pharmacist sees a

19    prescribing pattern that is alarming, that would be a red

15:38:58 20    flag to resolve, sure.

21    Q.    Drug cocktails, mixing opiates with the Benzo or

22    the trinity-mixing of drugs, would you agree that that's

23    a red flag that a pharmacist should be alert to and

24    resolve prior to dispensing?

15:39:17 25    A.    Yes.  If they -- if they see that, they need to

1    resolve that.

2    Q.    Cash payment.  Would you agree that cash payment is

3    a red flag that a pharmacist should be alert to and

4    resolve prior to dispensing?

15:39:37 5    A.    Potentially.

6    Q.    And I say cash, recognizing sometimes it might be

7    easily resolved because you might have somebody who's 25

8    years old and doesn't have any insurance.  They're going

9    to pay cash, right?

15:39:55 10    A.    Right.  Or you may have a patient where you know,

11    you know, they've lost their job.

12    Q.    Yeah.

13    A.    And, you know, you see a prescription come through

14    for cash, you know they don't have insurance.

15:40:08 15    Q.    Right.  So it's one that requires judgment and

16    discretion, but pharmacists should be tuned into that and

17    not blind to it.

18              Agreed?

19    A.    Agreed.

15:40:26 20              I mean, knowing your patients and your

21    prescribers are the integral part of pharmacy practice.

22    Q.    All right.  Next set of questions on my basics.

23              Defendants -- and let me put it to you this

24    way -- would you agree or disagree that -- let's just

15:40:47 25    talk CVS for you -- CVS should have red flag policies for

Davis - Cross/Lanier                    388

1    their stores.

2                    Agree or disagree?

3    A.    We have a controlled substance -- yes, we have a

4    controlled substance dispensing guideline that speaks

15:41:10  5    about red flags so we have that.

6    Q.    And CVS again, CVS should have trained their

7    pharmacists on red flags and the system in place.

8                    Would you agree?

9    A.    We have provided training, yes, on corresponding

15:41:31 10    responsibility and that would include, you know,

11    knowledge of what to look for with red flags.

12    Q.    And we'll look at this with other witnesses so I'm

13    not asking you to flesh through all of the when and whats

14    and all, but would you agree with me that CVS should have

15:41:55 15    given suitable tools to their pharmacists to address red

16    flags?

17    A.    Well, of course we have.  We've given them the

18    RxConnect pharmacy system, which has all the information

19    from a data perspective that they would need to exercise

15:42:13 20    corresponding responsibility.

21                    So we've done that.

22    Q.    So in 2012, CVS had given the ability to those

23    Florida pharmacists -- no, strike that, Your Honor.  Let

24    me start all over.

15:42:27 25                    So in 2012, it's your testimony then in

1    Ohio, in Lake and Trumbull Counties, CVS had given the

2    tools to the pharmacists to determine all of the red

3    flags that might come up and resolve them?

4    A.    Well, red flags, sir, can't just be identified

15:42:46  5    through a system.

6              You've got to look at the circumstance, the

7    patient that's before you, the prescriber.  There are

8    other red flags that a pharmacist could pick up on easily

9    in person that a system would not identify.

15:43:03 10    Q.    Okay.  That's fine.

11              Are you still saying that in 2012, CVS had

12    given the pharmacists all the suitable tools they needed

13    to identify red flags?

14    A.    Yes, I believe so.

15:43:22 15    Q.    So you've not changed what you do with pharmacists

16    since 2012 on RxConnect?

17    A.    Well, sir, we -- we are continually working to

18    improve.

19    Q.    That wasn't my question.

15:43:34 20    A.    We have -- no, we have made changes through the

21    years.

22              We evolve to improve our systems, and we

23    don't rest on our laurels.  We're working today as we sit

24    here to further improve our systems for the future.

15:43:47 25              We have to.

1    Q.    But you're telling us under oath that in 2012, your

2    pharmacists had all the same tools they've got now?

3    A.    In large part, they did.

4              We've made refinements over the years, but

5    pharmacists have always had, in the time that I've been

6    with the company, a pharmacy dispensing system that has,

7    you know, the patient profile, the doctor information,

8    the patient information.

9              All the -- all of the information is

10   readily available from a data perspective at the

11   fingertips of the pharmacists.

12   Q.    So in 2012, all of your pharmacists had access to

13   PDMPs in 2012?  That's a question.

14   A.    To my knowledge, there were states in 2012 that did

15   not have PM -- Prescription Drug Monitoring Programs.

16   They certainly have -- we're at the point now where I

17   believe every single state has one.

18              In 2012, that wasn't the case, and I

19   couldn't give you a list.  I don't remember which ones

20   did and didn't.

21   Q.    Well, sir, weren't there states that had PDMPs, but

22   CVS did not require their pharmacists to check PDMPs?

23              True?

24   A.    Our policy is if there's a state regulation that

25   requires the use of a PDMP, that the pharmacist follow

1    that regulation.

2                And that if in the pharmacist's

3    professional judgment with the patient in front of them,

4    if they need -- if they feel it's necessary to consult

15:45:43  5    the PDMP, then we expect our pharmacists to use that

6    judgment to do so.

7    Q.    Well, let's talk about PDMPs for just a

8    moment -- well, I'm going to -- I'm going to come back to

9    PDMPs.

15:45:57 10                I want to finish with *Holiday*, first.

11                But hang on to that answer in your brain,

12    okay?

13    A.    Yes, sir.

14    Q.    And I specifically want you to hang on because I

15:46:06 15    don't want to talk about what's your policy today; I want

16    to talk about what your policy was back in 2012 when you

17    came into your job.

18                Okay?

19    A.    Okay.

15:46:21 20    Q.    All right.

21                MR. DELINSKY:  Mr. Lanier, some of these

22    drawings are made for testimony.  They're not coming into

23    evidence, I know, but I just want it noted.

24                MR. LANIER:  Judge, I think I've been very

15:46:34 25    diligent to try and explain I'm writing CVS on my --

            1              THE COURT:  They are illustrative.  They're

            2   not testimony.

            3              MR. LANIER:  Okay.

            4              THE COURT:  They're not coming in as

15:46:42    5   exhibits.

            6              MR. LANIER:  Thank you, Judge.

            7              Your Honor, at this point I would ask that

            8   the witness be given and Court and counsel be given

            9   Plaintiffs' Exhibit 42147-A, which is the *Federal*

15:47:00   10   *Register Holiday* decision that Mr. Davis said that he had

           11   read.

           12              Thank you.

           13   BY MR. LANIER:

           14   Q.    Do you have that document in front of you, sir?

15:47:30   15   A.    Yes, sir, I do.

           16   Q.    And it's very small print, very hard to read.  I'm

           17   going to blow it up as best as I can, but this comes from

           18   the Department of Justice, the Drug Enforcement

           19   Administration, and it's a decision and an order entered

15:47:46   20   against CVS, your company, isn't it?

           21   A.    Yes, sir.

           22   Q.    And it's one that was entered on June the 8th of

           23   2012, and the Judge wrote, "Having considered the record

           24   in its entirety, including the parties' exceptions, I

15:48:04   25   have decided to adopt the Administrative Law Judge's

1    recommended rulings, findings of fact, except as

2    discussed below, conclusions of law, and proposed

3    sanction."

4                    Did I read that correctly?

15:48:25  5    A.    Yes, sir, you did.

6    Q.    And to put it into a nutshell, CVS lost this case,

7    didn't it?

8    A.    That would be my understanding.

9    Q.    And if we look on Page 62318, it's in the top

15:48:42 10    left-hand corner, you can see the page number, I'm in the

11    very first column looking at the first complete

12    paragraph.

13                    "At the hearing, the Government presented

14    extensive evidence" --

15:49:00 15                    MR. DELINSKY:  Your Honor, before

16    Mr. Lanier goes further, and I apologize, Mr. Lanier,

17    there's no foundation here for personal knowledge of the

18    underlying facts.

19                    THE COURT:  Well, we don't have a question.

15:49:15 20                    Mr. Lanier, can you pose a question about,

21    about this *Holiday* decision that you're going to ask this

22    witness?

23                    MR. LANIER:  Yes, Your Honor.

24    BY MR. LANIER:

15:49:24 25    Q.    What I was going to ask this witness is if these

Davis - Cross/Lanier                                394

1    findings were accurate, and I was going to read, would

2    you agree with me that this is something that should

3    affect every store in CVS's jurisdiction around the

4    United States?

15:49:58 5    A.    In terms of actions the company may have taken?

6    I'm not sure I fully understand your question.

7    Q.    It makes sense if we look a little bit more closely

8    at the language.

9                   But if I'm not going to read the language,

15:50:18 10   then I can't ask you that question where it will make

11   sense to you.

12                  Sir, you read this case, didn't you?

13   A.    I read -- yes, sir.

14   Q.    And you read this case because it's important to

15:50:36 15   your policies, isn't it?

16   A.    Yes.  This, this case occurred prior to my coming

17   into the role that I currently have today.

18                  When I did come into my role, I did read it

19   you know, I'm a layman, I'm not a skilled attorney so I

15:50:59 20   can't profess I understood everything in it but I did

21   read it approximately nine-and-a-half years ago when I

22   first came into my role with the company.

23   Q.    And I'm not asking you about the law.  I'm asking

24   you about the pharmacy opinions that I think are right in

15:51:11 25   your wheelhouse.

Davis - Cross/Lanier                    395

1    A.    Okay.

2    Q.    So my question would be, for example, at the end of

3    that page, or at the end of the first column, do you

4    agree that controlled substances are high alert drugs and

15:51:22  5    that among controlled substances drugs such as opioids,

6    Benzodiazepines, and other central nervous system

7    depressant drugs require the highest level scrutiny on

8    the part of a pharmacist?

9              Do you agree?

15:51:38  10   A.    Well, I would agree that under the law, we need to

11   provide the highest level of scrutiny to all controlled

12   substances.

13   Q.    Okay.  So you would take that highest level of

14   scrutiny and extend it even beyond those, but certainly

15:51:52  15   you would include those in it.

16              Fair?

17   A.    Well, I would presume that highest level of

18   scrutiny refers to corresponding responsibility which the

19   law requires, so, again, I can't really interpret out of

15:52:16  20   context what it means here, but that's what it means to

21   me.

22   Q.    Do you agree with the concept -- I know we've

23   discussed various red flags which create a level of

24   concern, but do you agree with the concept that the more

15:52:29  25   red flags there are, the stronger the suspicion is?

1    A.    Yes.   That seems reasonable.

2    Q.    Do you agree with the concept that while some red

3    flags might be resolvable by checking a patient's

4    identification or calling the prescriber, there are also

15:52:49  5    circumstances in which calling the prescriber will not

6    resolve the red flags because the red flags indicate that

7    the prescriber is collaborating with the patient to

8    "divert drugs"?

9            Do you agree?

15:53:06  10    A.    I could certainly agree that scenarios like that

11    could exist.

12    Q.    I'm not sure I heard you.

13            You said, "I could certainly agree"?

14    A.    I agree that scenarios like that could exist.

15:53:21  15    Q.    Okay.  And again, that's something else you did not

16    check with the stores in Lake and Trumbull County before

17    you came to testify, did you, whether or not that

18    situation might have been present?

19    A.    In the Florida stores?

15:53:41  20    Q.    I'm sorry, I didn't understand you.

21    A.    I'm sorry, are you asking me about the Florida

22    stores?

23    Q.    No.  I'm asking you -- and I think it's clear you

24    didn't, but I'd like it on the record that you

15:53:55  25    didn't -- I'm asking you did you check to see if there

1    were any indications in the stores in the counties at

2    issue in this case, did you check to see whether there

3    was any indication that there might have been prescribers

4    collaborating with patients to divert drugs.

15:54:13  5    A.    No, sir.

6    Q.    Okay.  You do agree in the red flag of paying for a

7    prescription with cash, that that would be a red flag.

8              Fair?

9    A.    As I testified, yes, it could be a red flag

15:54:29 10    potentially.

11    Q.    And respective locations you already testified

12    could be, as well as combinations and patterns of drugs,

13    right?

14    A.    If you could slow down, please, I'm trying to read

15:54:39 15    while you're drawing.

16    Q.    I apologize, sir.

17    A.    Okay.  What's your question, sir?

18    Q.    We've already agreed to this, and I don't mean to

19    be redundant so I'm just going to keep moving on, and I

15:54:50 20    apologize.

21              But I would like to get your opinion on

22    this Footnote 8.

23              "The doses of these medications, Oxycodone

24    30 milligram, are within therapeutic guidelines or limits

15:55:12 25    but, number one, it's just extremely suspicious to me

1    that these are always thirty milligram tablets, always in

2    large quantities."

3                    Do you agree that that would be suspicious

4    to a pharmacist?

15:55:38  5    A.    I'm not certain.

6    Q.    You do agree that people come in all shapes, sizes

7    and degrees of infirmity, and it's, you at least agree

8    with that?  You know, we're all shaped different,

9    different sizes, different aches and pains, right?

15:55:55 10   A.    Yes, sir.  Yep.

11                   MR. DELINSKY:  Judge, objection.  We're

12   just quoting now an expert witness from another case.

13                   MR. LANIER:  I'm trying to --

14                   THE COURT:  I'll allow that last question,

15:56:05 15   but I'm not going to let this go on and on.

16                   MR. LANIER:  Judge, I'm basically -- well,

17   I think that means that I am done.

18                   I had, I did have one more set of questions

19   but --

15:56:20 20                   THE COURT:  Well --

21                   MR. LANIER:  -- he may not know.

22                   If I could ask him if he at least knows.

23   BY MR. LANIER:

24   Q.    Sir, did you do any investigation after you read

15:56:29 25   this to find out whether or not your pharmacist was

```
        1    really having to keep a certain amount of Oxy on hand for

        2    her, quote, real pain patients, close quote?

        3                MR. DELINSKY:  Objection.  Objection.

        4                THE COURT:  Yeah, I'll sustain that.

15:56:45 5                I don't even understand the question.

        6    BY MR. LANIER:

        7    Q.   Okay.  Did you do any investigation when this

        8    decision came out?

        9    A.   I was not in my role when this decision came out,

15:56:56 10   sir.

       11    Q.   You came -- you came into your role almost

       12    immediately after this decision came out, didn't you?

       13    A.   I did.

       14    Q.   And this decision was one that you knew about, you

15:57:09 15   read, right?

       16    A.   Correct.

       17    Q.   And this decision was one that a lot of people

       18    talked about and read, it got written up in journals for

       19    pharmacists, right?

15:57:26 20               MR. DELINSKY:  Objection, Your Honor.

       21                THE COURT:  If he knows, he can answer

       22    that.

       23    A.   I don't know of any particular articles, not that I

       24    have seen.  I may have.

15:57:33 25   Q.   Did your company put this decision into PowerPoints
```

1    it used to present, including ones under your department?

2    A.    I'm sorry.  What was the last part of your

3    question?

4    Q.    Yes.  In your department, did y'all put this

15:57:48  5    decision into PowerPoints that you presented?

6    A.    It's certainly, certainly possible.

7              I don't recall.

8    Q.    All right.  Let's go back to PDMPs that we were

9    talking about before.

15:58:17 10            You are familiar with what a PDMP is,

11    correct?

12    A.    Yes, sir.

13    Q.    Would you tell the jury, please, what is a PDMP?

14    A.    So the acronym stands for Prescription Drug

15:58:38 15    Monitoring Program, and these are state-level programs

16    where pharmacies, like CVS, are required to send all of

17    our dispensing data, information regarding scripts that

18    are filled for controlled substances, to the state or

19    their agent.

15:59:01 20            And the state combines all that information

21    together, and then makes it available for pharmacies,

22    doctors, law enforcement to look at that data to help

23    understand whether or not predominantly if a patient is

24    doctor shopping, so you can see where they're getting

15:59:33 25    controlled substances from, which stores, which doctors,

1    what quantities, what dates.

2    Q.    Did I write this correctly, that it helps determine

3    doctor shopping?

4                  Is that what you're saying?

15:59:49  5    A.    That's -- that's one of the uses that you could

6    look for on that data, yes.

7    Q.    And PDMPs are extremely helpful, aren't they, in

8    reducing diversion?

9    A.    Well, they are.

16:00:06 10                  They're helpful.  They could be much more

11   helpful.  We certainly need a national PDMP.  Right now,

12   we just have it at a state level, and in some cases, some

13   states share data state-to-state, others don't, but it's

14   long been our position and we've asked and lobbied for

16:00:28 15   one national database to use.

16   Q.    When you say it's long been your position, are you

17   speaking on behalf of the company or are you speaking on

18   behalf of yourself?

19   A.    Myself and the company, through our Government

16:00:41 20   affairs team that has been, for as long as I've been in

21   the role, something that we've advocated for.

22   Q.    Okay.  Sir, in fact, that's not fully accurate, is

23   it?

24                  Y'all have actually lobbied against it,

16:01:02 25   haven't you?

1    A.    Not to my knowledge.

2              MR. LANIER:  Your Honor, I'd ask the

3    witness be given and the Court and counsel given

4    Plaintiffs' 23267.

16:01:49  5    Q.    Do you have that document in front of you, sir?

6    A.    I do.

7    Q.    You're familiar with this PowerPoint, aren't you?

8    A.    Allow me to take a look at it.

9              (Pause.)

16:02:16  10             I don't recall this document.

11    Q.    Well, you are -- you are on the front page of it,

12    aren't you?  Davis, comma, Thomas G?

13    A.    Yes.  Thank you.

14    Q.    So it was sent to you, wasn't it?

16:02:48  15    A.    Yes, it was.

16    Q.    And this is looking at model legislation dealing

17    with the idea of a national PDMP, wasn't it?

18    A.    I would have to equate myself with it.

19             I don't recall what's in this document.

16:03:08  20    Q.    So you don't recall working with Walgreen's and

21    Walmart, who are also in this "To" column in trying to

22    stop a national PDMP?

23    A.    Well, this is a NACDS document, sir, and it's not

24    uncommon for CVS to be at odds on policy matters with

16:03:40  25    NACDS.

```
 1              It happens quite frequently these days.

 2      Q.    I got into this because you voluntarily said we've

 3      wanted a national PDMP, and I said no, y'all have

 4      actually worked against one, and that's what this

 5      document shows you doing, doesn't it?

 6      A.    No, sir.

 7              This, this is a NACDS document, and it

 8      shows what the association is -- I presume, I haven't

 9      read the whole thing, but this would be their position as

10      an association.

11              And once again, unfortunately, it's not

12      uncommon for us to have a difference of opinion between

13      CVS and what NACDS chooses to advocate for on behalf of

14      its members.

15      Q.    Sir, do you recall, being a policy council member

16      on this, do you recall having a concern that it would

17      take too much time if pharmacists had to check a national

18      PDMP?

19      A.    No, sir, I don't recall that.

20      Q.    Do you recall lobbying against that?

21      A.    Do I recall lobbying against what, sir?

22      Q.    Okay.  Let's make sure we're clear.

23                   A PDMP --

24      A.    Yeah.

25      Q.    -- is what exists, for example, in the State of
```

1    Ohio, it's called OARRS here, right?

2    A.    Yes.

3    Q.    And it's now in every state where a pharmacist and

4    a doctor can access a computer system to see whether or

16:05:18 5    not someone tried to fill a prescription at another

6    place, or filled one with another doctor, that's data

7    that's available in that system, right?

8    A.    Yes, sir.

9    Q.    And it's important because it helps determine

16:05:33 10    doctor shopping, among other diversion issues, right?

11    A.    True.

12    Q.    Okay.  So within the framework of that, it's kind

13    of frustrating to the pharmacists if they're limited

14    state by state because someone in Trumbull County, for

16:05:51 15    example, might not know what happened in Pittsburgh, one

16    county -- I mean in Pennsylvania, one county away, right?

17    A.    Correct.

18    Q.    So a national one will let you find out what

19    happened in Florida, even if you're in Ohio, right?

16:06:08 20    A.    Yes, sir.

21    Q.    But that's going to take time for the pharmacist to

22    make that homework complete, right?

23              MR. DELINSKY:  Your Honor, I'm confused.

24              I don't understand what page of the

16:06:27 25    document we're looking at.

1           THE COURT:  We're not looking at any page

2      of the document.

3           These are general questions at this point.

4           MR. DELINSKY:  All right.

16:06:36  5  A.    No, sir, Mr. Lanier, theoretically it should take

6      no additional time to search a national database than it

7      would a state database.

8      BY MR. LANIER:

9      Q.    But did you not know that even in the State of

16:06:48 10  Ohio, CVS told their pharmacists to check that database

11     only if one of six circumstances were there and not

12     otherwise?

13          Do you know anything about that?

14     A.    I can tell you what our policy is.

16:07:03 15          I've testified to that earlier today.

16          I'm not aware if there's any exception to

17     that for the State of Ohio off the top of my head.

18     Q.    Okay.

19          MR. LANIER:  Your Honor, I would ask for

16:07:38 20  the counsel and Court and witness to be handed

21     Plaintiffs' Exhibit 8442.

22     BY MR. LANIER:

23     Q.    Do you have this document in front of you, sir?

24     A.    Yes, I do.

16:08:12 25  Q.    You will see that this document is from 2017.

1          You are one of the recipients of the

2     document, correct?

3     A.    Yes.

4     Q.    And it's still a document dealing with the same

16:08:29  5     issue of a national PDMP, specifically with that same

6     organization, the National Association of Chain -- of

7     NACDS, right?

8     A.    That appears to be right, yes.

9     Q.    And if you look on Page 2, you'll see the note,

16:08:56 10    "Attached you'll find a red-lined version of the document

11    which reflects the Policy Council's proposed changes to

12    the document."

13          Do you see that?

14    A.    Yes.

16:09:11 15    Q.    That Policy Council includes you, Tom Davis,

16    doesn't it?

17    A.    Yes.

18    Q.    And so we can look and see on Page 8 some of the

19    changes that were sent out?

16:09:30 20              MR. DELINSKY:  Objection to foundation,

21    Your Honor.

22              THE COURT:  Overruled.

23    BY MR. LANIER:

24    Q.    Do you have Page 8?

16:09:40 25    A.    Yes.  Allow me a moment, please, to read it.

1    Q.    Yeah.  And if it helps you, the part I'm going to

2    focus on is what's highlighted on the screen.

3                (Pause.)

4                Have you had a chance to read it?

16:10:17  5    A.    I'm just finishing it, sir.

6                I've read it.

7    Q.    All right.  It says "While a national PDMP," again

8    Prescription Drug Monitoring Program to help doctor

9    shopping, among other things, "While a national PDMP is

16:10:51 10    being established, work at the state level to support

11    legislation and regulations that would," and then it's

12    got some bullet points.  Do you see that?

13    A.    I do.

14    Q.    And one of the bullet points originally said,

16:11:06 15    "Require pharmacists to check state PDMP prior to

16    dispensing controlled substances when one or more red

17    flags are present (seven states have enacted requirements

18    for pharmacists to check the PDMP in limited, specified

19    circumstances)."

16:11:29 20                Do you see that and are you able to read it

21    with me underneath the strike-through?

22    A.    I see that.

23    Q.    And yet that, is a strike-through, that is a

24    recommendation of your committee --

16:11:45 25    A.    It's not my committee, sir.

1    Q.    -- the Policy Council, proposed change to the

2    document, true?

3    A.    Not my committee.

4    Q.    Your Policy Council?

16:11:54  5    A.    Not my Policy Council.

6    Q.    I thought you were on the Policy Council?

7    A.    It's not my council, sir.  It's NACDS's.

8    Q.    Okay.  The one you are on.  I may be speaking

9    Texas.  I'm sorry.

16:12:06  10          Let me ask it more clearly.  This

11   strike-through of saying that the pharmacist is going to

12   be ordered to check the PDMP is a strike-through that was

13   made by the Policy Council, of which you were a member.

14          True?

16:12:29  15   A.    That's true, although I can tell you as we sit here

16   today, I don't recall the particulars of the debate or

17   how the final document came out.

18   Q.    Well, you started this subject by telling us that

19   the company's always been for PDMPs.

16:12:52  20          Remember?

21   A.    That's true.

22   Q.    And you don't have any memory of whether or not you

23   personally edited on this document?

24   A.    I have not edited any on this document.  I would

16:13:22  25   have remembered that if I had.

1    I don't have any recall of the debate that

2    would have occurred.

3    What I can tell you is that as recently as

4    last week, sir, and meeting with our Government Affairs

16:13:42 5    leadership, I've asked them to look into finding out

6    where the national PDMP debate stands on Capitol Hill.

7    So it has always been of interest to me,

8    continues to be of interest to me, and it is not uncommon

9    in CVS's relationship with NACDS for the association to

16:14:09 10    take positions that differ from our own from time to

11    time.

12    Q.    Sir, I'll be asking this of Ms. Harrington, but was

13    she -- were you on the NACDS DEA working committee at

14    this point in time?

16:14:35 15    A.    I don't believe so, sir.  I don't think I was

16    attending those meetings at that point in time.

17    MR. LANIER:  Your Honor, I'd ask the

18    witness be given Plaintiffs' Exhibit 8444, and a copy to

19    counsel and the Court.

16:15:17 20    BY MR. LANIER:

21    Q.    Sir, do you have this document in front of you?

22    A.    Yes, I do.

23    Q.    Nicole Harrington, the author of this document,

24    reports directly to you, doesn't she?

16:15:26 25    A.    May I have a moment to review the document, sir?

```
 1    Q.    Yes, sir, but first, let me lay a foundation,
 2    please, because the Judge may tell me I can't ask you
 3    anything.
 4                   MR. LANIER:  Oh, a copy to the Court,
 5    please.
 6                   MR. STOFFELMAYR:  I have an extra.
 7                   MR. LANIER:  Here, I'll give the Court
 8    mine.
 9    BY MR. LANIER:
10    Q.    So, sir, my question was simply is Nicole
11    Harrington a direct line report to you?
12    A.    Yes.
13    Q.    You do her evaluation, don't you?
14    A.    Yes, I do.
15    Q.    She carries out the policies that you oversee.
16                Fair?
17    A.    That's true, yes.
18    Q.    And so when she writes here at this same time work,
19    she says, "We are" --
20                   MR. DELINSKY:  Objection.  Foundation, Your
21    Honor.
22                   MR. LANIER:  I'm going to be asking about
23    the policy which she's a direct line report.
24                   THE COURT:  Let's ask a question if he
25    knows anything about this.
```

          1              Maybe you can ask a general question.

          2     BY MR. LANIER:

          3     Q.    So did you know that your direct report was sending

          4     out e-mails saying that your chain and their counterpart

16:17:01  5     at WAG, Walgreen's, was firmly against the framework of

          6     what would be wanted in a national PDMP?

          7     A.    That's taken out of context, or if you read the

          8     entire e-mail.

          9              My recollection now, reading this, at the

16:17:20 10     time, there was a company called McKesson, which is a

         11     drug wholesaler, and they also have a technology called

         12     Relay Health, and they were, I think, lobbying to get,

         13     you know, their version of a national PMP put in place.

         14              And I believe we had some concerns with the

16:17:48 15     technical aspects that Sharon Gruttadaurio, to whom this

         16     e-mail was sent, is one of our experts on data, file

         17     format transition between our company and others.

         18              So it's not with the concept of having a

         19     national PMP.  The objection in this context is actually

16:18:10 20     to having kind of McKesson raise their hand to kind of

         21     get the business, and there were some technical nuances

         22     in what McKesson was looking for that would have been

         23     difficult for us to work with.

         24              I believe our position at the time was

16:18:31 25     there's already a company or two, ARCOS is the one that

1    many states use, which would have made it a much more

2    seamless integration in terms of data formatting and data

3    exchange, to just use either ARCOS or one of the other

4    major firms that are out there already doing this.

16:18:57  5              McKesson was basically coming in with their

6    own thing and saying, "Hey, let's -- let's recreate the

7    wheel," when our position was, no, you've already done

8    all this work with ARCOS and the systems work well, why

9    can't we just combine it altogether?

16:19:14  10   Q.    Well, sir, in truth, what this says is y'all didn't

11   want to pay the money.

12              That's what it says, doesn't it?

13   A.    No, sir.

14   Q.    It says, if you look at the bottom of Page 2,

16:19:30  15   "Mike, I need your expertise on how to address the below

16   inquiry from HGA, which is tied to the NCPDP, PDMP

17   strategy.  What surprised me the most is the request for

18   the $5,000 a month fee so that the applicable resources

19   could be put in place."

16:19:58  20              Do you see what I've highlighted?

21   A.    I've seen what you've highlighted.

22   Q.    And then if you'll look at the reply from Michael

23   Sargent to Sharon --

24              MR. DELINSKY:  Objection, Your Honor.

16:20:08  25   There's no question here.

1          THE COURT:  Well, there will be so let's

2    hear one.

3    BY MR. LANIER:

4    Q.   Michael Sargent says I wouldn't support it --

16:20:17 5          THE COURT:  All right.  What you can't do,

6    Mr. Lanier, if you ask this witness -- if you want to ask

7    him a question about the document, please do so.

8          MR. LANIER:  Your Honor, the witness has

9    testified without me asking him that this document says

16:20:28 10   A, B, C, D, E, and what I'm trying to do is show him that

11   it doesn't, it says something to the contrary and ask him

12   if, in fact, I'm correct instead of he's correct.

13         THE COURT:  Well --

14         MR. LANIER:  The witness voluntarily said

16:20:45 15   that this was a document that deals with --

16         THE COURT:  All right.  Well, you can ask

17   him about a specific part of it.

18

19   Q.   Sir, the reply was they wouldn't support with a

16:20:54 20   payment like that?

21         Do you see that language?

22   A.   I see that language.

23   Q.   This is about paying the money, that's what it's

24   about, isn't it?

16:21:02 25   A.   No, sir.

1                $5,000 a month is nothing.

2                I can't -- I -- if we could solve this

3       problem for $5,000 a month, we would do it in a

4       heartbeat, sir.

16:21:16  5     Q.    But --

6       A.    And I can't testify to what, you know, the two

7       people that wrote this are, you know, communicating

8       about.

9                But, no, by all means, I assure you $5,000

16:21:26 10     a month would not in any way stop CVS from investing in a

11      national PDMP.

12      Q.    Sir --

13      A.    We would spend much more than that.

14      Q.    You have already said what you thought this

16:21:39 15     document was about, and I'm asking did you even read it

16      to see that Nickie Harrington, who reports to you, and I

17      were both on the call, and we basically said we didn't

18      support the PSN concept as it was currently framed since

19      it would just add another level of workflow on the

16:21:58 20     existing state requirements.

21                Did you know about that?

22                MR. DELINSKY:  Objection.  Foundation, Your

23      Honor.

24                THE COURT:  Yeah, I -- I thought you were

16:22:05 25     claiming that the problem was the cost.

1          MR. LANIER:  It's two, Your Honor.

2          THE COURT:  All right.  I think we better

3    move on.

4    BY MR. LANIER:

16:22:11 5    Q.    Okay.  Sir, when you testified about what this

6    document is, you hadn't read it, had you?

7    A.    Sir, I'm doing my best.

8          You're giving me a lot of documents today.

9    I'm -- as I read this, it's starting to make, you know,

16:22:28 10   sense to me.  I'm recalling some of the issues.

11         And I'm providing you with my honest,

12   truthful testimony to what was occurring at that point in

13   time.

14         And, no, I'm not a speed reader, sir.  I

16:22:41 15   haven't read every line in here while you're asking me

16   questions.

17   Q.    All right.  Are you familiar with Kimberly Burns?

18   A.    I don't recall that name, sir.

19   Q.    Expert witness retained by CVS, doesn't ring a

16:23:08 20   bell?

21   A.    No, sir.

22   Q.    All right.  I'm almost done, Your Honor, if I could

23   ask a couple of last questions to sum up.

24         Are you aware that CVS produced dispensing

16:23:30 25   data -- do you know what dispensing data is?

1    A.    I presume you're referring to information regarding

2    prescriptions we dispense.

3    Q.    Yes.

4          Did you know that CVS produced that data

16:23:44 5    from 2006 to 2019 from the CVS stores in Lake and

6    Trumbull County?

7    A.    Well, I would imagine, yes, that would be true

8    because we have data from all of our stores during that

9    time period, sir.

16:24:04 10   Q.    Have you been made aware that the plaintiffs have

11   analyzed that data for red flags?

12              MR. DELINSKY:  Your Honor, only conceivable

13   way he could be aware of this is through conversations

14   with counsel.

16:24:18 15              This is about the litigation.  It's not

16   for --

17              THE COURT:  Yeah, I'll sustain.  I'll

18   sustain this.

19   BY MR. LANIER:

16:24:27 20   Q.    Okay.  I --

21              THE COURT:  Unless you can establish he had

22   some -- that he did this as part of his job, Mr. Lanier.

23              MR. LANIER:  I think it would be, Your

24   Honor, and I'll try and go that way.

16:24:41 25              THE COURT:  Ask it, ask a question that

1   way.

2                    MR. LANIER:  All right.  Thank you, sir.

3   BY MR. LANIER:

4   Q.   Sir, it falls within the ambit of what you do to

16:24:49  5   analyze that data for red flags or to have your people do

6   it who report to you.

7                    Right?

8   A.   I'm sorry, what data are you talking about, sir?

9   Q.   The dispensing data.

16:25:00 10   A.   Dispensing data, yes.  Specifically?

11   Q.   Yes.

12                    I mean you're -- have you read any of the

13   expert reports in this case?

14                    MR. DELINSKY:  Your Honor --

16:25:15 15                    THE COURT:  Yeah, I'll sustain that.

16   BY MR. LANIER:

17   Q.   Did your department perform its own analysis of the

18   dispensing data for these counties?

19   A.   I don't know.

16:25:33 20   Q.   Did you look at any of the hard copy

21   prescription --

22                    THE COURT:  Wait a minute.

23                    You don't know?

24                    THE WITNESS:  If our department --

16:25:46 25                    THE COURT:  Right.  If your department --

1          THE WITNESS:  -- looked at any of the data

2     for these counties?  I presume he's asking, Your Honor,

3     within the context of this litigation.

4          THE COURT:  No.  No.  Not as part of this

16:25:57 5     litigation; just did your department perform an analysis

6     of the dispensing data from these two counties for the

7     years 2006 to 2019?

8          THE WITNESS:  It would be, I would say yes,

9     within the context of the programs we operate, our store

16:26:31 10     monitoring program, and our, for example, and our

11     prescriber suspension program.  We're always looking at

12     dispensing data in those programs, and that would include

13     every store, including --

14     Q.    So we should find documents to that effect?  Is it

16:26:51 15     a process that produces a result, a report or something?

16     A.    I'm sorry.  Can you clarify?  I don't follow.

17     Q.    Yes, sir.  If your company, your department, excuse

18     me, performs its own analysis of the dispensing data for

19     these counties in those time frames, would we find that

16:27:05 20     in a report?

21     A.    Well, again, the data would be within the context

22     of those programs so it would be store-specific and it

23     would be prescriber-specific.

24          I don't believe that we would look at them

16:27:26 25     in the context of just these two counties, so if

1    you're -- if your question is do we analyze data to

2    include the stores in these counties, I'm saying yes, we

3    do.  It's part of those programs.

4              I would not say that we've taken these two

16:27:48  5    counties and taken those programs and looked at them

6    within the context of just these two counties because we

7    look at a store-by-store basis and a

8    prescriber-by-prescriber basis.

9    Q.   Okay.  My question, let me ask it this way because

16:28:07 10    I'm not understanding.

11              This data can be analyzed for red flags,

12    can't it?

13    A.   The dispensing data that comes out of RxConnect?

14    Q.   Yes, sir.

16:28:24 15    A.   Yes.

16    Q.   It can be analyzed for doctor shopping, right?

17    A.   Within the context of CVS data, yes.

18    Q.   It can be analyzed for doctor profiles, can't it?

19    A.   Well, certainly for prescribing habits.

16:28:48 20              I'm not sure what you mean by doctor

21    profiles.

22    Q.   Prescribing habits, that's fine.

23    A.   Okay.

24    Q.   It can be analyzed for cash payments, right?

16:28:56 25    A.   Yes.

```
 1    Q.    It can be analyzed for distance from the patient's
 2    address.
 3                   True?
 4    A.    Theoretically.
 5    Q.    It can be analyzed for distance from the doctor's
 6    address.
 7                   True?
 8    A.    Certainly.
 9    Q.    It can be analyzed for excessive dosing.
10                   True?
11    A.    Yes.
12    Q.    So my question to you was did your department
13    perform its own analysis of the dispensing data for those
14    red flags for your stores in these counties?
15    A.    Not to my knowledge.
16    Q.    You could order that to be done, couldn't you?
17    A.    Yes.
18    Q.    You could set a policy to do that once a month,
19    couldn't you?
20    A.    Theoretically, yes.
21    Q.    You could set a policy to do that once a week,
22    couldn't you?
23    A.    I could, but we have programs in place that we have
24    had for many years that, you know, look at our stores and
25    look at the prescribers, and there are many different
```

1    programs that we have in place to, you know, address this

2    issue.

3                   So, I mean, I could -- I could do a number

4    of things, but what we do is we're putting our programs

16:30:35  5    behind the most effective approach towards providing

6    solutions to this effort, sir, that we can.

7    Q.    Which brings us back to where we started.

8                   That would have been your approach, the

9    company's approach, with Dr. Veres and Dr. Torres.

16:30:55 10                   Fair?  What you're saying.

11    A.    I'm sorry, can you just provide a little more

12    context for that question?  I'm trying to follow, but

13    you've lost me.

14    Q.    Your company that has these policies that you say

16:31:17 15    are effective was following those very policies in the

16    way they handled Dr. Veres and Dr. Torres.

17                   True?

18    A.    The programs that I'm referring to, some of them

19    would have been certainly in place at that time, and then

16:31:38 20    since then, we've also, you know, rolled out additional

21    programs.

22    Q.    Before you came here today, did you look at any of

23    the hard copy prescriptions from Lake and Trumbull

24    Counties that were produced in this case?

16:31:54 25    A.    No, sir.

```
 1              MR. DELINSKY:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3              MR. LANIER:  Okay.  Your Honor, at this

 4    point, I'm going to pass the witness.

 5              THE COURT:  Okay.  Cross-examination.

 6              MR. DELINSKY:  I thought it was direct,

 7    Your Honor.

 8              THE COURT:  Well, some of both, I guess.

 9              MR. DELINSKY:  That's sort of an inside

10    joke.

11              THE COURT:  It's technically direct, you're

12    right.

13              MR. DELINSKY:  May it please the Court,

14    ladies and gentlemen, Mr. Davis.  Just a few questions to

15    clean up that last bit on how the company uses its data.

16    Okay?

17              THE WITNESS:  Yes, sir.

18          DIRECT EXAMINATION OF THOMAS DAVIS

19    BY MR. DELINSKY:

20    Q.    The company runs a store monitoring program,

21    correct?

22    A.    Yes, sir.

23    Q.    And by "Company," I of course mean CVS?

24    A.    Yes.

25    Q.    You understand that?
```

Davis - Direct/Delinsky                    423

1    A.    Yes.

2    Q.    Okay.  Does the store monitoring data analyze the

3    prescription -- excuse me, let me rephrase that.

4                 Does the store monitoring program analyze

5    CVS's prescription data?

6    A.    Yes, sir.

7    Q.    Does it do it for every CVS store throughout the

8    country?

9    A.    Yes, sir.

10   Q.    How often do those computer algorithms run across

11   all the data for all the CVS stores?

12   A.    We do that quarterly.

13   Q.    So it happens three times a year?

14   A.    Four times.

15   Q.    Four times a year, I apologize.

16                 And the purpose of running these

17   algorithms -- strike that.

18                 What's the purpose of running these

19   analyses across the data of all the CVS stores four times

20   a year?

21   A.    We're looking to ensure that there are no stores

22   out there that could be concerning with respect to their

23   practices.

24   Q.    Okay.

25   A.    Around controlled substance dispensing.

1    Q.    And if you find any concerns, what does the company

2    do?

3    A.    We engage the stores directly, and we investigate,

4    and then we work to resolve and take appropriate action.

16:35:01  5    Q.    Okay.

6                    MR. DELINSKY:  Thank you very much,

7    Mr. Davis.

8                    I have nothing further.

9                    MR. LANIER:  If I might, Your Honor.

16:35:10  10                    THE COURT:  Yes.

11                    Well, let me see if any of the other

12    defendants have any questions.

13                    MR. LANIER:  Oh, I apologize, Judge.

14                    MR. STOFFELMAYR:  Nothing for us, Your

16:35:20  15    Honor.  Thank you.

16                    MS. SULLIVAN:  No questions for Giant

17    Eagle, Your Honor.

18                    MR. MAJORAS:  No, sir.

19                    THE COURT:  Okay.  I guess if any of the

16:35:28  20    jurors have questions they want posed, if you reduce them

21    to writing, hand them to Mr. Pitts and then I will look

22    at them and give them to all counsel.

23                    (Pause.)

24                    THE COURT:  Okay.  I guess, Mr. Lanier, you

16:36:22  25    can proceed.

```
 1              MR. LANIER:  Thanks, Judge.
 2           RECROSS-EXAMINATION OF THOMAS DAVIS
 3    BY MR. LANIER:
 4    Q.   Sir, you were just asked questions about the state
 5    monitoring program that you run -- store monitoring
 6    program that you run quarterly.
 7                 Remember those questions?
 8    A.   Yes, sir.
 9    Q.   That program, as you run it, does not run all the
10    red flags, though, does it?
11    A.   Well, it runs what we call red flags that we would
12    be able -- that would be applicable in the data.
13                 As we've talked earlier, sir, red flags,
14    you know, could also be appearing in a patient walking up
15    to the pharmacy counter so we obviously can't see that,
16    but we look at attributes within the data that could be
17    concerning or what we would call red flags.
18    Q.   Sir, I specifically asked you if y'all ran those
19    for the red flags of doctor shopping, distances, things
20    like that, and I thought you had told me no previously.
21                 Are you saying now that you all do
22    quarterly and have for the last decade-plus?
23    A.   I'm sorry, sir, I don't recall any testimony, if
24    you want to refresh my memory, but with respect to the
25    store monitoring program, that is how that works.
```

Davis - Recross/Lanier                        426

1    Q.    So your testimony is that with respect to the store

2    monitoring program for the last 10, 15 years, every

3    quarter, y'all have run data to analyze for the red

4    flags.

16:38:01  5                      Is that your testimony?

6                      MR. DELINSKY:  Objection, Your Honor.

7                      I think there's things in there that --

8                      THE COURT:  Why don't you ask -- I'm

9    confused.

16:38:11 10                      Just ask a simple straightforward question

11    what this program does, store monitoring program does.

12    BY MR. LANIER:

13    Q.    Yeah, I just need to know, does this program

14    analyze for all the red flags that you can get out of the

16:38:26 15    data?

16                      Did CVS do that quarterly?

17    A.    The program started shortly before I came into role

18    in 2012, so about nine-and-a-half years, and it looks

19    across a number, the algorithm itself, and I'm not a

16:38:52 20    technical person, but, yes, we look for red flags that

21    would be apparent in the data.

22                      We hire an outside firm, it's called the

23    Analytics Group from Cambridge, Mass., they actually

24    designed the algorithm, and again, I'm not the best

16:39:13 25    person to testify as to, you know, how it works and what

 1    all the elements are.

 2                   But it's my understanding, sir, that yes,

 3    it's an exhaustive look at, you know, anything that the

 4    data could tell us that may be concerning.

16:39:30  5    Q.   Great.

 6                   So it's safe for the jury to assume that if

 7    running the data shows the presence of red flags that

 8    were never resolved, that's something your company would

 9    have been aware of because your company was doing that

16:39:45 10    quarterly.

11                   Fair?

12                   MR. DELINSKY:  Object to form.

13                   There's a confusion about --

14                   THE COURT:  Overruled.

16:39:51 15                   Overruled.

16    A.   This program, sir, looks at store dispensing

17    behavior in aggregate so it's not the same as any

18    individual prescription.

19                   We're looking for clues in the trend and

16:40:15 20    the dispensing history of the store.

21    Q.   Okay.  Then I need to ask the way the Judge told me

22    to at the beginning.

23                   Does it identify -- do you quarterly

24    identify all the red flags in these stores that can be

16:40:27 25    identified by data?

1   A.    Again, sir, the way the program works is we have an

2   algorithm that identifies a host of what we would call

3   red flags, and I can't give you specific testimony as to

4   an exhaustive list of what it does or doesn't do so I

16:40:51  5   don't want to mislead anybody.

6              It's a very complex algorithm.

7              MR. LANIER:  Okay.  Thank you, Your Honor.

8              THE COURT:  I have one question.

9              Have you -- do you look at what -- do you

16:41:25 10   look at these quarterly reports, sir?

11             THE WITNESS:  Yes, we have our -- we have a

12   team within my department that works this program every

13   day in their routine weekly, monthly reviews that occur

14   with the working team.

16:41:45 15             THE COURT:  Okay.  Can you give me an

16   example of what kind of things you've seen in these

17   reports, just -- I'm not going back twelve years.  Just

18   2021, just an example.

19             THE WITNESS:  Sure.

16:42:06 20             THE COURT:  An example of what kinds of

21   things are spit out by this program.

22             THE WITNESS:  Sometimes, sir, Your Honor,

23   you know, we'll look at a store that will come on the

24   report and we'll find, for instance, a pharmacist may be

16:42:19 25   suffering from an abuse or addiction problem themselves

```
          1    and they may be diverting drugs.

          2                    That's one potential case.

          3                    Many times, you know, when we go in, we may

          4    not find really any big issues except that, you know,

16:42:40  5    there's some additional training that needs to be done.

          6                    It really varies on a case-by-case basis.

          7                    The vast majority of the cases that we

          8    investigate typically around the edges, they are training

          9    issues.

16:43:07 10                    THE COURT:  Does it identify red flags that

         11    have not been resolved on a -- on a store basis,

         12    store-by-store basis?

         13                    THE WITNESS:  No, sir.

         14                    It provides trends.

16:43:25 15                    So have we seen an unusual spike in

         16    dispensing, for example, of controlled substances?  It's

         17    more of an aggregate analysis rather than on any one

         18    particular prescription per se.

         19                    Now, once they -- we go into the store,

16:43:45 20    then our team will do an in-depth review of, you know,

         21    prescriptions, other reports.  We'll interview the

         22    pharmacy staff.  There's a fairly in-depth investigation

         23    that occurs, sir, Your Honor.

         24                    THE COURT:  That's after the report's

16:44:03 25    generated?
```

```
             1              THE WITNESS:  Yes, Your Honor.

             2              THE COURT:  Okay.  All right.  Does anyone

             3    want to ask anything based on what I just asked?

             4              MR. DELINSKY:  Nothing further, Your Honor.

16:44:12     5              MR. WEINBERGER:  Do you mind if I ask a

             6    question or two?

             7              THE COURT:  Not at all, Mr. Weinberger.

             8         RECROSS-EXAMINATION OF THOMAS DAVIS

             9    BY MR. WEINBERGER:

16:44:25    10    Q.    Mr. Davis, is a hard copy of the store monitoring

            11    report ever generated?

            12    A.    Most of our files are now digital, sir.

            13              I, if we needed to, I'm sure the working

            14    team could produce a hard copy, but I think as we sit

16:44:53    15    here today, we're mostly working, trying to work in a

            16    paperless environment wherever possible.

            17    Q.    And has that store monitoring report algorithm

            18    changed over the years from 2012 to the present?

            19    A.    Yes, sir.

16:45:07    20    Q.    And as it has evolved, has it created additional

            21    analytics for your store, for your individual stores?

            22    A.    I don't believe so.

            23              I think we've mostly enhanced and tweaked

            24    it as we've gone, and we've also expanded the program to

16:45:37    25    include other types of controlled substances beyond
```

1    opioids over time.

2    Q.    And have you ever -- have you provided reports or

3    information regarding those store monitoring reports to

4    your store managers in Lake and Trumbull Counties?

16:45:57  5    A.    So not every store gets a report, sir.

6              It's -- it only -- the algorithm runs, and

7    if a store meets a certain criteria that, you know,

8    causes us to want to investigate that store, then we do

9    the investigation.

16:46:15  10              So to the extent that a store doesn't flag,

11    there's no, quote, unquote, report run.

12    Q.    Well, knowing that you were coming here to testify

13    in a case involving the pharmacies in Lake and Trumbull

14    County, did you review these store monitoring reports to

16:46:34  15    determine whether anyone, any of them were ever done for

16    these counties?

17              MR. DELINSKY:  Objection, Your Honor.

18              This is not a 30(b)(6) deposition.

19              THE COURT:  Overruled.

16:46:45  20    A.    No, sir.

21              MR. WEINBERGER:  That's all I have.

22              Thank you, Your Honor.  Appreciate it.

23              THE COURT:  Okay.  Any -- anything from the

24    defendants based on that?

16:46:56  25              MR. DELINSKY:  No.  Nothing further, Your

1    Honor.

2              THE COURT:  All right.  Thank you,

3    Mr. Davis.

4              We appreciate your testimony.

16:47:00  5              You may be excused.

6              THE WITNESS:  Thank you, Your Honor.

7              (Witness excused.)

8              THE COURT:  Okay.

9              MR. WEINBERGER:  Your Honor, we have no

16:48:07 10    further witnesses at this time for today.

11              THE COURT:  Oh, all right.  Well, then I

12    guess we have to be excused but I want to make sure in

13    the future we have the witnesses lined up so we can keep

14    going until, you know, 5:15, 5:30.

16:48:29 15              All right.  Ladies and gentlemen, we

16    will -- we will break for the day.

17              Again do not read, review, watch, hear,

18    anything about this case that you might encounter in any

19    sort of media.

16:48:48 20              Do not discuss this case at all with

21    anyone.  Do not let them discuss it with you.  Have a

22    good evening and we'll pick up tomorrow promptly at 9:00

23    o'clock with the plaintiffs' next witness.

24              (Jury out.)

16:49:39 25              THE COURT:  Okay.  Everyone can be seated.

```
 1              I think we'll -- my practice is to take up
 2     exhibits each day so we keep track of them.
 3              All right.  I'll just go through these in
 4     the order that I believe they were identified, and I'll
 5     see if there's any objection.
 6              All right.  23318.
 7              MR. DELINSKY:  No objection, Your Honor.
 8              THE COURT:  The next one, 23318, there's no
 9     objection.
10              23470.
11              MR. DELINSKY:  Your Honor, I'm trying to
12     locate it.  It got out of order here.
13              THE COURT:  It's a 2016 year-end
14     performance review, I believe.
15              MR. DELINSKY:  Your Honor, that was never
16     used.
17              THE COURT:  That's not being offered,
18     Mr. Lanier?
19              I need everyone's concentration here.
20              I don't have any --
21              MR. LANIER:  Not being offered at this
22     time, Your Honor.
23              THE COURT:  All right.  Not offered.
24              Okay.  8480.
25              MR. DELINSKY:  No objection, Your Honor.
```

         1              THE COURT:  Okay.  8427, the witness said
         2    he hasn't seen it, not familiar, so I assume that's not
         3    being offered with this witness.
         4              MR. LANIER:  No, Your Honor.
16:52:00 5              THE COURT:  Okay.  8408, is that being
         6    offered?
         7              MR. LANIER:  Not at this time, Your Honor.
         8              THE COURT:  All right.  8494, there was
         9    some testimony about that one.
16:52:20 10             Any objection?
         11             MR. DELINSKY:  Your Honor, I don't
         12   think -- I'm trying to pull it.  I don't think that was a
         13   document where foundation or knowledge was laid so
         14   there's an objection on that ground.
16:52:31 15             THE COURT:  Well, he said he recognized the
         16   format.
         17             It was a follow-up document to a prior one.
         18   He said he recognized the format and he testified about
         19   it.
16:52:41 20             MR. DELINSKY:  Yes, Your Honor, I think
         21   that was the document where he said that it only --
         22             THE COURT:  Well, Mr. Lanier, are you
         23   offering that?
         24             MR. LANIER:  Yes, Your Honor.
16:52:48 25             THE COURT:  Can someone hand it to me?

1      MR. DELINSKY:  And, Your Honor, that was

2  the document that I believe Mr. Davis testified -- I'm so

3  sorry, Sue.

4          That was the document that Mr. Davis

16:53:05  5  testified or the form would only be sent to him if there

6  was a suspension.

7          MR. LANIER:  Your Honor, Page 9 was the

8  page he talked about, he testified about it, we walked

9  through it.  He explained what 99 was behind the

16:53:38 10  program --

11          COURT REPORTER:  Wait a minute.

12          THE COURT:  All right.  I will

13  admit -- it's nine or ten pages and the only testimony

14  was Page 9, so let's just admit Page 9.

16:54:02 15          The next one, he is familiar with the

16  format but doesn't recall the document so I don't think

17  that should be offered.

18          MR. LANIER:  No need to offer, Your Honor.

19          THE COURT:  All right.  Are you offering

16:54:30 20  19738?

21          This had to do with Mr. Winsley, but --

22          MR. LANIER:  Your Honor, I don't think he

23  testified about that document in any details.

24          THE COURT:  I don't either so okay.

16:54:46 25          All right.  8954, all right, that comes in

1    over objection.

2               That's the Florida settlement with

3    admissions.

4               8955, that comes in over objection.  That's

16:55:06  5    the Maryland 2016 settlement agreement.

6               All right.  10214, that's the Texas, that

7    comes in over objection.

8               And 10212 comes in over objection, that's

9    the Rhode Island 2015.

16:55:35  10               And 10213 comes in over objection, that's

11    the 2016 Massachusetts settlement.

12               MR. DELINSKY:  Your Honor, we'd request a

13    limiting instruction on all the settlements.

14               THE COURT:  Well, if you want to propose

16:55:54  15    one and work it out with the plaintiffs, I'll certainly

16    give it.

17               You can do it overnight and you agree on

18    something, I agree it comes -- well, see what you can

19    come up with.

16:56:04  20               MR. DELINSKY:  Thank you, Your Honor.

21               And I think Your Honor was kind enough to

22    preserve our 408, 402 and 403 objections.

23               THE COURT:  I said they're all in over

24    objections.

16:56:26  25               MR. DELINSKY:  Thank you, your Honor.

```
         1              THE COURT:  Next, I have the Holiday
         2    decision, 42147-A.
         3              Are you offering that, Mr. Lanier?
         4              MR. LANIER:  Judge, historically I don't
16:56:40 5    believe decisions like that get offered into evidence.
         6              THE COURT:  Right.  I don't either.
         7              There was testimony so, right.
         8              MR. LANIER:  Yeah.  We use them as
         9    demonstratives where I'm from but --
16:56:51 10             THE COURT:  No, the testimony is in but the
        11    exhibit itself is not.
        12             MR. LANIER:  Exactly.
        13             THE COURT:  All right.
        14             23267, October, 2017 PowerPoint.
16:57:04 15             Are you offering that?
        16             MR. LANIER:  Yes, Your Honor.  This was one
        17    that he said he had familiarity with, I thought, and he
        18    answered some of the questions.
        19             THE COURT:  He answered some questions and
16:57:15 20   he's on the front page as having received it.
        21             Any objection to that?
        22             MR. DELINSKY:  Objection, Your Honor,
        23    because I believe he didn't recall -- he didn't recall
        24    the content, wasn't able to testify about --
16:57:25 25             THE COURT:  Well, I'm admitting it,
```

1      Mr. Delinsky, because it was sent to him or at least the

2      document says it was sent to him, so I'll admit it over

3      the objection for that basis.

4                    If it hadn't shown it was sent to him and

16:57:42  5      he didn't recall it, I wouldn't admit it.

6                    8442, again shows that Mr. Davis got it.

7                    Any objection to that?

8                    MR. DELINSKY:  Your Honor, objection on

9      hearsay grounds.

16:58:05 10                    THE COURT:  Well, he received it so it

11      comes in over objection.

12                    Again I'm going to be, with rare

13      exceptions, I'm going to admit documents, certainly

14      internal company documents that the witness shows that

16:58:18 15      either the witness sent or was sent to him or her.

16                    MR. DELINSKY:  Your Honor, this one's a

17      little different and I understand Your Honor's ruling,

18      but this comes from the Trade Association.

19                    THE COURT:  Well, it's relevant as to he

16:58:30 20      was on this Policy Council and there was a lot of

21      testimony about what the trade -- what the Policy Council

22      did and, you know, so.

23                    8444, any objection to that, that's in the

24      same --

16:58:47 25                    MR. DELINSKY:  Yes, a foundation objection.

         1          Mr. Davis is not on this document, Your

         2    Honor.

         3          THE COURT:  Are you offering this one,

         4    Mr. Lanier?

16:58:55 5          I believe there was a lot of stuff in here

         6    and he wasn't familiar with it, so --

         7          MR. LANIER:  Yeah, I'll withdraw this at

         8    this point in time.  With Ms. Harrington coming, I'll

         9    offer it through her.

16:59:07 10          THE COURT:  All right.  I think that makes

        11    more sense.

        12          That's all the documents I had.  Did I miss

        13    any?  I tried to keep track pretty well.

        14          Anyone, anyone on either side have any

16:59:24 15    documents that I missed?

        16          Mr. Pitts is keeping the final record, but

        17    I --

        18          MS. FLEMING:  That's all the documents,

        19    Your Honor.

16:59:32 20          THE COURT:  Okay.

        21          MR. LANIER:  Got you on the record.

        22          THE COURT:  All right.  I'm sort of keeping

        23    time in quarter hours so I got three-and-a-half for the

        24    plaintiffs and a quarter hour for the defendants, which

16:59:49 25    is the time that Mr. -- that defendants took in opening,

1    opening beyond the 15-minute grace period which I

2    immediately gave them.

3             And again, it's important that everyone

4    have witnesses lined up so we can maximize the jurors'

17:00:10  5    time.

6             MR. LANIER:  Your Honor, we'll take the

7    blame for that, certainly.

8             THE COURT:  Don't get -- you know, I'm just

9    making a -- making a comment so it doesn't happen again.

17:00:19 10             MR. LANIER:  Right.

11             One of the things that might help in that

12    regard, Your Honor, we understood there was going to be a

13    direct done of this witness and there wasn't.

14             THE COURT:  That's a good point.

17:00:28 15             I thought there would be, also.

16             MR. LANIER:  Yeah.  And we had agreed they

17    could put on their case in chief through him if they

18    wanted to and we thought they were going to.  That's not

19    a problem.

17:00:38 20             But I would ask, for example, we'll put on

21    Dr. Lembke in the morning and I would ask if they're not

22    planning on crossing her or their cross is going to be di

23    minimus.  If they could tell us --

24             THE COURT:  That's a good point.  It would

17:00:50 25    help so that we can, you know, maximize everyone's time.

```
 1                    So the next witness is Dr. Lembke?

 2              MR. LANIER:  Yes, sir.

 3              THE COURT:  All right.  Well, Mr. Lanier,

 4   how -- approximately how long do you envision your direct

 5   to be?

 6              MR. LANIER:  I think our direct will

 7   probably take something in the range of four hours,

 8   three-and-a-half.

 9              THE COURT:  What do the defendants think

10   about cross?

11              MS. SULLIVAN:  We certainly plan to cross

12   Dr. Lembke, Your Honor, two to three.

13              THE COURT:  Sounds like that's going to

14   take -- I won't make an editorial comment about math, but

15   if my math is right, that should take the whole day

16   tomorrow so I think -- I think that should suffice with

17   Dr. Lembke.

18              Okay.  Remember by tomorrow morning, I want

19   each sides' list of -- and I hope it's a limited number

20   of documents that you're going to challenge and there's

21   got to be some really substantive challenges and a quick

22   one or two sentence as to what the challenge is so that

23   Special Master Cohen and I can figure out how to address

24   them.

25              Okay.  Anything else that, since we
```

1    actually have a little extra time, anything else that

2    anyone wants to bring up to try and move things

3    expeditiously?

4                    MR. STOFFELMAYR:  I just had one logistical

17:02:17  5    question.

6                    The trial order instructs counsel to be

7    here at 8:30 in the morning.  The last couple days, I

8    think Your Honor starts at 9:00.  I'm happy to be here

9    but I don't want to be here unnecessarily.

17:02:31 10                    THE COURT:  Well, that's a good -- I didn't

11    -- I wasn't aware of that.

12                    Why don't we leave it -- my plan is to

13    start at 9:00 punctually.  If there's something that I

14    think we'll need to address before the jury, I'll tell

17:02:49 15    you that the night before.  Something could come up

16    overnight, all right, stuff has come up overnight and if

17    so, we'll communicate we will take it up at 8:30 before

18    the jury.

19                    But otherwise, there's no reason for all of

17:03:04 20    you to be hanging around for a half hour.

21                    MR. STOFFELMAYR:  Thank you, Judge.

22                    THE COURT:  In my view, which I can't see

23    any --

24                    Special Master Cohen, do you see any?

17:03:21 25                    SPECIAL MASTER COHEN:  Judge, I was just

1     going to mention that I believe we have chatted about

2     exhibits and you're going to talk to me about it and we

3     could probably chat about that now.

4                    THE COURT:  All right.  Well, that's fine.

17:03:44  5          Okay.  Then see everyone in the morning.

6                    MR. DELINSKY:  Your Honor.

7                    SPECIAL MASTER COHEN:  I'm sorry, I meant

8     that they should chat about it with you.

9                    THE COURT:  All right.  Okay.

17:04:01 10          MS. FUMERTON:  Yes, Your Honor, this is

11    Tara Fumerton from Walmart and we had a chance to

12    communicate with plaintiffs and we wanted some

13    clarification about your instruction for exhibits for

14    tomorrow.

17:04:10 15          There had been a stipulation that had been

16    entered between the parties that would permit sort of a

17    procedure for the night before for exhibits to be used to

18    be disclosed and any objections be raised the next

19    morning.  So what we were trying to get clarification on

17:04:24 20   is whether you wanted essentially any objections to all

21    potential exhibits.

22                   THE COURT:  Well, if I'm going to get a

23    whole raft of objections, Ms. Fumerton, you know, at

24    8:30, quarter to 9:00, this trial will never happen.

17:04:41 25          We're not going to do that.  So there

1    shouldn't be a lot of objections to documents at this

2    point, but, I mean, are there?  And if so, we've got to

3    figure out now how we're going to do it expeditiously

4    because it, you know, I want this trial to start at 9:00

17:04:57  5    o'clock.

6              The jury's here.  They're going to expect

7    testimony.  Not sitting in there while we worry about

8    objections to documents.

9              MS. FUMERTON:  Yes, Your Honor, we

17:05:08 10    understand.

11              I think that's what we were trying to aim

12    at was that we understand your direction on that.  We

13    don't anticipate there's going to be a ton, and if we do

14    this sort of on a rolling basis, there may be fewer,

17:05:20 15    depending on which witnesses plaintiffs call and

16    vice-versa since we don't know necessarily what all

17    witnesses are going to be, what witnesses will be called

18    at this point, and there are thousands of exhibits on the

19    exhibit list.

17:05:31 20              THE COURT:  Yes.  Most will never be used

21    in this case, we all know that.

22              MS. FUMERTON:  Yes.  Agreed.

23              THE COURT:  Most of the witnesses listed

24    won't be called, we know that, too.

17:05:41 25              We tried to streamline that.

1          Well, I don't -- I don't -- well, with the

2    expert witnesses, I mean everyone knows the documents.

3    There shouldn't be any objections at this point.  These

4    people have been deposed.  I mean, they've got their

17:06:12  5    reports, they've got their reports.

6          Anything they've seen, you know, is fair

7    game.  So, you know, they're not going to be identifying

8    company exhibits or exhibits, right?  I mean that isn't

9    going to be what happens.

17:06:26 10          So it's the fact witnesses where

11    potentially we could have objections so, I don't know,

12    what are you suggesting?

13          I mean again if we're talking about lots of

14    objections, there's no way that I can deal with this many

17:06:39 15    in this format.  If there are a handful, you know, I'll

16    look at them, eyeball them and just make -- call it real

17    fast.  But if there are a lot, it's not going to work

18    this way.

19          So --

17:06:57 20          MS. FUMERTON:  Yes.

21          THE COURT:  What are you suggesting?

22          MS. FUMERTON:  Yes, Your Honor.  So I think

23    what we're suggesting is to essentially streamline the

24    process so that, for example, we know that Dr. Lembke is

17:07:06 25    going to be testifying tomorrow, I think plaintiffs are

1   to disclose to us tonight any documents that they are

2   planning on using for their direct.

3                      We'll look at them.  If there are any

4   objections, and we'll be judicious on making any such, we

17:07:19  5   would identify them for plaintiffs, try to work them out,

6   and if not, bring the few limited ones to you in the

7   morning prior to testimony starting.

8                      And the process can continue that way as

9   particular witnesses are disclosed.

17:07:33 10                     THE COURT:  All right.  Well, I think what

11  we're going to need to do then is, I mean, I will -- I

12  will -- we ought to convene at 8:45 and if -- to address

13  them.

14                      So I'm not going to -- you know, everyone

17:07:51 15  knows we are addressing, we're taking 15 minutes so I'm

16  going to call them real -- if you give me a raft of them,

17  most of them will be summarily denied, okay?

18                      So if you've got a few principled ones,

19  I'll address.  So I don't want, you know, light weight

17:08:09 20  objections.

21                      If you've got a real serious objection to a

22  document and you can't work it out, then I'll deal with

23  it at 8:45 in the morning.

24                      But make sure you give them to -- don't

17:08:20 25  wait until midnight obviously to give them.  I mean,

1    right now, quite frankly, tomorrow I can't imagine there

2    will be any objections.  I mean, Dr. Lembke has been

3    deposed.  She's not going to show new documents now, it's

4    a little late, because then the plaintiffs

17:08:37  5    have -- defendants will correctly object that she's

6    somehow supplementing her report with analysis of new

7    documents.

8                    So it's really the lay witnesses.

9                    So I guess we'll just plan to come out here

17:08:48 10    at 8:45 and deal with any, any objections to documents.

11    And if there aren't any, we'll still wait.

12                    The jury will be ready at 9:00.  Hopefully

13    everyone will be on time.

14                    MS. FUMERTON:  Thank you, Your Honor.

17:09:08 15                    THE COURT:  Okay.  And I guess it would be

16    helpful, I mean why doesn't someone let, I guess, let

17    everyone know at 8:00 o'clock, by 8:00 o'clock if there

18    are going to be any objections so I'll know, you know.

19    Maybe that way, if not, I'll just take care of my other

17:09:28 20    matters back in chambers.

21                    I've got all my other cases to monitor and

22    keep going so there's plenty to do.

23                    Okay.

24                    MR. DELINSKY:  Your Honor, may I just be

17:09:37 25    heard on one final issue?

1          THE COURT:  Yes.

2          MR. DELINSKY:  Your Honor, I thought

3     Mr. Lanier's questions about whether the witness did any

4     work to prepare to testify were prejudicial and improper.

17:09:52  5          A witness has no burden to educate himself

6     to testify, and even worse, Your Honor, for him to have

7     done that would have required him to learn hearsay

8     documents about which he didn't have personal knowledge.

9          It was essentially calling on him both to

17:10:08 10    prepare in a way that's not contemplated by the rules,

11    and then to testify about matters not in his personal

12    knowledge.

13          So I'd ask for a limiting instruction on

14    that.

17:10:17 15          THE COURT:  Well, understand in the future,

16    Mr. Lanier, I think Mr. Delinsky has a good point.  You

17    can always ask a witness, you know, about anything, ask

18    him if he did or didn't do something in the ordinary

19    course of his job, okay, but lay witnesses don't -- they

17:10:38 20    don't prepare for testimony that way and they

21    don't -- they aren't supposed to look at documents or

22    generate reports for litigation.

23          So I think make sure when you ask a witness

24    questions, it's clear you're asking, you know, about did

17:10:56 25    they do this in the course of their job duties, did they

1    run reports, did they consult a database, whatever.

2    That's always fair game.  You can always ask a witness

3    what they did or didn't do in the course of their job

4    duties.

17:11:11  5              But what they did in preparation for

6    testifying, the only way they would do that would be in

7    conjunction with their counsel, and I think that's work

8    product.

9              So that goes both ways.

17:11:24 10              Now, experts are a little bit different

11    because, I mean, everything they did is litigation-based,

12    so.  But for lay witnesses, I think you're right, I don't

13    think lay witnesses themselves are to take it on

14    themselves to start doing things or checking things or

17:11:45 15    reading opening statements or whatever to prepare.

16              I don't think so.  They sit down with their

17    lawyers and they go through the, you know, on direct, all

18    right, so I think that's the way to do it.

19              MR. LANIER:  Your Honor, I'll certainly

17:12:02 20    honor what you said, absolutely, no questions asked.

21              But I would like to simply say on the

22    record that it's been my experience that that is not

23    always the case, and that a lot of witnesses do look at

24    documents because they're coming to be prepared and to

17:12:17 25    explain to the jury things and they want documents to

1    refresh their recollection and they don't want to look

2    like buffoons.

3                And I think it's not only proper to ask

4    that, but I believe there are cases and rules that say if

17:12:30   5    a witness looks at a document to refresh their

6    recollection before they testify, then that document is

7    admissible on that basis alone because it does happen

8    quite frequently.

9                Having said that, I will certainly honor

17:12:45 10    everything you said and I won't ask it again.

11                THE COURT:  Well, if you go into that, you

12    have to draw a distinction between something they did

13    purely on their own or something they did working with

14    their lawyer --

17:13:07 15                MR. LANIER:  Absolutely.

16                THE COURT:  -- to prepare for testimony,

17    which is not fair game.

18                MR. LANIER:  Agree with that a hundred

19    percent, Your Honor.  You're not allowed to go into what

17:13:15 20    lawyers told them to do, not to do, and what they did at

21    the request of the lawyers.  I don't --

22                THE COURT:  All right.  Mr. Delinsky's

23    point is you can't do it to make a witness look bad or

24    any way suggest that the witness was supposed to do it

17:13:28 25    and didn't, and so that's -- it's possible from the way

1     you asked those questions, Mr. Lanier, that the jury

2     could draw that conclusion.

3               That's not fair.

4               I suppose you can -- well --

17:13:43  5               MR. LANIER:  I'll follow your instructions.

6               THE COURT:  Yeah, I -- all right, look,

7     while you are technically correct that you can probably

8     ask a witness, all right, did -- did you totally on your

9     own, not in connection with any lawyer, totally on your

17:14:07 10    own do research or study or look at anything to prepare

11    for today, the problem is by asking it and if they say

12    no, the suggestion is, well, they weren't a diligent

13    witness.

14              That's the problem.

17:14:21 15              I mean, it's -- I think it's -- I think

16    it's a proper question, and if the answer is yes, then

17    you can ask them what they did.  But if the answer is no,

18    then it -- I mean then I'll have to give a general

19    instruction that a witness is under no obligation to do

17:14:46 20    anything other than show up at the time appointed.

21              And so they're not -- the jury is not to

22    draw any inference that a lot of witnesses say no.  So I

23    guess I'll have to do that, and so, Mr. Lanier, if you

24    ask it that way, I'll give a general instruction to the

17:15:03 25    jury that a witness -- witnesses on both sides are not

1    under any obligation to do any studying or preparation.

2    They are just supposed to show up and answer the

3    questions.

4              MR. LANIER:  And, Your Honor, I meant what

5    I said that I'm going to follow what you said.

6              THE COURT:  I mean, I'm telling you if you

7    want to ask that in a way, making clear you're not asking

8    about anything they did in preparation with counsel, if

9    they did it solely on their own, you can ask it, but if

10   you do, I will -- I will tell the jury that while I've

11   permitted you to ask the question, they should know that

12   a witness is under no obligation to do any preparation on

13   his or her own.

14             Okay?  So I think that's the way to do it.

15             MR. DELINSKY:  Your Honor, the

16   concern -- excuse me, Your Honor -- the concern on our

17   end is that those questions were asked.

18             THE COURT:  All right.

19             MR. DELINSKY:  So we'd like that general

20   instruction.

21             THE COURT:  I'll start out tomorrow, I

22   will -- I will simply say a witness is under no

23   obligation to do any study or preparation before

24   testimony.

25             Their only obligation is to come in at the

453

1    appointed time and answer both sides' questions.

2                    MR. DELINSKY:  Thank you, Your Honor.

3                    THE COURT:  Okay.  So I'll make a note to

4    do that tomorrow morning.

17:16:23  5          Okay.  Anything -- anything else?

6                    Okay.  Thank you.

7                    Then we're adjourned.

8                    (Proceedings concluded at 5:16 p.m.)

9                         -  -  -  -

10                  C E R T I F I C A T E

11                    I certify that the foregoing is a correct

12   transcript from the record of proceedings in the

13   above-entitled matter.

14

15

16

17   **/s/Susan Trischan**
     /S/ Susan Trischan, Official Court Reporter
18   Certified Realtime Reporter

19   7-189 U.S. Court House
     801 West Superior Avenue
20   Cleveland, Ohio 44113
     (216) 357-7087
21

22

23

24

25

454

1                               **I N D E X**

2

3    **WITNESSES:**                                              **PAGE**

4      CROSS-EXAMINATION OF THOMAS DAVIS                      282

5      BY MR. LANIER

6      CROSS-EXAMINATION OF THOMAS DAVIS (RESUMED)            293

7      BY MR. LANIER

8      DIRECT EXAMINATION OF THOMAS DAVIS                     422

9      BY MR. DELINSKY

10     RECROSS-EXAMINATION OF THOMAS DAVIS                    425

11     BY MR. LANIER

12     RECROSS-EXAMINATION OF THOMAS DAVIS                    430

13     BY MR. WEINBERGER

14

15                             * * * * *

16

17   **OTHER:**

18

19     OPENING STATEMENTS ON BEHALF OF CVS                    191

20     OPENING STATEMENTS ON BEHALF OF GIANT EAGLE            216

21     OPENING STATEMENTS ON BEHALF OF WALMART                255

22

23                             * * * * *

24

25