1           IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION

3

            IN RE:                    Case No. 1:17-md-2804
4           NATIONAL PRESCRIPTION      Cleveland, Ohio
            OPIATE LITIGATION
5                                      October 6, 2021
            CASE TRACK THREE           8:54 A.M.
6

7

8                         - - - - -

9
                          **VOLUME 3**
10

11                        - - - - -

12

13           TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14         BEFORE THE HONORABLE DAN A. POLSTER,

15           UNITED STATES DISTRICT JUDGE,

16                    AND A JURY.

17

18                        - - - - -

19

20

21   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
22                            801 West Superior Avenue
                              Cleveland, Ohio  44113
23                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

```
1   APPEARANCES:
    For the Plaintiffs:        Peter H. Weinberger, Esq.
2                              Spangenberg, Shibley & Liber
                               1001 Lakeside Avenue, Ste. 1700
3                              1900 East Ninth Street
                               Cleveland, Ohio    44114
4                              216-696-3232

5                              W. Mark Lanier, Esq.
                               Rachel Lanier, Esq.
6                              M. Michelle Carreras, Esq.
                               The Lanier Law Firm
7                              6810 FM 1960 West
                               Houston, Texas    77069
8                              813-659-5200

9                              Frank L. Gallucci, III, Esq.
                               Plevin & Gallucci Company, LPA
10                             The Illuminating Building
                               Suite 2222
11                             55 Public Square
                               Cleveland, Ohio    44113
12                             216-861-0804

13                             Salvatore C. Badala, Esq.
                               Maria Fleming, Esq.
14                             Napoli Shkolnik
                               360 Lexington Ave., 11th Floor
15                             New York, New York    10017
                               212-397-1000
16
    For Walgreen Defendants:   Kaspar J. Stoffelmayr, Esq.
17                             Brian C. Swanson, Esq.
                               Katherine M. Swift, Esq.
18                             Alex Harris, Esq.
                               Sharon Desh, Esq.
19                             Bartlit Beck LLP
                               54 West Hubbard Street, Ste.300
20                             Chicago, Illinois    60654
                               312-494-4400
21
    For CVS Defendants:        Graeme W. Bush, Esq.
22                             Eric R. Delinsky, Esq.
                               Alexandra W. Miller, Esq.
23                             Paul B. Hynes, Jr., Esq.
                               Zuckerman Spaeder - Washington
24                             Suite 1000
                               1800 M Street, NW
25                             Washington, DC    20036
                               202-778-1831
```

```
 1    For HBC/Giant Eagle
      Defendants:                    Robert M. Barnes, Esq.
 2                                   Scott D. Livingston, Esq.
                                     Marcus & Shapira
 3                                   35th Floor
                                     One Oxford Centre
 4                                   301 Grant Street
                                     Pittsburgh, PA   15219
 5                                   412-471-3490

 6                                   Diane P. Sullivan, Esq.
                                     Chantale Fiebig, Esq.
 7                                   Weil Gotshal & Manges
                                     Suite 600
 8                                   2001 M Street NW
                                     Washington, DC   20036
 9                                   202-682-7200

10    For Walmart Defendants:        John M. Majoras, Esq.
                                     Jones Day - Columbus
11                                   Suite 600
                                     325 John H. McConnell Blvd.
12                                   Columbus, Ohio   43215
                                     614-281-3835
13
                                     Tara A. Fumerton, Esq.
14                                   Tina M. Tabacchi, Esq.
                                     Jones Day - Chicago
15                                   Suite 3500
                                     77 West Wacker
16                                   Chicago, Illinois   60601
                                     312-782-3939
17

18    ALSO PRESENT:                  Special Master David Cohen

19
                               - - - - -
20

21

22

23

24

25
```

1          WEDNESDAY, OCTOBER 6, 2021, 8:54 A.M.

2                    THE COURT:  Okay.  Everyone can be seated.

3                    The plaintiffs wanted to address something?

4                    MR. LANIER:  Yes, Your Honor.  Thank you

08:55:14  5    for your kindness in giving us a couple of minutes this

6    morning.

7                    With respect, Your Honor, your rulings and

8    process for conducting this trial have unduly prejudiced

9    the right and ability of the plaintiffs to present their

08:55:31 10    case by not allowing fair questions to the witness

11    yesterday.

12                    Here is the impossible predicament you

13    leave the plaintiffs in.

14                    One, plaintiffs have the burden of proof.

08:55:42 15                    Two, defendants, in their unlimited—in—time

16    opening statement, were incessant in arguing that the

17    plaintiffs must show diversion on a store level in the

18    counties.

19                    Three, plaintiff has that, what's been made

08:56:02 20    critical proof in this case before the jury, but no way

21    to show it under your rules of court.

22                    Four, to wit:  The defendant stores

23    fulfilled the verdant prescriptions that the pharmacists

24    knew or reasonably should have known were illegal,

08:56:24 25    specifically with Dr. Veres and Dr. Torres in these

1    stores, in these counties.

2              This is shown in documents.  These

3    documents are properly authenticated.  They are properly

4    admissible evidence in a civil case.

08:56:42  5              They can and should be admitted, read to a

6    jury, and used as a basis for cross-examining a witness.

7              The witness yesterday was Mr. Tom Davis,

8    the Vice President and head of CVS's division that

9    oversees pharmacy actions regarding diversion and policy.

08:57:01 10              He is a proper person to ask questions of

11    regarding such documents and issues, even if he doesn't

12    remember or hasn't seen the document.

13              To not allow such documents to be read to

14    the jury, probed with the witness, and tested as to their

08:57:21 15    content and policies comparing it with the witness'

16    testimony is unfair, it's wrong under the law, and it's

17    highly prejudicial.

18              For example, CVS stores filled

19    prescriptions written by Dr. Veres for seven years after

08:57:40 20    he first came on to CVS's radar screen as an

21    overprovider.

22              There were reports of Dr. Veres being an

23    overprovider, of Dr. Veres refusing interviews, of

24    Dr. Veres finally giving an interview in which he said he

08:57:57 25    had a host of patients --

1          THE COURT:  Hold it.  Hold it.  Hold it.

2          Mr. Lanier, you're saying all this.  None

3     of this is in evidence.

4          All right?  None of this is in evidence.

08:58:09  5     It may come in with someone else.  You could have asked

6     this witness if he knew anything about any -- if this

7     happened, I don't know, was this after 2012 when he took

8     his position?

9          MR. LANIER:  Your Honor, yes.  That's what

08:58:24 10     the documents --

11          THE COURT:  Well, then, you could have

12     asked him -- you know, I allowed you to ask him about

13     Dr. Torres, Dr. Veres, if he knew anything about it.

14          MR. LANIER:  These were the documents, Your

08:58:37 15     Honor --

16          THE COURT:  If these were documents --

17     Mr. Lanier, the only thing I didn't allow you to do is

18     just do wholesale reading of the contents of the document

19     that the witness said he didn't -- he never saw and knew

08:58:48 20     nothing about, but you could have asked him, if this

21     happened in his division, in his office, people under his

22     control and he knew nothing about it, you could

23     have -- you could have kept going at it and say, "Why

24     didn't you?"

08:59:02 25          MR. LANIER:  Your Honor --

1        THE COURT:  -- this is in your, you know --

2   but and I would have allowed you to ask him that

3   question.

4        MR. LANIER:  Your Honor --

08:59:05  5        THE COURT:  This happened under your

6   division, you knew nothing about it; why not.

7        So I don't -- my recollection is the only

8   thing I didn't allow you to do is just do wholesale

9   reading of a document with no real question.

08:59:20 10        MR. LANIER:  Your Honor, I believe the

11   record will reflect --

12        THE COURT:  All right.  Well --

13        MR. LANIER:  -- very differently and I

14   would like to finish, if I could, putting on the record

08:59:27 15   what I believe.

16        THE COURT:  And again, if you thought, if

17   you thought -- the time to do this was requesting a

18   side-bar at the time.  All right?

19        If you think that my rulings are wrong,

08:59:38 20   unfair, or I have a different strike zone for one side or

21   the other, it's appropriate to raise that

22   contemporaneously while the witness is there.

23        But, I mean, to go back now, I think -- I

24   think my rulings were correct.

08:59:53 25        MR. LANIER:  Hey, Your Honor, if I could

1    finish making my record.  If you'd like me to make it in

2    writing, I'm glad to.

3                    THE COURT:  Okay.

4                    MR. LANIER:  Your Honor, you would not let

09:00:01  5    me ask this question, questions of this witness, if he

6    was not on the document or did not recall the document,

7    and for me to be able to put this case --

8                    THE COURT:  Hold on.  What questions?

9                    I mean --

09:00:11 10                    MR. LANIER:  The questions --

11                    THE COURT:  To be candid, this isn't making

12    a record.  Okay?

13                    You're complaining in total about things I

14    did over a course of four hours, all right?

09:00:22 15                    So you can -- I'll let you finish and then

16    we'll move on because it's not worth anything, in my

17    view.

18                    MR. LANIER:  Okay.  In that regard, Your

19    Honor, for me to have been able to use with this witness

09:00:32 20    Plaintiffs' Exhibit 8496, I would need to have Rachel

21    Joseph on the stand to testify about the document.

22                    THE COURT:  Someone give me 8496 so I can

23    look at it.  What --

24                    By the way, I let you use any exhibit you

09:00:49 25    introduced.  All right?  I let you start, start

1    questioning.

2                    MR. LANIER:  With due respect, Your Honor,

3    if the witness was not on the exhibit or did not remember

4    it, you insisted that I move on and it wasn't appropriate

09:01:01  5    questioning for the witness.

6                    THE COURT:  Well, no.  No.  I didn't let

7    you just keep reading and reading.

8                    Getting the whole contents in sort of

9    through the back door.

09:01:11 10                    If there was a question, if the document

11    was written by his underling, his direct report, you

12    could have asked him, "Well, why didn't you get it?"

13                    MR. LANIER:  I tried to do that, Your

14    Honor, and I was shut down on that.

09:01:25 15                    THE COURT:  I don't believe so.  I don't

16    think the record reflects that.

17                    I would allow these questions.

18                    There were a whole lot of questions I

19    thought you were going to ask which you didn't.

09:01:33 20                    MR. LANIER:  And in that regard, Your

21    Honor, I will go forward to continue to say if the

22    document is admissible into evidence, it is appropriate

23    for a document to be read.

24                    THE COURT:  I don't know if it's admissible

09:01:42 25    into evidence or not.

1          I mean, if the defendants haven't objected

2    and you just move them in wholesale at the beginning of

3    the case, fine.  And they don't object, fine, then it's

4    in.

09:01:53  5          But I don't know -- you know, I --

6          MR. LANIER:  These documents, Your Honor,

7    we contend are properly admissible.  They include

8    Plaintiffs' Exhibit 8500, 23365.

9          THE COURT:  All right.

09:02:07 10          MR. LANIER:  8494.

11          THE COURT:  Mr. Lanier, I've admitted -- I

12    have admitted every document that you offered yesterday.

13          MR. LANIER:  Your Honor, we would agree.

14          THE COURT:  I did not exclude a single

09:02:21 15    document that you offered into evidence, and I admitted

16    several over the defendants' objection.

17          The record's clear on that.

18          MR. LANIER:  Your Honor, we further contend

19    that not only should these documents be admitted into

09:02:33 20    evidence, but that they should be able to be read to the

21    jury.  Otherwise, the jury has no basis for assimilating

22    that evidence, and they should serve as a basis to

23    examine a witness whose job it is to see that these

24    things don't happen.

09:02:47 25          If the witness then wants to say, "I don't

1    remember that," so be it.  If the witness then wants to

2    say, "I don't know about that," so be it.  If the witness

3    then wants to say, "That happens in our stores and that

4    is fine CVS behavior," so be it.  But the witness must be

09:03:05  5    allowed to testify about it.

6                The Court's rulings and decisions on how

7    trial and cross-examination must proceed make a proper

8    presentation of this evidence impossible.  Under the

9    Court's procedures, we've got to put on the CVS witness

09:03:20  10    who actually noticed, first noticed the problem with

11    Dr. Veres, then the next CVS witness who documented the

12    problem, and then the next and then the next, until we

13    finally present the witness who interviewed Dr. Veres.  A

14    parade of five, ten witnesses is impossible in a case

09:03:37  15    where we're limited in the deposition numbers we were

16    allowed, we were limited in subpoena power, and we're

17    limited in our time for trial.

18                Furthermore, by not allowing the reading of

19    properly admissible documents and proper demonstratives

09:03:55  20    like the *Holiday* case to inform the jury and then ask

21    questions is also unfair and unduly prejudices the

22    plaintiffs.

23                THE COURT:  I allowed all the questions you

24    asked.  You asked him about *Holiday*.

09:04:08  25                MR. LANIER:  And you told me to move on and

1    I wasn't allowed to read any more out of the case.

2                    I would also like to address the fallout.

3    Plaintiffs expected to have Mr. Davis on the stand for

4    two days.  Our witnesses were ordered accordingly.  They

09:04:26  5    are coming in from out of town.

6                    By shutting down 80 to 90 percent of our

7    examination --

8                    THE COURT:  Wait.

9                    You expected a long direct examination by

09:04:33 10    CVS.  There was one question, all right?

11                    MR. LANIER:  I -- I also expected to go

12    myself with him well into today, as I said on the record.

13                    It left the plaintiffs scrambling to bring

14    in witnesses leaving inadequate time to get them here,

09:04:48 15    get adjusted to time zones, and prepared to take the

16    stand and efficiently present their testimony.

17                    In a timed trial, this is a grievous

18    consequence.  At some point, I will need to make a bill

19    with the testimony that the Court not allowed me to

09:05:03 20    secure with Mr. Davis and other witnesses should it

21    happen again in the future.  I can do that should the

22    Court allow it by narrative, or by Q & A, but I would ask

23    that time not be docked against my clock and it will take

24    a block of time.

09:05:16 25                    I would also ask if the Court insists on

1    these rules, that I be allowed under Rule 43 to compel

2    attendance of the many, many witnesses that will be

3    needed to cover each individual document of each

4    defendant, and I would ask the Court to drop the time

09:05:32  5    requirements and allow the nine to twelve months it may

6    take to try this case in that event.

7          THE COURT:  Obviously all that's rejected,

8    Mr. Lanier, and you know that.

9          MR. LANIER:  And I understand that, Your

09:05:46 10    Honor, and I'm making my --

11          THE COURT:  Look, as I said, you can put

12    anything on the record now.  It's untimely and

13    ineffective and candidly of no value for you to say it

14    now.

09:05:56 15          The time to have raised some of this would

16    have been contemporaneously if you felt that my rulings

17    were incorrect or unfair, all right?  I might have

18    reconsidered something.

19          Maybe I didn't understand where you were

09:06:07 20    going.  I mean, I was a trial lawyer and if I thought the

21    Judge didn't understand where I was going, I asked for a

22    side-bar and I said, "Judge, I'd like to make a proffer.

23    This is what -- the questions I want to ask, this is what

24    I expect to elicit, this is what I think is relevant."

09:06:25 25          I mean, everyone knows how to do that.

1          Your raising this now doesn't help anyone.

2     All right?

3               MR. LANIER:  Thank you, Your Honor.

4               THE COURT:  Again, you can't -- you're

09:06:35  5     suggesting that I just let you, like, get up and read in

6     a whole lot of facts and ask the witnesses is this true.

7               I mean, look, you could have -- you

8     can't -- you can't put in through your testimony or

9     through your questions a whole lot of facts that the

09:06:55  10    witness knows nothing about.

11              Everyone knows that.  Okay?  Then --

12    because I've already instructed the jury to disregard

13    your questions.

14              It's only the answers of the witness.  You

09:07:05  15    can ask whatever questions you want of him.  I mean, I

16    think you made some good points that, candidly, this guy

17    knew a lot less than he should have known, given his

18    position.

19              I think that's one of the things you were

09:07:16  20    trying to show.  I think you showed that.  He should have

21    known a lot more than he did.  He should have been a lot

22    more curious, in my opinion, as to what was, you know,

23    what was going on in the company.

24              He wasn't.  Okay.  You made that point.

09:07:29  25              But, all right, the --

1          MR. LANIER:  The rest of our concerns Mr.

2     Weinberger will address.

3          MR. WEINBERGER:  Your Honor, about a month

4     ago, we had a hearing before Special Master Cohen that

09:07:41   5     you ordered or agreed with so that we could provide a

6     sampling of documents and get some sense of what were the

7     guardrails surrounding the admissibility and use of those

8     documents at trial.

9          It's relevant to what happened yesterday

09:08:01   10     because what we -- what the rulings reflected was the

11     fact that we didn't need, in effect, a sponsoring witness

12     for documents that were clearly within the control and

13     custody of the defendants, had been produced by the

14     defendants, and so long as yesterday we were asking the

09:08:26   15     questions surrounding a document of somebody who was in

16     the department or in the division that oversaw the

17     conduct that was reflected in those documents, that if

18     the documents came from the defendants, the fact that the

19     witness's name was not on those documents would not

09:08:48   20     prevent us from cross-examining the witness on those

21     issues.

22          That's what we were trying to do yesterday.

23     And I appreciate the fact, Your Honor, that perhaps there

24     were some additional questions that could have been

09:09:02   25     asked.  However, what Mr. Lanier was attempting to do was

1    to show the document and -- to the witness, even though

2    he wasn't a recipient of the document, but we established

3    that it was within his department, and to ask him about

4    statements that were made specifically on this Veres

09:09:25 5    issue which is a critical issue to the case.

6                    THE COURT:  Well, I allowed -- I allowed

7    you to ask him questions about Dr. Veres and Dr. Torres.

8                    All right.  Look, as I said, I allowed

9    questions on every document.

09:09:39 10                    What I just didn't allow was wholesale

11    reading with no real question because you were getting in

12    something he knew nothing about.

13                    MR. WEINBERGER:  Well, the point was --

14                    THE COURT:  And if you wanted to establish,

09:09:52 15    look, I know nothing about Torres, I know nothing about

16    Veres, you had established that and that's your point.

17    All right.  He knows nothing about it and he should.

18                    MR. WEINBERGER:  But we should be able to

19    use the document to impeach the witness and to --

09:10:05 20                    THE COURT:  Impeach him about what?

21                    MR. WEINBERGER:  So if there was a

22    statement made about some -- something that their

23    division, their regulatory affairs division learned about

24    Veres, we should have had the ability to read the

09:10:21 25    statement, which is what Mr. Lanier was doing, and ask

1    him, A, did he hear about it; B, would that have been

2    important to your division; C, what --

3               THE COURT:  I didn't hear -- I didn't hear

4    any questions like that.

09:10:36  5               I didn't hear any questions like that.

6               MR. LANIER:  Because I was not allowed to

7    do that, Your Honor.  That's the whole point.

8               THE COURT:  I disagree.

9               MR. LANIER:  The document --

09:10:43 10               THE COURT:  I disagree, all right.  I don't

11    think that's what happened so.

12               MR. LANIER:  If the document is evidence, I

13    should be allowed to read the evidence to the jury.

14               THE COURT:  I didn't know it's evidence.  I

09:10:52 15    didn't know it's evidence.  You hadn't -- I mean if you

16    had had -- if all these things were admitted beforehand,

17    that should have been presented to me.  All right?  Then

18    they don't even have to be offered.  They all should come

19    in by stipulation if there's -- if there's documents that

09:11:06 20    you've, that both sides have agreed are admitted by

21    stipulation, fine, they should come in.  We don't need to

22    waste time at the end of every day offering them and

23    having rulings.

24               I mean I don't know any of this.  I mean to

09:11:23 25    my knowledge, no documents have been stipulated to as

1    admissible.

2                    MR. WEINBERGER:  Your Honor --

3                    THE COURT:  You know, there's no

4    disagreement on authenticity, but there's -- so, look,

09:11:33  5    again, respectfully, saying this now doesn't help me and

6    it doesn't help you.

7                    So the time to make an objection is

8    contemporaneous.

9                    MR. WEINBERGER:  Your Honor, if I --

09:11:49 10                    THE COURT:  Let me finish my statement.

11    All right.  You can make your record.

12                    MR. WEINBERGER:  May I suggest this, Your

13    Honor?

14                    Over the course of the afternoon, I think

09:11:57 15    you can appreciate the fact that as we got these rulings

16    one after another that limited our ability to do what we

17    intended to do with this witness, that set up parameters

18    that we understood was going to be the way that you were

19    going to rule on future issues associated with other

09:12:21 20    things that we wanted to get into evidence with respect

21    to this witness.

22                    This, you know, it all came as a surprise

23    to us in light of what --

24                    THE COURT:  I don't understand.  What is

09:12:33 25    the surprise?  I don't --

1          MR. WEINBERGER:  Because we had a hearing

2    before Special Master Cohen a month ago, and he not only

3    made some rulings, but indicated clearly what -- how it

4    was that you were going to handle these corporate

09:12:46  5    documents and what would or would not be required in

6    order for us to be able to use them.

7          So here's my -- here's my request and my

8    potential solution.  We would like the ability to recall

9    Mr. Davis to go through and make our record and ask

09:13:07 10    questions and --

11          THE COURT:  If you want to use your time

12    recalling him, fine.  You can recall him.

13          MR. DELINSKY:  Your Honor --

14          THE COURT:  They can recall him.  If

09:13:16 15    they -- I mean, I'm not going to let -- but it's maybe

16    very short.  I mean, not just for me to make -- I mean if

17    you -- well --

18          MR. DELINSKY:  Your Honor --

19          THE COURT:  All right.  Let's move on.  All

09:13:28 20    right?  Let's move on.

21          Again this is not helpful to me, it's not

22    helpful to you.

23          All right.  If both sides can agree on

24    documents that are admissible, just put them in by

09:13:38 25    stipulation.  You've had months and months to do that.

1    All right.

2                    MR. DELINSKY:  Your Honor, can we leave

3    this -- I'm just not hearing there's an order saying they

4    can recall him because that would be very prejudicial to

09:13:52  5    Mr. Davis.

6                    THE COURT:  Oh, I don't think it's

7    prejudicial at all.

8                    If they want to take their hours, I'm not

9    going to let them go -- well --

09:13:59 10                    MR. DELINSKY:  Well, Your Honor, we'd like

11    the opportunity for --

12                    THE COURT:  Hold it.

13                    I'm only going to allow him to be recalled

14    if you can convince me there was something you should be

09:14:11 15    able to do and my rulings were erroneous, I'll let you go

16    into that but you haven't done that.

17                    So if you can, you know, write some brief

18    and convince me -- but you'll have to show that you asked

19    that and I wouldn't let it be asked; not that I just

09:14:26 20    stopped or, you know, the only thing I stopped you from

21    doing, Mr. Lanier, is just wholesale reading of documents

22    and there was no real question.

23                    I would have asked you, you know, you want

24    to say -- all right, see this statement, sir?  Do you

09:14:40 25    agree with it, do you disagree with it?  Is this CVS

1    policy or not?

2                    Those are all proper.  There were a whole

3    lot of things that you didn't go into that I would have

4    let you go into with him.

09:14:52  5                    You chose not to.

6                    MR. LANIER:  We will file a brief on this,

7    Your Honor, and we will page and line the rulings and the

8    instructions that I was given with the questions I would

9    have asked.

09:15:01 10                    THE COURT:  And from now on, if either side

11   thinks that my evidentiary rulings are incorrect,

12   everyone knows you've got to make a contemporaneous

13   objection and give the Court the opportunity to

14   reconsider it.

09:15:15 15                    Doing it after the witness is off doesn't

16   accomplish a thing.

17                    All right.  At this point.  It's already

18   9:15.  From now on -- are there still issues with

19   documents or have those been worked out?

09:15:31 20                    Objections to documents with this next

21   witness?

22                    MR. HYNES:  Your Honor.

23                    THE COURT:  I'm going to charge both sides

24   any time I spend now on these documents but I'll deal

09:15:41 25   with them.

```
 1              What are the -- are there any objections?
 2    And I don't even have the documents so if there are, let
 3    me have them and I'll rule.
 4              MR. HYNES:  Your Honor, Paul Hynes for CVS.
 5    Yes, there are still some outstanding issues.
 6              THE COURT:  All right.  From now on, this
 7    time is being charged against both parties so let me
 8    have -- hand me up the documents and give them to me.  I
 9    don't have them.  I've got a bunch of e-mails that are
10    again of no value, I couldn't do any preparation, so --
11              MR. HYNES:  Your Honor, we handed up just
12    some exemplar documents because the documents we're
13    discussing now fall into the same bucket.
14              THE COURT:  All right.  These are documents
15    that the plaintiffs are seeking to use with Ms. Lembke?
16              MR. HYNES:  Correct.
17              MR. WEINBERGER:  Do you have a copy of the
18    exemplar documents?
19              THE COURT:  So the first one I've got is
20    8663.  All right.
21              All right.  I mean, I've got a bunch of
22    documents here.  8663, 8664, 8586.  Those are the three
23    that have been handed to me.
24              What --
25              MR. HYNES:  Correct.
```

1          THE COURT:  What is the objection?

2          MR. HYNES:  The objection, first, Your

3    Honor, is that plaintiffs cannot admit these documents

4    through an expert witness.  An expert witness cannot be

09:17:11  5    used as a conduit to admit evidence into the record

6    that's otherwise inadmissible.

7          These documents, many of them are very old,

8    from 20 years ago.  None of the witnesses who are on

9    these documents are on plaintiffs' witness list.  None

09:17:29 10    have been deposed.  None will testify at trial.

11          THE COURT:  Well, hold it.

12          Were these documents that Ms. Lembke, that

13    was shown to Ms. Lembke in preparation of her report and

14    that she reviewed and she's commented and opined on?

09:17:44 15          MR. WEINBERGER:  Yes.  Yes, Your Honor.

16          THE COURT:  All right.  Then they come in.

17          I mean, and they are CVS documents, all

18    right.  She got them.  She reviewed them.

19          MR. HYNES:  Your Honor, they are Purdue

09:17:56 20    documents.  They were not produced by CVS.  We have not

21    located these records in CVS documents.

22          THE COURT:  It says CVS.  The document I'm

23    looking at says CVS Pharmacy 8663.

24          MR. HYNES:  Plaintiffs cannot use an expert

09:18:08 25    witness as a conduit to admit documents.

1          They need a witness with knowledge of the

2    documents to admit them into evidence.

3          MR. WEINBERGER:  Your Honor, we have --

4          THE COURT:  No, I disagree.

09:18:19   5          I mean, Ms. Lembke can testify that based

6    on whatever she was given, okay.

7          If you can point out that what she was

8    given was untrue or inaccurate, you can certainly

9    cross-examine her on that.  All right?

09:18:34  10          At least they are CVS records, okay?  8663

11   is a CVS record.  I don't know what 8664 is.

12          MR. HYNES:  Just to clarify, Your Honor --

13          THE COURT:  CVS, okay.

14          MR. HYNES:  We're not saying they can't be

09:18:48  15   used with Ms. Lembke today.  We're saying they can't be

16   admitted into evidence through Ms. Lembke.  I just want

17   to make sure I'm being clear with Your Honor.

18          We're not objecting to them being used but

19   they can't be admitted into evidence, and if they are

09:19:02  20   used there should be a limiting instruction that they are

21   not being admitted into evidence.

22          MR. WEINBERGER:  Your Honor, at least one

23   of these documents was the subject of our hearing with

24   Special Master Cohen about a month ago.

09:19:16  25          We provided a certification from Purdue

```
 1    that these documents were business records of Purdue.

 2                    THE COURT:  Well --

 3                    MR. WEINBERGER:  Pursuant to the rules.

 4                    MR. HYNES:  But we objected to that

 5    certification a few days after the hearing, we objected

 6    in writing.

 7                    A certification is not proper.  It's

 8    executed by an outside lawyer for Purdue who has no

 9    personal knowledge of the documents.

10                    THE COURT:  Which Purdue document are we

11    talking about?  What's a Purdue document, 8586?  I

12    mean --

13                    MR. HYNES:  Your Honor, any of these

14    documents were produced by Purdue.  None of them were

15    produced by CVS.

16                    THE COURT:  I don't care who produced them.

17                    If they are CVS documents, they should

18    presumptively come in.

19                    If they're Purdue documents, I mean,

20    documents generated by Purdue, I don't see how they can

21    come in through Ms. Lembke.  All right?  They can say she

22    reviewed them, all right, and she can testify that she

23    reviewed them, and you can cross-examine on it.

24                    MR. HYNES:  And we're okay with that.

25                    THE COURT:  But I don't think you can admit
```

1    a Purdue document through Ms. Lembke.  All right?  She

2    doesn't know if it's -- anything about it.  You've shown

3    it to her so she can say she looked at it and --

4              MR. WEINBERGER:  We're not attempting to

09:20:29  5    admit the documents through Dr. Lembke.

6              THE COURT:  Okay.

7              MR. WEINBERGER:  On a separate issue, we

8    have a certification.

9              THE COURT:  All right, fine.  The point,

09:20:38 10    she can testify -- if she looked at them and it helped

11    form her opinion, she can -- she can say, "I looked at

12    this and I looked at that and I've reviewed all this and,

13    you know, these are my conclusions."

14              MR. HYNES:  We would submit we're fine with

09:20:52 15    using them and not admitting them today.  The

16    certification seems like a different issue we can address

17    at some other point in time.  We object to it --

18              THE COURT:  Let's move on.

19              MR. HYNES:  And just to be clear, those are

09:21:03 20    exemplar documents.  There were other documents Purdue

21    produced that fall into this bucket.  We didn't want to

22    burden you.

23              THE COURT:  They are not trying to admit

24    Purdue documents through Lembke, all right?  If she's

09:21:16 25    reviewed them, she can -- she's an expert.  She can

 1   testify about anything she was shown, and if you want to

 2   say what she was shown was inaccurate, you can certainly

 3   cross-examine her on that or bring that out and undermine

 4   her opinion that way.

09:21:30  5              That's fine.

 6              All right.  Was there any -- I was told

 7   there were a bunch of other objections.

 8              Have those been worked out?

 9              MS. FUMERTON:  Your Honor, this is Tara

09:21:44 10   Fumerton on behalf of Walmart.

11              Plaintiffs did withdrew a number of them

12   but I have a clarifying question for plaintiffs based on

13   Mr. Weinberger's representation.

14              So are plaintiffs not attempting to admit

09:21:55 15   any of these documents through Ms. Lembke?  They are

16   simply going to ask her about them?

17              MR. WEINBERGER:  No, we are not seeking to

18   admit them through this witness.

19              But clearly she's going to opine that she

09:22:06 20   relied on these documents, and the admissibility of those

21   documents will come -- will be handled through other

22   means.

23              THE COURT:  Right.  If they're going to

24   offer them, then we'll have to address them at that time

09:22:18 25   but anyone knows an expert can, you know, anything that

1    an expert saw or reviewed, both sides can examine on and

2    cross her on that.

3              MS. FUMERTON:  Your Honor, with that

4    clarification, then we are going to reserve our

5    objections to these documents if and when plaintiffs try

6    to admit them.

7              THE COURT:  All right.  Okay.

8              Was there anything else dealing with

9    Lembke?  There was an e-mail I got which had several

10   other categories.

11             Have those been taken care of?

12             MR. WEINBERGER:  Yes, Your Honor.

13             We have had -- it had to do with our

14   demonstratives and I think we've taken Special Master

15   Cohen's rulings and altered the demonstratives

16   appropriately.

17             THE COURT:  All right.  Well, there was

18   some other -- all right.  That's -- I thought there was a

19   lot --

20             MR. HYNES:  Your Honor, the first bullet of

21   our e-mail, those documents were withdrawn so I think

22   we're in good shape now.

23             THE COURT:  All right.  Purdue, and then

24   Walmart is objecting to settlements.

25             There were a couple -- I mean Walmart's

1    objections are noted but if there were settlements

2    within, within this time period on the subject of this

3    case like I admitted them for CVS, they would come in.

4                 MS. FUMERTON:  Yes, Your Honor, we

09:23:32  5    understand your prior rulings on this.

6                 This particular document plaintiffs

7    actually withdrew this morning so I don't think this

8    issue is ripe yet.

9                 THE COURT:  Okay.  All right.  Well, then,

09:23:40  10   let's proceed with Dr. Lembke.

11                MR. DELINSKY:  Your Honor?

12                THE COURT:  Yes.

13                MR. DELINSKY:  I just wanted a general

14   reminder of that instruction we talked about last night.

09:23:55  15                THE COURT:  Yes, I have that somewhere.

16                Okay.  I will say that at the beginning.

17                MR. DELINSKY:  Thank you, Your Honor.

18                (Jury in.)

19                THE COURT:  Okay.  Good morning, please be

09:25:38  20   seated.

21                Ladies and gentlemen, again I apologize for

22   the delay.  We had some evidentiary matters that I needed

23   to take up with the lawyers.

24                Before we begin with the next witness,

09:25:46  25   yesterday Mr. Lanier asked some questions of Mr. Davis as

1    to whether he had done anything to prepare on his own for

2    his testimony.

3              I allowed the questions, they are perfectly

4    permissible questions, but I want you to understand that

09:26:04  5    a witness has no obligation to do any preparation on his

6    or her own for testimony.  He or she can but is under no

7    obligation to do so, and you're not to draw any negative

8    inference if a witness is asked and said, "I didn't do

9    anything."

09:26:21 10              All a witness is obligated to do is show up

11    at a specified time, listen to both sides' questions and

12    answer to the best of his or her ability.

13              Okay.  Mr. Lanier, you may call your next

14    witness.

09:26:36 15              MR. LANIER:  Yes, Your Honor.

16              May it please the Court.  Good morning,

17    ladies and gentlemen.  Your Honor, our next witness is

18    Dr. Anna Lembke, L-E-M-B-K-E.

19              THE COURT:  Good morning.  Dr. Lembke, if

09:27:08 20    you could raise your right hand, please.

21

22

23

24

25

1                           ANNA LEMBKE

2              of lawful age, a witness called by the PLAINTIFFS,

3                   being first duly sworn, was examined

4                        and testified as follows:

09:27:16  5                   THE COURT:  You may take off your mask

6          while you're testifying.

7                        DIRECT EXAMINATION OF ANNA LEMBKE

8          BY MR. LANIER:

9          Q.    May it please the Court, ladies and gentlemen.

09:27:32 10                   Dr. Lembke, I really can't see you without

11         putting these on, so excuse me for a moment.

12                        Would you please introduce yourself to the

13         jury?

14         A.    Sure.

09:27:45 15                   So my name is Anna Lembke.  I am a

16         psychiatrist with expertise in addiction medicine, in

17         chronic pain.

18                        I am on the faculty at Stanford University

19         School of Medicine, and my role there is three basic

09:28:06 20         parts.

21                        I see patients, I teach medical students,

22         residents, fellows and in the broader medical community.

23         Q.    I'm going to interrupt you for a moment because I

24         want to put this into a framework for us.

09:28:23 25                   My goal is to ask you questions in four

Lembke - Direct/Lanier                486

```
         1   different broad areas and the first one we're already

         2   starting on, and that is -- oh, Mr. Pitts, could we turn

         3   on the monitors, please?

         4                    Thank you.  Thank you.

09:28:42 5                    My goal is, this is your roadmap, is to ask

         6   you in four main areas.  The first, about you as a

         7   person.  And what I've got in that regard is your CV.

         8   And a few other things.

         9                    And I'll ask you about those, but first let

09:28:57 10  me just ask some basic questions.

        11                    Where do you live?

        12   A.    I live in California.

        13   Q.    And you got into Cleveland when?

        14   A.    Late last night.

09:29:08 15  Q.    All right.  And you and I met to discuss this

        16   morning over breakfast at what time?

        17   A.    7:30.

        18   Q.    All right.  Thank you for being here and coming on

        19   quick notice.

09:29:25 20                   Do you treat people who are addicted to

        21   various things?

        22   A.    Yes.

        23   Q.    Do you write prescriptions?

        24   A.    Yes.

09:29:38 25  Q.    Do you teach and train others to do the same?
```

1    A.    Yes.

2    Q.    Do you lecture about these things?

3    A.    Yes.

4    Q.    Do you routinely deal with pharmacists in

09:29:57  5    conjunction with your patient care?

6    A.    Yes.

7    Q.    All right.  Dr. Lembke, I've got a copy of your CV,

8    which has been marked as demonstrative number 18, and so

9    the jury understands a bit of this, and we'll be getting

09:30:16 10    to purpose -- ah, we'll hold off.

11              This is -- you are Anna Lembke, M.D., fair?

12    A.    Yes.

13    Q.    What is the difference between a psychiatrist and a

14    psychologist?

09:30:31 15    A.    A psychiatrist goes to medical school and so has an

16    M.D., and a psychologist is either trained through a

17    Ph.D. program or a Psy.D program.  Psychologists

18    generally cannot prescribe medications.

19    Q.    So are you a psychiatrist or a psychologist?

09:30:50 20    A.    I am a psychiatrist.

21    Q.    And that's the M.D., you're a medical doctor?

22    A.    Yes.  I have gone to medical school and I received

23    medical training and residency and fellowship.

24    Q.    All right.  And if we look at your job title as

09:31:07 25    it's listed at least on your CV, tell the jury what it

           1    means that you are a Professor of Psychiatry and

           2    Behavioral Sciences.

           3              Let's start there.

           4    A.   I am on the faculty of Stanford University School

09:31:28   5    of Medicine.  I occupy the classic three-legged stool of

           6    academic medicine, which means that I see patients, I

           7    teach, and I do research.

           8    Q.   All right.  So the three legs of your stool are

           9    teaching.

09:31:45  10              How often do you teach?

          11    A.   I teach every day.  That's a major part of what I

          12    do.

          13              I teach in classrooms at Stanford and

          14    nationally, and I also do what is called bedside

09:32:01  15    teaching.  I teach while seeing patients, together with

          16    medical students, residents and fellows.

          17    Q.   And then the second leg of your stool was treatment

          18    or what did you call it?

          19    A.   Scholarly work.

09:32:22  20    Q.   Oh, scholarly work.  And explain what you mean by

          21    scholarly work.

          22    A.   I -- my role is also as a researcher, so the

          23    scholarly work encompasses my research.

          24    Q.   And what's the third leg of your stool?

09:32:38  25    A.   Clinical work.

Lembke - Direct/Lanier                    489

1    Q.    And clinical is a familiar term to many of our

2    jurors, but what is clinical work?

3    A.    Clinical work means that I actively see patients, I

4    have seen patients my entire career, and about 70 percent

09:32:55   5    of my job is seeing patients.

6                    I'm a clinician.  I'm a doctor who treats

7    patients.

8    Q.    All right.  You also have a courtesy appointment in

9    anesthesiology and pain medicine.

09:33:09 10                    Can you explain what that is, please?

11    A.    So I did have a courtesy appointment until this

12    year when I was promoted to full Professor, but what that

13    means is that I work closely with my colleagues in pain

14    anesthesia to treat patients who are struggling with a

09:33:32 15    variety of pain conditions.

16    Q.    All right.  And then all of this is done at

17    Stanford University?

18    A.    Yes.

19    Q.    To do that, you've -- and the law requires me to

09:33:46 20    put certain of your qualifications down on the record as

21    well as informing the jury, but let's get that done

22    fairly briefly.

23                    Do you have an undergraduate degree?

24    A.    Yes.

09:33:58 25    Q.    Tell the jury about your undergraduate degree,

 1   please, briefly.

 2   A.    I was a humanities major at Yale.

 3   Q.    All right.  And then you graduated with a

 4   Bachelor's in '89, then you went to the University of

 5   Beijing?

 6   A.    Yes.

 7   Q.    What is -- what did you do there?

 8   A.    I continued my studies in Chinese and then I became

 9   a middle school teacher in Changsha, China, to students

10   at Yali Middle School, which is an extension school of

11   Yale University.

12   Q.    So could you break out into Chinese for us here?

13   A.    I could.

14   Q.    The Court Reporter would love you.

15         Then from there, it looks like you got your

16   medical degree.

17         Where did you get your medical degree?

18   A.    At Stanford University.

19   Q.    And you did a residency in pathology.

20         Can you explain what pathology is?

21   A.    Pathology is the study of disease, and the

22   pathologist has different roles, but the ones you might

23   be most familiar with are examining bodies after death,

24   during autopsy, or examining tissue samples, for example

25   breast biopsies to determine the absence or presence of

1   cancer.

2   Q.    In addition to that extended residency you did, you

3   did a residency in internal medicine.

4           Can you explain what internal medicine is

09:35:30  5   -- or, no, you did an internship.

6           Excuse me.

7   A.    So that internship in internal medicine was a full

8   year at Highland Hospital, which is one of the safety net

9   hospitals in Oakland, California, and internal medicine

09:35:46 10   is, broadly speaking, the field of medicine so it's

11   front-facing, front line, you know, primary care

12   treatment of people with medical illnesses.

13   Q.    And then you did a residency in psychiatry,

14   psychiatry being what you've already explained, but

09:36:06 15   how -- what's the gamut, what's the range of psychiatry

16   work that you studied and do?

17   A.    I did a residency in adult psychiatry.  This was a

18   general residency, a broad-based clinical work in

19   treating patients with a variety of mental illness.

09:36:25 20   Q.    All right.  And then after that, it looks like you

21   did a two-year fellowship in mood disorders, psychiatry

22   and behavioral sciences.

23           Can you tell us about that, please?

24   A.    This was an additional time spent after my

09:36:43 25   residency, specifically working with patients who

1    struggle with mood disorders.

2              Mood disorders include things like major

3    depressive disorder and bipolar disorder.

4    Q.    Okay.  Your honors and awards, you probably don't

09:37:03  5    want me to dwell on these too much, but you had a good

6    GPA, that's what that means.  Fair?

7    A.    Yes.

8    Q.    Outstanding teacher in structural biology.

9              What is structural biology because I will

09:37:21 10    be asking you some of those questions today?

11    A.    It's basically the study of disease at the cellular

12    and tissue level.

13    Q.    Okay.  As I continue to look at your honors and

14    awards, a couple more jump out at me that I'd like you to

09:37:37 15    talk about.

16              The Fellowship Training Directors Award

17    with the American Society of Addiction Medicine, would

18    you tell us about that, please?

19    A.    So in 2013, we started an addiction medicine

09:37:47 20    fellowship in our program at Stanford.

21              This is an opportunity for young physicians

22    to do an additional year learning how to screen and

23    intervene for addiction, and general addiction is poorly

24    taught in medical schools and residencies, although

09:38:06 25    there's growing interest now in studying addiction.

1              So I am the program, the founding program

2      Director of our Addiction Medicine Fellowship, and I was

3      recognized by the American Society of Addiction Medicine

4      for my work in that area.

09:38:20  5   Q.   All right.  And then another one that seems

6      relevant to me for what we're talking about is the

7      Hazelden Betty Ford Foundation Humanitarian Kelly Clark

8      Spirit Award.

9              Can you tell us about that, please?

09:38:36 10   A.   That is an award for recognition of my years of

11     service in the field of addiction medicine.

12     Q.   All right.  If -- the next section of your CV has

13     academic and clinical appointments, and you've talked to

14     us about some of those.

09:38:53 15            But I'd like to go to the Outstanding

16     Research in Severe Mental Illness Janssen Scholar.

17             Can you tell us about that, please?

18     A.   That was an academic award during my residency.

19     That was awarded by my department in recognition of my

09:39:15 20    research at that time.

21     Q.   All right.  And then if we continue on, you are

22     currently the Medical Director for Addiction Medicine.

23             Can you explain what that is?

24     A.   So that means that in addition to my clinical and

09:39:32 25    teaching and research roles, I also now have

Lembke - Direct/Lanier                                              494

1    administrative roles where I lead our Addiction Medicine

2    initiatives in the Department of Psychiatry at Stanford

3    University School of Medicine Hospital and Clinics.

4    Q.    And starting last year, you're the Director of the

09:39:53 5    Taube Youth Addiction Initiative in the Department of

6    Psychiatry and Behavioral Sciences.

7                    Can you explain that, please?

8    A.    That is a new initiative we've launched in the past

9    couple of years, specifically targeting adolescents and

09:40:08 10    what are called transitional age youth, those 18 to 25

11    who are struggling with a variety of addictive disorders.

12    Q.    All right.  And, Doctor, you have a medical

13    license.  Is it on file with the appropriate authorities

14    and up-to-date?

09:40:25 15    A.    Yes.

16    Q.    And by the same token, you have Board

17    Certification, is that correct?

18    A.    Yes.

19    Q.    Would you explain to the jury, first, what is Board

09:40:36 20    Certification, and then we'll look at what you have

21    certification in.

22    A.    After medical school, physicians do a residency

23    which is specialized training in their medical field of

24    choice.  When they complete that residency, they sit for

09:40:52 25    an examination called the Board examination, and if they

Lembke - Direct/Lanier                        495

1    pass that exam, then they get Board Certification, which

2    is acknowledgement of their acquired expertise in that

3    medical discipline and which is often required for

4    employment.

09:41:10  5    Q.    And so are you Board Certified in psychiatry and

6    neurology?

7    A.    Yes.

8    Q.    Neurology is what?

9    A.    The study of the brain, as is psychiatry.

09:41:24  10   Q.    And are you also Board Certified in addiction

11    medicine?

12    A.    Yes.

13    Q.    And are you also Board Certified in preventive

14    medicine?

09:41:37  15   A.    No.  I am Board Certified in addiction medicine

16    under the auspices of the American Board of Preventive

17    Medicine.

18    Q.    So this Diplomate of the American Board of

19    Preventive Medicine is addiction medicine?

09:41:50  20   A.    Yes.

21    Q.    All right.  Now, if we were to go through the rest

22    of your CV, which time will not allow us to do, we would

23    see that you are an advisor at Stanford's Medical School

24    for Addiction Medicine fellows, is that right?

09:42:14  25   A.    Yes.

Lembke - Direct/Lanier                          496

1    Q.    You also do MedScholar advisory work, correct?

2    A.    Yes.

3    Q.    Would you explain to the jury briefly what that

4    means when you say you are an advisor.

09:42:29  5    A.    I have many mentees, medical students, Stanford

6    undergraduates, residents, fellows, people who I mentor

7    in their work and in pursuit of their career goals.

8    Q.    You also do editorial work as a guest editor and a

9    reviewer and an associate editor for several journals.

09:42:51  10           Would you explain to the jury what you do,

11    what you're called upon to do there.

12    A.    These are what are called peer-reviewed medical

13    journals.

14           One of the ways that the medical profession

09:43:07  15    tries to ensure quality in their publications is to send

16    those publications that are submitted by the authors out

17    to a group of anonymous peer reviewers who read it and

18    then weigh in on its merits and its worthiness for

19    publication.

09:43:25  20           And as editor, I have been responsible for

21    being on the editorial board, which is to say to oversee

22    this process and maintain the integrity of peer-reviewed

23    journals.  And as a reviewer, I myself have peer-reviewed

24    many, many articles over the years.

09:43:47  25    Q.    And have you also reviewed articles in the various

```
 1    journals that you've got listed?  It goes on for a couple

 2    of pages in your CV.

 3    A.    Yes.

 4    Q.    And so without reading through all of

 5    them -- oops -- you've actually done work relevant to

 6    each of these journals?

 7    A.    Yes.

 8    Q.    And do you receive funding for research from

 9    various places?

10    A.    Yes.

11    Q.    All right.  The next section beyond that is

12    scholarly work.

13               Have you published?

14    A.    Yes.

15    Q.    I showed the jury the cover of this book in my

16    opening.

17               Is this your book?

18    A.    Yes.

19    Q.    *Drug Dealer, MD.  How Doctors Were Duped, Patients

20    Got Hooked, and Why It's So Hard to Stop,* Anna Lembke,

21    M.D.

22               Was this a best-seller?

23    A.    Yes.

24    Q.    And what caused you to write this book?

25    A.    I became very concerned about the harm that doctors
```

Lembke - Direct/Lanier                                   498

1     were doing to patients, mostly unintentionally, in terms

2     of overprescribing medications like opioids, leading

3     those patients to become dependent, addicted, and in some

4     cases, die from those opioids.

09:45:21  5                 And what I observed was that this wasn't

6     just a matter of a small subset of so-called pill-mill

7     doctors, doctors who had lost their moral compass and

8     were prescribing for profit, this was a wholesale shift

9     in the way that doctors practiced medicine, beginning in

09:45:40 10    the late 1990s, that triggered a huge increase in opioid

11    prescribing for minor and chronic pain conditions,

12    leading to the opioid epidemic that we have today.

13                 So this book was my effort to show the

14    causes of that change in prescribing from inside of the

09:46:01 15    medical profession, focusing specifically on physician

16    prescribers and what factors have led to so many

17    well-intentioned, good, well-educated physicians to

18    overprescribe opioids and, thereby, essentially instigate

19    our current opioid epidemic.

09:46:27 20    Q.    And that's not your only book, right?

21                 You've got a brand new one that just came

22    out.

23                 When did this "Dopamine, Finding Balance in

24    the Age of Indulgence" -- oh, hold on, it's "Dopamine

09:46:46 25    Nation, Finding Balance in the Age of Indulgence."  When

Lembke - Direct/Lanier                                      499

```
 1       did this book officially come out?

 2       A.    It came out in August.

 3       Q.    In August?

 4       A.    In August.

 5       Q.    And some of this book will also be relevant in your

 6       testimony, I'm assuming?

 7       A.    It is relevant in the sense that my testimony is

 8       founded on the idea that the oversupply of addictive

 9       substances is the major contributor to people getting

10       addicted to that substance.

11       Q.    All right.  Doctor, I'm about through with the

12       personal aspect of these questions, but before I leave

13       that, I want to ask you if I ask opinion questions of you

14       today, the law allows you to only express those if you're

15       doing it within the reasonable medical or scientific

16       probabilities of your expertise.

17                  Do you understand that concept?

18       A.    Yes.

19       Q.    And will you agree to only offer opinions that are

20       based on reasonable probability within the medical or

21       scientific arena where you are testifying?

22       A.    Yes.

23       Q.    In other words, you can't be guessing and throwing

24       stuff out there.

25                  Okay?  All right.  Thank you.
```

09:46:54  (line 5)
09:47:18  (line 10)
09:47:38  (line 15)
09:47:55  (line 20)
09:48:07  (line 25)

Lembke - Direct/Lanier                          500

 1              So with that stop on the road, let's go to

 2     purpose.

 3              MR. BUSH:  Your Honor, just one second.  I

 4     want to note for the record that there are some

09:48:21  5     limitations on the scope of the expertise --

 6              COURT REPORTER:  I'm sorry.  I can't hear

 7     you.  I can't hear you.

 8              THE COURT:  I've made prior rulings on

 9     this.

09:48:30 10              MR. BUSH:  Thank you.

11     BY MR. LANIER:

12     Q.   Ma'am, what I'd like to talk to you next about is

13     the purpose.

14              What have we asked you to do in this case?

09:48:46 15     A.   You have asked me to search for the truth of the

16     matter as to whether or not the pharmacy defendants

17     contributed to a public nuisance in Lake and Trumbull

18     Counties.

19     Q.   And there are areas where the Court has ruled you

09:49:05 20     are allowed to testify.  I'm going to keep the testimony

21     to those areas carefully, but will you be here to testify

22     about whether or not the pharmacy -- I want to get it

23     just the way you said it -- pharmacy defendants

24     contributed to a public nuisance in these counties?

09:49:28 25     A.   I'm sorry.  Could you ask me the question again?

1    Q.    Yes.

2                   Are you prepared to testify about the truth

3    of whether the pharmacies contributed to a public

4    nuisance in these counties?

09:49:41 5    A.    Yes, I am prepared to testify on that matter.

6    Q.    And in that regard, I want to go to process, the

7    next stop, and ask you what work have you done, how did

8    you go about forming these opinions?

9    A.    So I reviewed the peer-reviewed medical literature.

09:50:01 10   These are the articles that are published in the field in

11   reputable journals.

12   Q.    All right.  Time out.  I've got to interrupt and

13   make sure I keep this in a Q & A form.

14                  So you have reviewed peer-reviewed

09:50:17 15   materials.

16                  Why is that important to do?

17   A.    Well, peer-reviewed journal articles hopefully set

18   a standard of quality that can be relied upon.

19   Q.    And so did any lawyers tell you which ones to

09:50:39 20   review, or did you go out and do this search yourself?

21   A.    I went out and did this search myself.

22   Q.    And were you satisfied that you had a chance to do

23   the literature search?

24   A.    Yes.

09:50:52 25   Q.    Is that something that's very standard for you to

1    do when researching your own articles or books?

2    A.   Yes.

3    Q.   All right.  So you reviewed peer-reviewed

4    materials.

09:51:04  5              What else did you do?

6    A.   I reviewed documents regarding the pharmacy

7    defendants' policies and procedures for assessing red

8    flags.

9    Q.   Now, this is a good time to talk about something

09:51:24 10   that we left out, and that is we talked about all of the

11   things you are in your CV, but we did not talk about the

12   things you are not.

13              Fair?

14   A.   Yes.

09:51:39 15   Q.   Are you a pharmacist?

16   A.   No.

17   Q.   Are you here to testify as a pharmacist?

18   A.   No.

19   Q.   Do you teach pharmacists?

09:51:57 20   A.   Sometimes.

21   Q.   Okay.  Do you work for a pharmacy chain or a

22   pharmacy?

23   A.   No.

24   Q.   Do you interact with pharmacists?

09:52:10 25   A.   Yes.

Lembke - Direct/Lanier

1    Q.    Do you have pharmacists call you as part of your

2    practice?

3    A.    Yes, on a regular basis.

4    Q.    Do pharmacists call you about prescriptions you've

09:52:23  5    written?

6    A.    Yes.

7    Q.    Do you engage with pharmacists?

8    A.    Yes.

9    Q.    Okay.  But you yourself, not one.

09:52:34  10            Fair?

11   A.    Yes.

12   Q.    All right.  So when you looked and reviewed these

13   documents on policies and procedures and red flags, were

14   you looking at them as a doctor who does the work you do?

09:52:52  15   A.    Yes.

16   Q.    Fair enough.

17            What else did you do?

18   A.    I reviewed other material provided by counsel

19   regarding this matter.

09:53:16  20   Q.    Were we able to supply you with certain documents

21   that involved various companies, businesses, people, that

22   are relevant to this case?

23   A.    Yes.

24   Q.    And were you able to review those and determine

09:53:32  25   whether or not they had any relevance in your opinions?

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    All right.  Now, I know once you've done all of |
| 3 | this, ultimately you wrote this report that's, like, |
| 4 | hundreds of pages long, but did you do anything else |
| 09:53:45 5 | before you wrote the report, or are we almost there? |
| 6 | A.    I'm sorry, I don't quite understand the question. |
| 7 | Q.    All right.  What did you do next? |
| 8 | What else did you do in this process? |
| 9 | A.    I reviewed -- I reviewed orders from the DEA and |
| 09:54:04 10 | the Department of Justice regarding criminal, criminal |
| 11 | investigations of pharmacy defendants. |
| 12 | Q.    All right. |
| 13 | MR. BUSH:  Objection, Your Honor. |
| 14 | MR. MAJORAS:  Objection. |
| 09:54:19 15 | MR. STOFFELMAYR:  Objection. |
| 16 | MR. BUSH:  I don't believe that's disclosed |
| 17 | in her report. |
| 18 | THE COURT:  Sustained. |
| 19 | The jury is to disregard that answer. |
| 09:54:30 20 | MS. SULLIVAN:  And, Your Honor, on behalf |
| 21 | of Giant Eagle I would just, if the Judge could just |
| 22 | instruct the witness when she talks about defendants, if |
| 23 | she could identify them as opposed to lumping them |
| 24 | altogether. |
| 09:54:41 25 | THE COURT:  That's a good point. |

1          So, Doctor, because the jury has to

2    consider the evidence against each defendant separately,

3    if you're speaking about any defendant or defendants, you

4    should identify them specifically so we know if your

09:54:58  5    answer applies to one, two, three, or four of them.

6               Otherwise, we wouldn't be able to know.

7               Thank you.

8               THE WITNESS:  Okay.

9               MR. MAJORAS:  Your Honor, one final

09:55:08 10    objection.  John Majoras.

11               Objection with respect to investigations

12    generally, whether she's reviewed them or not.

13               THE COURT:  I told the jury to disregard

14    the answer entirely, so --

09:55:17 15               MR. MAJORAS:  Thank you.

16               THE COURT:  -- Mr. Lanier needs a new

17    question.

18    BY MR. LANIER:

19    Q.    All right.  Ma'am, after reviewing these materials,

09:55:30 20    did you prepare a report?

21    A.    Yes.

22    Q.    And does that report contain your opinions that

23    you're prepared to offer in this case?

24    A.    Yes.

09:55:46 25    Q.    In addition to preparing that report, have you

```
 1    already testified in other opiate matters?

 2    A.    Yes.

 3    Q.    Tell the jury about your previous testimony.

 4    A.    I've testified in this court before regarding the

 5    very broad case that has been brought against opioid

 6    manufacturers, distributors, and pharmacies.

 7              I've also testified in individual cases

 8    regarding the same matter at the state and county level

 9    for a variety of different states and different counties

10    in the United States.

11              So I have been working on this case in one

12    form or another since 2018 and have been retained as a

13    medical expert witness in a variety of different cases.

14              And I have testified in those cases.

15    Q.    All right.  Fair enough.

16              And do you have your report with you today?

17    A.    Yes.

18    Q.    You've got your report up there?

19    A.    Yes, I do.

20    Q.    And then what I'd like to do now is spend the rest

21    of our time with you on the findings that you have made,

22    the conclusions that you have drawn.

23              Okay?

24    A.    Yes.

25    Q.    Oh, I left out something.
```

Lembke - Direct/Lanier                507

 1              Have you ever testified before the U.S.

 2    House of Representatives on the opioid epidemic and ways

 3    to mitigate the harms from that?

 4    A.    Yes.

09:57:25  5   Q.    And have you presented at numerous conferences

 6    before Governmental, professional, academic and lay

 7    audiences on these topics?

 8    A.    Yes.

 9    Q.    All right.  Then with that, let's look at your

09:57:40 10   findings.

11              What I've done is I've tried to take each

12    of your opinions and put it onto a card so that the jury

13    can see it while you talk about it and I question you

14    about it.

09:57:50 15             Okay?

16    A.    Yes.

17    Q.    The first one, opinion number one, you had said,

18    "The addictive nature of medicinal opioids has been known

19    for centuries."

09:58:07 20             I mentioned this to the jury in opening,

21    but I'd like you to give evidence to it, so take a moment

22    and tell us some of the salient points of history where

23    the addictive nature of medicinal opioids has been known

24    about.

09:58:23 25   A.    So the -- both the medicinal properties of opioids

1    have been known for thousands of years as well as the

2    potential for addiction to opioids.

3                    The problem of opioid addiction really took

4    off with the advent of technological progress and the

09:58:45  5    ability to take opium, which comes from the opium -- the

6    poppy plant, and distill out active ingredients making

7    them, thereby, more potent.

8                    So, for example, in the early 1800s,

9    chemists figured out how to distill Morphine in the

09:59:05 10    laboratory from opium, and Morphine is approximately ten

11    times more potent than opium.

12                    In the 1850s, the hypodermic syringe needle

13    was invented and the hypothesis at that time was that if

14    doctors administered Morphine through the hypodermic

09:59:33 15    syringe, patients were less likely to get addicted to

16    Morphine.

17    Q.    By the way, was that true?

18                    Did that work?

19    A.    No.  In fact, the opposite happened, that the

09:59:43 20    hypodermic syringe, which is not surprising to us now,

21    but was purportedly protecting patients, actually fueled

22    their addiction, leading to a whole generation of

23    individuals in the United States in the late 1800s

24    becoming addicted to Morphine specifically through the

10:00:04 25    hypodermic syringe, including many civil war soldiers but

1  also housewives and all kinds of people.

2  Q.    How did heroin come about?

3  A.    In the late 1800s, the Bayer Aspirin company said

4  that they had discovered or formulated a new opium, a new

10:00:28  5  opioid in the laboratory that would have all of the same

6  medicinal properties as Morphine and opium, but would not

7  be addictive.

8          This was an exciting new discovery that

9  they advertised, and they named it after the German word

10:00:43 10  for heroic or heroish and they marketed it beside baby

11  aspirin over the counter as heroin.

12          And heroin, then, of course led to the

13  narcomania of the early 19 --

14  Q.    The what?

10:01:00 15  A.    The narcomania.

16  Q.    Narcomania, what does that mean?

17  A.    It was a term that was used to describe rampant

18  heroin addiction that occurred in the early 1900s as a

19  result of over-the-counter dispensing, free availability

10:01:19 20  of heroin.

21  Q.    So you could just go to a drugstore and buy cough

22  syrup with heroin in it?

23  A.    Yes.  That is correct.

24          And as a result of that, the Harrison

10:01:32 25  Narcotic Act was passed in the early 1900s, effectively

1    banning heroin and making it illegal for distribution and

2    sale, which led to a marked decrease in the availability

3    of heroin and also a number of people who were getting

4    addicted to and dying from heroin.

10:01:53  5    Q.    So when the market availability decreased, did it

6    affect the addiction level?

7    A.    When the market availability decreased, the number

8    of people getting addicted to heroin also markedly

9    decreased.

10:02:09 10    Q.    Okay.  Now, throughout the 1900s after the Harrison

11    Act in, I think, 1914, but after the Harrison Act, what

12    was the catalyst for the next wave of opiate problems?

13    A.    The next major wave of opioid addiction started, is

14    essentially this opioid epidemic, which began in the late

10:02:33 15    1990s as opioid manufacturers primarily but also other

16    members of the opioid pharmaceutical industry widely

17    promoted the use of opioids in the treatment, not just at

18    the end of life or perioperatively or with severe trauma,

19    but for minor and chronic pain conditions.

10:03:01 20    Q.    What are the common names of these drugs that were

21    coming out in the late '90s, these opioids?

22    A.    There was, like, OxyContin, Vicodin, Percocet,

23    Percodan, Opana, Fentanyl.  So Fentanyl is a prescription

24    opioid that is manufactured entirely in the laboratory.

10:03:25 25    One of the salient features of the history

Lembke - Direct/Lanier                                    511

1      of opioids is how technology has progressively allowed us

2      to create more and more potent forms of opioids.

3                     So, for example, I told you Morphine is ten

4      times more potent than opium.  Fentanyl is 50 to a

10:03:43  5   hundred times more potent than Morphine.

6                     So we've seen a progression and an

7      explosion, not just in the numbers and varieties of

8      opioid-manufactured pain medication but also an

9      increasing in potency to the point today where doctors

10:04:02 10   can prescribe things like Fentanyl lollipops for their

11     patients.

12     Q.    Okay.  I want to ask you to explain a couple of

13     terms that you've just used and help us understand some

14     evidence that's already been suggested will come in in

10:04:19 15   this trial.

16                    You're talking about Morphine and Morphine

17     is how much more potent than the simple opium fluid?

18     A.    Ten times.

19     Q.    Ten times more potent?

10:04:38 20                   And I'm comparing it to what?

21     A.    Here you're comparing it to opium.

22     Q.    To opium.  All right.

23     A.    But our usual standard of comparison today is to

24     Morphine itself.

10:04:51 25   Q.    That's what I was going to have you explain to us.

|         |                                                                  |
|---------|------------------------------------------------------------------|
| 1       | So Morphine is the standard comparison?  In                      |
| 2       | other words, how do these other drugs compare to                 |
| 3       | Morphine, is that what you're saying?                            |
| 4       | A.    Yes.  That's right.                                        |
| 10:05:07 5 | Q.    And what is the abbreviation for that?  What's the      |
| 6       | words for that?                                                  |
| 7       | A.    Morphine milligram equivalents or MME.                    |
| 8       | Q.    Morphine milligram equivalents, did I write it            |
| 9       | right?                                                           |
| 10:05:26 10 | A.    That's right.                                          |
| 11      | Q.    And that's abbreviated as --                              |
| 12      | A.    MME.                                                       |
| 13      | It's essentially a way of seeing how much a                     |
| 14      | patient is taking by referencing everything back to             |
| 10:05:43 15 | Morphine.                                                    |
| 16      | Q.    So if I wanted to determine how much of a drug was        |
| 17      | dispensed, is there a difference between dosage and             |
| 18      | Morphine milligram equivalents?                                 |
| 19      | A.    Well, there are a couple of ways to look at how           |
| 10:06:03 20 | much of a drug is dispensed.  One way is to just count      |
| 21      | the number of pills.                                            |
| 22      | The other way is to convert those pills to                      |
| 23      | Morphine milligram equivalents, and the reason that             |
| 24      | that's important and useful is because it captures not          |
| 10:06:20 25 | just the quantity of opioids but also their relative        |

1    potency.

2    Q.    All right.  So if we wanted to -- but if we wanted

3    to see how many doses a pharmacy or a doctor prescribed

4    or dispensed, how do you count doses?

10:06:49  5    A.    Well, there are a number of different ways to count

6    doses, and I think looking at it from both perspectives

7    is important, counting the number of pills dispensed, but

8    also counting MMEs.

9    Q.    No question about that.

10:07:06 10            And I think, I'm not making my question

11    clear.

12            So let me try it again.

13            Let's do this.  Explain the MME of

14    Oxycodone.

10:07:26 15    A.    So Oxycodone is about 1. -- 1.5, basically ten

16    milligrams of Morphine is approximately equal to about 15

17    milligrams of Oxycodone, I believe.

18            There are equivalency charts that you can

19    use to make those analyses.

10:07:44 20    Q.    And I won't hold you to precision.  Give us general

21    data.  That works here fine.

22            Oxycodone, 1.5 MME.  How about Fentanyl?

23    A.    So Fentanyl, because it's so potent, is usually

24    measured in micrograms, but it's 50 to a hundred times

10:08:03 25    more potent than Morphine.

Lembke - Direct/Lanier                                    514

1    Q.    So it would have an MME of 50 to a hundred?

2    A.    It's 50 to a hundred times more potent, yes.

3    Q.    All right.  So if we measure by MME, we'll know how

4    strong the medication levels are.

10:08:24  5              If we're trying to figure out how many

6    pills people are popping, we can count the pills.

7                   Is that fair?

8    A.    Yes.

9    Q.    Great.

10:08:32 10              All right.  So as you were walking through

11   the history, you told us about Morphine.

12                  Where does heroin fit into this?

13   A.    In terms of --

14   Q.    Is it as -- Oxycodonish, 1.5, Fentanyl, in the

10:08:51 15  middle?  Where?

16   A.    I think the potency of heroin is pretty close to

17   Morphine.  It might be a little bit more potent than

18   Morphine.

19   Q.    All right.  So it's not on Fentanyl level?

10:09:02 20  A.    No.

21   Q.    All right.  Now, we roll into the 1990s.

22                  You've said the addictive nature has been

23   known for centuries.  How did people determine that it

24   was addictive?

10:09:25 25  A.    I mean it was obvious.

                        There were multiple epidemics, as I

described.

Q.    Are you going to be able to tell us -- preview

here -- are you going to be able to tell us why addiction

is -- what chemically is going on in the brain that

brings this addiction about?

A.    Yes.

Q.    All right.  We'll get to that, but let me ask you,

first, about this next part of your opinion.

            You said, "Recent misrepresentations of the

safety and efficacy of prescription opioids reversed a

century of appropriate restrictions on the use of these

dangerous drugs, and substantially contributed to the

current opioid epidemic."

            Is that your opinion?

A.    Yes.

Q.    Is it -- would you agree with the statement that

opioids are safe and effective, simply because the FDA's

approved them?

A.    Not -- not simply because the FDA has approved

them, no.

Q.    Explain what you mean when you talk about

misrepresentations of the safety and effectiveness,

efficacy of them.

            And we'll get into details later of how

1    that happened, but just what do you mean by that idea?

2    A.    So beginning in the late 1990s, there was a massive

3    effort to reeducate the medical community around the safe

4    and effective use of opioids.

5                       And this reeducation campaign was funded

6    and promoted by opioid manufacturers, and basically

7    communicated some fundamental untruths or

8    misrepresentations about opioids to the broader medical

9    community, which in turn led them to believe that opioids

10   are safer than they really are and also more effective

11   than they really are.

12                      And those representations are as follows.

13                      Number one --

14   Q.    All right.  Time out, because I've got to keep it

15   Q & A.

16   A.    Okay.

17   Q.    So what is the first misrepresentation?

18   A.    So the first misrepresentation that was taught to

19   the medical community is that as long as you are

20   prescribing an opioid for a person with pain, that they

21   are very unlikely to become addicted to that opioid.

22                      And there was even the implication that

23   there was some kind of biological protection that having

24   pain conferred to the vulnerability to becoming addicted

25   to that opioid.  None of that is true, by the way.

1                 But that is what doctors and others were

2       taught during the late 1990s and really very late into

3       this century, that a patient with pain prescribed an

4       opioid by their doctor for pain was very unlikely to

10:12:46   5    become addicted to that opioid or that it was very rare.

6       Q.    All right.  What is your second misrepresentation?

7       A.    The second misrepresentation was this idea that no

8       dose is too high.

9                 So one of the selling points or promotional

10:13:05 10     messages was that if you have a patient who seems to

11      respond to the opioid, that is they say, "Wow, this

12      really helped my pain but it stopped working," that it

13      was perfectly okay then to increase the dose in an

14      unlimited fashion to target subsequent pain relief.

10:13:27 15               And doctors were essentially told that

16      there was minimal or no risk in going up on the dose.

17                Very often this message was communicated by

18      comparing opioids to things like Tylenol by saying, you

19      know, Tylenol is something that you can't keep going up

10:13:46 20     on the dose because Tylenol can cause liver death, but

21      for opioids, that's not true, the implication being that

22      they were so much safer and that the dose was really

23      unlimited, when in fact, we have a lot of data showing

24      that the higher the dose and the longer that patients are

10:14:07 25     on opioids, the more likely they are to get addicted to

1    the opioid and the more likely they are to die from the

2    opioid.

3    Q.    Are there any other recent misrepresentations of

4    the safety and efficacy that come to your mind right now,

10:14:21  5    other than these two?

6    A.    Another really important misrepresentation was the

7    idea that opioids are effective treatment for chronic

8    pain.

9              In fact, there are no reliable studies

10:14:36 10    showing that opioids work well for chronic pain.

11              Now, there is good evidence showing that

12    opioids work short-term for short-term pain or what's

13    commonly called acute pain, but if taken for longer than

14    three months on a daily basis, opioids simply don't work

10:15:01 15    very well.

16              People develop what's called tolerance

17    where they need more and more to get the same effect over

18    time, which requires escalating doses, which then

19    contributes to the risk, such that the tipping point

10:15:16 20    between risks, benefits and alternatives of opioids used

21    daily long-term just isn't justified, based on the

22    evidence.

23    Q.    Now, Doctor, you've used a couple of words and I

24    want to make sure that I understand the medical usage

10:15:32 25    you're using.

```
  1            When you said, "Opioids are effective for

  2   chronic pain," what do you mean by "Chronic"?

  3   A.    Chronic refers to pain lasting for more than three

  4   months, which is past the time of normal tissue healing.

  5   Q.    All right.  And then acute pain is pain that lasts

  6   what?

  7   A.    Typically less than three months.

  8   Q.    All right.  Thank you.

  9            Any other misrepresentations that come to

 10   your mind right now?

 11   A.    Another important misrepresentation was this idea

 12   that doctors and other health care providers could be

 13   able to tell who would get addicted to opioids prescribed

 14   by a doctor and who wouldn't.

 15            In other words, there was this idea that a

 16   doctor could somehow determine who was at higher risk,

 17   when in fact, although that sounds like a really

 18   reasonable goal and something that, you know, we should

 19   aspire to, the reality is that right now we do not have

 20   any reliable tools to predict who will and will not get

 21   addicted to opioids prescribed by their doctor.

 22            And furthermore, the biggest risk factor

 23   for getting addicted to opioids prescribed by a doctor is

 24   dose and duration, so the longer you're on the opioid,

 25   and the higher the dose, the more likely you are to get
```

 1    addicted to that opioid.

 2                    And that dose and duration actually trump

 3    or overpower other common risk factors for addiction like

 4    a personal or family history of addiction.

 5    Q.    Any other misrepresentations aside from these four

 6    that jump out?

 7    A.    I think those are the main ones.

 8    Q.    All right.  So if we continue with your opinion,

 9    you say, "Recent misrepresentations of the safety and

10    efficacy of prescription opioids reversed a century of

11    appropriate restrictions on the use of these dangerous

12    drugs and substantially contributed to the current opioid

13    epidemic."

14                    You've explained the restrictions that had

15    existed.

16                    Explain what you mean by, "substantially

17    contributed to the opioid epidemic," and I need to narrow

18    your attention on this to, let's start with these

19    misrepresentations that you've described.

20                    How did those substantially contribute to

21    the current opioid epidemic?

22    A.    Those misrepresentations led prescribers to believe

23    that they could prescribe opioids with minimal risk, and

24    so they began prescribing opioids prolifically for not

25    just people with acute pain or people who are at the very

1    end of life or people who were experiencing trauma or

2    surgery, doctors then were encouraged to and were duped

3    into believing that opioids were safe and effective for

4    almost any kind of pain.

10:19:11  5              So that led to an increased opioid

6    prescribing, which then led to an increased supply of

7    opioids in our communities, in medicine cabinets, in high

8    schools, on the streets, which in turn made it very easy

9    for people to become exposed to opioids, even beyond

10:19:34 10   people who were seeing a doctor and getting a

11   prescription, which in turn led to several generations of

12   Americans getting addicted to opioids and dying from

13   opioids.

14   Q.   I want to make sure I'm writing and charting what

10:19:50 15   you're saying properly.

16              You're saying that the increased

17   prescribing led to an increase in supply, which led to an

18   increase in exposure?

19   A.   Yes.

10:20:10 20   Q.   Which made it -- which led to several generations

21   of addiction?

22   A.   Yes.

23   Q.   All right.  Is this some of what you talk about in

24   your book, *Drug Dealer, MD, How Doctors Were Duped,*

10:20:31 25   *Patients Got Hooked, and Why It's So Hard to Stop*?

1    A.    Yes.

2    Q.    I think the, "Why it's so hard to stop" is in your

3    next opinion, so I want to put your second opinion up and

4    discuss that with you, please.

5              You say, "Addiction is a chronic, relapsing

6    and remitting disease with a behavioral component,

7    characterized by neuroadaptive brain changes resulting

8    from exposure to addictive drugs."

9              I'll stop there and we'll do the last

10   sentence in a moment.

11             Are you prepared to testify as to why this

12   is your opinion?

13   A.    Yes.

14   Q.    All right.  Then let's get started.

15             What does it mean for addiction to be

16   chronic?

17   A.    Once people develop the disease of addiction, they

18   usually struggle with that disease lifelong.

19             It doesn't mean they don't get better.

20   Treatment actually works and people do get better, but it

21   means that it's a chronic illness just like diabetes is a

22   chronic illness, just like heart disease is a chronic

23   illness.

24   Q.    Okay.  Relapsing, what does it mean for it to be a

25   relapsing disease?

A.    That means it's a disease that is characterized by

periods of remission or recovery that can be

interspersed, not always, but can be interspersed with

periods of relapse where people return to addictive drug

use.

Q.    And then a remitting disease, what does remitting

mean?

A.    Remitting refers to episodes where that individual

is not engaging in addictive drug use, sometimes called

recovery or more colloquially referred to as sobriety.

Q.    Or being clean?

A.    We try not to use that terminology any more because

it's considered stigmatizing, clean versus dirty, but,

yes, that is common --

Q.    All right.  Sober.

A.    -- terminology.

Q.    So sober is the right word to use, someone is

sober?

A.    Well, even that is not the medical term that we're

using now.

          I will say that the language of addiction

is in flux as we try to de-stigmatize the language.

          We usually talk about people being in

recovery.

Q.    In recovery.  So remitting means episodes in

1  recovery?

2  A.    Yes.

3  Q.    All right.  Thank you for that.  I learned

4  something.

10:23:03  5          "With a behavioral component."

6          Explain what you mean by that?

7  A.    That's a way of drawing similarities between the

8  disease of addiction and, for example, the disease of

9  Type II diabetes.

10:23:21 10          Both diseases are chronic relapsing and

11  remitting diseases with a behavioral component.  For Type

12  II diabetes, the behavioral component is often related to

13  diet and inactivity.  For the disease of addiction, the

14  behavioral component is the drug seeking, the drug

10:23:41 15  taking, and the other behaviors around the disease of

16  addiction.

17  Q.    So is it fair for me to say that's drug seeking and

18  more?

19  A.    Yes.  Drug seeking, drug taking.

10:23:51 20  Q.    Got it.

21          Now, "characterized by neuroadaptive brain

22  changes resulting from exposure to addictive drugs."

23          You're not in a position to be able to draw

24  up there for everybody to be able to see, and in this age

10:24:08 25  of COVID, I'm hesitant to ask His Honor to let you come

1      down here to draw and testify.

2                     So, instead, if you'll explain to me what

3      to draw, I'll try and draw it.  And I've also got one of

4      your pictures from your report, but I want you to please

10:24:22  5      explain to us what it means to have "neuroadaptive brain

6      changes."

7                     And you might start with how the brain

8      works.

9                     So teach us.  How does the brain work?

10:24:37 10      A.    Right.  Yes.

11                     So this refers to the neuroscience of

12      addiction and the changes that occur in the brain as a

13      person is becoming addicted.

14                     And some key things to understand is that

10:24:51 15      there is a neurotransmitter in the brain called dopamine.

16      Q.    All right.  Time out.

17      A.    Okay.

18      Q.    A neurotransmitter.

19                     What is that?

10:25:01 20      A.    So a neurotransmitter is a chemical in the brain

21      that allows neurons to communicate with each other.

22                     Neurons are the main type of cell in the

23      brain.  Neurons are these long, very long spindly cells

24      that send electrical signals from one neuron to the next

10:25:22 25      neuron, creating electrical circuits, that allow us to

1    have our thoughts, emotions, behaviors.

2    Q.    All right.  So for those of us who are visual,

3    we've -- maybe people have seen those pictures of a brain

4    that's got all of these tendrils that just seem to grow

10:25:47  5    out and connect to various cells.

6                    Does this horrible drawing help at all

7    explain what you're talking about?

8    A.    Kind of.

9    Q.    Okay.  Sorry.

10:26:06  10    A.    It does a nice job capturing that neurons are long

11    cells, but one of the key features of neurons is that

12    they don't actually touch end-to-end.  There's a little

13    space between the neurons.  And that space is called the

14    synapse.

10:26:25  15                    And nature has done that for a very good

16    reason.  It allows chemical modulators to adjust the

17    electrical firing between neurons.

18                    So those chemical modulators are molecules

19    that are called neurotransmitters that transmit signals

10:26:50  20    in that synapse from one neuron to another.

21    Q.    All right.  I tried it again.  I only did three of

22    them.  Is this any better?

23    A.    Better, yes.

24    Q.    All right.  So instead of actually connecting one

10:27:05  25    cell to the other, you said there's a gap that chemicals

```
 1   can then step into and make the connection.

 2                  Is that right?

 3   A.    That's right.  Yeah.

 4   Q.    And the chemical, that is the synapse?

 5   A.    That's the synapse.

 6   Q.    So the synapse is the gap.

 7   A.    Um-hmm.

 8   Q.    And those chemicals that get into the synapse and

 9   connect the neurons, those are called neurotransmitters?

10   A.    Those are called neurotransmitters, and one way to

11   think about neurotransmitters is to imagine that on the

12   pre-synaptic neuron, there's a little pitcher throwing a

13   baseball.  That baseball is the neurotransmitter and the

14   pitcher throws it to a catcher on the post-synaptic

15   neuron, who catches the neurotransmitter.

16                  And that catcher's mitt is the receptor.

17   You probably have heard that neuroreceptors, but that's a

18   catchers mitt sitting on the neuron waiting to catch that

19   baseball, which is the neurotransmitter.  And in this

20   case, we're specifically talking about the

21   neurotransmitter dopamine?

22   Q.    All right.  So one neurotransmitter will throw the

23   baseball to another -- to a receiver, a glove.

24   A.    One neuron, one neuron will throw the baseball,

25   which is the neurotransmitter, to the catcher which is
```

1    holding the receptor.

2    Q.    You got four kids.  One of your kids is an athlete?

3    A.    Yes.

4    Q.    I see where the analogy came from.

10:28:46  5              All right.  We'll thank Elizabeth for this

6    one.

7              So you've got the connections then being

8    made.

9              What's the next thing -- you're doing a

10:28:59 10  neuroscience of addiction, I'm following you, but now I

11   know what a neurotransmitter is.  So go back, and you

12   said neurotransmitters, what do they do?

13   A.    Okay.  So dopamine, there are many different

14   neurotransmitters in the brain.  There's serotonin,

10:29:14 15  there's norepinephrine.  We're talking about dopamine

16   because it's probably the most important transmitter

17   involved in the process of addiction.

18              And there's a specific part of the brain

19   called the reward pathway.  And in the reward pathway,

10:29:30 20  there are a lot of neurons that deal in dopamine.

21              Dopamine is a very important

22   neurotransmitter in that specific part of the brain.

23   Q.    All right.  I've got to interrupt you to see if I'm

24   making sense of this in my head, in my brain.

10:29:46 25              So there are lots of different kinds of

1    neurotransmitters?

2    A.    Yes.

3    Q.    One of them is dopamine?

4    A.    Yes.

10:29:53  5    Q.    And that's the one you're going to be telling us

6    about here shortly?

7    A.    Yes.

8    Q.    So in the illustration you used, is dopamine the

9    baseball?

10:30:02  10    A.    Yes.

11    Q.    Got it.  All right.  So where does the dopamine

12    come from?

13    A.    Dopamine is made in our bodies.

14    Q.    Okay.  And the dopamine is used to connect the

10:30:21  15    neurons?

16    A.    Yes.

17    Q.    All right.  In what way does dopamine connect the

18    neuron, I mean what does that do, what is the dopamine

19    connection?

10:30:33  20    A.    So dopamine is the most important neurotransmitter

21    in our experience of reward, motivation, and pleasure.

22                    And one of the fundamental differences

23    between substances that are addictive and most that are

24    not is that substances that are addictive release a whole

10:30:56  25    lot more dopamine in the reward centers of the brain.

1    Q.    All right.  May be a stupid question, does my dog

2    have dopamine?

3    A.    Yes, your dog has dopamine.  And when you throw a

4    ball, the dopamine spikes, and when your dog gets the

10:31:22  5    ball, it probably goes even higher.

6              When you give your dog a dog treat, that

7    dog will have a release of dopamine.  Really anything

8    that's rewarding, motivating, enhancing.

9    Q.    Is that a way that dogs can be trained?

10:31:37 10   A.    Yes.  Absolutely.

11   Q.    Does it also train, then, a human being sometimes

12   in similar ways?

13   A.    Yes.

14   Q.    All right.

10:31:48 15   A.    It --

16   Q.    So if, if I redo the drawing here, we've got

17   dopamine as part of these connections.  And explain why

18   they are particularly important on issues of reward and

19   motivation and pleasure.

10:32:14 20   A.    So dopamine produces the pleasure that we

21   experience with any reinforcing behavior, and of course,

22   once we get that dopamine, then we learn that that

23   behavior gives us that feeling.

24             And then we learn to do it again.  So it's

10:32:37 25   very important to the learning loop.

Lembke - Direct/Lanier                531

1       But when it comes to the process of

2    becoming addicted, what essentially happens is that that

3    addictive substance hijacks this motivational circuit and

4    makes us begin to believe that we need that substance for

10:32:58  5    survival; that it's as important to us as food, clothing,

6    shelter, taking care of our children.

7            This is what we mean when we talk about the

8    hijacked brain of addiction.

9            Dopamine evolved in our brains over

10:33:12 10    millions of years to encourage us to approach pleasurable

11    stimuli and avoid painful ones, but the problem is

12    that -- and we were evolved that way so that in a world

13    of scarcity, we would seek out food, clothing, shelter

14    and a mate.  But the problem is that today, addictive

10:33:36 15    substances essentially take over that part of the brain

16    and confuse the brain into believing that getting that

17    substance is equivalent to food, clothing, shelter and a

18    mate.

19            And it does that in large part through this

10:33:52 20    process of neuroadaptation, which I'm happy to explain.

21    Q.    All right.  And I'm going to have you explain it,

22    but first I want to take this drawing that you've got in

23    your -- I think you use this in presentations, don't you?

24    A.    Yes.

10:34:06 25    Q.    Is this relevant to what we're discussing?

1    A.    Yes.

2    Q.    All right.  So I'm going to put your drawing up

3    there instead of mine, and ask you to explain why this

4    teeter totter between pleasure and pain, and it looks

10:34:21  5    like you've got me on some bad days here on one side and

6    me on some good days on the other side.

7                    Explain that, please.

8    A.    So one of the most important findings in

9    neuroscience in the last 75 years or so is that pleasure

10:34:40 10    and pain are co-located in the brain.  So the same parts

11    of the brain that process pleasure also process pain.

12                    And pleasure and pain work like opposite

13    sides of the balance.  So if you imagine that in your

14    brain, that part of your brain which I called the reward

10:34:57 15    pathway, there's a little teeter totter, like in a kids'

16    playground.  And when we experience pleasure, that

17    balance tips one way, and when we experience pain, it

18    tips the other.

19                    But one of the overarching rules governing

10:35:13 20    this pleasure/pain balance is that it doesn't want to be

21    tipped for very long to the side of pleasure or pain, and

22    the brain will work very hard to keep that balance level

23    or what's called homeostasis.

24                    So, for example, if I do something

10:35:30 25    pleasurable for me, like eat a piece of chocolate, my

1    pleasure/pain balance tips slightly to the side of

2    pleasure but no sooner has that happened, then my brain

3    will want to restore a level balance.  And here's the

4    really important point:  My brain does that by tipping an

10:35:49   5    equal and opposite amount to the side of pain before

6    going level again.

7              This is called the opponent process

8    reaction.

9    Q.    Called the what?

10:36:00  10    A.    Sorry.  The opponent process reaction.

11    Q.    Okay.

12    A.    I imagine this as right after I eat a piece of

13    chocolate, a little gremlin hops on the pain side of my

14    balance to bring it level again but the gremlins really

10:36:14  15    like it on the balance so they stay on until it's tipped

16    and equal and opposite or not to the side of pain, then

17    the gremlin gets off and my balance is level again.

18              That gremlin represents the process of

19    neuroadaptation; how the brain adapts to my having eaten

10:36:34  20    a piece of chocolate which released dopamine in my reward

21    pathway.  And essentially what the brain does in response

22    to a release of dopamine is it starts to downregulate my

23    own production of dopamine and my own dopamine receptors.

24              So taking that example and extending it to

10:36:48  25    somebody who takes opioids, they don't just get a little

Lembke - Direct/Lanier                          534

1    tip to the side of pleasure, they get a great big tip.

2    And if they inject it intravascularly, they get a really

3    fast tip.  Remember how much dopamine and how fast that

4    dopamine is released contributes to the experience of

10:37:06  5    getting addicted.  So they release it very quickly and a

6    whole lot, now I need a great big gremlin on the pain

7    side of my balance to bring it level again but remember,

8    that gremlin stays on until it's tipped to pain.  That's

9    the come-down or opioid withdrawal.

10:37:20 10                  It can be extremely painful.  But with

11    time, days, to weeks, the gremlin hops off and

12    homeostasis is restored.

13                  Now, here's --

14    Q.    One --

10:37:31 15    A.    Oh, sorry.  Just one more thing.

16                  To understand the process of addiction,

17    what you have to imagine is that when the gremlin is

18    tipped here, that person is experiencing the universal

19    symptoms of withdrawal from any addictive substance:

10:37:46 20    Anxiety, irritability, insomnia, depression, and craving,

21    intrusive thoughts, abusing.

22                  Also in the case of opioids, that person is

23    experiencing bodily pain, even if they don't have a pain

24    condition, when they're in opioid withdrawal, they will

10:38:04 25    experience bodily pain.

1              So if that person continues to take opioids

2       over days to weeks to months to years, even if that

3       opioid was prescribed by their doctor for chronic pain,

4       they will end up with so many gremlins on the pain side

10:38:20  5     of their balance that when they're not taking opioids,

6       their balance will tip to the side of pain and they will

7       be in withdrawal, they will be craving, they will be

8       irritable, anxious, restless, not able to sleep, and very

9       importantly, they then need to continue to take opioids,

10:38:39 10    not to feel good or even to relieve much pain, but just

11      to get out of abject misery, just to bring that balance

12      level and feel normal.

13             And it can take a really, really long time

14      for the brain to readapt.  So once those gremlins are

10:38:58 15    camped out on the pain side of the balance, that can last

16      for weeks to months and in some cases, even years after a

17      person has stopped using their drug of choice, which is

18      exactly why people will relapse, even when their lives

19      are so much better.

10:39:13 20             And this was, I think, really revelatory

21      for me because it was hard for me to understand why

22      someone with addiction, who stopped using and got their

23      job back and got their spouse back and got their kids

24      back, why would that person give it all up to use the

10:39:28 25    opioid again, but the neuroscience of addiction explains

Lembke - Direct/Lanier                          536

1    that the physiologic drive based on a balance chronically

2    tilted to the side of pain is going to overwhelm moral

3    compass, overwhelm future goals, it's all that person can

4    do really to get through a day.

10:39:48  5    Q.    All right.  I want to make sure I've got this in

6    ways that I can hold on to longer than today.

7                    So an opioid is going to cause a dopamine

8    dump or release that will go into the brain?

9    A.    It's in the brain.  This is happening in the brain.

10:40:11 10    Q.    Happening in the brain.  Got it.

11                    And when that happens, you can derive

12    pleasure from that?

13    A.    Initially that experience will give pleasure or

14    relieve pain.

10:40:25 15                    So, for example, not everybody starts out

16    with a level balance.  Right?  Some people are living

17    with terrible pain, and so when they take an opioid,

18    temporarily that opioid will relieve their pain, but what

19    happens is with repeated use over many months, the

10:40:41 20    balance will compensate and that person will end up in

21    some cases in even more pain than when they started.

22    Q.    All right.  So I go, I get a root canal, the

23    numbing medication wears off, I'm in pain, I've been

24    given an opiate.

10:41:02 25                    I may not get high from the opiate because

Lembke - Direct/Lanier                          537

1    all it's doing is bringing the teeter totter back to deal

2    with the pain, is that fair?

3    A.    That's exactly right, yeah.

4    Q.    And then if I keep taking it, at some point in

10:41:16 5    time, it may tip the teeter totter to where all of a

6    sudden, I'm -- well, no, I messed up again.

7                    I'm not sure I get all of this.

8                    So let me ask it this way.

9    A.    Let me interject, too, and say that a person in

10:41:30 10   pain who takes an opioid may experience relief of their

11   pain and also will likely experience psychological

12   reinforcements.  So those two aren't mutually exclusive.

13   You can get relief from pain and also get relief from

14   anxiety, get relief from depression, have more energy or

10:41:52 15   be able to sleep.

16   Q.    All right.  That's what I was trying to get to.

17                    Thank you.

18                    All right.  So if we look back at this

19   opinion, now, addiction, lifelong -- is "chronic,

10:42:03 20   relapsing, remitting disease with behavioral component,

21   characterized by neuroadaptive brain changes resulting

22   from exposure to addictive drugs," is that what you've

23   been describing to us?

24   A.    Yes.  Those gremlins represent the process of

10:42:20 25   neuroadaptation, how in response to a whole lot of

1    dopamine, the brain will downregulate its own dopamine

2    and its own dopamine receptors to compensate for that.

3    Q.    All right.  In your report you gave us -- and the

4    parties obviously -- a drawing -- not a drawing -- a

10:42:39  5    picture that is out of the molecular psychiatry book that

6    was entitled, "Dopamine in Drug Abuse and Addiction:

7    Results from Imaging Studies and Treatment Implication."

8             Can you explain why you thought this

9    relevant to put in your report for the Court?

10:43:00  10    A.    This is a very famous study by Nora Volkow, and her

11    team.  Nora Volkow is the Director of the National

12    Institutes of Drug Abuse.  And what she did here was she

13    took pictures in real-time of the brains of people,

14    healthy controls, people who had not been using drugs,

10:43:21  15    and those brains are on the left-hand side.

16             So ignore the words "Cocaine, meth, heroin

17    and alcohol" because they don't apply to the brains on

18    the left-hand side.

19             The left-hand side brains are the brains of

10:43:38  20    healthy controls, people who don't use drugs.

21             And what Dr. Volkow and her team did was

22    she measured dopamine transmission in the brain's reward

23    pathway.

24             And in this picture you'll see that

10:43:53  25    dopamine transmission is higher the redder the color.  So

1        the more red there is, the more dopamine transmission

2        there is.

3                       And what you see in those, that column on

4        the left, in those healthy brains, is that there's quite

10:44:12   5        a bit of red, meaning that there's a nice, healthy amount

6        of dopamine firing in the reward pathway of the brain,

7        which is great.

8                       We all have a tonic base line level of

9        dopamine that is firing all the time.  That is crucial

10:44:30  10        for our survival.  And when we do something that's

11        rewarding, it goes up, and when it goes below levels,

12        that's aversive or not rewarding.

13                       Then she scanned the brains of individuals

14        who had been addicted to drugs, and those drugs are

10:44:47  15        listed on the left-hand side; the cocaine, the meth, the

16        heroin and the alcohol.  And those brains are pictured in

17        the right-hand column.

18                       And what you'll see in those right-hand

19        column brains is that there's very little red, which

10:45:03  20        means that there's below-normal levels of dopamine

21        transmission in those brains.

22                       Now, what's really important here is that

23        these individuals stopped using their drug of choice two

24        weeks before these brains were scanned.  So there, you

10:45:27  25        have a wonderful example of how the brain goes into this

            1    dopamine-deficit state with addictive drug use.

            2                    And that dopamine-deficit state can persist

            3    even after people have stopped using drugs.

            4                    So two weeks after stopping using drugs,

10:45:50    5    these individuals still were not firing dopamine at

            6    normal levels.  They had a pleasure/pain balance that was

            7    tipped to the side of pain.

            8    Q.    All right.  Every human being has the potential to

            9    become addicted.

10:46:13   10                    Your Honor, this is a good breaking point?

           11                    THE COURT:  Okay.  I was going to ask you.

           12                    MR. LANIER:  Yes.

           13                    THE COURT:  Without

           14    breaking -- interrupting you.

10:46:22   15                    MR. LANIER:  Thank you, Judge.

           16                    THE COURT:  All right.  Ladies and

           17    gentlemen, we will take our midmorning break, 15 minutes.

           18                    Usual admonitions and then we'll pick up

           19    with Dr. Lembke.

10:46:31   20                    (Jury out.)

           21                    (Recess taken.)

           22                    (Jury in.)

           23                    THE COURT:  Okay.  Please be seated.

           24                    We need the witness.

11:09:02   25                    MR. LANIER:  Yes, the witness.

| | |
|---|---|
| 1 | THE COURT:  We will not get much testimony |
| 2 | without the witness. |
| 3 | MR. LANIER:  I now call -- no. |
| 4 | THE COURT:  Okay.  Doctor, I just want to |
| 11:09:23  5 | remind you you're still under oath from this morning, |
| 6 | ma'am. |
| 7 | And you can take off your mask while |
| 8 | testifying.  Yes. |
| 9 | BY MR. LANIER: |
| 11:09:38 10 | Q.   Dr. Lembke, just so the Court knows and the jury |
| 11 | knows and the lawyers know and we're clear, we've not |
| 12 | communicated with you at all during this break. |
| 13 | Is that fair to say? |
| 14 | A.   That's right. |
| 11:09:46 15 | Q.   All right.  And obviously, it would not be proper |
| 16 | to. |
| 17 | We're just following the rules, but I |
| 18 | wanted to put it on the record. |
| 19 | All right.  Before the break, then, we were |
| 11:09:57 20 | looking at your second opinion, and I moved to this last |
| 21 | sentence on the page, but your opinion actually blends |
| 22 | into more.  I just didn't have room to fit it all on one |
| 23 | side. |
| 24 | So let's pick this up.  "Every human being |
| 11:10:13 25 | has the potential to become addicted.  Some are more |

1     vulnerable than others.  Risks for becoming addicted

2     include genetic, developmental and environmental factors,

3     nature, nurture, and neighborhood."

4                    I want to pause there and have you explain

11:10:31   5     what you mean when you say these things that I've just

6     read.

7     A.    So with enough external stressors, anybody can get

8     addicted, and an important external stressor, which is

9     underappreciated, is simple access to a drug.

11:10:53   10                   If you live in a neighborhood where drugs

11     are sold on a street corner, you are more likely to try

12     those drugs and more likely to get addicted to those

13     drugs.

14                   If you see a doctor who is free with their

11:11:05   15     prescription pad when it comes to addictive medications,

16     you're more likely to be exposed to that drug and more

17     likely to get addicted to that drug.

18     Q.    All right.  So you continue your opinion to say,

19     "When supply of an addictive drug is increased, more

11:11:23   20     people become addicted to and suffer the harms of that

21     drug."

22                   What is the basis for your opinion?

23     A.    This current opioid epidemic is a prime example of

24     increased supply leading to increased exposure, leading

11:11:44   25     to increased rates of addiction and overdose death.

1          But there are other historical examples,

2    both showing that when drugs become more available, more

3    people get addicted and die from them, and also when

4    drugs become less available, fewer people get addicted

11:12:00  5    and die from them.

6    Q.    So what other examples can you give us so that we

7    maybe have a reference point in our brain?

8    A.    So a couple of historical examples include

9    Prohibition, for example.  So between 1920 and 1933 in

11:12:21 10   the United States, the distribution and sale of alcohol

11   became illegal, and what is seldom appreciated about that

12   time period is that when alcohol was not readily

13   available, the rates of public drunkenness and

14   alcohol-related liver disease decreased by half, which is

11:12:43 15   really a remarkable event when you look broadly at

16   epidemiologic studies or what kinds of policies change

17   disease outcomes, it's a very potent effect.

18          When Prohibition was reversed and alcohol

19   again became more readily available, rates of alcohol,

11:13:10 20   addiction, and related disease again began to climb,

21   although they remained quite low through the '30s, '40s

22   and '50s, and have recently increased again with

23   increased exposure to alcohol.

24          Another example is example of soldiers in

11:13:26 25   Vietnam who, while overseas, had ready access to various

Lembke - Direct/Lanier                     544

```
         1    forms of opioids, including opium, many became addicted

         2    with ready access, but the vast majority, when they

         3    returned to the United States, at a time when there

         4    were -- it was very difficult or more difficult to get

11:13:47 5    access to opioids, most of them, their addiction largely

         6    resolved.

         7                   So access is a really important aspect and

         8    a really big risk factor for addiction.

         9    Q.    All right.  You continue to say that, "Prescription

11:14:04 10   opioids are as addictive as heroin," and I want to pause

        11    there before we read the rest of this sentence.

        12                   Explain to us, please, the basis for your

        13    opinion that "prescription opioids are as addictive as

        14    heroin."

11:14:24 15   A.    So culturally we have this idea that heroin is much

        16    worse than other opioids, but in fact heroin is nearly

        17    identical to Morphine.  It's diacetylated Morphine,

        18    Morphine with two acetyl groups added.

        19    Q.    The Court Reporter is going to shoot you and me

11:14:50 20   both --

        21    A.    Sorry.

        22    Q.    -- if we don't pause for those words for a minute

        23    because I doubt they are in her machine.

        24                   Heroin is what?

11:14:59 25   A.    Diacetylated Morphine.
```

1    Q.    Okay.

2    A.    So it's molecularly almost identical to Morphine

3    and in terms of the way that opioids work in the brain,

4    binding opioid receptors which then trigger this cascade

11:15:17  5    leading to the dopamine release in the reward pathway,

6    opioids are opioids are opioids.  It doesn't matter

7    whether you get them from a doctor or you get them on the

8    street from a drug dealer.

9    Q.    And then you continue to say, "The defendants'

11:15:36  10   conduct in promoting increased supply and widespread

11   access to prescription opioids has resulted in an

12   epidemic of opioid addiction and overdose death."

13              MR. BUSH:  Your Honor.

14   Q.    Now, I'd like to break that down --

11:15:57  15              THE COURT:  Hold on.

16              MR. LANIER:  Sorry.

17              THE COURT:  This is where she's got to be

18   specific.

19              MR. LANIER:  Yeah, that's why I was going

11:16:03  20   to break it down, Your Honor.

21              MR. BUSH:  Thank you, Your Honor.

22   BY MR. LANIER:

23   Q.    So I'd like to break this down and talk about this

24   word "Defendants" for a moment.

11:16:13  25              Is it fair to say, as you are using the

```
 1    word here, you're talking much broader than simply these

 2    pharmacies?

 3    A.    Yes.

 4    Q.    Would you explain who you mean by that term

 5    "Defendants"?

 6    A.    In this context, I mean opioid manufacturers,

 7    opioid distributors, and pharmacies.

 8    Q.    Okay.  And are you making a difference here between

 9    chain pharmacies and -- that are large or chain

10    pharmacies that are regional?  Are you making a

11    distinction between mom and pop pharmacies and the

12    smaller or larger chains?  Are you making any

13    distinctions at all?

14    A.    I am focused on chain pharmacies.

15    Q.    Okay.  Within the framework of that, we've got

16    Walgreen's, CVS, and Walmart in this case.

17              Are you -- have you focused on those three?

18    A.    Yes.  And Giant Eagle.

19    Q.    So Giant Eagle as a regional chain instead of a

20    national chain, you're including them in this?

21    A.    Yes.

22    Q.    Great.

23              So "Defendants' conduct in promoting

24    increased supply and widespread access to prescription

25    opioids has resulted in an epidemic of opioid addiction
```

Lembke - Direct/Lanier                          547

1     and overdose death."

2              Do you give us in later opinions more

3     specific details of how this was -- this behavior

4     contributed?

11:17:47  5     A.    Yes.

6     Q.    All right.  Then we'll save that for those and try

7     to get those, if not before lunch, then at least right

8     after lunch.

9              Let's go to opinion number three now.

11:17:58 10             And so everybody knows, you've got, like,

11    14 or so opinions, but we won't spend this long on all of

12    them, right?

13    A.    I defer to you.

14    Q.    Okay.  I'll suggest to you we won't.

11:18:17 15             But I need to get the ground work laid,

16    please.

17              So opinion number three:  "Opioid

18    prescribing began to increase in the 1980s and became

19    prolific in the 1990s and the early part of the 21st

11:18:34 20    century, representing a radical paradigm shift in the

21    treatment of pain and creating more access to opioids

22    across the United States."

23              Is that your opinion?

24    A.    Yes.

11:18:49 25    Q.    And this opinion, does it -- are these dates such

1    that they require us to focus on actions that go back

2    several decades?

3    A.    Yes.

4    Q.    All right.  Explain what you -- the basis for your

11:19:09  5    opinion number three.  I know you've given us some of

6    that already, you don't need to be redundant, so anything

7    you've not told us about, would you explain the basis for

8    opinion number three, please?

9    A.    So the 1980s was the beginning of the hospice

11:19:27 10   movement imported from Europe, and the hospice movement

11   was a movement that recognized that people were living

12   longer and often dying in agony.

13            And there was a push at that time to make

14   opioids more liberally available at the end of life, and

11:19:48 15   this was a positive and a good and a humane thing.

16            But, unfortunately, what that led to,

17   especially when, you know, corporate entities, opioid

18   manufacturers and others got ahold of that message, was

19   to promote opioids based on false science, some of which

11:20:12 20   I've already talked about, especially beginning with

21   Purdue in the late 1990s and the release of OxyContin.

22            And with those promotional efforts on the

23   part of Purdue and others, there was, again, a complete

24   and radical reeducation of doctors and other health care

11:20:34 25   professionals and a shift in the way that doctors

Lembke - Direct/Lanier                              549

1    prescribed opioids, such that they prescribed more of

2    them, more often, and for minor and chronic pain

3    conditions at ever-escalating doses because they were

4    taught that no dose is too high.

11:20:52  5          And that essentially is what led to the

6    current U.S. opioid epidemic.

7    Q.    Now, one of the charts that you had put into your

8    report is this chart that I'm now showing to the jury

9    that you had entitled "CDC," is that the Center for

11:21:10 10  Disease Control?

11   A.    Yes.

12   Q.    Parallel increases in opioid sales, deaths, and

13   substance abuse."

14          And you've got a chart, "Rates of

11:21:23 15  Prescription Pain Killer Sales, Deaths, and Substance

16   Abuse Treatment Admissions From 1999 to 2010."

17          Can you explain this chart to us?

18   A.    What this chart shows is that as the sales of

19   opioids increased, quadrupling between 1999 and 2010, so,

11:21:50 20  too, in lockstep did the rates of addiction and overdose

21   death increase.

22   Q.    So the green line at the top is the increase in

23   sales?

24   A.    Yes.

11:22:06 25  Q.    And then the purple line in the middle, the

Lembke - Direct/Lanier                    550

1    increase in deaths?

2    A.    Yes.

3    Q.    And the bottom line, the increase in what?

4    A.    Treatment admissions for opioid addiction.

11:22:21  5    Q.    And you've got this chart you've selected, seems to

6    range in dates from 1999 up to 2010 for at least the

7    sales?

8    A.    Yes.

9    Q.    All right.  So if we continue to move through this,

11:22:42 10    your fourth opinion is that, "Misrepresentations

11    contributed substantially to the paradigm shift in opioid

12    prescribing through misleading messaging about the safety

13    and efficacy of prescription opioids."

14         Explain what a paradigm shift is.

11:23:12 15    A.    A paradigm shift is just a broad term to describe a

16    big change that happens.

17         And here what I'm referring to is the big

18    change that happened in medicine beginning in the late

19    1990s as a result of these misleading promotional

11:23:33 20    messages that it was okay to use opioids for any kind of

21    pain, at any dose, for any length of time when, in fact,

22    that is not supported by the evidence.

23    Q.    Dr. Lembke, we'll get into this later on, but are

24    you the only one in the United States who holds these

11:23:56 25    views today, or is this fairly understood science?

                    1          MR. MAJORAS:  Objection.  Bolstering.

                    2          THE COURT:  Overruled.

                    3     A.    Yes.  There are many reputed medical bodies that

                    4     agree with this opinion.

    11:24:21        5          This is not an outlier opinion.

                    6     Q.    And I'm not asking you to bolster you.

                    7          I'm asking you because is this something

                    8     that people who work with the distribution and the sales

                    9     of drugs would be aware of if they were reading

    11:24:38       10     contemporary literature on the subject?

                   11     A.    Absolutely.

                   12          So in 2009, for example, which was already

                   13     quite late into the epidemic, it was widely known that

                   14     the number of people dying from drug overdoses exceeded

    11:24:56       15     the number of people dying from motor vehicle accidents

                   16     or from firearms, which was unprecedented in history.

                   17          This was out in the media.  It was known.

                   18     Q.    All right.  You continued to say, "The misleading

                   19     messages were disseminated through an aggressive sales

    11:25:20       20     force, key opinion leaders, medical school curricula,

                   21     continuing medical education courses, clinical decision

                   22     support tools, professional medical societies, patient

                   23     advocacy groups, the Federation of State Medical Boards,

                   24     and the Joint Commission."

    11:25:50       25          Did I read your opinion correctly?

1    A.    Yes.

2    Q.    Do you believe that to be true?

3    A.    Yes.

4    Q.    What is the basis for your opinion?

11:25:57  5    A.    There is overwhelming evidence that Purdue Pharma

6    and others intentionally went about influencing the

7    practice of medicine by creating relationships with many

8    different people in medicine, leaders in the field of

9    medicine, regulatory bodies, other influential

11:26:23  10    organizations, paid millions of dollars to these leaders,

11    to these organizations, to medical schools, in order to

12    influence and bring about this paradigm shift that

13    changed the way that doctors viewed opioids and the way

14    that doctors prescribed opioids.

11:26:47  15    Q.    And we'll get into this in more detail later, but

16    as a pre-lunch appetizer, did you find Purdue Pharma, for

17    example, and the other manufacturers, but Purdue Pharma

18    particularly, working with some of the major chain

19    pharmacies, Walgreen's and Walmart and CVS that are in

11:27:12  20    this case?

21    A.    Yes.

22    Q.    Another item you had in your report that a lot of

23    us will recognize from going to the doctor is this pain

24    assessment tool.

11:27:28  25              Would you please tell us why you put that

1    in your report and why it's relevant?

2    A.    So beginning around 2001, doctors and other health

3    care professionals were encouraged to use this pain

4    assessment tool on every patient that walked into their

11:27:47  5    clinic or their emergency room or their hospital in order

6    to assess their level of pain.

7            And they were shown, patients were shown,

8    still are shown this chart where zero was no pain and 10

9    was the worst possible imaginable pain.

11:28:06  10           And the use of this chart was correlated or

11   went along with promoting pain as the fifth vital sign,

12   which again happened in 2001 with the aggressive

13   influence of Purdue Pharma and others, this idea that not

14   only was it necessary to take a patient's blood pressure,

11:28:30  15   heart rate, temperature, but it was also essential to ask

16   every single patient whether or not they were

17   experiencing pain and at what level, including patients

18   who didn't come in for pain or who didn't appear to be in

19   any pain.

11:28:47  20           And there are no data to support this, the

21   use of this tool.  There's no data saying that using this

22   tool improves pain outcomes.

23           There are data showing that using this tool

24   increases opioid prescribing, and it's just another

11:29:05  25   example whereby Purdue Pharma and others heavily

1    influenced the practice of medicine, including promoting

2    tools like this broadly across the country to choose the

3    way that doctors were prescribing.

4    Q.    All right.  Doctor, I want to move to opinion

5    number five.

6                And, Dr. Lembke, there we have, "Opioid

7    distributors collaborated with opioid manufacturers and

8    pharmacies to promote sales of opioid pills."

9                Now, let's talk about broadly, and then

10   we'll talk about specific pharmacies and name them based

11   upon your opinion, but, first, broadly, what are you

12   talking about?

13               And then understanding I need to break down

14   which pharmacies.  Okay?

15               Broadly, what's your basis for believing

16   this?

17   A.    Broadly, what I believe is that it wasn't just the

18   opioid manufacturers who promoted these misleading

19   messages, changed the paradigm around pain and

20   contributed to the supply, it was also opioid

21   distributors, the people who transport opioids from the

22   manufacturer to the pharmacies.

23   Q.    The middle person is what I described them as in

24   opening.

25               Is that --

```
 1    A.    Yep.  That's good.

 2    Q.    All right.

 3    A.    And also opioid -- also the pharmacies.

 4    Q.    All right.  And you understand that for these

 5    defendants in this case, for a period of time, for some

 6    opiates, they were distributors as well as dispensers or

 7    pharmacies.

 8              Did you know that or is that --

 9    A.    Yes, I did know that.

10    Q.    All right.  So how did -- well, I think you give it

11    here.

12              "Such coordinated efforts included programs

13    to give away free samples of opioids."

14              Again, without going into the specific

15    pharmacy chains that you're going to talk about, in

16    general, on a national level, what programs to give away

17    free samples of opioids are you talking about?

18    A.    So free samples are just what they sound like.

19              These were coupons or certificates that

20    allowed individuals to go to the pharmacy and pick up an

21    opioid medication for free.

22              And that contributed to the oversupply

23    problem and was facilitated and made possible through

24    coordinated, shared coordinated efforts between opioid

25    manufacturers, opioid distributors, and pharmacies.
```

1    Q.    Okay.  So if we look, then, you include the coupons

2    to discount as well as free, so they had multiple kinds

3    of coupons?

4    A.    There were multiple types of coupons.  Some of the

11:32:13  5    coupons were for free drug.  Some of the coupons were for

6    discounted drugs, where patients could pick up a drug and

7    pay less for it.

8    Q.    "Promotion of specific opioid products under the

9    guise of education."

11:32:31 10          What are you talking about there?

11    A.    This is a type of collaboration where pharmacists

12    were trained on a certain opioid product, and that in

13    their interactions with patients at the pharmacy counter

14    would naturally, as a result of that training, educate

11:32:57 15    the patient consumer in a certain way about that product.

16          And specifically, the same misleading

17    messages that were promoted to doctors overstating the

18    benefits and understating the risks of opioids were also

19    promoted to pharmacists.  And so I think it's fair to say

11:33:19 20    that pharmacists, many of them, were also duped as a

21    result and as part and parcel of this paradigm shift.

22    Q.    So one of the things -- is it a fair distinction to

23    draw between pharmacists in some regards and the

24    businesses or the companies that run the pharmacies?

11:33:44 25    A.    It's an important distinction to make between

1    individual pharmacists and the corporate structure under

2    which they're trying to do their job.

3    Q.    Why?

4    A.    Because based on the evidence that I have seen, at

11:34:05  5    the corporate level, there was cooperation between

6    pharmacies and companies like Purdue to mislead, not just

7    patient consumers and physician prescribers, but also

8    pharmacists about the risks and benefits; thereby,

9    encouraging pharmacists to regard opioids as safer and

11:34:30 10    more effective than they really are, which in turn would

11    influence a pharmacist's ability to use their proper

12    judgment to determine whether or not they should dispense

13    a certain drug.

14    Q.    And have you found evidence of this regarding CVS?

11:34:45 15    A.    Yes.

16    Q.    Have you found evidence of this regarding Walmart?

17    A.    Yes.

18    Q.    Have you found evidence of this regarding

19    Walgreen's?

11:34:54 20    A.    Yes.

21    Q.    How about the regional Giant Eagle?

22    A.    Yes.

23    Q.    Is it your opinion that these activities increased

24    the population of opioid users, dose and duration of

11:35:14 25    opioid use, and the risk of opioid misuse, addiction,

1    dependence, and death"?

2    A.    Yes.

3    Q.    Now, have you focused on the individual pharmacies

4    in these counties, or have you looked at the national

11:35:32  5    scope?

6    A.    I've looked at the national scope.

7    Q.    So the jury can be clear, we don't want to mislead

8    in the least, you have not focused on individual

9    pharmacists at the individual stores in these individual

11:35:48 10    counties.

11                    Fair?

12    A.    That is correct.

13    Q.    You're looking at national policy or regional

14    policies for the regional chain, Giant Eagle.

11:35:57 15                    Is that fair?

16    A.    Yes.

17    Q.    Thank you.

18                    Now, when you talked about, "These

19    activities increased the population of users, dose in

11:36:09 20    duration and risk of opioid misuse," there were some

21    other charts that I want to plug in here that you had in

22    your report.

23                    The one that I'm showing now is the one

24    that is labeled, "The dose in duration of prescription

11:36:29 25    opioids are the strongest risk factors for OUD."

1       What is OUD?

2       A.    Opioid Use Disorder.

3       Q.    And what does it mean that, "The higher the dose

4       and duration of opioids, the greater the risk of

11:36:47  5    addiction?"

6       A.    So opioid use disorder is synonymous, is the same

7       as opioid addiction, and these are data showing that the

8       biggest risk factor for becoming addicted to an opioid is

9       how long you're on it and how high the dose is.

11:37:09 10          And that as the dose goes up, you're more

11      likely to get addicted, and the longer you're on it,

12      especially if you're on it for more than three months

13      taken daily, you're more likely to get addicted.

14      Q.    So if we go to the big print down at the bottom of

11:37:26 15    this, it's got an odds ratio.

16          You deal with those things all the time.

17      Most of us do not.

18          Doctor, would you explain to us, please,

19      what is an odds ratio?

11:37:39 20    A.    An odds ratio is a way of determining risk to a

21      certain disease outcome based on exposure to a risk.

22      Q.    Okay.  So some people would more normally think of

23      an odds ratio as I'm going to roll the dice, I have a one

24      out of six chance, the odds are one out of six it is

11:38:05 25    going to be a one.

1          Is that like an odds ratio in your science

2     world, same type thing?

3     A.    Yes.

4     Q.    All right.  So the odds ratio for opioid use

11:38:19 5     disorder with chronic -- you said that's over 90

6     days -- use of prescription opioids, it shows none OR

7     equals one.

8               What's OR?

9     A.    OR is the odds ratio.

11:38:36 10    Q.    Okay.  So the odds ratio, if you're not taking it,

11    the odds of you getting addicted, that's the base line,

12    that's one.

13    A.    Right.

14    Q.    So low dose, if you're on one to 36 milligrams a

11:38:52 15    day, I would assume it depends on what the drug is -- or,

16    no, these are calculated in MMEs?

17    A.    That's right.

18    Q.    Excellent.

19              So one to 36 MMEs would be how many tablets

11:39:06 20    of Oxycodone?

21              Do you remember?  An Oxy 30, for example,

22    would that be in this group?

23    A.    Yes.

24    Q.    So an Oxy 30 OR 14.92, what does that mean?

11:39:24 25    A.    That means that a person who's taking that amount

1   of opioids is 14 times more likely to develop an opioid

2   addiction than a person who's not taking opioids.

3   Q.    And then if they bump up to 36 to 120 milligrams a

4   day -- and actually, maybe I was wrong.  That may be

5   where the Oxy 30 is, just bumping that number.  But the

6   medium dose, OR equals 28.69, what does that mean?

7   A.    That means that at that higher dose, that that

8   person is 28 more times -- times more likely to get

9   addicted than a person who is not exposed to opioids.

10   Q.    Does this scientific study that you have referenced

11   here -- by the way, I want to get the Oxy down.

12                    Oxycodone is 1.5 MME?

13   A.    Yes.

14   Q.    So an Oxy 30 pill, 30 milligrams of Oxy, would be

15   on this chart, 45?

16                    Is my math right?

17   A.    I think so.

18   Q.    Okay.  All right.  Fair enough.

19                    Let's keep moving.  If math -- we'll leave

20   the math out for now.

21                    Okay.  So you put this chart in there to

22   indicate that you had another chart that was very

23   similar, higher dosage, higher risk.

24                    Can you explain this chart, please?

25   A.    These charts are taken from studies looking at risk

1    of dying from an opioid, what's often called an overdose.

2    In a way, though, an overdose is a misnomer because it

3    implies that the person took more than they were supposed

4    to but, in fact, people can die of opioids taking them

5    exactly as prescribed.

6              And this, these are data showing that as

7    the dose of the prescribed opioid goes up, the risk of

8    opioid overdose death also increases.

9    Q.    Okay.  Thank you.

10             So with opinion five out of the way, let's

11   look at opinion six next.

12             In opinion six, you said, "Pharmacies," and

13   we'll talk about which ones because that's going to be

14   important so I want you to be thinking of the four in

15   here, if you've got specific testimony about them.

16             "Pharmacies leveraged their unique and

17   pivotal position in the opioid supply chain to contribute

18   to the unprecedented and unchecked flow of opioid pain

19   pills into the community.  They alone had direct contact

20   with opioid manufacturers and distributors upstream, and

21   patients and prescribers downstream."

22             Is that your opinion?

23   A.    Yes.

24   Q.    What is the basis for this opinion?

25   A.    Pharmacies' or pharmacists' role in the closed

1    opioid supply chain is really unique in that they alone

2    have not just contact with the manufacturers and

3    distributors, but they also talk to patients, they

4    educate patients.

11:43:10  5            In fact, patients have ranked pharmacists

6    as among the most trusted professionals that they -- that

7    they can consider compared to other types of

8    professionals.

9            Consumers rank pharmacists as even more

11:43:27 10   trusted than doctors.  Pharmacists also regularly

11   communicate with physician prescribers, so they have many

12   different points of contact, they're very influential,

13   there's enormous trust placed in pharmacists.  And so,

14   therefore, they really did and do play this key role in

11:43:48 15   the opioid supply chain and are pivotal in appreciating

16   whether or not opioids are being misused, overprescribed,

17   diverted, combined with other drugs that might harm them.

18   Q.   Okay.  So when you speak of words like "Upstream"

19   and "Downstream," you've got a pharmacy, you've got

11:44:18 20   patients, customers, and then you've got the

21   manufacturers and you've got the middle folks, the

22   distributors.  They're more than a truck driver but I'm

23   drawing a truck because they get it there.

24           So how is it that the unique position of a

11:44:46 25   pharmacy touches everybody?

Lembke - Direct/Lanier                                      564

```
           1   A.     I mean, pharmacies are really the hub in many ways.

           2   They interact on a business level, on a corporate level

           3   with distributors and manufacturers on a regular basis.

           4              Individual pharmacists will get

11:45:10   5   communications from manufacturers and distributors, and

           6   at the same time, pharmacists are patient-facing.  You

           7   know, they have many touch points with patient consumers.

           8   They are educators, patients rely on them to be educated

           9   about their -- the drugs that they're taking.

11:45:32  10              And they have many interactions with

          11   prescribers as well.

          12   Q.     All right.  Let me give you some examples or

          13   question you on some examples.

          14              Do you know for a fact specifically that in

11:45:49  15   this case, these national chain pharmacies, Walgreen's,

          16   Walmart and CVS, had direct contacts with manufacturers

          17   of opioids?

          18   A.     Yes.

          19   Q.     And is that as pharmacists as well as, as

11:46:10  20   distributors?

          21              MR. BUSH:  Objection, Your Honor.

          22              MR. LANIER:  As pharmacies.  Excuse me,

          23   Your Honor, I misspoke.

          24   BY MR. LANIER:

11:46:18  25   Q.     Is that as pharmacies as well as in their role as
```

```
          1    distributors?

          2                  MR. BUSH:  My objection was to that even

          3    though it's a fact.

          4                  THE COURT:  I'm sorry, what's the
11:46:29  5    objection?

          6                  MR. BUSH:  It's not a fact.  She's not here

          7    as a factual witness.

          8                  THE COURT:  All right.  Do you know?

          9    BY MR. LANIER:
11:46:35 10    Q.   Based on your opinion.

         11    A.   Can you repeat the question?

         12    Q.   Yes, ma'am.

         13                  Have you found evidence that indicates to

         14    you that Walgreen's, Walmart, and CVS have directly had
11:46:49 15    contacts on a national basis with, for example, Purdue, a

         16    manufacturer of opioids?

         17    A.   Yes.

         18    Q.   Okay.  You're a doctor, you write prescriptions,

         19    right?
11:47:13 20    A.   Yes.

         21    Q.   I would assume some doctors similarly had contacts

         22    at least with manufacturers and patients.

         23                  Fair?

         24    A.   Yes.
11:47:27 25    Q.   Maybe not distributors.
```

1              I don't know.  Do you have contacts with

2       distributors, do you deal with them?

3       A.    No.

4       Q.    All right.  Let's go to opinion number -- well,

11:47:44  5   before we go to another one, let me ask you this.

6              Based upon your experience, are there some

7       areas where doctors know things that pharmacists don't

8       know?

9       A.    Yes.

11:48:04 10   Q.    For example, when you're a doctor, are you able to

11      do a full exam on a patient?

12      A.    Yes.

13      Q.    So if I'm writing what doctors know, a full exam

14      includes a history?

11:48:22 15   A.    Yes.

16      Q.    And a physical examination, I would assume?

17      A.    Yes.

18      Q.    What else is there that doctors know about a

19      patient and prescriptions that perhaps a pharmacy may

11:48:45 20   not?

21      A.    Doctors might have access to laboratory data that a

22      pharmacist would not typically have access to, things

23      like urine toxicology screens to test for the presence of

24      drug in the urine, basic metabolic panels to determine

11:49:06 25   aspects of metabolism related to taking certain drugs or

1    certain disease processes.

2              The pharmacist wouldn't have the physical

3    impression and the collateral information that the doctor

4    would get on that day at that appointment necessarily.

11:49:31  5              The doctor would have, potentially have

6    access to other collateral information through family

7    members or significant others or other providers that

8    they may have contacted related to that individual's

9    disease process.

11:49:50 10   Q.    So other info from friends, family or medical

11   records, other doctors?

12   A.    Yes, or just if that's a long-standing relationship

13   with the patient, the doctor has access to that

14   relationship and what's transpired during that

11:50:12 15   patient/provider relationship.

16   Q.    All right.  Based upon your interactions with

17   pharmacies, pharmacists, what do the pharmacies -- and

18   I'm speaking here in terms of the patient himself or

19   herself; I'm not speaking in terms of manufacturers of

11:50:33 20   opioids, et cetera -- so in terms of patients, what is it

21   that the pharmacists, based upon your knowledge and

22   understanding, would have access to that's either the

23   same or different than a doctor?

24   A.    Well, the pharmacist would have access to their

11:50:53 25   physical impression of the patient when the patient comes

1    to the pharmacy to get their prescription, which may or

2    may not be on the same day that they got the prescription

3    from the doctor.

4    Q.    All right.  So physical impression of the Rx date,

11:51:13  5    we'll call it.

6    A.    The pharmacist would not typically have access to

7    history, physical exam, certain lab data.

8              The pharmacist would not typically have

9    access to friends and family, unless friends and family

11:51:33  10    accompanied that individual to the pharmacy.

11              And the pharmacist would not necessarily

12    have a long standing relationship with that patient,

13    although some pharmacists, because patients can frequent

14    the same pharmacy again and again, in some cases, some

11:51:50  15    pharmacists will develop close relationships with their

16    patient customers.

17    Q.    Now, do pharmacists have an ability to call

18    doctors?

19    A.    Yes.

11:52:01  20    Q.    Do you get phone calls from pharmacists?

21    A.    Yes.

22    Q.    Do pharmacists, when they call you, talk about the

23    exam findings or the lab data at times with some of your

24    patients?

11:52:15  25    A.    Well, we -- I mean, the pharmacist doesn't have

1    access to that data, but we might discuss it as pertains

2    to what is ever -- whatever is relevant to the question

3    that the pharmacist has or the doctor has and is also

4    within the bounds of patient privacy.

11:52:38  5         I was also, just finish -- we haven't quite

6    finished that list.  I was going to add all the things

7    that a pharmacist knows that a doctor doesn't, which I

8    didn't get to yet.

9    Q.    Oh, that would be great.

11:52:49 10         Tell us what a pharmacist knows that a

11   doctor doesn't know.

12   A.    So what a pharmacist -- pharmacist has access to,

13   importantly, is their own data systems that could tell

14   them, for example, whether or not the doctor that that

11:53:05 15   patient was seeing was a pill-mill doctor, somebody who

16   was prescribing lots and lots of opioids, essentially

17   exchanging opioids for cash.

18         So the pharmacist has access to

19   prescriber-level data that an individual prescriber

11:53:26 20   wouldn't have.

21         For example, I wouldn't know, necessarily,

22   that that patient was seeing a pill-mill doctor in

23   addition to seeing me.

24         Also, there's a database called the

11:53:41 25   Prescription Drug Monitoring Database that pharmacists

1    and prescribers can check to see all of the prescriptions

2    that that patient has obtained for a controlled addictive

3    medication in a geographic region.

4              And if a patient were engaging in doctor

11:54:03 5    shopping, that is going to multiple doctors to get the

6    same or a similar prescription, if I, as the prescriber,

7    check that database but the patient hasn't yet gone to

8    the pharmacy to get it dispensed, then I wouldn't be able

9    to see that they were doctor shopping.

11:54:23 10             There's a gap of time between when they

11    leave my office with the prescription and when they go to

12    the pharmacy to pick it up.  And if in that gap of time

13    they go to six or seven other doctors to get additional

14    prescriptions for opioids, and then at the end of that

11:54:44 15    process, go around to different pharmacies to pick that

16    up, the doctor could never see that.

17    Q.    All right.  So what I've put down here, I've tried

18    to list those that you've said.

19             They've got access to their own data, it

11:54:59 20    might tell them if the doctor is a pill-mill doctor.

21             Prescriber level data.

22             And then you talked about the PDMPs, the

23    Prescription Drug Monitoring Programs or the database,

24    and you -- you said that that's something that the doctor

11:55:17 25    also has access to, but it may be a different picture.

1          Is that right?

2    A.    That's right.

3               There's this important gap in time between

4    leaving a doctor's office with a prescription and

11:55:32  5    actually going to a pharmacy and getting that drug.

6    Q.    Explain to us, just to remind us, we spoke about it

7    yesterday, but remind us again what is a PDMP?

8    A.    A PDMP is a Prescription Drug Monitoring Program or

9    Prescription Drug Monitoring Database, and different

11:55:57 10    types of health care providers have access to this

11    database, including prescribing doctors and pharmacists.

12               And this database, when you go on it, what

13    you do is you look up the patient, so you look up the

14    patient by their name, and then you can see a list of all

11:56:19 15    of the prescriptions they've received for a controlled

16    drug.

17               Controlled drug means potentially addictive

18    drug like an opioid.

19               And that usually covers a certain

11:56:33 20    geographic region, typically the state, and a certain

21    period of time, depending upon how far back you check but

22    usually it's within the year.

23               And that's very useful and I would even say

24    essential for determining which patients are misusing

11:56:52 25    and/or getting addicted to and/or diverting opioids.

1    Q.    All right.  So if I am a patient and I want to get

2    extra doses of a drug, and so I go see one doctor and she

3    gives me some Oxycodone for my pain, and then I go see

4    another doctor like the next hour and he gives me some

11:57:29  5    Oxycodone for my pain, then I hit a third doctor who

6    gives me some Oxycodone for my pain, and then I take

7    those prescriptions and maybe instead of filling one at

8    one CVS or instead of filling all three at one CVS, I

9    fill one at one, one at another, and one at a third, or I

11:57:54  10   fill one, one day and then wait a few days or a week and

11   then I fill the second or I fill the third, is that

12   something that the pharmacies who have access to the data

13   would be able to see, that the doctors would not?

14   A.    Yes.  And it's why it's so critical for pharmacists

11:58:15  15   to check the PDMP before dispensing a highly addictive

16   and potentially lethal drug like an opioid.

17              It's absolutely fundamental.

18   Q.    Okay.  If a patient is going to pay cash for their

19   drugs, who's in a position to see that?

11:58:32  20   A.    The pharmacist.  Only the pharmacist would know how

21   a patient paid for their drug, and whether or not a

22   patient pays in cash is really important because patients

23   who pay with cash, that is correlated with patients who

24   are misusing and diverting prescription opioids.

11:58:54  25              And one of the reasons for that, the reason

1    to pay in cash, is because if you tried to use your

2    insurance to pay, the insurance company will pick up on

3    the fact that there's doctor shopping going on and

4    potentially notify the prescribing doctor; whereas, if

11:59:15   5    you pay in cash, you're less likely to be detected.

6                    Pharmacists are also the only ones that can

7    see that patients are traveling from far away.  That, for

8    example, you know, a patient who lives in Ohio may travel

9    to Florida to pick up their prescription or may travel to

11:59:34  10    a remote pharmacy somewhere within their state where

11    they're less well-known.

12    Q.    What about refusals to fill?

13                    Do you know anything about those on a

14    pharmacy level, or is that outside your ambit of personal

11:59:53  15    experience and knowledge?

16    A.    So refusals to fill are when a pharmacist has

17    identified that there is some kind of red flag.

18                    Red flag is a warning that the prescription

19    may be violating the Controlled Substances Act; that is,

12:00:15  20    it's not being used for a legitimate medical purpose or

21    has not been prescribed in the context of a meaningful

22    doctor/patient relationship.

23                    And according to the Controlled Substances

24    Act, a pharmacist has a responsibility to identify red

12:00:37  25    flags, and a red flag would be, for example, a patient

1    driving from a remote distance or in some cases, you

2    know, a patient who appears to be intoxicated or a

3    patient specifically asking for certain opioids by their

4    street name as they're given the prescription, there are

12:01:01  5    lots of red flags.

6              And the job of the pharmacists is to

7    identify that there's a red flag and then, importantly,

8    investigate that red flag.

9              Sometimes after investigating a red flag, a

12:01:11 10    pharmacist will decide, you know what, I thought that

11    this was a concern, but it's really not; I've resolved

12    that red flag.  And then the pharmacist will go ahead and

13    dispense that opioid to the patient.

14              But in other instances, the pharmacist may

12:01:27 15    determine, you know what, my suspicion about this, this

16    red flag, was actually correct and I think that this

17    patient would be harmed.  And that's really what it's all

18    about.

19    Q.    All right.  Doctor, I want to finish this list.

12:01:43 20    I've got two more to ask you about and then I'll warn you

21    about one thing and we'll go to lunch, if His Honor

22    allows it.

23              First, do you, as a Doctor, know whether or

24    not an opioid patient is going to refuse opioid

12:02:03 25    counseling from the pharmacist?

Lembke - Direct/Lanier                    575

1    A.    No.

2    Q.    Would you include that as something unique to the

3    pharmacist's knowledge?

4    A.    Yes.

12:02:15  5    Q.    Would you, as a Doctor, know if the patient goes

6    into the pharmacy and instead of just handing the

7    prescription, calls it by its -- the drug by its slang or

8    street name; would you know that that's going on as a

9    doctor?

12:02:33  10   A.    No.

11   Q.    Okay.

12                Well, with that, we're at a stopping point

13   with this, but I'll ask you after lunch to give us some

14   specific examples, please, of how these four pharmacies

12:02:47  15   were involved in these relationships with the

16   manufacturers.

17                Okay?

18                MR. LANIER:  And with that, Your Honor, we

19   are at a great stopping point if that's appropriate.

12:02:57  20                THE COURT:  All right.  Thank you,

21   Mr. Lanier.

22                All right.  We'll break for lunch.  Usual

23   admonitions.

24                We'll pick up at 1:00 o'clock with more

12:03:04  25   testimony from Dr. Lembke.

Lembke - Direct/Lanier

576

1          So have a good lunch.

2          (Jury out.)

3          (Luncheon recess taken.)

4          (Proceedings concluded at 12:04 p.m.)

12:57:51  5                 -  -  -  -

6

7

8

9

12:57:52 10

11

12

13

14

12:57:53 15

16

17

18

19

12:57:54 20

21

22

23

24

12:57:57 25

|   |   |
|---|---|
| 1 | <u>WEDNESDAY, OCTOBER 6, 2021, 1:02 P.M.</u> |
| 2 | (Jury in.) |
| 3 | THE COURT:  Okay.  Please be seated. |
| 4 | And, Doctor, I just want to remind you |
| 13:04:21 5 | you're still under oath from this morning. |
| 6 | So, Mr. Lanier, you may continue. |
| 7 | MR. LANIER:  Thank you, Your Honor. |
| 8 | DIRECT EXAMINATION OF ANNA LEMBKE (RESUMED) |
| 9 | BY MR. LANIER: |
| 13:04:29 10 | Q.   Dr. Lembke, did you get some lunch? |
| 11 | A.   Yes. |
| 12 | Q.   You got energy? |
| 13 | A.   Yes, hopefully. |
| 14 | Q.   All right.  Did your dopamine reactors work in your |
| 13:04:38 15 | brain? |
| 16 | A.   Yes. |
| 17 | Q.   Is it possible for someone to be addicted to Diet |
| 18 | Coke? |
| 19 | A.   Yes. |
| 13:04:44 20 | Q.   Thank you. |
| 21 | How about Chick-fil-A? |
| 22 | A.   Yes. |
| 23 | Q.   All right. |
| 24 | Doctor, before the break, we were looking |
| 13:04:55 25 | at your sixth opinion, and we had started out with this |

1    portion of the sixth opinion that I had highlighted as we

2    had read it and discussed it with the jury about

3    pharmacies leveraging their unique and pivotal position.

4            I want to finish that sixth opinion with

13:05:14  5  you, and as I indicated before lunch, talk about some

6    very specific examples with all four of the defendants

7    that are in the courtroom today.

8            Okay?

9            To that extent, I've put your sixth

13:05:29  10  opinion, or your opinion six, up in a bullet point form

11   so that we can discuss it.

12           "Their coordinated efforts to create

13   demand."  Why did you put "Create demand" in quotation

14   marks?

13:05:46  15  A.   Because it's not true that doctors write

16   prescriptions and then pharmacies simply dispense them.

17           That doesn't accurately characterize the

18   nature of how things really work.

19           Instead, it's a -- it's a bidirectional

13:06:09  20  communication and there are multiple influences that will

21   go into a doctor writing a particular prescription,

22   including, for example, the patient asking for a specific

23   product or a specific product being on the formulary.

24           And those things can be influenced by --

13:06:35  25  certainly a patient asking for a specific product can be

1    influenced by their interactions with a pharmacist.

2                    So there are things that a pharmacist and a

3    pharmacy does that can influence what the doctor ends up

4    writing a prescription for.

13:06:54 5    Q.    Okay.  Thank you for that explanation.

6                    And then in that regard, you continue to

7    say, "Coordinated efforts create demand included," the

8    first bullet point, "Advertising specific opioid products

9    at the pharmacy counter."

13:07:16 10                    Do you see that?

11    A.    Yes.

12    Q.    Now, what I'd like to do, Dr. Lembke, in your

13    report that you prepared, you've got these opinions but

14    then you elucidate on them, you expand them.

13:07:29 15                    Fair?

16    A.    Yes.

17    Q.    And if I put the expansions of your report up on

18    the screen, would you be able to explain them to us?

19    A.    Yes.

13:07:42 20    Q.    All right.  Then in that regard, I will do so and I

21    will start with Page 77 of your report, which is on

22    opinion six.  And instead of going through the entire

23    report, I'm going to go through a couple of sections that

24    I've marked and see if we can segregate out and discuss

13:08:07 25    some of this.

1          MR. BUSH:  Your Honor, we object to this.

2     It's not appropriate to have the report admitted into

3     evidence.

4               I'm sorry I'm sitting because I wanted to

13:08:15  5     make sure I got near the mic.

6               MR. LANIER:  And I'm not trying to --

7               THE COURT:  He's not admitting the report

8     but he can go through the report as a way of dealing with

9     the testimony.  So that's overruled.

13:08:27 10               MR. LANIER:  Yes.

11     BY MR. LANIER:

12     Q.   So, ma'am, you talked about the pharmacy defendants

13     advertising specific opioid products, higher doses and

14     longer duration at the pharmacy counter on Page 78.

13:08:49 15               Are you familiar with that part of your

16     report?

17     A.   Yes.

18     Q.   So can you take -- you've got your report in front

19     of you?

13:09:00 20     A.   Yes, I do.

21     Q.   So if you could, walk through a bit of the -- a bit

22     of the support for your opinion that you have provided to

23     all of the parties in your report here.

24     A.   Yes.

13:09:18 25               Focusing on Page 78?

1    Q.    Yes, ma'am, or, Doctor.  Excuse me.  I'm from

2    Texas.  I say "Ma'am," and that's not polite.

3              Yes, Doctor.

4    A.    So, for example, on Page 78, talked about how in

13:09:38  5    2011, CVS published an educational services document

6    describing a promotional campaign that they could launch

7    within CVS Pharmacies on behalf of selected opioid

8    manufacturers for a fee.

9              In other words, they were offering to

13:10:05 10    opioid manufacturers, like Purdue, to market things like

11    OxyContin from CVS Pharmacies.

12    Q.    And would CVS make money by promoting the opioid

13    manufacturer's opiates?

14    A.    Yes.

13:10:29 15              So CVS would make money twice, so to speak.

16    They would make money because they've asked the opioid

17    manufacturers to pay them to launch this educational,

18    quote, unquote, educational service, and they will also

19    make money because they will be dispensing opioids and

13:10:52 20    making money off of the opioids that they're selling.

21    Q.    Now, you quoted some language from this brochure,

22    and I'd like you to, first, would you read for the jury

23    the language you quoted, and then I'd like you to explain

24    why that was important language for your opinion.

13:11:14 25    A.    Yes.

1          So it says here, "Communicate your

2   product's unique clinical benefits to thousands of

3   targeted individuals.

4          Get the medicine right with the right

13:11:29  5   educational communications."

6          That, that's really important because it

7   shows that the pharmacies were not just dispensing these

8   opioids like a vending machine that somebody puts in

9   money and gets out the opioid.  They were in the business

13:11:49  10   of collaborating, at the corporate level with Purdue

11   Pharma and others, to sell these opioids, to promote

12   these opioids.

13   Q.    You note in the next provision that this

14   illustrates how CVS Caremark employed tactics initially

13:12:07  15   introduced by Purdue Pharma.

16          What do you mean by that?

17   A.    So Purdue Pharma was really genius in a very

18   devious way in terms of their opioid marketing and opioid

19   promotion.

13:12:30  20          They realized that the way to get doctors

21   to prescribe more opioids and pharmacists to dispense

22   them and patients to take them was to promote the same

23   misleading messages we talked about under the guise of

24   science.

13:12:49  25          In fact, there wasn't robust science or

1    really much of any science to support the idea that

2    addiction is rare or uncommon in pain patients who take

3    opioids, or that no dose is too high, or that you can

4    tell who's going to get addicted and who's not, or that

13:13:10  5    opioids are good treatment for chronic pain.

6                   There is not reliable evidence for any of

7    those things.  And, yet, Purdue Pharma infiltrated

8    medicine to convince the health care community that these

9    things were true.

13:13:24  10                   And what these documents show, which I cite

11   in my report, is that at the corporate level, CVS

12   collaborated in that campaign of misinformation.

13   Q.    And so you continue to talk about how CVS Caremark

14   used buzzwords like education and literature to give

13:13:49  15   their promotional efforts the sheen of science without

16   the substance of scientific accuracy.

17                   Is that what you meant?

18   A.    Yes.

19   Q.    Okay.  Explain, please, your next subpoint if you

13:14:03  20   would, the one about CVS offered these services to opioid

21   manufacturers for a fee.

22   A.    So CVS was doing this for money, and they

23   advertised that they could, for example, send a

24   newsletter out to thousands of CVS pharmacists if the

13:14:28  25   opioid manufacturer would pay them $40,000, or they could

 1    strategically place information about a manufacturer's

 2    opioid products right next to the prescription counter

 3    for $220,000 a month, that would reach 7,300 stores.

 4            They also had direct-to-consumer mailings,

13:14:55  5    so CVS -- CVS Pharmacy, and pharmacies in general, have a

 6    lot of powerful information about patients.

 7            They have names, they have addresses, they

 8    have the medication that the patient is currently being

 9    prescribed and dispensed, and that gives them enormous

13:15:16 10    reach in terms of influencing patient consumers.  And

11    they use this information or propose to use it to engage

12    in direct-to-consumer advertising with direct-to-patient

13    mailers to their homes.

14            They also talked about these promotional

13:15:38 15    messages being on patient receipts, so when you go and

16    you get a receipt for your medicine, there would be

17    little advertisements on the receipt, and again, this was

18    all for a fee.

19    Q.    Now, in your report, you are always careful to

13:15:55 20    footnote all of your statements.

21            What do you mean by the footnotes?

22    A.    The footnotes reference the actual documents

23    themselves that I reviewed, and from which these various

24    quotations and the information is drawn.

13:16:14 25    Q.    And when I was talking to you this morning and I

Lembke - Direct/Lanier                         585

1    said what is all of the work that you've done to prepare

2    to give your opinions, and you talked about reviewing

3    documents, are these those kinds of documents?

4    A.    Yes.

13:16:27  5    Q.    Okay.

6              Now, stepping aside from CVS for a moment,

7    you've got several paragraphs here on Walgreen's?

8              What did you find and what are your

9    opinions on what Walgreen's was doing in this same

13:16:42  10   regard?

11   A.    So similar to CVS, Walgreen's offered to opioid

12   manufactures like Purdue that for a fee of $25,000,

13   Walgreen's would send promotional material about, for

14   example, Purdue's OxyContin to 26,000 Walgreen's

13:17:10  15   pharmacists in over 7,800 retail store locations using

16   their web-based platform.

17             So again, this is another data point

18   showing that Walgreen's was in the business of

19   advertising and promoting specific opioid products for a

13:17:30  20   fee.

21             This was the way that they collaborated at

22   the corporate level with opioid manufacturers and

23   essentially disseminated the same misleading messages

24   that the -- that was going to prescribers, to individual

13:17:48  25   pharmacists as well.

 1   Q.    Okay.  But I've got a question.

 2              If all that CVS or Walgreen's was doing was

 3   telling patients about the medicines and their

 4   availability and how they worked, how does that drive

13:18:13  5   demand of the medicines?

 6   A.    There have been a lot of studies on this issue, and

 7   these studies consistently show that when you engage in

 8   what's called direct-to-consumer advertising in any form,

 9   you promote a specific brand of a medication to a

13:18:35 10   patient, that patient is more likely to ask for that

11   medication.

12              Likewise, direct-to-prescriber promotional

13   efforts result in the prescriber being more likely to

14   prescribe that medication.

13:18:51 15              So these are well-known and effective

16   strategies for influencing what medicine gets prescribed,

17   creating the demand for a specific medication.

18   Q.    So the advertisements we all see for prescription

19   drugs, even though I can't write a prescription for

13:19:16 20   myself, I see that advertisement, are you saying there

21   are studies that indicate that that will drive me to go

22   ask my doctor for it?

23   A.    That's right.

24   Q.    Okay.  Then look at the next paragraph on

13:19:26 25   Walgreen's where you talk about how Walgreen's allowed

Lembke - Direct/Lanier

587

1    Purdue sales reps to make calls on Walgreen's health care

2    supervisors who oversaw various sizes of retail stores.

3                    What are you talking about there and why is

4    that a problem?

13:19:43  5    A.    So sales reps are people who are employed by the

6    manufacturer of a given drug to go out typically to

7    doctors's offices and promote that drug.

8                    And for example, in the case of Purdue

9    Pharma, Purdue Pharma hired people who were called sales

13:20:05 10    reps or drug reps, whose entire job was to go out into

11    the fields, again typically we think of those individuals

12    as going to doctors, to promote prescribing of, for, in

13    this case, or for example, Purdue's product, OxyContin.

14                    But what is really important and also was

13:20:28 15    very surprising to me in my research was that Purdue

16    sales reps were allowed by Walgreen's to promote

17    OxyContin, Purdue's product, to Walgreen's health care

18    supervisors, who oversaw 70 to a hundred retail stores.

19                    And this was supposedly to, quote, unquote,

13:20:56 20    provide pharmacists education material to their

21    pharmacists through corporate coordination, including

22    branded and unbranded resources to reach 27,000

23    pharmacists.

24                    So Walgreen's colluded, excuse me, colluded

13:21:16 25    in and participated in the promotion of OxyContin, and

Lembke - Direct/Lanier

588

1       they did that by allowing drug reps to meet and promote

2       OxyContin to their pharmacy health care supervisors who,

3       in turn, would then promote OxyContin to the pharmacists

4       who were working in the stores.

13:21:41  5    Q.    And then, Doctor, as you conclude this paragraph,

6       you said, "Furthermore, this relationship was a quid pro

7       quo.  In return, Walgreen's provided Purdue with data on

8       OxyContin purchases at the store level."

9                   What are you talking about there?

13:21:59 10    A.    Yeah, so one of the ways that -- one of the ways

11      that Purdue would benefit from this collaboration with

12      Walgreen's was not just that their sales reps would go

13      and promote OxyContin to pharmacists, but also Walgreen's

14      agreed to provide Purdue with specific store-level data

13:22:29 15    about how much OxyContin they were selling and

16      dispensing.

17                   And again, that's another example to show

18      that Walgreen's, at the corporate level, was actively

19      cooperating and collaborating with opioid manufacturers

13:22:48 20    like Purdue to promote specific products in return for

21      money.

22      Q.    In your next section, you talk about how, "Pharmacy

23      defendants mailed promotional material directly to

24      patients and prescribers."

13:23:03 25                   And I'd like you to address with us,

1    please, this first paragraph where you talked about the

2    manufacturers, including Purdue and Actavis, contracting

3    with a company called Adheris, for prescription adherence

4    programs.

13:23:20  5           What's a prescription adherence program?

6    A.    A prescription adherence program is a program that

7    works to get patients to stay on a certain medication.

8    Q.    And this is one that was offered to retail pharmacy

9    chains, including you've got Giant Eagle and Walmart with

13:23:50 10   a footnote.

11           Do you -- is that based upon what you have

12   researched and read?

13   A.    Yes.

14   Q.    Is that a good thing or a bad thing?

13:24:00 15   A.    In the midst of an opioid epidemic, these adherence

16   programs contributed to the oversupply and to people

17   being harmed by opioids.

18   Q.    And the oversupply and the harm, is that only from

19   pill-mills and diversion, or is it a greater problem than

13:24:21 20   just that?

21   A.    It's a greater problem than just that.

22   Q.    So if the jury hears about studies that indicate a

23   lot of people get their start by taking extra drugs from

24   the medicine cabinet at home, maybe because they think

13:24:37 25   it's okay or whatever, is that part of the problem here?

1    A.    Yes.

2              So a big aspect of the current opioid

3    epidemic is not just the harm that was done to

4    individuals who were directly prescribed the opioids and

13:24:55  5    overprescribed the opioids or prescribed in dangerous

6    ways, it's also, very importantly, just the simple fact

7    that so many opioids flooded our society that opioids

8    became easily and widely available to people who hadn't

9    gotten the prescription themselves.

13:25:17 10              So teenagers rifling around in their

11    parents' or grandparents' medicine cabinets, just being

12    experimental, looking for something to use recreationally

13    with friends; not necessarily people who are addicted or

14    people who have pain and are seeing a doctor, but really

13:25:36 15    innocent people who take a very high dose, potent opioid,

16    because they're teenagers and because that's what

17    teenagers do.

18              And then end up dying from that.

19              This is a key piece of it.  It's the sudden

13:25:54 20    and ongoing increases in opioid prescribing in counties

21    across America that led to this oversupply, this

22    flooding, that then harmed people, not just those

23    receiving the prescription, but also anybody who had

24    access to it, including people who were not addicted,

13:26:14 25    importantly including people who were just experimenting

1    or including people who were physically dependent and not

2    addicted.

3    Q.    All right.  If we continue to look at what you've

4    said about this with this Adheris program, a 2013

13:26:36   5    agreement between Purdue and Adheris detailed a year-long

6    Directadhere program for Butrans.

7                    What is Butrans.

8    A.    Butrans is Buprenorphine in a patch formulation

9    that is FDA-approved for the treatment of pain.

13:26:55  10    Q.    Is it an opioid?

11    A.    Yes, it's an opioid.

12    Q.    Okay.  You have in here the goal behind it, and

13    then you have the agreement notes that the program will

14    be offered to the retail pharmacy chains in the Adheris

13:27:12  15    Pharmacy Network, which included Walmart and Giant Eagle.

16                    Is that true?

17    A.    Yes.

18    Q.    Why was that important to you to put into your

19    report?

13:27:31  20    A.    Because again, when it comes to opioids, you don't

21    need and shouldn't have adherence programs.

22                    Opioids sell themselves.

23                    The real challenge is getting patients who

24    have been on opioids off of them again.  There's no

13:27:45  25    difficulty keeping patients on opioids.

1        So an adherence program like this is really

2   just about business.  It's about promoting that product

3   so that the pharmacies could continue to sell that

4   product and make a profit.

13:28:02  5   Q.    When you include in here this language, "Templates

6   of the letters submitted for Giant Eagle's approval had a

7   Giant Eagle letterhead and optional language regarding

8   the savings program," can you read the quotation and tell

9   us why that was important from a Giant Eagle perspective?

13:28:22 10   A.    The quotation says, "The Butrans savings card

11   allows eligible patients with a valid prescription for

12   Butrans to save up to $50 on each prescription after

13   paying the first $15."

14        And the fact that the letter was submitted

13:28:38 15   on Giant -- Giant Eagle's letter template, again, just

16   shows that Giant Eagle was not just dispensing pills;

17   they were involved in promoting and selling these

18   products and worked directly with opioid manufacturers

19   like Purdue to promote specific products.

13:29:03 20              MS. SULLIVAN:  Objection, Your Honor.

21              I move to strike.  Lacks foundation as to

22   whether the letter was actually mailed by Giant Eagle.

23              THE COURT:  Overruled.

24   BY MR. LANIER:

13:29:18 25   Q.    Ma'am, you also spoke about in your report an

1    agreement that called for 37,500 projected letters to be

2    mailed to an estimated 15,000 Kadian patients.

3              What is Kadian?

4    A.    Kadian is long-acting Morphine.

13:29:41 5   Q.    So it's an opioid?

6    A.    Yes.

7    Q.    You continued to say, "The program was to be

8    offered to all the pharmacies in Adheris Pharmacy

9    Network, which included Rite Aid, Walmart, and Giant

13:29:52 10  Eagle."

11             Is that based upon your research?

12   A.    Yes.

13   Q.    Then you picked up on a six-month analysis of the

14   adherence program.

13:30:12 15            What did that indicate to you?

16   A.    That analysis showed that these adherence programs

17   were very effective; that patient consumers who were

18   exposed to the pharmacy adherence program compared to

19   control patients were more likely to maintain that opioid

13:30:37 20  for a longer period of time.

21             They were 5.2 percent more likely to remain

22   on the therapy, and 1.4 percent more likely to return

23   with a new prescription.

24             Now, again, really important to remember

13:30:52 25  that when you're talking about treating chronic pain with

1    an opioid, the evidence supports short-term use.  There

2    is not reliable evidence to support people being on

3    opioids taken daily for long periods of time.

4    Q.    Now, if we go back to your main opinion, number

13:31:19  5    six, "In addition to coordinated efforts to create

6    demand, including advertising specific opioid products at

7    the pharmacy counter," you have said "Building opioid

8    Super Stores to enhance unrestricted flow of opioid pain

9    pills."

13:31:34  10                What do you mean by that?

11   A.    So Walgreen's collaborated with Purdue to create

12   Super Store pharmacies, and these pharmacies essentially

13   became the pill-mill equivalent of a pharmacy.

14                They were pharmacies that people could

13:32:06  15   readily get opioids at, and the scrutiny of possible red

16   flags was reduced.

17                The supposed point of these was to make

18   sure that patients who really needed opioids got them.

19   And, of course, that is important and we want to make

13:32:24  20   sure that people who need opioids and who can benefit

21   from them have access to them.

22                But that is not the kinds of collaboration

23   that was going on here.  These were really business,

24   business-driven collaborations that were in the business

13:32:43  25   of selling as many opioids as possible.

1    Q.    And in that regard, when you fleshed this out in

2    your report, this idea of building Super Stores, I'd like

3    to direct your attention to Page 83, your comments at 11

4    and 12, Roman Numeral 11 and 12, and ask you about what

13:33:07  5    you mean by these and why it's important.

6                 Look first at 11.  Would you read to us

7    what you wrote in eleven?

8    A.    Yes.

9                 So this was a series of internal e-mails

13:33:25 10    that I reviewed between Purdue corporate representatives

11    regarding Walgreen's pharmacy, and Eric Perham from

12    Purdue, he was a Purdue sales rep, wrote to his manager,

13    "Today was a great day for pharmacy calls," and then the

14    e-mail went on to describe the interaction between

13:33:50 15    Purdue's Eric Perham and Bob Brody, a Walgreen's

16    pharmacist.

17    Q.    And in this regard, can you put a date on this for

18    the records sake?  It's in your report.

19    A.    This was February, 1997.

13:34:04 20    Q.    All right.  And then the follow-up paragraph, what

21    were you explaining to us in that one, please?

22    A.    So this was basically Bob, Walgreen's pharmacist

23    Bob Brody, recommending what they would do to create

24    these Walgreen's opioid Super Stores.

13:34:27 25                 They -- he said specifically that they

1    would increase their inventory of narcotics, narcotics

2    here refers to opioids, eight-fold in these specific

3    areas; high prescribers would always have an adequate

4    inventory, which is concerning because high prescribers

13:34:51  5    can and often do include pill-mill doctors or people who

6    are prescribing in dangerous ways; not always, but often.

7              And then just really importantly, at the

8    bottom, that the doctors will have the assurance that the

9    pain meds will be filled by a pharmacist less likely to

13:35:09 10    question his or her prescribing habits.

11              In other words, they were creating stores

12    where patients could fill opioid prescriptions without

13    much scrutiny, which is very troubling because it means

14    that these stores essentially became, you know, a funnel

13:35:29 15    for more opioids.

16    Q.    All right.

17              Now, in this same section of Super Stores

18    in your report, you continue to say, in Paragraphs 18 and

19    19 on Page 85, two points that I'd like you to testify

13:35:52 20    about; the first one, tell us what these documents also

21    attest to as per Walgreen's role in assuring the

22    availability and how that promotes a specific product.

23    A.    Another part of this agreement between Walgreen's

24    and Purdue was that Purdue agreed that if a given

13:36:23 25    pharmacy experienced a loss of OxyContin due to theft or

1    robbery, that they would replace opioid stock without

2    increasing safeguards to mitigate any kind of diversion,

3    which is extremely concerning because if you have a

4    pharmacy where there's theft or robbery, that is a

13:36:50  5    pharmacy that needs closer scrutiny, needs more

6    safeguards, needs better systems in place to make sure

7    that that theft or robbery doesn't happen again.

8         If you don't do that at the same time that

9    you just restock that pharmacy with opioids, you are

13:37:13 10    contributing to the problem of oversupply.

11    Q.    Dr. Lembke, if we continue to look at your opinions

12    in your report as we put them in the demonstrative, what

13    I've listed as a third bullet point is, "The coordinated

14    efforts to create demand included spreading

13:37:33 15    misinformation about the safety and efficacy of opioid

16    pain pills."

17         Is that also your opinion?

18    A.    Yes.

19    Q.    Do you hold that opinion today?

13:37:47 20    A.    Yes.

21    Q.    And if we look at how you elucidated that opinion,

22    I've marked a couple of paragraphs for you to testify

23    about, if you don't mind.

24         You say pharmacy defendants, but are you

13:37:59 25    able to specify which ones?

1    A.    Yes.

2    Q.    All right.  In terms of spreading misinformation

3    about the safety and efficacy, why is that a bad thing?

4    A.    It all contributes to the paradigm shift in opioid

13:38:18  5    prescribing, whereby the medical profession went from

6    recognizing that opioids are highly addictive, even to

7    patients being prescribed them, and that they need to be

8    used cautiously and sparingly, to prescribing them in

9    high doses, long duration, high volume, for all types of

13:38:40 10    pain.

11         And this paradigm shift occurred not just

12    among prescribers, but also among pharmacists.

13         And pharmacy education was provided by the

14    pharmacies themselves.  They opened their door to Purdue

13:39:06 15    and others to come into their pharmacies and teach their

16    pharmacists the same misleading messages that they had

17    been actively teaching to prescribers.

18         And that's really important because

19    pharmacists themselves also then didn't appreciate the

13:39:26 20    true risks and benefits of opioids and so weren't able to

21    use real science to inform their judgment about when to

22    dispense, about investigating red flags, about how far it

23    was necessary to go to investigate the red flags.

24    Q.    In this regard, you give some details in

13:39:46 25    Paragraph 2, Roman Numeral 2, you say --

1              MR. BUSH:  Objection, Your Honor, if I may

2       be heard.

3              Graeme Bush, I'm sorry.

4              THE COURT:  Let's go with the headphones.

13:40:05  5          (Proceedings at side-bar:)

6              MR. BUSH:  Can you hear me, Your Honor?

7              THE COURT:  Yes.  What's the objection,

8       please?

9              MR. BUSH:  This is a document that we were

13:40:15 10      going to deal with this morning and plaintiffs withdrew

11      the document so we did not actually address it, but it is

12      a document that comes from Purdue's files.  It was

13      hearsay upon hearsay and reflects a meeting, the

14      substance of a meeting that apparently or at least this

13:40:31 15      document reflects may have occurred at Purdue.

16              It is not authenticated.  There is no basis

17      to even show that it's a genuine document.

18              But even if it were authenticated, it's got

19      multiple levels of hearsay.

13:40:45 20              It's relating what actually happened at the

21      meeting.  If you read the rest of the --

22              THE COURT:  I don't have the document.  No

23      one's given it to me.  Apparently --

24              MR. BUSH:  Yeah.  Sure.  Sure, Your Honor.

13:40:56 25              THE COURT:  Plaintiffs agreed they were not

1    using it so I don't know why if plaintiffs agreed they

2    were not using it, why it's being used.

3              MR. BUSH:  We have another one.  We'll get

4    you one.  Just one second, Your Honor.

13:41:06 5         THE COURT:  Mr. Lanier, if you all went

6    through this this morning, and you agreed not to use it,

7    it shouldn't be used.

8              MR. WEINBERGER:  Your Honor, this is

9    Mr. -- this is Pete Weinberger.

13:41:16 10        We did -- we said we weren't moving to

11   admit it at this time.

12             We didn't say we weren't using it.

13             MR. BUSH:  I'm sorry, Your Honor.  I'm

14   having a little trouble hearing Mr. Weinberger.

13:41:27 15        THE COURT:  All right.  He said -- he said

16   they agreed not to admit it.

17             If this is a document Dr. Lembke reviewed,

18   Mr. Bush, she's entitled to say that she reviewed.

19             You can point out that it's not reliable,

13:41:39 20   it's hearsay.

21             She reviewed it.

22             MR. BUSH:  Actually, Your Honor, I think

23   the law in the Sixth Circuit is that you cannot use an

24   expert to get an inadmissible document into evidence and

13:41:51 25   that's in substance what they are doing.

```
 1              THE COURT:  They are not moving it into

 2    evidence.

 3              MR. BUSH:  They are in essence moving it

 4    into evidence, Your Honor.  They are citing exactly what

 5    it says.

 6              MR. LANIER:  Your Honor, it's the support

 7    for her opinion.

 8              THE COURT:  Well --

 9              MR. LANIER:  That's why she's allowed to

10    rely on it and you're allowed to cross-examine her

11    exactly as you said.

12              We're not moving it into evidence off of

13    this, nor are we trying to.  We're just trying to

14    elucidate the basis for her opinion which has been in her

15    report.

16              THE COURT:  Well, the problem with this,

17    Mr. Lanier, is that this is the reviewed document that

18    purports to say what Purdue did with CVS.

19              We don't have anyone really here to

20    authenticate that that happened.

21              The other document that she was testifying

22    to was a CVS document.  She said she reviewed agreements

23    which CVS produced.  There was no dispute about that.

24              MR. WEINBERGER:  Your Honor, at the hearing

25    30 days ago before Special Master Cohen, this document
```

1    was on the list of documents that we covered, and we

2    produced at that time a certification pursuant to the

3    Rules from Purdue that this was a business document kept

4    in the ordinary course of --

13:43:16  5              THE COURT:  All right.  I'm going to -- I

6    mean, with that, with that basis, you can use it and,

7    Mr. Bush, you can cross-examine that she has no, no

8    knowledge that it's not -- that it's legitimate.

9              MR. BUSH:  Your Honor, I mean the predicate

13:43:33 10   of that, of your ruling and of what Mr. Weinberger just

11   said is incorrect.

12              The affidavit that came from Purdue does

13   not even come from Purdue, it comes from an outside

14   counsel with no personal knowledge whatsoever of this

13:43:42 15   document.

16              And it's not a proper basis to authenticate

17   it.

18              THE COURT:  It's a lawyer from Purdue that

19   says it's an authentic document.

13:43:52 20              MR. BUSH:  It's an outside counsel from

21   some law firm.

22              THE COURT:  That's a lawyer.  What does

23   that mean?

24              MR. BUSH:  Just what I said, it's a lawyer

13:43:58 25   from an outside counsel for Purdue purporting to certify

1    that this is an authentic document for his client.

2              He has no basis to do that.

3              THE COURT:  Wait a minute.

4              You're an outside counsel for your client,

5    right?

6              MR. BUSH:  But I haven't certified the

7    authenticity of anything.  It's not my -- I'm not at

8    issue here.

9              THE COURT:  Well, but, you're speaking for

10   your client right now.

11             That lawyer was speaking for his client or

12   her client.

13             MR. BUSH:  As a matter of evidence, it's

14   not proper to have somebody with no personal knowledge

15   who isn't even a person at the company certify it.

16             THE COURT:  I'm overruling the objection.

17             You can cross-examine.  You can say, you

18   know, Dr. Lembke will have to admit she has no idea where

19   this came from, and, you know, I think I will -- it's not

20   being admitted as evidence.  It won't come in as

21   evidence.  All right?

22             And I'll instruct the jury that this

23   is -- this document is not coming in as evidence, but if

24   Dr. Lembke reviewed it, she can say it formed the basis

25   of part of her opinion and you can cross-examine on it.

1          MR. BUSH:  But, Your Honor, perhaps if she

2     said that there was such a document, it's the basis for

3     her opinion or part of the basis for her opinion, that

4     might be something.

13:45:18  5          But she's actually reciting the contents of

6     the document.

7          THE COURT:  All right.  I'm not going to

8     let her do anything until -- unless she says that this

9     helped her form the basis of her opinion.

13:45:30 10          Show it to her without showing it to the

11     jury and see what she says.

12          MR. LANIER:  All right.

13          (End of side-bar conference.)

14          MR. LANIER:  May I continue, Your Honor?

13:45:49 15          THE COURT:  In the manner which I allowed.

16          MR. LANIER:  I understood that.

17     BY MR. LANIER:

18     Q.   Dr. Lembke, the memorandum that summarized this

19     meeting, did you rely upon that memorandum in forming

13:46:07 20     your opinion that pharmacy defendants, specifically CVS,

21     spread misinformation about the safety and efficacy of

22     opioids?

23     A.   Yes.

24     Q.   Was this an important aspect of support for your

13:46:24 25     opinion?

1    A.    Yes.

2    Q.    And was the language in this, and what was conveyed

3    in this memorandum from 20 years ago, important language

4    for you to consider in forming your opinions?

13:46:40 5    A.    Yes.

6    Q.    Okay.

7              MR. LANIER:  And with that, Your Honor, may

8    I then ask her why and have her indicate the language

9    that was important to her?

13:46:50 10              THE COURT:  Yes.

11              MR. LANIER:  Thank you, Judge.

12    BY MR. LANIER:

13    Q.    Then, ma'am, what I'd like you to do is please tell

14    us why -- well, first of all, explain the language that

13:47:02 15    was important to you.  And by important to you, I mean it

16    formed, in part, the basis of your opinion.

17              What is that language, please?

18    A.    The language that is important to forming my

19    opinion includes statements like, "Ensuring the

13:47:31 20    availability of OxyContin," because again, in the context

21    of an opioid epidemic, simply ensuring availability

22    without proper safeguards is not adequate.

23              We all care about patients who need opioids

24    getting those opioids, but when there's not proper

13:48:06 25    systems in place to detect diversion and misuse and

1    dangerous prescribing, especially in the context of an

2    opioid epidemic, then simply ensuring availability is a

3    danger to individuals and to the public health.

4                 Also, there is a statement here from Barry

13:48:30  5    Jasilli, CVS Director of Quality Improvement, so again,

6    making an important distinction here between

7    representatives from these pharmacies who are in

8    leadership roles, who were in corporate leadership, as

9    distinct from individual pharmacists working on the front

13:48:52 10   lines, and this is one more of many examples of corporate

11    leadership essentially colluding and cooperating with

12    opioid manufacturers like Purdue.

13                 Here, the Director of CVS quality

14    improvement indicated that he felt Purdue was being

13:49:11 15   victimized by the situation, and that's -- that's a quote

16    here or that's a quote from, from the communication from

17    the senior executive at Purdue that the product is not

18    the issue; that the abuser is the issue, and that from

19    his perspective, the perspective of the CVS Director, we,

13:49:34 20   Purdue, should be fighting back even harder.

21                 So this --

22   Q.    Why is that important in your opinion?

23   A.    This is really important because one of the very

24    early strategies of Purdue Pharma to promote OxyContin

13:49:49 25   was to say that OxyContin is not the problem; the problem

1    is those addicts who are ruining it for all of the

2    legitimate pain patients; those bad guys, those evil

3    actors, those yucky addicted people are the ones who are

4    making it impossible for our legitimate pain patients to

13:50:14  5    get what they need.

6              And, in fact, that dichotomy does not

7    exist.  Legitimate pain patients get addicted.  People

8    with addiction are human beings who deserve to be

9    respected and deserve to have their addiction identified

13:50:31 10    and have access to treatment.

11              So when you have a CVS Quality Improvement

12    Director saying that Purdue was being victimized, that

13    the product is not the issue, that the abuser is the

14    issue, you're really propagating an untruth about who

13:50:53 15    gets addicted and you're also justifying a system that

16    says all We need to do is just identify those bad folk,

17    you know, those bad addicts, and we don't need to pay

18    attention to anything else.  We don't need to pay

19    attention to the oversupply problem.  We don't need to

13:51:13 20    pay attention to these patients on really high doses.  We

21    don't need to pay attention to patients who get

22    prescribed opioids and Benzodiazepines like Xanax

23    simultaneously because those are all legit real patients.

24              But those patients are the ones, many of

13:51:33 25    them, that went on to get addicted themselves or somebody

1    in their family did because they had so many opioids in

2    their medicine cabinet.

3    Q.    All right.

4           Ma'am, moving on, in the meeting, you've

13:51:43  5    made another note about CVS agreeing to post-diversion

6    brochures on their Intranet site.

7           That sounds like a good thing to me.

8           Why is that not a good thing?

9    A.    It does sound like a good thing, but if you

13:51:57 10    actually read the brochure that Purdue created, that CVS

11    was now disseminating to all the pharmacies, it really

12    minimizes the breadth and scope of the problem and tries

13    to paint the problem as a small subset of, quote,

14    unquote, addicts as opposed to the really much more

13:52:22 15    significant problem of oversupply, of flooding of our

16    communities, of millions of pain pills making the entire

17    society at risk.

18    Q.    The jury heard in opening statements reference to

19    another aspect of this that you've got here and that is

13:52:45 20    the Paragraph 7, Roman Numeral 7 on Page 87, the June,

21    2001 letter to CVS pharmacists announcing CVS's

22    participation in "Partners Against Pain," sponsored by

23    Purdue Pharma.

24           Why is that part of your opinion?

13:53:04 25    A.    So Purdue Pharma was involved in creating what are

1    called front groups.

2                  These are organizations that appeared to be

3    independent of Purdue Pharma but were, in fact, created

4    by Purdue Pharma, funded by Purdue Pharma, and became

13:53:25  5    basically the means by which Purdue Pharma promoted

6    opioids.

7                  And it is significant to note that CVS

8    promoted one of these front groups to their pharmacists,

9    this front group was called "Partners Against Pain" and

13:53:45 10    again, it was an organization that existed to promote

11    opioids using all of the same misleading messages that

12    we've been talking about.

13                  And this letter that went out to CVS

14    pharmacists, which was created by CVS, went so far as to

13:54:01 15    call Purdue, "A leader in educating the health care

16    community on effective pain management and the

17    appropriate use of pain medicines."

18    Q.    When you say this was created by CVS, what do you

19    mean by that?

13:54:19 20    A.    I mean that it was made at CVS corporate

21    headquarters, it was on CVS letterhead, CVS corporate

22    mailed it out to CVS pharmacists, promoting an

23    organization that repeated these untruths like the risk

24    of addiction is low in patients with no history of

13:54:48 25    substance use, that there's no tolerance to

1    opioids -- which is simply not true.  Most people taking

2    an opioid daily will develop tolerance, meaning they'll

3    need more and more over time to get the same effect.

4    Q.    You've got an excerpt from the CVS "Partners

5    Against Pain" website from March of 2001.

6              The excerpt that you've got here in your

7    report on Page 87, subsection eight, was that an

8    important part in you forming your opinion about

9    spreading misinformation about the safety and efficacy of

10   opioid pain pills, vis-a-vis CVS?

11   A.    Yes.

12   Q.    All right.

13              I would like you to, then, explain, first

14   would you show us the language that was important to you

15   and then I'll have you explain why it was important.

16              MR. BUSH:  Your Honor, I believe Mr. Lanier

17   misspoke and said the CVS Partners Against Pain site,

18   website.  And that's really Purdue's.

19              THE COURT:  I'm sorry?

20              MR. BUSH:  I'm sorry if you couldn't hear

21   me.

22              THE COURT:  No.

23              MR. BUSH:  I believe Mr. Lanier just

24   misspoke and said the CVS's Partners Against Pain

25   website.  It's actually Purdue's.

1          I just wanted that to be clear.

2                    MR. LANIER:  If I did, Your Honor, I'll fix

3     that.

4                    THE COURT:  Next question, please.

5                    MR. LANIER:  Yeah.

6     BY MR. LANIER:

7     Q.    You've talked about how CVS sent a June, 2001

8     letter to CVS pharmacists announcing CVS's participation

9     in Partners Against Pain sponsored by Purdue Pharma.

10                   Right?

11    A.    Yes.

12    Q.    And then in that regard, you have an excerpt from

13    the Partners Against Pain website that was three months

14    earlier than that letter, March of 2001.

15                   Correct?

16    A.    Yes.

17    Q.    And I'll ask you the same question to be sure I'm

18    clear and the record's clear.  Is this language that you

19    saw on that website from March of 2001 which forms part

20    of your opinion that they were spreading misinformation

21    about the safety and efficacy of opioids?

22    A.    Yes.

23    Q.    All right.  With that, I want to show you the

24    language and ask you to tell the jury, please, and the

25    Court why language was important to you that formed part

1    of your opinion.

2    A.    So starting with the quote where it says, "The

3    majority of physicians and nurses fear that opioid use

4    will result in addiction, drug tolerance, and

5    uncontrollable side effects, especially respiratory

6    depression," this is right from Purdue's primary playbook

7    about how to promote OxyContin, basically to say that

8    anybody who wasn't prescribing opioids for pain was

9    inappropriately afraid of things like addiction, things

10   like people not being able to breathe, which is how

11   people die from opioids, right?

12            Breathing slows down, heart rate slows

13   down, people fall asleep and don't wake up again.

14            So essentially what Purdue did and what

15   Partners Against Pain was continuing was to say -- was

16   to, in effect, shame health care providers for their

17   inappropriate fear or what was sometimes called opioid

18   phobia, their inappropriate fear of prescribing opioids

19   or in this case, dispensing opioids to patients for pain.

20            You'll also note that this quote says, "The

21   risk for addiction is low in patients with no history of

22   substance abuse."

23            In fact, there are data showing that

24   approximately a quarter of individuals with chronic pain

25   who take an opioid long-term will develop misuse or a

1    mild opioid addiction, and approximately 10 percent will

2    become severely addicted to opioids.

3              So it's clear that the risk for addiction

4    is not low, and although it is true that those with a

5    history of addiction are more likely to get addicted to

6    opioids prescribed by a doctor, the biggest risk factor

7    is dose and duration of opioid.

8              That is much more important when it comes

9    to who's going to develop addiction and who won't than

10   personal past history of substance use.  And in fact, we

11   have no reliable ways to predict who will and will not

12   get addicted through a doctor's prescription.

13   Q.   Toward the end of this paragraph, you have noted

14   how the memo touted CVS's long history of having a

15   positive relationship with Purdue, the benefit of the

16   program to both organizations, and how the continuing

17   education series would contribute significantly to our

18   strategic business goals.

19             Why is that language that you would include

20   in your report?

21   A.   Again, really important to recognize that at the

22   corporate level, CVS Pharmacy was collaborating with and

23   cooperating with Purdue Pharma for business reasons.

24             They wanted to make money together, and

25   this is how they partnered to do it.

1    Q.    All right.  Now, in addition to CVS, you've got

2    sections here where you're explaining your opinion of

3    spreading misinformation about safety and efficacy,

4    you've got sections in here on Walgreen's, is that

5    correct?

6    A.    Yes.

7    Q.    And if we look at Paragraph 14, you reference

8    a -- let me hold this up first -- a December, 1998 letter

9    to Walgreen's pharmacy supervisor, Scott Diveney,

10   D-I-V-E-N-E-Y, in Paragraph 14.

11                  Is this a significant document where you've

12   relied upon the content to form your opinion?

13   A.    Yes.

14                  So this is another example whereby at the

15   corporate level, Walgreen's pharmacy opened their doors

16   up to Purdue and let Purdue, quote, unquote, educate

17   their pharmacists about opioids.

18                  And we know that Purdue's so-called

19   educational efforts were really promotional efforts based

20   on misleading messages.

21   Q.    And so if we consider Walgreen's, do you think it

22   important for your opinion that Walgreen's is -- have

23   their pharmacy people being educated about opioids by

24   Purdue?

25   A.    Yes.

1          It means that Walgreen's pharmacists on a

2      national level were being fed the same false and

3      misleading messages about opioids that doctors were

4      during that same time period, contributing to the

14:02:20  5      paradigm shift in opioid prescribing and dispensing,

6      which led to the current opioid epidemic.

7      Q.   Well, you speak of a Purdue-sponsored continuing

8      education program.

9          What, for those who don't have a lifestyle

14:02:37 10     where continuing education programs are important, what

11     is one of those within the framework of what you're

12     testifying to?

13     A.   So continuing education is the education that

14     physicians and pharmacists must continue -- must continue

14:02:55 15     to engage in on an annual basis in order to maintain

16     their professional credentials.

17          These are often conferences or sometimes

18     they're lunches or dinners, but we are required to get a

19     certain amount of continuing education credits per year

14:03:14 20     in order to continue to practice medicine, or in this

21     case, continue to practice pharmacy.

22     Q.   The CE program for the pharmacists was entitled

23     "Use of Opioids, a Pharmacist's Responsibilities."

24          To me that sounds like a good program that

14:03:33 25     would be very helpful.

1              Why do you have it down as misinformation?

2       A.    A Purdue-sponsored program about opioids is going

3       to be a program about opioids full of misinformation.

4       Q.    You then go on to talk about an August, 1999

14:03:59 5      letter, almost a full year later, to the Walgreen's

6       pharmacy supervisor where Purdue offered to fund another

7       continuing education program.

8              Do you believe the funding of these

9       continuing education programs by Purdue are evidence of a

14:04:17 10     coordinated effort to create demand?

11      A.    Yes.

12      Q.    And by the same token, you've also got provisions

13      in here about Walmart.

14             Is that fair to say?

14:04:29 15     A.    Yes.

16      Q.    If we continue to look through this, we continue to

17      see Page 91, Paragraph 22, Walgreen's, you say that

18      Walgreen's executive, Sheila Bennett, was giving Purdue

19      executive Stephen Seid, S-E-I-D, inside information on

14:05:16 20     how Walgreen's trains its pharmacists, allowing Purdue to

21      reach a larger target audience than it otherwise would

22      have.

23             Why is that an important part of your

24      opinion?

14:05:27 25     A.    That establishes that leaders within the Walgreen's

1    corporation were actively collaborating with and

2    cooperating with Purdue Corporate to promote opioid

3    products.

4    Q.    And then you cite a memo revealing further that

14:05:48  5    Walgreen's -- and this is Roman Numeral 25 --

6    "Walgreen's, based on its own data, which it shared with

7    Purdue and is reproduced below, was able to see that as

8    the dose of OxyContin tablets went up, so, too, did the

9    number of pills dispensed."

14:06:08 10              Now, I want to ask you what you mean by

11   that, and I'll show the chart that you have put into your

12   report here and have you explain it, please.

13   A.    So what this chart shows is that as the strength of

14   the OxyContin pill went up from 10 to 20 to 40 to 80 to

14:06:31 15   160 milligrams, the number of prescriptions went down so

16   fewer people got those very high dose prescriptions

17   compared to the lower dose ones.

18              But importantly, the average prescription

19   size, so the quantity of pills dispensed, went up at the

14:06:57 20   highest doses.  And that is very concerning because we do

21   know that the more potent the opioid is, and of course

22   OxyContin 160 milligrams is like 16 Percocets in one

23   pill, that that is going to release an enormous amount of

24   opioids in a person's body deceptively in one pill, and

14:07:24 25   then added to that, as these pills' potency got greater,

1    the Walgreen's pharmacists were dispensing larger

2    quantities of them.

3                So the people who are most at risk because

4    of the size and potency of the OxyContin pill, the 160

14:07:42  5    milligrams, were also getting larger numbers of pills,

6    putting those individuals at very serious risk for

7    overdose and death as well as addiction.

8    Q.    All right.

9                In Paragraph 30, you talk about the New

14:07:58 10    Trends course program which was delivered to Walmart

11    pharmacists and elsewhere, being replete with misleading

12    messages about opioids, taught by individuals who were on

13    Purdue's Speaker Bureau, and receiving consulting fees

14    from opioid manufacturers?

14:08:17 15                Why is that an important part of your

16    opinion?

17    A.    So again, this was a part of Purdue's strategy.

18    They would identify people who were leaders in the field,

19    in this case Neil Irick, and Purdue would pay these

14:08:38 20    individuals to help them create these courses on opioids

21    and go around and teach these courses on opioids.

22                And I've reviewed many of these types of

23    courses, and they contain all of the same misleading

24    messages about opioids.

14:08:55 25                And what I learned, based on these

1    documents, is that this New Trends continuing medical

2    education course taught by Purdue Pharma's key opinion

3    leader, Neil Irick, was presented to Walmart pharmacists.

4              So that is an important example again

14:09:21  5    showing that pharmacists themselves were also duped by

6    Purdue with permission and even encouragement from

7    Walmart.

8    Q.   Now, your bullet points continue.

9              In the interest of time, I'm going to leave

14:09:42  10   out, "Partnering with pro opioid industry advocacy and

11   lobbying organizations," but I'd like to get to the next

12   bullet point where I've enumerated your concern about

13   ignoring red flags for misuse and diversion, including

14   concerns expressed by their own pharmacists.

14:10:02  15             Do you see that?

16   A.   Yes.

17   Q.   All right.  In that regard, can you explain what

18   you mean by that?

19   A.   As the opioid epidemic began to unfold and more and

14:10:22  20   more people were getting addicted to opioids and dying

21   from opioids due to the oversupply, the red flags started

22   to mount.

23             And, remember, red flags are the things

24   that a pharmacist by law has a responsibility to

14:10:43  25   investigate because they are suggestive of misuse,

1      diversion or just a dangerous drug-drug combination.

2              And what I discovered in reviewing these

3      materials is that not only were frontline pharmacists not

4      given the necessary tools to identify and investigate red

14:11:11  5      flags by their corporate leadership, but when pharmacists

6      themselves went to their managers and to corporate

7      leadership to express concern and worry that they had

8      about the way that opioids were being dispensed in their

9      stores, that corporate leadership woefully ignored pleas

14:11:33 10      from pharmacists and implicitly encouraged them to ignore

11      those red flags.

12      Q.   All right.  Let's go through and look to see it

13      if --

14              MR. STOFFELMAYR:  Objection.

14:11:42 15              THE COURT:  Hold it.

16              MR. STOFFELMAYR:  May we have a side-bar

17      before we go further?

18              (Proceedings at side-bar:)

19              MR. STOFFELMAYR:  Judge, can you hear me?

14:11:57 20              THE COURT:  Yes.

21              MR. STOFFELMAYR:  I have two concerns about

22      this line of questioning.

23              One is this goes into areas that are beyond

24      the areas of pharmacy practice you said she could testify

14:12:09 25      about in your *Daubert* decision.

1          You said she was, you know, qualified to

2     identify red flags, talk about why they were important

3     and what they mean, but now we are getting into the

4     internal operations of a pharmacy and whether they were

14:12:24  5     effective, which is not an area in which she has any

6     experience.

7          The second point is I'm pretty sure I know

8     where she's going with this, and what Mr. Lanier is going

9     to have her do is read out loud the entire content of a

14:12:38 10     clearly inadmissible e-mail, which I understand your

11     point that she can talk about inadmissible evidence but

12     she can't be put on the stand to simply read out loud an

13     inadmissible e-mail for the benefit of the jury.

14          THE COURT:  I mean, all these documents

14:12:54 15     were cleared for authenticity, all right, with Special

16     Master Cohen so they're authentic.

17          He's not putting the documents in.  I don't

18     know, you're saying it's inadmissible.  It may or may not

19     be.

14:13:05 20          He's not offering it.  She's relied on it

21     in her report.  We've seen the report.  If she's relied

22     on it, she can talk about it.

23          Now, she can only -- she cannot talk about

24     internal pharmacy, pharmacists, pharmacy practices but

14:13:23 25     she can certainly talk about red flags.

1          MR. LANIER:  Your Honor, the direction I

2    was headed with this is from Page 13 of your *Daubert*

3    motion ruling where you said she can testify to the

4    efficacy and effects of the defendants' policies and

14:13:40  5    procedures, such as ignoring red flags.

6          Page 13, you said that was in.

7          THE COURT:  Right.

8          MR. LANIER:  What you said was out on

9    Page 13 was the time that it would take pharmacists, the

14:13:49 10    resources that it would take pharmacists, and the

11    incentives that were provided to pharmacists.

12          I've read your *Daubert* ruling very

13    carefully.  I will avoid those.

14          You also threw out any idea that we can

14:14:01 15    argue that the marketing from anybody was causation in

16    this case, and I'll avoid that as well.

17          MR. STOFFELMAYR:  Judge, if she testified

18    as she's about to that an employee complaint was ignored,

19    not properly handled, that it reflected something about

14:14:20 20    the internal workings of the pharmacy that were improper,

21    that goes exactly --

22          THE COURT:  I mean, I'm not going to let

23    her opine about the internal workings of any particular

24    pharmacy.

14:14:31 25          All right?  Or any particular store.  She

1    knows nothing about that.  She said she hasn't analyzed

2    any particular store.

3              MR. STOFFELMAYR:  What she said is she's

4    going to testify about complaints being ignored by

14:14:43  5    pharmacists.

6              That is exactly about the operation of

7    particular stores; not about red flags in general.

8              MR. LANIER:  Your Honor, I understand your

9    ruling and I'll walk that --

14:14:56  10              THE COURT:  All right.  We're --

11              MR. LANIER:  -- exactly the way you've

12    said.

13              THE COURT:  All right.  We're going to

14    stick to my ruling.

14:15:04  15              MR. STOFFELMAYR:  Thank you, Judge.

16              (End of side-bar conference.)

17    BY MR. LANIER:

18    Q.    All right.  Dr. Lembke, in this regard of ignoring

19    red flags for misuse and diversion, including concerns

14:15:28  20    expressed by their own pharmacists, I want to leave the

21    concerns expressed by their pharmacists aside for a

22    moment and, instead, what I'd like to talk to you about

23    and direct you to are the things -- thank you,

24    Frank -- are the things you had to say about specifically

14:15:46  25    the *Holiday CVS* case in this regard.

           1                  And you talk about that on 10 -- Page 106

           2     of your report.  If you could turn to Page 106, please.

           3                  Roman Numeral 9, you start talking

           4     about -- oh, I just lost this monitor.

14:16:23   5                  MR. LANIER:  Your Honor, we've lost all of

           6     our monitors over here.

           7                  MS. SULLIVAN:  Mr. Lanier, is this too far

           8     if I turn it?

           9                  MR. LANIER:  Oh, thank you, Ms. Sullivan.

14:16:37  10                  I can't remotely see it.

          11                  MS. SULLIVAN:  I can move it.

          12                  THE COURT:  Robert, can you see what's

          13     going on?

          14                  (Pause.)

14:17:16  15                  THE COURT:  Robert, can you get IT up?

          16     What's the issue?

          17                  MR. LANIER:  Your Honor, in the interests

          18     of time, I think I might be able to see off of that table

          19     and I've got the small --

14:17:33  20                  THE COURT:  All right.  We are calling IT

          21     people to come up and address the monitors.

          22                  MR. LANIER:  All right.  But I think I can

          23     continue without this monitor and keep us on your

          24     schedule.

14:17:41  25                  THE COURT:  Great.  Thank you.

1        MR. LANIER:  Thank you, Judge.

2    BY MR. LANIER:

3    Q.    Okay.  Doctor, you talk about the *Holiday* case.

4            Can you tell the jury a little bit about

5    your understanding of what the *Holiday* case is, and why

6    it was important to you?

7    A.    The *Holiday CVS* case was important, number one,

8    because it involved CVS Pharmacies and CVS is a defendant

9    in this case.

10            And, number two, because it was a very

11    carefully done investigation over several years in

12    Florida, really documenting that these pharmacies, these

13    CVS Pharmacies in Florida, were systematically ignoring

14    red flags and, thereby, contributing to the opioid

15    oversupply problem.

16            And, in fact, the DEA then revoked the DEA

17    license from two Florida pharmacies based on their

18    investigation.

19    Q.    All right.  And in that regard, you speak about it

20    in your report, and you spoke of the CVS -- *Holiday CVS*

21    case involving a number of different red flags at that

22    CVS Pharmacy.

23            What is your understanding of -- that goes

24    into your opinion of why this is important information

25    for you and the jury?

A.    Well, this is important information because
according to the Controlled Substances Act, pharmacies
not only have a responsibility to identify red flags and
investigate them before dispensing, but pharmacies have a
responsibility to create a system that will effectively
detect red flags and support their pharmacists in doing
so.

So it's --

MR. BUSH:  Your Honor, I think this is
outside the scope of both her opinion and her expertise.

MR. LANIER:  This is her opinion, Your
Honor.

I mean, this is her report.

THE COURT:  Overruled.

A.    So importantly, it's really a dual responsibility.

It's a responsibility to detect red flags
and act on them, and it's a responsibility to create a
system that will allow the pharmacy to do that.

And --

Q.    And -- I'm sorry.

The reason I'm asking you this, and I want
to make sure that we put it clearly in the record in
light of the objection, is you go on to talk about how,
for example, a red flag for the combination of opioids
and Benzos should have been in place no later than 2007

          1    based on medical literature and no later than 2010 based

          2    on DEA enforcement actions.

          3                 Is that a red flag that you're talking

          4    about?

14:21:07  5    A.    Yes.

          6    Q.    And as a doctor who understands the brain and the

          7    way these drugs work and publish on them, can you explain

          8    why a combination of an opioid with a -- what is a

          9    Benzodiazepine?

14:21:25 10    A.    A Benzodiazepine is a sedative hypnotic drug.

         11    Q.    A sedative hypnotic drug?

         12    A.    Yes.

         13    Q.    So it's like a chill pill?

         14    A.    Yes, you could say that.

14:21:39 15                 And it includes drugs like Xanax, Ativan,

         16    Valium, Klonopin.

         17                 One of the big responsibilities of

         18    pharmacies is to identify dangerous drug combinations,

         19    and part of their independent and corresponding

14:22:05 20    responsibility is to do that.

         21                 You've probably had the experience or maybe

         22    someone you know has gone to the pharmacy to pick up a

         23    medication and have been told that it has an interaction

         24    with another drug that that person is taking.

14:22:15 25                 That's a very important thing, and that's a

1    big role of pharmacies.

2                    So opioids taken together with

3    Benzodiazepines is a very dangerous drug interaction.

4                    I told you earlier that the way that

14:22:34 5    opioids kill is that they slow down breathing, they slow

6    down heart rate, people fall asleep, their heart stops,

7    they stop breathing and they don't wake up again.

8                    When you add a sedative hypnotic like a

9    Benzodiazepine, like a Xanax or Valium or Klonopin or

14:22:55 10   Ativan to an opioid, you increase the risk of accidental

11   death because those drugs together potentiate or make

12   worse the problem of slowed breathing, slowed heart rate,

13   falling asleep and not waking up again.

14                   So this is a very significant drug-drug

14:23:20 15   interaction.

16   Q.    From a medical perspective, is there any reason

17   that an addict or a nonaddict would want to take those

18   two together?

19                   Do they have any dopamine effect or are

14:23:33 20   they mutually involved in something that's a high or

21   something?

22   A.    So in addition to the risk, increased risk of

23   overdose with that combination, it's also a red flag

24   because many people who become addicted to opioids will

14:23:46 25   seek out and take Benzodiazepines at the same time to

1    augment the high or the euphoric feeling.

2              It is well-known based on medical

3    literature and also based on patient experience that

4    combining an opioid with a Benzodiazepine is a way to

14:24:04 5    feed the addiction.

6    Q.    All right.  You go on to say then that in light of

7    the materials summarized above, it's my opinion a red

8    flag should have been in place no later than '07 or, no,

9    no later than '07 based on medical literature, no later

14:24:23 10   than '10 based on DEA enforcement actions.

11             The medical literature you're talking about

12   is what?

13   A.    There's medical literature going back quite awhile

14   to the late 1990s, but I cite medical literature starting

14:24:40 15   in 2002, showing that the combination of opioids and

16   Benzodiazepines increases the risk of overdose death.

17             And that the combination is also commonly

18   sought out by people who are misusing and addicted to

19   those drugs.

14:24:56 20   Q.    Okay.  Thank you.

21             And then you continue to say, "Despite

22   these red flags, the pharmacy defendants dispensed

23   prescriptions for an opioid and a Benzodiazepine

24   thousands of times in Lake and Trumbull Counties."

14:25:15 25             How do you know that to be true?

 1    A.    I know that based on data I saw showing the

 2    combinations of those pills.

 3    Q.    All right.  Your next sub point is sub point 1,

 4    where you talk about pharmacy defendant Walmart lacked

14:25:37  5    effective controls and actively undermined the efforts of

 6    pharmacists to prevent diversion.

 7          Now, I've got to ask you these opinions

 8    based upon your understanding as a pharmacist, and I want

 9    you to limit yourself --

14:25:55 10    A.    As a doctor, you mean?

11    Q.    I'm sorry, as a doctor.  I apologize.  My brain

12    just read pharmacist.

13          I need you to limit yourself to the

14    efficacy and effects of these policies and procedures

14:26:10 15    from a doctor's perspective.

16          Okay?

17    A.    Okay.

18    Q.    So within the framework of that, you start by

19    saying, "By the year 2005, the prescription opioid

14:26:19 20    epidemic was several years into its evolution, having

21    begun in the mid-to-late 1990s."

22          Is that true?

23    A.    Yes.

24    Q.    Now, that brings up a really important question.

14:26:34 25          Some of these things we're talking about

Lembke - Direct/Lanier

631

1    are 10 years old, some of these things we're talking

2    about are 20 years old, some 22, 23 years old.

3              Why does that matter today?

4    A.    Well, it matters because, especially vis-à-vis the

14:26:49  5    pharmacy defendants in this case, it is relevant to think

6    about when they did what in terms of improving their

7    screening procedures and setting up a system to prevent

8    misuse and diversion, which is another part of their

9    corresponding responsibility.

14:27:08 10              So appreciating the timeline, and in my

11    opinion really noticing that although pharmacy defendants

12    in this case made improvements over time, their efforts

13    were too little, too late.

14              They had the means much earlier to put

14:27:29 15    better systems in place and they chose not to do it.

16    Q.    I have mimicked your language that you use.

17              MR. BUSH:  Objection, Your Honor.

18              THE COURT:  I'll sustain the objection to

19    that comment.

14:27:40 20              If you would ask a question, please.

21    BY MR. LANIER:

22    Q.    Doctor, the -- specifically, did you examine the

23    evolving efforts of the pharmacies on their red flags?

24    A.    Yes.

14:28:03 25    Q.    And by the same token, when you testified about a

1    paradigm shift and you explained that as a different -- I

2    forgot your words.  What were your words?  Paradigm shift

3    in the sense of what?

4    A.    In terms of -- there was a paradigm shift or a big

14:28:19  5    change in the way that the medical community was using

6    opioids.

7    Q.    Right.

8             So does the -- do the actions that go back

9    decades affect that paradigm shift?

14:28:30 10    A.    Yes.

11             I mean, that paradigm shift is really at

12    the heart of what caused the current opioid epidemic.

13    That paradigm shift in prescribing and dispensing led to

14    the oversupply, which led to all kinds of different

14:28:48 15    people having easy access to opioids, which led to people

16    getting addicted and dying, which led to people turning

17    then to heroin, illicit Fentanyl, as it became harder to

18    get opioids, all of which are problems which we continue

19    to deal with today.

14:29:08 20    Q.    So you have looked, for example, at the November of

21    2005 Walmart section of its Pharmacy Operations Manual,

22    which included instructions for handling suspected forged

23    or altered prescriptions, such as contacting the

24    prescribing physician, contacting the local authorities.

14:29:34 25             Did you find that to be from a doctor's

1       perspective an adequate manual for 2005?

2       A.    No.

3       Q.    Why?

4       A.    Walmart did not give its pharmacists the tools that

14:30:04  5     were necessary and that were available in order to

6       detect typical --

7                     MR. BUSH:  Objection, Your Honor.

8                     Direct to the *Daubert* ruling.

9                     MR. LANIER:  And for the record, Your Honor

14:30:13 10     --

11                     THE COURT:  Yeah, I'll sustain that.

12                     MR. BUSH:  Ask for an instruction, Your

13     Honor.

14                     MR. LANIER:  And for the record, Your

14:30:22 15     Honor, I think it's in line with Page 13 of the *Daubert*

16     ruling.

17                     THE COURT:  I think it was over the line.

18                     MR. LANIER:  Okay.

19     BY MR. LANIER:

14:30:34 20     Q.    Ma'am, if -- Doctor, if enabled to, would you be

21     able to walk through what was known in the medical

22     community, what was known publicly, based upon news

23     accounts, and correlate them to inadequacies in the

24     Pharmacy Operations Manual of Walmart?

14:30:54 25                     MR. MAJORAS:  Same objection, Your Honor.

        1          THE COURT:  All right.  Let's go on the

        2   headphones.

        3               (Proceedings at side-bar:)

        4          THE COURT:  All right.  Mr. Lanier, I will

14:31:11  5   allow you to ask her -- I will allow you to ask her what

        6   was known in the literature as to what, what were best

        7   practices but I'm not going to allow you to talk about

        8   specific practices at specific pharmacies or stores.

        9               That's beyond her expertise.

14:31:46 10          MR. LANIER:  Okay.

       11               Your Honor, I don't want you to think I was

       12   flagrantly disregarding.

       13          THE COURT:  You were right on the line.

       14          MR. LANIER:  What I was trying to do is on

14:32:01 15   Page 13 of your *Daubert* ruling, you said, "Dr. Lembke is

       16   well qualified by experience to opine on the efficacy and

       17   effects of many of defendants' policies and procedures,

       18   such as defendants' alleged ignoring red flags for misuse

       19   and diversion, including concerns expressed by their own

14:32:19 20   pharmacists."

       21               So that's something you told me

       22   specifically in the *Daubert* ruling I could do, and I

       23   understand you're changing that now and that's fine, but

       24   I just didn't want you to think that I was just flying in

14:32:30 25   the face of what you were doing.

1          MR. MAJORAS:  Your Honor, two issues.

2          One, you're not changing anything in your

3   ruling.

4          I'm asking you simply to enforce it.

5          Second, I'd also ask of the document that's

6   been on the screen, there's a phrase in the document that

7   specifically goes to the last part of that paragraph that

8   says, "The pharmacists were precluded from doing a red

9   flag examination," I'd ask that that be taken down from

10  the screen.

11         One other --

12         THE COURT:  Well, I will allow her

13  to -- I'll stick with Paragraph 13 as best as I can, so I

14  think your question was a little over it and that portion

15  of the document was talking about incentives or lack of

16  incentives, but I'll allow her to, as I said in

17  Paragraph 13, she can opine that the pharmacists failed

18  to provide -- she can opine as to what, what red flags

19  were, and whether in her opinion that the pharmacists

20  were following those red flags or not.

21         MR. LANIER:  Thank you, Your Honor.

22         MR. MAJORAS:  Your Honor, Your Honor --

23         THE COURT:  All right.  Let's move on.

24         MR. MAJORAS:  I'm not asking for

25  reconsideration.  It's another matter, Your Honor.

```
         1              (End of side-bar conference.)

         2    BY MR. LANIER:

         3    Q.    So, Dr. Lembke, do you have an opinion -- thank

         4    you -- do you have an opinion on the efficacy and effects

14:34:54 5    of Walmart's policies and procedures when it comes to

         6    ignoring red flags for misuse and diversion?

         7              First, do you have an opinion?

         8    A.    Yes.

         9    Q.    And is that opinion based upon your work through

14:35:10 10   the material that we've been talking about in your

        11    report?

        12    A.    Yes.

        13    Q.    And what is your opinion as to whether or not the

        14    policies and procedures of Walmart were effective for

14:35:34 15   seeing and using properly red flags to prevent misuse and

        16    diversion?

        17    A.    Walmart's policies and procedures were not

        18    effective to detect red flags.

        19    Q.    Did it look to you, based upon your review of the

14:35:53 20   literature and the media public accounts, that Walmart

        21    had a policy manual that was kept up-to-date with the

        22    state-of-the-art knowledge of how to detect and resolve

        23    red flags?

        24    A.    No.

14:36:27 25   Q.    And did you work through the various sections of
```

1    Walmart's policy, Pharmacy Operations Manual, in

2    deriving, in coming up with your opinion in this regard?

3    A.    Yes.

4    Q.    Did you have an opportunity to read -- I'll

14:36:52 5   withdraw that, Your Honor.

6              MR. LANIER:  Your Honor, may I ask a

7    question?  That's off my time, of the bench at side-bar?

8              THE COURT:  Yes.

9              MR. LANIER:  Please?  Thank you.

14:37:17 10            (Proceedings at side-bar:)

11            THE COURT:  All right.  I just want to make

12   sure everyone understands my ruling.

13            What I'm allowing her to do is answer the

14   kinds of questions you just asked, her opinion as to

14:37:28 15  whether policies were adequate or not.

16            I'm not going to allow her to opine as to

17   why she thought -- what may have caused the inadequacies,

18   what internal activities, reviews, policies, caused the

19   inadequacies because that gets beyond her area of

14:37:52 20  expertise.

21            MR. LANIER:  Right.  Right.  That would go

22   to state of mind and she can't testify about that, I

23   understand.

24            THE COURT:  She has no knowledge of

14:38:02 25  internal policies, incentives, lack of incentives so I

1      will not let her to opine on that.

2                   MR. LANIER:  Understood.

3                   THE COURT:  What's your question,

4      Mr. Lanier?

5                   MR. LANIER:  Well, I'll tell you, first,

6      Your Honor, one thing I'm not doing and the reason I'm

7      moving forward a little more rapidly is two of her bases

8      for her opinions include a "Chicago Tribune" article and

9      a "New York Times" article and you haven't had the chance

10     to hear the fuss over that.  So I'm just going to skate

11     through that, that's my own decision, and I'll put on the

12     record I'm making that call right now.  I can deal with

13     you on that at another time with another witness.

14                   But what I want to get into with her is the

15     memorandum of agreement that was put in place with the

16     Government, because that does deal with accusations of

17     Walmart's failure to comply with dispensing obligations,

18     but I just know that those are touchy.

19                   THE COURT:  I think I've allowed -- I've

20     allowed that document in.

21                   MR. LANIER:  Thank you.

22                   MR. MAJORAS:  No.  No, sir.

23                   THE COURT:  No?

24                   MR. LANIER:  I don't know that I used that

25     one yet, Your Honor.

```
 1                    THE COURT:  Let me see it.
 2                    MR. LANIER:  Okay.
 3                    MR. MAJORAS:  Your Honor, for this, I'm
 4        going to turn it over to Ms. Fumerton, who is more
14:39:12  5        familiar with this particular issue.
 6                    Thank you.
 7                    MS. FUMERTON:  Your Honor.
 8                    THE COURT:  Let me see the document.
 9                    MS. FUMERTON:  And, Your Honor, I just want
14:39:24 10        to note that this is one of the documents that was
11        withdrawn this morning.
12                    MR. LANIER:  Judge, if that's the case,
13        then I'll just move on because I don't want to
14        misrepresent an agreement that we entered into.
14:39:32 15                    I thought our agreement this morning was
16        not to move them into evidence, but I can move on, Judge.
17                    THE COURT:  All right.
18                    MR. LANIER:  I'll have a chance to do this
19        hopefully with a Walmart witness.
14:39:42 20                    THE COURT:  All right.  I mean, if this is
21        important to do it with this witness, I need to see the
22        document.  If it's better with another witness, a Walmart
23        witness, that's fine.
24                    MR. WEINBERGER:  Your Honor, perhaps we
14:39:54 25        could take our afternoon break.  We can pull that
```

1    document out so you can look at it.

2                    MR. LANIER:  I think I can come back to it.

3                    MR. WEINBERGER:  Or we can come back to it.

4                    THE COURT:  Whatever.  Let's move on,

5    please.

6                    MR. LANIER:  All right.  Thank you.

7                    (End of side-bar conference.)

8                    MR. LANIER:  Thank you, Judge.

9    BY MR. LANIER:

10   Q.    All right.  Dr. Lembke, we may come back to that,

11   but what I'd like to do right now is continue to look at

12   the -- well, let's do this.

13                    You have further opinions about failing to

14   use or analyze dispensing data to assist pharmacies in

15   identifying red flags.

16                    Suffice it to say if we took the time, we

17   could walk through these opinions with you, right?

18   A.    Yes.

19   Q.    But for now, do you stand by that opinion as you've

20   got it before you and before the jury in this

21   demonstrative?

22   A.    Yes, I do.

23   Q.    Your opinion continues to say, opinion six, that by

24   increasing and assuring the supply of opioids and failing

25   to provide effective controls against diversion,

1    pharmacies contributed to opioid misuse, addiction,

2    dependence, and death.

3                Do you believe that to be true?

4    A.    Yes.

14:41:30  5    Q.    And is it based upon reasonable probabilities, as

6    you understand them within your science and medication

7    background?

8    A.    Yes.

9    Q.    Opinion number seven, you have said, "No reliable

14:41:45 10    scientific evidence shows that long-term opioid therapy

11    is effective for chronic noncancer pain."

12                Is that an opinion you hold?

13    A.    Yes.

14    Q.    Now, you've told us this in brief reference

14:42:06 15    earlier, but I'd like you to explain what you mean by,

16    "No reliable scientific evidence," please.

17    A.    Most of the studies looking at the benefits of

18    opioids in the treatment of pain are studies lasting 12

19    weeks or less.

14:42:29 20                And if you'll remember, chronic pain is

21    defined as pain lasting more than 12 weeks, the time

22    beyond which normal tissue healing occurs.

23                So it is not appropriate or scientific to

24    take a study that lasts 12 weeks or less and use that

14:42:52 25    study in support of opioids for longer than that time

1    period.

2                    And yet, that is what was commonly done,

3    beginning in the late 1990s for approximately a

4    decade-and-a-half, that these short-term studies were

14:43:12  5    used to support long-term use.

6    Q.    All right.  Let's move --

7    A.    I mean, there are other aspects of those studies

8    which make them unreliable, including the fact that many

9    of those studies were funded by companies like Purdue,

14:43:34 10    making the authors of those studies biased and the

11    studies inherently at risk of bias.

12                    Also, many of those studies were not

13    appropriately constructed to detect for addiction, misuse

14    or diversion, or included a sample population of

14:43:54 15    hospitalized patients, which is not the same as patients

16    who are walking around on the street.

17                    So there are lots of different ways in

18    which that science is not robust, and also is -- cannot

19    be used for the treatment of chronic pain or long-term

14:44:10 20    use.

21    Q.    All right.  The one study problem that you

22    referenced that I think bears a little examination for a

23    moment to see, if I'm understanding it right is, all

24    right, chronic -- again, remind us -- means how long?

14:44:24 25    A.    Pain that lasts more than 12 weeks.

Lembke - Direct/Lanier                     643

1    Q.    And you said the studies to show whether or not the

2    opioids would help pain that lasts longer than 12 weeks,

3    at least one of them of note, how long did it follow the

4    patient?

14:44:46 5    A.    Well, these studies, most of them, last less than

6    12 weeks and some of them much less than 12 weeks.

7    Q.    How can someone do a study less than 12 weeks to

8    determine if something works more than 12 weeks?

9    A.    It's really not appropriate to do that, especially

14:45:12 10   given the risks of opioids that increase with longer term

11   use.

12   Q.    Did these study results make it into some of the

13   materials that you've been talking about, for example,

14   with CVS today?

14:45:32 15   A.    So these materials, these misleading studies, were

16   often used by key opinion leaders, paid for by Purdue, in

17   these continuing medical education courses.

18            And the way the studies were presented is

19   really confusing because oftentimes the patients would

14:45:58 20   have chronic pain conditions like chronic low back pain,

21   so it was a population of patients who had chronic pain,

22   and then they entered a study where they got opioids

23   compared to a sugar pill for less than 12 weeks and the

24   outcomes showed some modest benefit over a sugar pill

14:46:20 25   less than 12 weeks.

1           But that's not evidence for effectiveness

2     long-term.  It's short-term, it's evidence for short-term

3     effectiveness in a population of patients with long-term

4     pain.

14:46:35  5           But what would happen is then the opioid

6     would be advertised as working in chronic low back pain

7     patients, if you follow that.

8           They were promoted as working in chronic

9     low back pain patients in a study that looked at chronic

14:46:58 10    low back pain patients but only assessed for short-term

11    use.

12    Q.   All right.  Thank you for clarifying that for me.

13          Opinion number eight, you have said in

14    opinion number eight that, "Certain manufacturers and

14:47:11 15    distributors misrepresented that the risk of addiction to

16    prescription opioids is rare or less than one percent,

17    when in fact prescription opioids are as addictive as

18    heroin, and the risk of addiction is far higher than

19    stated.  The best conservative data show an opioid

14:47:31 20    addiction prevalence of 10 to 30 percent among chronic

21    pain patients prescribed opioids."

22          Why is that an important opinion?

23    A.   Well, that's important because it gets at the heart

24    of this paradigm shift.

14:47:47 25          One of the main reasons that doctors felt

1    that they could prescribe opioids more liberally is

2    because they were convinced by Purdue Pharma and others

3    that as long as they were prescribing for a patient pain,

4    their patient had a less than one percent chance of

14:48:10  5    getting addicted.

6              So they thought, great, you know, I don't

7    have to worry about addiction because I'm prescribing the

8    opioid for pain, but if you really look at the evidence,

9    what you see is that there's nothing to support that

14:48:26 10    statement of less than one percent risk, which is a

11    number that Purdue actually used in its educational

12    materials.

13              And that, in fact, roughly one-in-four

14    patients prescribed an opioid for chronic pain have

14:48:41 15    developed addiction to opioids.

16    Q.    All right.

17              Doctor, before we get into your opinion

18    number nine, I need to ask you some general questions

19    that will be relevant on opinion number nine.

14:48:57 20              You are familiar with the concept of the

21    gateway effect.

22              You've used that phrase in your report, and

23    you've used that phrase with me, correct?

24    A.    Yes.

14:49:15 25    Q.    And in some ways, you have explained the gateway

1    effect has been disproven, in some ways it's proven.

2                   I need you to explain to us what is meant

3    by the gateway effect as something that's been proven to

4    be wrong, and then what is meant by the gateway effect

14:49:34 5    where it's actually a legitimate expression.

6                   All right?  So first, what is not accurate

7    on a gateway effect?

8    A.   So the gateway effect is a theory that was

9    developed decades ago to try to explain why it is that

14:49:55 10   people who use nicotine products, primarily cigarettes,

11   and also alcohol, are more likely to go on to develop

12   addiction to other substances colloquially referred to as

13   hard drugs like methamphetamine, cocaine, heroin and

14   other opioids.

14:50:16 15                  And originally, the gateway effect was

16   thought to be some kind of unique neurobiological

17   phenomenon whereby something unique specifically about

18   nicotine products or cigarettes would make a person

19   progress to other drugs.

14:50:38 20                  The way in which this original gateway

21   effect has essentially been disputed or debated is that

22   in all likelihood, there's nothing unique about nicotine

23   that makes people progress to other drugs.

24                   Instead, what's unique about nicotine is

14:51:03 25   that it's a legal drug.  And as a legal drug, people have

1    ready access to it.

2                    And as we talked about, the greater the

3    supply and the easier the access to any drug, the more

4    likely people are to try it and the more likely people

14:51:17  5    are to get addicted to it.

6                    And we know that addiction to any drug

7    changes the brain and makes that person more susceptible

8    to addiction to other drugs.  That's called cross

9    addiction.  So once you become addicted to one drug, you

14:51:32 10    are more likely to get addicted to another drug.

11                   So in other words, this idea that there was

12    something uniquely biological about nicotine versus any

13    other drug that you might take is probably not true.

14    That really what's moderating that effect is just that

14:51:49 15    nicotine is legal and so it's easily accessible.

16    Q.    All right.  Have I written this accurately?

17                   "Nicotine and alcohol does not lead to

18    other drugs in a neurobiological phenomenon"?

19    A.    I would say it does not uniquely.  They do not

14:52:03 20    uniquely lead.

21                   So there is neurobiology, the pleasure-pain

22    balance --

23    Q.    Right?

24    A.    -- the adaptation to gremlins but there is not

14:52:14 25    something unique about nicotine.

```
 1   Q.    All right.  So where does the gateway effect, where
 2   can we use that language more properly where it might be
 3   considered right in a sense?
 4   A.    The way that it's commonly used in our culture
 5   today is to talk about how one drug becomes a stepping
 6   stone to another drug.
 7               So this drug was my gateway to these harder
 8   drugs or these other drugs, and so it's used commonly in
 9   that way that we start out with one drug, that changes
10   our brain in the way that I've talked about, we develop
11   the disease of addiction, and then we're more likely to
12   progress on to other drugs or more potent versions of our
13   original drug as we develop tolerance and
14   neuroadaptation.
15   Q.    In that regard, movement from one opioid to
16   another, is that a legitimate scientific presence?
17   A.    Yes.  So that's essentially what has happened with
18   the opioid epidemic.
19               What started out as a prescription opioid
20   epidemic has now evolved into a heroin and illicit
21   Fentanyl epidemic.
22   Q.    All right.
23               So explain what you mean by what was
24   initially a prescription drug epidemic has evolved?
25   A.    So the increased supply of prescription drugs meant
```

1    that more people were exposed, more people got addicted.

2             As people progress in their disease of

3    addiction, they need more and more to get the same

4    effect, to counteract those gremlins, and/or they need

14:54:10  5    more potent forms.

6             Also, people with addiction, just like

7    everybody else, are price-sensitive so they will look at

8    how much something costs in terms of their drug habit or

9    how much effort it is to get that drug.

14:54:25 10             Opioid prescribing began to really escalate

11    at the end of the 1990s with OxyContin promotion and

12    continued to rise all the way until about 2012.

13             In 2011, the CDC said we are in the midst

14    of a prescription drug epidemic, primarily opioids, and

14:54:48 15    we need to do something about this.  So it was in about

16    2012 or so that opioid prescribing and dispensing started

17    to gradually decrease.

18             When that happened, you had more than a

19    decade of people who had already become dependent or

14:55:07 20    addicted to opioids who then, without treatment, needed

21    to continue to get enough opioids, so many of those

22    individuals turned to illicit sources, such as heroin.

23    Q.    So when we talk about and documents and witnesses

24    and studies talk about the problems of drug cartels

14:55:30 25    bringing in Chinese Fentanyl or street heroin through

1    some illegal means, is there a relationship between that

2    and the opioid epidemic?

3    A.    The reason that the drug cartels infiltrated

4    American communities around 2012, 2013, and started

14:55:59  5    flooding those communities with heroin and then

6    ultimately illicit Fentanyl --

7                MR. MAJORAS:  Objection.  Outside of

8    expertise in terms of criminal enforcement issues.

9                THE COURT:  Overruled.

14:56:13  10    A.    -- was essentially that we had created a population

11    of addicted individuals through the oversupply of

12    prescription opioids.

13                So prescription opioids created the demand

14    that heroin and then Fentanyl filled.

14:56:28  15    BY MR. LANIER:

16    Q.    In that regard, in your report you offered opinion

17    nine that, "Increased supply of prescription opioids

18    contributed substantially to more individuals becoming

19    addicted to opioids and transitioning from prescription

14:56:45  20    opioids to illicit sources of opioids, such as heroin and

21    Fentanyl."

22                Is that correct?

23    A.    Yes.

24    Q.    You gave a chart in your report that you pulled

14:57:00  25    from *McCabe*, it looks like a journal of -- is that the

1    Journal of Addictive Medicine?  Is that where you pulled

2    this one from?

3    A.    Yeah, the journal of -- the Journal of Addiction

4    Medicine.

14:57:18 5    Q.    Addiction Medicine, sorry.

6              Is that one where you've done peer review

7    yourself or been affiliated with it in any way?

8    A.    I think so, yes, I think I've reviewed for them

9    before.

14:57:28 10   Q.    And you've pulled this from an article entitled,

11   "From Pills to Powder:  A 17-year Transition From

12   Prescription Opioids to Heroin Among U.S. Adolescents

13   Followed Into Adulthood."

14             I want you to explain the picture, but,

14:57:45 15   first, can you tell us about the study?

16   A.    Yeah, the study was an important study.

17             It followed teenagers prospectively, and

18   what that means is that it looked at a population of

19   teenagers and it followed them forward into time, which

14:58:03 20   is a powerful study design because you're not just

21   looking backwards, you're actually following people

22   forward.

23             And it looked at the patterns of

24   prescription opioid use in that population relative to

14:58:19 25   whether or not those individuals went on to use heroin.

1            And what the study found was that both

2   medical and nonmedical use of prescription opioids

3   contributed to transitioning to heroin later in life.

4            So whether or not those teenagers got the

14:58:42 5   opioid prescription from a doctor or they bought it from

6   a friend or stole it from their grandparents' medicine

7   cabinet, those individuals were all at increased risk of

8   transitioning to heroin because of their exposure to

9   prescription opioids.

14:59:02 10   Q.    In that regard, is that -- well, explain.  Did they

11   follow medical use only, medical use followed by

12   nonmedical use?  Explain the chart now in light of that,

13   please.

14   A.    What this shows, what these data show, and there

14:59:24 15   are other studies showing the same thing as well, is that

16   nonmedical use and medical use are often intertwined.

17            For example, a person, including teenagers,

18   may get an opioid prescription for a wisdom tooth

19   removal, and then they might not go back for a refill at

14:59:46 20   all, so they used it medically.

21            Or they might then start to use opioids

22   nonmedically because they got a taste for it through

23   their dentist prescription, and then they might use

24   nonmedically recreationally and may or may not become

15:00:03 25   addicted but then at some later point, they may have

1    another injury and go back and be exposed to a medical

2    prescription, interweaving like this in and out, again

3    because the supply is so huge and it's everywhere.

4                    Doctors prescribing more, medicine cabinets

15:00:22  5    providing more.

6    Q.    Okay.

7    A.    So that's really the point here that nonmedical use

8    contributes to the progression to heroin.  Medical use

9    contributes to the progression to heroin.  It's all about

15:00:38 10    increased supply, increased access, increased exposure

11    being the most significant risk factor for the

12    development of addiction.

13    Q.    And does heroin work in the brain in the same way

14    that the opioids themselves did in terms of your

15:00:56 15    explanation of hijacking the brain and that

16    dopamine-learning loop?

17    A.    Yeah.

18                    So opioids all work similarly in the

19    brain's reward pathway.

15:01:08 20    Q.    Okay.  Next opinion.

21                    THE COURT:  Mr. Lanier, if you're going to

22    move on to another opinion, it might be a good time to

23    take a break.

24                    MR. LANIER:  Ready to break, Your Honor.

15:01:23 25                    Thank you.

```
  1              THE COURT:  Okay.  Ladies and gentlemen,
  2     we'll take our afternoon break, 15 minutes.
  3              Usual admonitions.
  4              Thank you.
15:01:30  5              (Recess taken.)
  6              THE COURT:  All right.  Please be seated
  7     for a minute.
  8              I have to take up something before the jury
  9     comes out.
15:19:44 10              I had made clear that, at the request of
 11     the parties, that there was a sequestration of witnesses
 12     and so obviously one witness can't hear what another.
 13              I've been advised that some experts have
 14     been listening, catching the livestream in the attorneys'
15:20:06 15     war rooms.
 16              I don't think that's appropriate.  No one
 17     had -- no one had requested permission, and they're going
 18     to be witnesses and they were supposed to be sequestered.
 19     And obviously, you know, if you're watching it in the war
15:20:20 20     room, it's the same.
 21              And I had allowed, obviously, this
 22     livestreaming into the war rooms because that way you
 23     keep the number of attorneys down here, and that's fine.
 24     But witnesses weren't supposed to be seeing it.
15:20:33 25              So apparently these are Giant Eagle
```

 1    experts.

 2              I've just been notified of that.

 3              MS. SULLIVAN:  And, Your Honor, Diane

 4    Sullivan.

15:20:41  5              My apologies, Your Honor.  In my

 6    experience, and I believe we can give you some case law,

 7    sequestered --

 8              THE COURT:  Ms. Sullivan, the point is no

 9    one -- no one said, "Well, all right, experts aren't

15:20:53 10    covered or are experts covered," so it was a blanket.

11              Now, so you should have raised that if you

12    planned to have your experts, you know, watching

13    proceedings.

14              MS. SULLIVAN:  Our apologies, Your Honor.

15:21:07 15              Typically experts do either sit in and

16    listen to other experts or review the transcripts to an

17    opinion.

18              THE COURT:  In some cases they do, in some

19    they don't.  All right.  And that's done with discussion

15:21:19 20    and agreement; not sub rosa.

21              So it's a big problem.  So I don't -- first

22    of all, unless everyone agrees, that's got to stop

23    immediately.

24              If everyone -- if everyone wants to exempt

15:21:32 25    experts, I mean obviously what works for one side, same

1     for the other.

2                     So --

3                     MR. WEINBERGER:  We don't agree.

4                     THE COURT:  All right.  Then it ceases.

15:21:39  5           All right?

6                     MS. SULLIVAN:  We'll make sure, Your Honor.

7                     Our apologies.

8                     THE COURT:  And it shouldn't -- it

9     shouldn't have happened.

15:21:46 10           All right.  So make sure, Ms. Sullivan,

11    that they are out of that room like now.

12                    MS. SULLIVAN:  Will do, Your Honor.

13                    (Jury in.)

14                    THE COURT:  Okay.  You may be seated.

15:23:34 15           And, Ms. Lembke, I remind you you are still

16    under oath and, Mr. Lanier, you may continue.

17    BY MR. LANIER:

18    Q.    Okay.  Your Honor.

19                    May it please the Court, ladies and

15:23:44 20    gentlemen.

21                    Dr. Lembke, we're in the homestretch.

22    We're at opinion number ten and we are going to 14, so

23    let's see if we can get this finished this afternoon.

24                    Opinion number ten, "The increased supply

15:23:54 25    of prescription opioids contributed substantially to more

1        individuals, including newborns becoming dependent on

2        opioids, increasing their risk for opioid-related

3        morbidity and mortality, it's called the dependence

4        effect.

15:24:13   5                Would you explain to us in general what you

6        mean by that?

7        A.    So this is one of the many harms caused by the

8        oversupply of prescription opioids, and it is the

9        physiologic phenomenon of dependence.

15:24:31  10                So dependence is related to addiction, but

11        it's not the same thing.

12                Dependence refers to the very specific

13        phenomenon of developing a physiologic adaptation to the

14        drug such that it stops working at a given dose, which is

15:24:51  15        usually called tolerance, and that when the dose is

16        decreased or stopped abruptly, people go into a classic

17        opioid withdrawal phenomenon, which in some cases can be

18        life-threatening.

19                So this is just making the point that

15:25:15  20        addiction is a harm of opioids, death is a harm of

21        opioids, but dependence is also a harm of opioids.

22                We have now several generations of chronic

23        pain patients who have been put on opioids by their

24        doctors, developed a physical dependence, never really

15:25:35  25        developed the symptoms of addiction, and now are having

1       great difficulty getting off of those opioids or even

2       going down to lower doses.

3                       And it's a very labor-intensive endeavor to

4       help them go down on those doses.

15:25:53  5       Q.    Dr. Lembke, I suspect that several of our jurors

6       are familiar with the DSM, I think is it up to number

7       five or something now?

8       A.    Yes.

9       Q.    All right, the DSM, but for the sake of all of us

15:26:10  10      and the record, would you explain what the DSM-V is?

11      A.    The DSM is the Diagnostic and Statistical Manual of

12      mental disorders.  It's a very large book which mental

13      health care professionals use to diagnose mental

14      illnesses.

15:26:28  15                      So if you open the DSM, and you go to a

16      certain page, for example, the page that says Opioid Use

17      Disorder, which is another way of saying opioid

18      addiction, you'll see eleven criteria listed there.

19                      And those criteria, if met, would qualify

15:26:50  20      that person as having an Opioid Use Disorder or an opioid

21      addiction.

22                      The more of those criteria that are checked

23      off, the more likely they are to meet criteria for

24      addiction, but also it's a spectrum diagnosis, mild,

15:27:08  25      moderate and severe.  And depending upon how many items

1    they check off, they meet criteria, they meet mild,

2    moderate or severe criteria for addiction.

3    Q.    So when the jury hears about studies and statistics

4    that talk about addiction, in general, at least in

15:27:26  5    academia, would it be referencing those criteria from the

6    DSM-V, those some range of 11 criteria?

7    A.    So this gets confusing because when the DSM-IV

8    edition -- the IV stands for the number of the edition --

9    when the DSM went from Edition Number IV to Edition

15:27:54 10    Number V, it changed the language used to describe

11    addiction.

12                 In older versions, the DSM-IV and earlier,

13    addiction was actually called abuse or dependence.  So

14    you could have opioid abuse or you could have opioid

15:28:12 15    dependence.

16                 In other words, the word dependence was the

17    word that we used to use for opioid addiction.

18                 Then with the new and more recent edition,

19    the DSM-V, they got rid of the terms "abuse" and the

15:28:30 20    terms "dependence," and they changed it to "use

21    disorder."

22                 So if nicotine was the problem, it was

23    nicotine use disorder; opioids, Opioid Use Disorder;

24    alcohol, alcohol use disorder, et cetera.

15:28:45 25                 So --

1    Q.    When you talk here, though, about dependence effect

2    using the modern DSM, you mean something different than

3    addiction, is that right?

4    A.    Yes.

15:28:58  5              I mean the physiologic -- I mean it the way

6    it's used in the DSM-V, the more current version.

7              "Dependence" in the DSM-V means the

8    physiologic adaptation to the drug marked by tolerance

9    and withdrawal.

15:29:17  10              That is often associated with addiction but

11   not always associated with addiction.

12              So, for example, a newborn baby exposed to

13   opioids in utero will go into opioid withdrawal when it

14   is born, but that baby can't rightly be said to have

15:29:34  15   opioid addiction because that baby didn't engage in the

16   behaviors that are really at the heart of addiction.

17              That baby was just exposed.

18              Likewise, a patient who received opioids

19   from their doctor and always took it as prescribed can't

15:29:53  20   really be said to have an opioid addiction, but they can

21   be extremely physically opioid-dependent.

22              And the attempt to try to taper them down

23   may, in fact, unmask an addiction as they start to engage

24   in drug-seeking behaviors.

15:30:09  25              But that's a distinction in the language

1    that we now use.  And the dependence effect really is

2    making the point that one of the many harms of the

3    opioid, prescription opioid oversupply is dependence,

4    babies being born dependent, chronic pain patients taking

15:30:29  5    their medicines as prescribed but then getting dependent

6    and having difficulty coming off.

7    Q.    So if I put -- if I'm tracking with you right, I

8    put under dependence, an example of an opioid baby or

9    someone who is following doctor's orders.

15:30:43  10            Give us some examples that distinguish

11    addiction.  What are the hallmarks of addiction that make

12    that language appropriate under the DSM-IV -- V?

13    A.    Yeah.

14            So the hallmarks of the criteria for being

15:31:01  15    diagnosed with an addiction can briefly be summarized as

16    the four Cs:  Control, compulsions, cravings, and

17    consequences.

18            Control refers to out of control use of

19    that substance, using more than intended, for example.

15:31:22  20            Compulsion refers to a lot of mental real

21    estate occupied with thinking about getting the drug,

22    using the drug, hiding drug use, and also a level of

23    automaticity that's hard to control.

24            Cravings refers to that pleasure/pain

15:31:45  25    balance tipping to the side of pain when people don't

1    have their drug and going into withdrawal, which is both

2    physical and psychological, and can be experienced as so

3    incredibly intense that patients will do whatever it

4    takes to get their next fix.  Again, usually not to feel

15:32:07  5    euphoria or anything good, but just to get out of being

6    in pain.

7            And then consequences is really the heart

8    of addiction, especially continued use despite

9    consequences.  As addiction becomes more severe, people

15:32:23  10   end up having all kinds of consequences, relationship

11   consequences, job consequences, health consequences; and

12   yet despite those consequences, continue to use their

13   drug, again because of the very strong physiologic drive

14   to restore homeostasis?

15:32:44  15   Q.    In your report you mentioned that over the last 30

16   years, the liberal prescribing of opioids for chronic

17   pain has created a legacy population of patients.

18            What do you mean by that?

19   A.    So when we're considering the harms to our

15:32:59  20   communities as a result of the opioid epidemic, we have

21   to consider people who have become addicted, we have to

22   consider people who have died, but we also, importantly,

23   need to consider the very large numbers of patients who

24   have become physically dependent and who are now

15:33:19  25   suffering the harms of being on opioids and struggling to

1    get off of opioids, or at least go to a lower safer dose.

2    Q.    Is it possible for us to be able to tell, just by

3    looking at people as they walk through the grocery store,

4    for example, if someone is dependent or an addict?

15:33:48  5    A.    No.  It's really impossible to tell.

6                Most people who take an opioid daily for

7    three months or more will develop some degree of physical

8    dependence and experience some degree of withdrawal when

9    the dose is lowered and/or stopped abruptly.

15:34:07 10                But it's really not possible to tell who

11    those people are unless you have their medication

12    history.

13                And in terms of addiction, it's definitely

14    very difficult to tell, also in part because people with

15:34:24 15    addiction become very adept at hiding their problematic

16    drug use for, you know, obvious reasons.  It's highly

17    stigmatized, they're ashamed, they may need to hide their

18    addiction in order to procure more of their drug.

19                So really impossible to note.

15:34:43 20    Q.    Could a grandma getting lettuce and milk and

21    pushing her cart to get Cheerios and Pop Tarts actually

22    be addicted?

23    A.    Yes.  Absolutely.

24                And I wrote an article about that

15:34:58 25    phenomenon in 2016.  I had a patient who roughly met that

1    description, who I was prescribing a Benzodiazapine to.

2    Remember that's Xanax, Valium, Ativan, that category.

3                    And I simply assumed, based on her

4    appearance and her demographics, that she was not

15:35:22  5    addicted to the Benzodiazepine that I was prescribing to

6    her.  And then I checked the Prescription Drug Monitoring

7    Database and I discovered through checking that, that she

8    had been doctor shopping and visiting multiple

9    prescribers, getting the same or similar prescriptions

15:35:39  10    that really was a revelation to me and made me realize

11    how important it is to check the Prescription Drug

12    Monitoring Database in order to know if that person may

13    be in trouble because we really can't judge a book by its

14    cover.

15:35:58  15    Q.    All right.

16                    In this regard, before we leave your

17    opinion here on the dependence effect, what are the

18    symptoms of withdrawal from dependence as opposed to

19    addiction?

15:36:13  20    A.    So the symptoms are really pretty much the same.

21                    Different drugs have different classic

22    withdrawal phenomena, and opioid withdrawal has very

23    distinctive set of symptoms that are very similar to

24    having the flu.

15:36:31  25                    People have fever, they have chills, they

1    have muscle spasms, they feel achy all over so a lot of

2    physical and muscle pain.

3              They may have muscle spasms which is where

4    this term kicking the habit comes from.  When people are

15:36:53  5    in opioid withdrawal, their muscles will contract

6    spontaneously and legs may kick out --

7    Q.    Wait.  That's where the expression "kicking the

8    habit" comes from?

9    A.    Yes.  Yes.

15:37:07 10    Q.    Okay.

11    A.    They have pretty much fluid secreting from most

12    orifices so they will have diarrhea, they will have

13    vomiting, sometimes there will be a lot of perspiration,

14    yawning, goose bumps is also a classic opioid withdrawal

15:37:27 15    phenomenon, dilated pupils.  And then, of course, the

16    psychological symptoms from any addictive substance;

17    anxiety, irritability, insomnia, depression and craving.

18    Q.    Have you seen from your experience that withdrawal

19    from dependence and addiction affects broader life beyond

15:37:53 20    simply the person themselves?

21              In other words, does it have an effect on

22    families and communities?

23    A.    Yeah, I mean opioid, physical opioid dependence,

24    whether in the context of an addiction or not, is very

15:38:07 25    debilitating and the withdrawal phenomenon can be

1    incredibly painful.

2              It can, in fact, not only affect the person

3    but of course, can affect entire families, sometimes so

4    bad that patients need to be hospitalized for that -- for

15:38:27  5    opioid withdrawal in order to stabilize their bodies

6    during that process.

7    Q.    All right.  And in this regard, we will set aside

8    opinion number ten and move now to opinion number 11.

9              Opinion number 11, you have said that, "An

15:38:57 10    increased supply of prescription opioids contributed

11    substantially to diversion of prescription opioids to

12    individuals for whom they had not been prescribed."

13              You call this the tsunami effect.

14              Can you explain first what you mean, and

15:39:13 15    then I'll ask you how you know this to be true or believe

16    this to be true?

17    A.    So what I mean by this is that the harms of the

18    prescription opioid oversupply, which are at the cause of

19    this opioid epidemic, have been incurred not just by

15:39:34 20    individuals who have been prescribed opioids but also by

21    individuals who never got a prescription because what the

22    oversupply of prescription opioids led to was more access

23    by all different types of people to prescription opioids,

24    including teenagers, including other people stealing or

15:39:57 25    diverting or selling.

1         So it just became very easy, especially in

2    the first decade of the 2000s, to get prescription

3    opioids, to buy them on the street, to get them from a

4    friend or family member.

15:40:11  5         And so the harms, again, must be

6    conceptualized, not just as the individual who received

7    the prescription, but really all of us.

8    Q.    You reference in your report a study by Cahn and

9    others that was in the Journal of the American Medical

15:40:30 10   Association's Internal Medicine Journal in 2019, where

11   you talk about it showing an opioid prescription to one

12   family member increases the risk of overdose death to

13   others in the family, even though they don't have a

14   prescription.

15:40:47 15        Explain to us what you mean by that and why

16   you include it in your report?

17   A.    Yeah.

18        So this study looked specifically at

19   families where an individual in the family had received

15:41:02 20   an opioid prescription from a doctor and compared that to

21   families where there was no opioid prescription.

22        And what the study found was that in

23   families where one identified family member was

24   prescribed an opioid, that another person in the family

15:41:22 25   was more likely to die of an opioid overdose compared to

1    a family where there wasn't any opioid prescribing going

2    on, which really gets to the heart of the tsunami effect

3    that the harms are not just to that one individual but to

4    anybody who comes in contact with that opioid supply.

15:41:46  5    Q.    Then as we move from opinion number 11 to opinion

6    number 12, you say the following:  "The increased supply

7    of prescription opioids through licit and illicit

8    sources," first explain what you mean by licit and

9    illicit sources?

15:42:10 10   A.    So licit sources are prescription opioids that are

11   used in accordance with the Controlled Substances Act;

12   that is to say that are used for an approved medical

13   indication in the context of a therapeutic relationship

14   with a doctor.

15:42:32 15              Illicit sources are any time that

16   prescription opioid goes outside of the closed boundaries

17   of that opioid supply chain and is diverted to a person

18   for whom it was not intended.

19              Illicit sources also includes

15:42:52 20   nonprescription opioids like heroin as well as opioids

21   like Fentanyl, which is a prescription opioid but is also

22   manufactured in illicit laboratories.

23              So there are licit forms of Fentanyl and

24   there are illicit forms of Fentanyl.

15:43:11 25   Q.    And you say the increased supply of prescription

1    opioids through licit and illicit sources resulted in a

2    prescription opioid epidemic in the United States."

3                What do you mean by that?

4    A.    Well, that means that prescription opioids obtained

5    through legitimate channels, as those numbers went up,

6    more people had access through prescriptions, more people

7    got addicted, more people died, that's one important

8    aspect of the epidemic, but also the prescription opioids

9    that got diverted outside of that closed supply chain are

10   another really important part of the opioid epidemic.

11   Q.    Talk to us a little bit about the long-term effects

12   of prenatal opioid exposure.

13                First, what do you mean by prenatal?

14   A.    So prenatal refers to the time in a mother's womb

15   before the baby is born.

16                Prenatal opioid exposure means that the

17   baby is exposed to opioids in the mother's womb because

18   the mother took opioids.

19                This opioid epidemic has been characterized

20   by many more pregnant women getting prescription opioids

21   for pregnancy-related pain, like round ligament pain,

22   which is actually a normal part of pregnancy but which

23   doctors started to treat with opioids, exposing those

24   babies to opioids in utero.

25                Also, pregnant women who take illicit

1    opioids and thereby expose their babies in utero.  And

2    those babies are born sick.  Basically they're born

3    dependent on opioids, they go into opioid withdrawal,

4    which is very painful.  They need to be kept in the

15:45:15  5    Neonatal Intensive Care Unit and often treated until

6    their opioid withdrawal subsides and they can then be

7    returned to the care of whoever is going to care for

8    them.

9                 And there are also studies showing that if

15:45:30 10    you look at those opioid babies who are exposed in utero

11    and you follow them prospectively through time into

12    elementary school, that they continue to show cognitive

13    and emotional delays that are significant and are not

14    seen in babies who are not exposed to opioids.

15:45:54 15                 So there's probably some long-lasting

16    damage that occurs.

17    Q.    As we continue to speak of the epidemic, is there

18    science and studies that indicate an effect on the

19    workforce within our communities from opioid -- from the

15:46:12 20    increased supply of prescription opioids?

21    A.    Yes.

22                 So the work that has been done in this area

23    has looked, for example, at Workers' Compensation, and

24    compared workers who get injured on the job and leave

15:46:31 25    work because of their injury and are treated with

1    opioids, are more likely to stay out of work longer and

2    less likely to return to gainful employment than people

3    who go out because of an injury and are not treated with

4    opioids.

15:46:48  5                    In other words, opioid prescribing in the

6    context of a work-related injury has contributed to large

7    numbers of workers not returning to the workforce, which

8    can be understood as those individuals essentially being

9    harmed by long-term opioid use, whether the harm is

15:47:09  10   because of dependence, whether they've developed

11   addiction, whether they've died from the opioid, or

12   whether they've just developed some of the other common

13   side effect of long-term opioid use that we haven't

14   actually discussed here yet today but which include

15:47:27  15   things like increased risk of depression, increased risk

16   of cognitive problems, general decreased function because

17   people are lethargic and sedated, actual worsened pain

18   through a phenomenon called opioid-induced hyperalgesia,

19   where as a result of taking opioids every day for long

15:47:49  20   periods of time, pain actually gets worse and people can

21   experience pain in parts of the body that they never had

22   pain in before because of the opioid.

23   Q.    Are these side effects you're giving us a

24   dependence, or addiction, or both?

15:48:07  25   A.    They can be side effects of both.

1       They're just side effects of long-term

2   opioid use.

3       Constipation, fatigue are some other ones.

4   Q.    All right.  I was trying to keep up with you.

15:48:20  5       You said increased depression.

6   A.    Yes.

7   Q.    Decreased cognitive --

8   A.    Yeah, just decreased cognition, so patients can

9   look a little bit demented when they're on opioids and

15:48:33 10   then you take them off and their head clears up.

11       Increased pain would be another one.

12       Increased fatigue.  Constipation is another

13   one.  Hormonal imbalance.  Men in particular on chronic

14   opioid therapy will develop a markedly decreased

15:49:12 15   testosterone levels and in fact start to get a more

16   female body habitus.

17       That's a pretty good list there.

18   Q.    In addition to the science, the work you've done in

19   this case, do you treat these people on a routine basis?

15:49:29 20   A.    Yes.  These are my patients.

21   Q.    Now, you have talked about overdosing.

22       I would assume there are fatal and nonfatal

23   overdosing.

24       Can you talk to us about the different

15:49:46 25   types of overdosing and the results of those?

1    A.    Yes.

2                  So nonfatal overdose -- and again,

3    remember, that overdose is really a misnomer.

4                  When I hear the word "Overdose," I think

15:50:05 5    about somebody intentionally taking more than they were

6    supposed to and dying as a result, when in fact the

7    majority of overdoses on prescription opioids among

8    chronic pain patients are happening at doses as

9    prescribed.

15:50:23 10                  And the reason for that is because as the

11    brain develops tolerance to the pain relieving effects of

12    the opioid, it then becomes necessary to go to

13    ever-higher doses in order to get the pain relief back.

14                  But the tolerance to the respiratory

15:50:44 15    suppression effects --

16    Q.    The respiratory --

17    A.    The slowed breathing effects.

18    Q.    All right.

19    A.    Doesn't happen at the same rate, it's slower.

15:50:54 20                  So as the dose goes up, in order to

21    recapture the pain relief, the breathing rate continues

22    to be suppressed.

23                  The brain doesn't adapt to that effect as

24    quickly.

15:51:08 25                  So it is very possible to try to go up on a

1      dose, especially if you've been taught that no dose is

2      too high, then end up on a dose where your breathing is

3      so slowed down that you essentially stop breathing and

4      die from that.

15:51:25  5              But sometimes people don't die from that.

6      Sometimes they're found and they're taken to the

7      emergency room and they're revived, so that's a nonfatal

8      overdose.

9              Sometimes somebody has Narcan available and

15:51:40 10     that's an opioid overdose reversal agent, so in the field

11     they might revive them as opposed to the emergency room.

12             But again, all of these are forms of harm,

13     and the numbers that we've looked at today really only

14     captured overdose deaths, having captured the many

15:52:01 15    thousands of nonfatal overdoses that are part of the

16     public nuisance or the ways in which our -- our

17     communities have been harmed by the opioid oversupply.

18     Q.    All right.

19             Doctor, if you would, please explain to us

15:52:16 20    what -- you said Narcan reverses the problem of the

21     overdose?

22             What is Narcan?

23     A.    So Narcan is an opioid receptor antagonist.

24             Remember, that the receptors are the

15:52:33 25    catchers mitt to which the molecules bind, and there are

1    opioid receptors in our brain and opioids bind those

2    receptors and the result is both the short-term pain

3    relieving effects as well as the effects on dopamine that

4    we talked about.

15:52:49  5              What Narcan does is it comes into that

6    receptor and it kicks off the opioid that's on the

7    receptor and it binds in place of the opioid and

8    essentially blocks the opioid from binding.

9              So for a person who is taking opioids, what

15:53:11  10   that will do is send them into immediate opioid

11   withdrawal.  It's not a comfortable or benign process.

12   Once that opioid gets kicked off the opioid receptor,

13   they go into opioid withdrawal, experiencing all the

14   classic symptoms that we talked about.

15:53:25  15   Q.   Okay.  Did I write it correctly using your metaphor

16   that it kind of fills up the catcher's mitt and kicks off

17   the opioid?

18   A.   Yes.

19   Q.   Okay.  And is Narcan one of these drug reaction

15:53:42  20   substances that is readily available to, like, EMTs and

21   folks like that?

22   A.   It's become more readily available.  Some

23   communities have it more readily available than others,

24   but it's been one of the major harm-reduction

15:53:58  25   interventions in the opioid epidemic in an effort to save

1    lives and try to get people into treatment.

2    Q.    All right.  Let's leave the epidemic behind at this

3    point, and let's move on to opinion number 13.

4              There is no doubt a cause and effect

5    relationship exists between the oversupply of

6    prescription opioids and the opioid epidemic.

7              Is that your opinion?

8    A.    Yes.

9    Q.    What is the basis for that opinion?

10   A.    As opioid prescribing increased four fold between

11   1999 and 2012, opioid-related overdose deaths increased

12   four-fold and opioid-related addiction increased

13   four-fold.

14             And it is my opinion that it is the

15   expansion of that supply that led to overdose deaths and

16   addiction, that led overdose deaths and addiction to

17   rise.

18   Q.    But if people were to look at the recent studies,

19   the recent studies seem to indicate that in the last few

20   years, more of the deaths seemed to be coming from the

21   illegal opioids; Fentanyl heroin, et cetera.

22             Why does that not change your opinion?

23   A.    Because that is a logical end result of the gateway

24   effect.

25             So the natural history of the disease of

Lembke - Direct/Lanier                              677

1    addiction is that as people become more addicted, they

2    need more and more to get the same effect, they look for

3    cheaper, more potent quantities.

4              And essentially what happened, as opioid

15:56:02  5    prescribing began to decrease, starting in about 2012,

6    people who had already become addicted, and even people

7    who were dependent and not addicted, had to look for

8    cheaper, more readily available sources.

9              And they turned to heroin.  And ultimately,

15:56:22 10    Fentanyl entered the heroin market, which really

11    increased the overdose death rate precisely because

12    Fentanyl is so much more potent than heroin.  Many people

13    who thought that they were taking their regular dose of

14    heroin were actually taking heroin laced with Fentanyl,

15:56:43 15    which caused them to die because they had judged how much

16    heroin they needed based on their standard supply, not

17    knowing that there's Fentanyl in there.

18              And, remember, Fentanyl is really potent

19    and really lethal because of its potency.

15:56:58 20              And today, we're really experiencing, you

21    know, a Fentanyl epidemic where I have patients who are

22    so addicted to opioids that they seek out Fentanyl.  It's

23    not even that they're accidentally taking it, although

24    that still happens.

15:57:16 25              I would also add that Fentanyl has

1    infiltrated the counterfeit prescription opioid supply,

2    so just last year, we lost a Stanford undergraduate who

3    thought he was taking something like Percocet or Vicodin,

4    but it was, in fact, a counterfeit Percocet or Vicodin

15:57:36  5    that had been adulterated with Fentanyl.

6                    And so he took it and he -- he didn't wake

7    up again.

8    Q.    Okay.

9                    Doctor, opinion number 14, your last

15:57:57  10   opinion to offer to the jury in this case right now is

11   you have said that, "For the reasons explained, many

12   parties bear responsibility for the misrepresentation of

13   safety and efficacy, the ubiquitous

14   distribution" -- well, let's stop.

15:58:24  15                   Many parties.  What do you mean by that?

16   A.    The opioid epidemic wasn't just one person's fault

17   or one group of persons' fault.

18                   This was really something that we all need

19   to take responsibility for from physicians to pharmacies

15:58:47  20   to manufacturers to distributors.

21                   Everybody had a role to play here and I

22   think it's essential that we look back and honestly

23   reflect on what our role was and try to do better.

24   Q.    So when you speak of, "Many parties bear

15:59:07  25   responsibility for the misrepresentation of safety and

Lembke - Direct/Lanier

679

1  efficacy, do you include in that Walmart?

2  A.    Yes.

3  Q.    Giant Eagle?

4  A.    Yes.

15:59:17 5  Q.    Walgreen's?

6  A.    Yes.

7  Q.    CVS?

8  A.    Yes.

9  Q.    The ubiquitous -- that's a Stanford word.  What

15:59:30 10  does that mean?

11  A.    Everywhere.

12  Q.    All right.  The everywhere distribution of

13  prescription opioids, and the unchecked dispensing of

14  prescription opioids, when you speak of that, do you

15:59:54 15  include the unchecked dispensing as you have uncovered in

16  your reviews of Walmart?

17  A.    Yes.

18  Q.    Giant Eagle?

19  A.    Yes.

16:00:07 20  Q.    Walgreen's?

21  A.    Yes.

22  Q.    CVS?

23  A.    Yes.

24  Q.    "To the extent other factors contributed, those

16:00:19 25  conditions were exploited to increase the extent of

 1   harm."

 2                What do you mean by that?

 3   A.    I mean that Purdue Pharma, for example, really

 4   exploited the good intentions of physicians putting aside

 5   pill-mill doctors, which exist and have always existed.

 6                It was really well-intentioned doctors who,

 7   on a very large scale, began prescribing more opioids

 8   essentially because they were miseducated about safety

 9   and harms.

10                And so entities like Purdue Pharma

11   understood what makes doctors tick and that they're very

12   motivated to want to try to help people, and led them

13   down the garden path of thinking that by prescribing more

14   opioids, they would be helping people; and, in fact,

15   shamed them into believing that if they didn't prescribe

16   opioids, they were harming their patients by withholding

17   that.

18                So that's an example of the ways in which

19   those other entities essentially exploited cracks in the

20   system.

21   Q.    All right.  Doctor, we've almost come to the end of

22   the road.

23                And I want to thank you for that, but

24   before I pass you, as the jury's already been informed, I

25   believe, you are one of the experts from all parties who

1    is getting reimbursed for your time.

2              I want the jury to be real clear on that.

3    You bill at $500 an hour?

4    A.    Yes.

16:02:02  5    Q.    And if you take all of the work that you've done in

6    opioid litigation, not just in this case, but in all of

7    the cases, about how much have you billed for your time

8    at this point?

9    A.    So I've been working on many different opioid

16:02:21 10    litigation cases for approximately the last four years,

11    and it's taken up a good portion of most weeks during

12    that time.

13              And I've made approximately $100,000 a year

14    doing that work.

16:02:36 15    Q.    And are you able to do that with Stanford's

16    approval?

17    A.    Yes.

18              MR. LANIER:  And, Your Honor, with that,

19    I'll pass the witness.

16:02:47 20              THE COURT:  Okay.  Thank you.

21              MR. BUSH:  Your Honor, if you would give me

22    a second.

23              THE COURT:  Okay.  Good.

24              MR. BUSH:  May I proceed, Your Honor?

16:04:47 25              THE COURT:  Yes, Mr. Bush.

1          CROSS-EXAMINATION OF ANNA LEMBKE

2     BY MR. BUSH:

3     Q.    Good afternoon, ladies and gentlemen.

4                 Good afternoon, Dr. Lembke.

16:04:55  5     A.    Good afternoon.

6     Q.    Nice to see you again.

7     A.    I'm having a little trouble hearing you.

8     Q.    How about that?

9     A.    Better.

16:05:03  10    Q.    Better?  I'm not sure which one of these I'm going

11    to end up using the most but I'll try, if you can't hear

12    me, just let me know.

13    A.    Okay.

14    Q.    As you just did.

16:05:12  15                So you covered a lot of territory, and

16    there's a few things that I do want to talk to you about,

17    but let's start, first, with just setting the table a

18    little bit.

19                You've talked -- you're obviously very

16:05:31  20    experienced in addiction issues, and this case is really

21    about pharmacies.

22                So let me start there.

23                I think you did testify on direct that

24    you're not a pharmacist, right?

16:05:48  25    A.    That's correct.

```
 1    Q.    And you never went to pharmacy school?

 2    A.    That is correct.

 3    Q.    And you've never sat through a pharmacy licensing

 4    exam?

 5    A.    That is correct.

 6    Q.    And you've never worked behind the -- or at the

 7    bench in a pharmacy?

 8    A.    That is correct.

 9    Q.    And you've never worked for a pharmacy company like

10    one of the defendants in this case?

11    A.    That is correct.

12    Q.    So you would not hold yourself out, and maybe

13    you've already said this, but you don't hold yourself out

14    as a pharmacy expert.

15                   You're testifying from the perspective of a

16    doctor?

17    A.    Well, I do hold myself out as an expert in terms of

18    red flags and determining what are red flags, what to do

19    about them, which are the same for a pharmacist and

20    physicians.

21                   But it's true, I'm not a pharmacist.

22    Q.    Right.

23                   And you did -- you have testified

24    previously that you don't hold yourself out as a pharmacy

25    expert?
```

1    A.    I'm -- I'm not recalling that specific testimony.

2    Q.    Well, let me ask you to take a look.

3                I think you have our documents up there, do

4    you?  Tab 1.

16:07:23  5                MR. LANIER:  May I approach the witness and

6    put the box by her that they left here?

7                MR. BUSH:  I'm sorry, Mr. Lanier.  I

8    thought it was already there.

9                MR. LANIER:  This is their box of

16:07:34 10   documents.

11   BY MR. BUSH:

12   Q.    You recall giving testimony in this matter in Track

13   One on April 24th, 2019?  And you can see that on the

14   front page of the transcript.

16:08:16 15   A.    Yes, I have that document here.

16   Q.    And when you gave that testimony, you were under

17   oath and swore to tell the truth?

18   A.    Yes.

19   Q.    So take a look at, if you would, at Page 271.

16:08:30 20                And did you -- was this question asked and

21   did you give this answer?  At Line 10.

22                "And you wouldn't hold yourself out as

23   having expertise with respect to pharmacy?

24                "Answer:  That's correct."

16:08:52 25                Do you recall that?

1              Do you recall giving that testimony?

2      A.    Yes, I see it now, and I recall giving it.

3      Q.    All right.  Thank you.

4              Now, prior to this case, and this is Track

16:09:11   5   Three, the case involving Lake and Trumbull County and,

6      I'm sorry if this is coming across, it sounds like it's

7      coming across a little too loud but --

8      A.    No.

9      Q.    It's not?

16:09:19  10   A.    No.

11     Q.    Okay, fine.

12             Prior to giving your opinions in this case,

13     you had not studied any policies or procedures the

14     pharmacy companies had developed to guard against filling

16:09:37  15   illegitimate opioid prescriptions?

16     A.    That is true.

17     Q.    Okay.  And you hadn't written any academic papers

18     that addressed that subject?

19     A.    I did publish in 2016 an academic paper on red

16:09:50  20   flags.

21             And checking the PDMP, which is pertinent

22     to the case.

23     Q.    Right.  But that wasn't an article or an academic

24     study on policies and procedures that related to

16:10:01  25   pharmacies guarding against the filling of illegitimate

                1   prescriptions?

                2   A.    It's true, that article didn't directly address

                3   pharmacies.

                4   Q.    And even to this date, at least as of your

16:10:26     5   deposition in this case, you had not evaluated any

                6   policies and procedures of any other pharmacy company,

                7   other than the four defendants in this case?

                8              And I guess Rite Aid was in this case at

                9   one point.

16:10:39   10   A.    Yes.

               11   Q.    Five defendants, right?

               12   A.    That's correct.  Yes.

               13   Q.    And so you're not in the position today to tell the

               14   jury how the policies and procedures that you have

16:10:54   15   evaluated of the defendants in this case compare to

               16   policies and procedures that might be in place at other

               17   pharmacies across the country or in Lake and Trumbull

               18   County that are designed to guard against the filling of

               19   illegitimate prescriptions?

16:11:08   20   A.    That is correct.

               21   Q.    And it's also correct that you haven't evaluated

               22   the -- withdrawn.

               23              You have also not -- you specifically have

               24   not done anything to evaluate whether any of the smaller

16:11:37   25   pharmacy companies or independent pharmacies have

1       policies and procedures to guard against the filling of

2       illegitimate prescriptions?

3       A.      That is correct.

4       Q.      And you specifically have not done anything to

16:11:49  5     evaluate whether they have any policies and procedures to

6       use their dispensing data to guard against the filling of

7       illegitimate prescriptions?

8       A.      Yes.   That is true.

9       Q.      So let me talk a little bit with you about the

16:12:32 10     Prescription Drug Monitoring Program.

11                      You testified about that.

12                      Doctors, I think you said this, that

13      doctors have the ability to check the Prescription Drug

14      Monitoring Programs in states where they're available?

16:12:53 15     A.      Yes.

16      Q.      And doctors, in the states where it's mandatory,

17      are required to check?

18      A.      Yes.

19      Q.      So many of the things that a pharmacist would check

16:13:06 20     for are things that a doctor would also check for?

21      A.      Yes.   Except that a pharmacist has potentially

22      access to more information on a big data level than a

23      physician would have.

24      Q.      Well, you mentioned that a pharmacist would be able

16:13:25 25     to see if a patient were doctor shopping.

1          Do you recall that testimony?

2     A.    Yes.

3     Q.    That's something that a doctor can see if he checks

4     the PDMP, right?

16:13:32 5     A.    Yes, but as I explained, there's that gap of time,

6     such that a pharmacist would be able to pick up data that

7     a physician would not.

8     Q.    And I think the example you used was maybe six or

9     seven -- a person went to six or seven different

16:13:52 10    prescribers, got six or seven prescriptions and then

11    didn't fill them one at a time -- well, he had to fill

12    them one at a time, but filled them all more or less at

13    the same time, is that right?

14    A.    Yes, that would be an example.

16:14:04 15    Q.    Okay.  You have no idea whether that ever happened

16    in Lake and Trumbull County?

17    A.    That certainly happens in my practice.

18    Q.    Right.

19    A.    And I don't think Lake and Trumbull County is -- is

16:14:15 20    unique in terms of the opioid epidemic and what occurred.

21    Q.    But you don't actually know whether that has ever

22    happened or the extent to which it's happened in Lake or

23    Trumbull County?

24    A.    I did not analyze data specific level, no.

16:14:31 25    Q.    So if somebody had done what you suggested, went to

1   six or seven doctors, presumably he's going to, or she is

2   going to need to do that again fairly shortly after the

3   prescriptions are filled.

4                Do you agree?

16:14:47  5   A.   Yes.  It's very possible.

6   Q.   And when they do that, the doctor's going to check

7   the PDMP and he's going to see that the person went to

8   six or seven different doctors the last time he or she

9   got opioid prescriptions filled?

16:15:00 10   A.   Yes.

11   Q.   I think you testified -- well, I know you testified

12   about the evolution of the opioid problem in this

13   country.

14   A.   Sir, I missed the word.

16:15:35 15                The what?

16   Q.   The evolution of the opioid problem.

17   A.   Evolution, yes.

18   Q.   Evolution.  Yeah, I'm sorry.

19   A.   That's okay.

16:15:41 20   Q.   I don't know why the --

21   A.   My hearing is also not very good so that's a

22   problem.

23   Q.   I'm with you there.

24                Is that a little better if I put it down?

16:15:49 25   A.   No.

1    Q.    Here?

2    A.    It was better up.

3    Q.    That's better?

4    A.    Yeah.

16:15:53  5    Q.    All right.  And I don't want to go back over all of

6    the territory you went over in some of your testimony

7    this morning where you described how people's thinking

8    about opioids has changed over history actually going

9    back hundreds or thousands of years, but focusing more

16:16:13 10    recently, as I understand it, in the 1990s and into the

11    2000s, that was when there was this paradigm change that

12    you've talked about?

13    A.    Yes.

14    Q.    To encourage the use of opioids to treat pain to a

16:16:33 15    greater degree than had been before?

16    A.    I'm sorry, I didn't catch the last part of your

17    sentence.

18    Q.    To encourage the use of opioids to treat pain to a

19    greater degree than had been the case before?

16:16:45 20    A.    Yes.

21    Q.    And then that pendulum started to swing back

22    sometime, what, near the end of the first decade of the

23    21st century?

24    A.    Yes.  Around 2012.

16:17:08 25    Q.    2012, okay.

1        And is that when you started to realize

2   that the -- that, well, in -- is that when you started to

3   have your opinion that opioids were being used too much

4   and in inappropriate circumstances?

16:17:23  5   A.    My opinion was not formed suddenly.

6        My opinion evolved over the first decade of

7   this century, as I began seeing more patients who were

8   addicted to and dependent on and dying from opioids they

9   were getting from a medical doctor.

16:17:45 10       But I would say that in 2011, when the CDC

11   announced that there was a prescription drug epidemic,

12   and in 2013 when the California Prescription Drug

13   Monitoring Database became available to physicians, those

14   events certainly contributed to and solidified my

16:18:07 15   opinion.

16        And then, of course, I have done a lot of

17   research since then, which has improved my understanding,

18   not just of the role that opioid manufacturers played,

19   but also the role of distributors and pharmacies,

16:18:24 20   something that I didn't appreciate initially.

21   Q.    But it also improved your understanding of the

22   risks and relative benefits of prescribing opioids in a

23   variety of different circumstances.

24        Is that right?

16:18:38 25   A.    I'm sorry, I'm not quite sure I understand the

           1    question.

           2    Q.    Well, you focused on it improved your understanding

           3    about what various actors in the closed system of

           4    distribution were doing, but I'm asking whether it also

16:18:51   5    improved your understanding of the medical uses,

           6    appropriate, in your view, medical uses of opioids?

           7    A.    Yes.

           8    Q.    Okay.  And it would be fair to say that you were at

           9    the cutting edge of understanding those issues relative

16:19:09  10    to other doctors around the country?

          11    A.    Yes.

          12    Q.    Okay.  You -- sorry.

          13                You testified a little bit about some

          14    programs that Purdue had in place, and you testified

16:19:29  15    about some documents in particular that CVS or some

          16    documents you looked at that were part of your opinion or

          17    the basis for your opinion against CVS.

          18                Do you recall that?

          19    A.    Yes.

16:19:40  20    Q.    And you also testified about some of those similar

          21    programs with respect to certain of the other defendants

          22    in the case?

          23    A.    Yes.

          24    Q.    So let me ask you, at the time that you were -- at

16:19:55  25    the time of the documents that you were looking at, which

1    was in 2001 -- is that your recollection?

2    A.    I'm sorry, what was the first part of the sentence?

3    Q.    At the time that those documents you relied on were

4    written, it was in 2001, isn't that right?

16:20:09  5    A.    Yes.

6    Q.    Okay.  Who at CVS, the company -- because I know

7    that Mr. Lanier was getting you to make a distinction

8    between the company and the pharmacists -- who at CVS

9    knew that the paradigm shift in prescribing opioids

16:20:34  10    shouldn't have happened, wasn't medically appropriate?

11              Anybody you can identify?

12    A.    Not in 2001.

13    Q.    All right.  Is that true for all of the other

14    defendants?

16:20:46  15              There's nobody at any of the other

16    companies that are defendants in this case who would have

17    known that in 2001?

18    A.    I'm not sure.

19    Q.    You can't identify anybody?

16:20:54  20    A.    Can I look at my report for a moment?

21    Q.    If you think that will help you.

22              (Pause.)

23    A.    That's correct, I can't identify anybody.

24    Q.    Thank you.

16:21:28  25              And, in fact, things keep on changing to

1    this day.

2                   You were talking about the DSM-V.  That

3    changed the definition of addiction?

4    A.    Yes.

16:21:36 5    Q.    And when was that?

6    A.    I think the DSM-V came out in 2015, 2016.

7                   I'm not remembering exactly.

8    Q.    Okay.  So as recently as 2016 --

9    A.    Might have been -- might have been a little

16:21:49 10    earlier.

11    Q.    Okay.  Well, whenever it was, the definition of

12    addiction itself changed?

13    A.    Yes.

14    Q.    Now, one of the opinions that you've given in the

16:22:27 15    case today is that the pharmacy defendants did not use

16    their data to help identify problematic prescriptions,

17    and put that however you want it if I haven't said it

18    correctly.

19    A.    I would say that pharmacy defendants didn't access

16:22:50 20    their data as early as they should have to try to help

21    pharmacists identify red flags.

22    Q.    Okay.  Speaking of CVS for a moment, are you

23    familiar with what RxConnect is?

24    A.    Say that again.

16:23:04 25    Q.    RxConnect?

1    A.    I'm not hearing the second word.  Rx?

2    Q.    RxConnect?

3    A.    RxConnect?

4    Q.    Correct.

16:23:12 5    A.    I'm not sure, no.

6    Q.    Okay.  So you didn't consider what system CVS had

7    available through its RxConnect system and made available

8    information for its pharmacists?

9    A.    Well, I am -- I am familiar with CVS's prescriber

16:23:36 10    monitoring policy and prescriber validation policy from

11    2015 and 2014.

12              If that goes by another name, is that

13    RxConnect?

14    Q.    No, that's not.  But we'll come back to that.

16:23:50 15    A.    Okay.

16    Q.    I plan to cover that, too.

17              So the answer to my question is you didn't

18    evaluate RxConnect?

19    A.    That's correct.  Not that I'm aware of by that

16:23:59 20    name, no.

21    Q.    And did you review CVS's prescriber suspension

22    program in reaching your opinions?

23    A.    I don't believe so.

24    Q.    Okay.  And did you review CVS's store monitoring

16:24:19 25    program in reaching your conclusions?

1    A.    I -- if it's in my materials reviewed, then I

2    reviewed it.

3              If it's not, then I didn't.

4    Q.    And you don't recall anything about it, I guess, as

16:24:31  5    you sit here today?

6    A.    Well, I am recalling reviewing some documents about

7    appropriate storage and monitoring that I do cite in my

8    report, but I don't remember if it's called the document

9    that you're referencing.

16:24:47  10   Q.    Your answer makes me think this may be another

11   thing where you didn't hear me properly correctly.  Not

12   your fault, but I said "store monitoring," not "storage

13   monitoring."

14              I don't know what you heard.

16:25:03  15   A.    So again, I'm not sure if I've reviewed that

16   document.  I'd be happy to look at it or if it's in my

17   materials, consider that I did.  So I'm not sure based on

18   the way you're describing it.

19              I have reviewed a lot of drug utilization

16:25:18  20   review documents from CVS, which do talk about how CVS

21   intended its pharmacists to detect and intervene for

22   various red flags.

23   Q.    Right.  But you don't recall reviewing -- well, you

24   haven't looked -- let me put it to you this way.

16:25:38  25              Your opinion is not based on any review on

1    something called a store monitoring program at CVS?

2    A.    If the store monitoring program at CVS is in my

3    materials cited, then I did rely on it.

4              I'm not recalling the name of that

16:25:54  5    document.  I reviewed over a thousand documents and my

6    report is 400-plus pages long.

7    Q.    I understand but you're here today giving your

8    opinions orally in court and you have not relied for

9    those opinions on the store monitoring program, is that

16:26:12 10    right?

11    A.    Again, I do not know if I've reviewed that

12    document.

13              I'm not currently recalling it.  I may have

14    reviewed it.

16:26:19 15    Q.    Okay.  Did you -- you didn't review the CVS forgery

16    monitoring program in reaching your opinion?

17    A.    I have reviewed documents regarding forged

18    prescriptions for CVS.

19              I don't know if I've reviewed that specific

16:26:35 20    document by that name.

21    Q.    Okay.  You don't express any opinion that I recall

22    in your report that the, excuse me, the CVS forgery

23    monitoring program was inadequate or untimely.

24    A.    I mean I do -- I do discuss forged prescriptions in

16:26:54 25    my report, vis-à-vis the *Holiday CVS* order, but I'm not

1    recalling a specific other instance where I talk about

2    CVS and forged prescriptions.

3    Q.    And you didn't mention that in your testimony today

4    so far?

16:27:13  5    A.    There are many things I did not mention in my

6    testimony today so far --

7    Q.    That's my point.

8    A.    -- that are in my report.

9              And I did review and rely on in forming my

16:27:25 10    opinions.

11    Q.    But it's not one that you testified about today,

12    assuming you reviewed it at all?

13    A.    I'm sorry, do you have --

14              THE COURT:  Put on the headphones a minute,

16:27:40 15    please.

16              (Proceedings at side-bar:)

17              THE COURT:  All right.

18              Mr. Bush, this witness, like anyone, simply

19    answers the questions that they're asked.  So to say you

16:28:00 20    didn't testify about this, you didn't testify about this,

21    I mean, that's really not a fair question.

22              If she -- if her answer didn't include it,

23    you can say did -- I mean something like that.  But to

24    just say you didn't testify about something is really not

16:28:18 25    a fair question and I don't think it's helpful to

Lembke - Cross/Bush                    699

1    anything.

2                    MR. BUSH:  All right.  I'll try and ask it

3    again.

4                    THE COURT:  Okay.

16:28:24   5                    (End of side-bar conference.)

6    BY MR. BUSH:

7    Q.    Can you hear me?

8    A.    Yes.

9    Q.    Okay.  You did not review CVS's patient monitoring

16:28:56  10    program in reaching your opinions about CVS?

11    A.    I reviewed many CVS documents.

12                    I'm not now recalling one called the

13    patient monitoring program, but these various monitoring

14    programs go by many different and similar names.

16:29:19  15                    If it's in my report as materials

16    considered, then I did review it and I did rely on it in

17    forming my opinions.

18                    And I would be happy to look at it now if

19    that would help.

16:29:39  20    Q.    You did not criticize the CVS patient monitoring

21    program in reaching your opinions in this case.

22    A.    Again, I'm not even sure if I reviewed it.

23                    We'd really have to look at my report and

24    see if I reviewed it.

16:30:00  25    Q.    All right.  So let's go back to the Prescriber

1    Monitoring Program which you mentioned in your prior

2    answer.

3              You did look at that?

4    A.    You mean CVS's policies regarding Prescription Drug

16:30:16 5   Monitoring Programs?

6    Q.    No.  Not the Prescription Drug Monitoring Program.

7              The Prescriber Monitoring Program.  I think

8    you said that you did look at that.

9    A.    I said that if it was mentioned in my materials

16:30:27 10  considered, then I did look at it, yes.

11             Again I've reviewed thousands of documents

12   so it's hard for me to recall every document by name.

13   Q.    I thought you said that you had reviewed it and

14   that you thought it should have been implemented earlier.

16:30:42 15  A.    Ah.

16   Q.    Do you recall that testimony?

17   A.    All right.  So I know that by, as the Prescriber

18   Monitoring Program in 2015, yes.

19   Q.    Okay.  And your understanding is that that program

16:30:54 20  was not implemented at CVS until 2015?

21   A.    That is my understanding, yes.

22   Q.    How early do you think it should have been

23   implemented?

24   A.    I think it should have been implemented really

16:31:12 25  from, the early 2000s, you know, as people started dying,

1    I would say by, somewhere between 2005 and 2010.

2              CVS should have used their own data to

3    figure out where these pills were coming from and where

4    they were going.

16:31:36 5    Q.    And this was even before the pendulum started to

6    swing back and people like you started to understand in

7    2012 that the guidelines for prescribing opioids were

8    perhaps misguided in your view?

9    A.    Yes.

16:31:50 10              And the reason for that is that pharmacies

11    were in a position to see these problems much earlier,

12    given their access to these very large data sets and

13    granularity of detail regarding these prescriptions, not

14    to mention that the DEA enforcement orders and

16:32:11 15    investigations were already happening by 2007, 2009.

16              The *East Main Street Pharmacy* ruling by the

17    DEA came out in 2010, which made it very clear how

18    pharmacies should be screening and intervening for red

19    flags.

16:32:34 20    Q.    Well, *East Main Street* didn't actually involve

21    policies at all, did it?

22    A.    I'm sorry, say that again.

23    Q.    *East Main Street*, that decision did not involve

24    policies at all, did it?

16:32:44 25    A.    Well, the *East Main Street* case clearly identified

1    what was happening, that there was a very serious problem

2    at the pharmacy level, and that pharmacies were not

3    living up to their obligation, vis-à-vis the Controlled

4    Substances Act to both create a system and implement that

5    system.

6    Q.    So actually *East Main Street* involved a particular

7    pharmacy, not pharmacies in general all across the

8    country, right?

9    A.    Yes.

10   Q.    Okay.  And it didn't involve the policies of that

11   particular pharmacy; it involved the actions of the

12   particular pharmacist, right?

13   A.    Yes, it did, but according to the Controlled

14   Substances Act, as well as other sources, pharmacies have

15   a responsibility to know about these DEA enforcements.

16                And the *East Main Street* case was published

17   in 2010.

18   Q.    You actually thought that the CVS Prescriber

19   Monitoring Program was pretty good, right?  Your only

20   complaint was that it should have been earlier?

21   A.    I thought it was pretty good as long as it was

22   really implemented and not just on paper, but I thought

23   it was too late.

24   Q.    So you also expressed some opinions about the

25   checking the PDMP, and I asked you before about whether

1    doctors have access to that.

2                But in Ohio in particular, I think

3    you -- you understand that doctors had the obligation

4    under certain defined criteria to check the PDMP before

16:34:37  5    prescribing opioids to their patients as early as 2011?

6    A.    Yes.

7    Q.    Okay.  And pharmacists did, too?

8    A.    Yes.

9    Q.    And the Stanford Clinic where you work and practice

16:34:58 10    medicine did not have the obligation to check the PDMP in

11    California until 2013, right?

12    A.    That's right.

13                And even then, it wasn't mandatory in the

14    State of California.

16:35:12 15    Q.    Okay.  And it wasn't mandatory in your clinic?

16    A.    Starting in 2013 it was mandatory in my clinic.

17    Q.    That's two years after it was mandatory and it was

18    checked here in Ohio?

19    A.    I'm sorry?

16:35:27 20    Q.    Never mind.  I withdraw the question.

21                So let me ask you about -- a question about

22    the -- actually, withdrawn.  Let me go back to a

23    different topic here.

24                Dr. Lembke, you'll agree that even to this

16:36:30 25    day, there are people, patients, who are prescribed

1    opioids to treat chronic long-term pain, right?

2    A.    Yes.

3    Q.    Okay.  And that at least in some set of those

4    circumstances, it's an appropriate treatment?

16:36:46  5    A.    Yes.

6    Q.    And you would also agree that for patients in that

7    circumstance to have the pharmacist refuse to fill a

8    prescription would be actually dangerous for them?

9    A.    Yes.

16:37:09  10   Q.    And I know that you've described a certain set of

11   patients where if they're on chronic long-term pain, that

12   they're likely to need more and more and higher and

13   higher doses, but that's not true of everybody, right?

14   A.    That's correct.

16:37:27  15   Q.    Okay.  And for some people, even though there's no

16   study or a peer-reviewed or valid study in your opinion

17   that supports the use of opioids to treat long-term pain,

18   there are people who at least subjectively get a lot of

19   relief from it?

16:37:48  20   A.    In those individuals, what's not clear is whether

21   they're getting actual pain relief from the chronic

22   opioid therapy or whether they're getting relief because

23   they're medicating withdrawal from the last dose.

24              I agree that subjectively they will endorse

16:38:06  25   release -- relief, but again it's not really clear that

1    the opioid is ultimately helping their pain condition, or

2    their functionality.

3    Q.    And the doctor who's prescribing the opioid

4    medications in that situation is prescribing them for a

5    legitimate medical purpose, right?

6    A.    That is a complicated answer because we've created

7    a legacy population of patients on chronic opioid therapy

8    who are physically dependent, who now may not ever be

9    able to get off of opioids, and it's not because the

10   opioids are helping their pain condition, but because

11   they've changed their brains irrevocably and can't not be

12   on opioids.

13            So is that a legitimate medical condition?

14   I mean, it's a humane approach to a problem that was

15   created by the health care system.

16   Q.    Well, if it's not a legitimate medical treatment,

17   then the doctor shouldn't write the prescription, right?

18            That's your understanding of how

19   corresponding responsibility and responsibility for

20   prescribing works?

21   A.    What I'm doing is drawing a distinction between

22   what is treatment for chronic pain and what is a harm

23   reduction strategy for someone who's become opioid

24   dependent.

25            So it has become a legitimate medical

Lembke - Cross/Bush

1    condition to continue opioids long-term in somebody who

2    is so physically dependent that they just can't get off,

3    but that wouldn't have been a legitimate medical

4    condition prior to this opioid epidemic.

16:39:51  5    Q.    Right.  But if we're looking at what a pharmacist

6    is doing right now, if they get a prescription for a

7    patient like the one we're talking about, you would agree

8    that they should fill a prescription?

9    A.    Well, I would actually consider that if the patient

16:40:07 10    is on high doses, long-term, which is outside of the

11    evidence, I would consider that a red flag that requires

12    investigation.

13                I would -- I would say that the pharmacist

14    would be required to communicate with the prescribing

16:40:24 15    physician and determine why they continue to prescribe

16    high dose opioids, given all the risks.

17                And if the prescriber could explain that in

18    this case the potential benefits outweigh the risks,

19    either because the patient is getting pain relief or

16:40:48 20    because the risks of tapering that individual outweigh

21    the risks of continuing on the medicine because of

22    doctor-caused harm, then that would be okay to dispense.

23                But it would require investigation.

24    Q.    So this person, if he's on -- or she is on

16:41:07 25    long-term opioid therapy, has been coming to the

1    pharmacist under this hypothetical for quite awhile,

2    presumably you don't think that the pharmacist has to

3    call the doctor every time she comes in?

4    A.    No.

16:41:20  5         I mean, the red flags would be for very

6    high doses at long duration or other harms related to

7    drug-drug combinations, for example an opioid and a

8    Benzodiazepine.

9         Again, we have a legacy generation where

16:41:39 10    three of individuals on a combination of a Benzo and

11    opioid which never should have been started, which

12    doesn't make it okay to just continue on, those need to

13    be investigated.

14    Q.    Okay.  But if that person has been coming to the

16:41:51 15    pharmacy for let's say two or three years with the same

16    doctor, getting the same prescription filled, that's not

17    something that the pharmacist needs to call the doctor

18    about every time the patient comes in.

19         Just a yes or no.  You don't -- I realize

16:42:06 20    you may have other opinions about it, but they don't have

21    to call the pharmacist -- I'm sorry -- the doctor, right?

22    A.    Not every time, no.

23    Q.    Okay.  And if -- one of the things that the

24    pharmacist, you would agree, would take into account is

16:42:22 25    her knowledge of the patient?

1    A.    Yes.

2              But as I said before, our perception of the

3    patient can be deceiving, which is why it's so important

4    to check these objective data points.

16:42:35  5    Q.    And one of the other things that the pharmacist

6    would take into account is her knowledge of the

7    practitioner who prescribed the opioids?

8    A.    Yes.

9    Q.    Okay.

16:43:17 10              MR. BUSH:  I'm actually not a hundred

11    percent sure what my team has here for Mr. Lanier's

12    opinion slides.

13              Can you put that up?

14              Okay.  Great.  Perfect.

16:43:29 15              Can you put that up and go to opinion

16    eight?

17    BY MR. BUSH:

18    Q.    I'm moving.  So if this doesn't work, let me know.

19    A.    Okay.

16:43:42 20    Q.    So I want to ask you about the last sentence here,

21    "The best, conservative data show an opioid addiction

22    prevalence of 10 to 30 percent among pain patients

23    prescribed opioids."

24              Do you see that?

16:44:03 25    A.    Yes.

1    Q.    Okay.  So that would mean between 90 and 70 percent

2    of the patients do not have an addiction prevalence?

3    A.    Yes.

4    Q.    You've listed four misleading statements that you

16:45:00  5    said the manufacturers had made, and I think around the

6    early 90s, about opioids that led to the paradigm shift.

7              Do you recall that?

8    A.    Could you say that again?  I'm sorry, I had a

9    hard --

16:45:11 10    Q.    Yeah, you listed, by my count, four misleading

11    statements that you said the manufacturers made in the

12    early 90s that led to the paradigm shift in opioid

13    prescribing?

14    A.    Yes.

16:45:22 15    Q.    Okay.  One was that patients were unlikely to

16    become addicted.

17              One was that no dose was too high.

18              One was that opioids were effective

19    treatment for chronic pain.

16:45:35 20              And one -- the last one was that doctors

21    could tell if a patient was likely to become addicted.

22              Did I get that more or less right?

23    A.    Yes.

24    Q.    Okay.  And none of the pharmacy defendants in here

16:45:51 25    made those statements in the early 90s?

1    A.    Can I look in my report for a moment?

2    Q.    Sure.  If that will help you.

3              (Pause.)

4    A.    So to my knowledge, none of the pharmacy defendants

16:46:24  5    here themselves made those statements, but they partnered

6    with Purdue who did make those statements.

7    Q.    Well, the only thing that I've seen that you've

8    referred to in your report and your testimony are the

9    documents that you testified about in 2001.

16:46:41  10              Is there something other than that?  Not

11   the early 90s.

12   A.    That's right, I'm talking about the late 1990s and

13   beyond, right.

14   Q.    So let's take a look at -- it's Tab 14.  If you

16:47:20  15   could pull that document out, please.

16              Actually while you're at it, Dr. Lembke, if

17   you could pull out Tabs 12 and 13, that would also be

18   helpful.

19              You let me know -- actually, we'll talk

16:48:00  20   about 12 first so let me know when you have that.

21   A.    Okay.

22   Q.    And while Dr. Lembke's looking for that, that's

23   P-08658.

24              Just let me know when you have it?

16:48:48  25   A.    Yes, I have it.

 1    Q.    Okay.  I think this was one of the documents you

 2    focused on as indicating that CVS participated in

 3    the -- what you call the false marketing of the

 4    manufacturers.

16:49:01  5              And I'd like to ask you to show me anywhere

 6    in this document where it refers to opioids, if you can

 7    find it.

 8    A.    I don't believe this document specifically refers

 9    to opioids.

16:49:37 10              It just refers to collaboration more

11    generally.

12    Q.    You would agree that educating your pharmacists

13    about new medications, new drug products, is not a bad

14    thing?

16:49:49 15    A.    I'm sorry?

16    Q.    You would agree that educating your pharmacists

17    about new drug products is not a bad thing?

18    A.    It would really depend on how the education was

19    done and who did the educating.

16:49:59 20    Q.    So if we get some new heart medicine or new blood

21    pressure medicine, you think it would be a bad idea for

22    CVS to have used this program to educate their

23    pharmacists about what that new product is?

24    A.    Yes.  I think it would be a bad idea if that

16:50:17 25    education was funded by and done by the people who made

1    that heart medicine.

2    Q.    Because the people who make the heart medicine are

3    never going to tell you the truth about what it does?

4    A.    No, it's not that they're never going to tell you

5    the truth.

6              It's that they are certainly biased and

7    motivated to sell their product.

8    Q.    So this says that CVS, I believe -- let's look at

9    this -- on Page 5, it says, "CVS NEWScript designed for

10   new product launches, prepares pharmacists for first

11   scripts to arrive," and then it says "Brief summary, one

12   page, authored by CVS clinical department."

13             Do you see that?

14   A.    Yes, I do see that.

15   Q.    Okay.  If CVS's, the clinical department writes the

16   information about the new medication that's coming out,

17   no reason to be worried it's biased, is there?

18   A.    Well, again, it would depend on what CVS based

19   their educational offering on.

20             If they based it on reliable evidence, that

21   would be great.  If they base it on material that they

22   got from the drug manufacturer, that would not be good.

23   Q.    And you have no idea what they based it on?

24   A.    Well, I -- I do, in fact, know what they base it on

25   because I've talked about examples of CVS basing their

1    education on opioids on materials that they, at least

2    working and collaborating with Purdue around providing

3    education.

4    Q.    So let's stick with this as opposed to other things

16:51:54 5    you may have testified about.

6              I'm asking with respect to the NEWScript,

7    which is a document pursuant to this program which you

8    said was facilitating the promotion of opioids.

9              You have no -- you've not even actually

16:52:11 10   looked at a NEWScript that was produced by this program,

11   have you?

12   A.    I'm sorry, which document?

13   Q.    You have not actually looked at a NEWScript?

14   That's what this document is that CVS prepares and sends

16:52:20 15   out to its pharmacists when there's a new medication.

16              You've never looked at one?

17   A.    Again, I may have looked at one if it's in my

18   materials considered.  I'm not specifically recalling a

19   document called NEWScript.

16:52:41 20   Q.    And --

21   A.    But I'd be happy to look at one now if you'd like

22   me.

23   Q.    Actually, your opinion is what your opinion is,

24   Dr. Lembke.  If you don't recall looking at a NEWScript

16:52:52 25   that's where it stands right now.

```
 1              But you also have not seen a NEWScript or

 2    any document that came out of this program that related

 3    to an opioid?

 4    A.    If it's not in my materials considered, then I

 5    didn't see it, and if it is, then I did.

 6    Q.    You have no recollection, as you sit here today,

 7    that you looked at any document related to an opioid that

 8    came out of this program that's reflected in P-8658?

 9    A.    Again, I have reviewed thousands of documents, and

10    if I reviewed something that came out of this specific

11    CVS NEWScript program, then it is in my materials

12    considered.

13    Q.    You can't tell us about any such document as you

14    sit here today?

15    A.    Not that I'm recalling, no.

16    Q.    All right.

17              Okay.  Let me ask you to take a look at

18    what was behind Tab 14.

19              And just let me know when you have it.

20    A.    Yes, I have it.

21    Q.    Okay.  And this is one of the documents you

22    testified earlier -- about earlier today, is that right?

23    A.    Yes.

24    Q.    And this is the brochure that came from Purdue, it

25    is a brochure that came from Purdue, right?
```

1   A.    Sir, I couldn't hear the last part, but, yes, this

2   is the brochure that came from Purdue.

3   Q.    That's what I asked.

4         And it's titled "How to Stop Drug Diversion

16:55:23 5   and Protect Your Pharmacy."

6         Right?

7   A.    Yes, it is.

8   Q.    Okay.  And this looks like this was folded, maybe

9   in thirds, like a brochure would be, so it's just to

16:55:40 10   orient everybody on this.

11        So if you look at the second page, that's

12   where the document text appears to begin and the first

13   heading there is "Scrutinize Prescriptions."

14        Yes?

16:55:58 15   A.    I'm sorry, say that again.

16   Q.    First heading is "Scrutinize Prescriptions."

17   A.    I'm really sorry.  I'm just not catching the words.

18   Q.    The first heading is "Scrutinize Prescriptions"?

19   A.    I'm sorry, the -- I think my copy is stapled out of

16:56:36 20   order.

21   Q.    That's what I said before, I think this is actually

22   a photocopy of a brochure so in real life, it would have

23   been folded in thirds, I think.

24        And if you look on the second page, it

16:56:48 25   looks like the first heading there is "Scrutinize

1    Prescriptions."

2              It's up on the screen.

3    A.    Yes, I see that now on the second page.

4    Q.    Yeah, okay.

16:56:55   5              And it has a number of things to look for:

6              "Does it look too good?  Is the writing too

7    legible?  Is it a photocopy?"  These are all things that

8    the brochure is recommending that a pharmacist look at to

9    determine whether this might be not a legitimate

16:57:15   10   prescription, right?

11   A.    Yes.

12   Q.    And I mean we can go through some of the rest of it

13   with handwritten prescriptions, the ink from the

14   preprinted information and the handwritten information

16:57:27   15   are generally slightly different colors, that's another

16   thing that the brochure suggests should be examined to

17   determine whether a prescription is legitimate?

18   A.    Yes.

19   Q.    And then it talks in heading two, "Types of

16:57:39   20   fraudulent prescriptions," and in heading three,

21   "Patterns of possible diversion."

22              And then in heading three, it talks about,

23   "Prescriber writes unexpectedly large quantities," right?

24   A.    Yes.

16:57:54   25   Q.    And that, "A diverter," meaning the patient as I

1    understand it, but correct me if you understand it

2    differently, "returns too frequently, refilling the same

3    prescription on a weekly or even daily basis," right?

4    A.    Yes.   That's what it says.

16:58:11   5    Q.    And then back on the first page, but probably some

6    different page in the real life of this document, it

7    says, "Preventing diversion."

8                Do you see that?

9    A.    Yes.

16:58:30  10    Q.    Okay.   There's nothing, as we've gone through this,

11    that you see that's false about this brochure?

12    A.    Nothing false, but as a complete policy,

13    inadequate.

14    Q.    I'm sorry.   I didn't hear you this time.

16:58:50  15    A.    Okay.   There's nothing false about this, but as the

16    entirety of a policy, it is inadequate.

17    Q.    Well, so you're saying it could have talked about

18    other things, but this is talking about drug diversion,

19    right?

16:59:04  20                Not about other things.

21    A.    Well, it's -- it's talking about what a pharmacist

22    individually can do, but there's a whole context in which

23    CVS Pharmacy could have allowed pharmacists to use their

24    databases, for example, to issue blanket refusals to

16:59:26  25    known criminal doctors, which CVS Pharmacy did not allow

1    their pharmacists to do until later.

2    Q.    Okay.  So let's reset this and go back to where we

3    are in time.

4                    We're in 2001.

16:59:38  5    A.    Um-hmm.

6    Q.    And this is a document that you have testified is a

7    basis, one of the bases for your opinion that CVS

8    collaborated with opioid manufacturers, in this case

9    Purdue, to falsely market drugs.

16:59:54 10                    And so let's just stay on that.

11                    There's nothing false about this document

12    or -- leave it at that.

13                    That's the question.

14    A.    Oh, there's a question there?

17:00:13 15    Q.    On the document, yes.

16    A.    Okay.  Okay.

17    Q.    Sorry.

18    A.    Again, there's nothing false about this document

19    per se, but as I said, even in 2004, CVS was not allowing

17:00:28 20    pharmacists to have blanket refusals for known pill-mill

21    doctors.

22    Q.    I'm sorry, I can't hear you now.

23    A.    Okay.

24    Q.    Maybe you need to lean up a little closer to your

17:00:37 25    mic.

1    A.    Yes.

2                   Even in 2004, CVS was not allowing its

3    pharmacists to deny dispensing pills for known pill-mill

4    doctors.

17:00:53  5          So this document, in the context of not

6    supporting pharmacists around preventing dispension for

7    dispensing to pill-mill doctors, known pill-mill doctors,

8    using their own data is really not a very useful

9    document.

17:01:17 10  Q.    You're not aware of any situation in Lake or

11   Trumbull County where CVS prevented its pharmacists from

12   refusing to fill a prescription that a patient presented

13   from a pill-mill, are you?

14                  Not even one?

17:01:38 15  A.    I did not analyze at the level of CVS Pharmacies in

16   Lake and Trumbull County, but I -- these are national

17   policies, and they are applied to CVSes all over the

18   country.

19   Q.    You're not even aware of one situation in the

17:01:54 20  entire country, Dr. Lembke, in which CVS refused to allow

21   its pharmacists to -- refused to fill or barred its

22   pharmacists from refusing to fill an opioid prescription

23   from a pill-mill doctor?

24                  You don't cite it in your report, do you?

17:02:22 25  A.    Well, I do cite the *Holiday CVS* case.

1    Q.    That's not 2004, is it?

2    A.    That is 2012.

3              I also mention the eleven million dollars

4    civil penalty to do recordkeeping violations.

17:02:44 5    Q.    Sorry, you're speaking down from your mic so I

6    couldn't hear you.

7              Sorry.

8    A.    Sorry, yeah.

9              I do cite specific instances where CVS

17:02:56 10    Pharmacies throughout the country at different regions in

11    the country failed to fulfill their obligation according

12    to the Controlled Substances Act.

13    Q.    That's not really the question I asked.

14              I asked --

17:03:10 15    A.    Okay.

16    Q.    -- whether or not you're aware of any situation in

17    which a pharmacist was prohibited from refusing to fill a

18    prescription that was presented by a patient who got it

19    from a pill-mill?

17:03:24 20              It's a very simple question.  Are you aware

21    of any situation like that?

22              You don't cite them in your report as far

23    as I can tell.

24    A.    I'm not aware of a specific situation where a

17:03:34 25    patient died as a result of getting their opioid from a

           1    pill-mill doctor and filling it at CVS Pharmacy.

           2    Q.    You would agree with me that CVS never had

           3    any -- took out any TV ads promoting prescription

           4    opioids?

17:04:14   5    A.    I'm sorry, I didn't catch the last part.

           6    Q.    Really sorry that we're having this technical

           7    issue.

           8    A.    It's a combination of my bad hearing and somehow

           9    not --

17:04:23  10    Q.    Well, you're behind the screen, too.  That's

          11    probably making it worse.

          12                You're not -- CVS never had any TV ads

          13    promoting prescription opioids, did it?

          14    A.    CVS never had what?

17:04:34  15    Q.    Any TV ads.

          16    A.    TV ads.

          17    Q.    Promoting prescription opioids.

          18    A.    Not that I know of.

          19    Q.    And none of the other pharmacy defendants had TV

17:04:44  20    ads promoting prescription opioids, did they?

          21    A.    I don't believe so, no.

          22    Q.    And CVS never had any radio ads promoting opioids?

          23    A.    Well, CVS did partner with Partners Against Pain

          24    and they did have, I believe, radio ads.

17:05:03  25    Q.    And you -- sorry.

1    A.    But again, that was -- that wasn't CVS directly.

2              It was their partnership with one of

3    Purdue's front groups.

4    Q.    And CVS partnered with Purdue at a time before you

5    had figured out that opioid prescription standards were

6    too lenient in the use of opioids?

7    A.    Yes.

8    Q.    And CVS did not take out newspaper ads promoting

9    prescription opioids?

10    A.    Not that I know of, no.

11    Q.    And never had any billboards promoting opioids?

12    A.    No.

13    Q.    And none of the other pharmacy defendants did that?

14    A.    Not that I know of.

15    Q.    You -- none of -- none of the pharmacy defendants

16    had any salespeople who went out to doctors like

17    detailing them, like the manufacturers had, right?

18    A.    That's correct.

19    Q.    And that was one of the principal ways in which

20    manufacturers in your opinion spread misleading or false

21    information about the safety and effectiveness of

22    opioids?

23    A.    Yes.

24    Q.    And, let's see, you also have, I think, rendered

25    the opinion that the opioid manufacturers used key

1    opinion leaders to spread false information about the

2    safety and effectiveness of opioids, right?

3    A.    Yes.

4    Q.    And neither CVS, nor any of the other pharmacy

17:06:46    5    defendants, had any key opinion leaders that did that?

6    A.    That's correct.

7    Q.    You, in your report, which we've talked about some,

8    you have an appendix?  It's appendix, I think it's

9    appendix one that lists for each of the manufacturers

17:07:18    10    that you've given opinions about the false and misleading

11    statements that they made to mislead the public about,

12    and the medical community in your view, about the safety

13    and effectiveness of opioids, right?

14    A.    Yes.

17:07:36    15    Q.    And that's about 30 pages?

16    A.    Yes.

17    Q.    And there's not any similar document for

18    pharmacists; you don't list even one such statement in

19    that appendix?

17:07:50    20    A.    That's correct.

21    Q.    Okay.  Just give me one second, Dr. Lembke.

22          (Pause.)

23          You testified about the gateway effect.

24          Remember that?

17:08:41    25    A.    Yes.

1    Q.    Okay.  You've never used the term gateway effect in

2    any peer review article that you published before you

3    started working on the opioid litigation with the

4    plaintiffs?

17:08:56 5    A.    No, that's incorrect.

6    Q.    Well, you recall testifying in New York at the *Frye*

7    Hearing?

8    A.    Yes.

9    Q.    Let me ask you to look at Tab 24.

17:09:27 10                    Let me know when you have that.

11                    Do you have it?

12    A.    Yes.

13    Q.    And when you testified at the *Frye* Hearing, that

14    was in court before Judge Gargiulo?

17:09:48 15    A.    Yes.

16    Q.    And you were sworn to tell the truth?

17    A.    Yes.

18    Q.    And you did tell the truth?

19    A.    Yes, I did.

17:09:54 20    Q.    And if you let me read to you from Page 156, Line

21    19 to 22.

22                    "You never used that specific phrase,

23    'gateway effect,' or published that observation in any

24    peer-reviewed journal articles, have you?

17:10:15 25                    "Answer:  No."

1        Do you recall giving that testimony?

2   A.    It is true that I did not use that specific

3   terminology in any of my publications, in peer-reviewed

4   journal articles, but I did use the term "gateway" in my

5   peer-reviewed book published in 2016, *Drug Dealer, MD*,

6   which I wrote before I was involved in any litigation.

7            And I did address that concept proudly in

8   my peer-reviewed journal article on checking the PDMP,

9   which I published in 2016, where I do talk about how

10  prescription medications, including Benzodiazepines, can

11  lead people to turn to illicit sources.

12  Q.    So let's take a look at your book.

13           It's -- I don't know if you -- I think we

14  have the hard copy of the book but I can put the page up

15  on the screen if that's a little easier because I'm just

16  going to ask you about one page in there.

17           But if you want to look at the book, I

18  think it's there behind Tab 8.

19           And can you put up Page 109?

20  A.    So I'm not finding it here but --

21           MR. LANIER:  May I approach and give her a

22  copy, Your Honor?

23           MR. BUSH:  I don't think that's the

24  right -- I don't think that's the right thing.

25           THE COURT:  I want to make sure that that's

1    the book that Mr. Bush wants her to see.

2                    Well, Mr. Bush, Mr. Lanier has what looks

3    to be her book.

4                    MR. BUSH:  Yeah, I was just trying to get

17:12:15  5    it up on the screen, sir, so everybody can see it.

6                    Oh, we have it.  Okay.  Somehow we have a

7    little technical difficulty.

8                    So do you have the page numbers there?  Or

9    is that just the cover?  Just the cover?  Okay.

17:12:35 10   BY MR. BUSH:

11   Q.   So I'm going to try and use the Elmo and probably

12   not going to be as good at it as Mr. Lanier.

13                    Yeah, I'm not going to write on your book.

14                    MR. LANIER:  You're welcome to write

17:13:09 15   anything in it.  I'm glad to help you on that.

16   BY MR. BUSH:

17   Q.   So if you look at the first full paragraph on

18   Page 109, and I want to direct your attention to the

19   sentence that says, "However, the relationship between

17:13:22 20   doctors' prescribing patterns and the initiation of

21   heroin use remains unclear."

22                    That's what you said in 2016 when you

23   published your book?

24   A.   Yes, and I'm happy to explain what I meant by that.

17:13:33 25   Q.   Well, what you said was that that pattern is

1    unclear to you in 2016; it's become clearer now?

2    A.    No.   What I meant by unclear was not whether or not

3    people progressed from prescription opioids to heroin.

4              That was very clear.

5              What was unclear was what was causing that

6    progression immediately.  Was it the progression of the

7    disease of addiction, or was it that doctors started

8    prescribing fewer opioids?

9              And it really wasn't until a year or so

10   later, after the book had already been submitted, that

11   studies came out to show that it was probably directly

12   related to the contraction of opioid prescribing and

13   people not being able to get opioids from their

14   prescriber any longer.

15   Q.    All right.  Let's take a look at -- behind Tab 26.

16   A.    Tab 26?  Okay.

17   Q.    And do you recall testifying at the trial in New

18   York before the jury and Judge Gargiulo?

19   A.    Yes.

20   Q.    Let me ask you to turn to Page 85.  That's where

21   I'm going to ask you about.

22              And down at the bottom of the page,

23   Mr. Hirschline asked you the question at Line 22, so 85,

24   Line 22, "Before you were hired by the plaintiffs in this

25   case, you had concluded that the relationship between

1    opioid prescribing and the initiation of heroin use was

2    unclear?

3              "Answer:  Yes."

4              Do you recall giving that testimony?

17:15:30  5   A.    Yes, I wrote in my book that it was unclear and I

6    testified to that at trial.  But again, what was unclear

7    was what was directly contributing to people turning to

8    opioids, to heroin, around 2013.

9              Was it that now we had a decade of

17:15:51 10  prescription opioids getting people addicted and that the

11   progression of their disease meant they needed more and

12   more to get the same effect and that's why they were

13   turning to heroin, or was it specifically related to the

14   fact that in 2012, opioid prescribing started to go down?

17:16:07 15            So that is the piece that is unclear.

16   Q.    Okay.  Thank you.

17   A.    The actual gateway effect is not -- not unclear.

18            And, in fact, in my book, I have a

19   subheading that says something like "Vicodin, the New

17:16:23 20  Gateway to Heroin."

21   Q.    So Mr. Lanier, in his opening, which referred to a

22   couple of different things -- sorry about that.

23   A.    That was loud.

24   Q.    That was loud.

17:16:41 25  A.    That was very loud.

1    Q.    Sorry?

2                 THE COURT:  Mr. Bush, excuse me.  If you're

3    about done, I don't want to cut you off, but if you're

4    moving -- if you've got a ways to go and you're moving to

17:16:52  5    a new area, I think it might be a good time for a break

6    so you just let me know.

7                 MR. BUSH:  Yeah, it would be a good time

8    for a break, Your Honor.

9                 THE COURT:  Okay.  Fine.

17:16:59 10                 MR. BUSH:  So --

11                 THE COURT:  All right.  Ladies and

12    gentlemen, it's been a long day and afternoon.  It's a

13    good time to stop, so we'll stop for tonight.

14                 Usual admonitions.  Don't read, consider,

17:17:11 15    view anything that you might see in the media.  Don't

16    discuss this case with anyone.

17                 Have a good evening and we'll see you at

18    9:00 tomorrow morning.

19                 (Jury out.)

17:17:55 20                 THE COURT:  Okay.  Everyone can be seated.

21                 All right.  First, our -- I don't think the

22    plaintiffs are offering any exhibits.  I just to want

23    take care of this.

24                 Is that right, Mr. Lanier or

17:18:12 25    Mr. Weinberger?

            1              MR. LANIER:  Your Honor, we are

            2     offering -- well --

            3              MR. WEINBERGER:  Your Honor, we're not

            4     offering any exhibits related to Dr. Lembke's testimony

17:18:20    5     at this point.

            6              THE COURT:  Okay.

            7              MR. WEINBERGER:  We are -- we are seeking

            8     to move for admission certain other exhibits relevant to

            9     yesterday, and --

17:18:30   10              THE COURT:  I'm confused because you

           11     didn't -- I admitted everything you offered yesterday.

           12              MR. WEINBERGER:  Right.

           13              So --

           14              THE COURT:  Oh.

17:18:37   15              MR. WEINBERGER:  -- I'd like to explain if

           16     I could, Your Honor.

           17              THE COURT:  All right.  Briefly.

           18              MR. WEINBERGER:  May we have Dr. Lembke --

           19              THE COURT:  Oh, sorry, Dr. Lembke.  You're

17:18:47   20     excused.

           21              You can stay if you want, but there's no

           22     reason for that.

           23              I apologize.

           24              All right.

17:18:57   25              MR. WEINBERGER:  So what we've done is

1   we've kind of, following your suggestion, we have come up

2   with some exhibits that we're going to move for admission

3   that are partially related to yesterday's witness.

4               THE COURT:  All right.  I --

17:19:22  5               MR. WEINBERGER:  Let me just explain to you

6   what I did, if I may, Your Honor.

7               THE COURT:  All right.

8               MR. WEINBERGER:  So we've submitted those

9   exhibits, a list of exhibits, to the defense and to

17:19:33 10   Special Master Cohen.

11               We haven't received back any objections to

12   those exhibits.  We don't have to deal with it right this

13   very second.

14               THE COURT:  Well, yeah, why don't you

17:19:44 15   discuss this?

16               I'll take these up at some other time.  I

17   mean, if there's no objection, I'll admit them.

18               If there's an objection, I'll have to

19   figure out when and how I'll deal with it, and --

17:19:57 20               MR. WEINBERGER:  So again, to --

21               THE COURT:  There's none with Lembke, okay,

22   that's what I'm asking.

23               MR. WEINBERGER:  We're taking up your

24   suggestion that we might be able to move this forward.

17:20:07 25               THE COURT:  I'm going to raise that in

1    general.

2                    Mr. Bush, are there any documents that

3    you're offering at this time from your last

4    cross-examination?

17:20:15    5                    MR. BUSH:  No, Your Honor.

6                    THE COURT:  Okay.  I didn't think so.

7                    All right.

8                    MR. DELINSKY:  Your Honor?

9                    THE COURT:  Yes.

17:20:23    10                    MR. DELINSKY:  I don't want to knock you

11    off your agenda if you have --

12                    THE COURT:  Let's stay on my agenda,

13    please.

14                    All right.  I want to figure out a better

17:20:31    15    way to deal with -- with documents and objections to

16    documents.

17                    All right.  It clearly isn't working well

18    and we're just starting.  We've got to figure out another

19    way.

17:20:45    20                    It clearly is not going to work well to

21    wait until 10:00 p.m., 11:00 p.m., 1:00 a.m., 2:00 a.m.,

22    whatever.

23                    So that we're done with that.

24                    So as far as I'm concerned, any objections

17:20:59    25    to authenticity have all been taken care of and there

1    weren't any or they weren't brought to my attention.

2                Now, admissibility is another thing, so

3    I've got to figure out a better way to do it.

4                It's not -- it is not going to work waiting

5    until the night before a witness' calling and then we get

6    a whole raft of objections to exhibits.

7                So what are you all proposing?  I'll listen

8    to your proposals.

9                Either we have to forget about it and just

10   I'll deal with them on the fly as they come in and they

11   will be real fast, or you have to get, get them to me and

12   Special Master Cohen at least two or three days before

13   any objections, which means you'll have to give each

14   other, you know, the documents two or three days before

15   you're planning to use them.

16               The problem is there was no way to deal

17   with these all in advance because everyone grossly

18   overdesignated the number of witnesses you were calling

19   and the number of documents you plan to use.

20               So --

21               MR. LANIER:  I'm following Your Honor

22   trying to figure it out in advance.

23               THE COURT:  I understand.

24               MR. LANIER:  I think frankly that if you'll

25   deal with them on the fly, parties offer a document into

1    evidence at their own risk.

2              If it's not permissible evidence and we

3    offer it or they do the same, then we're just sowing

4    reversible error, which makes no sense for anybody.  So I

17:22:38  5    think by and large, lawyers may assert objections on the

6    record to preserve an appeal, but --

7              THE COURT:  All right.  Well, as far as I'm

8    concerned, any authenticity is over and done with so

9    people can, you know, put the exhibits up and I'll

17:22:54 10    decide, you know, you can probably ask a witness about

11    almost any document if you -- do you know this, have you

12    seen it, do you recognize it?

13              If they say no, I may not allow many

14    questions unless there's a clear relevance or reason to

17:23:11 15    keep going.

16              So I'll just, I guess that's the way I'll

17    deal with it, just on the fly.

18              MS. FUMERTON:  Your Honor, if I may make a

19    suggestion.

17:23:18 20              I mean 48 hours would give us an

21    opportunity to streamline this a bit.  If that's not

22    something you're inclined to do, I guess my request would

23    be that the document not be published to the jury or sort

24    of described before given to counsel so that we can raise

17:23:31 25    an objection if it's something that we don't want the

1    jury to -- or we think it's impermissible for the jury to

2    see.

3                    Obviously once the, you know, plaintiffs

4    describe the document to the witness and we think it's

5    something that's completely out of bounds, you know, we

6    can't unring that bell.

7                    So if we're going to do it on the fly --

8                    THE COURT:  You can put it on the screen

9    and say do you recognize it and then if there's an

10   objection then, I'll deal with it.

11                   Someone will have to hand me the document

12   and I'll deal with it.

13                   MR. DELINSKY:  Your Honor, I thought that

14   worked well with Mr. Davis yesterday.

15                   Maybe your expectations are higher than

16   mine.  I thought that was relatively efficient.

17                   MS. FUMERTON:  See, I guess the one problem

18   we have with that is publishing it to the jury.  If it's

19   handed to the witness, that's one thing, but I guess my

20   point is that we would not -- would request it not be

21   published to the jury until after counsel has had an

22   opportunity to object.

23                   MR. LANIER:  Your Honor, historically what

24   I've done in cases that I think would work quite well

25   here, if I can throw out a suggestion is, before I offer

1     a document into evidence, I make sure that the other side

2     has it, and before I show it or anything else, they've

3     got it.  If they're going to have an objection, so be it.

4                    Historically what I've tried to do is go in

17:24:41  5     blocks of where we are, so given the block, here's a

6     whole set of documents I'm going to use until the lunch

7     break, go through these, take -- you know, I'll give them

8     to them before Court, go through it, see which ones you

9     have objection to.

17:24:58 10                    THE COURT:  I think that's fair.

11                    Then if there's going to be an objection,

12     then all you have to do is show it to the witness and

13     then they can --

14                    MR. LANIER:  Exactly.

17:25:05 15                    THE COURT:  -- at that point, they can

16     introduce an objection.

17                    You can put it on the screen and say I'm

18     going to ask you about this exhibit, and if at that point

19     one of the defendants objects, I'll put on the

17:25:15 20     headphones.  Someone will have to give it to me, and I'll

21     quickly deal with it.

22                    That just may be the way to do it.

23                    SPECIAL MASTER COHEN:  Could I ask a

24     question?

17:25:24 25                    It used to be the case, with changes in

1    technology, that at the podium, you could show a document

2    to the witness only and then publish it after the witness

3    said they recognize it.

4                    THE COURT:  Yeah, that's what we're doing.

17:25:36  5                    SPECIAL MASTER COHEN:  I don't know if you

6    can still do that.

7                    MR. LANIER:  And I think as a practical

8    matter, we can also make sure to hand the witness a hard

9    copy --

17:25:43 10                    THE COURT:  Whatever.

11                    MR. LANIER:  -- and they've got it.

12                    THE COURT:  Just make sure the witness sees

13    it and then if counsel objects, then they can object and

14    I'll make sure someone hands it to me and I'll address it

17:25:52 15    at that point.

16                    MS. FUMERTON:  Your Honor, just to close

17    the loop on this, I just want to make sure that we're

18    still going to follow the procedure the parties agree to

19    and that documents will be disclosed the night before.

17:26:03 20                    MR. LANIER:  Yes.

21                    THE COURT:  Yes, I'm not suspending that.

22                    At least that's for your preparation.

23                    MR. FIEBIG:  Your Honor, can we raise one

24    related point?  This is Chantale Fiebig speaking for

17:26:17 25    Giant Eagle.

1          Today and yesterday as well, there were

2     dozens of demonstratives created during the course of

3     witness testimony that were not disclosed the night

4     before, and we would ask that we be given copies of all

17:26:27  5     demonstratives that have been shown to the witness and

6     the jury, and that those be disclosed the night before as

7     well.

8               THE COURT:  Wait, wait, wait.  The

9     demonstratives created during the testimony, you mean

17:26:35 10     Mr. Lanier's writings?

11               MS. FIEBIG:  Yes, precisely, his writings

12     and his drawings.

13               THE COURT:  He can't disclose that to you

14     before he writes it.

17:26:41 15               MS. FIEBIG:  At a minimum, I think we

16     should get copies and I think there should be a mechanism

17     by which we can object.

18               THE COURT:  First of all, those are not

19     exhibits.

17:26:49 20               They will not be introduced.  If he offers

21     them, they're rejected so.

22               MR. LANIER:  And I don't offer them.

23               It's no different than writing on a tablet

24     or a chalkboard and drawing the scene of an accident.

17:27:01 25               And I am glad to give copies to you.  We

 1   will give digital copies.  I've already done that with

 2   Ms. Swift.

 3              THE COURT:  If you want to give them so

 4   they can have them, that's fine.

 5              MR. LANIER:  Sure.

 6              THE COURT:  But they're not coming into

 7   evidence.

 8              MR. LANIER:  Right.

 9              THE COURT:  And there's no way to give them

10   in advance because he creates them on the fly.

11              But fair enough, Mr. Lanier, after a

12   witness is done, if you can --

13              MR. LANIER:  Absolutely.

14              THE COURT:  -- assemble them and provide

15   them.

16              MS. FIEBIG:  Yes, thank you.  We'd like

17   copies.

18              MR. LANIER:  Yes.  Absolutely.

19              MR. WEINBERGER:  But again, Your Honor, to

20   try to facilitate what I think you're attempting to do

21   here, we've started that process with a list of exhibits

22   that we think should be admitted, whether they were

23   testified to or not, and we submitted them to the

24   defendants.

25              THE COURT:  All right.  That's fine.

1          MR. WEINBERGER:  Yes.

2          THE COURT:  And again, you know --

3          MS. FIEBIG:  And, Your Honor --

4          THE COURT:  If the parties can agree by

17:27:52   5   stipulation that certain exhibits come in, that's fine.

6          MS. FIEBIG:  Your Honor, could I --

7          THE COURT:  Yeah.

8          MS. FIEBIG:  I'm sorry.

9          Could I just ask for your guidance?

17:28:00  10          If in the event there is a drawing or some

11   illustration that one of the defendants perceives to be

12   either a mischaracterization of testimony or otherwise

13   prejudicial, would you like that objection at the time --

14          THE COURT:  No, you should object,

17:28:14  15   Ms. Fiebig, contemporaneously.  First of all, I'm going

16   to be mindful of that and if I think that anyone is

17   mischaracterizing the witness' testimony in what he or

18   she is writing, I'm going to say something because I

19   don't think that's proper.

17:28:30  20          It's got to be accurate or reasonably

21   close; paraphrase, reasonably close.

22          If I think it's fundamentally inaccurate,

23   I'm going to say something.  And if I don't, obviously

24   the other side should object and say that isn't what the

17:28:47  25   witness said and I'll address it.  That's a fair

```
 1   objection.
 2                   MS. FIEBIG:  Thank you, Your Honor.
 3                   THE COURT:  All right.
 4                   So my rudimentary time keeping, I charged
 5   each side a quarter of an hour for our -- what we had to
 6   do in the morning, and then I had, in addition to that,
 7   for the plaintiffs with Dr. Lembke, 2 point -- 4.75 for a
 8   total of five, and Mr. Bush took one and a quarter so
 9   that's one-and-a-half for the defendants.
10                   So, okay.  We'll see everyone.
11                   MR. DELINSKY:  Your Honor, may I raise that
12   one other issue I had?
13                   THE COURT:  Oh, sorry, Mr. Delinsky.
14                   Fair enough.  Yes.
15                   MR. DELINSKY:  Really quick, Your Honor.
16                   I understand Your Honor intends to make
17   exhibits public.
18                   THE COURT:  Well, that's -- anything that
19   is admitted I think is public.
20                   MR. DELINSKY:  Your Honor, there is
21   sensitive documents, not every document, not the vast
22   majority of documents, if I could explain.
23                   For instance, it didn't come in yesterday,
24   another category did, personnel files.  You know, pages
25   from personnel files, that's of a different ilk.
```

 1              The second category, Your Honor, is

 2    yesterday documents were admitted pertaining to the

 3    operation of ongoing programs that reflect not only

 4    technology, it's nonpublic technologies, but also

17:30:08  5    fashions in which a company like CVS reviews documents

 6    and it's not in the interest of CVS nor the public for

 7    that matter for the medical community to be seeing how

 8    the algorithms work, how they're graded out.

 9              That's sensitive --

17:30:25 10              THE COURT:  I wasn't aware any of that was

11    admitted and I don't know what -- how we deal with that.

12              It's --

13              MR. DELINSKY:  Well --

14              THE COURT:  It's a public proceeding, all

17:30:33 15    right, so --

16              MR. DELINSKY:  What I'd ask for, Your

17    Honor, is when those documents arise, that there be an

18    opportunity for redaction.

19              We just don't -- we just don't want pages

17:30:45 20    from personnel records.

21              THE COURT:  Candidly, that should have

22    happened well before.

23              I don't believe we had testimony on

24    commercially sensitive --

17:30:54 25              MR. DELINSKY:  We did, Your Honor.

1       Some of the documents --

2                   THE COURT:  If we had it, we had it,

3       Mr. Delinsky.

4                   You didn't say anything.

17:31:00  5         MR. DELINSKY:  We had testimony, Your

6       Honor --

7                   There's a difference between the

8       testimony --

9                   THE COURT:  I don't have time to take this

17:31:04 10     up now.

11                  I raised this before as to how this would

12      happen.  Everyone knew this.

13                  I, you know, document -- this is a public

14      proceeding, all right?  It's -- if you wanted to have

17:31:15 15     something redacted, candidly, it should have been

16      redacted and not even -- not even dealt with and all we'd

17      have is a redacted copy.

18                  MR. DELINSKY:  Your Honor, it could be the

19      subject of testimony but we'll work with the other side.

17:31:28 20                 THE COURT:  If it's the subject of

21      testimony, Mr. Delinsky, it is public.  It's too late to

22      do any redactions.

23                  MR. DELINSKY:  Your Honor, just so you

24      know, the result of this will be to compromise programs

17:31:37 25     that are intended to stop diversion because it will be

1    made public, what the algorithms look for and how people

2    can evade them, and I don't think that would be

3    appropriate and I don't think it's what the Court wants

4    but that's what I'm talking about.

5              THE COURT:  Well, I don't recall anyone

6    testifying about the details of algorithms.

7              MR. DELINSKY:  Number one, there were,

8    because there were certain scores that were asked about,

9    you know, this, this is looking at a certain percentage

10   for this metric or that metric, and there was more

11   information in the documents than was asked about in

12   court.

13             And that's -- that is important information

14   and I don't think anybody in this courtroom wants that to

15   be made public.

16             MR. LANIER:  Your Honor, for the

17   plaintiffs, I just told Mr. Delinsky --

18             THE COURT:  Why don't you work with this?

19   All right?  Figure it out.

20             In the future, my preference would be that

21   the redactions occur before they're even dealt with in

22   court.

23             All right?  So we don't have this anomaly

24   of where I've got to make retroactive redactions, which

25   I'm not even sure is lawful, candidly.

1           Okay?  So take care of it beforehand so

2    that if you're doing it, we don't have this again.

3           If there's a particular document you want

4    to hold off on, one or two now, I'll tell Mr. Pitts and

17:32:57  5    we'll hold off for a day or two.

6                MR. DELINSKY:  Thank you, Your Honor.

7                THE COURT:  And try to work it out.

8                MR. WEINBERGER:  Your Honor, for purposes

9    of tomorrow's scheduling, can we have some indication as

17:33:07 10    to how long the cross is going to take?

11                THE COURT:  Oh, good -- all right.

12           Do you have a sense among the defendants

13    how much longer you're planning to cross-examine

14    Dr. Lembke?  That's a reasonable request.

17:33:48 15                MR. BUSH:  Two to two-and-a-half hours.

16                THE COURT:  Peter, I think they said two to

17    two-and-a-half hours collectively so that's about the

18    morning, roughly about the morning.

19                MR. WEINBERGER:  Okay.

17:34:02 20                THE COURT:  Okay.  Have a good evening.

21                (Proceedings concluded at 5:34 p.m.)

22                      -  -  -  -  -

23

24

25

1                        C E R T I F I C A T E

2

3          I certify that the foregoing is a correct

4     transcript from the record of proceedings in the

5     above-entitled matter.

6

7

8

9     **/s/Susan Trischan**
      /S/ Susan Trischan, Official Court Reporter
10    Certified Realtime Reporter

11    7-189 U.S. Court House
      801 West Superior Avenue
12    Cleveland, Ohio 44113
      (216) 357-7087
13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3     **WITNESSES:**                                          **PAGE**

4       DIRECT EXAMINATION OF ANNA LEMBKE                      485

5       BY MR. LANIER

6       DIRECT EXAMINATION OF ANNA LEMBKE (RESUMED)            577

7       BY MR. LANIER

8       CROSS-EXAMINATION OF ANNA LEMBKE                       682

9       BY MR. BUSH

10

11                          * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25