1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3
      IN RE:                      Case No. 1:17-md-2804
4     NATIONAL PRESCRIPTION        Cleveland, Ohio
      OPIATE LITIGATION
5                                  October 7, 2021
      CASE TRACK THREE             9:00 A.M.
6

7

8                     - - - - -

9
                      **VOLUME 4**
10

11                    - - - - -

12

13        TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14       BEFORE THE HONORABLE DAN A. POLSTER,

15          UNITED STATES DISTRICT JUDGE,

16                  AND A JURY.

17

18                    - - - - -

19

20

21   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
22                            801 West Superior Avenue
                              Cleveland, Ohio  44113
23                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

```
 1    APPEARANCES:
      For the Plaintiffs:          Peter H. Weinberger, Esq.
 2                                 Spangenberg, Shibley & Liber
                                   1001 Lakeside Avenue, Ste. 1700
 3                                 1900 East Ninth Street
                                   Cleveland, Ohio    44114
 4                                 216-696-3232

 5                                 W. Mark Lanier, Esq.
                                   Rachel Lanier, Esq.
 6                                 M. Michelle Carreras, Esq.
                                   The Lanier Law Firm
 7                                 6810 FM 1960 West
                                   Houston, Texas    77069
 8                                 813-659-5200

 9                                 Frank L. Gallucci, III, Esq.
                                   Plevin & Gallucci Company, LPA
10                                 The Illuminating Building
                                   Suite 2222
11                                 55 Public Square
                                   Cleveland, Ohio    44113
12                                 216-861-0804

13                                 Salvatore C. Badala, Esq.
                                   Maria Fleming, Esq.
14                                 Napoli Shkolnik
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York    10017
                                   212-397-1000
16
      For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
17                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
18                                 Alex Harris, Esq.
                                   Sharon Desh, Esq.
19                                 Bartlit Beck LLP
                                   54 West Hubbard Street, Ste.300
20                                 Chicago, Illinois    60654
                                   312-494-4400
21
      For CVS Defendants:          Graeme W. Bush, Esq.
22                                 Eric R. Delinsky, Esq.
                                   Alexandra W. Miller, Esq.
23                                 Paul B. Hynes, Jr., Esq.
                                   Zuckerman Spaeder - Washington
24                                 Suite 1000
                                   1800 M Street, NW
25                                 Washington, DC    20036
                                   202-778-1831
```

```
 1    For HBC/Giant Eagle
      Defendants:                 Robert M. Barnes, Esq.
 2                                Scott D. Livingston, Esq.
                                  Marcus & Shapira
 3                                35th Floor
                                  One Oxford Centre
 4                                301 Grant Street
                                  Pittsburgh, PA    15219
 5                                412-471-3490

 6                                Diane P. Sullivan, Esq.
                                  Chantale Fiebig, Esq.
 7                                Weil Gotshal & Manges
                                  Suite 600
 8                                2001 M Street NW
                                  Washington, DC    20036
 9                                202-682-7200

10    For Walmart Defendants:     John M. Majoras, Esq.
                                  Jones Day - Columbus
11                                Suite 600
                                  325 John H. McConnell Blvd.
12                                Columbus, Ohio    43215
                                  614-281-3835
13
                                  Tara A. Fumerton, Esq.
14                                Tina M. Tabacchi, Esq.
                                  Jones Day - Chicago
15                                Suite 3500
                                  77 West Wacker
16                                Chicago, Illinois    60601
                                  312-782-3939
17

18    ALSO PRESENT:               Special Master David Cohen

19
                                  - - - - -
08:54:54 20

21

22

23

24

08:55:00 25
```

1              THURSDAY, OCTOBER 7, 2021, 9:00 A.M.

2                       THE COURT:  Okay.  Anything anyone needs to

3      bring to my attention before we bring in the jury?

4                       MR. LANIER:  Just one matter, Your Honor.

09:00:48 5              We have two different representatives today

6      from the counties.

7                       THE COURT:  Okay.  If you want to introduce

8      them, that's fine.

9                       MR. LANIER:  I don't want to.

09:00:55 10                     THE COURT:  Okay.

11                      MR. LANIER:  I just want to warn the Court

12     that one of them gave a deposition but he's not listed as

13     a witness on anyone's case and so we think it's okay for

14     him to be here.

09:01:03 15             He's not our one that is excused under the

16     Rule, but I didn't want the Court to think I brought in

17     someone who might be a witness.

18                      He's not a witness on anyone's list even

19     though he gave a deposition.

09:01:14 20                     That's all we have, Your Honor.

21                      THE COURT:  That's fine.  Okay.

22                      All right.  I think one of the jurors

23     suggested that it would be helpful if counsel at least

24     for a while identifies themselves and who they're

09:02:03 25    representing.

1          Particularly for the defendants.

2          I think everyone knows Mr. Lanier's

3     representing the plaintiffs so that will be helpful for

4     the jury.

09:02:12  5          MR. MAJORAS:  And they were having trouble

6     hearing Mr. Bush yesterday.

7          THE COURT:  Yeah, I was, too.

8          Mr. Bush, you probably like me, you have a

9     tendency to lower your voice as you go, and when it gets

09:02:23 10   low and the sound isn't great, so if you can try and keep

11    it up as much as possible.

12         MR. BUSH:  I'm going to try pretty hard

13    today.

14         It may be that -- for some reason it was

09:02:35 15   sounding to me like I was very loud.

16         THE COURT:  You weren't.

17         MR. BUSH:  Yeah.

18         THE COURT:  Your volume was okay when you

19    started but then you tend to sort of get a little quieter

09:02:46 20   and lower in the register and that's when it got hard.

21         MR. BUSH:  I usually don't have that

22    problem.

23         I'll try and solve it today.

24         THE COURT:  Okay.  Thanks.

09:02:56 25         (Jury in.)

| | |
|---|---|
| 1 | THE COURT: Okay. Good morning, ladies and |
| 2 | gentlemen. |
| 3 | Please be seated. |
| 4 | All right. We will continue with |
| 09:05:02 5 | cross-examination of Dr. Lembke, and I want to remind you |
| 6 | you're still under oath from yesterday. |
| 7 | And we will all try to speak into the |
| 8 | microphone and keep our voices up. So you may continue, |
| 9 | Mr. Bush. |
| 09:05:18 10 | MR. BUSH: Good morning, ladies and |
| 11 | gentlemen of the jury. Can you hear me? |
| 12 | THE JURORS: Yes. |
| 13 | MR. BUSH: Yes, everybody can hear. |
| 14 | Thanks. |
| 09:05:27 15 | CROSS-EXAMINATION OF ANNA LEMBKE (RESUMED) |
| 16 | BY MR. BUSH: |
| 17 | Q. And, good morning, Dr. Lembke. |
| 18 | A. Good morning. |
| 19 | Q. Can you hear me? |
| 09:05:32 20 | A. Yes. |
| 21 | Q. Okay. Hopefully that will go a little better |
| 22 | today. I'll try and speak up louder. |
| 23 | I only have a few things that I want to ask |
| 24 | you about this morning, Dr. Lembke. |
| 09:05:46 25 | I want to talk generally about your opinion |

1    that CVS collaborated with manufacturers to promote

2    opioids to its pharmacists.

3                   You relied in forming that opinion on some

4    documents from CVS in 2001.

09:06:03  5              Do you recall those?

6    A.   Yes.

7    Q.   Okay.  One of those documents was a document that

8    was titled "How to Stop Diversion," and let's put that up

9    on the screen.  It's Tab 14.

09:06:18  10             That's one of the documents that you relied

11   on?

12   A.   Well, this document itself is what I relied on, but

13   it's how the document was used by CVS in its partnership

14   with Purdue.

09:06:38  15             So it's as much the collaborative efforts

16   around the document, as the document itself.

17   Q.   All right.  Well, let's stick with the document.

18   That's one of the documents you relied on?

19   A.   Yes, it is.

09:06:50  20   Q.   Okay.  And another one of the documents, the other

21   document that you relied on, was a document that was an

22   educational services document from 2011, and actually

23   before you answer that question, let me go back to that

24   document that is up on the screen is from 2001, right?

09:07:10  25   A.   Yes, I believe so.

Lembke - Cross/Bush
755

1    Q.    Okay.  And then you also relied on the document

2    from 2011 that was an educational services document, and

3    that's Tab 12.

4                  Again, I think we can put that up on the

09:07:27  5    screen.

6    A.    Yes.  That was one of the documents that I relied

7    on.

8    Q.    And as we discussed yesterday in your testimony,

9    that document, I think you went through it, doesn't

09:07:47 10    mention opioids anywhere?

11    A.    That's correct.

12    Q.    And you don't know of any programs that are

13    discussed in this 2011 document that's up on the screen,

14    that involved opioids?

09:08:07 15    A.    Well, this is a broad approach, which I assume also

16    involved opioids.

17    Q.    Okay.  My question is you don't know of any

18    program -- of any opioids that were involved in that

19    program; you simply made an assumption?

09:08:22 20    A.    I also have no evidence to assume that opioids

21    weren't involved in that program.

22    Q.    But you did not see any indication of any opioid

23    product that was involved in that program?

24    A.    Yes.

09:08:42 25    Q.    And these documents that we've looked at here in

Lembke - Cross/Bush
756

1    2001 and 2011 are the documents that you rely on for your

2    opinion that CVS collaborated with manufacturers to

3    promote opioids to its pharmacists, and I'm talking about

4    documents, so let's be clear.

09:09:03  5    A.    Yes, I relied on those documents.

6    Q.    And putting aside the 2001 letter, you have cited

7    no communications in your testimony supporting your

8    opinion and no communications by CVS to its pharmacists

9    promoting opioids?

09:09:29 10   A.    That is not correct.

11   Q.    You didn't cite any document that went from CVS to

12   its pharmacists promoting opioids, other than the letter

13   in 2001, and if there's something else that you want to

14   cite would you please tell us now.

09:09:45 15   A.    Well, as I discussed yesterday, CVS did send a

16   letter out to its pharmacists telling them about its

17   partnership with Purdue around Partners Against Pain,

18   which is a pro-opioid front group, and as well as a

19   communication with its pharmacists referring to that

09:10:09 20   partnership with Purdue.

21   Q.    And that --

22   A.    Sorry, and also calling Purdue a reliable leader.

23          I can get the exact quote from my report,

24   but certainly promoting Purdue and promoting Purdue's

09:10:28 25   message to its pharmacists.

Lembke - Cross/Bush

757

```
         1    Q.    And that's a document that was sent in 2001; that
         2    was what I was asking about in my question.  That's
         3    behind Tab 13, if you could put that up, John.
         4                MR. LANIER:  Do you have a copy?
09:10:50 5                MR. BUSH:  I'm sorry, do you not have the
         6    document, Your Honor?
         7                THE COURT:  I don't have it.  Are you
         8    showing this --
         9                MR. BUSH:  Yeah, we're showing it, Your
09:11:02 10   Honor.  It's up on the screen.
        11                THE COURT:  All right.
        12    A.    Yes.
        13    BY MR. BUSH:
        14    Q.    So that's the only document that you've cited that
09:11:11 15   is a communication by CVS to its pharmacists regarding
        16    opioids?
        17    A.    This is one of the documents that I cited, yes.
        18    Q.    It's the only document that you've cited in your
        19    testimony, isn't it, Dr. Lembke?
09:11:28 20   A.    Well, I've cited this and I cited the other
        21    document that we talked about.
        22    Q.    I'm talking about communications by CVS to its
        23    pharmacists.
        24    A.    Yes, this is the only document that I've cited in
09:11:39 25   that regard around opioids.
```

          1    Q.    And you haven't cited in your testimony to the jury

          2    supporting your opinion any communications from CVS to

          3    any patients promoting opioids?

          4    A.    Can I have a moment to look at my report?

09:12:04  5    Q.    I'm not asking you about your report, Dr. Lembke.

          6    Your report's not in evidence.

          7                 I'm asking whether you've cited any such

          8    document --

          9                 THE COURT:  Wait a minute.

09:12:12 10                 When you say, Mr. Bush, "Cited," you've got

         11    to distinguish.

         12                 Does that mean anywhere?  Does that mean

         13    yesterday's testimony?  That's what's confusing.

         14                 MR. BUSH:  I will clarify it, Your Honor.

09:12:24 15    BY MR. BUSH:

         16    Q.    You have not testified about, in support of your

         17    opinion, any communications from CVS to any patients

         18    promoting opioids?

         19                 Dr. Lembke, with all respect, I'm asking

09:12:53 20    about whether you've testified about it, so looking at

         21    your report, which is that what you're doing right now.

         22    A.    Yes, I do believe I testified about it, but before

         23    I answer your question, I want to make sure that I'm

         24    right about that.

09:13:05 25    Q.    Yeah, I want to make sure that you're right, too,

1    so --

2    A.    Okay.  Thank you.

3                  (Pause.)

4                  So to answer your questions, the Partners

09:14:51  5    Against Pain website was accessible to patients, so in

6    collaborating with Purdue around the Partners Against

7    Pain front group with their website, that was a vehicle

8    by which through their collaboration with Purdue CVS

9    could communicate directly with patients.

09:15:14  10                  And also to elaborate further on other

11    supporting evidence for collaboration between Purdue and

12    CVS, in terms of communications with pharmacists, in

13    addition to the documents that you and I just discussed

14    this morning, I did mention yesterday, and I do mention

09:15:35  15    in my report, multiple educational activities, continuing

16    medicational -- continuing education activities for

17    pharmacists that were put on with CVS in collaboration

18    with Purdue.

19    Q.    So let me be real specific, Dr. Lembke.

09:15:53  20                  I really asked you about documents, and

21    activities are not documents.

22                  So you haven't cited -- I'm sorry, I

23    shouldn't use cited -- you haven't testified about any

24    continuing education document about opioids that CVS used

09:16:15  25    to communicate with its pharmacists about opioids?

1    A.    I mean, all of my opinion is based on documents

2    that I have reviewed in addition to my knowledge,

3    experience, and training.

4              So these collaborations around continuing

5    medical education for pharmacists are based on documents

6    that I reviewed.

7    Q.    But you didn't review any document related to

8    continuing education?

9    A.    As I say in my report, in 2001, CVS wrote a letter

10   to Purdue Pharma asking Purdue to fund an educational

11   program they would deliver to pharmacists at their

12   marketing and operations conference in Nashville,

13   Tennessee, in September, 2001.

14             In describing their proposed educational

15   plan, they emphasize pharmacists' role change from one of

16   dispenser of products to that of a supplier of

17   information, deliverer of medication, clinical reviewer

18   of drug therapy, and even disease state manager, and I

19   quote.

20             Furthermore, CVS requested 46, -- $46,000

21   for the continuing education course for pharmacists.

22   Q.    And you don't know whether that request was

23   honored?

24   A.    No, but that is a document that I reviewed.

25   Q.    And that wasn't a document that communicated with

1   pharmacists?

2   A.   It was a document about collaborating with Purdue

3   to create an educational course for CVS pharmacists.

4   Q.   It was not a document that was communicated to

5   pharmacists, right?

6   A.   Yes.

7   Q.   And you don't know whether the program was ever

8   implemented, right?

9   A.   Correct.

10  Q.   And even if it was implemented, you've never

11  reviewed any document that was generated in connection

12  with that request, is that correct?

13  A.   I don't believe so since I didn't talk about it in

14  my report.

15  Q.   And this is -- and this is also back in 2001,

16  correct?

17  A.   Yes, it is.

18  Q.   In your testimony supporting your opinion

19  yesterday, you did not testify about any communications

20  from CVS -- and I'm being careful with my words, I'm

21  talking about a communication from CVS -- to any doctors

22  promoting opioids.

23          Do you agree?

24          I'm asking about your testimony supporting

25  your opinion.

1    A.    Again, I would say that the CVS partnership with

2    the Purdue Pro-Opioid Front Group, Partners Against Pain,

3    was effectively a way of communicating with prescribers,

4    with doctors.

09:19:29  5    Q.    And you haven't cited or testified

6    about -- withdrawn about cited.

7              You haven't testified about any actual

8    communication from CVS to any doctors regarding opioids?

9    A.    Again, what I testified was that in their own

09:19:52 10    words, CVS talked about their collaboration with Purdue

11    around Partners Against Pain, and Partners Against Pain

12    website included such subheadings as Barriers to

13    Effective Cancer Pain Management, a review of the

14    literature, including the following, the majority of

09:20:12 15    physicians and nurses fear that opioid use will result in

16    addiction, but the risk for addiction is low in patients

17    with no history of substance abuse.  There is little or

18    no tolerance.  They have to overcome their fear of

19    opioids.

09:20:27 20              To me, that's clearly a communication to

21    doctors, to prescribers.

22    Q.    CVS did not send that letter that we talked about

23    before to doctors, right?  It's sent to its own

24    pharmacists?

09:20:42 25    A.    That's correct.

```
 1    Q.    And you haven't testified about any communication

 2    by CVS to doctors or prescribers regarding Partners in

 3    Pain or opioids in general?

 4    A.    I haven't testified about any communication

 5    directly from CVS to prescribers, but again, I did

 6    testify that in collaborating with Purdue around Partners

 7    Against Pain, they were effectively communicating with

 8    prescribers.

 9              MR. BUSH:  I have no further questions,

10    Dr. Lembke.

11              Thank you for your time.

12              And just in the interests of knowing how

13    this is working going forward, since I may be standing up

14    here again, are you able to hear me better today?

15              THE WITNESS:  Yes, it was better.

16              Thank you.

17              MR. BUSH:  Terrific.

18              Thank you.

19              I pass the witness, Your Honor.

20              THE COURT:  Okay.  That's fine.

21              I think Mr. Majoras from Walmart is next.

22              MR. MAJORAS:  Thank you, Your Honor.

23        CROSS-EXAMINATION OF ANNA LEMBKE

24    BY MR. MAJORAS:

25    Q.    Good morning, Your Honor.  Good morning, ladies and
```

09:21:00  5
09:21:19  10
09:21:29  15
09:21:39  20
09:22:03  25

1    gentlemen.  Good morning, Dr. Lembke.

2                    Are you able to hear me okay?

3    A.    Yes.

4    Q.    Please, as with everyone else, if at some point you

09:22:14 5    cannot hear me, please let me know and I'll be happy to

6    start over.

7                    As Judge Polster mentioned, my name is John

8    Majoras, I'm one of the lawyers for Walmart in this case.

9                    And I have some questions.  I'm going to

09:22:24 10    jump around a little bit.  I don't want to cover what's

11    been covered so if I lose you a little bit, let me know

12    and I'll be happy to start over.

13    A.    Thank you.

14    Q.    Yesterday you testified or you talked about your

09:22:35 15    book, *Drug Dealer, MD*, which I'm holding in my hand, is

16    that right?

17    A.    Yes.

18    Q.    And that, in your testimony, was your best effort

19    to explain the causes of the paradigm shift in opioid

09:22:48 20    prescribing behavior, correct?

21    A.    Yes.

22    Q.    And --

23    A.    In 2016.

24    Q.    So it was published in 2016, correct?

09:22:55 25    A.    Yes.

1    Q.    If we could pull that up on the screen, please.

2                While that's being done, you have an index

3    in the back of that book, correct?

4    A.    Yes.

09:23:05  5    Q.    The index is a handy way for someone reading it to

6    find particular topics they might be interested in?

7    A.    Yes.

8    Q.    It's in alphabetical order like most indexes?

9    A.    Yes.

09:23:18 10    Q.    You would agree with me that the phrase

11    "Pharmacies" is not in the index.

12                Is that correct?

13    A.    I would have to take a look.

14                I know that the word "Pharmacies" is in the

09:23:30 15    book, but it may not be in the index.

16    Q.    Well, let's take a look.

17                If we could turn to Page 171 of the index,

18    please.  It's actually 171 of the book but includes the

19    index, and if we could go, if it's possible to blow up

09:23:47 20    where the Ps are on that, please.

21                Now, you would agree if the word pharmacy

22    was in your index, it would be in this section right

23    here?

24    A.    Yes.

09:24:02 25    Q.    And it's not, is it?

A.   No.

Q.   You talked about chain pharmacies quite a bit in your testimony yesterday.

Is the phrase "Chain pharmacies" in your index?

A.   Probably not.

Q.   Let's verify.  Why don't we turn to Page 168, please.

And if we can blow that up for where the Cs are.

You would agree just as a matter of alphabetical indexing, if the phrase "Chain pharmacy" were in your index, it would appear right here, correct?

A.   Yes.

Q.   Your book was peer-reviewed, right?

A.   Yes.

Q.   And I believe you told us yesterday that peer-reviewed articles and books set a standard of quality that can be relied upon, right?

A.   Yes.

Q.   So --

A.   Usually, hopefully.  Sometimes not.

Q.   In fact, you've been a peer reviewer of books and articles, right?

A.   Yes.

Lembke - Cross/Majoras

767

1    Q.    So if the peer reviewers thought you had left out

2    something critical to your book, is that the type of an

3    edit or suggestion they would make to you?

4    A.    I mean, the key thing when you're writing a book

09:25:33  5    and when you're reviewing a book is what is the book

6    about.

7                 And my book was expressly about the opioid

8    epidemic from the perspective of physician prescribers.

9                 So peer reviewers would have seen it

09:25:51 10    through that lens.  The book was not about the opioid

11    epidemic from the perspective of pharmacies, chain

12    pharmacists.

13    Q.    But one of the principal reasons you wrote the

14    book, I believe you said this, was to explain the causes

09:26:06 15    of that paradigm shift, right?

16    A.    That is true.

17    Q.    And you talked about the causes in your testimony

18    yesterday, that as you see them, correct?

19    A.    Yes.  But again, the book is called *Drug Dealer,*

09:26:17 20    *MD*.  It's not called drug dealer, pharm D, although I

21    could probably write that book now.

22    Q.    After you've been working on this case with the

23    plaintiffs' lawyers, right?

24    A.    After I've had the opportunity to read many

09:26:30 25    documents that were not available to me prior to working

Lembke - Cross/Majoras

768

1    on this case.

2    Q.    But you have not, in your book in 2016, if you look

3    at the bottom of the first page -- maybe you recall it.

4    I can hand you the book if you need.  One of the things

09:26:44  5    you said in the subheading was the book is about how

6    doctors were duped.

7                    Correct?

8    A.    Yes.  That is what the book was about.

9    Q.    Were pharmacists duped?

09:26:55  10   A.    I think many front line pharmacists were duped by

11   their own corporate leaders.

12   Q.    So you mentioned that yesterday.

13                   Does that include corporate leaders at

14   Walmart?

09:27:04  15   A.    Yes.

16   Q.    Which ones?

17   A.    I didn't look at it by individual names.

18                   I looked at these -- the evidence in

19   aggregate.

09:27:13  20   Q.    Well, you would acknowledge that being here

21   accusing someone or a company as being the cause of the

22   opioid crisis is a pretty significant charge, right?

23   A.    Of course.

24   Q.    So having done your work in this case, you say the

09:27:27  25   pharmacists look like they may have been fooled, right?

Lembke - Cross/Majoras                     769

1    A.     Yes.

2                  I believe that the front line pharmacists

3    were at the mercy of corporate -- a corporate pharmacy

4    business that did not allow the pharmacists to enact

09:27:51  5    their corresponding responsibility for a number of

6    different reasons, one of them being that they didn't

7    provide them with accurate education about opioids.

8                  They partnered, instead, with Purdue, who

9    was rolling out misleading messages.

09:28:07 10    Q.     Who, Dr. Lembke?  Who at Walmart knew that there

11    were misleading messages from Purdue or anyone else and

12    passed that along to the pharmacists?

13    A.     What's --

14    Q.     Not what.

09:28:21 15                  Who, ma'am?

16    A.     Yeah, sorry, I'm trying to formulate my answer.

17                  My opinion is based on aggregate evidence

18    demonstrating that Walmart corporate leadership in

19    aggregate partnered with Purdue and others to mislead

09:28:54 20    front line pharmacists, and in a way, it doesn't really

21    matter that it was in 2001 and that maybe pharmacy,

22    Walmart pharmacy leaders themselves weren't yet aware of

23    how nefarious Purdue actually was.

24                  The simple fact that they opened up the

09:29:11 25    doors to Purdue coming into their pharmacies and

Lembke - Cross/Majoras

770

1    educating their pharmacists and at the same time, did not

2    create adequate systems to allow their pharmacists to

3    detect red flags.  It's those things combined, it's the

4    aggregate evidence, that leads me to believe that Walmart

09:29:31  5    bears some responsibility for the opioid epidemic; not

6    all of the responsibility, but certainly some

7    responsibility.

8    Q.    Let me break -- let me break some of that down.

9          You said that Walmart, in the aggregate.

09:29:44 10    I'll try to use that phrase that you just used.  Walmart,

11    I guess corporate leadership, right, in the aggregate?

12          What levels of corporate leadership?

13    A.    I don't really break it down at the individual

14    levels of corporate leadership, but --

09:30:00 15    Q.    So sitting here right now in front of this jury,

16    there's nothing you can tell the jury about the specific

17    people at Walmart who had misinformation that, in your

18    opinion, partnered with Purdue to mislead their

19    pharmacists.

09:30:14 20          Is that right?

21    A.    Let me look at my report for a moment and I'll see

22    if I can find specific names.

23    Q.    That would be fine.  I haven't seen them.

24          (Pause.)

09:31:23 25    A.    While I don't have specific names --

Lembke - Cross/Majoras                    771

1    Q.    That answers my question.  That answers my

2    question, Dr. Lembke.

3    A.    Okay.

4    Q.    Thank you.

09:31:29  5              Another thing you mentioned, said just a

6    minute ago, and I want to make sure I understand it, you

7    said that you referenced 2001 and you said that as of

8    2001 -- I want to make sure I have this correct -- it

9    wasn't clear to you that at that time Walmart knew it was

09:31:46 10   being misled.

11              Is that correct?

12   A.    It's not clear to me at that time, but again I

13   think, as I stated before, the larger point is that

14   Walmart invited Purdue in to educate its pharmacists and

09:32:05 15  even took money from Purdue to allow Purdue to do that

16   education.

17   Q.    I think the year is important to me, because

18   yesterday, you pointed to some Walmart documents that

19   were dated in the late 1990s.

09:32:19 20             Do you recall that testimony?

21   A.    Yes.

22   Q.    Is it your testimony that those documents in the

23   late 1990, in light of what you've just told the jury,

24   were produced by Walmart with the knowledge that they

09:32:32 25  were aware of misrepresentations?

```
          1    A.    No.

          2                    That is not my testimony.

          3    Q.    Thank you.

          4    A.    My --

09:32:39  5    Q.    Thank you, Dr. Lembke.

          6                    MR. WEINBERGER:  Your Honor, could the

          7    witness be permitted to finish her answer and not be cut

          8    off?

          9                    THE COURT:  I agree.

09:32:49 10                    Finish your answer, Doctor.

         11    A.    Yeah.

         12                    My testimony really hinges on the fact that

         13    Walmart and other defendants actively collaborated with

         14    Purdue and it's not necessarily important whether or not

09:33:08 15    at that -- at that time in the late 1990s or in 2001 they

         16    fully understood the degree to which Purdue was

         17    manipulating the opioid paradigm shift.

         18                    It's that they were collaborators.  They

         19    were business partners.  They took money.  They exchanged

09:33:30 20    data.  And at the same time, they did not uphold their

         21    corresponding responsibility to make sure that the

         22    opioids that they were dispensing were being used for

         23    legitimate medical purposes.

         24    BY MR. MAJORAS:

09:33:46 25    Q.    So, Dr. Lembke, what I'm trying to figure out is
```

1    that doctors were duped, you made that point, in 2016,

2    you acknowledged that pharmacists were probably duped,

3    and I want to find out when you have evidence that

4    Walmart knew about misrepresentations that you testified

09:34:03  5    yesterday.

6                    So let's go back to pre-2001.

7                    Do you have any information saying that

8    Walmart knew that Purdue or any other manufacturers were

9    making the misrepresentations you described for us

09:34:17 10    yesterday?

11    A.    So my opinion is based on inferences that come from

12    the timeline.

13                    Certainly, you know, by -- certainly by the

14    middle of the first decade of the century, but all the

09:34:36 15    more by 2011, Walmart knew that there was a problem with

16    opioids, there was a DEA investigation of Walmart.

17                    MR. MAJORAS:  Objection, Your Honor.

18                    The DEA investigation, I'm asking what

19    evidence she has that Walmart had knowledge about the

09:34:55 20    misrepresentations prior to 2000.

21                    THE COURT:  You can ask the question again,

22    but I -- this is the answer.

23    A.    Yeah.

24                    So the answer is based on a series of

09:35:06 25    logical inferences.

Lembke - Cross/Majoras

774

1           The increase in opioid prescribing that

2     began in the late 1990s and just shot straight up through

3     the first decade of this century, late 1999 to 2012,

4     Walmart had a responsibility to -- and should have known

09:35:31  5     in some point in that first decade of escalating

6     prescriptions, that there was a serious opioid problem,

7     including the fact that they were contributing to the

8     problem because the DEA investigated Walmart pharmacies.

9           They did that because there were instances

09:35:49 10     of Walmart pharmacies filling prescriptions for known

11    pill-mill doctors, Walmart pharmacies filling

12    prescriptions for known dangerous cocktails, such as

13    combinations of opioids and Benzodiazepines.

14           Walmart, in fact, in their memorandum

09:36:07 15     agreement in 2011 agreed that they were delinquent in

16    their responsibilities and would try to improve on those.

17           So it's all of that together.  It's not one

18    thing or another; it's all of that evidence in aggregate

19    on which I base my opinion.

09:36:25 20     BY MR. MAJORAS:

21    Q.    So I'd like an answer to my question.

22           My question was in reference to your

23    testimony about 2001 and your reference to Walmart

24    documents prior to 2000, do you have evidence, do you

09:36:35 25     have information that shows that Walmart knew that the

Lembke - Cross/Majoras                                    775

1    information from manufacturers was misinformation, as you

2    testified?

3    A.    I mean, I don't think that Walmart cared one way or

4    another.

5                I'm not sure Walmart even investigated what

6    the information was.

7                Walmart partnered with Purdue and then did

8    not do what they could have done to prevent the opioid

9    epidemic.

10   Q.    When did you first start prescribing opioids as a

11   doctor in your practice?

12   A.    Well, I started prescribing opioids as soon as I

13   graduated medical school, in my residency and internship.

14   Q.    And could you tell us that year, please?

15   A.    So that was the late 1990s.

16   Q.    And you've estimated in your testimony here that

17   you came to the realization, you personally in your

18   practice, came to the realization about 2013 to 2014 --

19   A.    That was not -- that was not my testimony.

20                That was not my testimony.

21   Q.    Why don't we, if you could, please, pull up your

22   binder with your deposition transcripts.

23                In particular, the deposition from Track

24   Three.  I'm sorry, you may not have that.

25                Do you have that there?

A.    I have a big box here.  It may well be here.

What number is it?

MR. LANIER:  Is there a copy for me?

MR. MAJORAS:  I believe it's the first tab.

It would show the deposition dated May

28th, 2021.

THE WITNESS:  Is there a number?  These are

numbered.

MR. MAJORAS:  Your Honor, may Mr. Carter

approach with the document?

THE COURT:  Yes.

Doctor, I think Mr. Majoras is referring to

the -- if your binder is like mine, the very first tab

that says your name.

THE WITNESS:  What does it say?

THE COURT:  All right.  I'm sorry, I had

your binder.

I was right up, you know, right on it, but

the question is not to me.

MR. LANIER:  At least we know what section

it is, Your Honor.

MR. MAJORAS:  Just glad it wasn't me, Your

Honor.

THE COURT:  No.

THE WITNESS:  All right.  Where do you want

1    me to look?

2    BY MR. MAJORAS:

3    Q.    Showing the tab with the --

4                THE COURT:  The first tab.  I got it.  The

09:39:04  5    first tab.

6    A.    The first tab.  Okay.  And what page?

7    Q.    It's going to be Page 237.

8                Let me ask you just a couple questions,

9    first, once you're ready.

09:39:33 10    A.    Okay.  I'm there.

11    Q.    So you recall in this case -- you probably did a

12    number of depositions, anyway you recall you took a

13    deposition in this case or gave a deposition in this

14    case, dated May 28th, 2021?

09:39:48 15    A.    Yes.

16    Q.    And just so the folks in the jury know, a

17    deposition is giving testimony to questions from lawyers,

18    correct?

19    A.    Yes.

09:39:56 20    Q.    Typically it's done in a conference room, but we do

21    it by Zoom now because of COVID, right?

22    A.    Yes.

23    Q.    And in that -- in that deposition, you raised your

24    hand to swear to the truth just like you did here?

09:40:08 25    A.    Yes.

1     Q.    If you'd turn to Page 237, starting at Line 23, you

2     had this question:  Question starts off, "And I

3     appreciate that.  Was there a point in time by which you

4     can say definitively you had that awareness?  I mean, by

09:40:24  5     the time you wrote your book, for example, you were aware

6     of that, correct?"

7                       Continuing on to the next page, the answer:

8     "Yes."

9                       "Was there a date prior to the publication

09:40:35 10     of your book by which you would be comfortable saying

11     that iterative process had run its course?  Your answer:

12     "Probably about 2013, 2014."

13                       Did I read that correctly?

14                       MR. WEINBERGER:  Objection, Your Honor.

09:40:48 15     That is not -- it's inconsistent testimony.

16                       THE COURT:  Overruled.  Overruled.

17     BY MR. MAJORAS:

18     Q.    Now, you told Mr. Bush yesterday --

19                       THE COURT:  Hold it.

09:40:57 20                       Wait a minute, Mr. Majoras.

21                       MR. MAJORAS:  I'm sorry.

22                       THE COURT:  I think you asked the witness

23     was that her testimony and I don't think she answered.

24                       MR. MAJORAS:  Thank you, Your Honor.

09:41:05 25                       I should know better than that.

Lembke - Cross/Majoras                    779

1    BY MR. MAJORAS:

2    Q.    Did I read that correctly, Dr. Lembke?

3    A.    Well --

4    Q.    Did I read that correctly?

09:41:13  5    A.    You read the words out of context.

6                  I very clearly say just prior to this that

7    it was an iterative process that started in the late -- a

8    full decade in the early -- starting in the early 2000s.

9    Q.    I agree.  I agree with that.  You're correct.

09:41:29  10                 You testified that there was a learning

11    process that you went through with your background, with

12    your education, with all of the things we saw in your CV

13    yesterday which is very impressive, and that you thought

14    that iterative process had run its course by 2013 to '14,

09:41:46  15    right?

16                 MR. WEINBERGER:  Objection, Your Honor.

17                 That's exactly my point, that this was not

18    proper impeachment.

19                 THE COURT:  Well, hold it.

09:41:52  20                 Overruled.  Overruled.

21    BY MR. MAJORAS:

22    Q.    Now, let me ask you a question.

23                 THE COURT:  Well, hold, Mr. Majoras.  I'm

24    not going to let you keep -- if you ask a question,

09:42:03  25    you've got to wait for an answer.

1          MR. MAJORAS:  I was just come being back

2     with that, Your Honor.

3          Thank you.

4          THE COURT:  If you don't care about the

09:42:10  5     question, okay, but --

6          MR. MAJORAS:  No, sir.

7          I appreciate that.

8     A.    This entire process of my investigating the opioid

9     epidemic has been an iterative process by which, I mean

09:42:25 10     at each opportunity that I have access to more evidence,

11     I review that evidence objectively and I incorporate that

12     into my opinion.

13          So the iterative process that began in my

14     investigation and understanding of the causes of the

09:42:46 15     opioid epidemic began in the early 2000s, when I started

16     seeing more and more patients coming in addicted to the

17     opioids their doctors were prescribing.

18          That iterative process continued until I

19     wrote my book, which, by the way, I finished probably

09:43:06 20     2015 or so.  Books are usually published a full year

21     before they come out.

22          My book was published in 2016, and my

23     iterative process has continued to the present day as I

24     have gained access to more evidence.

09:43:21 25          So learning is an ongoing endeavor.

1    Q.    You were first hired by plaintiffs' lawyers in the

2    opioid litigation in about 2017?

3    A.    Late 2017, early 2018, yes.

4    Q.    Do you recall yesterday Mr. Bush asked you a few

09:43:45  5    questions about whether it would be good for

6    manufacturers to send pharmacists information about new

7    blood pressure medication.

8              Do you recall that testimony?

9    A.    Yes.

09:43:55 10    Q.    And you told him it would not be a good idea

11    because if that information came from the manufacturer,

12    it would be biased?

13    A.    That's not my testimony.

14              I'm happy to tell you what I said again.

09:44:08 15    Q.    Well, let me look at directly what I have.

16              You said that information would not be

17    trustworthy because the manufacturer had a financial

18    interest.

19              Is that right?

09:44:18 20    A.    I believe that I clarified myself and I said it

21    certainly would be a possibility that if that information

22    came from the drug manufacturer, that it's not entirely

23    objective.

24              And by the way, that's not a unique

09:44:33 25    perspective.  That's well-known that information that

Lembke - Cross/Majoras                        782

```
        1   comes from drug manufacturers is going to be favorable to

        2   that drug.

        3   Q.    Do you agree that it's not unusual for

        4   manufacturers to provide information to the purchasers of

09:44:55 5   their products about their products, is that right?

        6   A.    Yes.

        7   Q.    In fact, they're required to provide information

        8   about their product through the FDA, right?

        9   A.    Yes.

09:45:04 10  Q.    And most of your clinical work -- I mean your

       11   actual practicing patients -- over the last 10 years has

       12   been treating patients who were abusing or addicted to

       13   opioids?

       14   A.    That is a big part of my clinical work.

09:45:26 15             We also see a lot of patients with chronic

       16   pain who are nonaddicted to opioids, but are physically

       17   dependent on opioids, and we help them taper slowly down

       18   and off of those opioids.

       19   Q.    Well, would you agree that the majority of the

09:45:39 20  patients you treat have either a substance abuse disorder

       21   or a chemical dependency problem?

       22   A.    Yes.

       23   Q.    So when it comes to opioids, your patient

       24   population, your personal patient population is one that

09:45:53 25  has had problems and harm from opioids, correct?
```

1    A.    Yes.

2    Q.    In other words, you aren't seeing patients who have

3    benefited from opioids without problems, have you?

4    A.    By and large, no.

09:46:03  5    Q.    And because of that experience, because of that

6    perspective you have, you consider yourself to be totally

7    biased when it comes to opioids, don't you?

8    A.    No, I don't.

9    Q.    Do you recall when you were in the process of

09:46:17 10    promoting your book, the one we've been talking about,

11    that you gave an interview to National Public Radio?

12    A.    Yes, I do.

13    Q.    A lot of people know it as NPR?

14    A.    Yes.

09:46:28 15    Q.    The interviewer in that interview was -- I've

16    forgotten her first name?  Ms. Gross.

17    A.    Terry Gross.

18    Q.    Terry Gross.  Thank you.

19              I'd like to play for you that interview and

09:46:39 20    see if that, in fact, is what you said.

21                      - - - - -

22                (Tape playing as follows:)

23

24    'Drug Dealer, M.D.': Misunderstandings And Good
      Intentions Fueled Opioid Epidemic

25    December 15, 2016 · 2:35 PM ET

1    TERRY GROSS, HOST:

2                    GROSS: Since you're only seeing the

3    patients who are addicted, and you're not the seeing

4    patients for whom opioids or Adderall or Ritalin or, you

5    know, Klonopin or whatever worked really effectively,

6    do you think that you're biased because you're only

7    seeing the people who have had problems and

8    you're not seeing the people who have benefited without

9    problem?

10                   LEMBKE: I'm totally biased. GROSS: OK.

11   (LAUGHTER)

12                   LEMBKE: I mean, there's no doubt about it.

13   GROSS: So how do we take that (laughter).

14                   LEMBKE: Well, you know, what I'm trying to

15   highlight here is that - not that these medications are

16   bad in all circumstances.  What I'm trying to highlight

17   is that the risk is tremendous and that we have really

18   not, heretofore, appreciated the extent of the risk and

19   that most doctors are completely clueless about the

20   addictive nature of medications that they're prescribing,

21   and they don't tell their patients about the addictive

22   potential so patients don't know.

23        And so I'm trying to raise awareness around the

24   dangers inherent in overprescribing these medications

25   which is not the same thing as saying they have no

1   utility or they should never be prescribed or no one

2   anywhere on planet Earth should ever take opiates

3   chronically.  I don't believe that. I believe that there

4   are patients out there who take opioids every day for

5   some kind of chronic pain condition for whom it is

6   incredibly helpful and life-changing. I believe it 100

7   percent.  But I think those patients are the minority.

8   I think the majority of people on chronic opioid therapy

9   will develop problems that make the drug riskier

10  than it is helpful.

11                  (End of tape playing.)

12  BY MR. MAJORAS:

13  Q.   Dr. Lembke, I think we've now recognized your

14  voice, but could you at least verify that was, in fact,

15  you on that interview we just heard?

16                  MR. WEINBERGER:  We will stipulate, your

17  Honor.

18  A.   Yes, yes, that was me.

19                  THE COURT:  All right.  It clearly was.

20  BY MR. MAJORAS:

21  Q.   Yesterday -- I'm going to switch topics now.

22  Yesterday --

23                  MR. LANIER:  Your Honor, at this point I'll

24  object.  If he's going to impeach her with a prior

25  inconsistent statement like that, the Rules say he has to

1     give her a chance to explain why it's contrary to what

2     she's saying today, and he's not giving her that chance.

3                     MR. MAJORAS:  Your Honor, I think that

4     misstates what the rule is in court.

09:49:10  5                     Counsel is going to have a chance to

6     redirect.

7                     THE COURT:  All right.  I think -- I think

8     she's explained what she said.

9     BY MR. MAJORAS:

09:49:18 10    Q.    Dr. Lembke, I'm going to switch topics here.

11                     Yesterday in your testimony --

12                     THE COURT:  You want to ask on redirect for

13    further explanation, you of course can.

14                     MR. LANIER:  Thank you, Judge.

09:49:28 15                     I'll put it there.

16    BY MR. MAJORAS:

17    Q.    Yesterday in your testimony, you worked with

18    Mr. Lanier to make a list with two columns, one was what

19    the pharmacists knew and one was what the doctor knew.

09:49:39 20                     Do you recall that?

21    A.    Yes.

22    Q.    I just want to make sure we're clear in your

23    overall testimony.

24                     Is it your testimony to the jury that

09:49:48 25    pharmacists are more informed about a patient's medical

1    situation than the doctors who examine, diagnose, and

2    direct the medical course of treatment?

3    A.    What I was trying to communicate is that

4    pharmacists have access to more data than an individual

09:50:04  5    physician working out of their office will have.

6            They have access to data on not just

7    patients but also prescribers, other prescribers, which

8    is something an individual doctor would not have.

9            And they, in checking the Prescription Drug

09:50:24 10    Monitoring database, could potentially see things that a

11    doctor who checked the same database the day before would

12    not see.

13    Q.    So you talked about that gap in time, for example,

14    if someone might be doctor shopping.

09:50:35 15            Do you recall that?

16    A.    Yes.

17    Q.    So if someone comes to, let's say came to you as a

18    doctor, you're the last doctor that person sees out of

19    six, and you were to prescribe an opioid medication, when

09:50:47 20    they have their six prescriptions now and they're ready

21    to go get them filled, you wouldn't know what else is in

22    their pocket.

23            Right?

24    A.    What was the last --

09:50:56 25    Q.    You wouldn't know what other prescriptions were

1    already in their pocket?

2    A.    I wouldn't know what other -- that's right, if they

3    hadn't yet gone to the pharmacy.

4                  So the Prescription Drug Monitoring

09:51:08   5    database, you only see it once it's been dispensed.  You

6    don't see it when the doctor prescribes it.

7                  And, in fact, you only see it once it's

8    been dispensed and the pharmacist has entered it into the

9    system or whoever has been designated to do that.

09:51:22  10                  So it doesn't show up on the Prescription

11    Drug Monitoring database until it has been dispensed or

12    until the pharmacist or other designee has entered it

13    into the database.

14    Q.    That helps my next question.

09:51:36  15    A.    Great.

16    Q.    So let's say that patient we talked about with the

17    six prescriptions in their pocket goes first to Walmart,

18    Walmart looks into the database, they wouldn't know about

19    the other five, would they?

09:51:46  20    A.    That's correct.

21    Q.    And do you know how long it takes before -- well,

22    let me back up.

23                  The information that the pharmacy gets

24    about a patient, that then gets sent to the state to put

09:51:56  25    into their PDMP program, right?

1    A.    Yes.

2    Q.    So the PDMP program is what you're talking about

3    which might help with doctor shopping?

4    A.    Yes.

09:52:06  5    Q.    And how long does it take before the PDMP program

6    is aware that a prescription's been filled?

7    A.    It varies state-to-state.

8              It depends on the robustness of that PDMP

9    program.  Some are very quick and efficient and it

09:52:22  10   happens almost immediately.  For others, there are

11   delays.

12   Q.    It sometimes can be as long as three days, correct?

13   A.    That's correct.

14   Q.    So if the -- that patient that we just talked

09:52:32  15   about, that hypothetical patient, tried to fill all six

16   of those prescriptions that day, it's certainly possible

17   that they were all filled before the pharmacists have

18   that information, right?

19   A.    It is possible, yes.

09:52:43  20   Q.    And let's now jump ahead.

21             Let's say that patient comes back to you a

22   month later, and those six prescriptions are now in the

23   PDMP base, correct, should be?

24   A.    Yes.

09:52:55  25   Q.    At that point, you can look at the base and find

1    out whether the doctor shopping has occurred, right?

2    A.    Yes.

3    Q.    You've got that same information the pharmacy would

4    have when that person tries to fill a script?

09:53:05 5    A.    Assuming that the pharmacy entered the data, yes.

6    Q.    Well, let me turn to that question.

7                Are you familiar with something at Walmart

8    called Connexus?  And I'll spell it, C-O-N-N-E-X-U-S?

9    A.    I am not recalling that, no.

09:53:22 10   Q.    Are you familiar at all with the computer system

11   that Walmart pharmacists use to enter data about

12   prescriptions when they come in?

13   A.    I'm not familiar with the specific computer system

14   that Walmart uses, no.

09:53:48 15   Q.    So in your work in this case, you didn't

16   investigate the information that Walmart puts into their

17   system.

18                Is that fair?

19   A.    No, that's not fair.

09:53:56 20   Q.    Do you know that the Connexus system has been

21   around since prior to 2000?

22   A.    As I just said, I'm not recalling that system.

23   Q.    Okay.  Let's again change topics.

24                You've never worked for the Food & Drug

09:54:10 25   Administration, the FDA, have you?

Lembke - Cross/Majoras
791

1    A.    No.

2    Q.    You're not an expert in FDA regulations?

3    A.    No.

4    Q.    You also don't have expertise or experience with

09:54:21  5    FDA regulations governing pharmaceutical marketing, do

6    you?

7    A.    No.

8    Q.    Do you have a degree or training in marketing?

9    A.    No.

09:54:30 10    Q.    You don't have any employment experience in

11    marketing, do you?

12    A.    No.

13    Q.    And you certainly don't have employment experience

14    working in the field of pharmaceutical marketing?

09:54:41 15    A.    No.

16    Q.    You don't belong to any professional associations

17    in the field of pharmaceutical marketing, correct?

18    A.    Correct.

19    Q.    And you've never worked for the Drug Enforcement

09:54:54 20    Administration?

21    A.    Correct.

22    Q.    Nor have you worked for a State Board of Pharmacy?

23    A.    Correct.

24    Q.    You -- again switching topics, you spoke yesterday

09:55:07 25    about coupons.

Lembke - Cross/Majoras                                    792

1          Do you recall that testimony?

2     A.    Yes.

3     Q.    And a coupon might be something that a patient has

4     that they can get a discount on medication.

09:55:18  5          Correct?

6     A.    Yes.

7     Q.    Without a prescription, though, without a

8     prescription that needs to be filled, that coupon doesn't

9     give the patient access to medication, does it?

09:55:28 10    A.    No.

11    Q.    In other words, a doctor first has to prescribe the

12    medication before a coupon has any value?

13    A.    Correct.

14    Q.    And you, as a doctor, would agree that if a patient

09:55:40 15    came to you and said, "Hey, I've got a nice coupon, can

16    you prescribe that," that would not be a medical basis

17    for prescribing medication?

18    A.    Well, it probably would influence that doctor's

19    prescribing.

09:55:51 20    Q.    Would it influence you?

21    A.    It might.

22    Q.    So the -- I'll switch gears again.

23          You agree that chronic pain is a real

24    medical condition?

09:56:08 25    A.    Yes.

Lembke - Cross/Majoras                                   793

1    Q.    You showed the jury yesterday a scale of sort of

2    happy faces to frowny faces, if that's the right word,

3    going from one to ten.

4                 Do you recall that?

09:56:19  5    A.    Yes.

6    Q.    Would you agree there's no objective measure for

7    pain?

8    A.    Yes.

9    Q.    In other words, if you tell me you're in pain,

09:56:27 10    there's no way for me to know exactly what you mean by

11    pain?

12    A.    That's correct.

13    Q.    And to assess a patient's, an individual patient's

14    pain, a doctor has to look at the specific conditions and

09:56:40 15    situation of that particular patient, right?

16    A.    That's part of what would go into medical

17    decision-making, yes.

18    Q.    And you would agree that chronic pain, you talked

19    about chronic pain yesterday, is very difficult to treat,

09:56:53 20    isn't it?

21    A.    Yes.

22    Q.    And if you look today at patient outcomes, so if

23    you look at patient outcomes today, pain is still

24    undertreated, isn't it?

09:57:06 25    A.    I would not use that terminology, undertreated.

1          That's a loaded term that Purdue rolled out

2    that implied that undertreatment of pain was because

3    people weren't using enough opioids.

4    Q.   If you could pull up the binder again with your

09:57:27 5   deposition transcript that we talked about earlier, and

6    this again, is the May 28th, 2021 deposition that you

7    gave.

8          I'm going to ask you to turn to Page 30.

9    A.   Okay.

09:57:59 10  Q.   And particularly starting at Line 9, I would ask

11   you to read along with me.  I'll ask you whether I've

12   read it correctly.  Starting at Line 9, there's the

13   question -- it's up on the screen in front of us all so

14   if that helps you.

09:58:14 15       "And pain, in fact, had been undertreated,

16   is that right?"

17          And your answer:  "Pain is still

18   undertreated if you look at outcomes, especially for

19   chronic pain."

09:58:25 20       Did I read that correctly?

21   A.   Well, you didn't include what I said right after

22   that which is --

23   Q.   Did I read that part correctly?

24   A.   That's what the words say.

09:58:33 25  Q.   I'm going to go to your next part.

Lembke - Cross/Majoras                    795

1              You then answered about seven lines down,

2     you said -- and is your answer:  "The truth is we have

3     very poor treatments for chronic pain"?

4     A.    Oops, you skipped a part.

09:58:48 5    Q.    Okay.  Let's go back.

6                   Let's put the whole thing in.

7                   So Line 13, the question:  "Before the

8     paradigm shift, had pain been undertreated?"

9                   Your answer:  "It really depends on how

09:59:01 10   you're defining undertreatment."

11                  Then the question, "How do you define

12    undertreatment as it existed prior to the paradigm

13    shift?"

14                  Your answer:  "The truth is we have very

09:59:11 15   poor treatments for chronic pain, and in that sense,

16    chronic pain is undertreated because we don't have good

17    treatments but I do not agree with the premise that

18    opioids are underprescribed or were underprescribed prior

19    to the 1909s."

09:59:25 20                 Did I read that correctly?

21    A.    Yes.

22    Q.    And to this day, we still have limited ability to

23    treat patients -- I say we -- doctors still have limited

24    ability to treat patients with severe chronic pain, is

09:59:38 25   that correct?

Lembke - Cross/Majoras

796

1      A.     That is correct.

2      Q.     Would you agree that among other things, the FDA,

3      Food & Drug Administration, is responsible for protecting

4      the public health by ensuring the safety, effectiveness,

09:59:51 5      and quality of prescription medicines?

6      A.     Yes.

7      Q.     And you understand that before approving any

8      prescription medicine, the FDA must determine that it is

9      safe and effective for its indicated use, correct?

10:00:02 10      A.     Yes.

11      Q.     I think we've all learned a lot about the FDA over

12      the last two years.

13             And to do that, the FDA itself has medical

14      doctors on its staff?

10:00:12 15      A.     Yes.

16      Q.     Scientists?

17      A.     Yes.

18      Q.     Other medical professionals?

19      A.     Yes.

10:00:18 20      Q.     And you understand that the FDA has approved

21      prescription opioid medicines?

22      A.     Yes.

23      Q.     And in approving those opioid medicines, the FDA

24      made the judgment that the benefits outweigh the risks,

10:00:32 25      correct?

1    A.    Yes.  At that time.

2              They've qualified their labeling since

3    then, but yes.

4    Q.    You agree that opioids have benefits?

10:00:43  5    A.    Yes.

6    Q.    Even today, there are chronic pain patients who

7    have a legitimate medical need for prescription opioids

8    to treat their chronic pain?

9    A.    Yes.

10:00:54 10    Q.    Should opioids be banned?

11    A.    Of course not.

12    Q.    And in terms of issuing prescriptions or

13    prescribing opioids, you would agree that there are many

14    medical specialties that prescribe opioid medications?

10:01:12 15    A.    Yes.

16    Q.    I'll list a few and see if you agree.

17              Oncologists?

18    A.    Yes.

19    Q.    Those are doctors who are primarily treating or

10:01:20 20    diagnosing cancer?

21    A.    Yes.

22    Q.    What about surgeons and surgery disciplines?

23    A.    Yes.

24    Q.    Orthopedic doctors?

10:01:30 25    A.    Yes.

Lembke - Cross/Majoras                    798

1    Q.    Geriatric doctors?

2    A.    Yes.

3    Q.    Dentists?

4    A.    Yes.

10:01:40  5    Q.    And that's just a partial list.

6                    There are other doctors as well, correct?

7    A.    Of course.

8    Q.    And you would agree that opioid medications are

9    also used for hospice care?

10:01:51  10    A.    Yes.

11    Q.    And could you describe just what hospice care is?

12    A.    Hospice care is for people who are terminally ill,

13    at the end of life, and it's a way to primarily make them

14    comfortable as they pass.

10:02:06  15    Q.    And you would agree, and I mean this without any

16    disrespect to anyone, you would agree that a hospice

17    patient who is dealing with terminal conditions does not

18    present the same addiction concerns that other

19    nonterminal patients present?

10:02:21  20    A.    Not necessarily.

21                    So part of the phenomenon of getting

22    addicted to opioids is, as I said before, how long you

23    take them.

24                    And the longer you take them and the higher

10:02:34  25    the dose, the more you are at risk.

1           And I have certainly treated hospice

2      patients who became addicted to their opioids that were

3      prescribed at the end of life because they ended up

4      living a lot longer than anybody thought.

10:02:49  5           So we have to be vigilant in that

6      population as well since we have more and more patients

7      who are living longer with severe illnesses and actually

8      surviving those illnesses.

9           So the question of opioids, again, has less

10:03:08 10     to do with the disease process that we're treating, and

11     more to do with the dose and duration and whether or not

12     that person begins to show signs and symptoms of the

13     disease of addiction.

14     Q.    The ultimate decision of whether to prescribe an

10:03:26 15     opioid or not rests with the doctor, correct?

16     A.    Decision-making in modern medicine belongs to many

17     different entities.

18           A doctor certainly plays a role, but there

19     are many other factors that go into those decisions.

10:03:43 20     Q.    At the very beginning of your testimony, you said

21     you had interactions with pharmacists, and that was in

22     relationship primarily to your practice, correct?

23     A.    Yes.

24     Q.    And you would agree that that was primarily

10:03:55 25     pharmacists calling you from time to time asking you

1  about a prescription they had from you.

2          Right?

3  A.    I would say more than time-to-time.

4          It's a daily interaction with pharmacists

10:04:04  5  around prescriptions.

6  Q.    But you don't call pharmacists to ask what you

7  prescribe, do you?

8  A.    Sometimes I will reach out to a pharmacist about a

9  particular prescription.

10:04:13 10  Q.    How often do you reach out to pharmacists about a

11  particular prescription before you prescribe it?

12  A.    I would say it's a fairly regular occurrence based

13  not so much on medical decision-making as much as how it

14  will be paid for, which is one of the factors whether or

10:04:43 15  not, you know, insurance covers it, what the patient's

16  co-pay is.

17          Sometimes there's a certain way you can

18  write for a medication that the insurance will cover for,

19  but if you have, you know, if you're doing a

10:04:59 20  three-times-a-day dosing, the insurance won't cover it,

21  so then you have to change your dosing, which gets back

22  to what I was saying before that doctors are not making

23  their medical decisions in a vacuum.  There are huge

24  external influences on what and how we decide to proceed.

10:05:17 25  Q.    In the case you just described, you made the

Lembke - Cross/Majoras

801

1   decision that an opioid treatment is appropriate, and as

2   a courtesy to your patient, you're trying to do it in a

3   way that meets your medical diagnosis but also makes it

4   most affordable to the patient.

10:05:31   5              Is that right?

6   A.    That can be one of the scenarios, but I might also

7   call a pharmacy to ask, for example, if they have

8   concerns about a patient who has been receiving a

9   controlled drug and whether or not they've seen

10:05:50   10   particular red flags or what the behavior is that they

11   have seen.

12              We work together around this corresponding

13   responsibility, and because we're seeing different parts

14   of the elephant, it's very important that we communicate.

10:06:03   15   Q.    So if you could put into the times you've called

16   and looked for help from a pharmacist, versus a

17   pharmacist asking about one of your prescriptions, what

18   percentage falls in the category of ones where you

19   reached out to the pharmacist first?

10:06:16   20   A.    I really couldn't put a percentage on it, but I

21   would say that it's mostly me -- it's mostly pharmacists

22   reaching out to me initially, rather than me reaching out

23   to them before I prescribe.

24              But once I've been prescribing I'm as

10:06:32   25   likely to reach out to the pharmacist as they to me.

Lembke - Cross/Majoras                    802

1        It's a very two-way interaction.

2        Q.    Sorry.  Didn't mean to interrupt.

3               Switching now to Lake and Trumbull

4    Counties, the counties in this case, do you agree that

10:06:44  5    the large majority of opioid prescriptions written in

6    Lake and Trumbull are written for what the doctor who

7    wrote them thought was a legitimate medical purpose?

8    A.    I mean, as I've said before, I think on a national

9    level, which would include Lake and Trumbull Counties, in

10:07:04 10    the first decade-and-a-half of this century, most of the

11    doctors who were writing opioid prescriptions thought

12    they were writing for a legitimate medical purpose.

13               We really only have seen kind of an

14    awareness, a dawning awareness in the last five years or

10:07:22 15    so, where doctors have realized that they were

16    essentially duped and that there's not evidence to

17    support the use of opioids in chronic pain, and that even

18    using opioids short-term for minor pain conditions can be

19    a gateway to opioid addiction and other harms.

10:07:42 20    Q.    You're unsure of whether you've actually been to

21    either Lake or Trumbull County, right?

22    A.    I don't believe that I have.

23    Q.    And in forming your opinions in this case, you did

24    not conduct any interviews of doctors or health

10:07:55 25    professionals in either of those counties, did you?

Lembke - Cross/Majoras

803

1    A.    That is correct.

2    Q.    You didn't interview any pharmacists in either of

3    those counties, did you?

4    A.    No.

10:08:05  5    Q.    You didn't interview any employees of Lake or

6    Trumbull County as part of your work in this case, did

7    you?

8    A.    That is correct.

9    Q.    And you didn't interview any law enforcement

10:08:15 10    officers working in those two counties?

11    A.    Correct.

12    Q.    Do you know how many total pharmacies there are in

13    Lake County?

14    A.    No.

10:08:29 15    Q.    I assume the same answer for Trumbull County.

16    A.    Correct.

17    Q.    You didn't do any study of specific patient level

18    data in these two counties, did you?

19    A.    No.

10:08:50 20    Q.    You didn't do any specific study of overdose death

21    records from Lake or Trumbull County, did you?

22    A.    Can you give me a moment to look at my report?

23    Q.    Sure.

24                (Pause.)

10:09:23 25    A.    On Page 3 of the specific appendix in my report, I

Lembke - Cross/Majoras                    804

1    cite the following statistics.

2                    The rate of prescription opioid overdose

3    deaths in Lake County increased from 5.9 deaths per

4    100,000 in 2008 to a peak of 11.31 per 100,000 in 2013.

10:09:51  5                    For Trumbull County, the rate increased

6    from 9.4 per 100,000 in 2008 to a peak of 10.6 per

7    100,000 in 2017.

8    Q.    That information you just cited, that wasn't a

9    study that you did, was it?

10:10:19 10  A.    No.

11   Q.    So my question, just very specific to you, is you

12   did not do any investigation beyond what you cited as to

13   specific overdose or Opioid Use Disorders in Lake or

14   Trumbull County, did you?

10:10:35 15  A.    Not beyond what I cited in my report.

16   Q.    And you can't identify any specific prescription

17   that was filled by any of the defendant pharmacists in

18   Lake or Trumbull County that was, in fact, diverted, can

19   you?

10:10:55 20  A.    Again, I did not look at the data at the county

21   level specifically in Lake and Trumbull Counties.

22                    I looked at it in aggregate.

23   Q.    Aggregate the way you looked at the conduct of the

24   Walmart leadership you talked about before?

10:11:12 25  A.    Similar, yes.

1              MR. MAJORAS:  Thank you, Your Honor.

2              I pass the witness.

3              Thank you, Dr. Lembke.

4              THE WITNESS:  You're welcome.

10:11:32  5              THE COURT:  Okay.  I think next we'll have

6    Mr. Stoffelmayr.

7              MR. STOFFELMAYR:  Thank you, Judge.

8              THE COURT:  For Walgreen's.

9              MR. STOFFELMAYR:  Judge, may I proceed?

10:12:35 10              THE COURT:  Yes.

11          CROSS-EXAMINATION OF ANNA LEMBKE

12    BY MR. STOFFELMAYR:

13    Q.    Good morning, Dr. Lembke.

14    A.    Good morning.

10:12:39 15    Q.    My name is Kaspar Stoffelmayr and I represent

16    Walgreen's, and we have met before but only on Zoom, so

17    it is very nice to meet you in person finally.

18    A.    Nice to meet you, too.

19    Q.    My first question for you is do you know what

10:12:56 20    Intercom Plus is?

21    A.    No.

22    Q.    So you couldn't tell us anything about how the

23    Walgreen's Intercom Plus system works or what data it

24    makes available to Walgreen's pharmacists?

10:13:10 25    A.    I'm not recalling that name, Intercom Plus.

1    Q.    All right.  I want to ask you about some of the

2    specific things you said yesterday about Walgreen's.

3              Does that sound strange to you, too, or is

4    that just me, the speaker?

10:13:27  5    A.    It sounds okay to me.

6    Q.    Okay.  Does it sound okay to everyone else?  A

7    little feedback or fuzzy over here.

8              Let me ask you, the University of

9    Washington Medical School, that's a top medical school,

10:13:43 10    isn't it?

11    A.    Yes.

12    Q.    And the Fred Hutchinson Cancer Research Center in

13    Seattle, that's a famous, well-known institution?

14    A.    I'm not familiar with it.

10:13:54 15    Q.    You're not familiar with the Fred Hutchinson Center

16    in Seattle?

17    A.    No.

18    Q.    It's your view, I think you've made this clear,

19    that things that Purdue says and things that Purdue does

10:14:11 20    should not be trusted, correct?

21    A.    In general, yes.

22    Q.    When did you come to that conclusion about Purdue?

23    A.    Again, it was an iterative process in the first

24    decade-and-a-half or so of this century.

10:14:26 25    Q.    So, say, between 2000, 2015?

Lembke - Cross/Stoffelmayr                    807

1    A.    Yeah.

2    Q.    Would you say that the level of conduct you've seen

3    at Purdue is worse than the average pharmaceutical

4    company?

10:14:44  5    A.    Are you talking about manufacturers?

6    Q.    Yes.

7    A.    Uh-huh.

8              I would say that Purdue probably represents

9    the most egregious examples.

10:14:55 10    Q.    You talked about continuing education for

11    pharmacists.

12              Doctors also do continuing medical

13    education programs, correct?

14    A.    Yes.

10:15:05 15    Q.    And have you ever attended -- it's called CME,

16    right?

17    A.    Yes.

18    Q.    Have you ever attended a CME program that was paid

19    for by a manufacturer of a medicine?

10:15:21 20    A.    I'm sure that I have, but often, they're invisible

21    sponsors so you don't actually know.

22    Q.    And at least in the 1990s, for example, it was very

23    common for doctors to attend CME programs that were

24    sponsored by a drug manufacturer, correct?

10:15:39 25    A.    Yes.

Lembke - Cross/Stoffelmayr                    808

1    Q.    Is that less common today?

2    A.    Actually I don't -- I don't know.

3    Q.    And I think you're familiar with this, that

4    pharmacists have to, under the Board of Pharmacy rules,

10:15:56  5    have to do their own continuing education, but pharmacy

6    education rather than doctor or medical education, right?

7    A.    Yes.

8    Q.    You talked with Mr. Lanier yesterday about a

9    document from 1998 where Purdue was going to put on a CE

10:16:18 10    program for some Walgreen's pharmacists, right?

11    A.    Yes.

12    Q.    And why don't we take a look at the document.  I'm

13    going to live dangerously and try to run my own computer.

14    If this doesn't work, it will be the last time.

10:16:45 15              Can you see the document on your screen,

16    Doctor?

17    A.    Yes, I see the document.

18    Q.    I'll make it a little bigger.

19              This is that document from, let's see,

10:17:06 20    let's get control of the mouse, December of 1998,

21    correct?

22    A.    Yes.

23    Q.    And it's a letter to Mr. Scott Diveney, who is a

24    pharmacy supervisor and a pharmacist at Walgreen's in

10:17:20 25    Bellevue, Washington, correct?

1    A.    Yes.

2    Q.    And the speaker, the presenter, was going to be

3    Dr. Louis Saeger, correct?

4    A.    Yes.

10:17:34  5    Q.    Are you familiar with Dr. Saeger?

6    A.    No.

7    Q.    So you don't know anything about his Board

8    certifications, where he did his fellowships, anything

9    like that?

10:17:44  10    A.    No.

11    Q.    You said yesterday that any Purdue-sponsored

12    program would be, I think the words you used were full of

13    misinformation, correct?

14    A.    Typically, yes.

10:18:01  15    Q.    You've never actually seen Dr. Saeger's

16    presentation, have you?

17    A.    I believe I tried hard to find it and could not

18    find it.

19    Q.    So you had not seen Dr. Saeger's presentation?

10:18:14  20    A.    No.  I would love to see it if you have a copy.

21    Q.    I do not.  I've looked for it as well.

22          But you were comfortable telling the jury

23    that Dr. Saeger's presentation was full of

24    misinformation, even though you haven't seen the

10:18:31  25    presentation and don't know anything about Dr. Saeger.

1      That was your testimony yesterday?

2   A.    I've reviewed so many continuing medical education

3   courses sponsored by Purdue and Purdue collaborators from

4   this time period, and they're extremely consistent in

10:18:47 5   their messaging.

6            So although I didn't see this because I

7   couldn't find it, yes, I am comfortable saying that it

8   was likely full of the same misleading messages.

9   Q.    Did you do any -- any research to learn about

10:19:00 10   Dr. Saeger, who he is today and who he was then?

11   A.    I tried very hard to find this continuing medical

12   education course and was not able to.

13   Q.    No, my question was Dr. Saeger.

14            Did you do anything to find out about

10:19:13 15   Dr. Saeger?  Did you Google him like I did last night?

16   A.    No.

17   Q.    Let me ask you about a different topic.

18            You said yesterday that Walgreen's

19   collaborated with Purdue to create Super Store

10:19:41 20   pharmacies, and these pharmacies essentially became the,

21   I think you said this, the pill-mill equivalent of a

22   pharmacy.

23            Do you remember that testimony?

24   A.    Yes.

10:19:51 25   Q.    The truth, Doctor, is you don't know if any of

Lembke - Cross/Stoffelmayr                    811

1      these Super Stores exist, ever existed?

2      A.    There are DEA investigations of Walgreen's.

3            Walgreen's has not just acted as a

4      pharmacy, but also as a distributor.  And there are

10:20:27  5    Department of Justice DEA complaints against Walgreen's

6      for not just selling, but also distributing large amounts

7      of Oxycodone in Florida and California.

8            And those DEA complaints were based on

9      large surges in sales of OxyContin or Oxycodone from

10:20:53 10    those stores.

11           So that's what I'm referring to, and there

12     is evidence from those DEA investigations showing that

13     these pharmacies essentially functioned as pill-mill

14     pharmacies and that Walgreen's had the data to know that

10:21:11 15    this was happening and should have been aware and should

16     have prevented it.

17     Q.    In your report when you talk about Super Stores,

18     let's put it this way, there's a specific section of your

19     report that talks about Super Stores, correct?

10:21:25 20    A.    Yes.

21     Q.    And I think there was an opportunity yesterday, you

22     commented on how careful you are with your footnotes,

23     right?

24     A.    Yes.  Try to be.

10:21:38 25    Q.    I want to go back to the page of your report that

1    Mr. Lanier asked you about here.

2                   This is the -- this is the page of your

3    report that you were talking about with

4    Mr. Lanier -- oops, it's not very good -- when you were

10:22:13 5    talking about Super Stores.

6                   Correct?

7                   I'm sorry.  It's Page 97.  I should have

8    told you.  Not 97, 83, I should have told you that.

9    A.    So there are multiple places in the report where I

10:22:54 10    talk about this general topic.

11    Q.    Well, let me ask you this.  This is what you

12    were -- these are the two paragraphs you were discussing

13    with Mr. Lanier when you talked about Super Stores.

14                   That's correct, right?

10:23:04 15    A.    That is correct, but there are other references in

16    my report regarding the phenomenon of Super Stores

17    overstocking, surges.

18    Q.    Are you telling us there are other places in your

19    report other than this section that use the words "Super

10:23:24 20    Stores"?

21                   I didn't see that.

22    A.    I don't always use the language of Super Stores.  I

23    used that here because I believe that's what -- I believe

24    that's what Brody used, but there are other sections of

10:23:35 25    my report, for example when I talk about --

1      Q.    Doctor, you've gone past my question now.

2                  My question was these are the paragraphs,

3      these are the paragraphs that discuss the concept of

4      Super Stores and use that language, correct?

10:23:51  5    A.    These are the paragraphs that discussed this

6      problem using that language.

7      Q.    And there are footnotes?

8      A.    And there are other places in my report where I

9      discuss this problem.

10:23:58 10    Q.    I heard you the first time.  Thank you.

11     A.    Okay.

12     Q.    There are footnotes, footnotes for these

13     paragraphs, that include your citations, correct?

14     A.    Yes.

10:24:07 15    Q.    And the citations are to documents that come out of

16     the files of Purdue, correct; not out of the files of

17     Walgreen's?

18     A.    Yes.

19     Q.    And the words "Super Store" no, Mr. Brody, we'll

10:24:25 20    get to Mr. Brody in a second, but this gentleman

21     Mr. Brody, no one else from Walgreen's, no one period

22     from Walgreen's, only people from Purdue ever used the

23     word "Super Store" in the documents you referred to?

24     A.    I don't know.

10:24:36 25    Q.    Mr. Brody was a -- you talked about him or you just

Lembke - Cross/Stoffelmayr                    814

1    mentioned him -- he was a pharmacist at Walgreen's,

2    correct?

3    A.    Yes.

4    Q.    And he -- we're talking about some e-mails from

10:24:57 5    1997, correct?

6    A.    Yes.

7    Q.    And back in 1997, Mr. Brody got the idea that there

8    should be 24-hour stores that stocked a wide variety of

9    pain medications and had experienced pain pharmacists and

10:25:17 10    things of that nature, correct?

11    A.    Yes.

12    Q.    And Mr. Brody was in Florida, correct?

13    A.    Yes.

14    Q.    He was a staff pharmacist; not a Walgreen's

10:25:32 15    executive of any kind, correct?

16    A.    Correct.

17          I believe that's correct.

18    Q.    And as far as you know, these Super Stores that

19    Mr. Brody had in mind, none of them ever opened up,

10:25:45 20    correct?

21    A.    Again, I can infer that there were such stores

22    throughout the country.

23          If you look at my report, on Page 84, I

24    quote, "Walgreen's distributes 374 million or 16.8

10:26:06 25    percent of Purdue's prescription products.  Walgreen's is

1   the largest of the greater than 200 retail chains that

2   dispense Purdue prescription products."

3              And then I include a chart with average

4   monthly sales showing that between 2010 and 2017, annual

10:26:27  5   sales were on the order of greater than three hundred

6   million per year.

7   Q.   Let me ask you a question.  What was the percent

8   you just said?  Can you read that again?

9   A.   16.8 percent.

10:26:38 10   Q.   Walgreen's, Walgreen's accounted for 16.8 percent

11   of --

12   A.   Of Purdue's prescription products.

13   Q.   In that same time period, what was Walgreen's

14   percent market share for antibiotics?  Was it greater or

10:26:53 15   less than 16 percent?

16   A.   I don't know.

17   Q.   In that time period, do you know what Walgreen's

18   market share for prescription drugs total was?  Was it

19   greater or less than 16 percent?

10:27:03 20   A.   I don't know.

21   Q.   In that time period was Walgreen's the largest

22   pharmaceutical chain in the United States?

23   A.   I don't know.

24   Q.   If Walgreen's was the largest pharmaceutical chain

10:27:13 25   in the United States, it wouldn't be too surprising that

Lembke - Cross/Stoffelmayr                    816

1    they were dispensing more Purdue products than other

2    people were, would it?

3                    That wouldn't shock you?

4    A.    That would not shock me.

10:27:24  5    Q.    Let's go back to the question we started with.

6                    Can you pull out your deposition transcript

7    again?

8    A.    Okay.

9    Q.    Let me -- let me ask you the question more clearly.

10:27:50  10                    How many Super Stores did Mr. Brody open

11    up?

12    A.    I don't know.

13    Q.    You don't know if any Super Stores were actually

14    opened up, correct?

10:27:59  15    A.    Again, there is good evidence that Walgreen's was

16    selling and distributing very large amounts of Oxycodone

17    in Florida and California and other places across the

18    United States, to the extent that there was a Department

19    of Justice and DEA investigation, and they were cited not

10:28:30  20    just for ignoring red flags, but also for ignoring huge

21    surges in the numbers of opioids distributed and

22    dispensed at certain pharmacies.

23    Q.    Why don't you look at Page 204 of your deposition

24    transcript.

10:28:56  25                    And at your deposition, at your deposition

           1    I asked you the question:  "How many of these Super

           2    Stores did Mr. Brody open up?"  The same question I asked

           3    you a minute ago.

           4                And at your deposition your answer was:  "I

10:29:19   5    don't know if any Super Stores were actually opened up.

           6    But it's more the point here that this was a strategy

           7    that was being considered by Walgreen's."

           8                Was that your testimony under oath at your

           9    deposition?

10:29:31  10    A.    Yes.

          11                THE COURT:  Well, Mr. Stoffelmayr, if

          12    you're moving to a different area, it might be a good

          13    time for a break, but if you're still in that same line

          14    of questioning, I want you to finish.

10:29:54  15                MR. STOFFELMAYR:  No, I'm moving to a

          16    different topic.

          17                Thank you, Judge.

          18                THE COURT:  All right.  Ladies and

          19    gentlemen, we'll take our midmorning break.

10:30:01  20                Usual admonitions.  We'll see you in 15

          21    minutes.

          22                Thank you.

          23                (Jury out.)

          24                THE COURT:  If everyone could just be

10:30:36  25    seated for a minute.

1          This morning, Mr. Pitts received a number

2     of written questions from the jury.

3          I normally ask them to ask if any jurors

4     have questions after the cross-examination, but this

10:30:50  5     witness has been on for a long time so some of these

6     questions pertain -- oh, Doctor, you can be excused for

7     the break -- some relate to Dr. Lembke, some are in

8     general.

9          I'll just read them.  People can look at

10:31:06 10     them.

11          "Were pharmacies, CVS, Walgreen's, Giant

12     Eagle, Walmart, given the OUD data, dose and duration?

13     Were they given the higher dose, higher risk?"

14          Second question:  "Do drug companies still

10:31:27 15     go to doctor offices and hospitals and pay for lunch and

16     give tokens to sell their drugs?"

17          This one does relate to Dr. Lembke, "The

18     documents she used to create her report, where do these

19     documents come from?  Provided by defense?  Provided by

10:31:53 20     plaintiff?  Or her own research?"

21          And the last one, "Will the report from

22     Dr. Lembke be available for the jury to review?"

23          Then that juror also wrote, "Please advise

24     defense counsel to identify themselves."

10:32:06 25          That I covered.

 1              So I don't know if counsel wants me to say

 2    that the report is not evidence; the expert report's not

 3    evidence.  That's typical.  But the testimony that any

 4    expert gives is the evidence.

10:32:30  5              If the parties want me to instruct, answer

 6    that question, because it may come up with experts on

 7    both sides, and I don't see any problem with letting the

 8    jury know that.

 9                   MS. SULLIVAN:  Yes, Your Honor.  Thank you.

10:32:46 10                   MR. LANIER:  We agree, Your Honor.

11                   THE COURT:  All right.  That one I'll take

12    care of myself.

13              But as with other questions, I'm not going

14    to ask them.  It's up to counsel just to know and however

10:32:55 15    you want to deal with them, you may.

16                   Okay.  Thanks.

17                   (Recess taken.)

18                   MR. WEINBERGER:  Your Honor, before the

19    jury is brought in, can we address one thing?

10:49:28 20                   THE COURT:  Yes.

21                   MR. WEINBERGER:  Your Honor, with respect

22    to the use of questions from the jurors, my understanding

23    of the procedure was that you were going to wait

24    until --

10:49:39 25                   THE COURT:  I was, Peter, but they handed

         1    these altogether.

         2                MR. WEINBERGER:  I understand.

         3                But in terms of lawyers dealing with them,

         4    I think at the end of the cross and not taking into

10:49:52 5    account those questions is really the fair way of

         6    handling them.

         7                THE COURT:  That's what I'm going to do in

         8    the future, but they handed them up at this time so we

         9    will proceed.

10:50:06 10               MR. WEINBERGER:  The other thing, with

        11    respect to your instruction about the report not being in

        12    evidence, we would prefer that that instruction be given

        13    later at the close of her testimony so that there's no

        14    inference about something that occurred during cross.

10:50:21 15               THE COURT:  All right.  I'll -- when she's

        16    done, I'll give a general instruction about expert

        17    reports because it will apply to all experts in the case.

        18               MS. SULLIVAN:  Your Honor --

        19               MR. WEINBERGER:  Thank you, Judge.

10:50:34 20               And one other thing, if I may.

        21               MR. DELINSKY:  I don't want to knock you

        22    off, but can I speak to the instruction issue

        23    specifically?

        24               THE COURT:  All right.  What --

10:50:45 25               MR. DELINSKY:  Your Honor, Rule 703

1      requires the Court give a limiting instruction when

2      potentially inadmissible evidence is shown to the jury as

3      a basis of the expert's opinion, advising the jury that

4      they can rely on it for some --

10:50:59  5            THE COURT:  I'm not -- there's no question

6      on that, Mr. Delinsky.

7                      There's nothing potentially inadmissible.

8      There was a reference to -- the question is the report.

9                      I'll deal with it.

10:51:08 10            MR. DELINSKY:  Your Honor, there is

11      something potentially inadmissible.  For instance, we

12      talked about yesterday she testified about a Purdue memo,

13      talking about --

14                      THE COURT:  I didn't say it's inadmissible.

10:51:18 15            MR. DELINSKY:  But it might be, Your Honor,

16      and Rule 703 said there needs to be, it's a must, the

17      commentary says there must be a limiting instruction that

18      when evidence that has not been admitted in court yet has

19      been shown to the jury to tease out the witness's

10:51:35 20      opinions, that there must be a limiting instruction

21      saying that they can't use that for substantive purposes.

22                      That may change if these documents

23      ultimately come in, but that's the state of play as we

24      sit here today.

10:51:47 25                      MR. LANIER:  So if that's the case, Your

1   Honor, then --

2                 THE COURT:  I'm moving on.

3                 I'm not giving any such instruction.  If

4   you want to file something, file it in general.  At this

10:51:55 5   point, I have no idea what's inadmissible.

6                 MR. WEINBERGER:  Your Honor, and one other

7   thing on the issue of impeachment by prior deposition

8   transcripts.  My understanding of the Rule, and I could

9   be wrong, but my understanding of the rule is that the

10:52:07 10   deposition -- the prior deposition testimony must be

11   shown to the witness and the witness asked whether or not

12   that is their testimony before it is published on the

13   screen.

14                 So publishing -- because if it is not

10:52:25 15   inconsistent, publishing it on the screen before that is

16   established for purposes of impeachment is improper

17   impeachment.

18                 MR. MAJORAS:  I completely disagree with

19   that, Your Honor.

10:52:37 20                 THE COURT:  Well, you can impeach -- you

21   can go right at it if it's impeachment but it's got to be

22   inconsistent, and there have been a couple that have been

23   real borderline, all right?

24                 So counsel is warned on this, I'm not going

10:52:52 25   to let you impeach unless it's really directly

Lembke - Cross/Stoffelmayr                    823

1    contradictory.

2                    And there are -- some have been right on

3    the border.

4                    All right.  Let's move on.

10:53:07 5         MS. SULLIVAN:  Your Honor, one quick

6    question on our *Daubert* challenges in terms of moving to

7    strike a witness's testimony when they're done.

8                    THE COURT:  I'm not going to strike the

9    testimony.

10:53:18 10        MS. SULLIVAN:  But just for preservation,

11   Your Honor, can we -- will the Court agree that our

12   *Daubert* challenges are preserved?

13                    THE COURT:  The *Daubert* challenges are

14   preserved.  I mean I've made my ruling so they are

10:53:29 15  preserved.

16                    Okay.  Let's bring in the jury, please.

17                    (Jury in.)

18                    THE COURT:  Okay.  Please be seated.

19                    And, Doctor, I want to remind you you are

10:55:46 20  still under oath.

21                    So, Mr. Stoffelmayr, you may continue.

22                    MR. STOFFELMAYR:  Thank you, Your Honor.

23   BY MR. STOFFELMAYR:

24   Q.    Doctor, I just want to ask you about two more

10:55:54 25  things real quickly.

1    Yesterday you testified, do you recall

2  this, that there was an agreement between Walgreen's and

3  Purdue where I think you said that Walgreen's agreed that

4  if there was a theft or a robbery of OxyContin, that

10:56:17  5  Walgreen's would not increase safeguards or do any kind

6  of mitigation to deal with the risk of theft?

7  A.    I don't believe that was my testimony.

8  Q.    All right.  Let's take a look.

9                    Her testimony from yesterday?

10:56:51 10                    A MALE SPEAKER:  I do.  Give me a second.

11                    MR. WEINBERGER:  Your Honor, I object to

12  publishing this until --

13                    THE COURT:  I agree.

14                    MR. STOFFELMAYR:  No problem.

10:57:03 15                    THE COURT:  Let's see it.  Let's see it and

16  I'll determine if it's improper impeachment.  So give it

17  to me.

18                    MR. STOFFELMAYR:  Your Honor, I don't

19  believe there's a way to put it on her screen without

10:57:26 20  publishing it so we're going to give her a hard copy

21  transcript, if that's all right.

22  A.    Thank you.

23  Q.    Doctor, let me ask you to turn to Page 596 of your

24  testimony from yesterday.

10:58:07 25                    Do you have 596, Doctor?

Lembke - Cross/Stoffelmayr                   825

```
          1   A.    Yes, I do.

          2   Q.    And this is -- this is the transcript we got last

          3   night from Sue.  She is very quick.  Thank you.  And I'm

          4   looking at your testimony that begins at the bottom of

10:58:22  5   Page 596, Line 23.

          6              Do you see that?

          7   A.    Yes.

          8   Q.    And what you said was -- Mr. Lanier asked you about

          9   a section in your report, and your testimony was:

10:58:39 10   "Another part of this agreement between Walgreen's and

         11   Purdue was that Purdue agreed that if a given pharmacy

         12   experienced a loss of OxyContin due to theft or robbery,

         13   that they would replace opioid stock without increasing

         14   safeguards to mitigate any kind of diversion, which is

10:58:59 15   extremely concerning."

         16              You go on to explain.

         17              Correct?

         18   A.    That's what it says.

         19              I think that I would like to clarify what I

10:59:08 20   meant by that.

         21   Q.    Please.  Thank you.

         22   A.    Okay.  Great.

         23              So as in my report, Purdue agreed that if

         24   there was loss of OxyContin due to theft or robbery, that

10:59:25 25   they would replace the opioid stock.
```

1        And that agreement, in the larger context

2   of Walgreen's being under DEA investigation for

3   dispensing opioids without paying attention to red flags

4   and without putting necessary safeguards in place to

10:59:55  5   prevent misuse and diversion, is extremely troubling.

6        So again, it's not one isolated data point.

7   It's the data point in the broader context of the fact

8   that over time, during which Walgreen's was actively

9   pursuing mutual business interests with Purdue, they were

11:00:17 10   also being investigated by the DEA, and they were not

11   taking the necessary action to prevent the opioid

12   oversupply.

13   Q.    Okay.  Doctor, the details here are really

14   important because the claim you made yesterday is -- it's

11:00:34 15   horrifying, the idea that Walgreen's agreed not to

16   investigate theft and diversion, agreed not to take

17   action after robbery.

18        So I want to make sure we've got the

19   details really straight here.

11:00:46 20        MR. WEINBERGER:  Objection to the argument

21   of counsel.

22        THE COURT:  Sustained.

23        If you want to ask a question,

24   Mr. Stoffelmayr, you should do so.

11:00:52 25

```
 1   BY MR. STOFFELMAYR:

 2   Q.    The agreement -- the e-mail you cite for that part

 3   of your report comes from 2008, correct?

 4   A.    I believe so.

 5               I'd really have to find it in my report.

 6   Would you like me to take a moment to find that?

 7   Q.    You can do that, if you need to.

 8   A.    Do you know what page it is?

 9   Q.    I do.  Page 85.

10   A.    Yes.

11               So on Page 85 of my report I, say:  "In

12   2008, Walgreen's had an agreement with Purdue, wherein

13   Purdue agreed to replace OxyContin losses at a pharmacy

14   due to theft or robbery.  Theft and robbery from

15   pharmacies are a form of diversion.  Replacing opioid

16   pharmacy stock without increasing safeguards to mitigate

17   diversion does little to help the public good."

18   Q.    And you, in fact, have no idea what Walgreen's does

19   to put increased safeguards after a robbery at one of its

20   pharmacies, do you?

21               You don't have any information about that?

22   A.    Well, I have written in my report, I do have an

23   opinion about safeguards broadly at Walgreen's pharmacy

24   chain drug stores to prevent misuse and diversion.

25   Q.    Asking about robberies, ma'am.
```

Lembke - Cross/Stoffelmayr                828

1      A.    Yeah, I don't believe I have anything specifically

2      about robberies.

3      Q.    You understand that Walgreen's has a loss

4      prevention function?

11:02:29  5   A.    Again, I don't believe that's in my report.

6                  I don't believe I reviewed that.

7      Q.    Do you know anything about what loss prevention

8      does, what actions they take immediately following a

9      robbery of a Walgreen's store, a robbery of controlled

11:02:42  10   substances?

11      A.    No.

12      Q.    Do you know anything about Walgreen's security

13      operation center and the role they play?

14      A.    No.

11:02:49  15   Q.    Do you know anything about the instructions that

16      are given to store managers and pharmacy managers and

17      pharmacists about the steps they must take in the event

18      of a robbery?

19      A.    No.

11:03:00  20   Q.    All right.  Last thing I want to ask you about is

21      another topic, in developing your opinions for this case,

22      you obviously looked at a lot of Purdue documents.

23                  That's clear.

24      A.    I looked at a lot of documents, including Purdue

11:03:20  25   documents.

1    Q.    And you've discussed some of those documents

2    yesterday with Mr. Lanier and today on cross-examination.

3                   Correct?

4    A.    Yes.

11:03:29  5    Q.    And one of the things you've talked about is that

6    your view that Walgreen's gave Purdue too much access to

7    its pharmacists, correct?

8    A.    Yes.

9    Q.    But you also know from your review of the documents

11:03:47  10   that there were people at Purdue who were unhappy because

11   Purdue would not let -- excuse me, let me ask that

12   correctly.

13                  You know from your review of the documents

14   that there were people at Purdue who were unhappy because

11:03:59  15   Walgreen's would not give Purdue the access to

16   pharmacists that Purdue wanted?

17   A.    I'm vaguely recalling some e-mail exchanges that

18   might have had those kinds of sentiments.

19                  I'm not recalling any specifics.

11:04:14  20   Q.    Yeah, there are documents, in fact documents you

21   got from -- documents you looked at where people at

22   Purdue were unhappy about their inability to get access

23   to Walgreen's pharmacists, that was a problem for them?

24   A.    Okay.

11:04:27  25   Q.    In their minds, correct?

1    A.    Again, I'm not specifically recalling that.

2          I would be happy to look at the particular

3    part of the document you're referencing.

4    Q.    You've also seen documents where people at Purdue

11:04:42 5    were complaining because Walgreen's policies were so

6    restrictive about the dispensing of opioid medications?

7    A.    What year was this?

8    Q.    Any time period at all.  Do you ever recall seeing

9    a document from any time period where people at Purdue

11:04:59 10    were complaining, where they were upset because

11    Walgreen's dispensing policies were so restrictive?

12    A.    I'm not recalling anything like that.

13          Many of the documents that I reviewed noted

14    that Walgreen's was not restrictive enough and did not

11:05:17 15    have systems in place to prevent misuse and diversion as

16    part of their corresponding responsibility.

17    Q.    So did you see Purdue documents where people at

18    Purdue were unhappy that they felt Walgreen's policies

19    were too restrictive about dispensing opioid medications?

11:05:34 20    A.    I may have done.

21          I'm not recalling that right now.

22    Q.    Let me ask you to get out your deposition again.

23    And go to Page 208.

24    A.    Deposition.

11:06:08 25    Q.    And let me ask you to look at the question and

Lembke - Cross/Stoffelmayr                831

1    answer that begins on Line 17 of Page 208.

2                    Do you see that?

3    A.    Can you give me a moment?

4    Q.    Sure.  Of course.

11:06:21   5                    (Pause.)

6    A.    Yes, I do see that.

7    Q.    Okay.  And at your deposition in May, I think, I

8    asked you the question:  "Did you see documents where

9    people at Purdue were unhappy that Walgreen's pharmacists

11:07:01  10    were refusing to fill prescriptions for OxyContin?"

11                    And your answer at your deposition under

12    oath was:  "I have seen documents where Purdue expressed

13    dismay about certain pharmacies that were, in their

14    words, overly concerned with DEA regulations.  I'm not

11:07:19  15    now recalling which pharmacies those were or where they

16    were located, but I have seen those types of documents."

17                    Was that your testimony at your deposition?

18                    MR. WEINBERGER:  Objection, Your Honor.

19                    THE COURT:  Sustained.  Objection is

11:07:29  20    sustained.

21                    The jury is to disregard that.

22                    That's not inconsistent.

23    A.    But this is a great opportunity --

24                    THE COURT:  Hold it.

11:07:36  25                    THE WITNESS:  Sorry.

1          THE COURT:  Doctor, the objection is

2   sustained.

3          You can disregard the question.

4          You can pose another question, but

11:07:45 5   that's -- that's not inconsistent.

6   BY MR. STOFFELMAYR:

7   Q.   So is it your -- is it your testimony today that

8   you do not recall seeing the documents where folks at

9   Purdue were upset that Walgreen's dispensing policies

11:08:01 10   were too restrictive?

11   A.   I have reviewed thousands of documents.

12          Since I testified in that deposition that I

13   recalled seeing those documents, on that day I recalled

14   seeing those documents.

11:08:14 15          Today I don't specifically remember those

16   documents, but as I said, I may well have done.

17   Q.   Let me ask you one, one final question, Dr. Lembke.

18          And I want to talk about your expertise in

19   addiction medicine, all right?

11:08:29 20   A.   Okay.

21   Q.   If we look at the population of heroin users today,

22   do we have any way of knowing how many of them were

23   abusing heroin or any other opioid 10 years ago or 15

24   years ago?

11:08:48 25   A.   No.  There are data showing that about 80 percent

1    of heroin users today started out with a prescription

2    opioid, which is very different from heroin users in the

3    1970s, for example, where heroin users in the 1970s, the

4    majority of them reported starting out with heroin.

5              So in terms of quantifying that number, I

6    would think there are data on that.  The National Survey

7    of Drug Use and Health does reference heroin users.

8              And again, there are multiple studies

9    looking at the progression from prescription opioids to

10   heroin, which is the most common historical trajectory

11   for heroin users today.

12   Q.   Doctor, I appreciate that.

13             I was trying, maybe inartfully, to ask a

14   slightly different question.

15   A.   Okay.

16   Q.   My question isn't how many current heroin users

17   used prescription drugs or cocaine or methamphetamine or

18   any other drug in the past.

19             My question is this:  Of people who are

20   using heroin today, as we sit here today, how many of

21   them were already using heroin or another opioid 10 years

22   ago?

23             Do we know the answer to that question?

24   A.   I don't know it off the top of my head.

25             MR. STOFFELMAYR:  All right.  Thank you.

1               Your Honor, I pass the witness.

2               THE COURT:  Okay.

3               MS. SULLIVAN:  Your Honor, may I question?

4               THE COURT:  Yes, Ms. Sullivan.

11:10:27 5               MS. SULLIVAN:  Thank you.

6          CROSS-EXAMINATION OF ANNA LEMBKE

7     BY MS. SULLIVAN:

8     Q.   All right.

9               MR. WEINBERGER:  Ms. Sullivan, I notice

11:11:14 10    that you gave -- your colleague gave a box of documents

11    to the witness.

12               Do you have a box for us?

13               MS. SULLIVAN:  We do, Mr. Weinberger.

14               Do you want to -- do you want to do -- he

11:11:27 15    wants the box.  Just give him the box.

16               MR. LANIER:  One at a time is fine.

17               MS. SULLIVAN:  Okay.  Thank you.

18               MR. LANIER:  That's fine.  It doesn't

19    matter.  I just need to make sure I have them before you

11:11:36 20    use them.

21               MS. SULLIVAN:  No worries.

22    BY MS. SULLIVAN:

23    Q.   Good morning, Dr. Lembke.

24    A.   Good morning.

11:11:40 25    Q.   We haven't met yet.  I'm Diane Sullivan and I'm

Lembke - Cross/Sullivan                835

1    here for the folks at Giant Eagle.

2    A.    Nice to meet you.

3    Q.    Nice to meet you, too.

4          Can you hear me?

11:11:50 5    A.    I can.

6    Q.    Good morning, jurors, and I want to introduce Lamia

7    Sampson.  She's a trial paralegal who has been working

8    with me for a long time.  She'd probably say too long.

9    She's here to help get the exhibits organized today.

11:12:04 10         Dr. Lembke, Giant Eagle is different in

11    many ways from some of these other defendants, and I want

12    to start out with they are not a national pharmacy chain,

13    correct?

14    A.    Correct.

11:12:17 15    Q.    They don't have thousands of stores across America?

16    A.    That is my understanding, yes.

17    Q.    And they are -- they don't have an Internet or

18    website pharmacy business?

19    A.    Not as far as I know.

11:12:32 20    Q.    And, Dr. Lembke, you understand that their

21    pharmacies are inside grocery stores in Lake and Trumbull

22    County?

23    A.    I didn't know that.

24    Q.    Okay.  You didn't know that?

11:12:46 25    A.    No.

Lembke - Cross/Sullivan                    836

1    Q.    Okay.  Do you know that -- do you know the hours

2    that -- were you provided information about the hours

3    that Giant Eagle stores stay open?

4    A.    No.

11:12:59  5    Q.    Okay.  And I understand for this case, in addition

6    to your general review the plaintiffs' lawyers provided

7    to you documents to take a look at?

8    A.    Yes.

9    Q.    And as I understand it, you looked at some

11:13:16 10    documents that Giant Eagle produced in this litigation?

11    A.    Yes.

12    Q.    And you relied on, for the Giant Eagle documents,

13    fair to say you relied on those that were selected out by

14    the plaintiffs' lawyers?

11:13:29 15    A.    I relied on those that were made available to me.

16              I asked for others, and I understand that

17    they were not obtainable so I relied on what I had access

18    to.

19    Q.    And what they selected out for you?

11:13:42 20    A.    Okay.

21    Q.    And you know, Dr. Lembke, Giant Eagle doesn't have

22    any stand-alone pharmacies in Lake or Trumbull County?

23    A.    Again, I didn't know that they were in grocery

24    stores.

11:13:59 25    Q.    Okay.  And do you know that their pharmacies close

Lembke - Cross/Sullivan                           837

        1    at 9:00 p.m., like their grocery stores?

        2    A.    No.

        3    Q.    Okay.  And as I understand it, or maybe this is

        4    wrong, but you've never been to a Giant Eagle store?

11:14:14 5    A.    Correct.

        6    Q.    And you live in California?

        7    A.    Yes.

        8    Q.    Okay.  And you know that, or I think you know

        9    because I think I saw it in your report, that Giant Eagle

11:14:24 10   only operates in five states?

        11   A.    I believe so.

        12   Q.    Okay.  Are you aware, Dr. Lembke, that Giant Eagle

        13   only operates in West Virginia, Indiana, Maryland,

        14   Pennsylvania and Ohio?

11:14:42 15   A.    I don't remember the specific states, but I believe

        16   you.

        17   Q.    Okay.  And no reason to dispute that?

        18   A.    What's that?

        19   Q.    No reason to dispute that?

11:14:54 20              You haven't seen any evidence to the

        21   contrary?

        22   A.    No.

        23   Q.    Okay.  And do you know, Dr. Lembke, that most of

        24   Giant Eagle stores are in Northeastern Ohio and in

11:15:07 25   western Pennsylvania?

Lembke - Cross/Sullivan                    838

```
         1   A.    Again, I don't know the geography exactly.
         2   Q.    And I think I heard you say that you've never been
         3   to Lake or Trumbull County?
         4   A.    Correct.
11:15:17 5   Q.    And you have not interviewed any Giant Eagle
         6   pharmacist?
         7   A.    Correct.
         8   Q.    And in connection with your opinions in this case,
         9   you haven't spoken to any patients who've gotten
11:15:31 10  prescriptions at Giant Eagle stores?
        11   A.    That's correct.
        12         I've focused on Giant Eagle's drug
        13   utilization review policies and their systems for
        14   detecting red flags.
11:15:40 15  Q.    And, Dr. Lembke, you have not interviewed any
        16   doctors in Lake or Trumbull County who have prescribed
        17   medicine that Giant Eagle dispensed?
        18   A.    Correct.
        19   Q.    And in terms of some of your general opinions,
11:16:01 20  Dr. Lembke, I think you talked about stores in Florida
        21   and your opinion that it was too easy to get opioids
        22   dispensed in those stores and they made their way up
        23   through the rest of the country, including in Ohio.
        24         Do you remember that testimony?
11:16:16 25  A.    Yes.
```

```
 1    Q.    Dr. Lembke, that opinion would not apply to Giant

 2    Eagle; they don't have stores in Florida, right?

 3    A.    Yes.

 4    Q.    Yes, that would not apply to Giant Eagle?

 5    A.    That's correct.

 6    Q.    Okay.  And, Dr. Lembke, some other opinions.

 7                Mr. -- when Mr. Lanier was asking you

 8    questions, do you remember the PowerPoint where you went

 9    through your general, I think it was 13 or maybe 14

10    general opinions?

11    A.    Yes.

12    Q.    And fair to say a lot of folks can have opinions,

13    but to actually to support them, you need facts to back

14    them up?

15                That's fair?

16    A.    Yes, and I think I do have facts to back up my

17    opinions.

18    Q.    And, Dr. Lembke, after you gave your general

19    opinions, as I remember it, Mr. Lanier said, "And that

20    applies to Giant Eagle, too," and I think you said yes to

21    a couple of those, right?

22    A.    I'm not recalling specifically, but I will take it

23    at face value that I did say that, yes.

24    Q.    And then when Mr. Lanier walked you through your

25    report for the specific facts to back up your opinions,
```

Lembke - Cross/Sullivan                    840

1    you actually mentioned some instances as it relates to

2    various defendants here, right?

3    A.    Yes.

4    Q.    And I wanted to kind of go through some of those

11:17:40  5    with you, if you'd be patient enough to do that.

6    A.    Sure.

7    Q.    And so I wanted to start, Dr. Lembke, on Page 78

8    and 79 about promotional efforts, and I think you had

9    mentioned in that some of the pharmacies advertise on

11:18:15 10    their counters for opioids?

11    A.    Yes.

12    Q.    And, Dr. Lembke, fair to say there's no evidence

13    that Giant Eagle ever did that?

14    A.    Well, the evidence for Giant Eagle, there is --

11:18:29 15    Q.    Ma'am -- Doctor, could you just answer my question?

16          There's no evidence that Giant Eagle ever

17    advertised on their counters for opioids?

18    A.    Well, I was trying to answer the question.

19    Q.    Can you answer that one yes or no, do you have any

11:18:51 20    evidence that --

21    A.    That's not a yes or no answer for me.  That's not a

22    yes or no answer for me.  I would have to elaborate on

23    that.

24    Q.    You don't -- you can't say for a fact yes or no

11:19:07 25    that you have hard evidence that Giant Eagle advertised

Lembke - Cross/Sullivan                    841

1    opioids on its pharmacy counters?

2    A.    So Giant Eagle participated in the medication

3    Adheris program, which involves interactions between

4    pharmacists and patient consumers at the counter.

5                 Giant Eagle participated in Butrans and

6    Kadian coupon programs which involves an exchange of

7    information at the pharmacy counter.

8    Q.    Let's talk about that.

9                 Aside from that Butran opinion which I want

10   to talk about, there was no advertisements that you're

11   aware of at Giant Eagle pharmacy counters, like, "Hey,

12   this is a great opioid, prescribe it"?

13                You've seen no evidence on that score?

14   A.    I mean it depends what you are meaning by

15   advertisements.

16                I do believe that the coupons are a form of

17   advertising.  I do believe that the Adheris programs were

18   a form of persuasion/advertising.

19                And Giant Eagle did participate in those

20   programs.

21   Q.    I want to talk to you about that testimony, but I'm

22   just asking you, Dr. Lembke, and maybe I'm not being

23   clear, in terms of what's on their pharmacy counters,

24   there was never any advertisements for opioids for Giant

25   Eagle?

Lembke - Cross/Sullivan                    842

1    A.    So it sounds like you're asking me if there was

2    like a specific piece of paper or something on the

3    counter.

4    Q.    Yes, Doctor.

11:20:28  5    A.    Not to my knowledge.

6    Q.    And then on this promotional issue that you talked

7    about, the Butrans issue that you mentioned, I believe

8    that's on Page 79 and Page 80 of your report, if we could

9    go to that.

11:20:42  10          And, Mr. Pitts, if I could have the Elmo.

11          Do you have it, Doctor?

12    A.    Yes, I do.

13    Q.    And, first, Doctor, I think this is what you were

14    referring to, Page 79 and Page 80, where you talked about

11:21:19  15    Giant Eagle working with Purdue?

16    A.    Yes.

17    Q.    Okay.  And if we turn to Page 80.

18          By the way, Dr. Lembke, Butrans is a

19    medicine, it's not a Schedule II opioid?

11:21:35  20    A.    It's a Schedule III opioid.

21    Q.    I'm sorry, it's not a Schedule II opioid?

22    A.    No.

23    Q.    Do you know --

24    A.    It's a Schedule III opioid.

11:21:44  25    Q.    Do you know if it's even at issue in this case?

1    A.    What do you mean by, "At issue"?

2    Q.    Do you know if it's even a part of the plaintiffs'

3    lawsuit in this case?

4    A.    I'm not sure I understand the question.

11:21:57  5              The defendants in this case are pharmacies.

6    Q.    And maybe I misstated.

7              Do you know whether the plaintiffs are even

8    suing about Butrans and dispensing of Butrans?

9    A.    My role here is to assess the pharmacies and their

11:22:20 10    practices and how their practices failed to meet the

11    standard of the Controlled Substances Act.

12              It is my understanding that this case is

13    about a public nuisance and whether or not pharmacy

14    defendants in their actions contributed to a public

11:22:37 15    nuisance, i.e. the opioid epidemic.

16              It's not my understanding that Butrans is

17    on trial here.

18    Q.    Okay.  And Butrans, Dr. Lembke, is a medicine that

19    people take when they're trying to get off of opioids,

11:22:52 20    right?  It's a withdrawal medicine?

21    A.    No.

22              Butrans is a patch formulation of

23    Buprenorphine, which is FDA-approved for the treatment of

24    pain.

11:23:04 25              It is now frequently being used to help

1    people transition off of opioids because it comes in

2    microdosing patches, but it's basically a pain treatment

3    medicine and it's FDA-approved for that indication.

4              Buprenorphine in sublingual formulations,

11:23:27  5    not Butrans, is approved to treat opioid addiction so

6    they are very different drugs for different indications.

7    Q.    Yes.  And as you mentioned, often prescribed to

8    help people get off, transition I think was your word,

9    transition off of opioids?

11:23:42 10    A.    That's really not how they have been used and not

11    what they're FDA-approved for.

12              There's been some experimentation just in

13    the last couple of years using a Butrans patch to help

14    people bridge off, but that's very new and very

11:23:58 15    experimental.

16              Butrans is a Buprenorphine, an opioid, in a

17    patch form to treat pain, and that is what it is

18    FDA-approved for.

19    Q.    And, Doctor, as I understand your opinion here,

11:24:13 20    Adheris, do you recognize that as a marketing company

21    that Purdue Pharma worked with?

22    A.    Yes.

23    Q.    And what happened here looking at the documents

24    that you cite is that Adheris and Purdue got together and

11:24:27 25    said, "Let's do a mailing to a bunch of pharmacies to see

Lembke - Cross/Sullivan                    845

1    if we can have patients ask their doctor about Butrans."

2              Fair?

3    A.    In collaboration with Giant Eagle, yes.  That's

4    fair.

11:24:40  5    Q.    And as it relates to Giant Eagle, if you look

6    carefully about what you say here -- and, Doctor, a lot

7    of us get stuff in the mail from, you know, catalogs or

8    on social media to sign up and do something, and most of

9    the time, we ignore or we throw it out, right?

11:24:58 10    A.    There's lots of evidence that direct-to-consumer

11    advertising works and that's what this was.

12              These were letters on Walmart letterhead to

13    patients encouraging them to ask their doctor for another

14    prescription of Butrans.

11:25:13 15    Q.    But that actually wasn't my question.

16              I guess my question, to be clear, is the

17    truth is you have no evidence that Giant Eagle ever sent

18    out the letters that you have in your report, that Giant

19    Eagle ever approved or sent out to their patients these

11:25:31 20    letters?

21    A.    And I also have no evidence to the contrary.

22    Q.    Doctor, the plaintiffs here are suing on very, very

23    serious allegations, and I know you're not a lawyer, but

24    you understand it's their burden to bring the evidence?

11:25:47 25              Do you understand that?

Lembke - Cross/Sullivan                    846

1    A.    I'm not a lawyer.

2    Q.    But as you put this in your report alleging that

3    Giant Eagle collaborated with Purdue to enhance the

4    dispensing of opioids, but the truth is you have no

11:26:04  5    evidence that Giant Eagle ever sent these letters.

6              Fair?

7    A.    That's fair, but again, I have no evidence that

8    they didn't send the letters.

9    Q.    Well, Doctor, millions of documents have been

11:26:17 10    produced in this case and the plaintiffs selected Giant

11    Eagle documents for you to review.

12              No evidence that Giant Eagle ever approved

13    this program from Purdue or sent these letters to their

14    patients, you have not seen any documents to that effect?

11:26:35 15    A.    There were many instances in this case when I asked

16    to see additional documents and they were not

17    forthcoming.

18    Q.    Produced millions of documents, you gave an opinion

19    to the jury that Giant Eagle, that the folks at Giant

11:26:50 20    Eagle collaborated with Purdue, and this is the evidence

21    you cited, and the truth is you have no facts, no

22    evidence, that Giant Eagle ever sent those letters, that

23    they ever approved this program?

24    A.    Well, I disagree with that.  I think this is

11:27:09 25    evidence.

Lembke - Cross/Sullivan

847

1   Q.   This is evidence, Doctor, when it says a template

2   was offered by Purdue and the marketing company, a

3   template was offered to Giant Eagle, but yet you have no

4   evidence that Giant Eagle ever sent those letters.

11:27:23  5              Fair?

6   A.   I feel like I've answered this question.  I don't

7   have much more to say about it.

8   Q.   And, Dr. Lembke, no evidence that Giant Eagle ever

9   gave free samples of opioids to patients?

11:27:45  10   A.   That's true.

11   Q.   And no evidence that Giant Eagle ever ran TV ads or

12   had a sales force promoting opioids?

13   A.   That is true.

14   Q.   And, Doctor, no evidence that Giant Eagle shared

11:28:00  15   their patient data with Purdue?

16   A.   Well, I do think that this offer to send these

17   letters directly to patients is a form of sharing data.

18   Q.   The letter that came from Purdue and its marketing

19   company that Giant Eagle you have no evidence ever sent,

11:28:20  20   that's Giant Eagle sharing data?

21   A.   When you're sharing patient addresses, that's data.

22   It's important data.

23   Q.   Where's your evidence, Dr. Lembke, that Giant Eagle

24   ever shared patient addresses?

11:28:31  25   A.   Again, the evidence is in the report.  I don't have

1    more evidence than that.

2    Q.    The evidence in your report is that Giant Eagle got

3    an offer to send letters and there's no evidence they

4    ever did?

11:28:45  5    A.    Yes.

6    Q.    Okay.  You talked, Dr. Lembke, about people

7    spending millions of dollars to fund continuing education

8    programs about opioids, to influence medical curriculum,

9    to lobby about availability of opioids.

11:29:07  10             Again, no evidence that Giant Eagle did any

11    of those things?

12    A.    Can I have a moment to look at my report?

13    Q.    Sure.

14             (Pause.)

11:30:15  15    A.    So on Page 93 of my report, I talk about how Purdue

16    sales representatives, quote, "Worked contacts at Giant

17    Eagle, a 150-store chain, to initiate a mailing of 550

18    Lipman continuing education program materials to the

19    chain's retail pharmacies.  Purdue's e-mail described

11:30:41  20    this program as a win-win for the customer and Purdue,

21    which advanced the sales of Purdue products while

22    educating, quote, while educating the health care

23    professionals, unquote, and helping, quote, either both

24    the prescription sales division or the hospital specialty

11:31:02  25    division sell more of our products."

1    Q.    Dr. Lembke, I'm going to ask you about that but

2    that wasn't my question.

3                My question was about you had an opinion of

4    millions of dollars that these pharmacy defendants spent

11:31:17  5    lobbying on continuing -- on medical school curriculum.

6                There's nothing like that for Giant Eagle?

7    A.    That is true.  I don't have any evidence like that

8    for Giant Eagle.

9    Q.    And what you just cited to our jury is actually

11:31:30 10    letters from Purdue to pharmacists, not to patients,

11    right?

12    A.    Yes.

13    Q.    And, Doctor, you also had an opinion about inside

14    information, about pharmacies sharing inside information

11:31:44 15    about Purdue.

16                Again, Giant Eagle never did that?

17    A.    No.  As far as I know.

18    Q.    And, Doctor, you mentioned Drug Enforcement

19    Administration settlements and the *Holiday* opinion.

11:32:01 20                Giant Eagle never had any issues with the

21    Drug Enforcement Administration?

22    A.    Not as far as I know.

23    Q.    No drug -- the Drug Enforcement Administration

24    never found Giant Eagle to be in violation of any law?

11:32:14 25    A.    Not as far as I know.

```
 1    Q.    There was never any Drug Enforcement Administration

 2    settlement for Giant Eagle?

 3    A.    That's correct.

 4    Q.    And, in fact, there was never even any drug

 5    enforcement action or allegation against Giant Eagle for

 6    violating any Controlled Substances Act law?

 7    A.    Not as far as I know.

 8    Q.    And that goes for the Department of Justice

 9    investigations that you mentioned, there was no

10    Department of Justice investigation against Giant Eagle

11    ever?

12    A.    Not as far as I know.

13    Q.    And then, Doctor, Dr. Lembke, did the plaintiffs'

14    lawyers give you the verdict sheets in this case before

15    you testified to tell you about what the questions our

16    jurors are actually going to have to answer what this

17    case is about?

18                    MR. WEINBERGER:  Objection.

19                    THE COURT:  Sustained.

20                    Sustained.

21    BY MS. SULLIVAN:

22    Q.    Doctor, are you aware this case is about what

23    happened in Lake and Trumbull County?

24    A.    Yes.

25    Q.    And I'd like to, if there's no objection, put up a
```

1    piece of your trial testimony from yesterday, but first

2    I'll show the plaintiff's lawyers.

3                 And, Doctor, you were asked by Mr. Lanier

4    whether you focused on any of the individual pharmacies

5    in Lake and Trumbull County.

6                 Do you remember that question?

7    A.    Yes.

8    Q.    And you -- and he asked you, "So the jury can be

9    clear, we don't want to mislead in the least, you have

10   not focused on individual pharmacists at the individual

11   stores in these individual counties, fair?"

12                And your answer was:  "That is correct"?

13   A.    Yes.

14   Q.    And you said you did a national review?

15   A.    Yes.

16   Q.    And you know that Giant Eagle is not a national

17   store?

18   A.    Yes.

19   Q.    And to follow up I think on what Walmart's lawyer,

20   Mr. Majoras, asked you, the truth is on the issue of

21   whether there was illegitimate dispensing in Lake and

22   Trumbull Counties by the pharmacists that went to the

23   illicit or illegal market and caused harm, you have not

24   looked at any of those pharmacies' data to determine that

25   question?

1    A.    Not at the level of individual pharmacies, no.

2                    MS. SULLIVAN:  Thank you, Dr. Lembke.

3                    I have nothing further.

4                    THE WITNESS:  You're welcome.

11:35:06  5         MS. SULLIVAN:  Safe travels home.

6                    THE COURT:  Okay.  Any redirect from the

7    plaintiffs?

8                    MR. LANIER:  Yes, Your Honor.

9         REDIRECT EXAMINATION OF ANNA LEMBKE

11:35:27 10   BY MR. LANIER:

11   Q.    Good morning.  Whoops, I forgot my pens, Your

12   Honor.  I'm sorry.

13                   Good morning, Dr. Lembke.

14   A.    Good morning.

11:36:09 15   Q.    I have not spoken with you about your testimony

16   since you began testifying.

17                   True?

18   A.    That is correct.

19   Q.    All right.  I still have a roadmap for you, though,

11:36:18 20   to tell you how we're going to do this.

21                   I want to, first, ask you about the

22   questions the CVS lawyer asked you.

23                   That would be yesterday afternoon bleeding

24   over, I think, a little bit into this morning.

11:36:31 25                   Okay?

A.    Okay.

Q.    Then we'll look at the ones the Walmart attorney
asked you about.

All right?

And they know we'll do Mr. Stoffelmayr, the
Walgreen's attorney, and we'll finish with Ms. Sullivan,
the Giant Eagle attorney that just asked questions.

Okay?

A.    Yes.

Q.    All right.

First of all, and some of these questions
bleed over into what other people said, but let's do it
as best as we can.

On the issue of local versus national, the
difference between one store and many stores, you with
me?

A.    Yes.

Q.    Okay.  Did you look at things on a local level?

A.    I looked at things on a local level in terms of
numbers of prescriptions, numbers of opioid overdose
deaths.

I did look at that specifically in Lake and
Trumbull Counties.

Q.    But in terms of the stores themselves, did you look
at the stores on an individual local level?

1    A.    No, I did not.

2    Q.    All right.

3          Does the national scope that you used

4    include local stores?

11:37:40  5    A.    Yes.  All the defendants are chain pharmacies, and

6    their policies are top down policies that are

7    disseminated at all of the pharmacies.

8    Q.    In other words, if there's a national policy for a

9    national chain or a regional policy for a regional chain,

11:38:01 10   would it apply, by your understanding, to all of the

11   individual stores?

12   A.    Yes, it would.

13   Q.    All right.  We'll come back to this theme with the

14   other attorneys' questions, but let's stop there.

11:38:14 15         Next subject, I want to talk to you about

16   your book and the gateway effect.  You were questioned on

17   this yesterday.

18         Do you remember that?

19   A.    Yes.

11:38:24 20   Q.    And specifically, you were questioned about whether

21   or not, in your earlier testimony, you had said that this

22   was not gateway; that you didn't know about the gateway

23   or you weren't sure about the gateway.

24         Do you remember that?

11:38:37 25   A.    I'm sorry.  What testimony are you referring to?

Redirect - Lembke/Lanier                          855

1    Q.    You were asked by Mr. Majoras yesterday, and he

2    showed you a section of your trial testimony from New

3    York?

4                    MR. MAJORAS:  This morning, Judge.

11:38:53  5                    MR. LANIER:  I'm sorry?

6                    THE COURT:  Mr. Bush.

7                    Mr. Majoras was today is my recollection.

8                    MR. LANIER:  Your Honor, I messed up.  Mea

9    culpa, my fault.

11:39:03 10   BY MR. LANIER:

11   Q.    You were asked by Mr. Graeme Bush, that fellow

12   right over there in the gray suit with the face mask.

13   A.    Yes.

14   Q.    All right.  You were asked by him yesterday and he

11:39:15 15   showed you testimony as if it contradicted what you said

16   about whether or not you believed in the gateway effect

17   in your book.

18                    Remember?

19   A.    Yes, I do.

11:39:25 20   Q.    And he borrowed, I think, my copy, but he put it up

21   and to show the jury that if you look up "Gateway," it's

22   not in the index.

23                    Right?

24                    MR. BUSH:  Objection, Your Honor.

11:39:40 25   A.    I don't think that's what he did.

```
         1    Q.    That's what was done --

         2                THE COURT:  Hold it.

         3                MR. BUSH:  I didn't actually do that.

         4                THE COURT:  I don't recall him doing it

11:39:50 5    either, Mr. Lanier.

         6                MR. LANIER:  And you all are both right and

         7    the witness has corrected me.  That's what was done with

         8    the chain pharmacy this morning, Your Honor.

         9                I apologize.

11:39:58 10   BY MR. LANIER:

        11    Q.    My point is, though, do you talk about the gateway

        12    effect in your peer-reviewed book?

        13    A.    Yes, I do.

        14    Q.    Do you have a section entitled, "The Gateway Now a

11:40:11 15   Runway"?

        16    A.    Yes, I do.

        17    Q.    Do you have a section where you talk about Vicodin

        18    as a gateway drug?

        19    A.    Yes, I do.

11:40:23 20   Q.    So when you were challenged on whether or not you

        21    had ever put into a peer-reviewed writing this gateway

        22    idea before you came into this lawsuit, what is your

        23    answer?

        24                Have you?

11:40:37 25                MR. BUSH:  Objection, Your Honor.
```

1              That mischaracterizes the course of my

2    cross-examination.

3                   THE COURT:  Hold on.

4                   Overruled.

11:40:43 5              Mr. Lanier is just asking a question.  He

6    didn't tie it to you.

7                   MR. BUSH:  I don't mind the question.

8                   I mind the characterization of what's the

9    predicate for it.

11:40:52 10                  MR. LANIER:  Ma'am --

11                  THE COURT:  Why don't you just --

12                  MR. LANIER:  I'll ask it differently.

13                  THE COURT:  Just ask the question,

14   Mr. Lanier.

11:40:58 15   BY MR. LANIER:

16   Q.    Ma'am, have you published in peer-reviewed material

17   about gateway effects before you were ever involved in

18   this litigation?

19   A.    Yes.

11:41:08 20   Q.    Has it -- has being involved in this litigation

21   altered your views at all?

22   A.    No.  It's just informed my views further because

23   I've had access to more material, more evidence, that

24   wasn't available to me prior to being involved in the

11:41:26 25   litigation.

        1           But it hasn't changed my views.

        2   Q.    All right.  Next subject.

        3           You were asked questions about the Partners

        4   Against Pain brochure.

11:41:38 5           Do you remember that?

        6   A.    Yes.

        7   Q.    And that brochure has been marked as CVS MDL

        8   Exhibit 4955.

        9           And you have said that there was nothing

11:41:48 10  false, but it was inadequate about diversion.

       11           What else should have been in this

       12   brochure, ma'am?  Or Doctor.  Excuse me.

       13   A.    What should have also been in that brochure is that

       14   pharmacists should have checked the Prescription Drug

11:42:07 15  Monitoring database prior to dispensing because that is

       16   one of the best objective ways to determine the presence

       17   of red flags.

       18           Pharmacists should have used the data that

       19   they had at hand, and I'm not talking about really

11:42:21 20  pharmacists; I'm really talking about pharmacies should

       21   have made those tools available to their pharmacists, for

       22   example, to look at prescriber patterns and identify

       23   potential pill-mill doctors.

       24           The pharmacies had that data and could have

11:42:39 25  created a system much earlier to help pharmacists know

1    who were the pill-mill doctors.

2              The pharmacies should have allowed their

3    pharmacists to issue what's called blanket refusals if

4    they identified a pill-mill doctor and not have to

11:42:59  5    evaluate every individual prescription that came in from

6    known pill-mill doctors.

7              The pharmacies, again, should have just

8    created an environment and provided tools to empower

9    pharmacists to detect and investigate red flags.

11:43:20  10             And the brochure should also have included

11   that the problem of misuse and diversion and the opioid

12   epidemic is not just a problem of people with addiction

13   or criminals coming to the pharmacy with forged

14   prescriptions.  That is a part of the problem, but it's

11:43:40  15   not the only part of the problem.

16             A huge part of the problem is the simple

17   oversupply, the surges in dispensing, flooding our

18   societies with these pills, huge quantities, high doses,

19   putting the entire populous at risk; not just patient

11:44:02  20   consumers.

21   Q.    Doctor, I want to challenge you on part of your

22   answer.

23             This brochure was 2001.

24             Were there PDMPs in 2001 that pharmacists

11:44:15  25   could check?

1    A.    That's true.  They, for the most part, they did not

2    have access to that.

3              But even then, the pharmacies should have

4    made their data available to the pharmacists.

11:44:29  5    Q.    Okay.  Next, you were asked questions this morning

6    by Mr. Bush about the communications on opioids, and

7    specifically, I think he used Plaintiffs' Exhibit 8663,

8    this June, 2001 letter put out on Partners Against Pain

9    CVS Pharmacy letterhead addressed to the CVS pharmacists.

11:44:59 10              Do you see this?

11    A.    Yes.

12    Q.    And in regards to this 2000 letter, I'd like you to

13    look at it a moment in detail and explain why you thought

14    it important to emphasize the website that's put here for

11:45:15 15    the pharmacists' information?

16              MR. BUSH:  Objection, Your Honor.

17              The witness explained that during

18    cross-examination.  It's cumulative.

19              THE COURT:  Overruled.  Overruled.

11:45:25 20    A.    Yes.  So this is important because this meant that

21    the content and the information that was being

22    disseminated by Partners Against Pain was available on a

23    website, and that it provided specific tools for pain

24    assessment and other information that would certainly

11:45:52 25    have influenced how pharmacists thought about the safety

1    and efficacy of opioids.

2    BY MR. LANIER:

3    Q.    Doctor, have you looked at that website?

4    A.    Yes, I have.

5    Q.    Was it true and accurate in what it had to say

6    based on your opinions?

7    A.    That website is, first of all, it's very extensive.

8             There are many different tabs.

9             Secondly, it's full of the same misleading

10   messages that were spearheaded by Purdue with statements

11   to the effect that addiction is rare among pain patients

12   prescribed an opioid by their doctor; that opioids are

13   effective treatment for chronic pain; that no dose is too

14   high; and that a doctor can continue to increase the dose

15   without being concerned about risks; that essentially the

16   problem of the opioid epidemic is a problem of those bad

17   apples, those bad, bad addict people who are ruining it

18   for the rest, and as long as we screen them out, there's

19   no problem.

20             When, in fact, that is not the case.

21   People who are addicted are the same people who are

22   chronic pain patients and vice-versa.

23   Q.    And, Doctor, where the letter notes, "We hope you

24   and your customers will visit this site."

25   A.    Right.  And so that's pertinent to some earlier

1    questioning whether or not CVS had communicated directly

2    with not just prescribers but also patient consumers, and

3    the point that I was trying to make before, and I'll try

4    to make again, is that through their collaboration with

11:47:46  5    Purdue and Partners in Pain, they were disseminating

6    these messages directly to pharmacists who, in turn, were

7    encouraged to encourage their customers to visit this

8    website.

9    Q.    And in that regard, this first person, plural

11:48:07 10   pronoun, "We hope," is the "We" -- well, assuming the

11   "We" means the people who sent the letter, can you tell

12   us whether or not it affects your opinion that this

13   letter is sent by a doctor at Purdue Pharma who is

14   evidently a Vice President of Medical Affairs and

11:48:25 15   Worldwide Drug Safety as well as the Director of Quality

16   Improvement at CVS, the Director of Regulatory Compliance

17   at CVS?

18              Does that make a difference to you?

19   A.    Yes.  So I was asked previously by Mr. Bush whether

11:48:43 20   I could come up with any specific names of people at CVS

21   who had disseminated these messages, these misleading

22   messages, along with Purdue.

23              And I wasn't able to recall any at the

24   time.  But this reminds me that indeed, here are some

11:48:59 25   specific names.

Redirect - Lembke/Lanier                    863

1    Q.    All right.  Next subject, and they know we'll be

2    finished with CVS.

3               But this subject bleeds over into the

4    others.

11:49:09  5               You were asked questions about specific

6    names for programs.

7               Do you know about this program, this

8    program, that program, remember those types of questions?

9    A.    Yes.

11:49:18 10  Q.    I want to lump them altogether, loop them

11   altogether and ask you this:  Without knowing the names,

12   do you have the ability to testify to the issues of your

13   expertise as you've done so?

14   A.    Yes.

11:49:33 15  Q.    Without knowing the particular names of each

16   program, do you stand by your opinions?

17   A.    Yes.

18   Q.    And do you leave the details of pharmacy computer

19   programs to our experts in that area?

11:49:49 20  A.    Yes.

21   Q.    You're not here to testify as a pharmacist, are

22   you?

23   A.    No.

24   Q.    All right.  Next on the road.

11:50:00 25               You were asked questions by the attorney

1    for Walmart, and now I get to say Mr. Majoras' name.

2              First of all, you were asked questions

3    about your bias, and we got to hear you on that NPR

4    interview.

11:50:15 5              Remember that?

6    A.    Yes.

7    Q.    And before he played the NPR interview where you

8    said, "Oh, I'm certainly biased" or "Yes, I'm biased," he

9    had asked you are you biased on the subject of opioids or

11:50:29 10   something to that effect and you had said no in here.

11             Right?

12   A.    That's right.

13   Q.    Would you please explain to the jury what you're

14   talking about, where you have a bias and where you don't?

11:50:40 15  A.    So in the NPR interview with Terry Gross when she

16   asked me if I was biased, what I meant in using that word

17   "Bias" was that I had formed a very strong opinion but I

18   do not believe that I came to the material with

19   preconceived notions.

11:50:57 20             In fact, I was as duped as any other doctor

21   in the earliest days of this epidemic.  But because I

22   essentially had a front row seat to the epidemic as an

23   Addiction Medicine specialist, and through my research,

24   which was revelatory for me as a physician prescriber

11:51:18 25  trained in the late 1990s, mid to late 1990s, I did form

```
 1   a very strong opinion and that's the sense in which I was

 2   using that word on Fresh Air.

 3   Q.    All right.  And is that any different than what

 4   you've explained to us right now?  I mean --

 5   A.    No.  No.

 6               I mean, the use of language was in

 7   retrospect unfortunate, but then again, I never imagined

 8   I would be sitting in a courtroom like this having it

 9   played back.

10   Q.    All right.  Next set of questions, and here I've

11   got Mr. Majoras on your book.

12               He used your book and put "Pharmacy" or

13   "Chain pharmacy," asked you are those words in your book.

14               My question to you is why not?

15   A.    Well, I'm sorry.  He actually asked me if those

16   words were in the index.

17   Q.    Ah.  You're right.

18   A.    And I said clearly they're not.

19               But those words are in my book.  They're

20   just not in the index.

21   Q.    Okay.  Explain in the context of your book why

22   you've used the words you have and if you've not used

23   them in other places relevant to this case, why that

24   would be the case.

25   A.    I used -- there's not much in my book on
```

1    pharmacies.

2              I do talk a little bit about it, especially

3    in terms of online pharmacies and how online pharmacies

4    became a way that people could order prescription opioids

5    under the radar, including illegal online pharmacies.

6              The reason that I don't talk about

7    pharmacies at any length in my book is twofold.

8              Number one, as I said before, the book is

9    focused on the experience of the physician prescriber and

10   how physician prescribers contributed to the opioid

11   epidemic and why.

12             But the other reason was that I really

13   hadn't yet researched the role and involvement of chain

14   pharmacies.  I wasn't aware because I hadn't researched

15   it.

16             And since the publication of my book, I've

17   had an opportunity to research chain pharmacies and to

18   discover that pharmacies, too, are complicit in the

19   opioid epidemic.

20   Q.    Doctor, are you on the front line of fighting the

21   results of this disease?

22   A.    I'm sorry.  Could you repeat the question?

23   Q.    Yes, Doctor.

24             Are you on the front lines of fighting the

25   results of this disease?

1              Do you deal with opiate addicts?

2       A.    Yes, I do deal with people with opioid addiction.

3       Q.    On a regular basis or infrequently?

4       A.    Every clinic day.

11:54:05  5     Q.    If you were not here today, would you be where?

6       A.    Is it Thursday today?

7       Q.    Just until midnight.

8       A.    Okay.  Thursdays I'm usually teaching, but

9       sometimes I see patients on Thursdays.

11:54:19 10     Q.    And what is your typical clinic day or days?

11      A.    My typical clinic day starts at 8:00 and ends at

12      5:00.

13              I see patients, new patients are usually an

14      hour to an hour-and-a-half.  Follow-up patients are

11:54:35 15     usually 30-minute visits.

16              I see patients together with residents,

17      fellows and medical students, so I'm supervising them so

18      I'll go into one room, talk with the patient, with the

19      fellow, come up with a plan, leave that room, go to the

11:54:51 20     next room.  So I'm seeing typically between 20 and 30

21      patients a day on an average clinic day.

22      Q.    All right.

23              Next set of questions by Walmart concerned

24      your testimony about the knowledge of Walmart and others.

11:55:13 25             And you were shown testimony in this

1    regard.  I want you to look at your testimony and explain

2    the context in which that snippet was placed.

3              Okay?

4              I will put the testimony up here and let

11:55:29  5    you and the jury see it and ask you to comment on it.

6              The question at first that was shown to you

7    was, "Is it your testimony that pharmacists working in

8    Lake or Trumbull County should have understood in 2005

9    something that you yourself did not understand?"

11:55:54 10              You've got an answer that said, "I think

11    the pharmacies had access to information that I as an

12    individual prescriber did not have and, therefore, would

13    have and could have known earlier than I could have

14    known."

11:56:07 15              Explain, please, what you meant.

16    A.    So pharmacies have access to all of the prescribers

17    whose prescriptions are proffered at their pharmacies.

18              And that information is very valuable,

19    especially in the context of an opioid epidemic where

11:56:32 20    there are pill-mill doctors, there are doctors who are

21    duped but are prescribing opioids in a way that's not

22    inconsistent with the evidence or that's harming people.

23              Pharmacies had and have access to all of

24    that prescriber information, which they could have and

11:56:51 25    should have used.

1              I, as an individual prescriber, don't have

2     any of that.

3     Q.    So if the suggestion was made that you didn't

4     become aware of this opioid problem until 2012, et

11:57:03 5     cetera, how could you expect a Walmart to be aware, if

6     that was the drive of this, let me ask you this question:

7              Did you see Walmart's settlement agreement

8     with the Government?

9     A.    Yes, I did.

11:57:15 10    Q.    Did you --

11              MR. MAJORAS:  Objection.

12              I would like to approach, Your Honor.

13              (Proceedings at side-bar:)

14              THE COURT:  What is the objection?

11:57:40 15              MS. FUMERTON:  Your Honor, this is Tara

16    Fumerton for Walmart.

17              Based on your prior rulings, there are five

18    settlement agreements.  We have a pending objection that

19    is before Special Master Cohen with respect to other

11:57:51 20    witnesses.  They told us with respect to this witness

21    they were not going to raise this issue so we withdrew it

22    the other day when we were going to discuss it with you.

23              But effectively, the five settlements over

24    a long period of time, two of which are recordkeeping

11:58:06 25    violations, two other ones deal with a single pharmacy,

1    not Ohio.

2                    THE COURT:  All right.

3                    Mister -- all right.  What settlement

4    agreement are you planning to show to this witness?

11:58:18  5                    MR. LANIER:  Your Honor, I wasn't going to

6    show one.

7                    What I was going to do with this witness is

8    ask her if she had seen the settlement agreement and if

9    that affects her --

11:58:27 10                    THE COURT:  Well, some are -- some may not

11    even be admissible.

12                    MR. LANIER:  And I would not be using

13    those, Your Honor.

14                    I'm referring specifically to --

11:58:35 15                    THE COURT:  So I'm going to sustain the

16    objection unless it's clear that you're talking about one

17    that I've already allowed in.

18                    MR. LANIER:  Your Honor, I'm talking about

19    the 2011 agreement which meets all of your criteria.

11:58:46 20                    THE COURT:  Let me see that.

21                    MR. LANIER:  Okay.  Your Honor, in the

22    interests of time, can I move on and come back to that?

23                    THE COURT:  All right.  That's fine.

24                    (End of side-bar conference.)

11:59:09 25

1    BY MR. LANIER:

2    Q.   Dr. Lembke, I want to see if I can come back to

3    that later but I want to ask you some other questions

4    relevant to Walmart knowledge before -- I mean other than

11:59:19  5    that.  Okay?

6                 THE COURT:  If you're moving on to another

7    subject, it's probably a good time to break for lunch.

8                 MR. LANIER:  Okay, Your Honor.  All right.

9    I'm fine breaking right now and then I'll keep in the

11:59:30 10    flow, I'll find them over lunch.

11                 THE COURT:  Okay.  Ladies and gentlemen, we

12    will take our noon recess, one hour.

13                 Again, all the normal admonitions apply and

14    we'll see you all after lunch.

11:59:42 15                 (Jury out.)

16                 THE COURT:  Okay.  In addition to figuring

17    out what we're doing with this one Walmart settlement, I

18    guess early this morning or late last night, I don't

19    know, the plaintiffs filed an emergency motion to

12:00:36 20    videotape the trial testimony of Joe Rannazzisi, who I

21    guess they're planning to call next week live.

22                 First, exactly how would you do this in an

23    unobtrusive -- if it can't be done unobtrusively, it's

24    out.

12:00:56 25                 So how would you do it?

1          MR. LANIER:  Your Honor, if you would allow

2     it, I think the way it would be done is by hitting a

3     record button on the video that is being transmitted to

4     the other places.

5               So it would just be --

6               THE COURT:  So it wouldn't need a big

7     camera or anything?

8               MR. LANIER:  Correct, Your Honor.

9               And if we could record that, just, it would

10    change nothing in the courtroom.  It would just be

11    someone hits a record button.

12              Then you can always look at it afterwards

13    and decide whether or not it can be used or should be

14    destroyed.  It could be done and kept totally within your

15    purview.

16              THE COURT:  All right.  I think you should

17    discuss it with defendants and see if they have any

18    objection to that.

19              If not, you can do it that way.

20              MR. STOFFELMAYR:  Judge, one comment on

21    that.  Kaspar Stoffelmayr.

22              Obviously we got this late last night, too,

23    but I just want to flag there are 20-odd other pharmacy

24    chains involved in the MDL who are not part of this.

25              THE COURT:  That may be but it's really

1    only the people here who would object because it's

2    recording this, this witness, all right?  I'm not saying

3    it can be used at all.

4              But in my view, I don't think anyone else

12:02:09  5    has a -- has an objection that I would really consider.

6              MR. STOFFELMAYR:  Understood.

7              Thank you.

8              THE COURT:  All right.  I guess, you know,

9    by no later than tomorrow, I'd like to know if there are

12:02:22 10    any objections, and if there are, what they are.

11             Again, I'm not saying this would

12    ever -- I'd ever allow the deposition to be used in lieu

13    of testimony, but they've asked to record this one

14    witness so okay.

12:02:36 15             MR. MAJORAS:  Your Honor --

16             MR. LANIER:  For housekeeping I just wanted

17    to let you and defendants know I think I've got about 10

18    or 15 minutes left max with this witness and our next

19    witness will be Carmen Catizone so the Court's aware.

12:02:48 20             THE COURT:  Okay.  Thank you.

21             MR. MAJORAS:  Your Honor?

22             THE COURT:  Yes.

23             MR. MAJORAS:  John Majoras.

24             I assume when we come back, we can address

12:02:54 25    the agreement issue we just raised with Walmart.

1          There's one other matter.

2          THE COURT:  I'd like to see this if someone

3     would give it to me.

4          MR. MAJORAS:  There's one other matter I'd

12:03:05  5     like to raise because it may come up particularly with

6     the next witness.

7          As you are aware, there's a lawsuit that

8     the Department of Justice filed against Walmart.

9          THE COURT:  I'm well aware of it.

12:03:15 10          MR. MAJORAS:  In 2020.  And we believe

11     fully within the rulings you've already made in this

12     case, it's not admissible, not usable in this case

13     because of the allegations, the highly prejudicial

14     nature.

12:03:24 15          If plaintiffs assure me they're not going

16     to use it, then we don't need to do anything.

17          I will also let you know that there was a

18     conversation I held with Mr. Weinberger, Mr. Lanier and

19     Special Master Cohen, which we all agree and I'll share

12:03:38 20     with other counsel, that our obligation is to make sure

21     our witnesses are aware of *Daubert* rulings or

22     inadmissibility rulings so they don't inadvertently bring

23     something up.

24          THE COURT:  Good idea.

12:03:50 25          MR. LANIER:  From the plaintiffs

1    perspective, I have no intention of getting into that.  I

2    don't think it would be right and I think you would hold

3    me in contempt.  And I'll speak to the witness about it.

4             THE COURT:  That's a good point,

5    Mr. Majoras, you know, because witnesses I don't expect

6    them to have read *Daubert* rulings or things like this.  I

7    mean I would be surprised if they did.

8             So if any of you know that your witness

9    would, you know, would be aware of things like that, you

10   should caution them not to -- not to refer to it in an

11   answer inadvertently or whatever, that they are to avoid

12   referring to it in any way.

13            MR. MAJORAS:  Thank you, Your Honor.

14            MR. LANIER:  Your Honor, in that sense,

15   just to make the record complete, so hopefully I'm not in

16   trouble, Mr. Majoras -- Mr. Majoras pointed out to me

17   that Ms. Lembke, Dr. Lembke had done that in a quick

18   reference.

19            I did ask Mr. Majoras if he was comfortable

20   that I just explain to her she's not allowed to reference

21   anything criminal and so I did say to her in the hall,

22   "By the way, you're not allowed to say anything about any

23   criminal investigation," and I do want the record to

24   reflect that I said that to the witness during the break.

25   And when I said I hadn't talked to you about your

1    testimony, I wasn't talking to her about her testimony.

2                    I was merely emphasizing that, but I just

3    want the record to be clear that I did do that.

4                    THE COURT:  All right.

12:05:16  5                    MR. MAJORAS:  Your Honor, I did agree with

6    that.

7                    I also pointed out there was a settlement

8    amount for one of the other defendants that was mentioned

9    yesterday, Mr. Lanier took that into account, and again I

12:05:25 10  just want to make sure there's not -- he's not

11   differentiating criminal from the DOJ complaint.  We

12   think that is clearly inadmissible.

13                    THE COURT:  All right.  I agree.

14                    The pending lawsuit, it's just an

12:05:35 15  allegation and no one should be referring to it at all.

16                    MR. MAJORAS:  Thank you.

17                    MR. DELINSKY:  Your Honor, may I be heard

18   on a related issue?

19                    THE COURT:  Yeah.

12:05:45 20                    MR. DELINSKY:  The CVS settlements that you

21   have let in thus far, several of which are no different

22   than the Walmart lawsuit, insofar as they are only

23   allegations --

24                    THE COURT:  Well, no, they were

12:05:55 25  settlements.  That's different.  The Walmart is pending.

1          MR. DELINSKY:  Yes, one of the main

2     differences is Rule of Evidence directly on point that

3     says they don't come in.  But be that as it may, over our

4     objection, they have come in.  They have come in with the

12:06:08  5     CVS witness.

6               The purpose for which you have allowed them

7     to come in, notice, is now established.

8               There are cases and I'm thinking in

9     particular and I can give Your Honor a cite of a case, a

12:06:22 10     Judge Facciola case -- the case by Judge Facciola

11     approved by Judge Lamberth, who I'm sure you know as

12     well, in the District of Columbia, that in this instance

13     have noted that when a settlement comes in for a

14     nonliability purpose, it comes in for the most

12:06:45 15     minimum -- one time, the most minimum possible way, once

16     notice is established.

17               And at that point, particularly with expert

18     witnesses or even other fact witnesses, experts can't be

19     used as a conduit to continue to repeat the number and

12:07:02 20     content of these settlements, especially, not only

21     because of the further prejudice from this once it's

22     established, but especially because notice, Your Honor,

23     is a question of fact; not opinion.

24               And the notice already was set by the fact

12:07:20 25     testimony to the fact witness.

1          So I think at this point in time,

2    especially with expert witnesses and nonCVS witnesses, we

3    can address further CVS fact witnesses down the road, it

4    needs to stop.

5               It's in, and every single time another of

6    these settlements continue to be measured, the unfair

7    prejudice is amplified and it gets worse and worse and

8    worse.

9               THE COURT:  Well, you made a good point.

10              I think --

11              MR. WEINBERGER:  Your Honor, can we

12   have --

13              THE COURT:  This is --

14              MR. WEINBERGER:  Can we have a chance to

15   look at these cases that he cited?

16              THE COURT:  But you don't need notice.

17   You've got it in for notice.  Seems to me for the fact

18   witness, the only way it's relevant is if you have

19   someone in responsibility, and the issue is you asked

20   him, I mean, did you do anything as a result of it.

21              And then that's different.  It's not

22   notice.  It goes to --

23              MR. WEINBERGER:  Right.

24              THE COURT:  -- what the witness did or

25   didn't do to change practices, and that's different.

1              And so the focus there is not the

2       settlement agreement; it's the -- what the witness did or

3       didn't do in a position of responsibility.

4                    MR. WEINBERGER:  Right.

12:08:25  5              THE COURT:  But as for notice, we don't

6       need it further.

7                    And while you're on that, I -- there are a

8       whole lot of documents that were shown to Dr. Lembke.

9       None of them were offered into evidence.

12:08:40 10              I don't know, you asked for some limiting

11      instruction to highlight -- you want me to highlight a

12      particular document and say the jury's only to consider

13      it for -- I mean, I don't know what kind of limiting

14      instruction you're asking for, Mr. Delinsky, and how it

12:08:57 15      would be done.

16                    So I suggest you discuss this with the

17      plaintiffs and see if you can work something out.

18                    MR. DELINSKY:  All right.

19                    MR. WEINBERGER:  But we, Your Honor, to be

12:09:07 20      clear, we haven't -- she hasn't finished.

21                    THE COURT:  Understood.

22                    MR. WEINBERGER:  It's not the end of the

23      day and so we haven't moved for admission of these

24      documents yet.

12:09:15 25                    On the issue of settlements, the

1    settlements that you've allowed to be presented to the

2    jury on opening statement were settlements that contained

3    admissions.

4              So there's no limiting instruction required

12:09:33  5    with respect to that.

6              Secondly, the other settlement agreements,

7    including the one you're reviewing now, Your Honor, with

8    respect to Walmart, is -- are settlement agreements in

9    which Walmart promises to the DEA that they intend to

12:09:52 10    comply with the Controlled Substances Act by, in part,

11    setting up red flag systems and other dispensing policies

12    that will further their compliance with the DEA's

13    regulations.

14              And I think to reiterate or to confirm what

12:10:20 15    you've already said, how they responded to that,

16    including how they responded during the compliance

17    period, which in the 2011 agreement is four years, what

18    they did or didn't do or what they did after the

19    compliance period ended in 2015, and whether or not they

12:10:43 20    changed their policies and didn't comply, are all issues

21    that are relevant, not only factually.

22              THE COURT:  I agree, and that should

23    be -- that's, quite frankly, that's the significance of

24    these agreements.

12:10:56 25              There's no admission but certainly it puts

1    the company on notice that DEA had a problem.

2              And so the key really is, you know, did the

3    company do anything as a result.  And that -- and

4    witnesses who are in a position to know that can be asked

12:11:17  5    that.

6              I don't want, you know, witnesses who are

7    not in a position to know, I think it's improper and

8    prejudicial.  But if it's a witness who is in a position

9    to know, he or she can be asked about that.

12:11:31  10              So, all right.

11              MS. FUMERTON:  Your Honor, just to be clear

12    what we're talking about, we're talking about the

13    singular settlement agreement.

14              THE COURT:  I'm speaking in general, Ms.

12:11:43  15    Fumerton, about settlement agreements in general.

16              The focus in this case is over a long

17    period of time, all right?  And no one -- you know, what

18    you did or didn't do in 2001, all right, there may be an

19    explanation for it, but that explanation may not be very

12:12:04  20    convincing in 2015.

21              So that's what -- that's what these are

22    about.

23              So I will look at -- I will look at this

24    one.  This is -- I know it's Exhibit 14711, so I'll look

12:12:20  25    at this over the noon hour.

Redirect - Lembke/Lanier                    882

1              MR. WEINBERGER:  Thank you, Judge.

2              MS. FUMERTON:  Thank you.

3              (Luncheon recess taken.)

4              (Proceedings concluded at 12:12 p.m.)

12:12:39  5

6                        -   -   -   -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       THURSDAY, OCTOBER 7, 2021, 1:02 P.M.

2                   THE COURT:  All right.  Please be seated.

3                   All right.  What, Mr. Lanier, for what

4       purpose are you planning to use 14711 with this witness?

13:02:23  5                 MR. LANIER:  Your Honor, Walmart suggested

6       that this witness has no basis for knowing what Walmart

7       should or shouldn't have known before the 2013 time to

8       2015 time range where this witness had culminated her

9       knowledge about the dangers of overprescribing.

13:02:43 10                 And this is one of the documents that would

11      show that Walmart -- that she's looked at that shows

12      Walmart would have been on notice and aware of the fact

13      that there were issues related to such problems prior to

14      Dr. Lembke herself.

13:03:02 15                 MR. MAJORAS:  Your Honor, those are -- I

16      never asked -- I'm sorry.

17                  I asked this witness questions about 2001,

18      what Walmart knew before 2001.

19                  I asked her personal experience, 2013 and

13:03:15 20      '14, which she answered.

21                  I didn't ask any questions about her

22      comparing.

23                  MR. LANIER:  No, I think he did, Your

24      Honor.

13:03:20 25                 I think he specifically asked her along the

 1    lines of whether or not she expected Walmart to know

 2    something that she hadn't yet figured out.

 3              MR. MAJORAS:  Which again was 2005.

 4              THE COURT:  Well, unless I see that she was

13:03:40  5    specifically asked about something in this time period,

 6    2011, 2012, it's not relevant.

 7              If she was, then it is.

 8              MR. LANIER:  Agreed, Your Honor.

 9              We'll pull that record transcript up, and

13:03:54 10   if I can't supply it to you before I ask the question, I

11    will not ask it.

12              THE COURT:  Okay.  We can bring them in.

13              (Jury in.)

14              THE COURT:  Okay.  Please be seated, ladies

13:06:18 15   and gentlemen.

16              And, Doctor, I just want to remind you that

17    you're still under oath.

18              All right.  Mr. Lanier, you may continue.

19              MR. LANIER:  Thank you, Your Honor.

13:06:28 20       REDIRECT EXAMINATION OF ANNA LEMBKE (RESUMED)

21    BY MR. LANIER:

22    Q.    To keep us oriented, we were talking about the

23    Walmart questions before the break, specifically about

24    the issue of what knowledge Walmart may have had that's

13:06:38 25   different than the knowledge you as a doctor have had.

1       Remember that subject?

2   A.   Yes.

3   Q.   Would it be relevant to you in your opinions of

4   Walmart having knowledge you didn't have, would it be

13:06:49 5   relevant to you if you had known that in 2007, Purdue had

6   pled guilty for fraud?

7   A.   Yes.  That would have been relevant if I had known

8   that Walmart had known that.

9   Q.   Did you know in 2007 that Purdue had pled guilty

13:07:10 10   for fraud in regards to their marketing and working with

11   opiates?

12   A.   I did not know that in 2007.

13            I did know that later.

14   Q.   In that regard, would it matter to you if you tried

13:07:33 15   to figure out Walmart's knowledge compared to yours, if

16   you had known that Walmart had an entire Health and

17   Wellness department in charge of keeping up with such

18   things?

19   A.   Yes, that would have mattered.

13:07:49 20   Q.   Why?

21   A.   Well, because that would have been evidence that

22   Walmart was keeping abreast of Purdue and what was

23   happening to Purdue vis-a-vis their misleading marketing

24   messages.

13:08:16 25   Q.   All right.  Next subject within this area as well.

1          You were asked some questions about the FDA

2     and this drug being safe and effective.

3          Do you remember those questions?

4     A.    Yes.

13:08:30  5     Q.    All right.  Why is it important that when you say

6     something is approved as safe and effective by the FDA,

7     why is it important to you as a doctor to have that

8     additional phrase that's there that says, "For their

9     intended use"?

13:08:49 10     A.    Because when the FDA approves something as safe and

11     effective, they're not saying it's safe and effective for

12     everything under the Sun.

13          They're saying it's safe and effective for

14     certain types of medical diagnoses.

13:09:05 15     Q.    In that regard, I'll ask you, does safe and

16     effective mean there are no unsafe issues with opioids?

17     A.    I'm trying to understand that.

18     Q.    Let me ask it this way.

19     A.    Yeah.

13:09:22 20     Q.    When the FDA approves opioids as a safe and

21     effective treatment for its intended uses, does that mean

22     that the FDA has decided opioids are 100 percent safe,

23     there's no problem?

24     A.    No.   That's not what it means.

13:09:39 25     Q.    Does that mean that any drug approved by the FDA

1    can be prescribed by you doctors with no concerns about

2    safety issues?

3    A.    No.

4              Even once a drug is approved by the FDA,

13:09:55  5    prescribers have to consider the risks, benefits, and

6    alternatives based on the information that they have.

7    Q.    All right.  To the next questions.

8              Mr. Majoras for Walmart asked you some

9    questions about Lake and Trumbull Counties so I want to

13:10:12  10    ask you about them in the reference in which he did it.

11              Are you the plaintiffs' witness for Lake

12    and Trumbull Counties and the specific pharmacies on a

13    county level?

14    A.    No.

13:10:28  15    Q.    Are you a witness for us on national policies and

16    national actions?

17    A.    Yes.

18    Q.    By the way, do all diverted pills have to come from

19    within the county anyway?

13:10:46  20    A.    No.  One of the key features of diversion is that

21    people will travel a far geographic distance to get

22    opioid pills, and it's well known that, for example,

23    patients traveled from remote regions to places like

24    Florida to get pills from pill-mill-type pharmacies

13:11:12  25    before traveling back to their home region.

1    Q.    Okay.  All right.  Doctor, that takes us through

2    the Walmart stop.

3                    Now we move to Walgreen's, please.

4                    Mr. Stoffelmayr for Walgreen's asked you

13:11:32  5    some questions about Dr. Saeger's presentation, and he

6    showed you an exhibit marked P-25984, and it was a

7    question about confirming that Louis Saeger, M.D. is

8    scheduled, as per your request -- this is Walgreen's

9    request -- to lecture at Double Tree Suites in Washington

13:12:07 10    on January 19th, 1999.

11                    Do you see this?

12    A.    Yes.

13    Q.    And the letter that was proffered by

14    Mr. Stoffelmayr is on Purdue letterhead.

13:12:17 15                    Do you see that as well?

16    A.    Yes.

17    Q.    All right.  And he asked you about the

18    qualifications of Dr. Saeger.

19                    You said you don't know?

13:12:26 20    A.    Yes.

21    Q.    I would like to ask you a couple of relevant

22    questions as follow up to that, and here's the first one.

23                    Can you explain, please, what a KOL is to

24    the jury?

13:12:41 25    A.    A KOL is a key opinion leader, and this was a

1    well-detailed strategy that Purdue Pharma and others

2    adopted to essentially create relationships with doctors

3    and others who they identified as key opinion leaders,

4    people who would effectively promote their product under

13:13:08  5    the guise of education and science.

6                And it turned out to be a very effective

7    strategy to promote opioids, including disseminating the

8    misleading messages that we've talked about.

9    Q.   So in that regard, would you explain to the jury

13:13:25 10    why you were comfortable and your reasons for speaking to

11    the idea that Purdue and a collaborator was behind in the

12    messaging?  That may not make sense.  It did when I wrote

13    it.

14                Let me ask it this way.  Doctor, you said

13:13:45 15    that you tried to find this lecture.

16                Why did you try to find it?

17    A.   Because I wanted to see specifically what was in

18    the lecture to confirm that it contained the misleading

19    messages that I had been talking about.

13:14:00 20    Q.   And you explained to Mr. Stoffelmayr that you had

21    not been able to locate it, but yet you still felt fairly

22    confident that it would have contained information that

23    you think is poor information or misinformation.

24                Why are you comfortable saying that?

13:14:16 25    A.   Because Dr. Saeger was a key opinion leader

 1    identified by Purdue, and as such, they would not have

 2    identified and sponsored him unless he was going to

 3    disseminate the messages that they wanted disseminated.

 4    Q.    In that regard, are you familiar with the

13:14:40  5    congressional finding regarding Purdue using and paying

 6    key opinion leaders?

 7    A.    I'm not sure.

 8    Q.    Fair enough.

 9              Next, Mr. Stoffelmayr asked you about

13:14:59 10   Walgreen's and theft and that agreement to restock a

11    Walgreen's.

12              Do you remember those questions?

13    A.    Yes.

14    Q.    In that regard, mine is this:  Did the agreement to

13:15:13 15   replace stock, Purdue agreed to replace stock that was

16    stolen, did that agreement require Walgreen's to increase

17    their safeguards on the stock based upon your reading?

18              MR. STOFFELMAYR:  Objection, Your Honor.

19              The agreement's not on her materials list.

13:15:34 20             MR. LANIER:  This is what he asked about.

21              THE COURT:  Overruled.

22              MR. LANIER:  Yeah.

23              THE COURT:  Overruled.

24    A.    No, it did not.

13:15:39 25

1    BY MR. LANIER:

2    Q.    Okay.  Is that a good thing or a bad thing?

3    A.    That is a very bad thing.

4    Q.    Why?

13:15:44 5    A.    Well, because if a pharmacy was subject to theft,

6    robbery, it had a bunch of their opioids stolen, that is

7    a pharmacy in which there should be closer scrutiny of

8    their safeguards and potentially improvement of their

9    systems.

13:16:08 10            To just replace the opioid stock without

11    any regard to that is concerning.

12    Q.    All right.  Next subject, you were asked about

13    restrictive and loose policies.

14            My question to you is this:  If the

13:16:26 15    pharmacy changes their policies after they get in trouble

16    with the DEA, does that excuse their prior actions?

17                    MR. STOFFELMAYR:  Objection.

18                    Beyond the scope of cross.

19                    MR. LANIER:  This is directly on the scope,

13:16:36 20    Your Honor, of the restrictive policies and he's --

21                    THE COURT:  Overruled.

22                    MR. LANIER:  Thank you.

23    A.    No.  It doesn't excuse their prior actions.

24    BY MR. LANIER:

13:16:46 25    Q.    Does it erase the consequences that you have

1    testified to from prior actions?

2    A.    No.

3    Q.    Okay.  Thank you.

4              Last stop, Giant Eagle.  Let's start with

13:17:05 5    size questions.

6              You were asked questions, and there was an

7    assumption that -- in the question that the Giant Eagle:

8    Stores close at 9:00 p.m.  I think some of them it's

9    11:00.  That makes no difference to me whether it's 9:00

13:17:21 10    or 11:00, but does size make any difference as to whether

11    or not you should follow the law?

12    A.    No.

13    Q.    Does it make any difference as to whether or not

14    you should follow good prescribing habits?

13:17:32 15    A.    No.

16    Q.    Does it make any difference whether or not you

17    should give your pharmacists the tools to use to prevent

18    diversion?

19    A.    No.

13:17:39 20    Q.    Does it make any difference in whether or not you

21    give your pharmacies the training they need to prevent

22    diversion?

23    A.    No.

24    Q.    Does the fact that a pharmacy exists in a grocery

13:17:54 25    store mean that the pharmacists don't need the tools to

Redirect - Lembke/Lanier                                    893

1    prevent diversion?

2    A.    No.

3    Q.    Does the fact that a pharmacy exists in a

4    training -- in a grocery store mean that you don't need

13:18:04  5    to give your pharmacists the training they need to

6    prevent diversion?

7    A.    No.

8    Q.    And then you were asked questions in this regard

9    about the store itself.

13:18:17 10          Are your statements valid if the evidence

11    turns out to be that Giant Eagle has 19,000 employees in

12    five states with 216 supermarkets?

13          Does that -- does size mean anything to

14    you?

13:18:35 15    A.    Well, that, that sounds sizable, but my review of

16    the evidence is not based on size.

17          It's based on their policies and

18    procedures.

19    Q.    Fair enough.  Next subject.

13:18:49 20          You were asked questions about Butran.  Am

21    I saying it right, is it Butran or Butran?

22    A.    Butran.

23    Q.    Butran, all right.

24          And you were asked is Butran on trial.

13:19:00 25          Do you remember those questions?

Redirect - Lembke/Lanier                              894

```
 1    A.    Yes.

 2    Q.    Well, is Butran an opioid?

 3    A.    Yes.

 4    Q.    Are opioids the issue that you're here to testify

 5    about?

 6    A.    Yes.

 7    Q.    Is Butran addictive?

 8    A.    Yes.

 9    Q.    Does Butran work on those dopamine, that brain loop

10    you talked about yesterday?

11    A.    Yes.

12    Q.    So is Butran relevant to your testimony in this

13    case about opioids?

14    A.    Yes.

15    Q.    Last area.  No.  Second-to--the last area.

16                    Sorry, Judge.

17                    You were asked questions specifically about

18    a letter and whether or not the letter was sent, and this

19    is in reference to a letter you talk about on Page 80 of

20    your report.

21                    Do you remember that question, those

22    questions?

23    A.    Yes.

24    Q.    I want to ask you what is your proof of the

25    likelihood that it was sent?
```

```
        1              MS. SULLIVAN:  Objection, Your Honor.

        2              Calls for speculation.

        3              MR. LANIER:  Your Honor, I don't think --

        4              THE COURT:  Well, rephrase that.

13:20:15  5              MR. LANIER:  Yeah.  I'd like to rephrase

        6   it.

        7              Thank you, Judge.

        8   BY MR. LANIER:

        9   Q.    First of all, when I asked you at the very

13:20:21 10   beginning of your testimony to restrict your opinions to

       11   those that seemed reasonably probable, do you remember

       12   that?

       13   A.    Yes.

       14   Q.    I want to ask you in terms of what's reasonably

13:20:32 15   probable in your opinion, what your basis was for saying

       16   that you believed there was an undue relationship between

       17   Giant Eagle and Purdue as witnessed in the paragraph that

       18   Ms. Sullivan put in front of the jury that I've now put

       19   back in front of the jury.

13:20:52 20   A.    So I think it's reasonably probable that these

       21   letters were actually sent, and I base that on the fact

       22   that the templates for the letters submitted for Giant

       23   Eagle approval had Giant Eagle letterhead on them.

       24   Q.    Okay.  The fact that this is an agreement you talk

13:21:18 25   about, does -- that the program will be offered to the
```

1    retail pharmacy chains, is that relevant to your opinion?

2    A.    I mean, yes.

3                  It -- it implies that it was, indeed,

4    offered.

13:21:43  5    Q.    Okay.  The agreement that called for 72,520 letters

6    to be mailed out, did you ever see those 72,520 letters

7    under the agreement?

8    A.    No.

9    Q.    Okay.  Last subject.

13:22:05  10                  The Giant Eagle attorney also asked you

11   what you did or didn't do in regard to examining Giant

12   Eagle's dispensing within its stores.

13                  Remember?

14   A.    Yes.

13:22:14  15   Q.    Okay.  My question is, we've already established

16   you're not a pharmacist, I don't need to ask that again,

17   but did you leave the store pharmacy dispensing questions

18   to our pharmacist expert to answer instead of you?

19   A.    I do include in my report opinions on pharmacy

13:22:36  20   dispensing.

21   Q.    Okay.  But in terms of examining store by store,

22   how the pharmacists behaved and whether or not it was

23   proper, is that your area of testimony?

24   A.    On a store-by-store level?  That is for other

13:22:53  25   experts.

1    Q.    Thank you.

2              MR. LANIER:  Your Honor, I'll pass the

3    witness.

4              THE COURT:  Any -- any redirect?

13:23:03  5              MS. SULLIVAN:  Nothing further, Your Honor.

6              MR. MAJORAS:  Very brief, Your Honor.

7              THE COURT:  Okay.

8         RECROSS-EXAMINATION OF ANNA LEMBKE

9    BY MR. MAJORAS:

13:23:30  10   Q.    Dr. Lembke, John Majoras, one of the Walmart

11   lawyers.  You heard a little bit about me in the last few

12   questions and that's what I wanted to ask you, one

13   follow-up question on one area.

14              Mr. Lanier asked you whether you're aware

13:23:41  15   that Walmart has a Health and Wellness department.

16              Do you recall that?

17   A.    Yes.

18   Q.    And you weren't here when I introduced the Vice

19   President of Health and Wellness to the jury, were you?

13:23:50  20   A.    No.

21   Q.    And are you aware that the Health and Wellness

22   department simply operates the Walmart pharmacies?

23   A.    I'm not that familiar with it.

24   Q.    Okay.  And he then followed up with a question

13:24:05  25   about the Purdue plea to fraud charges.

|   |   |
|---|---|
| 1 | You now are aware of that, correct? |
| 2 | A.    Yes. |
| 3 | Q.    You weren't aware of it when it happened in 2007? |
| 4 | A.    No. |
| 13:24:14  5 | Q.    But you now are aware that that was a court |
| 6 | proceeding, correct? |
| 7 | A.    Yes. |
| 8 | Q.    And it was publicly available to everyone, correct? |
| 9 | A.    I don't know. |
| 13:24:26 10 | Q.    Okay.  You've had no problem learning about it when |
| 11 | you started doing your research, have you? |
| 12 | A.    No. |
| 13 | MR. MAJORAS:  Thank you. |
| 14 | MR. STOFFELMAYR:  Judge, may I ask a couple |
| 13:24:49 15 | questions? |
| 16 | THE COURT:  Yes, Mr. Stoffelmayr. |
| 17 | MR. STOFFELMAYR:  Thank you, Judge. |
| 18 | RECROSS-EXAMINATION OF ANNA LEMBKE |
| 19 | BY MR. STOFFELMAYR: |
| 13:24:54 20 | Q.    Doctor, I just want to come back real quick to the |
| 21 | questions about theft and you offered some testimony a |
| 22 | minute ago about the agreement between Purdue and |
| 23 | Walgreen's. |
| 24 | Do you recall that? |
| 13:25:06 25 | A.    Yes. |

```
          1    Q.    Have you ever seen the agreement?

          2    A.    Pardon me?

          3    Q.    Have you ever seen that agreement?

          4    A.    I don't believe so.

13:25:15  5    Q.    Okay.  Do you --

          6                MR. STOFFELMAYR:  That's all I have.

          7                Thank you.

          8                THE WITNESS:  Yes.

          9                MS. SULLIVAN:  Nothing from Giant Eagle,

13:25:23 10    Your Honor.

         11                THE COURT:  Okay.

         12                All right.  Dr. Lembke, thank you very

         13    much.

         14                You may be excused and we appreciate all

13:25:30 15    the time you've spent here.

         16                Have a good return.

         17                THE WITNESS:  Thank you.

         18                MR. LANIER:  Your Honor?

         19                THE COURT:  Yes.

13:25:37 20                MR. LANIER:  Mark Lanier on behalf of

         21    plaintiff.

         22                Our next witness is Dr. Carmen Catizone.

         23                MR. WEINBERGER:  Not a doctor.

         24                MR. LANIER:  I'm sorry.  It's yes --

13:25:47 25    Mr. Car -- are you going to say something else?
```

```
  1              MR. WEINBERGER:  No, no.

  2              MR. LANIER:  Mr. Carmen Catizone, but it

  3    will take us about four or five minutes to set up for

  4    him, if the Court would indulge us.

13:25:55  5              THE COURT:  Okay.

  6              MR. LANIER:  Thank you.

  7              THE COURT:  So we need to clean off the

  8    witness stand, also.

  9              MR. LANIER:  Oh, a juror may have a

13:26:05 10    question, Your Honor.

 11              A JUROR:  We do.

 12              THE COURT:  All right.  If you want to pass

 13    it to Mr. Pitts, please.

 14              Well, we better get the witness back.

13:26:19 15              MR. LANIER:  Yes, we just sent our fastest

 16    fellow.

 17              THE COURT:  Because I assume the question

 18    is for the witness.

 19              A JUROR:  Yes.

13:26:36 20              THE COURT:  All right.  According to my

 21    protocol, I'm going to show this to counsel.

 22              If any counsel wants to ask this of this

 23    witness or any of it, that's fine.

 24              If not, it may be more appropriate with

13:26:49 25    other witnesses as I've indicated, but I appreciate the
```

1    question from the juror.

2                    (Pause.)

3                    MR. LANIER:  Your Honor, I'm fine with

4    whatever the defendants want to do.

13:27:13  5                    MR. STOFFELMAYR:  Judge, do you want us to

6    use the side-bar phones or how can we --

7                    THE COURT:  Well, all right.  Let's go on

8    this.

9                    MR. STOFFELMAYR:  I want to explain to you.

13:27:26  10                    THE COURT:  All right.

11                    (Proceedings at side-bar:)

12                    MR. STOFFELMAYR:  Judge, I don't think this

13   is the right witness, as other witnesses are a hundred

14   percent going to answer this question.

13:27:42  15                    THE COURT:  That's what I figured,

16   Mr. Stoffelmayr.

17                    MR. STOFFELMAYR:  Yes.  I just don't want

18   the juror to think we are ignoring her question.

19                    THE COURT:  I'll cover that.  So I gather

13:27:55  20   no one else wants to ask this or anything like this of

21   this witness.

22                    Correct?

23                    MR. STOFFELMAYR:  Correct.

24                    THE COURT:  Okay.

13:27:59  25                    (End of side-bar conference.)

|  |  |
|---|---|
| 1 | THE COURT:  All right. |
| 2 | Dr. Lembke, you may -- you may be excused. |
| 3 | And, ladies and gentlemen, again, the |
| 4 | protocol is I show the questions to counsel, and if they |
| 13:28:12  5 | think it's -- the right thing is to ask the question of |
| 6 | this witness, fine. |
| 7 | Often the questions may be better answered |
| 8 | from another witness, and they know that the juror has |
| 9 | the question. |
| 13:28:22 10 | So thank you. |
| 11 | (Pause.) |
| 12 | MR. LANIER:  And with that, Your Honor, may |
| 13 | we go about setting up for this witness? |
| 14 | THE COURT:  Yes. |
| 13:29:39 15 | (Pause.) |
| 16 | All right.  Sir, if you could raise your |
| 17 | right hand. |
| 18 | CARMEN CATIZONE, |
| 19 | of lawful age, a witness called by the PLAINTIFFS, |
| 13:30:41 20 | being first duly sworn, was examined |
| 21 | and testified as follows: |
| 22 | THE COURT:  Thank you. |
| 23 | And you may take your mask off while |
| 24 | testifying. |
| 13:30:52 25 | THE WITNESS:  Thank you. |

1          MR. LANIER:  Okay, Your Honor, thank you.

2     We are ready.

3               THE COURT:  Okay.

4               MR. LANIER:  May it please the Court,

13:31:35  5     ladies and gentlemen.

6          DIRECT EXAMINATION OF CARMEN CATIZONE

7     BY MR. LANIER:

8     Q.   Mr. Catizone, would you please introduce yourself

9     to the jury.

13:31:49 10     A.   Sure.  I am Carmen Catizone.

11     Q.   All right.  Mr. Catizone, like everyone else, I not

12     only have a roadmap for you, I tried to find your

13     picture.

14               Is that you?

13:32:01 15     A.   Yes, sir.

16     Q.   All right.  And I won't go into a lot of detail

17     about your personal life, but am I allowed to at least

18     ask you how old are you?

19     A.   65.

13:32:14 20     Q.   And, sir, I've got a copy of your CV, your

21     Curriculum Vitae, your resumé.

22               I've got it marked as demo 19.  I'd like to

23     put it up on the screen and ask you a couple of questions

24     about it.

13:32:35 25               And make sure that we get your

```
        1    qualifications out there in front of the jury.  That's

        2    our first stop, your experience.  Okay?

        3    A.    Yes, sir.

        4    Q.    Then after that, we're going to look at your focus

13:32:48 5    in this case and then we'll finish with your findings.

        6                   Okay?

        7    A.    Yes, sir.

        8    Q.    And I expect you'll be on the stand probably with

        9    me throughout today, and then maybe tomorrow the

13:32:58 10   cross-examination will start, depending on how fast we

       11    go.

       12                   All right?

       13    A.    Yes, sir.

       14    Q.    The biography that you've put here says you're

13:33:09 15   currently a senior advisor to the National Association of

       16    Boards of Pharmacy.

       17                   Is that true, still true?

       18    A.    Yes, sir.

       19    Q.    What is the National Association of Boards of

13:33:26 20   Pharmacy?

       21    A.    The National Association of Boards of Pharmacy, or

       22    NABP, is an organization of all of the state regulatory

       23    agencies in the United States and in Canada that regulate

       24    the practice of pharmacy and whose primary mission is the

13:33:44 25   protection of the public health.
```

Catizone - Direct/Lanier                    905

 1              No pharmacists, no pharmaceutical

 2    companies, no pharmacies can be members of the NABP.

 3    It's only the state regulatory agencies, and those

 4    individuals are appointed by the Governors of the state

13:33:58  5    to serve on those Boards of Pharmacy.

 6              And NABP was founded in 1904.

 7              MR. WEINBERGER:  Your Honor, can we turn up

 8    his microphone just a bit?

 9              THE COURT:  Okay.

13:34:10 10              MR. LANIER:  I'm having a little trouble

11    here, Your Honor.

12              THE COURT:  Good idea.

13    A.    I'll move the mic closer if that helps.

14              MR. LANIER:  I tend to shout so

13:34:20 15    people -- and that may influence how loud you are because

16    they set the system for me so I'll modulate down if you

17    can pull your microphone up.

18              All right.

19    A.    Sure.

13:34:30 20    BY MR. LANIER:

21    Q.    Thank you.  To make sure that everybody got that,

22    the National Association of Boards of Pharmacies, you

23    said, is an organization of regulatory agencies.

24              Now, are pharmacies members, full members,

13:34:51 25    of the National Association of Boards of Pharmacies?

1    A.    No, sir.  Only the states.  And each state has one

2    vote and one Board of Pharmacy member of NABP.

3    Q.    What does that organization do?

4    A.    It really has three primary focuses.

13:35:08 5              One is NABP develops the nationality

6    licensure exam for pharmacists.  So anyone who wants to

7    be a pharmacist in the United States has to take the

8    national examination that NABP develops.

9              Second, NABP manages the licenses of

13:35:25 10   pharmacists when they want to transfer from

11   state-to-state.  So if a pharmacist wants to move from

12   Illinois to Ohio, their application is processed through

13   NABP, and NABP examines that application and makes sure

14   that person doesn't have any disciplinary actions and

13:35:41 15   makes sure that person has all the brokered credentials

16   and lets the State of Ohio know that that person is ready

17   for transfer.

18              The third function is NABP has the

19   accreditation system where it accredits pharmacies,

13:35:57 20   wholesale distributors, Internet sites to make sure they

21   are in compliance with Allstate and federal laws and that

22   they're not doing anything that would actually harm the

23   public.

24   Q.    All right.  Sir, are you a pharmacist?

13:36:17 25   A.    Yes, sir.

Catizone - Direct/Lanier                    907

1    Q.    How did you get to be a pharmacist?

2    A.    I was always interested in the science and

3    chemistry of medicine and I also wanted to do something

4    where I could help people and interact with people and

13:36:38 5    pharmacy was a profession that I thought fit well for me

6    and something I would enjoy doing, and that's when I made

7    the decision to try to become a pharmacist and then

8    become a pharmacist.

9    Q.    When I was talking to you -- by the way, you and I

13:36:51 10   visited, via Zoom last night before you came in from out

11   of town.

12                    Is that right?

13   A.    Yes, sir.

14   Q.    And while we were talking via Zoom last night, you

13:37:02 15   told me something about being the first in your family to

16   go to college?

17   A.    Yes.  I was born and raised on the south side of

18   Chicago and my parents were both blue collar.  My dad

19   finished sixth grade, grammar school.  My mom finished

13:37:21 20   high school and I've been working since I was 14.  My

21   first job was selling magazines door-to-door which that

22   only lasted one day so I realized that probably wasn't

23   the right career path for me, and I've been working the

24   last 40 years as a pharmacist, and the first and only one

13:37:35 25   in my family that's actually gone to college.

Catizone - Direct/Lanier

908

1    Q.    Okay.  And you don't talk much about your family.

2                I'm not asking you much about your family

3    beyond just saying are you married, do you have family?

4    A.    Yes.  And yes.

13:37:51  5                And the reason I don't speak about my

6    family as much as, one, is because of all the issues with

7    identity theft and then some of the other things I did

8    while I was at NABP and continue to do is I serve as an

9    expert witness for the DEA and the U.S. Attorneys across

13:38:08 10   the country, and on more than one occasion, my life has

11   been threatened by individuals who have been convicted

12   and sent to prison or prisoners have actually tried to

13   contact my employer or my family to issue threats against

14   me for the work I do with the DEA and U.S. Attorney's

13:38:24 15   Offices.

16   Q.    So out of safety concerns, we'll leave family

17   background out of it.

18   A.    Okay.

19   Q.    But it's not because you're not proud of your

13:38:31 20   family or something like that if we don't ask you?

21   A.    I'm extremely proud particularly of my

22   grandchildren, who I like more than my children, so.

23   Q.    All the fun, none of the responsibility is what my

24   wife and I say.

13:38:44 25                All right.  Mr. Catizone, I want to go back

1    then and I want to look at your CV and look at your

2    biography a little bit.

3                    You are a founding partner of Catizone,

4    Luce and another fellow, Menighan.  How do you say it?

13:39:09  5    A.    Yes, sir, Menighan.

6    Q.    Menighan.

7                    Would you tell the jury a little bit about

8    your business entity there?

9    A.    So when I retired from my Executive Director

13:39:25 10    position December of 2020, I realized I needed to do

11    something else and I wanted to stay somewhat involved.

12                    But for my own safety, I knew if I was home

13    all day long, that my wife would probably kill me.  So I

14    needed to do something else to take the time up, and I

13:39:41 15    founded this company.

16                    And what our company does is advises

17    individuals, companies that are seeking to be licensed,

18    that are trying to become more knowledgeable about

19    pharmacy or trying to develop innovative ways to bring

13:39:59 20    medicine to care of the patients.

21    Q.    And is it in your capacity as a gentleman within

22    this entity that we have retained you to come testify

23    here?

24    A.    Yes, sir.

13:40:11 25    Q.    And we do reimburse you for your time at your

1    standard rates and all of that mess like I think all

2    parties do with their experts?

3    A.    Yes, sir.

4    Q.    Before you founded this, you were with the National

13:40:24 5    Association of the Boards of Pharmacy, that's the group

6    that you were telling us about earlier, correct?

7    A.    Yes, sir.

8    Q.    And when we look at your job from May of -- from

9    1988 to May of 2020, you were the Executive Director,

13:40:44 10   CEO.

11              What does that mean?

12   A.    I was responsible for the organization as a whole,

13   and so I oversaw all the employees, some of the

14   operations and then worked with the Board of Directors,

13:40:58 15   which are elected officials from all the states.

16              When I first started in 1985, there were

17   seven employees, and we had a budget of probably $300,000

18   and then when I retired in 2020, the organization had 150

19   employees and a budget of $40 million.

13:41:15 20   Q.    Of 40, 4-0, million?

21   A.    Yes, sir.

22   Q.    And you oversaw that whole organization?

23   A.    Yes, sir.

24   Q.    And as such, when we start looking at issues of

13:41:30 25   pharmacies and what they did or didn't do and did and

1    didn't know, were you actually the Executive Director/CEO

2    during the 1990s, the early 2000s, and the 2000 teens?

3    A.    Yes, sir.  And because it was such a small staff, I

4    was involved in all of the activities and I learned all

13:41:52  5    the programs firsthand and worked very closely with the

6    states on all of those issues.

7    Q.    And then after you moved from being the CEO and

8    Executive Director, you continued as a senior advisor,

9    which is what you even do now two years later or a

13:42:12  10    year-and-a-half later.

11             What is your responsibility as a senior

12    advisor?

13    A.    I'm supposed to advise the Executive Director and

14    staff on issues, provide the history of what's happened.

13:42:24  15    Many times I just go there because it's free coffee and a

16    get a few hours peace and quiet, but otherwise, I provide

17    advice to the staff that's there now.

18    Q.    In that regard, you have practiced also as a

19    registered pharmacist within Illinois?

13:42:44  20    A.    Yes, sir.

21    Q.    Is your license still valid?

22    A.    Yes, sir.

23    Q.    So you could, like, fill prescriptions for us?

24    A.    Legally, yes, sir.

13:42:57  25    Q.    Do you ever do any of that?

Catizone - Direct/Lanier                    912

1    A.    No.  I just simply respond to questions from my

2    family and friends about their medications and different

3    things but have not practiced, sir.

4    Q.    When was the last time you filled a prescription?

13:43:12  5    A.    Probably at around 2000.

6    Q.    Okay.  As we continue to look, there are a host of

7    presentations that you have made.  They go on for pages

8    within your CV.

9              Is that fair to say?

13:43:32 10    A.    Yes, sir.

11    Q.    And these presentations, you keep track of them, I

12    assume?

13    A.    Yes, sir.

14    Q.    And are any of them relevant to the issues that we

13:43:48 15    have asked you to look at in our case?

16    A.    In some regards, some more than others.

17              All of those are relevant to the

18    proceedings and discussions at this trial.

19    Q.    So the issues where you look at standard of care, a

13:44:06 20    regulatory approach, is that important?

21    A.    Yes, sir.

22    Q.    Why?

23    A.    Standard of care is one of the principles that I

24    was asked to look at, and my expertise in, to discuss

13:44:18 25    defendants' behavior and what was happening with

Catizone - Direct/Lanier                           913

1    prescriptions and activities in Lake and Trumbull County.

2    Q.    Understanding corresponding responsibility and red

3    flags in pharmacy cases, a presentation at the Drug

4    Enforcement Administration's federal pharmaceutical drug

13:44:36  5    investigation and prosecution training program in Texas,

6    2016, is that relevant?

7    A.    Yes, it is, sir.

8    Q.    In what way?

9    A.    Again, corresponding responsibility is one of the

13:44:48  10   key principles under discussion in this trial and one of

11   the key responsibilities of pharmacists and pharmacies.

12   Q.    And so when you did that presentation, were you

13   doing it at the request of the DEA or how did that come

14   about, if you remember?

13:45:06  15   A.    Yes.

16         The DEA requested that, because one of the

17   other responsibilities I had or activities I engaged in

18   is I was an adjunct faculty for the DEA and I taught DEA

19   agents at Quantico red flags, corresponding

13:45:23  20   responsibility, and what the Boards of Pharmacy were and

21   what their responsibilities were.

22   Q.    Wait.  Quantico?

23   A.    Yes, sir.

24   Q.    That's like FBI headquarters?

13:45:31  25   A.    Yes, sir.

Catizone - Direct/Lanier                    914

1    Q.   And you taught there?

2    A.   Yes, sir.

3    Q.   In that regard, also, you have spoken, I see, in

4    2015 at the National Heroin Task Force Subcommittee

13:45:49 5    meeting in D.C.

6              Is that relevant in this case?

7    A.   Yes, sir.

8    Q.   Why?

9    A.   What happened with the prescription drug abuse and

13:45:58 10   opioids, people would substitute opioids for heroin.

11   When it became difficult or too expensive to obtain

12   opioids, they would switch to heroin.  So there was a lot

13   of interplay and a lot of interactions between opioid

14   abuse and heroin abuse as well.

13:46:15 15   Q.   You gave a presentation on prescription opioid

16   abuse, misuse, and diversion back in 2014 in Dallas,

17   Texas.

18             Is that correct?

19   A.   Yes, sir.

13:46:27 20   Q.   Is that relevant to your opinions in this case?

21   A.   Yes, sir.

22   Q.   Why?

23   A.   Again, for many of the same reasons I mentioned,

24   the fact that opioids are abused and the problems that

13:46:38 25   they cause and the impact it had on people's lives.

```
          1              My expertise in how pharmacies, pharmacists

          2    and Boards of Pharmacy were managing those issues was the

          3    focus of my presentation and relevance to the proceedings

          4    we're involved in.

13:46:54  5    Q.    Sir, is it fair to say that you've been involved in

          6    issues that you'll be testifying about for decades?

          7    A.    Yes, sir.

          8    Q.    Now, before I leave your CV, you've got another

          9    section entitled "Expert testimony."

13:47:12 10              Is that fair?

         11    A.    Yes, sir.

         12    Q.    And your first section is U.S. Attorney.

         13              Can you explain what you mean by this list

         14    under that?

13:47:20 15    A.    As I mentioned earlier, I do expert work for the

         16    U.S. Attorney's Offices across the country on various

         17    cases that they have involving pharmacy regulation and

         18    pharmacy practice.

         19    Q.    And you've actually gotten at least one death

13:47:37 20    threat, you were telling me about, because of this?

         21    A.    Yes, sir.

         22    Q.    I think it's important people understand what

         23    you've done.

         24              So would you explain what happened to the

13:47:46 25    detail you're allowed to or comfortable with?
```

1    A.    Sure.

2              There was a case in Minnesota in which an

3    individual who was a high school dropout but was very

4    intelligent in terms of computer savviness actually

13:48:00 5    constructed a number of illegal Internet websites and was

6    selling opioids and other products on the Internet

7    through these websites, probably amassed a fortune of

8    between 12 and $21 million.

9              I was asked to testify against the

13:48:15 10    individual based upon my knowledge and experience about

11    what's illegal Internet pharmacy, what's safe practices,

12    what's corresponding responsibility.

13              As I went up to testify, the U.S. Attorneys

14    Marshals Service had to move me from hotel to hotel

13:48:31 15    because while the person was in jail, they tried to buy

16    someone to kill the witnesses before we could testify.

17    And so I did testify at the trial and then the individual

18    received an additional sentence for threatening witnesses

19    in that case.

13:48:47 20    Q.    You've done this, it looks like, if I'm looking at

21    the time period, for at least the last 15 years.

22              Is that right?

23    A.    Yes, sir.

24    Q.    You then have another section of your resumé where

13:49:03 25    you've provided expert testimony for the U.S. Department

1    of Justice Drug Enforcement Administration.

2                  Can you tell us about that, please?

3    A.    I work very closely with the DEA.  The DEA will ask

4    me to opine or give opinions on various matters or

13:49:20  5    testify in cases.  So again, it's very similar to the

6    work with the U.S. Attorneys.

7                  They'll have a pharmacist, pharmacy or

8    individual that owns a pharmacy that they feel is not

9    meeting the responsibilities, and I'm asked to assist and

13:49:33  10    testify as to what those responsibilities would be and

11    whether or not they're practicing pharmacy practice as

12    they should.

13    Q.    All right.

14                  In addition to that, you've testified for a

13:49:42  15    number of states?

16                  Can you tell us about that, please?

17    A.    In my role with NABP, I often was asked to testify

18    on issues before the states to give opinions as to what

19    the national standard might be or what the standards of

13:49:56  20    care would be or what the best regulatory practice would

21    be.

22                  And so I've made presentations to all the

23    states, many of the state legislatures, with the

24    exception of Alaska.  I've never testified in Alaska.

13:50:10  25    Q.    So when you testify in this case, Judge willing,

          1      when you testify in this case about standards of care, is

          2      that something that states have used you to talk about in

          3      different contexts, perhaps, but at least standard of

          4      care of pharmacists?

13:50:25  5      A.    Yes, sir.

          6      Q.    Okay.

          7                  Next, I notice you've got a couple of pages

          8      of congressional testimony.

          9                  Can you tell the jury a little bit about

13:50:34 10      your congressional testimony?

         11      A.    Again, in my role at NABP, we would be invited by

         12      various Senate or House committees or subcommittees to

         13      talk about pharmacy practice, pharmacy regulation,

         14      opioids, Internet pharmacies, corresponding

13:50:51 15      responsibility, because Congress and Senate was

         16      interested as to what was the picture, what was the

         17      landscape, from a national perspective, as to what the

         18      states were doing and what was happening in the states

         19      and what NABP was doing to recommend to the states what

13:51:06 20      practices to follow, what regulations that they may want

         21      to implement.

         22      Q.    All right.  You've also got a section in your CV

         23      where you've put in some chapters in books and you've

         24      published some articles.

13:51:18 25                  Fair to say?

1    A.    Yes, sir.

2    Q.    Do you like writing books and articles?

3    A.    It's interesting to do.

4          I'm not sure I would classify it as fun,

13:51:31  5    but it's interesting.

6    Q.    Okay.  Then you've got a set of media -- well,

7    actually pages of media appearances.

8          And finally, your last page you saved until

9    last, your awards and honors, right?

13:51:49 10   A.    Yes, sir.

11   Q.    And it looks like you've gotten a number of awards

12   from University of Illinois; Alumnus of the Year to

13   Federation of State Medical Boards Award of Merit, a

14   special citation from the Commissioner of the FDA on two

13:52:07 15   occasions.

16         Which one are you most proud of?

17   A.    The one I'm most proud of is that I've helped a

18   number of people at NABP actually realize their potential

19   and believe in themselves.

13:52:21 20        Those awards are very gratifying, but I

21   haven't been the one that's done the work behind many of

22   those awards so I appreciate being recognized but there's

23   a lot of other people that helped me get those awards.

24   Q.    You've got affiliations down here as well.

13:52:38 25        We've already discussed you as a registered

1    pharmacist in Illinois.

2                    But are you a member of the Federation of

3    Association of Regulatory Boards?

4    A.    Not any longer because that organization doesn't

13:52:53  5    exist anymore, sir.

6    Q.    All right.  Were you a member of the American

7    Foundation For Pharmaceutical Education?

8    A.    While it existed, yes, sir.

9    Q.    A member of the American Institute of the History

13:53:06 10    of Pharmacy?

11    A.    Yes, sir.

12    Q.    American Pharmacists Association?

13    A.    Yes, sir.

14    Q.    American Society For Pharmacy Law?

13:53:13 15    A.    Yes, sir.

16    Q.    American Society of Health System Pharmacists?

17    A.    No longer, but I was.

18    Q.    Okay.  President of the National Drug Trade

19    Conference at some point in 1995?

13:53:28 20    A.    Yes, sir.

21    Q.    Sir, with all of your experience and all of your

22    special knowledge that you come here as an expert with,

23    I'm going to be asking you a number of questions and

24    opinions.

13:53:44 25                    Are you with me?

Catizone - Direct/Lanier                    921

1    A.    Yes, sir.

2    Q.    And when I ask you those opinions, I would ask you

3    to only answer if they're within the realm of reasonable

4    probability for your field of expertise.

13:53:59  5              Okay?

6    A.    Yes, sir.

7    Q.    Thank you.

8              With that, we're through the first stop,

9    experience.  And I'd like to talk at the second stop

13:54:09  10   about your focus.

11             All right?

12             What have we asked you to do in this case?

13   A.    I've been asked to review information and data from

14   the defendants in the class and make an opinion or

13:54:31  15   provide opinion as to whether or not the defendants were

16   actually complying with the corresponding responsibility,

17   conducting due diligence regarding red flags, and whether

18   or not they were able to and did document what they did

19   to identify and resolve red flags so they could dispense

13:54:51  20   prescriptions safely.

21   Q.    And have you had a chance to do the necessary

22   homework to offer your opinions?

23   A.    Yes, sir.

24   Q.    Are you competent to testify about red flags?

13:55:12  25   A.    Based on my experience and all the things I've done

1    in the past 450 years, I believe so, sir.

2    Q.    And what is your definition as a pharmacist and an

3    ex-CEO of the national Boards of Pharmacy, what is your

4    definition of a red flag in terms of opioid --

13:55:32  5    A.    Sure.

6    Q.    -- and this case?

7    A.    And probably the simplest of definitions, it's a

8    warning sign, something is not right, something requires

9    additional review.

13:55:44  10                   And more of the pharmacy jargon, pharmacy

11    language, red flags.  It's a number of factors that have

12    been identified by the DEA, by the state Boards of

13    Pharmacy, any court cases, that alert the pharmacists

14    that there's a problem here with this prescription,

13:56:02  15    either that can harm the patient, or it's signalling if

16    there could be possible diversion or something else going

17    on that causes that pharmacist to pause and conduct due

18    diligence to make sure that that red flag gets resolved.

19    Q.    And that's my next general question, and we'll get

13:56:23  20    into lots of specifics with your findings as we walk

21    through your opinions, but when a red flag or more red

22    flags, plural, accompany a customer and a prescription,

23    is it an obligation of the pharmacist to resolve that red

24    flag before dispensing the prescription?

13:56:53  25    A.    Yes.

1    Q.    Is that an important responsibility?

2    A.    It's a -- it's a critical responsibility, and I can

3    explain it both in the context of a red flag and the

4    context of just a regular prescription.

5              If you had a prescription and there was

6    something wrong with that prescription, a red flag, maybe

7    the dose was too high or maybe it was a medication that

8    you shouldn't be taking or your child shouldn't be

9    taking, if the pharmacist doesn't resolve that warning

10   sign before dispensing the medication, you or your child

11   or a family member could be significantly injured by that

12   medicine.

13             The same concept applies with red flags.

14   If there's a red flag that signals that there may be an

15   issue with this prescription, patient harm or diversion,

16   the pharmacist has to resolve that before they dispense

17   it.  They simply can't say, "Here's the prescription.  I

18   notice there was something wrong with it, good luck."

19   That's just not pharmacy practice and that's not in the

20   best interests of the patient.

21   Q.    Okay.  In addition to red flags, when you said did

22   defendants comply with their obligations -- by the way,

23   before I say, "In addition," did we ask you to

24   deliberately focus on the specific pharmacies within Lake

25   and Trumbull County?

1    A.    I focused on the prescriptions from Lake and

2    Trumbull County that came from those pharmacies.

3    Q.    And you actually -- did you actually eyeball these

4    prescriptions?

13:58:28  5    A.    The sample set that was provided to me, which was

6    about 2,000 prescriptions per defendant, I actually

7    looked at every single one of those almost 8,000

8    prescriptions.

9    Q.    And those were the ones that, through Court order,

13:58:44 10    the defendants gave to us.

11              We didn't choose that sample, we being the

12    lawyers for Lake and Trumbull.  You understand that?

13    A.    That was my understanding, sir, but that was

14    between the lawyers.

13:58:54 15    Q.    So -- right.

16              So the four defendants in this case were

17    each to tender 2,000 to us as lawyers, and we gave them

18    to you, and did you look at each one of those?

19    A.    Yes, sir.

13:59:04 20    Q.    And those were specifically from Lake and Trumbull

21    Counties?

22    A.    Yes, sir.

23    Q.    So are you able to testify about whether or not the

24    pharmacists exercised good pharmacy practice when it came

13:59:25 25    to dispensing on those 8,000 prescriptions?

1    A.    Yes, sir.

2    Q.    And are you prepared to do that when we reach that

3    point in your testimony?

4    A.    Yes, sir.

13:59:39  5    Q.    I know that there are other areas that you're going

6    to testify about.  I'm going to come back to those in a

7    minute.

8              But I want to pause first and ask you some

9    generic questions about this, and the first one that I

13:59:52  10    would ask you is this:

11              What are the roles of a pharmacy and a

12    pharmacist?

13              Is there a distinction in your mind?

14    A.    No, sir.  The two work in tandem and share

14:00:10  15    responsibilities.

16              So --

17    Q.    All right.  Explain, please.

18    A.    So the pharmacist is the final gatekeeper for a

19    person receiving the medication.

14:00:19  20              Doctors have some knowledge about

21    medications, but the pharmacist spends their entire

22    professional career and education learning about

23    medications and learning how patients can best use those

24    medications.

14:00:31  25              So the pharmacist has to take

1    responsibility for that patient's medications and make

2    sure the patient receives the right medication.

3                  The pharmacy is to support the pharmacist

4    in that regard, provide them with the tools that are

14:00:44  5    necessary, provide them with the staffing that's

6    necessary, provide them with information and information

7    systems that allow the pharmacists to meet that

8    responsibility and actually take care of the patients and

9    serve as that last defense.

14:01:04  10    Q.    Tools, staff, and information systems.

11                 Have you looked at the tools, staff and

12    information systems of the four pharmacy defendants in

13    this case?

14    A.    Yes, sir.

14:01:22  15    Q.    And are you prepared to testify about whether or

16    not the pharmacy stepped up and did what you believe

17    reasonable practice should have done, timely, on these

18    four factors?

19    A.    Yes, sir.

14:01:42  20    Q.    And if the pharmacy fails to support with tools and

21    staff and information systems, will it affect the ability

22    of the pharmacist as a final gatekeeper?

23    A.    It will have a very significant impact on the

24    pharmacist.

14:01:58  25    Q.    Why is that true?

1    A.    The pharmacist has a very important responsibility

2    here.  If they dispense the wrong medication, somebody

3    could get hurt or killed.

4                   As a pharmacist, there have been many

5    sleepless nights where I've gone home and worried about

6    that prescription and wondered if I gave the patient the

7    wrong prescription and the first thing I did was run back

8    in that pharmacy that next morning and triple and double

9    checked to make sure I dispensed the right medication.

10                   With that responsibility, you have to focus

11   on that patient and you have to focus on that

12   prescription.  If you are distracted or don't have enough

13   staff, if you've got people at both windows, if you've

14   got the drive-up going, if you've got people banging

15   their keys asking where is my prescription, if you can't

16   get in touch with a doctor, if you don't have any

17   information on that patient or any place to document

18   what's going on, that takes you away from that primary

19   job of protecting that patient and making sure they get

20   the right medication, which translates into harm for the

21   patient.

22                   And that should never happen in any

23   pharmacy.

24   Q.    Is that why it's necessary for the pharmacy to

25   support with tools, enough staff, and with information

1    systems?

2    A.    Yes, sir.

3    Q.    All right.

4             Now, I have said in opening statement that

14:03:20  5    a pharmacist should not be viewed as a gum ball machine

6    where you just show your prescription, put in the money

7    and out spits the medicine; that a pharmacist should be

8    much more than that.

9             Do you agree with that?

14:03:34 10   A.    Yes, sir.

11   Q.    And so I ask you this, is a pharmacist just

12   supposed to fill prescriptions, no questions asked?

13   A.    No, sir.

14   Q.    Explain, please.

14:03:46 15   A.    Sure.

16             Many times the doctors don't understand the

17   medications or don't understand some of the other

18   conditions that the patient has.

19             Many times patients visit with their doctor

14:04:00 20   and it lasts anywhere between 23 and 36 seconds.  So

21   there's not much time for the patient to interact with

22   the doctor.  They rely on their nurses or other office

23   staff to do a lot of the work and for the doctor to come

24   in and make the final decisions.

14:04:14 25            The pharmacist has to take into account

1    everything about that patient, the other medications

2    they're taking, their allergies and make the right

3    decision to dispense that medication or not.  The

4    pharmacist has all that going on behind the scenes, and I

14:04:29  5    understand that for most patients, it's very difficult to

6    get an understanding of that because people say all you

7    have to do is take the pills out of the bottle, put them

8    in the bottle and give them to me, what could take so

9    long, why am I waiting for my prescription, but the

14:04:43 10    pharmacist has all those other responsibilities to make

11    sure that the patient receives the right medication and

12    to double-check the doctor and others that may be

13    involved with that patient's care.

14            And that takes time and that takes focus.

14:04:55 15    Q.    I've tried to jot a note of what you said, because

16    of several reasons, but one is I'm going to come back and

17    ask you how you know this to be true.

18            Many times, doctors don't understand, I

19    think you were talking about the way drugs interact or

14:05:09 20    something.

21    A.    Yes, sir.

22    Q.    So I'll just say drug interaction.

23            But in addition to that, you said many

24    times doctors visit between 23 and 36 seconds with a

14:05:24 25    patient.

1          Where did you get that from?

2     A.    There's been studies published that have written

3     about that and patient complaints about the lack of time

4     with their doctors.  The newest complaints have been that

14:05:36  5     their doctor spends more time looking at the computer or

6     punching things into their iPad than they do interacting

7     with the patient.

8     Q.    Why is that relevant to you as a pharmacist?

9     A.    Because if a doctor doesn't have the knowledge of

14:05:53 10     drugs that the pharmacist has, and if the doctor doesn't

11     have the time for whatever reason to talk to the patient

12     about their medicines, about their allergies, about other

13     medications they're taking or doesn't even know what

14     other medications the patient is taking, that pharmacist

14:06:09 15     is that last stop, the last person that could actually

16     help that person and make sure the patient's not harmed.

17     Q.    All right.  So your focus in this case, have you

18     been able to look at the metrics associated with staffing

19     as well as tools and information systems?

14:06:40 20     A.    Yes.

21          There were some analyses that were run

22     based on the data, and I looked at the aggregate data

23     that was analyzed by other witnesses or other experts.

24     Q.    All right.  And in this regard, what I need to do

14:06:53 25     is make sure that the record is clear.  His Honor knows

1    this stuff, but the jury doesn't, and we need to make

2    sure everybody understands what forms the basis of your

3    opinions.  Okay?

4                    First of all, would you please tell us what

14:07:08  5    is metrics when it comes to the areas in which you'll be

6    testifying today?

7    A.    My understanding is if the metrics are referring to

8    pharmacists' performance, then those metrics were how

9    long it takes for a pharmacist to dispense a prescription

14:07:29 10    and how long a patient is waiting for that prescription,

11    how many prescriptions the pharmacy dispensed, and what

12    the bonus programs were in place for pharmacists to

13    dispense more prescriptions and to meet certain quotas or

14    goals that the corporations had set for pharmacists.

14:07:51 15    Q.    So were there times with the four -- each of the

16    four defendants in this case, were there times where

17    bonuses were based upon the number of scripts they were

18    able to dispense?

19    A.    Yes.

14:08:12 20    Q.    In part, at least?

21    A.    Yes, sir.

22    Q.    Is that a good thing?

23    A.    If -- if it impacts the pharmacist's ability to

24    review those prescriptions and make sure the patient's

14:08:28 25    getting the right medication, the answer is no, it's a

1    bad thing, it's a really bad thing.

2                If the pharmacist feels that they're under

3    pressure to fill prescriptions when they shouldn't fill

4    prescriptions, because it's going to impact them

14:08:42   5    financially, that's another very bad thing.

6                The pharmacist has to be the patient's

7    advocate and be objective and do the right thing for the

8    patient and not be financially incentivized to do things

9    differently or to meet certain quotas of speed or metrics

14:08:59 10    that could endanger the patient.

11    Q.    Over time, did the defendants -- I'm jumping ahead.

12                Do you know whether, in the earlier stages

13    of this epidemic, the four defendants were bonusing their

14    pharmacists based upon the number of prescriptions

14:09:22 15    filled, including opiates?

16    A.    In some of the -- in the information I reviewed,

17    there was incentives that included some of the various

18    opioids that are the problem and have caused significant

19    harm and death in the opioid epidemic.

14:09:39 20    Q.    Why is that, when it comes to opiates, a dangerous

21    situation?

22    A.    Just by their very nature, opiates are extremely

23    dangerous drugs.

24                Some -- a person can take one dose of an

14:09:54 25    opioid and be addicted to that opioid.

1          So there's a very, very strong concern for

2      pharmacists to make sure the right patient gets the right

3      medication, particularly with opioids.

4          If you have a financial program that

14:10:08  5      includes opioids so that the more you dispense, the more

6      money you make, that's contrary to what pharmacies should

7      be doing with opioids.

8          They should be looking at these very

9      carefully and not be trying to push opioids to meet a

14:10:21 10      financial quota or to increase their bonus.

11  Q.    Did you find any of the pharmacies that you looked

12      at in this case, Walgreen's, Walmart, CVS, Giant Eagle,

13      did you find that any of them had a bonus program in

14      place to recognize when their pharmacists said no to an

14:10:46 15      opioid prescription because the pharmacist believed that

16      it was an improper prescription or should not be filled?

17  A.    In the materials that I reviewed, I did not see

18      that at all, sir.

19  Q.    Would that be a good policy to have in place?

14:11:01 20  A.    From a patient's safety and regulatory, I would say

21      yes.

22  Q.    All right.  Now, with that area of metrics in the

23      way, have you looked both at the broad United States

24      policies -- let me make Texas a little bigger -- the

14:11:28 25      broad United States policies as well as the policies of

```
 1   Ohio?

 2   A.    Yes, sir.

 3   Q.    And in addition to looking at the broad United

 4   States policies with these pharmacies, and the policies

 5   in Ohio, did you examine the actual pharmacies from Lake

 6   and Trumbull Counties?

 7   A.    Yes, sir.

 8   Q.    And you're prepared to testify about those opinions

 9   today and tomorrow?

10   A.    Yes, sir.

11   Q.    All right.  Then with that background on your

12   focus, let's start going through your findings.

13                You've issued a lot of opinions in this

14   case, haven't you?

15   A.    Yes, sir.

16   Q.    I'm not faulting you for it.  I'm just saying we're

17   going to be here for a while, aren't we?

18   A.    I have a flight to catch tomorrow so.

19   Q.    We'll do the best we can, sir.

20                Excuse me, Your Honor.

21                Opinion number one.  "The practice of

22   pharmacy is governed by well-defined laws and

23   regulations, both at the national and state-wide levels."

24                Is that your opinion?

25   A.    Yes, sir.
```

1    Q.    Would you explain that opinion to us.

2    A.    It's the finding is pretty self-evident:  That

3    pharmacies are very black and white, regulatory group.

4    In fact, pharmacists will always say the most regulated

14:13:06  5    profession so there are very specific federal laws, very

6    specific state laws that define what the scope of

7    practice is for pharmacists and what their

8    responsibilities are.

9                    And the federal and national laws dovetail

14:13:19 10    and complement the state laws.

11    Q.    Would you explain to us the system that exists in

12    opioids?  And by that, I mean a closed system.

13                    I expressed and talked to the jury about it

14    in opening, but that wasn't evidence and I need evidence

14:13:38 15    in the record about what the closed system of regulation

16    is for opioids.

17                    Could you explain that, please?

18    A.    Sure.

19                    The federal laws, the Controlled Substances

14:13:49 20    Act and what the DEA does is to ensure that, as the

21    attorney just said, it's a closed system of controlled

22    substance, which means that that drug, that opioid, can

23    be traced from the manufacturer to the patient throughout

24    that system.

14:14:05 25                    So if it goes from a manufacturer to a

1    wholesaler to a pharmacy to a patient or to a doctor to a

2    patient, each one of those registrants is responsible for

3    that produce and making sure that that product stays

4    within that closed system and that those prescriptions

14:14:24  5    and that distribution is all for legal purposes.

6                    The DEA and the federal laws do not

7    function as a national medical board or a national

8    pharmacy board.  They don't dictate practice, what

9    pharmacists or doctors should actually do in terms of

14:14:43  10   standards of care.  They support what the states say, and

11   the states then define what a pharmacist should do, what

12   their scope of practice is, and what they're responsible

13   for in the pharmacies.

14   Q.    All right.  So in this idea of a closed system,

14:15:00  15   I've drawn a closed loop.

16                    Are you able to see that?

17   A.    It looks like a trailer, but, yes, I see that, sir.

18                    (Laughter.)

19   Q.    Well, I won't be your Pictionary partner.

14:15:17  20                    And then I've got a manufacturer -- that's

21   a smoke stack.  That's manufacturers, okay?

22   A.    Okay.

23   Q.    Are they in the closed system?

24   A.    Yes, sir.

14:15:26  25   Q.    This represents -- I should have done the person in

1    the middle in a different color -- this represents the

2    distributors, the people in the middle who buy from the

3    manufacturers and get to the pharmacies.

4                   Are they in the system?

14:15:38  5    A.    Yes.

6    Q.    Closed system?

7    A.    Yes, sir.

8    Q.    And then the pharmacies, are they in the closed

9    system?

14:15:43 10    A.    Yes, sir.

11    Q.    And if you're going to be -- that's a stethoscope

12    up there.

13                   If you're going to be a doctor and write

14    prescriptions for opiates, do you have to be registered

14:15:55 15    within the closed system?

16    A.    Doctors are registrants, yes.

17    Q.    All right.  And then the prescription goes to the

18    patients?

19    A.    Correct.

14:16:05 20    Q.    Now, you used a term just now, you said doctors are

21    registrants.

22                   Everyone inside the closed system, are they

23    considered a registrant?

24    A.    Yes, sir.

14:16:16 25    Q.    And what is a registrant?

1        What does that mean?

2    A.    Registrants are defined in the Controlled

3    Substances Act at the federal law, and they are charged

4    with certain responsibilities to maintain that closed

14:16:31  5    system.

6    Q.    Do they have to register with the Federal

7    Government to process and deal with these opiate drugs?

8    A.    Yes, they do.

9    Q.    Now in addition to this federal system, which I've

14:16:53 10    done as a closed system, where does the state regulations

11    apply?

12    A.    Before we leave the federal system, sir, there was

13    something I left out, if I can mention.

14    Q.    Okay.

14:17:06 15    A.    Pharmacists are not registrants under the DEA.

16              So the pharmacist is a part of the

17    pharmacy's registration and, therefore, that's why the

18    pharmacy and pharmacist are treated equally in terms of

19    responsibility by the DEA.

14:17:25 20    Q.    All right.  So a registrant, someone who is

21    registered with the DEA, you said that is not a

22    pharmacist?

23    A.    Correct, sir.

24    Q.    But it is the pharmacy?

14:17:45 25    A.    Yes, sir.

Catizone - Direct/Lanier                939

1    Q.    And so can a pharmacist, on their own,

2    just -- could a pharmacist go to a middle person and buy

3    some opioids and then turn around and just sell them as a

4    pharmacist?

14:18:10   5              Would that be legal?

6    A.    No, sir.

7    Q.    Now, with that information added, the pharmacy here

8    is -- we'll keep it in a building as a pharmacy -- is a

9    registrant.

14:18:33  10              Tell me and the jury, please, explain to

11    them how the state regulations fit into this process.

12    A.    Sure.

13              The state regulations that, as I mentioned

14    earlier, complement the federal.  So all the state

14:18:51  15    practice acts deal with the security of those controlled

16    substances, the security of the pharmacy.

17              It restricts all access to the pharmacy --

18    to the pharmacy that require certain alarms --

19    Q.    Yeah.  Slow up, please.

14:19:01  20              COURT REPORTER:  Sir --

21              THE COURT:  If you could just slow down a

22    bit and speak into the mic.  Thanks.

23              THE WITNESS:  My apologies.

24    BY MR. LANIER:

14:19:08  25    Q.    All right.  Let's start all over.

           1              The state -- the Court Reporter got you up

           2     to the point the state regulations, as I mentioned

           3     earlier, complement the federal so all the state practice

           4     acts deal with the security of those controlled

14:19:24   5     substances.

           6              Why don't you take up from there?

           7     A.    Sure.

           8              So again, to make sure that system remains

           9     closed, the state regulations will deal with some very

14:19:33  10     specific items.

          11              What type of security systems need to be in

          12     place at a pharmacy, what are backup systems in case the

          13     power goes out or there's a flood or hurricane, and then

          14     they also deal with some of the recordkeeping that may be

14:19:50  15     mentioned at the federal level but that the state also

          16     wants in place.

          17              They will then also talk to the pharmacist

          18     about what their responsibilities are and what the

          19     standard of care is for dispensing controlled substances,

14:19:59  20     particularly opioids.

          21              It will talk to the pharmacist about

          22     conducting a drug utilization review, which is some of

          23     the things I talked about --

          24     Q.    Wait.  You got to slow up.

14:20:08  25              THE COURT:  Yeah.

```
 1    Q.    I'm trying to keep up and we have some jurors who

 2    may be taking notes.

 3    A.    I'm sorry.

 4    Q.    Some don't.  No, no, that's okay.  I'm just like my

 5    hand is cramping.

 6               Pharmacy standard of care, I got to that

 7    point.  So we got security systems, backup systems,

 8    recordkeeping, pharmacy standard of care.

 9               What next?

10    A.    I started talking faster than I was thinking so

11    I've lost my place.

12    Q.    All right.  Let me give it to you.

13               You said it will talk to the pharmacists

14    about conducting a drug utilization review.

15    A.    Right.

16               So the state laws will deal with what the

17    pharmacists as a practitioner is responsible for.

18               Reviewing that patient's medication,

19    reviewing the patient themselves, and then making sure

20    that medication's appropriate.

21               In terms of the controlled substances, it

22    will put further restrictions in some cases on the

23    pharmacist in terms of inventories, recordkeeping,

24    special prescription blanks that may be needed to

25    transmit those, and that both the federal and the state
```

1    systems require that the pharmacists document what's

2    happened with that prescription, with that patient.

3                   And that's critical for a number of

4    reasons.

5    Q.    All right.  Hold on.  I want to write that onto a

6    separate sheet because I'm running out of room and I'm

7    going to need that with you later.

8                   So you say documentation is required in

9    different places.  Is that where you were going?

10   A.    Yes, sir.

11   Q.    All right.  So on the requirement of documentation,

12   why is that critical?

13   A.    It's critical for a number of reasons.

14                  One, if another pharmacist treats that

15   patient who's not familiar with that patient and doesn't

16   know what the prior pharmacist did, that's dangerous to

17   the patient.

18   Q.    So you might have a patient that comes in, you've

19   got Pharmacist A and now she dispenses a drug but has

20   concerns and does this, that or the other, and then the

21   next week that person comes in and Pharmacist B is

22   working and he decides, he, Pharmacist B, decides

23   something different.

24                  Is it important that another pharmacist

25   have access to the documentation of the first pharmacist?

1    A.    Yes.

2    Q.    All right.  Why else is it critical?

3    A.    It's critical so that when a Board of Pharmacy does

4    an inspection or when the DEA conducts an inspection,

14:22:59  5    that they realize that those patients were being treated

6    legitimately and the red flags were resolved and that

7    there wasn't a problem with the system not being closed

8    and diversion occurring.

9              So it's another means of documenting what

14:23:14  10    was happening and that the right things were being done

11    and that patients have access to medications.

12    Q.    Now, does the -- well, I'll ask that of the DEA

13    gentleman.

14              All right.  Any other reasons documentation

14:23:29  15    is critical?

16    A.    One of the other requirements and part of

17    consideration is that if there is diversion or there is

18    theft, so it could be anything from an employee that's

19    stealing medications, what I've seen in hospitals

14:23:45  20    sometimes is that the people diverting the medications

21    will not administer the full dose to the patient or

22    they'll take the dose and then write in the patient's

23    chart that they gave the dose and there's no other

24    documentation and then the patient's pain isn't managed

14:24:03  25    correctly.

1          So having the documentation of diversion,

2     having documentation of what's happening, is critical not

3     only for the patient's care but then to get those people

4     out of the system and to stop that diversion from

5     continuing.

6     Q.    So does documentation help in the situation of

7     theft and diversion?

8          And by "Help," I mean it helps minimize it?

9     A.    It's a very important tool to identify, to stop it

10    in most cases, and to send the message to others that

11    this pharmacy's doing everything it can to prevent that

12    diversion so it discourages other people from trying to

13    divert drugs from there as well.

14    Q.    All right.  Any other reason you can think of why

15    documentation is critical?

16    A.    I think those are the primary, sir.

17    Q.    Okay.  And the requirement of documentation, does

18    the statute or regulations that you're familiar with

19    spell out exactly what a pharmacist is supposed to do, or

20    does it leave that up to the company's policies and the

21    pharmacists to do it?

22    A.    The laws work -- yeah -- in the same way, whether

23    it's a controlled substance or whether the requirements

24    are for something else.

25          A law will say this is what the

1    requirements are in a broad sense, so in regard to

2    documentation and opioid, what the law specifically says

3    is the pharmacist must comply with all good practices or

4    practices of standards.

14:25:37  5              And then it defers to or counts on the

6    state to define what those specifics would be,

7    particularly with documentation.

8              Now, when questions arise or when people

9    say the law is way too ambiguous or it's not specific

14:25:55 10   enough, then you have other court cases or other guidance

11   documents that are issued either by the federal agencies,

12   DEA, or by the state Boards of Pharmacy that provide more

13   specificity to those laws, but the requirement doesn't

14   change, what the standard of care is doesn't change.

14:26:14 15             It may give more direction but the

16   specificity the people are looking for can be found by

17   using that broad law and then what the states and what

18   the guidance documents have said to interpret or give

19   more direction to that.

14:26:26 20   Q.   All right.  You said something that I want you to

21   elaborate on for a moment.

22             You referenced cases.

23             Now, as lawyers, we dream about cases.

24   This is our life since law school.

14:26:42 25             But I think a lot of people don't

                1   understand the significance of cases when it comes to

                2   things like pharmacy practice.

                3            We're going to talk about some cases, but

                4   why are cases important to pharmacists?

14:27:01    5   A.    Speaking as a pharmacist and not as an attorney --

                6   Q.    Right.  Right.  And the Judge won't let you comment

                7   on the law and he'll yell at me if I ask you to -- he

                8   doesn't yell -- he will stop me if I ask you on the law.

                9            But so speak as a pharmacist, please.

14:27:18   10   A.    So I'm not sure of all the proper terminology

               11   within the law profession.

               12   Q.    Okay.

               13   A.    But when a court -- when a case goes to trial or in

               14   the court and the DEA or others are involved, the

14:27:32   15   decisions, the conclusions and findings in that case are

               16   binding on other pharmacies that may have been engaging

               17   in that practice or may be thinking of that practice.

               18            So when a Court case comes out and a

               19   defendant in a case may say red flags were never known in

14:27:52   20   pharmacy practice, they never existed, it's a term that

               21   people aren't familiar with, but then the Administrative

               22   Law Judge in the case says you're wrong, red flags have

               23   been around for a significant amount of time and they

               24   have been known in pharmacy and pharmacists, that becomes

14:28:08   25   a precedent and a standard so that others to try and make

1    that argument as a defense, it simply won't hold water

2    any longer because this Court and this case has said that

3    argument is no longer valid.

4                    MR. MAJORAS:  Objection to the term

14:28:23  5    binding, and he's already said he's not a lawyer.

6                    THE COURT:  Well, I'll allow the answer

7    with the caveat that this is this witness's understanding

8    as to what he as a pharmacist has to do if there's a

9    case.  That's how it goes in.

14:28:45 10                    MR. LANIER:  Yes.

11    BY MR. LANIER:

12    Q.    And so we're clear and the record is clear, you are

13    giving your understanding of what needs to be complied

14    with for all good practices or practices of standards as

14:28:57 15    opposed to the legal understanding.

16                    Is that fair?

17    A.    Yes, sir.

18    Q.    And you'll continue to do that, speak as a

19    pharmacist speaking about what it means to comply with

14:29:06 20    all good practices or practices of standards, okay?

21    A.    Yes, sir.

22    Q.    So if a case comes out like you talked about and

23    says these are red flags, they need to be resolved before

24    you dispense medicine, and that's the holding in a case,

14:29:20 25    does that become a good practice or practice of standards

```
 1    that you believe a good pharmacist will comply with?
 2    A.    From a pharmacist perspective and what I've seen
 3    over the past 40 years, the answer is yes, sir.
 4    Q.    All right.  Now, within the confines, then, the
 5    states require documentation and I've gotten away,
 6    perhaps, from your list.
 7                 Security systems, backup systems,
 8    recordkeeping, the pharmacy standard of care, drug
 9    utilization review.
10                 Can we talk about that just briefly?
11                 What is -- and I know that's a term of art
12    that we'll come back to with you later -- what is drug
13    utilization review?  And let's start with is that
14    frequently abbreviated?
15    A.    Yes, sir.
16                 It's different terminologies.  It can be
17    abbreviated, DUR.  In some cases, it's called medication
18    management.
19                 It's the process and responsibility that a
20    pharmacist has to undertake every time they receive a
21    prescription.  It's written in the state laws and
22    practice acts.  It's part of the standard of care that a
23    pharmacist has to meet.  And what it says is when I
24    receive a prescription as a pharmacist, I have to check
25    that prescription, I have to do a review of that
```

1    prescription, is it the right drug, is it the right

2    strength, is it the right course of therapy, is it

3    interacting with anything else that the patient is

4    taking, does the patient have any allergies that could

14:31:07  5    impact this medication?

6              And does the therapy look like it's

7    appropriate and the directions are appropriate for the

8    patient?

9              Every single prescription has to undergo

14:31:17 10    that process, and it's required legally and as a standard

11    of care in every pharmacy in the U.S.

12    Q.   Okay.

13              MR. LANIER:  Your Honor, I confess, I

14    forgot.  Am I targeting to stop at 2:30 or 3:00?

14:31:34 15              THE COURT:  3:00.

16              MR. LANIER:  3:00, good.

17

18    BY MR. LANIER:

19    Q.   So, sir, that's opinion number one.

14:31:42 20              I'd like to move on to opinion number two.

21              Opinion number two, you said, "The practice

22    of pharmacy is subject to established and well-known

23    standards of care, including requirements for the careful

24    evaluation of prescriptions and efforts to guard against

14:32:02 25    the diversion of medications into nonmedical or

         1    illegitimate use."

         2                Did I read that correctly?

         3    A.    Yes, sir.

         4    Q.    Is that your opinion?

14:32:13 5    A.    Yes, sir.

         6    Q.    I know you've given us some background information

         7    to help us understand this opinion, but I'd like you to

         8    explain it in your best understanding for us.

         9                Elucidate.

14:32:30 10   A.    Sure.

        11                What I could add from what I've mentioned

        12    earlier is that the curriculum, the program that a

        13    pharmacist undergoes, which is eight years of study --

        14    Q.    How many?

14:32:38 15   A.    Eight years of study.  There are some programs that

        16    vary that may be five years or six years, but those are

        17    full-time all year-round programs.

        18                The basic education of a pharmacist is

        19    probably six years, and some people undergo eight years,

14:32:53 20   depending upon what they did as pre-pharmacy.

        21                The focus of that education is medications,

        22    how medications work, how patients react to medications,

        23    and within that curriculum and that training are all of

        24    the standards of care that a pharmacist has to know and

14:33:15 25   that have been defined by practice and have been defined

1    by studies.

2                        Pharmacists are also required to take

3    pharmacy law, and in those pharmacy law classes, they are

4    taught and quizzed on federal laws, just as we explained

14:33:31  5    earlier, as well as state law.

6                        So that by the time a pharmacist leaves

7    pharmacy school and passes the national pharmacist exam

8    and the state law exam, they're safe to stand behind that

9    counter and dispense medications to you.

14:33:46 10    Q.    Now, a thought that occurs to me that I'd like you

11    to see if you can comment on is that if people go and

12    study for five, six, maybe as many as eight years, and

13    focus not only on the medicines but how they work and hue

14    people react, and people take a pharmacy law course, then

14:34:14 15    why is it important that the pharmacy that employs these

16    pharmacists, why is it important that a pharmacy train

17    pharmacists further or give them extra tools or extra

18    understanding?

19    A.    Even though the pharmacist may be prepared from a

14:34:34 20    competence standpoint, they know what the drugs are, they

21    know how they work, they know what the law is, when you

22    work in a pharmacy just like any other place of

23    employment, every place has its own system, every place

24    has its own staffing, and it's critical for that new

14:34:49 25    pharmacist to understand those processes, to be trained

1    in those processes, and to be given the tools that they

2    need to be able to utilize the education and training

3    that they've -- they've earned for their degree.

4                    Even though they're competent to practice

14:35:04  5    and they have a license, doesn't mean that they're fully

6    prepared yet.  They need that training and they need that

7    support from the pharmacy to actually be able to practice

8    effectively and, again, safely in that pharmacy setting.

9    Q.    The way I've written this, I want to make sure I've

14:35:20 10    accurately conveyed your testimony because I may come

11    back to this slide later, the pharmacist may be competent

12    but she or he needs training and tools on the job, it's

13    part of their preparation.

14                    Is that --

14:35:34 15    A.    Yes, sir.

16    Q.    Okay.  Now, is this something that's new or has

17    this been around for a long time?

18    A.    It's been around since the beginning of pharmacy,

19    sir.

14:35:52 20    Q.    You did pharmacy history or you got some award for

21    it or something.

22                    How long have pharmacies been around in the

23    United States and regulated, if you know?

24    A.    Sure.  1854 was when the first pharmacy school was

14:36:06 25    founded.  It was the Philadelphia College of Pharmacy.

1          And then shortly thereafter, pharmacy

2     organizations were founded and pharmacy education went

3     from on-the-job training and apprenticeships to the early

4     1900s so since that time, there have been standards of

14:36:23  5     care, formal education and defined requirements for

6     pharmacy.

7     Q.    Okay.  Excellent.

8          So why is your opinion number two going to

9     be important to us later in this case?

14:36:43 10     A.    It's really at the crux of the matter.

11          If the pharmacist doesn't follow standards

12     of care and doesn't conduct that careful evaluation, then

13     they're not meeting their responsibilities and the

14     patient's at risk.

14:36:58 15     Q.    And in that regard, what role does the pharmacy

16     play to make sure the pharmacist does this?

17     A.    Again, the pharmacy has to support that pharmacist.

18          With the system in place, the staffing in

19     place, the information provided to the pharmacist.

14:37:17 20          We would not as consumers and patients

21     expect a company that made store vaccines when we're

22     supposed to store vaccines at 30 below zero to simply put

23     that in a refrigerator or not to have a sterile

24     environment and for the company to say to the person

14:37:38 25     administering that vaccine or dispensing it saying it's

1    not my responsibility that you don't have the right

2    refrigeration or the right sterility.  You take care of

3    it.  That's not how the pharmacy works either.  The

4    pharmacy has to provide that support for the pharmacist

14:37:51   5    because of the registrant under the Controlled Substances

6    Act, they are licensed by the state to make sure those

7    requirements are in place and they have to deliver that,

8    otherwise the patient's at risk.

9    Q.    All right.  Thank you.

14:38:05  10              Opinion number three.  You said that the

11    federal and Ohio State controlled substances laws and

12    regulations require each defendant to maintain effective

13    controls for a closed system of distribution and

14    dispensing of opioids that guards against diversion."

14:38:29  15              Is that your opinion?

16    A.    Yes, sir.

17    Q.    All right.  I want to break this apart to

18    understand the opinion.

19              The federal substance laws you're talking

14:38:46  20    about, what's the main one at issue in this case?

21    A.    The Controlled Substances Act is how it's commonly

22    known, CSA.

23    Q.    And I told the jury that that was passed under

24    President Nixon in 1970 or '71.

14:39:04  25              Was I right?

1    A.    Yes, sir.

2    Q.    And from a pharmacist's perspective -- we've heard

3    about it from a doctor's, but from a pharmacist's

4    perspective, what is significant about the Controlled

14:39:19  5    Substances Act when it comes to the dispensing of

6    opioids?

7    A.    The Controlled Substances Act places certain

8    requirements on pharmacists and pharmacies to ensure that

9    there is a closed system as we talked earlier and, two,

14:39:36 10    that those opioids are dispensed for legitimate medical

11    purpose.

12              And the Controlled Substances Act outlines

13    what the parameters would be for a legitimate medical

14    purpose.

14:39:46 15    Q.    All right.  And I think some of your other opinions

16    go into some details on that, so for right now, just for

17    us to keep it in our brain, the requirements to ensure a

18    closed system, is that the system that we were talking

19    about before in opinion one?

14:40:04 20    A.    Yes, sir.

21    Q.    To maintain effective controls, who defines what an

22    effective control is?

23    A.    Again, the federal and state requirements list what

24    a pharmacy and pharmacists are expected to do, how those

14:40:26 25    controls are actually implemented by individual

1    pharmacies is left to a pharmacy but they have to meet

2    the requirements.  They can't simply avoid meeting the

3    requirements.

4                 So, for example, the requirements say that

14:40:41  5    there must be inventories conducted of the controlled

6    substance products to ensure that if there's a loss of

7    those products or someone's diverting them, the pharmacy

8    has a mechanism to detect it.

9                 It doesn't specifically say how they have

14:40:56 10    to count that, who has to count that, but they do set

11    parameters as to why that inventory should be done, how

12    it should be recorded, and if there are problems with the

13    inventory how that should be reported.

14    Q.    Okay.  So if the Government says it's got to be

14:41:11 15    done and there are lists perhaps provided in decisions or

16    in state cases, state regulations or something, you say

17    the pharmacy gets to choose how to -- how those controls

18    would be implemented?

19    A.    To a certain extent.

14:41:25 20                 They have to meet the requirements, and

21    then if there are specific requirements that have to be

22    done, they have to follow those requirements as well.

23    Q.    So if the requirements say you must inventory once

24    a week or once a month, the obligation is there, but it's

14:41:41 25    up to the pharmacy to decide whether they do it by

Catizone - Direct/Lanier                    957

1    counting in the middle of the day or weekend or whatever?

2    A.    Correct, sir.  Yes.

3    Q.    All right.

4                If something's got to be locked up, the

14:41:57  5    pharmacy gets to figure out where their locking area is

6    and how they lock it up?

7    A.    Correct.  The requirements would say you have to

8    have a secure area.  The secure area has to meet certain

9    standards of security but then it's up to the company if

14:42:11 10    they wanted to put other things in place to make it more

11    secure but they can't go below what those requirements

12    are.

13    Q.    All right.  Can you explain to us, please, the

14    difference between these words "distribution" and

14:42:23 15    "dispensing" when it comes to opioids?

16    A.    Yeah.

17                Distribution is what occurs when a

18    manufacturer ships products to a wholesaler, or a

19    wholesaler ships products to a doctor or a pharmacy or a

14:42:34 20    hospital.

21                There's no prescription involved, and the

22    end recipient of those is not the patient.

23                Dispensing is very strictly defined in all

24    the state practice acts and regulations and involves the

14:42:50 25    pharmacist receiving a legitimate prescription and

1   dispensing the medication, dispensing to a patient.

2   Q.   And then dispensing of opioids as opposed to

3   distribution is what?

4   A.   Dispensing then is usually defined in again, the

14:43:12  5   state practice acts and regulations and is not addressed

6   specifically under federal law.

7          Federal laws are more concerned with the

8   closed distribution, the security, and validity.

9          Dispensing is reserved for the state Boards

14:43:28  10   of Pharmacy of the states, such as the Ohio Board of

11   Pharmacy.

12   Q.   All right.

13          Is dispensing in laymen's terms the idea of

14   selling or giving the prescription to the patient?

14:43:44  15   A.   Yes.  The act of receiving a prescription,

16   interpreting that prescription, analyzing that

17   prescription, and then dispensing or giving the

18   medication to the patient.

19   Q.   All right.  And is that dispensing subject to the

14:44:00  20   drug utilization review standard of care that you talked

21   about before?

22   A.   Yes, sir.

23   Q.   Okay.  Now, I'd like to go to opinion number four

24   at this point, and opinion number four is rather long so

14:44:17  25   let's break it up to talk about it, please.  Okay?

1          "Corporate oversight includes established

2     practices of pharmacies that should incorporate top-down

3     compliance programs using data readily available to the

4     corporation to guard against diversion."

14:44:39 5          Did I read the first sentence right?

6     A.    Yes, sir.

7     Q.    All right.  I want to break it down and fully

8     understand your opinion.

9                By the way, these opinions have come out of

14:44:52 10    your report, is that right?

11    A.    Yes, sir.

12    Q.    Take a moment and tell the jury what you put

13    together as a report so they understand where this is.

14    A.    I'm sorry?

14:45:04 15    Q.    Yeah.  You wrote a report in this case?

16    A.    Correct.

17    Q.    Explain to the jury what you did in your report.

18    A.    For my report, I looked at a wealth of information

19    that was provided to me.

14:45:20 20          I looked at policies and procedures that

21    defendants had, I looked at the individual prescriptions,

22    and I looked at analysis of those prescriptions that were

23    performed by another expert.

24                And I looked at then also what the

14:45:34 25    dispensing practices were of the defendants in the case

1    in relation to all those items.

2    Q.   All right.  And then you put into a written report

3    your opinions?

4    A.   Yes, sir.

14:45:44  5    Q.   And did you explain your opinions to the defendants

6    in that report?

7    A.   In the report, yes, sir.

8    Q.   And did the defendants have a chance to take your

9    deposition and your sworn testimony to explain these

14:45:58 10    issues?

11    A.   Yes, sir.

12    Q.   In fact, I think they've done it more than once?

13    A.   Yes, sir.

14    Q.   Because you supplemented your report with some

14:46:08 15    additional material when you got it?

16    A.   Yes, sir.

17    Q.   All right.  So within the framework of that, in

18    your report, you explain this a lot more, but I'd like to

19    break it apart for the jury and the record.

14:46:19 20              "Corporate oversight," what do you mean by

21    that concept "corporate oversight"?

22    A.   So what the law says, in my opinion as a

23    pharmacist, is that the pharmacy is defined as a

24    responsible party.  At NABP and in state laws and state

14:46:39 25    regulations, the term is used as a person, and a person

1    is defined as a pharmacy, pharmacist.  So the pharmacy is

2    a person that's responsible for the activities in that

3    pharmacy.

4                    The pharmacy can't simply say it's all on

14:46:54  5    the pharmacist.  They have to exercise their professional

6    judgment.  We take the hands-off approach.  So what I

7    meant by that opinion in terms of corporate oversight is

8    the pharmacist is interacting on a daily basis with

9    patients.  They have limited information available to

14:47:09 10    them.

11                    The corporate oversight, the owner of that

12    pharmacy, the one who sets the policies for that

13    pharmacy, how much staffing there's going to be, when

14    breaks will occur, how much people get paid, that

14:47:24 15    corporate oversight also extends to responsibility for

16    making sure that the pharmacist gets all the information

17    they need.

18                    And that corporate entity knows how many

19    opioids are purchased across all their pharmacies.  They

14:47:42 20    have information about which doctors may be prescribing

21    opioids inappropriately.  They know how much each

22    pharmacy is dispensing.  They have all that information

23    that they could then share and give to the pharmacist so

24    the pharmacists make better decisions.

14:47:59 25                    So corporate oversight includes getting

 1   that information and then just as they monitor policies

 2   for saying how long it takes to fill a prescription or

 3   how long patients are waiting, they should be monitoring

 4   whether pharmacists are complying with their

14:48:13  5   requirements.

 6                And going back to those pharmacists and

 7   saying you didn't comply, you were dispensing all these

 8   medications that were way outside of what the standards

 9   of care or what the norms were; we need to sit down and

14:48:26 10   look at this and take action.

11                That's what I meant by corporate oversight

12   and what the responsibilities would be.

13   Q.   Okay.  You've got a lot in there under corporate

14   oversight and I've got what Ms. Sue is typing so fast but

14:48:43 15   I want to make sure that we've got it right here.

16                So corporate oversight, do you include

17   setting policies?

18   A.   Yes, sir.

19   Q.   Corporate oversight, do you include setting

14:48:54 20   staffing numbers and levels?

21   A.   Yes, sir.

22   Q.   Do you include when breaks occur?

23   A.   Yes, sir.

24   Q.   Do you include the money that's paid, the salaries

14:49:03 25   that's paid to the pharmacists or to the technicians and

1    the others working?

2    A.    Yes, sir.

3    Q.    Corporate oversight, do you include the information

4    system made available to the pharmacist?

14:49:22  5    A.    Yes, sir.

6    Q.    And did you include in that also policies for how

7    quickly or how long it might take to fill a prescription?

8    A.    Yes, sir.

9    Q.    Is that called wait time?

14:49:41 10    A.    That's the colloquial, yes, sir.

11    Q.    How would corporate oversight determine wait time?

12    A.    When someone drops off a prescription and it's

13    entered into the computer system, it's time stamped that

14    that prescription, when it was received.

14:50:08 15             When it was dispensed, at the point of

16    sale, there's another time stamp saying that the patient

17    received it at this point so they can monitor throughout

18    the system where that prescription is and how long it's

19    taking to get to DUR, how long it's taking to identify

14:50:24 20    what medications are and actually put those in the

21    bottles, all that is time stamped throughout the process

22    and within the computer systems.

23    Q.    And if a pharmacy wanted to decrease wait times,

24    how could a pharmacy go about doing that?

14:50:43 25    A.    One way would be to provide more staffing, more

1    technicians, more pharmacists, better tools for the

2    pharmacists to utilize, a number of ways that they can

3    reduce the wait time.

4    Q.    Okay.  And then you also referenced that a

14:51:01  5    corporate oversight includes monitoring the pharmacists.

6                    What did you mean by that?

7    A.    If there are policies and each of the defendants

8    had policies on what red flags were and what to do when

9    opioids were dispensed, if you have those policies, then

14:51:23 10    you have to have some way of monitoring those policies to

11    make sure that they were followed.  If you don't monitor

12    those policies, then why do you have policies.

13                    And that's what I was referring to, that

14    they should have had a system to monitor, and if they

14:51:38 15    weren't being monitored, then they have to take action to

16    find out why they weren't being monitored.

17                    And if it's a case where the pharmacist was

18    incompetent or there was something occurring like

19    diversion or the tools weren't in place, then as a

14:51:51 20    corporate -- corporation, I have responsibility to fix

21    that issue and not let it continue.

22    Q.    Okay.  So corporate oversight includes established

23    practices of pharmacies that should incorporate top-down

24    compliance programs.

14:52:10 25                    What is a top-down compliance program?

Catizone - Direct/Lanier                    965

1    A.     I was referring to the fact that the corporate

2    headquarters, the corporation that's in charge, the one

3    setting the policies, they have the ability to dictate or

4    change what happens in that pharmacy, and it has to come

14:52:30  5    from the top down.

6              The pharmacists and the individual

7    pharmacies can't say to corporate this is how we're going

8    to do it, this is how we're going to pay people, this is

9    what we're going to charge for prescriptions.

14:52:42 10              That all comes from corporate.  And just as

11    those policies are implemented, that's how compliance

12    policies should be implemented as well.

13    Q.     Okay.  And compliance policies meaning complying

14    with the standards and laws is understood?

14:53:00 15    A.     Yes, sir.

16    Q.     All right.  So using data readily available to the

17    corporation to guard against diversion, what kind of data

18    are you talking about here?

19    A.     As we mentioned, they have totals on what types of

14:53:14 20    medications they're buying, how much is being dispensed

21    at each individual pharmacy, how much is being dispensed

22    in a certain region, what doctors are the highest

23    prescribers of certain medications, all those data that

24    they collect at the corporate level, that's not available

14:53:32 25    to the pharmacist at the individual pharmacy, is the data

1    I was referring to, sir.

2    Q.    Oversight also should -- you go on to say, excuse

3    me, "Oversight also should support, and not impede,

4    pharmacists in complying with laws and regulations

14:53:56 5   related to the dispensing of controlled substances."

6              Explain what you mean by "Oversight should

7    support and not impede."

8    A.    And we touched on this briefly earlier.

9              If a policy says that a pharmacist has to

14:54:09 10  fill a prescription within a certain amount of time, and

11   that restriction then prevents the pharmacist from doing

12   the drug utilization review or taking the time to review

13   that prescription, that impedes what the pharmacist

14   should be doing and that type of policy shouldn't be in

14:54:29 15  place.

16             What should be in place is the policies

17   that support the pharmacists and say let's make sure that

18   every patient is actually evaluated as they need to be,

19   and if you need more help, then there's a mechanism,

14:54:42 20  there's a way for you to signal that and for us to

21   provide that additional staffing or additional support to

22   you.

23   Q.    In that regard, if you're going to have, let's say,

24   two pharmacists working a shift instead of one, with the

14:54:55 25  idea that you're going to cut the time in half, are there

1    pharmacy practice reasons that that's a bad idea, or is

2    it really just a case of economics?

3    A.    I think it could be either one of those, sir.

4              Medications, a pharmacist's salary is

14:55:18  5    significantly higher than a technician's salary so to

6    have two pharmacists and a technician would be a

7    significant financial impact.

8              Many times the pharmacies where a good

9    technician is worth more than a good pharmacist because

14:55:33  10   the technician knows the systems, can interact with the

11   computer, can do things maybe a lot quicker than another

12   pharmacist, so it would be on a case-by-case basis.

13   Q.    In that regard, you mentioned a good technician,

14   better than some pharmacists.

14:55:46  15             Is it fair to say -- are there good and bad

16   pharmacists?

17   A.    Yes.  Just like with lawyers, there's good and bad

18   lawyers, there's good and bad pharmacists as well.

19   Q.    I'm going to take that as I hope you meant it.

14:56:05  20             Good and bad technicians?

21   A.    Yes, sir.

22   Q.    All right.  To just paint everybody with the same

23   brush is probably not fair in any profession or any job

24   that we do, is that right?

14:56:22  25   A.    Any profession, any group of people, yes, sir, it's

1    not fair.

2    Q.    All right.  So when you give this opinion that

3    oversight should support and not impede pharmacists in

4    complying with the laws and regulations, is that

14:56:38  5    something that a good company will do?

6    A.    A good company, a company that's compliant, a

7    company that takes their responsibility seriously.

8    Q.    And in this regard, I want to ask you specifically

9    about some chain pharmacies.

14:56:53 10              Are chain pharmacies and their agents

11    responsible persons under the Controlled Substances Act?

12              MR. MAJORAS:  Objection.  Legal conclusion.

13              MR. LANIER:  From a pharmacy perspective

14    only, Your Honor, do they consider themselves that; not

14:57:11 15    is that the law.

16              MR. MAJORAS:  Not an appropriate question

17    for a pharmacist.

18              MR. LANIER:  Which he is.

19              THE COURT:  He can answer that from his

14:57:18 20    understanding as a pharmacist.

21    BY MR. LANIER:

22    Q.    Yeah.  From your understanding as a pharmacist and

23    as the ex-head of the National Association of Boards of

24    Pharmacies, did you operate under the premise that chain

14:57:34 25    pharmacies and their agents are responsible persons under

1    the Controlled Substances Act?

2    A.    Yes, I did.

3              And also in the model regulations that

4    NABP, when I was Executive Director, provided to the

5    states, we just defined persons, pharmacies and

6    pharmacists as the same entity.

7    Q.    And you've just thrown us something that we didn't

8    discuss earlier.

9              Model regulations.

10             What are you talking about?

11   A.    Because every state feels that what they do in

12   their state is better than the other states, when in

13   reality there's more uniformity amongst the states than

14   people consider.  NABP is a national organization.  We

15   developed national standards or national regulations and

16   there was a publication called *Model Practice and Acting*

17   *Roles* and we would commission task forces and do studies

18   to come up with those national models and rules and then

19   we would send those to the states or the states would

20   have access to utilize them.

21             And each state decided how much they wanted

22   to adopt of those national standards.

23             In the Model Act, persons are defined as

24   pharmacies and pharmacists, and every state incorporated

25   that definition in their model acts and rules.

1   Q.    All right.  Good.

2              And from the perspective of your work as

3   the head of the Boards of Pharmacy, the National

4   Association of Boards of Pharmacies, and from your

14:59:14  5   experience not as a lawyer, I do not want a legal

6   interpretation, from your experience, does a chain

7   pharmacy corporation, through the control it exerts over

8   its agent pharmacies, pharmacists, and pharmacy

9   employees, hold responsibility -- and I'm not asking

14:59:34 10   legal responsibility -- but responsibility for ensuring

11   all dispensing of controlled substances is carried out in

12   accordance with the applicable laws and regulations,

13   whatever they may be?

14   A.    Yes, sir.

14:59:48 15   Q.    Okay.

16   A.    And the reason for that is twofold.

17              One, as we talked earlier, the pharmacy is

18   the registrant under the federal law, and at the state

19   level, the pharmacy is also the permit holder or the

15:00:02 20   registrant.  And I am aware, based on my experience and

21   interactions with the states, that many times the state's

22   Boards of Pharmacy will take action only against the

23   pharmacist, but if the pharmacy hasn't put in place the

24   right systems, the right controls to support that

15:00:19 25   pharmacist, they will take action against that pharmacy's

1     permit or license because they're holding that pharmacy

2     accountable as well.

3                     MR. LANIER:  Your Honor, Mr. Weinberger is

4     telling me it's time for a restroom break.

15:00:37 5                     THE COURT:  All right.  If this is a good

6     stop, stopping point, we'll take one.

7                     Ladies and gentlemen, we'll take our

8     mid-afternoon break, 15 minutes, usual admonitions.

9                     Thank you.

15:00:46 10                     (Jury out.)

11                     (Recess taken.)

12                     (Jury in.)

13                     THE COURT:  Okay.  Please be seated.

14                     And, Mr. Catizone, I just want to remind

15:20:51 15    you you're still under oath.

16                     You may proceed, Mr. Lanier.

17    BY MR. LANIER:

18    Q.    Mr. Catizone, it is 3:21 in the afternoon and that

19    is a time when energy can get low and your voice can get

15:21:10 20    low, and I'm not going to let that happen.

21                     I would like you to please speak up and

22    give us that Catizone fastball.  Okay?

23    A.    Yes, sir.

24    Q.    What?

15:21:23 25    A.    Yes, sir.

1     Q.    All right.  Before the break, you were offering

2     opinion number five, and -- or actually it was opinion

3     number four, which talked about corporate oversight,

4     including the established practices of pharmacies that

15:21:51  5     would incorporate top-down compliance program using data

6     readily available, and I was going to break it apart but

7     I think you've covered it unless you think there's

8     anything more you need to add about -- yeah, let's do it.

9              What data is available to corporate

15:22:09 10     oversight -- to the corporation that may not be so

11     readily available to an individual pharmacist working

12     their shift?

13     A.    Sure.

14              The corporation has all of the data from

15:22:20 15     all of the pharmacies, as well as all the aggregate data.

16     So again, how much -- how many drugs were bought, how

17     many drugs were dispensed, what the prescription totals

18     and volumes were at each pharmacy, they could even track

19     it down to pharmacists, how much prescriptions a

15:22:40 20     pharmacist fills or checks.  So they have all that data

21     at the corporation headquarters.

22     Q.    Does that allow --

23     A.    Mr. Lanier, can I -- the Court Reporter was having

24     trouble hearing before.

15:22:49 25              Could I ask if it's better now?

1              MR. LANIER:  Ms. Sue, can you hear the

2     witness better?

3              COURT REPORTER:  Yes.

4              THE WITNESS:  Okay.  Thank you.

15:22:58  5   BY MR. LANIER:

6     Q.    The aggregate data that you were talking about,

7     does that allow corporations or the mother ship, if you

8     will, to see trends?

9     A.    Yes.

15:23:16 10   Q.    Are trends important in the dispensing of opioids?

11    A.    Yes.

12    Q.    Why are trends important?

13    A.    The trends are an indication of what might be

14    happening in a particular pharmacy, a particular county,

15:23:32 15   a particular state.  So if there's a trend where they're

16    seeing more opioids dispensed than in other pharmacies or

17    counties or states, that would be an alarming trend for

18    them to look at and do some investigation.

19    Q.    So is it important for corporate oversight to also

15:23:56 20   give those insights to the pharmacists?

21    A.    That would be part of the information and

22    information systems that pharmacists would need to do a

23    better job in the pharmacy.

24              If I knew, for example, that within my

15:24:10 25   pharmacy area that a particular doctor was trending and

1    writing more opioid prescriptions than he had been or she

2    had been before or other doctors in the area, that would

3    cause me to say -- pay more attention to that doctor or

4    to do more investigation to make sure that there wasn't

15:24:27  5    something happening or at least to make sure that I knew

6    what was happening and document that so that other

7    pharmacists would know as well.

8    Q.    Very good.

9              Now, I want to -- and our Special Master

15:24:42 10    has seen these slides before I used them, but I want be

11    -- I'm going to modify this one on the slide to make sure

12    you are aware and the Court's aware and the record's

13    aware of how I want to see this.

14              Here's the question.  And the way I'm

15:24:56 15    modifying it.

16              Under your practice, in other words not

17    under the law, but under your practice -- I can't

18    spell -- practice, can a pharmacy absolve itself of its

19    responsibilities under the CSA -- the CSA

15:25:19 20    responsibilities -- by placing unilateral responsibility

21    on the pharmacist dispensing the prescription?

22              And again, I don't want you to answer that

23    whether they can resolve them legally.  That's not our

24    issue for you to answer.

15:25:34 25              But just by responsibility of your

Catizone - Direct/Lanier

975

1    practice, can a pharmacy absolve itself under those -- by

2    placing responsibility on the pharmacist?

3    A.    No, sir.

4                The pharmacy is the registrant, and the

15:25:49 5    pharmacy has obligations that it has to meet under the

6    Controlled Substances Act, and those responsibilities

7    can't simply be pushed aside by saying it's the

8    pharmacist who has the ultimate decision-making authority

9    and I can't do anything to question that pharmacist's

15:26:08 10    authority.

11                That's not how the law's been interpreted.

12    That's not how the law's practiced.

13    Q.    Is it fair --

14                MR. BUSH:  Your Honor, excuse me.

15:26:17 15                I object to that.  Move to strike.

16                THE COURT:  Well, the last -- the last

17    sentence I will strike.

18                Most of it was fine, but that last sentence

19    about "that's how the law has been interpreted, that's

15:26:30 20    how the law is practiced," the jury is to disregard that

21    sentence.

22    BY MR. LANIER:

23    Q.    And these are difficult questions to answer but if

24    you'll listen, I'll try really hard to take

15:26:48 25    responsibility myself to focus it in a way that makes it

```
  1    admissible evidence.

  2              Okay?

  3    A.   Yes, sir.

  4    Q.   I want to do the same emphasis that I did here.

15:26:58  5              Don't tell us what's legally right, but

  6    tell us under your practice is a corporate chain pharmacy

  7    responsible for its operations, including individual

  8    pharmacy stores and employees.  Again, not under the law

  9    but under your practice.

15:27:17 10    A.   Yes.

 11    Q.   And is that important?

 12    A.   It's extremely --

 13              MR. DELINSKY:  Your Honor, objection.

 14              Could we do a side-bar, please?

15:27:29 15              (Proceedings at side-bar:)

 16              MR. DELINSKY:  Can you hear me, Your Honor?

 17              THE COURT:  Yes.

 18              MR. DELINSKY:  Okay.  The basis of the

 19    objection is there's two issues in this case.

15:27:49 20              Issue number one is did the

 21    defendant -- from a culpability perspective, is did the

 22    defendants act intentionally?  This testimony doesn't

 23    pertain to that.

 24              Issue number two is did they violate

15:28:03 25    statutes or regulations, laws?
```

1          Testimony about customs, standard of cares

2     in the industry, that is not about what would statutes

3     provide or regulations provide.  It's just irrelevant, so

4     this is a 402 objection, Your Honor.

5          THE COURT:  Well, you can't have it both

6     ways, Mr. Delinsky.

7          If you want me to let him testify about the

8     law, I'll let him do it.

9          I'll let him testify his understanding of

10    the law as a pharmacist.  And if that's what you want,

11    I'll switch it.  Let Mr. Lanier ask it that way.  That

12    takes care of it.

13         If you want that, we'll flip it around.

14         He could properly testify as to his

15    understanding of the law as it applies to pharmacies and

16    pharmacists because he is one.

17         He can't say what the law is but he can

18    certainly say what his understanding is in his practice.

19    So let's do that.

20         MR. DELINSKY:  Well, Your Honor, our

21    position is that it's neither.

22         You should state what the law is and

23    provide what the law is.

24         THE COURT:  You can't have it both ways.

25         So if you want him -- if you want

1    Mr. Lanier to ask him what is his understanding as a

2    pharmacist of what the responsibility, the legal

3    responsibility of a pharmacy is, and the legal

4    responsibility of what a pharmacist is, I think he's

15:29:18  5    qualified to say that.

6                So I'll have Mr. Lanier ask it that way.

7                MR. DELINSKY:  All right.  Your Honor,

8    given those choices, we'll -- we are preserving our

9    objections and stay with the status quo.

15:29:30 10                THE COURT:  No, I flipped it around.

11                I'll flip it around.  That's what the

12    defendants seem to want, so let's do it that way.

13                MR. WEINBERGER:  Well, it's certainly what

14    we want, Your Honor.

15:29:43 15                We were trying to walk the line based upon

16    some earlier rulings, but we think we have the ability

17    to -- should, to ask him from a pharmacist perspective

18    based on his experience, was it lawful or unlawful to do

19    certain things.

15:30:02 20                THE COURT:  Well --

21                MR. DELINSKY:  But, Your Honor, this

22    is -- I feel that we're just in an improper territory

23    because it's not for an expert in this case to either

24    opine on what the law is or what the standard of care is.

15:30:18 25                Neither is appropriate for this case.  The

1    Court, you should, Your Honor, be setting forth

2    instructions on what the law is.

3                    MR. WEINBERGER:  Well, with respect to the

4    standard of care --

15:30:29  5                    THE COURT:  All right.  Is there any

6    disagreement that the law imposes obligations on

7    pharmacies and the law imposes obligations under

8    pharmacists?  Is anyone disputing that?

9                    MR. DELINSKY:  I think there's intense

15:30:42 10    disagreement over what the law is.

11                    THE COURT:  I've already overruled you on

12    that so I -- I mean, he's going to testify one way or the

13    other.

14                    I mean, what do you want him to say?  Do

15:30:51 15    you want him to say what his understanding -- his

16    understanding of the legal obligations of the pharmacy

17    and a pharmacist?  He's qualified to say that.

18                    It's his understanding and how he practiced

19    it when he was a practicing pharmacist.

15:31:05 20                    Let's just ask him it, ask him it that way.

21    He was a practicing pharmacist, what did he feel his

22    obligations were as a pharmacist and what did he feel was

23    the obligations of his employer.

24                    MR. LANIER:  Fine.

15:31:23 25                    THE COURT:  Do it that way.

```
 1              (End of side-bar conference.)

 2    BY MR. LANIER:

 3    Q.    Mr. Catizone, I would like to ask you this as

 4    follows:

 5              What was your understanding of the legal

 6    obligation as a pharmacist in terms of the CSA placing

 7    unilateral responsibility on the pharmacist dispensing?

 8              What was your understanding of the legal

 9    obligation?

10    A.    My understanding is that the CSA does not place

11    unilateral responsibility on the pharmacist.

12              Responsibility also rests with the

13    pharmacy.

14    Q.    And is that --

15              THE COURT:  Is that -- sir, is that how you

16    practiced it when you were a practicing pharmacist for 20

17    years?

18              THE WITNESS:  Yes, Your Honor.

19              THE COURT:  All right.  I'd like you to

20    testify on that basis then.

21    BY MR. LANIER:

22    Q.    Yes.

23              In other words, the way you practiced, it

24    was based on this legal understanding, is that fair to

25    say?
```

Catizone - Direct/Lanier                    981

1     A.    Yes, sir.

2     Q.    And is that the way your employer interacted with

3     you?

4     A.    Yes, sir.

15:32:52  5     Q.    And is that the way, from the national Boards of

6     Pharmacy or National Association of Boards of Pharmacy,

7     is that the way that you all wrote your model legislation

8     with that understanding?

9     A.    Yes, sir.

15:33:17 10     Q.    And is that important?

11     A.    Yes, sir.

12     Q.    In terms of policy?

13              Is that an important policy the way the

14     system works?

15:33:25 15     A.    Yes, sir.

16              I think the slide you had up there

17     mentioned the pharmacy, pharmacist, and staff.

18     Q.    Yes.

19     A.    So as a practicing pharmacist, when I was the

15:33:36 20     pharmacist in charge, I would not hire a pharmacist who

21     wasn't licensed or hire a pharmacist who I didn't feel

22     was competent to practice, just like if I was the company

23     that owned a trucking company, I wouldn't hire a driver

24     that wasn't licensed and I wouldn't put trucks on the

15:33:56 25     road that were unsafe or didn't operate the way they

1    should.

2                    The same principle applies as a practicing

3    pharmacist in a pharmacy.  The pharmacy has to provide

4    the tools and the support that a pharmacist needs to

15:34:09  5    practice so that the responsibility doesn't fall on the

6    pharmacist alone.  It has to fall on the pharmacy as

7    well.

8    Q.    Okay.

9                    Now, as someone who's been in this arena

15:34:22 10    for your entire adult life, and as someone who -- well,

11    let me take a step back.

12                    MR. LANIER:  Your Honor, if I could strike

13    that, I need to lay a foundation a little better.

14    BY MR. LANIER:

15:34:34 15    Q.    When you were with the National Association of

16    Boards of Pharmacy, you were the CEO, did you all

17    interact with national chain pharmacies?

18    A.    Yes, sir.

19    Q.    In what way did the National Association of Boards

15:34:58 20    of Pharmacy interact with chain pharmacies?

21    A.    In a variety of ways.

22                    Many times we worked with chain pharmacies

23    on projects.

24                    Many times we talked with chain pharmacies

15:35:13 25    about what our position was on various practice

1    standards, rules, regulations.

2    Q.    All right.  Hold on, I want to make sure I've got

3    this right.

4              You worked on joint product -- joint

5    projects?

6    A.    Yes, sir.

7    Q.    Can you give us an example?

8    A.    One of the documents and one of the projects

9    mentioned in my report is a stakeholder task force on

10   controlled substances, in which we worked with many of

11   the major chains to try and better understand how red

12   flags were being viewed, interpreted, and managed by

13   doctors, pharmacists, and the manufacturers and

14   distributors.

15   Q.    I wrote state, but you said according to the --

16   A.    Stakeholders.

17   Q.    -- court reporter, stakeholders?

18   A.    Yes, sir.

19   Q.    Task force on controlled substances.

20             And what did y'all do in that regard?

21   A.    There was a problem with communications between the

22   doctors and pharmacists and pharmacies.

23             The doctors felt that the pharmacists were

24   encroaching on the practice of medicine and making

25   medical decisions because the doctors' position was

1    pharmacists should just fill every prescription they're

2    given and should never question what the doctor has

3    written.

4              The pharmacies, on the other side,

15:36:40  5    including the chain pharmacies, had the different

6    perspective, the perspective that I've talked with you

7    about in terms of the pharmacist's responsibility to make

8    sure that that prescription was right and to make sure

9    that that prescription was safe for the patient.

15:36:56 10              So the stakeholder task force was convened

11    to specifically look at the opioid issue and controlled

12    substances because that's where most of the problems were

13    occurring between prescribers who felt that their

14    prescriptions weren't being dispensed by pharmacists

15:37:14 15    because pharmacists were questioning them, and then

16    pharmacies and pharmacists saying, "That's our

17    responsibility, that's what we need to do."

18              And we convened a task force to bring the

19    parties together to make sure everybody had an

15:37:27 20    understanding of red flags responsibilities, so in the

21    end the patient had access to medications and wasn't the

22    one who suffered.

23    Q.   All right.  In addition to interacting with chain

24    pharmacies by working on joint projects, were there any

15:37:42 25    other interactions?

1    A.    From time to time, we disagreed with chain

2    pharmacies on the positions they took and testimony they

3    may have given at a state level that we gave the

4    opposite.

15:37:54    5              I can tell you that one of the positions or

6    one of the items we disagreed with in the course of my

7    tenure at NABP was documentation.

8              The position at that time of many of the

9    chain pharmacies was that documentation was not needed

15:38:12   10    and that documentation shouldn't occur and it was more of

11    a liability for pharmacists and pharmacies to document

12    what happened because it would become fodder for

13    plaintiffs' attorneys to then take action against the

14    pharmacies.

15:38:27   15              Our position always was that documentation

16    was important, necessary, and it actually validated what

17    the pharmacists and pharmacies did if they were doing the

18    right things.

19    Q.    Okay.  Can you think of any other interactions?

15:38:42   20    And I saw something about a joint council policy or

21    something like that.

22              Was there ever a council policy or

23    something of folks that worked with you all or maybe I've

24    got that mixed up?

15:38:59   25    A.    I'm not recalling it, sir, so.

1     Q.    Then I've clearly got it mixed up.

2                 All right.  Now, you worked with the

3     National Association of Boards of Pharmacy, and your

4     interactions with pharmacists, pharmacies, and Government

15:39:14  5   regulation entities and boards causes me to ask you to

6     look at your sixth opinion where you say you would expect

7     that each defendant became and remains aware of these

8     requirements.

9                 I need to ask you, first, what requirements

15:39:35 10   do you expect each defendant would have become and remain

11    aware of?

12    A.    Those requirements are the controls that we talked

13    about for the closed system for controlled substances,

14    and then the fact that the pharmacist has to make sure

15:39:49 15   that it's a valid prescription for a legitimate medical

16    purpose and that the pharmacist does everything they can

17    to make that determination by identifying red flags,

18    resolving red flags, and then documenting the resolution

19    of those red flags before a prescription is dispensed.

15:40:10 20   Q.    And if each defendant, as a corporate entity, is

21    aware of the need for a closed system and that the

22    pharmacist must determine the validity of the Rx, the

23    prescription, and deal with red flags and document, why

24    would the defendant themselves, the pharmacies, know that

15:40:49 25   as opposed to a pharmacist?

Catizone - Direct/Lanier                    987

1    A.    Those requirements are in the laws, in the rules,

2    in the regulations because the opioid epidemic has been

3    so tragic.  It's well-known to even people who are not

4    pharmacists or don't -- or not pharmacies but this has

15:41:10  5    been a significant problem and it's injured a number of

6    people and killed a number of people.

7                  So it was also in the popular press, the

8    things that we read every day that's outside of the

9    professional pharmacy literature.

15:41:23 10                  It was discussed by state Boards of

11    Pharmacy and the DEA to presentations, at which

12    defendants were present.  There were actions taken

13    against the defendants by the DEA where they specifically

14    spelled out what the requirements were, and then if you

15:41:40 15    look at the policies and procedures of the defendants,

16    they contain many of the requirements or some of the

17    requirements that we're talking about that we say

18    that -- I say they were aware of and should have been

19    aware of within their own policies and procedures.

15:41:55 20    Q.    All right.  I'd like you to break this apart and

21    give us some examples, if you're able to.

22                  Do you have your reports with you, by the

23    way?

24    A.    Yes, I do, sir.

15:42:04 25    Q.    Don't hesitate to refer to them if you feel that

Catizone - Direct/Lanier                          988

1    you need to for any of this, but I'd like to ask you

2    about what you just told us.

3                    You said, first of all, this has been a

4    significant problem that has killed a significant number

15:42:23  5    of people, right?

6    A.    Yes, sir.

7    Q.    And are you comfortable with the phrase "Opioid

8    epidemic"?

9    A.    Yes, sir.

15:42:33  10    Q.    And is that information you would expect that the

11    companies would be aware of?

12    A.    Yes, sir.

13    Q.    I've got a chart that was slide number 20 in your

14    demonstratives, three waves of the rise in opioid

15:42:56  15    overdose deaths.

16                    Do you see this?

17    A.    Yes, sir.

18    Q.    And it doesn't look that huge until you get to the

19    end, but if we had focused only on the beginning, I think

15:43:09  20    it would look a little different.

21                    So let's look at that first wave.

22                    The top line is any opioid, fair?

23    A.    Yes, sir.

24    Q.    The purple line are synthetic opioids like Tramadol

15:43:24  25    or Fentanyl, whether they were prescribed or made

1    illicitly.

2                       True?

3    A.     Yes, sir.

4    Q.     And then we've got the blue line is heroin, right?

15:43:37 5    A.     Yes, sir.

6    Q.     And then the light blue line, commonly prescribed

7    opioids, natural and semisynthetic opioids and Methadone.

8    This is going to be, what, Oxycodone and OxyContin and

9    Percocet and things like that?

15:43:55 10   A.     Yes, sir.

11   Q.     Okay.  So if we look just at the first wave, wave

12   one, and we do nothing except look in that section and

13   Zoom it up, why would you consider this to be a wave or a

14   rise in opioids from 1999 to 2005, opioid deaths?

15:44:22 15   A.     If the opioids are properly prescribed and

16   dispensed, you wouldn't expect to see any deaths or

17   minimum deaths or injury from those prescription drugs.

18                       The fact that we have this trend that

19   you're showing up on the screen and the number of opioid

15:44:40 20   deaths is rising from opioids and rising so significantly

21   would be one of those early trends that would cause some

22   concern.

23   Q.     Okay.  And if we focus on the light blue line,

24   which is the prescription opioid deaths, in a period of

15:44:57 25   five years to go from slightly over one per 100,000 to

Catizone - Direct/Lanier

990

1  almost three is an almost tripling?

2  A.  Yes, sir.

3  Q.  And is that a significant problem that you would

4  expect those who are dispensing opioids would be

15:45:21  5  attentive to?

6  A.  Yes, sir.

7  Q.  Then if we look at the second -- well, we will

8  isolate that wave here.

9          If we look at the second wave, the second

15:45:36 10  wave seems to go from 2004 to 2011.

11          Fair?

12  A.  Yes, sir.

13  Q.  And in this time period, we're able to see the

14  deaths from opiates that are prescribed go from nearly

15:46:01 15  three to four-and-a-half.

16          So another 150 percent increase or so, 150

17  to 200 percent.

18          Fair?

19  A.  Yes, sir.

15:46:13 20  Q.  Would you expect that industries involved in

21  dispensing these opioids would realize something like

22  that?

23  A.  Yes, sir.

24  Q.  And by the same token, as that rise is going on,

15:46:32 25  you've also got another big rise in any opioid, legal or

Catizone - Direct/Lanier 991

1    illegal.

2              Fair?

3    A.   Yes, sir.

4    Q.   If we go to the third wave, the third wave going

15:46:48 5   from 2011 up to 2018, you continue to have the opioid

6    that are commonly prescribed at a higher level, little

7    bumps up, little bumps down.

8              Fair?

9    A.   Yes, sir.

15:47:12 10  Q.   Look what happens to any opioid when you include

11   the synthetic opioids.

12             It goes way up, doesn't it?

13   A.   Yes, sir.

14   Q.   So I ask you in this regard, is this what you're

15:47:24 15  talking about when you were saying that there's public

16   information that the companies should have been aware of?

17   A.    Yes, sir.  And it goes to an earlier question you

18   asked about the importance of trends in corporate data.

19             If I'm a pharmacist -- I am a pharmacist,

15:47:44 20  but as a pharmacist, the last thing I want to do is for

21   my patients to be injured or to die from prescriptions.

22   So if I see a trend happening where people are dying from

23   opioids, and that trend keeps going up and up, then I've

24   got a problem with opioids that I have to manage.

15:48:06 25             And it also says to me as a pharmacist that

1    during these years and during the escalation of this

2    opioid problem, nothing was done to stop that trending

3    across the board, otherwise we would have seen some

4    decreases.

15:48:22  5         Instead, it just kept increasing, and the

6    trend was either ignored or people didn't pay any

7    attention to it whatsoever.

8    Q.    All right.  When you were detailing this to us, you

9    also said that this is something that was talked about

15:48:35 10   within state boards.

11         Can you tell us what you meant by that?

12   A.    The state Boards of Pharmacy became aware of this

13   trend, this epidemic, they gave presentations about that.

14         Forty-eight of the states have their own

15:48:54 15   state newsletter or a newsletter through NABP.  There

16   were articles in the state newsletters about opioids,

17   articles about corresponding responsibility, so the state

18   Boards of Pharmacy engaged in an information campaign to

19   alert pharmacists to this and also the holders of those

15:49:12 20   pharmacy registrations and licenses as well.

21   Q.    And for a pharmacy to have their head of their

22   division over these types of things looking carefully,

23   would you expect that person to not only be zoomed in on

24   this, but to actually be trying to take positive steps to

15:49:36 25   stop it?

Catizone - Direct/Lanier                    993

1    A.    Yes, sir.

2    Q.    The state board discussions, you added another one,

3    and that was DEA actions.

4                    Can you tell the jury what you mean by DEA

15:49:47  5    actions?

6    A.    Sure.

7                    We talked earlier about the court cases,

8    actions that the DEA took against some of the defendants,

9    and they took them against pharmacies that the defendants

15:50:00 10    managed where there were significant issues, significant

11    problems.

12                    And the DEA then put in certain

13    requirements for the defendants to make sure that they

14    were complying with what the Controlled Substances Act

15:50:12 15    were and what the other requirements were that the DEA

16    expected.

17    Q.    All right.  Sir, if we move on to opinion number

18    seven, you express, "Each defendant failed to timely

19    implement and apply necessary controlled substance

15:50:30 20    diversion policies across its pharmacy stores."

21                    Is that correct?

22    A.    Yes, sir.

23    Q.    And when you say, "Each defendant failed to timely

24    implement and apply" these, what are you -- first of all,

15:50:46 25    how can you form that opinion?

1    A.    Based upon the information that I reviewed, sir.

2    Q.    And what information is it you reviewed?

3    A.    So as I mentioned earlier, some of the defendants

4    had actions taken against them by the DEA as early as

15:51:03  5    2009 and 2011.

6              And those actions included very specific

7    requirements that they had to comply with because of

8    their failure to comply with the requirements that were

9    already in place.

15:51:17 10             If you look at the policies and procedures,

11    many of those policies and procedures were not changed or

12    weren't implemented until much later, 2013, 2015, and

13    then if you think back to the chart, during that time

14    period, the opioid crisis just kept increasing and more

15:51:38 15    and more people were harmed or died because of that

16    opioid epidemic during that time period.

17    Q.    So when you say many changes were not made, are you

18    saying for years later in some circumstances?

19    A.    Yes, sir.

15:51:52 20             If the actions were --

21             MS. SULLIVAN:  I'm sorry, I'm sorry to

22    interrupt.

23             Your Honor, I'm going to object to the

24    demonstrative because it says each defendant and then it

15:52:02 25    talks about the DEA.  It's objectionable.

```
 1                THE COURT:  Overruled.

 2                I mean, he testified to it so it's

 3      overruled.

 4      BY MR. LANIER:

 5      Q.   Many -- many changes were not made for years later.

 6                I wanted to make sure I understand.  Did

 7      you say years?

 8      A.   Yes, sir.

 9      Q.   Okay.  Now, what about, for example, Ms. Sullivan

10      objected, she's with Giant Eagle.

11                I don't know that Giant Eagle was ever

12      subject to an action by the DEA for failure to comply, so

13      my question to you would be while we say, "Each

14      defendant" here, do you include Giant Eagle when you talk

15      about actions by the DEA?

16      A.   I did not include Giant Eagle in that, but Giant

17      Eagle did have action taken against it.

18                MS. SULLIVAN:  Objection, Your Honor.

19                THE COURT:  Sustained.

20      BY MR. LANIER:

21      Q.   Let's set aside anything else like that and just

22      answer my focused question.

23                You don't have -- you're not including

24      Giant Eagle on an action by the DEA for failure to comply

25      and a failure to execute changes for years later?
```

1      That's not Giant Eagle, is that -- am I

2  right or wrong?

3  A.    You're right, sir.

4  Q.    Okay.  I just want to make sure we've got the data

15:53:27 5  right in front of the jury.

6              Now, when you give this testimony and you

7  apply necessary controlled substance diversion policies

8  across its pharmacy stores, why is that something that

9  the pharmacy business should be dealing with as opposed

15:53:47 10  to the pharmacist?

11  A.    Well, again, it's the pharmacy business that sets

12  policies, provides the resources, designs the stores,

13  provides the computer systems, determines what data are

14  going to be shared or not shared.

15:54:03 15              It's not the pharmacist that makes that

16  decision or has control over those items.

17  Q.    All right.  Now, if we take it apart from the DEA,

18  and we look at the Ohio Board of Pharmacy, did you

19  investigate whether the Ohio Board of Pharmacy found any

15:54:38 20  violations?

21  A.    Yes, sir.

22  Q.    And in that regard, did the Ohio Board of Pharmacy,

23  as you've set out in your report --

24              MS. SULLIVAN:  Objection, Your Honor.

15:54:49 25              This goes to Your Honor's ruling.

          1              MR. LANIER:  I'm not asking it as -- can we

          2    go to side-bar, Your Honor?

          3              (Proceedings at side-bar:)

          4              THE COURT:  All right.  No one has given me

15:55:13  5    any enforcement actions by the Ohio Board of Pharmacy to

          6    review, no one has given me any documents in that respect

          7    and no one has suggested they are planning to use it so

          8    this is coming out of the blue, Mr. Lanier.

          9              So I think before you use it, you've got to

15:55:29 10    give it to me and give the defendants a chance to object

         11    and me to review it in due course.

         12              MR. LANIER:  Thank you, Your Honor.

         13              That's exactly what I should have done and

         14    I apologize, and I will fix that and we'll deal with this

15:55:42 15    in the morning.

         16              THE COURT:  Thank you.

         17              MS. SULLIVAN:  Your Honor, just one more

         18    thing.

         19              I'm just concerned that this witness, and

15:55:47 20    he was ready to blurt it out, there is an action by the

         21    Board.  There is no admission.  It's not in Lake and

         22    Trumbull County --

         23              THE COURT:  I said it may -- I mean we're

         24    not dealing with it now.

15:55:57 25              MS. SULLIVAN:  Thank you.

1          (End of side-bar conference.)

2     BY MR. LANIER:

3     Q.     All right.

4              Sir, I'd like to move on from this at this

15:56:14 5    point in time.  We may approach it tomorrow, okay?  Put a

6     place holder in your brain, all right?

7              Opinion number eight, you say, "Once

8     controlled substance diversion policies were developed,

9     each defendant failed to monitor and enforce the policies

15:56:36 10   across its pharmacy stores."

11             Is that your opinion?

12    A.     Yes, sir.

13    Q.     And what is the basis for that opinion?  If you

14    have not already talked about it, save the Ohio Board

15:56:53 15   stuff for later.  What is the basis of your opinion?

16             Let me do it this way.  I want to make sure

17    we don't mess up.

18             Did you look at prescriptions for these

19    defendants?

15:57:07 20   A.     Yes, sir.

21    Q.     You're from the midwest, not Ohio midwest but

22    Illinois midwest, right?

23    A.     Yes, sir.

24    Q.     Okay.  I'm from Texas, and in Texas we have this

15:57:23 25   expression, "The proof is in the pudding."

1            Do you have that expression in the midwest?

2       A.    Yes, sir.

3       Q.    All right.  So my question is did you actually look

4       within the stores in these counties to see whether or not

15:57:43 5      the defendants were properly monitoring and enforcing the

6       policies across their pharmacy stores?

7       A.    Yes, sir.

8       Q.    Did you see the prescriptions that we were given?

9       A.    Yes, sir.

15:57:55 10     Q.    Did you see red flags in those prescriptions?

11      A.    Yes, sir.

12      Q.    Did you have a chance to look at the documentation?

13      A.    Yes, sir.

14      Q.    Did you have a chance to see if the due diligence

15:58:09 15     was done and documented?

16      A.    Yes, sir.

17      Q.    Tomorrow morning, if -- unless we get to it today,

18      but I reckon it will be tomorrow, are you going to be in

19      a position, whenever I ask it, to walk through those and

15:58:24 20     give us examples?

21      A.    Yes, sir.

22      Q.    Do those actual prescriptions, the histories you

23      looked at, do they indicate that each defendant failed to

24      monitor and enforce the policies across their pharmacy

15:58:40 25     stores in Lake and Trumbull Counties?

1    A.    Yes, sir.

2    Q.    Is that an important thing that a defendant do?

3    A.    Yes, sir.

4    Q.    Why?

15:58:47   5    A.    As we've mentioned several times, we're talking

6    about people's lives here, and the importance of properly

7    dispensing opioids.

8              So that's very important.

9    Q.    All right.

15:59:05  10              Opinion number nine, "Each defendant

11   implemented employee evaluation policies and performance

12   metrics that impeded their pharmacists' efforts to comply

13   with laws and regulations and meet standards of care."

14              Did I read your opinion correctly?

15:59:31  15   A.    Yes, sir.

16   Q.    Now, what do you mean when you say "Implemented

17   employment evaluation policies"?

18   A.    Those were the metrics and the metric policies we

19   talked about earlier involving the time to fill the

15:59:48  20   prescription, the wait time of customers, and then how

21   bonuses were calculated for pharmacists based on

22   prescription volume.

23   Q.    And why do those employment evaluation policies

24   make a difference in complying with laws and regulations

16:00:12  25   and meeting standards of care from your perspective and

 1   history?

 2   A.    It really touches on two points.

 3              If those policies do not allow the

 4   pharmacist sufficient time to perform the

 5   responsibilities and conduct a DUR, that's one issue.

 6   Q.    Time out.

 7              DUR?

 8   A.    Drug utilization review.

 9   Q.    Okay.  That's the thing where you said inspect the

10   prescription, do the due diligence and all of that?

11   A.    Correct, sir.

12   Q.    All right.

13   A.    The second comment is if it distracts the

14   pharmacist away from their primary goal of dispensing the

15   appropriate medication for the patient and instead focus

16   them on financial incentives or other metrics that again

17   distract the pharmacist or take away from the

18   pharmacist's responsibilities, that's not what those

19   metrics should be doing.

20   Q.    Can metrics be used to actually increase safety?

21   A.    Yes.

22   Q.    Can metrics be used to decrease safety?

23   A.    Yes.

24   Q.    Would it be appropriate for a national chain or a

25   regional chain to monitor those things in their

1       pharmacies?

2       A.     Yes.

3       Q.     Now, you talk about employment evaluation policies

4       and performance metrics.

16:01:42  5                     Are performance metrics just more of the

6       same?

7       A.     What we've talked about, sir, yes.

8       Q.     Okay.  Yes.

9                     That impeded the pharmacists' efforts.  Let

16:01:55 10     me ask you just as a practical issue, if you

11      need -- would you get a little closer to the microphone

12      or get the microphone a little closer to you.  It works

13      both ways.

14      A.     Yeah.  If I get too close, the Court Reporter can't

16:02:14 15     hear, it's very garbled, so I'm trying to balance the

16      two.

17                     I apologize.

18      Q.     Okay.  No, it's not your fault.

19                     You just got to balance them.

16:02:22 20                     And I'll try and do better at listening and

21      not yelling from my end.

22                     Hold on, I'm reading where I was.

23                     Okay.  Let's get practical for a moment.

24      Let's say that I'm a pharmacist, okay?  I don't see you.

16:02:53 25     I'm just -- got to hear.

Catizone - Direct/Lanier                    1003

1    A.    Oh, I'm sorry.

2    Q.    Yeah.

3    A.    I was trying to imagine you as a pharmacist, so go

4    ahead.

16:03:00  5              (Laughter.)

6    Q.    That was a good one.

7              Let's say I'm a pharmacist, and let's say

8    that I fill five normal prescriptions for every opioid I

9    fill.

16:03:22 10              Are you with me?

11   A.    You're filling five nonopioid prescriptions for

12   every opioid?

13   Q.    Yes.  Yes.  I'm sorry.

14   A.    Okay.

16:03:30 15   Q.    Z-Paks, Amoxicillin, birth control pills, whatever

16   it may be -- not for me.

17              And so let's put it where the opioids are

18   15 percent of what I do.

19   A.    Okay.

16:03:50 20   Q.    I'm filling.

21              And I'm told that I'm going to get bonused

22   at the end of the year, and I'm going to be -- my job

23   evaluation will be measured by how many prescriptions I

24   fill, at least that's part of it.

16:04:09 25   A.    Yes.

1   Q.    All right.  Now, if I've got an opiate in front of

2   me to fill, OxyContin, and it's got some red flags, and

3   I've got 15 minutes to get the prescription out but I've

4   got a backlog of a bunch of other prescriptions I've got

16:04:31  5   to fill, four or five for every opioid I've got to do,

6   will I be pressed for time to resolve the red flags

7   timely and keep my performance up?

8   A.    I think just the description alone in that

9   situation answers the question, and that's what

16:04:53  10   pharmacists faced in these situations.

11               The opioid with red flags was going to

12   require probably more than 15 minutes to resolve, but if

13   I'm on a timetable where I have to dispense prescriptions

14   in 15 minutes or I'm penalized and I have other

16:05:11  15   prescriptions as well that are waiting on me to be

16   dispensed because I don't have enough staffing to deal

17   with it, that's exactly the impediment that I was talking

18   about in my opinion.

19   Q.    And did I dream up a fictionary scenario that could

16:05:26  20   never happen, or is there realism in my example?

21   A.    As a pharmacist who's been in that situation, and

22   as the head of the National Association Boards of

23   Pharmacy where pharmacists would complain to us all the

24   time about that very situation and their concern for

16:05:42  25   patient --

1           MR. MAJORAS:  Objection.

2           Hearsay.

3           THE COURT:  I'll sustain that objection.

4    BY MR. LANIER:

16:05:47  5    Q.   Without saying what someone has said to you, just

6    tell me whether or not that is a realistic situation?

7    A.   Yes, it is.

8    Q.   Okay.  Let's go to opinion number 10.

9           By the way, before I leave opinion number

16:06:15 10   nine, Ms. Singletary would like me to ask you about

11   incentive plans based on customer satisfaction scores.

12          MR. LANIER:  Your Honor, I do not know what

13   that noise is but --

14          (Discussion had off the record.)

16:06:57 15   BY MR. LANIER:

16   Q.   All right.  Let me return to where we were for a

17   moment.

18          So the question is if an incentive plan is

19   based on a customer satisfaction score, how happy is the

16:07:13 20   customer, is that another way that a measurement can be a

21   good or a bad thing?

22   A.   Yes, sir.

23   Q.   Explain why, please.

24   A.   Clearly besides being in the business of taking

16:07:28 25   care of patients, the pharmacies are a business and their

Catizone - Direct/Lanier                    1006

1    customers have to be satisfied.

2              You can't treat your customers

3    disrespectfully or make them wait unnecessarily hours and

4    hours for prescriptions.  There has to be that balance.

16:07:42  5              So knowing good customer satisfaction

6    service helps the business improve.  But when customer

7    satisfaction surveys drive the professional decisions so

8    when a physician writes a prescription for opioids for a

9    patient because they're afraid they're going to get a bad

16:08:02  10    patient rating and that's going to affect their Yelp

11    review or their status at a hospital, and if a pharmacist

12    then gets complaints from patients, he won't or she won't

13    dispense an opiate prescription because of red flags.

14    And if those negative customer satisfaction surveys

16:08:18  15    impact the pharmacist's performance, their position at

16    the pharmacy, that's the bad part of customer

17    satisfaction surveys and how they could be misconstrued.

18    Q.    All right.

19              Now, in this regard, what I'd like to do is

16:08:35  20    go to your opinion number 10.

21              Each defendants' local stores filled

22    thousands of prescriptions presenting red flags without

23    evidence of resolving those red flags.

24              Did I read that correctly?

16:08:54  25    A.    Yes, sir.

1    Q.    Now, in this regard, I'd like to first talk about

2    some of the red flags that you have used and looked

3    through in the process of working to that conclusion.

4                Okay?

16:09:09  5    A.    Yes, sir.

6    Q.    So I'll put them up here and have you explain them

7    after we get them read into the record.

8                Red flag number one:  "An opioid was

9    dispensed to a patient who traveled more than 25 miles to

16:09:27 10    visit the pharmacy.  The distance here is calculated from

11    the center of the patient's Zip Code to the center of the

12    pharmacy's Zip Code."

13                Did I read that correctly?

14    A.    Yes, sir.

16:09:43 15    Q.    Why is that a red flag?

16    A.    So the statement I will make with all the red flags

17    is that there's been evidence to show that that's

18    resulted in diversion and also other misuse of those

19    prescriptions, but the rationale is based on logic as

16:10:07 20    well as information.

21    Q.    Explain the logic behind this.

22    A.    So studies have shown that most patients, frequent

23    pharmacies that are within three to five miles of their

24    home or three to five miles within their office.

16:10:21 25                People want that to be a convenient service

1    and that's what's separated the chain pharmacies from

2    independents, that convenience, having a pharmacy on

3    every corner.

4                    So for a patient to drive 25 miles to a

5    pharmacy and pass other pharmacies on the way just

6    doesn't make sense and has been one of the red flags that

7    the DEA has identified as an indication that there could

8    be a problem with this prescription.

9    Q.    Do you remember where the DEA or when the DEA

10   identified this red flag?

11   A.    I --

12   Q.    It's not a memory test.

13   A.    It may have been in the *Holiday* test.

14   Q.    All right.  Whenever, or however it is, is this a

15   common sense red flag?

16   A.    Yes, sir.

17   Q.    If you're a pharmacist who's practicing and you

18   know you've got a responsibility with these opioids and

19   you know you've got to be extremely careful and the

20   company is giving you the time and opportunity, whether

21   this has been identified as a red flag or not by the DEA,

22   would you, as a pharmacist, see this as a concern?

23   A.    Yes, sir.

24                    As a pharmacist, you get to know the

25   patients who frequent your pharmacy.  You know the

1    prescribers in the area so you're familiar with those

2    prescribers.

3                    When a person presents a prescription to

4    you and they're from 25 miles away, someplace that you've

16:11:53  5    never seen prescriptions come from, or the questions that

6    you begin to ask yourself are why is this patient coming

7    to my pharmacy instead of other pharmacies that may be

8    closer to the patient.

9                    So it's a very common sense red flag.

16:12:05 10    Q.    All right.

11                    Now, your second red flag, number two, "An

12    opioid was dispensed to a patient who traveled more than

13    25 miles to visit their prescriber.  The distance here is

14    calculated from the center of the patient's Zip Code to

16:12:29 15    the center of the prescriber's Zip Code."

16                    Do you see that?

17    A.    Yes, sir.

18    Q.    Can you explain in common sense why you put that

19    here as a red flag in your report?

16:12:43 20    A.    Yes, sir.

21                    Again, the studies have shown that people

22    are going to utilize physicians or prescribers that are

23    close and convenient for them.

24                    Now, where the common sense comes in, that

16:12:58 25    this red flag accounts for, is we're familiar with

1    universities or the Cleveland Clinic or specialists that

2    may be 25 miles away from the patient's Zip Code and so

3    as a pharmacist, I would look at that and be able then to

4    resolve that red flag.

16:13:15  5              The number of miles, that is not a

6    definitive indicator that says, "This prescription is a

7    bad prescription and should not be filled."

8              It's an aid to the pharmacist who's doing

9    all the things we talked about earlier, reviewing the

16:13:31 10   prescription and such to say, "Hey, there's a red flag

11   here; I'm wondering why this patient went to a prescriber

12   in Florida when they live in Ohio" or "Why this patient

13   went to a prescriber 50 miles away from their home when

14   it wasn't a university center or it wasn't the Cleveland

16:13:50 15   Clinic or it wasn't for a specialist."

16              Those are questions the pharmacist should

17   ask and answers that they should document so that if all

18   of the pharmacists are coming after that pharmacist and

19   filling that prescription, I don't have to ask the same

16:14:05 20   questions and put that patient through the same

21   questions.  I know that that red flag was resolved and

22   I'm comfortable with dispensing it.

23   Q.   By the way, are you saying that when you document

24   properly resolving red flags, that that actually helps

16:14:21 25   customer service later?

1    A.    Undoubtedly, sir.

2              As a pharmacist, then, I don't subject that

3    patient to the same questions they were probably already

4    asked or should have been asked by the pharmacist before

16:14:31  5    me who filled that prescription.

6    Q.    All right.  Let's continue.

7              Red flag number three, "The patient was

8    dispensed opioid prescriptions with overlapping days of

9    supply that were written by two or more prescribers."

16:14:50  10             First, would you explain what you mean by

11   that?

12   A.    So the common term that's used that's been again

13   documented in DEA cases and part of the knowledge, part

14   of what's communicated to a pharmacist is this is called

16:15:07  15   doctor shopping.

16             So if you think about what are opioids

17   primarily used for, they're supposed to treat severe

18   pain.  They're not supposed to be used for moderate pain.

19   They are supposed to be the last resort after a patient

16:15:21  20   has gone through therapy and tried other means like

21   Ibuprofen or Advil or Tylenol, something to deal with the

22   pain that doesn't escalate to an opioid.

23             So now you have a patient that comes into

24   your pharmacy that has multiple prescriptions for opioids

16:15:35  25   from different doctors.  From a logic sense, that doesn't

        1    make any sense.  Why would a patient go to two different

        2    doctors to be treated for the same thing and get opioid

        3    prescriptions unless there was something else going on

        4    there that the pharmacist should look at and then

16:15:52  5    document what they found.

        6    Q.    Could this be you called it doctor shopping.

        7                  Is that the same as a pill-mill doctor or

        8    is that different?

        9    A.    It could be the same, but it's different.

16:16:09 10                  A pill-mill doctor is a doctor that's

        11    actually writing prescriptions for nonlegitimate

        12    purposes.  They're simply being paid to write

        13    prescriptions to feed a person's drug habit or to divert

        14    medications.

16:16:23 15                  It's clear from the evidence as presented

        16    on past pill-mills that patients waiting outside,

        17    patients taking scores of patients to those pill-mills,

        18    paying people for prescriptions, all sorts of practices

        19    that would define and distinguish a pill-mill from a

16:16:41 20    traditional pharmacy.

        21    Q.    All right.

        22                  The third red flag -- I mean the fourth red

        23    flag that you -- wait, the third, is something written by

        24    two or more prescribers.

16:16:50 25                  The fourth red flag reads almost the same,

           1    but it says, "Patient was dispensed opioid prescriptions

           2    with overlapping days of supply at two or more

           3    pharmacies."

           4                    Pharmacies instead of prescribers.

16:17:06   5                    Can you explain the difference between

           6    those two?

           7    A.    Sure.

           8                    This is pharmacy shopping.

           9                    So if I have a prescription for an opioid

16:17:15  10    and I'm getting it filled at the pharmacy I always go to,

          11    why is there a need for me to go to another pharmacy and

          12    get the prescription where there's overlapping doses?  So

          13    now my opioid prescription is still there, I'm still

          14    taking it, I still have some of it, but I get a

16:17:33  15    prescription from another pharmacy for a duplication of

          16    that opioid therapy.

          17                    Are there some circumstances where that

          18    could happen?  Sure.  In my primary pharmacy, if they're

          19    out of the medication, they may direct me to another

16:17:47  20    pharmacy, but in that case, my medication would be pretty

          21    much out or at the end and I needed a refill.

          22                    Or if there was a problem with the

          23    medication not being in that pharmacy or I couldn't get

          24    to that pharmacy, I went to the pharmacy that was near my

16:18:03  25    home but now I went to the pharmacy that was at my work,

1    that would also be something that could be resolved and

2    explain that.

3                But when this red flag manifests and

4    manifests to a significant extent where there are more

16:18:16 5    than just a few of these prescriptions, that says that

6    the patient is going from pharmacy-to-pharmacy getting

7    prescriptions filled for opioids just to increase the

8    number of opioids that they have.

9    Q.    Okay.

16:18:27 10                Let's go to red flag number five.

11                The patient was dispensed an opioid, a

12    Benzodiazepine, and a muscle relaxer for overlapping days

13    of supply."

14                Why is that a red flag?

16:18:48 15    A.    Sir, as a pharmacist, you look at therapy and why

16    certain medications are prescribed.

17                Based on my background as a pharmacist,

18    there's no legitimate medical reason for these three

19    drugs to be dispensed at the same time or for an

16:19:10 20    overlapping day's supply, and the rationale for that is

21    simple:  When these three drugs are taken together, they

22    create the same euphoria and same effect as taking

23    heroin.

24                So what you've actually done here now is

16:19:26 25    dispensed prescription drugs instead of heroin, and that

1  would be a significant red flag that every pharmacy

2  should know and should question before they dispense.

3  Q.    Well, how do you know if you're just dispensing the

4  opioid and someone else dispensed the Benzodiazepine and

16:19:46  5  someone else dispensed the muscle relaxer?

6  A.    Again, we talked about the corporate responsibility

7  and the data that the corporations have.

8           Within my pharmacy or my chain pharmacy, I

9  may be able to look at that screen or that patient

16:20:02 10  profile and see if they were getting it filled at other

11  chains in my pharmacy.

12           I may or may not.

13           I may not have time to do that, and that's

14  something that the corporation should present the type of

16:20:15 15  information that the pharmacist should be made aware of

16  so that the pharmacist knows that that patient has been

17  going from pharmacy-to-pharmacy within my chain.

18           If they're going to a pharmacy outside of

19  my chain, the only way I'm going to know that is I have

16:20:30 20  access to the Prescription Drug Monitoring Program at

21  work that shows me every pharmacy, every doctor that that

22  patient has gone to for controlled substances.

23           And again, that's another tool that the

24  corporation needs to make available to pharmacists so

16:20:44 25  they could deal with these situations that they can't

1    deal with as a pharmacist practicing by themselves at

2    that individual pharmacy.

3    Q.    And if a pharmacist finds this red flag, should a

4    pharmacist document it?

16:20:59  5    A.    The requirements are quite clear.

6                    Whenever a pharmacist feels that that

7    prescription should not be dispensed or there are red

8    flags that need to be resolved, the pharmacist should not

9    resolve -- should not dispense that prescription until

16:21:14 10    the red flags are resolved.

11                    If they suspect it's diversion, the

12    pharmacist has an obligation to call authorities, local

13    law enforcement or DEA, and alert them to that situation.

14                    That is very specific in the requirements.

16:21:27 15    Q.    Wait a minute.

16                    You're saying if a pharmacist or a pharmacy

17    store believes there is diversion going on, that they

18    have an obligation by your understanding of the law to

19    contact the authorities?

16:21:46 20    A.    As a pharmacist that's my understanding of what the

21    requirements are, that if I suspect diversion, and I've

22    tried to resolve those red flags and my resolution or my

23    analysis comes back and tells me that this may be

24    diversion, then I have an obligation to notify

16:22:02 25    authorities.

1    Q.    Okay.  Would it be a good company policy if the

2    jury were to hear that a company did not notify

3    authorities because they thought the DEA didn't want them

4    to?

16:22:19  5              Would that be a good thing or proper under

6    your understanding of the law?

7    A.    I'm not sure what DEA you're referring to, but I've

8    worked with the DEA for 30 years and I've never heard

9    them say they didn't want to hear about diversion so I'm

16:22:33  10   not sure what that is.

11              But it clearly in my opinion would not be a

12   good policy.

13   Q.    So for a company to teach their pharmacists don't

14   report a bad doctor, don't report a suspicious diverted

16:22:48  15   order because the DEA doesn't want to hear about it, that

16   would be contrary to the way you believe a company should

17   respond under the law?

18   A.    Yes, sir.

19              And also how a pharmacist should practice.

16:23:01  20   Q.    All right.  If you look at number six of your red

21   flags, "Patient was dispensed an opioid" -- in that last

22   question, I asked you about documentation and you did not

23   answer about documentation.

24              I didn't give you a chance.  I apologize.

16:23:32  25              Go back and tell us, please, why is

1    documentation important on something like the three

2    different drugs being issued at the same time?

3    A.    Again, as we've talked a few times this afternoon,

4    if a pharmacist identifies red flags, then those red

16:23:53  5    flags should be documented.

6                 And if the pharmacist resolves those red

7    flags, that documentation should be resolved -- should be

8    documented so that the pharmacist or Board of Pharmacy or

9    DEA inspector can understand what happened and see that

16:24:05  10    the pharmacist acted appropriately.

11                 In a situation like this where you have

12    three drugs that are being dispensed and the only real

13    purpose in my experience has been to provide a

14    heroin-type effect, that's a very serious consideration.

16:24:21  15    And so for the pharmacist not to document that, puts the

16    pharmacist at risk.  And if they dispense the

17    prescription, then the patient clearly is at risk.

18                 And if they haven't notified law

19    enforcement or authorities as they're obligated to do so,

16:24:37  20    they just compounded the situation and made it even worse

21    than it was.

22    Q.    Okay.  Number six, "Patient was dispensed an

23    opioid, a Benzodiazepine, and a muscle relaxer on the

24    same day and all the prescriptions were written by the

16:24:57  25    same prescriber."

1          Similar, yet a different red flag.

2          Please explain why that is important.

3    A.    And I apologize to the jury, you may know this, I

4    didn't mention before that when we refer to

16:25:14  5   Benzodiazepines, we're talking about Valium or Xanax,

6    those medications, and you probably are aware of that.

7    So I just wanted to make sure we are on the same page.

8    Q.    Yeah, in fact, hold on.

9          Let's do this more carefully and that's my

16:25:27 10   fault, not yours.

11         A Benzodiazepine, Valium or what was the

12   other one?

13   A.    Xanax.

14   Q.    Is that X-A or Z-A?

16:25:34 15   A.    X-A.

16   Q.    And what -- take away the other drugs.

17         What's Valium and Xanax typically used for?

18   A.    So these are what they call central nervous system

19   depressants and they're also used as anti-anxiety drugs

16:25:53 20   so a person may be anxious, a person that needs to relax,

21   they'll prescribe Xanax or prescribe Valium.

22         People that are very concerned about

23   flying, sometimes they'll prescribe Xanax so that person

24   is able to get through the flight and not suffer anxiety.

16:26:12 25   Q.    Colloquially in Texas, is this what we call a chill

           1    pill, just kind of chillax?

           2    A.    I guess, yes, sir.

           3    Q.    Okay.

           4                A muscle relaxer, give us typical muscle

16:26:23   5    relaxer prescriptions.

           6    A.    So the names that most people probably know it by

           7    would be Soma or Flexeril.

           8                The chemical name is carisoprodol and what

           9    a muscle relaxer does is if somebody has a back injury or

16:26:39  10    someone is -- it helps that muscle relax so the tension

          11    and that pain is relieved somewhat.

          12    Q.    All right.  You said Flexeril was the first name.

          13                You used Soma, S-O-M-A?

          14    A.    S-O-M-A, yes, sir.

16:26:51  15    Q.    All right.  That just helps the Court Reporter if

          16    she's got that in her machine, so she'll thank you.

          17                So if someone's dispensed an opioid, an

          18    anti-anxiety pill, and a muscle relaxer on the same day,

          19    and all these prescriptions are written by the same

16:27:09  20    prescriber, why is that a red flag?

          21    A.    So three issues on this medication.

          22                The first one is what we've talked about

          23    with the red flags.  There has been documented incidents

          24    and DEA actions where these two drugs were dispensed

16:27:29  25    inappropriately and created problems with diversion and

1    prescriptions being dispensed for illegitimate purposes.

2                    So that was the basis for identifying this.

3                    The second is since they're both

4    depressants, they depress the nervous system, they also

16:27:48  5    depress the same controls over breathing.  So now you've

6    got two drugs that are going to depress a person's

7    breathing or really slow down their central nervous

8    system.  So if it's not carefully monitored, it could do

9    damage to that patient either by stopping their breathing

16:28:06  10    or causing them to get so lethargic, that they lose

11    control or simply pass out.

12                    The third consideration is this isn't a

13    hundred percent wrong every time it's prescribed.  There

14    could be situations where I've been involved in a car

16:28:24  15    accident and I can't sleep at night and so I need the

16    pain medication, but I may need the Benzodiazepine, the

17    Xanax, the Valium, to help me sleep so I could rest up.

18                    But in those situations, the prescriptions

19    would be written for a very limited time period, and

16:28:47  20    again the key to everything, as we keep coming back to,

21    is the pharmacist documenting that circumstance.

22                    So the next pharmacist knows that it's not

23    abuse, and that the patient's not at risk; that this is

24    what's really prescribed, and it's being monitored for

16:29:03  25    that patient.

1   Q.   All right.  I think it's possible that I've read

2   this in such a way that I've confused a couple of your

3   red flags.

4              So I want to make sure that I've got it

5   correct.

6              Red flag number six, I think I failed to

7   say, "Opioid, Benzodiazepine, and a muscle relaxer," in

8   other words, the same three drugs, but instead of being

9   just prescribed for overlapping days, this is those three

10  being written by the same prescriber.

11             Should a prescriber, based upon your

12  understanding as a pharmacist, know those three drugs

13  react the way you've said they are?

14  A.   Yes, sir.  And that was my error.  I didn't see the

15  opioid -- I mean I didn't see the muscle relaxer in the

16  second red flag.

17  Q.   Okay.  So let's go back to these three and we'll

18  look at the two in a moment in the next red flags.

19             But these three, if a doctor is -- the same

20  doctor's writing a prescription for a patient on all

21  three of these drugs, is it important that the doctor

22  himself or herself be documented as someone who's done

23  this?

24  A.   Again, the documentation should address the fact

25  that these three drugs should not be prescribed.

```
 1          And if there's a reason that I can't think
 2   of for them to be prescribed by the same prescriber, that
 3   should be documented and there should be something to
 4   substantiate that in the record.
16:30:35 5   Q.   All right.  Now, let's go to the dual drugs that
 6   you thought the last one showed.
 7              This is red flag number seven.  If a
 8   patient was dispensed an opioid and a Benzodiazepine
 9   within 30 days of one another, it's a red flag?
16:30:57 10  A.   Yes, sir, for all the reasons that I spoke of
11   earlier.
12   Q.   That's good.  We'll just say, "Remember earlier."
13              And again, does that mean categorically
14   that it's wrong?
16:31:12 15  A.   Not with these two -- this combination, sir, no.
16   Q.   Okay.  With the three combo, do you believe it's
17   categorically wrong?
18   A.   Yes, sir.
19   Q.   With the two combo, is it still a red flag that you
16:31:24 20  should check?
21   A.   Yes, sir.
22   Q.   Why?
23              In other words, what do the two do, the
24   three give you the euphoria of heroin, what do the two do
16:31:35 25  in tandem that would make someone want to take them for
```

1   diversion reasons?

2   A.    Again, what I mentioned earlier, they both depress

3   the central nervous system and so somebody to use the

4   technical term that Mr. Lanier used, they wanted to chill

16:31:51  5   out and have that chill and that type of sensation or

6   feeling, that's why you would take both medications

7   together.

8                    There wouldn't be a medical reason to do

9   that.  It's more of affecting how you feel and a

16:32:02 10   euphoria, trying to get that high, which would be a low,

11   that people would abuse these two drugs together for.

12   Q.    All right.

13                    Number eight seems to be the same as number

14   seven, except you've got it written by the same

16:32:15 15   prescriber, and I want to emphasize a point with you on

16   this.

17                    Should pharmacists start -- should

18   pharmacists have been on the lookout for doctors who

19   weren't prescribing properly?

16:32:35 20   A.    As a pharmacist, you know that and you look at

21   that, and you keep track of those doctors that you

22   suspect may not be prescribing appropriately.

23   Q.    Okay.  And you talked about how there are good

24   lawyers and bad lawyers.

16:32:49 25                    You talked about how there are good

1    pharmacists, bad pharmacists, good techs, bad techs.

2              I think we've seen indications that 99

3    percent of doctors are just phenomenal ladies and men,

4    but that doesn't mean that there's not one out of a

16:33:07  5    hundred that may not be up to snuff?

6    A.    Yes.  I think with all the examples you gave as

7    with society, we always kind of throw out percentages or

8    try to quantify who -- how many bad or good people there

9    are.

16:33:25  10             With doctors, with pharmacists, probably

11   the overwhelming majority are practicing the way they

12   should.

13             When you look at some of the societal

14   problems, people always say it's two percent that are

16:33:38  15   creating all the trouble for the 98 percent or it's the

16   one percent, so the percentage becomes less important

17   than the concept.  And the concept is that overall, the

18   overwhelming majority of practitioners, pharmacists,

19   doctors, are probably trying to do the right thing.

16:33:54  20             But that percentage of people that are

21   doing the bad thing, whether it's 0.1 percent or 10

22   percent, they're the ones that we should be addressing

23   and they're the ones, almost 900,000 people have died

24   from opioid overdoses.

16:34:12  25   Q.    And in that regard, sir, do the pharmacists, if

1    they are properly trained and equipped and given the time

2    to, and then do, the right thing on these prescriptions,

3    are they better able to detect which of those doctors are

4    bad doctors?

16:34:29  5    A.    Yes, sir.

6    Q.    And is it important to do that, that -- no.

7                   In order to do that, is it important that

8    documentation be right?

9    A.    Yes, sir.

16:34:39  10    Q.    How is documentation important on this subject of

11    identifying those few bad doctors that are the trouble?

12    A.    Sure.

13                   The other side of the issue with the opioid

14    crisis or epidemic is patient access.

16:34:53  15                   People should have access to pain

16    medications when that pain is legitimate and that

17    prescription is legitimate.

18                   That's why documenting bad doctors versus

19    good doctors is important.  If you misappropriately

16:35:07  20    designated a good doctor a bad doctor, then those

21    patients aren't going to get medications that they should

22    receive and should have access to.

23                   So documenting that, doing your due

24    diligence, is very, very important for patients and

16:35:20  25    doctors to make sure that the right decisions are made

1    and patients have access to their medications.

2    Q.    All right.  I've taken some depositions in this

3    case.  You know what a deposition is, right?

4    A.    I -- yes, sir.

16:35:32  5    Q.    And I've taken some depositions of some of the

6    defendants in this case, and I want to ask you in that

7    reference to your answer to that last question this:

8                     If someone within the hierarchy of the

9    company says that it's not good for pharmacists to

16:35:52 10    question customers because it's just going to upset the

11    customers and embarrass them and make them feel like

12    they're drug runners or something, do you believe that

13    that should stop a pharmacist from determining these red

14    flags through whatever means necessary?

16:36:14 15    A.    No, sir.

16    Q.    Why?

17    A.    The pharmacist is supposed to be a professional,

18    and one of the things the pharmacist must do is respect

19    that patient.

16:36:26 20                     Addiction is a disease.  It's not a

21    judgment about that person.  So a pharmacist has to know

22    or he should know how to ask patients the right questions

23    to make sure that the prescription that is being

24    dispensed is appropriate and safe for them.

16:36:44 25                     To anger the patient by asking questions

Catizone - Direct/Lanier                    1028

1      that accuse them of being a drug user or abusing drugs is

2      not the appropriate approach, but to say don't ask

3      patients questions about their medications is also not

4      the right approach.

16:36:58   5              It has to be that balance to resolve that

6      red flag and respect that patient.  If that patient needs

7      that medication or needs treatment, that's what the

8      pharmacist is there for.

9      Q.    By the same token, if it's been suggested to the

16:37:15  10      jury that the AMA has said you should never question a

11      doctor about the way the doctor writes a prescription, is

12      that consistent with your obligation that you see on a

13      pharmacy or a pharmacist?

14      A.    It's in conflict with what a pharmacist should do

16:37:33  15      and the background behind that, the New Jersey Medical

16      Society raised that issue in a resolution at one of the

17      AMA annual meetings a few years ago and it had a

18      resolution, a nonbinding resolution adopted by the AMA

19      House of Delegates that said pharmacists should not

16:37:50  20      question physicians and they should simply fill the

21      prescriptions as the physician wrote them.

22              As I mentioned earlier, we had a

23      stakeholder task force.  The AMA was involved in that

24      task force and worked with us and the chain pharmacies

16:38:05  25      that sat on the task force to clarify that that's not

1       what the overwhelming majority of physicians felt about

2       pharmacists' involvement.  In fact, the AMA and the other

3       groups recognized that the pharmacists on the health care

4       team are critical and beneficial to patient safety.

16:38:23  5   Q.    All right.  I'd like to go to your next red flag,

6       red flag number nine.

7                   "The patient was dispensed two short-acting

8       opioid drugs on the same day."

9                   Why is that a red flag?

16:38:44 10   A.    Again, if opioids are prescribed appropriately, you

11      wouldn't need two short-acting opioids.

12                  What opioids should be prescribed for is

13      break through pain.  Unless you're a cancer patient,

14      unless you're somebody that's suffering significant pain

16:39:01 15   due to a traumatic injury or some other condition, and

16      again, it goes back to what we keep saying that would be

17      documented.

18                  Studies are shown that using Ibuprofen,

19      Advil and Tylenol have more pain management than opioids.

16:39:20 20   And the reason people feel good with opioids is because

21      it causes a bit of euphoria, and they believe then that

22      the pain is lessened, when the pain may not have been

23      lessened or it would have been better treated with

24      Naprosyn, Elavil, any of those Ibuprofens and Tylenol.

16:39:39 25                 So to give two short-acting opioids, just

1       from a clinical perspective, doesn't make clinical sense

2       and again puts the patient at risk.

3       Q.    Number 10 -- by the way -- no.

4                   Number 10, "Patient was dispensed an opioid

16:39:59  5     prescription of over 200 MMEs per day before 2018 or over

6       50 MMEs per day after January 1st, 2018."

7                   First of all, is that your opinion?

8       A.    Yes.

9       Q.    That that's a red flag?

16:40:17 10    A.    Yes, sir.

11      Q.    And in that regard, the jury heard from Dr. Lembke

12      what a MME is, but I'd like for them to hear it from a

13      pharmacist who's a drug specialist.

14                  What's MME?

16:40:31 15    A.    The easiest way to describe it is it's really the

16      amount of opioid that a person would be taking and that's

17      just a measure of that.

18                  Some of them are measured in milligrams, 30

19      milligrams, 80 milligrams, this actually is the amount

16:40:50 20    that will get into your bloodstream, into your body, in

21      terms of Morphine milligram equivalents.  It's similar to

22      what -- how much Morphine you can take if you took that

23      strength of that opiate.

24      Q.    All right.  With that understanding, why is

16:41:03 25    dispensing an opioid prescription of over 200 MMEs per

1    day before 2018 or 50 after 2018, that seems goofy to me?

2    A.    So as all of us are probably tired of the pandemic

3    and probably know more now about the CDC than we ever

4    wanted to know, the CDC releases guidelines on what the

16:41:26 5    appropriate amount of opiates should be.

6                 The higher the dose of the opioid, the

7    higher the risk to the patient overdosing, stopping

8    breathing, or having other serious consequences.

9                 So when you prescribe somebody a dose of

16:41:41 10    over 200 MMEs of opioids, that's a significant dose.  The

11    best way I can say is like shooting somebody with an

12    elephant gun and literally knocking that person out.

13                 So prior to 2018, the CDC recommendation

14    was 200 milligrams, 200 MMEs.  That shouldn't be.

16:42:03 15                 Once they saw the effect that was

16    happening, how it was causing addiction and other

17    problems of abuse, they then revised the guidelines, like

18    they did with the vaccines, like they did with mask or no

19    mask --

16:42:20 20                 COURT REPORTER:  With what?

21    A.    Mask and no mask to deal with the pandemic.  So

22    when the CDC gets new data, new information, they revise

23    the guidelines.

24                 So in 2018, they said, "Whoa, 200 MMEs was

16:42:32 25    way too much.  We're saying now that the prescribing

1    guidelines should be 50 MMEs per day."

2    Q.   All right.  Red flags, we've got just about six

3    more to get through.

4              Red flags, number eleven.

5              "Patient was dispensed an opioid

6    prescription of over 200 --

7    A.   I think it's --

8    Q.   Yeah, did I --

9    A.   I think the 50 was incorrect.  It should be the 90.

10   Q.   Should be the 90.  So I need to go back to number

11   10 and fix that to 90.

12   A.   90.

13   Q.   And I'll take responsibility for that.

14              And so your answer that you just gave is

15   the answer for number 11.

16   A.   Yes, sir.

17   Q.   All right.

18              Number 12, "An opioid was dispensed to at

19   least four different patients on the same day and the

20   opioid prescriptions were for the same base drug,

21   strength and dosage form and were written by the same

22   prescriber."

23              Explain that one, please.

24   A.   So if we look around the room, each one of us is

25   different in so many ways.

1        So what you have here is a doctor making a

2   determination, if you look at it from simply prescribing,

3   saying that every person is exactly the same.

4        We have the same characteristics, we have

16:44:13  5   the same disease, we have the same allergies, and we're

6   all taking the same medications outside of what I'm going

7   to prescribe now.

8        And so I'm going to give every single one

9   of us the same medicine, the same dose, the same

16:44:31 10   strength, and the same quantity.

11        That makes no logical sense whatsoever

12   because somebody may have diabetes, somebody may be

13   allergic to a particular medication, there's no way

14   multiple patients should be getting the same medications

16:44:47 15   time after time.

16        It's something we'll talk a little bit more

17   in terms of prescribing.

18        Now, are there situations where certain

19   practitioners may prescribe similar medications for

16:45:00 20   similar patients?  If a dentist is treating patients for

21   toothaches and that rationale is, "I'm going to give that

22   person an antibiotic and enough pain medication to get

23   them through what might be the particular procedure,"

24   there may be some similarity there.

16:45:18 25        An orthopedic surgeon that deals with hip

1    replacements or other similar things, there will be some

2    similarities there.

3              But to give every single patient the same

4    medication, the same strength, the same quantity, either

16:45:32  5    says that everyone's the same, that prescriber is lazy,

6    the prescriber is not taking into account that those

7    medications could cause harm to that person because that

8    person is different from the other patients.

9    Q.    So let's say I'm working as a pharmacist at a

16:45:50 10   drugstore and there's a line of people who are coming in

11   with the same prescription from the same doctor for the

12   same dosage of the same pill, and I can look at them and

13   I can see they're different.  Should that alert a red

14   flag in my brain?

16:46:06 15   A.    Yes.

16              And again, it's a red flag that needs to be

17   resolved, and to ask the questions we just talked about.

18   "Doctor, why are these patients receiving the same

19   prescriptions?  Doctor, this patient has this underlying

16:46:19 20   disease, this underlying condition; they shouldn't be

21   receiving these same medications."

22              Resolving the red flags and then

23   documenting that resolution.

24   Q.    All right.  And red flag 13's very similar to red

16:46:32 25   flag 12, but look at red flag 13:  "An opioid was

1    dispensed to at least three different patients within an

2    hour and the opioid prescriptions were for the same base

3    drug, strength, and dosage form and were written by the

4    same prescriber."

16:46:53  5           Same reasons or is there anything to add to

6    this?

7    A.    There's a little bit to add to this.  It's probably

8    an expression that's used in Texas but no one in Chicago

9    would ever use it.

16:47:04  10           It's wearing a belt with suspenders because

11   we wouldn't do that, but anyway --

12   Q.    Wait.  Wait.  Wait.

13   A.    What this is saying is you've got three patients

14   that were seeing a physician within an hour, and they got

16:47:22  15   the same prescriptions.

16           How much time did that physician spend with

17   those patients and why; again, are they getting the same

18   medications?

19           So it's another way to look at the red

16:47:33  20   flag, to resolve the red flag, and work back to the point

21   where you can say dispense or not dispense because the

22   red flag has been resolved or not been resolved.

23   Q.    Okay.  That makes sense.

24           So it's the idea of if a doctor is seeing

16:47:47  25   patients that fast (indicating), writing the exact same

1    prescription and it's an assembly line, bells should go

2    off?

3    A.    That would be probably or could be a pill-mill and

4    how a pill-mill would operate.

5    Q.    And it may be legitimate?

6    A.    Yes.

7    Q.    But it may be a pill-mill?

8    A.    Yes, sir.

9    Q.    All right.

10             Red flag 14, "An opioid prescription was

11   refilled more than five days before the patient's

12   previous prescription should have run out."

13             Why is that a red flag?

14   A.    So again, we can argue about the number, some

15   people may say why five days, why three days, why not 10

16   days.

17             The concept here is if a patient's on a

18   medication, and particularly an opioid, they shouldn't be

19   getting it refilled early because if they're trying to

20   stockpile the medications and do themselves harm, that

21   would be a concern.  If they're getting it early because

22   they're taking it more than they should, that should be

23   communicated to the doctor because whatever therapy the

24   patient is on now is not working.  That patient's pain

25   hasn't gone away; it's gotten worse.

1      And also with insurance, insurance won't

2    pay for prescriptions that are filled early.  And so

3    it's -- the insurance companies themselves are saying

4    this is a red flag or something we'd want to look at

16:49:16  5    because we're not going to pay for that duplicate

6    therapy.

7      And again, within the policies and

8    procedures of the defendants, this was a red flag.  Maybe

9    the time period varied, but again, as we said, the red

16:49:28 10    flags are not stop signs for the pharmacists; they are

11    yellow signs.  They say proceed with caution.

12      This is just another way to help the

13    pharmacists to look at this prescription and say, "Whoa,

14    five days early, maybe three days, whatever, let's take

16:49:45 15    another look at this red flag and see what's going on."

16    Q.    All right.  I want to hone in on what you just

17    said.

18      You said it's not a stop sign; it's a

19    yellow caution sign, "proceed with caution"?

16:49:55 20      Are you saying it's okay for a pharmacist

21    to dispense a drug with a red flag without chasing down

22    the red flag first to see if it's valid or not?

23    A.    No.  No prescription should be dispensed unless

24    every red flag has been resolved.

16:50:10 25      The "proceed with caution" means don't just

        1    fill this prescription; you've got to spend some extra

        2    time resolving this red flag.

        3    Q.    So at least you stop sending the drug out until you

        4    resolve the red flag.

16:50:23 5              Is that fair?

        6    A.    Yes, sir.

        7    Q.    All right.  Red flag number 15 and 16, and then

        8    we've gotten through those that you've identified that

        9    will be relevant to your testimony tomorrow morning.

16:50:38 10             Number 15, "A patient was dispensed more

       11    than 210 days of supply of all opioids combined in a

       12    six-month period."

       13             Explain to us why that's a red flag,

       14    please.

16:50:56 15  A.    As we talked earlier, opioids are supposed to be

       16    for short-term use.  They're very addictive and people

       17    can become addicted to them very easily and they are

       18    easily abused.

       19             The longer you are on opioids, the greater

16:51:13 20  the chance of you becoming addicted to opioids.

       21             So for a pharmacist to see this amount of

       22    opioids, a 210-day supply of opioids, again without

       23    adequate documentation saying this is a terminally ill

       24    patient or this is a cancer patient or this is a patient

16:51:29 25  that's in some sort of intractable pain, that's been

1       documented and there's other evidence in that patient

2       profile, that's putting the patient at severe risk and

3       it's another red flag that the pharmacist needs to

4       resolve.

16:51:43  5   Q.    All right.  I want to try and get through these.

6               Opinion -- I mean red flag 16, "A patient

7       was dispensed an opioid and paid cash."

8               Why is that a red flag?

9       A.    The industry standards and information from the

16:52:07 10   industry show that about 90 to 95 percent of all patients

11      have some sort of insurance coverage for their

12      medications.

13              So as a pharmacist, if I have a patient

14      coming in with an opioid prescription, and that person

16:52:23 15   has insurance coverage for their other medications but

16      they want to pay cash for the opioid, that's a red flag.

17              It's telling me there's something going on

18      here again with this prescription and I need to resolve

19      that red flag.  Why would you pay money out of your

16:52:40 20   pocket if you have insurance coverage, and if you don't

21      have insurance coverage, which again could be a

22      legitimate exception, it's again back to what we've been

23      talking about, document that.

24              The patient between jobs or patient doesn't

16:52:54 25   have insurance, had to pay cash for this prescription, or

1       this medication wasn't covered by their plan.  As simple

2       as that.  So the pharmacist coming afterwards doesn't

3       have to question that patient again.

4       Q.    All right.  And, Doctor -- Doctor --

16:53:09 5       -- Mr. Catizone, to make sure that we've got our record

6       complete on this, I need to ask you this question.

7                   "Red flags" -- this is an opinion you've

8       put in your report on red flags.

9                   "Red flags are warning signs and can also

16:53:25 10       indicate activities are occurring outside the usual and

11       customary scope of pharmacy practice, activities that are

12       more likely to include abuse, diversion, and fraudulent

13       acts."

14                   Can you explain what you meant by that?

16:53:44 15       A.    As we've talked, and thank you for listening the

16       whole afternoon, red flags are exactly what they say, a

17       warning sign, a proceed with caution for the pharmacist

18       on three levels.

19                   One, that medication could be dangerous to

16:53:58 20       the patient.  So as a pharmacist, I want to make sure

21       it's the right medication, the right dose, and it's not

22       going to harm the patient.

23                   Second, it could be an indication to me

24       that my patient's suffering from the disease of addiction

16:54:11 25       and needs help so I need to work with that patient and

Catizone - Direct/Lanier                    1041

1      talk with that patient.

2                    Or, third, I've got a drug-seeker, somebody

3      who is abusing medications, selling medications,

4      diverting medications and those medications are doing

16:54:27  5   much more harm than I ever want to see happen.

6                    And so, therefore, I've got to look at

7      those red flags, particularly if a prescription has

8      multiple red flags, and go through each one of those to

9      see what is happening and then document whatever result

16:54:42  10  I've found.

11     Q.    In this regard, I need to ask you about two words

12     or one word and one phrase.

13                    The word "Foreseeable," based upon your

14     experience and expertise, is it foreseeable that if these

16:54:57  15  red flags exist and are not resolved and documented, is

16     it foreseeable that it would lead to abuse, diversion,

17     and fraudulent acts?

18     A.    Yes, sir.

19     Q.    Is it foreseeable to a pharmacy as well as a

16:55:18  20  pharmacist that unresolved red flags like you've

21     discussed with dispensing can lead to diversion and would

22     lead to diversion?

23     A.    Yes, sir.  We talked earlier about the boring part

24     of the Controlled Substances Act, which is closed system.

16:55:44  25                    When the closed system is breached by the

```
         1    things we just talked about, those drugs leave the closed

         2    system and get outside of that system and get into the

         3    hands of people that shouldn't be taking that medication.

         4              So yes.

16:55:58 5    Q.   All right.

         6              MR. MAJORAS:  Objection.  Daubert ruling.

         7              THE COURT:  Overruled.

         8    BY MR. LANIER:

         9    Q.   And then, my next question on a word or phrase is

16:56:13 10   "Knowingly dispensing."

        11              From your understanding of the law that

        12    says that a pharmacist shall not knowingly dispense a

        13    drug, do pharmacists know about red flags?

        14    A.   Yes, sir.

16:56:31 15   Q.   If a pharmacist dispenses a drug without

        16    resolving -- let me start between.

        17              If a pharmacist dispenses an opiate without

        18    resolving an apparent red flag, is that knowingly

        19    dispensing one in violation of the responsibilities under

16:56:55 20   the CSA as you understand them?

        21              MR. MAJORAS:  Objection.  Legal conclusion.

        22              THE COURT:  I'll sustain.  I'll sustain

        23    that one.

        24    BY MR. LANIER:

16:57:15 25   Q.   Do you understand that pharmacists know the
```

1    importance of resolving red flags before dispensing an

2    opiate?

3    A.    Yes, sir.

4    Q.    And do the pharmacies, as well as the pharmacists,

16:57:30  5    based upon your experience, know the importance of the

6    necessity of resolving red flags before dispensing?

7    A.    Yes, sir.

8    Q.    That's not a novel idea?

9    A.    No, sir.

16:57:58 10    Q.    All right.  In that regard, you have also said

11    that -- about red flags, that, "Determination of whether

12    a prescription issued for a controlled substance is valid

13    and legitimate requires systems and actions to recognize,

14    investigate, and resolve signs of a prescription's

16:58:27 15    invalidity, signs that are red signs."

16                    Can you explain what you mean by that?

17    A.    Yeah, that's really the basis of the corresponding

18    responsibility and the need for documentation, that the

19    systems and the pharmacists have to identify red flags,

16:58:46 20    resolve those red flags, because if a prescription has a

21    red flag, one of the warning signs it is pointing to is

22    this may not have been issued for a legitimate medical

23    purpose and, therefore, that pharmacist has to resolve

24    that and establish that it was issued for a legitimate

16:59:02 25    medical purpose and that the prescription is legitimate

1    and valid and then document that and then dispense.

2    Q.    And in that regard, you give another opinion which

3    is eleven, which is closely related, and you say, "Each

4    defendant and its pharmacists have a corresponding

16:59:19  5    responsibility to only fill prescriptions for controlled

6    substances that are issued for a legitimate medical

7    purpose by an individual practitioner acting in the usual

8    course of her or his professional practice."

9              Is that your opinion?

16:59:36  10   A.    Yes, sir.

11   Q.    Explain what you mean by that, please.

12   A.    All the things we talked about earlier, but this is

13   a little bit more specific saying that you would not want

14   a dentist prescribing opioids for a cancer patient.  That

16:59:50  15   would be outside their scope of practice.

16             So a pharmacist also has to look at what

17   that scope of practice of that prescriber is and make

18   sure, as part of the determination of whether it's

19   legitimate, that that's one of the things they look at as

17:00:08  20   well.

21   Q.    All right.  Opinion number 13, and I -- no, I

22   skipped 12.

23             Let's go to opinion number 12.

24             You've got, on opinion number 12, you've

17:00:28  25   got a couple of points.

```
 1            It starts with, "Each defendant's" -- no,
 2   we'll save that for tomorrow.
 3            Do this part.  "The pharmacy must
 4   accurately identify and document all red flags raised by
 5   the prescription, patient, and prescriber."
 6            Now, you've gone into that.  I don't want
 7   to be redundant.  I don't want to have you repeat what
 8   you've said, but why is it important that this be
 9   something not just for the pharmacist but also for the
10   pharmacy?
11   A.   Again, for all the reasons we talked about, the
12   pharmacy is responsible, it has the same requirements as
13   the pharmacist.
14   Q.   And then putting this altogether, you've got, "The
15   pharmacy must reasonably collect complete, relevant, and
16   accurate information concerning each red flag."
17            Why must the pharmacy do this?
18   A.   And again, as we've talked about that, information
19   must be clear and understandable for someone else looking
20   at that patient record.
21            To simply write something that that
22   pharmacist may know, like I checked with a doctor or
23   facts from his office, doesn't explain that that red flag
24   has been resolved for somebody else that's looking at a
25   prescription that needs to know why that was resolved.
```

Catizone - Direct/Lanier

1046

1    Q.    Does the CSA or the state regs, to your knowledge,

2    and this is how we're putting this together, tell

3    pharmacies how to go about documenting it and how to go

4    about collecting it?

17:02:05 5    A.    No, sir.

6    Q.    The obligation is there, but each pharmacy can

7    figure out its own process by which they do it?

8    A.    Yes, sir.

9    Q.    And so have you seen different approaches by the

17:02:20 10    four pharmacies you've looked at in this case?

11    A.    Yes, sir.

12    Q.    Okay.  And will you be able to tell us about those

13    differences where it's relevant?

14    A.    Yes, sir.

17:02:31 15    Q.    Opinion 12 continues on elements, common elements

16    of due diligence.

17                "The pharmacy must independently evaluate

18    the collected information to determine whether the

19    evidence is reliable and whether the evidence as a whole"

17:02:53 20    -- no, "Whether as a whole the evidence adequately

21    resolves each red flag."

22                Now, is that the pharmacy at this point or

23    the pharmacist that does this?

24    A.    It's both, sir.

17:03:05 25    Q.    Explain why it's both.

1    A.    So as we talked earlier, the pharmacy has to

2    provide the tools in support for the pharmacist to be

3    able to conduct this investigation and to give a

4    determination.

17:03:22  5              As a simple example, if I have a doctor

6    that's actually writing bad prescriptions and I see all

7    these patients coming from that doctor, if I call that

8    doctor and say, "Hey, doc, are you writing bad

9    prescriptions for your patients and do I need to call the

17:03:42 10   DEA and let them know this," I don't think very many

11   doctors are going to say, "Yeah, I admit that.  Please

12   call the DEA and I'll turn in my license."

13              So this says you have to go beyond that and

14   going beyond that would rely on the corporation or

17:03:57 15   pharmacy to give you that information or that data.  What

16   are they seeing from this doctor at other pharmacies,

17   what are they seeing aggregate, is there anything that's

18   been presented by the DEA or the Medical Board about that

19   doctor that would indicate there's a problem?

17:04:10 20              That's the type of support that the

21   pharmacist needs from the pharmacy beyond just simply

22   saying I'm going to call the doctor and ask the doctor if

23   he's really doing or she's really doing what I think

24   she's doing.

17:04:23 25   Q.    Okay.  Then you put number four lastly.

Catizone - Direct/Lanier                    1048

1              "The pharmacy must clearly and explicitly

2      document their evaluation of the evidence and their

3      reasoning supporting their judgment to dispense the

4      prescription."

17:04:36  5              Are you saying pharmacy or pharmacy, is

6      that including the pharmacist?

7      A.    Both.

8              The pharmacist has to do this, but the

9      pharmacy has to give them the means, the tools, and the

17:04:49 10     support to do so.

11     Q.    All right.

12              And again, when you go back and look at

13     prescriptions like you did in this case, in these

14     pharmacies in these counties, are you looking for that

17:05:03 15     documentation?

16     A.    Yes, sir.

17     Q.    And was, at least for some of the time periods, was

18     there a provision to provide that documentation?

19     A.    I'm sorry, sir, provision?

17:05:16 20     Q.    In other words -- well, we'll get to it when we

21     look at the prescriptions.  But I really want to try and

22     finish this before we do.

23              Opinion 13, "Each defendant failed to

24     provide its pharmacists with data, information and the

17:05:35 25     tools necessary to assist the pharmacists in fulfilling

1    their corresponding responsibility duties, including but

2    not limited to utilizing dispensing data to identify

3    patterns, trends, and practitioners possibly involved in

4    diversion, as well to recognize and resolve red flags."

17:05:59   5    Let's divide that and have you speak about

6    each, please.

7    So each defendant failed to provide with

8    data, information, and tools.

9    What kind of data, information and tools

17:06:12  10    are you looking for?

11    A.    The data is the information that we talked about

12    earlier, information about the prescribers, the amount of

13    medications or opioids that are being dispensed, all of

14    that information that the corporation has access to and

17:06:31  15    centralizes.

16    The information is the documentation of the

17    patient notes, the DUR notes, providing that information

18    to the pharmacists so they have it at their disposal when

19    they're dispensing a prescription.

17:06:42  20    And the tools are again having the

21    staffing, having computer systems, having the time to

22    actually conduct that diligence.

23    Q.    Now, have you seen that the pharmacies got better

24    over time as various things motivated them or educated

17:07:03  25    them and their systems evolved?

1  A.     After there were actions by the DEA, I saw some

2  improvements, but I didn't see anything that I -- I

3  really don't know how to respond to that question, sir.

4         I'm sorry.

17:07:27  5  Q.    All right.  Maybe you can when you walk through the

6  prescriptions you've actually looked at.

7         Now, you've explained corresponding

8  responsibility duties, including but not limited to

9  utilizing dispensing data to identify patterns, trends,

17:07:42 10  and practitioners possibly involved in diversion as well

11  as to recognize and resolve red flags."

12         Anything else you haven't told us in that

13  regard?

14  A.     No, sir.

17:07:50 15  Q.    All right.  Opinion 13 continues.

16         "The subsequent result of the failure to

17  provide such data, information, and tools likely led to

18  the diversion of quantities of controlled substances,

19  particularly opioids, outside of the closed distribution

17:08:12 20  and dispensing system for controlled substances."

21         Is that your opinion?

22  A.     Yes, sir.

23  Q.     And is it based upon reasonable probability of your

24  expertise?

17:08:21 25  A.     Yes, sir.

Catizone - Direct/Lanier                    1051

1    Q.    And would you explain why?

2    A.    For so much injury to have resulted from opioid use

3    in Lake and Trumbull Counties, if those medications were

4    controlled within the closed system, and if they were

5    issued for legitimate medical purposes, there shouldn't

6    have been the numbers of people that were injured or died

7    from those opiates.

8              And that's the data that I looked at, as

9    well as the number of prescriptions with multiple red

10   flags that were dispensed by the defendants without

11   having those red flags resolved.

12             MS. SULLIVAN:  Objection, Your Honor.  Move

13   to strike.

14             It's inconsistent with your *Daubert* ruling.

15             THE COURT:  Hold.

16             (Proceedings at side-bar:)

17             THE COURT:  All right.  Ms. Sullivan, that

18   was mighty late.

19             I was -- I waited for a very long question

20   and it was clear what that question was and what the

21   answer was, but, Mr. Lanier, I agree it was -- that was

22   outside the scope of my *Daubert* ruling.

23             So I'm going to have to instruct the jury

24   to disregard that last answer and I'd caution counsel

25   that, you know, it's your job to object; not mine.

1        MS. SULLIVAN:  And, Your Honor --

2            MR. LANIER:  Your Honor, if I could, I

3    thought I read that almost word-for-word from your

4    *Daubert* ruling.

17:10:04 5           Your *Daubert* ruling said that Carmen

6    Catizone can say dispensing of red flag prescriptions,

7    without conducting adequate investigation or due

8    diligence, is likely to lead to diversion, which is what

9    I put.

17:10:17 10          You said he cannot say that it definitely

11   resulted in diversion, and he cannot say a significant or

12   specific amount of diversion, but I think that I wrote

13   that the exact way --

14           THE COURT:  We're just taking a short pause

17:10:36 15   because a juror had to go to the restroom.

16           MR. LANIER:  Oh.

17           (End of side-bar conference.)

18           THE COURT:  All right.  The -- I'm

19   sustaining that objection.

17:12:30 20          The jury is to disregard the last answer.

21           MR. LANIER:  Your Honor, could I be heard

22   on it?

23           THE COURT:  If you want to rephrase the

24   question, I'm sustaining the question as asked and,

17:12:41 25   therefore, the answer.

           1              MR. WEINBERGER:  Your Honor, may we

           2    continue to have a side-bar?  Because we didn't have a

           3    chance to respond.

           4                   (Proceedings at side-bar:)

17:12:56   5              THE COURT:  I've made my ruling.

           6              The question asked was outside the scope of

           7    my *Daubert* ruling.

           8              MR. LANIER:  Okay.

           9              THE COURT:  I'm not saying that any

17:13:07  10    question anywhere close to that is outside it, but the

          11    question that was asked called for an answer that's

          12    outside of my *Daubert* ruling.

          13              MR. LANIER:  Okay.  Your Honor, Mark Lanier

          14    for plaintiffs.

17:13:17  15              MR. WEINBERGER:  Your Honor, we -- Your

          16    Honor, we didn't have a chance to respond, with all due

          17    respect, and we would ask for the opportunity to do that.

          18              THE COURT:  You can respond, but I'm -- you

          19    can put anything on the record you want.

17:13:46  20              I'm not changing my ruling.

          21              MR. LANIER:  Yes, Your Honor.

          22              I'll -- I'll move accordingly.

          23              I just would like the Court to understand

          24    that I worded that so carefully because at Page 11 on the

17:13:58  25    *Daubert* ruling, you said he may be qualified to testify

1      as to likely consequences but you specifically said he

2      couldn't say significant or definitely, but that he could

3      say likely.

4                   And that's the reason I worded it but I'll

17:14:14  5      reask it, Judge.

6                   THE COURT:  I believe the way you worded

7      that question exceeded the scope of my ruling.

8                   MR. LANIER:  I'll reask it, Your Honor.

9                   (End of side-bar conference.)

17:14:23 10    BY MR. LANIER:

11    Q.    All right.  May it please the Court.

12                  Mr. Catizone, let me ask it this way.

13                  Do you believe that these failures of

14    dispensing red flag descriptions, without conducting

17:14:46 15    adequate investigation or due diligence, is likely to

16    lead to diversion?

17    A.    Yes, sir.

18    Q.    Okay.  And with that, let me ask you about one last

19    set of questions on documentation and then we'll be

17:15:17 20    caught up to where we can go into the specifics.

21                  Documentation of red flags.  "Documentation

22    identifies critical factors, such as red flags, whether

23    the pharmacist resolved the red flags, and information

24    alerting to the occurrence or possibility of diversion.

17:15:38 25    It also provides proactive direction to other pharmacists

1    presented with the prescription going forward."

2              I know you've touched on a lot of this, and

3    I don't want to be redundant, so let's try and focus on

4    some important concepts you isolate with this opinion.

5              The critical factors are things like red

6    flags.

7              Fair?

8    A.    Yes, sir.

9    Q.    And are other critical factors things like

10   appearance of the person, whether they're inebriated, I

11   mean are there other aspects that are critical factors

12   beyond what we've discussed?

13   A.    Yes, sir.

14   Q.    Would you talk to us a little bit about those,

15   please?

16   A.    I mentioned those in my report.  There are other

17   signs besides the ones we discussed today where a patient

18   may show up inebriated or high, a patient may be having a

19   bunch of prescriptions for multiple patients and handing

20   those prescriptions out.

21              The patient may use slang terms in

22   referring to the drugs rather than the other names.

23              Other patient behaviors could signal the

24   pharmacist and could be red flags.

25   Q.    And these critical factors that are in addition to

1     the red flags we discussed, would you expect them to

2     cause a pharmacist to be on alert?

3     A.    Yes, sir.

4     Q.    Would you expect the pharmacist to document such

5     things?

6     A.    Yes, sir.

7     Q.    Would you expect a pharmacist to investigate such

8     things?

9     A.    Yes, sir.

10    Q.    If someone comes in and they're using slang terms

11    for the drugs, what kind of an investigation could a

12    pharmacist do in that situation?

13    A.    If that person had a prescription that was to be

14    dispensed, the pharmacist then should take action to

15    notify the prescriber and document that and then make a

16    determination whether or not that was a legitimate

17    prescription.

18    Q.    If a customer comes in and is inebriated or high

19    and they're seeking to fill a prescription, what can you

20    do about that as a prescriber -- I mean as a dispenser, a

21    pharmacist?

22    A.    As a pharmacist, the guidance that's been given by

23    the DEA and state boards is that a pharmacist can refuse

24    to dispense and, in fact, that's probably the best matter

25    of course than filling a prescription that you knowingly

| | |
|---|---|
| 1 | know is not for legitimate purpose or could be diverted. |
| 2 | Q. And then you've linked that to documentation. |
| 3 | Why would you want to document something as |
| 4 | small as inebriation or using slang terms? |
| 17:18:24 5 | A. Because that's a red flag that would indicate that |
| 6 | there's a problem with that patient, that prescriber, or |
| 7 | that prescription. |
| 8 | So the pharmacist would be on alert who |
| 9 | filled that prescription afterwards. |
| 17:18:36 10 | Q. And then when you talk about providing proactive |
| 11 | directions to other pharmacists as you're going forward, |
| 12 | is that what you're referencing there? |
| 13 | A. Yes, sir. |
| 14 | Q. And in what ways would another pharmacist benefit |
| 17:18:54 15 | from the due diligence you did? |
| 16 | A. If the pharmacist made a determination that it was |
| 17 | not a legitimate prescription, then the note in there |
| 18 | would be do not fill these prescriptions for this patient |
| 19 | or some other proactive message to the pharmacist so that |
| 17:19:09 20 | when the pharmacist or that patient returned, the |
| 21 | pharmacist then would have some idea of what action |
| 22 | should be taken or the other pharmacists had taken prior |
| 23 | to that. |
| 24 | Q. All right. |
| 17:19:19 25 | And then opinion number 10 is the one that |

1     I really want to probe tomorrow morning, if His Honor

2     will allow it, and that is "Each defendant's pharmacies

3     in Lake and Trumbull County filled thousands of

4     prescriptions presenting red flags without evidence of

17:19:36  5     resolving those red flags."

6                    Recognizing that our time is short this

7     afternoon, can you give us at least a thumbnail of why

8     you say that?

9     A.    In the supplemental report that I filed, I looked

17:19:53 10    at every single one of the prescriptions provided by the

11    defendants, and then I looked at spreadsheet information

12    that included all of the notes that were associated with

13    some of those prescriptions because not all the

14    prescriptions were provided where there were notes.

17:20:08 15                And I analyzed and looked at each of the

16    notes to determine whether or not they were relevant to

17    what we just talked about, the red flags, and based upon

18    that, that's where my opinion came.

19    Q.    All right.

17:20:24 20                MR. LANIER:  Your Honor, I'm glad to --

21                THE COURT:  If this is a good time to stop,

22    then I don't want to cut you off in the middle.

23                MR. LANIER:  No, you're not cutting me off.

24    In fact, my brain is dead and this would be a great time

17:20:41 25    to stop.

 1          THE COURT:  If your brain is dead, then

 2   it's definitely a good time to stop.

 3          MR. LANIER:  Thank you, Judge.

 4          THE COURT:  Ladies and gentlemen, we're

17:20:48  5   going to break for the evening.

 6          Usual admonitions.

 7          There was a question posed by one of the

 8   jurors and I discussed it with counsel, and they want me

 9   to answer.

17:20:59 10          All right.  We've had two experts.  We're

11   going to have a lot of experts, as almost all the

12   experts, I think every expert in this case provided a

13   report, the expert was deposed at least once on the

14   report.  A deposition is just questions by the lawyer

17:21:17 15   outside of Court.  There's a transcript.  You'll see

16   references to that.

17          The report itself is not evidence and is

18   not going to be introduced into evidence.  The evidence

19   is the testimony, the answers that the expert gives to

17:21:31 20   all the questions posed.

21          Okay.  Usual admonitions apply.  Excuse me.

22          Tomorrow in deference to the fact it's a

23   three-day weekend and a lot of the lawyers are from out

24   of town, we're going to conclude somewhere around 3:00

17:21:52 25   o'clock.  I'm sure none of you will object to getting out

1   a little early.

2              So have a good evening and we'll commence

3   promptly at 9:00 o'clock with the balance of

4   Mr. Catizone.

17:22:04  5              (Jury out.)

6              THE COURT:  Okay.  I just -- just for

7   everyone's scheduling, and plaintiffs need to know if

8   they need to have another witness, Mr. Lanier, about how

9   much longer do you anticipate with Mr. Catizone?

17:23:00 10              MR. LANIER:  I think it is likely going to

11   take about an hour-and-a-half to work through what I've

12   got left.  It's just so number intensive.

13              THE COURT:  All right.  Ballpark, an

14   hour-and-a-half.

17:23:10 15              MR. LANIER:  Yes, sir.

16              THE COURT:  Do defendants have a reasonable

17   estimate of your cross-examination?

18              MR. MAJORAS:  It could go as long as three

19   hours, I think, Your Honor.

17:23:19 20              That may be -- I'm leading with --

21              THE COURT:  Is that for you alone?

22              MR. MAJORAS:  I will take the first crack

23   at it, Your Honor.  There may be some follow-up as we saw

24   with Dr. Lembke.

17:23:32 25              THE COURT:  All right.  If you're saying

1    you're going to take three hours.

2              MR. MAJORAS:  That's probably overbroad,

3    Your Honor.

4              I was trying to incorporate everyone else

17:23:40 5    in my answer.

6              THE COURT:  Okay.

7              MR. MAJORAS:  I guess I would be in the

8    two, two-and-a-half hour range personally.

9              THE COURT:  All right.  I'm just trying

17:23:48 10    to -- my brain is fried, I can't count.

11              I'm just thinking, yeah, I mean I'm

12    thinking that, that looks like about four-and-a-half

13    hours, which is about what we've got.

14              MR. LANIER:  Yes.

17:24:01 15              THE COURT:  So I don't -- there's no point

16    starting a witness for five or 10 minutes so it looks

17    like the day will be pretty much finished.

18              I'd like to be able to conclude

19    Mr. Catizone, if we can, so if it's going -- if we're

17:24:15 20    going to be able to finish by going a little after 3:00,

21    I think it's preferable to everyone.

22              MR. MAJORAS:  Yes.

23              THE COURT:  But I will not cut off the

24    cross-examination.  If you have a lot more, so be it,

17:24:28 25    he'll have to come back.

1      MR. MAJORAS:  We will do that, Your Honor,

2  but --

3      THE COURT:  Especially since we are

4  breaking for three days, it would be better not to have

17:24:38  5  to break for three days in the middle of a witness but I

6  will not cut anyone off.

7      MR. MAJORAS:  We will endeavor to do that,

8  Your Honor.

9      (Discussion had off the record.)

17:25:16 10      MS. FIEBIG:  Your Honor, there were two

11  items we were hoping to note for the record.

12      THE COURT:  All right.  Everyone can be

13  seated.

14      MS. FIEBIG:  Very briefly, as a matter of

17:25:26 15  housekeeping, the plaintiffs introduced this morning two

16  new county executive representatives.  And just for the

17  record to be complete, their names, I believe, are Jason

18  Boyd from Lake County and Richard Jackson from Trumbull

19  County, and hopefully the plaintiffs can give us their

17:25:44 20  titles.

21      THE COURT:  Okay.  Well, if you know that,

22  Mr. Jackson's and Mr. Boyd's titles, that's great.

23      MR. GALLUCCI:  Mr. Boyd is the

24  administrator for Lake County.  Mr. Jackson is Director

17:25:57 25  of Human Resources for Trumbull County.  Mr. Boyd was

1    also present with us initially during voir dire.

2                    THE COURT:  Okay.  Thank you.

3                    MS. FIEBIG:  Thank you.

4                    The second item, Your Honor, is that the

5    demonstrative slides that have been displayed I think are

6    truly misnomers as demonstratives.  They are not

7    demonstratives.  Demonstratives are intended to aid the

8    jury in their understanding of admissible evidence and

9    here, the expert reports are not admissible evidence and

10   this is a clearly improper end run around that fact.

11                   What Mr. Lanier has done during his

12   examination is read opinions into the record before they

13   have been testified to and displayed them to the jury

14   before they have been testified to and then asked

15   questions about those opinions, which is plainly

16   improper.

17                   And it's obviously confusing the jury,

18   because they've now twice asked for a report that is not

19   in evidence.

20                   And so we would object to the practice and

21   ask the Court to instruct Mr. Lanier that is an improper

22   way for him to conclude his examination of Mr. Catizone.

23                   THE COURT:  Well, you know, I will let you

24   do the same thing if you want.

25                   Robert, my mic is off.  Can you get it back

1    on, please?

2                    All right.  I wouldn't allow it with a lay

3    witness, but I actually think it's -- I think it's

4    helpful, excuse me, helpful for the jury, understanding

5    what this expert's going to say, and if you want to do it

6    with yours, you can.  We've got the same ground rules for

7    both sides.

8                    I haven't seen it done before.  I certainly

9    wouldn't allow it with a fact witness.  But you'd never

10   do it with a fact witness.  With a fact witness, it would

11   be leading.

12                   MR. LANIER:  Right.

13                   THE COURT:  But you've got his report,

14   everyone knows what he's going to say.

15                   I don't think it's improper, but obviously,

16   I'll allow it for both sides.  You can do the same thing

17   with your experts, if you want.

18                   So I'm going to overrule that objection.

19                   MS. FIEBIG:  Thank you, Your Honor.

20                   THE COURT:  There's no worry about leading,

21   okay?  And I certainly wouldn't allow it if, you know, I

22   don't have the report.  If he's putting up something that

23   isn't in the report or is different, that's improper and

24   I certainly would sustain that.

25                   But I gather since there were not

 1    objections to that, that those demonstratives accurately

 2    reflect what the witness has in his or her report.

 3                    MR. WEINBERGER:  Your Honor, we should

 4    point out that these slides were provided in advance

17:28:50  5    pursuant to our protocols.

 6                    THE COURT:  Okay.

 7                    MR. WEINBERGER:  And there were no

 8    objections.

 9                    MS. FIEBIG:  There were objections.

17:28:56 10                    There were objections and it's inconsistent

11    with the *Bray* decision from the Sixth Circuit about what

12    the purpose of demonstratives is.

13                    MR. WEINBERGER:  Well, the Court has made

14    its ruling.

17:29:06 15                    THE COURT:  I'm not familiar with that

16    case.

17                    I think -- I don't think there's any

18    problem doing it with an expert.  You have a case where

19    the Sixth Circuit says that you can't do this with an

17:29:18 20    expert?  I'll certainly -- look, if the Sixth Circuit has

21    said that this is improper with an expert, obviously I've

22    got to look carefully at that.  And if the Sixth Circuit

23    has prohibited this, we can't do it.

24                    It may be okay in Texas, but I've got

17:29:33 25    to -- if the Sixth Circuit says I can't do it --

1       MS. FIEBIG:  Thank you, Your Honor.

2       MR. LANIER:  We'd love to see the case.

3       THE COURT:  All right.  So no.  If there is

4   one, I want to see it.

17:29:46   5       MS. FIEBIG:  Thank you, Your Honor.

6       We'll submit something in writing if it's

7   helpful to the Court.  It's not a ruling specific to

8   expert opinions, but it does clearly that demonstratives

9   are for summarizing or helping the jury to understand

17:29:58  10   admissible evidence and here the expert reports have not

11   been admitted and the testimony's not being elicited --

12       THE COURT:  Well, Ms. Fiebig, he's going to

13   say it.  The conclusion is his testimony is admissible,

14   okay?

17:30:08  15       MS. FIEBIG:  Understood.

16       THE COURT:  I mean there would be

17   nothing -- I mean if Mr. Lanier has a witness say do you

18   have conclusions and he goes what's the first conclusion,

19   the witness reads conclusion one from his or her report,

17:30:24  20   that's allowed.

21       So I mean it's the same thing.  Unless I

22   see a case where the Sixth Circuit says a lawyer cannot

23   do this, it's improper, I'm allowing it.

24       And if you want to do it with your experts,

17:30:40  25   obviously you can do exactly the same thing.

```
 1              MS. FIEBIG:  Thank you, Your Honor.

 2              THE COURT:  Okay.

 3              MR. WEINBERGER:  Your Honor, on behalf of

 4      plaintiffs, a couple things if we may.

 5              THE COURT:  All right.

 6              MR. WEINBERGER:  You may recall that

 7      subsequent to the issuance of expert reports, initial

 8      expert reports in this case, there was an order for the

 9      defendants to turn over a sample of their due diligence

10      notes.

11              THE COURT:  Presumably that's the -- well,

12      that's the 8,000 prescriptions and the notes.

13              MR. WEINBERGER:  Correct.

14              THE COURT:  That Mr. Catizone talked about.

15              MR. WEINBERGER:  And Mr. Catizone submitted

16      a supplemental report, and he was deposed on that

17      supplemental report.

18              Because of the significant time that it

19      took for the defendants to turn over these notes, the

20      report was issued within the last couple weeks.  He was

21      deposed last week.  And the defendants have not submitted

22      any response in terms of their -- supplementing their own

23      expert report.

24              So I just wanted to give that to you as

25      background.
```

1  We would like to submit that report to you

2  for your review because it's going to be relevant to

3  testimony tomorrow and it's relevant to your *Daubert*

4  ruling on this witness.

5  At footnote 10 -- at Page 10, Footnote

6  number 8, if you want to pull that out, Your Honor, of

7  the *Daubert* ruling you write, "In deposition, Catizone

8  testified a significant number, which he estimated to be

9  70 to 90 percent of flagged prescriptions were diverted

10  in the Track Three counties.  When asked to identify the

11  factors that led him to this conclusion, Catizone stated,

12  'absent patient notes and other documentation, I couldn't

13  qualify or quantify what significant meant.' "

14  So he, in his supplemental report, Your

15  Honor, he has reviewed the notes relating to the 2,000

16  scripts, random sample of scripts, and he has rendered

17  opinions as to what percentage of those notes did or did

18  not contain due diligence with respect to those red

19  flagged scripts.

20  So we would ask that you review the report

21  so that you know what his analysis was, and we are going

22  to ask questions relating to those notes and the

23  percentages that he found.

24  We also have an expert, Dr. McCann, our

25  statistician, who has issued a supplemental report which

1    we can provide to you.

2              THE COURT:  Let's stick with Catizone.

3              MR. WEINBERGER:  Okay.  I just wanted you

4    to know --

5              THE COURT:  I will allow Catizone to

6    testify his examination of 8,000, and if he says, you

7    know, X percent were red flags, just say 25 percent were

8    red flags, that's 2,000, and if he says, you know, I only

9    found notes on 10 percent, so 90 percent, they're -- I

10   mean, he can't say categorically they weren't resolved.

11             He can say I found no evidence of

12   resolution.

13             MR. WEINBERGER:  Correct.  Right.

14             THE COURT:  And then whatever.

15             But I'm not going to let him opine as to

16   what percent may have been diverted because he doesn't

17   know.

18             MR. WEINBERGER:  Right.

19             THE COURT:  Again, he has no idea.

20             He said a red flag doesn't mean it's

21   improper or not.

22             All he can testify to is what he saw and

23   that the best practice is to document, and if you don't

24   document, there's no way to know if the pharmacist did

25   due diligence or not.

 1             Okay?  So I will allow all that but I'm not

 2    going to let him opine as to what percent may have been

 3    or were diverted.

 4             MR. WEINBERGER:  Okay.  And I just want to

17:35:14  5    make clear that the notes -- that the scripts and the due

 6    diligence notes that were part of the random sampling

 7    were only of scripts that we identified previously that

 8    were red flagged scripts.

 9             THE COURT:  All right.

17:35:29 10             MR. WEINBERGER:  So that, I just wanted you

11    to understand for the math purposes.

12             THE COURT:  Okay.

13             MR. WEINBERGER:  Thank you, Your Honor.

14             I mean, if you're -- if you're interested

17:35:38 15    in seeing the reports, we're happy to provide them.  If

16    not --

17             THE COURT:  Well, I'll look at -- I'll look

18    at Catizone's supplemental report.

19             MR. WEINBERGER:  Okay.

17:35:47 20             THE COURT:  I'll read that tonight.  It

21    will help me understand where he's coming from and if

22    there are any objections --

23             MR. LANIER:  It will put you to sleep, Your

24    Honor.

17:35:58 25             MR. WEINBERGER:  I thought it was

1  fascinating.

2             MR. MAJORAS:  Your Honor --

3             THE COURT:  Yes?

4             MR. MAJORAS:  John Majoras.

17:36:02  5             Just in response to one thing

6  Mr. Weinberger said about the response reports, by that

7  we are permitted according to the Court's schedule, those

8  are not actually due until Monday so there will be

9  response reports.

17:36:14 10             So if you're listing reports that you might

11  want to read, just bear that in mind.

12             THE COURT:  I'm not going to read any more

13  of them, but I've got this witness on and there's a

14  specific *Daubert* ruling, and I want to make sure that

17:36:29 15  everything stays within it.

16             MR. MAJORAS:  Okay.  And I have one other

17  short --

18             THE COURT:  What I believe we have to date

19  so I will read this tonight.

17:36:36 20             MR. LANIER:  Your Honor, in that regard, I

21  wanted to say to you, whether on or off the record, I

22  went back and looked at the question that I had asked and

23  you were right and I was wrong.  It was outside your

24  *Daubert* ruling and I apologize.

17:36:50 25             THE COURT:  Yes.  There was a word or two.

1          MR. LANIER:  Yeah.  No, you are right.

2          THE COURT:  That was outside --

3          MR. LANIER:  So I was wrong and I

4    apologize.

17:36:56  5          THE COURT:  No problem.

6          I was listening very carefully and,

7    candidly, I expected an objection, you know, but since

8    there was one -- wasn't one until after the answer, but

9    then I sustained it.

17:37:07 10          So.

11          MR. LANIER:  Yes.

12          THE COURT:  The second question -- the

13   second question you asked was within, so that's the way

14   it should be.

17:37:13 15          All right.

16          MR. MAJORAS:  Your Honor, one -- I'm sorry,

17   one housekeeping issue related to today's testimony.

18          As you'll recall, we played a clip from an

19   interview with Dr. Lembke.

17:37:25 20          THE COURT:  Right.

21          MR. MAJORAS:  And the way the court

22   reporting is done that doesn't get transcribed into the

23   record.

24          I spoke to Madame Court Reporter, and

17:37:36 25   indicated that if it would be helpful, I could get a

1  digital copy of that transcript, that we can give to

2  insert into the court record.

3              THE COURT:  Probably a good idea,

4  Mr. Majoras.  Otherwise, it's sort of a --

5              MR. MAJORAS:  It's an empty space, Your

6  Honor.

7              THE COURT:  That's a good idea.

8              If -- to do that, and if anyone does that

9  again, obviously it's proper cross-examination, it's a

10  prior statement.

11              MR. MAJORAS:  And we will, of course, share

12  that with the plaintiffs, Your Honor.

13              Thank you.

14              THE COURT:  Good idea.

15              MR. WEINBERGER:  Your Honor, I want to move

16  into evidence some exhibits.

17              THE COURT:  Okay.  What exhibits?

18              MS. FLEMING:  CVS MDL 04955.

19              THE COURT:  04095 --

20              MR. WEINBERGER:  049.

21              THE COURT:  04 --

22              MR. WEINBERGER:  No, 04955.

23              THE COURT:  04955.  Sorry.  I didn't ask

24  for exhibits.  These are exhibits that they are moving.

25              MR. WEINBERGER:  I'm sorry.  I have to give

 1    you the P number, Your Honor.  Sorry.

 2                MR. DELINSKY:  Are these from today?

 3                THE COURT:  From Lembke.

 4                MR. DELINSKY:  It's from Lembke?

17:38:57  5                MR. GALLUCCI:  We have to do it at the end

 6    of the witness's testimony.

 7                MR. DELINSKY:  You can't introduce --

 8                MS. FUMERTON:  Not only that, Your Honor,

 9    just to add on to that, I spoke with Mr. Lanier at the

17:39:10 10    beginning of the testimony, and he said plaintiffs were

11    not going to be moving any exhibits through their

12    experts.

13                MR. LANIER:  Your Honor, my understanding

14    is, my practice from coast-to-coast has been an expert

17:39:21 15    cannot prove up a document for admission.

16                THE COURT:  Right.

17                MR. LANIER:  And so the expert, I cannot

18    use the expert to put a document into evidence.

19                However, it's also my understanding and

17:39:32 20    practice coast-to-coast that you can tender documents

21    into evidence at any point in time if they're admissible

22    documents.

23                You may have to prove up their

24    authenticity, that foundation.

17:39:44 25                THE COURT:  Authenticity has already been

 1     taken care of.

 2                    MR. LANIER:  Exactly.  So I think we can

 3     move in wholesale a number of documents.

 4                    THE COURT:  I had said yesterday I wanted

17:39:55  5     the parties to just confer.  If there are a whole bunch

 6     of exhibits that both sides want to admit and there's no

 7     objection, I'll just admit them.  Give me a list.  Okay?

 8                    I mean, all right, but if they're not

 9     related to Lembke, it doesn't --

17:40:15 10                    MR. WEINBERGER:  This is related to Lembke.

11     So this is -- these are exhibits that were used during

12     the Lembke testimony.

13                    THE COURT:  Except Ms. Fumerton said

14     Mr. Lanier said he wasn't offering anything through her.

17:40:30 15                    It sounds like these are documents --

16                    MR. WEINBERGER:  These are documents that

17     were authenticated and then were utilized, Your Honor.

18     They were the two Purdue documents, one was the CVS

19     letter --

17:40:40 20                    THE COURT:  All right.

21                    MR. WEINBERGER:  -- with Purdue.  And I

22     mean I can describe them to you.

23                    Can I have that list, please?

24                    THE COURT:  I agree, you know, they were

17:40:49 25     testified to extensively.

 1          MR. WEINBERGER:  Yes.

 2          THE COURT:  They are effectively in.

 3          MR. WEINBERGER:  One was the how to stop

 4   drug diversion --

17:40:57  5          THE COURT:  Just give me the numbers and

 6   I'll admit them.  If they are over objection -- if I

 7   thought they were inadmissible, I wouldn't have allowed

 8   all the testimony and have them shown.

 9          MR. WEINBERGER:  So it's the CVS document,

17:41:10 10  and we're pulling the P number.  I'm sorry.

11          The second is P 08658.

12          MR. DELINSKY:  Pete, which one is that?

13          MR. WEINBERGER:  That's the patient and

14   pharmacist educational service presentation.

17:41:34 15         THE COURT:  That's not the way it was --

16          MR. WEINBERGER:  Your Honor, I'm just

17   telling defense counsel how to look it up.

18          (Counsel conferring.)

19          All right.  And then two documents that

17:41:44 20  were used during cross-examination, P 08663, the letter

21   from CVS to the pharmacists, dated June, 2001, and P

22   25984, the letter from Purdue to Walgreen's pharmacy

23   supervisor, dated December 21st, 1998.

24          THE COURT:  All right.  Those two can be

17:42:10 25  admitted.

1    Is there a first one?  Is there a first

2    one?

3    MR. DELINSKY:  Your Honor, could I please

4    be heard on these?

17:42:20  5    THE COURT:  You used them.

6    MR. DELINSKY:  No, Your Honor, that's not

7    correct.

8    Mr. Lanier published to the jury in his

9    direct examination excerpts of these documents, okay,

17:42:32 10   from her report.

11   When he put her report up on the screen, he

12   is the one who published it.  We referenced them in our

13   cross-examination.  This was simply cross.

14   Your Honor had already determined at that

17:42:45 15  point that these are coming in as a basis of her opinion,

16   not as admissible evidence.

17   THE COURT:  Well, they're authentic.  They

18   were testified to.

19   MR. DELINSKY:  We disagree, Your Honor.

17:42:58 20   THE COURT:  I've overruled that objection.

21   That argument that you can't rely on an outside counsel,

22   there's no case law.

23   You're all outside counsel.  You're all

24   outside counsel.  If you make a statement to me, you're

17:43:09 25  binding your client.  All right.  That's how it works.

1       MR. DELINSKY:  Okay.  Well, Your Honor, let

2   me move to my next round of objections.

3       Documents cannot be admitted in a trial, in

4   a Federal Courthouse, in the United States of America,

17:43:23  5   without a witness with knowledge, period, the end.

6       We don't try cases based on paper and paid

7   experts coming from California and offering opinions

8   about them.  We conduct trials based on witness testimony

9   about documents, and there's none here.

17:43:39 10       Some of these documents may be admissible.

11   Some may not be.  But we need -- they need to be put in

12   with witnesses who can talk about them.

13       Absent that, we're just trying this

14   case --

17:43:51 15       THE COURT:  All right.  Fine.  I'll do this

16   on both sides.

17       You bring in the witnesses then.  I won't

18   admit -- yeah.

19       MR. WEINBERGER:  Your Honor --

17:44:01 20       THE COURT:  I won't admit anything, all

21   right?  No side will get any documents.

22       People can refer to whatever they want and

23   the jury is going to see it but the testimony -- you

24   know, the testimony is in so.

17:44:14 25       MR. WEINBERGER:  Your Honor, the first

1    Exhibit was P 17322 for the record.

2                    THE COURT:  P 17322?

3                    MR. WEINBERGER:  P 17322.

4                    THE COURT:  All right.  Well --

17:44:26  5                    MR. WEINBERGER:  Again, a CVS -- this is a

6    CVS document.

7                    Without --

8                    THE COURT:  Well, I'm going to admit the

9    CVS documents, okay?  All right?  I'm admitting the CVS

17:44:39 10    documents as admissions of CVS, but I guess I can't

11    technically, I can't admit the Purdue document without a

12    witness to --

13                    MR. LANIER:  We'll provide you case law on

14    that, Your Honor.

17:44:55 15                    With due respect to Mr. Delinsky, I've

16    tried 18 gazillion trials in federal courts around the

17    country.

18                    You have to have a witness to prove the

19    authenticity of a document.  That's what you have to have

17:45:09 20    a witness for.

21                    You do not have to have a witness to

22    testify that the document is anything other than

23    authentic.  Once you have authenticity, the document can

24    come into evidence unless there's a 402 or 403 or a 700

17:45:21 25    or 800 objection.  There's got to be an objection.

1        The only thing a witness does is prove

2    authenticity, and you can even do that with an affidavit

3    with a document.  Many cases have been tried where you

4    tender a lot of documents into evidence and you read

17:45:35  5    those documents.

6        THE COURT:  All right, look.  I've given 75

7    hours.

8        There's no way, if we've got to call in

9    live witnesses to someone who received or sent that

17:45:46 10    document, you know, that's all we're going to spend time

11    on and there will be no substantive testimony.

12        MR. DELINSKY:  But, Your Honor, let me

13    describe the prejudice here.

14        First of all, Mr. Lanier is wrong, and he

17:45:56 15    knows he's wrong.  There's Rules of Evidence.

16    Foundations have to be laid that go far beyond

17    authenticity.

18        THE COURT:  What --

19        MR. DELINSKY:  This letter from CVS is in

17:46:07 20    Purdue's files and Purdue's files only.

21        There was an assumption by an expert

22    witness that that letter actually was sent to CVS

23    pharmacists.

24        What testimony --

17:46:16 25        THE COURT:  Wait a minute.  Hold it.

1           Now, you're raising authenticity,

2    Mr. Delinsky.

3                MR. DELINSKY:  No.

4                THE COURT:  All this was taken care of.

17:46:25  5           If you're saying because it's not in CVS's

6    files you question the authenticity of it.

7                MR. DELINSKY:  That's correct.

8                THE COURT:  Well, that should have been

9    raised a long time ago.

17:46:34 10               MR. DELINSKY:  Your Honor, we've been

11   raising that objection at every turn.

12               THE COURT:  Special Master Cohen said all

13   the authenticity was covered.

14               MR. DELINSKY:  No.  No.

17:46:41 15               THE COURT:  All right.  Then I want

16   you -- all right.  I want you to bring in, I mean I'll

17   hold off on that.

18               I want you to have a witness who testifies

19   that they don't believe it's authentic because they have

17:46:54 20   searched CVS's files.

21               MR. DELINSKY:  We don't have any current

22   employees, Your Honor, who are on that document.

23               THE COURT:  You'd better find someone.

24   Bring in a witness, take some of your time to talk about

17:47:03 25   it, and then I'll have to make a decision.  All right?

1           MR. DELINSKY:  Okay.

2           THE COURT:  But, you know, I will hold off

3   on that because there is -- CVS is making a challenge to

4   the authenticity of that document, that because they

5   searched their files and they don't have it, they

6   question whether it's authentic.

7           So, all right.  So which one was that?  I'm

8   going to reserve ruling until I hear CVS's witness.

9           Which one?

10          MR. LANIER:  Your Honor, that would apply

11  to several documents, including the one CVS used today

12  that came out of the Purdue files.

13          THE COURT:  Well, that's a problem, too, if

14  you're using a document that came out of Purdue's files.

15          MR. DELINSKY:  Your Honor.

16          THE COURT:  All right.

17          Mr. Delinsky, you're going to use some of

18  your time to bring in witnesses who are going to

19  challenge the authenticity of those documents.

20          Which are those two?  I'm going to reserve

21  ruling.  You mentioned four documents.

22          Two of them were the Purdue ones.  I'm

23  going to hold off.

24          CVS ones, I'm going to admit.

25          MR. LANIER:  And with due respect to

```
 1   Mr. --
 2                   THE COURT:  I've moved on.
 3                   MR. LANIER:  All right.
 4                   THE COURT:  Just tell me which are the two
17:48:17  5   Purdue ones that I'm going to reserve ruling on?
 6                   You mentioned four documents.  I'm
 7   admitting two and holding off on two.
 8                   MR. WEINBERGER:  Okay.  So the one Purdue
 9   document is P 25984.
17:48:31 10                  THE COURT:  That's the last one?
11                   MR. WEINBERGER:  Right.
12                   THE COURT:  That's the December 21st, 1998.
13                   All right.  I'm reserving ruling.
14                   MR. STOFFELMAYR:  Judge, just to be clear,
17:48:40 15   we have no objection to the admission of that document.
16   That document concerns Walgreen's.
17                   I have a concern is a more general matter
18   to nonparty documents, but Mr. Delinsky's concerns about
19   that document do not apply to this document.
17:48:51 20                  I don't want you to think --
21                   THE COURT:  All right.  So that one comes
22   in.
23                   All right.  P 25948 comes in.
24                   Which is the one, Mr. Delinsky -- I think
17:49:00 25   it's the P 08663, June 2001, that's the one you're
```

```
 1    objecting to?
 2                MR. DELINSKY:  That is -- that is the first
 3    one.  That's the letter, right, Pete?
 4                MR. WEINBERGER:  That's correct.
 5                THE COURT:  All right.  I'm reserving until
 6    I hear from a CVS witness.
 7                All right.  Now what are the other two?
 8    17322 and 08658, those are the CVS documents?
 9                MR. WEINBERGER:  The first one is a CVS
10    document, that's their brochure.
11                THE COURT:  All right.  That can come in.
12                MR. DELINSKY:  Wait, which one are you
13    talking about, Pete?
14                THE COURT:  173.
15                MR. WEINBERGER:  173228.
16                THE COURT:  Okay.  That comes in.
17                MR. DELINSKY:  Do you have a copy of that?
18                THE COURT:  All right.  That's in.
19                MR. DELINSKY:  Your Honor, we do, that's in
20    the same bucket, that's the Purdue-produced document that
21    Dr. Lembke --
22                THE COURT:  Look, get this all straight end
23    out overnight and I'll deal with it in the morning.
24                I can't tell what the heck you're all
25    doing.  All right?
```

1            Any Purdue document that I'm going to

2      insist on a CVS witness coming in and testify that it's

3      not a CVS document, then I'll have to make a decision.

4            MR. LANIER:  Your Honor --

17:50:38  5            THE COURT:  That it's bogus.  All right.

6      Fine.  If someone from CVS comes in and says they don't

7      think it's authentic, that it was not sent by CVS, you

8      know, fine.  Let the jury -- you know --

9            MR. LANIER:  Thank you, Judge.

17:50:51 10            These -- everything I said comes right in

11      with Rule 11, 901 and 902.

12            THE COURT:  Not if there's a challenge to

13      authenticity and there is so I've got to hear some

14      testimony on it.

17:51:06 15            MR. WEINBERGER:  So I want to reiterate

16      again, Your Honor, that we started this process yesterday

17      when I informed Special Master Cohen and the defendants

18      of a list of --

19            THE COURT:  I don't know if you -- you were

17:51:17 20      supposed to all confer, and if there's by agreement, I

21      can admit a whole lot of documents.

22            If there's not, both sides are going to be

23      spending a whole lot of time not on the merits of this

24      but bringing in witnesses challenging authenticity so

17:51:31 25      fine.

1       MR. WEINBERGER:  So can we get a response

2    to that e-mail that listed a number of --

3           MR. DELINSKY:  If the e-mail is complete,

4    we need to see the witnesses with the documents that you

17:51:44  5    intend to --

6           THE COURT:  Well, that's irrelevant,

7    Mr. Delinsky.

8           MR. DELINSKY:  It's not, Your Honor.  It's

9    not irrelevant to us.  We don't believe documents should

17:51:52 10    be admitted in a case, absent testimony about what they

11    are and what they mean.

12           THE COURT:  Oh, hold it.

13           There is no way, and I'm going to apply it

14    to you, I'm not going to allow --

17:52:02 15           MR. DELINSKY:  I'm okay with that, Your

16    Honor.  I'll live with that rule.  That's the way I've

17    always handled trials.

18           You don't just introduce documents

19    and -- take off your headphones.

17:52:28 20           MR. WEINBERGER:  Your Honor can I give you

21    a simple example?

22           THE COURT:  Not any more.  If you guys want

23    to waste all your time.

24           MR. WEINBERGER:  We don't.  We don't want

17:52:35 25    to.

 1          THE COURT:  They will waste their time,
 2     too.
 3          MR. WEINBERGER:  That's exactly the point.
 4     We don't want to.
17:52:40  5          THE COURT:  You may not need any documents.
 6          MR. WEINBERGER:  Let me give an example of
 7     a document we need.
 8          THE COURT:  Bring in a witness that talks
 9     about that document.
17:52:50 10          All right.
11          MR. WEINBERGER:  Well, Your Honor, there
12     were millions and millions of documents produced in this
13     case.
14          We were limited in the number of
17:52:56 15     depositions we could take in this case.
16          We've been operating under the assumption
17     that if a document came from the defendants' files and it
18     was -- and it was properly authenticated as a result of
19     that, that we could move for admission of that document
17:53:18 20     as appropriate.
21          Now, let me give you an example.
22          THE COURT:  Well, I agree with that.
23          MR. WEINBERGER:  But I want to give an
24     example, Your Honor, if I may.
17:53:25 25          Because one set of exhibits that we

| | |
|---|---|
| 1 | produced yesterday included the contracts 2009 CVS and |
| 2 | I.M.S. whereby they sold their data. |
| 3 | THE COURT:  Right. |
| 4 | MR. WEINBERGER:  Okay? |
| 17:53:37 5 | That was mentioned in opening statement and |
| 6 | was discussed by Tom Davis during his testimony. |
| 7 | All right? |
| 8 | Not only do we have those documents from |
| 9 | the defendants' own files, we have the documents from |
| 17:53:50 10 | I.M.S., and we have a certification from I.M.S. |
| 11 | THE COURT:  Okay.  Those are going to come |
| 12 | in. |
| 13 | All right? |
| 14 | MR. DELINSKY:  No, they are not, Your |
| 17:53:58 15 | Honor, because they are not relevant under 402.  There's |
| 16 | a whole set of issues. |
| 17 | The issues in this case, Your Honor, is |
| 18 | whether any defendant or CVS in this case violated the |
| 19 | CSA or whether we acted intentionally in dispensing |
| 17:54:13 20 | illegitimate opioid prescriptions in a way that furthered |
| 21 | the opioid crisis. |
| 22 | THE COURT:  Mr. Delinsky, if you want to |
| 23 | argue relevancy, you can. |
| 24 | I'll overrule that.  They are clearly |
| 17:54:25 25 | relevant. |

 1              MR. DELINSKY:  Well, that's more error.

 2              THE COURT:  These records are

 3    presumptively --

 4              MR. DELINSKY:  They are not presumptively

17:54:33  5    relevant, Your Honor.

 6              THE COURT:  No, they are

 7    presumptively admissible.  They are not presumptively

 8    relevant.

 9              It is making a fact in issue more probable

17:54:47 10    than not.

11              MR. DELINSKY:  So with what fact in issue

12    does a contract with I.M.S. that we provided I.M.S. with

13    data, what facts in this case --

14              THE COURT:  Were you listening to the

17:54:58 15    testimony and the arguments?  It's directly relevant.

16              MR. DELINSKY:  How?

17              THE COURT:  It's directly relevant.

18              MR. DELINSKY:  I heard Mr. Davis.

19              How is that relevant to whether CVS

17:55:08 20    violated the CSA?  How is that relevant to whether

21    CSA --

22              THE COURT:  It goes to whether the

23    defendants turned over, essentially outsourced to Purdue

24    something that they should have been doing themselves and

17:55:21 25    monitoring it.

1     It's very highly relevant.

2                    MR. DELINSKY:  It doesn't go to Purdue.  It

3     went to I.M.S., Your Honor.  There's no testimony it went

4     to Purdue.

17:55:30  5              THE COURT:  I've moved on, okay?  You guys

6     deal with this yourselves.

7                    All right?

8                    I don't know if you've admitted any

9     documents so I can't tell what you want to do.

17:55:42 10             There were four documents.  I reserved two.

11    I don't even know what the other two are.

12                   CVS brochure, 173228 I've admitted and I've

13    admitted 259 -- 25884.  The other two I guess they're

14    being reserved until I determine if they're authentic.

17:56:01 15             That's P 08658 and P 08663.  CVS is

16    challenging the authenticity so I'll wait until I see the

17    CVS witness as to whether they're authentic.

18                   If I find they're authentic, they'll come

19    in.  If I find they're not, they won't.

17:56:19 20             If I have to do that with a whole lot of

21    documents again, you're all going to be wasting your time

22    in this trial and the jury will be bored out of their

23    minds but I'm not going to try your case for you or try

24    your defense.

17:56:35 25             MR. WEINBERGER:  Thank you, Judge.

1    MR. DELINSKY:  Thank you, Your Honor.

2    (Proceedings concluded at 5:56 p.m.)

3    -  -  -  -

4    C E R T I F I C A T E

5    I certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11   **/s/Susan Trischan**
     /S/ Susan Trischan, Official Court Reporter
12   Certified Realtime Reporter

13   7-189 U.S. Court House
     801 West Superior Avenue
14   Cleveland, Ohio 44113
     (216) 357-7087
15

16

17

18

19

20

21

22

23

24

25

1                                   **I N D E X**

2

3   **WITNESSES:**                                                        **PAGE**

4   CROSS-EXAMINATION OF ANNA LEMBKE (RESUMED)     753

5   BY MR. BUSH

6   CROSS-EXAMINATION OF ANNA LEMBKE              763

7   BY MR. MAJORAS

8   CROSS-EXAMINATION OF ANNA LEMBKE              805

9   BY MR. STOFFELMAYR

10   CROSS-EXAMINATION OF ANNA LEMBKE              834

11   BY MS. SULLIVAN

12   REDIRECT EXAMINATION OF ANNA LEMBKE          852

13   BY MR. LANIER

14   REDIRECT EXAMINATION OF ANNA LEMBKE (RESUMED)   884

15   BY MR. LANIER

16   RECROSS-EXAMINATION OF ANNA LEMBKE          897

17   BY MR. MAJORAS

18   RECROSS-EXAMINATION OF ANNA LEMBKE          898

19   BY MR. STOFFELMAYR

20   DIRECT EXAMINATION OF CARMEN CATIZONE       903

21   BY MR. LANIER

22

23                               * * * * *

24

25