1093

1    IN THE DISTRICT COURT OF THE UNITED STATES
     FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3

     IN RE:                    Case No. 1:17-md-2804
4    NATIONAL PRESCRIPTION      Cleveland, Ohio
     OPIATE LITIGATION
5                               October 8, 2021
     CASE TRACK THREE          8:48 A.M.
6

7

8                    - - - - -

9
                     **VOLUME 5**
10

11                   - - - - -

12

13       TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14      BEFORE THE HONORABLE DAN A. POLSTER,

15        UNITED STATES DISTRICT JUDGE,

16               AND A JURY.

17

18                   - - - - -

19

20

21   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
22                            801 West Superior Avenue
                              Cleveland, Ohio  44113
23                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

```
1    APPEARANCES:
     For the Plaintiffs:        Peter H. Weinberger, Esq.
2                               Spangenberg, Shibley & Liber
                                1001 Lakeside Avenue, Ste. 1700
3                               1900 East Ninth Street
                                Cleveland, Ohio    44114
4                               216-696-3232

5                               W. Mark Lanier, Esq.
                                Rachel Lanier, Esq.
6                               M. Michelle Carreras, Esq.
                                The Lanier Law Firm
7                               6810 FM 1960 West
                                Houston, Texas    77069
8                               813-659-5200

9                               Frank L. Gallucci, III, Esq.
                                Plevin & Gallucci Company, LPA
10                              The Illuminating Building
                                Suite 2222
11                              55 Public Square
                                Cleveland, Ohio    44113
12                              216-861-0804

13                              Salvatore C. Badala, Esq.
                                Maria Fleming, Esq.
14                              Napoli Shkolnik
                                360 Lexington Ave., 11th Floor
15                              New York, New York    10017
                                212-397-1000
16
     For Walgreen Defendants:   Kaspar J. Stoffelmayr, Esq.
17                              Brian C. Swanson, Esq.
                                Katherine M. Swift, Esq.
18                              Alex Harris, Esq.
                                Sharon Desh, Esq.
19                              Bartlit Beck LLP
                                54 West Hubbard Street, Ste.300
20                              Chicago, Illinois    60654
                                312-494-4400
21
     For CVS Defendants:        Graeme W. Bush, Esq.
22                              Eric R. Delinsky, Esq.
                                Alexandra W. Miller, Esq.
23                              Paul B. Hynes, Jr., Esq.
                                Zuckerman Spaeder - Washington
24                              Suite 1000
                                1800 M Street, NW
25                              Washington, DC    20036
                                202-778-1831
```

```
 1   For HBC/Giant Eagle
     Defendants:                 Robert M. Barnes, Esq.
 2                               Scott D. Livingston, Esq.
                                 Marcus & Shapira
 3                               35th Floor
                                 One Oxford Centre
 4                               301 Grant Street
                                 Pittsburgh, PA   15219
 5                               412-471-3490

 6                               Diane P. Sullivan, Esq.
                                 Chantale Fiebig, Esq.
 7                               Weil Gotshal & Manges
                                 Suite 600
 8                               2001 M Street NW
                                 Washington, DC   20036
 9                               202-682-7200

10   For Walmart Defendants:     John M. Majoras, Esq.
                                 Jones Day - Columbus
11                               Suite 600
                                 325 John H. McConnell Blvd.
12                               Columbus, Ohio   43215
                                 614-281-3835
13
                                 Tara A. Fumerton, Esq.
14                               Tina M. Tabacchi, Esq.
                                 Jones Day - Chicago
15                               Suite 3500
                                 77 West Wacker
16                               Chicago, Illinois   60601
                                 312-782-3939
17

18   ALSO PRESENT:               Special Master David Cohen

19
                          - - - - -
20

21

22

23

24

25
```

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | <u>FRIDAY, OCTOBER 8, 2021, 8:48 A.M.</u>                            |
| 2  | THE COURT:  All right.  I guess the robe                             |
| 3  | was a good idea to wear.                                              |
| 4  | All right.  I guess, first, do the                                   |
| 5  | defendants have any objection -- you can be seated.                  |
| 6  | Sorry.                                                                |

1  <u>FRIDAY, OCTOBER 8, 2021, 8:48 A.M.</u>

2  THE COURT:  All right.  I guess the robe

3  was a good idea to wear.

4  All right.  I guess, first, do the

08:49:03 5  defendants have any objection -- you can be seated.

6  Sorry.

7  Do the defendants have any objection to

8  recording Mr. Rannazzisi's testimony next week?

9  MR. DELINSKY:  Your Honor, Eric Delinsky

08:49:19 10  for CVS.

11  We do -- we do object, speaking for CVS, on

12  the ground that there's no basis to treat Mr. Rannazzisi

13  differently from any other witness in the case.

14  There's many witnesses who are testifying

08:49:33 15  multiple times at multiple trials, and --

16  THE COURT:  I'm not worried about that.

17  It's a health issue, okay.  The fact that

18  he's testifying multiple times or the DOJ finds it an

19  inconvenience, I'm not considering that.

08:49:51 20  It's the health issue and I would do it if

21  there's any other witness who may be needed in other

22  cases and whose health is precarious.

23  Again, I'm not deciding what I would do if

24  something came up, but I think it's a reasonable thing,

08:50:08 25  so anyone else have any objection?

1    MR. MAJORAS:  Your Honor, John Majoras for

2  Walmart.

3    The only thing I would add is that I don't

4  think it would be appropriate to note to the jury

08:50:18  5  that --

6    THE COURT:  Oh, I'm not going to say

7  anything.

8    MR. MAJORAS:  I know you're not, Your

9  Honor.

08:50:23 10    THE COURT:  Okay.  They're not even going

11  to know.

12    In fact, if it was not going to be in a

13  manner that no one would know, I wouldn't allow it.

14    MR. MAJORAS:  Thank you.

08:50:32 15    THE COURT:  So, okay, well, there's not

16  going to be any mention of it at all.

17    MR. STOFFELMAYR:  Judge, Kaspar

18  Stoffelmayr.

19    I don't want to pile on but I think this is

08:50:42 20  clear, I just want to make sure it's completely clear,

21  that in allowing this, Your Honor wouldn't be making any

22  determination about whether he is subject to depositions

23  in other cases depending on his health then.

24    THE COURT:  I'm not deciding anything.

08:50:55 25    MR. STOFFELMAYR:  Thank you.

1           THE COURT:  I'm simply -- there will be a

2       recording of his testimony, okay?  And so correct,

3       absolutely, that's all I'm deciding.

4               So with that, with that understanding and

08:51:08  5     the fact that it will be done in a way that no one will

6       see or know it, I'll allow it.

7           MR. WEINBERGER:  Your Honor, just from a

8       technology standpoint, we're making contact with Court

9       Connect today.

08:51:23 10         THE COURT:  Okay.

11          MR. WEINBERGER:  They're running the live

12      stream through the sound system in this courtroom.

13          THE COURT:  All right.

14          MR. WEINBERGER:  And so the, as I

08:51:34 15     understand it, at points in time, the live streaming has

16      some difficulty in picking up the microphone from the

17      witness.

18              And so we're going to make contact with

19      Court Connect, and we'll work with the Court's IT and

08:51:51 20     with Robert.

21          THE COURT:  Okay.

22          MR. WEINBERGER:  And we'll figure out how

23      we ensure that that occurs smoothly.

24          THE COURT:  Okay.  And I don't want any

08:51:59 25     recording if there are any bench side-bar conferences.

1             MR. WEINBERGER:  Yes.

2             THE COURT:  I don't want that recorded.

3             Only his testimony.

4             MR. WEINBERGER:  Yes, sir.

08:52:09  5             THE COURT:  The questions and answers.

6             All right.  At the end of the day,

7    yesterday we got into a heated discussion about

8    documents.  All right.

9             Look, I've got the best lawyers in the

08:52:23  10   country here, and this is a case of national importance.

11            We're not going to spend 150 hours wasting

12   time on documents, so this is what we're going to do.

13            I've discussed this with Special Master

14   Cohen.  He was under the understanding that there were no

08:52:43  15   challenges to authenticity.  If there are challenges to

16   authenticity, this is what's going to happen.

17            If I -- if I believe the document is

18   presumptively reliable, I will allow either side to use

19   it in examining a witness.

08:52:59  20            If the other side feels the document is not

21   authentic, they will present a witness live to contest it

22   and the jury will hear that.

23            And if I ultimately decide the document

24   isn't reliable, it won't come into evidence.  Again, it

08:53:19  25   can be used in examining a witness because it, you know,

1    may be relevant to the witness's testimony, but it won't

2    come into evidence if I ultimately decide it's not

3    reliable.

4                    And so the one document that was challenged

5    was this, a document was located in Purdue's file that

6    was authenticated by Purdue's lawyers, but apparently was

7    not located in CVS's files.  It refers to a proposed

8    business relationship about 20 years ago between CVS and

9    Purdue.

10                    So, Mr. Delinsky, if you're challenging the

11    authenticity, you've got to produce someone that says not

12    only has he or she searched the files and it doesn't

13    exist there but also there's nothing like it or nothing

14    relating to that business dealing, which suggests that

15    the document isn't authentic.

16                    And then I'll make a decision.

17                    So that's what we'll do with authenticity.

18                    Now, business records produced by either

19    side, but by any defendant, not only are they authentic,

20    but they're admissible, but they have to be brought in

21    through a witness who's providing relevant testimony in

22    connection to the document.

23                    I'm not about to have hundreds of documents

24    just sort of admitted and then we get up in closing

25    argument and counsel is essentially testifying about

1  documents that have never been used with a witness.

2  That wouldn't be proper and would be

3  unintelligible.

4  So you have to have used the document with

08:55:06  5  a witness, or it comes in through some -- some

6  stipulation.  Okay?  And if it's used with a witness, it

7  can be offered, okay?

8  And if it's admissible, it's admissible.

9  If it's not relevant, presumably someone would have

08:55:22  10  objected to the whole line of questioning with that

11  witness saying it's not relevant to this case and I would

12  have dealt with it.

13  If it's been used in the questioning of a

14  witness, and there was no objection, it is per se

08:55:37  15  relevant.

16  So again, that's the way we're going to

17  deal with it.

18  Anyone have any problem with that?

19  MR. LANIER:  Works.

08:55:50  20  MR. STOFFELMAYR:  No, Your Honor.

21  THE COURT:  Okay.  Fine.  That was smooth.

22  MR. DELINSKY:  Your Honor, we do object.

23  I guess it would be preliminary admission

24  to that one Purdue document we talked about.

08:56:02  25  THE COURT:  I haven't admitted it.

1       It was used, all right, it's a little late

2   to object to it -- I mean it was used.

3           I haven't admitted it.

4           MR. DELINSKY:  Yes.  Understood, Your

5   Honor.

6           THE COURT:  It's been offered, and I'm

7   holding off ruling until if you produce a witness, I'll

8   certainly listen to him or her, and if I determine that

9   it's not authentic, I won't admit it.

10          MR. DELINSKY:  Thank you, Your Honor.

11          THE COURT:  Like any other document.

12          If I'm not -- if I'm not convinced it's

13  authentic, either side's document, it's not going to be

14  admitted.

15          So, all right, Mr. Lanier, you

16  were -- well, I did read -- thank you, I read

17  Mr. Catizone's supplemental report so I'm familiar with

18  it.

19          The plaintiffs have advised me, I assume

20  they advised everyone, that they plan to use P 00511, the

21  first 32 pages of it, with Mr. Catizone.

22          All right.  Is this a document that he

23  relied on in preparing his first report?

24          MR. LANIER:  Yes, it is, Your Honor.

25          THE COURT:  All right.  Well --

1       MR. DELINSKY:  Your Honor, may I be heard

2   on that briefly?

3       THE COURT:  All right.

4       MR. DELINSKY:  Your Honor, the applicable

08:57:23  5   rule, my understanding is that the plaintiffs are not

6   seeking admission of the document; just seeking to

7   publish it and use it.

8       THE COURT:  Well, they are publishing it.

9       They can -- they're going to -- they're

08:57:35  10   allowed to question -- any party is allowed to question

11   any expert on anything that the expert used in his

12   report, saying it's a basis for his or her opinion.

13       MR. DELINSKY:  Well, the exception, Your

14   Honor, is set forth in Rule 703, okay, and 703 is the

08:57:53  15   rule that says they can base an opinion, without a doubt,

16   there's no doubt about it, an expert can base an opinion

17   on inadmissible -- on inadmissible information or

18   evidence, but if the underlying document in this case --

19       THE COURT:  Robert, will you give me my

08:58:18  20   rules, please, 703?

21       MR. DELINSKY:  I can hand mine up to you,

22   Your Honor.

23       THE COURT:  This microphone is a problem.

24       MR. DELINSKY:  But, Your Honor, what the

08:58:28  25   rule says is that if it's inadmissible, the proponent,

1   here, the plaintiffs, only can disclose them to the jury

2   if their probative value in helping the jury

3   substantially outweighs the prejudice so it turns Rule

4   403 around, Judge, and it puts the burden on the

08:58:50  5   plaintiff.

6                  Your Honor, I can hand Your Honor --

7                  THE COURT:  This is a nuisance.

8                  (Pause.)

9                  MR. DELINSKY:  So, Your Honor, we're

08:59:59  10   talking about in this instance a survey where the

11   probative value is low.  It doesn't mention any defendant

12   in this case, those pages.

13                  THE COURT:  Right.

14                  MR. DELINSKY:  And, number two, Your Honor,

09:00:09  15   you'll recall this from the briefing, the response rate

16   is so low, it's a 25 percent response rate that it is a

17   truly incomplete survey reflective of responsiveness by

18   us, whereas on the flip side, the prejudice of bringing

19   that in is extremely substantial.

09:00:33  20                  Now, it is, in this context under 703, it

21   is plaintiffs' burden to show the probative value

22   outweighs the prejudice.

23                  We submit that they cannot possibly meet

24   that, that burden here, under the circumstances.

09:00:52  25                  MS. SULLIVAN:  And, Your Honor, just to add

1    to that in terms of the objection, the prejudice is

2    multiplied because the survey is just not based on

3    customer experience with these four pharmacists's

4    experience with these four pharmacies, it's state-wide so

09:01:06  5    it has information --

6                    THE COURT:  That's a problem.  One, it's

7    state-wide, it's not these counties.

8                    Two, it's not defendant-specific.

9                    There are hundreds of pharmacies, and

09:01:20 10    that's my -- that's my concern.

11                    And it's --

12                    MR. LANIER:  Your Honor, may I be heard,

13    please?

14                    THE COURT:  Okay.

09:01:28 15                    MR. LANIER:  The charts that I was planning

16    on using, for example at Page 7, actually does divide up

17    the answers.

18                    You'll see that it has large chain

19    stand-alone.  You'll see that it has large chain grocery.

09:01:50 20    It's got small chain.  It's got mail order, long-term

21    care, outpatient, independent, and it breaks those apart.

22                    And so you're able to see, as we already

23    know from defendants as they've testified and argued,

24    that they are large chain stand-alone, at least three of

09:02:16 25    the defendants I should say, that they are among the

1    largest in the United States.  They're really, other than

2    Rite Aid, are going to be very few, if any, in the State

3    of Ohio.

4              So those are the charts that I'm using.  It

09:02:34  5    doesn't do me any good to just use the general figures

6    for everybody.  I've got to only look at the large chain

7    stand-alone.  I don't know whether or not Giant Eagle is

8    in the large chain grocery or not, and so I don't plan on

9    using this in regards to Giant Eagle.

09:02:53 10             I plan on using this in regards to CVS and

11    Walgreen, maybe Walmart is in large chain grocery, I'm

12    not a hundred percent sure.

13             THE COURT:  Which specific charts do you

14    plan to use?

09:03:05 15             MR. LANIER:  I would use the chart on

16    Page 7.  I would use the chart on --

17             THE COURT:  So that I have adequate time to

18    complete my job in a safe and effective manner by

19    practice site, and the respondents can mark strongly

09:03:21 20    disagree, disagree, neutral, agreed, strongly agree.

21             MR. LANIER:  Yes, sir.

22             That is one figure that I would use.

23             MR. DELINSKY:  And, Your Honor, the

24    problem --

09:03:30 25             THE COURT:  Hold it.  I just want to see

1     what charts he's going to use and then we can discuss it.

2     All right.

3                     MR. LANIER:  The second chart would be the

4     one on Page 9.  And again, I would only be using large

09:03:40  5     chain stand-alone with reference to CVS --

6                     THE COURT:  "I feel my employer provides a

7     work environment that allows for safe patient care by

8     practice site."

9                     MR. LANIER:  And then I would use the one

09:03:49  10     on Page 11.

11                     THE COURT:  "Pharmacy has sufficient

12     pharmacist staffing."

13                     MR. LANIER:  That allows for patient

14     safety.

09:04:02  15                     Any then I would use the one on Page 13,

16     which is "sufficient pharmacy technician staffing that

17     allows for safe patient care."

18                     Then I would use the chart on Page 15, "I

19     feel that inadequate staffing results in delays in

09:04:20  20     patients receiving medications in a timely manner."

21                     I would use the chart on Page 17, "I feel

22     pressure by my employer or supervisor to meet standards

23     or metrics that may interfere with safe patient care."

24                     Then I would use the chart on Page 19, that

09:04:43  25     says, "I feel that the workload-to-staff ratio allows me

1    to provide for patients in a safe manner."

2              And then number 21, "I am given the

3    opportunity to take lunch breaks or other breaks

4    throughout the workday by practice site."

09:05:04    5              Those are the charts and pages that I plan

6    on using.  I don't believe I should be entitled to use

7    all of the comments, and so even though they are really

8    nice, I think that they are objectionable and should not

9    be displayed to the jury.

09:05:15   10              I don't think that the big charts that

11    combine all of the Ohio statistics among all the

12    different kinds of pharmacies are specific enough to be

13    of use or probative value, and I would not use those just

14    because the cross-examination would be brutal.

09:05:34   15              But I believe that these others are of

16    extreme probative value.  I think their prejudicial

17    effect is almost nil because the defendants are entitled

18    to cross-examine the witness and say, "You don't know if

19    this was just all of the Rite Aid pharmacists, you don't

09:05:51   20    know which pharmacists it was."

21              THE COURT:  Look, I'm not going to allow

22    this with Mr. Catizone, but the defendants need to

23    understand that they may very well open the door to this,

24    depending on what they do in their defense.

09:06:04   25              All right?  If any -- you know, I don't

1    know what your corporate representatives are going to say

2    on the stand about your pharmacy practice, all right, but

3    this document -- everyone knows this document is there.

4              So if, depending on what they say, if that

09:06:24    5    opens the door to being cross-examined with this,

6    defendants -- plaintiffs can certainly use it.  But at

7    this point, at this point with this witness, since the

8    only relevance is that this is one of a whole lot of

9    things that he may have relied on, and since his primary

09:06:40   10    testimony -- he didn't interview any pharmacists.  He

11    looked at the policies and then today he's going to

12    testify that his examination of the actual documents and

13    the red flags and whatever notes, that's what he's

14    talking about.

09:06:58   15              He's not opining as to what may have caused

16    it or prompted it.  I'm not going to allow the plaintiffs

17    to use this with Mr. Catizone.

18              MR. WEINBERGER:  Your Honor, they've

19    already opened the door through Mr. Davis.

09:07:12   20              Mr. Davis on multiple occasions said that

21    CVS is proud of the environment and the tools that they

22    give their pharmacists.

23              He --

24              THE COURT:  Mr. Weinberger, you may have

09:07:24   25    been able to use it with Mr. Davis, I don't know, but

1    Mr. Davis is not Mr. Catizone.  Okay?  That's the point.

2                    MR. WEINBERGER:  Okay.

3                    THE COURT:  All right?  And the only

4    relevance to it is that this is one of many things that

09:07:36  5    Mr. Catizone relied on, but it certainly isn't the

6    principal thing that he looked at.

7                    He analyzed the policies, he analyzed -- he

8    looked at the 8,000 prescriptions, the sample roughly

9    2,000 per defendant, and he looked at the prescriptions

09:07:56 10    that he considered red flag and then he carefully

11    examined what, what, if anything, was written in the

12    notes section, and he wrote a supplemental report on

13    that.

14                    So none -- none -- this Ohio, State of Ohio

09:08:12 15    report in 2020 or 2021 doesn't bear on that at all so I

16    think to try and use this with him is more prejudicial

17    than probative, but that doesn't mean the analysis would

18    be the same if you seek to use it with a witness, a

19    representative of one of any of the defendants.

09:08:34 20                    MR. LANIER:  I understand the Court's

21    ruling, and we'll abide by it, Your Honor.

22                    The other thing that I want to make sure

23    the Court's aware of, which is semi-related, I've got a

24    copy here of documents that I do plan on displaying and

09:08:52 25    later offering it into evidence with this witness as

1  these go to the same issue of he's testified and has

2  opinions that the metrics, the number of -- the idea of

3  basing a bonus on a number of prescriptions that are

4  filled that includes opiates, the ideas of wait time,

09:09:08 5  those metrics are, in his opinions, and these are

6  documents relevant to the metrics of each defendant.

7  THE COURT:  All right.  Well, those he can

8  look -- those are documents he looked at and that's, you

9  know, that's not hearsay, those are admissions, those are

09:09:27 10  authentic so my analysis is probably different on that.

11  MR. LANIER:  And I think that's true, but I

12  want to make sure I've given the defendants or will give

13  the defendants here a copy.  I want to give the Court a

14  copy so when they come up, you've got them immediately at

09:09:40 15  hand, but I do want to emphasize or highlight one of the

16  documents in particular because I suspect that there will

17  be an objection to it.

18  And that is the memorandum of settlement

19  agreement entered between Walgreen's and the DOJ.  This

09:09:57 20  Walgreen's agreement I think under the Court's rulings

21  does come into evidence, but I'm going to use it because

22  part of the agreement that Walgreen's entered into said

23  that they would remove from their bonus system a bonus

24  based upon the number of opiates prescriptions that are

09:10:16 25  filled.

1          MR. STOFFELMAYR:  Judge, excuse me.  We, as

2   long as numbers are redacted as we've talked about many

3   times, we don't have any objection to using that document

4   with Mr. Catizone.

09:10:27  5          MR. LANIER:  Great.  Thank you.

6          And I will have, obviously, numbers

7   redacted and numbers will not be discussed.

8          That was part of your ruling earlier.

9          THE COURT:  Right.  Okay.

09:10:35 10          All right.  Then we'll proceed with --

11          MR. LANIER:  Thank you, Your Honor.

12          THE COURT:  -- bringing the jury in.

13          (Jury in.)

14          THE COURT:  Okay.  Good morning, ladies and

09:12:59 15   gentlemen.

16          Please be seated.

17          Good morning, Mr. Catizone.  I just want to

18   remind you you're still under oath from yesterday.

19          THE WITNESS:  Thank you, Judge.

09:13:13 20          THE COURT:  All right.  Mr. Lanier, you may

21   continue.

22          MR. LANIER:  Thank you, Your Honor.

23          May it please the Court, good morning,

24   ladies and gentlemen.

09:13:22 25

1       DIRECT EXAMINATION OF CARMEN CATIZONE (RESUMED)

2    BY MR. LANIER:

3    Q.    Good morning, Mr. Catizone.

4    A.    Good morning, sir.

09:13:24  5    Q.    We're going to jump right to it.  I've got two last

6    subjects and I'm going to try to get through them quickly

7    with you but thoroughly.

8                   The first subject are the issue of metrics.

9                   Oh, Mr. Pitts, could I have the WolfVision,

09:13:48 10    please?

11                   And I want to talk about metrics or have

12    you testify about metrics, and specifically the idea of

13    how pharmacy stores, businesses, incentivize their

14    pharmacists.

09:14:11 15                   So let's talk about incentives.

16                   What -- why are incentives important?

17    A.    For any business having incentives that motivate

18    employees to do the best job they can and provide the

19    best customer service, it's a crucial part of business.

09:14:38 20    Q.    All right.  In that regard, is -- do incentives

21    help motivate behavior hopefully?

22    A.    Yes, sir.

23    Q.    And do you want incentives to motivate good

24    behavior or bad behavior?

09:14:57 25    A.    I would hope good behavior.

Catizone - Direct/Lanier                    1114

1    Q.    And are you able to look at certain incentives that

2    businesses may give their pharmacists and determine

3    whether that incentive will promote safety and health?

4    A.    Based on the information I've reviewed, yes, sir.

09:15:17  5    Q.    And did you actually, in forming your opinions in

6    this case, have an opportunity to look at some documents

7    that reflect some of the incentives of these defendants?

8    A.    Yes, sir.

9    Q.    And did you find any that were troubling?

09:15:37 10    A.    Yes, sir.

11    Q.    So in terms of the troubling ones, I'd like to know

12    whether or not you consider a bonus based on the number

13    of prescriptions filled.

14              Is that a good incentive, motivation for

09:16:04 15    public health, or not?

16    A.    In the context of what we're talking about, that

17    was not a good incentive.

18              It was an incentive that actually impacted

19    the pharmacists's ability to do what they were supposed

09:16:16 20    to do.

21    Q.    So like on filling opiate prescriptions, you

22    consider it not a good incentive?

23    A.    No.  Filling opiate prescriptions that should not

24    be filled is not a good incentive.

09:16:28 25              So if the incentive says fill prescriptions

Catizone - Direct/Lanier                                    1115

1    regardless if there's a valid legitimate reason for that,

2    and fill prescriptions that you shouldn't fill because

3    there's an incentive to make more money, that's not a

4    good incentive.

09:16:42  5    Q.    Did you see over time that these incentives changed

6    with various defendants?

7    A.    Yes, I did.

8    Q.    So, for example, we have Plaintiffs' Exhibit 14750,

9    which I'll display to the jury and to you.

09:17:02 10                    This is a settlement and memorandum of

11    agreement entered into between the Department of Justice

12    Drug Enforcement Administration and Walgreen's with its

13    subsidiaries.

14                    Do you see this?

09:17:17 15    A.    Yes, sir.

16    Q.    And it's one that will be applicable to Walgreen's

17    corporate and any facility owned and operated by

18    Walgreen's registered to dispense or otherwise handle

19    controlled substances or List 1 chemicals.

09:17:37 20                    Do you see that as well?

21    A.    Yes, sir.

22    Q.    If we go towards the back of this agreement, we'll

23    see, as part of the agreement, Section 6, and this

24    Section 6 is the addendum -- well, let me first show the

09:17:54 25    addendum.

Catizone - Direct/Lanier                    1116

1            Prospective compliance, what does that

2    mean?

3    A.    That's compliance that the DOJ and DEA expected

4    going forward, to take that before something happened

09:18:08   5    rather than reactive compliance, which means to take

6    action after it happens.

7    Q.    Okay.  And in that regard, we've got a number of

8    different things where Walgreen's has agreed to changes

9    in the way they go about business, and I would like to

09:18:24  10    focus on number six.

11            Do you see this?

12    A.    Yes, sir.

13    Q.    Can you read that to the jury, please?

14    A.    "Beginning in 2014, Walgreen's will exclude any

09:18:37  15    accounting for controlled substance prescriptions

16    dispensed by a particular pharmacy from bonus

17    computations for pharmacists and pharmacy technicians at

18    that pharmacy."

19    Q.    So 2014, Walgreen's policy changes after this

09:18:55  20    settlement agreement with the DEA, is that your

21    understanding?

22    A.    Yes, sir.

23    Q.    Okay.  Do you believe that good businesses should

24    wait to get their incentives properly aligned until after

09:19:15  25    DEA actions?

Catizone - Direct/Lanier                          1117

```
          1              MS. SWANSON:  Objection, Your Honor.

          2              THE COURT:  Overruled.

          3     A.    No, sir.

          4     BY MR. LANIER:

09:19:29  5     Q.    Okay.  Now, if we continue to look beyond

          6     Walgreen's, we can look, for example, at Walmart, and I

          7     will display to the jury Plaintiffs' Exhibit 21572,

          8     Walmart pharmacy Facility Management Incentive Plan For

          9     Fiscal Year 2012.

09:19:52 10              Do you see that?

         11     A.    Yes, sir.

         12     Q.    And again, these are documents that you've looked

         13     at and relied upon in your report, is that fair to say?

         14     A.    Yes, sir.

09:20:03 15     Q.    And Walmart, on Page 3 of 21, in dealing with their

         16     incentive plan, gives some definitions.

         17              Look at their definition of script count.

         18     It reads, "End of month prescriptions after credit

         19     returns are accounted for.  Year end script count is

09:20:30 20     determined by summing the 12-month totals as reflected on

         21     the monthly P & L," which I think parties will stipulate

         22     means profit and loss.

         23              Would you explain what that means, please?

         24     A.    Sure.

09:20:46 25              The first part of that means that sometimes
```

1    people do not pick up their prescriptions and, therefore,

2    those prescriptions would be credited and those

3    prescriptions are taken out of the total prescriptions

4    that pharmacy filled for the year.

09:20:59  5              And the summing is just all of the

6    prescriptions that that pharmacy filled and added up for

7    the year.

8    Q.    Now, part of the Walmart incentive plan that's

9    shown on Page 4 is this added comment of customer

09:21:14 10   experience.

11              It says, "That's measured on feedback from

12   Walmart shoppers who responded to experience track survey

13   invitations printed on their receipts."

14              Now, they give the impression of their

09:21:34 15   pharmacy experience on a one to 10 scale.  Can that be a

16   good and a -- a positive and a negative motivator?

17   A.    Yes, sir.

18   Q.    Can you explain to the jury the positives and the

19   negatives built into such a broad incentive?

09:21:49 20   A.    Sure.

21              As customers of all of the defendants,

22   probably, at one point or another or other retail

23   establishments, customers need to be treated well and

24   feel that's a positive experience.

09:22:02 25              So if I'm operating a business, I want to

Catizone - Direct/Lanier                          1119

1       know that my staff is doing a nice job with my customers

2       and I would put in there factors and monitor factors that

3       would help me improve that customer service.

4                       That would be a very good incentive and

09:22:16  5       something most businesses do as part of their routine.

6                       A bad incentive would be looking at those

7       customer surveys and forcing or directing the pharmacists

8       to take actions that's against standards of care or

9       against regulations in dispensing prescriptions just to

09:22:32 10       improve customer satisfaction.

11                       That would not be a good incentive.

12      Q.    Okay.  Now, as we continue to work through this on

13      Page 10, Walmart explains, "An additional MIP," which I

14      believe means Management Incentive Plan, and it talks

09:22:55 15       about how a facility may be eligible to receive

16      additional Management Incentive Plan if the number of

17      scripts meets or exceeds 190,000 for the year.

18                       "In order to be eligible for the additional

19      Management Incentive Plan, the facility must first meet

09:23:21 20       80 percent profit qualifier, if the store achieves or

21      exceeds 190,000 scripts, each eligible associate in the

22      store will receive an additional amount equivalent to the

23      total award as calculated using the performance measures

24      in the previous section."

09:23:40 25                       And then it gives an example of how many

```
 1   scripts and how much profit mixed in with the customer

 2   experience.

 3               Is this a good or a negative -- time out.

 4   I've got it too wordy.

 5               Do you see the section I talked about and

 6   I've put into the record?

 7   A.    Yes, sir.

 8   Q.    Now, in terms of Walmart doing this, is that a

 9   positive or a negative on health and safety when it comes

10   to opiate prescriptions?

11   A.    In my opinion, it's a negative, sir.

12   Q.    Would you explain why?

13   A.    Yesterday we talked about how the systems did not

14   reward pharmacists for refusing prescriptions or

15   conducting DUR.

16               What this incentive says to the pharmacy

17   and the pharmacist and pharmacist technicians is that I

18   am not going to be rewarded financially unless I reach

19   190,000 prescriptions.

20               So if I fill less than 190,000

21   prescriptions because I've rejected prescriptions or

22   because I've taken my time to do my due diligence, I'm

23   going to get penalized for that even if it's better for

24   the customer and better for the pharmacy, because of the

25   service and the quality of care I'm providing.
```

1              There's nothing in that incentive to adjust

2      that number for that necessary work and the necessary

3      things that the pharmacist should do to improve customer

4      service and keep the patient safe.

09:25:12  5      Q.    All right.  Next, I would like to talk to you about

6      CVS and their incentives, okay?

7              In that regard, I will publish to the jury

8      Plaintiffs' Exhibit 15604, another document you reference

9      in your report.

09:25:28 10             It is the CVS 2006 pharmacist incentive

11      plan.

12             Do you recognize this document?

13      A.    Yes, sir.

14      Q.    2006 CVS says the following:  "The objective of all

09:25:46 15      CVS incentive plans is to motivate employees to exceed

16      top line results and maximize store profit while

17      maintaining high levels of customer service."

18             Do you see that?

19      A.    Yes, sir.

09:26:02 20      Q.    Is there a difference from the pharmacist's

21      perspective between an incentive plan to exceed top line

22      results and maximizing store profit while maintaining

23      high levels of customer service and being judicious and

24      careful and cautious as you execute your job?

09:26:22 25      A.    It depends how that incentive was implemented.

1          If top line results are to make sure that

2     every prescription is filled accurately and that the

3     patient is taken care of, then that's a mutually

4     beneficial or mutually achievable goal.

09:26:40   5          If the top line results is something that

6     contradicts that or something that impacts that, then it

7     wouldn't be something that would be mutually beneficial

8     or beneficial to the pharmacist.

9          And as a business to be real, businesses

09:26:55  10     have to make money to exist.  They can't operate at a

11     negative profit; otherwise, they go out of business.  So

12     it's in the best interests of the pharmacy and the

13     pharmacist to make sure that the business does make money

14     to support the business.

09:27:10  15          But to put profit ahead of patient care is

16     not a good incentive, and that's what creates problems

17     and impacts the pharmacist's ability to perform the

18     things they need to perform.

19     Q.    All right.  In this regard, if you look at this

09:27:26  20     incentive plan, it goes on to say that in 2006

21     pharmacists have the opportunity to earn incentives above

22     target based on store script performance.

23          Can you explain what store script

24     performance means in your expertise?

09:27:42  25     A.    I'm not sure of what it means in this specific

Catizone - Direct/Lanier                    1123

1    context, but what my experience has been, it means

2    filling a maximum number of prescriptions, filling more

3    generics than brand names, and making sure that your

4    inventory stays below a certain level, which means when

09:28:01 5    customers come in for the medications, you may not have

6    it in stock because you're trying to keep the inventory

7    low and meet some of those performance or some of those

8    script performance goals.

9    Q.    It continues to say, "Payouts increase

09:28:15 10    significantly when script budgets are exceeded, up to a

11    maximum payout of three times the target."

12                    And that's in bold and italics.

13                    What does that tell you?

14    A.    I can make a lot of money by reading -- meeting my

09:28:34 15    budget goals regardless of how I get there.

16    Q.    And then there's a section entitled, Incentive Plan

17    Metrics for CVS, gives some examples and says, "The

18    incentive is based on your store's performance in the

19    following three metrics."  The very first one is number

09:28:56 20    of scripts measured against the store budget with weekly

21    operating result and a 50 percent incentive at the

22    target.

23                    If you're including opioid prescriptions in

24    this incentive plan, is that good or bad for community

09:29:20 25    and patient health?

Catizone - Direct/Lanier

1    A.    Based on what I know with opiates, opioids and what

2    we're seeing, that's not a good incentive to include

3    that.

4    Q.    So down at the bottom, they give some very

09:29:33  5    specifics.

6              Average weekly script volume, depending

7    upon what it is, if the target is -- or the incentive is

8    there for the staff and the incentive is there for the

9    leader, the money is shown to be what it can be under the

09:29:51  10   incentive plan.

11             Do you see that?

12   A.    Yes, sir.

13   Q.    A good or a bad thing?

14   A.    In what we're talking about, that's a bad thing,

09:30:02  15   sir.

16   Q.    All right.  Now, is it fair to say over time, these

17   policies changed like we saw with Walgreen's?

18   A.    Yes, sir.

19   Q.    I'd like to show one additional time with CVS, and

09:30:22  20   this will be Plaintiffs' Exhibit 20695, which we'll

21   display at this point.

22             It's the WeCare performance reporting flow

23   chart.

24             Did you take this into account as well,

09:30:46  25   sir?

1    A.    Yes, sir.

2    Q.    And this is another CVS document where it's talking

3    about incentives and it sets -- speaks of properly set

4    waiter expectations, since the inception of PSI,

09:31:03  5    providing waiting prescriptions in 15 minutes or less is

6    a differentiator of CVS Pharmacy compared to our

7    competition.

8              What does that mean, sir, to you as a

9    pharmacist?

09:31:21 10    A.    As a pharmacist, what it's saying is if customers

11    are looking for a pharmacy to choose one of the selling

12    points that CVS markets, if you come into our pharmacy,

13    we'll fill your prescription in 15 minutes or less.

14    Almost like Domino's Pizza.  If you show up and let us

09:31:38 15    know you're there, we'll have your pizza out to you in

16    less than 15 minutes.

17    Q.    In this regard, sir, we've got some -- a scenario

18    that is given on Page 18 of this document, and this

19    scenario talks about providing a wait time of less than

09:31:55 20    or equal to 15 minutes.  It talks about if a prescription

21    is verified by the promised time, if the prescription is

22    picked up close to the verification, does it give credit

23    to the team.

24              Do you see that?

09:32:10 25    A.    Yes, sir.

1    Q.    And so as we work through this, if you provide a

2    wait time of less than or equal to 15 minutes, and if you

3    have the prescription verified by promise time and if you

4    pick it up close to verification, you get credit for the

5    team.

6                   True?

7    A.    Yes, sir.

8    Q.    But if you don't provide a wait time of less than

9    or equal to 15 minutes, even if you get it verified by

10   promise time, and it's picked up close to verification,

11   the team gets no credit.

12                  Do you see that?

13   A.    Yes, sir.

14   Q.    When it comes to opioids dispensing, is that a good

15   or bad policy?

16   A.    It's a bad policy, sir.

17   Q.    Why?

18   A.    As we've talked about, the opioids are a very

19   dangerous drug, and to expect the pharmacist to resolve

20   any red flags in 15 minutes or less puts a real risk to

21   the patient.

22                  If this incentive had said we're going to

23   exclude certain prescriptions because as a customer, no

24   one wants to wait for 45 minutes or an hour in a

25   pharmacy, that's just not good customer service, but you

1    also want the pharmacist to take the time to make sure

2    you and your family receive the right prescription.

3              If this incentive takes away from that time

4    and puts you and your family at risk, it's not a good

09:33:35   5    incentive.

6              So it's not bad to have some metrics that

7    make sure the customers get taken care of in the right

8    amount of time, but it's a bad metric when it comes to

9    opioids and other prescription medications that require

09:33:47  10    extra time and extra care.

11    Q.    And we're about to move into the red flag analysis

12    that you did of the prescriptions in these counties, but

13    before we do, I want to tie it into that idea.

14              Does 15 minutes or less give you -- on an

09:34:09  15    opioid prescription, give you time to properly chase down

16    red flags most of the time?

17              Does it give you time, especially when you

18    consider you've got all these other prescriptions coming

19    in that you've got to fill in the same 15-minute

09:34:21  20    timeline?

21    A.    As a pharmacist, sir, the answer is no.

22              The only prescriptions you could probably

23    fill in 15 minutes or less are maintenance medications

24    that patients have been on for a while, medications for

09:34:35  25    high blood pressure, diabetes, some other disease and

 1    there's no change in that patient, no change in that

 2    medication, those types of prescriptions could probably

 3    be filled in 15 minutes or less, but new prescriptions,

 4    opiate prescriptions, multiple prescriptions, it's going

09:34:50  5    to take longer than 15 minutes as a pharmacist.

 6    Q.    All right.  And then the final one in this subject

 7    area, before we move on to the actual prescription notes,

 8    is the Plaintiffs' Exhibit 9546.  This is the Giant Eagle

 9    bonus for their pharmacy in 2014.

09:35:10 10           The pharmacy bonus program -- let me first

11    ask you did you rely on this document in your analysis?

12    A.    Yes, sir.

13    Q.    "The pharmacy bonus program is designed to

14    encourage team members to work as a team toward a common

09:35:29 15    goal of improving company profitability, prescription

16    volume and customer service."

17           Again, there's no problem with the company

18    wanting to be profitable, agreed?

19    A.    Yes, sir.

09:35:43 20    Q.    There's no problem with wanting to be able to do a

21    lot of business and fill a lot of prescriptions.

22           That in itself is not a bad thing, is it?

23    A.    No, sir.

24    Q.    And customer service is certainly applaudable, all

09:35:56 25    customers, we all appreciate that, right?

1    A.    Yes, sir.

2    Q.    But if you look at how they go about doing this,

3    their bonus percentages, they are based upon the salary

4    at the beginning of the fiscal year, and then there are

09:36:14  5    individual minimum targets and maximum percentages

6    established by job level.

7                Do you see that?

8    A.    Yes, sir.

9    Q.    And one of the pharmacy performance modifiers is

09:36:29  10    prescription unit volume.

11                Do you see that as well?

12    A.    Yes, sir.

13    Q.    Now, again, if you do zero to 1,500 units, there's

14    not anything.

09:36:41  15                1501 to 2,500, units, you get a half

16    percent; 2501 to 3500, you get one percent.  And if

17    you're above 3500, you get one-and-a-half percent.

18                If that type of a metric is given and it

19    includes opioid dispensing, is that a good or a bad thing

09:37:07  20    related to public health?

21    A.    It's a bad thing, but, Mr. Lanier, could you go

22    back to that chart, please?

23                There was something that I'd like to point

24    out as well.

09:37:15  25    Q.    Okay.

1    A.    So if you go up above to the salary levels, so in a

2    typical chain pharmacy environment, there's a district

3    manager and then a pharmacy manager and a store manager.

4              Those individuals set the hours of

09:37:34  5    pharmacists and technicians in that pharmacy.

6              The pharmacist has little or no control

7    over that help.  They can request additional help but it

8    has to go through that process.

9              This incentive line item here is an

09:37:47 10    incentive for that pharmacy manager or that store manager

11    to keep salaries in the pharmacy low so that it looks

12    better on their incentives and that's why many times,

13    there's understaffing in the pharmacies because they're

14    trying to keep those salaries low, which is not a good

09:38:04 15    incentive as well.

16    Q.    Okay.  So this incentivizes lower staffing?

17    A.    Yes, sir.

18    Q.    As well as volume writing of prescriptions.

19              Fair?

09:38:20 20    A.    Yes, sir.

21    Q.    All right.  Thank you, sir.

22              Last subject to speak with you about, I

23    want to talk about the stores, individual store's red

24    flags that you've analyzed in this case.

09:38:37 25              Okay?

1    A.    Yes, sir.

2    Q.    Now, some of this can be -- well, the numbers Geeks

3    on the jury will have a good time with it, but I want to

4    try to organize it as carefully as I can to make it make

09:38:53   5    sense.

6              And this is -- I'm going to need your help,

7    okay?

8              I'll start with your opinion that you

9    expressed yesterday, "Is dispensing of red flag

09:39:07 10    prescriptions without conducting adequate investigation

11    or due diligence likely to lead to diversion?"

12              Your testimony on that is?

13    A.    Yes, sir.

14              MR. WEINBERGER:  Excuse me, Your Honor.

09:39:19 15    Robert, that screen back there is out.

16              THE CLERK:  What screen?

17              A JUROR:  The back one.

18              (Discussion had off the record).

19              THE COURT:  Someone from IT is coming but I

09:43:50 20    guess if the jurors can look, that big screen is working.

21    Look at that one.

22    BY MR. LANIER:

23    Q.    Okay.  Mr. Catizone, I'm going to ask you to also,

24    as much as you can, look at this screen because I want to

09:44:12 25    make sure that the writing is big enough for people from

Catizone - Direct/Lanier                    1132

1    your distance to be able to read it.  Okay?  Because the

2    jurors are going to have to read from the far end this

3    screen.

4                    Will you do that for me, please, sir?

09:44:26  5    A.    Yes.

6    Q.    Thank you.

7                    And if it's not big enough, I can't ask the

8    jurors but I can ask you to tell me it's not big enough.

9                    Okay?

09:44:34 10    A.    Yes.

11    Q.    All right.  You gave the opinion yesterday, you've

12    just expressed it again, is dispensing of red flag

13    prescriptions without conducting adequate investigation

14    or due diligence likely to lead to diversion?

09:44:46 15                    You said yes.

16                    In that regard, when a pharmacist gets to

17    their computer terminal and they get a prescription in,

18    and whether paper, but on the terminal, they get an

19    electric prescription, is there some kind of a screen

09:45:09 20    that they -- a form that's there?

21    A.    That will vary by pharmacy, but there's some sort

22    of mechanism, some sort of form, some sort of profile

23    that the pharmacist completes based on their dispensing

24    software.

09:45:23 25    Q.    And like you say, it will vary, depending upon

Catizone - Direct/Lanier                     1133

       1    which pharmacy has what kind of software and what kind of

       2    program their IT department wrote or wherever they got

       3    it.

       4                   Right?

09:45:35  5    A.    Correct.  And whether the IT is working that day or

       6    not.

       7    Q.    Good point.

       8                   I would assume, having talked to you before

       9    and having taken some witnesses, that there are what are

09:45:49 10    called fields on that screen, boxes to be filled in.

      11                   Is that right?

      12    A.    Yes, sir.

      13    Q.    And so one might be the name of the patient or

      14    customer, right?

09:46:03 15    A.    Yes, sir.

      16    Q.    One might be the name of the doctor, right?

      17    A.    Yes, sir.

      18    Q.    One might be the number of the prescription.

      19                   Fair?

09:46:22 20    A.    Yes, sir.

      21    Q.    One might be the drug name, right?

      22    A.    Yes, sir.

      23    Q.    One might be the dosage?

      24    A.    Yes, sir.

09:46:43 25    Q.    One might be insurance or cash payment?

1   A.   Yes, sir.

2   Q.   Huh?

3   A.   Yes, sir.

4   Q.   Now, there are going to be lots of other fields, I

5   would assume?

6   A.   Yes.

7   Q.   Are there also fields in there, and specifically in

8   the notes that you looked at from these pharmacies, are

9   there fields that talk about or allow the pharmacist to

10  put information about red flags?

11  A.   Yes, sir.

12  Q.   Can you tell the jury a little bit about that; any

13  fields that you think I ought to add on here?

14  A.   I think I would just add a general notes field

15  because among the various pharmacies, those fields differ

16  in what they're called and where they appear in the

17  patient profile or in the dispensing process, but there's

18  an ability for pharmacists to free form or free text in

19  information about that prescription, about that patient,

20  about that prescriber that's important information to

21  document for that prescription as well as for other

22  pharmacists or people looking at prescription afterwards.

23  Q.   All right.  And these prescriptions, do they have

24  places, then, that will alert you to red flags?

25  A.   Most of the dispensing systems that are in place in

1   pharmacy have what they call DUR, the drug utilization

2   review alerts, and these are proprietary packages that

3   are put together by companies, and those companies

4   identify for the pharmacist drug-drug interactions,

09:48:32  5   excessive doses, something that would be problematic with

6   that medication or combination of medication.

7              So if a patient's taking an aspirin-based

8   product and they get prescribed a Warfarin or Coumadin

9   product to thin their blood, an alert would come up to

09:48:49 10   the pharmacist saying this is a dangerous combination,

11   could cause excessive bleeding in the patient.

12             How that's presented, what the information

13   is that's presented to the pharmacist may vary from

14   company-to-company, but it's pretty much the same basic

09:49:02 15   alerts and the same basic information based on standards

16   of care and the medical literature for those drugs and

17   those diseases.

18   Q.    All right.  I've added a box in this drawing that

19   says DUR alerts, and you said DUR stands for drug

09:49:19 20   utilization review?

21   A.    Yes, sir.

22   Q.    And is that something that is -- do individual

23   pharmacists, the individual pharmacists, Giant Eagle had

24   a kind lady in here who is a pharmacist, sounds like a

09:49:36 25   wonderful person, do those pharmacists actually develop

Catizone - Direct/Lanier                    1136

```
 1    these programs and decide what goes in the alert box?
 2    A.    No, sir.
 3              They're developed by standard-setting
 4    organizations, such as the USP, used to be called the
 5    United States Pharmacopeia Company.  When you buy a
 6    product, it will say USP on there, which means it meets
 7    standards that have been set by this quasi-Government
 8    agency so that that medication is actually that
 9    medication.
10              Those types of companies develop these DUR
11    alerts for pharmacies.
12    Q.    All right.  And then the DUR alerts, any other
13    boxes of note that we should add before we start talking
14    about these prescription fields?
15              And we always can come back and add them
16    later if you see one that's relevant.
17    A.    Again, there are number of boxes for pharmacist
18    alerts or patient alerts that vary across the defendants,
19    Mr. Lanier, so it would be difficult to list all of them,
20    but --
21    Q.    All right.  This is -- this is good enough for now
22    and I'll come back to this chart as we go along.
23              I'm going to start with CVS, so in the far
24    corner over there, Mr. Delinsky and Mr. Bush's client,
25    CVS.
```

```
 1              Now, each of these defendants provided a
 2  sample of the red flag prescriptions, the fields of notes
 3  associated with those red flag prescriptions.
 4              Is that right?
09:51:18  5  A.    Yes, sir.
 6  Q.    And we talked about this yesterday, but you looked
 7  at --
 8              MR. DELINSKY:  Mr. Lanier, excuse me one
 9  moment.
09:51:25 10             Your Honor, we should probably make clear
11  for the record these were randomized samples, not
12  anything hand picked by anybody.
13             MR. LANIER:  Right.  He's right, Judge.
14             THE COURT:  All right.
09:51:34 15             MR. LANIER:  I'll clarify that.
16  BY MR. LANIER:
17  Q.    These were not hand-picked by the defendants.
18             This was a randomized sample overseen by
19  His Honor and his staff to make sure that a random
09:51:44 20  section was provided.
21             Are you with me?
22  A.    That's my understanding, sir.
23  Q.    And is it also your understanding that this was run
24  from the red flags that we identified based upon your
09:52:02 25  concept so that these prescriptions would have flagged
```

Catizone - Direct/Lanier                    1138

1    those red flags you've told us about?

2    A.    If I can repeat back to make sure I understand.

3                So from the prescriptions that were

4    identified that had red flags, this was a randomized

09:52:20  5    subset of those red flags, those prescriptions.

6    Q.    Okay.

7    A.    That's my understanding, sir.

8    Q.    Yes.  All right.  So you're looking at

9    prescriptions that have been identified as having red

09:52:34  10    flags, it's a random subset, not hand-picked by anybody,

11    right?

12    A.    Yes, sir.

13    Q.    And then you went and read all of them, right?

14    A.    Yes, sir.

09:52:45  15    Q.    And so the notes for CVS, you've got -- and let's

16    put your slide up, and this is really going to be tough.

17                Are you able to read it from there?

18    A.    Somewhat.  I don't know if the jurors can read it.

19                Actually if I cover one eye, I can see it.

09:53:08  20    Q.    I'm sorry, I can't hear you.

21    A.    I can see most of it, sir.

22                MR. WEINBERGER:  Your Honor, could we take

23    a short break?

24                THE COURT:  All right.  I think we will

09:53:17  25    have to and hopefully we can get it fixed.

```
         1              All right.  Ladies and gentlemen, we are

         2      going to take our midmorning break and hopefully we can

         3      fix the monitors so we will take a 15-minute break now.

         4              (Jury out.)

10:00:11 5              (Recess taken.)

         6              THE COURT:  Okay.  Please be seated.

         7              Fortunately, we have the monitors working

         8      with the very high tech technique of unplugging things

         9      and plugging them back in.

10:14:05 10             (Laughter.)

        11              THE COURT:  So that seems to have worked so

        12      far.

        13              So, Mr. Catizone, I just want to remind you

        14      you're still under oath.

10:14:14 15             THE WITNESS:  Yes, sir.

        16              MR. LANIER:  Thank you, Your Honor.

        17              May it please the Court and thanks to the

        18      Court's technicians for getting that fixed.

        19      BY MR. LANIER:

10:14:22 20     Q.   Mr. Catizone, during the break, I'm trying to get

        21      in my brain to make sure I've covered everything, and I'm

        22      worried about a couple of things I want to clarify so

        23      that we can best understand where we're going.

        24              First of all, that DUR alert box, let's

10:14:41 25     talk about what it is and what it isn't.
```

1       It's been referenced to the jury in opening

2   and we're going to need to be clear on what it is.

3       You described it as what?  Drug-to-drug --

4   A.   No, it covers the whole gamut of the Drug

10:15:08  5   Utilization Review process so if there's a drug-drug

6   interaction, the pharmacist would receive an alert.

7   Q.   That's the example you gave of aspirin and

8   Coumadin?

9   A.   Correct, sir.

10:15:20 10       If there was an excessive dose, that also

11   would be an alert.

12       So basically, anything that's outside of

13   what the recommended dose, dosage and therapy is, would

14   trigger one of those DUR alerts.

10:15:40 15   Q.   All right.  What else?

16       Anything?

17   A.   There's a whole list of --

18   Q.   Well, let me ask it this way.

19       Does the DUR alert ever, ever, ever stand

10:15:53 20   for identifying red flags and opiates beyond maybe the

21   interaction of opiates with other drugs?

22   A.   Because some of the red flags cut over to the

23   clinical side, for example, a dose that would be too high

24   is a red flag for opioids, that's also a DUR alert.

10:16:20 25       An early refill is a red flag.  That would

Catizone - Direct/Lanier                            1141

1        also be a DUR alert.

2                    The combinations of drugs that would create

3        concern for patients is also a DUR alert.

4                    And then based upon the DUR alerts that

10:16:40  5        I've reviewed of the defendants, if it's a drug of

6        possible abuse, that's another DUR alert that shows for

7        the pharmacist.

8        Q.    All right.

9                    And dose, early refill, combinations, and

10:17:02 10        then if it's a drug of possible abuse?

11                    In other words, it might -- the DUR would

12        say this is a drug of potential abuse?

13        A.    Yes.  Within the pharmacy world, there are two

14        types of prescription drugs that you may have heard about

10:17:20 15        from other witnesses.

16                    One are noncontrolled.  Those are the ones

17        you take for high blood pressure, diabetes.  And then the

18        other ones are controlled substances, which we've been

19        talking about; the opioids, the Benzodiazepines.  Those

10:17:32 20        medications, because they are prone to cause addiction

21        and abuse, those are the drugs that would trigger some

22        sort of alert to the pharmacist, if the DUR alert saw it

23        was too high a dose or too long of a time of treatment to

24        use that drug, based upon, again, what the medical

10:17:52 25        literature says that drug should be used for and how long

1    that drug should be taken.

2    Q.    All right.

3          So will the DUR tell you if your patient is

4    fulfilling multiple scripts in multiple different

10:18:11 5    locations?

6    A.    The proprietary, the ones you buy off the shelf

7    from these companies will have certain red flags built

8    into them, based upon how that drug should be taken and

9    used in the medical literature.

10:18:29 10          Then there's the ability to customize those

11    packages to include that particular component that

12    Mr. Lanier mentioned, or for the pharmacy to put in other

13    red flags or other warning signs that they would want to

14    alert their pharmacists to as well.

10:18:46 15   Q.    So a pharmacy is able -- first of all, when they

16    just get the standard DUR, the pharmacist is going to

17    know, if they don't already, that Vicodin is a controlled

18    substance?

19    A.    Correct.

10:18:59 20          The purpose of a DUR program, as you can

21    imagine, there's probably 50,000 drugs on the market.

22          There's no way any one person, a

23    pharmacist, can memorize all those drugs, all the

24    interactions, all the side effects.

10:19:13 25          This is a computer program that puts that

1    all in a searchable database and then gives the

2    pharmacist back that information.  And the pharmacist

3    can't continue to fill that prescription until they

4    actually override that alert.

10:19:29  5              So it reminds them, but then the pharmacist

6    has to actively override one of these alerts because

7    that's how important the DUR alerts are.

8    Q.    All right.  So the pharmacists can't accidentally

9    just forget about a drug like an opiate?

10:19:48  10              Even the program itself is going to tell

11   them, is that fair?

12   A.    Yes, sir.

13   Q.    All right.

14              Of course, then the question becomes what

10:19:55  15   the pharmacist does with that.

16   A.    Yes, sir.

17   Q.    The next thing I want to do is talk about where

18   these prescriptions came from before we look at them, and

19   so we've got these companies, we've got CVS, we've got

10:20:26  20   Walmart, we've got Walgreen's, and we've got Giant Eagle.

21              Each of them wrote prescriptions in Lake

22   and Trumbull County.

23              Fair?

24   A.    No, sir.

10:20:46  25              MR. DELINSKY:  Objection, Your Honor.

```
 1              MR. LANIER:  I said it wrong.  Sorry.

 2              THE WITNESS:  Dispensed.

 3              MR. LANIER:  Thank you.  Thank you.  I

 4    apologize.  Totally my fault.

 5              MR. DELINSKY:  That's a big one, Mark.

 6              MR. LANIER:  I agree.

 7              Thank you, Eric.

 8    BY MR. LANIER:

 9    Q.    In Lake and Trumbull County, each of these

10    pharmacies dispensed opiate prescriptions.

11                    True?

12    A.    Yes, sir.

13    Q.    Now, these are counties of roughly 200,000 people

14    each.

15                    Is that anything you know or am I just

16    asking you to assume it?

17    A.    I -- it's my understanding and mostly assumption as

18    well, sir.

19    Q.    All right.  So you've got counties of about 200,000

20    people apiece.

21                    These four pharmacies are the ones you

22    focused on.

23                    There is a funneling down -- you didn't

24    look at every opioid prescription every one of these

25    stores ever put out.
```

Catizone - Direct/Lanier                    1145

1                    Did you?

2        A.    No, sir.

3        Q.    All right.  I want to describe the funnel of how

4        you got to those prescriptions that you examined.  All

10:22:01  5      right?

6        A.    Yes, sir.

7        Q.    And this is some of what Mr. Delinsky was

8        referencing earlier as well.

9                    Oh, Trumbull.  Thank you, I can't spell.

10:22:13 10                   First of all, you've got all of the opioid

11       prescriptions they may have filled, so there's that

12       universe, right?

13       A.    Yes, sir.

14       Q.    And I think the jury will meet probably next week

10:22:38 15      the numbers guy, Dr. McCann, who runs all the numbers and

16       computer programs and figures out all of the databases.

17                   You're familiar with him because you've

18       used and worked with him on some of your data, right?

19       A.    Yes, sir.

10:22:52 20      Q.    All right.  So he, Dr. McCann, took your red flags

21       and applied them to all of the opioid prescriptions, and

22       applying your red flags, he came up with, applied Carmen

23       Catizone red flags, and he comes up with a smaller set of

24       prescriptions because not all of them had red flags.

10:23:28 25                   Right?

Catizone - Direct/Lanier                    1146

1    A.    Yes, sir.

2    Q.    And I think the jury will hear from Dr. McCann that

3    that's roughly 884,000 prescriptions that had the red

4    flags.

10:23:40  5              Within the realm of that, the Court applied

6    a random process to make sure nobody cherry picks, no

7    cherry-picking, right?

8              And the Court produces ultimately 2,000

9    prescriptions for each of these companies, right?

10:24:04 10   A.    Yes, sir.

11   Q.    Or roughly 2,000.

12              And that was based on the idea that there

13   would be 200 prescriptions per year for a 10-year time

14   span of each of these companies, right?

10:24:28 15   A.    That's my understanding, sir.

16   Q.    So out of this process, this funnel, comes

17   200 -- by the way, where does Rx come in from?

18   A.    It's from Latin, it means recipe.

19   Q.    It means recipe?

10:24:50 20   A.    Yes.

21   Q.    All right.

22              MR. DELINSKY:  Judge, excuse me, there's a

23   lot of leading going on.

24              THE COURT:  All right.

10:25:00 25              Mr. Lanier, if you can do a little less

Catizone - Direct/Lanier                    1147

```
          1    leading.

          2                    MR. LANIER:  Yes, sir.

          3                    I apologize.  I'm trying to get the status

          4    of this.

10:25:12  5    BY MR. LANIER:

          6    Q.    All right.  So 200 prescriptions for years of 2010

          7    all the way up through 2020.

          8                    Is that your understanding of what you did?

          9    A.    Yes, sir.

10:25:24 10    Q.    And I think for some it may have been lesser

         11    numbers, but basically that gave you how many that you

         12    eyeballed?

         13    A.    Roughly 8,000 prescriptions, give or take a couple

         14    hundred.

10:25:39 15    Q.    All right.  So those 8,000 prescriptions, were all

         16    of them electronic?

         17    A.    All the files I received were electronic, either

         18    JPEG or pictures of the prescriptions or contained within

         19    a spreadsheet.

10:25:54 20                    I did not receive any hard copy paper

         21    prescriptions, sir.

         22    Q.    But the JPEG, the pictures you got through e-mail

         23    or electronic, were there pictures of actual handwritten

         24    prescriptions in some cases?

10:26:10 25    A.    Yes, sir.
```

1            The front and back and any information on

2    the prescriptions.

3    Q.    All right.  Please tell the jury the process you

4    used to go through those 8,000.

10:26:20  5    A.    What I would do for each defendant is I would look

6    at every single one of the electronic copies of those

7    prescriptions.

8            So I reviewed about 2,000 individual

9    prescriptions for each defendant.

10:26:35  10            Then what I would do is look at the

11    spreadsheet that was prepared by Dr. McCann and go across

12    all of the columns and identify the columns that I needed

13    to look at that would contain any notes about that

14    prescription that would explain where the red flags were,

10:26:57  15    how the red flags were resolved, and whether or not that

16    was documented within that record.

17    Q.    So as I'm writing this down, I'm reducing your

18    records and I want to make sure I've got it right.

19            Did you verify that each of those

10:27:12  20    prescriptions had red flags, one or more?

21    A.    Yes, I did, sir.

22    Q.    And after you verified that each prescription had

23    one or more red flags, is that when you began your

24    process of determining whether or not they were

10:27:27  25    documented as resolved?

1    A.    Well, actually, sir, I went to every single

2    prescription on the spreadsheet.  And after I verified

3    they had red flags, I physically went through every

4    single line on the spreadsheet and looked at all the

10:27:43  5    information on each of those lines.

6    Q.    And what were you looking for?

7    A.    I was looking for documentation of the red flag and

8    resolution of the red flag.

9    Q.    All right.  Now, if a company has a well-trained

10:28:17 10    pharmacist who has adequate time based upon your

11    experience, does that pharmacist know that it's important

12    to document the resolution of the red flags?

13    A.    Yes.  They should know, sir, yes.

14    Q.    And should companies ensure that that policy's

10:28:35 15    followed?

16    A.    Yes, sir.

17    Q.    Why?

18    A.    If there's no accountability for that pharmacist to

19    comply with the policies that the companies have set, and

10:28:47 20    if those policies reflect what the legal requirements are

21    and what the standards of practice are or what are

22    problems that that company has identified that need to be

23    addressed, and you have a pharmacist that's not paying

24    attention or not complying, then there's no point of

10:29:03 25    having that policy, there's no accountability for that

1    policy.

2    Q.    So companies should ensure documentation on this?

3    A.    Yes, sir.

4    Q.    All right.  Now, then let's start looking at the

10:29:22   5    prescriptions.  And have you provided us some samples as

6    well as your overall assessment of these prescriptions

7    for each defendant in Lake and Trumbull Counties?

8    A.    Yes, sir.

9              In my report I provided a few prescriptions

10:29:39  10    for each of the defendants.

11    Q.    All right.  Let's start, now, with CVS.

12              First of all, you've got this statement

13    that I've put at the top that says "CVS's relevant due

14    diligence comments fields."

10:30:07  15              Can you explain what you mean by CVS's

16    relevant due diligence comment fields?

17    A.    So the spreadsheets that were provided to me had

18    multiple columns across an Excel spreadsheet.

19              As you see -- Mr. Lanier, can you lower the

10:30:25  20    paper somewhat, please, sir?  There were a number of

21    columns that had these types of abbreviations.  And so as

22    a pharmacist, I tried to figure out which one of those

23    would contain notes that pertained to that prescription,

24    that red flag, and how a red flag was resolved.

10:30:45  25              Part of the problem was I wasn't provided

Catizone - Direct/Lanier                    1151

```
          1    information as to what those various things meant, so I

          2    used my judgment as a pharmacist.

          3              If there were columns that I recognized

          4    that didn't have any relevant information to what I was

10:31:00  5    looking for, then that's not a comment that I -- a field

          6    that I actually looked at.

          7    Q.   All right.  So you looked at each -- by the way,

          8    did you understand the spreadsheet contained the

          9    information that would have been present in the various

10:31:16 10    fields of the computer program?

         11    A.   Yes, sir.

         12    Q.   And in that regard, you've got this general

         13    information about CVS in your review of the Lake and

         14    Trumbull County pharmacies for CVS?

10:31:33 15    A.   Yes, sir.

         16    Q.   You said, "950 of the prescriptions contained no

         17    information across all of these fields."

         18              Can you explain what you mean?

         19    A.   So if you remember the top of the slide, you can

10:31:52 20    see there were multiple columns there where there was an

         21    opportunity for the pharmacist to document the red flag

         22    that I verified was present with that prescription or the

         23    multiple red flags that were present with that

         24    prescription, with every prescription that I reviewed.

10:32:10 25              If we make the assumption that each
```

1   defendant provided 2,000 prescriptions, and 950 or a

2   thousand of those prescriptions had no information, no

3   relevant information across every single one of those

4   columns for that prescription, that was a real red flag

10:32:31  5   for me asking where was the documentation and what was

6   the pharmacist doing or not doing when they dispensed

7   these prescriptions.

8   Q.    So that 950 that contains no information at all,

9   that's out of the 2,000 that you looked at?

10:32:48  10   A.    Yes, sir.

11          Roughly.

12          Each defendant had different numbers.

13   Q.    We'll say plus or minus.

14          All right.  Then you continue to say, "Of

10:33:02  15   the 950 prescriptions with nothing in the relevant notes

16   fields, 686 also had nothing documented on the hard copy

17   prescription."

18          Explain what you mean.

19   A.    So again as I mentioned, I looked at every one of

10:33:22  20   the individual prescriptions, and if it had a notation on

21   there that I thought relevant to red flags or resolution,

22   I noted that prescription and I verified that with the

23   spreadsheet.

24          This says that of the 2,000 prescriptions I

10:33:38  25   looked at, 686 had nothing, no markings, on that

```
 1      prescription that had any relation at all to the red

 2      flags or a resolution of them.

 3      Q.    All right.  So if we do a funnel just for CVS, and

 4      you're talking about 2,000 random red flag prescriptions,

 5      out of those 2,000, you said 950 have no information?

 6      A.    In any of the fields, sir.

 7      Q.    And does that mean that the rest had some

 8      information?

 9      A.    Yes, sir.

10      Q.    Of the ones that had some information --

11              MR. DELINSKY:  Objection.  Objection, Your

12      Honor.

13              I think that last demonstrative was

14      incorrect because there are notations on many of the

15      prescriptions as well.

16              MR. LANIER:  Which demonstrative, the

17      funnel or this?

18              MR. DELINSKY:  The funnel.  The funnel.

19      BY MR. LANIER:

20      Q.    Okay.  Sir, let me see and make sure I've got this

21      correct on the record and for His Honor.

22              This is a CVS funnel.  You looked at 2,000

23      opiate prescriptions for red flags?

24      A.    The 950 should say no notes.

25      Q.    Oh, no notes.  Thank you very much.
```

1        No information in notes.

2    A.    Correct.  Across the note fields, sir.

3    Q.    Across the note fields.

4              So it doesn't give you -- does it give you

10:35:06  5    any information about the red flags and how they were

6    dealt with?

7    A.    Not within the fields on the spreadsheet, sir.

8    Q.    All right.  Now, are these prescriptions that were

9    filled, or are these prescriptions that were not filled?

10:35:23 10   A.    My understanding, and in looking at the data, every

11   one of those prescriptions was dispensed.

12   Q.    And then of the ones that had notes, did you read

13   the notes?

14   A.    Yes, I did, sir.

10:35:35 15   Q.    And in reading those notes, did you find that the

16   notes were acceptable?

17   A.    In the overwhelming majority of cases, the answer

18   is no.

19              MR. DELINSKY:  Objection.

10:35:50 20              I think the numbers are still off because

21   they don't account for Mr. Catizone's analysis of the

22   hard copy prescriptions.

23              THE COURT:  Well --

24              MR. DELINSKY:  That he identified the

10:36:02 25   prior --

1        THE COURT:  He hasn't written anything

2    about those.

3        MR. DELINSKY:  Yes, they are in the prior

4    demonstrative.

10:36:07  5        THE COURT:  I thought the objection was to

6    this one, so overruled on this one.

7        MR. LANIER:  Thank you.

8    BY MR. LANIER:

9    Q.   Sir, all we're trying to do is focus and make sure

10:36:14 10  we understand what you're saying.

11        Are you saying that all of the 1,050 that

12   did have notes were inadequate, or give us a feel for

13   what was and was not, what was your experience reading

14   through it based on your opinion?

10:36:28 15  A.   My experience was that the overwhelming majority of

16   those 1,050 notes approximately did not appropriately

17   document the existence of red flags and the resolution of

18   that red flag as required by standards of care and

19   requirements.

10:36:45 20  Q.   And did you bring us some examples of ones that did

21   not appropriately document the existence and resolution

22   of red flags?

23   A.   Those are contained in a few examples -- are

24   contained in my report, sir.

10:37:05 25  Q.   All right.  I've tried to run those out and

Catizone - Direct/Lanier                    1156

         1   provided them ahead of time to counsel.

         2                    Let's look at them together.

         3                    Here is example or example of an instance

         4   where a red flag -- or red flags, and alarming

10:37:30 5   situations, were identified but not resolved before

         6   filling.

         7                    MR. DELINSKY:  Objection, Your Honor.

         8                    THE COURT:  Well, overruled.

         9   BY MR. LANIER:

10:37:39 10  Q.   Would you please explain what you meant by CC

        11   number -- work through this.

        12                    Explain to us why you brought us this

        13   example.

        14   A.   Based upon my experience as a pharmacist, I try to

10:37:50 15  interpret what this note said.

        16                    And yesterday we talked about the

        17   importance of that note being clear, so that anybody that

        18   came after that pharmacist would understand that note.

        19                    I struggled to understand it, so I will

10:38:04 20  read it to the best of my understanding.

        21                    If I see CC number on file I think that

        22   means credit card number on file.

        23   Q.   All right.

        24   A.   It says "Use to pay."  Again, no relevance to the

10:38:22 25  red flag.

1           "Patient told me doesn't live in Florida,

2      they just travel there to see this for pain med.  Told

3      need to see local pain management for all pain

4      medications next time."

10:38:35  5           So if we look at red flags, you have a

6      patient that travels from Ohio to Florida to be treated

7      for pain where there's documentation that most of the

8      pill-mills existed and were distributing pain

9      medications, why would a person in Ohio not travel to a

10:38:55 10      pain management specialist in Ohio, like Cleveland Clinic

11      or some other?

12           Why are they traveling to Florida?

13           The pharmacist looks like they advised the

14      patient that they have to see a local pain management

10:39:08 15      specialist and said to the patient this will be the last

16      time filling Oxycodone 15 and 30.  So one of the red

17      flags we talked about yesterday again is two short-acting

18      opioids.

19           So now you've got a patient that has pretty

10:39:26 20      much told the pharmacist I probably didn't get this for a

21      legitimate purpose, I probably have some sort of

22      addiction or abuse problem, and what the pharmacist does

23      is dispense the prescription and says this is the last

24      time we can do this until you get a local pain management

10:39:42 25      doctor.

             1            This should have been treated a lot

             2    differently and the documentation and due diligence

             3    should have been recorded and probably this prescription

             4    should not have been filled.

10:39:52     5    Q.    You brought us another example for CVS that I'll

             6    show you right now where the note field begins, "This guy

             7    says."

             8            Would you read and explain this note to us,

             9    please.

10:40:09    10    A.    "This guy says is from Florida."

            11    Q.    By the way, for HIPAA purposes and other things,

            12    you don't have these people's names; they've been blocked

            13    out, fair?

            14    A.    Correct.  Yes.

10:40:22    15    Q.    Okay.

            16    A.    And that, "So and so is in the hospital in Ohio but

            17    so and so has filled narcotics in several different

            18    cities in Ohio and Indiana" and so the pharmacist put a

            19    note here that they would not fill out-of-state

10:40:37    20    prescriptions.

            21            Again, a patient is pretty much saying to

            22    the pharmacist, "I'm doing something with these

            23    medications that I shouldn't be doing.  I'm traveling to

            24    multiple cities to get opioids and get narcotics," so the

10:40:53    25    pharmacist note to me says, "I'm not going to fill

         1    anything from out of state, but if you travel to

         2    different cities in Ohio, I'll fill those prescriptions."

         3    Q.    And was this prescription, as you understand it,

         4    filled anyway even with this note?

10:41:09 5    A.    Yes, sir.

         6    Q.    Do you believe that this was a proper handling of

         7    the red flags?

         8    A.    No, sir.

         9    Q.    Any doubt in your mind?

10:41:17 10   A.    No, sir.

        11    Q.    Would you have filled that prescription?

        12    A.    No, sir.

        13    Q.    Next example from CVS's files.

        14              Look at this first bullet point, it starts

10:41:31 15   with "OARRS."

        16              We've not had a chance to explain to the

        17    jury fully what OARRS is.  Can you explain it briefly?

        18    We'll have another witness give it in more detail.

        19    A.    So every state has a program where any controlled

10:41:47 20   substance that's prescribed by a doctor, that

        21    prescription when it's filled at the pharmacy is entered

        22    into a database.  And every time as a patient you go and

        23    get a prescription filled, the doctor and pharmacy has

        24    access to that database to know what controlled

10:42:05 25   substances you were prescribed and dispensed, when,

1  where, and how much of that you were to receive.

2              So OARRS is Ohio's Prescription Drug

3  Monitoring Program.

4  Q.    All right.  So if I've got this right, OARRS is a

5  database of filled controlled substances in Ohio?

6  A.    Yes, sir.

7              And one point that goes to a red flag we

8  talked about yesterday, most insurance companies do not

9  have access to your prescription information when you pay

10  cash.

11              That's why people pay cash for

12  prescriptions, they don't want their insurance company to

13  know about.

14              OARRS captures every single prescription,

15  cash or no cash, and that's why when we see a red flag of

16  a patient paying for cash, that's why it's a red alert

17  and that's why pharmacists are advised to check OARRS and

18  other databases to see what's happening with that

19  patient.

20  Q.    All right.  And I'll use this again later, so but

21  go to your note now or go to this prescription now that

22  you have reviewed for the jury.

23              And work it through with us.

24  A.    The OARRS, and what they say OARRS ran, OARRS

25  provides to the pharmacist a listing of all the drugs

1       they receive, the pharmacies and the doctors.  It's an

2       electronic file that they can access.

3                    And Ohio does participate in a national

4       database, so they'll get information from all the other

10:43:35 5       states where that patient has filled a controlled

6       substance.

7                    It lists the Rx number.  I don't know what

8       AMCE means.  And then it says last time it was

9       refilled -- filled, it was filled for the same drug at

10:43:51 10       Walgreen's for the same day supply and quantity.  "Watch

11       for pharmacy shopping."

12                    Getting a prescription for the same supply,

13       the same drug on the same day, that's pharmacy shopping

14       as we talked about it yesterday.

10:44:06 15                    It says "Always check OARRS.  Do not fill

16       any controls."

17                    But they dispensed this prescription as

18       well.

19       Q.    All right.  I want to -- two things to clean up

10:44:23 20       but, first, let me ask you:  Would you have filled this

21       prescription?

22       A.    No.

23       Q.    Why not?

24       A.    Obvious red flags.

10:44:33 25                    The patient's pharmacy shopping.  There's

Catizone - Direct/Lanier                    1162

1    an issue with this medication.  There's nothing to say

2    how they resolved that prescription.  Did they call the

3    doctors and say this patient is seeing multiple -- is

4    getting the prescription at multiple pharmacies?  Did

10:44:46  5    they call the other pharmacy?

6                    There's nothing to document how they

7    investigated this red flag and nothing to put a note in

8    there for other pharmacists to say "Did not dispense,

9    should not dispense," or there's a problem with this

10:45:00  10    patient diverting or abusing this medication.

11    Q.    All right.  Two pieces to clean up before we go to

12    the next slide.

13                    You talked about how OARRS is a database

14    that's got national information and all.

10:45:11  15                    Has that changed over time and has OARRS

16    changed over time?

17    A.    All of the PDM programs have improved over times

18    and the number of states participating in the national

19    program have increased over time as well.

10:45:30  20    Q.    All right.  So what OARRS would or would not show

21    depends on the year in which you were looking.

22                    Fair?

23    A.    Yes, sir.

24    Q.    All right.  Second piece of cleanup.

10:45:39  25                    "Last prescription filled for same drug at

Catizone - Direct/Lanier                    1163

1      Walgreen's for same-day supply and quantity."

2                   Does that mean it was filled on the same

3      day, or for the same day supply?

4      A.    The same day supply, sir.

10:45:55 5                   So if the prescription was for 120 tablets,

6      which would be a 30-day supply, there was 120 tablets at

7      Walgreen's as well.

8      Q.    Next example from CVS.

9                   The one that starts, "Doctor shopping."

10:46:15 10                   Can you read it and explain it to us,

11     please?

12     A.    It says, "Doctor shopping BWC versus insurance."

13                   I would interpret that to say something

14     about using cash instead of insurance, again one of the

10:46:28 15     red flags we talked about yesterday.

16                   Medicare Part D plan, so we have a patient

17     that's old like me, 65, who's on Medicare.  They have a

18     drug benefit Part D that pays for pretty much most of the

19     medications unless you fall within the one that has been

10:46:50 20     resolved.

21                   This person is paying cash.  Again a red

22     flag and something we've talked about.

23                   Then it gives a comparison code and then it

24     says, "Watch for fake CII," which means the pharmacist

10:47:05 25     suspects that a prescription written for a Schedule II

```
 1    controlled substance, which is the most addictive and

 2    abusive under heroin, that that may be a fake

 3    prescription.  And again, this prescription was

 4    dispensed.

 5    Q.    Most of the opioids we're talking about in this

 6    case, OxyContin, Oxycodone, are they Schedule IIs?

 7    A.    Yes, sir.

 8                  MR. DELINSKY:  Objection, Your Honor.

 9                  (Proceedings at side-bar:)

10                  THE COURT:  What's the objection?

11                  What's the objection?

12                  MR. DELINSKY:  Just a simple objection,

13    Your Honor.

14                  Hydrocodone was a Schedule III controlled

15    substance through most of 2014.

16                  THE COURT:  If he got it wrong, you can

17    cross-examine him on it.

18                  If he made a mistake, you can jump on it.

19    So overruled.

20                  (End of side-bar conference.)

21    BY MR. LANIER:

22    Q.    Okay.  Before the objection, I had asked you are

23    most of the drugs we're talking about in this case,

24    Oxycodone, Percocet, those types of drugs, are they

25    Schedule II?
```

Catizone - Direct/Lanier                    1165

1    A.    Yes, sir.

2                The Schedule II drugs are listed and

3    mentioned in my report as well, sir.

4    Q.    Now, what about Hydrocodone?

10:48:42 5    A.    No, sir.

6    Q.    When did it become a Schedule -- when was it

7    shifted from Schedule III to Schedule II, if you know?

8    A.    Probably about three years ago, sir.

9    Q.    Time passes when you get older.

10:48:59 10    A.    Quickly.

11    Q.    2014, does that refresh your memory?

12    A.    Yes, sir.

13    Q.    All right.  That was just a few years ago.

14                Next example.

10:49:14 15                Would you please read us what you found on

16    that, in those fields?

17    A.    Yes.  It says, "Watch, patient states that they did

18    not authorize anyone to pick up their Soma on 6/25.

19    Spoke to Dr. Cayavec, no early refills.  Has happened

10:49:32 20    previously.  OARRS ran, numerous CIIs, all different

21    doctors and pharmacies."

22    Q.    Okay.  So are you able to, with some reasonable

23    likelihood, tell us what this scenario is, based upon

24    this note?

10:49:57 25    A.    Yes.

1    Q.    So tell us what this pharmacist was faced with

2    before this pharmacist chose to dispense this

3    prescription.

4    A.    As a pharmacist, I'm seeing several red flags.

10:50:08  5              Soma, and I know the person is taking CIIs.

6              We spoke yesterday about the trinity and

7    how some are muscle relaxers.  As a pharmacist, I'm

8    suspecting this person is getting the holy trinity and

9    shouldn't be prescribed that.

10:50:26 10              I see it says numerous Schedule IIs, all

11   different doctors and pharmacies, so this prescription,

12   at a minimum, probably has three to four red flags out of

13   the 16 that I've identified as red flags.

14              MR. DELINSKY:  Your Honor, these are two

10:50:42 15   different notes for two different prescriptions.

16              I think something's being conflated.

17              MR. LANIER:  They may very well be.

18              They're bullet points, Your Honor, and I

19   pulled these out.

10:50:53 20              Let's deal with them individually.

21              THE COURT:  Hold it.  That's misleading.

22              If this is -- I'll sustain the objection.

23              MR. LANIER:  Yeah.  And I'll change the way

24   that I'm asking it, too, because I did not understand

10:51:07 25   that, Judge.

1           THE COURT:  Remove this altogether.

2                It's confusing.

3    BY MR. LANIER:

4    Q.    Well, my question would be let's just do the top

10:51:15 5    one, the top bullet point, and I'll ask you about that

6    prescription.

7                "Patient did not authorize anyone to pick

8    up Soma.  Spoke to Dr. Cayavec, no early refills, has

9    happened previously."

10:51:34 10                That in itself, is that a red flag for

11   opiate prescriptions that you have given these things on?

12   A.    Though it doesn't mention they are opioids, the red

13   flags here are that they are receiving a prescription for

14   a muscle relaxer and there must have been an issue before

10:51:52 15   where someone else, who was not authorized to pick up

16   their prescriptions, picked up that patient's

17   prescription and picked up one of the prescriptions that

18   are usually part of that combination of drugs that

19   creates that heroin effect.

10:52:05 20                Then in talking to the doctor, the doctor

21   said, "No more early refills," which means this patient

22   is coming in early more than once to get their

23   prescriptions filled, and again, as we saw yesterday, if

24   there was a problem with pain management, the medication

10:52:21 25   wasn't working, that should be addressed.

1           If it was a question of abuse or diversion

2   or something else, that also should have been addressed

3   and documented further within this note.

4   Q.    And another --

10:52:32 5           MR. DELINSKY:  Your Honor, could we please

6   go to a side-bar for a sec?

7               (Proceedings at side-bar:)

8               THE COURT:  Okay.

9               MR. DELINSKY:  Your Honor, yesterday,

10:52:46 10  consistent with your *Daubert* ruling, you said that

11  Mr. Catizone could not state categorically that any

12  potential red flags were not resolved.

13           You said he could say he found no evidence

14  of them, but not that he can say categorically they

10:53:03 15  weren't resolved.

16           Yet the very title of the demonstrative

17  Mr. Lanier is using --

18               MR. LANIER:  Your Honor, Mr. Lanier here.

19           First of all, we gave these slides two days

10:53:16 20  ago to the defendants and they raised certain objections

21  but they never raised this objection.

22           I didn't see that.  I'm glad to make that

23  change.

24           I'll make that change and I'll clarify that

10:53:27 25  for the jury.

```
 1                    THE COURT:  Okay.

 2                    MR. LANIER:  We're not looking for anything

 3      other than accuracy.

 4                    THE COURT:  Okay.  We'll make that

10:53:32  5      correction.

 6                    MR. LANIER:  Thank you.

 7                    (End of side-bar conference.)

 8      BY MR. LANIER:

 9      Q.   Okay.  What I want to do, first, is make a

10:53:49 10      clarification on something because I want this to be as

11      precise as it can be, please.

12                    I have entitled this, "Examples of

13      Instances Where Red Flags and Alarming Situations Were

14      Identified But Not Resolved Before Filing," and actually

10:54:07 15      I think I said filling, not filing.

16                    And to be as accurate as we can, these are

17      ones where a documentation of resolution is not there,

18      right?

19                    In other words, you don't know if maybe it

10:54:23 20      was resolved; you just know it's not documented based on

21      this documentation.

22                    Is that right?

23      A.   Yes, sir.

24      Q.   Okay.  And the same is true for the other notes

10:54:33 25      that I've given you where we've talked about these.
```

1          These are examples of instances where

2     alarming situations, red flags, were identified but not

3     documented as resolved.

4               Fair?

10:54:46  5   A.    For all the prescriptions that I reviewed, sir,

6     yes.

7     Q.    All right.  And we're going to go back to a couple

8     of those because they had the bullet points, and if

9     they're separate prescriptions, we need to get that clear

10:54:58 10   as well.

11               So the second bullet point here is, "OARRS

12     ran, numerous CIIs, all different meds and pharmacies."

13               Does that adequately document resolution of

14     red flags?

10:55:12 15   A.    No, sir.

16     Q.    If we go back to the previous note, which I was

17     reading together, and separate it out as two bullet

18     points, the first one, "Doctor shopping," either

19     something with cash or maybe it's Workers' Comp., I don't

10:55:31 20   know, but "versus insurance, Medicare Part D plan

21     comparison code."

22               Is that -- does that show a documentation

23     of resolution that you, as a following pharmacist, would

24     understand?

10:55:47 25   A.    No, sir.

        1                And the bigger point to be made here is for

        2       adequate documentation, you would expect the prescription

        3       number or some other identifier so that we don't have the

        4       situation that just developed here where we don't know if

10:56:02 5       it was for the same prescription or different

        6       prescriptions on the same occasion or different

        7       occasions.

        8                That's what appropriate documentation does,

        9       identifies the prescription, identifies the day,

10:56:12 10       identifies the time.  All of that information should be

       11       clear so that anybody reading that note would be able to

       12       understand and make the determinations we're trying to

       13       make today.

       14       Q.    All right.  Let's move on then from CVS and let's

10:56:25 15       look at Walmart.

       16                On the hard copies that you were given by

       17       picture as opposed to computer screen, a computer Excel

       18       spreadsheet, do you follow what I mean?

       19       A.    Yes, sir.

10:56:57 20       Q.    Did you look at the front side and the back side?

       21       A.    If the back side was provided, I did, sir, yes.

       22       Q.    Okay.  So did you look at the hard copies for any

       23       other notes that were made on those prescriptions on

       24       either side?

10:57:12 25       A.    Yes, sir.

1    Q.    Okay.  And -- thank you.

2                    All right.  Now, if we move, then, to

3    Walmart -- and I think that helps our numbers if we

4    do -- this is what I pulled from your report.

10:57:30   5                    "Only two out of the 1800 prescriptions

6    contained no information across all relevant comment

7    fields."  Then you give those fields.

8                    "Though the majority of the information

9    contained in these comment fields would not qualify as

10:57:50  10   adequate or even relevant due diligence."

11                    Explain what you meant, and then we'll look

12   at a couple of examples.

13   A.    So again, I looked across all of the note fields,

14   as I did for all of the defendants, to see if there was

10:58:04  15   anything in those note fields where I thought a

16   pharmacist would be able to make a note or where a DUR

17   alert would show.

18                    And for this particular pharmacy, of all

19   the prescriptions I looked at, there were only two that

10:58:21  20   were completely blank across all fields.  But even within

21   the note fields that were completed, again, most of those

22   comments were not relevant to due diligence or to the red

23   flags.

24   Q.    Okay.  I was supposed to ask you, did the hard copy

10:58:39  25   notes reflect adequate due diligence for resolution?

1    A.    No, sir.

2    Q.    Okay.  Thank you.

3              All right.  So with Walmart, you explained

4    that, and then you give further details about the Walmart

10:58:56 5    prescriptions.

6              And I pulled this out of your report as

7    well.  Explain how out of the 1800 prescriptions, 1,639

8    prescriptions contain no information in the MISC info

9    field.

10:59:14 10              What did you mean by that?

11   A.    So once I identified what the note fields were, I

12   then looked at each one of those note fields to see

13   whether or not there was anything relevant in those

14   notes, and then ran an analysis like it shows.

10:59:29 15              So for the miscellaneous note field, of the

16   1800 prescriptions that were provided, 1639 had no

17   information in that miscellaneous field.  That would mean

18   about 200 or so prescriptions, fields, had some

19   information but the other 16, 1700 had no information

10:59:51 20   whatsoever.

21   Q.    And what was the number that had no information in

22   the prescription order detail comment fields?

23   A.    Approximately 1400.

24   Q.    And that's the prescription order detail comment

11:00:05 25   field.

         1          How many contained no information in the

         2    prescription comment field?

         3    A.    19.

         4    Q.    And how many, no information in the patient comment

11:00:15 5    field?

         6    A.    Three hundred.

         7    Q.    All right.  Now, we have some examples.

         8          Your Honor, I'll be a lot more careful with

         9    this one.  I think this one doesn't have bullet points

11:00:26 10   because each one is on a separate sheet, except for the

        11    first one.  And the first one actually took two sheets to

        12    make.

        13          So, sir, your first comment is on Slide 50

        14    and 51, and I put, because I couldn't fit it all onto one

11:00:46 15   slide, I put three dots.

        16          THE COURT:  The heading is still

        17    problematic.

        18          MR. LANIER:  Oh, yes, I need to -- "But not

        19    documented."

11:00:56 20         Thank you, Judge.  Before filling.

        21    BY MR. LANIER:

        22    Q.    So from this, you see the three dots at the end,

        23    that's because this prescription or this note continues

        24    onto the next page.

11:01:12 25         So let's read this as one, if we can, but

Catizone - Direct/Lanier                    1175

1      I'd like you to explain it as we go along, please.

2      A.    Sure.  So a note that would be very useful when

3      they are saying Valium dosing change was three times a

4      day, it's now twice a day, so the doctor cut that.

5      That's important for the pharmacist to know.

6                 No early refills.  Something going on with

7      the medication is perhaps why the doctor cut him from

8      three times a day to two times a day.

9                 No excuses.  And then the next part is very

10     confusing, "Stolen meds 3/13/16."  The patient must have

11     shown a police report, so either documenting that that

12     was stolen or not, and then the pharmacist ran an OARRS

13     report on February 1st, 2017, and it said, "Do not fill,"

14     I'm not sure what KFK is, if that's the doctor or who

15     that is, "do not fill until 1/19/16."

16                 So I'm a bit confused here.  They had

17     stolen meds on March 13th.  The OARRS report was run on

18     the 17th -- 2017, but it says, "Do not fill until

19     1/9/2016."  And then it says, "KB Insurance, date of

20     birth was changed" from whatever the date of birth was.

21     Now it says the patient name was changed, older name and

22     now a new one.

23                 So red flags.  If you see a patient come

24     into your pharmacy and they have a police report, that's

25     pretty concerning and would require more explanation and

```
 1      I would show the police report, who stole the meds, what
 2      happened.
 3                      A lot of questions with this, with this
 4      note.
 5      Q.    Is it unusual to have a patient change their name?
 6                      I guess maybe marriage or something.
 7      A.    It's not unusual.
 8      Q.    And then the same note continues.
 9                      THE COURT:  And we need to change the
10      heading again.
11      BY MR. LANIER:
12      Q.    All right.  Let's -- I want to go to the next one
13      that we've got.
14                      The next one that we got again, this is one
15      that's not documented as resolved.
16                      Can you tell us why you singled this one
17      out?  Walk through it with us, please.
18      A.    So it says, "5/16 MJM OARRS," which means I think
19      they ran an OARRS report.
20                      "December 29th, 2014, RMK recheck, would
21      not fill.  Watch March 15th, LAM, recheck Percocet 5, May
22      16th, MJM insurance, date of birth changed."
23                      So it looks as if this is the pharmacist,
24      the pharmacist, one of the pharmacists decided not to
25      fill the prescription so they must have had a really good
```

| | |
|---|---|
| 1 | reason not to fill that prescription and document that, |
| 2 | but there's no documentation as to why that prescription |
| 3 | was refused to be filled. |
| 4 | And now the pharmacist is trying to figure |
| 11:04:26 5 | out what that reason was, what was going on and goes |
| 6 | ahead and dispenses the prescription anyway. |
| 7 | Q.   All right.  And this -- thank you. |
| 8 | And now, I've got the sheet on the one that |
| 9 | had the three dots. |
| 11:04:41 10 | So you walked through this name change, |
| 11 | showed police report, let's finish the note that was |
| 12 | given, three dots. |
| 13 | It continues to say, "Percocet 10 and Soma |
| 14 | 350 last filled." |
| 11:05:02 15 | Do you see that? |
| 16 | A.   Yes, sir. |
| 17 | Q.   Walk through the rest of that for me, please. |
| 18 | MS. FUMERTON:  Your Honor, objection.  The |
| 19 | slide is still misleading. |
| 11:05:11 20 | THE COURT:  You have to change the heading. |
| 21 | MR. LANIER:  Yes.  Thank you. |
| 22 | A.   So again, there's that reference to the February |
| 23 | 1st, 2017.  "No more early refills.  Calling |
| 24 | Dr. Jurenovich this week to let him know about all early |
| 11:05:34 25 | refills and excuses.  Vacation, theft, et cetera. |

Catizone - Direct/Lanier                                    1178

1    Percocet 10 on May 18th, red Percocet 10 on May 17th, MJM

2    counseling patient on Percocet 10/325.  On 9/12/2016, DJ

3    Percocet and Soma both filled early.  April 3rd due to

4    theft/police report/override from insurance."

11:06:03  5              So with any red flag itself there's a story

6    here about this patient lying about making excuses -- I

7    won't say lying.  Excuse me.

8                   Vacation, left, to get early refills.

9                   A prescription note here saying no more

11:06:19 10    early refills, but yet this prescription was dispensed

11    and you have the combination again of the Percocet and

12    the Soma.  That's a combination that again is another red

13    flag.

14                   I can't interpret why that prescription,

11:06:35 15    what was dispensed, and if any of those red flags were

16    actually resolved.

17    Q.    All right.  And I'm taking the titles out.  I think

18    it will be cleaner for the record and everybody else.  So

19    I'm just going to the next Walmart pharmacy note and then

11:06:48 20    we're going to shift to Walgreen's.

21                   The next note.  "Watch big time!!

22    Insurance, date of birth changed from something to

23    something else.  Patient merge correct patient redacted

24    incorrect patient."

11:07:08 25                   Why are these red flags or, better yet, why

1    does this not seem adequate documentation of red flag

2    resolution?

3    A.    So as an explanation to the jury, when I mentioned

4    earlier that I looked at all the note fields, and much of

11:07:26  5    the information in the note fields were not relevant to

6    the red flags, this is an example of information that was

7    in the note fields.

8              It had to do with change of names or date

9    of birth or insurance; nothing to resolve the red flag.

11:07:43 10             I don't know what the top means when it

11   says watch big time.  That's usually an indication that

12   there's something going on here with that prescription,

13   that patient.

14             Unless the patient is somebody famous, I

11:07:58 15   don't know why you would put, "Watch big time," unless

16   you suspect something's happening.

17   Q.    All right.  Now, let's shift at this point in time,

18   please, from Walmart to Walgreen's.

19             And do you want me to say the thing about

11:08:13 20   handwritten notes again?

21             So my astute elder co-counsel notes that

22   you had said earlier of the 1800-sample prescriptions for

23   Walmart, a number of them contained information in

24   certain fields that may or may not have been helpful.

11:08:59 25             Is this an example of that?

1    A.    Yes, sir.

2    Q.    All right.  And did you see, for all of the

3    companies, any handwritten notes that you -- handwritten

4    prescriptions where you saw the pictures, did you look at

11:09:17  5    the front and the back when provided?

6    A.    I looked at the front and the back and did not see

7    adequate documentation of the red flags or resolution of

8    red flags on any of the hard copies, front or back, sir.

9    Q.    Thank you, sir.

11:09:28 10              Now, let's do Walgreen's and Giant Eagle

11    and then I'll ask a few wrap-up questions and I'll be

12    done.

13              Walgreen's.  This seems to be your general

14    assessment of Walgreen's.

11:09:42 15              "Of the 2,000 prescriptions totals," why

16    don't you read it instead of me and explain it as you go

17    along.

18    A.    Sure.

19              It says "160 prescriptions contain some

11:09:54 20    writing in the DUR comment field regardless of the DUR

21    alert."

22              So even if that pharmacist received a DUR

23    alert saying this was a problem, only 160 of those

24    fields, of those prescriptions, actually had a comment to

11:10:09 25    respond to that DUR alert.

Catizone - Direct/Lanier                    1181

1     Q.    Is that a good thing or a bad thing?

2     A.    The DUR alert pops up just for the obvious reason,

3     it's an alert.  There's a problem with this prescription,

4     there's a problem with this medication that should be

11:10:22  5     resolved or should be addressed.

6                   "Some DUR alerts include a popup in the

7     Walgreen software" which means the pharmacist gets a

8     popup on their screen to emphasize that this is a DUR

9     alert, that this has to be resolved or the pharmacist has

11:10:40  10     to address this DUR.

11                   "This notifies the pharmacist they need to

12     take an extra look at the prescription."

13                   For the 160 prescriptions that did have a

14     DUR comment, the comments were often just pharmacist

11:10:51  15     initials, notes about reviewing patient history, general

16     patient consult, and speaking to doctor.

17                   So now I've got an alert that's significant

18     enough that the pharmacist determined it should pop up on

19     my screen.  So I have to take another look and all I do

11:11:11  20     in my documentation is put in my initials CC.

21                   The next time that pharmacist fills that

22     prescription, that alert is going to come up again and

23     I'm going to check the patient notes and I'm going to see

24     CC; not adequate documentation.

11:11:28  25     Q.    You continued to say, "These comments fail to

 1    identify any of the specific red flags and fail to

 2    disclose that the red flag was resolved."

 3                What did you mean by that?

 4    A.    So again, the example, Mr. Lanier, every one of the

11:11:47  5    prescriptions I looked at had at least one red flag.

 6                Some of them had multiple red flags and

 7    some of the red flags we just talked about, significant

 8    red flags.

 9                Nothing in these notes addressed the red

11:12:01 10    flags.  Didn't address the DUR alerts, didn't address the

11    red flag.

12    Q.    All right.  And you brought us some examples from

13    the Walgreen's ones.

14                Oh, wait.  First I should add, you said

11:12:16 15    Walgreen's relevant notes fields, 1,237 were blank across

16    all these comment fields, representing 61 percent of the

17    sample.

18                What did you mean by that and why is it

19    important?

11:12:31 20    A.    Again, as with the other defendants I looked at all

21    the note fields, and if the comments weren't relevant,

22    like some you just saw, date of birth change, patient

23    name change, those comments, even though they were in the

24    field weren't relevant and that's why the 61 percent came

11:12:46 25    about.

1       When I total up all those fields that had

2   any relevant comments at all, the 61 percent had nothing

3   whatsoever.

4   Q.   And then you say, "Of the 1,237 prescriptions that

11:12:59  5   were blank across all relevant comment fields, there were

6   940 prescriptions that also had nothing written on the

7   hard copy prescription, representing 47 percent of the

8   sample."

9       Explain that, please.

11:13:13 10   A.   Sure.

11       When I looked at the hard copies, there

12   were notations on the hard copy, and of some of the

13   prescriptions as it indicates here.

14       Some of those notations were patient

11:13:24 15   waiting for prescription or some of them were the time

16   that the patient dropped them off so that the pharmacist

17   could keep track of when that patient dropped it off and

18   when it was filled.

19       Others may have been pharmacist initials.

11:13:38 20   Others may have been check with M.D.  There wasn't any

21   relevant notes regarding red flags and the resolution of

22   red flags on any of those hard copies that I reviewed.

23   Q.   All right.  Now, within the framework of this,

24   you've given us a number of notes as examples.

11:13:59 25       I'd like to look at those with you and have

1    you explain them.

2                    The first one is one of these that is

3    rather lengthy, and so it goes on to two sheets as

4    evidenced by the dot, dot, dot that I added and the dot,

11:14:16  5    dot, dot that continues.

6                    It's long, it's drawn out, but would you

7    please take your time to read it to us and explain it to

8    us.

9    A.    So this note said, "Abuse/dependency potential.

11:14:32 10    Duplication.  The allowance.  Zero," which means it

11    shouldn't -- there shouldn't be an allowance, there

12    shouldn't be any dispensing.

13                    "Oxycodone/Acetaminophen, 7.5-325 milligram

14    tablet and Tramadol 50 milligram tablets" are members of

11:14:54 15    the short-acting narcotic analgesics class and may

16    represent duplicate therapy.  "No DUR info returned from

17    plans.  No DUR info returned from plan 004 prescriptions

18    last 90 days, 120 days of Oxycodone/Acetaminophen in

19    previous prescriptions for this generic entities may

11:15:20 20    exceed the recommended adult duration of one to 30 days."

21                    I'll stop here.  As we mentioned earlier,

22    about the DUR alerts that come from these private

23    companies that put this together and some of those alerts

24    address abuse of medications and the therapy of

11:15:35 25    medications, this looks like it's one of those alerts,

 1    not something that the pharmacist typed in, but one of

 2    those predetermined alerts based upon the medical

 3    literature that's saying these two medications should not

 4    be prescribed together, it's exceeding what the normal

11:15:53  5    course of therapy is and the allowance is zero.

 6                    The rest of the note, please, Mr. Lanier.

 7    Q.    Yes, sir.

 8    A.    And it's detailing that, "From the plan for the

 9    last 90 days, they had Oxycodone/Acetaminophen with

11:16:13 10    Warfarin sodium.  Delayed severity.  Moderate

 11    documentation probable."

 12                    That's just saying the impact of the

 13    Oxycodone on the Warfarin, that blood thinner, is

 14    moderate.  So, it's more than just a passing.

11:16:28 15                    "Hypoprothrombinemic effects of Warfarin

 16    sodium five milligram may be increased by

 17    Oxycodone/Acetaminophen in a dose dependent manner.

 18    Bleeding may occur, especially when the

 19    Oxycodone/Acetaminophen 7.5-325 milligram tablet use

11:16:49 20    exceeds 2,000 milligrams daily or prolonged for several

 21    days."

 22    Q.    All right.  So this long extended note, where at

 23    any point in time does it document resolving the red flag

 24    or red flags that were triggered under the red flag

11:17:08 25    analysis?

Catizone - Direct/Lanier                     1186

1    A.    For this prescription, there was no information to

2    do that, sir.

3    Q.    All right.  If you're running a pharmacy business

4    and these are the number of notes that you get that

11:17:22  5    aren't relevant and aren't documenting resolving red

6    flags, is that a problem?

7    A.    Yes, sir.

8    Q.    Why?

9    A.    So if I'm running a business and this is the

11:17:32 10    information that a corporate entity would have and not

11    the individual pharmacy, if I see my pharmacist

12    dispensing medications they shouldn't be dispensing, this

13    medication, because it's going to harm the patient, from

14    a business perspective, I'm probably going to get sued by

11:17:46 15    that patient when they get injured.

16              From a patient care safety comply with

17    regulations, if I see abuse in other things and my

18    pharmacists are dispensing those medications, there's a

19    problem with that pharmacist or with the tools they're

11:17:59 20    getting.  I need to take action.

21              If I don't take action, it's going to

22    continue to happen.

23    Q.    Did you look at the Walgreen's good faith

24    dispensing policies?

11:18:08 25    A.    Yes, sir.

1    Q.    What did you learn?

2    A.    That they have a good faith dispensing policy.

3    Q.    Is this adequate due diligence that we're seeing?

4    A.    Not on that note, sir, and not on the prescriptions

11:18:26  5    I reviewed.

6    Q.    And you reviewed a totally random selection of

7    2,000 Walgreen's opiate prescriptions that were filled

8    that had red flags, fair?

9    A.    Yes, sir.

11:18:35 10    Q.    All right.  Here's neither example from Walgreen's

11    and I'm cutting this shorter out of time.

12              But you said -- well, why don't you read

13    it?

14    A.    "508 days of Oxycodone Acetaminophen 5-325 and

11:18:50 15    previous prescriptions for this generic entities may

16    exceed the recommended adult duration of one to 30 days,

17    no DUR info returned from plan, prescription last 90

18    days."

19              Again, we talked DURs, you should be on

11:19:04 20    opioids for short-term.  The DUR is one to 30 units.  508

21    days, that's a year -- more than a year supply of

22    Oxycodone.  It's very difficult for a person not to

23    become addicted after they take this medication for over

24    a year.

11:19:16 25    Q.    Do you see any evidence here that gave you

Catizone - Direct/Lanier                    1188

1    assurance in this note that this red flag was resolved?

2    A.    No, sir.

3    Q.    Next, Giant Eagle.

4              MR. WEINBERGER:  Wait a minute.

11:19:42 5              MR. LANIER:  Oh.

6    BY MR. LANIER:

7    Q.    You said that you looked at the Walgreen's good

8    faith dispensing checklist.

9              Is that right?

11:20:26 10   A.    Yes, sir.

11   Q.    Let's make a note on this and make sure we've got

12   it right.

13              Did you actually review the Walgreen's

14   checklist?

11:20:35 15   A.    Yes, sir.

16   Q.    Did the target drug good faith dispensing checklist

17   also get reviewed?

18   A.    Yes, sir.

19   Q.    And when you reviewed that Target drug good faith

11:21:06 20   dispensing checklist, did those forms reflect adequate

21   due diligence for these prescriptions?

22   A.    No, sir.

23   Q.    Why not?

24   A.    When I've looked at the checklist and the

11:21:21 25   information there, my opinion of the majority of the

Catizone - Direct/Lanier                    1189

1      checklists were that they were just filled out in a

2      perfunctory manner, simply check the boxes, and that

3      there was information that should have been included or

4      provided that wasn't.

11:21:37  5                    And also under Walgreen's policy, the

6      prescriptions that actually required a good faith

7      dispensing document, many of the prescriptions that were

8      dispensed did not have that form completed.

9                    And then when I also looked at the OARRS

11:21:56 10     report for some of those prescriptions that included the

11      OARRS report with the good faith dispensing, I found

12      additional red flags that weren't even tagged by the

13      analysis conducted by Dr. McCann, and again, none of

14      those red flags were addressed or documented.

11:22:13 15                    Simply said on the good faith dispensing,

16      "Checked OARRS" and that was the documentation that

17      existed.

18      Q.   All right.

19                    The good faith dispensing checklist was a

11:22:25 20     set of boxes that had to be checked off for Target drugs

21      that were being dispensed?

22                    Is that right?

23      A.   Yes, sir.

24      Q.   And give the jury a sample of what those boxes were

11:22:36 25     in the checklist.

1    A.    The first box asked about the patient, whether or

2    not the patient was known to the pharmacist or whether or

3    not the pharmacist actually checked a Government ID for

4    the patient.

11:22:49  5              That would cite the information, that

6    helps, the information about the prescriber, whether or

7    not the doctor, they checked to make sure that the doctor

8    was licensed and then whether or not the patient ever

9    received the medication before and what the medication

11:23:05  10    was.  Those were some of the questions.

11    Q.    And when you say that these were mostly or by and

12    large just done perfunctorily, what do you mean by that?

13    A.    Again, the boxes were just checked.  I didn't see

14    any information to explain why they were just checked to

11:23:28  15    identify the red flag or resolve the red flag.

16    Q.    And then you gave us one example where it said

17    check OARRS or something or you went and checked OARRS?

18              Explain that.

19    A.    No, included with some of the good faith dispensing

11:23:41  20    documents was an actual copy of the OARRS report because

21    one of the boxes also said "Check OARRS" as one of the

22    things that the pharmacist would do.

23              I'm not remembering exactly what that form

24    said.  Just generally.

11:23:55  25              MR. SWANSON:  Your Honor, Your Honor, may

1    we be heard on this, please?

2                        (Proceedings at side-bar:)

3                        THE COURT:  All right.

4                        MR. SWANSON:  Your Honor, these opinions

11:24:08  5    about checking OARRS and comparing them to the good

6    faith, Target drug good faith checklist are not disclosed

7    anywhere in his report.

8                        He hasn't disclosed these opinions that

9    he's now giving.

11:24:21 10                        MR. WEINBERGER:  Your Honor, he's

11    reflecting one specific script that had a target good

12    faith, target drug good faith dispensing checklist and

13    had apparently a note about checking OARRS.

14                        This isn't across the board.  This is one

11:24:41 15    script that he's describing.

16                        MR. SWANSON:  And if he disclosed it,

17    Mr. Weinberger, could show us what it was and what his

18    opinion was but he hasn't done that so it's improper.

19                        MR. LANIER:  I'll move on, Judge.

11:24:56 20                        THE COURT:  Well, if this wasn't in the

21    report at all as to work that he did, I would agree.

22                        MR. WEINBERGER:  Well, Your Honor, he -- in

23    his report and in his deposition, he testified that

24    the -- from his review of these checklists, there

11:25:16 25    was -- these checklists did not represent

```
 1    inadequate -- or did not represent adequate due

 2    diligence.

 3                    THE COURT:  I'll let him -- he can say --

 4                    MR. WEINBERGER:  But --

 5                    THE COURT:  He can say I looked at the

 6    Walgreen's checklist and this is what the checklist was

 7    supposed to do and I looked at, you know -- I didn't see

 8    any evidence of this being done on these notes.

 9                    MR. SWANSON:  Your Honor, my concern is

10    that he's identifying additional red flags.

11                    THE COURT:  I know.  It sounded like he

12    was --

13                    MR. LANIER:  I'm going to move on, Your

14    Honor.  I'm going to move on.

15                    THE COURT:  He's going into something,

16    something -- some additional work that he did after his

17    report, and that's a concern.

18                    MR. SWANSON:  Correct.

19                    I apologize but I move to strike that

20    answer, Your Honor, please.

21                    MR. WEINBERGER:  Your Honor, I don't think

22    that answer has to be stricken.

23                    Every single detail of what he did with

24    respect to these scripts is not disclosed.

25                    They had --
```

1          THE COURT:  No.  No.

2                We're not striking all of that.

3                It was the last -- the last question that

4      asked him about some additional, additional work that he

11:26:27  5      did, so I'll --

6                      MR. WEINBERGER:  Your Honor, he --

7                      THE COURT:  All right.  I'm going to --

8                      MR. WEINBERGER:  Okay.

9                      THE COURT:  -- direct the jury to disregard

11:26:35 10      the last question and answer.

11                      MR. WEINBERGER:  Okay.

12                      MR. SWANSON:  Thank you, Your Honor.

13                      (End of side-bar conference.)

14                      THE COURT:  All right.  I'm going to direct

11:26:43 15      the jury to disregard the very last question to this

16      witness and the very last answer.

17      BY MR. LANIER:

18      Q.    All right.  Mr. Catizone, so you have had an

19      opportunity to look and did the way the Walgreen's good

11:27:06 20      faith, target drug good faith dispensing checklist was

21      executed many of the times, was it adequate?

22      A.    It did not meet the documentation requirements.

23      Q.    Okay.  In other words, this -- okay.  Got it.

24                      Now, let's move on to Giant Eagle, please.

11:27:38 25                      Giant Eagle, again, about 2,000 notes you

1      looked at?

2      A.    Yes, sir.

3      Q.    All right.  You told everybody in your report that

4      1,094 of those prescriptions had no notes documented

11:27:54  5      across any of the relevant note fields, representing 54

6      percent of the sample.

7                    Is that right?

8      A.    Yes, sir.

9      Q.    Is that acceptable?

11:28:05  10                    Is that an acceptable documentation of red

11      flags, to have no notes across any of the relevant

12      fields?

13      A.    Again, the conclusion I reached was that the

14      majority of prescriptions didn't have adequate

11:28:16  15      documentation, and this is just a further example or

16      further support for that.

17      Q.    782 of the prescriptions did not contain any

18      information in the notes fields and did not contain any

19      handwritten documentation on the hard copy script,

11:28:33  20      representing 39 percent of the total sample.

21                    Is that a good practice of a good policy to

22      ensure documenting red flags?

23      A.    No, sir.

24                    Considering every prescription had at least

11:28:49  25      one red flag, the absence of the documentation is not

1   adequate.

2   Q.    And then you give us some Giant Eagle examples as

3   well, and I'd like to look at those.

4            Let's start with this first one, 2/5/12,

11:29:07  5   patient getting Percocet prescriptions.

6            Can you read and explain that to us and why

7   it's inadequate documentation in your mind?

8   A.    Sure.

9            "From Dr. Ricotti and filling them at

11:29:19 10   Franklin Pharmacy, patient getting Vicodin ES

11   prescriptions and filling them here.  Does Dr. Goodwin

12   know this?  Does Dr. Ricotti know this?  Per OARRS,

13   checked February 5th, 2012, pharmacist doctors to be

14   contacted on February 6th.  Do not fill any controlled

11:29:43 15   substances until calls are made and both doctors approve

16   and we document this in patient notes."

17            Questions being asked and should be asked,

18   does one doctor know the other doctor is prescribing

19   these medications.

11:29:55 20   Q.    Okay.  Time out.  I do need to warn you the

21   ellipsis, I haven't given you the whole note yet.

22   A.    Okay.

23   Q.    Because your note you gave in your report wouldn't

24   fit on one slide, so I did my ellipsis there.

11:30:08 25            Do you see that?

Catizone - Direct/Lanier                    1196

1    A.    Yes, sir.

2    Q.    Okay.  Do you want to comment on it up until this

3    point and then we'll look at the rest, or you want to

4    look at the rest now?

11:30:15  5    A.    The only comment I'll make before the ellipsis is,

6    "Do not fill any controlled substances until calls are

7    made and both doctors approve."

8    Q.    Okay.

9          Now, Mr. Stoffelmayr for -- the Walgreen's

11:30:27 10    attorney in opening statement showed a picture of the

11    Franklin Pharmacy and talked about it being a notorious

12    pharmacy for dispensing opiates.

13          Would you expect, in a community of, a

14    county of 200,000 people, that pharmacists will know

11:30:47 15    which other pharmacies, about their competition?

16    A.    Generally, the pharmacists would know about the

17    other pharmacies, sir, yes.

18    Q.    If you believed that someone's getting a

19    prescription filled at a pharmacy that you believe may be

11:31:03 20    loose in the way it dispenses opioids, would that affect

21    you if you find out that the same patient is getting

22    other opioids filled with you?

23    A.    Yes, sir.

24    Q.    All right.  Let's continue with the rest of this

11:31:22 25    note.

          1          It says, "Do not fill any controlled

          2    substances until calls are made and both doctors approve

          3    and we document this in patient notes?"

          4    A.    So then the pharmacist puts in there that, "On the

11:31:33  5    7th of February, per Dr. Goodwin, cancel the Vicodin ES

          6    prescription.  Do not fill until Dr. Goodwin's office

          7    calls back and okays this fill.  Doctor was not aware

          8    patient receiving Percocet prescription from Dr. Ricotti.

          9    OARRS reviewed.  Check OARRS 5/8, okay, continue to write

11:31:52 10    for it.  Only one doctor can write for it, Endocet, or we

         11    will not fill any more.  We did contact both doctors, but

         12    they still continue to write for them."

         13    Q.    Okay.  Now, explain to us then the total picture

         14    here.

11:32:09 15          Why is this a significant note you brought

         16    to our attention?

         17    A.    The pharmacist identified that there's a problem

         18    with prescription red flags, patient getting two

         19    prescriptions, two different from two different doctors,

11:32:23 20    two different pharmacies.

         21          In calling the doctor, the one doctor says,

         22    "Don't write, don't fill that prescription anymore,"

         23    which means the doctor has cut off that patient.

         24          Now, the other doctor is saying continue to

11:32:36 25    fill it but we know you have a problem with that patient.

1          And then it says have contacted both

2    doctors and they still continue to write for him.

3          To me it appears to be an issue now with

4    the prescriber or prescribers, and the pharmacist has to

11:32:48  5    do some additional due diligence and then document that

6    to make sure the doctors are issuing legitimate medical

7    prescriptions for legitimate medical purposes.

8    Q.    And from your perspective and expertise, if a

9    pharmacy determines that a doctor is a problem in himself

11:33:08  10   or herself, is there a responsibility that you believe

11   exists, not under the law, but from your experience to

12   put a notice out on filling those doctors?

13              MS. SULLIVAN:  Objection.

14              THE COURT:  Sustained.

11:33:24  15   Q.    Okay.  What do you do if you've got a doctor that

16   you think might be writing prescriptions pell-mell if

17   you're doing responsible practice as a pharmacist and a

18   pharmacy?

19   A.    As a pharmacist, if I thoroughly resolved that

11:33:39  20   issue and determined that the doctor is not issuing

21   controlled substance or opioids for legitimate purpose,

22   then I instruct the pharmacies -- pharmacists I work with

23   in the notes for that doctor to say do not dispense

24   controlled substances for this doctor.

11:33:57  25   Q.    And if it's been suggested that -- strike that.

Catizone - Direct/Lanier                    1199

1    That's not appropriate.

2              All right.  Next note.  "Asterisk,

3    asterisk, only, redacted, can pick up, redacted,

4    medications."  And then it's got this note, Giant Eagle

11:34:18  5    note.

6              Can you read it for us, please?

7    A.    "No more filling under discount cards, no matter

8    what.  Patient is getting controls early through cards."

9    Q.    What does that tell you?

11:34:28 10    A.    The first part says that maybe somebody else picked

11    up the medication for them or there's a reason why only

12    so and so can pick up the medication.

13              The second is they're using the discount

14    cards like cash.

11:34:39 15              As I mentioned yesterday, when you have

16    prescriptions filled under insurance, the insurance will

17    reject early refills and not pay for them, and the

18    pharmacy says you have to pay for this out of your

19    pocket, the insurance company will not pay for it.

11:34:54 20              In this case, the patient was using those

21    discount cards to avoid paying by insurance and they were

22    using it to get early refills.

23              Again, a number of red flags within this

24    prescription and no documentation of how it was resolved

11:35:05 25    and the prescription was still dispensed.

Catizone - Direct/Lanier

1200

1    Q.    Okay.  Next example from Giant Eagle.

2              "Absolutely no early fills, no earlier than

3    three days, on controls.  Patient has been told several

4    times.  No exceptions, even if patient says going out of

11:35:27  5    town."

6              What -- why is this note informative to

7    you?

8    A.    This is probably one of those patients I would ask

9    the other pharmacists to fill whenever they came in.

11:35:38  10             But we talked yesterday about early refills

11   and my red flag was five days.

12             That's just a measure or a guide to the

13   pharmacist.  It could be three days.  Just as you see

14   here.  It could be seven days.

11:35:53  15             There's the discretion of the pharmacist to

16   utilize it.  The red flag just says this could be an

17   issue.

18             They've determined that this patient has

19   been getting early refills and they can't refill it

11:36:04  20   mainly because of how much the patient is getting or how

21   strong that medication is no more than three days early

22   because if they do something three days early, it's going

23   to create some sort of problem for the patient.

24             But again, it's a red flag.  There's no

11:36:16  25   mention of calling the doctor, and this prescription was

1    dispensed.

2    Q.    And the last one that we'll look at, at least in

3    your direct, is this one, "Directions for Percocet."

4              This Giant Eagle note on a prescription

11:36:35  5    that they went ahead and filled, would you please tell us

6    why this note is important?

7    A.    Yeah, directions for Percocet should read two

8    tablets every six hours.  I'm not sure what PPA is, maybe

9    for pain as needed.

11:36:49 10              "If not call the nurse and run OARRS.

11    Patient wants 250 Percodans a month and complains the

12    nurse will not okay this prescription.  Call the number

13    on the script pad for clinic, not the number provided by

14    the patient."

11:37:05 15              So you've got a medical professional saying

16    I'm not going to authorize refills.  The patient wants

17    250 Percodan a month, a significant dose like we talked

18    yesterday about MMEs, the Morphine Milligram Equivalents,

19    and then it says call the number on the script because

11:37:21 20    the patient has given them a number to call that could be

21    their friend who's authorizing these prescriptions, it

22    could be a practitioner that's involved in some sort of

23    illicit activity.

24              Again, a red flag.  Numerous red flags.  No

11:37:35 25    documentation, and the prescription was dispensed.

Catizone - Direct/Lanier                    1202

1    Q.    Sir, if we took the time, could we go through many

2    more examples?

3    A.    Yes, sir.

4    Q.    Did I -- in summary, let me ask it this way.  Out

11:38:02  5    of the 10 -- no, the 8,000, near 8,000 prescriptions you

6    looked at, do you have an opinion whether or not you were

7    able to see documentation that those red flags were

8    resolved in a way that makes you -- well, let me just say

9    it that way first.

11:38:26  10            Were you able to see documentation in the

11    vast majority that the red flags were resolved?

12    A.    No, sir.

13    Q.    Is it, in fact, to the contrary?

14    A.    Yes, sir.

11:38:37  15    Q.    Is that important when you render the opinions

16    you've rendered in this case?

17    A.    Yes, sir.

18    Q.    Why is that important?

19    A.    As we talked, the red flags indicate that there's

11:38:50  20    something with the prescription that needs to be resolved

21    and then we're talking about opioids which are extremely

22    dangerous medications.

23            So when I looked at all these prescriptions

24    which had red flags, the overwhelming majority, and in my

11:39:06  25    report I said based upon my best educated experienced

1    guess, it looks like 90 percent of those prescriptions

2    did not have adequate documentation, but I couldn't

3    really tell on the others as well.

4              But given some of the exceptions that we

11:39:24  5    talked about yesterday where perhaps the person went to

6    the Cleveland Clinic, perhaps it was a prescriber like an

7    orthopedic surgeon, I said there's probably maybe 10

8    percent of those prescriptions that did have some

9    documentation or documentation that would have met

11:39:39 10    requirements so that someone else could understand and

11    fill it.

12             But overwhelmingly, in my overwhelming

13    opinion, about 90 percent of what I looked at didn't meet

14    that level of documentation that was required.

11:39:53 15             And any documentation, any one prescription

16    is important because any one prescription could harm or

17    kill a patient.

18    Q.    We've heard from several witnesses and we'll hear

19    from more that the pharmacist is the last line of

11:40:06 20    defense.

21             Are you familiar with that concept?

22    A.    Yes, sir.

23    Q.    Would you explain to the jury from your expertise

24    and perspective what that -- why that is important?

11:40:16 25    A.    Sure.

```
 1              When you're in the hospital and you're

 2      given a medication, there's a nurse that administers it,

 3      there's other people to monitor that medication, to take

 4      care of the patient in case something goes wrong.

 5              When you're walking into a community

 6      pharmacy, the minute that pharmacist or technician gives

 7      you that medication, that's the last person that can

 8      safeguard that you're getting the right medication and

 9      that you're protected, and if you take that medication or

10      your child or family member takes that medication, that

11      it's safe to do so.

12              Once it leaves that pharmacist and

13      pharmacy, and you take the medication, there's no one

14      else there to prevent something from happening.

15      Q.   Okay.

16              During opening, I used different sieves,

17      different sized screens to explain that there can be a

18      loose way of letting prescriptions go through or there

19      can be a tighter way where you have to work harder and

20      focus.

21              With that as a metaphor or analogy, can you

22      explain what in summation is your opinion about the

23      policies and procedures that you have seen from all of

24      the defendants, whatever is in common with all four?

25              MS. FUMERTON:  Objection, Your Honor.
```

1      Leading.

2      THE COURT:  Overruled.

3  A.    Not having heard the opening statement but from

4  what Mr. Lanier just said, as a pharmacist and what I'm

11:41:48  5  supposed to do as a pharmacist, I would say that the

6  filter I use and need to use is the smallest filter to

7  make sure that I do everything I can for that patient.

8           When I looked at the policies and looked at

9  the results of those policies, the numbers of

11:42:04  10  prescriptions with red flags that were actually

11  dispensed, the lack of documentation for that

12  overwhelming majority of red flags, it would be my

13  opinion on the example that Mr. Lanier gave that those

14  policies and the lack of enforcement of those policies

11:42:19  15  probably used much bigger or the biggest filter in order

16  to write as many prescriptions through as possible;

17  whereas, the pharmacist then has to work at the other end

18  and restrict how many prescriptions you go through,

19  particularly of the ones I looked at.

11:42:34  20  Q.    I mentioned to the jury through you at the

21  beginning of your examination, we have retained you as an

22  expert.

23           You, like the experts from all the parties,

24  I think are being paid.

11:42:46  25           I did not ask what your hourly rate was?

1              Can you tell us, please?

2     A.    Sure.

3              I'm being paid $300 an hour for my work.

4     Q.    It looks to me like the last bill we had gotten

11:42:57  5     from you was August of this year?

6     A.    Yes, sir.

7     Q.    So you owe us a bill, I guess, at this point?

8     A.    For September, sir.

9     Q.    Yes, sir.

11:43:04 10              And some of October.  You're not here for

11     free today, are you?

12     A.    No, sir.

13     Q.    All right.  But so the jury's got a way of putting

14     this into computations, as of August of '21 bill, you had

11:43:19 15     been paid $64,140.

16              Does that sound about right?

17     A.    Yes, sir.

18     Q.    All right.

19              MR. LANIER:  Thank you for all the work

11:43:27 20     you've done and for your testimony.

21              Your Honor, at this point, I'll pass the

22     witness.

23              THE COURT:  Okay.  Thank you, Mr. Lanier.

24              We will start the cross-examination.

11:43:38 25              Who is -- who is going first?

1       MS. FUMERTON:  Thank you, Your Honor.

2              Tara Fumerton on behalf of Walmart.

3              Just so I can plan accordingly, it's about

4    a quarter to noon right now.  When would you like to

11:43:50  5    break for lunch?

6              THE COURT:  Well, you can go for about 15

7    minutes or so.

8              MS. FUMERTON:  Okay.  Thank you, Your

9    Honor.

11:44:08  10             And, Your Honor, may I please approach the

11   witness?

12             THE COURT:  Okay.

13             MS. FUMERTON:  I have a binder for the

14   witness.

11:45:05  15             May it please the Court.

16             THE COURT:  Yes, ma'am.

17        CROSS-EXAMINATION OF CARMEN CATIZONE

18   BY MS. FUMERTON:

19   Q.   Good morning, ladies and gentlemen of the jury.  My

11:45:11  20   name is Tara Fumerton, and I am one of the attorneys for

21   Walmart.

22             I'm going to start off asking Mr. Catizone

23   some questions today.

24             Good afternoon -- or good morning,

11:45:21  25   Mr. Catizone.

           1    A.    Good morning.

           2    Q.    I'm excited to get to lunch.

           3                You testified yesterday about your role

           4    with the National Association of Boards of Pharmacy,

11:45:33   5    which is also abbreviated as NABP, correct?

           6    A.    Yes.

           7    Q.    But you are not here to talk to the jury on behalf

           8    of NABP, right?

           9    A.    Correct.

11:45:43  10    Q.    You are here in your personal capacity?

          11    A.    Yes.

          12    Q.    And your opinions are your own?

          13    A.    Yes.

          14    Q.    They are not the opinions of NABP, correct?

11:45:53  15    A.    Correct.

          16    Q.    And the NABP has not reviewed your report in this

          17    case, correct?

          18    A.    Correct.

          19    Q.    You agree that just because a prescription flags

11:46:08  20    under one of your 16 red flags, that does not mean that

          21    it was written for an illegitimate medical purpose,

          22    correct?

          23    A.    Correct.

          24    Q.    You also agree that it does not mean that the

11:46:20  25    medicine that was dispensed to fill that prescription was

1    diverted, correct?

2    A.    Correct.

3    Q.    You also agree that every one of your 16 red flags

4    is resolvable, right?

11:46:37  5    A.    No.

6    Q.    And is that because you believe that the red flag

7    with three different combinations is not resolvable?

8    A.    Correct, the Trinity red flag I do not believe is

9    resolvable.

11:46:49 10    Q.    But you are not a doctor, correct?

11    A.    Correct.

12    Q.    Every other one of your 15 red flags is resolvable?

13    A.    Correct.

14    Q.    And if those red flags are resolved, that

11:47:01 15    prescription is not likely to lead to diversion, correct?

16    A.    If one of the resolutions involves not dispensing

17    the prescription, then yes.

18    Q.    Well, if the red flags are resolved on a

19    prescription, so the prescription is legitimate, then

11:47:17 20    that prescription is not likely to lead to diversion,

21    correct?

22    A.    No.

23          What I would consider resolution or

24    resolving is not filling the prescription as one of the

11:47:26 25    ways to resolve a red flag.

1  Q.    But you can also resolve a red flag by turning out

2  that it's a legitimate prescription; it was a caution

3  sign but that you called the doctor and you found out

4  that that caution was resolved, right?

11:47:39  5  A.    Correct.

6  Q.    And in that instance, if you resolve those red

7  flags, that prescription, if it's filled, is not likely

8  to be diverted, right?

9  A.    Correct.

11:47:49 10  Q.    And you can resolve a red flag and not document it,

11  right?

12  A.    No.

13  Q.    Well, let's be clear.

14          I know your opinion is that you should

11:48:02 15  document it, but you can resolve a prescription -- a red

16  flag on a prescription and not document it, right?

17  A.    No.

18  Q.    And why is that?

19  A.    There are two, two references and two reasons for

11:48:16 20  that, and the federal law we talked about yesterday and

21  Section 1306.06, it talks about the responsibility of a

22  DEA registrant, which is the pharmacy and the pharmacist

23  acting as their agents, dispensing controlled substances

24  in accordance with professional practice and standards.

11:48:36 25          And then there was a DEA case, the *Hills*

1    case, that clarified what those further requirements or

2    what those additional documentation requirements would

3    be.

4                The second reference is 21, U.S.C., 827a,

11:48:54  5    and that specific language says any DEA registrant

6    dispensing controlled substances must provide an accurate

7    and complete record of that dispensing.

8                And then there were two other actions taken

9    by the DEA, the *Hills* case and the Dr. Volkman case,

11:49:17 10    which was a physician here in Ohio, that clarified

11    further what that documentation should be.

12                So my answer to the question is no, you

13    can't not resolve a red flag without documenting it.

14    Part of the accurate and complete record of documenting

11:49:33 15    red flags is the documentation, and you can't separate

16    the two, ma'am.

17    Q.    So I still think you're misunderstanding my

18    question and we're going to get to it in a little bit

19    probably after lunch, you know, where you think that this

11:49:46 20    documentation requirement is written.

21                But your position, just to be clear, is

22    that if you don't document a red flag, that turns a

23    legitimate prescription into an illegitimate

24    prescription?

11:50:02 25    A.    No, sir.

1           I think you're confusing -- if I can

2    understand the question for you, I apologize, if it's a

3    legitimate prescription, that's not going to change.  If

4    there's a red flag with a prescription and you resolve

11:50:16  5    the red flag, and document the red flag, is different

6    than whether it's a legitimate prescription or not.

7    Q.    And that was what I was asking with my original

8    question.

9           So you can have a prescription that's a

11:50:27 10    legitimate prescription that presents a red flag, you

11    resolve that red flag, you don't document it, but it's

12    still a legitimate prescription, correct?

13    A.    Again I -- I apologize.

14    Q.    Yes or no?

11:50:39 15    A.    The answer is you cannot -- you cannot dispense it

16    until the red flag has been resolved.

17    Q.    That wasn't my question.

18           It's still a legitimate prescription,

19    correct?

11:50:47 20    A.    No.

21    Q.    So if you have a prescription that's a legitimate

22    prescription with a red flag, you don't document it,

23    you're saying it's now an illegitimate prescription?

24    A.    I'm saying if you have a prescription with a red

11:51:00 25    flag, you don't know if it's legitimate until you resolve

1      and document that red flag.

2      Q.    So once you resolve the red flag, it's your opinion

3      that that prescription is illegitimate until you document

4      it?

11:51:15  5      A.    It's unknown to the pharmacist whether it's

6      legitimate or not until the red flag is resolved and

7      documented.

8      Q.    But, sir, I'm confused by this.

9              So I have a question about a prescription.

11:51:27 10     I call the doctor to resolve my question about the

11      prescription.

12              At that point in time, that red flag is

13      resolved; in my mind, I know that it's resolved.

14              Now, perhaps I don't document that, but I

11:51:40 15     resolve that red flag in my mind, correct?

16      A.    As a pharmacist, I can't resolve red flags in my

17      mind.  I have to actually resolve that red flag and

18      document that so that a pharmacist coming after me knows

19      the red flag's been resolved or the Board of Pharmacy or

11:51:58 20     DEA knows it's been resolved.

21              For me to just say I've resolved in my head

22      without documenting it doesn't solve the problem, it

23      doesn't provide the documentation that's required.

24      Q.    Again, sir, I understand what your position is that

11:52:10 25     you have a requirement to document, but a pharmacist can

1  absolutely resolve in their mind a red flag, correct?

2  A.    Again I respectfully disagree with you.

3              As a pharmacist, in my opinion a pharmacist

4  can't resolve a red flag in their mind and then dispense

11:52:26  5  that prescription.  It has to be documented.

6  Q.    So let's take the example you keep using, the

7  Cleveland Clinic.

8              There's a prescription that a patient

9  presents more than 25 miles from where they live because

11:52:37 10  they visited the Cleveland Clinic.

11             The pharmacist thinks, hmm, they traveled,

12  but it's the Cleveland Clinic.  Are you saying that's not

13  now resolved?

14  A.    Yes.

11:52:51 15  Q.    It's not resolved until they write the words

16  "Cleveland Clinic"?

17  A.    It's not resolved until they identify the red flag

18  that the patient lives more than 25 miles away and the

19  patient went to the Cleveland Clinic and verified with

11:53:04 20  the physician that it was for a legitimate medical

21  purpose.

22             I have seen fraudulent and nonlegitimate

23  prescriptions from the Cleveland Clinic, from

24  Massachusetts General, from Duke University.

11:53:18 25             So the pharmacist would need to resolve

1    that red flag, if that red flag was there, and document

2    it.

3    Q.    Well, I want to turn back to some of those examples

4    of red flags and look at some specific prescriptions

11:53:37  5    actually, but let's go back to your methodology, first.

6            You concluded that defendants' local stores

7    filled thousands of prescriptions presenting red flags,

8    right?

9    A.    Yes.

11:53:49 10    Q.    And in your opinion, a red flag is a caution sign,

11    right?

12    A.    Yes.

13    Q.    And then you relied upon another one of plaintiffs'

14    experts, Dr. Craig McCann, to review and calculate the

11:54:07 15    number of prescriptions dispensed, the amount of doses

16    dispensed, and the Morphine Milligram Equivalents

17    dispensed for each red flag by the pharmacies, correct?

18    A.    Not exactly.

19            If I can clarify, what I relied on Dr.

11:54:23 20    McCann to do is I identified the 16 red flags, and then

21    he ran the analysis of how many prescriptions flagged

22    those red flags and he also then determined when the red

23    flag was excessive dose, what the Morphine Milligram

24    Equivalents would be for that prescription.

11:54:39 25    Q.    Okay.  So I'm not trying to put words in your

| | |
|---|---|
| 1 | mouth, but in other words, you relied on Dr. McCann to |
| 2 | apply your red flags to the data? |
| 3 | A.    Yes, ma'am. |
| 4 | Q.    Is that fair? |
| 11:54:49 5 | A.    Yes, ma'am. |
| 6 | Q.    And you yourself are not a data expert, right? |
| 7 | A.    Correct. |
| 8 | Q.    You left it up to Dr. McCann to decide how to |
| 9 | implement your red flags to the data, right? |
| 11:55:01 10 | A.    Well, not to implement, but to run the data and |
| 11 | identify the red flags, so it may be just a |
| 12 | clarification, but whatever processes he used to identify |
| 13 | how many prescriptions, flagged those red flags. |
| 14 | Q.    And you've given depositions in this case, right? |
| 11:55:18 15 | A.    Yes, ma'am. |
| 16 | Q.    And I've put up there in your binder copies of |
| 17 | those deposition transcripts in case we need to reference |
| 18 | them. |
| 19 | A.    Yes. |
| 11:55:26 20 | Q.    But do you recall testifying previously that you |
| 21 | left it up to Dr. McCann how to implement the red flags? |
| 22 | A.    Yes, ma'am. |
| 23 | Q.    Does Dr. McCann have a background in pharmacy? |
| 24 | A.    I have no idea. |
| 11:55:45 25 | Q.    So then Dr. McCann ran the analysis, and he |

1    reported back to you the number of prescriptions for each

2    defendant that hit on one or more of your red flags,

3    right?

4    A.    Reported back to me, yes, essentially.

11:56:02  5    Q.    And at that point in time, and I want to focus

6    before this more recent report, you never looked at any

7    of the underlying prescriptions to determine if they, in

8    fact, had red flags, right?

9    A.    Correct.

11:56:32 10    Q.    And then months later, you wrote a supplemental

11    report, right?

12    A.    Correct.

13    Q.    And that was after the defendants in these cases

14    had produced the random sample of hard copy prescriptions

11:56:45 15    and associated electronic notes, correct?

16    A.    Correct.  Yes.

17    Q.    And you testified there's almost 8,000 hard copy

18    prescriptions that you reviewed?

19    A.    Yes.  Approximately.

11:56:54 20    Q.    And all the electronic notes that were produced for

21    those prescriptions as well?

22    A.    Yes.

23    Q.    And you said that you looked at every single one of

24    those prescriptions and notes, correct?

11:57:05 25    A.    Yes, I did.

1    Q.    And you reviewed all of those 8,000 hard copy

2    prescriptions, all of the electronic notes associated

3    with those 8,000 hard copy prescriptions, did whatever

4    other analysis you needed to do, wrote a report, and that

11:57:24 5    took you approximately 20 to 25 hours, correct?

6    A.    Yes.

7    Q.    I want to go into talking about this documentation

8    requirement --

9                    MS. FUMERTON:  And, Your Honor, this is

11:57:58 10   probably going to take awhile.

11                   THE COURT:  Okay.  Then I think it's a good

12   time for a break.

13                   Thank you, Ms. Fumerton.

14                   MS. FUMERTON:  Thank you.

11:58:05 15                  THE COURT:  All right.  Ladies and

16   gentlemen, we'll take our noon recess until 1:00 o'clock.

17                   Usual admonitions apply and then we'll pick

18   up with further cross-examination.

19                   Thank you.

11:58:15 20                  (Jury out.)

21                   (Luncheon recess taken)

22                            - - - - -

23

24

12:57:28 25

1          FRIDAY, OCTOBER 8, 2021, 12:57 P.M.

2                THE COURT:  All right.  I wanted to cover

3     something quickly before we bring the jury in.

4                Special Master Cohen is reviewing some

12:58:05 5     objections to the deposition of Brad Nelson, a former

6     Walmart employee who is on the plaintiffs' witness list

7     for next week.

8                The objections have been interposed because

9     the defendants believe that some of Mr. Lanier's

12:58:32 10    drawings, when he was deposing Mr. Nelson, inaccurately

11    depicted Mr. Nelson's testimony.

12                And there have been a few instances when

13    this has happened live and I've pointed that out, and

14    Mr. Lanier has corrected his drawings.

12:58:48 15                Obviously it can't be done retroactively,

16    so I don't know, you know, Special Master Cohen said this

17    deposition lasts six, seven hours.

18                I don't know how many instances the

19    defendants have identified where Mr. Lanier's writing of

12:59:11 20    what the witness said is just dramatically different.

21    I'm not saying that, you know, but it's just not what he

22    said.

23                Ms. Fumerton, Mr. Majoras, do you have a

24    sense of how -- of how frequent this was?

12:59:27 25                MS. FUMERTON:  Yes, Your Honor.

Catizone - Cross/Fumerton

1          It actually is throughout the deposition.

2          One big example would be with respect to

3    certain settlement agreements that we still object to

4    being admitted, and I think that's also pending before

12:59:42  5    the Special Master, but he refers to them as failures and

6    I know for other people, he changed them to problems.

7          These are settlements where there was no

8    admission.

9          THE COURT:  Does the witness say failures

12:59:54 10    or Mr. Lanier just wrote failures?

11          MS. FUMERTON:  Mr. Lanier just wrote

12    failures.

13          THE COURT:  All right.  Look --

14          MR. LANIER:  Your Honor, I'm glad to look

13:00:01 15    at those.

16          I don't want any misrepresentations in my

17    notes, and I have not reviewed those, but I'll represent

18    to the Court I'll do it this weekend and I'll take out

19    anything at all that's not accurate.

13:00:11 20          MS. FUMERTON:  And, Your Honor --

21          THE COURT:  Is there a way to do that

22    retroactively?

23          How do you do that, Mark?

24          MR. LANIER:  I'll just have to remove the

13:00:19 25    entire note from the video at that point, Your Honor.

```
           1                  THE COURT:  All right.
           2                  MR. LANIER:  But if I do that, I don't want
           3       an inaccuracy in the record and it's my obligation if I
           4       want to make the notes I need to make them right.
13:00:31   5                  Some of them --
           6                  THE COURT:  If it's close, it's not a big
           7       deal.
           8                  But for example, if the witness doesn't say
           9       failure and you write failure, you're testifying, that's
13:00:43  10       out.
          11                  MR. LANIER:  Right.  And I'll look at those
          12       and I'll be very careful and I've gotten a good feel for
          13       you throughout this trial I think at this point and
          14       certainly know Special Master Cohen has a great feel for
13:00:53  15       you.  And so I commit to you I'll go through those and
          16       I'll look at the examples and --
          17                  THE COURT:  Why don't, Ms. Fumerton, if you
          18       can point out what you think are the most flagrant
          19       examples so he certainly corrects that, and then I think
13:01:06  20       that's the way to do it.
          21                  MS. FUMERTON:  So, Your Honor, here just to
          22       sort of give you an example of the problem, he actually
          23       uses as one of his road maps, and I know we're all now
          24       familiar with that, one of the stops is failures.  So he
13:01:18  25       keeps going over and over and that was pre-populated by
```

1    him.  It was not something that the witness said.

2                We objected to the demonstrative at the

3    time of how it was inaccurate and we've continued to

4    object all along.

13:01:28  5                He had the opportunity to cure it, based on

6    our objection and chose not to cure it, and so he decided

7    how he wanted to do that deposition.  And, unfortunately,

8    now there's a large portion of that deposition --

9                THE COURT:  Look, the alternative is I can

13:01:42 10  just say forget the deposition; Mr. Nelson will testify

11   live via video and we'll just do him live.  And if there

12   are any drawings, they'll be accurate or they won't -- or

13   they will be objected to and corrected on the spot.

14               MS. FUMERTON:  So, Your Honor --

13:02:00 15               MR. LANIER:  Your Honor, in fairness, so

16   you understand the context, I think I understand the

17   deposition.  The only things I term as failures I don't

18   think you do, and so I want us to talk about them and see

19   if you'll agree that they are failures and so I

13:02:14 20  specifically said that was my word, not his.

21               I wasn't representing that was his word.

22               MS. FUMERTON:  And the witness disagreed

23   with you.

24               But, so, Your Honor, it's clearly --

13:02:25 25               THE COURT:  All right.  Fine, make it

1    simple.  We'll forget the deposition and he'll testify

2    live.

3                    Where does he live?

4                    MS. FUMERTON:  Well, so, Your Honor, he's

13:02:34  5    also a former employee who we do not have control over.

6                    THE COURT:  I have control.

7                    I'll tell him he will show up.  Where does

8    he live?  He'll go to an office in his city and testify

9    by video.

13:02:46  10                    MS. FUMERTON:  Your Honor, respectfully, I

11    think it seems unfair to have to require us to go through

12    that when the problem is with Mr. Lanier's objectionable

13    drawing and so he now gets a second bite at the --

14                    THE COURT:  What are you suggesting?

13:02:59  15                    MS. FUMERTON:  One potential would be

16    Mr. Lanier does not get to show that demonstrative, that

17    we cut that from the deposition.

18                    They want to show three different feeds at

19    once, including him drawing with his hands.  We cut that

13:03:11  20    out and take a hard look at the deposition over the

21    weekend and see if we can excise out the failure portion.

22                    THE COURT:  One option is to have two

23    cameras -- one and three, whatever.

24                    MS. FUMERTON:  Yes, Your Honor, that's

13:03:23  25    another way to do it.  Just have the witness testify --

```
 1              THE COURT:  Look, why don't you work on it

 2      over the weekend?

 3              If you come to a satisfactory resolution,

 4      fine.  If not, we'll just have Mr. Nelson, you know,

 5      testify by video from where he lives, and there will not

 6      be any inaccurate drawings because I'll make sure of it

 7      because I'll be watching.

 8              MS. FUMERTON:  Your Honor, respectfully,

 9      we'll discuss this with plaintiffs.

10              THE COURT:  That's the option.

11              If you can't work it out, Ms. Fumerton,

12      that's what I'll do.  You know, I -- that's what we'll

13      do.

14              I mean, there's no -- he's going to

15      testify.  He's allowed to testify, so there's -- and I

16      see three options.

17              One, you work it out so that -- so that

18      there's no showing of an inaccurate drawing.  Okay?

19              I mean, I can't excise Mr. Lanier's

20      questions or something, but the jury isn't going to see

21      any writing that's not accurate.  That's one.

22              Option two is I don't see Mr. Lanier at

23      all.  All right?  He's talking, obviously they hear him

24      and if he's talking about what he's writing, he's talking

25      about what he's writing but no one sees anything that
```

1    he's writing.  In fact, they only see him.  They only see

2    Mr. Nelson.

3                    And option three is Mr. Nelson just

4    testifies live, via video, and I'll make sure that if

13:04:50  5    Mr. Lanier chooses to do his drawings, that they

6    accurately reflect what Mr. Nelson says.

7                    MS. FUMERTON:  And, yes, Your Honor, the

8    first two options are fine with us.

9                    THE COURT:  Well, why don't you, you know,

13:05:04  10   then work it out and go with, you know, if you can work

11   out one of those two, fine.

12                   So, all right.

13                   MR. DELINSKY:  Your Honor, could I raise a

14   brief issue from this morning?

13:05:15  15                   THE COURT:  Very briefly.

16                   MR. DELINSKY:  I think there was a glitch,

17   Your Honor.

18                   Mr. Catizone, the plaintiffs introduced

19   this document and I'm showing it to your Honor so you can

13:05:29  20   see what it looks like, and this had not been

21   disclosed --

22                   THE COURT:  I don't know, what

23   document -- is there a number?

24                   MR. DELINSKY:  P 20695.

13:05:41  25                   THE COURT:  All right.  This WeCare work

1    flow.  All right.

2              MR. DELINSKY:  And what was disclosed was a

3    document that was one Bates label over that looks the

4    exact same.

13:05:56 5              This wasn't disclosed to us the night

6    before.

7              We're just asking that the document that

8    contains the comparable language --

9              MR. LANIER:  We're glad to substitute, Your

13:06:09 10    Honor.  Both were on his list.  One was the 2013 version,

11    one was the 2019 version, and evidently each night ahead

12    of time under, our protocol is we give them the list of

13    documents we plan on using.

14              It looks like they were given a

13:06:23 15    list -- they were given the number to the 2019 instead of

16    2013 version, which is the one that made my point but

17    we're glad to go ahead and clarify it on the record and

18    put it in.

19              THE COURT:  All right.

13:06:33 20              MR. LANIER:  That won't be a problem.

21              THE COURT:  20695, which is the one that

22    was referred to is actually the 2019?

23              MR. DELINSKY:  2013, Your Honor.

24              MR. LANIER:  20695 we used.

13:06:46 25              It is the 2013 version of 20645, which is

1    the 2019 version.

2                    We disclosed the '19 version instead of the

3    '13 version, though both are in his report.

4                    And so they should have, last night, I

13:07:05  5    should have told them I'm going to use the '13 instead of

6    the '19 version.

7                    But I'm glad to make that substitution.

8                    THE COURT:  All right.  Why don't you

9    clarify that when, you know --

13:07:14 10                    MR. LANIER:  I will.

11                    THE COURT:  All right.  Okay.  We can bring

12    in the jury then.

13                    (Jury in.)

14                    THE COURT:  All right.  Please be seated,

13:08:53 15    ladies and gentlemen.

16                    And, Mr. Catizone, I just want to remind

17    you you're still under oath from this morning.

18                    You may proceed, Ms. Fumerton.

19                    MS. FUMERTON:  May it please the Court.

13:08:57 20                    THE COURT:  Yes.

21        CROSS-EXAMINATION OF CARMEN CATIZONE (RESUMED)

22    BY MS. FUMERTON:

23    Q.    Good afternoon, Mr. Catizone.

24    A.    Good afternoon.

13:09:33 25    Q.    It is your opinion that the practice of pharmacy is

 1    governed by well-defined laws and regulations, correct?

 2    A.    Yes, it is.

 3    Q.    And so I want to spend some time talking really

 4    specifically about where in those well-defined laws and

13:09:57  5    regulation it refers to red flags and documentation and

 6    so I'm just setting the stage, sir, of the sort of

 7    questions that are going to come up.

 8                 Nowhere in the Controlled Substances Act do

 9    the words "red flag" appear, correct?

13:10:14 10   A.    Correct.

11    Q.    And nowhere in the Controlled Substances Act does

12    it list your 16 red flags that you described to the jury,

13    correct?

14    A.    Correct.

13:10:25 15   Q.    And nowhere in the CSA does it state that a

16    pharmacist must document red flags, correct?

17    A.    Not correct.

18    Q.    Well, let me be very clear.

19                 You just agreed that there's nowhere in the

13:10:42 20   CSA that the word "red flags" appears, right?

21    A.    Yes.  Yes, ma'am.

22    Q.    And so just by logic, there's nowhere in the CSA

23    that it says pharmacists must document red flags,

24    correct?

13:10:57 25   A.    That specific language is not in the Controlled

1    Substances Act.

2    Q.    And the Controlled Substances Act also does not

3    specifically state that a pharmacist must document the

4    resolution of red flags, correct?

13:11:13  5    A.    The specific wording, no.

6                But the concept is there and the

7    requirement is there.

8    Q.    So conceptually, it's there.  Is that your point?

9    A.    And specifically in terms of, as I mentioned

13:11:30  10   earlier, every registrant who dispenses a controlled

11   substance must maintain an accurate and complete record

12   of that dispensing, and corresponding responsibility,

13   which we've talked about, includes red flags.

14   Q.    Okay.  So let's take a look at those.

13:11:46  15             The first thing that you just talked about,

16   that was 21, U.S.C., 827a, that's what you cited before

17   lunch, right?

18   A.    Correct.

19   Q.    Okay.  Now, Mr. Catizone, is this the law that

13:12:08  20   you're citing?

21   A.    Yes.

22   Q.    Okay.  And can you please show us where it says

23   anything about red flags.

24   A.    I don't think, if I point to my screen, it shows

13:12:21  25   up, but it's in that where you've highlighted where it

1    says "Number one, every registrant under this sub chapter

2    shall, on May 1st, 1971, or as soon thereafter as such

3    registrant first engages in the manufacture, distribution

4    or dispensing of controlled substances and every second

5    year thereafter make a complete and accurate record of

6    all stocks thereof on hand, except that the regulations

7    prescribed under this section shall permit each such

8    biennial inventory following the initial inventory

9    required by this paragraph to be prepared on such

10   registration's regular general physical inventory date,

11   if any," and then it continues.

12   Q.    Okay.  I just want to make sure I have the entire

13   portion of this highlighted that you think states that

14   pharmacists have a document -- have a duty to document

15   the resolution of red flags.

16                    Is it all highlighted?

17   A.    Yes.

18   Q.    And I just want to make sure I get an exhaustive

19   list here.

20                    So the other regulation that you just cited

21   was 1306.04; is that correct?

22   A.    06, please.

23   Q.    1306.04?  I'm sorry?

24   A.    1306.06.

25   Q.    Sorry.  Got it.

1       Unfortunately, the copy I had ended at

2   1306.05, so I'm looking for another one or we might have

3   to come back to it.

4   A.   And while you're looking for that, I didn't read

13:14:26  5   the whole section, but under 3, that's tantamount to it

6   as well where it says, "Under this subchapter,

7   manufacturing, distribution, or dispensing a controlled

8   substance or substances shall maintain, on a current

9   basis, a complete and accurate record of each substance

13:14:47 10   manufactured, received, sold, delivered, or otherwise

11   disposed of."  Those two sections go together.

12   Q.   Okay.  So now we have the complete set from this

13   particular statute of where you say that it requires the

14   documentation of resolution of red flags, right?

13:15:08 15   A.   As long as we both have the understanding that the

16   Controlled Substances Act, like any other law, has to be

17   looked at in its entirety.  And if you pull out

18   subsections sometimes, you lose the other meanings or

19   other parts, but this is the most specific and is a

13:15:24 20   direct response to your question.

21   Q.   Okay.  Thank you.

22       And you mentioned 1306.06, and I think my

23   helper here, Steve, is going to be able to pull it up for

24   us, if we could turn the Elmo off.

13:15:42 25       And could we make that bigger?  I think

1    it's a fairly short provision.  Is that right?

2              Okay.  Mr. Catizone, is this what you were

3    referring to a few moments ago?

4    A.   Yes, I was.

13:16:07  5    Q.   Okay.  And so this particular regulation states, "A

6    prescription for a controlled substance may only be

7    filled by a pharmacist, acting in the usual course of his

8    professional practice and either registered individually

9    or employed in a registered pharmacy, a registered

13:16:25 10    central fill pharmacy, or registered institutional

11    practitioner."

12              Correct?

13    A.   Yes.

14    Q.   Okay.  And so this is the other regulation that you

13:16:32 15    say requires that a pharmacist identify the 16 red flags

16    that you referred to and then document the resolution of

17    those 16 red flags, correct?

18    A.   No.

19              This is -- I thought the response to the

13:16:48 20    question that said where does it say a pharmacist must

21    document, that was the reference there.

22              The definition of corresponding

23    responsibility is what lays out the basis for red flags

24    and resolving those red flags.

13:16:59 25    Q.   Okay.  So let's be clear.

```
       1                    I didn't mean to misstate what you said.

       2                    So this particular regulation states the

       3           requirement that a pharmacist must document the

       4           resolution of red flags, correct?

13:17:11  5        A.    A pharmacist and pharmacy, since the pharmacy is

       6           the registrant and the pharmacist are agents of the

       7           pharmacy.

       8        Q.    Okay.  And so now we've just looked -- we can take

       9           that down, thank you, Steve -- we've now just looked at

13:17:24 10        the two portions of the relevant regulations that you

      11           think most directly state what you're trying to testify

      12           to today, correct?

      13        A.    For documentation.

      14                    The definition of corresponding

13:17:34 15        responsibility is for the red flags.

      16        Q.    Yes.  And just since you mentioned it, why don't we

      17           just look at that, too, so the jury can get a full

      18           picture and then we will move on?  Can we pull up -- I

      19           actually think I have that here.

13:17:50 20                    And so that's 1306.04, correct?

      21        A.    Yes.

      22        Q.    And that's what I have highlighted right here,

      23           correct?

      24        A.    Yes, ma'am.

13:18:02 25        Q.    Okay.  And so specifically where does it identify
```

```
         1    your 16 red flags?

         2    A.    The specific red flags are not identified in this

         3    section, but the statutory and regulatory basis is laid

         4    there, the DEA in actions have defined as other red

13:18:22 5    flags.

         6    Q.    So let's focus on this regulation now.  So where

         7    specifically can you point me to the words that talk

         8    about the identification and resolution of red flags?

         9    A.    The very first sentence of the relevant sections --

13:18:37 10   and I apologize.  I have to look at the screen so I'm not

        11    addressing the jury directly but I apologize for that.

        12               "A prescription for a controlled substance

        13    to be effective must be issued for a legitimate medical

        14    purpose."

13:18:51 15              That says the pharmacist has to determine

        16    that that prescription's been issued for a legitimate

        17    medical purpose.  Anything that indicates that it's not

        18    for a legitimate medical purpose becomes a red flag as

        19    defined by the DEA.

13:19:04 20   Q.    Okay.

        21    A.    Continuing, it says, "The responsibility for the

        22    proper prescribing and dispensing for controlled

        23    substances is upon the prescriber, prescribing

        24    practitioner, but a corresponding responsibility rests

13:19:17 25   with the pharmacist who fills the prescription.  An order
```

1    purporting to be a prescription issued not in the usual

2    course of professional treatment or legitimate and

3    authorized research is not a prescription within the

4    meaning and intent of this section."

13:19:33  5               So the prior section we just read --

6    Q.    Respectfully, I think your counsel can ask you some

7    additional questions on redirect if he wants to.

8               But I'm just trying to get an understanding

9    of what the words are that you're relying on, and have I

13:19:47  10  accurately highlighted them?

11   A.    Well, you asked me what --

12               MR. WEINBERGER:  Your Honor, can he finish

13   his answer?

14               THE COURT:  There's a question.

13:19:55  15              Mr. Catizone, Ms. Fumerton has just

16   highlighted the balance of a big chunk of that paragraph

17   and asked you if that's what you're referring to.

18               THE WITNESS:  And then the next section is

19   underneath it says, "A person knowingly filling such a

13:20:10  20  purported prescription, as well as the person issuing it,

21   shall be subject to penalties provided for violations of

22   the provisions of law."

23               Those sections provide -- answer the

24   response to your question about what's the basis for the

13:20:24  25  red flags.

1    Q.    Thank you very much.

2                Mr. Catizone, you're familiar with the

3    DEA's publication, *The Pharmacists' Manual: An*

4    *Informational Outline of the Controlled Substances Act*,

5    correct?

6    A.    Yes, I am.

7    Q.    And the most recent version from 2020 was over 120

8    pages, does that sound about right?

9    A.    I haven't seen it, but I will take that word for

10   it.

11   Q.    If you could turn to Tab 1 of your binder.

12   A.    Okay.

13   Q.    This is the 2020 version of the DEA *Pharmacist's*

14   *Manual*, correct?

15               And please take a minute to look at it.

16   A.    Tab 1 says, "C. Catizone deposition, Volume 1."  It

17   doesn't -- Tab 2 is "C. Catizone deposition Volume 2."  I

18   don't see the *Pharmacist's Manual* in here.  Oh, it's tab

19   one, two, three, four -- Tab 6.

20   Q.    Thank you.  I apologize for that.

21               Can you turn to Tab 6?

22   A.    Yes, I've got it now.

23   Q.    Okay.  And so I'll ask my question again.

24               This is the DEA *Pharmacist's Manual* that

25   was revised in 2020, correct?

1    A.    Yes.

2    Q.    And the DEA publishes this manual, right?

3    A.    I believe so, yes.

4    Q.    And if we look at the second page of the document.

13:22:17 5    A.    Is that the letter from Timothy Shea, William

6    McDermott and Loren Miller?

7    Q.    Yes, but it's up on your screen to help orient you.

8         Please feel free to look at the document

9    that you have in front of you as well, but the screen can

13:22:29 10    help?

11         And this letter states, "This *Pharmacist's*

12    *Manual* has been prepared by the Drug Enforcement

13    Administration Diversion Control Division as a guide to

14    assist pharmacists in their understanding of the federal

13:22:43 15    Controlled Substances Act and its implementing

16    regulations as they pertain to the pharmacy profession."

17         Correct?

18    A.    Yes, that's what it says.

19    Q.    And so this manual is used to help pharmacists

13:22:55 20    understand some of the regulations and law that we just

21    looked at, right?

22    A.    Yes.

23    Q.    So nowhere in this over 100-page document do the

24    words "Red flags" appear, correct?

13:23:12 25    A.    I haven't had a chance to go through the 2020

1    version so I really can't comment on it, but I'd be glad

2    to go through it to see if it does.

3    Q.    Well, please, I don't want you to go page by page.

4              Would it help you to flip through it at

13:23:26  5    all?

6    A.    It would take awhile, but I would be glad to do

7    that.

8    Q.    Okay.  Well, look, you say you haven't looked at

9    the 2020 version, but have you looked at prior versions?

13:23:34  10    A.    Yes, I have.

11    Q.    And do the prior versions state anything about red

12    flags?

13    A.    I can't recall specifically again without looking

14    at those versions.

13:23:40  15    Q.    So you don't know one way or the other?

16    A.    Correct.

17    Q.    Okay.  We may have some more time later to look

18    through this.

19              And also, in this DEA *Pharmacist's Manual*,

13:23:53  20    it doesn't say anywhere that a pharmacist should document

21    the resolution of red flags, correct?

22    A.    Again I would like the opportunity to go through

23    and see that for myself to be able to make that

24    statement.

13:24:04  25    Q.    Okay.  Again, we have limited time, so I'll check.

1    A.    Thank you.

2    Q.    But right now you're not aware of any place in this

3    manual that says that, correct?

4    A.    I'm not aware because I haven't reviewed it.

13:24:17  5    Q.    You've never reviewed it?

6    A.    Not the 2020 version.

7    Q.    Okay.  What about the prior versions that you have

8    reviewed?

9    A.    I've reviewed those, but I'm not sure of the older

13:24:26 10    versions, what's been in and what's been taken out.

11               It's something I would have to specifically

12    refer to and look at the past versions.

13    Q.    So you can't point to anything in the prior

14    versions because you have not reviewed those, is that

13:24:37 15    correct?

16    A.    These were originally issued probably in the 1970s.

17               They've gone through several versions, so

18    I'm not sure what versions you want to refer back to or

19    --

13:24:48 20    Q.    I'm just asking any version that you can recall.

21    A.    I recall that there was, but I would have to do

22    some research to determine what version it was in.

23    Q.    Okay.  I want to switch to standard of care for a

24    moment.

13:25:15 25               You have defined the standard of care and

1    the practice of pharmacy as the expected care that should

2    be delivered by a pharmacist, right?

3    A.    Yes.

4    Q.    And it is your professional opinion that it is

13:25:29  5    possible to have a standard of care that most of the

6    pharmacists in this country do not actually follow,

7    right?

8    A.    Yes.

9    Q.    And you cannot name a single pharmacy chain or an

13:25:46 10   independent pharmacy or any type of pharmacy that meets

11   all of your standard of care requirements, including the

12   documentation and resolution of the 16 red flags that you

13   have identified, correct?

14   A.    Not correct.

13:26:03 15   Q.    Are you thinking of the one that you talked about

16   in your deposition, Albertsons where you worked?

17   A.    No.

18             I think I've looked at the information that

19   was provided to me about the defendants, but I cannot

13:26:14 20   make the statement that if I looked at every pharmacy in

21   the United States or every other chain the same way, that

22   I may be able to make the statement that not one pharmacy

23   meets those standards.

24             I have to believe that just from a

13:26:26 25   probability standpoint, that there are pharmacies that

1    meet that standard but I can't comment because I haven't

2    reviewed all the other pharmacies.

3    Q.    Well, but today, you can't name one, correct?

4    A.    Based upon what I've said, without reviewing that

13:26:40   5    information, I would say I can't name a pharmacy at this

6    point but would be glad to do that research if that would

7    help.

8    Q.    And we're going to talk about this in more depth in

9    a little bit, but you reviewed and you testified earlier

13:26:58 10    about reviewing about 8,000 sample prescriptions, right?

11    A.    Yes.

12    Q.    And you looked at every single one and every note

13    associated with that prescription, right?

14    A.    Yes, I did.

13:27:08 15    Q.    And after your review of the prescriptions and

16    notes in this case, you could not identify a single

17    instance in which you saw appropriate documentation,

18    correct?

19    A.    I think my report said that the overwhelming

13:27:24 20    majority did not have the documentation that I considered

21    adequate.

22    Q.    You did your deposition last Friday, correct?

23    A.    Pardon me?  I'm sorry.

24    Q.    You were deposed last Friday?

13:27:35 25    A.    Yes.  Yes.

1    Q.    And in your deposition last Friday, you were asked

2    can you think of a single instance in which you saw

3    appropriate documentation, and you said you cannot,

4    correct?

13:27:45  5    A.    Correct.

6              In the deposition I responded if I could

7    think of a prescription and identify that prescription,

8    and at the time I couldn't.

9    Q.    And can you now?

13:27:54 10    A.    Again, if I have the opportunity to go through and

11    look at those individual prescriptions, then I could

12    probably identify some.

13    Q.    And I don't need you to identify the specific

14    prescription.  I could see how that might be hard but can

13:28:06 15    you describe one that you saw or from whose defendants

16    files you saw that?

17    A.    Sure.

18              One of the prescriptions that I saw or one

19    of the notes associated with that prescription was that

13:28:17 20    it was for a cancer patient, and so I've looked at that

21    and said on the surface, this prescription could probably

22    be resolved because it was for an opioid, but then when I

23    went back to the spreadsheet, I noticed there were three

24    other red flags associated with that prescription, and so

13:28:36 25    I didn't have the additional information that wasn't

1    provided to me to actually resolve that red flag.

2              So on its face, just that prescription, I'd

3    probably say there's something that could -- did

4    document, but seeing the other red flags and not having

13:28:53  5    the other documentation, I couldn't make that statement

6    for that prescription.

7    Q.    Okay.  So that's another example of something you

8    think that the pharmacy defendants didn't get right.

9              I'm asking for an example of something you

13:29:04  10    think where they did appropriately document.

11    A.    I can't recall a prescription where there was

12    appropriate documentation to the extent that would be

13    required.

14    Q.    Okay.  Let's start talking about your red flags and

13:29:25  15    then we're going to look at a couple prescriptions.

16              And just in case it makes it easier for the

17    jury, I'm going to put up some of the slides that you

18    used with Mr. Lanier earlier today.

19              Okay.  So the first two red flags that you

13:30:10  20    identified relate to distance, right?

21    A.    Yes.

22    Q.    And I'm going to paraphrase, but red flag one is a

23    patient fills a prescription more than 25 miles from

24    where they live, right?

13:30:21  25    A.    Yes.

1    Q.    And red flag two is where a patient travels over 25

2    miles to a doctor, right?

3    A.    Yes.

4    Q.    And you agree that there are numerous reasons why a

13:30:30  5    patient may fill a prescription at a pharmacy more than

6    25 miles from his or her home, right?

7    A.    Yes.

8    Q.    And you also agree that there are numerous reasons

9    why a patient may visit a doctor more than 25 miles from

13:30:41 10   their home, right?

11   A.    Yes.

12   Q.    Speaking of traveling for more than 25 miles from a

13   pharmacy, for instance, an individual's drug coverage

14   under their insurance plan may mandate that they use

13:30:56 15   certain pharmacies over others, right?

16   A.    Yes.

17   Q.    Likewise, the pharmacy that an individual frequents

18   may be out of the medication the patient needs, right?

19   A.    Yes.

13:31:06 20   Q.    And with respect to visiting doctors, a patient

21   might travel to be treated by a doctor at a facility that

22   is highly specialized to provide services, such as

23   cardiac surgery?

24   A.    Yes.

13:31:19 25   Q.    Cancer treatment and management?

1    A.    Yes.

2    Q.    Burn treatment?

3    A.    Yes.

4    Q.    Plastic surgery?

13:31:25  5    A.    Yes.

6    Q.    Neurosurgery?

7    A.    Yes.

8    Q.    And then if that patient travels more than 25 miles

9    to visit that doctor and fills a prescription written by

13:31:36  10    that doctor at the pharmacy next door, that would flag

11    twice under your methodology, correct?

12    A.    I'm sorry.  I didn't understand the last part of

13    the question.

14    Q.    Sure.

13:31:48  15    A.    When you entered the other pharmacy?

16    Q.    So you have red flag one and two.  The first one

17    the patient travels more than 25 miles to visit a

18    pharmacy.  The second is the patient travels more than 25

19    miles to visit a doctor, correct?

13:32:01  20    A.    Correct.

21    Q.    So if a patient travels, for example, a resident of

22    Trumbull County goes to the Cleveland Clinic, which is

23    more than 25 miles away, correct?

24    A.    I -- yes.  I believe so.

13:32:13  25    Q.    You're just not familiar with this area?

1    A.    I was born and raised on the south side of Chicago

2    so I'm not familiar with this area.

3    Q.    I live in Chicago, too, but since you're testifying

4    here, I thought perhaps you might know more about the

13:32:26   5    area.

6                But do you assume that is more than 25

7    miles?  I mean do you have any reason to dispute that the

8    Cleveland Clinic is more than 25 miles?

9    A.    No, I'm not arguing that point.

13:32:35   10    Q.    Okay.  So you have a resident in Trumbull County

11    goes to the Cleveland Clinic, which is more than 25 miles

12    away, receives a prescription for an opioid from a

13    Cleveland Clinic doctor, and then fills that prescription

14    at the pharmacy close to the Cleveland Clinic.

13:32:50   15                That patient is going to flag twice for

16    that single prescription under your methodologies,

17    correct?

18    A.    The prescription would have two red flags

19    associated with it.

13:33:03   20                And yesterday we spoke -- I spoke to the

21    jury and discussed some of the examples that you gave and

22    exceptions and talked about how that was something that I

23    accounted for or recognized could occur.

24    Q.    And it's an exception?

13:33:16   25    A.    Exception from the red flag or something that would

1   be used to resolve that red flag if the pharmacist

2   properly documented that.

3   Q.    So it's an exception from the red flag, but you

4   still counted all those instances as red flags when you

13:33:28  5   were reviewing the data for pharmacies, correct?

6   A.    Correct, because the documentation wasn't adequate

7   to dispel that red flag.

8   Q.    And there are other reasons why a patient might

9   fill a prescription that is more than 25 miles away,

13:33:54  10   right?

11   A.    Yes.

12   Q.    And an individual might be off to college?

13   A.    There are numerous examples that we could talk

14   about that would cover under that red flag, yes.

13:34:06  15   Q.    Yes.  An individual might be on vacation, right?

16   A.    Yes.  Could be a snowbird.  A lot of different

17   exceptions, yes.

18   Q.    Let's look at red flag number three.

19        Your red flag number three is mainly for

13:34:42  20   doctor shopping, correct?

21   A.    Correct.

22   Q.    But specifically, you stated that, "A patient was

23   dispensed opioid prescriptions with overlapping days of

24   supply that were written by two or more prescribers,"

13:34:53  25   right?

1     A.     Yes.

2     Q.     And overlapping days supply means that the patient

3     has at least two prescriptions with at least one day of

4     overlap between the two, right?

13:35:03  5     A.     Yes.

6     Q.     So let me give you an example.

7              If Doctor A, say he's a family

8     practitioner, writes a patient a prescription for

9     Hydrocodone on January 1st, and that prescription is for

13:35:15 10     a three-day supply, that prescription should last until

11     January 3rd, right?

12     A.     Or January 4th.

13     Q.     Okay.  January 4th.  Right?

14     A.     Yes.

13:35:26 15     Q.     And if Doctor B, let's say she's a surgeon, writes

16     the same patient another prescription for a seven-day

17     supply of Hydrocodone on January 3rd, that would be an

18     overlapping day's supply and your flag would trigger,

19     right?

13:35:42 20     A.     If the patient filled that prescription on January

21     3rd or 4th, yes.

22     Q.     But if the pharmacist knows that patient and the

23     pharmacist knows the doctors involved, that isn't really

24     a cause for concern, correct?

13:35:56 25     A.     No, it is a cause for concern.

1    Q.    Let me ask you a few other questions about the

2    so-called doctor shopping.

3                    Under your red flag methodology, you flag

4    descriptions as doctor shopping when the patient visits

13:36:13  5    multiple prescribers within the same practice or clinic,

6    correct?

7    A.    Correct.

8    Q.    You view that as doctor shopping?

9    A.    That's one of the variations of doctor shopping

13:36:26 10    that could be possible.

11                    And again, if the patient is seeing

12    practitioners and practitioners rotate patients within

13    that clinic, and that's documented on the prescription,

14    that resolves the red flag, and the red flag is gone.

13:36:38 15                    But lacking that information, you don't

16    know if the person is actually seeing multiple persons in

17    that practice or actually under the type of a

18    multiple-practice setting that I just described.

19    Q.    So I just want the jury to be clear that they

13:36:52 20    understand what you mean by doctor shopping.

21                    So if a patient goes to a small practice

22    where there are two doctors and that patient sees both

23    doctors, that's doctor shopping under your definition,

24    correct?

13:37:02 25    A.    If the doctors don't know that the patient is

1      seeing both doctors and if the doctors aren't aware that

2      they're both writing prescriptions for opioids or

3      controlled substances for the same patient, then, yes, it

4      would be.

13:37:13  5      Q.    Let's look at an actual example of a prescription

6      that you reviewed, and I'm about to call it a Tab Number,

7      and I think it's going to be wrong based on my last

8      experience.  So it's, I believe, if my Tab 1 was your Tab

9      6, I'm adding five, so let's try Tab 9.

13:37:51  10      A.    Are you going to put that up on the screen as well?

11      Q.    I will.  I'm trying to see if my guess was write on

12      the tabbing.

13      A.    I'm not sure that the one, the identification

14      number, WMT-MDL-01343_0501?

13:38:20  15      Q.    Yes.  See, it's Tab 4 in my binder.  Thanks.

16              And for the record, I'm not sure if you

17      just said in the Bates Number or not, but it's been

18      marked as Defendant's Exhibit WMT-MDL-01343.

19              Do you recognize this document,

13:38:57  20      Mr. Catizone?

21      A.    Yes.

22      Q.    And this is a document that you relied on to

23      formulate your opinion, correct?

24      A.    Correct.

13:39:05  25      Q.    And I'll represent to you that this particular

1       prescription in your report flagged for red flag three

2       because this patient was dispensed an opioid prescription

3       with overlapping days of supply written by two or more

4       prescribers.

13:39:26  5              So let's take a look at this prescription

6       and then we can describe it for the jury.

7              This prescription -- well, let me back up

8       for a second and just so the jury understands, there is

9       redacted PHI information on this particular prescription.

13:39:43  10             And you understand, Mr. Catizone, that

11      prescriptions contain sensitive patient information and

12      that the defendants in this case have redacted that

13      information to protect the patient's privacy, correct?

14      A.    Correct.

13:40:00  15             MR. WEINBERGER:  Your Honor, can we tell

16      the jury that PHI stands for personal health information?

17             THE COURT:  I was going to suggest that.

18             Is that correct, Doctor, PHI is personal

19      health information?

13:40:09  20             THE WITNESS:  Personal health or protected

21      health information.

22             THE COURT:  Okay.  Thank you.

23             MS. FUMERTON:  Thank you, Dr. Catizone.

24      BY MS. FUMERTON:

13:40:17  25      Q.    So you can see this prescription was written from a

1    prescriber with the University Hospitals Seidman Cancer

2    Center, and I apologize, I'm actually from Chicago, too,

3    so if I butchered that name, I apologize.

4                    THE COURT:  It's Seidman.

13:40:37  5         MR. WEINBERGER:  Seidman.

6                    MS. FUMERTON:  Thank you, Your Honor.

7                    THE WITNESS:  I'm sorry?

8    BY MS. FUMERTON:

9    Q.    I'm sorry, I apologize.  I'll reask my question and

13:40:51 10   hopefully get the pronunciation right.

11                   This is a prescription -- how about I just

12   ask you, Dr. Catizone?  From whom was this prescription

13   written or by whom was this prescription written?

14   A.    I would defer to the Judge.

13:41:04 15   Q.    He's up on the pronunciation.  I was asking a more

16   substantive question, which is this prescription was

17   written from a prescriber with the University Hospitals

18   Seidman Cancer Center, correct?

19   A.    That's what the prescription says, yes.

13:41:17 20   Q.    And you have no reason to doubt that, correct?

21   A.    Not knowing the area, not knowing the prescriber,

22   from my perspective, I couldn't ascertain that for

23   certain, but I will make that as an assumption.

24   Q.    But a local pharmacist would know, right?

13:41:30 25   A.    That's what I was just saying.  I'm not a local

         1    pharmacist and I'm not familiar with that, but I would

         2    make that assumption.

         3    Q.    And you're not a local pharmacist, yet you were

         4    giving your opinion on the legitimacy of all of these

13:41:44 5    hard copy prescriptions you wrote, correct?

         6    A.    Correct.

         7    Q.    And there's a diagnostic code on this prescription,

         8    right?

         9    A.    Correct.

13:41:54 10   Q.    And let's see if we can blow it up.  It's kind of

        11    small.

        12               And the diagnostic code reads C 34.12.

        13    Right?

        14    A.    That's what it reads.

13:42:07 15   Q.    And are you aware of what that diagnostic code

        16    indicates?

        17    A.    No.

        18    Q.    Are you familiar with ICD 10 codes?

        19    A.    Yes, I am.

13:42:16 20   Q.    Can you please explain to the jury what they are?

        21    A.    What doctors do is they have a system of codes

        22    called ICD 9 codes and they use that for billing

        23    purposes.  So when a doctor treats you, they have to put

        24    that code in.

13:42:32 25               It identifies what the diagnosis was and

1   then also determines in some cases how much the doctor

2   will be reimbursed from the insurance companies.

3   Q.   And it also indicates to the pharmacist what the

4   prescriber's diagnosis of that patient was, correct?

13:42:48  5   A.   Not in all cases because most prescriptions don't

6   contain a diagnosis and pharmacists are not familiar with

7   the diagnosis codes as well as physicians are.

8            So for some pharmacists, yes, but for

9   others, it may not be.

13:43:03 10   Q.   Okay.  But you don't know what the knowledge of the

11   pharmacists in this local area are with respect to the

12   diagnostic codes, correct?

13   A.   Correct.

14   Q.   And I'll tell you, I looked this up, and I'm not a

13:43:16 15   doctor or pharmacist either, but it was malignant

16   neoplasm of upper lobe, left bronchus or lung.

17            Do you have any reason to dispute that?

18   A.   No.

19   Q.   Do you understand what that means?

13:43:27 20   A.   Yes, I do.

21   Q.   And in laymen's terms, what does it mean?

22   A.   Lung cancer.

23   Q.   So this is a patient who was diagnosed by their

24   doctor with lung cancer, correct?

13:43:36 25   A.   Correct.

1    Q.    And this prescription was written on February 22nd,

2    2018, right?

3    A.    It's hard to read, but yes, that's the date.

4    Q.    It is hard to read and I apologize for that but we

13:43:55 5    are pulling it up on the screen.  If you can toggle back

6    between the two, it might help.

7    A.    Yeah.

8    Q.    And the pharmacist wrote notes on this

9    prescription, right?

13:44:04 10    A.    Yes.

11    Q.    And you saw these notes when you were reviewing

12    this prescription and issuing and formulating your

13    opinions, right?

14    A.    Correct.

13:44:14 15    Q.    And again, we'll blow it up.  It's a little hard to

16    read, but it says "Aware of the script on January 29th,

17    2018.  Okay to fill.  February 22nd, '18, per Dr. Daniel

18    Silverberg."

19                        Correct?

13:44:34 20    A.    Correct.

21    Q.    So on this prescription, the pharmacist

22    identified -- oh, and I apologize.  I skipped one of the

23    notes.

24                        So if you look above that, it also

13:44:50 25    states -- oh, I'm sorry.  I did read that.

1       "Is aware of the script on January 29th,

2   2018, okay to fill, February 22nd, '18, per Dr. Daniel

3   Silverberg."

4             So on this prescription, the pharmacist

13:45:04  5   identified that there was another prescription for this

6   patient, contacted the prescriber, documented the

7   discussion with the prescriber, knew the patient saw an

8   oncologist, knew the patient was diagnosed with lung

9   cancer; yet, it's your opinion that this prescription

13:45:20 10   should not have been filled, correct?

11   A.    My opinion was it didn't have adequate

12   documentation and I could explain if you'll allow me to.

13   Q.    Well, your counsel can ask you additional questions

14   if he wants, but I don't think that quite answered my

13:45:34 15   question.

16             It's your opinion that this prescription

17   should not have been filled, correct?

18   A.    Until the red flags were resolved, correct.

19   Q.    And in your opinion, the red flags were not

13:45:43 20   resolved so in your opinion this prescription should not

21   have been filled, correct?

22   A.    Correct.

23   Q.    Let's talk about your red flag four.

24             Can we put that Elmo back up?

13:46:04 25             And your red flag four is designed to

1       identify patients who received prescription with

2       overlapping days of supply at two or more pharmacies,

3       right?

4       A.    Yes.

13:46:19  5   Q.    And we just talked about what overlapping days of

6       supply means.

7       A.    Yes.

8       Q.    And you agree that this red flag triggers when

9       there's even one day of overlap between two prescriptions

13:46:31 10   a patient receives, correct?

11      A.    Correct.

12      Q.    Meaning if the patient fills their prescription the

13      day before, they run out of medication, it would flag

14      under your methodology, correct?

13:46:42 15   A.    For the opioids and other controlled substances

16      I've looked at, yes.

17      Q.    And the second part of this red flag is that the

18      patient filled the prescription at two or more

19      pharmacies, right?

13:46:57 20   A.    Correct.

21      Q.    And there are lots of reasons a prescription might

22      be filled at different pharmacies, right?

23      A.    Yes, and I gave some of those reasons yesterday.

24      Q.    For instance, a patient might fill an initial

13:47:11 25   prescription near the doctor's office and a second

Catizone - Cross/Fumerton                    1258

1       prescription near their home, right?

2       A.    That was one of the examples, yes.

3       Q.    Or they may fill one prescription near their home

4       and another near where they work, right?

13:47:22  5     A.    That was another example, yes.

6       Q.    Okay.  So I'm now going to try to talk about a

7       series of these flags together and specifically red flags

8       five through eight.

9                       And without having to go through each one,

13:47:45 10     you recall that each of them involve -- each red flag,

11      red flag five, six, seven and eight, all involve

12      prescriptions for an opioid and then some other

13      medication, either a muscle relaxer, a Benzodiazepine or

14      both, right?

13:48:03 15     A.    Yes, but I'm not sure that the jury will remember

16      that so if we're speaking about a specific red flag,

17      maybe you can put that up so we're talking and the jury

18      is aware of which one we're talking about, please.

19      Q.    Okay.  We'll go through each one of them but they

13:48:19 20     all involve sort of that same concept, right?

21                      So red flag five, the patient was dispensed

22      an opioid, a Benzodiazepine, and a muscle relaxer for

23      overlapping days of supply.

24                      Red flag six is a patient was dispensed an

13:48:33 25     opioid, a Benzodiazepine, and a muscle relaxer on the

1   same day and all the prescriptions were written by the

2   same prescriber.

3   A.    Yes.

4   Q.    Correct?

13:48:40 5   A.    Yes.

6   Q.    And red flag seven is designed to flag an time an

7   opioid and a Benzodiazepine were dispensed to a patient

8   within 30 days of one another.  And red flag eight is

9   designed to flag any time a pharmacist dispensed an

13:49:03 10   opioid and a Benzodiazepine on the same day and all the

11   prescriptions were written by the same prescriber.

12                   Correct?

13   A.    Yes.  Thank you.

14   Q.    And you agree with me that a muscle relaxer is a

13:49:15 15   medication that helps relax a muscle when it's in spasm,

16   correct?

17   A.    That's why it's called a muscle relaxant, yes.

18   Sorry.

19   Q.    Thank you, Mr. Catizone.  You never know.  Probably

13:49:28 20   could have been obvious to some but as I said, I'm not a

21   doctor or pharmacist so I just want to make sure

22   everybody understands.

23                   And a Benzodiazepine is a medication that's

24   often prescribed to treat anxiety-related conditions,

13:49:41 25   correct?

1    A.    Correct.

2    Q.    And an opioid, a muscle relaxer and a

3    Benzodiazepine all treat different symptoms, correct?

4    A.    There is some overlap between the three medications

13:49:55 5    and the effect they have because all three medications

6    involve the central nervous system and depressing

7    responses from the central nervous system so they could

8    have a cumulative and overlapping effect.

9    Q.    But the reason for prescribing them is to treat

13:50:13 10   different conditions oftentimes, correct?

11   A.    If I can ask, if you asked a patient does their

12   back hurt, treating their back pain, then you could

13   prescribe any of those three because all three treat back

14   pain.

13:50:28 15   Q.    So you might have an option to do one of the

16   multiple medications for the same treatment but you could

17   also use the medications to treat for different things;

18   so, for example, if somebody is in a lot of pain, has an

19   upcoming surgery and has anxiety, you would give them two

13:50:42 20   different medications, correct?

21   A.    That was one of the examples we talked about

22   yesterday, about giving a Benzodiazepine and an opioid,

23   depending upon the circumstances.

24   Q.    And the four flags we just looked at, and I don't

13:50:55 25   know if there is going to be a way for me to get all of

| | |
|---|---|
| 1 | these up here, I'm not skilled on this as -- let's |
| 2 | see -- Mr. Lanier is -- but how you structured these |
| 3 | oftentimes, if they flag one, they'll flag another, |
| 4 | correct? |
| 13:51:20 5 | One prescription will hit multiple ones of |
| 6 | these flags, right? |
| 7 | A.    The red flags five and six would just indicate that |
| 8 | both those occurrences happen for the same prescription. |
| 9 | The same with seven and eight, but five, |
| 13:51:35 10 | six, seven and eight would not all show at the same red |
| 11 | flag. |
| 12 | Q.    But the five and six could, right?  So you have one |
| 13 | prescription, the exact same issue, but you're counting |
| 14 | it as flagging twice, correct? |
| 13:51:46 15 | A.    Correct. |
| 16 | Q.    Okay.  Let's look at another prescription. |
| 17 | So, Steve, this is Tab 3 in my binder and I |
| 18 | believe it's going to be Tab 8 in your binder, |
| 19 | Mr. Catizone.  We'll pull it up on the screen to help |
| 13:52:09 20 | orient you, too. |
| 21 | For the record, this document is |
| 22 | Defendant's Exhibit WMT-MDL-01343. |
| 23 | A.    Excuse me, ma'am.  I think that's the same |
| 24 | prescription you put up earlier. |
| 13:52:38 25 | Are you back to the same one?  Because |

1    that's the one we just went through, I think.  We just

2    discussed that prescription and you said on redirect I

3    could explain my process for this prescription.

4    Q.    Okay.  I'm not seeing the screen very well so let

13:52:57 5    me make sure that I've got it right.

6    A.    Okay.

7    Q.    Is this the prescription -- could we put up the

8    Elmo for a second?

9              Okay.  So I don't think that we did just

13:53:15 10    look at this prescription.  So this is the one we talked

11    about earlier, correct, Mr. Catizone.

12    A.    I --

13              MR. WEINBERGER:  There was one before that.

14    A.    There was one before that, the hospice patient that

13:53:26 15    was mentioned.

16              The 0501, that was entered into the record.

17    Q.    Right.  So I'm looking at the one that's on the

18    screen.  So did we talk about that one before?

19    A.    We talked about both of these.

13:53:39 20    Q.    Okay.  So you looked at this one and we looked at

21    this one?

22    A.    Yes, I did.

23    Q.    Okay.  And so this particular prescription, just to

24    make sure the record is clear because I might have messed

13:53:49 25    it up, for WMT-MDL-01343, this is for a hospice patient,

1    correct?

2    A.    Which -- that's not the one on the screen, though,

3    is it?

4                    THE COURT:  Well, I have 1343 as the

13:54:07  5    hospice patient, what, UH Seidman Cancer Center, lung

6    cancer.

7    A.    So there's two 01343s.  There's a 0501 and now

8    there's a 0241.

9                    Which one are you referring to, please?

13:54:28 10    Q.    So I'm looking at the one that's 0501 with the

11    hospice patient.

12    A.    Okay.

13    Q.    Do you see that?

14    A.    Yes.

13:54:35 15    Q.    Okay.  And did we discuss -- you looked at this one

16    earlier?

17    A.    I thought you had it up on the screen, but I may be

18    mistaken.

19    Q.    Okay.  So let me just clarify because I think the

13:54:48 20    record might not be clear, but this is one of the hard

21    copy prescriptions that you reviewed, correct?

22    A.    Yeah, I think what you did is you showed this

23    prescription and then may have represented that the other

24    prescription was part of this prescription, when they're

13:55:01 25    actually two separate prescriptions.

Catizone - Cross/Fumerton                    1264

1    Q.    They are absolutely two separate prescriptions.  So

2    to the extent I was confusing about that, I apologize so

3    let's quickly clear this up and we will go through

4    quickly.

13:55:13  5              So for the record -- and why don't we pull

6    this one up on the screen.

7              So I'm looking at WMT-MDL-01343-0501 and on

8    top of this, this is hospice patient with two underlines,

9    correct?

13:55:30 10   A.    Correct.

11   Q.    And if you take a look at the information on the

12   right side midway down the patient, there's a

13   pharmacist's note.  And can you read what that says right

14   above the redacted PHI?

13:55:48 15              Does it say hospice?

16   A.    I think it says hospice.  It's hard to read.

17   Q.    Okay.  Great.

18              And that's circled, right?

19   A.    Yes.

13:55:56 20   Q.    So not only did the prescriber indicate that the

21   prescription was for a hospice patient but the pharmacist

22   saw that note, right?

23   A.    Yes, ma'am.

24   Q.    Okay.  And if you look at the date of the birth,

13:56:06 25   this particular patient was born in 1936, right?

1    A.    Yes, ma'am.

2    Q.    And it was this prescription was written on

3    December 18th, 2013, correct?

4    A.    Yes, ma'am.

13:56:16  5    Q.    So based on this prescription, you'd agree that the

6    patient is probably about 77 years old at the time that

7    this was written, right?

8    A.    Yes, ma'am.

9    Q.    And, Mr. Catizone, if you look at the

13:56:29 10    prescription -- the prescribers direction for use, it

11    says take 2.5 milliliters teaspoon by mouth every hour

12    for shortness of breath or pain as needed.

13            Is that right?

14    A.    Yes.

13:56:42 15    Q.    So, Mr. Catizone, on the face of this prescription,

16    the pharmacist was able to identify that this patient was

17    77 years old in a hospice program and that the prescriber

18    told the patient to take the medicine for shortness of

19    breath, correct?

13:56:56 20    A.    Yes.

21    Q.    Okay.  And despite all of that, Mr. Catizone, it's

22    your opinion that Walmart's documentation on its

23    prescription was insufficient, correct?

24    A.    I can't answer that question completely because I

13:57:15 25    don't know what other red flags were associated with this

Catizone - Cross/Fumerton

1    prescription, which was how I reviewed these

2    prescriptions.

3                My immediate concern looking at the

4    prescription is that Morphine is a -- is a breathing

13:57:27 5   depressant, and if this patient is 76 years old and given

6    something that's going to depress their breathing, that

7    would be a concern, and so I would also look at that from

8    a clinical standpoint but I would need to see if there

9    were other red flags associated with this prescription,

13:57:44 10  perhaps another opioid, that would further depress that

11   person's breathing and put that patient at risk and

12   that's why I would say there's not adequate documentation

13   until I could review the entire spreadsheet for this

14   prescription.

13:57:55 15  Q.    Okay.  And I can represent to you this flagged on

16   your red flags seven and eight.

17                And just as a reminder, that that is that a

18   patient was dispensed an opioid and a Benzodiazepine.

19                Can we put up the Elmo?  Thank you.

13:58:13 20  A.    So we have a prescription now that simply says

21   76-year-old patient, hospice, we have a red flag that

22   says that patient was also prescribed a Benzodiazepine,

23   and they received that Benzodiazepine -- those

24   medications at more than one pharmacy.

13:58:29 25  Q.    Right.  So looking at what this is, well, no, red

1    flag number seven is that the patient was dispensed an

2    opioid and a Benzodiazepine within 30 days of another,

3    right?

4    A.    Right.  I was confusing five and six, but what it

13:58:47  5    says then is the patient received an opioid and a

6    Benzodiazepine within 30 days so there's overlap, and

7    it's from the same prescriber.

8              Again, the same concerns, you have a

9    76-year-old woman suffering from cancer getting two

13:59:06  10    medications that's going to depress her breathing which

11    is already in a compromised state.

12              When I reviewed that, I didn't know what

13    that other prescription was that triggered that

14    Benzodiazepine red flag, and there's no notes on there

13:59:17  15    from the pharmacist indicating that it's safe to give

16    both prescriptions.

17              Simply the notation that you see, and that

18    the patient is a hospice patient.

19              In some cases, that could be used to

13:59:30  20    euthanize the patient by stopping the patient's breathing

21    so that's why I didn't have enough information and I

22    didn't think the information was enough to document that

23    that prescription should be dispensed.

24    Q.    And so you think this hospice patient shouldn't

13:59:42  25    have received their medication unless all those steps

1    were taken, correct?

2    A.    As I've said, until those red flags were resolved

3    and you could say the patient was safe, then they

4    shouldn't be dispensed.

13:59:54  5              But once they were resolved, if they were

6    resolved and the patient was safe, then you should

7    dispense the prescription.

8    Q.    And in your mind, if you were presented as a

9    pharmacist a prescription where you confirmed it's a

14:00:06 10    hospice patient, they're receiving an opioid and a

11    Benzodiazepine perhaps for anxiety being a hospice

12    patient, you would think that that has red flags that

13    would require you to do additional investigation and

14    document, even if you knew the patient and you knew the

14:00:25 15    prescriber, correct?

16    A.    Correct.  As a pharmacist and a caregiver, yes.

17    Q.    And so every time this hospice patient comes in,

18    this hospice patient that you know and you know the

19    doctor, you think you have to call the doctor, get

14:00:42 20    confirmation once again, document, and in the meantime

21    hold back that medication until you've taken all those

22    steps and documented it, correct?

23    A.    No.  But you said the key word there, you said

24    document.

14:00:55 25              If that was documented in the prescription,

1          that I knew the patient, that these medications were

2          safe, then I would never have to ask those questions

3          again and I could dispense it and any pharmacist after me

4          could dispense that prescription as well.

14:01:08   5   Q.   So how do you know the other prescription didn't

6          have those notes on it?

7          A.   I -- if you have the other prescription, I'd be

8          glad to look at it at this point but just looking at this

9          prescription and knowing that it had all those red flags

14:01:20  10   and there was another prescription written for it, I'd

11         like to see the other prescription.

12         Q.   So you don't know one way or the other because you

13         don't think you had enough information, correct?

14         A.   No.  I responded that based upon the red flags

14:01:31  15   identified with this prescription and the concerns that I

16         had for the patient and the other documentation that

17         would be needed to justify and resolve flags five and

18         six, that I couldn't, couldn't dispense it until red

19         flags five and six were resolved.

14:01:47  20   Q.   But to be clear, Mr. Catizone, the pharmacist who

21         looks like they've initialed this, knows whether they

22         know the patient, knows what that other prescription

23         said, knows what perhaps who the doctor is, and

24         apparently felt that in their professional opinion it was

14:02:16  25   okay to dispense.

1        Correct?

2    A.    I -- I can't make that assumption because I don't

3    know what the pharmacist was thinking.

4            My -- my chore was to review these

5    prescriptions from what would be the required

6    documentation and what documentation would be adequate

7    for some other pharmacist or some regulator to look at

8    and be able to justify or determine that those red flags

9    are resolved.

10           On that basis, I would say that it wasn't

11    adequate documentation.

12    Q.    Because you would want more information and you

13    don't think you have all the information because you

14    don't know what the pharmacist knew, right?

15    A.    Correct.

16    Q.    Okay.  I want to talk about red flags 10 and 11,

17    and I'm actually going to use the slides that Mr. Lanier

18    used because I think I'm a little bit confused.

19           So yesterday you were asked about red flag

20    number 10, correct?

21    A.    Yes.

22    Q.    And that's the patient was dispensed an opioid

23    prescription of over 200 MME per day before 2018 or over

24    90 MME per day after January 1st, 2018.

25           Correct?

1    A.    Correct.

2    Q.    And red flag number eleven is that the patient was

3    dispensed an opioid prescription of over 200 MME per day

4    before 2018 or over 900 -- I'm sorry -- over 90 MME per

14:03:48 5    day after January 1st, 2018, correct?

6    A.    Correct.

7    Q.    What's the difference between those two flags?

8    A.    I apologize, because I forgot some of the facts and

9    some of the background, so at some point, the CDC and

14:04:03 10    medical standards say that you shouldn't prescribe over

11    50 MMEs and so the data was analyzed for 50 MMEs and then

12    after January of 2018, again, they revised it to 90 MMEs.

13              So in changing standards from the CDC on

14    what's an appropriate daily dose of opioids and in my

14:04:23 15    testimony yesterday it was confusing to remember that it

16    changed a couple times instead of just once, so my

17    apologies.

18    Q.    I think your testimony might be confused today

19    unless I'm not following.

14:04:32 20              What's the difference between number 10 and

21    number 11?

22    A.    40 -- the difference was that it was 50, and the

23    error I made yesterday was saying that that 50 should be

24    90, where it should be 50 instead of 90.

14:04:48 25              So number 10 should be 50, not 90.

1    Q.    So that's how this is supposed to read?

2    A.    Correct.

3                The original.

4    Q.    And so this is another example, though, where you

14:05:03  5    have two different flags, though, that potentially flag

6    the same prescription for the same reason, correct?

7    A.    I don't think so, because there were dates where

8    the MMEs were evaluated based upon what the standard was

9    at the time, so I don't think that would happen, but I

14:05:18 10    can't say for certain.

11    Q.    But if a patient, if we're looking at a

12    prescription prior to 2018 that was over 200 MME, it

13    would flag twice under both 10 and 11, correct?

14    A.    For the 50 and the 90, yes.

14:05:46 15    Q.    And for the 200, if it was before 2018, you would

16    be docking the defendants twice for the exact same issue,

17    correct?

18    A.    No.  No.

19                What number 10 says is if it was 200 -- if

14:05:59 20    it was higher than 200 MMEs before January of 2018, then

21    that would have been flagged as a red flag.

22                After 2018, if it was 50 MMEs, they would

23    be zinged as a red flag.  So anyone that received 60

24    would be zinged, but anybody under that number, and the

14:06:25 25    same with the 90 --

1    Q.    Right.

2                So here's my hypothetical.  It's before

3    2018, it's 2017.  Okay?  Are you following me?

4    A.    So far.

14:06:32 5    Q.    Okay.  And the prescription was for over 200 MME,

6    correct?

7    A.    Correct.

8    Q.    It would flag both 10 and 11.

9                You're counting that as two violations of

14:06:46 10    your red flag rules, correct?

11    A.    No, I think in putting the slides together, it

12    would only be flagged once.

13                And I think there a was time period in

14    January -- or in 2018 where it changed from 50 to 90, so

14:07:01 15    those prescriptions prior to that, if they were less than

16    90, less than 50, wouldn't have been, but then when it

17    changed, they would have been flagged.

18    Q.    And you just described that your 50 and 90 MME dose

19    limits were based on CDC's guidelines in prescribing

14:07:26 20    opioids for chronic pain, correct?

21    A.    Chronic pain and the possibility for addiction and

22    abuse.

23    Q.    Okay.  So the CDC guidelines that you're referring

24    do not apply to opioids that are prescribed for acute

14:07:40 25    pain, correct?

```
 1    A.    I -- I'd have to see the guidelines.

 2    Q.    You don't know?

 3    A.    I don't remember exactly.

 4    Q.    Okay.  And they also don't apply to cancer

 5    treatment, palliative care or end-of-life care, do they?

 6    A.    Again if you have that document there, I'd be glad

 7    to look at it and refresh my memory.

 8    Q.    Yeah, but in your expert opinion, you can't recall

 9    what the CDC guidelines say with respect to the subject?

10    A.    Not here at this moment.

11    Q.    And the CDC guidelines also only apply to primary

12    care physicians, right?

13    A.    Again, I would like the opportunity to review that

14    document to make sure, but I can't recall at this moment

15    what I reviewed prior to the case.

16    Q.    Okay.  But we'll probably be discussing these

17    guidelines some more later on in this case, but with

18    respect to your methodology, you applied those guidelines

19    to any doctor and for any condition, acute or chronic,

20    correct?

21    A.    No.

22                When I conducted my analysis, I had the CDC

23    guidelines in front of me, and I used those guidelines in

24    instructing how those red flags should be analyzed.

25                I don't have that document here to respond
```

1    or remember everything I saw, but at the time.  I would

2    have had that document in front of me and used that as a

3    reference material.

4    Q.    So that's what you instructed Dr. McCann to do when

14:09:08 5    he was applying these red flags to look at what the CDC

6    guidelines actually say and apply your red flags in that

7    way?

8    A.    In the communications that may have -- that

9    occurred, the information would have been conveyed back

14:09:20 10    and forth.  If the CDC guidelines changed at this point

11    and this is the red flag I would be looking for in the

12    MME totals.

13    Q.    And so if the CDC guidelines do not apply to

14    prescribing opioids for acute pain, you would not, under

14:09:33 15    your methodology, want your red flags to flag, correct?

16    A.    Again when the methodology was performed, I used

17    the CDC guidelines as a reference and if it didn't

18    pertain, then it would not have been included in the red

19    flag analysis.

14:09:52 20    Q.    Your red flags 12 and 13 address pattern

21    prescribing, correct?

22    A.    I believe so, but again, if you could put those on

23    the screen it would --

24    Q.    Okay.  You can't remember what your red flags 12

14:10:05 25    and 13 are?

Catizone - Cross/Fumerton

1276

1    A.    Oh, I remember but I want to make sure the jury

2    did.

3    Q.    Could you just describe for us what are red flags

4    12 and 13?

14:10:13  5    A.    Sure.

6    Q.    Oh, look, if you have to look it up, I'll put it on

7    so we're all doing it at the same time.

8              Mine are two different pages.  So this is

9    red flag 12, which is an opioid was dispensed to at least

14:10:46 10    four different patients on the same day but the opioid

11    prescriptions were for the same base drug, strength,

12    dosage, form and were written by the same prescriber,

13    right?

14    A.    Yes.

14:10:55 15    Q.    And you call that pattern prescribing, correct?

16    A.    Yes.

17    Q.    And 13 was an opioid was dispensed to at least

18    three different patients within an hour and the opioid

19    prescriptions were for the same base drug, strength,

14:11:09 20    dosage, form, and were written by the same prescriber,

21    correct?

22    A.    Correct.

23    Q.    And again, that's pattern prescribing?

24    A.    Yes.

14:11:14 25    Q.    Doctors often have specialties, correct?

1    A.    I'm sorry, I didn't hear the question.

2    Q.    I apologize.

3              Doctors often have specialties, correct?

4    A.    Yes.

14:11:28  5    Q.    And a prescriber who specializes in a condition

6    will often see patients with similar conditions, right?

7    A.    Yes.  As we discussed yesterday, there may be some

8    prescriptions for patients of a specialist or a dentist,

9    but there would be some variation, based upon patient

14:11:47 10    differences and the other medications they've taken.

11    Q.    There could be or there could not be, right?

12    A.    Yes.

13    Q.    And, for example, a surgeon might schedule multiple

14    patients for the same type of surgery in a day, right?

14:12:01 15    A.    That was one of the examples I gave yesterday as

16    well.

17    Q.    And if multiple patients all receive the same type

18    of surgery for the same condition on the same day, they

19    might all need the same type of medication, right?

14:12:13 20    A.    Hypothetically.  But realistically, maybe not.

21    Q.    But maybe they could, right?

22    A.    Anything's possible, yes.

23    Q.    Well no, not just anything's possible,

24    Mr. Catizone.

14:12:21 25              It's -- when you have a doctor who is, for

1    example, doing surgery on knees, they oftentimes will

2    prescribe the same type of medication to the same type of

3    patients, right?

4    A.    Right.  But as I described yesterday to answer the

14:12:37  5    question, if one of those patients has diabetes or one of

6    those patients is allergic to the particular medication

7    that the doctor normally prescribes, they wouldn't all

8    get the same medication.  So I can't make the

9    generalization that a surgeon is going to write the same

14:12:51 10    medications for every single patient they see.

11                 That's not a statement that I feel

12    comfortable making as a pharmacist.

13    Q.    Okay.  But the opposite's true, too.

14                 If there's not some sort of specific issue

14:13:05 15    with a patient, it wouldn't be uncommon to see multiple

16    patients being prescribed the same dosage for the same

17    type of condition, correct?

18    A.    Correct.

19                 But the chance of seeing the same patients

14:13:14 20    with the same conditions within the same hour seem very

21    unlikely.

22    Q.    Let's talk about that.

23                 So you specifically pointed to, I think,

24    where Mr. Lanier circled and said time, right?

14:13:32 25    A.    Correct.

Catizone - Cross/Fumerton

1    Q.    Okay.  I think we talked earlier, you didn't

2    actually do these calculations, you relied on Dr. McCann,

3    right?

4    A.    Correct.

14:13:41 5    Q.    Do you know how Dr. McCann calculated that, if he

6    didn't have data saying what time the prescription was

7    filled?

8    A.    I don't know how he calculated it, but I know that

9    on the reports that I saw, there were time dates on

14:13:56 10    those, on that at that time.

11    Q.    So you would be surprised to learn if he had

12    calculated those all using the exact same hour, correct?

13    A.    Again, I didn't conduct analysis so I don't know

14    what Dr. McCann used or how he calculated.  I simply put

14:14:13 15    the light on the data.

16    Q.    Yeah, but you didn't expect him to do that based on

17    your flag because you said the time is important, right?

18    A.    I'm sorry?

19    Q.    Well, did you expect him when you asked him to run

14:14:22 20    your analysis to apply the same hour for all of the

21    prescriptions where that information was otherwise

22    unpopulated?

23    A.    What I expected Dr. McCann to do is to make sure

24    that the data analysis for each of the defendants used

14:14:37 25    the same variables, the same factors, so that it was

1     apples-to-apples and oranges-to-oranges and not to use

2     different parameters or different variables that would

3     confound the data.

4               But I left that to Dr. McCann and his

5     specialty.

6     Q.    And so it's okay with you if he had just filled in

7     for a large percentage of prescriptions that they were

8     all filled at noon, right?

9     A.    That's making the assumption that Dr. McCann did

10    not do this professionally and would compromise standards

11    and I can't make that, but I don't believe that that

12    occurred and I would not have relied on the data if I

13    suspected that at all.

14    Q.    And you think that if he had done that, that would

15    be compromising professional standards, correct?

16    A.    I apologize for laughing, but I think anybody that

17    doesn't follow what they're supposed to do, whether it's

18    data analysis or prescriptions, would be compromising

19    professional standards, but there's nothing I have to

20    indicate that Dr. McCann did that.

21    Q.    So you have nothing to indicate that he just

22    substituted a single time period for a large percentage

23    of times?

24    A.    Again, I wasn't involved in the actual analysis of

25    the data.

1    Q.    Okay.

2    A.    I just relied on what was provided to me but I did

3    not suspect anything was inappropriate with the data.

4    Q.    Let's talk about red flag number 15, a 210-day

14:15:58  5    supply.

6              Do you know, Mr. Catizone, whether that

7    would flag if a patient was just refilling a 30-day

8    supply for six months?

9    A.    Well, the first big problem with that hypothetical

14:16:24  10   is that since most of the drugs we were talking about

11   involved Schedule II controlled substances, Schedule II

12   controlled substances cannot be refilled under federal

13   and state law, so that would be a significant red flag if

14   that pharmacist was refilling that Schedule II

14:16:40  15   prescription.

16   Q.    And you're right about that, and I used the term,

17   if I used the term "refill," I apologize because that's

18   not what I meant to say.

19              What I meant to say is if a patient is

14:16:50  20   presenting a 30-day supply of a prescription and they're

21   doing a new one every month, which is what's required for

22   a Schedule II prescription, that would flag every time

23   they are filling a 30-day prescription each month within

24   a six-month period, correct?

14:17:10  25   A.    As you recall from earlier, one of the DUR alerts

1    says it should be one-to-30 days.  And again, I go back

2    to if that pharmacist had documented that this was a

3    patient that was going to require longer therapy because

4    they were a cancer patient, then you wouldn't have to

14:17:25  5    resolve that every single time it came up because it

6    would be resolved and documented within the record.

7    Q.    So the answer to my question was yes, it would flag

8    every time, right?

9    A.    Unless properly documented, yes.

14:17:35 10    Q.    And it wouldn't just flag once.  In my

11    hypothetical, it flags six times because you're counting

12    each prescription that was presented within that

13    six-month period to be a separate flagged prescription,

14    correct?

14:17:48 15    A.    I don't know if that same -- that same

16    prescription, it wouldn't, because that prescription

17    number then would be present six times, which means it

18    was refilled six times.

19                It would have to be six different or new

14:18:02 20    prescriptions.  And I'm not sure that -- so then it

21    wouldn't be flagged, each one of those prescriptions

22    would be flagged, but not six times.

23    Q.    So in that hypothetical, that patient who's

24    presenting a prescription each month for a three-day

14:18:17 25    supply would get flagged six times under your

1    hypothetical, correct, or under my hypothetical?

2    A.    Unless it was documented.

3    Q.    Well, it would get flagged no matter, correct?

4    A.    I'm lost in your hypotheticals because if those

14:18:33  5    prescriptions were in a data set, I don't think they

6    would have been counted six times, but I don't know

7    because you're giving me a hypothetical that I'm not sure

8    could actually take place.

9    Q.    Let's talk about red flag 16 quickly, and that's

14:18:48  10    cash pay, right?

11    A.    Correct.

12    Q.    All right.  So when you use the term cash, you

13    don't literally mean cash, right?

14    A.    I'm sorry, yes, cash dollars.

14:19:04  15    Q.    Okay.  So what about credit card?  And maybe my

16    question was unclear, I apologize if it was.

17    A.    Oh, I'm sorry.

18                Credit cards, discount cards, anything

19    that's outside of insurance.

14:19:12  20    Q.    Okay.

21    A.    So I apologize.

22    Q.    Yeah, so what --

23    A.    I just say that because my children never carry

24    cash and so when I say do you have cash, they don't know

14:19:21  25    what cash is so I apologize.

1           (Laughter.)

2    Q.    As I said, sometimes the question is too -- too

3    basic to be asking.

4                So in this instance, when you use the term

14:19:29  5    cash, you're using effectively noninsurance, correct?

6    A.    Correct.  Correct.

7    Q.    So it would also flag people who are presenting a

8    credit card?

9    A.    Correct.

14:19:36 10    Q.    Correct?

11               And then if somebody presents a credit

12   card, then there's a record of who got that information,

13   right?

14   A.    There's not a record for the insurance company.

14:19:48 15               The only record would be with the credit

16   card company.

17   Q.    Well, right, because it's one of the main reasons

18   that a person could present cash is because they have no

19   insurance, correct?

14:19:56 20   A.    Correct.  That was one of the examples we talked

21   about yesterday as well.

22   Q.    And we can -- actually it's me that has to pull

23   this down.  Thank you.

24               So I just want to make sure that I'm clear

14:20:22 25   about what your methodology does and does not do.

1        Your red flag approach doesn't consider the

2   information that's available to the pharmacist relating

3   to the local area, correct?

4   A.    If that information was documented on the

14:20:40  5   prescription, then I did consider it.

6   Q.    But if it wasn't documented on the prescription,

7   so, for example, you have a pharmacist who's filling a

8   prescription for a long-term patient of theirs, you don't

9   expect to see every single prescription to have

14:20:54 10   documentation, right?

11   A.    I would have expected to see at least one

12   documentation.

13   Q.    But it could have been the first time they saw that

14   patient and not the sixth or seventh or eighth or ninth

14:21:06 15   times that they saw that patient, correct?

16   A.    Correct.  So in my analysis, when I said that the

17   overwhelming majority, that was some of the wiggle room I

18   left in saying maybe this was documented and they didn't

19   provide it in the records.

14:21:18 20        There was room for exceptions within my

21   assessment of how many prescriptions actually had all the

22   documentation needed.

23   Q.    But you just reviewed a sample, right?

24        So if somebody had refilled several

14:21:31 25   prescriptions at a pharmacist and there could be

1    documentation on another prescription, you wouldn't know,

2    right?

3    A.    Right.  But my task was to review the prescriptions

4    that were provided to me by the defendants and make an

14:21:44  5    assessment on those prescriptions.

6              I have no idea what happened outside of

7    those prescriptions, and, therefore, I can't comment or

8    make an assessment on that.

9              Based on what I reviewed, that's what I

14:21:55 10    found.  If there's other information, other prescriptions

11    that occurred, other patient notes, it wasn't part of my

12    analysis.

13    Q.    Okay.  Can we please pull up Mr. Catizone's

14    supplemental report at Page 16, Footnote 48?

14:22:38 15              And, Mr. Catizone, this is an example of

16    some electronic notes that you found with respect to a

17    Walmart or with respect to a prescription that was filled

18    by a Walmart pharmacy, correct?

19    A.    Correct.

14:22:59 20    Q.    Okay.  And you think this documentation was

21    inadequate, correct?

22    A.    I'm rereading it, but, yes, based on what was in my

23    report, yes.

24    Q.    And this actually shows that the pharmacist was

14:23:15 25    checking OARRS over a dozen times and documenting it,

1    right?

2    A.    Shows that they verified with the doctor, the

3    doctor/patient relationship, but it doesn't show or

4    verify or document that flags the word shown about the

14:23:50 5    combination of these prescriptions and why the patient

6    was getting those medications.

7    Q.    And so if you even look at the dates of these OARRS

8    checks, do you see that this patient was coming to this

9    particular pharmacy for over 10 years, right?

14:24:11 10    A.    Correct.

11    Q.    But this still is inadequate, inadequate

12    documentation, right?

13    A.    Again, when I looked at the prescriptions, I looked

14    at all the red flags.

14:24:21 15              If you could pull up the spreadsheet with

16    this prescription, I could see what the other red flags

17    were that weren't documented or weren't covered by this

18    note, and that would help me very much.

19    Q.    I want to show you some of the prescription notes

14:24:51 20    that Mr. Lanier walked through with you earlier today.

21    So here's one example and I don't have the corrected

22    version so I'm going to put that over.

23              This is again one of the examples that you

24    showed insufficient documentation, correct?

14:25:38 25    A.    Correct.

1    Q.    What was the red flag on this prescription?

2    A.    I don't know, but if you have the spreadsheet with

3    this prescription, it will identify what the red flags

4    are.

14:25:46  5    Q.    Well, this was the example that you walked through

6    with Mr. Lanier today, correct?

7    A.    Correct.

8    Q.    And so you're not suggesting that anything on here

9    was a red flag, is that right?

14:25:55  10    A.    Oh, no, I am suggesting that there are red flags in

11    this, but I don't know what the specific red flags are

12    beyond what I can deduct from this note.

13    Q.    Okay.  So when you were saying that this was

14    insufficient to resolve the red flag, you can't recall

14:26:10  15    what the red flag was that was at issue here, correct?

16    A.    I can identify what the red flags, what one of the

17    two red flags might be, but not specifically all the red

18    flags.

19    Q.    No, I'm just asking for this particular

14:26:28  20    prescription where you said that the documentation was

21    insufficient, if you could tell the jury what the red

22    flag was.

23    A.    Sure.

24    Q.    And what is it?

14:26:36  25    A.    One of the red flags is early refills.  It's

1    specifically mention there.

2    Q.    Well, let me stop you because I think my question

3    must not have been clear.

4                I'm asking for this particular

14:26:47 5    prescription, do you know why this particular

6    prescription flagged your methodology?

7    A.    So that's what I answered earlier, which was

8    without seeing that prescription on the spreadsheet, I

9    can't give you all the red flags, but clearly early

14:27:02 10    refills must have been a red flag for that prescription

11    because even the pharmacist noted that in their notes,

12    but there was no documentation nor explanation of how

13    that early refill came to be or how it was resolved.

14                And they still dispensed the prescription.

14:27:20 15    Q.    And I think actually when you were testifying about

16    this earlier, you said that you didn't know whether one

17    of these prescriptions for this patient was not filled,

18    correct?

19                In other words, that's a poor question, let

14:27:34 20    me reask it.

21                You talked about how you would want to know

22    why a pharmacist may have refused to fill one of these

23    prescriptions, correct?

24    A.    Correct.

14:27:43 25                And also the early refill, you asked the

1    question or gave the hypothetical earlier that if a

2    patient filled it earlier, what would be wrong with that.

3              This is the type of documentation that that

4    would have -- or situation that that documentation would

14:27:57 5    have resolved, so again, I don't think there was adequate

6    documentation on this early refill to know whatever

7    happened and that would be one of the red flags.

8    Q.    I think you're going on to another subject.

9              My question was about the refusals to fill

14:28:09 10   and how you had wished you had reviewed refusal to fill

11   documentation.

12             Did you review any of the refusal to fill

13   documentation that Walmart produced in this case?

14   A.    Did you ask if I reviewed the refuse to fill, the

14:28:23 15   RTFs that Walmart has?

16   Q.    Yeah, are you aware that Walmart produced

17   information in this case relating to prescriptions that

18   its pharmacists refused to fill?

19   A.    I know that Walgreen's -- I mean, I'm sorry,

14:28:35 20   apologize to both companies -- that Walmart had a program

21   on refuse to fill, but I did not see any of that

22   information in the materials that was provided to me.

23   Q.    So if Walmart had produced it, but you didn't see

24   that, that was because the plaintiffs' lawyers didn't

14:28:51 25   give it to you?

1    A.    I don't know why I didn't receive it, whether it

2    was plaintiffs or defendants.

3              I don't know.

4    Q.    All right.  I want to switch subjects just for a

14:29:04  5    brief moment, and you testified earlier about Walmart's

6    fiscal year 2012 facility managed incentive plan.

7              Do you recall that testimony?

8    A.    I recall the slide, yes.

9    Q.    Okay.  And is your testimony that it's not a good

14:29:28 10    incentive to fill or that you should not incentivize

11    filling opioids that should not be filled, is that right?

12              Let me ask the question even better because

13    I butchered it that time, too.

14              It was -- you testified earlier that it's

14:29:47 15    not good to incentivize filling opioid prescriptions that

16    should not be filled, correct?

17    A.    Correct.

18    Q.    You also testified that's not good to put profits

19    above patient care?

14:29:57 20    A.    Correct.

21    Q.    Correct?

22              You don't have any evidence in this case

23    that that occurred with respect to any prescription that

24    Walmart filled, correct?

14:30:08 25    A.    In regard to what, please?

1    Q.    Your testimony.

2    A.    When I looked at the data and I saw that there were

3    thousands of prescriptions that were dispensed without

4    resolved red flags, that indicated to me that something

5    happened that shouldn't have happened or something wasn't

6    enforced that should have been enforced.  I don't know if

7    the rationale or reason for that was incentivizing the

8    pharmacist to do that.  I also don't know if Walmart

9    encouraged people to, not to fill prescriptions that

10   shouldn't have been refilled.

11         All I had to do was look at the data and

12   there were thousands of prescriptions that should not

13   have been dispensed until those red flags were resolved.

14   Q.    So you don't know one way or another whether or not

15   pharmacists were incentivized in the way that you

16   testified earlier, correct?

17   A.    Not specifically.

18   Q.    Are you aware that controlled substance

19   prescriptions were removed from the MIP script count

20   metrics in fiscal year 2015 at Walmart?

21   A.    I know when Mr. Lanier asked me questions about did

22   these programs change over time, I indicated yes, that

23   they did change.

24         So I'm not sure the specific dates, but I

25   know that Walmart, Walgreen's and others did change some

1  of their policies, yes.

2  Q.    Are you aware that Walmart's fiscal year begins on

3  February 1st, so if they made the change for fiscal year

4  2015, they actually made the change for February 1st,

5  2014?

6  A.    I didn't get involved in what the fiscal years were

7  for various defendants, so, none of that was calculated.

8  Q.    Okay.  Switching subjects, I believe one of the

9  first things you testified to actually when you were

10  describing what NABP does, you testified that a third

11  function of NABP is that it has the accreditation system

12  where it accredits pharmacies, wholesale distributors,

13  Internet sites to make sure they are in compliance with

14  all state and federal laws and that they were not doing

15  anything that would actually harm the public.

16           Do you recall that testimony?

17  A.    Yes, I do.

18  Q.    And one of the NABP distribution accreditation

19  systems that NABP administers is called the Verified

20  Accredited Wholesale Distributor accreditation, which is

21  often referred to as VAWD, is that right?

22  A.    Correct.  That was its former name, it's now a new

23  name but that's not really relevant.

24           Yes.

25  Q.    And the defendants in this litigation each received

1    a VAWD accreditation from NABP, correct?

2    A.    Correct.

3    Q.    So at least from a policies and procedures

4    standpoint, if the VAWD isn't giving accreditation, it is

5    concluding that the distributor's policies and procedures

6    --

7              THE REPORTER:  I'm sorry.  I'm sorry.

8    Could you start that over?

9              MS. FUMERTON:  Sure.

14:33:34 10    Q.    So from a policies and procedures standpoint, if a

11    distributor receives the VAWD accreditation, NABP is

12    concluding that the distributor's policies and procedures

13    are compliant with the Controlled Substances Act, right?

14    A.    No.

14:33:52 15    Q.    Okay.  Let me ask a different question.

16              So from a policies and procedures

17    standpoint, if the VAWD accreditation is given, then VAWD

18    is concluding that the distributor's policies and

19    procedures are compliant with the Controlled Substances

14:34:06 20    Act, correct?

21    A.    No.

22    Q.    So do you recall giving a deposition in this case

23    on June 15th, 2021, correct?

24    A.    Correct.

14:34:27 25    Q.    Okay.  And let's look at that testimony.

          1            Do you recall saying:

          2                 "Question:  And so at least from a policies

          3     and procedures standpoint, if the VAWD is giving

          4     accreditation, it is concluding that their policies and

14:34:40  5     procedures are compliant with the CSA, correct?

          6                 "Answer:  Along with distribution lines,

          7     yes."

          8                 Correct?

          9     A.    Correct.

14:34:55 10                 Can I also just clarify a point that you

         11     made earlier that I think is important that you made?

         12     Q.    I think that Mr. Lanier will ask you questions.

         13                 We have a limited period of time so let me

         14     get through these and then if we have additional time --

14:35:09 15     A.    I don't represent the NABP as you said at the

         16     beginning, so.

         17     Q.    Well, you were the Executive Director of NABP for

         18     many years, correct?

         19     A.    Right.  But at the beginning, you asked me if when

14:35:20 20     I testified today I represented.  I just want to make

         21     sure I was adhering to what you asked and I wanted to

         22     clarify.

         23     Q.    The jury heard just a little bit about Walmart's

         24     Health & Wellness department but you're familiar with a

14:35:39 25     number of individuals that worked at Walmart's

1    Health & Wellness department, correct?

2    A.    Correct.

3    Q.    And, in fact, NABP has given those folks awards

4    over the years for their work in pharmacy, correct?

14:35:51  5    A.    Correct.

6    Q.    And we touched on it briefly but I just want to

7    make sure that we're clear.

8              You're aware Walmart pharmacists have

9    always had the ability to refuse a prescription that they

14:36:22 10    felt was inappropriate for any reason, right?

11    A.    I wasn't aware of that until I saw the refuse to

12    fill policy.

13              I don't know what occurred prior to that

14    policy or whether that was something the pharmacists had

14:36:31 15    the option to.

16    Q.    Well, do you recall testifying at your deposition

17    on June 16th, 2021, that you understood that Walmart

18    pharmacists have always had the ability to refuse to fill

19    any prescription that they felt was inappropriate for any

14:36:44 20    reason?

21              MR. WEINBERGER:  Objection, Your Honor.

22              If we're going to quote testimony, can we

23    have the witness look at it?

24              THE COURT:  I agree.

14:36:53 25              MS. FUMERTON:  Okay.  Let's pull it up,

 1    please.

 2                    MR. WEINBERGER:  Well, can we have the

 3    witness see it rather than publish it?

 4                    MR. LANIER:  It doesn't matter.

 5                    MS. FUMERTON:  I was trying to -- I was

 6    trying to address the objection of publishing it to the

 7    witness.

 8                    MR. LANIER:  We're fine showing it to the

 9    world.

10                    We just need page and line so we can follow

11    along and see what's being said in the context, Your

12    Honor.

13                    THE COURT:  I think that's fair.

14                    MS. FUMERTON:  Okay.

15                    THE COURT:  Give the page and the line.

16                    MS. FUMERTON:  It would be Page 513, Lines

17    10 through 13 of the June 16th, 2021 deposition and we

18    will pull it up on the screen.

19                    MR. LANIER:  What page?

20                    THE COURT:  Page 513.

21                    MR. LANIER:  Thank you, Judge.

22                    THE COURT:  513.

23    BY MS. FUMERTON:

24    Q.   Okay.  So if we look at Page 513, Line 10, you were

25    asked by me, actually:

1          "You understood that Walmart pharmacists

2     have always had the ability to refuse to fill any

3     prescription that they felt was inappropriate for any

4     reason, correct?

14:38:15  5          "Answer:  Yes."

6               Right?

7     A.    Yes.  Can you show the next part of the deposition,

8     please, because that's relevant to the answer I just gave

9     there.

14:38:24 10    Q.    Okay.

11    A.    So then you said --

12    Q.    And that meant that Walmart pharmacists could

13    exercise their professional judgment and not fill a

14    single prescription from a prescriber they felt was

14:38:33 15    problematic, correct?

16    A.    Correct.

17    Q.    You said, "That's my understanding, yes."

18    A.    Under a pharmacist's professional judgment, they

19    have that ability.  If a company restricts that, I didn't

14:38:42 20    know that.

21               So under professional judgment, every

22    pharmacist in the world has the ability to not fill a

23    prescription based on their professional judgment.

24    Q.    Mr. Catizone, under your tenure, did NABP market

14:39:02 25    and promote opioids to try and influence prescriber

1    behavior?

2    A.    Not -- not at all.

3              I'm -- I don't know how to respond to that.

4    Definitely not.

14:39:21  5    Q.    And under your tenure, did NABP receive sponsorship

6    grants from Purdue Pharma?

7    A.    No.

8    Q.    Did Purdue Pharma fund continuing education

9    programs put on by NABP?

14:39:35 10    A.    I can't recall if they did, but Purdue Pharma

11    provided a million dollars to NABP and NABP turned around

12    and gave that money to the states, every dime of it, so

13    that the states could establish their PDMP programs as

14    part of the payback that we felt Purdue owed the states

14:39:55 15    and patients that were affected by the opioid problem.

16    Q.    So but you signed contracts with Purdue Pharma to

17    receive money for -- to promote continuing education

18    programs, correct?

19    A.    We accepted money from Purdue Pharma, Walmart,

14:40:11 20    Walgreen's, for educational programs of grants no larger

21    than $5,000, and those programs are regulated by the

22    accreditation council and pharmacy education and we have

23    to follow those guidelines.

24              And anyone who sponsored a program had no

14:40:25 25    control over the topic or over the subject or over the

1    people who spoke at those sessions.

2    Q.    So and that's not my question.

3          My question is by accepting the $5,000 on

4    contracts that you signed, right?

14:40:39 5    A.    Correct.

6    Q.    You were promoting opioids, right?

7    A.    We -- I at NABP never promoted opioids, ma'am.

8    Q.    And you would agree that entering into a contract

9    with Purdue to put on pharmacist education would not be

14:40:59 10   promoting opioids, correct?

11   A.    Agreed, because the programs that Purdue sponsored

12   did not deal with opioids.

13         They dealt with other subjects.

14   Q.    And so if somebody were to suggest that because

14:41:39 15   NABP received grants for programs from Purdue, NABP was

16   colluding with Purdue -- I'm sorry, let me rephrase.

17         So if somebody were to suggest that because

18   NABP received grants for programs from Purdue, that NABP

19   was colluding with Purdue and responsible for the opioid

14:41:54 20   crisis, that would be inaccurate, right?

21   A.    Not only it would be inaccurate, I would take that

22   as a person and professional insult to myself and NABP.

23         MS. FUMERTON:  Thank you.

24         I have no further questions and will pass

14:42:06 25   it on to the next defendant.

1          Thank you for your time, Mr. Catizone.

2          THE WITNESS:  Thank you.

3          MR. SWANSON:  Your Honor, excuse me, I'm

4    happy to begin.

14:42:19  5          I'm mindful of the time, in that I'm not

6    going to get through my exam and certainly my colleagues

7    on the defense side are not going to --

8          THE COURT:  Why don't you take about 15

9    minutes and when it's a good time to stop, we'll stop.

14:42:34  10          MR. SWANSON:  Happy to do it, Your Honor, I

11   was going to say you give me the time out to --

12          THE COURT:  I'm not going to cut you off.

13          Go for about 15 minutes and if I see it

14   looks like you're moving to another subject, we'll stop.

14:42:48  15          MR. SWANSON:  Okay.  Thank you.

16          MR. STOFFELMAYR:  I'll give you the time

17   out over here.

18          MR. SWANSON:  Mr. Pitts, do I have it on

19   the computer?  Thank you.

14:43:19  20          Your Honor, may I proceed?

21          THE COURT:  Yes.  Yes, Mr. Swanson.

22          MR. SWANSON:  Thank you.

23          CROSS-EXAMINATION OF CARMEN CATIZONE

24   BY MR. SWANSON:

14:43:26  25   Q.   Mr. Catizone, good afternoon.  Members of the jury,

1     good afternoon.

2                     We're on the final stretch for the week and

3     so I hope you'll bear with me for a few questions and we

4     can reconvene on Tuesday morning.  Okay?

14:43:36  5     A.    Yes, sir.

6     Q.    Now, Mr. Catizone, you may not recall or you may

7     not have noticed, but you and I have actually met a few

8     times before over a Zoom deposition.

9                     Do you recognize my face?  I recognize

14:43:49 10     yours.

11     A.    Yes, sir.

12     Q.    I may have had some -- some bad COVID facial hair

13     at the time but I smartened up or my wife made me.

14                     What I want to do with the last few minutes

14:44:02 15     today is continue with our discussion of red flags you

16     were having with Ms. Fumerton, but I want to take it to a

17     bit more general level.

18                     And, sir, to start that discussion, I

19     wanted to touch on something that you talked about

14:44:18 20     yesterday a couple times with Mr. Lanier.

21                     You sort of touched on it in passing, and

22     that is the stakeholders red flag document that you put

23     together with some stakeholders when you were over at

24     NABP.

14:44:35 25                     Do you recall generally that topic coming

        1   up yesterday?

        2   A.    Yes, sir.

        3   Q.    And you and I have talked about that a bit in your

        4   depositions, too, do you recall that?

14:44:43 5   A.    Yes, sir.

        6   Q.    And the stakeholders document, I think you told me,

        7   was an example of the NABP working together with

        8   pharmaceutical -- or pharmacy chains and other interested

        9   parties to put out a document that you believe brought

14:45:03 10  value, right?

       11   A.    Yes, sir.

       12   Q.    And if, if my notes were right, and you can correct

       13   me if I'm wrong, but I believe that was in the 2013, 2014

       14   time frame.

14:45:13 15               Is that right?

       16   A.    I believe so, sir, yes.

       17   Q.    Okay.  So just to reset the stage for everyone's

       18   benefit here, at that time, 2013, 2014, there were

       19   problems that were arising between prescribers and

14:45:31 20  pharmacists regarding red flags and the pharmacists'

       21   corresponding responsibility, right?

       22   A.    Yes, sir.

       23   Q.    All right.  And what I wanted to know is just talk

       24   a bit more specifically about the genesis of that

14:45:47 25  project.

Catizone - Cross/Swanson                    1304

 1              As I understand it, I think you've

 2       mentioned this yesterday, you at NABP were approached

 3       jointly by Walgreen's and the American Medical

 4       Association to convene a group of stakeholders, right?

14:46:06  5       A.    Yes, sir.

 6       Q.    And can you just remind us all or tell us for the

 7       first time who the AMA is?

 8       A.    That's the American Medical Association.

 9              It's a professional association for

14:46:16 10       individual practicing doctors.

11       Q.    And do you have any sense how big, how many members

12       are in the AMA?

13       A.    From just what I read, I think there are over two

14       million doctors.

14:46:26 15              I know for certain there are two million

16       doctors licensed in the United States based upon my work

17       with the Federation of State Medical Boards, but the AMA

18       members are significantly less, I think somewhere in the

19       range of maybe 39,000 doctors are actually members of the

14:46:43 20       AMA.

21              And the AMA is based in downtown Chicago.

22       Q.    And when you were at NABP, did you frequently work

23       with the AMA?

24       A.    Yes, sir.

14:46:51 25       Q.    Okay.  And so if I understood it, what would have

1    happened in that time frame, the AMA had passed a

2    resolution that pharmacists should simply fill

3    prescriptions from doctors and that pharmacists shouldn't

4    be providing a check or second-guessing the prescribers'

14:47:13  5    decisions.

6              Is that right?

7    A.    Yes, sir.

8    Q.    They said at AMA that prescribers, or pharmacists,

9    excuse me, were interfering with the practice of medicine

14:47:24 10   by conducting prospective Drug Utilization Review, right?

11   A.    They -- my recollection -- and I wasn't there --

12   they made the statement that pharmacists were interfering

13   by requesting MRIs and other diagnostic tests.

14             I'm not sure of the specific language, but

14:47:43 15   I agree with what you said, sir.

16   Q.    Okay.  And so what was happening is that

17   pharmacists were getting prescriptions from patients and

18   I take it these were prescriptions for opioid

19   medications, right?

14:47:54 20   A.    Yes, sir.  For controlled substances, opioids as

21   well.

22   Q.    Okay.  But was opioids sort of the focus of this?

23   A.    Yes.

24   Q.    And what was happening is that these pharmacists in

14:48:03 25   exercising their corresponding responsibility were

1    calling up physicians and were asking for further

2    information so that they could make a decision whether to

3    dispense, right?

4    A.    Yes, sir.

14:48:13  5    Q.    And this was Walgreen's and other chain pharmacies

6    who were coming to you with this information, right?

7    A.    Yes, sir.

8    Q.    And Walgreen's had a problem with this because

9    they're trying to fulfill their corresponding

14:48:29 10    responsibility, and they're being told that they may need

11    to contact a physician to check up on the prescription,

12    and the physicians were saying stop calling me, right?

13    A.    Yes, sir.

14    Q.    Just dispense what we prescribe and don't ask

14:48:42 15    questions, right?

16    A.    Yes, sir.

17    Q.    And Walgreen's wasn't willing to do that, were

18    they?

19    A.    For the -- yes, in the situations that occurred,

14:48:50 20    yes.

21    Q.    In the situation I'm describing, that's how it

22    arose, right?

23    A.    Correct.

24    Q.    Now -- excuse me, he can't hear.

14:49:04 25               You weren't here for openings, I don't

```
 1   believe, and have you seen the openings?

 2   A.    No, sir.

 3   Q.    Okay.  In the openings, Mr. Lanier made a reference

 4   to pharmacists at the chain pharmacies acting like

 5   gumball machines when it came to dispensing opioid

 6   medications.

 7             MR. LANIER:  Objection, Your Honor.  I did

 8   not.  I said the exact opposite, that they should not be

 9   treated bike gumball machines.

10             THE COURT:  All right.  Well, remember,

11   ladies and gentlemen, I said that the opening statements

12   are not evidence, nor are questions.

13             So the jury is to essentially disregard

14   that colloquy because it's inconsequential.

15   BY MR. SWANSON:

16   Q.    Let me ask you this.

17             What was happening at Walgreen's at the

18   time when they approached you at the AMA, was not

19   Walgreen's pharmacists acting like gumball machines, was

20   it, sir?

21   A.    No, sir.

22   Q.    And the folks at Walgreen's and at the other chain

23   pharmacies wanted guidance from the NABP as to what was

24   appropriate in their interactions with physicians when

25   the pharmacists were trying to fulfill their
```

1    corresponding responsibility, right?

2    A.    The original intent, sir, was to open the lines of

3    communication and resolve the conflict that was occurring

4    between the doctors and the pharmacists and reach a

14:50:26 5    balance between both responsibilities, sir.

6    Q.    Okay.  So you wanted to bring together doctors, you

7    wanted to bring together pharmacists, and other entities,

8    to have a discussion about how pharmacists could fulfill

9    their corresponding responsibilities without interfering

14:50:41 10   with the physicians' practice of medicine, right?

11   A.    Yes, sir.

12   Q.    Okay.  And so a bunch of folks came together,

13   Walgreen's participated in that, right?

14   A.    Me -- I don't have the list, but, yes, sir, I'll

14:50:55 15   try and remember them all.

16   Q.    Well, let me try and then I can show you the list

17   in just a minute, but do you recall -- well, obviously

18   Walgreen's participated, right?

19   A.    Correct.

14:51:03 20   Q.    And do you recall if CVS participated?

21   A.    Yes, they did.

22   Q.    And obviously the AMA?

23   A.    Yes, they did.

24   Q.    And do you recall if the NACDS participated?

14:51:15 25   A.    I believe they did.

1    Q.    And who is the NACDS?

2    A.    The NACDS is the National Association of Chain Drug

3    Stores.  They're the trade association for the chains

4    that would lobby for legislation and advocate for the

14:51:29 5    chains in the states and in Federal Government.

6    Q.    Okay.  And what happens is everybody got together

7    and there were meetings and they lasted for a couple of

8    years at least, right?

9    A.    I think about a year-and-a-half, sir.

14:51:44 10            But the other participants that were

11    important to mention is that the DEA also attended those

12    meetings, as well as Rite Aid, as well as all the major

13    distributors, Cardinal Health was there, and also some of

14    the manufacturers were there, and I can't recall, but

14:52:01 15    it's important that those participants were noted, too.

16    Q.    Okay.  Good.

17            So the DEA could come in and they could

18    discuss with the pharmacies what they thought the

19    pharmacists should be doing in their interactions with

14:52:13 20    prescribers, right?

21    A.    Exactly, sir.

22    Q.    Got it.  Okay.

23            And what happened is over the course of

24    these meetings, these -- all of these entities got

14:52:24 25    together and they generated a document, right?

```
         1    A.    I don't want to characterize them as enemies in

         2    case the testimony gets out, but, yes, those

         3    stakeholders --

         4    Q.    I said entities.

14:52:35 5              (Laughter.)

         6    A.    I'm sorry, I thought you said enemies.

         7    Q.    We are at different spots.

         8    A.    I was getting nervous there for a second.

         9    Q.    I think we like each other.

14:52:44 10             All right.  The entities got together and

        11    met several times and they worked on a document that then

        12    was put out by your organization, the NABP, right?

        13    A.    Yes, sir.

        14    Q.    And the stakeholders document that they put out,

14:52:57 15   that was a document that you supported as the CEO in its

        16    final form, right?

        17    A.    Yes, sir.

        18    Q.    Okay.

        19             MR. SWANSON:  Your Honor, I can get into

14:53:09 20   the document.

        21             I'm afraid that I'm going to get cut off.

        22             THE COURT:  All right.  Well, then, a good

        23    time to stop.

        24             All right.  Ladies and gentlemen, we're

14:53:19 25   breaking early because of the holiday weekend.  So I want
```

1        to remind you of a couple things.

2                    No Court on Monday.  It's Columbus Day, so

3        enjoy a good holiday.

4                    On Tuesday, we're going to start at 9:00.

14:53:35  5        We're going to take a slightly later lunch, around 1:00

6        because I'm going to conduct a naturalization ceremony up

7        the street.  So we'll be back essentially on our usual

8        schedule 9:00 to 5:30 on Tuesday.

9                    It's important that you remember all of the

14:53:52 10        admonitions because you're going to be off for three

11        days.

12                    If you encounter anything about this case

13        in the media, print, electronic, whatever, just turn the

14        channel, page, ignore it.  Do not discuss this case with

14:54:06 15        anyone.

16                    Tell your family members, friends,

17        colleagues, whatever, you're sitting on a jury and this

18        Judge has ordered me not to talk about it until it's

19        over.

14:54:16 20                    Just relax, have a good few days, and we'll

21        see you all on Monday -- Tuesday, Tuesday, 9:00 a.m.

22                    Oh, and that was Mr. Swanson for

23        Walgreen's.  He didn't introduce himself or I forgot to.

24                    MR. SWANSON:  I apologize, Your Honor.

14:54:37 25        That's rude.  My apologies.

1312

| | |
|---|---|
| 1 | (Jury out.) |
| 2 | THE COURT:  Have a good weekend, and I'll |
| 3 | see everyone Tuesday. |
| 4 | My basic tally was 14.57 hours for the |
| 14:55:20  5 | plaintiffs and 6.25 for the defendants so -- |
| 6 | MR. LANIER:  Thank you, Judge. |
| 7 | THE COURT:  -- see you all on Tuesday. |
| 8 | (Proceedings concluded at 2:55 p.m.) |
| 9 | - - - - |
| 10 | C E R T I F I C A T E |
| 11 | I certify that the foregoing is a correct |
| 12 | transcript from the record of proceedings in the |
| 13 | above-entitled matter. |
| 14 | |
| 15 | **/s/Susan Trischan** |
| 16 | /S/ Susan Trischan, Official Court Reporter Certified Realtime Reporter |
| 17 | 7-189 U.S. Court House |
| 18 | 801 West Superior Avenue Cleveland, Ohio 44113 (216) 357-7087 |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1      **I N D E X**

2

3  <u>**WITNESSES:**</u>                                              <u>**PAGE**</u>

4    DIRECT EXAMINATION OF CARMEN CATIZONE (RESUMED)    1113

5    BY MR. LANIER

6    CROSS-EXAMINATION OF CARMEN CATIZONE               1207

7    BY MS. FUMERTON

8    CROSS-EXAMINATION OF CARMEN CATIZONE (RESUMED)     1227

9    BY MS. FUMERTON

10   CROSS-EXAMINATION OF CARMEN CATIZONE               1301

11   BY MR. SWANSON

12

13                        * * * * *

14

15

16

17

18

19

20

21

22

23

24

25