1   IN THE DISTRICT COURT OF THE UNITED STATES
    FOR THE NORTHERN DISTRICT OF OHIO
2   EASTERN DIVISION

3

    IN RE:                          Case No. 1:17-md-2804
4   NATIONAL PRESCRIPTION           Cleveland, Ohio
    OPIATE LITIGATION
5                                   October 12, 2021
    CASE TRACK THREE                9:00 a.m.
6

7

8                        - - - - -

9
                        **VOLUME 6**
10

11                       - - - - -

12

13          TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14          BEFORE THE HONORABLE DAN A. POLSTER,

15             UNITED STATES DISTRICT JUDGE,

16                     AND A JURY.

17

18                       - - - - -

19

20

21   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
22                            801 West Superior Avenue
                              Cleveland, Ohio  44113
23                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

```
 1    APPEARANCES:
      For the Plaintiffs:          Peter H. Weinberger, Esq.
 2                                 Spangenberg, Shibley & Liber
                                   1001 Lakeside Avenue, Ste. 1700
 3                                 1900 East Ninth Street
                                   Cleveland, Ohio   44114
 4                                 216-696-3232

 5                                 W. Mark Lanier, Esq.
                                   Rachel Lanier, Esq.
 6                                 M. Michelle Carreras, Esq.
                                   The Lanier Law Firm
 7                                 6810 FM 1960 West
                                   Houston, Texas   77069
 8                                 813-659-5200

 9                                 Frank L. Gallucci, III, Esq.
                                   Plevin & Gallucci Company, LPA
10                                 The Illuminating Building
                                   Suite 2222
11                                 55 Public Square
                                   Cleveland, Ohio   44113
12                                 216-861-0804

13                                 Salvatore C. Badala, Esq.
                                   Maria Fleming, Esq.
14                                 Napoli Shkolnik
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York   10017
                                   212-397-1000
16
      For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
17                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
18                                 Alex Harris, Esq.
                                   Sharon Desh, Esq.
19                                 Bartlit Beck LLP
                                   54 West Hubbard Street, Ste.300
20                                 Chicago, Illinois   60654
                                   312-494-4400
21
      For CVS Defendants:          Graeme W. Bush, Esq.
22                                 Eric R. Delinsky, Esq.
                                   Alexandra W. Miller, Esq.
23                                 Paul B. Hynes, Jr., Esq.
                                   Zuckerman Spaeder - Washington
24                                 Suite 1000
                                   1800 M Street, NW
25                                 Washington, DC   20036
                                   202-778-1831
```

1316

```
 1    For HBC/Giant Eagle
      Defendants:                Robert M. Barnes, Esq.
 2                               Scott D. Livingston, Esq.
                                 Marcus & Shapira
 3                               35th Floor
                                 One Oxford Centre
 4                               301 Grant Street
                                 Pittsburgh, PA   15219
 5                               412-471-3490

 6                               Diane P. Sullivan, Esq.
                                 Chantale Fiebig, Esq.
 7                               Weil Gotshal & Manges
                                 Suite 600
 8                               2001 M Street NW
                                 Washington, DC   20036
 9                               202-682-7200

10    For Walmart Defendants:    John M. Majoras, Esq.
                                 Jones Day - Columbus
11                               Suite 600
                                 325 John H. McConnell Blvd.
12                               Columbus, Ohio   43215
                                 614-281-3835
13
                                 Tara A. Fumerton, Esq.
14                               Tina M. Tabacchi, Esq.
                                 Jones Day - Chicago
15                               Suite 3500
                                 77 West Wacker
16                               Chicago, Illinois   60601
                                 312-782-3939
17

18    ALSO PRESENT:             Special Master David Cohen

19                              - - - - -

20

21

22

23

24

25
```

 1                   TUESDAY, OCTOBER 12, 2021, 9:03 A.M.

 2                         THE COURT:  All right.  Good morning.

 3                         Everyone be seated.

 4                         I think the witness could come up.

09:05:34  5               (Jury in.)

 6                         THE COURT:  Okay.  Please be seated.

 7                         Good morning, ladies and gentlemen.  I hope

 8       you all had a good weekend so we're going to continue

 9       with Mr. Catizone's testimony, and, sir, I'd like to

09:06:10 10      remind you you're still under oath from last week.

11                         Mr. Swanson.

12                         MR. SWANSON:  Good morning, Your Honor.

13       Good morning.

14                         Your Honor, over the weekend I put together

09:06:21 15      just a few documents I'd like to use.

16                         May I approach the witness?

17                         THE COURT:  Yes.

18                         MR. SWANSON:  So I can hand it to him.

19       I'll go over the top.

09:06:33 20               THE WITNESS:  Thank you, sir.

21                         MR. SWANSON:  Thank you.

22               CROSS-EXAMINATION OF CARMEN CATIZONE (RESUMED)

23       BY MR. SWANSON:

24       Q.    Good morning, Mr. Catizone.  How are you today?

09:06:51 25      A.    Fine, sir.  Yourself?

1     Q.    Well.  Thank you for asking.

2              Again, I'm Brian Swanson, I represent

3     Walgreen's.

4              What I wanted to do to start off this

09:07:02  5   morning is to pick up where we left off, and that was

6     talking about the stakeholders document that your

7     organization, former organization, the NABP, created with

8     input from the DEA and the chain pharmacies and others.

9              Okay?

09:07:21 10   A.    Yes, sir.

11    Q.    Okay.  So what I'm going to do is call up a

12    document.

13              Okay.  So, Mr. Catizone, I've given you a

14    hard copy of the document.  It's behind Tab 1.  And then

09:07:45 15   I've also put the document up on the screen, so whichever

16    is easier for you to follow along, feel free.

17    A.    Thank you.

18    Q.    Do you recognize what's been marked as Defendants'

19    MDL Exhibit 11427?

09:07:59 20   A.    Yes, sir.

21    Q.    Is this the stakeholders document that you put

22    together when you were at the NABP?

23    A.    Yes, sir.

24    Q.    And it's several pages and I'm not going to talk

09:08:12 25   about every page, but I do want to ask you about a few of

1       them.

2                           If you look at the executive summary there,

3       I think I asked you on Friday, but I just wanted to

4       confirm, this project, putting together this document, it

09:08:28  5   began in 2013.

6                           Is that true?

7       A.    Yes, sir.

8       Q.    And it looks like, if you can see in the first

9       paragraph, it was October of 2013.

09:08:43 10                 Did I highlight it there?  Do you see that?

11      A.    Yes, sir.

12      Q.    Okay.  And so that was when you were approached by

13      Walgreen's and the AMA?

14      A.    No, sir.  We were approached prior to that.  That

09:08:53 15  was the first meeting of the group.

16      Q.    I see.  So they had come to the organization before

17      that and October, '13 is when the team got together?

18      A.    Yes, sir.

19      Q.    Okay.  If you could flip, please, to Page 7.

09:09:12 20                 I want to ask you about this second

21      paragraph here.  Trying to call it up.

22                          Okay.  Do you see the paragraph I'm looking

23      at there I have blown up on the screen?

24      A.    Yes, sir.

09:09:28 25  Q.    Okay.  It says, "During the past two decades,

Catizone - Cross/Swanson

1320

1    growing numbers of patients with persistent noncancer

2    pain have been offered long-term opioid therapy.  This

3    change in prescribing behavior has been influenced by

4    several competing interests."

09:09:47  5              Do you see that?

6    A.    Yes, sir.

7    Q.    Okay.  And that was -- that was the view of the DEA

8    and the NABP and everyone involved in this document.

9              True?

09:09:56 10   A.    No, sir.

11   Q.    Okay.  Is that the document that or is that the

12   language that went into the document the organization put

13   out?

14   A.    That was the language submitted by the prescribers

09:10:07 15  based upon their position that others then deferred to

16   the prescribers to say that's what the prescribers are

17   finding, and others simply signed off on the document

18   summary and the conclusions at the end, sir.

19   Q.    I see.  So the prescribers were explaining to the

09:10:24 20  rest of the group what they were seeing in the evolving

21   standard of care, is that fair?

22   A.    Exactly, sir.

23   Q.    Okay.  Thank you.

24              If you look on a bit further in there, you

09:10:34 25  see that it talks about, "In both hospital and outpatient

1    settings, the recognition of pain as the fifth vital

2    sign, and the evolution of patient satisfaction surveys

3    that include a focus on the extent to which a patient's

4    pain is relieved, created a practice environment that,

09:10:55  5    although intended to promote pain assessment and

6    effective treatment, in general ultimately led to an

7    increase in opioid prescriptions."

8                 Do you see that?

9    A.    Yes, sir.

09:11:05 10    Q.    And then it continues, "Despite the substantial

11    burden of persistent pain in the United States, access to

12    multi-disciplinary care and reimbursement for

13    nonpharmacologic approaches is woefully inadequate."

14                 Can you tell me what that sentence means?

09:11:24 15    A.    Yes, sir.  Before someone is prescribed an opioid,

16    because of how significant that medication is and how

17    dangerous that is, patients are put through a whole

18    regimen of other nonpharmacological, which means nondrug,

19    therapies.

09:11:39 20                 First thing would be to send the patient to

21    physical therapy if they had back pain, to use some of

22    those common over-the-counter products, Ibuprofen,

23    Tylenol, and when those products didn't work, when the

24    prescribers exhausted all those different options and

09:11:56 25    only then are opioids used as a last resource.

Catizone - Cross/Swanson                    1322

1          What this statement is saying,

2    unfortunately, is that some of those alternate therapies,

3    there may not be insurance coverage or funding for those,

4    and patients may not have access to those services.

09:12:09  5    Q.    So what the prescribers were telling you is that we

6    might want to put one of our pain patients in physical

7    therapy or some alternative treatment, but because of

8    insurance we're forced to put them on opioid therapy.

9          Right?

09:12:23 10   A.    That was their perspective on it, sir, yes.

11   Q.    Okay.  And what the prescribers told you is that

12   all of these factors that you and I have just discussed

13   have contributed to the routine use of opioid analgesics,

14   right?

09:12:37 15   A.    Yes.  Again, from the doctors' perspective that's

16   what they felt, sir.

17   Q.    Okay.  If we can flip now to Page 9, this is a

18   section you can see on the bottom, if I just blow it up,

19   let's do this, let me show you a little bit more.

09:13:05 20         So just to be clear, this is a section that

21   is talking about the pharmacist's responsibilities when

22   it comes to dispensing medications and specifically when

23   it comes to dispensing opioid medications, right?

24   A.    Yes, sir.

09:13:21 25   Q.    Okay.  And if you look at the -- at the last bullet

1     there, right above, it says, "The presentation of

2     controlled substance prescription adds the following

3     complicating factors to the dispensing responsibilities."

4              Do you see that?

5     A.    Yes, sir.

6     Q.    Okay.  And the first bullet point that's listed

7     there is recognizing red flag warnings, right?

8     A.    Yes, sir.

9     Q.    And that's something that we've talked a bit about

10    on Friday and we'll talk a bit more about today, but that

11    paragraph sort of spells out the responsibilities that

12    the stakeholders had identified when it comes to red

13    flags and dispensing, right?

14    A.    No, sir.

15             This was written by the pharmacists, the

16    pharmacy organization, so it would have been Walgreen's,

17    the American Pharmacy Association, and this was one of

18    the primary interactive components between prescribers

19    and others.  Not all the responsibilities of the

20    pharmacist was listed in this paragraph, sir, in regard

21    to red flags.

22    Q.    I didn't say everything, all the responsibilities

23    were listed in that paragraph.

24             What I said is that paragraph talks about

25    the red flags we've been discussing and what the

1   pharmacist's responsibilities are when it comes to red

2   flags, right?

3   A.    Not all the responsibilities, sir.

4   Q.    Okay.  Well, let's move on.

09:14:39  5              Will you agree with me that that does

6   discuss red flags and what the pharmacists had told the

7   NABP and the DEA the responsibilities were when it comes

8   to red flags?

9   A.    One of the responsibilities, recognizing red flags,

09:14:53  10  sir.

11  Q.    Okay.  Let's then, if we could, please, sir, flip

12  to the following page, and that list then continues, and

13  I'll just blow that up.

14              I'm having trouble with that today.

09:15:08  15              Okay.  Another one of the responsibilities

16  that the pharmacists had identified in this document that

17  NABP put out and the DEA worked on is satisfactorily

18  determining legitimacy of the prescription, right?

19  A.    Yes, sir.

09:15:25  20  Q.    And then it walks through some of the steps that

21  can be taken to determine the legitimacy of the

22  prescription, right?

23  A.    Yes, sir.

24  Q.    The next bullet then continues, "Accessing PMP

09:15:38  25  data."

Catizone - Cross/Swanson                    1325

1                    Do you see that?

2    A.    Yes, sir.

3    Q.    And we talked about PMP data last week, but

4    that's -- that's the database that a pharmacist can go

09:15:45 5    into and see what other prescriptions the patient may

6    have filled at any pharmacy, right?

7    A.    Yes, sir.

8    Q.    All right.  And then the final bullet point that's

9    listed under the responsibilities for pharmacists in

09:16:02 10    dispensing opioid medication is, "Distribution

11    restrictions implemented by wholesale distributors."

12                    Right?

13    A.    Yes, sir.

14    Q.    Okay.  So the document that the DEA participated in

09:16:14 15    creating and that you as the CEO of the NABP supported in

16    final form says nothing about documenting the resolution

17    of red flags in this section on pharmacists'

18    responsibilities, true?

19    A.    The specific phrase is not used, sir.

09:16:35 20    Q.    Right.  I mean, nowhere does it say the pharmacist

21    has an obligation to document the resolution of red

22    flags, right?

23    A.    Not in this section, sir.

24    Q.    Well, not anywhere in the document, right?

09:16:46 25    A.    No, sir.

1    Q.    No, sir, I'm incorrect?

2    A.    Yes, sir, you're incorrect, sir.

3    Q.    Okay.  Well, if you can point me to where it is in

4    this document that it states that a pharmacist has an

09:16:59 5    obligation to document the resolution of red flags, I'm

6    all ears.

7    A.    Sure.

8    Q.    Okay.

9    A.    Several times in the document, but I'll give you

09:17:09 10    one reference, if you can turn to Page 13, sir.

11    Q.    Okay.  Give me one second.

12    A.    So the paragraph beginning "When presented," so

13    what it says there --

14    Q.    Let me blow it up so everyone can see it, okay?

09:17:29 15    A.    So the key points that we talked about on Friday,

16    pharmacists must exercise their professional judgment and

17    must adhere to corresponding responsibility.

18            The document also does not include the word

19    "Diagnosis."  Doesn't include the word "Physical -- the

09:17:48 20    words "Physical examination" which pertain to

21    prescribers, and it doesn't specifically say "Document"

22    because the intention of the document was not to outline

23    all the responsibilities the prescribers and pharmacists

24    must engage with that are part of their professional

09:18:03 25    judgment, corresponding responsibility.

```
  1              So words like "Document" and what the

  2    pharmacist needs to do to document are assumed to be

  3    included in these responsibilities and not something that

  4    other practitioners/prescribers should say the

09:18:20  5    pharmacists should be doing it.

  6                   That was something the pharmacists should

  7    know and was defined in those particular terms.

  8    Q.    Sir, you just asked me to blow up this paragraph,

  9    and I want you to show me in this paragraph where it says

09:18:32 10    the pharmacist has an obligation to document the

 11    resolution of red flags.

 12    A.    Yes, sir.

 13                   As I mentioned, the specific word

 14    "Document" is not there, but clearly how pharmacists

09:18:39 15    interpret and how others interpret professional

 16    responsibility and corresponding responsibility contains

 17    the requirements to document.

 18    Q.    Well, you said the DEA participated in the creation

 19    of this document, right?

09:18:50 20    A.    Yes, sir.

 21    Q.    And the DEA didn't come out and say, "Hey, wait a

 22    second, guys, this is missing the most important part,

 23    documentation of red flags."

 24                   The DEA didn't say that, did they?

09:19:02 25    A.    As I explained, everyone realized who was at that
```

1    meeting the corresponding responsibility including

2    documentation.

3    Q.    But respectfully, sir, you don't have any idea what

4    everybody understood or realized who participated in that

5    meeting, do you?

6    A.    I do, sir, because I participated in the

7    discussions.

8              I was physically at that -- every meeting,

9    and that came up at the meetings, talking about the

10   importance of documentation, and people said from the

11   various groups that that was part of corresponding

12   responsibility, sir.

13   Q.    So at this meeting you're saying you talked about

14   how important it was to document the resolution of red

15   flags, and nobody saw fit to put any of that language in

16   this document that you supported in its final form.

17             Is that your testimony?

18   A.    Yes, sir.

19   Q.    Okay.  Let's turn then if we can to the section on

20   red flags, and that's on Page 10.

21             Okay.  And do you see there there's a

22   Section 3 which reads, "Factors more indicative of

23   substance abuse or diversion (red flags)"?

24   A.    On Page 10?  I'm sorry.

25   Q.    Well, I thought it was -- yes, Page 10 in the upper

             1    right-hand corner.

             2    A.    Oh, yes.

             3    Q.    Do you see that?

             4    A.    Yes, sir.

09:20:22     5    Q.    And do you see there the section, Section 3, where

             6    it talks about red flags?

             7    A.    Yes, sir.

             8    Q.    Okay.  And then it talks about red flags for

             9    prescribers and then there's a section on red flags for

09:20:36    10    pharmacists who are presented with the prescription,

            11    right?

            12    A.    I talk -- are you referring to Page 13, sir?

            13    Q.    Yes, sir, I am.

            14    A.    Okay.

09:20:45    15    Q.    Okay.  So --

            16    A.    Do you want me to look at, I'm sorry, 10 or 13 now,

            17    sir?

            18    Q.    I just want to orient everybody that we're in the

            19    red flag section now, and then on Page 13 it talks about

09:20:54    20    the red flags for pharmacists, right?

            21    A.    Yes, sir.  Some of the red flags.

            22    Q.    Okay.  And I don't want to go through all of

            23    the -- all of the red flags that are listed in this

            24    document, but is it safe to say that some of those red

09:21:08    25    flags are included in the red flags that you came up with

1    for this litigation and others are not?

2    A.    Yes, sir.

3    Q.    I do want to ask you about one of the red flags in

4    here, just very briefly.

09:21:21    5              If you'd turn to Page 14, there's a section

6    on "Medication taking/supply."

7              Do you see that?

8    A.    Yes, sir.

9    Q.    Okay.  And one of those, you can see the second

09:21:41   10   bullet point, "Therapeutic duplication of two or more

11   long-acting and/or two or more short-acting opiates."

12              Right?

13   A.    Yes, sir.

14   Q.    That's also a red flag that you've come up with in

09:21:55   15   this litigation as one of your 16, right?

16   A.    Yes, sir.

17   Q.    Can you tell me what are some examples of a

18   long-acting opiate?

19   A.    There's various designations that the

09:22:09   20   pharmaceutical companies may use, extended relief,

21   extended sustained relief, so some of the opioid products

22   like OxyContin, ES or such have an extended release which

23   would be a long-term acting opiate, sir.

24   Q.    And what about what are some of the examples of

09:22:27   25   short-acting opiates?

1   A.    Short would be just an OxyContin 30 milligram,

2   OxyContin 80 milligram, Hydrocodone, whatever strength,

3   the 325, 10 milligram, those that don't have the extended

4   release or sustained release or long-acting designations

09:22:43  5   after them.

6   Q.    One opioid I've heard talked about is Methadone.

7                  Is that a long acting or short acting?

8   A.    That's a rather complicated question, sir, to

9   answer because Methadone just recently was approved for

09:22:59 10   pain management, and it is very difficult to dose

11   Methadone because of how quickly it is absorbed into the

12   body and how long it stays in the body.

13                  So some people may consider it long acting,

14   short acting.  It's not supposed to be used in pain

09:23:14 15   management unless that person's very specifically

16   trained, and the patient is very carefully monitored.

17                  As many of you know, it's used as an

18   alternative to heroin, so people that don't utilize

19   heroin, they use Methadone, but from a clinical

09:23:29 20   perspective, sir, it's difficult for me to answer that

21   question.

22   Q.    Okay.  So it could be long acting, it could be

23   short acting, depending how it's --

24   A.    Depending how the patient reacts to it, sir.

09:23:38 25   Q.    Okay.  If we could flip, please, sir, a couple of

1    pages to Page 15.  So the document here lists all the red

2    flags, and then -- oh, I went one past it.

3                 Do you see there there's a Section 4?

4    A.    Yes, sir.

09:23:59  5    Q.    And it reads, "Other aberrant medication-related

6    behaviors and factors potentially indicative of substance

7    abuse or diversion."

8                 Right?

9    A.    Yes, sir.

09:24:12  10    Q.    Okay.  And this apparently is a pretty literate

11    group.

12                 Aberrant, that means abnormal?

13    A.    No, sir.  That's behavior outside of the normal.

14    Q.    So abnormal?

09:24:22  15    A.    Yes, sir.

16    Q.    Okay.  So if you could flip then -- so this is the

17    section then that's talking about other abnormal

18    behaviors that may potentially be indicative of

19    diversion, right?

09:24:40  20    A.    Yes, sir.

21    Q.    And if you flip then just one page, and I'll blow

22    it up for you, these two paragraphs, it talks about

23    abnormal behaviors that a pharmacist should be on the

24    lookout for, right?

09:24:53  25    A.    Yes, sir.

```
 1    Q.   Okay.  And it says, let me just highlight here, it

 2    says, "While the above factors," and that was like the

 3    long acting, short acting factors, "or red flags are more

 4    indicative of substance abuse or diversion, oftentimes

 5    more subtle aberrant or abnormal behaviors exist, that

 6    while in and of themselves may not be problematic, may

 7    indicate a potential issue that warrants further

 8    evaluation prior to dispensing."

 9             Right?

10    A.   Yes, sir.

11    Q.   And then it continues, and let me just get it

12    highlighted, then we can read it together, "Aberrant

13    behaviors that patients may exhibit upon the presentation

14    of the prescription include traveling unexplainable

15    and/or unreasonably long distance to a physician office

16    and/or the pharmacy or requesting to pay cash for a

17    controlled substance prescription, when it has been

18    documented that he or she has insurance that would

19    normally cover the prescription."

20             Right?

21    A.   Yes, sir.

22    Q.   I want to pause on each of those for just a moment.

23             The first non-red flag, abnormal behavior,

24    is traveling an unexplainable and/or unreasonably long

25    distance to the doctor or pharmacy, right?
```

Catizone - Cross/Swanson                          1334

1    A.   If I may, sir, I think you said non-red flag.

2              These are additional red flags, not non-red

3    flags, sir.

4    Q.   We'll talk about that.

09:26:38  5              Do you see this issue, though, of somebody

6    traveling an unreasonably long distance to the pharmacy?

7    A.   Yes, sir.

8    Q.   And I think that's something that you put into your

9    red flag bucket in this, in the red flags you came up

09:26:56 10   with for this lawsuit, right?

11   A.   Yes, sir.

12   Q.   You testified last week that a patient with the

13   prescription might elect to visit the pharmacy close to

14   where that person works because that's more convenient

09:27:10 15   than getting the prescription filled closer to the

16   person's home, right?

17   A.   That's what studies have shown, and I testified to,

18   sir, yes.

19   Q.   Yeah.  And you agree that's pretty common, right?

09:27:20 20   A.   Yes, sir.

21   Q.   Your analysis, the red flag analysis you talked

22   about on Thursday or Friday, that's based on the distance

23   between where the patient lives and where the pharmacy

24   is, right?

09:27:34 25   A.   There were two red flags.

Catizone - Cross/Swanson                              1335

1          One where the patient lived and the

2     pharmacy was located, and one where the patient lived and

3     the prescriber was located, sir.

4     Q.    Yeah, I understand.  I'm focusing on the pharmacy

5     now, okay?

6     A.    Yes, sir.

7     Q.    So your analysis, when it comes to the pharmacy, is

8     based on the distance from where the patient lives to

9     where the pharmacy is located, right?

10    A.    Yes, sir.

11    Q.    And you don't have any idea where any of those

12    folks who are filling their prescriptions, you don't have

13    any idea where they work, you just know where they live,

14    right?

15    A.    Right.

16          We talked -- I talked about with the jury

17    last week that that would be an exception if a person had

18    the prescription filled where they work or there was some

19    other reason that could be explained and the red flag

20    resolved, sir.

21    Q.    Right.  But when you are doing your analysis, you

22    don't have any idea how many of the folks that you have

23    flagged were filling prescriptions close to where they

24    work rather than close to where they lived, right?

25    A.    Correct, sir.

1    Q.    Okay.  The second aberrant behavior indicated here

2    says, "When a patient requests to pay cash when it's been

3    documented that he or she has insurance that would

4    normally cover the prescription," right?

09:28:45  5    A.    Yes, sir.

6    Q.    Why does it matter if the patient has insurance?

7    A.    The -- well, if you're filling a prescription at a

8    pharmacy and you would submit it to insurance, that claim

9    is reviewed by your insurance company.

09:29:00 10          And the insurance companies then review the

11   clinical requirements of that prescription as well as

12   whether or not that prescription should be reimbursed

13   for, and one of the biggest issues that pharmacies

14   struggle with is insurance companies rejecting claims or

09:29:15 15   clawing back payment from pharmacies.

16          So if you submit something to insurance, it

17   has to be perfect.  Otherwise, the pharmacy's not going

18   to get paid for it and that creates a significant

19   problem.

09:29:27 20          People utilize cash, then, to avoid that

21   second or third review by an insurance company that the

22   pharmacy may not do or that the pharmacy may miss.

23   Q.    So when you were doing your red flag analysis, did

24   you include that limitation that they're paying cash but

09:29:44 25   they have insurance?

Catizone - Cross/Swanson

1337

A.     I -- the red flag, I'm not sure how Dr. McCann
pulled those, but my direction to Dr. McCann was if any
of the patients paid with cash or a discount card or
anything indicated outside of insurance that that should
be flagged, sir.

Beyond that, I'm not sure what else was
pulled.

Q.     So it could have been that the folks that you
flagged in your analysis, they paid with cash because
they didn't have insurance and you just don't know that,
correct?

A.     Correct, sir.  That was one of the exceptions we
spoke about last week as well.

Q.     And I think you said last week that the industry
standards and information from the industry show that 90
to 95 percent of all patients have some sort of insurance
coverage for their medications, right?

A.     Yes, sir.

Q.     And what that means is there is 5 to 10 percent of
the population out there that doesn't have some sort of
insurance, right?

A.     Yes, sir.

Q.     The only option for those folks is to pay cash or
not get health coverage?

A.     Correct.

1    Q.    Health care, right?

2    A.    Correct.  That's why the notes are so critical to

3    document that, and I didn't see any documentation in the

4    notes that indicated like that saying patient does not

09:30:53  5    have insurance, must pay cash, sir.

6    Q.    But given your data you would expect that 5 to 10

7    percent of the folks who present a script at any of the

8    pharmacies don't have insurance just based on the data,

9    right?

09:31:04 10    A.    Right.  Not being an expert that would make sense,

11    that if there's a percentage of people that don't have

12    insurance, there's probably that same percentage that

13    would be reflected in the prescriptions as well.

14    Q.    If we could flip, and I'm almost done with this

09:31:22 15    document, to Page 17, the next page, and what we were

16    just talking about there is what the stakeholders had

17    called other aberrant behaviors, right?

18    A.    Yes, sir.

19    Q.    And what the document that your organization put

09:31:41 20    out, you supported, said is that "Whereas these abnormal

21    behaviors we've just been talking about may be indicative

22    of potential drug abuse and/or diversion, they are not in

23    and of themselves positive identifiers that unequivocally

24    result in a pharmacist taking specific actions or be used

09:32:03 25    to establish general standards of care or to inform

1    statutory or regulatory requirements."

2             Right?

3    A.    Yes, sir.

4    Q.    In the red flags you came up for for this

09:32:15  5    litigation, you say that distance and cash is a red flag

6    that unequivocally means a pharmacist has to take action,

7    right?

8    A.    Yes, sir.

9    Q.    And the stakeholders document that you participated

09:32:26 10    in creating, that DEA participated in creating, in

11    its -- those conditions don't make the test of red flags,

12    do they?

13    A.    The next sentence, sir, if you could read that, it

14    says, "These types of behavior should, however, result in

09:32:42 15    an increased vigilance with taking all patient

16    circumstances into consideration."

17             What I testified is that the pharmacist

18    must identify red flags and then resolve those red flags,

19    and if the red flags are resolved, then the pharmacist is

09:32:56 20    safe to dispense the prescription, sir.

21    Q.    And you would agree with me that the red flags and

22    other abnormal behaviors that you created for the

23    plaintiffs' lawyers in this litigation are different from

24    the red flags and behaviors that went into the document

09:33:14 25    that you blessed as the head of the NABP, right?

1    A.    They are not different, sir.

2          The document doesn't include all the red

3    flags, but those other red flags are noted in the

4    footnotes and the various DEA cases.  If you turn to the

09:33:28  5    document, there's a number of references that point to

6    the other red flags that are mentioned in my report, sir.

7    Q.    And the red flags that you created for this

8    litigation are different than the criteria that the DEA

9    has identified in its *Pharmacist's Manual*, true?

09:33:46 10    A.    No, sir, because the DEA clarified the pharmacy

11    manual by the Court actions it took in the *Holiday*, the

12    *Hills*, the *East Main Street* pharmacies, and so the red

13    flags I identified were identical to what the DEA has

14    said, sir.

09:34:00 15    Q.    Well, sir, if the red flags that you created for

16    this litigation were the law --

17          MR. LANIER:  Your Honor, objection to form.

18    At some point I have to object.

19          He keeps saying the red flags that you

09:34:13 20    created for this litigation.

21          This witness didn't create these red flags

22    for this litigation.  And to put that into the

23    question --

24          THE COURT:  Okay.  I'll sustain the

09:34:21 25    objection the way the question was asked.

1               MR. LANIER:  Thank you.

2      BY MR. SWANSON:

3      Q.     The red flags that you have testified

4      about -- well, the red flags you've testified about in

09:34:28  5    this litigation were red flags that you identified and

6      you gave them to Dr. McCann, right?

7      A.     There were red flags that the DEA and cases

8      identified, and then I presented those identified red

9      flags to Dr. McCann, sir.

09:34:41 10    Q.     Well, sir, if the red flags that you have been

11     talking about in this litigation were the law or the

12     standard practice for pharmacists, there wouldn't be any

13     need to get this stakeholder group together to develop a

14     set of red flags, true?

09:34:57 15    A.     Well, sir, at the beginning when you first started

16     talking about this, the primary purpose was to open up

17     lines of communication between the doctors and

18     pharmacists because those lines of communication had

19     broken down, and the purpose of this document and

09:35:11 20    identifying some of the red flags was reaching a common

21     ground between the pharmacists and the doctors on what

22     each other's responsibilities were.

23               It wasn't to say these are the definitive

24     list of red flags that everyone must follow and here's

09:35:23 25    what everyone must do, sir.

Catizone - Cross/Swanson

1342

1    Q.    Let me conclude on this issue of red flags with a

2    couple specific things you talked about last week.

3              The first one is you said, I think, and you

4    can correct me if I get it wrong, but I think you said

09:35:45  5    that all of the 16 red flags that you have been using in

6    this litigation, all of them can be resolved except one,

7    right?

8    A.    Yes, sir.

9    Q.    And the one that you said can't be resolved is what

09:35:57 10    you've called a trinity prescription, right?

11    A.    Yes, sir, the opioid, the Benzodiazepine, the Xanax

12    and such --

13              THE COURT:  Mr. Catizone.

14              THE WITNESS:  I'm sorry.

09:36:10 15              THE COURT:  Particularly when you're giving

16    drug terms or long words, I need you to slow down.

17              Thanks.

18    A.    The trinity again is a combination of three drugs,

19    and there are several trinities, but the one specifically

09:36:23 20    in this example is an opioid, and there is a

21    Benzodiazepine, which we've talked about could be Xanax,

22    Valium, and then the third is a muscle relaxant, and it's

23    Carisoprodol, C-A-R-I-S-O-P-R-O-D-O-L, brand name

24    generally Soma.

09:36:45 25              That's the trinity, sir, that I was

1   referring to.

2   Q.    And in your opinion, as you've testified in this

3   case, if that prescription is presented, that red flag

4   can never be resolved, right?

09:36:54  5   A.    The resolution, sir, is to not dispense that

6   prescription.

7   Q.    Okay.  So a physician or prescriber should never

8   write a trinity prescription according to you, right?

9   A.    Yes, sir.

09:37:06  10   Q.    And you understand that your position, you've just

11   articulated, is inconsistent with the position of the DEA

12   on this issue, right?

13   A.    I'm not familiar what the position of the DEA is on

14   this issue, sir.

09:37:20  15   Q.    So you didn't know that the DEA's position is that

16   it's up to the prescriber to make determinations as to

17   what to prescribe?

18   A.    I based my response upon the fact that when we met

19   with the stakeholder group and there were pain management

09:37:33  20   physicians there and family practitioners and other

21   practitioners, the prescribers in that group all

22   agreed --

23            MR. SWANSON:  Your Honor, I have to object

24   to this hearsay.

09:37:42  25            THE COURT:  Well, it's not hearsay.

Catizone - Cross/Swanson                           1344

1          MR. SWANSON:  What's that?

2          THE COURT:  He answered.  This is his

3    answer, I mean, but this is his answer, so overruled.

4    A.     During that stakeholder meeting, those prescribers

09:37:56 5    who are experts outside of me as a pharmacist said there

6    was no legitimate medical purpose to prescribe those

7    three drugs together.

8    BY MR. SWANSON:

9    Q.     So, sir, what I want to do is I want to go back to

09:38:07 10   the DEA's position that he had asked you about.

11         And I've put up on the screen here a letter

12   you can see dated July 12th, 2019, from three different

13   organizations.

14         Do you see at the top there NACDS?

09:38:28 15   A.     Yes, sir.

16   Q.     And I think you spoke about them last week, that's

17   the National Association of Chain Drug Stores?

18   A.     Yes, sir.

19   Q.     And then from the American Pharmacists Association,

09:38:40 20   do you see that?

21   A.     Yes, sir.

22   Q.     And what is that organization?

23   A.     It's very similar to the American Medical

24   Association.  It's an individual organization -- it's an

09:38:49 25   organization for individual pharmacists.

1    Q.    And then the last is the NCPA, National Community

2    Pharmacists Association, what is that?

3    A.    That's a subgroup within pharmacy.  It's all of the

4    pharmacists who own pharmacies rather than the individual

09:39:07 5    pharmacists who may be employees of chains or other

6    employers.

7    Q.    Okay.  And just so it's a little easier to see I'm

8    going to blow it up.  So those three entities are sending

9    a letter, and I might not have made it clear, you can see

09:39:24 10    the letter they are putting out has gone to the DEA.

11            Do you see the two addressees up there?

12    A.    Yes, sir.

13    Q.    Okay.  So now let me see if I can blow it up so

14    folks can read it.

09:39:42 15            So they are following up on a discussion

16    that they had had with the DOJ and it says, "We seek

17    written clarification with respect to a central

18    allegation in the U.S. complaint."

19            Do you see that?

09:39:56 20    A.    Yes, sir.

21    Q.    And then the allegation is that there's no medical

22    basis for the simultaneous prescription of any version of

23    the three trinity drugs, do you see that?

24    A.    Yes, sir.

09:40:06 25    Q.    And that's the trinity drugs that you've just been

Catizone - Cross/Swanson                          1346

1    talking about?

2    A.   Yes, sir.

3    Q.   And they say, "Insofar as we are aware, neither DOJ

4    nor DEA has otherwise asserted that there can never be a

09:40:27 5    medical basis to prescribe the trinity drugs.  The CDC

6    has stated that clinicians should avoid prescribing

7    opioids and Benzodiazepines concurrently whenever

8    possible."

9            Right?

09:40:39 10    A.   Yes, sir.

11    Q.   And then if you just look over to the next page,

12    they say, they conclude this letter, "To clear any

13    confusion, we ask that you provide guidance in writing

14    that neither DOJ nor DEA have a position on the medical

09:41:02 15    basis to prescribe specifically the simultaneous of any

16    version of the three trinity drugs, or generally any

17    prescription drug therapy."

18            Right?

19    A.   Yes, sir.

09:41:14 20    Q.   And then it's signed by those three organizations,

21    do you see that?

22    A.   Yes, sir.

23    Q.   And I see that the representative of the APA is

24    Thomas Menighan.

09:41:24 25           Could you remind us who that is?

Catizone - Cross/Swanson                                        1347

1    A.    Sure, the Thomas Menighan who is listed here is the

2    CEO of the American Pharmacies Association.  He is

3    currently one of my two partners in my consulting

4    business.

09:41:36  5    Q.    Okay.  So he's signing off on a letter to the DEA

6    saying we seek guidance on whether it's appropriate for

7    doctors ever to prescribe the trinity, right?

8    A.    Yes, sir.

9    Q.    Okay.  I want to put up now the response from the

09:41:56 10    DEA.

11          So do you see here I've put up a November

12    4th, 2019 letter to Mr. Nicholson?

13    A.    Yes, sir.

14    Q.    And he was one of the authors of that letter we

09:42:08 15    just looked at, right?

16    A.    Yes, sir.

17    Q.    And what I'm going to do here is try to get both

18    pages of the letter so that we can see it.

19          Okay.  And let me just blow up the

09:42:27 20    conclusion so everyone has it.

21          I don't want to highlight it, I want to

22    blow it up.

23          Okay.  So do you see that the response from

24    the DEA is that, "The DEA has not promulgated new

09:43:02 25    regulations regarding the treatment of pain.  Federal law

1       and DEA regulations do not impose a specific quantitative

2       minimum or maximum limit on the amount of medication that

3       may be prescribed on a single prescription, or the

4       duration of treatment intended with the prescribed

09:43:20 5      controlled substances.  The DEA has consistently

6       emphasized and supported the prescriptive authority of an

7       individual practitioner under the CSA to administer,

8       dispense, and prescribe controlled substances for the

9       legitimate treatment of pain within acceptable medical

09:43:38 10     standards."

11              That was the position of the DEA, right?

12      A.    In regard to the Controlled Substances Act, sir.

13      Q.    Right.  In regard to the holy trinity prescription,

14      right?

09:43:50 15     A.    No, sir.

16      Q.    Sir.  This letter is responding to a specific

17      request for clarity regarding prescribing trinity drugs,

18      right?

19      A.    Yes, sir.

09:44:02 20     Q.    And the DEA is saying we leave that position up to

21      the prescriber, right?

22      A.    No, sir.

23      Q.    The DEA is saying that federal law and DEA

24      regulations do not impose a specific quantitative minimum

09:44:20 25     or maximum limit on the amount of medication that may be

Catizone - Cross/Swanson                                    1349

1    prescribed or the duration of treatment, right?

2    A.    But it's not answering the question in the letter,

3    sir.

4                    If we could go to your first page.

09:44:31  5    Q.    Sure.

6    A.    And if you could highlight an important section,

7    please.

8    Q.    I'm sorry?

9    A.    If you could highlight an important section, that

09:44:39 10    second paragraph, please.

11                    So what this says is that the DEA cannot

12    provide information outside of the Controlled Substances

13    Act and what those regulations mean.

14                    It's been longstanding policy not to

09:45:01 15    provide legal advice to private parties.  All federal

16    agencies, including the DEA, can only opine or opinion or

17    talk about what the law says and what the law is.

18                    The question specifically asked in the

19    previous letter, can we prescribe or is it okay to

09:45:16 20    prescribe the trinity, the DEA never said, "Yes, you can

21    prescribe the trinity, or no."  It simply said we can

22    only comment on what the Controlled Substances Act says,

23    here's what it says, and you make individual decisions in

24    what you prescribe based upon what the law says.

09:45:35 25                    We can't tell doctors what to do or not to

1    do in terms of those patient decisions because that's

2    left to the State Medical Boards.

3              The DEA only can enforce the Controlled

4    Substances Act and there's nothing in there saying what

09:45:49  5    prescribers have to do with their patients or should do

6    with their patients to prescribe, sir.

7    Q.    I want to move to another statement you said last

8    week.

9              You said, I think it was in response to

09:46:01 10    Mr. Lanier's questions, that as a pharmacist, you get to

11    know the patients who frequent your pharmacy, you know

12    the prescribers in the area, so you're familiar with

13    those prescribers.

14              Do you remember giving that testimony?

09:46:13 15    A.    Yes, sir.

16    Q.    And I guess, and that's probably especially true in

17    the smaller towns and communities like some of the rural

18    areas around Trumbull County?

19    A.    I think it's true for most pharmacies, but

09:46:28 20    probably, yes, sir, in smaller towns, they probably know,

21    have a smaller patient population, sir, yes.

22    Q.    Okay.  But it's not limited to smaller towns.

23              Any pharmacist tends to know the patients

24    who come in regularly and the prescribers who prescribe

09:46:42 25    regularly, right?

1    A.    Yes, sir.

2    Q.    We'll start with patients.

3          You agree with, I think you just said, but

4    pharmacists frequently create relationships with the

5    patients who come in to see them, right?

6    A.    Yes, sir.

7    Q.    And through those relationships, the pharmacists

8    can learn the patient's medical condition, right?

9    A.    Yes, sir.

10   Q.    And can learn the patient's treatment plans, right?

11   A.    Yes, sir.

12   Q.    And that includes whether the patient's being

13   treated for a chronic condition like rheumatoid

14   arthritis, right?

15   A.    Yes, sir.

16   Q.    And they might know the treatment plan that that

17   patient is getting for rheumatoid arthritis, right?

18   A.    Yes, sir.

19   Q.    And the pharmacists also get to know the

20   prescribers in their community.

21          True?

22   A.    Yes, sir.

23   Q.    So a pharmacist, for example, might know that two

24   doctors in town are part of the same practice, right?

25   A.    Yes, sir.

1    Q.    So if they're getting prescriptions from that

2    practice, even though it's from two different doctors,

3    that's something that the pharmacist might understand

4    because he has a relationship with those physicians,

09:47:40  5    right?

6    A.    Yes, sir.

7    Q.    And you agree that's common, right?

8    A.    Yes, sir.

9    Q.    And do you agree with me that no -- that a

09:47:50 10    pharmacist, knowing the patients and knowing the

11    prescribers in the community, that can help to resolve

12    red flags or resolve situations that might otherwise be a

13    red flag, right?

14    A.    As long as the pharmacist documents that, sir, yes.

09:48:07 15    Q.    Well, we'll get to that.

16               But my first question is that might help

17    the pharmacist understand why a prescription is being

18    provided that might otherwise be a red flag if the

19    pharmacist didn't know the patient and the doctor, right?

09:48:20 20    A.    Yes, sir.

21    Q.    So if a pharmacist knows that a patient is

22    suffering from rheumatoid arthritis, is on opioid therapy

23    from a doctor that the pharmacist also knows, that

24    prescription might not be a red flag to that pharmacist,

09:48:35 25    right?

Catizone - Cross/Swanson                                    1353

1    A.    May not be to that pharmacist, but to other

2    pharmacists, sir.

3    Q.    So, okay, so but at least for the pharmacist who is

4    dispensing to that patient, he or she can take in that

09:48:49  5    prescription, saying Ms. Smith, I hope you're feeling

6    better, here's your prescription, right?

7    A.    Correct, as again the documentation is critical.

8    Q.    But you're not saying that every time a patient

9    with rheumatoid arthritis comes into the pharmacy, a

09:49:07 10    pharmacist has to sit down and say Ms. Smith has

11    rheumatoid arthritis, she's been taking this opioid

12    therapy for two years, it's okay to fill, I'm going to

13    call the doctor.

14              They don't have to take all of those steps

09:49:18 15    every time for a patient that the pharmacist knows, do

16    they?

17    A.    Anytime there's an opioid involved and there are

18    red flags involved, the answer is yes, sir.

19    Q.    Okay.  Sir, you testified on direct that you

09:49:29 20    haven't filled a prescription as a pharmacist since

21    probably around 2000, right?

22    A.    Yes, sir.

23    Q.    So it's been 20 years or so since you stood behind

24    the counter, evaluated a prescription, and had to make a

09:49:44 25    sometimes difficult decision about whether or not to

```
  1    dispense that medication, right?

  2    A.    Yes, sir.

  3    Q.    In arriving at your opinions in this case, you

  4    didn't talk to any current pharmacists at any of the

  5    chain pharmacies like Walgreen's, right?

  6    A.    I don't think that would be appropriate, sir, but

  7    no, I did not.

  8    Q.    Well, I'm not limiting it to Walgreen's.

  9              You didn't go out to any chain pharmacy,

 10    any currently practicing pharmacist, and talk to them

 11    about the current conditions in Ohio, right?

 12    A.    No, sir.

 13    Q.    And you didn't visit any Walgreen's pharmacies in

 14    Lake or Trumbull County, right?

 15    A.    No, sir.

 16    Q.    Have you ever been to Lake or Trumbull County?

 17    A.    Probably so.  My daughter went to Miami of Ohio,

 18    and I'm sure I've probably driven around trying to find

 19    out where she was on a Saturday night, but otherwise I'm

 20    not sure, sir.

 21    Q.    Do you know what cities or towns in Lake or

 22    Trumbull County have a Walgreen's pharmacy?

 23    A.    When I was preparing my report I did look at how

 24    many pharmacies Walgreen's, Walmart, CVS were in those

 25    counties, but I don't have that information readily
```

            1    available, sir.

            2    Q.    Do you know the largest pharmacy by volume in

            3    Trumbull County?

            4    A.    No, sir.

09:50:55    5    Q.    The jury has heard about a pharmacy in Trumbull

            6    County called Overholt's Pharmacy.

            7              Have you ever heard of Overholt's?

            8    A.    No, sir.

            9    Q.    They've heard about another pharmacy in Trumbull

09:51:07   10    County called Franklin Pharmacy.

           11              Have you ever heard of them?

           12    A.    No, sir.

           13    Q.    You didn't speak to any doctors in Lake or Trumbull

           14    County about the prescribing practices in those counties

09:51:14   15    in arriving at your opinions, right?

           16    A.    No, sir.

           17    Q.    You didn't investigate what the medical standard of

           18    care was in those counties in arriving at your opinions,

           19    right?

09:51:22   20    A.    I base my opinion on what the medical standard of

           21    care was in regard to the Controlled Substances Act,

           22    which is the same in Lake and Trumbull County as it would

           23    be across the country, sir.

           24    Q.    Okay.  So you know, then, that there was an

09:51:32   25    increase in prescribing opioids over time in the period

1    you looked at, right?

2    A.    Yes, sir.

3    Q.    And you understand that prescribers exercise their

4    own professional judgment in deciding whether to

5    prescribe an opioid medication, right?

6    A.    Yes, sir.

7    Q.    All right.  I want to flip now to talk about

8    Walgreen's a little bit more specifically, okay?

9    A.    Yes, sir.

10   Q.    One of the things that you did on your direct with

11   Mr. Lanier is you talked about a set of prescriptions

12   from Walgreen's that you had reviewed.

13                Do you recall that?

14   A.    Yes, sir.

15   Q.    And I believe the number was 2,000 prescriptions?

16   A.    Approximately, sir, yes.

17   Q.    So you -- you reviewed approximately 2,000

18   individual Walgreen's prescriptions, electronic notes

19   fields associated with those scripts, right?

20   A.    Yes, sir.

21   Q.    And you previously concluded that every one of

22   those prescriptions was a red flag?

23   A.    No, sir.

24                I didn't conclude that.  The prescriptions

25   were sorted by Dr. McCann, and every one of the

1    prescriptions that I was presented with had either one or

2    multiple red flags.

3    Q.    Okay.  So I think we're saying the same thing.

4          That set of 2,000, according to you and Dr.

09:52:46  5    McCann, those were all red flags?

6    A.    Yeah.  According to Dr. McCann's analysis and my

7    review of it, yes, sir.

8    Q.    And then according to you, there were insufficient

9    notes on a number of those scripts that you reviewed,

09:52:59 10   right?

11   A.    Yes, sir.

12   Q.    Are you familiar, sir, with Intercom Plus?

13   A.    Yes, I am.

14   Q.    And can you tell us what that is?

09:53:05 15   A.    That's Walgreen's computer system, and so

16   Walgreen's utilized Intercom Plus or Intercom for its

17   dispensing.  It provided its dispensing system as well as

18   its alerts for various drugs.

19         When Walgreen's was purchased by Boots

09:53:24 20   Pharmaceutical in the UK, there was a move to change

21   Intercom Plus --

22   Q.    Dr. Catizone, can I cut you off?  I just asked you

23   what it was.

24   A.    Yes, sir.

09:53:36 25         MR. LANIER:  He asked, "Can you tell us

1      what it is," and that's the answer he was given.

2                  THE COURT:  I think he finished the answer.

3      If you want to come back on redirect, Mr. Lanier, you

4      may.

09:53:43  5                  MR. LANIER:  Thank you.

6      BY MR. SWANSON:

7      Q.    Now, Mr. Catizone, the jury is going to hear a lot

8      more about Intercom Plus when the Walgreen's folks

9      testify, but I think as you were saying, it's a system so

09:53:52 10   when a prescription comes into Walgreen's, the pharmacist

11     takes the prescription and enters a bunch of data into

12     Intercom Plus, right?

13     A.    Correct.  Either the pharmacist or the technician,

14     sir.

09:54:02 15   Q.    Or both, right?

16     A.    Correct, sir.

17     Q.    And so the Intercom Plus system, that contains

18     information and data about the patient beyond whatever

19     you're saying with just the prescription that's been

09:54:14 20   presented, right?

21     A.    Yes, sir.  Information that the pharmacist or

22     technician would collect about the -- collect about the

23     patient, yes, sir.

24     Q.    True.  But it's also going to have historical

09:54:26 25   information about the patient if the patient has filled a

1    prescription at Walgreen's, right?

2    A.    Yes, sir.

3    Q.    So if it's a patient who comes in every month with

4    a prescription, when the pharmacist sits down in Intercom

09:54:37 5    Plus, he or she is going to see not just what's in the

6    prescription before her but the information that's been

7    collected from those previous fills, right?

8    A.    I believe so, sir, but I don't remember if

9    Walgreen's Intercom Plus had a delete time period where

09:54:52 10   after so much time period then the information would be

11   deleted, but if it didn't have that, then yes, sir.

12   Q.    Okay.  So if a patient had come in previously to

13   fill a prescription, there would be information about

14   that patient in the system, right?

09:55:06 15   A.    Correct, sir.

16   Q.    Now, when you looked at those 2,000 prescriptions

17   that you testified about on direct, you only looked at

18   the prescription that was before you and you didn't look

19   at any of that historical data that was in the Intercom

09:55:22 20   Plus system, right?

21   A.    Any historical data, sir, that was in the notes,

22   and there was information in the notes about some

23   patients, I looked at that information, sir.

24   Q.    Right.  But you didn't go back and look at all of

09:55:32 25   the previous fills that those patients in those 2,000

Catizone - Cross/Swanson                              1360

1    scripts that were contained in Intercom Plus, you didn't

2    do that, right?

3    A.    I didn't have access to that data, sir.

4    Q.    Well, let's talk about that.

09:55:44  5              Did you know or would you be surprised to

6    learn that 97 percent of the patients in those 2,000

7    prescriptions that you reviewed, 97 percent had

8    previously filled a prescription at Walgreen's?  Did you

9    know that?

09:56:00 10   A.    No, sir.

11   Q.    And so the Intercom Plus had data on 97 percent of

12   the patients whose scripts you looked at in those 2,000.

13              Fair?

14   A.    Yes, sir.

09:56:15 15   Q.    And I take it that the plaintiffs' lawyers didn't

16   tell you that Walgreen's produced all of that data, all

17   of that data on those 97 percent of those patients.

18              You didn't know that, did you, sir?

19   A.    All I knew, sir, was the data what was presented to

09:56:32 20   me.  I didn't know what was presented or not presented.

21   Q.    So you didn't know that Walgreen's had produced

22   more than 150,000 records for the 97 percent of the

23   patients that you evaluated, is that true?

24   A.    Again, sir, I don't -- what was reviewed was what

09:56:48 25   was presented to me.  I didn't know about any other data

Catizone - Cross/Swanson                                    1361

1    set, sir.

2    Q.    Well, would you have liked to have known that that

3    other information was available to you when you were

4    coming up with your opinions in this case?

09:56:56  5    A.    When I looked at the sample and what information

6    was there for those patients and in those notes, and then

7    what I also found that the good faith dispensing policy

8    that Walgreen's had that required that to be completed

9    for patients that had certain opioids and only one-third

09:57:12 10    of those forms were filled, I'm not sure that anything in

11    those other data would have changed my opinion or

12    indicated otherwise based upon the samples that I looked

13    at, sir.

14    Q.    Sir, my question was simply would you have liked to

09:57:25 15    have known that that 150,000 records was available for

16    you to review if you wanted to?

17              Would you have liked to have known that?

18    A.    It's a tough question to answer, sir, because I

19    don't know what was in that data set.

09:57:36 20              Clearly if I have more information, more

21    information would be helpful, sir.

22    Q.    So, for example, if one of the prescriptions, one

23    of those 2,000 prescriptions that you looked at was for a

24    cancer patient, there may have been a record in the

09:57:51 25    patient's history that said, "This patient is a cancer

1    patient," you wouldn't know that because you didn't look

2    at that history, right?

3    A.    The assumption, sir, was that the history would be

4    part of that record that was provided to me to review.

09:58:04  5         If it wasn't provided, then I don't know

6    where else that would have been available to look at,

7    sir.

8    Q.    But you were willing to draw conclusions about

9    2,000 prescriptions without looking at all the data that

09:58:18  10   was available to you that Walgreen's had produced.

11         True?

12   A.    I drew my opinion based upon that, sir, yes.

13   Q.    Now, switch gears a little bit.

14         On direct with Mr. Lanier you discussed two

09:58:30  15   or three specific prescriptions that you looked at that

16   Walgreen's pharmacists had filled that you claim they

17   shouldn't have filled, right?

18   A.    I claimed that those red flags weren't resolved and

19   they should have been resolved before being dispensed,

09:58:44  20   sir.

21   Q.    So you agree you say those shouldn't have been

22   filled, right?

23   A.    Yes.

24   Q.    I want to ask you about Walgreen's refusal to fill

09:58:55  25   and policy of refusing to fill.

1  You've seen Walgreen's policies that state

2  explicitly that a pharmacist may always use her

3  professional judgment to refuse to fill a prescription if

4  she believes it doesn't meet the corresponding

09:59:07  5  responsibility, right?

6  A.    I believe that's one of the policies, yes, sir.

7  Q.    And you know that Walgreen's pharmacists did, in

8  fact, refuse to fill many, many prescriptions that didn't

9  meet Walgreen's policies for dispensing, right?

09:59:20 10  A.    I did not see that information in any of the data I

11  reviewed, sir.

12  Q.    So when you were giving your opinions, you're

13  telling me that the plaintiffs' lawyers didn't give you

14  the files that Walgreen's produced of its refusals to

09:59:33 15  fill prescriptions?

16  A.    When I reviewed the data I specifically looked for

17  refusals to fill or anything in those notes that would

18  have indicated that that prescription was not filled or

19  the pharmacist refused to fill it, and I did not see any

09:59:47 20  data like that, sir.

21  Q.    Behind Tab 2, I've put it up on the screen, is a

22  prescription.

23  You recognize that as a prescription,

24  right?

09:59:57 25  A.    Yes, sir.

1    Q.    From March of 2018, written by a doctor at the

2    Cleveland Clinic, right?

3    A.    Yes, sir.

4    Q.    And you can see the notes on the bottom from the

10:00:14  5    Walgreen's pharmacist, right?

6    A.    Yes, sir.

7    Q.    And I'm going to blow up those notes so everyone

8    can see.

9              The pharmacist who got this prescription,

10:00:31 10    Walgreen's pharmacist who got this prescription writes,

11    "Rx turned away."

12              You know that that means that the

13    pharmacist didn't fill that prescription, right?

14    A.    Yes, sir.

10:00:41 15    Q.    "Called the doctor for diagnosis, treatment plan,

16    and" something unintelligible at least to me, do you see

17    that?

18    A.    Yes, sir.

19    Q.    "Also, patient gets other prescriptions from Giant

10:00:55 20    Eagle."

21              So also goes to a different pharmacy,

22    right?

23    A.    Yes, sir.

24    Q.    It says "The doctor's office called back with no

10:01:02 25    further information other than just fill it.  So I

1    advised with no information, I wouldn't fill it."

2              Is that what it says?

3    A.    Yes, sir.

4    Q.    So even though the pharmacist just called the

10:01:15  5    doctor, the doctor didn't satisfy the pharmacist that the

6    prescription should be dispensed, so the Walgreen's

7    pharmacist refused, right?

8    A.    That's what the note says, sir, yes.

9    Q.    And I assume that you agree that the pharmacist was

10:01:28 10   doing the right thing there, right?

11   A.    Yes, sir.

12   Q.    And this isn't a document that you've seen or that

13   you were provided with in this litigation?

14   A.    I'm sorry, I didn't hear the question, sir.

10:01:37 15   Q.    You haven't seen this document before, have you?

16   A.    No, sir.

17   Q.    If we can look at Tab 4, and by the way, just for

18   the record, these, these are a collection of

19   prescriptions from Plaintiffs' Exhibit P 17230-A.

10:02:06 20             Do you see the document that I put up from

21   behind Tab 4 is a prescription for Roxicodone, right?

22   A.    Yes, sir.

23   Q.    And here you can see that the Walgreen's pharmacist

24   said that this patient tried to get the prescription

10:02:23 25   early by paying cash, right?

Catizone - Cross/Swanson                                    1366

1     A.    Yes, sir.

2     Q.    And the Walgreen's pharmacist refused to fill that

3     prescription, right?

4     A.    Yes, sir.

10:02:30  5     Q.    I assume you agree that the pharmacist was doing

6     the right thing in his or her judgment, right?

7     A.    Yes, sir.

8     Q.    This is another document that the lawyers didn't

9     give you to review in arriving at your opinion, right?

10:02:48 10     A.    Correct, sir.

11     Q.    Behind Tab 5, another prescription from Walgreen's

12     files, do you see that?

13     A.    Yes, sir.

14     Q.    And you can see that the first page there is a

10:03:05 15     prescription for Percocet dispense 20, do you see that?

16     A.    Yes, sir.

17     Q.    And then at the top it says, "Voided, do not fill."

18           Do you see that?

19     A.    Just above the words that say "Medical Center"?

10:03:24 20     Q.    Yes.

21     A.    Yes, sir.

22     Q.    And then if you look, what the Walgreen's

23     pharmacist did with this prescription is he or she sent

24     it along to the DEA.

10:03:31 25           Do you see that?  Do you see it's a fax to

Catizone - Cross/Swanson                                      1367

1       the DEA there?

2                   Do you see that?

3       A.    I am looking at it now, sir.

4       Q.    I'm sorry.

10:03:45 5      A.    Yes, sir.

6       Q.    So the Walgreen's pharmacist took this prescription

7       and sent it to the DEA with a message.

8                       Let's look at that.

9                       Okay.  So the pharmacist said, "This

10:04:01 10     patient has had seven opioid prescriptions in the last 30

11      days and six in the" whatever "March 10th to April 10th

12      of '14."

13                      Right?

14      A.    Yes, sir.

10:04:14 15     Q.    So this pharmacist has clearly gone into the PDMP

16      database and looked at this patient's prescriptions,

17      right?

18      A.    Yes, sir, quite possibly.

19      Q.    Or else it was in the Walgreen's system, right?

10:04:24 20     A.    Correct.

21      Q.    So this pharmacist then called up the doctor that

22      issued the prescription and learned that the doctor had

23      issued that prescription without consulting OARRS.

24                      The doctor said he or she was too busy,

10:04:40 25     right?

1    A.    Yes, sir.

2    Q.    And that the prescription shouldn't have been

3    issued, right?

4    A.    Yes, sir.

10:04:45  5    Q.    So this is a circumstance where the Walgreen's

6    pharmacist is not only calling the doctor but is telling

7    the doctor you have to check OARRS before you -- before

8    you write these prescriptions, right?

9    A.    Yes, sir.

10:04:58 10    Q.    He says, "Also this patient had a good faith

11    dispensing refusal and prescription canceled back in

12    2011."

13              Right?

14    A.    Yes, sir.

10:05:06 15    Q.    So that the Walgreen's system had indicated that

16    this patient had been refused a prescription back in

17    2011, right?

18    A.    Yes, sir.

19    Q.    Based on all of that information the Walgreen's

10:05:18 20    pharmacist made the decision not to dispense the

21    medication, right?

22    A.    Right.  It hit all the red flags and what to do

23    with those red flags we discussed, and if they documented

24    this in the patient history so that, as you said, when

10:05:31 25    the Walgreen's pharmacist would look at that patient they

1    would have that information, then, yes, the pharmacist

2    has really practiced as they should.

3    Q.    Right.  But you don't know one way or the other

4    whether that happened because this isn't a document that

10:05:43  5    you have seen before, correct?

6    A.    Correct, sir.

7    Q.    Switch gears a little bit, Mr. Catizone.

8              You agree with me that a prescriber can

9    write some prescriptions that don't have a legitimate

10:06:01 10    medical purpose while at the same time writing other

11    prescriptions that do have a legitimate medical purpose,

12    right?

13    A.    No, sir.  If that prescriber did that they should

14    have their license looked at because I don't know why

10:06:21 15    they would write.

16    Q.    I'm just asking you if that can happen.  A doctor

17    can write a prescriptions, can write some prescriptions

18    that don't have a legitimate medical purpose and other

19    prescriptions that do have a legitimate medical purpose?

10:06:33 20    A.    So I understand, the question is that somebody can

21    break the law and not break the law?  Is that the

22    question, that then physicians could then issue a

23    nonlegitimate prescription, violate all the laws and

24    standards, and also issue?

10:06:46 25              The answer would be yes, anyone can break

1    the law or not break the law at different times, sir.

2    Q.    So that could occur.

3              Let me ask it a little bit differently.

4              It's not your view that if a prescriber

10:06:58 5    writes one prescription for an opioid medication that

6    doesn't have a legitimate medical purpose then that means

7    that all of the prescriber's opioid prescriptions are

8    invalid and illegitimate, right?

9    A.    It would be my position that that physician

10:07:12 10   shouldn't be writing prescriptions because that one

11   prescription could harm or kill that one patient, and,

12   therefore, that prescriber should never issue that

13   prescription.

14   Q.    Let me just maybe ask it differently.

10:07:23 15             We've heard a lot about pain clinics in

16   Ohio and elsewhere.

17             You're familiar with pain clinics?

18   A.    I think we've referred to them when we've talked

19   about them as pill-mills and pain clinics and different

10:07:36 20   versions.

21   Q.    Okay.  And is it possible for a doctor at a

22   pill-mill to have a patient who actually needs the

23   medication that that doctor might prescribe?

24             Is that possible?

10:07:47 25   A.    It's possible, but again, sir, you're saying if

1    somebody repeatedly robs banks and then why would the

2    banks put a couple dollars in the charity box, is that

3    okay, for a doctor who is repeatedly writing illegitimate

4    prescriptions and knows that they are illegitimate and

10:08:05   5    continue to write, and to write a legitimate prescription

6    is possible.

7         Yes, sir, it's possible.

8    Q.    Yeah, and, Mr. Catizone, with respect, that's not

9    what I'm saying.

10:08:20  10         I'm looking at it from the perspective of

11    the patient.

12         Is it possible that a patient can be in

13    need and go to a doctor that you would call a bad doctor

14    and get a prescription from that doctor that's valid?

10:08:32  15    A.    It's possible, but I don't know why a patient would

16    go to a doctor that's involved in those activities and

17    harming other patients, sir.

18    Q.    Well, we don't know what patients are going

19    through, right?  We don't know what their pain is or why

10:08:44  20    they go to the doctor they go to.  We don't know that.

21         I'm only asking you can a patient in need

22    go to what you would call a bad doctor and get a

23    legitimate prescription?

24    A.    But I think in this situation you described, sir,

10:08:57  25    you said a pill-mill, and as you said earlier pharmacists

Catizone - Cross/Swanson

1372

1    who are familiar with their patients and practice, if

2    this was a pill-mill and the patient went there for a

3    legitimate treatment instead of going to another doctor

4    at Cleveland Clinic or pain management, yes, it's

10:09:10  5    possible, but I don't know why a patient would go there

6    or why there would be a need to go there, sir.

7    Q.    As a pharmacist, would you withhold treatment from

8    a patient who had a legitimate medical need because of

9    where he or she got the prescription?

10:09:25 10    A.    If it was a legitimate prescription and the

11    prescriber was not a bad prescriber operating a

12    pill-mill, then yes, I would fill that prescription, sir.

13    Q.    My question was more specific.

14              Would you refuse to fill a prescription for

10:09:40 15    a patient with legitimate medical need because that

16    patient had gone to a doctor that you personally believe

17    is a bad doctor?

18              Would you refuse that prescription?

19    A.    Not necessarily, sir.

10:09:50 20    Q.    Okay.  Last topic.

21              Going back to the 2,000 sample

22    prescriptions from the Walgreen's data that you looked

23    at, I take it your opinion -- so I'll take it in bites

24    here.

10:10:12 25              I think you just said your opinion, all of

1    those were Dr. -- or between you and Dr. McCann you

2    determined that all of those 2,000 were red flags, right?

3    A.    The prescriptions had either one or multiple red

4    flags, sir.

10:10:27  5    Q.    And according to you, I think you also just said

6    none of those prescriptions should have been dispensed,

7    right?

8    A.    I said the overwhelming majority of prescriptions

9    lacked the necessary documentation to resolve those red

10:10:38  10   flags to dispense the prescription, sir.

11   Q.    And do you believe that some number of those

12   prescriptions were written by doctors not for legitimate

13   medical purpose?

14   A.    Yes, sir.

10:10:46  15   Q.    By a doctor violating the law?

16   A.    Yes, sir.

17   Q.    How many doctors in the Walgreen's data that you

18   reviewed do you contend were violating the law when they

19   wrote their prescription?

10:10:58  20   A.    I didn't specifically review that.  I just reviewed

21   the prescription, sir, I was presented.

22   Q.    So sitting here today you can't tell me which of

23   those 2,000 prescriptions according to you was written by

24   a doctor for not a legitimate purpose, correct?

10:11:14  25   A.    Correct, sir.

Catizone - Cross/Swanson                    1374

1    Q.    And of those 2,000 doctors in the sample, did you

2    undertake any sort of analysis as to who the doctors are,

3    what hospitals they're affiliated with, what their

4    specialties are?

10:11:25  5    A.    No, sir.  I simply looked at the red flags and

6    whether they were resolved and documented by the

7    pharmacist to be resolved, sir.

8    Q.    Okay.  So in those 2,000 scripts written by those

9    doctors, you don't know how many work in hospice, right?

10:11:38 10   A.    Yes.  Well, based upon the notes, sir, I was able

11   to identify in some of the data as few as 16

12   prescriptions or 32 that actually had markings for

13   hospice or cancer in the data sets.

14              I'm not sure if that was specific to

10:11:52 15   Walgreen's, but less than one percent had any of those

16   types of markings or notes, sir.

17   Q.    And I might have misheard.

18              You're saying of all the prescriptions you

19   looked at that was the number you came up with?

10:12:04 20   A.    I know for one of the individual defendants, and

21   I'd have to check my report, it was only 16 and 32

22   prescriptions that had either hospice or cancer, and then

23   when I looked at all the prescriptions across the board

24   for all defendants it was probably less than one percent

10:12:18 25   that I could find that type of designation, sir.

Catizone - Cross/Swanson

1375

1   Q.    How many of those doctors worked for the Cleveland

2   Clinic or University Hospitals?

3   A.    I again looked at the prescriptions to see how many

4   came from the Cleveland Clinic, and again, that was a

10:12:31  5   small percentage across all prescriptions, probably about

6   less than one percent or so.

7             And that was one of the exceptions we

8   talked about, that if it was from the Cleveland Clinic,

9   that may have resolved some of the red flags as long as

10:12:43 10   that was documented, sir.

11   Q.    Well, sir, you're not telling me that you've done

12   an analysis of all the prescriptions you looked at and

13   can tell me what percentage came from Cleveland Clinic or

14   Lake Health, right?  You're not telling me that?

10:12:54 15   A.    Pretty much, sir.  I've looked at all those

16   prescriptions, and if they noted Cleveland Clinic,

17   because I knew that was going to be an issue to look at,

18   I kept that total, and I would say it's less than, maybe,

19   five, five percent max across all prescriptions.

10:13:11 20   Q.    What percentage of those doctors were orthopedic

21   surgeons who do hip replacements?

22   A.    I didn't make that analysis, sir.

23   Q.    What percentage were doctors, orthopedic surgeons,

24   who do knee replacements?

10:13:22 25   A.    Didn't have that information, didn't conduct that

Catizone - Cross/Swanson                          1376

1    analysis, sir.

2    Q.   How many were neck and spine surgeons?

3    A.   Again, same answer, sir.

4    Q.   How many doctors treated patients with rheumatoid

5    arthritis?

6    A.   Same response, sir.

7    Q.   Okay.  That's something you couldn't tell by

8    looking at the face of the document, but a pharmacist

9    looking at his dispensing system would have that

10   information?

11   A.   And I could have told if it was documented in the

12   notes.

13   Q.   Well, but you didn't look at all the notes.

14              You looked at just the prescriptions that

15   were given to you by the plaintiffs' lawyers for

16   Walgreen's.  You didn't look at the 150,000 files that

17   were also provided that might have had that information,

18   true?

19   A.   I looked at all the prescriptions and the notes

20   that were provided to me for those prescriptions.

21              I don't know if that was part of the other

22   data you're referring to, sir, but there were notes in

23   patient information for the prescriptions I looked at.

24   Q.   And what you looked at was what was provided to you

25   by the plaintiffs' lawyers, right?

```
 1    A.    Yes, sir.
 2                   MR. SWANSON:  Okay.  Thank you.
 3                   I don't have any other questions.
 4                   MS. SULLIVAN:  If I may, Your Honor.
 5                   THE COURT:  Yes.  Mr. Fumerton for Walmart.
 6                   MS. SULLIVAN:  No, Giant Eagle, Your Honor.
 7                   THE COURT:  Oh, I'm sorry, it was
 8    Ms. Sullivan.
 9                   MS. SULLIVAN:  Yes.
10            CROSS-EXAMINATION OF CARMEN CATIZONE
11    BY MS. SULLIVAN:
12    Q.    Good morning, jurors.  Good morning, Dr. Catizone.
13                   We haven't met yet.  Diane Sullivan, and
14    I'm here for the folks at Giant Eagle.  Good to meet you.
15    A.    It's a pleasure to meet you.  Thank you.
16    Q.    If you could bear with me, I don't think I'll be
17    that long this morning.
18                   I want to go back to the American Medical
19    Association resolution that you discussed with
20    Mr. Lanier, and I think with Mr. Swanson a little bit,
21    and that's the -- and that is in Tab 43, Mr. Catizone, of
22    the binder that Ms. Sampson just gave you.
23                   MS. SULLIVAN:  We're getting a copy for
24    Mr. Lanier.  There we go.
25                   And any objection, Mr. Lanier, to my
```

1     showing the jury the AMA resolution that was discussed?

2                     MR. LANIER:  I haven't seen it.  I was just

3     handed it, but I don't think I've got any objection.

4                     MS. SULLIVAN:  Okay.

10:16:08  5           MR. LANIER:  It looks legit to me.

6                     MS. SULLIVAN:  And, Mr. Pitts, if I could

7     have the Elmo.  Thank you.

8     BY MS. SULLIVAN:

9     Q.    All right.  And, Dr. Catizone, this is the American

10:16:28 10   Medical Association resolution from 2013 that you were

11    discussing last week where the AMA basically told

12    prescribers "Don't second guess our medical decisions,"

13    right?

14    A.    Can you tell me what page it's on, please?

10:16:43 15   Q.    Oh, I'm sorry, sir.  It's -- if you look at the

16    Bates Number on -- it's on the top of the page 443.

17    A.    Thank you.

18    Q.    Let me know when you have it.

19    A.    Are you referring to D-35.9A1?

10:17:08 20   Q.    It's on Page 443, on the top.

21    A.    Right, but it says "House action, adopted as

22    follows"?

23    Q.    Yes.  Resolution 218, do you have it?

24    A.    Yes.

10:17:17 25   Q.    And, Mr. Catizone, this was the document you were

1    discussing last week where the American Medical

2    Association basically issued a policy document resolving

3    that it was inappropriate for pharmacies to inquire about

4    verifying medical rationale behind prescriptions, right?

10:17:37  5    A.    My understanding is that this was adopted, but I'm

6    not sure it became policy with the AMA.

7              My understanding from the AMA attorneys

8    that we worked with, that it was nonbinding, but I can't

9    speak as to what it was, but it was passed by one of the

10:17:51  10    delegates of AMA or by the House of Delegates of AMA,

11    yes.

12    Q.    Yes.  We can pull it up, but do you know,

13    Mr. Catizone, if you go to the American Medical

14    Association's website and look up their policy documents,

10:18:07  15    this is an existing policy.

16    A.    Okay.

17    Q.    Okay.  You don't dispute that?

18              I can have Roman do that if you'd like.

19    A.    Nope, don't dispute.  Just wasn't familiar with the

10:18:17  20    process.

21    Q.    Okay.  So, Mr. Catizone, according to the American

22    Medical Association's website, this is in 2021 an

23    existing policy of the Medical Association, okay?

24    A.    Yes.

10:18:27  25    Q.    And I think Mr. Lanier -- and I think maybe you

1       said that there are, you think, 39,000 doctors that are

2       part of the American Medical Association?

3                    That's not right, is it, sir?

4       A.    That was a guesstimate on my part.

10:18:43  5              I know there are two million licensed

6       prescribers.  That's a definitive answer, but I don't

7       know how many members they have.

8       Q.    In fact, if you look at the American Medical

9       Association's website, there's over 200,000 members of

10:18:54 10      the American Medical Association, right?

11                   MR. LANIER:  Your Honor, I'm going to

12      object to that.

13                   A, I think it's wrong, and B, I think it

14      should be in evidence if she's going to be making

10:19:09 15      assumptions.

16                   THE COURT:  Sustained.

17      BY MS. SULLIVAN:

18      Q.    The truth is, Mr. Catizone, you don't know how many

19      members there are of the American Medical Association?

10:19:18 20      A.    I know the numbers reported sometimes don't reflect

21      the actual membership, and in discussions that I've had

22      even though it may be reported as 200,000, that may be a

23      generous number, is what I could say.

24      Q.    And, Mr. Catizone, you know it is the largest

10:19:33 25      medical organization association in America?

1     A.    I don't know that.

2     Q.    No reason to dispute that?

3     A.    I'm sorry, I didn't hear you.

4     Q.    Do you know of a bigger one?

10:19:43  5     A.    Than the AMA?

6     Q.    Yes, sir.

7     A.    The Teamsters.

8     Q.    I'm talking about a medical -- yeah, the Teamsters

9     are way bigger, way bigger, way bigger.

10:19:53 10              I'm talking about no other medical

11    association bigger than the American Medical Association?

12    A.    I'm not sure the family physicians, I'm not sure

13    what their membership is either.

14    Q.    And I think Mr. Lanier told the jury this was a

10:20:05 15    resolution by the folks in New Jersey?

16    A.    No, that was my comment.

17    Q.    Okay.

18    A.    I thought it was that.

19    Q.    I apologize.

10:20:11 20              And, Mr. Catizone, you can see here that

21    this is actually a resolution proposed by a few medical

22    organization states, Connecticut, Maine, Massachusetts,

23    New Hampshire, Rhode Island, and Vermont, right?

24    A.    Yes.

10:20:26 25    Q.    I know people like to pick on New Jersey, but New

1   Jersey is not here, right?

2   A.    No comment.

3   Q.    And in fact, not only was it proposed by these

4   various medical associations in these several states, it

10:20:40  5   was adopted by the entire national medical organization,

6   correct, by the American Medical Association?

7   A.    By the House of Delegates, yes.

8   Q.    Yes.  And it's an existing policy where even to

9   this day the American Medical Association says that it is

10:20:53 10   inappropriate for pharmacists to call to verify the

11   medical rationale about -- behind doctors' prescriptions,

12   right?

13                   MR. LANIER:  Objection, Your Honor.  That

14   is not what it says.

10:21:03 15                   Misrepresentation of the document.

16                   THE COURT:  I'll sustain.  I'll sustain the

17   objection.

18                   MS. SULLIVAN:  I'm happy to read it if I

19   misread it, Mr. Catizone.

10:21:13 20   BY MS. SULLIVAN:

21   Q.    It says that "Our AMA, the American Medical

22   Association, deem inappropriate inquiries from pharmacies

23   to verify the medical rationale behind prescriptions,

24   diagnoses and treatment plans to be an interference with

10:21:27 25   the practice of medicine and unwarranted."

1          Do you see that, sir?

2     A.    Yes.

3     Q.    So the AMA is saying, it deems it inappropriate

4     inquiries from pharmacies to verify medical rationale

5     behind prescriptions, diagnoses and treatment, right?

6               MR. LANIER:  I still object, Your Honor.

7     That's not what it says.

8               It says --

9               THE COURT:  It is not clear to me what this

10    document says, Ms. Sullivan, so -- the grammar is not

11    great, so --

12    BY MS. SULLIVAN:

13    Q.    The grammar could be better, sir, but I think you

14    testified last week that essentially the AMA said to

15    doctors it is inappropriate inquiries from pharmacists to

16    verify the medical rationale behind prescriptions,

17    diagnoses, and treatment plans because they viewed that

18    to be an interference with the practice of medicine,

19    right?  That was your testimony?

20    A.    No, it wasn't.

21              My testimony was that the physicians were

22    objecting that the pharmacists were calling for MRI and

23    other x-rays, and that was my understanding.

24              The resolution calls for AMA to work with

25    pharmacy organizations and also to resolve the drug abuse

1    and diversion, which was my understanding of what the

2    result was of those communications.

3    Q.    In fairness, Mr. Catizone, this doesn't say

4    anything about MRIs.

10:22:48  5         It says "Inquiries to verify medical

6    rationale behind prescriptions, diagnoses and treatment,"

7    right?

8    A.    Correct.  You asked me what my testimony was, and

9    that's what I provided back to you, ma'am.

10:22:58 10  Q.    Okay.  But this talks about inquiries about

11   prescriptions, right, in addition to medical diagnoses

12   and treatment?

13   A.    That's what the resolution says, yes.

14   Q.    And, Mr. Catizone, in fact you've acknowledged,

10:23:22 15  sir, that doctors have a lot more information than

16   pharmacists about medical records, patient history,

17   diagnostic tests, et cetera, right?

18   A.    They have more patient information, but not drug

19   information.

10:23:34 20  Q.    Yeah.  They have a lot more medical information

21   about a patient?

22   A.    Yes.

23   Q.    And one of the things that doctors were concerned

24   about is that pharmacists second-guessing doctors would

10:23:49 25  put patient health at risk, that was part of what was in

1    the meeting minutes, et cetera, of the American Medical

2    Association?

3                    They thought pharmacists by saying, no, I'm

4    not going to prescribe a medicine a doctor thought was

10:24:02 5    important, was putting patient health at risk.

6                    Fair?

7    A.    For me, I thought it was a -- based on the

8    information I had -- a turf battle.  The doctors didn't

9    want pharmacists interfering or taking over any of their

10:24:16 10    responsibilities because there was issues and concerns

11    about payment as well, so --

12    Q.    And patient health?

13    A.    To some degree, yes.

14    Q.    Yes.  And, in fact, Doctor, the Federal Government,

10:24:30 15    you're familiar, and I think the jury's heard a little

16    bit about it, the Drug Enforcement Administration's

17    guidelines in the pharmacy manual?

18    A.    I'm unfamiliar with the *Pharmacist's Manual*.

19    Q.    Yeah.  And the *Pharmacist's Manual*, and we can look

10:24:46 20    at it, was when the Drug Enforcement Administration sent

21    out a manual for pharmacists to use to try and make sure

22    they were complying with the Controlled Substances Act?

23    A.    I think it was more of an educational resource

24    where it further defined corresponding responsibility and

10:25:04 25    said the doctors have a responsibility for that

1    prescription, for that patient, but pharmacists have a

2    corresponding responsibility to that physician's

3    responsibility, and pretty much set the ground for

4    pharmacists and doctors working together.

10:25:19  5    Q.    Okay.  Why don't we just look at what they -- why

6    don't we just look at what they say?

7                If we could put up starting with the 2004

8    *Pharmacist's Manual*, Defense Exhibit MDL 10863, that's

9    Tab 35.

10:25:35  10    A.    Ma'am, is that in the packet?

11    Q.    It's Tab 35, Mr. Catizone.

12    A.    Thank you.

13    Q.    Let me know when you have it, sir.

14                Do you have it, sir?

10:26:18  15    A.    Yes, I do.  I'm sorry.

16    Q.    Okay.  And if we can just look at it here on the

17    Elmo, in the sort of the introductory page --

18                MS. SULLIVAN:  And I'm sorry, Ms. Sampson,

19    can you grab me a highlighter over there?

10:26:32  20                Thank you.

21    BY MS. SULLIVAN:

22    Q.    -- the DEA is saying that "The manual is to assist

23    pharmacists in understanding the provisions of the

24    Controlled Substances Act and its implementing

10:26:48  25    regulations."

Catizone - Cross/Sullivan                                    1387

1             Right?

2    A.    And to preventing diversion and abuse, yes.

3    Q.    Yeah.  Yeah.  In other words, this was the DEA's

4    efforts to pharmacists, read our manual, here are

5    guidelines to assist you in complying with the Controlled

6    Substances Act, including trying to prevent diversion?

7    A.    Yes, ma'am.

8    Q.    Okay.  And if we look at Page 84, Dr. Catizone, of

9    the federal government's -- the DEA's manual here to

10   pharmacists.

11   A.    Yes.

12   Q.    Okay.  And what it says is, "Proper controls

13   against bogus prescriptions can best be accomplished by

14   following common sense, sound professional practice, and

15   proper dispensing procedures and controls."

16             Right?

17   A.    Yes.

18   Q.    So the DEA is saying you, pharmacists, have a job

19   in guarding against bogus illegitimate prescriptions,

20   right?

21   A.    That's part of the message.

22   Q.    Yeah.  Yeah.

23             What the -- what the DEA is not saying is

24   that pharmacists should be second-guessing doctors'

25   legitimate prescriptions, that's not the pharmacist's

Catizone - Cross/Sullivan                    1388

1    job, right, sir?

2    A.    No, I think if you turn back to the beginning of

3    the document, and it's probably the second page --

4    Q.    Sir, we're going to look at it, but I just want to

5    stick to this.

6    A.    I'm trying to answer the question about -- because

7    you said was that the message.

8              There it says, "The DEA is greatly

9    concerned about the diversion and abuse of controlled

10   substances and drug products containing listed chemicals.

11   Most drug diversion occurs at the retail level where the

12   pharmacist plays a critical role in supervising the

13   proper control of prescription drugs, prescription and

14   over the counter drugs.  Because the pharmacist dispenses

15   controlled substances to the patient, he or she is in a

16   key position to safeguard the health of the patient and

17   prevent diversion.

18              "The pharmacist and the prescribing

19   practitioner share responsibility for monitoring the

20   therapeutic drug usage of patients whose health depends

21   on concerned and knowledgeable professionals."

22              I think the DEA is saying that pharmacists

23   have to play an active role in preventing diversion and

24   questioning the therapeutic drug usage of those drugs.

25   It's right here in the manual, ma'am.

1    Q.    Sir, it doesn't say they should be second-guessing

2    the medical judgment of doctors.

3                      What page are you reading from,

4    Mr. Catizone?

5    A.    That's the second page, it's listed as Roman

6    Numeral VI.

7                      I think the second-guessing is a colloquial

8    term that the doctors have described what they believe

9    pharmacists are doing.

10                     Pharmacists would say we're simply doing

11   what we're supposed to be doing.

12   Q.    And when the -- when the DEA, in the *Pharmacist's*

13   *Manual*, Mr. Catizone, talks about policing bogus

14   prescriptions, it talks about pharmacists using their

15   common sense and sound professional practice and

16   judgment, right?

17   A.    Yes.

18   Q.    And the *Pharmacist's Manual*, you know, sir, that

19   the *Pharmacist's Manual* both in 2004, in 2010, and in

20   2020, lists criteria that may indicate that a

21   prescription was not issued for a legitimate medical

22   purpose, right?

23   A.    But in context, this --

24   Q.    Could you answer my question, sir?

25   A.    To some degree, yes.

1    Q.    Yes.  So the -- so, in other words, the

2    *Pharmacist's Manual*, the DEA is trying to tell

3    pharmacists "Here's the things you look for, here are the

4    criteria" -- they call it criteria in the manual, right,

10:30:50  5    sir?

6    A.    Yes.

7    Q.    Okay.  "Here are the criteria that may" -- that

8    may, not necessarily as you've said -- "may give rise to

9    a suspicious prescription," right?

10:31:01 10    A.    For information at the time, yes.

11    Q.    Yes.  And when the Government, in 2004, and we can

12    pull out the 2020 edition, but it's the same six

13    criteria, do you know that, sir?

14    A.    Yes.

10:31:14 15    Q.    Okay.  And so the Government lists six, what you

16    would call red flags, right, in the manual?

17    A.    No.  I think I would call these signs of forgery or

18    abuse or diversion.

19                The red flags are referenced in the 2020

10:31:30 20    manual and subsequent editions by footnotes to DEA cases

21    where those red flags have been identified.

22    Q.    But we're going to look at that, but you talk about

23    forgery.  That's a whole different section, right, sir?

24                If you look at the manual, forgery is a

10:31:48 25    whole different section?

1    A.    Correct.

2    Q.    Okay.  But I'm sticking with the six what you would

3    say are red flags for potential diversion, right?

4    A.    No.

10:31:54  5              I testified and didn't say they were red

6    flags.

7              If you look at the heading, it says

8    "Characteristics of forged prescriptions," so this

9    section back in 2004, before the opioid crisis really

10:32:03  10   hit, the primary concern of pharmacists and the DEA were

11   forged prescriptions or stolen prescriptions and,

12   therefore, the DEA said, here it is, here are some

13   characteristics.

14             In fact, they had a colloquial way to

10:32:17  15   remember it, it was the three Ds to look at doctors:

16   Duped, deception, and the third was doesn't know what

17   they're doing, basically.

18             So that's what they told pharmacists to

19   look for, forged or stolen prescriptions.

10:32:30  20             Opioids hadn't hit the fan yet.

21   Q.    Doctor, can we look at the 2020 manual?

22             We can agree by 2020 the opioid crisis was

23   in full bloom?

24   A.    Correct.

10:32:45  25   Q.    So the 2020 *Pharmacist's Manual* that's Defense

1  Exhibit MDL 11598, that would be Tab 52.

2  A.   I'm sorry, what tab?

3  Q.   52, sir.

4        And, Mr. Catizone, while you're looking for

10:33:05  5  that, we can agree that the 2020 *Pharmacist's Manual* came

6  out after the *Holiday* decision, the *Superior* 1 and 2

7  decision, and after the *Hills* decision that you talked to

8  the jury about, right?

9  A.   Yes, ma'am.

10:33:19 10  Q.   They were all years before the 2020 *Pharmacist's*

11  *Manual*?

12  A.   Correct.

13  Q.   And if we look, Mr. Catizone, in the 2020

14  *Pharmacist's Manual* on Page 114.

10:33:51 15        Let me know when you're there.

16  A.   Yes.

17  Q.   In addition to the section on fraudulent

18  prescriptions, and, Mr. Catizone, as I understand it, you

19  had 16 red flags in addition to fraud, in other words,

10:34:05 20  that's different than looking at forged prescription

21  pads, that wasn't one of your red flags?

22  A.   That would be one of the aberrant behaviors of

23  patients but it wasn't one of the red flags that I had

24  the analysis for.

10:34:18 25  Q.   Yes.  And the DEA does the same thing.

1           They had six criteria plus, then they have

2      a section about forged prescriptions.

3                 Do you see that?

4      A.    Yes.

10:34:27  5      Q.    Okay.  But where you have 16 red flags, in 2020,

6      after these DEA decisions that you discussed with the

7      jury, the DEA lists six, right?  Six criteria for

8      identifying potentially illegitimate prescriptions.

9                 They list six.

10:34:54 10      A.    No.  Again, what the Pharmacist's --

11      Q.    Sir --

12      A.    I'm answering.  The *Pharmacist's Manual*, what's

13      listed, these are fraudulent prescriptions or out of

14      scope prescriptions.

10:35:03 15      Q.    No, sir.  The fraudulent prescription section is

16      underneath.

17      A.    I'm sorry, I thought you were referring to that.

18      Q.    No.  I'm looking at the criteria that the

19      Government says pharmacists should look at for

10:35:15 20      identifying illegitimate prescriptions.

21      A.    Yes.

22      Q.    Do you see that?

23      A.    Yes.

24      Q.    Okay.  And they list six?

10:35:20 25      A.    Yes.

1    Q.    Okay.  You have 16, they have six, fair?

2    A.    There's other references where they refer to

3    Page 113 and Page 103.

4    Q.    Sir, when they say, "Here are the criteria, here

5    are the red flags that pharmacists should look for" in

6    their manual instructing pharmacists about how to comply

7    with the Controlled Substances Act, they list six

8    important criteria that indicate that a prescription may

9    not be issued for a legitimate medical purpose.  That's

10   what they say?

11   A.    With all due respect, ma'am, as a pharmacist I

12   wouldn't read just one paragraph.

13             The whole document is important and other

14   references are in the document, ma'am.

15   Q.    Okay.  And I'm going to look at Tab 47.  I want to

16   just take you back, Mr. Catizone, to the corresponding

17   regulation.

18             And I believe it's Tab 47, Ms. Sampson.

19   And the jury's seen this before.

20             This is -- and Dr. Catizone, you've

21   testified about it before?

22   A.    Excuse me, ma'am.  My monitor is not showing me.

23   Q.    Oh, I'm sorry, your monitor went down, sir.

24   A.    Yeah.  But what document are you on?

25   Q.    This is -- this is the Federal Regulation 1306.

```
 1    A.    What tab?

 2    Q.    This is Tab 47.

 3                THE COURT:  Tab 47.

 4                THE WITNESS:  Thank you, Your Honor.

 5    A.    Okay.  I have it.

 6                Thank you.

 7                I've got it, yes.  Thank you.

 8    BY MS. SULLIVAN:

 9    Q.    Okay.  And, Doctor, this is the federal regulation

10    that outlines the responsibilities of pharmacists,

11    correct?

12    A.    Correct.

13    Q.    And the regulation talks about the responsibility

14    for the proper prescribing and dispensing of controlled

15    substances is upon the prescribing practitioner.

16                That's the first part, right?

17    A.    Yes.

18    Q.    But the corresponding responsibility rests with the

19    pharmacist who fills the prescription, right?

20    A.    Yes.

21    Q.    And it goes on to say that a prescription that's

22    not in the usual course -- that means an illegitimate

23    prescription, right?

24    A.    Yes.

25    Q.    That a pharmacist should not knowingly fill such a
```

Catizone - Cross/Sullivan                          1396

1    prescription, right?

2    A.    Yes.

3    Q.    Okay.  That's the responsibility, don't knowingly

4    fill an illegitimate prescription.

5                    That's what the law says?

6    A.    There's a -- yes.

7    Q.    Okay.  And in talking about signs that a

8    prescription may be illegitimate, may be bogus, I think

9    we can look at your report, but you've acknowledged that

10   this concept of concerns or suspicions or red flags goes

11   back for decades, that pharmacists are educated on these

12   potential red flags in pharmacy school, for example?

13   A.    Yes.

14   Q.    And it's on the multi-state test that pharmacists

15   take?

16   A.    Yes.

17   Q.    And it's generally well known to pharmacists what

18   to look for, they're trained on it in pharmacy school,

19   they're tested on it, what to look for in determining

20   whether a prescription is illegitimate or not?

21   A.    Yes.

22   Q.    And, in fact, I think you've said it's common sense

23   for a pharmacist?

24   A.    Well, part of knowing is common sense, yes.

25   Q.    And in other words, red flags or concerns about

1    potential illegitimate prescriptions is something that

2    every pharmacist is trained on and knows?

3    A.    Yes.

4    Q.    And I just want to ask you, it's your view that if

10:40:00   5    a pharmacist does the right thing, checks the Government

6    database, the OARRS data to see if a patient has sought

7    opioids from another doctor, and called the prescriber,

8    basically cleared a red flag, if that effort is not

9    documented, I think it was your testimony it doesn't

10:40:19  10    count?

11    A.    No.

12          It was my testimony that they haven't met

13    the requirements for resolving and documenting that red

14    flag.

10:40:25  15    Q.    But it still happened.

16          In other words --

17    A.    If you don't document it, how do you know it

18    happened.

19    Q.    Okay.  Well, if I spent two days cleaning my house

10:40:34  20    and nobody takes my picture or videos me, that doesn't

21    mean I didn't clean my house?

22    A.    But somebody has to come in and see your house.  If

23    your house what you consider is clean is not clean to

24    someone else, lack of documentation like in the pharmacy,

10:40:50  25    the documentation is the key to other pharmacists knowing

1    that you cleaned your house.

2    Q.    Is that a comment on my housekeeping skills,

3    Mr. Catizone?

4    A.    Not at all.  I've learned to be quiet on those

10:41:00 5    issues.

6    Q.    But, Doctor, the truth is a pharmacist could do

7    everything right and clear a red flag, but not document

8    it?

9    A.    Then they didn't do everything right.

10:41:13 10    Q.    That's your view?

11    A.    That's my expert opinion based upon 40 years and

12    based upon thousands of prescriptions and cases that I've

13    worked on in this regard.

14    Q.    And, Doctor, there's a video that you talk about in

10:41:24 15    your expert report, it's an anti-diversion video, I think

16    you were proud of, and it's used to train pharmacists on

17    how to spot and evaluate red flags?

18    A.    If you're referring to the red flag video, yes.

19    Q.    Yes.  And it actually was part of the

10:41:41 20    anti-diversion task force and your organization, the

21    National Association of Pharmacy Boards, worked together

22    to put this out to pharmacists to help them evaluate and

23    spot concerns or red flags?

24    A.    The organization I formerly was in charge of, yes.

10:41:56 25    Q.    And in fact you were on the web introducing that

Catizone - Cross/Sullivan                    1399

1    video as --

2    A.    What I did is I introduced the video and then each

3    individual state Executive Director of the Board of

4    Pharmacy did a little introduction as well for them.

10:42:09  5    Q.    And you would think it would be a good thing if

6    companies like Giant Eagle, Walgreen's, CVS, Walmart, if

7    they used that video to train their pharmacists in how to

8    evaluate and clear red flags?

9    A.    Yes.

10:42:20  10    Q.    And, Dr. Catizone, the truth is that that video

11    says absolutely nothing about the requirement to document

12    red flags?

13    A.    I can't recall the entire video, so I'd like to

14    have a chance to look at it again.

10:42:37  15            If it doesn't, it talks about corresponding

16    responsibility, so --

17    Q.    Do you know, sir?  I mean, we can --

18    A.    I'd be glad to watch it if you'd like.

19    Q.    Yeah.  Do you know, sir, it says absolutely nothing

10:42:47  20    about documenting or clearing red flags?

21    A.    I believe it probably specifically doesn't say

22    document, but I'm sure it talks about corresponding

23    responsibility and identifying red flags.

24    Q.    Sir, do you know it says absolutely nothing about

10:42:59  25    the need to document?

Catizone - Cross/Sullivan                    1400

1     A.     I've agreed with you it probably doesn't

2     specifically say that, but it's inherent to what

3     corresponding responsibility is.

4     Q.     Okay.  Mr. Catizone, you talked about some of the

10:43:14  5     work you've done with the Drug Enforcement

6     Administration?

7     A.     Yes.

8     Q.     And the Drug Enforcement Administration, and I

9     think you've mentioned some of this, they have -- they

10:43:24 10     have tools or tests or metrics that they use to try to

11     determine whether a dispensing or distribution is

12     suspicious?

13     A.     I'm not aware of those metrics and I haven't seen

14     those metrics in any of the cases I've worked.

10:43:41 15     Q.     Maybe my question was poor, but you mentioned, for

16     example, that one thing that people look at is how much

17     cash business you're doing in terms of opioid and how

18     people are paying, paying for opioids?

19     A.     Correct.  Those are the established red flags that

10:43:56 20     prior DEA actions have defined, yes.

21     Q.     Yeah.  Yeah.  And it's one of the metrics that DEA,

22     one of the tests that DEA uses to determine whether

23     there's suspicious activity, how much -- how much of a

24     pharmacy's business is cash as it relates to opioids?

10:44:11 25     A.     Yes.  It's one of the factors they look at.

```
 1    Q.    Yes.  And that's not one of the tests that you
 2    applied here.
 3              In other words, you did not look at Giant
 4    Eagle's prescriptions and opioids and to figure out what
 5    percentage was cash or not?
 6    A.    What I did is I looked at the cash prescriptions to
 7    see if there was a note explaining why, but I did not
 8    look at the percentage that you just described.
 9    Q.    Yes.  So in fairness, Mr. Catizone, you did not
10    apply that Government test to Giant Eagle?
11              In other words, you didn't look at what
12    percentage of Giant Eagle's controlled substance
13    dispensing was paid for by cash?
14    A.    Correct.
15    Q.    Okay.  And you didn't do that for any of these
16    companies?
17    A.    Correct.
18    Q.    And in fact, Mr. Catizone, there's a whole bunch of
19    tests that the Government looks at to determine whether
20    pharmacies are engaged in potentially suspicious
21    diversion activities?
22    A.    I'm uncomfortable when you say there's a number of
23    tests without knowing what those tests are, but I'm sure
24    that the Government has things that they look at that may
25    be different than what I looked at as a pharmacist, yes.
```

1    Q.    And I think you've mentioned one.

2              What -- so one of the things the Government

3    or the Drug Enforcement Administration looks at is what

4    percentage of the medicines you're dispensing are

10:45:33  5    controlled substances versus noncontrolled substances

6    versus regular prescriptions?

7    A.    I've seen that in other documents, I've seen it

8    opined more so for distributors as well, but, yes, I've

9    seen that metric used before.

10:45:47 10    Q.    And, Mr. Catizone, that's also a test that you did

11    not use here?

12    A.    It was data that I didn't look at or analyze, yes.

13    Q.    Okay.  In other words, you didn't look at what

14    percentage of Giant Eagle's prescriptions were controlled

10:46:01 15    substances versus noncontrolled substances, regular

16    medicines?

17    A.    Correct.

18    Q.    And you didn't do that for any of the other

19    pharmacies either?

10:46:09 20    A.    Correct.

21    Q.    And another test or metric that the Drug

22    Enforcement Administration looks to to see if a business

23    or a pharmacy is perhaps engaged in diversion or

24    suspicious activity is what percentage of high dose

10:46:27 25    opioids they're prescribing versus other opioids?

1    A.    That metric I'm not familiar with.

2              I haven't seen that metric applied.

3    Q.    Okay.  And you didn't -- so you didn't apply that

4    here either?

10:46:39 5   A.    Correct.

6    Q.    And, Doctor, I want to talk a little bit about

7    Giant Eagle.

8              You know, Dr. Catizone, that Giant

9    Eagle -- Mr. Catizone, you'd like to be called Mister or

10:47:03 10  Doctor, or --

11   A.    Either way is fine.

12             The Doctor is a designation conferred on me

13   by the State of Oklahoma based upon my work.  It's more

14   honorary.

10:47:13 15            My family doesn't respect me or call me

16   Doctor, so you can call me Mister if you'd like.

17   Q.    Mr. Catizone, you know that Giant Eagle is not a

18   national chain?

19   A.    Is not?

10:47:27 20  Q.    Is not.

21   A.    It's a regional chain.

22   Q.    Yes.

23   A.    Yes.

24   Q.    You know that they don't have thousands of stores

10:47:34 25  across the country?

Catizone - Cross/Sullivan                                    1404

1      A.     Correct.  Yes, I do know that.

2      Q.     And, Mr. Catizone, do you know which states they

3      operate in?

4      A.     I'm not specifically sure but I know it's more of

10:47:46 5     the Mid-Atlantic, but I'm not sure.

6      Q.     You don't know which states they operate in?

7      A.     No.

8      Q.     Do you know they don't have any operations in

9      Florida?

10:47:55 10    A.     No.  I don't know that.

11     Q.     You don't know that?

12            Okay.  So when you reviewed information

13     about this case, were you not told that Giant Eagle only

14     has stores in five states?

10:48:11 15    A.     What I was asked to do is review the prescriptions

16     from Giant Eagle based upon the red flags that presented,

17     whether or not Giant resolved those red flags and

18     documented those red flags, and that's what I was asked.

19            I wasn't asked to do any corporate analysis

10:48:26 20    or analysis of the footprints of those chains in the

21     country or in the various states.

22     Q.     But I think the jury heard you give some opinions

23     about Florida pill-mills and people trafficking pills

24     from Florida and other states into Ohio.

10:48:41 25           Do you remember talking about that?

1    A.    I think that was raised by one of your colleagues

2    asking if I knew about pill-mills and knew about the

3    preponderance of pill-mills in Florida, and I simply said

4    yes, that was known in pharmacy.

10:48:52 5    Q.    And do you know, sir, that Giant Eagle has no

6    stores in Florida?

7    A.    I didn't know that but I'm not sure it made any

8    difference or would make any difference to my opinion.

9    Q.    Do you know, sir, that Giant Eagle pharmacies

10:49:04 10   are -- in Lake and Trumbull County are all in grocery

11   stores?

12   A.    Yes.

13   Q.    And as I understand it, you didn't talk to any

14   Giant Eagle pharmacists as part of your review in this

10:49:15 15   case?

16   A.    No.

17   Q.    Either current pharmacists or former pharmacists?

18   A.    No.

19   Q.    And you didn't talk to any of the doctors that

10:49:22 20   prescribed the prescriptions that you looked at?

21   A.    No.

22   Q.    And you didn't talk to any patients --

23               THE REPORTER:  I'm sorry, could you hold on

24   for one second?

10:49:53 25               MS. SULLIVAN:  Sure.  Sorry, Sue.

1       THE COURT:  Ms. Sullivan, if you're about

2    to conclude or ready to wrap up, let me know if it's a

3    good time to take a break.

4       MS. SULLIVAN:  It's a good time to take a

10:50:03 5    break, Your Honor.

6       THE COURT:  Ladies and gentlemen, we're

7    going to take our break.  You might eat a few more snacks

8    because we're going to go longer today and then take a

9    lunch.

10:50:15 10       (Jury out.)

11       (Recess taken.)

12       (Jury in.)

13       THE COURT:  Okay.  Please be seated.

14       And, Ms. Sullivan, you may continue.  And,

11:11:15 15    Dr. Catizone, just reminding you you're still under oath.

16       THE WITNESS:  Yes, sir.

17       MS. SULLIVAN:  Thank you, Your Honor.

18    BY MS. SULLIVAN:

19    Q.   Mr. Catizone, I want to shift gears and talk about

11:11:24 20    the time metric slide you put up that you were talking

21    about how companies put a time in terms of wait times.

22       Do you remember that slide?

23    A.   Yes.

24    Q.   Okay.

11:11:36 25    A.   I don't think it was a slide.

1        It was a discussion about some of the

2   markings I saw on the hard copies, I believe.

3   Q.    Okay.  I thought it was on a PowerPoint, too, but

4   in any event, you talked about Giant Eagle having a

11:11:50 5   15-minute wait time.

6        Do you remember that?

7   A.    No, I think it was in reference to CVS.

8   Q.    Sorry?

9   A.    I think it was in reference to CVS.  I don't think

11:11:58 10   I spoke about Giant Eagle in that regard.

11   Q.    Okay.  Fair enough.  So you didn't say

12   anything -- so it's not your opinion that Giant Eagle set

13   a certain wait time for people?

14   A.    That's my understanding.

11:12:07 15   Q.    They did not?

16   A.    Correct.

17   Q.    Okay.  I just want to clear that up.  So when you

18   were talking about companies who had, you know, certain

19   wait times, you had to rush out prescriptions, Giant

11:12:17 20   Eagle did not have a fixed wait time?

21   A.    That's my understanding.

22   Q.    And you did, Mr. Catizone, talk about I believe

23   Giant Eagle and bonuses and prescription volume.

24        Do you remember that?

11:12:32 25   A.    I'm sorry, you went a little fast.  I didn't hear

1    any of the question.

2    Q.    Do you recall your testimony about Giant Eagle and

3    prescription bonuses based on volume of prescriptions?

4    A.    What I testified was the metrics that the various

11:12:46  5    policies have, and Giant Eagle had certain metrics as

6    well.

7    Q.    And I wanted to -- and I believe you showed the

8    jury this document -- I want to just put it back up, if I

9    could.

11:12:55  10           It's Exhibit 9546, if I can get it here.

11    And that would be Tab 27, Doctor, if you want to get a

12    hard copy.

13    A.    Okay.  I have it.

14    Q.    Okay.  And I want to start by looking at the

11:13:31  15    pharmacists on Page 2.

16    A.    Okay.

17    Q.    And I believe you were critical of Giant Eagle by

18    having a bonus system that was in some way tied to

19    prescription unit volume.

11:13:47  20           Do you remember that?

21    A.    My testimony was that that impacted the

22    pharmacist's ability to conduct due diligence, yes.

23    Q.    Yeah.  And I just wanted to talk a little bit more

24    about that.

11:13:57  25           So do you see, sir, that the pharmacist

Catizone - Cross/Sullivan                                    1409

1    bonus is based on their salary, right?

2    A.    No, I don't think it's based upon their salary.

3          It's based upon the salary for -- the

4    salary cost within the budget was my understanding.

11:14:14 5    Q.    Well, do you see the top line says "Based upon the

6    salary at the beginning of the fiscal year," right?  The

7    bonus percentage is based upon the salary at the

8    beginning of the fiscal year, that's what it says, sir,

9    right?

11:14:27 10   A.    Yes.

11   Q.    And it says the maximum you can get is one percent

12   of your salary, right?

13   A.    That's -- yes.

14   Q.    And the maximum based upon prescription unit volume

11:14:36 15   is one percent, right?

16   A.    Yes.

17   Q.    And in 2014, the average salary for a pharmacist

18   was roughly $100,000?

19   A.    Yes.

11:14:44 20   Q.    Okay.  So if the average salary for a pharmacist is

21   $100,000, and prescription volume, that's all

22   prescriptions, right, in the store?  That's just not

23   opioids?

24   A.    That would be my understanding, yes.

11:14:59 25   Q.    Okay.  And do you know what percentage of

Catizone - Cross/Sullivan                              1410

1   prescriptions Giant Eagle dispensed in 2014 were

2   noncontrolled substances?

3   A.    I think you asked that earlier and the answer is

4   no.

11:15:12  5   Q.    Okay.  So if I told you that Giant Eagle's ratio

6   was 90 percent noncontrolled substances and 10 percent

7   controlled substances including opioids, you would have

8   no reason to dispute that?

9   A.    No.

11:15:24 10   Q.    Okay.  So if you take -- if Giant Eagle is doing 10

11  percent of controlled substances, including opioid, then

12  the volumetric for opioid prescriptions or controlled

13  substance prescription would be one-tenth of one percent,

14  right?

11:15:40 15   A.    No.

16  Q.    Well, if they're doing 10 percent of their

17  prescriptions are for noncontrolled substances, that

18  would be one-tenth of one percent of the volume, fair?

19  A.    Not fair.

11:15:52 20                   What you're making --

21  Q.    I'm sure you're going to get a chance to explain

22  and you can explain to me, but I just want to, if I can

23  just get an answer to my question, sir?

24                   THE COURT:  The answer was "Not fair."

11:16:02 25  Okay.

Catizone - Cross/Sullivan                                    1411

1    A.    Not fair.

2    Q.    But it's true, sir, that if only 10 percent of

3    Giant Eagle's prescriptions are for controlled

4    substances, that would be one-tenth of one percent of the

11:16:13  5    volume bonus?

6    A.    No.

7    Q.    Okay.  So, and, Doctor, you know this is

8    store-wide, right?  This is just not for the one

9    pharmacist.

11:16:32  10            Do you know the prescription volume is

11   calculated store-wide?

12   A.    Yes.

13   Q.    Okay.  And it's calculated based on total volume,

14   including noncontrolled substances?

11:16:43  15   A.    Correct.

16   Q.    Okay.  So the one percent includes both opioid

17   prescriptions and nonopioid prescriptions?

18   A.    Correct.

19   Q.    Okay.  And if Giant Eagle's nonopioid prescriptions

11:16:56  20   are 90 percent and their controlled substance

21   prescriptions, including opioids, are 10 percent, that

22   would be one-tenth of one percent of the total volume

23   bonus?

24   A.    No.

11:17:08  25   Q.    Okay.  You and I do math differently, Doctor.

```
 1              But if I'm right that's a hundred dollars?
 2    A.    It's not math.  It's pharmacy practice, and I don't
 3    believe you're right, with all due respect.
 4    Q.    And if it's -- the prescription unit volume
 5    includes all of the prescriptions, opioids and
 6    nonopioids, right?
 7    A.    You're -- yes.
 8    Q.    Okay?
 9    A.    The answer is still no because you're not
10    approaching it the right way.
11    Q.    Okay.  I got it.
12              I want to turn to do you know, sir, that
13    Giant Eagle got rid of the prescription volume bonus such
14    as it was in 2016?
15    A.    No.
16    Q.    So when you were giving opinions criticizing that
17    kind of bonus, you did not know that Giant Eagle had
18    eliminated it?
19    A.    I looked at the information and the prescription
20    volumes, and if they had it in place up to 2016 then
21    there was probably six years' worth of that bonus.
22    Q.    Do you know, sir, that Giant Eagle produced to the
23    plaintiffs dispensing data for almost 1.4 million
24    prescriptions?
25    A.    Again, I reviewed the sample scripts from all the
```

11:17:25  (line 5)
11:17:34  (line 10)
11:17:54  (line 15)
11:18:07  (line 20)
11:18:27  (line 25)

1      defendants that were provided to me.

2                  I didn't know what the total universe was.

3      Q.   So you -- and as I understand it, sir, you reviewed

4      2,000 prescriptions for Giant Eagle?

11:18:42  5    A.   Approximately, yes.

6      Q.   And so you didn't review 1.2 million prescriptions?

7      A.   No.

8                  My understanding was that the defendants

9      provided a random sample and those 2,000 prescriptions

11:18:56 10   would give an indication of what that 1.2 represented

11     without having to look at all 1.2 million.

12     Q.   Okay.  But the 2,000 Giant Eagle's prescriptions

13     you reviewed is a fraction of one percent of the total

14     prescriptions?

11:19:08 15   A.   It's a representative sample of the entire sample.

16     Q.   A small fraction of less than one percent?

17     A.   I didn't do the math, but it's supposed to be in

18     terms of what it is, it's a representative sample of

19     everything Giant Eagle dispensed.

11:19:23 20   Q.   And, Mr. Catizone, as I understand it, you did not

21     look to see how many of the patients who received the

22     2,000 prescriptions that you looked at were already

23     existing patients of Giant Eagle pharmacies?

24     A.   No.  My understanding the way you've asked the

11:19:44 25   question, no.

Catizone - Cross/Sullivan                     1414

1    Q.    Okay.  So you don't know if they were customers who

2    had a long history with Giant Eagle, patients?

3    A.    If it was in the notes, then I knew that.  If it

4    wasn't in the notes, then I didn't know that.

11:19:55 5   Q.    And if I told you that 90 percent of the

6    prescriptions that you looked at of the 2,000 involved

7    existing Giant Eagle pharmacy patients, you could not

8    dispute that?

9    A.    Well, since you and I disagreed on math before, I'm

11:20:11 10  not sure I would take that, but I'd have to give it to

11   you, so --

12   Q.    And I think you talked to Mr. Swanson and

13   Mr. Lanier about the fact that pharmacists get to know

14   their patients, they get to know the doctors, and they

11:20:26 15  have familiarity with the patients, with the patients

16   they serve?

17   A.    Correct.  Yes.

18   Q.    In terms of their -- the medicines they've been

19   prescribed, their doctors, and often their conditions,

11:20:39 20  right?

21   A.    Correct.

22   Q.    And I want to just look at, if I could, some of the

23   demonstrative slides that you put up as related to Giant

24   Eagle.

11:21:00 25        Doctor, the first one is in Tab 37.

Catizone - Cross/Sullivan                          1415

1    A.    I have that, thank you.

2    Q.    You got it?  Okay.

3          And I think you said that 54 percent of the

4    2,000 scripts you looked at for Giant Eagle didn't have

11:21:28 5    notes, right?

6    A.    Correct.

7    Q.    But then when you looked at the hard copy of the

8    prescription, which were different than the computer, the

9    pharmacist actually did put notes in about -- in many of

11:21:40 10   those?

11   A.    Yes.  The slide said 782 of the prescriptions did

12   not contain any information in the notes and any

13   handwritten documentation on the hard copy, so of the

14   1,094 there were some notations on the remaining roughly

11:21:56 15   1,300.

16   Q.    Okay.  So of the 2,000 sample that you looked at,

17   over 60 percent of the Giant Eagle prescriptions did have

18   notes from the pharmacists?

19   A.    It had markings or something, but not relevant

11:22:06 20   notes, no.

21   Q.    And looking at the notes that you put up for

22   our -- for our jurors, I just want to go back to those,

23   if I could.

24          And, Doctor, there's a notes database that

11:22:28 25   was produced that you looked at in connection with these

1    prescriptions, right?

2    A.    I was provided spreadsheets for all the defendants

3    with all of the notes and some hard copy prescriptions as

4    a JPEG, yes.

11:22:39  5    Q.    And I want to put up, if I could, Defense Exhibit

6    HBC/GE MDL 00178, and that's the notes field for one of

7    the prescriptions that was in your demonstrative.

8    A.    What tab is that, please?

9    Q.    That would be in Tab 38.

11:22:58  10    A.    30?

11             THE COURT:  30 or 38?

12             MS. SULLIVAN:  38.

13             THE COURT:  38.

14             Thank you, Ms. Sullivan.

11:23:04  15             MS. SULLIVAN:  Sure.

16    A.    I've got it.

17    BY MS. SULLIVAN:

18    Q.    Okay.  And this is the -- an example of the kinds

19    of notes fields you look at, right, sir?

11:23:22  20    A.    Yes.

21    Q.    Okay.  And what it has is it has the year that the

22    prescription you looked at was dispensed, right?

23    A.    Correct.

24    Q.    And then it has the notes that the pharmacist wrote

11:23:35  25    in here, right?

1    A.    Correct.

2    Q.    And it has a sample number for the patient, right,

3    or for the prescription, I'm sorry.

4              Do you see that?

11:23:45  5    A.    Yes.

6    Q.    Okay.  And one of the problems that you pointed out

7    in your expert report is that when you pull up the

8    prescription that was dispensed, you get notes for a

9    whole bunch of things that have nothing to do with that

11:23:59 10    prescription, right?

11    A.    Correct.

12    Q.    In other words, if we look at this, it talks

13    about -- it talks about a prescription from 2012, from

14    2016, from other dates, but the prescription that was

11:24:12 15    dispensed is 2010, right?

16    A.    Yes.

17    Q.    Okay.  So and you cited that in your report as a

18    problem, as an issue?

19    A.    Correct.

11:24:25 20    Q.    So in other words, when you're looking at these

21    notes, you can't assume this has anything to do with the

22    prescription that was dispensed?

23    A.    That was one of the comments I made in my report as

24    well.

11:24:34 25    Q.    Yeah.  So when you're telling the jury that this

1    means that this -- this note means that this prescription

2    was dispensed, that's not necessarily true because it

3    could relate to a completely different prescription?

4    A.    No.   The reason this prescription is in the sample

11:24:52 5    is it had more than one flag.

6              I can't recall specifically, but I think

7    this prescription had six or seven red flags.

8    Q.    So, Doctor, I think you're missing my question.

9              The prescription that was dispensed is

11:25:05 10    2010, right?

11    A.    Correct.

12    Q.    But the notes relate to prescriptions in 2012 and

13    2016?

14    A.    Correct.

11:25:12 15    Q.    And you don't have any evidence that those were

16    actually dispensed?

17    A.    No.   My comment was that the prescription issued in

18    2010 that had the multiple red flags for which there are

19    no notes was dispensed.

11:25:27 20    Q.    But, Doctor, you showed the jury, and we'll put it

21    up, these are the examples of the red flags, but they

22    relate to completely different prescriptions?

23    A.    I don't know that.

24    Q.    But the dates are two years apart, the dates are

11:25:39 25    two years apart, the dates are four years apart?

Catizone - Cross/Sullivan                    1419

1    A.      Part of the problem is the prescription numbers

2    were not included in the notes.

3                   I had no idea if this related back to that

4    original prescription that was filled in 2010, if this

11:25:52 5    was a new prescription, or if this was an ongoing problem

6    with the patient.

7                   That's the reason documentation is critical

8    in these situations.

9                   No one knows what these notes mean.  All I

11:26:02 10    know is that prescription had multiple red flags in 2010.

11    Those red flags were not resolved.  That prescription was

12    dispensed.  And now we've got notes for 2012 citing

13    there's some other significant issues.

14                   Don't know what that related to, and even

11:26:18 15    those issues then I don't know how those were resolved as

16    well.

17    Q.      But, Doctor, part of the problem here is that we

18    know the 2010 prescription was dispensed, that's the one

19    you looked at, right?

11:26:27 20    A.      Yes.

21    Q.      But then you talked to the jury about all of these

22    other notes that have nothing to do with the 2010

23    prescription?

24    A.      Again, as I've just discussed, there were no notes

11:26:39 25    related to the 2010 prescription that had multiple red

1    flags.

2              These notes appeared in that section.

3    Either the pharmacist just was putting random notes in

4    that section for that prescription, or significant

5    documentation is missing that is intelligent people in

6    this room probably could figure out what happened or what

7    that note means, and we still don't know what happened to

8    the red flags for that prescription in 2010 that was

9    actually dispensed.

10   Q.   But, Doctor, part of the problem is you put up this

11   slide, you and your lawyer.

12              Did you create these slides or did the

13   plaintiffs' lawyers?

14   A.   The plaintiffs' lawyers did.

15   Q.   They did.  Okay.

16              So the plaintiffs' lawyers created these

17   slides for you with what you talked about as red flags,

18   right, that have absolutely nothing to do with the

19   prescription that was dispensed?

20   A.   I --

21   Q.   Isn't that a problem?  Isn't that misleading, sir?

22   A.   I respectfully disagree with you.

23              This was in that patient profile under that

24   notes, under those notes, for this prescription.

25              If it was not appropriate, it was not

1    appropriate on the part of Giant Eagle and their

2    pharmacists for not including that documentation as it

3    should have been, or they made a huge mistake including

4    documentation for another prescription that shouldn't

11:27:54  5    have been in there.

6                 That's a significant problem.  That's

7    something that's very dangerous for the patients.

8    Q.    Doctor, isn't it a significant problem for the

9    plaintiffs' lawyers to put up notes that -- for

11:28:06 10    prescriptions that you have no idea were dispensed or

11    not?

12                 The pharmacists could have refused to

13    prescribe these things, could have refused to fill these

14    prescriptions, and you have no idea.

11:28:17 15                 Fair?  Can you answer that?  You have no

16    idea that these notes that the plaintiffs' lawyers

17    decided to put up for you relating to 2012 and 2016 have

18    anything at all to do with the 2010 prescription?

19    A.    Not fair.

11:28:34 20    Q.    Okay.  You have no evidence, Doctor, do you have

21    any evidence that the 2012 and 2016 prescriptions

22    referred to in these PowerPoints were actually dispensed

23    by Giant Eagle?

24    A.    The evidence I have --

11:28:47 25    Q.    Can you answer that question, sir?  Can you --

1    A.    Yes.

2    Q.    -- answer whether you have any evidence that these

3    2012 and 2016 prescriptions that you guys talked about to

4    the jury were actually filled?

11:29:01 5    A.    My answer is yes.

6    Q.    You -- and where is that, Doctor?  Because the only

7    ones that are filled according to this was the 2010 one.

8    A.    There's no evidence to indicate that these were

9    different prescriptions whatsoever.

11:29:16 10    Q.    Doctor -- I'm sorry.

11    A.    I'm sorry, you asked for evidence, ma'am, and I'm

12    trying to answer your question.

13    Q.    No evidence even though the years are two years

14    different, four years different, right?

11:29:26 15    A.    Part of the problem I found with the prescription

16    data set is that people were on opioids for multiple

17    years, so it doesn't surprise me that a prescription

18    originally dispensed in 2010, that a patient would still

19    be on that and that the pharmacist would attach notes to

11:29:41 20    that prescription.

21         Why would the pharmacist include notes for

22    different prescriptions in a note file for that

23    prescription unless it was an ongoing prescription?  And

24    so, yes, the evidence to me is that same prescription

11:29:54 25    dispensed in 2010 was dispensed in 2012 and again in

1    2016, based upon the notes and documentation I was

2    provided.

3    Q.    Doctor, in looking at the next slide that the

4    plaintiffs' lawyers -- did the plaintiffs' lawyers create

11:30:14  5    all these slides for you?

6    A.    I just responded yes.

7    Q.    They're the ones that picked these out to talk

8    about?

9    A.    Those were all part of my report, and they took

11:30:22  10    excerpts out of my report.  So I picked those out

11    originally and the plaintiffs' attorneys put those

12    together for a presentation to explain things to the

13    jury.

14    Q.    So this is the same exhibit number, but Tab 40.

11:30:37  15    A.    Okay.  I have it.

16    Q.    And, doctor, this relates to your slide 63 and 64,

17    it's the same patient.

18                Do you see that?

19                Do you have your slides?  I'll put them up

11:30:50  20    for you, but these are slides that you talked to the jury

21    about, 63 and 64.

22    A.    Okay.

23    Q.    And it relates to a March 16th, 2011 prescription,

24    your slides do, anyway.

11:31:00  25                Do you see that?

1    A.    No.   It refers to that prescription in 2010.

2    Q.    But the dates in these notes are March 11th, that

3    says "Absolutely no early refills," right?

4    A.    Correct.

5    Q.    "No more filling," right?

6    A.    We're back to the same situation we just discussed.

7    Q.    We are back to the same situation, sir.

8          But if you look at the notes for this

9    prescription, it's actually two different prescriptions,

10   right?  We've got two different index numbers, do you see

11   that?

12   A.    Sometimes different index numbers were front and

13   back of the prescription, so without looking at these I

14   couldn't -- I can't tell you specifically.

15   Q.    You don't know that this refers to, these two

16   different numbers means these are two different

17   prescriptions?

18          Do you know that, sir?

19   A.    What numbers are you utilizing?

20   Q.    I'm looking at, if you go in Tab 40, I'm looking at

21   the prescription notes that correspond to the slides you

22   showed the jury.

23   A.    Aren't those all the same date, 65?

24   Q.    No, sir.  Look at 15352.

25   A.    Okay.

1    Q.    Do you see that?  Do you see those are two

2    different prescriptions, right?  Okay.  You didn't tell

3    the jury those are two different prescriptions, did you,

4    sir?

11:32:14  5    A.    No, I thought that that would be understood, so --

6    Q.    Okay.  And the prescription again that was filled

7    was 2010, do you see that, sir?

8    A.    Yes.

9    Q.    But again, the notes relate to years 2011, right?

11:32:31  10    A.    Yes.

11    Q.    And do you know, sir, in fact that Giant Eagle did

12    not fill this prescription in 2011?

13          Do you know that, sir?

14    A.    I do not know in 2011, but the evidence would

11:32:42  15    indicate since it was part of the note for 2012 that it

16    probably was dispensed.

17    Q.    Sir, do you have any evidence that the March 16th,

18    '11 note, that this prescription was actually dispensed?

19    A.    The evidence I have is what's been provided by

11:32:57  20    Giant Eagle.

21          There's the prescription, 2012.  There's

22    notes surrounding that prescription, and as the defense

23    has said, information's in there that they've been

24    documenting.  I took that as saying this prescription was

11:33:10  25    dispensed every single time that those dates appeared.

1    Q.    Yeah, you assume that, but the record actually says

2    it was dispensed in 2010, right?

3                    Do you see that?

4    A.    Yes.

5    Q.    And it was dispensed in 2012, do you see that?

6                    Do you see that, sir, if you look at the

7    prescription database?

8    A.    It says 3/16/11 and 3/1/11 for --

9    Q.    No, sir, I'm looking at the actual database that

10   says what was dispensed.

11                   Do you see that?  It says it was

12   dispensed --

13   A.    I'm sorry, can you tell me which one you're on?

14   Q.    Sure.  I'm looking at the database for the notes.

15                   Do you see they match up here, sir?

16   A.    No, I know that, but which one are you looking at

17   8865 or 15352?

18   Q.    I'm looking at both of them.  I'm looking at the

19   prescription that was dispensed, the 15 --

20                   THE COURT:  Hold it.  Hold it.

21                   Ms. Sullivan, I think you've established

22   they are two different prescriptions.

23                   MS. SULLIVAN:  Yes, sir.

24                   THE COURT:  The witness just wants to know

25   which prescription you're referring to.

1        MS. SULLIVAN:  Well, Your Honor, I was

2    looking at both, but we can start with 15352.

3    BY MS. SULLIVAN:

4    Q.    Do you see that?

11:34:13  5    A.    Yes.

6    Q.    Okay.

7    A.    That was not dispensed in 2012, according to the

8    notes.  That was dispensed in March of 2011.

9    Q.    No, sir.

11:34:22 10            So, do you know, sir, that the left-hand

11    column means the prescription was dispensed?  Do you know

12    that?

13    A.    That was my understanding of the notes.

14    Q.    Okay.  And there is no note in the column that says

11:34:33 15    the prescription was dispensed, there's no 2011 for this

16    prescription, is there?

17    A.    Not in that column, but in the notes column.

18    Q.    Okay.  In the notes column it says "No more

19    filling," right?

11:34:47 20    A.    Correct.

21    Q.    "No more discount cards."

22            In the notes column it says "No early

23    fills," right?

24    A.    Correct.

11:34:54 25    Q.    And in the column that tells you what was actually

1    filled, there is no evidence that this prescription was

2    filled in 2011.

3                    Fair?

4    A.    No.

11:35:03 5    Q.    Okay.  So, Doctor, do you know, sir, do you know

6    that this is the database that shows what was actually

7    dispensed?

8    A.    That's my understanding, yes.

9    Q.    And in terms of what was actually dispensed, the

11:35:26 10    years we have in this database relating to these two

11    prescriptions are 2010 and 2012, right?

12    A.    And the notes section as well.

13    Q.    But what was actually dispensed, there's no 2011,

14    it doesn't say anything was dispensed in 2011 if that's

11:35:42 15    not in that column?

16    A.    If you'd allow me to explain I can explain my

17    answer.

18    Q.    I'm sure Mr. Lanier will let you explain, but we

19    can agree that in the column that says "Concretely here's

11:35:52 20    what the pharmacist dispensed," there is no entry for

21    2011 for this prescription?

22    A.    I disagree.

23    Q.    Okay.  Is that the kind, Doctor, is that the kind

24    of analysis you did for the other 2,000 prescriptions,

11:36:07 25    too?

1    A.    That thorough analysis, yes.

2    Q.    Okay.  Terrific.

3                 Can we -- I think I'm about done, Doctor.

4                 And, Doctor Catizone, just because you

11:36:27  5    flagged a prescription or had Mr. -- Dr. McCann flag a

6    prescription under your 16 red flags does not mean that

7    it was written for an illegitimate purpose.

8                 Fair?

9    A.    Fair.

11:36:39 10    Q.    And you agree it does not mean, just because Dr.

11    McCann and you flagged these, some of these prescriptions

12    under your 16 red flags, that does not mean that the

13    prescription was diverted?

14    A.    Correct.

11:36:54 15                 MS. SULLIVAN:  I have nothing further.

16                 Thank you, Dr. Catizone.

17                 THE WITNESS:  Thank you.

18                 THE COURT:  All right.  Thank you,

19    Ms. Sullivan.

11:36:59 20                 I think Mr. Delinsky, you're up?

21                 MR. DELINSKY:  Thank you, Your Honor.

22                 THE COURT:  This is Mr. Delinsky for CVS.

23                 MR. HYNES:  Your Honor, may I approach for

24    a moment to hand up documents?

11:37:15 25                 THE COURT:  Sure.

1          MR. DELINSKY:  May it please the Court.

2          THE COURT:  Yes, Mr. Delinsky.

3      CROSS-EXAMINATION OF CARMEN CATIZONE

4   BY MR. DELINSKY:

11:37:53   5   Q.    Jurors, Mr. Catizone, my name is Eric Delinsky, and

6   I represent CVS in this case.

7   A.    Nice to meet you, sir.

8   Q.    It's nice to meet you, too.  As a matter of fact,

9   we shook hands outside, right?

11:38:05  10   A.    Yes, sir.

11   Q.    But no conversations other than hello?

12   A.    Yes, sir.

13   Q.    Okay.  Mr. Catizone, in response to questions put

14   to you by several lawyers, you discussed noncontrolled

11:38:19  15   medications.

16              Do you recall that?

17   A.    Yes, sir.

18   Q.    Noncontrolled medications are medications that are

19   not scheduled by the U.S. DEA, correct?

11:38:32  20   A.    Correct, and the states as well, sir.

21   Q.    They are not as susceptible to potential abuse as

22   controlled substances?

23   A.    Yes, sir.

24   Q.    Okay.  And noncontrolled medications include heart

11:38:48  25   medicine?

1    A.    Diabetes medications, yes, sir.

2    Q.    Okay.  Blood pressure medication?

3    A.    Yes, sir.

4    Q.    Cholesterol medicine?

11:38:57  5    A.    Yes, sir.

6    Q.    Asthma medicine?

7    A.    Yes, sir.

8    Q.    And there's a lot of other kinds of noncontrolled

9    medications, correct?

11:39:03 10    A.    Yes, sir.

11    Q.    Now, on the flip side, we have controlled

12    medications also known as controlled substances, correct?

13    A.    Yes, sir.

14    Q.    And the opioid medications that are the subject of

11:39:18 15    your opinions are one of these controlled medications,

16    correct?

17    A.    Yes, sir.

18    Q.    There are several other types of controlled

19    substances or controlled medications as well, correct?

11:39:31 20    A.    Outside of the five Schedules, sir?

21    Q.    I'm sorry, I don't think my question -- that's my

22    bad.

23                In addition to opioid medications, there

24    are other classes of medications that are categorized as

11:39:49 25    controlled substances?

1    A.    Yes, sir.

2    Q.    For instance, Benzodiazepines, correct?

3    A.    Yes, sir.

4    Q.    Testosterone, correct?

11:39:58  5    A.    Yes, sir.

6    Q.    Stimulants, correct?

7    A.    Yes, sir.

8    Q.    And there's other kinds of medications that are

9    deemed controlled substances?

11:40:07  10    A.    Correct.

11    Q.    So opioid medications are just one of the several

12    kinds of controlled medications that are out there,

13    correct?

14    A.    Yes, sir.

11:40:16  15    Q.    Okay.  And being an expert in the field as you are,

16    it would not surprise you to learn that for the CVS

17    Pharmacies in Lake and Trumbull County, approximately

18    87.5 percent of the prescriptions they filled were for

19    these noncontrolled medications?

11:40:48  20    A.    Yeah, I have nothing, no reason to dispute or doubt

21    that, sir.

22    Q.    Okay.  Before we go any further, just some really

23    quick housekeeping questions.  Okay?

24    A.    Yes, sir.

11:41:00  25    Q.    Since you left the stand on Friday, you did not

1    discuss your testimony with any of the counties' lawyers,

2    correct?

3    A.    Correct.

4    Q.    And since you left the stand on Friday, you didn't

11:41:16  5    discuss any issues that came up in your testimony or that

6    could come up, that could come up in your testimony with

7    any of the counties' lawyers?

8    A.    Correct, sir.

9    Q.    And you did not review any materials since you left

11:41:29  10   the stand on Friday, correct?

11   A.    No, sir.

12               I reviewed my materials at home, but not in

13   conjunction with counsel or not at the direction of

14   counsel.  Just for my preparation, sir.

11:41:42  15   Q.    Okay.  And what materials did you review,

16   Mr. Catizone?

17   A.    I reviewed my report that was submitted on May,

18   2021, and then the supplemental report that was submitted

19   thereafter.

11:41:53  20   Q.    Okay.  Fair enough.  Thank you, Doctor.

21               I get spun around on Doctor and Mister, So

22   I guess I'll probably vacillate between them both.

23               You testified on Friday about this

24   15-minute fill time, correct?

11:42:12  25   A.    Yes, sir.

```
  1    Q.    That was in connection with my client CVS?

  2    A.    Yes, sir.

  3    Q.    And you testified that CVS asks its pharmacists to

  4    fill prescriptions in 15 minutes or less?

  5    A.    Yes, sir.  And I think part of the testimony was

  6    that was in one of the documents that said -- that

  7    distinguishes CVS from the other pharmacies, sir.

  8    Q.    Okay.  You did not base this part of your opinion

  9    on any testimony provided by a CVS pharmacist in this

 10    case, correct?

 11    A.    I read depositions from the CVS pharmacists as part

 12    of that, and that I had direct interactions in my role at

 13    NABP where I've received information about that, sir.

 14              But not part of the testimony.

 15    Q.    Do you have your report with you?

 16    A.    Yes, I do.

 17    Q.    Mr. Catizone, could you please turn to Page 94?

 18    A.    The supplemental report, sir, or the first report?

 19    Q.    The first report.

 20    A.    Okay, sir, I'm there.

 21    Q.    Okay.  You have footnotes here, correct?

 22    A.    Yes.

 23    Q.    And this is the page of the report where you talk

 24    about the 15-minute fill time, correct?

 25    A.    Yes, sir.
```

1    Q.    And you don't cite any excerpts of any depositions

2    of any CVS witnesses, correct?

3    A.    Correct.

4    Q.    Okay.  As you said in your testimony last week, you

11:44:06  5    based your opinion on this 15-minute fill time on a CVS

6    document, correct?

7    A.    Correct.

8    Q.    And, Mr. Catizone, if you could please pull up

9    20695.

11:44:28  10    A.    Okay.  I have that here, sir.

11    Q.    This is the document about which you testified on

12    Friday, correct?

13    A.    Yes, sir.

14    Q.    And I believe you testified about Page 18 in

11:44:45  15    particular.  I'll flip there.  You can flip as well.

16                And I'm using the -- there's a lot of

17    different numbers on this.  I'm using the one in the

18    bottom right corner.

19    A.    I've got that, sir, yes.

11:44:57  20    Q.    For page numbers.  Okay.

21                Okay.  This -- I'm sorry -- this is

22    Page 18.  This was one of the pages you testified about,

23    correct?

24    A.    Yes, sir.

11:45:07  25    Q.    And you testified about this chart that contains

1    guidance on the 15-minute wait time, correct?

2    A.   Yes, sir.

3    Q.   Okay.  Mr. Catizone, you appreciate that this

4    15-minute wait time is for patients who choose to wait in

11:45:34  5    the pharmacy for their prescription to be filled,

6    correct?

7    A.   Yes, sir.

8    Q.   Okay.  As a matter of fact, on Page 19 of this

9    document, it says that.

11:45:46  10            It says, "Many of our customers choose to

11    wait in-store for their prescriptions, either because

12    they need a medication immediately or because they are

13    unable to return at a later time."

14                 Correct?

11:46:04  15    A.   Yes, sir.

16    Q.   So this 15-minute time period pertains to what CVS

17    terms as -- in this document as "waiters," correct?

18    A.   Yes, sir.

19    Q.   The patients who either need their medicine right

11:46:23  20    away or can't come back later, and, therefore, hand the

21    prescription to the pharmacist and wait to get their

22    medicine back, correct?

23    A.   Yes, sir.

24    Q.   Okay.  Now, you understand that CVS treats

11:46:39  25    non-waiters differently, correct?

1     A.    Yes, sir.

2     Q.    Okay.  I think it's self-explanatory, but

3     non-waiters are patients who choose not to drop off their

4     prescription and wait for it to be filled, correct?

11:46:57 5    A.    Yes, sir.

6     Q.    Non-waiters can have their prescription, for

7     instance, phoned in by their doctor, and then they drop

8     by the pharmacy to pick it up later that day or maybe the

9     next day, correct?

11:47:10 10   A.    Yes, sir.

11    Q.    Or non-waiters can be patients who drive by the

12    pharmacy in the morning, hand the pharmacist or the

13    pharmacist technician her prescription, and then return

14    after work at the end of the day, correct?

11:47:24 15   A.    Yes, sir.

16    Q.    And you understand that for patients who don't

17    wait, for non-waiters, CVS sets no time at all, imposes

18    no guidance at all for how long pharmacists may take to

19    review and potentially fill those prescriptions, correct?

11:47:48 20   A.    Yes, sir.

21    Q.    So in that instance, when we're talking about

22    non-waiters, a pharmacist could set a wait time of 45

23    minutes, correct?

24    A.    Yes, sir.

11:48:03 25   Q.    The pharmacist could set a wait time of one hour?

1    A.    Yes, sir.

2    Q.    The pharmacist could set a wait time of two hours,

3    correct?

4    A.    Correct, sir.

11:48:11  5    Q.    The pharmacist could even set a longer wait time,

6    correct?

7    A.    Yes, sir.

8    Q.    Okay.  And in that instance, when we're dealing

9    with a patient who is not a waiter, and the pharmacist

11:48:23 10    sets that wait time to be an hour or two hours, or

11    whatever that pharmacist thinks is appropriate, that's

12    not Domino's Pizza, correct?

13    A.    Yes, sir.  It's not, yeah.

14    Q.    Okay.  So again, we have two buckets on this

11:48:53 15    15-minute time limit.

16              We have the waiters.  That's the kind of

17    patient to whom the 15-minute guidance applies, correct?

18    A.    Yes, sir.

19    Q.    And then we have the non-waiters, and the 15-minute

11:49:07 20    goal does not apply to them, correct?

21    A.    Yes, sir.

22    Q.    Okay.  And you know that CVS pharmacists have the

23    flexibility to determine that a waiter should be treated

24    as a non-waiter?

11:49:31 25    A.    I'm not understanding that question, sir, so

Catizone - Cross/Delinsky                                    1439

1    perhaps you could help me understand it, please.

2    Q.    You know that if a patient comes to the pharmacy

3    and drops off a prescription and says, "I want to wait

4    for it," that the pharmacist, the CVS pharmacist, has the

5    flexibility to say, "I'm sorry, I know you want to wait,

6    but I can't handle this on a waiter basis; I'm going to

7    convert you to a non-waiter and you're going to have to

8    come back and pick it up at some later time"?

9    A.    My question, to understand just what you're asking,

10   sir, is if you have the two buckets as you describe, the

11   waiter and non-waiter, and if the people coming in as

12   waiters need that prescription immediately or within that

13   15-minute time period, if the pharmacist then says

14   "You're a non-waiter," then does that count for the

15   pharmacist bonus calculation and metrics that that person

16   has been moved to the non-waiter, or what impact then do

17   those metrics have on the pharmacist, and then what if

18   the patient refuses to go to the non-waiting bucket?

19   Q.    So I believe you've asked -- you've answered my

20   question with more questions.

21   A.    Correct.

22   Q.    Pretty common among lawyers, but you're not one,

23   but you're close to one.

24              My question is simply, you appreciate, do

25   you not, that the pharmacist, the CVS pharmacist, has

1    great flexibility in how to treat a patient so that if

2    the CVS pharmacist looks at a prescription and says it's

3    not appropriate for me to endeavor to fill that in 15

4    minutes, they can set a longer wait time, they can

11:51:17 5    categorize that patient as a non-waiter?

6              You understand that, correct?

7    A.    Understand that, but I would say as a pharmacist

8    it's not a great flexibility.

9              I would say it's a limited flexibility

11:51:30 10   based upon the patient's needs and some of the other

11   restrictions that the pharmacist has placed upon them,

12   sir.

13   Q.    You understand that when pharmacists exercise this

14   flexibility to tell a waiter, "I'm going to need more

11:51:49 15   time," that they can set whatever time they think is

16   appropriate?

17   A.    Again, sir, as a pharmacist in real situations

18   that's very difficult to do, particularly if a patient

19   doesn't want to be a non-waiter or if the patient is ill

11:52:08 20   and wants to get home as quickly as possible.

21             So there's not that much flexibility for

22   the pharmacist to set any time they want.  There's some,

23   sir, but not to say "Please come back in two hours" if

24   the patient can't come back in two hours.

11:52:21 25   Q.    And you raise a very, very good point.

 1                      Being a pharmacist is difficult and

 2      stressful at times, correct?

 3      A.     Almost as much as testifying, yes, sir.

 4      Q.     I imagine you were as good a pharmacist as you are

11:52:39  5      a testifier.

 6      A.     Well, thank you, but --

 7      Q.     But being a pharmacist isn't being in a laboratory,

 8      correct?

 9      A.     Correct, sir.

11:52:48 10      Q.     Because you have to deal with real life patients?

11      A.     And people's lives, yes, sir.

12      Q.     Correct.  And when you're dealing with people and

13      human beings, sometimes you get ones who are just

14      impatient and don't want to wait and are angry, correct?

11:53:08 15      A.     Yes, sir.

16      Q.     And that's difficult for the pharmacist?

17      A.     Yes, sir.

18      Q.     And sometimes you're dealing with people who need

19      medicine immediately; they're in discomfort and they need

11:53:19 20      treatment, correct?

21      A.     Yes, sir.

22      Q.     And that limits the pharmacist's flexibility,

23      correct?

24      A.     Yes, sir.

11:53:26 25      Q.     So by way of example, if a roofer -- and I'm just

Catizone - Cross/Delinsky                    1442

1     pulling this out of thin air, okay? -- fell from the roof

2     and suffered a very significant bone break and has just

3     been treated in the emergency room and has gotten a

4     prescription for an opioid medication, that person may

11:53:52  5     need that prescription pretty quickly, correct?

6     A.    Yes, sir.

7     Q.    Because that person is in intense discomfort,

8     correct?

9     A.    Yes, sir.

11:54:00 10     Q.    Okay.  So the limitations on deviating from the

11     15-minute fill time to some extent are dictated by the

12     patient and the patient's individual needs and

13     circumstances?

14     A.    Yes, sir.

11:54:16 15     Q.    Okay.  Let's come back to CVS and CVS's policies.

16               CVS gives the pharmacists flexibility on

17     that 15-minute fill time such that the pharmacists, if

18     they are able to or if the patient needs it, the

19     pharmacist can endeavor to fill in 15 minutes, but if

11:54:42 20     they don't, if the patient doesn't need it on that time

21     frame, and the pharmacist feels he or she needs more

22     time, she has the flexibility within CVS to convert that

23     patient from a waiter to a non-waiter and set a much

24     longer time to evaluate and process that prescription,

11:55:05 25     correct?

1    A.    In concept, I would agree with you, but I did not

2    see anything in the information that specifically

3    addressed that in the policies and procedures.

4              All I saw was the 15-minute time limit, but

11:55:17  5    I didn't see anything that rewarded the pharmacist for

6    that or gave pharmacists that discretion.

7    Q.    Correct.  And this brings us back to where we began

8    on this.

9              You didn't review any testimony in this

11:55:32 10    case from a CVS employee or a CVS pharmacist about how

11    this works, correct?

12    A.    I'm -- I've read the depositions, but I can't

13    recall everything, sir, so --

14    Q.    Okay.  Fair enough.

11:56:08 15              It's taken me awhile, I'm looking for

16    Lanier's -- Mr. Lanier --

17              MR. DELINSKY:  Excuse me, Mark.

18    Q.    -- Mr. Lanier's slides.

19              MR. LANIER:  It's okay, Delinsky.

11:56:21 20              THE COURT:  You can leave that last name,

21    too.  It's okay.

22    BY MR. DELINSKY:

23    Q.    You testified about several of the notes you

24    analyzed that were written by CVS pharmacists, correct?

11:56:36 25    A.    Yes, sir.

1    Q.    Okay.  I'm not going to go through them all.

2                I think it would be tedious for everyone,

3    but I just want to go through a few, okay?

4    A.    Yes, sir.

11:56:48  5    Q.    This is one of the notes you testified to when

6    Mr. Lanier, or Lanier, was asking questions of you.

7                Do you recall that?

8    A.    Yes, sir.

9    Q.    Okay.  And this, this is one of the notes you

11:57:15 10    reviewed of the 2,000 sample notes from CVS that was

11    prepared by CVS pharmacists in connection with a

12    prescription he or she filled for an opioid medication,

13    correct?

14    A.    Yes, sir.

11:57:30 15    Q.    And this note indicates that the pharmacist ran an

16    OARRS report, correct?

17    A.    Yes, sir.

18    Q.    Okay.  And running an OARRS report is a good thing,

19    correct?

11:57:49 20    A.    Yes, sir.

21    Q.    Okay.  I believe in the stakeholders report you

22    testified about this morning, it was called valuable,

23    correct?

24    A.    Valuable and necessary, sir.

11:58:00 25    Q.    You're right.  You're right, Mr. Catizone.  It said

1    valuable and necessary.

2              And just to orient everyone on what an

3    OARRS report is, an OARRS report is a report, it comes

4    from a database maintained by the State of Ohio Board of

11:58:17  5    Pharmacy, correct?

6    A.    Yes, sir.

7    Q.    And the pharmacist has the ability to log on and

8    get the prescription history maintained by the State

9    Board of Pharmacy for the particular patient that the

11:58:35 10    pharmacist is filling a prescription for in the moment,

11    correct?

12    A.    And any other state data where that patient may

13    have had their prescription dispensed outside of Ohio.

14    Q.    And that's absolutely correct.

11:58:49 15              So Ohio, by way of example, has an

16    agreement with Pennsylvania, so when you log on, if you

17    have a Trumbull County patient for instance, that patient

18    may be filling prescriptions at one time or another in

19    Pennsylvania since it's right over the line, correct?

11:59:03 20    A.    Correct.

21    Q.    And in Ohio, when you pull up this, this OARRS

22    report, you get both?

23    A.    Yes, sir.

24    Q.    Okay.  But this pharmacist did a good thing by

11:59:15 25    running an OARRS report, correct?

1  A.    That's what it looks like, sir, yes.

2  Q.    Okay.  Now, the language that you testified about

3  was what follows the last Rx, and that's shorthand for

4  prescription, correct?

11:59:30  5  A.    Yes, sir.

6  Q.    The last prescription was filled for the same drug

7  at Walgreen's for the same day supply and quantity.

8               Correct?

9  A.    Yes, sir.

11:59:41  10  Q.    And you identified that as a red flag for potential

11  pharmacy shopping, correct?

12  A.    Yes, sir.

13  Q.    And the concern with pharmacy shopping, among

14  others, is that a patient may be filling overlapping

11:59:55  15  prescriptions, correct; getting more pills than that

16  patient may need, correct?

17  A.    Correct.

18  Q.    Okay.  Now, you also testified that you did not

19  know what AMCE is, correct?

12:00:09  20  A.    Yes, sir.

21  Q.    Okay.  So you didn't know, first of all, that the

22  letters are wrong; it's ACME, that's a typo.

23               You wouldn't have known that?

24  A.    I had no way of knowing that, sir.

12:00:24  25  Q.    Okay.  And you didn't know that ACME is Active

1   Cumulative -- I'm going to screw this up -- Morphine

2   Equivalent dose?

3              You didn't know that, correct?

4   A.   I've never seen that definition anywhere, no, or

12:00:47  5   acronym.  Yes, sir.

6   Q.   Okay.  And you didn't know that this is an acronym

7   that's used in OARRS, did you?

8   A.   No.

9   Q.   And you didn't know that what ACME means on OARRS

12:01:02  10   or what it does on OARRS is it gives a score, and it

11   advises the pharmacist how much of the prior opioid

12   prescription should be left at that point in time based

13   on the days supply?

14              You didn't know that, correct?

12:01:21  15   A.   I'm familiar with the algorithm because I was

16   involved in the creation of the algorithm that the PDMPs

17   use, sir.

18   Q.   Okay.  So you do know, then, that when you have

19   these ACME algorithms, if the score is really high, that

12:01:38  20   means there's this patient has -- still has pills from

21   her last prescription?

22   A.   What the algorithm tells the pharmacist is that the

23   potential for abuse and diversion is much higher and that

24   the pharmacist has to take a significant look at the

12:01:57  25   patient.

1    Scores in the 600 to 900 range indicate

2    that in the OARRS report.  Middle scores say this may be

3    problematic.  And then low scores assure or provide the

4    pharmacist with a guide to say this looks like a

12:02:11  5    relatively safe dispensing.

6    Q.    I think we're talking about two different kinds of

7    scores, and I appreciate it's tough to keep them

8    straight.

9        You're talking about the NarxCare score,

12:02:24 10    correct?

11    A.    Correct.

12    Q.    And the NarxCare score in fact was built off a

13    platform which NABP pioneered and began to develop before

14    selling to a company called Appriss, correct?

12:02:39 15    A.    Correct.  That's what the basis for OARRS is and we

16    took it, we worked with the Ohio Board of Pharmacy and

17    incorporated that nationally.  So much of what OARRS does

18    is based on NarxCare and NARxCHECK score, sir.

19    Q.    Okay.  This ACME score is different from the

12:02:57 20    NarxCare score because what it's telling the pharmacist,

21    it's very specific, is how many Morphine equivalents does

22    this patient still have based on their last prescription.

23    Okay?

24    A.    Yes.

12:03:08 25    Q.    And if that score is high, that means this patient

1    has leftover pills, and that's a danger sign, correct?

2    A.    Yes, sir.

3    Q.    But if the score is low, that means that if the

4    patient followed the instructions, the proper dosing

12:03:25  5    instructions on her last prescription, there's nothing

6    left over, it's not an early fill, right?

7    A.    Not that it's not an early fill, but there's no

8    left over.

9    Q.    Okay.  And here, coming back to here, we took a

12:03:39 10    little detour and I apologize for that, but when we come

11    back to here, the pharmacist is writing down here and

12    indicating, "I looked at this ACME score and I determined

13    that it was zero."

14                    Correct?

12:03:52 15    A.    Yes, sir.

16    Q.    And what that means is that the patient shouldn't

17    have had any leftover pills, correct?

18    A.    So far, yes, sir.

19    Q.    Okay.  And what this pharmacist was able to learn

12:04:11 20    from the ACME score was that the prior prescription fill

21    at Walgreen's wouldn't overlap with the current

22    prescription that she was trying to fill or he was trying

23    to fill at CVS, correct?

24    A.    That's what it says, but the following information

12:04:36 25    sort of conflicts with that, and if they made an error on

1    the abbreviation, then I'm a little bit concerned about

2    whether the zero is correct as well, because the next

3    part says that they filled it at Walgreen's, "Watch for

4    pharmacy shopping, always check OARRS," which indicates

12:04:53  5    that there's something going on here, instead of saying

6    "AMCE equals zero, no overlap, no problem."

7    Q.    I think that's precisely right, Mr. Catizone.

8                Because what this pharmacist was doing was

9    saying there is no concern here, I'm going to fill it,

12:05:11 10    but I'm a little bothered by the pharmacy shopping piece.

11    I'm a little bothered by the fact that one was filled at

12    Walgreen's, the patient probably properly used that

13    prescription, but now she's coming to CVS.  So even

14    though this is appropriate for me to fill, I am going to

12:05:30 15    be extra careful and include additional notations saying

16    that we should always check OARRS and that we should be

17    on the lookout for that.

18                That's good notetaking, correct?

19    A.    In that explanation, yes, sir.

12:05:40 20    Q.    All right.  Before we move off this, you're aware

21    that this prescription was for a 15-day supply, correct?

22    A.    I don't remember specifically, but I would take

23    your word for it, sir.

24    Q.    Okay.  And it wouldn't surprise you to know that

12:06:03 25    the daily strength for this prescription was 15 MME?

Catizone - Cross/Delinsky                    1451

1   A.    The strength would have to be in milligrams, sir.

2   The MME is how much of the Morphine was actually in the

3   system, so I don't know what the strength was.

4   Q.    But the daily MME, it wouldn't surprise you to

5   learn that the daily MME in this prescription was 15?

6   A.    Not surprise me.  I just don't recall that.

7   Q.    Okay.  And that's fair.  There's a lot of data

8   here.

9   A.    Right.

10  Q.    But assuming that it was 15, that would be within

11  the CDC guidelines for MMEs, correct?

12  A.    Yes, sir.

13  Q.    And that doesn't solve all potential problems with

14  a script but it's an indicator, correct?

15  A.    I don't know how many red flags were associated

16  with this prescription, sir, as you just said.

17  Q.    And you don't know, and I know you're going to

18  testify why you don't know, okay, but you don't know what

19  the patient's condition was here or why her doctor

20  prescribed this medication, do you?

21  A.    No, sir.

22  Q.    Okay.  And you would say you don't know that

23  because it's not written down here, correct?

24  A.    And was not also on the hard copy.

25  Q.    Okay.  But the fact that it wasn't reduced to paper

1     and written down does not mean that the pharmacist didn't

2     know that information, correct?

3     A.    Correct.

4     Q.    Let's look at another example.  I'll try to make

12:07:48  5     this simple.

6                     I'm copying this technique of using white

7     pages from Mr. Lanier.

8                     This is another slide you testified about,

9     correct?

12:07:59 10    A.    Yes, sir.

11    Q.    And this is another note by a CVS pharmacist that

12    raised concerns for you, correct?

13    A.    Yes, sir.

14    Q.    And the concern is that the note here says "Watch

12:08:11 15    fake CII," correct?

16    A.    Yes, sir.

17    Q.    Okay.  And this is the computer note, correct?

18    This comes from the computer fields that you looked at,

19    correct?

12:08:25 20    A.    Yes, sir.

21    Q.    And for the ladies and gentlemen of the jury, CII

22    is a reference to a Schedule II controlled substance,

23    correct?

24    A.    Yes, sir.

12:08:35 25    Q.    And generally speaking, Schedule II controlled

Catizone - Cross/Delinsky                    1453

1   substances include the opioid medications that we've been

2   talking about in this case, correct?

3   A.    Yes, sir.

4   Q.    Okay.  Now, you know that this prescription was

12:08:52  5   only for a five-day supply, correct?

6   A.    I don't recall that, sir.

7   Q.    Fair enough.  Take my word for it?

8   A.    Yes, sir.

9   Q.    Okay.  And you know that the -- that MME on this

12:09:06 10   prescription was, for those five days, was 20?

11   A.    I would have to take your word again, sir.

12   Q.    Okay.  And that would be consistent with a

13   prescription for something acute maybe, correct?

14   A.    Possibly, yes.

12:09:18 15   Q.    Okay.  Beyond this, when you testified about this

16   note on Friday, you testified about this computer note,

17   but you didn't testify about the handwritten notes that

18   the pharmacist made on the prescription, correct?

19   A.    Yes, sir.

12:09:44 20            And the problem and disconnect is -- if you

21   could put up the spreadsheet -- because each of these

22   prescriptions, even though we can resolve some of what's

23   happening on the surface or with these notes, each of the

24   examples I gave had six or more or five or more red flags

12:10:01 25   that weren't resolved.

1          So this is one aspect of it.  It would be

2   very helpful, sir, if I could see that spreadsheet and we

3   could go through each of those red flags to make sure

4   that each of those were resolved and not just this

12:10:12 5   immediate.

6          We talked last week about some of the

7   prescriptions just on their face looked like they were

8   okay until I looked at the other red flags that existed

9   with that prescription, sir.

12:10:21 10   Q.   Sir, would you please look at CVS MDL 02487?

11   A.   Yes, sir.

12   Q.   Okay.  And I will represent to you that this is the

13   hard copy prescription that accompanied the note we're

14   looking at, "Watch fake CII."

12:10:51 15   A.   Yes, sir.

16   Q.   Okay.  Now, you would have reviewed this note,

17   correct, or this prescription?

18   A.   Right.  I would have looked at the spreadsheet and

19   looked at all the red flags that this prescription had,

12:11:04 20   and then I would have looked at this hard copy, sir.

21   Q.   Okay.  And this prescription shows that it came

22   from the emergency department, do you see that?

23   A.   Yes, sir.

24   Q.   And it says "Minor emergency department," but we

12:11:24 25   know this patient was not a minor because her date of

Catizone - Cross/Delinsky                    1455

1    birth or his date of birth was 1977, correct?

2    A.    Yes, sir.

3    Q.    Okay.  If you look on the reverse side of the

4    prescription, we then have pharmacist's notes, correct?

12:11:41 5    A.    Yes, sir.

6    Q.    Handwritten notes?

7    A.    Yes, sir.

8    Q.    And the pharmacist says, "OARRS checked," correct?

9    A.    Yes, sir.

12:11:53 10    Q.    And again, that is a valuable and, in your words,

11    necessary step, correct?

12    A.    Yes, it's necessary, yes, sir.

13    Q.    Okay.  This was a good effort on the part of this

14    pharmacist to get this script from the emergency

12:12:09 15    department and then pull up OARRS to check on the

16    patient, correct?

17    A.    Yes, but in accordance with CVS policies where they

18    give specific examples of documentation that was not

19    acceptable and it was in my report, things such as

12:12:25 20    reviewed, check with M.D., check OARRS, was designated by

21    CVS as not approved, and then CVS provided recommended

22    language on how to document those types of activities,

23    sir.

24    Q.    100 percent, CVS wants a lot of documentation, no

12:12:42 25    doubt about it, but what you just testified about was the

1       quality of the documentation, correct?

2       A.    Correct.

3       Q.    I want to talk about the quality of the work the

4       pharmacist did.

12:12:52  5                      And by checking OARRS, that was good

6       quality work, correct?

7       A.    Yes, sir.

8       Q.    Okay.  And the pharmacist says that this is a new

9       patient, correct?

12:13:05 10     A.    Yes, sir.

11      Q.    So the pharmacist is noting that.

12                      And the pharmacist is then saying -- then

13      adds, "Also note to watch patient with controls."

14                      Correct?

12:13:19 15     A.    Yes, sir.

16      Q.    So this pharmacist is saying, "I have a

17      prescription from the emergency department," correct?

18      A.    Yes, sir.

19      Q.    The pharmacist is saying, "I've checked OARRS,"

12:13:30 20     correct?

21      A.    Yes, sir.

22      Q.    "This is a new patient who I'm not familiar with,"

23      correct?

24      A.    Yes, sir.

12:13:36 25     Q.    "I'm deciding to fill this prescription from an

1       emergency department that's only for five days and is

2       relatively low MME," correct?

3       A.    Yes, sir.

4       Q.    "But I'm going to include a note in the file to

12:13:51 5      watch this patient," correct?

6       A.    Yes, sir.

7       Q.    Okay.  And it's always prudent if you have a little

8       bit of a concern, even if you feel "Just put a note in

9       the file to watch the patient," that's good pharmacy

12:14:04 10     practice, right?

11      A.    Yes, sir.

12      Q.    Okay.

13      A.    And if I can just for clarification for the jury, I

14      think where they say minor emergency, it's not an age

12:14:12 15     consideration, it's minor as something that's not

16      serious.

17                  So when you quoted the date of birth, I

18      just want to make sure the jury is aware.

19      Q.    I think that's a great qualification, I think

12:14:23 20     you're absolutely right, so thank you.

21                  I'm about to sit down.  I just want to ask

22      you a few more questions, okay?  But I want to be crystal

23      clear in asking these questions.  Okay?  Crystal clear.

24                  We are not accusing NABP, your former

12:14:54 25     organization, or you, of any misconduct, okay?  I want to

1   be crystal clear about that, and we'll tie it up at the

2   end to make that clear, okay?

3              Okay.

4   A.    Sure.

12:15:04  5   Q.    The stakeholder red flag project that you testified

6   about in response to questions from Walgreen's counsel,

7   you recall that, right?

8   A.    Yes, sir.

9   Q.    And that was a committee, it included Walgreen's,

12:15:20 10   correct?

11   A.    A coalition.

12   Q.    A coalition?

13   A.    People get concerned when you say they served on a

14   committee, particularly when lawyers are around, so it

12:15:30 15   was a coalition.

16   Q.    Coalition, and it included DEA, correct?

17   A.    Yes, sir.

18   Q.    It included doctors' associations, correct?

19   A.    Yes, sir.

12:15:39 20   Q.    It included my client, CVS, correct?

21   A.    Yes, sir.

22   Q.    It included your organization, NABP, correct?

23   A.    Yes, sir.

24   Q.    Okay.  You interacted with my clients, correct?

12:15:47 25   A.    Yes, sir.

1    Q.    And it also included Purdue Pharma, correct?

2    A.    Yes, sir.

3    Q.    And that did not take away from the utility of the,

4    what do we call it, the stakeholders coalition at all,

5    correct?

6    A.    In my opinion, no, sir.

7    Q.    Okay.  And I agree with you.

8                The NABP Foundation, you know that,

9    correct?

10   A.    Yes, sir.

11   Q.    That's the foundation that's affiliated with your

12   former organization NABP, correct?

13   A.    Yes, sir.

14   Q.    And you had involvement in the foundation, correct?

15   A.    Yes, sir.

16   Q.    Received a $1 million grant from Purdue Pharma in

17   connection with NABP's efforts on the PDMP front,

18   correct?

19   A.    Correct.  I mentioned that last week to the jury.

20   Q.    And that's the one, I believe, where you said you

21   sort of returned, you used that money to the communities

22   to try to help communities, correct?

23   A.    Yes, sir.  What we did is we published on the

24   foundation website the grant, and each amount of that

25   grant that was disbursed to the states for them to fund

1    their PMP to make enhancements so that people could

2    actually see where every dollar of that million dollars

3    went, and it went to the states.

4    Q.    Okay.  So NABP received the grant from Purdue and

12:17:08  5    NABP then disbursed it to the states for their use,

6    correct, for these very important reasons, correct?

7    A.    Yes, sir.

8    Q.    Okay.  And NABP published an annual Survey of

9    Pharmacy Law, correct?

12:17:24 10    A.    Yes, sir.

11    Q.    And I'm showing you that, it's Defendant DEF MDL

12    1124.

13    A.    I have that, sir.

14    Q.    Okay.  And this is an example of one of those

12:17:41 15    Surveys of Pharmacy Law that NABP sponsored, correct?

16    A.    Yes, sir.

17    Q.    Okay.  And Purdue Pharma sponsored this publication

18    by NABP, correct?

19    A.    What Purdue Pharma sponsored was us providing a

12:18:00 20    copy of the Survey of Pharmacy Law to every graduating

21    pharmacy senior.

22    Q.    And that's a really good point.

23          This Survey of Pharmacy Law went to

24    graduating pharmacy students, correct?

12:18:12 25    A.    Yes, sir.

1    Q.   It went to future pharmacy -- future pharmacists?

2    A.   Yes, sir.

3    Q.   And the purpose of this was to give them, the

4    pharmacists, a resource that would help in their

12:18:25 5   understanding of the law, correct?

6    A.   Yes, sir.

7    Q.   Okay.  And if we turn the page, there's -- well,

8    we'll look, first, at the second page of the document.

9              This is just the copyright page and it

12:18:39 10  contains -- I think your name is there, correct?

11   A.   Yes, sir.

12   Q.   Okay.  Then we go to the third page of the

13   document, okay, and this is a letter from Purdue Pharma,

14   correct?

12:18:48 15  A.   Yes, sir.

16   Q.   And it's a letter from Kristi Dover, correct?

17   A.   Yes, sir.

18   Q.   And in her letter she says, "In your new career as

19   a pharmacist, your evaluation of the validity, safety and

12:19:02 20  appropriateness of prescriptions and medication orders

21   will be a critical aspect of health care delivery."

22              That's a correct statement, right?

23   A.   Yes, sir.

24   Q.   The letter goes on to say, "Purdue understands how

12:19:18 25  important it is for pharmacists to possess a strong

1   understanding of the rules and regulations governing the

2   practice of pharmacy."

3                   Do you see that?

4   A.   Yes, sir.

12:19:25  5   Q.   And that's the letter that was included in NABP's,

6   your organization's Survey of Pharmacy Law that was

7   provided to pharmacy students, correct?

8   A.   Yes, sir.

9   Q.   Okay.  And on the page that comes after the Purdue

12:19:40 10   letter is -- it's hard for me to get this on here because

11   I'm not particularly skilled with this, I think I told

12   the ladies and gentlemen of the jury that I'm really bad

13   with technology and even this technology I'm bad with.

14                   This is a note from you, correct?

12:19:53 15   A.   Yes, sir.

16   Q.   And there's your signature at the bottom, correct?

17   A.   Yes, sir.

18   Q.   Okay.  And Purdue's sponsorship of this publication

19   did not detract from it in any way whatsoever, correct?

12:20:07 20   A.   Correct, sir.

21   Q.   Okay.  The Purdue executive or the Purdue employee

22   who signed this is a person named Kristi Dover, correct?

23   A.   Yes, sir.

24   Q.   And you know Kristi Dover, correct?

12:20:17 25   A.   Correct.

1    Q.    As a matter of fact, you asked Ms. Dover to serve

2    on an NABP task force aimed at looking at the Controlled

3    Substances Act, the Controlled Substances Act, and

4    determining whether it should be revised in any ways,

12:20:32 5   correct?

6    A.    Yes, sir.

7    Q.    Okay.  And NABP gave a very prestigious award to

8    Ms. Dover for her service, correct?

9    A.    Correct.

12:20:40 10  Q.    The award was the Henry Cade Memorial Award,

11   correct?

12   A.    Correct.

13   Q.    And NABP gave Ms. Dover that award while she was at

14   Purdue Pharma, correct?

12:20:52 15  A.    Correct.

16   Q.    Okay.  Now, here's the punch line that I promised

17   would be coming.

18            None of this, none of your interactions or

19   NABP's interactions with Purdue involved any misconduct

12:21:06 20  by Purdue, correct?

21            That was a terrible -- I'll withdraw it.

22   A.    You mind if I can answer it?

23            THE COURT:  Hold it, Doctor.  Mr. Delinsky

24   withdrew his question so he needs to pose another one.

12:21:31 25            THE WITNESS:  Okay.

1        MR. DELINSKY:  Sometimes they just come out

2    really terribly.

3    BY MR. DELINSKY:

4    Q.    By working with Purdue on these projects, accepting

12:21:37  5    their money, their sponsorship, working with people like

6    Ms. Dover, neither you nor your organization NABP

7    participated in any misconduct whatsoever that Purdue may

8    or may not have been involved in, correct?

9    A.    Correct, sir.

12:21:52 10    Q.    Okay.

11        MR. DELINSKY:  Thank you very much,

12    Mr. Catizone.  I appreciate it.

13        Thank you, ladies and gentlemen, Your

14    Honor.

12:22:02 15        THE COURT:  Okay.  Ladies and gentlemen,

16    before we do the redirect, if any of the jurors have any

17    questions, you should hand them to Mr. Pitts, and I will

18    give them to both counsel.

19        (Pause.)

12:22:51 20        THE COURT:  Okay.  I guess, Mr. Lanier, you

21    can begin.

22        MR. LANIER:  Thank you.  Thank you, Judge.

23      REDIRECT EXAMINATION OF CARMEN CATIZONE

24    BY MR. LANIER:

12:23:26 25    Q.    Mr. Catizone.

                     1  | A.    Yes, sir.

                     2  | Q.    It's been awhile.

                     3  | A.    Yes, sir.

                     4  | Q.    So I want to ask you about things that you were

12:23:35    5  | cross-examined on Friday -- no, yes, it was Friday -- as

                     6  | well as today.

                     7  |          I've tried to put together a roadmap to

                     8  | give you an idea, call it "Redirect Road," because I'm

                     9  | going to redirect the examination.

12:23:50   10  |          You follow me?

                    11  | A.    Yes, sir.

                    12  | Q.    Now, I originally had four stops -- we were going

                    13  | to talk about red flags, documentation, policies and then

                    14  | the NABP -- but I decided to put a detour on here with

12:24:03   15  | some questions that were asked by Ms. Sullivan concerning

                    16  | the AMA.

                    17  |          So we'll start actually with the detour,

                    18  | okay?

                    19  | A.    Yes, sir.

12:24:11   20  | Q.    You were asked these questions, you were asked

                    21  | these questions this morning, and one of the issues that

                    22  | you were asked about was Defendants' Exhibit 35922.  And

                    23  | the way this was being read to you and the jury was that

                    24  | "Our AMA deem inappropriate inquiries from pharmacies to

12:24:47   25  | verify the medical rationale behind prescriptions,

            1    diagnoses and treatment plans to be an interference with

            2    the practice of medicine and unwarranted."

            3                I believe even the Court noted that that

            4    seems to be poor grammatically.  Do you remember those

12:25:02    5    questions?

            6    A.   Yes, sir.

            7    Q.   Well, if instead of putting the emphasis the way

            8    Ms. Sullivan did, we just read it, "Our AMA" --

            9                MS. SULLIVAN:  Objection, Your Honor.

12:25:14   10    That's argument.

           11                I did just read it.

           12                MR. LANIER:  No.

           13                THE COURT:  All right.

           14                MR. LANIER:  I'll reask it this way.

12:25:19   15                THE COURT:  You can rephrase it.

           16                I'll sustain the objection the way it was

           17    asked.

           18    BY MR. LANIER:

           19    Q.   Okay.  See if it makes sense to read it like this,

12:25:27   20    that "Our AMA deem inappropriate inquiries from

           21    pharmacies to verify the medical rationale behind

           22    prescriptions, diagnoses and treatment plans to be an

           23    interference with the practice of medicine and

           24    unwarranted," do you see a difference in those two?

12:25:45   25    A.   Yes, sir.

1    Q.    Aside from the fact of whether the AMA is even most

2    doctors, do you see how this speaks to inappropriate

3    inquiries as a wrongful intrusion?

4    A.    Yes.

12:26:03 5    Q.    Is that consistent with your MRI comment?

6    A.    Yes, it is.

7    Q.    Is it consistent with your memory of the

8    stakeholders meeting?

9    A.    Yes, it is, sir.

12:26:13 10   Q.    Is it consistent with your dialogue with the

11   various doctors involved?

12   A.    Yes, sir.

13   Q.    And so what do you believe it to mean to you as a

14   pharmacist and a man who is involved in this work that

12:26:29 15   the AMA deem inappropriate inquiries from pharmacists to

16   be an interference?

17            MS. SULLIVAN:  Objection.

18   BY MR. LANIER:

19   Q.    What would be an inappropriate inquiry?

12:26:40 20           MS. SULLIVAN:  I'm sorry, Mr. Lanier.

21            Objection, Your Honor.  No foundation he

22   had anything to do with the resolution by the AMA.

23            MR. LANIER:  Your Honor --

24            THE COURT:  Well, I'm going to sustain it

12:26:53 25   the way you asked it.

BY MR. LANIER:

Q.    All right.  In terms of the dialogues that you've
had -- no, I'll take that back, too.

            Let me ask it this way.

            Sir, just as a pharmacist, what would you
consider to be an inappropriate inquiry from a pharmacy?

A.    Based on my experience as a pharmacist and what
transpired at the time that I witnessed, some pharmacists
were requesting things like MRIs or very extensive
diagnosis information that went beyond the scope of what
a pharmacist should ask.

            And pharmacy groups that I spoke with
acknowledged that as well, that there was blame on both
sides; that the doctors have to recognize the role of the
pharmacists and pharmacists have to recognize the role of
the doctors, and neither side can go too far and
interfere with what the prescribers need to do and what
the pharmacists need to do.

            MS. SULLIVAN:  Objection, Your Honor.

            Move to strike on hearsay grounds.

            THE COURT:  Overruled.

BY MR. LANIER:

Q.    If it's been suggested to the jury through the
questioning of you by Ms. Sullivan, Giant Eagle's lawyer,
if it's been suggested that the AMA was saying there

```
         1   should be no questions by pharmacists of doctors, would

         2   you agree with that?

         3                    MS. SULLIVAN:  Objection, Your Honor.

         4                    That was not my question.  Mischaracterized

12:28:14 5   it.  It's argument.

         6                    THE COURT:  I'll overrule it.

         7                    He said if it was, if it was your question.

         8   If it was, the jury is to remember what the question and

         9   answer was.

12:28:27 10  A.    No, sir, I don't agree with that.

        11   BY MR. LANIER:

        12   Q.    All right.  By the way, if some doctors are getting

        13   annoyed if pharmacists second-guess them, does that

        14   matter?

12:28:42 15  A.    Not if the patient comes first and if the

        16   pharmacist is doing what they're supposed to do.

        17   Q.    Should the pharmacists do the right thing even if

        18   it annoys some doctors?

        19   A.    Yes.

12:28:53 20  Q.    Okay.  Now, that's the detour.  Let's get to the

        21   red flags and then the documentation.

        22                    You were asked a number of questions about

        23   red flags, and I'd like to try and go through them,

        24   recognizing that some were last Friday and some were this

12:29:25 25  morning.  All right?
```

1    A.    Yes, sir.

2    Q.    First of all, this morning you were asked about

3    your red flags or the red flags you came up with in this

4    litigation, or the red flags that you created for this

12:29:40  5    litigation.

6              Walgreen's lawyer over and over asked that.

7              My question to you, sir, is did you make up

8    these red flags?

9    A.    No, sir.  They came from DEA documents, they came

12:29:52  10   from DEA decisions in administrative cases and criminal

11   and civil cases, and they are information that was known

12   or should be known to all pharmacists.

13   Q.    Should Walgreen's know that these aren't made up by

14   you?

12:30:04  15   A.    I -- I would hope so, sir.

16   Q.    I mean, shouldn't -- shouldn't the chain pharmacies

17   certainly understand what red flags are?

18   A.    There's been enough documentation, presentations by

19   the DEA and state Boards of Pharmacy, that that

12:30:20  20   information should have been known.

21   Q.    In fact, are there more red flags than those you

22   selected for us here?

23   A.    Yes, sir.

24   Q.    Now, general red flag questions.

12:30:35  25             Can red flags be resolved?

1    A.    Except for the one that we discussed, the trinity,

2    the holy trinity, yes, they can be resolved, sir.

3    Q.    But why do pharmacists have to be so careful to

4    resolve them?

12:30:53  5    A.    Every time a pharmacist dispenses a prescription,

6    on the other side of that prescription is a patient or a

7    family member of that patient.

8          If the pharmacist doesn't take care in

9    dispensing that prescription and resolving that red flag,

12:31:08  10    two things happen.

11          One, that prescription gets to the patient

12    and could injure the patient.

13          Second is the controlled and closed system

14    that we've talked about that's been established by the

12:31:24  15    federal laws and such, that closed system is breached.

16    And now medications that should have been dispensed to

17    the patient for a legitimate medical purpose get outside

18    of that system to be abused, to be diverted, and now

19    we're talking about patients who are really at risk now

12:31:45  20    or individuals who are really at risk because that

21    medication has left that closed system and is being

22    abused and diverted.

23    Q.    Okay.  Well, why is it important that pharmacists

24    document this resolution?

12:31:58  25    A.    Again, as we went through some of the notes and

1    some of the examples, as a pharmacist filling that

2    prescription after the initial fill or after the refills,

3    if I don't understand what happened with that patient or

4    that the red flags were resolved, I'm going to ask the

12:32:14  5    same questions of the patient or perhaps I'm not going to

6    dispense it, and the patient's going to be denied their

7    medication.

8                    So documentation is key for me and everyone

9    else looking at that to keep the patient safe and know

12:32:27  10    that that system is still closed and that those red flags

11    have been resolved.

12    Q.    All right.  You were asked by the lawyer for

13    Walgreen's about your familiarity with Lake and Trumbull

14    County.

12:32:42  15                    Remember those questions?

16    A.    Yes, sir.

17    Q.    I think they wanted to know what are the major

18    towns, you know, that kind of stuff.

19                    Remember?

12:32:52  20    A.    Yes, sir.

21    Q.    Here's my question.  Can you think of any reason

22    that Walgreen's shouldn't protect those citizens just as

23    much as the citizens of Cleveland?

24                    MR. SWANSON:  Objection, Your Honor.

12:33:05  25                    This is just argument.

1          MR. LANIER:  It's a direct reply, Judge, to

2     his questions about familiarity.

3               Let me ask it this way.

4               THE COURT:  I'm going to sustain, sustain

12:33:16  5     it the way you've asked that.

6     BY MR. LANIER:

7     Q.    All right.  Let me ask it this way.

8               Does geography change the rules of the DEA?

9     A.    No, sir.

12:33:23 10     Q.    Do you have any reason to suspect that two counties

11     in Northeast Ohio are exempt from the rules?

12     A.    No, sir.

13     Q.    Do you have any reason to suspect that two counties

14     from Northeast Ohio should not have the same protections

12:33:40 15     as everybody else?

16     A.    No, sir.

17               Quite the opposite.  Every individual in

18     the country, every county, should have the same

19     protections and the same requirements.

12:33:49 20     Q.    So the steps that a pharmacist should take when

21     faced with red flags, does it change when all of a sudden

22     you go to Trumbull County?

23     A.    No, sir.

24     Q.    Well --

12:34:01 25     A.    They're universal.  They apply across all patients,

1       all geographic locations, all settings.

2       Q.    Is it ever right in any location to take shortcuts

3       when you're dispensing opioids?

4       A.    No, sir.

12:34:16  5    Q.    Even if you think that you're a smaller county

6       where there are only 200,000 people and you know a good

7       bit of them, does that allow it?

8       A.    Those shortcuts put patients at risk and the

9       pharmacist is not meeting the responsibility, so the

12:34:29 10    answer is no, sir.

11      Q.    Now, you were also asked about your eyeballs that

12      were on prescriptions and what those prescriptions

13      actually said and did.

14                   Do you remember that?

12:34:44 15    A.    Yes, sir.

16      Q.    And then you were asked about files of refusals to

17      fill.

18                   Do you remember those questions?

19      A.    Yes, sir.

12:34:53 20    Q.    Do you expect every bad prescription to be filled?

21      A.    Yes -- no.

22      Q.    Let's do that one again.

23                   Do you expect -- let me ask it, I will ask

24      a clearer question.

12:35:12 25                  Do you know anybody who's arguing that the

                1    pharmacies never did their job right?

                2    A.    No, sir.

                3    Q.    Of course they did their job right many times,

                4    would you agree?

    12:35:23    5    A.    Yes, sir.

                6    Q.    Okay.  Would you agree that not every prescription

                7    is a bad prescription?

                8    A.    Yes.

                9                MR. SWANSON:  Your Honor, can I get an

    12:35:31   10    objection on this?  It's just leading, showing him

               11    statements that --

               12                THE COURT:  Hold.

               13                I'm going to sustain.  Mr. Lanier, I have

               14    no problem with your showing the question before you ask

    12:35:41   15    it.  I do have a problem with you showing him an answer

               16    or a possible --

               17                MR. LANIER:  You're exactly right, Your

               18    Honor, and I apologize.

               19                THE COURT:  The objection will be

    12:35:50   20    sustained.

               21                MR. LANIER:  You're exactly right, I

               22    apologize.

               23    BY MR. LANIER:

               24    Q.    But look at Plaintiffs' Exhibit 17230, which is one

    12:35:56   25    that was turned away.

Catizone - Redirect/Lanier                                    1476

1          Do you remember this?

2     A.    Yes, sir.

3     Q.    Where did this prescription come from?

4     A.    The Cleveland Clinic, sir.

5     Q.    So in spite of everything that we've heard that you

6     never need to check on a Cleveland Clinic prescription,

7     would you agree that sometimes even the Cleveland Clinic

8     might give a prescription that should be turned away?

9               MR. SWANSON:  Objection.  Objection, Your

10    Honor.  That's not what anybody has said.

11              THE COURT:  Well, I'll overrule it.

12              He can answer.  Answer and ask the

13    question -- or ask and answer the question.

14    A.    Yes.  One of the examples we talked about were the

15    assumption that people make, just because it's the

16    Cleveland Clinic, that everything is appropriate there.

17              And I think I commented where the question

18    was asked that I've seen fraudulent or illegitimate

19    prescriptions from the Cleveland Clinic, Massachusetts

20    General, the Mayo Clinic.

21              So just because it comes from the Cleveland

22    Clinic doesn't mean that you avoid doing all the due

23    diligence and red flag work that you need to do.

24    Q.    And as for this whole category of documents where

25    the pharmacies did refuse to fill, did we ask you to

1    analyze whether or not those were done properly?

2    A.    No, sir, but here's the problem I have with that.

3              Each of the defendants provided a

4    representative sample of their prescriptions.

12:37:22  5              So just talking common sense and logic,

6    there should have been some of those do not fill

7    prescriptions that were just shown in that sample,

8    because if you take a random sample and you have enough

9    of those, that they're going to be represented, some of

12:37:41 10  them should have came up to the surface or should have

11   been in the sample.

12              I didn't see any of those in the

13   prescriptions I reviewed, which from a logic standpoint

14   says either there were so few of those that when you do a

12:37:55 15  random study, a random selection, they don't appear; or

16   for some other reason, which I can't come up with another

17   reason, just bad draw, that none of those prescriptions

18   presented.

19              But a representative sample is just that,

12:38:09 20  it gives you a snapshot of that entire sample of

21   prescriptions.  And why none of those came up in the

22   sample is -- is a -- it's confusing to me, if there was

23   that many or if there were actually prescriptions being

24   turned away at the numbers as may be suggested.

12:38:26 25  Q.    All right.  If we go back to last Friday, out of

1    the 1,800 Walmart prescriptions, I want you to look at

2    the one that they chose first to talk to you about and

3    ask you this question.

4              Why aren't the red flags resolved?

12:38:41   5          Here's the prescription, it's marked

6    Walmart MDL 13343_0241.

7              Can you see that well enough to tell us why

8    the red flags were not resolved?

9    A.   So the red flag, the notation says they're aware of

12:39:07  10   the script on one, I believe, 20, 29, and I can't make

11   out what that is.  "Okay to fill per doctor, 6:30."

12             And then the documentation there, based

13   upon the red flags that were noted with this

14   prescription, doesn't explain it thoroughly, doesn't

12:39:28  15   document it thoroughly.

16   Q.   And then with the same number you were shown the

17   hospice patient prescription.

18             Do you remember that?

19   A.   Yes.

12:39:38  20   Q.   And my question to you on that one is why is it

21   important to resolve red flags even if it's a hospice

22   patient?

23   A.   Again, with all of the prescriptions that we're

24   looking at, it wasn't just the one red flag, sir, there

12:39:57  25   were multiple red flags.

1       With some of the patients it may be the

2    distance, where they traveled from out of state and came

3    to the pharmacy.  So until those red flags were resolved,

4    then you really can't move forward with the prescription.

12:40:09  5       If you look at the patient we talked about

6    on Friday, I believe she was in her 70s, suffering from

7    lung cancer, and we get an opioid and a Benzodiazepine, I

8    think that's what the prescription was.

9       So we've got a poor individual who is

12:40:26 10    suffering so bad from lung cancer that she can't even

11   breathe, and so they give her a medication to help her

12   breathing.  But they've also given her a Benzodiazepine,

13   so as a pharmacist now I'm worried about that patient

14   because the opioid and the Benzodiazepine slow or can

12:40:46 15   stop that breathing.

16      So I've got a woman already compromised and

17   I have to be very careful to make sure I don't give her

18   too much of that medication to actually stop her

19   breathing and really injure that poor patient.

12:41:03 20   Q.   All right.  As we continue through this stop of the

21   red flags, you were asked this morning about the DEA

22   speaking of trinity cocktails being okay.

23      Do you remember those questions?

24   A.   Yes, sir.

12:41:17 25   Q.   You had the document there in front of you from the

1    DEA.

2                  Does the DEA in that document actually say

3    it's okay to prescribe the holy trinity?

4    A.    As we discussed earlier, the DEA can only comment

12:41:37  5    on where it has jurisdiction over and it only has

6    jurisdiction over the Controlled Substances Act.

7                  It can't talk about anything outside of

8    that because they have no authority or no reason to be

9    involved in that.

12:41:49 10                  The letter prior to that that elicited this

11    response specifically asked can we dispense the trinity

12    or is it inappropriate or prohibited to dispense the holy

13    trinity, and nowhere in this letter does the DEA answer

14    that very direct question by saying, "Yes, it's okay" or

12:42:12 15    "No, it's okay."

16                  They simply said, which is what the DEA can

17    only say, that you have to practice according to what

18    your professional standards and laws allow, and only can

19    comment on is the Controlled Substances Act says that we

12:42:26 20    can't tell you what to do or not to do in regard to

21    Medical Board issues or standard of care issues involving

22    patient care.

23    Q.    And in that regard, you pointed out to the lawyer

24    asking questions and the jury this second paragraph, "The

12:42:46 25    DEA may only address its position based on the authority

 1    granted by the Controlled Substances Act and its

 2    implementing regulations."

 3                 The DEA's longstanding policy is not to

 4    provide legal advice to private parties, and so they give

12:43:01  5    the following general information.

 6                 What is your understanding of this response

 7    from the DOJ, Department of Justice?

 8    A.    My understanding is that this is very typical of

 9    every federal agency, DEA, FDA.

12:43:18 10                 They cannot go beyond what's written in the

11    law and what they've sent out as guidance documents.  To

12    go beyond that would put them in a very difficult

13    position and probably they would be acting illegally to

14    give any opinions or advice outside of what that law says

12:43:35 15    or what guidance documents they've provided.

16    Q.    All right.  In this regard, you were asked about

17    the pharmacy manual in 2020 when the opioid crisis was in

18    full bloom, as Ms. Sullivan, the Giant Eagle lawyer,

19    said, and my question to you is this:  That out of scope

12:43:59 20    section on Page 114, is that an exclusive list of red

21    flags?

22                 And I'll show you Page 114 so you can

23    answer it.  This is the section that Ms. Sullivan was

24    quizzing you about.

12:44:17 25    A.    No.

1    Q.    It says --

2    A.    It's not an exclusive list, and you can even see by

3    the language, it says "The following criteria may

4    indicate."  It doesn't say this is the definitive list of

12:44:28  5    criteria, and there are no more.

6             And if you read the entire *Pharmacist's*

7    *Manual*, there are references throughout that to other DEA

8    cases, other DEA decisions or guidance that provide

9    information and identify other red flags as well.

12:44:44 10    Q.    And by the same token, you were shown earlier the

11    National Association of Boards of Pharmacy, your NABP,

12    and the stakeholders meeting with the AMA and the

13    pharmacies.

14             Remember that?

12:44:58 15    A.    Yes, sir.

16    Q.    A document that I'd like to show you at this point

17    in time, which is Plaintiffs' Exhibit 26403, Plaintiffs'

18    Exhibit 26403 is a document that's a follow-up to that

19    meeting, "Follow-up stakeholder meeting on prescribing

12:45:39 20    and dispensing controlled substances" with a Stakeholder

21    Meeting Booklet PDF attached.

22             Do you see that?

23    A.    Yes, sir.

24    Q.    And it's got a CC to you, so you are one of the

12:45:51 25    people who received this.

          1              Is that fair?

          2    A.    Yes, sir.

          3    Q.    And it is sent from Dana Oberman.

          4              Is she one of the folks that worked with

12:45:59  5    you at the NABP?

          6    A.    Yes, sir.

          7    Q.    And it's sent to a number of people.  The jury will

          8    meet many of these.  They've already met at least one of

          9    them from CVS, I believe that gentleman is on here, but

12:46:13 10    we've got Walgreen's, we've got the AMA gentleman, and I

         11    may be wrong on the CVS.  I may have misread it.

         12              But let's stick with Walgreen's.  Clearly

         13    the Walgreen's people who were quizzing you are on here,

         14    is that correct?

12:46:30 15    A.    Not the person who asked questions today, but other

         16    Walgreen's people.  Thank you.

         17    Q.    All right.  And there he is, Mr. Davis, the first

         18    witness.

         19              Okay.  In regards to this document that's

12:46:43 20    dated back in 2013, does it already talk about red flags

         21    in 2013?

         22    A.    Yes, it does.

         23    Q.    And if you'll look, you will see that it's not only

         24    an editing of documents, but that it's got a PowerPoint

12:46:59 25    attached.

             1              The PowerPoint begins on Page, Bates Number

             2      Page 49.

             3              The PowerPoint's entitled, "The evolving

             4      concept of corresponding responsibility."

12:47:22     5              Do you see that?

             6      A.    Yes, sir.

             7      Q.    I'd ask you to flip a couple of pages to the back,

             8      and let's kind of work from the back forward with this

             9      document.

12:47:33    10              And so if you'll go, please, to Page 77 of

            11      the PowerPoint, you'll see one entitled "Red flags."

            12              Do you see that?

            13      A.    Yes, sir.

            14      Q.    Okay.  These red flags are going on for pages.

12:47:55    15              That's the last page, but there were red

            16      flags in the page before, red flags in the page before,

            17      red flags in the page before, red flags in the page

            18      before, red flags in the page before, red flags in the

            19      page before.

12:48:15    20              Do you see that?

            21      A.    Yes, sir.

            22      Q.    To suggest that you made up or created red flags

            23      for purposes of this case, is that a fair representation

            24      of what you've done?

12:48:27    25      A.    No, sir.

1    Q.    Did these red flags already exist for some time?

2    A.    Yes, sir.

3               And the slide presentation was done by an

4    outside law firm that NABP has no affiliation or

5    contracts with, Quarles & Brady, so it wasn't even an

6    NABP-prepared document.

7               It was something that this law firm has

8    given presentations on and speaks to pharmacies and

9    pharmacists about as well.

10   Q.    In that regard, if we continue to look at what was

11   presented and sent around to at least Walgreen's and CVS,

12   if you'll look on Slide 56, it goes back to 1989.

13              Do you see that?

14   A.    Yes, sir.

15   Q.    And in 1989, it notes something about Ralph J.

16   Bertolino.

17              Do you know about that?

18   A.    Vaguely I remember that, sir.

19   Q.    "Facts supporting failure to exercise corresponding

20   responsibility.

21              "The number of prescriptions issued by a

22   small number of prescribers, the number of dosage units,

23   the duration and pattern of the alleged treatment," and

24   it looks like it's specifically talking in that case

25   about the drug Preludin as a widely abused drug.

```
 1              Do you see that?
 2    A.    Yes, sir.
 3    Q.    I don't think Preludin is an opioid, is it?
 4    A.    No, sir.
 5    Q.    But the idea of corresponding responsibility is the
 6    same -- is it the same idea?
 7    A.    Yes, sir.  There's another point here as well, so
 8    there's been some question about red flags and whether
 9    red flags have been specifically mentioned in various
10    documents or regulations.
11              The concept of red flags as warning signs
12    has existed for 40, 50 years, as you can see by this
13    document.
14              So whether it's called the red flag, the
15    warning sign, a criteria, indicator, it hasn't changed.
16    It's only increased based upon new information, so
17    pharmacists have been advised of red flags for a long,
18    long time.
19              Whether or not they are specifically called
20    red flags, they're warning signs.  And warning signs have
21    been known for quite awhile.
22    Q.    If we continue to look at this PowerPoint that was
23    sent out with the stakeholders meeting, it has another
24    one from 1989, Liberty Discount Drugs on Page 57, where
25    it talks about a dispensing pattern being indicative of
```

         1    diversion even for those with no pharmacy training.

         2               Can you comment on whether or not that red

         3    flag still exists today?

         4    A.   It still exists, and it's an example of what we

12:51:17 5    talked about the past couple days.

         6               The regulations spell out what should be

         7    required, and then DEA actions like the Liberty and

         8    Bertolino provide more clarity and identify very specific

         9    incidents or very specific red flags pertaining to that

12:51:32 10   overall general requirement.

        11    Q.   And then the next bullet point, this idea that

        12    pharmacists can say not my job to detect because

        13    customers have a right to get prescriptions filled, has

        14    that excuse been known since 1989?

12:51:52 15   A.   Yes, it has.

        16    Q.   And is it an acceptable excuse?

        17    A.   It was not acceptable in 1989 and it's not

        18    acceptable in 2021, and it won't be acceptable in 2089.

        19    Q.   And if we continue to go further, if we come up to

12:52:10 20   2008 and the reference in 2008 to the *Med. Shoppe versus*

        21    *DEA* matter, do you have that?

        22    A.   Yes, sir.

        23    Q.   Slide 62?

        24    A.   Yes, sir.

12:52:19 25   Q.   It talks about "Facts proving pharmacist did not

1    fulfill corresponding responsibility," and one of them is

2    "Drugs prescribed by practitioner outside the normal

3    practice area."

4              Is that one of your red flags?

12:52:35  5    A.    Yes, it is.

6    Q.    Did you make it up?

7    A.    No, sir.

8              All the red flags I included in my report

9    and asked for analysis on have come from these types of

12:52:45 10    documents, these types of guidance from the DEA.

11    Q.    Evidence that patients were doctor-shopping, is

12    that still a red flag?

13    A.    Yes, it is.

14    Q.    Did you make that one up?

12:52:56 15    A.    No, sir.

16    Q.    If we continue and you look at the next page,

17    Page 63, you'll see that this document even uses the

18    language "Red flag" in reference to the *Holiday* case.

19              Are you familiar with the *Holiday CVS*

12:53:16 20    action?

21    A.    Yes, I am.

22    Q.    2012?

23    A.    Yes, I am, sir.

24              MR. DELINSKY:  Objection, Your Honor.

12:53:23 25              THE COURT:  Overruled.

BY MR. LANIER:

Q.   Are you familiar with it, sir?

A.   Yes, sir.

Q.   This comment on the slide that was part of your
stakeholders send-out, "Violation of corresponding
responsibility required delivery of controlled substance,
a red flag was or should have been recognized, the
question raised by the red flag was not resolved
conclusively prior to dispensing."

          Is that a red flag still today?

A.   Yes, it is.

Q.   And these red flags, were they known back in 2012?

A.   Yes, sir, they were.

Q.   Did y'all mail this out as part of your
stakeholders summation?

A.   Yes, we did.

Q.   If we continue to look at what y'all mailed out to
people, you've got, on Page 64, this section from *Holiday*
that says the irresolvable red flags.

          MR. DELINSKY:  Same objection, Your Honor.

          THE COURT:  Well, yeah, I'm going to
sustain this.

          MR. LANIER:  Okay.  Well, my question was
whether or not these are irresolvable red flags, in his
mind today.  I just hadn't gotten the question out.

1          THE COURT:  Well, I'm going to sustain this

2     slide.

3          MR. LANIER:  Okay.

4     BY MR. LANIER:

12:54:56  5     Q.    If we continue to look at --

6          MR. LANIER:  Your Honor, I don't mean to be

7     persistent, it's the next slide that I was going to use

8     from that that talks about irresolvable red flags from

9     *Holiday*.

12:55:17 10          THE COURT:  All right.  The *Holiday* you can

11     put up.

12          MR. LANIER:  Thank you, Judge.

13     BY MR. LANIER:

14     Q.    The irresolvable red flags of dispensing Oxycodone

12:55:24 15     30 and 15 to the same patient, is that still a red flag

16     in your book today?

17     A.    It's -- it's a red flag still.

18     Q.    Prescribers whose prescribing pattern suggests a

19     one size fits all concept, is that one of your red flags?

12:55:40 20     A.    One of the ones I've asked to be analyzed, yes,

21     sir.

22     Q.    Okay.  Did you make that up?

23     A.    No, sir.

24     Q.    Sir, the red flags that you've testified about in

12:55:59 25     this case, why are they important?

1    A.    As we talked earlier, if controlled substances,

2    particularly opioids, get outside of that closed system

3    that's so safely guarded by all the laws, regulations,

4    and the pharmacists' responsibility, those products

12:56:17  5    are -- can be abused and diverted.  And when they're

6    abused and diverted, that's what we see happening in all

7    of our -- across the country with the opioid epidemic.

8    Q.    All right.  Then let's move from red flags to

9    documentation.

12:56:39 10         The documentation questions that you were

11    asked from last week and this week, I've tried to put

12    together, but I want to start by saying that the data set

13    you looked at, those 7,800 prescriptions, right?

14    A.    Yes, sir.

12:56:57 15   Q.    You understand that those are from a set that

16    admittedly were filled?

17    A.    Yes, sir.

18    Q.    So this is not one where you don't know if it was

19    filled or not, because they've been represented by the

12:57:11 20   defendants as being filled.

21         Do you understand?

22    A.    Yes, sir.

23    Q.    Okay.  So why is documentation so important when it

24    comes to opioids?

12:57:20 25   A.    As we've talked about, the documentation provides

1    information for pharmacists or others looking at that

2    prescription afterwards.  It documents that there was a

3    legitimate medical need for that prescription and it

4    helps resolve any red flags that may prevent the patient

12:57:37  5    from having access to the medications they need.

6    Q.    All right.  Now, in that regard, you were asked

7    questions by the lawyer for Walmart, I believe went

8    first, and in it she put forward the *Pharmacist's Manual*

9    from 2020, which is marked as Defendants' Exhibit 11599.

12:58:05 10            Do you remember this?

11    A.    Yes, sir.

12    Q.    And it's an informational outline of the Controlled

13    Substances Act.

14            Now, she asked you a question, and you gave

12:58:16 15    an answer.

16            She said, "In this DEA *Pharmacist's Manual*,

17    it doesn't say anywhere that a pharmacist should document

18    the resolution of red flags, correct?"

19            Your answer was:  "I would like the

12:58:30 20    opportunity to go through and see that for myself to make

21    that statement."

22            Do you remember that answer?

23    A.    Yes, sir.

24    Q.    In that regard, I'd like to show you Page 35 and

12:58:41 25    ask you if this has any relevance at all to this subject.

1        A.     That's the reference I spoke about earlier,

2        probably on Thursday.

3                        That's the specific reference to

4        documentation that forms the basis for the opinions I

12:58:55  5      presented.

6        Q.    So this being in that document that she

7        said -- asked you the question about, it reads -- why

8        don't you read it for the jury and explain it?

9        A.     Sure.

12:59:06 10                       "Every pharmacy must maintain complete and

11       accurate records on a current basis for each controlled

12       substance received, sold, delivered, or otherwise

13       disposed of."

14                       Yes, the word "Document" may not be present

12:59:24 15      in the *Pharmacist's Manual*, but clearly if you say

16       "maintain complete and accurate records," I don't know

17       how else you would define "Document."

18       Q.    And it says, "These records are required to prove

19       accountability of all controlled substances from the

12:59:45 20      manufacturing process through the dispensing pharmacy and

21       to the ultimate user."

22                       Why is -- why are records like you're

23       talking about required to provide accountability?

24       A.     The reason is the next sentence.  "The closed

13:00:03 25      system reduces the potential for diversion of controlled

1    substances."

2               Without that closed system, without that

3    documentation, opioids get outside of the pharmacy and

4    the patient, into the hands of people then that abuse and

13:00:17 5   divert those drugs, and that causes serious harm and

6    death.

7               MR. LANIER:  Your Honor, I know you've got

8    a commitment.

9               It is 1:00 o'clock, and I don't want to

13:00:25 10  abuse that.

11              THE COURT:  I was going to suggest it, if

12   you've finished with this document it's a good time to

13   break.

14              MR. LANIER:  Yes, Your Honor.

13:00:32 15             THE COURT:  All right.  Thank you, ladies

16   and gentlemen, for indulging my schedule.

17              We'll take our lunch break.  Because you've

18   gone longer we'll go until 2:15, and then we'll pick up

19   with the balance of Dr. Catizone's testimony.

13:00:49 20             (Jury out.)

21              THE COURT:  Be seated for a second.

22              I did understand the next witness is

23   Mr. Rannazzisi.  I've read the defendants' objections,

24   motion in limine, and the plaintiffs' response.

13:01:44 25             All I'll say is this:  The plaintiffs have

1   agreed they're calling Mr. Rannazzisi as a fact witness.

2   Therefore, he's not going to give any expert testimony.

3                    And as a fact witness, I intend to apply

4   the rules that apply to all fact witnesses, which he

13:02:03  5   can't -- he can only testify to matters, statements,

6   whatever, within his personal, personal knowledge and

7   experience.

8                    So if there are objections based on hearsay

9   or outside his personal knowledge, defendants can object,

13:02:20 10   and I'll have to rule on them on a question-by-question

11   basis.

12                    MR. LANIER:  One thing that will help me

13   frame my questions is a number of the *Touhy*

14   authorizations that have been granted by the Government

13:02:35 15   say that he is allowed to say, since he was the head of

16   the DEA for this stuff, he's allowed to say this was the

17   DEA position.

18                    I don't think that's an expert opinion.

19                    THE COURT:  Well --

13:02:46 20                    MR. LANIER:  As long as it was his position

21   at the time.

22                    THE COURT:  Right.  He can testify since he

23   was a DEA official, he can testify to his understanding

24   of what the DEA's position was at that time.

13:02:56 25                    MR. LANIER:  Thank you.

1           MR. MAJORAS:  Your Honor, John Majoras.

2           Certainly we will object as necessary, but

3   to give a broad license to talk about everything in the

4   DEA given his specific role in the DEA would certainly be

5   going too far.

6           MR. LANIER:  And I won't do that.  It's

7   within his personal knowledge of the job he was doing.

8           THE COURT:  Right.  Absolutely.

9           Okay.  Thank you.

10          Have a good lunch.

11          MR. LANIER:  Thank you, Judge.

12          (Luncheon recess taken).

13          (Proceedings concluded at 1:04 p.m.)

14                    -   -   -   -

| | |
|---|---|
| 1 | <u>TUESDAY, OCTOBER 12, 2021, 2:17 P.M.</u> |
| 2 | (Jury in.) |
| 3 | THE COURT: Okay. Please be seated. |
| 4 | Mr. Lanier, you may continue. And, |
| 14:19:12 5 | Dr. Catizone, you are still under oath. |
| 6 | MR. LANIER: Thank you, Your Honor. May it |
| 7 | please the Court, ladies and gentlemen, good afternoon. |
| 8 | REDIRECT EXAMINATION OF CARMEN CATIZONE (RESUMED) |
| 9 | BY MR. LANIER: |
| 14:19:19 10 | Q. Mr. Catizone, we were at documentation station, for |
| 11 | lack of a better way of saying it, all right? |
| 12 | A. Yes, sir. |
| 13 | Q. And in that regard, I want to ask you a couple of |
| 14 | questions about documentation covering what's already |
| 14:19:30 15 | been asked of you. |
| 16 | First of all, you were asked questions |
| 17 | about the importance of documenting. |
| 18 | You got that asked by all of the lawyers on |
| 19 | the other side. |
| 14:19:40 20 | Do you remember that? |
| 21 | A. Yes, sir. |
| 22 | Q. All right. Here are my questions in response. |
| 23 | Should corporate policies ensure |
| 24 | documentation? |
| 14:19:49 25 | A. Yes, they should. |

1    Q.   Even if it takes time to do the documenting?

2    A.   Yes, sir.

3    Q.   Should it diminish one's bonus to have to document

4    and to take that time?

14:20:05  5    A.   No, sir.

6    Q.   Now, you were asked questions about prior notes.

7              Do you remember those questions?

8    A.   Yes, sir.

9    Q.   In other words, you had the 2,000 per defendant

14:20:38 10    save, I think, 1,800 for Walmart, but you had those that

11    you actually looked at the dispensing notes on.

12              Remember?

13    A.   Yes, sir.

14    Q.   Okay.  And then you were asked questions this

14:20:48 15    morning about, well, did you ever go back and look at the

16    hundreds of thousands of other notes that were there.

17              Remember?

18    A.   Yes, sir.

19    Q.   All right.  And we've pulled some of those, if

14:21:01 20    we've got time to look at them.

21              But regardless of that, let me ask you

22    this:  If red flags get resolved by looking back through

23    hundreds of thousands of prescriptions to find a note

24    that resolves the red flag, should the pharmacist

14:21:19 25    document that?

```
             1              MS. SULLIVAN:  Objection, Your Honor.

             2              That's argument.

             3              THE COURT:  Yeah, I'm going to sustain

             4     that.

14:21:25     5    BY MR. LANIER:

             6    Q.    Okay.  Should, if the pharmacist goes through the

             7    prior notes and finds something that resolves a red flag,

             8    should the pharmacist make a note of that?

             9    A.    Not -- no.

14:21:42    10    Q.    As long as the notes are there, that's adequate?

            11    A.    Correct.

            12    Q.    Whoops.  But those notes should be readily

            13    available to the pharmacist, right?

            14    A.    Readily available and understandable.

14:21:57    15    Q.    Okay.  And did you see any evidence of that based

            16    upon the 8,000 you looked at?

            17    A.    No, sir.

            18    Q.    Now, that duty to document resolution of red flags,

            19    do you consider that part of corresponding

14:22:15    20    responsibility?

            21    A.    Yes, sir.

            22    Q.    And by the same token, if those exact words

            23    "Document red flags" are not used, does that mean you

            24    don't need to do it?

14:22:30    25    A.    No, sir.
```

```
 1                  It's explained in other language in the
 2       regulations and in the guidance documents from the DEA.
 3       Q.    And is that consistent with your experience?
 4       A.    Yes, sir.
 5       Q.    Is that consistent with what you've seen in your
 6       role overseeing the National Association of the Boards of
 7       Pharmacy?
 8       A.    Yes, sir.
 9       Q.    Is that consistent with the interactions you've had
10       with the DEA?
11       A.    Yes, sir.
12       Q.    Is that consistent with the interactions you've had
13       with the various chain pharmacies?
14       A.    Yes, sir.
15       Q.    Now, if we look, for example, at some of the
16       Walgreen's historical notes that could be aligned with
17       the notes that you have, you've already testified about
18       the note from Walgreen's that talked of "508 days of
19       Oxycodone/Acetaminophen tabs and previous prescriptions
20       for this generic entities may exceed the recommended
21       adult duration of one to 30 days," do you remember
22       testifying about this note?
23       A.    Yes, sir.
24       Q.    Now, if you had had the chance to go back and look
25       at the entire history field associated with this patient,
```

 1    and I'll put it up here, as associated with that

 2    prescription number 1299624, you've got "Walgreen"?  Can

 3    you read that?

 4    A.    It looks like it says "prescription consultation

 5    request."

 6    Q.    All right.  Any comments there?

 7    A.    No, sir.

 8    Q.    Does that resolve the red flag for you looking at

 9    that historical note?

10    A.    No, sir.

11    Q.    What about the next historical note?  Does it

12    resolve the red flags?

13    A.    No, sir.

14    Q.    Does the next historical note resolve the red

15    flags?

16    A.    No, sir.

17    Q.    Does the next historical note resolve the red

18    flags?

19    A.    Not all of the red flags, sir.

20    Q.    It does have a prescriber comment of "Pain

21    management."

22                    Does that change anything?

23    A.    Not the overall picture, but it may address one of

24    the red flags that was identified with this prescription.

25    Q.    The next historical note, does it resolve the red

```
        1   flags?

        2   A.   No, sir.

        3   Q.   The last historical note, does it resolve the red

        4   flags?

14:25:18 5  A.   No, sir.

        6   Q.   So if we look at the historical notes for the

        7   prescription that you talked about, do you find red flag

        8   resolution?

        9   A.   No, sir.

14:25:31 10 Q.   Similarly, you were shown another example or you

       11   gave another example of a prescription from Walgreen's

       12   that did not properly document a resolution of red flags

       13   and yet was still dispensed.

       14            Do you remember this one?

14:25:56 15 A.   Yes, sir.

       16   Q.   You were asked a lot about it during redirect -- or

       17   cross-examination.

       18            Remember those questions?

       19   A.   Yes, sir.

14:26:05 20 Q.   All right.  Let's look at the actual notes fields

       21   from prescription number 740278 and tell us if you had

       22   looked at these historical note fields, if it -- let's

       23   see, here we go -- does it resolve the red flags?

       24   A.   No, sir.

14:26:24 25 Q.   What about the next entry?
```

1    A.    No, sir.

2    Q.    What about the next entry?

3    A.    No, sir.

4    Q.    What about the next entry?

14:26:33  5    A.    No, sir.

6    Q.    What about the next entry?

7    A.    No, sir.

8    Q.    What about the last entries?  Whoops.

9    A.    No, sir.

14:26:41 10    Q.    By the way, so the jury has an idea of time, did

11    you get all of these prescriptions, were they all

12    produced, the 8,000, years ago for you to study?

13    A.    No, sir.

14    Q.    When did we finally get the 8,000 and get them into

14:27:06 15    your hands for you to study?

16    A.    Some of the data I received probably about a month

17    to 10 weeks ago, and then some of the data came in just

18    about a week before my deposition, so about two weeks

19    ago.

14:27:21 20    Q.    Instead of looking at more examples of Walgreen, I

21    want to shift to CVS.

22              You spoke about this CVS prescription being

23    an inadequate resolution of red flags, at least an

24    inadequate documenting.

14:27:51 25              MR. DELINSKY:  Objection.  Scope, Your

1    Honor.

2                MR. LANIER:  I think this is what they

3    asked him on, Judge.

4                THE COURT:  Overruled.

14:27:56 5   BY MR. LANIER:

6    Q.    If --

7                THE COURT:  I recall some questioning on

8    this, so --

9                MR. DELINSKY:  Not from me, Your Honor.

14:28:07 10                This was from Mr. Lanier's direct.

11                MR. LANIER:  Okay.  Judge, in the interest

12   of time, I'll move on if he's not contesting this.

13                THE COURT:  All right.

14                MR. LANIER:  If there's no contest, I'll

14:28:16 15   move on.

16   BY MR. LANIER:

17   Q.    Let's talk about Giant Eagle for a moment, and I

18   think that there may have been some miscommunication with

19   the Giant Eagle attorney.  That's my comment in red --

14:28:42 20                MS. SULLIVAN:  Objection, Your Honor, move

21   to strike the question.

22                THE COURT:  I'll strike the comment, and it

23   doesn't matter with the attorney.

24                You can ask the question.

14:28:48 25                MR. LANIER:  All right.

BY MR. LANIER:

Q.    Sir, I want to talk to you about that issue of the
prescription that was dated 2010 that was filled in 2012
that y'all went back and forth and back and forth on.

                    Do you remember that?

A.    Yes, sir.

Q.    All right.  First of all, Ms. Sullivan, the Giant
Eagle lawyer, kept trying to tell you that this first
column is the column when the prescription was filled, as
opposed to what it says here the prescription identifiers
years.

                    Can you explain the difference between a
prescription year and the date of fillment?

A.    The prescription year would be when the
prescription actually was written.

Q.    And are prescriptions often written that allow for
refills or phoned in refills, or something like that?

A.    Except for Schedule IIs, yes, sir.

Q.    And so can you have a prescription that is written
in the year 2010 where the filling of that prescription
is done in 2012?

A.    It's -- yes, sir, it's possible.

Q.    Okay.  And because you were only given a random
selection of prescriptions, does it eliminate your
ability to see whether or not this was something that was

 1    being filled routinely?

 2    A.    Yes.

 3    Q.    And if you continue to look, is there anything

 4    that's on here that's inconsistent with your opinions?

 5    A.    No, sir.

 6    Q.    And if Giant Eagle got the dates wrong, does that

 7    change your opinion of whether or not the red flags are

 8    right?

 9              MS. SULLIVAN:  Objection.

10              Lacks foundation.  Argument, lawyer

11    argument, Your Honor.

12              THE COURT:  Overruled.

13    A.    No, sir.

14              As I looked at this, the principal

15    identifier is the prescription number or the prescription

16    ID that was used for the data set.

17              Years ago, when I was in college, we used

18    our Social Security numbers as IDs, which is unheard of

19    now, but they would post test scores based on your Social

20    Security Number.

21              The prescription number, an identifier, is

22    the key to everything that happens with that

23    prescription.  It's like your last name or whatever the

24    file would be.

25              So I could not assume anything else except

1    that this was all related to that prescription.

2    Otherwise, it should not have been filed with that

3    prescription.  It's just against all of the recordkeeping

4    standards and standards of practice to mix and match

14:31:36  5    prescriptions within a patient profile or within a

6    document.

7    Q.    Thank you.

8             Next part of dispensing.  A question that

9    was asked of you by the CVS lawyer concerned active

14:31:52 10    cumulative Morphine equivalent doses.

11             Do you remember that subject?

12    A.    Yes, sir.

13    Q.    Here's my question.

14             Does an ACME score of zero mean there's no

14:32:03 15    need to do remaining due diligence on red flags?

16    A.    No, sir.

17    Q.    Do you still do due diligence on the other red

18    flags?

19    A.    Yes, sir.

14:32:11 20    Q.    And is -- if a company's got a program that when

21    the ACME is zero, if there's a program in place that says

22    you can ignore the other red flags, is that consistent

23    with your understanding of good practice?

24    A.    No, sir.

14:32:27 25             MR. DELINSKY:  Objection.

```
        1              Argumentative, Your Honor.

        2              THE COURT:  Overruled.

        3    BY MR. LANIER:

        4    Q.   Okay.  Next stop on the road.

14:32:38 5              I want to talk to you about policies.

        6              Okay?

        7    A.   Yes, sir.

        8    Q.   Let's begin with some questions you were asked

        9    about the size of Giant Eagle.

14:32:53 10             Do you remember those questions?

       11    A.   Yes, sir.

       12    Q.   Does size make any difference at all on the

       13    application of the law?

       14    A.   Size doesn't matter, sir.

14:33:05 15   Q.   Does size make any difference at all in good

       16    dispensing practice?

       17    A.   No, sir.

       18    Q.   Does size allow anyone who is a registered pharmacy

       19    with a licensed pharmacist to do shortcuts?

14:33:27 20   A.   The standards of care requirements cut across all

       21    pharmacies, whether it's one pharmacy that fills 10

       22    prescriptions a day, or a chain that fills thousands or

       23    millions of prescriptions a year.

       24    Q.   All right.  Ms. Sullivan with Giant Eagle also

14:33:42 25   asked you about the law.  It was one of her exhibits, and
```

1    she asked you specifically about 21 C.F.R. 1306.04, the

2    purpose of issue of prescriptions.

3                    Do you remember those questions?

4    A.    Yes, sir.

14:33:57  5    Q.    And she asked you about this language that she

6    highlighted with you, "The responsibility for the proper

7    prescribing and dispensing of controlled substances is

8    upon the prescribing practitioner, but a corresponding

9    responsibility rests with the pharmacist who fills the

14:34:15  10    prescription."

11                    That's your testimony, right?

12    A.    Yes, sir.

13    Q.    And then she pointed out that the "Person knowingly

14    filling such a purported prescription" shall be subject

14:34:29  15    to penalties.

16                    Do you see that word "Knowingly"?

17    A.    Yes, sir.

18    Q.    Explain how that is understood and applied.

19                    MR. DELINSKY:  Objection, Your Honor.

14:34:39  20    Calls for a legal conclusion.

21                    MR. LANIER:  I'll reask it, Judge.

22    BY MR. LANIER:

23    Q.    Would you explain from the perspective of the

24    pharmacist how you understand that to be applied?

14:34:50  25    A.    As a pharmacist, I cannot give the excuse that I

1    didn't know or I was unaware of my corresponding

2    responsibility.

3                    And because it's something that's taught in

4    pharmacy school, part of the law curriculum, part of

14:35:05  5    guidance from the DEA, and part of the information the

6    State Boards of Pharmacy provide, I as a pharmacist can't

7    say I don't know or I wasn't aware of the corresponding

8    responsibility and red flags.

9                    That defense was used in one of the cases

14:35:22 10    cited where the expert witness said pharmacists are

11    unaware of red flags and red flag is not a common term,

12    and the Administrative Law Judge in that case ruled

13    against that and said, "No, red flags are known and

14    should be known to the pharmacists and red flags are part

14:35:38 15    of corresponding responsibility."

16    Q.    Can a pharmacist or their company be willfully

17    blind to the effects of their dispensing?

18                    MR. DELINSKY:  Objection.  Calls for a

19    legal conclusion, Your Honor.

14:35:54 20                    MR. LANIER:  I don't think so.

21                    THE COURT:  Overruled.

22                    If he -- you have to ask -- answer this in

23    your, your experience as a pharmacist, sir.

24                    MR. LANIER:  Yes, sir.

14:36:04 25    A.    As a pharmacist, I would say a company cannot

1  ignore their responsibility or say that it doesn't exist,

2  and I don't know what willfully would mean in legal

3  terms, but that would be what a pharmacist would, I as a

4  pharmacist, I would interpret it.

14:36:19  5  BY MR. LANIER:

6  Q.   All right.  On policies, you were asked whether or

7  not you reviewed the refuse to fill documentation that

8  Walmart produced.

9          Remember that question?

14:36:28  10  A.   Yes, sir.

11  Q.   Okay.  And you said that you knew of a program but

12  you didn't see the information.

13          Do I have that right?

14  A.   Yes, sir.

14:36:35  15  Q.   Here's my question:  Did we call on you and retain

16  you to opine on Walmart's refusal to fill policy?

17  A.   No, sir.

18  Q.   Is that part of your expert opinion in this case?

19  A.   No, sir.

14:36:50  20  Q.   If we had called on you to do that, could you have?

21  A.   Yes, sir.

22          MS. FUMERTON:  Objection.  Outside the

23  scope.

24          THE COURT:  Overruled.  Overruled.

14:37:06  25

```
 1    BY MR. LANIER:

 2    Q.    Next issue.

 3                You were shown Walmart -- Walgreen's,

 4    excuse me, Your Honor, let me start that over.

 5                You were shown Walgreen's Plaintiffs'

 6    Exhibit 17230, which was a target drug good faith

 7    dispensing checklist?

 8                MR. SWANSON:  I object, Your Honor.  I

 9    didn't show this document.

10                MR. LANIER:  I think it was attached to the

11    exhibit that he used, but if he's not fussing it, Your

12    Honor, I'll pull it down.

13                THE COURT:  Okay.  I don't recall

14    Mr. Swanson using that one.

15                MR. LANIER:  Okay.

16                THE COURT:  I mean, it could have been

17    attached, but a lot of things could have been attached.

18                MR. LANIER:  Then I'll move on, Your Honor,

19    in the interests of time.

20                Thank you.

21    BY MR. LANIER:

22    Q.    Now, Giant Eagle specifically asked you through

23    their attorney, Ms. Sullivan, about second-guessing

24    prescribing doctors, and she kept using that term

25    "Second-guessing."
```

1            Do you remember that?

2      A.    Yes, sir.

3      Q.    Is second-guessing a term that's frequently used by

4      you or others in the pharmacist profession?

14:38:19  5   A.    No.  Second-guessing, pharmacists refer to it as

6      simply need or responsibility to be that filter to make

7      sure patients receive the right medications.

8      Q.    And if we asked the question, if Giant Eagle policy

9      is to never second-guess a doctor's prescription, would

14:38:37 10   that be a good policy?

11            MS. SULLIVAN:  Objection, Your Honor.

12      Lacks foundation.  Lawyer argument.

13            THE COURT:  Yeah, I'll sustain that.

14      BY MR. LANIER:

14:38:43 15   Q.    All right.  Sir, would it be a good policy to

16      automatically fill a prescription?

17      A.    Without doing the Drug Utilization Review or red

18      flag review, no, sir.

19      Q.    Okay.  Do pharmacists -- are pharmacists properly

14:39:02 20   taught to make sure that a prescription is the right

21      prescription?

22      A.    Pharmacists are taught that, and they're held

23      responsible.  If they dispense that prescription and it

24      harms the patient or it was the wrong dose, the wrong

14:39:15 25   drug, that's part of what the pharmacist is held

1    accountable for by licensure.

2    Q.    Okay.  Now, you were also asked questions by

3    Ms. Sullivan about the Giant Eagle bonus structure, and

4    y'all went back and forth on the math.

14:39:34 5                        Remember that?

6    A.    Yes, sir.

7    Q.    I'm not sure I followed it, but I want to make sure

8    your answer is on the record.

9                        MS. SULLIVAN:  Objection, Your Honor.

14:39:40 10                      Move to strike the lawyer colloquy.

11                        MR. LANIER:  Judge, I'll just ask the

12   question.

13                        THE COURT:  All right.  Let's ask a

14   question, please.

14:39:46 15   BY MR. LANIER:

16   Q.    Sir, would you please explain what you were trying

17   to explain to Ms. Sullivan when she was asking you

18   questions?

19   A.    Sure.

14:39:54 20                      The question to me was could I just equate,

21   overall, Giant Eagle's percentage of prescriptions for

22   noncontrolled and controlled.

23                        Is that the area, sir?

24   Q.    Yes.  I think she showed you the pharmacist's

14:40:11 25   calculation that maximized at one percent and skipped

1    over the pharmacy team leader that maximized at three

2    percent.

3                   MS. SULLIVAN:  Objection, Your Honor.

4    Argument and colloquy.

14:40:19  5                   MR. LANIER:  That's not, Judge.

6                   THE COURT:  Oh, that, I'll overrule that.

7                   It's on the back of it.  He said you

8    weren't shown that.  I think that's right.

9    BY MR. LANIER:

14:40:28 10   Q.    So please look at what she showed you, first, and

11   explain to the jury your math?

12   A.    So I think the question was if overall Giant Eagle

13   dispensed 10 percent of all their drugs for controlled

14   substances would that make the conversion over so that

14:40:48 15   the pharmacist salary or bonus would be tied at almost a

16   10 percent or .1 percent of that.

17                   And the reason the math didn't work out for

18   me that way or to make that assumption is that a

19   pharmacy, each pharmacy has a number of drugs that they

14:41:04 20   called fast movers, which means based upon their patient

21   population and the prescribers in the area, they dispense

22   more of those medications than the other medications.

23                   For a number of years during the height of

24   the opioid epidemic, Vicodin or the Hydrocodone

14:41:21 25   combination product was the number one dispensed drug in

1        the entire United States.

2                        Out of 200 drugs, because industry

3        publishes the top 200, that was the number one dispensed

4        drug by a wide margin across all of the U.S.

14:41:37  5                        So, therefore, you may have a pharmacy

6        that's dispensing Hydrocodone as the top drug of that

7        pharmacy that would totally skew the percentage of

8        controlled substances to noncontrolled substances, and

9        then when you look at the overall data of the company,

14:41:56 10       the overall data then may make that look like 10 percent

11       because there would be a number of pharmacies that aren't

12       dispensing controlled substances, but it wouldn't give

13       you an accurate picture of that pharmacy or the

14       percentage.

14:42:09 15                        So I was hesitant to make that

16       extrapolation because maybe it's nine percent or 10

17       percent Hydrocodone and not so much of the other

18       controlled substances.

19                        The other reason is in other cases that

14:42:24 20       I've looked at, because people are aware of this metric,

21       people abusing and diverting drugs in those cases require

22       patients to buy noncontrolled drugs with their controlled

23       substances so they could alter their percentage and keep

24       it low.

14:42:44 25       Q.    How does that work?

1          Explain to me that.  I'm not tracking with

2     you, but explain that.

3     A.    So when a patient would go see a doctor that was

4     involved in the cases I looked at, the doctor would write

14:42:57 5     a prescription for an opioid, and then also write a

6     prescription for a noncontrolled substance, maybe

7     something for stomach disorder, indigestion, gastric

8     reflux, and tell the patient they had to get both

9     prescriptions filled.  And then when the patient went to

14:43:14 10    the pharmacy, some of the pharmacies that were involved

11    in these schemes would only fill the opioid if the

12    patient also filled that noncontrolled substance.

13          So patients and others involved in abuse

14    and diversion were aware of that metric, and, therefore,

14:43:30 15    they would use the noncontrolled-to-controlled substance

16    percentage to hide what they were doing as well.

17          So I couldn't make that extrapolation to

18    say, yes, that's true, because of how that number may be

19    inaccurate and how people have been misusing that to hide

14:43:45 20    abuse and diversion.

21    Q.    All right.  Last stop on the road, your National

22    Association of Boards of Pharmacy.

23          You were asked a number of questions by

24    different lawyers about that, and I want to put them up

14:44:02 25    here and give you a chance to explain.

          1                First of all, the National Board of

          2    Association & Purdue Programs that you were asked about

          3    on Friday, remember those?

          4    A.    Yes, sir.

14:44:19  5    Q.    Here's my question.  Did the National Association

          6    of Boards of Pharmacy let Purdue pay doctors to present

          7    on opioids?

          8    A.    No, sir.

          9    Q.    Was there ever any point in time where the NABP let

14:44:37 10    Purdue put their spin on medicines?

         11    A.    No, sir.

         12    Q.    Did you ever allow Purdue to bring in doctors to

         13    train your employees at the National Association of

         14    Boards of Pharmacy?

14:44:57 15    A.    No, sir.

         16    Q.    When the National Board of Association of

         17    Pharmacies put out a Survey of Pharmacy Law in 2009,

         18    where Purdue paid for this to be mailed to pharmacists

         19    around the country, remember that?

14:45:19 20    A.    Yes, sir.

         21    Q.    My question in that regard is this:  Was there

         22    anything in this mail-out that was persuading people to

         23    write or to dispense opioid prescriptions?

         24    A.    No, sir.

14:45:40 25    Q.    Would you have allowed Purdue to come in and to

1    teach your association about opioids and how they should

2    be handled?

3    A.    No, sir.

4    Q.    Thank you.

5                    MR. LANIER:  Your Honor, I pass the

6    witness.

7                    THE COURT:  Okay.

8                    MS. SULLIVAN:  Your Honor, if I might, just

9    two follow-up questions.

10                    THE COURT:  That's fine.  If you

11   can -- whatever, whatever order you wish.

12                    So start with Ms. Sullivan.

13        RECROSS-EXAMINATION OF CARMEN CATIZONE

14   BY MS. SULLIVAN:

15   Q.    Mr. Catizone, good afternoon.  Good afternoon,

16   jurors.

17                    Mr. Lanier asked you about Giant Eagle

18   being small and somehow arguing the law didn't apply.

19                    You didn't see any evidence in any of the

20   materials you reviewed that Giant Eagle ever made an

21   argument like that, that because we're smaller, the law

22   didn't apply?

23   A.    Not on the documents I reviewed, no.

24   Q.    Yeah.  In fact, that's not true, the law applies

25   equally to everybody?

1    A.    Yes.

2    Q.    And no evidence Giant Eagle ever argued

3    differently, correct?

4    A.    As far as I'm aware.

14:46:58  5    Q.    Yeah.

6    A.    No.

7    Q.    Okay.  And, Mr. Catizone, you were asked about the

8    bonus program for Giant Eagle, and you talked about

9    fast-moving prescriptions.

14:47:10  10           The truth is, sir, you have not done any

11    analysis of Giant Eagle's prescribing data to determine

12    which opioids, if any, were prescribed -- were filled

13    more often by the pharmacy?

14    A.    Correct.

14:47:21  15    Q.    Okay.  And you talked about -- and I think,

16    Mr. Catizone, we can agree that almost all of your

17    testimony last week and today involved the Controlled

18    Substances Act and requirements under the Controlled

19    Substances Act?

14:47:35  20    A.    Correct.

21    Q.    Including your testimony about red flags?

22    A.    Correct.

23    Q.    And diversion, right?

24           And we can agree that the Drug Enforcement

14:47:47  25    Administration is the Government agency charged with

1    enforcing the Controlled Substances Act?

2    A.    The DEA and the State Board of Pharmacy.

3    Q.    Yeah.  And as it relates to the Drug Enforcement

4    Administration that oversees the federal Controlled

14:48:04 5    Substance Act, Mr. Catizone, it's true, sir, that there

6    is no evidence that Giant Eagle was ever in violation of

7    the Controlled Substances Act according to the DEA?

8    A.    Not with the DEA.

9    Q.    Yes.  And in fact, Mr. Catizone, there is no

14:48:20 10    evidence that the Drug Enforcement Administration ever

11    even filed an enforcement action alleging that Giant

12    Eagle violated the Controlled Substances Act, the DEA?

13    A.    Not that I'm aware of.

14                   MS. SULLIVAN:  Okay.  Thank you.

14:48:34 15                   I have nothing further.

16                   THE COURT:  All right.  Thank you,

17    Ms. Sullivan.

18                   Mr. Swanson for Walgreen's.

19                   MR. SWANSON:  Thank you, Your Honor.

14:48:42 20        RECROSS-EXAMINATION OF CARMEN CATIZONE

21    BY MR. SWANSON:

22    Q.    Good afternoon, Mr. Catizone.

23    A.    Good afternoon, sir.

24    Q.    I just have a few follow-up questions.

14:48:55 25                   I wanted to clear something up from your

1    redirect.

2                    We've talked a lot last week and today

3    about this set of 78-or-so-hundred prescriptions that you

4    looked at, right?

14:49:09  5    A.    Yes, sir.

6    Q.    And so it was 2,000 of those prescriptions samples

7    for Walgreen's?

8    A.    Yes.  Approximately, sir.

9    Q.    Give or take?

14:49:17 10    A.    Yes.

11    Q.    Approximately 2,000.

12                    And in response to a question from

13    Mr. Lanier, you said you were very surprised that in that

14    set of 2,000 prescriptions, you didn't see any refusals

14:49:27 15    to fill in that data set.

16                    Do you remember saying that to Mr. Lanier?

17    A.    Yes, sir.

18    Q.    All right.  And you now know, I take it, that the

19    reason you didn't see any refusals to fill in that data

14:49:40 20    set is because that data set was taken from only

21    prescriptions that were filled by Walgreen's, right?

22    A.    That were dispensed, yes, sir.

23    Q.    Yeah.  So the 2,000 you saw, those were all

24    dispensed; you wouldn't expect to see any refusals to

14:49:54 25    fill in that file, right?

1    A.    I would have expected something in the notes and

2    history, but for the ones that were dispensed, yes, I

3    wouldn't expect that unless there was something in the

4    history or the notes.

14:50:06 5    Q.    Because those 2,000 prescriptions, they were all

6    filled, they were all dispensed, right?

7    A.    Yes, sir.

8    Q.    Okay.  And what you and I went through when I asked

9    you some questions on cross-examination were some actual

14:50:17 10    refusals to fill that Walgreen's pharmacists had not

11    dispensed, right?

12    A.    Yes, sir.

13    Q.    And those were documents that the plaintiffs'

14    lawyers hadn't shown you before, right?

14:50:27 15    A.    Again, whatever I reviewed, they sent over.

16          I'm not sure whether they had possession or

17    not, sir, but yes.

18    Q.    Okay.  So when Walgreen's in this litigation

19    produced its files of its refusals to fill, that's just

14:50:42 20    not something you've seen because it was not provided to

21    you by the lawyers, right?

22    A.    Yes, sir.

23    Q.    And that's the same for the other defendants, true?

24    A.    Yes, sir.

14:50:49 25          MR. SWANSON:  Thank you.

                         1              I don't have anything else.

                         2                   THE COURT:  All right.  Thank you,

                         3         Mr. Swanson.

                         4                   Anything from Walmart or CVS?

      14:50:57   5                   MS. FUMERTON:  No.

                         6                   MR. DELINSKY:  Nothing from CVS, Your

                         7         Honor.

                         8                   MS. FUMERTON:  Nothing else from Walmart.

                         9                   Thank you.

      14:51:02  10                   THE COURT:  All right.  Thank you,

                        11         Dr. Catizone.

                        12                   You may step down.

                        13                   (Witness excused.)

                        14                   THE COURT:  Plaintiffs may call their next

      14:51:30  15         witness, please.

                        16                   MR. LANIER:  Thank you, Your Honor.

                        17                   Our next witness is Joe Rannazzisi.  He is

                        18         retired from the DEA and he will testify about his

                        19         actions at the DEA.

      14:52:30  20                   THE COURT:  All right.  Mr. Rannazzisi, if

                        21         you could raise your right hand, please.

                        22                        JOSEPH RANNAZZISI,

                        23            of lawful age, a witness called by the Plaintiffs,

                        24                being first duly sworn, was examined

      14:52:41  25                        and testified as follows:

```
 1              THE COURT:  Thank you.

 2              And you may take off your mask while

 3    testifying.

 4              MR. LANIER:  May it please the Court.

 5         DIRECT EXAMINATION OF JOSEPH RANNAZZISI

 6    BY MR. LANIER:

 7    Q.    Mr. Rannazzisi, I have taken your deposition once

 8    before and I watched a second deposition via Zoom.

 9              Fair?

10    A.    Yes, sir.

11    Q.    And then met you face-to-face in the sense of

12    outside of the deposition for the first time last night

13    when we spent, I don't know, less than an hour talking

14    about your testimony today.

15              Is that right?

16    A.    Yes, sir.

17    Q.    And in that regard, sir, I've got a roadmap of

18    where I want to take you today and tomorrow morning.

19              I don't think we'll finish with you this

20    afternoon.

21              But I want to talk about your experience,

22    and then I want you to explain some things relative to

23    the DEA, and then we're going to talk about some of your

24    interactions with the defendants in this case.

25              All right?
```

```
 1    A.    Yes, sir.

 2    Q.    So with that as our roadmap, let's start with your

 3    experience.

 4              First of all, tell the jury a little bit

 5    about you, who you are.  Introduce yourself to them.

 6    A.    Good afternoon.

 7              My name is Joe Rannazzisi.  I retired from

 8    the Drug Enforcement Administration as the Deputy

 9    Assistant Administrator of the Office of Diversion

10    control.  I was also a Deputy Chief of Operations.

11              I worked most of my career in the

12    three -- in the field in the three-state area of

13    Michigan, Ohio and Kentucky.

14              During that time period, I worked all

15    different types of investigations, including homicide,

16    clandestine laboratory, and general undercover cocaine

17    and heroin investigations.

18    Q.    All right.  Where do you live today?

19    A.    Today I live in Virginia.

20    Q.    And you drove over here this weekend, I guess?

21    A.    Yes, I did.

22    Q.    All right.  You used to have one of these fancy DEA

23    badges?

24    A.    I -- I still do, but it says "Retired."

25    Q.    Oh.  I mean, did they give you one of them jackets
```

1       that had the yellow printing like we see on TV?

2       A.    Yes, I had one of those.  Yes, I did.

3       Q.    Did you, like, go bust open crack houses and stuff

4       in your day?

14:55:28  5       A.    Early in my career I -- I was on the street

6       enforcement crew, yes.

7       Q.    All right.  Before we get to your DEA career, I

8       think it's helpful for us to understand some of your

9       experience.

14:55:39  10              We're going way back here.  You and I are

11      both the same age, right?

12      A.    Yes, sir.

13      Q.    So you must have graduated from high school, I'm

14      guessing, '79, '78, somewhere in there?

14:55:53  15      A.    1979.

16      Q.    Where did you go to high school?

17      A.    Freeport High School, Freeport, New York, on Long

18      Island.

19      Q.    All right.  And you graduated from high school.

14:56:02  20              Where did you go from there?

21      A.    Butler University, Indianapolis, Indiana.

22      Q.    And at Butler University, what kind of degree did

23      you get?

24      A.    My degree was in pharmacy, Bachelor of Science

14:56:18  25      degree in pharmacy.

1    Q.    And what year did you get it?

2    A.    1984.

3    Q.    And are you or did you become a licensed

4    pharmacist?

14:56:31 5    A.    Yes, sir, I did.

6              I'm licensed to practice pharmacy in the

7    State of Indiana.

8    Q.    And have you practiced as a pharmacist in your

9    life?

14:56:41 10    A.    Yes, I have.

11    Q.    When did you do that?

12    A.    From 1984 to 1986.

13    Q.    All right.  And then, well, side note, where did

14    you practice pharmacy?

14:56:59 15    A.    I interned at a Polk's Drug in North, North

16    Indianapolis, and once I graduated and passed my pharmacy

17    boards I worked at an outpatient clinic at the Veteran's

18    Administration Hospital, and then inpatient for a while,

19    too.

14:57:23 20    Q.    And then from there, is that when you went into the

21    DEA?

22    A.    Yes, sir.

23    Q.    Tell the jury why you went into the DEA.

24    A.    I grew up in a neighborhood on Long Island where it

14:57:37 25    was almost all public servants, people who would either

1    be firemen, policemen, worked for the town or the village

2    or the county, or even the state.

3             During that time period a lot of my -- my

4    friends' parents were either firemen or police officers,

14:57:54 5    and at one point in time while I was growing up there was

6    a news story about a police officer, a DEA agent, he was

7    actually in the Bureau of Narcotics and Dangerous Drugs,

8    which was before DEA, who was involved in an undercover

9    deal.  And during the deal he was shot and killed.

14:58:16 10             And that was one of the things that stuck

11   in my mind, and I knew I was going to go into law

12   enforcement eventually, and that's what drew me towards

13   DEA.

14   Q.    All right.  So you started with the DEA what year?

14:58:31 15   A.    1986.

16   Q.    And you stayed with the DEA until?

17   A.    2015, October 31st, 2015.

18   Q.    All right.  During that time period, I think it

19   would help the jury to understand what your different

14:58:49 20   jobs were and positions were.

21             So how did you start out in 1986?

22   A.    In 1986 to 1988 I was a diversion investigator.

23             I investigated violations of the Controlled

24   Substances Act related to pharmaceuticals and chemicals.

14:59:10 25   That was in Indianapolis, Indiana.

1    Q.    And the jury's heard that word "diversion," but

2    just to make sure we're clearly using it the way the DEA

3    does, how do you define "Diversion"?

4    A.    Diversion is the illegal movement of

5    pharmaceuticals from the legitimate stream of commerce

6    into the illegitimate market.

7    Q.    All right.

8    A.    Pharmaceuticals and chemicals.

9    Q.    So you do diversion investigation for several

10    years, and then in 1988 what do you become?

11    A.    I become a special agent in 1988.

12    Q.    And what is a special agent for the DEA?

13    A.    Well, a diversion investigator generally

14    concentrates on pharmaceuticals and chemicals.  A special

15    agent conducts all the wide range of controlled substance

16    and chemical investigations.

17              So they could be on street enforcement

18    doing, you know, buy busts, small amounts of drugs,

19    conspiracy crews that actually do long-term

20    investigations.  Undercover investigations, where you're

21    actually meeting drug dealers to purchase drugs.

22    Clandestine lab investigations, where you investigate,

23    follow chemicals to a place where they're manufacturing,

24    illegally manufacturing controlled substances like

25    methamphetamine, amphetamine, things like that.

1    Q.    Did you -- did you actually go undercover yourself?

2    A.    Yes, sir, I did, on numerous occasions.

3    Q.    Back then, did you have more hair?

4    A.    I had -- I had long hair, yes.  I did have long

15:00:55  5   hair.

6    Q.    And --

7    A.    As a matter of fact, it was pretty long for a

8    while.

9    Q.    And so did you have, like, an undercover name that

15:01:03 10   you're allowed to tell us?

11   A.    I don't know if I'm allowed to tell you but, yeah,

12   most of us had another personality, yes.

13   Q.    You did this work as a special agent for how many

14   years?

15:01:21 15   A.    From 1988 until I became a supervisor in 1997.

16   Q.    And what kind of a supervisor did you become?

17   A.    I supervised the Homicide Task Force in Detroit,

18   Michigan.

19   Q.    And the Homicide Task Force in Detroit, what kind

15:01:51 20   of work did the DEA Homicide Task Force do as opposed to

21   FBI or someone else?

22   A.    We strictly investigated drug-related homicides,

23   both cold cases and active investigations.

24   Q.    Okay.  Somewhere in here you decided to go to law

15:02:15 25   school.

1    A.    Yes, sir.

2    Q.    What made you decide to go to law school?

3    A.    When you're doing these investigations

4    you're -- you're constantly being told what's legal and

15:02:30    5    what's not, and what you can do and what you can't do,

6    what we can prosecute and what we can't prosecute.

7                    And I just found it fascinating that there

8    were a lot of rules that needed to be, you know, need to

9    be addressed.

15:02:44    10                   So I decided I was going to learn for

11    myself exactly what the law was, and I've always been

12    fascinated with the law.

13    Q.    So you went -- I'll slip back over here to your

14    education.

15:02:58    15                   You went to law school where?

16    A.    Detroit College of Law, Michigan State University.

17    Q.    And did you complete law school?

18    A.    Yes, I did.

19    Q.    And did you take the Bar exam?

15:03:13    20    A.    Yes, sir, I did.

21    Q.    Did you pass?

22    A.    Yes, sir, I did.

23    Q.    So are you a licensed attorney as well as a

24    pharmacist?

15:03:22    25    A.    I am.  I'm a member of the Michigan State Bar.

1    Q.    Do you keep your Bar up?

2    A.    Yes, sir, I do.

3              It's due just before Thanksgiving.

4    Q.    And do you keep your license as a pharmacist up?

15:03:41 5    A.    Yes, sir, I do.

6    Q.    Now, were you going to law school at the same time

7    you were working for the DEA?

8    A.    Yes, sir, I was.

9    Q.    How did you manage that?

15:03:53 10    A.    Law school was at night, and I switched my hours so

11    when I was a special agent I moved my hours to work a lot

12    of evening, midnight hours.

13              So midnight to 8:00 or 10:00 to 6:00 or

14    10:00 to 8:00, or whatever the hours worked at that point

15:04:15 15    in time.  And then when I became a supervisor it was

16    close to the end of my time in law school, so it worked

17    out very well.

18    Q.    All right.  After -- what was your next position in

19    the DEA after supervisor?

15:04:29 20    A.    I was transferred to headquarters sometime around

21    2000, right around January, January, February, 2000.

22              And I was assigned to the Domestic

23    Operations West section as one of the clandestine lab

24    coordinators in headquarters.

15:04:50 25    Q.    And the headquarters for the DEA is where?

1    A.    In Arlington, Virginia, right across from the

2    Pentagon.

3    Q.    Right across from where?

4    A.    The Pentagon.

15:05:08  5    Q.    And what did you do, what was your job title when

6    you were transferred?

7    A.    I was -- I was transferred as a group supervisor,

8    and when I got to headquarters I was a staff coordinator.

9              It's a supervisory position, a lower

15:05:28 10    supervisory position in DEA headquarters.

11    Q.    All right.  And how long did you stay in that job

12    at the DEA?

13    A.    About a year-and-a-half, I guess.

14    Q.    And what was your next position?

15:05:42 15    A.    I was promoted to the section chief position in the

16    Dangerous Drugs and Chemicals section.

17    Q.    And what did you do as a section chief in Dangerous

18    Drugs and Chemicals?

19    A.    Worked all investigations involving synthetic drugs

15:06:08 20    and chemical investigations, and clandestine lab

21    investigations.

22              So anything that you could make, we

23    investigated, be it methamphetamine, amphetamine, MDMA,

24    Fentanyl.  If you could make it, we investigated it.

15:06:26 25    Q.    Okay.  And you kept that job position how long?

1    A.    Until about 2000, the end of 2002, beginning of

2    2003, I was transferred back to Detroit as an Assistant

3    Special Agent in Charge.

4    Q.    And what is an Assistant Special Agent in Charge?

15:06:51 5    A.    Assistant Special Agent in Charge works underneath

6    the Special Agent in Charge.  His role is to -- the

7    day-to-day, to oversee day-to-day operations, ensure that

8    the Special Agent in Charge has all the information he

9    needs to make decisions.

15:07:09 10          But the Assistant Special Agent in charge

11   or the ASAC, his responsibility is to make sure that his

12   group or groups within the division are operating,

13   functioning as they should, and they have all of the

14   resources necessary to do their jobs.

15:07:26 15   Q.    All right.  Next job.

16   A.    In 2004 I was transferred back to DEA headquarters

17   by Administrator Tandy as the Deputy Director for the

18   Office of Diversion Control.

19   Q.    All right.  Deputy Director, Office of Diversion

15:07:54 20   Control.

21   A.    Yes, sir.

22   Q.    And I meant to write down what you meant by

23   diversion.

24          Diversion, you define, as what?

15:08:04 25   A.    The movement of pharmaceuticals, legitimate

1    pharmaceuticals and chemicals from the normal legitimate

2    stream of commerce into the illicit market.

3    Q.    Can I just say moving pharmaceuticals from legal to

4    illegal market?

15:08:21  5    A.    That would be perfect.

6    Q.    All right.  So as the Deputy Director for the

7    Office of Diversion Control, what types of activities

8    were you doing?

9    A.    I handled day-to-day operations within the Office

15:08:45  10    of Diversion Control, and reported to the deputy

11    assistant administrator who oversaw that office.

12              My job was to make sure that he had all the

13    materials and information, resources, necessary to do his

14    job.

15:08:57  15              I also oversaw several sections within the

16    Office of Diversion Control, making sure, again, that

17    they function appropriately and efficiently.

18    Q.    And then what was your next job after that?

19    A.    Three months later they made me the Deputy Chief of

15:09:17  20    Enforcement Operations, Global Enforcement Operations.

21    Q.    And your next job after that?

22    A.    In 2005, July of 2005, they asked me to do both the

23    Global Enforcement Operations job and assist at the

24    Office of Diversion Control as the Acting Deputy

15:09:41  25    Assistant Administrator because then Deputy Assistant

 1    Administrator Bill Walker was deployed to the Service.

 2              So I took both jobs, I handled both jobs

 3    for approximately six months.

 4    Q.    And after that, what did you do then six months

 5    later?

 6    A.    The Administrator asked me to take over the Office

 7    of Diversion Control as the full-time Deputy Assistant

 8    Administrator.

 9    Q.    And that, I think, is part of what you were in for

10    the times that will be most relevant in this case.

11              Is that right?

12    A.    Yes, sir.

13    Q.    So Office of Diversion Control, when did you become

14    that lead, whatever the job title was?

15    A.    January of 2016.

16    Q.    January, 2006?

17    A.    '6, 2006.

18    Q.    All right.  And as head of the Office of Diversion

19    Control, as the jury hears what your testimony's going to

20    be, when we walk through this, tell them what your job

21    responsibility was, please.

22    A.    My jobs included the promulgation of regulations

23    under the Controlled Substances Act, the Code of Federal

24    Regulations, regarding any pharmaceutical or chemical

25    regs.

1        Generally that's done through passage of

2   laws and statutes.

3        I was also one of the liaisons to Congress

4   when it came to pharmaceuticals and chemicals, I briefed

15:11:25   5   Congress and appeared before Congress on numerous

6   occasions.

7        I was the liaison to federal, state and

8   local law enforcement agencies related to chemicals and

9   pharmaceuticals.

15:11:38 10        I oversaw all inspections and

11   investigations regarding pharmaceuticals and chemicals in

12   the U.S. and abroad.

13        I was -- I was responsible for going out

14   and talking to both the regulated community, parents,

15:12:01 15   teachers, law enforcement, attorneys, regarding all

16   aspects of diversion, chemical and pharmaceutical.

17   Q.   All right.  How many times do you think you

18   testified or spoke to Congress in your tenure?

19   A.   I testified over 30 times before the different

15:12:26 20   committees of Congress.

21        I've spoken to Congress, different

22   committees, staffers, probably double that.

23   Q.   All right.  Now, since you've retired in October,

24   2015, what have you been up to?

15:12:48 25   A.   I -- after I retired, I didn't do anything for a

1    few months.

2                    I was trying to figure out what -- I was

3    trying to find myself, and then I decided I'd go work for

4    a small company.  And that lasted about a year, and then

15:13:07  5    I started working with the states as they worked through

6    the opioid epidemic and started looking at litigation

7    against the regulated industry.

8    Q.    And the jury needs to hear your role in that

9    regard.

15:13:29  10                    You have been hired as an expert by a

11    number of different states to help them in their opioid

12    litigation, is that fair?

13    A.    Yes, sir, it is.

14    Q.    So, for example, have you been hired and worked for

15:13:45  15    the State of Ohio?

16    A.    Yes, I have.

17    Q.    And those states, when they hire you, do they pay

18    you?

19    A.    Yes, sir, they do.

15:13:53  20    Q.    And so the jury has a feel, what's your hourly

21    rate?

22    A.    $500 an hour.

23    Q.    And you've made, over the last six years or however

24    long you've been doing this, five years, how much money

15:14:07  25    would you say you've made working as an expert for the

1    states and others who have hired you?

2    A.    Since 2017, I made about $930,000.

3    Q.    So this has been a full-time job for you?

4    A.    Yes, sir.

15:14:22 5    Q.    And in that regard, are you appearing here as a

6    hired expert by me or anyone on our team?

7    A.    No, sir.

8    Q.    Are you here to testify as an expert witness?

9    A.    No, sir.

15:14:41 10    Q.    Have we served on the Government papers to have you

11    testify as a fact witness?

12    A.    I believe that's what I'm here for, to testify as a

13    fact witness.

14    Q.    And we've had to specify to the Government the

15:14:57 15    areas in which we plan on talking to you.

16              Fair?

17    A.    That's correct.

18              And --

19    Q.    Can you explain to the jury why that's important?

15:15:04 20    A.    As a Government employee, any Government employee,

21    you're exposed to certain things that the Government does

22    not necessarily want to be out in the public view:

23    Privileged information, information regarding

24    investigative process, nonpublic information that you

15:15:26 25    receive during meetings and during briefings, and things

1    like that.

2                So the department allows me to testify here

3    under a letter, basically a letter directing me what I

4    can and can't talk about.

15:15:42 5   Q.    And you're aware of the fact that the Government

6    has a lawyer in the courtroom with us right now who's got

7    an ability to object if we get outside those boundaries,

8    either side?

9    A.    Yes, sir, there is.

15:15:55 10  Q.    Now, in this regard, I want to make sure that we're

11   on the -- I need to talk to you about your testimony

12   because are there times in the past, for example, where

13   you have testified and actually testified as the

14   mouthpiece of the DEA?

15:16:26 15  A.    In front of Congress, yes.  Absolutely.

16               Generally, if I appear before Congress, I'm

17   appearing as the conduit for the administration, the

18   Department of Justice and DEA, to provide their views,

19   their position on certain matters.

15:16:48 20              And so they would generally select a senior

21   executive service officer or somebody in a position like

22   mine to appear and explain to Congress what we're doing,

23   how we're doing it, what resources we need, and why it's

24   happening.

15:17:02 25  Q.    When you testified as a mouthpiece of the DEA and

 1    you were giving DEA positions to Congress, were they

 2    always something that you personally agreed with?

 3    A.    Not necessarily, no.

 4    Q.    But would you be required as the DEA mouthpiece to

15:17:20  5    say what you believe the DEA position to be that you'd

 6    been asked to represent?

 7    A.    Yes, sir.

 8              It's the position -- when a senior

 9    executive goes before Congress, you're appearing there on

15:17:31 10    behalf of the administration, the department or the Drug

11    Enforcement Administration.  You're not appearing as

12    yourself in your personal capacity.

13              So everything that's discussed, everything

14    that's written and provided to Congress is the

15:17:46 15    administration's position, not my own position.

16    Q.    Now, as you are here today to testify as a fact

17    witness, and this is what I need to contrast, are there

18    going to be times where I'm asking you questions about

19    the DEA position on things based upon your experience and

15:18:09 20    your knowledge?

21    A.    Yes, you will.

22    Q.    But do I also have the liberty of asking you

23    questions about your personal experiences and knowledge

24    of the facts?

15:18:29 25    A.    If, if they're public record facts, yes.

1        Q.    Explain what you mean by that, personal opinions if

2        they're -- or personal facts if they're public facts.

3        A.    Sure.

4                    If I'm going to give you my personal

15:18:47 5        opinion, it's got to be based on -- on things that are in

6        the public view, things that would be available to you,

7        and I could be a conduit to explain what went on during

8        that time period.

9                    I couldn't -- I couldn't just reach out and

15:19:03 10       take a fact that's not in the public domain and say,

11       "Well, this is what happened because of this, this and

12       this" and no one knew about it.

13                   The Government wouldn't allow me to do that

14       because it's not available in the public domain.

15:19:17 15       Q.    And is that important for the DEA's ability to

16       continue to do what it does?

17       A.    Yes.   It protects the integrity of the

18       investigations and the integrity of the investigative

19       process.

15:19:28 20       Q.    All right.   Then with that as the first stop of

21       your experience, let's go to the second stop, where we

22       start talking about the DEA.

23                   Okay?

24       A.    Yes, sir.

15:19:40 25       Q.    I'm going to have you explain the DEA.   We'll try

1    to keep, to some extent, a running tab of what you're

2    talking about.

3                First thing I want you to do is explain

4    what it means in terms of opiates to have a closed

15:20:18  5    system.

6    A.    Sure.

7                The closed system of distribution is a

8    system that was created by Congress in the Controlled

9    Substances Act to ensure that we could account for every

15:20:35 10    amount of drug that's coming down from the raw material

11    level all the way down into the final pill form, into the

12    pharmacies, and then out to the patients.

13                It's a system of accountability.  The

14    system of accountability involves recordkeeping, it

15:20:57 15    involves scheduling, it involves security, it involves

16    quota, it involves audits.  Different aspects of the

17    closed system of distribution protect the integrity of

18    the closed system of distribution.

19                So theoretically I could go somewhere in

15:21:18 20    that supply chain and find out where the drugs went or

21    where they were diverted to.

22                It's a system that protects the integrity

23    of the controlled substance supply chain.

24    Q.    All right.  I've drawn a circle to represent that

15:21:33 25    closed system.

1         I want you to help us populate that,

2   please.

3   A.    Okay.

4   Q.    So what belongs in the circle?

5         Let's start with the opiate opium itself or

6   whatever it is, the raw materials that come from the

7   poppy?

8   A.    Raw materials, yes.

9         So in the closed system, depending on if

10  the drug is synthetic or if the drug is a semisynthetic,

11  like Oxycodone, Hydrocodone, or if it's a pure opiate

12  like Morphine, the raw material comes in, it's brought

13  into the country or it's made in the country by a

14  manufacturer.

15        And that manufacturer, an importer to a

16  manufacturer and then manufacturer, could manufacture

17  what the Government allows them to manufacture.

18        From that manufacturing point, the drug is

19  inventoried and maintained until it is sent downstream to

20  either a dosage form manufacturer, or if it's in dosage

21  form to a distributor.

22        Every stop along the way throughout that

23  whole process, there's records.  There's records of how

24  much was made, there's records of how much was produced,

25  how much was wasted during the production, how much went

1    into pill form, and where it went downstream.

2              Now, for a Schedule II controlled

3    substance, that form of record could be a 222 form or a

4    Schedule II controlled substance form.  For Schedule III,

15:23:19 5   IV and V drugs it would be some type of invoice or

6    receipt.

7              But no matter what, any time there's

8    movement, there's documentation of that movement through.

9              And every time there's movement, there's

15:23:34 10  not only documentation of the movement through

11   recordkeeping, but there's also documentation of the

12   movement through a system called ARCOS.  ARCOS is the

13   Automation of Reports and Consolidated Orders System, and

14   that system tracks drugs all the way through the chain.

15:23:53 15            That's another part of the closed system.

16   To maintain the integrity, you don't only have the

17   paperwork that you could go back and look at, but you

18   also have the ARCOS system for all Schedule I, II and III

19   narcotics.

15:24:10 20  Q.   All right.  I've got to interrupt you because I

21   want to make sure that I've got an ability to flow

22   through what you're saying and get it right.

23              This closed system, you started out by

24   saying it's imported or made by a manufacturer.

15:24:25 25  A.   Yes.

 1    Q.    I've got that right.

 2              And then it's inventoried.

 3    A.    Yes.

 4    Q.    All right.  The jury has heard a little bit about

15:24:34  5    the DEA having a quota system --

 6    A.    Yes.

 7    Q.    -- for importing the raw materials.

 8              Can you take a moment and explain the role

 9    of the DEA in this importation?

15:24:49 10    A.    Well, importation is separate from quota.

11              Importation involves the movement of raw

12    materials like concentrated poppy straw or Thebaine, or

13    any number of different types of raw product, into

14    the -- into the United States from growing countries,

15:25:07 15    countries that grow the poppy or countries that process

16    poppy.

17              The quota system attaches when we start

18    looking at their manufacturing process.

19              So if you're a manufacturer, and you're

15:25:22 20    manufacturing raw material into a what we call a basic

21    class, we'll say Oxycodone, that's a basic class, you

22    have a certain amount of drug that you need to meet all

23    of your contracts for all these other dosage form

24    manufacturers that are purchasing from you.

15:25:43 25              So what we will give you a quota based on

1    your contracts, based on your need, your assessed need,

2    based on a number of different factors, and all of that

3    is by statute.  It's all in 21, U.S.C., 826, which is the

4    quota statute.

5                So anytime a controlled substance is moved

6    downstream, the opioid controlled substance is moved

7    downstream, it starts with a quota that's granted to the

8    manufacturing companies.

9    Q.    All right.  So the DEA's got a quota on the

10   manufacturing.

11               This is inventoried, and then where does

12   the medicine go from there, the pharmaceutical go from

13   there?

14   A.    From the manufacturers, once they're produced in

15   final dosage form and packaged, they would go to a

16   distributor.

17               The manufacturer would transfer them

18   eventually to a distributor.

19   Q.    And distributor is a word of art in this arena, is

20   that fair?

21   A.    Yes.  They are also called wholesalers.

22   Q.    Wholesalers?

23   A.    Yes.

24   Q.    And are records kept along the way?

25   A.    Yes, sir.

1          Records have to be kept along the way.

2     That's part of the regulation, the statute.

3     Q.    All right.  And those records will show -- what do

4     they show from the manufacturer to the distributor?

15:27:27  5          What will the records show?

6     A.    Show the movement of whatever quantity of drugs

7     being moved from the manufacturer to the distributor, the

8     day it's transferred, the day it's received; the

9     quantity, the drug, the dosage form, the strength.

15:27:47 10          That's all the NDC number, the National

11    Drug Code number, so all of that is in the paperwork.

12          It shows the transfer, going from

13    manufacturer to distributor.

14    Q.    And do the distributors, what do they do with the

15:28:06 15   drugs when they get them, the wholesaler?

16    A.    Well, the distributor would put them in inventory,

17    and then start supplying their customers, which generally

18    hospitals, pharmacies, clinics, things like that.

19          And those drugs, part of this closed system

15:28:28 20   of distribution is the security of those drugs, so those

21    drugs, depending on what they are, a Schedule II

22    controlled substance would be stored in a vault at the

23    distributor location and at the manufacturer location.

24          If it's a Schedule III, IV or V drug, it

15:28:44 25   would be stored in a cage, what they called a controlled

1    substance cage.

2                   So all along the way there's security

3    that's attached to the recordkeeping that's attached to

4    the flow of the drug downstream.

15:29:00  5    Q.    And is the reason that these drugs are stored in

6    vaults and cages because of a concern over theft or

7    diversion?

8    A.    Theft, diversion, and the nature of the drugs.

9                   They're very dangerous.  They're -- if they

15:29:15 10    are used inappropriately, they cause harm, so we want to

11    ensure that they're not leaking out of the system.

12                   That's why the security is so important to

13    the system.

14    Q.    So where do the pharmacies come into this closed

15:29:30 15    system?  Where do I draw them?

16    A.    Right next to the distributor.

17    Q.    And are pharmacies also required to be registered?

18    A.    Yes.

19                   Everybody in the chain has to have a DEA

15:29:52 20    registration, so a manufacturer is registered as a

21    manufacturer, but they also distribute because a

22    manufacturer just doesn't manufacture and keep their drug

23    in inventory, it's got to go downstream.

24                   So a manufacturer is automatically a

15:30:07 25    distributor.

1          A distributor is registered as a

2     distributor.

3          A pharmacy is registered as a pharmacy.

4     And the reason all -- that registration allows you or

15:30:17  5     gives you the authority to handle controlled substances.

6          So in the case of a pharmacy, the

7     pharmacy's registered but the pharmacist is not

8     registered.  It's just the pharmacy.

9     Q.   And then the pharmacies, I assume, get valid

15:30:41 10     prescriptions, and what goes on from there?

11     A.   The pharmacies get prescriptions generally written

12     by prescribers, either doctors, dentists, mid-level

13     practitioner, a nurse practitioner, and what they do is

14     they take that prescription, they evaluate it, and then

15:31:06 15     they dispense medication if it meets the criteria for

16     dispensing the medication.

17     Q.   And that's how it gets into the hands of the

18     consumer?

19     A.   Yes, sir.

15:31:14 20     Q.   And at that point it's out of the closed system?

21     A.   At that point the closed system ends, because it's

22     in the hands of the person who should be taking the

23     medication, yes.

24     Q.   You said records each step.

15:31:30 25          You talked of ARCOS as a record system.

1          Do the records need to be kept all the way

2    through until the drug leaves the closed system?

3    A.    Yes, sir.

4          Every step of the way there's a record.

15:31:46  5    There's a check.  Somewhere in that system in a readily

6    achievable format there should be a record of the

7    transfer, inventory, of the medication.

8          So when a DEA investigator walks in with a

9    notice of inspection and says, "I'm here to inspect, I

15:32:04 10    need to see your records, I need to see your

11    manufacturing records, I need to see your distribution

12    records, I need to see your prescription records and your

13    receipt records," they should be in a readily retrievable

14    format where the pharmacist or the distributor supervisor

15:32:21 15    or the manufacturer supervisor could turn around and say,

16    "Our records are over here.  Let me help you find them,"

17    and should be able to go through and start the process of

18    the audit.

19    Q.    All right.  So you've walked us through the closed

15:32:35 20    system.

21          I want to focus a little bit more carefully

22    in the closed system, first, on distributors.

23          So can we talk about distributors for a

24    little bit?

15:32:48 25    A.    Yes, sir.

 1   Q.    All right.  You also called them wholesalers.

 2              Explain why.

 3   A.    It's just another term for a distributor.

 4              They take bulk drug that they receive at

15:33:02  5   whatever cost and then they turn around and cut that bulk

 6   drug down to smaller sizes to be transferred to

 7   pharmacies.

 8   Q.    All right.  So the dispenser cuts bulk down and

 9   then dispenses it?

15:33:22 10   A.    Distributor.

11   Q.    No, the distributor.  I'm sorry, I messed up.

12              The distributor cuts the bulk down.

13              So is there specific laws that apply to

14   distributors?

15:33:34 15   A.    Yes, sir.

16   Q.    What are the key laws that apply to distributors?

17   A.    Well, the first, all registrants, regardless of

18   where they are in the chain, they all must maintain

19   effective controls against diversion, which means they

15:33:56 20   have to have in place a system of security,

21   recordkeeping, that protects the drugs that they're

22   dealing with, the drugs that they're transferring, that

23   protects them from being moved out into the illegitimate

24   or illegal stream.

15:34:14 25              So everyone in that chain -- distributors

1   have a specific requirement that they maintain a system

2   where they could look at, identify, and then report a

3   suspicious order.

4           And a suspicious order is an order that's

15:34:39  5   basically going downstream to a pharmacy or other entity

6   that's of unusual size, unusual frequency, or deviating

7   substantially from the normal ordering pattern.

8   Q.   All right.  We've got to make a record on this, and

9   the jury needs to understand it, so let's break this

15:35:04  10   apart.

11           You said distributors must maintain a

12   system.

13           What do you mean by "System"?

14   A.   It -- some type of functional method, so they could

15:35:23  15   look at all of their orders and determine if there's some

16   anomaly within their ordering pattern, something that is

17   suspicious, something that jumps out at them and says

18   "There's something wrong with this order, I have to

19   investigate it to find out why this order is so different

15:35:40  20   than other orders."

21   Q.   Give -- give the jury an example.

22           I mean, what -- what in the world of these

23   wholesalers, what could be out there that would seem

24   suspicious?

15:35:57  25           Real life examples.

1    A.    Back in 2006, we were experiencing a rise in

2    Internet pharmacies in the United States.  An Internet

3    pharmacy is generally a pharmacy that's rogue, it's

4    operating outside the legal boundaries of the Controlled

5    Substances Act.

6              That whole system, that Internet pharmacy

7    system, worked on a system where you never saw a doctor

8    or a pharmacy.  All you did was get online, run

9    "Hydrocodone without a prescription," and you'd get

10   200,000 hits.

11             You'd look for one that says "Buy

12   Hydrocodone now without a prescription," and you'd hit

13   their website.  Their website would take you to an anchor

14   site or a pass-through site to an anchor site that would

15   take your Visa card, name, date of birth, weight, height,

16   what's your problem.

17             You'd say "I have back pain, and I

18   generally take Hydrocodone and Alprazolam," or

19   Hydrocodone, Alprazolam and Soma.  At that point in time

20   the order is processed through the Internet and it goes

21   to a doctor somewhere in cyberspace.

22             The doctor might call the patient, but he

23   doesn't examine the patient.  He doesn't do anything but

24   look at the order and say, "Okay, I'll approve it."

25             He approves the order, it's sent back to

1    the anchor site, and the anchor site sends it to, like, a

2    pharmacy bulletin board.

3            The pharmacy bulletin board picks it up,

4    and some pharmacist out there, could be in Iowa, could be

15:37:54 5    in California, could be in Florida, they fill the

6    prescription, and within 24, 48, 72 hours, you have your

7    medication.

8            The problem is that whole system was

9    illegal.  It was in violation of the law.  It was a

15:38:05 10   conspiracy, a drug conspiracy.

11           So you have a patient sitting in

12   Washington, the State of Washington, the doctor's in New

13   Jersey, the pharmacy's in Iowa, and the company that's

14   coordinating all this is in Florida, and they're all

15:38:22 15   getting paid.

16           The doctor would get, like, a prescription

17   cost, so he might get $15 for every prescription he

18   approves.  That doesn't seem like a lot, but if you're

19   approving 30, 40, or 50 prescriptions a day and you're

15:38:36 20   doing it from home, and you really don't need to do

21   anything else but approve, approve, approve, that's a lot

22   of money.

23           A pharmacist gets drug cost plus $15 for

24   every prescription he fills, and these pharmacies were

15:38:50 25   filling hundreds of prescriptions a day.

1    Q.    All right.  So in that sense, would that scenario,

2    which I'll bet all parties in this courtroom would say is

3    an atrocious problem, how do the distributors have some

4    measure of responsibility to try to stop that from

5    happening?

6    A.    During that time period, and I use this all the

7    time as an example for how a suspicious order would be

8    identified, if these were all brick and mortar pharmacies

9    that were operating outside of the law, if you've got a

10   pharmacy and you're a distributor, and your pharmacy was

11   ordering -- this pharmacy was ordering 5,000 tablets a

12   month for the last two years, and then all of a sudden

13   the pharmacy orders 20,000, and then the next month it

14   orders 40,000, and the next month it orders a hundred

15   thousand Hydrocodone 10 milligram tablets, and then it

16   also starts ordering 20, 30, 40,000 Alprazolam tablets

17   per month, that's suspicious because you had a pattern of

18   purchase, and all of a sudden you started increasing for

19   no apparent reason.

20              That's a suspicious order.  That's an order

21   that needs to be investigated through due diligence to

22   determine what was going on.

23   Q.    All right.  Now, you've got that distributor

24   concern with rogue Internet pharmacies?

25   A.    Yes.

1    Q.    In this case we've got four defendants who weren't

2    rogue Internet pharmacies per se, but were brick and

3    mortar, or grocery store in one circumstance --

4    A.    Yes, sir.

15:40:38  5    Q.    -- pharmacies, but they also distributed to --

6                    THE COURT:  Hold it.  There was an

7    objection.

8                    MR. MAJORAS:  Objection.

9                    "Per se" is argumentative.

15:40:47 10                    MR. LANIER:  Well --

11                    THE COURT:  Overruled.

12    BY MR. LANIER:

13    Q.    But they also distributed to themselves.

14                    Here's the question.

15:40:53 15                    Is there a requirement for those

16    distributors to maintain a system if they're just

17    distributing to themselves?

18    A.    Of course, yes.  Absolutely.

19    Q.    Why would that be relevant as compared to an

15:41:08 20    Internet, rogue Internet pharmacy?

21    A.    Because again, it's not just Internet.

22                    I used Internet as an example because

23    that's a pretty straightforward example, but it's any

24    type of diversion.

15:41:20 25                    So a brick and mortar pharmacy that's not

1    involved in Internet trafficking can still have anomalies

2    in their ordering patterns because there might be a bad

3    doctor or a bad clinic in that area.

4              Same concept.  You start and you're a

15:41:37 5    normal pharmacy and everything's going fine, and you

6    might be ordering five or 10,000 tablets of Hydrocodone

7    or Oxycodone or whatever, and then all of a sudden you

8    start jumping up 15, 30, 40,000, and pretty soon at the

9    end of the year you're up to, you know, 45,000 tablets a

15:41:56 10   month, when you started a few months back at 5,000

11   tablets.

12             And that's an anomaly in the ordering

13   pattern that has to be investigated because obviously

14   there's a bad doctor out there, or a bad clinic or a bad

15:42:12 15   prescriber that's prescribing drugs that -- in quantities

16   that should trigger some type of investigation at that

17   distributor level.

18   Q.    In that regard, sir, did you find a time where you

19   wrote letters to the distributors in the United States

15:42:34 20   and talked in those letters about their responsibilities?

21   A.    Yes, sir, I did, in 2006 and 2007.

22   Q.    All right.  So what I'd like to do is look at your

23   letters in 2006 and 2007.

24             First of all, let's start, can you tell the

15:42:57 25   jury why you wrote these letters?

1   A.    In 2006 and 2007, in addition to the -- we had a

2   serious, a serious opioid problem.  We were seeing opioid

3   prescriptions on the rise.  We were seeing our overdose

4   deaths increasing.  We were seeing the amount of

15:43:20  5   addiction increasing.  We were seeing the amount of ER

6   visits due to drugs increasing.  And we needed to do

7   something, we needed to light a fire under the industry

8   to make sure that they understand what's going on.

9           So we sent letters to basically remind them

15:43:40 10   of what their role was in this distribution chain, and

11   also what the requirements were under the law to protect

12   the drugs' movement.

13   Q.    I've got a sample letter of the ones that you sent

14   out or that were sent out from the Department of Justice

15:43:59 15   through your name.

16           It's Plaintiffs' Exhibit 10101, if we could

17   please give those to the other side.

18           This is one of the distributor letters that

19   you sent in 2006 to the CVS Indiana, Limited Liability

15:44:25 20   Company.

21           Do you see this?

22   A.    Yes, sir.

23   Q.    Do you recognize this letter?

24   A.    Yes, sir.

15:44:33 25   Q.    Is this a letter that -- I think it's about four

1    pages.

2                    Did you sign this letter?

3    A.    Yes, sir.

4    Q.    Did you write this letter?

15:44:42  5    A.    I drafted -- I drafted the letter, and it was

6    changed.

7                    I drafted the letter.  We -- at DEA, we

8    have a system where everybody gets to look at the letter

9    and decide, you know -- I make the final decision on the

15:44:59  10    letter.

11    Q.    All right.  And I want to have you explain some

12    parts of this letter to the jury, please.

13    A.    Sure.

14    Q.    You began by saying, "This letter is being sent to

15:45:10  15    every commercial entity in the United States registered

16    with the Drug Enforcement Administration to distribute

17    controlled substances."

18                    What did you mean?  What were you doing?

19    A.    We sent this letter to everybody who has a

15:45:23  20    distribution component within their system.

21                    So a manufacturer would get the letter

22    because they're distributors under the Controlled

23    Substances Act.

24                    A distributor would get the letter because

15:45:33  25    they're distributors as well.

1        Like a pharmacy chain would get the letter

2   because they are -- they could be self-distributing or

3   they have their own distribution system, they wouldn't

4   necessarily go to a larger distributor like one of the

5   big three.

6   Q.    You continue to say -- wait, like one of the big

7   three.

8        Tell the jury what big three means?

9   A.    The big three would be AmerisourceBergen, Cardinal,

10  and McKesson.

11  Q.    All right.  Now, you continue to say, "The purpose

12  of this letter is to reiterate the responsibility of

13  controlled substance distributors in view of the

14  prescription drug abuse problem our nation currently

15  faces."

16       What I'd like you to do is explain why you

17  use this word "Reiterate" here.

18  A.    Well, we were just repeating what we said

19  previously during face-to-face meetings or during, you

20  know, inspections, just reminding them what their

21  responsibilities are.

22       It's very clear within the Controlled

23  Substances Act, but we just wanted to tweak them and tell

24  them, you know, remember, this is what your

25  responsibility is.

1   Q.   In other words, were you coming up with new

2   responsibilities here?

3   A.   No, sir.

4   Q.   How long had these responsibilities been in place?

15:47:04  5   A.   Since around 1970.

6   Q.   The next paragraph you said, "As each of you is

7   undoubtedly aware, the abuse (none medical use) of

8   controlled prescription drugs is a serious and growing

9   health problem in this country."

15:47:30  10              Do you see that (nonmedical use)?

11   A.   Yes, sir.

12   Q.   So when you wrote this, not just to CVS but to all

13   commercial entities that were distributors, what did you

14   assume they knew was already a problem?

15:47:50  15   A.   That -- that the controlled substances,

16   specifically opioids, were basically running through the

17   country, ravaging towns and cities, and that we had to

18   try and put an end to it.

19   Q.   All right.  You continue to say that, "The CSA,"

15:48:14  20   and that's the Controlled Substances Act?

21   A.   Yes, sir.

22   Q.   "The CSA was designed by Congress to combat

23   diversion by providing for a closed system of drug

24   distribution."

15:48:28  25              What were you talking about there on a

1    closed system?

2    A.    Again, we were trying to get across the fact that

3    the Congressional -- the architecture for the Controlled

4    Substances Act was a system that would prevent drug

15:48:44  5    diversion, prevent -- help prevent addiction, these drugs

6    getting out into the market -- into the illegitimate

7    market, the illegal market, and hurting people.

8                   So that was the basis of that.

9                   Congress created the infrastructure for the

15:48:58  10    Controlled Substances Act and the closed system.

11    Q.    All right.  You go on to say that, "The

12    distributors are, of course, one of the key components of

13    the distribution chain.  If the closed system is to

14    function properly as Congress envisioned, distributors

15:49:21  15    must be vigilant in deciding whether a prospective

16    customer can be trusted to deliver controlled substances

17    only for lawful purposes."

18                   Explain what you meant, please.

19    A.    What Congress expected from the Drug Enforcement

15:49:40  20    Administration through the Controlled Substances Act was

21    that we would oversee this system that would stop the

22    movement of controlled substances from the legitimate

23    market to illicit market.

24                   And we, in this -- and this system, since

15:49:57  25    we were talking about distributors and distribution, we

1    wanted to make sure that distributors understood that

2    they had to be vigilant, because at that distribution

3    level, at that level where they're supplying pharmacies,

4    they see the whole field, and they could stop diversion

15:50:14  5    from occurring just by employing the requirements that

6    are in the regulations.

7    Q.    Was it only the distributors who had that

8    responsibility?

9    A.    No, sir.

15:50:27 10    Q.    So if we continue to work through your letter, you

11    have on the second page this paragraph that starts out,

12    "DEA recognizes."

13              "DEA recognizes that the overwhelming

14    majority of registered distributors act lawfully and take

15:50:46 15    appropriate measures to prevent diversion.  Moreover, all

16    registrants, manufacturers, distributors, pharmacies, and

17    practitioners, share responsibility for maintaining

18    safeguards against diversion."

19              Did I read that correctly?

15:51:04 20    A.    Yes, sir.

21    Q.    What is your point behind the fact that all

22    registrants, including pharmacies, share a

23    responsibility?

24    A.    Because every entity, every registrant within that

15:51:20 25    distribution chain, has certain obligations under the

1    Act.

2              Under the regulations, they all must

3    prevent or they all have to have practices in place to

4    prevent diversion.

15:51:33  5              However, they all have their own set of

6    requirements for preventing diversion, and that's why

7    it's not just one entity, it's just not one level.

8              If they're all doing what they're required

9    to do, then it would minimize diversion considerably.

15:51:55 10   But if one person breaks down in that system, you have

11   diversion.  And depending on how quickly it could be

12   discovered, you can have a lot of diversion, a great

13   amount of diversion.

14   Q.   In this regard, for these distributors to properly

15:52:12 15  do their job, you've said they need to maintain a system

16   to identify and report a suspicious order.

17              Does the DEA tell them how to do that?

18   A.   No, sir.

19              It's -- it's a business decision, a

15:52:29 20  business practice.  They know their customers, and they

21   know exactly what they need to meet the requirements of

22   this particular provision within the regulations.

23   Q.   So does everyone have to do it the exact same way?

24   A.   No, sir.

15:52:50 25  Q.   But do distributors have to have a program in

        1    place?

        2    A.    Yes, they do.  Absolutely.

        3    Q.    And does that system need to properly identify and

        4    report a suspicious order?

15:53:02 5    A.    Yes, it does.

        6              That's a requirement under the regulations.

        7    Q.    Whether it's distributing to the Internet or

        8    distributing to brick and mortar?

        9    A.    Doesn't matter.

15:53:12 10   Q.    All right.

       11    A.    If they've got a registration and they're

       12    distributing, it's all the same.

       13    Q.    Now, in addition to this letter in 2006 -- by the

       14    way, I think the evidence is going to indicate that Giant

15:53:27 15   Eagle was not distributing in 2006 when you sent this.

       16              Do you know anything about -- I don't even

       17    know that you know the facts of our case.

       18              Do you know anything about that?

       19    A.    No, sir.

15:53:38 20   Q.    All right.  Were these letters also posted anywhere

       21    where people who started distributing later could get

       22    them?

       23    A.    I don't know if they're posted now, but I believe

       24    they were posted years ago, yes.

15:53:55 25   Q.    And in that regard, let's look at a second letter

1    that you sent in 2007.  It's Plaintiffs' Exhibit 36 is

2    one that I'll use as a sample.

3                 Let me make sure counsel get a copy.

4    A.   Thank you.

15:54:28  5    Q.   Do you have Plaintiffs' Exhibit 36 in front of you?

6    A.   Yes, sir, I do.

7    Q.   This is a -- we pulled one that you had sent to

8    Walgreen's.

9                 Do you see this?

15:54:38 10    A.   Yes, sir.

11    Q.   December 27th, 2007.

12                 Is that your signature at the end?

13    A.   Yes, sir, it is.

14    Q.   Why did you write a second letter a year later?

15:54:55 15    A.   Because we were still seeing issues within the

16    supply chain regarding diversion, and we again wanted to

17    send a letter out reminding them again what their

18    obligations were.

19    Q.   And if the jury were to take the time or we were to

15:55:20 20    take the time to read through this letter, do you say

21    anything new or different than you did the year before,

22    to the best of your memory, recognizing this was 14 years

23    ago?

24    A.   One of the things I remember about this letter was

15:55:37 25    we had a final order that was -- that was handed down

1    from the DEA Administrator and the Administrative Law

2    Judge at DEA on a case called Southwood Pharmaceuticals.

3                    And we directed them to that particular

4    case so they -- to understand what their requirements

5    were under the Act.

6                    Southwood was a revocation action where we

7    removed the license of that particular manufacturer

8    because they were not complying with the Controlled

9    Substances Act.

10   Q.    All right.  What I'd like to do now is -- and we're

11   almost through with this stuff, but I'd like to try to

12   make sure that we're clear.

13                    On the closed system, you've just talked

14   about the distributors.

15                    Now, I want to talk about the dispensers

16   and their obligations, the pharmacies.

17                    Okay?

18   A.    Yes, sir.

19                    MR. LANIER:  Your Honor, I know we have not

20   yet --

21                    THE COURT:  Yeah, I was going to suggest if

22   you're -- this may be a good time to take our

23   mid-afternoon break.

24                    Ladies and gentlemen, we'll take 15

25   minutes, and then continue with Mr. Rannazzisi.

1              (Jury out.)

2              (Recess taken.)

3              (Jury in.)

4              THE COURT:  Okay.  Please be seated.

16:16:02  5              Mr. Lanier, you may continue.

6              Mr. Rannazzisi, you're still under oath.

7              THE WITNESS:  Thank you.

8    BY MR. LANIER:

9    Q.    All right.  Mr. Rannazzisi, before that break we

16:16:09 10   were in the thrilling world of distributors.

11              It occurs to me that there are a couple of

12   questions that I failed to ask you that I need to do

13   about the system itself.

14              I think you've told us that each defendant

16:16:27 15   in this case, but any distributor that's a distributor is

16   required to have a Suspicious Order Monitoring system.

17              Can you tell us the abbreviation for that?

18   A.    SOM, S-O-M.

19   Q.    A SOM program, right?

16:16:40 20   A.    Yes.

21   Q.    Now, does it have to identify -- is it required to

22   identify orders of unusual size, quantity or deviating

23   from a normal pattern?

24   A.    Yes.  It's required.

16:16:57 25              That's exactly what it's supposed to be

1     doing, and that's not all-inclusive.

2                   Those are just examples.

3     Q.    So that and more?

4     A.    Yes.

16:17:11  5     Q.    You gave us an example of unusual size or quantity.

6                   I don't remember which one.  But can you

7     give us an example of deviating from a normal pattern?

8     A.    Well, there's so many different -- you know, a

9     switch in drugs, where a pharmacy might be ordering a

16:17:30 10     certain Oxycodone 5 milligram is the normal dosing that

11     they're ordering, and they're ordering a certain

12     quantity, and all of a sudden it shifts and they no

13     longer are ordering Oxy 5 anymore, they're ordering Oxy

14     10 or Oxy 15.

16:17:48 15                   There's a dramatic shift and no explanation

16     for why that shifted.  What happened to all those

17     patients that were on Oxy 5?

18                   A perfect -- another perfect example was

19     back in 2010, OxyContin, which was a sustained release,

16:18:07 20     modified release Oxycodone product, went to what they

21     call abuse deterrent formulation.

22                   And what we started seeing was pharmacies

23     that were ordering that drug at a certain level, in 2010

24     they started to plummet.  I mean, there was almost no

16:18:24 25     orders, but we saw Oxycodone 30 milligram tablets go on

1    the rise.

2              Oxycodone 30 milligram tablets are

3    immediate release single entity product, so there's no

4    explanation.

16:18:39  5              If OxyContin has been used appropriately

6    for so many years, why are the numbers of OxyContin

7    plummeting and why are the Oxycodone 30 milligram tablets

8    going up?  That's something that's deviation from the

9    normal pattern, that's something that they should be

16:18:56 10   looking at.

11   Q.   All right.  I've got size, quantity.

12              Am I missing frequency?  Is frequency one

13   of these?

14   A.   Yes.

16:19:04 15   Q.   Explain frequency.

16   A.   So a pharmacy might be ordering once or twice a

17   week.  Once a week, twice a week.  And all of a sudden

18   they're ordering three times a week, four times a week,

19   maybe twice a day.  That's -- that's an unusual

16:19:25 20   frequency.

21              It had a pattern of ordering once or twice

22   a week, and now they're up to three or four times a week,

23   or maybe twice a day.

24   Q.   All right.  Before I leave this subject, let me ask

16:19:37 25   you this.

1    Can a distributor, whether a defendant or

2    another distributor, ship -- if their system is

3    triggered, can they ship the drug before their due

4    diligence clears the order?

16:19:54 5    A.    No, sir, they cannot.

6    Q.    Can you explain what that means?

7    A.    Well, if -- if an order is deemed to be suspicious

8    by whatever system you're using, if it's a suspicious

9    order, then they have to investigate the order to either

16:20:13 10    resolve the suspicions, or not send the order and report

11    it.

12    If you just send an order downstream even

13    though there's a -- something suspicious about that

14    order, some nature that's suspicious about that order,

16:20:32 15    you're not maintaining effective controls against

16    diversion, which is a requirement both under the statute

17    and the regulations.

18    Q.    All right.  And then the last question on the

19    system.

16:20:42 20    What is their reporting duty?  They being

21    the distributors, either the defendants in this case, or

22    another distributor.

23    A.    The distributors must report a suspicious order

24    when it's discovered to the local DEA office.

16:20:59 25    Q.    Is that important?

1   A.   Yes, sir, it is.

2   Q.   Why?

3   A.   Because those orders, when received, are looked at.

4              It kind of gives us a pointer system of

16:21:13  5   maybe there's a problem with a certain pharmacy or

6   certain clinic that we need to look at closer.

7   Q.   Okay.  As we continue to work on explaining the

8   DEA, and working through the closed system, you've talked

9   about the closed system itself, you've talked about the

16:21:30  10   distributors.

11              Now, I'd like you to talk about the DEA's

12   perspective on the obligations of the pharmacies.  Okay?

13              And in that regard, let's start with what

14   -- the pharmacies are considered dispensers, is that what

16:21:52  15   they are?

16   A.   Yes.  They have a dispensing function, that's what

17   they do.

18   Q.   And as dispensers, what is the root obligation the

19   DEA believes exists for the behavior of dispensers on

16:22:11  20   opioids, Schedule II drugs?

21   A.   Well, on any controlled substance prescription, be

22   it an opioid or any other Schedule II, III, IV or V

23   prescription, when a pharmacist evaluates a prescription,

24   a pharmacist receives a prescription, he must ensure that

16:22:33  25   prescription is issued for a legitimate medical purpose

1      in the usual course of professional practice.

2                        That's a corresponding responsibility that

3      a doctor also has.  The doctor has a responsibility to

4      prescribe for a legitimate medical purpose in the usual

16:22:50  5      course of professional practice.

6                        If they're not doing that, they're in

7      violation of the Controlled Substances Act.

8                        A corresponding responsibility exists with

9      the pharmacist to ensure that that prescription is valid

16:23:03 10      and effective; that it contains all the elements

11      and -- elements of a prescription, but also that when

12      that prescription was issued, it was for a legitimate

13      medical purpose.

14                        If --

16:23:19 15      Q.    I don't mean to interrupt.

16      A.    Go ahead.

17      Q.    I was going to put the law up here, 1306.04.  The

18      jury saw this with the last witness, but I'd like for you

19      from the DEA's perspective, as you understood it when you

16:23:30 20      were there, to speak about this language.

21                        "A prescription for a controlled substance

22      to be effective must be issued for a legitimate medical

23      purpose by an individual practitioner acting in the usual

24      course of his professional practice."

16:23:46 25                        First of all, that sexist.  It could be a

1    she, couldn't it?

2    A.    Yes, sir.

3    Q.    Did you write that?

4    A.    No, sir.  That was written before I -- way before I

16:23:56 5    was involved.

6    Q.    All right.  So in the usual course of his or her

7    professional practice.

8                Explain, first of all, this is an

9    individual practitioner.  What do we commonly call them?

16:24:13 10   A.    Doctor, dentist, nurse practitioner, physician's

11   assistant, podiatrist.  It depends on what type of doctor

12   it is or what your discipline is.

13   Q.    Okay.  "The responsibility for the proper

14   prescribing and dispensing of controlled substances is

16:24:36 15   upon the prescribing practitioner," again, is that

16   doctor, dentist, nurse practitioner, et cetera?

17   A.    Yes.

18   Q.    "But a corresponding responsibility rests with the

19   pharmacist who fills the prescription."

16:24:55 20               That phrase "Corresponding responsibility,"

21   is that what you're talking about?

22   A.    Yes.

23   Q.    And what, from the DEA's perspective, does that

24   entail for the pharmacist?

16:25:16 25               What is that corresponding responsibility?

1    And for the pharmacy, I should say.

2    A.    When -- when a pharmacist is presented with a

3    prescription, some prescriptions are presented with what

4    we term red flags.

16:25:31  5         Red flags are identifiers for a pharmacist

6    that there may be a problem with a prescription, and

7    there's a number of red flags.

8         It's the pharmacist's responsibility to

9    resolve those red flags before they dispense the

16:25:48 10   medication.  If they can't resolve the red flags, they

11   cannot dispense the medication.

12        That's what corresponding responsibility

13   is.  It's a check of the doctor.  It's a check to make

14   sure that that doctor is not doing something that could

16:26:03 15   potentially harm the patient.

16        And that pharmacist, who's a professional,

17   has the exact same requirements to make sure that the

18   patient is not being harmed by the drug therapy that he's

19   about ready to dispense.

16:26:18 20        So if the pharmacist cannot resolve those

21   red flags that are in the prescription, or within the

22   prescription, then he can't fill that prescription.

23   Q.    In that regard, the next thing I'd like to talk to

24   you about is the difference between the pharmacy and that

16:26:34 25   obligation, and the pharmacist, that obligation.

1         What is the difference between them from
2  the DEA's perception of the law?
3  A.    The pharmacy is the DEA registrant.
4              The pharmacy is the responsible party.
5              The pharmacist can't practice without a
6  pharmacy registration or a hospital registration.  All he
7  is is a professional that has a license in the state to
8  practice pharmacy, but he needs somewhere to practice.
9              The practice location, that, wherever that
10 practice location is, is the pharmacy, and that is the
11 entity that's registered.
12             So the pharmacist conducts the business of
13 the pharmacy that's registered.
14 Q.    So when the statute talks about -- I want to make
15 sure I get this right -- the pharmacy, you said, is the
16 registrant and responsible accordingly?
17 A.    Yes.
18 Q.    The pharmacist conducts the business of the
19 pharmacy?
20 A.    Yes.
21 Q.    So who needs to supply the tools for this work?
22 A.    Well, the pharmacy would -- would be responsible
23 for supplying the drugs, the computer systems, the
24 reference material, all of the things a pharmacy is
25 required to have to operate appropriately.

```
 1              And the pharmacist, he uses those tools to

 2    practice pharmacy, to ensure that the patients --

 3    Q.    All right.  But when the statute itself says that

 4    the corresponding responsibility rests with the

16:28:24  5    pharmacist who fills the prescription, how does the DEA

 6    understand that and enforce that in terms of the

 7    pharmacy?

 8    A.    The pharmacist is under that obligation of

 9    corresponding responsibility, but he wouldn't be a

16:28:44 10    pharmacist under -- he wouldn't be practicing pharmacy

11    without that pharmacy license.

12              So the pharmacist inevitably is responsible

13    to practice pharmacy, but the pharmacy, the registrant,

14    is ultimately responsible for what that pharmacist does.

16:29:02 15              Remember, the pharmacist would not be

16    practicing if he didn't have a practice location or a DEA

17    registration, which is the pharmacy location.

18              So, therefore, it's ultimately the

19    responsibility of the pharmacy for whatever the

16:29:18 20    pharmacist is doing.

21    Q.    And accordingly, we'll talk about tomorrow some of

22    the enforcement actions that you've overseen and entered

23    into with various defendants in the courtroom, but have

24    you entered into those with the pharmacies or the

16:29:36 25    pharmacists, or both?
```

1    A.    Generally both, but I can't do a revocation action

2    on a pharmacist because the pharmacist is not a

3    registrant.

4              Pharmacists could lose his

16:29:52  5    registration -- his ability to practice pharmacy.  We

6    could go to the State board and ask the State board to

7    review what he's done and have the State board revoke his

8    pharmacist registration, the ability to practice

9    pharmacy.

16:30:06  10             But in the end, we would take action

11    against the pharmacy and remove their registration,

12    because they're the responsibility party.

13             The pharmacist could also be charged with a

14    crime, because if he's distributing a controlled

16:30:20  15    substance outside that usual course of professional

16    practice and not for legitimate medical purpose, if he's

17    just continuing to send drugs out of the store without

18    performing corresponding responsibility analysis,

19    that's -- there's a crime attached to that.

16:30:37  20             That's illegal distribution.

21    Q.    Okay.  Now, the next word I'd like you to talk

22    about in terms of dispensers and pharmacies and the views

23    from the DEA is this word "Knowing," and I'll show it to

24    you in the language of the regulation.

16:30:56  25             It says, "The person knowingly filling such

1       a purported prescription, as well as the person issuing

2       it, shall be subject to the penalties provided for

3       violations of the provisions of law related to controlled

4       substances."

16:31:21  5                    I'd like you to focus on this word

6       "Knowingly filling" and explain how the DEA sees that

7       understanding in the regulation?

8                           MR. DELINSKY:  Objection.

9                           Legal conclusion, Your Honor.

16:31:36 10                  MR. LANIER:  I --

11                          THE COURT:  Well --

12                          MR. LANIER:  I'm asking how the DEA --

13                          THE COURT:  Well, you need to rephrase

14      this, during the time he was head of the Bureau.

16:31:46 15                  MR. LANIER:  Right.  I've got it.

16                          THE COURT:  So sustained as it stands.

17      BY MR. LANIER:

18      Q.    Sir, and that's the key, during the time that you

19      were at the DEA and you were control head of the Office

16:32:01 20     of Diversion, explain to us what the DEA understanding

21      was of this language of what it means to knowingly fill

22      such a prescription?

23                          MR. DELINSKY:  Objection, Your Honor.

24                          402.  What the DEA believes is --

16:32:17 25                  THE COURT:  Okay.

```
 1              (Proceedings at side-bar:)

 2              THE COURT:  All right.  I'll still sustain

 3      the objection the way it's asked.

 4              You can ask him how did he apply it when he

 5      was head of the division of control.

 6              All right?

 7              MR. LANIER:  Okay.  Got it.

 8              (End of side-bar conference.)

 9      BY MR. LANIER:

10      Q.   So the record is clear, sir, let me ask it this

11      way.

12              How did you apply that language of

13      "Knowing" when you had the leadership roles you had in

14      the DEA?

15      A.   During my time at the DEA, it was we looked at it

16      as knowing or having reason to know.

17              And that's been discussed in DEA cases, in

18      DEA final orders, since 2009 -- or, I'm sorry, take that

19      back, since 1990.

20              The -- when you're presented with red

21      flags, you can't turn a blind eye to those red flags.

22      You have to analyze the prescription, look at the red

23      flags, and resolve them.

24              You can't just take a blind eye and say, "I

25      don't see anything" and send the prescription out.
```

 1   You're not doing the patient any good.  You're not doing

 2   the -- your practice any good.  And you could potentially

 3   hurt somebody.

 4                   So you can't turn a blind eye.  You

 5   must -- you must resolve those red flags.  You can't turn

 6   a blind eye to the red flags and, therefore, it's reason

 7   to know as well as know.

 8   Q.    All right.  Mr. Rannazzisi, another term that you

 9   keep using that I'd like you to discuss for a moment is

10   that term "Red flags."

11                   What do you mean when you use the term "Red

12   flags"?  And when you use it, I'm talking about as your

13   role in DEA?

14   A.    Again, during my time at DEA, red flags were

15   indicators to the pharmacist there could be a potential

16   problem with the prescription.

17                   So it could be that the patient is seeing a

18   doctor that's 50 miles away from your pharmacy and he

19   lives 30 miles away from your pharmacy, but he's showing

20   up at your pharmacy to get the prescription filled.

21                   It could be that you're on the largest, the

22   highest dose of the highest single entity Oxycodone

23   product in large quantities with a drug like Alprazolam

24   and Carisoprodol.

25                   It could be that you're traveling in pairs

1        or three people who are showing up at the same pharmacy

2        with the same prescriptions from the same doctor who's

3        located quite a bit away.  Same people at the same

4        address who are showing up with the same prescriptions.

16:35:47 5               There's so many different things that are,

6        quote, unquote, red flags that the pharmacists are

7        trained to look at, they're trained to see these

8        potential indicators of diversion, and they have to

9        resolve those.

16:36:04 10      Q.   Now, in that regard, I've put down the four

11       illustrations you gave, but I added the note "So many

12       more" because I think that's what you were saying just

13       now, but I want to make sure I've got that accurate.

14       A.   There's a ton.  I just gave you four off the top of

16:36:21 15      my head, but there's many different red flags in

16       different circumstances.

17       Q.   Would you expect pharmacies that deal in this stuff

18       to be conversant with that language I'll use of red

19       flags?

16:36:35 20      A.   Yes.

21       Q.   Now, the next thing I'd like you to talk about is

22       something that is called -- I'm calling it, I should say,

23       percentage testing.

24               Let me tell you what I'm talking about.

16:36:56 25               In this case, the lawyers for the

1    pharmacies have said that the DEA has a test, and as long

2    as less than 20 percent of the drugs, prescriptions being

3    filled, are opiates, then it doesn't trigger the DEA

4    test.

16:37:18  5           My question to you is, sir, does the DEA,

6    if you're below 20 percent fill on opioids, does the DEA

7    at that point say you can ignore red flags, it's all

8    fine?

9    A.    No.

16:37:36 10   Q.    Can you put any sense to this at all for us so that

11   we can understand the perspective that you bring from

12   your job at the DEA?

13                   MR. MAJORAS:  Objection.  Leading.

14                   Opinion testimony.

16:37:49 15                   THE COURT:  Overruled.

16   A.    During my tenure at DEA we looked at percentages,

17   but that was not -- that was not the end-all.

18           You could have a pharmacy that has a

19   smaller percentage of opioid -- a larger percentage of

16:38:10 20   opioid-to-noncontrolled drug purchases or dispensing, and

21   that pharmacy might be fine; but you also could have a

22   pharmacy that has a very small percentage, 12 percent,

23   but when you look at their opioids, every opiate that's

24   going out the door is an Oxycodone 30 milligram tablet.

16:38:31 25           Well, that doesn't make any sense.

1              Okay.  So the percentage is there.  It's,

2       again, it's a pointer, it's a trigger, it's an indicator,

3       but it's not necessarily the end-all.  And you can't say,

4       well, if it's less than 20, we don't have to worry about

16:38:49  5       it, because that's not how the system should be set up.

6       Q.    Then if I can wedge it in, the last thing I need to

7       talk to you about is the need to document the resolution

8       of red flags.

9              Can you talk to us about that, please?

16:39:07  10      A.    Yes.

11      Q.    Well, let me take a time out and take a step back,

12      and go back to red flags.

13             If a prescription for opiates presents with

14      red flags, what, according to the DEA while you were

16:39:26  15      there, what should the pharmacist do?

16      A.    During my tenure, we expected the pharmacists to

17      resolve those flags.

18             That means look at each individual red flag

19      and try and determine why that flag is there and can it

16:39:50  20      be resolved, can -- "Is there a reason why this guy's 50

21      miles away from home with a doctor 20 miles the other way

22      going to your pharmacy in Ohio," or wherever.

23             "Is there a reason why this particular

24      patient, who you've never seen before, is getting

16:40:13  25      Oxycodone 30 milligram tablets in addition to Alprazolam

1    or Xanax, and another drug like Carisoprodol or

2    Flexeril?"

3                    You know, it may mean making a phone call

4    to the doctor, it probably is an initial phone call to

16:40:32   5    the doctor saying, "We're just curious, what are you

6    treating this patient for, why is he on the highest dose

7    Oxycodone?  Why is he on two opioids?  Why is he coming

8    to my pharmacy?  And what's your specialty?  It doesn't

9    say on the prescription.  Is this a cancer patient, an

16:40:48  10    oncology patient?"

11                    That's how a pharmacist would resolve.

12    It's not just the phone call, though.  He's got to use

13    his professional judgment.

14                    So if I pick up a phone and call a doctor

16:40:58  15    and say, "Hey, Doc, I'm just curious, I don't know you or

16    your practice, but I've got this prescription in here for

17    Oxycodone 30 milligram tablets, 180, and Alprazolam.

18    Just curious, what are you treating the patient for?"

19                    And if his response is, "Oh, don't worry

16:41:14  20    about it, it's good, just go ahead and fill it," that's

21    not enough.

22                    Just because a doctor tells me that the

23    prescription's okay is not enough.  You've got to do a

24    little further digging because, remember, that's your

16:41:26  25    patient just like it's the doctor's patient.  That's what

1    corresponding responsibility is all about.

2              We're trying to prevent that patient from

3    getting harmed.  And if you don't take that step, if you

4    just say, you know, "Doctor, that's all right, as long as

16:41:40  5    you say it's okay, I'm going to fill it," well, you're

6    not doing corresponding responsibility.

7              And we have case upon case upon case where

8    that's occurred, and people were harmed, and people died.

9    Q.   All right.  In this regard, now, with that

16:41:58 10   understanding of red flags, talk to us about

11   documentation and what it needs to be, please.

12   A.   Whenever a pharmacist --

13              MR. DELINSKY:  Objection, Your Honor.

14              There's no qualification to that question.

16:42:13 15             THE COURT:  All right.  You're going to

16   have to go through a few steps, Mr. Lanier.

17   BY MR. LANIER:

18   Q.   All right.  Are you still a licensed pharmacist?

19   A.   Yes, sir.

16:42:22 20   Q.   Do you understand the obligations of a pharmacist

21   as a pharmacist?

22   A.   Yes, sir.

23   Q.   Are you still someone who carries in your brain the

24   memories of what you did when you worked for the DEA?

16:42:34 25   A.   Yes, sir.

1    Q.    Have you given lectures for the DEA that concern

2    the issues, including documentation?

3    A.    Yes, sir.

4    Q.    Have you given lectures not just on behalf of the

16:42:49  5    DEA, but to other groups, where you've spoken about the

6    need to document?

7    A.    Yes, sir.

8            Pharmacy Boards and Medical Boards.

9    Q.    And are you up-to-date with the Pharmacy Boards and

16:43:01 10    the Medical Boards and the standards of professional

11    conduct when it comes to documentation?

12    A.    I believe I am, yes.

13            MR. LANIER:  With that foundation, Your

14    Honor, I'd like to ask him his understanding of

16:43:13 15    documentation?

16            THE COURT:  Okay.

17            MR. DELINSKY:  Objection.

18            Calls for a legal conclusion, Your Honor.

19            THE COURT:  Overruled.

16:43:17 20    BY MR. LANIER:

21    Q.    So, please, with that background as your

22    foundation, would you tell the jury your testimony about

23    what documentation needs to be?  And then I'll ask you

24    another question about why.

16:43:32 25            But what does it need to be, first?

1    A.    There has to be some documentation that you -- if

2    you call the doctor, there's got to be documentation

3    somewhere, either in a patient profile or on the

4    prescription, that you called the doctor and why you

16:43:49 5    resolved those red flags.

6              That's -- during my time at DEA, we

7    expected that.  When we pulled prescriptions, that's what

8    we were looking for.

9    Q.    Okay.

16:44:01 10   A.    That doc doesn't necessarily have to be on the

11   prescription.  It could be in a patient profile.  It

12   could be in some type of medium within a computer, but

13   there's got to be something there.

14             It's a professional practice standard.

16:44:18 15   Q.    And why is that, from your perspective and your

16   foundation, why is that important?

17   A.    Because again, you're establishing whether you

18   filled the prescription or you didn't fill the

19   prescription, and why.

16:44:36 20            This might come back a month from now, this

21   prescription might come back two months from now, and

22   it's in the patient profile, and the other pharmacists,

23   if you're working with other pharmacists, could see what

24   you did and build on that, try and figure out if there's

16:44:51 25   still a problem with this prescription, even though it

1   was -- the red flags are resolved.

2                    But at least you've established some kind

3   of record.

4                    The Drug Enforcement Administration doesn't

16:45:00  5   dictate the practice of pharmacy.  At least when I was

6   there, we didn't dictate the practice of pharmacy.  We

7   actually looked to the Pharmacy Board to determine what

8   the requirements are.

9                    And I was taught, and when I did practice,

16:45:16 10   notation on the prescription for what you did, especially

11   when you called a doctor, was imperative, it was

12   important.  It was part of your requirements as

13   practicing pharmacy.

14   Q.    All right.  Now, what I'd like to do, the last

16:45:31 15   thing I want to do under the education stop or explain

16   the DEA, is I would like you to explain enforcement

17   proceedings and how they came about, and what they

18   basically are.

19                    And in regards to this, I want you to do it

16:45:55 20   without referencing any of these defendants at this point

21   in time.  So let's just talk in general about how

22   enforcement proceedings came about.

23                    Okay?

24   A.    Okay.

16:46:06 25   Q.    All right.  Stage one of enforcement proceedings,

        1    where does it start?

        2    A.    We'll receive a tip or we will be conducting an

        3    investigation or inspection, and we'll develop

        4    information from that investigation or that inspection

16:46:29 5    that shows violations that are at a level that would

        6    require us to move forward with an administrative action.

        7    Q.    All right.  Let's stop for a moment.

        8              So you'll get a tip.  Give us an example of

        9    what that might be.

16:46:46 10   A.    Could be from a Board of Pharmacy, could be from a

       11    doctor, it could be from a pharmacist.  Could be from a

       12    patient that something happened during that -- that

       13    transaction, or something happened with a doctor's

       14    prescribing, or something happened with a pharmacist's

16:47:05 15   dispensing that was not right.

       16              It could be an inspection, we're in a

       17    facility or in a pharmacy, and we're inspecting

       18    something, and we're seeing things that we shouldn't be

       19    seeing.

16:47:18 20             Recordkeeping, security, all those things

       21    could trigger an administrative action.

       22    Q.    All right.  So those trigger an administrative

       23    action.

       24              Explain what happens when an administrative

16:47:33 25   action gets triggered.

1     A.    We review the evidence from whatever that tip or

2     investigation, subsequent investigation is.

3                 And we make a decision, the agency makes a

4     decision on how to proceed.

16:47:54  5     Q.    How is the evidence gathered?

6     A.    Through things -- we could be gathering that

7     evidence on a notice of inspection.

8                 We could gather it on an administrative

9     inspection warrant, which is like a search warrant, but

16:48:10 10    it's for the registrant.  It's an administrative action

11    rather than a full-blown search warrant.

12                It could be obtained by subpoena request,

13    but in either case we gather all of this information, we

14    put it together, and we match the information that we

16:48:31 15    received, the information that we developed during the

16    investigation, and we match it to what the regulations

17    say and what the statute says, what you're required to

18    do.

19                And if we find that those regulations and

16:48:45 20    the statute have been violated, and depending on the

21    nature of the violation, we proceed with the

22    administrative action.

23    Q.    All right.  And then what is the process if you

24    proceed with an administrative action?

16:49:02 25                What does that mean?

Rannazzisi - Direct/Lanier                    1594

1    A.    Well, it depends on the violations.

2              If the violations are minor, we might send

3    a letter of reprimand, just a letter basically outlining

4    what your violations are.

16:49:22 5              If they're a little more serious, they

6    might have a field hearing, where you'd appear before the

7    field and -- the Special Agent in Charge in the field,

8    and they'd talk about the violations, and they'd come up

9    with a method of resolving those violations to ensure

16:49:43 10   that diversion doesn't occur.

11              But there are times where we have to

12   proceed in a more forceful administrative action, and

13   that would be an order to show cause.

14              And an order to show cause is basically

16:49:59 15   notice.  When we do an order to show cause, it's served

16   on the registrant, and what an order to show cause is,

17   basically here's a notice that you've committed

18   violations that would take you to a level that you

19   must -- you can appear before an Administrative Law

16:50:18 20   Judge.

21              And what an order to show cause does is

22   gives you the opportunity to appear before that Judge, if

23   you wish, and show cause as to why the Government should

24   not revoke your registration or take action against your

16:50:30 25   registration.

1    Q.    So this order to show cause, is that a written

2    document?

3    A.    It is a written document, yes.

4    Q.    Who prepares it, Mr. Rannazzisi?

16:50:50  5    A.    When I was with DEA, the -- the document was

6    prepared by, generally, the investigating DI, and then

7    it's provided to an attorney.

8              And the attorney does the review and

9    overall preparation, completion of the preparation,

16:51:14  10   before it's sent up the chain to be reviewed and

11   looked -- and signed.

12   Q.    Tell the jury if you -- who all you had on your

13   staff when you were the head.

14             Did you have a lawyer, et cetera?

16:51:27  15   A.    I had a -- my staff included a special agent, a

16   senior special agent, a senior diversion investigator,

17   and an attorney that handled both regulatory, regulatory,

18   legislative, and liaison matters.

19             But inevitably, she would look at the order

16:51:55  20   to show cause, the two executives would look at the order

21   to show cause before I saw it.

22   Q.    We are going to get to the *Holiday* case tomorrow,

23   hopefully.  The *Holiday* case is a written decision.

24             How does this enforcement proceeding

16:52:17  25   section finally produce a written decision?

1    A.    If you're the registrant and we take action against

2    your registration through the order to show cause

3    process, you're entitled to due process, to appear before

4    an Administrative Law Judge to hear your case.

16:52:35    5              Once the Government presents evidence and

6    the registrant presents their evidence, the

7    Administrative Law Judge looks at everything and

8    gets -- basically gives a recommended decision to the

9    administrator of the Drug Enforcement Administration.

16:52:54  10              The administrator then looks at the

11   recommended decision, looks at the administrative record,

12   and makes a decision on what should be done with that

13   registrant, be it a revocation, a suspension, maybe a

14   suspension with a removal of certain drug products from

16:53:17  15   their registration, but it's ultimately the Administrator

16   of the Drug Enforcement Administration makes that

17   decision.

18   Q.    Now, the jury has also heard about settlement

19   agreements.

16:53:36  20              MR. STOFFELMAYR:  Excuse me, Judge.

21              THE COURT:  Wait.  Hold it.

22              (Proceedings at side-bar:)

23              THE COURT:  All right.  Is there an

24   objection?

16:53:49  25              MR. STOFFELMAYR:  Yeah, Judge.  It's Kaspar

1    Stoffelmayr.

2            The witness has said three times,

3    obviously, this is an administrative proceeding before an

4    Administrative Law Judge.  It's all internal to the

16:53:58  5    agency.  And Mr. Lanier keeps writing down "Judge" which

6    leaves the impression it's a Judge like yourself in

7    court.

8            MR. LANIER:  I'm glad to make that change,

9    Judge.

16:54:06 10            THE COURT:  "ALJ."

11            MR. LANIER:  Yeah, I'm glad to make that

12    change.

13            (End of side-bar conference.)

14    BY MR. LANIER:

16:54:19 15    Q.    For clarity sake, I wrote "Appear before Judge" and

16    I wrote "Judge renders a decision."

17            You called that Judge an Administrative Law

18    Judge, is that right?

19    A.    Yes, sir, an ALJ, an Administrative Law Judge.

16:54:34 20    Q.    An ALJ is an Administrative Law Judge.

21            Can you explain how that's different than,

22    for example, His Honor, Judge Polster?

23    A.    Judge Polster's a District Court Judge, an Article

24    III Judge, part of the Judiciary branch, judicial branch

16:54:58 25    of the three-branch system of Government.

         1            An Administrative Law Judge is not a

         2    Senate-confirmed position.  An Administrative Law Judge

         3    is appointed by the Department of Justice and sits at the

         4    agency that he's assigned to to hear cases.

16:55:20  5            Different, he doesn't hear criminal cases.

         6    He doesn't hear civil cases.

         7            The only thing an Administrative Law Judge

         8    does is hear administrative cases regarding DEA

         9    registrants.

16:55:32 10    Q.    So when we spoke here about appearing before a

        11    Judge, you mean an Administrative Law Judge, an ALJ?

        12    A.    Yes, sir.

        13    Q.    And when we spoke here about the Judge renders a

        14    decision -- well, take a step back.

16:55:47 15            About the Government presenting their

        16    evidence, do they present it to a jury, or to the

        17    Administrative Law Judge?

        18    A.    To the Administrative Law Judge, who reviews

        19    evidence and makes evidentiary rulings, just like a

16:56:01 20    regular judge does.

        21    Q.    And -- and by the same token, when the registrants

        22    present their evidence, are they presenting it also to

        23    the same Administrative Law Judge?

        24    A.    Yes, they are.

16:56:12 25    Q.    And then is that the Judge that renders a decision?

1    A.    It's a -- it's a recommended decision.

2    Q.    Explain what you mean by a recommended decision.

3    A.    The Administrator does not have to take the

4    decision of the ALJ.

5              The Administrator is tasked with coming up

6    with the final order, looking at what the ALJ did,

7    looking at what the administrative record says, and then

8    creating a final order that either does the revocation of

9    the registration or does a suspension, or something less

10   than revocation.

11             But it's -- the ALJ provides a recommended

12   decision or recommended opinion on what happened and

13   what -- what they feel is -- should be done, and the

14   Administrator can take the recommended decision and make

15   it the final order, or they could -- they could modify

16   it, or they could change it.

17             It's up to the ALJ -- the -- it's up to the

18   Administrator.  The Administrator sits as the trier of

19   fact.

20   Q.    All right.  Now, you've walked us through the

21   enforcement proceeding, but I think it would be relevant

22   to also hear about settlement agreements that are entered

23   into between the Department of Justice and various people

24   or entities under the Controlled Substances Act.

25             So can you explain to us, please, how a

1    settlement agreement comes about, back during your

2    tenure?

3    A.    During -- during my tenure, a settlement -- so it

4    could happen before the order to show cause is issued or

16:57:58  5    it could happen after the order to show cause is issued.

6              Generally, the Government or the Drug

7    Enforcement Administration and the registrant sits down

8    and they discuss the case, the matter, and if they could

9    come to a reasonable settlement that both parties agree

16:58:22 10    to, then they proceed with the settlement and sign the

11    documents for settlement.

12    Q.    Okay.  So the settlement agreement, I assume,

13    starts with the same tip or investigation?

14    A.    Yeah.  It's the same, same concept.

16:58:39 15              It could happen before the order to show

16    cause is issued or it could happen after the order to

17    show cause is issued, but before it goes -- it actually

18    could happen at any time before the final order is issued

19    by the Administrator.

16:58:56 20    Q.    So it's fair for me to write down here "Any time

21    before the decision or final order is issued"?

22    A.    Yes.

23    Q.    Okay.  I think that eliminates our material at this

24    stop, and so we've made it through experience, explain

16:59:31 25    DEA, and now it's time to talk about defendant

1      interactions.

2                  What I'd like to do on defendant

3      interactions is start out by talking to you about one of

4      your PowerPoints.  And I think the best way to go about

16:59:59  5      this is to have you first explain -- I mean, I've got a

6      monster PowerPoint here that's yours.  I've got a bunch

7      of them, and it's on card stock, so it's a little

8      thicker.

9                  Did you -- tell the jury where these things

17:00:20 10      come from.

11      A.    These, these are presentations that we do in the

12      normal course of our -- our day-to-day employment when I

13      was at DEA.

14                  So we would create the presentations.

17:00:39 15      Generally I would -- I would come up with how I want the

16      presentation to proceed, and I might create slides, and I

17      would provide them to somebody who's a lot better at

18      PowerPoint than I was.

19                  They tweaked the slides, send it back to

17:00:54 20      me.  We go back and forth.  But any -- those slides and

21      those presentations were done by my office and my

22      immediate staff.  We all worked together to create those

23      presentations.

24      Q.    And what are these presentations you are making?

17:01:11 25      A.    They could be for the regulated community.

1           They could be for continuing education for

2   pharmacists or doctors, professional organizations, law

3   enforcement, community groups, Congress.

4           We've done presentations pretty much for --

17:01:35  5   when I was there we did presentations for pretty much

6   everyone that requested them.

7   Q.    And would you travel around the country to give

8   these presentations?

9   A.    Yes.

17:01:46 10   Q.    Would you give these presentations to pharmacies?

11   A.    If -- pharmacists, yes.

12   Q.    Would you give these presentations to doctors?

13   A.    Yes.

14           And I believe both the pharmacists and the

17:02:01 15   doctors were afforded continuing education to see those

16   presentations.

17   Q.    So they would get credit towards their number of

18   hours they have to stay up to snuff, as we would say?

19   A.    Yes.

17:02:19 20   Q.    Would you give these presentations to national or

21   to state pharmacy boards?

22   A.    Yes.

23   Q.    In fact, sometimes would you give these

24   presentations in conjunction with state pharmacy boards?

17:02:32 25   A.    Yes.

1    Q.    Did you give presentations, for example, with one

2    of the Ohio Board of Pharmacy's people?

3    A.    Yes.  We did pharmacist diversion awareness

4    conferences with the National Association of Boards of

17:02:52  5    Pharmacy, and my department, the person that I presented

6    with regularly was the former President of the Ohio

7    Board of -- Executive Director of the Ohio Board of

8    Pharmacy.

9    Q.    And what was that person's name?

17:03:10 10    A.    William T. Winsley.

11    Q.    William Winsley.  And you would co-produce with

12    him?  Co-produce -- co-present with him?

13    A.    Yes.  Just pretty much every presentation that I

14    did, he was with me when we did it.

17:03:34 15    Q.    All right.  You kind of had PowerPoints that were

16    living, breathing, growing organisms, you said in your

17    deposition.

18            Explain that to the jury so that they

19    understand that there will be slight nuanced differences

17:03:50 20    in your presentations.

21    A.    The presentations were created to inform a

22    particular audience about what's going on.

23            So the presentation for a community group

24    is not going to be the same as a presentation for a group

17:04:04 25    of doctors or a group of pharmacists.

1    We also tried to get the most updated

2    information to them when we were out there.  So if we

3    knew that a new drug was emerging as a potential drug of

4    abuse, that would be thrown into the presentation.

5    If we saw things that we didn't -- that we

6    haven't seen since the last presentation, or we learned

7    from those pharmacists about something they were seeing,

8    it would be thrown in the next presentation.

9    We use statistics from that particular

10   state where we're operating from, so when we set up the

11   statistical chart, they would see the rise of

12   prescriptions for Hydrocodone or the rise in distribution

13   of Hydrocodone, the rise in distribution of Oxycodone,

14   little anomalies within their state on the distribution

15   of certain drugs.

16   We talked about red flags for pharmacists.

17   We talk about red flags for doctors.

18   So depending on who we talked to, the

19   presentation was molded so they understood what was going

20   on in their little world and how they could help.

21   Q.    So when you did these as DEA, I understand that one

22   of the first ones of a certain kind you actually did in

23   Cincinnati, Ohio.

24   Is that right?

25   A.    Yes.

1     Q.    Can you explain what that one was, that group where

2     you kicked it off in Cincinnati?

3     A.    It was -- it was pharmacists.

4                 And we invited law enforcement, too.  If I

17:05:34  5     remember correctly, and that was back in, I think, 2010

6     or '11, I think it was '11, we wanted to get the

7     pharmacists in a room with some law enforcement people so

8     they could know each other and know the regulatory board,

9     and learn about what was going on at that time, because,

17:05:53 10     remember, '11 was pretty much right almost at the top,

11     height of the pharmaceutical opioid epidemic.  I think we

12     peaked at '12.

13                 And we were trying to get as much

14     information out as possible.

17:06:08 15     Q.    Okay.  Now, we need to go for another nine minutes,

16     and I can get into this, but instead I'm going to ask you

17     a side topic for just a moment, and then -- because I

18     want to try to do this in one fell swoop tomorrow.

19     A.    Okay.

17:06:23 20     Q.    So here's a side topic.

21                 In addition to these PowerPoint

22     presentations, I know of at least two other kinds I want

23     you to tell the jury about.  Okay?

24                 One is you gave a presentation after you

17:06:36 25     left the DEA to the Central Oklahoma -- no, to the

1    Oklahoma State Medical Association as their continuing

2    education program.

3               Can you tell the jury how you're giving

4    presentations now, having left the FDA -- I mean the DEA?

17:06:56  5               MR. MAJORAS:  Objection.  Relevance.

6               MR. LANIER:  Judge, it's dead on relevant.

7               It's --

8               MR. MAJORAS:  Oklahoma?

9               MR. LANIER:  Yeah.  It's not tailored to

17:07:09 10   Oklahoma only.

11              It's --

12              THE COURT:  Well, I'm not --

13              MR. LANIER:  It's entitled "Who should

14   we" --

17:07:16 15              THE COURT:  Let me --

16              (Proceedings at side-bar:)

17              MR. LANIER:  Judge, it's entitled "Who

18   should we blame for the opioid epidemic?"

19              He gave this presentation two years ago,

17:07:34 20   October 25th, 2019.  He gave it to the Oklahoma State

21   Medical Association.  In it, he talks about not only the

22   stuff he did with the DEA, but he specifically talks

23   about the responsibility that pharmacies have.  And he

24   was questioned about it in his deposition by Ms. Swift

17:07:55 25   last week and -- or the week before last, and I think

1    it's incredibly relevant.

2                  It's a summary of his --

3                  THE COURT:  Well, I'm going to sustain

4    this.

17:08:04  5                  He's not an expert witness, and I don't

6    think you can bring him in just to say who he blames.

7                  MR. LANIER:  Okay.

8                  THE COURT:  If you want to establish that

9    somehow -- well, he's not speaking for the DEA in 2020 or

17:08:20  10   '21.

11                  MR. LANIER:  Okay.

12                  THE COURT:  So I'm going to sustain -- I'm

13   going to sustain the objection.

14                  MR. LANIER:  All right.  Thank you, Judge.

17:08:26  15                  (End of side-bar conference.)

16   BY MR. LANIER:

17   Q.    In addition to the presentations that you've done

18   that we've talked about, you've also presented to

19   community groups, is that right?

17:08:46  20   A.    Yes, sir, I have.

21   Q.    And just to get an idea of that, were you doing

22   that also when you were with the DEA?

23   A.    Yes, sir.  Yes, sir.

24   Q.    And what would your community -- I mean, when we

17:08:59  25   say community groups, what do you mean?

1    A.     Different organizations that have, for instance,

2    there's an organization in Michigan that, prior to COVID,

3    used to ask me to come out and speak, Families Against

4    Narcotics.

5                   And I would go out and speak to them about

6    what I was seeing now post DEA as a problem, and we'd

7    just give them a presentation just to make sure they're

8    up-to-date on what's going on.

9    Q.    Are these presentations something that you took

10   seriously?

11                  And by these, I'm especially talking about

12   the ones you did as the DEA.

13   A.     Yeah, it was part of our -- we felt that we had to

14   take the information to the regulated community.  They

15   needed to see what was going on.

16                  And not just distributors and pharmacies,

17   but the doctors as well, and, you know, anybody who would

18   listen, the boards.  Anybody that could touch on the

19   problem and maybe make a difference in the problem.

20   That's who we looked at.

21   Q.    All right.  In that regard, I'd like to begin

22   talking to you about your presentations, and the specific

23   one that I want to direct the attention to, first, is

24   Plaintiffs' Exhibit 15962.

25                  If we could hand that out, please, Rachel.

```
          1                    Thank you.  Thank you, Maria.

          2                    Is this a pretty standard example of what

          3        you would do when you go out as the DEA and give these

          4        presentations?

17:11:00  5        A.    Yes, sir.

          6        Q.    And the front page --

          7                    MR. MAJORAS:  Objection.

          8                    THE COURT:  Well --

          9                    MR. MAJORAS:  Relevance in terms of

17:11:16 10        jurisdiction.  Hearsay, hearsay within hearsay.

         11                    THE COURT:  Wait.

         12                    (Proceedings at side-bar:)

         13                    THE COURT:  All right.  First, it's not

         14        hearsay.

17:11:33 15                    He did it.  It's his presentation,

         16        Mr. Majoras, so --

         17                    MR. MAJORAS:  Your Honor, if I could just

         18        on that point, there's hearsay within hearsay if there

         19        are documents in this multi -- you know, major thing that

17:11:44 20        purports to state facts.  Those are all hearsay as to

         21        what those facts are.

         22                    THE COURT:  Not if he's made the

         23        presentation.  You can cross-examine him on anything he

         24        said.

17:11:54 25                    MR. MAJORAS:  But it doesn't verify the
```

1       facts, Your Honor.

2                      It's what he said out-of-court.

3                      THE COURT:  It's what he said, so what is

4       the -- what is the relevance of this document?

17:12:04  5            MR. LANIER:  The relevance, it basically is

6       from nuts to bolts.  He'll talk about the migration map

7       that I used in opening.  He'll talk about the problems of

8       diversion, what those problems are, where they come from,

9       what can be done about it.  He'll talk about red flags.

17:12:23 10     He'll talk about corresponding responsibility.  It's

11      dead-on relevant, it's the case.

12                     MR. MAJORAS:  Sounds like expert testimony,

13      Your Honor.

14                     MR. LANIER:  No.  It's what he gave as

17:12:31 15     his --

16                     THE COURT:  Well, yeah, you can't bring him

17      in as an expert on what he concludes about the cause of

18      the opioid epidemic.

19                     He can testify about what he did while he

17:12:53 20     was head of the DEA Office of Diversion, but he

21      can't -- he can't -- he's not an expert.

22                     I'm concerned about this whole line, and

23      certainly this document.  So I'm not saying you can't ask

24      him any questions.  Again, you can -- he can testify as

17:13:15 25     to what he did while he was head of that office at DEA

1    and that he made presentations, that's fine.

2                    MR. LANIER:  Well, Judge, I mean, that he

3    made a presentation in itself is irrelevant if I don't

4    get into the presentation.

5                    The issue I've got is, and I know we're at

6    5:15, so maybe we can look at this and I can give you a

7    bench brief of one page or two pages.

8                    THE COURT:  All right.  Well, Mr. Lanier,

9    you can't -- you can't use him as an expert as to the

10   causes of the opioid epidemic.

11                   I'm not going to allow that.  He can't

12   testify to that.

13                   He can testify as to DEA enforcement

14   actions, DEA settlements, but I don't know where this is

15   going, so at the moment I'm going to sustain the

16   objection.

17                   MR. LANIER:  All right.  Can I -- can I

18   reoffer it in the morning, Your Honor, with a clearer

19   presentation of what I want?

20                   MR. MAJORAS:  I've got other objections,

21   too, Your Honor.

22                   THE COURT:  Why don't over the evening you

23   discuss this among yourselves and see if you can come to

24   some agreement?  If not, I'll have to deal with it

25   tomorrow.

```
 1                    MR. MAJORAS:  Yes, sir.

 2                    MR. LANIER:  Okay.  Thank you.

 3                    (End of side-bar conference.)

 4                    THE COURT:  All right.  Ladies and

 5          gentlemen, we're going to break for the evening.

 6                    It's been a long day, and I appreciate your

 7          accommodating my schedule so I could do that

 8          naturalization.

 9                    Usual admonitions apply.  Don't, you know,

10          read, view, listen to anything in the media.  Do not

11          discuss this case with anyone.

12                    And we'll pick up tomorrow at 9:00 a.m.

13          with more testimony from Mr. Rannazzisi.

14                    (Jury out.)

15                    THE COURT:  All right.  Everyone can be

16          seated for a minute.

17                    And now you can step down, sir.  This is a

18          legal discussion I need to have.

19                    THE WITNESS:  Thank you.

20                    THE COURT:  All right.  I don't have time

21          now to have a protracted discussion on this because I

22          have to teach a class this evening, but see if you can

23          figure out agreeable contours for this.

24                    If you can't, again, at the moment I don't

25          understand how this is going to lead to admissible
```

Line timestamps: 17:14:39 (line 5), 17:14:53 (line 10), 17:15:35 (line 15), 17:15:44 (line 20), 17:16:02 (line 25)

1    testimony, so see what you can figure out.  And if you

2    can't agree, I'll have to deal with it tomorrow morning

3    at 8:45.

4                     Also, there were a large number of exhibits

5    that both sides used with Mr. Catizone over the course of

6    two full days almost.  I'd like to know, have a list of

7    what exhibits the plaintiffs want to offer, and what, if

8    any, exhibits the defendants want to offer, because,

9    again, the defendants are free to offer documents that

10   were used, and if there's any objection I'll deal with it

11   on the record at some point tomorrow.

12                     Okay?

13                     MR. DELINSKY:  Your Honor.

14                     THE COURT:  Yes.

15                     MR. DELINSKY:  I think we're heading into

16   territory tomorrow that could be a little charged on

17   where the line is.

18                     MS. FUMERTON:  Mr. Delinsky, the witness is

19   still here.

20                     THE COURT:  Doesn't matter what he hears.

21   I mean, it's not what questions will be asked.

22                     MR. DELINSKY:  It's fine with me.

23                     But where the line is, Your Honor, what's

24   sufficient for notice and what goes beyond notice.

25                     In other words, this --

```
           1              THE COURT:  Well, this has nothing to do

           2     with notice testimony.

           3              MR. DELINSKY:  Your Honor, I'm talking

           4     about the enforcement action in Florida and to what

17:17:30   5     degree of detail, to the extent there's --

           6              THE COURT:  Well, I know little or nothing

           7     about this Florida enforcement action, what documents,

           8     what the plaintiffs are planning to get into, so again,

           9     you know, a lot of this stuff should have been presented

17:17:41  10     to me beforehand.

          11              If we have to take up time after 9:00

          12     o'clock, it's charged to both sides.

          13              MR. DELINSKY:  Okay.

          14              THE COURT:  Each will be charged with it.

17:17:50  15              I mean, obviously if it's something I've

          16     got to deal with it, I'm the Judge, I'll deal with it,

          17     but it's going to cost both sides in terms of their time.

          18     That's how it works, so --

          19              MR. DELINSKY:  Your Honor, could we appear

17:18:03  20     at 8:50 on that?  I think I can say my peace in 90

          21     seconds.

          22              THE COURT:  I said I'll come out at 8:45

          23     and deal with exhibits, and maybe this --

          24              MR. DELINSKY:  Okay.

17:18:15  25              THE COURT:  -- and whatever, but if it goes
```

 1    past 9:00 o'clock, it goes past 9:00 o'clock.  I'm not

 2    going to cut it off if I've got to deal with it for this

 3    person's testimony.

 4                    MR. MAJORAS:  Thank you, Your Honor.

17:18:27  5            MR. DELINSKY:  Thank you, Your Honor.

 6                    MR. STOFFELMAYR:  Judge, I have one

 7    question, and I think not controversial, because this

 8    hasn't come up yet.

 9                    Tomorrow after Mr. Rannazzisi plaintiffs

17:18:34 10   are calling adversely a retired Walgreen's employee.

11    He's local and he's been subpoenaed.

12                    THE COURT:  Who is this?

13                    MR. STOFFELMAYR:  His name is Brian Joyce.

14    He'll be the next witness, we understand.

17:18:44 15            THE COURT:  Well, I thought it may be

16    Ashley.  I don't know what the order is.

17                    MR. STOFFELMAYR:  Well, regardless of

18    whether he testifies tomorrow or the day after, I just

19    wanted to confirm that because he's retired and coming

17:18:55 20   pursuant to subpoena we'll have some leeway in our

21    examination if it goes beyond the strict bounds of the

22    direct examination.

23                    THE COURT:  Well, Mr. Stoffelmayr, you're

24    free, if you want to put in what would be direct now -- I

17:19:07 25   mean now, after his examination -- you're free to.

1616

1    MR. STOFFELMAYR:  Thank you.

2    THE COURT:  If you want to recall him,

3    that's your call.

4    MR. STOFFELMAYR:  Understood.  Thank you.

17:19:15  5    THE COURT:  As happened with the first

6    witness, I don't know if Mr. Delinsky wants to recall

7    that witness in the CVS case.  He's free to do it because

8    he didn't do any real -- you know, it was one question.

9    So that's -- I'm not telling anyone how to

17:19:31  10    try their case.

11    MR. STOFFELMAYR:  Thank you.  Understood.

12    THE COURT:  Okay.  See everyone tomorrow

13    morning.

14    Oh, I guess there was, I think, three hours

17:19:41  15    for the defendants and I have 3.25 for the plaintiffs.

16    Okay.  See you tomorrow.

17    (Proceedings concluded at 5:19 p.m.)

18                    -  -  -  -

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3              I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    **/s/Susan Trischan**
     /S/ Susan Trischan, Official Court Reporter
9    Certified Realtime Reporter

10   7-189 U.S. Court House
     801 West Superior Avenue
11   Cleveland, Ohio 44113
     (216) 357-7087
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1618

1    **I N D E X**

2

3    <u>**WITNESSES**</u>:                                                    <u>**PAGE**</u>

4     CROSS-EXAMINATION OF CARMEN CATIZONE  (RESUMED)        1317

5     BY MR. SWANSON

6     CROSS-EXAMINATION OF CARMEN CATIZONE                   1377

7     BY MS. SULLIVAN

8     CROSS-EXAMINATION OF CARMEN CATIZONE                   1430

9     BY MR. DELINSKY

10    REDIRECT EXAMINATION OF CARMEN CATIZONE                1464

11    BY MR. LANIER

12    REDIRECT EXAMINATION OF CARMEN CATIZONE                1497

13     (RESUMED)

14    BY MR. LANIER

15    RECROSS-EXAMINATION OF CARMEN CATIZONE                 1519

16    BY MS. SULLIVAN

17    RECROSS-EXAMINATION OF CARMEN CATIZONE                 1521

18    BY MR. SWANSON

19    DIRECT EXAMINATION OF JOSEPH RANNAZZISI                1525

20    BY MR. LANIER

21

22                              * * * * *

23

24

25