1619

1        IN THE DISTRICT COURT OF THE UNITED STATES
            FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3

     IN RE:                    Case No. 1:17-md-2804
4    NATIONAL PRESCRIPTION      Cleveland, Ohio
     OPIATE LITIGATION
5                              October 13, 2021
     CASE TRACK THREE           8:47 a.m.
6

7

8                        - - - - -

9
                        **VOLUME 7**
10

11                       - - - - -

12

13        TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14        BEFORE THE HONORABLE DAN A. POLSTER,

15          UNITED STATES DISTRICT JUDGE,

16                   AND A JURY.

17

18                       - - - - -

19

20

21   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                             7-189 U.S. Court House
22                           801 West Superior Avenue
                             Cleveland, Ohio  44113
23                           216-357-7087
                             Susan_Trischan@ohnd.uscourts.gov
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

```
 1    APPEARANCES:
      For the Plaintiffs:         Peter H. Weinberger, Esq.
 2                                Spangenberg, Shibley & Liber
                                  1001 Lakeside Avenue, Ste. 1700
 3                                1900 East Ninth Street
                                  Cleveland, Ohio   44114
 4                                216-696-3232

 5                                W. Mark Lanier, Esq.
                                  Rachel Lanier, Esq.
 6                                M. Michelle Carreras, Esq.
                                  The Lanier Law Firm
 7                                6810 FM 1960 West
                                  Houston, Texas    77069
 8                                813-659-5200

 9                                Frank L. Gallucci, III, Esq.
                                  Plevin & Gallucci Company, LPA
10                                The Illuminating Building
                                  Suite 2222
11                                55 Public Square
                                  Cleveland, Ohio   44113
12                                216-861-0804

13                                Salvatore C. Badala, Esq.
                                  Maria Fleming, Esq.
14                                Napoli Shkolnik
                                  360 Lexington Ave., 11th Floor
15                                New York, New York   10017
                                  212-397-1000
16
      For Walgreen Defendants:    Kaspar J. Stoffelmayr, Esq.
17                                Brian C. Swanson, Esq.
                                  Katherine M. Swift, Esq.
18                                Alex Harris, Esq.
                                  Sharon Desh, Esq.
19                                Bartlit Beck LLP
                                  54 West Hubbard Street, Ste.300
20                                Chicago, Illinois   60654
                                  312-494-4400
21
      For CVS Defendants:         Graeme W. Bush, Esq.
22                                Eric R. Delinsky, Esq.
                                  Alexandra W. Miller, Esq.
23                                Paul B. Hynes, Jr., Esq.
                                  Zuckerman Spaeder - Washington
24                                Suite 1000
                                  1800 M Street, NW
25                                Washington, D.C.  20036
                                  202-778-1831
```

```
 1   For HBC/Giant Eagle
     Defendants:              Robert M. Barnes, Esq.
 2                            Scott D. Livingston, Esq.
                              Marcus & Shapira
 3                            35th Floor
                              One Oxford Centre
 4                            301 Grant Street
                              Pittsburgh, PA   15219
 5                            412-471-3490

 6                            Diane P. Sullivan, Esq.
                              Chantale Fiebig, Esq.
 7                            Weil Gotshal & Manges
                              Suite 600
 8                            2001 M Street NW
                              Washington, D.C.  20036
 9                            202-682-7200

10   For Walmart Defendants:  John M. Majoras, Esq.
                              Jones Day - Columbus
11                            Suite 600
                              325 John H. McConnell Blvd.
12                            Columbus, Ohio   43215
                              614-281-3835
13
                              Tara A. Fumerton, Esq.
14                            Tina M. Tabacchi, Esq.
                              Jones Day - Chicago
15                            Suite 3500
                              77 West Wacker
16                            Chicago, Illinois   60601
                              312-782-3939
17
     For U.S. Department
18   of Justice:             James Bennett, AUSA
                              Office of the U.S. Attorney
19

20   ALSO PRESENT:           Special Master David Cohen

21                             - - - - -

22

23

24

25
```

|  | |
|---|---|
| 1 | WEDNESDAY, OCTOBER 13, 2021, 8:47 A.M. |
| 2 | THE COURT:  All right.  Please be seated. |
| 3 | All right.  I guess the first thing to |
| 4 | address is the chart where we broke yesterday with |
| 08:47:45 5 | Mr. Rannazzisi. |
| 6 | I've read the plaintiffs' submission. |
| 7 | Defendants want to say anything about it? |
| 8 | MR. MAJORAS:  Good morning, Your Honor. |
| 9 | John Majoras. |
| 08:48:05 10 | Your Honor, we raised a number of |
| 11 | objections yesterday, and we stand on those objections. |
| 12 | These are -- this PowerPoint slide is well |
| 13 | over 200 pages, contains -- |
| 14 | THE COURT:  First of all, we're not using |
| 08:48:17 15 | 200 pages. |
| 16 | I think, I assume Mr. Lanier showed you |
| 17 | what pages he plans to use. |
| 18 | MR. MAJORAS:  Mr. Lanier did talk to me |
| 19 | about that this morning. |
| 08:48:26 20 | There were a number of pages that we still |
| 21 | have some significant concerns about, one of which we |
| 22 | identified as certainly opinion testimony if it would |
| 23 | relate to addiction and the cycles of addiction. |
| 24 | I don't know whether Mr. Lanier agreed he |
| 08:48:40 25 | would withdraw that. |

1    THE COURT:  Well, this is a -- the

2    testimony is going to be that this is a presentation that

3    Mr. Rannazzisi made in 2015 that's part of his official

4    duties, and there were a number of representatives of

08:48:56  5    some of these defendants present.

6    So it's, in my view, it's relevant to

7    notice and what he did as DEA, a DEA official, in

8    advising the world, and particularly the pharmaceutical

9    industry, of what their obligations were.

08:49:16 10    And that he did it in 2015, and he's not

11    just coming up with it today.

12    So whether it's -- whether what he said was

13    accurate or not, I mean, you can cross-examine him on it.

14    All right?  It may have been accurate.  It may not have

08:49:32 15    been accurate, but he did it as an official of DEA, so it

16    comes in.

17    I'm not going to let him opine in any way

18    as to causal connection of anything that the pharmacists

19    did or didn't do.

08:49:50 20    If he's asked that, it's -- I'm going to

21    block it immediately.

22    MR. LANIER:  And I will not ask that, Your

23    Honor.

24    I understand your injunction and, frankly,

08:49:59 25    I agree with you upon reflection.

1        MR. MAJORAS:  Your Honor, the fact that

2    Mr. Rannazzisi gave this presentation previously, the

3    presentation itself is classic hearsay.

4        The fact he gave it, we're not denying he

5    gave presentations.  We've already -- we've already

6    allowed testimony like that without objection, the whole

7    mouthpiece part that we heard.

8        The issue here is this document itself is

9    hearsay, and it relies on hearsay within hearsay when it

10    cites statistics and information.

11        Let me give an example.  The one example

12    that plaintiffs showed to me this morning is this map of

13    Florida and where pill-mills migrated from Florida.

14        We haven't heard any, any basis that

15    Mr. Rannazzisi has that he did an investigation,

16    understands what the investigation is, what that leads

17    to, and now I've got a slide which is a conclusory slide

18    that you would typically see from an expert.

19        THE COURT:  Well --

20        MR. MAJORAS:  In addition to that, Your

21    Honor --

22        THE COURT:  He'll have to lay a -- I mean,

23    if he's going to testify about that slide and the

24    statistics in it, Mr. Lanier is going to have to lay a

25    foundation.  And if Mr. Rannazzisi did that work or it

1    was done under his direction as a DEA official, he can

2    testify about it.

3              MR. MAJORAS:  The other concern I have,

4    Your Honor, which I alluded to yesterday, didn't get a

08:51:14  5    chance to make on the record, is we fully anticipate that

6    this is going to be another exercise of leading a witness

7    through a set of PowerPoint slides.

8              THE COURT:  I'm not going to -- I mean --

9              MR. MAJORAS:  We agree with your statement

08:51:25 10    you made that it's helpful certainly from an expert, but

11    again, we're distinguishing an expert from this is

12    supposedly a fact witness.

13              MR. LANIER:  Your Honor, I don't intend to

14    lead.

08:51:34 15              I intend to put the slide -- ask him if he

16    gave the presentation, if some of the defendants were

17    present; here's a couple of slides that have been pulled

18    out, did he present this slide; was it prepared by him

19    and his staff, what did he mean.

08:51:46 20              Did he present this slide?  What did he

21    mean?  I mean, those are not leading questions.

22              MR. MAJORAS:  The slides have the effect of

23    writing out his testimony, Your Honor, exactly concerned

24    with what Mr. Lanier said was a fact witness.

08:51:59 25              THE COURT:  All right.  Well, let's do it

1        this way.

2                    You can ask him if he made the

3        presentation, what work did he do to generate the

4        information he gave, and you can ask him what he said,

08:52:11  5        and if Mr. Lanier wants to say, "All right, did you

6        present it in written form to these people, and is this

7        it"; "Yeah," and he can identify it, "This is the

8        information I presented to the pharmacists on X date in

9        2015."

08:52:28 10                    MR. MAJORAS:  Your Honor, one last point

11        before I sit down, and that goes to the notice point.

12                    The testimony we heard yesterday was there

13        may have been a handful of people at this presentation in

14        Virginia or something to that effect, I'm not trying to

08:52:39 15        quote it exactly.

16                    We don't believe that is sufficient to base

17        a notice claim on in terms of these defendants and what

18        Mr. Rannazzisi is --

19                    THE COURT:  We'll find out specifically who

08:52:51 20        was invited, who was there, if it was disseminated to

21        people afterward.

22                    I want to hear that to make sure

23        there -- that essentially that this was given to -- this

24        was presented to pharmacies, some of these defendants.

08:53:09 25                    All right?  If there's no evidence that any

1    of these defendants were there, Mr. Lanier, I'm not sure

2    it is so relevant.

3                    MR. LANIER:  I'll not only make that

4    record, Your Honor, I'll also represent to the Court it's

5    still listed on the DEA website and downloadable.

6                    I also would like the record to reflect

7    that --

8                    THE COURT:  Well, there's a lot of stuff on

9    the DEA website, but I'm not going to just, you know, to

10   say, "Well, it's on the website, so defendants had to see

11   it," I mean, they might have seen it.

12                   MR. LANIER:  Fair enough.

13                   I would also like the record to reflect I

14   tried really hard and, I think, effectively pulled out a

15   lot of the hearsay within hearsay.  There were comments

16   that I think I should be able to use, but I'm not trying

17   to.  I'm not suggesting it.  Some of the newspaper

18   articles, some of the things that based on your rulings

19   thus far, I don't think would come in, and I think you'd

20   be very frustrated if I did it.

21                   And so I've pulled out all of those.  I've

22   given Special Master Cohen and the other side the

23   selected slides that I would show, and I'll keep it to

24   that, Your Honor.

25                   THE COURT:  Well, first, we've got to

1  confirm that there were representatives of at least one

2  of the four defendants present.

3           MR. LANIER:  Understood.  Understood.

4           MR. STOFFELMAYR:  Can we have the slides?

08:54:25  5  We haven't seen those.

6           MR. LANIER:  Yes.

7           MR. MAJORAS:  I understand the Court's

8  ruling.

9           I'll just note for the record that these

08:54:31 10  objections are to the PowerPoint presentation as a whole

11  on behalf of all defendants.

12           We'll, of course, raise individual

13  objections as we see fit.

14           THE COURT:  All right.  Well, the whole

08:54:40 15  PowerPoint isn't going to come in, Mr. Majoras.

16           MR. MAJORAS:  I understand, sir.

17           THE COURT:  All right.  We're doing it with

18  selected portions and maybe selected slides, but I'm not

19  going to -- there's a lot in that document I wouldn't let

08:54:51 20  in for some of the reasons you've articulated.

21           MR. LANIER:  Understood.

22           THE COURT:  Okay.

23           MR. MAJORAS:  Thank you, Judge.

24           THE COURT:  All right.  Mr. Delinsky, there

08:55:02 25  was something you said you wanted to raise.

1    MR. DELINSKY:  Thank you, Your Honor.

2    The issue I want to raise pertains to

3    testimony Mr. Rannazzisi may or may not give, but I

4    suspect Mr. Lanier will attempt to adduce this

08:55:23 5    information, regarding the details of what happened in

6    his investigation of and the findings of the two

7    particular CVS Pharmacies in Sanford, Florida that were

8    the subject of the *Holiday* opinion and the settlement.

9    And by details, I mean the -- what

08:55:44 10    pharmacists said in interviews, what the data showed on

11    those two particular pharmacists, and that's what I want

12    to address, Your Honor.

13    THE COURT:  Well, first, let me find out,

14    Mr. Lanier, are you going to try to elicit this?  If

08:55:59 15    so --

16    MR. LANIER:  I'm unclear on exactly what

17    Mr. Delinsky's referencing because there are two sets,

18    two buckets.

19    One bucket is the *Holiday* indictment,

08:56:10 20    complaint, and all of that mess which has information

21    that, frankly, Mr. Rannazzisi is not responsible for,

22    even though he oversaw it.

23    The second -- and I don't plan on getting

24    into those details in that bucket.

08:56:21 25    The second bucket is a declaration that

1    Joseph Rannazzisi made and signed, and that declaration

2    that he signed as the Deputy Assistant Administrator for

3    the Office of Diversion is based upon his job and what he

4    did, and in that declaration he explains what all was

08:56:41  5    done from the DEA perspective under his purview and what

6    his findings were.

7                It's a declaration that he signed saying,

8    "I declare under penalty of perjury that the foregoing is

9    true and correct," executed February 24th, 2012.

08:56:57 10                And that's the declaration that I do intend

11    to ask him about.

12                THE COURT:  Well, what -- I haven't seen

13    the declaration.

14                How -- what -- what is the purpose of going

08:57:09 15    into this?

16                MR. LANIER:  Your Honor, the declaration

17    itself shows the work that was done, the concerns the DEA

18    had, the illegal conduct of the defendants under the

19    auspices at least or oversight perception of the DEA.

08:57:27 20                And that's one of the things I've got to

21    prove under the charge.  I've got to prove either illegal

22    or intentional misconduct, and the way I get there is by

23    showing in Florida, in part, with a migration issue that

24    we've got that comes to Ohio, that these defendants, CVS,

08:57:49 25    engaged in what I hope the jury will determine is illegal

1          activity.

2                       But I've got to put on some evidence of

3          that, even from the DEA's perspective, though it's not a

4          binding perspective on the Court or the jury.

08:58:02  5                       MR. DELINSKY:  And so, Your Honor, we

6          have --

7                       THE COURT:  Well, the *Holiday* or *Holiday*

8          decision, the Court made that finding.

9                       I mean the ALJ made that finding, correct?

08:58:13 10          And it's in evidence, right?

11                       MR. LANIER:  I don't think it's in evidence

12          yet.

13                       THE COURT:  As far as I'm concerned, it is

14          in evidence.

08:58:21 15                       MR. LANIER:  Okay.

16                       THE COURT:  There's been ample testimony

17          about it and I, you know, so the decision, the decision,

18          the DEA decision and the finding against CVS is in

19          evidence and there's been a lot of testimony about it.

08:58:35 20                       So --

21                       MR. LANIER:  What Mr. Rannazzisi offers is

22          the facts behind the decision; not simply the holding of

23          the decision.

24                       And it's those facts that I think are

08:58:46 25          relevant to a jury.

 1          MR. DELINSKY:  And, Your Honor, that's

 2     where our objection comes in, and it's a twofold

 3     objection.

 4          THE COURT:  Doesn't the Court make those

08:58:55   5     findings -- it's not the Court -- the ALJ, which the DEA

 6     Administrator adopted in the order?  It's a published

 7     decision, made findings that CVS violated the CVS -- I

 8     mean the Controlled Substances Act, the CSA.

 9          MR. LANIER:  Does make those findings, but

08:59:15  10     doesn't give a lot of the detail and --

11          THE COURT:  Well, I don't think --

12          MR. LANIER:  -- of the facts.

13          THE COURT:  Well, the finding of illegality

14     is all you need.

08:59:25  15          That's a judicial finding of illegality,

16     that illegal conduct by CVS in Florida.

17          MR. LANIER:  Okay.

18          THE COURT:  Right?  I mean --

19          MR. LANIER:  Yes, Your Honor, but I think

08:59:34  20     it's helpful if I've got the underlying facts that belie

21     the case that's being made by the defendants that they

22     did nothing wrong.

23          THE COURT:  Is the defendant, CVS,

24     disputing -- I mean, you know, disputing the finding?  I

08:59:49  25     mean, if you are then I'll let him testify about it, if

1633

1    you're disputing that the ALJ made those findings and it

2    was adopted by the Administrator that CVS violated the

3    CSA in Florida.

4              MR. DELINSKY:  Your Honor, CVS in the

09:00:03 5   settlement, there's been testimony on this as well, has

6    admitted that the pharmacists did not fully comply with

7    their corresponding responsibility, and that has been the

8    subject of evidence, too.

9              We don't dispute that admission.

09:00:18 10            I think the real issue here, and I think

11   we're in agreement, Mr. Lanier and I are in agreement on

12   what the issue is, is do the bottom line facts come in

13   through Mr. Rannazzisi.

14             And we have two objections to that, Your

09:00:36 15  Honor, and they're important, and let me lead with the

16   more global one first.

17             The purported use of this is for notice.

18   It's a similar theory as for --

19             THE COURT:  No.  This is not notice.

09:00:53 20            That --

21             MR. DELINSKY:  Well, if it --

22             THE COURT:  This is coming in as direct

23   evidence; not hearsay.  This is -- Mr. Lanier is offering

24   this as direct evidence of CVS's intent.

09:01:08 25            MR. DELINSKY:  Well, but there's -- oh,

1   boy, Your Honor, there's no evidence of CVS intent in

2   this opinion.

3            There's evidence --

4            THE COURT:  Well, I don't have the opinion.

09:01:18  5            MR. DELINSKY:  Yeah.  There's evidence that

6   CVS --

7            THE COURT:  Can someone give me the

8   opinion?  It speaks for itself.

9            MR. DELINSKY:  Mr. Rannazzisi expressly

09:01:25 10   determines in his declaration that this was the conduct

11   of certain pharmacists who did not follow CVS policy.

12            THE COURT:  Well, then, if that's what he

13   says, then that's what he says.

14            MR. DELINSKY:  But, Your Honor, there are

09:01:39 15   402 issues here and 403 issues.

16            This case is not about two pharmacies in

17   Florida; it's about the pharmacies here.

18            Your Honor, over intense objection from

19   CVS, has permitted the introduction of many settlements

09:01:57 20   and a lot of testimony --

21            THE COURT:  I want to see, where is the

22   finding?  This is a long opinion.  I don't have time for

23   this now.

24            Where is the finding that the Judge makes?

09:02:05 25            MR. LANIER:  Your Honor, look at the flags

 1    up at the top.

 2              Those have the finding pages.  I've flagged

 3    them for my reference, at least, and I'll let the other

 4    side know I don't have anything other than the flags at

09:02:16  5    the top that I gave the Court.

 6              But those take you to a couple of pages.

 7              MR. DELINSKY:  I mean, Your Honor, we

 8    would -- we do not dispute that the DEA determined that

 9    corresponding responsibility wasn't followed and revoked

09:02:34 10    the licenses of --

11              THE COURT:  "Statement of respondent's

12    employees thus manifest a complete abdication of their

13    responsibility to exercise professional judgment before

14    dispensing prescriptions for highly-abused controlled

09:02:47 15    substances."

16              All right?  That's intentional conduct.

17    They abdicated, CVS pharmacists abdicated their

18    responsibilities.  So that's here, it's published, that's

19    a finding.

09:03:08 20              MR. DELINSKY:  Your Honor, we object to any

21    of this coming in under 402 and 403 in that it's Florida,

22    but --

23              THE COURT:  Well, that's overruled, but

24    it's very relevant.

09:03:18 25              All right.

1        MR. DELINSKY:  If the testimony is limited

2   to that line that you said, that resolves another layer

3   of our objections; not our global objection to why we're

4   talking about Florida in a case about 14 pharmacies in

09:03:31  5   two counties in Ohio.

6        THE COURT:  Because, Mr. Delinsky, all the

7   evidence has been clear, all these defendants had

8   national policies, okay?  They had national policies as

9   to what pharmacists were to do and not to do.

09:03:42  10        And so something that happens in Florida in

11   the time period is directly relevant.  So I've overruled

12   that and I'll continue to overrule objections.

13        MR. DELINSKY:  All right.

14        Your Honor, the one other thing I would add

09:03:55  15   is, look, in candor, Your Honor, you know, we think the

16   admission of this evidence, coupled with the admission of

17   what, I think four or five other CVS settlements, is in

18   the land of very significant error, but each time we get

19   another witness being questioned about these facts, that

09:04:14  20   potential error and the prejudice that results from it is

21   magnified.

22        There already has been testimony in this

23   case about it.  Over our objection, Your Honor has

24   determined that it's relevant, but to the extent that

09:04:29  25   it's relevant it's not Ohio relevant.  And there has to

1    be an end game here.  If it comes piling on on

2    pharmacies, two pharmacies that are not -- that are

3    hundreds of miles away from where the case is, so there

4    has to be some limiting factors on how often this can be

09:04:46  5    raised in this trial.

6                    These are aggressive --

7                    THE COURT:  The reason I'm concerned is

8    that we already have a judicial finding, all right, a

9    contested judicial finding.

09:04:56 10                    That's in evidence and you can admit that,

11    okay, on the issue of intent as well as notice.

12                    I don't think it's appropriate to have, you

13    know, essentially the prosecutor, who was Mr. Rannazzisi,

14    or the prosecutor's agent, putting in his opinion as to

09:05:16 15    why, why CVS's conduct was particularly bad or going into

16    a lot of details that go beyond the published opinion.

17    All right?

18                    I think the published opinion speaks for

19    itself.  It's not hearsay.  It's a judicial record.  It's

09:05:32 20    a finding, a contested finding, and whatever that Judge

21    determined, that's that.

22                    All right?

23                    MR. LANIER:  Okay.

24                    THE COURT:  Both for notice and as evidence

09:05:42 25    of conduct, but I'm -- you know, to have Mr. Rannazzisi

1638

1    say why it was particularly important for DEA to pursue

2    this or what he saw in the evidence, I --

3                    MR. LANIER:  Your Honor.

4                    THE COURT:  -- I'm not inclined to admit

09:06:02 5    that.

6                    MR. LANIER:  All right.  Your Honor,

7    perhaps if I approach it this way.

8                    I've already had Mr. Rannazzisi explain the

9    process of how these things come about in a global sense.

09:06:13 10                    THE COURT:  Right.  Right.

11                    MR. LANIER:  So I could walk back through

12    that and say "The jury has heard about the *Holiday* case,

13    it's been admitted into evidence."

14                    "Were you involved in that?  Did you give a

09:06:24 15    declaration?  Did you do the necessary investigation?

16    Did you follow the steps?"

17                    And I'll just do that without going into

18    great detail of what the declaration says.

19                    THE COURT:  That's fine.

09:06:36 20                    MR. LANIER:  And I'll just leave it as a

21    bill or something like that.

22                    THE COURT:  All right.  I think that's

23    satisfactory.

24                    MR. STOFFELMAYR:  Judge.

09:06:50 25                    MR. LANIER:  Do you mind?

1       Your Honor, the only other concern I've got

2   is our records show that the *Holiday* case was not

3   admitted, that all you did was allow testimony on certain

4   sections that I read, and then had me move on from it at

09:07:04   5   that point.

6       So if we're going to admit it, that makes a

7   world of difference to me.

8       MR. DELINSKY:  Well, Your Honor, there's a

9   lot of information that's -- that underlies factual

09:07:14  10   findings that underlies the conclusion Your Honor quoted.

11       I think that we should attempt to either

12   come up by way of stipulation --

13       THE COURT:  See what you can do.

14       If you think that there's something -- but

09:07:25  15   I'm going to admit the decision, all right, at least key

16   parts of it.

17       MR. DELINSKY:  Okay.

18       THE COURT:  So there's a lot of footnotes

19   and a lot of other stuff.

09:07:33  20       Maybe you can, you know, work out a

21   stipulation, fine; but it's coming in.

22       MR. LANIER:  Thank you, Judge.

23       MR. STOFFELMAYR:  Judge, real quickly, and

24   we can -- I want to flag this, we can address it in

09:07:44  25   real-time if it comes up.

1          We have a related concern about allegations

2    made in orders to show cause.  Those are charging

3    documents, not a decision by anybody.

4                    THE COURT:  Right.

09:07:55  5          MR. STOFFELMAYR:  There are, Your Honor,

6    allegations, you can call them salacious, inflammatory.

7    There's a settlement agreement.  Mr. Lanier has already

8    read the admissions of the settlement agreement.  We

9    understand the jury gets to hear what we admitted to.

09:08:08 10   You know, that's not for today, obviously.

11              But it is, obviously, important to us that

12   Mr. Rannazzisi isn't able to testify to the jury about

13   these very inflammatory allegations about very local

14   events and specific pharmacies in Florida.

09:08:23 15              They were never adjudicated by an ALJ or

16   anybody else.

17                    THE COURT:  Well, I don't -- all right,

18   Mr. Lanier, I don't know what Mr. Stoffelmayr is

19   referring to, if you're planning to go into this.  I

09:08:38 20   again don't think it's appropriate for Mr. Rannazzisi to

21   just talk about allegations that he -- the DEA made in

22   the case.

23                    MR. LANIER:  I understand, Your Honor.

24              And I don't think that's what we have here.

09:08:51 25                    THE COURT:  All right.

1          MR. LANIER:  What we have here is a

2    settlement and memorandum of agreement that the Court has

3    already said I'm allowed to get into.

4              THE COURT:  Right.

09:08:59    5          MR. LANIER:  It is the Walgreens settlement

6    and memorandum of agreement.  It's got a procedural

7    background in the agreement.  It's got certain language

8    within the agreement.

9              And this is an agreement that Joe Ran --

09:09:12    10   Joe Rannazzisi testified in the case, he signed the order

11   to show cause.  Actually he signed --

12             THE COURT:  We don't have to go through

13   this, but the point is I don't think it's appropriate for

14   Mr. Rannazzisi to just list a whole lot of allegations

09:09:27    15   that were made, all right?

16             That's -- I think that's more prejudicial

17   than probative.  Findings, settlement, that's, you know,

18   that's -- that testimony can be allowed.

19             MR. LANIER:  Understood, Your Honor.

09:09:41    20             MR. STOFFELMAYR:  Thank you, Judge.

21             MS. FUMERTON:  Your Honor, for Walmart,

22   there's also four potential settlements that might be at

23   issue.

24             I'm not sure if Mr. Lanier is intending to

09:09:50    25   go into this with Mr. Rannazzisi or not.  If he's not, we

1642

1    don't need to discuss this now.

2              I think there's one memorandum of

3    agreement.

4              THE COURT:  Well, there's one -- there are

09:09:58 5   four Walmart settlements that I looked at in connection

6    with, I think, Nelson.  All right?

7              Two were in -- one of them, one of them, an

8    earlier one, 2011 or '12, I don't think covers the

9    conduct we're talking about in this case and I don't

09:10:16 10  think it's relevant.  It had to do with theft, and we're

11   not talking about theft.

12             So but the other three, the other three

13   relate to diversion.  I think the first one was 2011.

14   There were two in 2015.  If Mr. Rannazzisi had something

09:10:36 15  to do with it, he can, you know, he can talk about what

16   he did and that there was a settlement, but again, I'm

17   not going to allow him to testify to what DEA's

18   allegations were.

19             MR. LANIER:  Your Honor, I believe

09:10:54 20  Mr. Rannazzisi only has knowledge of one of them, and

21   that's the one that I was going to use because that's the

22   only one he's got personal knowledge of.

23             THE COURT:  Which one's that?

24             MR. LANIER:  It is the one that was -- the

09:11:05 25  background was 2009.  It was signed and entered, signed

1    by Mr. Rannazzisi on March 17th, 2011.  It's the one that

2    says that Walmart improperly dispensed controlled

3    substances to individuals based on purported

4    prescriptions issued by physicians who were not licensed

09:11:23 5    to practice medicine in California.

6                    Then two other dispensing issues.

7                    So it's one of the ones that we believe is

8    proper.

9                    THE COURT:  All right.  Ms. Fumerton, I

09:11:32 10   think he can -- I think that that testimony, that

11   settlement comes in the same way the others do.

12                   MS. FUMERTON:  Yes, Your Honor.  We

13   actually don't have an objection based on the prior

14   rulings --

09:11:44 15                   THE COURT:  All right.

16                   MS. FUMERTON:  -- on that one.

17                   So if that's the only one we're talking

18   about, that's fine with us.

19                   MR. WEINBERGER:  Your Honor, can I just add

09:11:51 20   one thing for the record as far as the settlement

21   agreements are concerned?

22                   Specifically as to Walgreens, and you're

23   going to hear this afternoon a district manager from

24   Walgreens, there were, in response to, for example, the

09:12:05 25   2013 MOA that Walgreens entered into, there were a number

1       of policy changes, there were a number of audits, there

2       are a number of documents that talk directly about that

3       MOA and whether or not they complied or not complied.

4                     That MOA contains an exhibit which is a

09:12:28  5       going-forward compliance document which Walmart -- which

6       Walgreens agreed to follow.

7                     There's a lot of evidence about what they

8       did or didn't do, and how successful they were or were

9       not in complying with that agreement and that compliance

09:12:43 10       document.

11                     MR. STOFFELMAYR:  Judge, that wasn't what I

12       was talking about.

13                     I was talking about --

14                     THE COURT:  That's different,

09:12:51 15       Mr. Stoffelmayr.

16                     MR. WEINBERGER:  Can I just -- so the

17       reason I'm saying this is that it gives you the context,

18       not only with respect to notice, but with respect to

19       going-forward conduct and whether or not they were in

09:13:04 20       compliance with what they agreed were the standards that

21       they had to follow.

22                     THE COURT:  That's -- that crystallizes why

23       these settlements are relevant.

24                     Yeah, there's notice, but to me what is

09:13:20 25       particularly probative on, on whether or not the

1  plaintiff can prove its case, is what the defendants did

2  or didn't do after these settlements.

3                    MR. LANIER:  Agreed, Your Honor.

4                    THE COURT:  Did they change their conduct,

09:13:38 5  all right?

6                    I mean, if they did, well, that is

7  relevant.  If they didn't, that's also relevant.  And I

8  will -- I will allow testimony on any witness who has

9  knowledge of that, okay, as to what any of the four

09:13:55 10  defendants did or didn't do.

11                    It doesn't apply to Giant Eagle because

12  they don't have any of these settlements, so it's really

13  the other three, Walgreens, CVS, Walmart, what those

14  defendants did or didn't do after any of those

09:14:08 15  settlements in the area we're talking about, their SOMS.

16  All right?

17                    MR. WEINBERGER:  It's not just SOMS, it's

18  dispensing conduct, also, Your Honor.

19                    THE COURT:  All right.  So what they did or

09:14:20 20  didn't do, and that, to me, that is far more important

21  than the fact that there were a few settlements.

22                    MR. STOFFELMAYR:  We agree completely, Your

23  Honor.

24                    THE COURT:  Particularly since we're

09:14:32 25  talking about a 10-year period, all right, 2007 -- or

1    12-year period, I guess.

2              All right.  Anything else that we need

3    to -- yes, Mr. Delinsky.

4              MR. DELINSKY:  Your Honor, very briefly,

09:14:46  5    and this is more by way of housekeeping related to this

6    issue.  We do need a limiting instruction, we've talked

7    about this before on the settlements.

8              THE COURT:  Have you provided -- have you

9    worked something out?  If you've worked something out

09:15:02  10    I'll give it.

11             MR. DELINSKY:  We've provided one to

12    plaintiffs.  We're just awaiting comments.  Pete had

13    identified an issue.

14             MR. LANIER:  We will get it to you.

09:15:14  15             THE COURT:  As soon as you come up with it,

16    Mr. Delinsky, I'll give it.  I think, you know, if the

17    parties agree on the language, I'll give it.

18             MR. DELINSKY:  What we did, Your Honor, is

19    we based it on the limiting instruction that Judge Sargus

09:15:26  20    gave in the *DuPont* ruling, which is one of the cases Your

21    Honor relied on.  So it's largely modeled after that, but

22    we will endeavor to get that.

23             THE COURT:  All right.  Did someone give to

24    Mr. Pitts or to me the exhibits from the prior witness,

09:15:43  25    Mr. Catizone?

1    I mean, I don't want to forget and I don't

2  want to leave all this to the end of the case, so I

3  need -- I need to have that and what, if any, objections

4  there are, and I'll figure it out.

09:15:53 5    So if you haven't, I'd like to do that, to

6  stay current, because otherwise there would be no way to

7  go back, you know, weeks remembering what exhibits were

8  offered and what objections there are.

9    MS. FUMERTON:  Your Honor, we exchanged

09:16:09 10  lists with plaintiffs last night.

11    I think there's some objections we logged.

12    I, if Your Honor is okay with it, I think

13  maybe we would benefit from one additional discussion.

14    THE COURT:  That's fine.  You can take

09:16:19 15  another day, Ms. Fumerton, but I don't -- my mind isn't

16  good enough to keep track of all this days and days in

17  arrears, all right?

18    MR. LANIER:  I doubt that.

19    THE COURT:  No, I'll testify to that under

09:16:34 20  oath.

21    So I've got to keep reasonably current on

22  these or else we'll just get all balled up, and I don't

23  want to do that, obviously.

24    MS. FUMERTON:  Yes, Your Honor.  I think we

09:16:44 25  can do that by the end of the day.

```
  1                    THE COURT:  Okay.  All right.  Well, we

  2         took 15 minutes, so I have to charge that to each side,

  3         all right.

  4                    So we can bring the jury in and have our

09:16:53  5         witness back, I believe.

  6                        (Jury in.)

  7                    THE COURT:  Good morning, ladies and

  8         gentlemen.  Please be seated.

  9                    I apologize for the delay.  We had some

09:18:41 10         legal issues I needed to take up, so, Mr. Rannazzisi, I

 11         want to remind you you're still under oath from

 12         yesterday.

 13                    And, Mr. Lanier, you may continue.

 14                    MR. LANIER:  Thank you very much, Your

09:18:53 15         Honor.  May it please this Court, Mr. Rannazzisi, thank

 16         you for being here.  Ladies and gentlemen, good morning

 17         to y'all, and we shall commence.

 18              DIRECT EXAMINATION OF JOSEPH RANNAZZISI (RESUMED)

 19         BY MR. LANIER:

09:19:06 20         Q.    Mr. Rannazzisi, yesterday I've given you and the

 21         jury and the Court a roadmap to kind of organize our

 22         thoughts and keep us on track, and we'd gotten to the

 23         third stop, your interactions with the defendants.

 24                    Do you remember that?

09:19:18 25         A.    Yes, sir.
```

1    Q.    And in that regard, we discussed PowerPoint

2    presentations that you made, different ones that you've

3    done to different groups.

4              Do you recall that, as well?

5    A.    Yes, sir.

6    Q.    And that's where I'd like to pick up now.

7              I'd like to draw your attention to

8    Plaintiffs' Exhibit 15692 and ask you a few questions

9    about it.

10             I'll put the initial slide up so you can

11   see it.

12             This was a PowerPoint presentation you

13   made?

14   A.    Yes, sir.

15   Q.    Was this prepared -- who prepared this PowerPoint

16   presentation?

17   A.    I prepared the PowerPoint presentation, the slides

18   that were going to be used.

19             Some of the slides that are in here were

20   prepared by some staff members, but generally they were

21   prepared, I had an idea of what I wanted the slide to

22   look like, and they just created it; but for the most

23   part, if I didn't create the slide, the slides were

24   created at my direction for this presentation.

25   Q.    Very good.

1        When did you make this presentation?

2    A.    May 30th and 31st, 2015.

3    Q.    And we see on the front that it was made to the

4    Virginia Pharmacy Division Awareness Conference, the

5    National Association of Boards of Pharmacy, the Virginia

6    Board of Pharmacy, and the DEA.

7              Can you tell us who was present when you

8    made this presentation?

9    A.    Everybody who was in that list made some sort of

10   presentation.

11             There was also a law enforcement officer

12   present who did a presentation, as well.

13             So the Virginia Pharmacy Diversion

14   Awareness Conference is the title of the event.  The

15   National Association of Boards of Pharmacy had a

16   representative.  It was either Bill Winsley or one of the

17   NABP members.

18             The Virginia Board of Pharmacy Executive

19   Director was there and made a presentation.

20             And then I made the presentation for the

21   DEA.  We might have had one chemical person make a

22   presentation, too.

23   Q.    Do you remember whether or not this was attended by

24   any of the national chain pharmacies that are here in the

25   courtroom?

1    A.    We all --

2    Q.    I'm sorry, do you know the three that are in here?

3    A.    Yes.

4    Q.    Okay.

09:21:48  5    A.    We generally had a representation from the chains.

6          I am almost -- I can think of not one where

7    one of the chains did not attend the conference.

8    Q.    And when you say chains, are you meaning CVS,

9    Walgreens, Walmart?

09:22:07  10   A.    Yes.

11   Q.    Okay.  So based upon your memory, would those

12   chains have -- at least one or two or three of those

13   chains been present at these presentations, at this

14   presentation?

09:22:18  15   A.    At least one.

16          And to clarify, it would be a pharmacist

17   from the chain, because this is geared towards the

18   pharmacists.  Now, we didn't, we didn't say "Only

19   pharmacists could attend."

09:22:29  20          We could have had the techs, we've had

21   people from their management, regional managers, district

22   managers, whatever you want to call them.

23          But for the most part, at least every

24   conference was attended by at least one, yes.

09:22:47  25   Q.    Did you present -- and we're going through steps

```
 1    before we look at the PowerPoint.

 2    A.    Yes.

 3    Q.    Did you present each one of these slides?  And by

 4    that I mean, did you display it for those in attendance

 5    to see?

 6    A.    Yes.

 7    Q.    Did you speak about the content on each one of

 8    these slides?

 9    A.    Yes.

10    Q.    Do these slides represent not only what you showed

11    to those in attendance, but what you said to those in

12    attendance?

13    A.    Yes.

14    Q.    Okay.  With that foundation, I wanted to look

15    through --

16                   MR. MAJORAS:  Objection.

17                   No foundation, and relevance.

18                   THE COURT:  Let me --

19                   (Proceedings at side-bar:)

20                   THE COURT:  All right.  Foundation is a bit

21    thin.

22                   I mean, we have his memory is that there

23    was --

24                   MR. LANIER:  At least one.

25                   THE COURT:  -- one pharmacist from at least
```

1    one of the three defendants who was there.

2                   MR. MAJORAS:  And no specificity whatsoever

3    on who that pharmacist is or where they were from, what

4    company.

09:24:13  5                   MR. LANIER:  Well, Your Honor, he

6    specifically -- I mean, he's making the presentations

7    here.

8                   THE COURT:  I know he's making the

9    presentation, but if -- I mean this presentation is not

09:24:25 10   different than what he's testified to already, so the

11   fact that he's, you know, he made a presentation about a

12   number of things he's testified to isn't -- isn't

13   relevant unless it was specifically made to these

14   defendants.

09:24:44 15                   And I just -- his memory is so vague, and

16   there doesn't seem to be any written record of who was

17   there, that I'm not sure -- I'm really not sure of the

18   relevance.

19                   MR. LANIER:  Your Honor, the records

09:25:04 20   indicate that there were 410 pharmacists in attendance.

21                   For him to have a memory --

22                   THE COURT:  All right.  There were 410

23   pharmacists in attendance?

24                   MR. LANIER:  Yes, Your Honor.

09:25:13 25                   THE COURT:  I mean, he hasn't said that.

1                    MR. LANIER:  All right.  I'll be glad to

2       ask that, and that's why he can't sit there under oath

3       and swear, "Oh, I know that there were three from CVS or

4       I know they were --"

09:25:25  5                    THE COURT:  Does it say what geographic

6       area?  Were they all from Virginia?

7                    MR. LANIER:  I don't know.  I'll have to

8       ask him that.

9                    THE COURT:  Well, let's see.  I want to

09:25:32 10      know who, who from the industry was there.

11                    MR. LANIER:  Okay.

12                    THE COURT:  All right?

13                    MS. FIEBIG:  Your Honor, we can confirm

14       that Giant Eagle was not there and does not operate in

09:25:43 15      Virginia.

16                    THE COURT:  That doesn't mean they weren't

17       at the conference.  He didn't talk about Giant Eagle.

18                    MR. LANIER:  Yeah, he does not know --

19                    THE COURT:  He didn't say Giant Eagle was

09:25:49 20      there at all.

21                    MR. LANIER:  Right.

22                    THE COURT:  In fact, I think he effectively

23       said they weren't there, so -- were the others.

24                    MR. LANIER:  All right.  I'll ask that,

09:25:57 25      Your Honor.

```
 1                      Thank you.
 2                      (End of side-bar conference.)
 3      BY MR. LANIER:
 4      Q.    Do you have any basis for knowing numbers that
 5      would have attended this conference?  Are we talking
 6      handful, or what?
 7      A.    It depends.
 8                      We, for instance, in Florida, I think we
 9      had over 1,700 pharmacists attend.
10                      Sometimes it's a hundred or less.  It just
11      depends.
12                      We've had 400, 600, you know, 300.  It just
13      depends on the location.
14                      And it's a two-day conference, so each day
15      is a separate presentation, so it just depends on, like,
16      Sunday might be attended more than Saturday.  It just
17      depends.
18      Q.    All right.  If we look at the DEA records and they
19      record 410 in attendance at this, would that be
20      consistent with your memory or would that refresh your
21      memory?
22                      MR. MAJORAS:  Objection.
23                      Leading.
24                      THE COURT:  Yeah, I'll sustain that.
25                      MR. LANIER:  Okay.
```

            1              THE COURT:  If there are records, you can

            2    show him the records.

            3    BY MR. LANIER:

            4    Q.    Okay.  While we effort to pull those, I want to

09:27:15    5    make sure that I ask you, who from -- if you are -- what

            6    is your comfort level at saying that there were

            7    pharmacists from the national chains that we have in this

            8    courtroom, at least one, two or three of them, in

            9    attendance at this Virginia seminar?

09:27:37   10    A.    Oh, I'm sure there was at least one.  At least one

           11    was represented.

           12              As I said, I don't believe, though -- I

           13    can't recall any conference where we didn't have at least

           14    one person from a chain representing.

09:27:53   15    Q.    All right.  And by "Chain," you mean Walgreens, CVS

           16    or Walmart?

           17    A.    Yes.

           18    Q.    And this presentation that was done in Norfolk,

           19    Virginia, would it have been limited to who could attend,

09:28:07   20    or anything like that?

           21    A.    No.

           22              It was sent to every -- the invitation was

           23    sent out by the Board of Pharmacy to every registered

           24    location, every registered pharmacy, and then every

09:28:21   25    registered pharmacist in the state that the Board had on

                1    its roster.

                2    Q.    So would the attendance invitation at least be to

                3    Virginia pharmacists?

                4    A.    Yes.

09:28:32        5    Q.    Okay.  All right.

                6              MR. LANIER:  Your Honor, with that

                7    foundation of --

                8              THE COURT:  Well, I --

                9              MR. LANIER:  Oh.

09:28:54       10              (Proceedings at side-bar:)

               11              THE COURT:  All right.  Mr. Lanier, if you

               12    have a document that shows that there were 410 Virginia

               13    pharmacists there, coupled with what he said, I think it

               14    is more probable than not that a bunch of them were in

09:29:23       15    the national chains.

               16              Is it conceivable that you could have 410

               17    Virginia pharmacists and none of them were at these three

               18    national chains?  It's conceivable, but it's certainly

               19    not probable.

09:29:34       20              MR. LANIER:  Okay.  Your Honor, what we're

               21    printing for you right now is the press release that was

               22    done by the DEA that's still on their website.  It speaks

               23    specifically of this conference.

               24              It calls it out by name, says the

09:29:47       25    conference was developed and designed to address the

1    growing problem of diversion of pharmaceutical controlled

2    substances throughout the United States.

3              Over 410 pharmacists, pharmacy technicians,

4    loss prevention personnel, and pharmaceutical students

5    attended.  They received seven hours of instruction on a

6    variety of topics.

7              THE COURT:  All right.  Well, if he -- if

8    he can authenticate that, I'll allow him to proceed.

9              MR. LANIER:  All right.  Thank you, Your

10   Honor.

11             MR. MAJORAS:  Your Honor --

12             (End of side-bar conference.)

13   BY MR. LANIER:

14   Q.   Mr. Rannazzisi, we are going to run a hard copy up

15   for the Court's records, but for purposes of this I'll

16   just put it down here.

17             Are you familiar with the U.S. Department's

18   Diversion Control Division?

19   A.   Yes, sir, I am.

20   Q.   And where it talks about the DEA meetings and

21   events, the Pharmacy Diversion Awareness Conference of

22   May -- oops -- of May 30th and 31st, 2015, Norfolk,

23   Virginia, is that the same conference?

24   A.   Yes, it is.

25   Q.   Where it says, "The Drug Enforcement held a

1    pharmacy diversion conference ,"and it says "Over 410

2    pharmacists, pharmacy technicians, loss prevention

3    personnel, and pharmaceutical students attended," does

4    that -- is that something you would recognize as being a

09:31:28  5    fair representation of the numbers attending?

6    A.    Yes.

7              If it's in their website in that manner,

8    then it's based on the roster.  Because it's a CE

9    program, everybody would be rostered, and so they would

09:31:42 10    have an accurate count.

11              MR. MAJORAS:  Your Honor, I'm just going to

12    lodge the same objection.

13              THE COURT:  All right.  Overruled.

14    BY MR. LANIER:

09:31:56 15    Q.    And in that regard -- in that regard, sir, I want

16    to go through a few of these slides.

17              Some of the testimony is what you've

18    already told us.  Those, I don't want to spend any time

19    on because it's redundant, and it's just simply to make

09:32:12 20    sure that everybody understands you made the

21    presentation.

22              Okay?

23    A.    Yes, sir.

24    Q.    But some of it's got some new material.

09:32:19 25              First, why do you put the financial

Direct - Rannazzisi/Lanier                    1660

1    disclosure statement in here?

2    A.    Because it's a continuing education program, and I

3    have to show that I have no bias.

4    Q.    All right.  You have the next slide that you wrote,

09:32:33  5    "Goals and objectives."

6              Do you see that?

7    A.    Yes, sir.

8    Q.    I'd like you to discuss three of those that seem

9    relevant to our case.

09:32:42 10              The first bullet point, can you tell the

11    jury what it is and why you wrote it?

12    A.    Because we always start off every presentation the

13    DEA does with an analysis of the problem.  We show that,

14    you know, where we were, where we started, and how the

09:32:57 15    problem increased over time.

16              So it could be the abuse of

17    pharmaceuticals, it could be ER visits, it could be the

18    distribution of controlled substances into a certain

19    region or area.

09:33:08 20              We just want them to know where we start

21    and where we are now, and that forms the foundation of

22    the presentation.

23    Q.    Would you look at your third bullet point goal and

24    objective, and read it, and let us know what you meant by

09:33:24 25    it?

1  A.      "Identify methods of pharmaceutical diversion and

2  discuss how the pharmacist can prevent diversion in the

3  retail setting."

4          Again, we want -- this is geared more

09:33:35  5  towards the pharmacist.  We want them to understand how

6  diversion occurs at the pharmacy level, and we want them

7  to understand what their role is in preventing diversion,

8  how they could stop diversion, and then give

9  a -- practical examples of how that occurs at the

09:33:57 10  pharmacy level.

11  Q.   And then the final goal and objective, "Discuss the

12  pharmacist and corresponding responsibility," why did you

13  speak on that?

14  A.   Because the pharmacist principal method of stopping

09:34:12 15  diversion is to exercise corresponding responsibility at

16  the presentation of those prescriptions.

17          He's the last stop, the last check before a

18  prescription gets into the hands of somebody that might

19  hurt themselves, and that's why corresponding

09:34:27 20  responsibility is important and we spend time on

21  corresponding responsibility during -- throughout the

22  presentation.

23  Q.   All right.  I want you to look at Slides 19 and 20.

24          Slide 19 has drug overdose mortality rates

09:34:43 25  per 100,000 people in 1999.

Direct - Rannazzisi/Lanier                    1662

1       Do you see your slide?

2   A.   Yes.

3   Q.   If you look at Ohio as an example, can you explain

4   what the data is, or what it means?

09:34:57 5   A.   Those are -- the -- less than -- greater than five

6   but less than 10 persons died per 100,000 people in 1999.

7   Q.   And --

8   A.   Based on an overdose mortality.

9   Q.   And then you put another slide, your next slide,

09:35:17 10   Slide 20, is the same statistics but for 2010, eleven

11   years later.

12       Is that correct?

13   A.   Yes.

14   Q.   And if we look at it in eleven years later, take,

09:35:29 15   for example, Ohio, is it still greater than five and less

16   than 10?

17   A.   No, it's greater than 15, less than 20.

18   Q.   And why is that alarming to you, or was that

19   alarming to you such that you put it in there?

09:35:43 20   A.   Well, it just shows that with the pharmaceutical

21   diversion, what we were seeing was an uptick, an

22   increase, almost doubling of the drug mortality.

23           And that's why that slide's there, just to

24   impress upon them that their responsibility is extremely

09:36:04 25   important to prevent mortality from continuing, drug

1    mortality continuing to occur.

2    Q.    All right.  Next, I want to jump to Slides 102 and

3    103.

4                   102 is one where you've got a booklet.

09:36:19 5              Tell us about the cover of the booklet.

6    A.    Yeah, that's the -- from the International

7    Narcotics Control Board.  These are the narcotic drug

8    distribution -- narcotic drug consumption numbers for the

9    world from all countries.  All countries that are

09:36:40 10  signatories to certain conventions have to submit what

11   their consumption numbers are.

12   Q.    So if we look at the next page, Slide 103, you've

13   pulled out some statistics that I'd like you to discuss.

14                  The first bullet point, can you tell us

09:36:57 15  what you are saying there?

16   A.    For the United States, the United States consumed

17   99 percent of the world's Hydrocodone.

18   Q.    Why is it significant to you that the U.S. consumes

19   99 percent of the world's Hydrocodone?

09:37:19 20             MS. FIEBIG:  Objection, Your Honor.  This

21   is expert testimony.  He hasn't established that he knows

22   that the world consumes 99 percent -- that the U.S.

23   consumes 99 percent.

24                  THE COURT:  Well, I agree.  I don't think

09:37:28 25  you've laid the foundation for all of this yet.

1   BY MR. LANIER:

2   Q.    All right.  Sir, when you as the DEA representative

3   presented, made this presentation to the pharmacists,

4   what were you -- why did you turn to the International

5   Narcotics Control Board for those statistics?

6   A.    Because they maintain the statistics for the world

7   on consumption.

8               We all have to submit our consumption

9   records, our receipt and consumption records to the INCB.

10              In fact, at DEA there's a unit that that's

11  all there -- that's what their responsibility is, to send

12  all the consumption records to the INCB.

13              That's included in this report.  And I

14  personally reviewed that report, and the statistics that

15  are in this slide were taken directly from that report

16  that I personally reviewed.

17  Q.    And did you find that report to be reliable such

18  that you could rely on it in your job, to do your job?

19  A.    I relied on that report to do my job, but also to

20  make these presentations.

21              And that report was updated every year and

22  the slides were updated accordingly.

23  Q.    All right.

24              MR. LANIER:  Then with that, Your Honor,

25  may I ask a question about why he chose that statistic?

1        MR. DELINSKY:  Objection.

2        THE COURT:  You may.

3        MR. DELINSKY:  Hearsay, Your Honor.

4        THE COURT:  Overruled.

09:38:58  5   BY MR. LANIER:

6    Q.    Sir, please tell us why as the DEA man making this

7    presentation, person making this presentation, why did

8    you choose to put that bullet point in there.

9    A.    Because in the United States at this point in time

09:39:10 10   Hydrocodone was the number one prescribed drug in the

11   United States, period.

12              It was the most prescribed drug of any

13   drug, lipid medication, cardiac medication, thyroid

14   medication.  It was the number one prescribed drug.

09:39:27 15              And in my opinion, while I was working at

16   DEA, we saw wholesale abuse of Hydrocodone, and it

17   just -- it struck me that we were consuming 99 percent of

18   the world's Hydrocodone, we -- it was the number one

19   prescribed drug, and there had to be something going on

09:39:52 20   other than appropriate medical care with this drug.

21   Q.    The only other bullet point I need to talk to you

22   about on this page is the second one.

23              "U.S. was the country with the highest

24   consumption of Oxycodone, 82 percent."

09:40:08 25              Why did you choose that bullet point to put

1    into your presentation?

2    A.    Because Oxycodone was right up there with

3    Hydrocodone as the most abused opioids in the United

4    States at that time.

09:40:20  5    Q.    All right.  The next slide I draw your attention to

6    is Slide 126.

7              Would you tell us why you chose to put this

8    slide in there and what it means?

9              MR. DELINSKY:  Same objections, Your Honor.

09:40:42  10              THE COURT:  Overruled.

11    A.    What we were -- this slide, what this slide

12    reflected was the increase in opioid sales as related to

13    the increase in opioid deaths, and then the increase in

14    opioid treatment admissions.

09:41:03  15              And what it showed is as opioid sales

16    increased, opioid deaths increased, and opioid treatment

17    admissions also increased.

18    BY MR. LANIER:

19    Q.    Sir, you had another slide that is Slide 154.

09:41:18  20              I showed this to the jury in opening, but

21    I'd like you to explain why you had this slide, put this

22    slide in your presentation, and what it meant.

23              MR. DELINSKY:  Objection.

24              Hearsay.

09:41:36  25              THE COURT:  Well, you've got to lay a

 1    foundation.

 2    BY MR. LANIER:

 3    Q.    All right.  Sir, did you prepare Slide 154?

 4    A.    I -- I began the preparation of Slide 154.  I knew

09:41:49  5    what I wanted, but technically I couldn't do it so I

 6    passed it off to my tech team.  I think it was John

 7    Bostic who actually did the slide, sent it back to my

 8    exec, and we put it in the slide.

 9              But this is exactly what I wanted.  He's

09:42:04 10    really good with PowerPoint.

11    Q.    In other words, if we were doing your actual

12    PowerPoint, is this doing what they call the animation

13    feature in PowerPoint, where it makes the arrow and then

14    changes the colors as it goes along?

09:42:15 15    A.    Yes.

16              It was -- it was animated, and it was they

17    call it the slide progression, where it moves.

18              It starts in Florida.  If you see the

19    presentation, it would go to Florida, and then I'd click,

09:42:26 20    and it would pop up Georgia with the slide, and then

21    click, and it would go to Tennessee, and click, and go to

22    Kentucky, and so on.

23    Q.    Now, in this regard, where did you get your

24    information from?  And by that I mean, is this something

09:42:42 25    where you were just relying on what people told you or

1      was this information that you knew based upon your

2      investigations?

3      A.    No, we knew the investigations.

4            I can't take credit for thinking about this

09:42:57  5      slide, because this slide evolved from a conversation I

6      had with the head of Georgia Bureau of Narcotics.  He was

7      telling me that --

8      Q.    We don't want to ask you what he was telling you.

9      A.    Okay.

09:43:13 10            But he informed me that they were -- well,

11      the fact is, based on my conversation, I decided that a

12      slide progression would be in order to show that the

13      migration of the clinics moving from one point to another

14      was important.

09:43:27 15      Q.    And when you were making this presentation as the

16      DEA, were you basing it upon your investigation into

17      these matters, whether it's discussing it with one person

18      or the cumulative knowledge you had from Florida, or

19      whatever it may be?

09:43:44 20      A.    It was -- it was based on the investigations that

21      we were doing and that we were also doing in conjunction

22      with the states, yes.

23      Q.    Okay.  All right.  And what were you trying to

24      convey in this slide?

09:43:58 25            MR. DELINSKY:  Objection, Your Honor.

```
         1    BY MR. LANIER:

         2    Q.    What was the DEA concern?

         3                    MR. DELINSKY:  Sorry, Mr. Lanier.

         4                    Objection.  Hearsay.

09:44:03 5                    THE COURT:  I'll allow the second question.

         6    BY MR. LANIER:

         7    Q.    What was the DEA concern you were trying to

         8    express?

         9    A.    Well, we were trying to show that as we

09:44:14 10   concentrated on one area, they would migrate away from

         11   that area into another area.

         12                   So the pain clinics were mobile, they were

         13   just -- they kept moving, and we were just always one

         14   step behind them; but they were always moving.

09:44:28 15                   So what we were trying to say is the pain

         16   clinics aren't just in Florida, they're everywhere.

         17                   If I -- if I squeeze a balloon in Florida

         18   they're going to move somewhere else, and that's why you

         19   have to be vigilant, because they're in your backyard,

09:44:44 20   just like they're in Florida.

         21   Q.    So did you find it also present in Ohio on this

         22   migration?

         23   A.    Yes.

         24   Q.    If we look at Slide 155 next, did you make a

09:45:01 25   presentation point that the vast majority of patients
```

1    visiting Florida pain clinics come from out of state?

2    A.    Yes.

3    Q.    Did you tell them which states were notable from

4    your investigations?

09:45:17 5    A.    Yes, I did.

6    Q.    And was Ohio one of those states?

7    A.    Yes, it was.

8    Q.    And so Slide 155, why did you put Ohio in there as

9    one of the states where it fits under "Vast majority of

09:45:36 10    patients visiting Florida pain clinics come from out of

11    state"?

12               Why Ohio?

13    A.    Because we had information that we were acting on

14    that Ohio, citizens of Ohio were traveling down to

09:45:48 15    Florida to visit pain clinics and then come back.

16    Q.    Okay.  Sir, if you look now at Slide 181, this is

17    stuff you discussed yesterday, so I don't want to get

18    into it in depth.  It's repetitive.

19               But did you at least present on the checks

09:46:08 20    and balances of the Controlled Substances Act?

21    A.    Yes, sir, I did.  I did.

22    Q.    And did you talk about the obligation of

23    distributors?

24    A.    Yes, sir.

09:46:24 25    Q.    And again, the distributors are what you called

1    yesterday what?

2    A.    Distributors are wholesalers, they are the people

3    who move the drugs from the manufacturers into the

4    pharmacies.

09:46:36 5    Q.    All right.  And did you also speak about the

6    responsibility of pharmacists?

7    A.    Yes.

8    Q.    I'm showing you Slide 189.

9              Tell us, first of all, what is the AACP

09:46:53 10   program material?  What does that mean that you reference

11   there?

12   A.    I believe that's the American Association of

13   Colleges of Pharmacy.

14   Q.    All right.

09:47:01 15   A.    And the program material is it's the material they

16   handed out during their -- during their annual event.

17   Q.    Why did you think it important to put a slide that

18   says that pharmacists have a responsibility to protect

19   patients, as well as the public, from the abuse, misuse,

09:47:21 20   and diversion of prescription drugs?

21   A.    Because from the time that I was a pharmacy

22   student, that was -- that was what a pharmacist was

23   supposed to do.

24             Pharmacist is not a clerk.  He's not just

09:47:40 25   going to hand out prescriptions.

1        A pharmacist has certain skill sets that

2   nobody else in the health delivery system has, and the

3   pharmacist has to use those skill sets to protect their

4   patients.

5        What they're doing is, what AACP did is

6   just to remind the pharmacists that they're there for a

7   reason.

8        And in our case, when we talk to the

9   pharmacists, we impressed upon them that that's what

10  corresponding responsibility is, and that's what you're

11  supposed to be doing.  You're supposed to be protecting

12  your patients, protecting the integrity of the system,

13  making sure that they are not harmed by their --

14  Q.   Now, your slide says not only a responsibility to

15  protect patients, but it talks "as well as the public."

16       How is the public protected from abuse,

17  misuse, and diversion?

18  A.   Because in addition to protecting your patients,

19  some of the patients are drug-seekers, but they're

20  drug-seekers for a different reason.  They're not

21  necessarily drug-seekers because they're going to ingest

22  their drugs and harm themselves.

23       They're drug-seekers because they're

24  getting the drugs for sale in the public domain, you

25  know, out in the communities.

1        And so that's how you are protecting.

2   Again, the pharmacist is there to protect, make sure the

3   drugs aren't diverted.

4   Q.    Your next slide that I want to draw attention to is

09:49:00  5   Slide 190, still under "Checks and balances" under the

6   "Controlled Substances Act."

7        But you say there that pharmacists are the

8   last line of defense.

9        What did you mean by that?

09:49:09 10  A.    It's the last stop in the health care delivery

11  before the prescription is handed to the patient, and so

12  the pharmacist using corresponding responsibility, that's

13  the last line of defense before that prescription can get

14  into the hands of someone that's not using it for a

09:49:27 15  medical purpose.

16  Q.    And Slide 192, you've got a picture of a kind

17  pharmacist there with the same tag line.

18        Fair?

19  A.    Yes.

09:49:36 20  Q.    And is it an important role in the whole system,

21  the closed system, for the pharmacist to see their job as

22  the last line of defense?

23        MR. MAJORAS:  Objection.

24        Opinion testimony.  Leading.

09:49:52 25        THE COURT:  All right.

```
 1              MR. LANIER:  It's opinion, Judge.  I
 2    withdraw it.
 3              THE COURT:  Also, leading.
 4              MR. LANIER:  Yeah, I'll pull that down,
 5    Your Honor.  I apologize.
 6    BY MR. LANIER:
 7    Q.   Next, I'd like to draw your attention to Slide 195.
 8              This is the first of a series of slides
 9    where you talk about potential red flags.
10              Can you explain, please, what you meant by
11    that?
12    A.   A red flag is just an indicator for the pharmacist,
13    upon prescription presentation.
14              So if -- when the pharmacist gets the
15    prescription, there are certain things that he reviews as
16    part of the elements of the prescription, and some things
17    just jump out at you.
18    Q.   The jury's heard about these from Mr. Catizone, and
19    I'm not going to be repetitive except to ask you, is this
20    the kind of thing that was made up for a courtroom when
21    you did this?
22    A.   No.
23              These, these red flags were actually
24    observed during investigations that we had related to
25    pharmacies, bad pharmacies, bad pharmacists.
```

1       Q.    You give, I don't know, six on the first page and

2       then you've got another slide, number 196, where you give

3       another five.

4                       Are these eleven the only red flags that

09:51:19  5       exist?

6       A.    No.  No.  Absolutely not.

7                       But we base these red flags on the cases

8       we're discussing that day, and so these are red flags

9       that were related to two cases.

09:51:36 10                       The previous slide, *East Main Street*

11      *Pharmacy* and the *Holiday* case.

12      Q.    All right.  And we'll talk about *Holiday* in

13      particular in a little bit, but to remind us, is *Holiday*

14      a case that was against which pharmacy?

09:51:48 15      A.    CVS.

16      Q.    Then you put another slide, 197, which you only

17      have very little verbiage on it, just a few words.

18                       What do you say on Slide -- what were you

19      saying with Slide 197?

09:52:07 20      A.    Well, it's a slide that we put up, and I said,

21      well, the way I present it is I say, "Well, you know, now

22      that I've showed you what are the red flags, what do you

23      do?  What do you do with these red flags?"

24                       And so what happens?  You resolve.

09:52:24 25                       And then I discuss the resolution process.

1    Q.    Which is Slide 170 -- I mean 198.  "Resolution is

2    comprised of many factors."

3    A.    Yes.

4    Q.    Can you give us an idea of why you wrote this slide

09:52:41 5   and what you were trying to explain?

6    A.    This slide is written to give them kind of a map,

7    guidelines, to resolution.

8               We want them to understand that this

9    process is not a one-step process; call the doctor, the

09:53:02 10  doctor says okay.  There's many steps to the process.

11              But each one of those steps is crucial

12   because --

13              (Pause.)

14              MS. SULLIVAN:  I'm sorry, Your Honor.  My

09:53:16 15  apologies, Your Honor.

16              MR. LANIER:  Objection to relevance.

17              (Laughter.)

18   BY MR. LANIER:

19   Q.    Go ahead.  Sir, the question was, you were saying

09:53:25 20  "This slide was written to give them kind of a map,

21   guidelines, to resolution.  We want them to understand

22   this process is not a one-step process."

23              Continue.

24   A.    It's not a one-step process.

09:53:34 25             Just calling the doctor is not enough.  If

1   it's a bad doctor, he's going to say "The prescription's

2   okay."

3                You've got to -- you've got to ask.  You've

4   got to examine the doctor, say, "Well, explain exactly

5   what you're trying to" -- "what your goals are.  What are

6   you doing here?"

7                Because chances are the doctor's going to

8   be very open, and he might say there was a problem with

9   this prescription, and, you know, then they can open the

10  dialogue.

11               But if the doctor just says, "Look, it's

12  fine, don't worry about it, fill it," that's not

13  corresponding responsibility analysis.  You're not doing

14  your job.  You're just doing, you know, what a

15  nonprofessional would do, just accept the offer.

16               You're abdicating your responsibilities.

17  Q.   All right.  The last Slide I'd like to draw your

18  attention to in this deck is the very next one, "Who do I

19  call to report a practitioner?"

20               Why in your job at the DEA did you put this

21  slide on here, and then can you tell us what it meant?

22  A.   During these PDACs, these presentations, we have

23  pharmacists come up during breaks or afterwards and ask

24  us, "I've got a bad doctor, what should I do with it,

25  what should I do with them."

1          And I thought that maybe we should start,

2     you know, putting that into the presentation, because

3     obviously they don't know how to handle bad doctors.

4          So, you know, we always go to State Board

09:55:03  5     of Pharmacy, Medicine, Nursing or Dental, that's also the

6     first step, because eventually they're going to call us.

7          But then you can go state and local county

8     police, the DEA local office, and the tactical diversion

9     squads.  The health department, because some states the

09:55:20 10     state health department has oversight over the medical

11     practitioners.

12          And then finally, if it's Medicare or

13     Medicaid fraud, which we have seen a lot of, we ask them

14     to call HHS OIG.  And that was so important that HHS OIG

09:55:37 15     started going to all the presentations with us because

16     they were picking up tips on Medicare and Medicaid fraud

17     during those presentations, and they actually gave

18     presentations on Medicare and Medicaid fraud to the

19     people, to the participants.

09:55:49 20     Q.    All right.  Setting aside that PowerPoint now, on

21     specific defendant interactions, I want to talk to you

22     about three defendants in particular.

23          Let's start with CVS.

24          MR. LANIER:  Your Honor, may I go side-bar

09:56:22 25     for just a moment?  Take it out of my time, but I just

1     realized something.

2                    (Proceedings at side-bar:)

3                    MR. LANIER:  Your Honor, I spent very, very

4     minimal time with this gentleman, and I did not myself

09:56:43  5   warn him not to tell amounts, through your motion in

6     limine on amounts.

7                    I don't think he would blurt that out, but

8     I would feel a lot safer if you or I or the defendants

9     could go say to him somehow right now, "Just make sure

09:57:03 10   you don't talk about any amounts or what any agreements

11    or penalties were in terms of money."

12                   MR. DELINSKY:  Your Honor, I'd only ask

13    that that admonition be made outside the presence of the

14    jury.

09:57:19 15                   THE COURT:  All right.

16                   MR. LANIER:  It doesn't come up on *Holiday*.

17                   THE COURT:  All right.  Just say

18    that -- why don't you say specifically, I'm not going to

19    ask you any of the details.

09:57:35 20                   MR. LANIER:  Of the penalties?  No.

21                    I can try to say it, and if not, I'll hold

22    those questions on the CVS agreement until a break.

23                   THE COURT:  Yeah.  Why don't you do that,

24    because we'll take a break in half an hour.

09:57:51 25                   MR. LANIER:  Okay.

1            THE COURT:  And you can caution him that

2    you're not going to ask and he's not to --

3                    MR. LANIER:  Got it.  Got it, Judge.

4            THE COURT:  Answer that way.

09:57:58  5            MR. LANIER:  I got it, Your Honor.

6                    Thank you, Judge.

7                    (End of side-bar conference.)

8    BY MR. LANIER:

9    Q.    All right.  Mr. Rannazzisi, I need you to focus

09:58:12 10    very carefully on my questions, please.

11    A.    Okay.

12    Q.    And keep your answers tight.

13    A.    Okay.

14    Q.    All right.  Tell us, first, what your involvement

09:58:27 15    was -- the jury's heard about *Holiday*, the *Holiday CVS*

16    case.

17                    You referenced it just briefly a few

18    moments ago, right?

19    A.    Yes.

09:58:36 20    Q.    We spoke yesterday about the various processes that

21    are involved in trying to resolve a situation that comes

22    up.

23                    Do you remember that discussion?

24    A.    Yes.

09:59:00 25    Q.    I think this was the PowerPoint or the presentation

Direct - Rannazzisi/Lanier                          1681

1    card that I made while we were talking, an enforcement

2    proceeding.

3                    Was *Holiday* an enforcement proceeding

4    against CVS?

09:59:15   5                    MR. DELINSKY:  Objection, Your Honor.

6                    THE COURT:  Overruled.

7    A.    Yes, it was.

8    BY MR. LANIER:

9    Q.    Do you know -- well, where were you involved in

09:59:27  10    this enforcement proceeding?  You personally, because

11    you're here as a personal witness.

12                    So what was your level of involvement?

13                    MR. DELINSKY:  Your Honor, could we

14    side-bar for 10 seconds?

09:59:41  15                    THE COURT:  All right.

16                    (Proceedings at side-bar:)

17                    MR. DELINSKY:  Your Honor, this already is

18    extremely misleading.

19                    This case was not against CVS.  It was a

09:59:59  20    case against two particular pharmacies, the numbers of

21    which are identified in every document associated with

22    the case, including the *Holiday* opinion and order.

23                    That needs to be made clear.  It's not

24    clear.

10:00:10  25                    THE COURT:  All right.  He can make that

1       but, you know, the order may have been -- CVS is the

2       registrant, so --

3                       MR. LANIER:  Yeah.

4                       THE COURT:  That is against CVS, the

10:00:18  5       registrant, but you should make clear that it involved

6       two stores.

7                       MR. LANIER:  Two stores.

8                       THE COURT:  And I guess in Florida.

9                       MR. LANIER:  I will, Your Honor, and I

10:00:27 10       guess --

11                      MR. DELINSKY:  CVS was not the registrant.

12                      Each individual store is the registrant.

13                      THE COURT:  I don't think so.

14                      MR. LANIER:  Yeah, you're right, Your

10:00:34 15       Honor, and the *Holiday* decision even says it applies to

16       the CVS big-time entity.

17                      THE COURT:  All right.

18                      MR. LANIER:  Thank you.

19                      (End of side-bar conference.)

10:00:44 20       BY MR. LANIER:

21       Q.    Now, the *Holiday* case pertained to how many CVS

22       stores were you all looking at?

23       A.    There was two stores in Sanford, Florida, 219 and

24       5195.

10:01:10 25       Q.    And the two stores in Sanford, Florida, both

1    registrants?

2    A.    Both were DEA registrants, yes.

3    Q.    All right.  So if we go back to the enforcement

4    proceeding, did you have an administrative action

10:01:35  5    triggered?

6    A.    Yes, we did.

7    Q.    Did y'all proceed with that administrative action?

8    A.    Yes, we did.

9    Q.    Did you reach a point of even the written decision?

10:01:51  10    A.    Yes.  A final order was handed down by the

11    Administrator, yes.

12    Q.    Tell us what time range we're looking at here.

13    A.    The administrative inspection warrant was done at

14    the end of 2011.

10:02:10  15          The immediate suspension order and order to

16    show cause was done in 2012, probably February of 2012,

17    and I think the final order was handed down somewhere

18    later in the year, 2012.

19    Q.    All right.  And so --

10:02:35  20          MR. LANIER:  I'm sorry, I thought I heard

21    Your Honor.

22          Bad hearing.

23          THE COURT:  No, I was silent.

24          MR. LANIER:  Okay.

10:02:42  25          THE COURT:  I was.

1           MR. LANIER:  I'm nervous, Judge.

2      BY MR. LANIER:

3      Q.    All right.  So you said that you got the written

4      decision at the end of 2012.

5                 I'd like the jury to hear, please, where

6      you had personal touches in that process, Joe Rannazzisi.

7      A.    I had -- I oversaw the investigation pretty much

8      from start-to-finish.

9                 My -- I had people from headquarters

10     deployed to help out with that investigation.  It

11     was -- it was an investigation that pretty much I oversaw

12     right through the end, I mean right until we got the

13     final order.

14     Q.    Okay.  And in overseeing that investigation, did

15     you issue yourself warnings or orders to show cause or

16     any of the things that you spoke to us about yesterday in

17     this process?

18     A.    I approved the orders to show cause.

19                I believe those were ISOs, immediate

20     suspension orders, so the Administrator ultimately signed

21     them.

22                Normally an order to show cause would be

23     signed by the Deputy Assistant Administrator, which at

24     that point in time during my tenure was me.

25                But if we go after -- if we do an ISO or

Direct - Rannazzisi/Lanier                    1685

         1    seek an ISO or -- it means that we're immediately going

         2    to take, take their registration, and that is done

         3    through a -- through the Administrator.

         4    Q.    We don't know -- I don't know what an ISO is.

10:04:23 5              What's an ISO?

         6    A.    An ISO is an immediate suspension order.

         7              During an order to show cause, I serve you

         8    an order to show cause as a pharmacy, but you could still

         9    practice until the case is adjudicated, so you could

10:04:38 10   still handle controlled substances.

        11              An immediate suspension order is special.

        12    An immediate suspension order means that what you're

        13    doing is an imminent threat -- well, back then it meant

        14    what you're doing is an imminent threat to public health.

10:04:52 15   Q.    All right.

        16    A.    And we have the authority in the Controlled

        17    Substances Act to take the registration if the

        18    Administrator finds that there's an imminent threat.

        19    Q.    Okay.

10:05:04 20   A.    So we executed the order to show cause, and then

        21    took -- we also executed an immediate suspension order.

        22    Q.    And in this regard, was there ultimately a

        23    resolution -- and this is a yes or no question -- was

        24    there ultimately a resolution with CVS on these matters?

10:05:34 25   A.    Yeah, a final order was handed down by the

1    Administrator, and they lost the registrations for those

2    two stores.

3    Q.    Okay.  Does the order itself contain the

4    language -- so I don't mean to get you to repeat

10:05:56  5    it -- does the order itself contain the language of the

6    findings of the Administrative Law Judge?

7    A.    Yes.  The findings of the Administrative Law Judge

8    are embedded in the final order.

9    Q.    Did you end up testifying, either written or

10:06:14 10    orally, in that trial?

11    A.    I didn't testify in the administrative hearing, but

12    I did file a written declaration regarding my role and

13    what I was involved with with the Court in D.C. that was

14    also looking at the case on a temporary restraining order

10:06:36 15    that was filed.

16    Q.    All right.  The next set of events I'd like to talk

17    to you about concern Walmart, and specifically the

18    agreement that was reached in 2011 that you signed

19    arising out of California.

10:07:00 20                    Do you have memory of that?

21    A.    Yes, I do.

22    Q.    Without going into the details of the agreement,

23    would you please give us a general idea of what was

24    involved in that case?

10:07:19 25                    And I've got the document, if it helps you

1      to look at it to refresh your memory.

2                      MR. MAJORAS:  Objection.  We just renew our

3      objection on this, Your Honor.

4                      THE COURT:  Overruled.

10:07:28  5    A.    I believe that case -- well, that case involved a

6      Walmart Pharmacy in San Diego.

7      Q.    You are correct.

8                      I'm going to put it down so you can look at

9      it.  I've got --

10:07:45 10                    MR. LANIER:  Your Honor, this is redacted

11     appropriately.

12     Q.    -- Plaintiffs' Exhibit 14711.  Is this -- is that

13     your signature at the end for the Department of Justice?

14     A.    Yes, it is.

10:08:07 15    Q.    This administrative agreement in the background, it

16     talks about the OTSC.

17                     What does that stand for?

18     A.    Order to show cause.

19     Q.    All right.  So that's back in our picture we had

10:08:24 20    looked at, that's one of the processes along the way?

21     A.    Yes, sir.

22     Q.    Here it is.  I can't find it.

23                     All right.  "Order to show cause alleged

24     that Walmart," and that's a number.  Is that the

10:08:42 25    registrant number, to your understanding?

1    A.    No.  That's their store number.

2    Q.    Oh, okay.  So that Walmart store, which is in San

3    Diego, according to the previous paragraph, "improperly

4    dispensed controlled substances to individuals based on

10:09:02  5    purported prescriptions issued by physicians who were not

6    licensed to practice medicine in California."

7              Is that appropriate, the conduct?

8    A.    Depends on the state law, but generally no.

9    Q.    "Dispensed controlled substances to individuals

10:09:26 10    located in California based on Internet prescriptions

11    issued by physicians for other than a legitimate medical

12    purpose and/or outside the usual course of professional

13    practice, in violation of federal and state law."

14              How is that allegation, if true, a

10:09:45 15    violation of the federal law that you were seeking to

16    enforce as you understood it in the DEA?

17    A.    During my time, those Internet prescriptions, as I

18    explained yesterday, generally there was no bona fide

19    patient/doctor relationship.

10:10:05 20              They were -- they were obtained over the

21    Internet and, therefore, they were invalid.  And so

22    that's why the order to show cause was issued.

23    Q.    All right.  You continued to note, "Three,

24    dispensed controlled substances to individuals that

10:10:23 25    Walmart Pharmacy" and it gives the number, "knew or

Direct - Rannazzisi/Lanier 1689

1    should have known were diverting the controlled

2    substances."

3              And it references Appendix A.

4              Can you explain why that was a serious

10:10:39  5  allegation?

6    A.    Again, because it's a violation of the Controlled

7    Substances Act and it's a violation that we would use as

8    a foundation for the order to show cause.

9    Q.    "In addition to the allegations raised in the order

10:10:53 10  to show cause, the DEA's investigation also revealed that

11   that Walmart Pharmacy was allegedly dispensing controlled

12   substances based on prescriptions that contained expired,

13   suspended, and/or invalid DEA numbers."

14             Why is that improper conduct?

10:11:13 15  A.    Because if the prescriber of the medication does

16   not have a valid DEA number or it's suspended, expired,

17   whatever, it's not a valid prescription.

18             The prescription is invalid and, therefore,

19   it's not a prescription.

10:11:33 20  Q.    And "That Walmart Pharmacy was allegedly refilling

21   prescriptions for controlled substances too early."

22             Why is that an issue?

23   A.    Because one of the red flags that we see is

24   patients going back to the pharmacy way too early to get

10:11:49 25  medication.

1      Q.    All right.  Now, in this agreement that was entered

2      into, there are certain -- if we go to Page 2 --

3      obligations that Walmart took upon itself as part of the

4      agreement, but before we read those, I think in fairness

10:12:08  5      we need to note point number two.

6                 Do you see the number two?

7      A.    Yes, sir.

8      Q.    "This agreement is neither an admission by Walmart

9      of liability or of any allegations made by the DEA in its

10:12:24 10      order to show cause and its investigation of Walmart

11      Pharmacy, nor a concession by the DEA that its

12      investigation and allegations are not well-founded."

13                Did I -- I didn't get it exactly

14      word-for-word, but did I basically get that right?

10:12:44 15      A.    Yes, sir, you did.

16      Q.    All right.  So with that no admission or concession

17      language, I'd like you to talk about the obligations that

18      Walmart entered into that you signed off on for the DEA.

19                The first one, "Walmart agrees to maintain

10:13:04 20      a compliance program, updated as necessary, to detect and

21      prevent diversion of controlled substances by the

22      Controlled Substances Act and applicable regulations."

23                What did you understand that to mean?

24      A.    We were directing them to make sure that they had a

10:13:25 25      compliance program, that their pharmacists -- that the

1    corporation and the pharmacists would agree to, that

2    would prevent the diversion of controlled substances,

3    something that would stop diversion at their pharmacies.

4    Q.    And when it says "Obligations of Walmart," did

5    you -- who did you understand you were entering into this

6    agreement with that's on the front page I'm highlighting

7    now?

8    A.    It would be the corporation who owns the

9    pharmacies, and generally it's because the corporation

10   has control over the pharmacies.

11              So if the corporation agrees to the

12   compliance program, we would assume that the pharmacies

13   would move forward with the compliance program.

14   Q.    And in these obligations to "maintain a compliance

15   program, updated as necessary," it says that "It shall

16   include procedures to identify the common signs

17   associated with the diversion of controlled substances,"

18   and then it gives a list, "including but not limited to."

19              Can you go through some of these and

20   explain why these are important for Walmart to agree to

21   maintain a compliance program?

22   A.    Sure.

23              First of all, doctor shoppers, doctor

24   shoppers are individuals who go from one pharmacy to

25   another looking to obtain prescriptions.  They generally

1    have either fraudulent prescriptions or prescriptions

2    from a bad practitioner.

3                  That is easily stopped by looking at the

4    local prescription drug monitoring program.  A pharmacist

10:15:17  5    would look at the Prescription Drug Monitoring Program

6    and he could tell exactly where that patient or that

7    drug-seeker has been.

8                  "Early refills," just a standard statement

9    to the pharmacist that early refill is not -- is not

10:15:32 10    appropriate, unless there's a circumstance.

11                  Now, there's always a circumstance where an

12    early refill is necessary, but not in all cases.  And

13    it's an exception; it's not the rule.

14                  "Altered or forged prescription," teach the

10:15:53 15    pharmacist what to look for in an altered or forged

16    prescription, have a system in place to determine whether

17    a prescription is altered or forged, including calling

18    the doctor.

19                  "Prescriptions written by doctors not

10:16:05 20    licensed to practice medicine in the jurisdiction where

21    the patient is located," that's looking up the doctor,

22    looking up the DEA number, finding out where he's

23    located.

24                  And "Written for a legitimate medical

10:16:18 25    purpose in the usual course of professional practice,"

Direct - Rannazzisi/Lanier                    1693

1    that's corresponding responsibility.  Have a program in

2    place to make sure that the pharmacist is exercising his

3    responsibility for corresponding responsibility analysis.

4    Q.    You go on to note, "The program shall also include

10:16:37  5    the routine and periodic training of all Walmart

6    employees, including new employees, responsible for

7    controlled substances regarding their responsibilities

8    under the CSA and regarding relevant elements of the

9    compliance program."

10:16:54  10              Why is that an important aspect of the

11   agreement?

12   A.    Because pharmacists are always coming in and

13   leaving.  Pharmacists are -- you know, the whole

14   landscape of diversion changes, and the compliance

10:17:11  15   program should change as the -- as diversion changes.

16              So all we're saying is you should have

17   periodic training to update your pharmacists on changes

18   within the program and also changes in the world of

19   diversion.

10:17:29  20   Q.    Then the last part of this paragraph that I'd like

21   you to explain is, "This compliance program shall apply

22   to all current and future Walmart pharmacies registered

23   with the DEA."

24              Does that include nationwide?

10:17:45  25   A.    Yes.

1    Q.    Is this a -- "Walmart acknowledges and agrees that

2    the obligations undertaken in this subparagraph do not

3    fulfill the totality of its obligations under the CSA and

4    its implementing regulations."

10:18:02  5              Explain what you mean by that, please.

6                    MR. MAJORAS:  Objection.

7                    Opinion testimony.

8                    MR. LANIER:  Okay.  Let me ask it this way.

9    BY MR. LANIER:

10:18:08 10   Q.    Would you explain why this was important to you

11   when you put your signature on it?

12   A.    Well, during my tenure at DEA, there are several

13   different areas of the Controlled Substances Act and the

14   regulations that are not covered under this agreement.

10:18:23 15  We wanted to make sure that they understood that there

16   were other areas within the Controlled Substances Act

17   that they also had to comply to; not just what was in the

18   agreement.

19   Q.    All right.  So with the Walmart California

10:18:38 20  agreement out of the way, what I'd like to do is I've

21   selected a Walgreens agreement that has been marked as

22   Exhibit Number 15, and so let's look at Walgreens next.

23                    MR. SWANSON:  Your Honor, we'll renew our

24   objection to the exhibit.

10:18:57 25                    THE COURT:  Overruled.

```
 1    BY MR. LANIER:
 2    Q.    In reference to Walgreens, sir, this is a
 3    memorandum of agreement entered into by and between the
 4    U.S. Department of Justice, the U.S. Drug Enforcement
 5    Administration, and Walgreen Company and it's
 6    wholly-owned subsidiaries.
 7                 Do you see that?
 8    A.    Yes, sir.
 9    Q.    And are you also familiar with this action and
10    agreement?
11    A.    Yes, sir, I am.
12    Q.    Now, the document itself shows that this was signed
13    by Michele Leonhart instead of you.
14                 Why is that signature there?
15    A.    We had -- the Administrator Leonhart began to sign
16    the -- all of the settlement agreements after 2011.
17    Q.    All right.  Was this one that you looked at or
18    signed off on, or approved internally within the DEA?
19    A.    Well, all settlement agreements would come through
20    my office before they went to Administrator Leonhart.
21                 There's a system, it's called a chop
22    system, but if a settlement comes to me and I have
23    questions with it, it has to be resolved before it goes
24    up to the Administrator.
25                 If the Administrator doesn't -- didn't see
```

1  my initials or my chop on the final, it would have been

2  sent back for me to review.

3              So, yes, I see all the settlement

4  agreements.

10:20:56 5  Q.    All right.  In the section entitled "Procedural

6  background," we see under Paragraph 6 that "On November

7  26th, 2012, the DEA, by its Deputy Assistant

8  Administrator Joseph T. Rannazzisi" -- that's you?

9  A.    Yes, sir.

10:21:15 10  Q.    What's T stand for?

11  A.    Thomas.

12  Q.    Okay -- "Joseph T. Rannazzisi issued three" -- what

13  are the OTSCs again?

14  A.    Orders to show cause.

10:21:25 15  Q.    -- "to Walgreens retail pharmacy," and then it

16  lists several stores.

17              Is that right?

18  A.    Yes, sir.

19  Q.    And I think, is it three of them, it looks like.

10:21:39 20  It continues on the back.

21  A.    Yes, sir.

22  Q.    Question:  Why did you issue orders to show cause

23  to those three Walgreens stores?

24  A.    Because of the violations that we found during our

10:21:55 25  investigation went to the level that we believed an order

1    to show cause was appropriate.

2    Q.    And then it says, "On February 4th, 2013, the DEA,

3    by Deputy Assistant Administrator Rannazzisi, issued an

4    order to show cause," and it's got another store in

10:22:20  5    Florida.

6                    Do you see that?

7    A.    Yes, sir.

8    Q.    And by the way, at this point in time, orient us

9    this to the *Holiday* case time-wise.

10:22:38 10    A.    These orders to show cause were after the *Holiday*

11    *CVS* case.

12    Q.    Was the *Holiday* case from the DEA's perspective a

13    fairly notable event in the U.S.?

14                    MR. DELINSKY:  Objection, Your Honor.

10:22:59 15                    THE COURT:  Overruled.

16    A.    During my time it was, because it was -- it was a

17    chain drugstore, and up until that point in time we

18    didn't have multiple -- I don't believe we had multiple

19    chain drug stores going into an order to show cause

10:23:20 20    hearing.

21                    So, yes, it was -- it was different.  It

22    was a different event.

23    BY MR. LANIER:

24    Q.    But when *Holiday* happens, is that done

10:23:33 25    confidentially, or is that something people in the

 1    business would know about?

 2    A.    Oh, no, it was in the news, and people would

 3    understand.  Plus the final order is a record of an

 4    agency decision and an agency -- what the agency believed

 5    was the violation.

 6              So the final order in and of itself is

 7    notice.

 8              We also provided notice through the media.

 9    The Department of Justice, I believe, and DEA both put

10    out press releases on it to tell the world this is what

11    happened and this is why it happened.

12    Q.    All right.  Then on February 11th, a week later,

13    the DEA, by you, issued another order to show cause for

14    another store in Florida, for Walgreens.

15              Fair?

16    A.    Yes, sir.

17    Q.    And why did you do that order to show cause?

18    A.    Again, the violations rose to the level that an

19    order to show cause was necessary.

20    Q.    Then finally, Paragraph 9, on February 19th, 2013,

21    you issued another order to show cause for another

22    Walgreens store in Florida.

23              Anything peculiar or different about that

24    one, or same reasons?

25    A.    Same reasons.

Direct - Rannazzisi/Lanier                        1699

```
 1    Q.    Then it looks like all of those seven cases were
 2    consolidated into one proceeding for hearing purposes.
 3                Is that right?
 4    A.    Yes, sir.
 5    Q.    Now, in this stipulation and agreement section, it
 6    says that -- it references the facts that are listed in
 7    an appendix, that if proven would constitute grounds
 8    under which the DEA could revoke the registration of
 9    Walgreens Jupiter.
10                And then it speaks of the other stores as
11    well.
12                Do you see that?
13    A.    Yes, sir.
14    Q.    And then it says, "Walgreens acknowledges that
15    suspicious order reporting for distribution to certain
16    pharmacies did not meet the standards identified by DEA
17    in three letters from the Deputy Assistant Administrator,
18    Office of Diversion Control, that were sent to every
19    registered manufacturer and distributor, including
20    Walgreens, on September 27th, 2006, February 7th, 2007,
21    and December 27th, 2007."
22                Do you see that?
23    A.    Yes, sir.
24    Q.    Is that referencing the very letters that we talked
25    about yesterday from you?
```

1    A.    Yes, sir.  Yes, sir.

2    Q.    So Walgreens acknowledges that they didn't meet the

3    standards that you had identified, and how many years had

4    passed between the time you sent those letters?

10:26:32  5              MR. SWANSON:  Objection.

6              THE COURT:  Overruled.

7    A.    From the last letter, six years.

8    BY MR. LANIER:

9    Q.    "Furthermore" -- by the way, those are for

10:26:46 10   distribution.

11              Remind us again, distribution is what part

12   of that picture?

13   A.    The movement of pharmaceuticals from a distributor

14   to the pharmacy or hospital, or whoever's getting them.

10:26:59 15   Q.    From distributor or from manufacturer?

16   A.    Well, from the manufacturer to the

17   distribution -- from the manufacturer to distributor,

18   that's distribution.

19              Then from the distributor to the pharmacy,

10:27:09 20   that's also distribution.

21   Q.    Oh, got it.  Thank you.

22              "Furthermore, Walgreens acknowledges that

23   certain Walgreens retail pharmacies did on some occasions

24   dispense certain controlled substances in a manner not

10:27:22 25   fully consistent with its compliance obligations under

1       the CSA, Section 801 and following, and its implementing

2       regulations under the C.F.R. Part 1300."

3                   Can you remind the jury what those are?

4       A.    The CSA is the Controlled Substances Act.  The

10:27:43 5      federal Controlled Substances Act is the statutes, the

6       statutes, the laws that oversee controlled substances in

7       the United States.  And the Regulations, the Code of

8       Federal Regulations is an interpretation of the Act and

9       also a series of regulations that are rules and

10:28:02 10     regulations that the pharmacies, any registrant has to

11      operate under.

12      Q.    Now, the terms and conditions of this agreement

13      begin on Page 5, and it starts with the distribution

14      centers, that middle person.

10:28:29 15                  Right?

16      A.    Yes, sir.

17      Q.    It says, "Walgreens will continue to review, and

18      where reasonable and appropriate, to revise its processes

19      and practices for conducting Suspicious Order Monitoring

10:28:48 20     and reporting suspicious orders from Walgreens

21      pharmacies, as set forth in the attached addendum."

22                  Can you explain what that is from the DEA's

23      perspective, please?

24      A.    This is just -- this is just a -- what we were

10:29:04 25     looking for was that they would look and reevaluate and

1    reconfigure their Suspicious Order Monitoring program.

2              So it's effective, more effective than what

3    it was.

4    Q.   All right.  And so we remember where we are, we're

10:29:26  5  talking about their work as a distributor here?

6    A.   Yes.  Yes.

7    Q.   And then it stays that, "Walgreens shall inform the

8    DEA of suspicious orders in a format mutually and

9    reasonably agreed upon."

10:29:45 10             Can you explain how that's any different

11   than their obligation under the law to start with?

12   A.   No.  There's really no difference.  It might be in

13   the manner that they're going to transfer the suspicious

14   order to DEA and what office, if they want a specific

10:30:02 15  office to transfer it to, but the obligation is exactly

16   the same.

17             They have to, when discovered, immediately

18   transfer that suspicious order.

19   Q.   Okay.  In that regard, you've got the next section,

10:30:17 20  which is "Obligations of the pharmacies and CPO

21   facilities."

22             Do you see that?

23   A.   Yes, sir.

24   Q.   Do you remember what a CPO facility is?

10:30:30 25  A.   It's a central fill.

1    Q.    Central fill.

2                We haven't heard that concept.  What is

3    that?

4    A.    A central fill pharmacy, I got to get this right, a

10:30:41  5    central fill pharmacy is a pharmacy that's not

6    necessarily the pharmacy that gets the prescription, but

7    is filling prescriptions for that pharmacy.

8                So it might be in a different pharmacy in a

9    different location, but it is filling prescriptions for

10:30:52  10    the pharmacy that actually received the prescription.

11    Q.    All right.  So at this point we're further down the

12    line of the closed system.

13                As we look at these, would you explain what

14    the significance was to A, "Walgreens agrees to maintain

10:31:12  15    a compliance program in an effort to detect and prevent

16    diversion of controlled substances as required under the

17    CSA and applicable DEA regulations, as shown in the

18    attached addendum."

19                Do you see that?

10:31:26  20    A.    Yes.

21    Q.    Can you explain the significance of that, please?

22    A.    Well, there are certain things that a central fill

23    pharmacy has to do.

24                There has to be some kind of notation.

10:31:38  25    Now, what we were looking for was a consolidated group of

         1    rules and regulations that the registrant would have in

         2    place to make sure that if they're using central fill, or

         3    whatever their pharmacy is doing, it's in compliance with

         4    not only the rules and regulations of the -- of the

10:32:00 5    Controlled Substances Act, but also in compliance with

         6    other -- whatever policies and procedures are put in

         7    place by the registrant.

         8    Q.    "This program shall include procedures to identify

         9    the common signs associated with the diversion of

10:32:15 10   controlled substances."

        11              What's the everyday word that -- phrase

        12    that y'all use for these common signs?

        13    A.    Red flags.

        14    Q.    Doesn't use the word "Red flag" here, does it?

10:32:32 15   A.    No, sir.

        16    Q.    Is that what's meant by this?

        17    A.    Yeah.

        18              MR. LANIER:  Oh, Your Honor, I think this

        19    is a good time to stop if we need to.

10:32:44 20              Oh, the monitor is gone.

        21              A JUROR:  Yeah.

        22              THE COURT:  That's not good.  On all the --

        23              THE JURORS:  Jurors back row.

        24              THE COURT:  All right.  We'll take our

10:32:53 25   midmorning break, 15 minutes, and we'll get that squared

                1    away.

                2                    Usual admonitions.

                3                    Thank you.

                4                    (Jury out.)

10:33:46        5                    MR. SWANSON:  Sorry, Brian Swanson for

                6    Walgreens.

                7                    And I think this is probably a minor issue,

                8    but I want to raise it before the document is displayed.

                9                    On the next page of this document that

10:33:55       10    Mr. Lanier is going through with the witness, it has the

               11    section about the settlement amount that we agreed to

               12    pay.

               13                    And I realize that's not coming in, but the

               14    way that it's redacted, rather than redacting the whole

10:34:09       15    paragraph, it redacts the amount.

               16                    MR. LANIER:  I don't even plan on showing

               17    that page, Your Honor --

               18                    MR. SWANSON:  Okay.

               19                    MR. LANIER:  -- because it infers an

10:34:15       20    amount, and I think that's outside the bounds of what you

               21    said.  So my plan right now is not to do that, and I

               22    should mention to the Court, I should not be doing the

               23    specific facts that are alleged in the addendum.

               24                    THE COURT:  Right.

10:34:24       25                    MR. LANIER:  I'm just entering into -- I'm

         1    walking through the settlement agreement with the terms

         2    until we get to that page, but I don't plan on using

         3    that.

         4              MR. SWANSON:  I just didn't want it showed

10:34:34  5    because of --

         6              MR. LANIER:  That's fair.

         7              THE COURT:  Okay.  Since we took a break,

         8    one of the reasons I let Mr. Rannazzisi testify about

         9    that DEA presentation, in addition to what I said,

10:34:58 10    it -- the presentation was made to the industry as a

        11    whole.

        12              It shows -- it put the -- it put the

        13    industry, including the defendants, on notice of this

        14    overwhelming problem and that there was very likely

10:35:15 15    abuse, diversion, huge numbers of controlled opioids,

        16    prescriptions for controlled opioids that were not being

        17    prescribed for legitimate medical purposes, and so all

        18    pharmacists should have been on notice of that.

        19              Also, as we know, the plaintiffs have to

10:35:33 20    prove that each of the defendants was a substantial cause

        21    of the opioid problem, and it may very well be that

        22    fingers are pointed at the Federal Government as a part

        23    of the cause, and I think it's relevant for this witness

        24    to testify to what DEA did.

10:35:57 25              So it's also relevant to show what DEA did.

 1              Okay.

 2              MR. MAJORAS:  Your Honor, just because

 3    we're going to be on break, as Mr. Lanier pointed out

 4    before he had not had that particular conversation with

10:36:09  5    the witness, he of course can't talk to the witness

 6    during the break; but I would ask, since the other

 7    defendants join in --

 8              MR. LANIER:  The witness is right here.

 9              MR. MAJORAS:  And that's why I'm speaking

10:36:20 10    obtusely on the issue, sir, and other rulings.

11              THE COURT:  All right.  I'll direct

12    Mr. Lanier to have that specific conversation.

13              MR. LANIER:  Your Honor, I think it's safe

14    to do it on the record.

10:36:29 15              THE COURT:  All right, fine.

16              MR. LANIER:  You're not allowed to get into

17    any settlement amount or that money was paid.

18              It's been ruled on by the Court, so don't

19    slip in that somewhere in the questioning.

10:36:39 20              THE COURT:  So, sir, you're not going to be

21    asked and I don't want you to include it in any answer.

22              THE WITNESS:  Yes, sir.

23              MR. LANIER:  Thank you, Judge.

24              (Recess taken.)

10:52:51 25              (Jury in.)

1          THE COURT:  All right.  Please be seated.

2          And, Mr. Rannazzisi, I want to remind you

3  you're still under oath.

4          So, Mr. Lanier, you may proceed.

5          MR. LANIER:  Thank you, Judge.

6  BY MR. LANIER:

7  Q.    Mr. Rannazzisi, before the break we were talking

8  about the Walgreens agreement with the DOJ, and we had

9  talked about Walgreens agreed to maintain a compliance

10 program as set forth in the attached addendum.

11         We mentioned that it doesn't say red flag

12 here.

13         Do you remember that?

14 A.    Yes, sir.

15 Q.    Now, I want to pause for a moment and go to the

16 attached addendum, because the addendum has a section

17 about prospective compliance.

18         And what was your understanding of what

19 y'all meant by prospective compliance?

20 A.    Prospective means before the act occurs; not after.

21 Q.    In other words, this is what the Walgreens will do

22 into the future?

23 A.    Yes, for the duration of the agreement.

24 Q.    All right.  And in that regard, if you look at

25 number four of what Walgreens agreed to do, it says,

Direct - Rannazzisi/Lanier                     1709

 1     "Walgreens remains committed to properly training its

 2     pharmacy personnel to deal with evolving

 3     diversion-related issues."

 4              Do you see where I'm reading?

10:56:16  5     A.    Yes.

 6     Q.    And then it says, "Walgreens will continue to

 7     enhance its good faith dispensing policy and training

 8     materials to identify red flags of potential diversion

 9     for pharmacists to consider in making professional

10:56:33 10     judgments regarding dispensing of controlled substances."

11              Do you see this?

12     A.    Yes, sir, I do.

13     Q.    Does -- are those -- is -- what do you understand

14     "Red flags" to mean within this context?

10:56:52 15     A.    Red flags are the indicators that a pharmacist

16     looks at when he's analyzing the prescription before

17     dispensing to ensure that the prescription's valid and

18     effective, and is not issued for an illegitimate medical

19     purpose in the course of professional practice.

10:57:17 20     Q.    And this was used with another witness, but

21     "Beginning in 2014 Walgreens will exclude any accounting

22     for controlled substance prescriptions dispensed by a

23     particular pharmacy from bonus computations for

24     pharmacists and pharmacy technicians at that pharmacy."

10:57:33 25              Did you understand that to be an agreement

1    entered into, as well?

2    A.    Yes, sir.  Um-hmm.

3    Q.    If we go back to the agreement itself where we're

4    looking at obligations of Walgreens pharmacies,

10:58:05  5    "Walgreens shall direct and train its pharmacists that

6    their corresponding responsibility under federal law

7    requires them not to fill a prescription that such

8    pharmacist knows or has reason to know was issued for

9    other than a legitimate medical purpose or by a

10:58:25 10    practitioner acting outside the usual course of

11    professional practice."

12               Sir, why did the DEA take this action to

13    put that into writing here, based upon your

14    understanding?

10:58:39 15    A.    Because we wanted the corporation to understand

16    that it's their obligation to make sure those pharmacists

17    know what their corresponding responsibility is.

18               They could touch, reach their pharmacists a

19    lot easier than DEA can, when I was there at DEA anyway,

10:58:55 20    and that's why it's in there.

21    Q.    All right.  Sir, with that, we'll set aside -- by

22    the way, on all of these, are you making these agreements

23    with simply individual pharmacists, or with individual

24    stores, or with whom?

10:59:21 25    A.    These agreements are made with the corporation,

1    whoever the corporation is that oversees the stores.

2    Q.    So if we think of it like an octopus with all of

3    the different stores being a part of it, where did you

4    make this agreement and which stores would it apply to?

5    A.    Well, the agreement would be the head of the

6    octopus, and we would expect that the enforcement of the

7    agreement would happen at the tentacle level of the

8    octopus, the stores.

9    Q.    All right.  Then the last set that I want to talk

10   to you about is CVS.

11              No, we just did -- we did CVS.  Let's make

12   sure we've got everybody.

13              Walgreens, Walmart, *Holiday*.

14              You did not do anything on Giant Eagle

15   during your tenure there, is that fair?

16   A.    That's correct, sir.

17   Q.    All right.  We need to add that to the record as

18   well.

19              MR. LANIER:  Your Honor, at this point in

20   time I will pass the witness.

21              THE COURT:  Okay.  Who would like to begin?

22              Mr. Majoras for Walmart.

23              MR. MAJORAS:  Thank you, Your Honor.  If I

24   could just have a few moments to get together.

25              THE COURT:  Yes.

Cross - Rannazzisi/Majoras                    1712

1          MR. LANIER:  Oh, Your Honor, a bit of

2     housekeeping.  Do I need to mark and -- oh, we can do

3     that later.

4          I've got the run-out of what I showed on

5     the screen, if anybody needs it.

6          MR. MAJORAS:  May I proceed, Your Honor?

7          THE COURT:  Yes, you may, Mr. Majoras.

8     CROSS-EXAMINATION OF JOSEPH RANNAZZISI

9     BY MR. MAJORAS:

10    Q.    Good morning, folks.  Good morning, Mr. Rannazzisi.

11    A.    Good morning, sir.

12    Q.    You and I have not met before, but I am John

13    Majoras, I'm one of the lawyers for Walmart.  And you

14    also may not be aware that we have experienced occasional

15    problems with our sound system during the trial, so if at

16    any point I can clarify or speak louder or softer, please

17    let me know and I'd be happy to do that.

18    A.    Yes, sir.

19    Q.    Mr. Rannazzisi, at the beginning of your testimony

20    yesterday, you noted the fact that you are now retired

21    from the DEA, correct?

22    A.    That is correct.  Yes, sir.

23    Q.    You were the head of the Office of Diversion and

24    Control for about 10 years?

25    A.    From 2005 to 2015, yes.

Cross - Rannazzisi/Majoras                                    1713

1    Q.    And Mr. Lanier covered with you some of your

2    obligations you have about not testifying about internal

3    matters at the DEA from your time there.

4                Do you recall that?

11:03:10  5    A.    Yes, sir.

6    Q.    And I'm going to ask you in responding to my

7    questions, you respond with the same level regarding your

8    experience and your knowledge about DEA that you did with

9    Mr. Lanier, and I'm going to ask my questions in that

11:03:24 10   same format.

11                Do you understand?

12   A.    Yes, sir.

13   Q.    Thank you.

14                And speaking of testimony, you've testified

11:03:29 15   a number of times in opioid litigation already, correct?

16   A.    In depositions and trial, yes.

17   Q.    In fact, there's a trial in West Virginia against

18   some of the distributors not in this case, and you were

19   on the stand for about three or four days; is that right?

11:03:45 20   A.    That is correct.

21   Q.    And you are not testifying in this case on behalf

22   of the DEA?

23   A.    No, sir, I'm not.

24   Q.    You're not here -- there was a question earlier

11:03:58 25   about being a mouthpiece.

1                You're not a mouthpiece to give the DEA's

2    view of anything in this case, are you?

3    A.    No, sir.

4                I believe I'm here to talk about what

11:04:10  5    happened at DEA during my tenure at DEA.

6    Q.    So along that line, you cannot offer any firsthand

7    information in terms of what happened in terms of the

8    DEA's law enforcement role dealing with opioids since you

9    left in 2015?

11:04:28 10   A.    Well, yes.  I'm no longer employed by DEA, and I no

11   longer are a supervisor at DEA, so I can't discuss what

12   happens after 2015.

13   Q.    Sir, I'd like to talk about some subjects that

14   you've already covered with Mr. Lanier, and if I jump

11:04:44 15   around a bit and I lose you, just let me know, and I'll

16   be happy to, you know, try and situate us a little

17   better.

18   A.    Sure.

19   Q.    The DEA is the federal agency charged with

11:04:53 20   overseeing the entire closed system that you talked about

21   earlier, correct?

22   A.    That is correct, yes.

23   Q.    And the DEA is there to oversee how the system

24   works?

11:05:05 25   A.    Yes, sir.

1    Q.    The DEA is the one that decides whether to allow

2    people to be part of the closed system through the

3    registration process, right?

4    A.    With -- with the state, yes.

5          The DEA can't register anyone without the

6    state authorizing the registration.

7    Q.    But likewise, someone cannot be participating in

8    the closed system without DEA registration?

9    A.    That is correct.

10   Q.    Now, anyone who handles controlled substances

11   within that system, except for nurses and pharmacists,

12   has to be registered with the DEA, right?

13   A.    That is correct.  Yes.

14   Q.    Well --

15   A.    It is.  There's an exception for common carriers,

16   but other than that, yes.

17   Q.    And common carriers are the companies that operate

18   trucks and trains that may deliver --

19   A.    Yes.

20   Q.    -- opioid products.

21         And pharmacists have to be affiliated with

22   a pharmacy that is registered with the DEA?

23   A.    Yes, sir.  That has to be their practice location.

24   If they don't have a pharmacy, they can't practice -- or

25   a pharmacy or hospital, so --

1    Q.    So the pharmacist's ability to participate in this

2    system is through the pharmacy or the hospital in which

3    he or she works as a pharmacist?

4    A.    That is correct.

11:06:32  5    Q.    And the DEA registers any prescriber who is able to

6    prescribe opioid medication?

7    A.    The DEA registers practitioners based on the state

8    authorization, but, yes, that's -- that's correct.

9    Q.    So like your earlier answer, without DEA

11:06:57 10    authorization, a prescriber cannot write an opioid

11    prescription?

12    A.    Without a DEA registration, that's correct, they

13    cannot.

14                 Oh, well, there's an exception to that.

11:07:12 15                 If you're working under a -- if you're a

16    prescriber or doctor working under a hospital

17    registration, you can prescribe.  You don't have a

18    registration, but you're using the hospital's

19    registration to prescribe.

11:07:23 20                 So if you're, like a hospitalist or a

21    visiting doctor, or an intern or a resident, you could

22    use the hospital's registration to prescribe.

23    Q.    So it's possible that a prescription can have

24    multiple prescribers using that DEA registration?

11:07:39 25    A.    Yes, but if I remember the way it works correctly,

1    there's got to be the registration plus a designator for

2    that particular prescriber.

3    Q.    And the reason for this registration process is

4    that the Federal Government wants to ensure that

11:07:59 5    controlled substances are being handled appropriately,

6    right?

7    A.    Yes.  Securely and appropriately.

8    Q.    And distributors need to renew their DEA

9    registration every year?

11:08:08 10    A.    Yes, they do.

11    Q.    Prescribers have to renew theirs every three years?

12    A.    When I was at DEA, it was three years.

13              I don't know if that's changed.

14    Q.    Same is true for pharmacies when you were there?

11:08:18 15    A.    Three years, yes, sir.

16    Q.    Three years.

17              DEA doesn't issue permanent or lifetime

18    registrations?

19    A.    No, sir, they don't.

11:08:26 20    Q.    And that's because DEA wants to ensure periodically

21    that nothing had changed that would disqualify that

22    person or entity from having a registration, right?

23    A.    That is correct.

24    Q.    Now, to your knowledge, in terms of the DEA, DEA's

11:08:44 25    never suspended nor revoked any Walmart Distribution

1    Center registration, has it?

2    A.    During my tenure at DEA, no.  Not that I'm aware

3    of.

4    Q.    DEA has never delayed or denied a Walmart

11:09:01 5    Distribution Center registration renewal, has it?

6    A.    Again, during my tenure at DEA, no.

7    Q.    And the same is true for the other pharmacy

8    defendants in this case, Walgreens, CVS, and Giant Eagle,

9    with respect to -- I'm sorry, let me start over again.

11:09:19 10            Let me get you into the two counties that

11    we're talking about in Ohio.

12            You understand that to be Lake and Trumbull

13    County, correct?

14    A.    Yes, sir.

11:09:29 15    Q.    Have you been there before?

16    A.    I'm sorry?

17    Q.    Have you been to either of those counties before?

18    A.    I -- "Have you," and I didn't hear.

19    Q.    I'm sorry, the Court Reporter is laughing because

11:09:40 20    she tells me to slow down all the time, and now I'm

21    proving it, so let me try it again.

22            Have you ever been to either Lake or

23    Trumbull County?

24    A.    Yes.

11:09:50 25    Q.    Okay.  But within Lake or Trumbull County, the DEA

1  has never suspended or revoked the registration of any

2  Walmart Pharmacy, is that right?

3  A.   Not that -- not during my tenure that I'm aware of,

4  no.

5  Q.   And likewise, with the other defendants in this

6  case, Giant Eagle, CVS and Walgreens, you're not aware of

7  any pharmacy of those companies being -- having a

8  registration revoked in either of those counties?

9  A.   No.  Not that I'm aware of during my tenure.

10  Q.   And you're not aware that the DEA has ever delayed

11  or denied the registration renewal for any Walmart

12  Pharmacy in either Lake or Trumbull County, right?

13  A.   No.  Again, not during my tenure, I don't know.

14  Q.   So you talked a bit about distribution, and you're

15  aware that at least some of the defendants in this case

16  at times distributed to their own pharmacies, correct?

17  A.   Yes, sir.

18  Q.   Are you aware during that time with respect to

19  Walmart, by being a self-distributor, it means that

20  Walmart is only distributing within those two counties to

21  the five DEA-registered pharmacies it has in those

22  counties?

23  A.   Yes.  As a self-distributor, you only distribute to

24  your stores, that's your corporate structure.

25  Q.   And you're not aware that DEA ever warning Walmart

1    that it should not distribute controlled substances to

2    one of those five Walmart Pharmacies in Trumbull or Lake

3    County?

4    A.    During my tenure, no, I'm not aware of any

5    notification like that.

6    Q.    Would you agree that the DEA has a mission to

7    ensure an adequate and uninterrupted supply of controlled

8    substances?

9    A.    Yes, sir.

10   Q.    And you agree that it's vital that an adequate and

11   uninterrupted supply of pharmaceutical controlled

12   substances be available for effective patient care,

13   correct?

14   A.    Yes, sir.

15   Q.    In fact, it's a public health concern when

16   pharmacists cannot dispense legitimate controlled

17   substance medication to patients, right?

18   A.    "Legitimate," yes.

19   Q.    Would you agree that drug shortages can adversely

20   affect the public health?

21   A.    Absolutely.

22   Q.    Would you also agree that distributors play an

23   important role in ensuring an adequate and uninterrupted

24   supply of prescription opioids?

25   A.    Yes.

1    Q.    And you've already discussed with us the

2    distribution role about moving the prescription

3    medications downstream to ensure that pharmacies and

4    hospitals have the prescription medications they need,

11:12:52  5    correct?

6    A.    That is correct.  Yes.

7    Q.    And that's important, because if a patient doesn't

8    get the medication he or she needs, there's a breakdown

9    in the system, right?

11:13:01  10   A.    That's correct.

11   Q.    In fact, it's critical for patients with legitimate

12   medical needs to have access to their prescription opioid

13   medications?

14   A.    Yes.  Legitimate patients, absolutely.

11:13:14  15   Q.    Going back to the DEA registration, would you agree

16   that DEA-registered pharmaceutical manufacturers are the

17   ones responsible for studying the safety and

18   effectiveness of prescription opioids and other

19   medications that they make?

11:13:45  20   A.    For medications that they -- they manufacture and

21   market, absolutely, yes.

22   Q.    And manufacturers are the ones that actually obtain

23   the Food & Drug Administration approval for new

24   prescription opioids, right?

11:14:01  25   A.    Yes.  They do the new drug application, the NDA,

1    and shepherd it through the process, absolutely.

2    Q.    And at the DEA, in looking at what the DEA does

3    versus the FDA, Food & Drug Administration, at the DEA

4    you recognize that when the FDA approves an opioid

11:14:19 5    prescription, the FDA has determined that the benefits

6    outweigh the risks, right?

7    A.    The FDA doesn't approve prescriptions.

8              If you're talking about the drug, yes.

9    Q.    Yes, sir.

11:14:30 10   A.    The drug, yes.

11   Q.    Thank you for that clarification.

12   A.    Yes.

13   Q.    Okay.  So just so everyone is clear on this, and I

14   didn't mean to misspeak, the FDA approves the drug, and

11:14:43 15   in doing that it determines that the benefits outweigh

16   the risks, right?

17   A.    That is correct.

18   Q.    You recognize that Walmart is not a manufacturer of

19   any of the opioid medication in this case, is that right?

11:15:02 20   A.    To the best of my knowledge, during my tenure, no,

21   they were not.

22   Q.    And none of the other defendants, Giant Eagle,

23   Walgreens or CVS, were manufacturers of opioid

24   medication, were they?

11:15:19 25   A.    To the best of my knowledge, no, they were not

1    manufacturers.

2    Q.    And -- I apologize, I brought some water up myself.

3    If you need some, by all means, please.

4    A.    I've got it.

11:15:34 5    Q.    And in your testimony today, you have no evidence

6    or you're offering no evidence that Walmart distributed

7    prescription opioid medications in Lake or Trumbull

8    Counties that were not approved by the FDA, are you?

9    A.    No, sir.

11:15:47 10    Q.    And that's true with the other defendants as well?

11    A.    That is correct.  Yes.

12    Q.    I want to change subjects a little bit.

13            This is a topic you talked about in terms

14    of quotas.  Just let me ask a few questions, if I could,

11:16:05 15    about that.

16            From your experience, you would agree that

17    when it comes to the supply of prescription opioids,

18    supply does not drive demand, correct?

19    A.    Supply does not drive demand, yes, I could agree to

11:16:22 20    that.

21    Q.    And I believe you testified to the effect that

22    demand comes from things like prescribing hospitals,

23    research and development, and exports, correct?

24    A.    Are we talking about demand as -- for the -- for

11:16:35 25    the basic class aggregate production quota, or are we

1    talking specifically down the road?

2    Q.    Let's talk about the aggregate production quota.

3    A.    Okay.  For the aggregate production quota there's

4    several things.

11:16:49  5              Demand, loosely defined, prescriptions or

6    hospital use, yeah, but there's other things in demand

7    besides that that are generally never discussed.

8    Q.    So let's move, as you suggested, there's further

9    down the stream the demand by -- relating specifically to

11:17:08 10   prescriptions.

11             You would agree that demand for

12   prescriptions is driven by patient care and patient

13   needs; not by supply?

14   A.    The demand for prescriptions has many facets.

11:17:25 15  Patient care is one of them, but there's also

16   prescriptions that are -- that are illegal, illegitimate,

17   that have nothing to do with patient care.

18   Q.    Well, with respect to the illegitimate

19   prescriptions, is it your testimony that illegal

11:17:43 20  prescriptions, the demand for those are driven by the

21   supply?

22   A.    No.

23             Illegal prescriptions, like legitimate

24   prescriptions, are -- are basically handed off from a

11:17:58 25  prescriber.  It has nothing to do with supply.  It has

1     something to do with whether they are prescribing legally

2     or illegally.

3     Q.    So just because there is a supply, availability of

4     prescription opioids, doesn't mean that supply has to be

11:18:12  5     used, right?

6     A.    That is correct.

7                 MR. LANIER:  Your Honor, I do want to note

8     for the record an objection that if he's going to be

9     asking opinion testimony like this, that I be allowed to

11:18:24 10     redirect on these issues of opinion testimony that are

11     based on his DEA tasks.

12                 THE COURT:  I agree.  So if the door is

13     open, you can direct on it.

14                 MR. LANIER:  Thank you, Judge.

11:18:36 15     BY MR. MAJORAS:

16     Q.    Sir, just to make this point, I'll make sure to you

17     that I'm asking about information within your knowledge

18     at the DEA in your answers.

19                 If you don't have that, please tell me.

11:18:45 20     A.    Yes, sir.

21     Q.    So turning to specifically the quotas with respect

22     to controlled substances, the DEA sets the quotas for

23     controlled substances each year, correct?

24     A.    Yes, sir.

11:19:00 25     Q.    That includes opioids, right?

Cross - Rannazzisi/Majoras

1726

1    A.    Yes, sir.

2    Q.    And you personally, while you were at the DEA,

3    oversaw the DEA group that managed the aggregate

4    production quota, is that right?

11:19:12 5    A.    That is correct.

6    Q.    And I'm going to try to keep using the full term of

7    that, but you use abbreviation APQ?

8    A.    Yes, sir.

9    Q.    And so APQ is the aggregate production quota,

11:19:24 10    that's the quota that the DEA sets, correct?

11    A.    Yes, sir.

12    Q.    And the DEA's opioid quotas were based on the

13    estimated medical, scientific research, and industrial

14    needs of the United States, correct?

11:19:37 15    A.    Yes, sir.  It's 826.

16    Q.    "Prescription opioid levels are based on the

17    presumption that there is a legitimate" -- I'm sorry, let

18    me start again.

19             I'll do it in English this time, I hope.

11:19:55 20             "Prescription opioid levels are based on

21    the presumption that there are legitimate medical needs,"

22    right?

23    A.    Yes, sir.

24    Q.    "And the quotas that the DEA sets were designed to

11:20:07 25    set an estimated amount that would meet the legitimate

1    medical demands without providing excess medications that

2    may be diverted into the illicit market," correct?

3    A.    Yes.  That's somewhat correct, yes.

4    Q.    You would agree that a controlled substance

11:20:35   5    prescription issued for legitimate medical purpose by a

6    registered doctor in the usual course of his or her

7    profession is not a diversion, right?

8    A.    If it's issued under the *Moore* guidelines, for

9    legitimate medical purpose in the usual course, yes.

11:20:57  10    Q.    I'd like to take a look at some of the quotas over

11    time, so I'm going to ask -- you should have this in the

12    binder in front of you, but I'll put it up on the

13    screen -- that Defendants' MDL 01487 be presented to you.

14    I'll let you find that.

11:21:51  15    A.    Did you say 01487?

16    Q.    01487?

17    A.    I've got it.

18    Q.    And you could do it whatever way works best for

19    you.  You can look at the paper document in front of you

11:22:03  20    or the one we'll put on the screen.  Sometimes the screen

21    can help you focus.

22              But let me ask you, first, what you see as

23    Defendants' MDL 01487 is the aggregate production quota

24    history for selected substances, is that right?

11:22:19  25    A.    That is correct.

1  Q.   If you could just say that, your answer again, so

2  we make sure we have that?

3  A.   That is correct.

4  Q.   Thank you.

11:22:30 5          This is the type of information you were

6  familiar with when you were at the DEA, right?

7  A.   Yes, sir.

8  Q.   And in fact, the years on this particular chart are

9  the years that coincide with your role as the head of the

11:22:43 10  Office of Diversion, right?

11  A.   Yes, sir.

12  Q.   So just across the top, that's the 2005 through

13  2015?

14  A.   Yes, sir.

11:22:50 15  Q.   And the amounts here are expressed in kilogram

16  amounts, correct?

17  A.   Yes, sir.

18  Q.   So these, for example, aren't individual tablets or

19  anything of that nature?

11:23:01 20  A.   It's bulk powder.

21  Q.   Bulk powder?

22  A.   Yeah, bulk powder, for the most part.

23  Q.   And that's the powder that's used to make the

24  medication that eventually would get prescribed to an

11:23:13 25  individual?

1    A.    Yes.

2    Q.    In your view -- I'm sorry, in your experience

3    during this time period, you would agree that the

4    increases in the volume of the annual DEA quotas were

11:23:27 5    driven by legitimate medical needs, correct?

6    A.    In part, yes.

7    Q.    When you set the quotas, did you take diversion

8    into account?

9    A.    We looked at diversion, yes.

11:23:50 10   Q.    So when you were setting the quota, you were

11   building in the fact that you understood that there was

12   going to be some diversion, correct?

13   A.    Of course we knew there was diversion.  We didn't

14   set the quota based on the diversion, though.

11:24:06 15   Q.    But you wanted to make sure that there was adequate

16   supply for legitimate needs of opioids when you were

17   setting the quotas, even in light of diversion?

18   A.    That is correct.  Yes.

19   Q.    So let's look at Exhibit MDL 01487 a little more

11:24:32 20   closely.

21             And if we look in particular at the line

22   for Oxycodone, which will be highlighted on your screen

23   but also is in front of you --

24             MR. MAJORAS:  Mr. Ferry, can we make that

11:24:56 25   any larger, or is that what I've got?

1        Thank you.

2    BY MR. MAJORAS:

3    Q.    So do you see where Oxycodone appears in the

4    aggregate production quota chart history?

11:25:10  5    A.    Yes, sir.

6    Q.    And if we look at that line in particular, this

7    shows a steady increase by thousands of kilograms every

8    year from 2005 through 2013, the short drop in 2011?

9    A.    Yes, sir.  That's correct.

11:25:26 10    Q.    And even when it begins to decrease in 2014 and

11    2015, the quota is still nearly three times as large as

12    the quota had been in 2005, right?

13    A.    Yes, sir.  There are reasons for that.

14    Q.    I'm sure there are.

11:25:45 15         My question, though, quite simply is, are

16    these the quotas that were approved by the DEA during the

17    time period that you were in your role in the Office of

18    Diversion?

19    A.    Yes, sir.

11:25:56 20    Q.    Switching topics again.

21         MR. MAJORAS:  You can take that down,

22    Mr. Ferry.  Thank you.

23    Q.    Would you agree that Internet pharmacies gained

24    prominence in the early 2000s?

11:26:14 25    A.    Yes, sir.  Absolutely.

1    Q.    And you talked a little earlier about Internet

2    pharmacies?

3    A.    Yes, sir.

4    Q.    In 2008, you're aware that Congress passed the Ryan

11:26:27  5    Haight Act, which effectively shut down most Internet

6    pharmacies, right?

7    A.    That is correct.

8    Q.    That's an action that Congress itself took?

9    A.    Yes.

11:26:37 10          Well, shut down the brick and mortar

11    pharmacies that were facilitating Internet drug sales.

12          The Internet pharmacies were still out

13    there.

14    Q.    So Internet pharmacies were still available for

11:26:49 15    someone to obtain prescriptions even after that

16    Congressional Act?

17    A.    Right.  It just shut down the brick and mortar

18    pharmacies that were operating, facilitating drug sales

19    over those Internet websites, but there were still

11:27:03 20    Internet websites out there.

21    Q.    And until those brick and mortar pharmacies were

22    shut down, they had been registered by the DEA, correct?

23    A.    They were -- yes.  They had to be, yes.

24    Q.    Are you familiar with the term "Rogue" pharmacies?

11:27:21 25    A.    Yes.

Cross - Rannazzisi/Majoras                                    1732

1    Q.    Those would be pharmacies acting outside of what

2    you would understand to be the appropriate dispensing of

3    medication?

4    A.    Yes.  They'd be operating outside of the law.

11:27:35  5    Q.    You would agree that with respect to the brick and

6    mortar stores that you just described for me, that were

7    ultimately shut down, they were primarily independent

8    pharmacies, right?

9    A.    As I testified previously, the vast majority were

11:27:54 10    independent pharmacies.

11    Q.    You're not aware of any shipments from Walmart to

12    an Internet pharmacy, are you?

13    A.    Shipments as a Walmart distributor to an Internet

14    pharmacy?

11:28:08 15    Q.    Yes, sir.

16    A.    I -- I can't say that because, again, in 2009

17    Walmart -- a Walmart Pharmacy was issued an order to show

18    cause for illegally -- for dispensing medication through

19    an Internet source.

11:28:39 20          So unless that Walmart Pharmacy was getting

21    the medication they were obtaining, getting their

22    medication that they dispensed from a source outside of

23    Walmart, which I don't believe you guys would allow,

24    then, no, I can't say that you're correct.

11:28:56 25    Q.    Was that in Trumbull or Lake County?

1       A.    You didn't ask me, but no, it was not, yeah.

2       Q.    Was that the agreement you described, you discussed

3   earlier?

4       A.    Yeah, in the San Diego Walmart Pharmacy.

11:29:09  5   Q.    But you're not aware of Walmart ever operating a

6   pain clinic, are you?

7       A.    No, sir, I'm not.

8       Q.    The same is true for the other defendants, you're

9   not aware that either Giant Eagle, CVS, or Walgreens,

11:29:23 10  ever operated a pain clinic?

11      A.    Not that I'm aware of, no.

12      Q.    If we focus again on Lake and Trumbull Counties,

13  it's true that you have no information that any Walmart

14  pharmacist ever knowingly filled a prescription for a

11:29:45 15  pill-mill in either county, is that correct?

16      A.    No, I have never looked at any prescriptions

17  related to Lake or Trumbull County Walmart stores, no.

18      Q.    I -- I'm sorry, I didn't mean to interrupt.  Didn't

19  mean to do that either.

11:30:01 20            You would agree that you did not do that

21  type of look in Trumbull or Lake County for the other

22  defendants either, did you?

23      A.    Again, I've not reviewed any of the prescriptions

24  for any of the defendants in Lake and Trumbull County.

11:30:15 25  Q.    I'd like to turn now to some of the tools that you

1    have had -- you had available to you at the DEA when you

2    were there.

3              While you were head of the DEA's Office --

4    why don't we restrict it to the last year, 2015, before

11:30:29  5    you retired.  While you were head of the DEA's Office of

6    Diversion, you oversaw approximately 300 personnel?

7    A.    Probably a little more than that, yes.

8    Q.    And under your tenure, the Office of Diversion

9    Control had an annual budget of nearly $350 million,

11:30:49 10    right?

11    A.    It varied between 350 and 405 million.

12    Q.    And even beyond the potentially 300 personnel

13    within your division, there were nearly a thousand field

14    personnel to whom you provided, to whom the DEA provided

11:31:09 15    strategic direction, correct?

16    A.    Probably about 1,200, but, yeah, right around that.

17    Q.    What is the tactical diversion squad?

18    A.    Tactical Diversion Squad is a group of Special

19    Agents, diversion investigators, and state and local

11:31:22 20    officers that work together specifically targeting

21    diversion; doctors, pharmacies, nurses, large

22    organizations that are conducting -- that are

23    participating in prescription fraud, things like that,

24    any method of diversion.

11:31:39 25    Q.    And by the time you left the DEA in 2015, you had

1    approximately 66 Tactical Diversion Squads available to

2    you, right?

3    A.    Yeah, that's -- that's correct.

4    Q.    You testified earlier that you have provided

11:32:00  5    testimony to Congress at times, correct?

6    A.    Yes, sir.

7    Q.    I'd like to ask you in particular about some

8    testimony, and you can find it on Defendants' MDL 01502

9    in your binder.

11:32:35 10    A.    Yes, sir.

11    Q.    I apologize, this -- this is a very poorly

12    photocopied, if I will, exhibit.

13         Why don't we -- let's put that aside and

14    cover that a bit later.  Let me see if I can find

11:32:58 15    something better.

16         Switching, switching topics again a bit,

17    sir, when you were at the DEA, the DEA's position was

18    that the responsibility for monitoring and preventing

19    controlled substance abuse was shared by state and

11:33:23 20    federal governments, right?

21    A.    We all had regulatory and enforcement authority at

22    the federal level, state and local agencies, yes.

23    Q.    And you've already, in some of your answers to me

24    today, pointed that out, that there were times where a

11:33:35 25    state had specific roles, correct?

1       A.    Yes.

2       Q.    While you were at the DEA, the DEA itself affirmed

3       the fact that it would never want a patient to go without

4       pain relief.

11:33:47  5                 True?

6       A.    We -- we have said different manners, but we've

7       always said that a legitimate patient should not be

8       denied medication because of supply issues.

9       Q.    And one of your goals was, of course, preventing

11:34:04  10      the abuse of pain medications?

11      A.    That is correct.

12      Q.    But you balance that goal with the policy of

13      promoting pain relief and the fact that you believed

14      patients should get the appropriate medical care to

11:34:15  15      relieve their pain.

16                  Is that fair?

17      A.    Yes, depending on the patient class, absolutely.

18                  Yes.

19      Q.    And you -- you would agree that the DEA emphasized

11:34:29  20      its view that physicians who are engaged in legitimate

21      pain treatment should not be discouraged from providing

22      proper medications to patients as medically justified,

23      correct?

24      A.    Where -- where did that -- where was that from, if

11:34:46  25      you don't mind me asking?

Cross - Rannazzisi/Majoras

1737

1    Q.    Well, actually what I could do is I could refer you

2    to your testimony in another case, if that would be

3    helpful.

4    A.    Sure.

5    Q.    If you, in your binder, and I'll just ask you to do

6    this before putting it up on the screen, this is from

7    your West Virginia trial testimony that I mentioned

8    earlier.

9    A.    Okay.

10   Q.    The date on this one is June 9th, 2021, to find the

11   transcript.

12   A.    Okay.

13   Q.    And in particular, I'm going to ask you to go to

14   Page 125, and why don't you read to yourself Lines 1

15   through 16?

16             (Pause.)

17   A.    I'm sorry, which volume is that?

18   Q.    This would be in -- I think it's done by date, June

19   9th, 2021.

20   A.    Okay.  Got it.

21             And what page was that?

22   Q.    125.

23             (Pause.)

24   A.    Okay.  I've read it.

25   Q.    And, sir, my question:  Simply having read that,

 1    does that refresh your recollection as to whether the DEA

 2    emphasized its view that physicians who are engaged in

 3    legitimate pain treatment should not be discouraged from

 4    providing proper medications to patients as medically

 5    justified?

 6    A.    Again, emphasizing "legitimate pain treatment,"

 7    yes.

 8    Q.    I'm trying to jump ahead to things that aren't

 9    already covered, sir.  Hopefully that will get you out of

10    here sooner.

11              Are you familiar with the changes in the

12    rules regarding 90-day supply of opioids while you were

13    at the DEA?

14    A.    Yes, sir.

15    Q.    And that issue is that the DEA wanted to ensure

16    that patients received the medical care they needed for

17    pain relief, and took steps on your watch to make it

18    easier for doctors to prescribe opioids for longer

19    periods of time without seeing the patients in between.

20              Correct?

21    A.    Yes.  But that was not just for opioids.

22              And, in fact, the reason that was done was

23    for a particular class of drugs.  The opioids were

24    included, but we started looking at that for ADHD

25    medication, for students that were out of state at the

Cross - Rannazzisi/Majoras

1  time and couldn't come back to get their medication every

2  month.

3  Q.   So when the rule change was made, though, and we'll

4  talk about the rule change, it covered opioid medication,

11:38:19  5  correct?

6  A.   Yes, it did.

7  Q.   Controlled substance category Class II?

8  A.   Yes, sir, it did.

9  Q.   And during -- during your tenure the DEA amended

11:38:31  10  its regulations to allow practitioners to provide

11  individual patients with multiple prescriptions to be

12  filled sequentially for those products, correct?

13  A.   That was the same -- that was the same regulation.

14  Q.   So in simple terms, what the Government did was

11:38:47  15  allow a patient to see a doctor one time and get

16  back-to-back-to-back, so 30-day supplies of prescriptions

17  to cover them for up to 90 days total, without having to

18  see the doctor in between?

19  A.   That -- that is, again, correct, but there were

11:39:07  20  things built into that, including corresponding

21  responsibility and do-not-fill dates.

22              So they couldn't get just an unreasonable

23  amount of drug, and that also stopped doctors from

24  writing large quantities of medication to last a certain

11:39:26  25  amount of time.

1      Q.     Okay. So let's break that down a little bit.

2             In the refusal-to-fill date in particular,

3    so a doctor, under the new regulation, was allowed to

4    write a prescription, three prescriptions for opioids,

5    30-day supplies; correct?

6      A.     Dated on the date he wrote, but he'd write three

7    prescriptions with a "Do not fill until" date on the face

8    of the prescription.

9      Q.     Okay. And I'm probably going to embarrass myself

10   with my calendar math, but that would mean if I went to a

11   doctor today who had decided it was an appropriate

12   treatment to have me on pain medication for 90 days, the

13   doctor today could write three separate prescriptions

14   but, for example, on the second one he would write "Don't

15   fill until November 14th," and then the third

16   prescription would say, "Don't fill until December 14th,"

17   if my math is roughly correct, for 30 days?

18     A.     That is correct.

19     Q.     And you supported that rule, didn't you?

20     A.     I did support that rule.

21            It was specifically for chronically ill

22   patients and patients who were on ADHD medication that

23   were out of state and couldn't get back to see their

24   doctors every month.

25     Q.     But the rule applied to the medication itself,

1    right?  It didn't require someone to check to see if it

2    was a student or if someone had chronic pain, did it?

3    A.    The rule applied to the medication, yes, the

4    Schedule II medications.

11:40:59 5    Q.    And you would agree that that rule change came at a

6    time when the DEA was struggling with Internet pharmacies

7    and rogue pain clinics, correct?

8    A.    Yes, sir.

9    Q.    Speaking -- speaking of pain clinics, the DEA never

11:41:16 10    adopted a rule or a practice where it refused to register

11    doctors if they were in pain clinics, did it?

12    A.    The DEA, when -- during my tenure at the DEA, we

13    looked at what the state was doing as far as the doctor

14    registration, medication -- the controlled substance

11:41:43 15    registration, as well as his medical license before we

16    issued.

17         We didn't necessarily look at where he was

18    practicing.

19    Q.    So in terms of my question, though, the DEA itself

11:41:54 20    never adopted a rule or practice where it refused to

21    register doctors if they worked at pain clinics, did it?

22    A.    No.

23    Q.    Because there are pain clinics out there that are

24    actually not rogue clinics, right?

11:42:07 25    A.    That is correct.  Yes, sir.

Cross - Rannazzisi/Majoras                    1742

1    Q.    When the DEA is investigating a doctor, it does not

2    share that information publicly, does it?

3    A.    No, it does not.

4    Q.    It wants to conclude its investigation without

11:42:31 5    knowledge being out in public, correct?

6    A.    That, and there's due process issues.

7    Q.    And the same with pharmacies:  If the DEA is

8    investigating a pharmacy, it doesn't share that publicly,

9    does it?

11:42:42 10    A.    No, sir, it does not.

11    Q.    So if a pharmacy or a pharmacist were to ask one of

12    your agents during the time you were in your role at the

13    DEA, "Should we be worried about this particular doctor

14    we are seeing prescriptions from," and you were

11:42:58 15    conducting an investigation of that doctor, you would not

16    be able to disclose the fact that investigation was

17    underway.

18                Right?

19    A.    No, because that would be a due process violation.

11:43:24 20    Q.    And likewise, if the DEA was in the process of

21    investigating a doctor who was registered with the DEA,

22    the DEA will not tell pharmacies whether or not they

23    should fill prescriptions from that particular doctor,

24    right?

11:43:40 25    A.    Again, that's -- that would be a due process

1       violation, the fact of action by the Government.

2                   No, we wouldn't do that.

3       Q.    You talked before about administrative actions that

4       the DEA could take.

11:44:05  5                   During your tenure as the DEA Office of

6       Diversion Control -- I'm sorry.  During your tenure, the

7       DEA Office of Diversion and Control delayed filing

8       administrative actions such as immediate suspension

9       orders while a criminal investigation was ongoing, right?

11:44:23 10     A.    That information is privileged, and I would not be

11      allowed under *Touhy* to answer any of those questions.

12                  MR. MAJORAS:  Your Honor, I'm afraid I need

13      to go to the headset, please.

14                  THE COURT:  Okay.

11:45:03 15                  (Proceedings at side-bar:)

16                  MR. MAJORAS:  Your Honor, during

17      Mr. Rannazzisi's deposition in Track One, that question

18      was asked of Mr. Rannazzisi.  Mr. Bennett, the DOJ's

19      lawyer, authorized him to answer the question only "Yes

11:45:16 20     or no."  He did, in fact, answer that question.

21                  And I'm happy to restrict the answer simply

22      to "Yes or no."

23                  THE COURT:  All right.  I think you can't

24      act -- answer -- I think he thought the answer was to

11:45:27 25     some specific investigation.

 1          You can say, you know, "During your tenure

 2   was there ever a situation where the DEA delayed filing a

 3   civil or administrative action pending the resolution of

 4   a criminal investigation?"

11:45:42  5          And I assume he can answer that "Yes or

 6   no."

 7                    MR. MAJORAS:  Thank you.

 8                    MR. LANIER:  Your Honor, one of the

 9   objections that I would have in this regard is that --

11:45:57 10  Mr. Majoras, please -- since the witness believes that he

11   has a *Touhy* issue, that Mr. Majoras let the witness know

12   he will limit the question to a yes or no.

13                    THE COURT:  Okay.

14                    MR. MAJORAS:  Happy to do that.

11:46:08 15                    THE COURT:  Okay.  Thank you.

16                    (End of side-bar conference.)

17   BY MR. MAJORAS:

18   Q.    So, Mr. Rannazzisi, just let me know when you're

19   ready.

11:46:36 20  A.    I'm ready.

21   Q.    The question I'm going to ask you, I'm only asking

22   for a yes or no.

23          I am not asking about any specific

24   investigation.  Okay?

11:46:47 25          So do you understand that's my parameters

Cross - Rannazzisi/Majoras                                    1745

1       on my question?

2       A.    Okay.

3       Q.    And I ask you specifically only to answer yes or

4       no.

5                     Do you understand?

6       A.    Okay.

7       Q.    So during your tenure, were there

8       situations -- were there any situations in which the DEA

9       Office of Diversion Control delayed filing administrative

10      actions such as an immediate suspension order while a

11      criminal investigation was ongoing?

12      A.    Yes.

13      Q.    Thank you.

14                    THE COURT:  And just so the jury

15      understands what we just did there, there are federal

16      regulations that govern what a present or former federal

17      official may testify to.

18                    And so that was why the question was

19      rephrased the way Mr. Majoras did, and why the witness

20      answered the way he did.

21      BY MR. MAJORAS:

22      Q.    So, Mr. Rannazzisi, I'd like to talk to you now

23      about diversion, which I think you covered in some, some

24      detail with plaintiffs' counsel earlier.

25                    Would you agree that the most frequent way

1  prescription controlled substances are obtained for

2  nonmedical use is from family and friends?

3  A.    No.

4  Q.    I'm going to ask you to turn to your West Virginia

11:48:22  5  trial testimony again, and that was testimony you gave in

6  a Federal Court like this one?

7  A.    Yes.

8  Q.    You did that under oath?

9  A.    Yes.

11:48:30 10  Q.    You swore to tell the truth in that testimony?

11  A.    Yes.

12  Q.    I'm going to ask you specifically -- and let's not

13  put this on the screen yet, please -- to turn to the

14  testimony on June 9th, 2021, Page 137, Line 23.

11:48:54 15            Are you with me?

16  A.    Line --

17  Q.    Line 23, continuing over until Page 138.

18  A.    Oh, 138?

19  Q.    Starts on 137.  Should be a question beginning with

11:49:10 20  the word "Sure."

21  A.    Yes.

22  Q.    Okay.  And I'm going to ask that this be displayed

23  on the screen so you can see it there, too, if that's

24  helpful.

11:49:23 25            At that -- at that trial, you were asked

1    the following question:  "Sure.  Of course.  The most

2    frequent method of obtaining a pharmaceutical controlled

3    substance for nonmedical use is friends and family for

4    free?"

11:49:39  5           And your answer was:  "Yes.  I've testified

6    to that based on the opinion of the Administration, but

7    that was not my own personal view."

8                 Correct?

9    A.    That is correct.

11:49:49 10   Q.    Have I read that correctly?

11   A.    Yes.

12   Q.    So this is one of the -- you mentioned at the

13   beginning of your testimony that from time to time you

14   were a mouthpiece for the Administration but from time to

11:50:00 15   time you might disagree with it?

16   A.    That is correct.

17                That was the Administration's view through

18   ONDCP, yes.

19   Q.    So your testimony or your description of that,

11:50:12 20   about the family and friends for free, was the view of

21   the Administration; in other words, the DEA, correct?

22   A.    Yes.

23                Well, not necessarily the DEA, but the

24   Administration.

11:50:28 25   Q.    But you were -- when you talk about that you were

1    always -- I'm sorry, whenever you had a discussion about

2    this, it was in your role at the DEA, right?

3    A.    Because again, that was the position of the

4    Administration, and you do have to present the position

11:50:42  5    of the Administration, yes.

6                    Absolutely.

7    Q.    So in terms of friends and family as a source of

8    prescription medication diversion, let me try this, try

9    this again.

11:50:55 10              In terms of friends and family as a source

11    of prescription medications, someone who is not actually

12    the person who is prescribed the medication may just

13    simply take those out of the medicine cabinet, right?

14    A.    That is a form of diversion, yes.

11:51:10 15    Q.    It's also a form of diversion if someone has a

16    prescription and simply gives that to the family or

17    friend because they think it might help that family or

18    friend?

19    A.    I guess that would happen.

11:51:29 20              So, yeah, that is another form of

21    diversion, yes.

22    Q.    So a family or friend -- a family member or a

23    friend may actually steal the prescription from the

24    medicine cabinet, that's a form of diversion?

11:51:41 25    A.    That's correct, but it's a very small volume.

Cross - Rannazzisi/Majoras

1749

Q.    But it's likewise a form of diversion, though, if

the person who actually has the prescription simply gives

it to that person because, you know, they may think that

will help that other person, right?

A.    Yes.  Again, but it's a very small volume.

Q.    Both of those are diversion, though, correct?

A.    Yes.

Q.    I'm going to turn our attention now to your

testimony about suspicious -- Suspicious Order Monitoring

programs.

            Now, do you recall when you testified about

that?

A.    Yes, sir.

Q.    There's no official checklist of specific elements

that a Suspicious Order Monitoring system must have from

the DEA, correct?

A.    The regulations are pretty straightforward, so, no,

I don't believe there's anything outside of the

regulations and the two letters or the three letters that

we sent.

Q.    But the DEA leaves the development and operation of

a SOM system, Suspicious Order Monitoring system, to the

registrant, correct?

A.    Yes.

            It would be a business decision of the

Cross - Rannazzisi/Majoras

1750

1    registrant how he would establish and set up.

2    Q.    And in part, that's -- I'm sorry, did I cut you

3    off, sir?

4    A.    No.  That's fine.

11:53:08  5    Q.    And in part, that's because the particular

6    registrant, the distributor, is the one that knows their

7    customers and employees better than anyone else, correct?

8    A.    They know their customer base, they know their

9    employees, and they know their capabilities at their

11:53:25 10    distribution facilities, yes.

11    Q.    And in this case, the distribution issues in this

12    case, you understand to the extent they existed among the

13    defendants were only distributing to their own stores,

14    correct?

11:53:39 15    A.    Yes, I believe so.

16    Q.    So you talked to the jury about your definition

17    of -- and I don't mean to say it's your definition -- the

18    definition you used for suspicious order and how it

19    includes orders of unusual size, deviating substantially

11:54:11 20    from a normal pattern, and orders of unusual frequency.

21          Do you recall that?

22    A.    Yes, sir.

23    Q.    So I want to follow up on that.

24          Those, those criteria are actually the only

11:54:22 25    ones specified in the regulation, right?

1    A.    That is correct.  Yes.

2    Q.    And when this comes to applying the criteria to

3    determine whether an order is suspicious, that's the

4    judgment that the DEA leaves to the distributors that we

11:54:33 5    just talked about?

6    A.    Yes.  As long as it meets the -- the requirements

7    of 1301.74, yes.

8    Q.    And those are the requirements I just read, right?

9    A.    Yes.  And that the reporting requirement, which is

11:54:48 10   underneath it.

11   Q.    And in your policy at the -- while at the DEA was

12   that you could not tell a distributor if a particular

13   order was suspicious, right?

14   A.    That was the policy of the Drug Enforcement

11:55:10 15   Administration and the Department of Justice, yes.

16   Q.    So if a distributor were to contact the DEA by -- I

17   do that all the time.  Let me start over.

18         If a distributor were to contact the DEA

19   and ask by letter or e-mail or by phone call whether a

11:55:25 20   particular order should be considered suspicious, the

21   DEA's position was that it would not answer that

22   question?

23   A.    Again, the Drug Enforcement Administration has no

24   idea about your customer base.

11:55:40 25         We don't know about your customer base.  We

1     don't know historically what a customer's done.  We don't

2     know historically how you've distributed.  We don't know

3     the -- the range of drugs, the quality, the different

4     types of drugs this pharmacy is getting.

5                     So, no, we wouldn't answer that question.

6     Q.    And, in fact, the DEA did not even have any

7     internal guidance for what qualified as a suspicious

8     order, did it?

9     A.    Well, yeah, we followed the regulations.

10    Q.    The one we just read?

11    A.    The ones you just read, yes.

12    Q.    And likewise, the DEA had no internal guidance as

13    to what would constitute a compliant system; in other

14    words, a system that would comply with the regulations.

15                    Is that correct?

16    A.    Well, yeah, the internal guidance would be that the

17    system would identify suspicious orders for reporting.

18    Q.    But other than that, the DEA didn't spell out, for

19    example, what a Suspicious Order Monitoring system should

20    have as its components?

21    A.    How you get to the point of 1301.74, identification

22    and reporting is up to the company, as I testified to.

23                    No, we wouldn't tell you what your

24    system -- we wouldn't offer you "This is the system that

25    you should use," no.

Cross - Rannazzisi/Majoras                              1753

1    Q.    And in particular, one of the things that you would

2    not do is tell a distributor you should have a certain

3    computer system that does any particular aspects of order

4    monitoring, do you?

11:57:14  5    A.    Again, no, the department and DEA would not do

6    that.

7    Q.    I believe you talked about, in your earlier

8    testimony, about information that registrants could send

9    to the DEA about their suspicious orders, correct?

11:57:35 10    A.    Could you repeat that question?  I'm sorry.

11    Q.    Sure, and it was mainly just a set-up.

12              You recall there was some testimony earlier

13    about the information the DEA would like to receive about

14    suspicious orders, correct?

11:57:49 15    A.    Yes.

16    Q.    And, in fact, what you wanted the registrants to

17    send your office or the relevant field office were

18    specific suspicious orders, the truly suspicious ones,

19    right?

11:58:05 20    A.    That is correct.  Yes.

21    Q.    And, in fact, I think you gave some examples of

22    where, you know, maybe the order was for 20,000 and

23    suddenly goes to 40,000, and maybe even up to a hundred

24    thousand; is that right?

11:58:16 25    A.    Yes.

1       Q.      That was --

2       A.      That was just an example.

3               I mean, there's -- there's several

4       different ways you could identify a suspicious order.

11:58:27  5               That's -- that was a basic example of what

6       a suspicious order would look like.

7       Q.      So that's the example you gave us at this trial,

8       but the DEA didn't actually publish examples of

9       suspicious orders, did it?

11:58:40  10      A.      Didn't publish examples of suspicious orders, but I

11      believe in one of the letters, maybe it was the first

12      letter, it talks about how to evaluate the suspicious

13      order based on the criteria and definitions within

14      1301.74(b).  I believe that's in the 2006 letter.

11:59:02  15      Q.      Sir, in the information that the DEA sent to the

16      public, your testimony is now that the DEA is going to

17      give specific information as to how to identify a

18      suspicious order?

19      A.      No.

11:59:16  20               That -- you asked for a -- the question, I

21      believe you said, was you wanted to look at a specific

22      suspicious order, and I believe the letter kind of

23      discussed in each category how -- you know, one way you

24      could evaluate it, just to show you that there's ways to

11:59:36  25      evaluate it.

1    Q.    Okay.

2                    MR. MAJORAS:  Your Honor, if this is

3    appropriate for you, I think it's a good point.

4                    THE COURT:  I would suggest that you break

11:59:43  5    at a convenient time, Mr. Majoras.

6                    So, all right, ladies and gentlemen, we'll

7    take our lunch recess.

8                    One hour.  Usual admonitions apply, and

9    we'll pick up with the balance of this witness's

11:59:53 10    testimony.

11                    (Jury out.)

12                    THE COURT:  All right.  If everyone can be

13    seated for a moment.

14                    Sir, you can step down.  I have a matter I

12:00:31 15    want to cover.

16                    Special Master Cohen and I have been

17    reviewing a number of objections to the designations of

18    Mr. Nelson's deposition.

19                    He was a former Walmart employee, I

12:00:47 20    understand, and there were a number of objections to the

21    demonstratives that Mr. Lanier used in the deposition.

22    Basically the, I guess, charts that he created during the

23    testimony.

24                    And Special Master Cohen and I have

12:01:02 25    determined that there are a lot of those charts,

1    demonstratives, where Mr. Lanier wrote things that the

2    witness didn't say or didn't agree to.

3              And the best thing -- this is what I've

4    concluded, that if the plaintiffs want to go forward with

12:01:24 5   the deposition, we'll just do it without the

6    demonstratives and the charts.

7              But if the plaintiffs prefer to have

8    Mr. Nelson testify live via video, they may do so.

9    That -- they are allowed one, one witness per defendant,

12:01:44 10  and if they want to use their Walmart witness to be

11   Mr. Nelson, they can do so.

12             So it's their choice, either use the

13   deposition without the charts, without the

14   demonstratives, and just the witness's answers and, of

12:02:00 15  course, the questions, or have him -- arrange to have him

16   testify live via video.

17             MR. LANIER:  Understood, Your Honor.

18             Can we have until after lunch to make that

19   decision?

12:02:09 20            THE COURT:  That's fine.  You can --

21             MR. LANIER:  Thank you, Judge.

22             MS. FUMERTON:  So, Your Honor, just to

23   respond to a couple of things on that point.

24             So, first of all, they had made their

12:02:21 25  selection under your trial order as to which their one

1  witness would be under Rule 43.

2       Your order specifically states that if then

3  the defendant chooses to bring that witness live, that

4  they don't get a second choice.  So they had chosen

12:02:36 5  Suzanne Hiland as their Rule 43 witness.

6       We then said we would bring her live, so we

7  don't think it's fair for them to get a second bite at

8  the apple with respect to this.

9       MR. LANIER:  So, Your Honor, if we need to

12:02:50 10  do this with Mr. Nelson and that's the choice we make, we

11  will forego Ms. Hiland as our one choice.

12       We will make that determination over lunch.

13       MS. FUMERTON:  Again, I'm not quite sure

14  that's how the process was supposed to go.

12:03:01 15       THE COURT:  Well, Ms. Fumerton, I mean you

16  objected.

17       I mean, I'm trying to be fair to everyone

18  and they get one Walmart witness, you know, remotely, and

19  you get -- you can do the same thing.

12:03:13 20       So there's no way -- there's no way to, you

21  know, say this slides in, this slides out, it will all be

22  truncated, so this is the cleanest way to do it.

23       And if they are happy with that, we will do

24  it.  If they want to have Mr. Nelson testify live via

12:03:34 25  video, then -- and I'll make sure that any demonstratives

1   Mr. Lanier uses are within my boundaries, which is

2   they've got to be accurate, and they can't be in advance

3   of what the witness says.

4                   MS. FUMERTON:  So, Your Honor, the only

12:03:48  5   other point that -- I guess two additional points we

6   would make is we objected at the time during the

7   deposition that these demonstratives were being made and

8   that they were inaccurate.

9                   He had the opportunity during the

12:04:01  10   deposition to do that.  He chose, Mr. Lanier chose not

11   to, to forego that, and to continue to use his misleading

12   demonstratives.

13                   So it seems unfair for Walmart to then have

14   to bear the --

12:04:15  15                   THE COURT:  Walmart is benefiting because a

16   number of the demonstratives are okay, and I'm telling

17   him he can't use any of them.

18                   MS. FUMERTON:  So, Your Honor, we have a

19   much easier way to solve this issue would be not to show

12:04:29  20   the demonstratives.  That absolutely can be done.  The

21   witness can still testify.

22                   THE COURT:  Well, I've made my ruling.  I

23   think it's a fair one.

24                   MR. LANIER:  Thank you, Judge.
                    (Luncheon recess taken).
12:04:43  25                   (Proceedings concluded at 12:04 p.m.)
                              -  -  -  -

1        WEDNESDAY, OCTOBER 13, 2021, 1:16 P.M.

2              (Jury in.)

3              THE COURT:  All right.  Please be seated.

4              All right.  I apologize for the delay.  I

13:19:14  5   had two criminal matters during the noon hour, and one of

6    them started late because of some technical issues and it

7    finished late.

8              So it was on me.

9              So, Mr. Majoras, you may continue your

13:19:27 10  cross-examination.

11             And, Mr. Rannazzisi, you're still under

12   oath from this morning.

13             THE WITNESS:  Thank you, Your Honor.

14             MR. MAJORAS:  Thank you, Your Honor.  Good

13:19:35 15  afternoon, folks.  Good afternoon, Mr. Rannazzisi.

16             THE WITNESS:  Good afternoon.

17      CROSS-EXAMINATION OF JOSEPH RANNAZZISI (RESUMED)

18   BY MR. MAJORAS:

19   Q.   And I just remind you again in terms of the

13:19:43 20  questions I'm asking you and the basis for your response

21   to continue to do what you've done both with me and

22   Mr. Lanier, to talk within your personal information,

23   personal experience.

24             Is that fair?

13:19:52 25  A.   I'm sorry, could you --

1      Q.    Is it fair that you continue to do that, speak from

2      your own personal experience and information?

3      A.    Based on my time at DEA, yes.

4      Q.    Yes, sir.

13:20:03   5      A.    Based on my tenure at DEA, yep.

6      Q.    Exactly.  I want to go back to a topic you and I

7      spoke about earlier, which was the quotas.

8              And I want to make sure there's no

9      confusion here.

13:20:16  10             One of the things we talked about was

11      exports, do you recall that, just briefly?

12      A.    Yes, sir.

13      Q.    And I want to make sure the exports we're talking

14      about, there are exports of legitimate products and

13:20:29  15      chemicals used in the substances that the DEA is

16      providing quotas on, correct?

17      A.    No.  Companies will export raw materials that's

18      manufactured here in the United States.  It's part of the

19      aggregate production quota, yes.

13:20:45  20      Q.    Okay.  And I guess what I want to get to is if you

21      talk about, for example, illegal heroin, that's not

22      included at all in the quota?

23      A.    That's not necessarily true, because there's

24      research being done in all aspects of opioids.  There

13:21:01  25      could be someone out there who's doing something with

1  heroin, so it could be in the quota, yes.

2  Q.    You'd expect that to be very minor?

3  A.    Very small, yes.

4  Q.    And the same question with illegal Fentanyl we've

5  often heard exported into the United States, that's not

6  part of a quota, right?

7  A.    No.  There's no illicit drug that's outside of the

8  closed system of distribution that's within the quota.

9  Q.    Sir, I'd like to turn your attention now, if you

10  would, to a new exhibit, and it's in your book, it's

11  Defendants' Exhibit MDL 01107.

12        Could you turn to that, please?

13  A.    Yes.

14  Q.    Ready?

15  A.    Yes.

16  Q.    Thank you.

17        While you were at the DEA, the Government

18  Accountability Office had concluded in a report that the

19  DEA should give more guidance to distributors, correct?

20  A.    Yes.  There was a report that was done, yes.

21  Q.    The GAO or the Government Accountability Office is

22  often referred to as a watchdog within the Government?

23  A.    I'm sorry?

24  Q.    I said is it true that the Government

25  Accountability Office or the GAO is often referred to as

Cross - Rannazzisi/Majoras

1       a watchdog within the Government?

2       A.    They're auditors of Government programs.

3       Q.    So if we look at what we have in front of us, and

4       in front of you, on the monitor, it's the United States

13:22:49 5     Government Accountability Office Report to Congressional

6       Requesters, and the date is June, 2015.

7                    Correct?

8       A.    Yes.

9       Q.    That was prior to your retirement?

13:22:58 10    A.    Yes.

11      Q.    And the title of the report itself is "Prescription

12      drugs, more DEA information about registrants' controlled

13      substances roles could improve their understanding and

14      help ensure access."

13:23:17 15                  Is that right?

16      A.    That's what it says, yes.

17      Q.    Just so the jury is reminded of this, distributors

18      are the groups that are also referred to as wholesalers,

19      correct?

13:23:31 20    A.    That's correct.

21      Q.    And you're not only aware that this report came out

22      while you were at the DEA, you actually responded to it,

23      didn't you?

24      A.    Yes, I did.

13:23:43 25    Q.    Why don't we take a look at that, it's at Page 82,

1    please.

2                    And you can see here that this is the

3    response that you sent to the DEO -- I'm sorry -- the GAO

4    report once it came out, correct?

13:24:03  5    A.    That's correct.

6    Q.    That's your signature?

7    A.    Yes, it is.

8    Q.    All right.  Let's look to some other parts of the

9    report itself, and in particular, I'm going to ask you to

13:24:12 10   turn to Page 27.

11                    And in particular, I'm going to go to I

12   guess which is the first full paragraph, the one

13   beginning "The guidance document."

14                    And you would agree that this is one of the

13:24:38 15   recommendations that the GAO had, which is that "A

16   guidance document for distributors similar to one offered

17   for pharmacies and practitioners could help distributors

18   further understand and meet their roles and

19   responsibilities under the CSA for preventing diversion,

13:24:55 20   though the document may not need to be as detailed."

21                    Do you see that?

22   A.    Yes.

23   Q.    And it continues that "Such steps are key to

24   addressing distributors' concerns, as without sufficient

13:25:07 25   guidance and communication from DEA, distributors may not

1       be fully understanding or meeting their roles and

2       responsibilities under the CSA for preventing diversion."

3                    Did I read that correctly?

4       A.    Yes, I believe so.

13:25:21  5   Q.    And in furthering the Government Accountability

6       Office's recommendation, there's an additional part

7       beginning with "In the absence of" in the middle, and

8       I'll ask Mr. Ferry to highlight that so we know where it

9       is.

13:25:43 10              MR. MAJORAS:  About two-thirds of the way

11      down, right about there, Steve.  Just lightly higher.

12      Okay.  Thank you.

13      Q.    So the additional recommendation is that "In the

14      absence of clear guidance from DEA, our survey data show

13:26:00 15  that many distributors are setting thresholds on the

16      amount of certain controlled substances that can be

17      ordered by customers, i.e. pharmacies and practitioners,

18      which can negatively impact pharmacies and ultimately

19      patients' access."

13:26:15 20              Is that what the GAO wrote?

21      A.    Yes.

22                   MR. MAJORAS:  Let's turn to Page 44 of

23      their report, please.

24                   So, Mr. Ferry, if you would go to the

13:26:47 25  second recommendation.

1         No, I'm afraid I'm not -- I'm not with you.

2    If you could take that down, please.  Oh, I'm sorry, I'm

3    reading the wrong -- my wrong notes.

4         Let's, again -- you're correct where you

13:27:16  5    are, Mr. Ferry.  Please highlight that.

6    BY MR. MAJORAS:

7    Q.    So an additional recommendation, do you see where I

8    am, sir, in the middle of the page, "Solicit input from

9    distributors"?

13:27:26 10    A.    Yes.

11    Q.    The additional recommendation from the Government

12    Accountability Office is that "Solicit input" -- is to

13    "Solicit input from distributors or associations

14    representing distributors, and develop additional

13:27:39 15    guidance for distributors regarding their roles and

16    responsibilities for suspicious orders monitoring and

17    reporting."

18         And that's what the GAO is recommending to

19    the DEA, correct?

13:27:49 20    A.    That's correct.

21    Q.    And the DEA responded to that second

22    recommendation, didn't it?

23    A.    I have to go back and look.  It's been awhile.

24    Q.    Well, if we go into the -- if we go into the same

13:28:04 25    document, Page 45, please.  And the bottom paragraph

 1    starting, "DEA raised concerns."

 2              So the GAO in writing their report, they

 3    recognized that the DEA had raised concerns and wrote,

 4    "DEA raised concerns about our second recommendation to

13:28:36  5    solicit input from distributors or associations

 6    representing distributors, and develop additional

 7    guidance for distributors regarding their roles and

 8    responsibilities for suspicious orders monitoring and

 9    reporting.  DEA stated that short of providing arbitrary

13:28:54 10    thresholds to distributors, it cannot provide more

11    specific suspicious orders guidance because the variables

12    that indicate a suspicious order differ among

13    distributors and their customers."

14              Do you see that, sir?

13:29:06 15    A.    Yes.

16    Q.    And you had testified earlier that some of those

17    variables and what the distributors knew about their

18    business would be important in arriving at their own

19    thresholds, correct?

13:29:19 20    A.    Yes.  That's why it's a business decision.

21    Q.    Okay.  I'd like to turn our attention now to your

22    testimony about red flags.

23              Is it fair to say that the DEA does not

24    regulate the practice of medicine?

13:29:40 25    A.    No, the practice of medicine is regulated by the

1    states.

2    Q.    And the DEA does not define medical standards of

3    practice either, does it?

4    A.    Again, the practice of medicine's regulated by the

13:29:55  5    states.

6    Q.    Let's turn to Defendants' Exhibit MDL 10857,

7    please.

8                    And this is, on the screen in front of us

9    is -- if you would take that down just a moment,

13:30:32  10    Mr. Ferry.  Thank you.

11                    This is a -- I'm trying to read it -- a

12    response to a request, and if you look at the re: line on

13    the top, the subject is "Concern about current

14    regulations."

13:30:49  15                    Do you see that, sir?

16    A.    Yes, sir.

17    Q.    Okay.  And if we go into the document, I know we've

18    taken out the specific information about to whom it was

19    sent; in fact it may have been produced to us that way.

13:31:01  20                    If we go to the bottom of the paragraph,

21    the first paragraph that says, "The doctor is the one,"

22    it says, "The doctor is the one who goes to medical

23    school and is licensed by the state in which he or she is

24    located to practice medicine.  The doctor is the

13:31:18  25    only" -- I'm sorry -- "The doctor is the one who is

```
         1    legally authorized to make these medical decisions, not

         2    the DEA.  The DEA will only intervene in those situations

         3    where a doctor or pharmacist is engaged in large-scale

         4    illegal dispensing and distribution of controlled

13:31:36 5    substances."

         6                   And is that consistent with the DEA's

         7    position when you were in your position there?

         8    A.    Well, that's not the standard, and this letter was

         9    done four years after I left, and I've never seen this

13:31:56 10   letter, and I don't know who wrote the letter, I don't

         11   know the context of the letter.

         12                  But not necessarily.

         13                  Our standard is for doctors, according to

         14   Moore.  Issuing a prescription for legitimate medical

13:32:09 15   purpose in the usual course of professional practice,

         16   that same standard operates for the pharmacists,

         17   including the corresponding responsibility analysis

         18   that's required by the pharmacists.

         19                  This is not -- this is not anything I've

13:32:22 20   ever seen before.  It's not anything that I can really

         21   comment on because it's --

         22   Q.    Fair enough.

         23                  MR. LANIER:  And, Your Honor, I am going to

         24   object.

13:32:33 25                  Mr. Majoras then has asked a question about
```

1  a document four years after this gentleman left the DEA,

2  asking this gentleman his opinion on which, which can

3  only be asked as an expert; it cannot be asked as a fact

4  witness since this is not something he was there for.

5  And if we're opening him up to that kind of

6  testimony, then I think it's an open door.

7  MR. MAJORAS:  Your Honor, my question is

8  very --

9  THE COURT:  The question was asked:  Is

10  this consistent with what the view of the DEA when you

11  were in charge, when you were there, and he said no, and

12  he explained it.

13  So I think that's a fair question.  He said

14  it's not, things have changed.

15  BY MR. MAJORAS:

16  Q.  Let's turn to another exhibit, Defendants' Exhibit

17  MDL 00498.

18  A.  Yes, sir.

19  Q.  So this document, as you can see, is titled "*The*

20  *Practitioner's Manual*, an Informational Outline of the

21  Controlled Substances Act."

22  Do you see that?

23  A.  Yes, sir.

24  Q.  And it was produced by the United States Department

25  of Justice Drug Enforcement Administration, correct?

1    A.    Yes, sir.

2    Q.    That's the DEA?

3    A.    Yes, sir.

4    Q.    And the date on this is 2006, is that correct, sir?

13:34:12  5    A.    That's correct.

6    Q.    This is the DEA's practitioner manual that your

7    office published at that time, right?

8    A.    Yes, sir.

9    Q.    And the purpose of the manual is to provide

13:34:28  10   guidance to prescribers regarding their duties under the

11   Controlled Substances Act, correct?

12   A.    It's that, and also an overview of the Controlled

13   Substances Act and controlled substances.

14   Q.    You would agree that there are no specific federal

13:34:55  15   limits on the quantity of drugs that can be dispensed to

16   be a prescription, correct?

17   A.    There is nothing in the statute based on quantity

18   of a prescription -- quantity of drugs written in a

19   prescription.

13:35:17  20   Q.    And that's because the criteria, like a

21   prescription quantity, will vary from patient-to-patient

22   and depend on the patient's unique medical history and

23   condition?

24   A.    Yes, I would say that's probably one of the

13:35:34  25   reasons, yes.

1    Q.    Now, the DEA never published a distributor's

2    manual, did it?

3    A.    During my tenure at the Drug Enforcement

4    Administration, we did not publish a distributor's

13:35:56 5    manual.

6    Q.    And we just looked at a *Practitioner's Manual*, but

7    the DEA also published a *Pharmacist's Manual*, right?

8    A.    That's correct.  Yes.

9    Q.    And that manual contains public -- published

13:36:14 10    guidance from the DEA specifically for pharmacists?

11    A.    The *Pharmacist's Manual*, yes, for operation of

12    controlled substance within the pharmacies, yes.

13    Q.    So let's just mark that so we can make sure we're

14    talking about the same thing.

13:36:29 15           If we could turn to Defendants' Exhibit MDL

16    00507, please.

17    A.    Yes, sir.

18    Q.    And again, you have the front page on the screen.

19    It's identified as a document from the United States

13:36:50 20    Department of Justice Drug Enforcement Administration,

21    correct?

22    A.    Yes, sir.

23    Q.    And it's titled *Pharmacist's Manual*, an

24    Informational Outline of the Controlled Substances Act,

13:37:00 25    correct?

1        A.    That is correct.

2        Q.    This particular one was revised in 2010?

3        A.    Yes.

4        Q.    The DEA from time to time will revise its manuals

5   when it feels a need?

6        A.    Yes.

7        Q.    In fact, this particular one, given the time

8   period, 2010, was a manual that you reviewed and

9   approved, right?

10       A.    Yes.

11       Q.    In fact, if we turn to the second page of the

12  manual, we see your name right there, second from the

13  top, correct?

14       A.    Yes, sir.

15       Q.    And you would agree that it's important for a

16  manual such as this to be complete and accurate, right?

17       A.    Based on the -- complete and accurate synopsis of

18  the regulations and the statute, yes.  That's what it's

19  for, so they don't have to go through the whole book of

20  regulations and statutes to find something that was

21  pertinent to them.

22       Q.    And you're not aware of anything in this manual, in

23  the *Pharmacist's Manual*, that instructs a pharmacist to

24  document resolution of red flags, are you?

25       A.    Not in this manual, no.

Cross - Rannazzisi/Majoras

1773

1    Q.    So you gave an example, I think it may have been

2    yesterday, may have been this morning, about if a

3    pharmacist were to call a doctor's office to get

4    information, you gave that as an example of something you

13:38:42 5    thought should be documented, correct?

6    A.    Yeah.  And I'm pretty sure that under state law

7    that would be something that should be documented, yeah.

8    Q.    Is that written in this manual, sir?

9    A.    Again, we don't dictate the practice of pharmacy.

13:38:57 10    That's done by the state.  That's why it would be in

11    state law, but we would look at the state law to

12    determine if the practitioner, be it a pharmacist or a

13    doctor, was doing what he was doing in line with the

14    practice guidelines of the state.

13:39:12 15    Q.    Anything in this document say -- anything in this

16    *Pharmacist's Manual* say "If you want to learn about

17    documentation, take a look at state law"?

18    A.    No.

19    Q.    And you would also agree that there's nothing in

13:39:35 20    the *Pharmacist's Manual* that talks about using a

21    pharmacy's computer systems or algorithms to identify red

22    flags, is that right?

23    A.    I don't believe there's anything in this manual

24    that discusses that.

13:39:54 25    Q.    Are you aware of any statute or regulation from

1    your time at the DEA that states a pharmacist must

2    document the resolution of red flags on prescriptions?

3    A.    Again, during my time at the DEA, I don't recall

4    any, any document that states that, no.

13:40:13   5    Q.    And are you aware of any point in time in your time

6    at the DEA where the DEA sent a "Dear Registrant" letter

7    to pharmacists or pharmacies, instructing them on how to

8    document resolution of red flags?

9    A.    No.

13:40:38  10          Notice would probably be given within the

11    final orders that were handed down by the

12    Administrator -- by the DEA Administrator.

13    Q.    And are you aware of anyone at DEA sending a "Dear

14    Registrant" -- maybe I should qualify what that is.

13:41:00  15          We saw some "Dear Registrant" letters

16    earlier today, didn't we?

17    A.    Yes, sir.

18    Q.    And those are the types of letters the DEA would

19    send to someone who has a DEA registration, providing

13:41:11  20    information the DEA wanted them to know?

21    A.    Yes, sir.

22    Q.    And are you aware of anyone at DEA ever sending a

23    "Dear Registrant" letter to a pharmacist or pharmacies

24    instructing them to use their computer systems or

13:41:26  25    computer algorithms to identify red flags on

1    prescriptions?

2    A.    No.    DEA wouldn't do that, because that's something

3    that we wouldn't do.

4    Q.    I'd like to turn now to some of your discussion of

13:41:39  5    red flags from this morning.

6    A.    Sure.

7    Q.    I'll try to put up a slide that you saw earlier.

8            But before I do that, one of the -- one of

9    the red flags that you've identified is distance between,

13:42:10 10    I think you discussed some of that yesterday, between the

11    pharmacist and where the patient lives, and perhaps where

12    the doctor's located?

13    A.    Yes, sir.

14    Q.    And I believe in your examples, and if I'm wrong

13:42:21 15    just tell me, you used 50 miles or 20 miles for some of

16    those examples, correct?

17    A.    Yes, sir.

18    Q.    Your significant point of your testimony is that

19    distance is a potential indication, if there are

13:42:38 20    significant distances that's a potential indication of a

21    possible problem with that prescription, correct?

22    A.    Distance can be a factor, yes.

23    Q.    And there's no specific number of miles between a

24    prescriber and a patient that would trigger a red flag,

13:42:53 25    is there?

1    A.    No.  There's no specific, but there's some things

2    that just jump out at you.

3    Q.    Sure.  And in that case, a pharmacist should use

4    their professional judgment, right?

13:43:07  5    A.    That's right.

6                     He should inquire, make inquiries.

7    Q.    Unless the pharmacist, because of the local area,

8    already understands what the circumstances are, right?

9    A.    Well, now you're asking me to put myself in the

13:43:22  10    pharmacist's position.

11    Q.    I won't do that.

12    A.    The pharmacist uses professional judgment, yes.

13    Q.    Fair enough.  Thank you.

14                     I'm going to try to put this up on the

13:43:45  15    screen.

16                     Mr. Pitts, if I could switch over.

17                     Do you recognize this slide that you saw

18    this morning that Mr. Lanier showed you which was

19    entitled "Resolution is comprised of many factors"?

13:44:05  20    A.    Yes.

21    Q.    And the resolution we're talking about here is a

22    resolution of red flags, right?

23    A.    Yes.

24    Q.    And if you look at the third point, you just made

13:44:19  25    this point about using professional judgment, which

1    includes training and experience; is that right?

2    A.    Yes.

3    Q.    You even note in your slide that we all make

4    mistakes, right?

13:44:28  5    A.    That's -- that's absolutely correct.

6    Q.    Judgment, sometimes judgments are correct,

7    sometimes they're wrong?

8    A.    Yes.  Just when you make the same mistake 30 times

9    in the same day, that's no longer a mistake.

13:44:40 10    Q.    Fair enough.

11                Would you agree with me that, if you go to

12    the fourth bullet point, "Knowledge and history with the

13    patient," that's something that the individual pharmacist

14    on location might be able to assess, right?

13:44:53 15    A.    Absolutely.  Yes.

16    Q.    And when we talk about circumstances of

17    prescription presentation, this may come down to how the

18    person looks as they're providing the prescription to the

19    pharmacy?

13:45:06 20    A.    Not so much look as far -- that's not what that is

21    for.

22                I think in that bullet we're talking about

23    three people are walking in and handing the pharmacist

24    the same prescription from the same doctor who is a few

13:45:21 25    miles, 30, 40 miles away; yeah, those are circumstances

Cross - Rannazzisi/Majoras

1778

1    that the pharmacist should look at.

2    Q.    So that's something that the pharmacist in the

3    store should be observing, right?

4    A.    Absolutely.

13:45:32 5    Q.    And when you talk about the next bullet point,

6    "Experience with prescribing practitioner," that's the

7    pharmacist's experience, right?

8    A.    That's correct.  Yes.

9    Q.    And then I want to make the point, the last bullet

13:45:45 10    point, it says here, "It does not require a call to the

11    practitioner for every CS Rx," CS is controlled

12    substance, is that right?

13    A.    That's correct.

14    Q.    And Rx is prescription?

13:45:57 15    A.    That's correct.

16    Q.    So the resolution of red flags doesn't always

17    require a call to the prescriber, right?

18    A.    May I explain why that's there?

19    Q.    Well, first, I'd like an answer to my question.

13:46:07 20    A.    It doesn't, no, it doesn't require a call for every

21    controlled substance prescription.

22    Q.    Okay.

23              You can take that down, Mr. Pitts.  Thank

24    you.

13:46:27 25              Yesterday, Mr. Lanier asked you some

1    questions about ratios of controlled substances to

2    noncontrolled substances that have been dispensed.  Do

3    you recall that?

4    A.    Yes.

13:46:39 5    Q.    Now, you agree that that ratio can be an indicator

6    of diversion, correct?

7    A.    Yes, it can be, yes.

8    Q.    And so just so we're clear, when we're talking

9    about "the ratio" is if we look at the amount of

13:46:52 10   controlled substances that are dispensed, and we compare

11   it to the overall prescriptions dispensed by the

12   pharmacy, correct?

13   A.    That's correct.  Yes.

14   Q.    And you, you talked about rogue pharmacies.

13:47:07 15              In your experience at the DEA, you have

16   found rogue pharmacies to have that ratio as high as 90

17   to 95 percent, haven't you?

18   A.    It was high.  I don't know if 90 95, but we've seen

19   pharmacies in the '70s, yes, absolutely.

13:47:27 20   Q.    And those numbers are probably -- when the numbers

21   are that high, that's a problem to you at the DEA, right?

22   Or let me rephrase that.

23              When the numbers are that high, you see

24   that as a problem at the DEA, right?

13:47:40 25   A.    Again, it can be a problem.  It's part of an

1    analysis that's being done.

2    Q.    It's a useful measurement?

3    A.    It's an indicator, it's a pointer.

4    Q.    I want to be sure we understand your relationship,

13:47:59  5    your testimony in relationship to Trumbull County and

6    Lake County.

7                You're not here to tell the jury whether

8    any of the pharmacy defendants, in fact, shipped a

9    suspicious order into Lake or Trumbull County, are you?

13:48:12  10    A.    No.  I'm here to discuss my time at DEA and what

11    happened during that time.

12    Q.    So you haven't made any analysis about Lake or

13    Trumbull County, either from the distribution side of the

14    business or the pharmacy side.

13:48:27  15                Is that fair?

16    A.    That is correct.

17    Q.    Switch topics again.

18                Would you agree that the DEA regulations

19    are clear that the responsibility for the proper

13:48:54  20    prescribing and dispensing of controlled substances is

21    upon the prescribing practitioner?

22    A.    Yes.  That's -- that's clear, because there's a

23    second part to that that discusses what the pharmacist's

24    responsibility are.

13:49:13  25    Q.    But with respect to the practitioner or the doctor,

1    I'll just use that, that phrase, to the doctor, the

2    doctor is the one who examines the patient, makes the

3    diagnosis, and then designs the treatment; correct?

4    A.    That's what's supposed to happen, yes.

13:49:41 5    Q.    You would agree that none of the pharmacy

6    defendants in this case are authorized by federal law to

7    write prescriptions, right?

8    A.    In the State of Ohio?

9    Q.    Yes, sir.

13:50:00 10    A.    I believe I would agree with that, yes.

11    Q.    Sir, I'd like to talk a little more about the

12    prescribing doctors.

13              During your time at the DEA, the DEA had

14    taken the -- had made the -- let me start over.

13:50:26 15              During your time at the DEA, the DEA had

16    stated that 99 percent or more of prescribers were not

17    overprescribing; isn't that right?

18    A.    That was -- that statement was made in the context

19    of how many people were actually charged with

13:50:44 20    administrative criminal and civil violations.

21    Q.    Well, you yourself were on record testifying that

22    99 percent of doctors are perfect, aren't you?

23    A.    That's -- that's right, based on civil/criminal

24    administrative prosecutions.

13:50:59 25    Q.    That was testimony you gave to Congress?

1    A.    Yes.

2    Q.    And during your time at the DEA, the DEA was also

3    on record as recognizing that nearly every prescription

4    issued by a physician in the United States is written for

5    a legitimate medical purpose in the usual course of

6    professional practice, correct?

7    A.    That, I don't know where that came from.

8                Do you have a document that I could look

9    at, please?

10   Q.    We have MDL 01096, please, Defense Exhibit.  Let me

11   know when you're ready, sir.

12   A.    Yes.

13   Q.    Okay.  So looking at the title or the initial page

14   of this document, this is a page on the *Federal Register*,

15   do you see that?

16   A.    Yes, sir.

17   Q.    It's dated September 6th, 2006, while you were at

18   the DEA; is that right?

19   A.    Yes, sir.

20   Q.    And in sort of the subheading it has Department of

21   Justice Drug Enforcement Administration?

22   A.    Yes, sir.

23   Q.    So let's go to Page 7, please.

24                The *Register* writes in very small prints, don't they?

25                The language I'm looking for is beginning

1    "To the contrary."

2              So you see it's highlighted on the screen.

3    You may find it in sort of the bottom right on that page.

4    A.    In the very -- I'm saying, where is it?  Is it

13:53:27 5    under "Other recurring questions"?

6    Q.    It is -- Mr. Ferry, if you can move that up just a

7    touch -- right above "Other recurring questions," please.

8    A.    Okay.

9    Q.    So then up on the screen, the agency -- this is

13:53:40 10    what the agency reported in the *Federal Register*.

11             "To the contrary, the agency recognizes

12    that nearly every prescription issued by a physician in

13    the United States is for a legitimate medical purpose in

14    the usual course of professional practice."

13:53:53 15             Was that the agency's statement on that

16    issue?

17    A.    Yes.  That's -- that's in there, that's correct.

18    Q.    And --

19    A.    That's in there.

13:54:17 20    Q.    -- this particular statement is something you would

21    have reviewed while you were in your role at the DEA,

22    correct?

23    A.    Again, I would have reviewed it, but because this

24    is a *Federal Register* notice that would impact the

13:54:34 25    practice of medicine, it would impact certain aspects of

1    the Department of Justice and DEA, it would have to be

2    vetted through multiple agencies, including the FDA, so

3    FDA and HHS; so, therefore, again, this document is a

4    position of the United States Government; not necessarily

13:54:58 5    the Drug Enforcement Administration.

6    Q.    And I'm not sure you answered exactly my question,

7    which is, do you recall that you did, in fact, review

8    this document before it was published in the *Federal*

9    *Register*?

13:55:09 10   A.    Yes, I reviewed it with countless other people.

11   Q.    Let's take a look at -- I think we may have

12   done -- I'm sorry, we're on the same document.

13              Let's look at Page 5 of this document,

14   please.

13:55:38 15   A.    Page 5.

16   Q.    And Mr. Ferry is going to call up a section of it

17   beginning "The number of physicians who prescribe," which

18   is actually a subheading of the document, so the

19   right-hand side, the subheading.

13:55:59 20             And the subheading reads, "The number of

21   physicians who prescribed controlled substances in

22   violation of the CSA is extremely small and there is no

23   DEA crackdown on physicians."

24             Did I read that correctly?

13:56:21 25   A.    Yes, you did.

Cross - Rannazzisi/Majoras                                    1785

1    Q.    And this is from that same document, which, as you

2    described, was the Government's position, correct?

3    A.    That is correct.

4    Q.    And if you go on further -- yes, Mr. Ferry, that's

13:56:42 5    exactly where I'm headed.

6              So down that same column, sir, there's the

7    italicized part beginning with the words "In any given

8    year" which is on the screen.

9    A.    Yes.

13:56:53 10    Q.    And as part of that document, the Government

11    stated, "In any given year, including 2005, fewer than

12    one out of every 10,000 physicians in the United States,

13    less than .01 percent, lose their controlled substance

14    registrations based on a DEA investigation of improper

13:57:12 15    prescribing."

16              Did I read that correctly?

17    A.    That's correct.  That's just the -- the

18    administrative cases.

19    Q.    And in fact, that information provided was correct

13:57:24 20    information, right?

21    A.    Yes.

22    Q.    Moving on.  Now, prior to your retirement, you were

23    transferred to another area of the DEA?

24    A.    Prior to my retirement, I was -- yes, I was.

13:58:08 25              I was -- it was a position to be named.

            1     Q.    Okay.  And part of the reason that you decided to

            2     retire is that you felt it was time to leave rather than

            3     move into that new position?

            4     A.    Well --

13:58:20    5     Q.    It wasn't named.  So --

            6     A.    The new position wasn't named, and I didn't want to

            7     take another transfer and submit my family to another

            8     transfer wherever.

            9               I had already transferred numerous times.

13:58:43   10     Q.    Sir, I'd like to show you -- and, Mr. Pitts, I'll

           11     ask you to bring up the monitor again -- this is another

           12     slide that you talked about this morning.

           13               Do you recall that?

           14     A.    Yes, sir.

13:59:04   15     Q.    And you said that you wanted to make clear to the

           16     audience that because you had no financial relationships,

           17     you had no bias, correct?

           18     A.    That is correct.

           19     Q.    Now, since you retired from the Government, you get

13:59:18   20     your Government pension, right?

           21     A.    Yes, sir, I do.

           22     Q.    But your only other income at the moment comes from

           23     your working with plaintiffs' lawyers in litigation like

           24     this, correct?

13:59:29   25     A.    That's correct.

1    Q.    And I believe you've testified that since 2017,

2    you've received over $950,000 for working with those

3    plaintiffs' lawyers?

4    A.    Yeah.  I believe it's less than that, but 900,

13:59:44 5    yeah.

6    Q.    In that range?

7    A.    In that area, yeah.

8    Q.    And is it fair to say that the vast majority of

9    your income comes from your work with plaintiffs'

13:59:51 10   lawyers?

11   A.    Yes.

12   Q.    And that has been the case since 2017, correct?

13   A.    Yes.

14              MR. MAJORAS:  No further questions, Your

14:00:01 15   Honor.

16              Thank you, Mr. Rannazzisi.

17              MR. SWANSON:  No additional questions for

18   Walgreens, Your Honor.

19              Thank you.

14:00:15 20              MR. DELINSKY:  Nothing further from CVS,

21   Your Honor.

22              Thank you, Mr. Rannazzisi.

23              THE COURT:  Okay.

24              MS. FIEBIG:  Your Honor, if I may for Giant

14:00:21 25   Eagle.

```
 1              THE COURT:  Yes, Ms. Fiebig.

 2          CROSS-EXAMINATION OF JOSEPH RANNAZZISI

 3   BY MS. FIEBIG:

 4   Q.    Good afternoon, Your Honor, ladies and gentlemen of

 5   the jury, and Mr. Rannazzisi.

 6   A.    Good afternoon.

 7   Q.    My name is Chantale Fiebig and I'm representing

 8   Giant Eagle today.

 9              I have just a few specific questions for

10   you that are specific to my client.

11              Are you aware, Mr. Rannazzisi, that Giant

12   Eagle is a regional grocery store chain that has in-house

13   pharmacies?

14   A.    I am aware of that, yes.

15   Q.    And are you aware that it only operates in five

16   states?

17   A.    I've -- I didn't do a background on it, no.

18              I don't know how many states you operate

19   in.

20   Q.    Sir, are you aware that Giant Eagle doesn't have

21   any pharmacies or pharmacists in Virginia?

22   A.    To be honest with you, I don't shop at Giant Eagle

23   so I wouldn't know that.

24   Q.    Sir, you talked earlier about a presentation made

25   to the Virginia Board of Pharmacy, but you don't have any
```

1    reason to believe that any Giant Eagle pharmacists were

2    in attendance at that presentation, correct?

3    A.    No, I don't.

4    Q.    You've talked a lot in the last couple of days

14:01:28  5    about various enforcement powers and enforcement actions

6    that the DEA was involved with.

7              Do you remember that testimony?

8    A.    Yes, ma'am.

9    Q.    And I recall you testifying that you were not

14:01:37 10    personally involved with any actions against Giant Eagle,

11    but I'd like to ask you just a few questions about

12    whether you have any awareness of DEA enforcement actions

13    against Giant Eagle at all.

14              Okay?

14:01:47 15    A.    Okay.

16    Q.    So from your time at DEA, do you have any

17    recollection of any DEA enforcement actions at all

18    against Giant Eagle relating to opioid distribution or

19    dispensing?

14:02:03 20    A.    During my tenure at DEA, no, I do not.

21    Q.    Do you have any recollection of DEA issuing any

22    letters of reprimand to Giant Eagle relating to opioid

23    distribution or dispensing?

24    A.    During my tenure, no, I do not.

14:02:20 25    Q.    Do you have any recollection of DEA issuing any

1       orders to show cause against Giant Eagle in connection

2       with opioid distribution or dispensing?

3       A.      During my tenure, I do not remember any orders to

4       show cause issued for Giant Eagle.

14:02:38 5      Q.      And are you aware of any memorandums of

6       understanding between the DEA or Giant Eagle relating to

7       opioids?

8       A.      No.  I do not remember any.

9       Q.      And are you aware of any settlement agreements

14:02:54 10     between DEA and Giant Eagle relating to opioid

11      distribution or dispensing?

12      A.      No, I do not.

13      Q.      Are you aware that the DEA has never even asserted

14      any public allegations against Giant Eagle alleging that

14:03:09 15     it was in violation of the Controlled Substances Act?

16      A.      During my time at DEA I don't know of any time

17      where that's happened.

18      Q.      And do you have any recollection of even a single

19      Giant Eagle store having its DEA registration revoked?

14:03:26 20     A.      Again, during my time at DEA, no, I do not have any

21      recollection of that.

22      Q.      Okay.  So just to make sure that the jury has a

23      clear depiction, let's go through them just really

24      quickly.

14:03:39 25                     So the number of times that you're aware of

1       Giant Eagle stores losing their DEA license is zero,

2       correct?

3       A.    Yes.  During my tenure at DEA, yes.  That's

4       correct.

14:04:05 5    Q.    Okay.  And the number of settlement agreements

6       between DEA and Giant Eagle is zero, correct?

7       A.    During my tenure, yes.  That's correct.

8       Q.    And the total number of enforcement actions that

9       you're aware of by DEA or DOJ against Giant Eagle is

14:04:29 10   zero, correct?

11      A.    That would be correct, yes.

12                  MS. FIEBIG:  Thank you, Your Honor.

13                  No further questions.  We pass the witness.

14                  THE COURT:  Okay.  I guess we have

14:04:44 15   redirect, Mr. Lanier.

16                  And if any of the jurors have any

17      questions, please give them to Mr. Pitts.

18            REDIRECT EXAMINATION OF JOSEPH RANNAZZISI

19      BY MR. LANIER:

14:05:01 20   Q.    All right.  Mr. Rannazzisi, I don't have a lot, and

21      I don't have a roadmap because I didn't know I'd be going

22      that quick.  I'm sorry.

23      A.    Well, that's all right.

24      Q.    All right.  Here's what I'd like to do, though, I'm

14:05:16 25   going to cover the subjects with you that have been

1    covered.

2                    We're going to start with the Giant Eagle

3    since they were the last up to bat, okay?

4    A.   Yes, sir.

14:05:23   5    Q.   You answered all of those questions only as to the

6    DEA and only as to during your tenure for Giant Eagle.

7                    Fair?

8    A.   That's absolutely correct.

9    Q.   So you did not answer on behalf of the Ohio Board

14:05:36 10    of Pharmacy or anybody else.

11                    True?

12    A.   Absolutely.

13    Q.   Next subject.

14                    Income issues.  When I started asking you

14:05:49 15    questions yesterday, were you very up front about the

16    money that you made at the very start of this case?

17    A.   Yes, sir.

18    Q.   All right.  Am I paying you or is anybody paying

19    you to be here for this?

14:06:00 20    A.   No, sir.

21    Q.   Are you here as part of your obligation with the

22    Government and your obligation as an American citizen?

23    A.   I'm obligated to see this through, so yes, I'm here

24    as --

14:06:15 25    Q.   And by the same token, when you were on "60

1     Minutes," did you get paid for that?

2                    MR. MAJORAS: Objection. Scope.

3                    THE COURT: Overruled.

4     A.    No, sir, I didn't get paid by "60 Minutes."

14:06:27  5   BY MR. LANIER:

6     Q.    When you have been paid by, quote, unquote,

7     plaintiffs' lawyers, does that include, for example, the

8     legal team that works for the State of Ohio?

9     A.    Yes.

14:06:39 10   Q.    So you have actually rendered opinions in the Ohio

11    opioid litigation on behalf of Ohioans, is

12    that -- "Ohioans," I don't even know if that's the word;

13    the folks from Ohio.

14                    Is that fair?

14:06:54 15   A.    Yes.

16    Q.    Okay.  But I haven't asked you to come give those

17    opinions, have I?

18    A.    No, sir, you haven't.

19    Q.    I haven't asked you to give your analysis of the

14:07:03 20   counties in this case, have I?

21    A.    No, sir, you haven't.

22    Q.    Okay.  What I've asked you to give, does the amount

23    of money that you've been -- by the way, have I ever

24    hired you for anything?

14:07:13 25   A.    No, sir.

         1    Q.    Has my law firm ever hired you?

         2    A.    No, sir.

         3    Q.    And I'm sure there are other people on the teams

         4    where their law firms have.  I don't want to hide that

14:07:28 5    from anybody.

         6              But are you being paid one red dime for

         7    being here, other than reimbursed for your travel?

         8    A.    I was going to say, my mileage, but other than

         9    that, no.

14:07:38 10   Q.    Well, we're also paying for your hotel.

        11    A.    And my --

        12    Q.    And if you don't eat too richly, we're paying for

        13    your meals, aren't we?

        14    A.    That I didn't know, but at the hotel, yes, now that

14:07:52 15   I know I'm going to go to Morton's tonight.

        16    Q.    Fair enough.  Fair enough.

        17              All right.  Next subject.  The DEA

        18    regulations, I'm worried that perhaps something was

        19    misspoken, and if I -- if my daughter has it right in her

14:08:10 20   notes, she has down that "The DEA regulations are

        21    clear" -- and this is a quote -- "that the responsibility

        22    for the proper prescribing and dispensing of controlled

        23    substances is on the prescribing practitioner."

        24              Is that your testimony?

14:08:30 25   A.    Actually, that's -- in the Controlled Substances

Redirect - Rannazzisi/Lanier

1795

1       Act, this has come up before, the act of handing a

2       prescription over to a patient is called dispensing.

3                   So that dispensing is used differently.

4                   If you look at the definition of

14:08:55  5       "Dispensing," it's the act of handing the prescription to

6       the patient as a doctor, and then also dispensing

7       medication from a pharmacy.

8       Q.    Is there a corresponding responsibility on the

9       pharmacist in this regard?

14:09:14 10      A.    Yes, there is.

11      Q.    Can you make sure you're unequivocally clear on

12      what that means?

13      A.    The pharmacist must determine, through his

14      professional judgment and analysis of the prescription,

14:09:27 15      that the prescription was valid, issued in a

16      legitimate -- issued for a legitimate medical purpose, in

17      the usual course of professional practice.

18                  That ensures that the prescription is valid

19      and effective.

14:09:40 20      Q.    All right.  Next, you were asked questions about

21      the GAO report.

22                  Remember that?

23      A.    Yes, sir.

24      Q.    And that was document number 1107, and you were

14:09:59 25      asked Page -- you were asked questions related to, for

Redirect - Rannazzisi/Lanier

1796

1     example, Page 44, where the recommendations for executive

2     action included "Solicit input from distributors or

3     associations representing distributors and develop

4     additional guidance for distributors regarding their

14:10:26   5     roles and responsibilities for Suspicious Order

6     Monitoring and reporting."

7               Do you remember being asked those

8     questions?

9     A.    Yes, sir.

14:10:36  10     Q.    I'd like to read a couple of pages before that with

11     you to put it into context.

12               If you will look, please, at Page 23.

13     Page 23 says, in bold print on the side, "Most

14     registrants that interacted with DEA are generally

14:11:10  15     satisfied, although some distributors and pharmacies want

16     additional communication and guidance."

17               Then it's got the section again, "Most

18     registrants that interacted with DEA were generally

19     satisfied."

14:11:24  20               Would you then put all of that into context

21     for the jury and explain to them what you've brought out

22     of this GAO report from that?

23     A.    Generally, most of the registrants we deal with

24     understand that there's -- there's ways to get

14:11:41  25     information if they do need it.

1       They could call their local offices.  They

2   could get on the website.  The website is, if you've

3   never been on the DEA website, it's unbelievable wealth

4   of information.  They could call their local office.

14:11:56  5   They could look at -- they could look at different final

6   orders that were done.

7       But I think what that was saying was most

8   of the people were able to access the information that

9   they needed, and there were just a few that decided that

14:12:09 10   it was a little -- that they needed more information.

11   Q.   In that regard, did you write your letters that we

12   referenced, the '06, '07, '08 letters, to give

13   information?

14   A.   Yes, sir.

14:12:24 15   Q.   Now, what I'd like to do is come back to this

16   subject in a moment, but first dance over to the

17   questions that were asked of you about the DEA and the

18   number of prescriptions that are legitimate.

19       Do you remember this document, Exhibit

14:12:44 20   1096?

21   A.   Yes, sir.

22   Q.   And you were directed, for the jury, to read that

23   paragraph that says, "To the contrary" -- hold on, there

24   we go -- "To the contrary, the agency recognizes that

14:13:06 25   nearly every prescription issued by a physician in the

```
       1    United States is for a legitimate medical purpose."

       2              Do you remember that?

       3    A.    Yes, sir.

       4    Q.    Here's what I'd like to do with you, please, sir.

14:13:17 5              I'd like to put this onto a timeline, and

       6    this timeline is one where we make this make sense with

       7    everything else you've testified to.

       8              First of all, when was the Controlled

       9    Substances Act initially into law?

14:13:48 10   A.    1970.

      11    Q.    And when do you, based upon your tenure and

      12    experience, pinpoint the opioid crisis starting to ramp

      13    up?

      14    A.    The late '90s.

14:14:12 15   Q.    Late?

      16    A.    Yeah.  Probably around 1997, '8 , '9, somewhere in

      17    that area.

      18    Q.    And as the crisis began to ramp up, when did it

      19    become a matter of concern to the DEA, based upon your

14:14:39 20   experience with the DEA and your tenure?

      21    A.    Well, as soon as we started seeing increases, it

      22    became a concern.

      23              So I would say right around the same time,

      24    late '90s.

14:14:50 25             There's always been diversion, but
```

1    high-volume diversion right around the late '90s.

2    Q.    All right.  And then you've got this testimony in

3    the *Federal Register* that we looked at that counsel for

4    Walmart asked you about, of nearly -- "The agency

5    recognizes nearly every prescription is for a legitimate

6    medical purpose in the usual course."

7              What was the year of that testimony?

8    A.    The *Federal Register* notice was 2016, if I'm not

9    mistaken.

10    Q.    So as of 2006, is this testimony that nearly every

11    doctor okay, is that fair?

12    A.    It -- it would be consistent, somewhat consistent

13    with what we were seeing at that point in time.

14    Q.    Okay.  Is this before the big advent of pill-mills?

15    A.    Actually, this is before -- when that was written,

16    that was right during the Internet crisis, so we didn't

17    actually -- really the Internet crisis was not taken into

18    account in that scheme.

19              So you didn't have the Internet crisis and

20    it was before the pill-mill crisis happened.

21    Q.    So the Internet crisis comes after that and the

22    pill-mill crisis comes after that?

23    A.    Yes, sir.

24    Q.    Now, when did you write your first letter where you

25    expressed concerns about how the distributors, the

1    wholesalers, the transporters, about how they were doing

2    business?

3    A.    2006.

4    Q.    End of the year?

14:16:52 5    A.    Yeah, it was close.

6              I think it was September of 2006.

7    Q.    And we'll call that the "Joe Ran letter one."

8              And when did you write this second letter?

9    A.    The second letter was in 2007.

14:17:11 10             The second letter was a duplication, but it

11   was, I think, in February of 2007.

12   Q.    And when did you write your third letter?

13   A.    December of 2007.

14   Q.    And when did you begin the investigation into the

14:17:37 15   Walmart problems in Florida?

16             MR. MAJORAS:  Objection.  There's no

17   testimony about Walmart in Florida.

18             MR. LANIER:  I'm sorry, Walgreens.  I got

19   my "Wal-s" mixed up, Judge.

14:17:48 20   BY MR. LANIER:

21   Q.    When did you start your investigation into the

22   Walgreens in Florida?

23             Walmart was San Diego.

24             MR. SWANSON:  Objection, Your Honor.

14:17:57 25   Scope.  I didn't stand up.

 1          THE COURT:  Overruled.

 2   A.    We started that investigation --

 3               MR. BENNETT:  Your Honor, may I be heard on

 4   that issue?

 5               MR. LANIER:  Oh, if that's outside *Touhy*,

 6   Your Honor, I'll pull the question down voluntarily and

 7   I'll ask a different one.

 8               THE COURT:  All right.  That's withdrawn.

 9   BY MR. LANIER:

10   Q.    Within the context of the ultimate decision on that

11   Walgreen case, there are some dates that y'all provided

12   publicly of the investigation and the problems.

13               What are those public dates, to put them

14   into this timeline, if you recall?

15   A.    Yeah.  There was -- there was settlements I think

16   occurred right around 2013, and so there would have been

17   a press release and there would have been something on

18   the Department of Justice website making notification of

19   it.

20   Q.    All right.  And before that, when was CVS, the CVS

21   *Holiday* case in Florida?

22   A.    Between 2010 and 2012.

23   Q.    When was the Walmart case in California?

24   A.    2009.  I believe that's when the -- we had the

25   order to show cause.

1    Q.    And then the dates on Walgreens?

2    A.    At 2000 -- I think those are 2012 to 2013.

3    Q.    Okay.  Related subject.

4              You were asked about roles of distributors,

14:20:20  5    and whether or not they knew how to create their own

6    Suspicious Order Monitoring System.

7                   Remember that?

8    A.    Yes, sir.

9    Q.    Did the defendants -- should the defendants have

14:20:38  10    known that they had that responsibility, at least going

11    back since they started distributing?

12    A.    Yes.  Absolutely.

13    Q.    I mean, is that something that was hidden?

14    A.    No, sir.

14:20:53  15    Q.    And is it -- who is it up to -- let me ask it this

16    way.

17              Who is it up to to determine how they go

18    about doing that within their own business and their own

19    system?

14:21:08  20    A.    It's -- it's up to the company, the distributor and

21    the company that operates the distributor.

22    Q.    Now, if some of these companies just distributed to

23    themselves, as was pointed out to you in

24    cross-examination, how does that affect their access to

14:21:25  25    information?

1    A.    Actually, it should be easier to gain information.

2              Outside -- or outside vendors or outside

3    distributors don't have that direct access to the

4    pharmacy prescription data.  They don't have direct

14:21:40  5    access to -- they can't walk in and do an inspection of a

6    pharmacy, but because it's all the same corporation, that

7    impediment is not there, so they can just walk in

8    whenever they want and start pulling data out.

9    Q.    Okay.  And in that regard, you were asked questions

14:21:59  10    about whether or not the companies knew what indicated

11    diversion.

12              If you go back to the 2006 letter you sent

13    out -- and I pulled the Walgreens one -- but you said you

14    sent it to every distributor at the time, every

14:22:14  15    registrant?

16    A.    Yes, sir.

17    Q.    So we've got Plaintiffs' Exhibit 35.

18              In that letter, do you detail circumstances

19    that might indicate diversion?

14:22:22  20    A.    Yes, sir.

21    Q.    Did you give that information to everyone who was a

22    registered distributor?

23    A.    Yes, sir.

24    Q.    Is it consistent with what you have told us today?

14:22:34  25    A.    Yes, sir.

1    Q.    Did you also give explanations of how a distributor

2    seeking to determine whether a suspicious order is

3    indicative of diversion of controlled substances may wish

4    to inquire with the ordering pharmacy?

14:22:55 5    A.    Yes, sir.  That's in the letter.

6    Q.    And again, these are for distributors, which are

7    the wholesalers, right?

8    A.    Yes, sir.

9    Q.    Okay.  And you understand -- well, strike that.

14:23:08 10            Now, in that regard, there are different

11   systems that could be used.  One of them is a system of

12   pickers and packers.

13            Do you know what that is?

14   A.    Yes, sir.

14:23:26 15   Q.    What is pickers and packers?

16            MR. SWANSON:  Objection, Your Honor.

17   Beyond the scope and expert testimony.

18            MR. MAJORAS:  Objection, Your Honor.

19            THE COURT:  Yeah.  I'll sustain that.

14:23:36 20   BY MR. LANIER:

21   Q.    All right.  Next subject.  Let's talk quotas.

22            You were asked in regards to quotas this

23   question:  "Does supply drive demand?"

24            Do you remember that question?

14:23:57 25   A.    Yes, sir.

```
 1    Q.    And then you started talking or you were referenced
 2    to the aggregate production quota.
 3    A.    Yes, sir.
 4    Q.    My question to you is explain, explain your answer
 5    in a little more detail than you've been able to thus
 6    far.
 7    A.    Well, the reason supply -- when you -- in the quota
 8    context, when you're talking about quotas, supply doesn't
 9    drive demand because just in that scope, it would be just
10    prescriptions, but quota is so much more than
11    prescriptions.
12               Quota, while there's a good portion that is
13    prescriptions, there's other things involved.
14               For instance, the quota takes into account
15    the studies and research they're doing, shelf studies,
16    new drug studies where they're trying to develop new
17    formulations or new delivery systems for those drugs.
18               It takes into import and export.  It also
19    takes into quantities that are needed in case there's a
20    catastrophic event.  It takes into account export
21    quantities, so if they're manufacturing and exporting.
22               You see, so quota is not just
23    prescriptions.
24               And that's one of the things, if you look
25    at 826, all the quota -- it's like a roadmap for what we
```

1    have to look at:  Inventory position, we must keep a

2    certain inventory position in place in these companies.

3    It's a requirement under the law.

4              So we didn't have a lot of leeway with

14:25:37  5    quota.  In fact, the reason quota was set up that way was

6    because if we didn't have enough quota in the system, and

7    there were shortages, patients wouldn't get their

8    medication.

9              Now, if it's a patient who's a drug-seeker,

14:25:54 10    no one cares.  But if it's a patient who's in end-of-life

11    care, palliative care, hospice, oncology, we do care,

12    because that's important.

13              That's why quota is set up the way it is

14    and that's why Congress set up quota the way it is.

14:26:10 15    Q.    All right.  Next subject.  You were asked some

16    specific questions about Lake and Trumbull County.

17              Do you remember those?

18    A.    Yes, sir.

19    Q.    And specifically by the Walmart attorney about

14:26:24 20    Walmart in Lake and Trumbull County.

21              Do you remember?

22    A.    Yes.

23    Q.    Here's my question.

24              Did the DEA regularly inspect every

14:26:31 25    pharmacy store in America for diversion?

Redirect - Rannazzisi/Lanier

1807

1    A.    No, sir.

2                The inspection of pharmacies, generally the

3    State Board, because that inspection is in line with the

4    practice of pharmacy.

14:26:51  5                So the State Board does the inspections.

6    That's not to say that DEA doesn't do inspections, but we

7    do very few because we rely on the state boards to do

8    those inspections.

9    Q.    But we know what you found in Florida, we know what

14:27:06  10   you found in California, the jury's heard about what was

11   found in Massachusetts or Rhode Island, somewhere up

12   east, Maryland.

13               Is that routine for the DEA to just go

14   check out every pharmacy in every county, or how do you

14:27:25  15   find those that become the subject of a settlement

16   agreement?

17   A.    If we, when we do inspections, be it a regular

18   inspection or an Immediate Suspension Order or an

19   administrative inspection warrant, those are done based

14:27:43  20   on information that we've received or developed, and

21   that's why we're there.

22   Q.    In that regard, do you find that at least where big

23   national chains or where large regional chains are

24   concerned, do the national or uber regional policies

14:28:07  25   affect the local stores?

1          MR. SWANSON:  Objection, Your Honor.

2          MR. MAJORAS:  Objection.

3          MR. SWANSON:  Objection.

4          MR. MAJORAS:  Objection to scope.  He's not

5    talked about policies.

6          MR. LANIER:  He was asked specifically

7    about Lake and Trumbull.

8          THE COURT:  Overruled.

9    BY MR. LANIER:

10   Q.    Do the national policies affect the local stores?

11   A.    Absolutely.

12   Q.    Did the DEA take that into account when it entered

13   into agreements with these chain pharmacies to affect

14   their national behavior?

15   A.    During -- during the time I was at DEA, when we

16   looked at settlements or, you know, we looked to the

17   corporation, and to ensure that they would -- they would

18   implement policy, they would implement procedures that

19   would trickle down to the pharmacies so to ensure their

20   compliance at the pharmacy level.

21   Q.    Next set of questions.

22          You were asked some questions about sources

23   of pills.

24          I want to start with the one about friends

25   and family as a source -- hold on, there we go -- of

1       medicines.

2                       You were asked about specifically some

3       testimony you gave on that in West Virginia.

4                       Do you remember that?

14:29:23  5     A.     Yes, sir.

6       Q.     I would like you to explain, please, the reasons

7       for your answer, and let's get your answer back on the

8       screen.

9                       You were asked, "You agree with me the most

14:29:40  10    common, most frequent method of obtaining a

11      pharmaceutical controlled substance for nonmedical use is

12      through friends and family for free?"

13                      You said "No."  Then you said "I -- repeat

14      that question again.  I want to make sure I got that one

14:29:54  15    right."

16                      And then what you were read today, "Sure.

17      Of course, the most frequent method of obtaining a

18      pharmaceutical controlled substance for nonmedical use is

19      friends and family for free?"

14:30:08  20                    Your answer was:  "Yes.  I've testified to

21      that based on the opinion of the administration, but that

22      was not my own personal view."

23                      Please explain what you meant by that, sir.

24      A.     At a national level when I was at DEA, I was

14:30:29  25    looking at volumes of drugs -- volume of drugs, and the

1    volume of drugs coming out of some of these pharmacies

2    was just outrageous.

3                    The idea is that that's the way people were

4    getting drugs, just passing it to and from, does not make

14:30:44 5    sense based on what I was seeing.

6                    When we -- when we look at controlled

7    substances and we look at how they arrive in the

8    community, you just don't go to the medicine cabinet,

9    open the medicine cabinet, and there's controlled

14:30:59 10   substances there, just like you don't go to the

11   refrigerator and open it, and there's a bottle of milk

12   there.  It's got to get there somehow.

13                    It was getting there in many cases because

14   of the volume that was leaving the pharmacies, and the

14:31:12 15   volume that was leaving the pharmacies based on

16   illegitimate and illegal prescriptions was huge.

17                    So to say that that's where, you know,

18   that's the most common or most frequent method is -- it

19   doesn't do the whole operation of diversion, it doesn't

14:31:33 20   do it justice, because diversion occurs in large volumes.

21   It doesn't occur one tablet after another.

22                    So that's why I didn't agree with that.

23   Q.   On a related matter, then, you defined rogue

24   pharmacies as "Acting outside the law."

14:31:48 25                   Fair?

```
 1    A.    Yes.

 2    Q.    Based upon your tenure and experience at the FDA

 3    then, would that include Walmart?

 4    A.    Based on the cases that I saw, well, based on the

 5    one case that we did the order to show cause on, yes,

 6    they operated outside the law.

 7    Q.    How about Walgreens?

 8                MR. SWANSON:  Objection, Your Honor.

 9                THE COURT:  Overruled.

10    A.    Yes.  Based on the case, the 2011, '12, '13 case,

11    yes.

12    Q.    How about CVS?

13                MR. DELINSKY:  Objection, Your Honor.

14                THE COURT:  Overruled.

15    A.    Yes.  Based on *Holiday*, of course.

16    Q.    Last subject.  You spoke about documentation and

17    what's required and what's not.

18                You began, and I'm including this in, you

19    took the resolution slide and you were asked a question

20    about "It does not require a call to the practitioner for

21    every controlled substance prescription."

22                Do you remember that?

23    A.    Yes.

24    Q.    You were not opportuned to explain that.  I would

25    like you to have a chance to explain.
```

1          What do you mean?

2     A.    Sure.  There are -- there are prescriptions that

3     pharmacists see every day that they know are correct.

4     For instance, I always use this as an example:  You have

5     a child on Phenobarbital because he's epileptic, he's an

6     epileptic, okay.

7               The pharmacist knows what that

8     Phenobarbital is for and he knows the patient.  He's not

9     going to call the doctor unless the dose is so

10    ridiculously high that he thinks that patient's harmed.

11              But if the patient is stabilized on that

12    medication, then the pharmacist doesn't need to call that

13    particular doctor.

14              So what we're saying is, yeah, there are

15    circumstances where you don't have to call because in

16    your professional judgment, if you believe that that drug

17    is not being diverted or if that drug was not

18    issued -- is issued for a legitimate medical purpose that

19    you could see on the face of the prescription, that's

20    fine.

21              Same thing with an elderly patient in a

22    nursing home that's taking a small amount of a hypnotic

23    like temazepam.  Same concept.  Do you think the

24    pharmacist is going to call?  He knows the doctor, he's

25    not going to waste the doctor's time, you know,

1    dispensing that medication because there's just some

2    things that the pharmacist knows are correct.

3             So that's why we didn't include it for

4    every controlled substance prescription.

14:34:26  5    Q.   But when it comes to these, is it still important

6    that the pharmacists document their knowledge and what

7    they do?

8    A.   Yes, absolutely.

9    Q.   And you were asked is the documentation language in

14:34:42 10   the Controlled Substances Act, my question is on the need

11   to document, must pharmacies follow the standard protocol

12   on documentation?

13   A.   I'm sorry, when you say standard protocol, are you

14   talking about pharmacy practice protocols?

14:35:02 15   Q.   Yes, sir.

16   A.   Yes.

17   Q.   Nobody gets a free pass because of the Controlled

18   Substances Act?

19   A.   No.

14:35:12 20   Q.   Did you teach pharmacists, when you gave those

21   lectures on behalf of the DEA, the need to document?

22   A.   Yes.  Doctors and practitioners.

23   Q.   Why?

24   A.   Because on both doctors and practitioners, your

14:35:31 25   documentation is why you did something.

1    For a doctor, when he prescribes or he or

2    she prescribes a certain drug, there's got to be some

3    type of -- some type of documentation showing why,

4    what -- what's this patient's ailment, why is -- why does

14:35:50 5    he need that drug?

6    It's the same concept with the pharmacist.

7    If the pharmacist looks at a prescription and makes a

8    decision that there's a problem with that prescription,

9    the dose is too high, it interferes with another drug

14:36:03 10    he's taking, he calls the doctor, and the doctor gives

11    him a reason why that's a reasonable excuse, it should be

12    put down, it should be documented.

13    It's for the patient's safety as well as

14    the pharmacist's.

14:36:18 15    Q.    Okay.  You were asked, well, does the manual say

16    that every red flag needs to be documented, the

17    prescription -- *The Practitioner's Manual*.

18    Does this manual contain every detail

19    someone needs to know to practice pharmacy?

14:36:31 20    A.    No, sir.

21    Q.    Is the need to document something that you think

22    needs to be in a manual?

23    A.    No, sir.

24    Q.    Why not?

14:36:38 25    A.    Because, again, it's a requirement under state law.

1           MR. LANIER:  Thank you, Your Honor.

2                   That's all I have.

3                   Pass the witness.

4           THE COURT:  Okay.  If there's any, any

14:36:49 5  redirect.

6           MR. MAJORAS:  Yes, sir.

7           THE COURT:  Okay.  Mr. Majoras for Walmart.

8       RECROSS-EXAMINATION OF JOSEPH RANNAZZISI

9    BY MR. MAJORAS:

14:37:22 10  Q.   I have just a few questions related to the timeline

11   that Mr. Lanier just used.

12                   Isn't it true, sir, that you and the DEA

13   continued to make official public statements well after

14   2006 that 99 percent of prescribers were perfect?

14:37:43 15  A.   That statement was probably made, yeah.  I don't

16   have all the statements in front of me, but I'm sure

17   somebody at DEA made that statement.

18   Q.   Well, do you recall your testimony in March of 2012

19   to the House of Representatives, the federal House of

14:37:57 20  Representatives, in which you made that statement about

21   99 percent of the doctors are perfect?

22   A.   Could -- again, do you have -- is that in my book

23   here?

24   Q.   Sure.  I could bring that up.  Thanks for asking.

14:38:09 25  A.   Great.  Thank you.

         1    Q.    If we could look at Exhibit, Defendants' MDL 01226.

         2          If we look at just the title of this

         3    document -- are you with me, sir?  I don't want to jump

         4    ahead.

14:38:31 5          MR. MAJORAS:  No, it's not.

         6    A.    Yeah, I'm looking at it on the screen.

         7          MR. MAJORAS:  So when I said "No, it's

         8    not," I was responding to Mr. Lanier just now.

         9          THE WITNESS:  Oh, I'm sorry.

14:38:34 10         MR. MAJORAS:  That's all right, just so

        11    we're clear for the record.

        12          Back to you, Mr. Rannazzisi.

        13    BY MR. MAJORAS:

        14    Q.    So, Mr. Rannazzisi, you recall giving testimony to

14:38:52 15   the Subcommittee on Commerce, Manufacturing and Trade of

        16    the Committee on Energy and Commerce, House of

        17    Representatives, on March 1st, 2012?

        18    A.    Yes.

        19    Q.    Why don't we turn to Page 49 of this document,

14:39:08 20   please?  And if we blow it up.

        21          Mr. Rannazzisi, this is your testimony

        22    responding to Mr. Harper of Congress, is that right?

        23    A.    Could I just look at the question beforehand?

        24    Q.    Sure.

14:39:35 25   A.    Thank you.

```
 1    Q.    Take your time.  You --

 2    A.    Yeah.

 3                (Pause.)

 4    A.    Okay.

 5    Q.    Sir, and I'll read this into the record.  You can

 6    tell me if I read it correctly.

 7                Your response was, "I think the

 8    requirements that are in place right now for these drugs

 9    are fine if the individuals within the supply chain and

10    health care delivery system would follow them.  The

11    problem is that the doctors continue, not all doctors, 99

12    percent of the doctors are perfect.  It is that small

13    percentage of doctors that just don't want to fulfill

14    their obligation.  What they do is prescribe for

15    illegitimate purposes, or they don't make a medical

16    determination.  They just go with patient-directed

17    prescribing, which is just wrong.  I think that if

18    everybody within that supply chain would just police each

19    other, we wouldn't have that problem."

20                Is that your testimony, sir?  Did I read

21    that correctly?

22    A.    Yes, and I -- that testimony was done, looking

23    at --

24    Q.    My only question was whether or not that was your

25    testimony.
```

1    A.    That was my testimony, yes.

2    Q.    And earlier, Mr. Lanier showed you a timeline, and

3    he was drawing on it.

4                  Mr. Pitts, if we could bring up the screen.

14:41:27  5                  And I don't mean any offense here, your

6    name is rather long, so is mine, but I'll use the same

7    abbreviation Mr. Lanier used.

8                  Would you agree that in this timeline, if I

9    were to put your testimony, it would go approximately

14:41:40 10    here, and it would be -- if we could bring up the

11    monitor, please.  Thank you.

12                  So if we were to put it on the timeline,

13    and I'm not very good at drawing lines, but we'd have

14    Mr. Rannazzisi testified to Congress "99 percent

14:42:20 15    perfect," would you agree that that's the time, the

16    period would fit in the timeline Mr. Lanier drew?

17    A.    Yes.  It's about right.

18                  MR. MAJORAS:  No further questions, Your

19    Honor.

14:42:31 20                  MR. LANIER:  Your Honor, could I ask one

21    set of redirects, just on that, please?

22                  THE COURT:  Yes.

23                  MR. LANIER:  Thank you.

24                  THE COURT:  No, I'm just going to see, any

14:42:40 25    other defendants on recross?

```
                          MS. FIEBIG:  No, Your Honor.
```

 1                    MS. FIEBIG:  No, Your Honor.

 2                    MR. SWANSON:  No, Your Honor.

 3                    MR. DELINSKY:  Nothing further, Your Honor.

 4                    THE COURT:  Okay.  I will only allow a few

14:42:50  5     rounds.

 6                    MR. LANIER:  Very briefly.

 7                    THE COURT:  No.  If I start with this one,

 8      we'll never end.

 9                    So thank you, sir.  You may be excused.

14:43:00 10                    (Witness excused).

11                    MR. WEINBERGER:  Your Honor, it's quarter

12      to 3:00.  Do you want to get started right away, or do

13      you want to --

14                    THE COURT:  Well, maybe we'll just take our

14:43:53 15     break a little early so we don't break with the witness

16      right at the beginning.

17                    So we'll take a 15-minute break.  Usual

18      admonitions.

19                    (Jury out.)

14:46:44 20                    (Recess taken.)

21                    (Jury in.)

22                    THE COURT:  Okay.  Please be seated, ladies

23      and gentlemen.

24                    All right.  Mr. Lanier, you may call your

15:06:11 25     next witness, please.

1           MR. WEINBERGER:  If you don't mind --

2           THE COURT:  Mr. Weinberger, sorry.

3           MR. WEINBERGER:  -- it's going to be me.

4           I'm going to call Mr. Brian Joyce as if

15:06:21  5   upon cross-examination and an adverse witness.

6           THE COURT:  Okay.  Mr. Joyce, if you could

7   raise your right hand, sir.

8                   BRIAN JOYCE,

9      of lawful age, a witness called by the Plaintiffs,

15:06:53 10        being first duly sworn, was examined

11              and testified as follows:

12          THE COURT:  Thank you.

13          You may remove your mask while testifying.

14          MR. WEINBERGER:  May I proceed, Your Honor?

15:07:09 15        THE COURT:  Yes, Mr. Weinberger.

16      CROSS-EXAMINATION OF BRIAN JOYCE

17   BY MR. WEINBERGER:

18   Q.    Please state your full name.

19   A.    Brian M. Joyce.

15:07:14 20   Q.    Mr. Joyce, are you currently employed?

21   A.    No.

22   Q.    Were you employed at Walgreens?

23   A.    I was.

24   Q.    When did you stop your employment?

15:07:26 25   A.    I retired on March 4th of this year.

1    Q.    Congratulations.

2    A.    Thank you.

3    Q.    Before your retirement, you had spent a number of

4    years working for Walgreens, correct?

15:07:38 5    A.    Yes, about 16.

6    Q.    Right.  You started there in 2000 and --

7    A.    '4.

8    Q.    -- '4?  November of 2004, right?

9    A.    Yes.

15:07:56 10    Q.    I had an opportunity to take your deposition by

11    Zoom on February 26th, 2021 when you were still working

12    for Walgreens, correct?

13    A.    Correct.

14    Q.    Are you represented by Walgreens' lawyers today?

15:08:13 15    A.    Yes.

16    Q.    Did you meet with them to prepare yourself for

17    today's testimony?

18    A.    Yes.

19    Q.    On how many occasions?

15:08:22 20    A.    Like on the phone, or in person?

21          In person, just yesterday.  But on the

22    phone, several meetings since I was subpoenaed probably a

23    month ago, so two or three times.

24    Q.    Okay.  About how many hours did you spend in

15:08:38 25    preparation with your lawyers?

1          MR. STOFFELMAYR:  Judge, I'm going to

2     object.

3               This is improper, whether he met with

4     lawyers to prepare for his testimony, as every witness

15:08:45  5     does.

6               THE COURT:  Well, no suggestion it's

7     improper, but he can ask how long he spent.

8     BY MR. WEINBERGER:

9     Q.    How long?

15:08:53  10    A.    In total?

11    Q.    Yes.

12    A.    Five hours maybe.

13    Q.    At the time I took your deposition on February

14    26th, 2021, we went through a number of documents, didn't

15:09:06  15    we?

16    A.    Yes.

17    Q.    Have you seen any other documents

18    associated -- associated with your employment at

19    Walgreens since that date?

15:09:16  20    A.    I don't believe so.

21    Q.    Okay.  You are appearing here today pursuant to a

22    subpoena that was issued upon you, correct?

23    A.    Yes.

24    Q.    And you live in Girard, Ohio; correct?

15:09:32  25    A.    Which is Youngstown, north of Youngstown just a

1    bit.

2    Q.    Well, it's in Trumbull County, isn't it?

3    A.    It is.

4    Q.    Okay.  And you know that the plaintiffs in this

5    case are the counties of Trumbull, where you live, and

6    the county of Lake.  You know where Lake County is, don't

7    you?

8    A.    Sure do.

9    Q.    Painesville is the -- is the county seat there,

10   right?

11   A.    Yeah, Madison, sure.

12   Q.    And you have a BS degree from the University of

13   Toledo, a degree in Pharmacy, correct?

14   A.    Right.

15   Q.    You got that degree in 1980?

16   A.    I graduated in December of 1980.

17   Q.    And you got your pharmacy license in 1981, right?

18   A.    March 1st.

19   Q.    And you were employed elsewhere other than

20   Walgreens, including Rite Aid, right?

21   A.    Correct.

22   Q.    And you started your employment, as you told us, at

23   Walgreens in November of 2004.

24            Right?

25   A.    Yes.

1    Q.    And then you worked as a -- you worked as a

2    pharmacy manager there from November of 2004 until

3    December of 2006, right?

4    A.    Not -- no, not really.

15:10:45  5              I think it was maybe March or April of 2005

6    through December 25th, 2006.

7    Q.    As pharmacy manager?

8    A.    Correct.

9    Q.    And then you moved to a position as pharmacy

15:10:59 10   supervisor?

11   A.    Yes.

12   Q.    And that was from December of 2006 until April of

13   2015, correct?

14   A.    Sounds right, yep.

15:11:08 15   Q.    And then you were district manager until you

16   retired?

17   A.    Correct.

18   Q.    April, '15 until you retired in March, right?

19   A.    Correct.

15:11:20 20   Q.    And while you were working as district manager, you

21   were in charge of six Trumbull County stores of

22   Walgreens, right?

23   A.    Five or six, yeah.

24   Q.    Right.  So were they store number -- stores number

15:11:42 25   5549, 6888, 9077, 9669, 10569, and 1170?

1    A.    Yes.

2    Q.    And you were also in charge of seven stores in

3    Mahoning County, right?

4    A.    Yeah.

15:12:01 5    Q.    So for a total of six and seven, that would be 13

6    stores?

7    A.    I think I had 12 stores.  I think maybe there was

8    six in Mahoning County.

9    Q.    Okay.  Now, during that time you were part of what

15:12:15 10   Walgreens calls Market Number 29, right?

11   A.    For part of the time, yes.

12   Q.    And I think sometimes, including presently, that's

13   known as Region 29, right?

14   A.    No.  Market 29 was my little chunk of Ohio with

15:12:35 15   Pennsylvania and New Jersey, and then I think we are in

16   Region 1.  Region 1 was like the east coast.

17   Q.    Okay.  So we'll talk about Market 29 and some

18   documents related to that later, a little later on in

19   your testimony.

15:12:53 20             So in managing 13 or 14 Walgreen stores as

21   district manager, you were in charged -- in charge of

22   both the front end of the store, the retail space, as

23   well as the pharmacy.

24                  Right?

15:13:11 25   A.    Correct.

Joyce - Cross/Weinberger                                    1826

1    Q.    And when you were pharmacy supervisor, before 2015,

2    you were in charge of actually the pharmacies only,

3    right?

4    A.    Correct.

15:13:23  5    Q.    And so you've had an opportunity to supervise in

6    both of those roles a number of pharmacists, correct?

7    A.    Many, many pharmacists, yes.

8    Q.    So how many on average pharmacists would you say

9    that an average store in your region employs?

15:13:46 10    A.    Depending upon what kind of store it was, for

11    instance, if it's -- if the midnight store that has three

12    shifts, they would have obviously at least three

13    pharmacists, plus folks to fill in for days off.

14              So they would have close to five

15:14:00 15    pharmacists in a store like that.

16              And at other stores, you know,

17    two-and-a-half, three pharmacists.

18    Q.    And would the pharmacists transfer from

19    store-to-store within your region?

15:14:15 20    A.    So the pharmacy managers kind of stayed put for the

21    most part.  Sometimes we'd move them or they'd want

22    moved.  Staff pharmacists pretty much stayed at one

23    store, and again, they would move sometimes if they got

24    promoted to pharmacy manager.

15:14:30 25              And then we had floaters that, you know,

1    worked at different locations to cover days off, and so

2    forth.

3              But we tried to stick those folks in the

4    same, you know, two or three stores.

15:14:43  5    Q.    So your job as a district manager was to make sure

6    that the stores were running to their full potential,

7    including hiring and supervising and training the

8    employees, right?

9    A.    I did some training.

15:15:02 10              I had folks that helped me train.  I had

11    certain pharmacy managers I'd stick new pharmacists with

12    for training, and then I would do some of it as well.

13    Q.    And you are a registered -- or before your

14    retirement you were --

15:15:19 15    A.    I'm still a registered pharmacist.

16    Q.    Okay.  So during this whole time we're talking

17    about at Walgreens you were a registered pharmacist,

18    correct?

19    A.    The entire time.

15:15:27 20    Q.    And while you had other managers directly

21    supervising the pharmacists, it really was part of your

22    role to make sure that they were operating correctly and

23    within the law, right?

24    A.    Sure.

15:15:44 25    Q.    Now, during the course of your career at Walgreens,

Joyce - Cross/Weinberger                          1828

1    have you ever attended any diversion conferences put on

2    by the DEA?

3    A.    I don't believe I have, no.

4    Q.    Have you ever seen any publications of the DEA

15:16:11  5    regarding the issue of diversion?

6    A.    There might be articles in the Ohio Pharmacists

7    Association that would have some of that information, but

8    I don't remember seeing a specific publication put out by

9    the DEA.

15:16:25 10   Q.    Now, in your -- in your job working for Walgreens,

11   you don't use the term "Red flags," do you?

12   A.    I haven't, no.

13   Q.    Did you say "by habit"?

14   A.    I haven't.

15:16:43 15   Q.    You haven't?

16   A.    Correct.

17   Q.    So you haven't used the term "Red flags" either

18   generally or in relation to investigating opioid

19   prescriptions?

15:16:57 20   A.    I use the term "Concerns" or "Issues."

21   Q.    Right.  You don't use the term "Red flags" because

22   you think that has a negative connotation, true?

23   A.    Yeah.  Because not all red flags are really red

24   flags.  They are yellow flags, they need investigated.

15:17:15 25   Q.    Right.  So when you say negative connotation,

Joyce - Cross/Weinberger                1829

1    you're meaning -- what you mean to say is that if you use

2    the term "Red flags," it means there's automatically

3    something wrong with that prescription, right?

4    A.    Yes.

15:17:25  5    Q.    It doesn't mean to you that that's something that's

6    a prescription that has a red flag where you should stop

7    and act with caution and be vigilant to investigate the

8    red flag?

9            You don't use that terminology that way,

15:17:45 10   correct?

11   A.    I don't.  If you want me to I will, but I don't as

12   a practice.

13   Q.    So when you've had an opportunity to interact with

14   pharmacists since 2006, when you had a supervisory role,

15:18:05 15   you never used the term "Red flags."

16           True?

17   A.    I don't know if I never used.

18           I would refer to these things as concerns

19   or issues that need looked into, a phone call or talking

15:18:21 20   to the patient, and getting some more information.

21   Q.    So you understand that you have to follow the

22   policies of Walgreen or you had to follow them?

23   A.    Yeah.  I was an employee of Walgreens, so yeah.

24   Q.    And that included the dispensing of opioids,

15:18:39 25   correct?

Joyce - Cross/Weinberger                          1830

```
 1      A.      Yes.

 2      Q.      And that included investigating prescriptions of

 3      opioids that might have red flags, right?

 4      A.      Yes.

15:18:50 5      Q.      And when you would supervise your employees in

 6      regard to that policy, you never used the term "Red

 7      flag," did you?

 8      A.      I'm not saying I never used it.

 9              In general -- in general terms I didn't use

15:19:07 10     it.  I used the word "problems" or "concerns" or

11      "issues."

12      Q.      So your responsibility included assuring that the

13      Walgreens pharmacist who worked at the stores that you

14      managed and supervised complied with all the federal and

15:19:24 15     state laws regarding controlled substances dispensing,

16      correct?

17      A.      Yes.

18      Q.      Now, do you know, have you heard of the name Joseph

19      Rannazzisi?

15:19:38 20     A.      Yeah, I may have heard it before.

21              I don't know who he is.  I don't -- I never

22      met the guy or --

23      Q.      You know him to have been the Associate Director in

24      charge of Diversion Control at the DEA?

15:19:55 25     A.      No.
```

```
 1    Q.    At the corporate level, there was a Walgreens

 2    department known as Corporate Pharmacy Integrity that was

 3    supposed to monitor and ensure compliance with the

 4    Controlled Substances Act.

 5                    True?

 6    A.    Yeah.  Tasha Polster I think was the head of that

 7    department.

 8    Q.    Right.  And I was going to ask you about Tasha

 9    Polster.

10                    Did you have interactions with her over the

11    years?

12    A.    Occasionally, occasionally.

13    Q.    I'm sorry?

14    A.    Occasionally.

15    Q.    So I want to talk to you now about the concept of

16    corresponding responsibility.

17    A.    Okay.

18    Q.    You're familiar with that term?

19    A.    Sure.

20    Q.    In this courtroom, over the last 10 days, the jury

21    has heard of the corresponding responsibility of

22    Walgreens and its pharmacists, and we've gone over the

23    Controlled Substances Act and its regulations.

24                    You would agree that Walgreens is in the

25    business of dispensing prescription opioids.
```

1              True?

2    A.    All prescription drugs.

3    Q.    Well, prescription opioids are part -- is part of

4    that, right?

5    A.    Yeah, but that's not our entire business.

6              The business is dispensing any

7    prescription, controlled, uncontrolled.

8    Q.    So but with respect to controlled substances such

9    as opioids, the manner in which those are dispensed is

10   regulated by the Controlled Substances Act and its

11   regulations.

12             Correct?

13   A.    Yes.

14   Q.    And are you aware of the fact that for many of the

15   years that Walgreens was in the business of dispensing

16   opioids, it was also in the business of distributing

17   opioids to themselves bought directly from manufacturers?

18   A.    Yes.

19   Q.    And so as distributors, as a distributor, you know

20   that Walgreens also has certain responsibilities under

21   the Controlled Substances Act.

22             True?

23   A.    I don't know that.  I mean, I don't know the laws

24   for wholesalers, no.

25   Q.    Well, from time to time you would be in charge of

1    placing orders to the distribution centers of Walgreens

2    on behalf of your pharmacies, right?

3    A.    No.

4    Q.    You never did that?

15:22:28  5    A.    I didn't place orders, no.

6    Q.    How about pharmacists who worked under your

7    supervision?

8    A.    Sure.  They did the ordering.

9    Q.    And when they placed orders from the distribution

15:22:42 10    center of Walgreens, do you know whether or not they knew

11    what the obligations were in placing that order under the

12    Controlled Substances Act?

13    A.    It's the responsibility of a pharmacist to know the

14    federal and state law, so yes.

15:22:58 15    Q.    Okay.  Well, didn't you just tell us that you don't

16    know what the laws are applicable to distribution

17    of opioids?

18    A.    You're talking about what the laws are for the

19    wholesaler?  No, I don't -- I don't really know that.

15:23:12 20    Q.    As dispensers, the filling of prescriptions and the

21    sale of those prescriptions to patients or to customers,

22    Walgreens was required to act as the last line of defense

23    to the dispensing of opioids.

24                    Correct?

15:23:36 25    A.    Yes.

1    Q.    And the last line of defense is a shorthand

2    description for the corresponding responsibility of a

3    pharmacist.

4                 Right?

15:23:47  5    A.    Sure.

6    Q.    The -- that corresponding responsibility of

7    pharmacists and pharmacies is particularly important when

8    you're dispensing opioids.

9                 Correct?

15:24:03 10    A.    It's important for every prescription, opioids for

11    sure.

12    Q.    Well, particularly with respect to opioids,

13    Mr. Joyce, those drugs are potentially dangerous to the

14    patient and to the community.

15:24:19 15                 True?

16    A.    Sure they are.  They're addictive, sure.

17    Q.    Opioids can often lead to diversion and addiction.

18                 True?

19    A.    They can, among other drugs, sure.

15:24:30 20    Q.    And you don't understand "diversion" to mean

21    prescriptions not written -- it could be prescriptions

22    not written by a doctor or a fraudulent prescription,

23    right?

24    A.    Sure.

15:24:43 25    Q.    Or it could mean prescriptions written by a doctor

 1    where the pills end up in the hands of someone who's not

 2    a patient of the doctor.

 3                    True?

 4    A.    Um-hmm.  That's diversion, yep.

15:24:56 5    Q.    And you're aware as a pharmacist that people who

 6    take opioid pills, whether it's the actual patient who

 7    got the dispensed pills or someone who was not a patient

 8    but is taking the pills, are at risk for addiction,

 9    right?

15:25:13 10    A.    Sure.

11    Q.    And addiction can lead to all sorts of other

12    problems, including problems with the law.

13                    True?

14    A.    Yeah.  Sure.

15:25:25 15    Q.    Problems within a family?

16    A.    Sure.  Saw it many times.

17    Q.    Problems in the community?

18    A.    Yep.

19    Q.    And when there's a lot of opioid pill diversion

15:25:37 20    occurring within a community, it directly affects the

21    health and safety and welfare of the communities in which

22    that is occurring?

23    A.    I would agree.

24    Q.    And you live in Trumbull County, we've established

15:25:54 25    that, right?

Joyce - Cross/Weinberger                            1836

1    A.    Yep.

2    Q.    And Trumbull County and this region have seen the

3    effects of the opioid pill diversion directly.

4                True?

15:26:07 5    A.    I would say so.

6    Q.    And have you experienced firsthand the opioid

7    epidemic caused by diversion?

8    A.    Well, you see prescriptions written by doctors that

9    you refuse, that you don't think are legitimate.

15:26:26 10                You read about folks, you know their

11   brother or their parents that have overdosed.  You look

12   at the obituaries and, you know, three out of 10 are for

13   an 18-year-old kid, so sure.

14   Q.    So would you agree that any pharmacist working at

15:26:47 15   Walgreens in your district should be well-aware of the

16   problems associated with opioid pill --

17   A.    Every pharmacist in the State of Ohio is aware of

18   the opioid problems.

19   Q.    And would you agree that the knowledge of the

15:27:09 20   opioid pill epidemic should have an influence on

21   Walgreens dispensing policies?

22   A.    Well, I mean, I think you've always got to be

23   careful.

24                We're not, you know, in the '80s when I was

15:27:27 25   a pharmacist, in the '90s when I was a pharmacist, there

 1      were always issues.  Obviously we didn't have OxyContin

 2      then, but it was when I first got out of pharmacy school

 3      it seemed to be amphetamines and Seconal that were the

 4      drug of choice, or Quaaludes that were the drug of choice

15:27:45  5   for diversion, and then that moved on to Percodan, and

 6      then that graduated to Dilaudid, and then that kind of

 7      morphed into OxyContin.

 8                  So there's always been opioid issues in the

 9      community.

15:28:00 10   Q.    Well, would you agree that as the risk to the

11      people and to the communities associated with opioid

12      diversion, use and diversion, increases, the degree of

13      vigilance that pharmacists have to utilize with respect

14      to those prescriptions increases?

15:28:23 15   A.    I think you've always got to be --

16                  MR. STOFFELMAYR:  Objection to form, Your

17      Honor.

18                  THE COURT:  Overruled.

19                  THE WITNESS:  I can answer now?

15:28:36 20                  MR. WEINBERGER:  Yes, you can.

21                  THE COURT:  You may answer, sir.

22      A.    Yeah, so I think you've always got to be vigilant

23      with controls, with drugs that aren't controlled; with

24      pediatrics, little kids that come in with extremely low

15:28:47 25   doses of medication; with heart medications like Lanoxin,

Joyce - Cross/Weinberger                    1838

1    very poisonous if you put the wrong directions on the

2    bottle.

3              You got to be on your game every

4    prescription that's handed to you.

15:29:04  5    BY MR. WEINBERGER:

6    Q.    Well, let's take a look at and discuss together

7    what Walgreens knew about prescription drug abuse.

8              Would you give the witness Exhibit P 20808.

9              Do you have that exhibit in front of you?

15:29:50 10    A.    I do.

11    Q.    We discussed this exhibit at your deposition,

12    didn't we?

13    A.    I think so.

14    Q.    Okay.  So P 0208, the first page, is an e-mail that

15:30:11 15    a John Colaizzi --

16    A.    Colaizzi.

17    Q.    -- Colaizzi sent to you on April 1st, 2013,

18    attaching this drug abuse PowerPoint.

19              True?

15:30:22 20    A.    Looks like it, yeah.

21    Q.    And you had asked him for that drug abuse

22    PowerPoint, and he responded with the e-mail and a copy

23    of the PowerPoint, right?

24    A.    Yes.

15:30:38 25    Q.    This is a PowerPoint published by Walgreens, right?

1    A.    Yeah.  I think John made it up but, yeah, we made

2    it at Walgreens.

3    Q.    And this is one of many PowerPoints that you've

4    seen over the years while an employee at Walgreens,

15:30:55  5    right?

6    A.    I've seen lots of PowerPoints over 16 years with

7    Walgreens, right.

8    Q.    Right.  Let's back up for a second, and let's talk

9    a little bit about communications between Walgreen and

15:31:05 10    its employees and a district manager such as yourself.

11              There are many ways in which Walgreens

12    corporate communicates with you, right?

13    A.    Well, pretty much e-mails.

14    Q.    Right.  E-mails.

15:31:21 15              How about webinars?

16    A.    Occasionally.

17    Q.    How about do you know what a PPL is?

18    A.    Yeah.  PeoplePlus Learning, yeah.

19    Q.    PeoplePlus Learning, is it?

15:31:35 20              And do you participate in those?

21    A.    Everyone does.

22    Q.    So that includes you?

23    A.    That includes me.

24    Q.    Right.  And so this PowerPoint, which is entitled

15:31:53 25    "Prescription drug abuse," goes on to, on the next page,

1    describe what prescription drug abuse is.

2              It says, "When someone takes a medication

3    that someone -- that was prescribed for someone else or

4    takes their own prescription in a way different from what

15:32:13  5   was originally prescribed."

6              Do you agree with that definition?

7    A.    Sure.

8    Q.    And then the next page goes on to talk about types

9    of prescription drug abuse.

15:32:26 10            One is "Taking a medication to get high."

11             You agree with that?

12   A.    Yeah.  Yep.

13   Q.    "Taking someone else's prescription, either because

14   they shared it with you or you stole it."

15:32:38 15            Do you agree with that?

16   A.    I would.

17   Q.    "Taking a prescription medication in a way other

18   than prescribed."

19             Do you agree with that?

15:32:47 20   A.    Sure.

21   Q.    And then the next page talks about common drugs of

22   abuse.

23             And the first category is pain medication.

24             Do you see that?

15:33:01 25   A.    Um-hmm.

Joyce - Cross/Weinberger                                     1841

```
        1    Q.    And the PowerPoint uses several examples.  One is

        2    OxyContin or Oxycodone, right?

        3    A.    Um-hmm.

        4    Q.    Yes?

15:33:11 5    A.    Yes.

        6    Q.    Or Percocet?

        7    A.    Percodan or Percocet.

        8    Q.    And then there's the term "Vikes" stands for

        9    Vicodin, right?

15:33:24 10   A.    Correct.

       11    Q.    Now, some of these drugs are Oxycodone-based and

       12    some of these are Hydrocodone-based.

       13                  Right?

       14    A.    Yes.

15:33:35 15   Q.    And these drugs, both of these drugs or categories

       16    of drugs are dispensed at Walgreen pharmacies.

       17                  Correct?

       18    A.    Sure.

       19    Q.    So the PowerPoint goes on to say -- describe

15:33:57 20   sources.

       21                  "Given for free by a friend or relative."

       22                  Do you agree with that?

       23    A.    Sure.  Could be.

       24    Q.    "Purchased from a friend or relative."

15:34:07 25                True?
```

1    A.    Could be, sure.

2    Q.    "Stolen from a friend or relative."

3              True?

4    A.    I've seen that, sure.

15:34:13 5    Q.    "Their own prescription," right?

6    A.    True.

7    Q.    Or "from drug dealers," right?

8    A.    Yes.

9    Q.    This next page talks about or is entitled "Myth

15:34:31 10  busters."

11             The myth being or described that

12   "Prescription drugs are safer than illegal drugs," and

13   there's a big "False" sign under that.

14             You agree that it is not true that

15:34:49 15  prescription drugs are safer than illegal drugs, correct?

16   A.    Ask me that again.

17   Q.    Sure.

18             It's a myth, is it not, that prescription

19   drugs are safer than illegal drugs?

15:35:03 20  A.    Yes.

21   Q.    By the way, after you asked for this PowerPoint

22   presentation, did you use it yourself in --

23   A.    I think I used it at a pharmacy manager meeting.

24   Q.    Okay.  And what was the purpose of that meeting?

15:35:29 25  A.    Just to raise awareness.

Joyce - Cross/Weinberger                    1843

1      Q.    To raise awareness about what?

2      A.    Opioids, you know, just to be careful and do your

3      due diligence when you're filling a prescription.

4      Q.    Okay.  So this next chart, this next page of this

15:35:48 5   PowerPoint from Walgreens, from the Walgreens PowerPoint,

6      is entitled "Unintentional drug overdose deaths by major

7      type of drug in the United States, 1999 to 2008."

8                Do you see that?

9      A.    I do.

15:36:03 10  Q.    And in the category of "opioid analgesics," that is

11     in red and follows this line, correct?

12     A.    Yep.

13     Q.    And then "cocaine," which is in a lighter red,

14     follows this line, correct?

15:36:27 15  A.    Yes.

16     Q.    And then "heroin" follows this line, and this

17     covers the period from 1999 to 2008, right?

18     A.    Yes.

19     Q.    And the intent of this slide from this Walgreens

15:36:39 20  PowerPoint is to demonstrate that with respect to

21     unintentional overdose deaths, first of all, they were on

22     the rise between 1999 and 2008, right?

23     A.    Yes.

24     Q.    And, in fact, it shows in the left-hand side the

15:36:57 25  number of deaths and how the number of deaths rose from

1    either 2,000 or 4,000 in 1999 to as high as 12,000 in

2    2008, right?

3    A.    Yes.

4    Q.    And the important part of this slide is that it

15:37:20  5    demonstrates that opioid analgesics significantly

6    contribute to unintentional drug overdose deaths than do

7    illegal drugs cocaine and heroin, correct?

8    A.    Yes.

9    Q.    Now, is that something that you knew as a

15:37:38 10    pharmacist before you saw this slide?

11    A.    I think you can kind of infer that from reading the

12    newspaper.

13            I mean, reading about drug overdoses going

14    up in counties, I mean we have that in our newspaper all

15:37:50 15    the time, so certainly I knew that opioids were a huge

16    problem or huge issue.

17    Q.    Right.  But the -- but the important part of this

18    slide is that it -- that it was the opioid pills that

19    were causing the highest increase in unintentional

15:38:10 20    overdose deaths, right?

21    A.    Yeah.  I'm kind of surprised Fentanyl isn't on

22    here, but, yeah, opioid analgesics were a big part of the

23    problem.

24    Q.    Right.  And would you agree that if Walgreens knew

15:38:31 25    that that was happening between 1999 and 2008, that they

1    should be doing everything to create policies and train

2    their pharmacists to make sure that opioid prescriptions

3    are properly dispensed to people for legitimate medical

4    purposes?

15:38:54  5    A.    Yeah, but every pharmacist has been doing this from

6    the time they got out of pharmacy school.

7             I mean, that's what you do every day as a

8    pharmacist.  You look at prescriptions, evaluate them,

9    maybe investigate them, make a judgment call whether to

15:39:12 10   fill or refuse.

11            We filled and we've refused plenty of

12   prescriptions.

13   Q.    All right.  Let's go on to the next slide,

14   Mr. Joyce.

15:39:21 15            This is a slide entitled "Deaths from

16   opioid pain relievers exceed those from all illegal

17   drugs."

18            Do you see that?

19   A.    I do.

15:39:35 20   Q.    And the source of this is the Center for Disease

21   Control Morbidity and Mortality Weekly Report from 2011,

22   right?

23   A.    That's what it says, yep.

24   Q.    And what this -- what this graph shows is the

15:39:54 25   significant impact of opioid pain relievers on deaths in

1  our country, does it not?

2  A.  Yes.

3  Q.  And how much more significant the impact is of

4  opioid pain relievers to deaths per hundred thousand than

15:40:13  5  illegal drugs, right?

6  A.  Sure.

7  Q.  Go on to Page 13 of the PowerPoint.

8       This is a -- this Walgreens publication

9  describes what opioids does to your body.

15:40:42  10      Right?

11  A.  Yes.

12  Q.  It alters judgment and decision-making.

13      Right?

14  A.  Correct.

15:40:48  15  Q.  It can lead to dangerous behavior.

16      Right?

17  A.  True.

18  Q.  It can even slow -- it can slow or even stop

19  breathing and lead to death.

15:40:57  20      Right?

21  A.  That's how you would die from an opioid overdose,

22  yes.

23  Q.  It can lead to uncontrollable movements.

24      True?

15:41:07  25  A.  True.

        1    Q.    It can lead to mood and behavior changes.

        2              Right?

        3    A.    True.

        4    Q.    Go to the next page.

15:41:15  5              So the dangers of opioids are described on

        6    this page.

        7              First, first is addiction.

        8              You agree with that, right?

        9    A.    Absolutely.

15:41:26 10    Q.    Physical dependence and withdrawal symptoms, you

       11    agree with that, right?

       12    A.    Sure.

       13    Q.    Increases the likelihood to use other drugs, right?

       14    A.    Sure.

15:41:38 15    Q.    Are you familiar with the concept of the gateway

       16    effect?

       17    A.    Sure.

       18    Q.    That's a description of the gateway effect, isn't

       19    it?

15:41:47 20    A.    Yes.

       21    Q.    And prescription pill opioids increases the

       22    likelihood that the user of those opioids might end up

       23    using illegal or illicit drugs, right?

       24    A.    Yeah.  I --

15:42:08 25              MR. STOFFELMAYR:  Objection, Your Honor.

                    1              It calls for an opinion.

                    2              THE COURT:  Overruled.

                    3              THE WITNESS:  Can you ask me again?

                    4    BY MR. WEINBERGER:

15:42:18   5    Q.    Sure.  We're talking about the gateway effect that

                    6    the jury has heard in this case, and this bullet point is

                    7    intended to communicate that opioid prescription pills,

                    8    using them, increases the likelihood of the use of other

                    9    drugs, including illicit drugs.

15:42:39  10              Right?

                   11    A.    Sure, but, you know, I don't think any of them are

                   12    any more dangerous than opioids.  Opioids are bad for

                   13    sure.

                   14    Q.    Um-hmm.  The other dangers include side effects,

15:42:51  15    right?

                   16    A.    Um-hmm.

                   17    Q.    And overdose, right?

                   18    A.    Sure.

                   19    Q.    As of the time of this slide, overdose on opioids

15:43:01  20    was the number two leading cause of death, with car

                   21    accidents being number one.

                   22              Right?

                   23    A.    Yes.

                   24    Q.    As we go -- as we went past 2009 and into 2011 and

15:43:14  25    '12 and '13, did you come to learn that opioid-related

1    deaths actually exceeded deaths from car accidents in our

2    country?

3    A.    Yes.   I think in Trumbull County they're still

4    going up.

15:43:34  5    Q.    When you say "In Trumbull County they're still

6    going up," you're saying the overdose deaths are still

7    going up --

8    A.    I think so.

9    Q.    -- in Trumbull County?

15:43:42 10                  So the epidemic still exists in Trumbull

11   County, right?

12   A.    I think the epidemic exists everywhere.

13   Q.    Yes, it exists and it's ongoing, isn't it?

14   A.    It is.

15:43:50 15   Q.    And do you have familiarity with Lake County and

16   the effect of the epidemic in Lake County?

17   A.    I don't.

18   Q.    Do you have any reason to believe that there's any

19   difference between Lake County and Trumbull County when

15:44:03 20   it comes to the fact that the epidemic is ongoing?

21   A.    I don't have any reason to believe it's different.

22   Q.    Okay.  Now, this next graph from the Center for

23   Disease Control and Prevention is another depiction of

24   the rise in unintentional drug overdose deaths between

15:44:39 25   1970 and 2007.

1          Right?

2     A.    Looks that way, yep.

3     Q.    Right.  Now, you were talking earlier that certain

4     other -- well, certain drugs early on in your career that

15:44:55 5    were opioids were a problem, right?

6     A.    Sure.

7     Q.    They've always been a problem and always been

8     dangerous, right?

9     A.    Yes.

15:45:00 10   Q.    And you've been practicing as a pharmacist since

11    19 --

12    A.    Over 40 years.

13    Q.    Right.  Since 1980.

14    A.    '1.

15:45:12 15   Q.    Since '81.

16          So if you look just from 1981 until 2007,

17    can we agree that the unintentional drug overdose deaths

18    has increased substantially, particularly since 1996

19    until 2007?

15:45:35 20   A.    I would say it started going up in 1988 or so.

21    Q.    Okay.  We're done with that exhibit.

22          The next, the next subject that I want

23    to -- the next subject that I want to talk to you about,

24    Mr. Joyce, is the Ohio Board of Pharmacy.

15:46:11 25         The Ohio Board of Pharmacy is charged with

1    enforcing state law regarding the operation of

2    pharmacies.

3                 True?

4    A.    True.

15:46:20 5    Q.    And it's a state agency, right?

6    A.    Yes.

7    Q.    With an executive director and employees, such as

8    pharmacy inspectors and field agents, right?

9    A.    Correct.

15:46:31 10    Q.    And it -- its long-time Executive Director was a

11    Mr. Winsley, right?

12    A.    Mr. Winsley, yes.

13    Q.    Um-hmm.  And it has a public Board that oversees

14    the Board of Pharmacy, right?

15:46:51 15    A.    Yes.

16    Q.    And under state law in Ohio, eight positions on the

17    Board are filled by pharmacists.

18                 Right?

19    A.    Correct.  And one public member.

15:47:03 20    Q.    Right.  And it's been a custom that the Governor

21    appoints pharmacists who are employed by some of the

22    retail drug chains, right?

23    A.    I think the Governor likes to spread it around to

24    hospital, institution, retail chains, and independent

15:47:23 25    pharmacies.

1      Q.    All right.  And it is often the case that

2   pharmacists from Walgreens and CVS and Walmart and Giant

3   Eagle are appointed to be members of the Board.

4              Right?

15:47:43  5   A.    I didn't know anyone from Walmart.  I did know

6   folks from a hospital system in Columbus, and I think

7   some are on there now might be from the Cleveland Clinic,

8   but everyone was represented on the Board of Pharmacy.

9      Q.    Okay.  So let's stick to retail pharmacy chains.

15:48:03  10             It's been your experience or knowledge that

11   somebody from Walgreens has been on the Board, right?

12   A.    Not always, but usually.

13   Q.    Somebody from CVS has been on the Board?

14   A.    I've known folks from CVS on the Board, sure.

15:48:20  15   Q.    Sure.  Some pharmacists from Giant Eagle has been

16   on the Board, right?

17   A.    Yep.

18   Q.    And the reason that you know that is because you

19   applied for a Board position and you were appointed by

15:48:34  20   the Governor in 2009 to a four-year term.

21             Right?

22   A.    Sure.

23   Q.    And did I read the records correctly that somebody

24   from the Ohio Retail Merchants Association is the one

15:48:48  25   that encouraged you to apply for a Board membership?

1    A.    I don't think they encouraged me.

2          I think they helped facilitate the process

3    with the Governor's office.

4    Q.    Okay.  And the Ohio Retail Merchants Association is

15:49:06 5    a trade organization that, in part, represents the retail

6    pharmacy chains that do business in Ohio, right?

7    A.    They represent retail merchants in Ohio, including

8    the pharmacy chains, yeah.

9    Q.    Yeah, the chains like CVS, Walgreens, Walmart and

15:49:22 10   Giant Eagle, right?

11   A.    And others, Target, you know, so forth.

12   Q.    And so somebody from the Ohio Retail Merchants

13   Association helped facilitate your appointment to the

14   Board, right?

15:49:35 15   A.    Yes.

16   Q.    And you were appointed by the Governor -- I think

17   it was Governor Strickland at the time, right?

18   A.    It was.

19   Q.    -- in 2009, for a four-year term, right?

15:49:51 20   A.    Yes.

21   Q.    From August of 2009 until August of 2013, right?

22   A.    Sure.

23   Q.    And you were President of the Board for a year

24   during your last -- part of the last year of your term as

15:50:07 25   a Board member, right?

1    A.    Correct.

2    Q.    And while you served on the Board, you were working

3    for Walgreens as a pharmacy supervisor, correct?

4    A.    Sure.

15:50:32  5    Q.    And so when you served on the Board, you were

6    actually wearing two hats:  You were wearing the hat of a

7    Walgreens pharmacy supervisor, and as a Board member,

8    right?

9    A.    Well, when you serve the Board, you're representing

15:50:49 10    the people of the State of Ohio.

11    Q.    Right.  And when you serve on a public Board like

12    that, in the State of Ohio, perhaps elsewhere, you're

13    required to sign a conflict of interest statement?

14    A.    True.

15:51:06 15    Q.    Acknowledging that you had a responsibility first

16    to the public as a result of your Board position, right?

17    A.    Sure.

18    Q.    And from time to time the Ohio Board of Pharmacy

19    would bring disciplinary proceedings against pharmacists,

15:51:21 20    right?

21    A.    Sure.

22    Q.    And those disciplinary proceedings ultimately,

23    after being investigated, would be heard by the Board,

24    right?

15:51:31 25    A.    Sure.

 1   Q.    And from time to time, as a Board member, you would

 2   sit in judgment of other pharmacists who disciplinary

 3   actions had been brought against, right?

 4   A.    Without question.

15:51:45 5   Q.    And on occasion, you sat on panels involving

 6   disciplinary actions against Walmart -- Walgreen

 7   pharmacists, if you didn't personally know them, right?

 8   A.    Sure.

 9   Q.    You didn't recuse yourself or step aside on those

15:52:04 10   occasions, did you?

11   A.    No, I didn't.

12   Q.    Some of those cases involved Walgreen pharmacists

13   who were charged with diversion, right?

14   A.    Sure.  And if you ask folks on the Board, I was

15:52:33 15   probably tougher on the Walgreens pharmacists than I was

16   on the other pharmacists.

17   Q.    Is there any record of that anywhere?

18   A.    Not unless you go talk to the other members of the

19   Board.

15:52:42 20   Q.    Well, when I say record, I mean documentation.

21         Is there any documentation of that?

22   A.    You can look at the outcomes of the hearings for

23   the Walgreens pharmacist, any pharmacist that appeared

24   before the Board.

15:52:54 25         That's all public record.

1    Q.    Well, sometimes while you're on the Board or

2    President of the Board, issues of interest to Walgreens

3    pharmacy business would come before the Board for

4    consideration and approval, right?

15:53:11 5    A.    Sure.

6    Q.    And if a Walgreens' employee was going to make a

7    presentation on behalf of Walgreens to the Board, are

8    there occasions when you would plan in advance with that

9    employee as to how you would handle the presentation so

15:53:30 10   it wouldn't appear as if you were improperly trying to

11   influence the Board?

12   A.    I didn't present to the Board.

13         He would present to the Board.

14   Q.    Right.

15:53:39 15   A.    Would I facilitate getting him on the agenda?

16   Sure.

17   Q.    Yeah.  That didn't answer my question, sir, so

18   listen carefully to my question.  Okay?

19   A.    Sure will.

15:53:49 20   Q.    If a Walgreens' employee was going to make a

21   presentation on behalf of Walgreens to the Board, there

22   were occasions when you and that employee would plan in

23   advance to make it look like you weren't trying to

24   improperly influence the Board with respect to the

15:54:08 25   decision.

1              True?

2    A.    I didn't influence the Board on any Walgreens

3    decisions.

4              Did I help facilitate getting him on the

15:54:18 5    docket and make sure he was going to come in for the

6    August meeting?  Yeah.

7              These were matters that would assist

8    pharmacies, Walgreens pharmacies, on new methods of

9    dispensing that would certainly help the people of the

15:54:34 10   State of Ohio.

11   Q.    Well, do you know Walgreens employee by the name of

12   Bill Cover?

13   A.    I do.

14   Q.    He was in a position of corporate manager on

15:54:44 15   pharmacy affairs at Walgreens?

16   A.    Sure.

17   Q.    Was it his job to interact with governmental

18   agencies?

19   A.    He did.  He came and presented in front of the Ohio

15:54:54 20   Board.

21   Q.    And did he help you -- did he approach you to help

22   gain support from the Ohio Board of Pharmacy for a

23   project known as The Well Experience for Walgreens

24   stores?

15:55:05 25   A.    I think he approached me to help get him on the

Joyce - Cross/Weinberger                    1858

1    schedule.

2              Well Experience stores were a little

3    different than that.  A pharmacist was kind of out in the

4    waiting room out of the physical fill area, and we wanted

15:55:21  5    to see if the Board would approve that model being tried

6    in a store in Ohio.

7              And there were some different things that

8    had to be approved by the Board.  For instance, that

9    pharmacist would be verifying prescriptions via computer

15:55:38 10    rather than physically holding the pills and looking at

11    them, and making sure they are white, round, with the

12    right numbers on them, and so forth.

13              So it was something that needed approval by

14    the Board, and the clinic would come in front of us for a

15:55:54 15    way for us to try something new, and then it would be

16    evaluated to see if it worked or not, if it decreased

17    error rates, and so forth.

18              Ultimately, the Well Experience Store in

19    Ohio I don't think was ever -- was ever rolled out, and

15:56:11 20    the company shelved that store design at some point.

21    Q.    So to summarize that answer, would you agree that

22    the concept of the Well Experience for Walgreens would

23    change the interior of the Walgreens store to move

24    pharmacists out from behind the counter to a work station

15:56:35 25    in the store where they could answer questions from the

1    public and provide health counseling?

2    A.    Sure.  You could have -- you'd have easier access

3    to the public and you could have better, hopefully if you

4    had the right person there, have better conversations,

5    maybe find out why someone -- someone's diabetic medicine

6    that should last 30 days is coming in for a refill every

7    45 days, or someone mentioned, "Hey, my daughter had a

8    baby, and I'm going to be babysitting," so maybe they

9    might want to get a certain type of pertussis

10   immunization, and so forth.

11   Q.    That Well Experience project was piloted in

12   Indiana, right?

13   A.    I don't know that.

14   Q.    Well, in 2011, was your colleague Mr. Cover

15   President of the Indiana State Board of Pharmacy?

16   A.    Is that a question or a statement?

17   Q.    That's a question.

18   A.    Was he?  I think he was, yeah.

19   Q.    Well, he was a Walgreens employee, right?

20   A.    I believe so.

21   Q.    And are you aware that he presented while Board

22   President of the Indiana State Board of Pharmacy, this

23   Well Experience project?

24             Are you aware of that?

25   A.    Presented to who; Ohio or Indiana?

```
             1    Q.    To the Indiana State --

             2    A.    No.

             3    Q.    -- Board of Pharmacy?

             4    A.    No.

15:58:13     5    Q.    So you're not aware of the fact that in 2011, that

             6    presentation created a fire storm regarding ethical

             7    issues associated with Mr. Cover?

             8    A.    No.

             9    Q.    Mr. Cover never told you that?

15:58:27    10    A.    I don't believe so.

            11               That was 10 years ago.

            12    Q.    Well, it was 2012 --

            13    A.    Nine years ago.

            14    Q.    Well, now, wait a minute.  Let me finish my

15:58:39    15    question.

            16    A.    Sure.

            17    Q.    It was 2012 when Mr. Cover approached you to help

            18    him make a presentation about the Well Experience before

            19    the Ohio Board of Pharmacy, right?

15:58:52    20    A.    I'm not arguing that.

            21               Probably, yeah.

            22    Q.    While you were President, right?

            23    A.    If it was after September 1st, I was probably

            24    President then, yeah.

15:59:02    25    Q.    Well, take a look at P 24017.
```

Joyce - Cross/Weinberger                    1861

1    A.    Is that in the same packet?

2    Q.    Nope.  We're going to give it to you.

3    A.    Okay.

4    Q.    So I'll let you read the e-mail for a minute before

15:59:44  5    I put it up.

6                    (Pause.)

7    A.    Sure.

8    Q.    So this is -- this is an e-mail sent from Mr. Cover

9    to you, Brian Joyce, on July 11th, 2012.

16:00:18  10                    Right?

11    A.    Yeah.  So I was Vice President of the Board then.

12    Q.    Well, Mr. Cover writes in the e-mail, he says,

13    "Brian, nice work.  Please remember my role is to present

14    and defend our position in compliance -- of compliance in

16:00:46  15    the public meetings so that you can eliminate any

16    perception of bias by the Board with you being

17    President."

18                    Have I read that correctly?

19    A.    Yeah.  So I'm guessing he was going to come present

16:00:56  20    maybe in the September meeting or October meeting.

21    Q.    And he goes on to write, "I really appreciate your

22    helping with this process in private conversations but

23    you should minimize comment at the public meeting."

24                    Did I read that correctly?

16:01:15  25    A.    Sure.

Joyce - Cross/Weinberger                          1862

```
 1    Q.    "I think we can overcome the concerns you mention

 2    below."

 3                    Have I read that correctly?

 4    A.    Sure.

 5    Q.    And he goes on to say, "Thanks again.  Bill."

 6                    Right?

 7    A.    Yeah.

 8    Q.    By the way, was it your experience, back to

 9    disciplinary cases of pharmacists brought before the

10    Board, that Giant Eagle, employees of Giant Eagle were on

11    the Board for some of those?

12    A.    Sure.  Giant Eagle was.  CVS was.  Independent

13    pharmacy was.  A hospital pharmacist.  The private

14    member.

15    Q.    Right.

16    A.    And someone who worked at the Cincinnati Free

17    Clinic.

18    Q.    Was it your experience that a Giant Eagle Board

19    member would sit in on disciplinary proceedings that were

20    brought against Giant Eagle pharmacists?

21    A.    If the --

22                    MS. SULLIVAN:  Your Honor, objection, Your

23    Honor.

24                    Lacks foundation, and if we can go to

25    side-bar.
```

16:01:28 (line 5)
16:01:47 (line 10)
16:02:02 (line 15)
16:02:13 (line 20)
16:02:20 (line 25)

1          THE COURT:  All right.

2          (Proceedings at side-bar:)

3          MS. SULLIVAN:  Your Honor, can you hear me?

4          THE COURT:  Yes.

16:02:35  5          MS. SULLIVAN:  Your Honor, I specifically

6   asked Mr. Weinberger before the witness got on the stand

7   whether he was going to bring up an unrelated different

8   county no-admission settlement by Giant Eagle, and he

9   said he was not, and now he's asking about Giant Eagle's

16:02:49 10  involvement in disciplinary proceedings.

11          It's our position, Your Honor, that if they

12  want to use that settlement agreement, Your Honor should

13  rule on it.  It falls squarely within your ruling that it

14  is unrelated to the litigation.  It relates to employee

16:03:03 15  theft in a different county.

16          THE COURT:  Well, I haven't seen it at all

17  at this point.

18          MS. SULLIVAN:  But, Your Honor --

19          THE COURT:  So I won't let the witness get

16:03:10 20  into it until I've seen it and had argument on it.

21          MS. SULLIVAN:  And, Your Honor, I move to

22  strike the question as improper.

23          MR. WEINBERGER:  It's -- it's not my intent

24  to ask about Ohio Board of Pharmacy actions brought

16:03:24 25  against Giant Eagle pharmacies.

```
 1              I'm asking only about disciplinary

 2      proceedings against a GE pharmacist.

 3                   MS. SULLIVAN:  There weren't any -- that's

 4      the point, Your Honor -- except for this unrelated

 5      settlement agreement.

 6                   MR. WEINBERGER:  Your Honor, I'll move on

 7      to another question.

 8                   THE COURT:  Let's move on, please.

 9                   MS. SULLIVAN:  Your Honor, I move to strike

10      the question.

11                   (End of side-bar conference.)

12                   THE COURT:  All right.  The witness and

13      jury are to disregard that last question.

14      BY MR. WEINBERGER:

15      Q.    Was it customary, Mr. Joyce, that Walgreens

16      annually would do evaluations of your work as a

17      pharmacist and as a district or pharmacy supervisor?

18      A.    Everyone at Walgreens had an evaluation once a

19      year.

20      Q.    And was that evaluation in part used to set your

21      compensation and bonus?

22      A.    Yeah.

23      Q.    And isn't it a fact that on multiple

24      occasions -- oh, by the way, when these personal

25      evaluations would occur, you would actually sit down and
```

1    meet with Walgreen -- your supervisors at Walgreens or

2    members of the HR department, and you would go over these

3    evaluations, right?

4    A.    Sure.  So I would have -- when I was a pharmacy

16:04:58 5  supervisor I would sit down with my district manager once

6    a year, and we'd go over the eval.

7    Q.    Right.  And so you would have -- you would have

8    this conversation, and you would talk about things that

9    you accomplished during the prior year as part of the

16:05:14 10  evaluation process, right?

11   A.    Yeah.  So I would do a self-evaluation and rank

12   myself, and then they would write down their thoughts and

13   rank me on that same measure.

14   Q.    Right.  And while you were the board member and

16:05:29 15  ultimately the President of the Ohio Board of Pharmacy,

16   that's one of the things that you touted as part of your

17   accomplishments, right?

18   A.    Hey, I was proud to be on the State Board of

19   Pharmacy as a pharmacist.  I was happy to work for my

16:05:41 20  profession and give my input to the Board and hopefully

21   improve pharmacy for the citizens of Ohio.

22             I was very proud of that and still am

23   today.

24   Q.    So as a Board member, you were charged with

16:05:57 25  ensuring that the Ohio Board of Pharmacy enforced the

1    rules regulating pharmacists, right?

2    A.    Yeah.

3    Q.    And pharmacies, right?

4    A.    Correct.

16:06:07 5    Q.    Particularly the rules involving the handling and

6    dispensing of controlled substances, right?

7    A.    It ran the gamut, everything.

8    Q.    And the Ohio Board of Pharmacy's stated goal is to

9    protect the health and safety of the public.

16:06:23 10                    True?

11   A.    True.

12                    So most of my time in Columbus, it was

13   three days a month, the first Monday, Tuesday and

14   Wednesday of every month, primarily was disciplinary

16:06:36 15   proceedings against pharmacists.

16   Q.    The Ohio Board of Pharmacy had a duty to ensure

17   that the retail chain pharmacies follow the law, true?

18   A.    That everyone follow the law, sure.

19   Q.    They had -- the Ohio Board of Pharmacy had a duty

16:06:51 20   to promulgate regulations that protect patient safety,

21   right?

22   A.    Sure.

23   Q.    And particularly with respect to prescription

24   opioid drugs, right?

16:07:01 25   A.    I mean, I don't know if particularly.

1               Every drug.

2    Q.    The Ohio Board of Pharmacy had a duty to enforce

3    the laws to prevent diversion, right?

4    A.    Without question.

16:07:15  5    Q.    And you had a duty as a Board member to ensure that

6    the Ohio Board of Pharmacy regulations were enforced by

7    the Board.

8               Right?

9    A.    Ask me that again.

16:07:26 10    Q.    Sure.

11               You had a duty as a Board member to ensure

12    that the Ohio Board of Pharmacy employees enforced the

13    drug laws to prevent diversion, right?

14    A.    Sure.

16:07:39 15    Q.    And particularly to prevent the unlawful diversion

16    of opioid pills, right?

17    A.    Sure.

18    Q.    And it is the case, sir, that while you were on the

19    Board, the Ohio Board of Pharmacy personnel working for

16:07:57 20    the Board were accumulating and studying statistical

21    information and data on how dangerous the opioid

22    dispensing crisis was to our communities in Ohio, right?

23    A.    Did I know they were doing that?  No.  I'm not

24    surprised they were doing it, but I don't know if I knew

16:08:22 25    that while I was on the Board.

1    Q.    Okay.  Part of those -- well, you had Board

2    discussions?

3    A.    Sure, we had Board discussions.  We had --

4    Q.    Right?

16:08:31  5    A.    -- the Attorney General come and present in front

6    of the Board, Mike DeWine.

7              Sure, we did all that.

8    Q.    And even after you were -- you left the Board you

9    kept up with the Ohio Board of Pharmacy work, right?

16:08:50  10    A.    I tried to.

11    Q.    Including the work that was done on

12    opioid-dispensing issues and the epidemic, right?

13    A.    I tried to keep up on as much of the State Board

14    that I could.

16:09:01  15              They send out newsletters quarterly, and I

16    would talk to folks occasionally that I knew that were

17    still on the Board, but some had rotated off, so --

18    Q.    Right.  Now, in fact, in your evaluations and after

19    you left your Board position, your evaluations with

16:09:17  20    Walgreens in 2014 and '15 and 16 talked about the fact

21    that you kept current on issues before the Ohio Board of

22    Pharmacy, right?

23    A.    I sure tried to.

24    Q.    So let's take a look at P 20809.

16:10:00  25              Do you have that document in front of you?

      1    A.    20809.

      2    Q.    Right.

      3                Go to the second page, if you would.

      4    A.    Sure.

16:10:08  5    Q.    This document is a presentation on OARRS.

      6                You know what OARRS is, right?

      7    A.    Sure do.

      8    Q.    It's the -- it's what the jury has heard is the

      9    PDMP for the State of Ohio, right?

16:10:28 10    A.    Sure.

     11    Q.    And this is -- we talked about this publication at

     12    your deposition, right?

     13    A.    I believe so.

     14    Q.    Right.  And you see that it's a guide for law

16:10:44 15    enforcement presented by the Ohio State Board of Pharmacy

     16    and the office -- Ohio Office of Criminal Justice

     17    Services, right?

     18    A.    Yes.

     19    Q.    And it's a presentation done by Trey Edwards,

16:11:00 20    right?

     21    A.    Correct.

     22    Q.    Dated August 26th, 2004 -- '14, right?

     23    A.    Yes.

     24    Q.    And you know Mr. Edwards, right?

16:11:11 25    A.    I know Trey, sure.

1    Q.    Trey was a compliance agent who spent time

2    at -- inspecting some of the pharmacies that you oversaw,

3    right?

4    A.    I don't think he had ours.

16:11:25  5          I had George Pavlich for most of the time.

6    Q.    Okay.  So what about in Lake County --

7    A.    No, I don't know who did Lake County.

8    Q.    But anyway, you know -- you know Trey Edwards,

9    right?

16:11:39 10   A.    I know Trey Edwards, sure.

11   Q.    Okay.  So going to the next page, this page

12   describes Mr. Edwards' experience, right?

13          MR. STOFFELMAYR:  Your Honor, there's a

14   lack of foundation.

16:11:52 15          There's no testimony he's ever seen this

16   before other than being shown it at a deposition.

17          THE COURT:  Okay.  I'm not sure where

18   you're going with this, Mr. Weinberger.

19          Maybe we should go on the headphones.

16:12:28 20          THE WITNESS:  Could I stand up and stretch

21   for a second?

22          THE COURT:  Sure.

23          (Proceedings at side-bar:)

24          MR. WEINBERGER:  So, Your Honor, this is an

16:12:36 25   official publication of the Board of Pharmacy, which he

1    formerly was associated with.

2                        In this publication, there are a number of

3    charts and discussions about the opioid crisis.

4                        There are -- there's a discussion in the

16:12:58 5    context of the PDMP, OARRS, that operates within the

6    State of Ohio.

7                        He testified extensively about this

8    publication in his deposition without objection, and we

9    discussed his familiarity with many of the statements

16:13:22 10   that were made in this publication.

11                       And, you know, it is an official

12   publication of the Ohio Board of Pharmacy.

13                       MR. STOFFELMAYR:  After he left the Board.

14                       THE COURT:  Well, it's just a year or two

16:13:36 15   after he left the Board.

16                       If he can authenticate it and if he says he

17   remembers getting it, and you can ask him if he agrees or

18   disagrees with the characterization of this, he's

19   knowledgeable, he's a pharmacist, so --

16:13:53 20                      MR. STOFFELMAYR:  I think that's fine, Your

21   Honor.

22                       I just want to clarify the foundation

23   that's missing is what you just said, that he got it but

24   he saw it before.  The fact that he was asked questions

16:14:03 25   about it at his deposition before was neither here nor

         1    there.

         2                    MR. WEINBERGER:  Your Honor, I don't think

         3    this witness has to -- this is a self-authenticating

         4    document.

16:14:14 5                    MR. STOFFELMAYR:  Our objection is --

         6                    MR. WEINBERGER:  Can I finish, please?

         7                    This is a Government document.

         8                    He -- he doesn't have to authenticate this.

         9                    THE COURT:  No, he's not -- Peter, Mr.

16:14:26 10   Weinberger, it's not so much authenticating it.

        11                    If you're going to essentially read in or

        12    get in the contents of this, he has to say, all right,

        13    "I'm familiar with it, this is something I used" or "I

        14    agree with this," with this characterization.

16:14:46 15                    I don't know exactly what you're going to

        16    ask him, if you're going to ask him about OARRS and what

        17    OARRS is, and is this a correct characterization of OARRS

        18    and how a pharmacist sees it.

        19                    I mean, he's certainly knowledgeable about

16:15:00 20   that.

        21                    MR. WEINBERGER:  So --

        22                    THE COURT:  I don't know where --

        23                    MR. WEINBERGER:  Let me tell you where I'm

        24    going --

16:15:04 25                    THE COURT:  All right.

1          MR. WEINBERGER:  -- so there's no

2     surprises.

3               If you go -- if you go to Page 14 of this

4     document, of the Bates stamp, tell me when you're there.

16:15:21 5          THE COURT:  I've got it.

6               MR. WEINBERGER:  Okay.  There's information

7     about the background of the scope of the drug abuse

8     problem, including some charts, specifically relating to

9     Ohio and nationally.

16:15:39 10              There is also a map on Page 20, which takes

11    information from OARRS and calculates the per capita

12    doses for each county, all of which are in this official

13    document.

14               I asked him about it, and, you know, he

16:16:11 15    didn't deny that any of this was, in fact, true.

16               In fact, we went through each one, each one

17    of those pages.

18               MR. STOFFELMAYR:  Well, Judge, how could he

19    possibly know any of this is true?  The point is he

16:16:24 20    didn't endorse this document, he didn't author it, he's

21    never seen it.  To ask him if he has any reason to

22    disagree, which is going to happen with this data someone

23    generated, of course he's going to say "I see it on the

24    page, I don't think they would lie," what is that going

16:16:39 25    to establish?  It's just making him a sounding Board for

1       evidence that should come in through a witness who

2       actually knows the subject matter, like Mr. Edwards, who

3       will testify in this case.

4                    THE COURT:  Mr. Weinberger, let's -- I

16:16:54  5   mean, I mean I'm going to apply the same rules to him as

6       the others.

7                    I'm only going to let witnesses testify

8       about documents they have some knowledge about, if they

9       used it, they relied upon it, that they had

16:17:14  10  something -- some connection with, either in their work

11      or whatever.

12                    If that's what he's going to say, fine.

13      You know, you don't need him to authenticate the document

14      to put in all these contents.

16:17:28  15                    He'll either have to say I -- particularly

16      if there's going to be a witness who actually prepared

17      it, Mr. Edwards is testifying, he's the one you should go

18      through page by page.

19                    MR. WEINBERGER:  Well, I'm not going to go

16:17:44  20  through every page of this document, but there are

21      certainly pages that are relevant to his knowledge of the

22      opioid crisis.

23                    THE COURT:  But there are a few pages, and

24      if you're going to say "Look at this, do you believe this

16:17:55  25  is accurate, and is this the state of things in Ohio, you

 1    know, the year after you were on the Board and while you

 2    were still at Walgreens," I'll let him do that.

 3                   But it's got to be limited.

 4                   MR. STOFFELMAYR:  Judge, he's already used

16:18:09  5    a document that the witness was familiar with to

 6    establish his knowledge of the same information two years

 7    earlier or three years earlier.

 8                   The fact that there is a document that he's

 9    never seen before that has the same information doesn't

16:18:22 10    establish his knowledge of anything.

11                   THE COURT:  I will allow a very limited use

12    of this, but I'll see where this is going, and I may cut

13    it off.

14                   MR. STOFFELMAYR:  Thank you, Judge.

16:18:34 15                   (End of side-bar conference.)

16    BY MR. WEINBERGER:

17    Q.    Mr. Joyce, we've already established you're

18    familiar with OARRS, right?

19    A.    Sure.

16:18:55 20    Q.    And this document that's in front of you is a

21    presentation about OARRS, right?

22    A.    That's what the front of it says.

23    Q.    Right.  And you're aware of the fact that after

24    OARRS came into existence in Ohio, there was evidence

16:19:16 25    to -- published by the Ohio Board of Pharmacy that it was

1       effective in reducing diversion, the use of OARRS was

2       effective in reducing diversion.

3                   True?

4       A.    Sure.  And I would agree with that.

16:19:27  5     Q.    Okay.  And this, this document, describes -- let's

6       just take a look at beginning on Page 27.

7       A.    Okay.

8       Q.    This document says that, "On January 1st, 2006,

9       Ohio created a dangerous drug database and tasked the

16:20:01 10     Board of Pharmacy with collecting, analyzing, and

11      distributing the data.  The database is known as the Ohio

12      Automated Prescription Reporting System or OARRS."

13                  Did I read that correctly?

14      A.    You did.

16:20:12 15     Q.    And it goes on to say "Who has the obligation to

16      report to OARRS," and it says "All pharmacies,

17      prescribers who personally furnished medication, and

18      wholesalers must submit controlled substance dispensing

19      data to OARRS."

16:20:32 20                 Did I read that correctly?

21      A.    You did.

22      Q.    And that "Pharmacies and prescribers must report at

23      least daily; wholesalers, monthly."

24                  Right?

16:20:41 25     A.    You read that correct.

```
 1                    MR. STOFFELMAYR:  Judge, I'm going to
 2      object to just reading out loud.
 3                    That doesn't establish anything.
 4      BY MR. WEINBERGER:
 5      Q.    Well, you agree with those statements, do you not?
 6      A.    I agreed that you read them right and that's what
 7      OARRS does.
 8                    THE COURT:  That isn't the --
 9      BY MR. WEINBERGER:
10      Q.    No.
11                    You agree with the substance of the
12      statements?
13                    THE COURT:  Hold it.
14                    (Proceedings at side-bar:)
15                    THE COURT:  This isn't going anywhere.
16                    If you want to ask him what OARRS is and
17      how it worked, and how he dealt with it when he was on
18      the Ohio Board of Pharmacy, I'll certainly allow that.
19                    But there's no reason to be reading into
20      this document -- reading the document.  You can just ask
21      him these questions himself and he'll give the answers.
22                    And if he gets it wrong and you want to
23      cross-examine with this, you can cross-examine him.
24                    But I'm not just going to let you read the
25      document in through him, unless it's something that you
```

1    can establish he used, he relied on it.

2                   (End of side-bar conference.)

3    BY MR. WEINBERGER:

4    Q.   Mr. Joyce, when you were working for Walgreens, did

16:22:22  5  you have any idea what the volume of pills were being

6    dispensed out of your stores regarding opioid

7    prescriptions?

8    A.   I think we got reports sometimes that showed a

9    month or two of numbers, but I don't remember seeing it.

16:22:47 10  I don't think we had access to a report that showed,

11   like, a historical trend or history of that.

12   Q.   So on occasion, you would receive a monthly report

13   regarding the volume of pills dispensed from your stores?

14   A.   No.

16:23:10 15            I think it had to do with wholesalers just

16   verifying with the drug stores, you know, what kind of

17   neighborhood it was; or high prescribers, was there an

18   oncology clinic, was there a pain clinic, those sorts of

19   things.

16:23:31 20  Q.   So you, you yourself or Walgreens corporate, to

21   your knowledge, never provided you with statistics

22   regarding the quantity or amount of dosage units

23   dispensed from your Trumbull County stores.

24                   True?

16:23:50 25  A.   I don't believe I ever saw those.

1    Q.    Do you know whether or not Walgreens corporate had

2    the capabilities of analyzing the dispensing data of

3    opioid prescriptions being dispensed from your stores?

4    A.    I -- I don't, but I would assume so.

16:24:13  5    Q.    But you never saw such a report?

6    A.    I don't remember seeing any such report.

7              Could I have?  Sure.  Do I remember 10

8    years ago a report I saw in an e-mail?  No.

9    Q.    But you knew that in general in Trumbull County,

16:24:33  10   OxyContin's prescriptions and Hydrocodone prescriptions

11   were fueling the opioid epidemic in these counties,

12   right?

13   A.    Mr. Weinberger, without question, every pharmacy in

14   the State of Ohio was well-aware of the opioid problem in

16:24:49  15   every city, county, 'burb in the state.

16   Q.    And you have no idea whether Walgreens was

17   accumulating the information from the dispensing data

18   from your stores and other stores in the State of Ohio

19   prescription by prescription.

16:25:07  20             True?

21   A.    Well, they could only accumulate Walgreens'

22   numbers.

23   Q.    So they were accumulating Walgreens'?

24   A.    I have no idea.

16:25:15  25   Q.    You never saw any reports?

1    A.    I don't remember seeing any report.

2    Q.    Did you know while you were working as a district

3    manager or pharmacy supervisor that Walgreens' corporate

4    data could be used to calculate and chart out trends

16:25:32 5    regarding the number of opioid pills dispensed annually

6    from every one of your Trumbull County stores?

7    A.    Did I know that?  No.

8    Q.    We're going to show you Exhibit 26321.

9    A.    Is that in this packet?

16:25:56 10    Q.    No, we're going to bring it up to you.

11    A.    Are we done with this?

12    Q.    Yes, we are for now.  Um-hmm.

13              MR. WEINBERGER:  Your Honor, for the

14    record, this is a Rule 1006 document.

16:26:21 15    BY MR. WEINBERGER:

16    Q.    Before we get to the document, Mr. Joyce, I want

17    you to assume that all of the dispensing data for pills,

18    opioid pills dispensed from your Trumbull County stores,

19    were produced by Walgreens to us for the years 2006 until

16:26:53 20    2019, and that we have created a number of charts based

21    upon an analysis of that data.

22              Okay?

23    A.    Sure.

24    Q.    Are you with me?

16:27:08 25    A.    Sure.

1    Q.    All right.  I want you to take a look at the third

2    page of this document, this P 26321.

3                MR. STOFFELMAYR:  Judge, I'm going to

4    object to lack of foundation, asking a fact witness about

16:27:28  5    a chart prepared by an expert.

6                THE COURT:  Well, overruled so far.

7                He is just showing him the document.  We'll

8    see where it goes.

9                MR. STOFFELMAYR:  Thank you.

16:27:39 10    BY MR. WEINBERGER:

11    Q.    So this document, let's just concentrate on

12    Trumbull County.

13                You were from 2006 until 2019, you were in

14    charge of or had some association with the Trumbull

16:28:01 15    County Walgreens stores, right?

16    A.    Through 2021.

17    Q.    Right.  And take a look at this column that says

18    "Total dosage units," that's total number of pills from

19    2006 until 2019 dispensed out of those Trumbull County

16:28:27 20    stores.

21                Do you see that?

22    A.    I do see that.

23    Q.    Would it surprise you, sir -- strike that.

24                Let's just take a look at 2008.

16:28:35 25                Does the number 1,324,188 pills strike you

1     as correct?

2     A.    I have no idea.

3     Q.    Do you see how it increases in number through 2011

4     and stays relatively steady until 2015 for pills

16:29:08   5     dispensed out of your store, stores in Trumbull County?

6     A.    Yeah.

7                 So those stores in Trumbull County that

8     you've brought up when we first started, Niles, fairly

9     new store, Hubbard opened up after I became a supervisor,

16:29:24  10     Cortland opened up after I became supervisor.  Warren was

11     an older store.  Elm Road opened up sometime around the

12     time that I became a supervisor.  So these were new

13     stores that were growing, front-end sales and pharmacy

14     sales, quickly.

16:29:48  15                 So I'm not surprised that there are

16     increases like that because when stores are new, they

17     tend to have high growth rates, like 20 percent, 25

18     percent, and so forth.  And that's -- that is expected.

19     Q.    All right.  Well, take a look at Page 4 of this

16:30:07  20     exhibit.  We've broken this down by store, you see, on

21     the -- on this side of the exhibit.

22     A.    Sure.

23     Q.    These are the Trumbull County stores, and Store

24     5449, which one is that?

16:30:35  25     A.    That's the store that I came out of.

|         |                                                              |
|---------|--------------------------------------------------------------|
| 1       | Q.   And is that a new store or an older store?              |
| 2       | A.   Established store.  That's an older store.             |
| 3       |            The other ones are relatively new.               |
| 4       | Q.   Okay.  So between 2006 and 2019, 8,225,000 pills       |
| 16:30:54 5 | were dispensed out of that store, correct?               |
| 6       |            MR. STOFFELMAYR:  Objection, Your Honor.         |
| 7       | A.   I didn't add them up.                                   |
| 8       |            THE COURT:  Overruled.                           |
| 9       | BY MR. WEINBERGER:                                           |
| 16:31:00 10 | Q.   I'm sorry?                                          |
| 11      | A.   I didn't do the math.  I don't know.                   |
| 12      |            I trust your math.                               |
| 13      | Q.   Okay.  Well, this comes from Walgreens' dispensing     |
| 14      | data.                                                        |
| 16:31:08 15 | A.   Okay.                                               |
| 16      | Q.   Do you understand that?                                |
| 17      |            MR. STOFFELMAYR:  Your Honor, just my            |
| 18      | foundational objection.                                      |
| 19      |            He's being asked if these numbers are            |
| 16:31:14 20 | correct, and it's just a chart that their expert has    |
| 21      | prepared and been put in front of him.  How could he       |
| 22      | possibly answer these questions?                            |
| 23      |            MR. WEINBERGER:  Your Honor, these --            |
| 24      |            THE COURT:  Hold it.  Hold it.  Let's go on      |
| 16:31:25 25 | the headphones.                                         |

```
 1              (Proceedings at side-bar:)

 2              MR. WEINBERGER:  Your Honor, this 1006

 3    pursuant to our CMO was presented to the defendant, there

 4    was no objection to it, and as a result it is admissible

 5    and can be used by --

 6              THE COURT:  All right.  Mr. Weinberger, I

 7    will let you -- you know, you can ask -- the witness has

 8    already established he never saw it, never got any of

 9    this data.  Forget the chart.  He never saw or received

10    any reports.

11              You can show him this and you can ask him

12    does he have any, you know, any explanation for these

13    increases or these numbers.

14              And if he does, he can give it.  If he's

15    saying he doesn't, well, then, his testimony is "I

16    don't -- I don't know."

17              He said some stores are older, some are

18    newer.  You can ask him if the older store seems to have

19    the biggest number that contradicts what he says.

20              So I'll allow some questioning about this

21    document, but not -- not ad nauseam.

22              MR. STOFFELMAYR:  But, Judge --

23              THE COURT:  He doesn't know anything about

24    it.

25              MR. STOFFELMAYR:  To be fair, can he ask if
```

1    these numbers are correct?  That was the last question

2    that made no sense at all.

3              If these numbers are correct or incorrect,

4    Mr. McCann has to testify to that, but you can't possibly

5    expect this witness to look at this for the first time in

6    his life and say, "Oh, yeah, 8,243,000, that's correct, I

7    know that."

8              THE COURT:  Well, you

9    can -- Mr. Weinberger, you can ask, assuming this is

10   correct, "Do you have any explanation for these trends or

11   why the older store seems to have more pills than the

12   newer store?"

13             He's already said, "Well, I'd expect big

14   growth rate from the newer stores."

15             All right.  You can ask that, because these

16   are the stores under his supervision, so see what

17   knowledge he's got and what explanation he gives.

18             (End of side-bar conference.)

19   BY MR. WEINBERGER:

20   Q.   As, Mr. Joyce, as district manager for the five

21   years before you retired, and as pharmacy supervisor

22   before that, did you from time to time keep track of

23   dispensing volumes within the stores?

24   A.   Sure.

25   Q.   And did you break it down by controlled versus

1    noncontrolled?

2    A.    No.

3    Q.    Did you -- would it have been helpful to you if

4    the -- if Walgreens corporate would have provided that

16:34:42  5    information to you?

6    A.    I don't think so.  We did a good job filtering

7    prescriptions, doing good-faith dispensing, whether that

8    was on a form provided by Walgreens or just what

9    pharmacists do every day.

16:34:57  10              We did a good job in Trumbull County.

11    Refusing prescriptions that we thought were not ethical,

12    they were legal prescriptions, they were written by a

13    doctor who had an active state license and DEA license,

14    but they weren't ethical, so we didn't fill them, and we

16:35:15  15    gave those back to the patient.

16              And we filled those prescriptions that we

17    thought should be filled for people with legitimate

18    medical needs.

19    Q.    So if 8,225,000 pills were dispensed out of your

16:35:30  20    Store 5549, you're saying that your pharmacists did an

21    excellent job of screening out those scripts, looking for

22    red flags, and resolving them.

23              Right?

24    A.    That's a high-volume store.

16:35:47  25              Sure.

1    Q.    Now, the Store 9077, which store is that?

2    A.    That's Elm Road.

3    Q.    Was that a new store or older store?

4    A.    It was a newer store.

16:36:00  5          It maybe opened in, you know, 2005 maybe,

6    something like that.

7    Q.    Well, track with me, if you would, that column.

8          It looks like it may have opened somewhere

9    around 2005 or '6, and that you can see the growth up to

16:36:16  10   as high as 539,000 pills dispensed in 2014.

11         Right?

12   A.    2013 they filled, looks like, 421,000.

13   Q.    Right.  419,000 in 2014, right?

14   A.    Sure.

16:36:33  15   Q.    And 539,000 in 2015, right?

16   A.    Sure.

17   Q.    And what about Store Number 6888, where is that?

18   A.    That's in Niles, Ohio.

19   Q.    Is that a newer or old store?

16:36:48  20   A.    Newer.

21         These stores, Walgreens stores, other than

22   Warren and three Mahoning County stores, were all new

23   stores.

24   Q.    And with respect -- and if you would track with me,

16:36:59  25   with respect to each one of those stores, the trends in

Joyce - Cross/Weinberger                               1888

          1      opioid pill dispensing increases pretty much all along

          2      the way.

          3                  Right?

          4      A.   Well, total volume increased all along the way.

16:37:14  5                  They were new stores and growing quickly.

          6                  We were fighting for insurance plans.  If

          7      you look at 5549, in 2006 they only had 163,000

          8      dispensed.  I think we lost a General Motors Lordstown

          9      contract that year, so we lost a lot of scripts there.

16:37:32 10                  So there's a lot of factors in these

         11      numbers not related to, you know, what -- what contracts

         12      did we have, what doctors were nearby; were there pain

         13      clinics, was there oncologists, those sorts of things.

         14      Q.   So just track with me for a moment here.

16:37:53 15                  In Trumbull County on Page 3 of this

         16      exhibit there are 210 -- do you see where it says

         17      "Average population," there are 210,000?

         18                  I just circled it for you, if you want to

         19      look on the screen.

16:38:12 20      A.   Sure.  I see it.

         21      Q.   Right.  And so in this county of 210,000

         22      population, according to this chart, there were

         23      26,000,000 pills dispensed out of Walgreens' Trumbull

         24      County stores between 2006 and 2019.

16:38:37 25                  Does that sound excessive to you?

1    A.    Well, if you look at --

2    Q.    Sir --

3    A.    -- dosage units per capita, it looks like 10 pills

4    a year per person, or 11 pills.

16:38:51  5              I mean, some people took pain pills month

6    after month, they had legitimate injuries from wrapping

7    their car around a telephone pole or laying their

8    motorcycle in the back end of a semi, or industrial

9    accidents at mills, and so forth.

16:39:09 10              So I don't know if that's a -- doesn't seem

11   to be a crazy number of pills.

12   Q.    So using the per capita column that you just

13   referred to, that's -- that's 10 pills per person for

14   every man, woman and child in Trumbull County.

16:39:31 15              You understand that?

16   A.    Sure, I understand it.

17   Q.    And you don't feel that that's excessive?

18   A.    Well, if one person is taking 180 pills a month,

19   there's lots of people that are taking zero pills per

16:39:46 20   month.

21              So --

22   Q.    So let's do that computation.

23              If one person is taking 180 pills a month,

24   did you say?

16:39:59 25   A.    Yeah.  Say they're taking something every four

1    hours for pain.

2    Q.    Okay.

3    A.    Per month.

4    Q.    Sure.

16:40:11   5             And over what -- do you want to -- over,

6    you think that happens over a number of months with

7    respect to one patient?

8    A.    Sometimes they're on it for extended, a year.

9    Q.    For a year, okay.

16:40:24  10             So even if we took one year's worth of

11   pills for one -- for one patient, and you multiply 12

12   times 180, okay --

13   A.    Roughly 2,400, or something like that.

14   Q.    That would be about 4,000 pills for one person,

16:40:53  15   right?

16   A.    No.

17             MR. LANIER:  No.

18   Q.    Like 2,000?

19             THE COURT:  Your math isn't right,

16:41:00  20   Mr. Weinberger.

21   BY MR. WEINBERGER:

22   Q.    All right.  Well, 10 times 180 -- you're right,

23   Your Honor -- 10 times 180 is 1,800?

24             THE COURT:  Whenever I do something in my

16:41:11  25   head at my age I get it wrong, and you're about the same

1    age as I am, so you have to do it the old-fashioned way,

2    because that's how I now have to do it.

3                    MR. WEINBERGER:  All right.

4    BY MR. WEINBERGER:

16:41:22  5    Q.    It would be 2,160, right?

6    A.    Yeah.

7    Q.    So one person taking 180 pills a month, right?

8    A.    Yes.

9    Q.    So is that your explanation, that you had a number

16:41:35 10   of patients within your Trumbull County stores who were

11   getting dispensed that kind of quantity to make up 26

12   million pills?

13   A.    Some were.

14                    Some were taking a hundred a month, some

16:41:47 15   would take 40 a month; some would take, you know, 50 a

16   month, whatever the case might be.

17                    I can tell you that every prescription that

18   we filled, I took a lot of pride in who I hired in my

19   pharmacies and they took a lot of pride in their

16:42:03 20   technicians.

21                    I think we did a good job screening

22   prescriptions.

23   Q.    So --

24   A.    We sent many people out the front door with a piece

16:42:12 25   of paper in their hand --

1    Q.    So --

2    A.    -- on a prescription.

3    Q.    -- if you had been provided with this data while

4    you were working as the district manager, these kinds of

16:42:23 5    numbers would not have concerned you.

6                   Is that your testimony?

7    A.    Yeah, they concern me, but, you know, if they're

8    evaluating every prescription on its own merit, they did

9    a good job screening through folks that came in that were

16:42:40 10   pill-seekers.

11                   We didn't have lines of people in our

12   stores.

13   Q.    Would you have been concerned that there was

14   over-dispensing?

16:42:48 15   A.    Would I be concerned if there was over-dispensing?

16   Q.    No, would you have been concerned, seeing those

17   numbers, that there was over-dispensing out of your

18   stores?

19   A.    No.

16:42:56 20                   We had good employees.  They did a nice

21   job.  We had, I think, pharmacists by nature are fairly

22   conservative on the most part.  Those are the kind of

23   folks that I went to pharmacy school with, and these are

24   the folks that I interacted with professionally.

16:43:09 25                   Pharmacists do a nice job.

1           My pharmacists did a great job, I think.

2     Q.    Would you have been concerned about whether the

3     pharmacists had time to investigate these scripts?

4     A.    A good pharmacist takes the time needed to

16:43:23  5   investigate any prescription.

6     Q.    Would you agree, sir --

7     A.    Pharmacists take it personally when a bad script

8     gets past them, so there's a lot of pride in pharmacy on

9     what they do.

16:43:35 10   Q.    Would you agree, Mr. Joyce, that an oversupply of

11    opioid pills in a community can lead to diversion?

12    A.    Sure.

13    Q.    And --

14    A.    I don't think we're a part of it.

16:43:46 15   Q.    And would you agree that diversion can lead to an

16    unreasonable interference with the public health and

17    safety?

18    A.    Without question.

19           MR. STOFFELMAYR:  Objection to form, Your

16:43:56 20   Honor.

21           THE COURT:  Overruled.

22    A.    Without question.

23    BY MR. WEINBERGER:

24    Q.    Did you know that Walgreens had data, dispensing

16:44:09 25   data, from your stores and others where they could create

Joyce - Cross/Weinberger                                1894

1    reports and trends about prescriber prescribing habits

2    and profiles?

3    A.    Honestly, Mr. Weinberger, maybe I'm an old-time

4    pharmacist.

16:44:24 5              I don't know.

6    Q.    Were you --

7    A.    We evaluated every prescription that came into our

8    stores for both legality and being ethical to dispense.

9              So there was a problem in Trumbull County?

16:44:39 10   There was a problem in every county in Ohio.

11             Do I think Walgreens was a part of that

12   problem?  No.

13   Q.    Sir, did you ever use the PDMP OARRS yourself?

14   A.    I tried to log in and get in, look at it, sure.

16:44:57 15  Q.    How many occasions?

16   A.    Dozens.

17   Q.    Um-hmm.  And you understand that that's a

18   data-driven resource?

19   A.    Sure.

16:45:05 20  Q.    And you understand that the data that goes into the

21   OARRS PDMP come from Walgreens as well as the other

22   retail pharmacy chains in Ohio?

23   A.    I think we've talked about that, yeah.

24   Q.    And do you realize that OARRS can analyze that data

16:45:25 25  and provide information regarding prescribing habits of

1 doctors?

2 A. And we looked at that all the time.

3 My pharmacists used OARRS every time they

4 were required to.

16:45:36 5 Q. But before the PDMP went into effect in 2011, there

6 was no way for a pharmacist at your stores to look at the

7 prescribing profile of a particular doctor because they

8 didn't have the data, did they?

9 A. You can judge a doctor's profile by the

16:45:58 10 prescriptions that they see coming into your store.

11 I mean, that's -- that's the old-fashioned

12 way, but that's the way it was done before the PMP.

13 Prior to OARRS, pharmacists had to make

14 their own judgment calls. OARRS helped you make that

16:46:13 15 judgment call. But in the '80s, '90s and early 2000s,

16 you know, plenty of folks walked in and were either

17 evaluated and filled, or handed a prescription back and

18 told to hit the road.

19 Q. How many -- do you have any idea, sir, how many

16:46:29 20 physicians' prescriptions are filled in your Walgreens

21 stores in Trumbull County?

22 A. With the prescription number? No.

23 Q. Do you have -- do you have how many -- do you have

24 any idea how many discreet physicians have prescriptions

16:46:49 25 that are filled by patients at your stores?

           1    A.    Did you say discreet physicians?

           2    Q.    Yes.

           3    A.    What's a discreet physician?

           4    Q.    Do you have any idea, sir, as to how many

16:47:05   5    individual physicians have their prescriptions -- have

           6    their patients' prescriptions filled at your stores?

           7    A.    Like they direct them to our stores?

           8    Q.    Yes.

           9    A.    None that I know of.

16:47:18  10    Q.    No.

          11          There are probably -- I'm sorry, I'm not

          12    making myself clear.

          13          Let me see if I can get -- get a little

          14    clearer for you.

16:47:27  15          Aren't there literally thousands of

          16    physicians who write prescriptions that end up getting

          17    filled at your stores?

          18    A.    Sure.

          19    Q.    You can't expect your pharmacist to know the

16:47:41  20    prescribing habits of every one of those physicians, can

          21    you?

          22    A.    I have a pretty good idea if they're in your -- if

          23    they're in your neighborhood, their prescribing habits.

          24    Q.    Well, isn't that the -- wasn't that the whole

16:47:53  25    purpose of OARRS being established in Ohio, to provide

1    information and data and data analysis to pharmacists so

2    they could evaluate the prescribing habits of doctors?

3    A.    Sure.

4              MR. STOFFELMAYR:  Your Honor, I'm going to

16:48:10  5    object.

6              There's some confusion about what OARRS

7    does and doesn't do here.

8              We can go to side-bar, but these questions

9    are --

16:48:18 10              THE COURT:  Well, the witness can testify

11    to what his understanding is.

12              MR. STOFFELMAYR:  I think we're getting

13    into a distinction between prescribers and patients, is

14    where the confusion comes in.

16:48:27 15              THE COURT:  Mr. Weinberger, please clarify

16    your question, and then the witness can testify to his

17    understanding.

18    BY MR. WEINBERGER:

19    Q.    Do you know how OARRS works?

16:48:34 20    A.    I'm sorry?

21    Q.    Do you know how OARRS works?

22    A.    Sure.

23    Q.    And what is the -- doesn't OARRS provide an

24    analysis of a prescriber's prescribing habits and

16:48:47 25    profile?

1    A.    It gives you data on -- I don't think it gives

2    prescriber-specific information.

3              It gives data on the prescription history

4    of a patient that you're looking up as far as where

16:49:05 5    they've been, like you can see if they've been at Walmart

6    last week and CVS the week before and an independent

7    pharmacy yesterday, and those sorts of things.

8    Q.    Well, can you agree that -- do you agree that OARRS

9    is a helpful tool --

16:49:19 10   A.    OARRS is a helpful tool.

11   Q.    Let me finish my question, sir.

12   A.    Sure.

13   Q.    It's a helpful tool to Walgreens' pharmacists who

14   are looking at prescriptions and trying to evaluate red

16:49:31 15   flags?

16   A.    A tool, correct.

17   Q.    Right.  And do you believe it is a helpful tool to

18   preventing diversion?

19   A.    Sure, it is.

16:49:37 20   Q.    And do you understand that OARRS actually went into

21   existence for purposes of use by pharmacists in 2011?

22   A.    Sounds about right.

23   Q.    And before 2011, that tool didn't exist, did it?

24   A.    It existed for law enforcement, I think, for a few

16:49:59 25   years prior to pharmacists getting on it.

Joyce - Cross/Weinberger                      1899

1    Q.    For pharmacists it didn't exist as a tool, did it?

2    A.    Oh, it existed.

3          We didn't have access to it.

4    Q.    Right.

5          You couldn't -- pharmacists before 2011

6    could not use OARRS, correct?

7    A.    Correct.

8    Q.    So do you understand that in 2011, the regulations

9    of the Ohio Board of Pharmacy required pharmacists to

10   check OARRS under certain circumstances?

11   A.    Sure.

12   Q.    And that was a change in the regulation, correct,

13   in 2011?

14   A.    I believe so, yeah.

15   Q.    So let's take a look together at P 20810.

16   A.    Am I getting a new packet, or is that in here?

17   Q.    We're getting it for you, sir.

18   A.    Thank you.

19   Q.    All right.  Let's go to P -- apparently we don't

20   have enough to provide to everybody, so let's take a look

21   at P 20811.

22   A.    Could I have a copy?

23   Q.    We're going to get you one.

24   A.    Thanks.

25         Thank you, ma'am.

Joyce - Cross/Weinberger                                    1900

1    Q.    So this is an e-mail that you sent to a number of

2    other Walgreen employees, correct?

3    A.    Yes, sir.

4    Q.    And this e-mail was sent by you on August 11th,

16:52:48 5    2011, right?

6    A.    Sure.  Yes.

7    Q.    And it was sent to Al Carter, right?

8    A.    Yep.

9    Q.    And who is Al Carter?  What is Al Carter's

16:52:59 10    position?

11    A.    I think he worked in Government Affairs.

12    Q.    Okay.  And Deborah Platts, who is she?

13    A.    She was kind of the supervisor of the pharmacy

14    supervisors.

16:53:10 15    Q.    And Tim Anhorn?

16    A.    Regional Vice President for Market 29 out of New

17    Jersey.

18    Q.    And Natasha Ramlagan?

19    A.    Ramlagan, she worked underneath Debbie Platts and

16:53:25 20    above my level.

21    Q.    And Nick Barsan?

22    A.    He was a pharmacy supervisor in Cincinnati.

23    Q.    And Patrick Hawthorne?

24    A.    Maybe a Vice -- a corporate Vice President.  I

16:53:37 25    don't know his exact role at that time, but I think maybe

1    a corporate Vice President.

2    Q.    Okay.  So this e-mail is about the fact that

3    4729.5-20, which is a regulation of the Ohio Board of

4    Pharmacy, was going to change and create certain

16:54:00  5    circumstances that made checking OARRS by pharmacists

6    mandatory.

7                    Correct?

8    A.    Correct.

9    Q.    So this new language said that, "Prior to

16:54:15 10   dispensing a controlled drug prescription, at a minimum,

11   a pharmacist shall request and review an OARRS report

12   covering at least one-year time period and/or another

13   status report, where applicable --"

14                    THE COURT:  Another state's report, I

16:54:36 15   believe.

16   BY MR. WEINBERGER:

17   Q.    -- "another state's report where applicable and

18   available, if a pharmacist becomes aware of a person

19   receiving reported drugs from multiple prescribers."

16:54:46 20                    Let me stop you there.

21                    That's a red flag, isn't it?

22   A.    That's a red flag or a concern, whatever you want

23   to call it.

24   Q.    Well, you would call it a concern.

16:54:55 25   A.    I'll call it a concern.

Joyce - Cross/Weinberger                    1902

1    Q.    Right.  You wouldn't call it a red flag, right?

2    A.    Not unless you want me to.

3    Q.    I don't want you to do anything that you're not

4    comfortable with, sir.

5    A.    It's a concern.

6    Q.    I want you to do what you would normally do and how

7    you would normally use that phrase or not --

8    A.    A patient --

9    Q.    -- back at the time you were working for Walgreens.

10   A.    A patient going to multiple prescribers is a

11   concern, for sure.

12   Q.    Okay.  Receiving reported drugs for more than 12

13   weeks, is that a red flag?

14   A.    No.  That's -- that's a concern.  I mean, lots of

15   people are on pain pills longer than 12 weeks.

16   Q.    Okay.

17   A.    So I think the multiple prescribers was way more

18   important than reported drugs for more than 12 weeks.

19   Q.    "Abusing or misusing reported drugs,

20   overutilization, early refills, or appears overly sedated

21   or intoxicated upon presenting a prescription for a

22   reported drug."

23              Is that a red flag?

24   A.    Sure.  It's a concern that you want to look into

25   before you would fill that prescription.

1    Q.     "Requesting a reported drug by specific name,

2    street name, color or identifying marks."

3              Is that a red flag?

4    A.     Definitely needs looked into.  It's a concern,

16:56:10  5    sure.

6    Q.     "Requesting the dispensing of reported drugs from

7    a prescription issued from -- issued from a prescriber

8    with whom the pharmacist is not familiar (located out of

9    state or prescriber is outside the usual pharmacy

16:56:30 10    geographic prescriber care area)."

11              Is that a red flag?

12    A.     So again, that would be a low-level concern.

13              We had lots of folks that travel to the

14    Cleveland Clinic, or UPMC in Pittsburgh, or Akron

16:56:46 15    Children's Hospital, or Sloan Kettering Cancer Center in

16    New York, or Johns Hopkins in Baltimore.

17              So that was not -- that was a concern.  It

18    needed looking into, but that was not unusual.

19    Q.     And number six, "Presenting a prescription for

16:57:02 20    reported drugs when the patient resides outside the usual

21    pharmacy geographic patient population."  Red flag?

22    A.     Again -- again, it's a concern because, you know,

23    if you'd investigate and find that this is Mrs. Jones's

24    sister who is staying with her for three months to help

16:57:23 25    her convalesce, that wouldn't be a concern at all.

Joyce - Cross/Weinberger                          1904

1          But it's something that you need to look

2    into.

3    Q.    So you understand that the regulation was being

4    changed to require the pharmacist to check OARRS if any

16:57:40 5   of these circumstances -- you call areas of concern, some

6    people call them red flags, if any of those existed, it

7    required -- it would require the pharmacist to check

8    OARRS, correct?

9    A.    Yes.

16:57:57 10  Q.    Now, OARRS -- by the way, these concerns, as you

11   talk about them, these six concerns, are these all red

12   flags well-known to pharmacists?

13   A.    You would do that normally whether you had OARRS or

14   you didn't have OARRS.

16:58:24 15  Q.    That's my question.

16          Are they red flags well-known to most

17   pharmacists?

18   A.    Any good pharmacist, yeah.

19   Q.    Um-hmm.  Now, the data that's in OARRS, if someone

16:58:38 20  were to check into it, could reveal doctor-shopping,

21   couldn't it?

22   A.    It could.

23   Q.    It could reveal pharmacy-shopping, right?

24   A.    It could.

16:58:49 25  Q.    It could reveal payments by cash, right?

          1    A.   I don't know if that would show payments by cash.

          2              I'm not sure if OARRS had that capability.

          3    Q.   It could reveal pattern prescribing by doctors,

          4    right?

16:59:09  5              MR. STOFFELMAYR:  Objection, Your Honor.

          6              THE COURT:  Overruled.

          7    A.   It could -- ask me that again, Mr. Weinberger.

          8    Q.   It could reveal pattern prescribing by doctors.

          9              True?

16:59:20 10    A.   The pattern typically was the pattern of the

         11    patient.

         12              In other words, it would show you a history

         13    of where they've been over a time frame, what stores

         14    they've gotten controlled drugs filled at.

16:59:32 15              That's what it showed you.

         16    Q.   Um-hmm.  So you're saying it doesn't do an analysis

         17    of prescribers?

         18    A.   I don't think it did.

         19    Q.   Can it reveal improper early refills?

16:59:44 20    A.   Oh, yeah, sure.

         21    Q.   Could it reveal excessive prescription dosing?

         22    A.   Sure.

         23    Q.   Could it reveal multiple short-term opioid

         24    prescriptions?

16:59:55 25    A.   That's -- yeah, that's what it did, sure.

1    Q.    Could it reveal doctors who are prescribing outside

2    their area of specialty?

3    A.    I don't think it had that capability.

4              In other words, I don't think it would

17:00:11  5    show -- I don't think it would show, like, the specialty

6    of the doctor, no.

7              I don't think it had that capability.

8    Q.    Well, Mr. Joyce, when is the last time you actually

9    opened up the OARRS program and looked at it?

17:00:25  10    A.    Probably a year ago.

11    Q.    And when you did that a year ago, when was the last

12    time before that?

13    A.    I didn't look at it all the time.

14    Q.    Well, you -- I'm getting the feeling that you

17:00:39  15    seldom looked at it.

16              Is that true?

17    A.    I looked at it when I needed to look at it at work

18    or if the pharmacist wanted to show me something about a

19    patient.

17:00:46  20              I didn't use it.  I wasn't a practicing

21    pharmacist.

22    Q.    So you didn't look at it very often, did you?

23    A.    I looked at it when I needed to.

24              Not real often, no.

17:00:55  25    Q.    Not often, right?

1     A.   Not real often.

2     Q.   Um-hmm.  Now, is doctor-shopping a red flag, sir?

3     A.   It's definitely a red flag or a concern, sure.

4     Q.   Is pharmacy-shopping a red flag?

17:01:09  5   A.   Without question.

6     Q.   Is payment by cash a red flag?

7     A.   Usually.

8     Q.   Is pattern prescribing by a doctor a red flag?

9     A.   If you see a doctor writing the same thing over and

17:01:26 10   over to every patient, that's a red flag.

11    Q.   Is improper early refills a red flag?

12    A.   Usually.

13         Not always, but usually.

14    Q.   Is --

17:01:39 15   A.   If someone went to an emergency room and got a

16    three-day supply or whatever, four-day supply, and they

17    went to their family doctor on two days later and got a

18    30-day supply, that would be an early refill, but that

19    wouldn't really be a concern.

17:01:53 20   Q.   Yeah, but the question is, is that a concern or red

21    flag that needs to be further investigated and resolved?

22    A.   You'd look into those things, sure.

23    Q.   Sure.  So we're talking about red flags that may

24    arise or trigger further investigation, right?

17:02:08 25   A.   Yes.

```
 1    Q.    And the prescription should not be filled unless
 2    the red flag is resolved, right?
 3    A.    Sure.
 4    Q.    Is excessive prescription dosing a red flag?
 5    A.    Sure.
 6    Q.    Is multiple short-term opioid prescriptions a red
 7    flag?
 8    A.    It could be.
 9               Again, I gave the example of an emergency
10    room and then going to the family doctor.
11    Q.    Right.
12    A.    You know, could be very innocuous or could be a
13    concern.
14    Q.    Right.  So it's a red flag that needs to be
15    investigated and resolved before the prescription is
16    filled, right?
17    A.    Sure.  Yeah.
18    Q.    If the pharmacist is exercising their corresponding
19    responsibility.
20               True?
21    A.    Sure.
22    Q.    And are doctors who are prescribing outside
23    their -- opioids outside their area of specialty, is that
24    a red flag?
25    A.    Yeah.  I mean, if they have a diagnosis code on
```

1    there, I mean, that really wasn't a big -- I don't think

2    that was a huge issue.

3                When I think of doctors prescribing outside

4    their specialty, I think of, like, a dentist writing for

17:03:27  5    a birth control pill, or something like that.

6                Any doctor can write for a controlled drug

7    if they have the proper licensing, so specialists wrote

8    for controlled drugs, general practitioners wrote for

9    controlled drugs, dentists wrote for controlled drugs,

17:03:46 10    internal medicine wrote for controlled drugs, ER doctors,

11    and so forth.

12    Q.   So we're going to get into this tomorrow, but

13    you're familiar with the targeted drug good-faith

14    dispensing policy of Walgreens?

17:04:00 15    A.   Sure.

16    Q.   And are you familiar with the fact that one of the

17    issues that a pharmacist exercising corresponding

18    responsibility has to investigate is what the specialty

19    of the patient -- of the doctor is and --

17:04:20 20    A.   He --

21    Q.   -- and whether or not the prescription of an opioid

22    is outside that area of practice?

23    A.   Well, if you look on the prescription head --

24    Q.   Sir, it's a simple question.

17:04:32 25                Is that a part of the targeted drug

| | |
|---|---|
| 1 | good-faith dispensing policies of Walgreens? |
| 2 | A.    Yes.  It's on the prescription header. |
| 3 | Q.    Okay.  Now, in 2011, going back to this Exhibit |
| 4 | 20811, you were on the Ohio Board of Pharmacy, right? |
| 17:04:52  5 | A.    I was. |
| 6 | Q.    And actually, you were writing this e-mail to these |
| 7 | department -- these Walgreen department heads and other |
| 8 | Walgreens employees to indicate that you objected before |
| 9 | the Board of Pharmacy, yourself and together with a CVS |
| 17:05:23 10 | Board member, to the Ohio Board changing this rule, |
| 11 | making -- |
| 12 | MR. DELINSKY:  Objection. |
| 13 | Hearsay, Your Honor. |
| 14 | THE COURT:  Sustained. |
| 17:05:38 15 | BY MR. WEINBERGER: |
| 16 | Q.    Well, you -- you're communicating that you objected |
| 17 | to this change in the Ohio Board of Pharmacy regulation |
| 18 | to make mandatory checking of OARRS applicable under |
| 19 | certain circumstances. |
| 17:05:54 20 | Right? |
| 21 | A.    I didn't think this was ready for prime time the |
| 22 | way they rolled it out. |
| 23 | Q.    So you objected to it, right? |
| 24 | A.    Sure. |
| 17:06:00 25 | Q.    Right.  And there are a number of reasons that you |

1    communicate in this e-mail as to why you objected.

2              Right?

3    A.    Sure.

4    Q.    So let's look at that.

17:06:10  5              By the way, which hat were you wearing when

6    you wrote this e-mail?

7              Were you wearing the Walgreens hat or the

8    Ohio Board of Pharmacy hat?

9    A.    I think I was wearing the Ohio Board of Pharmacy

17:06:23  10   hat.

11   Q.    Okay.  But you're communicating to your colleagues

12   at Walgreens that on behalf of the Ohio Board of Pharmacy

13   or on behalf of Walgreens, you objected to the change in

14   this rule?

17:06:38  15   A.    I'm not sure what you mean.

16             I was giving Walgreens information on how

17   those rules were going to change.  There's nothing

18   nefarious about this information that I was sending to

19   Walgreens' leadership.

17:06:50  20   Q.    Well, you're communicating to your Walgreens

21   colleagues that at the Board meeting, associated with

22   consideration of this amendment making OARRS mandatory

23   for pharmacists, that you objected to it, right?

24   A.    I objected to it in its present form.

17:07:08  25             I thought they should do some -- do their

            1    due diligence, and that's my duty as a Board member.  If

            2    I don't think this is going to benefit at, in this

            3    version, the people of the State of Ohio, sure, I

            4    objected.

17:07:22    5    Q.    So you knew at the time, as you've apparently

            6    always known, that a pharmacist has an independent

            7    corresponding responsibility with respect to dispensing

            8    opioids, right?

            9    A.    I think I've said that a dozen times today.

17:07:35   10    Q.    All right.  So your objections were, the doctors

           11    are required to do this also, so why should -- so why do

           12    both professions have to do it.

           13               What you were communicating there, sir,

           14    was, "Well, if doctors have to check OARRS, why should

17:07:56   15    the pharmacists," right?

           16    A.    I wondered why we both had to do it.  Maybe the

           17    pharmacists should just be the ones.  Maybe the doctors

           18    should just be the ones.

           19               I wasn't sure we both needed to do it.

17:08:07   20    Q.    Well, diversion of opioids is very dangerous to the

           21    health and safety of our communities, right?

           22    A.    Without question.

           23    Q.    And diversion is dangerous to individuals, right?

           24    A.    It's terrible.

17:08:23   25    Q.    And so having a double-check in the system as to

1    whether or not a prescription is valid or not, you're

2    saying is a bad idea?

3    A.    I was questioning whether it was necessary.

4    Q.    Right.  And you go on to say, "This will take

17:08:39  5    valuable patient care time away from the pharmacist."

6    A.    And I was right about that, because when it rolled

7    out, it was very clunky, took minutes to bring up

8    information for the pharmacist, and it did take valuable

9    time away from the pharmacist.

17:08:56 10           The most important thing a pharmacist can

11    do is spend a minute talking with the customer.

12    Q.    Right.  At the time in 2011, didn't Walgreens have,

13    as one of its policies, a 15-minute -- 15-minute time

14    limit on filling prescriptions?

17:09:12 15    A.    I don't believe so.

16    Q.    All right.  We'll get into that tomorrow.

17    A.    Good.

18    Q.    You thought this was going to take valuable patient

19    care time away from the pharmacist, true?

17:09:23 20    A.    And it did.

21    Q.    And you go on to say, "The information is already

22    in the OARRS report with law enforcement access."

23           Have I read that correctly?

24    A.    You did.

17:09:33 25    Q.    "No need for us to play policeman."

1          That's what you said, right?

2     A.    That's what I typed.

3     Q.    So when you're faced under this regulation with one

4     of these six flags that under this regulation makes

5     mandatory checking OARRS, is there somebody from law

6     enforcement there or available to check OARRS for that

7     particular script?

8     A.    I don't believe so.

9          My concern, like I said, is that this

10    system wasn't ready for prime time, and the Board should

11    have done a little more work on it before they roll it

12    out.

13         For instance, when I was on the Board, the

14    Board rolled out a one-transfer policy for controlled

15    drugs.  Sounds like a great idea, but folks would go from

16    Ohio to Florida for a couple months in the winter,

17    transfer their prescription down there, and then when

18    they came back they couldn't transfer it back.

19         I objected to that.  Sounds like it's a

20    great idea, though, right?  You're limiting transfers of

21    controls.  And again, they did repeal that down the line.

22              MR. WEINBERGER:  Your Honor, move to strike

23    the answer as not responsive.

24              THE COURT:  Well, overruled.

25    BY MR. WEINBERGER:

1    Q.    Sir, in objecting to this change in the regulation,

2    on behalf of Walgreens, you were putting profits over

3    safety, weren't you?

4    A.    No.

17:11:15  5              MR. STOFFELMAYR:  Objection, Your Honor.

6    It's argument.

7                    He wasn't objecting on behalf of Walgreens.

8                    THE COURT:  Well, overruled.

9    BY MR. WEINBERGER:

17:11:22 10    Q.    Your answer, you weren't?

11    A.    Ask me again.

12    Q.    Sure.

13              On behalf of Walgreens, while you were a

14    member of the Board objecting to this change in the

17:11:31 15    regulation making OARRS mandatory, you were putting

16    Walgreens' profits over safety, weren't you?

17    A.    I was not, and --

18    Q.    Sir.

19    A.    Let me answer the question.

17:11:43 20    Q.    Sir.

21    A.    Let me answer the question.

22                    MR. STOFFELMAYR:  Objection.

23                    THE COURT:  Overruled.

24                    Let him answer the question.

17:11:49 25    BY MR. WEINBERGER:

1    Q.    Okay.

2    A.    This version of OARRS was edited down the road, so

3    my -- some of my objections were certainly valid.

4    Q.    Sir, Item 6 of your e-mail, one of your objections

17:12:03  5   is that this was just another unfunded mandate imposed on

6    retailers.

7            You wrote that, right?

8    A.    I did wrote -- I did write that, and what I was

9    referring to is we didn't know, number one, if the

17:12:21  10  interface between all of the pharmacies in the State of

11   Ohio could interface with the State Board website.

12           And as it turned out, that was correct,

13   some of them couldn't interface with the individual

14   companies' websites or it was very, very clunky.

17:12:37  15          I didn't know if every little mom and pop

16   store in Chillicothe, Ohio, had the capability to do this

17   or even had the money to do this.

18           So I thought we should do a little more

19   work before we roll out this -- this perfect program that

17:12:53  20  the State Board had.

21   Q.    Sir, are you familiar with a study that Walgreens

22   did on the cost of checking OARRS across -- or PDMPs

23   across this nation?

24   A.    No.

17:13:11  25  Q.    So you're not aware of a study that indicated that

 1    it would cost between 15 and $80 million across the

 2    country for Walgreens to have their pharmacists check

 3    PDMPs?

 4    A.    That's what I said.

17:13:30  5                MR. WEINBERGER:  Your Honor, do you want me

 6    to keep going or is this a good --

 7                THE COURT:  Well, I was going to inquire,

 8    if it's a convenient place to stop.

 9                MR. WEINBERGER:  It is.

17:13:38 10                THE COURT:  I didn't want to break you off

11    in midstream.

12                Okay.  All right.  Ladies and gentlemen, we

13    will break for the evening.

14                Usual admonitions.  Don't read, watch,

17:13:48 15    listen to anything remotely connected to this case.

16    Don't discuss the case with everyone -- anyone.  Just

17    tell them that this Judge has ordered me not to talk

18    about it until the case is over.

19                And we'll pick up with this witness's

17:14:03 20    testimony tomorrow.

21                Have a great evening.

22                (Jury out.)

23                THE COURT:  Okay.  Everyone can be seated

24    for a minute.  I wanted to make sure the doors -- sir,

17:14:40 25    you can step down.  You're excused for the evening.  I

1     have some legal issues.

2           MS. SULLIVAN:  Your Honor, can I put

3     something on the record?  Mr. Weinberger has a note about

4     Giant Eagle that the jury was looking at when the jury

17:14:53 5    was walking out.

6           THE COURT:  I don't know what you're

7     referring to.

8           MS. SULLIVAN:  It's on the monitor, Your

9     Honor.  It's been on the monitor.  He took it off.  I'm

17:15:03 10   hoping it was inadvertent.

11           THE COURT:  I just saw it at the last

12    second.  All right.  Everyone should be careful about

13    those notes.

14           All right.  Did the plaintiffs make a

17:15:19 15   decision on what they're doing with Nelson?

16           MR. LANIER:  Yes, Your Honor.

17           Yes, Your Honor.  Mark Lanier for

18    plaintiffs.

19           We decided that we would put Nelson on live

17:15:29 20   at a time next week that is convenient.  And I

21    expressed -- when I expressed that to Tara, she said that

22    perhaps we should make one more stab at finding some

23    agreeable modifications to the notes.

24           I'm fine doing that as well.

17:15:44 25           THE COURT:  All right.

1    MR. LANIER:  So we'll try and do that

2  tonight and let the Court know first thing in the

3  morning.

4    THE COURT:  All right.  I think that's, if

17:15:51  5  you can --

6    MR. LANIER:  It's easier.

7    THE COURT:  Well, it's easier and that's

8  how everyone planned it.

9    MR. LANIER:  Yes.

17:15:57 10    THE COURT:  So if you can do it, that's

11  great.

12    MR. LANIER:  We'll try in good faith, Your

13  Honor.

14    THE COURT:  All right.  That's fine.

17:16:02 15    MR. LANIER:  And, Your Honor, we'll alert

16  Special Master David Cohen in agreement with that.

17    THE COURT:  All right.  Now we have two

18  completed witnesses with exhibits.

19    We have Mr. Catizone and Mr. Rannazzisi.

17:16:19 20    So I don't want to get too far behind, so

21  certainly by the beginning of tomorrow I'd like to have a

22  list of what each side's offering and if there are any

23  objections, and I strongly suggest keep the objections to

24  a minimum.

17:16:36 25    Tomorrow we're going to end a little

1    earlier because I need to make a condolence call, so

2    we'll go to 5:00, maybe a touch before 5:00.  Right

3    around 5:00 o'clock will be fine.

4              Okay.  Anything else anyone needs to bring

5    up?

6              Mr. Delinsky, yes.

7              MR. DELINSKY:  Your Honor, just very

8    briefly, on the OARRS questions, what is available in

9    OARRS is demonstrable facts, and there is no prescriber

10   analysis on OARRS.

11             What the pharmacist can see is a patient

12   profile.  And I'm not suggesting anything was intentional

13   from counsel, but some of the questions were misleading

14   insofar as they suggested that a pharmacist could see

15   information about the prescriber on OARRS.

16             It's just not available as a factual

17   matter.

18             THE COURT:  Well, Mr. Delinsky, I may be

19   the only person in this room who hasn't looked at OARRS

20   to see what's there.

21             MR. DELINSKY:  We're not allowed to as a

22   matter of law.

23             THE COURT:  Well, I'm not allowed to.  I'm

24   not in that profession.

25             I figured the lawyers might have as part of

1 preparing witnesses, so I guess we'll have to clear it up

2 with other witnesses or, you know, this was his

3 understanding.

4          I mean, again, he said he doesn't consult

5 it regularly because he's not a practicing pharmacist.

6          MR. STOFFELMAYR:  My concern or the reason

7 I objected, and I can't speak for Mr. Delinsky, is if you

8 ask a leading question with a demonstrably false premise,

9 that is unfair to the witness.

10          THE COURT:  Well, counsel, I'm assuming

11 Mr. Weinberger was not doing that, okay?  Everyone knows

12 a lawyer is not supposed to do that.

13          You're not supposed to deliberately lead a

14 witness to something that's factually incorrect, so --

15          MR. STOFFELMAYR:  I assume it was

16 unintentional, which is the reason for objecting.

17          THE COURT:  All right.  Well, maybe I

18 didn't perceive the basis for the objection, but, you

19 know, I want everyone to be conscious of what -- of not

20 doing that.  And if you can't get that from OARRS, you

21 shouldn't suggest to the witness that you can.

22          All right.  Then we'll see everyone

23 tomorrow morning.

24          (Proceedings concluded at 5:19 p.m.)

25          -  -  -  -

1922

1          C E R T I F I C A T E

2               I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6

7

8    **/s/Susan Trischan**
     /S/ Susan Trischan, Official Court Reporter
9    Certified Realtime Reporter

10   7-189 U.S. Court House
     801 West Superior Avenue
11   Cleveland, Ohio 44113
     (216) 357-7087
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1923

1                              **I N D E X**

2

3   **WITNESSES:**                                             **PAGE**

4   DIRECT EXAMINATION OF JOSEPH RANNAZZISI        1648

5   (RESUMED)

6   BY MR. LANIER

7   CROSS-EXAMINATION OF JOSEPH RANNAZZISI         1712

8   BY MR. MAJORAS

9   CROSS-EXAMINATION OF JOSEPH RANNAZZISI (RESUMED)   1759

10   BY MR. MAJORAS

11   CROSS-EXAMINATION OF JOSEPH RANNAZZISI         1788

12   BY MS. FIEBIG

13   REDIRECT EXAMINATION OF JOSEPH RANNAZZISI      1791

14   BY MR. LANIER

15   RECROSS-EXAMINATION OF JOSEPH RANNAZZISI       1815

16   BY MR. MAJORAS

17   CROSS-EXAMINATION OF BRIAN JOYCE            1820

18   BY MR. WEINBERGER

19

20                              * * * * *

21

22

23

24

25