1924

1    IN THE DISTRICT COURT OF THE UNITED STATES
     FOR THE NORTHERN DISTRICT OF OHIO
2            EASTERN DIVISION

3
     IN RE:                    Case No. 1:17-md-2804
4    NATIONAL PRESCRIPTION      Cleveland, Ohio
     OPIATE LITIGATION
5                              October 14, 2021
     CASE TRACK THREE          8:49 a.m.
6

7

8                    - - - - -

9
                    **VOLUME 8**
10

11                   - - - - -

12

13       TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14      BEFORE THE HONORABLE DAN A. POLSTER,

15        UNITED STATES DISTRICT JUDGE,

16              AND A JURY.

17

18                   - - - - -

19

20

21   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
22                            801 West Superior Avenue
                              Cleveland, Ohio  44113
23                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

```
 1    APPEARANCES:
      For the Plaintiffs:        Peter H. Weinberger, Esq.
 2                               Spangenberg, Shibley & Liber
                                 1001 Lakeside Avenue, Ste. 1700
 3                               1900 East Ninth Street
                                 Cleveland, Ohio    44114
 4                               216-696-3232

 5                               W. Mark Lanier, Esq.
                                 Rachel Lanier, Esq.
 6                               M. Michelle Carreras, Esq.
                                 The Lanier Law Firm
 7                               6810 FM 1960 West
                                 Houston, Texas    77069
 8                               813-659-5200

 9                               Frank L. Gallucci, III, Esq.
                                 Plevin & Gallucci Company, LPA
10                               The Illuminating Building
                                 Suite 2222
11                               55 Public Square
                                 Cleveland, Ohio    44113
12                               216-861-0804

13                               Salvatore C. Badala, Esq.
                                 Maria Fleming, Esq.
14                               Napoli Shkolnik
                                 360 Lexington Ave., 11th Floor
15                               New York, New York    10017
                                 212-397-1000
16
      For Walgreen Defendants:   Kaspar J. Stoffelmayr, Esq.
17                               Brian C. Swanson, Esq.
                                 Katherine M. Swift, Esq.
18                               Alex Harris, Esq.
                                 Sharon Desh, Esq.
19                               Bartlit Beck LLP
                                 54 West Hubbard Street, Ste.300
20                               Chicago, Illinois    60654
                                 312-494-4400
21
      For CVS Defendants:        Graeme W. Bush, Esq.
22                               Eric R. Delinsky, Esq.
                                 Alexandra W. Miller, Esq.
23                               Paul B. Hynes, Jr., Esq.
                                 Zuckerman Spaeder - Washington
24                               Suite 1000
                                 1800 M Street, NW
25                               Washington, DC    20036
                                 202-778-1831
```

```
 1   For HBC/Giant Eagle
     Defendants:                Robert M. Barnes, Esq.
 2                              Scott D. Livingston, Esq.
                                Marcus & Shapira
 3                              35th Floor
                                One Oxford Centre
 4                              301 Grant Street
                                Pittsburgh, PA   15219
 5                              412-471-3490

 6                              Diane P. Sullivan, Esq.
                                Chantale Fiebig, Esq.
 7                              Weil Gotshal & Manges
                                Suite 600
 8                              2001 M Street NW
                                Washington, DC   20036
 9                              202-682-7200

10   For Walmart Defendants:    John M. Majoras, Esq.
                                Jones Day - Columbus
11                              Suite 600
                                325 John H. McConnell Blvd.
12                              Columbus, Ohio   43215
                                614-281-3835
13
                                Tara A. Fumerton, Esq.
14                              Tina M. Tabacchi, Esq.
                                Jones Day - Chicago
15                              Suite 3500
                                77 West Wacker
16                              Chicago, Illinois   60601
                                312-782-3939
17

18   ALSO PRESENT:             Special Master David Cohen

19                          - - - - -

20

21

22

23

24

25
```

08:49:05

<u>THURSDAY, OCTOBER 14, 2021, 8:49 A.M.</u>

1

2          THE COURT:  Okay.  Everyone can be seated.

3          All right.  I want to take a few minutes

4   dealing with I guess it's CVS's objections to some

08:49:28  5   rulings or some tentative rulings that Special Master

6   Cohen made on objections to designations for Mark

7   Vernazza, V-E-R-N-A-Z-Z-A.

8          Obviously, I'm relying a great deal on

9   Special Master Cohen and his team to help me.  There's no

08:49:51 10   way I would have the time or ability to go through all

11   these depositions and all these excerpts and all these

12   objections.

13          I'm reiterating what I said before, I think

14   the parties are consuming a lot of resources.  Your

08:50:09 15   clients are paying for it.  You know, all these

16   objections are just consuming a lot of my time and the

17   Special Master's time that should be devoted to more

18   important things.

19          If we don't dial it back, I'm going to say

08:50:26 20   forget the depositions, everyone testifies live.

21          Candidly, it would be better for the jury.

22   They don't pay attention to these depositions, and you

23   all know that.  But I spent a whole lot of time last

24   night going through all these pages after pages of

08:50:44 25   Mr. Vernazza's deposition.

1        I can't tell what CVS is objecting to.  You

2   weren't specific.  It sounded like you were objecting to

3   all questions pertaining to these two documents.

4        I mean, it went on and on.  The witness

08:51:01  5   says three things.  You know, I haven't seen these

6   documents before.  I really don't know much about them.

7   I don't think they reflect CVS policy, and I don't know

8   what the writer of these documents, Mr. --

9        MR. DELINSKY:  Mortelliti.

08:51:24 10        THE COURT:  Mortelliti, thank you -- what

11   he meant.  He says those three things over and over and

12   over again.

13        Now, I don't know why the plaintiffs want

14   to keep wasting your time having him say those three

08:51:36 15   things over and over and over again.

16        I don't think it helps or hurts either

17   side, but that's not for me to decide.  You can play

18   whatever you want.

19        But since it's going over and over and over

08:51:49 20   again, I think the only fair thing is I'm going to

21   overrule CVS's objections, but if CVS wants to play

22   immediately after we have Vernazza's deposition, if CVS

23   wants to play as part of their allotted 75 hours a few

24   minutes of Mr. Mortelliti's testimony saying "What I

08:52:14 25   meant when I wrote those documents," they can do it, so

1    it's in context, rather than having them two weeks apart.

2              So that to me, I think, is the fairest way,

3    but my, you know, a whole lot of time of mine is consumed

4    by something that I think is, candidly, not significant

08:52:37  5    to either side, but that's how I'm going to rule on it.

6              MR. DELINSKY:  Thank you, Your Honor.

7              THE COURT:  All right.  Was there anything

8    else that anyone wanted to bring up?

9              The time for yesterday, according to my

08:52:50  10   tally, is four-and-a-half hours for the plaintiffs.

11   2.25, two and a quarter for the defendants.

12             Do we have a list of the exhibits for the

13   prior two witnesses?  I mean, I don't want to get too far

14   behind.  And if there are any objections, I've got a few

08:53:10  15   minutes, I could quickly review it.

16             MS. FLEMING:  Yes, Your Honor, for the

17   Plaintiffs we do.

18             THE COURT:  Well, have you exchanged -- I

19   mean, have you exchanged these and --

08:53:20  20             MS. FLEMING:  Yes.

21             THE COURT:  All right.  Well, let me see

22   what you've got.

23             All right.  We'll start with Mr. Catizone.

24   These are the -- the plaintiffs are introducing six

08:53:49  25   documents that they are offering.

1       P 14750, settlement agreement between the

2    DEA and Walgreens, 2014.

3           MR. SWANSON:  Your Honor, we have an

4    objection to that.

08:54:06  5           THE COURT:  I'll admit that over objection.

6           MR. SWANSON:  And the only other thing on

7    that, Your Honor, is we are still working out the

8    specific document that would go to the jury in redacting

9    the settlement amount, so once that's --

08:54:17 10           MR. LANIER:  We'll stipulate, Your Honor,

11    that we will be redacting that.

12           THE COURT:  That will be redacted.  The

13    amount was out, okay.

14           Was that the only -- you had a general

08:54:25 15    objection, but I'm admitting that.

16           P 21572, Walmart Pharmacy Facility

17    Management Incentive Plan, any objection to that?

18           MS. FUMERTON:  No, Your Honor, just subject

19    to the fact that the witness did not have personal

08:54:42 20    knowledge to any of that, but otherwise we have no

21    objection.

22           I know CVS wants to be heard on a related

23    document, though.

24           THE COURT:  All right.  So that, that one

08:54:50 25    can be admitted.

1          P 15604, CVS Pharmacist Incentive Plan,

2    2006.

3          Any objection to that?

4          MR. HYNES:  Your Honor, I want to note our

08:55:01  5    objection for the record that the witness had no personal

6    knowledge of the document, but it's a business record.

7          THE COURT:  You're disputing that's a

8    business record?

9          MR. HYNES:  No, we do not.

08:55:12  10         I talk too fast.

11         THE COURT:  Well, it's admitted.

12         20695, CVS WeCare performance and flow

13   chart 2013.  Any objection to that?

14         MR. HYNES:  We will note the same objection

08:55:24  15   for that.  Beyond that, Your Honor, we have some

16   objections as to proprietary information.  We can work

17   with Mr. Pitts to get some information redacted from that

18   document before it goes on the public record, if that's

19   okay.

08:55:35  20         THE COURT:  All right.  Well, I see you did

21   that with the others.  Work with the plaintiffs on that.

22         All right.

23         09546, Giant Eagle Pharmacy bonus, 2014.

24         Any objection to that?

08:55:49  25         MS. FIEBIG:  No, Your Honor.

1          THE COURT:  Okay.  That's admitted.

2          And last, P 26403, stakeholder meeting

3   booklet, there was a lot of testimony on that.

4          Any objection?

08:56:01  5          MR. SWANSON:  Not from us, Your Honor.

6          THE COURT:  Okay.  That's admitted.

7          Then the plaintiffs are offering through

8   Mr. Rannazzisi P 00035, 2006 Walgreen letter one and two.

9          I know there was a lot of testimony about

08:56:23  10   that.

11          Any objection to those letters?

12          MR. SWANSON:  No objection, Your Honor.

13          THE COURT:  All right.  They are in.

14          And then also 00036, 2007

08:56:34  15   Walgreen-Rannazzisi letter number two.

16          MR. SWANSON:  No objection.

17          THE COURT:  Thank you.

18          All right.  Then P 15962-A, the DEA

19   PowerPoint presentation.  Plaintiff is offering only the

08:56:52  20   following pages, and I'll read them off.  I assume this

21   is the one there was testimony about.

22          Pages 1, 2, 3, 19, 20, 102, 103, 126, 154,

23   155, 181, 189, 190, 195, 196, 197, 198, 199.

24          Any objection to those pages?

08:57:25  25          All right.  Hearing none, they're admitted.

                        MS. FUMERTON:  No, Your Honor.

                        THE COURT:  All right.  Then P 14711,

Walmart and DEA memorandum of understanding, March 17th,

2011.

08:57:38          MS. FUMERTON:  We'll just renew our

objections for the record, but understand you've

overruled them.

                        THE COURT:  Okay.  That's admitted over

objection.

08:57:43          And I assume the same, Ms. Fumerton,

P 0015, Walgreens 2013 settlement and MOA agreement.

                        MR. SWANSON:  Yeah, we have the objection,

Your Honor, but it's actually, I think, the same as --

                        THE COURT:  All right.  Offering 2013, so

08:58:01  that's admitted over objection.

                        MR. SWANSON:  With the settlement redaction

that we will work out.

                        THE COURT:  All right.  Fine, the amount's

redacted.

08:58:08          All right.  Do defendants want to admit any

documents through either of those witnesses?

                        MS. FUMERTON:  Yes, Your Honor.

                        May I approach?

                        THE COURT:  Sure.

08:58:30          All right.  A bunch through Catizone.

1934

1    Walmart 1343 -- I can't tell, 01343_02411,

2    is that all one number?

3    MS. FUMERTON:  Yes, Your Honor.

4    It differentiates the two prescriptions, so

08:58:57  5    it's an underscore 0241 --

6    THE COURT:  Okay.  Any objection to that,

7    hard copy sample prescriptions?

8    All right.  It's admitted.

9    MS. FUMERTON:  Your Honor, just to make

08:59:07 10    sure the record is clear on that number, the number that

11    we were just discussing is WMT-MDL-01343 underscore 0241.

12    THE COURT:  All right.  Walmart MDL 1343

13    underscore 0501, any objection to that, hard copy

14    prescriptions for sample set prescriptions?

08:59:33 15    MR. LANIER:  No, Your Honor.

16    THE COURT:  All right.  That's admitted.

17    MDL 10863, DEA *Pharmacist's Manual*, any

18    objection?

19    MR. LANIER:  No objection.  No objection.

08:59:44 20    THE COURT:  Okay.  MDL 11598, also a DEA

21    *Pharmacist's Manual*, any objection?

22    MR. LANIER:  No objection.

23    THE COURT:  All right.  Another one, MDL

24    11599, is another manual.

08:59:58 25    MR. LANIER:  No objection.

1          THE COURT:  Okay.  MDL 11427_0002,

2     stakeholders challenges and red flag warnings?

3          MR. LANIER:  No objection.

4          THE COURT:  Okay.  Plaintiffs'

09:00:22  5     17320-A_00149, there are three of these, Walgreens

6     refusal to fill compilations.

7               There's also 00690 and 00442.

8               Any objection to those?

9          MR. LANIER:  No objection to any, Your

09:00:36 10     Honor.

11          THE COURT:  Then the next is the July 12th,

12     2019 letter from NACDS, MDL 11433_underscore 00001.

13          MR. LANIER:  No objection.

14          THE COURT:  Okay.  Then there's a November

09:00:56 15     4th, 2019 letter from Thomas Prevoznik, MDL 11433_00002.

16          MR. LANIER:  No objection.

17          THE COURT:  And lastly, the 2009 NABP

18     Survey of Pharmacy Law, MDL-11274, Pages 1 through 3.

19          MR. LANIER:  No objection.

09:01:19 20          THE COURT:  Okay.  Then there are a few

21     with Mr. Rannazzisi.

22          MR. HYNES:  Your Honor, we have one more

23     that I think was missing, you left off for Mr. Catizone.

24               It's CVS-MDL-2487, it's a hard copy

09:01:36 25     prescription that was shown to him during CVS's

            1    cross-examination of him.

            2                    THE COURT:  Any objection to that?

            3                    MR. HYNES:  I have it for Mr. Pitts.

            4                    MR. LANIER:  Not having seen that, Your

09:01:47    5    Honor, I'm trying to go back in my memory bank.

            6                    I'm sure that it's got to be legit, so I

            7    won't -- no objection.

            8                    THE COURT:  Okay.  All right.  Thanks.

            9                    Then there are a few with Mr. Rannazzisi.

09:01:58   10                    MDL 01487, aggregate production quota

           11    history.

           12                    MR. LANIER:  No objection.

           13                    THE COURT:  Okay.  MDL 01107, Government

           14    GAO, it's GAO survey report.

09:02:18   15                    Any objection to that?

           16                    MR. LANIER:  No objection.

           17                    THE COURT:  Okay.  MDL 00498, DEA Office of

           18    Diversion Control, *Practitioner's Manual*.

           19                    MR. LANIER:  No objection.

09:02:31   20                    THE COURT:  Then the next one is the 2010

           21    *Manual*, MDL 00507.

           22                    MR. LANIER:  No objection.

           23                    THE COURT:  And then the 2006 DEA *Federal*

           24    *Register* notice, 01096.

09:02:43   25                    MR. LANIER:  No objection.

         1          THE COURT:  And lastly, Mr. Rannazzisi's

         2    statement, March 1st, 2012, that was his, I guess, his

         3    testimony to Congress.

         4              That's MDL 01226.

09:02:58  5          MR. LANIER:  Your Honor, that, that

         6    document as marked has a lot of testimony in front of

         7    Congress from a lot of different people.

         8          THE COURT:  Right.

         9          MR. LANIER:  That's hearsay.

09:03:06 10          THE COURT:  Right.  It should only -- I

        11    assume that the defendants are only offering

        12    Mr. Rannazzisi's testimony.

        13          MR. MAJORAS:  We are, Your Honor, and I can

        14    come back to you with specific pages and talk to

09:03:16 15    Mr. Lanier about that.

        16          THE COURT:  All right.

        17          MR. LANIER:  With that, Your Honor, no

        18    objection.

        19          THE COURT:  I think -- I think,

09:03:22 20    Mr. Majoras, we should only be admitting, obviously, his

        21    testimony, and really only the portion that there was

        22    some questioning about.

        23          MR. MAJORAS:  We will do that.

        24          THE COURT:  Okay.  Subject to that, that's

09:03:34 25    admitted.

Joyce - Cross/Weinberger                                    1938

1              Okay.  Thank you.

2              It's good for everyone to stay current,

3    because otherwise you won't even remember what the

4    documents were.

09:03:45  5              Okay.  All right.  Then we can bring in the

6    jury, and resume with the witness.

7              (Jury in.)

8              THE COURT:  Good morning, ladies and

9    gentlemen.

09:05:50 10              Please be seated, everyone.

11              If we could have Mr. Joyce back on the

12   stand to continue his testimony.

13              Good morning, Mr. Joyce.  I would just like

14   to remind you you're still under oath from yesterday,

09:06:21 15   sir.

16              THE WITNESS:  Sure.

17              THE COURT:  And, Mr. Weinberger, you may

18   continue.

19              MR. WEINBERGER:  Thank you, Your Honor.

09:06:27 20       CROSS-EXAMINATION OF BRIAN JOYCE (RESUMED)

21   BY MR. WEINBERGER:

22   Q.   Mr. Joyce, since you left the stand yesterday,

23   until this morning, have you had any discussions with

24   Walgreens counsel about your testimony?

09:06:37 25   A.   No.

Joyce - Cross/Weinberger                                    1939

1    Q.    Now, yesterday we left off, we were talking about

2    your opposition to the Ohio Board of Pharmacy changes to

3    the OARRS regulation that made it mandatory to check

4    OARRS if a prescription triggered certain red flags.

09:06:59 5                Do you recall that?

6    A.    Yeah.

7    Q.    And over your objections, that regulation, that new

8    regulation, came into effect on October 17th, 2011.

9                Correct?

09:07:14 10  A.    It did.

11   Q.    We're going to -- we're going to show you that in

12   Exhibit P 20810.

13               So we saw part of this in your e-mail.

14               Now, I want to go over it in detail with

09:07:48 15  you.

16               This, this document is a regulation of the

17   Ohio Board of Pharmacy with the number 4729-5-20, right?

18   A.    Yes.

19   Q.    Now, this shows the prior version on February 3rd,

09:08:06 20  2003, so I want you to flip over to the third page, which

21   shows the version that went into effect on October 17th,

22   2011.

23               Do you see that?

24   A.    Yep.  Sure do.

09:08:22 25  Q.    Okay.  We're showing it on the screen also for you,

Joyce - Cross/Weinberger                          1940

1       if you want to look at it.

2                   Now, this section is entitled "Prospective

3       Drug Utilization Review," right?

4       A.    Yes.

09:08:36  5    Q.    And it has been the case since the early 2000s that

6       this regulation provided that every pharmacist who was

7       going to fill a prescription had to undertake a

8       prospective drug utilization review for that particular

9       prescription, right?

09:08:53 10    A.    Yes.  That was made into rule then, but prior to

11      that, pharmacists did that as part of their job.

12      Q.    Right.  Thank you, sir.

13                  Now, this is going to go a lot faster if

14      you'd just listen to my questions and answer my

09:09:08 15    questions, okay?

16      A.    Got you.  I'll do my best.

17                      MR. STOFFELMAYR:  Objection.

18                      THE COURT:  Well, overruled.

19      BY MR. WEINBERGER:

09:09:15 20    Q.    All right.  So this first section that I've

21      highlighted is what has been in effect for quite awhile,

22      right?

23      A.    Yes.

24      Q.    And it says, "The pharmacist shall review the

09:09:28 25    patient profile for the purposes of identifying" various

1    things, including overutilization or underutilization,

2    therapeutic duplication, drug-disease state

3    contraindications, drug-drug interactions, and then

4    dropping down, abuse-misuse, or inappropriate duration of

09:09:52 5    drug treatment.

6                    Do you see that?

7    A.    I do.

8    Q.    And at Walgreens, pharmacists have a software

9    program which helps do this DUR review, correct?

09:10:06 10    A.    Sure.

11    Q.    All right.  So flip over to the next page, and this

12    has -- this has the changes that went into effect on

13    October 17th, 2011.

14                    Right?

09:10:20 15    A.    Yes.

16    Q.    Okay.  So let's go through those.

17                    It says, "Prior to dispensing a

18    prescription, at a minimum, the pharmacist shall request

19    and review an OARRS report covering at least one year

09:10:40 20    time period and/or another state's report where

21    applicable and available, if a pharmacist becomes aware

22    of a person currently," and then there are five red flags

23    for the pharmacist to look for.

24                    "One, receiving reported drugs from

09:11:05 25    multiple prescribers."

Joyce - Cross/Weinberger                                          1942

1              Have I read that correctly?

2    A.    You have.

3    Q.    "Two, receiving reported drugs for more than 12

4    consecutive weeks."

09:11:16  5              Have I read that correctly?

6    A.    Yes.

7    Q.    Now, as a district manager and pharmacy supervisor,

8    let's take a look at -- let me just ask you with respect

9    to those two, do you consider those red flags?

09:11:31 10   A.    I consider those concerns that need looked into

11   when you're filling a prescription.

12   Q.    Okay.  So we're back again to your unwillingness to

13   use the term red flags, right?

14              MR. STOFFELMAYR:  Objection, Your Honor.

09:11:44 15   Argumentative.

16              THE COURT:  Yeah, I'm going to sustain it

17   the way you asked that, Mr. Weinberger.

18   BY MR. WEINBERGER:

19   Q.    All right.  So this is another example, sir, this

09:11:55 20   morning of your unwillingness to use the term "Red

21   flags," right?

22              MR. STOFFELMAYR:  Same -- same question.

23   Same objection.

24              THE COURT:  Well, "unwilling" has a

09:12:10 25   negative connotation, so that's why I'm sustaining the

1    objection.

2              He's declined to use "Red flags," all

3    right?

4              MR. WEINBERGER:  With all due respect, Your

09:12:18  5    Honor, I wasn't intending it to have a negative

6    connotation.

7    BY MR. WEINBERGER:

8    Q.   Let me ask you directly.

9              You're using the term "issues of concern"

09:12:27 10    or "areas of concern" instead of "red flags," right?

11    A.   Yes.

12    Q.   Okay.  Now, the third one is "Abusing or misusing

13    reported drugs, i.e. overutilization, early refills,

14    appears overly sedated or intoxicated upon presenting a

09:12:46 15    prescription for a reported drug, or an unfamiliar

16    patient requesting a reported drug by specific name,

17    street name, color, or identifying marks."

18              Have I read that correctly?

19    A.   You have.

09:12:59 20    Q.   And when this regulation uses the term "Reported

21    drugs," we're talking about controlled substances, right?

22    A.   I believe so, yeah.

23    Q.   Including opioids, right?

24    A.   Opioids, sure.

09:13:11 25    Q.   Okay.  And the fourth instance which would trigger

1       the pharmacist on a mandatory basis to request an OARRS

2       report is:  "Requesting the dispensing of reported drugs

3       from a prescription issued by a prescriber with whom the

4       pharmacist is unfamiliar, i.e. a prescriber is located

09:13:36  5       out of state or the prescriber is outside the usual

6       pharmacy geographic prescriber care area."

7                       Have I read that correctly?

8       A.    You have.

9       Q.    And the fifth is, "Presenting a prescription for

09:13:51 10      reported drugs when the patient resides outside the usual

11      pharmacy geographic patient population."

12                      So and I've read that correctly, too,

13      right?

14      A.    True.

09:14:05 15      Q.    So these are five separate instances when -- which,

16      when the pharmacist is confronted with any of those

17      instances with respect to a controlled substance

18      prescription, this regulation makes it mandatory that

19      they check -- that they log onto OARRS and request and

09:14:34 20      review an OARRS report.

21                      Correct?

22      A.    Yes.

23      Q.    That's this language up here, "A pharmacist shall

24      request and review an OARRS report covering at least one

09:14:50 25      year period of time."

Joyce - Cross/Weinberger                                    1945

1              Right?

2        A.    Yes.

3        Q.    Now, yesterday, I asked you whether checking OARRS

4        would give you information about a doctor's prescribing

09:15:04 5    habits, and I apologize, I was actually incorrect and

6        assuming that to be the case in my question.

7              Okay?

8              So OARRS, is it your understanding that

9        OARRS does not provide information about a prescriber's

09:15:21 10   profile?

11       A.    Not provide a history of his providing -- of his

12       prescribing habits, but you can see in the OARRS report

13       where they went, what they got, what the strength was,

14       what the dosage was, and who the doctor was that wrote

09:15:40 15   it.

16             So in that respect you had some

17       information --

18       Q.    Right.

19       A.    -- about the doctor's prescribing habits.

09:15:45 20   Q.    Sorry, I didn't mean to interrupt you.

21       A.    That's all right.  That's fine.

22       Q.    So that's exactly where I was going, and that is

23       what the OARRS report does, is it focuses on the patient

24       whose prescription has been presented, right?

09:16:01 25   A.    It focuses on the patient who handed you a

Joyce - Cross/Weinberger                    1946

1    prescription for you to fill for a -- potentially a

2    narcotic or an opioid-type drug.

3    Q.    Right.  So the information that's in the data of

4    OARRS is patient-specific, so if Joe Smith comes to a

09:16:28 5    Walgreens with a prescription for Oxy 30 milligrams, and

6    one of these instances is triggered and the OARRS report

7    is requested online, what the pharmacist is looking at is

8    information about Joan Smith, right?

9    A.    Yes.

09:16:49 10   Q.    And that information about Joan Smith, at least for

11   a year prior, would be information about prior controlled

12   substances prescriptions that were filled, right?

13   A.    It's the entire history included in that database.

14              So if California is not participating in

09:17:12 15   this, that information may not be there, but for the most

16   part their history's in there.

17   Q.    So it would include when a prior prescription was

18   filled, right?

19   A.    Yeah.

09:17:23 20   Q.    It would include which pharmacy the prescription

21   was filled at, right?

22   A.    Sure.  Sure.

23   Q.    It would include dosages and quantities, right?

24   A.    Yep.

09:17:33 25   Q.    And it would provide information as to who the

Joyce - Cross/Weinberger                                    1947

1    prescribers were for that prior -- for those prior

2    prescriptions, right?

3    A.    Yes.  It basically gave you whatever was on the

4    label of that prescription that was filled at another

09:17:51 5    location.

6    Q.    Right.  And so a pharmacist looking at that

7    information, if there's multiple doctors that the patient

8    is getting opioid prescriptions from, the pharmacist

9    could, for example, use that information and determine

09:18:11 10   whether that patient was engaging in doctor-shopping,

11   right?

12   A.    Sure.

13   Q.    Now, for any prescription filled after October

14   17th, 2011, that triggered any of these five -- any of

09:18:30 15   these five flags, there should be documentation that the

16   pharmacist obtained an OARRS report, right?

17   A.    Yeah, you would print the OARRS report out and save

18   that, and the State Board could see if you logged in at a

19   certain time, and the State Board could see who checked

09:18:55 20   OARRS when and where, and so forth.

21            So there was a record of it.

22   Q.    Right.  But was it Walgreens' requirement as of

23   2011 that the documentation about the pharmacist checking

24   OARRS under these circumstances would be in the record,

09:19:19 25   in the electronic record at Walgreens?

Joyce - Cross/Weinberger                    1948

1    A.    I'm not sure.

2              It may have been a paper record at that

3    time.

4              I'm not sure.

09:19:27 5   Q.    Well, if it was a paper record, it would be a

6    record that would be attached to the physical copy of the

7    prescription, right?

8    A.    Not necessarily.

9              It could be filed.

09:19:41 10  Q.    Okay.  It could be filed somewhere else in the

11   pharmacy, right?

12   A.    Right.

13   Q.    So if six months later to that same pharmacy the

14   patient returns, that same patient returns to fill

09:19:59 15  another controlled substance prescription, that notation,

16   that physical notation or documentation that's stored

17   somewhere in the pharmacy, that would not be accessible

18   to that subsequent pharmacist filling that prescription,

19   right?

09:20:17 20  A.    Yeah, it would be in the patient comments, the

21   pharmacist would type in "OARRS checked on 1/1."

22   Q.    Okay.  Now you're saying something different.

23              So you're saying that it would be

24   entered -- now you're saying it would be entered into the

09:20:30 25  computer system?

1   A.    No.  You said "Was the report electronically

2   saved."  I don't think the report was electronically

3   saved.

4              The pharmacist would type a brief comment,

09:20:41  5   "OARRS checked, 6/5/13," like that.

6   Q.    All right.  So what you're telling us is there

7   would be two areas where there would be documentation

8   about getting an OARRS report?

9   A.    There could be, sure, yeah.

09:20:56  10  Q.    Well, could be or should be?

11  A.    There should be.

12  Q.    All right.  So it should be in electronic records,

13  right, of Walgreens?

14  A.    In the patient comments.

09:21:06  15             I consider electronic like a photocopy of

16  the OARRS report in the patient profile.

17             This wasn't --

18  Q.    All right.

19  A.    This wasn't that.  This was -- this was just a

09:21:17  20  comment.

21  Q.    Right.  So this would be a pharmacist physically

22  typing onto a computer and into the -- using the software

23  program into the patient comments field some indication

24  that for a particular prescription a pharmacist checked

09:21:35  25  OARRS, right?

Joyce - Cross/Weinberger                                  1950

1    A.    Yeah.

2    Q.    As opposed to the physical documentation of an

3    OARRS report that you're saying doesn't get

4    electronically scanned into the system, right?

09:21:46  5    A.    I think at one point it did, but you --

6    Q.    When was that?

7    A.    I'm not sure exactly when the date was, but I think

8    at one point they did begin to scan those into the

9    patient's profile.

09:21:58  10    Q.    All right.  So if, if the -- if Walgreens had

11    produced to their lawyers, to produce to us, a random

12    sample of 200 prescriptions filled at Walgreens stores in

13    Trumbull and Lake County, there should be, in the

14    electronic records, at some point in time some record

09:22:31  15    when a pharmacist checked OARRS, right?

16    A.    I would think so, yes.

17    Q.    Now, under 4729-5-20, as of October 17th, 2011, it

18    would be unlawful to fill a prescription that triggered a

19    red flag, one of these five red flags, without requesting

09:23:01  20    and reviewing an OARRS report.

21              Correct?

22    A.    Yes.

23    Q.    So I just wrote out that statement that I just

24    asked you, and that is true, right?

09:23:19  25    A.    Yes.

Joyce - Cross/Weinberger                                    1951

1    Q.    And so if a pharmacist failed to request and look

2    at an OARRS report when the prescription triggered any of

3    those red flags, what that pharmacist was doing was a

4    violation of 4729-5-20, correct?

09:23:47  5    A.    Looks --

6              MR. STOFFELMAYR:  Objection, Judge.  Looks

7    like now we are just asking for legal conclusions.

8              THE COURT:  Overruled.

9    BY MR. WEINBERGER:

09:23:55 10    Q.    And the answer is "correct"?

11    A.    Yes.

12    Q.    All right.  Now, we're going to go to a different

13    subject for a moment.

14              THE COURT:  All right.  Just so the last

09:24:10 15    answer is clear, you're answering that from your

16    knowledge as a pharmacist and a supervisor, correct?

17              THE WITNESS:  Yes.

18              THE COURT:  Thank you.

19    BY MR. WEINBERGER:

09:24:21 20    Q.    Now, in your role as a pharmacist supervisor over

21    Trumbull County stores, did you yourself ever spot check

22    or randomly audit or review opioid prescriptions that

23    were filled at those stores?

24    A.    Yes.

09:24:39 25    Q.    On how many -- how frequently would you do that?

1    A.    Oh, when I would be visiting the pharmacy, I would

2    typically pick up the C-II file, and as I'm talking and

3    visiting with folks, I'd look through prescriptions just

4    to see what I saw.

09:24:57  5              So how often?  Probably not every visit,

6    but every other visit maybe, something like that.

7    Q.    Um-hmm.  So there would be a file of C-II -- of

8    controlled substances, C-II scripts that were filled?

9    A.    Yeah.

09:25:16 10   Q.    What about C-III?

11   A.    I could look through those as well, look through

12   those.

13   Q.    And would you from time to time, since 2011, see

14   OARRS reports that were printed out?

09:25:28 15   A.    I did see OARRS reports printed out.

16              I did see pharmacists accessing OARRS.

17   Q.    So did you -- did you attempt to look at the

18   prescription and the information to determine whether or

19   not, under 4729-5-20, the pharmacist followed that

09:25:54 20   regulation and ordered an OARRS report because any of

21   these five red flags were triggered?

22   A.    Did I match them up for previously-filled

23   prescriptions?

24   Q.    Correct.

09:26:13 25   A.    Not necessarily.  I did observe pharmacists filling

```
 1    prescriptions for controlled drugs and running OARRS

 2    reports.

 3    Q.    So isn't the documentation of red flags and

 4    resolution of those red flags important to ensure safe

 5    patient care?

 6    A.    Documentation is important to use when there's a

 7    need for documentation, and let me just give you an

 8    example of that.

 9    Q.    Well, I'd like an answer to my question, so let me

10    repeat the question, if I may.

11    A.    Sure.

12    Q.    Okay.  My question is:  Isn't documentation of red

13    flags and the resolution of red flags important to safe

14    patient care?

15    A.    It could be.

16    Q.    All right.  And to your knowledge, did Walgreens,

17    at the corporate level, ever look at Walgreens'

18    dispensing data looking for potential red flags

19    associated with that data?

20    A.    I don't know.  I worked in Youngstown, Ohio.  I

21    didn't have access to what corporate did.

22    Q.    Right.  In fact, in your deposition you said, "I

23    certainly never saw it.  That was above my pay grade."

24                Right?

25                MR. STOFFELMAYR:  Judge, that's not
```

```
  1    impeachment.  That's exactly the same thing he said,

  2    using different words.

  3                 THE COURT:  Yes, sustained.

  4    BY MR. WEINBERGER:

  5    Q.    Well, you certainly never saw that data, right?

  6    A.    I didn't.

  7    Q.    And it would be because it would be above your pay

  8    grade, correct?

  9    A.    It wasn't my job.

 10                 I'm not monitoring corporate people.

 11    They're monitoring me.

 12    Q.    Right.  You never saw any Walgreens report that

 13    it's -- that looked at its dispensing data looking for

 14    red flags specifically, right?

 15    A.    No.

 16    Q.    Now, as a -- I'm switching to another subject,

 17    Mr. Joyce.

 18                 As a Board member of the Ohio Board of

 19    Pharmacy, did you become familiar with an organization

 20    known as the National Association of Boards of Pharmacy?

 21    A.    Yeah, vaguely.

 22                 I mean, I knew about it.  I knew kind of

 23    what they did, but wouldn't say I'm an expert on that.

 24    Q.    Didn't, during your tenure at the Ohio Board,

 25    didn't -- weren't there occasions when the National
```

1       Association of the Boards of Pharmacy would provide

2       guidance to the State Boards on various issues, including

3       controlled substances dispensing?

4       A.    I believe so.

09:28:56 5       Q.    Okay.  And at some point in time, did you become

6       familiar with the Executive Director of the National

7       Association of Boards of Pharmacy, a gentleman by the

8       name of Carmen Catizone?

9       A.    I knew his name.  I never met the guy or talked to

09:29:11 10      him.

11      Q.    Okay.  You knew him to be a long-time Executive

12      Director of the NABP?

13      A.    I don't think I knew how long he had served with

14      NABP.

09:29:20 15                  Like I said, I wasn't that -- I'm not an

16      expert at NABP.

17      Q.    Right.  Well, were there occasions when you

18      observed the fact that the Ohio Board of Pharmacy

19      considered him to be an expert on pharmacy operations?

09:29:39 20      A.    Mr. Weinberger, we went down there three days a

21      month and heard hearings about -- for disciplinary

22      actions against entities like drugstore chains, hospitals

23      and pharmacists.

24                  We weren't involved in the nitty-gritty

09:29:55 25      details of running the Board of Pharmacy.  That's what

Joyce - Cross/Weinberger                                    1956

1    the Executive Director does, and his staff.

2    Q.    Well, we talked about Mr. Winsley before.

3    A.    Sure.

4    Q.    Am I pronouncing his name correctly, is it

09:30:07  5    "Winsley"?

6    A.    "Winsley."

7    Q.    "Winsley," right?

8    A.    Right.

9    Q.    He was the long-time Executive Director of the Ohio

09:30:15 10    Board of Pharmacy, right?

11    A.    I think about 20 years.

12    Q.    Yeah.  And did you ever hear him talk about Carmen

13    Catizone and his expertise in the field of pharmacy

14    operations?

09:30:24 15    A.    No.

16    Q.    Do you know that after Mr. Winsley left the Ohio

17    Board of Pharmacy as Executive Director, he began to make

18    presentations around the country with Mr. Catizone, where

19    the issue of red flag identification and resolution was

09:30:51 20    covered?

21    A.    Did I know he went and gave presentations?

22            No.

23    Q.    Well, did you know that Mr. Winsley was making

24    presentations?

09:31:01 25    A.    No.

1    Q.    Okay.  Would it surprise you if he was?

2    A.    No.

3    Q.    Did you ever talk with Mr. Winsley about the issue

4    of red flags and the identification of red flags?

09:31:16   5    A.    No.

6    Q.    Did you ever see a presentation that Carmen

7    Catizone made?

8    A.    I have no idea.

9          I don't think so.

09:31:32   10    Q.    So is it your testimony that your involvement with

11    the Ohio Board of Pharmacy was merely to attend meetings

12    that covered disciplinary actions that were brought

13    against pharmacists?

14    A.    That was the crux of it.  That was probably 90

09:31:53   15    percent of what we did.

16    Q.    Okay.

17    A.    We had three days of hearings, Monday, Tuesday,

18    Wednesday, in a room just like this, with -- with nine

19    other Board members and the legal counsel from the Board,

09:32:07   20    and the defendants that would come in, and the public

21    could sit out there and watch.

22          And that was 90 percent of what we did on

23    the Board.

24    Q.    Right.  Well, an example of a matter that was not a

09:32:22   25    disciplinary matter was the debate over the change in

 1    4729-5-20, right?

 2    A.    Probably.

 3    Q.    That had nothing to do with discipline, right?

 4    A.    No.

 5    Q.    And when -- when there was a discussion about

 6    4729-5-20 at the Board level, was it discussed that these

 7    five elements that the pharmacists should look at were

 8    all red flags?

 9    A.    I'm sure those five things were discussed.

10                  I don't know what the terminology was that

11    was used at the Board meetings from 10 years ago.

12    Q.    Well, sir, yesterday you told us how you knew and

13    every pharmacist knew about the raging opioid pill

14    epidemic, right?

15    A.    Sure.

16    Q.    And that includes 10 years ago?

17    A.    Sure.

18    Q.    12 years ago?

19    A.    Sure.

20    Q.    14 years ago, right?

21    A.    Yeah.  Absolutely.

22    Q.    So here we have -- and you know that OARRS was

23    established in the State of Ohio to help prevent

24    diversion of opioid pills, right?

25    A.    Sure.

Joyce - Cross/Weinberger                                    1959

1    Q.    A very important development, using data to assist

2    pharmacists to prevent diversion, right?

3    A.    Of course.

4    Q.    All right.  So in the context of what you knew was

09:33:55  5    happening in our neighborhoods in Ohio, and in our

6    communities with respect to the opioid pill epidemic, are

7    you telling me that you can't remember discussing the

8    fact that these were red flags that might indicate

9    diversion?

09:34:10 10    A.    That's not what I said.

11              If you're asking me about exact

12    terminology, they may have used "Red flags," they may

13    have used "concerns," they may have used "checks."

14              I don't know what was said in a meeting 11

09:34:22 15    years ago.

16    Q.    Mr. Joyce, I want to move to another subject, if we

17    could, and that is the Drug Enforcement Administration's

18    interaction with your employer Walgreens.

19              Okay?

09:34:59 20    A.    Sure.

21    Q.    Now, did you know that the DEA, in September of

22    2009, filed an order to show cause against Walgreens

23    arising out of prescriptions that were dispensed out of a

24    Walgreen store in San Diego, California, where the

09:35:25 25    prescriptions were issued by doctors who were not

1          licensed to practice medicine in California?

2                        MR. STOFFELMAYR:  Judge, may we go to

3          side-bar?

4                        THE COURT:  Okay.

09:35:49  5                        (Proceedings at side-bar:)

6                        MR. STOFFELMAYR:  Judge --

7                        MR. LANIER:  Wait.  Can he put on the --

8                        MR. STOFFELMAYR:  I'm sorry.  I'm sorry.  I

9          didn't know he didn't have it on yet.

09:36:00 10                        THE COURT:  Okay.

11                        MR. STOFFELMAYR:  Judge, this is pretty

12         transparent.  He's going to read out loud accusations

13         made, and the witness isn't going to know --

14                        THE COURT:  Well, first, he's not going to

09:36:11 15         read anything.

16                        The question was "Are you aware of it, were

17         you aware of it."  And if he says no --

18                        MR. STOFFELMAYR:  I understand that.

19                        My concern is he's going to say -- this

09:36:22 20         would be like coming in and saying "Are you aware that

21         one of your pharmacists," you know, "was caught for drunk

22         driving," and he says no, that doesn't make it okay to

23         elicit, to put in front of the jury something improper.

24                        THE COURT:  First of all, it's not

09:36:34 25         improper.

1            The jury knows about it.  All right?  So he

2   can ask one, one or maybe two questions.

3            If the witness doesn't have any knowledge,

4   I'm going to cut it off.  That's it.

09:36:43  5            MR. STOFFELMAYR:  Okay.  The San Diego one,

6   what I'm more worried about is he gets exactly to the

7   Florida one, which is "Are you aware there was an order

8   to show cause that said" A, B, C, D, E, F and G happened,

9   all of which is in a charging document, as we discussed

09:37:00  10   yesterday.

11            THE COURT:  All right.

12            MR. WEINBERGER:  Your Honor, Your Honor,

13   I'm actually following your directives on how to use

14   documents that this -- that a witness may or may not have

09:37:12  15   seen.

16            I'm laying the foundation for that.

17            MR. STOFFELMAYR:  The proper question was

18   "Are you aware of an order to show cause involving a

19   pharmacy in San Diego?"

09:37:21  20            If he says no, there's no reason to ladder

21   it up with "Are you aware of an order to show cause where

22   the accusation was that they filled for an unlicensed

23   doctor and three people overdosed," or whatever comes

24   next.

09:37:35  25            THE COURT:  The jury has already heard the

1    allegations, all right, so I think you just need to ask

2    the question with enough detail that it's clear what

3    you're asking about, and the witness either says "I know

4    about it," in which case you can go further, or he says

09:37:50    5    "I don't know anything about it," in which case that's

6    it.

7                    You've got to move on.

8                    MR. STOFFELMAYR:  All right.  My concern is

9    just that the question is asked with more detail purely

09:37:58    10    for, you know, prurient effect.  More details than

11    necessary.

12                    I understand some details are necessary.

13                    THE COURT:  I don't think this was more

14    than necessary, all right?

09:38:07    15                    MR. STOFFELMAYR:  Okay.  Thank you, Judge.

16                    (End of side-bar conference.)

17    BY MR. WEINBERGER:

18    Q.    So let me, Mr. Joyce, let me repeat the question.

19    A.    Sure.

09:38:25    20    Q.    Did you know that the DEA, in September, 2009,

21    filed an order to show cause against Walgreens for

22    dispensing prescriptions out of a Walgreens store in San

23    Diego, California where the prescriptions were issued by

24    doctors who were not licensed to practice medicine in

09:38:45    25    California?

```
 1    A.    I was a step above pharmacy manager working in
 2    Trumbull and Mahoning Counties.
 3              No.
 4    Q.    All right.  In the course of your work as
 5    supervisor or district manager, have you ever been shown
 6    any settlement agreements or memorandum of agreements
 7    that Walgreens entered into with the DEA?
 8    A.    No.
 9    Q.    So did you know about a 2011 settlement agreement
10    and Memorandum of Agreement with the DEA that Walgreens
11    entered into?
12    A.    I knew about a -- just from reading the
13    newspaper -- about a settlement in Florida.
14    Q.    Do you know whether or not that was the 2011
15    settlement?
16    A.    May have been.
17              I'm not positive.
18    Q.    So you're not sure, right?
19    A.    It's a maybe.
20              I am not sure.
21    Q.    Well, let me ask it a different way.
22              Did Walgreens, the Pharmacy
23    Integrity -- let me back up.
24              The Pharmacy Integrity department, which
25    was headed by Tasha Polster, is it your understanding
```

Joyce - Cross/Weinberger                                    1964

1    that that department dealt with compliance issues

2    regarding the Controlled Substances Act?

3    A.    Generally, yes.

4          Again, I'm working in Youngstown and

09:40:44 5    Warren, Ohio, so --

6    Q.    Well, we've established that many times already,

7    sir.

8    A.    I thought so, too.

9    Q.    Okay.  So the question that I'm asking you is

09:40:59 10   did -- did Walgreens ever provide you with a copy of the

11   Walgreens settlements with the DEA, specifically the 2011

12   settlement?

13   A.    No.

14   Q.    And --

09:41:23 15         MR. STOFFELMAYR:  Well, Judge, that's a

16   different -- he just circled "no" to a completely

17   different question than the one that was asked.

18         THE COURT:  Well, that's a good point, but

19   I -- all right.  Be careful, Mr. Weinberger, what you're

09:41:41 20   circling with these illustrations, all right?

21   BY MR. WEINBERGER:

22   Q.    All right.  Fair enough.

23         So if I write "Brian Joyce never received a

24   copy of the 2011 settlement agreement," the answer

09:42:10 25   actually would be yes, you never received a copy.

Joyce - Cross/Weinberger                                          1965

1                     Right?

2    A.     Yes.

3    Q.     Is that right?

4    A.     Yes.

09:42:16 5    Q.     And similarly, if there was a settlement in 2013,

6    you would have never received a copy of that either,

7    right?

8    A.     At my level, no.

9    Q.     Well, were there occasions when these settlement

09:42:33 10   agreements were discussed by the Pharmacy Integrity

11   department with supervisory pharmacists or district

12   managers?

13   A.     Well, I can answer for myself; no.

14                    Did I ever hear them discussing it with

09:42:54 15   other pharmacy supervisors?  No.

16   Q.     So as of 2010, Mr. Joyce, did Walgreens corporate

17   provide periodic training to employees on dispensing

18   controlled substances?

19   A.     We had all kinds of training come down to us called

09:43:20 20   PPLs, we talked about briefly yesterday.

21                    Can I remember what all came down, when it

22   came down?  No.  But they provided us with a lot of

23   training.

24   Q.     Right.  Well, I'm interested in your memory as of

09:43:35 25   2010.

1   A.   I don't remember.

2   Q.   All right.  Now, in 2012, as a pharmacy supervisor,

3   would you have received e-mails from Walgreen corporate

4   office through an e-mail LISTSERV known as Rx SS?

09:44:06 5   A.   I don't know what that is.

6   Q.   Well, do you know what a LISTSERV is?

7   A.   No.

8   Q.   So are you familiar with an e-mail known as Market

9   29 DM at Walgreens.com?

09:44:34 10   A.   I was in Market 29 at that time, I believe.

11   Q.   And Market 29 DM would be "district manager,"

12   right?

13   A.   Oh, DM.  I thought you said EM.

14        Yeah, Market 29 DM would go to the district

09:44:47 15   manager.

16   Q.   And that's you when you served in that market,

17   right?

18   A.   I was pharmacy supervisor then.

19   Q.   Well, no.

09:44:55 20   A.   No, I was not a DM for Market 29.

21        I became a DM, remember, in 2015 or so, and

22   I was in a different market out of Michigan market, I

23   don't know, 17 maybe or something like that.

24   Q.   Okay.

09:45:06 25   A.   I was a pharmacy supervisor for 29.

Joyce - Cross/Weinberger                                    1967

1    Q.    Right.  So they would use this e-mail when you were

2    a --

3    A.    Not for me.

4    Q.    Wait.  Wait.

09:45:20  5          When you were a pharmacy supervisor,

6    Market29RxSupervisor@Walgreens.com, right?

7    A.    Yeah, but you just asked me about DM; so no to DM,

8    yes to Rx supervisor.

9    Q.    Okay.  I switched the question, Mr. Joyce.  Just

09:45:37 10   hang on.

11   A.    I'm hanging on.

12   Q.    When you were pharmacy supervisor, would you get

13   e-mails with the e-mail address, using the e-mail address

14   Market29RxSUPV@Walgreens.com?

09:45:57 15   A.    Yeah.

16   Q.    All right.  And when you were district manager,

17   would the e-mail be District305Rx@Walgreens.com?

18   A.    When I was DM?

19   Q.    Yes.

09:46:09 20   A.    No.

21          That would be district 305

22   DM@Walgreens.com, I believe.

23   Q.    Okay.  What about D74.DM@Walgreens.com, is that an

24   e-mail that was used?

09:46:27 25   A.    D74?

1    Q.    D724.

2    A.    Yeah.

3    Q.    Okay.  So we're going to pull that document

4    P 15314.

09:46:54 5              THE COURT:  Can you give us that number

6    again, Mr. Weinberger, please?

7                     MR. WEINBERGER:  Sure.  P 15314.

8                     THE COURT:  Thank you.

9    BY MR. WEINBERGER:

09:47:29 10   Q.    Do you see this document, sir?

11   A.    I do.

12   Q.    And this is an e-mail that was sent from mail.Rx to

13   various LISTSERVs, right?

14   A.    Various -- yeah, sure, I guess.

09:47:48 15   Q.    Right.  And it says MVPs, MPDs, MLPSs, DMS, and

16   RxSS, right?

17   A.    Yes.

18   Q.    And RxSS stands for pharmacy supervisors, right?

19   A.    I thought it was just RxS, but that's probably what

09:48:14 20   it is, right.

21   Q.    Yeah.  So if this e-mail was sent in June of 2012

22   to a LISTSERV that included RxSS, that would have been

23   you, you would have been one of the people receiving it

24   as a pharmacy supervisor, right?

09:48:28 25   A.    Yes.

Joyce - Cross/Weinberger                       1969

```
 1    Q.    Okay.  All right.  So this e-mail says the subject
 2    is "Materials for today's controlled substance action
 3    plan videoconference."
 4              Have I read that correctly?
 5    A.    Yes.
 6    Q.    And it goes on to say that, "Good morning.
 7    Attached are the materials that will be reviewed during
 8    today's videoconference, which include Controlled
 9    Substance Action Plan PowerPoint, Good Faith Dispensing
10    Policy, Focus on Compliance Survey, and FOC pain
11    management cover letter and job aid."
12              Do you see that?
13    A.    I do.
14    Q.    So you would have received this and attached to
15    this document is a PowerPoint entitled, "Controlled
16    Substance Action Plan."
17              Right?
18    A.    Yes.
19    Q.    And it's likely you would have attended this
20    videoconference, right?
21    A.    Likely.
22    Q.    All right.
23    A.    It could have been.  June 7th could have been a
24    Board meeting, in which case I wouldn't have attended
25    this.  I don't know if June 7th was a Monday, Tuesday or
```

Joyce - Cross/Weinberger       1970

1    Wednesday, and if it was the first Monday, Tuesday or

2    Wednesday in June, I wouldn't have attended this.

3    Q.    All right.  Whether you attended or not, you would

4    have received materials for that conference, right?

09:49:51  5    A.    I would have.

6    Q.    All right.  So let's look at the first page of

7    that.

8            It says "Controlled Substance Action Plan,

9    June 7th, 2012."

09:50:04 10            Have I read that correctly?

11    A.    You have.

12    Q.    And the very next slide says "Agenda.  Overview,

13    review updated policies and procedures, exception store

14    visits, future enhancements, and call to action and next

09:50:26 15    steps."

16            Have I read that correctly?

17    A.    Yes.

18    Q.    And the next slide says, "Due to recent action

19    taken by the DEA, select policies and procedures have

09:50:48 20    been updated to ensure our pharmacists, stores are

21    compliant when dispensing controlled substances."

22            Have I read that correctly?

23    A.    You have.

24    Q.    Do you remember that -- do you remember that

09:51:03 25    occurring at this conference?

1    A.    No.

2    Q.    It goes on to say, "Corresponding enhancements

3    include:  Update to the Good Faith Dispensing Guidelines,

4    revised ordering procedures for controlled substances,

09:51:20  5  and Drug Utilization Review enhancements."

6              Have I read that correctly?

7    A.    You have.

8    Q.    And then it goes on in another bullet point to talk

9    about "Exception stores that have been identified that

09:51:32  10  may require additional action by market and district

11   leadership."

12             Do you know what is meant by that?

13   A.    Not yet.

14   Q.    So as you sit here today, you don't know

09:51:46  15  what -- you can't remember what is meant by that

16   "exception stores," right?

17   A.    They are stores that we probably have to take a

18   look at or do some sort of additional work on, but I

19   don't know what the reason is yet.

09:51:59  20  Q.    Okay.  Go to Page 6 so that you can follow what I'm

21   looking at, sir.  That's this Page 6 here of the slides.

22             It says, "Good Faith Dispensing Policy has

23   been updated to provide pharmacists additional resources

24   for making decisions when dispensing controlled substance

09:52:29  25  prescriptions."

1                    Right?

2      A.    Yes.

3      Q.    Now, this is a -- this is a rollout of a new or

4      changed program or policies as of 2012, when this -- when

09:52:42 5     this videoconference is taking place, right?

6      A.    Well, it says "update"; not "new."  So I'm assuming

7      it's an update.

8      Q.    Okay.  And it says, "The following components have

9      been updated:  Prescription validation procedures, and

09:53:00 10    the roles and responsibilities of each pharmacy team

11     member."

12                   Have I read that correctly?

13     A.    You have.

14     Q.    And it goes on to say, "There's a pathway to Good

09:53:13 15    Faith Dispensing Policy, and it says, "Storenet RxOps,

16     pharmacy policies and procedures, filling prescriptions."

17                   So let's stop there.  What does storenet

18     mean?

19     A.    Storenet is our Walgreens resource.  You'd go in

09:53:36 20    there to look up whatever information you needed for

21     store operations, for payroll, for hiring, documentation,

22     just things like that.

23                   Just it's -- it was a very busy, busy, busy

24     system, lots of stuff in there.

09:53:52 25    Q.    And RxOps, what does that mean?

1        A.    Rx Operations.  There were different headers

2        in-store that once you got in, maybe Rx Operations, I

3        don't know, hiring, and so forth.

4                       Probably a dozen different headers.

09:54:08 5     Q.    So within Storenet would be Rx Operations?

6        A.    Correct.

7        Q.    And within Storenet would there be Pharmacy

8        Policies and Procedures?

9        A.    Yeah.  And then within Pharmacy Ops you'd find

09:54:24 10    Pharmacy Policies and Procedures.

11       Q.    And then within Policies and Procedures there would

12       be Filling Prescriptions, right?

13       A.    Yes.

14       Q.    And within that would be information about

09:54:37 15    controlled substance prescriptions and Good Faith

16       Dispensing, right?

17       A.    Right.

18       Q.    So the next page of this PowerPoint as of 2012 is

19       Validation Procedures For Good Faith Dispensing.

09:54:53 20                    Do you see that?

21       A.    I do.

22       Q.    And it talks about tools for the pharmacist in

23       order to carry out their corresponding responsibility.

24                       Right?

09:55:04 25    A.    Yes.

Joyce - Cross/Weinberger                                    1974

1   Q.    And that includes the patient ID, the verifying and

2   document the ID if the patient doesn't have a

3   relationship with the pharmacy, right?

4   A.    Correct.

09:55:16  5   Q.    "Follow state-specific guidelines."

6               Right?

7   A.    Right.

8   Q.    As to the prescriber, "Verify prescriber DEA

9   number," right?

09:55:25  10   A.    Right.

11   Q.    "Use the DEA website if necessary."

12               Right?

13   A.    Right.

14   Q.    And then PDMP, it says, "Utilize to obtain

09:55:38  15   additional information to help determine validity of

16   prescription."

17               Right?

18   A.    Right.

19   Q.    And it goes on to say that's state specific.

09:55:49  20               And then it says, "Data/DUR review, review

21   the patient profile to resolve and document any

22   associated DURs."

23               Right?

24   A.    Correct.

09:56:01  25   Q.    And then "Evaluate GFD," Good Faith Dispensing

1     Guidelines.  "Ensure usual course of professional

2     practice."

3                    What does that mean, sir?

4     A.    Do your job.  Do your job as a pharmacist.

09:56:15  5     Q.    Okay.  And "Verify noticeable trends with

6     prescribers or patients."

7                    What does that mean?

8     A.    That means pay attention to how doctors are

9     writing, what they're writing.  Are they writing the same

09:56:32 10     thing for every patient, or is it different medications;

11     are all of the patients for this doctor from 300 miles

12     away; just things like that.

13     Q.    Red flags, right?

14     A.    Yeah.  Red flags, concerns, sure.

09:56:52 15     Q.    "Verify prescriptions have not been altered or

16     forged," right?

17     A.    Correct.

18     Q.    And then number six says, "Document.  Document all

19     efforts used to validate Good Faith Dispensing."

09:57:11 20                    Right?

21     A.    Yes.

22     Q.    So that's the documentation we were talking about

23     earlier that's so important to patient safety, right?

24     A.    Sure.  It's good for patient safety and it's good

09:57:22 25     to cover the pharmacist if someone asks you about

Joyce - Cross/Weinberger                    1976

1    something two years from now.

2    Q.    Right.  Just like a medical record, so when you go

3    to the hospital or you go to your doctor, and they make a

4    record of what happened at that visit, it's important to

09:57:37  5    patient safety that the doctor -- that a doctor who picks

6    up that medical record sometime later knows what happened

7    at that visit.

8                   Right?

9    A.    Sure.

09:57:46 10    Q.    Knows what the examination was, knows whether or

11   not there were tests done, knows whether or not any drugs

12   were prescribed.

13                  Right?

14   A.    Sure.

09:57:55 15    Q.    Right.  And it's just important for patient care

16   and safety for pharmacists and pharmacies to do the same

17   thing with respect to filling prescriptions.

18                  Right?

19   A.    Sure.  When needed, you want to document.

09:58:12 20    Q.    Right.  So number seven says "RPh action."

21                  What does that stand for?

22   A.    What they want the pharmacist to do.

23   Q.    Okay.  "Determine how to proceed after using GFD

24   guidelines," and the options are to "dispense," or "not

09:58:29 25    valid to dispense," or "refuse to dispense."

Joyce - Cross/Weinberger                    1977

1          Right?

2     A.   Yes.

3     Q.   And then there's an option to notify the DEA of a

4     refusal to fill if the prescription is forged, altered,

09:58:43   5     or issued outside the usual course of professional

6     practice.

7          Right?

8     A.   Correct.

9     Q.   So if we were to look at samples of prescriptions

09:58:59  10     produced and notes regarding those prescriptions produced

11     from your Trumbull County Walgreens stores, you would

12     expect documentation of this process to be in those

13     materials, right?

14     A.   When necessary.

09:59:20  15     Q.   Well, is there any indication on this document that

16     it says you only document when necessary?

17     A.   "Document all efforts used to validate Good Faith

18     Dispensing."

19          So if Mrs. Jones came in with her narcotic

09:59:38  20     prescription every month because she's dying of cancer,

21     you would note that in the patient comments and you

22     wouldn't document that on every successive prescription

23     that came in.

24     Q.   All right.  Well, let's take a look at --

09:59:55  25     A.   You wouldn't need to.

Joyce - Cross/Weinberger                                    1978

1    Q.    Well, does it say -- does it say that when there's

2    prior information available from a prior script, that

3    when the new script comes in you don't have to document

4    what efforts you've made?

10:00:13  5    A.    You have to use your judgment as a pharmacist,

6    Mr. Weinberger.

7    Q.    Where does it say that the pharmacist should use

8    their judgment as to whether or not to document?

9              Where does it say it on there?

10:00:25 10    A.    Where does it say that you have to document every

11    prescription?

12    Q.    My question is, where does it say with respect to

13    documentation on this slide that the documentation is

14    subject to professional judgment of the pharmacist?

10:00:46 15    A.    I mean, you're doing your due diligence.  If you're

16    documenting it once and it's the same thing, you know the

17    customer, you're not going to -- there's not a need to do

18    it every time.

19              That's real world.

10:00:57 20    Q.    All right, sir, we'll move on.

21              Looking at Page 8, this is a flow chart

22    that's entitled "Everyone plays a role in the GFD

23    process."

24              Do you see that?

10:01:15 25    A.    I do.

Joyce - Cross/Weinberger                              1979

```
 1    Q.    And there's a role for the technician, right?

 2    A.    Sure.  Yes.

 3    Q.    There's a role that's entitled "The shared

 4    responsibility of the pharmacist," right?

 5    A.    Sure.

 6    Q.    And under that section it says, "Validate

 7    prescriber scope of practice."

 8                  We had a little bit of a discussion about

 9    that yesterday.

10                  What is your understanding of what that

11    means, "Validate prescriber scope of practice"?

12    A.    So like I said yesterday, you don't want to fill a

13    birth control prescription from a dentist, or things like

14    that, if the scope of practice is not what this doctor is

15    doing.

16                  A lot of doctors have a pretty wide scope

17    of practice, general practitioners, internal medicine and

18    so forth, their scope of practice, they see all kinds of

19    different patients.

20    Q.    And there were a lot of scopes -- a lot of

21    specialties -- ear, nose and throat, for example;

22    gynecologic surgeon, for example -- where the scope of

23    practice is very limited, right?

24    A.    Yes.

25    Q.    And may or may not be the kind of practice that,
```

10:01:31 (line 5)
10:01:46 (line 10)
10:02:10 (line 15)
10:02:20 (line 20)
10:02:36 (line 25)

Joyce - Cross/Weinberger                                    1980

1    generally speaking, results in the doctor prescribing

2    opioids, right?

3    A.    I'm trying to think of a lot of scope of practices

4    that a doctor wouldn't and couldn't prescribe an opioid.

10:03:01  5                An OB-GYN could, internal, general

6    practitioner, dentist, hematology, oncology; ear, nose

7    and throat; ear doctor, eye doctor.

8    Q.    Well, would the scope of practice as you've

9    described these specialties be relevant as to whether or

10:03:23 10    not that particular specialist should be prescribing

11    opioid drugs over an extended period of time?

12    A.    It could be.

13    Q.    Right.  So there's -- there's one instance where,

14    for example, let's say an oral surgeon who has performed

10:03:41 15    surgery on a patient might prescribe a few days of

16    opioids, right?

17    A.    Or longer.  Depends on what they did, what kind of

18    surgery they did; what happened, was there an infection

19    after the fact and they had to come back, and they needed

10:03:56 20    more antibiotics and more pain pills.

21                I went to my dentist two weeks ago and I

22    still have pain back in my mouth.  I'm taking Advil,

23    but -- I mean, so a short-term course of action for a

24    doctor may or may not be how they practice.

10:04:14 25    Q.    But that's -- but my point is that if it's a

1        long-term prescription over many months of an opioid

2        prescription, the scope of practice has some relevance to

3        that, doesn't it?

4        A.    It could.

10:04:35 5        Q.    All right.  So this slide goes on to say that the

6        shared responsibility of the pharmacist is to "Review the

7        PDMP, state specific," right?

8        A.    Yes.

9        Q.    And it goes on to say, "NonPOWER only."

10:04:54 10               What does that mean?

11        A.    I don't know what that means.

12        Q.    All right.  Presumably if you were there listening

13        to this videoconference that was using these slides, it

14        would have been explained to you, right?

10:05:04 15        A.    Could have been, um-hmm.

16        Q.    Now, it says, "Verify script with PBR."

17               What does that mean?

18        A.    Prescriber.

19        Q.    Okay.  It says "Evaluate the elements of Good Faith

10:05:20 20        Dispensing," right?

21        A.    Sure.

22        Q.    It says "Review patient profile and resolve drug

23        utilization report issues," right?

24        A.    Yes.

10:05:30 25        Q.    And then it says, once again, "Document

 1    information," right?

 2              And then "Action, determine if appropriate

 3    to fill," right?

 4    A.    Sure.

10:05:45 5    Q.    And then it says, "The ultimate responsibility of

 6    the pharmacist," which is the part of the corresponding

 7    responsibility under the Controlled Substances Act, is to

 8    "Confirm" -- thank you -- "to confirm GFD validation and

 9    documentation was completed, including PDMP in POWER."

10:06:15 10             Right?

11    A.    Yes.

12    Q.    What does "in POWER" mean?

13    A.    You asked me that previously.

14              I'm not sure what that means.

10:06:22 15    Q.    Well, does that mean document the -- do the

16    documentation in a software known as Power?

17    A.    I don't -- I never used the term Power at

18    Walgreens.  I don't know what that means.

19    Q.    All right.  And "If not, then complete Good Faith

10:06:49 20    Dispensing Guidelines to determine if the prescription

21    should be dispensed."

22              Right?

23    A.    Yes.

24    Q.    And then it goes on to "The final responsibility to

10:07:02 25    complete, determine if it's appropriate to fill," and

Joyce - Cross/Weinberger                                    1983

1    then "Both the technician and pharmacist should verify

2    the ID, follow up on any open issues, and consult the

3    patient."

4                     Right?

10:07:15  5    A.    Yes.

6    Q.    Now, this next slide talks about Ordering

7    Controlled Substances, correct?

8    A.    That's the title.

9    Q.    And this slide has to do with what the pharmacist

10:07:43 10   should do at the store level in terms of ordering

11   supplies of opioids from the distribution part of the

12   chain, right?

13   A.    Yes.

14   Q.    And it says that "The controlled substance ordering

10:08:02 15   procedures have been updated to minimize risk."

16                     By the way, in your experience, have you

17   ever, as a pharmacist, had to order for your store from

18   the distribution chain, part of the chain?

19   A.    Sure.  I was a pharmacist for two years for

10:08:19 20   Walgreens before I got promoted, so we ordered.

21   Q.    Okay.  What about when you were pharmacy supervisor

22   or district manager, did you ever have to do that?

23   A.    No.

24   Q.    You had somebody working under you to do that,

10:08:29 25   right?

1    A.    The pharmacy manager and the staff

2    pharmacist -- any pharmacist at the store can order, but

3    I wouldn't order because I wasn't filling prescriptions.

4              They -- they knew what they ran out of and

10:08:46  5    when they would get low, they would reorder.

6    Q.    Okay.  So it says here, "The following changes have

7    been implemented:  Manual orders to DC and Cardinal will

8    no longer be accepted."

9              DC stands for the Walgreens Distribution

10:09:04 10   Center, right?

11   A.    It does.

12   Q.    That's Walgreens' own distribution arm of the

13   company, right?

14   A.    The warehouse, yep.

10:09:12 15   Q.    Right.  And Cardinal, that refers to an independent

16   distributor, Cardinal Health, right?

17   A.    Yeah, they're from Columbus, um-hmm.

18   Q.    Right.  And during your tenure at Walgreens, did

19   you know that Cardinal or other third-party distributors

10:09:33 20   were used to a significant extent to order C-II drugs?

21   A.    When I was a pharmacist, we ordered through our

22   Distribution Center.

23   Q.    Including OxyContin and Oxycodone?

24   A.    I believe so.

10:09:55 25   Q.    And Hydrocodone?

1    A.    Yeah.

2    Q.    Okay.  What about after that, do you know whether

3    or not Oxycodone and OxyContin and Hydrocodone would come

4    from the Distribution Center?

10:10:09 5    A.    At some point they didn't.

6              They came, I think they came for a short

7    time from Cardinal, and then we switched to ABC.  That's

8    another -- there's two, there's like three big --

9    Q.    So do you -- sir, do you know or can you recall

10:10:27 10    from the presentation why manual orders to the

11    Distribution Center and Cardinal would no longer be

12    accepted?

13    A.    Yeah.

14              Because I think we started doing them

10:10:39 15    electronically.

16    Q.    Right.  And it says, "All controlled substance

17    orders will be required to be processed through SIMS,

18    including requests for specific manufacturers."

19    A.    Yeah.  So the old way we did it was on --

10:10:53 20    Q.    I asked you what is SIMS, sir?

21              What is SIMS?

22    A.    It's one of our ordering systems.

23    Q.    Right.

24    A.    I don't know what the acronym is.

10:11:02 25    Q.    Okay.  Do you know --

1    A.    Store Inventory Management System I think is what

2    it stands for.

3    Q.    And do you know that Walgreens as a distributor had

4    a responsibility to look at orders coming from their

10:11:15  5    pharmacies to determine whether or not those orders

6    demonstrated unusual quantities, unusual frequency, or a

7    deviation from the normal pattern?

8    A.    No.

9              MR. STOFFELMAYR:  Objection, Your Honor.

10:11:32  10    BY MR. WEINBERGER:

11    Q.    So you don't know that --

12              THE COURT:  Hold it.

13              MR. WEINBERGER:  I'm sorry.  I'm sorry,

14    Your Honor.

10:11:38  15              MR. STOFFELMAYR:  There was testimony on

16    this yesterday by this witness.

17              THE COURT:  Overruled.

18              THE WITNESS:  Judge, could I ask for

19    another bottle of water?

10:11:48  20              THE COURT:  Oh, all right.  Sure.

21              Thank you, Mr. Lanier.

22              MR. LANIER:  Thank you, sir.

23    BY MR. WEINBERGER:

24    Q.    So my question, sir, is, and do you know that

10:12:03  25    Walgreens as a distributor had a responsibility to look

Joyce - Cross/Weinberger                                    1987

1    at orders coming from their pharmacies to determine

2    whether or not those orders demonstrated unusual

3    quantities, unusual frequency, or a deviation from the

4    normal pattern?

10:12:19  5    A.    No.

6    Q.    So this next slide goes on to say, "Maximum

7    ordering quantities.  Store specific limits, chain-wide

8    order limits."

9                Is this a reflection of the fact that for

10:12:42  10   individual pharmacies, there were limits in quantities of

11   opioids that could be ordered from distributors?

12   A.    Yeah.  If you wanted more, you had to give a good

13   reason why you needed more.

14   Q.    Right.  That's called a threshold override, right?

10:12:57  15   A.    It's called a what?

16   Q.    A threshold override.

17   A.    I don't remember that term being used, but there

18   would be some sort of a process to --

19   Q.    Right.

10:13:07  20   A.    You've got to send up some sort of documentation

21   that, you know, you had a new doctor next door or the

22   hospital expanded, or whatever the case might be.

23   Q.    Right.  So that's what we're talking about with

24   respect to deviation from normal pattern or frequency.

10:13:22  25               If you have one of your pharmacies has for

1    months on end ordered a certain quantity of opioids for

2    their pharmacists to dispense, if there's a sudden

3    increase in an order, there has to be a reason given for

4    that.

10:13:40   5                    Right?

6    A.    Sure.

7    Q.    I mean, that's part of the responsibility of

8    Walgreens under the Controlled Substances Act, right?

9                    MR. STOFFELMAYR:  Objection.

10:13:53  10                    THE COURT:  Overruled.

11                    If he knows.

12   A.    I don't know.

13   BY MR. WEINBERGER:

14   Q.    Well, there's a -- there's a bullet point here that

10:14:02  15   says, "Controlled substance order quantity override

16   form."

17                    Is that -- is that what you were just

18   talking about, an override of an allowed quantity?

19   A.    Yes.

10:14:16  20   Q.    And it says, "The pharmacy supervisor will be

21   required to evaluate and complete the override form for

22   orders exceeding the maximum quantity only."

23                    Right?

24   A.    Sure.

10:14:34  25   Q.    Now, you just told us that it was the pharmacy

1    manager that would do that, right?

2    A.    The ordering is done by the pharmacy manager.

3                In this instance, I would have to look at

4    the reason they gave and either approve or deny.

10:14:51  5                So am I doing the override?  Did I answer

6    correctly?  Yes, I did.

7    Q.    All right.  So this is a slide, Slide Number 12,

8    that talks about exception stores.

9                Do you see that?

10:15:14 10    A.    I do.

11    Q.    It says, "Walgreens has taken a proactive approach

12    to minimize risk for targeted stores that may be impacted

13    in the future."

14                Do you know what that means?

10:15:27 15    A.    It means Walgreens is trying to be proactive to

16    minimize risk for stores that they think may -- might be

17    ordering too much.

18    Q.    Right.  Or might be the subject of a DEA action?

19    A.    Maybe.

10:15:47 20    Q.    And this bullet point says, "Exception stores were

21    identified using the following criteria:  Controlled

22    substance volume and trending."

23                Have I read that correctly?

24    A.    You have.

10:16:06 25    Q.    That's an analysis of a store's history and trends

Joyce - Cross/Weinberger                                    1990

1    regarding quantities of controlled substances ordered,

2    right?

3    A.    It looks that way to me, yeah.

4    Q.    Right.  Well, did you ever study those trends at

10:16:27  5    any of the stores, the store numbers that we looked at

6    yesterday, where there were volumes of pills?

7                    Remember that chart?

8    A.    From the very beginning?

9    Q.    Yes.

10:16:38 10   A.    Did I ever --

11   Q.    No.  Let me just focus you on the question.

12   A.    All right.

13   Q.    Remember yesterday we looked at the volume of pills

14   dispensed from the stores that you were associated with

10:16:52 15   from 2006 until 2019?

16   A.    Sure.

17   Q.    Right.  So my question for you, sir, is that did

18   you, as either a pharmacy supervisor until 2015 or as a

19   district manager since 2015 ever look at "Controlled

10:17:14 20   substance volume and trends" for your stores?

21   A.    I looked at prescription files.  I made sure they

22   were doing OARRS.  I talked to them about trends in the

23   neighborhood; who, you know, new doctor, doctor moved

24   out, new insurance plan, those sorts of things.

10:17:38 25                   So did I look at trends?  Yeah, I looked at

1    trends.

2              Were they graph-like on paper?  No.

3    Q.    Yeah, because this bullet point says, "Controlled

4    substance volume" which would require you to look at some

10:17:59 5  data or report that --

6    A.    Not necessarily.  You can look through prescription

7    files and see that.

8    Q.    Sir, I'm going to try not to cut you off, okay?

9    A.    Fair enough.

10:18:10 10  Q.    All right?  So if you would just wait for me to

11   finish my question, I know sometimes I pause and

12   sometimes I'm slow.

13   A.    My apologies.

14   Q.    All right.  So my question is, sir, did you ever

10:18:24 15  see any reports or study any data from your stores that

16   contained information about volume of pills or the

17   trending of those volume of pills from month-to-month or

18   year-to-year?

19   A.    I would, like I said, I would look at prescription

10:18:48 20  -- hard copy prescriptions, which have all the

21   information on it you need to look at.

22              Sometimes I would review DEA orders.

23              I would observe how they filled controlled

24   substance prescriptions and prescriptions in general, not

10:19:03 25  just controlled drugs.

1              And I'd discuss issues at the store,

2    neighborhood issues, those sorts of things, with the

3    pharmacists and the technicians and the store managers.

4              I mean, but did I have a report that I

10:19:20  5    looked at?  No.

6    Q.    So the next bullet point asks about proportionality

7    to total business.

8              Do you know what that means?

9    A.    I believe they're talking about the percent of the

10:19:37 10    controlled drugs you're filling versus the total number

11    of prescriptions.

12    Q.    Right.  So did you ever look at any volume reports

13    or trends from the data from your stores that you managed

14    and supervised that reflected the percentage of

10:19:57 15    noncontrolled versus controlled scripts dispensed from

16    the store?

17    A.    No, but you could see three piles of prescriptions,

18    C-II, III through V, and regular prescriptions.

19              We didn't have stacks of C-IIs and stacks

10:20:16 20    of III through Vs, and little, little piles of

21    noncontrolled drugs.

22              You filled way more noncontrols.  You

23    filled a volume of C-III through Vs, and you filled some

24    C-IIs.

10:20:33 25    Q.    So --

Joyce - Cross/Weinberger                                1993

1    A.    So I could notice if they, you know, if there was

2    something there where there were huge stacks of C-IIs and

3    folks hanging around the pharmacy looked like they were

4    drug-dependent folks; we never saw that.

10:20:47  5            There's ways to see things without a paper

6    in front of you, and I think it's more impactful to

7    observe rather than look at a piece of paper.

8            I wouldn't even need to go to a store.

9    Q.    So for you, sir, in your experience, the actual

10:21:09 10   data is not that important, right?

11   A.    I'm telling you I have the data.

12           It's not in the form that you're talking

13   about, but I have the data.

14   Q.    Right.  So you have anecdotal data that you see on

10:21:26 15   the occasion when you are making a visit to one of the 14

16   stores that you are supervising as district manager,

17   right?

18   A.    Sure.

19           And I have --

10:21:40 20   Q.    Okay.

21   A.    -- I think good pharmacists working for me that I

22   trusted that did a good job, and, you know, sifted

23   through these prescriptions to the best of their ability.

24           I think they did a nice job.

10:21:56 25   Q.    So if you had 14 stores to visit as a district

Joyce - Cross/Weinberger                                    1994

1    manager, how many times per month would you visit one of

2    your stores?

3    A.    Usually three times a month.

4    Q.    Okay.  So --

10:22:11  5    A.    Not always.

6                Some stores needed more attention.  You'd

7    go there five times.

8                Some stores ran with very little

9    supervision.  I might skip a month.

10:22:19  10    Q.    Right.

11    A.    But in general, three times a month.

12    Q.    So you'd look at these files of prescriptions that

13    were filled, right, these paper files, right?

14    A.    Among other things, yes.

10:22:32  15    Q.    All right.  And you would do that per store maybe

16    three times a month; sometimes less, sometimes more?

17    A.    Sure.

18    Q.    And you're telling us that that's better

19    information than looking at -- specifically at the actual

10:22:52  20    volume of data to determine volume and trends?

21                That's what your testimony is, right?

22    A.    I've been a pharmacist for 40 years.  I can walk

23    into a store in 10 minutes and determine whether or not

24    it's a pill-mill pharmacy.

10:23:09  25                We didn't have those.

Joyce - Cross/Weinberger                                    1995

1    Q.    So take a look at Page 22 of this PowerPoint.

2    A.    Got it.

3    Q.    Got that in front of you?

4                This is -- says, "Focus on Compliance,

5    June, 2012, Pain Management Prescriptions.  Why it's

6    Important:  Prescription drug abuse is the nation's

7    fastest growing drug problem."

8                Have I read that correctly?

9    A.    Yes.

10   Q.    "Both the White House and the Center for Disease

11   Control have recently referred to this growing concern as

12   an epidemic.  Community pharmacy has become a target for

13   individuals seeking these drugs."

14               That includes the Walgreens retail pharmacy

15   chains, right?

16   A.    Yes.

17   Q.    "As part of our commitment to follow Good Faith

18   Dispensing Guidelines, a select group of stores has been

19   identified as having potentially higher risk related to

20   the pain management prescription activity."

21               Were any of your stores, sir, any of your

22   14 stores, identified as part of a select group?

23   A.    They could have been.

24               9669 in Hubbard could have been.

25   Q.    9669.

Joyce - Cross/Weinberger                      1996

1         Where is that located?

2    A.    Hubbard.

3    Q.    Do you recall whether or not it's that particular

4    store that filled prescriptions written by a Dr. Veres?

10:25:27   5    A.    No.  I don't think so.

6    Q.    You remember Dr. Veres, don't you?

7    A.    Very well.

8    Q.    What do you remember about him?

9    A.    Dr. Veres has been a problem in the Mahoning Valley

10:25:40  10    for a long time.

11              Dr. Veres, I talked to the Board agent

12    about Dr. Veres on numerous occasions, and I think that

13    was George Pavlich I talked to.

14              I don't know if I was working for Walgreens

10:25:56  15    or if it was prior, but Dr. Veres is -- I think he just

16    retired.

17              But he wrote a lot of controlled substance

18    prescriptions, and I -- I asked the State Board guy about

19    him.  I thought he should look into this guy.

10:26:12  20              He did, and he got back to me that

21    Dr. Veres kept impeccable records.  He didn't give

22    prescriptions early.  He wasn't giving crazy high doses.

23    He maintained his staff in a good way.  The guy visited

24    the office a couple times.

10:26:34  25              So he didn't think that Dr. Veres was a

Joyce - Cross/Weinberger                                    1997

1    huge -- or wasn't -- wasn't anything they could do

2    anything about, but he was one of those doctors that you

3    definitely wanted to look at his prescriptions carefully.

4    Q.    What time frame are we talking about, sir?

10:26:56  5    A.    I'm sorry?

6    Q.    What time frame are we talking about?

7    A.    We're talking about the last 25 years.

8    Q.    You mean, there was an issue with respect to

9    Dr. Veres for 25 years?

10:27:08 10    A.    I thought so.

11    Q.    And Walgreens was filling his prescriptions over

12    that 25 years?

13    A.    If Dr. Veres --

14    Q.    Sir, just -- just answer my question.

10:27:22 15    A.    If Dr. Veres --

16    Q.    Sir --

17    A.    A customer came in with a prescription for high

18    blood pressure --

19            THE COURT:  Hold it.  Hold it.  Calm down,

10:27:30 20    both of you.

21            MR. WEINBERGER:  I'm calm, Your Honor.

22            THE COURT:  Mr. Weinberger, let the witness

23    finish his answer.

24            And, sir, let Mr. Weinberger finish his

10:27:38 25    question.  It will go a lot better.

Joyce - Cross/Weinberger                              1998

1    BY MR. WEINBERGER:

2    Q.    Sir, did Walgreens fill opioid prescriptions

3    written by Dr. Veres for 25 years?

4    A.    Some.

10:27:56  5    Q.    Okay.

6    A.    Again, they would -- they would -- they --

7                   THE COURT:  Hold it.

8                   MR. WEINBERGER:  I'm sorry, Your Honor.

9                   The witness is finishing his answer, so

10:28:09 10    please let him finish.

11    A.    So whether we had Good Faith Dispensing or just the

12    process of a pharmacist doing their due diligence, you

13    know, doctors that are questionable, doctors that are

14    questionable have good patients that come to them.

10:28:23 15                   Good doctors have a couple folks that you

16    wonder about.  So it isn't like you just stop filling

17    every prescription for a doctor before you because you

18    have, you know, you see a prescription and it raises your

19    eyebrows.

10:28:34 20                   That's when you put on your investigator

21    cap and maybe make a phone call or maybe look at their

22    history, and do those sorts of things, and then

23    determine; talk to the patient, you know, "Why are you

24    taking this," and so forth; call the doctor, you know,

10:28:51 25    "What's the problem, what's the diagnosis, what's the

Joyce - Cross/Weinberger                    1999

1        treatment plan."

2                    And if those things check out, yeah, you'd

3        fill the prescription.

4        Q.    Did there come a time in 2018, Mr. Joyce, when you

10:29:03  5        learned that the Walmart, Sam's Club in Trumbull County,

6        and the Giant Eagle in that county, stopped filling

7        controlled substances for Dr. Veres?

8        A.    Yes.

9        Q.    And despite learning that, your stores continued to

10:29:31 10        fill his prescriptions, right?

11        A.    Some of his prescriptions.

12                    Like I just said, you would look at a

13        prescription, evaluate it.  If it was blood pressure,

14        diabetes, skin conditions, eye drops, ear drops, you fill

10:29:46 15        them, you know, really without question.

16                    If it's a controlled drug, you would look,

17        you know:  What's the combination, is there a combination

18        of controlled drugs; what's the dose, what's the duration

19        of treatment.  Is there a diagnosis code, did you call

10:30:01 20        the doctor, that sort of thing.

21                    And if those things checked out, you would

22        fill the prescription.

23        Q.    That --

24        A.    And we turned away plenty of Dr. Veres

10:30:11 25        prescriptions.

```
 1    Q.    So can we give the witness Plaintiffs' Exhibit

 2    24039?

 3              Do you have that exhibit in front of you?

 4    A.    I do.

 5    Q.    This is an e-mail that was written to you from RXM

 6    09077 on May 7th, 2018, correct?

 7    A.    Correct.

 8    Q.    What's RXM 09077?

 9    A.    That's store manager from Store 09077, the store

10    manager in Trumbull County.

11    Q.    One of your stores, correct?

12    A.    Correct.

13    Q.    That you're district manager over, right?

14    A.    I was, yes.

15    Q.    Right.  So this e-mail starts with an e-mail from

16    you to Adam.

17              Who is Adam?

18    A.    Adam's the pharmacy manager at Store 9077.

19    Q.    Okay.  And it says, "Is there a new prescriber in

20    your area for Oxycodone?  The last two months have been

21    sizable increases in Oxycodone scripts at your store."

22              Right?

23    A.    Sure.

24    Q.    And his response is, "Hey, Brian, so Walmart/Sam's

25    Club and Giant Eagle have stopped filling controls for a
```

1    local doctor named Frank Veres.  This doc has a

2    reputation for prescribing a high number of pain meds.

3    So I think over the past few months we've been picking up

4    a lot of his patients.  From our angle, Veres has always

10:32:21  5    complied with our GFD."

6              That's Good Faith Dispensing Guidelines,

7    right?

8    A.    Yes, ma'am.

9    Q.    "And his patients are always on time, but the high

10:32:30 10    ratio of controls written has become more obvious."

11              Right?

12    A.    Yes.

13    Q.    So that's a statement about the fact that this

14    pharmacist was looking at the percentage of controlled

10:32:45 15    substances that he was prescribing versus noncontrolled

16    substances that were being filled at your store, right?

17    A.    I think he was referring to picking up those

18    prescriptions maybe from Walmart and Giant Eagle.

19    Q.    Well, it says, "To combat this, Greg and I have

10:33:05 20    discussed not accepting any new controls from his office

21    since patients have been displaced from those other

22    pharmacies and the flood of controls is eminent.  At this

23    time we feel comfortable filling controls for our

24    patients that have been coming here for years, but that

10:33:24 25    is subject to change.  I would like to hear your

1    thoughts."

2                    Do you see that?

3    A.    I do.

4    Q.    Now, did you get back to Adam?

10:33:35 5    A.    I believe so.

6                    I certainly hope so.

7    Q.    Well, did you tell Adam, "Adam, call Sam's,

8    Walmart, call the pharmacist there, and find out why they

9    stopped filling his opioid scripts"?

10:33:51 10                   Did you tell him to do that?

11   A.    No.

12                   I'm sure they -- he had the same concern as

13   them, though.  That's the reason.

14   Q.    So you didn't -- as the district manager, one of

10:34:00 15   the ways that you could investigate what was going on

16   with this Dr. Veres was to call the pharmacist at the

17   Walmart, right?

18   A.    We know what's going on with Dr. Veres.

19                   He's been like this for 25 years.

10:34:16 20   Q.    Okay.  So your experience with him as a

21   high-prescribing opioid prescriber for 25 years gave you

22   comfort.

23                   Is that what you're saying?

24   A.    No.

10:34:30 25                   I said you evaluate each prescription on

Joyce - Cross/Weinberger                    2003

1    its own merit.

2                    The ones that you don't find acceptable,

3    you give it back to them, and they walk out the door.

4                    The ones that you feel --

10:34:43  5    Q.    Well, you --

6    A.    -- are legitimate, you would fill.

7    Q.    So do you --

8    A.    I don't think it's a good policy to cut any one

9    doctor off completely because, like I said, good doctors

10:34:56  10   have a couple bad patients; bad doctors have some good

11   patients.

12                    So why should you punish the folks that

13   have legitimate medical need for opioids or blood

14   pressure or insulin by just cutting them all off?

10:35:13  15                    We live in a poor community where some

16   folks walk to the drugstore or take the bus to the

17   drugstore.  It's a major inconvenience when you would

18   just cart blanche cut a doctor off no more prescriptions

19   from Dr. Jones.

10:35:30  20   Q.    So back to my question, which I think was, did you

21   advise Adam to call Walmart to find out from the

22   pharmacist why Walmart had cut off Dr. Veres's

23   prescriptions?

24   A.    No.  And I would find that unusual.

10:35:51  25   Q.    Have you --

1    A.    Every pharmacist in Trumbull and Mahoning County

2    knows Dr. Veres, you got to be careful.

3    Q.    Did you call the -- did you tell Adam to call the

4    Giant Eagle pharmacist to find out why Giant Eagle

5    Pharmacy had cut off Dr. Veres's prescriptions?

6    A.    I didn't see the need to.

7    Q.    You don't think that would be a good part of Good

8    Faith Dispensing policy?

9    A.    If I know the answer to the question, I'm not going

10   to ask the question.

11   Q.    Is sharing information among the pharmacists

12   working from different retail -- working for different

13   retail pharmacy chains an important part of controlling

14   diversion of opioids?

15   A.    Not only within Walgreens, but within chains, yes.

16          We would, if we knew that there was a batch

17   of prescription pads stolen from a doctor in Youngstown,

18   we would let pharmacies in other districts and areas

19   know.  We might call pharmacies down the road and let

20   them know.

21          There's definitely a network, a

22   behind-the-scenes network in pharmacy that gets that

23   information out as efficiently as it can.

24          MR. WEINBERGER:  Your Honor, I think at

25   this point it might be a good time to take a break if --

```
 1                    THE COURT:  All right.  I was going to wait
 2       for a convenient time.
 3                    All right.  Ladies and gentlemen, we'll
 4       take our midmorning recess, 15 minutes.
10:37:31  5          Usual admonitions, and then we'll pick up
 6       with this witness's testimony.
 7                    (Jury out.)
 8                    MR. LANIER:  Your Honor, are we dismissed
 9       as well?
10:38:14 10          THE COURT:  Oh, yes.
11                    (Recess taken.)
12                    (Jury in.)
13                    THE COURT:  Okay.  Please be seated.
14                    And, Mr. Joyce, I want to remind you you're
11:03:11 15  still under oath, and of course you can remove your mask.
16                    THE WITNESS:  Sure.
17                    MR. WEINBERGER:  May I proceed, Your Honor?
18                    THE COURT:  Yes, Mr. Weinberger.
19       BY MR. WEINBERGER:
11:03:21 20  Q.    Yesterday we put -- we prepared this chart
21       regarding your employment at Walgreens.
22                    Remember that?
23       A.    I do.
24       Q.    And so as pharmacy supervisor and district manager,
11:03:51 25  you were, in fact, the boss over a number of employees,
```

Joyce - Cross/Weinberger                                    2006

     1    right?

     2    A.    Sure.

     3    Q.    You were their boss, you were their supervisor,

     4    correct?

11:04:07  5    A.    Yes.

     6    Q.    And so with respect to the operations of the

     7    pharmacies within those stores that you were managing or

     8    supervising, the buck stopped with you, didn't it?

     9    A.    With most things, the pharmacy manager has

11:04:29 10    responsibility for licensing and so forth, so, I mean, I

    11    was their boss, but they were responsible for inventory

    12    control.

    13              I oversaw that and things like that.

    14    Q.    But as district manager and pharmacy supervisor,

11:04:46 15    didn't you have the ultimate responsibility to ensure

    16    that they carried out their job duties?

    17    A.    Sure.

    18    Q.    So are you willing to say the buck stopped with

    19    you, or not?

11:05:00 20    A.    The buck stopped with me.

    21    Q.    And I'm a little confused, probably my fault, about

    22    regions and markets and stuff, but is it true that when

    23    you were pharmacy supervisor, the pharmacies that you

    24    managed were part of Market 29?

11:05:23 25    A.    For part of the time.

1    Q.    Okay.  What about in 2012?

2    A.    I believe 29.

3    Q.    Okay.  Thank you.

4                We'll get to that, we'll get to that in a

11:05:34  5    little bit.

6                Now, Mr. Joyce, did you know that in 2012,

7    Walgreens corporate could run a report from dispensing

8    data to create a list of the top 100 list of prescribers

9    with the largest volume of Oxycodone prescriptions?

11:05:56 10    A.    Did I know that?

11                I don't believe I knew that.

12    Q.    Okay.  Let's take a look together with us, P 06911.

13                THE WITNESS:  Thank you, ma'am.

14    Q.    So I'm not going to show this exhibit to the jury,

11:06:37 15    I just want you to take -- right now.

16                I just wanted you to take a look at

17    P 06911, just read that e-mail to yourself, and the

18    subject is entitled, "Prescriber dashboard, top 100, New

19    Jersey and Pennsylvania only."

11:06:57 20                Do you see that?

21    A.    Yes.

22    Q.    Okay.  So take a look at the rest of the attached

23    documents, if you would.

24    A.    The next pages?

11:07:08 25    Q.    Yes, sir.

         1              These pages have printouts from what

         2    appears to be a data analysis, and at the top it says,

         3    "Prescriber dashboard, recent three-month activity."

         4              Do you see that?

11:07:43 5    A.    Yeah, I have to put my glasses on.  I'm sorry.

         6    Q.    Sure.  Have you taken your contacts out?

         7    A.    One of them.

         8    Q.    Okay.

         9    A.    I only wear one.

11:07:54 10             Okay.

        11    Q.    So my question for you is -- and I know you're

        12    not -- this isn't a document that you're on, but my

        13    question for you is, now that you've seen this, does this

        14    refresh your recollection that Walgreens was providing to

11:08:15 15   managers prescriber dashboards where they listed the top

        16    100 prescribers of opioid volume?

        17    A.    No.

        18    Q.    You were never provided anything like this from

        19    Walgreens, to your knowledge, right?

11:08:33 20   A.    I don't remember ever seeing this before.

        21    Q.    Well, do you believe that from your perspective as

        22    a pharmacy supervisor or a district manager, that it

        23    would be helpful for you to see a report that reports the

        24    top 100 prescribers of opioids in the State of Ohio?

11:08:54 25   A.    Could be, sure.

Joyce - Cross/Weinberger                          2009

1    Q.    But you never received anything like this from

2    Walgreens?

3    A.    I did not, I don't believe.

4    Q.    Now, in 2012, as a -- you could put -- I mean, you

11:09:12 5    can read it if you want it or -- we're going on to

6    something else.  Okay?

7    A.    Oh, I'm sorry.

8    Q.    That's okay.  That's all right.

9              In 2012, as a pharmacy supervisor, would

11:09:24 10    you have been considered a member of the Walgreens market

11    leadership?

12    A.    As a supervisor, I mean, I guess.

13              I'm not a -- I wasn't a district manager.

14    I wasn't a market vice president.  I wasn't a market

11:09:42 15    pharmacy supervisor.

16              I mean, I'm -- I'm above store level.

17    Q.    Right.  So do you recall Tasha Polster, Director of

18    Walgreens' Pharmaceutical Integrity department, making a

19    presentation by webinar in January of 2012 entitled "DEA

11:10:04 20    update"?

21    A.    I don't remember that.

22    Q.    All right.  Let's put the document in front of you

23    and see if that refreshes your recollection.  Okay?

24    A.    Okay.

11:10:14 25    Q.    20639.

Joyce - Cross/Weinberger                                    2010

1          So I'm just going to put the first page in

2     front of you on this, on the Elmo.

3               So this is, as you can see, is a

4     DEA -- it's a PowerPoint.

11:10:54  5     A.    Sure.

6     Q.    "DEA update, market leadership meeting, Tasha

7     Polster, Director of Pharmaceutical Integrity, January of

8     2012."

9               Do you believe it's likely that you

11:11:05 10    received this PowerPoint?

11    A.    I -- I could have.

12               It doesn't give a specific market number.

13    Maybe it was all markets.  I don't remember.

14    Q.    Well, it says "market leadership meeting," so that

11:11:21 15    seems to communicate that it's all markets, right?

16    A.    Not necessarily.

17    Q.    Okay.  Well, but you think that it's quite possible

18    you received this, correct?

19    A.    Sure.

11:11:30 20               MR. STOFFELMAYR:  Objection to form.

21               THE COURT:  Overruled.

22    BY MR. WEINBERGER:

23    Q.    Okay.  So the first slide says, "The hot new topic.

24    Deadly dose."

11:11:47 25               By the way, sir, have you ever given a

Joyce - Cross/Weinberger                                    2011

1     PowerPoint presentation?

2     A.    Yes.

3     Q.    And do you know how PowerPoint works, wherein the

4     presenter can type in on the PowerPoint notes that they

11:12:02  5   want to cover with respect to particular slides?

6     A.    Sure.

7     Q.    Okay.  So --

8             MR. STOFFELMAYR:  Judge, can we go to

9     side-bar, please?

11:12:13 10           THE COURT:  Okay.

11            MR. WEINBERGER:  Let me just put my mask

12    on, Your Honor.

13            (Proceedings at side-bar:)

14            MR. STOFFELMAYR:  Judge, the issue is he

11:12:38 15   now wants to ask questions about the content of the

16    speaker notes for a presentation that all we know is he

17    says he possibly saw.

18            It's not clear from his understanding if he

19    even counts as market leadership given his level in the

11:12:52 20   organization, so I don't think it's proper to ask him

21    questions about this document.

22            Certainly not about the speaker notes.

23            MR. WEINBERGER:  Well, Your Honor,

24    he -- they can examine him in their case about more

11:13:05 25   details regarding his involvement with this, but I think

1      I've laid the proper foundation for this.

2                  MR. STOFFELMAYR:  No.

3                  The point is we can't examine him on more

4      details because he doesn't know anything.

11:13:15  5                  Ms. Polster will be here next week, she can

6      testify about this in as much detail as anybody could,

7      but having this witness talk about it makes no sense.

8                  THE COURT:  Well, I will scrutinize each

9      question.

11:13:28 10                  The witness didn't recognize this, said he

11     might have gotten it.

12                  You're going to have to be very careful,

13     Mr. Weinberger, about questioning him on speaker's notes

14     unless you want to ask him is this Rite Aid policy, or

11:13:44 15     something like that, because he would not know anything

16     about the speaker's notes.

17                  But if there's something specific in here,

18     you can ask him, you know, is this Rite Aid policy or

19     not, do you agree, disagree, or something like that.  But

11:13:58 20     just to read in the document --

21                  MR. WEINBERGER:  Your Honor, with all due

22     respect, I think you're unduly limiting our ability to

23     use this Walgreen-generated document by the compliance

24     department, which he's testified he interacts with on

11:14:18 25     occasion, and where he admits to going to webinars and

1    seeing PowerPoints.

2              And he's admitted knowing that a presenter

3    creates notes.

4              I mean, if this was -- if this wasn't a

5    business record involving the very activity that this

6    gentleman is involved in as a district manager or

7    pharmacy supervisor, I mean --

8              THE COURT:  All right.  I'm going to have

9    to scrutinize each question and see if I'll allow it or

10   not.

11             It will go slowly, but it's -- you can use

12   it to question him about, you know, what kind of

13   information that he normally got, how he used it; if this

14   is what he got, what he cared about; but it's got to be

15   something relevant to his knowledge.

16             (End of side-bar conference.)

17   BY MR. WEINBERGER:

18   Q.   Mr. Joyce, have you had a chance to leaf through

19   this PowerPoint presentation?

20   A.   Yeah.  I'm a big fan of Sanjay Gupta, and I think

21   this would have rung a bell with me.

22             I don't think this was my level of

23   PowerPoint.

24   Q.   You're saying you don't think --

25   A.   I don't think it was.

Joyce - Cross/Weinberger                    2014

1          It says "market leadership," so I have a

2    feeling this is like the regional vice presidents going

3    to Chicago for this presentation.

4          I don't think this was anything I saw.

11:16:13  5    Q.    Well, in looking through these slides from this

6    PowerPoint, which I'm not going to show the jury yet, do

7    you see information that would have been -- that would

8    have assisted you in your role as a pharmacy supervisor

9    in Trumbull County?

11:18:35 10          (Pause.)

11    A.    Not -- not necessarily.

12    Q.    There's some parts that --

13    A.    No, not really.

14    Q.    All right.  Sir, let me ask you specifically, are

11:19:48 15    you aware of Walmart -- Walgreens, sorry, are you aware

16    of Walgreens taking data and creating dispensing patterns

17    in certain geographic areas?

18    A.    No.

19    Q.    Do you recall Walgreens ever providing district

11:20:18 20    managers with the top 500 or the top 100 store indexing

21    reports for volumes of OxyContin or Oxycodone?

22    A.    Changes in that, yes.  They would -- they had

23    a -- we looked at the report earlier.

24          That was Exhibit 24039?

11:20:46 25    Q.    Yes.

Joyce - Cross/Weinberger                2015

1    A.    That showed deterioration, in other words,

2    your -- I think this is how it worked, is you were ranked

3    in all the Walgreens stores, so one to 10,000 or so, and

4    this report showed if you deteriorated 500 or plus spots

11:21:06  5    on that report.

6              Now, you can deteriorate by using more of

7    that -- dispensing more of that medication that they're

8    looking at; for instance, Oxycodone.

9              You can also appear on this report if you

11:21:23  10   dispense the same number of pills or if you dispensed a

11   lesser amount of pills, depending upon how the stores

12   above and below you dispensed that month.

13             So it was somewhat useful.

14   Q.    Okay.  So on to another subject, sir.

11:21:46  15             Were you aware that Walgreens, in 2012,

16   used their corporate dispensing data to rank the top 500

17   potentially risk -- risky stores using a risk index for

18   Oxycodone dispensing?

19   A.    I -- I don't remember that, no.

11:22:02  20   Q.    Do you recall whether any of your Trumbull County

21   stores were analyzed for Oxycodone prescription in terms

22   of the risk index?

23   A.    Not that I remember.

24             I don't think so.

11:22:16  25   Q.    What about 9669?

Joyce - Cross/Weinberger                    2016

1    A.    That's in Trumbull County, so that would be a no.

2    Q.    Okay.  Were you made aware, sir, that in June,

3    2013, Walgreens entered into a settlement and memorandum

4    of understanding with the DEA?

11:22:41  5    A.    I read it in the paper, yes.

6    Q.    Were you ever provided a copy of the memorandum of

7    understanding?

8    A.    No.  They didn't send me a copy of the memorandum

9    of understanding.

11:22:52 10    Q.    Well, let me hand it to you, sir, and just

11    ask -- so I could ask you whether or not, seeing the

12    document itself --

13    A.    Sure.

14    Q.    -- refreshes your memory.

11:23:05 15                P 0015.

16    A.    I'm sorry, are we looking at it -- okay.  I got

17    you.

18    Q.    So we're handing you, Maria is handing you P 0015,

19    it's a --

11:23:27 20    A.    Sure.

21    Q.    -- fairly thick document --

22    A.    It is.

23    Q.    -- entitled, "Settlement and Memorandum of

24    Agreement."

11:23:34 25    A.    Yes.

Joyce - Cross/Weinberger                                    2017

1    Q.    Have you ever seen this document before?

2    A.    No.

3    Q.    All right.  You never -- you were never given this

4    document by the Pharmaceutical Integrity department?

5    A.    Well, let me look at a couple pages here, but at my

6    level, unlikely.

7                    No, I never saw this.

8    Q.    Were you -- just take a look at -- let me give you

9    a page number.  I'm not going to ask you to read it out

10   loud.

11                   I just want you to take a look at Page 14

12   of 349.

13   A.    All right.

14   Q.    Okay?

15   A.    Yep.  Got it.

16   Q.    This is an addendum to the agreement, and it's

17   entitled, "Prospective compliance."

18                   And you see what the first paragraph says

19   about Walgreens maintaining the following specific

20   compliance measures?

21                   Do you see that?

22   A.    I do.

23   Q.    At any point in time in webinars or communications

24   with Tasha Polster or her department, did you become

25   aware of the fact that on a going-forward basis from the

1    date of this agreement in 2013, Walgreens had promised to

2    the DEA that they would comply with certain terms and

3    regulations?

4    A.    No.

11:25:07  5    Q.    Okay.  You can put that aside.

6              Now, are you familiar with the checklist

7    form entitled "Target drug good faith checklist"?

8    A.    Yes.

9    Q.    This is the checklist referred to, I think, in

11:25:29 10    prior testimony, right?

11    A.    Yes.

12    Q.    Okay.  This is a checklist that documents the

13    resolution of red flags in checklist form with respect to

14    certain targeted drugs.

11:25:45 15              Right?

16    A.    Yes.

17    Q.    Okay.  Let me hand you P 15068.

18              MR. STOFFELMAYR:  Judge, I'm sure it's

19    unintentional but, Mr. Weinberger, I think your notes are

11:26:00 20    visible on the screen.  I don't think you intended to

21    ask --

22              MR. WEINBERGER:  I'm sorry?

23              MR. STOFFELMAYR:  Your notes are --

24              MR. WEINBERGER:  Oh, I'm sorry.  I'm sorry.

11:26:24 25    BY MR. WEINBERGER:

Joyce - Cross/Weinberger                                    2019

1   Q.   So take a look, sir, at Page 9 of 15068.

2   A.   Sure.

3   Q.   Do you have that in front of you?

4   A.   I do.

11:26:41  5   Q.   Is this an example of the Target Drug Good Faith

6   Dispensing Checklist?

7   A.   It is.

8   Q.   So is this generally the case that the target

9   group -- Target Drug Good Faith Dispensing Checklist has

11:27:12  10   both a section for the technician to complete and for the

11   pharmacist to complete?

12   A.   Yes.

13   Q.   And, you know, we really haven't told the jury much

14   about the role of a technician.

11:27:25  15        What is the role of the technician in

16   pharmacy practice?

17   A.   To assist the pharmacist in all of his duties with

18   the exception of taking, in Ohio, taking original

19   prescriptions and counseling patients.

11:27:41  20        They can even, if licensed to, immunize now

21   and they are licensed by the State of Ohio now.  So they

22   do most of what the pharmacist does, with a few

23   exceptions.

24   Q.   All right.  So that this form indicates what drugs

11:28:06  25   the form is intended to be used for.

Joyce - Cross/Weinberger                                    2020

1              Correct?

2    A.    Correct.

3    Q.    Oxycodone, right?

4    A.    Um-hmm.

11:28:14  5    Q.    And a brand name for Oxycodone would be, what,

6    OxyContin?

7    A.    Correct.

8    Q.    And Hydromorphone.

9              Give us a brand name for Hydromorphone?

11:28:26 10    A.    Hydromorphone, I think is Dilaudid.

11    Q.    Dilaudid?

12    A.    I think.  I'm just trying to remember.

13    Q.    Okay.

14    A.    I could look it up on my phone real quick for you.

11:28:46 15    Q.    And then Methadone, right?

16    A.    Yes.

17    Q.    And there's an opioid that we've talked a lot about

18    in this case which is known as Hydrocodone, right?

19    A.    Sure.

11:29:04 20    Q.    And Hydrocodone generally is an opioid that comes

21    as a combination product, right?

22    A.    Yes.  With -- with Acetaminophen or Tylenol.

23    Q.    Right.  It's combined with Tylenol, right?

24    A.    Or -- or Ibuprofen.

11:29:19 25    Q.    And it has a number of brand names, right, such as

Joyce - Cross/Weinberger                    2021

1    Vicodin?

2    A.    Um-hmm.

3    Q.    Yes?

4    A.    Yes.   Um-hmm.

11:29:28 5   Q.    Any others?

6    A.    Vicodin ES.

7    Q.    Anything else?

8    A.    Not off the top of my head.

9    Q.    So yesterday in court, Mr. Rannazzisi, head of the

11:29:45 10  division of Diversion Control, told the jury that

11   Hydrocodone and Hydrocodone products is the number one

12   prescribed drug, not just opioids, but the number one

13   prescribed drugs in our country.

14              Were you aware of that?

11:30:04 15  A.    No, but it wouldn't surprise me.

16   Q.    Okay.  And this form -- and can we agree that

17   Hydrocodone, like Vicodin, is frequently dispensed at

18   your Walgreen stores?

19   A.    Sure.

11:30:22 20  Q.    This form and this process of target drug Good

21   Faith Dispensing does not apply to Hydrocodone products,

22   right?

23   A.    It's not on here.

24   Q.    So the answer is it doesn't apply, right?

11:30:37 25  A.    It doesn't.

Joyce - Cross/Weinberger                    2022

1          There's a space for optional.  A district

2     could use that, but I think this form focused on Class II

3     drugs, not Class III drugs --

4     Q.    Well --

11:30:51  5     A.    -- which have a higher potential for addiction.

6     Q.    Before 2014, Hydrocodone combination products were

7     a Class III opioid, right?

8     A.    Correct.

9     Q.    And after 2014, the DEA changed the classification

11:31:09 10     of Hydrocodone and Hydrocodone combination products to a

11     Class II, correct?

12     A.    Yes.  Yes.

13     Q.    And that was out of a recognition that Hydrocodone

14     combination products have addictive properties, right?

11:31:29 15     A.    Sure.

16     Q.    And can be very dangerous, right?

17     A.    Well, the recognition of it being addictive,

18     anything that has a C in front of it is addictive, Class

19     II, Class III, Class IV, Class V.

11:31:43 20          It's the -- it's the abuse potential and

21     the likelihood of addiction.  So nothing changed with

22     Hydrocodone, but I think the abuse potential obviously

23     increased.

24          You can look at the charts we saw over the

11:32:01 25     last couple of days and see that that's the reason, I

Joyce - Cross/Weinberger                    2023

1    believe, they changed it to a C-II.

2    Q.    Right.  There was a recognition during the ramp-up

3    of the opioid epidemic that Hydrocodone, in terms of

4    diversion of that drug, was a significant factor in the

11:32:21  5    ramp-up of the epidemic, correct?

6    A.    Sure.

7    Q.    So knowing that, however, Walgreens chose not to

8    put Hydrocodone on this list for using this particular

9    checklist, right?

11:32:38 10    A.    I think they put it on a later version of this.

11    Q.    When?

12    A.    I don't know exactly, but this would -- this was

13    not -- I think this was fluid, but they could change the

14    drugs on here.

11:32:51 15                So I think a later version did have

16    Hydrocodone on there.

17    Q.    But you don't know when?

18    A.    No, sir.

19    Q.    So this first box for the technician asks the

11:33:12 20    question whether or not a valid Government photo ID was

21    copied and attached to a hard copy of the script.

22                Right?

23    A.    Yes.

24    Q.    "Yes or no," right?

11:33:24 25    A.    Yes.

Joyce - Cross/Weinberger                           2024

1    Q.    And the second question is, "No prior Good Faith

2    Dispensing refusal for this exact prescription in the

3    patient comments file."

4              Right?

11:33:35  5    A.    Yes.

6    Q.    "Yes or no," right?

7    A.    Yes.

8    Q.    Number three is, "The patient has received this

9    prescription from Walgreens before, yes or no," right?

11:33:45 10    A.    Yes.

11    Q.    Fourth, "The prescription is from the same

12    prescriber for the same medication as the previous fill."

13              Right?

14    A.    Yes.

11:33:54 15    Q.    "Third-party insurance is billed.  If cash or cash

16    discount, use caution."

17              Right?

18    A.    Correct.

19    Q.    "Yes or no."

11:34:05 20              And "The patient does not appear

21    intoxicated or under the influence of illicit drugs."

22              Right?

23    A.    Correct.

24    Q.    So all of these checkboxes relate to potential red

11:34:22 25    flags, right?

Joyce - Cross/Weinberger                          2025

```
 1    A.    Sure.

 2    Q.    And then steps for the pharmacist to complete,

 3    number seven, "If available, review the PDMP," right?

 4    A.    Yes.

 5    Q.    By the way -- well, strike that.

 6                "If your state regulates early refills of

 7    controlled substance prescriptions, follow your state

 8    regulations."

 9                Answer that "Yes or no," right?

10    A.    Yes.

11    Q.    "The patient or the prescriber address is within

12    geographical proximity to the pharmacy.  Any variances

13    can be explained."

14                Have I read that correctly?

15    A.    You have.

16    Q.    "Chronic prescription use can be explained and is

17    supported by documentation, ICD code or diagnosis

18    consistent with a chronic pain condition."

19                Have I read that correctly?

20    A.    You have.

21    Q.    The ICD code is a diagnostic code, right?

22    A.    Yeah.  The doctors use that, I think, for billing

23    purposes.

24    Q.    Right.  But usually the ICD code is not on the

25    prescription, is it?
```

11:34:32  (line 5)
11:34:48  (line 10)
11:34:59  (line 15)
11:35:15  (line 20)
11:35:26  (line 25)

1    A.    No.  We -- it's -- it's on the prescription, or the

2    pharmacist would call and get it on the prescription.

3    Q.    Okay.  Fair enough.

4          And then it says, "Per CDC recommendation,

11:35:38 5   Naloxone was offered to the patient in case of an

6    emergency for prescriptions of greater than 50 Morphine

7    Milligram Equivalents.  Yes or no."

8          Right?

9    A.    Yes.

11:35:53 10  Q.    And so then it goes on to say, "If in your

11   professional judgment a call to the prescriber's clinical

12   staff is warranted, document conversation in note

13   section.  If no call is required, complete this form with

14   your signature."

11:36:08 15        Do you see that?

16   A.    I do.

17   Q.    Now, if we go back to the chart we looked at

18   yesterday, 26321, do you have the exhibits up there from

19   yesterday?

11:36:45 20  A.    No.

21         MR. WEINBERGER:  Maria, could you assist

22   him?

23   A.    I might.  What's the number on it?

24   Q.    26321.

11:37:06 25  A.    Okay.

              1    Q.    So look at the second page of 26321.

              2    A.    All right.

              3    Q.    This chart breaks down the Oxycodone versus the

              4    Hydrocodone dispensed by the Trumbull County -- the Lake

 11:37:51     5    County as well as the Trumbull County stores from 2006 to

              6    2019.

              7              Do you see that?

              8    A.    I do.

              9    Q.    Yes?

 11:38:01    10    A.    I do.

             11    Q.    Okay.  And if we look over on the very last column

             12    where I've highlighted, from -- for that 13-year period

             13    of time, Store 5549 dispensed over five million

             14    Hydrocodone pills, right?

 11:38:29    15    A.    Looks that way, yep.

             16    Q.    Store 9077 dispensed 2,711 --

             17    A.    Two million.

             18    Q.    2 million 711 -- here goes my math -- 2,711,000

             19    pills, right?

 11:38:49    20    A.    2,714,950.

             21    Q.    All right.  Very good.

             22              And Store 6888, 2,826,000, right?

             23    A.    Sure.

             24    Q.    And Store 10569, 1,948,000, right?

 11:39:09    25    A.    Correct.

1    Q.    And Store 11730, 1,651,000, right?

2    A.    Yep.

3    Q.    And Store 9669, 974,000, right?

4    A.    Yes.

11:39:26 5    Q.    Would it be fair to say -- well, first of all,

6    during this entire 13-year period of time, Walgreens was

7    not using this Target Drug Good Faith Dispensing

8    Checklist at all, right?

9    A.    Yeah, we were.

11:39:45 10   Q.    For this entire 13-year period of time?

11   A.    Starting from -- let's look at -- what was the date

12   again?

13   Q.    From 2006 --

14   A.    Oh, maybe not from 2006, but for a good portion of

11:39:57 15  that we were.

16          And like I think, I explained yesterday,

17   this is what pharmacists do every day, whether you have a

18   form in front of them or not.

19          I did it in 1981, and I did it in 1991, I

11:40:09 20  did it in 2001.  This is what pharmacists do every day.

21   Q.    Well, was corporate concerned about whether or

22   not -- strike that.

23          Did corporate ever -- did -- strike that.

24          Did the Pharmaceutical Integrity department

11:40:27 25  ever inform district managers and pharmacy supervisors

1    like you that they were concerned about whether or not

2    the pharmacists were actually complying with Good Faith

3    Dispensing practices?

4    A.    I don't remember.

11:40:45  5              I -- that was kind of my job to make sure

6    this was going on.

7              I hired, like I said, we had good people.

8    We had good pharmacists at our stores.  We had good

9    technicians.  And we did a good job evaluating

11:40:59 10   prescriptions.

11   Q.    Well, do you know whether or not the genesis of

12   this form -- first of all, this form came from the

13   Pharmaceutical Integrity department, right?

14   A.    I believe it did.

11:41:12 15   Q.    Right.  And was the genesis of the form a concern

16   from Pharmaceutical Integrity that pharmacists were not

17   carrying out their corresponding responsibility and that

18   they were -- and they were concerned, also, about

19   documentation?

11:41:31 20   A.    I don't think I know the answer to that.

21              That would be a question for another

22   person, I think.

23   Q.    All right.  Well, we'll ask Ms. Polster about it.

24              The Target Drug Good Faith Dispensing

11:41:52 25   Checklist, you will agree, was Walgreens' way of

Joyce - Cross/Weinberger

2030

1    documenting the resolution of red flags, right?

2    A.    I would agree with that, yes.

3    Q.    And we've also agreed that it's not used normally

4    or applicable to Hydrocodone, right?

11:42:06  5    A.    That form, no.

6    Q.    Right.

7    A.    But a pharmacist still does it.

8                That's part of their duties as a

9    pharmacist.

11:42:15 10    Q.    Right.  So every prescription for these three

11    opioids, Oxycodone, Hydromorphone, and Methadone,

12    dispensed from your stores should have a completed TD GFD

13    checklist, true?

14    A.    Yes.

11:42:45 15    Q.    And if we looked at a random sample of these three

16    drugs dispensed out of your stores and a number of those

17    prescriptions for those drugs did not contain a Target

18    Drug Good Faith Dispensing Checklist, that would be

19    evidence that your pharmacists were not complying with

11:43:20 20    Walgreens' policy, right?

21    A.    Walgreens' policy, yes.

22    Q.    So the Target Drug Good Faith Dispensing Checklist

23    was Walgreens' method of documenting the resolution of

24    red flags.

11:44:00 25                True or false?

Joyce - Cross/Weinberger                    2031

 1    A.    True.

 2    Q.    If a Target Drug Good Faith Dispensing Checklist

 3    was not completed for an Oxycodone prescription, the

 4    policy was violated.

11:44:16  5             Right?

 6    A.    True.

 7    Q.    And the Target Drug Good Faith Dispensing Checklist

 8    was not used to resolve red flags for Hydrocodone

 9    scripts.

11:44:33 10             True?

11    A.    Ask me that one more time.

12    Q.    I'm sorry?

13    A.    Could you ask me that one more time?

14    Q.    Yes.

11:44:40 15             The Target Drug Good Faith Dispensing

16    Checklist was not used to resolve red flags for

17    Hydrocodone scripts.

18             Right?

19    A.    The form, no.

11:44:53 20             The process, yes.

21    Q.    Okay.  Well, I've asked you about the checklist, so

22    that's true, right?

23    A.    True.

24    Q.    By the way, the target drug Good Faith Dispensing

11:45:13 25    forms, I think you told us this before, are hard copies

1    not scanned into the system, into the computer system?

2    A.    I believe that's correct.

3              I think they're electronic now, though.  I

4    think they're built into the system.

11:45:27  5    Q.    Right.

6    A.    So you do it as you're filling the prescription

7    now.

8    Q.    As of 2019, they're electronic in form.

9              True?

11:45:35 10    A.    Sounds about right date-wise.

11    Q.    Okay.  And before they were electronic in form,

12    there would be no way to pull up these checklists later

13    on with respect to a particular patient and a new

14    prescription.

11:45:51 15              Right?

16    A.    No.  They were -- they were filed and they could

17    refer back to them if they needed to, and they would put

18    a comment like, on the patient comment section of filling

19    a prescription.

11:46:03 20    Q.    All right.  Well, let's --

21    A.    So it would take some effort, but they

22    could -- they could resurrect that form, I believe.

23    Q.    So let's assume we've got a patient who fills a

24    script at Store 5549, 804 West Market Street.

11:46:26 25    A.    Yeah.

          1    Q.    A script for Oxycodone.   Okay?

          2    A.    Sure.

          3    Q.    Say January 1st, 2020.   Okay?

          4          And the -- or let's say 2018, because we

11:46:41  5    talked about 2019 being when this was maybe in electronic

          6    form.

          7          Let's go to 2018 or '17.

          8          Script filled at this store.  A checklist

          9    is filled out in a hard copy and stored in that store.

11:46:59 10          Right?

         11    A.    I believe it was stored.  It could have been

         12    scanned in, but I believe it was stored manually.

         13    Q.    All right.  Now you're saying maybe it was scanned.

         14          Which was it, sir?

11:47:10 15    A.    I'm remembering the best I can.

         16    Q.    I know you can't remember back 10 years, and I've

         17    got the same problem, okay?

         18    A.    Okay.

         19    Q.    I'm just saying, we're just talking three, four

11:47:19 20    years ago.  Okay?

         21    A.    Yeah.

         22    Q.    So was it scanned or wasn't it?

         23    A.    May have been.  May have been hard copy.  I'm not

         24    positive.

11:47:28 25    Q.    All right.

1    A.    I'm giving you an honest answer.

2    Q.    Follow me if you will then, Mr. Joyce.

3                So let's say six months later, that same

4    patient, instead of going to the West Market Street store

11:47:41  5    goes to the Elm Street, Elm Road store, to fill another

6    prescription of Oxycodone.

7                Okay.  With me so far?

8    A.    I'm following you.

9    Q.    All right.  That pharmacist at the Elm Road store

11:47:55 10    would not be able to retrieve the hard copy of the

11    checklist because it was being stored at the other store.

12                Right?

13    A.    Or if they happened to scan it --

14    Q.    Can you just answer my question?

11:48:08 15    A.    I'm trying to.

16    Q.    I'm talking about the hard copy.

17    A.    Yeah.

18    Q.    Okay?  The Elm Road pharmacist, six months later,

19    would not be able to retrieve and view the hard copy of

11:48:21 20    the checklist.

21                True?

22    A.    They may be able to, if the pharmacist had scanned

23    it in.

24                If you are denied a prescription on a Good

11:48:31 25    Faith Dispensing, they would enter it in the comments,

Joyce - Cross/Weinberger                          2035

1    and the next pharmacist would read that.

2                   So they couldn't, like, fill a prescription

3    for that same drug.

4    Q.    There's so much there we can't unpack that, sir.

11:48:43 5    A.    Hey, it's a complicated business.  It's highly

6    regulated.

7                   That's pharmacy.

8    Q.    Now you're telling us that if the prescription is

9    not filled, that's when it gets scanned?

11:48:53 10   A.    No, I didn't say that.

11   Q.    All right.  Well, maybe I'm just confused.

12   A.    So if someone hands you a prescription, pharmacist

13   goes through a Good Faith Dispensing and says, I'm not

14   filling this, the prescription goes back to the customer.

11:49:09 15                   You enter a comment into the patient screen

16   that says, you know, "Prescription rejected for Percocet

17   11/1/19."

18                   So if the guy walks down the street and

19   goes into another Walgreen store, the pharmacist would

11:49:24 20   pull that customer up, he'd see the comment in there.

21   Q.    Sir, let's move on to something else.

22   A.    Okay.

23   Q.    Did you know that in December of 2014, Walgreens

24   performed an internal audit to assess whether Walgreens

11:49:45 25   was complying with the terms of the 2013 settlement

1    agreement with the DEA?

2    A.    I have no recollection of that.

3    Q.    You've certainly never seen a copy of the internal

4    audit, right?

11:50:00  5    A.    I don't believe so.

6    Q.    That's above your pay grade?

7    A.    Yes, sir.

8    Q.    You've never been informed by Pharmaceutical

9    Integrity about the results of that audit?

11:50:11 10    A.    Not that I recall, no.

11    Q.    You became a district manager at Walgreens in April

12    of 2015.

13             Right?

14    A.    Sounds right, yep.

11:50:21 15    Q.    And in that role, you participated in monthly

16    district manager webinars, didn't you?

17    A.    I'm not -- I don't think so.

18    Q.    Well, take a look at 15085.

19    A.    Okay, good.

11:51:08 20    Q.    So this is 15085.

21    A.    Sure.

22    Q.    And this is an e-mail that reflects monthly

23    district manager webinars, right?

24    A.    Yeah.  Could have been for one market, though.

11:51:34 25             Not necessarily for the whole company.

               1                    I don't remember these, and I don't know

               2      these people on this e-mail trail, so I don't think this

               3      was for us.

               4      Q.    So you're saying that webinars were conducted for

11:51:49       5      different parts of the country?

               6      A.    Sometimes.

               7      Q.    Um-hmm.

               8      A.    You know, the pharmacy business is, to some degree,

               9      state-specific, so they might have reasons to do this in

11:52:07      10      Texas but not in Oklahoma, or in Ohio but not Washington.

              11      Q.    Well, what is -- let's take a look at this e-mail,

              12      Natasha Polster to Edward Bratton, Eric Stahmann.

              13      A.    What page are we on?

              14      Q.    We're on the second page.

11:52:36      15      A.    Okay.

              16      Q.    I put it up on the screen.

              17      A.    Okay.

              18      Q.    And it says, "We've been given time on the monthly

              19      district managers webinar."

11:52:52      20                    And it says the webinar date is September

              21      21st, and this is in 2015.

              22      A.    Okay.

              23      Q.    Do you see that?

              24      A.    I do.

11:53:06      25      Q.    So is there any indication in this e-mail chain, at

1   least, that this is only being -- only a webinar for a

2   certain region of Walgreens' operations?

3   A.   No.

4   Q.   So the webinar was given by the Rx Integrity

11:53:32 5   Manager of Western Operations, but it's entitled "Good

6   Faith Dispensing district manager webinar."

7            Right?

8   A.   Correct.

9   Q.   So if you were diligent as a district manager in

11:53:47 10   attending monthly district manager webinars, you would

11   have attended this one.

12            Right?

13   A.   We were not in Western Operations.

14            MR. STOFFELMAYR:  Objection, Your Honor.

11:53:57 15            THE COURT:  Hold it.  Hold it.

16            Overruled.  I'll allow the answer.

17   A.   Western Operations, I'm not sure that was for us.

18   BY MR. WEINBERGER:

19   Q.   Sir, that's the title of the presenter.

11:54:15 20            It doesn't say anything in this title, or

21   you can look at the rest of it, and it doesn't say

22   anything about it being specific to a particular region,

23   does it?

24   A.   No, but I'm guessing that's who it was for.

11:54:33 25   Q.   Well, sir, this presentation talks about the

1    Administrative Memorandum of Agreement with the DEA,

2    right?

3    A.    It does.

4    Q.    And that was a Memorandum of Agreement that applied

11:54:55  5    to Walgreens nationally, right?

6    A.    I think so.

7    Q.    Right.  And it -- it went into effect out of a

8    recognition that the dispensing policies of Walgreens for

9    controlled substances are national policies, right?

11:55:15  10                   MR. STOFFELMAYR:  Objection, Your Honor.

11                   This is now three levels removed from the

12    witness's personal knowledge.

13                   THE COURT:  Well, overruled.

14    A.    I have no idea.

11:55:22  15    BY MR. WEINBERGER:

16    Q.    Sir, are there policies for Walgreens stores by

17    region with respect to dispensing controlled substances?

18    A.    If they are related to state laws, yes.

19                   There's 50 Boards of Pharmacy.

11:55:39  20    Q.    Right.  But in terms of the national -- in terms of

21    the corresponding responsibility applicable to stores

22    around the country under the control, the federal

23    Controlled Substances Act, there are national policies

24    issued by Walgreens, true?

11:55:57  25    A.    Yeah, I believe so, and it's in the oath you take

1   when you become a pharmacist.

2   Q.    Right.  So in this slide it says that Walgreens

3   agreed to the following obligations.

4                 "Walgreens to maintain a compliance program

11:56:11  5   to detect and prevent diversion of controlled substances

6   as required by the CSA" -- that's the federal Act, right?

7   A.    The Controlled Substances Act, yes.

8   Q.    -- "and the applicable DEA regulations.  Includes

9   procedures to identify the common signs associated with

11:56:33 10   the diversion of controlled substances."

11                 Right?

12   A.    Yes.

13   Q.    Red flags, right?

14   A.    Could be, sure.

11:56:43 15   Q.    Um-hmm.

16                 MR. STOFFELMAYR:  Judge, I'm going to

17   object to just reading out loud a document the witness

18   has never seen before.

19                 THE COURT:  Well, hold it.  Let's go on the

11:56:52 20   microphones -- the headphones, I mean.

21                 (Proceedings at side-bar:)

22                 MR. STOFFELMAYR:  Judge, there will be

23   plenty of witnesses familiar with this document who can

24   testify about it.

11:57:29 25                 To read it out loud to somebody who has

1    never seen it before, it's pretty clear from his

2    testimony probably he wasn't at the presentation,

3    although we'll never know that for sure, it's improper.

4                    THE COURT:  Well, Mr. Stoffelmayr, I'm

11:57:43  5    inclined to allow these questions.

6                         First, the witness has been very vague.

7                         It sounds like he was there or should have

8    been there.  He hasn't given a good explanation why he

9    wasn't there.

11:57:58 10                    And I think Mr. Weinberger -- I understand

11    where he's going with this, and I think he can inquire

12    whether -- whether this witness was given these

13    instructions, all right, by corporate, and

14    whether -- whether he was or he wasn't, I think, is part

11:58:23 15    of plaintiffs' case.

16                         So I'm -- this is something that he should

17    have been at, it appears to me, or should have -- or

18    should remember, or at least had been instructed, so I'll

19    allow the questions.

11:58:38 20                    MR. STOFFELMAYR:  Just so we're clear, Your

21    Honor, there's no reason to think he should have been at

22    that.

23                         As he explained from the face of the

24    document, it looks to him that this is a presentation for

11:58:48 25    district managers in a different part of the country, and

1    he's explained that --

2                THE COURT:  Mr. Weinberger can ask him was

3    he given the same instructions.  It's a national

4    agreement, a national obligation, so I mean on the face

5    of it there's no reason to believe that Walgreens would

6    have only told the people in the west about this.

7                So I'm going to allow these questions, over

8    the objection.

9                MR. WEINBERGER:  Your Honor, do you want to

10   break at this point in time?  It's noon.

11               THE COURT:  Oh, well, it's up to you.

12               If you were -- if you think it's a

13   convenient time, fine.

14               I didn't want to cut you off in the middle

15   of --

16               MR. WEINBERGER:  Let me just finish with

17   this document.

18               THE COURT:  All right.  Okay.  Fine.

19               MR. STOFFELMAYR:  Could I ask how much

20   longer we have?  The gentleman has been here for several

21   days now.

22               He's retired.  I think he would like to get

23   home today.

24               MR. WEINBERGER:  Well, I've only got maybe

25   another 45 minutes after, after lunch.

```
         1              THE COURT:  Okay.

         2              MR. STOFFELMAYR:  That will bring us to six

         3    hours with him?

         4              THE COURT:  Well, I don't know if he's been

11:59:50 5    six hours.

         6              Well, I guess he was about two-and-a-half

         7    yesterday, so five or some hours.

         8              All right.  Then maybe six.  So whatever.

         9    It's charged to the plaintiff.

12:00:01 10             MR. WEINBERGER:  He's the district manager

        11    of the stores at issue in this case.

        12              THE COURT:  All right.  Mr. Weinberger,

        13    let's wrap up with this document then.

        14              MR. WEINBERGER:  Okay.

12:00:12 15             THE COURT:  And then we'll break for lunch.

        16              MR. WEINBERGER:  Okay.

        17              (End of side-bar conference.)

        18    BY MR. WEINBERGER:

        19    Q.    So we're going to go through this document and then

12:00:28 20   break for lunch.

        21              So to finish up on this page, it says --

        22    A.    What page are we on here?

        23    Q.    We're on Page 5.

        24    A.    Okay.

12:00:45 25   Q.    All right?
```

1    A.    Yep.

2    Q.    This is under the Administrative Memorandum of

3    Agreement.

4              The next bullet point is that Walgreens is

12:00:55  5    to maintain a compliance program "To implement and

6    maintain policies and procedures to ensure that

7    prescriptions for controlled substances are only

8    dispensed to authorized individuals."

9              Have I read that correctly?

12:01:09  10   A.    You have.

11   Q.    The next slide says, "Basic control initiative.  In

12   order to check if stores are compliant with the

13   policies/procedures put in place per the Memorandum of

14   Agreement, a sample size audit was conducted in June.

12:01:45  15             "Roughly 2,400 stores" -- by the way, how

16   many Walgreens stores are there across the country?

17   A.    Today?

18             10,000.

19   Q.    "Roughly 2,400 stores were audited for compliance

12:02:02  20   on various Good Faith Dispensing and target drug Good

21   Faith Dispensing policies and procedures.

22             "The results were unfavorable."

23             Were you aware of that, sir?

24   A.    No.  I haven't seen this before.

12:02:24  25   Q.    It continues to say, "When target drug

1    prescriptions were dispensed, pharmacy team members were

2    responsible for completing the Target Drug Good Faith

3    Dispensing Checklist.

4                "The number of stores from the roughly

12:02:44  5    2,400 that were audited that correctly had completed a TD

6    GFD checklist attached to filled TD prescription hard

7    copies, 2,400 stores audited, a compliance rate of 59.6."

8                Have I read that correctly?

9    A.    You have.

12:03:05 10                THE COURT:  I think it was 59.5.

11                MR. WEINBERGER:  You're right.  59.5.

12                MR. STOFFELMAYR:  Judge, don't we need a

13    question other than "Did I read that correctly" because

14    he was just reading out loud.

12:03:19 15                THE COURT:  I assume there's going to be a

16    question with that.

17    BY MR. WEINBERGER:

18    Q.    Sir, were you aware of this compliance rate at your

19    own stores?

12:03:25 20    A.    No.

21    Q.    Did you ever yourself audit your own stores to see

22    whether or not there was compliance with the policies

23    required for this checklist?

24    A.    Sure.

12:03:40 25    Q.    And so did you go through it

           1    prescription-by-prescription for every controlled

           2    substance covered by the form on a monthly basis?

           3    A.    No.

           4    Q.    You did that during your couple times a month

12:03:58   5    visiting each store?

           6    A.    Yeah.

           7    Q.    Um-hmm.  This PowerPoint goes on to say, "If the

           8    pharmacist determines that a -- determines that a TD

           9    prescription does not meet GFD requirements, a copy of

12:04:18  10    the refused prescription and completed TD GFD checklist

          11    must be in the designated refuse -- refusal file folder.

          12              "Number of stores that had correctly

          13    completed this and attached to the refused TD

          14    prescriptions, 1,820, a 75 percent -- 75.7 percent

12:04:43  15    compliance rate."

          16              Did you ever compare that to your stores?

          17    A.    I never saw this.

          18    Q.    This PowerPoint then had this summary.

          19              "If the pharmacist determines that a TG

12:05:08  20    prescription does not meet GFD requirements, a copy of

          21    the refused prescription and completed TD GFD checklist

          22    must be in the designated refusal file folder.

          23              "After reviewing the refusal file folders

          24    for the calendar year 2015, how many refused TD

12:05:32  25    prescriptions were identified?"

1                    Out of the 2,400 audited stores, it says

2     1,160 had zero refused prescriptions.

3                    Have I read that correctly?

4     A.   You have.

12:05:48  5   Q.   271 stores had one refused prescription, correct?

6     A.   Yes.

7     Q.   502 stores had two to five for the calendar year

8     2015, correct?

9     A.   Yeah.

12:06:03 10   Q.   233 stores had six to 10 refused prescriptions,

11    correct?

12    A.   Sure.

13    Q.   176 had 11 to 25, right?

14    A.   Sure.

12:06:15 15   Q.   And 63 had 26 or more refused prescriptions.

16                    Have you compared that to your stores?

17    A.   I've never seen this before.

18    Q.   Have you done that work at your stores?

19                    Have you looked on a monthly basis

12:06:34 20   prescription-by-prescription for these checklist drugs to

21    determine what percentage of those scripts had refused

22    fillings?

23    A.   Early on I did, but if I knew a store was doing it,

24    I would then just spot check them.

12:06:58 25   Q.   When's the last time you actually did it on a

 1    monthly basis or for a whole month?

 2    A.    Years ago.

 3    Q.    Like how many?

 4    A.    On a monthly basis, maybe five years ago.

 5                    Or, or if a new pharmacy manager took over

 6    I'd do it then just to make sure, if you promoted

 7    someone, that they knew what they were doing.

 8    Q.    This slide goes on to say, this PowerPoint goes on

 9    to say, "What we need from leadership.  Leadership should

10    be checking for compliance on a regular basis."

11                    Have I read that correctly?

12    A.    You have.

13    Q.    Leadership includes you?

14    A.    Yeah.

15    Q.    "The decision to dispense a prescription is

16    ultimately up to the pharmacist.  However, proper

17    documentation to support the decision is needed."

18                    Do you agree with that statement, sir?

19    A.    Sure.

20    Q.    "It is important that pharmacists document all

21    actions taken during the Good Faith Dispensing process."

22                    Do you agree with that?

23    A.    Yeah, so if you call the doctor you might want to

24    put that down if there was something significant that the

25    doctor said to you.

Joyce - Cross/Weinberger                    2049

1    Q.    Now, you said that -- let me ask you this.

2                Sorry.

3                Are you familiar with the concept at

4    Walgreens of routine pharmacy walks?

12:08:40  5    A.    Routine pharmacy walks?

6    Q.    Yeah.  Routine pharmacy walks by the district

7    manager?

8    A.    Yeah, that's what I did during my visits.

9    Q.    So during your visits, a couple times a month per

12:08:56 10   store, you walked through the Walgreens store, right?

11   A.    Yeah.

12   Q.    And you walked through the front of the store,

13   right?

14   A.    Depending upon what the issues were at the store, I

12:09:11 15   might go in and sit in the office and talk about one

16   person that worked in the store.

17                I might do the front end and pharmacy.  I

18   might include the stockroom and restrooms.  I might only

19   go to the pharmacy.

12:09:24 20                It just depended on what needed done.

21   Q.    Do you, sir, make any record of your visits?

22   A.    Yes.

23   Q.    How do you make that record?  On a computer?

24   A.    Sure.

12:09:42 25   Q.    And where are those records -- are those records

1    kept at Walgreens corporate?

2    A.    No.  No.  No.

3              They're my records.  I send a copy to the

4    store, and I had a record on my laptop.

12:09:58 5    Q.    Have you produced those records in this case?

6    A.    I didn't produce any records in this case.

7              MR. WEINBERGER:  I think now's a good time

8    to stop, Your Honor.

9              THE COURT:  Okay.  Ladies and gentlemen,

12:10:12 10   we'll take our lunch break until 1:10.

11             Usual admonitions.

12             And then we'll pick up with the balance of

13   Mr. Joyce.

14             Have a good lunch.

12:10:22 15             (Jury out.)

16             (Luncheon recess taken.)

17             (Proceedings concluded at 12:11 p.m.)

18                  -   -   -   -

19

13:10:18 20

21

22

23

24

13:11:58 25

```
 1              THURSDAY, OCTOBER 14, 2021, 1:11 P.M.

 2                   (Jury in.)

 3                   THE COURT:  All right.  Please be seated.

 4                   Mr. Joyce, you're still under oath from

 5         this morning.

 6                   And, Mr. Weinberger, you may continue.

 7                   MR. WEINBERGER:  Yes, sir.

 8                   Thank you, Your Honor.

 9            CROSS-EXAMINATION OF BRIAN JOYCE (RESUMED)

10         BY MR. WEINBERGER:

11         Q.    Mr. Joyce, I want to take you back to 2012, when

12         you were pharmacy supervisor.

13                   And do you recall that Walgreens corporate

14         came up with an action plan for the pharmacies in market

15         region -- in Market 29?

16         A.    I don't, but that doesn't surprise me.

17                   There's plenty of action plans at

18         Walgreens.

19         Q.    Okay.  So we're going to hand you P 24019.

20                   So the very first page of 24019 has the

21         e-mails to whom this was sent, and you see where it says

22         Market 29 Rx supervisor?

23         A.    I do.

24         Q.    That would be you, right?

25         A.    Yes.  Um-hmm.
```

Joyce - Cross/Weinberger                                    2052

1    Q.    And it says, "Here are the plans and assignments.

2    Look over -- look them over and update.  Please return by

3    September 12th."

4                   And so I want to go to the very next page

13:16:53  5    of this action plan for your stores in your -- under your

6    supervision, which included the Trumbull stores at the

7    time, right?

8    A.    Yes.

9    Q.    So it says, this page says, "Increase prescription

13:17:17 10    sales and prescription counts.  Action plan for Market

11    Number 29."

12                   Have I read that correctly?

13    A.    You have.

14    Q.    You remember, this is the plan project summary was,

13:17:30 15    "The following action plan will be put in place to

16    improve pharmacy sales and prescription counts.  The

17    action plans -- the action items selected for your store

18    were chosen after reviewing areas in the pharmacy and

19    store that may need improvement and may be contributing

13:17:48 20    to negatively trending prescription sales dollars and

21    sold prescriptions."

22                   Do you see that?

23    A.    I do.

24    Q.    This is 2012, right?

13:18:01 25    A.    Yeah.

1         This was sent out to the district managers

2    at the time.  I worked for Zagami, he's the third one

3    down, he's also a pharmacist.

4         So we would -- they would update these

5    action plans, and typically they would pick either for

6    work on in our market or in our district or in our

7    stores.

8    Q.   Right.  And go to the next page, the categories

9    include "Decrease wait times."

10        Do you see that?

11   A.   I do.

12   Q.   And includes "Improve C-II business and Suboxone

13   clinics," do you see that?

14   A.   I do.

15   Q.   So C-II business would be what we've been talking

16   about in court, which is the controlled substance Class

17   II drugs, right?

18   A.   It is, but this document is out for review.

19        It's -- I don't think it's a completed

20   document.

21   Q.   Okay.

22   A.   They want these guys to look over these things, and

23   it says on the first page "Look over and update and then

24   return."

25   Q.   So this --

Joyce - Cross/Weinberger                    2054

 1    A.    So --

 2    Q.    Sorry.

 3    A.    I don't believe this is a finished action plan.

 4          I think it's a starting point.

13:19:29  5    Q.    Okay.  Well, this is -- this is what has been

 6    produced to us that we're going to talk about today,

 7    okay?

 8    A.    I'm happy to talk about it, sure.

 9    Q.    And if you go to Page 6, it talks about external

13:19:49 10    programs, and one of the items is "doctor detailing."

11          Do you see that?

12    A.    Sure.

13    Q.    Now, having read your personnel evaluations, doctor

14    detailing was something that you did, right?

13:20:03 15    A.    No.

16          The pharmacy managers would do it at

17    individual stores.

18    Q.    And what does doctor detailing mean?

19    A.    Well, a pharmacist might go to a doctor's office

13:20:15 20    and introduce himself, and just familiarize the doctor

21    with what we had to offer at our stores; what he might

22    need us to carry, what immunizations we had available,

23    how many immunizers we had.

24          If it was a pediatrician, maybe we could

13:20:33 25    compound something special for him or flavor

Joyce - Cross/Weinberger                                    2055

1    prescriptions a certain way.

2                        Those sorts of things.

3    Q.    Would doctor detailing include making a

4    presentation to doctors who might prescribe controlled

13:20:52  5    substances in --

6    A.    I don't think so.

7    Q.    Well, do you know?

8    A.    I'm pretty sure that didn't happen.

9                        I never heard of that happening.  We didn't

13:21:00 10    do it in my district.

11    Q.    So going back to the "Improve C-II business and

12    Suboxone clinics," I forgot to ask you about Suboxone.

13                        Isn't Suboxone a drug used to treat opioid

14    addiction?

13:21:24 15    A.    Yes.  It's like the modern day version of a

16    Methadone clinic.

17    Q.    So was this -- is this category to detail Suboxone

18    clinics or to develop them within the store?

19    A.    No.  No.

13:21:40 20                        Detail a Suboxone clinic.

21                        I wasn't aware of any Suboxone clinics in

22    Ohio.  There might have been in New Jersey, different

23    state laws again.

24    Q.    Okay.  Let's say -- let's go on to Page 24 of this

13:22:06 25    plan for Market 29.

1              This is to "Increase overall customer

2     satisfaction," correct?

3     A.    Sure.

4     Q.    And it says, "The following action plan will be put

13:22:23 5     in place to improve overall customer satisfaction.  The

6     item -- action items selected for your store were chosen

7     after reviewing areas in your store that require

8     attention and improvement in order to positively affect

9     your overall customer satisfaction."

13:22:44 10              Have I read that correctly?

11    A.    You have.

12    Q.    It goes on to say, "Through a collaborative

13    agreement with the district manager, pharmacy supervisor,

14    loss prevention supervisor, and operations trainer, the

13:22:58 15    action items listed in the document were chosen for your

16    particular store needs."

17              Right?

18    A.    Yes.

19    Q.    And under this section of the action plan, there

13:23:16 20    are a number of items, and assigned to, due date, status,

21    and measure.

22              Right?

23    A.    Sure.  Yep.

24    Q.    And if you look at Page 26 for your stores, it

13:23:36 25    says, "Pharmacy wait times must be less than 15 minutes

1      at all times during the day."

2                      Do you see that?

3      A.   I do see that.

4      Q.   And it says that's assigned to the pharmacy manager

13:23:59  5   and the pharmacy staff.

6                      Right?

7      A.   Sure.

8      Q.   And that was a stated goal, right?

9      A.   That was a template that they were going to work

13:24:10 10   on, and get something together that we would use, which

11     may or may not include that.

12     Q.   So would it be -- do you have a memory of the fact

13     that in 2012, that was eventually implemented?

14     A.   I don't.

13:24:27 15              We had --

16     Q.   Was it -- is the 15-minute wait time, as you

17     understand it, a goal and a metric that Walgreens

18     corporate would like to see?

19     A.   It's a -- it's a measure, an average wait time

13:24:43 20   measure.

21                At some times it was 15 minutes, at times

22     it was 20.  It wasn't for any prescription at any time of

23     day.  I mean, that's impractical.  But at any time

24     between 4:00 and 7:00 o'clock you're not getting your

13:24:59 25   prescription in 15 minutes.  Between 12 and 1:00 o'clock,

1    when people are at lunch, you're not going to get your

2    prescription in 15 minutes.

3                 Overall, you know, if someone comes in at

4    9:00 o'clock in the morning you can bang out an inhaler

13:25:13 5    in 15 minutes, it's not a big deal.  So on average they

6    would like to have these wait times in 15 minutes, yes.

7    Q.    What about opioid prescriptions?

8    A.    Again, those took longer.  Some prescriptions took

9    longer than others.  You had insurance plans that would

13:25:28 10   ask for a prior authorization, and those might take eight

11   hours or two days to get a doctor to do a prior

12   authorization.

13   Q.    But if a patient came to the store seeking an

14   opioid prescription and wanted to wait for it, would you

13:25:43 15   try to get it out in 15 minutes?

16   A.    No.  There's somewhere in one of these documents,

17   there's something that says the one thing you do with an

18   opioid prescription is you tell the customer it might be

19   a little bit longer.

13:25:57 20                 So those things did typically take longer

21   because you had to do the Good Faith Dispensing, and you

22   might make a phone call or call one of your colleagues or

23   talk to the customer.

24   Q.    So was it a fairly standard practice for your

13:26:24 25   pharmacists to be able to fill an opioid prescription

1    within that 15-minute wait time?

2    A.    Was it -- did it often occur?

3    Q.    Yes.

4    A.    Probably not.

5          It could have occurred, depending upon the

6    circumstances, depending upon the store.

7          If it was Store 4605 and they're filling

8    500 scripts a day, it's probably not going to happen.  If

9    it's at 9669 in Hubbard, it's a newer store, filling 90 a

10   day, it could happen.

11   Q.    So do you remember an inquiry from the Governor's

12   office to Kyle Parker, the Executive Director of the Ohio

13   Board of Pharmacy, regarding pharmacy wait times?

14   A.    I do.

15   Q.    We're going to give you P 24022.

16          Do you have that in front of you?

17   A.    Sure.

18   Q.    So you received an e-mail from Mr. Parker, this is

19   about, oh, three or four months after the document we

20   just saw regarding action plans, and Mr. Parker had

21   received apparently a question from the Governor's

22   office.

23          He says, "Hey, all, I was posed a question

24   by the Governor's office re:  Retail pharmacy policy.

25   They were appalled to find that major retailers had a 15

Joyce - Cross/Weinberger                                    2060

1    minute policy on filling prescriptions, and/or

2    pharmacists were being punished for not filling enough

3    scripts per hour."

4              Have I read that correctly?

13:28:53 5   A.    You have.

6    Q.    "I remember about a year ago Rite Aid had something

7    similar, but thought this was dead.  This came out of

8    left field, but they want to convene the major chains to

9    meet about giving pharmacists time needed to fill scripts

13:29:08 10  safely, including checking of OARRS.  This did not come

11   from me, so I assume a cabinet member had a pharmacist

12   friend give them an earful.  They stated every time they

13   go to a pharmacy, the pharmacy is slammed, and feel that

14   the upcoming regs around Morphine equivalent dose, OARRS,

13:29:29 15  will create a public safety issue due to not enough time,

16   causing error.  Solutions they mentioned included tech

17   issues, scripts per hour ratios, et cetera."

18             What that's communicating is that in light

19   of mandatory OARRS checking, maybe there's a need to put

13:29:54 20  more people behind the pharmacy counter to allow more

21   people to fill scripts.

22             Do you recall that issue coming up?

23   A.    I remember this e-mail, sure.

24   Q.    Right.  And your response was, "Kyle, we don't have

13:30:11 25  any such policy."

1          Right?

2     A.    True.

3     Q.    And with respect to the action plan that was

4     seeking the goal of 15-minute fill policy, was that

13:30:26  5     ultimately concluded?

6     A.    I don't believe so.

7          We didn't have a 15-minute mandatory wait

8     time or punish pharmacists for taking longer than 15

9     minutes.

13:30:38 10          I'll tell you that in my district, our wait

11     times were 15, 16, 17 minutes on average, so I didn't

12     have a problem with that.

13          MR. WEINBERGER:  Your Honor, I pass the

14     witness.

13:30:56 15          THE COURT:  Okay.  All right.  This is

16     Mr. Stoffelmayr from Walgreens.

17          You may proceed.

18          MR. STOFFELMAYR:  Thank you, Your Honor.

19     REDIRECT EXAMINATION OF BRIAN JOYCE

13:31:38 20     BY MR. STOFFELMAYR:

21     Q.    Good afternoon, ladies and gentlemen.  Good

22     afternoon, Mr. Joyce.

23     A.    Hello.

24     Q.    How are you holding up?  I do not have too long,

13:31:46 25     but I do have some questions I need to ask you.

```
 1                      All right?

 2     A.    Sure.

 3     Q.    Let me start by filling in -- excuse me -- some of

 4     the details from your background.

 5                      Where are you from originally, sir?

 6     A.    Born in Youngstown, Ohio, grew up in Liberty

 7     Township, which is just north of the city line.

 8     Q.    Have you spent your whole life in the Youngstown

 9     area?

10     A.    Other than college in Toledo.

11     Q.    Okay.  You said you went to the University of

12     Toledo, correct?

13     A.    I did.

14     Q.    And you said a couple times you are retired.

15                      Is anyone paying you to be here today or

16     yesterday?

17     A.    No.

18     Q.    Sorry?

19     A.    No.

20     Q.    What brings you here?  Why did you come?

21     A.    A guy handed me a subpoena and said "You got to be

22     in court."

23     Q.    All right.  Is this your first time testifying in

24     court or some kind of administrative proceeding?

25     A.    In an administrative proceeding?
```

1    Q.    No, is this your first time testifying in court?

2    Say it that way.

3    A.    No.

4    Q.    What -- what other reasons have you ever had for

13:32:46  5    testifying in court?

6    A.    Dozens of times throughout my career, when I would

7    catch someone with a phony prescription, we hopefully

8    catch them in the parking lot before they left, and go

9    through the process of going to court.

13:33:00 10           Sometimes it would be -- I'd go and it

11    would get settled, I wouldn't appear in court, but other

12    times I had to testify as to, you know, what happened,

13    and so forth.

14           And that was with Walgreens and Rite Aid,

13:33:12 15    and other places I worked at.

16    Q.    Were you so testifying in cooperation with the

17    prosecution?

18    A.    Yeah.

19    Q.    All right.

13:33:20 20    A.    I wasn't for the defendant.

21    Q.    Did anyone at Walgreens ever try to discourage you

22    from testifying in court to help prosecutors?

23    A.    No.

24           When -- when we would have pharmacists get

13:33:31 25    subpoenaed to appear in court, they were paid for their

1    time to go to court and testify.

2    Q.    See you didn't have to take personal time?

3    A.    No.

4    Q.    All right.  How long did you say you've been a

5    pharmacist?

6    A.    Forty-plus years, 40-and-a-half.

7    Q.    Let's -- I want to fill in some of your other jobs

8    at Walgreens.

9              What was your very first job working at

10   Walgreens?

11   A.    I was just a floating pharmacist.

12   Q.    Where were you floating around?

13   A.    I floated in -- it was the Pittsburgh North Market

14   then.  When I started I think there were 12 stores, but

15   primarily there were I think four or five stores in

16   Youngstown.  And when I mean Youngstown, I mean Trumbull

17   and Mahoning Counties.  And there was a store in Sharon,

18   PA that I worked at, and they opened one in Hermitage,

19   PA, south of Sharon, and I worked at that store; so

20   wherever needed.

21   Q.    As a floating pharmacist, you were like the guy we

22   are used to seeing behind the counter filling

23   prescriptions?

24   A.    Yes.

25   Q.    What was your first job as a staff pharmacist

1    assigned to pharmacy at Walgreens?

2    A.    I was at 6945, which is Warren, Trumbull County.

3    Q.    And then you mentioned that you got promoted to

4    pharmacy manager at some point, correct?

5    A.    Yes.

6    Q.    When you're a pharmacy manager at Walgreens, are

7    you just management or are you still working behind the

8    counter?

9    A.    No.  You fill prescriptions just like the other

10   pharmacists.

11             You just have more responsibility,

12   licensing, technician oversight, staff pharmacist

13   oversight, oversight of the floater pharmacist if they

14   work in your store, and that sort of thing.

15   Q.    All right.  Once you were a pharmacy supervisor, at

16   that point were you still regularly working behind the

17   counter?

18   A.    Regularly, no.

19             I jump in if I went back to a pharmacy to

20   do a visit and they were getting slammed, I would hop on

21   the computer and verify some prescriptions, or ring

22   people up, or something like that.

23   Q.    As pharmacy supervisor, did you have ultimate

24   responsibility for all the pharmacies in your region?

25   A.    Yes.

1    Q.    And that included Trumbull County, you said,

2    correct?  Trumbull and Mahoning?

3    A.    Yeah.

4    Q.    As district manager, once your responsibilities

13:35:41 5    expanded to the whole store, did you continue to be

6    responsible for the pharmacy?

7    A.    Yes.

8    Q.    As pharmacy supervisor or district manager, what's

9    your role in hiring new pharmacists?

13:35:57 10    A.    We would go recruiting at the universities, at

11    Pitt, at LECOM, which is up at Lake Erie, a College of

12    Medicine in Erie.  We'd go to NEOCOM, which is the

13    Northeast Ohio College of Medicine.  And I would help,

14    maybe if one of the supervisors needed folks to interview

13:36:19 15    pharmacists, maybe at Toledo or Ohio State, or somewhere

16    like that.

17    Q.    Who was making the hiring decisions for new

18    pharmacists in your district?

19    A.    I hired the pharmacists.

13:36:28 20    Q.    And who would make decisions about promoting a

21    pharmacist to pharmacy manager?

22    A.    I did.

23    Q.    All right.  I want to shift gears and try to move

24    quickly, and ask a few questions about your time on the

13:36:42 25    Board of Pharmacy.

1              Did you say that you were appointed by

2    Governor Strickland?

3    A.    Correct.

4    Q.    Is being a member of the Ohio Board of Pharmacy a

13:36:52  5    full-time paid position?

6    A.    It's three days a month, Monday, Tuesday -- the

7    first Monday, Tuesday, Wednesday of the month.

8    Q.    So you continued -- you kept your job at Walgreens?

9    A.    Yeah.  And I don't think we had meetings in

13:37:02  10   December, so 11 months out of the year.

11   Q.    The other members of the Board, did they also have

12   regular jobs in addition to being Board members?

13   A.    Correct.

14   Q.    Was there anything unusual about working at a

13:37:15  15   pharmacy or a large hospital while serving on the Board?

16   A.    No.  It wasn't just, like, pharmacy supervisor-type

17   people that did it.

18              There were regular pharmacists on the Board

19   as well.

13:37:25  20   Q.    And folks, other people besides you on the Board,

21   did they also work for hospitals or pharmacies that might

22   have business before the Board?

23   A.    Hospitals, retail, CVS, Giant Eagle, independent.

24   Q.    Did anyone consider that improper that you were

13:37:42  25   serving on the Board while you worked for a hospital or

1    pharmacy that might have business in front of the Board?

2    A.    The Board of Pharmacists had to be comprised, I

3    believe, of -- I believe it was nine pharmacists, eight

4    of which had to be pharmacists.

13:37:58  5              So you're not going to have someone on the

6    Board that's not an active pharmacist, with the exception

7    of the public member.

8              So everyone worked somewhere.

9    Q.    They all worked for a pharmacy of some kind?

13:38:08  10   A.    Yeah.  One guy was a semi-retired guy, he worked

11   like a Free Clinic-type pharmacy in Cincinnati.

12   Q.    When you became the Vice President of the Board,

13   how do you get to be Vice President of the Board of

14   Pharmacy?

13:38:22  15   A.    The other members would elect you.

16   Q.    What about when you became President, same thing?

17   A.    Same thing.

18   Q.    Sometimes people use the term "Board of Pharmacy"

19   in a way that it might be a little vague.

13:38:35  20              There are the members who sit on the Board,

21   but there's also an entity, a Government agency, called

22   the Board of Pharmacy that has a whole staff.

23              Correct?

24   A.    Correct.

13:38:43  25   Q.    And that Board staff, well, give us a sense of what

1    kind of jobs does the Board staff do?

2    A.    Well, there's a lot of administrative people that

3    work there, keeping track of who's licensed in Ohio and

4    who isn't.

13:39:01  5              For instance, if licensing comes up and

6    there's 25 pharmacists that don't renew, an agent would

7    contact them or stop in at their place, their last place

8    of employment, and find out if they have a license or

9    not.

13:39:13  10             And they did investigations of customer

11   complaints, so if a customer wasn't happy with something

12   at Walgreens, they -- say, for instance, they said

13   Walgreens shorted my pills, they might call the Board,

14   and the Board would come out and investigate.

13:39:32  15             If we caught a technician that we thought

16   was stealing, we'd work with the Board, set up cameras if

17   necessary, they would do interviews, to catch -- to see

18   if folks were stealing drugs from the pharmacy.

19   Q.    The Board also -- there was some testimony earlier

13:39:54  20   I guess today about some pharmacy regulations.

21             Is that something the Board does, is

22   formulate regulations that control how pharmacists work?

23   A.    The Board members don't do it.

24             The Board office does it, and then we

13:40:10  25   would, you know, approve it or not approve it.

1    Q.    When you were serving as a member and then the

2    President of the Ohio Board of Pharmacy, were you sitting

3    on the Board as Brian Joyce or as a representative of

4    Walgreens?

13:40:26  5    A.    So you take an oath when you become a Board member

6    that you're serving, representing the people of Ohio.

7    Q.    Are you there to do the bidding of Walgreens on the

8    Board?

9    A.    No.

13:40:38 10    Q.    Are Board members allowed to intervene with the

11    Board investigators to try to --

12    A.    No.

13    Q.    -- influence an investigation?

14    A.    No.

13:40:48 15    Q.    Would that be tolerated at the Board?

16    A.    We wouldn't even know about investigations until

17    the investigation is completed, unless it was your

18    pharmacist in particular and maybe for some reason the

19    Board inspector would, you know, ask to put cameras in

13:41:04 20    your store at night, or something like that.

21    Q.    Would the Board tolerate it, in your experience, if

22    a Board member tried to intervene to protect their

23    employer?

24    A.    I've never seen it happen, so it just didn't

13:41:16 25    happen.

1    Q.    Remember you were asked some questions yesterday

2    about a Board meeting where you got a gentleman named

3    Bill Cover on the agenda so he could come and talk about

4    The Well Experience concept, do you remember that?

13:41:29  5    A.    Yes.

6    Q.    And Well Experience was a concept that would kind

7    of get the pharmacist out from behind the counter and in

8    better closer interaction with patients?

9    A.    Correct.

13:41:36  10    Q.    And I think you said, correct me if I've got this

11    wrong, that in order to do that experiment you would need

12    to get permission from the Board to make exceptions to

13    certain rules about where pharmacists work?

14    A.    It was called a waiver.

13:41:48  15          And you needed two waivers for The Well

16    Experience, one because the prescriptions that were due

17    tomorrow would be filled centrally somewhere else, and

18    then delivered to Walgreens, and then the customer would

19    come into Walgreens and pick them up.

13:42:04  20          And those were waiver exceptions that we

21    would do occasionally for, you know, hospitals that had

22    retail clinics, and so forth.

23          The other waiver exception would be to have

24    a pharmacist that's outside of the filling area, but he

13:42:19  25    would have -- he'd be at a terminal, you know, kind of

1    like this, with sides on it, so, you know, there's no

2    compromise of patient information, and instead of -- he

3    could -- you could verify prescriptions on a screen like

4    this.  This is how we did it.  It came up like this and

13:42:37  5    you verify everything was input correctly.

6              But the part that needed a waiver was the

7    product review, so instead of a pharmacist physically

8    picking up a bottle and looking to make sure that the

9    drug is supposed to be round, yellow, with the number 972

13:42:56 10    on it, there would be a camera above the product, and the

11    pharmacist would look down by camera to do it.

12              So that was kind of innovative and it

13    needed a waiver.

14    Q.    Were you and Mr. Cover doing anything nefarious to

13:43:09 15    try to get these waivers for The Well Experience project?

16    A.    I think the idea of the Well Experience thought was

17    to get better interaction between the pharmacist and the

18    patient, so, you know, a lot of times you go into the

19    pharmacy and they're kind of, you know, buried back here

13:43:29 20    with their nose in the computer, and you have more

21    interaction with the technician.

22              This would kind of flip-flop that role.

23    Q.    When you were serving on the Board, did everyone

24    know, were you completely up front with everyone and

13:43:42 25    everyone knew that you were employed by Walgreens?

```
 1              That wasn't a secret or anything, was it?

 2    A.    No.

 3    Q.    All right.  Let's talk about OARRS.

 4              You gave a lot of testimony, both yesterday

 5    and today.

 6              You said a couple times, I think the

 7    language you used was back in 2011 you were concerned

 8    that OARRS wasn't ready for prime time.

 9              Could you explain to the jury what you

10    meant by that?

11    A.    I think I did.

12              I didn't think -- we didn't have a lot of

13    questions answered, so could everyone's computer --

14    everyone has a different computer system, every chain has

15    a different computer system.  Hospitals that have retail

16    clinics, free clinics in hard-to-serve areas, independent

17    pharmacies, didn't know if those could interface with the

18    state system.

19              And I was concerned about the little drug

20    stores that -- little independent pharmacies, and I

21    figured Walgreens and CVS and Rite Aid and Walmart and

22    Parker could figure it out, but I wasn't sure about the

23    independents.  We had an independent member on the Board.

24              And I didn't know if they'd have the money

25    to comply with the Board by the time they wanted this
```

1    rule implemented, and I was afraid that, like the one

2    transfer rule that they had implemented I think a year

3    previous, there was going to be some editing that needed

4    to be done with the system.

5              And that was my concern.

6    Q.   When you said in that e-mail, Mr. Weinberger asked

7    you about, there was an unfunded mandate, were you

8    talking about this or something else?

9    A.   I was talking about these little pharmacies or any

10   pharmacy, I didn't know, maybe Walgreens, would have to

11   spend a lot of money to interface with that system.

12             It hadn't been, as far as I know, tested

13   with all the retail chains and independents, and so

14   forth, and as it turned out, when it did get rolled out

15   it was very -- it was very clunky and a hard-to-use

16   system.

17   Q.   As time went on, was Walgreens able to devote

18   resources to get the OARRS system to integrate better

19   with the Intercom Plus Plus system so pharmacists weren't

20   going back and forth?

21   A.   I'm not sure if they did it, if OARRS got better,

22   but they definitely worked better, and the board made

23   some rules changes that technicians, you could assign --

24   a pharmacist with access to OARRS could assign a

25   delegate, like a technician, to access OARRS for them.

1           So that, you know, would free up other

2       people to access the OARRS site.

3       Q.     You said in that same e-mail that, yeah, you

4       thought the regulation would end up getting repealed.

13:46:26  5           Did that happen?

6       A.     No, but it got edited.

7       Q.     What do you mean by "edited"?

8       A.     The requirements for prescriptions changed so that

9       it wasn't quite so demanding of the pharmacist.  You

13:46:42 10     know, you didn't have to do it -- I think it changed that

11      you had to do it every year or with every new -- new

12      controlled drug medication.

13      Q.     All right.  Let me go -- you probably got a copy in

14      your pile somewhere still.

13:47:02 15           This is P 20810.

16            This is the document Mr. Weinberger showed

17      you, and I think he directed you to the fourth page.

18            And this is the language that was added in

19      2011, correct?

13:47:19 20     A.     Yes.

21      Q.     Trying to make that a little bigger.

22            Take a look at that, that language.

23            Is there anywhere in there that says to you

24      as a pharmacist that it's the law, not talking about a

13:47:44 25     company policy, but it's the law that every time you

1  check OARRS, you have to create a documentary record of

2  exactly what you did?

3              MR. WEINBERGER:  Objection.

4              THE COURT:  Is there an objection?

13:48:01 5              MR. WEINBERGER:  Yes.

6              THE WITNESS:  Could I answer?

7              THE COURT:  Yes, you can answer.

8              THE WITNESS:  Ask me that again.

9              MR. STOFFELMAYR:  Sure.  Sure.

13:48:10 10  BY MR. STOFFELMAYR:

11  Q.    As a pharmacist or a member of the Board of

12  Pharmacy, for that matter, is there anything in this, in

13  this language that Mr. Weinberger showed you, that says

14  that it's a rule of the Board of Pharmacy, not talking

13:48:21 15  about company policies, but a rule of the Board of

16  Pharmacy that every time a pharmacist checks the OARRS

17  system under this rule, you've got to create some kind of

18  documentary record of what you did?

19  A.    No.

13:48:33 20  Q.    I want to show you a part of the regulation.

21              Mr. Weinberger, I think, read the whole

22  thing out loud except for the last paragraph, and I want

23  to go to the last paragraph.

24              Why don't you tell us what the last

13:48:54 25  paragraph says?

1    A.    "After obtaining an initial OARRS report on a

2    patient, a pharmacist shall use professional judgment

3    based on prevailing standards of practice in deciding the

4    frequency of requesting and reviewing further OARRS

13:49:06  5    reports and/or other states' reports for that patient."

6    Q.    So after a pharmacist runs an OARRS report under

7    this regulation for a particular patient, does the

8    regulation tell the pharmacist to run the OARRS report

9    over and over again when the patient comes back?

13:49:27  10    A.    Per state, no.

11    Q.    Have you, as a pharmacy supervisor and district

12    manager, did you ever discourage your pharmacists from

13    checking OARRS, tell them not to do it?

14    A.    No.

13:49:51  15    Q.    Has anyone at Walgreens ever suggested to you that

16    checking the PDMPs is a bad idea because it costs money?

17    A.    No, not that -- I've never heard that.

18    Q.    Let me show you the Good Faith Dispensing Policy,

19    it's another document you saw earlier.  It's P 15608.

13:50:17  20          Do you remember this e-mail Mr. Weinberger

21    showed you, and he showed you an attachment which was the

22    Good Faith Dispensing Checklist?

23    A.    Yes.

24    Q.    All right.  Earlier in this e-mail, we've got the

13:50:30  25    controlled substances -- excuse me -- controlled

1    substance prescriptions and Good Faith Dispensing Policy.

2                    Do you see that?

3    A.    I do.

4    Q.    And is it your understanding that this policy would

13:50:39 5    apply to all controlled substances; not just those target

6    drugs?

7    A.    Right.

8    Q.    And what does the Walgreens Good Faith Dispensing

9    Policy say about checking a PDMP?

13:51:07 10    A.    "If available in your state, use the PDMP to obtain

11    additional information to help determine the validity and

12    confirm the appropriateness of the prescription."

13    Q.    Now, this particular e-mail that Mr. Weinberger

14    showed you comes from 2018.

13:51:21 15                    This wasn't new in 2018 -- let me ask you,

16    was it brand new in 2018 that Walgreens was telling

17    pharmacists to check the PDMP?

18    A.    No.

19    Q.    And the discussion of the OARRS system,

13:51:36 20    Mr. Weinberger suggested -- didn't suggest, he said, he

21    just flat out said that your objection to that regulation

22    that you've been talking about was an example of you

23    putting profits above patient safety.

24                    What is your reaction to that?

13:51:52 25    A.    I'm kind of put off by it.

1          I mean, I've been a pharmacist for 40

2     years.  We did a pretty good job.

3          I mean, we -- we did -- we followed

4     the -- we followed the book, and I think, yeah, was I

13:52:19  5     offended?  Of course I was.

6          I think working with Walgreens, I've worked

7     with other chains before, I think Walgreens was pretty

8     deliberate in how they ran their business, and I

9     was -- it was very structured.  I liked the structure of

13:52:34 10     Walgreens.

11          So I think I took a lot of pride in my

12     pharmacists.  I think we did a good job.

13     Q.    Has there ever been a time in your career at

14     Walgreens where you encouraged your pharmacists to cut

13:52:47 15     corners so you could make money at the expense of patient

16     safety?

17               MR. WEINBERGER:  Objection.

18               THE COURT:  Overruled.

19     A.    I can answer?

13:52:59 20     BY MR. STOFFELMAYR:

21     Q.    Yes.

22     A.    No, I mean, I'm a pharmacist, so, you know,

23     15-minute wait times didn't mean anything to me.

24          I have some pharmacists, they might be a

13:53:07 25     little bit older, who had longer wait times, but they

1    never had a customer complaint.

2              So if Mrs. Jones comes into this pharmacy

3    and has to wait 20 minutes or 45 minutes or five minutes,

4    the pharmacist was great with customer service, it wasn't

13:53:25  5    a big deal.

6    Q.    So let's keep going about talking about the

7    pharmacies you were responsible for in Trumbull County.

8              We've talked about where you lived.

9              Is it also true that the pharmacists you

13:53:36  10   hired lived in the communities where they worked?

11   A.    I tried to make that happen.

12             I mean, the biggest issue when I came on

13   with Walgreens was staffing that area.

14             You know, Youngstown, Ohio is Youngstown,

13:53:51  15   Ohio, so you had to find people from Youngstown to work

16   Youngstown.

17             You know, you would recruit someone from

18   the University of Pittsburgh that lives in Philadelphia

19   to come work in Youngstown, and it never lasted, you

13:54:05  20   know.

21             So I liked to get pharmacists that were

22   local and I liked to put them, for instance, the folks at

23   the Hubbard store, 9669, are both born and raised in

24   Hubbard.  They work at that store.  They know the people

13:54:18  25   in the neighborhood.  And that worked out not only well

 1    for them, it worked out well for us, because those folks

 2    could build the business.

 3              They knew -- they knew the trade market.

 4    And I tried to do that in other stores around Youngstown

13:54:35  5    as well.

 6    Q.   Did you ever have a pharmacist working for you

 7    where you felt they weren't concerned or weren't

 8    concerned enough about the problems of drug abuse and

 9    drug diversion in the communities where they lived and

13:54:46 10    raised their kids?

11    A.   I was proud of my pharmacists, and that's managers,

12    staff, and floaters, as well as my technicians.

13    Q.   Did you ever work with a pharmacist at Walgreens

14    who you felt like they didn't understand what their

13:55:03 15    corresponding responsibility was?

16    A.   No.

17    Q.   Did you ever work with a pharmacist at Walgreens

18    where you felt like they didn't take that corresponding

19    responsibility seriously?

13:55:09 20    A.   No.

21              I mean, that's their license.  I mean,

22    that's their ticket to work.

23              So pharmacists in general, not just

24    Walgreens, but pharmacists in general take that

13:55:19 25    responsibility, you know, pretty seriously.

Joyce - Redirect/Stoffelmayr                    2082

1    Q.    Your -- well, is it true that the pharmacists who

2    worked for you would at least from time to time refuse to

3    fill prescriptions?

4    A.    Sure.

13:55:33 5    Q.    Did you ever, ever pressure your pharmacists to

6    fill prescriptions they weren't comfortable filling?

7    A.    No.  And occasionally I'd have a customer call me

8    and complain about that.

9    Q.    Well, let me ask you, did you ever get pressure

13:55:48 10   from corporate, from outside your, you know, Trumbull and

11   Mahoning County, did you ever get pressure from corporate

12   that said "You guys are refusing to fill too many

13   prescriptions, you got to fill more"?

14   A.    No.

13:55:59 15   Q.    Did you ever get any kind of pressure from

16   corporate that you were too restrictive in how you

17   dispensed controlled substances in Trumbull and Mahoning

18   Counties?

19   A.    No.

13:56:07 20   Q.    Now, you mentioned this.  Did you say that you

21   would get complaints from customers?

22   A.    Every now and then someone would call, there would

23   be a customer complaint.  I'd have to call the person,

24   and their complaint would be, you know, I went to the

13:56:21 25   Niles store and the guy wouldn't --

1          MR. WEINBERGER:  Objection, Your Honor.

2          Hearsay.

3          THE COURT:  Well, yeah.  Sir, if you can

4    answer the question without repeating what someone else

13:56:33 5    said to you, because that's hearsay.

6          THE WITNESS:  Oh.

7          MR. STOFFELMAYR:  I'll ask the question

8    again with that understanding.

9    BY MR. STOFFELMAYR:

13:56:40 10   Q.   What I really just wanted to know is were there

11   times when you had to field complaints from customers who

12   were upset because they couldn't get a controlled

13   substance prescription filled?

14   A.   Yes, or they couldn't get it refilled early.

13:56:52 15   Q.   And when that happened, did you get your pharmacist

16   in trouble?

17   A.   No.

18          I backed up my pharmacist because I -- I

19   know what they go through with this nonsense, and my

13:57:07 20   response was, "Look" -- typically the complaint was,

21   doctor, doctor wrote it, the pharmacist should fill it.

22   And I said, no, that's really not what their job is.

23   Their job is also to evaluate whether that's a legitimate

24   prescription to fill.

13:57:25 25          Pharmacists have a right to refuse to fill

1    a prescription or refuse to fill it early; not just

2    controls, any drug.

3              If they think there's some lotion that's

4    not appropriate for someone they would, you know, refuse

13:57:35  5    to fill it.  I've never seen that happen but, yeah, that

6    would happen occasionally.

7    Q.    Did you ever have to field a complaint from a

8    doctor or other prescriber who was upset that a Walgreens

9    pharmacist hadn't filled one of their prescriptions?

13:57:48  10   A.    I think I did one time years ago.

11   Q.    Did you get the pharmacist in trouble?

12   A.    No.

13   Q.    Did you back up the pharmacist?

14   A.    I did.

13:57:55  15             I'm a pharmacist.

16   Q.    You were asked a question about a survey, it was a

17   PowerPoint you hadn't seen before, about a survey to see

18   how pharmacists were filling out those target drug

19   checklists.

13:58:08  20             Do you recall that?

21   A.    Yeah.  Um-hmm.

22   Q.    Do you have the foggiest idea how that survey was

23   performed?

24   A.    I never saw it before.  I have no idea.

13:58:16  25   Q.    So do you have any idea at all when they were

1    looking at those checklists how they decided, "Well, this

2    one is compliant and this one is not compliant"?

3                Do you know anything about the standards

4    they were using?

5    A.    I don't know anything about any of it.

6    Q.    When you were in charge of the Walgreens pharmacies

7    in Trumbull County, was it your view or Walgreens' view

8    that you wanted to see drug-seekers come into the

9    pharmacy because they filled a lot of prescriptions?

10   A.    Those folks are the last people pharmacists want in

11   their pharmacy.

12                They -- they shoplift.  They have these

13   long crazy stories about why they need this medicine.

14   They come back early.  They're high-touch people,

15   meaning, you know, it takes a lot of time to deal with

16   these folks.

17                Those aren't the folks you want in your

18   pharmacy.

19   Q.    You talked a lot over the last day or two, or

20   yesterday afternoon and this morning, about red flags and

21   when people do or don't document the resolution of a red

22   flag.

23                Do you recall all that?

24   A.    Yes.

25   Q.    In your, you know, 40-plus years as a pharmacist in

1    Ohio, starting with your training at that University of

2    Toledo, your service on the Ohio Board of Pharmacy, did

3    anyone ever tell you, say to you that it's a legal rule

4    under the Controlled Substances Act or the regulations

13:59:42  5    that you have to document the resolution of every red

6    flag?

7                    MR. WEINBERGER:  Objection.

8                    MR. STOFFELMAYR:  The question was whether

9    anyone ever told him.

13:59:53 10                   THE COURT:  I'll allow it.

11                   Overruled.

12    A.    No.

13    Q.    Same thing, in your 40-plus years as a pharmacist

14    in the State of Ohio, starting with your training at the

14:00:04 15    University of Toledo and your service on the Board of

16    Pharmacy, did anyone ever tell you that it's a rule under

17    the law of Ohio or Board of Pharmacy rules in Ohio that

18    you have to document the resolution of every single red

19    flag?

14:00:16 20    A.    No.

21    Q.    All right.  Last subject I want to ask you about,

22    Mr. Joyce.

23                   The jury has heard a little bit about a

24    pharmacy in Trumbull County called Overholt's.

14:00:28 25                   Are you familiar with the former Overholt's

1    Pharmacy?

2    A.    Very much so.

3    Q.    And it was run by a pharmacist named Ken Overholt,

4    correct?

14:00:37 5    A.    Ken Overholt, yep.

6    Q.    Did there come a time when Mr. Overholt tried to

7    sell his business to Walgreens?

8    A.    Yes.

9    Q.    How did you find out about this?

14:00:46 10    A.    I don't know if he approached me or not.  He may

11    have approached me.  I think it came down corporately,

12    though, through the chain of command, but I --

13    Q.    Let's just stop on that.

14              When you say it came down corporately, do

14:00:59 15    people approach Walgreens corporate to try to sell their

16    pharmacies?

17    A.    Yeah.  So a pharmacy might -- a guy might be

18    retiring or whatever, he'd approach the chains and see if

19    the chains wanted to buy the pharmacy, and they would

14:01:11 20    take bids, and the guy would take a highest bid.

21    Q.    If you go on like chain pharmacy websites sometimes

22    there's a little "sell your pharmacy" button and you can

23    provide information if you're trying to sell your

24    pharmacy to one of the chains, correct?

14:01:23 25    A.    I don't know.

1    Q.    Okay.  Never mind.

2               Anyway --

3    A.    You can just call the chain, you can just call

4    Walgreens.

14:01:30  5    Q.    So you found out that Mr. Overholt was interested

6    in selling his pharmacy to Walgreens, that's what you

7    were telling us?

8    A.    Yes.

9    Q.    And did Walgreens corporate contact you about this?

14:01:41 10    A.    They did.

11    Q.    What did they want from you?

12    A.    They wanted to know my opinion of what I thought

13    about us buying Overholt's Pharmacy.

14    Q.    And what did you tell them?

14:01:49 15    A.    Maybe not in these words, but "No damn way."

16    Q.    Why?  What was that based on?

17    A.    Because you had a -- say he's filling 400

18    prescriptions, you're going to pay whatever the price is

19    for 400 prescriptions, and by the time we got in there

14:02:04 20    with someone we'd end up with 60 prescriptions a day.

21    Q.    Why would you only have 60 if --

22    A.    Because he filled -- he filled everything at that

23    store.

24               He filled crazy amounts of narcotics.  I

14:02:17 25    mean, outrageous amounts of narcotics.

1    Q.    And if Walgreens took over the store, you wouldn't

2    continue that business was your plan?

3    A.    No.

4    Q.    After you passed your advice up the chain of

14:02:31 5    command to corporate, did you ever hear anything further

6    about Walgreens having any interest in buying Mr.

7    Overholt's business?

8    A.    No.

9              MR. STOFFELMAYR:  All right.  That's all I

14:02:40 10    have, Your Honor.

11              Thank you.

12              THE COURT:  Okay.  Anything from any of the

13    other defendants?

14              MR. DELINSKY:  No, Your Honor.

14:02:49 15              THE COURT:  None.  All right.  If any of

16    the jurors have any questions, after we have finished the

17    direct and the cross, if you'd pass those to Mr. Pitts.

18              All right.  Mr. Weinberger, you may proceed

19    with redirect.

14:03:23 20         RECROSS-EXAMINATION OF BRIAN JOYCE

21    BY MR. WEINBERGER:

22    Q.    Overholt's was closed down in 2011, true?

23    A.    I believe.

24    Q.    So when we've looked at -- and did you pick up at

14:03:35 25    the Walgreen stores in Trumbull County customers from

1    Overholt's?

2    A.    I don't believe so.

3             We weren't real close to Overholt's.

4    Q.    Well, wasn't Overholt's close to one of your stores

14:03:49  5    in Trumbull County?

6    A.    Five miles away, six miles, seven miles.

7             I don't know exactly.

8    Q.    How about Youngstown?  Was it close to any of your

9    stores in Youngstown?

14:03:59 10    A.    No, Youngstown is on the other side.  It's north of

11    Warren --

12    Q.    Sure.

13    A.    -- and Youngstown is south of Warren.

14    Q.    Sure.  So after Overholt's closed in 2011, are you

14:04:08 15    saying that the scripts that they used to sell there had

16    no impact, did not increase with scripts at your store

17    from the same customers?

18    A.    It didn't close.

19    Q.    It didn't close?

14:04:21 20    A.    No.

21             I don't think it's closed now.  I think

22    it's called Champion Pharmacy.  A couple guys from PA

23    bought it.

24    Q.    Well, if we have the statistics from -- you know

14:04:33 25    what?  Do you know what the ARCOS data is?

1    A.    Do I know what what is?

2    Q.    The DEA ARCOS data.

3    A.    No.

4    Q.    Okay.  Sir, you were asked does OARRS require

14:04:47 5   documentation.

6                 You say it's contained nowhere in the

7    regulations?

8    A.    I don't think so, no.

9    Q.    Okay.  Well, are you familiar, generally speaking,

14:04:59 10  with the pharmacist standard of care?

11   A.    Sure.

12   Q.    And the pharmacist standard of care is something

13   that you learned in pharmacy school and you tried to

14   carry out throughout your career, right?

14:05:10 15  A.    Sure.

16   Q.    And you -- I think you agreed with me earlier that

17   documentation of what the pharmacist does in resolving

18   red flags is important for patient safety, right?

19   A.    Where necessary, sure.

14:05:27 20  Q.    Right.  Just like a medical record should contain

21   all the pertinent information for patient safety, right?

22   A.    Pertinent information, yes.

23   Q.    And so the pharmacist standard of care -- strike

24   that.

14:05:40 25                 Isn't it the Board of Pharmacy's job to

1    make sure that pharmacists carry out the pharmacist

2    standard of care?

3    A.    Sure.

4    Q.    And the pharmacist standard of care, you would

14:05:53  5  agree, is to provide appropriate documentation of the

6    actions of the pharmacist when they clear an opioid

7    prescription?

8    A.    I -- you might put something down.

9             If there's nothing there significant,

14:06:07 10  there's no need to put something down.

11   Q.    So the pharmacist standard of care on documentation

12   is important so that when a subsequent prescription is

13   presented by the patient to the pharmacy, that the

14   pharmacist knows the history of scripts filled for that

14:06:32 15  patient prior to that script, right?

16   A.    Only if it's significant.

17             If --

18   Q.    Well --

19   A.    If the one red flag is location, and they're going

14:06:42 20  up to Cleveland for cancer treatment, you wouldn't need

21   documentation.

22             The next pharmacist would see "Cleveland

23   Clinic Oncology Center."

24             I mean, that's not something I would

14:06:52 25  document.

```
      1    Q.    Right.  But there are a number of red flags that

      2    are important and are critical to prevent diversion,

      3    right?

      4    A.    Lots of them.

14:07:00  5          I --

      6    Q.    Yeah.  Right.

      7              And the resolution of those red flags and

      8    the documentation of that has an important effect on the

      9    ability to prevent diversion.

14:07:13 10          True?

     11    A.    Sure.

     12              MR. WEINBERGER:  No further questions, Your

     13    Honor.

     14              THE COURT:  Okay.  Mr. Stoffelmayr,

14:07:20 15    anything on that?

     16              MR. STOFFELMAYR:  Nothing else.

     17              Thank you, Your Honor.

     18              THE COURT:  All right.  Thank you very

     19    much, Mr. Joyce.

14:07:25 20              You may be excused.

     21              (Witness excused.)

     22              MR. LANIER:  May it please the Court.

     23              THE COURT:  Yes, Mr. Lanier.

     24              MR. LANIER:  I believe they're bringing in

14:09:01 25    the next witness.
```

1              Our next witness is Dr. Craig McCann.

2              I believe our next witness is Dr. Craig

3    McCann.

4              THE COURT:  Well, you got a break, because

14:09:55 5    we need to clean the witness stand for whoever you call.

6              MR. LANIER:  I will check on the witness.

7              (Pause.)

8              MR. LANIER:  Your Honor, with the

9    uncertainty over the timing and how long the direct would

14:11:29 10   be, Dr. McCann has stepped out.  It may be another minute

11   or two.

12             THE COURT:  Okay.

13             MR. LANIER:  I apologize, Judge.  I'll be

14   beating the streets.

14:11:36 15            THE COURT:  All right.  Ladies and

16   gentlemen, what I think we'll do, we'll just take our

17   afternoon break a little early.

18             No point -- these things occur, so we need

19   to be flexible, so we'll take a 15-minute break.

14:11:57 20            Usual admonitions apply, and then we'll

21   pick up, hopefully, with Mr. McCann.

22             (Jury out.)

23             (Recess taken.)

24             (Jury in.)

14:31:57 25            THE COURT:  Okay.  Please be seated.

1          MR. LANIER:  May it please the Court, our

2    next witness standing immediately to my right is

3    Dr. Craig McCann.

4          THE COURT:  All right.  Dr. McCann, if you

14:32:07  5    want to come forward, please.  Sir, raise your right

6    hand, please.

7                    CRAIG McCANN,

8        of lawful age, a witness called by the Plaintiffs,

9             being first duly sworn, was examined

14:32:28 10              and testified as follows:

11          THE COURT:  Thank you.

12          All right.  Please be seated.  You can take

13    your mask off while testifying.

14          Okay.  Mr. Lanier.

14:32:35 15      DIRECT EXAMINATION OF CRAIG McCANN

16    BY MR. LANIER:

17    Q.   Dr. McCann, would you take a moment and introduce

18    yourself to the jury, please?

19    A.   Yes.  Thank you.

14:32:43 20          My name is Craig McCann, C-R-A-I-G,

21    M-C-C-A-N-N.

22    Q.   I've got your name written down here by your

23    picture on your roadmap for your testimony.

24          I'm calling you Dr. McCann, but you're not

14:32:56 25    a medical doctor, are you?

McCann - Direct/Lanier                    2096

1    A.    That's correct.

2    Q.    If any of us gets sick, other than use your cell

3    phone to call someone, you can't help us, right?

4    A.    Yes.  I don't need the honor.  Mister, or even

14:33:10  5    Craig is fine.  Thank you.

6    Q.    All right.  Sir, you are here this afternoon to

7    give riveting testimony about math.

8              Is that basically right?

9    A.    I'm going to do my best.

14:33:27 10    Q.    Okay.  What I'd like to do is break your testimony

11    apart into three different sections so that we can more

12    easily follow it.

13              The roadmap has got, first, your

14    background, and then we'll do your work, and then we'll

14:33:41 15    do the results of your work.

16              Okay?

17    A.    Yes.  Thank you.

18    Q.    All right.  In that regard, let's start with your

19    background.

14:33:50 20              I have a document that we'll mark as

21    Demonstrative Exhibit 24.  It is your resumé or your CV.

22              Is that fair to say?

23    A.    Yes.  Yes.

24    Q.    And to the best of your awareness at this point, is

14:34:09 25    it accurate and up-to-date?

1   A.    Yes.  I'm not sure of the dates on the bottom of

2   this one, but it's updated periodically as I file

3   additional reports or testify.

4                It's -- it's certainly up-to-date as of

14:34:24 5   whatever the date that's on this.

6                There may be one or two line items of

7   testimony that is not on here that have occurred since

8   the date of this one.

9   Q.    And you are with, the principal actually, of a

14:34:39 10   group called Securities Litigation & Consulting Group,

11   abbreviated SLCG.

12                Is that right?

13   A.    Yes.  That's correct.

14   Q.    What you do for a living, and the people who work

14:34:51 15   at your firm, is basically analyze data and come testify

16   about it in some place or another.

17                Is that fair?

18   A.    Yes.  That's correct.

19   Q.    Okay.  And so look at your key qualifications and

14:35:06 20   explain them to us briefly.

21                You're the principal of this group.

22                Tell us about the group and what it is.

23   A.    It's a company based in the suburbs outside of

24   Washington, DC that I own.  It's a Virginia-incorporated

14:35:21 25   company.

McCann - Direct/Lanier                    2098

1          We provide consulting services and do

2    research, but the consulting service is primarily related

3    to data analysis.

4          We provide those services to state and

14:35:38 5    federal governments and to private parties, individuals

6    and corporations involved in litigation.

7    Q.    And if we went to your corporate website, which

8    I've marked as Demo 46, does this give an idea of the

9    people who are the professionals that work at your

14:35:58 10   company?

11   A.    Yes.  There's a bio for each of my 16 employees

12   currently on our website, and so you could go there and

13   learn a little bit about each of the people.

14          Those are the -- the, what I call, the

14:36:14 15   professional staff, so it's those 12 people plus three or

16   four more people on another page.

17   Q.    And give us a feel for what kind of background

18   these folks have academically so the jury understands

19   what your company's been putting into this manpower-wise

14:36:35 20   or womanpower-wise?

21   A.    Sure.  Well, over the years a third to half of our

22   employees have had Ph.D.s in economics, as I do, or in

23   finance, or statistics or math or physics.

24          Currently, of my 16 employees, four of us

14:36:54 25   have Ph.D.s.  Eight more have graduate degrees in some

1    technical field.

2                And the remaining four have undergraduate

3    degrees in some specialty that's relevant.

4    Q.    And did a number of these people work on the matter

14:37:13  5    that you'll be here testifying about this afternoon?

6    A.    Yes.  It's varied a little bit over time.

7                Seven or eight of those people intensively,

8    and another seven or eight people occasionally when a

9    task required additional people or people with the skill

14:37:34 10    levels, the tools that those additional seven or eight

11    had.

12                But seven or eight primary people working

13    most of the time for the last several years on the opioid

14    data.

14:37:45 15    Q.    And we'll get to more details about it in a moment,

16    but this is the tab of "Our people."

17                You make it real clear on your website,

18    y'all do expert testimony like you're here doing today,

19    is that fair?

14:38:02 20    A.    Correct.  Yes.

21    Q.    You've testified, I don't know, how many times?

22    Hundreds of times?

23    A.    Yes.  Between 500 and 600 times.

24    Q.    You do data analytics.

14:38:14 25                Can you tell us what that is?

1     A.     Yes.  So you could think of some analysis that you

2     might do yourself in your checkbook, for instance, how

3     much money you spent on groceries last year.

4               You can think of that as data analysis.

14:38:29  5     You would look at the register, you'd see the entries

6     related to groceries, and you would add them up.

7               That's data analysis.

8               We do that, just on a much larger scale.

9     Q.     Nobody's hired you to balance their checkbook?

14:38:44 10     A.     Correct.

11    Q.     All right.  Valuation services.  Explain what y'all

12    do there, please.

13    A.     Well, in some of our cases and some of our

14    consulting arrangements we've been asked to value

14:39:01 15    investments or value individual securities, and so

16    there's some discussion on our website about our

17    capabilities in that area.

18    Q.     Okay.  You do research.

19               Can you give us a clue of what kind of

14:39:16 20    research work you do?

21    A.     Yes.  We do a lot of what's called peer review

22    publishing, which is the standard in academia; for

23    instance, where you research a particular topic, you

24    maybe analyze some data.  That's largely what we do, and

14:39:37 25    so it's reflected in our research.

1          You submit the results to a, what's called

2     a journal, where it's reviewed by people who have similar

3     backgrounds and similar interests, and then if it's

4     acceptable to those peers, then it get published in the

14:39:55 5     journal.  That's why it's called a peer-reviewed

6     publication.  And we do a lot of that work.

7     Q.    All right.  Ultimately, when all is said and done,

8     you're going to explain the math behind Lake and Trumbull

9     Counties and these pharmacies, but in the process of

14:40:14 10     explaining all of that over the next -- I hope to take

11     not more than an hour-and-a-half with you.  In the

12     process of that, I want to hone in on this sentence, "Our

13     experts."

14          Do you see where I'm highlighting?

14:40:27 15     A.    Yes.

16     Q.    "Are skilled at effectively communicating their

17     conclusions to Judges, juries, and arbitration panels."

18          Do you see that?

19     A.    Yes.  I hope I didn't oversell myself.

14:40:42 20     Q.    Well, we're going to find out.  That's what I'm

21     telling you.  We're going to test it.

22          We've got one Judge and we've got 14 fine

23     folks on the jury.  We don't have an arbitration panel.

24          So you're going to make this -- you're

14:40:56 25     going to effectively communicate this.  That's your skill

McCann - Direct/Lanier                               2102

1    set.

2                    Fair?

3    A.    I'm going to do my best.  Thank you.

4    Q.    I'm going to hold you to it.

14:41:06  5              All right.  Let's go back to your CV, your

6    resumé, for lack of a better way of saying it.

7                    It says you've taught graduate investment

8    management at Georgetown University, and at the

9    University of Maryland, College Park.

14:41:24 10              That was a pretty good while back, is that

11   right?

12   A.    That's correct.  That was in the 1990s.

13   Q.    Okay.  You hold a Series 7 and a Series 63 NASD.

14                   What is that?

14:41:36 15  A.    Those are securities registrations.  It says I held

16   those registrations back in, again, back in the 1990s.

17   Q.    Okay.  And it says you're a chartered financial

18   analyst.

19                   Fair?

14:41:51 20  A.    Yes.

21   Q.    All right.  Let's do briefly your educational

22   qualifications.

23                   Tell us, you've got a BA, a Bachelor's

24   Degree and a Master's Degree in economics from the

14:42:04 25  University of Western Ontario, and a doctor degree in

1     economics from UCLA.

2                    Right?

3     A.    That's correct.

4                    The University of Western Ontario, as you

14:42:16  5     may know, is in London, Ontario, about a four-hour drive

6     from here.  That's where I went to college.

7     Q.    And what were the areas of specialty in your study

8     that might be relevant to what you've done in this case?

9     A.    Well, I did a lot of economics courses in my

14:42:39 10     undergraduate and graduate training.

11                    All of that, and then some focused

12     mathematics courses in the mathematics department, both

13     at UCLA and at the University of Western Ontario, focused

14     on analysis.

14:42:57 15                    My dissertation and much of my study as a

16     graduate student was what we call an empirical study;

17     that is, gathering data, analyzing it, reaching

18     conclusions, as opposed to what might be called a

19     theoretical study.

14:43:13 20                    So the way I think about my -- my

21     undergraduate and graduate training, now 40 years ago, is

22     that it was largely an empirical or a mathematical effort

23     where the mathematics are applied to data, to reach

24     conclusions.

14:43:32 25     Q.    Okay.  Could you do a square root without a

 1    calculator?

 2    A.    I might.

 3    Q.    I'm not testing you on it.  Just wanted to know.

 4          All right.  You have published in

14:43:50  5    *Alternative Investment Analyst Review* and a boatload of

 6    other journals.

 7          Is that fair to say?

 8    A.    Yes.  There may be 12 or 15.  I'm not sure exactly.

 9    Q.    And if we went through your whole CV, we'd find a

14:44:05 10    number of those publications listed in the CV?

11    A.    That's correct.

12    Q.    In addition to that, you testified in state and

13    Federal Court, is that right?

14    A.    Yes.

14:44:16 15    Q.    And then it's got NASD, NYSE, JAMS, and AAA

16    arbitration proceedings, and before the U.S. Senate.

17          Can you give the jury and His Honor a

18    flavor of where you've testified and what you've

19    testified on, the range?

14:44:37 20    A.    Certainly.

21          Early in my career, in the 1990s, most of

22    my testimony dealt with investments and investment

23    management issues, sort of very simple analysis of very

24    simple investments.

14:44:55 25          Over the last 30 years, what people invest

McCann - Direct/Lanier                                    2105

1    in, what's sold to them, has become more complicated, and

2    so my -- my writing and my testimony has evolved with

3    that, and my staff has evolved with that.

4                And that's why we handle -- we employ

14:45:17  5    Ph.D.s in fields like statistics and physics and

6    mathematics, because we focused on very complex topics in

7    litigation.

8                And that's reflected, also, in the research

9    that we publish.  Again, the very most recent work we've

14:45:36 10    been doing the last three, four years has been highly

11    technical.

12    Q.    And so as we have stopped at your background and

13    looked at the firm and looked at your personal, I want to

14    be sure that the jury understands, y'all -- obviously

14:45:52 15    this is what you do for a living, a bunch of you.

16                How much do you charge?  The jury needs to

17    know your hourly rates.

18    A.    Well, we -- we charge what's referred to often as

19    time and expenses.

14:46:05 20                So each of those employees you saw on my

21    website have a billing rate.  They keep track of their

22    time.  And then monthly we submit bills itemized by those

23    workers.

24                Their billing rates vary from, I think the

14:46:20 25    lowest one is $115 or $125 an hour, and I'm the highest

McCann - Direct/Lanier                              2106

1    one, I'm $475 an hour.

2                I haven't exactly thought of how to average

3    them, but you could think of it as approximately $250 an

4    hour, because there are more people at $125 or $175 or

14:46:44 5    $200 an hour than there are at my hourly rate.

6    Q.    All right.  What I'd like to do now, sir, is move

7    on to the work that you have done.

8                Okay?

9                And when I say "you," I'm talking about all

14:47:01 10    of your folks together.

11    A.    Yes.

12    Q.    How many people would you say you've had working on

13    this?

14    A.    Well, quite steadily, seven or eight people.

14:47:23 15                There may be some times, there may be some

16    weeks or months, where not all seven or eight of them are

17    fully occupied with the opioid work that we've been doing

18    the last three-and-a-half years.

19                But those seven or eight people are -- we

14:47:39 20    jokingly within the firm call it our opioid department.

21    So those seven or eight people are available to help on

22    other projects, but they're mostly tied up with this

23    work.

24                And then, as I said, there are seven or

14:47:52 25    eight more people who from time to time will put in a

McCann - Direct/Lanier

2107

1    half a day or a couple of days helping the rest of us

2    working on the opioid project with some other -- with

3    some task that we need a little bit more help with.

4    Q.    All right.  So you've got those seven to eight that

14:48:11  5    you said were steady.  The other seven to eight, what's a

6    good word we can use for them?

7    A.    Well, "as needed."

8    Q.    As needed.

9    A.    I see them as they are on the project as needed.

14:48:21 10    Q.    All right.  And y'all have been doing that for

11    three-and-a-half years?

12    A.    Yes.  It's evolved and grown over time, but we

13    started in March of 2018, so three-and-a-half years ago.

14    Q.    All right.  Set aside other projects to work on

14:48:41 15    this?

16    A.    Oh, yes.

17         It's -- it's crowded out a significant part

18    of work that I would otherwise be doing, because

19    it's -- it's occupied the best seven or eight people at

14:48:53 20    my firm, including myself.  And we're just not available

21    for other projects or developing other lines of work.

22    Q.    Okay.  So I'm going to figure out in a little bit

23    how many hours y'all have put in on this, but, first, I

24    think the jury would be interested in knowing what it is

14:49:12 25    you've done here at the "work" stop.

1              So the jury heard from Joe Rannazzisi, a

2    gentleman who used to be with the DEA, and he spoke about

3    the closed system where there is an importing or

4    manufacturing of an opiate that has been inventoried.

14:49:34 5              Then it goes to distributors or

6    wholesalers, where again it is inventoried.

7              And then goes to pharmacies, where

8    ultimately it is dispensed.

9              Are you familiar with those stages of the

14:49:49 10   closed system?

11   A.    Yes.

12   Q.    Dr. McCann, we were also told by Mr. Rannazzisi

13   that there is a -- records for each step along the way,

14   and he referenced it as ARCOS, a record system.

14:50:07 15             Do you see that?

16   A.    Yes.

17   Q.    Did you get the ARCOS record system for the entire

18   United States of America for all of the years going back

19   at least some measure of time?

14:50:26 20   A.    Close.

21             We got the -- that ARCOS data that is

22   referenced for 14 drugs -- ARCOS covers more than just

23   those 14 drugs -- but for those 14 drugs that we've been

24   referring to as opioids, for a nine-year period, 2006 to

14:50:46 25   2014.

1    Q.    2006 to 2014?

2    A.    Correct.

3    Q.    And what did you understand or what do you

4    understand that ARCOS data to be?

14:51:09  5    A.    Well, it -- it's a record of a shipment of a

6    controlled substance, a drug, opioids in this case.

7                    And that record reflects both who shipped

8    the drug out, and who received the drug.

9                    So you saw on the graphic that was put up a

14:51:33 10    minute ago, there's really two main channels from the

11    manufacturer to the distributor, so those shipments are

12    recorded in ARCOS.

13                    And then from the distributor to the

14    dispensers, and those shipments are recorded in ARCOS.

14:51:52 15                    There's some others, but those two channels

16    account for the vast majority, almost all of the shipment

17    records that are in ARCOS.

18    Q.    All right.  And so these records of who shipped

19    each time and who received, how did it come to you?

14:52:13 20                    How do you get that record?

21    A.    Well, physically it came on a hard drive like you

22    might -- nowadays we have what are called thumb drives,

23    they are little storage devices about the size of your

24    thumb; but if you remember with me, it used to be that

14:52:34 25    computers had much bigger hard drives, about the size of

1      a brick, and they got smaller over time.

2                    So the hard drives that we received the

3      data on were somewhere between the size of a brick and

4      those little thumb drives, like a little bit bigger than

14:52:48  5      a pack of cards perhaps, maybe a pack of cigarettes.

6                    And we received those in three or four

7      different stages back in early 2018.  A little sample of

8      the data in March of 2018, I think; a little bit more of

9      the data in April; a little bit more in May.  I think the

14:53:14 10      last tranche of the data came in in either June or August

11      of 2018.  June, I think, but I'm not a hundred percent

12      sure.

13      Q.    Before His Honor ordered that data to be released,

14      was that data that any of us could just access publicly?

14:53:32 15      A.    Oh, no.

16                    It was highly confidential, and we had to

17      agree to very strict security protocols to receive the

18      data.

19      Q.    So what kind of security protocols did you have to

14:53:43 20      put in place to be able to look and work with that data?

21      A.    Well, there were three or four things, perhaps,

22      that I remember.  There may be some additional items that

23      I've forgotten now in the three-and-a-half years since.

24                    But if you think about how an office

14:54:06 25      network of computers work, each -- each desk has a

McCann - Direct/Lanier                    2111

1   computer on it, and they connect through a, what we call

2   a server or a network server, where you might have some

3   files that everybody in the office can access.

4           Well, with the ARCOS data, we were told

14:54:22  5   that that couldn't sit on that network server that any

6   desk computer in the office could access.

7           It had to be on a standalone server that

8   only the keyboard and the monitor attached to that

9   standalone computer could see, could manipulate.

14:54:47 10          And that data also had to be on that server

11   or computer separate from any Internet connection, so not

12   connected to the network and not connected in any other

13   way, to online in any way.

14           So the term they used, I think, was air

14:55:03 15   gap, which just means that there was no way of getting to

16   that computer that the ARCOS data sat on from some

17   outside source, someone trying to hack into the server.

18   Q.   When you got those hard drives and you hooked them

19   up to this dedicated computer that's got an air gap and

14:55:22 20   security protocols, does it just pop right up and say,

21   "I'm here" like Alexa or Siri, "What would you like me to

22   do for you today?"

23   A.   No, it's not that kind of data.

24   Q.   All right.  Tell the jury what you had to do once

14:55:40 25   you got this chunk, these hard drives in this secured

McCann - Direct/Lanier                    2112

1   system.

2   A.    Well, I actually find this quite fascinating, so I

3   hope I don't --

4   Q.    We're riveted.  We're on the edge of our seats.

5                 Keep going.

6   A.    If you think about an Excel file, I don't know if

7   any of you work with spreadsheets, but --

8   Q.    Tell what an Excel file is, for all of us.

9   A.    Excel is a software package.  It's one of the

10  Microsoft software packages, and it allows you to do

11  simple calculations on data that are in the spreadsheet

12  in rows and columns.

13                So, for instance, we might create a

14  spreadsheet of everybody's age and height and weight in

15  this room.  There would be about 60 records, and for each

16  of us there would be three entries:  Our age, our height,

17  our weight.

18                You could think of that as a very simple

19  spreadsheet.

20                There are lots of applications that we use

21  spreadsheets for, and they are especially good for doing

22  calculations on fairly small amounts of data.

23  Q.    Okay.  And so you are going to use that

24  illustration to explain to us how you got data out from

25  the hard drives into something that ultimately you could

1    use to come here, for example, and testify?

2    A.    Yes.  So going back to my simple Excel spreadsheet

3    example, there's -- there's as many rows as there are

4    people here.  There are 60, perhaps, rows.

5                The first row might be our name, and then

6    these three characteristics, so four columns.  I'm sorry,

7    60 rows and four columns.

8                If you save that file, you can open it back

9    up and edit it.  You could do some calculations.  You

10   could see how many people in the room are as short as I

11   am or as old as I am.  There are things you can do with

12   it.

13   Q.    How short are you?

14   A.    I'm pretty short.  Five-foot-six, at about what

15   they call the 15th percentile.

16                So you could do things like that with the

17   data, you could sort it by height.

18                When you think of the ARCOS data, it's a

19   very different set of data.

20                First thing is that it's not 60 rows, it

21   was almost 500 million rows.  So it's a half a billion

22   records, and that covers, as I say, all of the shipments

23   across the country from primarily manufacturers to

24   distributors and distributors to what we call dispensers,

25   but you could think of them primarily as pharmacies.

McCann - Direct/Lanier                    2114

1           And then instead of there being four

2    columns, as in my example, there are initially 34

3    columns.  So it's 500 million lines or rows of data and

4    34 records -- 34 -- I'm sorry -- 34 columns.

14:58:43  5           But even that doesn't capture how enormous

6    the data is and how difficult the data is, because when

7    you open up an Excel file, you can visualize it, you can

8    see those 60 rows and four columns.

9           With the data that comes from ARCOS, it

14:59:02 10   arrives to us in what's called a comma separated variable

11   file, CSV, or a text file, and what that means is that

12   it's just a string of text.

13           If you opened it up on a computer screen it

14   would just fill up your screen with letters and numbers.

14:59:23 15   And if you looked closely you'd identify words or dates

16   in that string, but it would just wrap, so the data would

17   continue to wrap on your screen through the bottom of the

18   page onto, perhaps, 20,000 more pages before you'd get to

19   the end of it.

14:59:40 20           And the software that we use has to open up

21   that file, that 500 million records, 34 fields in a

22   record, and count 34 fields.

23           So there's -- I don't know if you can

24   visualize one of those old IBM Selectric typewriters or a

15:00:02 25   modern keyboard, there's a vertical bar as one of the

1    special keys.  We almost never use them, but there's a

2    vertical bar there, and so the way the data is organized,

3    the value for a field, like my name, and then there's a

4    vertical bar, and then my age and a vertical bar, and my

15:00:21  5    height and a vertical bar, and my weight and a vertical

6    bar; and then Mr. Lanier's name and a vertical bar.

7                So his record just comes after my record

8    without going on to another row, and the software goes

9    through and it counts 34 records, and then it puts in a

15:00:42 10   line break and starts the next -- 34 fields, puts in a

11   line break, and starts the next 34 fields.

12               And then it creates this data set that is

13   500 million records long, 34 fields wide.

14   Q.    So did y'all have to write that software or do

15:01:05 15   you -- I mean you don't just, like, mail order it, do

16   you?

17   A.    Well, there are different database software

18   packages that will open a file like that.

19               The one we use is called R, it's just the

15:01:21 20   capital letter R, is the software.  It's software used by

21   research scientists and by academics to analyze large

22   data sets.

23   Q.    All right.  Now, how long did it take your people,

24   working steady on this, in essence full-time, how long

15:01:46 25   did it take you to get all of this done in the secure

 1    protocols so that you had data that could be used?

 2    A.    Well, it was an evolving process.

 3               As I say, we got the data in stages over

 4    several months, and we learned about the data.  The data

 5    had some errors in it, so in 500 million records of data

 6    there are going to be errors in the data that have to be

 7    cleaned up.

 8               There were -- there were gaps in the data.

 9    There were duplicates.  There was a lot of work that had

10    to be done to first understand what all of this data was,

11    to figure out what data was necessary for the analysis

12    that we had been asked to do; to clean the data so that

13    it could support the analysis.

14               And that was roughly the first six months

15    with the data.  I would say by August or September of

16    2018 we had a pretty good understanding of the data, well

17    enough that we could produce reliable what we call

18    process data.

19               So the data that I described coming from

20    the DEA, we've referred to as raw data.  It's just this

21    text file.

22               And then the data that is cleaned up and if

23    you could open it would look something like you would see

24    in an Excel file, we call that process data.

25               And it probably took us six months to get

1    -- five or six months to get from that raw data to

2    process data.

3              And even then, in the 500 million records

4    every now and then we would spot something else that

15:03:38  5    might only involve 50 of those 500 million records, but

6    we would fix them, so we were constantly fixing little

7    tiny bits in the data.  And it probably was another year

8    before that fully settled down.

9    Q.    This data is relied on and provided for whom?

15:04:01  10    A.    Well, initially we -- we were instructed to

11    distribute the data to, I believe it was, all 50 states'

12    Attorneys General, so they had to sign a confidentiality

13    agreement covering the data.

14              But when they did, we shipped out a Fed Ex

15:04:26  15    package with a thumb drive on it with their state's data,

16    as well as reports that we created for the state, for

17    every county in the state, for every pharmacy in every

18    city and county in the country.

19              So by that fall, by the fall of 2018, we

15:04:47  20    were distributing reports for every one of the 50 states

21    for -- there's 3,150 counties, including the two counties

22    we're here to talk about this week, and

23    there's -- there's something like 30 ,000 cities in the

24    country and hundreds of thousands of pharmacies.

15:05:10  25              And we've produced reports on every single

McCann - Direct/Lanier                                      2118

1    one of those and had done so, I think, by -- by the fall

2    of 2018, and distributed them to people who signed,

3    government agencies, states that had signed

4    confidentiality agreements.

15:05:29  5    Q.    And at first as this was being presented you were

6    saying people had to sign a confidentiality agreement to

7    get the data?

8    A.    That's my understanding.

9    Q.    Yeah.  And this was all done through a number of

15:05:45 10   different law firms and legal teams, but what was the

11   main law firm that worked with you on getting the data,

12   storing the data, and being a communication point for the

13   data?

14   A.    Well, we worked with a number of law firms, but the

15:06:00 15   primary law firm is a firm in Pensacola, Florida called

16   Levin Papantonio.

17   Q.    And the Levin law firm was a communication point

18   for people.

19             How could people sign a protective order

15:06:22 20   and get access to the data?

21             Where would you send people if they needed

22   that?

23   A.    Yes.  It wasn't -- it wasn't my responsibility.  I

24   just don't have the capability or the qualifications to

15:06:35 25   ensure that whoever was receiving the data had signed the

1    confidentiality order that Judge Polster required for the

2    data to be distributed.

3            And so this law firm in Pensacola took all

4    of the requests for the data, ensured that the entity

5    requesting the data was entitled to the data, and that

6    they had signed whatever documents they needed, whatever

7    confidentiality agreements or releases they needed to

8    sign in order to get the data.

9            When we then got the sign-off, we got

10   instructions to send the data to whoever that entity was.

11           It may have been, as I said, the state AGs,

12   but also then there was a period there where it was

13   attorneys representing plaintiffs in other cases in the

14   MDL proceedings around the country.  There's

15   around -- there's thousands of cases.

16           And so those lawyers were also entitled to

17   the data, and that was part of what we were doing is

18   distributing the data.

19           Eventually we distributed it online, not

20   through thumb drives, but initially it was through thumb

21   drives.

22   Q.   All right.  And lawyers like me or Mr. Gallucci

23   here or Ms. Fleming, or whomever it might be, could

24   e-mail where to try and plug into all of this, if we had

25   questions about it?

McCann - Direct/Lanier                                    2120

1   A.     Well, there was a standard e-mail address.  It was

2   arcos@levinlaw.com, and that was -- initially we put up a

3   standalone website, not a website associated with my

4   firm, a standalone website that had some interactive

15:08:26  5   features; a map, and then a workaway through that map

6   that you could download the data if you were entitled to

7   it.

8              There was a password on it initially.  The

9   password was provided by the Levin law firm to someone

15:08:40 10   who was entitled to the data.

11             And there was a -- if you had any further

12   questions -- if you had any questions contact

13   arcos@levinlaw.  That's the way it was set up initially.

14             And then at some point a year later,

15:08:55 15   approximately, we imported that content over onto my

16   firm's website; but otherwise, it looks the same as it

17   did as a standalone website.

18   Q.     All right.  In addition to the ARCOS data and all

19   of the work you did with the ARCOS data, did you also get

15:09:14 20   any other data that you analyzed?

21   A.     Yes.  We ended up using a lot of other data sets as

22   well.

23   Q.     Can you tell the jury, please, the other data sets

24   that you've analyzed?

15:09:29 25   A.     Yes.

1       I won't -- I won't be able to remember all

2    of them, but to start, you could imagine that in addition

3    to the ARCOS data, which is data that is accumulated as a

4    result of submissions that those manufacturers and

15:09:49  5    distributors make monthly to the DEA, accumulated over

6    the course of many years, and we receive the data from

7    the DEA, there's a set of data we call the defendants'

8    transaction data, and that's the same basic information

9    that they had submitted over time to the DEA, but instead

15:10:11 10    coming out of their business records directly to us.

11       So it replicates, almost duplicates the

12    data that we got in ARCOS for a number of defendants, and

13    so we took that data and we used it to verify the ARCOS

14    data, because there are two different sources of the same

15:10:35 15    transaction shipment data.  One of them is from the

16    Government, where it had been accumulated monthly over

17    the course of many years, and the other source of this

18    similar data was directly from the manufacturers and

19    distributors.

15:10:49 20       So that was a big data set.

21    Q.    So the jury has been told already that there have

22    been a number, I think all parties agree on this, a

23    number of different defendants that have been involved in

24    this -- it's multi-district litigation in front of His

15:11:08 25    Honor.

1            Were you able to get data from a number of

2   those different defendants and their data sources as

3   well?

4   A.    That's correct.

15:11:18 5            That's what I'm referring to.

6   Q.    So, for example, in this trial where we're asking

7   the question of whether or not a role was played also by

8   these four companies, did you have access to their data?

9   A.    Yes.

15:11:32 10            The data that I just described, but also in

11   the context of these particular defendants, and a third

12   data set that we call dispensing data.

13            And that is information on prescriptions

14   that were filled for these opioid products.

15:11:58 15   Q.    You're the one who did the work for Carmen Catizone

16   that the jury will hear about later as far as getting

17   those prescriptions for him to look at?

18   A.    Correct.

19   Q.    Okay.  And then did you do anything with -- the

15:12:18 20   jury's heard about how various states have a database,

21   the Ohio one is called OARRS, like keep your oar in the

22   water except it's got two Rs, but OARRS.

23            Have you had a chance to look through those

24   data sets?

15:12:37 25   A.    Yes.

1              Different states have different acronyms.

2      You could think of it, it goes generically by the acronym

3      PMP or PDMP, which stands for prescription monitoring

4      program data.

15:12:57  5              And so this is information on the drug and

6      the patient and the prescriber, and the pharmacy that is

7      dispensing the drug.

8              So it's -- if you think of Mr. Rannazzisi's

9      graphic, he discussed shipments from manufacturers to

15:13:18 10     distributors, distributors to pharmacies; the PMP data is

11     from the pharmacies to the patient, information on that

12     last step.

13             And that's what OARRS is.  OARRS is a

14     version of the PMP data.

15:13:38 15  Q.    All right.  And because this is Mr. Rannazzisi's

16     chart where I've added that information, I'm going to

17     circle it and put your name next to it so we don't forget

18     that was your add.

19             Okay?

15:13:49 20  A.    Thank you very much.

21  Q.    Now, in the process of doing all of that work, $250

22     an hour average billable time, three, three-and-a-half

23     years, seven, eight people, full-time or steady, seven or

24     eight as needed, how much has your entire company billed

15:14:17 25     for the work that you've done, so the jury gets an idea

McCann - Direct/Lanier                                    2124

1    of how expensive this work is, please.

2    A.    Well, including the work from the very beginning

3    that was shared across the entire country and the work

4    done on -- intensively done on approximately a dozen of

15:14:39  5    these cases, around $6 million; maybe a little bit more

6    than that now, but approximately $6 million.

7    Q.    And is that for the nationwide count, all of the

8    work you've done for all states, all cities, all

9    counties, everybody put together up to this point?

15:15:00 10    A.    Yes.  It's all of our work related to opioids

11    altogether.

12    Q.    And does that include all the expenses and also all

13    of the work that all 14 to 16 people did on it?

14    A.    Yes.  That's correct.

15:15:10 15    Q.    Now, in addition to that, we're also paying you

16    today to come in here and put numbers before the jury,

17    and before His Honor's record as well.

18                    Aren't we?

19    A.    Yes.

15:15:25 20    Q.    And do we pay you your normal hourly rate or do you

21    charge more to come in here?

22    A.    No.  I charge the same rate, whatever I'm doing.

23    Q.    And I met with you last night for about an

24    hour-and-a-half or so and told you basically what I

15:15:40 25    wanted to do.

1           I think I showed you the roadmap.

2                Is that right?

3      A.    Yes.  That's correct.

4      Q.    All right.  I also asked you to get some data ready

15:15:51  5      so that we could talk about some different things as we

6      move to the final stop, the results.

7                Do you have that data with you?

8      A.    Yes.  I took some notes.  I'll have to get out my

9      glasses to read them, but I have some notes here.

15:16:07 10      Q.    All right.  Well, what I'd like to do, the jury has

11     already seen one of your work products with the last

12     witness that Mr. Weinberger asked some questions of, but

13     I'd like to walk through each of these as best as we can,

14     as thoroughly as need be, but keep it riveting.  Okay?

15:16:31 15      A.    Thank you.

16     Q.    All right.  I'm going to show you Plaintiffs'

17     Exhibit 26319.

18                This relates to the CVS defendant, is that

19     right?

15:16:45 20      A.    Yes.  That's correct.

21     Q.    And is this a spreadsheet that you've got for us?

22                THE WITNESS:  Thank you.

23     A.    Yes, it is.

24     Q.    And it's talking about the dispensing of eight

15:17:00 25      prescription opioids from CVS stores, and these stores,

1    you looked specifically at Lake County, Ohio and Trumbull

2    County, Ohio.

3                    True?

4    A.    Yes.  That's correct.

15:17:18  5    Q.    And then you also combined them so that we could

6    get a combined view.

7                    Fair?

8    A.    Yes.

9    Q.    All right.  Where did you get your average

15:17:27 10    population?

11    A.    From the Census Bureau.

12    Q.    You don't just Google that stuff?  You actually go

13    somewhere more authoritative?

14    A.    Well, not Wikipedia, but, yeah, there are

15:17:43 15    Government sources.

16                    Ohio has a website page that gives you

17    population estimates, and the Census Bureau does.

18    Q.    And then if we look at Plaintiffs' 26319, Page 3,

19    we've got it narrowed down from eight prescriptions to

15:18:05 20    simply Oxycodone and Hydrocodone from those CVS stores,

21    and you've done it by year.

22                    Is that correct?

23    A.    Yes.

24    Q.    And so, for example, in Lake County, Ohio, in the

15:18:26 25    year 2006, dosage units from the CVS stores that year of

```
         1    those two drugs were over a million pills, right?

         2    A.    Yes.

         3    Q.    And that averaged out to 4.53 pills for everybody

         4    in Lake County.

15:18:48 5                      Fair?

         6    A.    Correct.  Yes.

         7    Q.    Does that include infants?

         8    A.    Yes.

         9    Q.    Does that include children?

15:18:54 10   A.    Yes.

        11    Q.    Does that include every person in the county that

        12    makes the U.S. Government statistics?

        13    A.    Yes.

        14    Q.    And in Trumbull County, another million-plus pills,

15:19:09 15   5.22 average annual dosage units per capita.

        16                      Is that every man, woman and child?

        17    A.    Yes.

        18    Q.    Regardless of age?

        19    A.    Yes.

15:19:19 20   Q.    Regardless of how much hair they've got?

        21    A.    Correct.

        22    Q.    What their skin color is?

        23    A.    Correct.

        24    Q.    What their education is?

15:19:28 25   A.    Correct.
```

McCann - Direct/Lanier                              2128

1    Q.    Now, if we look through your numbers, do those

2    numbers stay the same year by year?

3    A.    No, they increase over time, peaking in 2011 and

4    '12, and then decline thereafter back to where they were

15:19:50  5   or below where they were at the beginning of the table.

6    Q.    So when we reach that 2011, '12 mark, they're

7    putting out, and 2010 as well, are they putting out

8    something north of six pills per person, every man, woman

9    and child per year?

15:20:15 10   A.    In Trumbull, that's correct.

11               More than 10, almost 11 in Lake, and

12   combined across the two counties almost nine pills per

13   person.

14   Q.    In other words, there's even more coming out of

15:20:29 15   Lake than there is Trumbull, when you look at it per

16   person?

17   A.    Yes.  That's correct.

18   Q.    Now, there's a Page 4 to this chart where you broke

19   it out by stores for CVS.

15:20:42 20               Is that right?

21   A.    Yes.

22   Q.    And how did you do that?

23               Where did you get this data from?

24   A.    It's all from the CVS, what we call, dispensing

15:20:53 25   data.

1                  It identifies the store number that

2      dispensed the prescription that is recorded in the

3      dispensing data.  It's just adding up the dosage units

4      for those two opioids, Oxycodone and Hydrocodone, using

15:21:10   5      the store number and CVS's data.

6      Q.    And are you able to see, just take the first

7      column, Store 4351, in 2006 you've got 211,000-plus.

8                  Is that right?

9      A.    Yes.  That's correct.

15:21:28  10      Q.    And then it climbs up in 2012 and '13 to north of

11      700,000.

12                  Is that right?

13      A.    That's correct.

14      Q.    Okay.  You've given us, then, these statistics of

15:21:48  15      how many average annual pills were being put out by the

16      CVS stores in the county.

17                  Did you do that for the other defendants as

18      well?

19      A.    Yes.

15:21:58  20      Q.    So are we able to look and see how many Giant Eagle

21      was putting out?

22      A.    Yes.

23      Q.    All right.  I'm going to keep CVS, as much as I

24      can, up here near the screen.  CVS.

15:22:15  25                  But let's look at Giant Eagle.  Giant Eagle

1    is Plaintiffs' Exhibit 26320.  This is Giant Eagle.

2                    You've got the cover sheet, which are the

3    eight prescription opioids.  Whoops.  Right?

4    A.    Yes.  That's correct.

15:22:33  5    Q.    And then you've got Page 3 doing the same as you

6    did before, dispensing of Oxy and Hydro in Lake County

7    and in Trumbull County.

8                    Fair?

9    A.    Yes.  That's correct.

15:22:52 10    Q.    And if we look at how much Giant Eagle did, let's

11    start with the year 2006.

12                    In Trumbull County, they're putting out 8.4

13    dosage units per capita.

14                    Is that right?

15:23:10 15    A.    Yes.  That's correct.

16    Q.    If we compare that to the Trumbull County of CVS,

17    at 5.22, does that mean that Giant Eagle is selling or

18    dispensing, I'm sorry, almost 50 percent more?

19    A.    Yes.  You could -- you could see that by looking at

15:23:33 20    those per capita numbers or just at the total dosage

21    units.

22                    And it's the same population, so Giant

23    Eagle dispensed 1,765,000 dosage units, and CVS dispensed

24    1,096,000.

15:23:49 25    Q.    All right.  So you're saying we can look at

1    the -- we can look at the total dosage units and compare.

2              Is that right?

3    A.    Correct.  That's the way I would do it.

4    Q.    All right.  So I've got CVS, and I can put Trumbull

15:24:11  5    County up and compare it to Giant Eagle, and you can just

6    compare and see how many they're putting out or how many

7    they're dispensing.

8              Fair?

9    A.    Yes.

15:24:27 10    Q.    So Giant Eagle, over this time span, put out 26

11    million compared to just 15 million for CVS in terms of

12    dosage.

13              Right?

14    A.    Correct.  Yes.

15:24:40 15    Q.    And if we look at the height of the problem or the

16    height of the dispensing, did CVS -- did Giant Eagle's

17    numbers continue to escalate more so than CVS?

18    A.    Well, you can see, at least for Trumbull County,

19    the shipments in 2011 exceed the shipments in a year in

15:25:12 20    the CVS exhibit for Trumbull County.

21    Q.    Okay.  Now, in addition to this, did you break it

22    out for Giant Eagle by stores?

23    A.    Yes.

24    Q.    So it looks like they -- do they have the same

15:25:29 25    number of stores as CVS?

```
 1    A.    I don't know if that's the case.

 2              It -- it looks similar.

 3    Q.    You count Giant Eagle, I'll count CVS.

 4              CVS in Lake County has, looks like, eight

 5    or nine.

 6    A.    Giant Eagle seems to have seven in each county.

 7    Q.    Okay.  Seven.

 8              Okay.  And then CVS has, yeah, seven in one

 9    county and it may be eight in Trumbull.

10              All right.  Now, in addition to Giant Eagle

11    and CVS, did you do this for Walgreens?

12    A.    Yes.

13    Q.    And we've got the same type chart for Walgreens

14    that you have for the others?

15    A.    Yes.

16    Q.    And it's marked Plaintiffs' Exhibit 26321, and it's

17    the same thing.  You did the eight prescription opioids,

18    and then on Page 3 you've got it from each -- from all of

19    the Walgreens stores put together in Lake and Trumbull.

20              Is that right?

21    A.    Yes.

22    Q.    And this work that you did here, are we able to

23    find the same comparison-type data that we did for Giant

24    Eagle and CVS?

25    A.    Yes.
```

1    Q.   Would it be in that last column?

2    A.   If you want to focus on Trumbull County, yes.

3    Q.   And we can do the same for Lake, but right now I'm

4    just going to focus on Trumbull.

15:27:09 5              And we'll get the total numbers for both on

6    the record in a little bit.

7              So Trumbull, for Walgreens, you've got,

8    starting out, 1.54 pills per person per year.

9              Is that right?

15:27:38 10   A.   Yes.

11   Q.   And then starting in around -- well, that, that

12   changes dramatically, doesn't it?

13   A.   It does, yes.

14   Q.   Put into the record the kinds of changes we're

15:27:53 15  seeing for Walgreens over this point in time.

16   A.   Well, you could see in the first year it tripled,

17   and by the time you get to the third year it's -- it's

18   roughly four times what it was at the beginning in the

19   first year.

15:28:10 20             So in two years it's quadrupled and then it

21   increases over time, peaking at 13 per capita, so --

22   Q.   Which compared to the base year is how many times?

23   A.   It's a little more than eight times.

24   Q.   Now, if we look at these and we see how many

15:28:30 25  millions of pills they're putting out, is it fair to say

1    that while CVS is putting out six pills per person, and

2    Giant Eagle is putting out 10 to 11 per person, and

3    Walgreens is putting out nine, 10, at one point 13 per

4    person, you add all of that up together to come up with

15:29:00  5    how many are being put out by those three?

6    A.    Correct.  Yes.

7    Q.    Did you also learn similar numbers for Walmart?

8    A.    Yes.

9    Q.    And that we've got as -- oh, before I leave

15:29:17  10   Walgreens, did you break it apart by store with

11   Walgreens?

12   A.    Yes.

13   Q.    And this is the information that Mr. Weinberger,

14   this is the same copy that he was using, so I won't spend

15:29:25  15   our time repeating that information.

16              But did you also do the math and run the

17   computers for Walmart?

18              MR. LANIER:  We'll mark that Walmart as

19   Plaintiffs' Exhibit 26322.

15:29:44  20   Q.    Same type charts?

21   A.    Yes.

22   Q.    Same type information?

23   A.    Yes.

24   Q.    And so if we want to get a fuller perspective of

15:29:54  25   what was being dispensed into the county by these four

McCann - Direct/Lanier                    2135

1  chain pharmacies, and we add Walmart to it for Trumbull

2  County, we can just set them next to each other.

3              Fair?

4  A.    Yes.

15:30:12  5  Q.    And Walmart starts out at .92 pills per person in

6  Trumbull County, right?

7  A.    Yes.

8  Q.    And develops it up to a point of somewhere between

9  2 to 3.3 pills per person?

15:30:34 10  A.    Correct.

11  Q.    Fair?

12  A.    Yes.

13  Q.    Now, we could also do the same with Lake County,

14  because you've got that math as well, right?

15:30:43 15  A.    Yes.

16  Q.    And, sir, these opinions or data sheets that you've

17  put together for us, do these, are these done to a degree

18  of scientific certainty such that you can reasonably rely

19  upon them in this Court?

15:31:09 20  A.    Yes.

21              These are just summaries of the data.  You

22  heard me reference the dispensing data several times.

23  It's data that came from CVS and Walgreens and Walmart

24  and Giant Eagle.

15:31:24 25              All these two tables, these three tables

1    for each of them we looked at does is it takes their data

2    and adds up the Oxycodone and Hydrocodone dosage units

3    by -- by store and by year, and presents that in a table.

4                So it's like counting up how many people

15:31:53  5    are in this room.  It's -- it's not complicated math.

6    It's not -- it's not even really science.  It's just

7    summarizing the data.

8                And we've done that to the best of our

9    ability.  I believe it's completely reliable.  It's as

15:32:08 10    reliable as the defendants' transaction data is.

11    Q.    In other words, if they had their data right when

12    it was given to you, this is -- this is two plus two

13    equals four?

14    A.    That's exactly right.

15:32:22 15    Q.    Okay.  No magic to this math?

16    A.    Right.  I'm not judging what went into two or went

17    into the second two.

18                I'm just saying if you add two and two you

19    get four, and I've reported four to you.

15:32:34 20    Q.    All right.  Now, the jury heard a couple of days

21    ago from Carmen Catizone.

22                I know you've read his expert report.  Have

23    you ever met him?

24    A.    I'm sorry, I actually didn't read his expert

15:32:49 25    report.

McCann - Direct/Lanier                                    2137

1    Q.    Oh.

2    A.    I -- I spoke to him or spoke to him on conference

3    calls, either an old-fashioned conference call or a Zoom

4    call, a few times over the last six months or a year.

15:33:09  5    Q.    Okay.  Would these have been integrated with

6    lawyers trying to figure out how to put this stuff

7    together for the Court?

8    A.    That's correct.

9              There was always someone interacting

15:33:19  10   between Mr. Catizone and me.  I don't think that I had

11   any real direct interactions with him.

12   Q.    Well, I did, with Mr. Catizone, a funnel, because

13   he testified about 7,800 prescriptions that he visually

14   laid eyes on either the hard copy or the data set that

15:33:41  15   was provided ultimately by you.

16   A.    Correct.

17   Q.    Do you understand that?

18   A.    Yes.

19   Q.    And you did that for those 7,800 prescriptions that

15:33:49  20   we got just in the last few months?

21   A.    Correct.

22   Q.    Now, I want the record to reflect the work that you

23   did in coming up with that set of random prescriptions

24   for him.

15:34:04  25             Okay?

1    A.    Yes.

2    Q.    So I've got the Craig McCann funnel, and I need you

3    to help me fill it in.

4                    Now, in fairness, I told you I was going to

15:34:17  5    do this last night, didn't I?

6    A.    Yes.

7    Q.    And, in fact, I asked you to figure out the math

8    from -- I mean, tell the jury how many charts you've

9    given us that we've tried to weed through to do this.

15:34:37 10    A.    The charts that I brought with me that are summary

11    charts that I thought you might look at, like the 10 or

12    12 pages we looked at just now, are eight or 900 pages

13    long.

14                    It was a binder that I put together,

15:34:51 15    printed double-sided, about the thickness of a package of

16    copier paper.

17                    So around eight or 900 pages.  And

18    Mr. Lanier last night selected the, I think it's 12 that

19    he wanted to talk to me about, and those are the 12 that

15:35:06 20    we looked at.

21    Q.    Okay.  And in that regard, instead of using all

22    eight or 900 pages, I've told you to go through those

23    pages and figure out how to answer these questions for

24    me.

15:35:20 25                    Have you done that?

          1    A.    Yes.  I had a homework assignment last night, and

          2    I've got my notes.

          3    Q.    All right.  Good.

          4              Well, refer to your notes, because we've

15:35:31  5    got to make the record exactly right to the extent we

          6    can.  Okay?

          7    A.    Yes.

          8    Q.    And the jury's entitled to that as well.

          9              So Lake and Trumbull Counties altogether,

15:35:44 10    how many prescriptions from CVS are we talking about?

         11    A.    851,198.

         12    Q.    Okay.  851,198.

         13    A.    198, yes.

         14    Q.    And for Giant Eagle, how many total prescriptions

15:36:08 15    are we looking at for the top of the funnel?

         16    A.    1,399,920.

         17    Q.    And for Walgreens Lake and Trumbull Counties?

         18    A.    One million.

         19    Q.    The top of the funnel, how many prescriptions?

15:36:30 20    A.    1,007,556.

         21    Q.    And for Walmart, Lake and Trumbull Counties, top of

         22    the funnel, how many prescriptions?

         23    A.    275,700.

         24    Q.    Now, those aren't pill counts, are they?

15:36:57 25    A.    No.

1          Those are prescriptions.

2     Q.    Explain again the difference between the number of

3     pills that you talked about before and these numbers of

4     prescriptions.

15:37:10  5     A.    Well, the prescription filled would be for a

6     package.  I typically visualize this in a bottle form, so

7     a bottle of, perhaps, 10 pills or 30 pills or 90 pills,

8     whatever the number of pills are that are in the package.

9          It's the number of pills that were in the

15:37:34 10   dosage units that we were talking about on those prior

11    exhibits that Mr. Lanier asked me about.

12         Here he's asking me really about the number

13    of bottles, the number of prescriptions that were filled,

14    and the prescription would typically be for some

15:37:50 15   packaging of more than just a single dosage unit.

16    Q.    All right.  And are these for all opioids, or just

17    looking at Oxy and Hydro?

18    A.    No, this is for all.

19    Q.    Okay.  You took those opioids that were filled in

15:38:05 20   Lake and Trumbull County, and then you ran them for red

21    flags, is that right?

22    A.    Correct.

23    Q.    And the red flags that we asked you to use here

24    were those red flags that were testified to by

15:38:25 25   Mr. Catizone.

 1               Is that right?

 2     A.    I didn't observe his testimony, but I understand

 3     that's correct, that he described 16 red flag

 4     calculations, and those are calculations that -- that we

15:38:43  5     did for him or for Mr. Lanier.

 6     Q.    Now, some of those red flags, the jury's already

 7     heard, had missing times.

 8     A.    Just one, yes.

 9     Q.    All right.  I want to talk about the missing times,

15:39:06 10     because I think there may be a misunderstanding of what

11     you were doing.

12               So explain, first of all, I think it was

13     red flag 13, and the time issue with red flag 13.

14     A.    So for 15 of the 16 flags, there's no time

15:39:33 15     component.  It's -- other than perhaps a day.

16               So if you recall Mr. Catizone's

17     explanation, there are things like perhaps the distance

18     that a patient traveled to a pharmacy or prescriptions

19     being filled for overlapping days of supply, or -- a

15:39:59 20     total of 16.  15 of them are of that type.  One of them,

21     flag 13, is three patients filling a prescription at the

22     same pharmacy for the same very narrowly defined package

23     of drug, written by the same prescriber.

24               And so it's a highly restrictive, highly

15:40:22 25     limiting flag, and it's the only one that has a time

1    element.  It says that those prescriptions have to be

2    filled, to trip the flag, within the same hour.

3    Q.    I'll put "At the same time."  It's actually "Same

4    hour."

15:40:39  5    A.    Correct.

6    Q.    All right.  So the work that -- the information

7    that the defendants gave you, did all of it have the time

8    in it?

9    A.    With really very few exceptions, all of the CVS and

15:40:57 10    all of the Walgreens data include a time.

11                   For Giant Eagle and Walmart, approximately

12    half of the prescriptions they provided us information on

13    didn't include the time.  Half of them did.

14                   So for two of the defendants, we got time

15:41:19 15    for -- fill time for all of the prescriptions.

16                   There were some issues with the CVS fill

17    times, but at least we did get a fill time for all of

18    their prescriptions and all of Walgreens' prescriptions.

19                   For Giant Eagle and Walmart, roughly half

15:41:37 20    of the prescriptions they gave us fill times and half of

21    them they didn't.

22    Q.    All right.  So the jury can follow this and the

23    Court and the written record and the defendants can, I've

24    drawn two buckets.

15:41:49 25                   One bucket were those prescriptions in your

1   funnel when you applied the red flag 13, that included

2   time.

3   A.    Correct.

4   Q.    The second bucket is that where there is no time.

15:42:02   5              You follow me?

6   A.    Right.  Yes.

7   Q.    All right.  Which companies always included time?

8   A.    CVS and Walgreens.

9   Q.    So their prescriptions are all in the time included

15:42:21   10  bucket?

11  A.    Correct.

12  Q.    And what about Walmart, how often did they include

13  time, roughly?

14  A.    I don't -- I don't remember the exact proportions,

15:42:31   15  but the way I think about it, approximately half of the

16  time there was, on half of the prescriptions there was a

17  fill time, and on half there was not.

18  Q.    And what about Giant Eagle?

19  A.    The same thing with Giant Eagle.

15:42:48   20  Q.    So we've got Giant Eagle, half in one bucket and

21  half in the other?

22  A.    Correct.

23  Q.    And we've got Walmart, half in one bucket and half

24  in the other?

15:42:59   25  A.    Yes.

1    Q.    Now, were you able to use your statistics and math

2    background to create a range, not knowing for this no

3    time bucket, since you didn't know the time, were you

4    able to do a range that would show the two possible ends

15:43:24  5    of time, and then it's going to be somewhere in the

6    middle?

7    A.    Yes.

8    Q.    All right.  Well, if we look at that range in this

9    bucket, I think the easiest one is what is going to be

15:43:38 10    the lower end of the range.

11              And by that -- let me, I'm not asking a

12    clear question.  Let me ask it this way.

13              If there's no time information given, and

14    you're trying to see if three patients filled the same

15:43:55 15    prescription in the same hour from the same doctor,

16    what's the best case scenario for never tripping the

17    flag?

18    A.    Zero.

19    Q.    All right.  So at one end of the spectrum is may be

15:44:13 20    none of them would have tripped that flag, fair?

21    A.    Yes.

22    Q.    You don't have to do math to figure that out, do

23    you?

24    A.    Correct.

15:44:18 25    Q.    At the other end of the spectrum, it could be every

1    one of them tripped the flag, right?

2    A.    Yes.

3           If I could explain that, just add a

4    sentence to that.

15:44:33   5    Q.    Okay.  Explain it.

6    A.    So, remember, it's got to be three patients coming

7    to the pharmacist with the same doctor's prescription for

8    exactly the same package drug, the same strength, the

9    same type of drug, the same size of bottle.

15:44:49  10           So exactly the same prescription from the

11    same doctor, three different patients.  And at one end of

12    the spectrum, of the times you see that in the data, you

13    can assume that they, all three of them come in at

14    different times during the day.  That would be the zero

15:45:08  15    tripping the flag.

16           At the other end of the spectrum would be

17    each time you see that triplet, which is rare, assume

18    that they all came in within the same hour, and that

19    would give you the maximum number of such triplets that

15:45:27  20    could trip the flag.

21    Q.    All right.  And so to compute the long end of this

22    spectrum, what time did you insert where they would all

23    trip it?

24    A.    Well, we inserted 12:00 noon for the missing time,

15:45:43  25    so where the defendants didn't produce a time, just a

1    month and day, we put in 12:00 noon as the time it was

2    submitted, it was filled.

3    Q.    Right.  And then from that, are you able to compute

4    the difference it would make in the numbers of flag 13 if

5    the times were properly given?

6    A.    Well, we can put that range on it.

7                We know the actual number is going to be

8    somewhere in between.

9    Q.    In between the zero and all at the same time.

10                Fair?

11   A.    Correct.

12   Q.    All right.  We'll get to that as we explain, then,

13   your funnel.

14                You've applied all the red flags.  In the

15   process of applying those red flags, we need to know how

16   many prescriptions you had at that point for CVS, for

17   Giant Eagle, for Walgreens, and for Walmart.

18                Can you give us the data, first, for CVS?

19   A.    Yes.  It is 175,254.

20   Q.    All right.  I'm going to put 175,254.

21                What if the extreme -- and does that

22   include the extreme being at the noon end on flag 13?

23   A.    That's correct.  Yes.

24   Q.    What if, instead, you're at the zero end, what does

25   it become for CVS?

McCann - Direct/Lanier                    2147

1    A.    It's the same number.

2          It doesn't affect CVS at all, so it's

3    1 million -- I'm sorry, 175,254.

4    Q.    And is that because CVS was all totally within the

15:47:36 5    time included bucket?

6    A.    Correct.

7    Q.    All right.  Then we've got Giant Eagle.

8          Now, Giant Eagle was half in the time

9    included bucket but half of their prescriptions they gave

15:47:52 10   you didn't have a time.

11          So with that, tell us how many

12   prescriptions were flagged by the red flags using the

13   range that you've got here.

14   A.    Well, at the upper end it's 164,698.

15:48:14 15  Q.    And if -- and is that if they're all at noon?

16   A.    Correct.

17   Q.    And if, instead, on their half in the no time

18   bucket, they all came in at different times, different

19   hours, different buckets, nobody trips the flag, what

15:48:35 20  would the number be?

21   A.    155,764.

22   Q.    And then Walgreens, I believe you've got Walgreens

23   all -- they always had the time, is that right?

24   A.    Yes.  Virtually always.

15:48:52 25          I say "always"; there's some, but not very

1       many missing times.

2       Q.    All right.  So Walgreens, how many prescriptions

3       are left that trigger red flags?

4       A.    226,843.

15:49:12    5   Q.    And do we have a second number, or is that so close

6       that you just left it there?

7       A.    Well, it is really close, but it's 14 lower, it's

8       226,829.

9       Q.    All right.  So Walgreens is all in the time

15:49:29   10   included bucket, but a little bit of it sloshed out into

11      the other bucket.

12      A.    Right.  Just a drop or two.

13      Q.    All right.  Then we've got last in alphabetical

14      order is Walmart.

15:49:40   15          And for Walmart, what is the -- and

16      Walmart, you had half in the bucket where they gave time

17      and half where they didn't, so you've got to do the

18      range.

19             What was the number in the bucket at the

15:49:57   20   top end of the range?

21      A.    49,243.

22      Q.    And at the bottom end of the range?

23      A.    48,557.

24      Q.    All right.  Now, once you've done that, the Court

15:50:22   25   put in a randomizer to, at random, filter those down to

McCann - Direct/Lanier                    2149

1    the final amount of red flags for Carmen Catizone to see

2    of 7,800.

3                    Is that what you understand?

4    A.    Yes.

15:50:43  5    Q.    And that 7,800, did you provide the spreadsheet and

6    the data for Mr. Catizone?

7    A.    Yes.

8    Q.    All right.  Now, I got a housekeeping matter and

9    then we're going to be basically done.

15:50:58 10                    I think for the record I've got to put some

11   numbers down here and I'm going to need your help to make

12   sure I've got the numbers right.

13                    Here's what we've got to do.  We've got to

14   show on this record the number of prescriptions per

15:51:19 15   defendant per county, and we need to break it apart into

16   before 2011 and after.

17                    We do that for each one.  Okay?

18   A.    Yes.

19   Q.    And in that regard, sir, let's do it by defendant,

15:51:51 20   and we'll start with CVS.

21                    Can you put into the record --

22                    MS. SWIFT:  Objection, Your Honor.

23                    May we be heard on this?

24                    THE COURT:  I'm sorry?

15:52:05 25                    MS. SWIFT:  I have an objection.

 1                 (Proceedings at side-bar:)

 2                 THE COURT:  All right.  What's the

 3     objection?

 4                 MS. SWIFT:  Your Honor, Kate Swift for

15:52:20  5     Walgreens.

 6                 I raised this with Mr. Lanier this morning.

 7                 The only place this information appears in

 8     Dr. McCann's supporting materials does not break out the

 9     information by defendant.

15:52:33 10                 Defendants are lumped together and Rite Aid

11     is included.  So it's an undisclosed opinion, I believe,

12     what he's trying to do right now.

13                 MR. LANIER:  Your Honor, it's not an

14     undisclosed opinion.

15:52:47 15                 I've been told by Peter Mougey and by the

16     witness, I believe the witness, that he's got this in

17     those 900 pages.

18                 We clearly cannot use the Rite Aid data.

19     We've got to break it out because Rite Aid is not here

15:53:02 20     anymore.

21                 This is no different than a car wreck case

22     where the economist changes the future life expectancy by

23     two months when he's testifying because he's testifying

24     two months after his report, or changes the lost wages.

15:53:16 25                 THE COURT:  Look, I'm sure this is in the

1       data.  Any of the defendants can see this, so it's just

2       distinguishing between before 2011 and after.

3                   MS. SWIFT:  Your Honor, I asked Mr. Lanier

4       to show me where it appears, and he hasn't done that.  I

15:53:34  5       ask that he do that before he allow this witness to put

6       this information into the record.

7                   MR. LANIER:  I hate to take a break to do

8       that, Ms. Swift.  I'm glad to do it, Your Honor;

9       obviously she can take him on voir dire on this.  I mean,

15:53:46 10       I don't care.  I mean the data is the data.  I mean, it

11       is what it is.  We just have to take out Rite Aid.

12                   THE COURT:  I mean if you want to use your

13       time, fine, you can question him right now, and he'll

14       pull out the pages.

15:53:57 15                   I'm not going to have him talk about Rite

16       Aid, but I mean if you want to -- does he have his 8,000

17       pages here?

18                   MR. LANIER:  I'm not sure if he does, Your

19       Honor, but if not, I am sure he can access them.

15:54:12 20                   MS. FUMERTON:  Your Honor, this is Tara

21       Fumerton from Walmart.

22                   We would just join in the objection, and I

23       would also echo --

24                   THE COURT:  Well, who cares?  Why are you

15:54:21 25       objecting?  It's there.

1        MS. FUMERTON:  Your Honor, we don't know

2   that it's there, actually.  This has not been disclosed

3   to us previously.  We asked this morning for that

4   information to be shown to us, where it was.  Mr. Lanier

15:54:29  5   said he would get it for us, and that has not happened.

6        MR. LANIER:  Your Honor, this morning in an

7   effort to try to make this go smooth, I sat down with

8   them, actually we stood up, stood up with them, and I

9   showed them every chart I was going to fill out, that I

15:54:43 10   was going to draw, all of the data.

11        At the end of our conversation, where I

12   showed them each sheet I was going to use and how I was

13   going to use them, laid out the whole exam for them, and

14   at the end one of them asked me, "Oh, by the way," came

15:54:57 15   back to me, "Where is that data," and I said "I think

16   it's in all of those pages.  I'll go try to find out and

17   let you talk to him ahead of time if you need to."

18        They never came back to me and said they

19   needed to, so I didn't volunteer it.

15:55:12 20        MS. SWIFT:  That's not entirely accurate.

21        THE COURT:  We're going to go ahead.  I

22   assume this witness will be on overnight, there will be

23   cross-examination, and I'll direct the plaintiffs to

24   supply the charts --

15:55:22 25        MR. LANIER:  We will.

1               THE COURT:  -- tonight where, exactly

2      where.

3               And if it turns out it's not there, I'll

4      just tell the jury to disregard that --

15:55:29  5               MS. SWIFT:  We --

6               THE COURT:  -- the breakdown, overall.

7               MR. LANIER:  Okay.  Thank you, Judge.

8               (End of side-bar conference.)

9      BY MR. LANIER:

15:55:45 10     Q.   Dr. McCann, I want to make crystal clear something

11     before we walk in through these numbers.

12               Mr. Mougey is a lawyer that's been helping

13     us in this case.  He works at the Levin law firm.  You've

14     worked with him a boatload in your life on different

15:56:02 15     cases.

16               Right?

17     A.   Yes.

18     Q.   And Mr. Mougey is the one who told me that in your

19     huge list of data, those eight, 900 pages, or whatever

15:56:15 20     you've produced, you've got the figures that break out

21     per defendant the prescriptions that were filled before

22     and after 2011.

23               Is it in that data set?

24     A.   Very close.

15:56:32 25               It's not in what I heard referred to as the

1    1006 summaries I was carrying yesterday.

2    Q.    Right.

3    A.    But in the production attached to each of my expert

4    reports, there is data files, there's code, and there's

15:56:49 5    actual exhibits.

6              And it's -- it's in the production given to

7    the defendants with my expert reports.  It shows by

8    county, by defendant, and by year.

9              So you could see what's 2006, '7, '8, '9,

15:57:06 10    '10, and it's just a matter of adding those numbers up;

11    and it's 2011, '12, '13 and '14, and you can add those

12    numbers up.

13    Q.    Great.  Then with that, let's proceed --

14              MR. BUSH:  Your Honor -- I'm sorry, I

15:57:21 15    apologize -- can we go off the record again and go to

16    side-bar?

17              THE COURT:  What?

18              MR. BUSH:  Can we go to side-bar, please?

19              (Proceedings at side-bar:)

15:57:31 20              THE COURT:  All right.  What is the

21    objection now?

22              MR. BUSH:  The objection now is --

23              THE COURT:  I can't hear you.

24              MR. BUSH:  I'm sorry, I have a problem with

15:57:39 25    these electronics.

```
         1              Is that a little better, Your Honor?

         2              THE COURT:  Yes.

         3              MR. BUSH:  The number that Mr. Lanier, and

         4    I don't know if this is true for the other defendants,

15:57:47 5    but the numbers that Mr. Lanier used for the total

         6    prescriptions of opioids, which is what he said and led

         7    Mr. McCann to say, is not accurate.

         8              Mr. McCann's numbers include all -- it's

         9    the total number of scripts that flag, and the opioid

15:58:04 10   scripts is less, significantly less.

        11              So this is really an enterprise that's just

        12   headed off in the wrong direction.

        13              THE COURT:  Well, you can cross-examine.

        14   If he's switching his numbers, he won't be very credible,

15:58:16 15  Mr. Bush.

        16              I mean, they've been provided.  He did the

        17   math.

        18              MR. BUSH:  He's being lead, I think, into

        19   an incorrect statement.

15:58:24 20              THE COURT:  Well, if that's the case,

        21   you'll make a heyday with him in your cross-examination.

        22              All right?  The jury will disregard him

        23   completely if you succeed in that.  You should want this.

        24              I mean, seriously.

15:58:38 25              MR. BUSH:  That is one way to do it, Your
```

1    Honor.  It's just that if you're having a witness who is

2    supposedly an expert on the numbers and he's being led by

3    counsel to put incorrect numbers up, that seems to be --

4              MR. LANIER:  Your Honor, I have not led him

5    on any of these numbers.

6              THE COURT:  He was not led.

7              The witness said that he did all this work

8    and he pulled it out of his data.

9              Mr. Lanier didn't do these computations.

10   The witness said he did everything.

11             If he -- if you cross-examine him, he's not

12   going to be able to support it, that will be very good

13   for you.

14             MR. BUSH:  All right.

15             THE COURT:  I mean, he'll be discredited

16   and you'll have your chance, you know, your -- we've got

17   another hour or so today, or tomorrow, so you've got

18   overnight to work on your cross-examination.

19             (End of side-bar conference.)

20             MR. LANIER:  Thank you, Judge.

21             All right.  So, Ms. Sue, are you ready

22   again?

23   BY MR. LANIER:

24   Q.   Okay.  CVS, pre-2011, can you give us that, that

25   number, please?

1    A.    Yes.  It's 183,352.

2    Q.    After 2011?

3    A.    355,795.

4    Q.    And that's for Lake.

16:00:10  5          What about for Trumbull, before 2011?

6    A.    129,025.

7    Q.    After 2011?

8    A.    183,026.

9    Q.    And we'll switch colors for --

16:00:30 10          THE COURT:  Sir, is this -- is this total

11   or this is the breakdown of the red flag prescriptions?

12          THE WITNESS:  This is total prescriptions.

13   BY MR. LANIER:

14   Q.    And then for Giant Eagle, the number before 2011 in

16:00:53 15  Lake?

16   A.    191,575.

17   Q.    And after?

18   A.    405,060.

19   Q.    Trumbull, before 2011?

16:01:11 20  A.    312,377.

21   Q.    After?

22   A.    490,968.

23   Q.    And then for Walgreens, Lake County, before 2011?

24   A.    193,826.

16:01:38 25  Q.    After?

McCann - Direct/Lanier                                    2158

1    A.    320,461.

2    Q.    Trumbull County, before 2011?

3    A.    128,717.

4    Q.    After?

16:01:54  5    A.    364,552.

6    Q.    And again, are these prescriptions or pill numbers?

7    A.    Prescriptions.

8    Q.    And are these all the opioids, or prescriptions, or

9    only the red flag ones?

16:02:12  10    A.    All of them.

11    Q.    And then the final one we'll look at is Walmart.

12                   Lake County, before 2011?

13    A.    68,726.

14    Q.    After?

16:02:27  15    A.    114,566.

16    Q.    Trumbull, before 2011?

17    A.    26,867.

18    Q.    After?

19    A.    65,541.

16:02:45  20    Q.    Okay.

21                   THE COURT:  All right.  I want to go on the

22    headsets again a minute.

23                   (Proceedings at side-bar:)

24                   THE COURT:  All right.  Mr. Lanier, I'm

16:03:09  25    trying to reconcile the first set of numbers this witness

1    gave and the second set, and I can't do it.

2              All right?  He said total number of

3    prescriptions.  I'm just looking at CVS.

4              It seems to me the total number before 2011

16:03:28  5    plus the total number after 2011 should equal the total,

6    right?  Unless there's something missing.

7                   MR. LANIER:  I --

8                   THE COURT:  I'm just looking at CVS, Lake

9    County.

16:03:44 10              Is -- all right.  I'll have to do the math.

11    I just want to make sure that 183,000 plus 355 plus 129

12    plus 183 equals 851,000, so it makes sense.

13              If it doesn't, I don't know what he's

14    doing.

16:04:08 15                   MR. LANIER:  Okay.

16                   THE COURT:  Do you understand what I

17    just --

18                   MR. LANIER:  Oh, yeah, Judge.  I think

19    that's a great point.

16:04:15 20                   THE COURT:  So if -- do the defendants

21    understand what I just did?

22                   MS. FUMERTON:  Your Honor, this is Tara

23    Fumerton from Walmart.

24              I think this emphasizes our point and our

16:04:26 25    objection.

1        THE COURT:  No, if that adds up then what

2   he did is fine.  He just broke it down between -- I mean,

3   he gave total prescriptions, Lake and Trumbull for CVS,

4   851,000.

5        So he's now just broken down in the two

6   counties before 2011 and after 2011.

7            I just want to make sure those four add up.

8            MR. LANIER:  So, Your Honor, I only did CVS

9   just now, but I did CVS just now, and it is -- to quote

10  *My Cousin Vinny* -- identical.

11           THE COURT:  All right.  So that's four

12  numbers add up to the 851,000.

13           MR. LANIER:  Yes, sir.

14           THE COURT:  All right.  851, 198.  All

15  right.  Well, fine.

16           Why don't you just have this witness

17  confirm that?

18           MR. LANIER:  I will.

19           THE COURT:  And then the numbers, everyone

20  will see what you did.

21           MR. LANIER:  Yes.  That makes good sense.

22           MS. FUMERTON:  And, Your Honor, this is

23  Tara Fumerton again.

24           The witness testified that these numbers

25  were in his report.

1          If you could point to where that is, that

2    would be helpful.

3          THE COURT:  Fine.  If he can do that, that

4    would be helpful, or at least where, what he did.

16:05:34  5          It looks to me like it's just math, but if

6    it's actually broken down this way, that would be

7    helpful.

8          All right.

9          MR. LANIER:  All right.  Thank you.

16:05:44 10          (End of side-bar conference.)

11    BY MR. LANIER:

12    Q.   All right.  Sir, if this -- if I'm understanding

13    what you've done, we can take, for example, the CVS line

14    down here and add up these numbers, and will that equal

16:06:13 15    or should that equal the number of total prescriptions

16    that were filled in Lake and Trumbull County up at the

17    top?

18    A.   Yes.  That's correct.

19    Q.   And the same for each of the others?

16:06:25 20    A.   Correct.  That's right.

21    Q.   All right.  The last thing I need to ask you in

22    regards to this is did -- and it's 4:06, this is a great

23    time to talk about this -- are you able and have you done

24    a statistical analysis -- well, let me ask it this way.

16:06:51 25          I want you to assume with me that

McCann - Direct/Lanier                    2162

1    Mr. Catizone said that conservatively he thought that 90

2    percent of these prescriptions were inadequately

3    documented for dispensing.

4              If Mr. Catizone, in fact, had a

16:07:18  5    conservative 90 percent of 7,800, are you able to

6    determine whether or not that's a reliable figure that we

7    can extrapolate over all of the red flagged

8    prescriptions?

9              MR. BUSH:  Objection, Your Honor.  We may

16:07:35 10    need to go --

11              MR. LANIER:  I think he's done this.

12              THE COURT:  No.

13              (Proceedings at side-bar:)

14              MR. LANIER:  Your Honor, I believe --

16:07:53 15              MR. BUSH:  Can I state the objection?

16              THE COURT:  Hold it.  Robert, we've got to

17    get the white noise on.

18              MR. BUSH:  All right.  Thank you.

19              Your Honor, I believe this is an

16:08:05 20    undisclosed opinion.

21              Neither Mr. Catizone nor Dr. McCann --

22              THE COURT:  Well, first of all --

23              MR. BUSH:  Sorry.

24              THE COURT:  I'm not sure this -- the

16:08:12 25    defendants have represented that this is a random sample,

1    okay, so they're stuck with that.

2                    MR. BUSH:  That's not -- that's not the

3    question.

4                    They have never --

16:08:20  5    THE COURT:  No.  No.

6                    So I don't -- I don't think this witness

7    has determined that on his own expertise.

8                    So, I mean, anyone can do whatever they

9    want with this 8,000 or 7,800.  All right?  Anyone can

16:08:39 10   extrapolate that, do the math.  All right?  So anyone can

11   do that.

12                    As far as I'm concerned, anyone can do

13   that.  It's good math.

14                    But I don't think this witness has

16:08:53 15  independently determined whether the 7,800 or 8,000 are a

16   representative sample.

17                    The defendants have represented it and so

18   they are stuck with that.

19                    MR. LANIER:  Your Honor, Mark Lanier.

16:09:06 20                    My understanding is the supplemental expert

21   report he specifically says that the confidence interval

22   statistically says that you can extrapolate the 90

23   percent from those 7,800 over the breadth of those

24   prescriptions that hit red flags.

16:09:25 25                    THE COURT:  I mean, is that -- if it's in

1    the report, Mr. Majoras, then I'll overrule that.

2                    I haven't seen his report.

3                    MR. BUSH:  That's not in the report.  That

4    was my point.

16:09:35 5                    THE COURT:  Or Mr. Bush.

6                    I don't know.  Have him point out to where

7    it's in his report.

8                    MR. LANIER:  Judge, I have not -- I do not

9    want to represent that I personally looked at it.  I'm

16:09:44 10   taking the word of other lawyers.

11                   And so what I would like to do is reserve

12   that, and if we finish with Mr. McCann today, then I will

13   submit that maybe as a stipulation that he would have

14   testified to it, if it's in his report.

16:09:58 15                   If it's not in his report, we're done.

16                   THE COURT:  Well, I'll tell you what, I'll

17   let you, if it's in his report, I'll let you ask it on

18   redirect -- all right?

19                   MR. LANIER:  Perfect.

16:10:12 20                   THE COURT:  -- whether it's in there or

21   not.

22                   If it's not in his report, then it won't be

23   asked at all.

24                   Fair enough?

16:10:22 25                   MR. BUSH:  Yes.

```
            1              THE COURT:  Okay.

            2                    (End of side-bar conference.)

            3              MR. LANIER:  Your Honor, if I could

            4    proceed?

16:10:42    5              THE COURT:  Yes.

            6              MR. LANIER:  It is on Page 8, 9 and 10 of

            7    the report, so I'll just ask the questions.

            8              THE COURT:  Pages 8, 9 and 10 of the

            9    supplemental report?

16:10:53   10              MR. LANIER:  Yes, Your Honor, the third

           11    supplemental report.

           12              THE COURT:  What's the date of the

           13    supplemental report?

           14              MR. LANIER:  The date on it is September

16:11:00   15    21st, 2021.  It's the third supplemental report, and I'm

           16    glad to approach with it.

           17                    (Pause.)

           18              THE COURT:  What page is this?

           19              MR. LANIER:  Oh, Your Honor, it's

16:11:17   20    Pages -- starts on Page 8 is the discussion on the

           21    confidence interval for random sampling.

           22              MR. BUSH:  Your Honor, I'm sorry, I've got

           23    an objection that we're going to have to go back.  I'm

           24    sorry.

16:11:33   25              MR. LANIER:  I can't hear.
```

 1                    THE COURT:  I guess he wants to go back on

 2      here.

 3                    (Proceedings at side-bar:)

 4                    MR. BUSH:  I'm sorry, I don't have this

16:11:56  5      report right here in front of me.  I'm trying to get to

 6      the page that Mark's talking about.

 7                    THE COURT:  All right.

 8                    MR. BUSH:  But I remember the report.

 9                    And the report talked about confidence

16:12:06 10      intervals but never closed the gap and said, "And

11      therefore, I can conclude that you can extrapolate and

12      find that X number of the entire universe was not sampled

13      properly, there was no notation."

14                    So that final step is not in the report, as

16:12:22 15      I recall it.

16                    Mr. Lanier, if you can tell me again the

17      page that you're referring to?

18                    MR. LANIER:  It starts on the bottom of

19      Page 8 and goes to Page 9, and then on to Page 10.

16:12:32 20                    THE COURT:  Let's just do it step by step.

21                    Ask him what -- I mean, there's a lot of

22      words here.

23                    MR. LANIER:  I can do that, Your Honor,

24      very easily.

16:12:40 25                    THE COURT:  And see what he's saying.

```
             1              And if -- and if he did this in his report,

             2      I'll allow him to testify to it.

             3                   MR. LANIER:  Great.

             4                   THE COURT:  If it's not there, he can't

16:12:49     5      point to it in his report, you'll have to stop wherever

             6      he's not able to sync it up with his report.

             7                   MR. LANIER:  Perfect.  Thank you, Judge.

             8                   (End of side-bar conference.)

             9      BY MR. LANIER:

16:13:07    10      Q.    Okay.  Fun with statistics on a Thursday afternoon.

            11              Can you explain a confidence interval for

            12      us?  Let's start with this.

            13              Sir, do you, when you talk about

            14      statistics, is there something that's involved in trying

16:13:26    15      to determine how accurate a finding is?

            16      A.    Yes.

            17      Q.    So, for example, if I'm going to roll a dice, and

            18      when I roll the dice I get two threes, does that mean

            19      that I'm always going to get two threes when I roll dice?

16:13:53    20      A.    No.

            21      Q.    Are you able statistically to figure out the odds

            22      of that happening?

            23      A.    Yes.

            24      Q.    And when you figure out those odds, it not only

16:14:04    25      makes it useful for you at the casino, but it also allows
```

1     you to come testify about things such as that.

2                    Is that right?

3     A.    Yes.

4     Q.    All right.  But whenever you're giving the

16:14:18  5     statistics of the odds of something to be likely or not

6     likely, do you have some ability to give range?

7     A.    Yes, we call them confidence intervals.

8                    They are a range around the estimate that

9     you believe -- you have some reason to believe

16:14:41 10     incorporates, within that range, the true value that

11     you're trying to estimate.

12                    And I could give you an example if you'd

13     like, but --

14     Q.    Please.

16:14:51 15     A.    -- that's the basic.

16                    So in the introductory statistics course,

17     they often talk about red marbles and blue marbles pulled

18     out of a jar.

19                    You've got a jarful of these colored

16:15:05 20     marbles and you pull out 10 of them, and you see how many

21     are red and how many of them are blue, and then draw some

22     what we call inferences, some intuition, some opinion,

23     about how many red and blue marbles there are in the jar.

24                    In the context of this case, imagine that

16:15:29 25     it's not a jar but a great big 45-gallon drum.  And it

1    doesn't have a hundred marbles in it, it's got 616,000

2    marbles in it, the number of flagged prescriptions using

3    Mr. -- the flags that Mr. Catizone explained.

4              So there's 616,000 marbles in the barrel,

5    and we pulled out 7,800 of them, so a little bit more

6    than one percent of the 616,000.

7              Mr. Catizone apparently testified that

8    there was not documentation to his view of the standard

9    in 90 percent of them, conservatively.

10             So he's telling you something about the

11   7,800 marbles that were pulled out of the barrel, and

12   confidence intervals or statistics that I would report to

13   you gives you a range of what you could find if you

14   dumped out the whole barrel and counted up how many were

15   red and how many were blue.

16             The 90 percent is what we call a point

17   estimate.  That's taking the sample, reviewing them as he

18   did, and saying 90 percent were inadequate, at most 10

19   percent were adequate.

20             So with that information, with his point

21   estimate, and with the size of that sample, what can we

22   say about the entire 616,000?

23             Well, with some what we call confidence

24   level, 95 percent is the standard that is used, we would

25   say that the true value, if we could dump out all 616,000

1    and count them up, the true value will be below -- will

2    be between some number below 90 percent, maybe 87

3    percent, and will be above that lower number, and below

4    some upper bound, maybe 93 percent.

16:17:43 5              So in my example, the confidence interval

6    is 95 percent confidence and the range is from 87 to 93.

7              The range depends on the confidence, how

8    confident you want to be, 95 percent or 99 percent, and

9    how large the sample is.  Is the sample only one toss of

16:18:05 10    the die like Mr. Lanier's first example?  If you only

11    pull out one marble and it's red, would you conclude that

12    a hundred percent of the marbles are red?  No, you just

13    took one draw.

14              If you took out 7,800 or 2,000 or 200, I

16:18:24 15    can give you a range around Mr. Catizone's 90 percent

16    number.  It's a tighter range, the larger the sample, and

17    a broader range, the smaller the sample.

18    Q.    All right.  And a housekeeping matter.

19              I gave you that 90 percent figure

16:18:43 20    previously here, but I did not talk to you about the

21    testimony of Carmen Catizone in preparing for today or at

22    any point in time.

23              Is that fair?

24    A.    Correct.

16:18:53 25              MR. LANIER:  Thank you, Your Honor.

         1              That allows me to pass the witness, and

         2    thank everybody for letting us be math nerds.

         3                   MS. SWIFT:  Your Honor, I understand we're

         4    stopping early today.

16:19:12  5                   THE COURT:  Yes.

         6                   MS. SWIFT:  Do you want us to get started?

         7                   THE COURT:  I think we'd start.

         8                   MS. SWIFT:  All right.  I'll just need a

         9    couple minutes to set up.

16:19:25 10                   THE COURT:  All right.

        11                   MS. SWIFT:  Thank you.

        12                   MR. SWANSON:  Your Honor, these are just

        13    transcripts.  Can I bring these up?

        14                   THE COURT:  Oh, sure.

16:22:37 15                   MR. SWANSON:  Thank you.

        16                   MS. SWIFT:  I understand there was a juror

        17    who left the room, but I apologize, I don't know if the

        18    juror came back.

        19                   We're good?  Okay.

16:23:00 20                   THE COURT:  Yes.  Yes.  Go ahead.

        21                   MS. SWIFT:  Thank you.

        22                   May I proceed, Your Honor?

        23                   THE COURT:  Yes.  This is Ms. Swift.  Yes.

        24                   MS. SWIFT:  Good afternoon, ladies and

16:23:11 25    gentlemen of the jury.

1

2

3          CROSS-EXAMINATION OF CRAIG McCANN

4     BY MS. SWIFT:

16:23:12  5     Q.    Dr. McCann, my name is Kate Swift and I represent

6     Walgreens.

7               It's nice to see you again, Dr. McCann.

8     How are you?

9     A.    It's good to see you, Miss Swift.

16:23:18 10               I'm well.  Thank you.

11     Q.    I'm going to focus my questions, or I'm going to

12     try to, anyway, on three areas:  Some of the examples

13     Mr. Catizone talked about in his testimony, the flagging

14     analysis that you did, and then I want to talk to you

16:23:31 15     about what you did not do.

16               But first of all, I want to go back to

17     something that Mr. Lanier was asking you about on direct.

18               And if I could have the Elmo, Mr. Pitts, I

19     would appreciate it.

16:23:49 20               So what I've got back on the screen here,

21     Dr. McCann, is P 26321, which is some of the dispensing

22     data for the Walgreens stores in Lake and Trumbull

23     Counties, correct?

24     A.    Yes.

16:24:03 25     Q.    You don't have any opinion that any of those dosage

1    units that are tallied up in this exhibit should not have

2    been dispensed in Lake and Trumbull County, correct, sir?

3    A.    Correct.

4    Q.    The numbers in the charts like P 26321, those don't

16:24:23  5    have any red flag analysis applied to them or anything

6    like that?

7            That's just totals, right?

8    A.    Correct.

9            MS. SWIFT:  Thank you, Mr. Pitts.  You can

16:24:32 10    take that down.

11    Q.    Now, Dr. McCann, I'd like to ask you some questions

12    about some examples that Mr. Catizone used in his

13    testimony last week.

14            I understand you testified you didn't watch

16:24:51 15    any of that testimony or read any of that testimony, is

16    that correct?

17    A.    Correct.

18    Q.    Do you have an understanding that Mr. Catizone

19    testified in this courtroom on October 7th, 8th and 12th?

16:25:02 20    A.    I don't recall those precise dates, but I recall

21    that I was aware that he was testifying late last week

22    and early this week.

23    Q.    All right.  I want to ask you questions about what

24    you did that Mr. Catizone relied on in his testimony in

16:25:20 25    the case.

McCann - Cross/Swift                                    2174

1                     The four pharmacies in the case provided

2          your team electronic notes data and hard copy

3          prescriptions for a sample of prescriptions that

4          plaintiffs say have red flags.

16:25:35  5                     Correct?

6          A.     Yes.

7          Q.     Your testimony then created a spreadsheet of each

8          of those pharmacies' notes productions.

9                     Fair?

16:25:45 10          A.     Yes.

11          Q.     There were roughly 2,000 prescriptions in each one

12          of those four notes spreadsheets that you put together.

13                     Correct?

14          A.     Correct.

16:25:59 15          Q.     The prescription summary spreadsheets that you put

16          together for Mr. Catizone, they include electronic data

17          and notes that you received for each prescription in the

18          sample, the 2,000 each, right?

19          A.     Correct.

16:26:15 20          Q.     And then you also included links to the hard copy

21          prescriptions that the pharmacies in the case produced.

22                     Correct?

23          A.     Correct.

24          Q.     So what you had at the end of the day in each of

16:26:26 25          those four spreadsheets was one row for each of the 2,000

McCann - Cross/Swift

2175

1    prescriptions in that pharmacy's sample.

2              Fair?

3    A.    Correct.  It's a little bit more complicated than

4    the process you've described, but that's the end result,

16:26:41 5    yes.

6    Q.    Okay.  And it's your understanding that the

7    plaintiffs' lawyers gave the sample prescription summary

8    for each of the pharmacies in the case to Mr. Catizone.

9              Right?

16:26:52 10    A.    That's my understanding.

11    Q.    Did you know that in the three days that

12    Mr. Catizone testified in the case he only identified two

13    examples of Walgreens' pharmacy notes?

14    A.    No, I don't know anything about the testimony that

16:27:10 15    he gave.

16    Q.    All right.  I'd like to show you one of those two

17    examples, if I could, please.

18              Have you ever seen what I just put on the

19    screen, Dr. McCann?

16:27:29 20    A.    No.

21    Q.    I'll represent to you that this is a slide that

22    Mr. Lanier showed to Mr. Catizone during his testimony,

23    and you can see at the top it says "Walgreens pharmacy

24    notes."

16:27:37 25              Correct?

1    A.    Yes.

2    Q.    And I'll read into the record the actual portion of

3    this that is the note.

4              It says, "508 days of

16:27:47  5    Oxycodone/Acetaminophen 5-325 milligrams tab and previous

6    prescriptions for this generic entity may exceed the

7    recommended adult duration:  1-30 days.  No DUR info

8    returned from plan 004 RXS last 090 days."

9              Then there's what looks like might be a

16:28:13  10   footnote or something.

11             Do you see that?

12   A.    Yes.

13   Q.    You're not offering any opinion in this case about

14   what that note means, correct, sir?

16:28:18  15   A.    Correct.

16   Q.    Do you understand that Oxycodone/Acetaminophen

17   5-325 is the generic name for Percocet?

18   A.    Yes.

19   Q.    Do you understand that Percocet is a combination of

16:28:32  20   Oxycodone and Tylenol?

21   A.    Yes.

22   Q.    You can't tell from the note, but I'll represent to

23   you and ask you to assume that I'm right, that this, this

24   prescription that this note comes from, flagged on

16:28:46  25   Mr. Catizone's methods number 12 and number 13.

1          Can you go along with that for me, please?

2     A.     Yes.

3     Q.     All right.  Do you know from memory what flags 12

4     or 13 -- and 13 are, or would you like me to put them on

16:29:03  5     the screen for you?

6     A.     I recall flag 13, but, I'm sorry, I don't recall

7     flag 12.

8     Q.     That's perfectly fine.

9               Do you have a copy of your April 16th

16:29:10 10     report?

11     A.     No.

12     Q.     Okay.  I believe we can get you a copy.  Just one

13     second.  And I'm going to put it on the screen, too.

14               MR. SWANSON:  May I hand it up?

16:29:32 15               THE COURT:  Yes.  Thank you.

16     BY MS. SWIFT:

17     Q.     Dr. McCann, do you see that I've got on the screen

18     the first page of your April 16th report in this case?

19     A.     Yes.

16:29:41 20     Q.     And I'll ask you to turn to Page 152.

21     A.     Yes.

22     Q.     And you can see there methods 12 and 13, correct?

23     A.     Yes.

24     Q.     Method number 12 flags a prescription if an opioid

16:30:05 25     is dispensed to at least four different patients on the

McCann - Cross/Swift

2178

1    same day and the opioid prescriptions were for the same

2    base drug, strength, and dosage form, and written for the

3    same -- by the same prescriber.

4              Correct?

16:30:18  5    A.    Yes.

6    Q.    And then flag 13, we've heard about this one a

7    little bit earlier today, that one flags when an opioid

8    is dispensed to at least three different patients within

9    an hour and the opioid prescriptions were for the same

16:30:31 10    base drug, strength, and dosage form, and were written by

11    the same prescriber.

12              Correct?

13    A.    Yes.

14    Q.    Both of those two flags are based on multiple

16:30:42 15    prescriptions being filled on the same day, correct?

16    A.    Yes.

17    Q.    And to focus on the flag that you focused on with

18    Mr. Lanier, flag 13, it's not just the same day, we're

19    talking within the same 60 minutes," correct?

16:30:58 20    A.    Correct.

21    Q.    So the time of day when a prescription was filled

22    is quite important for flag 13, would you agree with

23    that?

24    A.    Yes.

16:31:09 25    Q.    Do you have an understanding that the idea behind

1    flag 13 is that you're trying to capture situations where

2    groups of drug-seeking patients are coming into the

3    pharmacy to fill bogus prescriptions at the same time or

4    roughly the same time?

16:31:28  5    A.    No.  I didn't give any thought to that issue.

6    Q.    That's outside the scope of your expertise,

7    correct, sir?

8    A.    Correct.

9    Q.    Flag 13 identifies prescriptions where an opioid

16:31:41  10   was dispensed within an hour, and those prescriptions are

11   all roughly the same.

12              We've established that, right?

13   A.    Correct.

14              Really identically the same, I think.

16:31:52  15   Q.    So just to give an example, you might have a

16   situation where somebody comes in with one of those

17   prescriptions at 1:00 o'clock in the afternoon, somebody

18   else comes in at 1:10, maybe they come in together, and

19   the third one is filled at 1:20.  They are all filled

16:32:09  20   within a half hour or so of each other and they are all

21   the same drug and same prescriber, and that would flag on

22   flag 13.

23              Fair?

24   A.    Yes.

16:32:16  25   Q.    But it's critical for flag 13 to know what time the

1    prescription was filed, right, sir?

2    A.    Correct.

3    Q.    If somebody comes in at 8:00 in the morning with

4    the identical prescription, then at noon, and then at

16:32:30 5    5:00 p.m., those three prescriptions are not going to

6    flag on flag 13.

7              Correct?

8    A.    Correct.

9    Q.    That's not a group of drug-seeking patients coming

16:32:37 10    in together, it's a different scenario, right?

11    A.    Well, it may or may not be, but it's not going to

12    be flagged by flag 13 given the times that you just

13    described.

14    Q.    A prescription is only going to flag on flag 13 if

16:32:51 15    the fill time was within an hour of the other two

16    prescriptions, right?

17    A.    Correct.

18    Q.    All right.  Now, I want to talk to you a little bit

19    about how you handled the data necessary for

16:33:02 20    Mr. Catizone's method 13.

21              The pharmacies in this case each provided

22    you with data on the time a prescription was filled.

23              Correct?

24    A.    For -- for some of the prescriptions; not for all

16:33:19 25    of the prescriptions.

1    Q.    Right.  And you talked about that a little bit on

2    direct, correct, sir?

3    A.    Correct.

4    Q.    For Walgreens, I believe the field in the computer

16:33:28  5    system is called "dispense time."

6              For the other defendants it might have been

7    something a little different, like "fill time" or

8    "dispense hour and minute."

9              Is that fair?

16:33:36 10   A.    Yes.  All of these productions have slightly

11   different field labels or names on the fields, but that

12   sounds right.

13   Q.    Those fields, the dispense time or fill time

14   fields, they contain the time of day a prescription was

16:33:52 15   filled or dispensed.

16              That's your lay understanding, correct?

17   A.    Correct.

18   Q.    And that's the -- the fill time, we'll call it the

19   fill time field just for simplicity, that's the field you

16:34:02 20   used to identify the prescriptions that flagged on method

21   13, right?

22   A.    Correct.

23   Q.    And what you found when you looked at the data from

24   the pharmacies in the case, as you testified on direct,

16:34:13 25   some of the pharmacies didn't always capture the fill

McCann - Cross/Swift

1    time, right, sir?

2    A.    Well, whether they captured it or not, they didn't

3    produce it in the production we received some of the

4    time.

16:34:24  5    Q.    The data was not there in the data you received?

6    A.    Correct.

7    Q.    Were you aware that Giant Eagle and Walmart didn't

8    have historical fill time data in their systems before

9    2012 or 2013?

16:34:43  10    A.    No, I wasn't aware of that.

11    Q.    You testified --

12    A.    I'm sorry.

13            I wasn't aware of that at some point, and

14    then at some point in the last several months I became

16:34:53  15    aware of that.

16    Q.    And I believe you testified that for Giant Eagle

17    and Walmart, there was simply no fill time data there for

18    roughly half of their prescriptions, right, sir?

19    A.    Right.  I don't remember the precise proportion,

16:35:09  20    but for some large fraction there was not fill time, and

21    for some also large fraction there was fill time.

22    Q.    For the other pharmacies in the case, CVS and my

23    client Walgreens, you testified that they provided fill

24    time data for almost every prescription.

16:35:24  25            Fair?

1    A.    Correct.  Yes.

2    Q.    I think you just said this, but just to make sure.

3            Do you know how many prescriptions in the

4    data that you received lacked data on fill time?

16:35:38  5    A.    Not from memory.

6            I'd have to look it up in the data.  I

7    don't recall.

8    Q.    And you said on direct that Walgreens had fill time

9    for all or almost all of the prescriptions.

16:35:50 10            Did you know that Walgreens did not capture

11    data on fill time for more than 9,000 prescriptions?

12    A.    That wouldn't surprise me.

13            That's less than one percent of the

14    prescriptions, so, like I said, not all, but almost all

16:36:04 15    of the prescriptions had fill time from Walgreens.

16    Q.    Did you know that Walmart lacked data in its system

17    on fill time for more than 150,000 prescriptions?

18    A.    I don't recall that precise number, but it's a

19    little bit more than 50 percent of the prescriptions, so

16:36:21 20    that number is consistent with my -- my recollection.

21    Q.    For Giant Eagle, the computer system lacked data on

22    fill time for more than 770,000 prescriptions.

23            Does that sound right to you?

24    A.    Yes.

16:36:33 25    Q.    And for whatever reason; I understand you don't

McCann - Cross/Swift                     2184

1    know why, you just didn't have that data.

2              It's not like you're saying the defendants

3    in this case were keeping it from you or did anything

4    wrong with that data, right, sir?

16:36:45  5    A.    Correct.

6    Q.    All right.  So what you did, because you didn't

7    have the data for fill times for -- we could add it up, I

8    think it's something like -- something north of 900,000

9    prescriptions, you just -- you just made up a time,

16:37:01  10   right, sir?

11   A.    Well, I would say it a little bit differently, but

12   we used 12:00 noon as the fill time for all of those

13   prescriptions.

14   Q.    If there was no fill time in the data that the

16:37:13  15   pharmacies provided to you, you just filled in 12:00 noon

16   for every single one of them, right, sir?

17   A.    Correct.

18   Q.    Every time you did that, every time you filled in

19   "noon" where there was no data, you didn't actually know

16:37:26  20   what the fill time was, right, sir?

21   A.    Correct.

22   Q.    You just made it up?

23   A.    I would say it the way I said it, but we filled in

24   "12:00 noon."

16:37:36  25   Q.    You have no idea what time of day that any of those

1    prescriptions were filled, right?

2    A.    Correct.

3    Q.    Am I right that it could have been the case where a

4    prescription that came in at 8:00 a.m., another at noon,

16:37:54 5    another at 5:00 p.m., if you lacked the data for those

6    fill times, you just filled in "noon" for all three of

7    them?

8    A.    Correct.

9    Q.    You inserted the exact same time of day for more

16:38:08 10   than 900,000 prescriptions even though you have

11   absolutely no idea what time of day any of those

12   prescriptions were filled?

13   A.    Correct.

14   Q.    By making up fill times all with the exact same

16:38:19 15   time of day, you made sure you would find prescriptions

16   filled within an hour of each other, whether or not that

17   was true.

18              Isn't that right?

19   A.    No.  Not quite.

16:38:30 20   Q.    Well, if you got 900,000 prescriptions, you don't

21   know what time they were actually filled, so you just say

22   noon for every single one of them, doesn't that make it a

23   lot more likely that you're going to find prescriptions

24   all filled within an hour of each other; they were all,

16:38:49 25   from your perspective, filled at the exact same minute?

1    A.    No, you're reading the rest of the requirements of

2    flag 13.  It had to be three identical prescriptions from

3    the same prescriber, and that triplet is really quite

4    rare.

16:39:01  5              So it's not 900-and-some thousand

6    prescriptions that are implicated by this lack of fill

7    time.

8              It's really only those triplets where it's

9    the same prescription from the same prescriber presented

16:39:16 10  on the same day, and where the defendants didn't give us

11   a fill time.

12   Q.    You're not disputing that there are 900,000

13   prescriptions where you made up a fill time?

14   A.    Correct.  I'm not.

16:39:31 15  Q.    How many red flags did you generate by making up a

16   fill time?

17   A.    Not very many.

18              I gave you the range on my direct.  It was

19   around -- well, it was exactly 9,634 of the 616,000

16:39:56 20  flagged prescriptions.

21              So it was about one-and-a-half percent of

22   the flagged prescriptions were caused by this lack of

23   fill time, and our use of 12:00 noon for that missing

24   data.

16:40:09 25  Q.    Your analysis for flag 13 where you made up the

McCann - Cross/Swift

2187

1    fill time, that's an analysis that you said you did to a

2    reasonable degree of professional certainty, right, sir?

3    A.    Correct.

4    Q.    In your field of expertise, if you don't have data,

16:40:25  5    is it appropriate just to make it up?

6    A.    In some instances it is.

7    Q.    Is that how you do it at SLCG?

8    A.    In some instances we do.

9    Q.    Have you made up data in other cases where

16:40:40  10   plaintiffs' lawyers are paying you for your work?

11   A.    Only if it was appropriate to complete the

12   analysis.

13   Q.    Did anyone ever tell you that it was inappropriate

14   to make up a fill time where the time of day was

16:40:55  15   particularly meaningful for identifying red flags?

16   A.    No.  Not that I recall.

17   Q.    Did you know that Mr. Catizone testified that if

18   you had told him you'd made up the fill times, he would

19   not have relied on your data?

16:41:15  20        MR. LANIER:  Judge, I'm going to -- that's

21   all right.  I'll do it in redirect.

22   A.    I'm not sure what was represented to him as our

23   practice, what we did.

24        I'd have to know better what he understood,

16:41:29  25   but what I explained on direct, the narrow range of

        1    flagged prescriptions and the narrow range of sample

        2    flagged prescriptions implicated or involved in this

        3    issue, I think if Mr. Catizone understood that, he would

        4    have agreed with what we did.

16:41:49  5              I'm not sure that he -- it was explained to

        6    him what we did and the impact of, the very small impact

        7    of this issue.

        8    Q.   Well, you didn't explain it to him, did you, sir?

        9    A.   I did not.

16:42:02 10    Q.   And you didn't actually answer my question.

       11              My question was simply whether you knew

       12    that Mr. Catizone testified that if you had told him --

       13              MR. LANIER:  Judge, I'm going to object to

       14    this.

16:42:13 15              I've made it clear that we've not discussed

       16    Mr. Catizone's testimony.  It would be wrong for him to

       17    know what Mr. Catizone testified to.

       18              It would be wrong for him to --

       19              THE COURT:  Hold it.

16:42:22 20              We're not going to have speaking

       21    objections.

       22              MR. LANIER:  Objection.

       23              THE COURT:  I'll sustain the objection.

       24              MS. SWIFT:  Your Honor, he's an expert.

16:42:31 25              I'd like to show him what Mr. Catizone said

McCann - Cross/Swift                                    2189

1    on this score.

2                    THE COURT:  All right.  You can show him

3    the testimony.

4                    I'd like to see it, too, exactly what it is

16:43:04 5    you're going to show him.

6                    MS. SWIFT:  I have on the screen Page 1280

7    of the trial transcript.

8                    MR. LANIER:  Don't put it up for the jury,

9    please.

16:43:22 10                    MS. SWIFT:  I'm sorry.  You'd like to see

11    it before I give it to him, Your Honor?

12                    THE COURT:  Yes.

13                    MS. SWIFT:  I apologize.

14                    Hold on one second.

16:43:53 15                    (Pause.)

16                    MS. SWIFT:  For those who are following

17    along, it's Page 1280, Lines 6 to 13.

18                    THE COURT:  Okay.  You may show it to him.

19                    MS. SWIFT:  I'm sorry, Your Honor, I

16:44:44 20    couldn't hear what you said.

21                    THE COURT:  You may show it to him.

22                    MS. SWIFT:  Thank you, Your Honor.

23    BY MS. SWIFT:

24    Q.    Reading Lines 6 to 13 from Page 1280 of the trial

16:45:00 25    transcript, "Question:  And so it's okay with you if he

1    had just filled in for a large percentage of

2    prescriptions that they were all filled at noon, right?

3              "Answer:  That's making the assumption that

4    Dr. McCann did not do this professionally and would

16:45:16  5    compromise standards, and I can't make that, but I don't

6    believe that that occurred, and I would not have relied

7    on the data if I suspected that at all."

8              I take it from your testimony, sir, that

9    you did not know that?

16:45:28 10   A.    Correct.  I did not see this testimony.

11             MS. SWIFT:  Your Honor, I'm roughly at a

12   breaking point.

13             I'm mindful of the time.

14             THE COURT:  Okay.  All right.  If this is a

16:45:40 15   convenient time, ladies and gentlemen, we're going to

16   break a little early today because I need to make a

17   condolence call.

18             So usual admonitions apply.  Don't read,

19   see, or listen to anything you might encounter in any

16:45:57 20   sort of media on this case.

21             Do not discuss this case with anyone.  We

22   will pick up tomorrow morning at 9:00 o'clock with the

23   balance of this witness's testimony.

24             And I believe we may adjourn a bit early

16:46:12 25   tomorrow.  I'm sure no one will complain if we do.

1          So have a good evening, and we'll see you

2     tomorrow morning.

3               (Jury out.)

4               THE COURT:  Okay.  If everyone could be

16:46:47  5     seated for a minute.

6               Doctor, you may be excused.

7               MS. FUMERTON:  Your Honor --

8               THE COURT:  I'd like someone to give me

9     26320.  I've got three of them, but I'd like 26320, and

16:46:59 10     then tomorrow if we could do the same procedure first

11     thing in the morning with any documents that either side

12     wants to introduce through Mr. Joyce, that way we can

13     stay current.

14               MS. FUMERTON:  Your Honor, I'm sorry to

16:47:14 15     interrupt you, but the witness was walking out, and it

16     appears that he has notes with him that might have

17     information that was not yet disclosed.

18               I apologize if I'm mistaken by that, but I

19     just wanted to request that we have a copy of those

16:47:26 20     notes.

21               THE COURT:  All right.  If he's got

22     any -- if you've got any notes, those should be provided.

23               Okay.  Anything else anyone wants to bring

24     up?

16:47:40 25               MR. LANIER:  No, Your Honor, other than

```
 1    best wishes on the condolence call.  Those aren't fun.
 2                    THE COURT:  This doesn't have to be on the
 3    record.
 4                    (Discussion had off the record.)
 5                    THE COURT:  So okay.
 6                    MR. MAJORAS:  Your Honor, we'll have one
 7    exhibit.  We can do that tomorrow morning, though.
 8                    We talked about this morning there's an
 9    exhibit with a page number to admit, but we can do that
10    in the morning.
11                    THE COURT:  Would this be with Joyce?
12                    MR. MAJORAS:  No, it was back to
13    Mr. Rannazzisi.
14                    We had some testimony and we pulled one
15    page.
16                    I spoke to Mr. Lanier.
17                    THE COURT:  All right.  Well, which one?
18    I'll admit it now.
19                    MR. MAJORAS:  It's Defendants' MDL 01226,
20    Pages 1 and 94.
21                    MR. LANIER:  No objection, Judge.
22                    THE COURT:  All right.  That's admitted
23    without objection.
24                    MR. MAJORAS:  Thank you, Your Honor.
25                    (Proceedings concluded at 4:48 p.m.)
                               -  -  -  -  -
```

1                C E R T I F I C A T E

2                    I certify that the foregoing is a correct

3       transcript from the record of proceedings in the

4       above-entitled matter.

5

6

7

8       **/s/Susan Trischan**
        /S/ Susan Trischan, Official Court Reporter
9       Certified Realtime Reporter

10      7-189 U.S. Court House
        801 West Superior Avenue
11      Cleveland, Ohio 44113
        (216) 357-7087
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3      **WITNESSES:**                                        **PAGE**

4       CROSS-EXAMINATION OF BRIAN JOYCE (RESUMED)        1938

5       BY MR. WEINBERGER

6       CROSS-EXAMINATION OF BRIAN JOYCE (RESUMED)        2051

7       BY MR. WEINBERGER

8       REDIRECT EXAMINATION OF BRIAN JOYCE               2061

9       BY MR. STOFFELMAYR

10      RECROSS-EXAMINATION OF BRIAN JOYCE                2089

11      BY MR. WEINBERGER

12      DIRECT EXAMINATION OF CRAIG McCANN                2095

13      BY MR. LANIER

14      CROSS-EXAMINATION OF CRAIG McCANN                 2172

15      BY MS. SWIFT

16

17                          * * * * *

18

19

20

21

22

23

24

25