1           IN THE DISTRICT COURT OF THE UNITED STATES
                FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3
      IN RE:                         Case No. 1:17-md-2804
4     NATIONAL PRESCRIPTION          Cleveland, Ohio
      OPIATE LITIGATION
5                                    October 15, 2021
      CASE TRACK THREE               8:46 a.m.
6

7

8                         - - - - -

9
                         **VOLUME 9**
10

11                        - - - - -

12

13          TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

14         BEFORE THE HONORABLE DAN A. POLSTER,

15            UNITED STATES DISTRICT JUDGE,

16                    AND A JURY.

17

18                        - - - - -

19

20

21    Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                               7-189 U.S. Court House
22                             801 West Superior Avenue
                               Cleveland, Ohio  44113
23                             216-357-7087
                               Susan_Trischan@ohnd.uscourts.gov
24

25    Proceedings recorded by mechanical stenography;
      transcript produced by computer-aided transcription.

```
 1    APPEARANCES:
      For the Plaintiffs:          Peter H. Weinberger, Esq.
 2                                 Spangenberg, Shibley & Liber
                                   1001 Lakeside Avenue, Ste. 1700
 3                                 1900 East Ninth Street
                                   Cleveland, Ohio    44114
 4                                 216-696-3232

 5                                 W. Mark Lanier, Esq.
                                   Rachel Lanier, Esq.
 6                                 M. Michelle Carreras, Esq.
                                   The Lanier Law Firm
 7                                 6810 FM 1960 West
                                   Houston, Texas    77069
 8                                 813-659-5200

 9                                 Frank L. Gallucci, III, Esq.
                                   Plevin & Gallucci Company, LPA
10                                 The Illuminating Building
                                   Suite 2222
11                                 55 Public Square
                                   Cleveland, Ohio    44113
12                                 216-861-0804

13                                 Salvatore C. Badala, Esq.
                                   Maria Fleming, Esq.
14                                 Napoli Shkolnik
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York    10017
                                   212-397-1000
16
                                   Jeff Gaddy, Esq.
17                                 Levin Papantonio Rafferty
                                   316 South Baylen St.
18                                 Pensacola, Florida    32502
                                   850-435-7054
19

20    For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
                                   Brian C. Swanson, Esq.
21                                 Katherine M. Swift, Esq.
                                   Alex Harris, Esq.
22                                 Sharon Desh, Esq.
                                   Bartlit Beck LLP
23                                 54 West Hubbard Street, Ste.300
                                   Chicago, Illinois    60654
24                                 312-494-4400

25
```

```
 1   For CVS Defendants:          Graeme W. Bush, Esq.
                                  Eric R. Delinsky, Esq.
 2                                Alexandra W. Miller, Esq.
                                  Paul B. Hynes, Jr., Esq.
 3                                Zuckerman Spaeder - Washington
                                  Suite 1000
 4                                1800 M Street, NW
                                  Washington, DC   20036
 5                                202-778-1831
     For HBC/Giant Eagle
 6   Defendants:                  Robert M. Barnes, Esq.
                                  Scott D. Livingston, Esq.
 7                                Marcus & Shapira
                                  35th Floor
 8                                One Oxford Centre
                                  301 Grant Street
 9                                Pittsburgh, PA   15219
                                  412-471-3490
10
                                  Diane P. Sullivan, Esq.
11                                Chantale Fiebig, Esq.
                                  Weil Gotshal & Manges
12                                Suite 600
                                  2001 M Street NW
13                                Washington, DC   20036
                                  202-682-7200
14
     For Walmart Defendants:      John M. Majoras, Esq.
15                                Jones Day - Columbus
                                  Suite 600
16                                325 John H. McConnell Blvd.
                                  Columbus, Ohio   43215
17                                614-281-3835

18                                Tara A. Fumerton, Esq.
                                  Tina M. Tabacchi, Esq.
19                                Jones Day - Chicago
                                  Suite 3500
20                                77 West Wacker
                                  Chicago, Illinois   60601
21                                312-782-3939

22
     ALSO PRESENT:                Special Master David Cohen
23

24                            - - - - -

25
```

1        <u>FRIDAY, OCTOBER 15, 2021, 8:46 A.M.</u>

2            THE COURT:  All right.  Please be seated.

3            All right.  I was extremely dismayed at

4 7:30 in the morning to have this issue dumped on by

08:46:49 5 really both sides about potential cross-examination of

6 Dr. McCann, and I'll take as much time as necessary this

7 morning to make my ruling, and that time is obviously

8 being charged to both sides.

9            If we keep this up, the trial is going to

08:47:05 10 be a heck of a lot shorter, which is fine with everyone.

11            There's absolutely no reason why this was

12 not raised weeks ago, okay?  I knew nothing about it.

13            Both sides have been aware for months that

14 Dr. McCann was going to be a key witness, and have been

08:47:27 15 aware for weeks or months that he was excluded in prior

16 cases and defendants would want to cross-examine him

17 about it.

18            So, again, it's both sides' fault that

19 we're dealing with it now.

08:47:43 20            I'm not going to do anything on a

21 hypothetical.

22            I want to know specifically what, what

23 prior judicial rulings the defendants plan to bring out

24 on cross-examination and get -- and what, what do you

08:48:01 25 plan, specifically do you plan to elicit about that, and

 1     then I'll try and figure out what to do.

 2                    MS. SWIFT:  Your Honor, Kate Swift for

 3     Walgreens.

 4                    There were a number of opinions we could go

08:48:13  5     into.  I wasn't anticipating doing that.

 6                    There's only one I might want to ask him

 7     about, it's the *Freddie Mack* opinion from the Southern

 8     District of New York by Judge Cedarbaum.  It is relevant

 9     here.

08:48:23 10                    THE COURT:  When specifically was this

11     opinion or ruling?

12                    MR. LANIER:  Nine years ago, Your Honor.

13     March --

14                    THE COURT:  Hold it.  Hold it.  Nine years

08:48:35 15     ago?

16                    MR. LANIER:  Yes, sir.

17                    MS. SWIFT:  Your Honor, I wasn't going to

18     impeach him with the opinion.

19                    I asked him about this in the *Frye* Hearing

08:48:42 20     in New York.  I have his sworn testimony on it.

21                    I think it would take a couple -- not even

22     a minute, maybe a couple of minutes.

23                    It's relevant.  Judge Cedarbaum concluded

24     he changed his analyses so many times and they were so

08:48:56 25     inconsistent that he was unreliable.

1      THE COURT:  All right.  Let's slow down.

2      Is this one of the things referenced in the

3 plaintiffs' memo?  One of the --

4      MS. SWIFT:  Your Honor, it was plaintiffs'

08:49:08 5 motion that was filed this morning.

6      MR. LANIER:  Yes, Your Honor.

7      THE COURT:  Which one, which one is this?

8      MR. LANIER:  This is the Southern District

9 of New York, the *Federal Home Loan Mortgage Company* case

08:49:19 10 that's being handed up to you right now.

11      MS. SWIFT:  The relevant portion is on

12 Page 8, Your Honor.  It's highlighted.

13      THE COURT:  I may not -- I want to know

14 what, what exactly the Judge did.

08:49:39 15      All right.  Well, all right.  So this is

16 the one you're planning to introduce.  So that's the *Fed.*

17 *Home* case.  All right.

18      If I understand this, in this case I assume

19 there was a -- there was an equivalent of a *Daubert*

08:50:05 20 motion, and the Judge, Judge excluded Dr. McCann's

21 testimony, precluded him from testifying as an expert

22 witness.

23      MS. SWIFT:  That's correct, Your Honor.

24      THE COURT:  Right?

08:50:16 25      And what, what specifically -- how do you

1    plan to question him?

2              What are you going to try to elicit?

3              MS. SWIFT:  It will depend on how the cross

4    goes, Your Honor.

08:50:37 5              The point is that he's --

6              THE COURT:  Well --

7              MS. SWIFT:  The point is --

8              THE COURT:  You're doing the cross.

9              I just want to know what, what questions or

08:50:46 10   question do you -- what information do you want to elicit

11   from him?

12             MS. SWIFT:  I'm going to ask him whether a

13   prior Federal Court has ruled that his testimony is

14   unreliable because he's changed his analysis.

08:50:58 15             THE COURT:  Well, I don't know if I'm going

16   to allow that question, but it seems to me it's relevant

17   that he was excluded as an expert.

18             MS. SWIFT:  Yes.

19             THE COURT:  All right?  And I may allow

08:51:11 20   that.

21             What the Judge said is hearsay, and there's

22   no way to cross-examine the Judge or bring the Judge in,

23   and I'm not about to have a mini trial about the Judge's

24   ruling.

08:51:24 25             But since the plaintiffs brought out, and I

1    took pretty good notes, I think, Mr. Lanier, you elicited

2    that he's testified in some 600 cases, if I recall that?

3                   MR. LANIER:  Correct, Your Honor.

4                   THE COURT:  Well, the fact that he was

08:51:44  5    excluded in one, I think, is relevant and, you know,

6    that's still pretty good.

7                   That's a lot better than my

8    affirmance/reversal rate.  I'd be happy to take 600 and

9    one any day, and you can argue that.

08:52:03 10                   But it is one, okay, and I think it's

11    relevant that the Judge, you know, excluded it, found he

12    wasn't a qualified expert, but I'm not going to allow the

13    defense to go into the details of what the Judge said or

14    why the Judge said.  That's hearsay.

08:52:18 15                   The fact that he was excluded, I mean it

16    seems to me it's relevant, the same way I let the

17    plaintiffs bring in that he was included.

18                   I mean, you know, allowed to testify 600

19    times.

08:52:34 20                   So presumably those 600 Judges, you know,

21    most of the time it wasn't challenged but, whatever, 600

22    Judges determined he was a qualified expert, one

23    determined he wasn't.

24                   So, you know, I think the jury is entitled

08:52:49 25    to hear that, but if the plaintiffs think I'm wrong I'd

```
 1   like to hear why you think I'm wrong on that.

 2                   MR. LANIER:  Okay.  My brain is going in

 3   two different directions.

 4                   THE COURT:  All right.

 5                   MR. LANIER:  If you'd let me go both with

 6   you.

 7                   First direction.  I do think that produces

 8   a trial within a trial because I've got to then go into

 9   why were you excluded, why do you think that was wrong,

10   why do you think you were right, and all of a sudden

11   we're talking about a securities case in the midst of

12   this.

13                   THE COURT:  Well, no, I don't

14   think -- Mr. Lanier, I don't think you would want to go

15   into that because the more you go into it you're going to

16   bring in all the hearsay.

17                   I'm only going to allow the fact that nine

18   years ago, one Judge determined he wasn't, you know,

19   couldn't testify as an expert, period.

20                   MR. LANIER:  All right.  If that's the

21   extent of the questioning and that's the extent of the

22   answering, that's fine.

23                   And then I can assume, also, where their

24   experts have been *Daubert*ed by Judges in the past, I'll

25   be able to point that out as well on cross.
```

```
 1                    THE COURT:  Yeah.

 2                    MR. LANIER:  Thank you.

 3                    THE COURT:  If a Judge determined -- yeah,

 4         if one of their experts was challenged and a Daubert

 5         challenge was sustained and the Judge said that expert's

 6         not qualified, you can bring out that fact.

 7                    MR. LANIER:  All right.

 8                    THE COURT:  I'm not going to let you go

 9         into --

10                    MR. LANIER:  The details.

11                    THE COURT:  -- the details of what the

12         Judge said.

13                    MR. LANIER:  Understood.  If that's the

14         limit, I understand the Court and I'll trust counsel to

15         abide by the limits, and I'll sit here and handle it.

16                    THE COURT:  All right.

17                    MR. LANIER:  Thank you, Your Honor.

18                    THE COURT:  Obviously I'll apply the same

19         rules to both sides and, you know, I can't recall having

20         to deal with this in the civil context, but I have in

21         criminal context where Courts generally allow the police

22         officers testifying; there he's not an expert, but he's a

23         witness, and Courts generally allow the defense to

24         impeach the witness if --

25                    MS. SWIFT:  Thank you, Your Honor.
```

1          THE COURT:  -- if another Court didn't

2     allow that officer to testify or determine him, him or

3     her, to be unreliable.

4          So I'm -- and again, it's because the

08:55:03  5     plaintiffs brought out that he testified in 600 other

6     cases, which means 600 other Judges found him to be a

7     qualified expert.

8          MS. SWIFT:  Your Honor, we have one other

9     issue we need to raise before the jury comes in.

08:55:18 10          We raised this yesterday during

11     Mr. McCann's -- Dr. McCann's testimony, the issue of the

12     before and after 2011 numbers that are at the bottom of

13     the chart.

14          THE COURT:  All right.

08:55:30 15          MS. SWIFT:  You ordered Mr. Lanier to

16     produce the charts that this was based on last night, and

17     said that if they did not do that, you would tell the

18     jury to disregard those numbers.

19          Plaintiffs did not produce anything to us

08:55:42 20     last night and, therefore, we would ask that the jury be

21     instructed to disregard these numbers.

22          MR. LANIER:  Your Honor, in that regard,

23     after you said that, I went back and I quizzed him

24     instead on the stand, and he told them --

08:55:53 25          THE COURT:  Right.  I mean, he explained

1     all it is is math, Ms. Swift.

2                  MS. SWIFT:  Your Honor, these numbers do

3     not appear anywhere.  We don't have the numbers.  I've

4     looked for the numbers, our experts have looked for the

08:56:06  5     numbers.  We don't have it.  It was not ever produced to

6     us.

7                  THE COURT:  You don't have -- I mean, I

8     assume his charts have numbers by year, correct?

9                  MS. SWIFT:  Not these numbers.

08:56:16 10                  We don't know where these come from.

11                  THE COURT:  Hold it.  Hold it.

12                  This was just math.  We went through this.

13     The numbers added up.

14                  I assume, I mean --

08:56:25 15                  MR. LANIER:  Yes, Your Honor.

16                  THE COURT:  Look, he's got numbers by years

17     for a 10 or 11 year period, all right, so you can break

18     it up any way you want.

19                  If you want to say before 2010, you got

08:56:36 20     2010 and the rest is after, you just add it up.

21                  MS. SWIFT:  He does not provide the numbers

22     of total prescriptions filled by defendant by year so you

23     can add them up to get to the numbers that he's trying to

24     get to here.

08:56:51 25                  MR. LANIER:  I think he does.

```
 1                    THE COURT:  I don't -- let's --
 2                    MS. SWIFT:  If this is something that they
 3        have, I don't understand why they didn't produce it when
 4        you ordered them to do it last night.
08:57:01  5          THE COURT:  You have -- did he produce a
 6        chart where he has, he has this broken down by defendant
 7        by year?  If so, you know, you can add it, subtract it,
 8        any way you want.
 9                    MS. SWIFT:  Then he should do that.
08:57:13 10          We don't have that.  They did not produce
11        that.
12                    MR. LANIER:  Your Honor, we gave the
13        reference to it in the testimony.
14                    I will send it to Ms. Swift right now.  All
08:57:22 15       right.
16                    THE COURT:  All right.  I want to see this.
17                    You know, again, we've got the best lawyers
18        in the country, and I can't do, you know, monitor every
19        little thing.
08:57:33 20          MR. LANIER:  Yeah.
21                    THE COURT:  I made sure the math added up,
22        but if he didn't produce a chart where this is broken
23        down by year, then he's got a problem.
24                    MS. SWIFT:  Thank you, Your Honor.
08:57:51 25          So just to be clear, Your Honor, as I
```

1  understand what you said, you've asked the plaintiffs to

2  produce the charts.

3                    MR. LANIER:  It's not the chart.

4                    It's the backup data.

08:58:01  5                    MS. SWIFT:  It doesn't --

6                    THE COURT:  He said --

7                    MS. SWIFT:  It doesn't exist.  I don't know

8  what it is.  I've never seen it.

9                    MR. LANIER:  I'm sorry, I can't be your

08:58:09 10  eyes and ears, but I'll pull it and give a copy to you

11  and a copy to the Court.

12                    MS. SWIFT:  We have looked for it and we

13  cannot find it.  Our experts have looked for it, they

14  cannot find it.

08:58:18 15                    THE COURT:  Look, it's 9:00 o'clock.  This

16  time is being charged to both sides.  I'll wait as long

17  as you want.  I don't care.  It's fine with me, because

18  since I'm charging the time to both sides the trial is

19  being shortened, and the jury will be thrilled with that.

08:58:32 20                    So we'll just wait and, you know, if I see

21  the chart I see the chart, and if I don't, well, then

22  it's out.

23                    MR. DELINSKY:  Your Honor, while we're

24  waiting for this.

08:58:44 25                    THE COURT:  Yes.

1          MR. DELINSKY:  I would just like to lodge

2     an objection to the deduction of time for legal argument.

3          I think --

4          THE COURT:  Overruled.

08:58:57  5          MR. MAJORAS:  Your Honor, John Majoras.

6          There's another issue I'd like to address.

7     We've been trying to do this prior to when you came to

8     the bench, been in discussions with Mr. Lanier.

9          This relates to the playing of the

08:59:08  10    deposition of Mr. Nelson, which the plaintiffs have

11    scheduled for today.

12          We have, both sides have gone back and

13    forth throughout the evening and throughout the morning

14    trying to get the video completely ready so that in

08:59:21  15    particular it takes out all references to materials that

16    Special Master Cohen has ruled should be excluded.

17          Neither side is comfortable we have gotten

18    to that point yet or that the plaintiffs, in terms of

19    what they have proffered to us, have gotten to that point

08:59:37  20    yet.

21          Additionally, there's some concerns that

22    the cut doesn't include a number of documents that we use

23    on the recross.

24          What I proposed to Mr. Lanier is that the

08:59:49  25    parties move that playing of that deposition until

1    Monday.  The parties do agree on that.  It poses a timing

2    issue.

3            There's another deposition to be played

4    today, but it would pose a timing gap to do that.

09:00:00    5            If, if the Court rules that we're unwilling

6    to do that, then I would ask at a minimum we at least be

7    allowed through the lunch break, which I think will get

8    us there through the other deposition being played, but I

9    may have to ask for the prospect of during the playing of

09:00:18  10    the deposition my colleague, Ms. Fumerton, stop playing

11    the deposition so she can put the exhibits in front of

12    the jury since those are not on the tape.

13            That's one of the issues.

14            MR. LANIER:  Judge, I do think it important

09:00:30  15    for the Court to know that a number of people from both

16    sides and a number of technical people have truly been up

17    all night long, have not slept, trying to make sure that

18    this would play just right.

19            Our concern is because of the rulings that

09:00:44  20    have been made and our efforts to make sure that

21    everything is meticulous from both sides, we have this

22    just right, one of the aggravating factors is that the

23    defendants have their play with their technology people

24    and we've got our play with our technology people.

09:01:02  25            To integrate the two together, it turns out

2211

1    they were using different platforms, and so --

2                THE COURT:  All right.  So we can't play

3    it, and again --

4                MR. LANIER:  We have Mark Martin in the

09:01:13  5    can.  We'll play that instead.

6                THE COURT:  Okay.  We'll do that.

7                And again, you know, I'm very close to

8    ending depositions.  Okay?  All right?

9                And I've made this, you know, I'm very

09:01:27 10    close to ending them, and we'll just have people testify

11    by video.  Okay?  I think it's better for everyone.

12                I mean, I don't want any -- people to be up

13    all night is insanity, okay?  We've got -- and I want

14    people to be concentrating on the important things in

09:01:42 15    this trial.  So if this is what it's going to evolve to,

16    just forget this deposition enterprise altogether, and

17    everyone will testify, and I'll make my rulings like I do

18    in live testimony, and testify by video.

19                MR. MAJORAS:  Your Honor, I think we're

09:01:57 20    very close through the work that the folks have put in.

21                THE COURT:  Mr. Majoras, I don't want a

22    repetition of this with every deposition.

23                MR. MAJORAS:  We're fed what we had, Your

24    Honor.

09:02:07 25                THE COURT:  Well, then if that's the case,

1    I'll end it.

2              Maybe we'll end it now, you know, so just

3    end -- I mean, we'll try, try and salvage Nelson's

4    because so much effort has been spent in, and I guess

09:02:20  5    we've got Martin, but maybe we just end it.

6              These are the last two depositions.

7              MR. MAJORAS:  I think we will see if we do

8    this on Monday it will go in smooth, Your Honor, and --

9              THE COURT:  Well, if it doesn't then it's

09:02:32 10    over, okay?

11              MR. MAJORAS:  Yes, sir.

12              THE COURT:  And if we have a repetition of

13    this on Monday it's over with depositions, and everyone

14    will testify either live in court or live by video.

09:02:40 15              We have the technology and we can do it.

16    Okay?

17              So, you know, I'm trying to save everyone,

18    you foremost and me and my staff, and so with -- I'll let

19    it go until Monday, but if there's another repetition

09:02:59 20    then it's over as far as depositions.

21              MR. MAJORAS:  Thank you, Your Honor.

22              THE COURT:  All right.  So we're going to

23    finish up with Mr. McCann, and then have the Martin

24    deposition.

09:03:12 25              Is that it?

```
 1            MR. LANIER:  Yes, Your Honor.

 2            SPECIAL MASTER COHEN:  Judge, there is

 3    another issue that came in last night with regard to

 4    whether Giant Eagle witness Chunderlik -- there's another

09:03:35 5    issue, Judge, that came in last night that I'm finally

 6    getting to via e-mail, the question is whether Giant

 7    Eagle witness Chunderlik, who is in Pittsburgh, should

 8    appear live -- he has been subpoenaed and is within a

 9    hundred miles -- or instead live via video, which is his

09:03:52 10    preference.

11            And I'll just leave it there and let the

12    parties argue it.

13            MR. LANIER:  Your Honor, we'll do whatever

14    the Court's preference is.

09:04:01 15            He's within subpoena range.  We served him

16    with a subpoena.  We understand now that he wants to

17    appear by video.  Our preference is to have him live

18    since it's within a hundred miles.

19            THE COURT:  What is his -- what is his

09:04:15 20    grounds for not wanting to appear live?

21            MS. FIEBIG:  Your Honor, he's a former

22    Giant Eagle employee who has a full-time job with a new

23    employer, and he considers it a hardship to have to

24    travel in light of COVID and his age and his job.

09:04:29 25            THE COURT:  How old is he?
```

1          MS. FIEBIG:  He's 64, his wife is 66.

2     During the week they also help care for their eight-month

3     grandchild.

4          THE COURT:  If it's related to COVID I

09:04:39  5     think I made that ruling before, that any witness who has

6     a COVID concern could testify by video.

7          MR. LANIER:  All right.

8          THE COURT:  On both, on both sides.

9          MS. FIEBIG:  Thank you, Your Honor.

09:04:47 10          THE COURT:  So it works both ways.

11          So he will appear, just make the

12     arrangements through Mr. Pitts and the IT people so it

13     can go smoothly.

14          He'll appear by video whenever you want to

09:04:57 15     call him.

16          SPECIAL MASTER COHEN:  When are you going

17     to call him?

18          MR. LANIER:  The plan was Monday, but if

19     we're going to do it by video that's a process to set up,

09:05:06 20     so we may bump him to Tuesday and play Nelson on Monday.

21          MS. SWIFT:  Your Honor, Mr. Lanier just

22     handed me -- frankly, I don't know what this is, with

23     respect to Dr. McCann.

24          This is not a chart showing year by year so

09:05:19 25     that he could show before and after 2011.

1          THE COURT:  Ms. Swift, if it has it by year

2    by county by defendant, you can slice and dice it any way

3    you want.

4          You can say, all right, here are the -- if

09:05:32  5    there are 12 columns, you can say, all right, there's two

6    columns before 2011 and nine after, and you add them up.

7          If you want to break it at 2016, you can do

8    that.

9          MR. LANIER:  This is what I was saying in

09:05:44 10    terms of it was never produced as a chart.  It was the

11    backup data to his report that was produced, and there's

12    the report appendix, and they've had it for, what, six

13    months.

14          MS. SWIFT:  What I'm hearing is that there

09:06:00 15    is no chart of this information that exists, it doesn't

16    exist, we've never seen it before.  I don't know what's

17    on this.

18          MS. LANIER:  It's right here.

19          MS. SWIFT:  It's not right here, but --

09:06:08 20          MR. LANIER:  If you go to that --

21          THE COURT:  If this shows, this is a

22    spreadsheet that just shows this combination, the red

23    flag prescriptions by year, by county, by defendant;

24    again, we're only talking about Trumbull and Lake; so if

09:06:23 25    it shows for Trumbull and Lake by year, by defendant, for

2216

1    this relevant time period -- what, is it 2006 to 2019?

2    2019?

3                    MR. LANIER:  Yes, Your Honor.

4                    THE COURT:  Okay.  Well, if you want to

09:06:36  5    draw a line at 2011 and say you got five columns before

6    2011 and eight columns after and I added them up, fine.

7                    Anyone can do that.  That's -- that's just

8    mathematics.  That's not any analysis.

9                    That's why I asked my questions yesterday,

09:06:52 10    because I just wanted to understand what he was doing and

11    if the math added up.

12                    So if, if this was produced and it is what

13    it seems to be, then -- then I'll allow that testimony to

14    stay.

09:07:11 15                    So, Mr. Lanier, you're representing that

16    this is --

17                    MR. LANIER:  I am representing that

18    I -- and I want it clear, I don't have it on personal

19    knowledge, but the people who would have the personal

09:07:23 20    knowledge --

21                    THE COURT:  Well, can someone -- can

22    someone --

23                    MR. LANIER:  I gave them the --

24                    THE COURT:  Can Mr. McCann pull this out

09:07:32 25    and, you know, show it to us?

1       MR. LANIER:  I don't know.

2           I know that this is the defendants' data

3   that was given to him that he put into his report

4   appendix, and so it's based upon the defendants' data.

09:07:44  5           And I'm glad to bring him into the

6   courtroom and ask him if he can pull it out.

7           MS. SWIFT:  It is not in any of the

8   appendices, Your Honor.  We have looked.  It does not

9   exist.

09:07:50  10           MS. LANIER:  It is a pathway showing how to

11  get there.

12           MS. SWIFT:  That is not an appendix,

13  it's a --

14           (Discussion had off the record.)

09:08:02  15           MR. LANIER:  That was the production we

16  gave.

17           THE COURT:  All right.  I want someone to

18  pull it out and show it to me.  All right?  Go pull it

19  out, and if I -- if I see --

09:08:17  20           MR. LANIER:  Okay.

21           THE COURT:  -- a spreadsheet that looks

22  like this, and all he did was, you know, addition, okay?

23  That's, you know, anyone can do addition.

24           Anyone can look at a spreadsheet and add

09:08:32  25  columns, you know.  It's not of any great surprise or

2218

1    prejudice.

2                        (Pause.)

3                        MR. LANIER:  Your Honor, we've got people

4    tasked with pulling it up right now.

09:10:00  5                        THE COURT:  All right.

6                        MR. LANIER:  Your Honor, I'd like to

7    introduce to the Court Mr. Jeff Gaddy, a lawyer with

8    Levin Papp who has been hands-on with this witness and

9    this data.

09:14:04 10                        He has gone to the site and hasn't told me.

11    I told him in the interest of time just tell the Court

12    and show the Court and opposing counsel whatever he's

13    got.

14                        I tender the floor.

09:14:16 15                        MR. GADDY:  Good morning, Your Honor.

16                        What we've pulled out here is a spreadsheet

17    that's included in Mr. McCann's data.

18                        The title of the spreadsheet is 43 F

19    nonrecurrent.

09:14:30 20                        THE COURT:  43 F nonrecurrent.

21                        MR. GADDY:  Number of prescriptions.

22                        And it has a tab for each defendant for

23    each county, and on each tab it has the total number of

24    prescriptions.

09:14:44 25                        THE COURT:  Is it broken down by year?

```
 1              MR. GADDY:  Broken down by year.  And then
 2    it also has the total number of red flags broken down by
 3    year.
 4              And if you, like you were referring to, if
 5    you were to add them up, you get the numbers that
 6    Dr. McCann testified to yesterday.
 7              THE COURT:  So all he did was take the
 8    columns, what, 2006, '7, '8, '9 and 10 and add them up,
 9    and 2011 through 2019 and add them up?
10              MR. GADDY:  Yes, sir.
11              I'm happy to show them to you if you want.
12              THE COURT:  Well, show them to Ms. Swift.
13              MS. SWIFT:  Thank you, Your Honor.
14              What I'm going to ask is if I have an
15    opportunity to -- could I have it printed out so I can
16    use this in cross-examination?
17              I haven't had a chance to look at it.  I
18    heard what he just said, but I'd rather have it printed
19    so I can actually show it to the witness on the stand.
20              MS. LANIER:  It's, like, thousands of
21    pages.
22              MS. SWIFT:  What I'm looking at on
23    Mr. Gaddy's screen says "CVS red flag summary."
24              The numbers that we are talking about are
25    non-red flag prescriptions.
```

1          THE COURT:  No.  I think, I think,

2     Ms. Swift, we're only talking about --

3          MR. GADDY:  The number at the bottom left

4     of the chart yesterday with the total number of

09:16:15  5     prescriptions, and that's represented in row 10 of this

6     spreadsheet, broken down on an annual basis.

7          MS. SWIFT:  And what I'm saying, Your

8     Honor, is the top of the spreadsheet that Mr. Gaddy just

9     showed to me says "red flag summary."

09:16:27 10          I would like an opportunity to look at what

11     he's got on his screen.

12          THE COURT:  All right.  That's fine.

13          I -- it's my understanding that -- let's

14     just start with CVS.  I've got my notes.

09:16:46 15          The total, the total prescriptions was

16     851,198.  This was 2006 to 2019.

17          And I thought that that was the total

18     number of prescriptions that had red flags because out of

19     that 851,000, we took roughly 2,000.

09:17:16 20          But now I'm -- I'm not sure if the 851,198

21     was the total number of CVS prescriptions.

22          MR. GADDY:  It was, Your Honor.

23          THE COURT:  2006 to 2019, and then a subset

24     of that would be the ones that contained one or more red

09:17:37 25     flags.

1     MR. GADDY:  Your Honor, the 851,198 is the

2  total prescriptions, and then 175,254 was the red -- and

3  this is just for CVS -- 175,254 was the red flag

4  prescriptions.

09:17:52  5          And then the numbers --

6          THE COURT:  All right.

7          MR. GADDY:  -- at the bottom of the chart

8  that Dr. McCann did yesterday was the total number of

9  prescriptions before and after 2011.

09:18:03 10          And all of those numbers can be derived

11  from this one chart that I have here pulled up.

12          THE COURT:  All right.  I think, I think

13  that's right.

14          I have both sets.  So it was -- so the

09:18:17 15  figures that Dr. McCann was using, he broke down the

16  851,198 to -- and that was total Lake and Trumbull, and

17  what he did, he broke down the Lake prescriptions before

18  and after 2011, and then the Trumbull prescriptions

19  before and after 2011.

09:18:52 20          There were four columns, and the four of

21  them added up to 851,198.

22          So it was total prescriptions.

23          So if you can print that out for Ms. Swift

24  and then she can cross-examine Mr. -- Dr. McCann on

09:19:08 25  whatever, whatever his testimony was.

```
        1              MS. SWIFT:  Thank you, Your Honor.

        2              (Pause.)

        3              MR. WEINBERGER:  Your Honor.

        4              THE COURT:  Yes.

09:35:48 5             MR. WEINBERGER:  Let me update you on

        6  what's going on.

        7              We are printing -- we have a printer here.

        8              THE COURT:  Okay.

        9              MR. WEINBERGER:  The data is so voluminous

09:35:57 10 that we are printing it in our war room which is at the

        11 Post Office building, and using a much bigger printer, so

        12 that's what we are doing.

        13             THE COURT:  Okay.

        14             MR. LANIER:  Your Honor, I am being

09:36:09 15 told -- oh, Mr. Gaddy -- I'm being told there is a

        16 Plaintiffs' Trial Exhibit number also assigned with this

        17 data.

        18             It's 355-some odd pages, but the data might

        19 be able to be pulled up that way as well.

09:36:25 20             THE COURT:  All right.

        21             MR. LANIER:  If defendants want to pull up

        22 Plaintiffs' 23158.

        23             (Pause.)

        24             MR. LANIER:  Were you given the exhibit?

09:39:37 25             MS. SWIFT:  I was.  I'm just checking it
```

2223

1    now.

2                    MR. LANIER:  Great.

3                    (Pause.)

4                    MS. SWIFT:  Your Honor.

09:41:49  5          THE COURT:  Yes.

6                    MS. SWIFT:  Kate Swift for Walgreens.

7                    Plaintiffs have identified an exhibit where

8    this information exists.

9                    As long as it's all right with the Court,

09:41:59 10  we can use the exhibit on the screen without printing out

11   a hard copy.

12                   THE COURT:  That's fine.

13                   MS. SWIFT:  All right.  Great.

14                   THE COURT:  That's fine.

09:42:05 15              So with that, we're ready to go?

16                   MS. SWIFT:  I believe so.

17                   THE COURT:  Okay.

18                   (Jury in.)

19                   THE COURT:  All right.  Please be seated.

09:45:06 20              All right.  Ladies and gentlemen, I

21   apologize for the delay.  There were some matters for me

22   to take up before we resumed with Dr. McCann's testimony.

23                   So, Doctor, I just want to remind you

24   you're still under oath from yesterday, and, Ms. Swift,

09:45:20 25  you may continue your cross-examination.

1          MS. SWIFT:  Thank you, Your Honor.

2          Good morning, ladies and gentlemen of the

3     jury.  Again, Kate Swift for Walgreens.

4          CROSS-EXAMINATION OF CRAIG McCANN (RESUMED)

09:45:29  5     BY MS. SWIFT:

6     Q.    Good morning, Dr. McCann.  How are you this

7     morning?

8     A.    I'm well.  Thank you.  Good morning, Miss Swift.

9     Q.    Dr. McCann, yesterday Mr. Lanier asked you

09:45:37 10     questions about the number of opioid prescriptions the

11     pharmacies in this case provided to you for your work,

12     and the numbers of prescriptions that you flagged.

13          Do you remember that testimony?

14     A.    Yes.

09:45:55 15     Q.    Mr. Lanier drew a picture of a funnel with all of

16     those numbers in it.

17          Do you remember that?

18     A.    Yes.

19          MS. SWIFT:  Mr. Pitts, may I have the Elmo,

09:46:04 20     please?

21          Just give me one moment, sir.  I apologize.

22          I needed a little technical assistance.

23     Thank you for that.

24     BY MS. SWIFT:

09:46:57 25     Q.    Dr. McCann, can you see the demonstrative I've put

1  on the screen?

2  A.    Yes.

3  Q.    Do you recognize this as the drawing that you and

4  Mr. Lanier created yesterday during your testimony?

09:47:07 5  A.    Yes.

6  Q.    When you gave your testimony on these numbers in

7  Mr. Lanier's funnel yesterday, you were testifying under

8  oath on behalf of plaintiffs in this case, correct, sir?

9  A.    Correct.

09:47:30 10  Q.    And you've had -- you were hired three-and-a-half

11  years ago to work in this litigation by the plaintiffs'

12  lawyers in this case, correct?

13  A.    Not on this case, but more generally on opioids

14  three-and-a-half years ago.

09:47:50 15  Q.    You've been --

16  A.    On this case sometime in the last year.

17  Q.    You've been working on putting together the numbers

18  for these cases for three-and-a-half years?

19  A.    Correct.

09:47:59 20  Q.    You and your team have been working very steadily

21  ever since then; I think you testified about more than a

22  dozen folks on your staff working on these cases for the

23  past three-and-a-half years?

24  A.    To some extent, yes.

09:48:12 25  Q.    I believe you also testified that your firm, SLCG,

1    has made something like $6 million in the course of that

2    work; is that right, sir?

3    A.    Close.

4                Revenues, not profits, so depends on what

09:48:27  5    you mean by "Made," but I think our revenues over those

6    three-and-a-half years on the opioid-related work have

7    been about seven -- six million.

8    Q.    You own 100 percent of SLCG, correct, sir?

9    A.    I do.

09:48:41 10    Q.    When you got on the stand yesterday, Mr. Lanier

11    asked you if you had notes with you.

12                Do you remember that?

13    A.    Yes.

14    Q.    And you said that you did, right, sir?

09:48:49 15    A.    Yes.

16    Q.    And that was important, right?

17                Because, as Mr. Lanier said, "We've got to

18    make the record exactly right to the extent we can."

19                Do you remember that?

09:49:02 20    A.    Yes.

21    Q.    All right.  You testified that this demonstrative

22    that I've got on the screen, which I'll go ahead and I'm

23    going to write on this copy.  This is not the copy

24    Mr. Lanier made.  We'll identify this as WAG Demo 00004.

09:49:22 25                You testified that what this shows for Lake

1    and Trumbull Counties was the numbers of opiate

2    prescriptions these four pharmacies filled, correct, sir?

3    A.    Correct.

4    Q.    And Mr. Lanier actually wrote that down twice.  Do

5    you see that?

6              Once at the top he wrote "numbers opiate

7    Rx," do you see that?

8    A.    Yes.

9    Q.    And then again right here under this row of

10   numbers, Mr. Lanier wrote "Opioid Rx filled in Lake and

11   Trumbull."

12             Correct?

13   A.    Correct.

14   Q.    For this next line of questions that I'm going to

15   ask you, Dr. McCann, I'd like for you to have a copy of

16   your appendix 14 handy, and I don't know if that's up

17   there for you or we need to hand it to you.

18             Could you let me know, please?

19   A.    I've got a box of documents here.  I don't know if

20   it's in here.

21             MS. SWIFT:  We'll get you a copy, sir.

22             MR. SWANSON:  May I, Your Honor?

23             THE COURT:  Sure.

24             THE WITNESS:  Thank you.

25   BY MS. SWIFT:

1    Q.    Do you have Appendix 14, Dr. McCann?

2    A.    Yes.

3    Q.    And this is an appendix from the report that you

4    provided in this case, right?

09:50:37 5    A.    Correct.

6    Q.    I'd like you to turn to Page 9, please.

7    A.    Yes.

8    Q.    This is your CVS red flag prescription summary,

9    correct?

09:50:56 10    A.    Correct.

11    Q.    And you testified yesterday, and Mr. Lanier wrote

12    down on his funnel, that CVS filled 851,198 opioid

13    prescriptions in Lake and Trumbull County, correct?

14    A.    I didn't recall as I was testifying that he was

09:51:17 15    referring to only opioid prescriptions.

16            I was referring to total prescriptions

17    that -- that in this case CVS filled, and gave the

18    851,198 number.

19            MS. SWIFT:  Mr. Pitts, if you could switch

09:51:38 20    off the Elmo, I'm going to ask him to -- well, actually

21    hold on a second.  Maybe we don't need to put it on the

22    screen yet.

23    Q.    Dr. McCann, do you have a copy of the trial

24    transcript from yesterday in your box?

09:51:50 25    A.    I don't think so.

1          MR. SWANSON:  May I, Your Honor?

2          THE COURT:  Okay.

3          THE WITNESS:  Thank you.

4   BY MS. SWIFT:

09:52:05 5   Q.    Do you have it, sir?

6   A.    Yes.  Thank you.

7   Q.    Turn to Page 2140 of yesterday's trial transcript,

8   please.

9          And I'll ask you to read to yourself Lines

09:52:25 10  16 to 22.

11  A.    Yes.

12  Q.    You were asked:  "And are these for all opioids or

13  just looking at Oxy and Hydro?"

14         And you answered:  "No, this is for all."

09:52:45 15         Correct?

16  A.    Correct.

17  Q.    You were asked:  "Okay.  You took those opioids

18  that were filled in Lake and Trumbull County and then you

19  ran them for red flags, is that right?"

09:52:53 20         And you answered:  "Correct."

21         Right, sir?

22  A.    Correct.

23  Q.    And as we've already seen on the funnel picture,

24  Mr. Lanier wrote down twice that these are numbers of

09:53:04 25  opioid/opiate prescriptions; right, sir?

McCann - Cross/Swift                                           2230

1    A.    Correct.

2    Q.    What is the actual number of opioid prescriptions

3    that CVS filled in Lake and Trumbull County, according to

4    your Appendix 14 at Page 9?

09:53:25  5    A.    701,467 of the 851,198 were opioids.

6    Q.    All right.  I'm going to cross out the 851,198, and

7    write in that number.

8                   So what you told the jury yesterday and

9    what Mr. Lanier wrote down was wrong with respect to

09:53:56 10   opioid prescriptions, right, sir?

11   A.    I don't believe so.

12                  I think I was referring to all of the

13   prescriptions in CVS's dispensing data, almost all of

14   which were opioids.

09:54:07 15                  Some I imagine which were muscle relaxers

16   and Benzos that were produced because they were

17   potentially tripping some of the flags.

18                  So the total prescriptions I thought is

19   what I was being asked for, and that's what I reported

09:54:24 20   the 851,000.

21                  But you're correct, 150,000 of those are

22   the muscle relaxers and Benzos.

23   Q.    You were off by 150,000 prescriptions for CVS,

24   right, sir?

09:54:37 25   A.    I wouldn't say I was off.

McCann - Cross/Swift

2231

1          What I said was I may have misunderstood

2     the question.  I thought I was being asked what were the

3     total number of prescriptions and what were the number of

4     prescriptions that were flagged, and that's what I gave.

09:54:51  5          I didn't distinguish between opioids and

6     the muscle relaxers and Benzos.

7     Q.    And you understand, though, sir, that on this chart

8     that Mr. Lanier created with you yesterday it only talks

9     about opioid prescriptions.

09:55:06 10          You see that, right, sir?

11    A.    I see that.

12    Q.    And you agree with me that the correct number of

13    opioid prescriptions filled by CVS in Lake and Trumbull

14    County was not the number that you testified to

09:55:16 15    yesterday?

16    A.    I think that's fair.

17    Q.    Then for the number of CVS prescriptions that had

18    red flags applied, you testified and Mr. Lanier wrote

19    down 175,254, correct?

09:55:35 20    A.    Correct.

21          Again, I -- I thought I was being asked how

22    many prescriptions were flagged.  141,000 of those were

23    opioids, another 24,000 were muscle relaxers or Benzos,

24    dispensed at the same time as the opioids, and also

09:55:59 25    flagged.

1    Q.    Sir, this will be quicker if you'd just answer my

2    question.  I'd appreciate that.

3              The correct number of opioid prescriptions

4    that you flagged for CVS was 141,651, correct?

09:56:11  5    A.    Correct.

6    Q.    So I'm going to cross out the wrong number that you

7    gave Mr. Lanier yesterday and --

8              MR. LANIER:  Judge, I object to her saying

9    "Wrong number."

09:56:22 10              That's lawyer argument; not testimony or

11    questioning.

12              THE COURT:  Well, I'll allow her to use

13    "Wrong number," but so -- but the jury is to disregard

14    the last, the last half of that question.

09:56:34 15              So you can refer to it as the wrong number

16    if he's testified it's the wrong number.

17    BY MS. SWIFT:

18    Q.    You'd agree with me, Dr. McCann --

19              THE COURT:  If it was, the jury can figure

09:56:44 20    it out.

21              MR. LANIER:  I'll deal with it.

22    BY MS. SWIFT:

23    Q.    You agree with me, Dr. McCann, the correct number

24    for flagged prescriptions for CVS is 141,651; that's

09:56:55 25    different from the number you gave under oath to this

1    jury yesterday?

2    A.    No.

3              Just exactly as you asked that question,

4    that's how I heard the questions yesterday, and the

09:57:05  5    correct answer to that question is 175,254, the answer I

6    gave yesterday.

7    Q.    You have in your Appendix 14 at Page 9 for CVS,

8    opioid prescriptions that you flagged, 141,651, correct?

9    A.    Yes.  But that's not the question you asked me a

09:57:26 10    minute ago.

11             Just 30 seconds ago you asked me about the

12    number of prescriptions that were flagged, and that

13    number is 175,254.

14    Q.    All right.  The record --

09:57:40 15    A.    The questions, I heard Mr. Lanier's question the

16    way you just said it a minute ago and answered "175,254."

17    Q.    In any event, so that the record is clear, the

18    actual number of opioid prescriptions that you flagged

19    for CVS is 141,651, right, sir?

09:57:59 20    A.    Yes.

21    Q.    Turn to Page 15 of Appendix 14, please.  This is

22    the Giant Eagle red flag prescription summary, correct,

23    sir?

24    A.    Yes.

09:58:37 25    Q.    All right.  Before I go any further, I want to make

1    a better record here.

2              We saw the CVS prescription summary.  That

3    was on Page 9 of Appendix 14, correct?

4    A.   Yes.

09:58:48  5    Q.   I'm going to write here "Appendix 14, Page 9."

6              Now, the Giant Eagle summary, that's on

7    Page 15, right?

8    A.   Correct.

9    Q.   You testified yesterday that the number of

09:59:12 10   prescriptions filled for Giant Eagle in Lake and Trumbull

11   County, and what Mr. Lanier wrote down as opioid Rx

12   filled in Lake and Trumbull, was 1,399,920, correct?

13   A.   Correct.

14   Q.   What is the actual number of opioid prescriptions

09:59:36 15   filled by Giant Eagle in Lake and Trumbull County?

16   A.   The opioid prescriptions filled are 774,690.

17   Q.   All right.  Then for the number of prescriptions,

18   the number of Giant Eagle prescriptions that had red

19   flags, you testified, and Mr. Lanier wrote down, two

10:00:11 20   different numbers.

21              Do you see that right here?

22   A.   Yes.

23   Q.   And this was based on the fact that you made up the

24   fill times whenever that data was missing fill time

10:00:21 25   information.

1          Do you remember that?

2     A.    I would describe it differently, but it's the

3     impact of not having fill times for the -- for the

4     prescriptions that were flagged by flag 13.

10:00:34  5          That's the difference in those two numbers.

6     Q.    You took out the flag 13 flags, is that a fair

7     statement?

8     A.    Correct.  In total, about 10,000 of the flagged

9     prescriptions were flag 13-flagged prescriptions that

10:00:51 10   didn't have fill times.

11    Q.    And those were the ones where, in your analysis,

12    you just filled in "noon" for all of the prescriptions,

13    even though you didn't know what time those prescriptions

14    were actually filled?

10:01:02 15   A.    For all of those slightly less than 10,000 out of

16    three-and-a-half million, yes.

17    Q.    Well, you did that for something like 900,000

18    prescriptions, filled in "noon," because you didn't have

19    the data, right?

10:01:14 20   A.    Effectively, though, only for 9,800-and-some, not

21    for one-and-a-half million, as I can explain.

22    Q.    Well, just bear with me for a minute, sir.

23          Turning back to Appendix 14, to Page 15

24    that shows Giant Eagle's summary, there's nothing here

10:01:33 25   that shows the number of flagged opioid prescriptions

1    that you would have tallied up if you hadn't filled in

2    missing fill times with "noon" across the board.

3                Right?

4    A.    Not on this page.

10:02:01  5    Q.    Is there on some other page?

6    A.    Well, yes.  The backup for this page includes the

7    backup for each of the numbers that are in that flagged

8    column that add up to 164,698 on Page 15.

9                So if you look at flag 13 that says 19,624,

10:02:26 10    in the -- in the backup provided with my expert report

11    that this appendix was attached to, it's got a list of

12    every single one of those prescriptions that flag 13

13    flagged and whether it was flagged by any other flag, and

14    the actual detailed listing of the prescription so you

10:02:48 15    can see whether they are ones that were marked as 12:00

16    noon fill time versus --

17    Q.    Sir, I'm sorry to interrupt you.  I'm just going to

18    ask a simple question.

19                Can you tell me --

10:03:00 20                THE COURT:  Well, wait a minute.

21                MR. LANIER:  Yes.

22                THE COURT:  None of these questions are

23    simple, so you need to let the witness finish his answer.

24                Then you can ask another question.  Or if

10:03:09 25    you're not satisfied with the answer, ask it again.

1          So, Doctor, have you finished your answer,

2    please?

3          THE WITNESS:  Thank you.  I apologize,

4    sometimes my answers are long, but it's a complicated

10:03:21  5    issue.

6          I was asked where the other number, the

7    number that you would deduct from flag 13 on this page,

8    would be if you didn't include the ones where we didn't

9    have fill times.

10:03:33 10          And what I was explaining --

11    BY MS. SWIFT:

12    Q.    That actually wasn't my question, sir.  I

13    apologize.  That was not the question I asked.

14          I understand maybe you misheard it.

10:03:42 15          MS. SWIFT:  I withdraw the question.

16          MR. LANIER:  I would ask she not interrupt

17    the witness and allow him to answer as the Court ordered.

18          THE COURT:  At this point she's withdrawing

19    the question, so she can withdraw it.

10:03:52 20          MR. LANIER:  Okay.

21          THE COURT:  You can ask it on redirect if

22    you want, Mr. Lanier.

23    BY MS. SWIFT:

24    Q.    Can you tell me here in court today for this jury,

10:03:58 25    Dr. McCann, what would the number of flagged

1  prescriptions for opioids be without the flags on number

2  13, where you filled in the made-up fill time?

3  A.    I can't tell you precisely.

4         I can give you a very good estimate, but I

10:04:21  5  can't tell you precisely as I sit here.

6  Q.    Okay.  All right.  Turn to Page 33 of Appendix 14,

7  please.

8         This is the Walgreens red flag summary,

9  correct?

10:04:51 10  A.    Correct.

11  Q.    All right.  I'm going to write "Page 33" here.

12         You testified yesterday, and Mr. Lanier

13  wrote down, that for opioid prescriptions filled in Lake

14  and Trumbull, Walgreens filled 1,007,556, correct?

10:05:16 15  A.    Correct.

16  Q.    What is the actual number of opioid prescriptions

17  that you reported Walgreens had filled in Lake and

18  Trumbull County?

19  A.    806,193.

10:05:29 20  Q.    All right.  For the flagged prescriptions for

21  Walgreens, we have the same issue that we have for Giant

22  Eagle, right?

23         You have two numbers; the second number

24  takes out the flag 13 flags that had the fill time that

10:05:51 25  you put in as noon where you didn't have the data, right?

1    A.    Correct.

2    Q.    Can you tell me, sitting here today, what the

3    number would be for just the opioid prescriptions that

4    flagged if you took out flag 13?

5    A.    I can give you a very good estimate, but I can't

6    tell you precisely.

7    Q.    Turn to Page 27 of Appendix 14.

8              And this is the Walgreens -- the Walmart

9    red flag prescription summary, correct, sir?

10    A.    Correct.

11    Q.    You testified yesterday and Mr. Lanier wrote down

12    for the opioid prescriptions filled in Lake and Trumbull

13    County 275,700, correct?

14    A.    I would say it a little differently, but Mr. Lanier

15    wrote down on a -- on a funnel labeled "Opioid

16    prescriptions" rather than just "prescriptions" that

17    number, 275,700, which I gave him and which I still

18    believe is the correct number.

19    Q.    Well, what is the actual number of opioid

20    prescriptions that you reported Walmart had filled in

21    Lake and Trumbull Counties?

22    A.    229,006.

23    Q.    And then for Walmart, we have the same issue we saw

24    before.

25              There are two numbers you wrote down for

1    the number of flagged prescriptions, right, sir?

2    A.    Correct.

3    Q.    Sitting here today, can you tell the jury how many

4    opioid prescriptions you would have flagged for Walmart

10:07:56 5    without the flag where you filled in the missing fill

6    times as noon?

7    A.    Not precisely, but I can give you a very good

8    estimate.

9    Q.    Dr. McCann, did you speak to Mr. Lanier or any

10:08:16 10    other lawyers for plaintiffs last night about your

11    testimony?

12    A.    No.

13    Q.    Did you talk to anyone on your staff about your

14    testimony?

10:08:23 15    A.    No.

16    Q.    Did any of your staff talk to any of the attorneys

17    for the plaintiffs?

18    A.    I have no idea.

19             I wasn't cc'd or involved in any such

10:08:34 20    communication if there was.  I don't know.

21    Q.    All right.  I think that takes care of the numbers

22    in Mr. Lanier's funnel.

23             You agree that we have corrected the

24    numbers in the funnel to reflect the numbers of opioid

10:08:52 25    prescriptions that you reported in Appendix 14 of your

1    report?

2    A.    I wouldn't say that you've corrected them.

3          You've changed them.  If the funnel had

4    been labeled "Total prescriptions" and "Total flagged

5    prescriptions," every number on there would be correct.

6          You've clarified in my mind that Mr. Lanier

7    was writing down "Opioid prescriptions," and you changed

8    the numbers to reflect opioid prescriptions only.

9    Q.    I have accurately changed the numbers on the funnel

10   to reflect opioid prescriptions only, right, sir?

11   A.    Correct.

12   Q.    All right.  Now, I need to ask you some questions

13   about the numbers in the bottom left-hand side of the

14   funnel demonstrative.

15         These are the numbers under where

16   Mr. Lanier wrote "Key."

17         Do you see that?

18   A.    Yes.

19   Q.    These are the before and after 2011 numbers, right?

20   A.    Correct.

21   Q.    This set of numbers in the lower left-hand

22   page -- lower left-hand of the page, they're broken out,

23   first, by Lake and Trumbull County, right?

24   A.    Correct.

25   Q.    And then they are further broken out so that we see

McCann - Cross/Swift                                    2242

1    numbers for before 2011 and after 2011 for each county,

2    right?

3    A.    Yes.

4    Q.    And we have a column like that for all four

10:10:19 5    pharmacies in the case?

6    A.    Correct.  Yes.

7    Q.    And you testified yesterday in response to a

8    question from the Judge that this was a breakdown of

9    total prescriptions, right?

10:10:28 10    A.    Correct.

11    Q.    You said yesterday that these before and after 2011

12    numbers just add up to the total number of opioid

13    prescriptions that were filled in Lake and Trumbull

14    County, the numbers at the top of Mr. Lanier's funnel.

10:10:45 15              Do you remember that?

16    A.    I don't.

17    Q.    Well, do you remember testifying that if you add up

18    all the CVS numbers down here on the lower left, you

19    would get the number up here?

10:10:58 20    A.    Exactly.  Yes.

21    Q.    So for CVS, the numbers down here in the left-hand

22    corner, they add up to 851,198, correct, sir?

23    A.    Correct.

24    Q.    They do not add up to the actual number of opioid

10:11:19 25    prescriptions that CVS filled in Lake and Trumbull

McCann - Cross/Swift

2243

1    County, which we've already established is 701,467,

2    correct?

3    A.    I don't think it's a matter of "actual."

4              They don't add up to the number of "opioid

10:11:31 5   prescriptions only."  They add up to the number of total

6    prescriptions, including the Benzos and muscle relaxers

7    that were produced.

8    Q.    Well, again, not to belabor it, but what this says

9    right here and what you testified to yesterday was opioid

10:11:49 10  prescriptions filled in Lake and Trumbull County.

11   A.    I see that.

12   Q.    And these numbers for CVS down here on the left do

13   not add up to 701,467, which is the number of opioid

14   prescriptions filled in Lake and Trumbull County for CVS,

10:12:05 15  right?

16   A.    Correct.  They add up to 851,198.

17   Q.    Sitting here today, can you tell the jury what

18   these numbers, these before 2011 and after 2011 numbers,

19   would be if we were talking about opioid prescriptions

10:12:23 20  specifically?

21   A.    Not as I sit here.

22              I don't have that.

23   Q.    The same is true for Giant Eagle, Walgreens and

24   Walmart:  Sitting here today, you cannot tell the jury

10:12:37 25  what these numbers would be for before 2011 and after

1    2011, specifically for opioid prescriptions.

2              Is that fair?

3    A.    Not as I sit here.  I didn't bring a note for that.

4    It's an easy number to look up, but it's not a number

10:12:51  5    that I brought with me.

6    Q.    All right.  When you reported back to the

7    plaintiffs' lawyers, what did you tell them was the

8    percentage of opioid prescriptions with red flags?

9              Do you know that number sitting here today?

10:13:19 10   A.    No, I don't.

11             I'm sorry, I could calculate it for you.

12   Q.    I believe we have a calculator sitting there for

13   you, if you can find it.

14   A.    I have it.

10:13:35 15   Q.    If you wanted to figure out what is the percentage

16   of opioids prescriptions flagged for Lake and Trumbull

17   Counties, how would you do that, based on the information

18   on this chart?

19   A.    Well, for each of the defendants, I would divide

10:14:03 20   the number of "red flagged prescriptions" by the number

21   of "total prescriptions" or flag -- or divide the number

22   of "red flagged opioid prescriptions only" divided by the

23   "opioid prescriptions only" number.

24   Q.    So let's go ahead and do that, because I'd like to

10:14:22 25   know what your assessment of the percentage of opioid

McCann - Cross/Swift

2245

1    prescriptions flagged is.

2              Can you tell me which numbers I should add

3    up, sir?

4    A.   Well, for CVS, I would divide 141,651 by 701,467.

10:14:49 5    Q.   Why don't we do this for, so that we don't have to

6    do it four times, let's do it for all defendants

7    together.

8              So if you wanted to know overall how many

9    prescriptions for the pharmacies in this case, how many

10:15:03 10   opioids prescriptions were flagged, what would you add

11   together and then what would you divide by?

12   A.   You want all of the prescriptions, the related

13   prescriptions that you produced, or just the opioid

14   prescriptions you produced?

10:15:25 15   Q.   Sir, I've been trying to be very clear.

16              I want to talk about opioids prescriptions.

17   A.   Well, then, I'd have to add up four numbers, the

18   141,651 for CVS and the analogous numbers that we looked

19   at for Giant Eagle, Walgreens and Walmart, and divide

10:15:45 20   that by --

21   Q.   Which numbers for Giant Eagle, Walgreens and

22   Walmart?

23   A.   Well, for instance, on Page 15, we looked at a few

24   minutes ago, of Appendix 14, for Giant Eagle it's

10:16:03 25   125,944.  For Rite Aid on Page 220 --

1    Q.    I'm sorry, Rite Aid is not a defendant in this

2    case, sir.

3                THE COURT:  We're not using Rite Aid.

4                THE WITNESS:  I apologize.

10:16:15  5                THE COURT:  Rite Aid is not in the case,

6    sir, so disregard them.

7                THE WITNESS:  Oh, I'm sorry.

8    BY MS. SWIFT:

9    Q.    Let's go to Walgreens next.

10:16:21 10                We've got CVS and Giant Eagle.

11   A.    The Walgreens number is 175,609.

12   Q.    All right.  And how about for Walmart?

13   A.    37,379.

14   Q.    And what is the total that you get?

10:17:48 15   A.    480,633.

16   Q.    Say it one more time for me, please, sir.

17   A.    480,633.

18   Q.    Just so that I'm clear, were you adding up

19   the -- what numbers were you adding up?

10:18:09 20                Were you adding up the numbers across the

21   bottom here that I crossed out, or were you using some

22   other numbers that don't appear on this page?

23   A.    I was using the numbers we looked at on the four

24   pages in Appendix 14 for number of red flagged

10:18:32 25   prescriptions, all prescriptions, and then opioid

McCann - Cross/Swift                                          2247

1    prescriptions.

2                      I was using the opioid prescriptions

3    number.

4    Q.   All right.  So you were using 141,651 for CVS?

10:18:44  5    A.   Correct.

6    Q.   You were using 125,994 for Giant Eagle?

7    A.   Yes.

8    Q.   You were using 175,609 for Walgreens?

9    A.   Yes.

10:19:00 10    Q.   And you were using 37,379 for Walmart?

11    A.   Yes.

12    Q.   All right.  Then to figure out the percentage of

13    opioid prescriptions flagged for all defendants, what

14    would you divide that number by, that 480,633?

10:19:21 15    A.   I'd add up four analogous numbers, starting with

16    CVS's 701,467, and add Giant Eagle's 774,690, and

17    Walmart's 229,006, and Walgreens' 806,193, for a total of

18    2,511,356.

19    Q.   And how do we get the percentage, sir?

10:20:15 20    A.   19.14 percent.

21    Q.   I'm sorry, say it one more time.

22    A.   19.14.

23    Q.   Okay.  Before we leave this, these numbers down

24    here on the left, they do not reflect simply the opioids

10:20:53 25    prescriptions that were filled, right?

1    A.    Correct.

2    Q.    All right.  I think we're done with that one.

3              There's one last area I'd like to ask you

4    about, Dr. McCann.  I want to clear something up that the

10:21:29 5    jury heard about these numbers -- I guess let's leave

6    them on the screen for that purpose.

7              I want to clear something up that the jury

8    heard about these numbers in opening statement.

9              Would you agree with me that it's

10:21:45 10    important, when you're talking about data in a case like

11    this, it's important to get the numbers right?

12    A.    In general, yes.

13    Q.    I'd like to show you what Mr. Lanier said about

14    these percentages in his opening statement.

10:22:04 15              MS. SWIFT:  And if I could switch over to

16    the computer, Mr. Pitts, that would be helpful.

17              MR. LANIER:  Your Honor, I don't have any

18    objection to this, unless, as long as the defendants

19    don't object to me doing it.  They objected when I tried

10:22:17 20    to show Ms. Sullivan's opening and I was told --

21              THE COURT:  All right.  Well, both sides

22    can refer to what --

23              MR. LANIER:  That would be great.

24              Thank you, Judge.

10:22:25 25    BY MS. SWIFT:

1     Q.    All right.  I'm going to call out for you,

2     Dr. McCann, Lines 7 through 13 of Page 103 of the trial

3     transcript.

4              Mr. Lanier said during opening statement,

10:22:51  5   "And we'll have Carmen Catizone and others explain the

6     red flags," and we heard from Carmen Catizone.  And the

7     "others" that Mr. Lanier mentions here, you know that's

8     you, right?

9     A.    I don't know what he's referring to.

10:23:04 10             I haven't seen this and I didn't hear the

11    opening.

12    Q.    You understand that you're the -- you're the expert

13    to come in and talk about the numbers, right?  That's --

14             THE COURT:  Hold.

10:23:13 15             Let's go on the headphones, please.

16             (Proceedings at side-bar:)

17             THE COURT:  Yes.  Ms. Swift, I'm now going

18    to sustain the objection.

19             This, there's no reference to this witness.

10:23:36 20             I would allow you to cross-examine a

21    witness on what counsel said the witness was going to do

22    or not do, but some general statement about "others," he

23    wasn't there and he didn't make the statement.

24             MS. SWIFT:  Your Honor, Mr. Lanier said in

10:23:51 25   opening statement that he was going to have witnesses

1    come in and testify that 90 percent of the prescriptions

2    were flagged.

3                    The only witness who has any basis to

4    testify about how many prescriptions, how many opioids

10:24:07  5    prescriptions were flagged in this case, is Dr. McCann.

6                    THE COURT:  Well, you can ask him -- I

7    think Dr. McCann said "90 percent" in his testimony.

8                    MR. LANIER:  That's the key, Your Honor.

9                    No, he said "90 percent were not adequately

10:24:20 10    documented."

11                    That's been the statistic.  This is a

12    misquote.

13                    THE COURT:  Well, I think that this

14    is -- this is generally consistent with what Dr. McCann

10:24:30 15    said.

16                    MS. SWIFT:  Dr. McCann just testified that

17    only 19 percent of opioid prescriptions were flagged.

18                    Mr. Lanier said in opening statement that

19    that number was 90 percent.

10:24:42 20                    MR. LANIER:  No, Your Honor.

21                    THE COURT:  I'm going to sustain the

22    objection.

23                    MR. LANIER:  Okay.

24                    THE COURT:  You can't cross-examine one

10:24:47 25    witness on what a lawyer said, unless it's -- he says

McCann - Cross/Swift                                           2251

1     this witness is going to come in and say X, and the

2     witness says something totally different.

3                    I don't see that here.

4                    (End of side-bar conference.)

10:25:12  5          MS. SWIFT:  Mr. Pitts, if I could have the

6     Elmo one more time, please.

7     BY MS. SWIFT:

8     Q.    I just to want make sure it's clear, Dr. McCann,

9     from your testimony, this 19.14 percent that we did the

10:25:36 10   math to come up with, that reflects the number of opioid

11    prescriptions that you flagged in this case, correct, for

12    each of the -- for the defendants all together?

13    A.    It is the number of opioid prescriptions in

14    isolation from the muscle relaxer and Benzo prescriptions

10:26:14 15   that were filled at or about the same time for the same

16    patients, and also triggered flags.

17    Q.    All right.  We'll get to the other prescriptions

18    that I understand you want to talk about in a minute.

19                    My question right now is, if I am correct,

10:26:29 20   that if we're talking about opioid prescriptions, you

21    flagged 19.14 percent of the prescriptions that these

22    pharmacies filled in Lake and Trumbull Counties; right,

23    sir?

24    A.    Correct.

10:26:44 25   Q.    All right.  And since you brought it up, I think

1      we're going to need to do the math for the other

2      prescriptions as well.

3                  Do you know what the percentage, before we

4      go through the math exercise, if we did this for all of

10:26:59  5      the prescriptions, do you know what the percentage of

6      prescriptions flagged would be?

7      A.    Not off the top of my head.

8                  I'm sorry, I'd have to do the calculation.

9      Q.    Well, I think we should do it just so we can see

10:27:14 10      it.

11                  What numbers would you add up to figure out

12      the percentage of overall prescriptions flagged?

13      A.    I can give you the number if you'd like.

14                  It's 616,038.  That is the 175,254 for CVS,

10:27:45 15      the 164,698 for Giant Eagle, the 226,843 for Walgreens,

16      and the 49,243 for Walmart.

17                  They add up to 616,038.

18      Q.    All right.  And what would you divide that by to

19      get the overall percentage of prescriptions flagged?

10:28:15 20      A.    The total number of prescriptions in the data we

21      received 3,534,374.

22      Q.    I apologize, I'm going to have to ask you to read

23      that number to me once again.

24      A.    3,534,374.

10:28:35 25      Q.    And is that the sum of these numbers that I've

1    crossed out up here at the top?

2    A.    Correct.

3    Q.    So what's the percentage that you get when you

4    divide the number of all prescriptions flagged by the

10:28:48  5    total number of all prescriptions?

6    A.    17.43.

7    Q.    So it's an even lower number than the number for

8    the opioids prescriptions that are flagged, correct, sir?

9    A.    It's a lower number.

10:29:25 10    Q.    You didn't flag anywhere near 90 percent of

11    prescriptions, right, sir?

12    A.    Correct.

13            MS. SWIFT:  Thank you, Dr. McCann.  That's

14    all I have.

10:29:56 15            THE WITNESS:  Thank you, Ms. Swift.

16            THE COURT:  All right.  I think -- any, any

17    other cross-examination by any of the other counsel?

18            MS. FUMERTON:  Your Honor, this is Tara for

19    Walmart.  I do have some questioning.  I know it's 10:30,

10:30:13 20    so I didn't know if you wanted to --

21            THE COURT:  I think I want to continue a

22    little more because we got a late start with this

23    witness, so --

24            MS. FUMERTON:  Yes, Your Honor.

10:30:20 25            THE COURT:  We'll take a break in around 15

1    or 20 minutes.

2                    MS. FUMERTON:  Your Honor, may we approach

3    the witness and you to hand out some binders?

4                    THE COURT:  Okay.

10:30:45 5              THE WITNESS:  Thank you.

6        CROSS-EXAMINATION OF CRAIG McCANN

7    BY MS. FUMERTON:

8    Q.    Good morning, Mr. McCann.

9                    I want to raise this up actually.  Hold on

10:31:21 10    one second.

11                    Hopefully folks can hear me better that

12    way.

13                    Good morning, Dr. McCann.  And good

14    morning, ladies and gentlemen of the jury.

10:31:35 15              Just as a reminder, my name is Tara

16    Fumerton, I'm one of the attorneys for Walmart.  And,

17    Dr. McCann, we have met several times before in your

18    depositions, correct?

19    A.    We have, yes.  Thank you.

10:31:46 20    Q.    Okay.  Nice to see you again.

21    A.    Good to see you again, ma'am.

22    Q.    I hopefully will be very quick.

23                    We handed up a binder to you that might

24    have some reference material.  I'm hoping to not even

10:31:56 25    have to look at it.  We handed one copy up to the Judge

1  and to counsel as well, but hopefully this will go

2  quickly.

3  　　　　　So, Dr. McCann, you created the algorithms

4  to identify the prescriptions in the dispensing data that

10:32:16 5  purportedly met the criteria of Mr. Catizone's 16 red

6  flags, is that right?

7  A.  "Created" is too strong.

8  　　　　　We programmed algorithms that reflected

9  flagging rules suggested to us by counsel, I understand

10:32:49 10  coming originally from Mr. Catizone.

11  　　　　　So we received an instruction to flag a

12  particular pattern of prescriptions.  We had the data,

13  and so it's a matter of writing some formulas, some

14  computer code, so we did that last step.

10:33:08 15  　　　　　We didn't create the algorithms or create

16  the rules.  We implemented those rules on the data that

17  we had.

18  Q.  So I just want to simplify it, and I think we're

19  saying the same thing, so tell me if I'm incorrect.

10:33:22 20  　　　　　Mr. Catizone identified 16 red flags,

21  correct?

22  A.  Or 16.

23  Q.  16 red flags, correct?

24  A.  I think 16, I think not 15.

10:33:34 25  Q.  I'm sorry, I said 16.

```
     1    A.    I'm sorry.

     2    Q.    I apologize if I wasn't being clear.

     3                16 red flags, correct?

     4    A.    Correct.

10:33:40 5    Q.    And then you applied those red flags to the

     6    defendants' data, correct?

     7    A.    Correct.

     8    Q.    And so you're familiar, and I think you testified

     9    yesterday, about red flag 13, and I actually want to talk

10:33:5310    about both red flag 12 and red flag 13.

    11                If we need to reference your report, we

    12    can, but just so we're on the same page, red flag 12 is

    13    an opioid that was dispensed to at least four different

    14    patients on the same day, and the opioid prescriptions

10:34:1015    were for the same base drug, strength, and dosage form,

    16    and were written by the same prescriber.

    17                Right?

    18    A.    That's my memory, yes.

    19    Q.    Okay.  And flag 13 identifies the prescriptions

10:34:2420    where an opioid was dispensed within an hour and those

    21    prescriptions are all roughly the same.

    22                Do you recall --

    23    A.    Yes.

    24    Q.    -- that?

10:34:3225                And there's lots of testimony about the
```

1    time issue.  I'm not going to revisit that.

2              But in response to Mr. Lanier's questions,

3    you said that it really identifies identical

4    prescriptions that are presented, correct?

5    A.    Yes, at least on those three categories; the opioid

6    itself, the strength, and the packaging, the dosage

7    format.

8    Q.    And you described them as identical, correct?

9    A.    Correct.

10   Q.    But those prescriptions could be written for

11   different quantities, right?

12   A.    Correct.

13   Q.    And they could be written for different drugs days

14   supply, correct?

15   A.    I think that means the same thing.

16   Q.    Well, so in other words, the prescriptions aren't

17   identical; they could be written for different things,

18   correct?

19   A.    No.  They're all written, in our example, I think

20   for something like 10 milligram Oxycodone tablets, some

21   of the prescriptions might be for 30 tablets and some of

22   them for 90 tablets.

23   Q.    Or some of them could be for 30 tablets and eight

24   tablets, right?

25   A.    Correct.

McCann - Cross/Fumerton                                      2258

1   Q.    Okay.  And some of them could be written for 10

2   tablets, correct?

3   A.    Correct.

4   Q.    But in your analysis, you treated prescriptions of

5   the same drug base the same if one was written for 30

6   days and one was written for eight days, correct?

7   A.    Correct.  That's how the -- the flag is specified

8   and that's how we implemented.

9   Q.    Okay.  I want to talk now about red flags 10 and

10  11, and you're familiar with those, correct?

11  A.    I'm not as familiar with them as I am with 12 and

12  13.

13  Q.    Okay.

14  A.    You can ask me some detailed questions.  We'll have

15  to look at them.

16  Q.    You know what?  I'll read them to you.  If you

17  still have to refer to your report you can do that, okay?

18  A.    Yes.

19  Q.    So "Red flag 10 triggers when a patient is

20  dispensed an opioid prescription of over 200 MME per day

21  before 2018 or over 50 MME per day after January 1st,

22  2018."  Do you recall that?

23  A.    Yes.

24  Q.    And red flag 11 is similar, but slightly different.

25              It "triggers when a patient was dispensed

1    an opioid prescription of over 200 MME per day before

2    2018 or over 900 MME per day after January 1st, 2018."

3               Correct?

4    A.    That's consistent with my memory, yes.

10:37:11  5    Q.    Okay.  And can you just remind the jury, what does

6    MME mean?

7    A.    Morphine Milligram Equivalents, it's a standardized

8    measure of opioids.  It allows you to compare doses of

9    different strengths or of different drugs.

10:37:30 10              So Oxycodone versus Hydrocodone, or

11   Oxycodone 10 milligrams versus Hydrocodone 30 milligrams.

12              So it's a standard unit of measure to

13   combine those different drugs and drug strengths.

14   Q.    Okay.  And for red flags 10 -- thank you,

10:37:49 15   Dr. McCann.

16              And for red flags 10 and 11, do you know

17   that when Mr. Catizone created them, he used the Centers

18   for Disease Control & Prevention, their guideline for

19   prescribing opioids for chronic pain?

10:38:08 20              MR. LANIER:  Your Honor, I'm going to

21   object to the question.

22              It --

23              THE COURT:  Well, hold.

24              (Proceedings at side-bar:)

10:38:25 25              MR. LANIER:  Your Honor, my objection is

1   she puts into the question this statement "when

2   Mr. Catizone created them."

3               There's no testimony, and I think there's

4   testimony to the opposite.  He didn't create these red

10:38:37  5   flags.

6               THE COURT:  All right.

7               MR. LANIER:  That's an improper question.

8               THE COURT:  All right.  I'll sustain the

9   question as it was asked.

10:38:43 10               If you can rephrase it, I'll permit it.

11               (End of side-bar conference.)

12   BY MS. FUMERTON:

13   Q.    Dr. McCann, are you familiar with the CDC

14   guidelines for prescribing opioids for chronic pain?

10:39:34 15   A.    Somewhat.

16               I'm aware of them, and I've reviewed them

17   once or twice.  I wouldn't say that -- I'm certainly not

18   an expert in them.

19   Q.    So last week the jury heard testimony from

10:39:50 20   Mr. Catizone that he instructed you that when you were

21   applying red flags 10 and 11, to look at what the CDC

22   guidelines actually say, and apply your red flags in that

23   way.

24               Is that what he actually did?

10:40:09 25               MR. LANIER:  How --

1   Q.    We can look -- we can pull up the transcript if

2   counsel doesn't remember this testimony.

3              But let me just ask the question:  Did

4   Mr. Catizone instruct you to apply the CDC guidelines

10:40:24  5   when applying red flags 10 and 11 to defendants' data?

6   A.    I don't know.

7              I don't recall if I -- if I was aware of

8   some communication at some point in time on this issue.

9   I've since forgotten about it.

10:40:40 10              There was some back-and-forth as to how

11   each of these red flags should be specified and

12   implemented.  That's now eight or 10 months ago.  I don't

13   remember the back-and-forth.

14              And I wasn't involved in it.

10:40:54 15   Q.    Well, do you know whether the CDC guidelines

16   differentiate between chronic pain patients and acute

17   pain patients when applying the MME limits that

18   Mr. Catizone used for these red flags?

19   A.    No, I have no idea.

10:41:09 20   Q.    So when you applied these red flags, you did not

21   differentiate between acute and chronic patients,

22   correct?

23   A.    Absolutely.

24   Q.    And when you -- are you aware that the CDC

10:41:28 25   guidelines also differentiate between primary care

1    physicians and specialists?

2    A.    No.

3    Q.    And so when you applied these two red flags to

4    defendants' data, you did not differentiate between

10:41:41  5    primary care physicians and specialists, correct?

6    A.    Correct.

7    Q.    Are you aware that the CDC guidelines also

8    differentiate between patients with chronic pain and

9    patients that are undergoing cancer treatment?

10:41:56 10    A.    No.

11    Q.    And so when you applied red flags 10 and 11, you

12    did not differentiate between patients who were receiving

13    cancer treatment and any other patients, correct?

14    A.    Correct.

10:42:09 15    Q.    Last subject, hopefully.

16          Dr. McCann, I just also want to briefly ask

17    you about Mr. Catizone's red flag 9, and "Red flag 9

18    triggers when a patient was dispensed two short-acting

19    opioid drugs on the same day," correct?

10:42:49 20    A.    I don't recall that from memory, but that sounds

21    like one of the flags, yes.

22    Q.    Okay.  And if you want to, you can turn to your

23    report at Page 151, if necessary, but I was reading

24    directly from it.

10:43:01 25    A.    I'll accept that.

1    Q.    Okay.

2    A.    Thank you.

3    Q.    And so to apply this red flag, you needed to

4    differentiate between short-acting opioids and

5    long-acting opioids, correct?

6    A.    Correct.

7    Q.    And you included Methadone among the short-acting

8    opioids for flag 9, correct?

9    A.    I don't recall as I sit here.

10   Q.    I'm going to show you something in your binder that

11   might refresh your recollection and then we can publish

12   it to the jury if need be, but if you'd turn to Page 6 in

13   your binder, I'll represent that that's an excerpt from

14   your spreadsheet.

15                These Excels are incredibly voluminous and

16   so I didn't print out the whole thing, but if you look at

17   that excerpt would that refresh your recollection that

18   you treated Methadone as a short-acting opioid?

19   A.    I'm sorry, did you turn me to Page 6?

20   Q.    I'm sorry, Tab 6.

21   A.    I'm sorry, Tab 6, yes.

22   Q.    And does that refresh your recollection that you

23   treated Methadone as a short-acting opioid?

24   A.    No.

25   Q.    And why does it not?

 1              THE COURT:  Hold.  Let's go on the

 2    headphones a minute.

 3                  (Proceedings at side-bar:)

 4              THE COURT:  Ms. Fumerton, I've never -- you

10:44:59  5    show something to a witness and ask "Does it refresh your

 6    recollection," and if he says "yes," you can ask the

 7    question.

 8              If he says it doesn't, I think you have to

 9    move on.  You can ask him why it doesn't refresh his

10:45:12 10    recollection.  If it does, it does; if doesn't, it

11    doesn't.

12              MS. FUMERTON:  Your Honor, I think that's a

13    fair point.  I think I can clarify it by publishing the

14    particular document and ask him --

10:45:25 15              THE COURT:  Well, I don't even know what it

16    is.  What are you showing him?

17              MS. FUMERTON:  Right.  That is actually an

18    excerpt from his backup data, and if you look at Column

19    L, that's the indicator of whether he treated something

10:45:36 20    as a short-acting or a long-acting opioid.

21              THE COURT:  All right. Well, if you

22    can -- it's his backup data, I don't have a problem with

23    you showing it and asking him about it.

24              MS. FUMERTON:  Yes, Your Honor.

10:45:46 25              Thank you.

1        (End of side-bar conference.)

2    BY MS. FUMERTON:

3    Q.    All right.  Thank you, Dr. McCann.  I just want to

4    walk through this excerpt and see if it can help us

5    understand, and maybe the mistake is mine, so I want to

6    make sure I understand.

7              So what I can represent is that this is

8    essentially a screenshot of your Excel that we had

9    filtered to "Methadone," and this is in your backup data.

10   This is specifically the heading of the Excel file is up

11   at the top.

12              Do you recognize that?

13   A.    You say do I recognize the file name at the top?

14   Q.    Yes.

15   A.    It looks similar to file names I've seen in this,

16   in this litigation.

17              I don't recall this one specifically, but

18   it looks similar.

19   Q.    And do you recall one of your spreadsheets that you

20   provided in this litigation looks something like what we

21   have excerpted here?

22   A.    Hundreds of spreadsheets look similar to this that

23   we provided, I think.

24   Q.    So is the answer no, you don't recall this?

25   A.    I don't recall this one, but I recall generally

1    this type of spreadsheet with this type of data.

2    Q.    And so if you look at Column L where it says ER

3    indicator, do you recall having a column in your data

4    that refers to that?

10:47:10  5    A.    I'm sorry, I don't as I sit here.

6    Q.    Okay.  Thank you very much.

7              So you don't know one way or another

8    whether Methadone was included as a short-acting or

9    long-acting opioid in your analysis, is that fair?

10:47:23 10   A.    I don't know whether all NDC code variants of

11   Methadone are of one type or another, that is extended

12   release or fast-acting, but if -- if they are some NDC

13   codes that are not extended release or fast-acting they

14   would be subject to that flag 9, 9 that you asked me

10:47:49 15   about.

16   Q.    No.  I appreciate that that's what you were

17   intending to do.

18              I'm just asking whether you know whether or

19   not Methadone was, in fact, treated as a short-acting or

10:47:59 20   long-acting opioid for your analysis, and you don't know

21   the answer.

22              Is that fair?

23   A.    I apologize if my answer wasn't clear.

24              There may be some formulations that are

10:48:10 25   fast-acting and some that are extended release, and I

1    just don't know as I sit here.

2    Q.    Right.  So you don't know one way or the other

3    whether or not you had included Methadone as short acting

4    or long acting, right?

10:48:22  5    A.    I'm still not saying it correctly then.

6              What I'm trying to say is I don't know

7    whether there are some NDC codes for Methadone that were

8    included as fast-acting.

9              I just don't know one way or another as I

10:48:33 10    sit here.

11    Q.    Okay.  Thank you.

12              MS. FUMERTON:  No further questions.

13              THE WITNESS:  Thank you.

14              THE COURT:  Okay.  This will be a good

10:48:42 15    time, ladies and gentlemen, to take our midmorning break.

16    Usual admonitions, and then we'll pick up in 15 minutes

17    with Dr. McCann's testimony.

18              (Jury out.)

19              (Recess taken.)

11:07:19 20              (Jury in.)

21              THE COURT:  Okay.  Please be seated.

22              And, Dr. McCann, you're still under oath

23    from this morning.

24              THE WITNESS:  Thank you.

11:09:11 25              THE COURT:  Any additional questions or

1    examination?

2              MS. FIEBIG:  Yes, Your Honor, just very

3    briefly for Giant Eagle.

4              CROSS-EXAMINATION OF CRAIG McCANN

11:09:19 5   BY MS. FIEBIG:

6    Q.    Good morning, Your Honor.  Good morning,

7    Mr. McCann.

8    A.    Good morning.

9    Q.    My name is Chantale Fiebig, and I'm one of the

11:09:30 10  attorneys representing Giant Eagle in this litigation.

11   A.    It's nice to meet you.

12   Q.    And you, too.

13             Do you recall yesterday you were explaining

14   some of the data that you reviewed for this case, and I

11:09:43 15  believe you testified it was ARCOS data, is that right?

16   A.    Yes.

17   Q.    And do you recall your testimony that you shared

18   some of that data across the country, with cities and

19   counties all across the United States?

11:09:54 20  A.    Yes.

21   Q.    And, Mr. McCann, are you aware that Giant Eagle is

22   a regional grocery store chain that doesn't operate all

23   over the United States?

24   A.    I didn't investigate that, but I understand that

11:10:08 25  generally, yes.

1    Q.    So the data that was shared all across the United

2    States, Giant Eagle isn't present everywhere, right?

3    A.    Correct.

4    Q.    They only operate in five states?

11:10:21 5    A.    I don't recall as I sit here how many states.

6    Q.    Okay.  But you recall that you testified that this

7    information was state -- shared with counties and cities

8    everywhere and state AGs, do you recall that?

9    A.    Like I said, their state's data was shared with

11:10:36 10    them.

11    Q.    And some of that was relating to investigations

12    into opioid manufacturers, right?

13    A.    Correct.

14    Q.    And into opioid national distributors who just

11:10:46 15    distribute, correct?

16    A.    Correct.

17    Q.    And you know, right, that not a single AG has sued

18    Giant Eagle?

19    A.    I don't know that.

11:10:56 20    Q.    Do you have any reason to dispute that?

21    A.    No, not if you tell me.

22    Q.    So are you here today offering the jury any expert

23    opinion that Giant Eagle broke the law?

24    A.    No.

11:11:09 25    Q.    And are you here to tell the jury that in your

         1    expert opinion, Giant Eagle didn't comply with the

         2    Controlled Substances Act or its corresponding

         3    regulations?

         4    A.    No.  I didn't give any testimony like that at all.

11:11:22 5    Q.    And you're not here to tell the jury that Giant

         6    Eagle violated any Ohio law, right?

         7    A.    Correct.

         8    Q.    In fact, you're not here to tell the jury that any

         9    of these defendants broke the law, are you?

11:11:33 10   A.    Any law, any regulation, any industry practice,

        11    that wasn't the subject of any of my testimony.

        12    Q.    Right.  And you don't have any evidence to offer

        13    this jury that these defendants broke the law?

        14    A.    That's a different question.

11:11:48 15              I don't know the answer.  I'm not sure that

        16    I'm qualified to answer that question.

        17    Q.    Right.  Because in your expertise, you don't have

        18    an opinion on whether these defendants violated the

        19    Controlled Substances Act, right?

11:12:04 20   A.    No, that's not why.

        21              I provided quite a bit of information that

        22    may or may not be useful for someone, the jury really, to

        23    determine whether some law was broken.

        24              I -- I don't know whether what I provided

11:12:18 25   is helpful to the jury or not.

McCann - Cross/Fiebig                           2271

1    Q.    But you don't have an expert opinion, right, these

2    defendants violated the Controlled Substances Act?

3    A.    Right.  On that ultimate opinion whether some

4    Controlled Substances Act or some other law was violated,

11:12:32  5    no, I don't have an opinion on that ultimate conclusion.

6    Q.    Now, I wanted to ask you a few questions about some

7    of the information that you did provide the jury about

8    Giant Eagle.

9          And you went over some of this with

11:12:48  10    Ms. Swift this morning, so we won't spend too much time

11    on it.

12          If you could show the Elmo, I've marked

13    this demonstrative as Giant Eagle Demo 004, but do you

14    recognize that you also discussed this with Ms. Swift

11:13:02  15    this morning?

16    A.    Yes.

17    Q.    And I just wanted to draw your attention to some of

18    the numbers back at the top, and Ms. Swift established

19    with you that the numbers written in blue by Mr. Lanier

11:13:13  20    yesterday were the number of total prescriptions that the

21    defendants produced in this case that were dispensed in

22    Lake and Trumbull Counties, correct?

23    A.    Close.

24          The total prescriptions for opioids,

11:13:32  25    Benzos, and muscle relaxers, correct.

McCann - Cross/Fiebig                                    2272

1    Q.    And that's the number in blue, correct?

2    A.    Correct.

3    Q.    And if we actually just wanted to isolate the

4    opiate prescriptions, those numbers are the ones written

11:13:44  5    underneath in purple, correct?

6    A.    Correct.

7    Q.    So you can see that for CVS, the actual number of

8    opioid prescriptions is about 150,000 different from the

9    number that was originally written on this slide,

11:14:02 10    correct?

11    A.    Correct.

12    Q.    And for Walgreens, the number of actual opioid

13    prescriptions is about 200,000 less than what was

14    originally written on this slide, correct?

11:14:11 15    A.    Correct.

16    Q.    And for Walmart, it's about -- it's about a

17    50,000-prescription difference between opioid

18    prescriptions and what was originally written on this

19    slide, correct?

11:14:22 20    A.    Correct.

21    Q.    But for Giant Eagle, do you see that the difference

22    between the total prescriptions number that's presented

23    on this slide, which is close to 1.4 million, and the

24    actual opioid prescriptions, which is actually closer to

11:14:40 25    775,000, do you see that that number was off by almost

1    650,000 prescriptions?

2    A.    Well, they're different by about 625,000, that is

3    the number of the muscle relaxer and Benzo prescriptions

4    Giant Eagle filled, yes.

11:14:58  5    Q.    Right.  So yesterday when you testified before the

6    jury that Giant Eagle's opiate prescriptions were

7    approximately 1.4 million, you knew that wasn't true,

8    right?

9    A.    Absolutely not.

11:15:12  10             As I said several times when discussing

11    this with Ms. Swift, I understood, in fact she asked the

12    question a couple of times without the opioid

13    qualification, just the total number of prescriptions

14    that we reviewed and ran through the flagging algorithms.

11:15:29  15             Those were the numbers that I was giving

16    Mr. Lanier yesterday, and those are the numbers that he

17    wrote down across the top.

18             I had not noted that he had put on the

19    funnel "Opioid" to isolate the opioid amongst the other

11:15:47  20    two as well.

21    Q.    So you didn't clarify for the jury that "opiate

22    prescription" is what was written on the slide, right?

23    A.    I did not.

24    Q.    And you didn't clarify that if actually we were

11:16:02  25    just tracking the opiate prescriptions the number for

McCann - Cross/Fiebig                    2274

1    Giant Eagle would be about 625,000 less than the number

2    you gave them?

3    A.    I did not.

4    Q.    Mr. McCann, isn't it true that in at least one

5    prior case, your expert testimony has been excluded

6    altogether?

7    A.    I'm not sure.

8    Q.    You don't know?

9    A.    The one I'm thinking about, I'm thinking about one,

10   yes.

11            I'm not sure it's the same one you're

12   thinking about one, but I'm thinking about one.

13   Q.    Is it possible that there's more than one?

14   A.    No, there's only one.

15   Q.    And in at least that one, the Court concluded that

16   your testimony was unreliable and inconsistent, correct?

17   A.    No.  That's not correct.

18            MR. LANIER:  Your Honor, I'm going to

19   object to her going beyond what you allowed.

20            THE COURT:  That's sustained.

21            The jury will disregard the last question

22   and answer.

23            MS. FIEBIG:  Okay.  Thank you.

24            No further questions, Your Honor.

25            Thank you, Mr. McCann.

1            THE WITNESS:  Thank you.  Nice to meet you.

2            MR. BUSH:  Your Honor.

3            THE COURT:  Yes, Mr. Bush.

4            MR. BUSH:  CVS has no questions.

11:17:17  5            THE COURT:  All right.  Thank you.

6            Mr. Lanier, you may redirect.

7            If any of the jurors have any questions for

8    Dr. McCann, please give them to Mr. Pitts.

9            Thank you.

11:17:37 10            MR. WEINBERGER:  Judge, I think there is

11    one juror.

12            THE COURT:  All right.  Robert, can you get

13    the question, please?

14        REDIRECT EXAMINATION OF CRAIG McCANN

11:17:46 15    BY MR. LANIER:

16    Q.   Mr. McCann -- sorry.

17            THE COURT:  Is there any others?  I just

18    want to make sure we got them all.

19            Robert, I just want you to give that to the

11:18:14 20    lawyers so they can see it.

21            (Pause.)

22            MR. LANIER:  We believe the question should

23    be asked, Your Honor.  I'm glad to ask it on redirect.

24            THE COURT:  Well, as I said, as I

11:18:36 25    explained, I'm giving these questions to the lawyers so

1    they know that any -- that a juror has a question, and

2    leave it to them whether or not to ask it with this

3    witness or whether or not to ask it with a future

4    witness; or if they don't think it's relevant, not to ask

11:18:51  5    it.

6                        It's up to the counsel.

7                        MS. FIEBIG:  I would ask it.

8                        MR. LANIER:  And I'm glad to ask it, Your

9    Honor.

11:19:01 10                        You passed the witness.

11    BY MR. LANIER:

12    Q.    Dr. McCann, first --

13                        MR. LANIER:  Oh, mask.  Thank you, Juan.

14    "Who was that masked man?"  No.

11:19:16 15    Q.    First things first:  Did Dr. McCann say the muscle

16    relaxers and Benzos were dispensed at the same -- maybe

17    time -- an opioid script was?

18    A.    Doesn't have to be exactly at the same time, but to

19    the same patient that also received an opioid.

11:19:42 20                        They have to have received a muscle relaxer

21    or a Benzo, and then the flags that were run sometimes

22    flagged only combinations or what are referred to

23    sometimes as cocktail drugs, where there's both the

24    opioid and a muscle relaxer or a Benzo.

11:20:01 25                        So they're connected, and the flagging

1    methods are run on all of the prescriptions; not just the

2    opioids.

3                    And it was the flagging the number of

4    prescriptions subject to the flags and the result of the

11:20:16  5    flags that I reported through Mr. Lanier to you

6    yesterday.

7    Q.    Okay.  Thank you.

8                    And we'll get into that in a little more

9    detail later, but I want to start by asking you, you

11:20:29 10    testified you have testified over 600 times, and

11    defendants brought up one time where a Judge excluded

12    your testimony.

13                    Is that right?

14    A.    Yeah, not the one that I was asked the follow-up

11:20:42 15    question on, but there was one case, a small case, a very

16    long time ago.

17    Q.    Did it have anything to do with opioids?

18    A.    No.

19                    It was a defamation case.

11:20:53 20    Q.    Okay.  Now, here's the road for your redirect.

21                    I'm calling it Perspective Road.  We're

22    going to stop at fill times and numbers as well.

23                    But how important is it to have the right

24    perspective when you look at things?

11:21:12 25    A.    Oh, critical.

1            Proportionality in life is important, and

2    we lost the sense of proportionality yesterday and this

3    morning, I think, on this fill time issue especially.

4    Q.    And we'll get to that in a minute.

5            But, for example, when people ask you

6    questions about whether or not someone broke the law, are

7    you here to even testify about those things?

8    A.    No.

9    Q.    When someone will ask you a question like Giant

10   Eagle, "Did the states sue Giant Eagle," are you familiar

11   with what the states are watching in this trial, for

12   example?

13   A.    No.

14            MS. FIEBIG:  Objection, Your Honor.

15            MS. FUMERTON:  Objection.

16            THE COURT:  Overruled.

17   BY MR. LANIER:

18   Q.    I want clarity and perspective on your work.

19            In a sense, what you testified to in this

20   case for the jury, I at least grouped into two subject

21   areas.

22            One, did you count the opioid pills these

23   defendants pumped into the county?

24   A.    Yes.

25   Q.    Did you get cross-examined on one of those pills

1    when you gave those numbers?

2    A.    No.

3                   MS. SWIFT:  Objection, Your Honor.

4                   THE COURT:  Sustained.

11:22:29  5              The jury is to disregard that question and

6    answer.

7                   MR. LANIER:  Well, all right, I'll go into

8    it in a minute, Your Honor.  I'm sorry.

9    BY MR. LANIER:

11:22:37  10  Q.    But the second job was to help make sure Carmen

11   Catizone looked at a random sample of prescriptions to

12   check the notes.

13                  Did you do that as well?

14   A.    Yes.

11:22:49  15  Q.    And so when I talk about the importance of

16   perspective, I hope that you will help me show where the

17   cross-examination of you lies in terms of these two jobs.

18                  Okay?

19                  Let's begin with the next stop then, fill

11:23:14  20  times.

21                  Is fill times important to you when you

22   counted the opiate pills that were put into the counties

23   by each defendant?

24   A.    No.

11:23:24  25  Q.    Does fill time have anything at all to do with the

1   number of opioid pills you put out?

2   A.   No.

3   Q.   Doesn't come into the picture at all?

4   A.   Correct.

11:23:45 5   Q.   Tell the jury where fill time became relevant to

6   what you did?

7   A.   Well, you've heard a lot of talk yesterday and this

8   morning about flag 13.

9           This is the flag that was tripped if three

11:24:08 10   different patients presented a prescription for the same

11   drug, the same drug strength, and the same packaging,

12   written by the same prescriber in the same hour, or in

13   the same 60-minute span.

14           The other 15 of the 16 flags that

11:24:30 15   Mr. Catizone described to you doesn't have -- don't have

16   a time component, so it's only those instances where I

17   referred to yesterday several times as a triplet, where

18   you have three people come in with virtually identical

19   prescriptions.  They're all for the same drug, Oxycodone

11:24:50 20   or Hydrocodone; all for the same strength, 10 milligrams

21   or 20 milligrams; all in the same format, a pill or a

22   caplet or something else; and written by the same doctor.

23           So you had to have three people presenting

24   what are virtually identical prescriptions within an

11:25:13 25   hour.

1          That's the only time the hour -- the time

2      of the prescription being filled mattered.

3      Q.    And in that regard, where the time mattered to one

4      of the red flags you were asked to run, is it only on

11:25:29  5      that one red flag?

6      A.    Yes.

7              If I could give an example.  May I give an

8      example, please?

9      Q.    Please.  Yes.

11:25:38  10      A.    This is going to date me as one of the older people

11      in the room, but if you remember, some of you will, when

12      before debit cards, before credit cards, when I was young

13      people used cash and checks.

14              My parents had a hardware store, and it was

11:25:55  15      rare as a child I saw a credit card.  It was all cash and

16      checks and on account.

17              Well, but I remember these rolls of change,

18      pennies, nickels, dimes and quarters, and if you can

19      recall them, they are paper, brown paper-wrapped stacks

11:26:15  20      of coins.  And in a stack of quarters, there were 40 of

21      them, so that's $10.

22              Now, if you'll visualize with me, I have 10

23      of those stacks of quarters; 10 times 40, I've got 400

24      quarters, I've got a hundred dollars worth.

11:26:32  25              Now, let me unroll them, put them on the

1    desk in front of me here.  I have a big stack here of 400

2    quarters and the number of -- and imagine that that's the

3    total number of prescriptions, three-and-a-half million

4    prescriptions that we subjected the red flagging

5    algorithms to that were described to you by Mr. Catizone.

6                     So that's my stack of

7    300 -- three-and-a-half million prescriptions, it's these

8    400 quarters.

9                     We spent more than half of my time, I

10   think, talking to you about one quarter, one 25 cent

11   piece out of that stack of 400.  That's where we lost

12   perspective, that's where we lost proportionality, I

13   think.

14                    The total number of those triplets where

15   there was a missing fill time, we know the number, it's

16   9,000 -- I gave it to you yesterday, 9,800 approximately,

17   out of three-and-a-half million.  It's one 25 cent piece

18   out of this hundred-dollar stack of 400 quarters.

19                    That's the extent to which this fill time

20   issue impacted the results of the red flags that I ran as

21   explained to you by Mr. Catizone.

22   Q.   Okay.  Now, in this regard, though, maybe it's

23   argued that while it's just a rounding error of sorts, it

24   shows that you are not careful in what you do.

25                    So maybe the argument is just being used to

1    impeach you, and I'd like to focus on that element, if

2    for no other reason than for your reputation.  Okay?

3    A.    Thank you.

4                 MS. FIEBIG:  Objection.  Attorney argument.

11:28:22  5                 Move to strike that.

6                 THE COURT:  Yeah, the jury's to disregard

7    the last comment.

8                 You, of course, can ask your question,

9    Mr. Lanier.

11:28:31  10                 MR. LANIER:  Thank you, Judge.  I'll move

11    to the question.

12    BY MR. LANIER:

13    Q.    We know that General Electric and Walmart --

14                 THE COURT:  Giant Eagle.

11:28:46  15                 MR. LANIER:  General Electric, oh, mercy!

16    Judge, it was a long week.

17    BY MR. LANIER:

18    Q.    We know that Giant Eagle or General Electric, I'll

19    bet it's true for them, and Walmart --

11:29:01  20                 MR. LANIER:  Let me step back, Your Honor.

21    This is serious, and I apologize for the lightness.

22    Q.    We know that Giant Eagle and Walmart didn't have

23    any history fill time data in their systems before 2012

24    and 2013.

11:29:16  25                 Right?

1    A.    That's my understanding, yes.

2    Q.    That's what we were told during cross-examination

3    of you?

4    A.    Yes.

11:29:23  5    Q.    Which, of course, are you able to testify how well

6    their pharmacists were able to do their job when it comes

7    to flag 13 if they don't have that data?

8    A.    No.

9              MS. FUMERTON:  Objection.  It's outside the

11:29:39  10   scope --

11             THE COURT:  Overruled.

12             MS. FUMERTON:  -- completely of his report.

13             THE COURT:  Overruled.

14   A.    I apologize.  No.

11:29:45  15   BY MR. LANIER:

16   Q.    But you've got to do something with that data to

17   give your testimony here today.

18             Fair?

19   A.    Yes.

11:29:51  20   Q.    And so I thought we covered this in your direct but

21   maybe I wasn't clear, so I'm going to reask it now.

22             You have a range of times those

23   prescriptions could have been filled in terms of same

24   hour or not.

11:30:12  25             True?

1    A.    Yes.

2    Q.    And one end of the range is what?

3    A.    Well, none of them are filled in the same hour.

4    Q.    The other end of the range is what?

11:30:26  5    A.    All 9,800 are filled at the same -- in the same

6    hour.

7    Q.    And so for you to give the jury the range, do you

8    have to compute where all of them come in at one time?

9    A.    Yes.

11:30:45 10    Q.    And what was the time you chose?

11    A.    12:00 noon.

12              Could have been any time.  It's just a

13    placeholder, really.

14    Q.    So you can provide the lower end of the range and

11:30:58 15    you can provide the upper end of the range, and then see

16    how much difference it makes to see if it needs to be

17    examined further.

18              Fair?

19    A.    Yes.

11:31:09 20              May I give you another sentence or two on

21    that?

22    Q.    Sure.

23    A.    So going back to my example of the stack of

24    quarters, these 10 rolls of quarters I've broken apart,

11:31:20 25    there are 400 quarters in front of me.  We're really

1    talking about whether there's a time stamp or not on one

2    of these quarters.

3                   With Ms. Swift an hour ago, we talked about

4    the percentage of prescriptions that were flagged and the

11:31:35  5    number was 19 percent of the opioids, 17 percent overall.

6                   So of that 400, stack of 400 quarters, it's

7    about 75 of the quarters.

8                   So about 75 of the quarters are flagged,

9    and what Mr. Lanier is asking me is this range is the

11:31:56 10    difference between 74 quarters and 75 quarters.

11                   And I gave you both numbers yesterday.  I

12    gave you the 74 coin number and the 75 coin number, and

13    we've spent all of this time talking about that one coin,

14    that 25 cent piece that didn't have a time stamp on it.

11:32:18 15    Q.    So if we put this into perspective, the range

16    between them all coming in at different times and all

17    coming in at noon, when you're not given that data and

18    you have to plug it in, that range is the difference of

19    one quarter out of how many in your stack?

11:32:41 20    A.    75.

21    Q.    Is that a big difference?

22    A.    It was not to me, but I gave you both of those

23    numbers yesterday; and I don't know, to me it doesn't

24    seem like a big number, but I gave you both numbers --

11:32:57 25    Q.    And here's --

1    A.    -- to you, Mr. Lanier.

2    Q.    And here's the chart we used yesterday, the

3    demonstrative.

4    A.    Yes.

11:33:03  5    Q.    Red flag number 13, three patients filling the

6    prescription the same hour, the same doctor, right?

7    A.    Yes.

8    Q.    15 of the 16 flags had no time component?

9    A.    Yes.

11:33:15  10    Q.    Still true?

11    A.    Correct.

12    Q.    Cross-examination didn't change that CVS and

13    Walgreens included time, but half the time Walmart didn't

14    and half the time Giant Eagle didn't.

11:33:26  15              Right?

16    A.    Correct.

17    Q.    And so you moved half of Giant Eagle and Walmart

18    into the bucket of "no time information given," right?

19    A.    Correct.

11:33:37  20    Q.    And then what you did is you used the zero and gave

21    the zero as if they're all different, and you gave them

22    all at the same time of noon, where the three people come

23    in in the same hour with the same prescription and the

24    same doctor.

11:33:57  25              Right?

1    A.    Correct.

2    Q.    Did you hide any of this?

3    A.    No.

4                In fact, I brought this to the defendants'

5    attention in my very first deposition in this case.  I

6    explained the fill time issue and what we did.

7    Q.    And in that regard, did you give a range?

8    A.    I don't recall whether in my deposition I provided

9    that detail of these numbers.

10   Q.    I mean to this jury?

11   A.    Oh, yes, here, I told you that the difference -- I

12   gave the difference across each of the defendants and the

13   total across all four.

14               It was 9,634 out of 616,000.  It was one

15   coin out of 75 counties.

16               That was the -- those were the numbers I

17   gave you yesterday.

18   Q.    In your range that you gave, did you give a best

19   case scenario?

20   A.    Yes.

21   Q.    Did you give a worst case scenario?

22   A.    Yes.  Yes.

23   Q.    And did you explain the difference that it makes so

24   the jury can understand and give sense to the

25   prescriptions where the defendants had missing data?

1    A.    Yes.

2    Q.    And the lawyer kept using this phrase "You made it

3    up, you made it up."

4              Let's be a little more professional on

11:35:15 5    this.

6              In your profession, sometimes do you have

7    to make necessary assumptions?

8    A.    Yes.

9    Q.    Did you make the necessary assumptions?

11:35:24 10   A.    Yes.

11   Q.    Did we communicate them clearly to the

12   jury -- well, maybe not clearly.  That's my fault.

13              Did we at least try to communicate them to

14   the jury in your direct?

11:35:36 15   A.    I did the best I could.

16              I tried.

17   Q.    Okay.  And if we, when we get to the funnel, that's

18   the whole reason we had that range of numbers on the

19   funnel.

11:35:50 20              True?

21   A.    Yes.

22   Q.    And you were not here for Mr. Catizone's testimony,

23   were you?

24   A.    I was not.

11:35:55 25   Q.    You were not here to see if the lawyer

1    cross-examining him explained that you had given a range?

2                You weren't here for that, were you?

3                MS. SWIFT:  Objection, Your Honor.

4    Q.   The lawyer did not --

5                MR. LANIER:  Excuse me, Your Honor, I'll

6    reask it.

7    BY MR. LANIER:

8    Q.   When the lawyer showed you the testimony of

9    Mr. Catizone, she showed you Page 1280, starting with

10   Line 6, "It's okay with you if he" meaning Dr. McCann"

11   just filled in for a large percentage of prescriptions

12   that they were all filled in at noon?"

13               "Answer:  That's making the assumption that

14   Dr. McCann did not do this professionally and would

15   compromise standards, and I can't make that, but I don't

16   believe that that occurred and I would not have relied on

17   the data if I suspected that at all."

18               Do you see that?

19   A.   Yes.

20   Q.   Was at any time that you're aware of Mr. Catizone

21   told that you had provided the range?

22               MS. FUMERTON:  Objection, Your Honor.

23               Could we be heard at side-bar?

24               (Proceedings at side-bar:)

25               MS. FUMERTON:  Your Honor --

1              THE COURT:  Wait.  Wait a second.

2              Okay.  All right.  What's the objection?

3              MS. SWIFT:  Your Honor, the range didn't

4    exist until it came out of Dr. McCann's mouth yesterday.

11:37:19 5              MR. LANIER:  That's not true, Your Honor.

6              THE COURT:  I don't know if that's true or

7    not.

8              MR. LANIER:  This is the problem when they

9    stumble into something without doing it right.

11:37:30 10              MS. SWIFT:  That's absolutely incorrect.

11              That's -- Mr. Lanier knows it.

12              MR. LANIER:  No.

13              MS. SWIFT:  Mr. McCann didn't say anything

14    about a range in his report.

11:37:38 15              THE COURT:  Well, first of all,

16    Mr. Catizone said he didn't think that Dr. McCann did

17    anything wrong.

18              All right?  So that's the testimony and

19    that's there.

11:37:46 20              If there's -- I'm going to sustain the

21    question the way it was asked because although,

22    Mr. Lanier, if you ask the question of this witness "Did

23    you" -- "Did you convey to Mr. Catizone a range" I will

24    allow that.  I'll allow that, but I don't know if you

11:38:23 25    want to ask it.

|              |    |                                                        |
|--------------|----|--------------------------------------------------------|
|              | 1  | MR. LANIER:  Yeah.  I'll -- I'll work                  |
|              | 2  | through it, Your Honor.  I got your ruling.            |
|              | 3  | THE COURT:  All right.                                 |
|              | 4  | MR. LANIER:  Thank you.                                |
| 11:38:29     | 5  | (End of side-bar conference.)                          |
|              | 6  | BY MR. LANIER:                                         |
|              | 7  | Q.   Sir, have you given all of this data to the       |
|              | 8  | defendants?                                            |
|              | 9  | A.   Yes.                                              |
| 11:38:46     | 10 | Q.   Have you given them hundreds and hundreds of pages |
|              | 11 | that explain every one of these numbers?               |
|              | 12 | A.   Yes.                                              |
|              | 13 | Q.   Approximately how many pages would you say you've  |
|              | 14 | given them showing this entire breakout and the way you |
| 11:39:01     | 15 | did it?                                                 |
|              | 16 | A.   Somewhere between 20 and 30,000 pages of          |
|              | 17 | appendices.                                            |
|              | 18 | We looked at one, Appendix 14, in some of              |
|              | 19 | the questioning here this morning.                     |
| 11:39:17     | 20 | We looked at a few pages from Appendix 14,             |
|              | 21 | but in total, 20 to 30,000 pages like that.           |
|              | 22 | And then underlying data files and                    |
|              | 23 | programming codes that would allow you to reproduce    |
|              | 24 | everything that's in those 20 to 30,000 pages, and the |
| 11:39:38     | 25 | data and the code goes on for forever.  It's an enormous |

1    amount of material but provided all with my expert

2    report.

3                      And it shows how to go from every little

4    record of data, every piece of information to those,

11:39:56  5    those exhibits, and ultimately to the numbers that I've

6    testified to here today and yesterday.

7    Q.    And if the defendants had chosen to look at the

8    range from lower end to higher end, could they have done

9    so?

11:40:11 10    A.    Yes.  It's really a very easy thing to figure out.

11    Q.    Okay.  While we're on fill times, a side note that

12    you were asked that's also an issue of perspective.

13                      You were asked did you know that Carmen

14    Catizone used only two Walgreen notes to illustrate the

11:40:31 15    shortcomings of the prescriptions to the jury, and you

16    said you don't know.

17                      Is that even remotely relevant to your

18    numbers testimony here?

19    A.    It was not.

11:40:42 20    Q.    Are you here to testify about what prescription was

21    good or what prescription was bad?

22    A.    No.

23    Q.    Do you have the expertise to do that?

24    A.    No.

11:40:57 25    Q.    Whether Carmen Catizone had taken the time with me

1    in front of this jury to show two examples or 20 or 200,

2    would it be relevant at all to your testimony?

3    A.    No.

4    Q.    That's fill times.

5                    Now, let's go to numbers, please.

6                    On the numbers, we've got two different

7    categories of your work that I want to talk to you about:

8    Counting the opiate pills and helping Catizone look at a

9    random sample.

10                    Are you with me?

11   A.    Yes.

12   Q.    Why is it important that Carmen Catizone, when he's

13   examining these, look at a random sample?

14   A.    Well, there were 616,000 prescriptions that were

15   flagged by the 16 flags that Mr. Catizone explained to

16   you, and it would be impossible, without spending months

17   and months, to review each of the 616,000, maybe, maybe

18   more than months, for Mr. Catizone to review all of them.

19                    But you don't have to review all of them if

20   you review a sufficiently large number of them drawn from

21   across the range of the 616,000.

22                    So there's two issues there:  How large a

23   number do you have to review, can you just look at two,

24   or do you have to look at 200, or do you have to look at

25   2,000?  When is enough?

1           And then by "random," we just mean that it

2     wouldn't do to look at only prescriptions that were

3     filled in one month.  Maybe that would be a month but

4     that was an outlier, was not representative of the full

11:43:10  5     period that notes were produced for.

6           The notes were produced for 10 years, I

7     think, 120 months.  So you wouldn't just look at

8     prescriptions from one month, you'd want them distributed

9     across the months.

11:43:20 10           You wouldn't look at prescriptions from

11     just one defendant or just one pharmacy or written by

12     just one doctor.  You wouldn't narrow the sort of pull

13     that you took on the 616,000 to be able to draw a

14     reliable conclusion from your sample.

11:43:42 15           So those are the two things:  The size of

16     the sample and that they be representative.

17           And usually we ensure that they're

18     representative by taking them randomly from the -- from

19     the population.

11:43:56 20     Q.    All right.  In that regard, when you started with

21     these numbers that we put on the funnel, in fear that I

22     did not make it clear of what this whole chart was trying

23     to get to, and I'll take the fault if I didn't ask you

24     clear questions or make it clear, but we want the record

11:44:22 25     to be precisely right.  And so I want to make sure we're

McCann - Redirect/Lanier                                    2296

1    clear.

2              The numbers of prescriptions for opiates

3    that we're ultimately going to be talking about, why was

4    it important to you to include in that the other two

11:44:38  5    drugs that make up what they've been calling the holy

6    trinity?

7    A.    Well, because some of the flags that Mr. Catizone

8    explained to you are tripped if a patient receives two or

9    more of those three -- well, an opioid and one or two of

11:44:56 10    the other two drugs.

11             And so they're included in the flagged

12    prescriptions or the potentially flagged prescriptions.

13    You can't run a flag that requires an opioid, a Benzo,

14    and a muscle relaxer if you don't have any Benzos and

11:45:14 15    muscle relaxers in your data.

16             So the defendants provided data on muscle

17    relaxers and Benzos for patients who also got opioids.

18             And for application of the flags, the total

19    number of prescriptions had to be all three of those

11:45:34 20    types.

21    Q.    Okay.  So you said that it's those are the

22    prescriptions that were needed to run for the flags.

23             How do you run for a flag of the trinity

24    cocktail, as they call it, if you don't have the

11:45:52 25    prescriptions for the trinity cocktail?

1        A.    You can't.

2        Q.    So if you had used only the numbers that Ms. Swift

3    was suggesting, would you have been able to run the red

4    flags for the entire trinity cocktail?

11:46:06 5    A.    No.

6        Q.    Could you have given the jury the truth on how many

7    prescriptions were available for Mr. Catizone to look at

8    and examine?

9        A.    I'm sorry, could you ask me that again, please?

11:46:27 10   Q.    Yeah, that's a poorly worded question.

11                  Ultimately, what you're doing, the point of

12   this funnel, is to give random prescriptions for

13   Mr. Catizone to look at and examine the notes fields.

14                  You understand that?

11:46:40 15   A.    Yes.

16       Q.    Okay.  And whether that means you looked and ran

17   through your system 851,198 or 700,000, does it matter in

18   terms of you trying to get a random completion down here?

19       A.    It doesn't.

11:47:04 20                 What -- what -- well, other than if, if I

21   didn't have the Benzo and muscle relaxer information so I

22   was running the flags on the lower sets of prescriptions

23   that Ms. Swift asked me about, I wouldn't be picking up

24   any of the -- any of the cocktail drugs, any of the

11:47:26 25   prescriptions that Mr. Catizone's -- the flags that he

1    explained to you are designed to capture.

2            So I wouldn't have been doing the

3    calculations that would support the testimony that he

4    gave ultimately on whether there was adequate due

11:47:45  5    diligence on those types of prescriptions.

6    Q.    Okay.  So if we had wanted to run only those flags

7    that come up from opioid prescriptions only and give that

8    to the jury, if we had done that funnel instead, could

9    you have done that with no problem?

11:48:07  10   A.    Yes.

11   Q.    And then you would have given the numbers for CVS

12   of 701,467, and those are just opiate prescriptions,

13   right?

14   A.    Correct.

11:48:34  15   Q.    You would have given the number for Giant Eagle of

16   774,690, is that correct?

17   A.    Yes.

18   Q.    For Walgreens, you would have given the number of

19   806,193, is that right?

11:49:02  20   A.    Yes.

21   Q.    And then for Walmart, you would have given the

22   number 229,006.

23            Okay?

24            Those are the numbers if you don't have the

11:49:20  25   extra prescriptions for the cocktails, right?

McCann - Redirect/Lanier                                    2299

1    A.    Correct.

2    Q.    Now, if you don't have the extra prescriptions for

3    the cocktails, how can you run for the cocktails?

4    A.    Well, you can't.

11:49:39 5    Q.    And so if we want to focus on only the opiate

6    prescriptions, how can you run the red flags to see if

7    they're dispensing an opiate at the same time they're

8    dispensing a Benzo, at the same time they're doing a

9    muscle relaxer?

11:49:56 10    A.    You can't.

11    Q.    How can you do your job if you do what they want

12    you to do?

13              MS. SWIFT:  Objection.

14              THE COURT:  Overruled.

11:50:10 15    A.    I just couldn't run those 16 red flags on the

16    smaller data set that doesn't include the Benzo and

17    muscle relaxer prescriptions written to patients who also

18    received opioid prescriptions.

19    BY MR. LANIER:

11:50:22 20    Q.    So when you apply the red flags, the way they are

21    suggesting you should have done --

22              MS. SWIFT:  Objection, Your Honor.

23              THE COURT:  Well --

24              MR. LANIER:  All right.  I'll reask it.

11:50:32 25              THE COURT:  Reask that, please.

McCann - Redirect/Lanier

2300

1    BY MR. LANIER:

2    Q.    When you apply the red flags on these numbers that

3    were generated by the cross-examination, instead of

4    applying 16 red flags, how many would you only be

11:50:45  5    applying?

6    A.    I'd have to look at the list, but 10 or 12 of them,

7    there's at least two or three or four that require the

8    combination prescriptions.

9    Q.    Let's be conservative and say two, without us

11:51:05 10    pulling them back up; I don't remember either.  But you

11    wouldn't be applying all of the red flags, would you?

12    A.    Correct.

13    Q.    And so when you get your results from that, your

14    results are not going to contain the trinity or the

11:51:21 15    cocktail numbers, will they?

16    A.    That's correct, they won't.

17    Q.    And so your results will not be accurate when you

18    testify to the jury, will they?

19    A.    Not if I claim that they were the result of

11:51:37 20    applying all 16 of the flags that Mr. Catizone explained

21    to you.

22    Q.    And then ultimately, the whole point of this

23    perspective is to make sure that there was a good random

24    selection for Carmen Catizone to put his eyes on, right?

11:51:55 25    A.    That's my understanding, yes.

1    Q.    And then you had nothing to do with the decision

2    process that Carmen had when Carmen said there were 7,800

3    prescriptions and he viewed 90 percent to be inadequately

4    documented?

11:52:14  5           You had nothing to do with that other than

6    provide him the spreadsheets and the random sampling,

7    right?

8    A.    Correct.

9    Q.    And the 90 percent that you were being quizzed

11:52:27 10   about, do you understand his testimony was 90 percent of

11   these 7,800 had inadequate documentation?

12           MS. SWIFT:  Objection, Your Honor.

13           We said many times we're not going to have

14   lawyers questioning witnesses about what other witnesses

11:52:41 15   said.

16           THE COURT:  Overruled.  Overruled.

17   A.    I'm sorry, could you ask me again, please,

18   Mr. Lanier?

19   BY MR. LANIER:

11:52:50 20   Q.    Yes.  Do you understand his 90 percent --

21           THE COURT:  Hold.

22           MR. LANIER:  Judge, in the interests of

23   time I'll move on.

24           THE COURT:  Well, I want to go on the

11:53:00 25   headphones.

1          MR. LANIER:  All right.

2               (Proceedings at side-bar:)

3          THE COURT:  Reviewing this, I'm going to

4     sustain the objection.

11:53:05  5          It's not -- I mean, questioning a witness

6     on what another witness meant is not appropriate.

7          MR. WEINBERGER:  Your Honor, they --

8          THE COURT:  I'm sustaining the question the

9     way it was asked.

11:53:19 10          MR. LANIER:  Yeah.  I'll reask it, Your

11    Honor.  It makes sense.

12               (End of side-bar conference.)

13    BY MR. LANIER:

14    Q.    When Ms. Swift --

11:53:29 15          MR. LANIER:  Whoa, something happened, Mr.

16    Pitts.  I'll step back.

17    BY MR. LANIER:

18    Q.    When Ms. Swift asked you the questions about the 90

19    percent, are you in a position to be able to testify

11:53:45 20    whether or not the 90 percent was talking about how many

21    had inadequate documentation that he reviewed, or not?

22    A.    No, I'm not.

23    Q.    Okay.  If he -- if, in fact, there is testimony

24    that 90 percent had inadequate documentation, did you

11:54:07 25    take that and then testify to the jury whether or not you

```
 1   could extrapolate that improper documentation to the

 2   larger numbers?

 3   A.   Yes.

 4   Q.   Okay.  Next, while we're on this chart looking at

 5   numbers.

 6              Either you or I did goof up somewhere, and

 7   we need to get the record right.  Okay?

 8   A.   Yes.

 9   Q.   None of them picked up where we goofed up, but I

10   did, so I need you to fix it.

11              All right?

12   A.   Sure.

13   Q.   The numbers down here on Giant Eagle before 2011, I

14   wrote 191,575.  I got your handwritten notes, as the

15   defendants did yesterday, and on Giant Eagle on your

16   handwritten notes you had 191,515.

17   A.   I must not have been able to read my own note.

18   Q.   So you're off by 60?

19   A.   Yes.

20   Q.   So let's get it right.

21              Giant Eagle is 191,515, okay?

22   A.   Yes.

23   Q.   Perspective:  Does that change any of your opinions

24   in this case?

25   A.   No.
```

McCann - Redirect/Lanier                                    2304

1    Q.    Now, all of this work on the red flags was simply

2    to help make sure Mr. Catizone had a random sample to

3    look at.

4              Right?

11:55:50  5    A.    That's my understanding.

6    Q.    And in that regard, did you also prepare and

7    testify to the jury about the actual pill numbers of

8    opiates that each of these defendants put out?

9    A.    Yes.

11:56:14 10    Q.    And those pill counts, are those only opioid pills?

11    A.    Those were, yes.

12    Q.    When we put those up yesterday, and we had, for

13    example, from Plaintiffs' 26319 we had CVS, we

14    had -- this one is still -- yeah, CVS.

11:56:46 15              We've got them for CVS, we had it for Giant

16    Eagle, we had it for Walgreens, and we had it for

17    Walmart.

18              These pill counts you put up here, the

19    millions and millions of pills going out, is that only

11:57:22 20    opioids here?

21    A.    Yes.  In fact, only two Oxycodone and Hydrocodone.

22    Q.    And that's in reference to a question I had asked

23    you yesterday that was shown when I said "Did you include

24    all of the opioids," you did on one page, but here you've

11:57:38 25    only isolated out Oxy and Hydro, right?

McCann - Redirect/Lanier                    2305

1       A.    That's correct.

2       Q.    And so when we look at the way, between these

3    defendants, just take one of the big years; we've got

4    this year, this is 2012, can you do the math for us,

11:58:11  5    please?

6                  6.18 plus 11.73 -- uh-oh, you ready?

7       A.    Yeah, sorry.  Dropped the calculator here.

8       Q.    Tell me when you're ready.

9       A.    I'm ready.

11:58:33 10    Q.    6.18 plus 11.73 plus 10.23 plus -- make sure, I

11    think it's 2012 is 1.78.  How many pills, opiate-only

12    pills?

13      A.    Oxy and Hydro-only pills --

14      Q.    Right.

11:58:57 15    A.    -- 30.  29.92.

16      Q.    29.92 pills in Trumbull County put out per person,

17    every man, woman and child, by these four pharmacies in

18    2012?

19      A.    Yes.  That's correct.

11:59:13 20    Q.    If we look at Lake County, I don't want them to

21    feel bad, Ms. Fraser is sitting here, and she'll get her

22    feelings hurt.

23                  If we look at Lake County, and we take CVS,

24    add the numbers up for us, please.

11:59:30 25                  2012 add 2.92 --

1              MR. WEINBERGER:  10.92.

2              MR. LANIER:  10.92, thank you.

3    BY MR. LANIER:

4    Q.    Add 10.92 for CVS, for Giant Eagle 6.93 -- wait,

5    wait.  No.  No.  I just crossed years.

6              We're doing 2012.

7              Yeah, 6.93.

8              For Walgreens 2012, 7.88.  And then for

9    Walmart 2012, 3.82.

10              So in -- what is your number?

11   A.    Almost identical, 29.55.

12   Q.    So for Lake County, in 2002 --

13              MR. WEINBERGER:  '12.

14   BY MR. LANIER:

15   Q.    2012 --

16              MR. LANIER:  Judge, I apologize.  I didn't

17   eat breakfast.

18   BY MR. LANIER:

19   Q.    Lake County, 2012 --

20              MS. SWIFT:  Objection.  These total

21   numbers, I fail to see the relevance of this, Your Honor.

22              THE COURT:  Overruled.

23   BY MR. LANIER:

24   Q.    2012 in Lake County, 29.55 pills for every man,

25   woman and baby?

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    2012, Trumbull County, 29.92 for every man, woman |
| 3 | and baby? |
| 4 | A.    Yes. |
| 12:01:01  5 | Q.    And this is how you do the math with these millions |
| 6 | and millions of pills that have been put into these |
| 7 | counties by these defendants? |
| 8 | MS. SWIFT:  Objection.  He's lumping all |
| 9 | defendants together, Your Honor. |
| 12:01:11 10 | It's improper. |
| 11 | THE COURT:  Overruled. |
| 12 | A.    Yes.  That's correct. |
| 13 | MR. LANIER:  Okay.  Thank you. |
| 14 | I'll pass the witness, Your Honor. |
| 12:01:21 15 | THE COURT:  All right.  Ladies and |
| 16 | gentlemen, we will break for lunch. |
| 17 | It might have been better to conclude the |
| 18 | testimony, but I've got a couple of criminal matters I |
| 19 | need to conclude, and I don't want to keep them waiting. |
| 12:01:31 20 | I also don't want to delay your lunch.  So |
| 21 | usual admonitions, don't discuss this case with anyone, |
| 22 | and we'll pick up with the balance of Dr. McCann's |
| 23 | testimony after lunch at 1:00 o'clock. |
| 24 | Thank you. |
| 12:01:48 25 | (Jury out.) |

```
 1                  MR. STOFFELMAYR:  Your Honor --

 2                  THE COURT:  Wait until the jury is out,

 3       please.

 4                  Okay.  You can be seated.

 5                  MR. STOFFELMAYR:  Your Honor --

 6                  MR. LANIER:  Can the witness leave?

 7                  MR. STOFFELMAYR:  I wanted to raise one

 8       issue outside the presence of the jury.  Something that

 9       happened twice now I thought it was inadvertent the first

10       time, but I want to make sure.

11                  When jurors have presented with you a

12       question and we've reviewed it, both times Mr. Lanier has

13       said loud enough for the juror to hear, "Oh, we don't

14       have a problem with that," and so then if the question is

15       not asked the juror is going to naturally infer that we

16       didn't want them to hear.

17                  THE COURT:  All right.  I agree.

18                  There shouldn't be -- there should be no

19       comment at all.  I'm simply going to show the

20       witness -- show the lawyers the question, and you can do

21       what you want, but there should be absolutely no comment.

22                  MR. LANIER:  My fault, Your Honor.  I

23       apologize to counsel and everybody else.  I was a little

24       bit eager this morning.

25                  THE COURT:  All right.  It's a correct
```

1    objection by Mr. Stoffelmayr.

2                    MR. LANIER:  Yes, Your Honor.

3                    THE COURT:  So there won't be any more of

4    that.

12:03:15  5                    Okay.

6                    (Luncheon recess taken.)

7                    (Proceedings concluded at 12:03 p.m.)

8                            -   -   -   -

9

13:06:19 10

11

12

13

14

13:06:20 15

16

17

18

19

13:06:21 20

21

22

23

24

13:06:23 25

| | |
|---|---|
| 1 | <u>FRIDAY, OCTOBER 15, 2021, 1:06 P.M.</u> |
| 2 | (Jury in.) |
| 3 | THE COURT:  All right.  Please be seated. |
| 4 | I believe Mr. Lanier has one more question. |
| 13:08:43 5 | MR. LANIER:  Yes, Your Honor.  I just need |
| 6 | to fix a chart issue in my brain difficulties this |
| 7 | morning. |
| 8 | REDIRECT EXAMINATION OF CRAIG McCANN (RESUMED) |
| 9 | BY MR. LANIER: |
| 13:08:55 10 | Q.   Dr. McCann, we talked about the random 7,800 |
| 11 | prescriptions that Mr. Catizone looked at and we had |
| 12 | those in the funnel. |
| 13 | And then when I was writing it down on the |
| 14 | sheet, I said "9,800" instead of 7,800. |
| 13:09:10 15 | Is 7,800 the right number? |
| 16 | A.   No, I'm sorry, it's a little bit confusing. |
| 17 | Those three numbers are close, but what I |
| 18 | was saying there was that only seven -- just bear with me |
| 19 | one second. |
| 13:09:29 20 | Q.   Oh. |
| 21 | A.   It's 9,634.  9,634 out of the three-and-a-half |
| 22 | million prescriptions are prescriptions that meet the |
| 23 | holy trinity but didn't have a time stamp. |
| 24 | Q.   Got it.  Okay. |
| 13:09:45 25 | MR. LANIER:  Thank you for letting me |

1    clarify that on the chart.

2                      Thank you, Your Honor.  Thank you,

3    Ms. Swift.

4                      THE COURT:  Okay.  All right.  Recross by

13:09:55  5    Ms. Swift.

6                      MS. SWIFT:  Thank you, Your Honor.

7              RECROSS-EXAMINATION OF CRAIG McCANN

8    BY MS. SWIFT:

9    Q.    Good afternoon, ladies and gentlemen.  Just give me

13:10:03  10   one second.

11                     Good afternoon, Dr. McCann.

12   A.    Good afternoon, Ms. Swift.

13   Q.    Earlier today we had a question from a juror about

14   whether the Benzodiazepine and muscle relaxer

13:10:21  15   prescriptions that were flagged were all filled at the

16   same time as the opioid prescriptions.

17                     And I want to make sure we have a clear

18   answer to that question.

19                     In your analysis, the answer to that

13:10:36  20   question is no, correct?

21   A.    Correct.  They just have to be to the same patient.

22   Q.    And all but four of the 16 red flags that you ran

23   have nothing to do with Benzodiazepines and muscle

24   relaxers, correct, sir?

13:10:53  25   A.    I didn't recall whether it was two, three or four

1    that touched on the Benzo and muscle relaxers, but it may

2    be four.

3    Q.    Well, let's take a look at them.

4          If you would please pull out your report,

13:11:05  5    do you have a copy of your April 16th report, sir?

6    A.    Not that I'm aware of.

7    Q.    We'll get you one.

8    A.    I'm sorry, I do have it here.

9    Q.    Oh, great.  Can you take that out, and turn to

13:11:22 10    Page 151, please?

11    A.    Yes.

12    Q.    I'm trying to put that up on the screen, if I

13    could.

14          Thank you, Mr. Pitts, the computer screen,

13:11:46 15    please.

16          Do you see that I've got Page 151 from your

17    report on the screen, Dr. McCann?

18    A.    No.

19          MR. LANIER:  We don't have anything on our

13:12:02 20    screens.

21          MS. SWIFT:  Seem to be having an issue with

22    the screens.

23          I'll use the Elmo.  If you could flip to

24    the Elmo, if that works for Mr. Pitts.

13:12:19 25    BY MS. SWIFT:

McCann - Recross/Swift

2313

1    Q.    Can you see that I've got Page 151 of your report

2    on the screen now?

3    A.    Yes.

4    Q.    And this shows flags 2, 3, 11 just on this page?

13:12:33  5    A.    Yes.

6    Q.    And you can see flags 5, 6, 7 and 8 involve

7    Benzodiazepines and some of them also involve muscle

8    relaxers?

9    A.    Yes.

13:12:44  10    Q.    And if you would just take a moment, Dr. McCann,

11    and look at all 16 of those -- the flags in your report

12    on Page 150, 151 and 152, could you confirm for me, these

13    are the only four flags that have anything to do with a

14    Benzodiazepine or muscle relaxer?

13:13:03  15    A.    That appears to be correct, yes.

16    Q.    For each of those four flags, let's start with

17    number 5, it says a patient was dispensed an opioid, a

18    Benzodiazepine and a muscle relaxer for overlapping days

19    of supply, right, sir?

13:13:28  20    A.    Yes.

21    Q.    This flag does not require all three of those

22    medications to have been dispensed at the same time,

23    right, sir?

24    A.    Correct.

13:13:39  25    Q.    It just requires that there be an overlapping days

1    supply, which means those drugs could have been dispensed

2    10, 20, 30 days apart?

3    A.    As long as the days of supply for at least one of

4    them is 30 days or more, yes.

13:13:57  5    Q.    Then flag number 6 reads, "Patient was dispensed an

6    opioid, a Benzodiazepine and a muscle relaxer on the same

7    day, and all the prescriptions were written by the same

8    prescriber."

9              Right?

13:14:09 10    A.    Yes.

11    Q.    Now, for this flag, those three medications might

12    have been dispensed at the same time on the same

13    prescription, but that's not required, right, sir?

14    A.    Correct.

13:14:19 15    Q.    Those could have been dispensed 8:00 o'clock in the

16    morning, 1:00 o'clock in the afternoon, 5:00 o'clock in

17    the evening; correct, sir?

18    A.    Correct.

19    Q.    For flag number 7, it says, "The patient was

13:14:34 20    dispensed an opioid and a Benzodiazepine within 30 days

21    of another -- of one another."

22              Just like those other two flags, it doesn't

23    require that the opioid and the Benzodiazepine be

24    dispensed at the same time, right?

13:14:46 25    A.    Correct.

1    Q.    And likewise, for flag number 8, it says, "Patient

2    was dispensed an opioid and a Benzodiazepine on the same

3    day and both prescriptions were written by the same

4    prescriber."

13:14:57  5                   It could have been the same prescription,

6    it wasn't required to be, right?

7    A.    Correct.

8    Q.    And I think that covers it.

9                    There aren't any other flags that have

13:15:07  10   anything to do with Benzodiazepines or muscle relaxers

11   among the 16 flags that you analyzed for Mr. Catizone,

12   right?

13   A.    Yes.

14   Q.    The other thing I want to ask you about with

13:15:21  15   respect to these four flags, numbers five through eight,

16   every single one of those flags requires there to be an

17   opioid prescription in order for it to flag, right?

18   A.    Yes.

19   Q.    So then when we were talking about this

13:15:42  20   demonstrative WAG Demo Number 4 that I annotated earlier

21   today, do you remember those questions where we went

22   through and changed the numbers to reflect just the

23   opioid prescriptions?

24   A.    Yes.

13:15:52  25   Q.    Every single opioid prescription that flagged on

1    one of your flags five through eight, the only ones that

2    involve Benzodiazepines and muscle relaxers, every one of

3    those opioid prescriptions would be included in the flag

4    numbers that I added down here, correct, sir?

13:16:16  5    A.    Yes.

6    Q.    And just to be clear about it, because I actually

7    see that they're not all on here, that would be 141,654

8    for CVS.

9              Any one of the flags that you identified

13:16:31 10    for a trinity prescription, the opioid prescription,

11    would be included in that number, correct?

12    A.    Correct.

13    Q.    And the same would be true for the opioid-specific

14    prescriptions that flagged for the other three pharmacies

13:16:43 15    in the case as well, right?

16    A.    Correct.

17    Q.    All right.  I want to ask a question or

18    two -- well, it will probably be more than two, about

19    this set of notes that Mr. Lanier created with you

13:17:06 20    earlier today, and I want to make sure I understood.  I

21    thought Mr. Lanier wanted to change the 9,800 that we

22    have here to 7,800.

23              I just want to ask you to re-explain what

24    this number should be because I annotated it before he

13:17:28 25    asked you the question, and now I think I've got it

 1    wrong.

 2    A.    Yes.  The number is 9,634, so it's in between those

 3    two numbers, and it's the number of flagged prescriptions

 4    that are flagged only by flag 13 and didn't have a fill

13:17:48  5    time.

 6                That's my one coin out of the 74 or 75

 7    coins that are flagged.

 8    Q.    You talked about a range of fill times when -- in

 9    this portion of your -- I'm waving my hand over the notes

13:18:05 10   that Mr. Lanier created with you on redirect today.

 11               Do you remember when he was asking you

 12   questions about the range of fill times?

 13   A.    Yes.

 14   Q.    You don't recall ever discussing the red flags with

13:18:19 15   Mr. Catizone, correct, sir?

 16   A.    Correct.

 17   Q.    You never told Mr. Catizone about the range of fill

 18   times that you testified to on direct today, correct,

 19   sir?

13:18:32 20   A.    No, I didn't talk directly to Mr. Catizone at all

 21   about these issues, I don't think.

 22   Q.    You also never told Mr. fill time -- Mr. Catizone

 23   that the fill time was irrelevant to your analysis,

 24   right, sir?

13:18:46 25   A.    Well, certainly for the counting of the number of

```
 1   pills, if we had any -- I just don't think we had any

 2   discussion on any of the substance here.

 3   Q.    You never told Mr. Catizone that it was your view

 4   that fill time was irrelevant, right, sir?

 5   A.    We just didn't discuss this issue as far as I can

 6   recall, certainly not with respect to the item that you

 7   just circled, the counting up the number of pills.

 8   Q.    You never discussed with Mr. Catizone that it was

 9   your view that the fill time, the time a prescription was

10   filled, was irrelevant to your analysis?

11   A.    Irrelevant to this calculation counting up the

12   number of pills.

13             I didn't have that discussion with him, but

14   I'm sure he would agree.

15   Q.    Well, you don't know because you never talked to

16   him about it, right, sir?

17   A.    It's just counting up the number of pills that were

18   distributed to dispense -- that were dispensed by

19   defendants here.  The time of day that they were

20   dispensed doesn't change the number that were dispensed

21   in total.

22   Q.    Well, to be clear, you never talked to Mr. Catizone

23   about anything relating to the red flags, right, sir?

24   A.    That's correct, other than as we've talked before,

25   I was on a couple of conference calls or Zoom calls early
```

```
            1   with Mr. Catizone and 20 or 30 other people, and I don't

            2   call -- recall participating, other than to listen while

            3   there was a discussion between Mr. Catizone and staff.

            4   Q.    All right.  You mentioned pill counts a couple of

13:20:20    5   times, and Mr. Lanier asked you about pill counts for

            6   Oxycodone and Hydrocodone dispensed by the four

            7   pharmacies in this case.

            8              Do you remember that, sir?

            9   A.    Yes.

13:20:29   10   Q.    You didn't talk about how many opioids were

           11   dispensed by any of the other pharmacies in Lake and

           12   Trumbull County, did you?

           13              MR. WEINBERGER:  Objection, Your Honor.

           14              Improper recross.

13:20:40   15   BY MS. SWIFT:

           16   Q.    Mr. Lanier asked about pill counts for these --

           17              THE COURT:  Overruled.  Overruled.

           18              MS. SWIFT:  I'll ask the question again.

           19   BY MS. SWIFT:

13:20:46   20   Q.    You did not talk about how many opioids were

           21   dispensed by any of the other pharmacies in Lake and

           22   Trumbull County, correct, sir?

           23   A.    Correct.

           24   Q.    I'd like to ask you some questions about that.

13:20:56   25              MR. WEINBERGER:  Objection, Your Honor.
```

1    Not covered in redirect.

2              THE COURT:  Let's go on the headphone a

3    minute.

4              (Proceedings at side-bar:)

13:21:14  5              MR. LANIER:  Your Honor, our objection to

6    this --

7              THE COURT:  I'm going to sustain the

8    objection unless I understand from Ms. Swift how this is

9    proper recross for what he covered on direct or redirect.

13:21:29  10              MS. SWIFT:  Your Honor, we spent a lot of

11    time on redirect on the number of pills that were

12    dispensed, overall number of pills that were dispensed by

13    the four pharmacies in the case, and this is a question

14    of perspective.

13:21:38  15              In order to put this into perspective I

16    need to ask him about the other pharmacies that also

17    dispensed.

18              THE COURT:  He said he didn't do anything

19    that --

13:21:46  20              MS. SWIFT:  I can lay the foundation for

21    this, Your Honor.

22              He has information in his expert report

23    about the numbers of pills dispensed by every other

24    pharmacy in Lake and Trumbull County.  I'm only going to

13:21:56  25    ask him about a few of them.

1     MR. LANIER:  And, Your Honor, to the extent

2  she was allowed to do this, I don't get to redirect on

3  this brand new area.

4     THE COURT:  Well --

13:22:05  5     MR. LANIER:  I just don't see how this

6  comes in on a second-level cross.

7     THE COURT:  I'm not sure either.

8     I've allowed one question.  I'm going to

9  listen to each question very carefully, and I may cut

13:22:17 10  this off.

11     MS. SWIFT:  Thank you, Your Honor.

12     (End of side-bar conference.)

13  BY MS. SWIFT:

14  Q.   Dr. McCann, in the interests of providing a

13:22:42 15  perspective, do you think it would have been helpful to

16  tell the jury how many opioid pills were dispensed by the

17  other pharmacies in Lake and Trumbull County?

18     MR. WEINBERGER:  Objection.

19     THE COURT:  Sustained.

13:22:53 20  BY MS. SWIFT:

21  Q.   Dr. McCann, did you include in your expert report

22  in this case the overall number of opioids dispensed by

23  every pharmacy in Lake and Trumbull County?

24     MR. WEINBERGER:  Objection.

13:23:07 25     THE COURT:  Overruled.

McCann - Recross/Swift                                    2322

1    A.    I'm not sure.  Not precisely that number, but

2    related numbers.

3                   Not that number.

4    BY MS. SWIFT:

13:23:25  5    Q.    I've put on your chair right before you came back

6    into the room an excerpt from your Appendix 10.

7                   Do you have that handy?

8    A.    Yes.

9    Q.    And if you look at Page 890, which is actually the

13:23:53  10   second page in the excerpt that I created for you, do you

11   see that it says pharmacy reports?

12   A.    Yes.

13   Q.    And then the next page has a list of 12 opioid drug

14   shipments to pharmacies in Lake County and Trumbull

13:24:07  15   County, Ohio.

16                   Correct, sir?

17                   MR. WEINBERGER:  Objection, Your Honor.

18                   THE COURT:  Well --

19                   MR. WEINBERGER:  Improper recross.

13:24:13  20                   THE COURT:  I'll -- I'll allow her to ask

21   if the document has that, but one question.

22                   You can answer that yes or no.

23   A.    That's what that title says.

24   BY MS. SWIFT:

13:24:27  25   Q.    This list of pharmacy shipments in your Appendix 10

|  |  |
|---|---|
| 1 | lists the number of total MME, total dosage units, and |
| 2 | total weight in milligrams of 12 opioid drugs that were |
| 3 | shipped to every pharmacy in Lake and Trumbull County; |
| 4 | correct, sir? |
| 13:24:46 5 | MR. WEINBERGER:  Objection. |
| 6 | THE COURT:  Sustained. |
| 7 | BY MS. SWIFT: |
| 8 | Q.    The number one pharmacy -- |
| 9 | MR. WEINBERGER:  Objection, Your Honor. |
| 13:25:00 10 | THE COURT:  Let me -- let's go back on the |
| 11 | headphones. |
| 12 | (Proceedings at side-bar:) |
| 13 | THE COURT:  All right.  Look, the jury's |
| 14 | already heard, and I'm sure they're going to hear from |
| 13:25:20 15 | other witnesses, that these defendants only dispensed |
| 16 | about, I don't know, 37, 39 percent of the opioids in |
| 17 | these two counties. |
| 18 | But this is not proper recross. |
| 19 | MS. SWIFT:  He opened the door on redirect |
| 13:25:37 20 | by going into the pill counts for every one of the |
| 21 | pharmacies in this case and saying nothing about these |
| 22 | other pharmacies. |
| 23 | THE COURT:  Well -- |
| 24 | MR. LANIER:  I -- |
| 13:25:48 25 | THE COURT:  I don't believe that's the |

        1    case, and I'm not sure this witness has even calculated

        2    what percentage these defendants prescribed or dispensed

        3    in Lake and Trumbull Counties.

        4                    Is that in his report?

13:26:05 5                    MS. SWIFT:  Your Honor, that's not what I'm

        6    trying to get to.

        7                    THE COURT:  Well, what are you --

        8                    MS. SWIFT:  I want to ask him if the top

        9    pharmacies on the list in Lake and Trumbull County

13:26:14 10   ordered by total MME, are Franklin Pharmacy, Overholt's

       11    Pharmacy/Bellevue Champion Medicine Shoppe.

       12                    THE COURT:  Ordered?

       13                    MS. SWIFT:  They are ranked by MME.  The

       14    biggest one on the list --

13:26:31 15                   THE COURT:  What was dispensed?

       16                    MS. SWIFT:  Correct.

       17                    MR. WEINBERGER:  What was distributed to

       18    them.

       19                    THE COURT:  First of all, what was

13:26:35 20   distributed to them is irrelevant at this point.

       21                    MR. WEINBERGER:  It's from ARCOS, Your

       22    Honor, and again, it's not a proper subject for recross.

       23                    THE COURT:  Well, I don't think it's a

       24    proper subject for recross, either.

13:26:46 25                   There's other witnesses who are going to be

              1    able to testify to that.

              2                    MS. SWIFT:  All right.  Thank you, Your

              3    Honor.

              4                    (End of side-bar conference.)

13:27:06      5    BY MS. SWIFT:

              6    Q.    Dr. McCann, you didn't provide any flagging

              7    analysis for the opioid prescriptions or any other

              8    prescriptions dispensed by Overholt's Pharmacy, is

              9    that --

13:27:29     10                    MR. WEINBERGER:  Objection, Your Honor.

             11                    THE COURT:  Sustained.

             12    BY MS. SWIFT:

             13    Q.    You didn't do a red flag analysis on any

             14    prescriptions for any other pharmacy other than the four

13:27:37     15    pharmacies in this case, correct, sir?

             16                    MR. WEINBERGER:  Objection, Your Honor.

             17                    THE COURT:  Well, overruled.

             18                    He can answer that.

             19    A.    That's not quite right.

13:27:50     20                    There was another defendant that we did

             21    flagging analysis on, but not, to my knowledge, other

             22    than those five pharmacies.

             23    BY MS. SWIFT:

             24    Q.    You didn't provide a flagging analysis for any

13:28:05     25    other pharmacy in the case other than the five pharmacies

```
 1   that were in the case at the time you conducted your
 2   analysis, correct, sir?
 3   A.    That's my recollection, yes.
 4              MS. SWIFT:  Thank you, Dr. McCann.
 5              That's all I have.
 6              THE COURT:  Any other recross from
 7   defendants?
 8              MR. BUSH:  Nothing from CVS.
 9              THE COURT:  Okay.
10              MS. FIEBIG:  Yes.  Just very briefly for
11   Giant Eagle.
12              THE COURT:  Okey doke.
13          RECROSS-EXAMINATION OF CRAIG McCANN
14   BY MS. FIEBIG:
15   Q.   Good afternoon, again, Dr. McCann.  Your Honor,
16   ladies and gentlemen of the jury.
17              Again, I'm Chantale Fiebig for Giant Eagle.
18              You received an important question that I
19   wanted to address with respect to Giant Eagle
20   specifically to see if we could clear up some of the
21   confusion caused by the funnel, and that relates to --
22              MR. WEINBERGER:  Objection to the comments
23   of counsel.
24              THE COURT:  Yeah, Ms. Fiebig, if you
25   just -- both counsel, all counsel, we don't need
```

13:28:15 (line 5)
13:28:25 (line 10)
13:28:39 (line 15)
13:28:54 (line 20)
13:29:05 (line 25)

1    comments.

2                    That's for closing argument.  Just

3    questions, please.

4    BY MS. FIEBIG:

13:29:11  5    Q.    Sure.  My question relates specifically to the

6    total prescriptions that were written on the funnel.

7                    And I've just put it back up again.

8                    Now, the question, as I understood it, was

9    whether Benzodiazepines and muscle relaxers were

13:29:29 10    prescribed in connection with opioids.

11                    Do you recall that question, Dr. McCann?

12    A.    Yes.

13    Q.    So for Giant Eagle, the number of total

14    prescriptions written here is almost 1.4 million,

13:29:42 15    correct?

16    A.    Yes.

17    Q.    And are you aware that this 1.4 million includes

18    prescriptions for muscle relaxers and Benzodiazepines

19    that were prescribed to patients even if those patients

13:29:58 20    never received any opioid prescription at all?

21    A.    I don't recall that.

22    Q.    Did you confirm that when you were analyzing the

23    data?

24    A.    Not that I recall.

13:30:10 25    Q.    So you would agree that it's possible that this 1.4

1       million total prescription for Giant Eagle includes

2       prescriptions that have no opioid prescription related.

3                    Correct?

4       A.    Correct.  I don't know as I sit here.  I can't

13:30:29  5    confirm what you're suggesting.

6       Q.    So it's possible that the nonopioid prescriptions,

7       prescriptions issued to patients who never received any

8       opioid prescription from Giant Eagle, that could be

9       jacking up this 1.4 million total prescription number for

13:30:43 10    Giant Eagle, correct?

11      A.    Only if you submitted them while the other

12      defendants only included Benzos and muscle relaxers for

13      patients that got opioids.

14                   It wouldn't in any case go into the flagged

13:30:57 15    prescriptions because the patient also has to have

16      received an opioid.

17      Q.    Right.  But I'm not asking about the flagged

18      prescriptions.

19                   I'm just asking you about the total

13:31:06 20    prescriptions.

21                   And you testified yesterday that you spent

22      months going over this data scrubbing it and cleaning it,

23      correct?

24                   Do you remember that testimony?

13:31:14 25    A.    Yes.  I was referring to the ARCOS data in 2018

1    when I was discussing that.

2    Q.    But would you agree that you also took care to

3    understand the different types of data that were produced

4    by the defendants, the different fields that they made

5    available?

6    A.    Yes.

7    Q.    So for Giant Eagle, did you confirm whether this

8    1.4 million in prescriptions includes prescriptions for

9    patients who never received an opioid at all?

10   A.    Not that I recall.

11   Q.    Okay.  You were also asked some questions about

12   whether or not you're here to testify or whether you even

13   could testify about whether any of the defendants broke

14   the law.

15              Do you recall those questions from

16   Mr. Lanier?

17   A.    Yes.

18   Q.    And I just want to confirm, Dr. McCann, you don't

19   have any opinion as to whether or not the prescriptions

20   in this case were legitimate or illegitimate, correct?

21   A.    Correct.

22   Q.    And you don't have any opinion about the

23   prescriptions in this case and whether any of them were

24   diverted, correct?

25   A.    Correct.

McCann - Recross/Fiebig

2330

1    Q.    Okay.  You were also asked by Mr. Lanier about your

2    testimony being excluded, and you testified that that

3    happened a long time ago in a small defamation case.

4               Correct?

13:32:29  5    A.    Correct.

6    Q.    But didn't a court in a large securities case --

7               MR. WEINBERGER:  Objection, Your Honor.

8               MS. FIEBIG:  Can I finish my question?

9               THE COURT:  I'm going to sustain it.

13:32:40 10               I'm sustaining the objection.

11               MS. FIEBIG:  Okay.  Thank you, Dr. McCann.

12               THE WITNESS:  Thank you.

13               THE COURT:  I believe Ms. Fumerton had some

14    questions for Walmart.

13:32:54 15               MS. FUMERTON:  No, Your Honor.

16               THE COURT:  No?  Okay.

17               All right.  Doctor, thank you.

18               You may be excused.

19               THE WITNESS:  Thank you very much.

13:33:03 20               (Witness excused)

21               MR. LANIER:  May it please the Court, our

22    next witness is Barb Martin, and, Your Honor, while we've

23    not taken advantage of your ruling that said we can give

24    a short introduction of each, if you would or allow me

13:33:35 25    to, I think with Barb Martin it might be helpful because

1    this is the first deposition we'll be playing, and so for

2    you to perhaps explain a deposition to the jury would be

3    helpful.

4                    THE COURT:  All right.  I was going to do

13:33:48  5    that.

6                    All right.  Ladies and gentlemen, you've

7    heard about depositions.  It's simply when the lawyers

8    question a witness out-of-court in preparation for a

9    trial.  There's a court reporter just like we have one

13:34:01 10    here, the witness takes the oath, same oath.  The only

11    difference is it's usually in a lawyer's office, not in a

12    courtroom.

13                    The Rules of Evidence provide that

14    sometimes these depositions can be used at trial, and it

13:34:17 15    saves a lot of time and money, particularly if the

16    witness is out of town.  He or she doesn't have to fly

17    in.

18                    There are a lot of travel risks now, we all

19    know about that, so we're going to have a number of

13:34:30 20    witnesses who appear by deposition.  I'm instructing you

21    that you're to treat this testimony exactly the same as

22    if -- the same as the witnesses who testified here in the

23    courtroom.

24                    No greater weight, no less weight.  It's

13:34:45 25    not more important, it's not less important.

1        I know it's harder to concentrate when

2    you're just watching the screen, and everyone understands

3    that, but I'm going to ask you to treat it just the same

4    as witnesses who testify live.

13:34:59  5        And I expect during this trial there will

6    be witnesses to testify live but by video, and that's a

7    third way that witnesses can testify.

8        And again, all the testimony has the same

9    weight.  In other words, the media, the way it's being

13:35:14  10    presented, has nothing to do with the weight.

11        The weight goes to what you give it and how

12    credible you find it, but the way it's presented has no

13    bearing.

14        Okay.  So, Mr. Lanier, you can present your

13:35:28  15    next witness.

16        MR. LANIER:  Thank you, Your Honor.

17        So with that, we will call by deposition

18    Ms. Barb Martin.  She worked at Walgreens, and this is on

19    the distribution case end of this.

13:35:42  20        The deposition's about 70, 7-0, minutes

21    long, and it was taken by Mr. Peter Mougey, a lawyer not

22    present in the courtroom, but representing plaintiffs in

23    various litigation.

24        And it does include both our play and the

13:35:58  25    play by the questions relevant for the defense, so it's

1    everybody's combined, Your Honor.

2                    THE COURT:  Well, I was going to explain

3    that.

4                    As you've seen when the witness appears

13:36:09  5    live, we have questions by both sides, so we do the same

6    thing by depositions.  And these are excerpts.  It's not

7    the entire testimony of this witness.

8                    Each side is allowed to designate certain

9    portions that they deem relevant and important, and we

13:36:25 10    combine it so it's coherent and understandable.

11                    MR. LANIER:  Thank you, Your Honor.

12                    With that, Dan the man, if you'll hit the

13    button.

14                         BARBARA MARTIN,

15         of lawful age, a witness called by the Plaintiffs,

16              being previously duly sworn, was examined

17                   and testified as follows:

18                    (The following testimony was played by

19    videotape to the jury:

13:39:12 20         VIDEO EXAMINATION OF BARBARA MARTIN

21    Q.    Have you given testimony before -- good morning,

22    Ms. Martin.  My name is Peter Mougey.  I represent the

23    plaintiffs in this case.

24                    Have you given testimony before?

13:39:34 25    A.    I did once before, yes.

Martin (Video Deposition)                                    2334

1    Q.    Okay.  Ms. Martin, you've been at Walgreens as an

2    employee in different capacities since 1986, correct?

3    A.    Actually 1985.

4    Q.    Now, if I say Suspicious Order Monitoring policy,

13:39:50 5    do you have an understanding of what that means?

6    A.    I wouldn't mind if you kind of clarified it so

7    we're on the same page.

8    Q.    Well, actually, why don't you tell me what you

9    think suspicious order monitoring at Walgreens is from

13:40:04 10    all of your various capacities?  You tell me.

11    A.    It would be a process put in place to monitor

12    orderings for any type of unusual or potentially

13    suspicious activity.

14    Q.    And that would include, but not limited to,

13:40:24 15    Schedule II and III narcotics, correct, controlled

16    substances?

17    A.    Not limited to, but yes, correct.

18    Q.    Now, would you please explain to me what you mean

19    by "Potential suspicious activity"?

13:40:40 20    A.    What I mean by that is it could be something that

21    looks like it's outside of a normal parameter, but there

22    would be some logical and justifiable reason for it to be

23    outside of those parameters.

24    Q.    So it's outside of normal parameters, but there may

13:41:00 25    be a reason for being outside the parameters.

Martin (Video Deposition)                                    2335

1                    Is that what -- is that what you're saying?

2       A.    Yes.

3       Q.    Okay.  So it's outside the normal parameter, so

4       would you say it's fair to call it an outlier?

13:41:11  5    A.    Yes.

6       Q.    So it's an outlier, and then you do some homework

7       on it to see if there's a reason for it being an outlier?

8       A.    Correct.

9       Q.    Okay.  Now, during your tenure from 1985 up until

13:41:24 10   today, you've had various capacities at Walgreens,

11      correct?

12      A.    Yes.

13      Q.    And some of those roles touched on suspicious order

14      monitoring as you just defined it, a process to identify

13:41:38 15   outliers, right?

16      A.    It was developed.  It wasn't anything part of my

17      normal course of business when I first started in

18      corporate.

19      Q.    So why don't we start off with what your first

13:41:49 20   recollection is of Ms. Barbara Martin being contacted in

21      Walgreens and asked to participate in suspicious order

22      monitoring.

23      A.    That would have been during my corporate time.  I

24      really wouldn't have been involved with anything like

13:42:06 25   that while I was in the stores.

1    Q.    Okay.  So during your corporate time, are you

2    referring to your tenure as -- in the department that was

3    managing some of the databases?

4    A.    No.

13:42:17    5            It was once I moved to Inventory.

6    Q.    Once you moved to Inventory, which is in 2007?

7    A.    If that's what my resumé says, it's --

8    Q.    All right.  So when you mentioned earlier that your

9    first recollection of being involved with suspicious

13:42:34   10    order monitoring policy was when you got to corporate,

11    are you referring to the last entry on your resumé,

12    Manager, Pharmacy Inventory Control, beginning in July of

13    2007?

14    A.    I am, but it was much after '07.

13:42:50   15    Q.    It was much after '07.

16            So do you mean by like maybe '08 or '09?

17    A.    Definitely probably closer to '09.

18            It might have been '08.

19    Q.    Late '08 or early '09, what is your first

13:43:03   20    recollection of suspicious order monitoring policy at

21    Walgreens and what were you asked to do?

22    A.    I'm not sure what came first and what came second.

23            I know that my team was asked to provide

24    data to field leadership in various states regarding

13:43:30   25    purchasing and dispensing of controlled substances.

1          And then as we developed systems, I was one

2     of a number of different people, I can't remember all the

3     names, but I worked actively with Loss Prevention.

4     Marcie Ranick was one of the people that I worked with,

5     and she and I were looking at reports on our system to

6     see if we were flagging the right types of orders or if

7     we were indiscriminately flagging orders.

8     Q.    All right.  So let's start with -- and I recognize

9     that you don't remember which specific order, but let's

10    start with the category data that you were pulling to for

11    the field.

12          So, first of all, when you say, "Field,"

13    who do you mean?

14    A.    It's people that supervise the stores:  Pharmacy

15    manager, district leaders.  I forget all the exact titles

16    above that.

17          You know, could be regional vice

18    presidents, or things like that.

19    Q.    Is "field" just noncorporate?

20    A.    Yes.

21    Q.    So if you say "Field," that's field in your

22    regional office or the stores, but not the Distribution

23    Centers?

24    A.    Correct.

25    Q.    So data to the field on -- in various states

Martin (Video Deposition)                    2338

1    regarding purchasing, dispensing.

2              Do you recall what specific types of data

3    you were asked to pull?

4    A.   A few times I remember working with different

13:45:12 5    departments to obtain purchasing records on select

6    controlled substances.  I don't remember exactly which

7    drugs.

8              And then I also worked with other groups to

9    look at dispensing of the same product.

13:45:25 10   Q.   And was that in particular in regard to

11   relationship to controlled substances?

12   A.   Yes.

13   Q.   So you're looking at, tell me, like, ordering

14   patterns and volume for controlled substances,

13:45:39 15   Schedule II, Schedule III.

16              Is that fair?

17   A.   I really was just pulling the data.  I wasn't

18   looking for patterns --

19   Q.   Okay.

13:45:49 20   A.   -- at the time.

21   Q.   So what I asked was:  Were there different time

22   periods pulled so there could be comparisons made?

23   A.   I wasn't involved with any comparisons.

24              The requests I got were more ad hoc

13:46:04 25   one-offs.  So if someone else was asking me to do it and

1    making comparisons, I'm not aware of that.

2    Q.    Okay.  How often would those requests come in in

3    late '08, early '09?

4    A.    My best recollection is a few.

13:46:20  5    Q.    Other than the couple of examples, pulling

6    purchasing data and dispensing data for certain stores,

7    groups of stores and time frames, anything else generally

8    you recall pulling in late '08, early '09?

9    A.    No.

13:46:37  10    Q.    And you weren't involved in any form or fashion of

11    analyzing the data you were pulling?

12    A.    No.

13    Q.    And you were pulling that data for field, which you

14    defined as pharmacy managers, maybe district supervisors,

13:46:54  15    I think you gave the vice president title; but folks in

16    the field, not in the Distribution Centers and not in

17    corporate, is your recollection; correct?

18    A.    Correct.

19    Q.    So is there any point in '09 when the scope of what

13:47:06  20    you were being asked to do changed from pulling the data

21    you just described?

22    A.    We started to develop systems, more logic in our

23    ordering systems.  And this new logic was generating data

24    and reports.

13:47:34  25    Q.    You mentioned a logic, developed systems, and I

1    think you referred to it as logic; is that correct?

2    A.    That's the term I'm using, yes.

3    Q.    Okay.  Help me.  What does that mean to you, logic?

4    What is that?

13:47:46  5    A.    It would have been programming that would have been

6    put in place to help identify potentially suspicious

7    orders.

8    Q.    What involvement did you have with the system that

9    you were working on with the team you just described?

13:48:04 10    A.    Once it was in pilot testing phases, there were

11    reports that were being generated, and myself and Marcie

12    Ranick were looking at those reports trying to see if the

13    logic was sound.

14    Q.    All right.  So we're checking to see if the logic

13:48:32 15    was sound.

16              What time frame was that?

17    A.    '09, '010.

18    Q.    Okay.  Now, how often were you and Marcie reviewing

19    reports from logic to determine if the methodology was

13:48:52 20    sound?

21    A.    We probably met several times a month, maybe

22    weekly.

23    Q.    All right.  And what were you looking for on these

24    reports to determine if the methodology was sound?

13:49:10 25    A.    We were looking, first, to see what was flagged.

Martin (Video Deposition)                                    2341

1       Q.    Um-hmm.

2       A.    And then we were looking to see why it was flagged,

3       and if it was flagged for a reason that seemed correct or

4       not.

13:49:29   5   Q.    The reports you were looking at were driven by the

6       formula that Mr. Bamberg and Mr. Bancroft's team put

7       together and began to implement at Walgreens?

8       A.    Yes.

9       Q.    Now, the reports that you looked at from

13:49:51  10   Mr. Bancroft and Mr. Bamberg's -- I'm going to call it an

11      algorithm.  Is that fair?

12      A.    It's fair.

13      Q.    All right.  So the reports that you looked at from

14      the Bancroft algorithm were those orders, at least in

13:50:07  15   2009, that had already been shipped?

16      A.    I believe so, yes.

17      Q.    Okay.  And was the scope of your review primarily

18      to determine if the algorithm was doing its job to

19      identify outliers?

13:50:30  20   A.    What we were looking at was why these orders

21      flagged --

22      Q.    Um-hmm.

23      A.    -- and if the reason they were flagged was

24      over-reactionary or sound.

13:50:49  25   Q.    Was it your understanding that this report was

Martin (Video Deposition)                                    2342

1    being used to fulfill Walgreens' obligations as a

2    distributor to identify suspicious orders during this

3    time period?

4    A.    It wasn't my area of responsibility to know what

13:51:01 5    Walgreens was supposed to be doing.  I wasn't in charge

6    of distribution regulations.

7    Q.    And you understood that this entire process was

8    because Walgreens had responsibility to monitor and

9    identify suspicious orders, correct?

13:51:23 10   A.    That's the statement I'm struggling with.

11             I don't remember at that time what I knew

12    and what I didn't know.

13             I don't believe that someone sat down and

14    said, "Walgreens has to do this because we're a

13:51:42 15   distributor."

16             I just remember being told to start looking

17    at these reports.

18    Q.    Okay.  Do you ever recall being educated on what

19    Walgreens' responsibilities as a distributor were?  Yes

13:51:56 20   or no?

21    A.    I relied on other people to make sure that they

22    knew that the -- Walgreens was following the policies and

23    procedures.

24    Q.    So the answer to my question is no, correct?

13:52:06 25             You can't recall ever being educated on

Martin (Video Deposition)                    2343

1    what Walgreens' responsibilities as a distributor were,

2    correct?

3    A.    If that's how you want to interpret what I'm

4    saying.

13:52:17 5    Q.    Ms. Martin, we are in '09, 2010, where you are

6    reviewing reports generated by Wayne Bancroft's

7    algorithm.

8              In a general description, can you tell me

9    what other areas of responsibility you had with

13:52:39 10   Walgreens' suspicious order monitoring?

11   A.    At that time all I was really doing was looking at

12   these reports in regards to order monitoring.

13             I had a lot of other roles and

14   responsibility in Inventory.

13:52:57 15   Q.    How many hours a week on average in '09 were you

16   looking at these reports?

17   A.    One to three maybe.

18   Q.    How many reports would you look at during the one

19   to three hours a week?

13:53:15 20   A.    It's difficult to quantify that.

21             It would depend on how easy they were to

22   look at.

23             The one that we looked at, it's simple.

24   Three is smaller than five.

13:53:29 25   Q.    Are we talking a dozen, 15?  Are we talking a

1    thousand?

2    A.    Definitely not a thousand.

3    Q.    Are we talking several hundred?

4    A.    Again, it's -- it's hard to quantify.

13:53:43  5              Could be anywhere between 10 to 75.  I

6    really don't know.

7    Q.    How about less than a hundred, more than 10 a week,

8    is that fair?  Somewhere in that range?

9    A.    That sounds fine.

13:53:59 10   Q.    All I simply asked was you did not perceive your

11   job to ensure Walgreens' compliance with DEA rules and

12   regs regarding its role as a distributor, correct?

13              Yes or no, was that part of your job?

14   A.    Again, it goes back to I wasn't responsible for the

13:54:21 15  regulations.

16              Someone said, "Look at this report.  Look

17   at this data.  Does it make sense?  Pull this."

18   Q.    And you, your job wasn't to say, "I've looked at

19   this report, I've looked at the responses," and comparing

13:54:38 20  that to what Walgreens' obligations were as a

21   distributor, correct?

22   A.    I wasn't asked to do that.

23   Q.    You were just looking at reports?

24   A.    Correct.

13:54:46 25  Q.    You had no idea what the structure of -- was of the

Martin (Video Deposition)                    2345

1     rules and regulations.

2                   You were relying on somebody else, correct?

3     A.    Correct.

4     Q.    Would you mark as Martin 11.

13:54:58  5                   See at the top right-hand corner,

6     Ms. Martin, it says "Walgreen Company" and directly below

7     it "suspicious control orders," and directly below that

8     "for the month of"?

9                   Do you see that?

13:55:12  10    A.    Yes, I see that.

11    Q.    Okay.  And on the left-hand side the date is

12    1/29/07 and 12/06.

13                   Do you see the range of dates on the

14    left-hand side?

13:55:21  15    A.    I see those dates.

16                   I don't think it's a range.

17    Q.    Okay.  So have you seen a similar document to

18    Martin 11?

19    A.    This document doesn't look familiar to me.

13:55:41  20    Q.    I hand you one more, Martin 12, which I believe is

21    a report in similar format.

22                   Again, upper right-hand side, "Walgreen

23    Company," below that, "Suspicious controlled drug orders

24    for the month of," and there's a date on the left-hand

13:56:20  25    side that says 1/3 of '12.

1              Are we on the same page?

2    A.    Yes, that's --

3    Q.    And this is Bates --

4    A.    I see where you're reading.

5    Q.    Yes, ma'am.

6              Bates Number 394499, and take a minute and

7    look through this document.

8              Similar to the last document, does this,

9    too, not -- the form and the format and contents -- not

10   look familiar to you?

11   A.    None of this looks familiar to me.

12   Q.    Let me look and have you look at both Martin 11 and

13   12, and look directly in the middle of the page where it

14   says "Description.  Average order," and it has a star,

15   "times DEA factor equals trigger."

16             And then below that it says, "Oxy-APAP

17   5-325," and then below it says "6, 3 and 18."

18             Do you see that?

19   A.    Yes, I see that.

20   Q.    Does any of that look familiar?

21   A.    No, none of this looks familiar to me.

22   Q.    Okay.  Does the language in the middle of the

23   report, the "DEA factor," does that seem familiar to you?

24   A.    No, it does not.

25   Q.    The what appears to be 6 and 3 and 18 below, does

1     that look familiar to you?

2     A.    No, it doesn't.

3     Q.    Anything "6 times 3 equals 18" in relation to a

4     "DEA factor equals trigger" look familiar to you?

13:57:41 5    A.    It does not.

6     Q.    Okay.  Does the internal phrase "Chemical Handler's

7     report" ring a bell to you?

8     A.    No, it doesn't.

9     Q.    All right.  Does the reference to E-3 of the

13:58:00 10   Chemical Handler's report ring a bell to you?

11    A.    No, it doesn't.

12    Q.    And during your tenure at Walgreens, is it -- can

13    we conclude by the fact you don't recall looking at those

14    reports or that Chemical Handler's report does not ring a

13:58:29 15   bell to you, that you weren't performing due diligence on

16    any of those -- the orders identified in those reports?

17    A.    Looking just at these reports, I am not familiar

18    with these reports.

19              I personally wasn't doing due diligence.

13:58:47 20   That doesn't mean that someone else in the company

21    wasn't.

22    Q.    Totally understand.  And I'm not -- you know who

23    Mr. Bratton is, correct?

24    A.    Yes.

13:59:09 25   Q.    And were you interviewed by Mr. Bratton or did you

1    discuss with Mr. Bratton in the last month or two about

2    your different roles at Walgreens in relation to

3    suspicious order monitoring policies?

4    A.    I talked to him about some of the things that I

13:59:31  5    did.

6    Q.    Okay.  In the last month or two?

7    A.    Yes.

8    Q.    Now, I'm going to read you some of his testimony as

9    Walgreen representative, and I want you to help me

13:59:42  10    understand if this is accurate from your perspective.

11    Okay?

12                And I asked him, "Was there ever due

13    diligence performed on the orders that were flagged as

14    part of the Chemical Handler's report?"

14:00:00  15                And as the Walgreens representative, he

16    said, "It's my understanding based on discussions with

17    folks from our Inventory team and Loss Prevention, they

18    would look at retrospective analysis of a sample of these

19    orders and review them for appropriateness."

14:00:18  20                Okay.  Now, I know there's a lot of

21    different names for given groups, but your group was

22    often referred to as the Inventory team, is that fair?

23    A.    That is correct.

24    Q.    All right.  And I followed up and I said, "So Barb

14:00:30  25    Martin and Marcie Ranick were the ones responsible then

Martin (Video Deposition)                    2349

1    for performing due diligence on those Chemical Handler

2    reports?"

3                    And he answered, "They would investigate

4    the sample of the orders in those reports."

14:00:46  5                    Do you recall at any point in time at

6    Walgreens reviewing samples of the Chemical Handler's

7    reports and performing due diligence on those suspicious

8    orders?

9    A.    I'm not familiar with the Chemical Handler's

14:01:04 10   report.

11                    I can say that I did review other orders,

12   but if they were tied to the Chemical Handler report, I

13   have no knowledge of that.

14   Q.    But the reports that I just -- you and I just went

14:01:18 15   through, which was a sample of a couple, with the "DEA

16   factor" referenced in the middle of the report, you don't

17   recall ever seeing those reports?

18   A.    I have not seen these.

19   Q.    And you don't recall ever performing any due

14:01:32 20   diligence on a sampling of those reports?

21   A.    I have not performed due diligence on these

22   reports.

23   Q.    You do not ever recall sampling or validating

24   reports that use the DEA factor as part of your duties at

14:01:45 25   Walgreens, correct?

Martin (Video Deposition)                                      2350

1    A.    They were not part of my duties.

2    Q.    Okay.  And do you know, sitting here today, who, if

3    anyone -- you referenced earlier somebody else might have

4    been.

14:02:05   5           Do you know if anyone was reviewing the DEA

6    factor reports or the Chemical Handler reports?

7    A.    I have no direct knowledge of anyone doing that.

8    That doesn't mean it wasn't being done.

9    Q.    Yes, ma'am.  I understand.

14:02:22  10           But sitting here today, you don't have any

11   independent knowledge of anyone reviewing those Chemical

12   Handler reports?

13   A.    I personally do not.

14   Q.    More notes I need your help with.

14:02:32  15           Martin 13.  The first entry, I'm just going

16   to -- like we did in the last exercise, I'm going to read

17   what I think it says, and you tell me if I'm -- if I'm

18   correct.

19           "The DEA" it says "requires registrants to

14:02:47  20   report suspicious or excessive orders."

21           Did I get that right?

22   A.    That's what it says, yes.

23   Q.    "Now informing that formula is not enough."

24           Did I get that right?

14:02:57  25   A.    Yes.

Martin (Video Deposition)                    2351

1    Q.   Do you have -- and it says on the left-hand margin,

2    I think it says "Last Monday 7/28."

3    A.   I believe that's actually a 4/28.

4    Q.   4/28?  Okay.

14:03:10  5         I believe the next entry says, "Current

6    report kept for five years at DC, not really work/used."

7              Do you see that?

8    A.   Yes, I see that.

9    Q.   Do you know what you're -- first of all, are these

14:03:33  10  your notes?

11   A.   Yes, this is my handwriting.

12   Q.   All right.  The last Monday that was 4/28 was in

13   2008.

14             I'm sure somebody can correct me at a later

14:03:43  15  point if I'm wrong.  So 4/28/2008 was the last time that

16   was a Monday.

17             Okay?

18             So does that help you recall what "Now

19   informing that a formula is not enough, cannot report --"

14:04:02  20  "Current report kept for five years at DC, not really

21   work/used."

22             Do you know what report you're referencing?

23   A.   I do not.

24             I mean, it's something that obviously it's

14:04:13  25  the DCs.  I was more store-facing than DC-facing.

Martin (Video Deposition)                          2352

1    Q.    Someone's telling you that "A formula is not

2    enough" and that "The current report not really

3    work/used," and you're taking a note, correct?

4              Correct, Ms. Martin?

14:04:32  5    A.    That is what I wrote.

6    Q.    The next section says, "DEA really wants us to

7    validate orders and only report true suspicious orders

8    and what was done to approve orders."

9              Do you know what that references?

14:04:46  10    A.    I could just, you know, reverbalize what I wrote.

11    Q.    What it says?

12    A.    Yes.

13    Q.    But you have no independent recollection of writing

14    these notes or what context it was in?

14:04:57  15    A.    No, I don't.

16    Q.    Same with the next section, "Just reporting these

17    orders not good enough, need to document what happens."

18              Do you see that?

19    A.    Yes, I see that.

14:05:05  20    Q.    Do you know of any reports at Walgreens that are

21    run for suspicious order monitoring on a formula?

22    A.    Again, if you're going back to if you said this was

23    '08, I think that was prior to the reporting I was

24    working on.

14:05:22  25              So my answer would be no.

1    Q.    And the first one is the P-WAG-1747A, Bates number

2    624503, and it's Martin 14.

3              Why don't you take a second and just kind

4    of flip through it, and we'll go through it in some

14:05:51    5    detail.

6              Does this look familiar to you?

7    A.    My name is on it so I must have seen it at one

8    point or another.

9    Q.    And do you see -- when you said your name is on it,

14:06:04   10    on the "To" line you see Barb Martin, obviously, correct?

11    A.    Yes.

12    Q.    The "re:" line or the "regarding" is DEA suspicious

13    order reporting.

14              Do you see that?

14:06:13   15    A.    Yes, I see that.

16    Q.    And then as we mentioned the date is June 23rd,

17    2008.

18              So consistent with your recollection this

19    morning, last half of 2008 is when you recall beginning

14:06:22   20    to be involved with suspicious order monitoring at

21    Walgreens.

22              Is that fair?

23    A.    Yes.

24    Q.    Okay.  And the "deliverable" is a "Proposal for

14:06:35   25    defining suspicious orders in the Walgreen distribution

1    system."

2                    Did I read that right?

3    A.    That's what it says.

4    Q.    All right.  And then the "Overview" section below,

14:06:46  5    "The DEA is requiring Walgreens to monitor the orders for

6    controlled substances that our stores place on

7    distribution centers for suspicious activity.  Suspicious

8    orders are defined in terms of order size and order

9    frequency."

14:07:06 10                    Did I get that right?

11   A.    That's what it says.

12   Q.    And is that consistent with your understanding that

13   suspicious orders are defined in terms of order size and

14   order frequency?

14:07:16 15   A.    I'm not sure I would have been able to define it.

16   It's clearly written here, though.

17   Q.    You'd agree that -- well, tell me what you -- what

18   your part in this process with Mr. Bancroft in this June

19   23rd, 2008 memorandum.

14:07:39 20   A.    I mean, I don't really remember any of this.

21                    I would have to assume that my

22   responsibility would probably be on the analysis side,

23   making sure that we're doing the right thing to make sure

24   that Walgreens isn't generating or fulfilling suspicious

14:08:03 25   orders, but that we're doing a right balance between

1    making sure that our stores have the product they need to

2    service their patients.

3    Q.    Martin 14, "DEA suspicious order reporting, June

4    23rd, 2008."

14:08:21  5              Second paragraph.  Mr. Bancroft relays that

6    "To monitor the orders size, tolerance limits will be

7    established for each store/item combination.  If an order

8    is placed on the DC that exceeds its tolerance limit the

9    order is flagged as suspicious."

14:08:38  10             Do you see that?

11   A.    Yes, that's what this says.

12   Q.    So as of the date of this memorandum, any order

13   that's flagged as a result of Mr. Bancroft's algorithm is

14   determined to be suspicious, correct?

14:08:48  15  A.    It has the potential to be suspicious.

16   Q.    I am sorry, but I don't see the word "Potential" in

17   that sentence.

18             "If an order is placed on the DC" -- that's

19   Distribution Center -- "that exceeds its tolerance limit,

14:09:02  20  the order is flagged as suspicious."

21             Is that the plain language of this

22   document, Ms. Martin?

23   A.    That's the words used in this document, yes.

24   Q.    Do you see anywhere in that sentence that I just

14:09:12  25  read the use of the word "Potential," "Potentially

1    suspicious"?

2    A.    I do not see it on the document.

3    Q.    Do you see the word "Possibly suspicious"?

4    A.    I do not see that in this sentence.

14:09:24 5    Q.    Do you see the words "It might be suspicious"?

6    A.    I do not see those words.

7    Q.    Do you see the phrase "To conduct due diligence to

8    see if it's suspicious"?

9    A.    In this sentence, I do not.

14:09:36 10    Q.    Instead, what it says, "If an order is placed on

11    the DC that exceeds its tolerance limit, the order is

12    flagged as suspicious."

13              Correct?

14    A.    That's what this says, yes.

14:09:46 15    Q.    And it continues, "To monitor order frequency, the

16    geometric distribution," skip some of the math language

17    in the beginning -- I mean in the middle, then "The next

18    order is placed earlier than expected, that order is

19    flagged as suspicious."

14:10:04 20              Correct?

21    A.    That's what the document says.

22    Q.    It doesn't say "Possibly," correct?

23    A.    The document doesn't use that word.

24    Q.    It doesn't say "Potentially," correct?

14:10:17 25    A.    It does not.

1    Q.    Now, do you think that that language is in error on

2    Martin 14?

3    A.    Yes, I believe that we should have used

4    "Potentially suspicious," because if you looked at my

14:10:33 5    earlier report, I think it was the 2 or 3, that one was

6    flagged, but it wasn't in my mind suspicious.

7    Q.    If an order is placed on the DC for an item and the

8    order quantity exceeds the upper limit, it is flagged as

9    suspicious, so that's the third time that the words

14:10:52 10    "possibly" or "potential" do not appear, correct?

11    A.    In what we've reviewed.

12    Q.    I hand you what we will mark as Martin 19.

13          Do you see the date at the top of this

14    e-mail on Martin 19, that -- you are part of the CC on

14:11:09 15    this e-mail, correct?

16    A.    That is correct.  Yes.

17    Q.    "Orders that are flagged as suspicious will be

18    intercepted and the order quantity will be reduced to a

19    level which is not considered to be an outlier when

14:11:27 20    compared to other orders within its history."

21          Did I get that right --

22    A.    Yes.

23    Q.    -- that time?

24    A.    You read that correctly.

14:11:35 25    Q.    Okay.  Good.

Martin (Video Deposition)                    2358

1              So as the algorithm progressed through 2009

2      and 2010, there was a modification made that an order

3      that was flagged as suspicious was reduced, correct?

4      A.    That's what this document says, yes.

14:11:53  5      Q.    Do you recall have -- do you have an understanding

6      of whether or not the orders that were flagged as

7      suspicious were reported to the DEA?

8      A.    That wasn't my area of responsibility.

9      Q.    So you don't have an understanding, right?

14:12:08 10      A.    I don't know one way or another.

11      Q.    Okay.  Now, sitting in these meetings, did you hear

12      anyone discussing about whose responsibility it was to

13      send the orders that were being flagged by the Walgreens

14      algorithm as suspicious, who was responsible for

14:12:25 15      reporting those to the DEA?

16      A.    I don't remember.

17      Q.    You don't remember or you don't remember anyone

18      ever talking about it?

19      A.    I don't remember either way.

14:12:37 20      Q.    All right.  Do you know if once an order that was

21      flagged by the Bancroft algorithm as suspicious, who it

22      was that was performing the analysis or review on those

23      orders to determine the due diligence analysis?

24      A.    On this reporting, it would have been primarily at

14:12:58 25      this time myself and Marcie Ranick.  And probably various

1    other members of the Loss Prevention team.

2    Q.    All right.  So were you and Ms. Ranick contacting

3    pharmacies and inquiring about the reason why the order

4    was flagged on the Walgreens algorithm?

14:13:16  5    A.    I don't know what Marcie was doing.

6    Q.    Um-hmm.  But how about yourself?

7    A.    Yes, there were times that I reached out to stores.

8    Q.    So would you -- would the order, if it was flagged

9    by Walgreens' algorithm and it was, as these memos

14:13:39 10    indicate, suspicious, would you perform your analysis or

11    review prior to the order being shipped?

12    A.    I -- I don't remember which came first.

13    Q.    You don't remember, sitting here today, whether the

14    order was shipped before you had to perform due

14:13:58 15    diligence?

16    A.    I believe the orders were shipped, but I don't know

17    for certain.

18    Q.    When you say the orders were shipped, you mean the

19    orders were shipped prior to you performing any due

14:14:09 20    diligence or analysis, correct?

21    A.    I believe so, but in some of this logic, there was

22    also talk about orders being cut and reduced.

23                So they would have been reduced before they

24    were shipped.

14:14:21 25    Q.    But what we do know, looking at Martin 19, is that

1    as of March 27th, 2009, internally Walgreens is still

2    marking orders that are flagged by the algorithm as

3    suspicious, correct?

4    A.    That is correct.  Yes.

14:14:39  5    Q.    Would that have been information that you would

6    think would have been important for you to have as part

7    of this group, that orders that were being flagged as

8    suspicious were required to be reported to the DEA?

9    A.    If someone else was reporting it, I didn't need to

14:15:00 10    know.

11    Q.    But as part of this committee, this group, with

12    six, seven, eight, nine people on it, wouldn't it have

13    been important for you to know that orders that were

14    flagged as suspicious need to be reported to the DEA?

14:15:13 15    A.    I don't know if someone was reporting it or not.

16    Q.    Ms. Martin, do you have in front of you Bates

17    number 542, Martin 22, an e-mail dated October 27th,

18    2011, and from Rakesh Khanna, correct?

19    A.    That is correct, yes.

14:15:34 20    Q.    And you're copied on this e-mail?

21    A.    Yes, I am.

22    Q.    And Rakesh relays to Kristie, "As per your request,

23    I am ending you this document which explains the business

24    reason behind the DEA project," correct?

14:15:48 25    A.    That's what it says, yes.

Martin (Video Deposition)                                    2361

1    Q.    And in the second paragraph of the memorandum on

2    Bates number 43, "The purpose of this project is to

3    create a process to systematically identify and prevent

4    suspicious orders based on a formula used to determine

14:16:05  5    inconsistent (suspicious) ordering patterns for

6    controlled drugs."

7                   Did I get that right?

8    A.    That's what this says, yes.

9    Q.    And the following -- skip a sentence and go to the

14:16:18 10    following, which says, "The order that is flagged as

11    suspicious on the store side will be intercepted."

12                   Did I get that right?

13    A.    That's what that part of the document says, yes.

14    Q.    And then similar to these last several documents

14:16:33 15    that we've reviewed, now that Walgreens is three years

16    into this project, orders being flagged are identified as

17    suspicious, correct?

18    A.    The system is flagging what we consider possibly

19    suspicious orders.

14:16:48 20    Q.    Yes, ma'am.

21                   Now, I must have just missed it.  Is the

22    word "Possibly" in there?

23    A.    That word is not in here.

24    Q.    Or "probably" is not in here, right?

14:17:04 25    A.    It is not in here.

1    Q.    It just says, "The order that is flagged as

2    suspicious on the store side will be intercepted."

3              Correct?

4    A.    That's the first part of this sentence, yes.

14:17:14  5    Q.    We're now into three years of you working on this

6    and memos being drafted.

7              I think we've gone through three, four,

8    five of them over the course of three years, and

9    Walgreens internally is still referring to orders being

14:17:30 10    flagged by the Walgreens algorithm as suspicious,

11    correct?

12    A.    That's the term they were using in these documents.

13    Q.    And according to the plain language of the letters

14    that we have gone through, Walgreens is required to

14:17:44 15    report those orders to the DEA, correct?

16    A.    I believe that that's what those documents say,

17    yes.

18    Q.    I hand you what we'll mark as Martin 25.

19              Document entitled "Business requirement,"

14:18:11 20    "Project name:  DEA suspicious ordering-Phase 5."

21              Do you see that?

22    A.    Yes, I see that.

23    Q.    In the left-hand corner, second box, the date is

24    August 2nd, 2012, correct?

14:18:26 25    A.    Yes, I see that.

1      Q.    And "Business owner" on the right-hand side still

2      includes you, Barb Martin; correct?

3      A.    I am one of the owners, yes.

4      Q.    And under the "Business objectives," now more than

14:18:38  5      four years after the initiation of Walgreens' suspicious

6      order monitoring program with the Wayne Bancroft

7      algorithm, if you look in the third paragraph of Bates

8      number 51, the sentence that begins with "The order that

9      is flagged."

14:18:56  10                    Did you find the spot?

11      A.    Yes, I see that sentence.

12      Q.    "The order that is flagged as suspicious on the

13      store side will be intercepted and the quantity will be

14      reduced to a nonsuspicious (order limits) level."

14:19:17  15                    Correct?

16      A.    That's what that sentence says, yes.

17      Q.    So even now in Phase 5 of the DEA suspicious

18      ordering program, April, '12 -- I'm sorry, August, 2012,

19      in a project that you're the business owner of, this

14:19:32  20      algorithm is still being referred to or -- I'm

21      sorry -- the orders flagged by this algorithm are still

22      being referred to as suspicious, correct?

23      A.    That is what this document says, yes.

24      Q.    And again, now four years later, no notes, no input

14:19:49  25      from you or any members of the team saying that language

Martin (Video Deposition)                                2364

1    is incorrect.

2                It should include the words "Potential."

3    It should include the words "Probable."

4                You don't see that -- you don't see that

14:20:06  5    change after four years anywhere, correct?

6    A.    As they say, hindsight is 20/20.

7    Q.    So in 2006, late; in 2007, on two separate

8    occasions, the DEA provided clear direction that orders

9    identified as suspicious needed to be reported for

14:20:28 10    Walgreens to fulfill its obligations as a distributor,

11    correct?

12    A.    That's what those documents say.

13    Q.    This isn't an exercise in hindsight.

14                In fact, the DEA gave that direction prior

14:20:40 15    to these several documents we have just reviewed over the

16    last hour, hour-and-a-half, that suspicious orders had to

17    be reported to the DEA; correct?

18    A.    That's what those documents say.

19    Q.    Walgreens had the information it needed based on

14:20:56 20    these 2006 and 2007 letters from the DEA that it was

21    supposed to report suspicious orders to its field

22    offices, correct?

23    A.    That's what those letters say, yes.

24    Q.    Ms. Martin, I'm going to hand you what we'll mark

14:21:13 25    as Martin 26.

1              The bottom of this e-mail, this is from you

2    to your boss, Denman Murray, correct?

3    A.    Yes.

4    Q.    And you relay to Mr. Murray on September 14th,

14:21:30  5    2012, "The DEA at the Jupiter Distribution Center

6    9/14/2012," correct?

7              That's the same day?

8    A.    That's the subject line, yes.

9    Q.    Yes, ma'am.  And so the same that the DEA is at the

14:21:45 10    Jupiter Distribution Center, you were e-mailing

11    Mr. Murray, correct?

12    A.    Yeah.  That's what the e-mail says.

13    Q.    Yes, ma'am.  And you were relaying to Mr. Murray

14    that "The DEA showed up at our Jupiter Distribution

14:22:01 15    Center and changed the locks on the control cages."

16              Do you see that?

17    A.    Yes.  That's on this e-mail.

18    Q.    Walgreens could not access OxyContin in the cage,

19    correct?

14:22:10 20    A.    I'm not at the Jupiter DC, but, yes, I'm assuming

21    so.

22    Q.    Walgreens could not access Hydromorphone in its own

23    cage in its own Distribution Center, correct?

24    A.    That would be my assumption based on this

14:22:23 25    information.

Martin (Video Deposition)                    2366

1    Q.    Walgreens could not access Hydrocodone in the cage,

2    correct?

3    A.    That would be my assumption based on the

4    information on this e-mail.

14:22:34  5    Q.    So that's October 12th, 2012.

6              Let me hand you P-WAG-1050.  We will mark

7    as Martin 28.

8              I want you to turn to the last page so we

9    can see that this is an e-mail from Rex Swords, who is

14:23:10 10    the divisional Vice President of Pharmacy Services.

11              Are you familiar with Mr. Swords?

12    A.    Yes, I know him.

13    Q.    Okay.  And if you turn two pages forward, you can

14    see that he sent an e-mail to Kermit Crawford.

14:23:26 15              Do you know who Kermit Crawford is?

16    A.    Yes.

17    Q.    Who is Mr. Crawford?

18    A.    I believe he was Rex's boss at the time.

19    Q.    This is about as senior at Walgreens as you can get

14:23:36 20    here at corporate, correct?

21    A.    Short of going to like a company President or CEO.

22    Q.    Yes.  All right.  And then so that e-mail then is

23    forwarded to several people, correct?

24    A.    Yes.  He sent this e-mail to a number of different

14:23:52 25    people, yes.

1    Q.    And then Mike Bleser sent the e-mail to you,

2    correct?

3    A.    Me, Denny and Frank.

4    Q.    So let's look back down at Mr. Swords' e-mail to

14:24:04 5    Kermit Crawford, amongst others, and what I want to

6    direct your attention to is that he's referencing a

7    November 8th DEA meeting at NAPB, correct?

8    A.    That's the subject line, yes.

9    Q.    And I forget the acronym now, National Association

14:24:25 10    of?

11    A.    Of Boards of Pharmacy.

12    Q.    There you go.

13              And he relays that, "I have a sense that

14    today's meeting was a condensed version of the regional

14:24:32 15    meetings the DEA is holding throughout the country for

16    pharmacists?"

17              And he references that he thought several

18    of the chains were there.

19              Do you see that?

14:24:38 20    A.    Yes.

21    Q.    And if you'd turn the page to Bates number 47, at

22    the top of the page, the fourth bullet down, "Reviewed 21

23    C.F.R. 1301.74."

24              Are you there with me?

14:25:00 25    A.    Yes, I see that.

Martin (Video Deposition)                    2368

1    Q.    And that's -- you recognize that language?

2          That was in all of the letters that we

3    reviewed from the DEA in 2006 and 2007 about the

4    registrant designing and operating "A system to disclose

14:25:14 5  to the registrant suspicious orders of controlled

6    substances," correct?

7    A.    That's what this says, yes.

8    Q.    And the bullet below, "If suspicious, you don't

9    ship.  Decreasing the order and shipping is not complying

14:25:28 10  with the regulation."

11         Did I read that right?

12   A.    You read that correctly, yes.

13   Q.    So we just looked at a Buzzeo presentation that you

14   attended in October of 2012, and within a month of the

14:25:40 15  Buzzeo presentation Mr. Rex Swords is at another meeting

16   with the DEA where he's being told "Decreasing the order

17   and shipping is not complying with the regulation,"

18   correct?

19   A.    That's what this says, yes.

14:25:56 20  Q.    And this was sent to you as well, correct?

21   A.    It was forwarded on to me, yes.

22   Q.    And then the next bullet says, "Ignoring suspicious

23   orders will result in civil penalties," cited Cardinal,

24   ABC and McKesson fines, correct?

14:26:12 25  A.    That's what that statement says, yes.

Martin (Video Deposition)                                    2369

1    Q.    Now, let's go down to three-quarters of the page,

2    and do you see "Red flags"?

3    A.    Yes, I see that.

4    Q.    And at least some of these red flags are the same

14:26:30 5    red flags that were identified in the Buzzeo

6    presentation, correct?

7    A.    I believe so.

8    Q.    And this is coming directly from the DEA to

9    Walgreens -- correct?

14:26:40 10    A.    It's coming from an e-mail that Rex wrote.

11    Q.    Yes, ma'am -- where he references a meeting with

12    Joseph Rannazzisi, the Deputy Administrator -- Deputy

13    Assistant Administrator, Office of Diversion Control,

14    correct?

14:26:54 15                First page, middle of the page.

16    A.    Yes.

17    Q.    Ms. Martin, I want to go back in time to August of

18    2010.

19                Mark this as Martin 29.  This is an e-mail

14:27:14 20    from Daniel Coughlin to yourself, amongst others, dated

21    August 3rd, 2010, correct?

22    A.    It's to Marcie, and I'm cc'd, among another bunch

23    of people.

24    Q.    Yes, ma'am.  And including Mr. Piqon, correct?

14:27:34 25    A.    Yes, I see his name.

Martin (Video Deposition)                    2370

1   Q.    So the subject line is "Suspicious control drug

2   orders."

3                Do you see that?

4   A.    Yes, I see that subject line.

14:27:42  5   Q.    And he had two questions.

6                Do you see that it's number one and number

7   two?

8   A.    Yes, I see that.

9   Q.    And number one he said, "I recall the old paper

14:27:53 10   report as being inches thick.  This was replaced by same

11   data on disk and eventually electronic transmission.  We

12   were instructed in 1985 not to review or contact anyone

13   on the data."

14                Did I get that right?

14:28:06 15   A.    That's what this says, yes.

16   Q.    Okay.  "Who from your group has been reviewing the

17   data collected for the past 25 years?"

18                Now, did that give you some pause for alarm

19   in August 3rd of 2010 that Mr. Coughlin was asking

14:28:31 20   Ms. Ranick in Loss Prevention and copying you, asking who

21   has been reviewing the suspicious controlled drug orders

22   for the last 25 years?

23   A.    This e-mail wasn't sent to me, so I don't know what

24   Marcie or her team was doing, and --

14:28:51 25   Q.    Did you ask?

1    A.    I personally did not.

2    Q.    In 25 years?  Who has been reviewing these reports

3    for the last 25 years, somebody from the Distribution

4    Center, under suspicious drug, controlled drug orders?

14:29:13  5    That doesn't make you stop what you're doing for the

6    course of the day and follow up?

7              25 years?

8    A.    It wasn't my area of responsibility.

9    Q.    Did it not give you any concern that a member of

14:29:33 10   Walgreens' Distribution Center is asking who has been

11   reviewing our suspicious controlled drug orders for the

12   last 25 years?

13   A.    He's asking a question.  We don't know based on

14   this e-mail who was or who wasn't doing it.

14:29:48 15            Just because he's asking "who" doesn't mean

16   it wasn't being done.

17   Q.    And it certainly wasn't you, correct?

18   A.    It -- this reporting was not my area of

19   responsibility.

14:29:58 20   Q.    And not just reporting.

21            Reviewing.  What he is asking is who from

22   the group has been reviewing the data collected for the

23   last 25 years, suspicious controlled drug orders.

24            That was not you, correct?

14:30:11 25   A.    No, it was not me.

Martin (Video Deposition)                                    2372

1           We didn't have -- the program that I worked

2      on didn't exist 25 years ago.

3      Q.   At any point in time in your tenure at Walgreens

4      that we have been discussing today from the suspicious

14:30:28  5   order monitoring that you were involved in, so from 2008

6      to 2012, were you charged with reviewing suspicious

7      controlled drug orders to perform due diligence to ensure

8      the viability of those orders going to legitimate

9      patients, outside of just testing the validity of the

14:30:54 10   reports?

11     A.   Yes, I was performing due diligence on some of

12     those reports.

13     Q.   And define for me what you mean by "Due diligence."

14     A.   I would look at data.

14:31:10 15          I would look at the store's history and see

16     if it made sense.

17               If something didn't make sense to me, I

18     would call the store or the district manager or the

19     pharmacy supervisor, and try to obtain additional

14:31:24 20   information.

21     Q.   And that was part of your responsibilities in the,

22     you know, a few hours up to 10 hours a week reviewing the

23     reports from the algorithm?

24     A.   Yes.

14:31:38 25   Q.   Let me hand you Martin 30.

1                  This is an e-mail chain with you included

2       and Christine Atwell.

3                  Are you familiar with Ms. Atwell?

4       A.    I remember her name, yes.

14:32:01  5     Q.    Yes, she worked at the Jupiter Distribution Center?

6       A.    Yes.

7       Q.    And you can see this is an e-mail from Christine

8       Atwell, "What are your thoughts on this matter?"  Do you

9       see that?

14:32:11 10     A.    I see that.

11      Q.    Okay.  Let's go to the previous page where

12      Ms. Atwell from the Jupiter Distribution Center asks you,

13      "I have" -- and I'm on Bates number 50 -- "I have several

14      stores that are ordering huge quantities of 682971 on a

14:32:31 15     regular basis" and that is a controlled substance,

16      correct?

17      A.    Off the top of my head I don't remember what that

18      WIC number is associated with, but --

19      Q.    This is -- I'm sorry, go ahead.  Were you finished?

14:32:43 20     A.    I assume it's some kind of a C-II because she's

21      mentioning the 222 forms.

22      Q.    So essentially Ms. Atwell is asking you these

23      stores should justify these large amounts of Schedule II

24      controlled substance, correct?

14:32:58 25     A.    Of this particular item, yes.

Martin (Video Deposition)                                    2374

1    Q.    Yes, ma'am.

2                And you respond to her on Bates number 49

3    and reply, "I am able to look at store item movement if

4    this helps."

14:33:14  5                Do you see where I am?

6    A.    Yes.

7    Q.    "You can contact the store for more information."

8                So you didn't contact the store.  You told

9    her to contact the store.

14:33:26 10                Correct?

11   A.    That's what I wrote, yes.

12   Q.    Somebody in the Distribution Center, correct?

13   A.    That's what I wrote, yes.

14   Q.    Not Barb Martin performing the due diligence.

14:33:35 15                You told her to contact the store, correct?

16   A.    I told Christine to reach out to the store, yes.

17   Q.    You said, "These sales are quite high compared to

18   other non-Florida stores."

19                Correct?

14:33:47 20   A.    That's what I wrote, yes.

21   Q.    "Store 7298 sells about 22,000 tabs of 682971 every

22   week."

23                Correct?

24   A.    That's what I wrote, yes.

14:33:58 25   Q.    "That translates to 220 bottles per week."

```
 1              Is that "S-O," is that supposed to be "Of"?
 2    Oh, I'm sorry, never mind.
 3              "That translates to $220 per week, so 450
 4    bottles is more than a two-week supply."  Did I get that
 5    right?
 6    A.    I wrote "A little more than a two-week supply."
 7    Q.    Yes, ma'am.  And if you turn to Bates number 47,
 8    Ms. Atwell responds to you, "She runs a query to see how
 9    many bottles we have sent and she says store 3836 and we
10    have shipped them 3,271 bottles between 12/1/10 and
11    1/10/11."
12              Now, do I have that right, that's from her
13    to you, correct?  That's from her to you, correct?
14    A.    Yes, she wrote this e-mail.
15    Q.    So she runs the query and then she says, "I don't
16    know how they can even house this many bottles, to be
17    honest."
18              Correct?  Did I get that right?
19    A.    That's what she wrote, yes.
20    Q.    "How do we go about checking the validity of these
21    orders," correct?
22    A.    That's what she wrote, yes.
23    Q.    So here we are, Barb Martin doing due diligence on
24    the store, gets contacted by the Distribution Center.
25              There is 3,271 bottles.  The Distribution
```

Martin (Video Deposition)                                    2376

1    Center is asking you "What do we do," and what do you

2    tell her on the first page, Ms. Martin?

3                    Make sure I get this right.  From you to

4    her, right?  You don't make the call.  You tell her after

14:35:41 5    3,200 bottles of a Schedule II to one pharmacy, you tell

6    her, "Terry Collins is the District Pharmacy Supervisor.

7    His cell is," and you give her the cell.  "He may be able

8    to shed the light on the subject."

9                    Did I get that right?

14:35:59 10    A.    That's what I wrote, yes.

11    Q.    Yes, ma'am.  Now, when you were testifying to this

12    jury about the due diligence you would perform on orders

13    that would -- that were flagged, is this the kind of due

14    diligence you performed, where you told the Distribution

14:36:13 15    Center after they ask you how do we check about the

16    viability, you tell them to contact the District Pharmacy

17    Supervisor?

18    A.    That is one way of doing it.

19                    I can look at sales history and I can see

14:36:30 20    what was ordered, but I'm not near that store.  I don't

21    have access to the prescriptions that they're filling and

22    I don't have access to any of their patient information.

23                    That is why I referred her to Terry, who is

24    in the district, and he could go and work with that store

14:36:50 25    to determine why they're filling so many prescriptions

Martin (Video Deposition)                                2377

1      for their patients.

2      Q.    So this is the typical type of due diligence when

3      you mentioned it earlier, you would tell the Jupiter

4      Distribution Center that was ultimately locked by the DEA

14:37:09  5      that she should call the District Pharmacy Supervisor,

6      correct?

7      A.    It's one of the types.

8            Since I didn't have access to this store's

9      information, that's -- I couldn't take any, any direct

14:37:26 10      action.

11     Q.    I'll hand you what we're going to mark as Martin

12     31, and I ask you to remember that store number.

13           So before we go to Exhibit 31, the store

14     number that she was asking about with the 3,200 bottles

14:37:39 15     on Bates number 47 is 3836.

16           Okay?

17           Do you see that, 3836?

18     A.    That I see, yes.

19     Q.    Okay.  Martin 21 -- 31 is titled the Settlement and

14:37:57 20     Memorandum of Agreement, correct?

21     A.    That's the title of this document, yes.

22     Q.    You will see in Paragraph 5, "On September 13th,

23     2012, the DEA by its Administrator issued an order to

24     show cause and immediate suspension to Walgreens

14:38:14 25     Jupiter," and it cites to Exhibit B.

Martin (Video Deposition)                              2378

1              Do you see that?

2    A.    I see that, yes.

3    Q.    All right.  If you turn the page to Page 350 of

4    349, at the top of the page lists six store locations.

14:38:28 5              Do you see those?

6              All right.  Do you see those?

7    A.    Yes, I see those.

8    Q.    And if you look at number four, 3836 is the exact

9    same store that Ms. Atwell was e-mailing you about in the

14:38:44 10   beginning of 2011, correct?

11   A.    That is, yes, one of the stores.

12   Q.    When she relays, "I ran a query to see how many

13   bottles we have sent to store 3836.  We've shipped them

14   3,271 bottles from 12/1/10 to 1/10/11.  I don't know how

14:39:10 15   they can keep this many bottles, to be hon -- how they

16   can even house this many bottles, to be honest.  How do

17   we go about checking the validity of these orders?"

18              Correct?

19   A.    That's what she wrote, yes.

14:39:21 20   Q.    Yes, ma'am.  And if you look at number four on

21   store 3836, Oxycodone is Schedule II, and one of the most

22   highly abused controlled substance -- controlled

23   substances, correct?

24   A.    By definition, when the DEA classifies a product as

14:39:41 25   a Schedule II, it's both highly addictive and abusable.

Martin (Video Deposition)                          2379

1    Q.    And according to these numbers and the agreement

2    between Walgreens and the DEA in 2009, there were 344,000

3    dosage units of Oxycodone in 2009, correct?

4    A.    I'm not sure where this data is being supplied

14:40:04  5    from.

6    Q.    The Oxycodone purchases by dosage unit from 2009 to

7    2010, according to the agreement with the DEA, Walgreens

8    went from 344,000 dosage units to 849,000 dosage units,

9    correct?

14:40:21 10   A.    I see the changes in numbers.

11                  Again, I'm just not -- I'm not sure where

12   this data is coming from.

13   Q.    I -- I understand.  But let's just look at -- let's

14   do this just to clear up any confusion.

14:40:32 15                  Turn to Page 2 of 349 and keep your thumb

16   in 30 of 49.

17                  Do you see "Stipulation and Agreement"?

18   A.    I see that title.

19   Q.    What do you understand, Ms. Martin, that

14:40:52 20   Stipulation and Agreement means?

21   A.    I'm not really sure.

22                  This looks like a very complicated legal

23   document, and I would leave it for someone that's

24   more --

14:41:01 25   Q.    Yes.  Paragraph Number 2, "Walgreens acknowledges

Martin (Video Deposition)                                        2380

1    that suspicious order reporting for distribution to

2    certain pharmacies did not meet the standards identified

3    by DEA in three letters from DEA Deputy Assistant

4    Director, Office of Diversion Control, sent to every

14:41:18  5    registered manufacturer and distributor, including

6    Walgreens, on September 27th, 2016, February 7th, 2007,

7    and December 27th, 2007."

8                    Did I get that right?

9                    Did I get that right, Ms. Martin?

14:41:35 10    A.    I believe you read the words correctly.

11    Q.    Yes, ma'am.

12                    And you understand that Walgreens is

13    acknowledging that its suspicious order reporting for the

14    Jupiter Distribution Center did not meet the standards

14:41:48 15    identified in those letters?

16    A.    That's the verbiage on this form.

17    Q.    Yes.  Now, you were contacted by Ms. Atwell and

18    asking you to check the validity of those orders in the

19    very beginning of 2011, January, correct?

14:42:07 20    A.    Got the dates on the e-mail?

21    Q.    Yes, ma'am.

22    A.    Okay.

23    Q.    Very beginning of 2011, correct?

24    A.    Yes, I see that.

14:42:19 25    Q.    And in 2011, the dosage units to this one store

Martin (Video Deposition)                                      2381

1    that you were contacted by -- about in January, the

2    annual dosage units for just Oxycodone were 1.4 million.

3                    Do you see that?

4    A.    I see that number, yes.

14:42:46  5    Q.    Do you have any idea how large the community is in

6    Store 3836, Port Richey, Florida?

7    A.    I -- I don't know that area.

8    Q.    Yes, ma'am.

9                    As part of your due diligence, did you even

14:43:04 10    look to see how many people lived in this community that

11    you were contacted about in January, '11 about 3,271

12    bottles coming off the shelves?

13    A.    I personally did not --

14    Q.    Yes, ma'am.

14:43:19 15    A.    -- look at the population.

16                    Quite frankly, I would think that that

17    would be -- do more harm than good.

18                    As a pharmacist, I wouldn't want to turn

19    away a patient just because they didn't live in the same

14:43:31 20    city my store was in.

21                    I personally live in Chicago and I stop in

22    a store in Park Ridge, so if I looked at just the

23    population of each city and I said I can only fill that

24    many prescriptions, I think we would be doing more harm

14:43:46 25    than good to our patient population.

1              And that's why I referred her to Terry,

2     because he was in the area.  He would know what that

3     store is doing, and if they had patients that they were

4     serving from other areas.

14:43:58  5     Q.    So the fact that when you looked, that 849,000

6     dosage units of Oxycodone was given -- was being

7     dispensed into a town of 5,000 people would not have

8     caused Barb Martin any alarm in the beginning of 2011?

9     A.    I wasn't looking at that data.

14:44:18 10     Q.    Yes, ma'am, and that's not what I asked, if you

11     looked at it.

12              We've already established that you didn't

13     know that there was 5,000 people in that community.

14              What I asked was a little different.  If

14:44:27 15     you had looked in the beginning of 2011 and you would

16     have seen that 849,000 dosage units of Oxycodone were

17     being dispensed by Walgreens, where you had spent almost

18     25 years at this point, would that have caused you any

19     alarm?

14:44:41 20     A.    I would need to know more history than just a

21     couple of the numbers on a piece of paper.

22     Q.    And that's exactly the point of doing -- performing

23     due diligence, correct, Ms. Martin; is that you gather

24     information to make an educated decision, correct?

14:44:56 25     A.    And if I'm not capable of gathering that

1    information, I find other people that can.

2    Q.    So when you told this jury earlier that you were

3    performing due diligence on stores, your realm of

4    expertise, your wheelhouse does not even include Googling

14:45:13 5    the city where the pharmacy is located to see what the

6    population is?

7    A.    Again, I don't see how that's relevant.

8               I wouldn't want to limit patients to only

9    go to pharmacies in the city they live in.

14:45:30 10    Q.    Yet you're telling this jury that from the middle

11    of 2008 until the end of 2012, you were a material

12    participant in developing Walgreens' suspicious order

13    monitoring policies and procedures, correct?

14    A.    I was one of a number of people involved with the

14:45:46 15    processes, yes.

16    Q.    You were one of a number of people who were charged

17    with the objective of identifying and reporting

18    suspicious orders to the DEA, correct?

19    A.    I thought our objective was more coming up with the

14:46:05 20    system enhancements.

21               I wasn't involved with the reporting part.

22    Q.    Ms. Martin, it's been a long day and I know you're

23    tired, and I promise that I'm not going to take a whole

24    lot more of your time, but I do have just a few questions

14:46:23 25    that I hope I can ask and you can help clarify some

Martin (Video Deposition)                                    2384

1       questions that I had from your earlier testimony.

2                        Earlier, actually for a good part of the

3       afternoon today, Mr. Mougey went through several

4       documents with you, memoranda, business requirement

14:46:39  5       documents, et cetera, that related to the suspicious

6       order monitoring system that you had some involvement in

7       working on.

8                        Do you recall that generally?

9       A.    Yes.

14:46:52 10       Q.    And he focused a lot of his attention on a specific

11       word that was contained in those reports, and that was

12       "Suspicious orders."

13                        Do you remember that?

14       A.    Yes.

14:47:06 15       Q.    And there were some back-and-forth between you and

16       Mr. Mougey over whether that was a reference to an actual

17       suspicious order or a potential or possible suspicious

18       order.

19                        Do you recall that?

14:47:18 20       A.    Yes.

21       Q.    And can you tell us what your understanding of that

22       term "Suspicious order" as it was used in those business

23       requirement documents referred to?

24       A.    Even though the document didn't use the word

14:47:31 25       "Potentially," that was what my belief was, that we were

1    looking for orders that had the potential to be

2    suspicious.

3                    But until we did more evaluations of those

4    orders, we weren't sure whether they were suspicious or

14:47:46  5    not.

6    Q.    And he pulled out or he showed you during the

7    course of the day a couple of different reports, and I'd

8    like to ask you about those now.

9                    The first is -- was marked Martin Exhibit

14:47:59  10    Number 2.

11                    Could you pull that out, please?

12    A.    Here, I have it.

13    Q.    Okay.  And is Martin Exhibit Number 2 one of the

14    reports that was generated by the system that you were

14:48:24  15    asked questions about today?

16    A.    Yes.

17    Q.    Okay.  And if you look, it's a document dated

18    August 25th of 2009, right?

19    A.    Correct.

14:48:34  20    Q.    And in the top right corner, it says "Suspicious

21    order," right?

22    A.    Right.  That's the name that we were using.

23    Q.    Was this a document, Martin 2, a document that was

24    flagged by the system for you to review?

14:48:48  25    A.    This item was flagged, yes.

1    Q.    If you look at Martin Exhibit 2, do you consider

2    this to be a suspicious order as you understand that

3    term?

4    A.    I do not consider this to be a suspicious order.

14:49:03  5              My reasoning for that is that the suggested

6    order quantity and the ordered quantity are both three,

7    so there was no changes that the store made from what our

8    system wanted to order.

9                  And then that number three is well below

14:49:18 10    the tolerance limit of five.

11    Q.    So even though Martin Exhibit 2 was a report that

12    was flagged by the system, it said "Suspicious order" on

13    it, you don't consider this to be a suspicious order?

14    A.    No.

14:49:35 15    Q.    And then the only other document he showed you, a

16    report that he showed you, was Martin Exhibit 20.

17                 Can you pull that one out, please?

18    A.    Might be faster if I just look on the screen.

19    Q.    Okay.  That's fine.  Thank you.

14:49:47 20                 This is another report that Mr. Mougey

21    showed you again with a title or the words on there

22    "suspicious order."

23                 Do you see that in the upper right-hand

24    corner?

14:50:04 25    A.    Yes.

Martin (Video Deposition)                                    2387

1    Q.    And was this a report that was flagged by the

2    system that Mr. Mougey asked you about today?

3    A.    Yes.

4    Q.    Do you consider Martin Exhibit 20 to be a

14:50:16    5    suspicious order?

6    A.    I do not consider this order to be suspicious

7    either.  While the suggested quantity, the system order

8    was zero, there was an order by a store user with a user

9    ID of Zulic that ordered a quantity of two.

14:50:27  10                This is equal to the tolerance limit, so I

11    would not consider this suspicious.

12                They could have been punching this order

13    manually for a number of different reasons.  The first

14    one that would come to my mind would be the fact that

14:50:40  15    it's possible without seeing any other different

16    information that this store never had an order history in

17    the past.

18                If they hadn't had it before and a new

19    patient presented a prescription, the system wouldn't

14:50:52  20    know to order it.  They would have to order it manually.

21    Q.    So even though Martin Exhibit 20 was a report that

22    was flagged by the system marked as a suspicious order,

23    you don't consider this to be in fact a suspicious order?

24    A.    I do not think this is a suspicious order.

14:51:13  25    Q.    Was it flagged as a potential suspicious order?

1    A.    It was flagged for our review, which is why I kept

2    using the term "Potentially suspicious."

3              (End of video.)

4              MR. LANIER:  Your Honor, I believe that

14:51:28  5    concludes the offer of both sides from the deposition of

6    Barb Martin.

7              THE COURT:  Okay.  Let me just go on the

8    headphones for a minute.

9              (Proceedings at side-bar:)

14:51:50 10              THE COURT:  All right.  I gather, then,

11    everyone wants to break for the week.

12              Is that it?  And then we'll have some other

13    witnesses next week.

14              MR. WEINBERGER:  Yes, Your Honor.

14:52:00 15              MR. STOFFELMAYR:  We would not object.

16              THE COURT:  All right.  Well, the

17    next -- the next witness is going to be the Nelson

18    deposition, if you can pull it off, or that witness will

19    just testify live.

14:52:12 20              MR. WEINBERGER:  Yes, Your Honor.

21              THE COURT:  Okay.

22              (End of side-bar conference.)

23              THE COURT:  All right.  Ladies and

24    gentlemen, we are going to recess for the week.

14:52:27 25              I know no one's disappointed to get out

1  early.

2              We will do some preparation before the next

3  witness, so it's very important, since we won't be here

4  for a couple days, don't listen, read, encounter,

14:52:42  5  anything that might be in the media, electronic print,

6  TV, radio, whatever.

7              Just put it aside, turn the page, channel,

8  whatever.

9              Do not discuss this case with anyone.

14:52:56 10  We're obviously in the middle of the case.  Do not form

11  any conclusions.  If anyone asks you, just tell them

12  you're seated on a jury and the Judge has ordered you not

13  to talk about it.

14              Have a good couple days, and we'll pick up

14:53:07 15  at 9:00 a.m. on Monday.

16              (Jury out.)

17              THE COURT:  Okay.  Please be seated.

18              If someone would close the back door,

19  please.

14:53:48 20              All right.  Just before we break, I want to

21  make sure we're caught up with exhibits.

22              I don't know if there were any exhibits

23  that we were going to introduce with Dr. McCann.

24              We took care of Mr. Joyce, correct?  I

14:54:09 25  think we took care of --

```
 1                    MS. FLEMING:  We didn't.

 2                    THE COURT:  Okay.  What do we have on

 3       Joyce?

 4                    MS. FLEMING:  May I approach, Your Honor?

14:54:22  5          THE COURT:  Okay.

 6                    MS. FLEMING:  (Handing).

 7                    THE COURT:  All right.  Have you shown

 8       these to the defendants?  If not, I'll go through them

 9       fast.

14:54:32 10          MR. STOFFELMAYR:  We received these last

11       night.

12                    THE COURT:  Any objections?

13                    MR. STOFFELMAYR:  On a couple only.

14                    THE COURT:  All right.  Which ones do you

14:54:38 15      object to, and I'll just briefly put the others in, and

16       then I'll deal with those.

17                    MR. STOFFELMAYR:  P 208809, that was a

18       third-party document, the Board of Pharmacy

19       presentation --

14:54:47 20          THE COURT:  All right.

21                    MR. STOFFELMAYR:  -- that he hadn't seen.

22                    THE COURT:  Any other ones you object to?

23                    MR. STOFFELMAYR:  Two -- well, three

24       others.

14:54:56 25          P 06911, that was an e-mail about
```

1    pharmacies in New Jersey and Pennsylvania that he had

2    never seen, wasn't familiar with.

3                    THE COURT:  Wait.  P 06 -- okay.  That one.

4                    MR. STOFFELMAYR:  P 06911.

14:55:12  5            Same with P 20639, it was a PowerPoint he

6    hadn't seen and wasn't familiar with, wasn't able to

7    testify about.

8                    And same on P 15085.

9                    No objection on any of the others.

14:55:30  10           THE COURT:  All right.  Well, so the

11    following are admitted without objection.

12                    P 20808, P 24017, P 26321, P 20811, P

13    20810, P 15314, P 24039, P 15068, P 24019, and P 24022.

14                    Let me take a quick look at the others.

14:56:11  15           All right.  P 20809 was an August 6th, 2014

16    OARRS presentation presented by the Ohio State Board of

17    Pharmacy.

18                    MR. WEINBERGER:  Your Honor, this was the

19    lengthy document that I started to get into with

14:56:45  20    Mr. Joyce, and the Court made some rulings that limited

21    that.

22                    At this point in time we will not seek to

23    admit the document.  I think later on it will be --

24                    THE COURT:  All right.

14:56:57  25           MR. WEINBERGER:  -- properly identified and

2392

```
 1    admissible, I mean unless -- they are objecting to it.
 2                    THE COURT:  We'll just say not offered now.
 3                    MR. WEINBERGER:  Yes.
 4                    THE COURT:  Deal with it later.
14:57:10  5          All right.  The P 06911, the dashboard.
 6                    MR. WEINBERGER:  Your Honor, again same
 7    thing.
 8                    THE COURT:  Okay.  Fine.
 9                    MR. WEINBERGER:  We'll seek the admission
14:57:21 10    through another witness.
11                    THE COURT:  Very good.  Thank you,
12    Mr. Weinberger.
13                    20639, DEA Market Leadership, January, 2013
14    PowerPoint.
14:57:32 15                    MR. WEINBERGER:  So he was shown this
16    document and testified at length about it.
17                    There was some testimony from him as to
18    whether or not he actually saw it and was a market
19    leader, but I think there was enough evidence presented
14:57:45 20    through him, I mean, to admit it into evidence.
21                    MR. STOFFELMAYR:  I don't need to repeat
22    what I already said except to note Ms. Polster will be
23    here on Tuesday, and I suspect it will be admissible
24    through her without objection.
14:58:04 25                    MR. WEINBERGER:  Well, if you're
```

1      representing now --

2                    THE COURT:  Then we'll just hold off --

3                    MR. WEINBERGER:  Sure.

4                    THE COURT:  -- and admit it then.

14:58:10  5          MR. WEINBERGER:  Sure.

6                    THE COURT:  All right.  And then the last

7      one is P 15085.

8                    MR. WEINBERGER:  This was the one that I

9      think was much clearer.  This had the accompanying e-mail

14:58:23 10     that indicated that district managers, and he was

11     identified as a district manager --

12                    THE COURT:  Right.

13                    MR. WEINBERGER:  -- was invited to this

14     webinar.

14:58:32 15                  He testified extensively about it.

16                    This one in my mind is definitely

17     admissible.

18                    THE COURT:  Yeah, I think this one --

19                    MR. STOFFELMAYR:  Judge, may I just say one

14:58:41 20     thing?

21                    He testified extensively that he didn't

22     know what any of it meant.  That was his testimony.

23                    THE COURT:  He may not have known what any

24     of it meant, but he believes he received it and --

14:58:51 25                  MR. STOFFELMAYR:  No, he said he didn't

1    recognize it.

2              He said it's possible that he attended this

3    webinar.  He had no idea.

4              THE COURT:  Well, he said -- he said -- it

14:58:59 5    shows that it went -- that it went to him, people on his

6    level, so I think this comes in.  I'll admit over

7    objection.

8              MR. WEINBERGER:  Your Honor, and I

9    just -- I may have misheard you, but I think the second

14:59:12 10    exhibit you said was P 24107, and it's P 24 --

11              THE COURT:  I meant P 24017.

12              MR. STOFFELMAYR:  That's what I had, too.

13              THE COURT:  Okay.  Fine.

14              All right.  I should have said do the

14:59:29 15    defendants have any exhibits they are offering with

16    Mr. Joyce?

17              MR. STOFFELMAYR:  No, Your Honor.

18              THE COURT:  Okay.  All right.  Then we

19    have, I guess, Dr. McCann and we have this Ms. Martin.

14:59:43 20              I don't know, I don't think there will be

21    exhibits from Dr. McCann from either side.  We have his

22    testimony.

23              MR. LANIER:  Your Honor, with Dr. McCann we

24    do have the 1006 summaries that we were seeking to admit

14:59:56 25    in lieu of dumping into an appellate record all of the

1    data.

2              We tried to condense it down to those 1006

3    summaries that were provided in part of our motion in

4    limine as well.

15:00:10  5              THE COURT:  Well, I'm not even sure

6    what --

7              MR. LANIER:  I will get with opposing

8    counsel on those if you'll give us until Monday --

9              THE COURT:  That's fine.

15:00:18 10              MR. LANIER:  -- to work through it.

11              Thank you, Judge.

12              THE COURT:  All right.

13              MR. LANIER:  And when I say "I," I mean

14    Ms. Fleming.

15:00:28 15              MS. SWIFT:  I'd be happy to talk to

16    Ms. Fleming about that, Your Honor.

17              THE COURT:  All right, fine.  And hopefully

18    you can work that out.

19              And I don't know if there are any documents

15:00:38 20    through this deposition witness, Ms. Martin.  There were

21    a couple referred to.

22              I mean it's certainly proper to admit

23    documents through a deponent witness.

24              MR. WEINBERGER:  We will do the same for

15:00:50 25    those with her, we will confer.

```
 1              THE COURT:  Okay, fine.

 2              All right.  So what's the plaintiffs' plan?

 3              We're going to have -- the next witness is

 4     Nelson, either video if you can work it out, or

 5     testifying live via video, right?

 6              MR. LANIER:  Correct, Your Honor.

 7              And that gives us the rest of today and

 8     tomorrow to try and work it out, and if not, Sunday to

 9     get him in.

10              And then we also are looking at two Giant

11     Eagle witnesses after that.  The Mr. Chunderlik will be

12     the one appearing via video, so we spoke with Mr. Pitts

13     and suggested -- and opposing counsel, suggested we start

14     that Tuesday morning at 9:00 a.m.  A video takes awhile

15     to set up, and that gives us not just the weekend but it

16     gives us Monday to make sure we've got it set up.

17              A 9:00 a.m. start time is a lot cleaner

18     because we can check it and test it, and we don't have to

19     do it right before, we can do it before the jury comes

20     in.  So our proposal would be to roll him until Tuesday

21     morning, and that leaves Monday for Nelson and the other

22     Giant Eagle witness for Monday.

23              THE COURT:  Will that fill up the day?  I

24     don't want to have big gaps.

25              MR. LANIER:  I think it will take
```

1    us -- we'll go -- we'll go steady, and our goal is still

2    to rest at the end of next week, Your Honor.

3                    THE COURT:  All right.

4                    MR. WEINBERGER:  The Nelson deposition is,

15:02:21  5    I think, cut down to three hours.

6                    MR. LANIER:  Three-and-a-half hours.

7                    MR. WEINBERGER:  Three-and-a-half hours.

8                    THE COURT:  Who is the other Giant Eagle

9    witness, Mr. Lanier?

15:02:33 10                    MS. SULLIVAN:  By video, Your Honor,

11   Mr. Tsipakis.

12                    THE COURT:  I'm sorry, what was his name?

13                    MS. SULLIVAN:  Mr. Tsipakis, T-S-P, on

14   distribution issues, Your Honor.

15:02:45 15                    THE COURT:  I'm sorry, what?  T-S-P?

16                    MR. LANIER:  T-A-P-A-K-I-S.

17                    THE COURT:  So Tsipakis.  Okay.

18                    MS. SULLIVAN:  T as in Tom.

19                    THE COURT:  Tsipakis.

15:02:51 20                    MR. LANIER:  I've heard it both ways.

21                    THE COURT:  All right.  Tsipakis.

22                    All right, fine.

23                    So Monday we'll have Nelson and

24   Mr. Tsipakis.

15:03:01 25                    MR. MAJORAS:  Your Honor, John Majoras.

2398

1          I would make a point for the record.

2      Plaintiffs are well-aware of this and I believe Special

3      Master Cohen is well-aware of this.

4              Mr. Nelson is not an employee.  He has been

15:03:12  5      retired.  He's not controlled by Walmart.  He has his own

6      counsel.

7              And I fully expect we're going to be able

8      to work out the deposition to be able to have that played

9      on Monday, but I just want to make sure that is on the

15:03:23 10      record.

11              THE COURT:  Well, that's -- that's fine.

12              I mean, he has counsel, that's fine.  So if

13      you can work it out, great.  If not, he'll need to be

14      testifying by video at 9:00 a.m. from wherever he is.

15:03:37 15              That's fine.

16              MR. MAJORAS:  Just in terms of whatever

17      process needs to be done, that's not something I can

18      control, is my point, Your Honor.

19              THE COURT:  Well, it's a little late for

15:03:49 20      that.

21              I had made that clear earlier today.  Well,

22      he's under Court order, and someone can communicate

23      him that if this can't be worked out, he'll need

24      to -- where does he live?

15:04:01 25              MR. MAJORAS:  I don't know that.  I think

1    it's in Arkansas somewhere.

2              THE COURT:  Well, someone needs to start

3    making arrangements to get him to a place in Arkansas

4    where he can be deposed -- I'm sorry, deposed -- where he

15:04:15  5    can be testifying live by video 9:00 a.m. Monday morning.

6              I mean, I hope you can work this out, but

7    if not, he's under Court order to testify.

8              MR. LANIER:  Arkansas's pretty close to

9    Texas, Judge.  We've got connections.

15:04:29 10              THE COURT:  All right.  Well, I mean, don't

11    wait until Sunday at 10:00 p.m.

12              MR. LANIER:  We will start connecting

13    sooner, yes.

14              THE COURT:  Start right now and notify his

15:04:39 15    counsel, so again, I don't want to have a big gap.

16              MR. LANIER:  Understood.

17              THE COURT:  Okay.  Anything else that I

18    have to know about so I can be prepared?

19              MR. STOFFELMAYR:  Not for Walgreens, Your

15:04:54 20    Honor.

21              MR. MAJORAS:  No, sir.

22              THE COURT:  All right.

23              MR. LANIER:  Nothing for plaintiff.

24              MR. WEINBERGER:  Your Honor, I'm just

15:04:59 25    thinking, for every Friday now we should probably put up

1    a Browns banner, or maybe they can wear a piece of Browns

2    paraphernalia.

3                   THE COURT:  Well, they asked, Mr.

4    Weinberger, they asked if it was okay.  I said I have no

15:05:13  5    objection.

6                   I don't care what the jurors choose to

7    wear.  It's fine with me.  I'm going to wear the same

8    robe, but what I wear under it, who cares.

9                   But they are not wearing robes, but they

15:05:24  10    did ask, and I said it was fine.

11                   All right.  According to my time tallies

12    this week, I had 15-and-a-half hours for the plaintiffs

13    and nine for the defendants.

14                   Okay.  Have a good weekend, and see you

15:05:44  15    Monday.

16                   MR. LANIER:  You, too, Judge and thank you.

17                   (Proceedings concluded at 3:05 p.m.)

18                         -  -  -  -

19               C E R T I F I C A T E

20                   I certify that the foregoing is a correct

21    transcript from the record of proceedings in the

22    above-entitled matter.

23

24

25

1    **/s/Susan Trischan**

2    /S/ Susan Trischan, Official Court Reporter
     Certified Realtime Reporter

3    7-189 U.S. Court House
     801 West Superior Avenue
4    Cleveland, Ohio 44113
     (216) 357-7087

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2402

1                          **I N D E X**

2

3    **WITNESSES:**                                    **PAGE**

4    CROSS-EXAMINATION OF CRAIG McCANN (RESUMED)      2224

5    BY MS. SWIFT

6    CROSS-EXAMINATION OF CRAIG McCANN               2254

7    BY MS. FUMERTON

8    CROSS-EXAMINATION OF CRAIG McCANN               2268

9    BY MS. FIEBIG

10   REDIRECT EXAMINATION OF CRAIG McCANN            2275

11   BY MR. LANIER

12   REDIRECT EXAMINATION OF CRAIG McCANN (RESUMED)  2310

13   BY MR. LANIER

14   RECROSS-EXAMINATION OF CRAIG McCANN             2311

15   BY MS. SWIFT

16   RECROSS-EXAMINATION OF CRAIG McCANN             2326

17   BY MS. FIEBIG

18   VIDEO EXAMINATION OF BARBARA MARTIN             2333

19

20                        * * * * *

21

22

23

24

25