UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Track Three Cases* | Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

## PLAINTIFFS' MOTION FOR SANCTIONS AGAINST WALMART FOR FAILING TO COMPLY WITH DISCOVERY OBLIGATIONS

Basic fairness requires that prior to going to trial, a party is entitled to know the evidence available to it so it can properly prepare its case. Trial in this action commenced two weeks ago. Notwithstanding that fact, and in flagrant disregard of its discovery obligations, Walmart produced hundreds of thousands of documents to Plaintiffs in the three months leading up to trial and continues to produce documents during trial that are important to the Plaintiffs' case. This discovery misconduct has prejudiced the Plaintiffs and should be severely sanctioned as an abuse of the discovery and trial processes.

Since trial commenced, Walmart has produced 1,102 documents. These late productions are part of a larger pattern of withholding importance evidence from the Plaintiffs. In the months leading up to trial, Walmart has produced hundreds of thousands of documents, and its production continues to date. These productions are in response to a March 16, 2021 order from Special Master Cohen, affirmed by Judge Polster on April 9th, requiring that Walmart produce documents from 14 existing Home Office custodians without the geographic limitations that Walmart imposed. Walmart's counsel represented on June 25th that it anticipated that these productions would be substantially complete "by the end of July." This was simply false. Since July 31st, Walmart has produced over 185,000 additional documents. Over 59,000 of these documents were

produced in September alone. The productions come in bulk with no identifiers reflecting which document requests they are responsive to. Significant work must be done to weed through the productions to discover the documents that this motion describes below. These productions have continued during trial, with no indication from Walmart as to when they will be complete.[1]

There is no justification for these late productions. These are custodial documents from existing custodians, and hence these are all documents that Walmart previously collected, reviewed and, as this Court and Special Master Cohen found, improperly withheld. Plaintiffs have been prejudiced by Walmart's misconduct. By producing such a massive volume of documents up to, and during, trial, Plaintiffs have been forced to continually review new documents and evidence during trial, and to constantly amend their exhibit list to take into account late produced documents. In addition to interfering with Plaintiffs' trial preparation, Plaintiffs did not have these documents during the deposition of Walmart's witnesses, thereby preventing Plaintiffs from questioning the deponents on these documents or laying the foundation for these documents through depositions.

These documents are highly relevant to Plaintiffs' case. The documents are from the custodial files of Walmart's Home Office employees. They relate to Walmart's national policies and procedures, and bear directly on the implementation, and effectiveness, of these policies and procedures. Many of these late produced documents are from the custodial files of Brad Nelson, a key witness in this litigation, and one for whom Walmart has repeatedly and improperly sought to avoid producing documents. Below are specific examples of highly relevant documents that Walmart improperly withheld from production until shortly before, or in some cases even during,

---

[1] Plaintiffs alerted Special Master Cohen to the problem of Walmart's ongoing late productions by letter dated September 27, 2021.

trial. Given the importance of these documents, Walmart should not be permitted to game the discovery process to its advantage and to Plaintiffs' severe disadvantage. Accordingly, Plaintiffs respectfully request that the Court impose one or more of the following sanctions on Walmart:

- enter a default judgment against Walmart in Plaintiffs' cases;

- declare a mistrial as to Walmart only;

- admit all the documents listed herein into evidence at trial, without requiring Plaintiffs to do so through a witness, and deem any objections against admissibility to be forfeited or overruled;

- allow Plaintiffs to call Brad Nelson to testify live at trial by remote testimony (*in addition to and not in lieu of* playing his deposition as scheduled on Monday, October 17), with all trial time used for his remote testimony charged to, and all associated costs paid by, Walmart; and/or

- allow Plaintiffs to question Susanne Hiland, the only Walmart witness currently scheduled to testify live in Plaintiffs' case-in-chief, about any of the documents listed herein, regardless of whether she has personal knowledge of the document, and with all trial time associated with such questioning to be charged to Walmart.

### A. Background

Plaintiffs deposed former Walmart employee Brad Nelson, Walmart's Senior Manager of Controlled Substances for Health & Wellness and later a Director of Practice Compliance, on March 23, 2021. Since Mr. Nelson's deposition in March, Walmart has produced over 56,000 additional documents. Numerous emails produced after Mr. Nelson's deposition contain information that is highly relevant to Plaintiffs' claims.

For example, late-produced emails to Mr. Nelson show that Walmart was aware of pill mills and suspicious prescribing around the country and the problems its pharmacists faced using the prescription-by-prescription approach to handling prescriptions from such prescribers. Many of these emails alert Walmart to fact patterns that are indicative of the red flags that have been discussed as part of Plaintiffs' case. Despite this knowledge, in many cases Walmart's purported

efforts to support its pharmacists often consisted of sending a boilerplate email response telling them that they were required to evaluate every prescription on a prescription-by-prescription basis and to use their professional judgment.  These documents also show that Walmart was aware of the issue of pills and patients crossing state lines, an important issue given Walmart's repeated reference throughout the trial to its market share in Lake and Trumbull counties:

1. **P-14659, WMT_MDL_001813066, produced on 10/5/21.**  On February 28, 2012, Mr. Nelson forwarded a refusal-to-fill ("RTF") webform to market directors and Home Office Compliance and Investigations personnel, writing, "FYI.  Here is another one from Jenny at Pooler [Georgia store location] from Monday. *Everyday this continues we are at greater risk of a problem*."  (emphasis added).  The webform submitted by the pharmacist stated that the doctor at issue "is located approximately 4 hours away yet we see a lot of his prescriptions at this store. All his patients receive Oxycodone 15 & 30. These prescriptions appear to have been presented at multiple pharmacies based on the notations on RX."

2. **P-14658, WMT_MDL_001813064, produced on 10/5/21.**  The following day, on February 29, 2012, Mr. Nelson forwarded another RTF webform to the same group, and says, "Check this out, This refusal to fill is written by the same DR Bacon from store 4820 in Pooler, However this RX was presented in Illinois!!! *I think we have been attracting the wrong kind of Business at Pooler for a while*. Just FYI" (emphasis added).  Dadrion Gaston, Director of Corporate Compliance, responds, "I believe FBI calls that a clue."  The prescription at issue was a combination of opioids and a benzodiazepine: Oxycodone 15 mg, oxycodone 30 mg, and Xanax 2mg.

3. **P-26885, WMT_MDL_001619534, produced on 9/3/21.** This document is an email to Mr. Nelson in March 2013 about patients filling prescriptions in Kentucky when the

4

prescriptions were written by a doctor in Tennessee. The email notes the prescriptions are for 120 pills of Oxycodone 30mg, and that patients have been filling these prescriptions at multiple Walmart pharmacies, and further states that the prescriptions contain the exact same combination of non-controlled drugs with the oxycodone: "What is so suspicious is these rx are exactly the same - 4 rx on one page, 1 for ranitidine, naprosyn, omeprazole, and oxycodone."

4. **P-14646, WMT_MDL_001742245, produced on 9/18/21.** This November 2016 email to Mr. Nelson states that the Walmart pharmacy in Mason, West Virginia, "gets a lot of OH patients filling in WV." In addition to the issue of Walmart-dispensed pills moving across state lines—in this instance from West Virginia to Ohio—this document shows that Walmart knew that it presented a problem with pharmacists in West Virginia being unable to check information in OARRS for the patients from Ohio.

Other late-produced emails from the custodial file of Mr. Nelson and other Home Office custodians also show that Walmart was aware of the particular problem of pill mills and excessive oxycodone prescribing in Florida:

5. **P-14660, WMT MDL 001813149, produced on 10/5/21.** This document is RTF webform from a Walmart in Titusville, Florida, dated 9/14/2012, which states that "from 9:30am to 11:30am, the pharmacy received 10+ calls for oxycodone 30, at 11:30am, 10+ patients followed the fed-ex delivery person to the pharmacy for delivery of cgs. customers gathered and upon review, it was noticed that *2 doctors from orlando and kissimmee had given out rx's for over 2000 oxycodone 30 pills*. The crowd became agitated and started bickering about who was in line first." (emphasis added).

5

6. **P-17698, WMT_MDL_001619685, produced on 9/3/21.** In this May 2013 email, a Market Health & Wellness Director from *Maine* writes to Mr. Nelson with concerns about a pain clinic in Florida: "There is 'Broward Pain Facility' in Florida whose rx's are showing up in our stores at a high rate. They seem to be all for oxycodone 30mg and all for a similar amount, 130-140. If you call to verify, it will be verified and the clinic will claim everything is legitimate." The email advises that "Florida stores are refusing to fill these rx's so patients are taking 200$ flights to states that will." Although the Market Health & Wellness Director recommends that his Maine pharmacists not fill these Florida prescriptions for high quantities of Oxycodone 30mg from this pill mill, Mr. Nelson reiterates Walmart's policy of no blanket refusals and its requirement that all prescriptions be evaluated on a prescription-by-prescription basis.

7. **P-17654, WMT_MDL_001458995, Produced 8/20/21.** This July 2013 email chain describes the increase in excessive CII orders shown on Walmart's "Over 20 Reports" and indicates that increased orders in Florida are a result of other chain pharmacies changing their dispensing policies. Walmart's John Oldfather, Senior Investigator in Global Investigations, writes, "In reviewing feedback, from MHWD's in regards to the Over 20 Report sent out for drug orders, a common trend is being noted explaining the influx in drug quantity ordered. Particularly in FL, excessive orders are explained by the new dispensing policies implemented by Costco and Walgreens." Mr. Oldfather's supervisor, Greg Beam, Director of Global Investigations, wrote to Compliance Director George Chapman, "With Kristy [Spruell] in her new role with Logistics, we need to consider shifting the tracking and follow up in that direction. She will have immediate access to monthly totals, order trends by store, and can bring a focus to the process that quite frankly

6

is missing at the moment." Mr. Beam was suggesting that follow-up on these excessive order reports should shift from his department—which was tasked with investigating internal theft, not over-dispensing—to the person in charge of Walmart's SOM program.

8. **P-26855, WMT_MDL_001766156, Produced 9/26/21.** This December 2013 email from a Market Health & Wellness Director in a Walmart in Orlando, Florida, describes customers waiting for narcotic delivery every Friday and asks if Walmart's Replenishment department will stop restocking Oxycodone 30mg for eight weeks "to give the Pharmacy a chance to break the Friday cycle of customers waiting for the CII order." The MHWD requests that, as an alternative, the Home Office at least change the delivery day to Tuesday.

Additional late-produced emails show Walmart's compliance department adhering to the "no blanket refusal" policy even when the pharmacists advised the Home Office of numerous red flags and that Walmart's dispensing policy compared to its competitors was causing problematic prescriptions to "funnel in to our WalMart stores" and that filling such prescriptions was "feeding addiction and diversion":

9. **P-26892, WMT_MDL_001764242, produced 9/26/21.** This February 2013 email to Mr. Nelson raises concerns about an Oklahoma pain clinic, "The Wellness Clinic of Roland is continually writing prescriptions for large numbers of multiple narcotic pain relivers. Other chain and independent pharmacies in the area have stopped accepting prescriptions from this clinic, which is causing them to funnel in to our WalMart stores. Also, with the recent actions against the WalGreens pharmacies in Florida, I along with my collegues (Adrienne, Sitt, Amanda, and even Martha) feel that we need to STOP accepting rx's from this clinic. The pharmacists in these WalGreens stores have been called in front of the DEA to be

7

questioned on why they felt that there is legitimate medical need for such high quantities and multiple rx's for these drugs. *THERE IS NOT (**other than feeding addiction and diversion**).* Not a single one of us ever feel comfortable about filling these prescriptions, and if questioned, we wouldn't be able to justify this type of prescribing. ***We continue to fill them** because if we call to verify Dr/Pt relationship they tell us bogus info*." The pharmacist also noted that the store had seen a 97% increase in the number for Oxycodone 30mg dispensed from 2011 to 2012, and a *545% increase* in the number of Oxycodone 15mg pills dispensed from 2011 to 2012. Mr. Nelson's response to this is that, again, Walmart does not permit any blanket refusals.

10. **P-26888, WMT_MDL_001620103, produced on 9/3/21.** In an August 12, 2013 email, a pharmacist asks about Walmart's official position on a particular prescriber, and how pharmacists should justify refusals given that the prescriber always validates prescriptions when pharmacists call: "Some are 'legit' but totally aren't in my opinion. What are we to tell patients? What reason do we give for not filling the rx? They are VERY persistent because all other competitors are now just simply refusing to fill." As the email explains, the pharmacists appear to have concerns about the legitimacy of these prescriptions but believed that the validation by the prescriber resolved the red flags, at least pursuant to Walmart's procedure, stating that "in the eyes of our protocol it is legit."[2]

11. **P-26890, WMT_MDL_001748202, produced on 9/18/21.** This late-produced email (which Walmart withheld on the claim that it lacked geographic relevance to CT3) shows

---

[2] At the time of this email exchange, the State Board of Nursing had already been investigating this prescriber (a nurse practitioner) for two months. Just a few weeks later, on September 5, 2013, the Board suspended her license without hearing, "finding that immediate jeopardy existed" and that following the usual hearing procedures "would fail to adequately respond to a known risk to the public safety." *See* https://www.maine.gov/boardofnursing/discipline/Consent%20Agreements/S/SOLMITZ,DORIS(2-28-14%20VoluntarySurrender).pdf.

Mr. Nelson receiving an inquiry about how Walmart pharmacists should handle prescriptions from Cleveland prescriber Lorenzo Lalli. The email from the pharmacy manager references a "trinity" prescription of Norco (hydrocodone and Tylenol), Soma, and Valium. Walmart stores in CT3 filled hundreds of prescriptions written by Lorenzo Lalli, who was eventually sentenced to a year in prison in 2014 for running a pill mill.[3]

Still other late-produced emails show that Walmart refused to permit blanket refusals *even when the local DEA requested* that Walmart stop filling a prescriber's prescriptions, and that Walmart's policy was to put the onus of halting bad prescribers entirely on the DEA or state medical boards:

12. **P-17681, WMT_MDL_001468780, produced on 8/20/21.** This email raises concerns about a Georgia pill mill, stating that the local DEA agent specifically asked them to not fill the prescribers' prescriptions. Mr. Nelson, however, responds, ""You are 100% correct in stating that we are not offered the ability to blanket refuse prescriptions from a practice or prescriber. *If this prescriber is such a danger to the public safety then the DEA or Medical board needs to suspend his registration or his license*." Mr. Nelson goes on to say that he judges the particular prescriber "low risk" because not many RTFs have been submitted and Mr. Nelson's "DEA contacts in Atlanta" do not "have this guy on their radar." Mr. Nelson makes the determination that the prescriber is "low risk" despite the pharmacists' report that the doctor is "over-prescribing multiple CII's, Oxycodone 30mg in particular" and that "multiple patients have confirmed" that "*if patients are willing to pay a $500 office visit fee, the physician will write you anything you want*." (emphasis added).

---

[3] *See* http://prosecutor.cuyahogacounty.us/en-US/2014-07-29-PR-Pill-mill-doctor-headed-for-prison.aspx.

13. **P-26811, WMT_MDL_001619532, produced on 9/3/21.** At the same time, Mr. Nelson told pharmacists that a DEA investigation into a prescriber's "inappropriate and dangerous medical care" is not a valid reason to refuse to fill a prescription; because if such an allegation about the prescriber were true, the DEA would have already suspended the doctor's license. In fact, Mr. Nelson says the Home Office is "always concerned when pharmacist chooses this reason for refusal to fill[.]" In this particular instance, the doctor at issue in this email was eventually criminally charged for improper prescribing, but did not stand trial because of mental infirmities.

14. **P-26874, WMT_MDL_001358216, produced 7/31/21.** In response to an April 2013 inquiry about a doctor in Michigan, Mr. Nelson stated, "At this point this Prescriber still has all the necessary credential to practice medicine," and provided a screen shot of the prescriber's active DEA registration, reinforcing the message that as long as the DEA has not suspended the prescriber's registration yet, it is acceptable for Walmart pharmacists to continue filling prescriptions.

At the same time as Walmart put the onus on the DEA, other late-produced emails show that Walmart's policy was to limit the information it would provide to DEA with respect to suspect prescribers:

15. **P-26881, WMT_MDL_001438595, produced 8/15/21.** This June 2013 email from pharmacist in Arkansas raises concerns about oxycodone prescriptions brought in by different patients written by two Florida doctors. The email states that Walmart's pharmacists called the doctors' offices and the nurse validated the prescriptions, and that Walmart filled one prescription but avoided filling the second by stating that the store did not have enough oxycodone in stock to fill it. The email further stated that the pharmacist's

10

brother works for the DEA and had asked if Walmart could provide the DEA with information on the prescribers so the DEA could investigate. However, Mr. Nelson responded, "They can NOT give the information to the DEA, These folks are protected by Hipaa especially since she validated the Dr/PT relationship."

Another late-produced email shows that Walmart was cited by the DEA for failing to complete accurate medical records, which came to light after Walmart provided inaccurate information to the DEA as part of the agency's investigation of a prescriber. Mr. Nelson was tasked with determining how Walmart failed to provide accurate information to the DEA.

16. **(P-number needed), WMT_MDL_001748279 and attached letter from DEA, WMT_MDL_001748281, produced on 9/18/21.** The letter from the DEA states that Walmart was found to have failed to keep accurate records. Specifically, Walmart's Connexus system was not accurate and had incorrect patients connected with a doctor under investigation.

Another late-produced email shows that Walmart's corporate policy, as stated by Mr. Nelson, was that it could not run reports on prescribers because that would violate patients' privacy rights:

17. **P-14643, WMT_MDL_001764118, produced on 9/26/21.** This email from January 2013 asks about an Oregon store where the managing pharmacist says this is "one of the 2 stores that we had concerns about the quantity of C2 prescriptions being processed" and asks if the Home Office could do "some analysis…to get an understanding of the number of CS prescriptions coming from this doctor." Nelson says that Walmart cannot run reports on a prescriber without "an official request from a regulatory agency or law enforcement" because it would affect patients' privacy rights.

11

Additional late-produced documents show that Walmart pharmacists were requesting the Home Office's help in handling prescriptions from pill mills over a decade before Walmart implemented procedures for blanket refusals and corporate blocks in 2017:

18. **P-17663, WMT_MDL_001350826, produced on 7/30/21.** In this June 2007 email, a Walmart pharmacist wrote, "With all the news about the pill mills on tv and the paper and so many pharmacies starting to refuse to fill rxs from them, what are we supposed to do? I think this is something that needs to be addressed. With Wal-Mart not allowing us to refuse prescriptions, soon we may be the only place that they will be able to go." The email was forwarded to Susanne Hiland. The fact that Plaintiffs may now question Ms. Hiland about this document at trial does not cure the prejudice caused by Walmart's decision to withhold this and similar documents based on its geographic scope objection.

19. **P-14645, WMT_MDL_001753436, produced on 9/18/21.** In this email from August 2007, a Walmart pharmacist raises concerns about a about pain clinic in which the doctor routinely prescribes the "trinity" combination of an opioid, a muscle relaxer, and a benzodiazepine: "Every patient that leave that office has one control of pain (lorcet, lortab, norco) 120 tab, soma 120 tab and xanax 2 mg 30 to 60 tab." When the email is forwarded to Ms. Hiland for guidance, she responds, "I'm not sure what the concern is other than having enough stock. … *In her statement Lorinda says that all rx's and patient's were legit. If that is the case we should not be refusing to fill.*" (emphasis added).

These emails are just examples from the 185,000 late-produced documents that Walmart had previously withheld from the custodial productions of fourteen Home Office employees. They are relevant to Walmart's national policies for addressing problem prescribers and its awareness of the effectiveness of those policies. Many pertain to the issue of pill mills in Florida, which—

as Walmart knew—had a serious effect on multiple other states, including Ohio. The examples described above would be admissible into evidence in this case through the testimony of Mr. Nelson, except that Walmart did not produce them until after Mr. Nelson's deposition.

**B.**     **Sanctions Are Warranted Pursuant to Federal Rule of Civil Procedure 37 and the Court's Inherent Authority Due to Walmart's Untimely Disclosures.**

In federal court, "the rules matter." *ECIMOS, LLC v. Nortek Glob. HVAC, LLC*, 736 F. App'x 577, 578 (6th Cir. 2018). "Parties are obliged to comply, and when they don't, they risk repercussions. Such consequences often come by way of sanctions imposed by the district court." *Id.* Pursuant to Rule 37(b)(2), the Court may sanction a party that "fails to obey an order to provide . . . discovery, including an order under Rule 26(f), 35, or 37(a)[.]" FED. R. CIV. P. 37(b)(2). Available sanctions may include, among other things: (1) "directing that the matters embraced in the order or other designated facts be taken as established for the purposes of the action, as the prevailing party claims;" (2) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;" or (3) rendering a default judgment against the disobedient party[.]" FED R. CIV. P. 37(b)(2)(A)(i), (ii), and (vi). Additionally, "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e)," the Court may, "on motion and after giving an opportunity to be heard:" (1) "order payment of the reasonable expenses, including attorney's fees, caused by the failure;" (2) "inform the jury of the party's failure;" and (3) "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi). The decision to order sanctions under Rule 37 is within this Court's broad discretion. *See ECIMOS*, 736 F. App'x at 578–79; *Trimboll v. Maxim Crane Works, L.P.,* Case No. 3:18-cv-00346, 2020 WL 1031871, at *13 (M.D. Tenn. June 30, 2020).

This Court also has "the inherent authority to sanction bad-faith conduct, as well as conduct that is tantamount to bad faith."  *Trimboll*, 2020 WL 1031871, at *15 (citation and internal quotation marks omitted).  *See also ECIMOS*, 736 F. App'x at 582 ("Courts also possess inherent power to tailor sanctions when bad faith occurs.").  The appropriate sanctions for a party's discovery failures depends on the specific circumstances of the case.  *See, e.g., Trimboll*, 2020 WL 1031871, at *9 ("'Because failures to produce relevant evidence fall along a continuum of fault— ranging from innocence through the degrees of negligence to intentionality, the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault.' Therefore, a proper sanction, which can range from dismissal of the case to an instruction that the jury 'may infer a fact based on lost or destroyed evidence,' will serve 'both fairness and punitive functions.'") (internal citation omitted).

As set forth above, Walmart failed to timely produce documents that are highly material to Plaintiffs' nuisance claims in this case, despite their obligations to do so under the Federal Rules of Civil Procedure and this Court's prior orders.  *See, e.g., Trimboll*, 2020 WL 1031871, at *15 (court authorized to imposed sanctions based on party's delay in producing relevant document in discovery); *Kidwell v. Ruby IV, L.L.C.*, No. CV 18-02052, 2020 WL 6391260, at *3 (E.D. La. Nov. 2, 2020) (sanctions appropriate where defendants failed to produce documents in timely fashion). Even after the Special Master and the Court determined these documents had been improperly withheld, Walmart continued to drag its feet in producing the documents.  It claimed it would finish its production by the end of July.  But that was not true, as Walmart has produced almost 200,000 additional documents since July 30 and their production is not even complete, despite trial having commenced two weeks ago.  Walmart's unjustified delays and obstructive conduct is indicative of bad faith.  Moreover, this untimely production has prejudiced Plaintiffs greatly in

their ability to prepare for trial and present their case to the jury.  For example, Plaintiffs were unable to question Brad Nelson regarding these documents, of which he has personal knowledge, during his deposition because they had not yet been produced.

Plaintiffs do not believe that the prejudice caused by Walmart's egregious discovery misconduct can be rectified at this point.  For that reason, Plaintiffs request that the Court enter a default judgment against Walmart or, alternatively, declare a mistrial as to Walmart alone so that Plaintiffs can later proceed against Walmart with the benefit of all the relevant and required discovery.  If the Court does not believe a default judgment or mistrial is warranted, Plaintiffs respectfully request that it impose one or more of the following sanctions: (i) admit all the documents listed herein into evidence at trial, without requiring Plaintiffs to do so through a witness, and deem any objections against admissibility to be forfeited or overruled;[4] (ii) allow Plaintiffs to call Brad Nelson to testify live at trial by remote testimony (***in addition to and not in lieu of*** playing his deposition as scheduled on Monday, October 17), with all trial time used for his remote testimony charged to, and all associated costs paid by, Walmart; and/or (iii) allow Plaintiffs to question Susanne Hiland, the only Walmart witness currently scheduled to testify live in Plaintiffs' case-in-chief, about any of the documents listed herein, regardless of whether she has personal knowledge of the document, and with all trial time associated with such questioning to

---

[4] *See, e.g., Trimboll*, 2020 WL 1031871, at *16 (as part of sanction, court held that certain incidents of party's discovery misconduct "will be admissible at trial" and that party "is precluded from disputing" them); *Kidwell*, 2020 WL 6391260, at *10 (recommending district court "deem admitted all information and allegations in Exhibit 7 to the Rule 30(b)(6) deposition" and noting "[t]his sanction should also include that the foregoing information shall be admissible at trial and that Defendants shall be prohibited from presenting any evidence attempting to contest the matters deemed admitted (along with an appropriate instruction to the jury to be included in the Court's jury instructions)"); *Sacks v. Four Seasons Hotel Ltd.*, No. 5:04CV73, 2008 WL 11348388, at *16 (E.D. Tex. Feb. 20, 2008) (court sanctioned plaintiffs for failing to produce two documents relevant and critical to the defendants' defense by, among other things, ordering that both documents "shall be admissible at trial").

be charged to Walmart. Without the imposition of one or more of these sanctions, Plaintiffs will be irrevocably damaged by Walmart's discovery misconduct.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court impose one or more of the following sanctions against Walmart: (i) enter a default judgment against it; (ii) declare a mistrial as to Walmart only; (iii) admit all the documents listed herein into evidence at trial, without requiring Plaintiffs to do so through a witness, and deem any objections against admissibility to be forfeited or overruled; (iv) allow Plaintiffs to call Brad Nelson to testify live at trial by remote testimony (*in addition to and not in lieu of* playing his deposition as scheduled on Monday, October 17), with all trial time used for his remote testimony charged to, and all associated costs paid by, Walmart; and/or (v) allow Plaintiffs to question Susanne Hiland, the only Walmart witness currently scheduled to testify live in Plaintiffs' case-in-chief, about any of the documents listed herein, regardless of whether she has personal knowledge of the document, and with all trial time associated with such questioning to be charged to Walmart.

.

Respectfully submitted,

DATED: October 17, 2021.

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR 00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

*/s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114 (216) 696-3232
(216) 696-3924 (fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

W. Mark Lanier
THE LANIER LAW FIRM
10940 Sam Houston Pkwy N., Suite 100
Houston, TX 77064
(713) 659-5200
(713) 659-2204 (fax)
Mark.Lanier@LanierLawFirm.com

*Plaintiffs' Trial Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113
(216) 861-0804
(216) 861-5322 (fax)
FGallucci@pglawyer.com

          Hunter J. Shkolnik
          NAPOLI SHKOLNIK
          270 Munoz Rivera Avenue, Suite 201
          Hato Rey, Puerto Rico 00918
          (347) 379-1688
          hunter@napolilaw.com

          *Counsel for Plaintiffs Lake County and Trumbull County, Ohio*

**On the brief:**

**KELLER ROHRBACK L.L.P.**

Lynn Lincoln Sarko
Derek W. Loeser
Dean Kawamoto
David J. Ko
Alison S. Gaffney
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Phone: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
dloeser@kellerrohrback.com
dkawamoto@kellerrohrback.com
dko@kellerrohrback.com
agaffney@kellerrohrback.com

*Attorneys for Plaintiffs*

18