2403

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2           EASTERN DIVISION AT CLEVELAND

3   ------------------------------X
    IN RE:                        :  Case No. 1:17-md-2804
4                                 :
    NATIONAL PRESCRIPTION          :
5   OPIATE LITIGATION             :
                                  :  **VOLUME 10**
6   CASE TRACK THREE              :  JURY TRIAL
                                  :  *(Pages 2403 - 2700)*
7                                 :
                                  :
8                                 :
                                  :  *October 18, 2021*
9   ------------------------------X

10

11

12          TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>

13

14      HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16          SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:        Lance A. Boardman, RDR, CRR
                                    United States District Court
21                                  801 West Superior Avenue
                                    Court Reporters 7-189
22                                  Cleveland, Ohio 44113
                                    216.357.7019
23

24
    Proceedings recorded by mechanical stenography; transcript
25  produced by computer-aided transcription.

```
 1   APPEARANCES:

 2   For the Plaintiffs:          Peter H. Weinberger, Esq.
                                  SPANGENBERG, SHIBLEY & LIBER
 3                                1001 Lakeside Avenue, Ste. 1700
                                  1900 East Ninth Street
 4                                Cleveland, Ohio 44114
                                  216-696-3232
 5
                                  W. Mark Lanier, Esq.
 6                                Rachel Lanier, Esq.
                                  THE LANIER LAW FIRM
 7                                6810 FM 1960 West
                                  Houston, Texas 77069
 8                                813-659-5200

 9                                Frank L. Gallucci, III, Esq.
                                  PLEVIN & GALLUCCI COMPANY, LPA
10                                The Illuminating Building
                                  Suite 2222
11                                55 Public Square
                                  Cleveland, Ohio 44113
12                                216-861-0804

13                                Salvatore C. Badala, Esq.
                                  Maria Fleming, Esq.
14                                NAPOLI SHKOLNIK
                                  360 Lexington Ave., 11th Floor
15                                New York, New York 10017
                                  212-397-1000

16

17

18   For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
                                  Brian C. Swanson, Esq.
19                                BARTLIT BECK LLP
                                  54 West Hubbard Street, Ste.300
20                                Chicago, Illinois 60654
                                  312-494-4400
21

22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:          Eric R. Delinsky, Esq.
                                   Alexandra W. Miller, Esq.
 3                                 ZUCKERMAN SPAEDER - WASHINGTON
                                   Suite 1000
 4                                 1800 M Street, NW
                                   Washington, DC 20036
 5                                 202-778-1831

 6    For HBC/Giant Eagle          Diane P. Sullivan, Esq.
      Defendants:                  Chantale Fiebig, Esq.
 7                                 WEIL GOTSHAL & MANGES
                                   Suite 600
 8                                 2001 M Street NW
                                   Washington, DC 20036
 9                                 202-682-7200

10    For Walmart Defendants:      John M. Majoras, Esq.
                                   JONES DAY - COLUMBUS
11                                 Suite 600
                                   325 John H. McConnell Blvd.
12                                 Columbus, Ohio 43215
                                   614-281-3835
13
                                   Tara A. Fumerton, Esq.
14                                 Tina M. Tabacchi, Esq.
                                   JONES DAY - CHICAGO
15                                 Suite 3500
                                   77 West Wacker
16                                 Chicago, Illinois 60601
                                   312-782-3939
17

18    ALSO PRESENT:               David Cohen, Special Master

19                                      - - - - -

20

21

22

23

24

25
```

1                        <u>I N D E X</u>

2

3                                                              <u>Page</u>

4   DEPOSITION TESTIMONY OF BRAD NELSON            2414

5   DEPOSITION TESTIMONY OF JAMES TSIPAKIS         2585

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 08:48:16 | 1 | M O R N I N G   S E S S I O N |
| 08:50:04 | 2 | (In open court at 8:49 a.m.) |
| 08:50:04 | 3 | THE COURT:  All right.  First, is there any |
| 08:50:07 | 4 | reason that plaintiffs' motion for sanctions against Walmart |
| 08:50:10 | 5 | should be filed under seal? |
| 08:50:13 | 6 | I don't see any.  I thought I would take that up |
| 08:50:16 | 7 | first. |
| 08:50:20 | 8 | MS. FUMERTON:  So, Your Honor, they quote |
| 08:50:22 | 9 | extensively from medical documents providing doctors and |
| 08:50:25 | 10 | other names.  We're assessing right now what confidentiality |
| 08:50:29 | 11 | obstacle allegations we have to other parties with respect |
| 08:50:31 | 12 | to this, and given the names that are in there. |
| 08:50:34 | 13 | I also need to check to the extent to which there |
| 08:50:37 | 14 | might be information in the attached documents.  We didn't |
| 08:50:39 | 15 | get this till midnight last night. |
| 08:50:41 | 16 | THE COURT:  Well, the presumption is |
| 08:50:42 | 17 | everything's public.  These documents if they were |
| 08:50:48 | 18 | introduced at trial, they'd be public. |
| 08:50:54 | 19 | MR. WEINBERGER:  Your Honor, I would note |
| 08:50:55 | 20 | that -- |
| 08:50:55 | 21 | THE COURT:  If they don't reveal patient |
| 08:51:00 | 22 | information, I don't -- |
| 08:51:00 | 23 | MR. WEINBERGER:  Yes, that's been redacted |
| 08:51:03 | 24 | from the number of documents that mention patient names. |
| 08:51:06 | 25 | MS. FUMERTON:  I don't think that PHI is the |

08:51:08  1    only reason we can keep things as confidential.  As I said,

08:51:11  2    we got this at midnight.  Likely, the bottom of the brief is

08:51:14  3    not something we're going to have an objection to, but the

08:51:17  4    attached documents, if they're intending to include those in

08:51:20  5    what they file might --

08:51:21  6                 THE COURT:  All right, look, I'm -- the motion

08:51:28  7    can be filed publicly.  I'll wait until noon to deal with

08:51:32  8    the attachments, so at the moment keep the attachments under

08:51:37  9    seal.  The motion can be filed publicly.

08:51:46  10        How I deal with it, I'm not sure.  I think I'll hear

08:51:53  11   briefly from Walmart at noon.

08:51:57  12        But where -- Mr. Nelson is a former employee; is that

08:52:01  13   right?

08:52:03  14                 MR. MAJORAS:  Yes, sir, he's retired.

08:52:04  15                 THE COURT:  Where does he live, Mr. Majoras?

08:52:07  16                 MR. MAJORAS:  As I said, somewhere in

08:52:09  17   Arkansas.  I don't know exactly where, Your Honor.

08:52:13  18                 THE COURT:  I think right now you better have

08:52:14  19   someone contact him and his lawyer.  I expect he'll be here

08:52:19  20   this week, and you'll probably need to arrange to have him

08:52:21  21   brought here on Walmart's private jet.  That will get around

08:52:27  22   the hundred-mile limit, so I expect he'll be here in person

08:52:31  23   for testimony.

08:52:33  24                 MR. MAJORAS:  Your Honor, for the record, we

08:52:34  25   object to this.  He has counsel.  His counsel will

08:52:37  1    presumably respond.

08:52:38  2              THE COURT:  You can object all you want.

08:52:39  3    That's an order.  Okay?  So start making the arrangements.

08:52:45  4    I'll deal with this one step at a time.  My hope is not to

08:52:49  5    have to consider draconian sanctions.  And it's clear that

08:52:55  6    the Court's supposed to before imposing sanctions see if I

08:53:00  7    can remedy whatever harm through ordinary means, and the

08:53:05  8    most logical one is to have Mr. Nelson testify so he can be

08:53:09  9    examined on these documents.  And if I determine that that's

08:53:12  10   sufficient, well, then that's sufficient.  But he's got to

08:53:15  11   be here.

08:53:16  12       I don't -- so start making arrangements to have him

08:53:19  13   here.  Whenever he's here, we'll put him in.  I assume we

08:53:24  14   can have him on and off in a day.  So I'll deal with that at

08:53:27  15   noon, but you should start making the arrangements.

08:53:31  16              MR. MAJORAS:  Your Honor, we would like an

08:53:32  17   opportunity to respond to the motion.  Again, I read that

08:53:35  18   this morning.

08:53:36  19              THE COURT:  I'll deal with it at noon.  I'm

08:53:39  20   just saying, Mr. Majoras, because that's my intent is to

08:53:42  21   have him testify, okay?  So start making the arrangements.

08:53:47  22   Walmart's a big company.  They can get anyone anywhere in

08:53:51  23   prompt order, so I think that's the way to do it.  And I

08:53:54  24   think it's better to have him testify live than live by

08:53:57  25   video under the circumstances.

08:54:02   1        And if the testimony, the examination with the

08:54:05   2   documents I think is sufficient, then that's what we'll do.

08:54:09   3   I won't have to consider anything else.  And that's my

08:54:13   4   intent.  And I can deal with the time, charge the time

08:54:17   5   accordingly.  That's relatively minor.

08:54:19   6        But I want to keep this trial on track, and I think

08:54:27   7   that's my first order of business.  And if I can do that,

08:54:30   8   that's what I'll do with all the defendants that we have.

08:54:34   9             MR. MAJORAS:  Your Honor, just with respect to

08:54:35  10   the documents, we will reserve the right to object to those

08:54:39  11   documents.  Quite a few of them are out of scope, unrelated,

08:54:43  12   and not relevant under rulings we've already had.  And I

08:54:47  13   just want to for the record note that we will make those

08:54:49  14   objections.

08:54:50  15             THE COURT:  You can make the objections

08:54:51  16   whenever you want, sir.  I'll decide if they come in, if

08:54:58  17   they -- if they gave anything to him on this subject, the

08:55:04  18   general subject, obviously they come in, or anything he

08:55:07  19   sent, if they relate to the subject of this trial.  If they

08:55:09  20   don't relate to the subject of the trial, I won't let them

08:55:14  21   in if they're offered.

08:55:16  22        So I'll deal with this more at noon.  I have a

08:55:20  23   criminal matter, but I don't think it's till 12:30, so I'll

08:55:25  24   deal with this at -- yeah, my criminal matter is at 12:30,

08:55:34  25   so I'll take it up at noon.

08:55:37   1       Okay.  Anything else we need to take up before we

08:55:40   2  bring up the jury?

08:55:48   3       Okay.  We have an extra five minutes.  I don't want to

08:55:51   4  rush the jurors.

08:57:22   5       Mr. Weinberger, when were the documents that you

08:57:24   6  referred to in this motion, to your knowledge, when were

08:57:31   7  they produced?  Not the exact day but when were they

08:57:36   8  produced?

08:57:36   9            MR. WEINBERGER:  Sure.  It's -- I actually

08:57:39  10  have each of them with their dates.

08:57:49  11            THE COURT:  All right.  What's the range?

08:57:50  12            MR. WEINBERGER:  It starts in the end of July,

08:57:51  13  but predominantly, the documents that we cite were produced

08:57:58  14  in September and as late as October 5.

08:58:06  15       Since July 16, Your Honor, there have been 39 separate

08:58:13  16  productions.  Since we began --

08:58:20  17            THE COURT:  Robert, I'm not getting the

08:58:22  18  realtime.

08:58:35  19       There have been 39 productions since when?

08:58:39  20            MR. WEINBERGER:  Since July 16.

08:58:45  21       Since we began jury selection on September 27, there

08:58:51  22  have been 13 productions.  Since we began trial, there have

08:58:59  23  been six productions.  Since July 16, the total productions,

08:59:09  24  documents, this is not pages, documents, have been 206,739.

08:59:17  25            THE COURT:  All right.  I just -- I was really

08:59:19  1    interested in the documents you cited.

08:59:23  2              MR. WEINBERGER:  Okay.

08:59:24  3              THE COURT:  All right.  Robert, can you and

08:59:27  4    Lance before they get the jury out get this set up here?

09:00:11  5              MS. FUMERTON:  Your Honor, when you get a

09:00:12  6    moment, I just want to put some broader context with respect

09:00:16  7    to the numbers and the motion.  And obviously I understand

09:00:18  8    we'll talk about this more broadly, but of the documents

09:00:20  9    that they cite that have been produced since trial, it's

09:00:23  10   only been a handful.  Some of them had already been produced

09:00:26  11   previously, and others are, the substance of them had

09:00:29  12   already been produced as well.

09:00:30  13        And again, these all come from a motion that

09:00:34  14   plaintiffs filed at the end of discovery after all the

09:00:37  15   depositions had taken place and which then we were ordered

09:00:40  16   to produce nationwide discovery from --

09:00:44  17             THE COURT:  That is why I'm trying to deal

09:00:46  18   with this step by step, and I'm hopeful that this can be

09:00:49  19   remedied by having Mr. Nelson testify.  He can be examined

09:00:52  20   on these documents.  And that's what I'm going to try to

09:00:56  21   accomplish.  And if I can't, then I don't have to consider

09:00:59  22   anything else.

09:01:01  23             MS. FUMERTON:  And just to bring perspective,

09:01:04  24   Mr. Nelson was responsible for 17 different states, and so

09:01:08  25   that's why all those Ohio-related documents have been

09:01:10  1    produced prior to this point in time, including many of the

09:01:14  2    other ones.  In fact, we're about to hear Mr. Nelson's

09:01:17  3    deposition testimony, and you'll see that he's been examined

09:01:19  4    almost exclusively on issues outside of Ohio and

09:01:22  5    specifically in Texas.

09:01:23  6                    THE COURT:  Well, that's fine --

09:01:25  7                    MS. FUMERTON:  Plaintiffs are trying to try

09:01:27  8    this case outside of Ohio.

09:01:27  9                    THE COURT:  Walmart is a national company and

09:01:30  10   has national policies.

09:01:31  11                   MS. FUMERTON:  Your Honor, these aren't about

09:01:32  12   the national policies.  The policies they've had extensive

09:01:35  13   discovery on.

09:01:37  14                   THE COURT:  I've made my rulings,

09:01:39  15   Ms. Fumerton, and I want you to start having someone getting

09:01:42  16   ahold of this gentleman and making arrangements, because I

09:01:44  17   expect he's going to be here, all right?  And if he's not,

09:01:47  18   then I may have to consider something a lot more draconian.

09:01:51  19   I don't want to do that.  Is that clear?

09:01:53  20                   MS. FUMERTON:  Your Honor --

09:01:54  21                   THE COURT:  You want to test me, test me.

09:02:02  22   Okay.

09:04:47  23                   (Jury present in open court at 9:04 a.m.)

09:05:15  24                   THE COURT:  Good morning.  Please be seated.

09:05:17  25   I hope everyone had a good weekend.

| | | |
|---|---|---|
| 09:05:19 | 1 | All right.  Mr. Lanier, Mr. Weinberger, you may call |
| 09:05:24 | 2 | your next witness, please. |
| 09:05:26 | 3 | MR. LANIER:  Thank you, Your Honor.  Good |
| 09:05:28 | 4 | morning.  May it please the Court. |
| 09:05:29 | 5 | Good morning, ladies and gentlemen.  At the risk of |
| 09:05:35 | 6 | glares from Your Honor from others, today is a deposition |
| 09:05:39 | 7 | day.  And so we begin with the deposition of Brad Nelson. |
| 09:05:42 | 8 | He's a former employee of Walmart.  He is the senior manager |
| 09:05:47 | 9 | for Controlled Substances.  And he'll say that in his |
| 09:05:50 | 10 | deposition. |
| 09:05:55 | 11 | But this, Your Honor, is a 3 hour and 55 minute play |
| 09:05:59 | 12 | if you add both plaintiff and defense together. |
| 09:06:01 | 13 | And so we call by deposition, video deposition, Brad |
| 09:06:05 | 14 | Nelson. |
| 09:06:13 | 15 | VIDEO TECHNICIAN:  Today's date is Tuesday, |
| 09:06:15 | 16 | March 23, 2021, and the approximate time is 9:04 a.m. |
| 09:06:20 | 17 | Our deponent is Brad Nelson. |
| 09:06:23 | 18 | (Witness sworn.) |
| 09:06:23 | 19 | DEPOSITION TESTIMONY OF BRAD NELSON |
| 09:06:30 | 20 | **Q**    My name is Mark Lanier, and I'm going to be asking the |
| 09:06:33 | 21 | questions on behalf of the plaintiffs today, okay? |
| 09:06:37 | 22 | **A**    Yes. |
| 09:06:37 | 23 | **Q**    You and I have never met before, have we? |
| 09:06:39 | 24 | **A**    Not that I'm aware of. |
| 09:06:41 | 25 | **Q**    All right.  Well, I've had a chance to read about you |

**Nelson - (By Video Deposition)**

2415

| | | |
|---|---|---|
| 09:06:45 | 1 | and read through a number of different documents in your |
| 09:06:47 | 2 | file, and I've got a number of different things to talk to |
| 09:06:53 | 3 | you about today.  But what I've done is to give you and the |
| 09:06:56 | 4 | jury some direction, I've kind of put together a road map to |
| 09:06:59 | 5 | show what areas we're going to cover. |
| 09:07:01 | 6 | Are you able to see that okay? |
| 09:07:03 | 7 | **A**    Yes, sir. |
| 09:07:04 | 8 | **Q**    Great.  The first thing we'll do of any import is |
| 09:07:09 | 9 | we're going to, aside from talk about you, we're going to |
| 09:07:12 | 10 | stop and talk about the requirements that are associated |
| 09:07:16 | 11 | with controlled substances and opioid distribution on a |
| 09:07:21 | 12 | pharmacy level. |
| 09:07:24 | 13 | You tracking with me? |
| 09:07:26 | 14 | **A**    Yes, sir. |
| 09:07:26 | 15 | **Q**    And then we're going to talk about what I consider to |
| 09:07:30 | 16 | be failures by Walmart.  I know you may take issue with |
| 09:07:33 | 17 | that, but we will discuss at least the issue of failures |
| 09:07:36 | 18 | next.  Okay? |
| 09:07:38 | 19 | **A**    Yes, sir. |
| 09:07:38 | 20 | **Q**    And then one final thing I want to talk to you about |
| 09:07:43 | 21 | is I really want to focus in on the motives behind some of |
| 09:07:49 | 22 | what Walmart did and I'll talk to you about as well.  Okay? |
| 09:07:54 | 23 | **A**    Okay. |
| 09:07:54 | 24 | **Q**    So before we do that, we need to understand you a |
| 09:07:56 | 25 | little more fully, so I've got a sheet just for you. |

**Nelson - (By Video Deposition)**                                        2416

09:07:59   1        This is Brad Nelson.

09:08:02   2        Now, is it fair for us to say that your professional

09:08:06   3   life has basically centered around Walmart?

09:08:14   4   **A**    I'm not sure I understand your question, sir.

09:08:16   5   **Q**    Well, you worked for Walmart from 19, what, 92 through

09:08:33   6   2017, early 2017, right?

09:08:37   7   **A**    That is incorrect, sir.  I worked for Walmart from

09:08:40   8   1983 until March of 2017.

09:08:44   9   **Q**    Wow.  Even longer than I thought.  Okay.

09:08:50  10        1983 through 2017.  That's most of your professional

09:08:57  11   life, isn't it?

09:08:59  12   **A**    That's who I worked for, yes, sir.

09:09:02  13   **Q**    Yeah.  So when I say your professional life centered

09:09:04  14   around Walmart, you worked for them for how long?

09:09:14  15   **A**    Approximately 32 years.

09:09:22  16   **Q**    Yeah.  So centered on Walmart.

09:09:24  17        All right.  Now, in that time -- I wasn't able to get

09:09:29  18   all of your personnel files, but it looked to me that just

09:09:34  19   from 1992 to 2017 you made somewhere, if you count all your

09:09:45  20   stock options and things like that, somewhere around 8 --

09:09:48  21   well, north of $8 million.

09:09:52  22   **A**    Sir, I have no idea.  I didn't track it that way.  I

09:09:55  23   have no idea what my income was at that time.

09:09:57  24   **Q**    Okay.  Well, there is a source document that is

09:10:00  25   Walmart 545, if you want to look at it.  And I've got it

**Nelson - (By Video Deposition)**                    2417

| | | |
|---|---|---|
| 09:10:06 | 1 | summarized, and I'll put a summary up here for us to look |
| 09:10:09 | 2 | at.  And I'll represent that these are based upon -- these |
| 09:10:12 | 3 | are plaintiffs' prepared summaries of the Excel spreadsheet |
| 09:10:20 | 4 | that is Plaintiffs' Walmart 500. |
| 09:10:22 | 5 | Now, if you've got these three in front of you, sir, |
| 09:10:28 | 6 | you will see that one page is entitled Brad Nelson salary |
| 09:10:31 | 7 | history, and it shows your salary going back to 1992, going |
| 09:10:37 | 8 | up through 2016. |
| 09:10:39 | 9 | Do you see that? |
| 09:10:41 | 10 | **A**    Yes, I see a list on the summary, yes. |
| 09:10:43 | 11 | **Q**    All right.  Does that seem fairly consistent with your |
| 09:10:46 | 12 | memory of the way your salary changed over the years at |
| 09:10:52 | 13 | Walmart? |
| 09:10:52 | 14 | **A**    Sir, I have no idea.  I did not track my salary in |
| 09:10:57 | 15 | that manner. |
| 09:10:57 | 16 | **Q**    And other earnings?  Because in addition to your |
| 09:11:01 | 17 | salary, you got other things paid to you, didn't you? |
| 09:11:05 | 18 | **A**    I was paid things according to my compensation |
| 09:11:08 | 19 | program, sir. |
| 09:11:08 | 20 | **Q**    Your compensation program included incentive pay, |
| 09:11:12 | 21 | didn't it? |
| 09:11:12 | 22 | **A**    As well as investments for myself. |
| 09:11:15 | 23 | **Q**    Is that a "yes" answer on incentive pay? |
| 09:11:20 | 24 | **A**    Incentives were paid by the company as a result of the |
| 09:11:23 | 25 | company's performance, yes. |

**Nelson - (By Video Deposition)**                                    2418

| | | |
|---|---|---|
| 09:11:26 | 1 | **Q**    Yeah.  Yours was called I think a management |
| 09:11:30 | 2 | incentive, right? |
| 09:11:31 | 3 | **A**    I don't recall the name of the incentive program. |
| 09:11:33 | 4 | **Q**    And you got stock options, didn't you? |
| 09:11:35 | 5 | **A**    Stock options were part of the incentive program. |
| 09:11:40 | 6 | **Q**    And if the plaintiffs tally all of your earnings, your |
| 09:11:49 | 7 | stock options, your regular earnings, and come to a |
| 09:11:53 | 8 | conclusion that just over the 15 years, the last 15 years |
| 09:11:58 | 9 | you were there, you made over 8 1/2 million dollars, you |
| 09:12:04 | 10 | don't have any reason to fuss that, do you? |
| 09:12:05 | 11 | **A**    Sir, I have no idea if these numbers are accurate. |
| 09:12:09 | 12 | **Q**    I want to talk to you not about your entire |
| 09:12:12 | 13 | professional life, per se, at Walmart, but I want to talk to |
| 09:12:15 | 14 | you in particular about three different time periods related |
| 09:12:17 | 15 | to what I'm going to call "the job." |
| 09:12:24 | 16 |      Now, the job that I'm referencing when I say that is |
| 09:12:28 | 17 | the job you took in 1990 -- in 2012. |
| 09:12:33 | 18 |      Do you remember that? |
| 09:12:35 | 19 | **A**    I don't know which job you're referring to in 2012, |
| 09:12:41 | 20 | sir. |
| 09:12:42 | 21 | **Q**    All right.  You should have Plaintiffs' Walmart 264, |
| 09:12:50 | 22 | which is a job application we pulled out of your personnel |
| 09:12:55 | 23 | file. |
| 09:12:57 | 24 |      Do you see this is an application for a job you put in |
| 09:13:01 | 25 | in 2010? |

| | | |
|---|---|---|
| 09:13:03 | 1 | **A**　　I see an e-mail subject that says "Application for job |
| 09:13:06 | 2 | 36156" from August 13 of 2010. |
| 09:13:13 | 3 | **Q**　　All right, sir.  In regards to this, you were applying |
| 09:13:17 | 4 | for a job, as you noted earlier.  The job you were applying |
| 09:13:21 | 5 | for had a number, 36156, true? |
| 09:13:28 | 6 | **A**　　That's what's written here, yes, sir. |
| 09:13:30 | 7 | **Q**　　And that 36156 job, the job title, as you wrote it |
| 09:13:35 | 8 | down, was senior manager, Professional -- is that Relations? |
| 09:13:43 | 9 | **A**　　Yes, sir. |
| 09:13:46 | 10 | **Q**　　And then HW, what does that stand for? |
| 09:13:49 | 11 | **A**　　Health and Wellness. |
| 09:13:52 | 12 | **Q**　　All right.  Controlled Substance, Regulatory Affairs, |
| 09:13:58 | 13 | correct? |
| 09:14:00 | 14 | **A**　　That's what the document says. |
| 09:14:02 | 15 | **Q**　　All right.  So as a senior manager, Substance -- |
| 09:14:10 | 16 | Controlled Substance, Regulatory Affairs, that's the job you |
| 09:14:17 | 17 | were applying for, right? |
| 09:14:22 | 18 | **A**　　Yes, sir. |
| 09:14:22 | 19 | **Q**　　And the job title, there are explanations of what that |
| 09:14:27 | 20 | job entails. |
| 09:14:31 | 21 | 　　Do you see those? |
| 09:14:32 | 22 | **A**　　I see the parts that you've highlighted, sir, yes. |
| 09:14:35 | 23 | **Q**　　So you're applying for a job where the |
| 09:14:38 | 24 | responsibilities include managing the notifications and |
| 09:14:44 | 25 | reporting of controlled substance losses to regulatory |

09:14:48  1   agencies; is that correct?

09:14:53  2   **A**    That's one of the responsibilities, sir.

09:14:57  3   **Q**    And another responsibility was to manage the training

09:15:03  4   and the education for controlled substance distribution,

09:15:06  5   true?

09:15:10  6   **A**    Again, it's what the document says.

09:15:12  7   **Q**    And this was a responsibility to identify gaps, to

09:15:17  8   develop and facilitate training for field management, and to

09:15:22  9   create resource documents and company intranet postings,

09:15:25  10  true?

09:15:27  11  **A**    Again, that's what the document says.

09:15:28  12  **Q**    This job had an additional responsibility to

09:15:33  13  communicate additional information requested from regulatory

09:15:38  14  agencies, true?

09:15:39  15  **A**    That's what the document says.

09:15:41  16  **Q**    And also to drive the company's compliance with

09:15:47  17  federal and state regulatory requirements related to the

09:15:51  18  handling, the distribution, the dispensing, and the

09:15:56  19  destruction of controlled substances, true?

09:15:58  20  **A**    That's what the document says.

09:16:01  21  **Q**    And the final paragraph under Job Description and

09:16:08  22  Responsibilities says that the job's also to oversee the

09:16:14  23  company's policies and assessments related to the controlled

09:16:17  24  substances by analyzing state and federal guidelines to

09:16:20  25  ensure the company's programs meet the requirements.

**Nelson - (By Video Deposition)**

09:16:25  1      Also true?

09:16:27  2  **A**   The document states that, sir.

09:16:28  3  **Q**   All right.  Then there's a third section, Job

09:16:36  4  Requirements.

09:16:38  5      Do you see where I've highlighted that?

09:16:40  6  **A**   Yes, sir.

09:16:40  7  **Q**   And Walmart gives minimum qualifications for this job

09:16:45  8  in this exhibit.

09:16:46  9      Do you see?

09:16:49  10  **A**   Yes, sir, I see it.  It's what the document says.

09:16:53  11  **Q**   All right.  Had to be a licensed pharmacist with a

09:16:55  12  minimum of two years.

09:16:57  13      You were that, weren't you?

09:16:59  14  **A**   Yes, sir.

09:17:02  15  **Q**   In fact, you had, like, a lot more than two years'

09:17:05  16  experience as a licensed pharmacist, fair?

09:17:11  17  **A**   Yes, sir.

09:17:13  18  **Q**   And then the candidates had to demonstrate competency

09:17:16  19  in a few other areas:  Judgment, customer service, executing

09:17:24  20  programs and getting desired results, planning and

09:17:27  21  improvement, ability to influence and communicate, ethics

09:17:31  22  and compliance, adaptability, and building relationships.

09:17:36  23      Do you see that as well?

09:17:38  24  **A**   Yes, sir.

09:17:39  25  **Q**   Now, in addition to the minimum requirements, there

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 09:17:41 | 1 | was one additional preferred qualification, and that is that |
| 09:17:46 | 2 | somebody be a pharmacy manager or a pharmacist in charge or |
| 09:17:51 | 3 | have some similar additional experience. |
| 09:17:53 | 4 | Do you see that? |
| 09:17:55 | 5 | **A**   Yes, sir. |
| 09:17:55 | 6 | **Q**   All right.  So you applied for this job, didn't you? |
| 09:18:03 | 7 | **A**   That is correct. |
| 09:18:03 | 8 | **Q**   And I looked at your CV, which continues in this |
| 09:18:08 | 9 | exhibit with page 4. |
| 09:18:12 | 10 | Are you able to see that? |
| 09:18:14 | 11 | **A**   Yes, sir, I see the parts you have highlighted, and I |
| 09:18:17 | 12 | have the document in my hand. |
| 09:18:18 | 13 | **Q**   Great.  Well, I want to look at it in reference to |
| 09:18:21 | 14 | this question.  And here's my question that I'm asking you. |
| 09:18:25 | 15 | The way Walmart structured your job with the minimum |
| 09:18:37 | 16 | requirements they had for what the responsibilities were, |
| 09:18:40 | 17 | were you set up to fail because of your -- |
| 09:18:51 | 18 | UNIDENTIFIED SPEAKER:  Objection.  Form. |
| 09:18:53 | 19 | **Q**   Were you set up to fail because of your |
| 09:18:55 | 20 | qualifications? |
| 09:18:56 | 21 | **A**   Not that I'm aware of. |
| 09:18:57 | 22 | **Q**   I mean, you understand the job of doing this work, |
| 09:19:03 | 23 | being the senior manager of Controlled Substances, it means |
| 09:19:07 | 24 | more than just making sure that Walmart's profitable, |
| 09:19:11 | 25 | doesn't it? |

**Nelson - (By Video Deposition)**

2423

09:19:13  1    **A**    Sir, I don't know where profitability comes into this

09:19:16  2    job description.  I didn't see that in here.

09:19:21  3    **Q**    Did you view the job as one that meant more than

09:19:23  4    making Walmart more profitable?

09:19:25  5    **A**    Sir, I didn't have anything in my mind about

09:19:27  6    profitability when I applied for this position.

09:19:30  7    **Q**    But when you applied for this position, you wrote down

09:19:37  8    on what -- your resume specifically, and one of the things

09:19:43  9    you thought would be relevant, that you handled an annual

09:19:47  10   budget of 1.5 billion in sales and 300 million in profits,

09:19:53  11   didn't you?

09:19:55  12   **A**    I see it.  Thank you.

09:20:00  13           Those were requirements in the job that I was in in

09:20:02  14   2009, sir.

09:20:03  15   **Q**    P&L responsibility.

09:20:07  16           What's P&L stand for?

09:20:10  17   **A**    At Walmart it stands for profit and loss.

09:20:19  18   **Q**    Profit and loss.

09:20:23  19           You put that in your very top profile, right?

09:20:27  20   **A**    That's where it's at in the document, sir, yes.

09:20:29  21   **Q**    And then under Qualifications Summary where you

09:20:33  22   summarize it, you say you've had over 20 years of full

09:20:36  23   profit and loss responsibility; is that right?

09:20:44  24   **A**    Over the area of -- over the area of operations that I

09:20:47  25   was working in, yes.

**Nelson - (By Video Deposition)**

2424

09:20:51  1   **Q**     Uh-huh.  And you led successful executive-level

09:20:56  2   marketing and finance campaigns where growth and

09:20:58  3   accountability were paramount; is that right?

09:21:01  4   **A**     That's what the document says.

09:21:03  5   **Q**     So when I asked you whether or not this job meant more

09:21:08  6   than making Walmart more profitable, and you said, I didn't

09:21:13  7   think of it in terms of profitable, you do think quite

09:21:20  8   heavily in terms of profit, don't you?

09:21:21  9   **A**     In my previous areas of responsibility, profitability

09:21:24  10  was one of the things that was manage -- that was measured.

09:21:28  11  **Q**     Well, this is -- this first one at the bottom where

09:21:30  12  you're touting your annual budget of 1.5 billion in sales

09:21:40  13  and 300 million in profit, that's the job that you had at

09:21:45  14  the time that you were applying, isn't it?

09:21:46  15  **A**     That is correct.

09:21:46  16  **Q**     In fact, you can go to the job you had before that,

09:21:49  17  which is on the very next page, where the first bullet point

09:21:52  18  you've got is "Analyze competition and market conditions."

09:21:56  19        Do you see that?

09:21:59  20  **A**     I see that.

09:21:59  21  **Q**     This is where you were talking about how you were

09:22:02  22  the -- a team member of the Pharmacy Strategic Planning

09:22:11  23  Committee that did everything from initiatives and budgets,

09:22:13  24  objectives and procedures.

09:22:15  25        See that?

**Nelson - (By Video Deposition)**                    2425

| | | |
|---|---|---|
| 09:22:18 | 1 | **A**     Yes, sir, I see that. |
| 09:22:19 | 2 | **Q**     And then this is one where you talked about your |
| 09:22:23 | 3 | annual revenue of 5.1 billion in sales and 400 million in |
| 09:22:28 | 4 | profits. |
| 09:22:28 | 5 |        See that? |
| 09:22:30 | 6 | **A**     Yes, sir, I see that. |
| 09:22:32 | 7 | **Q**     Now, I tried to find where you might have some legal |
| 09:22:35 | 8 | things or some compliance things that you touted, and I |
| 09:22:39 | 9 | don't want to miss this. |
| 09:22:40 | 10 |        You did develop and implement the California |
| 09:22:44 | 11 | Pharmacist Meal and Break Program so that you-all gave your |
| 09:22:51 | 12 | pharmacists break time and meal time, I guess, compliant |
| 09:22:54 | 13 | with California laws. |
| 09:22:55 | 14 |        Is that right? |
| 09:22:57 | 15 | **A**     That's again what the document says. |
| 09:22:59 | 16 | **Q**     And then again, if you look at your job before that, |
| 09:23:02 | 17 | you again are talking about how you would evaluate financial |
| 09:23:07 | 18 | performance to ensure region profitability. |
| 09:23:10 | 19 |        Do you see that? |
| 09:23:14 | 20 | **A**     Yes, sir, I see where it says that. |
| 09:23:16 | 21 | **Q**     Not where it says that.  That's where you said it. |
| 09:23:19 | 22 |        You wrote this, didn't you? |
| 09:23:22 | 23 | **A**     That is what the document says, sir. |
| 09:23:24 | 24 | **Q**     No, that's what you wrote, isn't it? |
| 09:23:28 | 25 | **A**     That's what I said, yes, sir. |

**Nelson - (By Video Deposition)**

09:23:31  1    **Q**    All right.  Good.

09:23:32  2         So, and we can keep going through here.  I think

09:23:35  3    you'll see on just about every page you're talking about how

09:23:37  4    you managed budgets, projected sales, and evaluated

09:23:41  5    financial performance to ensure store profitability, profit

09:23:45  6    and loss, journal accounting responsibilities.

09:23:47  7         You've got that on page 3 of your CV.  You see that?

09:23:57  8    **A**    Yes, sir.

09:23:57  9    **Q**    Again, financial performance to ensure store

09:23:59  10   profitability, profit and loss journal accounting

09:24:02  11   responsibilities, et cetera.

09:24:03  12        You see that as well?

09:24:04  13   **A**    I do see that.

09:24:05  14   **Q**    All right.  So now I'm going to take you back to the

09:24:07  15   question that got us down that look through your CV and ask

09:24:13  16   again:  Did you feel like the job as the senior manager of

09:24:19  17   Controlled Substance and Regulatory Affairs should mean more

09:24:23  18   than just making Walmart profitable?

09:24:27  19   **A**    I'm not sure I understand your question, sir.

09:24:29  20   **Q**    Okay.  My question is, you know, I'm -- I see the

09:24:33  21   qualifications, and I see the way you applied for the job

09:24:36  22   with your CV you wrote, but don't you believe that the job

09:24:39  23   of someone who is going to drive the company's compliance

09:24:41  24   with the regulatory requirements and oversee the company's

09:24:50  25   policies and manage the training and education for the

09:24:53   1   controlled substance distribution, don't you figure that

09:24:59   2   person ought to do more than simply make Walmart more

09:25:04   3   profitable?

09:25:06   4   **A**    The minimum requirements don't talk about anything in

09:25:08   5   regards to profitability, sir, so I don't know what you're

09:25:12   6   asking me.

09:25:12   7   **Q**    Well, I'm asking you very simple:  Does the job that

09:25:24   8   you were applying for call for something more than simply

09:25:30   9   making Walmart more profitable?

09:25:35   10  **A**    Again, I don't see anywhere on this job description

09:25:38   11  for the senior manager of Controlled Substances, Regulatory

09:25:41   12  Affairs, Health and Wellness, where it says anything about

09:25:44   13  profitability of the company.

09:25:48   14  **Q**    Well, that's not my issue that I'm trying to get from

09:25:52   15  you, but I will direct your attention to the very first

09:25:55   16  thing, it says, "Oversees asset protection."

09:26:02   17       That kind of speaks about profits, doesn't it?

09:26:04   18  **A**    Asset protection is about property of the company.

09:26:06   19  **Q**    Yeah, that's part -- that's protecting the bottom

09:26:09   20  line, isn't it?

09:26:13   21  **A**    That's your definition, sir.

09:26:14   22  **Q**    No, I think that's a -- isn't it yours?

09:26:16   23  **A**    No, sir, I didn't see that -- anything about that.  I

09:26:19   24  said it -- asset protection is protecting the property of

09:26:23   25  the company.

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 09:26:24 | 1 | **Q**    You don't think that affects the bottom line of the |
| 09:26:26 | 2 | company's profitability, to protect their assets? |
| 09:26:30 | 3 | **A**    I did not say that. |
| 09:26:32 | 4 | **Q**    Well, does it? |
| 09:26:33 | 5 | **A**    I'm not sure how to answer that question, sir. |
| 09:26:36 | 6 | **Q**    Well, it's easy.  When you oversee protecting the |
| 09:26:40 | 7 | company's assets, are you helping the company in terms of |
| 09:26:49 | 8 | the financial posture? |
| 09:26:52 | 9 | **A**    I was not overseeing the company's assets, sir.  That |
| 09:26:55 | 10 | was not my responsibility.  I was going to participate in |
| 09:26:57 | 11 | asset protection investigations. |
| 09:27:00 | 12 | **Q**    And this also deals with controlled substance loss |
| 09:27:02 | 13 | action plans if y'all are having drugs stolen or things like |
| 09:27:06 | 14 | that that affect profitability, right? |
| 09:27:10 | 15 | **A**    It means to overview the loss action plan, sir, as it |
| 09:27:14 | 16 | says in the document. |
| 09:27:15 | 17 | **Q**    Yeah.  Well, when you lose merchandise because it's |
| 09:27:17 | 18 | stolen or something, that affects profitability, doesn't it? |
| 09:27:21 | 19 | **A**    It could. |
| 09:27:22 | 20 | **Q**    Now, let's talk about not just the job and the |
| 09:27:27 | 21 | description of the job, but I want to talk about your |
| 09:27:33 | 22 | performance in that job.  Okay? |
| 09:27:42 | 23 | **A**    Sure. |
| 09:27:43 | 24 | **Q**    Did you get the job, I guess I should put on the |
| 09:27:46 | 25 | record first? |

**Nelson - (By Video Deposition)**

09:27:48  1    **A**    Yes, sir.

09:27:48  2    **Q**    And we'll go into more detail under your performance

09:28:00  3    when we get to the other issues I want to talk to you about

09:28:03  4    later in the deposition.

09:28:04  5         But for starters, part of what your job responsibility

09:28:14  6    was was to implement the Archer program, right?

09:28:27  7    **A**    I don't know what you are referring to by the Archer

09:28:29  8    program.

09:28:29  9    **Q**    You've never heard about the Archer System Program?

09:28:39  10   **A**    I am familiar with the Archer software program.  I

09:28:44  11   don't know what an Archer System Program is.

09:28:46  12   **Q**    Oh, I'm sorry, I'm using the words that were used in

09:28:49  13   your performance evaluation.

09:28:53  14        Why don't you take a moment and pull out Plaintiffs'

09:28:57  15   Walmart 457.  And I'm going to ask you about the first page

09:29:05  16   of it and the second page, if you would.  It's a long

09:29:10  17   document.  If you'll pull those and look at pages 1 and 2

09:29:12  18   with me.

09:29:13  19        Now, you said you're not familiar with the term

09:29:16  20   "Archer sister program -- Archer System Program" such that

09:29:22  21   you could answer my question, but I was looking at your

09:29:24  22   annual performance evaluation for the first year you were in

09:29:27  23   this job or pretty close thereto, and one of your tasks that

09:29:31  24   was given to you was to develop and implement the Archer

09:29:38  25   System Program to track compliance.

**Nelson - (By Video Deposition)**

09:29:42    1          Do you see where I read that?

09:29:44    2    **A**    Okay.  I see that down there.

09:29:46    3    **Q**    Okay.  So when I say that one of your performance

09:29:49    4    tasks was to implement the Archer System Program, since your

09:29:55    5    boss called it that and said that was your task, you're not

09:29:59    6    going to fuss over it, are you?

09:30:01    7    **A**    To me, sir, a system means that the actual hardware

09:30:06    8    that's being used to operate the software.  And I was not

09:30:08    9    involved in the design or development of this -- the actual

09:30:14   10    system.  I was involved in the process of using the Software

09:30:18   11    to track the DEA 106 plan of actions.

09:30:23   12    **Q**    Well, I'm asking not did you write the program.  I'm

09:30:25   13    asking were you in charge of implementing the program.

09:30:29   14          Do you see I've wrote the word "implement" there?

09:30:33   15    **A**    I will agree with the fact that I was working on the

09:30:35   16    Archer software program, yes.

09:30:37   17    **Q**    And you were going to implement it.  That was your

09:30:41   18    job?

09:30:41   19    **A**    The software program, yes.

09:30:43   20    **Q**    All right.  And you were supposed to do this to help

09:30:50   21    track compliance with the Drug Enforcement Administration --

09:30:55   22    Agency, right?

09:30:56   23    **A**    That was a tool that was going to assist us in being

09:30:59   24    able to track DEA 106s, yes.

09:31:04   25    **Q**    And another part of your job at the time, if you look

**Nelson - (By Video Deposition)** 2431

| | | |
|---|---|---|
| 09:31:06 | 1 | at the performance on the next page, you were supposed to |
| 09:31:12 | 2 | direct controlled substance programs and policies. |
| 09:31:18 | 3 | And the description of that was to monitor and improve |
| 09:31:26 | 4 | controlled substance training, policies and/or procedures. |
| 09:31:30 | 5 | Fair? |
| 09:31:31 | 6 | **A**    One of the goals, yes, sir. |
| 09:31:33 | 7 | **Q**    All right.  Your performance would include to monitor |
| 09:31:36 | 8 | and improve the training, fair? |
| 09:31:43 | 9 | **A**    That is what the goal says. |
| 09:31:46 | 10 | **Q**    That's what your goal was, isn't it? |
| 09:31:49 | 11 | **A**    That's what the document says, sir. |
| 09:31:50 | 12 | **Q**    Okay.  Well, you're not disagreeing with the document, |
| 09:31:53 | 13 | are you? |
| 09:31:54 | 14 | **A**    The document says that that was one of my goals. |
| 09:32:00 | 15 | **Q**    Now, another goal that you had that's going to be |
| 09:32:02 | 16 | relevant as we work through this is you were in charge of |
| 09:32:16 | 17 | managing the refusal to fill policy, correct? |
| 09:32:23 | 18 | **A**    That was one of the responsibilities that developed |
| 09:32:25 | 19 | after the job was created. |
| 09:32:26 | 20 | **Q**    Yeah.  And that's sometimes abbreviated by the first |
| 09:32:30 | 21 | letter, RTF, in your documents, refusal to fill.  Correct? |
| 09:32:37 | 22 | **A**    RTF is used as an abbreviation for refusal to fill. |
| 09:32:42 | 23 | **Q**    And at some point you tried to integrate that or you |
| 09:32:48 | 24 | were responsible to integrate that into the Archer program, |
| 09:32:52 | 25 | correct? |

**Nelson - (By Video Deposition)**  2432

| | | |
|---|---|---|
| 09:32:52 | 1 | **A**    I was not involved in integrating RTF into Archer. |
| 09:32:58 | 2 | **Q**    Did you at least assist in the conversion of RTF into |
| 09:33:03 | 3 | Archer? |
| 09:33:03 | 4 | **A**    I'm not sure what you mean by assist.  I was aware of |
| 09:33:06 | 5 | it, if that's what you're asking. |
| 09:33:08 | 6 | **Q**    Well, what I mean is -- if you'll pull out Document |
| 09:33:12 | 7 | 291. |
| 09:33:13 | 8 | And on 291 I'm going to want to direct your attention |
| 09:33:16 | 9 | to page 4. |
| 09:33:17 | 10 | All right.  The only reason I'm asking it is because I |
| 09:33:20 | 11 | just asked you this question before.  I said, "Did you at |
| 09:33:26 | 12 | least assist in the conversion of RTF into Archer?" |
| 09:33:35 | 13 | And you said, "I'm not sure what you mean by assist." |
| 09:33:42 | 14 | And so I've asked you to pull that document because on |
| 09:33:45 | 15 | page 4, your boss's comments include that "Brad," you, "has |
| 09:33:54 | 16 | managed the RTF process from the outset and assisted in the |
| 09:33:57 | 17 | conversion of the RTF process into Archer." |
| 09:34:01 | 18 | Which is my question.  So when you said, "I'm not sure |
| 09:34:07 | 19 | what you mean by assist," I just mean whatever your boss |
| 09:34:10 | 20 | said. |
| 09:34:11 | 21 | Does that help you at all to answer my question of |
| 09:34:14 | 22 | whether or not you assisted in the conversion? |
| 09:34:17 | 23 | **A**    Again, I don't know what Mr. Koch or Mr. Chapman, who |
| 09:34:21 | 24 | wrote this -- let me see.  I don't remember who wrote this |
| 09:34:23 | 25 | one.  I don't know what Mr. Chapman is referring to when he |

**Nelson - (By Video Deposition)**

09:34:27  1    says the word "Assist."  I don't know what he means by

09:34:32  2    assist.

09:34:34  3    **Q**    Do you have a lot of trouble with your bosses because

09:34:36  4    they seem to say things you didn't understand?

09:34:38  5    **A**    Sir, I was definitely aware of the fact that

09:34:42  6    Mr. Archer was being moved -- excuse me, that RTF was being

09:34:44  7    moved to Archer.  I was not involved in writing the

09:34:48  8    software, changing the directions, changing what it looked

09:34:51  9    like.  I was not involved in that.

09:34:56  10         I was involved in making sure that they were -- the

09:34:58  11   people that were doing that work were put in touch with the

09:35:01  12   people at Walmart's information systems that managed

09:35:06  13   Archer's program.

09:35:10  14   **Q**    Okay.  And then the last thing we ought to cover,

09:35:14  15   looking at your professional life and background before we

09:35:19  16   get into our four stops, is I want to talk about the results

09:35:22  17   of you with the job.  So we'll just put this down as the

09:35:33  18   "Job results."

09:35:35  19         You tracking with me?

09:35:37  20   **A**    Yes.

09:35:38  21         And, sir, you keep referring to my career at Walmart

09:35:41  22   as my professional life.  I would prefer you didn't call it

09:35:44  23   that.  I did not agree to call it my professional life.

09:35:47  24   **Q**    What did you do for a profession if it wasn't working

09:35:50  25   at Walmart?

**Nelson - (By Video Deposition)**                    2434

| | | |
|---|---|---|
| 09:35:50 | 1 | **A**    Well, profession is a practice of pharmacy.  It's a -- |
| 09:35:56 | 2 | law is a profession as well.  But just because I was a |
| 09:35:59 | 3 | pharmacist for Walmart, it does not mean that was my |
| 09:36:02 | 4 | professional life.  There was things I did inside and |
| 09:36:05 | 5 | outside that weren't just at Walmart. |
| 09:36:07 | 6 | **Q**    Okay.  So should we call it your corporate life? |
| 09:36:13 | 7 | Would you be more comfortable -- |
| 09:36:15 | 8 | **A**    I think that Walmart career is appropriate. |
| 09:36:24 | 9 | **Q**    Okay.  I'll try and remember to reference it that way. |
| 09:36:26 | 10 | Would you rather me change it on -- I've got it |
| 09:36:29 | 11 | written down here.  Would you be more comfortable if I put |
| 09:36:32 | 12 | this down as your Walmart life? |
| 09:36:33 | 13 | **A**    I would prefer you to call it my Walmart career. |
| 09:36:45 | 14 | **Q**    You were a -- all right.  Got it.  We got your Walmart |
| 09:36:48 | 15 | career. |
| 09:36:49 | 16 | Okay.  Then with that, we are through with the first |
| 09:36:53 | 17 | stop -- or not stop per se, the personal knowledge about |
| 09:36:59 | 18 | you.  And now we're ready to get on down the road to the |
| 09:37:07 | 19 | next exit.  Next exit is the requirements exit. |
| 09:37:10 | 20 | You tracking with me? |
| 09:37:12 | 21 | **A**    Yes, sir. |
| 09:37:13 | 22 | **Q**    Okay.  And we'll start a clean sheet on this.  This |
| 09:37:19 | 23 | sheet will be the requirements. |
| 09:37:20 | 24 | And you'll see, looking at the sheet, that there were |
| 09:37:25 | 25 | four areas that I want to talk to you about, and these |

**Nelson - (By Video Deposition)**

2435

09:37:27　1　numbers that I've got on here are part of the Code of

09:37:36　2　Federal Regulations pertaining to the type of career you had

09:37:39　3　at Walmart.

09:37:46　4　　　Do you recognize those numbers?

09:37:50　5　**A**　I don't recognize those numbers individually.  I have

09:37:52　6　heard of the Code of Regulations.

09:37:56　7　**Q**　All right.  The Code of Regulations is the law part of

09:38:00　8　what you were required to oversee at Walmart, fair?

09:38:04　9　**A**　The Code of Federal Regulations guided what we were

09:38:07　10　supposed to do to be compliant, yes.

09:38:12　11　**Q**　I mean, you were a man kind of in charge of that,

09:38:15　12　weren't you?

09:38:15　13　**A**　Can you help me with what time frame we're talking

09:38:18　14　about?

09:38:19　15　**Q**　Yes, sir.  And I'll go back to Exhibit 2 that we

09:38:22　16　talked about earlier and look at your -- the job detail of

09:38:26　17　the job you were applying for and got.  And it included

09:38:33　18　under Description and Responsibilities that you were to

09:38:40　19　"drive the company's compliance with federal and state

09:38:42　20　regulatory requirements."

09:38:43　21　　　Do you see that?

09:38:44　22　**A**　That is what the document says.

09:38:50　23　**Q**　And so part of your job description and

09:38:53　24　responsibilities was to see that y'all complied with federal

09:39:00　25　and state regulatory requirements.

**Nelson - (By Video Deposition)**

09:39:06  1      Now are you tracking with me?

09:39:08  2  **A**    Yes, sir.

09:39:08  3  **Q**    So in that regard, I want to talk to you about those

09:39:12  4  requirements.  And we'll start with Section 1301.71.  If you

09:39:24  5  can find P-GEN-187.

09:39:28  6      All right.  Do you have that in front of you, sir?

09:39:30  7  **A**    I do.

09:39:30  8  **Q**    Okay.  This is one of the regulations that you were

09:39:35  9  making sure y'all complied with, correct?

09:39:41  10  **A**    It is part of the Federal Regulations, Code of

09:39:45  11  Regulations.

09:39:45  12  **Q**    And it's part of the Code of Regulations that deals

09:39:47  13  with the registration of manufacturers, distributors, and

09:39:53  14  dispensers of controlled substances, fair?

09:39:59  15  **A**    That is what the code -- that's what the topic says.

09:40:04  16  **Q**    Now, Walmart, Walmart was a dispenser of controlled

09:40:15  17  substances, true?

09:40:18  18  **A**    Walmart and Sam's.

09:40:22  19  **Q**    Oh, that's right, not just Walmart.  But the Sam's

09:40:26  20  stores were also dispensers, right?

09:40:32  21  **A**    That is correct.

09:40:39  22  **Q**    Now, did you know that Walmart was also a distributor

09:40:41  23  of opioids?

09:40:43  24  **A**    Walmart did maintain its own warehouse systems and

09:40:55  25  distributed to the stores.

**Q**     Yeah.  So Walmart didn't distribute to other

corporations, but Walmart distributed to itself and to

Sam's; is that fair to say?

**A**     Walmart would have had reverse distribution

relationships with manufacturers to send back outdated

product and things along that line, recalled materials,

things like that.  So there was distribution other than just

Walmart stores and Sam's Clubs.

**Q**     Thank you for that clarification.

Now, the controlled substances that are talked about

in this section, that includes opioids, true?

**A**     Opioids are a controlled substance.

**Q**     All right.  And if we look at the requirements, the

security requirements generally, which is 1301.71.

Do you see that?

**A**     Yes, sir.

**Q**     And that in my requirements note card is 1301.71.

I've called it "effective controls and procedures."

Do you see where I've written that?

**A**     I do.

**Q**     And I got that -- I'd like you to look at the language

with me -- from Section A that says, "All applicants and

registrants shall provide effective controls and procedures

to guard against theft and diversion of controlled

substances."

**Nelson - (By Video Deposition)**                    2438

| | | |
|---|---|---|
| 09:42:34 | 1 | Do you see that? |
| 09:42:35 | 2 | **A**    I do. |
| 09:42:41 | 3 | **Q**    And so what we have here is "effective controls and |
| 09:42:43 | 4 | procedures," which is what I've called that requirement. |
| 09:42:48 | 5 | Fair? |
| 09:42:51 | 6 | **A**    Correct. |
| 09:42:57 | 7 | **Q**    And then it is "to guard against theft and diversion |
| 09:43:02 | 8 | of controlled substances," which would include opioids, |
| 09:43:09 | 9 | right? |
| 09:43:10 | 10 | **A**    Opioids are a controlled substance, so they would be |
| 09:43:12 | 11 | included. |
| 09:43:12 | 12 | **Q**    So we're looking under this provision, "this" being |
| 09:43:21 | 13 | 1301.71, for effective controls and procedures to guard |
| 09:43:25 | 14 | against theft and diversion, right? |
| 09:43:37 | 15 | **A**    That's what it says in the first paragraph, yes, sir. |
| 09:43:40 | 16 | **Q**    And you, one of your jobs, was to implement these and |
| 09:43:48 | 17 | oversee these -- and oversee these effective controls and |
| 09:43:54 | 18 | these effective procedures. |
| 09:43:57 | 19 | Is that also fair to say? |
| 09:43:59 | 20 | **A**    I would say that that's not called out in the specific |
| 09:44:01 | 21 | job description.  It says "will be compliant with federal |
| 09:44:07 | 22 | regulations."  This happens to be one of the federal |
| 09:44:09 | 23 | regulations. |
| 09:44:10 | 24 | **Q**    Yeah, there are other ones y'all had to comply with |
| 09:44:13 | 25 | too.  We'll look at those in a moment. |

**Nelson - (By Video Deposition)**                    2439

09:44:16    1        But to comply with this federal regulation, you had to

09:44:21    2   see to effective controls and procedures to guard against

09:44:23    3   theft and diversion of controlled substances, including

09:44:29    4   opioids.  Right?

09:44:32    5   **A**    That's what the requirement says.  I won't say that

09:44:35    6   that was specifically my job to do.

09:44:40    7   **Q**    Okay.  That's what your job description was, though?

09:44:46    8   **A**    Job description I think said something about making

09:44:49    9   sure that we remained compliant with federal and state

09:44:51   10   regulations.

09:44:53   11   **Q**    Right.  And this is a federal regulation, right?

09:44:58   12   **A**    One of many, yes, sir.

09:44:59   13   **Q**    Okay.  So you are to drive the company's compliance

09:45:06   14   with this regulation; is that fair to say?

09:45:10   15   **A**    As with all regulations, is my understanding.

09:45:14   16   **Q**    And all I'm driving at is -- I'm guessing you grew up

09:45:20   17   somewhere around St. Louis, because you went to school

09:45:23   18   there.

09:45:25   19        Am I right?

09:45:25   20   **A**    I went to school in St. Louis, that is correct.

09:45:27   21   **Q**    Where did you grow up as a kid?

09:45:29   22   **A**    Northern Illinois.

09:45:32   23   **Q**    Okay.  And where I grew up, one of my favorite things

09:45:38   24   to do was to eat pie.  I'm sure in your life you've eaten

09:45:44   25   some pie.  Right?

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 09:45:47 | 1 | **A**      Sure. |
| 09:45:48 | 2 | **Q**      And I would like to think I could eat an entire pie, |
| 09:45:55 | 3 | but I don't think I've ever pulled that one off, though I've |
| 09:45:58 | 4 | eaten some pretty big pieces. |
| 09:46:01 | 5 | But you're familiar with how when you get a pie, you |
| 09:46:03 | 6 | get to cut yourself a piece generally.  And that's a piece |
| 09:46:07 | 7 | of the pie, right? |
| 09:46:08 | 8 | **A**      Yes, sir. |
| 09:46:10 | 9 | **Q**      Your job was to drive the company's compliance with |
| 09:46:17 | 10 | the whole pie, with all of the federal and state regulatory |
| 09:46:22 | 11 | requirements that related to handling, correct? |
| 09:46:25 | 12 | **A**      The job was to oversee that process of those systems |
| 09:46:31 | 13 | that were in place, and most of the time deal with issues |
| 09:46:34 | 14 | that developed if there was a problem with compliance with a |
| 09:46:38 | 15 | particular regulation. |
| 09:46:42 | 16 | **Q**      Right.  But you didn't get to pick and choose which |
| 09:46:45 | 17 | ones you drove compliance with.  You were supposed to drive |
| 09:46:47 | 18 | compliance with all of them, right? |
| 09:46:49 | 19 | **A**      Well, Walmart should have been compliant with |
| 09:46:53 | 20 | everything as it was.  We should have found out exclusions |
| 09:46:55 | 21 | or issues that would have been developed or found out and |
| 09:46:59 | 22 | reported to us.  That's how we would have dealt with driving |
| 09:47:03 | 23 | compliance. |
| 09:47:04 | 24 | **Q**      I'm not going to fuss on that point.  That's part of |
| 09:47:06 | 25 | my argument. |

**Nelson - (By Video Deposition)**

09:47:07  1    I just want to say, your job description was to drive

09:47:13  2  the compliance.  That's with all of the federal and state

09:47:16  3  regulatory requirements, not just one or two of them.

09:47:19  4  Right?

09:47:20  5  **A**    The processes and programs for all federal regulations

09:47:23  6  would have been a job much bigger than one person.

09:47:27  7    My job was to look into issues that developed and fix

09:47:31  8  those problems that were pointed out as errors or issues

09:47:35  9  with compliance.

09:47:38  10  **Q**    I asked you earlier if they were setting you up for

09:47:40  11  failure by giving you that big of a task.

09:47:43  12    Do you remember me asking you that question?

09:47:45  13  **A**    Yes, sir, I remember that.

09:47:50  14  **Q**    Because that's the task they gave you.  That was the

09:47:53  15  job description and responsibility, to drive the company's

09:47:56  16  compliance with federal and state regulatory requirements

09:47:59  17  related to handling, distribution, dispensing, and

09:48:02  18  destruction of controlled substances.  Wasn't it?

09:48:09  19  **A**    Yeah, but if you look at the rest of that document,

09:48:12  20  sir, it says by reviewing existing things that are in them.

09:48:16  21  "By reviewing processes and logistics and providing

09:48:19  22  recommendations based on regulatory requirements and guiding

09:48:21  23  the development of corrective action plans."  It didn't say

09:48:23  24  that I had to create all of the compliance programs.

09:48:26  25  **Q**    It says you were supposed to review the processes to

**Nelson - (By Video Deposition)**                    2442

09:48:29  1    ensure regulatory compliance.

09:48:33  2         "Ensure."  See that word?

09:48:35  3    **A**    Yes, sir.

09:48:36  4    **Q**    You were supposed to identify process and assessment

09:48:39  5    gaps where there were problems.

09:48:41  6         Do you see that?

09:48:42  7    **A**    Yes, sir.

09:48:43  8    **Q**    You were supposed to provide recommendations based on

09:48:46  9    the regulatory requirements.

09:48:48  10        Do you see that?

09:48:50  11   **A**    Yes, sir.

09:48:51  12   **Q**    You were supposed to guide the development of the

09:48:54  13   corrective action plans to fix stuff.

09:48:57  14        Do you see that?

09:48:58  15   **A**    That is what the document says.

09:49:00  16   **Q**    And then you were supposed to ensure the execution of

09:49:03  17   those action plans, weren't you?

09:49:06  18   **A**    Again, that's -- when there was issues that were

09:49:09  19   pointed out, if there was compliance problems, action plans

09:49:13  20   would be created to resolve that compliance issue and we

09:49:16  21   would oversee that process.

09:49:16  22   **Q**    I mean, your job included analyzing these state and

09:49:19  23   federal guidelines as well, to make sure the company's

09:49:23  24   program met requirements, wasn't it?

09:49:25  25   **A**    That is correct.  When there are changes to the

**Nelson - (By Video Deposition)** 2443

09:49:27  1  guidelines or requirements, we would make sure that

09:49:30  2  Walmart's policies and procedures were adjusted accordingly.

09:49:33  3  **Q**    Now, you were in charge with the company of not only

09:49:39  4  taking care of and dealing with the 1301.71, but you also

09:49:48  5  then had responsibility for the state laws as well, state

09:49:54  6  regulations.

09:49:55  7      That was a part of that, wasn't it?

09:49:57  8  **A**    The job required compliance with federal and state

09:50:00  9  regulations.

09:50:03  10  **Q**    And the job required you to drive that compliance.

09:50:05  11  That was the words used in the document, right?

09:50:07  12  **A**    That was what was in the job description, yes, sir.

09:50:10  13  **Q**    And so you had to have familiarity and work with the

09:50:15  14  Ohio regulations as well, didn't you?

09:50:18  15  **A**    We're still talking about 2011?

09:50:21  16  **Q**    Yes, sir.

09:50:21  17  **A**    It would have been one of the states, yes, sir.

09:50:29  18  **Q**    This is, I'll represent to you, a regulation in Ohio

09:50:33  19  that is entitled "Prospective Drug Utilization Review," and

09:50:46  20  this is the one that was in effect and promulgated as of,

09:50:49  21  you'll see on page 2, 2003.

09:50:52  22      Do you see that?

09:50:56  23  **A**    I do, on the back page, yes, sir.

09:50:58  24  **Q**    Great.

09:51:00  25      If you'll look at the front page, this regulation

**Nelson - (By Video Deposition)**

09:51:02  1    says, "Prior to dispensing any prescription, a pharmacist

09:51:09  2    shall review the patient profile for the purpose of

09:51:13  3    identifying," and then it's got nine different things that

09:51:16  4    have to be identified.

09:51:17  5        Do you see that?

09:51:18  6    **A**    Yes, sir, there are nine things listed.

09:51:24  7    **Q**    And one of them, the number 1, is "Overutilization or

09:51:31  8    underutilization."

09:51:32  9        Do you see that?

09:51:35  10   **A**    Yes, sir.

09:51:36  11   **Q**    And number 3, sir, says, "Drug-disease state

09:51:43  12   contraindications."  In other words, if the medicine doesn't

09:51:47  13   fit the disease-type thing, right?

09:51:50  14   **A**    Yes, sir.

09:51:51  15   **Q**    Number 4 is "Drug-Drug interactions."  You might be

09:51:55  16   drinking a cocktail that doesn't go down too well, right?

09:51:58  17   **A**    Some drugs do interact inappropriately with each

09:52:03  18   other, yes, sir.

09:52:05  19   **Q**    Number 5, "Incorrect drug dosage."  Too much, too

09:52:10  20   little, right?

09:52:10  21   **A**    Yes, that's what it says.

09:52:12  22   **Q**    "Abuse or misuse."  That's another thing that the

09:52:18  23   pharmacist needs to review for, correct?

09:52:20  24   **A**    I said that's what it says.

09:52:23  25   **Q**    Yeah.

**Nelson - (By Video Deposition)**

2445

| | | |
|---|---|---|
| 09:52:24 | 1 | **A**    Point 7 says "Abuse or misuse." |
| 09:52:27 | 2 | **Q**    And Point 8 says "Inappropriate duration of drug |
| 09:52:31 | 3 | treatment," doesn't it? |
| 09:52:32 | 4 | **A**    That is correct. |
| 09:52:32 | 5 | **Q**    And then point B says, "Upon recognizing any of the |
| 09:52:38 | 6 | above, a pharmacist, using professional judgment, shall take |
| 09:52:41 | 7 | appropriate steps to avoid or resolve the potential |
| 09:52:48 | 8 | problems," even consulting with the prescriber or counseling |
| 09:52:51 | 9 | the patient. |
| 09:52:52 | 10 | Correct? |
| 09:52:52 | 11 | **A**    Yes, sir. |
| 09:52:55 | 12 | **Q**    Now, these regulations that Ohio had make it clear |
| 09:53:07 | 13 | that before dispensing -- these are before dispensing, |
| 09:53:13 | 14 | right? |
| 09:53:19 | 15 | **A**    Yes, sir. |
| 09:53:20 | 16 | **Q**    -- that the patient profile needs to be examined |
| 09:53:24 | 17 | carefully.  Would you agree? |
| 09:53:25 | 18 | **A**    The patient profile did need to be reviewed, yes. |
| 09:53:28 | 19 | **Q**    And issues needed to be resolved, correct? |
| 09:53:32 | 20 | **A**    It says issues needed to be reviewed. |
| 09:53:36 | 21 | **Q**    Well, down at the bottom it says, "Upon recognizing |
| 09:53:39 | 22 | any of the above, a pharmacist shall take appropriate steps |
| 09:53:43 | 23 | to avoid or resolve the potential problem," doesn't it? |
| 09:53:47 | 24 | **A**    Yes, so it could be avoided or it could be resolved; |
| 09:53:50 | 25 | not necessarily resolved. |

09:53:51  1    **Q**    Okay.  So resolve issues or avoid them.  I guess you

09:54:00  2    can just send the person away, right?

09:54:01  3    **A**    Or contact the prescriber and change the medication to

09:54:03  4    a different drug.

09:54:04  5    **Q**    In 2011, these rules changed in Ohio, didn't they?

09:54:12  6    **A**    I don't know, sir.

09:54:16  7    **Q**    Okay.  Well, I thought -- I mean, you were in charge

09:54:20  8    of keeping up with this, weren't you?

09:54:22  9    **A**    The job description says that I was responsible for

09:54:24  10   checking compliance with them, yes.

09:54:26  11   **Q**    All right.  Well, I'll tell you that it changed in

09:54:29  12   2011.  And I'll ask you to pull up the change -- it's

09:54:33  13   Plaintiffs' Walmart 552 -- so I can ask you questions about

09:54:37  14   it.  And I'm going to mark this as Exhibit Number 8.

09:54:41  15        Have you got it in front of you?

09:54:42  16   **A**    I do.

09:54:43  17   **Q**    Okay.  Let me help orient you to this.  It's the exact

09:54:50  18   same section of the Ohio regulations, but if you look on the

09:54:54  19   very back page, you'll see that this one is from 2011.

09:55:01  20        See that?

09:55:02  21   **A**    I do.

09:55:03  22   **Q**    And the way they do their regulations, the additional

09:55:10  23   "new material" is the part that they underline.

09:55:14  24        Do you see that?

09:55:18  25   **A**    Yes, sir.

**Nelson - (By Video Deposition)** 2447

09:55:18 1 **Q** And so the new material includes, in Section B, this

09:55:26 2 statement. And let's keep it in context. We already looked

09:55:33 3 at it, "Upon recognizing any of the above, a pharmacist,

09:55:37 4 using professional judgment, will take appropriate steps to

09:55:42 5 avoid and resolve the problem."

09:55:43 6 Remember we had that discussion?

09:55:45 7 **A** Yes, sir.

09:55:46 8 **Q** And then it adds this: "These steps may include," not

09:55:52 9 simply consulting with the prescriber or counseling the

09:55:55 10 patient, but "also requesting and reviewing an OARRS report

09:56:02 11 or another state's report, if applicable and available."

09:56:10 12 Do you see that?

09:56:11 13 **A** Yes, sir.

09:56:12 14 **Q** Can you tell the jury, please, what is the, as of

09:56:17 15 2011, what is the OARRS report?

09:56:19 16 **A** Most likely the OARRS report is a prescription

09:56:22 17 monitoring program.

09:56:24 18 **Q** For Ohio perhaps?

09:56:26 19 **A** I would guess, yes.

09:56:29 20 **Q** Those are important prescription monitoring programs,

09:56:37 21 aren't they?

09:56:38 22 **A** They are a tool to assist the pharmacist in their

09:56:40 23 professional judgment.

09:56:42 24 **Q** So this continues to say -- it's added this whole

09:56:48 25 subpoint D on the back -- "Prior to dispensing a

**Nelson - (By Video Deposition)**                    2448

| | | |
|---|---|---|
| 09:56:53 | 1 | prescription, at a minimum, a pharmacist shall request and |
| 09:56:59 | 2 | review an OARRS report covering at least a one-year time |
| 09:57:05 | 3 | period or another state's report, where applicable and |
| 09:57:08 | 4 | available, if a pharmacist becomes aware of a person |
| 09:57:12 | 5 | currently," and then it lists five items. |
| 09:57:14 | 6 | Do you see that? |
| 09:57:19 | 7 | **A**    Yes, sir, I see those. |
| 09:57:32 | 8 | **Q**    And then "It's after obtaining that initial OARRS |
| 09:57:35 | 9 | report on a patient that a pharmacist uses professional |
| 09:57:40 | 10 | judgment about dispensing." |
| 09:57:43 | 11 | You see that as well? |
| 09:57:45 | 12 | **A**    Yes, sir, I do see that. |
| 09:57:47 | 13 | **Q**    Now, this was set to become effective as of October |
| 09:57:51 | 14 | 27, 2011.  We see that on the third page. |
| 09:57:57 | 15 | Do you see that as well? |
| 09:57:58 | 16 | **A**    That's what the document states, yes. |
| 09:58:02 | 17 | **Q**    Okay.  So you are -- let's go back to your sheet on |
| 09:58:12 | 18 | the job. |
| 09:58:13 | 19 | You started that in February of 2011?  Is that right? |
| 09:58:24 | 20 | **A**    That is correct. |
| 09:58:24 | 21 | **Q**    So you are in the job of driving compliance with state |
| 09:58:31 | 22 | regulations like this -- and by "this" I mean Exhibit 8 -- |
| 09:58:41 | 23 | in 2011.  Fair? |
| 09:58:43 | 24 | **A**    That was one of the requirements to be compliant with |
| 09:58:45 | 25 | state regulations. |

**Nelson - (By Video Deposition)**                                2449

09:58:45  1   **Q**    So did you have a computer program for your stores

09:58:50  2   that would give the OARRS report so that the pharmacist

09:58:59  3   could look it up immediately when someone presented with a

09:59:01  4   prescription that a pharmacist might have had a concern

09:59:06  5   over?

09:59:07  6   **A**    Sir, I don't know the exact dates of when Walmart went

09:59:10  7   online with the OARRS system, but Walmart went online with

09:59:13  8   all state prescription monitoring programs as they became

09:59:18  9   available and as they were tested throughout the years.

09:59:21  10  **Q**    So we ought to know that if it was effective October

09:59:25  11  27, 2011, you would have driven compliance almost

09:59:30  12  immediately with it, right?

09:59:35  13  **A**    I would not have personally been the individual

09:59:37  14  involved in that.  I would have utilized the director over

09:59:40  15  that particular state.

09:59:41  16  **Q**    Yeah.  You would have told people to do it, but you

09:59:45  17  would have seen that the computer system had the OARRS

09:59:48  18  report available, right?

09:59:55  19  **A**    Again, I don't know the dates specifically in this

09:59:57  20  particular state, sir.  That was nearly 10 years ago.

10:00:03  21  **Q**    Okay.  But it's reasonable to expect that you'd have

10:00:07  22  done that.  That was your job to do it, to drive compliance,

10:00:10  23  right?

10:00:10  24  **A**    It's reasonable to assume that Walmart would have been

10:00:13  25  compliant with that regulation.

| | | |
|---|---|---|
| 10:00:15 | 1 | **Q**    And I want to go back to the bigger picture and talk |
| 10:00:30 | 2 | about 1306.4, "Corresponding responsibility." |
| 10:00:39 | 3 |    Do you see that section? |
| 10:00:41 | 4 | **A**    Yes, sir. |
| 10:00:42 | 5 | **Q**    Now, I asked you earlier if you wanted to pull that in |
| 10:00:46 | 6 | advance, to pull P-GEN-174.  And that is the regulation |
| 10:00:53 | 7 | we're going to be talking about now.  So if you could pull |
| 10:00:56 | 8 | that, that would be helpful. |
| 10:00:58 | 9 |    I'm going to mark this as Exhibit 9. |
| 10:01:02 | 10 |    "A prescription for a controlled substance to be |
| 10:01:04 | 11 | effective must be issued for a legitimate medical purpose by |
| 10:01:11 | 12 | an individual practitioner acting in the usual course" -- |
| 10:01:18 | 13 | should say -- "her or his professional practice," right? |
| 10:01:20 | 14 | **A**    Yes. |
| 10:01:22 | 15 | **Q**    And so I'm using that language about the corresponding |
| 10:01:27 | 16 | responsibility, and I want to make sure we understand the |
| 10:01:31 | 17 | requirements in that regard.  All right? |
| 10:01:35 | 18 | **A**    Okay. |
| 10:01:36 | 19 | **Q**    So the corresponding responsibility of the pharmacist |
| 10:01:42 | 20 | who fills the prescription.  It says, "An order purporting |
| 10:01:51 | 21 | to be a prescription issued not in the usual course of |
| 10:01:54 | 22 | professional treatment or in the legitimate or authorized |
| 10:01:56 | 23 | research is not a prescription within the meaning and intent |
| 10:02:00 | 24 | of" this section -- well, of actually Section 309. |
| 10:02:03 | 25 |    Do you see that? |

**Nelson - (By Video Deposition)**                    2451

| | | |
|---|---|---|
| 10:02:04 | 1 | **A**    Yes. |
| 10:02:04 | 2 | **Q**    "And the person knowingly filling such a purported |
| 10:02:11 | 3 | prescription, as well as the person issuing it, shall be |
| 10:02:15 | 4 | subject to the penalties provided for violating this |
| 10:02:18 | 5 | provision of the law relating to controlled substances." |
| 10:02:26 | 6 |         Do you see that? |
| 10:02:27 | 7 | **A**    Yes. |
| 10:02:27 | 8 | **Q**    So the pharmacist has the responsibility under this |
| 10:02:34 | 9 | requirement that's also in addition to the doctor's, right? |
| 10:02:42 | 10 | **A**    Yeah, it says the pharmacist has a corresponding |
| 10:02:44 | 11 | responsibility along with the prescriber. |
| 10:02:46 | 12 | **Q**    Yeah.  And that is a corresponding responsibility to |
| 10:02:50 | 13 | fill only those prescriptions that, one, are proper |
| 10:02:58 | 14 | prescriptions; and, two, have been written by a medical |
| 10:03:09 | 15 | practitioner.  Correct? |
| 10:03:15 | 16 | **A**    I think it states that the pharmacist needs to be sure |
| 10:03:18 | 17 | the prescription was issued for a legitimate -- legitimate |
| 10:03:21 | 18 | medical purpose and that the prescriber was acting within |
| 10:03:25 | 19 | their -- their individual course of practice. |
| 10:03:30 | 20 | **Q**    Okay.  I'm going to mark P-GEN-220 as Exhibit 10. |
| 10:03:44 | 21 | It's not too big.  It's just 13.06 -- no, 1306.06. |
| 10:03:51 | 22 |         Do you see that, sir? |
| 10:03:53 | 23 | **A**    Yes. |
| 10:03:53 | 24 | **Q**    And that's -- I think I got it right that time, |
| 10:04:00 | 25 | "Professional Practice." |

10:04:04  1        Read it with me, okay?

10:04:07  2        It says, "A prescription for a controlled substance

10:04:11  3  may only be filled by a pharmacist acting in the usual

10:04:14  4  course of her or his professional practice and either

10:04:19  5  registered individually or employed in a registered

10:04:25  6  pharmacy, a registered central fill pharmacy, or registered

10:04:30  7  institutional practitioner."

10:04:32  8        Do you see where I read?

10:04:33  9  **A**    Yes, sir.

10:04:34  10  **Q**    And there's this requirement of someone doing it in

10:04:38  11  their professional practice.  Right?

10:04:47  12  **A**    It's what the document says.

10:04:48  13  **Q**    And so only pharmacists can fill these opioid

10:04:58  14  prescriptions in the usual course of their professional

10:05:02  15  practice, right?

10:05:07  16  **A**    This document states that they can fill controlled

10:05:10  17  substances.  And opiates is a controlled substance, but it

10:05:13  18  doesn't state specifically opiates.

10:05:15  19  **Q**    Right.  But it includes -- that's kind of like the big

10:05:18  20  pie and one of the slices.  The big pie is controlled

10:05:23  21  substances; one of the slices is opioids.

10:05:25  22        They're included in that, aren't they?

10:05:27  23  **A**    Opioids are a controlled substance.

10:05:29  24  **Q**    Now, what I'd like to do is talk to you about how you

10:05:35  25  became aware of various issues related to these provisions.

**Nelson - (By Video Deposition)** 2453

| | | |
|---|---|---|
| 10:05:47 | 1 | Okay? |
| 10:05:48 | 2 | **A**    Okay. |
| 10:05:50 | 3 | **Q**    Okay.  You know about the *Holiday* case, don't you? |
| 10:05:56 | 4 | **A**    Sir, I'm unaware of the *Holiday* case. |
| 10:05:59 | 5 | **Q**    Okay.  I saw a bunch of e-mails from you about it. |
| 10:06:02 | 6 |      Do you not remember it? |
| 10:06:03 | 7 | **A**    I do not recall e-mails specifically stating the |
| 10:06:05 | 8 | *Holiday* case. |
| 10:06:08 | 9 | **Q**    All right.  Well, let's look at the case together and |
| 10:06:10 | 10 | see if it rings any bells to you as we go along. |
| 10:06:14 | 11 |      You can see on the front where I've highlighted |
| 10:06:17 | 12 | *"Holiday CVS, doing business as CVS Pharmacies Numbers 219,* |
| 10:06:24 | 13 | *5195,* decision and order." |
| 10:06:26 | 14 |      Do you see that? |
| 10:06:27 | 15 | **A**    I do see that on this document. |
| 10:06:31 | 16 | **Q**    And this was an enforcement action by the Department |
| 10:06:37 | 17 | of Justice. |
| 10:06:37 | 18 |      Do you see that as well? |
| 10:06:48 | 19 | **A**    That is what the document states. |
| 10:06:49 | 20 | **Q**    And in that document you'll see on the third page this |
| 10:06:55 | 21 | bold print, "Exception Number 2"? |
| 10:07:05 | 22 | **A**    I do. |
| 10:07:05 | 23 | **Q**    And it says "the Administrative Law Judge's" -- that's |
| 10:07:08 | 24 | what ALJ stands for -- "findings that the respondents" -- |
| 10:07:13 | 25 | that's the pharmacy here, that's CVS -- "dispensed |

| | | |
|---|---|---|
| 10:07:20 | 1 | controlled substances pursuant to prescriptions which raised |
| 10:07:24 | 2 | red flags that could not be resolved, and thus violated |
| 10:07:27 | 3 | their corresponding responsibility under federal law." |
| 10:07:39 | 4 | And the challenge was that that finding wasn't |
| 10:07:42 | 5 | supported by substantial evidence. |
| 10:07:51 | 6 | Do you see where I've read? |
| 10:07:52 | 7 | **A**   I do see that on that document, sir. |
| 10:07:55 | 8 | **Q**   Well, this says, "The respondents take exception to |
| 10:07:59 | 9 | the Administrative Law Judge's findings because they are, |
| 10:08:01 | 10 | quote, based solely on the testimony of the Government's |
| 10:08:06 | 11 | expert, who stated that he found certain red flags on |
| 10:08:09 | 12 | approximately 50 of the more than 25,000 prescriptions |
| 10:08:13 | 13 | filled by respondents."  Says he found them "to be |
| 10:08:19 | 14 | unresolvable." |
| 10:08:20 | 15 | Do you see that? |
| 10:08:21 | 16 | **A**   I see where it says that in this document, yes, sir. |
| 10:08:25 | 17 | **Q**   Okay.  Now, the ALJ finding then is detailed here. |
| 10:08:36 | 18 | And you can go down to the paragraph that starts with the |
| 10:08:39 | 19 | Administrative Law Judge, "the ALJ." |
| 10:08:44 | 20 | Do you see that paragraph? |
| 10:08:45 | 21 | **A**   Yes, sir. |
| 10:08:45 | 22 | **Q**   It says, "The Administrative Law Judge found credible |
| 10:08:52 | 23 | Professor Doering's testimony that controlled substances are |
| 10:08:56 | 24 | high alert drugs." |
| 10:09:03 | 25 | Do you see that? |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 10:09:03 | 1 | **A**    I see where it says that in this document. |
| 10:09:05 | 2 | **Q**    "And that among controlled substances, drugs such as |
| 10:09:08 | 3 | opioids and benzodiazepines, and other central nervous |
| 10:09:15 | 4 | system depressant drugs, require the highest level of |
| 10:09:19 | 5 | scrutiny on the part of a pharmacist who's presented with |
| 10:09:23 | 6 | prescriptions for these drugs." |
| 10:09:24 | 7 | Do you see that as well? |
| 10:09:25 | 8 | **A**    Again, that is what the document says. |
| 10:09:36 | 9 | **Q**    And it goes on to talk about the red flags, "that in |
| 10:09:39 | 10 | pharmacy practice there are various red flags which create a |
| 10:09:42 | 11 | level of concern that might cause a pharmacist to either |
| 10:09:45 | 12 | choose not to fill a prescription or take some other kind of |
| 10:09:47 | 13 | actions." |
| 10:09:51 | 14 | And the professor also testified, "The more red flags |
| 10:09:55 | 15 | there are, the stronger the suspicion is." |
| 10:09:58 | 16 | Do you see where I'm reading? |
| 10:09:59 | 17 | **A**    I do see where you're reading, sir. |
| 10:10:01 | 18 | **Q**    All right.  So if we go back to the note card that |
| 10:10:08 | 19 | we're taking, the *Holiday* case talks about the need -- that |
| 10:10:12 | 20 | there are red flags that must be resolved, correct? |
| 10:10:23 | 21 | **A**    The *Holiday* case does talk about red flags. |
| 10:10:25 | 22 | **Q**    And that's not a brand new term for you.  You know |
| 10:10:29 | 23 | what are red flags, don't you? |
| 10:10:31 | 24 | **A**    I would think any pharmacist would know what a red |
| 10:10:37 | 25 | flag is. |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 10:10:38 | 1 | **Q**    And Professor Doering specifically identified such red |
| 10:10:44 | 2 | flags as including the patient's paying for it with cash. |
| 10:10:46 | 3 | Do you see that? |
| 10:10:47 | 4 | **A**    I do. |
| 10:10:53 | 5 | **Q**    The respective locations of the patient and |
| 10:10:56 | 6 | prescriber. |
| 10:10:57 | 7 | See that? |
| 10:10:59 | 8 | **A**    Yes, sir, I see that. |
| 10:11:00 | 9 | **Q**    That a prescriber writes for certain combinations of |
| 10:11:09 | 10 | drugs or patterns of drugs. |
| 10:11:12 | 11 | Do you see that? |
| 10:11:13 | 12 | **A**    That is correct. |
| 10:11:13 | 13 | **Q**    That multiple patients presenting prescriptions for |
| 10:11:16 | 14 | the same drugs in the same quantity from the same doctor, |
| 10:11:20 | 15 | without any kind of variability or change. |
| 10:11:24 | 16 | Do you see that? |
| 10:11:29 | 17 | **A**    I do see that. |
| 10:11:31 | 18 | **Q**    I mean, those -- this decision came out in 2012.  So |
| 10:11:37 | 19 | we at least certainly expect to see these red flags listed |
| 10:11:40 | 20 | for Walmart in 2012, right? |
| 10:11:46 | 21 | **A**    Those appear to be this doctor -- or Professor |
| 10:11:50 | 22 | Doering's red flags that he called out.  Whether or not |
| 10:11:52 | 23 | those red flags are listed in Walmart's POMs, I do not |
| 10:11:57 | 24 | recall. |
| 10:11:58 | 25 | **Q**    Well, they're not just ones he listed out.  They're |

10:12:01  1    ones that caused the -- were used to support the

10:12:04  2    Government's finding that the pharmacy failed to follow

10:12:08  3    1306.4, true?

10:12:10  4    **A**    Again, it says Dr. Doering is the one who called out

10:12:13  5    these red flags.

10:12:16  6    **Q**    Uh-huh.  And the Administrative Law Judge is the one

10:12:19  7    that found them a violation of corresponding responsibility,

10:12:22  8    right?

10:12:23  9    **A**    That's what it says.  That's what you're telling me

10:12:27  10   is -- the summation of this information is from the *Holiday*

10:12:30  11   case.

10:12:31  12   **Q**    And because there's corresponding responsibility, the

10:12:40  13   pharmacist can't just blame the doctor and say, hey, not my

10:12:44  14   fault.  I didn't write it.  I just filled it.

10:12:51  15         That is not a legitimate excuse, is it?

10:12:54  16   **A**    The corresponding responsibility appears to be the

10:12:58  17   Federal Government's definition of what the states refer to

10:13:02  18   as professional judgment.  And so when a pharmacist applies

10:13:05  19   their professional judgment when interpreting a

10:13:07  20   prescription, that's how they apply corresponding

10:13:09  21   responsibility in interpreting whether that prescription is

10:13:11  22   for legitimate purposes and should be filled or should not

10:13:14  23   be filled.

10:13:15  24   **Q**    Yeah.  And I think we're saying the same thing.  Let

10:13:19  25   me -- let me try it this way.

**Nelson - (By Video Deposition)** 2458

10:13:21 1    When it comes to dispensing opioids, any other drugs

10:13:26 2    as well, the pharmacist is not just a human vending machine

10:13:33 3    where if you put your money and prescription in, they spit

10:13:36 4    out the product, right?

10:13:39 5    **A**    Well, pharmacists have a profession for a reason.

10:13:43 6    It's not just interpret prescriptions.  It's also to, you

10:13:47 7    know, communicate with the patients and the doctors, and

10:13:49 8    many other responsibilities.

10:13:50 9    **Q**    Yeah.  They're supposed to be analyzing this stuff,

10:13:53 10   not just blindly saying, oh, Doctor wrote it, I'll fill it,

10:14:02 11   right?

10:14:02 12   **A**    That's why they use their professional judgment before

10:14:04 13   filling a prescription.

10:14:04 14   **Q**    And then these opioids, according to *Holiday*, opioids

10:14:07 15   are a high alert drug.  Fair?

10:14:10 16   **A**    All controlled substances are high alert drugs.

10:14:15 17   **Q**    Right.  So that would include opioids, right?

10:14:18 18   **A**    Opioids is one of the controlled substances, that is

10:14:22 19   correct.

10:14:22 20   **Q**    If you can find 188, P-GEN-188, I'll mark it as

10:14:33 21   Exhibit 12 and ask you a question or two about it, not a

10:14:37 22   lot.

10:14:37 23       And this is just another requirement, that this is the

10:14:39 24   requirement that records and reports be kept.  Every

10:14:44 25   inventory and other record required to be kept must be kept

**Nelson - (By Video Deposition)**                    2459

| | | |
|---|---|---|
| 10:14:47 | 1 | by a registrant and available for at least two years from |
| 10:14:51 | 2 | the date of such inventory or records, true? |
| 10:15:00 | 3 | **A**    That's what the regulation states. |
| 10:15:02 | 4 | **Q**    And so you were aware when you were with the company |
| 10:15:04 | 5 | about the need to maintain records related to controlled |
| 10:15:06 | 6 | substances.  Fair? |
| 10:15:07 | 7 | **A**    I was aware there were record requirements for |
| 10:15:11 | 8 | controlled substances, yes. |
| 10:15:11 | 9 | **Q**    Then with that, we can move on down the road. |
| 10:15:30 | 10 | So the next step on the road map.  We've done |
| 10:15:33 | 11 | requirements.  Now I want to look at failures.  Okay? |
| 10:15:36 | 12 | **A**    Okay. |
| 10:15:37 | 13 | **Q**    And again, that's my word for it, and I don't want to |
| 10:15:41 | 14 | leave a suggestion you're agreeing with me.  Maybe you will, |
| 10:15:47 | 15 | maybe you won't.  But that's the subject I want to talk to |
| 10:15:49 | 16 | you about.  All right? |
| 10:15:50 | 17 | **A**    Yes, sir. |
| 10:15:54 | 18 | **Q**    Now, Walmart needs to avoid failing to follow the |
| 10:16:00 | 19 | rules.  The rules need to be followed, true? |
| 10:16:06 | 20 | **A**    If you're going to be compliant, you have to follow |
| 10:16:08 | 21 | the rules. |
| 10:16:09 | 22 | **Q**    And then also, in addition to that, I'm looking for |
| 10:16:12 | 23 | you to admit or deny that the pharmacy is the last line of |
| 10:16:15 | 24 | defense when it comes to keeping prescriptions from being |
| 10:16:20 | 25 | filled wrongly. |

**Nelson - (By Video Deposition)**                                    2460

| | | |
|---|---|---|
| 10:16:27 | 1 | Would you agree with me? |
| 10:16:27 | 2 | **A**    I would say pharmacies are one of the links in the |
| 10:16:32 | 3 | chain before a prescription gets filled, that has to be |
| 10:16:41 | 4 | reviewed before you get a prescription filled. |
| 10:16:43 | 5 | **Q**    Okay.  I like that, "one of the links in the chain." |
| 10:16:46 | 6 | In fact, they're the last link in the chain to getting |
| 10:16:49 | 7 | it filled, aren't they? |
| 10:16:50 | 8 | **A**    Well, they're the person that the prescription is |
| 10:16:52 | 9 | presented to towards end of the process, yes. |
| 10:16:54 | 10 | **Q**    All right.  Next subject on the issue of failures.  I |
| 10:16:57 | 11 | want to first look at what I'm going to call written-up |
| 10:17:00 | 12 | failures. |
| 10:17:03 | 13 | Does that make any sense to you or do I need to |
| 10:17:13 | 14 | explain it, "written up"? |
| 10:17:16 | 15 | **A**    I'm not sure what you mean. |
| 10:17:18 | 16 | **Q**    All right.  Let me ask it this way -- or explain it |
| 10:17:21 | 17 | this way. |
| 10:17:22 | 18 | Do you drive a car? |
| 10:17:25 | 19 | **A**    Yes. |
| 10:17:26 | 20 | **Q**    Okay.  You are familiar with how most roads post a |
| 10:17:30 | 21 | speed limit, right? |
| 10:17:37 | 22 | **A**    That is correct. |
| 10:17:38 | 23 | **Q**    And sometimes there'll be a police officer who has got |
| 10:17:43 | 24 | a radar gun in that road -- or on that road who can catch |
| 10:17:51 | 25 | those people who violate the law on the speed limit, right? |

**Nelson - (By Video Deposition)**                                    2461

10:17:59  1    **A**    That is the practice of some police departments.

10:18:02  2    **Q**    And several of the police officers I've gotten to know

10:18:07  3    over the years have a tendency to write me up.  They'll

10:18:10  4    write a ticket to me saying, you went 63 in a 55, or

10:18:16  5    whatever it may be.  Right?

10:18:20  6    **A**    That's a possibility.

10:18:23  7    **Q**    But not every time I violate the speed limit -- which

10:18:30  8    I try not to do, but at times I do -- not every time do I

10:18:34  9    get caught and written up.

10:18:35  10        You tracking with me?

10:18:38  11   **A**    Okay.

10:18:41  12   **Q**    So what I want to talk about here are not every time

10:18:44  13   that the company may have failed.  I want to talk about the

10:18:50  14   times the company's failed where it's gotten written up by

10:18:52  15   the DEA.  All right?

10:18:55  16   **A**    Yes, sir, I understand.

10:18:57  17   **Q**    Do you have Plaintiffs' Exhibit -- well, it's

10:19:03  18   Plaintiffs' Walmart 255.  I'm going to make it Exhibit 13.

10:19:06  19        This is a settlement agreement.

10:19:10  20        Do you see that?

10:19:11  21   **A**    That's what it's titled.

10:19:13  22   **Q**    And it's a settlement agreement between the United

10:19:22  23   States, with the Drug Enforcement Agency being the operative

10:19:26  24   part of the Department of Justice, and Walmart Stores.

10:19:30  25        Do you see that?

**Nelson - (By Video Deposition)**

10:19:31  1    **A**    Yes, sir.

10:19:35  2    **Q**    And this is a settlement agreement that arose out of

10:19:39  3    the investigation of Walmart Store 2292 for violation the

10:19:47  4    CSA.

10:19:48  5         Do you see that?

10:19:51  6    **A**    Again, that's what the document says.

10:19:53  7    **Q**    You understand the CSA --

10:19:56  8    **A**    It says CSA.

10:19:58  9    **Q**    Which is the Controlled Substances Act based on your

10:20:02  10   knowledge, right?

10:20:03  11   **A**    Well, I don't know if that's what this document is

10:20:05  12   referring to or not, but it does say CSA.

10:20:07  13   **Q**    So we know as we're reading along that as a result of

10:20:13  14   its investigation, the DEA has contended that Walmart 2292

10:20:19  15   has violated the CSA and the related Code of Federal

10:20:26  16   Regulations.  And then it gives us the explanation if we

10:20:28  17   continue.

10:20:29  18        You tracking with me?

10:20:30  19   **A**    I followed you so far on this form.

10:20:35  20   **Q**    All right.  It says, "By, 1," and it talks about

10:20:43  21   "filling 104 prescriptions written by Daniel Healy under

10:20:47  22   Dr. Murray's DEA number."

10:20:50  23        It talks about, "2, failing to include all the

10:20:53  24   required information on 39 prescriptions for controlled

10:20:59  25   substances written by Dr. Healy."

**Nelson - (By Video Deposition)**

10:21:01  1          And then it's got number 3 right here.

10:21:04  2          Do you see where I've circled that?

10:21:06  3  **A**     Yes, sir.

10:21:06  4  **Q**     "Filling the 104 prescriptions referenced above,

10:21:12  5  notwithstanding the absence of a legitimate medical purpose

10:21:18  6  for those prescriptions."

10:21:20  7          Did I read that correctly?

10:21:28  8  **A**     That is what the document says.

10:21:31  9  **Q**     And then it cites CFR, Code of Federal Regulations,

10:21:39  10  1306.04, little A.

10:21:44  11          Do you see that?

10:21:45  12  **A**     I do.

10:21:45  13  **Q**     And that is the corresponding responsibility

10:21:49  14  requirement, 1306.04, that we talked about as a requirement

10:21:56  15  before, right?

10:21:57  16  **A**     We did talk about 1306.04 before.

10:22:09  17  **Q**     So now let's go to 2011.  And I want to look at

10:22:16  18  Walmart 304, which I'm going to mark as Exhibit Number 15.

10:22:23  19          This is the Administrative Memorandum of Agreement.

10:22:29  20          Now, you're familiar with this document because this

10:22:32  21  was something that was in place at the time you took over

10:22:36  22  the job of driving Compliance, correct?

10:22:41  23  **A**     I was not familiar with this document at the time I

10:22:43  24  took over in 2011.

10:22:46  25  **Q**     But you became familiar with it real quick once you

**Nelson - (By Video Deposition)**                                   2464

10:22:50  1   took over, didn't you?

10:22:51  2   **A**     It was brought to my attention there would be some

10:22:53  3   things that needed to be worked on as a result of this

10:22:56  4   agreement.  That happened sometime after March of 2011.

10:23:03  5   **Q**     Now, I want you to first look at the background and

10:23:08  6   the allegations that are made.  And so that's under this

10:23:15  7   point -- subpoint -- big point II, Roman Numeral II.  And

10:23:22  8   it's concerning specifically Walmart Pharmacy 10-2177 in San

10:23:32  9   Diego, California.

10:23:33  10        Do you see that?

10:23:34  11  **A**     I do.

10:23:35  12  **Q**     Now, the Office of Diversion Control issued an order

10:23:46  13  to show cause, and that order to show cause alleged that the

10:23:54  14  Walmart pharmacy did some things that are enumerated here.

10:24:01  15  And I want to make sure we're reading it together.

10:24:03  16        Do you see where I am?

10:24:04  17  **A**     Yes, sir.

10:24:04  18  **Q**     All right.  "Improperly dispensed controlled

10:24:10  19  substances to individuals based on purported prescriptions

10:24:16  20  issued by physicians who were not licensed to practice

10:24:19  21  medicine in California."

10:24:21  22        Did I read that right?

10:24:25  23  **A**     That's what it says.

10:24:27  24  **Q**     "2, Dispensed controlled substances to individuals

10:24:33  25  located in California based on Internet prescriptions issued

**Nelson - (By Video Deposition)**

2465

| | | |
|---|---|---|
| 10:24:37 | 1 | by physicians for other than a legitimate medical purpose |
| 10:24:46 | 2 | and/or outside usual course of professional practice, in |
| 10:24:51 | 3 | violation of federal and state law." |
| 10:24:54 | 4 | Do you see that? |
| 10:24:54 | 5 | **A** I do. |
| 10:24:55 | 6 | **Q** "3, Dispensed controlled substances to individuals |
| 10:25:04 | 7 | that Walmart Pharmacy knew or should have known were |
| 10:25:07 | 8 | diverting the controlled substances." |
| 10:25:09 | 9 | Do you see that as well? |
| 10:25:10 | 10 | **A** That's what the document says. |
| 10:25:13 | 11 | **Q** All right.  Now, "if these allegations could be proven |
| 10:25:24 | 12 | at a hearing, it would constitute a basis to revoke the DEA |
| 10:25:30 | 13 | registration of that Walmart pharmacy." |
| 10:25:33 | 14 | Do you see that as well? |
| 10:25:34 | 15 | **A** Again, it is what the document says. |
| 10:25:41 | 16 | **Q** And the document goes on to lay out that "The parties, |
| 10:25:45 | 17 | however, wish to settle this administrative matter." |
| 10:25:49 | 18 | And that's what this is, is an agreement to do so. |
| 10:25:52 | 19 | Fair? |
| 10:25:55 | 20 | **A** Yes, sir. |
| 10:25:56 | 21 | **Q** All right.  Then the terms and conditions of the |
| 10:26:00 | 22 | settlement are on the next page, Roman Numeral III.  And I |
| 10:26:04 | 23 | want to focus on the obligations of Walmart, which are |
| 10:26:07 | 24 | enumerated in subpoint 4. |
| 10:26:11 | 25 | Do you see where I am? |

**Nelson - (By Video Deposition)** 2466

10:26:14  1   **A**    I do, sir.

10:26:19  2   **Q**    Now, this is an obligation of Walmart, not simply that

10:26:26  3   individual store, correct?

10:26:31  4        All right.  "Walmart agrees to maintain a compliance

10:26:35  5   program, updated as necessary."

10:26:43  6        Fair?  And we're going to take it in bite size.

10:26:46  7   That's not the only thing.  I know the sentence continues.

10:26:48  8   But that's the start, right?

10:26:50  9   **A**    Again, that's what the document says so far.

10:26:51  10  **Q**    All right.  So we can put on our bullet points,

10:26:55  11  "maintain compliance program," and we can also put "update

10:27:02  12  as necessary," right?

10:27:05  13       Is that fair?

10:27:07  14  **A**    That's what the first two lines say of this.

10:27:13  15  **Q**    "And this compliance program will be designed to

10:27:18  16  detect and prevent diversion of controlled substances."

10:27:22  17       Do you see that?

10:27:28  18  **A**    Yes, sir.

10:27:28  19  **Q**    So we can say that it's designed to detect and prevent

10:27:32  20  diversion.  Fair?

10:27:47  21  **A**    Again, that's what the document says.

10:27:53  22  **Q**    "This program shall include procedures to identify the

10:27:59  23  common signs associated with the diversion of controlled

10:28:04  24  substances."

10:28:07  25       Do you see that as well?

**Nelson - (By Video Deposition)**

| 10:28:09 | 1 | **A**     Yes, sir. |

10:28:09    1    **A**     Yes, sir.

10:28:09    2    **Q**     And so we can add to here, the agreed terms is to

10:28:20    3    identify common signs.  Right?

10:28:22    4    **A**     That is one of the things listed on this document.

10:28:27    5    **Q**     And then it gives us some examples, including, but not

10:28:33    6    limited to, doctor shopping, requests for early refills,

10:28:41    7    altered or forged prescriptions, prescriptions written by

10:28:43    8    doctors not licensed to practice medicine in the

10:28:45    9    jurisdiction where the patient's located, prescriptions

10:28:48    10    written for other than a legitimate medical purpose, by an

10:28:54    11    individual practitioner acting outside the usual course of

10:28:56    12    her or his professional practice.

10:28:58    13          Right?

10:28:58    14    **A**     Those are things listed on the document, yes.

10:29:08    15    **Q**     And this document -- the agreement goes on to say,

10:29:10    16    "The program shall also include procedures to report thefts

10:29:12    17    and significant losses of controlled substances."

10:29:17    18          Right?

10:29:17    19    **A**     That's what it says.

10:29:20    20    **Q**     And then I want to pay attention to the next clause.

10:29:24    21    "And the routine and periodic training of all Walmart

10:29:29    22    employees, including new employees, that are responsible for

10:29:40    23    controlled substances regarding their responsibilities under

10:29:43    24    the CSA and regarding relevant elements of the compliance

10:29:47    25    program."

| | | |
|---|---|---|
| 10:29:49 | 1 | Do you see that? |
| 10:29:51 | 2 | **A**    Yes, sir. |
| 10:29:52 | 3 | **Q**    And this idea, or obligation if you will, is for |
| 10:29:59 | 4 | training all employees that are dealing with the controlled |
| 10:30:14 | 5 | substances, right? |
| 10:30:15 | 6 | **A**    That is what it says on this document. |
| 10:30:20 | 7 | **Q**    It's to be routine and periodic, right?  That |
| 10:30:30 | 8 | training. |
| 10:30:32 | 9 | **A**    That is what the document says. |
| 10:30:34 | 10 | **Q**    Now, this isn't just for that Walmart store.  Again, |
| 10:30:44 | 11 | this says that this compliance program shall apply to all |
| 10:30:50 | 12 | current and future Walmart pharmacies that are registered |
| 10:30:54 | 13 | with the DEA; is that right? |
| 10:31:00 | 14 | **A**    It's what the document says. |
| 10:31:02 | 15 | **Q**    So this is an obligation that Walmart has entered into |
| 10:31:05 | 16 | on behalf of all of its pharmacies; is that correct? |
| 10:31:09 | 17 | **A**    That's what the document says. |
| 10:31:12 | 18 | **Q**    Now, the document goes on to say, under point C, that |
| 10:31:27 | 19 | "Walmart shall implement and maintain policies and |
| 10:31:33 | 20 | procedures designed to ensure that its pharmacies comply |
| 10:31:36 | 21 | with all applicable laws." |
| 10:31:38 | 22 | Do you see where it says that? |
| 10:31:41 | 23 | **A**    Yes, sir. |
| 10:31:45 | 24 | **Q**    And the word "ensure," what do you understand that to |
| 10:31:50 | 25 | mean in just your everyday parlance as someone who drives |

**Nelson - (By Video Deposition)**

2469

10:31:54  1   compliance?

10:31:56  2   **A**    It would mean to me that I should do what I can to get

10:31:58  3   that information.

10:31:59  4   **Q**    Okay?

10:32:00  5   **A**    To make sure it's done.

10:32:02  6   **Q**    Yeah.  Ensure means kind of guarantee, ensure.  Right?

10:32:11  7   **A**    No, it does say that they shall try to comply with all

10:32:16  8   the laws that require identification being given on people

10:32:22  9   picking up prescriptions where laws apply.

10:32:23  10  **Q**    Well, we've got a difference here.

10:32:27  11         It says "ensure," and you said "try to comply."

10:32:34  12         Do you think that by "ensure" that means try to

10:32:39  13  comply?

10:32:39  14  **A**    I believe it means try to comply with the laws and

10:32:41  15  regulations of that particular area.

10:32:45  16              (Deposition playback stopped.)

10:32:45  17              MR. WEINBERGER:  Your Honor, this is a good

10:32:47  18  stopping point.

10:32:47  19              THE COURT:  I was going to say, I was going to

10:32:49  20  inquire.

10:32:50  21         Okay, ladies and gentlemen, we'll take our mid morning

10:32:53  22  break, 15 minutes, and then pick up with some more of this

10:32:55  23  testimony.  Thank you.

10:33:46  24              (Recess taken at 10:33 a.m.)

10:53:14  25              (Jury present in open court at 10:53 a.m.)

**Nelson - (By Video Deposition)**

2470

| | |
|---|---|
| 10:53:15 | 1 |
| 10:53:17 | 2 |
| 10:53:23 | 3 |
| 10:53:28 | 4 |
| 10:53:38 | 5 |
| 10:53:40 | 6 |
| 10:53:43 | 7 |
| 10:53:43 | 8 |
| 10:53:48 | 9 |
| 10:53:50 | 10 |
| 10:54:01 | 11 |
| 10:54:06 | 12 |
| 10:54:10 | 13 |
| 10:54:13 | 14 |
| 10:54:17 | 15 |
| 10:54:20 | 16 |
| 10:54:21 | 17 |
| 10:54:23 | 18 |
| 10:54:25 | 19 |
| 10:54:33 | 20 |
| 10:54:37 | 21 |
| 10:54:41 | 22 |
| 10:54:44 | 23 |
| 10:54:49 | 24 |
| 10:54:51 | 25 |

1      THE COURT:  Okay.  Please be seated.

2         You can resume the deposition of Mr. Nelson.

3          MR. LANIER:  Thank you, Your Honor.

4   **Q**    We got a difference here.  It says "ensure," and you

5   said "try to comply."

6         Do you think that by "ensure" that means "try to

7   comply"?

8   **A**    It means try to comply with the laws and regulations

9   of that particular area.

10  **Q**    Huh.  Okay.

11        The next subpoint says that "Walmart shall comply with

12  all state and federal laws and regulations with regard to

13  dispensing controlled substances based on a prescription

14  written or otherwise transmitted by a prescriber located

15  outside of the state where the patient and pharmacy are

16  located."

17        Do you see that?

18  **A**    Yes.

19  **Q**    So in addition to ensure that its pharmacies comply

20  with the applicable laws requiring pharmacists to obtain

21  current identification from a person picking up the

22  substance, it also says they shall comply with the state and

23  federal laws and regulations with regard to dispensing these

24  substances based on a prescription written by someone

25  outside the state.  Right?

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 10:54:53 | 1 | **A**     That's what the document says. |
| 10:54:54 | 2 | **Q**     Then subpoint I, "Walmart shall institute policies and |
| 10:54:59 | 3 | procedures to block the early refill of controlled |
| 10:55:04 | 4 | substances." |
| 10:55:04 | 5 | Do you see that as well? |
| 10:55:08 | 6 | **A**     I do. |
| 10:55:08 | 7 | **Q**     So we would need to add to our list, policies and |
| 10:55:20 | 8 | procedures to block early refills, right? |
| 10:55:24 | 9 | **A**     Early refills of controlled substances. |
| 10:55:27 | 10 | **Q**     Right.  That's fair.  That's what I'm referencing in |
| 10:55:32 | 11 | this are the controlled substances. |
| 10:55:33 | 12 | All right.  Now, we've got this in 2011, "this" being |
| 10:55:39 | 13 | Plaintiffs' Exhibit 15. |
| 10:55:45 | 14 | And this memorandum of agreement was in place when you |
| 10:55:49 | 15 | were driving compliance, wasn't it? |
| 10:55:57 | 16 | **A**     It took effect after at a point after I became in that |
| 10:56:02 | 17 | role. |
| 10:56:04 | 18 | **Q**     So it was in -- you were driving compliance when this |
| 10:56:08 | 19 | came into effect, fair? |
| 10:56:09 | 20 | **A**     I was in the role of compliance, senior manager of |
| 10:56:14 | 21 | Health and Wellness, Controlled Substance. |
| 10:56:16 | 22 | **Q**     Okay.  Now, during this period of time, there is an |
| 10:56:26 | 23 | opioid epidemic that is raging across the country, fair? |
| 10:56:37 | 24 | **A**     I would prefer to call it a drug abuse epidemic across |
| 10:56:42 | 25 | the United Nation -- across the United States, of which |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 10:56:44 | 1 | opioids were one of those items. |
| 10:56:50 | 2 | **Q**    So you don't think that opioids are in any way |
| 10:56:53 | 3 | particular problem themselves or -- what other drugs were |
| 10:56:58 | 4 | causing this epidemic at that point? |
| 10:57:04 | 5 | **A**    Well, opioids were certainly one of the drugs that |
| 10:57:07 | 6 | would have been involved.  So were illicit drugs causing |
| 10:57:12 | 7 | drug abuse concerns.  Drugs that don't have medical uses, |
| 10:57:17 | 8 | such as heroin and cocaine, things along that line. |
| 10:57:20 | 9 | Methamphetamine, other items.  And unfortunately, |
| 10:57:24 | 10 | prescription medications were misused at times which |
| 10:57:27 | 11 | contributed to a drug abuse epidemic.  And opioids are |
| 10:57:30 | 12 | certainly one of those items that was misused. |
| 10:57:33 | 13 | **Q**    Yeah.  Are you familiar with any of the concerns that |
| 10:57:36 | 14 | there was an opioid epidemic all by itself?  Opioids |
| 10:57:41 | 15 | themselves amounted to an epidemic. |
| 10:57:44 | 16 |      Did you know that? |
| 10:57:45 | 17 | **A**    Well, as I stated, I prefer to call it a drug abuse |
| 10:57:49 | 18 | epidemic because multiple drugs were being used, not just |
| 10:57:54 | 19 | opioids. |
| 10:57:54 | 20 | **Q**    Oh, I don't fuss that other drugs have been abused as |
| 10:57:57 | 21 | well.  But you can -- are you familiar with the idea of |
| 10:58:00 | 22 | diluting a problem by not focusing on it? |
| 10:58:05 | 23 | **A**    I don't think focusing on drug abuse as a epidemic is |
| 10:58:11 | 24 | ignoring the opioid concerns. |
| 10:58:13 | 25 | **Q**    Okay.  So you'll grant me that the opioid concerns |

**Nelson - (By Video Deposition)**                    2473

10:58:15   1   were very important because opioids themselves were causing

10:58:18   2   a lot of death that was needless and a lot of community

10:58:22   3   problems that were needless all around the country in this

10:58:29   4   time period, true?

10:58:31   5   **A**     Opioids were one of those drugs.  There were other

10:58:33   6   drugs that were doing the same thing.

10:58:35   7   **Q**     Yeah.  And I'm all for dealing with all of them.

10:58:39   8         But y'all weren't dispensing heroin, were you?

10:58:46   9   **A**     Of course not, sir.

10:58:48  10   **Q**     Y'all weren't selling methamphetamines, were you?

10:58:50  11   **A**     No, sir, but precursors were being purchased at

10:58:55  12   Walmart and other places as well which we had to protect

10:58:59  13   against.

10:59:00  14   **Q**     And I'm sure that's true.

10:59:02  15         Heavens, y'all weren't even selling pot, were you?

10:59:05  16   **A**     I'm not aware of that, sir.

10:59:06  17   **Q**     Not supposed to be selling it anyway.

10:59:07  18         But y'all were selling opioids, weren't you?

10:59:13  19   **A**     We were dispensing opioids according to legitimate

10:59:16  20   prescriptions when they were presented and the pharmacist

10:59:21  21   exercised their professional judgment.  When they decided

10:59:23  22   that was a valid prescription, they would dispense the

10:59:25  23   prescription.

10:59:26  24   **Q**     Okay.  "Dispense" is one word -- y'all were selling

10:59:33  25   them.  Y'all were making money off of them, weren't you?

**Nelson - (By Video Deposition)**

2474

| | | |
|--|--|--|
| 10:59:35 | 1 | **A**     Well, when dispensing a drug, they do have to somehow |
| 10:59:39 | 2 | pay for it, either through an insurance company or the |
| 10:59:42 | 3 | patient pays for it directly. |
| 10:59:43 | 4 | **Q**     In other words, Walmart wasn't just giving these out |
| 10:59:47 | 5 | as a pro bono.  This was something that Walmart was making a |
| 10:59:51 | 6 | profit off of.  They were selling it, right? |
| 10:59:53 | 7 | **A**     I can't attest to whether or not they made a profit on |
| 10:59:57 | 8 | every opioid prescription that was sold.  I do not know |
| 10:59:59 | 9 | that. |
| 10:59:59 | 10 | **Q**     So what you and I have tried to go through in the |
| 11:00:02 | 11 | process of this from my perspective are those situations |
| 11:00:07 | 12 | where Walmart has put into writing some type of a settlement |
| 11:00:14 | 13 | agreement pursuant to allegations that it had failed to |
| 11:00:16 | 14 | follow the law, the regulation. |
| 11:00:22 | 15 | Are you tracking with me? |
| 11:00:26 | 16 | **A**     Yeah, I don't know if Walmart wrote those documents or |
| 11:00:29 | 17 | some other party wrote those documents, but those documents |
| 11:00:31 | 18 | definitely talk about Walmart and the different compliance |
| 11:00:36 | 19 | agencies. |
| 11:00:36 | 20 | **Q**     All right.  What I'd like to do now is shift gears and |
| 11:00:41 | 21 | not talk about written-up failures but how many other |
| 11:00:47 | 22 | failures we can see just looking through your files that |
| 11:00:51 | 23 | were never brought to the attention, perhaps, of the drug |
| 11:00:56 | 24 | enforcement people. |
| 11:00:56 | 25 | You with me? |

**Nelson - (By Video Deposition)**

2475

| | | |
|---|---|---|
| 11:01:00 | 1 | In other words, we've looked at -- you know, I used |
| 11:01:03 | 2 | the police car as an example.  We looked at situations where |
| 11:01:10 | 3 | in a sense you got written up, kind of like getting a |
| 11:01:13 | 4 | ticket, though you pled not guilty and paid a fine. |
| 11:01:18 | 5 | I want to talk to you now about ones where you may not |
| 11:01:22 | 6 | have had a police officer there, to use my speeding analogy. |
| 11:01:28 | 7 | Do you understand what I'm saying? |
| 11:01:29 | 8 | **A**    Well, what I do believe is that the alleged failures, |
| 11:01:32 | 9 | since they were agreed to as not being violations, I don't |
| 11:01:36 | 10 | agree with them being failures.  They were issues that were |
| 11:01:40 | 11 | resolved and taken up with the regulatory agencies and |
| 11:01:44 | 12 | Walmart and resolved. |
| 11:01:45 | 13 | So calling them alleged failures, they may have |
| 11:01:49 | 14 | started out that way, but they didn't end up that way. |
| 11:01:52 | 15 | **Q**    So what I want to do is I want to talk about some |
| 11:01:57 | 16 | other failures, and I'll set it up by making sure we're |
| 11:01:59 | 17 | clear of what Walmart knew back in the time where you had |
| 11:02:07 | 18 | your job.  And I'll do that beginning with Walmart 359. |
| 11:02:16 | 19 | 359. |
| 11:02:17 | 20 | If you will go to that.  I'll mark it as Exhibit 18. |
| 11:02:22 | 21 | This is a March 4, 2011, Wal-Mart Stores, Inc., and |
| 11:02:30 | 22 | Drug Enforcement Administration memorandum of agreement |
| 11:02:32 | 23 | setting out the obligations and expectations. |
| 11:02:38 | 24 | Do you see that on the front at least? |
| 11:02:46 | 25 | **A**    I do. |

**Nelson - (By Video Deposition)** 2476

11:02:46  1    **Q**    Slide 4.  Walmart, at this point in time, the store

11:02:50  2    itself, was familiar with the agreements that had been

11:02:57  3    reached with the Department of Justice and the Drug

11:03:03  4    Enforcement Administration, correct?

11:03:03  5    **A**    I'm not sure who the audience was for this

11:03:05  6    presentation.  I haven't read that yet.

11:03:09  7    **Q**    Okay.  If you'll look at the front page, you can at

11:03:12  8    least see that Susanne Hiland, Paul Beahm, and Andy Gottman

11:03:21  9    were aware of it within Walmart, because they're talking

11:03:26  10   about it.

11:03:27  11        Is that fair?

11:03:31  12   **A**    Yes, those individuals would know.

11:03:33  13   **Q**    All right.  Now, then if we look at slide 4, there's

11:03:39  14   awareness within the company that in 2009, November, the DEA

11:03:43  15   began an enforcement action against Wal-Mart Stores,

11:03:51  16   Incorporated, based on several allegations.  True?

11:03:55  17   **A**    Someone at Walmart knew that, that's for sure, yes.

11:03:58  18   **Q**    All right.  And those allegations were improper

11:04:00  19   dispensing of controlled substances based on prescriptions

11:04:09  20   written by out-of-state prescribers, right?

11:04:15  21   **A**    That's what the document says.

11:04:16  22   **Q**    It says, "Improper dispensing of controlled substances

11:04:19  23   based on prescriptions not issued for a legitimate medical

11:04:23  24   purpose."

11:04:27  25        Right?

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:04:27 | 1 | **A**     That's what it says. |
| 11:04:29 | 2 | **Q**     "Improper dispensing of controlled substances to |
| 11:04:33 | 3 | patients whom the pharmacists knew or should have known were |
| 11:04:38 | 4 | diverting controlled substances." |
| 11:04:40 | 5 |        Do you see that? |
| 11:04:40 | 6 | **A**     I do. |
| 11:04:43 | 7 | **Q**     "Use of expired, suspended, or invalid DEA numbers to |
| 11:04:51 | 8 | fill prescriptions." |
| 11:04:53 | 9 |        Do you see that? |
| 11:04:54 | 10 | **A**     I do. |
| 11:04:54 | 11 | **Q**     And finally, point 5, "An early refill of controlled |
| 11:04:59 | 12 | substances." |
| 11:04:59 | 13 |        You see that as well? |
| 11:05:01 | 14 | **A**     I do. |
| 11:05:02 | 15 | **Q**     Now, if you look at slide 6, there are obligations |
| 11:05:09 | 16 | that are set out here as well on this Walmart presentation, |
| 11:05:17 | 17 | correct? |
| 11:05:17 | 18 | **A**     That's correct. |
| 11:05:20 | 19 | **Q**     And the obligations start out with maintaining a |
| 11:05:25 | 20 | compliance program that must be designed to detect and |
| 11:05:28 | 21 | prevent diversion of controlled substances, right? |
| 11:05:35 | 22 | **A**     That's what the document says. |
| 11:05:36 | 23 | **Q**     That it's going to include procedures to identify |
| 11:05:39 | 24 | signs of diversion, including, and then it gives some red |
| 11:05:44 | 25 | flags, right? |

**Nelson - (By Video Deposition)**

11:05:44  1    **A**      Well, they're not labeled as red flags.

11:05:51  2    **Q**      Well, you and I know these to be red flags.  Doctor

11:05:55  3    shopping is a red flag, isn't it?

11:05:57  4    **A**      In some circumstances, yes.

11:05:58  5    **Q**      Early refills, a red flag.

11:06:01  6           You need to look carefully if there's an early refill,

11:06:04  7    right?

11:06:04  8    **A**      Yes, in some circumstances.

11:06:07  9    **Q**      Altered and forged prescriptions.  That's a red flag

11:06:11  10   now, isn't it?

11:06:11  11   **A**      It could be.

11:06:12  12   **Q**      I mean, can you think of any time an altered and

11:06:16  13   forged prescription is not a red flag?

11:06:17  14   **A**      If you contact the prescriber and the prescriber says,

11:06:19  15   yes, I'm the one who altered that prescription, then, yes,

11:06:23  16   it wouldn't be a red flag.  It would have been, but it would

11:06:26  17   have been resolved by the pharmacist.

11:06:27  18   **Q**      Yeah, I'm not saying it's an unresolvable red flag.

11:06:32  19   I'm just saying it's a red flag.  You don't just fill it.

11:06:35  20   You need to at least check it out, right?

11:06:38  21   **A**      In my opinion, a red flag is one that you can't

11:06:40  22   resolve, but that's my opinion.

11:06:42  23   **Q**      Okay.  So if by red flag I mean it's something that

11:06:44  24   you should check out, but it is a resolvable red flag, I'm

11:06:48  25   using the word differently than you do.

**Nelson - (By Video Deposition)**                                    2479

11:06:50    1         Is that fair?

11:06:51    2    **A**    That sounds accurate.

11:06:55    3    **Q**    So we know that as of March 4 of 2011, at least some

11:06:59    4    higher-ups within Walmart are aware of what's expected and

11:07:05    5    obligated under the agreement with the Drug Enforcement

11:07:10    6    Administration, true?

11:07:16    7                 UNIDENTIFIED SPEAKER:  Objection, form.

11:07:17    8    **A**    If those individuals who are stated on this -- on page

11:07:20    9    1 were actually in this presentation or webinar -- I don't

11:07:23   10    know what the format was where this presentation was made.

11:07:26   11    If they were actually there, then those people would have

11:07:28   12    known.  I don't know.  I don't see a roll call or know that

11:07:31   13    they were actually there, but they're listed as potential

11:07:33   14    people because of the verbiage.

11:07:37   15    **Q**    And it's very potential that this was a week later, a

11:07:41   16    week earlier.  I don't know the details.  But somewhere

11:07:42   17    around this time period, somebody prepared a slide that

11:07:45   18    said, "This is Susanne Hiland, senior director of Regulatory

11:07:52   19    Affairs.  Thank you for joining me this afternoon.  Joining

11:07:54   20    me are Paul Beahm and Andy Gottman."

11:07:57   21         Do you see?

11:07:58   22    **A**    I do see that.

11:08:01   23    **Q**    All right.  So within the framework of this, I want to

11:08:05   24    now begin to walk through what Walmart did, starting in that

11:08:11   25    area -- era of, you know, Walmart actions when you are on

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:08:23 | 1 | the job. |
| 11:08:23 | 2 | You with me? |
| 11:08:27 | 3 | **A**   I don't know yet.  I understand what you're saying, |
| 11:08:29 | 4 | but I don't know if I'm with you. |
| 11:08:30 | 5 | **Q**   Have you got Exhibit 19 in front of you? |
| 11:08:32 | 6 | **A**   I do. |
| 11:08:33 | 7 | **Q**   All right.  So this is an e-mail from you, sent |
| 11:08:41 | 8 | February 2 of 2011, and talking about common signs of |
| 11:08:50 | 9 | diversion in the pharmacy operation manual 1703 and 1311, |
| 11:08:55 | 10 | right? |
| 11:08:56 | 11 | **A**   That's what the document says. |
| 11:08:59 | 12 | **Q**   All right.  So what we know as of 2011 is you're |
| 11:09:06 | 13 | writing and you're saying that "common signs associated with |
| 11:09:13 | 14 | diversion" include doctor shopping, requests for early |
| 11:09:20 | 15 | refills, and prescriptions written by doctors not licensed |
| 11:09:23 | 16 | to practice in the jurisdiction where the patient's located. |
| 11:09:25 | 17 | Is that right? |
| 11:09:29 | 18 | **A**   Again, it's what the document says. |
| 11:09:31 | 19 | **Q**   That's what you said. |
| 11:09:34 | 20 | You wrote this, didn't you? |
| 11:09:35 | 21 | **A**   My name is at the top of the document. |
| 11:09:39 | 22 | **Q**   So do you think you wrote it or did someone else write |
| 11:09:42 | 23 | your name? |
| 11:09:42 | 24 | **A**   I don't have any reason to believe someone else wrote |
| 11:09:44 | 25 | this. |

**Nelson - (By Video Deposition)**          2481

| | | |
|---|---|---|
| 11:09:45 | 1 | **Q**     All right.  So you wrote to Susanne and said that |
| 11:09:49 | 2 | you'd reviewed the POMs and that there were a few common |
| 11:09:53 | 3 | signs of diversion that are spelled out in the memorandum of |
| 11:09:56 | 4 | agreement but not mentioned in the POMs; is that right? |
| 11:10:01 | 5 | **A**     It's what the document says. |
| 11:10:02 | 6 | **Q**     That's what you said, right? |
| 11:10:05 | 7 | **A**     Well, the only reason it gives me pause to say whether |
| 11:10:08 | 8 | I wrote this or not is if you look at the "sent" line, it |
| 11:10:12 | 9 | says it was 9:31 p.m., if you see at the top of the |
| 11:10:15 | 10 | document. |
| 11:10:16 | 11 | **Q**     Uh-huh? |
| 11:10:17 | 12 | **A**     I'm not customarily working at 9:30 in the evening. |
| 11:10:20 | 13 | So that's what gives me pause.  And all those other names at |
| 11:10:23 | 14 | the top there that I assume are redacted or changed in some |
| 11:10:26 | 15 | fashion, I would never have sent an e-mail out with those |
| 11:10:30 | 16 | type of recipients.  I would have used the names.  So that's |
| 11:10:33 | 17 | the reason why I'm not familiar with this type of document. |
| 11:10:36 | 18 | This can't be its original form. |
| 11:10:38 | 19 | **Q**     So someone may have gotten into your e-mails and sent |
| 11:10:44 | 20 | out an e-mail as Brad Nelson, Regulatory Affairs, senior |
| 11:10:51 | 21 | manager, to basically the Listserv that's the Walmart home |
| 11:10:57 | 22 | office recipients -- |
| 11:10:58 | 23 | **A**     Yeah, I'm not familiar with that list.  I don't know |
| 11:11:02 | 24 | that list. |
| 11:11:02 | 25 | **Q**     Are you suggesting someone, like, fraudulently used |

**Nelson - (By Video Deposition)** 2482

| | | |
|---|---|---|
| 11:11:06 | 1 | your name? |
| 11:11:08 | 2 | **A**    I'm saying there's no way I would have written an |
| 11:11:10 | 3 | e-mail with those "to" and "from" -- the "to" and "cc's" up |
| 11:11:16 | 4 | there, I don't know who those people are or what that |
| 11:11:18 | 5 | e-mail -- that distribution list or whatever that is.  I |
| 11:11:21 | 6 | would have had their names individually listed.  So I |
| 11:11:23 | 7 | don't -- I don't recognize that part up at the top. |
| 11:11:26 | 8 | Susanne I know, but I don't see her name on the "to." |
| 11:11:28 | 9 | Do you see it up there?  I don't see it in the address list. |
| 11:11:31 | 10 | So I don't know who that Walmart home office |
| 11:11:35 | 11 | recipient/F0171A, so forth, I don't know who that is. |
| 11:11:42 | 12 | That's not something I recognize. |
| 11:11:43 | 13 | **Q**    All right.  Well, somebody wrote under your name, |
| 11:11:47 | 14 | whether it's you or someone else, "Susanne, upon review of |
| 11:11:53 | 15 | both POMs" -- |
| 11:11:54 | 16 | Now, let's be real clear.  What's a POM? |
| 11:11:59 | 17 | **A**    Pharmacy operations manual. |
| 11:12:02 | 18 | **Q**    And that's something that's within Walmart.  That's |
| 11:12:07 | 19 | Walmart written, right? |
| 11:12:07 | 20 | **A**    The operations manual is a Walmart document. |
| 11:12:14 | 21 | **Q**    Okay.  So we'll say that's Walmart's pharmacy |
| 11:12:18 | 22 | operations manual. |
| 11:12:18 | 23 | Is that fair? |
| 11:12:22 | 24 | **A**    That's what POM stands for. |
| 11:12:26 | 25 | **Q**    Okay.  So "Upon review of Walmart's pharmacy |

**Nelson - (By Video Deposition)**

2483

| | | |
|---|---|---|
| 11:12:31 | 1 | operations manual 1703 and 1311, there are a few common |
| 11:12:33 | 2 | signs of diversion that are spelled out in the MOA but not |
| 11:12:39 | 3 | mentioned in the POMs." |
| 11:12:40 | 4 | Is that right? |
| 11:12:45 | 5 | **A**    Well, I'd like to point out that at that time, those |
| 11:12:47 | 6 | POMs were not published yet because the memorandum of |
| 11:12:50 | 7 | agreement did not go into effect until March of 2017.  So |
| 11:12:57 | 8 | this would have been during the review process. |
| 11:12:59 | 9 | **Q**    Okay.  That's helpful. |
| 11:13:02 | 10 | So y'all didn't have -- y'all had been selling opioids |
| 11:13:11 | 11 | for years and years and years, hadn't you? |
| 11:13:13 | 12 | **A**    Well, Walmart had filled prescriptions for years and |
| 11:13:15 | 13 | years and years, and certainly there are prescriptions that |
| 11:13:19 | 14 | would have been controlled substances filled in there. |
| 11:13:20 | 15 | **Q**    Okay.  So are you telling us and telling the jury that |
| 11:13:24 | 16 | y'all didn't have any type of pharmacy operations manual |
| 11:13:29 | 17 | until the DEA got y'all in that agreement in 2011? |
| 11:13:36 | 18 | **A**    No, I'm referring to the ones in this e-mail, 1703 and |
| 11:13:41 | 19 | 1311.  Those POMs were not published at that time because |
| 11:13:45 | 20 | they were related to the MOA. |
| 11:13:48 | 21 | **Q**    So whatever your pharmacists were operating under as |
| 11:13:56 | 22 | recently as 2011, they haven't been told that a few common |
| 11:14:01 | 23 | signs of diversion include doctor shopping, requests for |
| 11:14:07 | 24 | early refills, and prescriptions written by doctors not |
| 11:14:10 | 25 | licensed to practice in the jurisdiction where the patient |

**Nelson - (By Video Deposition)**

2484

| | | |
|---|---|---|
| 11:14:12 | 1 | is? |
| 11:14:14 | 2 | **A**    I did not -- I did not say that.  I said that these -- |
| 11:14:17 | 3 | this particular POM, 1703 and 1311, apparently were missing |
| 11:14:23 | 4 | some information that needed to be included, in my opinion, |
| 11:14:27 | 5 | before being published. |
| 11:14:28 | 6 | **Q**    Okay.  So if we're going to put a little timeline |
| 11:14:30 | 7 | together here, you've taken the job, you said, in February |
| 11:14:34 | 8 | of 2011?  Is that right? |
| 11:14:39 | 9 | **A**    Yup.  Looks like my second day. |
| 11:14:44 | 10 | **Q**    If you wrote it. |
| 11:14:48 | 11 | You take the job in 2011.  Let's get down the road |
| 11:14:54 | 12 | here. |
| 11:14:54 | 13 | And also in February, 2/2, you send an e-mail out |
| 11:15:03 | 14 | about missing signs of diversion.  Right? |
| 11:15:11 | 15 | **A**    I sent an e-mail to my supervisor, and I don't |
| 11:15:13 | 16 | recognize those other names on there or those other |
| 11:15:16 | 17 | distribution lists, so I don't know who else was included on |
| 11:15:18 | 18 | that e-mail. |
| 11:15:18 | 19 | **Q**    All right.  Now, if you'll keep going, let's pass on |
| 11:15:31 | 20 | by Exhibit 19 and go to Walmart Exhibit 236, Tab 236, which |
| 11:15:45 | 21 | I will mark as Exhibit Number 20. |
| 11:15:51 | 22 | The first e-mail is the one at the bottom dated |
| 11:15:57 | 23 | February 27 at 9:48 a.m. |
| 11:16:04 | 24 | Do you have that in front of you? |
| 11:16:05 | 25 | **A**    I do. |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:16:05 | 1 | **Q**      "Deputy Assistant Administrator Joseph Rannazzisi |
| 11:16:14 | 2 | charged in the document that DEA officials met with CVS |
| 11:16:17 | 3 | executives twice before about the increase in the volume of |
| 11:16:23 | 4 | OxyContin prescriptions presented at two pharmacies, which |
| 11:16:28 | 5 | far exceeded the norm." |
| 11:16:30 | 6 | Do you see that? |
| 11:16:31 | 7 | **A**      That's what the document says. |
| 11:16:38 | 8 | **Q**      And then the pertinent information I want to point to |
| 11:16:40 | 9 | you is on the second page. |
| 11:16:45 | 10 | "'Employees there willfully ignored many typical red |
| 11:16:49 | 11 | flags in filling prescriptions, even though they knew or |
| 11:16:55 | 12 | should have known the drugs were not for medical purposes,' |
| 11:16:59 | 13 | DEA alleged. " |
| 11:17:00 | 14 | Do you see where I'm reading? |
| 11:17:01 | 15 | **A**      Yes, sir. |
| 11:17:01 | 16 | **Q**      Now, y'all were still trying to get the red flags put |
| 11:17:08 | 17 | into your manual; is that right? |
| 11:17:09 | 18 | **A**      There was lots of other policies and procedures in |
| 11:17:11 | 19 | place before that previous e-mail that we looked at about me |
| 11:17:15 | 20 | stating that there are some things missing that need to be |
| 11:17:18 | 21 | included on those two POMs. |
| 11:17:22 | 22 | **Q**      Yeah, well -- |
| 11:17:23 | 23 | **A**      I can tell you which POMs were in place prior to this |
| 11:17:26 | 24 | message that contained the information regarding red flags, |
| 11:17:29 | 25 | using your word. |

| | | |
|---|---|---|
| 11:17:34 | 1 | **Q**     Well, you or whoever is writing e-mails under your |
| 11:17:39 | 2 | name said, "Common signs associated with diversion that need |
| 11:17:43 | 3 | to be added." |
| 11:17:44 | 4 |     Y'all were missing some common signs, weren't you? |
| 11:17:47 | 5 | **A**     In those two POMs before they were published, yes. |
| 11:17:52 | 6 | **Q**     And then the next paragraph, do you see where it |
| 11:17:54 | 7 | starts "The"? |
| 11:17:56 | 8 | **A**     Yes, sir. |
| 11:17:59 | 9 | **Q**     "'The company's efforts to curb the illegal practice |
| 11:18:04 | 10 | have been reactionary and would not ensure that it would |
| 11:18:08 | 11 | stop,' DEA officials said." |
| 11:18:15 | 12 |     Do you see that? |
| 11:18:16 | 13 | **A**     I can see what it says on the document, yes. |
| 11:18:18 | 14 | **Q**     You know the difference between being reactive, where |
| 11:18:22 | 15 | you're reacting, or being proactive, where you're actually |
| 11:18:26 | 16 | acting ahead of time, don't you? |
| 11:18:28 | 17 | **A**     In most situations, proactive is better than reactive. |
| 11:18:32 | 18 | **Q**     Now, did you know that this is the *Holiday* case that |
| 11:18:36 | 19 | you and I were talking about earlier that you said you |
| 11:18:38 | 20 | hadn't heard of? |
| 11:18:39 | 21 | **A**     No, sir, I would not have known that. |
| 11:18:43 | 22 | **Q**     You took this and you sent this around to people, |
| 11:18:48 | 23 | didn't you? |
| 11:18:48 | 24 | **A**     I sent it to the colleagues that I worked with at the |
| 11:18:51 | 25 | time, yes, sir, but I don't see anything about it saying |

11:18:54  1    *Holiday* case on there.

11:18:57  2    **Q**    Okay.  That's fair.

11:18:57  3         Did you bother to look it up once you got this so that

11:19:02  4    you could be sure and drive compliance in a good way?

11:19:04  5    **A**    I believe we were already driving compliance in a

11:19:08  6    favorable way at that time.  That was nearly a year after

11:19:12  7    the MOA was signed.

11:19:12  8    **Q**    So are you telling me that, no, I did not look it up?

11:19:16  9    **A**    I'm not -- did not look up what, sir?

11:19:19  10   **Q**    You didn't look up this case and try to get more

11:19:21  11   details about it?

11:19:21  12   **A**    No, sir, I did not.

11:19:26  13   **Q**    All right.  So on 2/27, you're e-mailing about the CVS

11:19:34  14   woes on red flags.  Is that fair to say?

11:19:38  15   **A**    Let's be sure we put 2012 on there.

11:19:47  16   **Q**    Great point.  Thank you.

11:19:50  17   **A**    And I also want to point out at this time there was

11:19:56  18   more than just Brad doing this role.  People had joined the

11:20:00  19   task force or joined that role with me.

11:20:03  20   **Q**    Yeah.  You finally got some help, didn't you?

11:20:07  21   **A**    I don't know about "finally," but I was fortunate to

11:20:12  22   get some additional resources, yes.

11:20:13  23   **Q**    All right.  So now let's go to Walmart 364, which I'm

11:20:18  24   going to mark as Exhibit 21.

11:20:27  25        This is a press release that's dated September 12 of

**Nelson - (By Video Deposition)** 2488

| | | |
|---|---|---|
| 11:20:30 | 1 | 2012. |
| 11:20:32 | 2 | Do you see that? |
| 11:20:33 | 3 | **A** I do. |
| 11:20:36 | 4 | **Q** And this press release -- let's see if I can make it a |
| 11:20:40 | 5 | little bigger for you and the jury. |
| 11:20:45 | 6 | (Video playback interruption:) |
| 11:20:45 | 7 | MR. DELINSKY: Your Honor, may we go in side |
| 11:20:47 | 8 | bar briefly? |
| 11:20:57 | 9 | (At side bar at 11:20 a.m.) |
| 11:21:05 | 10 | THE COURT: Okay. |
| 11:21:06 | 11 | MR. DELINSKY: Your Honor, I understand that |
| 11:21:07 | 12 | the Court has admitted aspects of the *Holiday* case and CVS |
| 11:21:13 | 13 | settlements over our objections, but this is getting |
| 11:21:15 | 14 | gratuitous. |
| 11:21:16 | 15 | THE COURT: I thought all this was agreed to, |
| 11:21:19 | 16 | these depositions? |
| 11:21:20 | 17 | MR. LANIER: It was, Your Honor, and Special |
| 11:21:23 | 18 | Master Cohen ruled on this, and the time for appealing his |
| 11:21:23 | 19 | rulings is long gone. |
| 11:21:27 | 20 | MR. DELINSKY: This is gratuitous. We're now |
| 11:21:27 | 21 | looking at newspaper articles, we're looking at press |
| 11:21:29 | 22 | releases. |
| 11:21:30 | 23 | THE COURT: Wait a minute. First of all, |
| 11:21:31 | 24 | this -- I hear your objection, Mr. Delinsky, okay, it's way, |
| 11:21:36 | 25 | way, way too late. This has all been dealt with, these |

**Nelson - (By Video Deposition)**                                    2489

11:21:40  1   deposition excerpts, okay?  You knew these were coming in a

11:21:43  2   long time ago.  So it's untimely, and, you know, there's

11:21:48  3   been a lot of discussion about this, and it's fair game

11:21:52  4   anyway because of this witness's position and what he knew

11:21:59  5   about it and what he did or didn't do with respect to

11:22:01  6   Walmart.

11:22:02  7       So it's overruled because it's untimely, and even if

11:22:05  8   it were timely, I think I'd overrule it.

11:22:13  9              MR. DELINSKY:  Well, Your Honor, we believe we

11:22:15  10  did assert objections to this, but we just wanted it noted

11:22:18  11  for the record.

11:22:18  12             THE COURT:  Well, it's noted.  I've overruled

11:22:19  13  it for two reasons.

11:22:35  14             (End side bar at 11:22 a.m.)

11:22:39  15  **Q**    This press release talks about the same thing, doesn't

11:22:41  16  it?  It is the two CVS retailers' DEA case.  Same case,

11:22:45  17  right.

11:22:46  18  **A**    I don't know if it's the same case or not.  I didn't

11:22:52  19  read that entire first document that you gave to us about

11:22:54  20  the *Holiday* situation.  I didn't know if it had more stores

11:22:57  21  or less stores involved than this.  This appears to be new

11:23:01  22  stores as well, so I'm assuming it's not the same.

11:23:03  23  **Q**    Huh.  Well, without unnecessarily fussing with you, on

11:23:16  24  February 4 the DEA served an immediate suspension order at

11:23:19  25  *Holiday*.

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:23:19 | 1 | Do you see that? |
| 11:23:20 | 2 | **A** I do. |
| 11:23:21 | 3 | **Q** And that's the store on Orlando Drive. |
| 11:23:26 | 4 | Do you see that as well? |
| 11:23:27 | 5 | **A** I do see that. |
| 11:23:28 | 6 | **Q** And then one on West First Street. |
| 11:23:31 | 7 | Do you see that as well? |
| 11:23:32 | 8 | **A** That's correct. |
| 11:23:32 | 9 | **Q** And Exhibit 20, which you and I have just been |
| 11:23:36 | 10 | discussing, the previous one that talked about Joe |
| 11:23:38 | 11 | Rannazzisi, two CVS stores on Orlando Drive and West First |
| 11:23:43 | 12 | Street. |
| 11:23:47 | 13 | See that? |
| 11:23:48 | 14 | **A** Yes, that paragraph does reference the first e-mail we |
| 11:23:50 | 15 | talked about, yes. |
| 11:23:51 | 16 | **Q** Okay.  Great.  So now we've got it, and now you do |
| 11:23:57 | 17 | know it's the *Holiday* case. |
| 11:23:59 | 18 | You see that? |
| 11:24:00 | 19 | **A** That would not have been a key takeaway from me, no. |
| 11:24:06 | 20 | I see it says that, but that would not have been a takeaway |
| 11:24:09 | 21 | for me to know it was called *Holiday CVS*. |
| 11:24:12 | 22 | **Q** Well, it's not just there, it's throughout here.  It |
| 11:24:15 | 23 | talks about the hearing in front of the ALJ, administrative |
| 11:24:27 | 24 | law judge.  It talks about the evidence during the hearing. |
| 11:24:28 | 25 | It says that the final order was issued and denies any |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:24:33 | 1 | pending applications of Holiday and gives the name again. |
| 11:24:38 | 2 | Do you see that? |
| 11:24:40 | 3 | UNIDENTIFIED SPEAKER:  Objection.  Form. |
| 11:24:43 | 4 | **A**    Yes, sir, I do see that, but the name of the pharmacy |
| 11:24:47 | 5 | would not have been what I was focusing on.  I was focusing |
| 11:24:49 | 6 | on the issues at hand. |
| 11:24:52 | 7 | **Q**    Well, I'm just wondering, when you sent an e-mail out |
| 11:24:56 | 8 | that said, "Looks like the DEA made a statement here" -- you |
| 11:25:04 | 9 | see that? |
| 11:25:06 | 10 | **A**    Yes, sir. |
| 11:25:07 | 11 | **Q**    I'm just wondering if when you knew the DEA made a |
| 11:25:11 | 12 | statement, if you bothered to go read it. |
| 11:25:13 | 13 | **A**    I read the press release from the DEA.  That's what |
| 11:25:16 | 14 | this item is that I forwarded out. |
| 11:25:18 | 15 | **Q**    Did you read the case?  Did you do any investigation |
| 11:25:22 | 16 | beyond reading a press release and sending it out? |
| 11:25:26 | 17 | **A**    I read this press release and forwarded it to my |
| 11:25:30 | 18 | supervisors. |
| 11:25:31 | 19 | **Q**    Did you do anything else to investigate what had |
| 11:25:36 | 20 | happened and what had gone wrong? |
| 11:25:37 | 21 | **A**    Not that I recall. |
| 11:25:41 | 22 | **Q**    Do you recall doing anything that would have led you |
| 11:25:46 | 23 | to learn about those red flags that were in the *Holiday* |
| 11:25:52 | 24 | case, Exhibit 11, that we looked at before lunch? |
| 11:25:57 | 25 | **A**    As I recall, sir, we talked before lunch about this |

**Nelson - (By Video Deposition)**                                       2492

| | | |
|---|---|---|
| 11:26:01 | 1 | case and said that that was Professor Doering's example of |
| 11:26:05 | 2 | what red flags were in those particular instances. |
| 11:26:07 | 3 | Red flags exist, but they're different in each |
| 11:26:12 | 4 | circumstance. |
| 11:26:12 | 5 | **Q**    Well, that's what Professor Doering said were red |
| 11:26:16 | 6 | flags pertaining to the distribution of the opioids. |
| 11:26:19 | 7 | I'm just asking if you went to research it to find out |
| 11:26:24 | 8 | what was the problem here. |
| 11:26:26 | 9 | **A**    Not that I recall. |
| 11:26:27 | 10 | **Q**    That's part of your job, though, wasn't it? |
| 11:26:35 | 11 | **A**    I don't recall seeing that in the job description, to |
| 11:26:38 | 12 | read DEA cases against other pharmacies. |
| 11:26:40 | 13 | **Q**    No, the job description isn't that specific, but that |
| 11:26:45 | 14 | doesn't change the requirements. |
| 11:26:49 | 15 | I mean, you know, they don't -- your job description |
| 11:26:52 | 16 | was to -- go back to Exhibit 2. |
| 11:26:56 | 17 | Your job description includes driving compliance with |
| 11:27:04 | 18 | federal and state regulatory requirements, doesn't it? |
| 11:27:07 | 19 | **A**    Well, the good news was, at this point in September of |
| 11:27:13 | 20 | 2012, I had additional colleagues to help me, and there was |
| 11:27:15 | 21 | another one on the way.  So it wasn't just me. |
| 11:27:18 | 22 | **Q**    So you didn't have to do it, someone else could? |
| 11:27:25 | 23 | **A**    No, I had additional support to do it. |
| 11:27:26 | 24 | **Q**    I mean, you -- but you hired onto this job.  You |
| 11:27:31 | 25 | applied for it.  You were getting paid and bonused for it, |

**Nelson - (By Video Deposition)**                    2493

| | | |
|---|---|---|
| 11:27:35 | 1 | right? |
| 11:27:35 | 2 | **A**    As were other colleagues of mine doing the same thing. |
| 11:27:39 | 3 | **Q**    I mean, part of what you were supposed to be doing |
| 11:27:43 | 4 | included communicating additional information requested from |
| 11:27:47 | 5 | regulatory agencies. |
| 11:27:50 | 6 | So you had to have some kind of relationship with the |
| 11:27:52 | 7 | DEA, didn't you? |
| 11:27:53 | 8 | **A**    Not with regard to their ongoing cases that they had |
| 11:27:58 | 9 | filed against other people or even settlements. |
| 11:28:00 | 10 | **Q**    Who's the biggest drugstore out there in the U.S. |
| 11:28:04 | 11 | writing prescriptions -- I mean filling prescriptions when |
| 11:28:08 | 12 | you were working for Walmart? |
| 11:28:09 | 13 | **A**    In 2017, I'm not sure.  I'm not sure which one was the |
| 11:28:16 | 14 | top dog at that point. |
| 11:28:17 | 15 | **Q**    Well, you got to have -- Walmart's up there near the |
| 11:28:20 | 16 | top at least, isn't it? |
| 11:28:21 | 17 | **A**    I don't recall where Walmart fell.  I just don't. |
| 11:28:26 | 18 | **Q**    There's no excuse for Walmart not to be on top of its |
| 11:28:30 | 19 | game and know what other pharmacies know, true? |
| 11:28:33 | 20 | **A**    I have no idea how Walmart would know what other |
| 11:28:37 | 21 | pharmacies know. |
| 11:28:38 | 22 | **Q**    All right.  Pull out, please, Walmart 107.  We'll mark |
| 11:28:42 | 23 | it as Exhibit 23. |
| 11:28:55 | 24 | From Brad Nelson to Caroline Riogi and Shelley |
| 11:29:04 | 25 | Tustison -- I don't know how to say her name -- sent March |

**Nelson - (By Video Deposition)**                                    2494

11:29:13   1    of 2013.

11:29:13   2         Do you see that?

11:29:14   3    **A**    I do.

11:29:16   4    **Q**    Do you think you wrote this one?

11:29:18   5    **A**    Well, again, it's at 9:55 at night, so nearly 10 p.m.

11:29:25   6    That was not normal time to conduct business.  So, I mean,

11:29:28   7    again, I have no reason to believe that this isn't from me

11:29:30   8    to Shelley and Caroline.

11:29:36   9    **Q**    Yeah, I mean, because you said before you didn't think

11:29:39   10   it was you because of the time signature.  This is another

11:29:41   11   one where you're writing pretty late if it's you, right?

11:29:44   12   **A**    I'm sorry, I didn't hear that.

11:29:45   13   **Q**    I said -- you said before you didn't think it was

11:29:50   14   your -- you because of the time signature, but this one is

11:29:54   15   another one where you're -- if it's you, you're writing

11:29:57   16   pretty late, right?

11:30:03   17   **A**    I agree.

11:30:03   18   **Q**    Now, this says, "I would encourage you" -- "I would

11:30:11   19   encourage you to review these pharmacy operation manual

11:30:20   20   forms.  Pharmacists are granted the ability to exercise

11:30:25   21   their professional judgment and choose to refuse to fill any

11:30:27   22   prescription if they feel the prescription was written for

11:30:35   23   other than a legitimate medical purpose."

11:30:37   24         Did I read that right?

11:30:39   25   **A**    That's what the document says.

**Nelson - (By Video Deposition)**

2495

| | | |
|---|---|---|
| 11:30:40 | 1 | **Q**    Now, "granted the ability" is actually not just |
| 11:30:47 | 2 | granted the ability.  They're supposed to not fill a |
| 11:30:52 | 3 | prescription if they think it's written for other than a |
| 11:30:54 | 4 | legitimate medical purpose.  It's not optional, is it? |
| 11:30:58 | 5 | **A**    No, it states there they're given the ability to |
| 11:31:02 | 6 | exercise their professional judgment and refuse to fill a |
| 11:31:04 | 7 | prescription.  So stating there they can do that. |
| 11:31:06 | 8 | **Q**    Well, yeah, I know they can.  They're supposed to do |
| 11:31:08 | 9 | that though.  That's like -- that's the difference between |
| 11:31:10 | 10 | telling my kid, hey, you can make up your bed, or you're |
| 11:31:14 | 11 | supposed to make up your bed. |
| 11:31:16 | 12 | Those are two different things, aren't they? |
| 11:31:19 | 13 | **A**    I don't understand what you're getting at.  This says |
| 11:31:21 | 14 | they are granted the ability to exercise their professional |
| 11:31:23 | 15 | judgment and refuse to fill any prescription. |
| 11:31:24 | 16 | **Q**    Well, my kids are too old for me to tell that to, so |
| 11:31:29 | 17 | let me come up with a different illustration, okay? |
| 11:31:32 | 18 | Did you ever teach any of your kids how to drive a |
| 11:31:35 | 19 | car? |
| 11:31:35 | 20 | **A**    Yes, sir. |
| 11:31:36 | 21 | **Q**    Did you give them the ability to drive it below the |
| 11:31:43 | 22 | speed limit, or did you instruct them to drive it below the |
| 11:31:49 | 23 | speed limit? |
| 11:31:49 | 24 | **A**    I don't know that that's the same situation.  There's |
| 11:31:56 | 25 | not professional judgment involved in that, and no back and |

**Nelson - (By Video Deposition)**

2496

| | | |
|---|---|---|
| 11:32:00 | 1 | forth between -- it's not the same situation.  I do -- this |
| 11:32:04 | 2 | says that they're granted the ability to exercise their |
| 11:32:06 | 3 | professional judgment and choose not to fill a prescription |
| 11:32:11 | 4 | if they feel the prescription was written for other than a |
| 11:32:14 | 5 | legitimate purpose. |
| 11:32:14 | 6 | **Q**    And I'm suggesting to you if they think it's written |
| 11:32:18 | 7 | for other than a legitimate purpose, they're supposed to |
| 11:32:21 | 8 | find out, and if they can't find out, they're not supposed |
| 11:32:26 | 9 | to fill it at all. |
| 11:32:27 | 10 | You disagree with me? |
| 11:32:29 | 11 | **A**    I would not fill a prescription if it was me that I |
| 11:32:34 | 12 | felt was for other than a legitimate purpose.  I just want |
| 11:32:37 | 13 | to make sure that the pharmacists know that they have that |
| 11:32:40 | 14 | ability at Walmart. |
| 11:32:41 | 15 | **Q**    Well, sir, you're in charge of driving their |
| 11:32:43 | 16 | compliance with this regulatory requirements. |
| 11:32:50 | 17 | Shouldn't you be telling them that if they don't think |
| 11:32:54 | 18 | it's written for a legitimate medical purpose, it's not, ah, |
| 11:33:01 | 19 | they could choose to exercise their judgment and not fill |
| 11:33:04 | 20 | it, it's don't fill it until you decide if it's right, |
| 11:33:08 | 21 | correct? |
| 11:33:08 | 22 | **A**    So again, as -- I don't want to be misrepresented.  I |
| 11:33:12 | 23 | was not the only person at this time doing that job. |
| 11:33:15 | 24 | Shelley and Caroline were my counterparts who did the same |
| 11:33:19 | 25 | thing.  We had the country split up into geographical areas. |

**Nelson - (By Video Deposition)**                                   2497

| | | |
|---|---|---|
| 11:33:23 | 1 | This e-mail was just to let them know that this was |
| 11:33:27 | 2 | guidance that was being sent out when a pharmacist would ask |
| 11:33:30 | 3 | a question about refusal to fill. |
| 11:33:34 | 4 | **Q**    Yet these are the two people that Walmart had hired to |
| 11:33:37 | 5 | help you, right? |
| 11:33:37 | 6 | **A**    These are the two people that Walmart hired to do the |
| 11:33:39 | 7 | same job as me. |
| 11:33:40 | 8 | **Q**    Well, you're telling them -- I mean, look, you're |
| 11:33:44 | 9 | telling them -- you're e-mailing them and saying, "I would |
| 11:33:50 | 10 | encourage you to review these."  You're telling them |
| 11:33:54 | 11 | pharmacists are granted the ability. |
| 11:33:58 | 12 | You're teaching them, aren't you? |
| 11:33:59 | 13 | **A**    This e-mail was an e-mail that I sent to Shelley and |
| 11:34:03 | 14 | Caroline for their review to see if they agreed that this |
| 11:34:08 | 15 | was the common verbiage that we should all three use when |
| 11:34:11 | 16 | addressing pharmacists that have questions about refusal to |
| 11:34:16 | 17 | fill. |
| 11:34:19 | 18 | This was not training Caroline and Shelley.  This was |
| 11:34:22 | 19 | giving them information that I proposed we should use to |
| 11:34:25 | 20 | send out when they asked -- when pharmacists asked questions |
| 11:34:30 | 21 | about refusal to fill. |
| 11:34:34 | 22 | **Q**    Now, with due respect, I want to put that to the test. |
| 11:34:40 | 23 | Okay? |
| 11:34:41 | 24 | Look at the rest of this and see if it bears up what |
| 11:34:44 | 25 | you're saying. |

**Nelson - (By Video Deposition)**

2498

| | |
|---|---|
| 11:34:45 | 1 |

First of all, Caroline and Shelley, probably wonderful people, but to be clear, they're both under the age of 30 at this point in time, right?

A    Well, with all due respect, Ms. Shelley Tustison was actually doing this job before I applied for this and was given it.

Q    Okay.  So she's still under -- under the age of 30, was my question, right?

A    I don't know what their -- I don't know what their ages were at that time.

Q    Okay.  That's fair, and it's probably something I'm being nosy about.

I'm just saying they hadn't had decades in the pharmaceutical field like you had, right?

A    None of us had a lot of experience in the regulatory affairs area.  We were all new to that space.

Q    Yeah, I agree.

All right.  You told them, "Pharmacists are granted the ability to exercise their judgment."

And then you continue to say, "Even after the pharmacists establish that there's a doctor-patient relation, the pharmacist is still allowed to refuse to fill a prescription on an individual prescription basis.  No blanket refusals are allowed by boards of pharmacy."

Do you see where you said that?

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:36:02 | 1 | **A**    That is correct. |
| 11:36:02 | 2 | **Q**    Where on Earth did you get that idea, that no blanket |
| 11:36:06 | 3 | refusals are allowed by the boards of pharmacy? |
| 11:36:15 | 4 | **A**    I don't know that I got that idea anyplace.  I don't |
| 11:36:21 | 5 | recall. |
| 11:36:21 | 6 | **Q**    I mean, you say that over and over, month after month, |
| 11:36:23 | 7 | year after year in e-mails, telling people that no blanket |
| 11:36:28 | 8 | refusals are allowed by the boards of pharmacy. |
| 11:36:31 | 9 |     Where on Earth do you get a basis for saying that? |
| 11:36:34 | 10 | **A**    That was the guidance that was being given at the |
| 11:36:36 | 11 | time. |
| 11:36:36 | 12 | **Q**    By who? |
| 11:36:37 | 13 | **A**    By all of us. |
| 11:36:40 | 14 | **Q**    No.  Who told you that no blanket refusals are allowed |
| 11:36:44 | 15 | by boards of pharmacy?  Who told you that? |
| 11:36:48 | 16 | **A**    I honestly can't recall anybody specifically telling |
| 11:36:50 | 17 | me that. |
| 11:36:51 | 18 | **Q**    Where did you come up with it? |
| 11:36:54 | 19 | **A**    I don't know that I came up with it.  I just know that |
| 11:36:58 | 20 | was the guidance that was being given at that time. |
| 11:37:01 | 21 | **Q**    That was the guidance you were giving. |
| 11:37:03 | 22 |     Did you make it up? |
| 11:37:04 | 23 | **A**    I think I just said, I didn't make it up.  That was |
| 11:37:08 | 24 | the guidance that was being given at that time, so that was |
| 11:37:10 | 25 | the guidance I gave out to people. |

**Nelson - (By Video Deposition)**

2500

| | | |
|---|---|---|
| 11:37:12 | 1 | **Q**    You continued to tell these people who were helping |
| 11:37:16 | 2 | you out in this job now, "Feel free to give me a call, and |
| 11:37:20 | 3 | I'll be happy to discuss your concerns.  Unfortunately, |
| 11:37:23 | 4 | there are many prescribers that write for large quantities |
| 11:37:27 | 5 | of controlled substances; however, this does not mean that |
| 11:37:32 | 6 | you as a professional are required to fill these |
| 11:37:35 | 7 | prescriptions. |
| 11:37:37 | 8 | "Walmart encourages and supports the pharmacist in |
| 11:37:39 | 9 | exercising their professional judgment.  We simply ask that |
| 11:37:42 | 10 | you follow the policies and procedures outlined in the |
| 11:37:46 | 11 | pharmacy operations manual to protect you and the company |
| 11:37:51 | 12 | from false claims of discrimination from the prescriber or |
| 11:37:55 | 13 | the patient.  We appreciate your concerns and understand the |
| 11:37:59 | 14 | impact to your practice.  Let us know how we can help." |
| 11:38:02 | 15 | That's the way you end it, right? |
| 11:38:04 | 16 | **A**    Again, I want to remind you that this was not sent for |
| 11:38:07 | 17 | Caroline and Shelley's education.  This was sent for their |
| 11:38:12 | 18 | review to see how they agreed with the verbiage that was |
| 11:38:16 | 19 | going to be sent out to pharmacists who had sent e-mails in |
| 11:38:19 | 20 | asking for guidance on, what should I do with a prescription |
| 11:38:24 | 21 | I don't want to fill. |
| 11:38:25 | 22 | **Q**    Where does it say that?  Where do you say, would you |
| 11:38:28 | 23 | please review this and give me your input? |
| 11:38:31 | 24 | **A**    I would say that's probably an e-mail that was sent |
| 11:38:34 | 25 | prior to this one. |

| 11:38:34 | 1 | **Q**    Because this one doesn't say it, does it? |
| 11:38:38 | 2 | **A**    No, but I can assure you that that's what this e-mail |
| 11:38:40 | 3 | is in regards to. |
| 11:38:42 | 4 | **Q**    All right.  So 3/26/13 is you saying no blanket |
| 11:38:46 | 5 | refusals are allowed. |
| 11:38:48 | 6 | **A**    That was not me saying that.  That is information that |
| 11:38:53 | 7 | was taken out of the POMs. |
| 11:38:57 | 8 | **Q**    I thought you were in charge of the POMs on this |
| 11:39:03 | 9 | stuff. |
| 11:39:03 | 10 | **A**    No, sir, I was not responsible for writing the POMs. |
| 11:39:05 | 11 | **Q**    Were you responsible for making sure they were right? |
| 11:39:09 | 12 | **A**    I was responsible to make sure they were communicated |
| 11:39:12 | 13 | out to the field. |
| 11:39:13 | 14 | **Q**    And that they were right? |
| 11:39:15 | 15 | **A**    That was not my responsibility, to ensure that POMs |
| 11:39:18 | 16 | were written correctly. |
| 11:39:18 | 17 | **Q**    Well, you were supposed to oversee the company's |
| 11:39:23 | 18 | policies. |
| 11:39:24 | 19 | Isn't POM a policy? |
| 11:39:25 | 20 | **A**    There was processes in place to review POMs before |
| 11:39:28 | 21 | they were published. |
| 11:39:29 | 22 | **Q**    That wasn't my question. |
| 11:39:31 | 23 | Your job description, Exhibit 2, was to oversee the |
| 11:39:36 | 24 | company's policies. |
| 11:39:39 | 25 | Do you see that? |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:39:39 | 1 | **A**     Again, at this point, I was not the only person doing |
| 11:39:42 | 2 | this job. |
| 11:39:42 | 3 | **Q**     Not my question, sir. |
| 11:39:45 | 4 |     You applied for, and you said you were qualified, and |
| 11:39:49 | 5 | you got a job to oversee the company's policies and |
| 11:39:53 | 6 | assessments related to controlled substances by analyzing |
| 11:39:57 | 7 | state and federal guidelines to ensure the company's |
| 11:40:00 | 8 | programs met them. |
| 11:40:05 | 9 |     Do you see that? |
| 11:40:05 | 10 | **A**     Again, there was two other people that applied for the |
| 11:40:08 | 11 | same position and were also helping oversee company policies |
| 11:40:11 | 12 | and assessments. |
| 11:40:14 | 13 | **Q**     Yeah, they were the people you wrote to and told them |
| 11:40:17 | 14 | no blanket refusals are allowed. |
| 11:40:19 | 15 |     And you're -- right? |
| 11:40:22 | 16 | **A**     No, they are people that were included on an e-mail |
| 11:40:24 | 17 | string, but I was not training them.  I was giving them |
| 11:40:27 | 18 | information about verbiage that we could send out so we were |
| 11:40:31 | 19 | sending out consistent information. |
| 11:40:35 | 20 | **Q**     Uh-huh.  And so you e-mail out, no blanket refusals |
| 11:40:38 | 21 | are allowed by boards of pharmacy, and you can't tell me one |
| 11:40:42 | 22 | Board of Pharmacy that said that, can you? |
| 11:40:44 | 23 | **A**     I certainly don't know what all boards of pharmacy say |
| 11:40:48 | 24 | about that topic. |
| 11:40:49 | 25 | **Q**     All right.  Next go to Walmart 18.  I'm going to mark |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:40:53 | 1 | Walmart 18 as Exhibit Number 24. |
| 11:41:05 | 2 | Do you have it in front of you? |
| 11:41:09 | 3 | **A**   Yes, sir. |
| 11:41:10 | 4 | **Q**   Now, this is a document that's dated July 9 of 2013, |
| 11:41:18 | 5 | and it's an update on order monitoring and retailer due |
| 11:41:24 | 6 | diligence at a CPPC meeting. |
| 11:41:26 | 7 | Do you know what that stands for? |
| 11:41:30 | 8 | **A**   I do not recall. |
| 11:41:32 | 9 | **Q**   All right.  It's dated July 9 of 2013, and it's by -- |
| 11:41:38 | 10 | or it's got on the title slide, "Steve Seid, executive |
| 11:41:45 | 11 | director, National Accounts and Trade Relations." |
| 11:41:47 | 12 | Do you see that? |
| 11:41:51 | 13 | **A**   I do. |
| 11:41:51 | 14 | **Q**   I will represent to you that we pulled this document |
| 11:41:53 | 15 | out of Purdue Pharma's internal files. |
| 11:42:01 | 16 | Do you know who Purdue Pharma is? |
| 11:42:03 | 17 | **A**   A drug manufacturer, as I recall. |
| 11:42:06 | 18 | **Q**   Made OxyContin, one of the largest selling opioids in |
| 11:42:12 | 19 | history, right? |
| 11:42:12 | 20 | **A**   I know that was one of the drugs they manufactured, |
| 11:42:16 | 21 | yes. |
| 11:42:17 | 22 | **Q**   Now, did you know that Purdue Pharma, the manufacturer |
| 11:42:29 | 23 | of that drug was in contact with senior management at |
| 11:42:34 | 24 | Walmart? |
| 11:42:34 | 25 | **A**   I was not aware of that. |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:42:38 | 1 | **Q**     Did you ever become aware of the fact that Purdue |
| 11:42:41 | 2 | Pharma was setting contacts with Walmart and working on |
| 11:42:46 | 3 | marketing with pharmacists at Walmart? |
| 11:42:54 | 4 | **A**     I'm not aware of that. |
| 11:42:55 | 5 | **Q**     Would it have bothered you as the person in charge -- |
| 11:43:02 | 6 | or as one of the compliance people, driving compliance, |
| 11:43:08 | 7 | would it have bothered you to know that the manufacturer of |
| 11:43:13 | 8 | one of those drugs was meeting with senior management in |
| 11:43:16 | 9 | regards to the sale and marketing of the drugs? |
| 11:43:21 | 10 | **A**     That was certainly not my role, to be involved in |
| 11:43:25 | 11 | marketing of prescription medications. |
| 11:43:27 | 12 | **Q**     I mean, how does a manufacturer -- how does a |
| 11:43:33 | 13 | pharmacist, for that matter, market a drug that's only |
| 11:43:38 | 14 | written by prescription? |
| 11:43:40 | 15 | **A**     I honestly don't know. |
| 11:43:42 | 16 | **Q**     All right.  Pull out Walmart 366, please.  We'll mark |
| 11:43:44 | 17 | it as Exhibit 25. |
| 11:43:46 | 18 |         Okay.  It's an e-mail chain, so I'm going to read it |
| 11:43:49 | 19 | with you.  We're going to start at the bottom of the second |
| 11:43:51 | 20 | page. |
| 11:44:02 | 21 |         There's an e-mail from Neil Desautels to Lurene Riel. |
| 11:44:10 | 22 | And I don't know what any of that is talking about. |
| 11:44:12 | 23 |         Do you see where I'm referencing? |
| 11:44:16 | 24 | **A**     I do, and I agree.  I don't know what it's talking |
| 11:44:18 | 25 | about either. |

**Nelson - (By Video Deposition)**

11:44:19  1  **Q**     All right.  We're on the same page.

11:44:24  2       But I start to get it when Lurene writes to you and

11:44:29  3  Rick Irby, July 15 of 2013.

11:44:32  4       Do you see that?

11:44:36  5  **A**     Yes.

11:44:36  6  **Q**     "This is an update for addresses that this medical

11:44:44  7  doctor is writing out of.  I just sent an e-mail to you both

11:44:46  8  about this doctor being under investigation."

11:44:49  9       Do you see that?

11:44:55  10  **A**     Okay.  I do.

11:44:56  11  **Q**     Then you write back to Lurene, and this now we're on

11:45:00  12  the first page.

11:45:03  13       You said, "Lurene, here is some information you can

11:45:07  14  share with your stores regarding refusal to fill and

11:45:11  15  professional judgment.  Only pharmacists are granted the

11:45:17  16  ability to refuse to fill for professional reasons, not the

11:45:21  17  permit holders or home office.  There are plenty of doctors

11:45:26  18  and pharmacies under investigation, including Walmart.  I

11:45:32  19  would not want patients to stop bringing their prescriptions

11:45:35  20  to Walmart because of an investigation by the state board or

11:45:40  21  other regulatory agency.  If the public were in danger, the

11:45:45  22  DEA would suspend the prescriber's DEA registration or the

11:45:51  23  state medical board would step in and suspend their medical

11:45:53  24  license.

11:45:55  25       "Until one of those two events happen, then the

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:45:58 | 1 | pharmacists must execute their professional judgment when |
| 11:46:01 | 2 | they get prescriptions from prescribers with questionable |
| 11:46:05 | 3 | prescribing habits. |
| 11:46:07 | 4 | "This is not the first time some of our competition |
| 11:46:10 | 5 | have sent letters to prescribers or their stores about |
| 11:46:13 | 6 | refusing all prescriptions from a particular prescriber for |
| 11:46:18 | 7 | controlled substances.  Walmart will not be send [sic] such |
| 11:46:24 | 8 | a letter due to the reasons stated below [sic].  Only the |
| 11:46:28 | 9 | pharmacist is granted the professional judgment right to |
| 11:46:31 | 10 | refuse a prescription, not the permit holder." |
| 11:46:39 | 11 | Do you see that? |
| 11:46:39 | 12 | **A**   Yes. |
| 11:46:39 | 13 | **Q**   Where do you get that idea from, that Walmart can't |
| 11:46:42 | 14 | send out a "nobody can fill prescriptions by this doctor" |
| 11:46:46 | 15 | order? |
| 11:46:47 | 16 | **A**   Again, I don't know exactly where that came from, but |
| 11:46:49 | 17 | I can assure you that that was the direction it would have |
| 11:46:53 | 18 | been sent out at that time.  If that were incorrect |
| 11:46:55 | 19 | information, either Caroline Riogi or Rick Irby, which was |
| 11:46:59 | 20 | her supervisor who supervised this store and Lurene Riel, |
| 11:47:03 | 21 | would have stepped in and said that's not accurate |
| 11:47:05 | 22 | information, and that did not happen. |
| 11:47:06 | 23 | **Q**   Actually, what Caroline Riogi said was thank you.  She |
| 11:47:11 | 24 | appreciated you telling her that. |
| 11:47:12 | 25 | Do you see that? |

**Nelson - (By Video Deposition)**

11:47:13  1    **A**    I don't believe that's what the intent of the "thank

11:47:16  2    you, Brad" was.  I think it was thank you for responding to

11:47:19  3    this situation.

11:47:19  4    **Q**    So you've got now -- what was the date on that one,

11:47:33  5    sir?  Your e-mail?  7/15/13?

11:47:35  6    **A**    That's the date, yes, sir.

11:47:46  7    **Q**    And you're e-mailing out that the -- how did you say

11:47:51  8    it?  Walmart cannot issue -- the stores can't issue a refuse

11:47:58  9    to fill?  Or the company can't?  Let's get it just right.

11:48:06  10                  UNIDENTIFIED SPEAKER:  Objection.

11:48:08  11   **Q**    Permit holders, the home office, cannot issue a refuse

11:48:12  12   to fill.  Right?

11:48:17  13   **A**    Yeah, that's what the document says.

11:48:19  14   **Q**    What you said in the document, right?

11:48:21  15   **A**    That's what the e-mail says.

11:48:25  16   **Q**    Yeah, but that's your e-mail that says it.  There's a

11:48:28  17   bunch of e-mails on there.  Yours is the one that said that,

11:48:31  18   right?

11:48:31  19   **A**    My e-mail includes reference to that, yes.

11:48:34  20   **Q**    If we continue with Plaintiffs' 367, which is the

11:48:39  21   other one I asked you to pull out, it is another e-mail from

11:48:42  22   Scott Ortolani to you, August of 2013.

11:48:53  23          All right.  Well, let's read it together.

11:48:56  24          "Good morning."

11:48:57  25          This is an e-mail to you.

11:48:58   1      "I spent part of yesterday with an inspector, and he

11:49:02   2   wanted to give me a heads up that the inspectors

11:49:07   3   collectively feel Walmart is starting to become a funnel

11:49:11   4   with C-IIs due to more liberal policy on dispensing pain

11:49:20   5   meds."

11:49:22   6      Do you see where I've highlighted that?

11:49:24   7   **A**   I see that.

11:49:25   8   **Q**   C-IIs, those are controlled substances, level II.

11:49:30   9   That would include opioids, right?

11:49:35  10   **A**   Opioids -- most opioids are C-IIs.

11:49:39  11   **Q**   Yeah.  "Walmart is starting to become a funnel."

11:49:49  12      In other words, all the prescriptions are starting to

11:49:51  13   go to Walmart.  Is that the way you understand that?

11:49:54  14   **A**   Apparently, that was this person's opinion, yes.

11:49:57  15   **Q**   I mean, this is -- the idea is all of those

11:50:01  16   prescriptions start funneling down and going to Walmart,

11:50:09  17   right?

11:50:12  18   **A**   Again, I don't know who this person was, what the

11:50:14  19   inspector's name was, but that was their opinion.

11:50:16  20   **Q**   All right.  So Walmart, a funnel.

11:50:20  21      And what's the date on this?

11:50:21  22   **A**   It says August of -- August 7 of 2013.

11:50:28  23   **Q**   And if we look at this, it says, "i.e.," in other

11:50:36  24   words, kind of like "in other words," "King Soopers,

11:50:46  25   Walgreens, Safeway, and Target all have algorithms" --

**Nelson - (By Video Deposition)** 2509

11:50:53  1      You see that?

11:50:53  2   **A**    That's what the document says.

11:50:56  3   **Q**    Right -- "algorithms that determine whether or not

11:51:02  4   they'll dispense a C-II."

11:51:03  5      Did your company not have an algorithm?

11:51:05  6   **A**    I'm not familiar with an algorithm.

11:51:08  7   **Q**    All right.  So we'll add that to it.  Walmart a funnel

11:51:13  8   and no algorithm.

11:51:14  9      It says, "Walgreens and Kings are required to check

11:51:22  10  PMP on all oxys and hydromorphone medication."

11:51:30  11     Was Walmart not requiring their physicians to check

11:51:33  12  the PMPs?

11:51:34  13  **A**    I'm unaware of Walgreens' or King Soopers' policies

11:51:38  14  with regard to PMP on oxy or hydro.  I don't know anything

11:51:43  15  about it.

11:51:43  16  **Q**    What about Walmart?  Did Walmart require your

11:51:45  17  pharmacists to check PMPs?

11:51:48  18  **A**    Yes, sir.

11:51:48  19  **Q**    In 2013, that was a requirement?

11:51:51  20  **A**    I believe we had a POM that stated that if you were

11:51:54  21  going to dispense oxycodone 30, that you had to check the

11:51:59  22  PMP.

11:52:00  23  **Q**    All right.  And that is true for all the other opiates

11:52:02  24  as well?

11:52:03  25  **A**    Not all opiates, no.

**Nelson - (By Video Deposition)**

2510

| | | |
|---|---|---|
| 11:52:05 | 1 | **Q**    I'm sorry, you said -- I said, "Is that true for all |
| 11:52:08 | 2 | of the opiates."  And what was your answer? |
| 11:52:11 | 3 | **A**    My answer was, not all controlled substance |
| 11:52:14 | 4 | prescriptions had to be checked on PMP.  It was up to the |
| 11:52:19 | 5 | pharmacist's discretion to use their professional judgment |
| 11:52:22 | 6 | on which ones they wanted to look at and why. |
| 11:52:24 | 7 | **Q**    So they could fill opiates without doing the PMP check |
| 11:52:30 | 8 | at this point in time, "they" being the Walmart pharmacists, |
| 11:52:34 | 9 | right? |
| 11:52:34 | 10 | **A**    Not all states had their PMP up and active at that |
| 11:52:37 | 11 | time, so states that did have their PMP active, the |
| 11:52:40 | 12 | pharmacists were supposed to check on oxy 30 prescriptions |
| 11:52:45 | 13 | and any other prescriptions they needed to satisfy concerns |
| 11:52:48 | 14 | about professional judgment issues. |
| 11:52:51 | 15 | **Q**    Yeah, no, this says check PMP on all Oxys, not just |
| 11:52:56 | 16 | oxy 30, and hydromorphone. |
| 11:52:59 | 17 |     Did Walmart have the requirement that all Walmart |
| 11:53:02 | 18 | pharmacists check PMPs on all Oxys and hydromorphone? |
| 11:53:11 | 19 | **A**    Not that I recall. |
| 11:53:12 | 20 | **Q**    Okay.  And PMP stands for what? |
| 11:53:13 | 21 | **A**    As stated earlier, it's usually prescription |
| 11:53:16 | 22 | monitoring program. |
| 11:53:23 | 23 | **Q**    And that does what?  Give the jury a sample of what a |
| 11:53:26 | 24 | prescription monitoring program would typically do. |
| 11:53:28 | 25 | **A**    The pharmacy portion of a prescription monitoring |

11:53:30  1    program was to transmit filled -- filled prescriptions for

11:53:37  2    controlled substances to a database at the state, and then

11:53:40  3    the state would compile them and make them available to

11:53:42  4    prescribers and to other pharmacies.

11:53:46  5    **Q**    This e-mail to you ends with, "I know, Brad, you're

11:53:50  6    mindful of this but wanted to let you know what the rumors

11:53:54  7    are from the Board."

11:53:56  8         Do you see that?

11:53:57  9    **A**    I do.

11:53:58  10   **Q**    Then you sent this on to Shelley with an FYI, correct?

11:54:06  11   **A**    That is correct, because Shelley and -- Shelley

11:54:15  12   supervised that area in Colorado.  I did not have that area

11:54:18  13   as my supervision.

11:54:19  14   **Q**    No recommendation things be done differently or

11:54:23  15   anything like that.  Just an FYI, right?

11:54:25  16   **A**    I think the e-mail speaks for itself.

11:54:27  17   **Q**    All right.  And then let's roll forward to Walmart

11:54:31  18   242, which I'll note as Exhibit 27.

11:54:37  19        So this e-mail -- I've outgrown my timeline.  I had to

11:54:42  20   tape another sheet to it.

11:54:43  21        This e-mail is January 14 of 2014, correct?

11:54:52  22   **A**    That looks correct.

11:54:55  23   **Q**    And it is an e-mail from you to Christina Strobel and

11:55:07  24   Kimberly Snow, correct?

11:55:16  25   **A**    Those are the two people on that e-mail, yes.

**Nelson - (By Video Deposition)**

11:55:21   1   **Q**     Again, you say, "Pharmacists are granted the ability

11:55:24   2   to exercise their professional judgment and choose to refuse

11:55:27   3   to fill any prescription if they feel it was written for

11:55:30   4   other than a legitimate medical purpose."

11:55:32   5        Do you see that?

11:55:32   6   **A**     Yes, sir.

11:55:33   7   **Q**     But again, it's not that they're granted the ability.

11:55:39   8   That's what they're supposed to do, isn't it?

11:55:45   9   **A**     Again, the purpose of the e-mail is to make sure the

11:55:49  10   pharmacists realize they're allowed to do it at Walmart as

11:55:52  11   well.

11:55:52  12   **Q**     Well, I mean, I'm suggesting that instead of saying

11:55:55  13   they're allowed to do it, it goes back to my kids

11:55:57  14   speeding -- or following the speed limit.  They're allowed

11:55:59  15   to drive under the speed limit or they're required to.

11:56:05  16        Right?  They ought to be required to do that,

11:56:08  17   shouldn't they?

11:56:09  18   **A**     That's your interpretation, sir.

11:56:13  19   **Q**     It's not yours, as the person driving compliance.

11:56:16  20   Yours is, eh, you can believe it's other than a legitimate

11:56:20  21   medical purpose, then go ahead and fill it.  That was --

11:56:23  22   **A**     I think I've pointed out that there's multiple people,

11:56:26  23   not just me, working on compliance of controlled substances.

11:56:30  24   At this point, Shelley, myself, and all the directors also

11:56:33  25   were working on compliance of controlled substances.  It was

**Nelson - (By Video Deposition)** 2513

| 11:56:35 | 1 | not just Brad. |

**Q**    So this is something that all of the Walmart compliance people agreed on; is that right?

**A**    My understanding is that Shelley and Caroline sent this information just as I did.

**Q**    Okay.  So everybody at Walmart seemed to agree that it was an ability not to fill a prescription if they thought it was for a legitimate medical purpose rather than a requirement, right?

**A**    I can't speak to everybody at Walmart, but the three of us were sending out this information.

**Q**    Okay.  Then you go on to say that "there are no blanket refusals allowed by the boards of pharmacy."

You say it again, don't you?

**A**    Well, that was the guidance that was being offered by Walmart at the time, and we'll continue to say that because that was the guidance that was being offered.

**Q**    So no blanket refusals are allowed by boards of pharmacies is again being said in January of 2014, right?

**A**    That's the date of this e-mail.

**Q**    And this is the same e-mail that also says they have the ability to refuse if they think it's wrong, it's not legitimate.  Right?

**A**    That's what the e-mail states.

(Interruption in video playback:)

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 11:58:27 | 1 | MR. LANIER:  Your Honor, this is a good |
| 11:58:28 | 2 | breaking point for lunch at page 294, line 25. |
| 11:58:32 | 3 | THE COURT:  Okay.  Ladies and gentlemen, we'll |
| 11:58:36 | 4 | take our noon recess for an hour and then pick up with |
| 11:58:40 | 5 | Mr. Nelson.  I'm sorry that your fine Browns spirit didn't |
| 11:58:45 | 6 | translate to the performance of the team yesterday.  You're |
| 11:58:49 | 7 | welcome to dress the same way Thursday, or maybe mix it up |
| 11:58:51 | 8 | or change it a bit, and maybe we'll have better results. |
| 11:58:55 | 9 | So have good lunch. |
| 11:59:08 | 10 | (The jury is not present.) |
| 11:59:24 | 11 | THE COURT:  All right.  If everyone can be |
| 11:59:25 | 12 | seated. |
| 11:59:26 | 13 | Mr. Lanier, if I permit some additional questioning of |
| 11:59:36 | 14 | Mr. Nelson on these late produced documents, I mean, I note |
| 11:59:41 | 15 | that you interrogated him during the deposition about a |
| 11:59:46 | 16 | number of e-mails, and they are somewhat similar, at least |
| 11:59:50 | 17 | they related to, you know, this blanket refusal -- or no |
| 12:00:00 | 18 | blanket refusals to fill. |
| 12:00:03 | 19 | How much time would you want? |
| 12:00:05 | 20 | MR. LANIER:  Your Honor, it seems to me I |
| 12:00:08 | 21 | should be able to do it within two hours. |
| 12:00:14 | 22 | THE COURT:  Okay.  All right. |
| 12:00:19 | 23 | MR. WEINBERGER:  Your Honor, can I just add to |
| 12:00:22 | 24 | that on behalf of the plaintiffs? |
| 12:00:23 | 25 | THE COURT:  Yes. |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 12:00:23 | 1 | MR. WEINBERGER:  So the notion that we were |
| 12:00:28 | 2 | able to question a witness on a couple of e-mails reflecting |
| 12:00:36 | 3 | policies, compliance with policies, does not really address |
| 12:00:43 | 4 | our concerns about these failure to produce documents. |
| 12:00:48 | 5 | Because as the Court I'm sure is aware, the more times that |
| 12:00:53 | 6 | documents reflect violations of compliance, the more |
| 12:01:00 | 7 | examples that exists in, you know, large -- nationwide, the |
| 12:01:10 | 8 | more proof that we have to present to the jury about the |
| 12:01:17 | 9 | misconduct. |
| 12:01:18 | 10 | And so just because there were some documents that may |
| 12:01:20 | 11 | have been similar in nature that we did have before the |
| 12:01:24 | 12 | additional 56,000 documents were produced after his |
| 12:01:28 | 13 | deposition really doesn't address our concerns about the |
| 12:01:35 | 14 | lack of production and our ability to use that. |
| 12:01:38 | 15 | I mean, I understand there's some limit to which the |
| 12:01:41 | 16 | judge -- to which you can set, but I just wanted to address |
| 12:01:46 | 17 | that correctly. |
| 12:01:47 | 18 | THE COURT:  All right.  The question I have to |
| 12:01:49 | 19 | Walmart, when is this production going to end?  I mean, I -- |
| 12:01:55 | 20 | this was -- I understood that it was promised to be |
| 12:02:01 | 21 | completed in July.  I mean, we're now in the end of -- well, |
| 12:02:03 | 22 | middle of October.  So when will these documents finally be |
| 12:02:06 | 23 | produced? |
| 12:02:08 | 24 | MR. MAJORAS:  Your Honor, I think a number of |
| 12:02:10 | 25 | things here.  The motion itself of course ignores the |

**Nelson - (By Video Deposition)**

2516

12:02:14  1   tortured history of the discovery process here.  We have

12:02:18  2   been endeavoring to produce since the Court's March 3 order

12:02:21  3   of this year the nationwide discovery issued with respect to

12:02:26  4   14 of our individuals at headquarters, which includes

12:02:29  5   Mr. Nelson.

12:02:30  6        And I'll point out that Mr. Nelson's job

12:02:34  7   responsibilities did not include Ohio.  So the production

12:02:37  8   done prior to the Court's order almost by just the nature of

12:02:42  9   the order meant that Mr. Nelson's documents would come out

12:02:46  10  after that time period.

12:02:48  11            MR. WEINBERGER:  Your Honor --

12:02:49  12            THE COURT:  I have a limited amount of time.

12:02:53  13  When will the production be complete?

12:02:56  14            MR. MAJORAS:  Your Honor, I'd like to believe

12:02:57  15  it's complete now, but I can't tell my folks in good faith

12:03:00  16  if they come across something that they think should be

12:03:03  17  produced to be produced.  And I think that's what we're

12:03:05  18  seeing here, especially over the last few weeks where we've

12:03:08  19  had very minor productions.  And the three that were

12:03:11  20  produced during the course of this trial were essentially

12:03:13  21  duplicates of what had been produced a long time ago.

12:03:16  22        I'll also note --

12:03:17  23            THE COURT:  Obviously everyone has a

12:03:19  24  continuing obligation, but are you representing that you

12:03:23  25  believe you've -- Walmart has produced the documents that

12:03:28  1    have been directed to be produced?

12:03:29  2             MR. MAJORAS:  Your Honor, I believe we have

12:03:30  3    produced all documents we have located on the production

12:03:34  4    that was supposed to have been made.

12:03:36  5             THE COURT:  Okay.

12:03:36  6             MR. MAJORAS:  If someone were to come to me

12:03:38  7    tomorrow and say I've found something, obviously I'll be

12:03:41  8    obligated to --

12:03:41  9             THE COURT:  Of course, I understand that, but

12:03:43  10   that's always the case.  I mean, we all know that.

12:03:48  11            MR. MAJORAS:  That's what we've been doing.

12:03:50  12            THE COURT:  All right.  Well -- all right.

12:03:52  13            MR. WEINBERGER:  Your Honor, can I just

12:03:54  14   respond about their obligations?

12:03:58  15            THE COURT:  All right.

12:04:00  16            MR. WEINBERGER:  This is such an important

12:04:01  17   issue regarding our ability to prepare for trial that I

12:04:04  18   think it's really important that I be allowed to provide

12:04:08  19   some context in the record.

12:04:10  20        So in CT 1, Walmart refused to add Mr. Nelson as

12:04:18  21   custodian.

12:04:19  22        On March 25, 2020, *ProPublica* published an article

12:04:26  23   regarding Walmart's -- regarding the DOJ complaint, civil

12:04:33  24   complaint, that had been filed against Walmart, and revealed

12:04:37  25   Nelson's role in corporate compliance.

| | | |
|---|---|---|
| 12:04:42 | 1 | On July 11, 2020, Special Master Cohen ordered Walmart |
| 12:04:50 | 2 | to add Nelson as a custodian and to prioritize production of |
| 12:04:56 | 3 | his documents.  And in that order he says, "Walmart should |
| 12:05:05 | 4 | have identified Nelson back then and produced documents from |
| 12:05:08 | 5 | his custodial file in Track One.  If those documents are not |
| 12:05:12 | 6 | relevant to the distribution claims in Track One-B as |
| 12:05:16 | 7 | Walmart insists, then plaintiffs will not be allowed to use |
| 12:05:19 | 8 | them. |
| 12:05:20 | 9 | "I understand Walgreens intends to introduce Nelson |
| 12:05:24 | 10 | documents presumably" -- |
| 12:05:26 | 11 | MR. LANIER:  Walmart. |
| 12:05:27 | 12 | MR. WEINBERGER:  I mean Walmart -- actually, |
| 12:05:29 | 13 | I'm reading from Special Master Cohen's order, so we've all |
| 12:05:35 | 14 | confused the two defendants. |
| 12:05:36 | 15 | "I understand Walmart intends to produce Nelson's |
| 12:05:39 | 16 | documents presumably in connection with Track Three, but |
| 12:05:43 | 17 | production of Nelson's documents must be prioritized because |
| 12:05:47 | 18 | he is a Track One custodian." |
| 12:05:53 | 19 | So Walmart then added Nelson as a custodian but |
| 12:05:56 | 20 | restricted the production of his documents based upon |
| 12:05:58 | 21 | geographic scope. |
| 12:06:01 | 22 | Now, he just testified, Nelson testified that when he |
| 12:06:07 | 23 | was driving compliance, it included the state of Ohio. |
| 12:06:11 | 24 | On January 29, 2021, we sent a letter to Special |
| 12:06:16 | 25 | Master Cohen objecting to Walmart's geographic scope |

**Nelson - (By Video Deposition)**

2519

12:06:22 1  limitations and provided evidence of relevant materials that

12:06:24 2  were being withheld based upon DR 22 productions.

12:06:30 3      On March 16, Special Master Cohen overruled Walmart's

12:06:37 4  geographic scope limitations.  They appealed to you.  You

12:06:41 5  overruled Walmart's geographic scope limitations or

12:06:45 6  objections on April 9, 2021.  And on May 14, Walmart started

12:06:51 7  producing these geographic scope documents.

12:06:57 8      And I've already detailed the history of the fact that

12:07:02 9  multiple times during that time frame, June 24, June 26,

12:07:07 10  there are -- there's correspondence going back and forth

12:07:10 11  with Special Master Cohen being copied about the fact that

12:07:16 12  these documents continually come in.  And this is after

12:07:25 13  Walmart is representing that they anticipate production

12:07:31 14  being complete by the end of July.

12:07:37 15      The other thing that's important is this is not just

12:07:40 16  about Nelson, Your Honor, and his documents, of which there

12:07:44 17  are 56,000 that were produced since July.  This is about a

12:07:47 18  larger production involving 200,000 documents.

12:07:53 19      We intend to call his boss, the director of regulatory

12:07:58 20  affairs, Susanne Hiland, as our only live witness involving

12:08:05 21  Walmart, other than, if you order Mr. Nelson to come to

12:08:14 22  court to testify.

12:08:14 23      And we just got a document on September 18, 2021, an

12:08:19 24  e-mail to Susanne Hiland from 2007 talking about a

12:08:28 25  problematic doctor in Houston, Texas, and the concerns that

**Nelson - (By Video Deposition)**

12:08:33   1    the pharmacist had.

12:08:35   2        And her response was, I don't understand the concern.

12:08:37   3    If you don't have enough stock, we need to get you more

12:08:41   4    stock of opioids.

12:08:44   5        Back to Mr. Nelson.  A recently produced document,

12:08:50   6    September 18, 2021, it was in that production, I can't tell

12:08:56   7    you exactly when we found it in this needle in the haystack

12:09:04   8    of documents that were produced, Mr. Nelson is writing an

12:09:06   9    e-mail about a Cleveland doctor, a Dr. Lally, in June of

12:09:16  10    2013, where the pharmacist is concerned about Dr. Lally's

12:09:21  11    volume of scripts and the fact that he is prescribing the

12:09:27  12    cocktails together.  And Brad Nelson is asked to comment on

12:09:36  13    thoughts about refusal to fill.

12:09:37  14        This is a document just produced.

12:09:41  15        So, Your Honor --

12:09:43  16            THE COURT:  All right, look, I -- as I said,

12:09:48  17    this is what I'm going to do.  I'm doing this step by step.

12:09:53  18    Obviously, Mr. Nelson will be testifying.  Now, I believe I

12:10:00  19    have the authority to make him come here, but rather than

12:10:08  20    having a big brouhaha about that, the important thing is

12:10:13  21    that he testify.

12:10:18  22        So when do you want him to testify in your order?  You

12:10:20  23    gave me an order for witnesses in the week.  Monday is these

12:10:24  24    two depositions.  Mr. Nelson and Ms. -- or Mr. Tsipakis.

12:10:30  25    Tuesday, T. Villanueva, Natasha Polster, live witnesses.

**Nelson - (By Video Deposition)**                                      2521

12:10:37  1   Wednesday, you've got three depos; Thursday, Chunderlik and

12:10:41  2   Cutler; and Friday, five witnesses.

12:10:43  3        When do you want -- in that order, when do you want

12:10:46  4   Nelson?  And what I'm going to do is he'll testify live by

12:10:49  5   video.

12:10:51  6                  MR. LANIER:  Your Honor, two options there.

12:10:57  7   One would be on Thursday we would try to fit him in.  The

12:11:01  8   other option is Ms. Hiland, who was his boss, we had been

12:11:07  9   asked by Walmart if we could bump her to next week because

12:11:11  10  of a personal crisis she has had.

12:11:14  11                  THE COURT:  All right.

12:11:15  12                  MR. LANIER:  And so she's coming next Monday.

12:11:17  13       We could do him by video right before we do her on

12:11:20  14  Monday, and then we'll be done.  But we bumped her to Monday

12:11:24  15  because of a personal issue.

12:11:27  16       And they would fit well together because it's him and

12:11:30  17  then it's Boss, but we could also do it Thursday, whatever

12:11:35  18  is --

12:11:36  19                  THE COURT:  Well, it's --

12:11:37  20                  MR. LANIER:  My preference would be Monday,

12:11:38  21  Your Honor.

12:11:38  22                  THE COURT:  All right.  Well, then, all right,

12:11:44  23  that's what we'll do.

12:11:45  24       And I think we had determined it's easier to begin the

12:11:50  25  day with a witness testifying by video.

12:11:53   1                 MR. LANIER:  Yes, Your Honor.

12:11:53   2                 THE COURT:  So we'll have it 9 a.m. Monday.

12:12:03   3                 MR. MAJORAS:  Your Honor, I need to make a

12:12:04   4       number of notes for the record, please.

12:12:06   5                 THE COURT:  Yes.

12:12:07   6                 MR. MAJORAS:  First of all, without going into

12:12:08   7       the detail because I understand your timing right now, we

12:12:11   8       certainly disagree with the timeline and the materials that

12:12:16   9       Mr. Weinberger went through.  We agreed that this has been a

12:12:19  10       tortured process of discovery.  We also are confident we

12:12:22  11       have acted in good faith throughout this process and will

12:12:24  12       continue to do so.  And therefore, even with respect to a

12:12:28  13       motion for sanctions, that would be relevant to that motion,

12:12:32  14       I'll note that we filed, probably as I'm speaking, just so

12:12:35  15       we have it on the record, an opposition to the motion which

12:12:39  16       is docket number 4038.

12:12:40  17                 THE COURT:  Well, no one's handed it to me, so

12:12:43  18       I'm not -- I'm putting off, quite frankly, putting off any

12:12:47  19       consideration of sanctions.  The only sanction will be what

12:12:50  20       I -- you know, how we deal with the time.  And I will charge

12:12:53  21       it all to Walmart.  But I'm not -- at the moment, I'm not

12:12:58  22       imposing any additional sanctions.  I want to see how this

12:13:01  23       goes.  All right?

12:13:03  24           So that's what a Court's supposed to do, to see if we

12:13:06  25       can remedy it.  And so we will have -- so, Mr. Majoras, you

| | | |
|---|---|---|
| 12:13:14 | 1 | are to arrange for Mr. Nelson to be at a place Monday |
| 12:13:20 | 2 | morning at 9:00 where he can be deposed.  It will be two |
| 12:13:22 | 3 | hours by the plaintiffs.  I don't know how -- obviously, |
| 12:13:25 | 4 | Walmart is entitled to -- I don't know if it's technically |
| 12:13:30 | 5 | cross-examination or responsive questioning.  And you can |
| 12:13:36 | 6 | use as much of your time as you want.  I'm not cutting you |
| 12:13:40 | 7 | off. |
| 12:13:40 | 8 | Just so he knows, I am limiting Mr. Lanier to two |
| 12:13:43 | 9 | hours. |
| 12:13:45 | 10 | MR. MAJORAS:  I will do what I can, Your |
| 12:13:46 | 11 | Honor, again noting he's out of my control.  We have contact |
| 12:13:50 | 12 | with his counsel. |
| 12:13:50 | 13 | THE COURT:  Well, he's now in your control, |
| 12:13:52 | 14 | okay?  He's in your control. |
| 12:13:54 | 15 | MR. MAJORAS:  I respectfully disagree, Your |
| 12:13:56 | 16 | Honor. |
| 12:13:56 | 17 | THE COURT:  Well, fine, I respect your |
| 12:13:58 | 18 | disagreement.  He's in your control to accomplish this. |
| 12:14:01 | 19 | And if I get any pushback, trust me, I'll just have |
| 12:14:05 | 20 | him here, okay?  I mean -- |
| 12:14:06 | 21 | MR. LANIER:  He had a settlement agreement |
| 12:14:07 | 22 | with Walmart that requires him to cooperate, so it's in |
| 12:14:11 | 23 | writing. |
| 12:14:11 | 24 | THE COURT:  But I'd rather just do it |
| 12:14:16 | 25 | simply -- you know, I think we can accomplish the same thing |

**Nelson - (By Video Deposition)** 2524

12:14:18　1　by video.  The technology works.  And rather than get into a

12:14:22　2　whole big issue about flying him here, we'll do it this way.

12:14:25　3　So it will be 9 a.m. Monday, and then we'll follow it Monday

12:14:29　4　with Ms. Hiland.

12:14:38　5　　　　And I hope that this takes care of the issue, but I'm

12:14:41　6　going to hold in abeyance anything further.  I'm watching to

12:14:44　7　see how this trial unfolds.

12:14:51　8　　　　And so all the time pertaining to Nelson will be

12:14:55　9　charged to Walmart.  Now, I've given the defendants

12:14:58　10　collectively 75 hours.  I haven't told you how you'd

12:15:02　11　allocate it among you.  But how ever you're allocating it,

12:15:06　12　all the time for Mr. Nelson on Monday, Mr. Lanier's

12:15:12　13　questioning and then whatever questioning Mr. Majoras and

12:15:16　14　Ms. Fumerton want to do, will be charged against Walmart.

12:15:19　15　　　　　　　MR. MAJORAS:  I object to that as an

12:15:21　16　inappropriate sanction, Your Honor.

12:15:22　17　　　　　　　THE COURT:  Your objection's noted.  It's

12:15:24　18　mighty mild compared to what I could do.  So -- or it

12:15:28　19　might -- but it's still under consideration.

12:15:31　20　　　　Okay.

12:15:34　21　　　　　　　(A luncheon recess was taken at 12:15 p.m.)

22

23

24

25

| | |
|---|---|
| 12:58:11 | 1 |

                    A F T E R N O O N   S E S S I O N

01:07:50    2                          - - - - -

01:07:50    3              (The jury is present at 1:07 p.m.)

01:07:52    4              THE COURT:  Please be seated.

01:07:53    5          Mr. Lanier, you may continue with your video

01:07:55    6    deposition of Mr. Nelson.

01:07:56    7                  MR. LANIER:  Thank you, Your Honor.

01:07:56    8          Mr. Lawlor, thank you.

01:08:08    9    Q     Sir, during the break did you have a chance to pull

01:08:10   10    out exhibit -- I'm going to call it Exhibit Number 28, but

01:08:13   11    it's Walmart 547.  It's a slide show.

01:08:27   12          Okay.  "Health & Wellness Compliance focus areas

01:08:32   13    steering meeting."  The date on this is January 2, 2014.

01:08:42   14          Do you see that on the cover?

01:08:43   15    A     Yes, sir.

01:08:44   16    Q     The slide that I want to talk to you about is slide

01:08:46   17    number 6.  I've got it up here as "Focus Areas Dashboard."

01:08:53   18          Do you see that?

01:08:55   19    A     Yes.

01:08:55   20    Q     And are you familiar with this document or this

01:09:00   21    presentation?  Does this ring a bell?

01:09:02   22    A     I don't recall this specific document, no, but --

01:09:17   23    Q     I won't go into great lengths, then.  I'll just ask

01:09:20   24    you a couple of questions off of this line right here.

01:09:22   25          The work group of Controlled Substances, a project

01:09:28  1   name, refusal to fill.  The project purpose is "establish a

01:09:35  2   process for the analysis of refusal to fill data and

01:09:40  3   reporting problematic prescribers or patients internally.

01:09:49  4        Do you see where that project is set out?

01:09:51  5   **A**   Yes.

01:09:53  6   **Q**   The project leader for this is you, according to this

01:09:59  7   Exhibit Number 28, correct?

01:10:03  8   **A**   That's what the document states, yes.

01:10:06  9   **Q**   Doesn't say Shelley or -- who was the other one that

01:10:13  10  works with you at that?  Kimberly -- Christina.  Doesn't say

01:10:19  11  Shelley --

01:10:19  12  **A**   No, Caroline.

01:10:20  13  **Q**   Caroline.  Doesn't say Shelley or Caroline.  It just

01:10:24  14  says you, doesn't it?

01:10:25  15  **A**   That is correct.

01:10:30  16  **Q**   And it looks like your due date on that project was

01:10:32  17  the first quarter of 2015.  Correct?

01:10:35  18  **A**   That's what the document says.

01:10:37  19  **Q**   Now, do you recall whether or not this document is

01:10:39  20  accurate?  And by that I mean, were you given a project on

01:10:44  21  refusing to fill where your purpose was to establish a

01:10:49  22  process for the analysis of the refusal to fill data and

01:10:53  23  report problematic prescribers or patients internally, with

01:10:58  24  a completion date around first quarter of fiscal year 2015?

01:11:02  25  **A**   I honestly don't recall that specific project.

| | | |
|---|---|---|
| 01:11:09 | 1 | **Q**    Well, if you were assigned it, it didn't stick into |
| 01:11:15 | 2 | your memory; is that what you're saying? |
| 01:11:18 | 3 | **A**    I just don't remember that specific project. |
| 01:11:19 | 4 | **Q**    All right.  Well, let's say from January 2 of 2014, |
| 01:11:30 | 5 | which actually is before that last letter you wrote, but up |
| 01:11:35 | 6 | through Quarter 1 of 2015, fiscal year, you are, according |
| 01:11:44 | 7 | to Exhibit 28, project leader on the refusal to fill |
| 01:11:59 | 8 | process.  Right? |
| 01:12:01 | 9 | **A**    That's what the document says. |
| 01:12:03 | 10 | **Q**    Let's keep going.  Now we're going to look at Walmart |
| 01:12:07 | 11 | 377, which I'm going to mark as Exhibit Number 29. |
| 01:12:22 | 12 | All right.  The first thing is an easy one.  It's the |
| 01:12:25 | 13 | e-mail on the front. |
| 01:12:27 | 14 | Gayle Lane sends you an e-mail March 21, 2014.  And |
| 01:12:36 | 15 | she sends one at 9 at night. |
| 01:12:39 | 16 | Do you see that? |
| 01:12:40 | 17 | **A**    I do. |
| 01:12:40 | 18 | **Q**    Who is Gayle Lane? |
| 01:12:42 | 19 | **A**    As I recall, she was a DEA contact in south Florida, |
| 01:12:52 | 20 | as I recall. |
| 01:12:54 | 21 | **Q**    DEA Miami, Weston Diversion Office in Weston, Florida, |
| 01:13:00 | 22 | is her signature line. |
| 01:13:01 | 23 | Is that your testimony? |
| 01:13:03 | 24 | **A**    I don't know which office she was located in.  I just |
| 01:13:06 | 25 | known southern Florida, so Miami would probably fit that |

**Nelson - (By Video Deposition)**

01:13:10    1    spot.

01:13:11    2    **Q**    All right. She says, "Nice talking with you today.

01:13:14    3    Questionable circumstances start on page 28."

01:13:19    4    You see that?

01:13:22    5    **A**    Yes, sir.

01:13:24    6    **Q**    And if you'll turn the page, you'll see the *Federal*

01:13:33    7    *Register* that dates way back in October 12 of 2012.

01:13:40    8    You see that as well?

01:13:41    9    **A**    Yes, sir.

01:13:42   10    **Q**    Look, it's the *Holiday* case.

01:13:50   11    You see?

01:14:01   12    **A**    Yes, sir, I see that.

01:14:02   13    **Q**    Now, if we go back to our timeline, we're in 2014, but

01:14:11   14    we got to go all the way back -- this was put out just in

01:14:19   15    the couple of weeks after, maybe a month after you had read

01:14:26   16    the *Holiday* press release, wasn't it?

01:14:30   17    **A**    I believe that's accurate.

01:14:31   18    **Q**    So we can go and look, if you had done the work back

01:14:40   19    then, 10/12/12, you've actually got the *Holiday* case written

01:14:43   20    up in the *Federal Register*, right?

01:14:52   21    **A**    Yeah, the *Holiday* case appears to be in the *Federal*

01:14:57   22    *Register* on October 12 of 2012.

01:14:59   23    **Q**    All right. Now, you're getting it sent to you after

01:15:01   24    you were talking on the phone, I assume, with the DEA people

01:15:09   25    in 2014. But she directed you to page 28.

**Nelson - (By Video Deposition)**

01:15:15  1      Do you see that?

01:15:16  2  **A**    I do see where she says that.

01:15:18  3  **Q**    If you go to page 28, do you see the center column?

01:15:22  4  Let me make it bigger so maybe you can see it here.

01:15:28  5      The center column.  Do you see it?

01:15:36  6      "The Agency does not require omniscience.  However,

01:15:43  7  when the circumstances surrounding the presentation of a

01:15:45  8  prescription would give rise to suspicion in a reasonable

01:15:50  9  professional, there is a duty to question the prescription."

01:16:03  10      See that?

01:16:04  11  **A**    Okay.

01:16:04  12  **Q**    "Though initially framed as a reasonable professional

01:16:08  13  standard, the Agency has considered the duty to discharge

01:16:12  14  the corresponding responsibility --" that's our echoing term

01:16:20  15  from that COR, right?

01:16:22  16  **A**    I see what you're highlighting, but I don't see where

01:16:24  17  it ties back to pharmacist responsibility yet.  Go ahead.

01:16:27  18  **Q**    All right.  "By evaluating the circumstances in light

01:16:30  19  of what would be considered suspicious by a reasonable

01:16:32  20  pharmacist."

01:16:35  21      Ties back there.  Do you see it?

01:16:37  22  **A**    Yes.

01:16:41  23  **Q**    Then reads, "Accordingly, a pharmacist or pharmacy may

01:16:49  24  not dispense a prescription in the face of a red flag."

01:16:58  25      You following with me so far?

**Nelson - (By Video Deposition)**

01:17:00  1  **A**     I'm reading the document.  Go ahead.

01:17:05  2  **Q**     And then it defines a red flag as a "circumstance that

01:17:10  3  does or should raise a reasonable suspicion as to the

01:17:14  4  validity of a prescription, unless he or it takes steps to

01:17:22  5  resolve the red flag and ensure that the prescription is

01:17:25  6  valid."

01:17:29  7       Do you see that?

01:17:30  8  **A**     Yes.

01:17:32  9  **Q**     So this e-mail that is sent to you in 2014 -- what was

01:17:41  10  the day?  March 2014?  Yeah.

01:17:51  11  **A**     Yes.

01:17:51  12  **Q**     All right.  So March of 2014 you get the e-mail that

01:18:00  13  has *Holiday* attached.  And it says not that a pharmacist

01:18:14  14  is -- has an ability to refuse, it says something a little

01:18:22  15  different, doesn't it?

01:18:24  16       What you were sent a couple -- a year and a half or so

01:18:28  17  after it was published, out of the *Holiday* case, doesn't say

01:18:35  18  that a pharmacist has an ability to refuse if they don't

01:18:43  19  think the prescription is legitimate.  It says something

01:18:47  20  much harder.  It says that they "may not dispense until

01:18:53  21  they've resolved the red flag and ensured the prescription

01:18:55  22  is valid."

01:18:58  23       Do you see that?

01:18:59  24  **A**     Yes, I do see that, but I don't know what the red flag

01:19:02  25  was that they were resolving, so...

**Nelson - (By Video Deposition)**

01:19:04  1    **Q**     Well, I think they say that there are a number of

01:19:07  2    those.  But in the process of that, this is -- you never

01:19:14  3    told this to your pharmacists, did you?

01:19:16  4    **A**     That information that was sent out contained red flags

01:19:22  5    in those POMs.

01:19:24  6    **Q**     Yeah.  I'm not fussing that.

01:19:30  7    **A**     As well as the refusal to fill policy.

01:19:32  8    **Q**     Okay.  So you told your pharmacists, you're not

01:19:36  9    allowed to dispense until you ensure that prescription is

01:19:40  10   valid.  We're going to see that kind of language from you?

01:19:44  11   **A**     You will see the information is stated in the POMs

01:19:47  12   that after -- after they have used their professional

01:19:49  13   judgment, they can refuse to fill a prescription or fill the

01:19:52  14   prescription if they've resolved the issues.

01:19:55  15   **Q**     Actually --

01:19:56  16   **A**     That's in the POMs.

01:19:57  17   **Q**     Sir, I'm not talking about the POMs.  I'm talking

01:20:00  18   about these e-mails you've been sending out.

01:20:03  19           You've been sending out e-mails that say pharmacists

01:20:05  20   are granted the ability to exercise their professional

01:20:08  21   judgment and choose to refuse to fill any if they feel it

01:20:14  22   was written for other than a legitimate purpose.

01:20:16  23           That's what you've been sending out, like Exhibit 27

01:20:19  24   I've got on the screen, right?

01:20:21  25   **A**     And if you continue to read the next statement, it

**Nelson - (By Video Deposition)**                    2532

01:20:23  1    will say, "You and your staff are encouraged to review the

01:20:26  2    POMs," which are called out there.  And in those POMs it

01:20:29  3    talks about red flags and establishing those and correcting

01:20:32  4    the issues before they would fill a prescription.  And if

01:20:35  5    they choose not to, then they would refuse and fill out the

01:20:39  6    information on a refusal to fill form.

01:20:41  7    **Q**    Well, you don't say -- look, you don't even tell them

01:20:44  8    they have to read it.  You just say, "You are encouraged to

01:20:47  9    review them."

01:20:49  10         But my point is, sir, you give them the ability to

01:20:54  11   exercise their judgment and refuse instead of do what the

01:21:00  12   case said, that they have a responsibility and they may not

01:21:06  13   dispense until they ensure.

01:21:08  14         Do you not see the difference between those two?

01:21:12  15   **A**    Yeah, the information is included in the POMs that

01:21:16  16   explains for them to use their professional judgment before

01:21:20  17   they would fill a prescription, resolve whatever issues they

01:21:23  18   want -- comes up, and to -- and if they don't resolve the

01:21:27  19   issues, then not to fill the prescription and to fill out a

01:21:29  20   refusal to fill document.

01:21:31  21   **Q**    That's not what you said, sir.  You told them they're

01:21:34  22   granted the ability to do that.  Time after time again, in

01:21:38  23   e-mails, correspondence, you said they're granted the

01:21:41  24   ability to exercise the professional judgment and choose to

01:21:46  25   refuse.  You did not say the law says you cannot fill this

01:21:50   1   until you resolve it, did you?

01:21:52   2   **A**    I think the e-mail stands for itself.  It says they --

01:21:56   3   after using professional judgment, they can take many

01:21:59   4   actions with that prescription, to fill it or not fill it.

01:22:02   5   **Q**    And so we're real clear on this, and I think you and I

01:22:06   6   have communicated on it before, but I want to make sure.

01:22:09   7          This same *Federal Register* you were sent that talked

01:22:15   8   about the pharmacists having a corresponding responsibility

01:22:18   9   under the federal law to dispense only lawful prescriptions,

01:22:22  10   do you see that, where I've highlighted it?

01:22:26  11   **A**    I see that on the document.

01:22:28  12   **Q**    You were aware that the corresponding responsibility

01:22:31  13   to ensure the dispensing of valid prescriptions extends to

01:22:37  14   the pharmacy itself, correct?

01:22:40  15   **A**    Certainly through our MOA we were responsible to make

01:22:42  16   sure they were legal -- they were valid prescriptions.

01:22:45  17   **Q**    Okay.  And that's your understanding of the

01:22:50  18   requirements that you had as well, isn't it?

01:22:52  19   **A**    That Walmart was supposed to make sure they were valid

01:22:55  20   prescriptions before they were dispensed?

01:22:56  21   **Q**    Yes, sir.

01:22:57  22   **A**    That was the agreement in the MOA.

01:22:59  23   **Q**    And not just in the MOA.  I mean, that's the

01:23:05  24   responsibility that Walmart has regardless, right?

01:23:08  25   **A**    That's what was agreed to by the DEA and Walmart, so I

**Nelson - (By Video Deposition)**                    2534

01:23:12  1    would assume yes.

01:23:13  2    **Q**    All right.  This is an e-mail chain.  Marking it as

01:23:18  3    Exhibit Number 30, but we'll read it together.  It starts on

01:23:23  4    the very back page, if you want to get to the back page.

01:23:26  5         Got it?

01:23:40  6    **A**    I do.

01:23:42  7    **Q**    "Debbie, we have two doctors in the north central

01:23:50  8    Texas area, Dr. Diamond from Sherman, Dallas, Paris, and

01:23:54  9    wherever else he lands, and a Dr. Randall Wade from the

01:24:02  10   McKinney area.  Both doctors are under investigation by the

01:24:06  11   DEA.  Steven will confirm for you what Dr. Diamond's office

01:24:10  12   looks like in Paris on the days he is there.

01:24:14  13        Walmart is getting slammed with C-II and other

01:24:19  14   controlled substances from these two doctors.

01:24:25  15        C-II, that includes opioids, doesn't it?

01:24:29  16   **A**    Well, as we discussed before, most opioids are C-II

01:24:33  17   prescriptions.

01:24:34  18   **Q**    All right.  "Currently, in the Sherman/Denison area,

01:24:43  19   Target, Walgreens, Kroger, Medicine Shoppe, will not honor

01:24:49  20   prescriptions from these two physicians.  Three

01:24:52  21   independents, and Brookshires, Albertsons, CVS, will fill

01:24:57  22   for these physicians after they verify each patient in the

01:24:59  23   Texas DPS system and on a case-by-case basis.  Does Walmart

01:25:05  24   have any policy concerning DEA investigations?"

01:25:09  25        See that?

**Nelson - (By Video Deposition)** 2535

01:25:16    1    **A**    Yes.

01:25:16    2    **Q**    And Debbie Mack, who got that, sends it on up to you,

01:25:22    3    December 24, 2014 you reply.  That's on page 2.

01:25:27    4    Do you see that?

01:25:29    5    **A**    I do.

01:25:30    6    **Q**    You said, "Here is our best practices for refusing to

01:25:36    7    fill a prescription.  Being under investigation is simply a

01:25:38    8    red flag to consider when using your professional judgment."

01:25:46    9    Did I read that right?

01:25:47    10    **A**    That's what the document says.

01:25:50    11    **Q**    Yeah, but you told me earlier when you say red flag,

01:25:54    12    you meant it cannot be resolved.

01:25:58    13    Is that a new meaning for you?

01:26:04    14    UNIDENTIFIED SPEAKER:  Objection.  Form.

01:26:06    15    **A**    I'm not sure I understand your question.  You said red

01:26:10    16    flag.

01:26:10    17    **Q**    I asked you earlier, I said red flag is just something

01:26:13    18    that means, hey, we need to look into it.  You said, no, no,

01:26:17    19    not when I use it.  When I say red flag, I mean it's

01:26:22    20    something that cannot be resolved.

01:26:23    21    Do you remember that?

01:26:24    22    **A**    I don't remember that specifically, sir, but it may

01:26:27    23    have come up that way.

01:26:28    24    **Q**    All right.  You say, "However, an investigation of

01:26:31    25    itself is not a good reason to discontinue filling

**Nelson - (By Video Deposition)**

01:26:34  1    legitimate prescriptions.  The key is to determine which

01:26:39  2    prescriptions are legitimate.  Use the best practices below

01:26:44  3    to guide you.  Remember, we are not allowed to blanket

01:26:48  4    refuse to fill for any prescriber."

01:26:52  5         See that?

01:26:56  6    **A**    Yes.

01:26:57  7    **Q**    And again, that's your mantra you keep sending out

01:27:01  8    that we've talked about before, right?

01:27:03  9    **A**    Again, I want to remind you, it's not just me that was

01:27:06  10   sending that out.

01:27:08  11   **Q**    Well, yours is one I'm reading and deposing, right?

01:27:12  12   **A**    I understand.  But Caroline and Shelley also used this

01:27:17  13   same information.

01:27:17  14   **Q**    Well, we are in 12 -- this is Christmas Eve, Christmas

01:27:24  15   Eve 2014, and you again are saying, no blanket refusals.

01:27:33  16   Right?

01:27:33  17   **A**    That was Walmart's policy at the time.

01:27:36  18   **Q**    And this is after you'd been, it seems, assigned to be

01:27:41  19   project leader on this refusal to fill process at Walmart,

01:27:47  20   right?

01:27:48  21   **A**    I don't know what that has to do with blanket

01:27:51  22   refusals, sir.

01:27:51  23   **Q**    Well, I mean, if you're project leader on the refusal

01:27:54  24   to fill process, you sure ought to be considering whether or

01:27:59  25   not you're allowed to do a blanket refusal to fill, don't

**Nelson - (By Video Deposition)**

2537

01:28:04    1    you think?

01:28:04    2    **A**    And Walmart's policy already did not allow blanket

01:28:07    3    refusals, so that would have been included in the process.

01:28:13    4    **Q**    "Pharmacists are granted the ability to exercise their

01:28:16    5    professional judgment and choose to refuse to fill."

01:28:20    6    You do that -- they have the ability if they think

01:28:23    7    it's for some reason other than legitimate.

01:28:26    8    You do that again, don't you?

01:28:28    9    **A**    Yes, sir, that is the direction that was being sent

01:28:30   10    out at the time.

01:28:30   11    **Q**    And then even on this one, you continue to say, "Even

01:28:38   12    after the pharmacist established there is a doctor-patient

01:28:43   13    relationship, the pharmacist is still allowed to refuse on

01:28:46   14    an individual prescription basis, but no blanket refusals

01:28:51   15    are allowed by the boards of pharmacy."

01:28:56   16    Do you see that?  You say it again.

01:28:59   17    **A**    Yes.  If there was a concern with that, Ms. Mack would

01:29:05   18    have said something, because she's a supervisor.

01:29:06   19    **Q**    Well, if you look at the next e-mail, it's on the next

01:29:10   20    page, from Donna Hander.  It's sent to you.  And now we're

01:29:17   21    in February of 2015.

01:29:20   22    You see?  You see where I am?

01:29:28   23    **A**    I do.

01:29:28   24    **Q**    "This situation has gotten worse.  Now this doctor

01:29:33   25    wants our stores to accept C-II electronic, which we all

01:29:38   1    know is legal, but when his, quote, patients, closed quote,

01:29:43   2    come up three at a time with Methadone, Norco, Xanax, and

01:29:50   3    sometimes MS Contin, and then tell you he video chats with

01:29:57   4    them, what do you do?  He's even FedEx'd prescriptions to my

01:30:05   5    pharmacy for people living over 100 miles away.  If all of

01:30:09   6    us got together and started filling out refusal to fill,

01:30:11   7    that's all we'd do all day longer.  Sherman, Store 947,

01:30:18   8    started out the day with eight prescriptions for Norco from

01:30:21   9    Dr. Diamond, some e-scribed.

01:30:26  10        "I've included the names of other pharmacists in the

01:30:28  11    CC area because they're looking to me for guidance.  We are

01:30:32  12    concerned about our jobs and about filling for a pill mill

01:30:36  13    doctor.  I'm in my 29th year with Walmart and have never had

01:30:39  14    a situation this bad with a doctor.  Other chains are

01:30:42  15    refusing to fill for him, which makes our burden even

01:30:45  16    greater.  Please help us."

01:30:55  17        Did I read that correctly?

01:30:56  18    A    That's what the document says.

01:30:58  19    Q    And your reply?  "The information below still applies

01:31:05  20    to electronic controlled substance prescriptions.

01:31:08  21    Pharmacists are still able to refuse to fill any

01:31:10  22    prescription, electronic or otherwise."

01:31:16  23        You just say go back to what I said before, don't you?

01:31:19  24    A    I didn't change any direction there, no, but there's

01:31:22  25    additional information down below on that e-mail.

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 01:31:24 | 1 | **Q**     "There have been zero refusal to fill web forms filled |
| 01:31:29 | 2 | out for Dr. Diamond."  You're not even filling them out in |
| 01:31:33 | 3 | your stores even though you know this, right? |
| 01:31:34 | 4 | **A**     That is what the document states. |
| 01:31:36 | 5 | **Q**     In 2014, store 147 filled out none for Dr. Diamond. |
| 01:31:43 | 6 | Store 148, one for Dr. Diamond.  Store 947, none for |
| 01:31:50 | 7 | Dr. Diamond.  Is that correct? |
| 01:31:51 | 8 | **A**     That is what the document says. |
| 01:31:52 | 9 | **Q**     So when you get notice that there may be a pill mill |
| 01:31:57 | 10 | concern, people are asking for help, saying, please help us, |
| 01:32:02 | 11 | they're worried about their jobs, they're worried about |
| 01:32:04 | 12 | filling for a pill mill doctor, and you look and you've only |
| 01:32:11 | 13 | got one refusal to fill form, do you do a deep dive and |
| 01:32:15 | 14 | investigation to see what's going on? |
| 01:32:18 | 15 | **A**     I think that's what this e-mail shows. |
| 01:32:19 | 16 | **Q**     That you did a deep dive?  I mean, did you check out |
| 01:32:24 | 17 | why they're not filling out those forms? |
| 01:32:26 | 18 | **A**     Well, their e-mail stated that they had lots of |
| 01:32:29 | 19 | prescriptions being presented, and that was not the |
| 01:32:31 | 20 | information that was being shown to Walmart. |
| 01:32:47 | 21 | **Q**     Sir -- hold on one second. |
| 01:33:00 | 22 | After this, you've got another e-mail.  If you'll pull |
| 01:33:06 | 23 | out Walmart 393, I'm going to mark it as Exhibit 31. |
| 01:33:15 | 24 | This starts out with an e-mail on the second page from |
| 01:33:17 | 25 | Sabrina Edgeman, who says, "Eric, we had a question come up |

**Nelson - (By Video Deposition)**

01:33:23   1   this weekend concerning a local physician and his

01:33:25   2   prescribing of CDs."

01:33:31   3       Those are control drugs, right?

01:33:33   4   **A**   I don't know if that's what they're referring to or

01:33:36   5   not, but CDS.

01:33:38   6   **Q**   We'll keep going.  It will make sense as we go through

01:33:41   7   it.

01:33:41   8       "Both the corporate office of Target and Kroger have

01:33:44   9   told their pharmacists they're not allowed to fill CDs from

01:33:47   10  Dr. Howard Gregg Diamond at all, period."

01:33:53   11      See where I'm reading?

01:33:54   12  **A**   Yes.

01:33:59   13  **Q**   "Target was illusive, made me call the corporate

01:34:02   14  office, all I got was a legal answer.  But Kroger said their

01:34:05   15  corporate offices sent out a letter saying they weren't to

01:34:08   16  fill for him due to some legal issues being investigated

01:34:11   17  with his practice and prescribing, and they didn't want

01:34:13   18  their pharmacists put at risk filling these medications that

01:34:16   19  were not needed and overdosing his patients."

01:34:23   20      Do you see that?

01:34:24   21  **A**   I see what the pharmacist wrote.

01:34:26   22  **Q**   "Has Walmart heard anything about this?"

01:34:30   23      Do you see that question?

01:34:31   24  **A**   Yes, I see it on this e-mail.

01:34:39   25  **Q**   All right.  And then Eric Frikken replies and says,

**Nelson - (By Video Deposition)**                    2541

01:34:47   1   "Sabrina, this is the first time I'm hearing of this doctor.

01:34:50   2   I'll forward up to Compliance.  Does he currently have a

01:34:54   3   valid license?  Remember for any refusal to fill, we just

01:35:32   4   need to ensure that we fill out the refusal to fill."

01:35:04   5        He says also, "At this time we cannot do a blanket

01:35:09   6   refusal on a doctor."

01:35:10   7        He's echoing your line, isn't he?

01:35:12   8   **A**    That is Walmart's direction.

01:35:17   9   **Q**    And who is Eric Frikken?

01:35:23  10   **A**    I don't -- the name rings a bell, but I don't recall

01:35:25  11   what his title was at that moment.

01:35:34  12   **Q**    Sabrina e-mails back and says, "Yes, he's got a valid

01:35:38  13   license.  We called his office this morning to verify.

01:35:40  14   Asked the nurse if they knew what was going on.  They said,

01:35:44  15   yes, they heard several pharmacies were refusing to fill his

01:35:48  16   prescriptions, but they won't tell the office why.

01:35:50  17        "It's weird though.  The prescription has a Sherman,

01:35:53  18   Texas, office address, and then a Dallas phone number.  I'm

01:35:58  19   guessing they have multiple offices.  Anyway, the nurse

01:36:03  20   validated the prescription and the patient's been on it for

01:36:06  21   years, so we all felt comfortable it was a valid

01:36:09  22   prescription and took care of the patient.  We just thought

01:36:11  23   it was weird that other certain pharmacies had a blanket

01:36:15  24   refusal for a doctor.  Very odd.  Maybe we will learn

01:36:20  25   something from Compliance on him.  It's just very weird."

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 01:36:24 | 1 | Do you see what the assistant manager from the Walmart |
| 01:36:26 | 2 | store wrote? |
| 01:36:28 | 3 | **A**   Yes, I see what they wrote. |
| 01:36:39 | 4 | **Q**   All right.  So we've got this alert going out.  And it |
| 01:36:42 | 5 | comes to you, by the way.  You send it on.  Eric Frikken |
| 01:36:46 | 6 | sent it to you.  You send it on to Shelley, asking her to |
| 01:36:51 | 7 | assist because Eric's in Oklahoma. |
| 01:36:53 | 8 | Do you see that? |
| 01:36:54 | 9 | **A**   That's correct. |
| 01:36:55 | 10 | **Q**   Are you familiar with Dr. Wade?  Does that ring a |
| 01:37:01 | 11 | bell? |
| 01:37:02 | 12 | **A**   I am not familiar with Dr. Wade, but I've heard the |
| 01:37:07 | 13 | name. |
| 01:37:07 | 14 | **Q**   Why don't you pull out Walmart 373.  I'll mark it as |
| 01:37:11 | 15 | Exhibit 33.  This e-mail will start -- the first e-mail on |
| 01:37:22 | 16 | this chain is at the bottom of page 2.  It's an e-mail from |
| 01:37:25 | 17 | Brad Polk to Thuy Nguyen and Linda Dowden.  The subject is |
| 01:37:35 | 18 | DEA and doctor cocktails. |
| 01:37:39 | 19 | Do you see that? |
| 01:37:50 | 20 | **A**   I do. |
| 01:37:50 | 21 | **Q**   Brad Polk, who is he? |
| 01:37:54 | 22 | **A**   I don't know that I've ever met Brad Polk. |
| 01:37:56 | 23 | **Q**   Okay.  He writes and says, "This is a topic that I |
| 01:38:02 | 24 | think we need to start talking about since it could result |
| 01:38:04 | 25 | in hefty fines for our company and for us personally.  I've |

**Nelson - (By Video Deposition)**

2543

| | | |
|---|---|---|
| 01:38:10 | 1 | heard over the last few weeks that Kroger and Walgreens have |
| 01:38:17 | 2 | started blocking doctors that write excessively for certain |
| 01:38:22 | 3 | medicine, hydrocodone, APAP, Xanax, Soma, possibly others, |
| 01:38:27 | 4 | especially when prescribed in conjunction with each other. |
| 01:38:30 | 5 | I spoke with a Kroger pharmacist this morning, and he |
| 01:38:32 | 6 | mentioned that as of October 1, the DEA was going after |
| 01:38:38 | 7 | pharmacies and pharmacists that continue to fill from these |
| 01:38:40 | 8 | doctors that prescribe them excessively." |
| 01:38:47 | 9 | You tracking with me? |
| 01:38:49 | 10 | **A**    That's what that document says. |
| 01:38:50 | 11 | **Q**    "What their definition of excessive is, I'm not sure, |
| 01:38:53 | 12 | but the Kroger pharmacists mentioned that their home office |
| 01:38:57 | 13 | determined who to block and then blocked the pharmacies by |
| 01:39:04 | 14 | installing a hard halt when they tried to fill it.  This was |
| 01:39:09 | 15 | in response to the DEA's threatening a $73 million fine to |
| 01:39:15 | 16 | their company if they continued.  So far, they have blocked |
| 01:39:18 | 17 | four doctors in this area, Dr. Randall Wade being one of |
| 01:39:23 | 18 | them." |
| 01:39:24 | 19 | Do you see that? |
| 01:39:27 | 20 | **A**    That's what that pharmacist wrote. |
| 01:39:31 | 21 | **Q**    "He mentioned two in the Denton area, and I'm not sure |
| 01:39:37 | 22 | of the other.  We hear that Dr. Wade is telling his patients |
| 01:39:40 | 23 | to go to Walmart because they'll fill them, so he knows |
| 01:39:45 | 24 | about the block from the other stores." |
| 01:39:48 | 25 | Do you see that? |

**Nelson - (By Video Deposition)**

01:39:54   1   **A**   That's what the pharmacist wrote.

01:39:57   2   **Q**   "My concern now is that we as a company will start to

01:40:00   3   accumulate this suspect clientele and be in the same boat,

01:40:05   4   so to speak, as Kroger and Walgreens trying to fend off a

01:40:09   5   major fine."

01:40:10   6       Do you see that as well?

01:40:11   7   **A**   That appears to be that pharmacist's opinion.

01:40:17   8   **Q**   He ends this, "Do you or does the home office know

01:40:24   9   anything about this and, if so, what steps are being taken

01:40:27   10   to protect us and our company?"

01:40:29   11       Do you see that?

01:40:32   12   **A**   Yes, sir.

01:40:32   13   **Q**   I mean, also, we ought to be concerned about

01:40:35   14   protecting the public and the patients, right?

01:40:38   15   **A**   I can't answer to what the pharmacist was thinking

01:40:41   16   about protecting the public or the patients.

01:40:43   17   **Q**   Well, this gets up to you, and you reply, March 3,

01:40:49   18   2014.  At the bottom of page 1 it shows your reply.

01:40:55   19       Do you see that?

01:41:04   20   **A**   March 3?  Yes, I see that.

01:41:07   21   **Q**   And here's what you have to say.

01:41:10   22       "Walgreens has developed its own processes due to the

01:41:14   23   fine they received from the dispensing practices they were

01:41:17   24   allowed to continue in Florida -- that were allowed to

01:41:20   25   continue in Florida.  Their current CIA agreement with the

**Nelson - (By Video Deposition)**

01:41:24  1      DEA" -- sorry.

01:41:28  2           "Their current CIA agreement with the DEA is more

01:41:33  3      aggressive than anything else in the marketplace."

01:41:36  4           And you talk about that.

01:41:39  5           Then you say, "Blanket refusals are not allowed by

01:41:43  6      state boards of pharmacy."

01:41:45  7           See that?

01:41:48  8      **A**    Yes, sir.  That was the direction being sent out at

01:41:50  9      the time.

01:41:50  10     **Q**    Then you say, "Pharmacists are granted the ability to

01:41:57  11     exercise their professional judgment and choose to refuse to

01:42:03  12     fill if they feel the prescription was written for other

01:42:06  13     than a legitimate medical purpose."

01:42:08  14          You use that line again, don't you?

01:42:10  15     **A**    That's the same information that we've been sending

01:42:13  16     out.

01:42:14  17     **Q**    Yeah.  So you send that out in reference to this with

01:42:18  18     Dr. Wade, and you get back from Brad Polk, "Thank you, Brad.

01:42:26  19     I knew you could give a much more detailed explanation."

01:42:33  20          See that?

01:42:34  21     **A**    I don't think that was from Brad Polk.  I believe that

01:42:37  22     was from Linda Dowden to me.

01:42:41  23     **Q**    Ah, you're right.  You're right, you're right, you're

01:42:45  24     right.

01:42:45  25          Brad Polk sent this in reply to Shala on this chain.

**Nelson - (By Video Deposition)**

01:42:48  1        "I think I was talking to Carla a couple of weeks ago

01:42:52  2   regarding Dr. Randall Wade.  I told her I would forward any

01:42:55  3   information.  Bottom line is, it's based on each individual

01:42:59  4   situation, and you can't have a blanket denial to fill for a

01:43:02  5   doctor.  Brad Nelson explains it below."

01:43:06  6        Do you see that?

01:43:11  7   **A**    Yes, sir.

01:43:12  8   **Q**    He doesn't say it's Walmart policy.  He says Brad

01:43:15  9   Nelson explains it.

01:43:16  10       Do you see that?

01:43:18  11  **A**    No, that was that pharmacist's opinion, but it's

01:43:22  12  Walmart policy.

01:43:23  13  **Q**    Sir, did you know about this McKinney doctor, Randall

01:43:26  14  Wade, getting arrested and ultimately losing his license or

01:43:31  15  setting his license aside, with other punishments connected

01:43:34  16  to eight deaths connected with overdoses?

01:43:39  17  **A**    At some point I was made aware of this.

01:43:43  18  **Q**    Yeah, because this is 2016, November 11.

01:43:53  19       Do you see that?

01:43:53  20  **A**    Yes, that's the date.

01:43:55  21  **Q**    And the time where you were being discussed about him

01:43:57  22  in an e-mail chain where you, quote, explain it below and

01:44:02  23  explain why it's okay to dispense, is just being passed

01:44:05  24  around by Carla to Crystal, July of 2016, even though you

01:44:19  25  wrote it in March of 2014.

**Nelson - (By Video Deposition)**

01:44:21  1       Do you see that?

01:44:23  2  **A**    I see where that e-mail was forwarded in July of 2016,

01:44:30  3  but I don't agree with the fact that the information that

01:44:32  4  was explained before says it was okay to fill those

01:44:34  5  prescriptions.

01:44:36  6  **Q**    Well, what you said -- you said that pharmacists have

01:44:42  7  the ability to choose not to, but they can't have a blanket

01:44:48  8  refusal.

01:44:52  9       That's what you told me, isn't it?

01:44:54  10 **A**    Well, as I've explained before, that's Walmart's

01:44:57  11 policy and guidelines, you know, the information that was

01:44:59  12 being shared at the time.

01:45:00  13 **Q**    So in 2016, just four months before he's in front of

01:45:10  14 the judge and arrested and giving up his license, y'all are

01:45:13  15 still asking the question, "Should we stop filling his?"

01:45:23  16 **A**    That pharmacist did ask that question.

01:45:25  17 **Q**    All right.  So as we finish up this timeline, we've

01:45:31  18 got the 2015 and '16 where you're still continuing to say --

01:45:38  19 you're continuing to say there's no blanket refusal to fill

01:45:53  20 and that they have an ability to refuse if they question --

01:45:59  21 if they think that it's a bad prescription, right?

01:46:02  22 **A**    I saw where that e-mail was forwarded in 2016.  I

01:46:06  23 don't know if the verbiage that was being sent out in 2016,

01:46:11  24 on a new request, was the same as what was sent out in 2014

01:46:15  25 on that one that was forwarded.

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 01:46:16 | 1 | **Q**    Well, if you look at it, it's Exhibit 33.  Talks about |
| 01:46:20 | 2 | Randall Wade. |
| 01:46:26 | 3 | Says, "I'm forwarding this to you because this |
| 01:46:28 | 4 | discussion that we had about Randall Wade a couple of years |
| 01:46:31 | 5 | ago.  He's still under investigation by the DEA.  I just |
| 01:46:34 | 6 | found out today CVS is no longer filling his controls per |
| 01:46:38 | 7 | corporate orders.  Kroger stopped filling them a couple of |
| 01:46:42 | 8 | years ago.  Just thought you should know about all of this. |
| 01:46:46 | 9 | You might want to let Kirk know, too.  My question is, |
| 01:46:49 | 10 | should we stop filling his controls, too?" |
| 01:46:52 | 11 | And then it sends around -- |
| 01:46:54 | 12 | **A**    That was one pharmacist to another.  That's got |
| 01:46:56 | 13 | nothing to do with me. |
| 01:46:56 | 14 | **Q**    Well, except she sends around the e-mail, which is the |
| 01:47:00 | 15 | one where Brad Nelson explains it below. |
| 01:47:03 | 16 | That's -- your e-mail is the one making the rounds. |
| 01:47:08 | 17 | Do you see that? |
| 01:47:09 | 18 | **A**    That may be, but I did not send that e-mail in 2016. |
| 01:47:14 | 19 | **Q**    You never sent a correcting e-mail either, did you? |
| 01:47:17 | 20 | **A**    I didn't know it was sent, sir. |
| 01:47:20 | 21 | **Q**    All right.  Sir, as we were going down the road, we |
| 01:47:25 | 22 | stopped and looked at the -- you and then the requirements |
| 01:47:28 | 23 | and then the failures.  And my last stop on the road is |
| 01:47:32 | 24 | motive.  Why? |
| 01:47:37 | 25 | You understand what motive means, right? |

**Nelson - (By Video Deposition)**                    2549

01:47:43  1    **A**     Yes, sir.

01:47:43  2    **Q**     In other words, what was driving the activities that

01:47:50  3    we have seen over and over again.

01:47:52  4          Sir, would you agree or disagree with this answer:

01:48:10  5    It's all about money.

01:48:11  6          Agree or disagree?

01:48:12  7    **A**     I don't know what that's in context with, sir.

01:48:16  8    **Q**     Sir, when I say it's all about money, I want to know

01:48:22  9    why Walmart's filling prescriptions they shouldn't be

01:48:25  10   filling; why Walmart has someone driving compliance who

01:48:29  11   isn't compliance trained; why is Walmart having to have

01:48:36  12   repeated settlements and investigations; and why is Walmart

01:48:40  13   giving wrong instructions about refusing to fill.

01:48:44  14          Those questions, sir, I'm suggesting it's a profit

01:48:48  15   motive by Walmart.

01:48:50  16          Do you agree or disagree?

01:48:51  17   **A**     I can't agree or disagree to that -- that statement

01:48:55  18   that it's all about money.

01:48:56  19   **Q**     All right.  Then what I'm going to do is give you what

01:48:59  20   I'll mark as Exhibit 35, but it's Walmart Number 96.

01:49:05  21          All right.  This document says, down at the bottom,

01:49:08  22   it's an e-mail from you to a number of different people,

01:49:13  23   February 13, 2015.

01:49:16  24          It says, "Here are the refusal to fill notifications

01:49:20  25   sent to the DEA in the month of January 2015.  Feel free to

**Nelson - (By Video Deposition)**

01:49:26  1    share with your teams as you see appropriate."

01:49:28  2         Do you see that?

01:49:29  3    **A**    That's what the document says, yes.

01:49:33  4    **Q**    Then you got a reply e-mail, just 20 minutes later,

01:49:41  5    from David Reitnauer that said to you, "Does your team pull

01:49:49  6    out any insights from these we need to highlight?"

01:49:53  7         Do you see that?

01:49:55  8    **A**    I do.

01:49:56  9    **Q**    Now, that can be important for public safety.  I mean,

01:50:00  10   what we've got here is refusal to fill notifications.  Those

01:50:07  11   are important things, aren't they?

01:50:08  12   **A**    They were important to the MOA and reporting to the

01:50:11  13   DEA.

01:50:12  14   **Q**    Well, yeah.  There's a reason why, don't you figure?

01:50:16  15   **A**    I don't know why the DEA wanted the refusal to fill

01:50:19  16   information.

01:50:19  17   **Q**    Well, don't you figure it may be in part to make sure

01:50:26  18   your people are doing it?  Could be one reason, couldn't it?

01:50:29  19   **A**    As I stated, I don't know what the DEA wanted that

01:50:33  20   information for.

01:50:34  21   **Q**    Do you think maybe it's to accumulate information and

01:50:38  22   look for signs of a problem?

01:50:40  23   **A**    You would have to ask the DEA, sir.  I do not know.

01:50:43  24   **Q**    Does it -- did it ever occur to you that maybe it's

01:50:48  25   important because it forced you to drill down and actually

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 01:50:50 | 1 | look for insights from such things? |
| 01:50:54 | 2 | **A**    As I recall, the MOA simply required us to report |
| 01:50:58 | 3 | within seven days to the DEA.  It didn't require to do |
| 01:51:01 | 4 | analysis. |
| 01:51:01 | 5 | **Q**    Don't you want to do analysis to figure out where |
| 01:51:09 | 6 | you're contributing to an epidemic that's killing people? |
| 01:51:14 | 7 | **A**    Again, we were doing what we were told to do, and |
| 01:51:17 | 8 | that's what was important, to get that information to the |
| 01:51:19 | 9 | DEA. |
| 01:51:19 | 10 | **Q**    Well, look at what you said in reply to "Does your |
| 01:51:23 | 11 | team pull any insights." |
| 01:51:26 | 12 | You said, "The MOA that requires the reporting of the |
| 01:51:29 | 13 | refusal to fill expires in 30 days.  We haven't invested a |
| 01:51:35 | 14 | great amount of effort in doing analysis on the data since |
| 01:51:39 | 15 | the agreement's virtually over.  Driving sales and patient |
| 01:51:45 | 16 | awareness is a far better use of our market director's and |
| 01:51:52 | 17 | market manager's time." |
| 01:51:55 | 18 | Did I read that correctly? |
| 01:51:59 | 19 | **A**    That is what the document says. |
| 01:52:00 | 20 | **Q**    Is that what you said, Brad Nelson? |
| 01:52:03 | 21 | **A**    That is what I wrote in that e-mail, yes. |
| 01:52:07 | 22 | **Q**    Did you make the decision not to invest a great amount |
| 01:52:14 | 23 | of effort in doing analysis on the data? |
| 01:52:16 | 24 | **A**    I was not asked to do analysis on the information. |
| 01:52:21 | 25 | **Q**    Wasn't my question.  I said, did you make the decision |

**Nelson - (By Video Deposition)**

2552

01:52:24  1   not to invest a great amount of time or great amount of

01:52:29  2   effort in doing analysis on the data?

01:52:31  3   **A**     No, I did not make that decision.

01:52:32  4   **Q**     Who did?

01:52:39  5   **A**     As I already testified, I was not asked to do analysis

01:52:42  6   on that information.

01:52:47  7   **Q**     Did anybody direct you not to?

01:52:49  8   **A**     I don't recall being asked to do analysis on there.

01:53:02  9   **Q**     So you write, "Driving sales and patient awareness is

01:53:06  10  a far better use of our market director and market manager's

01:53:09  11  time."  Correct?

01:53:14  12  **A**     That is what the document says.

01:53:16  13  **Q**     That's what you said in the document, correct?

01:53:18  14  **A**     That is correct.

01:53:19  15  **Q**     So one insight we can get into motive from this

01:53:26  16  document would be, at least as far as you were concerned,

01:53:34  17  driving sales and patient awareness.

01:53:51  18       And that's being aware of patients, right?

01:53:54  19  **A**     No, patient awareness means patient being aware of all

01:53:58  20  the services and things that the pharmacy has to offer.

01:54:00  21  **Q**     Ah, let them know if there's a sale going on and

01:54:05  22  what-all the pharmacy can do, and all of that kind of stuff,

01:54:07  23  right?

01:54:07  24  **A**     Mostly about immunizations and pharmacy services.

01:54:11  25  **Q**     So what we have here is a statement by you that

**Nelson - (By Video Deposition)**

01:54:16  1    "driving sales and patient awareness is a far better use of

01:54:20  2    the market director's and market manager's time than

01:54:22  3    investing a great amount of effort analyzing refusal to fill

01:54:27  4    data," right?

01:54:31  5         Is that correct?

01:54:32  6    **A**    Yes.  Yes, given the fact that the agreement to report

01:54:35  7    was nearly over.

01:54:38  8    **Q**    All right.  I've got a few more, but I'm going to stop

01:54:40  9    now because Ms. Tara wants to ask you questions, and I'm

01:54:44  10   going to reserve anything I can do afterwards.  So I will

01:54:51  11   pass the witness.

01:54:52  12        Thank you, sir.

01:55:22  13                              - - - - -

01:55:22  14   **Q**    ...counsel in this litigation, we have not met before;

01:55:25  15   is that correct?

01:55:25  16   **A**    That is correct.

01:55:25  17   **Q**    And we haven't spoken before; is that correct?

01:55:28  18   **A**    That is correct.

01:55:28  19   **Q**    I'm just going to ask you a few follow-up questions to

01:55:30  20   clarify the record based on some of the stuff that

01:55:35  21   Mr. Lanier asked you about.

01:55:36  22        Do you have what's previously been marked in this

01:55:38  23   deposition as Nelson Exhibit 30 handy?  It also says

01:55:47  24   P-WMP_246 in the upper right-hand corner.

01:55:48  25   **A**    I do.

**Nelson - (By Video Deposition)**

01:55:49  1    **Q**    And this is an e-mail chain from you to a number of

01:55:52  2    folks.

01:55:54  3         And do you recall Mr. Lanier asking you questions

01:55:58  4    about this document?

01:56:01  5    **A**    Yes, I do recall that.

01:56:02  6    **Q**    Okay.  And he asked you about the top portion of the

01:56:08  7    e-mail.  That was your response on the first page.  And

01:56:12  8    asked you about a couple lines from it.  And I want to go

01:56:15  9    through the rest of your response to make sure that the

01:56:17  10   record is clear what the entire guidance is that you were

01:56:20  11   giving in this particular e-mail.

01:56:22  12        And we're going to start at the top of this e-mail.

01:56:25  13   You write, "The information below still applies to

01:56:29  14   electronic controlled substance prescriptions.  Pharmacists

01:56:33  15   are still able to refuse to fill any prescription,

01:56:36  16   electronic or otherwise."

01:56:38  17        Did I read that correctly?

01:56:38  18   **A**    That is correct.

01:56:39  19   **Q**    And then you go on to write, "The challenge with C-II

01:56:42  20   electronic prescriptions is that you cannot give a copy back

01:56:45  21   to the patient and you would need to contact the prescriber

01:56:48  22   and let them know that you are not filling the prescription

01:56:51  23   so that the prescriber can send the Rx to another pharmacy."

01:56:58  24        You continue, "I understand that the RTF process is

01:57:01  25   time consuming; however, when a complaint comes in, you will

**Nelson - (By Video Deposition)**

01:57:05  1   be glad you documented the event.  These bad actors will

01:57:11  2   continue to write for controlled substances, and when they

01:57:14  3   do, if you send the RTF web form, then I personally report

01:57:19  4   those to the DEA every morning."

01:57:21  5        Did I read that correctly?

01:57:24  6   **A**    You did read that correctly.

01:57:25  7   **Q**    And was one of your responsibilities at Walmart from

01:57:28  8   the time period of about 2011 to 2015 to report these

01:57:32  9   refusal to fills to the DEA?

01:57:35  10  **A**    That is correct.

01:57:35  11  **Q**    And can you describe to the jury a little bit about

01:57:41  12  that process?  Did you come in each morning, for example, to

01:57:43  13  do that?

01:57:46  14  **A**    Yes, I came in early in the mornings to process the

01:57:52  15  refusal to fill web forms that had come in from the previous

01:57:57  16  day.

01:57:58  17  **Q**    And then you go on in this e-mail to write, "Without

01:58:01  18  the refusal to fill documents, there is no information going

01:58:04  19  to the DEA in Dallas regarding this prescriber's writing

01:58:08  20  habits.  I encourage you to fill out the refusal to fill web

01:58:14  21  forms."

01:58:15  22        Do you see that?

01:58:16  23  **A**    I see that.

01:58:17  24  **Q**    And this prescriber here in the e-mail is referring to

01:58:20  25  Dr. Diamond; is that right?

**Nelson - (By Video Deposition)**

01:58:21   1   **A**     That is correct.

01:58:22   2   **Q**     And you go on to write, "So far, there have been zero

01:58:26   3   refusal to fill forms filled out for Dr. Diamond in 2015."

01:58:31   4   Correct?

01:58:31   5   **A**     That's correct.

01:58:31   6   **Q**     And then you write, "In 2014, Store 147 filled out

01:58:36   7   four RTFs and none for Dr. Diamond.  Store 148 filled out

01:58:41   8   two RTFs, and one was for Dr. Diamond.  And Store 947 filled

01:58:46   9   out one RTF, and none were for Dr. Diamond."

01:58:50   10      Did I read that correctly?

01:58:51   11   **A**     That is what the document says, yes.

01:58:53   12   **Q**     And then you go on to write, "The bottom line is I

01:59:01   13   have received only one RTF for Dr. Diamond in the last 14

01:59:04   14   months, therefore, the DEA is not hearing anything from

01:59:06   15   Walmart since stores are choosing not to file the RTF forms.

01:59:10   16   Please let me know how we can assist.  However, you can help

01:59:12   17   your situation the best by reporting the refusal to fills so

01:59:16   18   that the information can be shared with the DEA."

01:59:20   19      Did I read that correctly?

01:59:22   20   **A**     You did, that's correct.

01:59:23   21   **Q**     And was it your expectation that sharing this refusal

01:59:27   22   to fill information with the DEA would lead the DEA to take

01:59:32   23   appropriate action against Dr. Diamond if it felt that it

01:59:37   24   was necessary?

01:59:37   25   **A**     That would have been my understanding with what the

01:59:39  1    DEA did with this information when they received it.

01:59:43  2    **Q**    And then if you could pull out what was previously

01:59:45  3    marked as Exhibit Parker 30.  We are going to mark it in

01:59:51  4    this deposition as Nelson Exhibit 37.

01:59:55  5        And if you want to keep what was previously marked as

01:59:58  6    Nelson Exhibit 30 handy, what you can see by comparing the

02:00:03  7    two e-mails is that what's now been marked as Nelson Exhibit

02:00:08  8    37 is actually a continuation of the e-mail thread that was

02:00:14  9    in Nelson Exhibit 30.

02:00:16  10       Is that right?  I'll give you a moment to look over

02:00:19  11   the document.

02:00:19  12   **A**    Yes.  There are two additional e-mails that were

02:00:22  13   exchanged after the Exhibit 30 e-mail was produced.

02:00:31  14   **Q**    And so I want to pick up on Exhibit 37 where we had

02:00:35  15   left off with Exhibit 30.

02:00:37  16       So if you see, the last e-mail we had read in Exhibit

02:00:42  17   30 was your response that began with "the information below

02:00:47  18   still applies."  And then if you look immediately above that

02:00:49  19   on Exhibit 37, Miss Donna Hander responds to you:  "Sir, I

02:01:00  20   appreciate all your time spent on this."

02:01:02  21       Did I read that correctly?

02:01:03  22   **A**    You did.

02:01:04  23   **Q**    And she further writes, "My fellow pharmacists now

02:01:07  24   realize the importance of filling out the form.  We were

02:01:12  25   afraid of getting fired for refusing to fill, but now I

**Nelson - (By Video Deposition)**                        2558

02:01:16  1    understand it's for our protection."

02:01:18  2          Did I read that correctly?

02:01:18  3    **A**    That is what the document says, yes.

02:01:20  4    **Q**    And Mr. Nelson, did you ever reprimand any Walmart

02:01:25  5    pharmacist for submitting a refusal to fill form?

02:01:28  6    **A**    No, I never did.

02:01:30  7    **Q**    And are you aware of anyone at Walmart who ever

02:01:36  8    reprimanded a pharmacist for submitting a refusal to fill

02:01:39  9    form?

02:01:40  10   **A**    I'm not aware of any.

02:01:41  11   **Q**    And in fact, Walmart encouraged its pharmacists to

02:01:48  12   refuse to fill any prescription that the pharmacist felt was

02:01:52  13   inappropriate; is that right?

02:01:54  14   **A**    Yes, and that was the direction that was sent out in

02:01:56  15   e-mails multiple times.

02:01:57  16   **Q**    And this Hander goes on to say, "When you have two to

02:02:02  17   three people in line with the same C-II and have three each,

02:02:06  18   it is very difficult.  Again, thank you so much."

02:02:09  19          Did I read that correctly?

02:02:09  20   **A**    That is correct.

02:02:09  21   **Q**    And so Ms. Hander in this e-mail is thanking you for

02:02:16  22   the guidance that you're providing.

02:02:18  23          Do you agree with that?

02:02:19  24   **A**    I would agree with that.

02:02:20  25   **Q**    Okay.  And then you respond to Ms. Hander on February

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 02:02:26 | 1 | 8, 2015, and write:  "Donna, thanks for reaching out for |
| 02:02:31 | 2 | assistance and guidance.  We are happy to assist and support |
| 02:02:36 | 3 | in any way we can.  We have been successful in Georgia and |
| 02:02:39 | 4 | Florida with having pain management office either closed |
| 02:02:44 | 5 | down or significant reductions in controlled substance |
| 02:02:49 | 6 | prescriptions being written.  In all of these cases, the DEA |
| 02:02:52 | 7 | has stepped in to educate the prescribers.  I look forward |
| 02:02:57 | 8 | to assisting your staff in this endeavor." |
| 02:03:01 | 9 | Did I read that correctly? |
| 02:03:02 | 10 | **A**   That is what the document says. |
| 02:03:03 | 11 | **Q**   Mr. Nelson, based on your experience at Walmart, do |
| 02:03:05 | 12 | you think that Walmart had a good relationship with the DEA |
| 02:03:08 | 13 | when you worked at home office? |
| 02:03:12 | 14 | **A**   That was my experience.  The DEA was very supportive |
| 02:03:16 | 15 | of what Walmart was doing. |
| 02:03:18 | 16 | **Q**   Did you assist the DEA whenever an agent followed up |
| 02:03:22 | 17 | with respect to a refusal to fill and asked for assistance? |
| 02:03:29 | 18 | **A**   Either myself or my assistant, Heather Gregory, would |
| 02:03:32 | 19 | have done that. |
| 02:03:32 | 20 | **Q**   And you just testified that it was your experience |
| 02:03:35 | 21 | that Walmart had a good relationship with the DEA.  Was it |
| 02:03:40 | 22 | also your experience that they had a good relationship with |
| 02:03:42 | 23 | other regulatory bodies such as boards of pharmacy? |
| 02:03:46 | 24 | **A**   I don't know about -- I don't know that for sure. |
| 02:03:52 | 25 | **Q**   Okay.  In your experience, did you, whenever you had |

**Nelson - (By Video Deposition)**

02:03:55  1  to interact with the Board of Pharmacy, did you think you

02:03:58  2  had a good relationship with them?

02:03:59  3  **A**    Well, with the boards of pharmacy, yes.

02:04:01  4  **Q**    Do you agree that red flags means different things in

02:04:05  5  different contexts?

02:04:06  6  **A**    Red flags in written form, in a document may be one

02:04:10  7  thing, and actually when you see it on a prescription may be

02:04:13  8  something different.  It's not always exactly the same.

02:04:15  9  **Q**    Do you agree that in Walmart guidance there are

02:04:22  10  references to red flags that are things for pharmacists in

02:04:28  11  their professional judgment to look for and in their

02:04:32  12  judgment if they feel it's necessary to further resolve

02:04:36  13  before filling a prescription?

02:04:38  14  **A**    Yes, I believe that.

02:04:39  15  **Q**    Did the DEA ever suggest to you that Walmart should

02:04:44  16  adopt a blanket refusal to fill policy?

02:04:48  17  **A**    To Brad Nelson personally, no.

02:04:50  18  **Q**    A corporate block is often referred to as blocking a

02:04:56  19  prescriber from the home office so that no pharmacies could

02:04:58  20  fill for that particular prescriber.

02:05:00  21      Are you aware of any Board of Pharmacy that has

02:05:06  22  explicitly permitted a corporate block policy?

02:05:08  23  **A**    Again, I'm not aware of a Board of Pharmacy saying

02:05:13  24  that that was authorized.

02:05:15  25  **Q**    And did the DEA ever suggest to you that Walmart

**Nelson - (By Video Deposition)**

02:05:18 1　should adopt a corporate block policy?

02:05:21 2　**A**　Not to Brad Nelson directly, no.

02:05:25 3　**Q**　And you communicated with the DEA frequently in

02:05:30 4　connection with reporting the refusals to fill; is that

02:05:34 5　right?

02:05:34 6　**A**　That is correct.

02:05:37 7　**Q**　In your experience at Walmart, pharmacists were

02:05:40 8　encouraged to exercise their professional judgment and not

02:05:43 9　fill any prescriptions that they felt was inappropriate,

02:05:46 10　correct?

02:05:46 11　**A**　Yes, I believe that's accurate.

02:05:48 12　**Q**　And that would be true if it was one prescription that

02:05:53 13　they felt was inappropriate from a prescriber or multiple

02:05:58 14　prescriptions they felt was -- they felt were inappropriate

02:06:02 15　from a prescriber; is that right?

02:06:06 16　**A**　That is correct.

02:06:06 17　**Q**　So if in their professional judgment after reducing

02:06:11 18　the specific prescriptions a Walmart pharmacist did not want

02:06:15 19　to fill a single controlled substance prescription from a

02:06:19 20　prescriber, in your experience, Walmart would have supported

02:06:22 21　that pharmacist in that decision, correct?

02:06:25 22　**A**　If they documented each refusal as required by policy,

02:06:29 23　they would be 100 percent supported.

02:06:32 24　**Q**　And it is your understanding that corresponding

02:06:35 25　responsibility applies to the pharmacist and not to Walmart

02:06:40  1  as a corporation; is that correct?

02:06:42  2  **A**    That is correct.

02:06:43  3  **Q**    In your experience at Walmart, was patient safety the

02:06:52  4  number one priority?

02:06:54  5  **A**    In my experience as a pharmacist there and in my

02:06:57  6  experience as an operator there, patient safety was always

02:07:00  7  the top of the list.

02:07:02  8  **Q**    Mr. Nelson, more generally so, we've looked at a

02:07:05  9  number of e-mails.  Did you also follow up with pharmacists

02:07:08  10  via phone if they had concerns?

02:07:14  11  **A**    That would happen from time to time, yes.

02:07:17  12  **Q**    And would the same be true with market director?

02:07:21  13  **A**    Would I call the market directors?

02:07:23  14  **Q**    Yes.

02:07:23  15  **A**    That is true.

02:07:25  16  **Q**    And the same with regional directors as well?

02:07:28  17  **A**    That was much more rare because they are harder to

02:07:31  18  track down due to their travel.

02:07:33  19  **Q**    I understand.

02:07:34  20    I guess my point is that, you know, the guidance that

02:07:37  21  you're giving to the field, including leadership and to

02:07:40  22  pharmacists, isn't all reflected in e-mails.  Some of that

02:07:46  23  guidance was provided orally as well.  Do you agree with

02:07:49  24  that?

02:07:49  25  **A**    That is correct.

**Nelson - (By Video Deposition)**

02:07:50  1    **Q**      And was that also commonplace, that you encouraged

02:07:53  2    pharmacists to work with their market directors or regional

02:07:56  3    directors regarding any concerns they might have?

02:07:57  4    **A**      Absolutely.

02:08:00  5    **Q**      Did you ever pressure any pharmacist to fill a C-II

02:08:07  6    prescription that they felt was inappropriate?

02:08:12  7    **A**      I did not.

02:08:12  8    **Q**      And are you aware of anybody else at Walmart who

02:08:18  9    pressured a pharmacist to fill a C-II prescription that he

02:08:23  10   or she did not feel was appropriate?

02:08:24  11   **A**      I am not aware of that.

02:08:27  12   **Q**      Okay.  I think you can put that document aside.

02:08:31  13          And I want to ask you about what was previously marked

02:08:36  14   as Exhibit 35, which was also marked in the upper right-hand

02:08:45  15   corner P-WMT_96.

02:08:48  16          Let me know when you have that document in front of

02:08:50  17   you, Mr. Nelson.

02:08:51  18   **A**      I have it.

02:08:51  19   **Q**      Thank you.

02:08:52  20          And Mr. Lanier asked you a series of questions about

02:08:55  21   this e-mail, correct?

02:08:56  22   **A**      That is correct.

02:08:56  23   **Q**      And Mr. Lanier asked you a series of questions about

02:09:01  24   what you meant by patient awareness, and the record would

02:09:07  25   reflect what you explained to him that meant.

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 02:09:08 | 1 | So I wanted to ask you about the first part of that |
| 02:09:11 | 2 | sentence, which is driving sales. |
| 02:09:13 | 3 | And so just to refresh your recollection, the sentence |
| 02:09:18 | 4 | reads, "Driving sales from patient awareness is a far better |
| 02:09:22 | 5 | use of our market director's and market manager's time. |
| 02:09:28 | 6 | Did I read that correctly? |
| 02:09:28 | 7 | **A**    You did. |
| 02:09:30 | 8 | **Q**    Mr. Nelson, what are you referring to when you wrote |
| 02:09:33 | 9 | "driving sales"? |
| 02:09:34 | 10 | **A**    Well, being working at Walmart for as many years as I |
| 02:09:38 | 11 | had, in operations "driving sales" is just a Walmart-speak |
| 02:09:41 | 12 | for go out there and do your business.  That's basically |
| 02:09:44 | 13 | what that's all about, is it includes over-the-counter |
| 02:09:53 | 14 | medications, it includes prescription medications, it |
| 02:09:55 | 15 | includes all things around the business of pharmacy.  So |
| 02:09:57 | 16 | it's just kind of Walmart-speak of saying, go out and get |
| 02:10:01 | 17 | them, tiger. |
| 02:10:03 | 18 | **Q**    And you weren't in this e-mail at all referring to |
| 02:10:07 | 19 | driving sales of C-II prescriptions, correct? |
| 02:10:10 | 20 | **A**    Not at all. |
| 02:10:12 | 21 | **Q**    I just want to go over one other question about this |
| 02:10:16 | 22 | document at the bottom. |
| 02:10:19 | 23 | And so this is your first e-mail in Exhibit 35.  And |
| 02:10:24 | 24 | this is an e-mail from you to a number of folks on the "to" |
| 02:10:29 | 25 | line and the "CC" line. |

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 02:10:33 | 1 | Do you see that? |
| 02:10:34 | 2 | **A**    I do. |
| 02:10:34 | 3 | **Q**    And can you generally describe who these individuals |
| 02:10:39 | 4 | are?  Do they fall into a certain kind of area, for example, |
| 02:10:43 | 5 | field leadership, or what group generally were the positions |
| 02:10:46 | 6 | that they held? |
| 02:10:47 | 7 | **A**    In the "to" line, everybody there is a divisional |
| 02:10:53 | 8 | manager except for Paul Beahm, Susanne Hiland, and Warren |
| 02:11:01 | 9 | Moore.  They were in higher leadership in the Pharmacy |
| 02:11:06 | 10 | Health and Wellness area. |
| 02:11:11 | 11 | The people in the CC, those individuals were practice |
| 02:11:15 | 12 | Compliance folks, mostly my peers and supervisors. |
| 02:11:19 | 13 | **Q**    And in your e-mail on February 13, 2015, you write, |
| 02:11:24 | 14 | "Here are the refusal to fill notifications sent to the DEA |
| 02:11:27 | 15 | in the month of January 2015.  Feel free to share with your |
| 02:11:31 | 16 | teams as you see appropriate." |
| 02:11:32 | 17 | Did I read that correctly? |
| 02:11:34 | 18 | **A**    You did. |
| 02:11:34 | 19 | **Q**    And what did you mean by "Feel free to share with your |
| 02:11:38 | 20 | teams as you see appropriate"? |
| 02:11:40 | 21 | **A**    This report would have included information about the |
| 02:11:45 | 22 | refusal to fills that had been reported from their area of |
| 02:11:49 | 23 | supervision, and there are some stores that reported many |
| 02:11:54 | 24 | refusal to fills and other stores that would report a few |
| 02:11:58 | 25 | refusal to fills.  And I would encourage them to focus on |

**Nelson - (By Video Deposition)**

2566

02:12:03  1   both, actually to find out what's going on in terms of, hey,

02:12:06  2   this store is sending in a lot of refusal to fills, what's

02:12:09  3   going on; and, number, two, if a store isn't filling out

02:12:13  4   any, are they aware of the policies and the support that

02:12:16  5   Walmart gives them in refusing to fill prescriptions after

02:12:18  6   they exercise their professional judgment.

02:12:20  7   **Q**     And how often did you circulate this refusal to fill

02:12:24  8   information to the Health and Wellness leadership team?

02:12:28  9   **A**     It was regularly, most of the time monthly, but I may

02:12:33  10  have missed one or two.

02:12:34  11  **Q**     Mr. Nelson, you worked for Walmart for about 33 years;

02:12:41  12  is that right?

02:12:41  13  **A**     That is correct.

02:12:42  14  **Q**     Did you take pride in your work at Walmart?

02:12:48  15  **A**     I enjoyed working for Walmart very much.

02:12:50  16  **Q**     And Mr. Lanier asked you a series of questions where I

02:12:54  17  think he was trying to describe in his own words your

02:12:59  18  professional life, and I think you were clear on the record

02:13:03  19  as to how you would like that terminology to be used.

02:13:07  20      But you referenced something that I just wanted to

02:13:10  21  clarify, that essentially who you thought of -- again, if I

02:13:15  22  misstate this, I apologize, but your professional life is

02:13:18  23  more than just your work at Walmart.  And I wanted to know

02:13:21  24  what you meant by that.

02:13:21  25      Are you referring to things in the community or other

**Nelson - (By Video Deposition)** 2567

02:13:23 1 things?  What did you mean?

02:13:25 2 **A**      Yes, I meant other things related to the practice of

02:13:28 3 pharmacy.  For example, doing talks at schools about the

02:13:35 4 profession of pharmacy, doing information about Medicaid or

02:13:43 5 Medicare enrollment processes that were simply to help

02:13:46 6 educate seniors about how that process works as a

02:13:49 7 pharmacist, not as a Walmart representative.

02:13:52 8      Also participating in professional organizations that

02:13:57 9 dealt with either diversion of drugs or potentially practice

02:14:04 10 issues that faced pharmacies from time to time, such as

02:14:08 11 immunizations and what that would look like.  Again, not

02:14:11 12 representing Walmart, representing the profession of

02:14:14 13 pharmacy and what that might look like.

02:14:15 14 **Q**      Would you consider yourself to be active in your

02:14:18 15 community?

02:14:21 16 **A**      As active as I could be, yes.

02:14:23 17 **Q**      And can you explain some of the things that you were

02:14:27 18 active in in your community on a personal level?

02:14:34 19 **A**      As I said, going out giving speeches, maybe talks;

02:14:36 20 speeches might not be the right terminology, but talks about

02:14:39 21 the profession of pharmacy and the types of things that high

02:14:43 22 school students could look forward to if they were pursuing

02:14:46 23 a career in pharmacy, or in some cases it would even turn

02:14:48 24 into pharmacy technician situations because, again, as the

02:14:51 25 profession was growing, technicians were certainly needed in

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 02:14:56 | 1 | larger numbers, and it was a good career path for |
| 02:14:58 | 2 | individuals to become a technician or become a pharmacist. |
| 02:15:01 | 3 | I also participated in organizations about diverting |
| 02:15:06 | 4 | drugs such as the National Association of Drug Diversion |
| 02:15:10 | 5 | Investigators.  I participated in that not as a Walmart |
| 02:15:12 | 6 | representative but as a representative of the community of |
| 02:15:15 | 7 | pharmacy and what that would look like as to how pharmacists |
| 02:15:19 | 8 | could interact with that team or that group of individuals |
| 02:15:22 | 9 | in order to better reach a common goal, which would be |
| 02:15:27 | 10 | reduce diversion of prescription medications. |
| 02:15:45 | 11 | (End of video.) |
| 02:15:49 | 12 | THE COURT:  I take it that concludes |
| 02:15:52 | 13 | Mr. Nelson? |
| 02:15:53 | 14 | MR. LANIER:  No, I think we have our |
| 02:15:54 | 15 | redirect -- or recross, Your Honor. |
| 02:15:56 | 16 | THE COURT:  That's what I thought. |
| 02:15:58 | 17 | MR. LANIER:  I apologize.  But it's close. |
| 02:16:05 | 18 | - - - - - |
| 02:16:07 | 19 | Q    Sir, I have in front of you what I'm marking as |
| 02:16:10 | 20 | Exhibit 39.  It's Walmart 448.  It's your confidential |
| 02:16:14 | 21 | general release and settlement agreement that you entered |
| 02:16:16 | 22 | into with Walmart. |
| 02:16:19 | 23 | Do you remember this document? |
| 02:16:22 | 24 | A    Yes, sir, I remember this document. |
| 02:16:23 | 25 | Q    It's got your signature on the back, doesn't it? |

02:16:26   1    **A**    Yes, sir.

02:16:27   2    **Q**    It's got the severance payment where Walmart paid you

02:16:31   3    $124,000, doesn't it?

02:16:33   4    **A**    Okay.  Yes, sir, I see it.

02:16:35   5    **Q**    And then if you go to page 5, you'll see paragraph 11.

02:16:38   6    It's got a clause that says you've got to cooperate with the

02:16:41   7    company, doesn't it?

02:16:42   8    **A**    Yes, sir, it does say that.

02:16:46   9    **Q**    It says, "Associate," that's you, "may from time to

02:16:50   10   time after the termination date be asked to testify or

02:16:53   11   provide information to Walmart in connection with

02:16:56   12   employment-related or other legal proceedings involving

02:16:59   13   Walmart.  You will provide reasonable assistance to and will

02:17:02   14   cooperate with Walmart in connection with any Government

02:17:04   15   investigation, any litigation, arbitration, judicial,

02:17:11   16   nonjudicial, or administrative proceedings that may exist or

02:17:15   17   may arise regarding events about which you have knowledge."

02:17:19   18         That's what it says, isn't it?

02:17:21   19   **A**    That's what the document says, yes, sir.

02:17:22   20   **Q**    It says Walmart will compensate you for your

02:17:25   21   reasonable travel and other expenses incidental to that,

02:17:29   22   won't it?

02:17:29   23   **A**    That's what the document says.

02:17:33   24   **Q**    And then Walmart's paying for both of your lawyers

02:17:36   25   that are representing you today, aren't they?

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 02:17:38 | 1 | **A**    That is my understanding. |
| 02:17:41 | 2 | **Q**    All right.  Next issue. |
| 02:17:43 | 3 |       Dr. Diamond.  You were asked questions earlier about |
| 02:17:51 | 4 | Exhibit 30, which is the Walmart 246 tab.  This is the one |
| 02:17:58 | 5 | where Dr. Diamond was talked about, and it said, please help |
| 02:18:04 | 6 | us.  And then Ms. Fumerton also asked you about that. |
| 02:18:08 | 7 |       Remember? |
| 02:18:08 | 8 | **A**    Yes. |
| 02:18:09 | 9 | **Q**    All right.  In that regard, I'd like to go over some |
| 02:18:13 | 10 | of her questions and look at them. |
| 02:18:15 | 11 |       First of all, if we just consider the refusal to fill |
| 02:18:19 | 12 | forms in general, applying to Dr. Diamond, do you have a |
| 02:18:26 | 13 | clue how many refusal to fill forms would have come in if |
| 02:18:32 | 14 | you'd instructed the pharmacists they had to refuse if they |
| 02:18:36 | 15 | couldn't ensure the proper legitimacy of the prescription? |
| 02:18:41 | 16 | **A**    I have no idea, sir. |
| 02:18:49 | 17 | **Q**    But instead, you got one; is that right? |
| 02:18:56 | 18 | **A**    I believe that's what the document states. |
| 02:18:59 | 19 | **Q**    And you sent out the usual message of "you have the |
| 02:19:09 | 20 | ability not to do it, but no blanket refusal," right? |
| 02:19:14 | 21 | **A**    That's what the direction was, yes, sir. |
| 02:19:15 | 22 | **Q**    And in regard to this, you were also asked, "Did you |
| 02:19:20 | 23 | ever reprimand pharmacists for submitting a refusal to fill |
| 02:19:23 | 24 | form." |
| 02:19:24 | 25 |       Remember that question? |

02:19:25  1    **A**    I do.

02:19:25  2    **Q**    Sir, you didn't have authority to reprimand

02:19:28  3    pharmacists.  That wasn't in your job title, was it?

02:19:32  4    **A**    Not me personally, no.

02:19:34  5    **Q**    Okay.  And you never instructed them to file refusal

02:19:38  6    to fill forms, did you?

02:19:39  7    **A**    That would be incorrect.

02:19:42  8    **Q**    So you did instruct people, you have to file an RTF

02:19:48  9    form?

02:19:48  10   **A**    If they chose not to fill prescriptions, yes, sir.

02:19:51  11   **Q**    Oh, right, right, right.

02:19:53  12          But you never instructed them not to fill a

02:19:55  13   prescription, did you?

02:19:56  14   **A**    I may have -- I may have told people not to fill a

02:19:58  15   prescription after we conversed about it over the phone and

02:20:01  16   said, "If it was up to me, I would not fill that

02:20:04  17   prescription.  In my professional judgment, I would not fill

02:20:06  18   that."

02:20:06  19   **Q**    Well, that doesn't mean that they can't fill it, does

02:20:10  20   it?

02:20:11  21   **A**    That's correct.

02:20:11  22   **Q**    Because you've said you don't have that authority, at

02:20:15  23   least when Ms. Fumerton's asking you questions, right?

02:20:17  24   **A**    I don't have the authority to -- to hold them

02:20:22  25   accountable.

| | | |
|---|---|---|
| 02:20:23 | 1 | **Q**    And then Ms. Fumerton showed you Exhibit Number 37. |
| 02:20:28 | 2 | Do you have Exhibit Number 37 there? |
| 02:20:30 | 3 | **A**    I believe so. |
| 02:20:34 | 4 | **Q**    This is one where someone says -- look at this -- |
| 02:20:39 | 5 | "We're afraid of getting fired for refusing to fill, but now |
| 02:20:50 | 6 | I understand it's for our protection." |
| 02:20:52 | 7 | Do you see that? |
| 02:20:53 | 8 | **A**    That's what the document says. |
| 02:20:56 | 9 | **Q**    I mean, what kind of atmosphere did you have for your |
| 02:21:02 | 10 | pharmacists that they're afraid of getting fired for |
| 02:21:04 | 11 | refusing to fill? |
| 02:21:05 | 12 | **A**    I would not have been aware of what the atmosphere was |
| 02:21:11 | 13 | in that pharmacy. |
| 02:21:12 | 14 | **Q**    Well, did you fix the fear of being fired atmosphere? |
| 02:21:15 | 15 | Did you hold a nationwide conference? |
| 02:21:20 | 16 | **A**    I'm not aware of any reason to have held such a |
| 02:21:23 | 17 | meeting.  This particular pharmacy felt that way. |
| 02:21:28 | 18 | **Q**    This particular pharmacy was afraid of getting fired |
| 02:21:30 | 19 | for refusing to fill prescriptions. |
| 02:21:34 | 20 | You don't think that that should catalyze you and make |
| 02:21:37 | 21 | you say, hey, time out, I'll send an e-mail out to everybody |
| 02:21:42 | 22 | that says, don't ever worry about getting fired; you do |
| 02:21:46 | 23 | what's best for the population. |
| 02:21:52 | 24 | Did you ever even think of doing that? |
| 02:21:55 | 25 | **A**    That's what the e-mails were that were being sent out, |

**Nelson - (By Video Deposition)**

02:21:58  1  telling people they had the ability to refuse to fill

02:22:00  2  prescriptions.

02:22:00  3  **Q**    No.

02:22:01  4  **A**    That was the intent of those e-mails.

02:22:02  5  **Q**    So you think you were addressing the fear of getting

02:22:05  6  fired by telling people, you have the ability to refuse to

02:22:11  7  fill if you choose to.  That's -- saying, don't worry about

02:22:20  8  being fired; we want you to follow the law?

02:22:23  9  **A**    Sir, I don't know if people felt like they were going

02:22:25  10  to be fired or not.  The purpose of the e-mail was to let

02:22:28  11  them know that Walmart supported them in their decisions and

02:22:32  12  using professional judgment.

02:22:34  13  **Q**    All right.  Next subject.

02:22:36  14       Exhibit 33.  This is the one but explaining

02:22:45  15  Dr. Randall Wade and all of the stuff about whether or not

02:22:49  16  his prescriptions should be blanketly refused.

02:22:54  17       Do you remember Ms. Fumerton asking you about these?

02:22:58  18       Well, Ms. Fumerton asked you in regards to all of

02:23:02  19  that:  State boards of pharmacy don't allow a permit holder

02:23:05  20  to take action limiting the filling of a prescription, and

02:23:09  21  you affirmed her in that.

02:23:10  22       Remember?

02:23:15  23  **A**    Yes, I do recall that.

02:23:16  24  **Q**    Says who?  Where did you get that from?

02:23:21  25  **A**    It had been my experience in sitting in some phone

**Nelson - (By Video Deposition)**

02:23:24  1    conversations that when my director, Tim Koch, would talk to

02:23:28  2    boards of pharmacy, one particular Board of Pharmacy, I

02:23:32  3    think it was either North Carolina or South Carolina, told

02:23:36  4    them that -- told him that that would not be looked highly

02:23:39  5    upon by a Board of Pharmacy if the permit holder told the

02:23:42  6    pharmacist -- or told the pharmacy they could not fill a

02:23:45  7    prescription for a particular prescriber since that was

02:23:47  8    interfering with their professional judgment.

02:23:49  9    Q    Well, sir, you'd been told something very different by

02:23:52  10   the DEA, hadn't you?

02:23:54  11   A    Yeah, I -- I don't -- I don't even recall that

02:23:57  12   document even though you showed it to me, I mean, I didn't

02:24:00  13   have a habit of reading the *Federal Register*, I can tell you

02:24:03  14   that.

02:24:03  15   Q    Well, it got sent to you by the DEA.  "Nice talking

02:24:10  16   with you."  And you were directed to page -- whoops,

02:24:13  17   directed to page 28.

02:24:16  18        And page 28 specifically says, "A pharmacist has a

02:24:19  19   corresponding responsibility under federal law.  The

02:24:27  20   corresponding responsibility to ensure the dispensing of

02:24:30  21   valid prescriptions extends to the pharmacy itself."

02:24:33  22        Do you see that?

02:24:39  23   A    I see what it says.

02:24:40  24   Q    So the idea that the permit holder can't take action,

02:24:45  25   the DEA says they have an obligation to, right?

**Nelson - (By Video Deposition)**

2575

02:24:50  1   **A**     Yeah, I'm not aware of where it says the permit holder

02:24:54  2   is required to take action.

02:24:55  3   **Q**     Sir, it specifically said on page 28, what I just

02:25:00  4   read, that the corresponding responsibility extends to the

02:25:03  5   pharmacy itself.

02:25:07  6        Do you see that?

02:25:08  7   **A**     In regards to that particular one, that particular

02:25:11  8   Medicine Shoppe in Jonesborough, yes, I see that.

02:25:16  9   **Q**     Well, no, no, no.  That's the case that's referenced

02:25:19  10  there.  It doesn't say that applies to only one.  That

02:25:28  11  says -- that's just giving you a reference for it so that

02:25:30  12  you know where it came out.  But that's been around since

02:25:38  13  2008.

02:25:38  14       Do you see that?

02:25:39  15  **A**     Again, I see what that particular document says, but I

02:25:42  16  don't know the particulars of that case.

02:25:43  17  **Q**     So when you say that state board pharmacies don't

02:25:46  18  allow permit holders to take action limiting, you got

02:25:48  19  nothing on that, you can't give me one person's name who

02:25:51  20  told you that, can you?

02:25:52  21  **A**     Yeah, no one specifically told me that the boards of

02:25:55  22  pharmacy don't allow permit holders to take action against,

02:25:58  23  you know, filling -- or they don't allow blanket refusals, I

02:26:01  24  think is the thing we're looking for.

02:26:03  25       But in sitting in conversation with Tim Koch, my

**Nelson - (By Video Deposition)**

02:26:06  1    supervisor, and a Board of Pharmacy, they said that would

02:26:09  2    not be looked highly upon.  And I believe it was North

02:26:12  3    Carolina or South Carolina.  So it seemed legitimate.

02:26:16  4    **Q**    It wouldn't be looked highly upon.  That doesn't mean

02:26:21  5    it doesn't allow it, does it?

02:26:22  6    **A**    It sounds like they wouldn't be happy about it.

02:26:25  7    **Q**    I'm going to show you now a document that's Walmart

02:26:28  8    249.  I'm marking it as Exhibit Number 40.

02:26:35  9    **A**    I just pulled it out of the package, yes, sir.  Go

02:26:38  10   ahead.

02:26:38  11   **Q**    It's from you right before you left, looks like.

02:26:42  12        Do you see that?

02:26:43  13   **A**    Yes, sir, I see it.

02:26:53  14   **Q**    All right.  Here you specifically say, "It takes

02:27:00  15   hundreds of refusals to fill to be considered for a

02:27:05  16   corporate block.  It's a huge deal, and we only have a

02:27:09  17   handful that have been issued a corporate block."

02:27:14  18        Do you see that?

02:27:18  19   **A**    I see it.

02:27:19  20   **Q**    Well, now, what are we supposed to believe?  That the

02:27:22  21   state Board of Pharmacy has said you're not allowed to do

02:27:24  22   one, or that you did it but you just had a policy of a

02:27:28  23   hundred of them before you'd consider doing it?  Which do we

02:27:33  24   believe today?

02:27:33  25   **A**    Well, just policies and procedures do change over a

**Nelson - (By Video Deposition)**

02:27:36　1　period of time, and Walmart's policy on corporate blocks

02:27:40　2　apparently was changing at that time.

02:27:44　3　**Q**　Yeah.  So now all of a sudden y'all can do something

02:27:47　4　that you've already sworn under oath the state Board of

02:27:50　5　Pharmacy wouldn't allow you to do.

02:27:51　6　　Is that what I understand?

02:27:54　7　**A**　At the time that guidance was being sent out about the

02:27:57　8　state boards of pharmacy not allowing that, that was

02:27:59　9　accurate information.

02:28:02　10　　Sir, I was not involved in the -- I was not involved

02:28:05　11　in the decision-making of corporate blocks.  I don't -- I

02:28:08　12　don't know how it was determined.

02:28:09　13　**Q**　I mean, you understand you're under oath here, right?

02:28:13　14　**A**　Yes, sir, I'm answering truthfully.

02:28:17　15　**Q**　Okay.  I mean, you say in 2017, just seven months

02:28:23　16　later, that a handful have already been issued.

02:28:31　17　　So what do you want us to believe, that it's not

02:28:34　18　allowed or the company's got a policy on it?

02:28:41　19　**A**　The company was putting out a policy on corporate

02:28:45　20　blocks.

02:28:45　21　**Q**　And then Ms. Fumerton also asked you, she said, no one

02:28:48　22　said you can do a corporate block, and she defined it as

02:28:55　23　refusal to fill.

02:28:56　24　　Do you remember that?

02:28:57　25　**A**　I believe she asked me if any state Board of Pharmacy

**Nelson - (By Video Deposition)**

02:29:00  1   said you could do a corporate block.

02:29:02  2   **Q**   Yeah, because the company can do it.  You already know

02:29:05  3   that.  You're doing it, right?

02:29:06  4   **A**   I believe she was asking me in regards to a 2014 or

02:29:10  5   2015 e-mail.

02:29:11  6   **Q**   Huh.  Well, regardless, even if you take it at that,

02:29:16  7   the DEA isn't teaching you how to do your job.  That's not

02:29:19  8   their responsibility, is it?

02:29:21  9   **A**   The DEA does teach us some things about how to do our

02:29:25  10  jobs.

02:29:26  11  **Q**   Well, I mean, she sent up the e-mail that said read

02:29:29  12  page 28, but you said you didn't read that, remember?

02:29:32  13  **A**   Again, that was one particular case.  I don't know

02:29:34  14  that that particular case made it into the CFR.

02:29:39  15  **Q**   And you, sir, made false statements when you told

02:29:42  16  people you could not issue a refusal to fill?

02:29:47  17  **A**   No, sir, I did not.  We were talking about times prior

02:29:50  18  to 2017.

02:29:52  19  **Q**   Yeah.  I asked you on direct for six hours,

02:29:56  20  repeatedly, who ever told you the state board of pharmacies

02:30:02  21  won't let you issue a refusal to fill, and you told me, I

02:30:07  22  don't have a clue.

02:30:08  23      Remember?

02:30:09  24  **A**   I told you no one specifically told me not -- told me

02:30:15  25  to say that the state boards of pharmacy did not allow

**Nelson - (By Video Deposition)**

| | | |
|---|---|---|
| 02:30:19 | 1 | blanket refusals. |
| 02:30:20 | 2 | **Q**    I asked you what you based that on, and you said it's |
| 02:30:23 | 3 | just Walmart policy.  I said, can you name me any state |
| 02:30:26 | 4 | board?  No. |
| 02:30:28 | 5 |     Remember? |
| 02:30:29 | 6 | **A**    I don't recall that. |
| 02:30:30 | 7 | **Q**    As a corporate block? |
| 02:30:32 | 8 | **A**    I have no idea if they were issuing refusal to fills. |
| 02:30:36 | 9 | Some of them were doing corporate blocks. |
| 02:30:39 | 10 | **Q**    Corporate blocks saying, no, nobody's going to fill a |
| 02:30:43 | 11 | prescription for this doctor. |
| 02:30:45 | 12 |     Others were doing it, weren't they? |
| 02:30:46 | 13 | **A**    It was being reported that other companies were doing |
| 02:30:51 | 14 | that. |
| 02:30:51 | 15 | **Q**    Isn't it true the pharmacists, at least some that we |
| 02:30:54 | 16 | know of, were feeling pressure to fill the prescriptions? |
| 02:30:59 | 17 | **A**    That is correct.  That's what he said. |
| 02:31:03 | 18 | **Q**    Next subject. |
| 02:31:04 | 19 |     You said patient safety has always been the highest |
| 02:31:09 | 20 | priority.  Patient safety, number 1. |
| 02:31:12 | 21 |     Remember that? |
| 02:31:13 | 22 | **A**    That is correct. |
| 02:31:16 | 23 | **Q**    Sir, I'm looking at the evidence.  That's the best |
| 02:31:23 | 24 | thing to look at for something like this, isn't it? |
| 02:31:25 | 25 | **A**    Depends upon your definition of patient safety. |

**Nelson - (By Video Deposition)**

02:31:30  1   **Q**   I mean, we've been reading that with all of these

02:31:41  2   different documents we looked at, all of the investigations,

02:31:44  3   all of the settlements, the fear of losing the job.

02:31:49  4       Don't you think maybe instead of just saying it, it

02:31:52  5   would be helpful for the jury to look at the evidence?

02:31:54  6   **A**   "Patient safety" represents to me filling

02:31:58  7   prescriptions accurately, not making prescription medication

02:32:01  8   errors; making sure that the patient gets the medication the

02:32:05  9   doctor intended, and that they follow the course of action

02:32:07  10  that the doctor had prescribed.  It's not just about

02:32:10  11  controlled substances.

02:32:12  12  **Q**   Oh, and I'm not fussing that, sir.  And I'm sure

02:32:15  13  you've got a lot of pharmacists that do a real good job.

02:32:18  14  And I'm sure you've got a lot of pharmacists that put safety

02:32:21  15  first.

02:32:21  16      I'm talking about within the company itself, what was

02:32:24  17  driving the decisions to send out and -- and all of this

02:32:28  18  evidence we've looked at.

02:32:29  19      Don't you think it's fair just to say "look at the

02:32:32  20  evidence"?

02:32:33  21  **A**   Walmart supported patient safety in large ways, with

02:32:36  22  training programs, seminars, taught people how to fill

02:32:39  23  prescriptions more accurately and taking their time to

02:32:41  24  focus.  So I believe Walmart did a lot to help with patient

02:32:44  25  safety.

**Nelson - (By Video Deposition)** 2581

02:32:45 1   **Q**     And hired a man to drive compliance with the

02:32:48 2   memorandum of agreement who's never had any experience in

02:32:51 3   driving compliance before?

02:32:54 4   **A**     I can't answer to why Walmart chose me for that

02:32:57 5   particular position.

02:32:58 6   **Q**     Well, your CV didn't emphasize nearly as much patient

02:33:04 7   safety as it did profits and losses, did it?

02:33:09 8   **A**     The CV was not the same job that I did, that I was

02:33:12 9   applying for.

02:33:13 10  **Q**     And then on these refusal to fill forms, did you know

02:33:19 11  Walmart did not have a system to share those forms with its

02:33:21 12  pharmacists until after 2017?

02:33:25 13  **A**     I'm not aware of any requirement to share information

02:33:27 14  between stores.

02:33:28 15  **Q**     Sir, do you understand though it's not always what

02:33:31 16  you're required to do; sometimes it's what you ought to do?

02:33:34 17  **A**     It's real easy to look through glasses backwards.

02:33:39 18  It's hard to say what to do at the particular time.

02:33:41 19  **Q**     All right.  And then the last area, Exhibit 35.

02:33:47 20  Ms. -- in reply to Ms. Fumerton's questions, you said,

02:33:51 21  "Driving sales is Walmart-speak for go out there and get

02:33:55 22  them, tiger."

02:33:56 23       Is that right?

02:33:57 24  **A**     I did make the comment about "go out there and get

02:34:00 25  them, tiger."  David Reitnauer is a personal friend of mine

**Nelson - (By Video Deposition)**

02:34:04  1    and has been for many years.  You look at the document that

02:34:10  2    Ms. Fullerton [sic] put in the record, it shows that there

02:34:13  3    were some e-mails after that that talk about saying hello to

02:34:16  4    his wife and his kids, and so forth.  And I've known David

02:34:18  5    and his wife for years, so it's -- our conversations were

02:34:23  6    more open and direct about different things that had nothing

02:34:27  7    to do always with Walmart or Sam's.

02:34:29  8    **Q**    Well, yeah, but this is pretty open and direct, and

02:34:32  9    it's got something pretty direct to do with Walmart and

02:34:34  10   Sam's where you say, "We haven't invested a great amount of

02:34:38  11   effort in doing analysis.  Driving sales and patient

02:34:42  12   awareness is a far better use of our market director's and

02:34:45  13   market manager's time."

02:34:46  14        That's pretty Walmart direct, isn't it?

02:34:51  15   **A**    Did some things after that time frame to share the

02:34:57  16   information with other stores, so they were making changes.

02:35:00  17   We just didn't make changes during the MOA.

02:35:03  18   **Q**    No, that's not what we're talking about here.  We're

02:35:06  19   talking about -- you say driving sales, that that's some

02:35:10  20   normal code word within Walmart for "go out there and get

02:35:14  21   them, tiger," right?

02:35:22  22        Walmart-speak I think you called it?

02:35:24  23   **A**    Right, it's not -- it's not against the law to go out

02:35:28  24   and grow your business.

02:35:29  25   **Q**    And, oh, I'm not fussing it.  It's not against the

02:35:32  1    law.  I'm just asking if it reveals the motive.

02:35:38  2         "Don't invest a great amount of time doing analysis on

02:35:41  3    refusals to fill.  Go out there and grow your business.

02:35:45  4         Because that's what you mean, go grow your business,

02:35:47  5    right?

02:35:48  6    **A**    Indirectly, that's exactly what it would have said, go

02:35:52  7    grow your business.

02:35:53  8    **Q**    Okay.

02:35:54  9              MR. LANIER:  Pass the witness.

02:35:54  10             (Video deposition concluded.)

02:36:01  11             MR. LANIER:  And Your Honor, I believe that

02:36:03  12   ends the tender for the deposition from both sides.

02:36:06  13             THE COURT:  Ladies and gentlemen, I think it's

02:36:09  14   a good time to take a break now.  We're having another

02:36:13  15   deposition, but it's a good time to take a break now, so

02:36:17  16   we'll take 15 minutes, and then we'll have one more

02:36:19  17   deposition witness today.

02:36:46  18             (The jury is not present.)

02:36:48  19             MR. LANIER:  Your Honor, the next deposition

02:36:49  20   time play is 1:52 minutes.

02:36:52  21             THE COURT:  I was going to ask you.

02:36:54  22             MR. LANIER:  That will put us at about --

02:36:56  23             THE COURT:  Two hours.  Okay, that's fine.

02:36:59  24             MR. LANIER:  Thank you, Judge.

02:37:07  25             (Recess taken at 2:37 p.m.)

02:59:31  1                       (In open court at 2:59 p.m.)

02:59:33  2              MR. WEINBERGER:  Your Honor, just one

02:59:35  3  housekeeping matter briefly before the jury.

02:59:37  4    In a video deposition such as Mr. Nelson's, we were

02:59:43  5  using exhibit numbers.

02:59:44  6             THE COURT:  Right, a lot of different numbers.

02:59:45  7             MR. WEINBERGER:  They don't necessarily

02:59:47  8  correlate with the P numbers.

02:59:49  9    And we actually have a chart that's going to do that.

02:59:52  10  And my suggestion to be potentially that you might want to

02:59:58  11  inform the jury that at some point there -- because they may

03:00:01  12  be writing down exhibit numbers in their notes.

03:00:04  13             THE COURT:  Well, why don't you work out among

03:00:07  14  you which documents are going to be admitted, because,

03:00:11  15  again, if they aren't admitted, it doesn't really matter.

03:00:14  16             MR. WEINBERGER:  True.

03:00:15  17             THE COURT:  And do an agreement.  And then if

03:00:19  18  you agree on it, just give it to me, and I'll read the

03:00:21  19  numbers to the jury.

03:00:22  20             MR. LANIER:  The plan B would be, Your Honor,

03:00:24  21  to when we admit the document, put Deposition Exhibit Number

03:00:29  22  stickers on it so they could do it that way themselves, but

03:00:33  23  if this is easier --

03:00:34  24             THE COURT:  Right, in a meaningful way, yes.

03:00:38  25             MR. LANIER:  Thank you, Judge.

**Tsipakis - (By Video Deposition)**

2585

| | | |
|---|---|---|
| 03:02:10 | 1 | (The jury is present at 3:02 p.m.) |
| 03:02:13 | 2 | THE COURT:  Okay.  Please be seated, ladies |
| 03:02:14 | 3 | and gentlemen.  We now have our second video deposition. |
| 03:02:17 | 4 | MR. LANIER:  Yes, Your Honor.  And this will |
| 03:02:20 | 5 | be the video deposition of James Tsipakis.  And Mr. Tsipakis |
| 03:02:28 | 6 | worked for Giant Eagle, and he will be testifying he was |
| 03:02:30 | 7 | their head of Pharmacy. |
| 03:02:33 | 8 | The deposition play, there's an hour seven from the |
| 03:02:37 | 9 | plaintiffs' side and then 15-plus minutes from the defense |
| 03:02:40 | 10 | side, and then we've got eight minutes, and then they've got |
| 03:02:43 | 11 | 21 minutes.  So it's a total of an hour and 52 minutes, Your |
| 03:02:47 | 12 | Honor. |
| 03:02:51 | 13 | (Video played.) |
| 03:02:51 | 14 | DEPOSITION TESTIMONY OF JAMES TSIPAKIS |
| 03:02:53 | 15 | Q    Good morning.  State your name, please. |
| 03:02:54 | 16 | A    James Tsipakis. |
| 03:02:57 | 17 | Q    And Mr. Tsipakis, who do you work for? |
| 03:03:01 | 18 | A    Giant Eagle. |
| 03:03:01 | 19 | Q    What's your position with Giant Eagle? |
| 03:03:03 | 20 | A    Head of Pharmacy for Giant Eagle. |
| 03:03:04 | 21 | Q    You understand you're here to testify today on behalf |
| 03:03:10 | 22 | of HBC? |
| 03:03:11 | 23 | A    I do. |
| 03:03:11 | 24 | Q    And do you understand you've been designated by HBC as |
| 03:03:15 | 25 | a 30(b)(6) witness to testify on behalf of the company, HBC? |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:03:20 | 1 | **A**    I do. |
| 03:03:20 | 2 | **Q**    So you understand the answers that you give today will |
| 03:03:23 | 3 | not be Jim Tsipakis's answers but they would be HBC's |
| 03:03:27 | 4 | answers? |
| 03:03:28 | 5 | **A**    I do. |
| 03:03:31 | 6 | **Q**    Now, you mentioned you were employed by Giant Eagle, |
| 03:03:33 | 7 | correct? |
| 03:03:33 | 8 | **A**    Yes. |
| 03:03:34 | 9 | **Q**    Explain to me your understanding of the relationship |
| 03:03:36 | 10 | between Giant Eagle and HBC. |
| 03:03:39 | 11 | **A**    Giant Eagle as a company owns HBC. |
| 03:03:43 | 12 | **Q**    How long have you been with Giant Eagle? |
| 03:03:46 | 13 | **A**    Since late October 2017. |
| 03:03:50 | 14 | **Q**    Okay.  Do you understand that this deposition notice |
| 03:03:54 | 15 | will cover activity going back to 2006? |
| 03:04:00 | 16 | **A**    Yes. |
| 03:04:01 | 17 | **Q**    Okay.  And have you taken steps to prepare to be able |
| 03:04:05 | 18 | to answer questions about HBC's conduct going back to 2006? |
| 03:04:12 | 19 | **A**    Yes. |
| 03:04:19 | 20 | **Q**    What did you do to prepare? |
| 03:04:20 | 21 | **A**    Met with Giant Eagle's internal and external counsel. |
| 03:04:24 | 22 | Spoke to employees within our organization.  Looked through |
| 03:04:27 | 23 | documents and did a diligence. |
| 03:04:32 | 24 | **Q**    At some period of time, did HBC have a license to |
| 03:04:35 | 25 | distribute Schedules III, IV, and V controlled substances? |

**Tsipakis - (By Video Deposition)**                    2587

| | | |
|---|---|---|
| 03:04:38 | 1 | **A**     Yes. |
| 03:04:39 | 2 | **Q**     What period of time? |
| 03:04:40 | 3 | **A**     From -- my recollection is from 2009, late 2009, |
| 03:04:51 | 4 | through early 2016. |
| 03:04:59 | 5 | **Q**     So, Mr. Tsipakis, what's your understanding of the |
| 03:05:02 | 6 | time period in which HBC did, in fact, distribute Schedules |
| 03:05:05 | 7 | III, IV, and V controlled substances? |
| 03:05:08 | 8 | **A**     From late 2009 to early 2016. |
| 03:05:12 | 9 | **Q**     And to what businesses or entities did HBC distribute |
| 03:05:16 | 10 | controlled substances? |
| 03:05:16 | 11 | **A**     To our own stores, Giant Eagle pharmacies. |
| 03:05:20 | 12 | **Q**     During the time period that HBC distributed Schedule |
| 03:05:25 | 13 | III controlled substances, would it be accurate to say that |
| 03:05:29 | 14 | opioids, and more specifically, hydrocodone combination |
| 03:05:32 | 15 | products, was one of the drugs that HBC distributed? |
| 03:05:40 | 16 | **A**     HBC only distributed hydrocodone products as a |
| 03:05:44 | 17 | Schedule III.  Once it was reclassified, they no longer |
| 03:05:49 | 18 | distributed those products. |
| 03:05:49 | 19 | **Q**     Can you give me some examples of the types of |
| 03:05:53 | 20 | hydrocodone combination products that HBC would have |
| 03:05:55 | 21 | distributed? |
| 03:05:55 | 22 | **A**     Hydrocodone-containing products, generic Vicodin |
| 03:06:04 | 23 | products.  Certainly cough syrups that had hydrocodone in |
| 03:06:14 | 24 | it, different formulations and different generic names, |
| 03:06:17 | 25 | et cetera.  Those types of products. |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:06:18 | 1 | **Q**    Okay.  And Vicodin is a product that's a combination |
| 03:06:20 | 2 | of hydrocodone and acetaminophen? |
| 03:06:24 | 3 | **A**    Correct. |
| 03:06:25 | 4 | **Q**    Also Lortab, the same type of product? |
| 03:06:28 | 5 | **A**    Yes. |
| 03:06:28 | 6 | **Q**    Norco I think is the same type of product? |
| 03:06:32 | 7 | **A**    Yes. |
| 03:06:32 | 8 | **Q**    Okay.  And those are all types of drugs that HBC would |
| 03:06:36 | 9 | have distributed from 2009 until 2014, when the schedules |
| 03:06:40 | 10 | changed? |
| 03:06:41 | 11 | **A**    Yes. |
| 03:06:45 | 12 | **Q**    We certainly agree that HBC had an obligation to |
| 03:06:47 | 13 | design a system, operate a system that would disclose to the |
| 03:06:52 | 14 | registrant, HBC, suspicious orders of controlled substances, |
| 03:06:57 | 15 | correct? |
| 03:06:57 | 16 | **A**    Yes. |
| 03:07:03 | 17 | **Q**    That obligation was in place whether we're talking |
| 03:07:06 | 18 | about Schedule II controlled substances or whether we're |
| 03:07:08 | 19 | talking about Schedule III controlled substances, correct? |
| 03:07:12 | 20 | **A**    Correct. |
| 03:07:14 | 21 | **Q**    And HBC was aware of that back in 2009? |
| 03:07:23 | 22 | **A**    Yes. |
| 03:07:23 | 23 | **Q**    So my question to you, and if I said this wrong last |
| 03:07:26 | 24 | time, I'm sorry, but I'm asking whether or not HBC had any |
| 03:07:29 | 25 | written suspicious order monitoring program, policy, or |

| | | |
|---|---|---|
| 03:07:34 | 1 | procedure from 2006 until July 31, 2014. |
| 03:07:44 | 2 | **A**    Written policies?  You're asking specific written |
| 03:07:47 | 3 | policies? |
| 03:07:48 | 4 | **Q**    Correct. |
| 03:07:48 | 5 | **A**    I don't know. |
| 03:07:54 | 6 | **Q**    In the 40 to 50 hours that you spent preparing to |
| 03:07:57 | 7 | testify today on, one of the topics being your past and |
| 03:08:05 | 8 | present suspicious order monitoring systems program policy |
| 03:08:09 | 9 | and procedures, you don't know whether or not HBC ever had a |
| 03:08:12 | 10 | written suspicious order monitoring policy or procedure |
| 03:08:16 | 11 | prior to July 31, 2014? |
| 03:08:23 | 12 | **A**    I can't with certainty tell you they did or they |
| 03:08:25 | 13 | didn't.  That's what I'm telling you. |
| 03:08:26 | 14 | **Q**    That's fair. |
| 03:08:28 | 15 | We talked earlier about you had a duty to prepare for |
| 03:08:32 | 16 | the deposition today, correct? |
| 03:08:33 | 17 | **A**    Yes. |
| 03:08:34 | 18 | **Q**    Okay.  You took that duty seriously? |
| 03:08:35 | 19 | **A**    Absolutely. |
| 03:08:36 | 20 | **Q**    Okay.  You made a good-faith effort to be able to come |
| 03:08:39 | 21 | in here and be prepared to testify and be prepared to answer |
| 03:08:42 | 22 | all the questions that you were supposed to be prepared to |
| 03:08:45 | 23 | answer, correct? |
| 03:08:45 | 24 | **A**    Of course. |
| 03:08:50 | 25 | **Q**    And you spent 40 to 50 hours getting ready for this? |

03:08:53　1　**A**　　Yes.

03:08:54　2　**Q**　　Okay.  And you talked to different subject matter

03:08:57　3　experts within Giant Eagle or HBC about the topics that you

03:08:59　4　needed to testify on today?

03:09:00　5　**A**　　Yes.

03:09:01　6　**Q**　　Okay.  And as a result of that preparation, you don't

03:09:03　7　know whether or not HBC ever had a written suspicious order

03:09:07　8　monitoring policy or procedure in place from 2006 through

03:09:12　9　July 31, 2014; is that correct?

03:09:15　10　**A**　　I couldn't find whether there was or there wasn't

03:09:18　11　written policies.  For that time frame that you're asking

03:09:20　12　me, I'll answer it again:  I don't know.

03:09:23　13　**Q**　　HBC distributed hydrocodone combination products from

03:09:28　14　November 2009 through approximately October 2014, correct?

03:09:36　15　**A**　　Correct.

03:09:36　16　**Q**　　As far as you know, as far as HBC knows, the first

03:09:40　17　suspicious order monitoring policy or procedure that they

03:09:43　18　had was August 1, 2014?

03:09:46　19　**A**　　Again, the first one that I'm able to produce written

03:09:52　20　was August 2014.

03:09:54　21　**Q**　　But it's more than that.  It's the first one you know

03:09:56　22　about that's written, correct?

03:10:02　23　**A**　　It's the first written policy.  It doesn't mean there

03:10:06　24　wasn't others.  I don't know.

03:10:07　25　**Q**　　It's the first written policy that you know about,

| | | |
|---|---|---|
| 03:10:13 | 1 | correct? |
| 03:10:13 | 2 | **A**    Yes. |
| 03:10:14 | 3 | **Q**    Mr. Tsipakis, I'm going to hand you what I've marked |
| 03:10:17 | 4 | as Exhibit Number 12. |
| 03:10:18 | 5 | So the first document we see here is entitled |
| 03:10:24 | 6 | "Inventory Control Suspicious Order Policy." |
| 03:10:29 | 7 | Do you see that? |
| 03:10:30 | 8 | **A**    Yes. |
| 03:10:30 | 9 | **Q**    And it actually has a Giant Eagle header on it, not an |
| 03:10:34 | 10 | HBC. |
| 03:10:34 | 11 | Do you see that? |
| 03:10:35 | 12 | **A**    Yes. |
| 03:10:36 | 13 | **Q**    Again, we see on the left side that the effective |
| 03:10:42 | 14 | date, so I guess the first time the policy went into place, |
| 03:10:44 | 15 | was August 1, 2014. |
| 03:10:46 | 16 | Do you see that? |
| 03:10:49 | 17 | **A**    Yes. |
| 03:10:51 | 18 | **Q**    And if we go to the right-hand column, we see this is |
| 03:10:54 | 19 | Version 2? |
| 03:10:54 | 20 | **A**    Yes. |
| 03:10:55 | 21 | **Q**    Do you see that? |
| 03:10:56 | 22 | And the revision date that relates to this document is |
| 03:10:59 | 23 | April 9, 2015. |
| 03:11:01 | 24 | Do you see that? |
| 03:11:01 | 25 | **A**    Yes. |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:11:02 | 1 | **Q**    Okay. And the purpose of this policy was to identify, |
| 03:11:07 | 2 | investigate, record, and report suspicious pharmaceutical |
| 03:11:10 | 3 | product orders, correct? |
| 03:11:14 | 4 | **A**    Yes. |
| 03:11:14 | 5 | **Q**    And other than the first version of this policy that |
| 03:11:17 | 6 | would have come out August 1, 2014, you're not aware of any |
| 03:11:21 | 7 | earlier written policy other than the one that we're looking |
| 03:11:23 | 8 | at here? |
| 03:11:24 | 9 | **A**    I could not find any earlier policy. |
| 03:11:28 | 10 | **Q**    Okay. |
| 03:11:29 | 11 | **A**    Written policy. |
| 03:11:29 | 12 | **Q**    And the policy that identifies here, it says, |
| 03:11:34 | 13 | "Identify individuals from Giant Eagle Sourcing, Pharmacy |
| 03:11:36 | 14 | Compliance, and HBC team members, must review pharmacy |
| 03:11:39 | 15 | customer orders and order trends on a regular and for-cause |
| 03:11:42 | 16 | basis to identify suspicious drug orders." |
| 03:11:45 | 17 | Do you see that? |
| 03:11:46 | 18 | **A**    Yes. |
| 03:11:47 | 19 | **Q**    It goes on to say, that "Suspicious orders are blocked |
| 03:11:50 | 20 | and reported to the appropriate regulatory authority within |
| 03:11:53 | 21 | the specified time range." |
| 03:11:54 | 22 | Do you see that? |
| 03:11:55 | 23 | **A**    Yes. |
| 03:11:55 | 24 | **Q**    And then in the procedures below, under the second |
| 03:11:59 | 25 | bullet point, it lists the criteria that are used to |

**Tsipakis - (By Video Deposition)**

03:12:03  1    determine whether or not an order is suspicious.

03:12:05  2        Do you see that?

03:12:06  3    **A**    Yes.

03:12:09  4    **Q**    Okay.  And the first thing that it lists is "purchases

03:12:13  5    over a threshold"?

03:12:15  6    **A**    Yes.

03:12:18  7    **Q**    Okay.  And then it talks about "Orders of unusual

03:12:22  8    quantities or size compared to a customer's order history."

03:12:25  9        Do you see that?

03:12:26  10   **A**    Yes.

03:12:26  11   **Q**    The next one is "Unique patterns of orders that differ

03:12:30  12   from similar customers"?

03:12:31  13   **A**    Yes.

03:12:31  14   **Q**    And the next is "Orders outside of the normal pharmacy

03:12:36  15   customer ordering process," correct?

03:12:39  16   **A**    Yes.

03:12:39  17   **Q**    Okay.  And again, this is a policy that this revision

03:12:42  18   date is April 9, 2015, correct?

03:12:45  19   **A**    Yes.

03:12:51  20   **Q**    So you've told me that you're unaware of any written

03:12:54  21   suspicious order monitoring policy that HBC had from 2009

03:12:59  22   till August 1, 2014.

03:13:02  23       Did HBC have a system prior to August 2014 that was

03:13:07  24   designed and operated to disclose suspicious orders of

03:13:12  25   controlled substances?

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:13:13 | 1 | **A**      Yes. |
| 03:13:13 | 2 | **Q**      And can you describe that system for me, please? |
| 03:13:22 | 3 | **A**      Sure.  The system in our situation is a captive |
| 03:13:30 | 4 | warehouse.  We had tight controls over our inventory, our |
| 03:13:35 | 5 | controlled substance inventory, our procedures and our |
| 03:13:37 | 6 | controls at our warehouse operation, and also at our |
| 03:13:40 | 7 | pharmacies, the pharmacy operation. |
| 03:13:42 | 8 | **Q**      Let me be more specific. |
| 03:13:43 | 9 | Other than inventory controls, what were the controls |
| 03:13:49 | 10 | that would allow HBC to identify an order as suspicious? |
| 03:13:58 | 11 | **A**      So the warehouse, in addition to its physical security |
| 03:14:02 | 12 | and controls, would also have audits that it did, daily |
| 03:14:06 | 13 | audits, monthly audits.  It understands the patterns of |
| 03:14:10 | 14 | shipments to our locations, and it could identify deviations |
| 03:14:14 | 15 | from those patterns. |
| 03:14:21 | 16 | **Q**      How frequently were audits performed? |
| 03:14:23 | 17 | **A**      Daily. |
| 03:14:24 | 18 | **Q**      Okay.  What was the purpose of an audit? |
| 03:14:26 | 19 | **A**      To ensure the safety and security of the drug product. |
| 03:14:30 | 20 | And again, in that closed system we talked about earlier, to |
| 03:14:33 | 21 | make sure the product was not diverted, and going to its |
| 03:14:37 | 22 | intended recipient. |
| 03:14:40 | 23 | **Q**      Your testimony is that from November 2009 until the |
| 03:14:46 | 24 | end of October-ish of 2014, that HBC performed daily audits |
| 03:14:52 | 25 | of the warehouse? |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:14:54 | 1 | **A**    Daily audits of the counts in the warehouse, yes. |
| 03:15:02 | 2 | **Q**    Okay.  And the purpose of the counts in the warehouse |
| 03:15:04 | 3 | was to make sure that everything that was supposed to be in |
| 03:15:07 | 4 | the warehouse was actually there? |
| 03:15:10 | 5 | **A**    Mm-hmm, yes. |
| 03:15:11 | 6 | **Q**    Okay.  You also mentioned that the warehouse was aware |
| 03:15:19 | 7 | of ordering patterns, I think is how you said it, from the |
| 03:15:28 | 8 | Giant Eagle pharmacies? |
| 03:15:29 | 9 | **A**    Mm-hmm. |
| 03:15:29 | 10 | **Q**    You've got say "yes". |
| 03:15:31 | 11 | **A**    Yes.  Sorry, yes. |
| 03:15:33 | 12 | **Q**    Okay.  Who at the warehouse was aware of the ordering |
| 03:15:36 | 13 | patterns? |
| 03:15:37 | 14 | **A**    So the warehouse had a superintendent of the |
| 03:15:40 | 15 | warehouse.  So then there was specialized, highly-trained |
| 03:15:43 | 16 | individuals that worked the controlled substance cage that |
| 03:15:48 | 17 | were the same folks that picked the orders day in and day |
| 03:15:50 | 18 | out. |
| 03:15:51 | 19 | **Q**    From 2009 until October 2014, was there one |
| 03:15:58 | 20 | superintendent of the warehouse or were there multiple? |
| 03:16:00 | 21 | **A**    I believe there was one. |
| 03:16:06 | 22 | **Q**    Okay.  And who was that? |
| 03:16:07 | 23 | **A**    Walter Durr. |
| 03:16:16 | 24 | **Q**    Okay.  And so you said below Walter, there would have |
| 03:16:21 | 25 | been I think what you referred to as pickers? |

**Tsipakis - (By Video Deposition)**

03:16:23  1   **A**     Folks who would fulfill the orders, yes.

03:16:25  2   **Q**     Okay.  In laymen's terms, can you kind of describe for

03:16:29  3   me what a picker does?

03:16:30  4   **A**     Sure.  They -- an order comes in, and for whatever

03:16:33  5   product they need to get, they go to the shelf, the

03:16:37  6   particular shelf in the warehouse, and they pick the order.

03:16:39  7   **Q**     Okay.  Is it as simple as walking to a shelf and

03:16:44  8   there's a bottle of pills on the shelf, and they pick up the

03:16:50  9   bottle?

03:16:51  10       Break it down for me, please.

03:16:53  11  **A**     Yeah.  There's a system certainly that there's an

03:16:56  12  order well that generates and what each store needs or has

03:17:00  13  requested.  And then there's assistance, a device that

03:17:04  14  they -- I don't know the exact name for it, but there's

03:17:07  15  certainly a warehouse management system that they use.  And

03:17:11  16  it's different slotting in the warehouse, and they know

03:17:13  17  which slot to go to and how many to pick.

03:17:15  18  **Q**     Okay.  And then what?  They drop it in the tote and

03:17:21  19  put it on the truck?

03:17:23  20  **A**     Yes.

03:17:23  21  **Q**     And approximately -- let me back up.

03:17:27  22       How many different warehouses did HBC have that were

03:17:35  23  responsible for distributing Schedule III narcotics?

03:17:38  24  **A**     There's only one warehouse.

03:17:40  25  **Q**     Approximately how many pickers would have been working

**Tsipakis - (By Video Deposition)**

2597

| | | |
|---|---|---|
| 03:17:46 | 1 | under Walter Durr in the warehouse? |
| 03:17:49 | 2 | **A**     My understanding is three to four. |
| 03:17:50 | 3 | **Q**     Who were those people? |
| 03:17:51 | 4 | **A**     I don't know their names. |
| 03:17:53 | 5 | **Q**     Okay.  Are any of them still there? |
| 03:17:56 | 6 | **A**     The warehouse is no longer there anymore, so no. |
| 03:17:59 | 7 | **Q**     Anybody else who -- I think my original question was |
| 03:18:07 | 8 | who would have been aware of these patterns of shipments, |
| 03:18:10 | 9 | and you told me Mr. Durr, and you told me the pickers as |
| 03:18:13 | 10 | well, correct? |
| 03:18:14 | 11 | Anybody else that would have been aware of the |
| 03:18:18 | 12 | patterns of shipments to Giant Eagle pharmacies? |
| 03:18:22 | 13 | **A**     From the warehouse is your question? |
| 03:18:24 | 14 | **Q**     Well, this is all getting back to identification of |
| 03:18:27 | 15 | suspicious orders. |
| 03:18:30 | 16 | **A**     Sure. |
| 03:18:30 | 17 | **Q**     Okay?  So my question is, is from HBC, who had that |
| 03:18:35 | 18 | obligation to identify suspicious orders? |
| 03:18:40 | 19 | And I think you've identified Mr. Durr and these |
| 03:18:44 | 20 | pickers, but if I'm missing somebody, I want you to tell me. |
| 03:18:47 | 21 | **A**     So in our -- suspicious orders would have been |
| 03:18:53 | 22 | identified certainly from the warehouse, certainly folks in |
| 03:18:56 | 23 | corporate that were from the procurement team buying into |
| 03:18:59 | 24 | the warehouse.  They would know if there's any spike in |
| 03:19:03 | 25 | pattern of product being demanded to be shipped to the |

| | | |
|---|---|---|
| 03:19:07 | 1 | warehouse, et cetera. |
| 03:19:08 | 2 | So it's not just the warehouse.  It's also the folks |
| 03:19:12 | 3 | that do the procurement of these products as well would |
| 03:19:15 | 4 | identify any deviation of -- if all of a sudden they're |
| 03:19:20 | 5 | buying X and now they're being asked to buy Y, they would |
| 03:19:22 | 6 | identify that. |
| 03:19:23 | 7 | **Q**    Was there any written list of items that these people |
| 03:19:29 | 8 | in Procurement or people like Mr. Durr, the superintendent |
| 03:19:34 | 9 | of the warehouse, were supposed to be on the lookout for? |
| 03:19:40 | 10 | **A**    Not that I could find. |
| 03:19:41 | 11 | **Q**    Explain to me what you mean by procurement side. |
| 03:19:43 | 12 | **A**    So from the procurement side, the folks in the |
| 03:19:46 | 13 | warehouse don't do the purchasing, right?  There's a group |
| 03:19:49 | 14 | that does purchasing. |
| 03:19:50 | 15 | **Q**    Okay. |
| 03:19:50 | 16 | **A**    So those folks that do purchasing would absolutely |
| 03:19:52 | 17 | know what's being bought and what's being sold. |
| 03:19:55 | 18 | **Q**    And who were those folks from 2009 through 2014? |
| 03:20:03 | 19 | **A**    The specific people, I don't know. |
| 03:20:09 | 20 | **Q**    Okay.  Are any of them still with the company? |
| 03:20:17 | 21 | **A**    I don't know the folks that were involved. |
| 03:20:21 | 22 | **Q**    Okay.  Was there a list that these folks in the |
| 03:20:27 | 23 | procurement or purchasing office had to be on the lookout |
| 03:20:33 | 24 | for as far as trends or spikes, or anything like that, that |
| 03:20:36 | 25 | they should flag and bring to somebody's attention? |

03:20:39  1   **A**     So you're asking if there was a specific list that I

03:20:46  2   know of?

03:20:46  3   **Q**     Sure.

03:20:47  4   **A**     Not that I know of, I was able to find.

03:20:51  5   **Q**     Okay.  Are you aware of -- let me back up and ask you

03:20:53  6   this.

03:20:54  7         Who did you talk to within HBC or Giant Eagle to find

03:20:59  8   out about this policy that was in place from 2009 through

03:21:05  9   July 2014?

03:21:06  10  **A**     The policy or the system?  I'm sorry.

03:21:10  11  **Q**     Sorry.  You're right.  There's not a policy.

03:21:13  12        The system.

03:21:13  13  **A**     So in the investigative piece, the diligence, Walter

03:21:19  14  was one of the folks that was discussed about what happened

03:21:23  15  during this time frame.  Also, folks from corporate, from

03:21:29  16  our operations folks, pharmacy operations, as well as the

03:21:32  17  warehouse operations.

03:21:33  18  **Q**     You agree that the regulation says that HBC must

03:21:36  19  design and operate a system, correct?

03:21:39  20  **A**     Yes.

03:21:39  21  **Q**     What is that system?

03:21:41  22  **A**     Sure.  As I mentioned earlier, it's an integrated

03:21:45  23  system between operations, the warehouse, and our

03:21:49  24  pharmacies.

03:21:51  25  **Q**     Is there anything else you can tell me about the

**Tsipakis - (By Video Deposition)**

2600

1  system other than what you just said?

2  **A**    So, as far as what specific -- can you be a little

3  more -- as far as the system, it's an integrated approach

4  between -- for us, we're a self-distributing -- we're a

5  self-distributing distributor, right?  So we own the stores,

6  we own the warehouse, we own everything in between.

7      We're very different than a McKesson or a Cardinal or

8  a traditional distributor.  We have line of sight from the

9  time products are delivered to our warehouse all the way to

10  when they're dispensed to customers, patients.

11  **Q**    What I'm hearing from you is that your system, HBC's

12  system, that was mandated by these *Federal Regulations* was

13  that the distribution center superintendent, the pickers in

14  the distribution center, the corporate procurement officers,

15  and the pharmacies knew what to look for and looked for it.

16      Is that your answer as to what HBC's system was from

17  2009 until 2014?

18  **A**    I'm telling you it was an integrated system where the

19  stores were filling legitimate prescriptions which created

20  demand to our warehouse that was fulfilled to those stores.

21  **Q**    And if I'm being unclear, I'm trying to make sure I'm

22  understanding your answer.  But as far as the order --

23  excuse me, as far as the system to detect any suspicious

24  orders that come from the stores, what I'm hearing you say

25  is that the system was that the superintendent, the pickers,

**Tsipakis - (By Video Deposition)** 2601

03:23:36  1    the procurement folks, and -- who would be the only ones

03:23:42  2    with HBC, right, that we just talked about?

03:23:44  3    **A**    HBC-specific, yes.

03:23:48  4    **Q**    Okay.  So the pickers, the superintendent, and the

03:23:50  5    procurement folks knew what to look for and looked for it.

03:23:54  6         Is that the system that HBC operated to detect

03:23:57  7    suspicious orders?

03:23:58  8    **A**    The system also included the frontline scrutiny and

03:24:03  9    professional judgment of the pharmacist filling

03:24:06  10   prescriptions as well, together as one whole system, yes.

03:24:11  11   **Q**    But otherwise, that's the system?

03:24:12  12   **A**    That's the system.  And then over time, the system was

03:24:15  13   continually improved upon, which later added to thresholds

03:24:21  14   and some IT enhancements, et cetera, yes.

03:24:24  15   **Q**    But when the first hydrocodone pills started rolling

03:24:27  16   out the door in November of 2009, the system was that the

03:24:33  17   superintendent, the pickers, and the procurement officers

03:24:36  18   knew what to look for and looked for it?

03:24:38  19   **A**    As I stated, the system was an integrated system.

03:24:41  20   Again, we're in a unique situation.  We're distributing to

03:24:44  21   our own stores.  We know our stores.  We know they're -- we

03:24:49  22   have line of sight on every prescription that comes through

03:24:52  23   our doors that we fill, and we fulfill orders to those

03:24:56  24   stores.

03:24:56  25        And we have chain of custody of product all the way

**Tsipakis - (By Video Deposition)**

03:25:00  1    from the warehouse to our stores, ultimately to the

03:25:03  2    patients.

03:25:04  3         So what I'm telling you is our system was integrated

03:25:07  4    between store controls, warehouse controls, and corporate

03:25:10  5    controls.

03:25:16  6    **Q**    You keep using the word "integrated."  Tell me what

03:25:20  7    you mean by that.

03:25:20  8    **A**    It's an integrated system that if you think about it

03:25:26  9    again, the stores are doing their due diligence, making sure

03:25:29  10   they're filling legitimate prescriptions for legitimate

03:25:32  11   needs, right, that generate orders to our warehouse, and we

03:25:38  12   fulfill those orders.

03:25:39  13        So again, we have folks in the warehouse monitoring

03:25:43  14   and having controls, physical controls, as well as the

03:25:49  15   controls we discussed.  You have the folks in the

03:25:51  16   procurement side with their controls and the pieces that

03:25:54  17   they're buying into the warehouse and selling out of the

03:25:56  18   warehouse, as well as the folks in the store.  So that is

03:25:59  19   the system.

03:25:59  20   **Q**    Did HBC provide any training to Mr. Durr or the

03:26:05  21   pickers that worked underneath him as far as HBC's

03:26:08  22   obligations under the Controlled Substances Act?

03:26:15  23   **A**    That I don't know.

03:26:16  24   **Q**    Did HBC provide any training or education to the

03:26:19  25   procurement officers with corporate, I think you referred to

**Tsipakis - (By Video Deposition)**

03:26:22  1    it as, on HBC's obligations under the Controlled Substances

03:26:28  2    Act?

03:26:28  3    **A**    I don't know.

03:26:28  4    **Q**    Do you know whether or not there was any list -- we

03:26:32  5    keep kind of saying that these different people in these

03:26:36  6    different roles knew what to look out for.

03:26:39  7        Was there any list of those things that they should be

03:26:42  8    looking out for?

03:26:43  9    **A**    There's no list that I could find, but I think you

03:26:45  10   established early on in the testimony that these drugs were

03:26:48  11   commonly known as drugs of interest and certainly drugs that

03:26:53  12   we needed to keep an eye on.

03:26:55  13   **Q**    Okay.  Okay.  From the education that you did to

03:26:59  14   prepare to testify here today, do you know of anything that

03:27:04  15   Mr. Durr or Mr. Carlson or any of these pickers, do you know

03:27:09  16   anything that they were looking for, any data points that

03:27:11  17   they were looking at between '09 and 2014 to determine

03:27:17  18   whether or not an order was suspicious?

03:27:20  19   **A**    I didn't find any specific written documents of what

03:27:23  20   they were looking for or not looking for.

03:27:25  21   **Q**    Do you have any idea of what they would have been

03:27:27  22   looking for?

03:27:28  23   **A**    They would have been looking for any patterns that

03:27:35  24   deviated from the norm.  Certainly again, as I mentioned, we

03:27:38  25   know our stores.  We're selling product to our stores

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:27:43 | 1 | pursuant to legitimate prescriptions. And they'd be looking |
| 03:27:47 | 2 | for anything that's out of the norm. |
| 03:27:50 | 3 | **Q** How do you know that they were looking for anything |
| 03:27:52 | 4 | out of the norm? How do you have that knowledge? |
| 03:27:54 | 5 | **A** Because as part of the diligence, looking at their |
| 03:27:58 | 6 | responses and what they had discussed, that was clearly |
| 03:28:01 | 7 | ascertained from the conversation. |
| 03:28:06 | 8 | **Q** Okay. So you understand that what Mr. Durr, the |
| 03:28:11 | 9 | pickers, and the folks in corporate were looking for was any |
| 03:28:14 | 10 | orders or any patterns that deviated from the norm? |
| 03:28:21 | 11 | **A** That were suspicious, that looked suspicious, yes. |
| 03:28:23 | 12 | **Q** What information -- let me back up. I'm going to ask |
| 03:28:28 | 13 | you some questions about the pickers in particular. |
| 03:28:30 | 14 | Is their sole job function to receive orders and pick |
| 03:28:40 | 15 | the orders, and fill the totes and load the trucks? Is that |
| 03:28:44 | 16 | their sole -- is that their primary function? |
| 03:28:48 | 17 | **A** Primary functions, yes. |
| 03:28:50 | 18 | **Q** Okay. And would it be fair to say that they spend |
| 03:28:54 | 19 | most of their day in a warehouse receiving orders, locating |
| 03:28:58 | 20 | product, putting it into a tote, and facilitating it getting |
| 03:29:00 | 21 | on a truck so it can go out to a store? |
| 03:29:03 | 22 | **A** And maintaining the security of that product along the |
| 03:29:05 | 23 | way, yes. |
| 03:29:06 | 24 | **Q** Okay. What information, reports, data is available to |
| 03:29:16 | 25 | those pickers to allow them to identify patterns that |

**Tsipakis - (By Video Deposition)**

03:29:19  1   deviate from the norm?

03:29:21  2   **A**    I did not find any particular reports or any specific

03:29:29  3   things that they were looking for.

03:29:32  4   **Q**    Okay.  With Mr. Durr, the superintendent, can you kind

03:29:38  5   of generally describe for me what his job duties were on a

03:29:43  6   daily basis?

03:29:45  7   **A**    His responsibilities would be the security and

03:29:48  8   controls of running our pharmacy warehouse.

03:29:54  9   **Q**    Okay.  And that pharmacy warehouse included not only

03:29:56  10  the Schedule III hydrocodone combination products that we've

03:30:01  11  been talking about today, but it also included a variety of

03:30:04  12  other prescription medication, correct?

03:30:08  13  **A**    Nonscheduled, is that what you're asking?

03:30:12  14  **Q**    Sure.

03:30:13  15  **A**    Yes.

03:30:14  16  **Q**    Okay.  It also included Schedule IVs and Vs, correct?

03:30:18  17  **A**    Correct.

03:30:19  18  **Q**    It also included Schedule IIIs that are not

03:30:23  19  hydrocodone combination products, correct?

03:30:23  20  **A**    Yes.

03:30:24  21  **Q**    It also included, I think as you just said,

03:30:26  22  noncontrolled substances such as, you know, blood pressure

03:30:28  23  medicine, acne medication, birth control; all those types of

03:30:32  24  things would be included, correct?

03:30:33  25  **A**    Yes.

**Tsipakis - (By Video Deposition)** 2606

03:30:33  1  **Q**     And all of those things are under the purview of

03:30:36  2  Mr. Durr, correct?

03:30:36  3  **A**     Yes.

03:30:37  4  **Q**     Okay.  Are you aware of any data, reports, or

03:30:42  5  information that Mr. Durr had available to him to assist him

03:30:45  6  in identifying any patterns of Schedule III drug orders,

03:30:55  7  specifically HCPs, that would have deviated from the norm?

03:30:59  8  **A**     Through this process I did not find any -- you keep

03:31:02  9  asking me "reports."  I did not find any reports that he'd

03:31:05  10  be looking at.

03:31:06  11      But, again, as part of this integrated process, he

03:31:09  12  would be working with our operations folks.  The operations

03:31:15  13  folks oversee the stores.  So it's a closed system, so

03:31:18  14  there's a negative feedback loop within that system.

03:31:20  15  **Q**     And when you got information from Mr. Durr, he didn't

03:31:23  16  say, I had this report to review or I had this data set that

03:31:27  17  I got sent to me on a regular basis.  He didn't say anything

03:31:31  18  like that?

03:31:31  19  **A**     I didn't read any of that, no.

03:31:32  20  **Q**     There was no paper identified, no report, no Excel

03:31:37  21  spreadsheet, no -- nothing like that that was identified by

03:31:41  22  Mr. Carlson, Mr. Durr, or any information you received from

03:31:45  23  the pickers, no documents that were identified that were

03:31:48  24  reviewed to assist in this process, correct?

03:31:53  25  **A**     Specifically, again, our system continued to be

**Tsipakis - (By Video Deposition)**

03:31:59  1   improved and changed over time.  And there were certainly

03:32:06  2   procedures that were buttressed and improved over time.

03:32:14  3        But certainly through what I read, there was nothing

03:32:17  4   on a report or, to your point, an Excel spreadsheet that I

03:32:20  5   could glean.

03:32:22  6   **Q**    Okay.

03:32:22  7   **A**    It doesn't mean there wasn't any.  I just -- it wasn't

03:32:28  8   in what I had read.

03:32:29  9   **Q**    And you spent 40 to 50 hours preparing for today,

03:32:33  10  correct?

03:32:34  11  **A**    Yes, sir.

03:32:35  12  **Q**    Okay.  And you made every effort to get all the

03:32:38  13  information that you could, correct?

03:32:40  14  **A**    Yes.

03:32:41  15  **Q**    Okay.  You mentioned that the system had improvements

03:32:49  16  over time.

03:32:50  17  **A**    Yes.

03:32:51  18  **Q**    I think you said that at some point in time there was

03:32:54  19  a threshold program implemented?

03:32:57  20  **A**    Yes.

03:32:58  21  **Q**    Okay.  When did HBC first start utilizing a threshold

03:33:01  22  program?

03:33:02  23  **A**    A threshold program with some IT enhancements were put

03:33:06  24  into place roughly in 2013.

03:33:11  25  **Q**    Okay.  Do you know what month in 2013, or season even?

**Tsipakis - (By Video Deposition)**

03:33:15   1   **A**     I don't recall exactly in 2013.

03:33:32   2   **Q**     And were thresholds set for every prescription drug or

03:33:36   3   just controlled substances?

03:33:38   4   **A**     Controlled substances.

03:33:41   5   **Q**     And that included Schedule III controlled substances?

03:33:44   6   **A**     Yes.

03:33:44   7   **Q**     How were thresholds established?

03:33:50   8           Let me back up before you answer that.  I'm making an

03:33:54   9   assumption that threshold is a monthly ordering threshold.

03:33:57   10          Am I wrong on that?

03:34:01   11  **A**     So the threshold established was using diligence that

03:34:07   12  was ascertained at the time from DEA that a 3X threshold to

03:34:14   13  be established, monthly threshold, to your point, using 12

03:34:18   14  months of trailing data, 3X the average for that month.

03:34:27   15  **Q**     Let me say it back to you to make sure I understand

03:34:29   16  it.

03:34:29   17          This threshold program which was first begun in 2013

03:34:32   18  set a threshold at three times the average amount of that

03:34:44   19  substance that was distributed over the last 12 months?

03:34:48   20  **A**     So 3X the company average for that chemical.  So it

03:34:53   21  was at the GPI level.  So the chemical would include all the

03:34:56   22  drugs having that chemical in it.  So 3X, using 12 months of

03:35:02   23  trailing data, 3X the company average for that chemical,

03:35:06   24  that product.

03:35:08   25  **Q**     Okay.  So you explained two things there.  First of

03:35:11   1   all, it was based on the chemical.  Is what the threshold --

03:35:15   2   **A**     GPI level, yes.

03:35:16   3   **Q**     Okay.  So does that mean that Lortab and Vicodin don't

03:35:19   4   get different thresholds, they're all under the same

03:35:23   5   threshold?

03:35:23   6   **A**     It's all lumped together as one threshold, yes.

03:35:26   7   **Q**     Because that's the same combination of hydrocodone and

03:35:29   8   acetaminophen?

03:35:29   9   **A**     It's looking at the active ingredient, yes.

03:35:31  10   **Q**     Okay.  And then the -- as far as how the threshold is

03:35:37  11   set, if we had -- if HBC had sold a hundred HCP products

03:35:46  12   over a month for the last 12 months, the threshold for the

03:35:50  13   next month would have been 300; is that fair?

03:35:54  14   **A**     Well, the threshold was the -- yes.  Let me just play

03:36:07  15   that back.

03:36:07  16        So it would be 3X, again, at the GPI level of that GPI

03:36:14  17   using the 12 months worth of data, yes.

03:36:16  18   **Q**     I think I heard you mention that HBC received guidance

03:36:19  19   from the DEA that a three time average was an appropriate

03:36:25  20   threshold.

03:36:26  21   **A**     What I said is during the due diligence to set the

03:36:29  22   threshold, information was derived from the DEA published

03:36:35  23   websites on a 3X threshold that they used for list

03:36:41  24   chemicals, and that's where our 3X number was derived from.

03:36:46  25   **Q**     But for opioids.  That's my question.

**Tsipakis - (By Video Deposition)**

03:36:48  1        Are you testifying that HBC had information from the

03:36:51  2    DEA that they were approving or ratifying or blessing,

03:36:56  3    whatever verb you want to use, a 3X threshold in 2013 for

03:37:05  4    opioids?

03:37:05  5    **A**    No.  That is not what I'm saying.

03:37:07  6    **Q**    The DEA never told HBC that a three times average was

03:37:10  7    appropriate, correct?

03:37:12  8    **A**    Directly, no.  Never.

03:37:14  9    **Q**    Did DEA ever indirectly tell HBC that a three times

03:37:18  10   average was appropriate?

03:37:18  11   **A**    What I'm saying is the HBC set its threshold based on

03:37:23  12   information that it gleaned from a DEA -- just like you

03:37:30  13   showed me earlier, a page from the DEA website.  There was

03:37:37  14   information that they used from DEA and inferred to use a 3X

03:37:43  15   threshold.

03:37:44  16   **Q**    Okay.

03:37:44  17   **A**    HBC set the threshold, but it wasn't just some

03:37:47  18   arbitrary number they picked.  There was information they

03:37:50  19   used to get to a 3X threshold.

03:37:52  20   **Q**    I'll show you what I'll mark as Number 13.

03:38:01  21        Showing you a June 12, 2012, letter from Joe

03:38:10  22   Rannazzisi with the DEA.

03:38:13  23        Do you see that?

03:38:15  24   **A**    Yes.

03:38:16  25   **Q**    Have you ever seen this before?

03:38:17   1   **A**    Yes.

03:38:18   2   **Q**    Did you have the opportunity to review this document

03:38:23   3   in preparing for your deposition today?

03:38:24   4   **A**    Not all of it.

03:38:26   5   **Q**    Okay.  And I'll represent to you, and you can flip

03:38:30   6   through it, and we'll look through some of this, but it's a

03:38:33   7   2012 letter.  And attached to that letter were earlier

03:38:36   8   letters, two from 2007 and one from 2006.

03:38:41   9        Do you see that?

03:38:42  10   **A**    Yes.

03:38:50  11   **Q**    This one in 2012 was before HBC instituted its

03:38:54  12   threshold policy at three times average, correct?

03:38:56  13   **A**    Yes.

03:38:56  14   **Q**    And it says -- the first line says, "This letter is

03:39:02  15   being sent to every entity in the United States who is

03:39:04  16   registered with the Drug Enforcement Administration to

03:39:10  17   manufacture or distribute controlled substances."

03:39:11  18        Do you see that?

03:39:12  19   **A**    Yes.

03:39:12  20   **Q**    In June 2012, was HBC such a registrant?

03:39:19  21   **A**    Yes.

03:39:21  22   **Q**    "This letter is to remind controlled substance

03:39:24  23   manufacturers and distributors of their responsibility to

03:39:26  24   inform the DEA of suspicious orders in accordance with 21

03:39:30  25   CFR 1301.74(b)."

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:39:35 | 1 | Do you see that? |
| 03:39:36 | 2 | **A**     Yes. |
| 03:39:36 | 3 | **Q**     And the very next paragraph it says, "On September 27, |
| 03:39:39 | 4 | 2006, DEA sent a letter to its registrant community |
| 03:39:43 | 5 | expressing concerns regarding drug abuse in the United |
| 03:39:45 | 6 | States and highlighting the responsibility of manufacturers |
| 03:39:47 | 7 | and distributors to be vigilant in the distribution of |
| 03:39:50 | 8 | controlled substances." |
| 03:39:51 | 9 | Do you see that? |
| 03:39:52 | 10 | **A**     Yes. |
| 03:39:52 | 11 | **Q**     Well, it says it was sent to every entity who was |
| 03:39:56 | 12 | registered with the DEA, and you agreed to distribute |
| 03:39:59 | 13 | controlled substances, and you agree that HBC was registered |
| 03:40:01 | 14 | with the DEA to distribute controlled substances in June |
| 03:40:04 | 15 | 2012, correct? |
| 03:40:05 | 16 | **A**     Correct. |
| 03:40:05 | 17 | **Q**     Okay.  It says, "Although DEA's September 2006 letter |
| 03:40:09 | 18 | included a list of factors that might indicate diversion, |
| 03:40:12 | 19 | DEA wants to stress this was not a comprehensive list of all |
| 03:40:15 | 20 | possible indications of diversion.  DEA encourages the |
| 03:40:18 | 21 | registrants to take an integrated approach.  This point was |
| 03:40:20 | 22 | emphasized in the December 2007 letter, and DEA is once |
| 03:40:24 | 23 | again bringing it to your attention." |
| 03:40:25 | 24 | Do you see that? |
| 03:40:26 | 25 | **A**     Yes. |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:40:26 | 1 | **Q**     It goes on in the next paragraph to talk about the |
| 03:40:32 | 2 | Code and the Regulation that we looked at earlier today.  It |
| 03:40:36 | 3 | says, "Under federal law, all manufacturers and distributors |
| 03:40:39 | 4 | are required to maintain effective controls against |
| 03:40:42 | 5 | diversion." |
| 03:40:42 | 6 |      Do you see that? |
| 03:40:43 | 7 | **A**     Yes. |
| 03:40:43 | 8 | **Q**     It says, "The DEA regulations require all |
| 03:40:46 | 9 | manufacturers and distributors to report suspicious orders |
| 03:40:48 | 10 | of controlled substances." |
| 03:40:50 | 11 |      Do you see that? |
| 03:40:51 | 12 | **A**     Yes. |
| 03:40:51 | 13 | **Q**     And it says, "The registrant shall design and operate |
| 03:40:54 | 14 | a system to disclose to the registrant suspicious orders of |
| 03:40:58 | 15 | controlled substances.  This regulation clearly places the |
| 03:41:01 | 16 | responsibility on the registrant to design and operate the |
| 03:41:04 | 17 | system." |
| 03:41:04 | 18 |      Do you see that? |
| 03:41:05 | 19 | **A**     Yes. |
| 03:41:05 | 20 | **Q**     Okay.  And was HBC aware of that obligation going back |
| 03:41:10 | 21 | to 2009 when they first started distributing hydrocodone |
| 03:41:17 | 22 | combination products? |
| 03:41:17 | 23 | **A**     Yes. |
| 03:41:17 | 24 | **Q**     If you go down to the bottom paragraph, see where it |
| 03:41:30 | 25 | says, "Registrants who rely on rigid formulas to identify |

**Tsipakis - (By Video Deposition)**

03:41:34  1    whether an order is suspicious may fail to detect suspicious

03:41:37  2    orders."

03:41:37  3         Do you see that?

03:41:38  4    **A**    Yes.

03:41:38  5    **Q**    It says, "For example, this system might not identify

03:41:41  6    suspicious orders being placed by a pharmacy if that

03:41:45  7    pharmacy placed unusually large orders from the beginning

03:41:48  8    with its relationship with the supplier."

03:41:51  9         Do you see that?

03:41:52  10   **A**    Yes.

03:41:52  11   **Q**    Would you agree with me that HBC's threshold program

03:41:54  12   that was instituted in 2013 was a rigid formula?

03:41:59  13   **A**    No, I do not.

03:42:04  14   **Q**    Why not?

03:42:04  15   **A**    Because in our situation, as I testified earlier, we

03:42:07  16   have line of sight on our stores, warehouse, everything

03:42:12  17   involved.  So this is one component.

03:42:15  18        The threshold formula was one component of a total

03:42:18  19   system to identify and detect suspicious orders.

03:42:22  20   **Q**    So let me get back to the threshold report.

03:42:25  21        So those are established sometime in 2013, correct?

03:42:28  22   **A**    Correct.

03:42:29  23   **Q**    Okay.  How often would a report kind of updating HBC

03:42:37  24   on those thresholds be generated?

03:42:41  25   **A**    So a report would generate daily.  That would be

**Tsipakis - (By Video Deposition)** 2615

| | | |
|---|---|---|
| 03:42:49 | 1 | reviewed daily. |
| 03:42:50 | 2 | **Q**    Okay.  So the first of the month would be first report |
| 03:42:59 | 3 | for that month, correct? |
| 03:43:03 | 4 | **A**    Yes. |
| 03:43:07 | 5 | **Q**    Okay.  And on the first of the month, describe for me |
| 03:43:12 | 6 | what that report is going to look at.  Is it going to be a |
| 03:43:15 | 7 | list of every pharmacy and every controlled drug and how |
| 03:43:21 | 8 | many orders have been made, or is it only going to identify |
| 03:43:25 | 9 | orders that are approaching or over the threshold? |
| 03:43:30 | 10 | **A**    The daily report would identify orders of interest |
| 03:43:35 | 11 | that we would like to investigate further. |
| 03:43:37 | 12 | **Q**    And so you said that the threshold report would |
| 03:43:40 | 13 | identify I think what you called orders of interest, |
| 03:43:44 | 14 | correct? |
| 03:43:45 | 15 | **A**    Correct. |
| 03:43:45 | 16 | **Q**    Okay.  Is there any written policy and procedure |
| 03:43:52 | 17 | anywhere at any time that Giant Eagle has or had, HBC has or |
| 03:43:59 | 18 | had, that uses the term "order of interest"? |
| 03:44:02 | 19 | **A**    Can you define "at any time"?  What's the time frame |
| 03:44:10 | 20 | that you're describing? |
| 03:44:12 | 21 | **Q**    From 2006 until today. |
| 03:44:13 | 22 | **A**    Do we have a document or a report, is that right? |
| 03:44:20 | 23 | **Q**    Do you have a document, a policy, a procedure, |
| 03:44:24 | 24 | anything that uses the term "order of interest"? |
| 03:44:27 | 25 | **A**    So I'm trying to -- I don't know. |

**Tsipakis - (By Video Deposition)**                                    2616

03:44:38   1   **Q**     I want to make sure I'm not missing a policy or a

03:44:42   2   procedure or a definitions page or an appendix that would

03:44:47   3   tell me what "order of interest" means to HBC or Giant

03:44:50   4   Eagle.

03:44:51   5        Am I or am I not missing something?

03:44:54   6   **A**     No, you're not missing.  There's reports and things

03:44:56   7   that the misnomer of things that are classified as

03:44:59   8   suspicious, our orders are not classified as suspicious

03:45:02   9   until after an investigation happens.

03:45:04   10        So certainly our reports in its infancy when they were

03:45:08   11   created mention suspicious report, suspicious order.  That's

03:45:12   12   not what it means that those reports -- the fact that

03:45:16   13   something shows up on that report does not mean it's

03:45:19   14   suspicious until we've cleared it or not.  And if not, we

03:45:24   15   would report it.

03:45:25   16   **Q**     Okay.  When did that phrase "orders of interest" come

03:45:32   17   about within HBC or Giant Eagle?

03:45:34   18   **A**     I think looking at things through the 2018 lens versus

03:45:43   19   things that happened in the past, at some point along the

03:45:46   20   way there was an inference of the way these reports were

03:45:53   21   labeled or even internal communications were labeled were

03:45:57   22   not what they intended.

03:45:58   23        So our team started using "orders of interest" later.

03:46:03   24   The exact time, I can't tell you, but --

03:46:08   25   **Q**     That would be more recent?

03:46:09  1   **A**     More recent, yes.

03:46:10  2   **Q**     Okay.  It would be accurate to say that -- let me back

03:46:13  3   up.  Let's get back to these threshold reports.

03:46:16  4        So you said that they're generated daily.  Are they --

03:46:22  5   when they're generated, do they contain information for any

03:46:26  6   Giant Eagle pharmacy?

03:46:27  7   **A**     All pharmacies, yes.

03:46:30  8   **Q**     Was the threshold set store by store or was it

03:46:38  9   chain-wide?

03:46:38  10  **A**     Initially, it was set as the chain average, and then

03:46:41  11  later on it was improved on, per store improved just based

03:46:45  12  on continuing -- through this process we continued to look

03:46:49  13  at better ways of looking at things, et cetera.  It was

03:46:53  14  improved to look at each store's individual -- store by

03:46:59  15  store.

03:46:59  16  **Q**     When did that change happen?

03:47:01  17  **A**     2017.

03:47:06  18  **Q**     Okay.  So from 2013 through 2017, it was a chain-wide

03:47:15  19  Giant Eagle-wide threshold average?

03:47:21  20  **A**     Looking at our stores in totality as a chain and then

03:47:24  21  applying that threshold, the chain average to each location,

03:47:27  22  yes.

03:47:27  23  **Q**     So whether the Giant Eagle location was in downtown

03:47:32  24  Cleveland or a more rural location in Summit County, those

03:47:37  25  two pharmacies would have the exact same threshold for a

**Tsipakis - (By Video Deposition)**

03:47:41  1    particular product?

03:47:49  2    **A**    Yes.

03:47:50  3         And as I mentioned, the threshold was one component of

03:47:52  4    the total system that we used, but yes.

03:47:54  5    **Q**    Okay.  Were these orders that showed up on the

03:47:59  6    threshold report, did they show up before or after the order

03:48:03  7    had been shipped to the pharmacy?

03:48:30  8    **A**    It would have been -- I believe it would have been

03:48:33  9    either in process of shipping or having been shipped.

03:48:35  10   **Q**    I'm on number 14.

03:48:42  11        I'm going to show you HBC 1032 which we're going to

03:48:46  12   mark as Exhibit Number 14 for today's deposition.

03:48:49  13        Is this an example of one of the threshold reports

03:48:52  14   that we've been talking about?

03:49:15  15   **A**    In this format, I'm having trouble figuring out what

03:49:22  16   this is.

03:49:23  17   **Q**    I'm giving it to you how it was given to me, so --

03:49:28  18   **A**    Okay.

03:49:28  19   **Q**    I was hoping you could kind of explain some of it to

03:49:32  20   me, but --

03:49:37  21        Do you recognize this as being one of the threshold

03:49:39  22   reports that we've been talking about?

03:49:40  23   **A**    I'm just having difficulty just trying to understand

03:49:43  24   what I'm looking at.

03:49:45  25   **Q**    Okay.  Let's see if we can walk through it a little

**Tsipakis - (By Video Deposition)**

03:49:47   1   bit.

03:49:48   2        It looks like it was maybe a spreadsheet.  It looks

03:49:51   3   like the left-hand column is the pharmacy number?

03:49:54   4   **A**    Yes.

03:49:55   5   **Q**    Do you see that?

03:49:56   6        And those numbers going down underneath there, do

03:50:01   7   those correspond with different Giant Eagle stores?

03:50:03   8   **A**    It appears so, yes.

03:50:05   9   **Q**    Okay.  And I want to skip the vendor for a minute.

03:50:08   10  But the next one indicates month key, and it looks like

03:50:11   11  October of 2016 is the date of this report?

03:50:14   12  **A**    Yes.

03:50:15   13  **Q**    I couldn't see any way from this report to determine

03:50:19   14  when in October this report was run, whether it was run on

03:50:22   15  the 1st or the 15th or the 31st.

03:50:26   16       Do you know if there's a way to determine that?

03:50:30   17  **A**    Based on what I'm looking at, I agree, I can't tell.

03:50:33   18  **Q**    Okay.  The next column says, I guess it's GPI 10?

03:50:36   19  **A**    Yes.

03:50:37   20  **Q**    Can you explain what that is?

03:50:39   21  **A**    Sure.  The GPI is the GPI class of the drug.  I don't

03:50:45   22  know which GPI -- well, actually, this one, based on what

03:50:50   23  I'm reading here, I'm assuming this is oxycodone, GPI -- the

03:50:53   24  GPI 10 for oxycodone.

03:50:55   25  **Q**    Okay.  And you were just talking about the top one on

**Tsipakis - (By Video Deposition)**                    2620

03:50:58    1    the list?

03:50:58    2    **A**    Yes.

03:50:59    3    **Q**    Okay.  And the next column says the -- looks like the

03:51:03    4    total shipped quantity.

03:51:04    5         Do you see that?

03:51:05    6    **A**    Yes.

03:51:05    7    **Q**    Okay.  And it lists the total shipped quantity as

03:51:10    8    4500.  And the next column says the threshold quantity.

03:51:14    9         Do you see that?

03:51:14   10    **A**    Yes.

03:51:15   11    **Q**    Okay.  And the threshold was 4200, so less than the

03:51:23   12    4500, correct?

03:51:23   13    **A**    From what I'm reading, yes.

03:51:28   14    **Q**    Okay.  And then in the next column it has the product

03:51:32   15    name?

03:51:33   16    **A**    Yes.

03:51:33   17    **Q**    Okay.  And then, finally, the column on the right is

03:51:38   18    the schedule number, and oxycodone obviously is a Schedule

03:51:42   19    II drug, correct?

03:51:43   20    **A**    Yes.

03:51:44   21    **Q**    Okay.  Is there -- are you expecting there to be any

03:51:47   22    additional information on one of these threshold reports?

03:51:51   23    **A**    Again, I haven't seen this in this format, so -- I'm

03:51:59   24    sorry, I just really don't know what I'm looking at here.  I

03:52:01   25    know that on the report that the team would generate, it

**Tsipakis - (By Video Deposition)**

| 03:52:06 | 1 | looked different than this output.  I'm just -- I read the |
| 03:52:12 | 2 | columns with you here, but I just don't know. |
| 03:52:15 | 3 | **Q**     But there's -- if you were to go back to your office |
| 03:52:17 | 4 | and ask to see the threshold report for October of 2016, do |
| 03:52:23 | 5 | you think that that report would have any additional |
| 03:52:25 | 6 | information than what I have right here in front of me? |
| 03:52:27 | 7 | **A**     I don't believe so. |
| 03:52:28 | 8 | **Q**     Okay.  A couple questions about this. |
| 03:52:33 | 9 | Number one, you see the column, one, two, three, |
| 03:52:39 | 10 | fourth column over is total shipped quantity, correct? |
| 03:52:43 | 11 | **A**     Yes. |
| 03:52:43 | 12 | **Q**     Okay.  So you agree are that even though the quantity |
| 03:52:47 | 13 | that was ordered exceeded the threshold just for that first |
| 03:52:49 | 14 | one, 4500 is over the 4200 threshold, that that quantity was |
| 03:52:53 | 15 | shipped to the store? |
| 03:52:56 | 16 | **A**     Again, I'm just going by what's on this page.  I don't |
| 03:53:01 | 17 | know whether it was shipped or not.  I'm reading it like |
| 03:53:03 | 18 | you. |
| 03:53:04 | 19 | **Q**     Okay.  And it says it was shipped? |
| 03:53:06 | 20 | **A**     I'm reading that it says -- the title is ETL Shipped |
| 03:53:10 | 21 | Quantity, and it says 4500. |
| 03:53:13 | 22 | **Q**     Okay.  And we know that this threshold -- first off, |
| 03:53:16 | 23 | we can look down and we see the first seven or so entries |
| 03:53:19 | 24 | are all for the same product, correct? |
| 03:53:25 | 25 | **A**     Correct. |

**Tsipakis - (By Video Deposition)**                    2622

03:53:26   1   **Q**     Okay.  And if we go to the far left-hand column, we

03:53:29   2   see that that's for seven or eight different Giant Eagle

03:53:32   3   stores, correct?

03:53:33   4   **A**     Yes.

03:53:34   5   **Q**     And we know that that threshold that was set here in

03:53:38   6   2016, again, the threshold was identical for all these

03:53:42   7   different pharmacies regardless of where that pharmacy was

03:53:45   8   located, what that pharmacy's average sales were, what their

03:53:52   9   customer traffic were; the threshold was the same for all of

03:53:58   10  them, correct?

03:53:58   11  **A**     We went through how the threshold was set earlier,

03:54:01   12  yes.  And then looking at this report, a lot of the same

03:54:04   13  numbers are in that column.

03:54:07   14  **Q**     Okay.  Well, okay.  Well, just looking at the first

03:54:11   15  drug, the Oxaydo, the threshold for every pharmacy is

03:54:18   16  4213.83, correct?

03:54:19   17  **A**     I'm sorry.  Where are you at?

03:54:20   18  **Q**     The first seven entries, the threshold --

03:54:22   19  **A**     Oh, 4213?

03:54:24   20  **Q**     Yes.

03:54:24   21  **A**     Yeah 4213.83.

03:54:27   22  **Q**     So even in October of 2016, the thresholds were

03:54:30   23  uniform across the entire chain of Giant Eagle pharmacies?

03:54:33   24  **A**     Yes.

03:54:39   25         It appears to be, based on what I'm reading here.

**Tsipakis - (By Video Deposition)**                    2623

03:54:42  1    **Q**    So then what we're seeing for the rest of this page

03:54:45  2    here, for the entire second page, and then for the first

03:54:50  3    third of the third page, are incidences where orders from

03:55:00  4    Giant Eagle pharmacies for Co-Gesic, which I'm going to

03:55:09  5    represent to you is a hydrocodone combination product, are

03:55:12  6    exceeding the threshold, which is three times the monthly

03:55:17  7    average for the last year.

03:55:18  8         Do you see that?

03:55:25  9    **A**    I'm seeing what's on this page.  As far as what their

03:55:28  10   exact thresholds are, again, it's listed as that on the top

03:55:32  11   of the page, but -- it would appear as such, but without

03:55:39  12   being able to validate what I'm looking at or how I'm

03:55:42  13   looking at this, I can't answer with certainty.

03:55:44  14   **Q**    Okay.  Well, according to what HBC has provided us in

03:55:51  15   this litigation, the threshold for this hydrocodone

03:55:54  16   combination product in October of 2010 was -- let's just

03:56:00  17   round up and say 5000.

03:56:01  18   **A**    I'm sorry, where are you?

03:56:02  19   **Q**    I'm on the threshold for the Co-Gesic.

03:56:06  20   **A**    Which page?

03:56:07  21   **Q**    You can look at any of them.  It's on every single

03:56:10  22   one.

03:56:10  23   **A**    Got it.

03:56:11  24   **Q**    So to make the numbers easier, if we round up, the

03:56:14  25   threshold was about 5000, correct?

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 03:56:16 | 1 | **A**     Yes. |
| 03:56:17 | 2 | **Q**     The threshold is the monthly average times three, |
| 03:56:20 | 3 | correct? |
| 03:56:21 | 4 | **A**     Chain average times three, yes. |
| 03:56:23 | 5 | **Q**     Okay.  So if we did 5000 divided by three, we get |
| 03:56:29 | 6 | approximately 1700. |
| 03:56:32 | 7 | Do you agree with that, roughly? |
| 03:56:34 | 8 | **A**     Yes. |
| 03:56:35 | 9 | **Q**     Okay.  So the monthly average for the last year for |
| 03:56:39 | 10 | this hydrocodone combination product was approximately 1700, |
| 03:56:43 | 11 | correct? |
| 03:56:44 | 12 | **A**     The way you describe it, yes. |
| 03:56:48 | 13 | **Q**     I'm asking if you can tell me about how many different |
| 03:56:51 | 14 | stores we're seeing here who are over their threshold for |
| 03:56:56 | 15 | hydrocodone combination product.  I think I counted 37 on |
| 03:57:00 | 16 | the first page.  Then we have the entire second page, and |
| 03:57:04 | 17 | then about half of the third page.  Correct? |
| 03:57:08 | 18 | **A**     Yes. |
| 03:57:09 | 19 | **Q**     So roughly 80, 90, 100 stores; do you agree with that? |
| 03:57:17 | 20 | **A**     Yes. |
| 03:57:20 | 21 | **Q**     Well, let's just keep looking at this, and I'll just |
| 03:57:22 | 22 | ask you a couple questions.  And we'll go on the assumptions |
| 03:57:25 | 23 | that this report is what it should be, which is what you |
| 03:57:30 | 24 | testified to, that the threshold is three times the monthly |
| 03:57:34 | 25 | average.  Okay? |

**Tsipakis - (By Video Deposition)**

03:57:36  1  **A**    Yes.

03:57:36  2  **Q**    So if you look at the first page, oh, about 10 or 12

03:57:42  3  down in the Co-Gesic list, you see where there's a quantity

03:57:52  4  shipped of 18,500.

03:57:55  5      Do you see that?  I think it was for store 60?

03:57:59  6  **A**    Yes.

03:58:00  7  **Q**    Okay.  So we know that there's more than three times

03:58:06  8  over the threshold, correct?

03:58:07  9  **A**    It's three times the 4895 listed there, yes.

03:58:10  10  **Q**    How many pharmacies in the entire chain?

03:58:12  11  **A**    Over 200.

03:58:13  12  **Q**    Okay.  And what we also determined is that

03:58:16  13  approximately 80 to 100 pharmacies are listed on this

03:58:24  14  threshold report as exceeding that threshold in October of

03:58:26  15  2016, correct?

03:58:33  16  **A**    On this report, yes.

03:58:34  17  **Q**    And some of them, if we look at about the middle of

03:58:39  18  the screen there, you see there's I think Store 60, the

03:58:43  19  total shipped quantity in October of 2016 is 18,500.

03:58:47  20      Do you see that, 18,500?

03:58:53  21  **A**    Yes.

03:58:54  22  **Q**    Okay.  And I think we agreed that that's more than

03:58:57  23  three times over the threshold, correct?

03:58:59  24  **A**    For the chain, yes.

03:59:00  25  **Q**    Okay.  But that would also be over 10 times higher

**Tsipakis - (By Video Deposition)**                    2626

03:59:04 | 1 | than the monthly average for the last 12 months, correct?

03:59:12 | 2 | **A**    I'm sorry, say that again, please.

03:59:14 | 3 | **Q**    Sure.  We identified that the monthly average for the

03:59:16 | 4 | last 12 months would have been 1700, right?

03:59:20 | 5 | **A**    Correct.

03:59:20 | 6 | **Q**    So this 18,500 that this particular pharmacy received

03:59:24 | 7 | during October of 2016 is over 10 times the monthly average

03:59:28 | 8 | for the chain for the past 12 months, correct?

03:59:32 | 9 | **A**    That is correct, but that is one of our busiest

03:59:34 | 10 | stores.  So this -- the chain average takes our busiest

03:59:38 | 11 | stores and our slow stores, our less volume stores, and puts

03:59:41 | 12 | it together in an average.  So stores on this list will be

03:59:46 | 13 | definitely over the average based on volume.

03:59:51 | 14 | **Q**    Okay.  Because when HBC or Giant Eagle sets their

03:59:55 | 15 | thresholds, they do it chain-wide, they don't take into

03:59:58 | 16 | account differences between stores, correct?

04:00:00 | 17 | **A**    For this report at this particular time, yes.

04:00:04 | 18 | **Q**    Okay.  And if we go two entries down for it looks like

04:00:08 | 19 | Store 71, we similarly see that that store is over 10 times

04:00:13 | 20 | the monthly average for the last 12 months.

04:00:18 | 21 |     Do you see that?

04:00:18 | 22 | **A**    Yes.

04:00:19 | 23 | **Q**    Okay.  And if we go down about 15 or so entries, we

04:00:25 | 24 | see I believe it's Store 1405, which had 21,500 units

04:00:31 | 25 | shipped to it in October of 2016.

| | | |
|---|---|---|
| 04:00:34 | 1 | Do you see that? |
| 04:00:40 | 2 | **A**    Yes. |
| 04:00:40 | 3 | **Q**    And you agree that this is more than four times -- |
| 04:00:45 | 4 | excuse me -- this would be more than four times over the |
| 04:00:49 | 5 | threshold, correct? |
| 04:00:50 | 6 | **A**    The chain-wide threshold, yes. |
| 04:00:54 | 7 | **Q**    Okay.  And again, more than 10 times over the monthly |
| 04:00:59 | 8 | store average for the last 12 months? |
| 04:01:04 | 9 | **A**    For the chain, yes. |
| 04:01:06 | 10 | **Q**    Okay.  And I'm not going to go through every single |
| 04:01:12 | 11 | one of them, but if you flip through the next page, you see |
| 04:01:15 | 12 | several additional stores that are more than two times, |
| 04:01:21 | 13 | several that are more than three times the threshold that |
| 04:01:24 | 14 | Giant Eagle and/or HBC had set for this particular |
| 04:01:29 | 15 | hydrocodone combination product. |
| 04:01:33 | 16 | **A**    Correct. |
| 04:01:33 | 17 | **Q**    Was there any type of policy in place about what would |
| 04:01:37 | 18 | happen with anything that popped on this report? |
| 04:01:43 | 19 | **A**    There was an expectation the procedure -- and just for |
| 04:01:48 | 20 | matter of context, do you know the date of this report? |
| 04:01:51 | 21 | **Q**    What date it was generated? |
| 04:01:53 | 22 | **A**    Yes. |
| 04:01:54 | 23 | **Q**    I believe I saw a cover sheet during the break that |
| 04:02:01 | 24 | said it was the October 31 of '16. |
| 04:02:07 | 25 | **A**    Okay, thank you. |

**Tsipakis - (By Video Deposition)**                                    2628

04:02:09  1        So the expectation on the procedure would be any store

04:02:12  2    that shows up on this report, an investigation would be

04:02:16  3    conducted.

04:02:17  4    **Q**    Okay.  Would it be fair to characterize this report as

04:02:21  5    a tool that was utilized by Giant Eagle or HBC to

04:02:26  6    investigate potential suspicious orders?

04:02:32  7    **A**    One tool, but yes.

04:02:35  8    **Q**    And what was -- you said there was an expectation that

04:02:40  9    there would be an investigation, correct?

04:02:42  10   **A**    Yes.

04:02:42  11   **Q**    Is there an expectation that there would be an

04:02:45  12   investigation into every single one of these controlled

04:02:49  13   substances where the drugs that have already been shipped

04:02:56  14   exceeded the threshold?

04:02:57  15   **A**    Yes.  However, some of them -- you just mentioned this

04:03:00  16   report was dated the 31st, so it compounds.  Each day

04:03:04  17   compounds from the month.  So if they have already cleared a

04:03:06  18   store earlier in the month for whatever reason, then they

04:03:09  19   wouldn't reinvestigate it.  But every line item would be

04:03:12  20   investigated and cleared.

04:03:13  21   **Q**    Was it always the Procurement department who was in

04:03:16  22   charge of investigating these?

04:03:19  23   **A**    The Procurement department in conjunction with the

04:03:21  24   Compliance department.

04:03:22  25   **Q**    Okay.  And where does Loss Prevention fall in here?

**Tsipakis - (By Video Deposition)**                                    2629

04:03:28   1   Is Loss Prevention within either of those departments?

04:03:30   2   **A**    Well, they're a stakeholder, so certainly it's the

04:03:36   3   Procurement department, the Compliance department, and then

04:03:37   4   the Loss Prevention department's included in that.  So if we

04:03:41   5   need to send them out for an investigation, we need them to

04:03:44   6   go retrieve a product, they're certainly a stakeholder, yes.

04:03:47   7   **Q**    Essentially, what I'm trying to figure out is whether

04:03:50   8   or not HBC or Giant Eagle maintains any type of due

04:03:53   9   diligence files.

04:03:53  10        So, for example, this order for Store 71 for this

04:03:59  11   controlled II substance pops on this report.  If you wanted

04:04:02  12   to go back now two years after the fact and see what did we

04:04:06  13   do to justify and clear that order, is that possible?

04:04:10  14   **A**    I don't know.

04:04:13  15   **Q**    When did Giant Eagle or HBC put in place a system that

04:04:18  16   required employees to log or maintain files that explained

04:04:25  17   why particular orders were cleared or not cleared?

04:04:29  18   **A**    I can say from the diligence I had in early 2017, a

04:04:36  19   system was developed where investigative notes and

04:04:40  20   information could be entered regarding orders that we wanted

04:04:44  21   to look at, orders of interest.

04:04:46  22   **Q**    Prior to early 2017, HBC nor Giant Eagle had any

04:04:52  23   system that was dedicated to maintain notes, reports, or

04:04:59  24   memos that would explain or justify why particular orders

04:05:02  25   were cleared or not cleared?

**Tsipakis - (By Video Deposition)** 2630

04:05:04  1   **A**     We didn't have a repository, if that's what you're

04:05:07  2   asking.  There were certainly definitive e-mails to the

04:05:10  3   field, e-mails to the warehouse, things of sorts that

04:05:15  4   clearly show a diligence of trying to run the ground on why

04:05:22  5   an order happened or what triggered, sure.

04:05:27  6   **Q**     Can you say that that's the case for every order that

04:05:31  7   popped on one of these reports?

04:05:34  8   **A**     I can say after reviewing and talking to associates

04:05:36  9   involved and folks that do report to me, that every order

04:05:41  10  that pops up of interest is investigated --

04:05:48  11  **Q**     Okay.  But you can't --

04:05:50  12  **A**     -- and either -- I'm sorry.

04:05:52  13  **Q**     Go ahead.

04:05:52  14  **A**     -- and either cleared or not.

04:05:53  15  **Q**     But you can't tell me as you sit here today whether or

04:05:56  16  not there's any documentation to prove or disprove whether

04:06:01  17  or not any and all of those investigations actually

04:06:03  18  happened?

04:06:04  19  **A**     I can tell you that I don't know that -- I don't know

04:06:06  20  that I have specific for each line item on -- well, from

04:06:12  21  2017 on, I can tell you we have a repository that was built.

04:06:18  22  Prior to that, I cannot.

04:06:19  23  **Q**     Okay.  That's probably the easiest way to do this.

04:06:21  24           Prior to early 2017, Giant Eagle nor HBC had any

04:06:25  25  repository or location, whether it's physical or digital, to

**Tsipakis - (By Video Deposition)**                    2631

04:06:31  1  maintain any type of due diligence reports or efforts,

04:06:39  2  correct?

04:06:39  3  **A**     There's no central repository.  Certainly if there was

04:06:43  4  folders or e-mails or things that were kept -- I've seen

04:06:50  5  some of them, so definitely I know they exist.

04:06:52  6  **Q**     Can you tell me, between -- we can look at that

04:06:56  7  report, and we can -- assuming that in October of 2016 that

04:07:03  8  Giant Eagle followed their policies in place, if we estimate

04:07:08  9  that there's 200 entries on that report, we could say that

04:07:12  10  there were 200 separate investigations done, due

04:07:15  11  diligence-type investigations done in October 2016.  Would

04:07:20  12  that be fair?

04:07:20  13  **A**     I can tell you just by looking at some of them and

04:07:23  14  understanding the report better, I mean, we have stores that

04:07:26  15  are filling 6,000 prescriptions a week that are averaged

04:07:29  16  against stores that are doing 300 a week.  So obviously --

04:07:33  17  and if you're doing as a chain-wide average, you're going to

04:07:37  18  have a ton of false positives, which is predominantly a lot

04:07:41  19  of these orders on these reports.

04:07:43  20  **Q**     Well, isn't that a reason why having a chain-wide

04:07:46  21  average isn't a very good idea?

04:07:47  22  **A**     Again, it's our attempt to have a system in place.

04:07:57  23  We're not just relying on a threshold, we're relying on a

04:08:00  24  total system of a threshold being one of those controls.

04:08:03  25  **Q**     Okay.  Well, if you're relying on a system that uses

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:08:05 | 1 | an average and you have some stores that do 300 scripts a |
| 04:08:10 | 2 | week and some stores that do 6,000 scripts a week, you would |
| 04:08:13 | 3 | agree with me that that average probably isn't very helpful? |
| 04:08:16 | 4 | **A**    I would agree with you that it's probably flawed and |
| 04:08:22 | 5 | it could be done better, which is why our second version of |
| 04:08:24 | 6 | our threshold system was improved. |
| 04:08:27 | 7 | **Q**    Okay.  How long did Giant Eagle and HBC utilize this |
| 04:08:34 | 8 | flawed version of the threshold report that used a |
| 04:08:37 | 9 | chain-wide average, from 2013 until when? |
| 04:08:40 | 10 | **A**    To be clear, I didn't say this report was flawed.  I |
| 04:08:42 | 11 | said the methodology of averages could lead to a false |
| 04:08:45 | 12 | positive, which is what a lot of times reports -- a lot of |
| 04:08:51 | 13 | times records on these reports are. |
| 04:08:52 | 14 | **Q**    Tell me if I'm wrong, but I think you said that you no |
| 04:08:55 | 15 | longer use a chain-wide average, you now use a store |
| 04:08:58 | 16 | average -- |
| 04:08:58 | 17 | **A**    Correct. |
| 04:08:59 | 18 | **Q**    -- as we sit here today in 2018, correct? |
| 04:09:03 | 19 | **A**    Correct. |
| 04:09:04 | 20 | **Q**    When did you stop using the chain-wide average that |
| 04:09:07 | 21 | you indicated is somewhat of a flawed methodology that can |
| 04:09:09 | 22 | produce false positives? |
| 04:09:12 | 23 | **A**    Yeah, it can produce false positives.  Till 2017.  We |
| 04:09:17 | 24 | changed, early 2017. |
| 04:09:18 | 25 | **Q**    So if we were to look at the life of HBC's and Giant |

**Tsipakis - (By Video Deposition)**

04:09:25  1    Eagle's threshold program, from 2009 to 2013, there was no

04:09:28  2    threshold program.  From 2013 to 2017, there was a threshold

04:09:32  3    program based on a chain-wide average.  And from 2017

04:09:36  4    through present, there's a threshold program that's based on

04:09:41  5    individual stores' metrics setting the threshold?

04:09:54  6    **A**    Correct.

04:09:55  7    **Q**    Okay.  From 2009 to 2013, what would cause HBC to

04:09:59  8    perform a due diligence investigation?  What about their

04:10:02  9    system, what flags within the system would cause HBC to

04:10:07  10   perform a due diligence investigation?

04:10:08  11   **A**    So as we established earlier, we know what products

04:10:14  12   are coming into our warehouse, what products are going out

04:10:17  13   to our stores.  Any pattern that would show our procurement

04:10:21  14   team as well as the warehouse team, if they saw a spike in

04:10:24  15   orders or a deviation of sorts from that, they would see

04:10:28  16   that and they would recognize that.

04:10:31  17   **Q**    In 2009 until 2013, are you able to identify for me

04:10:34  18   any orders for hydrocodone combination products that due

04:10:40  19   diligence was ever performed on?

04:10:47  20   **A**    I believe there is, but -- when you say -- so orders,

04:10:57  21   obviously orders were placed from 2009 to 2013.  I can see

04:11:04  22   e-mails and investigative e-mails going back and forth on

04:11:07  23   questions on orders or product movement, et cetera.  So I

04:11:16  24   did see that through my diligence.

04:11:20  25        But your exact -- I'm sorry, I'm trying to understand

**Tsipakis - (By Video Deposition)**

04:11:23  1   your exact --

04:11:24  2   **Q**    I'm trying to determine whether or not from 2009 till

04:11:27  3   2013 you can identify for me any orders on which due

04:11:32  4   diligence was performed by HBC.

04:11:36  5   **A**    I don't know.

04:11:37  6   **Q**    You agree with me that any investigation that was

04:11:40  7   being done by Giant Eagle or HBC is happening after the

04:11:45  8   orders have been shipped, correct?

04:11:46  9   **A**    Perhaps, yes, perhaps.

04:11:52  10  **Q**    Let me just ask it this way.  Did HBC or Giant Eagle

04:11:55  11  have any policy in place that any orders that popped on the

04:11:58  12  threshold report were not shipped until they'd been cleared?

04:12:04  13  **A**    Not that I could find a policy.

04:12:07  14  **Q**    You don't remember any times where you had to turn a

04:12:09  15  truck around, don't remember any times where you had to call

04:12:11  16  a pharmacy and ask them to put a tote to the side and not

04:12:15  17  open it; that hasn't happened?

04:12:17  18  **A**    Not that I've seen in what I've looked at.

04:12:19  19  **Q**    So every time that orders have been flagged or popped

04:12:25  20  on this threshold report going back to 2013, they've always

04:12:31  21  been shipped and they've never been brought back?

04:12:35  22  **A**    As far as I can tell, no.

04:12:37  23  **Q**    2013 through, have there ever been any controlled

04:12:48  24  substances that have been flagged on this report that have

04:12:52  25  not been shipped to the stores?

**Tsipakis - (By Video Deposition)**

04:12:53　1　**A**　　The orders that have been flagged on this report were

04:12:56　2　received by the stores, is that your question?

04:13:03　3　**Q**　　I think you answered my question.

04:13:04　4　　So every report -- every entry that's flagged here on

04:13:07　5　this report was sent to the stores, correct?

04:13:09　6　**A**　　But every entry on these stores, none of them were

04:13:12　7　flagged as suspicious.  They were all investigated and

04:13:14　8　cleared.

04:13:15　9　**Q**　　From 2009 to 2014, did HBC ever report as suspicious

04:13:24　10　any orders for hydrocodone combination products?

04:13:26　11　**A**　　As a Schedule III, while it was classified as Schedule

04:13:30　12　III, no.  In general, no, but it was Schedule III during

04:13:33　13　that time.

04:13:34　14　**Q**　　Okay.  And never once during that time period did HBC

04:13:37　15　ever report any orders of that product as being suspicious?

04:13:41　16　**A**　　That's correct.

04:13:41　17　**Q**　　From 2009, when HBC first began distributing

04:13:47　18　controlled substances, until the present, so all the way

04:13:50　19　through HBC's lifetime and now through the Giant Eagle Rx

04:13:57　20　distribution center, how many suspicious orders have been

04:14:02　21　reported to the DEA?

04:14:03　22　**A**　　To answer your question, up until the date of June 1

04:14:07　23　of 2018, two.  Two orders.

04:14:12　24　**Q**　　How many of those suspicious orders that were

04:14:15　25　reported, how many of those two orders were for hydrocodone

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:14:20 | 1 | combination products? |
| 04:14:22 | 2 | **A**    Zero. |
| 04:14:36 | 3 |    Should I give this back to you or -- |
| 04:14:38 | 4 | **Q**    Just put it here. |
| 04:14:39 | 5 | **A**    Okay. |
| 04:14:39 | 6 | **Q**    I'm going to show you what I'll mark as Exhibit 18. |
| 04:14:52 | 7 | It's HBC 1005 internally. |
| 04:14:58 | 8 |    And if you would start for me, please, at the |
| 04:15:06 | 9 | beginning of the e-mail chain on page 2. |
| 04:15:11 | 10 | **A**    Pointer 2? |
| 04:15:13 | 11 | **Q**    Correct.  It starts halfway down the page with an |
| 04:15:16 | 12 | e-mail from Robert McClune. |
| 04:15:18 | 13 |    Do you see that? |
| 04:15:19 | 14 | **A**    Yes. |
| 04:15:19 | 15 | **Q**    The subject of the e-mail is Thrifty White Notes.  It |
| 04:15:22 | 16 | says, "Team, I wanted to send a note out regarding our trip |
| 04:15:26 | 17 | to Thrifty White yesterday in conjunction with the planned |
| 04:15:28 | 18 | warehouse move vault and refrigeration." |
| 04:15:31 | 19 |    Do you see that? |
| 04:15:32 | 20 | **A**    Yes. |
| 04:15:32 | 21 | **Q**    What is Thrifty White? |
| 04:15:33 | 22 | **A**    Thrifty White is another regional pharmacy chain. |
| 04:15:37 | 23 | **Q**    So it says "The team went to Thrifty White yesterday." |
| 04:15:39 | 24 | Then it says in the next paragraph, "Please chime into this |
| 04:15:43 | 25 | e-mail stream with your Thrifty White notes.  Do not worry |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:15:46 | 1 | about duplication.  Just bring them." |
| 04:15:47 | 2 | Do you see that? |
| 04:15:48 | 3 | **A**   Yes. |
| 04:15:48 | 4 | **Q**   And then if you look at the bottom of that page and |
| 04:15:51 | 5 | flip to the next page, you just kind of see a set of bullet |
| 04:15:54 | 6 | points, and there's a heading in there about Thrifty White |
| 04:15:57 | 7 | notes. |
| 04:15:58 | 8 | Do you see that? |
| 04:15:59 | 9 | **A**   Yes. |
| 04:15:59 | 10 | **Q**   Okay.  And if we flip through back to the first page |
| 04:16:01 | 11 | of the document.  Do you see the response from Joe Millward, |
| 04:16:07 | 12 | who I think you said was head of the Compliance department? |
| 04:16:11 | 13 | **A**   Yes. |
| 04:16:11 | 14 | **Q**   Okay.  And he writes, "Here are my notes," and the |
| 04:16:15 | 15 | title of his notes are "Thrifty White visit notes, |
| 04:16:20 | 16 | 8/19/2015." |
| 04:16:22 | 17 | Are you with me? |
| 04:16:22 | 18 | **A**   Yes. |
| 04:16:23 | 19 | **Q**   Note number 1 is, "Keep engaged with the DEA through |
| 04:16:27 | 20 | all steps of the process." |
| 04:16:28 | 21 | Do you see that? |
| 04:16:29 | 22 | **A**   Yes. |
| 04:16:30 | 23 | **Q**   Okay.  His second note that he writes is, "It is |
| 04:16:33 | 24 | critical to have a robust suspicious order monitoring |
| 04:16:40 | 25 | program." |

04:16:41  1      Do you see that?

04:16:41  2  **A**   Yes.

04:16:42  3  **Q**   Would you agree that from 2009 to 2014, HBC did not

04:16:50  4  have a robust suspicious order monitoring program?

04:16:58  5  **A**   I do not.

04:16:59  6  **Q**   The next sentence says, "Relying on thresholds is not

04:17:02  7  good enough for the DEA."

04:17:04  8      Do you see that?

04:17:05  9  **A**   Yes.

04:17:07  10  **Q**   Okay.  From '09 through '13, HBC didn't even have

04:17:13  11  thresholds, correct?

04:17:13  12  **A**   Correct.

04:17:14  13  **Q**   Okay.  But you still believed that the suspicious

04:17:18  14  order monitoring program that HBC had from '09 to '13 was

04:17:24  15  robust?

04:17:24  16  **A**   Yes.

04:17:32  17  **Q**   It then goes on to say, "They have a process to review

04:17:35  18  the orders before they are filled by the distribution

04:17:37  19  center."

04:17:38  20      Do you see that?

04:17:39  21  **A**   Yes.

04:17:45  22  **Q**   Okay.  And in fact, that's inopposite to HBC and Giant

04:17:52  23  Eagle's system where the orders are filled and then reviewed

04:17:56  24  afterwards, correct?

04:18:02  25  **A**   An investigation -- there could be situations where

**Tsipakis - (By Video Deposition)**                    2639

04:18:06  1   investigation is happening while orders are in transit for

04:18:09  2   delivery, yes.

04:18:10  3   **Q**      So HBC and Giant Eagle did not have a program to

04:18:17  4   review the orders before they're filled?

04:18:19  5   **A**      Giant Eagle had a process.  Some of the investigative

04:18:23  6   work would not have been before the order was shipped.

04:18:28  7   **Q**      Okay.  Then number 3 says that -- Thrifty White, is

04:18:40  8   that a standalone wholesale distributor or is that a

04:18:44  9   distributor and a pharmacy?

04:18:45  10  **A**      It's a pharmacy.

04:18:49  11  **Q**      Okay.  So I went through a list earlier of other folks

04:18:55  12  that distribute to themselves.

04:18:56  13         Thrifty White would fall into this bucket as well,

04:18:59  14  correct, of pharmacies that distribute to themselves?

04:19:02  15  **A**      Yes.

04:19:02  16  **Q**      Okay.  Number 3, it says, "Thrifty White has

04:19:11  17  instituted guardrails for dispensing of controlled

04:19:14  18  substances."

04:19:14  19         And then down below it, if you go down there's an A

04:19:16  20  and B, and then there's a little lower case I, and then it

04:19:20  21  gives some examples of flags.

04:19:21  22         Do you see that?

04:19:21  23  **A**      Yes.

04:19:22  24  **Q**      And it talks about this cash versus insurance,

04:19:24  25  something we've talked about a little bit already, correct?

04:19:27  1    **A**     Yes.

04:19:28  2    **Q**     It talks about geographical relationship of the

04:19:32  3    prescriber and the patient to the pharmacy?

04:19:34  4    **A**     Yes.

04:19:35  5    **Q**     Talks about combo drugs or combination of controls

04:19:39  6    being dispensed.

04:19:40  7          Do you see that?

04:19:41  8    **A**     Yes.

04:19:41  9    **Q**     And again, these are all factors that we ultimately

04:19:44  10   end up seeing in a Giant Eagle policy that comes up in 2015,

04:19:49  11   correct?

04:19:53  12   **A**     Components of this, yes.

04:19:54  13   **Q**     I'm going to show you what I'll mark as Exhibit Number

04:19:58  14   20.

04:19:58  15         This is HBC 1023, which we're marking as Exhibit 20.

04:20:08  16         And if we look at the first page, do you recognize

04:20:09  17   this to be an e-mail from Adam Zakin in March of 2016?

04:20:15  18   **A**     Yes.

04:20:19  19   **Q**     Do you see it says, "Hello, Joseph and George.  As a

04:20:23  20   follow-up to our discussions, I have attached our SOM

04:20:26  21   solution proposal for your review.  Once you've had a chance

04:20:27  22   to review this internally, we would welcome an opportunity

04:20:29  23   to talk through our two SOM options and answer any questions

04:20:32  24   you have."

04:20:32  25         Do you see that?

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:20:34 | 1 | **A**  Yes. |
| 04:20:34 | 2 | **Q**  And that's from Gary at Buzzeo. |
| 04:20:37 | 3 | Do you see that? |
| 04:20:37 | 4 | **A**  Yes. |
| 04:20:41 | 5 | **Q**  Do you know what the purpose of Buzzeo, what service |
| 04:20:44 | 6 | it is that they provide? |
| 04:20:45 | 7 | **A**  Consultant services that they provide. |
| 04:20:50 | 8 | **Q**  And what he's indicating here I think you'll see as we |
| 04:20:54 | 9 | go through, he wants to talk to Joe Millward and Joe |
| 04:20:57 | 10 | Chunderlik regarding suspicious order monitoring programs, |
| 04:20:59 | 11 | correct? |
| 04:20:59 | 12 | **A**  Yeah.  He's a salesman trying to pitch a solution or a |
| 04:21:03 | 13 | consultant or consulting engagement, sure. |
| 04:21:05 | 14 | **Q**  Okay.  If we go back to the first page and we go about |
| 04:21:09 | 15 | two-thirds of the way down, you see an e-mail from George |
| 04:21:12 | 16 | Chunderlik? |
| 04:21:14 | 17 | **A**  First page? |
| 04:21:15 | 18 | **Q**  Yes, about two-thirds of the way down. |
| 04:21:18 | 19 | **A**  Okay. |
| 04:21:18 | 20 | **Q**  Are you with me?  George Chunderlik on March 24, 2016? |
| 04:21:24 | 21 | **A**  Yes, mm-hmm. |
| 04:21:25 | 22 | **Q**  George says, "I think it would be worthwhile to talk |
| 04:21:27 | 23 | to these guys about their SOM program.  I'm curious to see |
| 04:21:30 | 24 | their products.  I'm going to set something up for us and |
| 04:21:33 | 25 | include Jason, unless you have any objections." |

**Tsipakis - (By Video Deposition)**

04:21:35  1      Do you see that?

04:21:35  2  **A**   Yes.

04:21:35  3  **Q**   If you go back up to the top of the page, you see

04:21:40  4  Adam's response, correct?

04:21:42  5  **A**   Yes.

04:21:42  6  **Q**   He says, "We saw this.  We're not there.  At the end

04:21:46  7  of the day, the only thing it did that our current system

04:21:49  8  would not do was stop the orders physically if there was a

04:21:52  9  threshold."

04:21:53  10      Do you see that?

04:21:53  11  **A**   Yes.

04:21:53  12  **Q**   So in March of 2016, HBC or Giant Eagle, their current

04:22:03  13  system would not physically stop the orders that rose above

04:22:11  14  the threshold, correct?

04:22:12  15  **A**   Correct.

04:22:16  16  **Q**   I'm going to show you what I've marked as HBC 1027 --

04:22:20  17  or which is HBC 1027, which I'm going to mark as Exhibit 21.

04:22:24  18      The e-mail is from an individual named James Cornwell,

04:22:28  19  written in August of 2016.  And the subject of that e-mail

04:22:32  20  is Order Item Blocking, December 5, 2013.

04:22:37  21      Do you see that?

04:22:38  22  **A**   Yes.

04:22:39  23  **Q**   Do you know who Mr. Cornwell is?

04:22:40  24  **A**   Yes.

04:22:41  25  **Q**   Who is he and what does he do?

**Tsipakis - (By Video Deposition)**

04:22:42  1    **A**    He's on the IT team.  He works on the IT side.

04:22:45  2    **Q**    He writes this e-mail.  He says, "Dominic, Phil, I

04:22:50  3    didn't find much on this.  I do see the SQL was written by

04:22:53  4    Kayla."

04:22:54  5        Do you know what SQL means?

04:22:55  6    **A**    Sequel, yes.

04:23:00  7    **Q**    What does that mean?

04:23:00  8    **A**    Sequel code.

04:23:02  9    **Q**    Okay.  So she designed the program that's generating

04:23:04  10   the report?  Explain that for me, please.

04:23:07  11   **A**    I know what SQL means.  I don't know who Kayla is.

04:23:15  12   **Q**    Okay.  It goes on to say, "The requirements were

04:23:18  13   utilizing a monthly average looking back at the last 12

04:23:21  14   months that had each item ordered based on GPI."

04:23:25  15       Do you see that?

04:23:26  16   **A**    Yes.

04:23:26  17   **Q**    Is that describing the threshold system that was put

04:23:28  18   in place in 2013?

04:23:30  19   **A**    Yes.

04:23:34  20   **Q**    It says, "This value was a monthly accumulation that

04:23:37  21   reset the first of each month which mirrored McKesson's

04:23:41  22   system but left big holes in our logic."

04:23:44  23       Do you see that?

04:23:45  24   **A**    Yes.

04:23:45  25   **Q**    Do you know what big holes Mr. Cornwell's referring to

**Tsipakis - (By Video Deposition)** 2644

04:23:48 1    there?

04:23:48 2    **A**    I do not.

04:23:49 3    **Q**    But you agree it would not be a good thing to have big

04:23:52 4    holes in your suspicious order monitoring program?

04:23:54 5    **A**    I think generally big holes are a bad thing.

04:23:57 6    **Q**    "If the item showed on the report, George evaluated

04:24:00 7    it, and if it was determined it should be blocked, a

04:24:03 8    blocking form was filled out."

04:24:05 9         Do you see that?

04:24:05 10   **A**    Yes.

04:24:05 11   **Q**    It goes on to say, "The form expired at the end of

04:24:09 12   each month, again a problem."

04:24:10 13        Do you see that?

04:24:11 14   **A**    Yes.

04:24:11 15   **Q**    I'm going to show you HBC 1033, which I'm going to

04:24:16 16   mark as Exhibit Number 22.

04:24:20 17        And the subject of the e-mail is Suspicious Order

04:24:23 18   Monitoring.

04:24:24 19        Do you see that?

04:24:25 20   **A**    Yes.

04:24:25 21   **Q**    And it says, "Scope document attached we will review

04:24:30 22   during tomorrow's call."

04:24:32 23        Do you see that?

04:24:32 24   **A**    Yes.

04:24:32 25   **Q**    Turn to page 3 for me, .3 in the top right.

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:24:50 | 1 | **A**      .3? |
| 04:24:51 | 2 | **Q**      Yes.  And there at 1.0 it says stakeholders. |
| 04:24:58 | 3 | **A**      Yes. |
| 04:24:58 | 4 | **Q**      Can you tell me what's meant by that? |
| 04:25:00 | 5 | **A**      Stakeholders, I mean -- I would read it as I'm reading |
| 04:25:12 | 6 | it here, folks that are involved in a particular meeting or |
| 04:25:16 | 7 | constituents as part of a project, I guess. |
| 04:25:23 | 8 | **Q**      As far as the stakeholders that are listed here, the |
| 04:25:25 | 9 | project sponsor is Mark Doerr, senior vice president of |
| 04:25:32 | 10 | Pharmacy? |
| 04:25:32 | 11 | **A**      Yes. |
| 04:25:32 | 12 | **Q**      Is he still with the company? |
| 04:25:34 | 13 | **A**      He is not. |
| 04:25:37 | 14 | **Q**      Are you serving in that position now? |
| 04:25:38 | 15 | **A**      I am, yes. |
| 04:25:39 | 16 | **Q**      Okay.  Turn to page .4. |
| 04:25:43 | 17 | It says, "Prior to January 2016, Giant Eagle's drug |
| 04:25:48 | 18 | control program was limited to the monitoring of store-based |
| 04:25:51 | 19 | dispensing of Schedule II narcotics." |
| 04:25:54 | 20 | Do you see that? |
| 04:25:55 | 21 | **A**      Yes. |
| 04:25:55 | 22 | **Q**      It says, "Giant Eagle's primary and secondary |
| 04:26:00 | 23 | suppliers of C-II products were responsible for the |
| 04:26:04 | 24 | monitoring of orders from distribution centers to Giant |
| 04:26:05 | 25 | Eagle retail pharmacies." |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:26:06 | 1 | Do you see that? |
| 04:26:07 | 2 | **A**  Yes. |
| 04:26:07 | 3 | **Q**  So let me ask you a couple questions about that. |
| 04:26:09 | 4 | From 2009 through 2014 -- I think we covered this this |
| 04:26:17 | 5 | morning, but Giant Eagle did dispense Schedule II drugs. |
| 04:26:20 | 6 | They just did not get them from HBC, correct? |
| 04:26:22 | 7 | **A**  Correct. |
| 04:26:22 | 8 | **Q**  From '09 to '14, HBC is only distributing Schedule |
| 04:26:29 | 9 | III, IV, and V drugs, right? |
| 04:26:32 | 10 | **A**  Correct. |
| 04:26:32 | 11 | **Q**  But because these Schedule II drugs which are coming |
| 04:26:34 | 12 | from, I think you said, McKesson and Anda, are going to |
| 04:26:38 | 13 | Giant Eagle pharmacies, information or data about how many |
| 04:26:42 | 14 | Schedule II drugs or the frequency of Schedule II drugs or |
| 04:26:45 | 15 | the quantity of Schedule II drugs going to those pharmacies, |
| 04:26:49 | 16 | that is information that would have been available to HBC? |
| 04:26:53 | 17 | **A**  HBC didn't distribute those.  So, I mean, Giant Eagle |
| 04:26:56 | 18 | is aware of those purchases. |
| 04:26:59 | 19 | Is that your question? |
| 04:26:59 | 20 | **Q**  My question to you is a little bit different. |
| 04:27:02 | 21 | If they wanted to, could they have determined the |
| 04:27:04 | 22 | quantity of C-II drugs going into the Giant Eagle |
| 04:27:09 | 23 | pharmacies?  That's information that could have been |
| 04:27:11 | 24 | available to HBC just like the percentage of controlled |
| 04:27:15 | 25 | versus noncontrolled that were being dispensed by the |

**Tsipakis - (By Video Deposition)**

04:27:19   1   pharmacy, correct?

04:27:20   2   **A**   Sure.

04:27:21   3   **Q**   We talked this morning about -- you know, you claim

04:27:25   4   that HBC had a suspicious order monitoring program from '09

04:27:30   5   to '14, I think you said it was an integrated program with

04:27:34   6   these different players involved.

04:27:38   7        I'm asking if one of the factors that was looked at by

04:27:41   8   HBC was the quantity and pattern of C-IIs going into the

04:27:46   9   stores.

04:27:47  10   **A**   HBC wouldn't have been looking at the C-IIs of -- they

04:27:51  11   wouldn't have been looking at products that it doesn't

04:27:53  12   distribute.

04:27:54  13   **Q**   Okay.

04:27:55  14   **A**   Does that answer your question?  I'm sorry.  I'm

04:27:58  15   trying really hard to make sure I answer your question.

04:28:00  16   **Q**   It does.  Thank you.

04:28:01  17        If we go back to the first page of this document, this

04:28:04  18   was a meeting that was being set in November of 2016; is

04:28:09  19   that correct?

04:28:09  20   **A**   I'm sorry.  Where are you at?

04:28:10  21   **Q**   The first page.

04:28:16  22   **A**   Yes.

04:28:16  23   **Q**   Okay.  Sorry I'm bouncing right back, right back to

04:28:25  24   .4, and going to the second paragraph.

04:28:27  25   **A**   I'm sorry, .4.

**Tsipakis - (By Video Deposition)**

04:28:28  1   **Q**     It says, "The DEA regulation CFR 1301.74(b)

04:28:33  2   specifically requires that a registrant design and operate a

04:28:35  3   system to disclose to the registrant suspicious orders of

04:28:38  4   controlled substances."

04:28:39  5        Do you see that?

04:28:40  6   **A**     Yes.

04:28:40  7   **Q**     And that's what we've been talking about a lot today,

04:28:42  8   correct?

04:28:42  9   **A**     Yes.

04:28:43  10  **Q**     Okay.  It goes on to say, "Purposely vague, the DEA

04:28:47  11  leads the registrant," which is Giant Eagle here," to

04:28:49  12  interpret the elements and metrics of monitoring the

04:28:54  13  system," correct?

04:28:54  14  **A**     Yes.

04:28:55  15  **Q**     It then goes on to say, "It is the belief of the

04:28:58  16  business that Giant Eagle's suspicious order monitoring

04:29:00  17  program is 75 to 85 percent of where it needs to be."

04:29:03  18        Do you see that?

04:29:03  19  **A**     Yes.

04:29:03  20  **Q**     Let me ask it this way.  This is a November 2016

04:29:08  21  document, correct?

04:29:09  22  **A**     Yes.

04:29:09  23  **Q**     And what's being said here is that Giant Eagle

04:29:12  24  believes that their suspicious order monitoring program is

04:29:15  25  only 75 to 85 percent of where it needs to be, correct?

**Tsipakis - (By Video Deposition)** 2649

04:29:19    1    **A**    That's what it says, yes.

04:29:20    2    **Q**    Okay.  And we know that in the two years prior to

04:29:24    3    this, there was actually some progress made, correct?  In

04:29:28    4    August of 2014, for the first time HBC had a written policy

04:29:31    5    to monitor for suspicious orders, correct?

04:29:34    6    **A**    Yes.

04:29:34    7    **Q**    In 2015, they issued a second version of that policy,

04:29:39    8    correct?

04:29:39    9    **A**    Yes.

04:29:39    10   **Q**    In 2015, they also for the first time had a written

04:29:45    11   policy that provided for some detailed investigation to be

04:29:48    12   performed on potential suspicious orders, including factors

04:29:52    13   like the geographical location of the prescriber, the

04:29:56    14   geographical location of the patient, the geographical

04:29:58    15   location of the pharmacy in relation to all those, the

04:30:01    16   percentages of cash versus third-party payer.

04:30:06    17         Do you recall that?

04:30:07    18   **A**    Yes.

04:30:07    19   **Q**    And all that came out in 2015, correct?

04:30:12    20   **A**    Of the written form, yes.

04:30:13    21   **Q**    So you agree there were some steps taken between

04:30:16    22   August 2014 and the date of this document, November of 2016,

04:30:20    23   that were some fairly significant steps for HBC and Giant

04:30:23    24   Eagle as far as their controlled substance monitoring plan,

04:30:26    25   correct?

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:30:27 | 1 | **A**     Yes.  And then this document here was the company's |
| 04:30:31 | 2 | efforts to further the electronic portions of that system. |
| 04:30:37 | 3 | **Q**     Okay.  But here in November of 2016, after all those |
| 04:30:41 | 4 | steps and the written policies that we talked about earlier |
| 04:30:45 | 5 | today and that I summarized just now, even after those steps |
| 04:30:48 | 6 | since August of 2014, it was still HBC and Giant Eagle's |
| 04:30:51 | 7 | belief in November of 2016 that their program was only 75 to |
| 04:30:58 | 8 | 85 percent of where it needs to be, correct? |
| 04:30:59 | 9 | **A**     I don't agree. |
| 04:31:01 | 10 | **Q**     Is that what it says here in the document? |
| 04:31:02 | 11 | **A**     That's what it says here in this document, but I don't |
| 04:31:05 | 12 | understand -- I don't have a clear understanding of what the |
| 04:31:10 | 13 | 75 to 85 percent is referring to because it's written by -- |
| 04:31:19 | 14 | I want to make sure -- it's written by the IT department. |
| 04:31:24 | 15 | So there was many things, as I looked through a lot of |
| 04:31:28 | 16 | systems that were being built, a lot of automated things |
| 04:31:31 | 17 | that required a lot of system integrations, warehouse |
| 04:31:35 | 18 | integrations. |
| 04:31:37 | 19 | So I don't know what this is being referred to as 75 |
| 04:31:40 | 20 | to 85 percent. |
| 04:31:42 | 21 | **Q**     But you're not disputing that the document says it's |
| 04:31:45 | 22 | the belief of the business that Giant Eagle's suspicious |
| 04:31:49 | 23 | order monitoring in November of 2016 is 75 to 85 percent of |
| 04:31:53 | 24 | where it needs to be?  You're not disputing that, are you? |
| 04:31:55 | 25 | **A**     I'm not disputing what it says, no. |

**Tsipakis - (By Video Deposition)** 2651

| | | |
|---|---|---|
| 04:31:58 | 1 | **Q**     As I listened to you explain the system that was in |
| 04:32:00 | 2 | place between 2009 and 2014 at HBC, it's my understanding |
| 04:32:06 | 3 | that there was communication between HBC and the Giant Eagle |
| 04:32:12 | 4 | pharmacies on a regular basis. |
| 04:32:16 | 5 | **A**     There's communication between the warehouse, Pharmacy |
| 04:32:22 | 6 | operations, corporate.  So it was not uncommon to have |
| 04:32:26 | 7 | dialogue and communication amongst those three teams, and |
| 04:32:32 | 8 | Loss Prevention, the constituents internally, all the |
| 04:32:36 | 9 | stakeholders. |
| 04:32:37 | 10 | **Q**     Similarly, there was sharing of information, so if a |
| 04:32:39 | 11 | question existed by HBC about a shipment, there was an |
| 04:32:42 | 12 | e-mail chain that somebody could e-mail to a colleague at |
| 04:32:45 | 13 | Giant Eagle to get information; is that right? |
| 04:32:47 | 14 | **A**     There was an ability to, sure. |
| 04:32:49 | 15 | **Q**     And we've seen some of these e-mails today, right? |
| 04:32:52 | 16 | **A**     Yes. |
| 04:32:52 | 17 | **Q**     And as I understand it from the spreadsheets we were |
| 04:32:56 | 18 | just looking at, did HBC have access to Giant Eagle |
| 04:33:00 | 19 | pharmaceutical data? |
| 04:33:08 | 20 |         UNIDENTIFIED SPEAKER:  I think this has been |
| 04:33:10 | 21 | covered already. |
| 04:33:12 | 22 | **A**     Sure, yes. |
| 04:33:13 | 23 | **Q**     If a pharmacist at Giant Eagle had a question or had a |
| 04:33:15 | 24 | concern they wanted to express to HBC, they could do that by |
| 04:33:18 | 25 | e-mail? |

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:33:18 | 1 | **A**     If a pharmacist? |
| 04:33:19 | 2 | **Q**     Yes. |
| 04:33:22 | 3 | **A**     Sure, they could. |
| 04:33:23 | 4 | **Q**     Mr. Tsipakis, you were asked some questions about the |
| 04:33:27 | 5 | so-called suspicious order regulation of 1301.74(b). |
| 04:33:37 | 6 |        Do you remember that? |
| 04:33:40 | 7 | **A**     Yes. |
| 04:33:40 | 8 | **Q**     Were you shown during your deposition at any time the |
| 04:33:43 | 9 | security regulation in 1301.71 of the Code of Federal |
| 04:33:51 | 10 | Regulations? |
| 04:33:51 | 11 | **A**     I was not. |
| 04:33:52 | 12 | **Q**     What do you understand the security regulation to be? |
| 04:33:56 | 13 | **A**     The security regulation in its entirety is meant to -- |
| 04:33:59 | 14 | for a registrant to have proper controls to prevent |
| 04:34:03 | 15 | diversion and theft. |
| 04:34:05 | 16 | **Q**     And do you understand that to be the main requirement |
| 04:34:10 | 17 | that distributors are supposed to meet? |
| 04:34:12 | 18 | **A**     Yes. |
| 04:34:12 | 19 | **Q**     Did HBC meet that requirement at all times? |
| 04:34:17 | 20 | **A**     Yes. |
| 04:34:18 | 21 | **Q**     Now, do you understand that the one part of the |
| 04:34:22 | 22 | regulation that was shown to you, the 1301.74, the one that |
| 04:34:27 | 23 | says "Design and operate a system to disclose to the |
| 04:34:32 | 24 | registrant suspicious orders of controlled substances," do |
| 04:34:35 | 25 | you understand that to be the only factor taken into |

**Tsipakis - (By Video Deposition)**

04:34:37  1   consideration for the security requirement?

04:34:43  2   **A**    It's not the only factor, no.

04:34:44  3   **Q**    What are some of the other factors?

04:34:46  4   **A**    Physical security, record keeping; basically multiple

04:34:51  5   controls at all levels in the distribution chain.

04:35:05  6   **Q**    And is it your understanding under the security

04:35:09  7   requirement regulation that you're supposed to look at the

04:35:12  8   registrant's overall security system, or do you just look at

04:35:16  9   the piece called suspicious order monitoring system?

04:35:22  10  **A**    The overall system.  The overall system, a lot of

04:35:28  11  different factors is listed in the type of controls that are

04:35:31  12  distributed, the type of chemicals, et cetera.  So there's a

04:35:35  13  whole host of things that go into that.

04:35:38  14  **Q**    And you told us under questioning by plaintiffs'

04:35:42  15  counsel that HBC was never a Controlled Substance II

04:35:46  16  facility; is that correct?

04:35:47  17  **A**    That's correct.

04:35:47  18  **Q**    So when determining compliance with the security

04:35:51  19  requirement, did HBC take into account that it was never a

04:35:56  20  Controlled Substance II distributor?

04:36:00  21  **A**    Yes.

04:36:01  22  **Q**    Okay.  Did HBC also consider the quantity of the

04:36:06  23  controlled substances it was handling when it designed its

04:36:11  24  overall security system?

04:36:12  25  **A**    Yes.

**Tsipakis - (By Video Deposition)**                         2654

| | | |
|---|---|---|
| 04:36:12 | 1 | **Q**     Did it consider its internal controls over the |
| 04:36:17 | 2 | receipt, manufacture, distribution, and disposition of the |
| 04:36:21 | 3 | controlled substances it was handling? |
| 04:36:23 | 4 | **A**     Yes. |
| 04:36:23 | 5 | **Q**     Did it consider the physical security facilities that |
| 04:36:26 | 6 | it had? |
| 04:36:27 | 7 | **A**     Of course, yes. |
| 04:36:29 | 8 | **Q**     And while HBC was distributing Controlled Substance |
| 04:36:43 | 9 | IIIs, IVs, and Vs, did it get visited frequently by the DEA |
| 04:36:47 | 10 | to perform audits and inspections? |
| 04:36:49 | 11 | **A**     Yes, it was visited by the DEA. |
| 04:36:50 | 12 | **Q**     Did the DEA ever say to HBC "You're not meeting the |
| 04:36:53 | 13 | security requirement under the regulations"? |
| 04:36:55 | 14 | **A**     To my knowledge, no. |
| 04:36:57 | 15 | **Q**     Are you aware of any DEA regulation that says you're |
| 04:37:09 | 16 | supposed to use a threshold-based system to monitor for |
| 04:37:12 | 17 | suspicious orders? |
| 04:37:12 | 18 | **A**     No. |
| 04:37:13 | 19 | **Q**     Are you aware of any DEA regulation that requires you |
| 04:37:19 | 20 | to set a threshold at any level? |
| 04:37:21 | 21 | **A**     No. |
| 04:37:21 | 22 | **Q**     Are you aware of the DEA's efforts for many years in |
| 04:37:26 | 23 | the late '08, '09, '10 period, with respect to Internet |
| 04:37:31 | 24 | pharmacies? |
| 04:37:32 | 25 | **A**     Yes. |

**Tsipakis - (By Video Deposition)**                    2655

04:37:32  1    **Q**    And can you just briefly summarize those for us?

04:37:35  2    **A**    Certainly.  There was a lot of pop-up pharmacies on

04:37:39  3    the Internet that the DEA was cracking down on and certainly

04:37:41  4    there wasn't a valid patient-prescriber relationship, and

04:37:46  5    the DEA, the DEA had ramped up regulatory efforts against

04:37:52  6    those to curb them or shut them down.

04:37:56  7    **Q**    Did Giant Eagle in any -- I'm sorry, did HBC or Giant

04:38:00  8    Eagle at any time ever supply an Internet pharmacy at any

04:38:03  9    time?

04:38:03  10   **A**    No.

04:38:03  11   **Q**    Now, with respect to the physical structure of the HBC

04:38:07  12   warehouse, did you have a locked cage?

04:38:10  13   **A**    Yes.

04:38:11  14   **Q**    Was there controlled access to that locked cage?

04:38:14  15   **A**    Yes.

04:38:14  16   **Q**    Was that locked cage inspected and approved by the

04:38:17  17   DEA?

04:38:18  18   **A**    Yes.

04:38:18  19   **Q**    Was admittance to the locked cage limited to only

04:38:26  20   certain personnel?

04:38:26  21   **A**    Yes.

04:38:27  22   **Q**    And was there limited entry for the number of

04:38:31  23   personnel?

04:38:31  24   **A**    Yes.

04:38:31  25   **Q**    And what was that number, do you recall?

**Tsipakis - (By Video Deposition)**

04:38:35 | 1 | **A**    Three or four individuals only.

04:38:41 | 2 | **Q**    And did they -- were they using any type of digital

04:38:44 | 3 | inventory system with scanners and wristbands, and things of

04:38:47 | 4 | that nature, while they were inside the controlled substance

04:38:49 | 5 | locked area?

04:38:50 | 6 | **A**    Yes.

04:38:50 | 7 | **Q**    Do you know the name of that system?

04:38:53 | 8 | **A**    I believe Volcom might be the right -- or -- I think

04:39:01 | 9 | it's Volcom.

04:39:02 | 10 | **Q**    Can you spell that, please?  The court reporter seems

04:39:05 | 11 | to be --

04:39:05 | 12 | **A**    V-O-L-C-O-M.

04:39:08 | 13 | **Q**    Okay.  And is that system a form of perpetual

04:39:14 | 14 | inventory system?

04:39:14 | 15 | **A**    Yes.

04:39:15 | 16 | **Q**    Is that a type of internal control at the warehouse?

04:39:21 | 17 | **A**    Sure, yes.

04:39:22 | 18 | **Q**    The controlled substance orders that were picked at

04:39:26 | 19 | the warehouse, the HBC warehouse, were they double-checked

04:39:29 | 20 | before shipping?

04:39:29 | 21 | **A**    Yes.

04:39:30 | 22 | **Q**    Were there physical safeguards to prevent theft and

04:39:34 | 23 | diversion at that warehouse?

04:39:35 | 24 | **A**    Yes.

04:39:36 | 25 | **Q**    Even while picking the orders?

**Tsipakis - (By Video Deposition)** 2657

04:39:38  1   **A**    Yes.

04:39:38  2   **Q**    Can you just describe a few of them?

04:39:41  3   **A**    So there would be daily audits, back-counts.  The

04:39:48  4   system would make sure that all of the inventory would tie

04:39:54  5   up.

04:39:56  6   **Q**    So if there was any product missing, would it be found

04:39:58  7   fairly promptly?

04:39:59  8   **A**    Oh, yes.

04:40:01  9   **Q**    Was there a daily warehouse inventory for controlled

04:40:06  10  substances?

04:40:06  11  **A**    Yes.

04:40:06  12  **Q**    Were there security guards and cameras throughout the

04:40:15  13  facility?

04:40:15  14  **A**    Yes, multiple.

04:40:17  15  **Q**    Were there -- besides the daily inventories, were

04:40:20  16  there yearly inventories and biannual DEA inventories?

04:40:23  17  **A**    Yes.

04:40:23  18  **Q**    Was the warehouse overseen by the Giant Eagle Audit

04:40:26  19  and Accounting department?

04:40:28  20  **A**    Sure, yes.

04:40:30  21  **Q**    You're a pharmacist; is that correct?

04:40:33  22  **A**    Yes.

04:40:33  23  **Q**    What kind of degrees in pharmacy do you have?

04:40:38  24  **A**    Bachelor of Science in Pharmacy.

04:40:39  25  **Q**    And were you a practicing pharmacist in a store for a

04:40:42    1    period of time?

04:40:43    2    **A**    Yes.

04:40:43    3    **Q**    Was that for a different chain, Albertsons?

04:40:47    4    **A**    Yes.

04:40:47    5    **Q**    Are you familiar with dispensing practices and things

04:40:51    6    of that nature?

04:40:52    7    **A**    Yes.

04:40:52    8    **Q**    You -- in your direct testimony upon questioning by

04:40:58    9    Mr. Gaddy, you referenced this integrated control system,

04:41:03    10   and you referenced three parts to it; at the warehouse, at

04:41:07    11   corporate, and at the stores.

04:41:08    12         Do you recall that testimony?

04:41:09    13   **A**    Yes.

04:41:09    14   **Q**    At the stores, are there internal controls over

04:41:14    15   controlled substances?

04:41:16    16   **A**    Sure, yes.

04:41:17    17   **Q**    Are there physical controls over controlled

04:41:19    18   substances?

04:41:19    19   **A**    Yes.

04:41:20    20   **Q**    Does that include vaults -- I'm sorry, not vaults, but

04:41:24    21   safes and things of that nature?

04:41:26    22   **A**    Locked cabinets and safes, yes.

04:41:28    23   **Q**    And who's allowed access to those locked cabinets and

04:41:30    24   safes?

04:41:31    25   **A**    Only the pharmacists.

**Tsipakis - (By Video Deposition)**                                2659

| | | |
|---|---|---|
| 04:41:33 | 1 | **Q**    Does Giant Eagle have a mechanism to train pharmacists |
| 04:41:36 | 2 | to keep tight control over controlled substances? |
| 04:41:39 | 3 | **A**    Yes. |
| 04:41:39 | 4 | **Q**    And is that monitored by Loss Prevention and Internal |
| 04:41:44 | 5 | Audit? |
| 04:41:45 | 6 | **A**    Yes. |
| 04:41:45 | 7 | **Q**    And are pharmacists and pharmacy techs trained and |
| 04:41:53 | 8 | supervised? |
| 04:41:53 | 9 | **A**    Yes. |
| 04:41:53 | 10 | **Q**    Does Giant Eagle at the store level impose policies |
| 04:41:57 | 11 | and procedures on the pharmacists and the pharmacy techs |
| 04:42:02 | 12 | with respect to dispensing prescriptions? |
| 04:42:05 | 13 | **A**    Yes. |
| 04:42:05 | 14 | **Q**    Are you familiar with the DEA pharmacist manual? |
| 04:42:10 | 15 | **A**    Of course, yes. |
| 04:42:11 | 16 | **Q**    Is that something that's kept at every Giant Eagle |
| 04:42:14 | 17 | pharmacy? |
| 04:42:14 | 18 | **A**    Yes. |
| 04:42:14 | 19 | **Q**    And are the pharmacists required to review it and sign |
| 04:42:17 | 20 | off on it? |
| 04:42:18 | 21 | **A**    Yes. |
| 04:42:18 | 22 | **Q**    Does Giant Eagle have controlled substance dispensing |
| 04:42:24 | 23 | guidelines? |
| 04:42:24 | 24 | **A**    Yes. |
| 04:42:24 | 25 | **Q**    And do those guidelines include red flags, things to |

04:42:29  1   watch for in terms of whether a prescription is legitimate

04:42:32  2   or not?

04:42:33  3   **A**      Yes.

04:42:33  4   **Q**      And are they required to review those and sign off

04:42:36  5   that they've been trained on it and understand them?

04:42:38  6   **A**      Yes.

04:42:38  7   **Q**      And are all of Giant Eagle's pharmacists licensed

04:42:43  8   pharmacists with experience?

04:42:44  9   **A**      Yes.

04:42:44  10  **Q**      Are there other manuals containing policies at the

04:42:49  11  store level related to controlled substance other than the

04:42:55  12  DEA pharmacist manual and the controlled substance

04:42:58  13  dispensing guidelines?

04:42:58  14  **A**      Yes.

04:42:59  15  **Q**      And do those policies include controls over all

04:43:04  16  controlled substances?

04:43:06  17  **A**      Yes.

04:43:06  18  **Q**      Do the stores interface with any statewide systems to

04:43:12  19  make sure that incoming prescriptions are legitimate?

04:43:18  20  **A**      Sure, yes.

04:43:18  21  **Q**      In the state of Ohio, is there a name for that system?

04:43:21  22  **A**      Sure.  It's the prescription drug monitoring program,

04:43:24  23  the OARRS program.

04:43:25  24  **Q**      And is that something that the pharmacists are trained

04:43:29  25  to consult?

**Tsipakis - (By Video Deposition)**                    2661

| | | |
|---|---|---|
| 04:43:30 | 1 | **A**     Yes, oh, yes. |
| 04:43:32 | 2 | **Q**     And will that provide some information about things |
| 04:43:34 | 3 | like doctor shopping and people coming in from out of state, |
| 04:43:42 | 4 | things of that nature? |
| 04:43:43 | 5 | **A**     Yes. |
| 04:43:43 | 6 | **Q**     And do Giant Eagle pharmacists use that system? |
| 04:43:45 | 7 | **A**     Regularly, yes. |
| 04:43:47 | 8 | **Q**     And does the DEA from time to time visit the stores? |
| 04:43:50 | 9 | **A**     Sure, yes. |
| 04:43:51 | 10 | **Q**     Do they perform surprise audits, things of that |
| 04:43:53 | 11 | nature? |
| 04:43:53 | 12 | **A**     Audits, or if they're coming in for investigations or |
| 04:43:57 | 13 | other things that they're working on, sure, yes. |
| 04:43:58 | 14 | **Q**     Do the boards of pharmacy of the states also interface |
| 04:44:03 | 15 | with the stores? |
| 04:44:04 | 16 | **A**     Yes. |
| 04:44:05 | 17 | **Q**     Does the Ohio Board of Pharmacy interface with the |
| 04:44:08 | 18 | Giant Eagle stores in these two counties at issue? |
| 04:44:10 | 19 | **A**     Yes. |
| 04:44:11 | 20 | **Q**     Do they perform surprise audits and inspections? |
| 04:44:14 | 21 | **A**     Absolutely, yes. |
| 04:44:15 | 22 | **Q**     And is the pharmacist required to immediately input -- |
| 04:44:18 | 23 | update the store's controlled substance inventory for |
| 04:44:23 | 24 | incoming orders? |
| 04:44:24 | 25 | **A**     Their on-hands? |

**Tsipakis - (By Video Deposition)**

04:44:27  1  **Q**      Yes.

04:44:29  2  **A**      Yes.

04:44:30  3  **Q**      And when controlled substance prescriptions are

04:44:32  4  filled, is the inventory, the store inventory immediately

04:44:34  5  credited for the outgoing prescription?

04:44:38  6  **A**      Yes.

04:44:38  7  **Q**      And at the end of the day, is there a check of the

04:44:41  8  remaining balance of controlled substances at the store?

04:44:43  9  **A**      Yes, and especially even more so on C-IIs.  They're

04:44:47  10  back-counted on every fill.

04:44:49  11  **Q**      What does it mean to back-count every fill?

04:44:50  12  **A**      So the system will prompt for how many pills are left

04:44:54  13  in the bottle.  So if you had a hundred bottles -- if you

04:44:59  14  had a hundred pills to start and you filled 50, you would

04:45:02  15  expect to have 50 left in that bottle.  So the back-count

04:45:06  16  would be to ensure that you had 50 left in that bottle and

04:45:11  17  inputting that, that you do have in fact 50.

04:45:13  18  **Q**      Are you familiar with the term "monthly narc. audit"?

04:45:17  19  **A**      Yes.

04:45:18  20  **Q**      What is that?

04:45:18  21  **A**      The requirement that all of our pharmacies do a full

04:45:22  22  inventory of C-II narcotics in our stores, and some other

04:45:28  23  products as well.  Not just C-IIs, but some C-III.

04:45:33  24  **Q**      So you have the daily perpetual inventory and the

04:45:37  25  monthly narcotics?

**Tsipakis - (By Video Deposition)**

04:45:38  1    **A**    Yes.

04:45:38  2    **Q**    You also have the annual audits -- or inventories of

04:45:43  3    controlled substance at every store?

04:45:44  4    **A**    The DEA requires a biannual inventory.  We do an

04:45:48  5    annual inventory on top, yes.  We do a yearly inventory

04:45:51  6    instead of biannual.

04:45:53  7    **Q**    Can you tell us what a PDL is?

04:45:56  8    **A**    PDL is a pharmacy -- excuse me, pharmacy district

04:46:02  9    leader.

04:46:03  10   **Q**    And what do they do?

04:46:04  11   **A**    They supervise the stores.  They're basically a

04:46:06  12   district manager that oversees the stores for all aspects of

04:46:12  13   ensuring Pharmacy Practice Act, DEA, company policy.

04:46:19  14   They're the oversight for the stores, direct oversight for

04:46:22  15   the stores.

04:46:23  16   **Q**    Do they regularly visit the stores?

04:46:25  17   **A**    Yes.

04:46:25  18   **Q**    Do they conduct audits or inquiries concerning their

04:46:30  19   procedures and things of that nature?

04:46:32  20   **A**    They do audits.  We also have an internal audit that

04:46:36  21   quarterly visits the stores for a myriad of things, but yes.

04:46:43  22   **Q**    Is there any supervision of training of pharmacists?

04:46:45  23   **A**    Yes.

04:46:45  24   **Q**    Is that something a PDL does?

04:46:48  25   **A**    A PDL would definitely make sure any training that

| | | |
|---|---|---|
| 04:46:53 | 1 | needs to be done or computer-based training is completed, |
| 04:46:56 | 2 | and if there's any remediation that's needed, that's their |
| 04:47:00 | 3 | job to make sure. |
| 04:47:01 | 4 | **Q**     Do the stores work with local law enforcement, police, |
| 04:47:04 | 5 | Board of Pharmacy inspectors, DEA agents? |
| 04:47:07 | 6 | **A**     Oh, yes, all the time. |
| 04:47:08 | 7 | **Q**     Is that a cooperative working relationship? |
| 04:47:11 | 8 | **A**     Very much so, yes. |
| 04:47:13 | 9 | **Q**     In working with local law enforcement and DEA, have |
| 04:47:18 | 10 | you been able to uncover people attempting to pass bad |
| 04:47:22 | 11 | scripts, things of that nature? |
| 04:47:24 | 12 | **A**     Yes. |
| 04:47:24 | 13 | **Q**     Is there a pharmacy investigator? |
| 04:47:35 | 14 | **A**     Yes. |
| 04:47:35 | 15 | **Q**     Who is that? |
| 04:47:37 | 16 | **A**     Rick Shaheen. |
| 04:47:42 | 17 | **Q**     How much experience does he have? |
| 04:47:43 | 18 | **A**     He has a lot of experience.  He has a background in |
| 04:47:47 | 19 | law enforcement, Attorney General's office, a very -- has a |
| 04:47:53 | 20 | lot of contacts with DEA, boards of pharmacy.  So he's been |
| 04:47:59 | 21 | in the business a long time. |
| 04:48:00 | 22 | **Q**     Does he spend a lot of time in the stores? |
| 04:48:02 | 23 | **A**     Yes. |
| 04:48:02 | 24 | **Q**     Does he also work individually with local law |
| 04:48:07 | 25 | enforcement and DEA? |

**Tsipakis - (By Video Deposition)**                           2665

04:48:08  1    **A**    Yes.

04:48:09  2    **Q**    Are you familiar with the term or the acronym BOLO,

04:48:13  3    B-O-L-O?

04:48:14  4    **A**    Yes.

04:48:15  5    **Q**    What is it?

04:48:15  6    **A**    "Be on the lookout for."  So he will send out

04:48:21  7    bulletins to the pharmacists when either law enforcement

04:48:24  8    will tell him that there's bad scripts on the street or a

04:48:28  9    prescription pad, for example, if it's stolen or something,

04:48:32  10   either if we have information -- so Rick is involved with --

04:48:36  11   Rick and Andrew, who works for Rick, are involved in all of

04:48:40  12   those activities and alert our stores as soon as they know

04:48:42  13   something, and we disseminate very quickly to all our

04:48:47  14   stores.

04:48:47  15   **Q**    And is that the type of information that's also in the

04:48:50  16   OARRS database, or is that different?

04:48:53  17   **A**    Different.

04:48:53  18   **Q**    It's different?  Okay.

04:48:55  19        Are there daily counts of certain drugs?

04:48:59  20   **A**    Yes.

04:48:59  21   **Q**    Does that include HCP, hydrocodone or HCP products?

04:49:05  22   **A**    Yes.

04:49:08  23   **Q**    Is there an electronic prescription system with

04:49:11  24   perpetual logs at the stores?

04:49:12  25   **A**    Yes.

**Tsipakis - (By Video Deposition)**

| | | |
|---|---|---|
| 04:49:12 | 1 | **Q**    Is that a form of internal control? |
| 04:49:15 | 2 | **A**    Yes. |
| 04:49:21 | 3 | **Q**    Is there diversion training for pharmacy employees on |
| 04:49:25 | 4 | a yearly basis? |
| 04:49:26 | 5 | **A**    Yes. |
| 04:49:27 | 6 | **Q**    Now, you were asked a lot of questions about so-called |
| 04:49:30 | 7 | suspicious orders, and I didn't hear a lot of questioning |
| 04:49:36 | 8 | about diversion. |
| 04:49:37 | 9 |      Do you understand the term "diversion"? |
| 04:49:38 | 10 | **A**    Yes. |
| 04:49:38 | 11 | **Q**    What does the term "diversion" mean to you? |
| 04:49:41 | 12 | **A**    The diversion, theft, loss, things being routed to |
| 04:49:45 | 13 | folks that shouldn't have access to the drugs or |
| 04:50:00 | 14 | prescriptions. |
| 04:50:00 | 15 | **Q**    If an order is suspicious, does that mean it was |
| 04:50:04 | 16 | diverted? |
| 04:50:04 | 17 | **A**    No, not necessarily, no. |
| 04:50:05 | 18 | **Q**    In fact, what has HBC's and Giant Eagle's experience |
| 04:50:11 | 19 | been with respect to so-called suspicious orders or flagged |
| 04:50:13 | 20 | orders?  Have they resulted in uncovering diversion? |
| 04:50:19 | 21 | **A**    No. |
| 04:50:21 | 22 | **Q**    In your direct questioning today, were you shown at |
| 04:50:24 | 23 | any time any evidence, any document, any piece of paper by |
| 04:50:27 | 24 | plaintiffs' counsel suggesting that any single one of these |
| 04:50:33 | 25 | prescriptions was anything other than a legitimate |

**Tsipakis - (By Video Deposition)**                                    2667

04:50:35  1   prescription issued by a doctor who had a legitimate license

04:50:38  2   to issue it?

04:50:41  3   **A**      No.

04:50:42  4   **Q**      Were you shown any evidence at any time that any of

04:50:48  5   these prescriptions caused anybody any harm at any time in

04:50:52  6   any jurisdiction?

04:50:53  7   **A**      No.

04:50:53  8   **Q**      Is Giant Eagle's integrated system designed to

04:50:58  9   maintain the integrity of the closed system of distribution

04:51:02  10  from incoming at the warehouse to outgoing at the stores?

04:51:07  11  **A**      Yes.

04:51:07  12  **Q**      You were asked by Mr. Barnes whether or not there was

04:51:10  13  any requirement that HBC adopt a threshold program.

04:51:15  14         Do you recall that?

04:51:16  15  **A**      Yes.

04:51:16  16  **Q**      And you said there's not, correct?

04:51:18  17  **A**      A specific threshold system?  Correct.

04:51:22  18  **Q**      But you agree that there absolutely is a requirement

04:51:25  19  that HBC design and operate a system meant to detect

04:51:31  20  suspicious orders of controlled substances, correct?

04:51:32  21  **A**      Yes.

04:51:32  22  **Q**      The DEA is not charged with designing and operating a

04:51:35  23  system to do that, are they?

04:51:36  24  **A**      They are not.

04:51:37  25  **Q**      Well, it's a Federal Regulation.

**Tsipakis - (By Video Deposition)**

04:51:41   1   **A**     Okay.

04:51:41   2   **Q**     It says that HBC has the responsibility to design and

04:51:44   3   operate a system, correct?

04:51:46   4   **A**     Yes.

04:51:47   5   **Q**     Okay.  So the Federal Regulation requires HBC to do

04:51:50   6   that, not anybody else, correct?

04:51:51   7   **A**     It requires the registrant, which HBC, it's ultimately

04:52:01   8   Giant Eagle, yes.

04:52:01   9   **Q**     Okay.  And that includes individuals or entities such

04:52:04   10   as HBC which were distributing Schedule III controlled

04:52:09   11   substances like hydrocodone combination products, correct?

04:52:11   12   **A**     Yes.

04:52:11   13   **Q**     You don't disagree that those drugs that HBC

04:52:16   14   distributed are subject to abuse and addiction?

04:52:20   15   **A**     Sure.

04:52:21   16   **Q**     In the answers that you were giving to Mr. Barnes as

04:52:27   17   it related to the different security requirements, were you

04:52:29   18   intending to imply that it was not important that HBC design

04:52:33   19   and operate a system to detect suspicious orders?

04:52:36   20   **A**     Absolutely not.  The whole point of it was that when

04:52:40   21   HBC designed their system, all of the different pieces of

04:52:45   22   the security provision needed to be taken into

04:52:50   23   consideration, including the class and type of medications

04:52:57   24   or prescriptions that we would be distributing.

04:53:00   25   **Q**     And you agree that all aspects of the security

04:53:01  1    requirement are important, correct?

04:53:02  2    **A**    Sure, yes.

04:53:03  3    **Q**    If you don't lock the door, that could be just as bad

04:53:07  4    as not having a program that detects suspicious orders?

04:53:11  5    **A**    A holistic system, keeping the security and the

04:53:18  6    sanctity and the security of controlled substances in a

04:53:22  7    closed system, is of utmost importance.

04:53:24  8    **Q**    And that includes the aspect of that security

04:53:26  9    requirement that requires HBC to design and operate a system

04:53:29  10   to detect suspicious orders, correct?

04:53:31  11   **A**    Yes.

04:53:32  12   **Q**    You mentioned the pharmacy investigator, Rick Shaheen,

04:53:36  13   correct?

04:53:37  14   **A**    Yes.

04:53:37  15   **Q**    I'm asking whether or not you're aware of him having

04:53:40  16   any training or experience or education as it relates to

04:53:43  17   HBC's duty under the Controlled Substances Act to design and

04:53:50  18   operate a system to detect suspicious orders.

04:53:52  19   **A**    That I do not know, no.

04:53:53  20   **Q**    We agreed that HBC was under no obligation to utilize

04:53:57  21   a threshold system in 2013, correct?

04:54:01  22   **A**    Correct.

04:54:01  23   **Q**    But HBC chose to do so, correct?

04:54:04  24   **A**    As one level of control, yes.

04:54:07  25   **Q**    Okay.  And this was touched on a little bit earlier,

**Tsipakis - (By Video Deposition)** 2670

04:54:10 1  but I think with me you indicated that the original

04:54:15 2  methodology was flawed and was a system that could produce

04:54:20 3  false positives, correct?

04:54:22 4  **A**    Certainly.  When you do an average, yes, it's

04:54:25 5  possible, yes.

04:54:27 6  **Q**    And then you also were asked after lunch whether or

04:54:30 7  not that same system could produce false negatives, and you

04:54:37 8  agreed also that was a possibility, right?

04:54:38 9  **A**    Possibly, yes.

04:54:39 10  **Q**    I might get these numbers wrong, but I believe the

04:54:42 11  example you gave to me when I was asking questions this

04:54:44 12  morning was that you had some pharmacies that wrote 6,000

04:54:47 13  scripts per month and you had some pharmacies that wrote 300

04:54:50 14  scripts per month.

04:54:52 15  **A**    If you mean dispense, yes, but that's not just

04:54:56 16  controlled substances.  That's total prescriptions.  But

04:54:58 17  yes.

04:54:59 18  **Q**    Sure.  So just like I think the example that you

04:55:03 19  pointed out where maybe one of your higher-volume stores

04:55:05 20  would consistently pop up on that threshold report, it's

04:55:08 21  just as likely that you could have a lower-volume store

04:55:12 22  doing two, three, four times what maybe it should be doing

04:55:16 23  for its traffic, but that would not pop on the threshold

04:55:19 24  report, correct?

04:55:20 25  **A**    It's possible.

04:55:21   1   **Q**     And the threshold system came around four years after

04:55:26   2   you started distributing hydrocodone combination product,

04:55:32   3   right?

04:55:32   4   **A**     Sure.

04:55:37   5                    (Video deposition concluded.)

04:55:37   6                    MR. LANIER:  Your Honor, that concludes our

04:55:40   7   tender from both sides of the deposition of James Tsipakis

04:55:44   8   and concludes the tender we've got fresh right now for

04:55:48   9   today, but we have live witnesses tomorrow.

04:55:50  10                    THE COURT:  Okay.  All right.  There's no

04:55:53  11   point starting a witness anyway for five or ten minutes.

04:55:57  12        So we will recess today.  Usual admonitions.  Don't

04:56:02  13   watch, listen, view anything you might see or hear about

04:56:06  14   this case in the media, do not discuss this case with

04:56:11  15   anyone, and we'll pick up tomorrow at 9 a.m. with the next

04:56:16  16   witness.

04:56:27  17                    (The jury was excused at 4:56 p.m.)

04:56:46  18                    THE COURT:  Okay.  Please be seated for a

04:56:47  19   minute.

04:56:48  20        My recollection is that the parties were going to try

04:56:55  21   and agree on the documents to be used with Martin.  We did

04:56:58  22   McCann, right, so it was just Martin that we were -- we have

04:57:04  23   something, so I can stay current.

04:57:06  24                    MS. FUMERTON:  Your Honor, we've not done

04:57:08  25   McCann.

04:57:09  1                    MR. LANIER:  Yeah, they've told me we did not

04:57:11  2   do McCann.

04:57:12  3                    THE COURT:  Didn't do McCann or Martin?

04:57:15  4                    MS. FLEMING:  No.

04:57:16  5                    THE COURT:  Well, do we have anything?

04:57:18  6                    MS. FLEMING:  Yes, Your Honor.  We have three

04:57:19  7   for McCann and we have several for Martin.

04:57:21  8                    THE COURT:  Well, let's have them and see if

04:57:23  9   defendants have any, and we'll go through these.

04:57:34  10       All right.  Well, again, these are three dispensing

04:57:39  11  summaries, 1006 summaries.

04:57:42  12       Did the parties go over these?  It's P-26319, 62320,

04:57:46  13  26322.

04:57:51  14                    MS. FUMERTON:  Your Honor, I spoke to

04:57:52  15  Mr. Lanier this morning.  We don't have an objection to the

04:57:54  16  pages that were actually shown or used with the witness, but

04:57:57  17  we do for the others.  So the ones that were used were pages

04:58:00  18  1, 3, and 4.

04:58:03  19                    MR. LANIER:  And, Your Honor, we agreed to

04:58:06  20  make that change in the order.

04:58:08  21                    THE COURT:  Well, I'm sorry, there's three

04:58:10  22  documents.  Are you referring to one of them, Ms. Fumerton?

04:58:13  23                    MS. FUMERTON:  Yes, Your Honor.  I apologize.

04:58:15  24  I should have been more clear.  I was referring to the

04:58:16  25  Walmart one, which is P-26322.

04:58:21  1                        THE COURT:  All right.  So that one will be

04:58:23  2    pages --

04:58:26  3                        MS. FUMERTON:  1, 3, and 4.

04:58:28  4                        THE COURT:  1, 3, and 4.  Okay.

04:58:31  5          And then the other two are coming -- no objection to

04:58:34  6    the other two?

04:58:35  7                        MR. DELINSKY:  Your Honor, for CVS, which is

04:58:40  8    P-26319, we have the same issue.  We're okay with pages 1,

04:58:44  9    3, and 4 as well.

04:58:45  10                       MR. LANIER:  Which we agreed to limit the

04:58:49  11   tender to that, Your Honor.

04:58:49  12                       THE COURT:  So it's 1, 3, and 4 for risk

04:58:52  13   factors.

04:58:52  14         What about the Giant Eagle, were there specific pages

04:58:55  15   there, too?

04:58:56  16                       MS. FIEBIG:  Yes, we're in the same position.

04:58:57  17         For P-26320, we had spoken with plaintiffs only about

04:59:01  18   the cover page and pages 3 and 4, which were used for

04:59:05  19   Mr. McCann, but we were waiting to hear back.

04:59:07  20                       MR. LANIER:  And we limit that tender as well.

04:59:10  21                       THE COURT:  Okay.  So it's the cover page, 3,

04:59:12  22   and 4 only.

04:59:15  23                       MR. FIEBIG:  And, Your Honor, we would also

04:59:16  24   ask that the title be corrected to reflect that it was just

04:59:18  25   Giant Eagle dispensing and not HBC, but we have yet to hear

04:59:22  1    back from the plaintiffs on that score.

04:59:23  2                    MR. LANIER:  That's fine.  We'll make that

04:59:24  3    change, Your Honor.

04:59:25  4                    THE COURT:  All right.  Fine.  Okay.

04:59:32  5        All right.  For Ms. Martin, these are the ones being

04:59:35  6    offered.  All right.  25959, the CV, resume, biography.

04:59:41  7        Any objection?

04:59:45  8                    MR. SWANSON:  No objection.

04:59:45  9                    THE COURT:  25900, order item detail,

04:59:49  10   suspicious order.

04:59:49  11                   MR. SWANSON:  No objection on that.

04:59:51  12                   THE COURT:  19724, suspicious controlled drug

04:59:55  13   orders for month of December 2006.

05:00:03  14                   MR. SWANSON:  No objection.

05:00:06  15                   THE COURT:  All right.  19720, suspicious

05:00:09  16   controlled drug orders for month of December 2011?

05:00:12  17                   MR. SWANSON:  No objection.

05:00:13  18                   THE COURT:  All right.  P-25879, Ms. Martin's

05:00:19  19   handwritten notes.

05:00:20  20                   MR. SWANSON:  No objection.

05:00:21  21                   THE COURT:  09065, DEA suspicious order

05:00:26  22   reporting.

05:00:27  23                   MR. SWANSON:  No objection.  Sorry.

05:00:30  24                   THE COURT:  25660, revised suspicious order

05:00:34  25   document.

05:00:35    1                    MR. SWANSON:  No objection.

05:00:36    2                    THE COURT:  Okay.  23857, e-mail about DEA

05:00:40    3    business reason.

05:00:41    4                    MR. SWANSON:  No objection to that.

05:00:43    5                    THE COURT:  All right.  19827, November 8,

05:00:46    6    2012 DEA meeting at NABP.

05:00:50    7                    MR. SWANSON:  No objection.

05:00:51    8                    THE COURT:  All right.  25761, just says

05:00:54    9    "requirements."

05:00:54   10                    MR. SWANSON:  No objection on that.

05:00:57   11                    THE COURT:  Okay.  Thank you.  25892, DEA at

05:01:00   12    Jupiter Distribution Center.

05:01:02   13                    MR. SWANSON:  No objection on that.

05:01:03   14                    THE COURT:  And 00058, suspicious controlled

05:01:06   15    drug orders with screenshots.

05:01:09   16                    MR. SWANSON:  No objection on that.

05:01:10   17                    THE COURT:  The last one is 08182, high

05:01:13   18    quantity stores.

05:01:16   19                    MR. SWANSON:  No objection on that one.

05:01:18   20                    THE COURT:  Okay.  Any defense documents with

05:01:22   21    either of those two witnesses?

05:01:26   22                    MR. SWANSON:  Not for Walgreens.

05:01:28   23                    THE COURT:  Apparently none.  Okay, fine.  All

05:01:30   24    right, good, then we're current.

05:01:31   25         So you're going to work on the ones for these two

05:01:35   1   witnesses, and we can deal with those tomorrow.

05:01:39   2       All right.  Defendants filed a motion earlier today to

05:01:44   3   preclude testimony from plaintiffs' fact witnesses about

05:01:48   4   prescription opioids being a gateway to other drug use, and

05:01:52   5   they refer to several witnesses.

05:01:53   6       I'll let the plaintiffs respond tomorrow, but to

05:01:57   7   streamline things, are you planning to elicit such testimony

05:02:02   8   with any of these witnesses and, if so, which ones?

05:02:09   9           MR. WEINBERGER:  Your Honor, with respect to

05:02:10  10   both of them, there will be testimony about personal

05:02:15  11   observations that they made with respect to -- so

05:02:21  12   Mr. Villanueva, who is in law enforcement, he will testify

05:02:24  13   about personal observations that he's made about individuals

05:02:27  14   who had the gateway effect from prescription opioids to --

05:02:34  15           THE COURT:  Well, we're saying personal

05:02:37  16   observations.  What -- he's in law enforcement, all right?

05:02:41  17   So --

05:02:42  18           MR. LANIER:  He's basically a top narcotic

05:02:46  19   guy.  He does the investigations.  He's finding the people

05:02:52  20   who are doing it both with illegal drugs as well as drugs

05:02:58  21   that have been diverted out of the pharmaceutical system.

05:03:03  22   So he'll be testifying based on personal knowledge.

05:03:05  23       I don't plan on turning him into a big gateway expert.

05:03:09  24   I haven't designated him as a gateway expert guy.

05:03:12  25           THE COURT:  Well, neither one's an expert, so

05:03:16   1   they can't give expert --

05:03:18   2                 MR. LANIER:  He meets the requirements of

05:03:19   3   having more than common person knowledge on the areas where

05:03:21   4   he's testifying, but he's testifying as a cop.  That's his

05:03:24   5   job.  That's what he does.

05:03:26   6                 MR. SWANSON:  Your Honor, it's Brian Swanson

05:03:29   7   for Walgreens.

05:03:29   8       You can't call it personal experience just to get

05:03:32   9   hearsay testimony in about what unidentified victims and

05:03:35  10   victims' families have said about how they began using

05:03:40  11   opioids.  You can't just say, well, it's personal experience

05:03:42  12   because somebody told me.  And that's the hearsay problem

05:03:45  13   that we have here.

05:03:46  14                 MR. LANIER:  Your Honor, I don't plan on

05:03:48  15   eliciting that testimony.  If something happens overnight

05:03:50  16   and I change my mind, I'll certainly approach the bench

05:03:53  17   before I do so.

05:03:55  18                 THE COURT:  All right.

05:03:56  19                 MR. SWANSON:  And can the witness be

05:03:57  20   instructed not to volunteer as well, Mr. Lanier?

05:03:59  21                 MR. LANIER:  Absolutely.

05:04:00  22                 THE COURT:  All right.  So that will take care

05:04:07  23   of Mr. Villanueva.

05:04:13  24       What about Ms. Caraway, who's on the ADAMHS Board and

05:04:18  25   Ms. Fraser, who is I think also on the ADAMHS Board.

05:04:21  1          MR. LANIER:  Your Honor, they won't be

05:04:22  2  testifying until the end of the week, and I'm frankly not

05:04:24  3  sure at this point in time, so I'd ask for at least tonight

05:04:27  4  to look at it.

05:04:28  5          THE COURT:  All right.

05:04:28  6          MR. LANIER:  But Mr. Villanueva is tomorrow

05:04:31  7  morning first thing.

05:04:32  8          THE COURT:  All right.  Well, again, everyone

05:04:34  9  knows the rule on hearsay, so -- and we -- you know, we've

05:04:38  10  had expert reports and I think we may have another expert

05:04:41  11  report, I don't know, about this.  And so --

05:04:48  12          MR. LANIER:  Yeah, they will not be offering

05:04:49  13  hearsay, Your Honor, at least not through my direct

05:04:52  14  examination.

05:04:53  15          THE COURT:  Okay.

05:04:55  16          MR. SWANSON:  Your Honor, can I just raise one

05:04:58  17  more issue with Mr. Villanueva, which actually may not be an

05:05:02  18  issue.  But in reviewing his deposition, he volunteered a

05:05:06  19  story about an acquaintance that he had who died of an

05:05:11  20  opioid overdose, and we had eliminated in Track One dealing

05:05:16  21  with those sorts of personal stories and anecdotes.

05:05:20  22      I'm not sure if you plan on eliciting that, but if you

05:05:23  23  do, we'd like to be heard on that.

05:05:26  24          THE COURT:  All right.  Well, I think we

05:05:30  25  should -- sadly, every one of us and I'm sure every witness

05:05:34   1    could recount something, but I don't think it's --

05:05:38   2                MR. LANIER:  This may be a little different,

05:05:39   3    Your Honor, because he actually investigated it.  He was the

05:05:42   4    investigating officer on it.

05:05:43   5                THE COURT:  Well, I understand that, but I

05:05:47   6    don't see how that, recounting one drug investigation, how

05:05:53   7    that's relevant to this case, unless it was tied to the

05:06:03   8    prescriptions that came from one of defendants in Lake or

05:06:07   9    Trumbull County.

05:06:10   10               MR. LANIER:  We believe it is, Your Honor.

05:06:11   11               THE COURT:  Well, has that been, you know,

05:06:14   12   identified to -- I mean, if that's the case, it may be

05:06:16   13   relevant.  But I don't know the facts, and I assume the

05:06:22   14   defendants know about it because it was covered in his

05:06:24   15   deposition.

05:06:25   16               MR. SWANSON:  All we know he said in his

05:06:27   17   deposition, "This is very real, I had an acquaintance from

05:06:29   18   high school who was a star football player," I think it was,

05:06:34   19   and he says "he died of an opioid overdose."

05:06:37   20        I've looked at the press and I can't find that in the

05:06:39   21   press, so we don't have the information --

05:06:42   22               THE COURT:  It's a little late if the

05:06:44   23   plaintiffs are now going to try to elicit testimony from

05:06:47   24   this witness about a specific investigation he conducted of

05:06:52   25   one of the defendants' stores in Lake or Trumbull County and

05:06:59  1  tie it to somehow that -- was there a prosecution of one of

05:07:06  2  the pharmacies here?

05:07:07  3          MR. LANIER:  No, Your Honor.  He can't

05:07:08  4  prosecute the pharmacies.  What we've got from this

05:07:11  5  gentleman -- I mean, they took his deposition.  They're

05:07:13  6  entitled to ask him anything that they wanted.  They're

05:07:15  7  entitled -- no, they're obligated under the law to do their

05:07:19  8  discovery.

05:07:19  9      We're not entitled to say, hey, you should have asked

05:07:22  10  him this, that, and the other, because these are other facts

05:07:25  11  he's got.  They took his deposition.  We'll bring him in

05:07:30  12  and --

05:07:30  13          THE COURT:  Well, look, before you elicit any

05:07:32  14  testimony like that, I want to know about it in advance.  If

05:07:38  15  you're bringing out a specific -- we ought to know about it

05:07:41  16  right now, if there was an investigation or prosecution of

05:07:43  17  one of the stores --

05:07:44  18          MR. LANIER:  No, there was not of the store.

05:07:45  19  They can't prosecute the store.  They can only -- they can

05:07:48  20  only prosecute an individual.

05:07:50  21      So, for example, these records --

05:07:52  22          THE COURT:  They can prosecute a pharmacy -- I

05:07:55  23  meant a pharmacist, okay?

05:07:56  24          MR. LANIER:  These records have been produced

05:07:57  25  to the defendants.  They've got the prosecutions, they've

05:07:59  1    got his investigation file.  He's an investigating officer.

05:08:03  2        There was one of the gentlemen that he will testify

05:08:05  3    about tomorrow morning, that he investigated who was

05:08:10  4    diverting drugs, who went to stores from a number of these

05:08:15  5    defendants to buy his drugs.

05:08:16  6              THE COURT:  You say he investigated someone

05:08:18  7    who was diverting drugs.  This is a -- someone who came in

05:08:24  8    with prescriptions?

05:08:26  9              MR. LANIER:  Yes, Your Honor, who went to each

05:08:29  10   of these stores with Overholt's and Franklin.  It's directly

05:08:32  11   dead on to what they've been saying.  We don't have evidence

05:08:34  12   of the whole case, but it's in the files that have been

05:08:37  13   produced.

05:08:37  14             THE COURT:  Was there a prosecution of this

05:08:39  15   person?

05:08:39  16             MR. LANIER:  Yes, there was, Your Honor.

05:08:40  17             THE COURT:  Was he convicted?

05:08:42  18             MR. LANIER:  I don't know.

05:08:44  19             THE COURT:  Well, when was the prosecution --

05:08:46  20   I mean, if it was found not guilty, then I think it's not --

05:08:49  21   then it's more prejudicial than probative.  If he was

05:08:51  22   convicted, well, then maybe it's relevant.

05:08:55  23             MR. LANIER:  It's my understanding the

05:08:58  24   gentleman may have died in the process of all of this.  I'm

05:09:01  25   not sure.

05:09:01  1          THE COURT:  Which gentleman, the --

05:09:04  2          MS. SULLIVAN:  Your Honor, I know what they're

05:09:05  3   trying to do here, and they should come clean about it.

05:09:09  4      At the deposition he was asked about -- he was asked

05:09:10  5   about an incident where somebody stole from Giant Eagle.

05:09:15  6          MR. LANIER:  No, that's not what we're talking

05:09:17  7   about.

05:09:17  8          THE COURT:  Look, look, it's late.  Before you

05:09:20  9   get anywhere near this, I want to know exactly what you're

05:09:27  10  planning to do or where you're going.  I don't want you

05:09:30  11  getting anywhere near it until I know what it is and I've

05:09:32  12  heard from the defendants.

05:09:33  13         MR. LANIER:  I'll show you first thing in the

05:09:35  14  morning or whenever you want, because that's the whole

05:09:37  15  reason we're calling him, is to put him on the stand to ask

05:09:39  16  these questions.

05:09:40  17     There's a gentleman named Douglas Winland who in 2009

05:09:44  18  was under investigation for a criminal situation.  They ran

05:09:49  19  his mugshot and ran his record.  They found the OARRS

05:09:54  20  write-ups from the defendants.  They have found him filling

05:09:58  21  prescriptions with all of the pharmacies from all of these

05:10:02  22  defendants, ultimately far beyond what any person could be

05:10:07  23  using in his situation.  He had doctor shopped, he had

05:10:10  24  pharmacy shopped.  We've got the investigation file.  We've

05:10:14  25  produced it to the defendants.

05:10:16  1    It sounds to me like they hadn't read it.  I can't do

05:10:19  2    anything about that.  And now they'll have the whole night

05:10:21  3    to prepare for the cross, so they get that.

05:10:25  4              THE COURT:  But again, this is all hearsay

05:10:27  5    unless someone was prosecuted.

05:10:30  6              MR. LANIER:  No, Your Honor, he investigated

05:10:31  7    it.  He's got the OARRS report that shows where the

05:10:34  8    prescriptions were filled as part of his investigation.

05:10:38  9    He's --

05:10:38  10             THE COURT:  Well, I wanted -- was this Winland

05:10:42  11   prosecuted?  Was a pharmacist prosecuted?

05:10:44  12             MR. LANIER:  The pharmacists were not

05:10:45  13   prosecuted because you can't prosecute a pharmacist like

05:10:47  14   this.  You can just report them to the Board.

05:10:50  15             MR. SWANSON:  Of course you can prosecute a

05:10:52  16   pharmacist.

05:10:52  17             THE COURT:  You absolutely can prosecute a

05:10:54  18   pharmacist.

05:10:55  19             MR. SWANSON:  And by the way, Your Honor --

05:10:57  20             THE COURT:  Were they reported to the Board

05:10:58  21   and were they disciplined?  I mean, I don't know -- at the

05:11:03  22   moment I'm not letting any of this in.  If I can know

05:11:06  23   specifically what it is and how it's relevant I'll consider

05:11:08  24   it, but at the moment it's out.

05:11:11  25             MR. SWANSON:  Your Honor, just to be clear,

05:11:12  1   this whole discussion started over this instant where he was

05:11:14  2   going to tell about a personal story about a friend of his,

05:11:18  3   and it sort of got segued.

05:11:20  4            MR. LANIER:  I'm not doing the personal story

05:11:22  5   right now.  But as His Honor said, he might know what the

05:11:24  6   fellow was going to say about the whole issue, so I'm being

05:11:27  7   candid in disclosing to the --

05:11:28  8            THE COURT:  At the moment I'm not allowing any

05:11:30  9   of it.

05:11:31  10            MR. LANIER:  Then we have no witness tomorrow

05:11:32  11   with him, but we'll need to put him on to secure an appeal,

05:11:36  12   so we'll put him on for a bill of exceptions.

05:11:39  13            MR. SWANSON:  Your Honor, this is a man who's

05:11:42  14   testified under oath that he has no information about the

05:11:45  15   specific pharmacies doing anything wrong in this case.

05:11:48  16   That's his under oath testimony.

05:11:49  17            MR. LANIER:  He will testify to the

05:11:51  18   prescriptions.  He can't give the testimony that they broke

05:11:55  19   the law.  That would be an illegal opinion on his part.  I'm

05:11:59  20   not offering him as an expert on that.  I'm offering him as

05:12:02  21   a fact witness who did an investigation.  I don't know --

05:12:05  22            THE COURT:  I don't know what he -- hold it,

05:12:07  23   hold it.  I don't know what he investigated, I don't know

05:12:08  24   what the result of the investigation is and how it's

05:12:11  25   relevant here.

05:12:12   1                    MR. LANIER:  Well, it would be like if I had a

05:12:14   2      car wreck case I was trying and I pulled the police officer

05:12:16   3      in and said, Did you investigate who ran the red light?

05:12:19   4      Yes.  Who did you talk to?  What did you do?

05:12:21   5                    THE COURT:  Well, that's hearsay.

05:12:22   6                    MR. LANIER:  Not if he's an investigating

05:12:24   7      officer.

05:12:24   8                    MR. SWANSON:  Sure it is.

05:12:25   9                    THE COURT:  Yeah, it still is.  He can't

05:12:27  10      testify to who ran the red light.

05:12:29  11                    MR. LANIER:  He can absolutely testify about

05:12:31  12      his investigation.  In this situation --

05:12:33  13                    THE COURT:  Well, but only if his

05:12:35  14      investigation is somehow an issue in the case.

05:12:38  15                    MR. LANIER:  Well, Your Honor, it's

05:12:40  16      absolutely -- he can testify to the OARRS report, he pulls

05:12:44  17      the OARRS report --

05:12:45  18                    THE COURT:  I mean, unless you -- it might be

05:12:47  19      relevant if he -- if he did an investigation and he found

05:12:52  20      there was wrongdoing or even grossly negligent behavior at a

05:12:59  21      pharmacist and he then reported it to the pharmacist and

05:13:01  22      then they didn't do anything, it might be relevant for

05:13:06  23      notice.  But I don't know if we have that.

05:13:07  24                    MR. LANIER:  All right.  So here's the

05:13:09  25      situation where this leaves me.

05:13:10  1   The entire defense of this case is you can't show

05:13:12  2   anything these pharmacies did wrong.  I can't call their

05:13:16  3   witnesses --

05:13:16  4              THE COURT:  No, no, that's not their -- their

05:13:19  5   defense is they didn't do anything wrong, not that you can't

05:13:21  6   show it.

05:13:21  7              MR. LANIER:  Well, there's no evidence they

05:13:24  8   did anything wrong, we'll say it that way.  So I've got the

05:13:27  9   evidence, but their witnesses say "We don't recognize that

05:13:29  10  evidence, I don't know it," so I can't put it on through

05:13:32  11  their witnesses.

05:13:32  12     So I've got the investigating officer who goes out and

05:13:35  13  does the investigation and gathers the evidence together and

05:13:37  14  has that evidence, but I can't put it on through him because

05:13:40  15  it's not relevant.

05:13:43  16              THE COURT:  No, hold.

05:13:45  17              MR. LANIER:  And there's evidence of

05:13:46  18  diversion.

05:13:47  19              THE COURT:  Hold it.  Wait a minute.  If you

05:13:50  20  can elicit from this man that he conducted an investigation

05:13:54  21  of one or more of the pharmacists in either of these

05:13:58  22  counties, all right, and then he presented it to them and

05:14:02  23  they didn't do anything, all right, that I think is

05:14:05  24  relevant.

05:14:07  25              MR. LANIER:  Well, that's *ex post facto*.

05:14:10   1    That's after the diversion.  That means they didn't do

05:14:14   2    anything after the diversion.  I've got to show that the

05:14:16   3    diversion happened.  And this gentleman, for example --

05:14:18   4                    THE COURT:  How is he going --

05:14:21   5                    MR. LANIER:  The OARRS report is not hearsay,

05:14:22   6    that's a Government document.  And so he's got the OARRS

05:14:25   7    report, and he runs the OARRS report and he sees that this

05:14:28   8    fellow takes two prescriptions at one time to a Walgreens

05:14:32   9    store for two different OxyContin prescriptions, and they

05:14:34   10   fill them both.  And that's five days after he's gone

05:14:38   11   somewhere else and they filled one.  And five days after

05:14:40   12   he's gone somewhere else and they filled one.  Two days

05:14:42   13   before he goes somewhere else and he fills one.  And he's

05:14:45   14   got the OARRS report, and he's certainly able and

05:14:48   15   competent --

05:14:49   16                   THE COURT:  Well, what did he do -- who was --

05:14:52   17   was anyone charged, was anyone prosecuted?

05:14:54   18                   MR. LANIER:  I have no idea because that's all

05:14:57   19   after the diversion.  I can't put him on to prove that.

05:15:01   20   What I can put him on to do is to prove the diversion that

05:15:05   21   happened, and that's what I've got.  And so -- what I've got

05:15:14   22   is --

05:15:15   23                   THE COURT:  What you actually -- you're

05:15:16   24   putting him on to put in the OARRS report.

05:15:19   25                   MR. LANIER:  I'm putting him on to put in the

05:15:21  1  OARRS report and explain who the stores are, and explain why

05:15:24  2  he pulled it, and explain what the investigation would be,

05:15:26  3  and explain how anybody could have figured this out if they

05:15:29  4  had run the OARRS report or whatever it may have been.  But,

05:15:32  5  yeah, he's got to -- he's there to explain the investigation

05:15:36  6  that says, here's a fellow, here's his mugshot, this is the

05:15:40  7  fellow who went here and did this, and went here and did

05:15:43  8  this, and went here and did this; and it's written up in my

05:15:47  9  investigation, and I personally investigated it and I signed

05:15:49  10  off on it, and this is a Government document that I've

05:15:52  11  signed off on it with, so it's not hearsay.

05:15:54  12          THE COURT:  Well, what's his Government

05:15:56  13  document?

05:15:57  14          MR. LANIER:  His investigation file, which has

05:15:59  15  been produced to the defendants years ago.  Not years ago,

05:16:03  16  some time ago.

05:16:04  17          THE COURT:  What is his position, Trumbull

05:16:09  18  County Sheriff?

05:16:09  19          MR. LANIER:  He's the commander of TAAG, which

05:16:13  20  is the Trumbull Ashtabula Action Group.

05:16:20  21          MR. SWANSON:  Your Honor, these are the kind

05:16:22  22  of allegations that haven't even passed muster to get into

05:16:25  23  evidence.  It's absolutely allegations that are unproven and

05:16:29  24  apparently never charged or even provided notice to the

05:16:31  25  pharmacies.

05:16:31  1        What this witness has said under oath, Your Honor, and

05:16:34  2    I'll read from his deposition:  "Do you have knowledge of

05:16:37  3    any specific wrongful act by CVS or one of the other chain

05:16:41  4    pharmacies in Trumbull County concerning the dispensing of

05:16:44  5    opioids?

05:16:44  6        Answer:  "I do not."

05:16:46  7        So we were entitled I think to rely on that answer

05:16:50  8    before -- you know, having this sprung on us.

05:16:53  9                THE COURT:  That sounds -- I mean --

05:16:56  10                MR. LANIER:  He cannot testify that CVS did

05:16:59  11    something wrong.  He cannot testify that --

05:17:01  12                THE COURT:  Well, that's the whole point of

05:17:03  13    your putting him on, that they did do something wrong.

05:17:05  14                MR. LANIER:  No, Your Honor, my point is not

05:17:07  15    putting him on to allow him to be a legal expert to say they

05:17:11  16    broke the law.  He can't do that.

05:17:12  17                THE COURT:  Well, what are you putting him on

05:17:14  18    to put in?

05:17:14  19                MR. LANIER:  I'm putting him on to show the

05:17:16  20    facts, the underlying facts that would allow the jury to

05:17:18  21    conclude they did something wrong.

05:17:19  22                THE COURT:  Hold it.  What was the under --

05:17:22  23    the only underlying facts I've heard is that there's an

05:17:25  24    OARRS report.

05:17:27  25                MR. LANIER:  No, there's a gentleman named

05:17:29  1   Douglas Winland who was under investigation, and in the

05:17:34  2   process of investigating they went and took statements from

05:17:38  3   doctors, they went and took statements from not just the

05:17:45  4   physicians, they got the OARRS statement, they went and ran

05:17:48  5   the prescriptions and checked, and he's got all of that data

05:17:52  6   in his investigatory --

05:17:54  7                THE COURT:  He's going to come in and say

05:17:57  8   based on this I thought -- I believed the pharmacist did

05:18:00  9   something wrong?

05:18:01  10               MR. LANIER:  He can't say that.

05:18:02  11               MR. WEINBERGER:  No, but he is going to say

05:18:04  12   that this is a gentleman who doctor shopped, and he

05:18:06  13   should --

05:18:07  14               THE COURT:  Well, that the pharmacist should

05:18:11  15   have picked it up, that's the whole point.

05:18:13  16               MR. DELINSKY:  Your Honor, one complexity to

05:18:15  17   this is that in 2009 when this occurred, OARRS wasn't even

05:18:17  18   available to pharmacists.  It was only available to law

05:18:19  19   enforcement.

05:18:21  20               MR. LANIER:  We're in a case, Your Honor,

05:18:22  21   where the other side --

05:18:23  22               THE COURT:  Again, I'm not happy -- you all

05:18:27  23   have known about this for months and months, both sides.  I

05:18:30  24   mean, the plaintiffs were going to plan to do this and the

05:18:34  25   defendants could have -- you know, you could have filed this

05:18:37   1    motion a long time ago.  All right?

05:18:40   2              MR. WEINBERGER:  Your Honor, one of the things

05:18:43   3    that they did extensive discovery on was subpoenaing law

05:18:48   4    enforcement files of both of these counties, because they

05:18:51   5    wanted to see what -- you know, what evidence did we have

05:18:55   6    that diversion was investigated within the counties.

05:19:00   7         Well, this is a perfect example of the investigation

05:19:04   8    of diversion.

05:19:05   9              THE COURT:  Well, if the defendants are saying

05:19:07  10    that no harm, no foul because the counties don't care about

05:19:10  11    it, then the fact that he -- that he's a county employee and

05:19:15  12    he does investigate, that's relevant.  But I haven't

05:19:16  13    heard --

05:19:17  14              MR. WEINBERGER:  That's certainly one of their

05:19:18  15    defenses and has been for a long time.

05:19:21  16              MR. LANIER:  He was charged and sentenced with

05:19:24  17    deception to obtain dangerous drugs.

05:19:26  18              THE COURT:  Wait, who was charged, Winland?

05:19:28  19              MR. LANIER:  Winland was charged and sentenced

05:19:30  20    for deception to obtain dangerous drugs.  And this is in a

05:19:35  21    case where the other side has used repeatedly nothing but

05:19:38  22    hearsay to say that Overholt's and Franklin are the bad

05:19:43  23    pharmacies that are continually diverting and giving out

05:19:46  24    prescriptions with an entire hearsay dissertation from

05:19:49  25    Mr. Joyce, who said that, yeah, we couldn't sell -- we

05:19:51  1    didn't buy the Overholt's Pharmacy because --

05:19:54  2              THE COURT:  And which pharmacies did Winland

05:19:57  3    get his drugs?

05:19:58  4              MR. LANIER:  Overholt's, Franklin, Walgreens,

05:20:03  5    CVS, and Giant Eagle and Walmart.

05:20:08  6         And for them to make the accusation that -- I don't

05:20:10  7    know how they're going to prove that Overholt's was

05:20:15  8    miswriting prescriptions, but surely they've got proof or

05:20:18  9    they wouldn't be saying it all the time.

05:20:20  10        But I've got proof here that they did.

05:20:24  11             THE COURT:  Well, the problem is the man

05:20:30  12   apparently testified he's got no evidence that any of those

05:20:34  13   four defendants did anything wrong in Trumbull County, and

05:20:39  14   your purpose of putting him on is just the opposite, to show

05:20:43  15   that they did something wrong with filling prescriptions of

05:20:49  16   this guy Winland who doctor shopped and that they should

05:20:54  17   have been onto him at some point.

05:20:55  18             MR. LANIER:  No, Your Honor.  Your Honor, I

05:21:00  19   cannot in my mind call a law enforcement witness to say

05:21:02  20   someone else broke the law.  He can't do that.  That calls

05:21:05  21   for a legal conclusion.

05:21:06  22             THE COURT:  Well, did something wrong, had a

05:21:09  23   poor system, had an inadequate system.

05:21:12  24             MR. LANIER:  And once I do that, he's become

05:21:13  25   an expert.

05:21:14    1          THE COURT:  Well, then exactly what --

05:21:15    2          MR. LANIER:  So all he's going to do is

05:21:18    3  testify to his investigation.  I investigated this fellow,

05:21:23    4  we charged him, he got sentenced.  Here's the reason I

05:21:27    5  investigated him, here's what my investigation showed.

05:21:31    6      They've had this.  They cross-examined I think on part

05:21:35    7  of this --

05:21:37    8          MR. SWANSON:  Your Honor, we didn't ask if

05:21:39    9  he'd broken the law.  We asked if he had any knowledge of

05:21:42   10  any specific wrongful act, and I think we're entitled to

05:21:46   11  rely on his testimony.  And there would be no reason for us

05:21:48   12  to file a motion to preclude something when he said "I don't

05:21:52   13  have any knowledge of any wrongful acts."

05:21:55   14          MR. LANIER:  And he will not say that he can

05:21:56   15  testify that it was wrong or right for them to fill the

05:21:58   16  prescriptions.  That's not what he's here to do.

05:22:00   17      All he's going to do is testify to the facts that

05:22:02   18  here's a person who has gone to the pharmacies that they

05:22:05   19  frequently have said repeatedly in this trial are the

05:22:09   20  bad-acting pharmacies in the county.  We've got a fellow who

05:22:11   21  went to them, but he filled just as many prescriptions at

05:22:15   22  Walgreens, if not more, than he did at some of these other

05:22:18   23  pharmacies.

05:22:19   24      And he was very good, and how else do I put that

05:22:22   25  evidence in?

05:22:23   1            THE COURT:  Well, all right, it may be

05:22:24   2    relevant -- that may be relevant that this one person who

05:22:27   3    went to Overholt's and Franklin, who the defendants are

05:22:30   4    going to try and pin all the blame on, also got

05:22:33   5    prescriptions from the other four pharmacies.  I may let

05:22:35   6    that in, okay?

05:22:37   7            MR. LANIER:  Thank you.

05:22:39   8            THE COURT:  And I can --

05:22:40   9            MR. LANIER:  That's why I'm calling him.

05:22:43   10           THE COURT:  I may let that in, okay, that

05:22:45   11   here's someone who was prosecuted, who was charged and he

05:22:49   12   was sentenced, and he shopped at all six; the Overholt's and

05:22:57   13   Franklin, and the other four.

05:23:01   14           MR. SWANSON:  Your Honor, here is the issue.

05:23:02   15   The question isn't whether he can testify about us doing

05:23:04   16   something wrong or breaking the law, he's asking if he had

05:23:06   17   any knowledge.  And we were entitled to have his knowledge

05:23:08   18   if he had it.

05:23:10   19           MR. LANIER:  That you did something wrong.

05:23:12   20           MR. SWANSON:  Did you have any knowledge of

05:23:13   21   wrongful conduct, so if he's going to take the stand and say

05:23:16   22   I don't consider that to be wrongful conduct, then he won't

05:23:19   23   be inconsistent with his testimony perhaps.

05:23:20   24           MR. LANIER:  I don't think he's going to

05:23:21   25   comment on whether it's wrongful or not.  I don't think he's

05:23:24  1    in a position to.

05:23:25  2              THE COURT:  I'm not going to let him comment

05:23:27  3    on that.  It's simply -- it's simply pointed that here's an

05:23:31  4    example of an individual who was investigated, charged,

05:23:37  5    convicted, and he went to all -- you know, he went to the

05:23:40  6    two places that have been identified and essentially

05:23:46  7    conceded as being pill mills, but he also went to the

05:23:49  8    defendants, all right?

05:23:50  9              MR. LANIER:  That's it.  Thank you.

05:23:51  10             THE COURT:  So I think that's -- that limited

05:23:55  11   testimony is relevant.

05:23:57  12             MR. SWANSON:  Was he convicted or did he

05:23:59  13   plead?

05:23:59  14             THE COURT:  Doesn't matter.  He's convicted.

05:24:00  15   If he's sentenced, he's convicted.  He can't be sentenced if

05:24:04  16   you're not convicted, Mr. Swanson.

05:24:06  17             MR. SWANSON:  I understand, but he can plead

05:24:08  18   and be sentenced.

05:24:09  19             THE COURT:  Well, sure, but it doesn't -- it's

05:24:13  20   legally irrelevant whether he went to trial and was

05:24:15  21   convicted or he entered a plea.  The judge accepted his --

05:24:20  22   there was a conviction and sentence, so it's like I have

05:24:22  23   lots of criminal cases, some people go to trial, most plead,

05:24:25  24   but the conviction is they're convicted of X crime and

05:24:30  25   they're sentenced.

05:24:33    1          So I think just that limited fact, but it's going to

05:24:35    2    be very short testimony.

05:24:38    3                MS. SULLIVAN:  Your Honor, Giant Eagle joins

05:24:40    4    in the objection.  It's sandbagging, Your Honor, it's

05:24:43    5    inappropriate.

05:24:45    6                MS. FUMERTON:  Walmart joins in the objections

05:24:47    7    as well.

05:24:48    8                MR. DELINSKY:  The same for CVS.

05:24:49    9                THE COURT:  All right.  Well, you can -- you

05:24:52   10    now know what he's -- you know, it's going to be very

05:24:54   11    limited, and apparently this was all gone into in the

05:24:57   12    deposition.  This guy -- was there testimony about

05:25:01   13    investigation of Douglas Windham or Winland?

05:25:05   14                MS. SULLIVAN:  No, Your Honor, he said

05:25:06   15    unequivocally nobody here did anything wrong.

05:25:10   16                MR. SWANSON:  If he said this one doctor

05:25:11   17    shopped we could have followed up, but what he said in his

05:25:15   18    deposition is that when it came to doctor shopping, he

05:25:17   19    handed it over to the BOP because they had the resources

05:25:20   20    that his group didn't have.  So not only did he say --

05:25:24   21                THE COURT:  Hold it.  There was no

05:25:26   22    testimony -- no question by anyone in his deposition about

05:25:28   23    Douglas Winland?

05:25:31   24                MR. GALLUCCI:  Your Honor, Frank Gallucci for

05:25:33   25    the plaintiffs.

05:25:34   1          There was no questioning specific to the case because

05:25:36   2   of Winland.

05:25:39   3                    THE COURT:  Had the plaintiffs somehow turned

05:25:41   4   over all these documents about Winland?

05:25:44   5                    MR. GALLUCCI:  We have produced all documents

05:25:45   6   in the regular course of discovery that we intend to use

05:25:48   7   with the witness.

05:25:49   8                    MR. SWANSON:  Your Honor, if this witness had

05:25:51   9   answered the question --

05:25:52  10                    THE COURT:  Wait.  When -- so when --

05:25:56  11   Mr. Gallucci, when did you turn over the documents with

05:26:00  12   Winland to the defendants?

05:26:01  13                    MR. GALLUCCI:  One moment, Your Honor.  I can

05:26:03  14   tell you when, but it was produced with the --

05:26:05  15                    MR. WEINBERGER:  Prior to his deposition.

05:26:07  16                    MR. GALLUCCI:  Correct, prior to his

05:26:08  17   deposition, prior to the discovery cutoff.

05:26:12  18                    MR. SWANSON:  But here's the thing, Your

05:26:13  19   Honor --

05:26:14  20                    THE COURT:  Well, have you produced the

05:26:15  21   documents --

05:26:16  22                    MR. WEINBERGER:  It's been on our exhibit

05:26:17  23   list.

05:26:18  24                    THE COURT:  All right.  Well, there --

05:26:19  25                    MR. SWANSON:  But, Your Honor, here's the

05:26:21   1    thing.  If he had answered the question when he was asked

05:26:24   2    "Yes, I am aware of conduct that I consider to be wrongful

05:26:26   3    because I investigated it or prosecuted it" --

05:26:28   4                    MR. WEINBERGER:  He's not testifying that the

05:26:30   5    pharmacies did anything wrong.

05:26:31   6                    THE COURT:  You can cross-examine on him and

05:26:32   7    if he says, well, you know, I have no idea if this was right

05:26:35   8    or wrong, I just know that the guy shopped at all six --

05:26:39   9    these six pharmacies, fine.  That's it, that's all he's --

05:26:43   10   that's all he's saying.

05:26:43   11                   MR. LANIER:  That's it.

05:26:44   12                   THE COURT:  That here's someone who was

05:26:46   13   investigated for doctor shopping, and they want to just put

05:26:49   14   in the fact that people don't just go to Overholt's and

05:26:55   15   Franklin, all right?  They go to all of them.  I think it's

05:27:00   16   relevant.  I think that's relevant, okay, but it's pretty

05:27:07   17   limited, so he's not going to be on very long.

05:27:10   18       So that doesn't sound like very long, so how long is

05:27:13   19   Tasha Polster's testimony.

05:27:15   20                   MR. LANIER:  Tasha Polster will be a good bit

05:27:18   21   of tomorrow, I expect.

05:27:19   22                   THE COURT:  I don't want to just run out of

05:27:21   23   witnesses.

05:27:21   24                   MR. LANIER:  I can't see us running out of

05:27:23   25   witnesses.  If we do, we'll play a deposition.

05:27:25  1          THE COURT:  All right.  Well, because I don't

05:27:27  2   think Officer Villanueva is going to be very long.

05:27:30  3          MR. LANIER:  My hope is to get him on and off

05:27:33  4   the stand within an hour to an hour and 15 minutes for both

05:27:36  5   sides.  He is a fact witness on a number of different

05:27:41  6   aspects of the county as well.

05:27:42  7          THE COURT:  It sounds like he's quick, so

05:27:45  8   Ms. Polster should be available.

05:27:45  9      I don't know her.  She may -- to my knowledge, she's

05:27:47  10   not related, but most of the Polsters are related, so I'm

05:27:52  11   going to --

05:27:56  12          MR. STOFFELMAYR:  We have asked her, but she

05:27:58  13   said not to her knowledge either.

05:28:02  14          THE COURT:  She's a witness.  Whether she's

05:28:04  15   related or not, she has relevant testimony; but I'll just

05:28:07  16   tell the jury if she's related, it's a very distant one, and

05:28:10  17   the two of us aren't acquainted.

05:28:13  18      Okay.  All right.  We'll see everyone tomorrow then.

05:28:16  19                    -  -  -  -  -

05:28:16  20             (Proceedings adjourned at 5:28 p.m.)

21

22

23

24

25

2700

1

2

3

4

5

6                    C E R T I F I C A T E

7

8        I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11           /s/Lance A. Boardman _____October 18, 2021

12           Lance A. Boardman                Date

13           Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25