2701

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION AT CLEVELAND

 3      ------------------------------X
        IN RE:                        :   Case No. 1:17-md-2804
 4                                     :
        NATIONAL PRESCRIPTION          :
 5      OPIATE LITIGATION              :
                                       :   VOLUME 11
 6      CASE TRACK THREE               :   JURY TRIAL
                                       :   (Pages 2701 - 2985)
 7                                     :
                                       :
 8                                     :
                                       :   October 19, 2021
 9      ------------------------------X

10

11

12              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13

14        HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16            SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20      Official Court Reporter:        Lance A. Boardman, RDR, CRR
                                        United States District Court
21                                      801 West Superior Avenue
                                        Court Reporters 7-189
22                                      Cleveland, Ohio 44113
                                        216.357.7019
23

24
        Proceedings recorded by mechanical stenography; transcript
25      produced by computer-aided transcription.
</pre>

```
 1     APPEARANCES:

 2     For the Plaintiffs:         Peter H. Weinberger, Esq.
                                   SPANGENBERG, SHIBLEY & LIBER
 3                                 1001 Lakeside Avenue, Ste. 1700
                                   1900 East Ninth Street
 4                                 Cleveland, Ohio 44114
                                   216-696-3232
 5
                                   W. Mark Lanier, Esq.
 6                                 Rachel Lanier, Esq.
                                   M. Michelle Carreras, Esq.
 7                                 THE LANIER LAW FIRM
                                   6810 FM 1960 West
 8                                 Houston, Texas 77069
                                   813-659-5200
 9
                                   Frank L. Gallucci, III, Esq.
10                                 PLEVIN & GALLUCCI COMPANY, LPA
                                   The Illuminating Building
11                                 Suite 2222
                                   55 Public Square
12                                 Cleveland, Ohio 44113
                                   216-861-0804
13
                                   Salvatore C. Badala, Esq.
14                                 Maria Fleming, Esq.
                                   NAPOLI SHKOLNIK
15                                 360 Lexington Ave., 11th Floor
                                   New York, New York 10017
16                                 212-397-1000

17                                 Laura S. Fitzpatrick, Esq.
                                   SIMMONS HANLY CONROY LLC
18                                 112 Madison Avenue, 7th floor
                                   New York, New York 10016-7416
19                                 212-257-8482
                                   lfitzpatrick@simmonsfirm.com
20

21
       For Walgreen Defendants:   Kaspar J. Stoffelmayr, Esq.
22                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
23                                 Alex Harris, Esq.
                                   Sharon Desh, Esq.
24                                 BARTLIT BECK LLP
                                   54 West Hubbard Street, Ste.300
25                                 Chicago, Illinois 60654
                                   312-494-4400
```

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:          Graeme W. Bush, Esq.
                                   Eric R. Delinsky, Esq.
 3                                 Alexandra W. Miller, Esq.
                                   Paul B. Hynes, Jr., Esq.
 4                                 ZUCKERMAN SPAEDER - WASHINGTON
                                   Suite 1000
 5                                 1800 M Street, NW
                                   Washington, DC 20036
 6                                 202-778-1831

 7    For HBC/Giant Eagle          Diane P. Sullivan, Esq.
      Defendants:                  Chantale Fiebig, Esq.
 8                                 WEIL GOTSHAL & MANGES
                                   Suite 600
 9                                 2001 M Street NW
                                   Washington, DC 20036
10                                 202-682-7200

11    For Walmart Defendants:      John M. Majoras, Esq.
                                   JONES DAY - COLUMBUS
12                                 Suite 600
                                   325 John H. McConnell Blvd.
13                                 Columbus, Ohio 43215
                                   614-281-3835
14
                                   Tara A. Fumerton, Esq.
15                                 Tina M. Tabacchi, Esq.
                                   JONES DAY - CHICAGO
16                                 Suite 3500
                                   77 West Wacker
17                                 Chicago, Illinois 60601
                                   312-782-3939
18

19    ALSO PRESENT:                David Cohen, Special Master

20
                                        - - - - -
21

22

23

24

25
```

1                          Table of Contents

2

3       Witnesses/Events                                   Page

4       TONY VILLANUEVA                                    2721

5             Mr. Lanier - Direct                          2721
              Mr. Swanson - Cross                          2756
6             Ms. Sullivan - Cross                         2777
              Mr. Majoras - Cross                          2782
7             Mr. Lanier - Redirect                        2788
              Ms. Sullivan - Recross                       2810
8             Mr. Lanier - Further Redirect                2821

9       NATASHA POLSTER                                    2825

10            Mr. Lanier - Cross                           2825

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2705

08:50:21   1                    (In open court at 8:50 a.m.)

08:50:27   2                    THE COURT:  All right.  I read the plaintiffs'

08:50:30   3       bench brief regarding Captain Villanueva.  It's pretty much

08:50:36   4       consistent with what I said at the end of the day yesterday.

08:50:40   5       I don't know if the defendants wanted to respond with

08:50:43   6       anything.

08:50:46   7                    MR. SWANSON:  Your Honor, Brian Swanson for

08:50:48   8       Walgreens.

08:50:50   9           We do want to respond.  I understand now that there

08:50:53  10       are two plaintiffs' exhibits that are at issue.

08:50:59  11                    THE COURT:  I only have one, so I'm --

08:51:01  12                    MR. SWANSON:  I can give you I copy of the

08:51:05  13       other if that will be helpful.

08:51:07  14                    THE COURT:  One is the -- I guess the docket

08:51:11  15       for Douglas Winland.

08:51:19  16                    MR. SWANSON:  So the one we spoke about

08:51:20  17       yesterday was Exhibit 4000.  That's the Winland file.

08:51:32  18           And then the one that they added last night is 4603.

08:51:40  19       And that is -- I've lost her name.

08:51:47  20                    THE COURT:  Autumn Renee Ansel.

08:51:50  21                    MR. SWANSON:  Yes, the Ansel file.  So now

08:51:53  22       they've put two --

08:51:54  23                    THE COURT:  I wasn't aware of Ansel.

08:51:56  24                    MR. SWANSON:  Well, Ansel was added as an

08:51:58  25       exhibit last night at 8:30.  That's why no one was aware of

08:52:01    1    it.

08:52:01    2             THE COURT:  We may not be using Ansel.  All

08:52:01    3    right?  It's a little late.

08:52:06    4             MR. LANIER:  So my intention on -- just so

08:52:07    5    that -- reduce the Court's time, my intention on Ansel --

08:52:09    6             THE COURT:  Well, let's start with Winland,

08:52:10    7    all right?

08:52:12    8             MR. LANIER:  Is not to use it unless it comes

08:52:14    9    up through an open door.

08:52:17   10             THE COURT:  I don't know what that even means.

08:52:19   11    I don't know what that means, Mr. Lanier.

08:52:20   12             MR. LANIER:  Well, if they say, well, this is

08:52:22   13    the only one, this is time one time or something like that.

08:52:25   14             THE COURT:  Okay, right.  They open the door

08:52:27   15    and then he can talk about any other investigations.  I

08:52:30   16    think the defendants are smart enough to limit their

08:52:33   17    questions to Winland, okay?  But if they, you know, try and

08:52:36   18    say is this the only investigation you ever did, well, you

08:52:39   19    know, he's obviously going to respond.

08:52:42   20             MR. LANIER:  That's all it was, Judge.

08:52:45   21             MR. MAJORAS:  Okay.  So --

08:52:45   22             MR. SWANSON:  Understood on that.

08:52:46   23        Now, I think we still are entitled to ask about

08:52:49   24    whether he was able to identify any wrongdoing without

08:52:54   25    opening the door to other files.

08:52:55  1          THE COURT:  Sure, right.  Then I think he --

08:52:59  2   well, there was wrongdoing.  Obviously Winland was convicted

08:53:03  3   of some improper use of --

08:53:11  4          MR. SWANSON:  Yeah, deception to obtain a

08:53:15  5   dangerous substance, so he was out there tricking doctors.

08:53:17  6          THE COURT:  All right.  He was convicted of

08:53:19  7   lying to get prescription opioids.

08:53:22  8          MR. SWANSON:  Correct.

08:53:22  9          THE COURT:  I don't -- you know, I don't think

08:53:24  10  the captain is in a position to say which doctors, if any,

08:53:31  11  had been proper prescriptions or which pharmacies filled

08:53:37  12  them or which knowledge any of the pharmacies had.

08:53:39  13  Mr. Lanier represented that he's not going to say that.

08:53:42  14     Really the purpose of this is to point out that the

08:53:48  15  problem in Trumbull County wasn't limited to Overholt's and

08:53:52  16  Franklin --

08:53:52  17          MR. SWANSON:  Yeah, and I guess --

08:53:53  18          THE COURT:  -- and that's why it's coming in.

08:53:56  19          MR. SWANSON:  I guess the point I'm making,

08:53:57  20  Your Honor, is just by virtue of putting a captain up there

08:54:00  21  and testifying about fills, there's going to be the

08:54:06  22  impression that we've done something wrong, and I want to

08:54:08  23  get him on the record saying he's not saying we've done

08:54:11  24  something wrong.

08:54:11  25          THE COURT:  That's fine.  You can

08:54:12   1    cross-examine him, absolutely.

08:54:14   2                MR. SWANSON:  Yeah.  Okay.  Now, I will put up

08:54:17   3    our objection again that we've tried and litigated this

08:54:23   4    entire case being on the plaintiffs' theory that they're

08:54:25   5    going to rely on aggregate proof and red flags.  And we've

08:54:28   6    asked them again and again and again to tell us which

08:54:31   7    prescriptions we shouldn't have filled, included in

08:54:34   8    interrogatory responses.  And all they've ever told us is

08:54:38   9    that they will rely on their red flag analysis.

08:54:41   10       So now we have a change in their theory in the middle

08:54:44   11   of trial that we're trying to defend on basically an

08:54:47   12   overnight disclosure, and we think it's unfair, and we think

08:54:50   13   they should be held to the statements they've made to the

08:54:53   14   Court and to us, that they are relying on a red flag

08:54:56   15   analysis and not individual prescriptions that they say we

08:54:59   16   shouldn't have filled, which is what they're trying to do

08:55:02   17   this morning.

08:55:02   18                THE COURT:  There isn't going to be any

08:55:04   19   testimony from Captain Villanueva or from, to my knowledge,

08:55:10   20   any other plaintiff that is going to identify a specific

08:55:13   21   prescription that was wrongfully filled by any of the

08:55:16   22   defendants.  Okay?

08:55:18   23       There hasn't been testimony yet, and I -- this witness

08:55:21   24   isn't going to advance any.  He's simply there to rebut the

08:55:28   25   inference or suggestion that the problem in Trumbull County

08:55:31   1   was exclusively these two pill mills, Franklin Pharmacy and

08:55:39   2   Overholt's Pharmacy.  That's it.

08:55:41   3            MS. SULLIVAN:  But, Your Honor -- Diane

08:55:42   4   Sullivan for Giant Eagle.

08:55:44   5       But that's exactly right, Your Honor.  You said the

08:55:46   6   problem.  And we have Interrogatory Number 25 where we asked

08:55:48   7   the plaintiff lawyers pointblank, "Identify each

08:55:51   8   prescription which you contend supports your claims in this

08:55:54   9   case."  And they did not identify any.  They certainly

08:55:56  10   didn't identify these.

08:55:57  11       And then Mr. Villanueva --

08:56:01  12            THE COURT:  All right.  As I said, I've ruled

08:56:03  13   on this, okay?  This witness is not identifying specific

08:56:07  14   prescriptions.  There's been a lot of testimony about

08:56:11  15   Overholt's and Franklin, and clearly the defendants are

08:56:13  16   pointing the fingers there, and I'd do the same thing if I

08:56:16  17   were the defendants.  And witnesses have identify those two

08:56:21  18   pharmacies as pill mills.

08:56:22  19            MS. SULLIVAN:  Your Honor, just -- they have a

08:56:23  20   list of prescriptions that I'm assuming they want to get in

08:56:26  21   through Mr. Villanueva, specific prescriptions.

08:56:29  22            THE COURT:  I'm not aware of any specific --

08:56:31  23            MS. SULLIVAN:  It's on their exhibit that they

08:56:33  24   intend to use, Your Honor.

08:56:34  25            THE COURT:  Where is this?  It's not coming

08:56:37  1    in.

08:56:38  2              MS. SULLIVAN:  It's Exhibit Number --

08:56:42  3    Plaintiff Exhibit Number 04600.

08:56:45  4              THE COURT:  Well, I don't have it.  The only

08:56:46  5    exhibit I saw is the docket sheet essentially for Winland

08:56:50  6    which doesn't list any prescriptions.

08:56:52  7              MR. SWANSON:  Your Honor, it's tab 9 in the

08:56:54  8    folder that I gave you if you want to see it.

08:56:56  9              THE COURT:  Well, I had -- I'm not letting it

08:56:57  10   in.

08:56:57  11             MR. SWANSON:  Okay.

08:56:58  12             THE COURT:  All right?  Mr. Lanier hasn't said

08:56:59  13   anything about it, and I --

08:57:02  14             MR. WEINBERGER:  Your Honor, in the TAG report

08:57:10  15   from Mr. Villanueva, Captain Villanueva, there's the OARRS

08:57:13  16   report.

08:57:13  17             THE COURT:  Well, I don't think that's -- if

08:57:16  18   it's listing specific prescriptions, which --

08:57:20  19             MR. WEINBERGER:  Well, the OARRS report -- he

08:57:22  20   ran an OARRS report.  That's P-04600 starting at page 32.

08:57:36  21   32 to --

08:57:38  22             THE COURT:  I'm not admitting any of these

08:57:40  23   documents.  We're not focusing on any prescriptions.

08:57:46  24             MS. SULLIVAN:  And, Your Honor, do I

08:57:47  25   understand your ruling, there won't be any testimony about

08:57:49   1    specific prescriptions?

08:57:50   2              THE COURT:  Correct, there won't be testimony

08:57:51   3    about specific prescriptions.

08:57:53   4              MS. SULLIVAN:  Thank you.

08:57:55   5              MR. WEINBERGER:  Your Honor, the only thing

08:57:57   6    that this OARRS report reflects is prescriptions filled at

08:58:03   7    what pharmacies.  There are -- he also retrieved copy --

08:58:08   8              THE COURT:  Well --

08:58:08   9              MR. WEINBERGER:  May I just --

08:58:10  10              THE COURT:  I'm allowing the witness to

08:58:11  11    testify that there were prescriptions filled by Winland at

08:58:17  12    Overholt's, Franklin, and all four of the defendants.  I'm

08:58:20  13    not going to have him identify specific prescriptions.

08:58:23  14              MR. WEINBERGER:  Right, but --

08:58:24  15              THE COURT:  If the defendants cross-examine

08:58:26  16    him and press him, you know, he can give all the specifics

08:58:29  17    he wants.

08:58:29  18              MR. WEINBERGER:  And it reflects at which

08:58:31  19    specific locations, which Walgreens stores, for example,

08:58:35  20    they were filled at.

08:58:37  21         And in the course of his investigation, after running

08:58:42  22    this OARRS report, which is a Government document within

08:58:49  23    this exhibit, and therefore admissible under 8038, he then

08:58:55  24    asks the pharmacies for the underlying scripts.

08:58:59  25         Now, he did not in any way investigate those

prescriptions. We're not going to have him testify as to whether or not the prescriptions were proper or not. And we're probably unlikely to even show any of those prescriptions, you know, to the jury.

So the importance of this testimony is that he got a tip about a person who was potentially diverting, and he ran an OARRS report, which is a Government document. And from that OARRS report he was able to tell what were the list of scripts that were filled and where were they filled.

And that's really what we're trying to put in --

THE COURT: Well, I will allow the testimony, but I'm not going to allow the document unless they press him on it, all right?

I'm going to allow him to testify that he ran the OARRS report, he identified that this guy Winland, who was a criminal, filled prescriptions in Trumbull County, not just at Franklin and Overholt's but at all of the four defendants. If he wants to identify the particular stores, that's fine, but that's it. I'm not going to have him identify specific prescriptions.

MS. SULLIVAN: Your Honor, here's the issue for Giant Eagle. He never got a -- an opioid prescription, but he did get a muscle relaxer, so there's no way -- if you're going to let him testify that he filled prescriptions --

09:00:25    1                    THE COURT:  Well, then he's going to have to

09:00:27    2    say that.  If he identifies Giant Eagle, he's going to have

09:00:29    3    to say it wasn't an opioid, it was a muscle relaxer.

09:00:32    4                    MS. SULLIVAN:  Thank you, Your Honor.

09:00:36    5                    MR. MAJORAS:  Walmart has the same issue, Your

09:00:37    6    Honor.

09:00:38    7                    THE COURT:  If he's going to say that

09:00:39    8    prescriptions were filled, he's got to say whether they were

09:00:42    9    opioids or muscle relaxers, all right, or else I'm not going

09:00:47   10    to let it in.

09:00:48   11                    MR. WEINBERGER:  Your Honor, I understand your

09:00:51   12    inclination is not to allow the OARRS report, which is

09:00:58   13    embedded within this document, which he utilized in order to

09:01:03   14    do this investigation.

09:01:06   15           Respectfully, I think the OARRS report is highly

09:01:09   16    relevant to the case.  It was run at a time when any of the

09:01:15   17    pharmacies in 2009 or '10, despite Mr. Delinsky's statement

09:01:22   18    yesterday, which I think he will correct on the record this

09:01:25   19    morning, as of 2009 and 2010 any of these pharmacies could

09:01:31   20    have run an OARRS report which would have revealed exactly

09:01:35   21    what it is that Captain Villanueva discovered.

09:01:40   22           Now, we're not going to have him testify that they

09:01:44   23    should have run an OARRS report or anything like that, but

09:01:47   24    it is highly relevant to their conduct that --

09:01:50   25                    THE COURT:  Well, Mr. Weinberger, you can make

09:01:51　1　that -- that's for you to argue in closing argument, okay?

09:01:55　2　The officer can testify what he did.

09:01:58　3　　　　　　　MR. WEINBERGER:  Right.

09:01:58　4　　　　　　　THE COURT:  Well, if he did it, any of the

09:02:00　5　pharmacies could have.

09:02:01　6　　　　　　　MR. WEINBERGER:  Right, but that's why this

09:02:02　7　Government document under 8038 is critical to this part of

09:02:09　8　this case and why I believe, respectfully, that the Court

09:02:13　9　should allow us to use the document with him and ultimately

09:02:17　10　ask for its admission into evidence.

09:02:21　11　　　　　　　MR. SWANSON:  Your Honor, what Mr. Weinberger

09:02:23　12　said is exactly what we asked for in Interrogatory Number

09:02:26　13　25.  Identify each prescription which you, plaintiffs,

09:02:30　14　contend --

09:02:30　15　　　　　　　THE COURT:  I'm not -- if the parties want to

09:02:34　16　admit a generic OARRS report just so the jury can see what

09:02:37　17　one looks like, I have no problem with that, but I -- but

09:02:41　18　we're not going to admit an OARRS report that points fingers

09:02:45　19　at specific prescriptions that maybe should or shouldn't

09:02:49　20　have been filled.

09:02:50　21　　　　　　　MR. SWANSON:  And we can talk to them and

09:02:51　22　agree on a generic OARRS report, but they're not talking

09:02:54　23　about a generic OARRS report right now.

09:02:56　24　　　　　　　THE COURT:  The officer can testify to what he

09:02:59　25　did and what it showed, that it showed Winland filled

09:03:03    1    prescriptions for opioids at these pharmacies, prescriptions

09:03:07    2    for muscle relaxers at those, okay, fine.

09:03:10    3           MR. SWANSON:  Thank you, Your Honor.

09:03:11    4           THE COURT:  And then you can argue that, well,

09:03:12    5    if Winland did it, you know, any of the pharmacies could

09:03:16    6    have and should have done it.  But that's for argument.  You

09:03:20    7    don't need the report to show that, it's the testimony.

09:03:24    8           MR. SWANSON:  Your Honor, thank you, and I

09:03:26    9    understand the ruling.

09:03:26   10        We have one other very small issue on the

09:03:30   11    demonstratives that plaintiffs disclosed for Captain

09:03:33   12    Villanueva today.  What we've -- we've objected to one of

09:03:37   13    them.  It's a collection of pictures of Mr. Villanueva

09:03:40   14    visiting preschool students and apparently giving talks or

09:03:45   15    something.  It's the sort of thing that shouldn't be coming

09:03:48   16    in.  It's meant to elevate him.

09:03:50   17        And as Your Honor knows, even through the beginning

09:03:53   18    instructions, there's a concern that with police officers,

09:03:57   19    they're already elevated in the minds of the jurors, and so

09:04:01   20    they have to be careful to know that their testimony is

09:04:04   21    entitled to no greater weight than anyone else.

09:04:06   22        To now put in pictures of Captain Villanueva at a

09:04:09   23    preschool where presumably he's not giving a talk on

09:04:15   24    opioids, it just paints him in a better light.  Which, you

09:04:19   25    know, great that he does it, but I don't think it's for the

09:04:21  1    jury to --

09:04:22  2              THE COURT:  All right.  He can testify -- I

09:04:24  3    mean, my recollection is that we had a -- I can't remember

09:04:31  4    which witness we had yesterday, and the defense brought out

09:04:35  5    on cross-examination that he gives talks and speeches and

09:04:38  6    other stuff in the community.

09:04:39  7              MR. WEINBERGER:  That was Mr. Joyce.

09:04:41  8              THE COURT:  All right.  So we don't need the

09:04:46  9    pictures of the captain with the children, but he can

09:04:48  10   testify to what he does.

09:04:50  11             MR. WEINBERGER:  I'm sorry, Your Honor, it was

09:04:53  12   Mr. Nelson.  He testified at length on direct yesterday

09:04:57  13   about all the community work that he did.

09:04:58  14             THE COURT:  I'll allow some reasonable

09:05:00  15   questions on what the captain does in the community, but I

09:05:02  16   don't think we need pictures of children.

09:05:05  17             MR. SWANSON:  Thank you, Your Honor.

09:05:07  18             MR. LANIER:  Your Honor, in terms of making

09:05:09  19   sure I've got an appellate record because we'll argue that

09:05:12  20   the police report and -- investigative report comes in under

09:05:18  21   the *Jones* case which reversed a lower court for excluding

09:05:21  22   one, do I need, in your mind, to question the witness on it

09:05:24  23   or will it be sufficient for appellate purposes that we --

09:05:27  24             THE COURT:  Well, I'm allowing the report in

09:05:29  25   Winland.  What I'm not allowing is the OARRS report.

09:05:34  1              MR. LANIER:  That is part of his investigatory

09:05:36  2    report, Your Honor.  It's pages 32 through --

09:05:39  3              THE COURT:  Well, I'm not allowing the OARRS

09:05:40  4    report because it allows specific prescriptions, and I don't

09:05:44  5    think we -- it's not necessary.

09:05:46  6         Again, if you want to -- if the parties want to put in

09:05:50  7    a generic OARRS report so the jury can see what it shows, I

09:05:56  8    have no problem with that.

09:05:57  9              MR. WEINBERGER:  Your Honor, one -- if you

09:05:58  10   look at page -- perhaps we can come to a middle ground here.

09:06:04  11        If you look at page 35, which is the fourth page of

09:06:09  12   the OARRS report --

09:06:10  13             THE COURT:  What exhibit is this?

09:06:11  14             MR. WEINBERGER:  This is 4600, Your Honor.

09:06:13  15   Sorry.

09:06:14  16             THE COURT:  Can someone just give me the -- I

09:06:15  17   don't know what this is or --

09:06:18  18             MR. SWANSON:  It's in Tab 9 of that, Your

09:06:20  19   Honor.

09:06:30  20             MR. WEINBERGER:  Your Honor, I'm looking at

09:06:31  21   page 35.  If you let me know when you're there.  P-4600,

09:06:41  22   page 35.

09:06:50  23             THE COURT:  All right.

09:06:52  24             MR. WEINBERGER:  All right.  This is the

09:06:53  25   fourth page of the OARRS report.  It's a four-page report.

09:06:56  1    It's page 4 of 4.

09:06:57  2         On this page, the OARRS report lists the pharmacies

09:07:02  3    that dispense the prescriptions but does not list the actual

09:07:07  4    prescriptions that are on the first three pages.  So if we

09:07:09  5    could -- if we could utilize this page of this document with

09:07:15  6    this witness and seek admission of it, I think that would

09:07:24  7    cover the issues that --

09:07:27  8              THE COURT:  Well, if you do this,

09:07:28  9    Mr. Weinberger, you're going to have to -- he's going to

09:07:31  10   have to say pharmacies that dispense prescriptions listed.

09:07:37  11   If you're going to admit this, he's going to have to say for

09:07:40  12   each one of these, you know, was it an opioid, was it a

09:07:45  13   muscle relaxer, was it a, you know -- a nothing.

09:07:51  14             MR. WEINBERGER:  Actually, we -- I mean, we

09:07:52  15   could probably enter into a stipulation with the defendants

09:07:57  16   based upon the lists of scripts on the first three pages.

09:08:03  17   We can -- I think we can stipulate as to which were visits

09:08:08  18   where scripts for opioids were dispensed.  And with respect

09:08:17  19   to the other visits, if they didn't include opioids, you

09:08:21  20   know, was it a muscle relaxant, was it a benzodiazepine.

09:08:27  21             THE COURT:  Well, it might be simpler to

09:08:33  22   just -- we're admitting this one page, all right?  And if he

09:08:35  23   wants to go down that list, pharmacies that dispense

09:08:38  24   prescriptions listed, he can say, all right, you know, the

09:08:41  25   first one is a Niles CVS.  And if it's -- he can say it's an

09:08:48  1   opioid, it's a muscle relaxer, it's a Benzo, or it's, you

09:08:55  2   know -- a noncontrolled substance and just irrelevant, all

09:08:58  3   right?  Then just say that.  Just list for each one and then

09:09:00  4   that's it.

09:09:02  5            MR. SWANSON:  And just so our objection is

09:09:04  6   preserved, Your Honor, this is what we asked them to

09:09:06  7   identify in Interrogatory 25.  They said red flags and

09:09:09  8   that's it.

09:09:11  9            THE COURT:  Well, I'm going to allow that

09:09:13  10  limited testimony, and he's going to say he doesn't -- he's

09:09:16  11  not saying, you know, you should confirm that on direct,

09:09:18  12  he's not saying any of them were illegal or unlawful, it's

09:09:22  13  just coming in to show that here's a guy who was convicted

09:09:26  14  and he was going to literally every pharmacy he could in

09:09:33  15  Trumbull County, period.

09:09:35  16            MR. LANIER:  And for the record, Your Honor,

09:09:36  17  to make sure that it's clear in the light of the arguments

09:09:38  18  being set forward by defense, it was the plaintiffs'

09:09:43  19  intention in this case to try this on mass numbers of pills,

09:09:46  20  and that's what we understood was the direction from the

09:09:50  21  Court.  And then the defendants began defending this case

09:09:53  22  based upon individual prescriptions, to wit, they played

09:09:57  23  yesterday deposition testimony where they elicited, this

09:10:02  24  testimony, have the plaintiffs shown one prescription that

09:10:05  25  shouldn't have been filled in questioning the Giant Eagle

09:10:10    1    witness.

09:10:10    2        So they're defending this case on the basis of

09:10:12    3    individual prescriptions.

09:10:13    4        I've got in a rebuttal sense to deal with that and

09:10:18    5    so --

09:10:18    6            THE COURT:  Candidly, I don't know why you

09:10:20    7    didn't object to that.  I probably would have, you know,

09:10:23    8    sustained it.  I think it was gratuitous and nothing even to

09:10:28    9    do with the witness.  But whatever.

09:10:30   10        So I'm allowing this limited testimony for the reasons

09:10:34   11    I've said.

09:10:35   12            MR. LANIER:  Thank you, Judge.

09:10:39   13            THE COURT:  All right.  Let's bring in the

09:10:41   14    jury.

09:12:38   15            (Jury present in open court at 9:12 a.m.)

09:12:40   16            THE COURT:  Good morning, ladies and

09:12:41   17    gentlemen.  Please be seated.

09:12:43   18        All right, Mr. Lanier, you may call your next witness,

09:12:47   19    please.

09:12:48   20            MR. LANIER:  Thank you, Your Honor.

09:12:49   21        Good morning.  May it please the Court.

09:12:52   22        May it please you, ladies and gentlemen.

09:12:53   23        Your Honor, our first witness this morning is Captain

09:12:55   24    Tony Villanueva.

09:13:21   25            THE COURT:  Captain, if you can raise your

09:13:23    1    right hand, sir.

09:13:31    2                    (Witness sworn.)

09:13:31    3                    THE COURT:  You may remove your mask while

09:13:33    4    testifying.

09:13:34    5                    THE WITNESS:  Thank you, sir.

09:13:36    6                    MR. WEINBERGER:  Your Honor, I think there's

09:13:37    7    some leftover exhibits that I'm going to remove.

09:13:39    8                    THE COURT:  All right.  Good idea.

09:13:50    9                    MR. LANIER:  Mr. Weinberger, if you'd remove

09:13:53   10    the leftover waters, too.  I don't want him to drink

09:13:56   11    someone's water.

09:14:05   12                    (Off-the-record discussion.)

09:14:17   13                    MR. LANIER:  Ready to roll, Your Honor?

09:14:19   14                    THE COURT:  Yes, now we're set.

09:14:21   15                    MR. LANIER:  All right.  Thank you.

09:14:24   16                         TONY VILLANUEVA

09:14:24   17                            - - - - -

09:14:24   18                      DIRECT EXAMINATION

09:14:24   19    BY MR. LANIER:

09:14:24   20    **Q**    Good morning, Captain Villanueva.  I say that you I

09:14:27   21    rode the elevator up with you this morning so I've already

09:14:30   22    said good morning to you.  But thank you for being here

09:14:32   23    today.

09:14:32   24    **A**    Good morning.

09:14:33   25                    MR. LANIER:  Your Honor, as we're talking, it

09:14:35   1   sounds to me like there's almost a rattle.  Am I the only

09:14:38   2   one hearing that rattle?

09:14:46   3        I don't --

09:14:48   4              THE COURT:  Something's vibrating.

09:14:52   5              MR. LANIER:  I mean, if it's not bothering

09:14:54   6   anybody, I'll just rattle away.

09:14:56   7              THE COURT:  Well, there's an echo or

09:14:59   8   something.

09:15:04   9              MR. LANIER:  Yeah.  It sounds (making a

09:15:14  10   sound), technically speaking.

09:15:16  11              (Off-the-record discussion.)

09:15:25  12              THE COURT:  All right.  We'll do the best we

09:15:27  13   can.

09:15:28  14              MR. LANIER:  Okay.

09:15:29  15   BY MR. LANIER:

09:15:30  16   Q    Captain Villanueva, I want to appreciate you being

09:15:34  17   here.  Introduce yourself for a moment.  Tell the jury who

09:15:37  18   you are.

09:15:37  19   A    I'm Captain Tony Villanueva with the Trumbull County

09:15:42  20   Sheriff's Office, and I'm the project director for the TAG

09:15:47  21   drug task force.

09:15:48  22   Q    All right.  Well, we'll get into that in some more

09:15:50  23   detail, because I have a road map for you.

09:16:00  24              MR. LANIER:  Mr. Pitts, if I could have the

09:16:02  25   Wolfe Vision, please.  Thank you.

09:16:05   1   **Q**     Simple road map, you're not going to be on the stand

09:16:10   2   that long this morning, but I want to talk about three

09:16:12   3   different areas.  I want to talk but personally so the jury

09:16:15   4   gets to know, I want to talk to you about your job, and then

09:16:19   5   I want to talk to you about some of your experiences at

09:16:21   6   work, okay?

09:16:22   7   **A**     Okay.

09:16:22   8   **Q**     Okay.  First of all, Tony Villanueva, the person, you

09:16:29   9   got a wife, you got kids, tell the jury -- well, let's start

09:16:33  10   back.

09:16:34  11        Where did you grow up?

09:16:35  12   **A**     I grew up in Youngstown, Ohio.

09:16:37  13   **Q**     And where did you go to high school?

09:16:40  14   **A**     I went to Poland, Poland High School.  That is just

09:16:47  15   south of Youngstown.

09:16:51  16   **Q**     And what year did you graduate?

09:16:52  17   **A**     I graduated in 2000.

09:16:54  18   **Q**     You ran track?

09:16:55  19   **A**     Yes, I did.

09:16:56  20   **Q**     And your personal record in the 400?

09:16:58  21   **A**     49.8.

09:17:00  22   **Q**     And you couldn't any more do that now than the man in

09:17:03  23   the moon, could you?

09:17:03  24   **A**     Not without a motor.

09:17:09  25   **Q**     What did you do after college -- I mean after high

09:17:12   1   school?

09:17:12   2   **A**   After high school I just went on to work.  I didn't go

09:17:17   3   to college.  I just went into the field as an electrician.

09:17:22   4   I got bored very quickly with being an electrician.  Became

09:17:29   5   a security guard.  Age 22 went into the police academy.

09:17:32   6   **Q**   And when did you get in the police force?

09:17:36   7   **A**   That would have been 2005.  I went to the police

09:17:43   8   academy 2003 and 2004, got my first police job, McDonald

09:17:48   9   Village in 2005.

09:17:53   10   **Q**   You're married?

09:17:54   11   **A**   Yes.

09:17:54   12   **Q**   You were a police officer when you met your wife?

09:17:58   13   **A**   Yes.

09:17:58   14   **Q**   Go ahead and confess to the jury where you were that

09:18:03   15   you were on duty when you met your wife.

09:18:05   16   **A**   I was working midnights at Howland Township, and my

09:18:11   17   wife was the manager at Dunkin' Donuts.

09:18:20   18   **Q**   I was laughing at this with you when you told me this

09:18:22   19   last night.

09:18:23   20   By the way, you and I got to visit for last night for,

09:18:26   21   what, 30 minutes, 45 minutes?

09:18:28   22   **A**   Roughly, yes.

09:18:29   23   **Q**   All right.  And before that, I met you one time for

09:18:34   24   about 45 minutes near where you live?

09:18:37   25   **A**   Yes.

09:18:37  1    **Q**    That was a few months back.

09:18:39  2         So last night you told me, I was teasing you about

09:18:46  3    Dunkin' Donuts, and you had something to say about Christmas

09:18:50  4    ornaments.

09:18:50  5         Tell the jury, please.

09:18:52  6    **A**    So every year Dunkin' Donuts has a new Christmas

09:18:58  7    ornament that comes out, so our Christmas tree is full of

09:19:01  8    them because we get one every year.

09:19:03  9    **Q**    Do they give those free to police officers?

09:19:05  10   **A**    No.

09:19:06  11   **Q**    You and your wife have five children.  Tell the jury

09:19:11  12   about those kids.

09:19:14  13   **A**    Yes.  We have five children.  Our oldest is 10, our

09:19:18  14   next is 8, just turned 8 years old, 7 years old, 4 years

09:19:23  15   old, and my son who is just turned 2 two weeks ago.

09:19:28  16   **Q**    Yeah, your four oldest are daughters.

09:19:31  17   **A**    Yes.

09:19:31  18   **Q**    So you're kind of president of your own sorority?

09:19:34  19   **A**    Yes.

09:19:34  20   **Q**    You have a personal life where you're active in the

09:19:44  21   community and things like that?

09:19:47  22   **A**    Yes.

09:19:49  23   **Q**    I know, for example, you went to your daughters'

09:19:53  24   school and did career day or something.

09:19:55  25        What kinds of things like that do you do in the

09:19:58  1    community?

09:19:58  2    **A**    It was a couple years ago I was a mentor with Warren

09:20:07  3    Inspiring Minds.  It's just an after-school program.

09:20:11  4          Also, I go out and I do drug awareness presentations,

09:20:20  5    anywhere from kindergarten all the way up through high

09:20:26  6    school.  We've changed the curriculum.  When I say "we,"

09:20:30  7    it's just myself and a couple other detectives that just

09:20:34  8    come up with a curriculum for school, something that's

09:20:36  9    suitable for kindergarten all the way up through senior

09:20:42  10   year.

09:20:45  11   **Q**    And you're active at church?

09:20:47  12   **A**    Yes.

09:20:47  13   **Q**    You're active in other community activities as well?

09:20:53  14   **A**    That's correct.

09:20:53  15   **Q**    All right.  Let's set aside then your personal life

09:20:57  16   and let's focus for a little bit on your job.

09:21:00  17         You gave me one of your business cards.  You are

09:21:03  18   Captain Tony Villanueva with the TAG drug task force.  Is

09:21:11  19   that right?

09:21:11  20   **A**    Yes.

09:21:11  21   **Q**    TAG drug task force, what is that?

09:21:20  22   **A**    That is the drug task force for Trumbull County.

09:21:28  23   **Q**    Does the "T" stand for Trumbull?

09:21:33  24   **A**    Yes.

09:21:35  25   **Q**    And how long have you worked for the Trumbull County

09:21:38   1   task force or whatever it was called at the time?

09:21:41   2   **A**    I started in 2010, January 2010.  I worked until

09:21:49   3   roughly 2014, 2015 where I was reassigned.

09:21:59   4        And let me clarify, I was with the Howland Township

09:22:02   5   Police Department assigned to the TAG drug task force.  So

09:22:06   6   roughly 2014, 2015 I was reassigned by Howland Township to

09:22:13   7   the criminal detective division.

09:22:19   8   **Q**    And how long were you with the criminal detective

09:22:22   9   division?

09:22:22  10   **A**    Until May of 2017 where I went over to the sheriff's

09:22:29  11   office.

09:22:29  12   **Q**    And is that where you are now?

09:22:30  13   **A**    That is correct.

09:22:31  14   **Q**    And what do you do at the sheriff's office?

09:22:34  15   **A**    I'm a captain with the Trumbull County Sheriff's

09:22:39  16   Office, and I am currently the project director for the TAG

09:22:43  17   drug task force.

09:22:43  18   **Q**    And so as project director of TAG, what do you do?

09:22:48  19   **A**    Right now I just oversee all the agents within the

09:22:56  20   drug task force.  I am responsible for making sure that the

09:23:00  21   investigations are done at the drug task force.  My job is

09:23:06  22   to make sure that we are properly funded at the drug task

09:23:11  23   force and also to do drug awareness presentations as well.

09:23:15  24   **Q**    Do you carry any certifications?

09:23:20  25   **A**    Yes.  I have my police certification through OPOTA.

09:23:26  1    **Q**     You have a police certification through OPOTA?

09:23:30  2    O-P-O-T-A?

09:23:31  3    **A**     Yes.

09:23:31  4    **Q**     And what was involved in getting your police

09:23:35  5    certification?

09:23:37  6    **A**     That was the police academy.

09:23:41  7    **Q**     So they teach you how to investigate?

09:23:47  8    **A**     Very basic police training.

09:23:49  9    **Q**     All right.  They teach you how to drive real fast?

09:23:52  10   **A**     One day.

09:23:53  11   **Q**     Do you have to do the mace thing where they spray mace

09:23:58  12   in your face?

09:23:58  13   **A**     Yes, we had to do that.

09:23:59  14   **Q**     Did you get any narcotic training, there or in the

09:24:10  15   process of your work?

09:24:11  16   **A**     If we received any narcotic training, it was more

09:24:18  17   basic things that would be on the state exam, maybe some

09:24:25  18   language in the ORC that we had to memorize for the state

09:24:29  19   exam.  But nothing that really trained us in narcotics at

09:24:35  20   the academy.

09:24:36  21   **Q**     You're not a DEA specialist?

09:24:38  22   **A**     I am not.

09:24:39  23   **Q**     You're not a specialist on the regulations or things

09:24:42  24   like that?

09:24:45  25   **A**     No.

09:24:45  1   **Q**    All right.  You also for a while were a commander

09:24:52  2   within the drug task force.

09:24:54  3        What was that about?

09:24:56  4   **A**    So the drug task force has a commander and a project

09:25:02  5   director.  Formerly, the project director was Chief Deputy

09:25:07  6   Joe Dragovich, and I was the commander.  Joe Dragovich will

09:25:14  7   be retiring within a couple months, so we've already made

09:25:17  8   the transition to where there's going to be a -- there's

09:25:20  9   already a commander in place, and I will be the new -- am

09:25:23  10  the new project director.

09:25:26  11  **Q**    You have done undercover work as well.  Tell the jury

09:25:30  12  a little bit about your undercover work, please.

09:25:32  13  **A**    Being a fairly new police officer for

09:25:39  14  Howland Township, I was on midnights.  Not too many people

09:25:43  15  knew who I was because I was originally -- I grew up in

09:25:47  16  Mahoning County my whole life.  So when I was promoted to

09:25:55  17  detective, I was asked if I would be willing to do

09:25:58  18  undercover narcotics, and I said sure, no problem.

09:26:02  19       So my first -- I pretty much jumped right in just

09:26:09  20  weeks after taking the assignment in January 2010.  Was

09:26:16  21  undercover for probably three years.

09:26:20  22       I finished out the last two years at the drug task

09:26:25  23  force, just doing basic narcotic investigations at that

09:26:29  24  point.  It got to the point where people started to

09:26:31  25  recognize me and starting to know who I was, so three years

2730

09:26:35  1   is pretty good -- a pretty good time.

09:26:38  2   **Q**   Did you, like, grow your hair out and look like --

09:26:42  3   different than you do today?

09:26:43  4   **A**   It's always a good idea to change your look.

09:26:51  5   **Q**   All right.  With that basic understanding of your job,

09:26:54  6   I'd like to now zone in at the last stop, which are your

09:27:00  7   experiences.  And with these experiences, I need to ask you

09:27:03  8   some general questions.

09:27:05  9       First of all, has it been your experience that there

09:27:10  10  is an opioid problem within your county?

09:27:14  11  **A**   Absolutely.

09:27:17  12  **Q**   And would you describe for the jury what you mean when

09:27:21  13  you say "absolutely," there's an opioid problem?

09:27:26  14  **A**   We've been investigating overdose deaths.  We've been

09:27:37  15  investigating prescription pill cases.  We've seen -- I've

09:27:46  16  personally seen where drug trends will change not just on a

09:27:52  17  monthly basis but sometimes as a -- a weekly basis as well.

09:28:01  18      Right as we speak, now we're fighting the whole

09:28:04  19  fentanyl issue in Trumbull County, which is, you know, a

09:28:10  20  result of all the overdose deaths we're seeing.

09:28:17  21  **Q**   The opioid problems that you're seeing from your

09:28:19  22  perspective, have they also involved the courts?

09:28:25  23  **A**   Could you repeat that?

09:28:26  24  **Q**   Yes.  Have -- one of the things we have to prove to

09:28:28  25  the jury is the way the opioid epidemic has affected the

09:28:33   1    community.  And so one of the reasons we've got you on the

09:28:35   2    stand is to talk about it from your perspective.

09:28:38   3         And so you've talked about explaining --

09:28:42   4              MR. SWANSON:  Objection to the lead in.

09:28:44   5              THE COURT:  Well, I'll sustain the objection.

09:28:44   6              MR. LANIER:  All right.

09:28:46   7              THE COURT:  If you'd just pose a question,

09:28:48   8    Mr. Lanier.

09:28:50   9    BY MR. LANIER:

09:28:50   10   Q    Sir, my question to you is, have you from your

09:28:52   11   experience seen that this opioid problem has involved also

09:28:57   12   the court system in Trumbull County?

09:29:00   13   A    Yes, it has.

09:29:08   14   Q    Has it affected the way you've had to deal with

09:29:11   15   children in Trumbull County?

09:29:12   16   A    Yes.

09:29:18   17   Q    Has it affected the crime rate in Trumbull County

09:29:21   18   based upon your experience?

09:29:23   19   A    Yes.  Crime and gun violence has been up since.

09:29:34   20   Q    Now, in regards to this, there has been a couple of

09:29:41   21   specific things I'd like to talk to you about.  One is an

09:29:49   22   investigation you did into a fellow named Doug Winland.

09:29:54   23        Do you recall that name?

09:29:58   24   A    Yes, I do.

09:29:58   25   Q    And we've marked a document Plaintiffs' Exhibit 4600.

09:30:08  1       Did you have an investigation report that you did as

09:30:10  2  part of the Doug Winland investigation?

09:30:14  3  **A**    Yes, I did.

09:30:14  4  **Q**    And in that report, I've got a basic timeline here

09:30:20  5  that I'll be using some during the trial.

09:30:23  6       But was this investigation one you were conducting in

09:30:28  7  early 2010?

09:30:29  8  **A**    Yes.

09:30:29  9  **Q**    And would you briefly tell the jury what you did in

09:30:40  10  your investigation?

09:30:44  11  **A**    So I recognize the name as an individual who was

09:30:54  12  involved with a situation in Howland Township.  The

09:31:02  13  individual shot towards officers as they were responding to

09:31:07  14  a domestic -- or some other type of issue at the residence.

09:31:14  15       The suspect then barricaded himself, and there was a

09:31:18  16  very large police presence.

09:31:20  17       I didn't know about the incident at the time.  I found

09:31:24  18  out about it afterwards because I was with the drug task

09:31:28  19  force at the time.

09:31:31  20       At some point in time, Mercy Health Pain Management

09:31:39  21  reached out to Howland Township detective, I believe it was

09:31:44  22  Detective Alan Sprocket, and let him know that this

09:31:48  23  individual was also seeing multiple doctors, visiting

09:31:54  24  multiple pharmacies, and obtaining the same prescription

09:31:58  25  from different doctors and getting -- or getting them filled

09:32:04   1    at multiple pharmacies.

09:32:10   2         So the detective from Howland Township, because I was

09:32:14   3    on the drug task force, said, well, I'm going to give this

09:32:17   4    to you because this will be, you know, something that the

09:32:20   5    drug task force would investigate.  So I took on the

09:32:27   6    investigation.

09:32:28   7    **Q**    And in that investigation, did you have a chance to

09:32:29   8    run an OARRS report on Mr. Winland?

09:32:37   9    **A**    Yes.  So I believe the original tip that came into

09:32:42   10   Howland Township mentioned OARRS, that they ran an OARRS on

09:32:45   11   the individual.  So I began my investigation, fresh start

09:32:51   12   with my own investigation, and ran my own OARRS report.

09:32:56   13   **Q**    All right.  The jury's heard something about OARRS,

09:32:59   14   but I'd like you to make sure that we're fresh on it.

09:33:01   15        What is an OARRS report?

09:33:06   16   **A**    An OARRS report would be -- I would call it an

09:33:11   17   investigative tool, so if an individual is suspected of what

09:33:17   18   we call doctor shopping or getting multiple prescriptions

09:33:21   19   from multiple doctors, visiting multiple pharmacies, we

09:33:25   20   would run an OARRS report on them.

09:33:28   21        So it's the Ohio Automated Prescription Report System

09:33:33   22   is what it stands for.

09:33:36   23        And to my knowledge, it just has scheduled or mainly

09:33:45   24   abused prescriptions on there.  So whatever a doctor

09:33:51   25   prescribes, it will show what doctor prescribed it, how many

2734

09:33:55  1    days the prescription was for, the quantity of the pills,

09:33:59  2    the type of pills, date it was subscribed, and also the date

09:34:05  3    it was filled and which pharmacy it was filled.

09:34:08  4    **Q**    Okay.  So when you get the Ohio Automated Prescription

09:34:16  5    Reporting System, or OARRS report, are you able to see the

09:34:19  6    doctor who prescribed it?

09:34:22  7    **A**    Yes.

09:34:23  8    **Q**    Or doctors?

09:34:24  9    **A**    Yes.  It would show the doctors on there.

09:34:26  10   **Q**    Are you able to see the dates for the doctors?

09:34:30  11   **A**    The date it was written and the date it was filled.

09:34:38  12   **Q**    Are you able to see the pharmacy that was used?

09:34:45  13   **A**    Yes.  It would have the pharmacy code or pharmacy

09:34:49  14   store number.  It also would give you a list of the

09:34:54  15   pharmacies as well as names and addresses.

09:34:57  16   **Q**    Are you able to see what the drug is?

09:35:00  17   **A**    Yes.

09:35:01  18   **Q**    Not only the name of the drug, are you able to see the

09:35:07  19   dosage?

09:35:09  20   **A**    Yes, it will show the dose.

09:35:10  21   **Q**    So can you see in OARRS if that drug might be an

09:35:17  22   opioid?

09:35:25  23   **A**    That I'm not sure.  It would show drug type.  I know

09:35:33  24   they've made some changes to OARRS.  They had some type of

09:35:37  25   number on the top right side.  I'm not sure if that shows

09:35:41 1    the opioid or not.

09:35:43 2    **Q**    But when it shows the drug type, will it show things

09:35:47 3    like oxycodone or hydrocodone where you can look to see if

09:35:51 4    that drug is an opioid?

09:35:52 5    **A**    Yes, it would have the drug name.

09:35:58 6    **Q**    And will it also enable you then to look to see if

09:36:00 7    that drug is a muscle relaxant that would be listed?

09:36:02 8    **A**    Yes.

09:36:16 9    **Q**    You can look and see if that drug is a controlled

09:36:24 10   substance or a listed drug?

09:36:25 11   **A**    Yes.  Again, it would show the name of the drug, and

09:36:35 12   oftentimes we're not too familiar with the names of the

09:36:37 13   drugs, so we would follow it up with just looking up the

09:36:43 14   name of the drug and see what type of drug it is, whether

09:36:47 15   it's an opiate or muscle relaxer.

09:36:51 16   **Q**    Does the OARRS investigative tool give you some

09:36:58 17   summary pages also?  In other words, does it give you a

09:37:08 18   list, for example, at the end of which pharmacies were used?

09:37:14 19   **A**    Yes.

09:37:14 20   **Q**    Which doctors had written which prescriptions when you

09:37:22 21   total them up?

09:37:22 22   **A**    Yes.

09:37:24 23   **Q**    So did you run this OARRS report --

09:37:28 24        By the way, do you have any reason to think that your

09:37:31 25   OARRS report you could run is any different than the OARRS

09:37:35  1    report that might be run by a doctor or by a pharmacist?

09:37:40  2    **A**    It would have the same information, whether it's

09:37:45  3    the -- if they have more information on there end or not, I

09:37:49  4    do not know.  But the meat and potatoes of it, it's going to

09:37:54  5    be the same.

09:37:54  6    **Q**    All right.  So in that regard, did you run an OARRS

09:37:59  7    report to get the information about Mr. Winland?

09:38:09  8    **A**    Yes, I did.

09:38:10  9    **Q**    And on Plaintiffs' 4600, we've got, on page 35, a

09:38:18  10   summary page from that OARRS report of the pharmacies that

09:38:24  11   dispensed the prescriptions that were listed.

09:38:28  12        Do you see that, sir?

09:38:31  13   **A**    Yes, I do.

09:38:32  14   **Q**    The first being CVS, Store 2486, Niles CVS,

09:38:42  15   Youngstown-Warren Road.

09:38:43  16        Do you know where that is?

09:38:56  17   **A**    Yes, I do.

09:38:56  18   **Q**    And is that in Trumbull County or close by?

09:38:58  19   **A**    Yes, it is.

09:38:59  20   **Q**    And then from CVS Store 4606, Revco Discount Drug

09:39:07  21   Centers, doing business as CVS Pharmacy in Warren, Ohio, do

09:39:15  22   you know where that store is?

09:39:16  23   **A**    Yes.

09:39:19  24   **Q**    And is it in Trumbull County or nearby?

09:39:20  25   **A**    Yes, it is in Trumbull County.

2737

| | | |
|---|---|---|
| 09:39:21 | 1 | **Q**     Then Franklin Pharmacy, the jury's heard a lot about |
| 09:39:26 | 2 | Franklin.  Is that in Trumbull County as well, or was it? |
| 09:39:31 | 3 | **A**     Yes, it is. |
| 09:39:31 | 4 | **Q**     And then Giant Eagle Pharmacy in Warren, Ohio. |
| 09:39:41 | 5 |          Also in Trumbull County? |
| 09:39:42 | 6 | **A**     Yes, it is. |
| 09:39:42 | 7 | **Q**     Overholt's, the jury's heard about Overholt's.  Also |
| 09:39:49 | 8 | in Warren. |
| 09:39:51 | 9 |          Is that or was that also in Trumbull County? |
| 09:39:54 | 10 | **A**     Yes, it is. |
| 09:39:54 | 11 | **Q**     Four Rite Aid stores. |
| 09:40:05 | 12 |          Troutman.  Is Troutman in Niles, Ohio?  Do you know |
| 09:40:09 | 13 | that? |
| 09:40:10 | 14 | **A**     Yes. |
| 09:40:10 | 15 | **Q**     Also in Trumbull County or nearby? |
| 09:40:17 | 16 | **A**     Yes, it is. |
| 09:40:18 | 17 | **Q**     And then Walgreens, 10569, Youngstown-Warren Road, |
| 09:40:26 | 18 | Niles, Ohio. |
| 09:40:27 | 19 |          Also Trumbull County? |
| 09:40:28 | 20 | **A**     Yes, it is. |
| 09:40:29 | 21 | **Q**     Walgreens 6675, Youngstown, Ohio. |
| 09:40:36 | 22 |          Trumbull County or nearby? |
| 09:40:38 | 23 | **A**     Trumbull County. |
| 09:40:39 | 24 | **Q**     Walgreens on Youngstown-Warren Road again, but this is |
| 09:40:48 | 25 | Store 6888. |

09:40:50  1      Also Trumbull County?

09:40:53  2  **A**    Yes, it is.

09:40:53  3  **Q**    And then Walmart in Cortland, Ohio.

09:41:02  4      Trumbull County or nearby?

09:41:03  5  **A**    Trumbull County.

09:41:04  6  **Q**    Okay.  Now, this does not tell us on this summary page

09:41:13  7  whether these drugs were -- are you familiar with the term

09:41:15  8  "the trinity" of drugs related to opioids?

09:41:21  9  **A**    I've heard of it.

09:41:21  10  **Q**    This sheet doesn't tell us if it's an opiate or if

09:41:28  11  it's a muscle relaxant or if it's a -- what's my third

09:41:38  12  category?

09:41:38  13          UNIDENTIFIED VOICE:  Benzodiazapine.

09:41:42  14          MR. LANIER:  Thank you, benzodiazapine.

09:41:45  15  **Q**    You don't get that from this sheet, you get that from

09:41:48  16  the earlier sheets, true?

09:41:49  17  **A**    Yes, it will show the type of drugs on the earlier

09:41:52  18  sheets.

09:41:56  19  **Q**    Now, in fairness, you're not in a position to say that

09:41:59  20  any of these prescriptions should or should not have been

09:42:02  21  filled.  That's not your job and that's not what you've

09:42:04  22  done, right?

09:42:05  23  **A**    No, it's not.

09:42:05  24  **Q**    But you did do an investigation into this gentleman.

09:42:10  25  And as a result, you were able to see these prescriptions

09:42:14  1    that were filled, right?

09:42:15  2    A      Yes.

09:42:15  3    Q      Once you did that, was a decision made whether or not

09:42:20  4    to prosecute Mr. Winland?

09:42:23  5    A      Once we get the OARRS report or once I receive the

09:42:29  6    OARRS report, usually myself and another person will go

09:42:34  7    through the OARRS report and look for multiple doctors,

09:42:41  8    multiple prescriptions, and multiple pharmacies.  And we

09:42:47  9    would go back roughly three months from the time that we

09:42:50  10   were looking at it.

09:42:55  11          And we would circle one and see if, for example, if

09:42:58  12   there was a 30-day supply, if he received another

09:43:02  13   prescription within that 30-day supply, and then we will

09:43:05  14   mark that as our first count, our first problem, so to

09:43:13  15   speak.

09:43:13  16   Q      If he filled multiple prescriptions at one pharmacy at

09:43:19  17   the same time, would that be a problem you would circle?

09:43:24  18   A      Yes, if it was from multiple doctors, yes.

09:43:31  19   Q      And by the same token, if we look at the top of page

09:43:36  20   35 from Plaintiffs' 4600, it shows you a synopsis or summary

09:43:42  21   of the various doctors who had written these prescriptions,

09:43:44  22   right?

09:43:45  23   A      Yes, it does.

09:43:47  24   Q      And so from that you're able to see, for example,

09:43:51  25   Dr. Zachary Veres or Dr. Jose Torres or a number of other

2740

09:43:55   1   doctors that may have written these, true?

09:44:02   2   A    Yes.

09:44:02   3   Q    Now, when you do this, does this enable you to look

09:44:06   4   for doctor shopping?

09:44:09   5   A    Just looking at this page, no.

09:44:14   6   Q    What do you need to add to it to determine if there

09:44:16   7   was doctor shopping?

09:44:18   8   A    We would need to look at the list of prescriptions,

09:44:24   9   the date they were written, and the date they were filled.

09:44:27  10   Q    And is that also in the earlier pages of the OARRS

09:44:32  11   report?

09:44:32  12   A    Yes, it is.

09:44:32  13   Q    Okay.  Do you look at this and determine whether or

09:44:37  14   not the patient was pharmacy shopping?

09:44:47  15   A    We would not use the term "pharmacy shopping."  The

09:44:51  16   term that we -- when we learned how to do these

09:44:55  17   investigations was "doctor shopping."  That's what the

09:44:59  18   patient was doing, going to multiple doctors.  And we -- I

09:45:06  19   should say I -- I've noticed that in these cases, the

09:45:11  20   patients would not just go to just one pharmacy, because the

09:45:17  21   pharmacy will know this person just came in and filled a

09:45:21  22   script from this doctor, now they have another script from

09:45:24  23   another doctor, so they would go to a different pharmacy.

09:45:29  24   And that's why it's called deception to obtain.

09:45:34  25   Q    And did you -- and you're not in a position to testify

09:45:38   1    about whether or not pharmacies ran and looked on the same

09:45:41   2    data.  You've got no testimony as to whether they did

09:45:43   3    something right or wrong, fair?

09:45:45   4    **A**      That is fair.

09:45:46   5    **Q**      All right.  But ultimately, did you charge

09:45:50   6    Mr. Winland?

09:45:52   7    **A**      Yes, I did.

09:45:53   8    **Q**      And do you remember what he was charged with?

09:46:00   9    **A**      For sure deception to obtain.  Typically, when we did

09:46:03   10   these doctor shopping cases, we would also consult with the

09:46:10   11   prosecutor and add a possession charge on that as well.

09:46:17   12   **Q**      Okay.  And by the way, when you did your OARRS report,

09:46:21   13   do you recall how far back in time you went to see his

09:46:25   14   behavior?

09:46:26   15   **A**      Typically, when we ran an OARRS report, it would go

09:46:33   16   back as far -- it can go back as far as a year, it can go

09:46:38   17   back two years, depending on how -- when they started

09:46:42   18   getting the prescriptions.

09:46:45   19          When we conducted the investigation, we would only go

09:46:50   20   back three months.  And that's just so we're not adding too

09:46:57   21   many charges.  We can go back a whole year, but we're only

09:47:01   22   going to go back three months.

09:47:03   23   **Q**      Why is that?

09:47:04   24   **A**      We don't want to make the judge mad by stacking

09:47:10   25   charges.

09:47:11   1   **Q**     Don't want to make the judge mad by stacking charges?

09:47:14   2          Does that happen?

09:47:15   3   **A**     It can happen on traffic citations and other things

09:47:19   4   like that.  But I'm -- I like to think of myself as fair.  I

09:47:28   5   just go back three months.

09:47:29   6   **Q**     All right.  The OARRS report that you pulled, I think

09:47:32   7   the evidence will indicate, went from 3/1/09 up through

09:47:48   8   3/10/2010.

09:47:49   9          Does that seem about right?

09:47:50   10  **A**     Yes, that seems about right.

09:47:51   11  **Q**     Okay.  We've pulled out Doug Winland, but is he the

09:48:00   12  only one you did such investigations on?

09:48:04   13  **A**     No, he's not.

09:48:07   14  **Q**     Is he the only one you charged?

09:48:08   15  **A**     No, he is not.

09:48:09   16  **Q**     Is he the only one you saw using multiple doctors and

09:48:15   17  multiple pharmacies?

09:48:17   18  **A**     No, he's not.

09:48:18   19  **Q**     Is he the only one you saw using the pharmacies that

09:48:21   20  are in this case, Walmart, Walgreens, Giant Eagle, and CVS?

09:48:31   21  **A**     No, he is not.

09:48:33   22  **Q**     Okay.  In terms of your experiences then, we've

09:48:40   23  covered some investigations.

09:48:50   24         I'd like to also ask you about a document that is

09:48:56   25  Plaintiffs' Exhibit 4598.  If you'll wait just one second,

2743

09:49:01  1    we'll get you a copy of it and get a copy to counsel.

09:49:05  2    Plaintiffs' 4598.

09:49:31  3         While that's being passed out, without showing you the

09:49:36  4    list, I want to make sure that we're clear on some of these

09:49:41  5    drugs that were being dispensed to Mr. Winland based upon

09:49:46  6    your investigation.

09:49:54  7         Were you able to determine that he was getting drugs

09:50:00  8    including clonazepam?

09:50:08  9    **A**    You said I'm not allowed to look at the --

09:50:12  10   **Q**    Oh.  Well, no, you're allowed to look at it.  I'm just

09:50:16  11   not allowed to show it.

09:50:19  12              MR. LANIER:  Rachel, could you or Maria get

09:50:22  13   him page 32 of Plaintiffs' Exhibit 4600.

09:50:26  14        Thank you, Ms. Fleming.

09:50:38  15              THE WITNESS:  Thank you.

09:50:45  16   **A**    Yes, I see.

09:50:45  17   **Q**    Were you able to confirm Lorazepam?

09:50:55  18   **A**    Yes, I see it on there.

09:50:57  19   **Q**    Were you able to confirm -- uh-oh, hold on.  I may

09:51:07  20   have messed up.

09:51:18  21        The clonazepam that you've just referenced was filled

09:51:20  22   at Rite Aid; is that right?  It's the first one, sir.

09:51:51  23   **A**    Yes, I see it.

09:51:51  24   **Q**    You see?

09:51:52  25   **A**    Yes.

09:51:52  1    **Q**     Were you able to confirm the Lorazepam was filled at

09:51:56  2    CVS?

09:52:02  3                    MR. MAJORAS:  Objection, Your Honor.  This is

09:52:04  4    counter to our discussion.

09:52:09  5                    THE COURT:  Let's go on the headphones.

09:52:11  6                    (At side bar at 9:52 a.m.)

09:52:32  7                    THE COURT:  All right.  I thought I went

09:52:33  8    through this before.  I was going to allow this witness to

09:52:37  9    refer to the one page of the OARRS report which listed a

09:52:41  10   number of pharmacies, and he could identify for any of those

09:52:48  11   whether Winland purchased an opioid, a muscle relaxant, or a

09:52:52  12   Benzo.  And that's what I was going to do.  If this witness

09:52:56  13   can't do that, then, you know, we'll just move on.  And just

09:53:01  14   say he doesn't know what drugs they got at any of the

09:53:04  15   pharmacies.

09:53:07  16                   MS. SULLIVAN:  Your Honor, Diane Sullivan for

09:53:09  17   Giant Eagle.

09:53:09  18       The problem for me with that, Your Honor, it's one

09:53:11  19   prescription at Giant Eagle that wasn't an opioid, and I'd

09:53:13  20   like to talk about that.

09:53:15  21                   THE COURT:  Well, he can -- fine, you can go

09:53:17  22   into it, but I just wanted him -- there was one page on that

09:53:21  23   OARRS report, the one you referred to before, and I said I

09:53:24  24   would allow this witness to testify to what kind of drug was

09:53:30  25   filled to Winland at those stores.

09:53:36    1              MR. WEINBERGER:  I think that's what we're

09:53:37    2    trying to do, Your Honor.

09:53:38    3              THE COURT:  Well, I want to tie it to that

09:53:39    4    exhibit because that's the one page I'm allowing and then

09:53:43    5    the testimony will make sense.

09:53:44    6              MR. WEINBERGER:  Well, we are tying it to that

09:53:46    7    one page of the exhibit, but in order for him to tell the

09:53:52    8    jury what the drug was that was filled at the store that's

09:53:57    9    summarized on page 4, he has to look at page 1, 2, and 3.

09:54:03   10        Now, while --

09:54:04   11              THE COURT:  He can do that, but I want him to

09:54:06   12    focus on the one page that's going to the jury, which is

09:54:09   13    page 4.

09:54:10   14              MR. WEINBERGER:  Okay.

09:54:11   15              THE COURT:  That listed a bunch of pharmacies,

09:54:13   16    and he can testify to whether there was an opioid, a Benzo,

09:54:16   17    a muscle relaxer at any of those, or if it was a -- you

09:54:21   18    know, a -- a diet -- you know, a blood pressure medicine or

09:54:25   19    something that has nothing to do with this case so everyone

09:54:28   20    knows it.

09:54:29   21              MR. LANIER:  All right, Judge, I think I know

09:54:31   22    how I can do that exactly the way you're saying it.  I

09:54:33   23    was -- I think perhaps Peter and I were misunderstanding it.

09:54:36   24    But I know what you're looking for, I think, and give me

09:54:38   25    another shot.

2746

| | | |
|---|---|---|
| 09:54:40 | 1 | THE COURT:  If the defendants want to |
| 09:54:41 | 2 | cross-examine further, they can do that. |
| 09:54:45 | 3 | MR. SWANSON:  Can I raise just one issue, Your |
| 09:54:46 | 4 | Honor? |
| 09:54:46 | 5 | THE COURT:  All right. |
| 09:54:48 | 6 | MR. SWANSON:  There is, as we've seen, I think |
| 09:54:49 | 7 | it's there's over a year of data that he looked at, and |
| 09:54:52 | 8 | there can't be a suggestion if it's not true that any |
| 09:54:55 | 9 | trinity prescriptions were filled, if a Benzo was filled in |
| 09:54:58 | 10 | June and an opioid in August, and so I don't want any |
| 09:55:03 | 11 | misleading -- |
| 09:55:04 | 12 | THE COURT:  He can say he doesn't know what |
| 09:55:06 | 13 | dates.  This is just some point during that year. |
| 09:55:08 | 14 | MR. LANIER:  Well, yeah, he actually has the |
| 09:55:09 | 15 | dates there, and I think that the dates are pretty clear |
| 09:55:12 | 16 | that the trinity were filled, Judge, based on my memory |
| 09:55:15 | 17 | anyway. |
| 09:55:15 | 18 | But I'm not getting into that because you're not |
| 09:55:17 | 19 | giving me a chance to do the times. |
| 09:55:19 | 20 | THE COURT:  That's right. |
| 09:55:20 | 21 | MR. LANIER:  So I'm just going to use that |
| 09:55:22 | 22 | chart that you are allowing in, and I'll call out the |
| 09:55:24 | 23 | prescription and the drug number -- or the store number, and |
| 09:55:26 | 24 | he can tell us which store that is. |
| 09:55:28 | 25 | THE COURT:  All right.  And just so you know, |

09:55:31  1   Mr. Swanson, if you go into it and he knows, he'll testify

09:55:35  2   about it.

09:55:36  3            MR. SWANSON:  I'm aware.

09:55:36  4            THE COURT:  All right.

09:55:40  5            MR. DELINSKY:  Your Honor, I would object,

09:55:41  6   though, to what Mr. Lanier just proposed.  He's going to go

09:55:44  7   prescription by prescription.  That's exactly what we agreed

09:55:46  8   would be out.  Your Honor permitted him to ask, you know, at

09:55:50  9   a higher level.

09:55:51  10            THE COURT:  I'm limiting it to that one

09:55:53  11  document, what was filled at those stores.

09:55:55  12            MR. DELINSKY:  And, Your Honor, I have a

09:55:56  13  further objection, which is that the OARRS report itself

09:55:58  14  could be used to refresh recollection, but he doesn't

09:56:01  15  remember.  He can't just testify from the OARRS report.  If

09:56:05  16  it doesn't refresh his recollection about what was filled,

09:56:08  17  that's it.  You know, he can't just read off the report if

09:56:12  18  he doesn't independently remember.

09:56:13  19            MR. LANIER:  That's flat wrong.  That's flat

09:56:16  20  wrong.

09:56:16  21            THE COURT:  I will allow him -- he's

09:56:19  22  testifying, I will allow him to testify if he knows what

09:56:22  23  drugs are filled at those pharmacies that are listed on the

09:56:26  24  one summary page that I'm allowing in.

09:56:29  25            MR. DELINSKY:  Okay, but, Your Honor, but not

09:56:30   1    on a prescription-by-prescription basis.

09:56:32   2            THE COURT:  No, not on a prescription-by-

09:56:33   3    prescription.

09:56:34   4            MR. DELINSKY:  Thank you.

09:56:35   5            MR. SWANSON:  Thank you.

09:56:47   6            (In open court at 9:56 a.m.)

09:56:47   7    BY MR. LANIER:

09:56:47   8    Q    Okay.  So let's do it this way.  I'm going to take

09:56:49   9    down my timeline for a moment, and I'm going to put back up

09:56:53  10    page 35 of the Exhibit 4600.  That's got those stores

09:57:02  11    listed.

09:57:03  12            Do you see that?

09:57:04  13    A    Yes, I do.

09:57:05  14    Q    And then what I'd like to do is read out various types

09:57:10  15    of drugs that were filled at various stores according to

09:57:13  16    this OARRS report, and you tell us which store it would be

09:57:17  17    based upon the store number, as I read the OARRS report.

09:57:22  18    Okay?

09:57:24  19    A    Okay.

09:57:24  20    Q    So if we've got drugs -- opiates, oxycodone, for

09:57:30  21    example, being filled at W-G688, what store would be filling

09:57:38  22    that oxycodone?

09:57:39  23    A    That would be Walgreens Store Number 06888.

09:57:51  24    Q    And if we have the clonazepam, one of the muscle

09:57:58  25    relaxants, being filled at Walgreens 6888, which store would

09:58:07  1    that -- W-G6888, which one would that be?

09:58:14  2    **A**    Walgreens.

09:58:16  3            MR. WEINBERGER:  That's a Benzo.

09:58:18  4            MR. LANIER:  That's a Benzo.  Oh, sorry.

09:58:21  5    Thank you.  Clonazepam.  I should put Benzo.

09:58:33  6    **Q**    If, for example, we see more Lorazepam dispensed at

09:58:40  7    R-A4605, which would that be?

09:58:43  8    **A**    Rite Aid, East Market Street.

09:58:51  9            THE COURT:  Mr. Lanier, you should ask him if

09:58:53  10   he knows what is a Lorazepam.

09:58:55  11   **Q**    Do you know what Lorazepam is?

09:58:58  12   **A**    No, I don't.

09:58:58  13   **Q**    All right.  We'll leave that one out.

09:59:01  14           THE COURT:  All right.  The jury's to

09:59:03  15   disregard that.

09:59:04  16   **Q**    Oxycodone filled W-G688, do you pay attention when

09:59:14  17   multiple prescriptions are filled?

09:59:20  18           MR. SWANSON:  I object to this, Your Honor.

09:59:21  19           THE COURT:  Sustained.

09:59:22  20   **Q**    Let me just summarize with you, sir.  If we went

09:59:45  21   through these prescription by prescription, would you be

09:59:46  22   able to tell us where every one of these pharmacies were

09:59:49  23   filling one, two, three, or more prescriptions depending on

09:59:54  24   the pharmacy?

09:59:59  25   **A**    Yes.

09:59:59   1    **Q**    Would you be able to show us the dates they were

10:00:01   2    filling so that we could look at the dates to see if it

10:00:03   3    might ring bells?

10:00:06   4    **A**    Yes.

10:00:06   5    **Q**    Would you be able to tell us at least the name of the

10:00:10   6    drug such that someone could look it up to see if it's a

10:00:14   7    Benzo or if it's a muscle relaxant or if it's an opiate?

10:00:19   8    **A**    Yes.

10:00:19   9    **Q**    Thank you.

10:00:23  10         The last document I'd like to talk to you about right

10:00:25  11    now, sir, is that exhibit that was handed out by Ms. Fleming

10:00:35  12    and Ms. Lanier, Plaintiffs' 45998, Trumbull County opiate

10:00:43  13    action plan, 2017 to 2021.

10:00:45  14         Do you have that in front of you, sir?

10:00:47  15    **A**    Yes, I do.

10:00:48  16    **Q**    Can you generally tell the jury what this Trumbull

10:00:52  17    County opiate action plan is, please?

10:00:55  18    **A**    This is an action plan, I believe it was made by the

10:01:02  19    Trumbull County Mental Health and Recovery Board and ASAP.

10:01:11  20         This is used as almost of a timeline of this is what

10:01:14  21    we're seeing, this is what we need to do, this is things we

10:01:17  22    need to try for the opiate problem in Trumbull County.

10:01:23  23         This is brought up at two different meetings.  We have

10:01:27  24    a meeting with ASAP, which is just part of the Trumbull

10:01:34  25    County Mental Health and Recovery Board.  They go over

10:01:36  1   statistics of how many overdoses we've seen quarterly, even

10:01:42  2   monthly.  And again, this is something that they brought up.

10:01:48  3   They would ask questions to myself and another lieutenant

10:01:55  4   with another police agency.

10:01:58  5       We represent the law enforcement for these meetings.

10:02:01  6   And again, it's for the ASAP coalition meeting and for the

10:02:05  7   OFR, which is Overdose Fatality Response meeting, which we

10:02:11  8   also have monthly as well.

10:02:14  9   Q     And, I'm sorry, ASAP is A-S-A-P?

10:02:20  10  A     Mm-hmm.

10:02:20  11  Q     And that stands for what?

10:02:23  12  A     Alliance for Substance Abuse Prevention.

10:02:30  13  Q     Alliance for Substance Abuse Prevention.  And where is

10:02:35  14  that out of?

10:02:36  15  A     That is out of Trumbull County Mental Health and

10:02:40  16  Recovery Board, same office.

10:02:40  17  Q     And in addition to ASAP, you said that this is also

10:02:43  18  the OFR?

10:02:46  19  A     Yes.  OFR is another meeting that is held by the

10:02:50  20  Trumbull County Health Department, the U.S. Attorney's

10:03:00  21  Office, Warren City Police Department, and drug task force.

10:03:03  22  Q     You said that stands for overdose something?

10:03:06  23  A     Overdose Fatality Response Team.

10:03:16  24  Q     And so if we look at some of what Trumbull County's

10:03:19  25  put in place as an opiate action plan, I want to talk about

10:03:24    1    some of these that you would be able to give us direct

10:03:27    2    information on.

10:03:28    3        The first one, increase law enforcement personnel,

10:03:37    4    acquire funding to recruit and hire police officers, 2017 to

10:03:42    5    current.  And then it says, "WPD is at full status-2019."

10:03:48    6        What's WPD?

10:03:50    7    A    Warren City Police Department.

10:03:51    8    Q    And then it's got "TCSD hired three deputies."

10:03:55    9        Who is SCSD?

10:03:57   10    A    That's supposed to say SCSO, Trumbull County Sheriff's

10:04:02   11    Office.

10:04:02   12    Q    Is that how work for now?

10:04:05   13    A    Yes.

10:04:06   14    Q    And then it says that the Warren Police Department is

10:04:10   15    currently understaffed by five officers?

10:04:15   16    A    That is incorrect.  It will be corrected today at

10:04:22   17    9:30's meeting.

10:04:22   18    Q    9:30's meeting how will it be corrected?

10:04:25   19    A    Yes.  They are roughly 16, 17 officers understaffed

10:04:29   20    right now.  Currently, we are 16 deputies understaffed at

10:04:36   21    the sheriff's office.

10:04:39   22    Q    And why do you need so many police officers?

10:04:43   23    A    Well, obviously we're not going to put somebody with

10:04:49   24    no experience on a drug task force, so we need to fill these

10:04:54   25    positions, courthouse positions, we need to fill road deputy

2753

10:05:00  1    positions, school resource officers' positions.  We need to

10:05:04  2    fill those positions first before we can pull manpower, more

10:05:09  3    experienced people over to the drug task force.

10:05:12  4        We are currently running bare bones at our drug task

10:05:17  5    force.  It's hard to get new applicants for this job, so

10:05:22  6    it's on this action plan because it's important to have the

10:05:27  7    numbers, to have the investigators, to have the detectives

10:05:33  8    working cases, drug cases, opiate cases.

10:05:38  9    **Q**    Okay.  Another entry on this first page that I'd like

10:05:43  10   you to testify about is "increase monitoring of persons on

10:05:47  11   probation."

10:05:48  12       Do you see that?

10:05:49  13   **A**    Yes.

10:05:50  14   **Q**    And the action step is to "acquire funding needed to

10:05:55  15   purchase ankle monitoring bracelets," with the status that

10:06:00  16   they cannot be purchased with current grants.

10:06:02  17       Can you explain that, please, and why it's relevant?

10:06:04  18   **A**    This was something that was brought up at a meeting by

10:06:12  19   Chief Deputy Joe Dragovich with the Sheriff's Office to find

10:06:19  20   a way to monitor probationary people that were -- that have

10:06:29  21   drug convictions.  You know, that's the problem we were

10:06:31  22   facing is the repeat offenders with drug convictions.

10:06:39  23   **Q**    Now, you also have on here the comment on page 4,

10:06:46  24   among the different needs, and it speaks of

10:06:52  25   "Reduce/eliminate drug traffickers entering into drug

10:06:56   1    courts.

10:06:59   2         "Drug courts and law enforcement form a team to review

10:07:04   3    cases prior to court dates to exclude drug traffickers."

10:07:08   4    **A**    Yes.

10:07:08   5    **Q**    This is something that involves judges, law

10:07:11   6    enforcement, and attorneys.

10:07:12   7         Can you explain that, please?

10:07:14   8    **A**    We were seeing an increase of drug trafficking cases

10:07:23   9    where the subject would go and get drug court, basically

10:07:31  10    probation.  Drug traffickers were -- they knew that if they

10:07:39  11    mentioned that they were -- they had an addiction, that they

10:07:44  12    were probably going to end up getting drug court and getting

10:07:46  13    out of the drug trafficking charges.

10:07:54  14    **Q**    Then as we continue to work through here, there's a

10:07:57  15    host of things like on page 8, "Increase access to Project

10:08:10  16    DAWN, Naloxone, Narcan."

10:08:13  17         Can you explain the significance of "All but

10:08:19  18    Brookfield Police Department are carrying Narcan"?

10:08:22  19    **A**    A lot of times.

10:08:24  20    **Q**    Let me step a step back.  The jury hasn't heard much

10:08:27  21    about Narcan.

10:08:28  22         Can you explain why you carry Narcan, what it does?

10:08:31  23    **A**    It's a reversal for an overdose, an opiate overdose.

10:08:36  24         So my whole team carries it, all the deputies carry

10:08:41  25    it.  We're even working on a project right now where we're

10:08:47  1   finding pouches so it can be worn on the deputy's belt,

10:08:52  2   their gun belt.

10:08:53  3        All of my team, we wear tactical vests.  Everyone has

10:08:58  4   a Narcan pouch on their tactical vest.

10:09:01  5        It's important because a lot of times we are

10:09:05  6   patrolling areas where there's overdoses, active overdoses,

10:09:09  7   and we're there before EMS personnel.  So we learn how to

10:09:16  8   use Narcan, and we make sure that our Narcan is not expired

10:09:21  9   and we keep up to date on it and keep it on us at all times.

10:09:29  10  **Q**    In this regard, there's also a provision in here, if

10:09:32  11  we keep looking, that says "Increase access to treatment and

10:09:42  12  detox."

10:09:45  13        "Increase indigent funding for Trumbull County

10:09:49  14  residents."

10:09:50  15        And it goes on to talk about on the next page the need

10:09:52  16  to put these through the Trumbull County Jail and other

10:09:55  17  things like that.

10:09:56  18        Why is it important that there be an increased access

10:10:08  19  to treatment and detox?

10:10:13  20  **A**    As of right now, I mean, we're -- our numbers are very

10:10:17  21  high for overdose and overdose deaths.  2017 was our

10:10:24  22  highest, and we are -- if we haven't already, again, these

10:10:28  23  meetings that we have monthly will keep us up to date on our

10:10:33  24  stats.  But if we haven't surpassed it, we are about to with

10:10:38  25  our overdoses and overdose deaths.

| | | |
|---|---|---|
| 10:10:41 | 1 | **Q**    Okay.  If we go back to your road map then.  We've got |
| 10:11:01 | 2 | the experience stop as your third stop.  And here we go. |
| 10:11:10 | 3 | We've covered the opioid problem, the investigations |
| 10:11:12 | 4 | are, and the need for what would we call that stuff, need |
| 10:11:16 | 5 | for future work, need for future help?  What's a good way to |
| 10:11:21 | 6 | term it? |
| 10:11:22 | 7 | **A**    Yeah.  Future action, future help. |
| 10:11:26 | 8 | **Q**    Future action. |
| 10:11:32 | 9 | MR. LANIER:  Thank you for your service to the |
| 10:11:33 | 10 | community, Officer. |
| 10:11:34 | 11 | Your Honor, I'll pass the witness. |
| 10:11:36 | 12 | THE WITNESS:  Thank you. |
| 10:11:37 | 13 | THE COURT:  Okay.  Cross-examination, |
| 10:11:41 | 14 | Mr. Swanson for Walgreens. |
| 10:11:43 | 15 | MR. SWANSON:  Yes, Your Honor.  Thank you. |
| 10:11:50 | 16 | Your Honor, if I may, I have some exhibits that I |
| 10:11:52 | 17 | might use. |
| 10:11:53 | 18 | THE COURT:  That's fine, Mr. Swanson. |
| 10:11:58 | 19 | MR. SWANSON:  And this is the same that I |
| 10:12:00 | 20 | provided to you this morning. |
| 10:12:00 | 21 | THE COURT:  Thank you. |
| 10:12:41 | 22 | - - - - - |
| 10:12:41 | 23 | CROSS-EXAMINATION |
| 10:12:42 | 24 | BY MR. SWANSON: |
| 10:12:42 | 25 | **Q**    Captain Villanueva, good morning.  My name is Brian |

10:12:47   1   Swanson, and I represent Walgreens.

10:12:50   2        I want to thank you for coming in and answering our

10:12:53   3   questions this morning.  I'm going to try to be as brief as

10:12:57   4   possible in asking some questions based on what you went

10:13:00   5   through with Mr. Lanier.

10:13:01   6        I'd like to start with some questions about drug

10:13:09   7   trafficking in Trumbull County.  And in order to do that, I

10:13:13   8   first just wanted to reset to make sure I have your timeline

10:13:18   9   down correctly in my notes.

10:13:20   10        2010 you're a detective for the Howland Police

10:13:26   11   Department; is that right?

10:13:27   12   **A**    Yes.

10:13:32   13   **Q**    All right.  And in January of that year is when you

10:13:34   14   began working for TAG?

10:13:35   15   **A**    Yes.

10:13:35   16   **Q**    And can I call it TAG?  I understand it's been through

10:13:37   17   some names.  It was -- was it Trumbull Ashtabula Geauga Task

10:13:43   18   Force?

10:13:43   19   **A**    Yes, at one point it was different names, but

10:13:47   20   essentially TAG.

10:13:47   21   **Q**    Okay.  But today it's focused on Trumbull?

10:13:51   22   **A**    Yes, it is.

10:13:51   23   **Q**    Okay.  So all right, we'll know what we're talking

10:13:54   24   about when we say TAG.

10:13:55   25        And so you were a detective at Howland up and through

10:14:02    1    2017 when you joined the sheriff's department, right?

10:14:06    2    **A**    Yes, the Trumbull County Sheriff's Office.

10:14:08    3    **Q**    Got it.  But for four or five of those years, from

10:14:11    4    2010 through 2014 or '15, you were assigned to TAG?

10:14:16    5    **A**    Yes, I was.

10:14:17    6    **Q**    Okay.  And then you came back to TAG in 2017?

10:14:22    7    **A**    Yes.

10:14:23    8    **Q**    Got it.  Okay, thanks.

10:14:25    9        So I've seen in some of your files that I've looked at

10:14:31    10   in getting ready for the case where you say that the mission

10:14:35    11   of TAG is to go after drug dealers.

10:14:38    12       Do you agree that that's the mission of TAG?

10:14:44    13   **A**    Yes, it is.

10:14:45    14   **Q**    And drug traffickers, drug cartels, they remain a

10:14:52    15   major problem in Trumbull, right?

10:14:54    16   **A**    Yes, it is.

10:14:55    17   **Q**    Okay.  So, for instance, you have cocaine.  Cocaine is

10:14:58    18   not an opiate, but cocaine is a drug that's abused in

10:15:02    19   Trumbull County, right?

10:15:05    20   **A**    Yes, it is.

10:15:06    21   **Q**    And that's been the case since 2010 or probably even

10:15:09    22   before, right?

10:15:11    23   **A**    Probably before.

10:15:13    24   **Q**    Yeah.  And here when we've heard a bit about heroin in

10:15:17    25   this case, that's a drug that's commonly abused in Trumbull,

10:15:20  1    right?

10:15:21  2    **A**    Yes, it is.

10:15:22  3    **Q**    When you became a detective in 2010, there was already

10:15:26  4    a heroin epidemic in Trumbull County, right?

10:15:29  5    **A**    Not that I know of.

10:15:34  6    **Q**    So -- I want to see if I can refresh you.

10:15:39  7          One of the documents that I gave you is a copy of your

10:15:42  8    deposition that you gave earlier in this case.  Can you just

10:15:47  9    go ahead and open that up and flip it to page 41.  I'm

10:15:56  10   sorry, page 154.  My apologies.  And if you look at lines 14

10:16:11  11   to 17 on that page.

10:16:21  12   **A**    Yes.

10:16:22  13   **Q**    Do you recall that there was a --

10:16:24  14              MR. LANIER:  Your Honor, I just want to

10:16:27  15   warn -- objection.  This is going to open a door.

10:16:31  16              MR. SWANSON:  You know what, I'll withdraw it.

10:16:33  17   I'll move on.  That's okay.

10:16:34  18              THE COURT:  All right.

10:16:35  19   **Q**    Let me ask it -- I'll just be more general.

10:16:38  20          Heroin was a problem in Trumbull County in 2010,

10:16:42  21   wasn't it?

10:16:43  22   **A**    Can you repeat the question?

10:16:44  23   **Q**    Yeah, yeah, sure.

10:16:45  24          Heroin, the drug, that was a problem in Trumbull

10:16:48  25   County back to 2010, right?

2760

10:16:50   1    **A**     Yes, it was -- heroin was around in 2010.

10:16:53   2    **Q**     That's fair.  Thank you.

10:16:54   3          And heroin is a drug that can't be legally

10:16:59   4    manufactured or sold in the U.S., right?

10:17:01   5    **A**     That is correct.

10:17:02   6    **Q**     So the problem with heroin is you get cartels and drug

10:17:06   7    traffickers who bring it into the community and sell it,

10:17:09   8    right?

10:17:10   9    **A**     Yes.

10:17:10   10   **Q**     We heard a little bit about illegal fentanyl.  That's

10:17:16   11   a problem in Trumbull County, right?

10:17:17   12   **A**     Currently it is.

10:17:19   13   **Q**     Okay.  And I take it from your answer it hasn't been a

10:17:23   14   problem for as long as heroin or cocaine?

10:17:24   15   **A**     That is correct.

10:17:25   16   **Q**     When we talk about fentanyl, what I'm talking about is

10:17:30   17   the -- not the legal kind of patch that you might get

10:17:33   18   prescribed but the illegal kind that gets manufactured out

10:17:36   19   of the country and then brought in.

10:17:37   20         You understand that?

10:17:39   21   **A**     Yes, I do understand.

10:17:41   22   **Q**     And fentanyl as we know is far more potent than

10:17:45   23   heroin, right?

10:17:47   24   **A**     Yes, it is.

10:17:47   25   **Q**     The problem that you see, I think, in your current

10:17:53  1    work is criminals who will cut fentanyl and then they'll put

10:17:57  2    it into the cocaine supply or the heroin supply and it makes

10:18:01  3    it more lethal, right?

10:18:03  4    **A**    Yes, they're putting it in multiple drugs.

10:18:06  5    **Q**    Okay.  So that leads to some tragic overdoses when

10:18:10  6    somebody might believe they're getting cocaine, which in

10:18:13  7    itself is dangerous, but when it's laced with fentanyl it's

10:18:16  8    even more so, right?

10:18:18  9    **A**    Yes.

10:18:18  10   **Q**    Are the three most serious drug threats in Trumbull

10:18:23  11   County today fentanyl, heroin, and cocaine?

10:18:26  12          Would you agree with that?

10:18:26  13   **A**    Fentanyl, heroin, and cocaine you said?

10:18:32  14   **Q**    Yes, sir.

10:18:33  15   **A**    Those are three of many drugs that are a problem in

10:18:38  16   Trumbull County right now.

10:18:39  17   **Q**    Okay.  But they constitute a big problem; you'd agree

10:18:42  18   with that, right?

10:18:43  19   **A**    Can you repeat?  I'm sorry, I'm having trouble hearing

10:18:45  20   you.

10:18:45  21   **Q**    Yeah, I'm getting a little buzz here too.  I can see

10:18:48  22   what Mr. Lanier was --

10:18:48  23                THE COURT:  I thought we would get this fixed.

10:18:51  24   **Q**    Just let me know if you can't hear me and I'll repeat.

10:18:53  25          I was just saying that those three drugs, heroin,

10:18:56  1    fentanyl, and cocaine, they're a problem in Trumbull County

10:18:59  2    today, right?

10:19:01  3    **A**     They're a problem, but drug trends will change on a

10:19:07  4    weekly basis.  In fact, we are seeing prescription pills

10:19:12  5    within the last couple months become the new trend as well.

10:19:19  6    **Q**     And I want to ask you about that because I was

10:19:25  7    interested in your testimony earlier.  But before I get

10:19:28  8    there, I saw a document, I'm just going to put it up.  It's

10:19:31  9    Tab 6 in that binder that I gave you.

10:19:44  10         So this is a document that's been marked as Defendant

10:19:48  11   MDL Exhibit 13052.  And you can see that it's an e-mail from

10:19:56  12   Joseph Dragovich to you from looks like April of 2019.

10:20:03  13   Right?

10:20:08  14   **A**     Yes.

10:20:08  15   **Q**     Okay.  And I think you mentioned Mr. Dragovich on

10:20:12  16   cross, but I didn't put a note of who he is.

10:20:15  17   **A**     That would be Chief Deputy Joe Dragovich.

10:20:20  18   **Q**     Okay.  So he is sending an e-mail to you that says,

10:20:25  19   "Looks like we're in trouble with the big three, cocaine,

10:20:30  20   heroin, and fentanyl.  We need to take down a few big

10:20:33  21   players [sic]."  Right?

10:20:37  22         That's what it says?

10:20:38  23   **A**     Yes.

10:20:39  24   **Q**     Okay.  And so maybe your previous answer explains it

10:20:43  25   to me, but it looks like at least at the time those three

2763

10:20:48  1  drugs, cocaine, heroin, and fentanyl were the big problem at

10:20:52  2  least according to what Mr. Dragovich was seeing.

10:20:55  3      Would you agree with that?

10:20:56  4  A    Yes.  He's referring to a BCI lab report.  It's a

10:21:05  5  quarterly report that we would get.  And that's drug cases

10:21:13  6  that are being brought into the BCI lab, which is the lab

10:21:17  7  that we use for the sheriff's office, and multiple agencies

10:21:22  8  around Ohio use BCI.

10:21:24  9  Q    And I'm glad you mentioned BCI, because I think

10:21:27  10  attached to this e-mail, and I'm just going to flip to Tab

10:21:31  11  7, I think that's the report that he was referring to.

10:21:35  12      Does that look like the BCI quarterly report?  It's

10:21:41  13  Defendants' MDL 13052-02?

10:21:48  14  A    Yes, it is.

10:21:48  15  Q    And just judging -- well, let me take a step back.

10:21:53  16  This is a report that's put out by the state attorney

10:21:56  17  general's office, right?

10:21:57  18  A    Yes.

10:21:58  19  Q    What they do, as I understand it, is they kind of look

10:22:03  20  at statewide and regional drug trends, and then they put out

10:22:06  21  a report so they can show law enforcement and others what

10:22:10  22  problems they're seeing throughout the state.

10:22:13  23      Is that, you know, a fair way to put it?

10:22:15  24  A    Yeah, the lab submissions that are being brought to

10:22:19  25  them, yes.

2764

| | | |
|---|---|---|
| 10:22:20 | 1 | **Q**     Got it. |
| 10:22:21 | 2 | So if we look at the report that was sent over in |
| 10:22:27 | 3 | 2019, it looks like we could probably add methamphetamine to |
| 10:22:31 | 4 | the list of problem drugs in Ohio? |
| 10:22:36 | 5 | **A**     According to this report, yes. |
| 10:22:37 | 6 | **Q**     And was that something you were seeing in Trumbull |
| 10:22:40 | 7 | County as well? |
| 10:22:42 | 8 | **A**     An increase of meth cases? |
| 10:22:44 | 9 | **Q**     Yes, sir. |
| 10:22:45 | 10 | **A**     Yes, we've seen an increase of meth cases as well. |
| 10:22:53 | 11 | **Q**     What about counterfeit pills?  Do you see problems |
| 10:22:56 | 12 | with counterfeit pills in Trumbull? |
| 10:22:59 | 13 | **A**     Yes, that's a newer trend where counterfeit pills are |
| 10:23:06 | 14 | being sold at the street level, and most of the time we do |
| 10:23:12 | 15 | have cases that are still pending lab results, but we |
| 10:23:16 | 16 | suspect that they would be laced with fentanyl if not |
| 10:23:21 | 17 | completely fentanyl. |
| 10:23:22 | 18 | **Q**     All right.  And just so it's clear, when we talk about |
| 10:23:26 | 19 | counterfeit pills, we're not talking about pills that have |
| 10:23:29 | 20 | maybe been diverted from a pharmacy or manufacturer.  We're |
| 10:23:32 | 21 | talking about criminals who are actually manufacturing fake |
| 10:23:36 | 22 | pills out of fentanyl and other dangerous drugs, right? |
| 10:23:39 | 23 | **A**     Yes, we are. |
| 10:23:40 | 24 | **Q**     All right.  And a moment ago, a few answers ago you |
| 10:23:45 | 25 | talked about how, you know, the trends change and you were |

10:23:48  1    seeing a problem with pills again in Trumbull.

10:23:51  2         Is that counterfeit pills or is that legal pills that

10:24:00  3    have been diverted?

10:24:00  4    **A**    That would be a mixture.

10:24:03  5    **Q**    All right.  The other thing which we've talked a

10:24:07  6    little bit more about today is prescription medications.

10:24:11  7         Those are drugs that can be legally made and

10:24:13  8    dispensed, right?

10:24:14  9    **A**    That is correct.

10:24:17  10   **Q**    Prescription medicine -- prescription opioid

10:24:20  11   medicines, I should have been clear, prescription opioid

10:24:24  12   medicines, they have value for many patients, for instance,

10:24:26  13   those who are suffering from cancer pain or other chronic

10:24:30  14   pain, right?

10:24:33  15   **A**    Yes.

10:24:37  16   **Q**    There are legitimate medical uses for opioid

10:24:42  17   medicines, right?

10:24:43  18   **A**    Yes, there is.

10:24:43  19   **Q**    But the problem is that they can be diverted by

10:24:47  20   criminals and then put out onto the streets where they can

10:24:50  21   be obtained unlawfully, right?

10:24:55  22   **A**    In certain circumstances, yes.

10:24:57  23   **Q**    And that's one of the things that your team at TAG

10:25:00  24   tries to stop, right, is illegally diverted pills making

10:25:05  25   their way onto the streets, right?

10:25:07  1   **A**      Yes.

10:25:07  2   **Q**      Am I correct that in particular when you're dealing

10:25:11  3   with prescription opioids and diversion, you tend to team up

10:25:17  4   with the Ohio State Board of Pharmacy to help you out with

10:25:22  5   those investigations?

10:25:25  6   **A**      Typically, it's case by case, depending on if it's a

10:25:31  7   larger case, if it involves a pharmacy, if it involves a

10:25:34  8   doctor, we would get the Board of Pharmacy involved, the

10:25:40  9   Board of Nursing involved.

10:25:42  10       If it is an individual who is doctor shopping,

10:25:46  11  typically we would do that investigation ourself.

10:25:51  12  **Q**      And I appreciate that distinction.

10:25:53  13       This morning you talked about Mr. Winland, and I'm

10:25:56  14  going to ask you some questions about him later, but that

10:25:59  15  was a circumstance where you had a criminal actor who was

10:26:03  16  participating in doctor shopping, and so that was something

10:26:06  17  that TAG took on.  Right?

10:26:08  18  **A**      Yes, it is.

10:26:09  19  **Q**      But if you had a situation maybe where there was a

10:26:12  20  doctor who was acting as a criminal and overprescribing or

10:26:19  21  passing out medicines for cash, the sort of pill mill sort

10:26:23  22  of doctor, that might be a situation where you'd get the BOP

10:26:27  23  involved, right?

10:26:29  24  **A**      Yes.

10:26:29  25  **Q**      Similarly, if it was a -- if it was a pharmacy that

10:26:35   1   was dispensing too much or wasn't being careful enough,

10:26:38   2   that's something where you might get the Board of Pharmacy

10:26:42   3   involved for that investigation, that's fair, right?

10:26:45   4   A    That is fair.

10:26:48   5   Q    And one of the reasons I think you know and I think

10:26:52   6   everyone here knows, the Ohio Board of Pharmacy, they

10:26:56   7   license all the pharmacies in the state, right?

10:26:59   8   A    To my knowledge, they would have to have some type of

10:27:04   9   license.

10:27:04  10   Q    They'll go out, they'll do inspections of the

10:27:08  11   pharmacies, right?

10:27:09  12   A    I've heard of them doing inspections.

10:27:11  13   Q    And I think you've just said they'll do investigations

10:27:14  14   if they're warranted, right?

10:27:17  15   A    Yes, I'm sure.

10:27:18  16   Q    And I take it you know some of the BOP inspectors in

10:27:27  17   Trumbull County?

10:27:28  18   A    I know of one.

10:27:33  19   Q    So if a pharmaceutical -- I'm sorry, I should ask.

10:27:35  20        What's the name of the inspector you know?

10:27:38  21   A    We would typically -- if I were to get an

10:27:45  22   investigation today, I would call Bill DiFrangia.

10:27:52  23   Q    So the jury hasn't heard from anyone at the Board of

10:27:58  24   Pharmacy yet, but I take it you'd agree that as compared to

10:28:02  25   TAG, the BOP is more focused on pharmaceutical diversion

10:28:07  1   from the pharmacy and doctor side, and the TAG is more

10:28:11  2   focused on, you know, what we said before, busting drug

10:28:18  3   dealers?

10:28:18  4                MR. WEINBERGER:  Objection to the comment that

10:28:19  5   the jury hasn't heard from anybody from the Board of

10:28:23  6   Pharmacy.  That's not correct.

10:28:24  7                THE COURT:  Well, the first comment is

10:28:26  8   sustained.  You can ask the question.

10:28:28  9        The objection's sustained as to the comment.  You can

10:28:30  10  ask the question.

10:28:32  11               MR. SWANSON:  Sure, I'm happy to.

10:28:34  12       Would you like me to repeat it for you, sir?

10:28:36  13               THE COURT:  I think that might be a good idea.

10:28:39  14  Thank you, Mr. Swanson.

10:28:41  15               MR. SWANSON:  Sure, I'm happy to.

10:28:42  16  **Q**    Would you agree that as compared to TAG, your

10:28:45  17  organization, the Board of Pharmacy is more focused on

10:28:49  18  pharmaceutical diversion from the pharmacy and the doctor

10:28:52  19  side and TAG is more focused ongoing after criminal

10:28:55  20  diversion like doctor shopping and busting heroin dealers?

10:28:59  21  Is that sort of a fair comparison?

10:29:02  22  **A**    I don't know what types of investigations the Board of

10:29:07  23  Pharmacy conducts.  I know they -- from my experience, they

10:29:11  24  have had investigations.  They've even done investigations

10:29:15  25  on individuals as well.

| | | |
|---|---|---|
| 10:29:18 | 1 | **Q**    Okay.  So going back, I want to return to this |
| 10:29:28 | 2 | comment.  You've made it a couple times.  That, you know, |
| 10:29:33 | 3 | we've talked about cocaine, methamphetamines, heroin.  And I |
| 10:29:36 | 4 | think you've said and agreed that the drugs of choice for |
| 10:29:41 | 5 | drug users change and they change frequently.  Right? |
| 10:29:45 | 6 | **A**    Yes. |
| 10:29:45 | 7 | **Q**    So you might have a month where methamphetamines are |
| 10:29:49 | 8 | all the rage and that's all you're seeing, and then for |
| 10:29:52 | 9 | reasons that might be unexplainable, it's cocaine the next |
| 10:29:55 | 10 | month and maybe heroin the next month.  It just changes like |
| 10:29:59 | 11 | that.  Is that fair? |
| 10:30:00 | 12 | MR. LANIER:  Judge, I'm going to object, for |
| 10:30:02 | 13 | reasons that are unexplainable, it's a clear open door. |
| 10:30:05 | 14 | THE COURT:  Well, I don't want speaking |
| 10:30:07 | 15 | objections. |
| 10:30:09 | 16 | MR. SWANSON:  Okay.  You know, what, Judge, I |
| 10:30:11 | 17 | can just withdraw it.  I'll ask it again. |
| 10:30:13 | 18 | THE COURT:  All right. |
| 10:30:14 | 19 | MR. SWANSON:  I wasn't trying to be |
| 10:30:16 | 20 | suggestive. |
| 10:30:17 | 21 | **Q**    What you'll see is, you know, you might have a month |
| 10:30:21 | 22 | or even a week where methamphetamine is the rage and then a |
| 10:30:26 | 23 | week or a month later all of a sudden you're seeing a lot |
| 10:30:28 | 24 | more cocaine cases.  And then maybe a week later or a month |
| 10:30:33 | 25 | later or days later you're seeing that heroin is the big |

10:30:36   1   problem here in your county.

10:30:38   2        Is that kind of a fair assessment of your experience?

10:30:41   3   **A**    It's my experience that when I've conducted

10:30:48   4   investigations that were too many to keep up with, starting

10:30:56   5   in 2010, yes, the drug of choice may have been crack

10:31:05   6   cocaine, and then it could have moved to cocaine, and then

10:31:10   7   it changed to pills.

10:31:12   8        There was a point in time where we couldn't keep up

10:31:15   9   with the prescription cases, the workload that was coming on

10:31:21   10   our desk.  There was only two of us in TAG that would do

10:31:24   11   those types of investigations.  I believe this was probably

10:31:28   12   one of my first ones that I did.  And I've personally seen

10:31:39   13   these prescription cases and then repeat offenders where now

10:31:44   14   the same person who was diverting these pills is now

10:31:48   15   addicted to an opiate, addicted to heroin.

10:31:55   16              MR. SWANSON:  Your Honor, can I interject

10:31:57   17   here?

10:31:58   18              MR. WEINBERGER:  Your Honor, can we have a

10:31:59   19   side bar, please?

10:32:06   20              (At side bar at 10:32 a.m.)

10:32:14   21              MR. WEINBERGER:  Your Honor, you granted a

10:32:19   22   motion in limine on the issue of gateway from this witness.

10:32:24   23   This door is now wide open, and we should be able to ask him

10:32:31   24   about his experiences.  Frankly, he just testified about

10:32:36   25   gateway directly, that he saw prescription pills users go to

| | | |
|---|---|---|
| 10:32:49 | 1 | illicit heroin.  It was their motion.  They opened up the |
| 10:32:50 | 2 | door. |
| 10:32:50 | 3 | THE COURT:  I agree, it's up to everyone so -- |
| 10:32:55 | 4 | MR. SWANSON:  Your Honor, Brian Swanson from |
| 10:32:56 | 5 | Walgreens.  Can I be heard?  He said on direct that these |
| 10:32:57 | 6 | things change from month to month.  I have to follow up on |
| 10:32:59 | 7 | that. |
| 10:32:59 | 8 | THE COURT:  Fine, you can follow up.  You can |
| 10:33:01 | 9 | follow up. |
| 10:33:02 | 10 | MR. SWANSON:  But it can't be opening a door |
| 10:33:04 | 11 | to follow up on a question that they elicited from him on |
| 10:33:07 | 12 | direct. |
| 10:33:08 | 13 | THE COURT:  Both sides can ask whatever they |
| 10:33:09 | 14 | want.  Let's go forward. |
| 10:33:09 | 15 | (In open court at 10:33 a.m.) |
| 10:33:25 | 16 | BY MR. SWANSON: |
| 10:33:25 | 17 | **Q**    Captain Villanueva, I'd like to turn now to the case |
| 10:33:30 | 18 | of Doug Winland that you talked about on direct, okay? |
| 10:33:34 | 19 | Obviously you conducted a pretty extensive |
| 10:33:37 | 20 | investigation into his conduct, right? |
| 10:33:41 | 21 | **A**    Yes. |
| 10:33:42 | 22 | **Q**    I think you said that it was your view and you |
| 10:33:45 | 23 | determined that he had engaged in doctor shopping? |
| 10:33:49 | 24 | **A**    Yes, based off of what we've seen on the OARRS report, |
| 10:33:53 | 25 | it was a -- what we would call a doctor shopping case. |

10:34:00  1    **Q**     And he said, and I want to put it in the record, but I

10:34:03  2    think you said he pleaded guilty to the crime of deception

10:34:05  3    to obtain a dangerous drug, right?

10:34:08  4    **A**     Yes.  That was one of the counts.

10:34:12  5    **Q**     Sure.  And let me just put up, so everyone can see, I

10:34:15  6    think it's Tab 14 in your binder.  Or perhaps it isn't.

10:34:30  7          Well, is it in your binder?  Do you have -- there we

10:34:34  8    go.  Okay.

10:34:34  9          And so you can see this exhibit -- oh, is it up?

10:34:40  10   **A**     I'm sorry, you said Tab 14?

10:34:42  11   **Q**     I hope so, but it -- I was a little slow on my

10:34:45  12   computer, so --

10:34:46  13   **A**     I'm sorry, I was on Tab 13.  I see it now.

10:34:49  14   **Q**     That's okay.  We're on the same page literally?

10:34:51  15   **A**     Yes.

10:34:52  16   **Q**     Okay.  So you can see that this is Mr. Winland's

10:34:55  17   indictment, right?

10:35:07  18         Is that right, sir?

10:35:08  19   **A**     I'm sorry, I'm just reviewing.

10:35:09  20   **Q**     I'm sorry.

10:35:18  21   **A**     Yes.

10:35:18  22   **Q**     So you can see that he was indicted by deception, did

10:35:22  23   knowingly procure the administration of a prescription for

10:35:27  24   the dispensing of a dangerous drug, right?

10:35:32  25   **A**     Yes.

| | | |
|---|---|---|
| 10:35:32 | 1 | **Q**     And just to complete the record, in Tab 13 you can see |
| 10:35:39 | 2 | that he ultimately pleaded guilty to that same crime, right? |
| 10:35:43 | 3 | **A**     On Tab 13? |
| 10:35:45 | 4 | **Q**     Yes, sir. |
| 10:35:45 | 5 | **A**     Yes. |
| 10:36:15 | 6 | **Q**     Okay.  So he was indicted and later pled guilty to the |
| 10:36:18 | 7 | crime of deception to obtain a dangerous drug, right? |
| 10:36:22 | 8 | **A**     Yes. |
| 10:36:22 | 9 | **Q**     All right.  And what that means is that he was going |
| 10:36:26 | 10 | out and he was trying to trick doctors into writing |
| 10:36:31 | 11 | prescriptions for him that he didn't need, he didn't have a |
| 10:36:34 | 12 | legitimate medical need for, right? |
| 10:36:38 | 13 | **A**     I don't know his medical history.  I do know that he |
| 10:36:44 | 14 | was seeing multiple doctors and going to multiple pharmacies |
| 10:36:48 | 15 | to fill those prescriptions. |
| 10:36:50 | 16 | **Q**     And the crime was that he was deceiving those doctors |
| 10:36:54 | 17 | and those pharmacies to obtain these drugs, right? |
| 10:36:57 | 18 | **A**     Yes.  The deception would be because he was seeing |
| 10:37:00 | 19 | multiple doctors. |
| 10:37:05 | 20 | **Q**     And even though Mr. Winland -- you talked a bit on |
| 10:37:12 | 21 | direct about some of the pharmacies where he had filled |
| 10:37:16 | 22 | prescriptions that were part of this crime of deception, |
| 10:37:19 | 23 | right? |
| 10:37:19 | 24 | **A**     Right. |
| 10:37:22 | 25 | **Q**     And you listed the defendant pharmacies as pharmacies |

10:37:28  1    where he had filled some of his prescriptions, true?

10:37:32  2    **A**    That was on the OARRS report, yes.

10:37:34  3    **Q**    Now, even though Mr. Winland filled some of his

10:37:39  4    prescriptions at Walgreens, CVS, and other defendant

10:37:44  5    pharmacies, you're not saying that those pharmacies did

10:37:48  6    anything wrong by filling those prescriptions, true?

10:37:50  7    **A**    I don't have an opinion on that.

10:37:56  8    **Q**    Right.  You don't have any knowledge in this case of

10:38:00  9    Walgreens or CVS or Giant Eagle or Walmart engaging in any

10:38:06  10   wrongful conduct related to Mr. Winland and his

10:38:09  11   prescriptions, right?

10:38:11  12   **A**    Again, the focus of my investigation was Douglas

10:38:18  13   Winland and that he was seeing multiple doctors and going to

10:38:25  14   multiple pharmacies.

10:38:29  15   **Q**    And sitting here today, you're not aware of any

10:38:31  16   specific instance of a pharmacy, including the pharmacies

10:38:36  17   who are here in court, of failing to comply with the

10:38:39  18   regulations for dispensing controlled substances, true?

10:38:43  19   **A**    I'm not up to speed on those regulations or know what

10:38:47  20   those regulations entail.

10:38:50  21   **Q**    Okay.

10:38:51  22            MR. SWANSON:  Thank you for answering my

10:38:53  23   questions, sir.

10:38:58  24            MS. SULLIVAN:  Your Honor, if I may?  Or do we

10:39:01  25   have to take a break?

| | | |
|---|---|---|
| 10:39:02 | 1 | THE COURT: Yes, Ms. Sullivan, for Giant |
| 10:39:06 | 2 | Eagle. |
| 10:39:11 | 3 | MS. SULLIVAN: Good morning, Captain |
| 10:39:13 | 4 | Villanueva. |
| 10:39:13 | 5 | MR. WEINBERGER: Your Honor, one of the |
| 10:39:15 | 6 | jurors -- |
| 10:39:16 | 7 | MS. SULLIVAN: Need a break? |
| 10:39:17 | 8 | Good idea, Your Honor. The jurors need a break. |
| 10:39:19 | 9 | THE COURT: All right. That's a good idea. |
| 10:39:20 | 10 | Thank you for reminding me. |
| 10:39:22 | 11 | We will take our mid morning break, 15 minutes, and |
| 10:39:25 | 12 | then pick up with the cross-examination. |
| 10:39:30 | 13 | (Recess taken at 10:39 a.m.) |
| 10:55:07 | 14 | (In open court at 10:55 a.m.) |
| 10:55:25 | 15 | MR. SWANSON: Your Honor, before the jury |
| 10:55:28 | 16 | returns, may we be heard on this issue of opening the door? |
| 10:55:28 | 17 | THE COURT: All right. |
| 10:55:30 | 18 | MR. SWANSON: On his direct examination, the |
| 10:55:32 | 19 | witness testified that we've been investigating prescription |
| 10:55:34 | 20 | pill cases, "We've seen, I've personally seen where drug |
| 10:55:41 | 21 | trends will change not just on a monthly basis but sometimes |
| 10:55:44 | 22 | on a weekly basis as well." |
| 10:55:46 | 23 | All I did is ask him what that meant and if my example |
| 10:55:52 | 24 | was accurate. If that's opening the door because he wants |
| 10:55:54 | 25 | to talk about gateway, then plaintiffs violated the MIL by |

2776

10:56:01  1    eliciting that testimony on direct.  So it can't be opening

10:56:03  2    the door to follow-up on testimony he gave.

10:56:05  3              MR. LANIER:  Your Honor, plaintiffs did not

10:56:06  4    open that door.  I was very careful not to open that door.

10:56:09  5    I didn't make any reference to gateway or pathway, I didn't

10:56:11  6    make any reference to heroin.  There are drug tends, it can

10:56:16  7    be hydro, it can be oxy, it can be fentanyl, it can any

10:56:20  8    number of different prescription opioids where the drug

10:56:23  9    trends go back and forth.

10:56:24  10       That doesn't open the door to him going to him saying

10:56:30  11   hey, here's heroin, and then he gives a state summary to the

10:56:32  12   witness of the state saying, heroin's the problem,

10:56:33  13   fentanyl's the problem, and he gives this to the witness,

10:56:37  14   which the witness doesn't know and he hasn't seen before and

10:56:40  15   he's not able to testify competently on.

10:56:44  16             THE COURT:  Mr. Swanson, I don't know why you

10:56:46  17   went through that elaborate cross-examination of bringing

10:56:47  18   out all that information, but you did so Mr. Lanier can go

10:56:51  19   into it now.

10:56:54  20             MR. SWANSON:  All I was establishing is that

10:56:56  21   there are a lot of drugs that are a problem, but that can't

10:56:59  22   open the door to gateway.

10:57:02  23             THE COURT:  Well, see what the witness says.

10:57:04  24   Let's move on.

10:58:47  25             (The jury is present at 10:58 a.m.)

| | | |
|---|---|---|
| 10:58:52 | 1 | THE COURT:  Okay.  Please be seated. |
| 10:59:06 | 2 | MS. SULLIVAN:  May I proceed, Your Honor? |
| 10:59:08 | 3 | THE COURT:  Yes, Ms. Sullivan. |
| 10:59:10 | 4 | MS. SULLIVAN:  Thank you. |
| 10:59:11 | 5 | - - - - - |
| 10:59:12 | 6 | CROSS-EXAMINATION |
| 10:59:12 | 7 | BY MS. SULLIVAN: |
| 10:59:12 | 8 | **Q**   Good morning, jurors.  Thank you for that break. |
| 10:59:14 | 9 | Good morning, Captain Villanueva.  I'm Diane Sullivan. |
| 10:59:18 | 10 | We haven't met.  And I'm here for the folks at Giant Eagle. |
| 10:59:20 | 11 | And your wife and I have something in common.  I |
| 10:59:22 | 12 | worked -- I was a counter girl at Dunkin' Donuts for a long |
| 10:59:27 | 13 | while, and I remember the police officers coming in.  We |
| 10:59:31 | 14 | gave away a lot of free donuts.  But they took good care of |
| 10:59:34 | 15 | us, so give your wife my best. |
| 10:59:36 | 16 | Mr. Villanueva, or Captain Villanueva, I just have a |
| 10:59:41 | 17 | few short questions about Giant Eagle and the prescriptions |
| 10:59:44 | 18 | that you talked to the plaintiffs' lawyer about, okay?  If |
| 10:59:47 | 19 | could you bear with me. |
| 10:59:48 | 20 | Do you still have Plaintiffs' Exhibit 4600, I think it |
| 10:59:54 | 21 | was your investigation report that lists the prescriptions |
| 10:59:58 | 22 | and had this chart of -- |
| 11:00:01 | 23 | MS. SULLIVAN:  Mr. Pitts, if I could have the |
| 11:00:05 | 24 | ELMO.  Thank you. |
| 11:00:09 | 25 | **Q**   Okay.  Let's see what we can do here.  All right. |

2778

| | | |
|---|---|---|
| 11:00:15 | 1 | Okay. |
| 11:00:18 | 2 | So Captain Villanueva, this was the chart Mr. Lanier |
| 11:00:21 | 3 | showed you.  I think he had it all highlighted, but I'm |
| 11:00:24 | 4 | highlighting Giant Eagle here, Store 4051 it looks like. |
| 11:00:30 | 5 | Do you see that sir?  Take your time. |
| 11:00:32 | 6 | **A**    Is this on -- |
| 11:00:34 | 7 | **Q**    It looks like it's on -- the bottom is marked 35 on |
| 11:00:37 | 8 | that -- on your report. |
| 11:00:39 | 9 | **A**    Okay.  Page 43? |
| 11:00:40 | 10 | **Q**    It looks like page 4 on top of mine.  But it looks |
| 11:00:50 | 11 | like 49 or 45 in terms of the page markings on the bottom. |
| 11:00:55 | 12 | **A**    Okay.  I do see that. |
| 11:00:57 | 13 | MR. WEINBERGER:  Do you mind if I help him?  I |
| 11:00:58 | 14 | can point out the page to him. |
| 11:01:00 | 15 | MS. SULLIVAN:  I think he said he's got it, |
| 11:01:03 | 16 | Peter. |
| 11:01:04 | 17 | THE WITNESS:  I'm looking at page 43. |
| 11:01:06 | 18 | MR. WEINBERGER:  It's actually 35. |
| 11:01:11 | 19 | THE WITNESS:  35?  Let me flip through.  Okay. |
| 11:01:29 | 20 | BY MS. SULLIVAN: |
| 11:01:29 | 21 | **Q**    Thank you.  And Captain Villanueva, I wanted to ask |
| 11:01:31 | 22 | you about your report and the prescriptions issued.  And |
| 11:01:35 | 23 | I've gone through it, and I want you to check me, if you |
| 11:01:39 | 24 | would.  It looks like Giant Eagle just issued one |
| 11:01:42 | 25 | prescription to Mr. Winland.  If could you check your sheet |

11:01:46  1   and just match it up with the -- I think it's -- the

11:01:50  2   notation is G-E4051.  Take a minute and just make sure I got

11:02:10  3   it right that there was one prescription from Giant Eagle to

11:02:13  4   Mr. Winland.

11:02:26  5   **A**     That's all I can see.

11:02:27  6   **Q**     Yes.  And do you see, Captain Villanueva, that that

11:02:32  7   prescription is not an opioid?  It's diazepam?

11:02:37  8   **A**     I see that is diazepam.

11:02:38  9   **Q**     Yeah.  And you know from your work in drug enforcement

11:02:41  10  that that is not an opioid?  It's a muscle relaxant?

11:02:46  11  **A**     Yes, that is a muscle relaxant.

11:02:49  12  **Q**     And so no evidence on your OARRS report that Giant

11:02:52  13  Eagle prescribed Mr. Winland any opioids?

11:03:00  14  **A**     That's correct.

11:03:03  15           MS. SULLIVAN:  Can I have the ELMO, Mr. Pitts?

11:03:13  16           COURTROOM DEPUTY:  You have the ELMO.

11:03:15  17           MS. SULLIVAN:  I'm sorry.  I guess it's just

11:03:16  18  not working on this screen.  Okay.

11:03:19  19       So no opioid from Giant Eagle.

11:03:21  20  BY MS. SULLIVAN:

11:03:21  21  **Q**     And do you know -- and I take it, Captain, in your

11:03:24  22  work you're familiar with the schedules for drugs, Schedule

11:03:26  23  I, Schedule II, Schedule III for narcotics and controlled

11:03:30  24  substances that the Government has generally?

11:03:33  25  **A**     Yeah, I'm familiar with the schedules.

11:03:36  1   **Q**    And do you know, Captain Villanueva, that diazepam is

11:03:45  2   issued by doctors for muscle spasms, ain't anxiety, alcohol

11:03:51  3   withdrawal, and for seizures, stuff like that, generally?

11:03:58  4   **A**    I do not know why doctors -- why doctors would issue

11:04:00  5   diazepam.  I'm not familiar.

11:04:02  6   **Q**    Fair enough.

11:04:03  7        You know it's not an opioid, as you said?

11:04:07  8   **A**    Yes.

11:04:07  9   **Q**    And I want to just have you take a look if we could at

11:04:15  10  HBC/GE MDL 1326, and that's Tab 9.

11:04:40  11              MS. SULLIVAN:  Any objection, Counsel?

11:04:47  12              MR. LANIER:  I don't object to this, Your

11:04:49  13  Honor.

11:04:49  14              MS. SULLIVAN:  Okay.

11:04:51  15  **Q**    And Captain Villanueva, just putting this up here,

11:04:54  16  this is, just looking at the last page, this is the

11:04:58  17  Government's schedule for controlled substances.

11:05:06  18        Do you see that?

11:05:09  19  **A**    Yes, I see it.

11:05:10  20  **Q**    And you know from your work that Schedule II are

11:05:18  21  opioids, or include opioids?

11:05:25  22  **A**    Yes, I see at the bottom it says examples of Schedule

11:05:30  23  II.

11:05:30  24  **Q**    And then they have Schedule III, drugs, controlled

11:05:36  25  substances, and they talk about how Schedule III have a

11:05:39   1   potential for abuse less than Schedule I or II, right?  And

11:05:43   2   you know that.

11:05:44   3   **A**    Yes, that's correct.

11:05:45   4   **Q**    And then they have Schedule IV controlled substances.

11:05:52   5   And on that list is the medicine that was dispensed by the

11:05:57   6   Giant Eagle store, diazepam, right?

11:06:01   7   **A**    Yes.

11:06:03   8   **Q**    And by the way, do you know that Giant Eagle -- you

11:06:05   9   know the Giant Eagle pharmacies in Trumbull County, they're

11:06:08   10   inside grocery stores?

11:06:10   11   **A**    Yes, I'm familiar.

11:06:10   12   **Q**    And it says that Schedule IV controlled substances

11:06:16   13   like the diazepam that Giant Eagle dispensed have a low

11:06:20   14   potential for abuse relative to substances in Schedule III,

11:06:25   15   right?

11:06:26   16   **A**    Yes, that's what it says.

11:06:30   17   **Q**    And did you know from your investigative report that

11:06:41   18   Mr. Winland suffered from seizures?

11:06:42   19   **A**    I do not know his medical history.

11:06:43   20   **Q**    Did you as part of your investigation look at the

11:06:47   21   presentence investigation report?

11:06:51   22   **A**    I'm not familiar with that.

11:06:52   23   **Q**    Okay.  So you wouldn't know whether he suffered from

11:06:55   24   seizures?

11:06:56   25   **A**    I wouldn't not know.

| | | |
|---|---|---|
| 11:06:58 | 1 | **Q**    Fair enough. |
| 11:06:59 | 2 | And just to kind of wrap up, then, Mr. -- Captain, I'm |
| 11:07:07 | 3 | sorry, Villanueva, based on your review of your |
| 11:07:10 | 4 | investigative report, Giant Eagle dispensed one |
| 11:07:22 | 5 | prescription, and it was not an opioid? |
| 11:07:25 | 6 | **A**    That is correct. |
| 11:07:25 | 7 | **Q**    Okay. |
| 11:07:29 | 8 | MS. SULLIVAN:  I have nothing further.  Thank |
| 11:07:33 | 9 | you so much, sir, and thank you for your service. |
| 11:07:53 | 10 | THE WITNESS:  Thank you. |
| 11:07:55 | 11 | THE COURT:  Mr. Majoras for Walmart. |
| 11:07:58 | 12 | MR. MAJORAS:  Thank you, Your Honor. |
| 11:07:59 | 13 | - - - - - |
| 11:07:59 | 14 | CROSS-EXAMINATION |
| 11:08:00 | 15 | BY MR. MAJORAS: |
| 11:08:00 | 16 | **Q**    Good morning, Captain Villanueva.  My name is John |
| 11:08:03 | 17 | Majoras.  I'm one of the lawyers for Walmart.  I'm going to |
| 11:08:06 | 18 | ask you questions similar to what you heard from |
| 11:08:09 | 19 | Ms. Sullivan, and so you may be using the same reference |
| 11:08:12 | 20 | materials. |
| 11:08:12 | 21 | But first I'd like to again show you the list that |
| 11:08:16 | 22 | we've seen before of the different pharmacies and also the |
| 11:08:20 | 23 | different doctors that you were shown on your direct |
| 11:08:23 | 24 | testimony. |
| 11:08:24 | 25 | Do you have that in front of you, sir? |

11:08:25  1    **A**     Yes, it's right here.

11:08:26  2    **Q**     So this is Plaintiffs' Exhibit 04600, and it's page

11:08:33  3    35.

11:08:34  4         And at the bottom you see there's a Walmart Pharmacy

11:08:38  5    that's identified.

11:08:38  6         Do you see that, sir?

11:08:43  7                   THE COURT:  Mr. Majoras, if you would realign

11:08:44  8    that a little bit so everyone can see.

11:08:48  9                   MR. MAJORAS:  I don't have a monitor in front

11:08:50  10   of me that's working, Judge, unfortunately, so --

11:08:53  11                  THE COURT:  All right.  That's better.  Thank

11:08:54  12   you.

11:08:54  13                  MR. MAJORAS:  There we go.

11:08:55  14   **Q**     Does that help, Captain?

11:08:57  15   **A**     Yes, at the bottom I see Walmart Pharmacy.

11:08:59  16   **Q**     And when you looked at the report that you generated,

11:09:03  17   the OARRS report you generated, do you recall that only one

11:09:07  18   Walmart prescription was identified, one Walmart dispensed

11:09:11  19   prescription was identified?

11:09:38  20   **A**     That is correct.  I see one prescription for Walmart.

11:09:45  21   **Q**     And do you also see that the prescription that was

11:09:48  22   dispensed by the Walmart store was for -- I knew I would

11:09:53  23   mispronounce this -- clonazepam?

11:10:12  24   **A**     That is correct.

11:10:13  25   **Q**     And you understand that clonazepam is not an opioid,

2784

11:10:16　1　correct?

11:10:17　2　**A**　That is correct.

11:10:21　3　**Q**　In fact, if we could use the chart that Ms. Sullivan

11:10:26　4　just showed you with the controlled substances, this is,

11:10:30　5　this is HBC/GE 1236, turn to page 2 of that.

11:10:40　6　　And if you see that, sir, on the second page under

11:10:44　7　Schedule IV controlled substances, I have clonazepam

11:10:49　8　underlined there?

11:10:50　9　**A**　Yes, I see it.

11:10:50　10　**Q**　And that's the same prescription that you just

11:10:53　11　identified from your report, correct?

11:10:56　12　**A**　That is correct.

11:11:00　13　**Q**　Now, earlier you were shown an indictment and then

11:11:04　14　also a plea agreement.

11:11:05　15　　Do you recall that?

11:11:07　16　**A**　Yes, I recall.

11:11:08　17　**Q**　That was for Mr. Winland?

11:11:11　18　**A**　Yes.

11:11:11　19　**Q**　And in both the indictment and in the plea agreement,

11:11:14　20　the only medications identified there that were part of his

11:11:18　21　deception were hydrocodone and oxycodone, correct?

11:11:24　22　**A**　Can I refer back to --

11:11:26　23　**Q**　Sure.  It's in your Tab 13 and 14 that Mr. Swanson

11:11:29　24　showed you.  I believe 14 is the indictment, 13 is the plea

11:11:35　25　agreement.

11:11:48   1      And if you could, why don't we take them one at a

11:11:50   2  time, so if you could tell me which one you want to look at

11:11:54   3  first.

11:11:54   4  **A**    I am on page 13.

11:12:11   5      Okay.  Your question, sir?

11:12:12   6  **Q**    So I assume you meant Tab 13.  And that's the plea

11:12:16   7  agreement, sir?

11:12:17   8  **A**    Yes.  Thank you.

11:12:17   9  **Q**    Thank you.

11:12:18  10      So within the plea agreement, would you agree that the

11:12:21  11  only medications identified as part of the deception are

11:12:26  12  oxycodone and hydrocodone?

11:12:31  13  **A**    Yes.

11:12:31  14  **Q**    And if you could turn to Tab 14, which is the

11:12:34  15  indictment, which is the charging document.  I have the same

11:12:38  16  question for you on that document.

11:12:44  17  **A**    Yes, it says oxycodone.

11:12:48  18          MR. MAJORAS:  Thank you, Captain.

11:12:55  19          MR. DELINSKY:  I'm sorry, Your Honor.  No

11:12:57  20  questions.

11:12:57  21          THE COURT:  All right.  Thank you,

11:12:59  22  Mr. Delinsky.

11:12:59  23      All right.  If any of the jurors have questions of

11:13:03  24  this witness before Mr. Lanier comes back?

11:14:07  25          (Juror question review.)

| | | |
|---|---|---|
| 11:17:08 | 1 | THE COURT: All right. All right. Someone |
| 11:17:10 | 2 | had a question here? |
| 11:17:11 | 3 | MR. WEINBERGER: I think we need white noise |
| 11:17:13 | 4 | on. |
| 11:17:14 | 5 | (At side bar at 11:17 a.m.) |
| 11:17:16 | 6 | MR. WEINBERGER: Your Honor, the one question |
| 11:17:19 | 7 | referencing the list on page 35 is a question from the juror |
| 11:17:30 | 8 | as to what were the dates that the scripts were filled, and |
| 11:17:38 | 9 | that information is contained on the OARRS report in the |
| 11:17:46 | 10 | first three pages that you've excluded. |
| 11:17:50 | 11 | THE COURT: Well, we're not going to get into |
| 11:17:52 | 12 | it in my view. I mean, we -- I've allowed -- the dates are |
| 11:17:55 | 13 | not relevant to anything. |
| 11:17:58 | 14 | MR. WEINBERGER: Well, the dates are relevant |
| 11:18:00 | 15 | with respect to if multiple prescriptions were filled at the |
| 11:18:10 | 16 | same time or close in time. I mean, the juror has really |
| 11:18:15 | 17 | focused on, you know, an important issue that, you know, I |
| 11:18:20 | 18 | think they're entitled to know the answer to. |
| 11:18:22 | 19 | THE COURT: Well, I disagree. This is not |
| 11:18:23 | 20 | part of the case. The plaintiffs are not focusing on any |
| 11:18:27 | 21 | particular prescriptions, and the witness said that he -- he |
| 11:18:32 | 22 | has no opinion. So we're moving on. I'm not going into |
| 11:18:34 | 23 | this, all right? |
| 11:18:43 | 24 | MR. WEINBERGER: Okay. |
| 11:19:02 | 25 | MR. LANIER: It is unclear to me -- am I |

11:19:04   1   allowed to ask the other two questions?

11:19:04   2                    THE COURT:  Yeah.

11:19:11   3                    MR. MAJORAS:  Your Honor, no.  We object, Your

11:19:11   4   Honor, at least on the particular ones, what happens after

11:19:13   5   an arrest.  There's only been one arrest here, we know what

11:19:19   6   happened.

11:19:19   7                    THE COURT:  Right, that's irrelevant.  This

11:19:20   8   person -- right, this person was convicted.  What his

11:19:23   9   sentence was again is irrelevant.  We're not a criminal

11:19:29  10   case, so I don't see that's germane to anything.

11:19:32  11                    MR. SWANSON:  And, Your Honor, on the other

11:19:34  12   question, just so you're aware, we may have a foundation

11:19:36  13   objection that asks what pharmacists did in response to

11:19:41  14   these prescriptions.  And I think that just gets into this

11:19:43  15   issue of whether they -- whether these prescriptions should

11:19:47  16   have been filled which you have ruled is out.

11:19:49  17       If he says they didn't look at OARRS, I mean, he's not

11:19:54  18   going to know that, but any suggestion that they didn't look

11:19:56  19   at OARRS, nobody knows that.

11:19:57  20                    THE COURT:  Right, I think we've pretty well

11:19:59  21   exhausted what we can do with these prescriptions.

11:20:03  22                    MR. LANIER:  Well, with due respect, Your

11:20:04  23   Honor, I think I'm allowed a little follow-up from the cross

11:20:07  24   that just went down.

11:20:08  25                    THE COURT:  You can ask -- but in terms of the

2788

11:20:10  1  detail on these questions, all right, we're not focusing on

11:20:14  2  any -- the witness says he has no opinion on whether any

11:20:19  3  pharmacist did anything wrong, and I think both sides should

11:20:22  4  just leave it at that.

11:20:27  5                    (In open court at 11:20 a.m.)

11:20:33  6                    MR. LANIER:  May I redirect, Your Honor?

11:20:37  7                    THE COURT:  Yes.

11:20:38  8                    MR. LANIER:  Thank you.

11:20:39  9                              - - - - -

11:20:39  10                    REDIRECT EXAMINATION

11:20:39  11  BY MR. LANIER:

11:20:45  12  Q    Captain Villanueva, three quick stops on a road to get

11:20:49  13  you off the stand.

11:20:52  14       I want to talk about the other drugs, I want to talk

11:20:54  15  about the pills, I want to talk about Mr. Winland.  Okay?

11:20:57  16       You got asked questions about other drugs.

11:21:03  17  Specifically, you got asked about heroin and fentanyl and

11:21:07  18  cocaine and crack cocaine.  Remember those questions?

11:21:09  19  A    Yes.

11:21:11  20  Q    Did you see trends in drugs?

11:21:20  21  A    Yes, I did.

11:21:21  22  Q    And in that regard, did you see -- the question was

11:21:30  23  asked with reference to defendants' document 13052, "Looks

11:21:36  24  like we're in trouble with the big three, cocaine, heroin,

11:21:39  25  and fentanyl."

11:21:40    1        Do you see that?

11:21:43    2   **A**    Yes, I see that.

11:21:44    3   **Q**    Now, the jury has already heard that heroin and

11:21:47    4   fentanyl are opiates, illegal ones.  Well, fentanyl can be

11:21:54    5   legal.

11:21:56    6        Did you personally observe any movement in these

11:22:07    7   trends from or away from opiates that are prescription

11:22:12    8   opiates?

11:22:16    9   **A**    Can you repeat the question?

11:22:17   10   **Q**    Yeah.

11:22:17   11        When he asked you all these questions about heroin and

11:22:25   12   the big problem of heroin now and the big problem of

11:22:28   13   fentanyl, did you in your own experience see people

11:22:34   14   transitioning from prescription opiates to these other

11:22:37   15   drugs?

11:22:39   16             MR. SWANSON:  Objection.  Leading.

11:22:40   17             THE COURT:  Sustained.

11:22:41   18   **Q**    Can you tell us what your experience is seeing what

11:22:46   19   happens to people who get addicted to prescription opiates

11:22:49   20   like we're talking about in terms of other drugs?

11:22:55   21             MR. SWANSON:  Objection.

11:23:02   22             DEFENSE COUNSEL:  Objection, Your Honor.

11:23:08   23             (At side bar at 11:23 a.m.)

11:23:35   24             THE COURT:  All right.  First, the question is

11:23:39   25   still leading.  There's no time period.  And the witness

| | |
|---|---|
| 11:23:42 | 1 |
| 11:23:48 | 2 |
| 11:23:52 | 3 |
| 11:23:53 | 4 |
| 11:23:55 | 5 |
| 11:23:57 | 6 |
| 11:23:59 | 7 |
| 11:24:02 | 8 |
| 11:24:04 | 9 |
| 11:24:09 | 10 |
| 11:24:12 | 11 |
| 11:24:16 | 12 |
| 11:24:22 | 13 |
| 11:24:25 | 14 |
| 11:24:29 | 15 |
| 11:24:31 | 16 |
| 11:24:34 | 17 |
| 11:24:37 | 18 |
| 11:24:41 | 19 |
| 11:24:43 | 20 |
| 11:24:46 | 21 |
| 11:24:49 | 22 |
| 11:24:50 | 23 |
| 11:24:52 | 24 |
| 11:24:56 | 25 |

1  hasn't said anything about this -- hasn't made this

2  connection at all anyway.  So I'm going to still sustain the

3  objection.

4           MR. LANIER:  All right.  Your Honor, here's my

5  concern.

6           THE COURT:  I didn't say you can't go into the

7  subject at all, but you can't do it this way.

8           MR. LANIER:  Okay.  That's fair.

9      I want to make sure I don't make an unnecessary extra

10  side bar here.  So the direction that I was headed was

11  basically giving him language from his own deposition of

12  what he said.  When asked by Mr. Swanson about this in the

13  deposition, we've got this time frame issue now of heroin

14  and fentanyl.  I'll put it in the current time frame.  But

15  in his deposition he said, "I've personally seen the effects

16  of people getting addicted to prescription medications.

17  They start off with a prescription, then they move the other

18  way."  And he talks about having arrested them for first

19  prescription drugs and then having to arrest them for

20  illicit drugs and that's his experience.

21      So I'll put it into a time frame and I'll do it

22  without leading.

23           MR. SWANSON:  And, Your Honor, you can now see

24  clearly that he's just going to get into hearsay what other

25  people told him.

| | | |
|---|---|---|
| 11:24:56 | 1 | MR. LANIER: No, no, no, his investigation. |
| 11:25:00 | 2 | MR. SWANSON: It's 100 percent hearsay, Mark. |
| 11:25:02 | 3 | THE COURT: Because, Mr. Swanson, you went |
| 11:25:03 | 4 | into this area pretty extensively, if this question can be |
| 11:25:08 | 5 | asked in a nonleading way and we have a specific time period |
| 11:25:12 | 6 | and the witness can answer it without talking about what |
| 11:25:17 | 7 | other people said to him. |
| 11:25:19 | 8 | MR. LANIER: Got it. |
| 11:25:20 | 9 | MR. SWANSON: Your Honor, respectfully, I'm |
| 11:25:22 | 10 | not clear what area I went to other than -- |
| 11:25:24 | 11 | THE COURT: Sir, you cross-examined him |
| 11:25:26 | 12 | extensively about what drug dealers do, with various drugs. |
| 11:25:33 | 13 | MR. SWANSON: Because it's important for the |
| 11:25:36 | 14 | jury to understand there's more than a pill problem, there's |
| 11:25:38 | 15 | a cocaine problem, a meth problem. But that's not a gateway |
| 11:25:41 | 16 | issue, Your Honor, that's simply that there are a lot of |
| 11:25:43 | 17 | drugs out there. |
| 11:25:44 | 18 | THE COURT: Yeah, but you went into the area |
| 11:25:45 | 19 | and put it all in there, so if this witness has the |
| 11:25:48 | 20 | knowledge to make a connection, he can from his knowledge |
| 11:25:53 | 21 | and experience, if he wants to draw a direction, fine. You |
| 11:25:57 | 22 | can cross-examine him on it. |
| 11:25:58 | 23 | MR. SWANSON: But I can't because all he's |
| 11:26:00 | 24 | going to say is I heard from somebody, we don't know who he |
| 11:26:03 | 25 | heard from. |

| | | |
|---|---|---|
| 11:26:04 | 1 | MR. LANIER:  No, no, no, no, he's investigated |
| 11:26:06 | 2 | this. |
| 11:26:06 | 3 | THE COURT:  He's investigated this.  It isn't |
| 11:26:08 | 4 | just hearsay. |
| 11:26:08 | 5 | MR. SWANSON:  Right, and the investigation is |
| 11:26:10 | 6 | what he was told. |
| 11:26:11 | 7 | MR. LANIER:  No, no, no, no. |
| 11:26:11 | 8 | MR. SWANSON:  If you can establish that there |
| 11:26:12 | 9 | are records -- |
| 11:26:12 | 10 | THE COURT:  Mr. Swanson, every answer he gave |
| 11:26:15 | 11 | you was from what he's learned from his investigation and |
| 11:26:21 | 12 | what he's been told.  He isn't personally talking about his |
| 11:26:24 | 13 | own drug use.  So you went into it and you elicited answers |
| 11:26:30 | 14 | based on his law enforcement experience.  That's the only |
| 11:26:32 | 15 | experience he's got, okay? |
| 11:26:36 | 16 | MR. MAJORAS:  Your Honor, John Majoras.  I'm |
| 11:26:38 | 17 | sorry, I've got one additional issue. |
| 11:26:39 | 18 | If he's going to show him his deposition to remind him |
| 11:26:42 | 19 | what he wants to tell about, that sounds like leading. |
| 11:26:44 | 20 | MR. LANIER:  I'm not.  I'm not.  I'm not.  I'm |
| 11:26:47 | 21 | not. |
| 11:26:47 | 22 | MR. MAJORAS:  I was just wondering. |
| 11:26:53 | 23 | (In open court at 11:26 a.m.) |
| 11:26:54 | 24 | BY MR. LANIER: |
| 11:27:01 | 25 | **Q**    You were asked in reference to Defendants' Exhibit |

| | |
|---|---|
| 11:27:07 | 1 |
| 11:27:11 | 2 |
| 11:27:14 | 3 |
| 11:27:16 | 4 |
| 11:27:16 | 5 |
| 11:27:22 | 6 |
| 11:27:27 | 7 |
| 11:27:33 | 8 |
| 11:27:33 | 9 |
| 11:27:36 | 10 |
| 11:27:41 | 11 |
| 11:27:45 | 12 |
| 11:27:50 | 13 |
| 11:27:57 | 14 |
| 11:28:00 | 15 |
| 11:28:01 | 16 |
| 11:28:05 | 17 |
| 11:28:09 | 18 |
| 11:28:20 | 19 |
| 11:28:30 | 20 |
| 11:28:34 | 21 |
| 11:28:39 | 22 |
| 11:28:46 | 23 |
| 11:28:51 | 24 |
| 11:28:55 | 25 |

1   13052 about whether or not as of two years ago the concern

2   was the big three, cocaine, heroin, and fentanyl.

3       Do you remember those questions?

4   **A**   Yes, I do.

5   **Q**   All right.  My question to you is, do you in that same

6   time period see any link between any of those and what

7   you've been testifying to in front of the jury?

8   **A**   Yes.

9   **Q**   Would you explain what you see as a link based upon

10  your investigation and your experience?

11  **A**   Well, without the heroin problem in Trumbull County,

12  we wouldn't have -- we wouldn't be in the fentanyl problem

13  that we're in right now.  And there's lots of other drugs

14  that aren't mentioned in there that got us to heroin and

15  fentanyl.

16  **Q**   Based on your experience, what other drugs got y'all

17  to heroin and fentanyl?

18  **A**   It starts with marijuana, starts with pills.  It can

19  start from anything.  It can -- my experience, I've seen,

20  again, multiple repeat offenders, they're starting off with

21  this type of drug, a prescription drug.  The addiction gets

22  so strong they can't afford that pill anymore or the OARRS

23  reports are now stopping doctor shopping, so they move to

24  street level drugs, so they're buying those pills off the

25  street now rather than getting them from a doctor.  And it

11:28:58    1    moves to -- it just gets too expensive.  They're not getting

11:29:04    2    the high that they would get anymore.

11:29:07    3        And I've seen to where they've moved to heroin, and

11:29:09    4    then I've seen them in and out of treatment and ultimately,

11:29:14    5    in some cases, fatal overdose.

11:29:21    6    Q    Okay.  Thank you.

11:29:21    7        Next subject:  Pills.

11:29:25    8        Oh, by the way, before I leave illegal drugs, does the

11:29:30    9    fact that there may be a cocaine problem affect whether or

11:29:35   10    not you decide to go after other drugs, illegal drugs?  In

11:29:40   11    other words, are you like one or none?

11:29:43   12    A    No.

11:29:46   13    Q    All right.  Pills.

11:29:48   14        You got asked questions about the Ohio Board of

11:29:54   15    Pharmacy.

11:29:54   16        Do you remember those?

11:29:54   17    A    Yes.

11:29:56   18    Q    And you mentioned that they handle pharmacy

11:30:01   19    inspections, or maybe you said investigations.  I don't

11:30:04   20    remember which one.

11:30:05   21        Which is it?

11:30:06   22    A    Board of Pharmacy handles both inspections and

11:30:14   23    investigations.

11:30:15   24    Q    Okay.  In that regard, sir, do you know, do you have

11:30:24   25    personal knowledge of whether or not Walgreens, for example,

11:30:26  1    or others are actually on the Ohio Board of Pharmacy?

11:30:32  2    **A**    I do not have that knowledge.

11:30:33  3    **Q**    Okay.  You mentioned also that there was a point in

11:30:39  4    time when you said "we couldn't keep up with the

11:30:42  5    prescription cases."

11:30:43  6         Can you explain that to the jury, please?

11:30:45  7    **A**    Yes, there was a point in time, like I mentioned

11:30:51  8    before, there was only two of us that knew how to do these

11:30:54  9    types of investigations with our office.  At the time, we

11:30:56  10   only had maybe five, six investigators with the local drug

11:31:03  11   task force.

11:31:06  12        And there was a point in time where the majority of

11:31:10  13   the cases would just get filtered through the commander.  So

11:31:14  14   tips would get sent in.  He'd start a case file, and he

11:31:18  15   would put that case file on our desk.  And there was a time

11:31:22  16   where we couldn't keep up with the prescription cases.  We

11:31:27  17   were getting backed up on heroin cases, crack cocaine cases.

11:31:36  18   And really that's our job as local law enforcement, is to

11:31:41  19   keep up with street drug dealers.

11:31:47  20   **Q**    Okay.  So were the prescription drug cases a drain on

11:31:52  21   your resources?

11:31:53  22   **A**    Absolutely.  These cases would take up a lot of time.

11:31:56  23   Our normal investigations for street drug dealers, they do

11:32:07  24   take some time.  The intel has to come in.  But once you get

11:32:12  25   going on a case, it happens pretty quick, whether you're

11:32:16    1    doing drug buys, doing search warrants, presenting cases to

11:32:21    2    the prosecutor.

11:32:22    3         But these cases take up a lot of time, a lot of

11:32:24    4    follow-up, meeting up with doctors, filling out receipts for

11:32:31    5    prescriptions, going -- physically going to pharmacies and

11:32:35    6    grabbing prescriptions as evidence takes a lot of time.  And

11:32:40    7    when we would work on a prescription case, it was one of the

11:32:44    8    times that we could not handle multiple prescription cases

11:32:47    9    at a time at our local level.

11:32:50   10    Q    Did it also have a drain or effect on the community,

11:32:54   11    all of these prescription cases?

11:32:57   12    A    Absolutely.

11:32:59   13    Q    Can you explain how?

11:33:00   14    A    I mean, the drain on the community as far as we've

11:33:07   15    seen an increase of prescription cases, people doctor

11:33:17   16    shopping.  Not only that, but we started to see individuals,

11:33:23   17    sometimes even informants of ours, getting addicted to pills

11:33:30   18    and then moving on to heroin because it was cheaper than

11:33:33   19    going out and spending 40, 50, sometimes even $80 for one

11:33:37   20    pill, where they would get the same high and use heroin.

11:33:41   21    Q    Now, you testified that you're not saying the

11:33:47   22    pharmacies did anything wrong or violated the regulations,

11:33:51   23    right?

11:33:53   24    A    Correct, I don't know the regulations.

11:33:56   25    Q    You're here as a fact witness to testify as Captain

11:34:00  1   Tony Villanueva?

11:34:01  2   **A**    My experience as a drug investigator and as a

11:34:05  3   commander of the drug task force.

11:34:06  4   **Q**    All right.  And in that regard, expert testimony of

11:34:13  5   pharmacies' obligations or abilities, things like that, is

11:34:17  6   that something you bring to the table to testify about?

11:34:23  7   **A**    I'm far from an expert.

11:34:26  8   **Q**    Last stop, Mr. Winland.

11:34:35  9        You were given the indictment of Mr. Winland, correct?

11:34:37  10  **A**    Yes, I was.

11:34:42  11  **Q**    And you indicted him by deception, he was indicted by

11:34:45  12  deception.

11:34:47  13       My question is --

11:34:51  14             MR. LANIER:  Not indicted by deception.  I

11:34:54  15  just messed up, Judge.  I see what a did.  Sorry.

11:34:57  16  **Q**    The courts did not did he receive anybody in indicting

11:35:00  17  him, nor did the DA, fair?

11:35:02  18  **A**    That's fair.

11:35:04  19  **Q**    All right.  Let me be a little bit better in the way I

11:35:07  20  say this.

11:35:08  21       You testified about Douglas Winland and the deception

11:35:10  22  of doctors.  Remember those questions?

11:35:14  23  **A**    Correct.

11:35:14  24  **Q**    And if we look at the indictment itself, it is Exhibit

11:35:22  25  Number 4961, Defendants' Exhibit Number 4965.  It talks

2798

| 11:35:27 | 1 | about that.  But look what it says. |

11:35:27   1   about that.  But look what it says.

11:35:33   2   "Did knowingly procure the administration of, a

11:35:38   3   prescription for, or the dispensing of, a dangerous drug, or

11:35:45   4   did possess an uncompleted preprinted prescription blank

11:35:51   5   used for writing a prescription for a dangerous drug."  The

11:35:59   6   drug involved is oxycodone.

11:36:01   7   Do you see that, sir?

11:36:03   8   **A**   Yes, I see that.

11:36:04   9   **Q**   If this gentleman has an uncompleted preprinted

11:36:11   10   prescription blank, is that used for deceiving a doctor or

11:36:21   11   deceiving a pharmacist?

11:36:26   12   **A**   That would be for deceiving a pharmacist.

11:36:29   13   **Q**   And if you look at the next -- or Count 5, Count 5

11:36:39   14   says "Douglas Winland did knowingly possess an uncompleted

11:36:45   15   preprinted prescription blank used for writing a

11:36:47   16   prescription for hydrocodone," what is termed here a

11:36:56   17   dangerous drug.

11:36:57   18   Do you see that, sir?

11:36:59   19   **A**   Yes, I see that.

11:37:01   20   **Q**   Is that deception -- if that prescription pad is used,

11:37:06   21   is that deception on a doctor or is that deception on a

11:37:11   22   pharmacist?

11:37:12   23   **A**   That would be the pharmacy.

11:37:17   24   **Q**   And by the same token, we have the plea that was

11:37:19   25   entered into, and that was Defendants' Exhibit 4964.

11:37:26  1        And if we look at the plea, specifically onto Count 5.

11:37:34  2        Are you able to see that, sir?

11:37:39  3        "Winland did knowingly possess an uncompleted

11:37:42  4  preprinted prescription blank used for writing a

11:37:45  5  prescription for hydrocodone."

11:37:51  6        Did he plead guilty to that?

11:37:52  7  **A**    Yes, he pled guilty to deception to obtain.

11:38:05  8  **Q**    And you got your evidence or a good bit of your

11:38:09  9  investigation by going through the OARRS report; is that

11:38:14  10  correct?

11:38:14  11  **A**    Yes, that is correct.

11:38:16  12  **Q**    And you've already testified that's the same OARRS

11:38:19  13  report that is available for others, right?

11:38:22  14  **A**    Yes, it is.

11:38:24  15  **Q**    And the numbers that you were just asked about from

11:38:30  16  that OARRS report was pointed out that only one of the

11:38:36  17  prescriptions listed in that one-year readout came from

11:38:39  18  Giant Eagle, diazepam.  Right?

11:38:42  19  **A**    That is correct.

11:38:43  20  **Q**    And only one came from Walmart, clonazepam.  Correct?

11:38:49  21  **A**    Yes, that is correct.

11:38:50  22  **Q**    And if you add them up, can you --

11:38:54  23        MR. DELINSKY:  Objection, Your Honor.

11:38:54  24  Objection.

11:38:55  25        MR. MAJORAS:  Objection.

| | | |
|---|---|---|
| 11:38:56 | 1 | THE COURT:  Yeah, I'm going to sustain the |
| 11:39:04 | 2 | next question the way it was asked. |
| 11:39:08 | 3 | MR. DELINSKY:  Your Honor, side bar, please. |
| 11:39:10 | 4 | (At side bar at 11:39 a.m.) |
| 11:39:27 | 5 | MR. DELINSKY:  Your Honor, I asked not a |
| 11:39:29 | 6 | single question on cross-examination.  I sat down and I did |
| 11:39:32 | 7 | nothing to open the door that should alter the Court's |
| 11:39:35 | 8 | rulings with regard to particular prescriptions. |
| 11:39:42 | 9 | THE COURT:  I think that's right, Mr. Lanier, |
| 11:39:45 | 10 | Mr. Delinsky didn't ask anything on cross-examination. |
| 11:39:51 | 11 | Okay?  And on direct I don't think this witness said |
| 11:39:52 | 12 | anything about CVS and may have started to say something on |
| 11:39:55 | 13 | one prescription. |
| 11:39:58 | 14 | MR. SWANSON:  Your Honor, for Walgreens, I |
| 11:39:59 | 15 | didn't ask him a single question about those either.  I did |
| 11:40:01 | 16 | not open the door on anything about those. |
| 11:40:03 | 17 | MR. LANIER:  So, Your Honor, what they do |
| 11:40:05 | 18 | here, first of all, I'm still going to want to make a record |
| 11:40:09 | 19 | outside the presence of the jury because I think this is |
| 11:40:11 | 20 | error in the case, and I want to be clear about that.  And |
| 11:40:15 | 21 | I've got to get the testimony some way onto the record. |
| 11:40:18 | 22 | But second of all, the number of prescriptions is |
| 11:40:21 | 23 | clearly an issue, and these defendants have a coordinated |
| 11:40:25 | 24 | defense.  They've struck together, they've allotted their |
| 11:40:28 | 25 | time together, they've planned who's covering which |

11:40:30  1    witnesses together.  And for two of the defendants to be

11:40:32  2    able to get up and to say just one and it wasn't an opiate,

11:40:36  3    just one and it wasn't an opiate, and I'm left not being

11:40:40  4    able to show, well, actually you've got dozens being filled

11:40:44  5    by the other defendants and they are opiates.  I think

11:40:48  6    that's highly prejudicial.

11:40:50  7                    THE COURT:  Well, wait a minute, wait a

11:40:51  8    minute.

11:40:52  9        I'm looking at, you know, page 35.  That was the

11:40:57  10   document I allowed in.  All right?  And I would -- I allowed

11:41:01  11   you to go through all of those prescriptions and identify

11:41:05  12   which of them were opiates.  And I think you identified one

11:41:12  13   Walgreens prescription and then stopped.  I don't think

11:41:19  14   you -- Giant Eagle's covered.  I mean, and then the Walmart

11:41:23  15   is covered.  So that's the document we're talking about.

11:41:26  16                    MR. LANIER:  I got stopped, Your Honor,

11:41:27  17   because I got told that I couldn't get into the individual

11:41:30  18   prescriptions.  But I was prepared --

11:41:32  19                    THE COURT:  Well, no, I said on this document.

11:41:34  20   This is the one you wanted to use.  I said you could go

11:41:37  21   through each and every one and identify which were opioids

11:41:41  22   and which were muscle relaxants and were Benzo, and

11:41:47  23   obviously you did what you could do.

11:41:48  24                    MR. LANIER:  Well, I think the record will

11:41:50  25   reflect you sustained an objection on me doing that, but --

```
11:41:53    1            THE COURT:  No, I didn't.  You started and I
11:41:55    2    think you stopped, but I'll -- if I was wrong, I will allow
11:42:02    3    you to use this document and identify which, if any, of
11:42:07    4    these prescriptions were opioids, which were muscle relaxers
11:42:12    5    and which were Benzo.  There's one CVS, one Giant Eagle, we
11:42:16    6    covered that.  There's one Walmart, we've covered that.
11:42:18    7    There's the Walgreens, I think those are the --
11:42:22    8            MR. LANIER:  Well, actually, Your Honor, there
11:42:23    9    are 11 CVS, there are over 20 Walgreens, and that's the
11:42:28   10    problem is even the Court has been misled into thinking
11:42:32   11    there's just one with each.  And I think I need to fix that.
11:42:37   12            THE COURT:  This is your witness, so --
11:42:44   13            MR. SWANSON:  Your Honor, Mr. Lanier moved on
11:42:45   14    from these questions.  He can show us if it is.  It wasn't a
11:42:48   15    sustained objection.  It's that he couldn't figure out what
11:42:51   16    question he wanted to ask next.  I did not ask a single
11:42:54   17    question about the prescriptions filled at Walgreens.  I
11:42:57   18    didn't open the door.  And to come back and suggest, as he
11:43:01   19    will, that by the sheer number that those shouldn't have
11:43:04   20    been filled because they were filled for a criminal, it's
11:43:07   21    getting back to the same issue that you addressed this
11:43:09   22    morning about whether they're trying to now say, having
11:43:12   23    failed to respond to Interrogatory Number 25 about what
11:43:16   24    prescriptions we shouldn't have filled, they're now
11:43:18   25    suggesting to the jury based on the number that those
```

1  shouldn't have been filled.

2  MR. LANIER:  No, that's not accurate, Your

3  Honor.  They are in a case where they're trying it and

4  they're asking witnesses questions like can you find one

5  prescription that shouldn't have been filled, and that's the

6  way they're trying this case.

7  And so when I went into it, I went into it, page 49,

8  line 3, I said oxycodone filled at W-G688, and this is as

9  I'm walking through the prescriptions and where they were

10  filled.

11  And I asked you, pay attention when multiple

12  prescriptions are filled because two of them were done

13  there.  And the objection was, "I object to this, Your

14  Honor."

15  And the answer was, "Sustained."

16  And there's got -- it's got to be appropriate for this

17  jury to hear the evidence that these companies were not just

18  filling prescriptions but the kid walks into a Walgreens and

19  fills two at the same time for the same drug.

20  MR. DELINSKY:  But, Your Honor, the problem I

21  have is that I asked no questions on behalf of CVS, not a

22  single question, and it is not appropriate for him to come

23  back and face no questions about CVS and start asking

24  questions about CVS.

25  MR. LANIER:  Well, I think when they have a

11:44:35   1   coordinated defense.

11:44:36   2            MR. DELINSKY:  It was not coordinated.  If I

11:44:38   3   had a vote for this, I would have asked my codefendants not

11:44:40   4   to ask those questions.  I can't control them.  It's not

11:44:43   5   coordinated.

11:44:48   6            THE COURT:  All right.  All sides have made a

11:44:52   7   hash of this, all right?  You're all at fault.  All right,

11:45:04   8   that's a fact.

11:45:04   9        I don't know -- Mr. Lanier, you have the -- from what

11:45:14  10   you were saying, I thought there was -- each of these was

11:45:17  11   one prescription, okay?  And then I said you could go

11:45:21  12   through each of these and say what one of these was filled.

11:45:30  13            MR. LANIER:  And yet they're not each one

11:45:32  14   prescription.  Some of these stores, there's a Walgreens

11:45:34  15   store where the kid goes in and he fills a 15 milligram and

11:45:37  16   a 30 milligram at the same time for 30 days, I think, if

11:45:40  17   I've got the -- maybe 10 and 30 milligrams.  But I mean,

11:45:45  18   this is -- this is the investigation.

11:45:49  19            MR. SWANSON:  Sounds like something they might

11:45:51  20   have disclosed in response to the interrogatory when we

11:45:53  21   asked them to identify which prescriptions should not have

11:45:55  22   been filled.  They said they punted on that, and now they're

11:46:00  23   trying to change their theory midway through the case when

11:46:02  24   we can't defend that.

11:46:03  25            MR. LANIER:  I did not use this with my expert

11:46:05  1   who testifies about which ones should or should not be

11:46:07  2   filled.  I don't have an expert on the stand to do that.

11:46:10  3   I'm not doing that.  I'm telling you that this is the

11:46:14  4   prescription pattern behind this fellow.  This was produced

11:46:17  5   in discovery, produced timely.  You've had it.  I even went

11:46:21  6   through it all last night.  The *Jones* case says that this

11:46:25  7   stuff is admissible.  The OARRS has been an issue the whole

11:46:31  8   time.

11:46:32  9       And y'all are the ones who have chosen to try this --

11:46:34  10  or the defendants are the ones who have chosen to try this

11:46:37  11  case on a prescription-by-prescription basis.  I can't --

11:46:39  12          THE COURT:  Well, look, I'm going to allow --

11:46:41  13  if this witness can answer this one question, I'll allow you

11:46:44  14  to ask it and I'll allow the defendants to cross-examine or

11:46:48  15  recross or whatever.  He knows how many prescriptions for

11:46:53  16  opioids, I don't care about muscle relaxants, if this

11:46:58  17  witness knows how many prescriptions for opioids were filled

11:47:02  18  at Overholt's, Franklin, CVS, Walgreens, Walmart, Giant

11:47:11  19  Eagle, he can answer that one question:  How many opioid

11:47:18  20  prescriptions Douglas Winland filled at those six places.

11:47:21  21  If he knows, I'll let him give me the answer and then if the

11:47:24  22  defendants want to ask him anything, they can.

11:47:28  23          MR. DELINSKY:  But, Your Honor, the answer

11:47:30  24  can't be provided simply by reading the four corners of the

11:47:32  25  document into the record if he doesn't have independent

11:47:34   1    recollection.

11:47:34   2            THE COURT:  If he knows, if he knows based on

11:47:37   3    his investigation, he can answer that one question in a

11:47:41   4    nonleading way.  If he knows, he can answer it.  If he

11:47:43   5    doesn't, if he wants to refer to his report, if it's part of

11:47:46   6    his report, I agree he wouldn't have memorized it.  If

11:47:52   7    looking at his report enables him to make that answer, he

11:47:54   8    can make that answer.

11:47:56   9            MR. MAJORAS:  Your Honor, it's inappropriate

11:47:57  10    to include Walmart and Giant Eagle in that just because we

11:48:00  11    already know the answer.

11:48:02  12            MR. LANIER:  I'll take them out.

11:48:03  13            THE COURT:  It may be zero.  Will that help

11:48:06  14    you, Mr. Majoras, if he says the answer is zero?

11:48:10  15            MR. MAJORAS:  It's just the way the question

11:48:11  16    was phrased it implied we may be in there.  We already know

11:48:14  17    the answer, but if Mr. Lanier takes it out, that's fine.

11:48:17  18            MR. DELINSKY:  Your Honor, the prejudice to

11:48:19  19    CVS here is twofold.  Number one, we are now on redirect

11:48:22  20    getting into an issue regarding my client when I didn't ask

11:48:26  21    a single question.

11:48:27  22        Number two, there's now a revision to the scope of

11:48:30  23    your order.  You had ordered this morning that he could

11:48:32  24    elicit whether a pharmacy dispensed an opioid, not on a

11:48:37  25    prescription-by-prescription or fill-by-fill basis.

11:48:40   1        If there's any relief to Mr. Lanier here, and I would
11:48:43   2   submit there is none given that I asked not a single
11:48:45   3   question on behalf of my client, the question should be did
11:48:48   4   CVS fill any opioid prescriptions for Mr. Winland, yes or
11:48:54   5   no.  That should be it.  That's the only way to do this
11:48:57   6   without going into a prescription-by-prescription analysis.
11:49:00   7   That was the ruling this morning, and we certainly, given
11:49:03   8   that I didn't ask any questions, be more expansive than we
11:49:07   9   were when we started.
11:49:10  10        MR. SWANSON:  And Your Honor, that's where you
11:49:11  11   were yesterday too.  You said he can say that he filled at
11:49:15  12   Walgreens, he can say he filled at CVS, he can say he filled
11:49:18  13   at Overholt's because that's what they're trying to
11:49:21  14   establish.
11:49:21  15        THE COURT:  Let's just leave it that.  We've
11:49:23  16   already established that he didn't fill an opioid
11:49:28  17   prescription at Giant Eagle and Walmart.  He said that.  He
11:49:30  18   already said he filled an opioid prescription at Walgreens.
11:49:34  19   That's in his testimony.
11:49:35  20        If they want to elicit that he filled an opioid
11:49:38  21   prescription at CVS, Mr. Lanier, if he can answer that
11:49:40  22   question, I'll let him -- you can ask it.  If he can answer
11:49:44  23   it, I'll let him answer that.  But let's move on.
11:49:48  24        I'm not going to go into the numbers.
11:49:50  25        MR. WEINBERGER:  Your Honor --

11:49:54    1              THE COURT:  I'm not going to do it, all right?

11:49:56    2              MR. WEINBERGER:  Your Honor, the part of the

11:49:58    3    transcript that Mark read to you was when you sustained an

11:50:01    4    objection during direct that prevented him from doing

11:50:07    5    exactly what we are now seeking to do, and that is look

11:50:10    6    through the -- from your investigation, did you -- can you

11:50:18    7    tell us from the documents how many prescriptions were

11:50:22    8    filled at CVS stores.  All he has to do is go through that

11:50:25    9    list and count them up in terms of opioids.

11:50:29   10        In direct, the objection was sustained so that Mark

11:50:35   11    could not do that.

11:50:36   12              THE COURT:  I'm not going to go into that

11:50:38   13    anymore.  I only allowed this witness from a general feeling

11:50:44   14    that the defendants have suggested that the only problem in

11:50:48   15    Trumbull County was Overholt's and Franklin, so I was going

11:50:51   16    to allow this witness to testify that here was a guy who was

11:50:55   17    breaking the law, and he was shopping, getting opioids from

11:51:01   18    not just Franklin and Overholt's but from at least some of

11:51:06   19    the defendants.  We've established he got opioids from

11:51:08   20    Walgreens.  If this witness knows he got opioids from CVS,

11:51:13   21    you can elicit that.  But he doesn't know whether any of

11:51:19   22    these prescriptions were unlawful, so I'm only allowing this

11:51:24   23    as sort of it generally balances the evidence.

11:51:41   24              (In open court at 11:51 a.m.)

11:51:42   25    BY MR. LANIER:

| | | |
|---|---|---|
| 11:51:42 | 1 | **Q**    You ever testify in other cases? |
| 11:51:43 | 2 | **A**    Yes, I have. |
| 11:51:44 | 3 | **Q**    Are you having fun yet? |
| 11:51:45 | 4 | **A**    Been a while.  Nice refresher. |
| 11:51:49 | 5 | **Q**    Without going into the numbers, let me ask it this |
| 11:51:57 | 6 | way. |
| 11:51:57 | 7 | Are you able to confirm -- no, let me ask it this way. |
| 11:52:01 | 8 | Did your investigation indicate whether or not |
| 11:52:04 | 9 | Mr. Winland had filled opioid prescriptions at CVS? |
| 11:52:10 | 10 | **A**    Yes. |
| 11:52:11 | 11 | **Q**    At Walgreens? |
| 11:52:12 | 12 | **A**    Yes. |
| 11:52:13 | 13 | **Q**    And if we went through all of your other |
| 11:52:17 | 14 | investigations that you've done, would we find similar |
| 11:52:21 | 15 | prescriptions being filled at all four of these defendants? |
| 11:52:27 | 16 | MR. MAJORAS:  Objection. |
| 11:52:28 | 17 | MR. SWANSON:  Objection. |
| 11:52:29 | 18 | THE COURT:  Sustained. |
| 11:52:29 | 19 | **Q**    Is this the only one you've ever done? |
| 11:52:31 | 20 | **A**    No, it's not the only investigation. |
| 11:52:38 | 21 | MR. LANIER:  Thank you.  That ends the road |
| 11:52:40 | 22 | map. |
| 11:52:40 | 23 | Your Honor, before the witness be excused, I would |
| 11:52:42 | 24 | like maybe over the lunch break to add some addition to the |
| 11:52:44 | 25 | record.  Thank you. |

2810

| | | |
|---|---|---|
| 11:52:45 | 1 | MS. SULLIVAN:  Your Honor, we have some -- |
| 11:52:47 | 2 | THE COURT:  All right.  Any recross? |
| 11:53:03 | 3 | MS. SULLIVAN:  Thank you, Your Honor. |
| 11:53:05 | 4 | - - - - - |
| 11:53:05 | 5 | RECROSS-EXAMINATION |
| 11:53:05 | 6 | BY MS. SULLIVAN: |
| 11:53:06 | 7 | **Q**    Captain Villanueva, compared to some of us you're |
| 11:53:08 | 8 | still young.  But I bet you've seen a lot in your job in |
| 11:53:12 | 9 | terms of human suffering? |
| 11:53:13 | 10 | **A**    Yes, I have. |
| 11:53:14 | 11 | **Q**    And I think you told our jury that there were a lot of |
| 11:53:17 | 12 | factors that go into drug use and reasons why people start |
| 11:53:22 | 13 | using drugs. |
| 11:53:26 | 14 | **A**    Yes. |
| 11:53:27 | 15 | **Q**    Including depression, job loss, economic |
| 11:53:30 | 16 | circumstances, mental illness, a whole host of reasons, |
| 11:53:34 | 17 | genetics? |
| 11:53:34 | 18 | MR. WEINBERGER:  Objection, Your Honor. |
| 11:53:35 | 19 | Improper recross. |
| 11:53:36 | 20 | THE COURT:  Sustained.  Sustained. |
| 11:53:41 | 21 | **Q**    And Captain Villanueva, I think you told our jurors |
| 11:53:44 | 22 | that drug abuse can start anywhere, marijuana, heroin, |
| 11:53:49 | 23 | cocaine, prescription drugs, et cetera.  Right?  You've seen |
| 11:53:53 | 24 | it. |
| 11:53:54 | 25 | **A**    Yes. |

11:53:54   1   **Q**     And I want to show you if I could Defense Exhibit

11:54:11   2   13097 in Tab 3.

11:54:27   3        And Captain Villanueva, when you told our jurors that

11:54:29   4   drug abuse can start anywhere, marijuana, alcohol,

11:54:33   5   et cetera, you were talking about that you could start with

11:54:36   6   a lighter drug like marijuana and move on to the heavy stuff

11:54:38   7   like opioids or heroin, something like that?

11:54:46   8             MR. WEINBERGER:  Objection, Your Honor.

11:54:47   9             THE COURT:  Overruled.

11:54:54  10   **Q**     That's what you were referring to, Captain, when you

11:54:56  11   said people can start with marijuana, alcohol --

11:55:05  12             THE COURT:  Well --

11:55:07  13             (At side bar at 11:55 a.m.)

11:55:13  14             THE COURT:  All right.  Miss Sullivan, you've

11:55:17  15   mischaracterized his answer.  Do you want to start going

11:55:19  16   back into that?  I mean, he said marijuana and prescription

11:55:23  17   opioids.  I don't think he said alcohol, and I don't think

11:55:26  18   it's appropriate to mischaracterize -- you can summarize the

11:55:32  19   testimony.  You can't truncate it like that.

11:55:37  20             MS. SULLIVAN:  I'm happy to ask it anew

11:55:40  21   because you've let them go into the gateway theory and say

11:55:43  22   we've opened the door on all this stuff and I'd just like to

11:55:45  23   recross on all this drug use.

11:55:46  24             THE COURT:  You can recross as long as you

11:55:49  25   want, but it's not proper to mis-cite the witness's

11:55:53 1   testimony.

11:55:53 2        MS. SULLIVAN:  Fair enough, Your Honor.  I'll

11:55:55 3   rephrase it.

11:55:55 4        THE COURT:  All right.

11:55:56 5        (In open court at 11:55 a.m.)

11:56:07 6   BY MS. SULLIVAN:

11:56:07 7   Q    Captain Villanueva, just to make my question more

11:56:09 8   clear, when you were talking to our jurors about it can

11:56:11 9   start with marijuana use, you were referring to the fact

11:56:14 10  that people can start with something like marijuana and move

11:56:17 11  up to heroin or other kinds of addictive drugs?

11:56:24 12  A    Yes, I was referring to multiple drugs.

11:56:26 13  Q    And I wanted to show us, Captain Villanueva, Defense

11:56:34 14  Exhibit -- and that would be true for alcohol, too, sir, in

11:56:37 15  your experience people can start drinking, drinking heavily,

11:56:39 16  and then move on to other drugs like heroin and cocaine?

11:56:43 17       MR. WEINBERGER:  Objection.

11:56:48 18  BY MS. SULLIVAN:

11:56:49 19  Q    In your experience?

11:56:50 20       THE COURT:  Sustained.  Sustained.

11:56:52 21  Q    And Captain Villanueva, if I can show you defense

11:56:56 22  Exhibit MDL 13097.

11:56:59 23       MS. SULLIVAN:  And Mr. Pitts, I think I still

11:57:01 24  have the ELMO.

11:57:01 25       MR. WEINBERGER:  Your Honor, before this gets

11:57:03   1   published, I am concerned that this is improper recross.

11:57:14   2                   THE COURT:  Let me see the exhibit.  Does

11:57:16   3   someone have it?  Someone hand it to me, please.

11:57:44   4        All right.  You can show him the exhibit.

11:57:45   5                   MS. SULLIVAN:  Thank you, Your Honor.

11:57:46   6   BY MS. SULLIVAN:

11:57:46   7   Q    And Captain, looking at --

11:57:50   8                   THE COURT:  Show him the exhibit first.

11:57:52   9                   MS. SULLIVAN:  Oh, I'm sorry.

11:57:53   10   Q    Do you have it -- Captain, do you have the MDL exhibit

11:57:58   11   on the bottom that says 13097?

11:58:03   12   A    I do not have that.

11:58:04   13   Q    Oh, I'm sorry.  I'm being told it's in the binder Tab

11:58:07   14   3.

11:58:16   15                   MR. LANIER:  Tab 3 is a different document for

11:58:22   16   us, Your Honor.

11:58:23   17   Q    Do you have it, sir?

11:58:24   18   A    It appears to be an investigative report.

11:58:27   19                   MR. SWANSON:  We have too many binders.

11:58:31   20                   MS. SULLIVAN:  Mr. Swanson has a binder too.

11:58:33   21                   THE COURT:  That was my confusion also.

11:58:35   22                   MS. SULLIVAN:  My apologies, Your Honor.

11:58:44   23   Q    And if we look at this document, Mr. --

11:58:49   24                   THE COURT:  Well, let's see -- what is the

11:58:51   25   question, Ms. Sullivan?

| | | |
|---|---|---|
| 11:58:55 | 1 | **Q**    Well, first -- |
| 11:58:58 | 2 |           MR. WEINBERGER:  Well, take the document down. |
| 11:59:00 | 3 |           MS. SULLIVAN:  I'm sorry. |
| 11:59:01 | 4 |           THE COURT:  What is the question, please? |
| 11:59:02 | 5 | **Q**    So, Captain, you're on the drug task force as you've |
| 11:59:05 | 6 | established? |
| 11:59:06 | 7 | **A**    Yes. |
| 11:59:06 | 8 | **Q**    And the TAG drug task force has something called drug |
| 11:59:13 | 9 | law application narrative where they summarize some of the |
| 11:59:17 | 10 | drug problems facing Trumbull County? |
| 11:59:19 | 11 | **A**    Yes, this would be our grant application. |
| 11:59:23 | 12 | **Q**    Fair enough. |
| 11:59:24 | 13 |           MS. SULLIVAN:  And Your Honor, may I display |
| 11:59:26 | 14 | the document? |
| 11:59:27 | 15 |           THE COURT:  Well, I'd like to hear a question |
| 11:59:29 | 16 | first. |
| 11:59:30 | 17 |           MS. SULLIVAN:  Sure. |
| 11:59:31 | 18 | **Q**    Captain Villanueva, does this document -- |
| 11:59:35 | 19 |           MR. WEINBERGER:  Objection, Your Honor, to |
| 11:59:36 | 20 | publishing the document.  It's -- |
| 11:59:37 | 21 |           MS. SULLIVAN:  I didn't mean to publish it. |
| 11:59:38 | 22 | I'm trying to read it. |
| 11:59:39 | 23 |           THE COURT:  I would like to have a question, |
| 11:59:41 | 24 | please. |
| 11:59:41 | 25 |           MS. SULLIVAN:  I'm trying, Your Honor. |

11:59:44  1   BY MS. SULLIVAN:

11:59:44  2   **Q**     And Captain Villanueva, does this document include a

11:59:48  3   discussion of overall drug problem factors in Franklin

12:00:13  4   County?

12:00:13  5   **A**     This application refers to what we do as a drug task

12:00:18  6   force and some of our objectives and our projects that we

12:00:25  7   have for the upcoming year for grant funds.

12:00:29  8   **Q**     And does it also, looking at the bottom of page 1,

12:00:32  9   talk about overall drug problem factors as part of that

12:00:35  10  application?

12:00:35  11  **A**     Yes.

12:00:41  12              MS. SULLIVAN:  Your Honor, may I display the

12:00:44  13  document?

12:00:48  14              THE COURT:  All right.

12:00:48  15              MS. SULLIVAN:  Thank you, Your Honor.

12:00:50  16              THE COURT:  We'll put this one portion on

12:00:52  17  there.

12:00:54  18  **Q**     And looking at your drug law application narrative

12:00:58  19  here, Captain -- let me see if I can get it so people can

12:01:02  20  see it.

12:01:04  21       It says that -- and this is so we can just establish,

12:01:08  22  this is 2019, sir?

12:01:10  23  **A**     Yes.

12:01:10  24  **Q**     And it talks about that Trumbull County's overall drug

12:01:17  25  problems are exacerbated by those factors indicated above.

12:01:22  1    And then talks about a fact that "A critical element of

12:01:25  2    concern is the local dealers in our communities who are

12:01:28  3    linked to larger cartels.  This link increases the supply of

12:01:32  4    illegal drugs to those dealers and oftentimes the potency

12:01:35  5    may be stronger (leading to more overdose deaths), while

12:01:41  6    also strengthening the dealers' protection and leading to an

12:01:43  7    increase of violence among their competitors."

12:01:46  8         Right?

12:01:47  9    **A**    That's what it reads, correct.

12:01:48  10   **Q**    And you've talked about that, the problem with illegal

12:01:50  11   drugs like heroin coming from drug cartels abroad and street

12:01:54  12   gangs selling it, et cetera, right?

12:01:55  13   **A**    Yes.

12:02:01  14             MS. SULLIVAN:  And, Your Honor, I'd also like

12:02:02  15   to show him a portion of page 2 of the document.

12:02:10  16             THE COURT:  Well, let's have a question first.

12:02:12  17             MS. SULLIVAN:  Sure.

12:02:14  18   **Q**    And Mr. Villanueva, it's true, looking at this

12:02:18  19   document, that it also talks about the influx of heroin,

12:02:23  20   fentanyl, and carfentanil as being a cause in spike of

12:02:28  21   overdose deaths in Trumbull County, right?

12:02:39  22   **A**    Are you seeing that on page 2?  I'm sorry.

12:02:41  23   **Q**    Yes, sir.  Under County Overdose Ratings in paragraph

12:02:48  24   2.

12:02:49  25   **A**    Yes, I see that.

12:02:50  1  **Q**     Yeah.  And you agree with that, right, sir?

12:02:52  2  **A**     I do.

12:02:56  3               MS. SULLIVAN:  May I display the document,

12:02:58  4  Your Honor?

12:02:58  5               THE COURT:  All right.

12:03:00  6  **Q**     And so what the TAG task force is saying here, that

12:03:05  7  it's not only heroin but fentanyl and -- and carfentanil is

12:03:10  8  I understand it an animal tranquilizer?

12:03:13  9  **A**     It can be used as an animal tranquilizer.  There's no

12:03:16  10  medical use for carfentanil.

12:03:18  11  **Q**     And that those were causing a spike in overdose deaths

12:03:21  12  in Trumbull County, right?

12:03:22  13  **A**     Yes.

12:03:24  14  **Q**     And Captain Villanueva, I'd also like to show you with

12:03:45  15  permission from the Court something that's in Tab 4 of your

12:03:48  16  binder, Defense Exhibit 13049.  It's in Tab 4.

12:04:11  17  **A**     Okay.

12:04:11  18  **Q**     You got it?

12:04:12  19         And this is a -- you were sent this report from

12:04:17  20  another Trumbull County employee, correct?

12:04:22  21  **A**     I may be on the wrong binder.

12:04:29  22               MS. SULLIVAN:  Ms. Sampson, can you help

12:04:35  23  Captain Villanueva get on the right binder in Tab 4?

12:04:40  24               MR. LANIER:  Tab 4 in this binder is an

12:04:42  25  investigation report.

12:04:43   1              MS. SULLIVAN:  That would be a different --

12:04:44   2     that is the wrong binder then.  I have a copy I can --

12:04:47   3              THE COURT:  Ms. Sullivan, if you're about

12:04:49   4     done, I'll let you finish but if you're not, we'll take a

12:04:54   5     lunch break.

12:04:55   6              MR. WEINBERGER:  Your Honor, we would like the

12:04:56   7     opportunity to redirect after these new documents are being

12:04:58   8     used on --

12:04:59   9              THE COURT:  Let's just take a lunch break.

12:05:02  10          All right.  Ladies and gentlemen, we'll take our usual

12:05:05  11     break for lunch, one hour.

12:05:08  12          The usual admonitions.  Have a good lunch.

12:05:53  13                  (A luncheon recess was taken at 12:05 p.m.)

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

01:02:08   1                    A F T E R N O O N   S E S S I O N

01:04:46   2                              - - - - -

01:04:46   3                 (In open court at 1:04 p.m.)

01:04:49   4                 THE COURT:  All right.  I only thought that

01:04:52   5     this witness was going to be on and off a long time ago.  In

01:04:58   6     my humble opinion, both sides are not using their time

01:05:01   7     wisely.  That's all I'm going to say.

01:05:02   8                      MS. SULLIVAN:  Your Honor, Diane Sullivan for

01:05:05   9     Giant Eagle.  I agree, Your Honor, and I don't think any

01:05:07   10    re-re-redirect would be appropriate.  I'm happy to stop my

01:05:10   11    exam now.

01:05:12   12                     MR. LANIER:  Well, the problem is, Your Honor,

01:05:13   13    she entered into a brand new document that either under

01:05:17   14    the --

01:05:19   15                     THE COURT:  As I said, I'm not controlling

01:05:22   16    either side.  You can keep asking questions of this witness

01:05:26   17    as long as you want.

01:05:27   18                     MS. SULLIVAN:  Your Honor, I don't think under

01:05:29   19    your court rules that a third redirect --

01:05:32   20                     THE COURT:  You were in the middle of your

01:05:33   21    cross-examination.  You did one document, 3097.  If you

01:05:41   22    want --

01:05:41   23                     MR. LANIER:  And I'll limit my redirect.

01:05:43   24                     THE COURT:  As I said, I'm not telling anyone.

01:05:45   25    You can keep going with the Captain as long as you want.

| | | |
|---|---|---|
| 01:05:49 | 1 | All right.  Let's bring in the jury. |
| 01:08:34 | 2 | (The jury is present at 1:08 p.m.) |
| 01:08:35 | 3 | THE COURT:  Please be seated. |
| 01:08:35 | 4 | Captain, I just want to remind you you're still under |
| 01:08:38 | 5 | oath from this morning. |
| 01:08:42 | 6 | MS. SULLIVAN:  Your Honor, in light of the |
| 01:08:43 | 7 | discussion, I have nothing further. |
| 01:08:45 | 8 | THE COURT:  All right.  Thank you, |
| 01:08:47 | 9 | Ms. Sullivan. |
| 01:08:48 | 10 | MR. LANIER:  Your Honor, on that document -- |
| 01:08:49 | 11 | THE COURT:  Hold it. |
| 01:08:51 | 12 | Were there any other defense attorneys who wanted to |
| 01:08:54 | 13 | ask anything on this round? |
| 01:08:57 | 14 | MR. SWANSON:  Nothing for Walgreens.  Thank |
| 01:08:59 | 15 | you. |
| 01:08:59 | 16 | MR. DELINSKY:  No, thank you, Your Honor. |
| 01:09:01 | 17 | MR. MAJORAS:  No, Your Honor. |
| 01:09:02 | 18 | MR. LANIER:  Two and a half minutes max. |
| 01:09:04 | 19 | THE COURT:  All right. |
| 01:09:04 | 20 | MS. SULLIVAN:  Your Honor, just note my |
| 01:09:06 | 21 | objection that Mr. Lanier is permitted to get up three |
| 01:09:08 | 22 | times. |
| 01:09:09 | 23 | THE COURT:  Overruled.  I want to see what he |
| 01:09:11 | 24 | asks. |
| 01:09:13 | 25 | - - - - - |

|          |    |                                                        |
|----------|----|--------------------------------------------------------|
| 01:09:14 | 1  | FURTHER REDIRECT EXAMINATION                           |
| 01:09:14 | 2  | BY MR. LANIER:                                         |
| 01:09:15 | 3  | **Q**     You were asked questions by Ms. Sullivan just now |
| 01:09:17 | 4  | before the lunch break about Defendants' MDL 13097, this |
| 01:09:25 | 5  | problem statement about the target population.         |
| 01:09:27 | 6  | Do you see that?                                       |
| 01:09:28 | 7  | **A**     Yes.                                         |
| 01:09:28 | 8  | **Q**     Can you tell the jury about the date on this |
| 01:09:30 | 9  | application you testified about?                       |
| 01:09:32 | 10 | **A**     That was the 2019 Drug Law Application.      |
| 01:09:38 | 11 | **Q**     All right.  And she read you a list of factors about |
| 01:09:42 | 12 | concerns in the community, but I'd like you to look at the |
| 01:09:47 | 13 | sentence not read.                                     |
| 01:09:49 | 14 | Would you please read the first sentence that I've    |
| 01:09:50 | 15 | highlighted?                                           |
| 01:09:53 | 16 | **A**     "Trumbull County's overall drug problems are |
| 01:09:57 | 17 | exasperated by those factors indicated above."        |
| 01:10:03 | 18 | **Q**     If we go back to page 14 on this document where it |
| 01:10:06 | 19 | talks about the quality of life factors and the problem, I'd |
| 01:10:14 | 20 | like to you talk about this sentence I've highlighted.  It |
| 01:10:18 | 21 | says "Trumbull County ranks as one of the lowest counties in |
| 01:10:21 | 22 | Ohio for overall length and quality of life.  Among the most |
| 01:10:25 | 23 | influential attributing factors in this ranking is our |
| 01:10:28 | 24 | county's heavy opiate and other narcotic abuse, which, as |
| 01:10:33 | 25 | you know, causes a snowball of other problems such as |

| | | |
|---|---|---|
| 01:10:38 | 1 | declining health and premature deaths." |
| 01:10:41 | 2 | Do you believe that to be accurate as of 2019? |
| 01:10:44 | 3 | **A**  Yes. |
| 01:10:51 | 4 | **Q**  The document also says on page 7 that "The main |
| 01:10:56 | 5 | obstacle that our task force faces." |
| 01:11:02 | 6 | Are you part of that task force? |
| 01:11:03 | 7 | **A**  Yes. |
| 01:11:03 | 8 | **Q**  "Are the steady current trend of overdoses caused not |
| 01:11:09 | 9 | only by heroin and opiate abuse but also from an increasing |
| 01:11:13 | 10 | amount of cocaine laced with fentanyl and the influx of |
| 01:11:16 | 11 | crystal meth in our county." |
| 01:11:18 | 12 | Is that true? |
| 01:11:20 | 13 | **A**  Yes. |
| 01:11:20 | 14 | **Q**  And the last thing I'm remiss, I don't point out, you |
| 01:11:28 | 15 | are singled out in this document, aren't you? |
| 01:11:32 | 16 | Did you know that? |
| 01:11:35 | 17 | Our commander, Captain Tony Villanueva, over 15 years |
| 01:11:42 | 18 | of law enforcement experience, nine as a narcotics agent, |
| 01:11:45 | 19 | including an undercover capacity, five through the TAG Task |
| 01:11:52 | 20 | Force assigned by Howland Police, three through the McDonald |
| 01:12:00 | 21 | Township.  You've deterred several narcotic traffickers, |
| 01:12:03 | 22 | you've halted area human trafficking rings, you've solved |
| 01:12:06 | 23 | high profile homicide and cold cases.  You've also obtained |
| 01:12:10 | 24 | your master criminal investigators certification. |
| 01:12:14 | 25 | Is that you? |

| | | |
|---|---|---|
| 01:12:15 | 1 | **A**     Yes, sir, that is me. |
| 01:12:16 | 2 | **Q**     And you stand by your testimony in this case today? |
| 01:12:19 | 3 | **A**     I do. |
| 01:12:20 | 4 |           MR. LANIER:  Thank you.  No further questions. |
| 01:12:24 | 5 |           THE COURT:  Okay.  Anything on that from any |
| 01:12:26 | 6 | of the defendants? |
| 01:12:30 | 7 |      Okay.  Hearing none, thank you. |
| 01:12:34 | 8 |           MR. WEINBERGER:  Your Honor, before he leaves |
| 01:12:35 | 9 | the stand, can we have a side bar?  I just want to discuss |
| 01:12:37 | 10 | the issue of proffer. |
| 01:12:39 | 11 |           THE COURT:  All right. |
| 01:12:43 | 12 |           (At side bar at 1:12 p.m.) |
| 01:12:49 | 13 |           MR. WEINBERGER:  Your Honor, admittedly, I |
| 01:12:53 | 14 | don't know what your procedure is.  We would just want to |
| 01:12:56 | 15 | have an opportunity at some point to proffer the fact that |
| 01:12:59 | 16 | we would have used the other three pages of the OARRS report |
| 01:13:03 | 17 | with this witness, just for purposes of the record. |
| 01:13:07 | 18 |           THE COURT:  Well, what were you going to |
| 01:13:09 | 19 | use -- what testimony were you going to elicit? |
| 01:13:14 | 20 |           MR. LANIER:  Your Honor, given a chance, I |
| 01:13:15 | 21 | would have elicited testimony on the Winland investigation |
| 01:13:18 | 22 | file.  I would have used the three pages of the OARRS report |
| 01:13:21 | 23 | to show the rapidity with which these different companies |
| 01:13:29 | 24 | dispensed, sometimes multiple opiates at the same time, |
| 01:13:34 | 25 | dispensed in an way that would have been visible on OARRS, |

01:13:39    1    the trinity, and dual drug cocktails.  I would have shown

01:13:43    2    the number of fills at CVS, the number of fills at

01:13:48    3    Walgreens.  Given a chance I would have asked him about

01:13:50    4    other investigations that involved Giant Eagle, that

01:13:54    5    involved Walmart and the drugs that were filled in those as

01:13:59    6    well.

01:13:59    7         That would be our proffer.

01:14:01    8              THE COURT:  All right.  Well, first of all,

01:14:02    9    most of that testimony would have been improper because you

01:14:07   10    had made it clear in answers to interrogatories and in this

01:14:10   11    witness's prior testimony that he wasn't here to offer

01:14:14   12    testimony that any of the defendants did anything wrong with

01:14:18   13    respect to any particular prescription or number of

01:14:22   14    prescriptions.  So, you know, the only purpose of eliciting

01:14:28   15    testimony about a three drug cocktail would be that the

01:14:33   16    defendants did something wrong by not seeing that doctors

01:14:36   17    were prescribing the three drug cocktail.

01:14:39   18         I allowed this witness to testify to the fact that at

01:14:43   19    least in one case, with Mr. Winland, that someone who's

01:14:50   20    involved in doctor shopping and prescription shopping

01:14:53   21    received prescriptions from these defendants.

01:15:00   22         All right.  Let's call the next witness, please.

01:15:05   23              (In open court at 1:15 p.m.)

01:15:06   24              MR. LANIER:  Your Honor, the next witness we

01:15:08   25    would call, adversely, Ms. Tasha Polster, please.

01:16:46  1          THE COURT:  Ma'am, before you sit down, please

01:16:48  2   raise your right hand.

01:16:49  3              (Witness sworn.)

01:16:56  4          THE COURT:  Thank you.  You may remove your

01:16:58  5   mask while testifying.

01:17:03  6          MR. LANIER:  May it please the Court.

01:17:05  7      Good afternoon, y'all.

01:17:07  8                  NATASHA POLSTER

01:17:07  9                  - - - - -

01:17:08  10                 CROSS-EXAMINATION

01:17:08  11  BY MR. LANIER:

01:17:09  12  **Q**    Ms. Polster, good afternoon.  My name is Mark Lanier.

01:17:11  13  I've not had the pleasure of meeting you before, but I'm

01:17:15  14  going to ask you questions on behalf of Lake and Trumbull

01:17:18  15  Counties, okay?

01:17:19  16  **A**    Okay.

01:17:19  17  **Q**    You work for Walgreens, I believe, is that right?

01:17:23  18  **A**    Yes.

01:17:23  19  **Q**    Ma'am, what I've done is kind of prepared a road map

01:17:26  20  for what I want to do with you in terms of areas of

01:17:29  21  questioning.  And the first thing I want to do is talk about

01:17:33  22  your experience a little bit so the jury gets to know you

01:17:35  23  and what your jobs have been at Walgreens.  Okay?

01:17:37  24  **A**    Sure.

01:17:38  25  **Q**    And then after that, I want to go over some basics,

01:17:41    1    just some things where hopefully you and I can agree on.

01:17:45    2    All right?

01:17:47    3    **A**    Yes.

01:17:47    4    **Q**    All right.  And then the third thing we're going to

01:17:50    5    do, I call it screens, but we're going to talk about how the

01:17:56    6    company went about screening prescriptions to see if they're

01:18:00    7    valid, just the whole techniques and the policies and

01:18:04    8    things.  Okay?

01:18:05    9    **A**    Okay.

01:18:05   10    **Q**    On the screens part, we're probably going to go in

01:18:08   11    chronological order if that helps you track along.  All

01:18:13   12    right?

01:18:13   13    **A**    Okay.

01:18:13   14    **Q**    Not totally but basically.

01:18:15   15         All right.  Let's start with you and your experience.

01:18:21   16         I've got a copy of your personnel file.

01:18:26   17              MR. LANIER:  Your Honor, it's marked

01:18:27   18    Plaintiffs' Exhibit 19927.

01:18:32   19    **Q**    Have you had a chance to look through your personnel

01:18:34   20    file?

01:18:35   21    **A**    I've seen, like, performance reviews, things like

01:18:39   22    that, but I have not looked through my entire performance --

01:18:42   23    or my personnel file, no.

01:18:43   24    **Q**    Well, and I'm not going to take you through your

01:18:46   25    entire personnel file.  I want to make sure that I'm

01:18:49  1  understanding what your jobs have been within the company

01:18:52  2  and what you did in those jobs.  Okay?

01:18:56  3  **A**    Okay.

01:18:57  4  **Q**    Ms. Fleming's giving you a copy of it so you can

01:19:00  5  follow along if you'd like to.  I've got a timeline that

01:19:04  6  folds up.  And I think I've started this timeline back in

01:19:12  7  1989.

01:19:14  8        Now, in 1989, by my count, you started working as a

01:19:23  9  pharmacist at Walgreens.  Is that right?

01:19:26  10  **A**    Yes, but I worked at Walgreens long before 1989.

01:19:30  11  **Q**    And I've got that and we'll get to that as well.  But

01:19:33  12  I've got to go step by step, okay?

01:19:36  13  **A**    Okay.

01:19:36  14  **Q**    So in 1989, that's when you took a job, got promoted

01:19:41  15  from being a pharmacy intern into a staff pharmacist.

01:19:46  16  Right?

01:19:47  17  **A**    Correct.

01:19:47  18  **Q**    And if we go back before 1989 -- and a pharmacist is

01:19:58  19  like -- how do you y'all abbreviate that?

01:20:01  20  **A**    RPH.

01:20:02  21  **Q**    RPH.

01:20:04  22        So you were a staff registered pharmacist; is that

01:20:07  23  right?

01:20:07  24  **A**    Correct.

01:20:08  25  **Q**    All right.  And before that, like you say, you had

01:20:11   1   already worked for three years as a pharmacy intern, true?

01:20:16   2   **A**   Yes.

01:20:16   3   **Q**   And before that, you were a cashier, cosmetician, and

01:20:20   4   a pharmacy technician outside of Denver from 1982 to 1986?

01:20:28   5   **A**   Correct.

01:20:28   6   **Q**   All right.  You have a bachelor's of science in

01:20:34   7   pharmacy that you got in 1989 at the University of Colorado

01:20:37   8   in Boulder?

01:20:39   9   **A**   Yes.

01:20:47  10   **Q**   And then you kept that job as pharmacy manager from

01:20:51  11   1989 -- oh, no, you were a staff pharmacist in 1989.  You

01:20:57  12   got bumped up to a pharmacy manager in 1991, didn't you?

01:21:00  13   **A**   Yes.

01:21:01  14   **Q**   And that -- we can just abbreviate that pharm manager;

01:21:08  15   is that fair?

01:21:09  16   **A**   Sure.

01:21:14  17   **Q**   Great.  And then you were a pharmacy manager in

01:21:17  18   St. Louis and Oklahoma City up through 1997.  And in 1997

01:21:22  19   you became a pharmacy supervisor, right?

01:21:24  20   **A**   Yes.

01:21:25  21   **Q**   And that was in Chicago?

01:21:27  22   **A**   First it was in Kansas City.

01:21:30  23   **Q**   Okay.

01:21:30  24   **A**   And then Chicago.

01:21:31  25   **Q**   Excellent.  Thank you.

01:21:36    1      And you stayed in that job of pharmacy supervisor
01:21:38    2   until about 2003, and that was when you became the manager
01:21:43    3   of the pharmacy operating systems, right?
01:21:46    4   **A**    Yes.
01:21:56    5   **Q**    That's a job you kept from 2003 until 2007.  And in
01:22:02    6   2007 you became the director of pharmacy operations
01:22:08    7   optimization; is that right?
01:22:10    8   **A**    Yes.
01:22:24    9   **Q**    And I was reading about this position on page 2 of
01:22:28   10   your personnel file.  And it gives some description of what
01:22:31   11   you did in that job.
01:22:36   12      Are you able to track along either with the hard copy
01:22:38   13   or with what I put on the screen?
01:22:39   14   **A**    Yes.
01:22:40   15   **Q**    You provided leadership, direction, and day-to-day
01:22:50   16   oversight of processes, procedures, training,
01:22:55   17   implementation, and optimization of strategic initiatives
01:22:59   18   for all retail pharmacies nationwide.
01:23:08   19      Is that true?
01:23:09   20   **A**    Yes.
01:23:09   21   **Q**    And by and large, your company has one set of policies
01:23:12   22   that apply to pharmacies, barring unusual pilot programs,
01:23:17   23   basically coast to coast, right?
01:23:18   24   **A**    Correct.
01:23:22   25   **Q**    You translated major strategic and retail pharmacy

01:23:26  1    operational initiatives into deployable and early adoption

01:23:36  2    models based on an assessment of training needs, operational

01:23:40  3    requirements and impact, change management requirements,

01:23:43  4    customer inconvenience avoidance, and a few other things.

01:23:46  5    Operational disruptions.

01:23:48  6         Right?

01:23:49  7    **A**    Yes.

01:23:50  8    **Q**    You also offered expertise and insight into pharmacy

01:24:01  9    remodels, designs, and layouts to ensure targeted fiscal and

01:24:04  10   operational objectives.

01:24:06  11        So do we give you credit if we can find the eye drops?

01:24:11  12   **A**    Yes.

01:24:11  13   **Q**    Okay.  But do you take the blame if we can't find the

01:24:16  14   tissues?

01:24:16  15   **A**    No, that's outside of the pharmacy.

01:24:17  16   **Q**    All right.  Directed the creation of metrics for

01:24:24  17   retail pharmacy operations and assess/measure performance to

01:24:29  18   identify performance trends, implement optimal best

01:24:33  19   practices from favorable trends, and/or eliminate practices

01:24:38  20   that create waste and/or add costs.

01:24:46  21        Did I read that correctly?

01:24:46  22   **A**    Yes.

01:24:47  23   **Q**    Is that part of what you did when you credit down

01:24:50  24   below that you implemented new metrics on this average Wait

01:24:57  25   Time Success Metrics?

01:25:00  1   **A**   Yes.

01:25:00  2   **Q**   So you used -- you implemented new metrics that were

01:25:03  3   used to assist management staff improve service, decrease

01:25:10  4   bottlenecks, and improve work flow?

01:25:14  5   **A**   Yes.

01:25:14  6   **Q**   The average wait time was reduced from 23 minutes to

01:25:18  7   16.8 due to awareness and supervision.

01:25:21  8        Did I read that correctly?

01:25:22  9   **A**   Yes.

01:25:22  10  **Q**   You all keep track of that stuff, or at least you did

01:25:26  11  back then, didn't you?

01:25:27  12  **A**   It was a metric that we measured, yes.

01:25:29  13  **Q**   I mean, you don't say, like, around 23 minutes to

01:25:32  14  around 16.  You got it down to 16.8, right?

01:25:36  15  **A**   Yes.

01:25:43  16  **Q**   So now you stayed -- you were employed as director of

01:25:46  17  pharmacy operations.  I want to keep track a couple of

01:25:51  18  things.

01:25:52  19       This is a job where you improved the wait time success

01:25:54  20  metric; is that fair to say?

01:25:57  21  **A**   Yes.

01:26:09  22  **Q**   And that wait time success metrics, that's Walgreens'

01:26:16  23  language, right?

01:26:16  24  **A**   Wait time is an industry standard and language, but,

01:26:19  25  yes, we use that very often at Walgreens.

01:26:21   1    **Q**     Yeah.  And use it as a success metric, to measure

01:26:28   2    success, right?

01:26:33   3    **A**     We used it as a metric to measure how performance was

01:26:36   4    in the stores in terms of are we able to take care of the

01:26:40   5    customers.

01:26:41   6    **Q**     Uh-huh.  Now, if we continue on the timeline, you

01:26:44   7    stayed in that job as director of pharmacy operations

01:26:47   8    optimization throughout 2008 and '9, throughout 2010, '11,

01:27:02   9    '12, '13, '14, into 2015.  Is that correct?

01:27:09  10    **A**     No.  In 2013 I moved into the director of

01:27:17  11    pharmaceutical integrity.

01:27:18  12    **Q**     Yup.  Here it is.  I failed to highlight it.

01:27:23  13       It actually shows 2012, but it was effective January

01:27:27  14    or so?

01:27:28  15    **A**     Well, it was the very end of December, beginning of

01:27:30  16    January, I believe.

01:27:32  17    **Q**     All right.  And so we need to go back to 2012 and note

01:27:36  18    that you were the senior director for pharmaceutical

01:27:41  19    integrity and third-party operations starting in 2012.

01:27:47  20    Right?

01:27:48  21    **A**     No.  At the end of 2012.

01:27:52  22    **Q**     I'm sorry, I misunderstood you.  What?

01:27:54  23    **A**     The end of 2012.  It was, like, at the end of December

01:27:57  24    or something like that.

01:27:58  25    **Q**     Yeah.  Okay.  So 2012 to 2013, something in that time

01:28:07  1    range.  Fair?

01:28:09  2    **A**    Yes.

01:28:09  3    **Q**    I'll put 2012 to '13-ish.

01:28:19  4    **A**    Okay.

01:28:19  5    **Q**    You were the senior director of pharmaceutical

01:28:25  6    integrity and third-party operations.  Whoops.  And third --

01:28:39  7    there we go -- party operations.

01:28:44  8        Now, in that job, if I'm reading it right, you were

01:28:50  9    responsible for the overall strategy for the pharmaceutical

01:28:55  10   integrity group; is that right?

01:28:57  11   **A**    Yes.

01:28:58  12   **Q**    Let's make sure that I'm understanding what it is that

01:29:02  13   the pharmacy integrity group did.

01:29:07  14       How would you define the pharmacy integrity group?

01:29:12  15   **A**    It was a brand new group to our organization, and I

01:29:20  16   was tasked to develop or change or improve policies and

01:29:27  17   procedures around controlled substance dispensing, around

01:29:33  18   suspicious order monitoring.  We were the single point of

01:29:38  19   contact for law enforcement and DEA.  We assisted stores in

01:29:47  20   ensuring that paperwork was filed correctly if there was a

01:29:51  21   theft or a loss.  I am not going to do it justice, but

01:29:58  22   that's what I can think of off the top of my head.

01:30:00  23   **Q**    Okay.  Here's what I've written off of what you said.

01:30:06  24       A brand new group to develop, change, or improve

01:30:10  25   policies and procedures around controlled substance

01:30:13　1　　dispensing as well as suspicious order monitoring.

01:30:22　2　　　　　Is that at least part of it?

01:30:25　3　　**A**　　That's part of it.

01:30:26　4　　**Q**　　All right.  The way it says in your personnel file is

01:30:33　5　　that you were responsible for the overall strategy for that

01:30:35　6　　group, including developing system solutions and managing

01:30:42　7　　projects; that you construct the process for third-party

01:30:47　8　　operations to enable the attainment of legal and ethical

01:30:51　9　　requirements of the pharmacy to increase

01:30:56　10　　efficiency/profitability, and to improve overall pharmacy

01:31:02　11　　operations for handling third-party prescriptions.

01:31:05　12　　　　　Fair?

01:31:06　13　　**A**　　It's fair, but I need to separate that those were two

01:31:10　14　　completely different roles.

01:31:12　15　　**Q**　　Okay.

01:31:12　16　　**A**　　So third-party operations has to do with billing of

01:31:15　17　　prescriptions, ensuring prescriptions are billed

01:31:21　18　　appropriately under patients' insurance, federally funded

01:31:26　19　　plans, Medicaids, that kind of stuff, and pharmaceutical

01:31:31　20　　integrity was a completely different separate job.

01:31:33　21　　**Q**　　You were busy.

01:31:35　22　　**A**　　We're busy at Walgreens, yes.

01:31:36　23　　**Q**　　I'm not thinking that we're going to need to get into

01:31:40　24　　the third-party prescription end of this and the billing and

01:31:43　25　　all of that kind of mess, so I'll set that aside and try to

01:31:47  1    focus on the things that I think are going to be more

01:31:49  2    relevant here.

01:31:51  3         But that brings me to this last sentence in this

01:31:54  4    section.  "Produces the strategy to mitigate risk in both

01:32:01  5    prescriptions integrity and third-party operations to

01:32:05  6    minimize loss of company assets."

01:32:08  7         Was that part of your job responsibility?

01:32:14  8    **A**    Yes.

01:32:15  9    **Q**    And you kept that job title until 2015, and that's

01:32:19  10   when you became a senior executive, pharmacy and retail

01:32:25  11   compliance execution; is that right?

01:32:27  12   **A**    Yes.

01:32:27  13   **Q**    So if I take the timeline to 2015 you become a senior

01:32:34  14   executive.  What's the difference between a senior and a

01:32:40  15   normal executive?

01:32:41  16   **A**    Well, it's -- I mean, my exact title is divisional

01:32:46  17   vice president.

01:32:48  18   **Q**    Divisional vice president?

01:32:52  19   **A**    Of pharmacy compliance patient safety.

01:32:57  20   **Q**    And this is pharmacy compliance patient safety.

01:33:04  21        And compliance means complying with state and federal

01:33:10  22   regulations, does it include that?

01:33:12  23   **A**    It's part of it.  It's more -- my role is more focused

01:33:15  24   on the execution of compliance-related tasks in the

01:33:20  25   pharmacies.

2836

01:33:23    1    **Q**    All right.  So if we were to look at your role in this

01:33:25    2    regard, you would call it execution of pharmacy-related --

01:33:35    3    no, of compliance-related tasks?

01:33:38    4    **A**    Yeah, in the pharmacy though, so pharmacy works.

01:33:41    5    **Q**    All right.  And this is also part of your job to

01:33:50    6    create the overall strategy, true?

01:33:53    7    **A**    Yes.

01:33:58    8    Mr. Lanier, is there a reason why the screen keeps

01:34:00    9    going blurry on my end?

01:34:03    10    **Q**    It may not be in a good mood.  I don't know.

01:34:05    11    **A**    That could be.

01:34:11    12    **Q**    You have just left my area of expertise.  But if it

01:34:15    13    makes it difficult for you to read; we'll tell His Honor --

01:34:17    14    or he's listening, and he'll do something about it.

01:34:22    15    **A**    Sounds good.

01:34:23    16    **Q**    I am going to be showing you a lot of documents, I

01:34:25    17    expect, so if you have trouble seeing them, we'll also make

01:34:28    18    sure that you've got a hand copy, but you can't -- if you're

01:34:31    19    reading my notes, you're going to need your screen.  Okay?

01:34:34    20    Now, as we look at the work that you did, there are

01:34:46    21    some things I'd like to fill in on the timeline to put it

01:34:49    22    into perspective for a lot of questions I'm going to be

01:34:51    23    asking you.  And in that regard, we'll get to those, but

01:34:58    24    just on the basics of my -- or your experience on the road,

01:35:03    25    have we covered your working history at Walgreens and

01:35:08   1   brought it up to date?

01:35:10   2   **A**    Yes.

01:35:10   3   **Q**    Great.  Then let's move on for right now to the

01:35:14   4   basics.

01:35:16   5        And the basics that I want to talk to you about are

01:35:19   6   just a few things, but I want to make sure that --

01:35:23   7                THE COURT:  Mr. Lanier, before we go on, I

01:35:25   8   just -- the jury is probably wondering.

01:35:28   9        Ms. Polster, you and I have never met.  We have the

01:35:31  10   same last name, okay?  So if we're related, it's obviously a

01:35:35  11   very, very, very distant one?

01:35:39  12                THE WITNESS:  Correct.

01:35:39  13                THE COURT:  Okay.  Thank you.

01:35:42  14   BY MR. LANIER:

01:35:42  15   **Q**    You hadn't seen the Judge at any family reunions, have

01:35:46  16   you?

01:35:46  17   **A**    I have not.

01:35:47  18   **Q**    And we've searched, we can't find that you're related,

01:35:49  19   but there aren't a lot of Polsters around here?

01:35:52  20                THE COURT:  That's why I phrased it the way I

01:35:54  21   did.

01:35:56  22                MR. LANIER:  Yeah.

01:35:56  23   **Q**    All right.  So I should have covered that in a basic

01:36:02  24   number one maybe.  No relation that we know of.

01:36:05  25        All right.  Here are the basics.  I've tried to write

| | | |
|---|---|---|
| 01:36:08 | 1 | them out to help us save time, and they're questions.  I |
| 01:36:14 | 2 | just want to ask you and see if you agree or disagree or |
| 01:36:17 | 3 | have I so messed it up you can't answer it for some reason. |
| 01:36:20 | 4 | Okay? |
| 01:36:21 | 5 | **A**    Okay. |
| 01:36:21 | 6 | **Q**    Basic question number 1.  Doctors write prescriptions. |
| 01:36:25 | 7 |       True? |
| 01:36:26 | 8 | **A**    Yes. |
| 01:36:26 | 9 | **Q**    And I know other health professionals do as well.  I'm |
| 01:36:30 | 10 | using doctor as an abbreviation for -- certain nurses have |
| 01:36:35 | 11 | that ability, certain PAs have that ability.  But I'm |
| 01:36:38 | 12 | including them with doctors.  All right? |
| 01:36:40 | 13 | **A**    Okay. |
| 01:36:40 | 14 | **Q**    Now, pharmacists fill prescriptions, true? |
| 01:36:45 | 15 | **A**    Yes. |
| 01:36:45 | 16 | **Q**    Pharmacists have a corresponding responsibility, and |
| 01:36:56 | 17 | I've put that in quotes, to ensure that the prescription is |
| 01:37:02 | 18 | written and filled for a legitimate medical purpose. |
| 01:37:05 | 19 |       True? |
| 01:37:06 | 20 | **A**    Yes. |
| 01:37:06 | 21 | **Q**    The pharmacist can't just blindly rely on the |
| 01:37:18 | 22 | prescriber as part of its corresponding responsibility when |
| 01:37:23 | 23 | making the determination that a prescription is written to |
| 01:37:26 | 24 | fill a legitimate medical purpose. |
| 01:37:32 | 25 |       True? |

01:37:33   1   **A**     Yes.

01:37:33   2   **Q**     Last, Walgreens supplied the tools and the policies to

01:37:43   3   the pharmacists to better enable those pharmacists to

01:37:48   4   exercise their corresponding responsibilities.

01:37:50   5        True?

01:37:51   6   **A**     Yes.

01:37:51   7   **Q**     We are cruising down the road.  That's the basics.

01:37:59   8        Now what I'd like to do is talk to you about something

01:38:02   9   that I'm calling "screens."  But what it basically is is

01:38:07  10   let's go chronologically and see how the story unfolds with

01:38:10  11   you.  Okay?

01:38:12  12        In 2009 you are a director of pharmacy operations

01:38:36  13   optimization, true?

01:38:39  14   **A**     Yes.

01:38:39  15   **Q**     This is before you become the senior director of

01:38:41  16   pharmacy integrity in 2012, right?

01:38:45  17   **A**     Yes.

01:38:46  18   **Q**     And I don't know when you would have become aware, but

01:38:53  19   at some point can we assume that you became aware of the

01:38:59  20   Department of Justice's order to show cause to Walgreens

01:39:03  21   that arose out of --

01:39:11  22             MS. SWIFT:  Objection, Your Honor.  Can we

01:39:13  23   take a side bar, please?

01:39:21  24             (At side bar at 1:39 p.m.)

01:39:32  25             MS. SWIFT:  Your Honor, you previously

01:39:35   1   excluded orders to show cause as charging documents, that

01:39:40   2   they are far more prejudicial than probative in this case.

01:39:43   3   This witness also I don't believe has personal knowledge of

01:39:47   4   any order to show cause.

01:39:50   5          THE COURT:  Well, if she has no knowledge of

01:39:52   6   it, that's -- the answer would be no and that's it.  If she

01:39:55   7   does and it's -- and she did something as a result of it,

01:39:59   8   that's very relevant.  And that's what it's relevant for.

01:40:03   9          MS. SWIFT:  Your Honor, previously when this

01:40:04   10  has come up you have instructed Mr. Lanier that he could ask

01:40:07   11  the witness about a settlement agreement, what she may have

01:40:10   12  done with respect to a settlement agreement.  The charging

01:40:13   13  documents, the order to show cause, is very different.

01:40:16   14  These documents are very inflammatory.  It doesn't add

01:40:22   15  anything to the settlement agreement.

01:40:26   16         MR. LANIER:  She's in charge of setting

01:40:27   17  policy, strategy, ultimately I'm sure if she did not see

01:40:32   18  this, it's highly relevant, but --

01:40:35   19         THE COURT:  Well, I don't know if it's highly

01:40:37   20  relevant.  There's a length of time between the order to

01:40:40   21  show cause and any ultimate resolution, and maybe she did

01:40:44   22  something or caused something to be done as a result.  If

01:40:48   23  so, it's relevant.  If not, it's not.  So I don't -- I mean,

01:40:53   24  I'm going to cut the questions off if it doesn't lead to

01:40:56   25  some action that she took.

01:40:57  1          MR. LANIER:  Yeah, and I won't even be asking

01:40:59  2  the questions if it doesn't.

01:41:00  3          THE COURT:  I'm not going to let you show her

01:41:03  4  the document to refresh her recollection.  She either knows

01:41:06  5  about it, and if she doesn't know about it, that ends it.

01:41:10  6          MR. LANIER:  Yup.

01:41:14  7          (In open court at 1:41 p.m.)

01:41:39  8  BY MR. LANIER:

01:41:40  9  Q     Ms. Polster, how many people grade your paper?

01:41:44  10  A     I'm sorry, how many?

01:41:45  11  Q     Yeah, how many people do you account to for your work?

01:41:53  12  A     I'm sorry.  I don't understand your question.

01:41:55  13  Q     That's okay.  I've got at least five of them in the

01:41:57  14  courtroom right now.

01:42:00  15      On the -- if we go back to the basics stop, I said

01:42:06  16  Walgreens supplied the tools.

01:42:07  17      At least we can agree, I think, that Walgreens is

01:42:10  18  supposed to supply.  And you believe they did and we'll take

01:42:14  19  issue with that, but at least we can agree that Walgreens --

01:42:17  20          THE COURT:  We'll sustain the comments.  I

01:42:20  21  mean --

01:42:20  22          MR. LANIER:  Okay.

01:42:21  23  Q     Is Walgreens supposed to supply the tools?

01:42:26  24          MS. SWIFT:  Objection, Your Honor.

01:42:28  25          THE COURT:  Well, you object -- overruled.

01:42:34  1    You can ask the question.

01:42:35  2    **Q**    Is Walgreens supposed to supply the tools and policies

01:42:38  3    to pharmacists to better enable corresponding

01:42:40  4    responsibility?

01:42:41  5    **A**    I don't know if I would agree with you when you say

01:42:44  6    "supposed to supply the tools and" -- we do supply tools and

01:42:48  7    policies and procedures.  However, a pharmacist when they go

01:42:52  8    to pharmacy school, they learn about their corresponding

01:42:55  9    responsibility, they learn about filling controlled

01:43:01  10   substance prescriptions, they learn about drug interactions,

01:43:03  11   they learn about all kinds of things.

01:43:05  12       And regardless of whether or not there's tools the

01:43:09  13   pharmacist should know, steps that they need to take when

01:43:11  14   satisfying their corresponding responsibility when filling

01:43:14  15   controlled substance prescriptions.

01:43:16  16   **Q**    Okay.  So pharmacists bring their own computers to

01:43:18  17   work?

01:43:18  18   **A**    They do not bring -- well, some of them have their

01:43:22  19   phones that have clinical pharmacology and whatnot on them,

01:43:28  20   so I guess yes, now.  Back when I practiced, no.

01:43:30  21   **Q**    Did Walgreens expect the pharmacists to bring their

01:43:34  22   own computers?  Or did Walgreens supply the computers?

01:43:38  23   **A**    Yes, Walgreens supplied computers.

01:43:40  24   **Q**    Did Walgreens expect the pharmacists to have their own

01:43:42  25   programs on the computer to determine whether or not a

01:43:45  1    prescription is properly written?  Or did Walgreens supply

01:43:50  2    those programs?

01:43:50  3    **A**    I don't understand your question.

01:43:51  4    **Q**    You know how you can take a prescription and enter it

01:43:56  5    into a computer?

01:43:57  6    **A**    Yes.

01:43:57  7    **Q**    And you know it will pull up, software pulls up a

01:44:01  8    report, a DUR, for example?

01:44:04  9    **A**    Okay.

01:44:04  10   **Q**    Do you understand what I'm talking about?

01:44:06  11   **A**    Sort of.

01:44:08  12   **Q**    Okay.  So a pharmacist enters a prescription into the

01:44:12  13   computer database, right?

01:44:15  14   **A**    Yes, yes.

01:44:16  15   **Q**    Is that computer database owned by the pharmacists?

01:44:20  16         Do they keep their own and write their own or is that

01:44:23  17   a Walgreens production?

01:44:23  18   **A**    It's a Walgreens system.

01:44:26  19   **Q**    Is it a Walgreens system that has the good faith

01:44:29  20   dispensing checklist or does the pharmacist make that up on

01:44:33  21   their own?

01:44:34  22   **A**    Well, it's a little bit of both.  And to clarify that,

01:44:37  23   when a pharmacist fills a prescription, first the checklist

01:44:43  24   is not a legally required document.  When the pharmacist

01:44:48  25   fills a controlled substance prescription, and I can tell

01:44:51   1   you from experience when I filled a controlled substance

01:44:53   2   prescription, you would go through different steps in

01:44:56   3   verifying the prescription in front of you, the patient in

01:44:58   4   front of you, whatnot.

01:44:59   5        Whether or not I had a checklist, which I did not way

01:45:02   6   back in the day when I dispensed prescriptions, or not, did

01:45:06   7   not take away from my requirement of fulfilling the

01:45:10   8   obligation of satisfying my corresponding responsibility

01:45:12   9   when filling a controlled substance prescription.

01:45:15   10   **Q**    No question we're in agreement on that, okay?

01:45:18   11        You as a pharmacist have had that responsibility

01:45:21   12   whether Walgreens supplied you with tools or not, right?

01:45:24   13   **A**    Correct.

01:45:24   14   **Q**    But the company does, as a matter of fact, take it

01:45:27   15   upon themselves to supply certain tools to the pharmacists,

01:45:32   16   true?

01:45:32   17   **A**    Yes.

01:45:32   18   **Q**    Because the company has been held accountable when

01:45:36   19   pharmacists fail to exercise their corresponding

01:45:39   20   responsibility, true?

01:45:44   21   **A**    True.

01:45:45   22   **Q**    Okay.  So I put on the sheet Basics, you don't know if

01:45:53   23   you agree that the company's supposed to supply the tools

01:45:55   24   and policies, but you do believe they do.  Is that fair to

01:46:01   25   say for the record?

01:46:01   1    **A**      That's fair.

01:46:01   2    **Q**      Great.

01:46:02   3           Now, before that, I was asking you about 2009, and I

01:46:07   4    was asking you whether or not you were familiar with the

01:46:10   5    order to show cause that was issued by the Department of

01:46:16   6    Justice, Drug Enforcement Administration, on Walgreens

01:46:20   7    arising out of problems in San Diego, California?

01:46:24   8    **A**      Off the top of my head, I do not know if I directly

01:46:26   9    worked on that.

01:46:27   10   **Q**      Okay.  But at least you have awareness of it as

01:46:31   11   someone who had to help ultimately put together the

01:46:35   12   memorandum of agreement around it, true?

01:46:38   13   **A**      No, I was not involved in the memorandum of agreement

01:46:42   14   back in 2009 that I'm aware of.

01:46:44   15   **Q**      Well, not in 2009 -- we'll come back to it later.

01:46:50   16   Let's see if we don't find you looking at it later.

01:46:53   17          For purposes of right now, if we go back to the work

01:47:01   18   that you were doing in 2010, can we agree that as of 2010,

01:47:21   19   you understood that there was no periodic training of all

01:47:26   20   Walgreens retail employees for dispensing controlled

01:47:34   21   substances?

01:47:34   22              MS. SWIFT:  Your Honor, objection.

01:47:35   23              THE COURT:  I was -- Mr. Lanier, what you have

01:47:38   24   up on the screen I don't think pertains to this witness.

01:47:41   25              MR. LANIER:  It's just a timeline, Your Honor.

01:47:43    1              THE COURT:  Well, there's something up there

01:47:44    2    that had nothing to do with her testimony.

01:47:46    3              MR. LANIER:  It doesn't to this point in time,

01:47:48    4    Your Honor, but it's just a coherent timeline for the whole

01:47:51    5    case that integrates the facts.

01:47:53    6              THE COURT:  Well, not through this witness, so

01:47:55    7    you'll -- I'd like you to take it off.  Thank you.

01:47:58    8              MR. LANIER:  All right, Your Honor, I'll cover

01:48:01    9    that portion up.

01:48:07   10    BY MR. LANIER:

01:48:08   11    Q    Ma'am, if you'll go back to my question.  Periodic

01:48:12   12    training of all Walgreens retail employees for dispensing

01:48:22   13    controlled substances.  That training did not exist back in

01:48:26   14    2010, did it?

01:48:28   15    A    We had an overarching controlled substance policy ever

01:48:34   16    since I've been at Walgreens and back in the pharmacy, and I

01:48:38   17    know that the training for good faith dispensing was given

01:48:44   18    at time of hire.  So anytime a pharmacist was hired into the

01:48:49   19    company or, you know, became a licensed pharmacist if they

01:48:53   20    were an intern first, you would have to conduct that

01:48:56   21    training.

01:48:57   22         Is that what you mean?

01:48:58   23    Q    No, ma'am, I don't think so.

01:49:03   24         I'm asking -- here, I'll write it so you can look at

01:49:07   25    it carefully.

| | | |
|--|--|--|
| 01:49:08 | 1 | Periodic training of all Walgreens retail employees |
| 01:49:27 | 2 | for dispensing controlled substances -- now, that would |
| 01:49:34 | 3 | include opiates, right? |
| 01:49:35 | 4 | **A**    Yes, opioids are controlled substances. |
| 01:49:37 | 5 | **Q**    That periodic training of all Walgreens retail |
| 01:49:50 | 6 | employees for dispensing controlled substances, such |
| 01:49:57 | 7 | training did not exist in 2010, did it? |
| 01:50:05 | 8 | **A**    I don't know what you mean by "periodic."  I do |
| 01:50:08 | 9 | remember a controlled substance policy, and do I remember at |
| 01:50:13 | 10 | time of hire, but not the word "periodic." |
| 01:50:18 | 11 | **Q**    Okay. |
| 01:50:18 | 12 | MS. SWIFT:  Objection, Your Honor.  The |
| 01:50:19 | 13 | writing does not reflect the witness's testimony. |
| 01:50:22 | 14 | MR. LANIER:  Well, it reflects my question, |
| 01:50:24 | 15 | and I'm asking this, Your Honor -- and I want a record of |
| 01:50:27 | 16 | what I'm asking so that we can see it.  And I'll be glad to |
| 01:50:30 | 17 | explain why. |
| 01:50:31 | 18 | I'll lift it from the screen for now. |
| 01:50:33 | 19 | THE COURT:  All right. |
| 01:50:36 | 20 | **Q**    I'd ask you to -- |
| 01:50:38 | 21 | MR. LANIER:  Ms. Fleming, Ms. Lanier, would |
| 01:50:40 | 22 | y'all hand out Plaintiffs' Exhibit 19566. |
| 01:50:44 | 23 | **Q**    You had a job at Walgreens in 2010, didn't you? |
| 01:50:48 | 24 | **A**    Yes. |
| 01:50:48 | 25 | **Q**    And you knew that y'all were, Walgreens, was going to |

01:50:53   1   enter into an agreement with the DEA based on an issue in

01:50:57   2   the California store, didn't you?

01:51:00   3   **A**     Yes, I recall that my team was involved in helping

01:51:16   4   Dwayne with this, yes.

01:51:19   5   **Q**     And you wrote an e-mail June 27 of 2010, 5:02 p.m.,

01:51:25   6   didn't you?

01:51:28   7   **A**     Yes.

01:51:28   8   **Q**     And the e-mail was concerning the DEA issue at 6094.

01:51:37   9         That's a store number in San Diego, California, isn't

01:51:43   10  it?

01:51:43   11  **A**     Yes.

01:51:43   12  **Q**     When I asked you before if you had ever looked at the

01:51:46   13  order to show cause, you said you weren't sure.

01:51:50   14        Does this refresh your memory as to whether or not you

01:51:52   15  were dealing with those issues?

01:51:53   16  **A**     It does.  Thank you.

01:51:54   17  **Q**     And in fact, were you dealing with those issues?

01:51:57   18  **A**     My team was dealing with these issues.

01:52:00   19  **Q**     And that includes you, doesn't it?

01:52:02   20  **A**     I had oversight, yes.

01:52:04   21  **Q**     And not just oversight.  Plaintiffs' Exhibit 9566 is

01:52:09   22  one where you are trying to determine the propriety of the

01:52:14   23  agreement that y'all were talking about entering into with

01:52:17   24  the DEA, correct?

01:52:17   25  **A**     Yes.

01:52:18  1   **Q**      And the DEA had suggested certain obligations of

01:52:23  2   Walgreens, like we see on page 5, and the obligations of

01:52:33  3   Walgreens included that Walgreens agrees to maintain a

01:52:41  4   compliance program to detect and avoid violations of the CSA

01:52:48  5   and applicable DEA regulations.

01:52:51  6          And the issue was whether or not to agree to this

01:52:53  7   language that says -- one of the issues -- "The program

01:52:58  8   shall also include the routine and periodic training of all

01:53:02  9   Walgreens walk-in, retail pharmacy employees responsible for

01:53:09  10  dispensing controlled substances on the elements of the

01:53:12  11  compliance program and their responsibilities under the

01:53:20  12  CSA."

01:53:21  13         Do you see that?

01:53:21  14  **A**      Yes.

01:53:22  15  **Q**      And an e-mail where you were writing on this subject

01:53:25  16  you said, Cheryl, Tomson, and Al.

01:53:27  17         Now, are they on your team?

01:53:29  18  **A**      Cheryl was on my team.  Tomson and Al were on teams

01:53:32  19  that we worked with closely.

01:53:35  20  **Q**      What teams were they on?

01:53:37  21  **A**      Al was on the pharmacy affairs team, and Tomson was I

01:53:47  22  believe on the intercom plus team.

01:53:49  23  **Q**      I'm sorry, what?

01:53:49  24  **A**      IntercomPlus, our computer system team.

01:53:53  25  **Q**      Oh, IntercomPlus.

01:53:57  1          You said, "We are having to enter into an agreement

01:54:00  2   with the DEA based on an issue in a California store.  The

01:54:06  3   document attached is what the DEA wants us to agree to.

01:54:13  4          "I will only put in the sections we need to work on."

01:54:17  5          Do you see where I'm reading?

01:54:18  6   A    Yes.

01:54:19  7   Q    Subpoint C is the first thing you list, right?

01:54:22  8   A    Yes.

01:54:23  9   Q    Periodic -- and you've quoted it here.  "Periodic

01:54:29  10  training of all Walgreens retail employees for dispensing

01:54:32  11  controlled substances."

01:54:33  12         Do you see that?

01:54:34  13  A    Yes.

01:54:34  14  Q    What is the thing you said immediately after quoting

01:54:38  15  it?

01:54:39  16  A    Correct.  "No such training exists."  This is periodic

01:54:45  17  training.  We had an annual good faith dispensing

01:54:47  18  training --

01:54:48  19  Q    Ma'am, I'm asking you to read that sentence, please.

01:54:50  20  A    Yeah.  "No such training exists today of periodic

01:54:55  21  training."

01:54:55  22  Q    So we started this by me asking this question which I

01:54:57  23  wrote down.  Periodic training of Walgreens retail employees

01:55:01  24  for dispensing of controlled substances.  I said such

01:55:03  25  training didn't exist in 2010.

01:55:06  1      Do you remember that?

01:55:07  2  **A**   Yes.

01:55:07  3  **Q**   That is actually me just directly quoting you in 2010,

01:55:14  4  isn't it?

01:55:26  5  **A**   Yes.

01:55:28  6  **Q**   I'm sorry?

01:55:31  7  **A**   Oh, I answered yes.

01:55:34  8  **Q**   I didn't hear you.  I apologize.

01:55:35  9      So if we go back to the timeline, I had asked you

01:55:48  10  about the order to show cause in 2009 that you are

01:55:52  11  discussing in an e-mail as you try to figure out how to

01:55:58  12  enter into an agreement with the DEA.

01:56:02  13      Would you agree with me then that surely you read the

01:56:06  14  order to show cause in 2009?

01:56:09  15  **A**   I don't know about 2009, but I do know that my team

01:56:12  16  helped Dwayne, so I don't know -- I don't remember the 2009

01:56:18  17  at all, but I remember this e-mail, now that you're -- you

01:56:22  18  showed it to me, that my team did work to determine how to

01:56:27  19  execute the periodic training that they were asking for in

01:56:33  20  the order to show cause -- or the MOA.  Sorry.

01:56:37  21  **Q**   So if we can at least agree that as of June 27, 2010,

01:56:48  22  that in your mind, there was no periodic training of all

01:56:55  23  Walgreens employees for dispensing controlled substances.

01:57:16  24      True?

01:57:16  25  **A**   Yes.

01:57:16   1   **Q**    And that's true whether it's happening in California

01:57:27   2   or Florida or Warren, Ohio, right?

01:57:35   3   **A**    Right.

01:57:35   4   **Q**    Now, do you think that as you worked on the

01:57:45   5   obligations of Walgreens and what Walgreens was going to

01:57:49   6   have to agree to do, do you think you looked or would have

01:57:53   7   looked at what went wrong, where the order to show cause had

01:58:00   8   arisen?

01:58:06   9        In other words, do you know what the allegations were

01:58:08   10  that prompted you to work on this?

01:58:10   11  **A**    I do not recall the order to show cause in this at

01:58:14   12  all.  I recall working on -- with my team, my team doing it,

01:58:20   13  my -- me having oversight.  On the training and the

01:58:27   14  PowerPoint deck vaguely, but I do not remember the details

01:58:30   15  of the order to show cause on this.

01:58:31   16  **Q**    Does it refresh your memory to know that -- do you

01:58:35   17  know Joe Rannazzisi?

01:58:36   18  **A**    Yes.

01:58:36   19  **Q**    Does it refresh your recollection to know that he

01:58:38   20  signed the order to show cause?

01:58:40   21  **A**    No.

01:58:40   22  **Q**    Okay.  Now, as we keep looking at 2010 and we move

01:58:47   23  forward a little bit, you are familiar with the pharmacy

01:58:51   24  manager bonus program at the time, aren't you?

01:58:56   25  **A**    I know we gave a pharmacy manager bonus at the time.

2853

01:59:01　1　I know some details around them.

01:59:04　2　**Q**　Okay.  Let me give you Plaintiffs' Exhibit 19821 and

01:59:10　3　see if this is something that's consistent with what you

01:59:13　4　know.

01:59:29　5　Do you have that exhibit in front of you?

01:59:31　6　**A**　Yes, I do.

01:59:32　7　**Q**　And in that regard, ma'am, do you see the definitions

01:59:40　8　of bonus components and the bonus formula, then, that's

01:59:43　9　explained on the second page?

01:59:45　10　**A**　Yes.

01:59:45　11　**Q**　Is this something that you would have been familiar

01:59:49　12　with and known about at the time?

01:59:51　13　**A**　Yes.

01:59:52　14　**Q**　Okay.  Plaintiffs' 19821 is the pharmacy manager bonus

02:00:00　15　program.

02:00:01　16　Now, you used to be a pharmacy manager, didn't you?

02:00:04　17　**A**　I did, yes.

02:00:05　18　**Q**　And did you have a similar bonus program when you were

02:00:12　19　pharmacy manager?

02:00:12　20　**A**　I did have a bonus program, yes.

02:00:15　21　**Q**　And if we look at some of the terms that are defined

02:00:20　22　here, we see the 12-month sales is defined, right?

02:00:26　23　**A**　Yes.

02:00:27　24　**Q**　We see the unadjusted script, 12-month unadjusted

02:00:32　25　scripts, which is just the number of scripts, right?

02:00:35   1    **A**    Yes.

02:00:36   2    **Q**    90-day scripts, correct?

02:00:38   3    **A**    Yes.

02:00:38   4    **Q**    Average daily scripts, true?

02:00:41   5    **A**    Yes.

02:00:42   6    **Q**    And then if we go to the second page, we've got the

02:00:45   7    bonus formula established.

02:00:50   8          Do you see where that is?

02:00:51   9    **A**    Yes.

02:00:51   10   **Q**    There's a primary element, an improvement element, and

02:00:57   11   then a total.  Right?

02:00:59   12   **A**    Yes.

02:01:00   13   **Q**    So the primary is to look at the last year's 12-month

02:01:05   14   prescription sales, and based upon the amount that's there,

02:01:13   15   you used math to figure out your bonus.  Right?

02:01:17   16   **A**    Yes.

02:01:18   17   **Q**    Same thing for the 12-month prescription sales,

02:01:22   18   unadjusted scripts, and then A plus B plus C equals the

02:01:27   19   primary bonus.  Right?

02:01:30   20   **A**    Yes.

02:01:31   21   **Q**    Then there's improvement, where if you improve and you

02:01:37   22   write more scripts, you get more of a bonus, right?  Or fill

02:01:41   23   more scripts, excuse me.

02:01:44   24          Right?

02:01:45   25   **A**    Yes.

02:01:45  1    **Q**     Then it gives on the next page the management bonus as

02:01:55  2    an incentive bonus and talks about the different ways that

02:01:57  3    you get a daily average incentive.  So you look to see what

02:02:02  4    the daily average of prescriptions filled is, right?

02:02:07  5    **A**     Yes.

02:02:08  6    **Q**     Then you've got your days of supply incentive.

02:02:14  7           Do you know what that is?

02:02:15  8    **A**     It was the amount of inventory that you kept in your

02:02:19  9    pharmacy monthly.

02:02:22  10   **Q**     So the more inventory the better or the less inventory

02:02:26  11   the better?

02:02:27  12   **A**     You had to find the right balance.

02:02:29  13   **Q**     Okay.  Then ultimately you've got an example of how

02:02:35  14   this might compute out on the page 4, and that gives you all

02:02:41  15   of the stuff, does the math.

02:02:43  16          And in this sample the bonus winds up being just under

02:02:47  17   $30,000.

02:02:48  18   **A**     I have got to laugh at this.  I don't know where this

02:02:51  19   came from, but let me tell you, from my experience working

02:02:54  20   as a pharmacy supervisor and giving bonuses and working as a

02:02:58  21   pharmacy manager, I have never seen a bonus this high for a

02:03:01  22   pharmacy manager.

02:03:02  23   **Q**     Okay.  So the example that they give is not one

02:03:08  24   that's -- hasn't been achieved to your knowledge?

02:03:09  25   **A**     Not even close, at least in my experience on the

02:03:13   1    stores I supervised or for me personally.

02:03:15   2    **Q**     The thrust of this for me is not the amount.  The

02:03:17   3    thrust that I want to ask you about is whether or not this

02:03:20   4    includes prescriptions for opiates.

02:03:25   5    **A**     It included all prescriptions.  So the way I

02:03:32   6    understood it was you had your total prescriptions you did

02:03:35   7    last year minus your total prescriptions you did this year,

02:03:44   8    and you multiply that by a penny, and that was a portion of

02:03:48   9    the bonus.  And it did include all controlled substances at

02:03:52   10   that time, and opioids were part of the total.

02:03:56   11   **Q**     All right.  And to your knowledge, did this bonus that

02:04:01   12   includes opiates go back in time at least as far back as the

02:04:05   13   bonus system?

02:04:06   14   **A**     As far as I know, it included all prescriptions.

02:04:11   15   **Q**     Thank you.

02:04:11   16         Now, ultimately, in 2011, Walgreens entered into a

02:04:25   17   memorandum of agreement concerning the California situation.

02:04:28   18         Are you familiar with that?

02:04:29   19   **A**     Is that the same one as this other one we talked

02:04:32   20   about?

02:04:32   21   **Q**     Yes, ma'am.  It's the one that has Walgreens'

02:04:37   22   obligations.  It's the one you were discussing in the e-mail

02:04:40   23   about the positions on things.

02:04:42   24   **A**     Okay.

02:04:46   25   **Q**     We've got it as Plaintiffs' Exhibit 15317.  If we

2857

02:04:49  1    could pass that around, please.

02:04:50  2         And while they're passing it around -- well, let me

02:04:53  3    wait until you get a copy of it.

02:05:18  4         Do you have a copy, ma'am?

02:05:19  5    **A**    I do.  Thank you.

02:05:20  6    **Q**    All right.  You're familiar with this memorandum of

02:05:23  7    agreement, aren't you?

02:05:32  8    **A**    I cannot honestly say I remember the whole thing.  I

02:05:35  9    remember working -- I mean, I remember seeing this and I

02:05:38  10   remember my team working on it.

02:05:40  11   **Q**    Right.  And in other words, I'm not going to quiz you

02:05:44  12   on memorization of paragraph 3(b)(4) or something like that,

02:05:50  13   but I don't want to ask you about it if it's not a document

02:05:53  14   you were familiar with.

02:05:55  15        You certainly had familiarity with this document,

02:05:59  16   didn't you?

02:05:59  17   **A**    I had familiarity with this document, of what we

02:06:02  18   needed to execute on.

02:06:03  19   **Q**    Exactly.  And so within that framework, I'd like to

02:06:10  20   talk to you about what you needed to execute on.  And it's

02:06:12  21   page 2.  Obligations of Walgreens.

02:06:17  22        Do you see page 2?

02:06:18  23   **A**    I do.

02:06:20  24   **Q**    Among the obligations of Walgreens was an agreement to

02:06:25  25   maintain a compliance program to detect and prevent

02:06:30   1    diversion of controlled substances.

02:06:34   2         Do you see where I'm reading?

02:06:35   3    **A**    I do.

02:06:36   4    **Q**    And this is something that's already been required

02:06:38   5    under the Controlled Substances Act and the applicable DEA

02:06:45   6    regulations.  Fair?

02:06:47   7    **A**    Yes.

02:06:47   8    **Q**    "This program shall include procedures to identify the

02:06:51   9    common signs associated with the diversion of controlled

02:06:54   10   substances, including, but not limited to, doctor shopping

02:07:02   11   and requests for early refills."

02:07:05   12        Do you see that?

02:07:05   13   **A**    I do.

02:07:13   14   **Q**    Now, this obligation that's entered into in 2011 --

02:07:19   15   we've got this as 4/7/11.

02:07:43   16        In essence it's saying that there's going to be a

02:07:46   17   compliance program to help identify red flags, for lack of a

02:07:52   18   better way of saying it.  Right?

02:07:54   19   **A**    Well, it does not say red flags here, but it says

02:08:00   20   compliance program.

02:08:01   21   **Q**    Right.  And whether you call them red flags or areas

02:08:03   22   of concern or whatever you want to call them, this was going

02:08:08   23   to include common signs associated with the diversion of

02:08:13   24   controlled substances, true?

02:08:15   25   **A**    Yes.

02:08:16  1   **Q**    Doctor shopping, you call it a red flag or call it a

02:08:19  2   common sign, call it an area of concern, it's still

02:08:22  3   something that pharmacists should be alert to, right?

02:08:25  4   **A**    Yes.

02:08:25  5   **Q**    You don't just fill a prescription if you have a

02:08:29  6   concern of doctor shopping, right?

02:08:31  7   **A**    Correct.

02:08:31  8   **Q**    For controlled substance?

02:08:38  9   **A**    Yes.

02:08:38  10  **Q**    Request for early refills, if there's a request for

02:08:43  11  early refill for a controlled substance, it should be a

02:08:46  12  cause for concern of the pharmacist such that they figure

02:08:49  13  out whether or not it's legitimate before they dispense it,

02:08:51  14  right?

02:08:52  15  **A**    Correct.  They would need to understand the reason why

02:08:54  16  before they make the decision to fill it or not.

02:08:57  17  **Q**    Yes.

02:08:58  18       Now, it says, "The program shall also include routine

02:09:02  19  and periodic training of all Walgreens walk-in, retail

02:09:06  20  pharmacy employees responsible for dispensing controlled

02:09:10  21  substances on the elements of the compliance program and

02:09:13  22  their responsibilities under the CSA.

02:09:18  23       Do you see that?

02:09:19  24  **A**    Yes.

02:09:19  25  **Q**    That's what earlier had been in the subpoint C that

02:09:22  1    you had said did not exist at the time at Walgreens, right?

02:09:29  2    **A**    Correct.

02:09:30  3    **Q**    And when I had asked you in the Basics stop if

02:09:35  4    Walgreens was supposed to supply tools and policies to the

02:09:39  5    pharmacists to better enable their exercising corresponding

02:09:43  6    responsibility, would you at least agree with me that under

02:09:48  7    this agreement with the DEA Walgreens was supposed to

02:09:51  8    provide policies and tools to better enable the pharmacists?

02:09:59  9    **A**    I would say that, you know, Walgreens takes any action

02:10:04  10   very seriously, that DEA is recommending that we do this,

02:10:10  11   and we complied.

02:10:12  12   **Q**    I understand that.  I'm just saying, this compliance

02:10:16  13   program shall apply to all current and future Walgreens

02:10:21  14   walk-in, retail pharmacies registered with the DEA in the

02:10:25  15   United States and its territories and possessions."

02:10:28  16        Right?

02:10:29  17   **A**    That's what it says.

02:10:31  18   **Q**    And that's so that -- this applies to Lake County,

02:10:36  19   Ohio, Walgreens, doesn't it?

02:10:38  20   **A**    Nationwide, yes.

02:10:39  21   **Q**    It applies to --

02:10:49  22        By the way, this is 2011, and we're going to walk

02:10:52  23   through how this was implemented and all.  But can you agree

02:10:55  24   with me, going back, that there had already been an opioid

02:11:01  25   crisis in America?

02:11:02  1  **A**     I would say the opioid crisis was beginning right

02:11:05  2  about that time.

02:11:11  3  **Q**     Really?

02:11:11  4  **A**     Yes.

02:11:12  5  **Q**     All right.  So we'll put you down as opioid crisis

02:11:26  6  beginning in 2011.

02:11:27  7       Is that at least when it was beginning in your mind?

02:11:30  8  **A**     In my mind, yes, because the pain management doctors

02:11:37  9  during that time frame were not allowed to dispense opioids

02:11:42  10  out of their clinics anymore.  And that was about the time

02:11:47  11  we started to see the shift of pain medications that went

02:11:52  12  from urgent acute from a broken leg or surgery or something

02:11:58  13  like that or end of life, which is what we used to see back

02:12:03  14  when I dispensed prescriptions and when I supervised stores,

02:12:06  15  to the chronic pain patients coming into the pharmacies.

02:12:11  16  **Q**     Well, you had for sometime there -- you had already

02:12:16  17  been a director of pharmacy operations optimization, right?

02:12:22  18  **A**     Yes.

02:12:23  19  **Q**     During all of that time, had anybody ever made you

02:12:28  20  aware of the letters written by the DEA in 2006 and '7 about

02:12:36  21  the opioid problem and distribution?

02:12:42  22  **A**     I am -- no, distribute -- no.

02:12:46  23  **Q**     You didn't know about those letters that went to

02:12:49  24  Walgreens and others?

02:12:50  25  **A**     No, I -- that was not part of my job at that time, in

02:12:56   1    the early -- well, whatever those years were.

02:12:58   2    **Q**    Okay.  We also note, if we go back to Plaintiffs'

02:13:04   3    Exhibit 15317, another obligation of Walgreens was in

02:13:09   4    connection with Walgreens' record keeping requirements

02:13:12   5    pursuant to 21 Code of Federal Regulations Section 1304,

02:13:20   6    "Walgreens agrees to maintain records regarding the

02:13:23   7    dispensing of controlled substances in electronic format, in

02:13:29   8    addition to the regularly maintained official paper files."

02:13:37   9        Did you understand that to be an obligation that

02:13:39  10    Walgreens agreed to?

02:13:40  11    **A**    You know what, I understood that to be an obligation

02:13:46  12    that we were supposed to do.  I guess I'm surprised to see

02:13:49  13    that in there.

02:13:52  14    **Q**    Because that's something you're just always supposed

02:13:56  15    to do anyway, right?

02:13:57  16    **A**    That was my understanding.

02:13:58  17    **Q**    Well, the same is true with dispensing controlled

02:14:03  18    substances.  Aren't you supposed to have a compliance

02:14:05  19    program to detect and prevent diversion anyway?

02:14:16  20        I'm sorry, I didn't hear your answer.

02:14:19  21    **A**    I didn't even understand your question.

02:14:20  22    **Q**    Okay.  Ma'am, you were surprised to see the subsection

02:14:24  23    F that talks about the need to keep records, right?

02:14:29  24    **A**    I was surprised to see that in there, yes.

02:14:32  25    **Q**    And I'm asking you, did it not surprise you to see

02:14:36  1   that you had to maintain a compliance program to detect and

02:14:39  2   prevent diversion?

02:14:40  3   **A**    Well, it did because I'm thinking to myself this is

02:14:46  4   what we did as an organization, as a company that protects

02:14:51  5   patients and helps them get better and dispenses controlled

02:14:57  6   substance prescriptions, we have to have compliance.

02:14:59  7        Clearly, the DEA didn't feel that we had compliance to

02:15:02  8   what they wanted.

02:15:04  9   **Q**    Well, you've already admitted y'all didn't

02:15:07  10  periodically train all the Walgreens employees on this,

02:15:09  11  right?

02:15:09  12  **A**    The key word being "periodic."

02:15:12  13  **Q**    Ma'am --

02:15:16  14  **A**    Because we trained our pharmacists on controlled

02:15:20  15  substances at time of hire.  But, correct, we did not have

02:15:24  16  periodic training, annual training, but we had training when

02:15:29  17  somebody started with controlled substances.

02:15:31  18  **Q**    But you know how times change, right?

02:15:38  19  **A**    Agreed.

02:15:38  20  **Q**    I mean, I started practicing law in 1984, and my

02:15:43  21  secretary had an IBM Selectric.  We didn't even have

02:15:50  22  computers.

02:15:50  23       Times change, don't they?

02:15:51  24  **A**    Sure.

02:15:52  25  **Q**    You can have a pharmacist who starts early like you

02:15:54  1   did, and you need more training as times change and

02:16:01  2   equipment and opportunities change, don't you?

02:16:06  3   **A**    Absolutely.  And we have improved and changed our

02:16:09  4   training yearly.

02:16:10  5   **Q**    But, ma'am, you were improving and changing training

02:16:14  6   to do things like decrease wait time before this, weren't

02:16:21  7   you?

02:16:21  8   **A**    There were all kinds of things that we were focused on

02:16:24  9   at Walgreens.

02:16:25  10  **Q**    Wasn't my question, ma'am.  I was very focused.

02:16:27  11      I'm saying -- we read your review together.  One of

02:16:33  12  the hallmarks in your personnel file is that you reduced

02:16:37  13  wait time by implementing new programs and training, right?

02:16:40  14  **A**    Correct, because that was my job at that time.

02:16:43  15  **Q**    And I'm saying, so y'all would train everybody to

02:16:51  16  reduce wait time, but you're saying there was no need to

02:16:54  17  train everybody on complying with good dispensing patterns

02:16:59  18  because --

02:17:01  19           MS. SWIFT:  Objection.  Mischaracterizes the

02:17:04  20  testimony.

02:17:04  21           THE COURT:  Overruled.

02:17:04  22           MR. LANIER:  That's what I'm trying to.

02:17:07  23  **Q**    Ma'am, I don't want to mischaracterize you.

02:17:09  24      Are you saying there was no need to train everybody on

02:17:11  25  complying with good dispensing patterns because they already

1  knew it?

2  **A**    I am saying they knew the responsibilities.  When you

3  become a pharmacist and you take the law exam, you go

4  through pharmacy school, you know your obligations under the

5  law.

6       I'm not saying you should never retrain pharmacists or

7  retrain based on things that are happening, but I am saying

8  that when you get out of pharmacy school and you pass the

9  board and you have to take a law exam, you know what your

10  obligations are because if you don't, you have the risk of

11  losing your license.

12  **Q**    Okay.  Okay.  So my question comes back to what it

13  was.

14       Are you saying there's no need to train everybody with

15  good dispensing patterns because they already knew it?

16  **A**    We did train our pharmacists.

17  **Q**    So that wasn't my question, ma'am.

18       Was it important to train them or was the mentality of

19  Walgreens is, eh, they graduated, they're license, they

20  already know it?

21  **A**    I don't agree with the way you're saying that.  I

22  would say that we had our annual training.  We thought it

23  was sufficient, times started changing, and we changed with

24  it.

25  **Q**    Okay.  As we continue to chart through the chronology

02:18:27  1    of these events, we can go to 2012.  And this is when you

02:18:37  2    become the senior director of pharmacy integrity but not

02:18:40  3    till the very end of the year, right?

02:18:42  4    **A**    Correct.

02:18:43  5    **Q**    2012, the staff pharmacy bonus program is still based

02:18:48  6    in part on the number of prescriptions, true?

02:18:50  7    **A**    Yes.

02:18:51  8    **Q**    Plaintiffs' Exhibit 19529, if we could pass that out,

02:19:02  9    please.

02:19:17  10   Do you have that in front of you, ma'am?

02:19:18  11   **A**    I do.

02:19:19  12   **Q**    And this is another one which shows a definition of

02:19:25  13   bonus components and explains the formula, right?

02:19:28  14   **A**    Yes.

02:19:28  15   **Q**    And you'll probably like the example at the end a

02:19:32  16   little bit better.  This time the example only gives a

02:19:35  17   $5,000 bonus.

02:19:36  18   Do you see that?

02:19:36  19   **A**    That's a little more realistic.

02:19:38  20   **Q**    All right.  So but again, this is based upon number of

02:19:44  21   prescriptions that you fill and how it compares and improves

02:19:47  22   over what you've done before, right?

02:19:50  23   **A**    I think it's important to distinguish between sales

02:19:54  24   and then the improvement of prescriptions this year over

02:19:59  25   last year.  There's a difference.

02:20:00  1    **Q**     Okay.  Let's break it apart.  I'm sorry, let me break

02:20:04  2    it apart, then, and ask you two separate questions.

02:20:06  3         The part that compares last year's prescription sales

02:20:12  4    to -- and last year's prescriptions scripts, does that

02:20:16  5    include opioids?

02:20:18  6    **A**     Yes, it includes controlled substances, all

02:20:22  7    prescriptions.

02:20:22  8    **Q**     The improvement section, does that include opioids?

02:20:31  9    **A**     Yes.

02:20:32  10   **Q**     So we can break it apart or put it together.  Either

02:20:39  11   way, we know we've got opioids included in both arms of that

02:20:43  12   bonus calculation, right?

02:20:44  13   **A**     Yes.

02:20:45  14   **Q**     So it is in the economic interest of the pharmacy

02:20:54  15   worker to fill opioid prescriptions, true?

02:20:58  16   **A**     I don't agree with the way you're saying that, so --

02:21:02  17   **Q**     Is it in the economic interest under the bonus program

02:21:09  18   to fill opiate prescriptions?

02:21:12  19   **A**     I would agree that when -- when you're filling a

02:21:22  20   prescription as a pharmacist, with the patient coming in in

02:21:24  21   front of you, with a bonus of $5,000 on a hundred thousand

02:21:33  22   dollar salary, I don't understand the way you're asking the

02:21:35  23   question.

02:21:35  24   **Q**     In your mind, it's not that big of an incentive?

02:21:37  25   **A**     That is exactly what I'm saying.

02:21:39  1   **Q**     All right.  That's fine.  So we can quibble about how

02:21:44  2   much of an incentive they gave you.  My question remains the

02:21:47  3   same.

02:21:48  4        Was the mindset being reinforced in the minds of the

02:21:52  5   pharmacists, one, that said the more we fill, the higher our

02:21:58  6   Christmas bonus, was that the concept, regardless of whether

02:22:04  7   it's opiates or birth control pills?

02:22:06  8   **A**     If you had -- well, yes, you're paid a penny based on

02:22:13  9   the difference between this year's and last year's

02:22:17  10  prescriptions, so yes.

02:22:19  11  **Q**     So if you fill an extra hundred, you get a buck?

02:22:26  12  **A**     Of total prescriptions, yes.

02:22:29  13  **Q**     So the mentality being -- and a lot of stores fill --

02:22:33  14  what, y'all had stores that filled 3, 4, 500 prescriptions a

02:22:38  15  day, didn't you?

02:22:39  16  **A**     Yeah, but remember, it's the difference between this

02:22:41  17  year and last year, not total.

02:22:44  18  **Q**     Uh-huh.  Reason to do more each year because you'll

02:22:48  19  get more at the end of the year, that's the motivation that

02:22:52  20  was set up, right?

02:22:53  21  **A**     That's what you're saying, but I disagree because it

02:22:56  22  is not worth a penny with the way you're implying.

02:23:00  23  **Q**     Well, ma'am, I don't -- your company calls it an

02:23:06  24  incentive plan, don't they?

02:23:08  25  **A**     Yes.

02:23:08  1   **Q**     Incentive carries the idea that you will incentivize

02:23:17  2   someone to do something, right?

02:23:18  3   **A**     Yes.

02:23:20  4   **Q**     And so you can incentivize a mindset that says I'm

02:23:29  5   going to award you as you fill more and more prescriptions,

02:23:32  6   right?

02:23:32  7   **A**     Yes.

02:23:33  8   **Q**     You can also incentivize a mindset, you can set up a

02:23:37  9   bonus that says every time you find someone who you believe

02:23:41  10  is diverting a controlled substance and you refuse to fill

02:23:46  11  that prescription and you turn them in to the authorities,

02:23:51  12  every time you do that, you get a $50 bonus.

02:23:55  13          You could do that, couldn't you?

02:24:00  14  **A**     I guess a company can do whatever they want to do in

02:24:03  15  terms of incenting.

02:24:07  16  **Q**     Exactly.  So incentives can work in a variety of ways,

02:24:11  17  can't they?

02:24:11  18  **A**     Yes.

02:24:18  19  **Q**     Now, at the end of 2012 you walked into your new job,

02:24:22  20  and I believe in your deposition you said you built that

02:24:25  21  division from the ground up.

02:24:27  22          Is that right?

02:24:28  23  **A**     Correct.

02:24:33  24  **Q**     So I'll put "T. Polster built from ground up."

02:24:44  25          It's not a division that existed before, is it?

02:24:49   1   **A**      No.

02:24:55   2   **Q**      One of the documents that the jury has heard about was

02:25:03   3   the Market 29 Action Plan at the end of 2012.  It's

02:25:12   4   Plaintiffs' Exhibit 24019.

02:25:17   5          Mr. Joyce testified about it some.  I'd like to ask

02:25:21   6   you if you're familiar with it.  If we could pass those

02:25:24   7   documents out, please.

02:25:49   8          Do you have this document in front of you, ma'am?

02:25:51   9   **A**      I do.

02:25:51   10  **Q**      You'll see some attachments.  You'll see who it's sent

02:25:56   11  to.  I think at this time you're either transitioning or you

02:26:04   12  will soon be transitioning, but at this time your job may

02:26:15   13  be -- what were you?

02:26:17   14         Director of pharmacy operation optimization, right?

02:26:22   15  **A**      Correct.

02:26:22   16  **Q**      So as someone who is directing pharmacy operation

02:26:28   17  optimization, had you seen these sales and prescription

02:26:35   18  action plans that are here in Exhibit 24019?

02:26:42   19  **A**      I do not ever remember seeing anything like this.

02:26:45   20  **Q**      Okay.  So do you have any memory whatsoever of

02:26:51   21  checking on such things as how the stores are going to go

02:26:57   22  about trying to be more profitable in light of the

02:27:05   23  controlled substance business?

02:27:06   24  **A**      Not that I recall.  My job was working with, like,

02:27:16   25  dynamic workload balancing, workflow back in the pharmacy.

02:27:22  1    I've never seen one of these reports.

02:27:24  2    **Q**    All right.  Do you have any familiarity with the

02:27:28  3    general idea of pharmacy regions like that in Ohio urging

02:27:36  4    their stores to figure out how to write more C-IIs at this

02:27:43  5    point in time?

02:27:43  6    **A**    I'm sorry, we don't write C-IIs.

02:27:46  7    **Q**    I'm sorry, fill more C-IIs.  My mistake.  Excuse me.

02:27:49  8    **A**    I don't know why that would ever be called out.

02:27:55  9    **Q**    Okay.  So if it was called out, does it run counter to

02:28:01  10   what you believe the company should be doing?

02:28:03  11   **A**    If C-IIs were specifically called out, you would want

02:28:10  12   to understand the total -- the total piece of the puzzle,

02:28:18  13   right?  I can't imagine they would focus only on Schedule II

02:28:24  14   prescriptions, but I don't know.

02:28:25  15   **Q**    Yeah.  So it strikes you, in light of the work you

02:28:28  16   were doing, as something that might be unusual if some -- if

02:28:31  17   the stores in this region were specifically told to, quote,

02:28:35  18   improve C-II business?  That would be weird to you?

02:28:41  19   **A**    It would be unusual.

02:28:51  20   **Q**    I'd like to look at the same time at Plaintiffs'

02:28:54  21   Exhibit 25631.  And by "same time" I mean we're still in the

02:28:58  22   October 2012 time range.

02:29:13  23        Do you have Plaintiffs' Exhibit 25631?

02:29:17  24   **A**    I do.

02:29:18  25   **Q**    And you'll see on the cover it is an e-mail sent to

02:29:22   1   you October 22 of 2012, right?

02:29:26   2   **A**   Yes.

02:29:26   3   **Q**   It says Tasha -- I assume -- I think your first name's

02:29:38   4   Natasha, isn't it?

02:29:39   5   **A**   Correct.

02:29:40   6   **Q**   All right.  But you go by Tasha with your friends and

02:29:42   7   colleagues, fair?

02:29:44   8   **A**   Fair.

02:29:45   9   **Q**   Okay.  "Tasha, I've attached two PowerPoints to this

02:29:49  10   e-mail.  The first is what we presented to Market and

02:29:54  11   District leaders (which is not posted).  The second

02:30:00  12   PowerPoint is what we provide to the store (which is

02:30:04  13   available on StoreNet under the GFD."

02:30:10  14        Do you see that?

02:30:10  15   **A**   Yes.

02:30:10  16   **Q**   That stands -- that's Walgreens-speak for good faith

02:30:17  17   dispensing, correct?

02:30:19  18   **A**   I don't know about it being Walgreens-speak.  I guess

02:30:24  19   I just thought it was an industry term.  But, yes, we use it

02:30:26  20   at Walgreens.

02:30:27  21   **Q**   Okay.  "Available on StoreNet under the GFD policy

02:30:34  22   located under Additional Resources on page 7."

02:30:38  23        So this is a PowerPoint that gets posted, the second

02:30:41  24   one at least, into a number of different places, fair?

02:30:44  25   **A**   Yes.

02:30:45   1   **Q**      And if you look at the PowerPoint that's attached, I'm

02:30:49   2   looking at the controlled substance action plan store

02:30:57   3   6.11.12, I think.  The PowerPoint says July 11, 2012.

02:31:04   4         Do you see that?

02:31:05   5   **A**      Yes.

02:31:07   6   **Q**      Looks like one of the two that are discussed.  It was

02:31:09   7   attached as given to us.

02:31:15   8         Now, you've had a chance to review this, haven't you?

02:31:17   9   **A**      Yes.  My team built it.

02:31:19   10  **Q**      And so -- and it was sent to you, right?

02:31:22   11  **A**      Yes.

02:31:22   12  **Q**      And on page 4 it talks about -- well, let's see.  It's

02:31:35   13  page -- PowerPoint slide 3.  Let me do it that way.

02:31:40   14        PowerPoint slide 3 gives an overview.

02:31:43   15        Do you see that?

02:31:46   16  **A**      Yes.

02:31:46   17  **Q**      Then it says, "Due to recent action taken by the DEA,

02:31:53   18  select policies and procedures have been updated to ensure

02:31:59   19  our pharmacists and stores are compliant when dispensing

02:32:04   20  controlled substances."

02:32:07   21        Do you see that?

02:32:07   22  **A**      Yes.

02:32:08   23  **Q**      So these are updates of select policies and

02:32:14   24  procedures, right?

02:32:15   25  **A**      Yes.

2874

02:32:16  1   **Q**     When I had asked you about basics and I asked you if

02:32:20  2   Walgreens was supposed to supply policies to better enable

02:32:26  3   corresponding responsibility, you said you don't know if you

02:32:29  4   agree that they're supposed to, but would you at least agree

02:32:35  5   that they were trying to?

02:32:37  6   **A**     Yes.

02:32:37  7   **Q**     And at this point in time, they're supplying policies

02:32:41  8   that are updated to make sure that they are compliant,

02:32:45  9   right?

02:32:46  10  **A**     Yes.

02:32:46  11  **Q**     Can we assume from this that the policies prior to

02:32:52  12  2012, October 2012, were different?

02:33:00  13  **A**     Yes.

02:33:00  14  **Q**     And those were policies that needed to be updated,

02:33:09  15  right?

02:33:12  16  **A**     Yes, we did update policies based on new things that

02:33:16  17  we were learning.

02:33:19  18  **Q**     So if you learned that your stores were not in

02:33:21  19  compliance, you would update policies to get them in

02:33:24  20  compliance, right?

02:33:28  21  **A**     Yes.

02:33:28  22  **Q**     If you learned that your employees were not being

02:33:31  23  trained right or didn't have adequate new training, you

02:33:35  24  tried to put a policy in place to train them differently,

02:33:38  25  right?

02:33:39   1   **A**     I would say we would try different methods to train.

02:33:45   2   **Q**     Okay.  So if we go back to the presentation that is

02:33:49   3   Plaintiffs' Exhibit 25631, you go on to say that

02:34:03   4   "Corresponding enhancements include:  Update to the good

02:34:09   5   faith dispensing guidelines."

02:34:14   6         You see that as well?

02:34:16   7   **A**     Yes.

02:34:16   8   **Q**     In opening statements I spoke with the jury about

02:34:23   9   screens, and I talked about the difference between a screen

02:34:30   10   that's very small and a screen that's got big old holes in

02:34:36   11   it.

02:34:36   12         You follow me?

02:34:37   13   **A**     Yes.

02:34:38   14   **Q**     In a real sense, the pharmacists are supposed to

02:34:44   15   screen prescriptions before they fill them, aren't they?

02:34:49   16   **A**     That's one way to look at it.

02:34:51   17   **Q**     And the screen should be one that catches the bad

02:34:58   18   prescriptions and fills the good prescriptions, right?

02:35:01   19   **A**     I think you're overgeneralizing how you do it, but the

02:35:07   20   grand scheme of things, yes.

02:35:09   21   **Q**     Okay.  And of course, there's always an exception

02:35:11   22   everywhere.  I'm not fussing that.  But that in general is

02:35:15   23   what's supposed to be done, right?

02:35:17   24   **A**     In general.

02:35:18   25   **Q**     And so what y'all tried to do at this point in time,

02:35:21  1    in 2012, because of recent action taken by the DEA, is tried

02:35:28  2    to update your policy so that your screens worked better,

02:35:32  3    right?

02:35:32  4    **A**    Yes.

02:35:33  5    **Q**    Okay.  And that included updating the good faith

02:35:42  6    dispensing guidelines, true?

02:35:43  7    **A**    Yes.

02:35:44  8    **Q**    Now, do you have any knowledge about whether or not

02:35:47  9    that could have been done ten years earlier?

02:35:52  10   **A**    I am aware of good faith dispensing policies way

02:35:57  11   longer than 10 years earlier, and I am also aware of good

02:36:03  12   faith dispensing policies being updated periodically

02:36:06  13   throughout the years.

02:36:06  14   **Q**    Right.  But the updates y'all did that is an

02:36:10  15   enhancement to ensure the pharmacists and stores are

02:36:14  16   compliant with the law when dispensing opiates and other

02:36:18  17   controlled substances, do you know any impediment or reason

02:36:24  18   you couldn't have made those changes years earlier?

02:36:26  19   **A**    I don't know that we didn't make changes years

02:36:30  20   earlier.

02:36:30  21   **Q**    Well, you do if you think about your targeted drug

02:36:35  22   good faith dispensing form, right?

02:36:37  23   **A**    Oh, yeah, but you need to fast forward way past this

02:36:40  24   timeline to when --

02:36:41  25   **Q**    Yeah, we will, trust me.

02:36:42  1   **A**     Okay.

02:36:43  2   **Q**     The screens can get progressively smaller as time goes

02:36:46  3   on.

02:36:46  4   **A**     Okay.

02:36:46  5   **Q**     I'm saying there's no reason you couldn't have used

02:36:51  6   that form that you used years later back in 2005, is there?

02:36:56  7   **A**     I don't know that we had the industry issue in 2005

02:37:05  8   that led to in my formulation of the good faith dispensing

02:37:10  9   checklist at the end of 2012-2013.

02:37:16  10  **Q**     In all of your work dealing with these issues, did you

02:37:18  11  ever come across the Congressional hearings in the early

02:37:23  12  2000s on the opioid crisis?

02:37:25  13  **A**     Not that I'm aware of.

02:37:26  14  **Q**     And we've already established you didn't -- nobody

02:37:29  15  ever told you about the DEA sending letters about the opioid

02:37:34  16  crisis in the 2006-'7 range, right?

02:37:38  17  **A**     I was not aware of those.

02:37:40  18  **Q**     Okay.  But are you aware of any reason that if the

02:37:42  19  company had chosen, the company could not have ensured all

02:37:49  20  of these changes in policy in 2005?

02:37:55  21  **A**     I don't know that that is not even true with what

02:37:57  22  you're saying.

02:37:59  23  **Q**     Okay.  We'll keep -- we'll come back to it as we look

02:38:03  24  at other what I call screen changes, okay?

02:38:05  25  **A**     Okay.

02:38:06  1    **Q**      "Revised ordering procedures for controlled

02:38:13  2    substances."

02:38:15  3           That's talking about not dispensing to the patient.

02:38:19  4    That's talking about ordering from the distributor, right?

02:38:22  5    **A**      Yes.

02:38:22  6    **Q**      In other words, at this time, was Walgreens

02:38:29  7    distributing to their own stores?

02:38:30  8    **A**      Yes.

02:38:31  9    **Q**      And you understand that part of distribution required

02:38:35  10   Walgreens to have a program in place to identify suspicious

02:38:41  11   orders, right?

02:38:41  12   **A**      Yes.

02:38:44  13   **Q**      And those suspicious orders could be as to size or

02:38:49  14   pattern or frequency or other items as well, right?

02:38:53  15   **A**      Yes.

02:38:54  16   **Q**      And it was an obligation of Walgreens if they were

02:38:56  17   going to be distributing to have a program in place that

02:39:01  18   would catch suspicious orders, right?

02:39:04  19   **A**      Yes.

02:39:05  20   **Q**      And then Walgreens had to catch those and report those

02:39:09  21   to the DEA before shipping the drug, right?

02:39:12  22   **A**      Correct.

02:39:12  23   **Q**      And Walgreens did not have a program in place to do

02:39:16  24   that, did they?

02:39:17  25   **A**      I don't know that to be true at all.

| | | |
|---|---|---|
| 02:39:19 | 1 | **Q**     All right.  That's before your time on that? |
| 02:39:22 | 2 | **A**     Correct. |
| 02:39:22 | 3 | **Q**     That's fair.  I'll save it for another witness. |
| 02:39:25 | 4 |       Drug -- now, this third bullet point, "Exception |
| 02:39:34 | 5 | stores have been identified that may require additional |
| 02:39:36 | 6 | action by Market and District leadership." |
| 02:39:41 | 7 |       Do you see that? |
| 02:39:41 | 8 | **A**     Yes. |
| 02:39:42 | 9 | **Q**     Do you know whether or not one of your stores in Ohio, |
| 02:39:47 | 10 | specifically Lake or Trumbull County, was ever isolated as |
| 02:39:51 | 11 | an exception store? |
| 02:39:52 | 12 | **A**     I do not know off the top of my head. |
| 02:39:55 | 13 | **Q**     All right.  Before we leave this document, I'd like to |
| 02:39:59 | 14 | go to page 7.  Page 7 has the headline "Everyone plays a |
| 02:40:09 | 15 | role in the good faith dispensing process." |
| 02:40:13 | 16 |       Do you see that? |
| 02:40:14 | 17 | **A**     Yes. |
| 02:40:19 | 18 | **Q**     And among those roles, you've got shared |
| 02:40:23 | 19 | responsibility with the pharmacists, right? |
| 02:40:25 | 20 | **A**     Yes. |
| 02:40:25 | 21 | **Q**     And that includes documenting the information, right? |
| 02:40:31 | 22 | **A**     Yes. |
| 02:40:32 | 23 | **Q**     And you said to the jury before when I said that y'all |
| 02:40:35 | 24 | had to put a documentation program into place, you said, I |
| 02:40:38 | 25 | thought we already had one.  Right?  That was already an |

02:40:42 1  obligation.

02:40:44 2  **A**   It's an obligation of the pharmacist to document

02:40:51 3  resolutions of red flags on prescriptions.

02:40:55 4  **Q**   Thank you.

02:40:55 5      And that's, again, the ultimate responsibility on the

02:40:58 6  pharmacist to do exactly what you said, to confirm good

02:41:03 7  faith dispensing validation and documentation was completed,

02:41:09 8  right?

02:41:09 9  **A**   Yes.

02:41:15 10  **Q**   Now, as we ramble along on the timeline, this is

02:41:19 11  October of 2012.  Are you in your new job yet?

02:41:22 12  **A**   No, I'm still in my old job.  It was December-ish,

02:41:28 13  late December maybe.  I don't remember the exact date.

02:41:30 14  **Q**   All right.  So were you getting this document through

02:41:32 15  your old job?

02:41:38 16          MR. LANIER:  Your Honor, I've gone too far

02:41:40 17  without taking a break.  I apologize.  And now is a

02:41:42 18  wonderful time to take a break.

02:41:43 19          THE COURT:  Well, I was going to go till about

02:41:47 20  3:00.  But if you think this is a good time, we can take a

02:41:50 21  break now.  I was -- Mr. Weinberger seems to think it is.

02:41:57 22          MR. WEINBERGER:  I'm the old guy in the room.

02:42:00 23          MR. LANIER:  My older brother is telling me to

02:42:02 24  take a break, Your Honor.

02:42:03 25          THE COURT:  That's fine.  We'll take our mid

02:42:04   1    afternoon break, 15 minutes.

02:42:07   2         Usual admonitions.

02:42:40   3              (Recess taken at 2:42 p.m.)

03:05:03   4              (The jury is present at 3:05 p.m.)

03:05:04   5              THE COURT:  Please be seated.

03:05:04   6         Ms. Polster, I still want to remind you you're still

03:05:08   7    under oath from this morning.

03:05:11   8              THE WITNESS:  Yes.

03:05:12   9              THE COURT:  Mr. Lanier, you may continue.

03:05:14  10    BY MR. LANIER:

03:05:16  11    **Q**    Ms. Polster, before the break we were talking about

03:05:17  12    this 2012 PowerPoint that came out -- was sent to you in

03:05:22  13    October of 2012.

03:05:23  14         Recall?

03:05:26  15    **A**    Yes.

03:05:26  16    **Q**    And in it was the Controlled Substance Action Plan

03:05:35  17    that was originally dated as June 11, 2012.  And we already

03:05:38  18    talked about how it was listed on the website and all this

03:05:40  19    kind of stuff, right?

03:05:41  20    **A**    Yes.

03:05:42  21    **Q**    We had looked at page 7 where it talked about the need

03:05:44  22    to document and the ultimate pharmacy responsibility, right?

03:05:47  23    **A**    Yes.

03:05:47  24    **Q**    By the way, it says to review PDMPs that are state

03:05:57  25    specific.

03:06:00  1          Do you see that?

03:06:01  2    **A**    Yes.

03:06:01  3    **Q**    PDMP, would you tell us what that stands for, please?

03:06:05  4    **A**    Yeah.  It's prescription drug monitoring program.  It

03:06:09  5    is a state-specific site where controlled substance

03:06:20  6    prescriptions are tracked.  To dispense, you send this data

03:06:24  7    to the website.  It was just becoming available during this

03:06:27  8    time.  Not all --

03:06:29  9    **Q**    Well, you say that.

03:06:31  10         Do you know the program in Ohio, OARRS, O-A-R-R-S?

03:06:35  11   **A**    Yes, I'm aware of OARRS.

03:06:37  12   **Q**    And you're aware that OARRS came online in 2003.

03:06:44  13   **A**    But not all states had them.

03:06:46  14   **Q**    Right, but if we're going to talk about Ohio, when

03:06:51  15   this came on online, this comes on in 2012, it had been

03:06:54  16   online in Ohio for nine years right?

03:06:57  17   **A**    In Ohio only.

03:06:58  18   **Q**    And so for example, in 2009, pharmacists had the

03:07:00  19   ability, if they chose, in Ohio to check OARRS, right?

03:07:05  20   **A**    Yes.

03:07:07  21   **Q**    But it wasn't mandatory within your company, was it?

03:07:10  22   **A**    No, I don't remember it being in policies.  It was

03:07:15  23   always in policies to check it if the pharmacist chose to

03:07:21  24   check it.

03:07:22  25   **Q**    Now, if we look, then, at this Controlled Substance

03:07:29  1   Action Plan that came out in 2012, I'd like to go back two

03:07:33  2   years to June of 2010.  And that was Plaintiffs' Exhibit

03:07:41  3   919566, that e-mail that you and I started out with at the

03:07:44  4   very beginning.

03:07:45  5        Recall that?

03:07:46  6   **A**    Yes.

03:07:52  7   **Q**    Now, what I did not do with you before was look past

03:07:55  8   that first sentence that says, "No such training exists

03:08:01  9   today."

03:08:01  10       Do you see that?

03:08:02  11  **A**    Yes.

03:08:02  12  **Q**    And you had commented, well, yeah, but we had annual

03:08:05  13  training or something like that or -- remember?

03:08:07  14  **A**    Yes.

03:08:08  15  **Q**    But look what you said in the e-mail.

03:08:11  16       You said:  We're looking for ideas of what we could

03:08:18  17  do, a yearly PPL.

03:08:20  18       Why don't you tell the jury what PPL means?

03:08:22  19  **A**    PPL is a term that we use internally at Walgreens.

03:08:28  20  That is a -- I cannot remember what it stands for.  It's a

03:08:32  21  learning program.  It's an electronic module and a software,

03:08:39  22  I believe, that we use that we called it PPL.

03:08:42  23  **Q**    All right.  We'll just put program for learning.

03:08:44  24       Is that fair?

03:08:45  25  **A**    Sure.

03:08:45  1  **Q**     Okay.  So you said maybe we could do a yearly PPL, add

03:08:50  2  something to the code of conduct, question mark.  Maybe you

03:08:54  3  guys can come up with something else that we didn't think

03:08:57  4  of, question mark.

03:08:58  5       You see that?

03:08:58  6  **A**     Yes.

03:08:59  7  **Q**     Then you said, "In the meantime, a PowerPoint will

03:09:03  8  need to be put together that contains the elements that

03:09:07  9  Dwayne will send in a separate document.  The PowerPoint

03:09:10  10  will be presented at a market leadership videoconference or

03:09:14  11  live meeting with instructions to cascade the information

03:09:18  12  down to the store level."

03:09:23  13       Do you see that?

03:09:24  14  **A**     I do.

03:09:24  15  **Q**     And that's what we have in this PowerPoint, the

03:09:26  16  Controlled Substance Action Plan, true?

03:09:29  17  **A**     Yes.

03:09:30  18  **Q**     But look at the difference in dates.  June of 2012 it

03:09:36  19  comes out after you say it's needed two years earlier,

03:09:43  20  right?

03:09:43  21  **A**     I don't know that these are exactly the same

03:09:47  22  situations.  Do you?  Have you -- do you have something that

03:09:50  23  shows they're exactly the same?

03:09:52  24  **Q**     Ma'am, what I've got is the Controlled Substance

03:09:56  25  Action Plan with the e-mail that was presented to Market and

03:10:01 1  District leaders, and then the second PowerPoint is what's

03:10:04 2  provided to the store available on StoreNet if you have any

03:10:10 3  questions below.

03:10:12 4  **A**    Well, I can tell you that Walgreens takes things very

03:10:14 5  seriously when it comes down to DEA or other -- taking any

03:10:19 6  type of action.  I find it hard to believe that we would

03:10:26 7  wait two years to send new training down.

03:10:28 8  **Q**    To a store level?

03:10:31 9  **A**    Or company level.

03:10:33 10  **Q**    Right.  But you understand the jury has already heard,

03:10:42 11  looking at Plaintiffs' Exhibit 26321, which is in evidence,

03:10:46 12  that during those years, between 2010, '11, and '12, the

03:10:55 13  prescriptions written in these counties alone by Walgreens

03:10:59 14  are in the millions and millions and millions.

03:11:05 15  **A**    Okay.  We did not write prescriptions.

03:11:07 16  **Q**    I'm sorry.  Filled.  I'm terrible about that.  Thank

03:11:10 17  you for correcting me.  I want to get the record just right.

03:11:13 18  I'll reask it.

03:11:14 19        Prescriptions filled by Walgreens of oxy and

03:11:22 20  hydrocodone, in the Walgreens stores in these counties,

03:11:25 21  totaled over 12 million pills in 2010, 2011, and 2012.

03:11:33 22  **A**    I see those numbers.

03:11:34 23  **Q**    This is not something to be trifled with, it's

03:11:37 24  something to be dealt with immediately, right?

03:11:40 25  **A**    Well, I think we need to think back of what was

03:11:43   1   happening in the industry during that time frame, and I

03:11:45   2   think we talked about --

03:11:45   3   **Q**    Ma'am, I'd like you to answer my question first.  This

03:11:48   4   is not something to be trifled with.  This is something to

03:11:50   5   be dealt with immediately, true?

03:11:52   6   **A**    You have to understand everything that was happening

03:11:55   7   in that area during that time before you can react.

03:12:02   8   **Q**    Ma'am, you're saying that when you never even read the

03:12:05   9   order to show cause to see what had happened in your own

03:12:09  10   store that caused this, did you?

03:12:11  11   **A**    I don't know what store --

03:12:13  12               MS. SWIFT:  Objection, Your Honor.

03:12:15  13               THE COURT:  I'm not sure that was the

03:12:15  14   testimony.

03:12:16  15               MR. LANIER:  Okay.

03:12:18  16   **Q**    You don't even remember reading the order to show

03:12:20  17   cause, do you?

03:12:21  18   **A**    Not the ones that -- the first one that you showed me,

03:12:24  19   no.

03:12:29  20   **Q**    See, you go back to that obligation of Walgreens that

03:12:34  21   y'all were discussing whether or not to put in there in

03:12:38  22   2010.  And we talked about the program that includes the

03:12:42  23   routine and periodic training of all Walgreens people.

03:12:45  24        Do you see that?

03:12:46  25   **A**    Yes.

03:12:48  1   **Q**    But before that is B.  "This program shall include

03:12:53  2   procedures to identify the common signs associated with the

03:12:56  3   diversion of controlled substances, including, but not

03:13:00  4   limited to, doctor shopping and requests for early refills."

03:13:05  5        Do you see that?

03:13:06  6   **A**    I see that.

03:13:06  7   **Q**    And again, the comment was, "I could not find anything

03:13:11  8   in our procedures that addressed this request."

03:13:17  9        Do you see that?

03:13:20  10  **A**    I see that, but I don't know whose writing that was.

03:13:24  11  **Q**    Well, this is from Debbie Platts to you.

03:13:28  12  **A**    Okay.  Gotcha.

03:13:29  13  **Q**    Do you see?

03:13:34  14       "I couldn't find anything in our procedures that

03:13:38  15  addressed this request."

03:13:41  16       "Suggestion:  We might consider adding something to

03:13:44  17  our pharmacy code of conduct with regard to identifying

03:13:48  18  common signs."

03:13:49  19       Do you see that?

03:13:50  20  **A**    Yes.

03:13:50  21  **Q**    And this was at a time where you say in 2011 the

03:14:01  22  opioid crisis is beginning, but back in 2010 it's already

03:14:06  23  there, isn't it?

03:14:10  24  **A**    It's beginning, I believe, yes.

03:14:12  25  **Q**    Well, no, ma'am, your -- same document, Plaintiffs'

| | | |
|---|---|---|
| 03:14:18 | 1 | 19566, on page 3, talking about your responsibilities. |
| 03:14:26 | 2 | And it says, "The abuse of prescriptions drugs, |
| 03:14:34 | 3 | especially controlled substance, is a serious social and |
| 03:14:37 | 4 | health problem in the United States." |
| 03:14:43 | 5 | Do you see that? |
| 03:14:43 | 6 | **A**    I do see that.  And I'm sorry, what document is that? |
| 03:14:46 | 7 | **Q**    This is the 2010 one from ultimately you to Debbie |
| 03:14:49 | 8 | Platts but originally Debbie Platts to you. |
| 03:14:59 | 9 | **A**    Got it.  Thank you. |
| 03:15:00 | 10 | **Q**    And this is in 2000 -- this isn't an opioid crisis |
| 03:15:05 | 11 | beginning in 2011.  This opioid crisis is already there in |
| 03:15:10 | 12 | 2010 in full bloom, isn't it? |
| 03:15:18 | 13 | **A**    Yes, that's the dates here, yes. |
| 03:15:20 | 14 | **Q**    And your company should hit the gas, accelerate, and |
| 03:15:27 | 15 | try to do something immediately, don't you think? |
| 03:15:32 | 16 | **A**    I don't know that we weren't doing things to help. |
| 03:15:37 | 17 | **Q**    Okay.  All right.  Well, we dropped off -- we just |
| 03:15:47 | 18 | left off with the PowerPoint that came out June 11, 2012. |
| 03:15:59 | 19 | And I'd like to keep going with you. |
| 03:16:01 | 20 | Now, a couple of months later we're still in 2012, but |
| 03:16:06 | 21 | now we're in November of 2012. |
| 03:16:11 | 22 | Got it? |
| 03:16:11 | 23 | **A**    Yes. |
| 03:16:12 | 24 | **Q**    Plaintiffs' Exhibit 19827.  If my young lawyers could |
| 03:16:23 | 25 | pass those out, please. |

03:16:49   1          I want to direct your attention to it looks like the

03:16:52   2     third e-mail on the page, it's about a third of the way

03:16:54   3     down, looks like Rex Swords, with a copy to you, Tasha

03:16:58   4     Polster.

03:16:59   5          Do you see that e-mail?

03:16:59   6     **A**     I do.

03:17:00   7     **Q**     And so the court and the jury know, who was Rex Swords

03:17:05   8     at the time?

03:17:05   9     **A**     He was my boss at the time.

03:17:07   10    **Q**     So you get an e-mail from your boss on November 8 --

03:17:10   11    **A**     Oh, you know what, sorry.  Sorry, I stand corrected.

03:17:12   12    I was not working for him yet.  He became my boss when I got

03:17:19   13    my new job.

03:17:20   14    **Q**     Okay.  Someone who becomes your boss -- by the way, do

03:17:22   15    you think you knew you already had the position as of

03:17:25   16    November 8?

03:17:25   17    **A**     No.  The position hadn't even come to fruition yet.

03:17:29   18    **Q**     Okay.  So it's a month away.

03:17:33   19         You get an e-mail from the gentleman who's going to

03:17:36   20    become your boss, and it concerns a November 8 DEA meeting

03:17:42   21    at the National Association of Boards of Pharmacy.

03:17:50   22         Do you see that?

03:17:52   23    **A**     Yes.

03:17:52   24    **Q**     Now, our jury has not only met a fellow with the DEA,

03:17:56   25    Joe Rannazzisi, who you know, right?

03:17:57   1    **A**    Yes.

03:17:58   2    **Q**    But they also met the CEO or president or executive

03:18:01   3    director, whatever his job title was, of the National

03:18:05   4    Association of Boards of Pharmacy, Carmen Catizone.

03:18:08   5         You know him as well, don't you?

03:18:10   6    **A**    Yes, I know who he is.

03:18:12   7    **Q**    Good guy, isn't he?

03:18:15   8    **A**    I know him vaguely through various meetings.  I don't

03:18:17   9    know him personally.

03:18:18   10   **Q**    All right.  Fair enough.

03:18:23   11        If we look at this e-mail that's copied to you from

03:18:26   12   Rex Swords, he says, "I have the sense that today's meeting

03:18:31   13   was a condensed version of the regional meetings the DEA is

03:18:37   14   holding throughout the country for pharmacists."

03:18:41   15        Now, I'll let you know that that Mr. Rannazzisi

03:18:48   16   testified in here about these meetings he was holding and

03:18:51   17   even walked through some of the slide deck, okay?

03:18:53   18   **A**    Okay.

03:18:55   19   **Q**    "Although no attendance list was available, I believe

03:19:00   20   most, if not all, major chain operators were present at the

03:19:03   21   meeting."  And these are the major chain operators listed.

03:19:08   22        CVS, you see that?

03:19:09   23   **A**    Yes.

03:19:09   24   **Q**    Walmart/Sam's, right?  You see that?

03:19:14   25   **A**    Yes.

| | | |
|---|---|---|
| 03:19:15 | 1 | **Q**   Rite Aid, Safeway, Kroger, you see them as well? |
| 03:19:21 | 2 | **A**   Yes. |
| 03:19:21 | 3 | **Q**   Giant Eagle is a major chain operator listed here, |
| 03:19:27 | 4 | right? |
| 03:19:27 | 5 | **A**   Yes. |
| 03:19:28 | 6 | **Q**   Kmart, to name a few.  And approximately 50 people in |
| 03:19:35 | 7 | total, right? |
| 03:19:36 | 8 | **A**   Yes. |
| 03:19:36 | 9 | **Q**   Joseph Rannazzisi, attorney and pharmacist, presented |
| 03:19:39 | 10 | a large PowerPoint deck on prescription drug trafficking and |
| 03:19:45 | 11 | abuse for approximately 2 hours. |
| 03:19:50 | 12 |      See that? |
| 03:19:51 | 13 | **A**   Yes. |
| 03:19:51 | 14 | **Q**   Now, you were told when you got this e-mail that the |
| 03:19:55 | 15 | DEA views chain and independent the same. |
| 03:20:00 | 16 |      Do you see that? |
| 03:20:01 | 17 | **A**   Yes. |
| 03:20:01 | 18 | **Q**   Now, chain, that would be someone like Walgreens, |
| 03:20:04 | 19 | true? |
| 03:20:05 | 20 | **A**   Yes. |
| 03:20:06 | 21 | **Q**   Independent would be something like, I don't know, mom |
| 03:20:11 | 22 | and pa's pharmacy store? |
| 03:20:18 | 23 | **A**   Correct. |
| 03:20:18 | 24 | **Q**   They've heard the complaints from chain that they |
| 03:20:22 | 25 | believe the DEA is focused on chain and not on independents. |

03:20:24  1    He dismisses that notion.

03:20:26  2         Do you see that?

03:20:27  3    **A**    Yes.

03:20:28  4    **Q**    "Chains come up to the Hill and say the DEA is

03:20:36  5    targeting them."

03:20:37  6         Did you ever have anything to do with any of the

03:20:41  7    lobbyists or anything like that for Walgreens?

03:20:43  8    **A**    No.

03:20:44  9    **Q**    Okay.  I'll leave that out.

03:20:46  10        " Pharmacist is a professional, and they shouldn't be

03:20:51  11   filling every prescription that comes through the door."

03:20:54  12        You see how that's got quotation marks around it?

03:20:57  13   **A**    Yes.

03:20:58  14   **Q**    You would agree with Mr. Rannazzisi on that, wouldn't

03:21:03  15   you?

03:21:03  16   **A**    Yes.

03:21:04  17   **Q**    "Believes that pressure from owners/operators to fill

03:21:08  18   scripts is driving the problem."

03:21:12  19        You read that, didn't you?

03:21:14  20   **A**    That's what it's here, yes.

03:21:16  21   **Q**    And you read that at a time where your bonus system at

03:21:20  22   Walgreens was still one that incentivized writing more

03:21:24  23   prescriptions, right, or filling more prescriptions?

03:21:27  24   **A**    At a penny a prescription this year over last year.

03:21:30  25   **Q**    Uh-huh.  Right.  So if you've got prescriptions that

03:21:47 1   are -- now, this is Plaintiffs' Exhibit 23631 is dosage

03:21:55 2   units, this is not prescriptions?

03:21:56 3   **A**    That's correct.

03:21:56 4   **Q**    There's a huge difference, right?

03:21:58 5   **A**    Yes.

03:21:59 6   **Q**    But you can see how those are escalating every year up

03:22:02 7   through 2011 in Lake and Trumbull Counties, right?

03:22:05 8   **A**    I don't know that to be -- oh, I see that at the top,

03:22:08 9   yes.

03:22:08 10  **Q**    Okay.  So, and certainly there was never an incentive

03:22:12 11  program that you could name that disincentivized filling

03:22:17 12  those prescriptions, true?

03:22:20 13  **A**    True.

03:22:21 14  **Q**    He says, "If this continues, they won't be just

03:22:24 15  assessing civil penalties, there may be criminal penalties."

03:22:27 16  **A**    I see that.

03:22:28 17  **Q**    "More people die from benzodiazapines than heroin and

03:22:35 18  cocaine."

03:22:36 19          You see that one as well?

03:22:37 20  **A**    Yes.

03:22:38 21  **Q**    And benzodiazapines are drugs like whatever pam,

03:22:47 22  diazepam, right?

03:22:50 23  **A**    Correct.

03:22:51 24  **Q**    Then he told everybody to be watching for drug

03:22:55 25  cocktails, example of carisoprodol, alprazolam, and

03:23:02  1    oxycodone, right?

03:23:04  2    **A**    Yes.

03:23:07  3    **Q**    He said that this is also relevant on the issue of the

03:23:13  4    distributors, the wholesalers, the shippers, right?

03:23:20  5          You know this to be true that "The registrants,"

03:23:24  6    Walgreens, for example, "shall design and operate a system

03:23:26  7    to disclose to the registrants suspicious orders of

03:23:30  8    controlled substances."

03:23:31  9          That's what you and I covered earlier, right?

03:23:34  10   **A**    Yes.

03:23:35  11   **Q**    "If suspicious, you don't ship."

03:23:39  12         We went over that, right?

03:23:40  13   **A**    Yes.

03:23:40  14   **Q**    "A prescription for a controlled substance must be

03:23:47  15   issued by a legitimate medical purpose by an individual

03:23:50  16   practitioner acting in the course of professional practice."

03:23:53  17         Also told you again, right?

03:23:54  18   **A**    Yes.

03:23:54  19   **Q**    "Pharmacists are the last line of defense."  True?

03:24:01  20   **A**    That's what it says there.

03:24:03  21   **Q**    And here he does use the term "red flags" and speaks

03:24:05  22   about paying cash, the same medication combination without

03:24:12  23   variation for different conditions or size of a person.

03:24:16  24         See those?

03:24:17  25   **A**    Yes.

03:24:17   1   **Q**      Same diagnosis code for every prescription, see that?

03:24:24   2   **A**      Yes.

03:24:24   3   **Q**      Long distances for prescribers or patients, you'd

03:24:27   4   agree, right?

03:24:28   5   **A**      Depends on the circumstance, but he's got that written

03:24:29   6   there.

03:24:30   7   **Q**      Well, yeah, but I mean, if it's -- you need to clear

03:24:33   8   it.  We're not saying you can't clear it.

03:24:36   9   **A**      Yeah, exactly.  You need to understand why.

03:24:38  10   **Q**      Right, if I go visit my grandson in Florida and I

03:24:43  11   forget to take my statin and I go to a Walgreens and say, I

03:24:49  12   forgot my statin, I'm in Houston, look me up on the computer

03:24:52  13   and can I have a couple of days to tide me over, it's a

03:24:58  14   prescription from far away, but they've got to make sure

03:25:00  15   that it's legit before they fill it, right?

03:25:02  16   **A**      Sure.

03:25:03  17   **Q**      Okay.  Might be.  I might be peddling statins on the

03:25:08  18   street corner, right?

03:25:09  19          Customers coming in groups, each with the same

03:25:12  20   prescriptions issued by the same physician.

03:25:19  21          Customers with prescriptions for controlled substances

03:25:22  22   out of scope, right?

03:25:24  23   **A**      Yup.

03:25:25  24   **Q**      I go in and I've got a prescription for oxycodone from

03:25:31  25   an OB-GYN, probably doesn't even need to be filled, right?

03:25:34  1   **A**      If it's written for you, it probably -- you would

03:25:37  2   question it.

03:25:37  3   **Q**      Could be trouble, yeah.  Red flag at least.

03:25:44  4        And then this.  "If a pharmacist does his job, we

03:25:48  5   wouldn't have this problem."

03:25:49  6        Do you see that?

03:25:49  7   **A**      Yeah.  I also see the quotations that that was his --

03:25:53  8   **Q**      Yes, this is what the DEA man, Joe Rannazzisi, told

03:25:58  9   everybody at a time when you think the opioid crisis has

03:26:00  10  just begun.  Right?

03:26:05  11  **A**      This took place in November of 2012.

03:26:07  12  **Q**      Right.  So you're a year out from when you think the

03:26:09  13  crisis just begun?

03:26:12  14  **A**      Yeah.

03:26:12  15  **Q**      Then he says, "Hearing complaints from pharmacists

03:26:19  16  that they don't have time to check all these prescriptions

03:26:21  17  for good faith.  Wants to make sure chains aren't inhibiting

03:26:25  18  this by pressuring their pharmacists to fill fast or not

03:26:30  19  providing adequate labor."

03:26:34  20       Do you see that?

03:26:35  21  **A**      I see that there.

03:26:36  22  **Q**      And yet you are someone who had a major accomplishment

03:26:43  23  of reducing wait time as a metric, aren't you?

03:26:47  24  **A**      We did reduce wait time, but you didn't ask me how I

03:26:51  25  reduced wait time.

03:26:52   1   **Q**     Okay.  I'm sure we'll get to that and I've some more

03:26:55   2   documents about it so we'll talk about it more fully if

03:26:58   3   we've got time.

03:26:59   4        "Believes that compensation (bonus) should not be tied

03:27:04   5   to prescription volume of controlled substances."

03:27:08   6        Do you see that?

03:27:09   7   **A**     I see that.

03:27:09   8   **Q**     And yet it was at Walgreens at this point in time,

03:27:11   9   true?

03:27:12   10  **A**     Yes, at that point in time.

03:27:19   11  **Q**     Now, this presentation is before you came into the job

03:27:24   12  yourself, right?

03:27:26   13  **A**     The presentation that we did the train the trainer

03:27:29   14  that we were just talking about that Darin [ph] sent over to

03:27:29   15  me?

03:27:29   16  **Q**     Yes.

03:27:38   17  **A**     Yes.

03:27:38   18  **Q**     All right.  Now, what I'd like to do now is you come

03:27:40   19  into the job in December.

03:27:41   20  **A**     Yes.

03:27:49   21  **Q**     Ma'am, you understand that your company had had

03:27:52   22  responsibility for suspicious order monitoring program from

03:27:57   23  the very first day they started distributing opioids, right?

03:28:03   24  **A**     Yes.

03:28:03   25  **Q**     And if that program existed when you took over in

03:28:08  1    December of '12, it sure wasn't adequately staffed at least,

03:28:13  2    would you agree with me on that?

03:28:14  3    **A**    No, I would say that we were changing our system to do

03:28:19  4    more electronic type review.  We were switching from the

03:28:26  5    distribution centers, doing the order monitoring, to bring

03:28:33  6    it up to the support office.  And the system was changing

03:28:36  7    over the summer.  We had quite a few changes.

03:28:40  8         And as I'm looking through this PowerPoint deck, it's

03:28:43  9    reminding me of those changes.

03:28:46  10   **Q**    Well, let's look at Plaintiffs' Exhibit 27 and see if

03:28:52  11   this bears any relevance, please.

03:29:05  12        Do you have Plaintiffs' Exhibit 27 in front of you?

03:29:08  13   **A**    Yes.

03:29:08  14   **Q**    You'll see at the top it says an e-mail that you sent

03:29:13  15   12/16 of 2012.

03:29:17  16        Do you see that?

03:29:18  17   **A**    Yes.

03:29:18  18   **Q**    And that's you, Tasha Polster?

03:29:21  19   **A**    Yes.

03:29:21  20   **Q**    You sent this to Dan Doyle?

03:29:27  21   **A**    Yes.

03:29:27  22   **Q**    Who is he?

03:29:28  23   **A**    He was our finance partner in our division.

03:29:32  24   **Q**    Finance partner, what does that mean?

03:29:34  25   **A**    He works in the finance department.

03:29:38   1   **Q**      So does he have say-so over whether or not you hire

03:29:41   2   people?

03:29:41   3   **A**      As a matter of fact, he did -- yeah, he did help get

03:29:47   4   my team established, yes.

03:29:48   5   **Q**      Okay.  So you say "Proposed org chart."

03:29:57   6          "Thanks and be well, Tasha."

03:30:01   7          And then look at this section for the "Business case

03:30:05   8   prescription integrity group."

03:30:08   9          Do you see that?

03:30:09  10   **A**      Yes.

03:30:09  11   **Q**      You started out in this by telling Mr. Doyle, "The DEA

03:30:17  12   has alleged that Walgreens' suspicious order monitoring

03:30:21  13   program for controlled substances is" -- what's the word

03:30:28  14   that you chose?

03:30:28  15   **A**      Yeah, I chose "inadequate."

03:30:31  16   **Q**      "And has taken aggressive enforcement actions against

03:30:35  17   three Florida pharmacies and the Jupiter distribution

03:30:38  18   center."

03:30:39  19          Is that a Walgreens distribution center that would

03:30:41  20   send out the medicines?

03:30:43  21   **A**      Yes.

03:30:53  22              MR. LANIER:  Your Honor, would you excuse me

03:30:54  23   one moment, please?

03:30:56  24                  THE COURT:  Sure.

03:31:16  25                  (Pause in proceedings.)

BY MR. LANIER:

**Q**     Continues.  "The DEA has confirmed that additional regulatory actions are pending against other Walgreen facilities due to the issues uncovered in their current investigation."

You see that as well?

**A**     Yes.

**Q**     That's because this was a systemic problem.  You all used the same system nationwide, didn't you?

**A**     We did use the same system.

**Q**     So the same system in Ohio that you -- or Perrysburg, where was the distribution center for Ohio?

**A**     I believe Perrysburg was the distribution center for Ohio.

**Q**     Yeah, Perrysburg is in Indiana?

**A**     I don't know where Perrysburg is.

**Q**     Wherever Perrysburg is, that was the distribution center for Ohio, right?

**A**     Okay.

**Q**     All right.  But it's the same policy.  Y'all had the same program in place, right?

**A**     Yes.

**Q**     "In response, the Company has enhanced its suspicious order monitoring program for controlled substances in an effort to convince the DEA that the new processes will

2901

03:32:24  1    ensure that similar incidents do not occur."

03:32:28  2         Do you see that as well?

03:32:29  3    **A**    Yes.

03:32:29  4    **Q**    The updated suspicious order monitoring system --

03:32:39  5    program is currently being piloted.

03:32:42  6         That means y'all are trying it out, right?

03:32:45  7    **A**    Yeah, it's -- it started sometime over the summer, and

03:32:48  8    we were refining it and making it right.

03:32:53  9    **Q**    And, Ms. Polster, to make sure that we're on the same

03:32:57  10   wavelength for this, the jury has heard about the role of a

03:33:04  11   distributor.  And I kind of linked it up as a middle person.

03:33:16  12   So someone who's taking from the wholesaler -- I mean the

03:33:26  13   manufacturer and getting it to the pharmacy.

03:33:28  14        Right?

03:33:28  15   **A**    Correct.

03:33:29  16   **Q**    And so that was a role that for a time period, in the

03:33:34  17   time period we're looking at, Walgreens not only was here as

03:33:42  18   a pharmacy but also here as a distributor?

03:33:47  19   **A**    Yes.

03:33:47  20   **Q**    And the distributor has a responsibility to make sure

03:33:52  21   that excessive opioids aren't going out the door, right?

03:33:59  22   **A**    Yes.

03:33:59  23   **Q**    And that's what are called suspicious orders, right?

03:34:08  24   **A**    Well, suspicious orders are unusual size, unusual

03:34:13  25   frequency.  So the way you worded that, you'd have to

03:34:19   1   rephrase that for me.

03:34:20   2   **Q**    All right.  Tell me how to rephrase it so I get it

03:34:23   3   right.

03:34:23   4   **A**    Well, say again what you said.

03:34:25   5   **Q**    All right.  Let's first add the unusual size,

03:34:28   6   frequency, or pattern.  Right?

03:34:36   7        And so Walgreens is supposed to develop a system to

03:34:39   8   detect suspicious orders, right?

03:34:49   9   **A**    So there should be a way to detect suspicious orders.

03:34:52  10   I do not know that that was not indeed the case prior to our

03:34:57  11   new enhanced system that I became aware of when I got my

03:35:01  12   job.

03:35:04  13   **Q**    Well, you've got a new monitoring program?

03:35:08  14   **A**    Correct.

03:35:09  15   **Q**    Suspicious order monitoring, that's what S-O-M or SOM

03:35:14  16   stands for?

03:35:14  17   **A**    Right, that was the new program.

03:35:16  18   **Q**    Uh-huh.  And this new one that's being piloted, once

03:35:20  19   turned on for all controlled medications nationwide, is

03:35:24  20   expected to generate thousands of orders of interest per

03:35:27  21   week.

03:35:30  22        It do you see that?

03:35:31  23   **A**    I do, because it was a brand new system that we did

03:35:34  24   not know how it was going to react when we turned it on.

03:35:37  25   **Q**    And that's radically different from the numbers that

03:35:40  1    had been being picked up before, right?

03:35:43  2    **A**    I don't know that to be true.

03:35:44  3    **Q**    Okay.  You never compared it?

03:35:49  4    **A**    No, because it was a completely different --

03:35:52  5    completely different system.

03:35:53  6    **Q**    Okay.  "Proposal.  I'm requesting that the full team

03:36:01  7    complement, which includes a manager for each division as

03:36:04  8    well as two analysts under each manager, a total of 12 head

03:36:08  9    count, be approved immediately."

03:36:10  10        Do you see that?

03:36:10  11   **A**    Yes.

03:36:11  12   **Q**    "We originally thought two managers and two BAs" --

03:36:20  13   what are BAs?

03:36:22  14   **A**    Business analysts.

03:36:23  15   **Q**    "Would get us started, and then we'd slowly ramp up

03:36:27  16   over the next year or two.  We see now that this is not

03:36:30  17   going to be enough to handle the amount of work that needs

03:36:32  18   to be done."

03:36:35  19        Do you see that?

03:36:36  20   **A**    Yes.

03:36:36  21   **Q**    Doesn't that convey to you an understanding that

03:36:38  22   historically your company had not been monitoring those with

03:36:42  23   a successful program?

03:36:43  24   **A**    No, I don't see that at all.  I see that we had a

03:36:46  25   significant change in our system and the way that we did

03:36:50  1   things, and we needed personnel to be able to, you know,

03:36:54  2   move through the process accordingly.

03:36:57  3   **Q**    So you think that the old system was working fine --

03:37:03  4   **A**    I don't know that to be true.  I did not -- I was not

03:37:07  5   involved with it.  I know that it significantly changed.

03:37:11  6   **Q**    Doesn't it suggest to you, isn't it a reasonable

03:37:14  7   inference that if y'all are going to hire 12 new people to

03:37:18  8   keep up with the volume of work trying to police the

03:37:23  9   suspicious orders, that perhaps you didn't have enough

03:37:27  10  manpower, woman power, policing power beforehand?

03:37:31  11  **A**    No, because it was a brand new system, and with the

03:37:34  12  new system, we had to make changes, I needed to understand

03:37:38  13  the volume of work that was coming in, we had to understand

03:37:43  14  how the system was going to react.  And if the system

03:37:45  15  reacted with an order of interest, it needed to be

03:37:49  16  investigated.

03:37:51  17       When we began the pilot and we started to see, okay,

03:37:55  18  these numbers are triggering orders of interest and I'm

03:37:58  19  realizing I don't have enough personnel to be able to

03:38:02  20  investigate the order of interest whether or not I would

03:38:06  21  report that order to the DEA as per my obligation, or

03:38:09  22  whether or not that order was indeed an order that I could

03:38:12  23  allow to process.  And I needed more people to ensure that

03:38:16  24  we were able to get that done, because the system had

03:38:19  25  changed substantially.

03:38:26   1   **Q**     Okay.  So your testimony at the end of the day on that

03:38:29   2   is, I think the other system works fine, but we got a new

03:38:34   3   system that was going to take 12 people, and I needed to

03:38:37   4   hire them ASAP because we were going to do a new system but

03:38:43   5   we didn't need to?

03:38:45   6   **A**     I never said that we didn't need to.  I was not part

03:38:48   7   of why a new system was put in place.  I don't know the

03:38:51   8   history before it.  I do know that we moved that

03:38:56   9   responsibility up to the support center which ultimately

03:38:59   10  came under me.

03:39:00   11       I want to make sure I'm doing a good job.  I want to

03:39:03   12  make sure I'm thorough.  I want to make sure I have enough

03:39:06   13  personnel to do the job that needs to be done.  And that was

03:39:09   14  what I was asking for in that e-mail.

03:39:12   15  **Q**     All right.  So in 2013 as we roll into 2013, your

03:39:16   16  company is now starting to do something called "targeted

03:39:23   17  drug good faith dispensing," correct?

03:39:25   18  **A**     Correct.

03:39:26   19  **Q**     You'd done it as a pilot program a couple of places at

03:39:30   20  the end of 2012, but April of 2013 y'all roll it out.

03:39:35   21  Right?

03:39:36   22  **A**     Correct, yes.

03:39:40   23  **Q**     And this is targeted drug -- or targeting drug good

03:39:49   24  faith dispensing, right?

03:39:54   25  **A**     Yes.

03:39:56  1    **Q**    Target there not referencing the department store,

03:39:59  2    correct?

03:39:59  3    **A**    Correct.

03:39:59  4    **Q**    Okay.  So the target drug that y'all roll out, we've

03:40:07  5    got a statement of it in Plaintiffs' Exhibit 17177.

03:40:15  6              MR. LANIER:  If we could distribute that,

03:40:17  7    please, Maria and Rachel.

03:40:36  8    **Q**    Do you have that?

03:40:37  9    **A**    Yeah.  This is not -- this is just a communication to

03:40:41  10   the stores.

03:40:41  11   **Q**    Right.  This is saying that it's coming out, right?

03:40:44  12   **A**    Yes.

03:40:45  13   **Q**    And that's what we're doing, we're trying to get the

03:40:47  14   date on the record so that we've got evidence of when it was

03:40:49  15   rolled out.

03:40:50  16   **A**    Okay.

03:40:50  17   **Q**    So this is an e-mail April 9 of 2013 from Christopher

03:40:57  18   Dymon to you, fair?

03:40:59  19   **A**    Yes.

03:41:02  20   **Q**    And who is Christopher Dymon?

03:41:04  21   **A**    At the time he was one of my managers on my team.

03:41:07  22   **Q**    All right.  This is for the National Target Drug Good

03:41:13  23   Faith Dispensing Compass.

03:41:15  24             What's Compass?

03:41:16  25   **A**    Compass is our electronic system that we use to

03:41:21  1    communicate down to our stores.

03:41:23  2    **Q**    All right.  "The national target drug good faith

03:41:28  3    dispensing policy is intended to be a supplemental policy

03:41:31  4    which will aid pharmacists in determining if a controlled

03:41:37  5    substance prescription for a specific subset of narcotics

03:41:40  6    has been written for a legitimate medical purpose."

03:41:44  7          You see that?

03:41:44  8    **A**    Yes.

03:41:45  9    **Q**    "This policy will aid in strengthening DEA regulations

03:41:51  10   that state the pharmacist has a corresponding responsibility

03:41:55  11   to ensure that all controlled substances are written for a

03:42:01  12   legitimate medical purpose before dispensing in good faith."

03:42:06  13         Right?

03:42:06  14   **A**    Yes.

03:42:07  15   **Q**    And so this is rolling out in April of 2013, correct?

03:42:13  16   **A**    Yes.

03:42:13  17   **Q**    Now, prior to rolling it out, you were aware and

03:42:37  18   speaking to the market leadership team about the problems

03:42:39  19   with opiates, weren't you?

03:42:40  20   **A**    Yes.

03:42:40  21   **Q**    We've got Plaintiffs' Exhibit 20639.

03:43:08  22         Do you have 20639?

03:43:10  23   **A**    I do.

03:43:10  24   **Q**    This is a PowerPoint that's got your name on it, DEA

03:43:16  25   Update Market Leadership Meeting, Tasha Polster?

03:43:25  1    **A**    Yes.

03:43:25  2    **Q**    Does that mean that you take responsibility for what's

03:43:28  3    in this PowerPoint?

03:43:28  4    **A**    I do, but that date is a typo for sure.

03:43:31  5    **Q**    Okay.  It's your PowerPoint.  What date do you want to

03:43:37  6    put on it?

03:43:38  7    **A**    So I messed up, but that date is not -- I did not

03:43:41  8    deliver that PowerPoint in January of 2012.

03:43:43  9    **Q**    Okay.  What date -- I was looking at it and I was

03:43:47  10   guessing you did it --

03:43:49  11   **A**    Probably January 2013 maybe, but I did not do this in

03:43:55  12   January of 2012.

03:43:55  13   **Q**    Just to make the record clear, why don't we just

03:43:58  14   circle it and say "question date" because we don't know what

03:44:03  15   the date would be, but you don't believe that's it.  Okay?

03:44:06  16   **A**    Correct.

03:44:06  17   **Q**    All right.  Now, in this PowerPoint you start out with

03:44:17  18   the hot new topic, deadly dose, Sanjay Gupta.

03:44:22  19         Remember?

03:44:23  20   **A**    Yes.

03:44:23  21   **Q**    And this was dealing with the prescription pain drug

03:44:27  22   abuse, right?

03:44:27  23   **A**    Correct.

03:44:27  24   **Q**    You noted that the Florida pill mills had been busted?

03:44:30  25   **A**    Yup.

03:44:31   1   **Q**      You noted that on page 4 this is the leading cause of

03:44:38   2   death at this point in the United States, correct?

03:44:41   3   **A**      Of accidental death, yes.

03:44:44   4   **Q**      And I think this particular statistic comes out of

03:44:48   5   California.  But as you note in your notes, there were

03:44:50   6   multiple examples across the country where the leading cause

03:44:54   7   of accidental death is prescription pain medications, opioid

03:45:01   8   use.

03:45:02   9          Do you see that?

03:45:03  10   **A**      Yes.

03:45:04  11   **Q**      That this national problem has brought increased

03:45:06  12   scrutiny to doctors, pharmacists, and drug wholesalers.

03:45:12  13          Those are the distributors we talked about, right?

03:45:14  14   **A**      Yes.

03:45:14  15   **Q**      From regulators, policymakers, and law enforcement.

03:45:20  16          Correct?

03:45:21  17   **A**      Yes.

03:45:21  18   **Q**      And so this is something that you recognized is as of

03:45:28  19   that time period, 2011, a huge problem, right?

03:45:33  20   **A**      We're starting to see an increase, yes.

03:45:35  21   **Q**      Well, you say we're starting to see an increase, and

03:45:38  22   you mentioned that you think it started in 2011 -- or '10.

03:45:45  23   What was your date?

03:45:46  24          2011 is when you think the crisis began.

03:45:48  25          But in fact, if you look at the numbers on your chart,

03:45:55  1    prescription drugs have already escalated significantly from

03:46:02  2    2002 to 2009.

03:46:03  3         Look at them, 2001 right here.

03:46:08  4         You see that change?

03:46:09  5    **A**    Yes.

03:46:09  6    **Q**    So if we look at your chart, the idea that this all of

03:46:14  7    a sudden became a problem in 2011, it's a problem before

03:46:20  8    that, isn't it?

03:46:20  9    **A**    It is growing on top of other drugs and poisons.

03:46:25  10   **Q**    Mm-hmm.  So with that, you talk on slide 5 about the

03:46:36  11   corresponding responsibility that exists for the

03:46:40  12   pharmacists, right?

03:46:41  13   **A**    Yes.

03:46:41  14   **Q**    And we've gone through that, don't need to go through

03:46:43  15   it again with you.  The jury's probably got it memorized.

03:46:47  16        But I want to keep looking at a few other things.  You

03:46:50  17   note in this national PowerPoint, this is for everybody,

03:46:56  18   right?

03:46:56  19   **A**    Yeah, it was my train the trainer PowerPoint, yes.

03:46:59  20   **Q**    All right.  You talked about in your timeline of

03:47:01  21   events the steady increase in Florida pill mills.

03:47:06  22        And that's before 2010, right?

03:47:10  23   **A**    Yes.

03:47:10  24   **Q**    In fact, that's, again, over a year before you think

03:47:15  25   the opioid problem was starting, right?

03:47:20   1                    MS. SWIFT:  Objection, Your Honor.

03:47:22   2                    THE COURT:  Overruled.

03:47:26   3    **Q**     Maybe instead of opioid problem I should say opioid

03:47:29   4    crisis.  Right?

03:47:32   5    **A**     Yes.

03:47:32   6    **Q**     "October, dramatic increase in the number of opioid

03:47:41   7    pain medications prescriptions seen at retail stores."

03:47:45   8           That's not limited to Florida, is it?

03:47:46   9    **A**     No, because that was about the time where the

03:47:48   10   regulations changed where a pain management clinic could no

03:47:54   11   longer dispense opioid medications out of their stores, and

03:47:59   12   they -- sorry, out of their clinics, and they had to send

03:48:02   13   the prescriptions elsewhere.

03:48:03   14   **Q**     And so was this U.S.-wide as you see the dramatic

03:48:09   15   increase in the numbers?

03:48:10   16   **A**     Yeah -- no, it was industrywide, yes.

03:48:14   17   **Q**     Okay.  Then you note in here that early this year the

03:48:28   18   DEA took action against Walgreens.  "In April DEA agents

03:48:35   19   executed inspection warrants on six Walgreens pharmacies.

03:48:39   20   An administrative subpoena was...served on the Jupiter,

03:48:44   21   Florida, distribution center."  And it goes on to talk about

03:48:48   22   these problems and says, "These warrants and subpoena

03:48:52   23   requested production of certain records of

03:48:56   24   the...prescriptions, the transaction data...form of payment,

03:49:00   25   and other...information."

03:49:03  1      Do you see that?

03:49:03  2  **A**    Yes.

03:49:04  3  **Q**    And then in November the DEA issued an order to show

03:49:06  4  cause to three of the six pharmacies that were initially

03:49:11  5  visited in April.  Right?

03:49:12  6  **A**    Yes.

03:49:12  7  **Q**    Now, this is over three years after the order to show

03:49:16  8  cause had already happened out in California, right?

03:49:18  9  **A**    Yes.

03:49:21  10  **Q**    This is several years after you had talked about the

03:49:25  11  need for a national program, isn't it?

03:49:31  12  **A**    There was a national program.

03:49:35  13  **Q**    Okay.  Well, this is several years -- I'm talking

03:49:37  14  about the one where you said we don't have this right now.

03:49:40  15  Remember?

03:49:41  16  **A**    Yeah, we had a national good faith dispensing policy.

03:49:46  17  We did not have a periodic training.

03:49:53  18  **Q**    Well, actually, if you go back, your actual document

03:49:57  19  itself, subpoint B:  Procedures to identify common signs

03:50:04  20  associated with diversion.  I couldn't find anything in our

03:50:07  21  procedures that addressed this request.

03:50:09  22  **A**    That was Debbie Platts, not me.

03:50:13  23  **Q**    Well, she wrote it to you?

03:50:14  24  **A**    Wrote it to me, but that doesn't make it true.

03:50:16  25  **Q**    Well, but if you look what you said, you said:  I will

03:50:21  1   only put out the sections we need work on.

03:50:25  2   **A**    Exactly.

03:50:25  3   **Q**    And so this one where "we don't have a program in

03:50:32  4   place," you've accepted what she says there, right?

03:50:35  5   **A**    Yeah, you're taking my words out of context.

03:50:37  6        We had a policy in place which identified good faith

03:50:41  7   dispensing.  It also included red flags to consider.  Now,

03:50:46  8   we didn't have a periodic training, I would agree with that.

03:50:49  9   We did update it, we did make changes.  We did add new

03:50:52  10  things that came along that became into the industry.

03:51:04  11  **Q**    So if we continue with your PowerPoint in 2013, you've

03:51:16  12  got that date on the PowerPoint, looks like it may be a

03:51:19  13  little different than even that because you've got February

03:51:22  14  2013 the DEA administrative hearing begins.

03:51:28  15       Correct?

03:51:28  16  **A**    Yeah, but we knew that the date of the administrative

03:51:32  17  hearing, so I may have just put that in even though I had

03:51:35  18  the meeting in January.

03:51:37  19  **Q**    Fair enough.

03:51:38  20       Then we've got the operational steps that were taken.

03:51:48  21  And this is slide number 9.

03:51:49  22       Do you have that?

03:51:50  23  **A**    Yes.

03:51:50  24  **Q**    The operational steps:  In June, we relaunched our

03:51:58  25  good faith dispensing across the chain.

03:52:01    1          I thought you said it was already in place?

03:52:02    2     **A**     It was in place, but we relaunched it, we updated it,

03:52:05    3     we've updated it across the, you know, continuum that I've

03:52:11    4     been in working for Walgreens.

03:52:12    5     **Q**     Did you update it in some way you couldn't have done

03:52:16    6     three years earlier?

03:52:18    7     **A**     I don't know that I didn't update it three years --

03:52:21    8     well, I didn't update it three years earlier.  I don't know

03:52:23    9     that all the dates that it's been updated, but it's been

03:52:26    10    updated many, many times from since I've been working at

03:52:28    11    Walgreens.

03:52:29    12    **Q**     No, I'm not making sense with my question.  Let me

03:52:31    13    write it down.

03:52:32    14          We are in the PowerPoint you think's January of '12,

03:52:41    15    but in June we relaunched, so that would be June 2012.

03:52:47    16          Right?

03:52:51    17          You with me?

03:52:52    18    **A**     Yes.

03:52:53    19    **Q**     And that's the year you relaunched.  That's like a

03:52:57    20    rocket ship.  Relaunch good faith dispensing.

03:53:12    21          Agreed?

03:53:12    22    **A**     Yes.

03:53:12    23    **Q**     And you said that when you relaunched it, you made

03:53:17    24    changes, you updated it was your language, right?

03:53:20    25    **A**     We did.

03:53:21    1   **Q**      And I ask you, did you update it in ways that you

03:53:28    2   could not have done three years earlier?

03:53:33    3   **A**      I do think it's possible that we got new information

03:53:36    4   between the time frames, so I can't necessarily say that

03:53:41    5   when we updated it in 2012 that we had the exact same

03:53:43    6   information as what we had three years previous.

03:53:47    7   **Q**      So you think between 2009 and 2012 you all got new

03:53:55    8   info that enabled you to better update?

03:54:02    9   **A**      I think there was new information, yes.

03:54:03   10   **Q**      By the way, that goes back to the discussion you and I

03:54:06   11   had about the need for periodic training.  When you said we

03:54:10   12   didn't need it because pharmacists learn everything in

03:54:13   13   pharmacy school?

03:54:14   14           MS. SWIFT:  Objection.  Mischaracterizes the

03:54:18   15   testimony.

03:54:19   16           THE COURT:  I'll sustain that objection.

03:54:22   17   **Q**      Do you remember telling me that you felt like you

03:54:24   18   didn't need periodic training because pharmacists already

03:54:28   19   learned that stuff in pharmacy school?

03:54:31   20           MS. SWIFT:  Same objection.

03:54:34   21           THE COURT:  Overruled.

03:54:34   22   **A**      I remember talking about that, yes.  I also

03:54:37   23   remember -- I also remember saying that things were changing

03:54:41   24   in the industry, things were changing and moving.  And, yes,

03:54:46   25   I agree that we needed to update our policy and, in fact,

03:54:49  1    did update our policy many times over the years that I've

03:54:54  2    been working for Walgreens.

03:54:54  3    **Q**    You needed to update your policies.  You also needed

03:54:57  4    to update your training and have regular training, didn't

03:54:59  5    you?

03:55:00  6    **A**    I take that as one and the same.  When we update a

03:55:03  7    policy, we relaunch it to the field and make sure that our

03:55:06  8    folks are aware of changes that have been taken in place.

03:55:09  9    **Q**    Well, you specifically say here -- maybe this is what

03:55:13  10   you meant by new information.  You specifically say:  In

03:55:18  11   June we are relaunched our good faith dispensing policy.

03:55:22  12   However, we've learned more about DEA's expectations around

03:55:28  13   good faith dispensing, and we felt the steps we were taking

03:55:32  14   with good faith dispensing did not go far enough.

03:55:37  15       Do you see that?

03:55:38  16   **A**    Yes.

03:55:38  17   **Q**    The game has changed.

03:55:43  18       Well, first of all, this isn't a game, is it?

03:55:45  19   **A**    Oh, no, this is very serious, and we took it very

03:55:48  20   seriously.

03:55:49  21   **Q**    The no, I'm just -- that's not the -- "the game has

03:55:53  22   changed" is not really necessarily the best word choice

03:55:57  23   there; would you agree?

03:55:57  24   **A**    You're taking my -- those were notes pages to myself.

03:56:02  25   **Q**    And I don't mean to fuss with you and I apologize.

| | | |
|---|---|---|
| 03:56:06 | 1 | **A**    Okay. |
| 03:56:06 | 2 | **Q**    You're right, I should -- I'm being too nitpicky. |
| 03:56:12 | 3 | "The game has changed.  We can no longer rely on the I |
| 03:56:17 | 4 | spoke to the prescriber and he or she said it was okay." |
| 03:56:21 | 5 | Correct? |
| 03:56:21 | 6 | **A**    Absolutely. |
| 03:56:22 | 7 | **Q**    Does that mean that that's what you all used to do? |
| 03:56:24 | 8 | **A**    No. |
| 03:56:24 | 9 | **Q**    Well, wait a minute. |
| 03:56:29 | 10 | "The game has changed."  That means it's different |
| 03:56:33 | 11 | now, right? |
| 03:56:33 | 12 | **A**    Yes, things have changed substantially in the |
| 03:56:35 | 13 | industry. |
| 03:56:35 | 14 | **Q**    And the difference you cite is, "we can no longer rely |
| 03:56:41 | 15 | on the I spoke to the prescriber and he said it was okay." |
| 03:56:46 | 16 | Do you see that? |
| 03:56:46 | 17 | **A**    That's what I've written there. |
| 03:56:48 | 18 | **Q**    And when you say, "we can no longer rely on that, it's |
| 03:56:56 | 19 | changed," doesn't that seem to imply y'all used to rely on |
| 03:56:59 | 20 | that? |
| 03:56:59 | 21 | **A**    Well, that's your interpretation of my words. |
| 03:57:08 | 22 | **Q**    No, ma'am. |
| 03:57:08 | 23 | Do you know whether or not the good faith practices in |
| 03:57:12 | 24 | 2006 specifically said, if the prescriber confirms the |
| 03:57:19 | 25 | validity of the prescription, document this on the hard copy |

03:57:24    1    and process the prescription as normal?

03:57:26    2    **A**    It may have said that, but there were a lot of things

03:57:28    3    different in the industry in 2006 than what was going on

03:57:32    4    during this time.

03:57:33    5    **Q**    Ma'am, my point is, we got into this because I said

03:57:37    6    y'all used to believe that if you spoke to the prescriber

03:57:40    7    and he said it was okay, that's all that was needed.  And

03:57:45    8    you were fussing with me on it.  Remember?

03:57:47    9    **A**    I'm fussing with you on it because things had changed

03:57:49    10   in the industry.

03:57:51    11          When I spoke earlier, I spoke about the fact that the

03:57:53    12   industry was changing, that retail pharmacies did not see

03:57:57    13   chronic pain medications.  We saw it -- when I practiced

03:58:01    14   pharmacy and up until I left pharmacy, you know, direct

03:58:05    15   supervision, we were seeing small quantities of

03:58:09    16   prescriptions for patients with acute pain of, you know,

03:58:14    17   surgery or a broken leg or hospice or where people were end

03:58:20    18   of life.  We did not see large quantities of

03:58:22    19   prescriptions -- or, sorry, excuse me, large quantities of

03:58:25    20   written prescriptions for -- to help patients manage their

03:58:31    21   chronic pain.

03:58:33    22   **Q**    Ma'am, when --

03:58:35    23   **A**    When I practiced pharmacy, if we called and said, hey,

03:58:38    24   Doc, did you write this prescription for, you know, 10

03:58:41    25   tablets of Tylenol 3 and they said yes, they were validating

03:58:46  1    that they wrote the prescription.  It was a much, much

03:58:49  2    different situation in 2012, 2013.

03:58:52  3    **Q**    Well, it was a different situation before that, wasn't

03:58:54  4    it?

03:58:55  5    **A**    Yes.  And you're showing me that, and, yes, I don't

03:58:58  6    disagree with you.  The opioid crisis was absolutely on a

03:59:01  7    roll.

03:59:01  8    **Q**    And you know that the problems in California, even if

03:59:06  9    you don't remember reading the show cause order, you know

03:59:11  10   those problems were cited to y'all as going back to 2007.

03:59:17  11   Did you know that?

03:59:17  12   **A**    I saw that in there, but I don't know all the details

03:59:20  13   around that.

03:59:20  14   **Q**    But if in 2007 you've got stores that are ultimately

03:59:24  15   written up in 2009 for issuing prescriptions that they

03:59:31  16   shouldn't -- no, for filling prescriptions they shouldn't be

03:59:33  17   filling, you've had years to know this, haven't you?

03:59:40  18   **A**    I would say there are years that have happened where

03:59:42  19   the industry has changed, I will agree with you.

03:59:44  20   **Q**    And so we look at the numbers of prescriptions filled

03:59:48  21   in Trumbull and Lake Counties during these years, and -- I

03:59:57  22   mean, that's there, isn't it?  It's happening while y'all

04:00:03  23   are taking your time, right?

04:00:06  24   **A**    I disagree with what you're -- the way you're

04:00:09  25   characterizing that, but I hear what you're saying.

04:00:14    1    **Q**    When -- you know Mr. Joyce, right, Brian Joyce?

04:00:18    2    **A**    I do.

04:00:18    3    **Q**    Brian Joyce was a supervising pharmacist over some

04:00:22    4    stores that included I think Trumbull County, right?

04:00:25    5    **A**    Yes.

04:00:25    6    **Q**    He testified the other day, and in his testimony

04:00:31    7    Mr. Weinberger was asking him questions, and he was asked

04:00:36    8    about when did the opioid crisis start getting worse.

04:00:44    9    This is in his deposition.  Then it's not been put in.

04:00:48   10    Would you disagree with the idea that the opioid

04:00:52   11    crisis in Ohio was noticeably starting to get worse in 2005?

04:00:56   12    **A**    Well, I saw that on the screen there, but I was -- I

04:01:01   13    did not have direct awareness.  I was not in my role at that

04:01:05   14    time.

04:01:05   15    **Q**    But I go back to y'all are waiting till 2012 to 2013

04:01:11   16    to tell people it's -- the game is changed, we can no longer

04:01:16   17    rely on "I spoke to the doctor and he said it was okay."

04:01:22   18    Shouldn't y'all have been doing that a decade earlier?

04:01:25   19    **A**    You know, there were a lot of changes that happened in

04:01:29   20    that industry.  There was -- you know, my team was new.  We

04:01:38   21    were training the trainer of our field leadership.  We had

04:01:40   22    training.  We had training.  We had policies and procedures

04:01:43   23    that our stores followed around dispensing controlled

04:01:48   24    substance prescriptions.

04:01:48   25    **Q**    Well, y'all -- you said:  This is especially true when

04:01:55   1    the prescriber may be assisting the patient to inappropriate

04:01:59   2    use controlled substances?

04:02:00   3    **A**    Correct, because we were starting to see the industry

04:02:03   4    change.

04:02:03   5    **Q**    We've had testimony from Mr. Rannazzisi, in fact, he

04:02:07   6    testified in front of Congress that 99 percent of the

04:02:09   7    doctors are doing a good job.

04:02:13   8         Would you agree with that?

04:02:14   9    **A**    I'd agree with that.  I might even agree with higher

04:02:17   10   than 99 percent.

04:02:18   11   **Q**    Well, you take 99 percent was his.  You take 30,000

04:02:21   12   doctors in Ohio.  That means you've got 300 bad doctors

04:02:24   13   you've got to find and keep up with, right?

04:02:26   14   **A**    There are bad doctors everywhere, yes.

04:02:29   15   **Q**    And so you've got these doctors that -- and y'all --

04:02:35   16   they've been around for a while.  They didn't all of a

04:02:37   17   sudden start showing up just in 2012, did they?

04:02:41   18   **A**    No, but you started to see them.  And I'll tell you

04:02:44   19   why.  Because they couldn't dispense the prescriptions out

04:02:48   20   of their clinics anymore.

04:02:49   21   **Q**    Well, you've got Joe Rannazzisi telling you all about

04:02:53   22   them in 2011, don't you?

04:02:55   23   **A**    He was saying that we were starting to see

04:02:58   24   prescriptions that he didn't agree with filling, yes.

04:03:01   25   **Q**    Well, he not only said that, he said that if the

04:03:05  1   pharmacists wouldn't be filling them, we wouldn't have the

04:03:07  2   problems we've got, didn't he?

04:03:09  3   **A**     Yeah, he said that.

04:03:10  4   **Q**     Okay.  Now, you continue.  And in your presentation,

04:03:18  5   before this June launch y'all did a pilot program in Florida

04:03:25  6   and Nevada of the target drug good faith dispensing, right?

04:03:31  7   **A**     No, we did the target drug good faith dispensing pilot

04:03:36  8   after I became in role, which was the end of 2012, beginning

04:03:44  9   of 2013.  You said before the June launch.  This was after

04:03:52  10  with me sent out our good faith dispensing and the changes

04:03:54  11  that we made.  This was an additional policy that we put in

04:03:57  12  place.

04:03:58  13  **Q**     All right.  I don't know that I'm understanding you on

04:04:02  14  this, so I need to clarify, please.

04:04:04  15         And my understanding was in 2012, from December,

04:04:20  16  November, October, from September -- end of August to

04:04:29  17  December of 2012, y'all ran a pilot program of this --

04:04:36  18  **A**     I don't -- I don't remember starting that pilot in

04:04:40  19  August.

04:04:42  20  **Q**     Okay.  Maybe it started in -- oh, I was saying the end

04:04:45  21  of August.

04:04:46  22  **A**     I don't even remember it being at the end of August.

04:04:48  23  I mean --

04:04:48  24  **Q**     Okay.  Here, let's do this.

04:04:51  25  **A**     We did pilot it in the last quarter of 2012.

04:04:54  1  **Q**    We'll stop the guesswork if you'll look at slide 12.

04:04:59  2      You've got a slide that talks about the pattern areas

04:05:03  3  and the pilot areas.  I'm sorry.

04:05:05  4      Do you see that?

04:05:06  5  **A**    Yes.

04:05:06  6  **Q**    "Dispensing data by the selected markets for the four

04:05:12  7  months ending December 2012 suggest that target drug good

04:05:18  8  faith dispensing is impacting the target drugs as

04:05:20  9  anticipated."

04:05:21  10      Do you see that?

04:05:22  11  **A**    Yes.

04:05:22  12  **Q**    And you've got a graph here that seems to indicate

04:05:29  13  that it is impacting it?

04:05:31  14  **A**    Yes.

04:05:31  15  **Q**    And I go back to the question, there's no reason you

04:05:41  16  couldn't have had the same targeted drug good faith

04:05:46  17  dispensing policy in place years earlier, is there?

04:05:49  18  **A**    Well, the reason was I wasn't in place.

04:05:52  19  **Q**    Okay.  So it's a company decision.  They should have

04:05:55  20  put you -- promoted you earlier, right?

04:05:57  21  **A**    We should have known about -- we should have known

04:06:00  22  about the situation, we should have known that the industry

04:06:02  23  was going to change, we should have known that the doctors

04:06:05  24  could no longer dispense pain medications out of their pain

04:06:09  25  clinics, I -- you know, it's hard -- you know, it's easy to

| 04:06:14 | 1 | have hindsight.  It's hard to know when everything's |
| 04:06:17 | 2 | happening all at the same time. |
| 04:06:18 | 3 | **Q**     By the way, you say that there's a cost involved in |
| 04:06:26 | 4 | this on slide 11 -- slide 10, page 11. |
| 04:06:31 | 5 |     Do you see that? |
| 04:06:34 | 6 | **A**     You're going to have to point it out to me. |
| 04:06:35 | 7 | **Q**     Well, it's in your comments.  It's easier to |
| 04:06:37 | 8 | understand in the comments. |
| 04:06:39 | 9 |     You said:  What's the impacted of good faith |
| 04:06:43 | 10 | dispensing?  I cannot stress enough we cannot approach this |
| 04:06:46 | 11 | as impacting volume.  Our objective is a safe and regulated |
| 04:06:51 | 12 | environment to keep our stores/pharmacists from scrutiny |
| 04:06:55 | 13 | from these agencies. |
| 04:06:57 | 14 |     Do you see that? |
| 04:06:58 | 15 | **A**     Yes, I did say that because I'm speaking to a room of |
| 04:07:01 | 16 | nonpharmacists.  I am speaking to a room of businesspeople |
| 04:07:05 | 17 | that are not pharmacists, and they need to understand the |
| 04:07:08 | 18 | why behind we put these policies in place. |
| 04:07:11 | 19 | **Q**     Right.  I would think even nonpharmacists could |
| 04:07:15 | 20 | understand the why of we have people dying from these drugs, |
| 04:07:20 | 21 | and we need to do something to stop it. |
| 04:07:23 | 22 | **A**     Of course, which is what we were doing. |
| 04:07:25 | 23 | **Q**     But that's not what you said here.  Your objective |
| 04:07:28 | 24 | here is to keep the stores and pharmacists from scrutiny |
| 04:07:32 | 25 | from the agencies. |

04:07:33  1    **A**    I agree those are my notes that I had in there.

04:07:35  2    **Q**    And then you said:  Realistically, bottom line, yes,

04:07:39  3    sales are going to be impacted.  However, some would say

04:07:43  4    that we shouldn't even be filling some of these

04:07:46  5    prescriptions.

04:07:47  6    **A**    Correct.

04:07:47  7    **Q**    Well, wouldn't you say that?

04:07:53  8    **A**    No, you know, here's the deal:  You're kind of

04:07:55  9    twisting my words around, which is fair, I get that's your

04:07:58  10   job.

04:07:58  11   **Q**    No, no, no, I don't want to twist your words around

04:08:01  12   and that's not fair.

04:08:03  13             MS. SWIFT:  Objection.  Can she answer the

04:08:04  14   question, Your Honor?

04:08:06  15   **A**    So my point being is that when I put this together,

04:08:11  16   the point that I was trying to make to the audience that I

04:08:14  17   was giving of a full of district managers and health -- you

04:08:20  18   know, operations leaders who are not pharmacists is that

04:08:25  19   they needed to understand that Walgreens is supporting our

04:08:30  20   pharmacists when they choose to not fill a prescription,

04:08:34  21   which we indeed did.  And we were doing more and more

04:08:37  22   because we were starting to see prescriptions that did not

04:08:41  23   meet good faith.  And I didn't want any of those leaders to

04:08:48  24   make those pharmacists feel like they were not supported in

04:08:51  25   our decision.

04:08:53    1    **Q**     So you are talking to the people who are going to make

04:08:55    2    the decisions and those within Walgreens at the time are

04:08:58    3    businesspeople who are looking at the bottom line --

04:09:03    4    **A**     No, no, I am talking to the leaders, the field leaders

04:09:07    5    of the area, those were the audience, that was the audience,

04:09:11    6    and explaining to them what a corresponding responsibility

04:09:16    7    meant, what was happening in the industry at the time, and

04:09:18    8    that the expectation was that they were supporting the

04:09:21    9    pharmacists in when the pharmacist was exercising their

04:09:27    10   corresponding responsibility and choosing that they were not

04:09:29    11   going to fill the prescription, that me and the Walgreens

04:09:35    12   corporate office was going to support that decision.

04:09:38    13   **Q**     How is this going to my sales, what is it going to do

04:09:44    14   to my good customers, numbers show we can address the issue

04:09:48    15   without significantly impacting our other business.

04:09:52    16   **A**     Exactly right, because I wanted them to know --

04:09:54    17   **Q**     Ma'am, I haven't asked my question yet.

04:09:57    18   **A**     Oh, sorry.

04:09:58    19             THE COURT:  Why don't you wait for a question.

04:10:03    20   **Q**     Is that what you said or is that just what you put in

04:10:05    21   your notes?

04:10:06    22   **A**     That's what I put in my notes.

04:10:10    23   **Q**     All right.  Now, did you also speak here about the

04:10:21    24   suspicious order monitoring changes?

04:10:25    25             Do you recall that?

04:10:27  1    **A**    Yes.

04:10:28  2    **Q**    And if you look at slide 18 -- or 17, it's page 18,

04:10:32  3    you speak about that.  And that again is -- that's the need

04:10:37  4    to detect suspicious orders.  Right?

04:10:42  5    **A**    Correct.

04:10:42  6    **Q**    For distributing, moving from the manufacturer to the

04:10:46  7    pharmacy, right?

04:10:48  8    **A**    Correct.

04:10:48  9    **Q**    Look at what you say here.

04:10:52  10         Well, first you explain the need:  How normal and

04:10:57  11    expected transactions are identified.

04:11:00  12         Do you see that?

04:11:01  13    **A**    Yes.

04:11:02  14    **Q**    Accumulation of receipts over time period.  The system

04:11:10  15    accumulates the amount of each controlled substance over the

04:11:13  16    last six weeks.

04:11:14  17         Is that right?

04:11:15  18    **A**    Yes.

04:11:15  19    **Q**    Ceiling limit.  Data mining is done across Walgreens

04:11:25  20    retail pharmacies to determine the maximum amount that a

04:11:27  21    pharmacy should be allowed to receive in a rolling six-week

04:11:31  22    time period based on statistical linear regression.

04:11:37  23         Boy, that's fun, isn't it?

04:11:40  24         Do you know how to do that yourself?

04:11:41  25    **A**    I don't.  Boy, I --

04:11:41  1  **Q**     All right.  That's fair.

04:11:43  2  **A**     I'd ask somebody who knew how to do that.

04:11:46  3  **Q**     The analysis compares like pharmacies across the

04:11:49  4  country based on script volume and determines by drug what

04:11:53  5  would represent unusual quantities.

04:11:56  6         That's the program, right?

04:11:57  7  **A**     Yes.

04:12:00  8  **Q**     Now, you say:  The DEA regulations require that

04:12:04  9  distributors, i.e., Walgreens distribution centers, must

04:12:10  10  take reasonable measures to identify its customers,

04:12:14  11  understand the normal and expected transactions conducted by

04:12:18  12  those customers, and identify transactions that are

04:12:23  13  suspicious in nature.

04:12:26  14         Those are your notes?

04:12:28  15  **A**     Yes.

04:12:28  16  **Q**     Any fuss with them or you agree with them?

04:12:30  17  **A**     No, I agree.

04:12:31  18  **Q**     Orders must be assessed to ensure that quantities for

04:12:35  19  controlled substances at a specific location are reasonable.

04:12:40  20  In making such assessments, a wholesale distributor may

04:12:43  21  consider the purchasing entity's clinical business need,

04:12:48  22  location, population.  In addition, Walgreens must report to

04:12:52  23  the DEA any order that is deemed suspicious.

04:12:56  24         Now, you just laid out the rules there, right?

04:13:00  25  **A**     Right.

| | | |
|---|---|---|
| 04:13:01 | 1 | **Q**  Then if you'll look at the next slide, it's entitled |
| 04:13:10 | 2 | "Next Steps Through Inventory Control." |
| 04:13:17 | 3 | You see that? |
| 04:13:18 | 4 | **A**  Yes. |
| 04:13:18 | 5 | **Q**  You've got a ceiling for oxy 30 milligrams given? |
| 04:13:26 | 6 | **A**  Yes. |
| 04:13:27 | 7 | **Q**  You've got an average chain-wide relationship, true? |
| 04:13:33 | 8 | **A**  Yes. |
| 04:13:33 | 9 | **Q**  Then you've got a bunch of green dots for stores that |
| 04:13:40 | 10 | are in what you would call the upper limit.  They're above |
| 04:13:44 | 11 | the ceiling, right? |
| 04:13:44 | 12 | **A**  Yes. |
| 04:13:44 | 13 | **Q**  That's a problem, isn't it? |
| 04:13:49 | 14 | **A**  Not necessarily. |
| 04:13:51 | 15 | **Q**  It's at least something you've got to identify, you've |
| 04:13:55 | 16 | got to warn the DEA, and you've got to resolve it before you |
| 04:14:01 | 17 | ship, right? |
| 04:14:01 | 18 | **A**  No, disagree.  What this is is it's showing that |
| 04:14:06 | 19 | they're by individual order, that there are orders that may |
| 04:14:12 | 20 | be above the ceiling limit, but the ceiling limit for those |
| 04:14:16 | 21 | stores are based on a rolling six-week period of time.  And |
| 04:14:23 | 22 | that linear regression line is an average. |
| 04:14:28 | 23 | And so there are stores that would have a need to have |
| 04:14:31 | 24 | an order that would go above that line, depending on the |
| 04:14:37 | 25 | volume, where their location is. |

04:14:39  1    You know, like, a good example would be the Cleveland

04:14:42  2    Clinic that dispenses a lot of pain medications to very ill

04:14:45  3    patients.  I would expect that we would have more oxy in

04:14:49  4    that particular pharmacy than we would a different pharmacy

04:14:55  5    that does not see patients of that nature.

04:14:57  6    **Q**    But that would be taken into account year after year,

04:15:01  7    so those stats would be consistent?

04:15:03  8    **A**    Well, not necessarily, because remember, at this

04:15:07  9    time -- I know you're getting frustrated with me.

04:15:09  10   **Q**    No, no, no, no.

04:15:11  11   **A**    But remember at this time it's a new system, so we had

04:15:14  12   just started this system.  So by this time it's maybe seven

04:15:19  13   months old.  And so we're explaining to the field leaders

04:15:22  14   what the system is, why it's doing what it's doing, why

04:15:26  15   orders are getting blocked, why they would need more

04:15:33  16   documentation as to why that store would need more

04:15:37  17   controlled substances based on the order and the volume.

04:15:39  18   **Q**    Ma'am, try to focus on my questions, please.  My

04:15:42  19   question is simple here.

04:15:43  20        You have outliers, don't you?

04:15:46  21   **A**    Of course.  Everybody --

04:15:48  22   **Q**    And these outliers need to see either a decrease or

04:15:51  23   you need to stop shipping certain substances, true?

04:15:55  24   **A**    No, I disagree with you.

04:15:56  25   **Q**    That's what you said in your notes, ma'am.  You said:

04:15:59 1    These outliers will see a decrease or in some cases we'll

04:16:01 2    stop shipping certain controlled substances until they're

04:16:04 3    brought down to the appropriate levels.

04:16:06 4         Do you see that?

04:16:07 5    **A**    They're not dispensing --

04:16:08 6    **Q**    I said did you see that?

04:16:09 7    **A**    I have that in my notes, yes.

04:16:10 8    **Q**    Yes.  And so when I asked you the question just now, I

04:16:18 9    said:  You have outliers, don't you?

04:16:21 10        You said of course.

04:16:22 11        I said, and these outliers need to either see a

04:16:25 12   decrease or you need to stop shipping certain substances,

04:16:28 13   true?

04:16:28 14        You said you disagree.

04:16:29 15        But that's exactly what you said in your notes:  These

04:16:34 16   outliers will see a decrease or in some cases we'll stop

04:16:37 17   shipping certain controlled substances.

04:16:39 18   **A**    Right.

04:16:39 19   **Q**    True?

04:16:40 20   **A**    That's what I have in my notes.

04:16:42 21   **Q**    Okay.  Now, in regards to this, this is January of

04:16:48 22   2013 or so.

04:16:50 23        Seem right?

04:16:51 24   **A**    Yes.

04:16:52 25   **Q**    If we continue to work through it -- now, there is a

04:17:06   1    computer program that comes up with every prescription.  And

04:17:13   2    if there's a controlled substance prescription, the

04:17:18   3    pharmacist has a choice of putting in some notes there of

04:17:20   4    how they might resolve red flags, right?

04:17:22   5    **A**    Yes.

04:17:22   6    **Q**    And the jury has heard testimony where some of the

04:17:27   7    Walgreens notes were looked at.  And an issue has been

04:17:32   8    raised as to whether or not those notes would have been in a

04:17:37   9    prior prescription or something like that.

04:17:40  10         You follow?

04:17:40  11    **A**    Yes.

04:17:40  12    **Q**    But the truth of the matter is, you know yourself that

04:17:49  13    your company was in a problem because there wasn't enough

04:17:55  14    room in the notes field?

04:17:58  15    **A**    Oh, I don't agree with that.

04:17:59  16    **Q**    You don't recall telling people that they can delete

04:18:02  17    prior notes if they don't have enough room in the notes

04:18:04  18    field?

04:18:04  19    **A**    Well, that is correct, you put the most recent notes

04:18:08  20    in there.

04:18:09  21    **Q**    And you delete -- you don't recall telling people to

04:18:13  22    delete prior notes if there's not enough room?

04:18:17  23    **A**    You had to delete because there was not enough room.

04:18:20  24    **Q**    Okay.  Well, when I started this line of questioning,

04:18:26  25    I said:  You know yourself your company was in a problem

04:18:29   1    because there wasn't enough room in the notes field.

04:18:34   2          You said, I don't agree.

04:18:36   3          But yet when I reminded you about them deleting, now

04:18:39   4    you do agree?

04:18:40   5    **A**    Well, you have to understand that our computer system

04:18:42   6    allows for many places for annotations, notes, what have

04:18:46   7    you, to be put in place.  So the notes field is not the only

04:18:51   8    place they could document.

04:18:57   9                MR. LANIER:  Let's pass out, please,

04:18:59   10   Plaintiffs' Exhibit 20801.  And we're in the 2013 range as

04:19:05   11   y'all are rolling out the target drug good faith dispensing.

04:19:21   12   **Q**    Do you have a copy of that, ma'am?

04:19:23   13   **A**    I do not.

04:19:26   14   **Q**    Oh, sorry.

04:19:31   15          Ma'am, I'm going to move to something else while we

04:19:33   16   try to find those copies.  And I've got it in a different

04:19:38   17   document if need be.

04:19:40   18          Now, at 2013 is when ultimately Walgreens enters into

04:19:50   19   their settlement and memorandum of agreement with the DEA on

04:19:57   20   the Florida situation, right?

04:19:59   21   **A**    Yes.

04:20:00   22   **Q**    And in that, you had an opportunity to be involved,

04:20:06   23   true?

04:20:07   24   **A**    I had an opportunity to execute the memorandum of

04:20:11   25   agreement.  It was in place.  I was not part of the

04:20:15  1  agreement.

04:20:17  2  **Q**    Did you ever read the order to show cause in that

04:20:20  3  case?

04:20:21  4  **A**    I did not read the full order to show cause.

04:20:23  5  **Q**    Did you read enough of it to understand what the

04:20:27  6  allegations were against Walgreens?

04:20:29  7  **A**    I knew high level.

04:20:31  8  **Q**    At a high enough level did you understand that

04:20:34  9  Walgreens was deemed an imminent danger to public health --

04:20:40  10                 MS. SWIFT:  Objection, Your Honor.

04:20:42  11                 THE COURT:  Overruled.

04:20:46  12  **A**    I don't -- I did not read the full order to show

04:20:49  13  cause, so those imminent danger and those words I don't

04:20:54  14  recall.  But I can tell you that I did read very thoroughly

04:20:57  15  the memorandum of agreement because I was in charge of

04:21:00  16  executing it.

04:21:02  17  **Q**    That has been marked and is in evidence as Plaintiffs'

04:21:08  18  Exhibit 15.  It is the memorandum of agreement entered into

04:21:16  19  between the DOJ, Department of Justice, Drug Enforcement

04:21:22  20  Administration, and Walgreens.  Correct?

04:21:23  21  **A**    Yes.

04:21:24  22  **Q**    And this was not entered into by simply the stores at

04:21:31  23  issue.  This is entered into by the big company, right, the

04:21:36  24  parent?

04:21:37  25  **A**    Yes.

| | | |
|---|---|---|
| 04:21:37 | 1 | **Q**    And all of its wholly owned subsidiaries, correct? |
| 04:21:41 | 2 | **A**    Yes. |
| 04:21:41 | 3 | **Q**    And so this applies to Ohio, doesn't it? |
| 04:21:46 | 4 | **A**    Yes. |
| 04:21:47 | 5 | **Q**    This applies to Lake County, doesn't it? |
| 04:21:50 | 6 | **A**    If that's in Ohio, yes. |
| 04:21:52 | 7 | **Q**    It is. |
| 04:21:53 | 8 | **A**    Okay. |
| 04:21:53 | 9 | **Q**    It's up on the lake. |
| 04:21:54 | 10 |          This applies to Trumbull County, which is in Ohio, at |
| 04:21:58 | 11 | the border of Pennsylvania.  Right? |
| 04:22:01 | 12 | **A**    Okay. |
| 04:22:02 | 13 | **Q**    But even if it were across the border in Pennsylvania, |
| 04:22:05 | 14 | it would still apply, wouldn't it? |
| 04:22:07 | 15 | **A**    Yes. |
| 04:22:07 | 16 | **Q**    Because this applies to all of them, right? |
| 04:22:10 | 17 | **A**    Yes. |
| 04:22:10 | 18 | **Q**    And in this there are certain agreements where -- that |
| 04:22:20 | 19 | include the facts alleged in the orders to show cause. |
| 04:22:27 | 20 | True? |
| 04:22:27 | 21 | **A**    Yes, that's what it says. |
| 04:22:28 | 22 | **Q**    Now, you say you read this agreement carefully, but |
| 04:22:33 | 23 | you did not bother to read the order to show cause? |
| 04:22:36 | 24 | **A**    I was not responsible for reading the order to show |
| 04:22:39 | 25 | cause.  I was responsible for executing the memorandum of |

04:22:45  1    agreement.

04:22:45  2    **Q**    So where it talks about the facts alleged in the

04:22:49  3    orders to show cause, you didn't read those is your

04:22:54  4    testimony?

04:22:55  5    **A**    I did not read the full order to show cause, no.

04:23:00  6    **Q**    Walgreens acknowledges that suspicious order reporting

04:23:04  7    for distribution to certain pharmacies did not meet the

04:23:07  8    standards identified by the DEA in three letters from DEA's

04:23:12  9    Deputy Assistant Administrator, Office of Diversion Control,

04:23:19  10   sent to every registered manufacturer and distributor,

04:23:21  11   including Walgreens, on September 27, 2006, February 7,

04:23:26  12   2007, and December 27, 2007.

04:23:31  13         Do you see that?

04:23:32  14   **A**    I do.

04:23:32  15   **Q**    Now, I had asked you earlier if you were aware or if

04:23:37  16   anyone ever made you aware of those letters that were sent

04:23:40  17   out by Joe Rannazzisi in 2006 and '7.  You said no.

04:23:45  18   **A**    I don't recall reading these particular ones.  I mean,

04:23:48  19   clearly I did if I read it, but obviously my mind was to

04:23:52  20   where my role was, which was executing the pieces of the

04:23:55  21   memorandum of agreement.

04:23:56  22   **Q**    Okay.  And was your mind also somewhere a little bit

04:24:00  23   different when you were testifying to this jury that the

04:24:02  24   opioid problem/crisis did not exist until 2011 in your mind?

04:24:08  25   **A**    I said that's when things started to really change,

04:24:10   1    was in 2010 -- or, excuse me, I said 2011.  That was when

04:24:15   2    the regulations changed around the pain management clinics.

04:24:19   3    **Q**    Right.  But that's not when these letters were sent

04:24:21   4    out about the problems in 2006 and '7, were they?

04:24:25   5    **A**    I see that.

04:24:26   6    **Q**    Further, Walgreens acknowledges certain Walgreens

04:24:32   7    retail pharmacies did on some occasions dispense certain

04:24:35   8    controlled substances in a manner not fully consistent with

04:24:39   9    its compliance obligations under the controlled substances

04:24:48  10    act and its implementing regulations, true?

04:24:53  11    **A**    Yes.

04:24:55  12    **Q**    And yet you know that the policies that existed in

04:25:00  13    Florida are the same policies that existed in Ohio, aren't

04:25:03  14    they -- weren't they?

04:25:03  15    **A**    Yes.

04:25:03  16    **Q**    Walgreens had to make some agreements about how they

04:25:16  17    would comply in the future under this agreement, true?

04:25:21  18    **A**    I'm sorry, could you ask that again?

04:25:23  19    **Q**    Yes, ma'am.

04:25:23  20         Walgreens had made an agreement to comply in special

04:25:30  21    ways into the future, right?

04:25:32  22    **A**    Yes.

04:25:32  23    **Q**    And so, for example, Walgreens would maintain a

04:25:38  24    department of pharmaceutical integrity.

04:25:41  25         That's your department, isn't it?

04:25:45  1    **A**    Yes.

04:25:45  2    **Q**    Any reason Walgreens couldn't have had such a

04:25:49  3    department years before?

04:25:52  4    **A**    I don't know.

04:25:52  5    **Q**    Composed of personnel with pharmacy related training.

04:25:57  6    You've got that, don't you?

04:25:58  7    **A**    Yes.

04:25:58  8    **Q**    Managerial personnel.  You've got that, right?

04:26:02  9    **A**    Yes.

04:26:02  10   **Q**    Who will be trained in relevant diversion-related

04:26:04  11   issues, to coordinate compliance efforts related to

04:26:09  12   controlled substances.

04:26:10  13   You see that as well?

04:26:11  14   **A**    Yes.

04:26:11  15   **Q**    So we should be able to take your file from here on

04:26:16  16   out and see that you're doing those very things, right?

04:26:20  17   **A**    Yes.

04:26:20  18   **Q**    Then let's move forward a little bit, and we'll come

04:26:34  19   back to that agreement as we need to.  But I'd like to start

04:26:39  20   out -- hold on.

04:26:58  21   I'd like to start out with January 24, 2014.

04:27:05  22   MR. LANIER:  If we could pass out, please,

04:27:07  23   Plaintiffs' Exhibit 19607 is.

04:27:28  24   Do you have Plaintiffs' 19607, ma'am.

04:27:32  25   **A**    Yes.

04:27:32  1   **Q**     And you'll see at the bottom as an e-mail from you to

04:27:35  2   Eric Stahmann, Christopher Dymon, and Patricia Daugherty.

04:27:44  3        Do you see that?

04:27:45  4   **A**     Yes.

04:27:49  5   **Q**     Now, you're running the compliance-related tasks and

04:27:53  6   creating overall strategy at this point, aren't you?

04:27:56  7   **A**     Yes.

04:27:59  8   **Q**     You say the following:  Ed and Jeff developed a report

04:28:05  9   that supervisors will be able to use in order to see

04:28:12  10  pharmacists in their district that are not dispensing a lot

04:28:19  11  of controlled drugs?

04:28:21  12  **A**     Yes.

04:28:21  13  **Q**     Y'all were looking for pharmacists that aren't

04:28:27  14  dispensing a lot to try to get them to increase their

04:28:30  15  dispensing, weren't you?

04:28:30  16  **A**     That could not be further from the truth.  What they

04:28:34  17  were looking for --

04:28:34  18  **Q**     Let's keep looking, ma'am.

04:28:36  19            THE COURT:  Hold it, hold it.  You need to let

04:28:37  20  the witness finish her answer, please.

04:28:39  21            MR. LANIER:  Oh, sorry, Judge.

04:28:40  22  **A**     What we were looking for were pharmacists that were

04:28:49  23  sloughing off their responsibilities.  We had cases where we

04:28:51  24  had a pharmacist that would like, you know what, I'm not

04:28:54  25  filling any, any controlled substance that walks through the

| | | |
|---|---|---|
| 04:28:57 | 1 | door, I'm not filling it. |
| 04:28:59 | 2 | You can't do that.  You have to take care of your |
| 04:29:02 | 3 | patients.  You have to be able to take each prescription on |
| 04:29:04 | 4 | its own merit, you have to evaluate the patient, you have to |
| 04:29:07 | 5 | evaluate the prescriber, and you have to evaluate the |
| 04:29:10 | 6 | medication that the prescription was written for. |
| 04:29:13 | 7 | You can't just say, oh, you know what, sorry, this -- |
| 04:29:17 | 8 | I'm not going to fill this prescription without doing your |
| 04:29:20 | 9 | due diligence. |
| 04:29:21 | 10 | Now, if you deem that that prescription was not |
| 04:29:23 | 11 | written in good faith, that you couldn't resolve the red |
| 04:29:26 | 12 | flags, I 110 percent supported any of our pharmacists that |
| 04:29:30 | 13 | did that. |
| 04:29:30 | 14 | We had pharmacists that weren't even going that far. |
| 04:29:34 | 15 | MR. LANIER:  Judge, I object to nonresponsive |
| 04:29:37 | 16 | on the answer. |
| 04:29:38 | 17 | THE COURT:  Overruled. |
| 04:29:41 | 18 | **Q**    Ma'am, can you answer my question now? |
| 04:29:46 | 19 | **A**    Reask your question, please. |
| 04:29:48 | 20 | **Q**    Yes, ma'am. |
| 04:29:48 | 21 | Isn't it true y'all were looking for pharmacists that |
| 04:29:52 | 22 | aren't dispensing a lot to get them to increase their |
| 04:29:56 | 23 | dispensing?  True? |
| 04:29:58 | 24 | **A**    Not to increase their dispensing just willy-nilly, but |
| 04:30:03 | 25 | they can't just say I'm not going to fill a prescription and |

04:30:06  1   not do their due diligence.

04:30:07  2   **Q**    Well, this doesn't say that they won't fill any.  It

04:30:10  3   says they're not dispensing a lot.

04:30:15  4        Do you see that?

04:30:15  5   **A**    I see that.

04:30:16  6   **Q**    Does it say "in order to see pharmacists in their

04:30:20  7   district that will not dispense controlled drugs"?

04:30:24  8        Does it say that?

04:30:24  9   **A**    It does not.  It does say a lot in there.

04:30:26  10  **Q**    And this is from you, you wrote it?

04:30:28  11  **A**    I wrote it.

04:30:29  12  **Q**    You didn't say, Ed and Jeff developed a report that

04:30:31  13  supervisors will be able to use in order to see pharmacists

04:30:34  14  in their district that won't fill controlled drugs, does it?

04:30:39  15  **A**    It does not say that, no.

04:30:40  16  **Q**    It says that aren't dispensing a lot of controlled

04:30:45  17  drugs?

04:30:45  18  **A**    Correct.

04:30:46  19  **Q**    The intent is to give visibility into whether or not

04:30:49  20  we have pharmacists that just won't fill a controlled med or

04:30:55  21  maybe are selective about filling them.

04:30:59  22        You see that?

04:31:00  23  **A**    That's right, yeah, selective about filling certain

04:31:03  24  controlled prescriptions that they had to take extra steps

04:31:05  25  for.

04:31:05　1　**Q**　For example, they have controlled drugs that they

04:31:09　2　fill, but none of them are for TDs.

04:31:13　3　**A**　Right.

04:31:14　4　**Q**　Explain what TDs are?

04:31:16　5　**A**　The target drugs are the drugs that we had on our

04:31:18　6　target drug good faith dispensing checklist.  Those were the

04:31:23　7　three medications that the DEA had the most areas of

04:31:24　8　interest.  They were medications that we required extra

04:31:29　9　steps to be taken and our pharmacists to fill.

04:31:32　10　The pharmacists were very aware that the DEA were

04:31:35　11　focusing on these drugs, and they were worried about

04:31:37　12　dispensing these medications.

04:31:39　13　**Q**　Okay.  Ma'am, can you answer my question, please?

04:31:45　14　MS. SWIFT:  Objection, Your Honor.  She asked

04:31:47　15　and answered.

04:31:48　16　THE COURT:  Overruled.

04:31:49　17　**Q**　What are the three TDs, the target drugs?

04:31:51　18　**A**　Oxycodone, hydromorphone, and methadone.

04:32:03　19　**Q**　We heard from Mr. Rannazzisi that the most prescribed

04:32:06　20　drug in America was hydrocodone.

04:32:17　21　Is it listed as one of the three target drugs?

04:32:21　22　**A**　It is not.

04:32:21　23　**Q**　When you just testified in your answer and said the

04:32:28　24　DEA -- these were the three medications the DEA had the most

04:32:32　25　areas of interest, did you talk to Joe Rannazzisi about

04:32:36  1    that?

04:32:36  2    **A**    They were the drugs that they focused on when I took

04:32:39  3    my role and developed the target drugs policy, yes.

04:32:44  4    **Q**    Yes, you did talk to Joe Rannazzisi?

04:32:46  5    **A**    No.

04:32:46  6    **Q**    Okay.  That was my question.

04:32:47  7          I said, did you talk to Joe Rannazzisi about that?

04:32:51  8    **A**    I didn't have a personal conversation with Joe

04:32:53  9    Rannazzisi.

04:32:54  10   **Q**    Okay.  So when you say the DEA, those are the three

04:32:58  11   drugs, did you attend any of Joe Rannazzisi's presentations

04:33:02  12   where he said 99 percent of the world's supply of

04:33:05  13   hydrocodone is consumed in the United States, and it's the

04:33:08  14   most prescribed drug in the United States, and it was the

04:33:10  15   subject of his presentation?

04:33:12  16          Did you ever attend those?

04:33:13  17   **A**    I did attend one of his presentations, but it was

04:33:16  18   focused on oxycodone, hydromorphone, and methadone.

04:33:23  19   **Q**    All right.  So you continue in here, and if you'll

04:33:25  20   look at the second page of what you've attached, you've got

04:33:39  21   pharmacist controlled substance dispensing opportunities.

04:33:36  22          Do you see that?

04:33:37  23   **A**    Yes.

04:33:39  24   **Q**    Now, before I get too much in-depth, did you have

04:33:44  25   pharmacists that maybe just didn't want to fill out the form

04:33:46    1    and that's why they weren't prescribing?

04:33:48    2    **A**    No, I felt that they had -- they didn't want to fill

04:33:51    3    the prescriptions, they didn't want to take the

04:33:54    4    responsibility that they were trained to take to determine

04:33:57    5    whether or not that prescription was written in good faith.

04:33:59    6    **Q**    So if Mr. Joyce told us that all the Walgreens

04:34:04    7    pharmacists were great and wonderful and always did their

04:34:06    8    job carefully, you take issue with that and say y'all were

04:34:09    9    having trouble with some that weren't writing -- weren't

04:34:12    10   filling enough opiates, right?

04:34:16    11               MS. SWIFT:  Objection.  Mischaracterizes.

04:34:20    12               THE COURT:  Overruled.

04:34:20    13   **A**    I would say that over our 26,000 pharmacists, we do

04:34:27    14   have -- or we did have or we still probably have pharmacists

04:34:31    15   that are not doing the jobs that we are expecting them to

04:34:34    16   do, meaning the point of this tool was to show the field

04:34:40    17   leaders that they had pharmacists that were -- and I was

04:34:45    18   getting complaints as well from pharmacists in those

04:34:49    19   locations complaining that their fellow pharmacists were

04:34:53    20   saving these prescriptions for them to fill.

04:34:56    21   **Q**    Well, let's look, then, at what you've actually said

04:34:59    22   in here and see if it's consistent with your testimony thus

04:35:02    23   far to the jury.

04:35:03    24         Goal.  Identify opportunities for improvement specific

04:35:09    25   to a pharmacist by reviewing controlled substance dispensing

04:35:14  1  opportunities and correctly following good faith dispensing

04:35:18  2  and target drug good faith dispensing procedures.

04:35:22  3       Right?

04:35:22  4  **A**    Yes, that's what's in there.

04:35:24  5  **Q**    Pharmacist Opportunities Tool.

04:35:31  6       The intent of the tool is to identify pharmacists that

04:35:34  7  are dispensing a low rate of controlled substances.

04:35:38  8       Is that right?

04:35:39  9  **A**    Yes.

04:35:39  10  **Q**    Doesn't say none, does it?

04:35:44  11  **A**    It does not say none.  A low rate.

04:35:47  12  **Q**    Which may potentially put an undue burden on fellow

04:35:50  13  pharmacists as well as disrupt customer service levels.

04:35:57  14       Right?

04:35:58  15  **A**    Yes.

04:35:58  16  **Q**    Pharmacists were selected based on low or lack of

04:36:03  17  dispensing in 11 categories.

04:36:06  18       Do you see that?

04:36:06  19  **A**    I do.

04:36:07  20  **Q**    You didn't say just the three target drugs, oxycodone,

04:36:14  21  hydromorphone, and methadone, did you?

04:36:16  22  **A**    No, I did not.

04:36:17  23  **Q**    You said all C-II drugs.

04:36:20  24       Do you see that?

04:36:20  25  **A**    Yes.

04:36:21   1   **Q**     Hydromorphone, oxycodone, methadone.  But then you've

04:36:27   2   added carisoprodol, buprenorphine, alprazolam, amphetamines,

04:36:37   3   hydrocodone, and tramadol.

04:36:41   4        Do you see that?

04:36:41   5   **A**     Yes.

04:36:42   6   **Q**     So your concern was not simply how are they handling

04:36:49   7   the three target drugs.  Your concern was people,

04:36:54   8   pharmacists, who were having a low or lack in all of these

04:36:59   9   categories, right?

04:37:01   10  **A**     We were ensuring our pharmacists were doing their job.

04:37:04   11  **Q**     Dispensing patterns include low cash percent, low

04:37:11   12  quantity, or low rate by category.

04:37:15   13       Right?

04:37:16   14  **A**     That's one of the algorithms, yes.

04:37:19   15  **Q**     So you all could find people that weren't dispensing a

04:37:23   16  lot of cash prescriptions and identify them, weren't you?

04:37:25   17  **A**     I'm sorry.  Say again?

04:37:26   18  **Q**     Were you y'all finding people that weren't dispensing

04:37:32   19  a lot of cash prescriptions?

04:37:33   20  **A**     No, that's part of the algorithm.  We weren't looking

04:37:35   21  for people that were not dispensing cash prescriptions.

04:37:38   22  **Q**     Whether you say it's part of the algorithm, it means

04:37:40   23  it's one of the factors you looked at to see if this may be

04:37:43   24  an underprescribing doctor, right -- underfilling -- let me

04:37:52   25  start that over.  It's late.

04:37:54  1      When you say it's part of the algorithm, it means that

04:38:01  2   one of the factors you're looking at to see if maybe this is

04:38:05  3   an underfilling pharmacist is whether or not they've got a

04:38:12  4   low cash percentage.  True?

04:38:15  5   **A**   We are looking at the whole thing, but yes.

04:38:18  6   **Q**   Okay.  That's -- I understand it's --

04:38:20  7   **A**   That's part of it, yes.

04:38:21  8   **Q**   That's why I said part of the algorithm.

04:38:23  9   **A**   Yes.

04:38:23  10  **Q**   In other words, y'all have got a formula to identify

04:38:27  11  these folks that aren't filling enough C-IIs, right?

04:38:30  12  **A**   But we have a formula of pharmacists that are picking

04:38:33  13  and choosing which prescriptions they want to fill.

04:38:36  14  **Q**   And one of the factors in that formula -- by the way,

04:38:40  15  aren't pharmacists supposed to pick and choose which

04:38:44  16  prescriptions to fill?

04:38:44  17  **A**   Absolutely, but we had documentation from their

04:38:49  18  partners in their stores where they were not even doing

04:38:52  19  their due diligence.  They were just saying, I'm not filling

04:38:54  20  it.  They didn't even look at it.  They didn't consider the

04:38:59  21  patient, they didn't consider the prescriber, they didn't

04:39:01  22  consider the medication.  You can't do that.

04:39:03  23  **Q**   Well, ma'am, that's not what you said here.

04:39:05  24      Here you're talking about not people who refuse but

04:39:08  25  you're including those with a low rate.  Correct?

04:39:11  1   **A**    That's what I have there.

04:39:12  2   **Q**    And we don't have the hearsay person to come in here

04:39:15  3   and to ask the questions of, did you really say that to

04:39:20  4   Ms. Polster, so we've got to go based upon the evidence

04:39:22  5   we've got here.  Fair?

04:39:23  6   **A**    I understand.

04:39:23  7   **Q**    All right.  So within the framework of that, what

04:39:27  8   we've got here is part of the dispensing pattern that was

04:39:32  9   looked at is how much of it was being paid in cash, right?

04:39:38  10  **A**    That is a thing that we looked at, yes.

04:39:41  11  **Q**    Because y'all kept up with cash payment levels, didn't

04:39:45  12  you?

04:39:45  13  **A**    We wanted to make sure that we didn't have a store

04:39:49  14  that was dispensing more controlled substances with cash.  I

04:39:53  15  mean, that is a metric that we measure.

04:39:55  16  **Q**    Right.  But this is the exact opposite here.

04:39:58  17  **A**    You're putting words in my mouth.

04:39:59  18  **Q**    Here your metric is if they have a low cash percent?

04:40:04  19  **A**    Yeah, that's what it says.

04:40:05  20  **Q**    Then it makes you wonder if they're turning away

04:40:08  21  people who are coming in with cash, right?

04:40:10  22  **A**    I did not think that when that was written.

04:40:15  23  **Q**    Well, ma'am, that's exactly what it means though,

04:40:18  24  isn't it?

04:40:20  25  **A**    Well --

04:40:21  1    **Q**    The algorithm --

04:40:21  2    **A**    That's the words I have there, yes.

04:40:23  3    **Q**    In other words, the store average may be 15 percent,

04:40:28  4    and I just totally made that up.

04:40:30  5    **A**    Completely made that up.

04:40:31  6    **Q**    Yeah, I got no clue.

04:40:33  7    **A**    Right.

04:40:35  8    **Q**    Okay.  So I'm just making up a percentage.

04:40:36  9    **A**    Okay.

04:40:37  10   **Q**    You can say, look, make it 2 percent?

04:40:38  11   **A**    Okay.  That's better.

04:40:39  12   **Q**    I don't know.  2 percent come in and pay cash for a

04:40:47  13   prescription, as opposed to insurance.  And actually, I

04:40:50  14   think Mr. Catizone gave us that statistic, but I don't

04:40:53  15   remember what it was, okay?

04:40:54  16        Do you remember what it is?

04:40:54  17   **A**    It's definitely not 15 percent.

04:40:56  18   **Q**    Wasn't it like 10?

04:40:57  19   **A**    I would say that the average -- we fill about anywhere

04:41:01  20   from 95-ish percent of controlled substance -- or, sorry, of

04:41:06  21   all prescriptions with insurance.

04:41:09  22   **Q**    Okay.  So we'll just say 5 percent pay cash.  All

04:41:13  23   right?

04:41:13  24        So the algorithm says there should be about 5 percent

04:41:21  25   cash fills on controlled substances, right?

04:41:24  1   **A**      You're supposing that that's what that meant.  I'm

04:41:27  2   just telling you that we have an algorithm of we were

04:41:32  3   looking for pharmacists that were not doing their due

04:41:34  4   diligence, that they were sloughing off their

04:41:37  5   responsibility, and that was part of the thing that we

04:41:38  6   looked at.

04:41:39  7         You're right, that's what I have written there.  I'm

04:41:41  8   not disputing that's what I have written there.

04:41:43  9   **Q**      And like low quantity, that means they weren't doing

04:41:46  10  as many of them, right?

04:41:47  11  **A**      Right.

04:41:47  12  **Q**      Low rate by category, they're not doing as many of

04:41:51  13  this kind or that kind, right?

04:41:52  14  **A**      That's right.  Exactly right.

04:41:53  15  **Q**      Solo cash percent, not the 5 percent we expect.

04:41:59  16        But, ma'am, don't you know that that's one of the

04:42:03  17  areas where pharmacists are supposed to be careful?

04:42:08  18  **A**      Of course I know that.  I'm a pharmacist.

04:42:10  19  **Q**      Okay.  But yet, so you do this and you send this out,

04:42:17  20  and you're refreshing this data quarterly, right?

04:42:20  21  **A**      Yes.

04:42:21  22  **Q**      So the pharmacists surely are made aware of this,

04:42:23  23  don't you think?

04:42:25  24  **A**      They may be made aware of it based on a field leader

04:42:29  25  going into their location and ensuring that they're filling

04:42:32  1    the prescriptions that are coming in and doing their due

04:42:36  2    diligence or they're refusing them based on their due

04:42:41  3    diligence.

04:42:41  4    **Q**    Do you think this is incentivizing pharmacists to be

04:42:45  5    extra careful and not fill diverted prescriptions?

04:42:51  6    **A**    No, I think when we put this in place, it was because

04:42:56  7    we had pharmacists that were not willing to fill controlled

04:43:01  8    substance prescriptions by doing their due diligence.  They

04:43:04  9    were blanketly refusing to prescriptions without doing their

04:43:09  10   due diligence.

04:43:09  11        I'm telling you why it took place.

04:43:11  12   **Q**    Ma'am, did you -- ma'am, you didn't go out there and

04:43:15  13   do this hands-on investigation yourself, did you?

04:43:17  14   **A**    I did not do the hands-on investigation; however, I

04:43:21  15   certainly took phone calls from field leaders, from pharmacy

04:43:25  16   managers, from pharmacists across the country.

04:43:27  17   **Q**    And we're going to have to leave the hearsay out,

04:43:30  18   ma'am.

04:43:30  19        But what I want to do is say you have an algorithm

04:43:33  20   here, don't you?

04:43:35  21   **A**    Yes.

04:43:36  22   **Q**    And the algorithm that you've got specifically says,

04:43:41  23   low cash percent.  That's part of it, isn't it?

04:43:44  24   **A**    It includes that.

04:43:45  25   **Q**    Low quantity.

04:43:48  1      You're not doing this by looking at the individual

04:43:51  2  pharmacists or taking a phone call on -- how many

04:43:55  3  pharmacists do y'all have?

04:43:56  4  **A**    Over 26,000.

04:43:57  5  **Q**    Yeah, you're not taking phone calls on over 26,000

04:44:01  6  pharmacists.  You're just looking at the metrics, you're

04:44:03  7  looking at the numbers that are generated, aren't you?

04:44:06  8  **A**    Exactly, which is why we have field leaders that are

04:44:10  9  boots on the ground to go in and look at the reports and do

04:44:13  10  their due diligence as we expect our pharmacists to do their

04:44:17  11  due diligence.

04:44:17  12  **Q**    So here's what y'all -- here's what you put on "What

04:44:22  13  can I do?"

04:44:23  14      Do you see that?

04:44:24  15  **A**    Yes.

04:44:24  16  **Q**    What can I do?  Well, review the refusals that are

04:44:32  17  documented in the folder?

04:44:33  18  **A**    Yes.

04:44:33  19  **Q**    Because when a prescription is being refused to be

04:44:36  20  field, that pharmacist has to go to the trouble of

04:44:39  21  documenting the reason why or should at least, right?

04:44:42  22  **A**    Correct.

04:44:42  23  **Q**    I mean, they can't just pell-mell say, eh, I'm not

04:44:46  24  doing it, eh, I'm not doing it, C-II, go to another store,

04:44:51  25  go to another pharmacist, I'm not doing it, I'm not doing

04:44:53  1    it?

04:44:53  2    **A**    That exactly what the other thing that we were talking

04:44:55  3    about was looking for.

04:44:56  4    **Q**    But this says review refusals documented in the folder

04:45:00  5    as if it's going to be documented, it's not just a flat

04:45:03  6    refusal.

04:45:03  7    **A**    Exactly.

04:45:04  8    **Q**    See?

04:45:04  9    **A**    So we wanted to make sure that if we had a pharmacist

04:45:08  10   that was on that report, that they had the corresponding

04:45:13  11   refusal prescriptions in that folder.

04:45:16  12   **Q**    All right.  So what percentage of your pharmacists at

04:45:20  13   this point in time did you not trust to do their job right

04:45:23  14   on controlled substances?

04:45:24  15   **A**    I wouldn't say I didn't trust them, but I don't know

04:45:27  16   the number of how many pharmacists that were on that report.

04:45:30  17   **Q**    But you're saying you didn't trust them.  You're

04:45:32  18   saying that they appear abrogating their responsibility.

04:45:35  19   **A**    I'm saying that we asked our field leaders to ensure

04:45:38  20   the policies were being followed.

04:45:40  21   **Q**    Because there were a certain number that you did not

04:45:43  22   trust were doing their job right in filling enough opiates?

04:45:48  23               MS. SWIFT:  Objection, Your Honor.

04:45:51  24               THE COURT:  I'm suggesting we move on to

04:45:53  25   another --

04:45:54  1            MR. LANIER:  All right.  Let me -- I'll move

04:45:56  2   to the next bullet.

04:46:00  3   **Q**     Look for documentation, the pharmacist use the tools

04:46:04  4   available as appropriate in making the decision to refuse,

04:46:07  5   such as the PDMP, reviewing the patient profile or speaking

04:46:12  6   with the patient.

04:46:14  7            And then:  Does the documentation support the

04:46:17  8   decision.

04:46:17  9            Do you see that?

04:46:18  10  **A**     Yes.

04:46:18  11  **Q**     And then have a conversation with the pharmacist, talk

04:46:24  12  to them, right?

04:46:24  13  **A**     Yes.

04:46:24  14  **Q**     Ask them how they follow good faith dispensing.

04:46:29  15            See that?

04:46:30  16  **A**     Yes.

04:46:30  17  **Q**     Ask how they decide to fill a control versus refuse a

04:46:38  18  prescription.

04:46:38  19            Do you see that?

04:46:39  20  **A**     Yes.

04:46:39  21  **Q**     Review specific refused scripts to better understand

04:46:44  22  if the pharmacist was acting in the best interest of the

04:46:47  23  patient and their care.

04:46:50  24            See that as well?

04:46:50  25  **A**     Yes.

| | | |
|---|---|---|
| 04:46:51 | 1 | **Q**    Who is this going to? |
| 04:46:56 | 2 | **A**    This is going to the field leaders. |
| 04:46:57 | 3 | **Q**    To the who? |
| 04:46:59 | 4 | **A**    The field leaders. |
| 04:46:59 | 5 | **Q**    Are they pharmacists? |
| 04:47:01 | 6 | **A**    Not necessarily. |
| 04:47:02 | 7 | **Q**    So you've got businesspeople going over with a |
| 04:47:08 | 8 | pharmacist, asking them how they follow good faith |
| 04:47:13 | 9 | dispensing, don't you? |
| 04:47:13 | 10 | **A**    Yes. |
| 04:47:13 | 11 | **Q**    And then:  Encourage the pharmacist to obtain more |
| 04:47:20 | 12 | information on pain management, such as continuing education |
| 04:47:27 | 13 | courses in order to better understand treatment protocol and |
| 04:47:30 | 14 | feel more comfortable in filling controlled substances. |
| 04:47:34 | 15 | Do you see that? |
| 04:47:34 | 16 | **A**    I do. |
| 04:47:35 | 17 | **Q**    Now, y'all had a program of education available for |
| 04:47:39 | 18 | your pharmacists, didn't you? |
| 04:47:41 | 19 | **A**    Are you referring to our training? |
| 04:47:43 | 20 | **Q**    Yes, ma'am. |
| 04:47:43 | 21 | **A**    Yes. |
| 04:47:44 | 22 | **Q**    And some of that was done in conjunction with Purdue |
| 04:47:49 | 23 | Pharma, wasn't it? |
| 04:47:51 | 24 | **A**    I don't recall that. |
| 04:47:51 | 25 | **Q**    Did you know that you were listed by Purdue Pharma as |

04:47:55   1    someone on a scale of 1 to 5 who's a 4 for your friendly --

04:48:00   2    not friendly, for your cooperative work?

04:48:11   3              MS. SWIFT:  Objection.

04:48:12   4    **A**    I did not know that --

04:48:13   5              THE COURT:  Overruled.

04:48:14   6    **A**    I did not know that Purdue rated me personally.

04:48:17   7    **Q**    Mm-hmm.

04:48:17   8    **A**    Okay.

04:48:35   9    **Q**    I want to make sure I -- relationship status with

04:48:47  10    Purdue, 4 out of 5; level of influence, 5 out of 5.

04:48:52  11        Did you have a relationship with Purdue?

04:48:55  12    **A**    I had occasions to meet with Purdue.  I wouldn't say a

04:48:59  13    relationship.

04:48:59  14    **Q**    Purdue being the top opioid manufacturer at the time?

04:49:05  15    **A**    Purdue was a manufacturer, yes.

04:49:07  16    **Q**    And so your idea is encourage the pharmacists to

04:49:16  17    obtain more information on pain management, right?

04:49:19  18    **A**    So what that is -- the point of that was as our

04:49:26  19    pharmacy leaders were going into stores talking to the

04:49:29  20    pharmacists -- and again, we started to see more pain

04:49:35  21    management prescriptions come in, legitimate pain management

04:49:38  22    prescriptions, by the way, and the pharmacists were

04:49:42  23    uncomfortable filling it, we did encourage training so that

04:49:45  24    they did understand the protocol.

04:49:47  25        Not one time did I ever say that a pharmacist needed

04:49:51   1   to fill a prescription when they did their due diligence and

04:49:56   2   reviewed the prescription.

04:49:57   3   **Q**     No, you sent the businesspeople in to have a

04:50:00   4   conversation to examine their decision --

04:50:02   5   **A**     Exactly.

04:50:03   6   **Q**     -- and decide if it was appropriate, didn't you?

04:50:06   7   **A**     Exactly.

04:50:07   8   **Q**     And those businesspeople had no business doing that,

04:50:09   9   did they?

04:50:09  10   **A**     I completely disagree with you.

04:50:11  11   **Q**     Then let's look at Plaintiffs' Exhibit 17254, ma'am,

04:50:14  12   and look at a very clear example together, please.

04:50:31  13         Do you have 17254?

04:50:33  14   **A**     Yes.

04:50:34  15   **Q**     You'll see on the front page you are the Natasha

04:50:38  16   Polster talking about an incident at store 7832.

04:50:42  17         Do you see that?

04:50:42  18   **A**     Yes.

04:50:43  19   **Q**     You e-mailed Eric Stahmann and said "Is this the one

04:50:46  20   that Ed was pulled into and compliance for a call?"

04:50:51  21         Do you see that?

04:50:52  22   **A**     Yes.

04:50:57  23   **Q**     If you'll go to page -- it ends in 12, page 12 in the

04:51:02  24   lower right-hand corner.

04:51:03  25         You'll see the e-mail that precipitates all of this

04:51:05  1    attached to yours.

04:51:06  2    **A**    Yes.

04:51:07  3    **Q**    From Robert Jaeger.

04:51:10  4          Do you remember this event?

04:51:12  5    **A**    I remember my team being pulled into this event and

04:51:14  6    the compliance department investigating it thoroughly.

04:51:17  7    **Q**    "I'm writing to inform you of an incident that took

04:51:19  8    place at 7832 in Long Beach, California, on January 15,

04:51:25  9    2018, 3:50 p.m."

04:51:27  10          You see where I'm reading?

04:51:28  11   **A**    Yes.

04:51:31  12   **Q**    "Earlier in the day I had of refused to fill a

04:51:33  13   prescription for a C-II medication."

04:51:36  14          C-II, what's that?

04:51:38  15   **A**    A Schedule II.

04:51:39  16   **Q**    That's where opioids fit, right?

04:51:41  17   **A**    Yes.

04:51:41  18   **Q**    "And thought to my knowledge I correctly followed the

04:51:49  19   company's policy regarding good faith dispensing.  The

04:51:54  20   customer was upset about the situation and continued to make

04:51:57  21   numerous complaints to the company.  On the day the

04:51:59  22   complaints were made, we just so happened to have many store

04:52:03  23   managers and our district manager present for a Frontier

04:52:07  24   meeting."

04:52:07  25          Do you see that?

| | | |
|---|---|---|
| 04:52:08 | 1 | **A**  Yes. |
| 04:52:08 | 2 | **Q**  What's a frontier meeting? |
| 04:52:09 | 3 | **A**  It's a leadership meeting that was dubbed Frontier. |
| 04:52:19 | 4 | **Q**  Okay.  So you've got leaders there? |
| 04:52:21 | 5 | **A**  Yes. |
| 04:52:22 | 6 | **Q**  "One store manager in particular, James Wang, of |
| 04:52:27 | 7 | nearby store 7870, decided to take the situation upon |
| 04:52:31 | 8 | himself and inquired as to why I had refused to fill a |
| 04:52:36 | 9 | prescription due to our GFD policy." |
| 04:52:40 | 10 | Do you see that? |
| 04:52:41 | 11 | **A**  Yes. |
| 04:52:41 | 12 | **Q**  Now, that's exactly what you recommended be done, |
| 04:52:43 | 13 | isn't it? |
| 04:52:46 | 14 | **A**  I didn't recommend a store manager from another store |
| 04:52:50 | 15 | to do that. |
| 04:52:52 | 16 | **Q**  Ma'am, you said have a conversation with the |
| 04:52:57 | 17 | pharmacists and ask them how they follow. |
| 04:52:58 | 18 | **A**  But this was not to the stores.  This was pharmacists |
| 04:53:03 | 19 | opportunity report going to the field leaders. |
| 04:53:04 | 20 | Our store managers didn't get that report. |
| 04:53:07 | 21 | **Q**  So the policy -- all right.  The idea of the |
| 04:53:13 | 22 | businessperson questioning the judgment of the pharmacist is |
| 04:53:19 | 23 | what you were endorsing, it's just a different |
| 04:53:24 | 24 | businessperson than the store manager level; is that right? |
| 04:53:26 | 25 | **A**  Yes.  And not questioning.  Asking the pharmacist |

04:53:32  1  about good faith dispensing, not questioning whether or not

04:53:35  2  they were dispensing.

04:53:36  3  **Q**    "He began to argue with Jansen Filio, my pharmacy

04:53:40  4  manager at 7832, about when and why we should use the GFD

04:53:45  5  policy to refuse to fill a prescription.

04:53:49  6      "Scott Hanson, store manager at 6903, was also present

04:53:54  7  and backed up the arguments of James.

04:53:57  8      "James Wang" -- I'm skipping down to the next

04:54:00  9  paragraph.

04:54:01  10      Do you see that?

04:54:02  11  **A**    Yes.

04:54:02  12  **Q**    "Who took the lead with Scott Hanson backing up his

04:54:05  13  argument proceeded to inform Jansen that unless a

04:54:08  14  prescription is too early to fill, then it doesn't fail good

04:54:12  15  faith dispensing."

04:54:12  16      That's wrong, isn't it?

04:54:16  17  **A**    That's what he's got written there.  And I would not

04:54:19  18  agree with that.

04:54:20  19  **Q**    But that's what happens when you get businesspeople

04:54:23  20  telling pharmacists how to do their job, fair?

04:54:26  21  **A**    You know, no, I don't know that I would say that.

04:54:29  22  **Q**    Jansen stated "The patient's behavior and other red

04:54:33  23  flags can contribute to failing good faith dispensing."

04:54:35  24      James's reply:  Patient's behavior doesn't have

04:54:39  25  anything to do with good faith dispensing.  Only if the

04:54:41  1    patient personally threatens you in a violent manner can you

04:54:45  2    refuse a prescription.  That is the only time behavior would

04:54:48  3    come into play.

04:54:49  4    **A**    That's not my words.  That's this guy's words.

04:54:51  5    **Q**    Right.  But this is a program that you're overseeing

04:54:55  6    around the United States, right?

04:54:57  7    **A**    Correct, where we have 10,000 stores.

04:55:00  8    **Q**    This is a program where you years before, several

04:55:03  9    years before, said if you identify low prescriber -- or low

04:55:08  10   fillers on these quarterly reports, the businesspeople need

04:55:11  11   to go in and question why they're not filling them.  Right?

04:55:21  12   **A**    So we take -- we took that report to ensure that our

04:55:26  13   pharmacists were doing their due diligence.  This is a

04:55:28  14   different situation.  And --

04:55:30  15   **Q**    Ma'am?

04:55:31  16   **A**    -- investigated thoroughly by our compliance

04:55:34  17   department.

04:55:34  18   **Q**    Yes.  And ultimately they said the businesspeople have

04:55:37  19   no right to question the judgment of the pharmacists.

04:55:39  20   **A**    Exactly.

04:55:40  21   **Q**    And yet you told the businesspeople to do that very

04:55:42  22   thing years before, didn't you?

04:55:44  23   **A**    I did not tell them to question.  I told them to go in

04:55:47  24   and talk to the pharmacists, make sure that the good faith

04:55:52  25   dispensing and the target good faith dispensing policies

04:55:53　1　were being followed, made sure that we had the proper

04:55:57　2　documentation.

04:55:58　3　　　　If I was getting reports that pharmacists were not

04:56:01　4　filling prescriptions, we should have corresponding refusals

04:56:05　5　of all of those prescriptions in those folders.

04:56:08　6　**Q**　　Ma'am, you were telling the businesspeople to review

04:56:14　7　specific refused scripts?

04:56:15　8　**A**　　Right.

04:56:15　9　**Q**　　To better understand if the pharmacist was acting in

04:56:19　10　the best interest of the patient and their care.

04:56:21　11　　　　Do you see that?

04:56:21　12　**A**　　And what is wrong with that?

04:56:23　13　**Q**　　Is there any training the businessperson has to

04:56:27　14　understand the rules face-to-face pharmacist?

04:56:29　15　**A**　　That's not what this was asking.  It was -- the point

04:56:32　16　of this was to make sure that the businesspeople that were

04:56:35　17　going in and talking to the pharmacists understood where the

04:56:40　18　pharmacist was coming from.

04:56:41　19　**Q**　　No, no, no.  You're specifically saying what can I do

04:56:46　20　about the low prescribers.  You tell the businesspeople,

04:56:48　21　review refusals in the folder.

04:56:51　22　　　　You said that, didn't you?

04:56:52　23　**A**　　I did to make sure that there were corresponding

04:56:55　24　refusals for all the prescriptions that they were refusing.

04:56:58　25　**Q**　　Well, not just that.  You said look for documentation

04:57:00  1   the pharmacist used the tools available as appropriate in

04:57:05  2   making the decision, such as PDMP, patient profile, speaking

04:57:09  3   with the patient or caregiver.  Didn't you?

04:57:11  4   **A**    That's correct.

04:57:11  5   **Q**    And then you ask:  Does the documentation support the

04:57:17  6   pharmacist's decision?

04:57:18  7   **A**    That's right.

04:57:18  8   **Q**    You're asking that of a businessperson?

04:57:20  9   **A**    Well, they were -- they're businesspeople, but there

04:57:23  10  were -- they're supported by field leaders that are also

04:57:26  11  pharmacists.

04:57:26  12  **Q**    Ma'am, do you not understand how this would lead to a

04:57:30  13  situation like we saw in the Jaeger e-mail --

04:57:36  14  **A**    Again.

04:57:36  15  **Q**    -- where he says the position from both James and

04:57:39  16  Scott was that "they, acting as my superior, are in

04:57:43  17  authority when it comes to deciding when a prescription

04:57:46  18  passes or fails GFD.  Collectively and individually, they

04:57:51  19  were extremely intimidating and persuasive."

04:57:55  20       Do you see that?

04:57:56  21  **A**    I see that's what the pharmacist --

04:57:57  22  **Q**    You know the businesspeople are the ones who decide

04:58:00  23  meritorious bonuses and raises, right?

04:58:03  24  **A**    No, not raises.

04:58:04  25  **Q**    Well, promotions.

04:58:07  1   **A**     Perhaps promotions but not the store manager's not

04:58:12  2   involved in the decision on whether or not somebody's going

04:58:14  3   to be promoted to a pharmacy manager.

04:58:16  4   **Q**     You were told in this e-mail:  This constitutes a

04:58:20  5   corporate policy for the dispensing of controlled substances

04:58:23  6   and averts the professional judgment of the pharmacist.

04:58:26  7        Do you see that?

04:58:28  8   **A**     Yeah, but I got to read that whole paragraph.  I don't

04:58:32  9   even understand the context.

04:58:35  10  **Q**     Do you see the context of this, or at least the

04:58:37  11  statement:  As long as Walgreens allows their pharmacists to

04:58:43  12  be evaluated by store managers who are trained by the

04:58:46  13  company to be concerned with profit, customer service, and

04:58:49  14  resolving customer complaints, store managers will assert

04:58:53  15  their authority over the pharmacists and will naturally

04:58:56  16  confuse good faith dispensing issues with customer service

04:58:59  17  issues.  This is a clear conflict of interest.

04:59:04  18  **A**     I see this is what the pharmacists wrote in their

04:59:07  19  complaint.

04:59:08  20  **Q**     It says -- I mean, ma'am, this was investigated and

04:59:15  21  found out to be valid, wasn't it?

04:59:19  22  **A**     Well, first off, I wasn't involved in the entire

04:59:22  23  investigation.  My understanding was that it was fully

04:59:25  24  investigated.  The entire compliance team was involved.  I

04:59:28  25  did have one of my team members involved in it.

| | | |
|---|---|---|
| 04:59:34 | 1 | **Q**    You got this brought to your attention where this |
| 04:59:37 | 2 | pharmacist says:  I'm hereby bringing it to the attention of |
| 04:59:43 | 3 | Walgreens Boots Alliance.  There's a system in place that's |
| 04:59:46 | 4 | contributing to pharmacists recklessly dispensing controlled |
| 04:59:50 | 5 | substances and that this is directly contributing to the |
| 04:59:54 | 6 | live in relation of controlled substances and the crisis of |
| 04:59:56 | 7 | drug overdose in our country.  This is due to a conflict of |
| 04:59:59 | 8 | interest by placing a store manager, trained to safeguard |
| 05:00:02 | 9 | profit, in a position of authority over a pharmacist who is |
| 05:00:07 | 10 | trained to safeguard the health of patients, which includes |
| 05:00:09 | 11 | the responsibility and ethical dispensing of controlled |
| 05:00:12 | 12 | substances. |
| 05:00:14 | 13 |     Put simply, if Walgreens Boots Alliance keeps in place |
| 05:00:19 | 14 | a system in which a store manager is allowed to evaluate a |
| 05:00:24 | 15 | pharmacist, it can be reasonably determined a store manager |
| 05:00:27 | 16 | will have influence over the pharmacist to fill |
| 05:00:29 | 17 | prescriptions for the purpose of profit and disregarding the |
| 05:00:31 | 18 | health and safety of the patient and community. |
| 05:00:33 | 19 |     Do you agree or disagree with that paragraph? |
| 05:00:35 | 20 | **A**    I agree that this pharmacist wrote that. |
| 05:00:39 | 21 | **Q**    Do you agree or disagree with the conflict of interest |
| 05:00:42 | 22 | that this pharmacist is pointing out? |
| 05:00:44 | 23 | **A**    I agree that the pharmacist wrote it.  I do not |
| 05:00:47 | 24 | necessarily agree with the fact that he understood the way |
| 05:00:50 | 25 | things work on the back end. |

05:00:53  1      So if a store manager wants to evaluate a pharmacist,

05:00:58  2  they're one point of the evaluation.  But the pharmacist is

05:01:03  3  evaluated by a higher level than just the store manager.

05:01:06  4  **Q**      But the store managers are evaluated based on customer

05:01:08  5  service and customer complaints, aren't they?

05:01:11  6  **A**      Well, yeah, the --

05:01:14  7  **Q**      So when the patient who doesn't get their prescription

05:01:17  8  filled complains, there is a complaint lodged that will

05:01:22  9  affect the store manager's bonus, won't it?

05:01:24  10 **A**      Not necessarily.  And --

05:01:25  11 **Q**      It might?

05:01:27  12         MS. SWIFT:  Objection, Your Honor.  She needs

05:01:29  13 to be allowed to finish her answer.

05:01:30  14         MR. LANIER:  I'm sorry, Judge.  I interrupted

05:01:31  15 that.  My fault.

05:01:33  16 **Q**      Ma'am, please finish your answer.

05:01:36  17 **A**      Can you read back where I was?

05:01:38  18 **Q**      Yes, ma'am.

05:01:38  19      I said:  So when the patient who doesn't get their

05:01:41  20 prescription filled complains, there's a complaint lodged

05:01:45  21 that will affect the store manager's bonus, won't it?

05:01:49  22      And you said:  Not necessarily.

05:01:51  23      I interrupted with it might, because you were not

05:01:53  24 through when you said not necessarily.

05:01:55  25 **A**      Yeah, not necessarily.  There was a point in time when

05:02:01   1    net promoter scores or customer service scores impacted

05:02:06   2    bonus, and it was a -- I don't know the years, I just know

05:02:10   3    it was at a point.

05:02:11   4         But one customer complaint is not going to impact a

05:02:16   5    store manager's bonus to -- you know, in a large way.

05:02:20   6    **Q**    But if you go to what Mr. Jaeger said on the next

05:02:24   7    page, he says:  Don't take this mistake as an isolated event

05:02:29   8    and treat it as such.  I have now recently had three store

05:02:32   9    managers, a district manager, and a pharmacy supervisor lay

05:02:36  10    down resistance when I refused to fill a prescription.  I

05:02:39  11    was even threatened with being insubordinate when I

05:02:43  12    resisted.  I also know many other pharmacists, both

05:02:47  13    currently working for the company and others who have since

05:02:49  14    left, who have felt the same pressure, either by being

05:02:53  15    directly told or to have resistance placed on them to fill

05:02:57  16    prescriptions that went against their own professional

05:03:00  17    judgment.

05:03:01  18         Ma'am, did this send alarm bells to you when you got

05:03:05  19    it?

05:03:06  20    **A**    Sure, I made sure that our compliance team thoroughly

05:03:10  21    investigated this.

05:03:12  22    **Q**    But you not only had the issue of this, you could

05:03:17  23    investigate it and tell Mr. Jaeger, gee, you were right,

05:03:21  24    they were wrong, they shouldn't have done it.

05:03:23  25         But did you bother to put together a national program

05:03:26  1    just to tell everybody, put the kibosh on what I told you

05:03:31  2    about low riders?

05:03:34  3    **A**     We don't make a big issue out of the -- I can't even

05:03:41  4    remember what the report's called now, the --

05:03:44  5    **Q**     The report is called --

05:03:46  6    **A**     Dispensing pharmacists or whatever.  It's part of the

05:03:50  7    overarching different tools that we give our field leaders

05:03:56  8    to look for when they're going into their stores to do

05:04:01  9    supervision.

05:04:03  10         But, you know, I completely disagree that there was

05:04:10  11   that much pressure put on our pharmacists.  I supported our

05:04:12  12   pharmacists.  Our company supported our pharmacists when

05:04:15  13   they did not fill prescriptions.  Doctor complaints, patient

05:04:20  14   complaints, we supported our pharmacists.

05:04:21  15   **Q**     Ma'am, with due respect, do you consider it supporting

05:04:24  16   your pharmacists when you issue a quarterly report of those

05:04:28  17   that are writing low volumes of controlled substances and

05:04:31  18   you're sending management, senior management, out to talk to

05:04:36  19   them and to assess whether or not they're doing their job

05:04:38  20   right?

05:04:38  21   **A**     I do because we're supporting all the pharmacists in

05:04:40  22   the store.  If we have a pharmacist that's sloughing off

05:04:43  23   their responsibility onto the next guy, that's not right

05:04:57  24   here.

05:04:57  25                    THE COURT:  All right.  Mr. Lanier, if you're

| | | |
|---|---|---|
| 05:04:58 | 1 | moving onto either another document or another area. |
| 05:05:01 | 2 | MR. LANIER:  I am. |
| 05:05:01 | 3 | THE COURT:  I think it might be a good time to |
| 05:05:03 | 4 | break for the evening. |
| 05:05:04 | 5 | MR. LANIER:  Got it, Judge.  This is perfect. |
| 05:05:06 | 6 | Thank you. |
| 05:05:07 | 7 | THE COURT:  Okay.  Ladies and gentlemen, we |
| 05:05:08 | 8 | will recess for the evening. |
| 05:05:10 | 9 | Usual admonitions apply.  Don't read, encounter, view |
| 05:05:16 | 10 | anything in the media, don't discuss the case among |
| 05:05:17 | 11 | yourself. |
| 05:05:18 | 12 | And we'll pick up at 9 a.m. with Ms. Polster's |
| 05:05:20 | 13 | testimony.  Have a good evening. |
| 05:05:44 | 14 | (The jury is not present.) |
| 05:06:00 | 15 | THE COURT:  You can be excused.  We've got |
| 05:06:01 | 16 | some legal issues, but you can be excused for the evening. |
| 05:06:13 | 17 | (Off-the-record discussion.) |
| 05:06:14 | 18 | THE COURT:  All right.  I want to stay current |
| 05:06:18 | 19 | with the exhibits.  Do we -- for the two yesterday we had |
| 05:06:26 | 20 | Mr. Nelson and Mr. Tsipakis.  I don't know if we have |
| 05:06:31 | 21 | exhibits.  Do you want to wait till tomorrow?  I guess we |
| 05:06:34 | 22 | can.  But if you have them, we can take them up. |
| 05:06:38 | 23 | MS. FLEMING:  Yes, Your Honor.  May I |
| 05:06:41 | 24 | approach? |
| 05:06:41 | 25 | THE COURT:  Yes.  Thank you. |

05:06:51    1          I'll tell you what, rather than -- have you shown

05:06:55    2    these to the defendants?  Do they have any objections to any

05:06:58    3    of them?

05:06:59    4                MS. FUMERTON:  Yes, Your Honor.  This is Tara

05:07:02    5    Fumerton.  We do have a number of objections to these

05:07:04    6    exhibits.

05:07:05    7                THE COURT:  All right.

05:07:07    8                MR. DELINSKY:  Your Honor, CVS does too given

05:07:09    9    that CVS was mentioned in a handful of them.

05:07:11   10                THE COURT:  Which ones do you object to?

05:07:13   11                MS. FUMERTON:  So, Your Honor, I'm not sure

05:07:14   12    what list or how they organized the list that's handed to

05:07:18   13    you.  Is yours by exhibit number or --

05:07:20   14                THE COURT:  Exhibit number.

05:07:21   15                MS. FUMERTON:  So Deposition Exhibit Number 3,

05:07:24   16    the --

05:07:25   17                THE COURT:  I just have P numbers.

05:07:26   18                MS. FUMERTON:  Okay.  So that would be

05:07:29   19    P-08076.

05:07:31   20                THE COURT:  All right.  Annual performance

05:07:33   21    evaluations for Nelson.

05:07:34   22                MS. FUMERTON:  Yes, Your Honor.  They're

05:07:38   23    irrelevant.  They contain lots of personal information.  The

05:07:40   24    only reason that they were asked was to refresh

05:07:43   25    recollection.  So --

05:07:44   1                  THE COURT:  Yeah, I agree.  I don't think

05:07:45   2    there was any real testimony about his performance

05:07:48   3    evaluation.

05:07:48   4        What -- what's the relevance to those?

05:07:55   5                  MR. LANIER:  Your Honor, I don't recall any

05:07:57   6    relevance to his performance evaluation either.  I was just

05:08:01   7    kind of like setting up some other questions, so I don't

05:08:04   8    have any problem.

05:08:06   9                  THE COURT:  So that's withdrawn.

05:08:09  10                  MR. LANIER:  Sure.

05:08:10  11                  THE COURT:  Yes, Ms. Fumerton, let's go

05:08:12  12    through your objections and I'll get to Mr. Delinsky.

05:08:14  13                  MS. FUMERTON:  Okay.  Thank you, Your Honor.

05:08:15  14        So there's a number of statutes that he is -- that the

05:08:20  15    plaintiffs want to put into evidence.  I guess we don't have

05:08:23  16    strong view on that, if the Court views that's appropriate,

05:08:26  17    but --

05:08:27  18                  THE COURT:  I don't -- I mean, it's the law,

05:08:29  19    and there's been a lot of discussion about it, and the jury

05:08:32  20    may want to read it themselves.

05:08:33  21                  MS. FUMERTON:  Okay.  That's fine with us

05:08:36  22    then, Your Honor.

05:08:37  23        I think the next one, at least I'm just going down on

05:08:40  24    my list, is P-08166.  And this is the *Holiday* case, so I

05:08:46  25    think CVS might have an objection on this one.

05:08:48    1              THE COURT:  I think this is already in.

05:08:50    2              MR. DELINSKY:  Your Honor, I think where we

05:08:51    3    left this is that it was not in and there was to be a

05:08:54    4    meeting of the minds among the parties to see if whether a

05:08:58    5    stipulation could be reached on the seminal portions of it.

05:09:01    6    Because I think Your Honor ruled that the factual portions

05:09:04    7    and the specific findings were out.  So we're going to have

05:09:08    8    to figure some way to get the core pieces in.

05:09:11    9              MR. LANIER:  We think *Holiday* comes in.  It's

05:09:13   10    been read, it's been read, it's been read.  They've read it,

05:09:15   11    we've read it.

05:09:16   12              THE COURT:  Yeah, I mean, the jury ought to

05:09:19   13    see what it says, okay?  It's been testified to by a number

05:09:22   14    of witnesses.  It's a --

05:09:25   15              MR. DELINSKY:  Your Honor, this is the height

05:09:26   16    of prejudice.

05:09:28   17              THE COURT:  Well, it's not the height of

05:09:29   18    prejudice.

05:09:30   19              MR. DELINSKY:  It is, because it contains

05:09:31   20    specific details about specific acts by specific pharmacists

05:09:35   21    that have no relevance whatsoever --

05:09:39   22              THE COURT:  I disagree.  If I felt that way, I

05:09:40   23    wouldn't have allowed all the testimony about it,

05:09:42   24    Mr. Delinsky.

05:09:43   25              MR. DELINSKY:  But Your Honor didn't allow the

05:09:45   1    testimony on it.  Your Honor specifically did not allow

05:09:47   2    testimony on the granular facts of what occurred and

05:09:51   3    required Mr. Lanier to stick to the findings, which is what

05:09:54   4    was the subject of cautioning.

05:09:56   5         There has been no cautioning --

05:09:58   6              THE COURT:  Well, get a stipulation on what

05:10:00   7    goes in, all right?  If you can't, I'll just have to admit

05:10:02   8    it myself, I'll have to do it --

05:10:04   9              MR. LANIER:  I'll be glad to meet with

05:10:07  10    Mr. Delinsky, and we'll see if he's got edits to it that he

05:10:10  11    wants to take out, I'll be glad to do that.

05:10:12  12              THE COURT:  All right.  So we'll work on that,

05:10:14  13    all right.

05:10:15  14              MS. FUMERTON:  Okay.  Your Honor, the next one

05:10:18  15    I had on my list for objections is P-21113.  Now I don't

05:10:25  16    know how many 1s I said.

05:10:27  17              THE COURT:  It's the DEA/Walmart settlement

05:10:29  18    agreement.

05:10:30  19              MS. FUMERTON:  Yes.  And Your Honor, you've

05:10:30  20    already ruled that can come in, but we are going to maintain

05:10:33  21    our objection to it.

05:10:33  22              THE COURT:  All right.  That comes in over

05:10:51  23    objection.

05:10:51  24              MS. FUMERTON:  Same thing with respect to

05:10:53  25    P-14711, which is the --

1          THE COURT:  All right.  That comes in over

2     objection.

3          (Court reporter interjection.)

4          THE COURT:  It's 21113 and 14711.  They come

5     in over objection.

05:10:59   6          MS. FUMERTON:  The next one is P-07846, and

05:10:59   7     again, this document has reference to the settlements, but I

05:11:03   8     think that should be admitted over objection.

05:11:04   9          THE COURT:  That comes in over objection then.

05:11:06  10          MS. FUMERTON:  The next one is P-07798.  And

05:11:13  11     again, this is a CVS objection.

05:11:17  12          MR. DELINSKY:  Your Honor, this exhibit, and I

05:11:19  13     can't remember if it was in the form of an e-mail or was

05:11:22  14     just standalone, is a news article about what happened in

05:11:26  15     *Holiday* titled, "Feds, CVS" --

05:11:30  16          THE COURT:  Yeah, I agree, this shouldn't come

05:11:31  17     in.  I don't think this should come in.  I mean, this is

05:11:38  18     out.

05:11:39  19          MS. FITZPATRICK:  Your Honor, respectfully,

05:11:41  20     Laura Fitzpatrick for the plaintiffs, it was actually an

05:11:43  21     e-mail to Mr. Nelson that Mr. Nelson acknowledged on the

05:11:47  22     stand that he recognized, and it was attaching a press

05:11:51  23     release, but it was not just a press release.  And for that

05:11:54  24     reason we think it is admissible.

05:11:56  25          THE COURT:  Whose press release?  Was it his

05:11:59  1   press release?

05:12:00  2               MS. FITZPATRICK:  No, Your Honor, it was a

05:12:01  3   press release regarding the *Holiday* case.

05:12:05  4               THE COURT:  I don't -- this doesn't come in.

05:12:06  5   That's out.

05:12:07  6               MS. FUMERTON:  Your Honor, the next one --

05:12:08  7               MR. WEINBERGER:  Your Honor, just one thing.

05:12:09  8   That was attached to an e-mail, remember, he had denied

05:12:13  9   seeing the actual *Holiday* case, and this e-mail, which was

05:12:18  10  an e-mail he received, which this -- which is this exhibit

05:12:23  11  demonstrates that he got the -- a copy of the case.

05:12:28  12              MR. LANIER:  Your Honor, may I suggest that

05:12:29  13  what we could do, since *Holiday* is likely coming into

05:12:33  14  evidence as you've already ruled, to stop a cumulative

05:12:36  15  problem is we just admit the e-mail without the attachment?

05:12:38  16              THE COURT:  Yeah, just admit the e-mail if

05:12:41  17  it's in it that he did get it, fine, the e-mail comes in and

05:12:43  18  the attachment.

05:12:44  19              MS. FUMERTON:  But, Your Honor, this actually

05:12:45  20  is not an attachment.  It's a --

05:12:48  21              THE COURT:  Let me have the document, please.

05:12:50  22              MS. FUMERTON:  Yes, Your Honor.

05:13:02  23              THE COURT:  Well, let's move on to the next

05:13:04  24  one.

05:13:04  25              MR. WEINBERGER:  Your Honor, one other point

05:13:05   1   to be made, Special Master Cohen has already made rulings on

05:13:11   2   all of these exhibits.

05:13:12   3              THE COURT:  No, he admitted -- he said they're

05:13:14   4   authentic.

05:13:15   5              MR. WEINBERGER:  No, no, no, because he

05:13:16   6   reviewed the deposition and the exhibits, he did two things:

05:13:20   7   One, he ruled on objections to the testimony and, secondly,

05:13:23   8   he ruled on whether or not the exhibits are admissible.

05:13:27   9      Am I -- I mean, unless I'm --

05:13:29  10             MS. FUMERTON:  No, Your Honor, actually this

05:13:32  11   is not accurate.  The admissibility of the documents was

05:13:37  12   actually reserved for your ruling based on the testimony.

05:13:40  13             THE COURT:  They're authentic.  Let me have

05:13:41  14   the document.

05:13:42  15             MS. FUMERTON:  Your Honor, this is a binder of

05:13:43  16   all of them.

05:13:49  17             THE COURT:  This doesn't do me any good.

05:13:51  18   Let's move on.  If you can find it for me.  I'll move on to

05:13:56  19   any other objections?

05:13:57  20             MS. FUMERTON:  Yes, Your Honor.  The next one

05:13:58  21   is a similar issue.  It's P-07797.  It will be immediately

05:14:05  22   after that other one in the tab.  I can help find that if

05:14:07  23   that's --

05:14:08  24             THE COURT:  All right, this is just not --

05:14:10  25   it's taking way too long.

05:14:11   1          Let's have the next one.

05:14:12   2          Any other objections?

05:14:15   3                  MS. FUMERTON:  Yes, Your Honor.  The next one

05:14:19   4    is P-08586.  And this is a Purdue-produced document.  It's a

05:14:28   5    Purdue presentation from Purdue individuals to other Purdue

05:14:32   6    individuals.  Mr. Nelson said he'd never seen it before, he

05:14:35   7    knew nothing about it.

05:14:36   8                  THE COURT:  All right.  Why -- this shouldn't

05:14:38   9    come in.  If he knew nothing about it.  All right.  That's

05:14:45  10    out.

05:14:46  11          Let me see the other two.

05:15:12  12          This doesn't seem to be the right document.  7798.

05:15:17  13    This is going nowhere.  I can't tell what -- so forget those

05:15:21  14    two.

05:15:21  15          Any other objections?  If someone can give me those

05:15:25  16    two documents, fine.  If not, we'll move on.

05:15:28  17                  MS. FUMERTON:  Your Honor, we have objections

05:15:30  18    to P-08069, P-20829 and P-08048.  I guess I should qualify

05:15:42  19    that.  These are all documents that relate to specific

05:15:45  20    instances outside of Ohio.  If these are just exemplars,

05:15:48  21    we're okay with them coming in, but we are going to object

05:15:50  22    to the cumulative effect of all of these types of documents

05:15:52  23    that are very similar and relate to --

05:15:54  24                  THE COURT:  These were testified to, all

05:15:55  25    right, there was -- was there testimony on these?

| | | |
|---|---|---|
| 05:15:58 | 1 | MS. FUMERTON:  Yes, there was. |
| 05:16:01 | 2 | MS. FITZPATRICK:  Yes, Your Honor, there was. |
| 05:16:01 | 3 | THE COURT:  They come in over objection. |
| 05:16:04 | 4 | MS. FUMERTON:  Your Honor, the next one is |
| 05:16:06 | 5 | P-07966, P-07908. |
| 05:16:10 | 6 | THE COURT:  Let's start with one. |
| 05:16:12 | 7 | MS. FUMERTON:  They're all related. |
| 05:16:15 | 8 | THE COURT:  These are all e-mails that were |
| 05:16:17 | 9 | testified to, right? |
| 05:16:19 | 10 | MS. FUMERTON:  They were.  Your Honor, we're |
| 05:16:20 | 11 | objecting for the record if they're coming in over |
| 05:16:23 | 12 | objection. |
| 05:16:23 | 13 | THE COURT:  For what reason? |
| 05:16:24 | 14 | MS. FUMERTON:  Because they're highly |
| 05:16:26 | 15 | prejudicial.  They deal with an issue specific to the state |
| 05:16:29 | 16 | of Texas and two doctors that have -- there's no evidence |
| 05:16:31 | 17 | that they had anything to do with Ohio. |
| 05:16:35 | 18 | THE COURT:  Overruled.  They're all in. |
| 05:16:38 | 19 | That's not a -- I mean, I've already -- if that was a -- I |
| 05:16:43 | 20 | allowed the testimony, all right?  He testified about it. |
| 05:16:49 | 21 | He dealt with these things so they come in. |
| 05:16:50 | 22 | MS. FUMERTON:  Your Honor, the last objection |
| 05:16:51 | 23 | that we have is with respect to P-0805.  This is a |
| 05:16:56 | 24 | confidential general separation agreement. |
| 05:16:58 | 25 | THE COURT:  I don't even see that on the list. |

05:17:02   1              MS. FITZPATRICK:  20850, Tara, is that what

05:17:05   2   you mean?

05:17:06   3              MS. FUMERTON:  No, no, no.  P-08075.

05:17:10   4              MR. WEINBERGER:  That's his settlement

05:17:13   5   agreement, separation agreement with the company.

05:17:15   6              THE COURT:  I'm not even finding this on the

05:17:16   7   list as one that's being offered.

05:17:22   8              MR. WEINBERGER:  Your Honor, it's 08075.  It's

05:17:25   9   three from the bottom on the second page.

05:17:27   10             MS. FUMERTON:  I apologize, Your Honor, I

05:17:29   11  don't have a copy of what you have, so it's hard for --

05:17:31   12             THE COURT:  I mean, there was testimony about

05:17:33   13  it, so what's the objection there?

05:17:35   14      Well, there may be a whole lot in there that's

05:17:37   15  irrelevant.

05:17:37   16             MS. FUMERTON:  Exactly, Your Honor.

05:17:38   17             THE COURT:  I mean, it's a 20-page -- you

05:17:41   18  know, the part that he testified to should come in, only

05:17:44   19  that part.

05:17:45   20             MS. FITZPATRICK:  Your Honor, we're happy to

05:17:47   21  work with Ms. Fumerton to redact the irrelevant portions.

05:17:50   22             THE COURT:  Just the part he testified to

05:17:53   23  his -- the amount of the compensation and the cooperation

05:17:56   24  clause.  It seems to me that's the only thing that's

05:18:00   25  relevant.

05:18:00   1                  MS. FITZPATRICK:  Yes, Your Honor.

05:18:01   2                  THE COURT:  All right.  Compensation clause

05:18:03   3     and cooperate -- and compensation.

05:18:09   4          All right.  Can someone give me the other two

05:18:12   5     documents that -- if you can hand them to me, I'll deal with

05:18:18   6     them.  If not, we'll just move on.  What are they?

05:18:22   7                  MS. FITZPATRICK:  Tara, could you give those P

05:18:25   8     numbers again?

05:18:25   9                  THE COURT:  Just hand me the documents,

05:18:25   10    please.

05:18:25   11                 MS. FUMERTON:  I can take care of it, Laura.

05:18:28   12                 THE COURT:  If not, we'll move on.

05:18:30   13                 MS. FITZPATRICK:  Yeah, I want to look at it.

05:18:32   14                 MS. FUMERTON:  Well, it's your documents.

05:18:33   15                 MS. FITZPATRICK:  Yeah, I just need the P

05:18:35   16    number.  7798 and 7797?

05:18:42   17                 THE COURT:  7798 is a -- is e-mail with a

05:18:47   18    press release, "CVS Failed to Ensure Legitimate

05:18:51   19    Prescriptions."

05:18:52   20                 MS. FITZPATRICK:  Your Honor, I believe that

05:18:53   21    is the one that Mr. Lanier suggested that we would redact

05:18:56   22    out the press release portion of it.

05:19:02   23                 THE COURT:  All right.  If you redact the

05:19:03   24    press release, the e-mail can come in.

05:19:06   25                 MS. FITZPATRICK:  Thank you, Your Honor.

05:19:09    1            MR. DELINSKY:  Your Honor, we'd just like to

05:19:11    2   reserve the right.  The subject line may require some

05:19:14    3   redaction too, but we'll work with Miss Fitzpatrick on that.

05:19:17    4            THE COURT:  It came to him, all right?  I said

05:19:19    5   the subject line comes in or else it's unintelligible.

05:19:23    6       All right.  What's the next one?

05:19:28    7            MS. FUMERTON:  It's --

05:19:30    8            THE COURT:  07797, was that a problem?

05:19:33    9            MS. FUMERTON:  Yes, Your Honor.

05:19:39    10           THE COURT:  Another press release, all right.

05:19:44    11   DEA Revokes Two CVS Retailers' Ability.  The press

05:19:48    12   release shouldn't come in.  If you want to admit the e-mail,

05:19:53    13   that's fine.

05:19:59    14      All right.  The others on here can come in.

05:20:02    15      All right.  Tsipakis, is there any objection?

05:20:08    16           MR. DELINSKY:  Your Honor, before you move off

05:20:10    17   that, there's just one more, I think it's covered, but 7799

05:20:14    18   is the final order in *Holiday* against CVS.

05:20:20    19           THE COURT:  Well, work it out -- *Holiday* is

05:20:22    20   coming in.  You're going to have to work out some excerpts.

05:20:25    21   If you can't we'll just have to admit it.

05:20:27    22           MR. DELINSKY:  I just want to make sure it was

05:20:28    23   put in that same bucket, Your Honor.

05:20:30    24           THE COURT:  You can just work it out.

05:20:31    25      I mean, *Holiday* is coming in, but probably not the

| 05:20:35 | 1 | entire document. |
| 05:20:38 | 2 | All right.  Any objections to these, they're nine and |
| 05:20:42 | 3 | ten on Tsipakis. |
| 05:20:44 | 4 | MS. FIEBIG:  Your Honor, we were hoping for |
| 05:20:45 | 5 | one more evening to confer with the plaintiffs and hoping |
| 05:20:47 | 6 | that we could address these tomorrow. |
| 05:20:50 | 7 | THE COURT:  That's fine. |
| 05:20:51 | 8 | MS. FIEBIG:  Thank you. |
| 05:20:57 | 9 | THE COURT:  All right.  CVS filed a motion to |
| 05:20:59 | 10 | exclude future references to *Holiday*.  That's denied.  But I |
| 05:21:03 | 11 | am going to limit it. |
| 05:21:05 | 12 | At this point, it's only relevant if the plaintiffs |
| 05:21:08 | 13 | can -- are seeking to elicit testimony from a witness either |
| 05:21:12 | 14 | from CVS or from another company that knew about it and |
| 05:21:17 | 15 | either did or didn't take any action as a result.  And so |
| 05:21:19 | 16 | that's all I'm going to allow. |
| 05:21:23 | 17 | MR. LANIER:  Understood. |
| 05:21:23 | 18 | THE COURT:  You don't have to read a whole lot |
| 05:21:26 | 19 | about it, just say did you hear about *Holiday*, yes, if so, |
| 05:21:29 | 20 | did you do anything, yes or no, Bingo, move on. |
| 05:21:32 | 21 | MR. LANIER:  Understood. |
| 05:21:32 | 22 | THE COURT:  So that's it. |
| 05:21:37 | 23 | All right.  There's a motion to exclude |
| 05:21:41 | 24 | McCallion [ph].  I don't know if the plaintiffs want to deal |
| 05:21:44 | 25 | with that now or tomorrow.  That witness isn't scheduled |

| | |
|---|---|
| 05:21:47 | 1 |
| 05:21:47 | 2 |
| 05:21:49 | 3 |
| 05:21:50 | 4 |
| 05:21:53 | 5 |
| 05:21:56 | 6 |
| 05:21:57 | 7 |
| 05:21:59 | 8 |
| 05:22:00 | 9 |
| 05:22:02 | 10 |
| 05:22:08 | 11 |
| 05:22:10 | 12 |
| 05:22:15 | 13 |
| 05:22:15 | 14 |
| 05:22:16 | 15 |
| 05:22:18 | 16 |
| 05:22:21 | 17 |
| 05:22:22 | 18 |
| 05:22:25 | 19 |
| 05:22:30 | 20 |
| 05:22:34 | 21 |
| 05:22:38 | 22 |
| 05:22:42 | 23 |
| 05:22:50 | 24 |
| 05:22:52 | 25 |

1    till Friday.

2                    MR. WEINBERGER:  We'll deal with it tomorrow

3    if you don't mind, Your Honor.

4                    THE COURT:  I think I know what the plaintiffs

5    are going to say, but I'd rather you file something and then

6    I'll deal with it.

7                    MR. WEINBERGER:  Okay.  We're working on that

8    as we speak.

9                    THE COURT:  All right.  We'll take that up

10   tomorrow.

11                   MR. WEINBERGER:  Also, you just got -- we just

12   got last night some proposed additional jury instructions

13   on --

14                   THE COURT:  Why don't you see what you can

15   work out with defendants.

16                   MR. WEINBERGER:  We are in the process of --

17   looking at it.

18                   THE COURT:  I am inclined to give some

19   positive as well as negative synonyms for substantial.  I

20   think there should be some affirmative or positive and some

21   negative.  And I don't think it's a good idea to define

22   substantial with the word "substantial."  It means nothing.

23   So my intent is to give two or three positive synonyms and

24   then two or three negatives.

25                   MS. SULLIVAN:  Your Honor, the defendants

05:22:53　1　object to that.  We opened on the final charge that you

05:22:55　2　circulated.  We talked to the jury about the language.

05:22:57　3　　　　　　　　THE COURT:  I think it's not helpful, and my

05:23:00　4　general rule is you don't use the word in the definition.

05:23:03　5　　　　　　　　MS. SULLIVAN:  I understand your ruling, Your

05:23:04　6　Honor.

05:23:04　7　　　　　　　　THE COURT:  I mean, it's not helpful to

05:23:07　8　anyone.  I mean --

05:23:07　9　　　　　　　　MS. SULLIVAN:  Your Honor, the problem is we

05:23:09　10　all opened on it and talked to the jury about the language

05:23:11　11　that you used in the charge.

05:23:14　12　　　　　　　　THE COURT:  Well, substantially, I mean, that

05:23:15　13　is the instruction, substantial.  That's what they have to

05:23:17　14　find.  But no one talked about, you know, synonyms.

05:23:22　15　　　　　　　　MR. LANIER:  Right.  And with due respect, any

05:23:23　16　lawyer always knows that they can open by saying we suspect

05:23:27　17　the Court will submit the following.  We never know what the

05:23:30　18　Court will submit in the end.

05:23:31　19　　　　　　　　THE COURT:  I'm not changing -- the jury has

05:23:33　20　to find substantial effect.  That isn't changing.  But

05:23:36　21　they're going to wonder what does that mean.  It's not a --

05:23:40　22　you know, so I'm trying to be as helpful as I can to the

05:23:44　23　jury because I surmise that's going to be the instruction

05:23:47　24　that you're going to spend the most time on, and candidly, I

05:23:51　25　think the jury's going to spend the most time on.  So I want

2985

| | |
|---|---|
| 05:23:55 | 1 | it to be as helpful to them as -- and not get a whole lot of |
| 05:23:59 | 2 | questions. |
| 05:24:02 | 3 | So if you can work on that and you can agree on |
| 05:24:05 | 4 | something, fine.  If not, I'll obviously make the decision |
| 05:24:08 | 5 | on it. |
| 05:24:11 | 6 | Okay.  Anything else? |
| 05:24:13 | 7 | MR. LANIER:  Not for the plaintiff. |
| 05:24:15 | 8 | THE COURT:  All right.  See you tomorrow. |
| 05:24:16 | 9 | Oh, today I had 5.25 for the plaintiffs and 1.25 for |
| 05:24:21 | 10 | the defendants, hours. |
| 05:24:25 | 11 | (Proceedings adjourned at 5:24 p.m.) |
| | 12 | * * * * * |
| | 13 | **C E R T I F I C A T E** |
| | 14 | I certify that the foregoing is a correct transcript |
| | | of the record of proceedings in the above-entitled matter |
| | 15 | prepared from my stenotype notes. |
| | 16 | */s/ Lance A. Boardman*_____ *10-19-2021* |
| | | Lance A. Boardman, RDR, CRR          DATE |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |