2986

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION AT CLEVELAND

3    ------------------------------X
     IN RE:                        :  Case No. 1:17-md-2804
4                                  :
     NATIONAL PRESCRIPTION         :
5    OPIATE LITIGATION             :
                                   :  **VOLUME 12**
6    CASE TRACK THREE              :  JURY TRIAL
                                   :  *(Pages 2986 - 3302)*
7                                  :
                                   :
8                                  :
                                   :  *October 20, 2021*
9    ------------------------------X

10

11

12          TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>

13

14      HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16          SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:        Lance A. Boardman, RDR, CRR
                                     United States District Court
21                                   801 West Superior Avenue
                                     Court Reporters 7-189
22                                   Cleveland, Ohio 44113
                                     216.357.7019
23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

2987

```
 1    APPEARANCES:

 2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                   SPANGENBERG, SHIBLEY & LIBER
 3                                 1001 Lakeside Avenue, Ste. 1700
                                   1900 East Ninth Street
 4                                 Cleveland, Ohio 44114
                                   216-696-3232
 5
                                   W. Mark Lanier, Esq.
 6                                 Rachel Lanier, Esq.
                                   M. Michelle Carreras, Esq.
 7                                 THE LANIER LAW FIRM
                                   6810 FM 1960 West
 8                                 Houston, Texas 77069
                                   813-659-5200
 9
                                   Frank L. Gallucci, III, Esq.
10                                 PLEVIN & GALLUCCI COMPANY, LPA
                                   The Illuminating Building
11                                 Suite 2222
                                   55 Public Square
12                                 Cleveland, Ohio 44113
                                   216-861-0804
13
                                   Salvatore C. Badala, Esq.
14                                 Maria Fleming, Esq.
                                   NAPOLI SHKOLNIK
15                                 360 Lexington Ave., 11th Floor
                                   New York, New York 10017
16                                 212-397-1000

17

18    For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
                                   Brian C. Swanson, Esq.
19                                 Katherine M. Swift, Esq.
                                   BARTLIT BECK LLP
20                                 54 West Hubbard Street, Ste.300
                                   Chicago, Illinois 60654
21                                 312-494-4400

22

23

24

25
```

2988

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:          Graeme W. Bush, Esq.
                                   Eric R. Delinsky, Esq.
 3                                 Alexandra W. Miller, Esq.
                                   ZUCKERMAN SPAEDER - WASHINGTON
 4                                 1800 M Street, NW, Suite 1000
                                   Washington, DC 20036
 5                                 202-778-1831

 6    For HBC/Giant Eagle          Robert M. Barnes, Esq.
      Defendants:                  Scott D. Livingston, Esq.
 7                                 MARCUS & SHAPIRA
                                   One Oxford Centre, 35th Floor
 8                                 301 Grant Street
                                   Pittsburgh, PA 15219
 9                                 412-471-3490

10                                 Diane P. Sullivan, Esq.
                                   Chantale Fiebig, Esq.
11                                 WEIL GOTSHAL & MANGES
                                   2001 M Street NW, Suite 600
12                                 Washington, DC 20036
                                   202-682-7200
13
      For Walmart Defendants:      John M. Majoras, Esq.
14                                 JONES DAY - COLUMBUS
                                   Suite 600
15                                 325 John H. McConnell Blvd.
                                   Columbus, Ohio 43215
16                                 614-281-3835

17                                 Tara A. Fumerton, Esq.
                                   Tina M. Tabacchi, Esq.
18                                 JONES DAY - CHICAGO
                                   77 West Wacker, Suite 3500
19                                 Chicago, Illinois 60601
                                   312-782-3939
20
                                   Jason C. Wright, Esq.
21                                 JONES DAY - LOS ANGELES
                                   555 South Flower Street, 50th Floor
22                                 Los Angeles, California 90071-2300
                                   213-489-3939
23

24    ALSO PRESENT:               David Cohen, Special Master

25                                        - - - - -
```

1                          Table of Contents

2       Witnesses/Events                                    Page

3       NATASHA POLSTER                                     3000

4             Mr. Lanier - Cross (Cont'd)                   3000

5       NATASHA POLSTER                                     3094

6             Ms. Swift - Direct                            3094
              Mr. Lanier - Cross                            3248

| | | |
|---|---|---|
| 08:51:19 | 1 | (In open court at 8:51 a.m.) |
| 08:51:21 | 2 | THE COURT:  You may be seated. |
| 08:51:22 | 3 | Can you give me the list from yesterday with the |
| 08:51:25 | 4 | exhibits? |
| 08:51:26 | 5 | All right.  I realized I didn't put on the record the |
| 08:51:32 | 6 | exhibits that are in without objection.  So I put Nelson |
| 08:51:40 | 7 | 08077, 07174, 41748, 20631, 08163, 08164, 08093, 07381, |
| 08:52:01 | 8 | 20824, 08048, 07036, 07799, 20852080 -- I'm sorry, 20850 and |
| 08:52:21 | 9 | 08037. |
| 08:52:31 | 10 | Then we'll deal with Tsipakis later. |
| 08:52:49 | 11 | All right.  I reviewed the plaintiffs' response in |
| 08:52:52 | 12 | option to the defendants' motion to preclude testimony from |
| 08:52:59 | 13 | plaintiffs' fact witnesses April Caraway and Kim Fraser |
| 08:53:05 | 14 | about prescription opioids being a gateway to other drug |
| 08:53:08 | 15 | use. |
| 08:53:11 | 16 | I'm going to wait and see what the basis these |
| 08:53:17 | 17 | witnesses give for their testimony, what experience.  And if |
| 08:53:21 | 18 | I'm satisfied that their experience qualifies them to give a |
| 08:53:26 | 19 | lay opinion, I will do so.  I'll listen carefully to the |
| 08:53:29 | 20 | question.  If there are objections, I'll deal with it, but |
| 08:53:33 | 21 | I'll deal with it on a question-by-question basis. |
| 08:53:38 | 22 | I think a lay witness, depending on their experience, |
| 08:53:42 | 23 | can give opinions commensurate with that experience, but |
| 08:53:47 | 24 | I'll see what it is and I'll see what the opinion's going to |
| 08:53:50 | 25 | be. |

2991

08:53:51  1          MR. DELINSKY:  Your Honor, just two issues.

08:53:55  2   And I understand Your Honor's ruling.

08:53:58  3          MR. WEINBERGER:  Your Honor, one of the

08:53:59  4   witnesses is our representative.  Do you want her to step

08:54:02  5   out during this colloquy?

08:54:08  6          MR. DELINSKY:  It's okay with me.

08:54:10  7          THE COURT:  I don't think it matters.

08:54:12  8          MR. DELINSKY:  I agree.

08:54:13  9      Depending on how the question is phrased, it could

08:54:16  10  obscure the basis.  And that's part -- in other words, if --

08:54:20  11  you know, do you have information that there's a gateway

08:54:24  12  effect could elicit --

08:54:25  13         THE COURT:  Well, I'm not going to allow a

08:54:27  14  leading question like that, Mr. Delinsky.  I mean, first

08:54:32  15  there will be questions about the witness's position, her

08:54:36  16  experience, what she does, et cetera, and I'll determine --

08:54:40  17  you know, I'll listen to that.  And then there will be a

08:54:44  18  nonleading question about an opinion.  And if there's an

08:54:47  19  objection, I'll address it then.

08:54:50  20         MR. DELINSKY:  Okay, Your Honor --

08:54:51  21         THE COURT:  And that's how I expect it to come

08:54:52  22  in.

08:54:53  23         MR. DELINSKY:  Okay.  Your Honor, one -- then

08:54:55  24  moving to the opinion part of it, there's two issues I'd

08:54:58  25  like to raise on the lay opinion issue to frame the issues

08:55:02    1    as we move into those examinations.

08:55:04    2        Number one is lay opinions have -- unlike expert

08:55:08    3    opinions, lay opinions have to be based on personal

08:55:11    4    knowledge as well.  They can't --

08:55:13    5                THE COURT:  Well, everyone says this, but that

08:55:15    6    isn't -- that really isn't accurate, Mr. Delinsky.

08:55:19    7    Everyone's opinion, if it's your professional experience, a

08:55:24    8    lot of your professional experience is working with people,

08:55:27    9    talking to them, listening to them.

08:55:30   10        Quite frankly, scientific expert opinion is often

08:55:33   11    based on hearsay.  You do a scientific study, you're

08:55:38   12    assuming that the subjects to the study are doing what

08:55:42   13    you've instructed them to do, and they tell you, yes, I

08:55:45   14    followed the instructions, I did this or that, but that's

08:55:47   15    hearsay.  You're not monitoring them 24/7.

08:55:49   16                MR. DELINSKY:  You're right, Your Honor --

08:55:51   17                THE COURT:  There's a whole lot of embedded

08:55:53   18    hearsay.

08:55:53   19        Now, you know, you can't just relate so and so told me

08:55:57   20    this, so and so told me this.

08:55:59   21                MR. DELINSKY:  No, Your Honor, you're exactly

08:56:02   22    right, but that's indicative of the difference between the

08:56:04   23    operation of Rule 701, which is lay opinion, and 702, which

08:56:09   24    is expert opinion.  You are absolutely 100 percent right

08:56:12   25    that an expert opinion, an expert witness, can rely on

08:56:16    1    testimony that is hearsay or is otherwise not admissible.

08:56:20    2    But that is not the case in the case of a lay -- of a lay

08:56:24    3    witness.  It has to be rationally based on the witness's

08:56:27    4    perception.  That's the language of the rule.

08:56:30    5        And the cases are crystal clear that it can't be

08:56:34    6    hearsay based, that 701 isn't an avenue to launder what is

08:56:39    7    hearsay into opinion.  And the cases are clear on that, Your

08:56:43    8    Honor.  So I want to --

08:56:46    9        The other issue I want to raise is that lay opinions

08:56:49   10    under the plain terms of the rule cannot be based on

08:56:51   11    scientific, technical, or other specialized knowledge.  They

08:56:55   12    can't be.

08:56:57   13                    THE COURT:  I agree with that.

08:56:59   14                    MR. DELINSKY:  So we are already having

08:57:02   15    opinions from experts on gateway, whether it's Caleb

08:57:06   16    Alexander, Anna Keys, Anna Lembke.

08:57:11   17        That by definition entails a determination by the

08:57:14   18    Court that the subject of that testimony is scientific,

08:57:21   19    technical, or other specialized opinions.  It can't be both.

08:57:26   20    If it's appropriate for a lay opinion, it by definition

08:57:29   21    cannot be appropriate for an expert opinion and vice versa.

08:57:32   22    It's one or the other.

08:57:33   23        So we have two problems here, one the hearsay and,

08:57:36   24    number two --

08:57:36   25                    THE COURT:  Well, I will see what experience

08:57:39  1  the witness has and what specific questions they're asked.

08:57:42  2  And I agree, I'm not going to let either of these witnesses

08:57:46  3  give expert testimony or phrased in a way that an expert

08:57:49  4  would answer the question, you're right, I'm not going to

08:57:52  5  permit that.

08:57:55  6      So I'll see what the experience is and exactly what

08:57:58  7  the question that's asked.

08:58:00  8              MR. MAJORAS:  Your Honor, John Majoras.

08:58:02  9      Just related to that, I guess I'll just apologize in

08:58:05  10  advance if this were to occur, but if, as Mr. Delinsky

08:58:07  11  pointed out, the witness were to -- regardless of the

08:58:11  12  question, were to venture into this area, we will object

08:58:14  13  immediately, and I apologize if that will interrupt, but I

08:58:16  14  think it's appropriate.  We think it's -- any mention of it

08:58:19  15  is highly prejudicial.

08:58:21  16              THE COURT:  If you think the witness is

08:58:41  17  venturing into an area that's objectionable, obviously you

08:58:26  18  should object.  If I see it, I'll try and stop it, but, you

08:58:29  19  know, that's what diligent counsel is supposed to do, be on

08:58:32  20  top of it.

08:58:33  21              MR. MAJORAS:  Thank you.

08:58:33  22              THE COURT:  I don't have a problem with that.

08:58:45  23      I guess earlier in the morning there was a motion to

08:58:48  24  preclude testimony from David Cutler or certain opinions

08:58:53  25  from David Cutler.  I'm sure I'll get a response.  When does

08:58:58  1    Mr. Cutler --

08:59:02  2                MR. LANIER:  He'll be the next witness after

08:59:05  3    Ms. Polster, Your Honor.  Oh, no, no, no.  No, David Cutler

08:59:09  4    will be the next witness after Tasha Polster.

08:59:13  5        Frankly, Judge, I think most of the questions that

08:59:15  6    they're objecting to aren't ones I plan on asking anyway.

08:59:18  7                THE COURT:  All right.  Well, then that's one

08:59:19  8    way to deal with it.  So, okay.

08:59:19  9                MR. LANIER:  So I'll look at it to give a

08:59:22  10   response but --

08:59:23  11               THE COURT:  Well, that's one way to deal with

08:59:28  12   it.

08:59:28  13               MR. LANIER:  I'm not going to have him on the

08:59:29  14   stand long, and I've got questions that I think are

08:59:32  15   unobjectionable, and I don't think it will be a problem.

08:59:35  16               THE COURT:  All right.  Well, then we'll put

08:59:40  17   that aside.

08:59:40  18       And then I still need a response from the plaintiffs

08:59:42  19   on the motion to preclude testimony from Nicole McCallion.

08:59:47  20   I guess she's slated to be on --

08:59:51  21               MR. LANIER:  She would like to take the stand

08:59:53  22   Friday, Your Honor.  And I know that our briefing people are

08:59:55  23   working on it as we speak.

08:59:57  24               THE COURT:  All right.  That's fine.  I just

08:59:59  25   didn't want to forget about that.

09:00:09    1    All right.  My staff was alerting me there was some

09:00:12    2    issue about a witness who is going to be testifying by

09:00:18    3    video.  Is that Mr. Chunderlik?

09:00:20    4             MS. SULLIVAN:  Yes, Your Honor.

09:00:23    5             THE COURT:  All right.  With the fact that he

09:00:24    6    didn't want anyone present with him handing the exhibits, so

09:00:29    7    the exhibits will be shown to him remotely.  And when that

09:00:32    8    happens, because of the technology, the exhibit will be very

09:00:36    9    large and he will be very small.  If that's the way it is,

09:00:44   10    that's the way it is.  I don't have a real problem with it

09:00:50   11    unless someone has a way to resolve that, we'll just do

09:00:53   12    that, and I'll just tell the jury that that's the way the

09:00:57   13    technology works.

09:00:58   14             MS. SULLIVAN:  Thank you, Your Honor.  We're

09:00:59   15    working on a way to resolve it, but if not, thank you, Your

09:01:01   16    Honor.

09:01:01   17             THE COURT:  All right.  I mean, it's not --

09:01:05   18    it's not the end of the world.  We've all done a whole a lot

09:01:09   19    of things on Zoom and remotely the last year and a half, I'm

09:01:12   20    sure the jurors have, and they can, you know, see two

09:01:16   21    screens at once, okay?  And again, they'll hear -- they'll

09:01:19   22    hear the testimony, and it's not critical that they, you

09:01:24   23    know, see the face large the whole time.

09:01:27   24             MR. LANIER:  Your Honor, Mark Lanier for

09:01:29   25    plaintiffs.

09:01:30  1      Let the Court know that we are working very

09:01:32  2  cooperatively with Ms. Sullivan, and the parties will work

09:01:37  3  together on that through Special Master Cohen.  But we have

09:01:43  4  an aligned interest, both sides want the same net effect,

09:01:46  5  and so there's no real discord.  We've just got to figure

09:01:49  6  out the best way to do it, and we commit to doing that with

09:01:51  7  the Court.

09:01:51  8           THE COURT:  If you can do it, fine, but if you

09:01:53  9  can't, I don't want people, you know, up all night.  I mean,

09:01:56  10  it's not so terrible that, you know, we have a split screen

09:02:00  11  and if the face is small during the time when there's a

09:02:03  12  document up there.

09:02:05  13      I mean, and knowing that, then I would, you know,

09:02:10  14  obviously caution counsel to only have the document up so

09:02:14  15  long as it's essential and then take it down so that the

09:02:19  16  rest of the time the witness's face is front and center.

09:02:24  17      It's not -- this jury can handle that, trust me.

09:02:30  18  They've handled everything else, they can handle that.

09:02:33  19           MS. SULLIVAN:  Thank you, Your Honor.

09:02:37  20           THE COURT:  Okay.  I guess if all the jurors

09:02:39  21  are here, we can start.

09:02:40  22           MR. LANIER:  The last thing, Your Honor, if I

09:02:42  23  could, we got a notice of a number of exhibits that are

09:02:46  24  going to be used supposedly in the direct examination of

09:02:52  25  this witness, Ms. Polster.  And among those exhibits, for

09:02:56   1    example, are four PowerPoint presentations of Joe Rannazzisi

09:03:05   2    which the parties objected to us even using one when

09:03:12   3    Joe Rannazzisi on the stand and the witness has said she

09:03:14   4    only went to one of his presentations and didn't really

09:03:17   5    remember it on direct.  And I don't understand a number of

09:03:21   6    their documents but including how they plan on using

09:03:24   7    exhibits that they would not let me use with Joe Rannazzisi

09:03:28   8    because they were hearsay, and yet they plan on using it

09:03:31   9    with a witness who has no basis of proving it up.

09:03:34   10       There are a number of other documents that she's not

09:03:36   11   on, she's a fact witness, and we don't understand how

09:03:39   12   they're going to be using those on direct when the

09:03:44   13   limitations exist that exist in this court.

09:03:48   14       And we just want to say that because we don't want to

09:03:50   15   interrupt everything.

09:03:51   16            THE COURT:  Well, I try and keep the same

09:03:53   17   strike zone for both sides.  And you can show a witness, in

09:04:00   18   my view, almost anything and ask them if they know anything

09:04:02   19   about it.  And if they do, you can ask relevant questions.

09:04:06   20   If they don't, generally that ends it.

09:04:11   21            MR. LANIER:  Well, our concern there is, for

09:04:13   22   example, I asked that question of Joe Rannazzisi about the

09:04:15   23   PowerPoints he prepared, and the answer was, well, yeah, I

09:04:19   24   prepared these.  And yet I wasn't allowed to use them, I

09:04:22   25   wasn't allowed to show them except for certain pages of only

09:04:25  1  one.

09:04:28  2          MS. SWIFT:  Your Honor, the witness testified

09:04:29  3  yesterday that she had attended one of Mr. Rannazzisi's

09:04:32  4  presentations.

09:04:33  5          THE COURT:  If she attended a presentation,

09:04:34  6  she can certainly be examined about it.  And Mr. Rannazzisi,

09:04:40  7  where -- if there was any evidence that he presented

09:04:45  8  anything where at least one representative of one of the

09:04:49  9  defendants was present, I allowed the testimony.

09:04:55  10         MR. LANIER:  You allowed the testimony about

09:04:58  11  the presentation, and you allowed certain pages of the

09:05:02  12  exhibit to be used of one presentation.

09:05:04  13      Our concern is they have four --

09:05:08  14         THE COURT:  Well, let's what we're going to

09:05:10  15  do.  And again, I'm going to apply the same ground rules to

09:05:13  16  them that I applied to the plaintiffs.

09:05:15  17         MS. SWIFT:  Thank you, Your Honor.

09:05:16  18         THE COURT:  And it's going to depend on, you

09:05:20  19  know, if the witness has knowledge of it.  If she does, she

09:05:23  20  can testify about it.  If she doesn't, that tends, we'll

09:05:27  21  move on to another document.  Okay.

09:07:58  22              (Jury present in open court at 9:07 a.m.)

09:08:04  23         THE COURT:  Good morning, ladies and

09:08:05  24  gentlemen.  Please be seated.

09:08:07  25      And Mr. Lanier, you may continue with your

**Polster (Cross by Lanier)**                    3000

09:08:10   1    examination.

09:08:11   2          And Ms. Polster, I just want to remind you you're

09:08:13   3    under oath from yesterday.

09:08:16   4                      NATASHA POLSTER

09:08:16   5                      - - - - -

09:08:17   6                  CROSS-EXAMINATION (CONT'D)

09:08:17   7    BY MR. LANIER:

09:08:18   8    **Q**    Good morning, Ms. Polster.

09:08:19   9    **A**    Good morning.

09:08:19   10   **Q**    Good morning, ladies and gentlemen.

09:08:20   11         Your Honor, may it please this Honorable Court.

09:08:26   12         Ms. Polster, we left off yesterday, and we were

09:08:32   13   talking about the era where you had sent an e-mail of

09:08:42   14   instructions out on how to handle certain things.  And then

09:08:47   15   I jumped forward to a 2018 situation with Mr. Yaeger.  I'd

09:08:52   16   like to now go back to the timeline where we were in that

09:08:56   17   2014 to 2015 era.  Okay?

09:09:00   18   **A**    Okay.

09:09:03   19   **Q**    And one of the questions I had asked you about was

09:09:05   20   going yesterday as far back as 2013 with the target drug

09:09:11   21   good faith dispensing.  And I asked you if you remembered

09:09:15   22   whether or not you told people whether it was appropriate to

09:09:23   23   delete information in the comments section of their computer

09:09:27   24   programs that talked about whether or not prescriptions

09:09:31   25   needed data on the customer.

09:09:34   1        Remember that?

09:09:35   2   **A**    Yes.

09:09:35   3   **Q**    And in that regard, I had a chance to pull another

09:09:43   4   exhibit which we'll mark as Plaintiffs' 25621.  And we're

09:09:50   5   moving forward into 2014 on that issue now.  But I'll ask

09:09:59   6   Ms. Fleming and Ms. Lanier to pass those and I'll a question

09:10:04   7   about them.

09:10:04   8        Do you have plaintiffs' 25621 in front of you?

09:10:08   9   **A**    Yes.

09:10:09   10  **Q**    And can you confirm this is an e-mail, the top one is

09:10:11   11  to you, but the one right below it is from you.  Correct?

09:10:15   12  **A**    Yes.

09:10:15   13  **Q**    And then the very bottom e-mail is to you.

09:10:20   14       And the one that is to you is dated May 21, 2014,

09:10:28   15  correct?

09:10:29   16  **A**    Yes.

09:10:33   17  **Q**    And it's about comments on good faith dispensing.

09:10:38   18       Do you see that as well?

09:10:39   19  **A**    Yes.

09:10:39   20  **Q**    It says, "I wanted to reach out to you about your

09:10:45   21  thoughts" -- let me see if I can help this -- "about your

09:10:51   22  thoughts on the good faith dispensing comments.  The

09:10:57   23  comments section is getting full for many patients and

09:11:00   24  requiring the deletion of comments (not just good faith

09:11:06   25  dispensing but other comments as well).  Especially in the

**Polster (Cross by Lanier)** 3002

| | | |
|---|---|---|
| 09:11:11 | 1 | Florida area." |
| 09:11:14 | 2 | Do you see this? |
| 09:11:15 | 3 | **A** Yes. |
| 09:11:18 | 4 | **Q** "Is it okay to give direction around purging of old |
| 09:11:23 | 5 | good faith dispensing comments?  I wanted to run this past |
| 09:11:25 | 6 | you before anything was done." |
| 09:11:28 | 7 | You see that as well? |
| 09:11:29 | 8 | **A** Yes, I do. |
| 09:11:30 | 9 | **Q** So to frame this problem, you understand the |
| 09:11:38 | 10 | importance of good faith dispensing comments, right? |
| 09:11:40 | 11 | **A** Yes. |
| 09:11:40 | 12 | **Q** You understand that that is where if a pharmacist is |
| 09:11:45 | 13 | going to do their due diligence, where they may input some |
| 09:11:49 | 14 | notes, correct? |
| 09:11:50 | 15 | **A** It's one of the areas, yes. |
| 09:11:51 | 16 | **Q** Right.  So they may put in notes about called the |
| 09:11:56 | 17 | physician or something like that? |
| 09:11:58 | 18 | **A** No. |
| 09:11:58 | 19 | **Q** Those notes would not go in there? |
| 09:12:01 | 20 | **A** Not necessarily. |
| 09:12:01 | 21 | **Q** Not necessarily or no, they would not ever go in |
| 09:12:04 | 22 | there? |
| 09:12:04 | 23 | **A** It was up to the pharmacist, but the direction for |
| 09:12:08 | 24 | that particular comment field was intended for if a |
| 09:12:12 | 25 | prescription was refused, so that if that patient did go to |

**Polster (Cross by Lanier)**                                    3003

| | | |
|---|---|---|
| 09:12:18 | 1 | another Walgreens store with that prescription, if the first |
| 09:12:22 | 2 | Walgreens store felt it did not neat good faith, the |
| 09:12:25 | 3 | pharmacy down the street would see that information for that |
| 09:12:29 | 4 | specific prescription. |
| 09:12:29 | 5 | **Q**    So your testimony is the only thing that should be in |
| 09:12:34 | 6 | that box is reasons to refuse a prescription? |
| 09:12:36 | 7 | **A**    That is not what I said. |
| 09:12:38 | 8 | **Q**    Okay. |
| 09:12:38 | 9 | **A**    However, that -- |
| 09:12:39 | 10 | **Q**    Well, help me understand. |
| 09:12:41 | 11 | Will that box -- here, let's -- this is the good faith |
| 09:12:48 | 12 | dispensing comments box, right? |
| 09:12:50 | 13 | **A**    No, it's not called that. |
| 09:12:53 | 14 | **Q**    That's -- it's called here, "I wanted to reach out to |
| 09:12:59 | 15 | you about your thoughts on the good faith dispensing |
| 09:13:01 | 16 | comments, the comments section." |
| 09:13:04 | 17 | So can we call it the good faith dispensing comments |
| 09:13:07 | 18 | section? |
| 09:13:08 | 19 | **A**    No, because that's not what she's referring to. |
| 09:13:11 | 20 | **Q**    Okay.  What is she referring to? |
| 09:13:13 | 21 | **A**    There are multiple -- |
| 09:13:15 | 22 | MS. SWIFT:  Objection to the writing on the |
| 09:13:17 | 23 | demonstrative that didn't match the witness's testimony. |
| 09:13:21 | 24 | THE COURT:  I don't have it anyway so -- |
| 09:13:23 | 25 | You may answer. |

**Polster (Cross by Lanier)**                     3004

| | | |
|---|---|---|
| 09:13:24 | 1 | **A**     The comments that she's referring to are specific to |
| 09:13:27 | 2 | the GFD refusal prescriptions or other comments that a |
| 09:13:32 | 3 | pharmacist might use.  But that is only one area in our |
| 09:13:36 | 4 | computer system where comments can be entered. |
| 09:13:39 | 5 | **Q**     Okay.  So your testimony on the comments section is |
| 09:13:45 | 6 | that she's talking about the refusal section? |
| 09:13:48 | 7 | **A**     A section where we do give direction for refusal. |
| 09:13:52 | 8 | **Q**     Section where give direction -- |
| 09:13:57 | 9 | **A**     To enter refusals. |
| 09:14:01 | 10 | **Q**     For refusal. |
| 09:14:03 | 11 | Well, that's critical, isn't it? |
| 09:14:06 | 12 | **A**     For that specific prescription. |
| 09:14:08 | 13 | **Q**     Yeah.  You understand some of these prescriptions have |
| 09:14:13 | 14 | renewals, so you can have a prescription that's a year old |
| 09:14:18 | 15 | and it will still be up for renewal, right? |
| 09:14:20 | 16 | **A**     A lot of things will change in a year, and each |
| 09:14:23 | 17 | prescription needs to be taken on its own merit. |
| 09:14:25 | 18 | **Q**     That wasn't my question, ma'am. |
| 09:14:27 | 19 | Can you answer my question? |
| 09:14:28 | 20 | **A**     Say your question again, please. |
| 09:14:30 | 21 | **Q**     Yes, ma'am. |
| 09:14:31 | 22 | I said this:  Some of these prescriptions have |
| 09:14:35 | 23 | renewals, so you can have a prescription that's a year old |
| 09:14:40 | 24 | and it can still come up for renewal, right? |
| 09:14:43 | 25 | **A**     I don't know what your definition of renewal is, but a |

| | | |
|---|---|---|
| 09:14:45 | 1 | prescription for a controlled substance cannot be renewed. |
| 09:14:49 | 2 | **Q**    Refilled. |
| 09:14:49 | 3 | **A**    A new prescription has to be written physically by the |
| 09:14:52 | 4 | prescriber for a Schedule II.  It cannot be refilled. |
| 09:14:55 | 5 | **Q**    So you cannot have a refill back in 2014? |
| 09:14:58 | 6 | **A**    Not on a Schedule II.  It would have to be a paper |
| 09:15:02 | 7 | written prescription or an electronic prescription that is |
| 09:15:06 | 8 | sent by the physician. |
| 09:15:07 | 9 | **Q**    So you've got a refusal section that's getting full, |
| 09:15:15 | 10 | and you give instructions to delete that information? |
| 09:15:18 | 11 | **A**    The oldest information should be deleted, and the most |
| 09:15:22 | 12 | recent information should be added. |
| 09:15:24 | 13 | **Q**    In other words, you'll have information about refusing |
| 09:15:29 | 14 | prescriptions, and you will instruct people delete that |
| 09:15:33 | 15 | information? |
| 09:15:33 | 16 | **A**    That information is located in multiple places within |
| 09:15:37 | 17 | the store and in the computer.  And, yes, the most recent |
| 09:15:40 | 18 | information needs to be entered into the comment field, |
| 09:15:45 | 19 | which means that, yes, older information that is not |
| 09:15:49 | 20 | relevant anymore to the prescription you're looking at will |
| 09:15:52 | 21 | be deleted in some cases. |
| 09:15:54 | 22 | **Q**    Well, wait a minute, wait a minute. |
| 09:15:57 | 23 |     Older information that's not relevant to the |
| 09:16:02 | 24 | prescription you're looking at will be purged, deleted? |
| 09:16:06 | 25 | **A**    In some cases. |

**Polster (Cross by Lanier)**

09:16:09    1    **Q**    And you say it's not relevant because it's a different

09:16:13    2    prescription?

09:16:14    3    **A**    That is correct.

09:16:15    4    **Q**    So if someone brings in a hydro prescription and it's

09:16:24    5    refused because it looks fake, that's not going to be

09:16:27    6    relevant when the person brings in an oxy prescription?

09:16:30    7    **A**    There's a difference.

09:16:30    8    **Q**    Is that what you're saying?

09:16:32    9    **A**    I'm saying that you have to enter the most recent

09:16:37    10    information.

09:16:38    11    **Q**    Ma'am, can you answer my question, please?

09:16:42    12    **A**    Can you ask your question again?

09:16:44    13    **Q**    Yes, ma'am.

09:16:45    14    So if someone brings in a hydro prescription and the

09:16:50    15    pharmacist determines that it's fake and enters that into

09:16:54    16    your comments field but that comments field gets full and so

09:17:00    17    it's purged, then later when that same prescription brings

09:17:05    18    in an oxy prescription, the comments are gone, aren't they?

09:17:10    19    **A**    For that situation in that field, yes.  But recall

09:17:15    20    that I mentioned there are multiple places that they can

09:17:18    21    enter comment.

09:17:19    22    **Q**    Ma'am, I'm sure they can enter comments in multiple

09:17:24    23    fields, but if that's the field they choose, and that's the

09:17:28    24    field where you direct them to put it, it's gone later by

09:17:33    25    your purging policy, correct?

**Polster (Cross by Lanier)** 3007

09:17:35   1   **A**     It's not a policy, but, yes, they have to purge it if

09:17:39   2   the field gets too full.

09:17:41   3   **Q**     Well, your reply to this was "Thoughts on this?"

09:17:49   4   **A**     Correct.

09:17:49   5   **Q**     And then you get told the following:  "I think that's

09:17:54   6   probably a good idea.  Target drug good faith dispensing

09:17:59   7   comments are only supposed to be for one script each time,

09:18:04   8   so technically, other than ID info that may be in the

09:18:08   9   comments, other info could be purged."

09:18:12   10         Do you see that?

09:18:13   11   **A**     I do.

09:18:13   12   **Q**     So the comment field that you say was the section

09:18:23   13   where direction for refusal was supposed to be could be

09:18:27   14   purged of information, true?

09:18:28   15   **A**     The older information, yes.

09:18:29   16   **Q**     And that older information could be a reason for --

09:18:33   17   well, should be by you a reason for refusal, right?

09:18:37   18   **A**     You're putting my words in my mouth.

09:18:39   19   **Q**     No, ma'am.

09:18:40   20   **A**     But for that specific prescription, the notes need to

09:18:43   21   be there.

09:18:44   22   **Q**     Ma'am, I'm not trying to put any words in your mouth.

09:18:47   23         You specifically, and I can show you the testimony,

09:18:49   24   you specifically said, you used these words, that "this is a

09:18:55   25   field for reasons for refusal."

**Polster (Cross by Lanier)**                    3008

| | | |
|---|---|---|
| 09:18:58 | 1 | Are you changing on that now?  Would you like to see |
| 09:19:01 | 2 | it? |
| 09:19:01 | 3 | **A**    No, that is one of the areas for reasons for refusal, |
| 09:19:04 | 4 | yes. |
| 09:19:06 | 5 | **Q**    Yeah, so I'm not putting words in your mouth.  I'm |
| 09:19:08 | 6 | trying to understand your testimony under oath.  Right? |
| 09:19:13 | 7 | Your testimony under oath is the comments section is |
| 09:19:17 | 8 | the section where direction for refusals are put, right? |
| 09:19:21 | 9 | **A**    Refusals for the prescription that you have in front |
| 09:19:24 | 10 | of you. |
| 09:19:25 | 11 | **Q**    And so you have recognized that your company's going |
| 09:19:29 | 12 | to have a policy or an approach that purges that |
| 09:19:37 | 13 | information, true? |
| 09:19:37 | 14 | **A**    It does not purge it on its own, but, correct, the |
| 09:19:41 | 15 | oldest information, if the newest information doesn't fit, |
| 09:19:44 | 16 | they have no other option than to delete older information. |
| 09:19:49 | 17 | **Q**    So you're saying now they have no other option, and |
| 09:19:54 | 18 | the reason they have no other option is because that's the |
| 09:19:56 | 19 | system y'all had in place at the time, right? |
| 09:19:59 | 20 | **A**    That's correct. |
| 09:19:59 | 21 | **Q**    And so you had a system in place that did not leave an |
| 09:20:03 | 22 | option for leaving the reasons for refusal.  Instead, they |
| 09:20:09 | 23 | would be purged as the age continued, as the time continued, |
| 09:20:14 | 24 | right? |
| 09:20:15 | 25 | MS. SWIFT:  Objection.  Mischaracterizes the |

**Polster (Cross by Lanier)** 3009

09:20:17  1    testimony.

09:20:18  2                    THE COURT:  Overruled.

09:20:21  3    **A**      So when a prescription is refused, the prescription is

09:20:26  4    refused for that specific prescription.  Our policy is we

09:20:30  5    take each prescription on their own merit.  What's happening

09:20:34  6    with the patient, what's happening with the prescriber who

09:20:36  7    wrote it, and what's happening at that time with the

09:20:40  8    pharmacist.

09:20:42  9          The reason why we do that is to ensure that if a

09:20:46  10   patient's prescription is refused at Walgreens, only that

09:20:50  11   prescription is refused.  And it's refused at all Walgreens.

09:20:53  12         And so the pharmacist's instruction is to put a note

09:20:57  13   in the computer system in addition to keeping a hard copy in

09:21:02  14   the refusal folder that we discussed yesterday, to put it

09:21:05  15   into the system so that the next pharmacist down the road,

09:21:10  16   should the patient show up with that prescription, know that

09:21:13  17   the pharmacist at store A refused to fill the prescription

09:21:16  18   and that prescription was refused at all stores.

09:21:19  19   **Q**      Right.  That's critical information, isn't it?

09:21:22  20   **A**      For that specific prescription, yes.

09:21:24  21   **Q**      Well, ma'am, let's say you've got a person, and this

09:21:28  22   person is holding a fake --

09:21:32  23   **A**      There's a difference between a --

09:21:34  24   **Q**      Prescription?

09:21:35  25   **A**      -- fake prescription.

**Polster (Cross by Lanier)**                                    3010

| | | |
|---|---|---|
| 09:21:37 | 1 | **Q**    Time out, ma'am.  I've got to ask questions, and then |
| 09:21:39 | 2 | you give answers, okay? |
| 09:21:41 | 3 | **A**    Okay. |
| 09:21:41 | 4 | **Q**    I want you to suppose that person's holding a fake |
| 09:21:44 | 5 | prescription and takes it into a Walgreens store. |
| 09:21:49 | 6 |     You with me so far? |
| 09:21:50 | 7 | **A**    Yes. |
| 09:21:50 | 8 | **Q**    And the Walgreens store says -- the pharmacist is on |
| 09:22:00 | 9 | top of their game, they say that prescription looks fake to |
| 09:22:05 | 10 | me.  I'm not going to fill it. |
| 09:22:07 | 11 |     You with me so far? |
| 09:22:08 | 12 | **A**    Yes. |
| 09:22:13 | 13 | **Q**    Then that Walgreens pharmacist puts a note in this |
| 09:22:18 | 14 | comments section where you direct them to put the note, and |
| 09:22:22 | 15 | the note says, "Note:  Person X, Rx refused, fake |
| 09:22:35 | 16 | prescription." |
| 09:22:36 | 17 |     Puts it in the notes field, right? |
| 09:22:39 | 18 | **A**    There may be a note in the field, but it won't say |
| 09:22:43 | 19 | "fake." |
| 09:22:43 | 20 | **Q**    All right.  It will say something more polite, like |
| 09:22:47 | 21 | "suspicious"? |
| 09:22:48 | 22 | **A**    No it will not.  It will say it did not pass the |
| 09:22:51 | 23 | Walgreens good faith dispensing policy. |
| 09:22:54 | 24 | **Q**    So y'all don't have them -- |
| 09:22:56 | 25 |     MS. SWIFT:  Objection.  She wasn't done with |

09:22:58  1    her answer.

09:22:59  2                    MR. LANIER:  I'm sorry, Judge.

09:23:00  3                    THE COURT:  Yes, let her finish, please.

09:23:01  4    **A**    There's a difference between a fake prescription and a

09:23:04  5    prescription that does not meet our good faith dispensing

09:23:07  6    policy.  Two completely different situations.

09:23:11  7    **Q**    Well, I'm asking you if it's a fake prescription, will

09:23:16  8    a note be put in there to that effect?  Should a note be put

09:23:22  9    in there to that effect?

09:23:23  10   **A**    It's possible, but there are multiple places where

09:23:25  11   they would enter that.

09:23:26  12   **Q**    But we're talking specifically about the section where

09:23:28  13   y'all direct them to put their reasons for refusal,

09:23:32  14   remember?  That was your testimony.

09:23:33  15   **A**    Oh, I remember my testimony, but I also recall that

09:23:36  16   there's a difference between a good faith dispensing

09:23:41  17   rejection prescription because it does not meet good faith

09:23:45  18   and a fake prescription where the doctor didn't write it,

09:23:47  19   the patient forged it.

09:23:48  20   **Q**    All right.  Then instead we'll say it's refused for

09:23:53  21   doctor shopping.  How's that?

09:23:57  22   **A**    I would say refused on good faith dispensing, not

09:24:00  23   doctor shopping.  That's different as well.

09:24:04  24   **Q**    So the policy is, just say we refuse it, don't give

09:24:07  25   details why?

**Polster (Cross by Lanier)**

| 09:24:07 | 1 | **A**    We have all that information in the refusal folder at |
| 09:24:10 | 2 | the home store, which is noted in the comments. |
| 09:24:13 | 3 | **Q**    But back then, it wasn't on a computer where any |
| 09:24:17 | 4 | pharmacist could see it.  It's on a paper copy, right? |
| 09:24:21 | 5 | **A**    Correct.  However, the store -- the store at store B |
| 09:24:25 | 6 | knows what store refused it at store A and calls -- can call |
| 09:24:31 | 7 | that pharmacist and have a conversation because the notes |
| 09:24:35 | 8 | are retained in the refusal folder. |
| 09:24:37 | 9 | **Q**    Okay.  So, ma'am, these are the notes of refusal that, |
| 09:24:44 | 10 | first of all, your policy is that these notes don't need to |
| 09:24:48 | 11 | contain the reason for refusal beyond just didn't pass our |
| 09:24:53 | 12 | standards, right? |
| 09:24:53 | 13 | **A**    That is correct, for that specific prescription. |
| 09:24:56 | 14 | **Q**    Don't you think it would be more useful to put into a |
| 09:25:04 | 15 | comments section the specific reasons, like called the |
| 09:25:06 | 16 | doctor, doctor said it was not genuine, or called the |
| 09:25:13 | 17 | doctor, doctor said didn't know the patient was shopping, or |
| 09:25:17 | 18 | we saw evidence -- checked OARRS, saw doctor shopping, saw |
| 09:25:23 | 19 | pharmacy shopping.  Don't you think putting substance like |
| 09:25:26 | 20 | that might be helpful? |
| 09:25:27 | 21 | **A**    We have many places in our computer system to put that |
| 09:25:30 | 22 | information. |
| 09:25:30 | 23 | **Q**    Is that a "yes," that you do think it would be helpful |
| 09:25:33 | 24 | to put into the comments section where you put the reasons |
| 09:25:35 | 25 | for refusal? |

09:25:36  1    **A**    Multiple places in IntercomPlus to put comments.  It

09:25:41  2    does not always have to be in that spot.

09:25:43  3    **Q**    Ma'am, can you answer my question?

09:25:47  4    **A**    Our policy is to enter information into our computer

09:25:50  5    system.  If a prescription fails good faith, it goes into

09:25:54  6    that comments section for that specific prescription.  We

09:25:59  7    have patient comments, we have prescription comments, and we

09:26:02  8    have prescriber comments.

09:26:03  9         The pharmacists are able to use any of those fields.

09:26:07  10   **Q**    That wasn't my question.  My question was, don't you

09:26:10  11   think it would be a good policy in this section where they

09:26:15  12   give their -- they're directed to give their reasons for

09:26:20  13   refusal, don't you think it would be a good policy to have

09:26:23  14   them explain why in some measure of detail?

09:26:27  15   **A**    It is explained why.  It did not pass the

09:26:32  16   pharmacy's -- the pharmacist's good faith dispensing

09:26:36  17   procedures when they went through it.

09:26:37  18   **Q**    Ma'am, that it does not pass good faith dispensing is

09:26:39  19   not in itself detail, is it?

09:26:41  20   **A**    It is because our pharmacists are trained that there

09:26:45  21   are multiple reasons why a prescription is failed for good

09:26:48  22   faith.  And they can always call that pharmacist who did not

09:26:52  23   pass that prescription and get more detail.

09:26:54  24   **Q**    What if that pharmacist isn't working?

09:26:57  25   **A**    The notes are in the refusal folder at the store for

**Polster (Cross by Lanier)**

09:27:00 1    the other pharmacists to pull.

09:27:01 2    **Q**    Wait.  The refusal folder, are you talking about the

09:27:04 3    hard copy notes that are back in the storage file cabinet

09:27:08 4    somewhere that get moved off site after a year to Iron

09:27:13 5    Mountain?

09:27:13 6    **A**    No, the refusal folder does not get removed from the

09:27:17 7    store.  It's the old prescription, like hard copy

09:27:21 8    prescriptions from two years or more.

09:27:24 9    **Q**    So you're saying that the refusal folders are present

09:27:27 10   at the stores at all times?

09:27:29 11   **A**    That's my understanding.

09:27:30 12   **Q**    And this is back when they were paper refusal folders

09:27:34 13   because you couldn't put them on the computer, they wouldn't

09:27:36 14   let you?

09:27:38 15   **A**    It's not that they wouldn't let me.  The computer

09:27:40 16   system needed enhancements in order to do that.  And, so,

09:27:45 17   yes, we did it on paper and put it in a folder.

09:27:48 18   **Q**    Well, actually, ma'am, we'll get into the documents in

09:27:52 19   a little bit on that, but you begged for years to put them

09:27:54 20   on the computer and they wouldn't, would they?

09:27:57 21   **A**    I have them on the computer now.

09:27:59 22   **Q**    Yes, as of 2019, right?

09:28:03 23               MS. SWIFT:  Objection.

09:28:03 24               THE COURT:  Overruled.

09:28:04 25   **Q**    As of 2019, right?

**Polster (Cross by Lanier)** 3015

| | | |
|---|---|---|
| 09:28:06 | 1 | **A**    We were able to put them in the computer for |
| 09:28:08 | 2 | electronic, yes. |
| 09:28:08 | 3 | **Q**    Yeah, but you had been begging for years for that to |
| 09:28:12 | 4 | happen, hadn't you? |
| 09:28:13 | 5 | **A**    It was an enhancement that I had on my list, yes. |
| 09:28:15 | 6 | **Q**    In other words, you'd been saying for years we need |
| 09:28:18 | 7 | electronic access to this, and it finally happens in 2019, |
| 09:28:22 | 8 | right? |
| 09:28:22 | 9 | **A**    Yes.  We entered it in 2019. |
| 09:28:25 | 10 | **Q**    So let's go back to 2014. |
| 09:28:27 | 11 |     This is a time where y'all are purging information on |
| 09:28:32 | 12 | the box that gives direction for refusal, right? |
| 09:28:36 | 13 | **A**    When you say "y'all," who is y'all? |
| 09:28:41 | 14 | **Q**    Walgreens. |
| 09:28:42 | 15 | **A**    No, it's not Walgreens. |
| 09:28:43 | 16 | **Q**    Okay. |
| 09:28:43 | 17 | **A**    It is the pharmacist at the location is removing the |
| 09:28:47 | 18 | information -- the old information, and the new information, |
| 09:28:51 | 19 | the relevant information for that specific prescription |
| 09:28:55 | 20 | would be documented into that box. |
| 09:28:57 | 21 | **Q**    Well, are you answering this question as a pharmacist |
| 09:29:00 | 22 | or are you answering this question as Walgreens' senior |
| 09:29:09 | 23 | director of pharmaceutical integrity and third-party |
| 09:29:13 | 24 | operations? |
| 09:29:14 | 25 | **A**    If you look at that e-mail, that is not me answering |

**Polster (Cross by Lanier)** 3016

09:29:16 1  that question.

09:29:18 2  **Q**    Ma'am, the question is, someone wanted to reach out to

09:29:25 3  you, and your reply was simply, what are your thoughts on

09:29:29 4  this.  Right?

09:29:30 5  **A**    Correct.

09:29:31 6  **Q**    So who are you -- who is Ed Bratton?  Is he a local

09:29:35 7  pharmacist?

09:29:35 8  **A**    Those are my team.  That's my -- those folks are the

09:29:40 9  people on my team.

09:29:42 10  **Q**    So who is Patricia Daugherty?

09:29:46 11  **A**    She is a pharmacist on my team.

09:29:47 12  **Q**    And your team is who?  What's your team?

09:29:52 13  **A**    The pharmaceutical integrity managers.

09:29:55 14  **Q**    Uh-huh.  Pharmaceutical integrity managers.

09:30:05 15       These are the people in charge of overseeing that

09:30:09 16  policy nationwide, right?

09:30:10 17  **A**    Ensuring that it is executed upon, yes.

09:30:13 18  **Q**    Well, in charge of developing, changing, and improving

09:30:18 19  the policies and procedures around controlled substance

09:30:23 20  dispensing.  That's what y'all did, isn't it?

09:30:27 21  **A**    Yes.

09:30:28 22  **Q**    And so when you say, wait, it wasn't company saying to

09:30:31 23  do this, it was the pharmacists, ma'am, y'all are the

09:30:36 24  company, aren't you?

09:30:42 25  **A**    I represent the company, yes.

**Polster (Cross by Lanier)**

09:30:43  1   **Q**    And so does Patricia Daugherty who says, I think

09:30:48  2   that's a good idea, other info beyond the ID info, other

09:30:54  3   info could be purged.

09:30:55  4        Do you see that?

09:30:56  5   **A**    Yes.

09:30:56  6   **Q**    So to blame this on the pharmacists and say it's the

09:31:00  7   pharmacists that purge, this is your policy that you're in

09:31:05  8   charge of developing, changing, and improving around

09:31:10  9   controlled substances throughout all the Walgreens stores,

09:31:14  10  right?

09:31:15  11              MS. SWIFT:  Objection.  Mischaracterizes the

09:31:16  12  testimony.

09:31:17  13              MR. LANIER:  Not at all.

09:31:18  14              THE COURT:  Overruled.

09:31:20  15  **Q**    Right?

09:31:20  16  **A**    So I kind of got lost in your statement on what was

09:31:27  17  the question.

09:31:28  18  **Q**    I'll reask it.

09:31:30  19       Ma'am, you said that this is the pharmacists' purging,

09:31:36  20  but the policy is not coming from the pharmacists.  It's

09:31:41  21  coming from the group within the company that develops,

09:31:43  22  changes, and improves policies and procedures around

09:31:48  23  controlled substance dispensing, right?

09:31:50  24  **A**    That's correct.

09:31:51  25  **Q**    Thank you.

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 09:31:55 | 1 | And it's your testimony to the jury today that that's |
| 09:31:58 | 2 | a good policy, it's a good thing to purge information about |
| 09:32:01 | 3 | why prescriptions were refused, right? |
| 09:32:05 | 4 | **A**   It's my testimony today that that was what we had to |
| 09:32:08 | 5 | work with at the time.  The directions to our stores have |
| 09:32:14 | 6 | always been you must enter information around your good |
| 09:32:18 | 7 | faith dispensing whether you're refusing it for that |
| 09:32:22 | 8 | specific prescription. |
| 09:32:24 | 9 | Each prescription is taken on its own merit, and what |
| 09:32:27 | 10 | might be refused today may -- or, excuse me, what may have |
| 09:32:32 | 11 | been refused let's say a year ago may not be refused today. |
| 09:32:38 | 12 | **Q**   Ma'am, can you please now answer my question? |
| 09:32:45 | 13 | **A**   You'll have to reask it.  I'm -- |
| 09:32:47 | 14 | **Q**   Yes, ma'am. |
| 09:32:47 | 15 | I said:  And it's your testimony to the -- here. |
| 09:32:55 | 16 | It's your testimony to the jury today -- |
| 09:33:04 | 17 | **A**   I can see it. |
| 09:33:05 | 18 | **Q**   Your testimony to the jury today that it's a good |
| 09:33:10 | 19 | thing, good policy -- it's a good thing to purge information |
| 09:33:12 | 20 | about why prescriptions was refused. |
| 09:33:16 | 21 | You think that's a good policy, right? |
| 09:33:19 | 22 | **A**   We've improved and changed our policies across the |
| 09:33:24 | 23 | years.  Of course we would not want anything major to be |
| 09:33:27 | 24 | purged from the system.  We have multiple places in our |
| 09:33:30 | 25 | computer system where information can be entered. |

**Polster (Cross by Lanier)** 3019

09:33:34  1  **Q**    Right.  And multiple places where it can be purged.

09:33:37  2      My question to you is simple:  Is that a good policy

09:33:42  3  to have, to purge information on reasons you've refused

09:33:48  4  prescriptions?  Is that a good policy or not?

09:33:51  5  **A**    It was the best we could do with the computer system

09:33:55  6  section that we had at the time.  And our policy is the most

09:33:59  7  recent information needs to be in there.  I hear you, you

09:34:04  8  said good.

09:34:05  9  **Q**    I'm not fussing that it's the best you could do at the

09:34:08  10  time because of your computer system.  We can then argue

09:34:11  11  whether or not the computer system should have been changed.

09:34:15  12      My question first is, do you think it's a good policy

09:34:18  13  to purge this information?

09:34:20  14  **A**    Depends on what the information is.

09:34:21  15  **Q**    If the information were the reasons that prescriptions

09:34:26  16  for controlled substances were refused, do you think it's

09:34:31  17  good to purge that information?

09:34:32  18  **A**    It would depend on how old that information is.

09:34:37  19  **Q**    So it's good to purge it if it's how old?

09:34:40  20  **A**    I can't give you that information.  Each situation has

09:34:42  21  got to be taken on its own merit.

09:34:44  22  **Q**    So it's good to have a policy that purges old

09:34:49  23  information as long as it's selectively purged, is that what

09:34:54  24  I'm hearing?

09:34:54  25  **A**    It was never written in our policy.

**Polster (Cross by Lanier)**

09:35:01  1   **Q**      Well, ma'am, did you send an e-mail out -- no, did you

09:35:08  2   make a budget request to enhance the computer system so that

09:35:15  3   those comments could be kept instead of purged?

09:35:18  4   **A**      Yes.

09:35:19  5   **Q**      And did it get shut down or was it enhanced in the

09:35:22  6   next coming weeks, months?

09:35:25  7   **A**      The way our budget system works, it's very

09:35:29  8   complicated.  It did not get approved right away.

09:35:33  9   **Q**      When did it finally get approved in this change?

09:35:35  10  **A**      I was able -- I was able to get the electronic good

09:35:41  11  faith dispensing information in our computer system in 2019.

09:35:43  12  **Q**      Five years later?

09:35:45  13  **A**      Yes.

09:35:48  14  **Q**      Do you have any clue how many prescriptions for

09:35:52  15  controlled substances went out in Lake and Trumbull County

09:35:56  16  in those five years?

09:35:57  17  **A**      I do not.

09:36:02  18  **Q**      Meanwhile, if we continue in 2014, y'all are under an

09:36:10  19  agreement with the Government concerning how you will run

09:36:16  20  your business, true?

09:36:21  21  **A**      If you're referring to the memorandum of agreement,

09:36:23  22  yes.

09:36:24  23  **Q**      Yeah, you signed that memorandum of agreement, right?

09:36:27  24  **A**      I did?

09:36:27  25  **Q**      And --

**Polster (Cross by Lanier)**

09:36:29  1    **A**    No, no, that was a question.

09:36:32  2         I didn't sign a memorandum of agreement.

09:36:35  3    **Q**    Oh, I'm sorry.  I thought you signed part of that.  I

09:36:40  4    must be wrong.  I'm crossing my wires.

09:36:42  5         There was a memorandum of agreement which you are

09:36:46  6    aware of because it's the one that in a sense established

09:36:50  7    your job, right?

09:36:51  8    **A**    It was the -- it was what I was asked to make sure

09:36:56  9    that we executed on.

09:37:00  10   **Q**    Now, part of what y'all had to do related to that is

09:37:10  11   monitor your stores and check on how things are going and

09:37:15  12   make sure that you're doing a better job nationwide, right?

09:37:18  13   **A**    Yes.

09:37:18  14   **Q**    I'm going to hand out Plaintiffs' -- I'm going to ask

09:37:23  15   to be handed out Plaintiffs' Exhibit 25492, please.

09:37:27  16        You did an internal audit in this regard, didn't you?

09:37:39  17   Or by "you," Walgreens did an internal audit, right?

09:37:42  18   **A**    Yes.

09:37:42  19   **Q**    And I've handed you Plaintiffs' Exhibit 25492.  This

09:37:48  20   is an e-mail to you December 12, 2014, concerning such

09:37:53  21   internal audit.  Correct?

09:37:55  22   **A**    Yes.

09:37:56  23   **Q**    And in this e-mail to you we see that it's the

09:38:08  24   controlled substance order monitoring process review.

09:38:12  25   Correct?

**Polster (Cross by Lanier)**

09:38:12  1    **A**    Yes.

09:38:13  2    **Q**    And it gives the background that on June 11, 2013,

09:38:19  3    Walgreens entered into a settlement agreement -- settlement

09:38:24  4    and memorandum of agreement with the DOJ and the DEA.  True?

09:38:30  5    **A**    Yes.

09:38:31  6    **Q**    And then it says, "We recommend the following

09:38:37  7    enhancements be made."

09:38:39  8          Do you see that?

09:38:40  9    **A**    I do.

09:38:40  10   **Q**    So now you're a year and a half after the agreement.

09:38:49  11   There's a set of enhancements that are being sought, right?

09:38:57  12   **A**    They're being recommended.

09:38:59  13   **Q**    Yeah.  These are because there are still problems even

09:39:06  14   rolling into -- throughout 2014, right?

09:39:10  15   **A**    Well, that he found -- they found items that they

09:39:15  16   recommended enhancement.  By that time, we were not

09:39:22  17   distributing -- or we were getting close to not distributing

09:39:26  18   controlled substances from our warehouses anymore.  And so

09:39:29  19   the order monitoring system that I have -- I had then and I

09:39:33  20   still have today was for my information because we're not

09:39:42  21   legally required to have an order monitoring system when we

09:39:45  22   do not distribute controlled substances ourselves.

09:39:49  23   **Q**    All right.  And to make sure we're clear, distribute

09:39:51  24   is different than dispense?

09:39:53  25   **A**    Yes.

**Polster (Cross by Lanier)** 3023

| | | |
|---|---|---|
| 09:39:53 | 1 | **Q**    Distribute's sending them to your stores; dispense is |
| 09:39:58 | 2 | sending them out of your stores.  Right? |
| 09:40:00 | 3 | **A**    Yeah, dispense to patients, correct. |
| 09:40:03 | 4 | **Q**    So this was a time where you had revamped the |
| 09:40:06 | 5 | distribution, the suspicious order monitoring program, |
| 09:40:11 | 6 | right? |
| 09:40:12 | 7 | **A**    Yes.  There was a new system in place. |
| 09:40:14 | 8 | **Q**    And yet your new system still needed more enhancing, |
| 09:40:18 | 9 | according to this, correct? |
| 09:40:20 | 10 | **A**    Yeah, they had recommendations. |
| 09:40:22 | 11 | **Q**    And instead of doing those, y'all just quit dispensing |
| 09:40:28 | 12 | the next year, didn't you? |
| 09:40:29 | 13 | **A**    No, that was of the plan all along, was to stop |
| 09:40:34 | 14 | distributing -- did you say distributing or dispensing? |
| 09:40:36 | 15 | **Q**    Distributing is what I meant to say. |
| 09:40:38 | 16 | **A**    Yeah, that was the plan all along.  When I accepted |
| 09:40:42 | 17 | the role in the pharmaceutical integrity team, the plan was |
| 09:40:46 | 18 | already in place to move all controlled substance |
| 09:40:51 | 19 | distribution to wholesalers versus our Walgreens |
| 09:40:54 | 20 | distribution centers. |
| 09:41:00 | 21 | **Q**    Well, these are all enhancements that y'all never did |
| 09:41:03 | 22 | because you just quit distributing? |
| 09:41:08 | 23 | **A**    No, I can't say that we didn't do all of them.  I |
| 09:41:10 | 24 | would have to take it line by line to be honest with you. |
| 09:41:13 | 25 | But I cannot say that we did not do all of them.  Some of |

**Polster (Cross by Lanier)** 3024

| | | |
|---|---|---|
| 09:41:17 | 1 | them of course were like, okay, yeah, that makes sense. |
| 09:41:20 | 2 | When you enter into a new system, you know, as you |
| 09:41:23 | 3 | learn things, you know, you get feedback from the field, you |
| 09:41:26 | 4 | learn things from team members that are working with the |
| 09:41:30 | 5 | system.  There are things that come up that, you know, you |
| 09:41:34 | 6 | do want to make adjustments on. |
| 09:41:36 | 7 | We make adjustments to systems that we have all the |
| 09:41:41 | 8 | time. |
| 09:41:42 | 9 | **Q**    So you're saying some may have been done, you don't |
| 09:41:44 | 10 | know unless you go line by line? |
| 09:41:46 | 11 | **A**    Correct. |
| 09:41:48 | 12 | **Q**    Now, beyond that, you were also doing an audit to |
| 09:41:51 | 13 | check on these dispensing, the drugs going out of the |
| 09:41:53 | 14 | stores, right? |
| 09:41:53 | 15 | **A**    Yes. |
| 09:41:54 | 16 | **Q**    And on page 2 you'll see this comment, "The purpose of |
| 09:41:59 | 17 | our review was to identify, evaluate, and test the policies, |
| 09:42:06 | 18 | procedures, and processes implemented as it pertains to |
| 09:42:09 | 19 | retail pharmacies as a result of the settlement agreement." |
| 09:42:13 | 20 | Do you see that? |
| 09:42:27 | 21 | **A**    Yes. |
| 09:42:28 | 22 | **Q**    And if we go then to page 12, if we're looking at the |
| 09:42:31 | 23 | audit report, it is page 15 of the document itself.  It's |
| 09:42:33 | 24 | the one that starts out with "Target good faith dispensing |
| 09:42:37 | 25 | policy." |

**Polster (Cross by Lanier)** 3025

| | | |
|---|---|---|
| 09:42:38 | 1 | Can you find that page, please? |
| 09:42:43 | 2 | **A**   Yes. |
| 09:42:45 | 3 | **Q**   Now, here we read, "Walgreens has implemented a target |
| 09:42:54 | 4 | drug good faith dispensing policy for the pharmacists to |
| 09:42:56 | 5 | follow, and a targeting drug good faith dispensing checklist |
| 09:43:04 | 6 | for the pharmacists to complete when certain controlled |
| 09:43:07 | 7 | substance prescriptions are dispensed." |
| 09:43:09 | 8 | Do you see that? |
| 09:43:10 | 9 | **A**   I do. |
| 09:43:10 | 10 | **Q**   "The target drug good faith dispensing checklist was |
| 09:43:16 | 11 | created to aid pharmacists in determining whether a |
| 09:43:20 | 12 | prescription for certain drugs have been written for a |
| 09:43:25 | 13 | legitimate medical purpose." |
| 09:43:27 | 14 | Do you see that as well? |
| 09:43:27 | 15 | **A**   Yes. |
| 09:43:28 | 16 | **Q**   And then an issue is identified, isn't it? |
| 09:43:32 | 17 | **A**   Yes. |
| 09:43:33 | 18 | **Q**   "Based on discussions with store operations |
| 09:43:39 | 19 | management, district managers and pharmacy supervisors are |
| 09:43:45 | 20 | expected -- oh, no. |
| 09:43:50 | 21 | Based on discussions with store operations management, |
| 09:43:54 | 22 | district managers and pharmacy supervisors are expected to |
| 09:43:57 | 23 | perform store walks of each store in their district and |
| 09:44:02 | 24 | approximately every 30 to 45 days." |
| 09:44:04 | 25 | Do you see this? |

**Polster (Cross by Lanier)**

09:44:05  1    **A**    Yes.

09:44:05  2    **Q**    Now, Mr. Weinberger questioned Mr. Joyce about his

09:44:11  3    store walks.

09:44:12  4         Do you know Mr. Joyce?  I think we said you do.

09:44:15  5    **A**    I know who he is, yes.

09:44:17  6    **Q**    And Mr. Joyce commented that he would log them into

09:44:21  7    his personal computer every time he did them.

09:44:23  8         Is that standard policy?

09:44:26  9    **A**    As far as I know, yes.

09:44:27  10   **Q**    "While specific questions are asked during these store

09:44:32  11   walks pertaining the target drug good faith dispensing

09:44:36  12   policy, no corporate reporting is generated to summarize the

09:44:42  13   results from the visits as the walks were not established as

09:44:46  14   an audit reporting vehicle."

09:44:50  15        Do you see that?

09:44:50  16   **A**    I do.

09:44:51  17   **Q**    Do you believe that that was a good policy you had in

09:44:53  18   place?  And by that I mean have the district manager or

09:44:59  19   pharmacy supervisor perform a store walk and not report back

09:45:04  20   to corporate on what happened.

09:45:08  21   **A**    I do believe that it was a good -- it was an adequate,

09:45:13  22   and I'll tell you why.

09:45:14  23        Because they are our boots on the ground.  They are

09:45:16  24   the ones that are eyes and ears of what's happening in the

09:45:20  25   store, what's happening in the community, and they would

**Polster (Cross by Lanier)**

09:45:24   1    escalate to my team or to, you know, one of the managers on

09:45:28   2    my team concerns that they may have. And I had other areas

09:45:36   3    of checks and balances that I would get reporting on.

09:45:39   4    **Q**    Well, actually, it says something different here,

09:45:42   5    doesn't it?

09:45:43   6    It says, "Based on discussions held with the

09:45:48   7    compliance and pharmacy services department, there is no

09:45:51   8    monitoring performed outside of the store walk program to

09:45:54   9    determine whether the pharmacists across the chain are

09:45:57  10    adhering to the requirements set forth."

09:46:01  11    Do you see that?

09:46:02  12    **A**    That is what it says.

09:46:03  13    **Q**    And so when you say "that was adequate," your word,

09:46:10  14    "adequate," right?

09:46:11  15    **A**    Yes.

09:46:11  16    **Q**    You said that was adequate "because I had other areas

09:46:14  17    of checks and balances I would get reporting on."

09:46:18  18    **A**    I did.

09:46:18  19    **Q**    But yet this says "there is no monitoring performed

09:46:25  20    outside of the store walk program to determine whether

09:46:28  21    pharmacists are adhering to the requirements."

09:46:31  22    Do you see that?

09:46:32  23    **A**    I do.

09:46:32  24    **Q**    And so when I asked you if this was a good policy and

09:46:38  25    you said you believe it was adequate, isn't truth be told

**Polster (Cross by Lanier)**

09:46:43   1   you could have a much better policy to make sure that the

09:46:47   2   stores are doing what they should be doing?

09:46:51   3   **A**     There are other ways from an electronic point of view

09:46:55   4   that you could have better or easier monitoring.

09:47:01   5   **Q**     Well, there's even a recommendation made, actually a

09:47:04   6   number of them.

09:47:06   7         Do you see that below?

09:47:07   8   **A**     I do.

09:47:09   9   **Q**     "A monitoring program and related procedures should be

09:47:13  10   created to provide an adequate level of assurance that

09:47:18  11   pharmacists across the chain are adhering to the

09:47:23  12   requirements set forth in the policy."

09:47:25  13         Do you see that?

09:47:26  14   **A**     I do.

09:47:26  15   **Q**     And when you say, no, no, no, what we had was

09:47:30  16   adequate, did you disagree with the recommendation of

09:47:34  17   creating a policy to ensure that pharmacists were adhering

09:47:39  18   to the requirements?

09:47:40  19   **A**     I felt that our policies were adequate, but we did

09:47:43  20   follow the recommendation from our audit department.

09:47:46  21   **Q**     Well, ma'am, you ultimately got an audit that shows

09:47:51  22   your policies were not adequate, didn't you?

09:47:54  23   **A**     Audits happen in place to make sure that compliance

09:47:57  24   measures and checks and balances are done.  So, yes, our

09:48:00  25   audit department did monitor and go back and check to make

**Polster (Cross by Lanier)** 3029

| | | |
|---|---|---|
| 09:48:03 | 1 | sure that our stores were doing what they were supposed to |
| 09:48:07 | 2 | be doing. |
| 09:48:09 | 3 | **Q**     Ma'am, I'm not sure that you answered my question, so |
| 09:48:11 | 4 | I want to show it to you and see if you're answering it. |
| 09:48:13 | 5 |      I said:  Ma'am, you ultimately got an audit that shows |
| 09:48:20 | 6 | your policies were not adequate, didn't you? |
| 09:48:23 | 7 | **A**     Oh, correct.  They felt it was not adequate, correct. |
| 09:48:27 | 8 | **Q**     But not just this audit.  You all hired an outside |
| 09:48:31 | 9 | company to come do an audit, didn't you? |
| 09:48:33 | 10 | **A**     You'll have to show me that one to refresh my memory. |
| 09:48:36 | 11 | **Q**     Okay.  So you had in place, as the person who was in |
| 09:48:44 | 12 | charge of developing, changing, and improving the policies, |
| 09:48:54 | 13 | you had in place a policy that you deemed adequate? |
| 09:49:05 | 14 | **A**     At the time I deemed it adequate, you are correct. |
| 09:49:08 | 15 | This was in 2014, like, you know, within a year of when we |
| 09:49:12 | 16 | launched our good faith dispensing policy. |
| 09:49:13 | 17 | **Q**     Right.  But you've already said that this is something |
| 09:49:22 | 18 | that should have been done from the very beginning of time. |
| 09:49:26 | 19 | **A**     Did I say that? |
| 09:49:27 | 20 | **Q**     Well, all right, maybe you didn't. |
| 09:49:29 | 21 |      Don't you think that your pharmacists and your stores |
| 09:49:33 | 22 | should have had policies in place to monitor the dispensing |
| 09:49:38 | 23 | of controlled substances whenever you're selling them? |
| 09:49:42 | 24 | **A**     We had policies in place that our pharmacists needed |
| 09:49:45 | 25 | to follow.  We had field supervision that reviewed policies |

**Polster (Cross by Lanier)** 3030

09:49:51  1  and procedures and made sure they were being adhered to when

09:49:54  2  they went into the stores.

09:49:54  3  **Q**    But they were inadequate, weren't they?

09:49:57  4  **A**    That's what the audit department found, that it could

09:50:00  5  be better.

09:50:01  6  **Q**    Yes, that they were inadequate, even under the

09:50:06  7  settlement agreement that y'all had entered into with the

09:50:07  8  Government, right?

09:50:10  9  **A**    You'll have to show me the settlement agreement and

09:50:13  10  this and, you know, the timing.

09:50:16  11  **Q**    The settlement agreement was entered into over a year

09:50:19  12  earlier.

09:50:20  13  **A**    I'm aware of when it was -- when it was agreed to.

09:50:23  14  **Q**    And it had specific agreements.  Do I need to show you

09:50:27  15  again what you all agreed to do?

09:50:33  16      You don't remember what you agreed to do with the

09:50:35  17  Government?

09:50:35  18  **A**    I remember there were many pages.  And we've improved

09:50:40  19  upon all of that since that was put in place.

09:50:42  20  **Q**    Do you remember what you -- what Walgreens agreed to

09:50:48  21  do on maintaining a -- it was Plaintiffs' Exhibit 15, on

09:50:53  22  "maintaining a compliance program in an effort to detect and

09:50:58  23  prevent diversion of controlled substances, the program

09:51:01  24  including routine and periodic training of all Walgreens

09:51:05  25  pharmacy employees responsible for dispensing controlled

**Polster (Cross by Lanier)** 3031

09:51:08   1   substances."

09:51:09   2      Do you remember that?

09:51:10   3   **A**   I do.

09:51:11   4   **Q**   I mean, that's what you were in charge of seeing to,

09:51:14   5   isn't it?

09:51:14   6   **A**   Yes, but this is just one piece of all of that.

09:51:16   7   **Q**   Yes, ma'am. And all I'm driving at is this is a piece

09:51:20   8   where your policies a year and a half later were still

09:51:25   9   inadequate, weren't they?

09:51:26   10   **A**   We made improvements, yes.

09:51:28   11   **Q**   They were still inadequate, weren't they?

09:51:31   12   **A**   They were inadequate to our audit department. I felt

09:51:34   13   that the boots on the ground, the pharmacy supervisors and

09:51:39   14   the district managers who went into the stores to review to

09:51:42   15   make sure good faith dispensing was done in accordance to

09:51:45   16   our policy, I felt that they were adequate. The audit

09:51:52   17   department found them not adequate, and we improved and

09:51:55   18   enhanced and added additional things.

09:51:58   19      This was just one piece of the puzzle of the work that

09:52:02   20   my team was doing.

09:52:03   21   **Q**   So your approach was, this is adequate because while

09:52:14   22   the audit department says it's not, you just trusted people

09:52:18   23   like Mr. Joyce to go through and do that?

09:52:20   24   **A**   I did.

09:52:21   25   **Q**   Would you be surprised to find out that we've asked

**Polster (Cross by Lanier)**                                    3032

| | | |
|---|---|---|
| 09:52:24 | 1 | for the computer information from Mr. Joyce where he says he |
| 09:52:29 | 2 | documented this, and it's strangely barren? |
| 09:52:33 | 3 | MS. SWIFT:  Objection, Your Honor.  That's |
| 09:52:37 | 4 | incorrect. |
| 09:52:45 | 5 | (At side bar at 9:52 a.m.) |
| 09:52:58 | 6 | THE COURT:  All right.  What's the objection? |
| 09:53:00 | 7 | MS. SWIFT:  I'll move to strike the question, |
| 09:53:01 | 8 | Your Honor.  It's completely inaccurate.  Walgreens has |
| 09:53:06 | 9 | produced numerous store walk documents from Mr. Joyce's |
| 09:53:08 | 10 | files, from other files, we went back and look at |
| 09:53:11 | 11 | plaintiffs' request if there was anything else to produce, |
| 09:53:13 | 12 | and we didn't identify anything except for I think three |
| 09:53:15 | 13 | documents that don't have anything to do with this. |
| 09:53:17 | 14 | THE COURT:  Well, did Walgreens produce the -- |
| 09:53:24 | 15 | did Walgreens produce the records that Mr. Joyce testified |
| 09:53:27 | 16 | that he maintained? |
| 09:53:30 | 17 | MR. WEINBERGER:  Your Honor, last night -- |
| 09:53:32 | 18 | MS. SWIFT:  I can't hear what the judge is |
| 09:53:34 | 19 | asking with people talking over. |
| 09:53:36 | 20 | THE COURT:  Mr. Joyce said that he maintained |
| 09:53:37 | 21 | on his personal computer the notes he made of his periodic |
| 09:53:42 | 22 | store walk-throughs.  So my question is, has Walgreens |
| 09:53:46 | 23 | produced those -- |
| 09:53:48 | 24 | MR. WEINBERGER:  Your Honor, last night. |
| 09:53:49 | 25 | THE COURT:  Hold it.  I'm asking Ms. Sullivan. |

09:53:49  1                    MR. WEINBERGER:  Oh, I'm sorry.

09:53:54  2                    THE COURT:  She made the objection.

09:53:55  3                    MS. SWIFT:  It's Ms. Swift, for Walgreens,

09:53:57  4      Your Honor.

09:53:57  5                    THE COURT:  Ms. Swift.

09:53:57  6                    MS. SWIFT:  Walgreens has produced all of the

09:53:58  7      store walk documents that are responsive in this litigation,

09:54:01  8      including documents from Mr. Joyce's file.

09:54:03  9                    MR. WEINBERGER:  So she didn't answer your

09:54:04  10     question, Your Honor.  So let me clarify.

09:54:07  11         Last night we got three pages of documents from his

09:54:15  12     computer.  All three pages are actually in substance the

09:54:22  13     same identical information.  They're just different -- it's

09:54:29  14     a different font.  And I can show you the documents.

09:54:35  15                    MR. STOFFELMAYR:  Judge, can I clarify this?

09:54:37  16     This is very misleading.

09:54:38  17                    THE COURT:  No, this is the question I'll

09:54:40  18     allow.  You can show her those documents, you can show her

09:54:45  19     the documents that were produced and ask her, you know, is

09:54:50  20     it surprising to you that these are the only documents that

09:54:52  21     Walgreens has produced for Joyce's walk-throughs.  Then you

09:54:58  22     can come back on redirect.

09:54:59  23                    MR. STOFFELMAYR:  Because he has to ask the

09:55:00  24     question about the documents that Walgreens actually

09:55:03  25     produced which are voluminous.

**Polster (Cross by Lanier)**                    3034

09:55:05   1          MR. WEINBERGER:  Your Honor.

09:55:06   2          MR. STOFFELMAYR:  No, let me finish, please.

09:55:07   3     There are voluminous store walk records kept centrally

09:55:10   4   and at the stores which we produced.  What Mr. Joyce

09:55:13   5   testified about was that he took informal notes as well

09:55:16   6   which he would e-mail to store managers after a visit.

09:55:20   7   Those were collected and searched at the beginning of the

09:55:23   8   case.  There is nothing relevant in there.  They discuss

09:55:26   9   things like whether store employees were dressed

09:55:28   10  appropriately, whether the bathroom is clean.

09:55:30   11         THE COURT:  As long as the question is asked,

09:55:34   12  show her the documents, the only documents that have been

09:55:36   13  produced that Joyce kept on his computer, all right, and as

09:55:42   14  long as you ask the question that way, are these -- would it

09:55:46   15  surprise you that these are the only documents that were

09:55:48   16  produced pertaining to what Mr. Joyce kept on his personal

09:55:52   17  computer for his walk-throughs, that's a fair question.

09:55:57   18         MR. STOFFELMAYR:  But the question needs to be

09:55:58   19  asked in a way that's not misleading.  To suggest to her

09:56:01   20  that these are somehow different --

09:56:02   21         THE COURT:  Let's move on.

09:56:11   22         (In open court at 9:56 a.m.)

09:56:42   23         MR. LANIER:  Your Honor, for purposes of the

09:56:44   24  record, I'm going to mark this as Plaintiffs' 3000.  We may

09:56:48   25  need to adjust the number later.  I just made that one up

| | | |
|--|--|--|
| 09:56:52 | 1 | because we think that it's an available one. |
| 09:56:55 | 2 | And these are three pages that were produced to us |
| 09:56:58 | 3 | that bear the Bates numbers E-04535266, E-04535260, and |
| 09:57:20 | 4 | E-04535259. |
| 09:57:36 | 5 | BY MR. LANIER: |
| 09:57:36 | 6 | **Q**    Ma'am, after Mr. Joyce testified we requested under |
| 09:57:42 | 7 | court authority to get the notes from his computer, and I'll |
| 09:57:45 | 8 | show you what we've marked as Plaintiffs' Exhibit 3000. |
| 09:57:51 | 9 | And in all of the years he was there, these are the |
| 09:57:55 | 10 | notes that -- |
| 09:57:59 | 11 | MS. SWIFT:  Your Honor, can we wait until |
| 09:58:01 | 12 | she's been asked if she's seen this before showing it to the |
| 09:58:03 | 13 | jury? |
| 09:58:04 | 14 | THE COURT:  Overruled. |
| 09:58:05 | 15 | **Q**    You'll see that on this page there's a 1/18 note.  It |
| 09:58:16 | 16 | says, district -- or DM. |
| 09:58:17 | 17 | THE COURT:  1/18/19. |
| 09:58:20 | 18 | MR. LANIER:  I'm sorry, 1/18/19.  Thank you, |
| 09:58:23 | 19 | Your Honor. |
| 09:58:23 | 20 | **Q**    Monday, January 18, 2019, Monday. |
| 09:58:26 | 21 | "DM," do you know what that would stand for in |
| 09:58:30 | 22 | parlance for your company? |
| 09:58:31 | 23 | **A**    I'm assuming district manager. |
| 09:58:33 | 24 | **Q**    Okay.  "District manager with stores lacking service, |
| 09:58:38 | 25 | to show me a coaching card win." |

**Polster (Cross by Lanier)** 3036

09:58:41 1      That's not really going to monitor -- no note they're

09:58:44 2  monitoring the dispensing of controlled substances, fair?

09:58:49 3  **A**     Fair.  But I don't know what the reason for the visit

09:58:52 4  was.  The district managers have lots of responsibilities,

09:58:57 5  and that tells me that they were looking for that specific

09:59:00 6  topic, but that doesn't mean that good faith dispensing was

09:59:05 7  not occurring at the store.

09:59:07 8  **Q**     Right.  This is where -- this is in response to

09:59:10 9  questions we asked him about his store walk program.  This

09:59:16 10  was the one where each of them every 30 to 45 days they're

09:59:22 11  supposed to be walking and doing specific questions asked

09:59:26 12  pertaining to the target drug good faith dispensing policy.

09:59:29 13      Remember?

09:59:30 14  **A**     Yeah, that was the recommendation from audit.

09:59:32 15  **Q**     Nothing here on target good faith dispensing based on

09:59:39 16  that one walk there, is there?

09:59:41 17  **A**     Correct.

09:59:41 18  **Q**     Look at the next one.  1/4/19 Friday.  "Visits going

09:59:48 19  forward will be, review and discuss POTW and how store team

09:59:54 20  understands and executes it."

09:59:56 21      You got any clue what that is?

09:59:58 22  **A**     I do.  It's plan of the week.

09:59:59 23  **Q**     It's what?

10:00:00 24  **A**     It's called plan of the week.

10:00:02 25  **Q**     Plan of the week.

**Polster (Cross by Lanier)**                    3037

10:00:04   1    That's certainly not targeted to how good faith

10:00:07   2   dispensing is being done, right?

10:00:09   3   **A**    Actually, it could have been.  We do send out plan of

10:00:13   4   the weeks on a regular basis that include good faith

10:00:18   5   dispensing or information about pharmacy that is -- that

10:00:23   6   happens.

10:00:24   7    I don't know that -- you know, I don't know if that

10:00:27   8   plan of the week had it, but I am telling you that there are

10:00:32   9   times throughout the year where we do send out plan of the

10:00:35  10   weeks that have that information in there for our stores.

10:00:38  11   **Q**    All right.  "Review and discuss pulse, looking for

10:00:56  12   wins and opportunities."

10:00:46  13    What's pulse?

10:00:47  14   **A**    A pulse is a measure that they look at multiple things

10:00:54  15   in the store.  There's many different items that go into a

10:01:00  16   store pulse.

10:01:03  17   **Q**    Like what?

10:01:04  18   **A**    Expired products, customer service.  And it's not

10:01:10  19   just -- it's front of store and pharmacy.

10:01:15  20   **Q**    "Review and discuss wins and opportunities with the

10:01:21  21   customer plan."

10:01:23  22    Not really an audit of targeting good faith dispensing

10:01:28  23   there, is it?

10:01:30  24   **A**    No.

10:01:31  25   **Q**    "Look at metrics."  That includes waiting time, right?

**Polster (Cross by Lanier)** 3038

| | | |
|---|---|---|
| 10:01:36 | 1 | **A**  I don't know if the waiting time was included in 2019. |
| 10:01:41 | 2 | **Q**  Well, it certainly was earlier, right? |
| 10:01:44 | 3 | **A**  It was something that we've measured in the past, yes. |
| 10:01:46 | 4 | **Q**  Look at metrics and have expectations on what you |
| 10:01:51 | 5 | struggled with so we can come up with a plan to help you." |
| 10:01:54 | 6 | Right? |
| 10:01:55 | 7 | **A**  Yes. |
| 10:01:55 | 8 | **Q**  And then we've got "HCS, 1/15 and 1/16," with a "Wrap |
| 10:02:09 | 9 | up 1/17." |
| 10:02:10 | 10 | Do you see that? |
| 10:02:11 | 11 | **A**  I do. |
| 10:02:11 | 12 | **Q**  It's got prescription quality? |
| 10:02:15 | 13 | **A**  It does. |
| 10:02:15 | 14 | **Q**  It's got prescription NPS.  What's NPS? |
| 10:02:19 | 15 | **A**  Net promoter score. |
| 10:02:21 | 16 | **Q**  Net promoter score? |
| 10:02:22 | 17 | **A**  Yes. |
| 10:02:22 | 18 | **Q**  Well, you've got to figure that's not controlled |
| 10:02:25 | 19 | substances, right? |
| 10:02:26 | 20 | **A**  Right. |
| 10:02:28 | 21 | **Q**  Better not be, right? |
| 10:02:30 | 22 | **A**  Correct. |
| 10:02:30 | 23 | **Q**  "Make sure the plan of the week is 100 percent |
| 10:02:38 | 24 | including the front consumption table in FE." |
| 10:02:45 | 25 | You know what "FE" is, don't you? |

**Polster (Cross by Lanier)**                    3039

10:02:48  1   **A**      Front end.

10:02:48  2   **Q**      Yeah, that's -- those are the tables up at the front

10:02:51  3   that get us to buy stuff when we're checking out because

10:02:54  4   it's right there, right?

10:02:55  5   **A**      That's where we put merchandise at the front of the

10:02:59  6   store, yes.

10:03:00  7   **Q**      Yeah.  So that part of the plan of the week we at

10:03:02  8   least know what it is, don't we?

10:03:03  9   **A**      For that week down there, yes.

10:03:06  10  **Q**      And then the only other note out of his 20-plus years

10:03:12  11  that we've got on this page is "7/30 area call."

10:03:18  12           Do you see that?

10:03:18  13  **A**      I do.

10:03:19  14  **Q**      It says, "No longer able to auto fill for controlled

10:03:26  15  substances."

10:03:28  16           So at least they know that, right?

10:03:31  17  **A**      Yes.

10:03:32  18  **Q**      "Are there any insurance plans, that's not good faith

10:03:42  19  targeted questions, is it?

10:03:43  20  **A**      No.

10:03:44  21  **Q**      "How is the customer plan getting not only to RXM and

10:03:48  22  staff but all of the staff."

10:03:51  23           Customer plans, not target drug good faith dispensing,

10:03:54  24  is it?

10:03:55  25  **A**      Correct.

**Polster (Cross by Lanier)** 3040

10:03:56  1    **Q**    "We need to turn up the heat on digital, front end

10:03:59  2    with in store orders and prescription texting."

10:04:03  3         Again, that's not checking to see how good good faith

10:04:07  4    target dispensing is going, is it?

10:04:09  5    **A**    No.

10:04:09  6    **Q**    Those same notes, the 7/30 area call, the 1/4/19

10:04:22  7    Friday, the wrap up, and the 1/18 are produced on another

10:04:28  8    page.  But that's it for all of his stores for years of

10:04:32  9    walking.

10:04:34  10        Do you understand that?

10:04:37  11             MS. SWIFT:  Objection.  That's

10:04:38  12   mischaracterizing the evidence again.

10:04:39  13             THE COURT:  Overruled.

10:04:40  14   **A**    I understand that's what --

10:04:42  15             THE COURT:  Hold it.

10:04:43  16             MR. LANIER:  Let me clarify, Your Honor.

10:04:45  17             THE COURT:  Rephrase -- I'll sustain the

10:04:46  18   objection the way it was asked.

10:04:48  19             MR. LANIER:  I got it, and I caught it at the

10:04:49  20   same time.

10:04:50  21   BY MR. LANIER:

10:04:50  22   **Q**    Ma'am, when Mr. Joyce testified that he kept these

10:04:54  23   notes on his computer of his in store walks that he was

10:04:59  24   doing to check these good faith dispensing issues every 30

10:05:03  25   to 45 days, in each of his stores, you understand from his

**Polster (Cross by Lanier)**

10:05:08  1    computer that's all we got?

10:05:10  2    **A**    I understand that he didn't document it.  That does

10:05:13  3    not mean he didn't do it.

10:05:15  4    **Q**    Ma'am, you know of all people how important it is to

10:05:19  5    document, don't you?

10:05:20  6    **A**    I do.  However, Brian Joyce is a pharmacist, and a

10:05:24  7    pharmacist can see and recognize things that don't look

10:05:28  8    correct or don't look right in their stores.  Brian Joyce

10:05:32  9    was a pharmacist.  He practiced as a pharmacist.  He

10:05:36  10   practiced as a pharmacy supervisor.  That doesn't

10:05:38  11   necessarily mean that good faith dispensing practices and

10:05:41  12   following of the policy was not happening.

10:05:44  13   **Q**    Well, ma'am, if it's not being documented, you have no

10:05:49  14   way of knowing quality control, do you?

10:05:52  15   **A**    I have no way of knowing quality control coming up to

10:05:55  16   the support center, but I rely on him and people in his

10:06:00  17   position to escalate concerns to my team.

10:06:03  18   **Q**    Like Mr. Yaeger did with the concerns he had?

10:06:06  19   **A**    Of course.  And he took those very seriously.

10:06:11  20   **Q**    But yet, you told --

10:06:11  21                THE COURT:  Hold it.  Hold it.  Let her finish

10:06:12  22   her answer.

10:06:14  23   **A**    He took those very seriously.  We have never told our

10:06:17  24   store leaders or our, you know, district or field leaders to

10:06:22  25   tell a pharmacist to fill a prescription.

**Polster (Cross by Lanier)** 3042

| | | |
|---|---|---|
| 10:06:24 | 1 | **Q**    But wait a minute, ma'am.  You told us yesterday |
| 10:06:30 | 2 | afternoon that you put a program into place of |
| 10:06:34 | 3 | businesspeople following up with the pharmacists because you |
| 10:06:39 | 4 | did have a problem with pharmacists that you did not trust |
| 10:06:42 | 5 | to fill all the prescriptions they needed to fill. |
| 10:06:45 | 6 | **A**    No, not all the prescriptions they needed to fill.  I |
| 10:06:49 | 7 | had a concern that we had pharmacists that were sloughing |
| 10:06:52 | 8 | off their responsibility and not filling controlled |
| 10:06:58 | 9 | substances. |
| 10:06:58 | 10 | They have to -- we're not telling them that they have |
| 10:07:00 | 11 | to fill a controlled substance, but we are telling them that |
| 10:07:03 | 12 | they have to go through their due diligence, they can't just |
| 10:07:06 | 13 | see a prescription and say, you know what, I'm not going to |
| 10:07:09 | 14 | fill this.  They have to go through their due diligence. |
| 10:07:12 | 15 | The point of that report was to ensure that those |
| 10:07:16 | 16 | pharmacists had the appropriate documentation in the refusal |
| 10:07:20 | 17 | folder that showed that they did their due diligence before |
| 10:07:23 | 18 | they refused the prescription. |
| 10:07:25 | 19 | **Q**    So you think it's adequate to have a program in place |
| 10:07:31 | 20 | that says, "specific questions are to be asked pertaining to |
| 10:07:38 | 21 | target good faith dispensing on these store walks every 30 |
| 10:07:42 | 22 | to 45 days, but it doesn't need to be documented and nothing |
| 10:07:46 | 23 | needs to be reported back, and there doesn't need to be any |
| 10:07:50 | 24 | accountability, and the documentation that people think |
| 10:07:52 | 25 | they're doing can be what we've just seen from Mr. Joyce. |

**Polster (Cross by Lanier)** 3043

| | | |
|---|---|---|
| 10:07:56 | 1 | And you are fine with that as the vice president over |
| 10:07:59 | 2 | this whole area, right? |
| 10:08:01 | 3 | **A**   Now that I'm the vice president and I have learned |
| 10:08:04 | 4 | many things over the years, we have changed our policies, |
| 10:08:07 | 5 | we've improved things.  So at the time, I felt it was |
| 10:08:11 | 6 | adequate.  After the audit, we made changes.  We made |
| 10:08:16 | 7 | changes based on recommendations. |
| 10:08:19 | 8 | **Q**   So my question is, looking back will you agree now |
| 10:08:22 | 9 | that it was inadequate? |
| 10:08:24 | 10 | **A**   I would say it could be better.  I wouldn't say it was |
| 10:08:26 | 11 | inadequate because we have eyes and ears at the field level |
| 10:08:32 | 12 | following up, and they are trained to escalate concerns up |
| 10:08:35 | 13 | to my team and up to the support center. |
| 10:08:37 | 14 | **Q**   And yet, there was an external audit done a year |
| 10:08:43 | 15 | later, wasn't there? |
| 10:08:44 | 16 | **A**   Yes.  Or so you tell me anyway. |
| 10:08:49 | 17 | **Q**   Well, let's see if I -- |
| 10:08:51 | 18 | **A**   You have to remind me. |
| 10:08:52 | 19 | **Q**   All right.  Let's see if I can remind you. |
| 10:08:54 | 20 | Plaintiffs' Exhibit 15085, please. |
| 10:09:12 | 21 | Do you have that document in front of you? |
| 10:09:14 | 22 | **A**   I do. |
| 10:09:14 | 23 | **Q**   You will see on the e-mail on the second page that you |
| 10:09:20 | 24 | started a chain here, Natasha Polster to Ed Bratton and the |
| 10:09:27 | 25 | others on your team. |

**Polster (Cross by Lanier)**                          3044

10:09:28   1         Do you see that?

10:09:28   2    **A**    I do.

10:09:30   3    **Q**    And you said, "Please see below.  We have been given

10:09:36   4    time on the monthly district manager webinars.  I want an

10:09:41   5    outline that breaks out the findings of the BCI."

10:09:46   6         Does that ring a bell with you?

10:09:47   7    **A**    I do.  That stands for a basic control initiative.  It

10:09:51   8    is an internal process that our asset protection team does

10:09:55   9    where they will follow up on various programs that we have

10:09:59  10    across our store, including in the pharmacy.  And they will

10:10:03  11    go into stores to check that things that we need to look at

10:10:08  12    are being followed.

10:10:10  13    **Q**    Okay.  This is not the T-A-T-A, TATA external analysis

10:10:18  14    I was going to ask you about.  This is one that's internal,

10:10:21  15    right?

10:10:21  16    **A**    Correct.

10:10:21  17    **Q**    So we are timewise over a year after those

10:10:27  18    recommendations had been made; is that right?

10:10:33  19    **A**    Yeah, this audit -- or not an audit, it was a basic

10:10:37  20    control initiative was done six months or however long after

10:10:40  21    that other one.

10:10:41  22    **Q**    Yeah, I think six months is closer to it.  The other

10:10:43  23    was 2014, but it was toward the end of 2014.  Right?

10:10:47  24    **A**    Okay.

10:10:47  25    **Q**    So within the realm of this you'll see a slide deck

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:10:52 | 1 | attached.  Good faith dispensing district manager webinar, a |
| 10:11:00 | 2 | presentation on this one that's got Eric Stahmann, one of |
| 10:11:03 | 3 | your team on it. |
| 10:11:04 | 4 | Do you see that? |
| 10:11:05 | 5 | **A**    Yes. |
| 10:11:09 | 6 | **Q**    And if we look at that, you will see that it sets out |
| 10:11:12 | 7 | the memorandum of agreement, what I read to you before, |
| 10:11:16 | 8 | right? |
| 10:11:16 | 9 | **A**    Yes. |
| 10:11:18 | 10 | **Q**    And it even calls it the Administrative Memorandum of |
| 10:11:22 | 11 | Agreement. |
| 10:11:23 | 12 | And then the next slide says, "In order to check" -- |
| 10:11:29 | 13 | I'll slide this down -- in order to check if stores are |
| 10:11:32 | 14 | compliant with the policies put in place per the MOA" -- and |
| 10:11:41 | 15 | again, that's 2013 MOA, right? |
| 10:11:44 | 16 | **A**    Yes. |
| 10:11:44 | 17 | **Q**    Over two years before. |
| 10:11:51 | 18 | -- "a random sample size audit was conducted in June." |
| 10:11:57 | 19 | Do you see that? |
| 10:11:58 | 20 | **A**    I do. |
| 10:11:59 | 21 | **Q**    "Roughly 2400 stores" -- that's what, one out of every |
| 10:12:07 | 22 | four? |
| 10:12:08 | 23 | **A**    Approximately. |
| 10:12:09 | 24 | **Q**    -- "were audited for compliance on various good faith |
| 10:12:15 | 25 | dispensing and target good faith dispensing policies and |

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:12:20 | 1 | procedures." |
| 10:12:21 | 2 | Do you see that? |
| 10:12:22 | 3 | **A** I do. |
| 10:12:22 | 4 | **Q** Now, these are the very procedures that we were |
| 10:12:24 | 5 | talking about in the previous year, correct? |
| 10:12:29 | 6 | **A** Yes. |
| 10:12:29 | 7 | **Q** These are the ones where you said the program that we |
| 10:12:33 | 8 | had was adequate to make sure that this was working, right? |
| 10:12:37 | 9 | **A** At the time, that is exactly what I felt. |
| 10:12:40 | 10 | **Q** And so you had let those policies be in place for |
| 10:12:45 | 11 | years because you thought it adequate, but when the basic |
| 10:12:51 | 12 | control initiative was done, the results were unfavorable, |
| 10:12:57 | 13 | weren't they? |
| 10:12:57 | 14 | **A** That's what it says, yes. |
| 10:12:58 | 15 | **Q** Not only were the results unfavorable, but when target |
| 10:13:09 | 16 | drug prescriptions, and those are all -- all three of those |
| 10:13:12 | 17 | are opiates, right? |
| 10:13:13 | 18 | **A** Yes. |
| 10:13:13 | 19 | **Q** When those three opioids are dispensed, pharmacy team |
| 10:13:21 | 20 | members are responsible for completing the target drug good |
| 10:13:28 | 21 | faith dispensing checklist. |
| 10:13:28 | 22 | Do you see that? |
| 10:13:29 | 23 | **A** Yes. |
| 10:13:29 | 24 | **Q** "Number of stores that correctly had completed a |
| 10:13:36 | 25 | target drug good faith checklist attached to the filled |

**Polster (Cross by Lanier)**

10:13:42  1    target drug prescription hard copies, 59.5 percent

10:13:47  2    compliance rate"?

10:13:49  3    **A**    Of a hundred percent compliance, that is correct.

10:13:54  4    **Q**    Yeah, in other words, out of 2407 stores that were

10:14:02  5    audited, a little over half, almost 60 percent, were

10:14:07  6    actually doing their job right?

10:14:09  7    **A**    On every target drug that the person went in to check

10:14:15  8    on every one of the prescriptions that they pulled there was

10:14:19  9    a checklist attached to in over 1400 stores.

10:14:25  10   **Q**    Is that yes, they were doing their job in almost 60

10:14:30  11   percent?

10:14:30  12   **A**    Yes.

10:14:31  13   **Q**    So that means over 40 percent weren't doing their job?

10:14:37  14   **A**    Over 40 percent did not have a hundred percent

10:14:40  15   compliance.  But remember, this is a hundred percent

10:14:42  16   compliance to the policy.  The target drug good faith

10:14:47  17   dispensing checklist is not a requirement by law.  It was a

10:14:49  18   policy that I put in place.  And of course I would love and

10:14:53  19   wanted to see a hundred percent compliance, and that is why

10:14:57  20   I wanted to have that webinar, I wanted to ensure the field

10:15:02  21   leaders knew what to look for when they went into the

10:15:04  22   stores.

10:15:06  23   **Q**    Ma'am, you didn't answer my question.

10:15:08  24   **A**    I did answer the question.

10:15:09  25   **Q**    No, ma'am.  My question was, over 40 percent weren't

**Polster (Cross by Lanier)**                    3048

10:15:12   1    doing their job.  Is that true or false?

10:15:14   2    **A**      That is false.  Over 40 percent were not 100 percent

10:15:19   3    compliant.

10:15:20   4          Go to the next page.

10:15:21   5    **Q**      I will.  Hold on one second.

10:15:24   6          Are you saying -- let's do this one first and we'll go

10:15:30   7    to the next one.

10:15:32   8          Should stores correctly complete the checklist and

10:15:38   9    attach it to the filled prescription?  Should they?  Is that

10:15:43  10    part of their job?

10:15:44  11    **A**      Per policy, yes.

10:15:46  12    **Q**      Right, that's my question.

10:15:48  13    **A**      Yes.  It's a policy, not a regulation.

10:15:52  14              THE COURT:  Hold it, Ms. Polster.  It would

10:15:55  15    work a lot better if you let Mr. Lanier complete his

10:15:57  16    question, and then I'll make sure that he lets you complete

10:15:59  17    his answer.

10:16:00  18              THE WITNESS:  Thank you.

10:16:01  19              THE COURT:  Otherwise, it's not going to work.

10:16:04  20    **Q**      This whole thing is put together as what Walgreens

10:16:08  21    agreed to do in the memorandum of agreement with the

10:16:12  22    Government.  And this was to make sure to check if stores

10:16:16  23    are compliant with the policies and procedures put in place

10:16:24  24    per the agreement with the Government.

10:16:25  25          Do you remember that?

**Polster (Cross by Lanier)** 3049

| | | |
|---|---|---|
| 10:16:27 | 1 | **A**  I do. |
| 10:16:28 | 2 | **Q**  So should stores be compliant?  Is that part of their |
| 10:16:31 | 3 | job? |
| 10:16:31 | 4 | **A**  Yes. |
| 10:16:32 | 5 | **Q**  Okay.  So part of job is to be compliant, right? |
| 10:16:38 | 6 | **A**  Yes. |
| 10:16:39 | 7 | **Q**  And is it true that over 40 percent were not |
| 10:16:42 | 8 | compliant? |
| 10:16:43 | 9 | **A**  Over 40 percent were not compliant a hundred percent |
| 10:16:47 | 10 | of the time. |
| 10:16:47 | 11 | **Q**  Well, I understand that, ma'am. |
| 10:16:51 | 12 | So a hundred -- I mean over 40 percent were not |
| 10:16:54 | 13 | compliant, and that compliance was part of their job; |
| 10:17:00 | 14 | therefore, over 40 percent weren't doing their job, right? |
| 10:17:04 | 15 | **A**  I don't agree with the way that is characterized.  And |
| 10:17:08 | 16 | you will get to that on the next page.  They were not -- |
| 10:17:11 | 17 | there was not a target drug good faith dispensing checklist |
| 10:17:14 | 18 | attached to every prescription that they were pulled in 40 |
| 10:17:19 | 19 | percent of the stores.  Of course, I would want a hundred |
| 10:17:22 | 20 | percent, but that does not mean that good faith dispensing |
| 10:17:24 | 21 | was not happening at that location. |
| 10:17:26 | 22 | **Q**  All right.  Their job is to comply.  Over 40 percent |
| 10:17:34 | 23 | did not comply. |
| 10:17:36 | 24 | You'll at least agree with that, all right?  Is that |
| 10:17:40 | 25 | fair? |

**Polster (Cross by Lanier)**

10:17:41  1          MS. SWIFT:  Objection.  It mischaracterizes

10:17:42  2   her testimony.

10:17:43  3          THE COURT:  Hold it.  There's a question.

10:17:45  4   We'll let the witness answer.

10:17:46  5   **A**    I don't agree with the way you're asking the question.

10:17:49  6   Over 40 percent did not get a hundred percent compliance

10:17:52  7   where a checklist was put on every hard copy that was asked

10:17:57  8   for by policy, but that does not mean that good faith

10:18:01  9   dispensing was not happening.

10:18:04  10  **Q**    Well, but no, the compliance that I'm asking about is

10:18:08  11  not whether or not the prescription should have gone out.

10:18:12  12  We've got no way of knowing that.

10:18:13  13  **A**    Correct.

10:18:14  14  **Q**    The compliance I'm asking about is with the policies

10:18:18  15  and procedures put in place, and that policy and procedure

10:18:21  16  says you complete this checklist and attach it to the

10:18:25  17  prescription, right?

10:18:26  18  **A**    Walgreens' policy for good faith dispensing for the

10:18:30  19  checklist, yes.  But that policy was not a requirement of

10:18:35  20  the MOA.

10:18:39  21  **Q**    The requirement of the MOA was put a plan in place to

10:18:42  22  do it?

10:18:43  23  **A**    To have --

10:18:44  24  **Q**    That's the plan and policy you put in place to do it,

10:18:47  25  right?

**Polster (Cross by Lanier)**

10:18:47   1   **A**     It was done --

10:18:48   2            MS. SWIFT:  Objection.

10:18:48   3   **A**     -- before the MOA was signed.

10:18:50   4   **Q**     You knew what was coming down the pike.  We've seen

10:18:53   5   that from the e-mails where you were commenting on it.

10:18:57   6   Remember?  Do I need to --

10:19:00   7   **A**     No, you don't need to show me again.

10:19:03   8   **Q**     Okay.  So the stores, part of their job was to be

10:19:08   9   compliant with the policies and procedures, and one of those

10:19:14  10   policies and procedures was to complete this checklist and

10:19:16  11   attach it to prescriptions, true?

10:19:18  12   **A**     One of those policies, yes.

10:19:19  13   **Q**     And if their job was to comply with that, you know

10:19:22  14   over 40 percent did not comply?

10:19:24  15            MS. SWIFT:  Objection.  Asked and answered

10:19:25  16   several times.

10:19:26  17   **A**     They were not 100 percent compliant, yes.

10:19:32  18   **Q**     Thank you.  Now we can go to the next sheet.  This is

10:19:35  19   the one you wanted me to turn to, right?

10:19:37  20   **A**     No, it was the next one after.

10:19:39  21   **Q**     Let's do this one anyway.

10:19:40  22            "If the pharmacist determines that a target drug

10:19:46  23   prescription does not meet good faith dispensing

10:19:47  24   requirements, a copy of the refused prescription and

10:19:53  25   completed target drug good faith dispensing checklist must

**Polster (Cross by Lanier)** 3052

10:19:56  1    be in the designated refusal file folder."

10:20:02  2         Do you see that?

10:20:03  3    **A**    Yes.

10:20:03  4    **Q**    This is one of those places you said before it doesn't

10:20:09  5    matter if we delete the comments because you can go back and

10:20:12  6    look in the folders, right?

10:20:14  7    **A**    Yes.

10:20:14  8    **Q**    So these folders that you can go back and look at

10:20:18  9    where it doesn't matter if the comments are deleted has a

10:20:22  10   statistic, don't they?

10:20:27  11        "Number of stores that correctly had completed that

10:20:32  12   checklist attached to a refused prescription."

10:20:36  13        Do you see that?

10:20:36  14   **A**    Yes.

10:20:36  15   **Q**    75.7 percent compliance rate, right?

10:20:42  16   **A**    A 75.7 percent compliance rate that the target drug

10:20:50  17   good faith dispensing checklist that they used was attached

10:20:53  18   to the refused prescription.  That does not mean that there

10:20:57  19   weren't refused prescriptions in that file.  They just did

10:21:00  20   not have the checklist attached to it.

10:21:03  21   **Q**    Didn't follow the policy?

10:21:05  22   **A**    Not exactly, they did not follow the policy.

10:21:07  23   **Q**    Not -- no, don't say not exactly.

10:21:10  24        They didn't follow the policy, did they?

10:21:12  25   **A**    Their checklist was not attached.  However, if the

**Polster (Cross by Lanier)** 3053

10:21:15   1   hard copy had notes on it, it was okay for them to do it

10:21:21   2   that way as long as there was a refused prescription in

10:21:23   3   there.

10:21:23   4   **Q**     Okay.  So your position and the policy for your

10:21:28   5   company coming from your job was it doesn't really matter if

10:21:33   6   you do that or not as long as you've got a note on the

10:21:37   7   prescription.  Is that what you're saying?

10:21:39   8   **A**     I'm saying that there are times where the good faith

10:21:42   9   dispensing checklist wasn't attached; however, there may

10:21:45   10  have been notes on the hard copy that was written in there

10:21:47   11  that gave the leadership or whoever was looking information

10:21:53   12  to show that the pharmacist did their due diligence and

10:21:57   13  their good faith, correct.

10:21:58   14  **Q**     So your policy that you're saying under oath right now

10:22:02   15  for all the Walgreens people around the United States is you

10:22:06   16  don't really need to do this as long as you make a note on

10:22:08   17  the prescription.  Is that what you're saying?

10:22:10   18                    MS. SWIFT:  Objection.  Mischaracterizes.

10:22:11   19                    THE COURT:  Overruled.

10:22:13   20  **A**     What I'm saying is is that a checklist is in the

10:22:17   21  policy, yes.  We want checklists done on each time.

10:22:20   22        What I know to be true is based on this and feedback

10:22:24   23  that we had from the stores was that a checklist was not

10:22:27   24  always used, but notes were put on the hard copy and put

10:22:31   25  into the refusal file.

**Polster (Cross by Lanier)** 3054

| | | |
|---|---|---|
| 10:22:33 | 1 | **Q**    Okay.  With due respect, ma'am, did you read the next |
| 10:22:36 | 2 | page of this? |
| 10:22:36 | 3 | **A**    I did. |
| 10:22:38 | 4 | **Q**    The next page doesn't say what you said.  It says the |
| 10:22:42 | 5 | exact opposite, doesn't it? |
| 10:22:45 | 6 |      Look, read with me.  "If the pharmacist determines |
| 10:22:49 | 7 | that a target drug prescription does not meet GFD |
| 10:22:53 | 8 | requirements, a copy of the refused prescription," what's |
| 10:22:59 | 9 | the next word? |
| 10:23:00 | 10 | **A**    "And completed checklist." |
| 10:23:03 | 11 | **Q**    "And completed checklist." |
| 10:23:06 | 12 |      What's the next word? |
| 10:23:07 | 13 | **A**    "Must be designated in the refusal file folder." |
| 10:23:10 | 14 | **Q**    "Must be in the designated refusal file folder." |
| 10:23:14 | 15 |      Do you see that? |
| 10:23:14 | 16 | **A**    I do. |
| 10:23:14 | 17 | **Q**    Doesn't say it's optional, does it? |
| 10:23:16 | 18 | **A**    It doesn't. |
| 10:23:17 | 19 | **Q**    Doesn't say just put the note on the prescription, |
| 10:23:20 | 20 | does it? |
| 10:23:20 | 21 | **A**    It doesn't. |
| 10:23:20 | 22 | **Q**    Doesn't say we're not too worried about it because we |
| 10:23:24 | 23 | trust our pharmacist, does it? |
| 10:23:26 | 24 | **A**    It doesn't say that. |
| 10:23:28 | 25 | **Q**    Doesn't say this is a policy that we don't really care |

**Polster (Cross by Lanier)**

10:23:31  1    about, does it?

10:23:32  2    **A**    I never once said that we didn't care about that

10:23:34  3    policy.

10:23:35  4    **Q**    It says it must be done, doesn't it?

10:23:38  5    **A**    Yes, it does.

10:23:39  6    **Q**    And then it says, "After reviewing the refusal file

10:23:45  7    folder for calendar year 2015, how many refused

10:23:48  8    prescriptions were identified?"

10:23:49  9          Do you see that?

10:23:50  10    **A**    I do.

10:23:50  11    **Q**    You had over a thousand stores that never refused a

10:23:53  12    prescription.  Do you see that?

10:23:55  13    **A**    And they didn't need to refuse a prescription.  You

10:23:58  14    have to understand the entire situation, the community, the

10:24:01  15    store, the prescriptions that they see.  They may have not

10:24:05  16    had a reason to fill that the prescription that they were

10:24:08  17    looking at and ready to dispense did not meet good faith

10:24:11  18    dispensing.

10:24:11  19    **Q**    Well, when you have only a 75 percent compliance rate

10:24:18  20    and 25 percent aren't complying, you can't really tell when

10:24:21  21    you go back and look at these that maybe refused two to

10:24:25  22    five, maybe did six to ten, true?

10:24:29  23    **A**    It's not my job to ensure whether or not the

10:24:33  24    pharmacists are doing their due diligence.  We have to trust

10:24:35  25    our pharmacists to make decisions based on the prescription

**Polster (Cross by Lanier)**                                    3056

10:24:39  1  that they fill.

10:24:41  2       And what I'm saying is, you're right, I don't know

10:24:44  3  because I'm not there.  That is why we have field

10:24:47  4  leadership, and that is why we have oversight of our stores.

10:24:50  5  **Q**    The guys that are walking through every 30 to 45 days

10:24:53  6  making entries in their computers, like Mr. Joyce?

10:24:56  7  **A**    That's one level of leadership.

10:24:59  8  **Q**    Because you don't have any greater accountability back

10:25:03  9  in that time zone on those store visits, do you?

10:25:06  10 **A**    We have the district managers, we have the store

10:25:15  11 managers are there, we have healthcare supervisors.  We have

10:25:18  12 multiple levels of leadership that are in our stores every

10:25:20  13 day.

10:25:20  14 **Q**    And when you say that these 1,106 [sic] stores that

10:25:27  15 had zero refused prescriptions, when you say, well, that's

10:25:29  16 probably okay because they were probably all legitimate.

10:25:32  17 Remember?  That's what you said?

10:25:33  18 **A**    That's what I said.

10:25:34  19 **Q**    But we won't know that either because that's where the

10:25:39  20 over 40 percent aren't filling out the checklist comes in.

10:25:43  21 You can't look at the checklist over 40 percent of the time

10:25:46  22 to see that, because they didn't do it, right?

10:25:49  23 **A**    Right.

10:25:50  24 **Q**    "Leadership should be checking for compliance on a

10:26:04  25 regular basis."

**Polster (Cross by Lanier)** 3057

10:26:06　　1　　　　That's a leadership issue, isn't it?

10:26:09　　2　**A**　　We are asking our leaderships when they go into the

10:26:12　　3　stores that they are checking for the compliance with

10:26:17　　4　policy, yes.

10:26:18　　5　**Q**　　But, ma'am, leadership goes beyond the store level,

10:26:21　　6　doesn't it?

10:26:21　　7　**A**　　Oh, yes, yeah.  That's the district --

10:26:27　　8　**Q**　　Leadership -- my fault.

10:26:27　　9　　　　Leadership on this goes to you, right?

10:26:31　10　**A**　　That is not -- so my team was giving the direction,

10:26:38　11　and the leadership was being referred to as the field

10:26:42　12　leadership in the field.

10:26:44　13　**Q**　　Ma'am, we're in 2015 at this point, right?

10:26:46　14　**A**　　Yes.

10:26:47　15　**Q**　　You have become -- or you're shortly becoming senior

10:26:53　16　executive vice president in charge of pharmaceutical

10:26:56　17　compliance, execution of compliance-related tasks and the

10:27:02　18　overall strategy, correct?

10:27:03　19　**A**　　Correct.

10:27:04　20　**Q**　　And before that, you were developing, changing, and

10:27:10　21　improving the policies and procedures around this controlled

10:27:13　22　substance dispensing, right?

10:27:14　23　**A**　　Yes.

10:27:14　24　**Q**　　So within the framework of that job, leadership on

10:27:19　25　compliance goes back to you, doesn't it?  The buck stops in

**Polster (Cross by Lanier)** 3058

| | | |
|---|---|---|
| 10:27:27 | 1 | your seat, right? |
| 10:27:28 | 2 | **A**    Yes, but that is not what this PowerPoint deck -- this |
| 10:27:31 | 3 | PowerPoint deck was intended for the audience in the field. |
| 10:27:36 | 4 | **Q**    But this PowerPoint deck says "Results were |
| 10:27:42 | 5 | unfavorable," doesn't it? |
| 10:27:43 | 6 | **A**    It does. |
| 10:27:44 | 7 | **Q**    This is a sign that the system you've got in place is |
| 10:27:49 | 8 | not working, right? |
| 10:27:51 | 9 | **A**    It is a sign that we need to make improvements, and we |
| 10:27:56 | 10 | have made improvements. |
| 10:27:57 | 11 | **Q**    Well, this is 2015.  You're two years after the |
| 10:28:03 | 12 | agreement, right? |
| 10:28:04 | 13 | **A**    Correct.  Again, one example of improvements that |
| 10:28:11 | 14 | we've made, but this is not the only thing that we looked at |
| 10:28:15 | 15 | around controlled substance dispensing. |
| 10:28:30 | 16 | **Q**    Now, at this same time y'all are looking at the |
| 10:28:40 | 17 | economic consequences of your good faith dispensing, aren't |
| 10:28:44 | 18 | you? |
| 10:28:46 | 19 | **A**    I'll have you refresh my memory. |
| 10:28:49 | 20 | **Q**    Plaintiffs' Exhibit 19574, please. |
| 10:29:14 | 21 |           MR. LANIER:  Oh, Your Honor, it is 10:30. |
| 10:29:17 | 22 | Before I do this -- |
| 10:29:18 | 23 |           THE COURT:  I was going to inquire. |
| 10:29:20 | 24 |      Okay.  Ladies and gentlemen, we'll take our mid |
| 10:29:22 | 25 | morning break.  The usual admonitions.  And then we'll pick |

| | | |
|---|---|---|
| 10:29:26 | 1 | up in 15 minutes with Ms. Polster's testimony. |
| 10:30:02 | 2 | (Recess taken at 10:30 a.m.) |
| 10:49:10 | 3 | (Jury present in open court at 10:49 a.m.) |
| 10:49:14 | 4 | THE COURT:  Please be seated. |
| 10:49:15 | 5 | Mr. Lanier, you may resume. |
| 10:49:17 | 6 | MR. LANIER:  Thank you. |
| 10:49:17 | 7 | THE COURT:  And Ms. Polster, you're still |
| 10:49:18 | 8 | under oath from yesterday.  Thank you. |
| 10:49:20 | 9 | MR. LANIER:  Thank you, Judge. |
| 10:49:22 | 10 | BY MR. LANIER: |
| 10:49:23 | 11 | **Q**    Ms. Polster, right before the break you said, in |
| 10:49:28 | 12 | answer to one of my questions:  "It's not my job to ensure |
| 10:49:35 | 13 | whether or not the pharmacists are doing their due |
| 10:49:38 | 14 | diligence.  We have to trust our pharmacists to make |
| 10:49:40 | 15 | decisions based on the prescription that they fill." |
| 10:49:45 | 16 | Did you mean to say that? |
| 10:49:50 | 17 | **A**    We do, we trust our pharmacists to fill their |
| 10:49:52 | 18 | prescriptions based on -- and ensuring their good faith |
| 10:49:58 | 19 | dispensing practices and their corresponding responsibility. |
| 10:49:59 | 20 | **Q**    Well, I'll talk about that in a moment.  The first |
| 10:50:03 | 21 | part, though, is what I was asking about. |
| 10:50:05 | 22 | "It's not my job to ensure whether or not the |
| 10:50:09 | 23 | pharmacists are doing their due diligence? |
| 10:50:12 | 24 | **A**    You're right, that is incorrect. |
| 10:50:14 | 25 | **Q**    That is your job, isn't it? |

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:50:17 | 1 | **A**    Yes, it is part of my job, yes. |
| 10:50:19 | 2 | **Q**    And when you say "we have to trust our pharmacists to |
| 10:50:21 | 3 | make decisions based on the prescriptions they fill," that |
| 10:50:26 | 4 | is unless they're underfilling prescriptions, right? |
| 10:50:30 | 5 | **A**    No, that is not at all what that report means. |
| 10:50:33 | 6 | **Q**    No, no, no, that -- I'm not referencing that report. |
| 10:50:36 | 7 | I'm referencing the one we talked about yesterday where you |
| 10:50:40 | 8 | said here are pharmacists that aren't filling enough C-II |
| 10:50:46 | 9 | prescriptions, so we need to have businesspeople review |
| 10:50:50 | 10 | them, look at the prescriptions, get them to take our |
| 10:50:54 | 11 | education, and try to get their -- those are not ones you're |
| 10:51:03 | 12 | trusting, are you? |
| 10:51:04 | 13 | **A**    As part of any program that we implement, we try to |
| 10:51:09 | 14 | ensure that we have follow up to ensure that things are |
| 10:51:11 | 15 | being done correctly. |
| 10:51:13 | 16 | **Q**    But -- |
| 10:51:13 | 17 | **A**    Part of that was -- and part of my responsibility was |
| 10:51:17 | 18 | I was getting complaints that were coming up from pharmacy |
| 10:51:22 | 19 | personnel and leadership saying, this guy I'm working with |
| 10:51:26 | 20 | won't fill any of the hard prescriptions, they just flat |
| 10:51:32 | 21 | out, straight up refuse prescriptions without even looking |
| 10:51:35 | 22 | at them. |
| 10:51:37 | 23 |         We did run reports and we -- I don't even know if we |
| 10:51:43 | 24 | use them today, but we did run those reports to ensure that |
| 10:51:46 | 25 | we didn't have pharmacists sloughing their responsibility |

10:51:50  1    and not filling prescriptions that were difficult just

10:51:52  2    because they had to take extra steps that were required.

10:51:55  3    **Q**    With due respect, I don't want to rehash what we did

10:51:59  4    yesterday.  But these are the same ones that didn't say in

10:52:03  5    your e-mail or in your writing they're not filling any.

10:52:07  6    These are the ones that weren't filling enough.  Remember?

10:52:11  7    **A**    It didn't say enough, did it?

10:52:13  8    **Q**    Well --

10:52:14  9    **A**    It said, all controlled substances or something like

10:52:20  10   that.  And what was intended in that is that you can't just

10:52:23  11   fill your, you know, phenobarb prescription, which is a

10:52:28  12   controlled substance, and not fill any pain medication that

10:52:30  13   comes in.

10:52:33  14   **Q**    The specific document, Plaintiffs' 19601, said

10:52:38  15   "they're not dispensing a lot."

10:52:39  16   **A**    A lot of controlled substances.

10:52:41  17   **Q**    Doesn't say they're not dispensing any?

10:52:45  18   **A**    Correct.

10:52:45  19   **Q**    So that we're clear on that.

10:52:47  20          But my point is --

10:52:48  21                MS. SWIFT:  Objection.  Did she finish her

10:52:51  22   answer?

10:52:51  23                THE COURT:  Did you finish your answer, ma'am?

10:52:58  24                THE WITNESS:  (Indicating).

10:52:58  25                MS. SWIFT:  Sorry.  I thought he had cut her

**Polster (Cross by Lanier)** 3062

| | | |
|---|---|---|
| 10:52:59 | 1 | off. |
| 10:53:00 | 2 | THE COURT:  Ask another question. |
| 10:53:04 | 3 | **Q**     Thank you. |
| 10:53:05 | 4 | So that we're clear on that, you trust the pharmacists |
| 10:53:12 | 5 | to never refuse a prescription.  But the pharmacists who |
| 10:53:19 | 6 | refuse a lot of prescriptions you don't trust? |
| 10:53:22 | 7 | **A**     That is not at all what that is.  They are to -- we |
| 10:53:27 | 8 | are to make sure that those pharmacists have the |
| 10:53:30 | 9 | documentation for those refusals.  They can't just say, |
| 10:53:34 | 10 | sorry, I'm not filling this prescription and leave it for |
| 10:53:37 | 11 | the next guy. |
| 10:53:38 | 12 | **Q**     Well, you ought to also make sure that they're |
| 10:53:42 | 13 | trained, right? |
| 10:53:44 | 14 | **A**     Training is part of it. |
| 10:53:47 | 15 | **Q**     Because if we go back to Plaintiffs' Exhibit Number |
| 10:53:51 | 16 | 25492, which was that internal audit report that you and I |
| 10:53:55 | 17 | went through.  Remember that? |
| 10:53:57 | 18 | **A**     Yes. |
| 10:53:58 | 19 | **Q**     If you'll look on page 17 in regards to this, it talks |
| 10:54:08 | 20 | about "a detailed review of the training data calendar year |
| 10:54:13 | 21 | 2013 and 2014." |
| 10:54:14 | 22 | Do you see that? |
| 10:54:15 | 23 | **A**     Yes. |
| 10:54:15 | 24 | **Q**     "2013, IA" -- and that's an internal audit? |
| 10:54:28 | 25 | **A**     Yes. |

**Polster (Cross by Lanier)**                                    3063

| | | |
|---|---|---|
| 10:54:28 | 1 | **Q** -- "noted that approximately 180 active employees at |
| 10:54:32 | 2 | the time of our testing (September 2014) had not completed |
| 10:54:37 | 3 | the good faith dispensing training, and that several |
| 10:54:40 | 4 | thousand active employees had not completed the good faith |
| 10:54:46 | 5 | dispensing policy." |
| 10:54:48 | 6 | Do you see that? |
| 10:54:49 | 7 | **A** Policy acknowledgement. |
| 10:54:53 | 8 | **Q** "At the time of our testing, over 35,000 employees had |
| 10:54:59 | 9 | not completed the good faith dispensing training that was |
| 10:55:02 | 10 | assigned in early October and required to be completed by |
| 10:55:06 | 11 | November 7." |
| 10:55:08 | 12 | Do you see that? |
| 10:55:09 | 13 | **A** I do. |
| 10:55:09 | 14 | **Q** And yet, 12 days later, 35,000 hadn't done it, right? |
| 10:55:15 | 15 | **A** Correct. |
| 10:55:16 | 16 | **Q** So these people that you're trusting are people that |
| 10:55:22 | 17 | you're not training the way your policies say you should, |
| 10:55:25 | 18 | right? |
| 10:55:26 | 19 | **A** No, I disagree with what you're saying. |
| 10:55:29 | 20 | The good faith dispensing training went to all store |
| 10:55:33 | 21 | and pharmacy -- or store leadership, field leadership, and |
| 10:55:37 | 22 | pharmacy technicians and pharmacists. |
| 10:55:42 | 23 | The pharmacists are required by their good faith |
| 10:55:45 | 24 | dispensing obligations under the CSA to ensure that they are |
| 10:55:49 | 25 | filling prescriptions for legitimate medical purpose.  The |

**Polster (Cross by Lanier)**

10:55:54  1    training was not completed by every single one of our

10:55:57  2    employees on time, yes, I agree with that.

10:55:59  3    **Q**    Okay.  This is the whole issue of monitoring good

10:56:04  4    faith dispensing training completion, right?

10:56:06  5    **A**    Right.

10:56:07  6    **Q**    And again, this internal audit says not getting it

10:56:11  7    done, right?

10:56:14  8    **A**    Two weeks after the due date, correct, we were not a

10:56:19  9    hundred percent complete.

10:56:20  10   **Q**    Well, not just not a hundred percent.  Over 35,000

10:56:25  11   employees?

10:56:26  12   **A**    Yeah, out of I can't remember how many because it was

10:56:28  13   way more than pharmacists, technicians, store personnel,

10:56:32  14   field personnel.

10:56:39  15   **Q**    Okay.  Now, within the framework, then, of this, let's

10:56:42  16   talk about some things that were being completed and where

10:56:44  17   y'all were paying attention to detail, okay?

10:56:52  18   **A**    Okay.

10:56:53  19   **Q**    And in that regard, right before the break I had you

10:56:58  20   handed Plaintiffs' Exhibit 19574.  I would hope during the

10:57:02  21   break you've had a chance to look at it.

10:57:04  22   **A**    I did.

10:57:05  23   **Q**    This is a document that has got you as a recipient,

10:57:11  24   according to the first page.  Correct?

10:57:13  25   **A**    Yes.

**Polster (Cross by Lanier)**                    3065

| | | |
|---|---|---|
| 10:57:13 | 1 | **Q**     And the subject on this is "Targeted drugs for good |
| 10:57:22 | 2 | faith dispensing," right? |
| 10:57:22 | 3 | **A**     Yes. |
| 10:57:22 | 4 | **Q**     And what y'all were finding out is the new program |
| 10:57:30 | 5 | you'd put in place, whether it was thorough or not is not |
| 10:57:36 | 6 | addressed, but that new program was affecting the budget, |
| 10:57:42 | 7 | wasn't it? |
| 10:57:44 | 8 | **A**     I don't agree with what you were saying there in terms |
| 10:57:47 | 9 | of affecting the budget.  I think -- |
| 10:57:49 | 10 | **Q**     Well, let -- I'm sorry. |
| 10:57:51 | 11 |       Let me show you, see if that would help. |
| 10:57:54 | 12 | **A**     Sure. |
| 10:57:55 | 13 | **Q**     If you look on page 2, there's an e-mail on page 2 |
| 10:57:59 | 14 | from Daniel Doyle. |
| 10:58:01 | 15 |       You know him, right? |
| 10:58:02 | 16 | **A**     Yes. |
| 10:58:02 | 17 | **Q**     It's to Kermit Crawford, with a copy to Rex Swords, |
| 10:58:10 | 18 | right? |
| 10:58:10 | 19 | **A**     Right. |
| 10:58:10 | 20 | **Q**     And this is before the e-mail comes to you, right? |
| 10:58:13 | 21 | **A**     Yes. |
| 10:58:14 | 22 | **Q**     "Kermit, we budgeted a negative $24 million impact |
| 10:58:22 | 23 | from controlled substance Schedule II drugs in fiscal year |
| 10:58:30 | 24 | 2014." |
| 10:58:30 | 25 |       Do you see that? |

**Polster (Cross by Lanier)**

10:58:31  1   **A**   I do.

10:58:34  2   **Q**   Those are drugs that include the opiates that we're

10:58:36  3   talking about, right?

10:58:37  4   **A**   Yes.

10:58:37  5   **Q**   "We're actually seeing closer to a negative $44

10:58:45  6   million of impact."

10:58:49  7        Do you see that as well?

10:58:49  8   **A**   I do.

10:58:50  9   **Q**   "The impact for the full year of the C-IIs that are

10:58:55  10  not impacted by GFD is about 7 to 9 million."

10:59:01  11       Do you see that as well?

10:59:03  12  **A**   I do.

10:59:03  13  **Q**   Now, that tells you that -- a number of things,

10:59:10  14  doesn't it?

10:59:10  15  **A**   It tells me that finance did not budget correctly.

10:59:18  16  When a corporation as large as Walgreens goes through the

10:59:22  17  budget process, they budget sales from front of store, from

10:59:27  18  pharmacy, and they have to plan very far in advance.  And

10:59:32  19  they did not budget correctly.

10:59:36  20       And this e-mail to the who was then our president is

10:59:39  21  saying, we're seeing a bigger impact on controlled

10:59:44  22  substances, and that is exactly what I would expect to have

10:59:48  23  happened during that time.

10:59:49  24  **Q**   Yeah, that's my point though.

10:59:51  25       Doesn't that tell you that the system y'all had in

**Polster (Cross by Lanier)** 3067

| | | |
|---|---|---|
| 10:59:54 | 1 | place until 2014 was overdispensing drugs? |
| 11:00:01 | 2 | **A**    No. |
| 11:00:01 | 3 | **Q**    Because when you put targeted good faith dispensing, |
| 11:00:04 | 4 | even with inadequate training, when you put it in place, all |
| 11:00:08 | 5 | of a sudden the number of scripts you all fill declines, |
| 11:00:13 | 6 | right? |
| 11:00:13 | 7 | **A**    There are multiple reasons why the number of |
| 11:00:15 | 8 | prescriptions declined.  I think, yes, our policy may have |
| 11:00:18 | 9 | had something to do with it, but we were seeing very, very |
| 11:00:21 | 10 | big decreases across the entire industry, not just |
| 11:00:24 | 11 | Walgreens, across our entire industry. |
| 11:00:26 | 12 | The doctors started getting on board, the DEA was |
| 11:00:28 | 13 | taking action against prescribers.  It was all over the |
| 11:00:33 | 14 | news.  We had hospital systems putting their own policies in |
| 11:00:36 | 15 | place on how many controlled substances doctors could |
| 11:00:39 | 16 | dispense.  The entire industry was decreasing. |
| 11:00:43 | 17 | **Q**    But you all put out a new program you piloted in Las |
| 11:00:48 | 18 | Vegas and Orlando, didn't you? |
| 11:00:50 | 19 | **A**    I don't know what this is.  This is not one of my -- I |
| 11:00:53 | 20 | see it, but I don't know enough to be able to speak to it. |
| 11:01:01 | 21 | **Q**    Well, I mean, you got this, right? |
| 11:01:03 | 22 | **A**    I did get it. |
| 11:01:04 | 23 | **Q**    And you do know enough to say that y'all did a pilot |
| 11:01:07 | 24 | program.  We discussed it yesterday.  In Las Vegas and |
| 11:01:12 | 25 | Orlando, right? |

**Polster (Cross by Lanier)**

11:01:15  1    **A**    Okay.  So yes.

11:01:17  2    **Q**    And so that pilot program where you did it in

11:01:21  3    Las Vegas and Orlando have seen a decrease in over 30

11:01:26  4    percent of prescriptions in the last 18 months.

11:01:29  5         Do you see that?

11:01:29  6    **A**    I do.

11:01:32  7    **Q**    So don't you believe that your program, however

11:01:37  8    adequate or inadequate it may have been, was at least in

11:01:40  9    some measure reducing the number of scripts that are being

11:01:44  10   filled?

11:01:44  11   **A**    Oh, yes.

11:01:46  12   **Q**    Which tells you that if the program had been in place

11:01:51  13   10 years earlier, you could have reduced the number of

11:01:55  14   scripts 10 years sooner, true?

11:01:56  15   **A**    There was a lot changing in the industry from 10 years

11:02:00  16   ago.  Hindsight is always 20/20.

11:02:03  17   **Q**    That wasn't my question, ma'am.  Can you answer my

11:02:05  18   question?

11:02:05  19   **A**    It is possible, but it is not -- I can't definitively

11:02:11  20   say.

11:02:12  21        I think the prescribing practices in 2006 versus what

11:02:14  22   happened in 2012, 2013 from prescribers changed dramatically

11:02:20  23   on the number of prescriptions that were coming in to retail

11:02:23  24   pharmacies.

11:02:23  25   **Q**    So you're saying that maybe it's not your program that

**Polster (Cross by Lanier)**                                    3069

11:02:26  1    was working, it's that the doctors were writing less?

11:02:28  2    **A**      No, I think my program absolutely had something to do

11:02:32  3    with it, but I also think the prescribers were starting to

11:02:36  4    decrease the amount of prescriptions they were writing.

11:02:38  5    **Q**      But if your program had something to do with it, then

11:02:41  6    that leaves me with my question.

11:02:44  7          Isn't it true that if you'd put such a program in

11:02:47  8    place earlier, you would have reduced the scripts earlier?

11:02:53  9    **A**      I don't know that to be true because we were not

11:02:56  10   seeing chronic pain patients coming in to Walgreens.  We

11:03:01  11   were seeing acute, we were seeing end of life.  But the

11:03:05  12   chronic pain patients that we were starting to see an

11:03:08  13   increase between 2010 and 20 whenever was just starting.

11:03:14  14   And that was when I put that policy in place and we started

11:03:18  15   to see a decrease.

11:03:19  16         But we were seeing it in the industry, not just

11:03:21  17   Walgreens.

11:03:22  18   **Q**      Well, you understand the industry was being put on

11:03:28  19   notice by the DEA just as much as you were, right?

11:03:30  20   **A**      Absolutely.  It was the entire industry.

11:03:34  21   **Q**      The industry was at Joe Ran's [sic] presentation that

11:03:38  22   we saw yesterday where the people in your company that took

11:03:41  23   notes of it, said if the pharmacists would do their job, we

11:03:45  24   wouldn't have this problem, right?

11:03:46  25   **A**      That was his words.

**Polster (Cross by Lanier)**

11:03:47  1   **Q**    And the industry's present there, right?

11:03:50  2   **A**    The pharmacy portion.  I don't know about the

11:03:53  3   prescribers being in those.

11:03:56  4   **Q**    This is the pharmacy portion, that's what I'm talking

11:03:59  5   about.

11:04:00  6   **A**    Okay.

11:04:00  7   **Q**    So finally, 2014, 2015, '16, y'all are putting

11:04:07  8   programs in place.  But if you'd put them in place earlier,

11:04:11  9   we wouldn't have had these problems in 2008, '9, '10, '11,

11:04:20  10  '12 that we had, true?

11:04:21  11  **A**    I don't know that to be true because the prescription

11:04:24  12  prescribing had changed dramatically.  I don't know if my

11:04:26  13  policy that I put in place in 2013 would have made a

11:04:31  14  difference because we weren't seeing those chronic pain

11:04:35  15  patients come in to Walgreens as much as we were in the

11:04:41  16  2012, '10, '12, 11, whenever those time frames were.

11:04:48  17  **Q**    But even still, if we continue on in this timeline, in

11:04:52  18  2015 y'all are still dispensing the trinity, aren't you?

11:04:55  19  **A**    In some cases the trinity is appropriate.  And, yes,

11:04:58  20  it is being dispensed.

11:05:00  21  **Q**    So when others have testified that the trinity should

11:05:02  22  not be dispensed under any reason at all, you disagree with

11:05:09  23  that, and the policy at Walgreens is it's an okay thing to

11:05:13  24  do?

11:05:13  25  **A**    It is -- I didn't say that it was an okay thing to do.

**Polster (Cross by Lanier)** 3071

11:05:17 1 I said it was -- in our policies, they must be doing their

11:05:21 2 due diligence around dispensing a trinity prescription.

11:05:24 3 They have to understand what is happening with that

11:05:27 4 particular patient as to why the prescriber would be

11:05:31 5 prescribing it.

11:05:32 6 **Q** And the trinity is an opioid, a benzodiazapine, and a

11:05:38 7 muscle relaxer, right?

11:05:39 8 **A** Yes.

11:05:40 9 **Q** And you understand that's a bold print major red flag,

11:05:50 10 right?

11:05:51 11 **A** Yeah, you want to be careful if you're going to use

11:05:53 12 something like that to ensure that you are dispensing safely

11:05:57 13 for the patients.

11:05:58 14 **Q** And so the policy for Walgreens has been it's okay to

11:06:01 15 do that, there are times where it's the right thing to do?

11:06:05 16 **A** I don't know if I ever put that exactly in those

11:06:08 17 words, but we do know that there are times when a

11:06:13 18 prescription for a trinity will be dispensed.

11:06:25 19 **Q** The latest good faith dispensing checklist that I've

11:06:28 20 been able to find has already been introduced as Plaintiffs'

11:06:35 21 15068, I believe.  I'll show you one of the pages and ask

11:06:42 22 you, does this look like the latest targeted drug good faith

11:06:46 23 dispensing checklist to you?

11:06:47 24 **A** I believe so.

11:06:47 25 **Q** The most prescribed controlled substance level II drug

**Polster (Cross by Lanier)** 3072

| | | |
|---|---|---|
| 11:07:02 | 1 | in America, in fact the most prescribed drug in America for |
| 11:07:05 | 2 | years, y'all still don't have it on your target drug good |
| 11:07:11 | 3 | faith dispensing checklist, do you? |
| 11:07:11 | 4 | **A**    No, but you see where we have other (optional-district |
| 11:07:16 | 5 | specific) or it could be pharmacist specific? |
| 11:07:19 | 6 | **Q**    Yeah. |
| 11:07:19 | 7 | **A**    That could be used at any time. |
| 11:07:20 | 8 | **Q**    Right.  You still don't have it listed, the most |
| 11:07:27 | 9 | overprescribed opiate out there, do you? |
| 11:07:30 | 10 | **A**    I don't have it on the list, no. |
| 11:07:32 | 11 | **Q**    Any reason you couldn't put it on your list? |
| 11:07:37 | 12 | **A**    I haven't updated that list.  I was focusing on the |
| 11:07:40 | 13 | drugs that the DEA was focused on when I put that policy in |
| 11:07:42 | 14 | place. |
| 11:07:45 | 15 | **Q**    That wasn't my question, ma'am. |
| 11:07:47 | 16 |     I said any reason you couldn't put it on your list? |
| 11:07:50 | 17 | **A**    No, I could put it on the list if I wanted to put it |
| 11:07:53 | 18 | on the list. |
| 11:07:53 | 19 | **Q**    And if you put it on the list and stores actually |
| 11:07:55 | 20 | followed the policies, they have to go through and answer |
| 11:07:59 | 21 | all of those questions before they dispensed it, wouldn't |
| 11:08:02 | 22 | they? |
| 11:08:02 | 23 | **A**    They'd still have to go through and answer all of |
| 11:08:06 | 24 | those questions when they're filling any controlled |
| 11:08:08 | 25 | substance prescription, not just a target drug. |

**Polster (Cross by Lanier)** 3073

| | | |
|---|---|---|
| 11:08:10 | 1 | The target drug checklist is a tool that our |
| 11:08:13 | 2 | pharmacists were able to -- well, it was a requirement for |
| 11:08:18 | 3 | those three drugs, but it can be used with any prescription. |
| 11:08:21 | 4 | **Q** Oh, it -- ma'am, you just said "it was a requirement |
| 11:08:24 | 5 | for those three drugs, but it can be used with any |
| 11:08:27 | 6 | prescription."  Right? |
| 11:08:28 | 7 | **A** Yes. |
| 11:08:28 | 8 | **Q** My question to you is, you could add it as a |
| 11:08:32 | 9 | requirement to hydrocodone, couldn't you? |
| 11:08:37 | 10 | **A** I could add it. |
| 11:08:38 | 11 | **Q** And then it would be a target drug checklist as a tool |
| 11:08:45 | 12 | that must be filled out with the most overprescribed opiate |
| 11:08:48 | 13 | out there and attached either to the prescription or is the |
| 11:08:52 | 14 | refusal to fill, right? |
| 11:08:53 | 15 | **A** Yes. |
| 11:08:53 | 16 | **Q** And there's no reason you haven't done that in almost |
| 11:09:00 | 17 | 10 years you've been in your jobs over this, has it? |
| 11:09:03 | 18 | **A** I have not done it. |
| 11:09:05 | 19 | **Q** That would be a good thing to do, wouldn't it? |
| 11:09:07 | 20 | **A** Something I could consider. |
| 11:09:09 | 21 | **Q** Then the last thing I've got for you, and we'll be |
| 11:09:16 | 22 | finished with this part, is the checklist that we just |
| 11:09:25 | 23 | looked at.  I want to make sure the jury understands where |
| 11:09:30 | 24 | those were. |
| 11:09:33 | 25 | When someone fills out that checklist, and we call |

**Polster (Cross by Lanier)** 3074

| | | |
|---|---|---|
| 11:09:41 | 1 | that the target drug good faith dispensing checklist, right? |
| 11:09:49 | 2 | **A**    Yes. |
| 11:09:50 | 3 | **Q**    It's got the little boxes.  It asks questions like |
| 11:10:04 | 4 | does the person have a valid Government Photo ID copied and |
| 11:10:07 | 5 | attached to the prescription, right? |
| 11:10:10 | 6 | **A**    Yes. |
| 11:10:11 | 7 | **Q**    Was there a prior good faith dispensing refusal for |
| 11:10:16 | 8 | this exact prescription in the patient comments, right? |
| 11:10:19 | 9 | **A**    Yes. |
| 11:10:20 | 10 | **Q**    That's assuming it hadn't been deleted, right?  Right? |
| 11:10:26 | 11 | **A**    Yes. |
| 11:10:28 | 12 | **Q**    "Patient's received this prescription from Walgreens |
| 11:10:33 | 13 | before."  Correct? |
| 11:10:34 | 14 | **A**    Yes. |
| 11:10:35 | 15 | **Q**    "This prescription is from the same prescriber for the |
| 11:10:38 | 16 | same medication as the previous fill," right? |
| 11:10:41 | 17 | **A**    Yes. |
| 11:10:41 | 18 | **Q**    "Third-party insurance is billed (if cash or a cash |
| 11:10:48 | 19 | discount card, use caution)."  Right? |
| 11:10:53 | 20 | **A**    Yes. |
| 11:10:53 | 21 | **Q**    "Patient does not appear intoxicated or under the |
| 11:10:56 | 22 | influence of illicit drugs." |
| 11:10:58 | 23 | Do you see that? |
| 11:10:58 | 24 | **A**    Yes. |
| 11:10:58 | 25 | **Q**    "If available in your state, PDMP has been reviewed." |

**Polster (Cross by Lanier)** 3075

11:11:09   1   Right?

11:11:09   2   **A**     Yes.

11:11:09   3   **Q**     And by the way, do you know that PDMP, in Ohio the

11:11:15   4   OARRS, could have been checked by your pharmacists had they

11:11:18   5   chosen to back as early as 2009?

11:11:20   6   **A**     Yes, you told me that yesterday.

11:11:21   7   **Q**     Okay.  "Prescription is being filled on time.

11:11:30   8          "You've got geographic proximity."

11:11:33   9          You see that?

11:11:34  10   **A**     Yes.

11:11:34  11   **Q**     If it's a chronic prescription, one that's over 90

11:11:38  12   days, the use can be explained and is supported by

11:11:41  13   documentation, right?

11:11:41  14   **A**     Yes.

11:11:41  15   **Q**     "Per CDC recommendation, you offer Narcan.  If the

11:11:49  16   prescription's more than 50 milligrams equivalent in

11:11:52  17   morphine, right?

11:11:54  18   **A**     Yes.

11:11:54  19   **Q**     Then you've got room for notes?

11:11:57  20   **A**     Yes.

11:12:02  21   **Q**     Now, that form is one that is very useful to have

11:12:06  22   available, right?

11:12:07  23   **A**     It's helpful for the pharmacist, yes.

11:12:09  24   **Q**     Well, so let's say I'm in Walgreens Store Number 1,

11:12:23  25   okay?

**Polster (Cross by Lanier)**

11:12:23   1   **A**     Okay.

11:12:23   2   **Q**     And I -- and let's go back to 2012.  Oh, no, this

11:12:31   3   program wasn't in place in 2012, was it?

11:12:34   4   **A**     Right, I didn't come into the position until December,

11:12:38   5   and so nationwide it went in 2013.

11:12:41   6   **Q**     In 2000 when?

11:12:43   7   **A**     2013.

11:12:45   8   **Q**     So in 2013, you've got your program in place.  We're

11:12:50   9   going to assume that people are actually filling out the

11:12:52   10   forms, okay?

11:12:53   11   **A**     Okay.

11:12:53   12   **Q**     Best case scenario, everybody's doing their job

11:12:58   13   filling out the forms, all right?

11:13:00   14   **A**     Okay.

11:13:00   15   **Q**     So you've got this good faith checklist.  You staple

11:13:06   16   it to the prescription.  Right?

11:13:11   17   **A**     Okay.

11:13:11   18   **Q**     And those two together aren't scanned into a computer,

11:13:17   19   are they?

11:13:18   20   **A**     The hard copy prescription is, yes.

11:13:21   21   **Q**     But the good faith dispensing checklist, those two

11:13:25   22   together, are not scanned into the computer?

11:13:27   23   **A**     Correct.

11:13:27   24   **Q**     So instead what you've got is one of them old file

11:13:34   25   cabinets back in the storage room, and they just get filed

**Polster (Cross by Lanier)** 3077

11:13:39  1    in Store Number 1 back in the old file cabinet, right?

11:13:43  2    **A**    Yes.

11:13:44  3    **Q**    Now, that person goes into Walgreens Store Number 2.

11:13:54  4    There's no way for the pharmacist to know about the

11:14:02  5    checklist that's been filled out and filed in Store Number

11:14:07  6    1, is there?

11:14:07  7    **A**    Oh, they can.  They can call that store, and that

11:14:11  8    store can pull the hard copy of a prescription that's

11:14:13  9    already been filled.

11:14:14  10   **Q**    So the pharmacist that's supposed to do these

11:14:20  11   prescriptions -- that's an old-time phone, sort of.

11:14:28  12       The pharmacist can call the pharmacist?

11:14:31  13   **A**    Yes.

11:14:31  14   **Q**    And say, hey, time out, would you go back and look in

11:14:34  15   your file cabinet and see if you can find this target good

11:14:40  16   faith dispensing checklist on this patient?

11:14:42  17   **A**    They could if they needed to do that to do their due

11:14:46  18   diligence, yes.

11:14:46  19   **Q**    And as a practical matter, do you know if these are

11:14:49  20   filed by patient name or prescription number?

11:14:55  21   **A**    Prescription number.

11:14:56  22   **Q**    So they can't even look up the patient name.  They've

11:14:58  23   got to know the prescription number?

11:15:00  24   **A**    No, they can look up the patient name.  They've got it

11:15:02  25   right in front of them.

**Polster (Cross by Lanier)** 3078

| | | |
|---|---|---|
| 11:15:03 | 1 | **Q**    And then they get the prescription number off of that? |
| 11:15:05 | 2 | **A**    They can and they can also see notes and annotations |
| 11:15:08 | 3 | and other things about that patient. |
| 11:15:09 | 4 | **Q**    That haven't been purged. |
| 11:15:11 | 5 | And then they can say, would you go find this and pull |
| 11:15:15 | 6 | it and come back and talk to me, right? |
| 11:15:19 | 7 | **A**    If they need it for -- but, you know, each |
| 11:15:22 | 8 | prescription that they fill is taken on their own merit per |
| 11:15:28 | 9 | our policy.  So the prescription that they're filling today, |
| 11:15:30 | 10 | they may not need previous information when they're making |
| 11:15:35 | 11 | their -- when they're, you know, going through their due |
| 11:15:39 | 12 | diligence to fill. |
| 11:15:39 | 13 | **Q**    But they've got to check for doctor shopping, don't |
| 11:15:41 | 14 | they? |
| 11:15:41 | 15 | **A**    They do.  That's on the PDMP. |
| 11:15:45 | 16 | **Q**    And they've got to check for pharmacy shopping, don't |
| 11:15:49 | 17 | they? |
| 11:15:49 | 18 | **A**    And that is also tonight PDMP. |
| 11:15:51 | 19 | **Q**    And that's assuming that they do the PDMP in 2013, |
| 11:15:59 | 20 | which is optional in Ohio until 2011 and then only required |
| 11:16:06 | 21 | with certain prescriptions, right? |
| 11:16:10 | 22 | **A**    Our overarching good faith dispensing policy has |
| 11:16:13 | 23 | checking the PDMP in there if the pharmacist needs to refer |
| 11:16:17 | 24 | to it, they had access to it, they could go see it. |
| 11:16:20 | 25 | **Q**    But again -- |

**Polster (Cross by Lanier)** 3079

11:16:21  1  **A**    Our target drug policy did ask them to document that

11:16:27  2  they indeed did it.

11:16:28  3  **Q**    And this is assuming, again, that this is one of the

11:16:33  4  60 percent where the form was filled out and kept, right?

11:16:37  5          MS. SWIFT:  Objection.  Mischaracterizes.

11:16:38  6  **A**    That does not mean that the pharmacist --

11:16:41  7          THE COURT:  Overruled.

11:16:41  8  **A**    -- did not do their due diligence.

11:16:43  9  **Q**    That wasn't my question, ma'am.

11:16:44  10    I said for them to call and get the pharmacist to go

11:16:47  11  look in the file cabinet to find it to read it to them over

11:16:50  12  the telephone, that's assuming that it's one of the 60

11:16:52  13  percent where there was compliance, right?

11:16:56  14  **A**    Yes.

11:16:56  15  **Q**    And that's why you recognized that it would have been

11:17:03  16  a better system for years to have those entered into the

11:17:06  17  computer, right?

11:17:11  18  **A**    I wanted to have an electronic good faith dispensing

11:17:16  19  in our computer system done within our work flow.  I had

11:17:20  20  asked for that.  I wanted it to make it easier for the

11:17:23  21  pharmacists.  And I did indeed do that.

11:17:25  22    And, yes, I did not get it done right away.  I got it

11:17:29  23  completed in 2019.  It was a very large enhancement in our

11:17:33  24  computer system.

11:17:34  25  **Q**    You got it completed at the end of 2019.

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 11:17:39 | 1 | **A**   Okay. |
| 11:17:40 | 2 | **Q**   Right? |
| 11:17:40 | 3 | MR. LANIER:  And, Your Honor, if we could pass |
| 11:17:45 | 4 | out, please, Plaintiffs' Exhibit 20795. |
| 11:18:02 | 5 | **Q**   Ma'am, do you have 20795 in front of you? |
| 11:18:05 | 6 | **A**   I do. |
| 11:18:06 | 7 | **Q**   This is an e-mail from you dealing with this subject, |
| 11:18:08 | 8 | isn't it? |
| 11:18:08 | 9 | **A**   Yes. |
| 11:18:09 | 10 | **Q**   There is an e-mail from you that's dated right before |
| 11:18:12 | 11 | Thanksgiving. |
| 11:18:15 | 12 | **A**   Yes. |
| 11:18:15 | 13 | **Q**   November 21, 2019? |
| 11:18:18 | 14 | **A**   Correct. |
| 11:18:19 | 15 | **Q**   And it talks about the electronic good faith |
| 11:18:24 | 16 | dispensing pilot. |
| 11:18:25 | 17 | Do you see this? |
| 11:18:26 | 18 | **A**   Yes. |
| 11:18:26 | 19 | **Q**   This is talking about actually having the good faith |
| 11:18:31 | 20 | dispensing checklist in the computer, isn't it? |
| 11:18:34 | 21 | **A**   A form of it, yes. |
| 11:18:38 | 22 | **Q**   You said, "Oh, yes, I will." |
| 11:18:44 | 23 | This was in reply to an e-mail.  We should look at |
| 11:18:46 | 24 | that first. |
| 11:18:47 | 25 | "Hi, Al/Tasha, can you keep us posted on how this |

**Polster (Cross by Lanier)** 3081

```
11:18:53   1   goes?  Seems like this could be a big win, but assume the

11:18:57   2   pilot will validate or not."

11:18:59   3        Do you see that?

11:18:59   4   A    Yes.

11:18:59   5   Q    Because y'all were initially doing this just as a

11:19:02   6   pilot program at the end of 2019, correct?

11:19:04   7   A    We always pilot new computer enhancements to make sure

11:19:08   8   that it's working as intended.  So, yeah, it was a pilot.

11:19:12   9   Q    I'm not fussing it, ma'am, I'm just pointing it out so

11:19:15  10   that this makes sense.

11:19:16  11   A    Okay.  Then that's correct.

11:19:17  12   Q    Okay.  Thank you.

11:19:18  13        You said, "Oh, yes, I will.  This is going to be

11:19:23  14   great.  I'll have the ability to pull data on the back end,

11:19:27  15   and there won't be Wyeth ability to bypass the checklist as

11:19:34  16   there is today."

11:19:35  17        What did you mean by Wyeth ability?

11:19:38  18   A    That had to have been an auto correct.  I don't know

11:19:43  19   what Wyeth ability is.

11:19:45  20        But the way our system has been designed is that if

11:19:50  21   the drug is -- required a checklist, the pharmacy staff have

11:19:57  22   to stop and enter in the information or it is calculated for

11:20:04  23   them in the process of computer system while they're filling

11:20:06  24   the prescription.

11:20:08  25   Q    Okay.  So the answer to my question is you don't know,
```

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 11:20:10 | 1 | right? |
| 11:20:10 | 2 | **A**    I don't know what Wyeth is, no. |
| 11:20:13 | 3 | **Q**    Thank you. |
| 11:20:13 | 4 |      "There won't be" -- whatever Wyeth is or is not with |
| 11:20:18 | 5 | auto correct -- "ability to bypass the checklist as there is |
| 11:20:23 | 6 | today." |
| 11:20:24 | 7 |      Do you see that? |
| 11:20:25 | 8 | **A**    I do. |
| 11:20:25 | 9 | **Q**    Because as of this date, there is an ability to bypass |
| 11:20:32 | 10 | the checklist in the computer, correct? |
| 11:20:34 | 11 | **A**    Because there was no checklist in the computer, it was |
| 11:20:38 | 12 | a hard copy piece of paper that may or may not have been |
| 11:20:41 | 13 | done, as you proved in the audit and we saw. |
| 11:20:43 | 14 | **Q**    Is that a "yes" answer? |
| 11:20:45 | 15 | **A**    Yes. |
| 11:20:45 | 16 | **Q**    All right.  So the question was, as of this date, |
| 11:20:50 | 17 | there is an ability to bypass the checklist.  Answer is yes? |
| 11:20:53 | 18 | **A**    Yes. |
| 11:20:54 | 19 | **Q**    Then you say, "I have been wanting to do this from day |
| 11:20:59 | 20 | one, and Kermit wouldn't let me." |
| 11:21:02 | 21 |      What is Kermit's job? |
| 11:21:04 | 22 | **A**    Kermit was the president when I first became in role. |
| 11:21:11 | 23 | **Q**    The president of Walgreens? |
| 11:21:12 | 24 | **A**    Yes. |
| 11:21:13 | 25 | **Q**    The president of Walgreens is making decisions on |

**Polster (Cross by Lanier)**                                    3083

| | | |
|---|---|---|
| 11:21:18 | 1 | whether or not these checklists can be entered into the |
| 11:21:23 | 2 | computer? |
| 11:21:25 | 3 | **A**     Okay, that's not what that says, so -- |
| 11:21:27 | 4 | **Q**     That's my question. |
| 11:21:28 | 5 | **A**     Okay.  Is it okay if I clarify? |
| 11:21:30 | 6 | **Q**     Yeah, but here, let me understand this first. |
| 11:21:33 | 7 |       "Kermit wouldn't let me." |
| 11:21:37 | 8 | **A**     Yeah. |
| 11:21:37 | 9 | **Q**     What do you mean by he wouldn't let you? |
| 11:21:40 | 10 | **A**     So each year we have to submit budget requests for |
| 11:21:48 | 11 | projects we want to do.  When I say "we," it's not just me. |
| 11:21:50 | 12 | Walgreens is a huge organization.  There's lots of business |
| 11:21:53 | 13 | units.  We all have to submit projects that we want to have |
| 11:21:58 | 14 | done into all areas of the company, our computer system and |
| 11:22:03 | 15 | what have you. |
| 11:22:03 | 16 |       Kermit asked that we handle this operationally because |
| 11:22:12 | 17 | we were in the process of building a new computer system, |
| 11:22:15 | 18 | and he did not want it built twice, meaning we're not going |
| 11:22:20 | 19 | to spend time and effort building in IntercomPlus when we |
| 11:22:24 | 20 | know we have this new computer system that is going to be |
| 11:22:29 | 21 | coming. |
| 11:22:29 | 22 |       That new computer system has not come to fruition yet, |
| 11:22:32 | 23 | and that is why I was able to get the electronic good faith |
| 11:22:36 | 24 | dispensing checklist added in our existing computer system. |
| 11:22:43 | 25 | **Q**     All right, ma'am, then I go back to my question. |

**Polster (Cross by Lanier)**                              3084

| | | |
|---|---|---|
| 11:22:45 | 1 | Are you saying that the president of Walgreens is |
| 11:22:48 | 2 | making a decision on this issue? |
| 11:22:51 | 3 | **A**    Yes, he did. |
| 11:22:52 | 4 | **Q**    And you wanted from day one, I assume you mean back to |
| 11:22:57 | 5 | 2012 when you took over the job to build from the ground up, |
| 11:23:02 | 6 | develop, change, and improve the policies and procedures? |
| 11:23:05 | 7 | **A**    Yes. |
| 11:23:05 | 8 | **Q**    So for seven years you've wanted to do this, and they |
| 11:23:13 | 9 | wouldn't do it, right? |
| 11:23:15 | 10 | **A**    We didn't -- that is correct, because we were in the |
| 11:23:19 | 11 | process of changing computer systems and -- |
| 11:23:22 | 12 | **Q**    Over -- I'm sorry. |
| 11:23:23 | 13 | **A**    Sorry. |
| 11:23:23 | 14 | **Q**    No, that's my fault. |
| 11:23:26 | 15 | **A**    And so they asked us to handle this operationally, |
| 11:23:30 | 16 | which we did with the paper checklist. |
| 11:23:32 | 17 | **Q**    So for seven years they're in the process of changing |
| 11:23:38 | 18 | the computer system? |
| 11:23:39 | 19 | **A**    Yes. |
| 11:23:39 | 20 | **Q**    And they don't have an ability -- you're scanning in |
| 11:23:47 | 21 | prescriptions already, aren't you? |
| 11:23:48 | 22 | **A**    We are scanning in prescriptions. |
| 11:23:51 | 23 | **Q**    And you're telling us the computer system wouldn't let |
| 11:23:54 | 24 | you scan in the good faith dispensing checklist as well as |
| 11:23:58 | 25 | the prescription? |

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 11:24:00 | 1 | **A**    Oh, I understand what you're asking. |
| 11:24:02 | 2 | We did not scan it in as part of the policy.  We just |
| 11:24:07 | 3 | scanned in the prescriptions that were legally required, and |
| 11:24:14 | 4 | the checklists were attached to those hard copies at store |
| 11:24:16 | 5 | level. |
| 11:24:17 | 6 | **Q**    And so you've been wanting to do this from day one, |
| 11:24:21 | 7 | but for seven years you haven't been able to.  The president |
| 11:24:25 | 8 | weighs in.  And you say, "this is a huge win for my team and |
| 11:24:31 | 9 | the field."  True? |
| 11:24:32 | 10 | **A**    Yeah, true. |
| 11:24:33 | 11 | **Q**    And then you say, "The next phase of this enhancement |
| 11:24:39 | 12 | (as long as it doesn't get reprioritized)," do you see that? |
| 11:24:45 | 13 | **A**    I do. |
| 11:24:46 | 14 | **Q**    Would you agree with me that if the company had viewed |
| 11:24:52 | 15 | this as a priority item, they could have done it sooner than |
| 11:25:00 | 16 | seven years? |
| 11:25:00 | 17 | **A**    But when you say priority item, you have to consider |
| 11:25:02 | 18 | all the other things of decisions that they're getting made. |
| 11:25:05 | 19 | When I already have a policy in place and I already have a |
| 11:25:09 | 20 | process, they were weighing the fact that that was already |
| 11:25:13 | 21 | being handled operationally, and we were going to get rid of |
| 11:25:18 | 22 | our existing computer system for a new computer system.  We |
| 11:25:22 | 23 | have the plan to put what we got finally in IntercomPlus in |
| 11:25:28 | 24 | the new computer system when it launches. |
| 11:25:30 | 25 | **Q**    But, ma'am, look at what you're saying here.  This |

| | | |
|---|---|---|
| 11:25:37 | 1 | will "give us the ability to require a checklist for high |
| 11:25:44 | 2 | morphine milligram equivalent prescriptions for chronic |
| 11:25:48 | 3 | patients, like Percocet, Vicodin." |
| 11:25:54 | 4 | **A**     Correct. |
| 11:25:54 | 5 | **Q**     And we will be able to configure the quantity and drug |
| 11:25:58 | 6 | instead of only the drug as it is today.  That way we can |
| 11:26:00 | 7 | reduce steps for acute fills and focus more time on chronic |
| 11:26:04 | 8 | fills." |
| 11:26:05 | 9 |          This is good for safety, isn't it? |
| 11:26:10 | 10 | **A**     Sure. |
| 11:26:11 | 11 | **Q**     And this thing that's good for safety, if it had been |
| 11:26:17 | 12 | given to you, the ability to do it seven years earlier, |
| 11:26:21 | 13 | would have been good for safety seven years earlier, right? |
| 11:26:24 | 14 | **A**     We have lots of things in place for safety.  But, yes, |
| 11:26:28 | 15 | it would be an added safety. |
| 11:26:30 | 16 | **Q**     In other words, the answer to my question is "yes," |
| 11:26:35 | 17 | right? |
| 11:26:35 | 18 | **A**     Yes.  We have lots of things for safety in our |
| 11:26:37 | 19 | computer system.  And, yes, it would have been an additional |
| 11:26:41 | 20 | safety measure. |
| 11:26:43 | 21 | **Q**     Yeah.  And I'm not fussing that you have lots of good |
| 11:26:46 | 22 | things in your computer system for safety.  You've probably |
| 11:26:51 | 23 | got things for convenience.  You can probably tell us |
| 11:26:53 | 24 | everything -- tissue we've ever bought there if we use our |
| 11:26:57 | 25 | card or something.  I'm not fussing that.  I'm just asking a |

**Polster (Cross by Lanier)** 3087

| | | |
|---|---|---|
| 11:27:00 | 1 | very simple question. |
| 11:27:00 | 2 | This thing that's good for safety, if it had been |
| 11:27:05 | 3 | given to you, the ability to do it seven years earlier, |
| 11:27:09 | 4 | would have been good for safety seven years earlier, right? |
| 11:27:15 | 5 | **A**   Yes. |
| 11:27:15 | 6 | **Q**   Answer is yes, right? |
| 11:27:16 | 7 | **A**   Yes. |
| 11:27:16 | 8 | **Q**   Now, the second page talks about why this is |
| 11:27:29 | 9 | important, and I'd like you to look at those bullet points. |
| 11:27:32 | 10 | **A**   Sorry, can you help me with this document?  I don't |
| 11:27:36 | 11 | know what this is. |
| 11:27:36 | 12 | **Q**   Sorry.  This is that Plaintiffs' 20795, the one that |
| 11:27:39 | 13 | we're talking about. |
| 11:27:40 | 14 | **A**   Okay.  Thanks. |
| 11:27:41 | 15 | **Q**   You got it?  All right. |
| 11:27:43 | 16 | Second page talks about why this is important. |
| 11:27:49 | 17 | Do you see that section? |
| 11:27:51 | 18 | **A**   Yes. |
| 11:27:51 | 19 | **Q**   And it gives us a couple of bullet points, four of |
| 11:27:54 | 20 | them. |
| 11:27:55 | 21 | It "provides enhanced ability for pharmacists to |
| 11:28:02 | 22 | document their good faith dispensing review." |
| 11:28:04 | 23 | That's a good thing, isn't it? |
| 11:28:06 | 24 | **A**   Yes. |
| 11:28:06 | 25 | **Q**   That helps make sure that the records are right, |

**Polster (Cross by Lanier)**

11:28:10  1   correct?

11:28:10  2   **A**    It helps make sure that there's documentation on the

11:28:15  3   prescription.

11:28:16  4   **Q**    In other words, that the records are right, correct.

11:28:21  5          Documentation, I'm --

11:28:23  6   **A**    Thank you.

11:28:23  7   **Q**    I'm not arguing terms.  I'm just trying to make sure

11:28:26  8   we've got a clear record.

11:28:27  9   **A**    I understand, but there's a difference between records

11:28:29  10  and documentation.

11:28:29  11  **Q**    Okay.  Thank you for fixing that.  This makes a record

11:28:33  12  and we want it to be right.

11:28:34  13         So there's -- you're trying to make sure that the

11:28:39  14  documentation is correct, right?

11:28:41  15  **A**    Yes.

11:28:41  16  **Q**    That's important for patient safety, correct?

11:28:44  17  **A**    Yes.

11:28:45  18  **Q**    It's important for record keeping, isn't it?

11:28:48  19  **A**    Yes.

11:28:50  20  **Q**    It's what your stores were failing at in the audit, or

11:28:53  21  a number of them, right?

11:28:54  22  **A**    Some of the stores, yes.

11:28:58  23  **Q**    It makes a difference in patient safety at times,

11:29:01  24  doesn't it?

11:29:06  25  **A**    I wouldn't agree that it makes at times --

**Polster (Cross by Lanier)**

11:29:10  1   **Q**    Let me ask it this way.

11:29:12  2   **A**    Okay.

11:29:12  3   **Q**    This can make a difference in patient safety, can't

11:29:15  4   it?

11:29:15  5   **A**    Yes.

11:29:16  6   **Q**    Thank you.

11:29:17  7        Through good faith dispensing evaluation, second

11:29:22  8   bullet point, and detailed -- "Thorough GFD evaluation and

11:29:29  9   detailed documentation ensures patient safety."

11:29:32  10       Do you see that?

11:29:33  11  **A**    Yes.

11:29:33  12  **Q**    So this is something that you wanted to have in place

11:29:38  13  seven years earlier to ensure patient safety, but it's

11:29:42  14  finally going to get done seven years later, right?

11:29:46  15  **A**    In an electronic format.  It was already being done

11:29:50  16  when the pharmacists were processing the prescriptions and

11:29:52  17  doing their due diligence when filling prescriptions.

11:29:56  18  **Q**    No, ma'am.  This is talking about why this, this

11:29:58  19  electronic system, is important.

11:30:00  20       Do you see that?

11:30:01  21  **A**    Yes.

11:30:02  22  **Q**    So the electronic system is important because the

11:30:04  23  thorough evaluation and detailed documentation will ensure

11:30:08  24  patient safety.

11:30:09  25       Do you see that?

| | | |
|---|---|---|
| 11:30:10 | 1 | **A**     I see it. |
| 11:30:10 | 2 | **Q**     That's a new change that was not present for the seven |
| 11:30:16 | 3 | years you tried to get this system, right? |
| 11:30:20 | 4 | **A**     This electronic good faith dispensing within our |
| 11:30:23 | 5 | system was new, but ensuring that we have proper |
| 11:30:27 | 6 | documentation and that we're taking care of patient safety |
| 11:30:30 | 7 | has always been there. |
| 11:30:31 | 8 | **Q**     No, ma'am, that -- we've looked at the audit. |
| 11:30:35 | 9 | **A**     Again, that doesn't mean that the pharmacist was not |
| 11:30:39 | 10 | doing their due diligence. |
| 11:30:40 | 11 | **Q**     But it doesn't mean they were, doesn't it? |
| 11:30:43 | 12 | **A**     Correct. |
| 11:30:43 | 13 | **Q**     I mean, so it's like pin the tail on the donkey, while |
| 11:30:47 | 14 | your eyes are closed, yeah, you might hit it but you might |
| 11:30:50 | 15 | not, there's no way to tell unless you open your eyes, is |
| 11:30:56 | 16 | there? |
| 11:30:56 | 17 | **A**     What was the question? |
| 11:30:57 | 18 | **Q**     Y'all play pin the tail on the donkey up here? |
| 11:31:00 | 19 | **A**     What's that? |
| 11:31:01 | 20 | **Q**     Okay.  That's a Texas game maybe. |
| 11:31:03 | 21 | Ma'am, all I'm driving at is, you can't make an |
| 11:31:08 | 22 | assumption if you don't have documentation, right? |
| 11:31:10 | 23 | **A**     You can't make an assumption when you don't have |
| 11:31:13 | 24 | documentation that the pharmacist is not doing their due |
| 11:31:16 | 25 | diligence either. |

**Polster (Cross by Lanier)** 3091

11:31:16  1  **Q**    Well, you can make an assumption they're not doing

11:31:18  2  their job, they're not complying with policy, can't you?

11:31:28  3              MS. SWIFT:  Objection.

11:31:28  4              THE COURT:  If that's the question, you can

11:31:29  5  answer the question.

11:31:31  6  **A**    The audit showed that there were some locations that

11:31:33  7  were not following policy a hundred percent.

11:31:36  8  **Q**    All right.  I'm almost through here.

11:31:39  9        But "Thorough GFD evaluation and detailed

11:31:42  10  documentation ensures patient safety and protects Walgreens

11:31:45  11  and our pharmacists."

11:31:47  12        You see that?

11:31:47  13  **A**    Yes.

11:31:51  14  **Q**    "This new process will allow for good faith dispensing

11:31:55  15  chain-wide reporting and monitoring at the corporate support

11:31:59  16  center and more efficient reporting to federal and state

11:32:04  17  entities, including the DEA."

11:32:07  18        Do you see that as well?

11:32:08  19  **A**    I do.

11:32:08  20  **Q**    All very good things, right?

11:32:12  21  **A**    Yes.

11:32:13  22  **Q**    All things that would have been good seven years

11:32:16  23  earlier, wouldn't they?

11:32:17  24  **A**    Easier seven years -- seven years earlier, but not --

11:32:25  25  I mean, we were already doing that.

**Polster (Cross by Lanier)**

11:32:27  1    **Q**    Okay.  So this isn't important because you're already

11:32:29  2    doing this stuff?

11:32:29  3    **A**    We're doing it on paper.  The reason why we're doing

11:32:32  4    it for electronic is so that we could have a centralized

11:32:38  5    reporting so when the DEA called and said they wanted --

11:32:40  6    they know about our checklist, and they asked for our

11:32:43  7    checklist, instead of us having to call the store and asking

11:32:48  8    for the checklist to be, you know, scanned up, we were able

11:32:50  9    to pull that data electronically in our computer system

11:32:55  10   today.

11:32:55  11   **Q**    All right.  So how were y'all monitoring at the

11:32:59  12   corporate support center this chain-wide reporting?

11:33:03  13   **A**    Through store walks, following up with different

11:33:06  14   audits, through the BCI, through our field leadership,

11:33:10  15   through train the trainer.

11:33:14  16   **Q**    So the process for monitoring is what you described to

11:33:17  17   us before.  Y'all would audit and find out it's not being

11:33:20  18   done a lot of time, y'all would have store walks and we'd

11:33:25  19   get the evidence of that that we've looked at for Trumbull

11:33:30  20   County.

11:33:30  21        And you don't think that the new process would be much

11:33:33  22   better?

11:33:33  23   **A**    Of course.  That's why I wanted to do it.

11:33:35  24   **Q**    Okay.  So to say "we were already doing that," you

11:33:39  25   weren't doing it as well as you'll be able to do it now,

| | | |
|---|---|---|
| 11:33:43 | 1 | fair? |
| 11:33:43 | 2 | **A**    Correct. |
| 11:33:43 | 3 | **Q**    "There will now be increased transparency for our |
| 11:33:49 | 4 | pharmacy team members into a full patient profile that |
| 11:33:53 | 5 | includes all good faith dispensing documentation." |
| 11:33:57 | 6 | Do you see that? |
| 11:33:58 | 7 | **A**    I do. |
| 11:33:58 | 8 | **Q**    And that's also a good thing, isn't it? |
| 11:34:02 | 9 | **A**    Sure. |
| 11:34:02 | 10 | **Q**    Okay. |
| 11:34:03 | 11 | MR. LANIER:  Your Honor, I'll pass the |
| 11:34:04 | 12 | witness. |
| 11:34:05 | 13 | Thank you, ma'am. |
| 11:34:09 | 14 | MS. SWIFT:  Your Honor, may we have just a few |
| 11:34:11 | 15 | minutes to get set up? |
| 11:34:12 | 16 | THE COURT:  Sure. |
| 11:34:13 | 17 | MS. SWIFT:  Thank you. |
| 11:34:22 | 18 | THE WITNESS:  Your Honor, may I go to the |
| 11:34:24 | 19 | restroom? |
| 11:34:24 | 20 | THE COURT:  Oh, yes. |
| 11:35:25 | 21 | (Pause in proceedings.) |
| 11:39:19 | 22 | THE COURT:  Okay.  We'll now have examination |
| 11:39:21 | 23 | by Ms. Swift for Walgreens. |
| 11:39:28 | 24 | MS. SWIFT:  Thank you, Your Honor. |
| 11:39:29 | 25 | May I proceed? |

**Polster (Direct by Swift)** 3094

| | | |
|---|---|---|
| 11:39:30 | 1 | THE COURT:  Yes. |
| 11:39:32 | 2 | MS. SWIFT:  Good morning, ladies and gentlemen |
| 11:39:34 | 3 | of the jury.  Kate Swift again for the Walgreens. |
| 11:39:37 | 4 | NATASHA POLSTER |
| 11:39:37 | 5 | - - - - - |
| 11:39:37 | 6 | DIRECT EXAMINATION |
| 11:39:38 | 7 | BY MS. SWIFT: |
| 11:39:38 | 8 | **Q**    Good morning, Ms. Polster. |
| 11:39:39 | 9 | **A**    Good morning. |
| 11:39:40 | 10 | **Q**    It's been a while. |
| 11:39:41 | 11 | **A**    Yes. |
| 11:39:42 | 12 | **Q**    Based on your experience over the past 30 years, has |
| 11:39:44 | 13 | there ever been a time when Walgreens pharmacists weren't |
| 11:39:49 | 14 | concerned about preventing the diversion of controlled |
| 11:39:53 | 15 | substances? |
| 11:39:53 | 16 | **A**    Not to my knowledge, no. |
| 11:39:54 | 17 | **Q**    And does that concern include concern about the |
| 11:39:58 | 18 | diversion of opioids? |
| 11:40:00 | 19 | MR. WEINBERGER:  Objection, Your Honor. |
| 11:40:01 | 20 | **A**    Yes. |
| 11:40:04 | 21 | THE COURT:  Overruled. |
| 11:40:04 | 22 | **Q**    You were asked questions by the plaintiffs' lawyer |
| 11:40:11 | 23 | about when you believed the opioid crisis began. |
| 11:40:13 | 24 | Do you recall those questions? |
| 11:40:14 | 25 | **A**    I do. |

**Polster (Direct by Swift)**

11:40:15  1  **Q**    I believe you said you thought it was around 2011, and

11:40:20  2  you may have noticed that the plaintiffs' lawyer latched

11:40:23  3  onto that?

11:40:23  4              MR. WEINBERGER:  Objection, Your Honor.

11:40:24  5              THE COURT:  Well, yeah, sustained as to the

11:40:28  6  comment about what the plaintiffs' lawyer latched onto.

11:40:32  7  Just please stick to the question.

11:40:33  8              MR. WEINBERGER:  Your Honor, this should be on

11:40:34  9  direct examination.

11:40:37  10              THE COURT:  Well, Ms. Swift can certainly

11:40:42  11  refer to a question that the witness was asked.  That's

11:40:44  12  proper on direct or cross.  It was the sort of editorial

11:40:48  13  comment that I sustained the objection to, not the direction

11:40:51  14  to a question.

11:40:55  15  BY MS. SWIFT:

11:40:55  16  **Q**    Ms. Polster, did you intend to say by your testimony

11:40:57  17  that there were no problems with prescription opioid abuse

11:41:00  18  before 2011?

11:41:01  19  **A**    No, I did not.

11:41:01  20  **Q**    Now, I'd like to take a step back and ask you a few

11:41:07  21  preliminary questions about Walgreens' policies and

11:41:10  22  procedures.

11:41:10  23      Has Walgreens had policies and procedures in place

11:41:16  24  around the good faith dispensing of opioids for as long as

11:41:19  25  you've been a pharmacist?

**Polster (Direct by Swift)** 3096

| | | |
|---|---|---|
| 11:41:20 | 1 | MR. WEINBERGER:  Objection. |
| 11:41:21 | 2 | THE COURT:  Well, yeah, now we're getting too |
| 11:41:26 | 3 | leading, Ms. Swift. |
| 11:41:32 | 4 | **Q**    Does Walgreens have procedures in place around the |
| 11:41:35 | 5 | good faith dispensing of opioids? |
| 11:41:36 | 6 | **A**    Yes. |
| 11:41:36 | 7 | **Q**    Do those procedures include red flags that the |
| 11:41:43 | 8 | pharmacists are supposed to look out for? |
| 11:41:44 | 9 | MR. WEINBERGER:  Objection. |
| 11:41:45 | 10 | THE COURT:  Overruled. |
| 11:41:46 | 11 | **A**    Yes. |
| 11:41:47 | 12 | **Q**    How long has Walgreens had policies like that in |
| 11:41:49 | 13 | place? |
| 11:41:51 | 14 | **A**    Ever since I've been a pharmacist, I remember those |
| 11:41:53 | 15 | policies being in place. |
| 11:41:54 | 16 | **Q**    When did you become a pharmacist? |
| 11:41:55 | 17 | **A**    I graduated in 1989. |
| 11:42:00 | 18 | **Q**    All right.  I'd like to give you a little bit of a |
| 11:42:21 | 19 | road map where I'm going to go for both your sake and the |
| 11:42:24 | 20 | jury's sake.  I'm going to ask you questions about your |
| 11:42:27 | 21 | background and education, I'm going to ask you questions |
| 11:42:30 | 22 | about Walgreens' policies and procedures, I'll ask you |
| 11:42:35 | 23 | questions about support and tools for pharmacists, and then |
| 11:42:39 | 24 | I will ask you some questions to follow up on what the |
| 11:42:42 | 25 | plaintiffs' lawyer did about how Walgreens monitors |

**Polster (Direct by Swift)**                        3097

11:42:46   1   pharmacists.  Okay?

11:42:47   2   **A**    Yes.

11:42:47   3   **Q**    I want to start with your background.

11:42:53   4        Ms. Polster, where are you from originally?

11:42:55   5   **A**    Colorado.

11:42:56   6   **Q**    Where is your family from originally?

11:42:58   7   **A**    My father's Lebanese, and my mother is from America.

11:43:04   8   And we grew up for the most part in Colorado.

11:43:07   9   **Q**    When we were speaking the other night, you told me a

11:43:09  10   story about why you became a pharmacist, and it involved

11:43:14  11   your uncle in Lebanon.

11:43:15  12        Would you please explain that to the jury?

11:43:17  13   **A**    Sure.  I knew that when I wanted to go to college, I

11:43:23  14   wanted to do something in the medical field.  And my uncle

11:43:25  15   in Lebanon is a doctor.  My father grew up in a very small

11:43:31  16   town in northern Lebanon.  And anyway, my uncle's a doctor,

11:43:37  17   and literally gets paid with goats.  The town is so small.

11:43:43  18        When I was -- we'd spend the summers over there

11:43:47  19   sometimes, and when he knew I wanted to be a doctor, there

11:43:50  20   was an accident in town where a young boy fell and cut his

11:43:55  21   groin and was bleeding pretty badly.  And so my uncle sent

11:44:00  22   for me to come down and watch as he treated this young boy.

11:44:07  23        And I have to set it up so that you understand why I

11:44:10  24   chose the difference between being a doctor and choosing my

11:44:13  25   path to be a pharmacist.  We didn't have good air

**Polster (Direct by Swift)** 3098

| | | |
|---|---|---|
| 11:44:17 | 1 | conditioning, there weren't the clinics like the hospitals |
| 11:44:19 | 2 | we have today.  And I walked down in that clinic, and it was |
| 11:44:23 | 3 | hot and there was blood everywhere and I was like, oh, man, |
| 11:44:27 | 4 | I can't -- I can't do it. |
| 11:44:29 | 5 | So I knew then and there I didn't want to be a doctor. |
| 11:44:32 | 6 | **Q** Let me stop you right there, Ms. Polster. |
| 11:44:33 | 7 | How old were you at this point in time? |
| 11:44:35 | 8 | **A** 15. |
| 11:44:35 | 9 | **Q** Okay.  I didn't mean to interrupt. |
| 11:44:37 | 10 | **A** And then shortly thereafter, when I turned 16 I began |
| 11:44:42 | 11 | working at Walgreens.  And one of the pharmacists asked me |
| 11:44:46 | 12 | what I wanted to do.  I told him that story.  He said, do |
| 11:44:49 | 13 | you like math and science?  And I said yes.  And he said, |
| 11:44:53 | 14 | you should consider pharmacy. |
| 11:44:54 | 15 | And so I did, and I made my decision when I was a |
| 11:44:58 | 16 | junior in high school to go to pharmacy school. |
| 11:45:00 | 17 | **Q** You've worked -- have you worked at Walgreens since |
| 11:45:03 | 18 | 1982?  Is that what I recall you saying yesterday? |
| 11:45:06 | 19 | **A** I have. |
| 11:45:06 | 20 | **Q** Did you work at Walgreens consistently throughout that |
| 11:45:09 | 21 | whole entire time since then? |
| 11:45:10 | 22 | **A** I did. |
| 11:45:10 | 23 | **Q** Did you work at Walgreens while you were in pharmacy |
| 11:45:14 | 24 | school in Colorado? |
| 11:45:15 | 25 | **A** I did. |

**Polster (Direct by Swift)**                              3099

| | | |
|---|---|---|
| 11:45:15 | 1 | **Q** What did you do, I think you said that you started out |
| 11:45:20 | 2 | as a cashier.  When did you start working in the pharmacy |
| 11:45:23 | 3 | part of the store? |
| 11:45:23 | 4 | **A** Probably when I was a senior in high school, I would |
| 11:45:28 | 5 | work back there when, you know, a technician was on |
| 11:45:32 | 6 | vacation, and then when I -- my first year in college I was |
| 11:45:35 | 7 | back in the pharmacy full-time. |
| 11:45:36 | 8 | **Q** When you were first working back in the pharmacy, what |
| 11:45:39 | 9 | kind of things did you do? |
| 11:45:40 | 10 | **A** Technician duties, typing prescriptions, you know, |
| 11:45:45 | 11 | helping at the cash register, things like that. |
| 11:45:48 | 12 | **Q** Did you fill prescriptions? |
| 11:45:50 | 13 | **A** No. |
| 11:45:50 | 14 | **Q** Then at some point while you were still in pharmacy |
| 11:45:56 | 15 | school, did you move -- well, let me take a step back. |
| 11:45:59 | 16 | Where did you go to pharmacy school? |
| 11:46:01 | 17 | **A** University of Colorado. |
| 11:46:02 | 18 | **Q** And where is that? |
| 11:46:03 | 19 | **A** It's in Boulder. |
| 11:46:04 | 20 | **Q** Did you live in Boulder the entire time you were in |
| 11:46:06 | 21 | pharmacy school? |
| 11:46:06 | 22 | **A** Not the whole time, but for those three years where it |
| 11:46:13 | 23 | was required where I was on campus.  And then when you move |
| 11:46:17 | 24 | to the externship programs, I was in Colorado Springs. |
| 11:46:22 | 25 | **Q** Why did you move to Colorado Springs? |

**Polster (Direct by Swift)**

| | | |
|---|---|---|
| 11:46:23 | 1 | **A**    My husband was transferred. |
| 11:46:25 | 2 | **Q**    What did you husband do at a time for a living? |
| 11:46:29 | 3 | **A**    He was a store manager at that time. |
| 11:46:31 | 4 | **Q**    Where did he work? |
| 11:46:31 | 5 | **A**    He worked for Walgreens in Colorado Springs. |
| 11:46:35 | 6 | **Q**    You said he was a store manager.  Is your husband a |
| 11:46:39 | 7 | pharmacist? |
| 11:46:39 | 8 | **A**    He is not. |
| 11:46:39 | 9 | **Q**    Does anyone else in your family work at Walgreens or |
| 11:46:43 | 10 | did they ever? |
| 11:46:43 | 11 | **A**    My mother-in-law worked for Walgreens.  She was a |
| 11:46:46 | 12 | bookkeeper and a cosmetician.  And my daughter, who is a |
| 11:46:51 | 13 | finance major, did an internship at Walgreens one summer |
| 11:46:57 | 14 | when she was in college. |
| 11:46:58 | 15 | **Q**    What is a cosmetician? |
| 11:47:01 | 16 | **A**    It's somebody that helps run the cosmetic department, |
| 11:47:04 | 17 | can help customers with cosmetics or shampoos or hair color. |
| 11:47:10 | 18 | **Q**    All right.  I think you've said a couple of times you |
| 11:47:14 | 19 | graduated from pharmacy school in 1989. |
| 11:47:17 | 20 |     Did you become a staff pharmacist at Walgreens at that |
| 11:47:20 | 21 | time? |
| 11:47:20 | 22 | **A**    I was a float pharmacist first. |
| 11:47:23 | 23 | **Q**    What's a float pharmacist? |
| 11:47:24 | 24 | **A**    It's a pharmacist that doesn't have one full-time |
| 11:47:27 | 25 | store.  They go from store to store to cover vacations and |

**Polster (Direct by Swift)** 3101

11:47:32  1   sick days and things like that.

11:47:34  2   **Q**    Okay.  We might come back to that later on.

11:47:36  3        So you started as a float pharmacist.  At some point

11:47:39  4   did you become a full-time pharmacist at a Walgreens store?

11:47:42  5   **A**    I did.

11:47:43  6   **Q**    When was that?

11:47:45  7   **A**    Probably sometime in 1990 I got a full-time position

11:47:53  8   at a store in Colorado Springs.

11:47:55  9   **Q**    At some point after that, were you promoted to

11:47:59  10  pharmacy manager?

11:48:00  11  **A**    Yeah, after -- my husband was transferred again to

11:48:04  12  St. Louis, and I was a staff pharmacist for a while in

11:48:08  13  St. Louis, and then I became a pharmacy manager in

11:48:10  14  St. Louis.

11:48:10  15  **Q**    All right.  And at some point -- I don't want to mess

11:48:13  16  up the timeline, but at some point were you promoted from

11:48:16  17  pharmacy manager to pharmacy supervisor?

11:48:19  18  **A**    Yeah, that was after we moved to Oklahoma City, I was

11:48:25  19  promoted from Oklahoma City pharmacy manager to a pharmacy

11:48:29  20  supervisor in Kansas City.

11:48:32  21  **Q**    Okay.  Let me break that down a little bit.

11:48:34  22        What is the difference between a pharmacy manager and

11:48:37  23  a pharmacy supervisor?

11:48:38  24  **A**    A pharmacy manager oversees one location, and a

11:48:41  25  pharmacy supervisor oversees multiple locations.

**Polster (Direct by Swift)**

11:48:45  1  **Q**     Do you have to be a pharmacist to be a pharmacy

11:48:48  2  manager?

11:48:48  3  **A**     Yes.

11:48:48  4  **Q**     Do you have to be a pharmacist to be a pharmacy

11:48:50  5  supervisor?

11:48:51  6  **A**     Yes.

11:48:52  7  **Q**     Okay.  All right.  So you testified that you and your

11:48:59  8  husband moved from Colorado to St. Louis, and I believe you

11:49:01  9  said you then moved to Oklahoma City.  Is that right?

11:49:05  10  **A**     Correct.

11:49:05  11  **Q**     What did your husband do when you moved to Oklahoma

11:49:07  12  City?

11:49:07  13  **A**     We were -- I was an emerging leader pharmacy

11:49:13  14  manager --

11:49:13  15  **Q**     I'm sorry.

11:49:15  16  **A**     Sorry.

11:49:15  17  **Q**     For the court reporter's sake, I'm just going to ask

11:49:18  18  you to slow down a little bit.  I didn't quit catch what you

11:49:20  19  said.  I apologize.

11:49:22  20  **A**     I was an emerging leader pharmacy manager.

11:49:24  21  **Q**     What is that?

11:49:26  22  **A**     In addition to the responsibilities of running a

11:49:28  23  pharmacy, I also had responsibility for hiring and training

11:49:33  24  new pharmacists for the market, and my husband was an

11:49:37  25  emerging leader store manager who oversaw a store, and then

**Polster (Direct by Swift)**                                    3103

| | | |
|---|---|---|
| 11:49:41 | 1 | he also did hiring and training for the market. |
| 11:49:43 | 2 | **Q**    Before you and your husband moved to Oklahoma City, |
| 11:49:48 | 3 | were there Walgreens stores in Oklahoma City? |
| 11:49:49 | 4 | **A**    No. |
| 11:49:50 | 5 | **Q**    Did you and your husband open Walgreens stores in |
| 11:49:53 | 6 | Oklahoma City? |
| 11:49:53 | 7 | **A**    Yes.  We assisted in opening and staffing the new |
| 11:49:57 | 8 | stores. |
| 11:49:57 | 9 | **Q**    How long were you in Oklahoma City? |
| 11:49:59 | 10 | **A**    For 18 months. |
| 11:50:00 | 11 | **Q**    And then where did you move next? |
| 11:50:02 | 12 | **A**    Kansas City. |
| 11:50:03 | 13 | **Q**    What did you and your husband do in Kansas City? |
| 11:50:05 | 14 | **A**    My husband was the emerging leader store manager of |
| 11:50:10 | 15 | Kansas City opening the new market, and I was the pharmacy |
| 11:50:13 | 16 | supervisor overseeing the pharmacies of that market as we |
| 11:50:18 | 17 | grew the market with -- in the stores. |
| 11:50:21 | 18 | **Q**    Before you and your husband moved to Kansas City, were |
| 11:50:25 | 19 | there Walgreens stores in Kansas City? |
| 11:50:26 | 20 | **A**    No. |
| 11:50:27 | 21 | **Q**    Did you -- if I'm understanding your testimony, did |
| 11:50:31 | 22 | you and your husband open stores in Kansas City? |
| 11:50:32 | 23 | **A**    We did. |
| 11:50:33 | 24 | **Q**    About what does it entail to open a new market like |
| 11:50:38 | 25 | that?  Does that involve hiring people? |

11:50:40   1    **A**    Yes.

11:50:40   2    **Q**    Does it involve training people?

11:50:42   3    **A**    Yes.

11:50:42   4    **Q**    How many stores did you and your husband open in

11:50:45   5    Kansas City?

11:50:45   6    **A**    For me as a pharmacy supervisor, I went from zero to

11:50:53   7    30 stores in the three-year period of time that we were

11:50:57   8    there.

11:50:58   9    **Q**    Then -- you just said you were in Kansas City for

11:51:06   10   three years.

11:51:07   11        Where did you go after that?

11:51:08   12   **A**    Chicago.

11:51:08   13   **Q**    What did you do when you got to Chicago?

11:51:10   14   **A**    In Chicago I was a pharmacy supervisor before moving

11:51:15   15   to the support office.

11:51:16   16   **Q**    I've heard you use this term the "support office" or

11:51:20   17   the "support center."

11:51:20   18        Can you explain what that means?

11:51:23   19   **A**    Yeah.  It is the central offices that the Walgreens

11:51:28   20   corporation has that have business units that support our

11:51:34   21   stores nationwide.

11:51:34   22   **Q**    Give us just a very high level what you did in the

11:51:42   23   2000 to 2012 time frame in Chicago before you took your role

11:51:46   24   in pharmaceutical integrity, just briefly.

11:51:49   25   **A**    Sure.  So when I came up to the support center, I was

**Polster (Direct by Swift)**

11:51:52  1    in charge of pharmacy operating systems.  Those were systems

11:51:55  2    that did not include the dispensing prescriptions system.

11:52:02  3    It was the payroll system, the scheduling system.  Sometimes

11:52:09  4    I helped with policies.  I was responsible for work flow,

11:52:14  5    making sure that the pharmacy design made sense for the

11:52:19  6    pharmacy staff.

11:52:20  7    **Q**    Then in 2012 you've already testified you took on a

11:52:24  8    new role as the head of pharmaceutical integrity.

11:52:29  9         Is that a fair characterization?

11:52:31  10   **A**    Yes.

11:52:31  11   **Q**    And I don't want to rehash it.  I believe that you

11:52:37  12   said your responsibilities included executing on --

11:52:37  13            (Court reporter interjection.)

11:52:47  14   **Q**    I'm just trying to orient you to where I'm going.

11:52:50  15        You already testified to what your responsibilities

11:52:51  16   were.  Part of your responsibilities when you took over as

11:52:56  17   the head of pharmaceutical integrity, did they include

11:53:00  18   executing on compliance for both dispensing and distribution

11:53:08  19   of controlled substances?

11:53:09  20   **A**    Yes.

11:53:10  21   **Q**    Prior to 2012, when you came into your role, were

11:53:19  22   there other groups at Walgreens that handled that function

11:53:22  23   or those functions I should say?

11:53:23  24   **A**    Yes.

11:53:24  25   **Q**    Before your group, pharmaceutical integrity, was put

**Polster (Direct by Swift)** 3106

11:53:31 1 in place, were there people in the distribution centers who

11:53:37 2 were responsible for parts of that compliance function?

11:53:41 3 　　　　　　　　MR. WEINBERGER:  Objection.

11:53:43 4 　　　　　　　　THE COURT:  Overruled.

11:53:48 5 **A**　　Yes.

11:53:48 6 **Q**　　Before your group came into being in 2012, were there

11:53:56 7 people in loss prevention who were responsible for parts of

11:54:01 8 that compliance function?

11:54:02 9 **A**　　Yes.

11:54:03 10 **Q**　　What is loss prevention?

11:54:06 11 **A**　　Loss prevention is a business unit that has personnel

11:54:13 12 at the support center as well as folks that live within the

11:54:19 13 field, in the districts, that follow up with -- with the

11:54:23 14 stores.  They're another set of eyes and ears for, you know,

11:54:29 15 checking to make sure that our controls storewide are in

11:54:35 16 place, to prevent loss of money or drugs or, you know,

11:54:41 17 merchandise, things like that.

11:54:44 18 **Q**　　Before you came into your role in 2012, were there

11:54:48 19 people in pharmacy inventory who had certain

11:54:52 20 responsibilities for the compliance functions we've been

11:54:54 21 discussing?

11:54:55 22 **A**　　I don't know exactly what the inventory folks'

11:55:03 23 responsibilities were, but we did have inventory people that

11:55:06 24 did order and manage controlled substances and all inventory

11:55:12 25 back in the pharmacy.

**Polster (Direct by Swift)** 3107

11:55:13  1   **Q**     Before you came into your role in 2012, were there

11:55:17  2   other people that I haven't asked you about who were

11:55:21  3   responsible for pieces of the compliance functions that

11:55:24  4   we've been talking about?

11:55:25  5   **A**     Yes.

11:55:28  6   **Q**     How do you know that?

11:55:29  7   **A**     We had and still do a compliance department that

11:55:40  8   will -- you know, that are -- you know, that are responsible

11:55:43  9   for our code of conduct training, that investigate hotlines

11:55:51  10  that would -- you know, that could be escalated from patient

11:55:55  11  or from an employee.  We have, you know, our legal

11:56:00  12  department, we have our district leaders.  You know,

11:56:05  13  Walgreens is a really big organization, and we have a lot of

11:56:09  14  people that are responsible for that kind of work.

11:56:13  15  **Q**     Was one of the goals of your group when you were put

11:56:17  16  in place in late 2012 to bring those functions together?

11:56:21  17  **A**     Yes.

11:56:21  18  **Q**     You testified before that overseeing pharmaceutical

11:56:34  19  integrity is just a piece of your job; is that correct?

11:56:37  20  **A**     Yes, a piece of my job today, correct.

11:56:40  21  **Q**     What else are you responsible for?

11:56:41  22  **A**     I'm responsible for the nationwide immunization

11:56:46  23  program that includes all vaccines including COVID vaccine.

11:56:52  24  I'm responsible for third-party operations, which includes

11:56:55  25  the processing and billing of patients' insurance

**Polster (Direct by Swift)**                                   3108

11:57:02  1    prescriptions.  The state PDMP and reporting into the state

11:57:09  2    PDMP is part of my responsibilities, in addition to

11:57:13  3    electronic prescribing, as well as the pharmacy automation,

11:57:18  4    the machines that assist the pharmacy staff back in the

11:57:23  5    pharmacy.

11:57:24  6    **Q**    What is your job title today?

11:57:26  7    **A**    Divisional vice president of pharmacy quality

11:57:31  8    compliance and patient safety.

11:57:32  9    **Q**    How many people work for you today?

11:57:40  10   **A**    83 maybe.

11:57:42  11   **Q**    How many of those are particularly focused on

11:57:46  12   pharmaceutical integrity, the compliance function we've been

11:57:48  13   talking about?

11:57:49  14   **A**    12.

11:57:51  15   **Q**    What are the backgrounds of people who work for you in

11:57:59  16   pharmaceutical integrity?

11:58:00  17   **A**    I have a couple pharmacists.  I have a former law

11:58:05  18   enforcement employee that then came to our loss prevention

11:58:08  19   department which then transferred to my department.  I have

11:58:14  20   a couple folks that are really, really good at pulling data.

11:58:19  21   And then I have some analysts and coordinators that have

11:58:25  22   store experience that helped with, you know, pulling data,

11:58:35  23   controlled substance inventories, that kind of stuff.

11:58:36  24   **Q**    So when you refer to your group as a support center,

11:58:40  25   are you talking about that group of pharmacists, former law

**Polster (Direct by Swift)**                                    3109

| | | |
|---|---|---|
| 11:58:44 | 1 | enforcement professionals, data analysts? |
| 11:58:48 | 2 | **A**   Yes. |
| 11:58:48 | 3 | **Q**   Who are -- who does the support center support? |
| 11:58:52 | 4 | **A**   The -- well, the stores, but that particular business |
| 11:58:59 | 5 | unit is the pharmacy. |
| 11:59:02 | 6 | **Q**   Are you still licensed as a pharmacist today? |
| 11:59:04 | 7 | **A**   I am. |
| 11:59:04 | 8 | **Q**   Do you hold a license in more than one state? |
| 11:59:06 | 9 | **A**   I do. |
| 11:59:06 | 10 | **Q**   Which states are you licensed in? |
| 11:59:08 | 11 | **A**   Colorado and Illinois. |
| 11:59:09 | 12 | **Q**   Do you still fill prescriptions today? |
| 11:59:13 | 13 | **A**   I don't. |
| 11:59:13 | 14 | **Q**   Why do you maintain your pharmacy licenses in multiple |
| 11:59:16 | 15 | states? |
| 11:59:17 | 16 | **A**   You know, I worked really hard for that license.  It's |
| 11:59:21 | 17 | pretty hard to decide to give up.  And I've just kept it up |
| 11:59:24 | 18 | throughout the years. |
| 11:59:27 | 19 | **Q**   Are pharmacists required to be licensed in all 50 |
| 11:59:32 | 20 | states? |
| 11:59:33 | 21 | **A**   No. |
| 11:59:33 | 22 | **Q**   Are they required to be licensed in most states? |
| 11:59:37 | 23 | **A**   They're required to be licensed in the state in which |
| 11:59:40 | 24 | they practice. |
| 11:59:41 | 25 | **Q**   Oh, my question was not clear.  I understand now I |

**Polster (Direct by Swift)**                    3110

11:59:44  1    couldn't said no.

11:59:45  2        If you want to be a pharmacist in any state in the

11:59:48  3    United States, do you have to be licensed in that state to

11:59:52  4    practice pharmacy?

11:59:52  5    **A**    Yes.

11:59:52  6    **Q**    Okay.  Do you have to have a degree that's called a

11:59:59  7    PharmD?

11:59:59  8    **A**    You do now, yes.

12:00:00  9    **Q**    What is a PharmD?

12:00:01  10   **A**    It is a doctor of pharmacy, and it is the designation

12:00:05  11   that you graduate with when you graduate from an accredited

12:00:10  12   pharmacy school.

12:00:11  13   **Q**    Do you have to sit for an example to become a licensed

12:00:15  14   pharmacist?

12:00:15  15   **A**    You do.

12:00:17  16   **Q**    Do you have to take more than one exam?

12:00:19  17   **A**    Yes.

12:00:19  18   **Q**    Why do you have to take more than one exam to become a

12:00:22  19   pharmacist?

12:00:22  20   **A**    There's the national board exam, and then there's the

12:00:26  21   state law exam.

12:00:29  22   **Q**    Do you have to take the state law exam in every state

12:00:32  23   where you want to practice pharmacy?

12:00:33  24   **A**    Yes.

12:00:34  25   **Q**    How many state law exams have you taken?

**Polster (Direct by Swift)**                              3111

| | | |
|---|---|---|
| 12:00:37 | 1 | **A**    Five. |
| 12:00:38 | 2 | **Q**    And is that because you were moving from Colorado to |
| 12:00:41 | 3 | Missouri to Oklahoma to -- I missed one. |
| 12:00:45 | 4 | **A**    Kansas City. |
| 12:00:47 | 5 | **Q**    Did you pass all of those state law exams? |
| 12:00:49 | 6 | **A**    I did. |
| 12:00:58 | 7 | MS. SWIFT:  Your Honor, I'm noticing the time. |
| 12:01:00 | 8 | I'm about to switch topics. |
| 12:01:01 | 9 | THE COURT:  I was about to inquire whether |
| 12:01:03 | 10 | it's a good time to break. |
| 12:01:05 | 11 | Okay.  Ladies and gentlemen, we'll take our lunch |
| 12:01:07 | 12 | recess.  The usual admonitions.  We'll pick up at 1:00 with |
| 12:01:21 | 13 | the balance of this witness's testimony. |
| 12:01:40 | 14 | (The jury is not present.) |
| 12:01:42 | 15 | MR. LANIER:  Just one quick thing on the |
| 12:01:43 | 16 | record.  Motion in limine number 42 was to preclude any |
| 12:01:47 | 17 | references to the COVID vaccine and administering it and |
| 12:01:50 | 18 | things like that.  It was granted by the Court.  It's been |
| 12:01:54 | 19 | violated.  I'm sure it was just a mistake, but I do want to |
| 12:01:57 | 20 | remind the other side the importance of warning witnesses |
| 12:02:01 | 21 | about motions in limine that have been granted. |
| 12:02:03 | 22 | MS. SWIFT:  Absolutely.  My apologies. |
| 12:02:05 | 23 | It was inadvertent, Your Honor. |
| 12:02:07 | 24 | MR. LANIER:  I don't think it was intentional. |
| 12:02:08 | 25 | THE COURT:  Okay. |

12:02:10    1                    MR. LANIER:  Thank you, Judge.

12:02:10    2                    (A luncheon recess was taken at 12:02 p.m.)

            3

            4

            5

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

01:02:03  1              A F T E R N O O N   S E S S I O N

01:02:43  2                      - - - - -

01:03:18  3              (In open court at 1:03 p.m.)

01:03:18  4              THE COURT:  Everyone can be cede.

01:03:20  5         Before we bring out the jury, CVS and Walgreens just

01:03:24  6    filed an objection, I guess, to rulings on certain

01:03:29  7    designations.  This pertains to Ms. Ashley.  She's an

01:03:36  8    employee of the DEA; is that right?

01:03:40  9              MS. SWIFT:  Former employee, Your Honor.

01:03:43  10             MR. WEINBERGER:  Yes, she followed Rannazzisi

01:03:47  11   in that position.

01:03:47  12             THE COURT:  All right.  I don't see any reason

01:03:50  13   to show her -- well, this is designation, all right.

01:03:57  14        She doesn't need any press releases about anything.  I

01:04:03  15   look to this testimony -- we don't need her to read

01:04:07  16   documents.  The documents are in already.  So I didn't see

01:04:13  17   any relevance from these designations that CVS and Walgreens

01:04:18  18   are now objecting to.  It's already -- the documents are in.

01:04:22  19   There's been testimony that the documents are with the

01:04:26  20   corporation, and the documents say themselves they're with

01:04:30  21   the corporation.  And if CVS or Walgreens puts anyone on to

01:04:34  22   say the opposite, that person is not going to leave the

01:04:36  23   stand intact after Mr. Lanier or Mr. Weinberger

01:04:40  24   cross-examine them.

01:04:42  25             MR. WEINBERGER:  Can I address a response,

01:04:44  1    Your Honor, since I'm the one that did the deposition on the

01:04:49  2    dispensing side?

01:04:50  3         So there was extensive testimony, you can't just look

01:04:55  4    at it in isolation, Your Honor.  There's extensive testimony

01:04:58  5    that she gave when directed -- on direct examination by the

01:05:05  6    defense lawyers.

01:05:06  7              THE COURT:  Who?  Who gave?

01:05:08  8              MR. WEINBERGER:  That Ms. Ashley gave.

01:05:11  9              THE COURT:  Yes.

01:05:11  10             MR. WEINBERGER:  About whether -- that dealt

01:05:13  11   with the issue of whether or not the DEA provided guidance

01:05:18  12   on issues involving dispensing.  You know, what were the --

01:05:24  13   what did the dispenser's handbook say, what did the -- the

01:05:33  14   pharmacist handbook, and varies other directives including

01:05:37  15   the provisions of the CSA.

01:05:38  16        The purpose of my putting in these documents as well

01:05:40  17   as the press releases was not just to put them in to

01:05:47  18   demonstrate that, for example, a Walgreens MOA applied to

01:05:51  19   Walgreens or that a Walgreens MOA was issued in a press

01:05:56  20   release by the DOJ that included a hyperlink to that MOA,

01:06:01  21   but that, as she testified, cases published in the Federal

01:06:10  22   Register, pronouncements by the DEA in the Federal Register,

01:06:22  23   press releases issued by the DOJ on behalf of the DEA, about

01:06:27  24   enforcement actions that were taken are notice not just to

01:06:30  25   who it was that the agreements were the subject of but

**Polster (Direct by Swift)**

01:06:35  1   everybody else in the industry about what the DEA and the

01:06:41  2   Department of Justice expected with respect to their

01:06:44  3   dispensing practices.

01:06:45  4        And so that was the purpose of that examination.

01:06:52  5        It wasn't -- of course, it was done long before we

01:06:55  6   were in trial and long before we knew what was going to come

01:06:59  7   into evidence and what not in terms of the agreements.

01:07:04  8        But again, it's an entirely different purpose, Your

01:07:07  9   Honor.  And I believe that I laid the foundation for that in

01:07:11  10  my examination of Ms. Ashley about the importance of --

01:07:15  11            THE COURT:  I don't have time to go through

01:07:16  12  this line by line, all right?  That's why we keep having

01:07:19  13  this, we'll forget about these depositions, we'll bring in

01:07:23  14  the people live and they can ask relevant questions.

01:07:27  15            MS. SWIFT:  Your Honor, if I may respond very

01:07:29  16  briefly, all of the points that Mr. Weinberger just made,

01:07:31  17  that evidence is already in.  You've already ruled that it

01:07:33  18  doesn't need to come in again.

01:07:34  19            THE COURT:  Well, I don't know if we've had

01:07:36  20  specific testimony --

01:07:40  21            MS. SWIFT:  I mean, the testimony in question

01:07:43  22  with respect to Walgreens relates to the 2013 settlement

01:07:46  23  agreement.

01:07:46  24            THE COURT:  I'll allow the one question about

01:07:51  25  whether something was published in the Federal Register or

01:07:54    1   something or what -- what could be accessed, but we don't

01:07:58    2   need to admit press releases, they're inadmissible.  And

01:08:03    3   we've had plenty of references to the documents.  We don't

01:08:05    4   need the documents read in again and again.

01:08:07    5           MR. WEINBERGER:  But, Your Honor, again in the

01:08:08    6   context of that -- well, then everything else about her

01:08:15    7   testimony, about whether she -- they did or didn't provide

01:08:19    8   guidance to the industry and they -- you know, they did in

01:08:23    9   some respects --

01:08:24   10           THE COURT:  But assume she said they provided

01:08:26   11   a lot of guidance to the industry.

01:08:28   12           MR. WEINBERGER:  Right, but she was also

01:08:30   13   examined about the things that they didn't say, that they

01:08:34   14   didn't provide guidance on.  And this is exactly -- that's

01:08:36   15   exactly the point.  When I'm examining her, I'm trying to

01:08:41   16   rebut that testimony that there was a significant amount of

01:08:46   17   guidance that was provided about dispensing practices, about

01:08:50   18   red flags, based upon the decisions and the MOAs that were

01:08:55   19   rendered.

01:08:56   20           THE COURT:  Those aren't the --

01:09:00   21           MR. WEINBERGER:  But you can't take those

01:09:02   22   questions in isolation, Your Honor.  It's the -- I mean, I

01:09:06   23   think I should have an opportunity to have you consider --

01:09:10   24           THE COURT:  Let's bring her in and you can ask

01:09:12   25   her those questions in a relevant way, all right?  I mean --

**Polster (Direct by Swift)**                                    3117

01:09:17  1            MS. SWIFT:  Your Honor, she's a third party.

01:09:19  2    She's outside the subpoena power.

01:09:20  3            THE COURT:  Put her on video, all right?  I

01:09:23  4    mean, as I said, I'm about done with this, okay?  It just

01:09:26  5    isn't -- it isn't working.

01:09:28  6            MS. SWIFT:  Your Honor, if we would have the

01:09:29  7    opportunity to talk to the plaintiffs about this.

01:09:31  8    Mr. Weinberger had the opportunity to ask the questions that

01:09:33  9    he is now seeking to have admitted.

01:09:35  10           THE COURT:  I said I'm about done, so if you

01:09:39  11   all can't work this out, this witness will testify live by

01:09:42  12   video, okay, and you can ask her the questions you want and

01:09:44  13   I'll rule on them on the fly.

01:09:48  14       So I don't -- I can't carve it up because I don't know

01:09:51  15   what she was asked before, and I don't know if this is --

01:09:55  16   this may be responding to something.  I don't know.  But in

01:09:59  17   isolation is what I've got.

01:10:01  18       So if you all can't work it out, scratch your depo,

01:10:04  19   put her on live by video and you can ask her whatever

01:10:07  20   questions you want, both sides.  All right?

01:10:10  21           MR. WEINBERGER:  That's fine, Your Honor.

01:10:11  22   Thank you.

01:10:11  23           THE COURT:  Okay.  All right.  Let's bring in

01:10:16  24   the jury.

01:11:52  25           (The jury is present at 1:11 p.m.)

**Polster (Direct by Swift)**                    3118

01:11:53    1              THE COURT:  Okay.  Please be seated.

01:11:55    2         And Ms. Polster, you're still under oath.

01:11:59    3         Ms. Swift, you may continue your examination.

01:12:03    4              MS. SWIFT:  Thank you, Your Honor.

01:12:06    5         Welcome back, Ms. Polster.

01:12:07    6         Good afternoon, everyone.

01:12:07    7    BY MS. SWIFT:

01:12:09    8    **Q**    Ms. Polster, I'd like to ask you some questions about

01:12:11    9    the training that Walgreens provides to its pharmacists,

01:12:15   10    okay?

01:12:15   11    **A**    Okay.

01:12:15   12    **Q**    You were asked questions earlier about pharmacist

01:12:18   13    training and the addition of periodic training on good faith

01:12:23   14    dispensing as part of -- that you added as part of an

01:12:25   15    agreement with the DEA.

01:12:26   16         Do you remember those questions?

01:12:27   17    **A**    Yes.

01:12:29   18    **Q**    Does Walgreens provide training on good faith

01:12:33   19    dispensing for every new pharmacist when they're first hired

01:12:35   20    at Walgreens?

01:12:36   21    **A**    Yes.

01:12:36   22    **Q**    How long has Walgreens been doing that?

01:12:38   23    **A**    Ever since I have been a pharmacist, I remember it

01:12:44   24    happening.

01:12:44   25    **Q**    How long does that training, that new hire training,

**Polster (Direct by Swift)** 3119

01:12:50 1   take to complete, for the pharmacist?

01:12:54 2   **A**    So a new hire pharmacist that has never worked for

01:12:57 3   Walgreens before has a minimum of two weeks of training that

01:13:02 4   is on the job between doing computer modules and then going

01:13:07 5   back into the pharmacy and practicing and going back and

01:13:13 6   forth to get comfortable with the practices at Walgreens.

01:13:16 7        In addition, there are -- I refer to them as PPLs,

01:13:22 8   which is our computer training software.

01:13:25 9   **Q**    What does PPL stand for?

01:13:27 10  **A**    I cannot remember.  People learning something.

01:13:31 11       But we use that software to get the training down to

01:13:39 12  all of our employees, not just pharmacies but all employees.

01:13:44 13  **Q**    Are you talking now still specifically about new hire

01:13:48 14  training?

01:13:48 15  **A**    Yes.  And depending on what the training is depends on

01:13:58 16  the time that that training would have to be completed.

01:14:00 17       So in other words, within the first two weeks of

01:14:03 18  training the good faith dispensing training would have to be

01:14:06 19  completed.  But there may be other training that happens or

01:14:12 20  is required, but it wouldn't have to be done within that

01:14:15 21  first two weeks.  That pharmacist might have, you know, a

01:14:17 22  month to do it or 60 days.

01:14:18 23  **Q**    Do pharmacists always complete the training exactly

01:14:22 24  when they're supposed to?

01:14:23 25  **A**    No.

**Polster (Direct by Swift)** 3120

01:14:23  1  **Q**    Do you and your team and others at Walgreens take

01:14:26  2  steps to make sure, to the best of your ability, that they

01:14:30  3  complete that training promptly?

01:14:31  4  **A**    Yes.

01:14:32  5  **Q**    And I think I heard you say it, but does the training

01:14:38  6  that they pharmacist at Walgreens receives when they first

01:14:41  7  are on the job, does it include training on good faith

01:14:45  8  dispensing policies?

01:14:45  9  **A**    It does.

01:14:52  10  **Q**    In addition to the new hire training that we were just

01:14:54  11  talking about, does Walgreens also provide training when new

01:14:58  12  policies are rolled out?

01:15:00  13  **A**    Yes.

01:15:01  14  **Q**    Why do you do that?

01:15:02  15  **A**    To make the pharmacy or whatever employee that it is

01:15:09  16  relevant to aware of the changes that have been put in

01:15:12  17  place.

01:15:13  18  **Q**    Have you taken steps to roll out training when new

01:15:18  19  versions of the good faith dispensing policy rolled out?

01:15:21  20  **A**    Yes.

01:15:21  21  **Q**    Have you taken steps to roll out training for

01:15:27  22  pharmacists when new versions of the target drug good faith

01:15:30  23  dispensing policy roll out?

01:15:31  24  **A**    Yes.

01:15:31  25  **Q**    Does Walgreens also provide training for pharmacists

**Polster (Direct by Swift)**

01:15:43  1    on an ad hoc basis if that pharmacist's performance isn't up

01:15:48  2    to par?

01:15:49  3    **A**    Yes.

01:15:49  4    **Q**    Are there other reasons that Walgreens might provide

01:15:51  5    ad hoc training to pharmacists on the job?

01:15:55  6    **A**    Yes.

01:15:55  7    **Q**    Now, you testified earlier that today Walgreens also

01:16:02  8    provides annual or periodic training on good faith

01:16:09  9    dispensing.  Is that correct?

01:16:09  10   **A**    Yes.

01:16:09  11   **Q**    Have you been doing that at Walgreens for several

01:16:11  12   years?

01:16:12  13   **A**    Yes.

01:16:12  14   **Q**    Is that something that Walgreens agreed to do as part

01:16:18  15   of an agreement with the DEA?

01:16:22  16   **A**    I believe it is in there, in the MOA, but we had

01:16:26  17   already made that decision that we were going to do the

01:16:29  18   annual training when I launched the target drug policy.

01:16:35  19   **Q**    When the DEA reaches out and asks Walgreens to add

01:16:39  20   something to its training or to its policies and procedures,

01:16:44  21   do you personally take that seriously?

01:16:46  22   **A**    Yes.

01:16:46  23   **Q**    Do the people you work with take that seriously?

01:16:51  24   **A**    Yes.

01:16:51  25   **Q**    I want to ask you just a few questions about hiring of

01:16:54    1    new pharmacists at Walgreens or, you know, experienced

01:16:57    2    pharmacists, just hiring of pharmacists.

01:16:59    3        Does -- well, what does Walgreens do when it wants to

01:17:03    4    hire a new pharmacist?  How does it find candidates?

01:17:06    5    **A**      We recruit at pharmacy schools, we have a

01:17:15    6    Walgreens.com careers website where applicants can put forth

01:17:20    7    their application for hire.  So mostly those two places.

01:17:27    8    **Q**      Does Walgreens have cameras in every pharmacy?

01:17:30    9    **A**      We do.

01:17:31    10    **Q**      Do the pharmacists who work there know that?

01:17:33    11    **A**      Yes.

01:17:33    12    **Q**      Does Walgreens have inventory control systems that are

01:17:37    13    designed to identify missing inventory due to employee

01:17:40    14    theft?

01:17:41    15    **A**      Yes.

01:17:42    16    **Q**      Do the pharmacists know that?

01:17:45    17    **A**      Yes.

01:17:47    18    **Q**      Is it fair to say that to be a pharmacist at

01:17:51    19    Walgreens, you need to be comfortable with a fair amount of

01:17:53    20    corporate oversight?

01:17:54    21           MR. WEINBERGER:  Objection.

01:18:01    22           THE COURT:  Overruled.

01:18:02    23    **A**      Yes.

01:18:02    24    **Q**      What is the starting salary for a pharmacist at

01:18:04    25    Walgreens?

01:18:05    1    **A**    On average, a hundred thousand.

01:18:10    2    **Q**    If you're an experienced pharmacist, can you say as a

01:18:13    3    general matter what the average, is there like a top salary?

01:18:16    4    **A**    Pharmacy managers will make more, and it will vary

01:18:21    5    based on cost of living in the market, where pharmacists in

01:18:27    6    Ohio might make less money than a pharmacist in

01:18:29    7    San Francisco.

01:18:30    8    **Q**    All right.  Now, I'm going to change to my next set of

01:18:33    9    questions.  I'm going to ask you questions about Walgreens'

01:18:37    10    policies and procedures for dispensing of controlled

01:18:39    11    substances, okay?

01:18:41    12    **A**    Okay.

01:18:41    13    **Q**    I think you testified earlier, but I want to make sure

01:18:43    14    it's clear, are there two controlled substance dispensing

01:18:51    15    policies, roughly speaking, at Walgreens?

01:18:52    16    **A**    Yes.

01:18:52    17    **Q**    What are those two policies?

01:18:53    18    **A**    There's an overarching good faith dispensing policy

01:18:57    19    that is intended for all controlled substances, no matter

01:19:00    20    what.  And then there's the target drug good faith

01:19:04    21    dispensing policy, which is for select drugs.

01:19:07    22    **Q**    All right.  I'm going to start with the good faith

01:19:09    23    dispensing policy which you referred to as the overarching

01:19:12    24    dispensing policy.  But before I asked you about the policy

01:19:18    25    itself, I want to go back to some of the questions the

**Polster (Direct by Swift)**                     3124

01:19:20   1   plaintiffs' lawyer asked you today about an e-mail exchange

01:19:24   2   between you and your team about what you were doing to put

01:19:28   3   in place addition policies, programs, because the DEA had

01:19:35   4   asked you to do that in relation to a store in San Diego.

01:19:38   5        Do you remember those questions?

01:19:39   6   **A**    Yes.

01:19:39   7   **Q**    The plaintiffs' lawyer showed you an e-mail, and I'll

01:19:46   8   ask you to see if you can find it in your stack, it's

01:19:49   9   Plaintiffs' Exhibit 19566.

01:20:11  10   **A**    Yes.

01:20:21  11   **Q**    Is that what I've got up on the screen here as well?

01:20:24  12   **A**    Yes.

01:20:33  13   **Q**    I'm going to scroll down to the e-mail on the bottom

01:20:36  14   half of the first page from you to Cheryl, Tomson, and Al.

01:20:41  15        Do you remember questions about this e-mail earlier

01:20:43  16   today?

01:20:43  17   **A**    Yes.

01:20:43  18   **Q**    Your e-mail says, "The document attached is what the

01:20:55  19   DEA wants us to agree to.  When you open the attachment, it

01:20:58  20   has various sections lettered A through M."

01:21:03  21        Do you see that?

01:21:03  22   **A**    Yes.

01:21:03  23   **Q**    And it says, "Debbie has added a few things in blue.

01:21:08  24   Below is what we need to accomplish.  I will only put the

01:21:11  25   sections we need to work on."

**Polster (Direct by Swift)**

01:21:13    1        Do you see that?

01:21:14    2   **A**    Yes.

01:21:14    3   **Q**    And then below your -- that first paragraph you have a

01:21:22    4   number of sections that start with section C.

01:21:27    5        Do you see that?

01:21:27    6   **A**    Yes.

01:21:27    7   **Q**    It goes C, then there's section D, E.  If we carry

01:21:33    8   over to the next page, you can see you continued with

01:21:38    9   sections F, G, J, and M.

01:21:41   10        Do you see that?

01:21:41   11   **A**    Yes.

01:21:41   12   **Q**    Are those the sections you were telling your team

01:21:45   13   needed to be worked on?

01:21:46   14   **A**    Yes.

01:21:46   15   **Q**    You did not mention in your e-mail sections A or B,

01:21:51   16   correct?

01:21:51   17   **A**    Correct.

01:21:52   18   **Q**    All right.  Then if we carry over to I think it's page

01:21:56   19   5 is the memo from Debbie Platts to you.

01:22:02   20        Do you see that?

01:22:04   21   **A**    Yes.

01:22:04   22   **Q**    And you can see if you look down through it she's got

01:22:08   23   sections A through M?

01:22:09   24   **A**    Yes.

01:22:10   25   **Q**    All right.  Let's look at sections A and B.  These are

**Polster (Direct by Swift)** 3126

01:22:13　1　the ones that you did not include as sections that needed to

01:22:17　2　be worked on.

01:22:21　3　　　　　Start with A.  It says, "Walgreens agrees to maintain

01:22:25　4　a compliance program to detect and avoid violations of the

01:22:28　5　Controlled Substances Act and applicable DEA regulations."

01:22:31　6　　　　　Do you see that?

01:22:32　7　**A**　　I do.

01:22:32　8　**Q**　　Did Walgreens already have a compliance program to

01:22:35　9　detect and avoid violations of the CSA and applicable DEA

01:22:40　10　regulations in June of 2010, the date of this memo?

01:22:43　11　**A**　　Yes.

01:22:44　12　**Q**　　Okay.  And just to be clear, I mean, you agreed to

01:22:47　13　continue to do that, right?

01:22:48　14　**A**　　Yes.

01:22:49　15　**Q**　　All right.  Then section B says, "This program shall

01:22:54　16　include procedures to identify the common signs associated

01:22:58　17　with the diversion of controlled substances, including, but

01:23:03　18　not limited to, doctor shopping and requests for early

01:23:06　19　refills."

01:23:07　20　　　　　Do you see that?

01:23:07　21　**A**　　Yes.

01:23:07　22　**Q**　　And then Debbie says, "I could not find anything in

01:23:12　23　our procedures that addressed this request."  And she has a

01:23:15　24　suggestion here about a pharmacy code of conduct.

01:23:18　25　　　　　Do you see that?

**Polster (Direct by Swift)** 3127

| | | |
|---|---|---|
| 01:23:19 | 1 | **A**    Yes. |
| 01:23:19 | 2 | **Q**    Did Walgreens already have a good faith dispensing |
| 01:23:23 | 3 | policy in place that identified common signs associated with |
| 01:23:27 | 4 | the diversion of controlled substances in 2010? |
| 01:23:30 | 5 | **A**    Yes. |
| 01:23:30 | 6 | **Q**    Common signs associated with diversion, is that just |
| 01:23:34 | 7 | another way of saying red flags? |
| 01:23:38 | 8 | **A**    Yes. |
| 01:23:38 | 9 | **Q**    All right.  Now I'd like to ask you some questions |
| 01:23:40 | 10 | about the good faith dispensing policy at Walgreens itself. |
| 01:23:44 | 11 | What is the good faith dispensing policy? |
| 01:23:49 | 12 | **A**    The good faith dispensing policy is a policy that |
| 01:23:53 | 13 | explains to our pharmacists our expectations with their |
| 01:23:57 | 14 | corresponding responsibility when filling controlled |
| 01:24:00 | 15 | substance prescriptions. |
| 01:24:01 | 16 | **Q**    Does the good faith dispensing policy identify red |
| 01:24:04 | 17 | flags that pharmacists are supposed to be aware of? |
| 01:24:06 | 18 | **A**    Yes. |
| 01:24:06 | 19 | **Q**    How long has Walgreens had a good faith dispensing |
| 01:24:10 | 20 | policy? |
| 01:24:10 | 21 | **A**    I remember talking about a good faith dispensing |
| 01:24:16 | 22 | policy when I became a pharmacist, but I know I've seen |
| 01:24:19 | 23 | written good faith dispensing policies since 1989. |
| 01:24:23 | 24 | **Q**    I'm going to put one on the screen. |
| 01:24:28 | 25 | Well, I'll ask you do you recognize the document that |

**Polster (Direct by Swift)**

| | | |
|---|---|---|
| 01:24:30 | 1 | I'm just put on the screen? |
| 01:24:31 | 2 | **A**    Yes. |
| 01:24:31 | 3 | **Q**    What is it? |
| 01:24:32 | 4 | **A**    It's our good faith dispensing policy from 1998. |
| 01:24:36 | 5 | **Q**    I think I just heard you say you recall written good |
| 01:24:41 | 6 | faith dispensing policies that go back even further than |
| 01:24:43 | 7 | this; is that right? |
| 01:24:44 | 8 | **A**    No, I think I misspoke the year.  I graduated in '89. |
| 01:24:48 | 9 | But I remember having a policy.  I don't remember what it |
| 01:24:50 | 10 | looked like or anything like that.  But I do recognize this |
| 01:24:54 | 11 | one from 1998. |
| 01:24:57 | 12 | **Q**    Now, I'm going to focus on the bullet list under |
| 01:25:03 | 13 | Elements at the top half of the page. |
| 01:25:05 | 14 | Do you see that? |
| 01:25:06 | 15 | **A**    I do. |
| 01:25:06 | 16 | **Q**    Well, first of all, just to walk through it because I |
| 01:25:09 | 17 | don't know that we've spent much time on the good faith |
| 01:25:12 | 18 | dispensing, actually what it says. |
| 01:25:13 | 19 | The first paragraph says, "The pharmacist must use the |
| 01:25:18 | 20 | elements of good faith dispensing in conjunction with state |
| 01:25:21 | 21 | and federal controlled substances" probably meant to say |
| 01:25:27 | 22 | controlled substances laws there. |
| 01:25:27 | 23 | Do you agree with that? |
| 01:25:28 | 24 | **A**    Yes. |
| 01:25:29 | 25 | **Q**    "When filling all prescriptions, the pharmacist must |

**Polster (Direct by Swift)**

01:25:32    1    determine if a prescription for a controlled substance is

01:25:35    2    dispensed for a legitimate medical purpose."

01:25:39    3        Do you see that there?

01:25:40    4    **A**    Yes.

01:25:40    5    **Q**    All right.  I want to focus your attention, I have a

01:25:43    6    number of questions about this bullet list under Elements.

01:25:46    7        It says, "The elements of good faith dispensing that

01:25:50    8    should alert a pharmacist to questionable circumstances

01:25:53    9    are:"

01:25:56   10        And then there's a bullet list of depending on how you

01:25:59   11    count it, either seven or 10 items there.

01:26:02   12        Do you see that?

01:26:03   13    **A**    Yes.

01:26:06   14    **Q**    As a pharmacist, do you recognize the questionable

01:26:10   15    circumstances that are listed here as red flags?

01:26:16   16    **A**    Yes.

01:26:16   17    **Q**    I'd like to walk you through each of these.

01:26:19   18        The first one on the list -- see if I can make this

01:26:22   19    bigger.

01:26:25   20        The first red flag on the list, it says, "Numerous

01:26:33   21    controlled substance prescriptions written by the same

01:26:36   22    prescriber or numerous prescribers."

01:26:38   23        Do you see that?

01:26:39   24    **A**    Yes.

01:26:39   25    **Q**    So I want to ask you a question about this bullet

**Polster (Direct by Swift)** 3130

01:26:43 1 point.

01:26:43 2     If a patient presents an opioid prescription or

01:26:48 3 multiple opioid prescriptions with overlapping days of

01:26:52 4 supply that were written by two or more doctors, would that

01:26:56 5 be captured by this item in the 1998 good faith dispensing

01:27:00 6 policy?

01:27:00 7 **A**     Yes.

01:27:01 8 **Q**     Would that be a concern for the pharmacist?

01:27:06 9 **A**     It would be something that the pharmacist should be

01:27:10 10 taking into consideration when doing their evaluation.

01:27:13 11 **Q**     Is the circumstance that I just described, a patient

01:27:18 12 presents opioid prescriptions written by multiple doctors,

01:27:23 13 is that something that you would refer to as doctor shopping

01:27:25 14 today?

01:27:27 15 **A**     You'd have to understand the circumstances around it,

01:27:31 16 but it could be.

01:27:33 17 **Q**     Was doctor shopping a term that was used by

01:27:36 18 pharmacists in 1998, if you know?

01:27:38 19 **A**     Yes.

01:27:38 20 **Q**     Are there circumstances where a patient presenting

01:27:43 21 opioid prescriptions from more than one prescriber would not

01:27:47 22 be a concern?

01:27:48 23 **A**     Yes.

01:27:51 24 **Q**     Why would a patient ever go to two different doctors

01:27:56 25 for the same medication?

**Polster (Direct by Swift)**                     3131

01:27:57  1   **A**     It could be that their prescriber is in a medical

01:28:04  2   practice that has multiple doctors, and maybe their doctor

01:28:08  3   was on vacation or they didn't see that doctor at the time,

01:28:12  4   or they went to the hospital for something else.  There

01:28:15  5   could be a lot of reasons and would be something that the

01:28:21  6   pharmacists would want to evaluate and take into

01:28:24  7   consideration.

01:28:24  8   **Q**     Based on that pharmacist's knowledge of the patient

01:28:29  9   and the prescriber, is it possible that a prescription that

01:28:33  10  fit this description wouldn't be a red flag to that

01:28:36  11  pharmacist at all?

01:28:37  12  **A**     It's possible.

01:28:41  13  **Q**     Still focused on that first bullet in the 1998 good

01:28:44  14  faith dispensing policy, if a patient presents prescriptions

01:28:48  15  for two short-acting opioids on the same day, would that be

01:28:52  16  captured by this red flag?

01:28:55  17  **A**     Yes.

01:28:56  18  **Q**     Would that be a concern that you would want a

01:28:58  19  pharmacist to look out for?

01:28:59  20  **A**     Yes.

01:28:59  21  **Q**     Would you agree with me, Ms. Polster, that there are a

01:29:06  22  number of ways for a pharmacist to resolve a red flag?

01:29:08  23  **A**     Yes.

01:29:08  24  **Q**     All right.  Now I want to ask you about the second

01:29:12  25  bullet in the 1998 good faith dispensing policy.  It says,

**Polster (Direct by Swift)**

01:29:17  1   "Numerous prescriptions submitted by the same person."

01:29:22  2       Could that include numerous prescriptions for an

01:29:26  3   unusual combination of medications, like an opioid and a

01:29:30  4   benzodiazapine?

01:29:30  5   **A**   It could.

01:29:31  6   **Q**   The jury has heard about cocktail or trinity

01:29:36  7   prescriptions in this case.

01:29:39  8       What is a cocktail prescription?

01:29:41  9   **A**   The DEA refers to the cocktail as an opioid,

01:29:47  10  benzodiazapine, and a muscle relaxant prescribed at the same

01:29:52  11  time or for the patient to take at the same time.

01:29:53  12  **Q**   Is that something that you want your pharmacists at

01:29:57  13  Walgreens to look out for?

01:29:58  14  **A**   Yes.

01:30:00  15  **Q**   Has Walgreens trained its pharmacists to watch out for

01:30:04  16  cocktail or other unusual combinations of medications for as

01:30:09  17  long as you can remember?

01:30:10  18  **A**   Yes.

01:30:12  19  **Q**   But I think I heard you testify earlier today that

01:30:14  20  there are circumstances where you have seen personally that

01:30:20  21  it would be appropriate to fill a prescription for an

01:30:23  22  unusual combination like that; is that a fair

01:30:25  23  characterization?

01:30:26  24  **A**   Yes.

01:30:26  25  **Q**   When you're looking at a combination -- unusual

**Polster (Direct by Swift)** 3133

01:30:32  1  combination prescription, something like a cocktail or an

01:30:35  2  opioid and a benzodiazapine, does it make a difference to

01:30:38  3  you if the prescriptions are all presented at the same time?

01:30:43  4  **A**    Well, that would -- well, I guess it would depend if

01:30:50  5  they were all presented at the same time written by the same

01:30:54  6  doctor or if they were different doctors.

01:30:55  7  **Q**    What's the difference in your mind?

01:30:57  8  **A**    Well, if it's the same doctor, then you're aware that

01:31:03  9  that doctor knows that that patient is taking those

01:31:07  10  medications, and they prescribed them.

01:31:12  11  **Q**    So let me stop you right there.

01:31:13  12        Are you saying that there could be a situation where

01:31:15  13  it would give you more comfort if those prescriptions, those

01:31:20  14  combination prescriptions, were written by the same doctor?

01:31:22  15  **A**    Well, different steps would have to be taken in that

01:31:29  16  instance.

01:31:31  17  **Q**    What were you meaning to explain when you said it

01:31:34  18  would depend if they were written by the same doctor or not?

01:31:37  19  **A**    So if they're written by the same doctor, then you

01:31:40  20  would know as a pharmacist that that doctor prescribed them.

01:31:42  21  If they were written by different prescribers, the

01:31:49  22  pharmacist may want to do due diligence to contact each of

01:31:53  23  the other prescribers to make sure that they were aware that

01:31:55  24  the other doctors prescribed controlled substances for that

01:31:59  25  same patient.

**Polster (Direct by Swift)** 3134

01:32:00 1 **Q**     Are there circumstances where the fact that one doctor

01:32:05 2 wrote prescriptions for an opioid, a benzodiazapine, and a

01:32:09 3 muscle relaxer increased your suspicion?

01:32:13 4 **A**     I guess it would depend on the dose.  You'd have to

01:32:18 5 understand the doctor's prescribing patterns as well as what

01:32:24 6 was going on with the patient at the time.

01:32:25 7 **Q**     Okay.  The next item in the 1998 good faith dispensing

01:32:28 8 policy has three subparts, and I'll try to take them one by

01:32:32 9 one.

01:32:33 10     The first is "Increased frequency of prescriptions for

01:32:37 11 the same controlled drug:  By one prescriber."

01:32:42 12     Why is that a potential concern?

01:32:44 13 **A**     Well, you know, if the patient continues to bring in a

01:32:54 14 controlled substance prescription from the same prescriber

01:32:57 15 more often than what the prescription should last, that

01:33:01 16 would be something that the pharmacist would want to

01:33:04 17 evaluate before moving forward and filling the prescription.

01:33:07 18 **Q**     All right.  The next one says, "Increased frequency of

01:33:11 19 prescriptions for the same controlled drug:  For large

01:33:16 20 numbers of patients."

01:33:17 21     I have a pretty specific question for you about this

01:33:20 22 one.  I'll give you an example.

01:33:21 23     If four or more patients presented prescriptions for

01:33:26 24 the same drug, the same dose, written by the same

01:33:31 25 prescriber, all on the same day, would that be the kind of

**Polster (Direct by Swift)** 3135

01:33:34 | 1 | scenario that would be captured by this red flag in

01:33:38 | 2 | Walgreens' 1998 policy?

01:33:40 | 3 | **A**     Yes.

01:33:40 | 4 | **Q**     Would that scenario that I just described always be a

01:33:45 | 5 | red flag, for example, if you have four people on the same

01:33:49 | 6 | day but one of them comes in at 8:00 in the morning, one

01:33:52 | 7 | comes at noon, one comes at 2:00 in the afternoon, one comes

01:33:56 | 8 | at 5:00 p.m., would it be the same kind of a scenario?

01:33:59 | 9 | **A**     It would be a different scenario.

01:34:04 | 10 | **Q**     Is it possible that prescriptions along the types of

01:34:09 | 11 | examples that I just described wouldn't present a red flag

01:34:11 | 12 | at all to a pharmacist depending on the knowledge of the

01:34:14 | 13 | patient, the prescriber, the prescriptions?

01:34:17 | 14 | **A**     Yes, it's possible.

01:34:18 | 15 | **Q**     All right.  The next item on the list in this 1998

01:34:28 | 16 | policy is, "Increased frequency of prescriptions for the

01:34:31 | 17 | same controlled drug:  For quantities beyond those normally

01:34:35 | 18 | prescribed."

01:34:35 | 19 |      Why is that a concern that Walgreens wanted its

01:34:38 | 20 | pharmacists to look out for?

01:34:41 | 21 | **A**     Well, you'd want to make sure that when dispensing

01:34:43 | 22 | your controlled substances, if you have a prescriber that

01:34:45 | 23 | you know to only prescribe 10 tablets at a time and all of a

01:34:50 | 24 | sudden a prescription comes in for a hundred, you as the

01:34:55 | 25 | pharmacist would take pause and look to make sure that the

**Polster (Direct by Swift)** 3136

01:34:59  1   doctor did really intend to write it for 100 or what was

01:35:03  2   happening that would change that prescriber's prescribing

01:35:11  3   habit.

01:35:11  4   **Q**     The next item on the list in the 1998 policy is,

01:35:16  5   "Unusual dosages or instructions in conflict with approved

01:35:19  6   labeling."

01:35:20  7         What does that mean?

01:35:25  8   **A**     Medications are given recommended prescribing to the

01:35:31  9   prescriber and also that pharmacists use as references.  And

01:35:37  10  if a dose came in that was out of the ordinary, for example,

01:35:40  11  you have a patient who's never taken an opioid before and

01:35:44  12  they come in with a high dosage or a high MME, that would be

01:35:51  13  something the pharmacist would want to stop and make sure

01:35:53  14  that it's safe to dispense.

01:35:55  15  **Q**     Are there circumstances where a patient, a new patient

01:35:59  16  coming in with a high dose prescription could be explained

01:36:03  17  right off the bat by the pharmacist looking at the patient

01:36:05  18  and it wouldn't be a red flag?

01:36:06  19  **A**     The pharmacist would need to do their due diligence,

01:36:12  20  but what would tell them if they're a new patient to

01:36:15  21  Walgreens is looking at the state PDMP.

01:36:19  22  **Q**     Okay.  All right.  The next one on the list is

01:36:23  23  "Unusual geographical distances between patient, pharmacist,

01:36:27  24  and prescriber."

01:36:28  25        Do you see that one?

**Polster (Direct by Swift)**

01:36:30  1  **A**    Yes.

01:36:30  2  **Q**    This is one that I think the jury has heard a fair

01:36:32  3  amount about.  The 1998 good faith dispensing doesn't

01:36:38  4  provide a specific distance that Walgreens has decided is

01:36:43  5  unusual across the board; is that a fair statement?

01:36:46  6  **A**    Yes.

01:36:46  7  **Q**    Why is that?

01:36:47  8  **A**    Well, there could be reasons why a patient would need

01:36:51  9  to travel to a specialist that maybe, you know, they live in

01:36:57  10  a rural town and they need to see a specialist, and it would

01:37:01  11  be further than a certain mileage number.  I mean, there are

01:37:05  12  some patients that travel across state lines to seek

01:37:08  13  treatment at specialty-type medical centers.

01:37:15  14  **Q**    Are there other reasons why a patient might need to

01:37:18  15  travel more than a particular distance to see the pharmacy

01:37:22  16  or the doctor?

01:37:23  17  **A**    Yes.

01:37:26  18  **Q**    Can a pharmacist use a bright-line rule of, say, 25

01:37:30  19  miles and call that an unusual distance?

01:37:32  20  **A**    They could, but they would need to resolve it.  So

01:37:37  21  you'd have to take the entire situation into consideration,

01:37:45  22  but it would be -- it needs to be explained as to why the

01:37:47  23  patient is going a long distance.

01:37:49  24  **Q**    Are there circumstances, depending on the community,

01:37:52  25  the location of the pharmacy, the size of the city or town,

**Polster (Direct by Swift)** 3138

01:37:57  1  where 25 miles wouldn't be unusual at all?

01:38:00  2  **A**    Yes.

01:38:03  3  **Q**    Has Walgreens ever included a bright-line distance in

01:38:11  4  its dispensing policies that it has determined are unusual?

01:38:14  5  **A**    No.

01:38:14  6  **Q**    Do you agree, Ms. Polster, that as a pharmacist you

01:38:20  7  tend to get to know your patients and the prescribers in the

01:38:23  8  area?

01:38:23  9  **A**    Yes.

01:38:23  10  **Q**    All right.  The next item on the list in the 1998 good

01:38:29  11  faith dispensing policy is, "Consistent prescription of

01:38:34  12  habit forming drugs."

01:38:36  13      The question I have for you about this one is, if a

01:38:39  14  patient is taking an opioid for a lengthy period of time,

01:38:43  15  would that be something that could fall under this red flag

01:38:47  16  in the 1998 policy?

01:38:49  17  **A**    Yes.

01:38:49  18  **Q**    Is that something that Walgreens wants its pharmacists

01:38:53  19  to look out for?

01:38:54  20  **A**    Yes.

01:38:54  21  **Q**    Okay.  Below the bullet list on the first page of the

01:39:04  22  1998 good faith dispensing policy it says -- let me call

01:39:12  23  this out for you -- "If a pharmacist becomes aware of

01:39:20  24  circumstances including one or more elements of good faith

01:39:23  25  dispensing, the pharmacist should:  Not dispense the drug."

01:39:29   1          Do you see that?

01:39:30   2   **A**      Yes.

01:39:30   3   **Q**      Is that something that has been policy at Walgreens as

01:39:36   4   long as you can remember for pharmacists?

01:39:38   5   **A**      Yes.

01:39:38   6   **Q**      And the second-to-last paragraph on this page says,

01:39:50   7   "The pharmacist must exercise professional judgment

01:39:53   8   regarding the patient's continued need for controlled

01:39:57   9   substances."

01:39:57  10          Do you agree with that statement?

01:39:59  11   **A**      Yes.

01:39:59  12   **Q**      It says, "The pharmacist must contact the prescriber

01:40:03  13   when all elements of good faith dispensing cannot be met."

01:40:08  14          Does that mean that if there are red flags on a

01:40:12  15   prescription that can't be resolved, you're supposed to call

01:40:16  16   the doctor?

01:40:16  17   **A**      Yes.

01:40:16  18   **Q**      Is calling the doctor the only thing that a pharmacist

01:40:23  19   is supposed to do if they can't resolve red flags?

01:40:25  20   **A**      No.

01:40:25  21   **Q**      If a doctor says either today or to a pharmacist in

01:40:29  22   1998 when they -- when the pharmacist picks up the phone

01:40:32  23   about a prescription, if the doctor says, just fill it, is

01:40:36  24   that what the pharmacist is supposed to do?

01:40:37  25   **A**      No.

**Polster (Direct by Swift)**

01:40:37   1   **Q**     If the red flag that the pharmacist is concerned about

01:40:42   2   is something suspicious about the doctor, is the pharmacist

01:40:46   3   supposed to just take the doctor's word that it's a good

01:40:50   4   prescription?

01:40:51   5   **A**     No.

01:40:51   6   **Q**     What is the pharmacist supposed to do in that

01:40:52   7   circumstance?

01:40:53   8   **A**     Well, after they exercise their due diligence, then

01:40:58   9   they should not dispense the prescription if they feel that

01:41:03   10   they haven't met their corresponding responsibility to

01:41:06   11   ensure the prescription was written in good faith.

01:41:09   12   **Q**     I'm going to show you -- well, I'll ask you to look at

01:41:12   13   Tab 2 in your binder, the one that I gave you.

01:41:18   14   **A**     Okay.

01:41:18   15   **Q**     Do you recognize the document behind Tab 2?

01:41:21   16   **A**     I do.

01:41:22   17   **Q**     What is it?

01:41:22   18   **A**     It is another good faith dispensing policy from --

01:41:29   19   well, let's see, it was revised in 2005 and revised again in

01:41:32   20   2006.

01:41:34   21   **Q**     Let's just get the date on this one.

01:41:39   22         Are you looking at the dates at the bottom of the

01:41:41   23   second page?

01:41:42   24   **A**     Yes.

01:41:42   25   **Q**     So you can see that the latest revision is from June

01:41:45  1    of 2006?

01:41:45  2    **A**    Yes.

01:41:46  3    **Q**    All right.  I'm going to go back to the first page.

01:41:51  4                    THE COURT:  Just to be clear, this is 00071?

01:41:54  5                    MS. SWIFT:  Yes, Your Honor.  My apologies.

01:41:56  6                    THE COURT:  Okay.  I just want to make sure

01:41:57  7    the record's clear.

01:41:58  8                    MS. SWIFT:  Thank you.

01:42:00  9    **Q**    You can see at the top of the page -- I'll call it

01:42:05  10   out -- it says again Elements.

01:42:08  11        And is that the same list of red flags we were looking

01:42:10  12   at before?

01:42:10  13   **A**    Yes.

01:42:11  14   **Q**    Then on the bottom of the page do you see, I think --

01:42:17  15   it's depending how you count, it's the fifth bullet.  I'll

01:42:22  16   try to call it out for you.

01:42:28  17        It says, "If the prescriber informs the pharmacist

01:42:32  18   that a prescription for a controlled substance is not valid

01:42:34  19   or authorized, contact law enforcement."

01:42:41  20        Do you know from your personal experience that

01:42:44  21   pharmacists do contact law enforcement when they identify

01:42:49  22   fraudulent prescriptions?

01:42:52  23                    MR. WEINBERGER:  Objection.

01:42:59  24                    MS. SWIFT:  I can withdraw the question.

01:43:00  25                    THE COURT:  I'm going to sustain that the way

**Polster (Direct by Swift)**                                    3142

01:43:04  1    it's said.

01:43:05  2              MS. SWIFT:  I'll ask it a different way.

01:43:05  3    **Q**    Do you know why this provision is in the 2006 good

01:43:08  4    faith dispensing policy?

01:43:10  5    **A**    Yes, because if the pharmacist identified a fraudulent

01:43:14  6    prescription, it's against the law, and we asked our

01:43:19  7    pharmacists to contact local law enforcement to let them

01:43:21  8    know that this patient was trying to pass a fraudulent

01:43:24  9    prescription.

01:43:24  10   **Q**    Do you know whether pharmacists at Walgreens do that

01:43:27  11   every single time they refuse a prescription?

01:43:31  12              MR. WEINBERGER:  Objection.

01:43:33  13              MS. SWIFT:  Just asking if she knows.

01:43:35  14              THE COURT:  Overruled.

01:43:36  15   **A**    No, I don't.

01:43:38  16              THE COURT:  Are you asking today?  I mean,

01:43:40  17   over 20 years what --

01:43:42  18              MR. WEINBERGER:  There's no foundation, Your

01:43:44  19   Honor.

01:43:44  20              MS. SWIFT:  I was asking her ...

01:43:46  21   **Q**    Do you know whether pharmacists at Walgreens contact

01:43:49  22   law enforcement every single time they refuse a

01:43:53  23   prescription?

01:43:53  24   **A**    No, I don't.

01:43:56  25              MR. WEINBERGER:  Objection.

01:43:56  1       THE COURT:  I'm going to -- let's go on the

01:43:58  2   headphones.

01:44:03  3              (At side bar at 1:44 p.m.)

01:44:11  4       THE COURT:  All right.  Ms. Swift, in

01:44:12  5   reviewing the question I'm going to sustain the objection

01:44:14  6   because it presumes that Walgreens pharmacists do refuse to

01:44:21  7   fill prescriptions.  And we just had a study that was -- she

01:44:25  8   talked about where when they did a survey in a thousand of

01:44:29  9   the stores the pharmacists had not filled -- not refused a

01:44:31  10  single prescription in a year.

01:44:34  11      So I'm going to sustain the objection the way you've

01:44:37  12  asked it.

01:44:37  13      MS. SWIFT:  I'll move on.  I'll come back to

01:44:40  14  the survey you were just talking about, but I'll ask the

01:44:42  15  question a different way.

01:44:43  16      THE COURT:  Okay.  Thank you.

01:44:48  17              (In open court at 1:44 p.m.)

01:44:57  18  BY MS. SWIFT:

01:44:58  19  Q    Ms. Polster, has it always been Walgreens' policy to

01:45:02  20  instruct pharmacists to call law enforcement when they

01:45:04  21  identify a fraudulent prescription?

01:45:05  22      MR. WEINBERGER:  Objection.

01:45:09  23      THE COURT:  I think you need to put a time

01:45:12  24  frame on that, Ms. Swift.

01:45:13  25  Q    All right.  We're looking at a 2006 Walgreens

**Polster (Direct by Swift)**                    3144

01:45:17  1    dispensing policy, right?

01:45:18  2    **A**    Yes.

01:45:18  3    **Q**    In 2006, was Walgreens empowering pharmacists to

01:45:24  4    contact law enforcement when they deemed it appropriate?

01:45:28  5                    MR. WEINBERGER:  Objection.

01:45:33  6                    THE COURT:  The way you're asking it, I'm

01:45:34  7    going to sustain the objection.

01:45:37  8    **Q**    The policy goes on to say, "If the prescriber can't be

01:45:45  9    reached, do not dispense."

01:45:48  10           Do you see that at the bottom of the page?

01:45:49  11   **A**    Yes.

01:45:49  12   **Q**    We've seen that before in the earlier policy as well,

01:45:53  13   correct?

01:45:53  14   **A**    Yes.

01:45:57  15   **Q**    All right.  Now I'd like you to turn to Tab 3 in your

01:46:00  16   binder.  And this is Exhibit 211.

01:46:06  17   **A**    Yes.

01:46:06  18   **Q**    Do you recognize Exhibit 211?

01:46:09  19   **A**    Yes.

01:46:09  20   **Q**    What is it?

01:46:10  21   **A**    It is another policy.  My 211 doesn't match what's on

01:46:18  22   the screen though.

01:46:19  23   **Q**    No, it doesn't, that's true.  Hold on a second.

01:46:23  24           Does it match now?

01:46:24  25   **A**    Yes.

**Polster (Direct by Swift)** 3145

01:46:24  1   **Q**    What is that document?

01:46:25  2   **A**    So this is another revised revision to the good faith

01:46:33  3   dispensing policy from June of 2011.

01:46:37  4   **Q**    All right.  And we see again under the word Elements

01:46:42  5   there is a list of bullets like we've seen before.

01:46:45  6         Would you agree with me, Ms. Polster, that this list

01:46:47  7   is longer than what we've seen before?

01:46:50  8   **A**    Yes.

01:46:52  9   **Q**    Do you know why the list of red flags in the good

01:46:57  10  faith dispensing policy got longer in 2011?

01:46:59  11  **A**    Yes.

01:46:59  12  **Q**    Why?

01:47:00  13  **A**    We were starting to see changes that were happening in

01:47:04  14  the industry.  We were starting to see just new things that

01:47:12  15  were happening that we wanted to include in the policy to

01:47:16  16  ensure that our pharmacists were aware.

01:47:18  17  **Q**    I think you may have touched on this a little bit

01:47:22  18  yesterday in your testimony.  You said you'd seen new things

01:47:27  19  start to change in the industry around 2011.  I believe you

01:47:32  20  said something to that effect in response to questions about

01:47:35  21  when the opioid crisis began.

01:47:37  22        Do you remember that?

01:47:37  23  **A**    I do.

01:47:38  24  **Q**    Were the changes in the industry that you just

01:47:44  25  referenced a moment ago what you were referring to in your

**Polster (Direct by Swift)**                                    3146

| | | |
|---|---|---|
| 01:47:47 | 1 | answers yesterday? |
| 01:47:48 | 2 | **A**    Yeah, that's some of them, yes. |
| 01:47:51 | 3 | **Q**    And I'd like to know a little bit more what you mean |
| 01:47:53 | 4 | when you say "changes in the industry." |
| 01:47:56 | 5 | What specifically are you talking about? |
| 01:47:57 | 6 | **A**    So when more chronic pain medications were coming into |
| 01:48:03 | 7 | a retail setting versus the acute or the hospice end of life |
| 01:48:11 | 8 | prescriptions, we were seeing chronic pain patients come |
| 01:48:15 | 9 | into a retail setting -- |
| 01:48:17 | 10 | **Q**    Can I stop you right there and ask a follow-up |
| 01:48:19 | 11 | question? |
| 01:48:19 | 12 | Do you have an understanding based on your experience |
| 01:48:21 | 13 | at Walgreens why you were seeing more chronic pain patients |
| 01:48:26 | 14 | in roughly this time frame? |
| 01:48:27 | 15 | **A**    I do. |
| 01:48:27 | 16 | **Q**    What is that understanding? |
| 01:48:29 | 17 | **A**    During that time frame, the regulations changed where |
| 01:48:34 | 18 | a prescriber who worked at a pain clinic could not dispense |
| 01:48:40 | 19 | pain medications for the patients that they were prescribing |
| 01:48:43 | 20 | for. |
| 01:48:44 | 21 | **Q**    You said the regulations. |
| 01:48:45 | 22 | Are you talking about specific state laws? |
| 01:48:48 | 23 | **A**    I don't know if it was state or federal. |
| 01:48:54 | 24 | **Q**    Are you talking about a particular location of the |
| 01:48:56 | 25 | country? |

**Polster (Direct by Swift)**

01:48:57  1   **A**   It was my understanding it was nationwide because we

01:49:02  2   started to see chronic pain patients nationally.

01:49:06  3   **Q**   And I think you said a moment ago it was because pain

01:49:12  4   clinics or pain management clinics were no longer allowed to

01:49:15  5   dispense directly to patients.

01:49:17  6        Do I have that right?

01:49:18  7            MR. WEINBERGER:  Objection.

01:49:21  8            MS. SWIFT:  I don't mean to mischaracterize.

01:49:23  9   I was just trying to get her back to what she just said.

01:49:26  10           THE COURT:  Overruled.  You can ask what she's

01:49:28  11  saying.

01:49:28  12  **Q**   Is that what you said?

01:49:30  13  **A**   Yes.

01:49:30  14  **Q**   Why did that have an effect on the patients that

01:49:34  15  Walgreens was seeing?

01:49:35  16  **A**   Because we started to see patients that would come in

01:49:40  17  that would get larger quantities than, you know, what would

01:49:43  18  be needed for a broken leg or recovering from a surgery.  We

01:49:48  19  started seeing patients that would have to come in that

01:49:51  20  would have to be -- their pain would need to be managed

01:49:55  21  because they weren't a surgical candidate or they didn't

01:50:00  22  have the benefit of being able to, you know, get better from

01:50:06  23  their pain quickly.

01:50:07  24  **Q**   Is what you're saying that the patients who used to go

01:50:09  25  to pain clinics were then coming to retail pharmacies like

**Polster (Direct by Swift)**

| | | |
|--|--|--|
| 01:50:14 | 1 | Walgreens? |
| 01:50:14 | 2 | **A**    Yes. |
| 01:50:15 | 3 | **Q**    Were all of those patients bad patients? |
| 01:50:21 | 4 | **A**    No. |
| 01:50:21 | 5 | **Q**    Were all of the prescriptions they presented |
| 01:50:28 | 6 | illegitimate? |
| 01:50:29 | 7 | MR. WEINBERGER:  Objection.  She wasn't a |
| 01:50:30 | 8 | pharmacist at the time. |
| 01:50:35 | 9 | THE COURT:  I'm going to sustain the |
| 01:50:36 | 10 | objection. |
| 01:50:37 | 11 | **Q**    Do you have an understanding from your experience at |
| 01:50:39 | 12 | Walgreens as to whether the increase in prescriptions and |
| 01:50:43 | 13 | patients who came in this time frame to Walgreens, whether |
| 01:50:47 | 14 | those were all illegitimate prescriptions or not? |
| 01:50:51 | 15 | MR. WEINBERGER:  Objection. |
| 01:50:51 | 16 | THE COURT:  Sustained. |
| 01:50:55 | 17 | **Q**    Do you have and understanding that Walgreens saw an |
| 01:50:57 | 18 | increase in the number of prescriptions that came into the |
| 01:50:59 | 19 | stores during this time? |
| 01:51:01 | 20 | MR. WEINBERGER:  Objection. |
| 01:51:02 | 21 | THE COURT:  I'll allow that.  Overruled. |
| 01:51:04 | 22 | **A**    Yes, we did see an increase in prescriptions for |
| 01:51:06 | 23 | chronic pain patients during that time. |
| 01:51:08 | 24 | **Q**    Was the change that you saw in this time frame unlike |
| 01:51:12 | 25 | changes in prescription trends that you had seen previously |

**Polster (Direct by Swift)** 3149

01:51:16 1 in your various jobs at Walgreens, including as a pharmacist

01:51:20 2 and a manager?

01:51:21 3             MR. WEINBERGER:  Objection, Your Honor.

01:51:23 4             THE COURT:  Sustained.

01:51:29 5 **Q**    Ms. Polster, when you said that you believed the

01:51:32 6 opiate crisis began around this time frame, were you

01:51:36 7 referring to this change in the types of patients and the

01:51:39 8 numbers of prescriptions that you saw in that time frame?

01:51:41 9             MR. WEINBERGER:  Objection.

01:51:42 10            THE COURT:  Well, I'll let her explain her

01:51:45 11 answer.

01:51:46 12       You can answer that.

01:51:51 13 **A**    Yes.

01:51:51 14 **Q**    Did you mean to minimize or brush aside in any way

01:51:53 15 problems with prescription opioid abuse that had been in the

01:51:59 16 country prior to that time frame?

01:52:00 17            MR. WEINBERGER:  Objection.

01:52:00 18            THE COURT:  Sustained.

01:52:03 19 **Q**    Does Walgreens have any influence over prescribing

01:52:07 20 practices?

01:52:08 21 **A**    No.

01:52:08 22 **Q**    Are pharmacists in a better position than prescribers,

01:52:13 23 in your view, to evaluate legitimate medical need?

01:52:19 24            MR. WEINBERGER:  Objection.

01:52:21 25            MS. SWIFT:  I'll withdraw it.

**Polster (Direct by Swift)**

01:52:22  1    **Q**     Ms. Polster, do pharmacists examine patients?

01:52:25  2    **A**     No.

01:52:25  3    **Q**     Do pharmacists have access to a patient's full medical

01:52:30  4    history?

01:52:31  5    **A**     No.

01:52:31  6    **Q**     Can a pharmacist order tests like blood work, X-rays,

01:52:37  7    and MRIs?

01:52:38  8    **A**     No.

01:52:38  9    **Q**     All right.  Turning back to the 2011 good faith

01:52:44  10   dispensing policy that we've got on the screen.

01:52:45  11          One of the new red flags that was added to this policy

01:52:50  12   is "Consistent requests for early refills."

01:52:55  13          Do you see that?

01:52:55  14   **A**     Yes.

01:52:55  15   **Q**     What counts as "early"?

01:53:05  16   **A**     There's not a cut and dry answer.  It depends on the

01:53:08  17   circumstance and the patient and what's happening.

01:53:10  18   **Q**     Why had it be a concern in certain circumstances if a

01:53:17  19   patient is presenting a prescription too early?

01:53:19  20   **A**     If it's the same patient that comes in each time they

01:53:23  21   need to get their pain medication again and they say, well,

01:53:28  22   I ran out, I dropped it, it fell in the toilet, there's a

01:53:35  23   myriad of reasons why a patient would -- you would need to

01:53:38  24   understand and be able to resolve the reasons why before you

01:53:42  25   should dispense it.

**Polster (Direct by Swift)** 3151

01:53:45 1 **Q**     If you're a staff pharmacist who has a patient like

01:53:47 2 what you just described who consistently tries to fill

01:53:50 3 prescriptions early and is consistently told you can't do

01:53:53 4 that, is it appropriate as a pharmacist to beg off and ask

01:53:58 5 one of the other staff pharmacists to fill for that patient?

01:54:01 6 **A**     No.

01:54:01 7 **Q**     Why not?

01:54:02 8 **A**     You can't slough off that responsibility onto another

01:54:08 9 pharmacist.  You know, you could if it's after hours and you

01:54:13 10 couldn't get ahold of the prescriber to resolve that

01:54:16 11 particular red flag, you could then leave it for when the

01:54:24 12 doctor's office is open to contact the doctor the next day.

01:54:26 13 But to just say, you know what, I'm not filling this, you

01:54:29 14 fill it, you can't do that, or you shouldn't do that.

01:54:32 15 **Q**     I'll direct your attention to the box at the bottom of

01:54:34 16 the first page of the 2011 good faith dispensing policy.

01:54:38 17      Do you see that?

01:54:40 18 **A**     Yes.

01:54:41 19 **Q**     It says, among other things, it says, "If asked by law

01:54:49 20 enforcement to dispense a fraudulent prescription, do not

01:54:54 21 dispense and inform law enforcement that this is a violation

01:54:57 22 of state and federal law."

01:55:00 23      Why is that in the 2011 policy?

01:55:02 24 **A**     We were starting to see patients that were trying to

01:55:07 25 pass fraudulent prescriptions, and the law enforcement would

**Polster (Direct by Swift)**

01:55:12  1   come into the store and say, we know this person is going to

01:55:17  2   give you a fraudulent prescription, and we want you to fill

01:55:20  3   it because we want to arrest the patient after they get the

01:55:25  4   medication.

01:55:26  5   **Q**    Was that something that was okay for a pharmacist at

01:55:28  6   Walgreens to do, in your view?

01:55:30  7   **A**    No.

01:55:30  8   **Q**    In fact, could a pharmacist get fired for doing that?

01:55:34  9   **A**    Yes.

01:55:35  10  **Q**    Even if a law enforcement official asked them to do

01:55:38  11  it?

01:55:38  12  **A**    Yes.

01:55:38  13  **Q**    And you can see the bottom part of the box says,

01:55:46  14  "Violation of state and federal law and/or company policy

01:55:51  15  will result in disciplinary action, up to and including

01:55:55  16  termination of employment."

01:55:58  17        Did I read that correctly?

01:55:59  18  **A**    Yes.

01:55:59  19  **Q**    Does Walgreens fire pharmacists who fail to follow the

01:56:02  20  law?

01:56:02  21  **A**    Yes.

01:56:02  22  **Q**    Does Walgreens fire pharmacists who knowingly dispense

01:56:07  23  illegitimate prescriptions?

01:56:09  24  **A**    Yes.

01:56:09  25  **Q**    Has that been the case for as long as you've been

**Polster (Direct by Swift)**          3153

01:56:13   1   working at Walgreens, as far as you know?

01:56:14   2   **A**    Yes.

01:56:22   3   **Q**    All right.  Take a look at Tab 4 in your binder,

01:56:24   4   please.  This is WAG-MDL-304.

01:56:33   5        Do you recognize what that is, Ms. Polster?

01:56:35   6   **A**    Yes.

01:56:36   7   **Q**    What is it?

01:56:36   8   **A**    It's the 2012 updated good faith dispensing policy.

01:56:44   9   **Q**    This one is longer than the previous policies we've

01:56:47   10  looked at, would you agree with me?

01:56:48   11  **A**    Yes.

01:56:49   12  **Q**    How many pages is it?

01:56:56   13  **A**    Six.

01:56:56   14  **Q**    I'm going to direct your attention first to the third

01:56:59   15  paragraph on the first page.

01:57:06   16       Would you agree me there again it says that "a

01:57:08   17  pharmacist at Walgreens who does not follow the good faith

01:57:11   18  dispensing policy can be fired"?

01:57:12   19  **A**    Yes.

01:57:12   20  **Q**    And we saw that before, right?

01:57:15   21  **A**    Yes.

01:57:18   22  **Q**    Would you agree with me that knowing you can get fired

01:57:20   23  for not following company policy is an incentive to follow

01:57:22   24  the policy?

01:57:25   25  **A**    I would think so, yes.

**Polster (Direct by Swift)**                                    3154

| | | |
|---|---|---|
| 01:57:26 | 1 | **Q**    Walgreens tells its pharmacists they could lose their |
| 01:57:30 | 2 | jobs if they don't follow the good faith dispensing policy |
| 01:57:32 | 3 | around red flags, correct? |
| 01:57:33 | 4 | **A**    Yes. |
| 01:57:33 | 5 | **Q**    Could a pharmacist lose their license if they |
| 01:57:38 | 6 | knowingly dispense illegitimate prescriptions? |
| 01:57:41 | 7 | **A**    It is possible that a board of pharmacy would take |
| 01:57:46 | 8 | action on a pharmacist, yes. |
| 01:57:46 | 9 | **Q**    Is that something pharmacists know?  Is that something |
| 01:57:49 | 10 | you know as a pharmacist? |
| 01:57:50 | 11 |                     MR. WEINBERGER:  Objection. |
| 01:57:51 | 12 | **Q**    Do you know that as a pharmacist? |
| 01:57:53 | 13 | **A**    Yes. |
| 01:57:53 | 14 | **Q**    All right.  Then the format of the 2012 policy is a |
| 01:58:00 | 15 | little bit different than the ones we've seen previously; |
| 01:58:03 | 16 | would you agree with that? |
| 01:58:05 | 17 | **A**    Yes. |
| 01:58:05 | 18 | **Q**    I'm going to call out item number 3 on the bottom of |
| 01:58:12 | 19 | the first page. |
| 01:58:13 | 20 |      Do you see that? |
| 01:58:13 | 21 | **A**    Yes. |
| 01:58:13 | 22 | **Q**    It says, "Prescription drug monitoring program, or |
| 01:58:17 | 23 | PDMP."  The jury has heard a lot about PDMPs.  That's the |
| 01:58:23 | 24 | state database of controlled substance prescriptions that |
| 01:58:26 | 25 | are filled by pharmacies in a given state.  Is that a fair |

**Polster (Direct by Swift)** 3155

| | | |
|---|---|---|
| 01:58:30 | 1 | characterization? |
| 01:58:31 | 2 | **A**    Yes. |
| 01:58:31 | 3 | **Q**    Were PDMPs becoming more available in this time frame |
| 01:58:37 | 4 | in 2012? |
| 01:58:38 | 5 | **A**    Yes. |
| 01:58:41 | 6 | **Q**    Did Walgreens provide access to state PDMPs for |
| 01:58:44 | 7 | pharmacists whenever they became available? |
| 01:58:46 | 8 | **A**    Yes. |
| 01:58:46 | 9 | **Q**    Was Walgreens a frontrunner when it came to making |
| 01:58:52 | 10 | PDMPs available to its pharmacists? |
| 01:58:54 | 11 | MR. WEINBERGER:  Objection. |
| 01:58:59 | 12 | THE COURT:  Sustained. |
| 01:59:00 | 13 | **Q**    Do the requirements for checking the state PDMP vary |
| 01:59:06 | 14 | from state to state? |
| 01:59:07 | 15 | **A**    Yes. |
| 01:59:07 | 16 | **Q**    If checking the PDMP in a particular type of |
| 01:59:12 | 17 | circumstance is required by state law, does Walgreens |
| 01:59:16 | 18 | require pharmacists do that that, to follow that law? |
| 01:59:20 | 19 | **A**    Yes. |
| 01:59:20 | 20 | **Q**    All right.  Another item that's new, I think, to this |
| 01:59:29 | 21 | 2012 policy is the last item on this page.  It says, |
| 01:59:37 | 22 | "Data/DUR review." |
| 01:59:39 | 23 | What does that mean? |
| 01:59:41 | 24 | **A**    The data review is ensuring that the information that |
| 01:59:47 | 25 | is typed into the computer system matches exactly what the |

**Polster (Direct by Swift)**

01:59:51  1   prescriber wrote.

01:59:53  2       And the DUR review is drug utilization review.  That

02:00:00  3   is where a drug interaction or an alert would show to the

02:00:04  4   pharmacist about the specific prescription they're filling.

02:00:06  5   **Q**    Would the drug interaction alert that you just

02:00:11  6   referred to, would that capture things like the cocktail

02:00:14  7   prescriptions you were talking about before?

02:00:15  8   **A**    Yes.

02:00:16  9   **Q**    Why is that?  How does that work?

02:00:19  10  **A**    We work with a vendor to review the patient's file,

02:00:29  11  and it -- the profile hits up against the vendor's database

02:00:34  12  that contains information about the drugs.  And then it --

02:00:43  13  any drug interaction would be displayed back to the

02:00:52  14  pharmacist in the filling of the prescription.

02:00:54  15  **Q**    So just to make sure I understand, is what you're

02:00:56  16  saying that there is something in the computer system that

02:01:00  17  will alert the pharmacist if somebody comes in with a

02:01:03  18  prescription for an opioid and they're already taking

02:01:06  19  another drug that might have a bad interaction with that

02:01:08  20  opioid?

02:01:09  21          MR. WEINBERGER:  Objection, Your Honor.

02:01:11  22  **Q**    Is that what you were saying?

02:01:12  23          THE COURT:  Sustained.

02:01:23  24  **Q**    Am I correct that the DUR review is meant to identify

02:01:26  25  drug-drug interactions?

**Polster (Direct by Swift)** 3157

| | | |
|--|--|--|
| 02:01:27 | 1 | **A**    Yes. |
| 02:01:30 | 2 | **Q**    If you'll turn to page 2 of the 2012 policy.  And at |
| 02:01:35 | 3 | the beginning of this page 2 it talks about in the second |
| 02:01:40 | 4 | paragraph it says, "The following are examples that should |
| 02:01:44 | 5 | alert the pharmacist to questionable circumstances." |
| 02:01:46 | 6 | That's similar language to what we've seen going back |
| 02:01:48 | 7 | to 1998, would you agree with me? |
| 02:01:50 | 8 | **A**    Yes. |
| 02:01:50 | 9 | **Q**    It says, "The list is not intended to be all |
| 02:01:54 | 10 | inclusive." |
| 02:01:54 | 11 | Do you see that? |
| 02:01:55 | 12 | **A**    Yes. |
| 02:01:55 | 13 | **Q**    And it says, "The pharmacist has a responsibility to |
| 02:01:59 | 14 | follow up with the patient and/or the prescriber to make |
| 02:02:01 | 15 | sure the elements of good faith dispensing are met." |
| 02:02:05 | 16 | Did I read that correctly? |
| 02:02:06 | 17 | **A**    Yes. |
| 02:02:06 | 18 | MR. WEINBERGER:  Your Honor, she's not reading |
| 02:02:11 | 19 | from the -- she's not correctly reading the document.  She's |
| 02:02:16 | 20 | paraphrasing.  I mean -- |
| 02:02:18 | 21 | MS. SWIFT:  I'm trying to move it along, but |
| 02:02:19 | 22 | I'm happy to read it all if -- |
| 02:02:21 | 23 | THE COURT:  Well, let's just go on the |
| 02:02:23 | 24 | headphones a minute. |
| 02:02:29 | 25 | (At side bar at 2:02 p.m.) |

02:02:35    1              THE COURT:  I'll remind both sides, if you're

02:02:40    2    examining a witness with a document that they know, you can

02:02:44    3    read a paragraph or a sentence or two and say what does that

02:02:45    4    mean, et cetera, but it's got to be read accurately.  If you

02:02:48    5    want to do it a different way, you can do it a different

02:02:50    6    way.  But if you're going to read it, it's going to be

02:02:54    7    reading it exactly.

02:02:55    8              MS. SWIFT:  Understood, Your Honor.  Thank

02:02:56    9    you.

02:03:02   10              (In open court at 2:03 p.m.)

02:03:21   11    BY MS. SWIFT:

02:03:21   12    **Q**    Ms. Polster, I'm going to go back for one minute to

02:03:25   13    the provision on the first page about the PDMP requirement

02:03:30   14    in this policy.  I just want to make sure this is clear.

02:03:32   15         This good faith dispensing policy reads exactly:  "If

02:03:38   16    available in your state, use the PDMP to obtain additional

02:03:41   17    information to help determine the validity and confirm the

02:03:46   18    appropriateness of the prescription."

02:03:49   19         Did I read that accurately?

02:03:51   20    **A**    Yes.

02:03:51   21    **Q**    Is that a requirement of the good faith dispensing

02:03:53   22    policy regardless whether state law also requires it?

02:04:00   23              MR. WEINBERGER:  Objection.

02:04:01   24    **Q**    Is it a requirement --

02:04:03   25              MS. SWIFT:  I'll withdraw the question.

**Polster (Direct by Swift)**                    3159

02:04:04    1                   THE COURT:  I'll allow that question.

02:04:05    2    **Q**     Is it a requirement of the policy?

02:04:06    3    **A**     Yes, if the pharmacist needs it to determine the

02:04:13    4    appropriateness of the prescription, yes.

02:04:15    5    **Q**     All right.  Turning back to page 2 of the 2012 policy.

02:04:21    6           The second paragraph starts out, "The following are

02:04:27    7    examples that should alert a pharmacist to questionable

02:04:29    8    circumstances."

02:04:34    9           Do you see that?

02:04:35   10    **A**     Yes.

02:04:35   11    **Q**     Then below that sentence there are a number of other

02:04:39   12    sentences, and then there are boxes at the bottom of the

02:04:41   13    page.

02:04:42   14           Would you agree with me?

02:04:43   15    **A**     Yes.

02:04:43   16    **Q**     Are those boxes providing different examples of red

02:04:51   17    flags?

02:04:51   18    **A**     Yes.

02:04:52   19    **Q**     And if you look onto the following pages, there are

02:04:56   20    more even than just what's on page 2, correct?

02:04:58   21    **A**     Yes.

02:04:58   22    **Q**     The first box says, "Usual course of professional

02:05:11   23    practice."

02:05:11   24           Do you see that?

02:05:12   25    **A**     Yes.

**Polster (Direct by Swift)**

02:05:12  1  **Q**     Would you agree with me that some of the examples of

02:05:17  2  red flags in this box in the 2012 policy are the same as

02:05:22  3  what we saw before in the earlier policies?

02:05:25  4  **A**     Yes.

02:05:25  5  **Q**     It includes the unusual geographical distances red

02:05:30  6  flag.

02:05:30  7       Do you see that?

02:05:31  8  **A**     Yes.

02:05:31  9  **Q**     It also includes several other red flags; would you

02:05:34  10  agree with that?

02:05:35  11  **A**     Yes.

02:05:35  12  **Q**     One of the new ones, I'll ask if you agree with this,

02:05:39  13  one of them says, "Does the prescription appear to be issued

02:05:43  14  pursuant to an online diagnosis questionnaire?"

02:05:48  15       Do you see that?

02:05:48  16  **A**     Yes.

02:05:48  17  **Q**     What is an online diagnosis questionnaire?

02:05:50  18  **A**     At that time, we were starting to see prescribers that

02:06:02  19  were prescribing prescriptions for patients that they may

02:06:05  20  not have had a relationship with, that the patient could

02:06:08  21  have gone online and filled out a questionnaire, and the

02:06:10  22  prescriber took that questionnaire and phoned in a

02:06:16  23  prescription or sent a prescription to that patient.

02:06:20  24  **Q**     Why is that a concern, if it is?

02:06:22  25  **A**     One of the requirements in dispensing a controlled

**Polster (Direct by Swift)**                           3161

02:06:31   1   substance, or any prescription really, is to make sure that

02:06:35   2   there is a doctor/patient relationship, that the doctor

02:06:38   3   knows the patient that they are prescribing for.

02:06:45   4   **Q**    And do you see the box that says, "Trends for

02:06:49   5   prescribers and patients"?

02:06:50   6   **A**    Yes.

02:06:50   7   **Q**    Do you see the bullet that says, "Frequent combination

02:06:59   8   prescriptions for known drug cocktails, such as

02:07:04   9   benzodiazapine, opioid, and carisoprodol?

02:07:09  10   **A**    Yes.

02:07:09  11   **Q**    Is this a more detailed example on unusual

02:07:12  12   combinations than what we saw on that in early policies?

02:07:16  13   **A**    Yes.

02:07:16  14   **Q**    Why was that spelled out more specifically in the 2012

02:07:20  15   policy?

02:07:20  16   **A**    Well, about that time we started to see more of that

02:07:23  17   practice, and the DEA and the industry was using that word,

02:07:30  18   cocktails.  And we added that to the policy to ensure that

02:07:34  19   our pharmacists had awareness about that.

02:07:38  20   **Q**    Now, I'd like to you turn to page 3 of the 2012

02:07:41  21   policy, if you would, please.

02:07:44  22         Do you see at the top of the page the box that says

02:07:47  23   "Prescribers"?

02:07:48  24   **A**    Yes.

02:07:48  25   **Q**    Is this a more detailed list of red flags for

02:07:54   1   prescribers than what we saw before?

02:07:55   2   **A**    Yes.

02:07:56   3   **Q**    And do you see there's also a box that says

02:08:03   4   "Patients"?

02:08:03   5   **A**    Yes.

02:08:03   6   **Q**    Is this a more detailed list of red flags for patients

02:08:06   7   than what we saw before?

02:08:08   8   **A**    Yes.

02:08:08   9   **Q**    The list for patients, let's see if I can find it, it

02:08:17   10  includes "request to pay by cash or by using a cash discount

02:08:22   11  card."

02:08:23   12       Do you see that?

02:08:24   13  **A**    Yes.

02:08:24   14  **Q**    The jury has heard a bit about this before, but why

02:08:30   15  might cash payment be a concern that you'd want a pharmacist

02:08:33   16  to look out for?

02:08:34   17  **A**    It's not always a concern, but it would be unusual if

02:08:38   18  the patient has insurance, and they're asking the pharmacy

02:08:42   19  staff to not bill their insurance when filling the

02:08:45   20  prescription.

02:08:45   21  **Q**    Can a pharmacist see when they're in the Walgreens

02:08:49   22  computer system whether or not a patient has insurance?

02:08:52   23  **A**    Yes.

02:08:52   24  **Q**    Then on page 4 of the 2012 good faith dispensing

02:09:00   25  policy there's a section that says "Document."

**Polster (Direct by Swift)** 3163

02:09:03  1      Do you see that at the top of the page?

02:09:05  2   **A**   Yes.

02:09:05  3   **Q**   Do you take steps to do what you can to get the

02:09:08  4   pharmacists to document the resolution of red flags?

02:09:11  5   **A**   Yes.

02:09:11  6   **Q**   Is it up to the pharmacist in the first instance to

02:09:15  7   determine whether there is a red flag?

02:09:19  8   **A**   Yes.

02:09:19  9   **Q**   Why is that up to the pharmacist?

02:09:21  10  **A**   Well, the pharmacist may know the circumstances around

02:09:29  11  the patient better than -- one better than the other, so a

02:09:33  12  pharmacist that is always at that store that knows that

02:09:35  13  patient, but if there's a pharmacist that's new to that

02:09:40  14  location, a floater pharmacist, they're filling in on

02:09:43  15  vacation or something like that, and they're not familiar

02:09:47  16  with the patient or the community or the prescriber, that

02:09:51  17  pharmacist may see it as a red flag where another pharmacist

02:09:53  18  may not.

02:09:54  19  **Q**   Is it necessary to re-document the same thing every

02:09:59  20  time a patient comes back to fill a prescription if it's

02:10:02  21  been resolved earlier?

02:10:03  22            MR. WEINBERGER:  Objection.

02:10:04  23  **Q**   Under Walgreens' policy?

02:10:07  24            MR. WEINBERGER:  Objection.

02:10:08  25            THE COURT:  Overruled.

**Polster (Direct by Swift)** 3164

02:10:09 1    **A**      No, because if it's not a red flag to the pharmacist,

02:10:12 2    then we would not expect them to document the resolution.

02:10:16 3    **Q**      And coming at that from a different angle, just

02:10:20 4    because a pharmacist documented the resolution of a red flag

02:10:24 5    on an earlier prescription, does that relieve the later

02:10:29 6    pharmacist reviewing and evaluating the later prescription?

02:10:34 7    **A**      Well, each pharmacist should be taking each

02:10:37 8    prescription on its own merit, but if -- if I was a

02:10:42 9    pharmacist and I saw that pain patient come in and I knew

02:10:48 10   the circumstances around that pain patient and I had already

02:10:53 11   done my due diligence on that specific page, that specific

02:10:56 12   doctor, that specific drug, and then that patient were to

02:11:00 13   come back and have the exact same prescription that was

02:11:03 14   written by the prescriber and the time made sense, I may not

02:11:08 15   go to as many steps as I did before because it wasn't a red

02:11:14 16   flag.  It would be appropriate for that time and that

02:11:17 17   circumstance.

02:11:19 18   **Q**      Ms. Polster, is it fair to say that you have spent

02:11:20 19   years working on policies and procedures and training

02:11:24 20   regarding those policies and procedures for the dispensing

02:11:26 21   of controlled substance at Walgreens?

02:11:29 22   **A**      Yes.

02:11:30 23   **Q**      Based on that experience and based on your knowledge

02:11:35 24   of how Walgreens pharmacists document the resolution of red

02:11:40 25   flags, do you have concerns that diligence is not being done

**Polster (Direct by Swift)** 3165

| | | |
|---|---|---|
| 02:11:43 | 1 | at Walgreens? |
| 02:11:44 | 2 | MR. WEINBERGER:  Objection. |
| 02:11:55 | 3 | THE COURT:  Overruled. |
| 02:11:55 | 4 | **A**    Can I say that I -- that diligence is done a hundred |
| 02:12:03 | 5 | percent on every single prescription?  I cannot.  We have to |
| 02:12:05 | 6 | ensure that our pharmacists understand their corresponding |
| 02:12:09 | 7 | responsibility and doing their due diligence. |
| 02:12:14 | 8 | I have concerns that our policies are in place and |
| 02:12:17 | 9 | that our pharmacists are following what we're asking them to |
| 02:12:21 | 10 | do and that they understand their corresponding |
| 02:12:25 | 11 | responsibility when they are filling a controlled substance. |
| 02:12:26 | 12 | **Q**    And do you believe that as a general matter the |
| 02:12:28 | 13 | pharmacists at Walgreens do that? |
| 02:12:30 | 14 | MR. WEINBERGER:  Objection. |
| 02:12:30 | 15 | THE COURT:  No, overruled. |
| 02:12:35 | 16 | **A**    I do. |
| 02:12:36 | 17 | **Q**    Is it true -- and I think you've said a little bit |
| 02:12:39 | 18 | about this already.  I'll try not to belabor it.  You |
| 02:12:44 | 19 | mentioned the floater pharmacist.  I think you said at the |
| 02:12:47 | 20 | beginning of your testimony, you're answering my questions |
| 02:12:50 | 21 | today, that you yourself were a floater pharmacist. |
| 02:12:52 | 22 | Do I have that right? |
| 02:12:54 | 23 | **A**    Yes. |
| 02:12:55 | 24 | **Q**    Would you expect that floater pharmacist -- well, |
| 02:12:59 | 25 | strike that.  Let me try to come at this a different way. |

**Polster (Direct by Swift)**

02:13:02  1    Is it true that whether a prescription presents a red

02:13:04  2    flag to begin with depends on the knowledge of the

02:13:08  3    pharmacist who's reviewing the prescription?

02:13:11  4    **A**    Yes.

02:13:14  5    **Q**    Would you expect a pharmacist who regularly works at a

02:13:18  6    pharmacy and knows the patients and the doctors in the

02:13:22  7    community, to have more knowledge about those patients than

02:13:24  8    a pharmacist who's new to the job or is it floater?

02:13:28  9    **A**    New to the location and the prescribing practices and

02:13:32  10   maybe that specific patient, yes.

02:13:37  11   **Q**    How might a floater pharmacist's identification of red

02:13:41  12   flags differ from a pharmacist who regularly works in the

02:13:46  13   pharmacy?

02:13:48  14   **A**    Let's say that you're at a small rural community, and

02:13:58  15   I'm not familiar with Ohio so I'm going to use Illinois as

02:14:03  16   an example.

02:14:04  17        But you're in a farming community in the middle of the

02:14:07  18   state, and a patient brings a prescription from Northwestern

02:14:14  19   Hospital, which is a big hospital in Chicago.  There's a lot

02:14:17  20   of specialists there.  There may be a -- it may be a far

02:14:24  21   distance to get from Northwestern to the pharmacy that I'm

02:14:28  22   working at in the small rural community in Illinois, and

02:14:32  23   that could be a red flag to the floater pharmacist as to why

02:14:34  24   is that patient going all the way to Northwestern to get

02:14:38  25   that prescription.

**Polster (Direct by Swift)**                    3167

02:14:39  1    **Q**     If a patient who is known to you as not having

02:14:49  2    insurance pays cash for a prescription and drives 26 miles

02:14:54  3    for an explainable reason, is that a red flag that needs to

02:15:00  4    be documented?

02:15:01  5    **A**     Not necessarily.

02:15:05  6    **Q**     As a pharmacist for more than three decades, has it

02:15:08  7    ever been your understanding that there is a legal

02:15:11  8    requirement to document the resolution of red flags?

02:15:17  9    **A**     Not a legal requirement.  A best practice.

02:15:20  10   **Q**     If you're talking about a pharmacist's obligation to

02:15:25  11   document, are you talking about it in terms of the best

02:15:27  12   practice and what is required by the Walgreens policy?

02:15:29  13   **A**     Yes.

02:15:29  14   **Q**     All right.  If you'd take a look at page 4 of the 2012

02:15:36  15   good faith dispensing policy.

02:15:38  16         Do you see the section with the heading "Refusal to

02:15:42  17   dispense"?

02:15:45  18   **A**     Yes.

02:15:46  19   **Q**     It says, "If the prescriber informs the pharmacist

02:15:53  20   that a prescription for a controlled substance is valid but

02:15:57  21   the pharmacist determines that the elements of good faith

02:15:59  22   dispensing are not present, the pharmacist has a

02:16:02  23   responsibility to refuse to dispense."

02:16:04  24         Did I read that correctly?

02:16:06  25   **A**     Yes.

**Polster (Direct by Swift)** 3168

02:16:06 1 **Q** We've seen similar language, not exactly like this, in

02:16:11 2 early policies; would you agree to that?

02:16:13 3 **A** Yes.

02:16:13 4 **Q** Is the obligation to refuse a prescription that does

02:16:19 5 not meet the elements of good faith or that has red flags

02:16:23 6 that cannot be resolved, the obligation to refuse that

02:16:27 7 prescription, is that in Walgreens' good faith dispensing

02:16:31 8 policy today?

02:16:31 9 **A** Yes.

02:16:32 10 **Q** Has it always been part of Walgreens' good faith

02:16:35 11 dispensing?

02:16:35 12 **A** Yes.

02:16:35 13 **Q** If you'll take a look at page 6 of the 2012 policy.

02:16:48 14 Do you see the summary of good faith dispensing

02:16:54 15 procedures by role and responsibility?

02:16:55 16 **A** Yes.

02:16:56 17 **Q** Does this -- what is this?

02:17:00 18 **A** It's just another way to display the responsibility of

02:17:06 19 each employee back in the pharmacy, whether it be a

02:17:12 20 technician or a pharmacist.

02:17:13 21 **Q** Were these steps that either the pharmacy tech or the

02:17:16 22 pharmacist was taking even before the steps were laid out

02:17:21 23 like this in a flowchart in the policy?

02:17:24 24 **A** Yes.

02:17:24 25 **Q** Why did you decide to include this in the 2012 policy?

**Polster (Direct by Swift)**                    3169

02:17:27  1    **A**      You know, we tried to -- you know, as things progress

02:17:34  2    and change and you learn different things, you get feedback

02:17:37  3    from the field and other places, we tried to shake things up

02:17:41  4    a little bit to, you know, display them differently, find

02:17:46  5    different ways.  People learn in different ways, people

02:17:49  6    remember in different ways.  And this is an example where we

02:17:52  7    just, you know, did it in like a flowchart rather than

02:17:57  8    spelling it all out.

02:17:58  9    **Q**      There are a number of steps in the filling of a

02:18:03  10   prescription for controlled substances; would you agree with

02:18:05  11   that?

02:18:05  12   **A**      Yes.

02:18:06  13   **Q**      Are all of the steps laid out in this flowchart or is

02:18:10  14   it just a summary?

02:18:10  15   **A**      It's probably just a summary.

02:18:13  16   **Q**      A number of the boxes say "shared responsibility," and

02:18:20  17   then one of them says "ultimate responsibility."

02:18:23  18           What does that refer to?

02:18:24  19   **A**      So everybody back in the pharmacy has a responsibility

02:18:29  20   to ensure that a prescription is being dispensed in good

02:18:33  21   faith.  If the technician knows that the prescription is

02:18:35  22   fraudulent, then they should say something to the

02:18:38  23   pharmacist, you know, point it out.

02:18:39  24           But the ultimate responsibility for dispensing a

02:18:43  25   controlled substance at Walgreens is the final check

**Polster (Direct by Swift)**                                    3170

02:18:46  1   pharmacist that puts the pills in the bottle before they

02:18:50  2   dispense the prescription to the patient.

02:18:53  3   **Q**    There are a number of -- well, it looks like to me but

02:18:57  4   tell me if I'm wrong, it looks like there are a number of

02:19:01  5   steps along in the process where someone, either a tech or a

02:19:06  6   pharmacist, can alert someone of questionable prescriptions.

02:19:10  7        Is that a fair summary or correct me if I'm wrong?

02:19:13  8   **A**    Yes, that's correct.

02:19:13  9   **Q**    I also see it looks like a number of checks,

02:19:17  10  especially the last three steps in the process.  There are a

02:19:21  11  number of checks that repeat for each process.

02:19:23  12       Do you see that?

02:19:24  13  **A**    Yes.

02:19:25  14  **Q**    It says, "Check patient ID, verify DEA, use PDMP,

02:19:31  15  review profile, evaluate GFD" -- that's good faith

02:19:37  16  dispensing?

02:19:37  17  **A**    Yes.

02:19:37  18  **Q**    -- "document, pharmacist action, notify DEA, and

02:19:46  19  Assign CAP."

02:19:50  20       Why are those checks listed at each phase of this

02:19:53  21  process?

02:19:53  22  **A**    They can be done at any of those phases, and so we

02:19:57  23  were calling it out that, you know, if a DUR review

02:20:01  24  pharmacist felt that additional action needed to be taken or

02:20:05  25  they took additional action, we were expecting them to

**Polster (Direct by Swift)** 3171

02:20:09  1    document if they did.

02:20:12  2         But it didn't necessarily have to happen at that

02:20:15  3    phase.

02:20:16  4    **Q**    All right.  I don't want to spend too much time on the

02:20:19  5    steps.

02:20:21  6         Does greet and scan mean what it sounds like, you

02:20:24  7    greet the patient and scan the prescription?

02:20:27  8    **A**    Yes.

02:20:27  9    **Q**    And the tech or the pharmacist could do that?

02:20:28  10   **A**    Yes.

02:20:29  11   **Q**    Data entry, again, is that just what it sounds like?

02:20:33  12   **A**    Yes.

02:20:34  13   **Q**    We've talked about data review and DUR.  Is that the

02:20:37  14   phase of the filling process when somebody checks for

02:20:42  15   drug-drug interactions and maybe does other things as well?

02:20:44  16   **A**    Yes.

02:20:45  17   **Q**    What is product review?

02:20:47  18   **A**    Product review is ensuring that the right pill is in

02:20:51  19   the right bottle for the right patient based on the

02:20:54  20   prescription that was written.

02:20:56  21   **Q**    What is consultation?

02:20:58  22   **A**    So consultation is a conversation that the pharmacist

02:21:03  23   would have with the patient or the caregiver about that

02:21:06  24   specific prescription.

02:21:07  25   **Q**    And for each of these steps it says "tech or RPH, for

**Polster (Direct by Swift)** 3172

02:21:14 1  pharmacist, or it just says pharmacist or RPH?

02:21:17 2  **A**    Correct.

02:21:17 3  **Q**    Are some of these steps steps that they technician can

02:21:20 4  do and some only a pharmacist accounted?

02:21:23 5  **A**    Correct.

02:21:23 6  **Q**    Which of the steps in the filling process does a

02:21:26 7  pharmacist have to do?

02:21:28 8  **A**    The pharmacist must do the data DUR review, they must

02:21:34 9  do the final product check, and they must be -- they must be

02:21:42 10  the person that has the conversation with the patient or the

02:21:46 11  caregiver.

02:21:47 12       However, an intern under the supervision of a

02:21:51 13  pharmacist might also do consultation.

02:21:54 14  **Q**    Does this flowchart mean to suggest that several techs

02:21:59 15  and several pharmacists will be involved in filling every

02:22:02 16  prescription?

02:22:02 17  **A**    It could mean that.

02:22:04 18  **Q**    But it doesn't necessarily mean that?

02:22:05 19  **A**    Correct.

02:22:05 20  **Q**    Could it all be the same pharmacist?

02:22:07 21  **A**    In some cases.

02:22:13 22  **Q**    I did like for you to pull out of the your stack one

02:22:16 23  of the documents that the plaintiffs' lawyer asked you

02:22:19 24  about.  It's Plaintiffs' Exhibit 25631.  It's an October

02:22:23 25  2012 e-mail with a Controlled Substance Action Plan attached

**Polster (Direct by Swift)** 3173

| | | |
|---|---|---|
| 02:22:29 | 1 | to it. |
| 02:22:40 | 2 | This is what the first page of it looks like.  I've |
| 02:22:43 | 3 | got it up on the screen. |
| 02:22:44 | 4 | **A**    Yes. |
| 02:22:45 | 5 | **Q**    And just to orient you, Ms. Polster, the policy we |
| 02:22:48 | 6 | were just looking at was from June of 2012. |
| 02:22:50 | 7 | Do you recall that? |
| 02:22:51 | 8 | **A**    Yes. |
| 02:22:51 | 9 | **Q**    This e-mail and attachment that the plaintiffs' lawyer |
| 02:22:54 | 10 | showed you is dated October 2012. |
| 02:22:56 | 11 | Do you see that? |
| 02:22:56 | 12 | **A**    Yes. |
| 02:22:57 | 13 | **Q**    Would you agree with me -- first, before I ask you |
| 02:23:00 | 14 | this question, I'll ask you just to flip through Plaintiffs' |
| 02:23:06 | 15 | 25631 to refamiliarize yourself with it. |
| 02:23:08 | 16 | **A**    Yes. |
| 02:23:09 | 17 | **Q**    Would you agree with me that the October 2012 |
| 02:23:13 | 18 | presentation is very similar to a June 2012 presentation |
| 02:23:19 | 19 | that is behind your Tab 5 in your binder as Exhibit 15314? |
| 02:23:36 | 20 | **A**    Yes. |
| 02:23:36 | 21 | **Q**    So turning back to the one I've got on the screen from |
| 02:23:39 | 22 | October, who were you giving -- or who was supposed to |
| 02:23:41 | 23 | receive the presentation from October of 2012? |
| 02:23:46 | 24 | **A**    This was for -- this was intended for market leaders. |
| 02:23:52 | 25 | It was sort of a train the trainer or for them to understand |

**Polster (Direct by Swift)**                                    3174

02:24:02  1    everything around good faith dispensing and the changes and

02:24:05  2    updates in the policy.

02:24:08  3    **Q**    And then with respect to the June 2012 version of this

02:24:12  4    presentation that is behind Tab 5, who was supposed to

02:24:15  5    receive that one?  Was it the same type of people or a

02:24:20  6    different group?

02:24:21  7    **A**    Correct, the same.

02:24:22  8    **Q**    Was it for the same purpose?

02:24:24  9    **A**    Yeah, so, you know, Walgreens is a very large company,

02:24:28  10   and we do use a train the trainer type of training that goes

02:24:34  11   down, so it would go to different levels of field leaders

02:24:39  12   down to district managers who then would ensure that their

02:24:45  13   stores were trained appropriately, their pharmacists were

02:24:48  14   trained appropriately.

02:24:51  15   **Q**    All right.  I'll turn to I believe this is page 7.  It

02:24:56  16   says 6 on the slide, but it's the seventh page in the

02:24:58  17   document.

02:24:59  18        Are these validation -- and I'm looking at the one

02:25:02  19   that was from October of 2012 now.

02:25:04  20        Are these validation procedures for good faith

02:25:07  21   dispensing that are included in the train the trainer

02:25:10  22   presentation from October 2012 the same procedures we walked

02:25:14  23   through in the June 2012 policy?

02:25:16  24   **A**    Yes.

02:25:16  25   **Q**    And then if you turn to the next page, do you see the

**Polster (Direct by Swift)** 3175

02:25:22  1    one that says, "Everyone plays a role in the good faith

02:25:25  2    dispensing process"?

02:25:26  3    **A**    Yes.

02:25:26  4    **Q**    Does this walk through the -- it looks different, but

02:25:31  5    does this walk through the same set of steps for filling a

02:25:34  6    controlled substance prescription that we saw in the 2012

02:25:37  7    policy?

02:25:37  8    **A**    Yes.

02:25:37  9    **Q**    And are these bullets that are underneath each of

02:25:41  10   these steps taken from the Walgreens good faith dispensing

02:25:45  11   policy, this is what the policy says you're supposed to do?

02:25:48  12   **A**    Yes.

02:25:49  13   **Q**    Whether it's with respect to reviewing the PDMP --

02:25:52  14   that's something that the Walgreens policy requires you to

02:25:55  15   do, correct?

02:25:55  16   **A**    Yeah, based on the state regulations, yes.

02:26:00  17   **Q**    Well, even if it's not required by stay law, this

02:26:05  18   policy requires pharmacists to check the PDMP if it's

02:26:08  19   appropriate to do so?

02:26:08  20   **A**    Yes.

02:26:09  21   **Q**    Is the same true with respect to the bullet that says

02:26:14  22   document information that's coming from the Walgreens

02:26:16  23   policy?

02:26:16  24   **A**    Yes.

02:26:17  25   **Q**    Okay.  All right.  I'd like you to take out another

**Polster (Direct by Swift)**

02:26:28    1    one of the exhibits that the plaintiffs' lawyer asked you

02:26:32    2    about.  This one is Plaintiffs' Exhibit 20639.  I believe

02:26:37    3    it's one of your PowerPoint presentations.

02:26:52    4    **A**    Okay.

02:26:53    5    **Q**    Is that what I've got up on the screen?

02:26:57    6    **A**    Yes.

02:26:59    7    **Q**    What is your best guess as to what the date is

02:27:02    8    supposed to be on this presentation?

02:27:03    9    **A**    January of 2013.

02:27:05   10    **Q**    Okay.  Is this another presentation that you and your

02:27:09   11    team used to train field leaders?

02:27:12   12    **A**    Yes.

02:27:13   13    **Q**    Who was the audience for this presentation?

02:27:14   14    **A**    The market leadership, they were -- they're the level

02:27:20   15    above the district managers in our organization.

02:27:23   16    **Q**    All right.  If you would, please, I'm going to take

02:27:26   17    you, and if you can turn yourself too, to page 11, which is

02:27:31   18    a slide that the plaintiffs' lawyer asked you about.

02:27:34   19                  THE COURT:  Is there a document number on --

02:27:36   20    it's 20639?

02:27:38   21                  MS. SWIFT:  20639.

02:27:40   22                  THE COURT:  Thank you.

02:27:42   23                  MS. SWIFT:  Do you have it, Your Honor?  We

02:27:44   24    can give you a copy.

02:27:45   25                  THE COURT:  Yes, I have it.

**Polster (Direct by Swift)** 3177

02:27:48 1 **Q**     And I'm going to call out the speaker notes and ask

02:27:51 2 you about them.

02:27:52 3     Do you recall being asked about the speaker notes with

02:27:56 4 the plaintiffs' lawyer?

02:27:57 5 **A**     Yes.

02:27:57 6 **Q**     And you were not given an opportunity to explain what

02:28:02 7 you meant by this last note here about good customers

02:28:14 8 impacting other business.

02:28:15 9     What did you mean by this speaker note?

02:28:18 10 **A**     So the intent of this was explaining to the market

02:28:22 11 leaders to explain to the district leaders that the

02:28:28 12 obligation of a pharmacist is to make sure that they're

02:28:32 13 filling prescriptions on good faith and the prescriptions

02:28:35 14 that they are filling are legitimate with, you know -- good

02:28:39 15 customers would be somebody who's bringing in a legitimate

02:28:42 16 prescription that was written in good faith.

02:28:45 17     We wanted them to understand that, listen, if your

02:28:50 18 pharmacists are refusing prescriptions that -- for

02:28:54 19 prescriptions that they don't feel that they meet good

02:28:57 20 faith, either the prescriber isn't writing it in good faith

02:29:00 21 or there are questions about the patient, that, you know,

02:29:04 22 that's okay.  We're supporting our pharmacy -- our

02:29:08 23 pharmacists in making those decisions, and that the field

02:29:11 24 leaders need to understand that that's okay, because we

02:29:15 25 don't want them filling prescriptions that they feel they

**Polster (Direct by Swift)**                    3178

02:29:18  1   should not be filling.

02:29:19  2   **Q**    All right.  I'm going to take you now to page 19 of

02:29:24  3   the slide deck.

02:29:25  4        Do you remember being asked questions about this slide

02:29:27  5   that shows the linear regression analysis for the order

02:29:33  6   monitoring system that's in place at Walgreens?

02:29:34  7   **A**    Yes.

02:29:35  8   **Q**    You said in your notes on this slide that "outliers

02:29:42  9   will see a decrease or in some cases will stop shipping

02:29:46  10  certain controlled substances to them."

02:29:49  11       The plaintiffs' lawyer didn't give you an opportunity

02:29:51  12  to explain what you meant there either.  What did you mean?

02:29:54  13  **A**    So the way the ordering system works is that we

02:29:58  14  compare the ordering of bottles of controlled substances

02:30:05  15  from store to store based on peer group.  Meaning that a

02:30:10  16  store that is doing 200 prescriptions a day would be

02:30:13  17  compared to other stores doing 200 prescriptions a day

02:30:16  18  across the country.

02:30:17  19       A store that is dispensing a larger quantity of

02:30:25  20  prescriptions total may need more controlled substances

02:30:27  21  because they have more business.

02:30:30  22       So what this was intended was that we're putting

02:30:37  23  ceilings in place, and in some cases a store that -- a

02:30:47  24  store's order might hit up against that ceiling even though

02:30:50  25  they were compared to another store.  Maybe they tried to

**Polster (Direct by Swift)** 3179

02:30:55　1　order or maybe the ordering system was trying to bring in

02:30:59　2　more bottles of that particular medication based on the

02:31:02　3　business that they were seeing over the rolling six-week

02:31:05　4　period of time.

02:31:07　5　　　　　What I was explaining to the field leaderships in this

02:31:12　6　slide was that we're going to have new steps and we're going

02:31:16　7　to require those stores to fill out an order monitoring form

02:31:22　8　or an ordering form that if they needed more bottles of a

02:31:28　9　certain medication, then what the ordering system was doing

02:31:33　10　for them, they needed to document that on the order form,

02:31:38　11　that they were an outlier, the ceiling was going to stop

02:31:41　12　that ordering system from ordering extra tablets.  And if

02:31:47　13　the store needed it, they had to show me or my team why they

02:31:50　14　would need extra tablets, what was changing in their

02:31:53　15　business or what their business needed to explain why they

02:31:57　16　needed those additional tablets in their store brought in.

02:32:01　17　**Q**　　All right.  Now, I want to switch gears a little bit.

02:32:07　18　We talked a bunch about a number of good faith dispensing

02:32:10　19　policies, but you said at the outset there are two policies

02:32:16　20　related to the dispensing of controlled substances.

02:32:17　21　　　　　Is the second one the target drug good faith

02:32:21　22　dispensing policy?

02:32:21　23　**A**　　Yes.

02:32:23　24　　　　　　　　MS. SWIFT:  I'm happy to keep going, Your

02:32:25　25　Honor, it's only 2:30, but I just wanted to check in.

**Polster (Direct by Swift)**

02:32:27  1              THE COURT:  Keep going.

02:32:28  2  **Q**    Okay.  All right.  We'll do the target drug good faith

02:32:28  3  dispensing policy.

02:32:29  4         Take a look, if you would, Ms. Polster, at the

02:32:31  5  document behind Tab 8 of your binder.

02:32:37  6  **A**    Okay.

02:32:37  7  **Q**    Do you recognize that document as a target drug good

02:32:44  8  faith dispensing checklist?

02:32:44  9  **A**    Yes.

02:32:44  10  **Q**    I'm not certain this is exactly the same one that the

02:32:49  11  plaintiffs' lawyer showed you earlier today, but I'll ask

02:32:51  12  you the same question he did.

02:32:53  13         Is this an earlier version or a later version?

02:32:55  14  **A**    This looks like a later version.

02:32:58  15  **Q**    Why did you create -- well, first of all, let me take

02:33:04  16  a step back.

02:33:04  17         Who created the target drug checklist at Walgreens?

02:33:07  18  **A**    The working group that would include my team.

02:33:10  19  **Q**    Why was it created?

02:33:11  20  **A**    We created it so that we would ensure consistency from

02:33:19  21  our stores, that we would give a process for stores to

02:33:24  22  follow -- or pharmacists to follow as they're filling

02:33:28  23  prescriptions, and additionally to point out to technicians

02:33:34  24  that they also had a responsibility to ensure that the

02:33:38  25  prescription was filled in good faith.

**Polster (Direct by Swift)**                    3181

02:33:39  1   **Q**    Did the DEA ask Walgreens to create the target drug

02:33:47  2   good faith dispensing policy and checklist?

02:33:48  3   **A**    No.

02:33:48  4   **Q**    Has DEA ever asked you to change the target drug

02:33:53  5   checklist?

02:33:54  6                    MR. WEINBERGER:  Objection.  By the

02:33:58  7   plaintiffs' lawyer.

02:33:59  8                    MS. SWIFT:  I'll withdraw it.

02:34:03  9   **Q**    Do you have an understanding, Ms. Polster, whether --

02:34:07  10  an understanding as a pharmacist whether a checklist like

02:34:10  11  this is required by law?

02:34:11  12  **A**    It is not.

02:34:12  13  **Q**    All right.  We've seen the steps of this checklist

02:34:28  14  with another witness, so I'm not going to walk through all

02:34:30  15  of them and repeat all of that.  But I do have a few

02:34:32  16  specific questions.

02:34:34  17       Step 7, I'll call it out for you, says, "If available

02:34:45  18  in your state, PDMP has been reviewed.  Prescription is

02:34:48  19  being filled on time."

02:34:53  20       Is that same requirement part of the good faith

02:34:55  21  dispensing policy as well?

02:34:56  22  **A**    Yes.

02:34:56  23  **Q**    Then I'll call out for you step number 10.

02:35:10  24       Do you see that it says, "Per CDC recommendation,

02:35:15  25  naloxone was offered to the patient in case of an emergency

**Polster (Direct by Swift)**                    3182

02:35:18   1    for prescriptions that are greater than or equal to 50

02:35:23   2    morphine milligram equivalents, or MME"?

02:35:28   3         Do you see that?

02:35:28   4    **A**    Yes.

02:35:28   5    **Q**    What is the CDC recommendation that's being referred

02:35:31   6    to there?

02:35:32   7    **A**    The CDC had put out a safety recommendation, and I

02:35:39   8    might not be using the right terminology, but that's the way

02:35:43   9    I view it, a safety recommendation that if a patient is

02:35:46  10    taking a high-dose opioid, they would be at risk for

02:35:50  11    respiratory arrest, that they would take -- if they

02:35:55  12    accidentally took too much.  And naloxone should be offered

02:35:59  13    to the patient to let them know that that's something that

02:36:01  14    they could keep on hand because naloxone is an antidote for

02:36:08  15    an opioid overdose and could help save the patient's life.

02:36:14  16    **Q**    Is information like the CDC recommendation that you

02:36:17  17    just described, is that publicly available information?

02:36:19  18    **A**    Yes.

02:36:19  19    **Q**    Is it information that you also provide to your

02:36:22  20    pharmacists?

02:36:25  21    **A**    Yes.

02:36:32  22    **Q**    I think you just explained what naloxone is.  I think

02:36:35  23    you called it an antidote for an overdose.  Is that a fair

02:36:39  24    description?

02:36:39  25    **A**    Yes.

**Polster (Direct by Swift)**

02:36:39　1　**Q**　Is naloxone sometimes also called Narcan?

02:36:42　2　**A**　It is.

02:36:43　3　**Q**　Is Narcan the brand name or is it the other way

02:36:45　4　around?

02:36:46　5　**A**　Narcan is the brand name.

02:36:47　6　**Q**　The jury has heard a little bit about Narcan.  Do you

02:36:50　7　know whether police officers typically carry Narcan with

02:36:52　8　them in case they encounter somebody having an overdosed?

02:36:56　9　**A**　I have heard that.

02:36:57　10　**Q**　So the CDC guideline to offer naloxone or Narcan to

02:37:02　11　patients with prescriptions greater than or equal to 350

02:37:07　12　MME, is that something that Walgreens pharmacists do?

02:37:14　13　**A**　Yes, they do let the patient know that it's available

02:37:16　14　and they can sell that prescription with that -- or they

02:37:20　15　could sell that prescription item without a patient-specific

02:37:24　16　prescription based on the new regulations that happen for

02:37:27　17　this.

02:37:27　18　**Q**　Does Narcan or naloxone save lives, in your

02:37:32　19　experience?

02:37:32　20　**A**　Yes.

02:37:32　21　**Q**　In your view, is the target drug checklist

02:37:37　22　perfunctory?

02:37:38　23　**A**　No.

02:37:38　24　**Q**　Why not?

02:37:41　25　**A**　I just -- I've never thought of it as perfunctory.  I

**Polster (Direct by Swift)** 3184

02:37:48  1  think the intent of it was to give the pharmacists a

02:37:52  2  framework to work by, but not intended to just check, check,

02:37:58  3  check, check, check, and it's okay to go.  They have to

02:38:01  4  think through it for that specific patient and that specific

02:38:04  5  prescription.

02:38:06  6  **Q**   All right.  I'd like you to find in your stack of

02:38:07  7  exhibits from the plaintiffs' lawyers the one about the BCI

02:38:14  8  presentation.

02:38:15  9     Do you remember that one with the big red arrow?

02:38:20  10  **A**   I do.  Do you have the number?

02:38:21  11  **Q**   I do.  It's P-15085.

02:38:28  12  **A**   Okay.

02:38:32  13  **Q**   Do you remember giving us questions about this

02:38:34  14  presentation during the cross-examination?

02:38:38  15  **A**   Yes.

02:38:40  16  **Q**   And just to reorient the jury, this is the

02:38:44  17  presentation -- go to the first page of it -- "It's a good

02:38:49  18  faith dispensing DM webinar."

02:38:51  19     Do you see that?

02:38:51  20  **A**   Yes.

02:38:52  21  **Q**   This is a presentation about the BCI audit that

02:38:54  22  Walgreens loss prevention conducted on a sample of 2400

02:39:00  23  stores to see if they were complying with the target drug

02:39:04  24  checklist policy.  Do you remember that?

02:39:06  25  **A**   Yes.

**Polster (Direct by Swift)** 3185

| | | |
|---|---|---|
| 02:39:06 | 1 | **Q**    Was this a presentation that your team sent out to the |
| 02:39:12 | 2 | field leaders to inform them about the results of that |
| 02:39:16 | 3 | audit? |
| 02:39:16 | 4 | **A**    Yes. |
| 02:39:16 | 5 | **Q**    Why did you do that? |
| 02:39:17 | 6 | **A**    Well, because it wasn't a hundred percent.  We wanted |
| 02:39:22 | 7 | all of our field leaders to know that, you know, we want |
| 02:39:28 | 8 | them to be looking for and checking against our policies and |
| 02:39:37 | 9 | understanding what the good faith dispensing and the target |
| 02:39:43 | 10 | good faith dispensing policies were, what the -- what things |
| 02:39:45 | 11 | that they should be looking for when they go into the stores |
| 02:39:48 | 12 | doing supervision.  You know, it was another train the |
| 02:39:56 | 13 | trainer type webinar. |
| 02:39:57 | 14 | **Q**    And just to get it back in your mind, there's the big |
| 02:40:03 | 15 | red arrow.  It says results were unfavorable. |
| 02:40:07 | 16 |      And then on the next page you talked about this 59.5 |
| 02:40:13 | 17 | percent compliance rate for the "number of stores that |
| 02:40:16 | 18 | correctly had a completed target drug checklist attached to |
| 02:40:21 | 19 | the filled TD prescription hard copies." |
| 02:40:24 | 20 |      Do you remember that? |
| 02:40:25 | 21 | **A**    Yes. |
| 02:40:25 | 22 | **Q**    And then just to get the other piece of this from this |
| 02:40:27 | 23 | deck, the next page, what it says is number of stores that |
| 02:40:33 | 24 | correctly had completed checklist attached to the refused TD |
| 02:40:40 | 25 | prescription hard copies," and it was a 75.7 percent |

**Polster (Direct by Swift)**                    3186

02:40:45  1    compliance rate.

02:40:47  2          Do you see that?

02:40:48  3    **A**    Yes.

02:40:48  4    **Q**    So for this one, and then we're going to go back and

02:40:50  5    I'm going to ask you some questions about the 59.5 percent

02:40:55  6    well.

02:40:55  7          But while we're here, what is being measured here, is

02:40:59  8    it whether the prescription was refused or is it whether

02:41:02  9    there was a checklist attached to the refusal?

02:41:04  10   **A**    Whether there was a checklist attached to the refusal.

02:41:10  11   **Q**    All right.  Now I'm going to put a different document

02:41:12  12   on the screen, and it's Tab 9 in your binder.

02:41:19  13         Do you recognize that document?  It's Exhibit 2606.

02:41:23  14   **A**    Yes.

02:41:25  15   **Q**    What is it?

02:41:25  16   **A**    It's the results of this BCI walk that loss prevention

02:41:34  17   did.

02:41:34  18   **Q**    You say it's the results.  It says it's an executive

02:41:38  19   summary at the top.

02:41:39  20         Do you see that?

02:41:39  21   **A**    Yes.

02:41:39  22   **Q**    Is this document one that walks through in a more

02:41:43  23   detailed way the very specific granular results of the BCI

02:41:49  24   audit that you were reporting on to your team?

02:41:51  25   **A**    Yes.

| 02:41:51 | 1 | **Q** Not to your team.  You were reporting on to the field? |
| 02:41:57 | 2 | **A** Yes. |
| 02:41:58 | 3 | **Q** I'll first direct your attention to -- and you can see |
| 02:42:01 | 4 | just walking through it there are questions and then it |
| 02:42:04 | 5 | shows what the results were for the different buckets of |
| 02:42:07 | 6 | stores. |
| 02:42:07 | 7 | Is that a fair characterization? |
| 02:42:09 | 8 | **A** Yes. |
| 02:42:09 | 9 | **Q** I'm going to focus on the ones that you put in the |
| 02:42:14 | 10 | presentation. |
| 02:42:14 | 11 | So the first one I'm going to focus on is question |
| 02:42:17 | 12 | number 5. |
| 02:42:18 | 13 | Do you see that at the bottom of the first page? |
| 02:42:20 | 14 | **A** Yes. |
| 02:42:20 | 15 | **Q** The question was:  "When target drug prescriptions are |
| 02:42:25 | 16 | dispensed, pharmacy team members are responsible for |
| 02:42:28 | 17 | completing the target drug good faith dispensing TD GFD |
| 02:42:33 | 18 | checklist."  And then it says, "Number of filled target drug |
| 02:42:38 | 19 | prescriptions that did not have a completed TD GFD checklist |
| 02:42:43 | 20 | attached." |
| 02:42:44 | 21 | Do you see that? |
| 02:42:45 | 22 | **A** Yes. |
| 02:42:45 | 23 | **Q** All right.  Did these results that we see down here, |
| 02:42:56 | 24 | we see at the very bottom 11 or more equals 10 stores or 0.4 |
| 02:43:03 | 25 | percent. |

02:43:04  1      Do you see that?

02:43:04  2  A    Yes.

02:43:04  3  Q    Does that mean that only 10 stores out of the 2400

02:43:09  4  that were audited had filled more than 10 target drug

02:43:12  5  prescriptions without a completed checklist attached to it?

02:43:15  6  A    Yes.

02:43:15  7  Q    And that was just 0.4 percent of the audited stores?

02:43:20  8  A    Yes.

02:43:20  9  Q    And then right above that do you see where it says, "6

02:43:27  10  to 10 equals 133 stores or 5.5 percent"?

02:43:33  11  A    Yes.

02:43:33  12  Q    Does that mean that another 5.5 percent of the audited

02:43:39  13  stores had between six and ten checklists missing?

02:43:46  14  A    Yes.

02:43:47  15  Q    And if you add the 5.5 percent to the .4 percent, you

02:43:53  16  get 5.9 percent?  Am I doing that math correctly?

02:43:57  17  A    Yes.

02:43:57  18  Q    Does that mean that 94.1 percent of the audited stores

02:44:03  19  had five or fewer checklists missing when loss prevention

02:44:08  20  conducted this audit?

02:44:08  21  A    Yes.

02:44:10  22  Q    That sounds pretty good.  Were you happy with these

02:44:15  23  results?

02:44:15  24  A    I would have liked to see a hundred percent

02:44:19  25  compliance, and, you know, that was part of the reason why

**Polster (Direct by Swift)** 3189

02:44:22 1 we, you know, shared all that information to field

02:44:28 2 leadership, that we expect a hundred percent compliance,

02:44:34 3 but, you know, I mean, 90 percent was very good, but I would

02:44:37 4 have liked to have seen a hundred percent.

02:44:39 5 **Q** The result that you put into your presentation to the

02:44:43 6 field, it didn't say great job, 94.1 percent; is that a fair

02:44:48 7 statement?

02:44:48 8 **A** Fair.

02:44:49 9 **Q** Now I'd like to ask you about -- and is that

02:44:55 10 because -- why didn't you say great job, 94.1 percent?

02:44:58 11 **A** Because there were instances where they did not follow

02:45:02 12 the policy, and we want them to follow the policy.

02:45:05 13 **Q** You want them to be perfect?

02:45:06 14 **A** Yes.

02:45:06 15 **Q** All right. Now, if you'd turn to the next page, I

02:45:12 16 want to ask you about question number 7. It says, "If the

02:45:21 17 pharmacist determines a TD prescription does not meet GFD

02:45:26 18 requirements, a copy of the refused prescription and

02:45:28 19 completed TD GFD checklist must be in the refusal file.

02:45:33 20 After reviewing the refusal California file folder for

02:45:37 21 calendar 2015, how many refused TD prescriptions lacked a

02:45:41 22 completed TD GFD checklist?"

02:45:45 23 Do you see that?

02:45:46 24 **A** Yes.

02:45:46 25 **Q** And do you see that the answer is zero for 1820

**Polster (Direct by Swift)**

02:45:56  1  stores?

02:45:56  2  **A**   Yes.

02:45:56  3  **Q**   So those are the stores that weren't missing any

02:46:01  4  checklists?

02:46:03  5  **A**   Yeah, based on the number 7 above, yes.

02:46:09  6  **Q**   Okay.  All right.  And we saw how you reported this to

02:46:14  7  your team to the field in the presentation that the

02:46:19  8  plaintiffs' lawyer showed you earlier today; is that fair?

02:46:25  9  **A**   Yes.

02:46:25  10  **Q**   I think I can do this one quickly before our break.

02:46:54  11       Take a look, if you would, Ms. Polster, at Tab 12, and

02:46:58  12  let me know if you recognize that document.

02:46:59  13  **A**   Yes.

02:46:59  14  **Q**   What is the document behind Tab 12?

02:47:01  15  **A**   It is our 2020 good faith dispensing policy.

02:47:07  16  **Q**   And is that what I have on the screen?

02:47:09  17  **A**   Yes.

02:47:09  18  **Q**   This is the last one of these I'm going to do.

02:47:11  19       Would you agree with me that the 2020 good faith

02:47:14  20  dispensing policy is even more detailed and it's even longer

02:47:19  21  than the previous policies we've looked at?

02:47:20  22  **A**   Yes.

02:47:21  23  **Q**   Is it fair to say that Walgreens has continued to

02:47:24  24  enhance its good faith dispensing policy to identify red

02:47:30  25  flags of potential diversion throughout the time you've been

**Polster (Direct by Swift)** 3191

02:47:32   1    at Walgreens?

02:47:33   2    **A**    Yes.

02:47:33   3    **Q**    Does Walgreens train its pharmacists at least annually

02:47:37   4    on good faith dispensing today?

02:47:39   5    **A**    Yes.

02:47:39   6    **Q**    All right.  You have behind you, I believe they're in

02:47:45   7    a Redweld, a group of other good faith dispensing policies

02:47:50   8    and target drug good faith dispensing policies, but what I'd

02:47:54   9    like for you to do is look at the documents in that Redweld

02:47:57  10    and tell me if that's what those are.

02:48:13  11    **A**    Yes, they're the paper copies of the good faith

02:48:19  12    dispensing policies.

02:48:19  13    **Q**    Okay.

02:48:25  14              MR. LANIER:  Your Honor, I think I'm going to

02:48:26  15    move to a longer new section.  This might be a good time to

02:48:29  16    take our afternoon break.

02:48:30  17              THE COURT:  Very good.  Then we'll take our

02:48:32  18    mid afternoon break.  Usual admonitions.  15 minutes, then

02:48:36  19    we'll pick up with more of Ms. Polster's testimony.

02:49:15  20              (Recess taken at 2:49 p.m.)

03:06:50  21              (The jury is present at 3:06 p.m.)

03:06:51  22              THE COURT:  Please be seated.

03:06:52  23        Ms. Polster, you're still under oath.

03:06:54  24        Ms. Swift, you may continue.

03:06:56  25              MS. SWIFT:  Thank you, Your Honor.

| | | |
|---|---|---|
| 03:06:57 | 1 | Mr. Pitts, if I could trouble you for the ELMO, I'd |
| 03:07:02 | 2 | appreciate it. |
| 03:07:04 | 3 | Welcome back, Ms. Polster. |
| 03:07:05 | 4 | THE WITNESS:  Thank you. |
| 03:07:07 | 5 | MS. SWIFT:  Ladies and gentlemen of the jury. |
| 03:07:08 | 6 | BY MS. SWIFT: |
| 03:07:08 | 7 | **Q**    I want to go back to something I was asking you about |
| 03:07:11 | 8 | before the break just to make sure it's really clear.  Let's |
| 03:07:14 | 9 | see if we can do this. |
| 03:07:16 | 10 | Do you remember this page of the train the trainer |
| 03:07:20 | 11 | presentation on compliance with the target drug checklist? |
| 03:07:25 | 12 | **A**    Yes. |
| 03:07:26 | 13 | **Q**    And it shows a 59.5 percent compliance rate. |
| 03:07:29 | 14 | Was that perfect compliance? |
| 03:07:34 | 15 | **A**    Yeah, 59.5 percent of the stores had perfect |
| 03:07:38 | 16 | compliance. |
| 03:07:39 | 17 | **Q**    So just I want to make really sure that that's clear |
| 03:07:43 | 18 | what that means.  And I'm going to try to show the -- so |
| 03:07:47 | 19 | this is the other document about the BCI, something we are |
| 03:07:50 | 20 | looking at before. |
| 03:07:50 | 21 | Do you remember this one? |
| 03:07:51 | 22 | **A**    Yes. |
| 03:07:51 | 23 | **Q**    And I've circled the number or the question that |
| 03:07:54 | 24 | relates to this particular question in your train the |
| 03:07:56 | 25 | trainer presentation, and you can see the 59.5 percent right |

**Polster (Direct by Swift)** 3193

| | | |
|---|---|---|
| 03:08:00 | 1 | there. |
| 03:08:00 | 2 | And that corresponds to this 59.5 percent compliance |
| 03:08:05 | 3 | rate right here, correct? |
| 03:08:07 | 4 | **A**   Correct. |
| 03:08:07 | 5 | **Q**   Is what that is saying that those stores, that 59.5 |
| 03:08:15 | 6 | percent, had every single checklist that they were supposed |
| 03:08:18 | 7 | to have completed? |
| 03:08:21 | 8 | **A**   Correct. |
| 03:08:21 | 9 | **Q**   The 94.1 percent that we were talking about before, do |
| 03:08:24 | 10 | you remember that number? |
| 03:08:25 | 11 | **A**   Yes. |
| 03:08:26 | 12 | **Q**   Is that the number of stores that had five checklists |
| 03:08:31 | 13 | missing or even fewer than that? |
| 03:08:33 | 14 | **A**   Yes. |
| 03:08:33 | 15 | **Q**   So is it fair to say for 94.1 percent of the stores, |
| 03:08:46 | 16 | they were doing a pretty good job? |
| 03:08:47 | 17 | **A**   Yes. |
| 03:08:47 | 18 | **Q**   All right.  The other number we talked about from this |
| 03:08:52 | 19 | presentation that went out to your field leaders was the |
| 03:08:58 | 20 | 75.7. |
| 03:08:59 | 21 | Do you see that? |
| 03:09:00 | 22 | **A**   Yes. |
| 03:09:00 | 23 | **Q**   This is the number of stores that correctly had |
| 03:09:03 | 24 | completed target drug good faith checklists attached to the |
| 03:09:07 | 25 | refusals. |

**Polster (Direct by Swift)** 3194

03:09:08　1　　　　Is that right?

03:09:09　2　**A**　　Correct.

03:09:09　3　**Q**　　And just to go back to it in the summary that gives

03:09:13　4　the details of the results so we can see it together -- I

03:09:17　5　don't know if I can put it on the screen together.

03:09:29　6　　　　It's 1820 stores, does that correspond to this number

03:09:33　7　as well?

03:09:33　8　**A**　　Yes, but let me read that question above it.

03:09:45　9　　　　Yeah, that's correct.

03:09:46　10　**Q**　　So the question number 7 is asking, "If the pharmacist

03:09:50　11　determines a target drug prescription does not meet GFD

03:09:54　12　requirements, a copy of the refused prescription and

03:09:56　13　completed checklist -- completed TD GFD checklist must be in

03:10:04　14　the refusal file.  After reviewing the refusal California

03:10:08　15　file folder for calendar 2015, how many refused

03:10:12　16　prescriptions lacked a completed TD GFD checklist?"

03:10:18　17　　　　Did I get that right?

03:10:19　18　**A**　　Yes.

03:10:20　19　**Q**　　And the answer for that was that 1820 stores weren't

03:10:23　20　missing a single checklist attached to a refusal, correct?

03:10:27　21　**A**　　Correct.

03:10:39　22　**Q**　　Ms. Polster, have you had an opportunity to see

03:10:41　23　refused prescriptions at Walgreens stores over your career?

03:10:45　24　**A**　　Yes.

03:10:45　25　**Q**　　Are there a number of places at Walgreens, whether in

**Polster (Direct by Swift)** 3195

| | | |
|---|---|---|
| 03:10:54 | 1 | the -- like, physically in the store or in the computer |
| 03:10:56 | 2 | system where a pharmacist can make a note that a |
| 03:11:01 | 3 | prescription has been refused? |
| 03:11:02 | 4 | **A**   Yes. |
| 03:11:02 | 5 | **Q**   Is one place in a physical folder in the store? |
| 03:11:09 | 6 | **A**   Yes. |
| 03:11:09 | 7 | **Q**   It's like a manila folder that folds over the |
| 03:11:14 | 8 | prescriptions? |
| 03:11:14 | 9 | **A**   Yes. |
| 03:11:14 | 10 | **Q**   And the pharmacists maintain the hard copy refused |
| 03:11:19 | 11 | prescriptions in that folder in the store, there's that one |
| 03:11:24 | 12 | place they can go to look if they want to see whether or not |
| 03:11:27 | 13 | a prescription has been refused? |
| 03:11:28 | 14 | **A**   Yes, they maintain a copy of the hard copy. |
| 03:11:31 | 15 | **Q**   Are there places in the computer system where a |
| 03:11:34 | 16 | pharmacist can document that a prescription for a patient |
| 03:11:36 | 17 | has been refused? |
| 03:11:37 | 18 | **A**   Yes. |
| 03:11:37 | 19 | **Q**   Is one of those places in the patient comment field? |
| 03:11:42 | 20 | **A**   Yes. |
| 03:11:42 | 21 | **Q**   Are there other places within the computer system |
| 03:11:46 | 22 | where a patient can make a note about that? |
| 03:11:48 | 23 | **A**   Where a pharmacist could make a note about the |
| 03:11:51 | 24 | patient, yes. |
| 03:11:51 | 25 | **Q**   And about whether a prescription has been refused? |

**Polster (Direct by Swift)**

03:11:54  1    **A**    Yes.

03:11:54  2    **Q**    Can pharmacists also put other information that they

03:12:01  3    deem relevant and important into the patient comment field?

03:12:04  4    **A**    Yes.

03:12:04  5    **Q**    Can pharmacists put notes on things they deem relevant

03:12:09  6    to a particular prescription in other fields in the

03:12:14  7    Walgreens computer system?

03:12:15  8    **A**    Yes.

03:12:16  9    **Q**    Is there a field called the annotation field where you

03:12:18  10   can do that?

03:12:19  11   **A**    Yes.

03:12:19  12   **Q**    Are there other -- is there a comment field for DUR or

03:12:28  13   drug utilization review comments where a pharmacist can do

03:12:33  14   that?

03:12:33  15              MR. WEINBERGER:  Objection.  I mean, I --

03:12:34  16              THE COURT:  Sustained.

03:12:37  17   **Q**    All right.  Well, you said a moment ago that refusals

03:12:41  18   are maintained in hard copy at the store, right?

03:12:44  19   **A**    Yes.

03:12:44  20   **Q**    Because of the different places where a pharmacist can

03:12:51  21   maintain information about a refused prescription, is it a

03:12:56  22   concern to you if a pharmacist deems it appropriate to

03:13:01  23   delete portions of a comment field about a refusal?

03:13:05  24              MR. WEINBERGER:  Objection.

03:13:06  25              THE COURT:  Overruled.

**Polster (Direct by Swift)** 3197

03:13:14 1    **A**    It would be a concern for me if the most recent

03:13:19 2    prescription that is in front of the pharmacist at the time

03:13:22 3    of refusing, if that information is not in the field where

03:13:30 4    another pharmacist could see that that prescription was

03:13:34 5    indeed refused, that would be a concern.

03:13:36 6    **Q**    Do you have any reason to believe that that is

03:13:39 7    something that happens on any kind of regular basis at

03:13:44 8    Walgreens?

03:13:45 9                    MR. WEINBERGER:  Objection.

03:13:45 10                    THE COURT:  Sustained.

03:13:52 11   **Q**    I think you just said if the most recent information

03:13:54 12   was removed from a comment field, that might be a concern.

03:13:58 13          Would it be a concern to you if older information is

03:14:02 14   removed from a comment field?

03:14:04 15                    MR. WEINBERGER:  Objection.

03:14:11 16                    THE COURT:  Sustained.

03:14:14 17   **Q**    All right.  I'd like you to take a look at the

03:14:16 18   document behind -- well, before I get to that, have you had

03:14:20 19   an opportunity to review the refusal files for the Walgreens

03:14:25 20   stores in Lake and Trumbull County?

03:14:27 21   **A**    Yes.

03:14:27 22   **Q**    Do you have an understanding of how many stores are in

03:14:31 23   Lake and Trumbull County, roughly speaking?

03:14:33 24   **A**    I'm guessing maybe 12.  12, I think.

03:14:39 25   **Q**    And if you'll turn to Tab 6 in your binder, let me

**Polster (Direct by Swift)**

| | | |
|---|---|---|
| 03:14:46 | 1 | know if you recognize what that is. |
| 03:14:53 | 2 | **A**    Yes, I -- it's a copy of a target drug good faith |
| 03:15:00 | 3 | dispensing checklist for a refused prescription. |
| 03:15:02 | 4 | **Q**    Have you seen this refused prescription and the |
| 03:15:06 | 5 | attached checklist before? |
| 03:15:07 | 6 | **A**    Yes. |
| 03:15:07 | 7 | **Q**    Can you tell whether the refusal and the attached |
| 03:15:14 | 8 | checklist, are those from a store in Ohio? |
| 03:15:18 | 9 | **A**    Yes. |
| 03:15:18 | 10 | **Q**    How can you tell that? |
| 03:15:19 | 11 | **A**    It has the Ohio prescription drug monitoring report, |
| 03:15:26 | 12 | and it has store numbers on here somewhere. |
| 03:15:37 | 13 | **Q**    Did you say it has the store numbers on there? |
| 03:15:40 | 14 | **A**    Yeah. |
| 03:15:40 | 15 | **Q**    Where does it have the store number? |
| 03:15:42 | 16 | **A**    Well, maybe it doesn't have an exact store number. |
| 03:15:58 | 17 | I'm sorry. |
| 03:15:59 | 18 | **Q**    Take a look at the third page at the bottom. |
| 03:16:01 | 19 |         Do you see a store number and an address? |
| 03:16:04 | 20 | **A**    On page 3? |
| 03:16:05 | 21 | **Q**    Yes.  It says 2604.899 at the bottom of it. |
| 03:16:19 | 22 | **A**    Okay. |
| 03:16:19 | 23 | **Q**    Do you see that? |
| 03:16:20 | 24 | **A**    Yeah. |
| 03:16:21 | 25 | **Q**    What's the address of that Walgreens? |

| | | |
|---|---|---|
| 03:16:22 | 1 | **A**    I want to make sure that I'm looking at the right line |
| 03:16:32 | 2 | here. |
| 03:16:33 | 3 | **Q**    It's the -- do you see the heading towards the bottom |
| 03:16:36 | 4 | of the page that says, "Pharmacies that dispensed |
| 03:16:41 | 5 | prescriptions listed"? |
| 03:16:42 | 6 | **A**    Yes. |
| 03:16:42 | 7 | **Q**    And the bottom one listed is W-G5549? |
| 03:16:45 | 8 | **A**    Yes. |
| 03:16:45 | 9 | **Q**    What's the address of that Walgreens store? |
| 03:16:47 | 10 | **A**    804 West Market Street, Warren, Ohio. |
| 03:16:52 | 11 | **Q**    Is the document that I've got on the screen the same |
| 03:17:14 | 12 | one that you're looking at, Ms. Polster? |
| 03:17:16 | 13 | **A**    Yes. |
| 03:17:16 | 14 | **Q**    And you recognize this as a Walgreens refusal to fill? |
| 03:17:22 | 15 | **A**    Yes. |
| 03:17:22 | 16 | **Q**    How can you tell this prescription has been refused? |
| 03:17:25 | 17 | **A**    Down at the bottom where it has pharmacist's |
| 03:17:32 | 18 | signature, there's a box for refused and their signature. |
| 03:17:35 | 19 | **Q**    Is that what you're talking about right there, that |
| 03:17:37 | 20 | little box that says "refused"? |
| 03:17:40 | 21 | **A**    Yes. |
| 03:17:41 | 22 | **Q**    All right.  I'd like to direct your attention to the |
| 03:17:50 | 23 | notes at the bottom. |
| 03:17:55 | 24 |         Can you read that for us, please? |
| 03:17:57 | 25 | **A**    "Per prescription drug monitoring program, the patient |

**Polster (Direct by Swift)**                    3200

03:18:02  1    is getting 360 methadone at Overholt's Pharmacy.  Both are

03:18:09  2    short-acting narcotics, and I don't feel comfortable filling

03:18:12  3    this prescription while X is getting the methadone.

03:18:21  4    **Q**    All right.  And that's a note that is at the bottom of

03:18:24  5    the page of the checklist.

03:18:26  6         Is the checklist also filled out?

03:18:28  7    **A**    Yes.

03:18:29  8    **Q**    And what do you see on the second and third pages of

03:18:34  9    this document?

03:18:35  10   **A**    This is a copy of the Ohio OARRS prescription drug

03:18:43  11   monitoring program for this patient.

03:18:50  12   **Q**    Do you see that on pages 2 and 3 of this refusal, the

03:18:53  13   OARRS report, most of the prescriptions listed are from a

03:18:59  14   pharmacy called Overholt's?

03:19:04  15   **A**    Yes.

03:19:06  16              MR. WEINBERGER:  Objection, Your Honor.

03:19:07  17              THE COURT:  Overruled.

03:19:08  18              MR. WEINBERGER:  Can we be heard at side bar?

03:19:11  19              (At side bar at 3:19 p.m.)

03:19:34  20              MR. WEINBERGER:  Your Honor, you previously

03:19:37  21   ruled that the PDMP report in the Winland investigation

03:19:44  22   was -- could not be used in terms of individual

03:19:46  23   prescriptions, so consistent with that ruling, where they're

03:19:54  24   going into an individual script to defend the case --

03:19:59  25              MS. SWIFT:  Your Honor, we disclosed this a

**Polster (Direct by Swift)**                                    3201

03:20:01   1    year ago, and we have always made it very clear that we were

03:20:04   2    going to defend our case prescription by prescription if

03:20:07   3    opposed, and you've always said that we were entitled to do

03:20:12   4    that.

03:20:12   5                    MR. WEINBERGER:  Well, then we should have

03:20:14   6    been entitled to go into the Winland PDMP report in detail.

03:20:19   7                    MS. SWIFT:  That was a very different

03:20:20   8    situation.  That stuff had not been disclosed.  We had a

03:20:23   9    specific interrogatory, Number 25, on it.  It was not

03:20:26   10   disclosed in response to that interrogatory.  We asked for

03:20:28   11   it and plaintiffs did not get it to us.

03:20:29   12       I'll withdraw the PDMP details.

03:20:35   13                    MR. LANIER:  Judge --

03:20:36   14                    THE COURT:  Look, I mean, if the defendants

03:20:38   15   are going to defend this case prescription by prescription

03:20:42   16   on redirect, I'll let the plaintiffs bring in prescriptions,

03:20:45   17   all right?

03:20:46   18       I'm not limiting how anyone defends the case, but if

03:20:49   19   you defend it this way, they've got rebuttal and they can

03:20:51   20   start bringing in individual prescriptions, Ms. Swift.  So

03:20:55   21   you --

03:20:56   22                    MS. SWIFT:  I'll withdraw it, Your Honor.

03:20:57   23                    THE COURT:  I'm not telling you to withdraw

03:20:58   24   it.

03:20:58   25                    MR. LANIER:  And that's a little late after

**Polster (Direct by Swift)** 3202

| | |
|---|---|
| 03:21:00 | 1 |
| 03:21:02 | 2 |
| 03:21:05 | 3 |
| 03:21:07 | 4 |
| 03:21:09 | 5 |
| 03:21:13 | 6 |
| 03:21:16 | 7 |
| 03:21:18 | 8 |
| 03:21:21 | 9 |
| 03:21:32 | 10 |
| 03:21:44 | 11 |
| 03:21:45 | 12 |
| 03:21:47 | 13 |
| 03:21:51 | 14 |
| 03:21:51 | 15 |
| 03:21:54 | 16 |
| 03:21:57 | 17 |
| 03:21:57 | 18 |
| 03:21:59 | 19 |
| 03:22:02 | 20 |
| 03:22:06 | 21 |
| 03:22:07 | 22 |
| 03:22:09 | 23 |
| 03:22:41 | 24 |
| 03:22:45 | 25 |

1  she's already displayed it.  I'd like the record to reflect

2  she displayed it for a minute and a half in front of the

3  jury and questioned on it.

4              THE COURT:  The point is they can bring out

5  the fact that sometimes Walgreens refuses prescriptions,

6  okay, because there's been a lot of testimony on it.  I

7  think it's relevant for that basis.  But if we're going to

8  start going into individual ones, then the plaintiffs can

9  bring in individual prescriptions in rebuttal.

10             (In open court at 3:21 p.m.)

11  BY MS. SWIFT:

12  **Q**    Ms. Polster, have you had an opportunity -- I believe

13  you said you did already, but I'll ask it again just to make

14  sure.

15        Have you had an opportunity to review other refusals

16  from the Walgreens stores in Lake and Trumbull County?

17  **A**    Yes.

18  **Q**    And I believe you have a box behind you.  Can you

19  please, if you would, take a look at that box and let me

20  know if those are the refusals from the Lake and Trumbull

21  County stores that you have reviewed?

22             MR. LANIER:  Could we have a copy of those?

23             MS. SWIFT:  I believe so, yes, sir.

24  **A**    There's a lot of papers in here.  I do recognize some

25  of the store numbers, and they are copies of refusals.

**Polster (Direct by Swift)**

03:22:54   1   **Q**    All right.  New topic.

03:22:56   2        What is IntercomPlus?

03:23:01   3   **A**    It's our prescription dispensing computer system.

03:23:04   4   **Q**    How long has IntercomPlus been in place at Walgreens?

03:23:07   5   **A**    We've had a computer system since 1984, and the newest

03:23:15   6   version, called IntercomPlus, started in 1997 with various

03:23:22   7   enhancements over the years.

03:23:23   8   **Q**    Does IntercomPlus -- so just to make sure this is

03:23:27   9   clear, explain for the jury, if you would, please, how a

03:23:34  10   pharmacist at Walgreens uses IntercomPlus?

03:23:38  11   **A**    So IntercomPlus stores the information for a specific

03:23:42  12   prescription that is filled, and so all the data entry for

03:23:48  13   the prescription, an image of the prescription for that

03:23:51  14   patient, it has a record of drug interactions, it has a

03:23:59  15   record of if the prescription was paid for by cash or

03:24:03  16   insurance.  It basically has all the information stored in

03:24:10  17   it for all filled prescriptions, and any annotations or

03:24:16  18   notes, allergies, health conditions that are relevant for a

03:24:20  19   patient.

03:24:20  20   **Q**    If you see a pharmacist in a pharmacy, like when you

03:24:25  21   go into the Walgreens you see a pharmacist behind the

03:24:28  22   counter working on a computer, are they working on

03:24:30  23   IntercomPlus?

03:24:31  24   **A**    Yes.

03:24:31  25   **Q**    Okay.  Does IntercomPlus help pharmacists at Walgreens

**Polster (Direct by Swift)**                                    3204

03:24:36  1    identify concerns with prescriptions?

03:24:38  2    **A**    Yes.

03:24:39  3               MR. WEINBERGER:  Objection.

03:24:40  4    **Q**    Can you --

03:24:41  5               THE COURT:  Hold it.

03:24:44  6          Overruled.

03:24:45  7    **Q**    Can you provide an example?

03:24:47  8    **A**    Yes.  A drug-drug interaction would be alerted the

03:24:56  9    pharmacist.  A drug allergy or a drug health condition could

03:25:00  10   be alerted the pharmacist.

03:25:01  11   **Q**    Is there a large amount of documented information in

03:25:04  12   IntercomPlus for every prescription that is filled at

03:25:07  13   Walgreens?

03:25:08  14   **A**    Yes.

03:25:08  15              MR. WEINBERGER:  Objection.

03:25:09  16              THE COURT:  Overruled.

03:25:09  17   **Q**    Does IntercomPlus include the store number and ZIP

03:25:15  18   code of the pharmacy?

03:25:15  19   **A**    Yes.

03:25:15  20   **Q**    Does IntercomPlus include the prescription number and

03:25:19  21   what date it's being filled?

03:25:22  22   **A**    Yes.

03:25:23  23   **Q**    Does IntercomPlus show the pharmacist whether a

03:25:26  24   prescription is new or a refill?

03:25:29  25   **A**    Yes.

**Polster (Direct by Swift)**

| | | |
|---|---|---|
| 03:25:29 | 1 | **Q**    Does IntercomPlus include a product description for |
| 03:25:34 | 2 | the medication? |
| 03:25:34 | 3 | **A**    Yes. |
| 03:25:35 | 4 | **Q**    Does IntercomPlus include the quantity dispensed? |
| 03:25:39 | 5 | **A**    Yes. |
| 03:25:39 | 6 | **Q**    Does IntercomPlus include how many days of supply a |
| 03:25:43 | 7 | prescription is for? |
| 03:25:44 | 8 | **A**    Yes. |
| 03:25:44 | 9 | **Q**    I think you already said this, but does IntercomPlus |
| 03:25:49 | 10 | indicate whether the patient paid for a prescription with |
| 03:25:53 | 11 | cash or insurance? |
| 03:25:54 | 12 | **A**    Yes. |
| 03:25:54 | 13 | **Q**    Is all of that available to the pharmacist at the |
| 03:26:00 | 14 | counter when they are filling a prescription? |
| 03:26:02 | 15 | **A**    Yes. |
| 03:26:02 | 16 | **Q**    Does IntercomPlus include the doctor's name? |
| 03:26:05 | 17 | **A**    Yes. |
| 03:26:05 | 18 | **Q**    Does it include the doctor's address? |
| 03:26:09 | 19 | **A**    Yes. |
| 03:26:09 | 20 | **Q**    Does it include the doctor's DEA number? |
| 03:26:11 | 21 | **A**    Yes. |
| 03:26:11 | 22 | **Q**    What is the doctor's DEA number?  Why is that person? |
| 03:26:14 | 23 | **A**    The DEA will assign a DEA number to a specific |
| 03:26:22 | 24 | practitioner based on the schedule of prescriptions that a |
| 03:26:29 | 25 | doctor is allowed to prescribe.  So a doctor applies for a |

**Polster (Direct by Swift)** 3206

| 03:26:33 | 1 | DEA number, and the DEA would grant the privilege of writing |
|---|---|---|
| 03:26:40 | 2 | a prescription for a controlled substance based on that |
| 03:26:45 | 3 | application. |
| 03:26:45 | 4 | **Q**    If a doctor is writing a prescription in Florida but |
| 03:26:51 | 5 | the patient fills it in Ohio, account pharmacist see that in |
| 03:26:56 | 6 | IntercomPlus? |
| 03:26:56 | 7 | **A**    Yes. |
| 03:26:56 | 8 | **Q**    Can the pharmacist see the patient's birth date, the |
| 03:27:01 | 9 | patient's sex, the patient's address, and the patient's ZIP |
| 03:27:04 | 10 | code in IntercomPlus? |
| 03:27:05 | 11 | **A**    Yes. |
| 03:27:05 | 12 | **Q**    Is all of that information provided to Walgreens |
| 03:27:12 | 13 | pharmacists to use while they're deciding whether to fill a |
| 03:27:16 | 14 | prescription? |
| 03:27:16 | 15 | **A**    Yes. |
| 03:27:16 | 16 | **Q**    And I think you said this already before, but just to |
| 03:27:24 | 17 | make sure, we talked about the hard copy target drug |
| 03:27:28 | 18 | checklists where a pharmacist can make a note. |
| 03:27:30 | 19 |         Are there many places in IntercomPlus where a |
| 03:27:33 | 20 | pharmacist can make a note as well? |
| 03:27:34 | 21 | **A**    Yes. |
| 03:27:35 | 22 | **Q**    When a pharmacist is filling a prescription at the |
| 03:27:53 | 23 | counter, can the pharmacist see earlier prescriptions that |
| 03:27:57 | 24 | that patient who is in front of them has filled at |
| 03:27:59 | 25 | Walgreens? |

**Polster (Direct by Swift)** 3207

| | | |
|---|---|---|
| 03:27:59 | 1 | **A**     Yes. |
| 03:28:00 | 2 | **Q**     How far back would say pharmacist see if looking at a |
| 03:28:07 | 3 | patient's prescription history, how far back in time? |
| 03:28:10 | 4 | **A**     18 months. |
| 03:28:11 | 5 | **Q**     Does a pharmacist typically need to look back any |
| 03:28:15 | 6 | further than that? |
| 03:28:15 | 7 | **A**     Not generally. |
| 03:28:16 | 8 | **Q**     Can they if they need to? |
| 03:28:18 | 9 | **A**     Yes, they could request information from the custodian |
| 03:28:21 | 10 | of records. |
| 03:28:23 | 11 | **Q**     All right.  You testified earlier today that for a |
| 03:28:29 | 12 | period of time the target drug checklist was in paper. |
| 03:28:33 | 13 |        Is the target drug checklist that the pharmacist fills |
| 03:28:36 | 14 | out for target drugs, is it still in paper today or is it |
| 03:28:41 | 15 | electronic or how is that done today? |
| 03:28:42 | 16 | **A**     We use an electronic format. |
| 03:28:46 | 17 | **Q**     And explain to the jury what that means when for the |
| 03:28:50 | 18 | pharmacist who's standing at the counter. |
| 03:28:53 | 19 | **A**     So IntercomPlus will trigger alerts or questions that |
| 03:28:59 | 20 | the pharmacist has to resolve based on the prescription that |
| 03:29:04 | 21 | they're filling and answer accordingly that they resolved |
| 03:29:11 | 22 | those steps while they're filling the prescription. |
| 03:29:14 | 23 | **Q**     And just to make sure it's clear, several of the |
| 03:29:17 | 24 | alerts that are in IntercomPlus today have been in |
| 03:29:22 | 25 | IntercomPlus since long before the target drug checklist |

**Polster (Direct by Swift)**                                    3208

03:29:27   1   became electronic; is that a true statement?

03:29:31   2   **A**   Yes.

03:29:31   3   **Q**   What did the electronic version of the checklist add

03:29:37   4   to IntercomPlus?  What's done electronically now in terms of

03:29:42   5   the alerts that pop up?

03:29:43   6   **A**   It automatically calculates the MME of the

03:29:49   7   prescription.  It helps calculate the distance so the

03:29:57   8   pharmacist doesn't have to look it up.

03:30:01   9   **Q**   Does it flag early refills?

03:30:03  10   **A**   It does flag early refills.

03:30:05  11   **Q**   Does the electronic version of the checklist force the

03:30:09  12   pharmacist to complete the checklist before the prescription

03:30:12  13   can be filled?

03:30:12  14   **A**   Yes.

03:30:12  15   **Q**   Remind the jury, if you would, how long the checklist

03:30:18  16   has been electronic.

03:30:19  17   **A**   The end of 2019.

03:30:23  18   **Q**   Is it fair to say that the pharmacist could do all of

03:30:26  19   the things that are now electronic, they could do those

03:30:29  20   things manually before?

03:30:31  21   **A**   Yes.

03:30:31  22   **Q**   Does the checklist make it easier for them to do that?

03:30:34  23   **A**   Yes.

03:30:34  24   **Q**   Does it make it faster?

03:30:40  25   **A**   Yes.

**Polster (Direct by Swift)**

03:30:40 1  **Q**     Does Walgreens make use of the prescription data that

03:31:02 2  it has to prevent the diversion of opioids?

03:31:09 3  **A**     Sorry, can you clarify that for me?

03:31:11 4  **Q**     I'd be happy to.  We'll come back to that.

03:31:15 5      Before I come back to that though, does Walgreens

03:31:19 6  provide other tools aside from IntercomPlus, like databases

03:31:24 7  of clinical information for pharmacists to use?

03:31:27 8  **A**     Yes.

03:31:27 9  **Q**     What kind of databases does Walgreens provide to its

03:31:30 10  pharmacists?

03:31:30 11  **A**     They have access to the CDC and the DEA websites, they

03:31:36 12  have access to clinical references such as clinical

03:31:41 13  pharmacology, Lexicomp, and Drugs Facts and Comparisons that

03:31:47 14  they can look up specific information on a drug that could

03:31:52 15  go all the way down to the detail of the mechanism of action

03:31:55 16  or how long the half-life is or whatever they would need

03:31:59 17  extra in filling the prescription.

03:32:01 18  **Q**     Are those paid services that Walgreens provides for

03:32:04 19  its pharmacists?

03:32:06 20  **A**     The drug references are, yes.

03:32:09 21  **Q**     Does Walgreens also have an internal complaint hotline

03:32:13 22  for employees?

03:32:15 23  **A**     Yes, we do.

03:32:17 24  **Q**     You were asked questions yesterday about a pharmacist

03:32:19 25  in Long Beach, California, who made some pretty serious

**Polster (Direct by Swift)**                    3210

03:32:26  1    complaints about the filling of prescriptions in his store.

03:32:32  2         Do you remember those questions?

03:32:33  3    **A**    Yes.

03:32:36  4    **Q**    He complained about the way two store managers had

03:32:39  5    handled a prescription he thought should be refused.

03:32:41  6         Do you remember that?

03:32:41  7    **A**    Yes.

03:32:41  8    **Q**    I'd like you to take a look at the document lined Tab

03:32:44  9    19 of your binder.

03:32:55  10   **A**    Okay.

03:32:58  11   **Q**    Do you recognize this document as the investigation

03:33:00  12   file for that pharmacist?

03:33:02  13   **A**    I do.

03:33:02  14   **Q**    Have you had a chance to review the investigation

03:33:09  15   file?

03:33:09  16   **A**    Yes, at a high level.

03:33:12  17   **Q**    And you can see on the first page -- well, let me just

03:33:16  18   put it on the screen so we can follow along.

03:33:19  19        You can see on the first page of the investigation

03:33:30  20   file in the third bullet it says this case is closed?

03:33:36  21   **A**    Yes.

03:33:36  22   **Q**    And just below that it says that the status is

03:33:39  23   resolved.

03:33:39  24        Do you see that?

03:33:40  25   **A**    Yes.

**Polster (Direct by Swift)** 3211

03:33:41 1  **Q**     And it says the issue type is an unfair job action.

03:33:50 2       Do you see that?

03:33:54 3  **A**     Yes.

03:33:54 4  **Q**     And I won't show it on the screen, but can you see on

03:33:57 5  the third page of the investigation file the pharmacist's

03:34:02 6  name is there and it says that he works at a store in Long

03:34:07 7  Beach.

03:34:07 8       Do you see that?

03:34:08 9  **A**     Yes.

03:34:08 10 **Q**     Is this the same pharmacist who made the complaint

03:34:11 11 that you were just asked about yesterday?

03:34:12 12 **A**     Yes.

03:34:13 13 **Q**     Did you have an opportunity to review this

03:34:15 14 investigation file and determine whether the complaint was

03:34:20 15 addressed thoroughly?

03:34:21 16 **A**     Yes.

03:34:21 17 **Q**     And what did you conclude about that?

03:34:23 18 **A**     I felt it was thoroughly investigated from my point of

03:34:31 19 view.

03:34:31 20 **Q**     Who handles complaints like this at Walgreens?

03:34:34 21 **A**     Our compliance department and our employee relations

03:34:38 22 department, and in some cases our HR department.

03:34:44 23 **Q**     Is it typical for a compliant like this one for

03:34:47 24 multiple departments to get involved?

03:34:48 25 **A**     Yes.

**Polster (Direct by Swift)**

| | | |
|---|---|---|
| 03:34:48 | 1 | **Q**    Is it typical for a complaint like this one for the |
| 03:34:52 | 2 | investigation to take, you know, several months? |
| 03:34:56 | 3 | **A**    Yes. |
| 03:34:56 | 4 | **Q**    Do you know from your review of the investigation file |
| 03:35:01 | 5 | whether the investigators in this case took witness |
| 03:35:05 | 6 | statements? |
| 03:35:06 | 7 | **A**    Yes. |
| 03:35:10 | 8 | **Q**    And did they? |
| 03:35:10 | 9 | **A**    Yes. |
| 03:35:10 | 10 | **Q**    Do you know from your review of this investigation |
| 03:35:12 | 11 | file whether the investigation led to retraining in the |
| 03:35:18 | 12 | local area where the two store managers worked? |
| 03:35:23 | 13 | **A**    Yes. |
| 03:35:25 | 14 | **Q**    When a complaint like this is made by an employee at |
| 03:35:29 | 15 | Walgreens, does Walgreens take it very seriously? |
| 03:35:32 | 16 | **A**    Yes. |
| 03:35:32 | 17 | **Q**    Do you believe based on your review of the |
| 03:35:36 | 18 | investigation file that Walgreens did take this complaint |
| 03:35:39 | 19 | very seriously? |
| 03:35:40 | 20 | **A**    Yes. |
| 03:35:40 | 21 | **Q**    If you look at page 9 of the investigation file.  I'll |
| 03:36:24 | 22 | put it on the screen over here. |
| 03:36:25 | 23 |      Do you see the description that reads that "JSB," I |
| 03:36:44 | 24 | believe you can tell from the investigation file that that's |
| 03:36:45 | 25 | Janeen Burrel? |

**Polster (Direct by Swift)**

03:36:47  1  **A**    Yes.

03:36:47  2  **Q**    It says, "JSB participated in a conference call with

03:36:50  3  Scott Jonkman, Eric Stahmann, and Lisa Domenick."

03:36:54  4      Do you know who those people are?

03:36:55  5  **A**    I know who Scott Jonkman is and Eric Stahmann.  I am

03:36:59  6  not familiar with Lisa Domenick or Janeen Burrel.

03:37:02  7  **Q**    Who is Scott Jonkman?

03:37:04  8  **A**    Scott Jonkman works in our compliance investigation

03:37:07  9  group.

03:37:10  10  **Q**    Do you see that it says, "Mr. Jonkman wanted to

03:37:13  11  clarify that he believes the managers' handling of the issue

03:37:15  12  to be an isolated incident and not a systemic matter"?

03:37:19  13  **A**    I do.

03:37:19  14  **Q**    Do you remember questions that you were asked earlier,

03:37:41  15  I believe today and yesterday, about something called a

03:37:46  16  nondispensing report?

03:37:47  17  **A**    Yes.

03:37:48  18  **Q**    I'd like you to pull out the document that went along

03:37:50  19  with those questions.  It's Plaintiffs' Exhibit 19607.

03:38:05  20      I've got it on the screen if that's easier.  It's up

03:38:08  21  to you if you want to find the hard copy.

03:38:10  22  **A**    I found it.

03:38:11  23  **Q**    Do you see that I've got the e-mail on the screen from

03:38:15  24  you to -- there's Eric Stahmann again.

03:38:20  25      He's on your team; is that right?

**Polster (Direct by Swift)**                    3214

03:38:21   1    **A**    Yes.

03:38:21   2    **Q**    Chris Dymon and Patty Daugherty, are they both on your

03:38:27   3    team as well?

03:38:28   4    **A**    Yes.

03:38:28   5    **Q**    And so is Ed Bratton?

03:38:41   6    **A**    Yes.

03:38:41   7    **Q**    All right.  The subject line is "Nondispensing

03:38:41   8    report."

03:38:41   9          Do you see that?

03:38:41   10   **A**    Yes.

03:38:41   11   **Q**    Your e-mail to your team about this report said, "The

03:38:48   12   intent is to give visibility into whether or not we have

03:38:52   13   pharmacists that just won't fill a controlled med or maybe

03:38:59   14   are selective about filling them."

03:39:01   15         What did you mean by that?

03:39:03   16   **A**    So we wanted to make sure when a pharmacist is

03:39:12   17   presented with a prescription, that they don't just pick and

03:39:15   18   choose which ones they decide to fill because it's easy.

03:39:20   19   That it's a, you know, noncontrolled prescription, you know,

03:39:23   20   it's fine, I'm going to fill it.  You know, that -- you

03:39:26   21   know, if a controlled substance prescription comes in and

03:39:30   22   the patient's in front of them, that they should take that

03:39:34   23   situation and that patient and the prescription as it comes.

03:39:38   24         And they can't just willy-nilly not fill the

03:39:43   25   prescription because they don't want to take the steps to do

**Polster (Direct by Swift)**

03:39:45  1   their due diligence.

03:39:47  2   **Q**    I'd like you to explain to the jury, because this is

03:39:49  3   important, were you trying to pressure pharmacists to fill

03:39:54  4   more controlled substance prescriptions?

03:39:57  5   **A**    No.

03:39:57  6   **Q**    Who received the nondispensing report at Walgreens?

03:40:01  7   **A**    Just field leadership, above district managers.

03:40:04  8   **Q**    Why did field leadership above district managers

03:40:08  9   receive this report and not other people?

03:40:11  10  **A**    It was -- well, lower than that didn't need it, and it

03:40:17  11  was meant as an all-encompassing report looking at many

03:40:23  12  different things around controlled substances for the stores

03:40:27  13  in their market.

03:40:27  14  **Q**    Did the field leaders, were they supposed to give this

03:40:32  15  nondispensing report to the pharmacists and tell them you

03:40:35  16  need to fill more prescriptions?

03:40:37  17  **A**    No, that was not the intent.

03:40:38  18  **Q**    Did the field leaders provide the pharmacists with

03:40:41  19  this report at all?

03:40:44  20  **A**    No.

03:40:45  21  **Q**    Is there anything inappropriate about having district

03:40:52  22  managers or other field leaders coaching pharmacists on good

03:40:57  23  faith dispensing?

03:40:57  24  **A**    No.

03:40:57  25  **Q**    And I'd like you to -- I'm sorry, I stepped on your

**Polster (Direct by Swift)**

03:41:00  1    answer.  Let me ask it again.  I apologize.

03:41:02  2         Is there anything inappropriate about having district

03:41:07  3    managers or other field leaders coaching pharmacists on good

03:41:12  4    faith dispensing?

03:41:12  5    **A**    No.

03:41:12  6    **Q**    Even if they're not a pharmacist?

03:41:16  7    **A**    Correct.

03:41:16  8    **Q**    Why not?

03:41:17  9    **A**    Well, when they're coaching around good faith

03:41:20  10   dispensing, they're not questioning whether or not that

03:41:22  11   pharmacist did or didn't fill the prescription.  They're --

03:41:28  12   in some cases they're coaching to understand why.  In some

03:41:31  13   cases a patient will complain if a pharmacist doesn't fill

03:41:35  14   their prescription.

03:41:36  15        And in some cases, the district manager has to handle

03:41:40  16   that complaint, and they may call or go into a store and get

03:41:45  17   more details around it so that they can talk to the patient

03:41:48  18   and let them know the reason behind why the prescription

03:41:52  19   wasn't filled.

03:41:53  20        Sometimes it's remember we're asking you to follow a

03:41:56  21   policy, we need you to fill out the target drug good faith

03:42:02  22   dispensing checklist, did you know that that checklist was

03:42:04  23   available, did you know that it's required.  That would be

03:42:08  24   something appropriate for the leader to follow up on.

03:42:12  25   **Q**    So when you were asked questions about the Long Beach

**Polster (Direct by Swift)**                     3217

03:42:16    1    pharmacist who complained that his store managers, the two

03:42:20    2    store managers, were pressuring him, is that a totally

03:42:26    3    different situation?

03:42:27    4    **A**    Yes.

03:42:28    5    **Q**    Why?

03:42:30    6    **A**    Because our policy is very specific that we support

03:42:44    7    our pharmacists when they refuse to fill a prescription.  I

03:42:47    8    was surprised and honestly, you know, concerned that we had

03:42:52    9    store managers, particularly not even in that pharmacist's

03:42:55   10    store, telling that pharmacist that he should or shouldn't

03:43:00   11    fill a prescription.

03:43:01   12    **Q**    Is that what you want to see from your store managers?

03:43:04   13    **A**    No.

03:43:08   14    **Q**    Is the nondispensing report that is referred to in

03:43:11   15    this e-mail the only report that your team runs on

03:43:14   16    pharmacists to make sure they're doing their jobs?

03:43:17   17    **A**    No.

03:43:18   18    **Q**    Does pharmaceutical integrity track the percentage of

03:43:27   19    controlled substance prescriptions filled at each of its

03:43:29   20    stores?

03:43:29   21    **A**    Yes.

03:43:29   22    **Q**    Did you look at those numbers for the Lake and

03:43:32   23    Trumbull County stores?

03:43:33   24    **A**    I did.

03:43:33   25    **Q**    Take a look if you would, please, at the document

03:43:36    1    behind Tab 14 of your binder.  This is Exhibit 2005.

03:43:43    2    **A**    Okay.

03:43:43    3    **Q**    And let me know if you recognize what that is.

03:43:45    4    **A**    I do.

03:43:45    5    **Q**    What is it?

03:43:46    6    **A**    It is one of the reports that my team will run.  I

03:43:54    7    recognize some of the store -- the store numbers as being

03:43:58    8    the stores you were referring to.

03:44:02    9    **Q**    Does your team generate reports like this on a regular

03:44:07   10    basis?

03:44:07   11    **A**    Yes.

03:44:07   12    **Q**    Do you know how far back they go?

03:44:08   13    **A**    When my team was formed, we started doing this for my

03:44:14   14    team.  Now, I don't know if it was done prior to that, but

03:44:18   15    my team began doing it when my team was formed, for me.

03:44:22   16    **Q**    I'll walk you across the columns just so we can give

03:44:25   17    the jury a sense of what's in this report.

03:44:29   18         The first column on the left says "Run date."

03:44:34   19         Is that the date the report was run?

03:44:36   20    **A**    Yes.  Well -- yes.

03:44:41   21    **Q**    And you can see there's the same date many times in a

03:44:43   22    row, and then you can see in the third column there are

03:44:47   23    different store numbers there.

03:44:48   24         Do you see that?

03:44:48   25    **A**    Yes.

**Polster (Direct by Swift)**

03:44:49  1   **Q**     And did you say you recognized some of those as the

03:44:52  2   Trumbull and Lake County stores that you had been looking at

03:44:56  3   information for?

03:44:56  4   **A**     Yes.

03:44:56  5   **Q**     I don't want to talk about all of these different

03:44:59  6   columns, but I'd like to focus on the one that says Rx

03:45:03  7   control percent.

03:45:03  8          What is that?

03:45:04  9   **A**     It's the total percentage of controlled substance that

03:45:08  10  that store dispensed during that time frame.

03:45:12  11  **Q**     When you looked at this report for the Lake and

03:45:17  12  Trumbull County stores, did you look to see whether any of

03:45:20  13  the control percentages seemed out of the ordinary to you?

03:45:23  14  **A**     Yes.

03:45:24  15  **Q**     And what did you determine?

03:45:25  16  **A**     I did not see anything out of the ordinary.

03:45:28  17  **Q**     All right.  It also shows a cash percentage.

03:45:34  18          Do you see that?

03:45:35  19  **A**     Yes.

03:45:35  20  **Q**     What does that mean?

03:45:37  21  **A**     So the cash percent is the total number of controlled

03:45:46  22  substance prescriptions that is -- that are paid for by cash

03:45:50  23  at that location.

03:45:51  24  **Q**     Okay.  Does pharmaceutical integrity also run reports

03:45:59  25  at a store level on prescriptions filled for combinations of

**Polster (Direct by Swift)**

03:46:04  1  medications that might increase the risk to the patient?

03:46:07  2  **A**    Yes.

03:46:07  3  **Q**    What is the purpose of a report like that?

03:46:10  4  **A**    So that report is a report that we give field leaders

03:46:19  5  to on occasion when they go into the store, if there is one

03:46:27  6  of those reports for that specific store, gives them an

03:46:31  7  example to look to make sure that all the elements of good

03:46:36  8  faith dispensing per our policy were followed.

03:46:38  9  **Q**    So is the idea that the report includes information

03:46:41  10  about individual prescriptions?

03:46:42  11  **A**    Yes.

03:46:42  12  **Q**    Is the point of the report to say, hey, these

03:46:47  13  prescriptions should not have been filled?

03:46:48  14  **A**    No.

03:46:48  15  **Q**    What is the point when the field leader goes into the

03:46:51  16  store with that kind of a report?

03:46:53  17  **A**    To look to make sure that all elements of good faith

03:46:57  18  dispensing did indeed happen, that documentation took place,

03:47:01  19  that the pharmacists who filled it understood what they were

03:47:05  20  doing and using caution in filling those prescriptions.

03:47:11  21  **Q**    Does pharmaceutical integrity also run other types of

03:47:14  22  reports called coaching opportunities reports?

03:47:16  23  **A**    Yes.

03:47:17  24  **Q**    If you'll take a look behind Tab 16, I'll ask you to

03:47:20  25  let me know if that's a coaching opportunities report.

**Polster (Direct by Swift)** 3221

| | | |
|---|---|---|
| 03:47:26 | 1 | **A**    Yes, it is. |
| 03:47:26 | 2 | **Q**    Can you tell if it's a coaching opportunities report |
| 03:47:31 | 3 | for the stores in Lake and Trumbull County? |
| 03:47:34 | 4 | **A**    Yes, it is. |
| 03:47:34 | 5 | **Q**    Is that what I've got up on the screen there? |
| 03:47:43 | 6 | **A**    Yeah. |
| 03:47:43 | 7 | **Q**    Many tiny rows? |
| 03:47:48 | 8 | **A**    Yeah. |
| 03:47:48 | 9 | **Q**    I'll just call out the column headers again.  You can |
| 03:47:51 | 10 | see along the left side again we've got the store number, is |
| 03:47:53 | 11 | that what it is? |
| 03:47:54 | 12 | **A**    Yes. |
| 03:47:54 | 13 | **Q**    You can see Store Number 5549.  We've seen that one |
| 03:47:57 | 14 | before, do you remember that? |
| 03:48:00 | 15 | **A**    Yes. |
| 03:48:00 | 16 | **Q**    And then it's got some information about the drug. |
| 03:48:07 | 17 |         And then over to the right so that you can get an |
| 03:48:09 | 18 | idea, it has more information about the individual |
| 03:48:12 | 19 | prescription, like the day's supply and the dose and some |
| 03:48:17 | 20 | other information.  Then there's a column that says |
| 03:48:20 | 21 | "reason." |
| 03:48:20 | 22 |         What is that? |
| 03:48:21 | 23 | **A**    So the reason is why it triggered on this report. |
| 03:48:26 | 24 | **Q**    And again, what is the purpose of running this kind of |
| 03:48:29 | 25 | a report, this coaching opportunities report? |

**Polster (Direct by Swift)**

03:48:31  1  **A**     To give the field leaders exact examples to -- in the

03:48:37  2  course of their supervision visits to pull those examples

03:48:40  3  and ensure that the appropriate steps were taken in the good

03:48:46  4  faith dispensing process.

03:48:46  5  **Q**     Is the purpose of giving the field leaders a report

03:48:50  6  like this to say, hey, these prescriptions should not have

03:48:53  7  been filled?

03:48:54  8  **A**     No.

03:48:54  9  **Q**     Do the pharmacists see these reports?

03:48:57  10  **A**     No.

03:48:57  11  **Q**     Would you agree with me that some of the reason codes

03:49:05  12  for the prescriptions on this coaching opportunities report

03:49:07  13  are similar to some of the red flags we've seen in the good

03:49:14  14  faith dispensing policy?

03:49:14  15  **A**     Yes.

03:49:15  16  **Q**     All right.  You've said that the field leaders receive

03:49:18  17  reports like this.  Does that include district managers?

03:49:25  18  **A**     I do believe that a district manager would see this.

03:49:27  19  **Q**     Would a healthcare supervisor see a report like this?

03:49:30  20  **A**     Yes.

03:49:30  21  **Q**     Would district managers -- well, just before I move

03:49:35  22  on, would a pharmacy manager who is in the store see a

03:49:39  23  report like this?

03:49:40  24  **A**     Only if their field leader showed it to them.

03:49:43  25  **Q**     Why would a field leader show a pharmacy manager a

| | |
|---|---|
| 03:49:49 | 1 |
| 03:49:51 | 2 |
| 03:49:54 | 3 |
| 03:49:58 | 4 |
| 03:50:00 | 5 |

report like this?  Explain it to the jury if you would.

**A**     So if -- when the field leader is going into the store

on the supervision visit and they are collecting for good

faith dispensing and ensuring that the stores are doing what

they're supposed to be doing with their documentation or

just their overall processes around good faith dispensing,

the field leader would access the report at the store, and

they would then go to the hard copy files and pull that hard

copy or also they could look in the computer system for

specific notes around that prescription.

**Q**     What does the field leader do if they don't find what

they're supposed to find when they do that?

**A**     Yeah, so it's intended to coach the employee on the

proper documentation for that prescription.

**Q**     Do -- when field leaders are having these coaching

conversations, is that something that sometimes happens

during something called a store walk?

**A**     It could, yes.

**Q**     You were asked questions earlier today about the

personal notes of a Walgreens district manager named

Brian Joyce.

       Do you remember those questions?

**A**     Yes.

**Q**     You were asked questions about Mr. Joyce's personal

notes on his visits to pharmacies in his district.

**Polster (Direct by Swift)**                                    3224

03:51:16  1    Do you remember that?

03:51:17  2  **A**    Yes.

03:51:17  3  **Q**    In addition to whatever personal notes Mr. Joyce may

03:51:23  4  have chosen to make, are there other ways that the field

03:51:25  5  leaders document store walk visits?

03:51:33  6  **A**    I don't know that off the top of my head.

03:51:35  7  **Q**    Are you familiar with something called a compliance

03:51:37  8  checklist?

03:51:39  9  **A**    Yes.

03:51:39  10  **Q**    What is a compliance checklist?

03:51:41  11  **A**    A compliance checklist, we have a couple different

03:51:47  12  ones that field leaders do and also the HCS and the DM could

03:51:53  13  do that together.  And it is a series of questions that are

03:51:59  14  used as a tool to evaluate the overall compliance of the

03:52:08  15  store, front of store and pharmacy.

03:52:10  16  **Q**    Are the compliance checklist visits, is that

03:52:14  17  sometimes -- is that separate from a store walk or is it

03:52:16  18  something that's sometimes done in conjunction or how does

03:52:18  19  that work?

03:52:18  20  **A**    It's separate.

03:52:19  21  **Q**    Are there visits that the field leader does in

03:52:24  22  conjunction with the compliance checklists, are those

03:52:28  23  documented through a centralized system?

03:52:31  24  **A**    Yes.

03:52:31  25  **Q**    Is there a questionnaire with questions about the

**Polster (Direct by Swift)** 3225

03:52:33  1  front end of the store and also questions about the pharmacy

03:52:37  2  that are supposed to be filled out?

03:52:39  3  **A**    Yes.

03:52:44  4  **Q**    Do the questions on those questionnaires change from

03:52:47  5  month to month?

03:52:47  6  **A**    Yes.

03:52:48  7  **Q**    Do they sometimes include questions about good faith

03:52:53  8  dispensing?

03:52:53  9  **A**    Yes.

03:52:53  10  **Q**    Do they sometimes include questions about whether the

03:52:58  11  pharmacy -- whether the pharmacists are properly completing

03:53:04  12  target drug checklists?

03:53:05  13  **A**    Yes.

03:53:09  14  **Q**    Do the compliance walk documents that you're

03:53:14  15  discussing sometimes include questions where instructions to

03:53:18  16  go find five target drug prescriptions in the store files

03:53:24  17  and determine whether the checklist has been properly

03:53:27  18  completed?

03:53:27  19  **A**    Yes.

03:53:27  20  **Q**    And if the field leader who goes into the store and

03:53:37  21  completes that questionnaire and answers those questions

03:53:40  22  doesn't find what they're supposed to find, what are they

03:53:42  23  supposed to do?

03:53:42  24  **A**    So they are supposed to speak with the pharmacists

03:53:49  25  that are on duty in addition to the pharmacy manager to let

**Polster (Direct by Swift)**

| | | |
|---|---|---|
| 03:53:52 | 1 | them know that they didn't find it and coach them to remind |
| 03:53:56 | 2 | them of the policy and what the policy entails. |
| 03:54:00 | 3 | **Q**    Now, I believe you testified that you know |
| 03:54:04 | 4 | Brian Joyce; is that right? |
| 03:54:04 | 5 | **A**    I do. |
| 03:54:05 | 6 | **Q**    If you would, please, take a look at the document |
| 03:54:07 | 7 | behind Tab 17 of your binder. |
| 03:54:11 | 8 | **A**    Okay. |
| 03:54:11 | 9 | **Q**    It's Exhibit 2625. |
| 03:54:20 | 10 | And do you see at the beginning of the e-mail chain |
| 03:54:22 | 11 | that you're copied on it? |
| 03:54:23 | 12 | **A**    Yes. |
| 03:54:26 | 13 | **Q**    I'll call that out. |
| 03:54:42 | 14 | It's an e-mail from an Rx Integrity e-mail address. |
| 03:54:46 | 15 | Can you explain to the jury what that means? |
| 03:54:49 | 16 | **A**    So the Rx Integrity e-mail address is an e-mail |
| 03:54:56 | 17 | address that's used by my team, so all the members of my |
| 03:55:00 | 18 | team have access to this e-mail address.  And that's what it |
| 03:55:06 | 19 | is. |
| 03:55:06 | 20 | **Q**    The subject line is "Rx Integrity reports for the |
| 03:55:09 | 21 | month of May now available." |
| 03:55:12 | 22 | Do you see that? |
| 03:55:12 | 23 | **A**    Yes. |
| 03:55:13 | 24 | **Q**    What is an Rx Integrity report, and specifically is |
| 03:55:17 | 25 | that something that is the same as what we've been talking |

**Polster (Direct by Swift)**

03:55:19   1   about so far, is it something different?

03:55:22   2   **A**    They would be the same, but there's more reports than

03:55:25   3   what we talked to in there.

03:55:26   4   **Q**    Got it.

03:55:27   5        And the message says, "Hello, this message is being

03:55:32   6   sent to notify you that the Rx Integrity monthly reports are

03:55:35   7   now available.  You can access these reports by going to the

03:55:39   8   following site," and then it provides a website -- or like a

03:55:42   9   link to the website.

03:55:43   10       Do you see that?

03:55:44   11   **A**    Yes.

03:55:44   12   **Q**    And if we scroll up to see what happens next -- we

03:55:54   13   need to go to the next page -- do you see, I think it's the

03:56:05   14   second page, the e-mail from Zachary Leslie to Brian Joyce

03:56:09   15   and another gentleman?

03:56:10   16   **A**    Yes.

03:56:11   17   **Q**    He says, "Beau and Brian, this is May's report, and as

03:56:18   18   expected the same two stores are on this list for oxycodone.

03:56:22   19   Have either of you received any feedback from these stores

03:56:25   20   around dispensing habits, GFD policy execution, doctors

03:56:29   21   prescribing more oxy, new pharmacists working at their

03:56:33   22   locations, et cetera?"

03:56:38   23       And then he clips into his e-mail what looks to be

03:56:41   24   part of an Excel report.

03:56:43   25       Is that correct?

**Polster (Direct by Swift)**

03:56:43 1    **A**    Yes.

03:56:43 2    **Q**    Do you see where it says in what looks like the Excel

03:56:49 3    portion, "Deterioration 500 plus"?

03:56:52 4    **A**    Yes.

03:56:52 5    **Q**    What does that mean?  Well, actually, let me take a

03:56:56 6    step back.  I apologize.

03:56:57 7        Does the part of this e-mail that looks like it's

03:57:00 8    clipped from an Excel spreadsheet, does that appear to you

03:57:02 9    to be a portion of an Rx Integrity report?

03:57:05 10   **A**    Yes.

03:57:05 11   **Q**    How can you tell that?

03:57:06 12   **A**    Well, we do have -- we do use that terminology, and

03:57:16 13   we -- that's just a report that we would use.

03:57:18 14   **Q**    What is deterioration 500 plus, what does that mean?

03:57:21 15   **A**    So we track the number of controlled substances that

03:57:29 16   are dispensed by stores, and we track the number of, like,

03:57:34 17   oxycodone and hydromorphone and methadone that are tracked,

03:57:38 18   and we rank the stores.  We do not give the field leaders

03:57:43 19   the number of where they sit for the chain for dispensing,

03:57:49 20   but we will tell them if their store is starting to dispense

03:57:53 21   more and they are moving up, so if, let's say, for example,

03:57:57 22   we have -- well, we have, like, 9000 stores today, and if a

03:58:02 23   store is ranked number 5000 today and next month it's ranked

03:58:10 24   4500 because they've started dispensing more controlled

03:58:13 25   substances of that report, the deterioration would mean that

**Polster (Direct by Swift)**

03:58:18   1   they moved up in dispensing more controlled substances by

03:58:23   2   500 points or places?

03:58:25   3   **Q**     What is the purpose of sharing that information with

03:58:28   4   your field leaders?

03:58:29   5   **A**     So we want them to know that their store is dispensing

03:58:34   6   more oxy, and that they should be checking on their

03:58:40   7   supervision visits, do the dispensing patterns for that

03:58:47   8   specific store make sense, what has changed in their

03:58:50   9   business that would explain why they're dispensing more of a

03:58:53   10  controlled substance.

03:58:54   11  **Q**     This report that we're looking at here, the duration

03:58:58   12  500 plus report, is that different from the coaching

03:59:01   13  opportunities report that we looked at before?

03:59:03   14  **A**     Yes.

03:59:03   15  **Q**     Is it different from the report that we looked at that

03:59:06   16  showed the control -- the percentage of controlled

03:59:09   17  substances for each of the stores?

03:59:11   18  **A**     Yes.

03:59:11   19  **Q**     Is this another tool that Walgreens provides to its

03:59:18   20  field leaders to help them look at what's going on in the

03:59:20   21  stores around controlled substances?

03:59:22   22  **A**     Yes.

03:59:22   23  **Q**     All right.  Do you know that Mr. Joyce, Brian Joyce,

03:59:28   24  was the district manager overseeing Walgreens' Trumbull

03:59:33   25  County stores?  Are you aware of that?

**Polster (Direct by Swift)**

03:59:34    1    **A**    Yes.

03:59:34    2    **Q**    I just want to show you the response, and my question

03:59:41    3    is going to be whether this is what you would hope to see,

03:59:45    4    if you have any concerns about it.

03:59:46    5    This is the response from RXM 09077.

03:59:54    6    What is that formulation, that e-mail address?

03:59:56    7    **A**    That's an e-mail address specific to Store 0 -- or

04:00:01    8    Store 09077.  So that would come from a pharmacy manager at

04:00:05    9    that store.

04:00:08    10    **Q**    The pharmacy manager says to Brian Joyce, "Hey, Brian,

04:00:11    11    so Walmart/Sam's Club, and Giant Eagle have stopped filling

04:00:14    12    controls for a local doctor named Frank Veres.  This doc has

04:00:18    13    a reputation for prescribing a high number of pain meds, so

04:00:23    14    I think over the past few months we have been picking up a

04:00:25    15    lot of his patients.

04:00:26    16    "From our angle, Veres has always complied with our

04:00:30    17    GFD guidelines and his patients are always on time, but the

04:00:32    18    high ratio of controls written has become more obvious.  To

04:00:36    19    combat this, Greg and I have discussed not accepting any new

04:00:40    20    controls from his office (since his patients have been

04:00:42    21    displaced from those other pharmacies and the flood of

04:00:46    22    controls is imminent).  At this time, we still feel

04:00:51    23    comfortable filling controls for our patients that have been

04:00:54    24    coming here for years, but that is subject to change.  I

04:00:56    25    would like to hear you thoughts on the matter.  Thanks."

**Polster (Direct by Swift)** 3231

| | | |
|---|---|---|
| 04:00:58 | 1 | Did I read all of that correctly? |
| 04:01:00 | 2 | **A** Yes. |
| 04:01:00 | 3 | **Q** And then you can see Brian's response is, "See below. |
| 04:01:11 | 4 | Is there any way that we can refuse his scripts?  This MD |
| 04:01:14 | 5 | has been a problem for a long time." |
| 04:01:16 | 6 | And it goes on.  And I'll call out the last two |
| 04:01:20 | 7 | e-mails in the chain so you can see how they're addressing |
| 04:01:23 | 8 | this. |
| 04:01:26 | 9 | First of all, let's see who Zach Leslie is. |
| 04:01:31 | 10 | Can you see that Mr. Leslie is an area healthcare |
| 04:01:34 | 11 | supervisor? |
| 04:01:34 | 12 | **A** Yes. |
| 04:01:34 | 13 | **Q** Are area healthcare supervisors pharmacists? |
| 04:01:37 | 14 | **A** Yes. |
| 04:01:38 | 15 | **Q** Mr. Leslie says, "We have to continue to adhere to our |
| 04:01:46 | 16 | GFD policy and guidelines.  However, if they are refusing |
| 04:01:49 | 17 | scripts and they feel this is a problem due to poor |
| 04:01:53 | 18 | prescribing behaviors, the store can also contact the Ohio |
| 04:01:56 | 19 | Board of Medicine to report the prescriber.  Please ensure |
| 04:02:00 | 20 | that if they feel this doctor is not prescribing medications |
| 04:02:03 | 21 | appropriately, they need to have good documentation." |
| 04:02:06 | 22 | And then Mr. Joyce forwards that to the RXM and says, |
| 04:02:12 | 23 | "Review each prescription on its own merit." |
| 04:02:16 | 24 | Does this course of communication between the field |
| 04:02:18 | 25 | leader and the pharmacist at the store, in your view, |

**Polster (Direct by Swift)** 3232

| | | |
|---|---|---|
| 04:02:22 | 1 | comport with Walgreens policy? |
| 04:02:25 | 2 | **A**    Yes. |
| 04:02:25 | 3 | **Q**    Why? |
| 04:02:26 | 4 | **A**    Because it's showing that multiple leaders in the |
| 04:02:30 | 5 | district as well as the pharmacy manager are doing their due |
| 04:02:35 | 6 | diligence around the dispensing of controlled substances and |
| 04:02:41 | 7 | why more controlled substances are being filled in their |
| 04:02:43 | 8 | store. |
| 04:02:44 | 9 | **Q**    All right.  I have a few questions about the oversight |
| 04:02:48 | 10 | that you do around orders that are placed by the Walgreens |
| 04:02:53 | 11 | pharmacies to the distribution centers. |
| 04:02:56 | 12 |         Does Walgreens distribute controlled substances today? |
| 04:03:00 | 13 | **A**    No. |
| 04:03:00 | 14 | **Q**    At some point did Walgreens distribute controlled |
| 04:03:07 | 15 | substances to its own pharmacies? |
| 04:03:08 | 16 | **A**    Yes. |
| 04:03:08 | 17 | **Q**    Do you know when Walgreens stopped doing that? |
| 04:03:10 | 18 | **A**    We started getting out of doing that around the time |
| 04:03:18 | 19 | that I started the pharmacy integrity team, but I believe we |
| 04:03:23 | 20 | were completely free of all controlled substances from our |
| 04:03:26 | 21 | distribution centers at the end of 2014.  I might be off on |
| 04:03:29 | 22 | the date daily. |
| 04:03:33 | 23 | **Q**    Did Walgreens in the time frame when it was |
| 04:03:35 | 24 | distributing controlled substances ever distribute to any |
| 04:03:39 | 25 | pharmacy that was not a Walgreens pharmacy? |

**Polster (Direct by Swift)**                                    3233

04:03:41  1   **A**     No.

04:03:41  2   **Q**     I believe you testified already that when you started

04:03:48  3   in pharmaceutical integrity in 2012, Walgreens had a system

04:03:52  4   in place to monitor the orders that Walgreens pharmacies

04:03:57  5   placed to its distribution centers.

04:03:59  6          Do I have that right?

04:04:00  7   **A**     Yes.

04:04:00  8   **Q**     When you started in 2012, did you have an

04:04:07  9   understanding that at that point in time, the DEA wanted

04:04:12  10  Walgreens to cancel orders that it deemed potentially

04:04:19  11  suspicious and to investigate them before shipping?

04:04:22  12               MR. WEINBERGER:  Objection.

04:04:31  13               THE COURT:  Let's go on the headphones for a

04:04:33  14  minute.

04:04:34  15               (At side bar at 4:04 p.m.) ever

04:04:43  16               THE COURT:  Mr. Weinberger, what's the

04:04:44  17  objection?

04:04:45  18               MR. WEINBERGER:  There's been no foundation

04:04:46  19  laid about her having reviewed any of the DEA regulations or

04:04:53  20  what her knowledge was with respect to distribution.

04:04:58  21               MS. SWIFT:  I just asked her if she had an

04:05:00  22  understanding.

04:05:00  23       Sorry, Judge.

04:05:01  24               THE COURT:  I'll allow the question.  She

04:05:03  25  either has this understanding or she doesn't.  If she does,

**Polster (Direct by Swift)** 3234

| | | |
|---|---|---|
| 04:05:06 | 1 | then we'll go further. |
| 04:05:09 | 2 | MR. WEINBERGER:  Okay.  Thank you. |
| 04:05:11 | 3 | (In open court at 4:05 p.m.) |
| 04:05:17 | 4 | BY MS. SWIFT: |
| 04:05:18 | 5 | **Q**    All right.  I'll withdraw and reask it again just so |
| 04:05:21 | 6 | that it's fresh in your mind. |
| 04:05:23 | 7 | When you started in pharmaceutical integrity in |
| 04:05:29 | 8 | 2012 -- strike that.  I already asked that one. |
| 04:05:30 | 9 | When you started in pharmaceutical integrity in 2012, |
| 04:05:36 | 10 | did you have an understanding at that point in time that the |
| 04:05:40 | 11 | DEA wanted Walgreens to cancel orders from its pharmacies |
| 04:05:47 | 12 | that it deemed potentially suspicious and to investigate |
| 04:05:50 | 13 | them before shipping them? |
| 04:05:51 | 14 | MR. WEINBERGER:  Objection. |
| 04:05:57 | 15 | THE COURT:  Overruled. |
| 04:05:58 | 16 | **A**    I understood that the responsibility of distributing a |
| 04:06:05 | 17 | controlled substance -- |
| 04:06:05 | 18 | THE COURT:  I'd like you to answer that |
| 04:06:07 | 19 | specific question if you can.  Yes or no, did you have an |
| 04:06:10 | 20 | understanding? |
| 04:06:12 | 21 | **A**    Yes. |
| 04:06:13 | 22 | **Q**    At Walgreens today, and since you've been in place in |
| 04:06:20 | 23 | 2012, does Walgreens have a system that evaluates |
| 04:06:26 | 24 | potentially suspicious orders? |
| 04:06:28 | 25 | **A**    Yes. |

**Polster (Direct by Swift)** 3235

| | | |
|---|---|---|
| 04:06:29 | 1 | **Q**    How does that system work? |
| 04:06:33 | 2 | **A**    So a pharmacy -- a pharmacy cannot order more tablets |
| 04:06:40 | 3 | that come in to that location above the ceiling without |
| 04:06:46 | 4 | filling out a order form.  And -- |
| 04:06:51 | 5 | **Q**    Do -- sorry.  Go ahead.  I didn't mean to interrupt |
| 04:06:54 | 6 | you. |
| 04:06:55 | 7 | **A**    And the order form will come to my team requesting |
| 04:06:59 | 8 | whether or not -- or requesting that they want more tablets. |
| 04:07:02 | 9 | And my team will determine whether or not the documentation |
| 04:07:07 | 10 | for getting more tablets into that location makes sense for |
| 04:07:10 | 11 | what's happening in the business after the district manager |
| 04:07:13 | 12 | does their due diligence, it goes to them first, then it |
| 04:07:16 | 13 | goes to my team. |
| 04:07:20 | 14 | And if we deem that it passes and it makes sense, then |
| 04:07:25 | 15 | the order is released to the wholesaler. |
| 04:07:30 | 16 | **Q**    Do you know whether prior to 2012, before you came |
| 04:07:33 | 17 | into your role in pharmaceutical integrity, do you know |
| 04:07:37 | 18 | whether DEA guidance on how to handle that process of |
| 04:07:41 | 19 | evaluating suspicious orders was different? |
| 04:07:43 | 20 | **A**    I don't know specifics, but I know it changed. |
| 04:07:59 | 21 | **Q**    You testified that you had an understanding that prior |
| 04:08:02 | 22 | to 2012, when you came on board in pharmaceutical integrity, |
| 04:08:06 | 23 | there was a system that Walgreens had in place, but you were |
| 04:08:10 | 24 | not familiar with how it worked. |
| 04:08:13 | 25 | Why is that?  Why didn't you have a familiarity with |

**Polster (Direct by Swift)** 3236

04:08:15  1   how that system worked?

04:08:16  2   **A**    That was a different department.  And when I came on

04:08:22  3   board, the new system was coming into place.

04:08:25  4   **Q**    Do you know how many people worked on the earlier

04:08:27  5   system over time?

04:08:29  6   **A**    I do not.

04:08:30  7   **Q**    Do you know the processes and procedures that they

04:08:33  8   followed?

04:08:34  9               MR. WEINBERGER:  Objection.

04:08:37  10              THE COURT:  Sustained.

04:08:50  11  **Q**    I think you testified a moment ago that the system

04:08:52  12  that Walgreens has in place today to evaluate orders from

04:08:57  13  its pharmacists involves ceiling limits and tolerance.  Is

04:09:02  14  that a fair characterization?

04:09:03  15  **A**    Yes.

04:09:03  16  **Q**    The pharmacies, if they want to order more controlled

04:09:11  17  substances and they get within the ceiling limits and the

04:09:16  18  tolerance limits, what do they have to do in order to get

04:09:19  19  that additional medication?

04:09:20  20  **A**    They have to request through an order form and fill

04:09:24  21  out documentation as to the reason why they need that

04:09:28  22  additional medication in their store.

04:09:31  23  **Q**    Why didn't Walgreens stop using that process of

04:09:39  24  evaluating orders in 2014 when Walgreens stopped

04:09:43  25  distributing controlled substances?

**Polster (Direct by Swift)** 3237

04:09:43  1   **A**      You know, I felt that it was a good checks and

04:09:48  2   balances for us to, you know, make sure that we have the

04:09:50  3   information about our stores.  And additionally, just

04:09:54  4   because Walgreens approves that it's okay for those stores

04:09:59  5   to get more tablets does not mean that the wholesaler is

04:10:03  6   going to approve it.  And there are times when it would

04:10:07  7   trigger on the wholesaler side as an order of interest, and

04:10:15  8   they would ask our team for information about that order,

04:10:18  9   and I would have that information at the ready and be able

04:10:20  10  to give it to the wholesaler.

04:10:23  11      And it, you know, helps patient care because generally

04:10:27  12  they have a patient waiting and, you know, it would save

04:10:30  13  time for the wholesaler because we'd have that information

04:10:33  14  already documented from the store and the district manager

04:10:37  15  on that order.

04:10:38  16  **Q**      I'm going to see if I can break that down a little

04:10:40  17  bit.

04:10:41  18      Today does Walgreens order controlled substances from

04:10:47  19  another distributor, a wholesaler as you're referring to it?

04:10:49  20  **A**      Yes.

04:10:50  21  **Q**      Is it your understanding that the wholesaler Walgreens

04:10:54  22  orders from has its own order monitoring system in place?

04:10:57  23  **A**      Yes.

04:10:57  24  **Q**      Is that what you were referring to a moment ago when

04:11:00  25  you said it might not go through the wholesaler?

04:11:02  1    **A**    Yes.

04:11:02  2    **Q**    Then Walgreens also has an additional system on top of

04:11:06  3    that to monitor the orders that are placed by its

04:11:09  4    pharmacies, is that what I'm hearing you say?

04:11:11  5    **A**    Yes.

04:11:11  6    **Q**    Do you have an understanding whether Walgreens is

04:11:14  7    obligated today to have a suspicious order monitoring system

04:11:21  8    in place since it's not distributing anymore?

04:11:23  9                    MR. WEINBERGER:  Objection.

04:11:24  10                   THE COURT:  Overruled.

04:11:25  11   **A**    We are not required.  We do it as an extra step.

04:11:29  12   **Q**    Is one of the reasons that you do that as an extra

04:11:32  13   step because if anything is out of the ordinary at one of

04:11:35  14   your stores, you want to know about it?

04:11:37  15   **A**    Yes.

04:11:37  16   **Q**    Is one of the reasons you do that, even though you're

04:11:40  17   not required to do it, because you want to prevent

04:11:43  18   controlled substances from being diverted?

04:11:49  19   **A**    Yes.

04:11:49  20   **Q**    All right.  You were asked questions today about a

04:12:01  21   2013 settlement agreement with the DEA.

04:12:02  22           Do you remember that?

04:12:03  23   **A**    Yes.

04:12:03  24   **Q**    And you were asked about the addendum on prospective

04:12:08  25   compliance, which are the three pages at the end of that

**Polster (Direct by Swift)**

04:12:11  1    agreement.

04:12:11  2        Do you remember those questions?

04:12:12  3    **A**    Yes.

04:12:12  4    **Q**    Do you still have handy Plaintiffs' Exhibit 15?  It's

04:12:35  5    a big thick one.

04:12:42  6    **A**    Oh, yes.  Thank you.

04:12:43  7    **Q**    Ms. Polster, do you have an understanding that this

04:12:47  8    2013 agreement related to a distribution center in Florida

04:12:51  9    and six Florida pharmacies?

04:12:53  10   **A**    Yes.

04:12:53  11   **Q**    Is the -- I'll ask you to turn to the last three pages

04:12:58  12   of the settlement agreement, which are that addendum on

04:13:01  13   prospective compliance.

04:13:02  14       Do you have that?

04:13:06  15   **A**    Yes.

04:13:06  16   **Q**    Is that three pages, is that a list of things that

04:13:09  17   Walgreens agreed to do as part of a settlement with the DEA

04:13:13  18   regarding six pharmacies in Florida?

04:13:15  19   **A**    Yes.

04:13:17  20   **Q**    Were you involved in making sure that Walgreens

04:13:19  21   complied with that agreement?

04:13:20  22   **A**    Yes.

04:13:25  23   **Q**    And you can see in the second sentence -- I want to

04:13:26  24   pull it out.

04:13:45  25       The second sentence on the first page of the addendum

**Polster (Direct by Swift)**                                    3240

04:13:49  1    says, "To the extent any compliance measures identified

04:13:53  2    below are not yet in place, Walgreens commits to implement

04:13:57  3    such measures within the time frame specified herein."

04:14:00  4         Do you see that?

04:14:04  5    **A**    Yes.

04:14:04  6    **Q**    Were some of the items on this list of things that

04:14:06  7    Walgreens was agreeing to do, were they things that

04:14:08  8    Walgreens was already doing?

04:14:09  9    **A**    Yes.

04:14:09  10   **Q**    For example, the first item on the list is to maintain

04:14:16  11   a department of pharmaceutical integrity.

04:14:18  12        That's your department, right?

04:14:20  13   **A**    Yes.

04:14:20  14   **Q**    Was your department already up and running by the time

04:14:24  15   this agreement was put in place?

04:14:25  16   **A**    Yes.

04:14:25  17   **Q**    And you agreed to keep it in place.  That's part of

04:14:27  18   the agreement, right?

04:14:28  19   **A**    Yes.

04:14:28  20   **Q**    Have you kept your department in place?

04:14:32  21   **A**    Yes.

04:14:32  22   **Q**    The addendum to the agreement also says your

04:14:37  23   department is to be composed of personnel with

04:14:43  24   pharmacy-related training and managerial personnel.  It says

04:14:51  25   those people should be trained in relevant diversion-related

**Polster (Direct by Swift)**

04:14:55　1　issues to coordinate compliance efforts related to

04:14:57　2　controlled substances.

04:14:58　3　　　　Do you see that?

04:14:58　4　**A**　　Yes.

04:14:58　5　**Q**　　Was your group made up of those kinds of people even

04:15:03　6　before this agreement?

04:15:04　7　**A**　　Yes.

04:15:04　8　**Q**　　Do the people on your team coordinate compliance

04:15:19　9　efforts related to controlled substances?

04:15:20　10　**A**　　Yes.

04:15:20　11　**Q**　　Have they done that ever since your department has

04:15:23　12　been in place?

04:15:23　13　**A**　　Yes.

04:15:23　14　**Q**　　Did your team set up a dedicated contact point, an

04:15:30　15　e-mail address for DEA to facilitate Walgreens' responses to

04:15:34　16　DEA requests for information?

04:15:36　17　**A**　　Yes.

04:15:36　18　**Q**　　Then if you scroll down -- well, I'll scroll down.

04:15:41　19　You see the section on pharmacies?

04:15:43　20　**A**　　Yes.

04:15:43　21　**Q**　　It says that within -- well, let me direct your

04:15:50　22　attention.

04:15:53　23　　　　You're familiar with this addendum, correct,

04:15:56　24　Ms. Polster?

04:15:57　25　**A**　　Yes.

**Polster (Direct by Swift)**

04:15:57　1　**Q**　　Does this second provision here have Walgreens

04:16:03　2　committing to provide within two business days of a request

04:16:07　3　from the DEA to provide controlled substance dispensing logs

04:16:14　4　consisting of the categories of information the regulations

04:16:16　5　require dispensers to maintain as records?

04:16:18　6　**A**　　Yes.

04:16:19　7　**Q**　　Does your team do that when the DEA asks you to?

04:16:21　8　**A**　　Yes.

04:16:23　9　**Q**　　The next item on the list is about the stickering of

04:16:26　10　paper controlled substance prescriptions.

04:16:30　11　　　　Do you see that?

04:16:30　12　**A**　　Yes.

04:16:30　13　**Q**　　Does Walgreens do what the DEA asked it to do with

04:16:35　14　respect to stickering of controlled substance prescriptions?

04:16:38　15　**A**　　Yes.

04:16:38　16　**Q**　　It also says that Walgreens will maintain a paper file

04:16:42　17　of those prescriptions organized chronologically by fill

04:16:46　18　date and will provide a list upon request of the DEA.

04:16:50　19　　　　Does Walgreens do that?

04:16:52　20　**A**　　Yes.

04:16:52　21　**Q**　　It says, "Walgreens will maintain paper prescriptions

04:16:58　22　at the pharmacy for two years or however long they're

04:17:02　23　required to be maintained by state law, whichever is

04:17:05　24　longer."

04:17:05　25　　　　Was Walgreens already doing that at the time of this

**Polster (Direct by Swift)** 3243

04:17:08  1  agreement?

04:17:08  2  **A**   Yes.

04:17:08  3  **Q**   Did Walgreens continue to do that?

04:17:10  4  **A**   Yes.

04:17:11  5  **Q**   There are two more pages of items in this addendum on

04:17:18  6  prospective compliance.  Do you agree with that?

04:17:21  7  **A**   Yes.

04:17:21  8  **Q**   Have you and your team taken steps to make sure that

04:17:24  9  you did what you needed to do to comply with that agreement?

04:17:27  10  **A**   Yes.

04:17:27  11  **Q**   Has DEA ever put you on notice that it believed

04:17:37  12  Walgreens was not in compliance with this agreement?

04:17:41  13  **A**   No.

04:17:43  14  **Q**   All right.  We're getting close to the end.

04:17:45  15       Ms. Polster, are you and your team in Chicago, are you

04:17:50  16  aware of the problems with opioid abuse around the country

04:17:52  17  today?

04:17:53  18  **A**   Yes.

04:17:53  19  **Q**   Have you been aware of that for well over a decade?

04:17:56  20  **A**   Yes.

04:17:57  21  **Q**   Have you personally taken steps throughout your time

04:18:01  22  at Walgreens to make sure that Walgreens' pharmacists are

04:18:11  23  also aware of the problems associated with opioid abuse?

04:18:13  24  **A**   Yes.

04:18:14  25  **Q**   Is that something you take seriously?

**Polster (Direct by Swift)**

04:18:16  1    **A**    Yes.

04:18:16  2    **Q**    Can you explain to the jury why that is?

04:18:19  3    **A**    Well, as the industry has changed, as the opioid

04:18:28  4    deaths and street drug deaths have increased, it's important

04:18:32  5    for our pharmacists to be trained and be aware of what's

04:18:39  6    happening across the industry.  We try to keep them updated

04:18:42  7    on new things that change and make sure that they are, you

04:18:49  8    know, trained and have the most relevant information for

04:18:52  9    them to practice pharmacy in our stores.

04:18:56  10   **Q**    And are the policies and procedures that we looked at

04:18:59  11   today part of the way you have communicated that to your

04:19:03  12   pharmacists?

04:19:03  13   **A**    Yes.

04:19:06  14   **Q**    Are the slide presentations and the training decks

04:19:09  15   that we've looked at today part of the way that you've tried

04:19:12  16   to communicate that to your pharmacists?

04:19:15  17   **A**    Yes.

04:19:15  18   **Q**    Have you in the course of your oversight of the

04:19:21  19   policies and procedures at Walgreens tried to take steps as

04:19:25  20   to reduce opioid abuse and diversion?

04:19:26  21   **A**    Yes.

04:19:28  22   **Q**    Do you sometimes speak at conferences to people

04:19:32  23   suffering from substance use disorders?

04:19:35  24   **A**    Yes.

04:19:35  25   **Q**    What do you talk to them about?

**Polster (Direct by Swift)** 3245

| | | |
|---|---|---|
| 04:19:37 | 1 | **A**    I talk to them about our drug take back program, the |
| 04:19:44 | 2 | availability of naloxone. |
| 04:19:48 | 3 | **Q**    What is your drug take back program?  I'm not sure the |
| 04:19:51 | 4 | jury's heard about that before. |
| 04:19:53 | 5 | **A**    We have a program in some of our stores where we have |
| 04:19:56 | 6 | a kiosk that patients can take old medications from their |
| 04:20:01 | 7 | medicine cabinets and put it in this kiosk in a location |
| 04:20:05 | 8 | that will then be destroyed and taken out of -- you know, |
| 04:20:15 | 9 | protect people in the people's homes from getting |
| 04:20:19 | 10 | medications that they should not use. |
| 04:20:21 | 11 | **Q**    Let me break that down a little bit. |
| 04:20:23 | 12 | You said you have kiosks in the Walgreens stores. |
| 04:20:27 | 13 | Do you have them in all stores? |
| 04:20:28 | 14 | **A**    No.  They're in a little more than 1500. |
| 04:20:31 | 15 | **Q**    Okay.  Why is it important for people to dispose of |
| 04:20:36 | 16 | their unused medications? |
| 04:20:38 | 17 | **A**    You know, it just decreases the chance of a |
| 04:20:43 | 18 | prescription being misused.  You know, you might have |
| 04:20:45 | 19 | surgery or you might have had a baby or something like that |
| 04:20:49 | 20 | where you have -- you were given pain medications or any |
| 04:20:53 | 21 | other medication, frankly.  And if you're not taking it |
| 04:20:56 | 22 | anymore, you should get it out of your house and destroy it |
| 04:21:01 | 23 | properly so it's not going into the water or wastewater, |
| 04:21:05 | 24 | it's going into an appropriate place to be incinerated or |
| 04:21:10 | 25 | destroyed safely. |

**Polster (Direct by Swift)** 3246

| | | |
|---|---|---|
| 04:21:12 | 1 | **Q**      Does Walgreens partner with law enforcement like the |
| 04:21:16 | 2 | DEA on drug take back programs? |
| 04:21:18 | 3 | **A**      Yes, we do. |
| 04:21:19 | 4 | **Q**      Does Walgreens also provide something called DisposeRx |
| 04:21:26 | 5 | kits? |
| 04:21:26 | 6 | **A**      Yes, we do. |
| 04:21:27 | 7 | **Q**      What are those? |
| 04:21:27 | 8 | **A**      DisposeRx kits are -- it's a powder that is available |
| 04:21:33 | 9 | at all of our locations to give to a patient where if they |
| 04:21:38 | 10 | have leftover medications, they can pour this powder into |
| 04:21:45 | 11 | their vial and add water.  It turns into a gummy substance |
| 04:21:49 | 12 | and it renders the pills inside the bottle inactive. |
| 04:21:55 | 13 | **Q**      Are the drug take back kiosks that Walgreens has and |
| 04:21:58 | 14 | the DisposeRx kits that Walgreens provides, are those |
| 04:22:02 | 15 | programs meant to prevent diversion? |
| 04:22:05 | 16 | **A**      Yes. |
| 04:22:07 | 17 | **Q**      Do you have an understanding of whether they do |
| 04:22:10 | 18 | prevent diversion? |
| 04:22:13 | 19 |                 MR. LANIER:  Objection. |
| 04:22:13 | 20 | **A**      Yes, they -- you're getting them out of the people's |
| 04:22:19 | 21 | homes so that somebody cannot take them if it's not |
| 04:22:21 | 22 | appropriate for them would be a way of presenting diversion. |
| 04:22:26 | 23 | **Q**      Ms. Polster, do you believe that Walgreens' |
| 04:22:29 | 24 | pharmacists are well trained and supported to identify and |
| 04:22:32 | 25 | resolve red flags on prescriptions? |

**Polster (Direct by Swift)** 3247

| | | |
|---|---|---|
| 04:22:34 | 1 | **A**   I do. |
| 04:22:36 | 2 | **Q**   Do you believe that that's been the case for as long |
| 04:22:39 | 3 | as you can remember? |
| 04:22:40 | 4 | **A**   Yes. |
| 04:22:40 | 5 | **Q**   Do you believe that you have improved over time? |
| 04:22:43 | 6 | **A**   Yes. |
| 04:22:43 | 7 | **Q**   Do you believe Walgreens pharmacists are well trained |
| 04:22:48 | 8 | and supported to document the resolution of red flags when |
| 04:22:52 | 9 | they deem it to be appropriate? |
| 04:22:54 | 10 | **A**   I do. |
| 04:22:54 | 11 | **Q**   Do you believe that Walgreens' pharmacists are well |
| 04:22:59 | 12 | trained and supported to refuse illegitimate prescriptions? |
| 04:23:02 | 13 | **A**   Yes. |
| 04:23:03 | 14 | **Q**   Does Walgreens provide its pharmacists with data, |
| 04:23:06 | 15 | information, and other tools to assist them in doing their |
| 04:23:09 | 16 | jobs? |
| 04:23:09 | 17 | **A**   Yes. |
| 04:23:12 | 18 | MS. SWIFT:  Thank you.  That's all I've got. |
| 04:23:14 | 19 | THE WITNESS:  Thank you. |
| 04:23:16 | 20 | THE COURT:  Thank you, Ms. Swift. |
| 04:23:18 | 21 | Any of the other defendants have any questions of |
| 04:23:21 | 22 | Ms. Polster? |
| 04:23:22 | 23 | MR. MAJORAS:  No, Your Honor. |
| 04:23:23 | 24 | MS. SULLIVAN:  No, Your Honor. |
| 04:23:25 | 25 | MR. DELINSKY:  No, Your Honor. |

**Polster (Cross by Lanier)**

04:23:25  1          THE COURT:  Okay.  It's time for redirect, but

04:23:27  2    also if any of the jurors have any questions, provide them

04:23:31  3    to Mr. Pitts.  I'll take a look.

04:23:36  4         (Juror question review.)

04:28:41  5          MR. LANIER:  Your Honor, we'll incorporate

04:28:43  6    these, and if we don't incorporate them all, then defense

04:28:46  7    counsel will.

04:28:55  8          MS. SWIFT:  Actually, Your Honor, I'd be happy

04:28:57  9    to go ahead and ask the questions.

04:29:01  10          THE COURT:  I think we'll go in turn.  You'll

04:29:04  11    have a follow-up opportunity, Ms. Swift.

04:29:06  12          MS. SWIFT:  Thank you, Your Honor.

04:29:33  13          MR. LANIER:  May it please the Court, ladies

04:29:35  14    and gentlemen, Ms. Polster.

04:29:41  15                       - - - - -

04:29:42  16                    CROSS-EXAMINATION

04:29:42  17    BY MR. LANIER:

04:29:42  18    **Q**    You have remarkable endurance, ma'am.  So does the

04:29:45  19    jury, so does the judge.

04:29:46  20         I'm the plaintiffs' lawyer.  My name is Mark Lanier.

04:29:49  21    And I'd like to ask you some questions, okay?

04:29:52  22    **A**    Okay.

04:29:52  23    **Q**    This time your road map gets a little bit longer, but

04:29:56  24    we're going to drive down this road at a fast pace.

04:29:59  25         We'll talk about the crisis, quick stop, we'll talk

**Polster (Cross by Lanier)** 3249

| | | |
|---|---|---|
| 04:30:03 | 1 | about pharmacists, quick stop, training in good faith |
| 04:30:07 | 2 | dispensing, longer stop, computers, medium stop, store |
| 04:30:11 | 3 | reports, medium stop.  Okay? |
| 04:30:13 | 4 | **A**   Okay. |
| 04:30:14 | 5 | **Q**   First stop, the crisis. |
| 04:30:22 | 6 |     You said that you believed the opioid crisis began in |
| 04:30:26 | 7 | 2011 because the change in the law concerning clinics. |
| 04:30:30 | 8 |     Remember that testimony? |
| 04:30:30 | 9 | **A**   Yes. |
| 04:30:31 | 10 | **Q**   And in that regard I've got a few questions for you |
| 04:30:35 | 11 | that you could help us with.  Legal changes on the pain |
| 04:30:39 | 12 | clinics, first question. |
| 04:30:40 | 13 |     What law? |
| 04:30:42 | 14 | **A**   I believe that was asked already, and I am not exactly |
| 04:30:46 | 15 | familiar as to what law it is. |
| 04:30:48 | 16 | **Q**   So don't know? |
| 04:30:49 | 17 | **A**   Okay. |
| 04:30:50 | 18 | **Q**   Is that fair? |
| 04:30:50 | 19 | **A**   Yes. |
| 04:30:51 | 20 | **Q**   Where?  Which states? |
| 04:30:55 | 21 | **A**   I know Florida, and I've heard in other states as |
| 04:31:01 | 22 | well.  I cannot think off the top of my head, but pain |
| 04:31:05 | 23 | clinics across the country stopped dispensing controlled |
| 04:31:10 | 24 | substances for prescriptions that the pain management |
| 04:31:14 | 25 | doctors were writing. |

| 04:31:16 | 1 | **Q**   So others, don't know; is that fair? |
| 04:31:19 | 2 | **A**   Okay. |
| 04:31:19 | 3 | **Q**   When?  When was the law changed? |
| 04:31:24 | 4 | **A**   It began somewhere around 2010, 2011 is my |
| 04:31:27 | 5 | understanding. |
| 04:31:28 | 6 | **Q**   And is that in Florida or is that all over the |
| 04:31:30 | 7 | country? |
| 04:31:31 | 8 | **A**   Again, I remember Florida specifically, but saw the |
| 04:31:35 | 9 | change across the country. |
| 04:31:36 | 10 | **Q**   But you're not a legal scholar on this, fair? |
| 04:31:40 | 11 | **A**   Fair. |
| 04:31:41 | 12 | **Q**   You're sort of just putting together from a patchwork |
| 04:31:45 | 13 | of memory.  You don't really have any memory of this, do |
| 04:31:47 | 14 | you? |
| 04:31:47 | 15 | **A**   Oh, I do have memory because we started seeing more |
| 04:31:51 | 16 | pain management prescriptions coming into our stores. |
| 04:31:54 | 17 | **Q**   Great.  So when did it change in Ohio? |
| 04:31:56 | 18 | **A**   I don't know the answer to that specific to Ohio. |
| 04:32:00 | 19 | **Q**   Were you a pharmacist when it changed? |
| 04:32:04 | 20 | **A**   Yes. |
| 04:32:04 | 21 | **Q**   So were you practicing behind the counter? |
| 04:32:09 | 22 | **A**   No. |
| 04:32:09 | 23 | **Q**   So when you say, I knew it was changing because the |
| 04:32:12 | 24 | way it was happening in our stores, were you working as a |
| 04:32:15 | 25 | pharmacist in those stores? |

04:32:17  1   **A**      No.

04:32:18  2   **Q**      And this is what you attribute the drug rise to and

04:32:27  3   the epidemic, right?

04:32:31  4   **A**      Part of it, yes.

04:32:32  5   **Q**      And yet, if we look at a PowerPoint, weren't you over

04:32:36  6   the pharmaceutical integrity division in 2013?

04:32:41  7   **A**      Yes.

04:32:41  8   **Q**      If we look at a PowerPoint from the pharmaceutical

04:32:46  9   integrity division in 2013, Plaintiffs' Exhibit 14746,

04:32:55  10  please, Maria and Rachel -- Ms. Fleming and Ms. Lanier.

04:33:12  11          Do you have that in front of you, ma'am?

04:33:14  12  **A**      I do.

04:33:15  13  **Q**      So here your division, your unit that you head up puts

04:33:19  14  out a slide in 2013 talking about the epidemic?

04:33:22  15  **A**      Yes.

04:33:23  16  **Q**      And it has the epidemic associated with painkillers.

04:33:27  17  That's what opiates are, right?

04:33:28  18  **A**      Yes.

04:33:30  19  **Q**      And it has it starting in 2000 and has it going up

04:33:36  20  through 2009 at a pretty high rate, doesn't it?

04:33:40  21  **A**      Yes.

04:33:40  22  **Q**      And this is one that talks about it as a national

04:33:43  23  prescription drug epidemic.  True?

04:33:46  24  **A**      Yes.

04:33:47  25  **Q**      Doesn't say it started in 2010 and '11 when the pain

**Polster (Cross by Lanier)** 3252

04:33:51  1    clinics shut down.  This has been a problem dating back to

04:33:55  2    2000, according to your unit's work, right?

04:33:59  3    **A**    Yes.

04:33:59  4    **Q**    So maybe it would have been helpful for your company

04:34:08  5    to put some of these policies in place much earlier.  Make

04:34:12  6    sense?

04:34:16  7    **A**    My company did put things in place.

04:34:19  8    **Q**    Well, we'll look at the dates, ma'am, and you've

04:34:21  9    already looked at the dates.  We'll look at the stuff y'all

04:34:23  10   have done since we filed the lawsuit, we'll look at all of

04:34:26  11   that.  But I mean back in the 2000 to 2009 range would be

04:34:32  12   important to do everything you could to stop this national

04:34:34  13   epidemic, right?

04:34:37  14   **A**    Right.

04:34:38  15   **Q**    Thank you.

04:34:38  16         That's the crisis.  Now let's talk about pharmacists.

04:34:45  17   Real brief start.

04:34:46  18         Starting salary for a pharmacist, a hundred thousand

04:34:50  19   or so?

04:34:50  20   **A**    Yes.

04:34:50  21   **Q**    You make about a half million dollars though yourself,

04:34:54  22   annually; is that right?

04:34:56  23   **A**    My salary is not half a million dollars.

04:34:58  24   **Q**    If you add your bonuses and stuff, I looked at your

04:35:01  25   personnel report, it was north of 400,000, wasn't it?

**Polster (Cross by Lanier)**

04:35:04   1   **A**   When everything vests?

04:35:09   2   **Q**   Yeah.

04:35:10   3   **A**   Yes.

04:35:11   4   **Q**   Thank you.

04:35:11   5        And you've had a career at Walgreens yourself?

04:35:18   6   **A**   Yes.

04:35:18   7   **Q**   How long did your husband work for them?

04:35:20   8   **A**   36 years.

04:35:22   9   **Q**   Career man too?

04:35:24   10  **A**   Yes.

04:35:24   11  **Q**   Then your mother-in-law was there some and your

04:35:29   12  daughter was there some; is that fair?

04:35:31   13  **A**   Yes.

04:35:31   14  **Q**   Now, you've been there for 30-plus years, and you

04:35:37   15  spoke about pharmacists' concerns, but can we just assume

04:35:42   16  you're not really speaking for all the pharmacists at

04:35:45   17  Walgreens?  Right?

04:35:49   18  **A**   Sure.

04:35:49   19  **Q**   And you don't know what all the concerns are of all

04:35:53   20  the pharmacists at Walgreens, right?

04:35:56   21  **A**   Sure.

04:35:57   22  **Q**   And if you were going to be totally candid with us

04:36:00   23  under oath, you would probably admit that there are some

04:36:05   24  really great pharmacists at Walgreens, right?

04:36:08   25  **A**   Yes, we have great pharmacists.

**Polster (Cross by Lanier)**

04:36:09  1  **Q**     Doing it right, day in, day out, working hard, great

04:36:14  2  customer service, protecting the communities, really good

04:36:17  3  people.  Right?

04:36:19  4  **A**     Yes.

04:36:19  5  **Q**     And you also, in all candor, would admit there are

04:36:24  6  probably some that aren't all that hot, right?

04:36:28  7  **A**     It is possible, yes.

04:36:29  8  **Q**     All right.  That's our stop at pharmacists.

04:36:33  9        Now we have a little longer delay at good faith

04:36:39  10  dispensing, okay?

04:36:41  11  **A**     Okay.

04:36:41  12  **Q**     Now, I want to start with this.  You were asked a lot

04:36:58  13  of general questions.  You were asked questions about

04:37:03  14  training for pharmacists.

04:37:04  15        Remember those?

04:37:05  16  **A**     Yes.

04:37:05  17  **Q**     You were asked questions about pharmacists doing their

04:37:08  18  job and doing it right.

04:37:11  19        Remember those?

04:37:12  20  **A**     Yes.

04:37:12  21  **Q**     You were asked questions about motivation and what

04:37:15  22  motivates a pharmacist and why they care.

04:37:19  23        Right?

04:37:20  24  **A**     Yes.

04:37:20  25  **Q**     You were asked questions about how pharmacists follow

04:37:23  1  good faith dispensing.

04:37:26  2         Right?

04:37:26  3  **A**    Yes.

04:37:26  4  **Q**    But you never told the jury about Megan Owens, did

04:37:30  5  you?

04:37:30  6  **A**    I don't know specifically who Megan Owens is.

04:37:33  7  **Q**    You never told them about Trudi-Ann Blackellar, did

04:37:38  8  you?

04:37:38  9  **A**    No.

04:37:38  10  **Q**    You never told them about Keri Kratofil, did you?

04:37:44  11  **A**    She was on one of the e-mails that you showed me.

04:37:53  12  **Q**    But how she fit in as a potential witness in the case

04:37:57  13  involving Walgreens that the DEA was filing, DOJ?

04:38:00  14  **A**    I don't know.  I didn't know that.

04:38:02  15  **Q**    Yeah, you never told the jury about Caren Cohalla, did

04:38:07  16  you?

04:38:07  17  **A**    No.

04:38:08  18  **Q**    You never told the jury about Terry Collins, did you?

04:38:11  19  **A**    No.

04:38:11  20  **Q**    You never told them about Nancy Levi, did you?

04:38:14  21  **A**    No.

04:38:14  22  **Q**    Never told them about Cassie Mulvey, did you?

04:38:17  23  **A**    No.

04:38:17  24  **Q**    Never told them about Tara Kapavicus, did you?

04:38:21  25  **A**    No.

04:38:21    1    **Q**    Never told them about Shane Van Gordon, did you?

04:38:24    2    **A**    No.

04:38:25    3    **Q**    I ran out of room on the paper, but there's a host of

04:38:28    4    others you never told them about who have allegedly had

04:38:33    5    problems within the company, true?

04:38:36    6    **A**    That's what you're telling me.

04:38:38    7    **Q**    Well, did you do your research before you said all of

04:38:44    8    our pharmacists do great work?

04:38:47    9    **A**    To my knowledge, our pharmacists do great work.

04:38:49   10    **Q**    I thought you told me yesterday you never read the

04:38:52   11    order to show cause where the allegations were made about

04:38:55   12    what your pharmacists had done wrong.

04:38:57   13    **A**    I didn't read the entire order to show cause, no.

04:39:00   14    **Q**    So you did not read whether or not there were

04:39:04   15    pharmacists specifically --

04:39:06   16              MS. SWIFT:  Objection, Your Honor.

04:39:08   17              THE COURT:  Overruled.

04:39:09   18    **Q**    -- specifically by name that weren't doing all of

04:39:13   19    these things you said to Ms. Swift were being done?

04:39:16   20    **A**    I did not read it, no.

04:39:18   21    **Q**    Okay.  Now, you talked about the 2012 policy.

04:39:26   22             Do you remember that?

04:39:27   23    **A**    Yes.

04:39:27   24    **Q**    And you said, in answer to this question, "Why did you

04:39:34   25    decide to include these new bullet points in the good faith

04:39:40  1  dispensing policy?  Why did you include the new changes.

04:39:43  2  And you talked about all the different things that y'all do

04:39:46  3  differently.  Remember?

04:39:47  4  **A**    Yes.

04:39:47  5  **Q**    Well, the truth of the matter is there's another

04:39:49  6  reason why, isn't there, that you didn't tell the jury?

04:39:58  7  **A**    And what would that be, Mr. Lanier?

04:39:59  8  **Q**    Well, this new policy came out after y'all got the

04:40:03  9  order to show cause by Joe Rannazzisi involving problems

04:40:07  10  with your policies and the way they were being implemented,

04:40:10  11  right?

04:40:13  12  **A**    I don't know when the order to show cause came.

04:40:15  13  **Q**    You didn't bother to look at the order to show cause

04:40:18  14  in Exhibit 15, which is the last exhibit I believe you

04:40:22  15  testified about with Ms. Swift?

04:40:24  16  **A**    You asked me if I read that.  I did not.

04:40:28  17  **Q**    There's a settlement and memorandum of agreement that

04:40:32  18  is Exhibit 15 that was entered into on behalf of the whole

04:40:36  19  country.  Remember that?

04:40:37  20  **A**    Yes.

04:40:38  21  **Q**    And attached to it was an Appendix A.  And the

04:40:41  22  Appendix A that's attached to Exhibit 15 talks about the

04:40:47  23  Walgreens Store 6094 that was allegedly refilling

04:40:54  24  prescriptions for controlled substances too early and had

04:40:56  25  allegedly filled prescriptions issued using expired DEA

**Polster (Cross by Lanier)**

04:41:02    1    registration numbers, and had dispensed controlled

04:41:06    2    substances to individuals that the store knew or should have

04:41:10    3    known were diverting the controlled substances.

04:41:13    4        Remember that?

04:41:15    5    **A**    Yes.

04:41:15    6    **Q**    And that was part of an administrative memorandum of

04:41:20    7    agreement that was entered into by the company in 2011,

04:41:29    8    isn't it?

04:41:29    9    **A**    Yes.

04:41:30   10    **Q**    And that is the agreement that caused the company to

04:41:32   11    rewrite their good faith dispensing as it came out in 2012,

04:41:36   12    isn't it?

04:41:37   13    **A**    I don't know the answer to that, but, yes, the timing

04:41:42   14    that you're talking about is correct.

04:41:44   15    **Q**    Okay.  So when you say the reason we wrote it is

04:41:47   16    because we came across new information, well, what you did

04:41:50   17    is you entered into an agreement with the Department of

04:41:54   18    Justice for the United States of America, didn't you?

04:41:57   19    **A**    We did.

04:42:06   20    **Q**    And this is when you added the three-drug cocktail to

04:42:11   21    your policy to ensure your pharmacists were aware of it,

04:42:14   22    right?

04:42:14   23    **A**    That's where we changed the terminology and we added

04:42:19   24    the word "cocktail," yes.

04:42:22   25    **Q**    Well, now, this can be a lethal cocktail, can't you?

**Polster (Cross by Lanier)**                           3259

04:42:25  1  **A**     Yes, when it's not used appropriately, yes.

04:42:28  2  **Q**     And aren't pharmacists supposed to know about drugs'

04:42:32  3  side effects and their contraindications already?

04:42:35  4  **A**     Yes.

04:42:35  5  **Q**     Did you hire pharmacists that already knew that?

04:42:41  6  **A**     Pharmacists know that in pharmacy school, yes.

04:42:44  7  **Q**     And yet, there was a need to put it into the policy,

04:42:48  8  wasn't there?

04:42:48  9  **A**     We did add it to the pharmacy policy -- or the policy

04:42:52  10  to make it more clear for them to understand what was

04:42:56  11  changing in the industry and how prescribing practices were

04:43:00  12  changing.

04:43:00  13  **Q**     And then you were asked questions about contacting law

04:43:05  14  enforcement under the 2006 policies.

04:43:08  15        Remember that?

04:43:09  16  **A**     Yes.

04:43:09  17  **Q**     And it was pointed out to the jury and highlighted,

04:43:12  18  "If the prescriber informs the pharmacist that a

04:43:18  19  prescription for a controlled substance is not valid or

04:43:21  20  authorized, contact local law enforcement."

04:43:24  21        Do you see that?

04:43:25  22  **A**     Yes.  That's referring to forged prescriptions, yes.

04:43:28  23  **Q**     It's referring to what?

04:43:29  24  **A**     Forged prescriptions.

04:43:30  25  **Q**     Forged prescriptions.

**Polster (Cross by Lanier)**                                    3260

04:43:37  1        "Because on the backside of this policy," unread to

04:43:40  2   the jury," is something that's different about Oklahoma

04:43:45  3   stores."

04:43:45  4        Do you see that?

04:43:46  5   **A**    Yes.

04:43:46  6   **Q**    "In Oklahoma, if notified by a prescriber about an

04:43:51  7   allegedly illegal activity involving a controlled substance,

04:43:57  8   please contact your local police department immediately."

04:43:59  9        Do you see that?

04:44:00  10  **A**    Yes.

04:44:00  11  **Q**    That would be a pretty good policy to have in Ohio,

04:44:03  12  wouldn't it?

04:44:03  13  **A**    What's different between that and the previous page --

04:44:11  14  **Q**    The previous page only deals with --

04:44:14  15            MS. SWIFT:  Objection.  She wasn't done with

04:44:15  16  her answer.

04:44:16  17  **Q**    I'm sorry.

04:44:17  18            MR. LANIER:  I apologize, Judge.  I didn't

04:44:19  19  understand.

04:44:19  20            THE COURT:  That's okay.

04:44:20  21  **A**    The previous page is talking about when they call the

04:44:23  22  prescriber and the prescriber says, I did not write this

04:44:26  23  prescription.

04:44:26  24  **Q**    Right, forged?

04:44:27  25  **A**    Yes.

**Polster (Cross by Lanier)**

04:44:27 1  **Q**    But this is not just that.  This is "illegal

04:44:34 2  activity."  So perhaps you're notified by a prescriber that

04:44:36 3  it's not a forged -- it's not a forged prescription, but the

04:44:41 4  doctors found out that another doctor had written, or the

04:44:45 5  doctors found out that, you know, any number of things that

04:44:48 6  doctors may find out.

04:44:49 7      Do you see that?

04:44:50 8  **A**    Yes.

04:44:50 9  **Q**    And so in Oklahoma, you all put in bold print Oklahoma

04:44:56 10  stores, right?

04:44:57 11  **A**    Yes.

04:44:59 12  **Q**    And then say in Oklahoma -- I mean, don't you think

04:45:01 13  that's a better policy just to say in the United States of

04:45:08 14  America?

04:45:08 15  **A**    So if a state board of pharmacy changes any type of a

04:45:13 16  regulation that needs to be called out, it will be called

04:45:15 17  out on that.  But we never told our pharmacists that they

04:45:18 18  shouldn't or couldn't contact law enforcement for any

04:45:22 19  prescription that they felt had illegal activity.

04:45:27 20  **Q**    Ma'am, it doesn't say that here.  This doesn't say,

04:45:31 21  hey, the state board of pharmacy may want you to do that,

04:45:37 22  but we don't tell you if you could or couldn't.

04:45:40 23      What you've done here is singled out Oklahoma for --

04:45:44 24  **A**    I see that.

04:45:45 25  **Q**    -- this treatment.

**Polster (Cross by Lanier)**

04:45:45  1  **A**   Yes.

04:45:46  2  **Q**   Why didn't you single out Ohio?

04:45:49  3  **A**   I don't know the reason for that specific entry, but I

04:45:51  4  can tell you from practice that I've had in the past when a

04:45:57  5  board of pharmacy has a specific regulation that we need to

04:46:00  6  call out by the state, but in no way are we telling our

04:46:03  7  pharmacists anywhere in that policy that they cannot contact

04:46:05  8  local law enforcement for any prescription that they want

04:46:09  9  to.

04:46:12  10  **Q**   We'll look in a little bit at this box of refusals to

04:46:15  11  fill.  I think there are like 640 something in there by our

04:46:20  12  count.

04:46:20  13       How many times do you think y'all contacted law

04:46:23  14  enforcement on those?

04:46:23  15  **A**   I don't know the answer to that.

04:46:32  16  **Q**   Now, on those policies, by the way, that y'all sent

04:46:35  17  out, those good faith dispensing policies in 1998, remember

04:46:44  18  those?

04:46:44  19  **A**   Yes.

04:46:45  20  **Q**   Do you do stuff with your hands, like tools and things

04:46:52  21  like that?  Do you build?

04:46:53  22  **A**   I don't build things.

04:46:56  23  **Q**   Okay.  Do you cook?

04:46:58  24  **A**   I do.

04:46:58  25  **Q**   Like what kind of stuff do you like to cook?

| | | |
|---|---|---|
| 04:47:01 | 1 | **A**      All kinds of things.  Dinners, salads. |
| 04:47:09 | 2 | **Q**      All right.  Let's say you got to cook and the recipe |
| 04:47:14 | 3 | says dice an onion to saute it, okay? |
| 04:47:19 | 4 | **A**      Okay. |
| 04:47:23 | 5 | **Q**      It will help to have a knife, won't it? |
| 04:47:25 | 6 | **A**      Yes. |
| 04:47:26 | 7 | **Q**      You can have the instructions, but if you don't have |
| 04:47:29 | 8 | the tools, makes it hard to get it done, doesn't it? |
| 04:47:33 | 9 | **A**      Yes. |
| 04:47:34 | 10 | **Q**      Do you think for a moment that your store -- that your |
| 04:47:39 | 11 | company was giving the pharmacists all of the tools they |
| 04:47:43 | 12 | needed to do these bullet points? |
| 04:47:48 | 13 | **A**      I think our company was giving the tools to the best |
| 04:47:51 | 14 | of our ability.  Was this back in 1998? |
| 04:47:55 | 15 | **Q**      Yes, ma'am. |
| 04:47:55 | 16 | **A**      Yes. |
| 04:47:56 | 17 | **Q**      To the best of your ability, really? |
| 04:47:59 | 18 | **A**      Yeah, I do. |
| 04:48:00 | 19 | **Q**      Because even if we fast forward and look at what it |
| 04:48:03 | 20 | was in 2012, '13 when you took over -- |
| 04:48:07 | 21 | **A**      Yes. |
| 04:48:07 | 22 | **Q**      -- your company wasn't giving you the electronic |
| 04:48:10 | 23 | refusals to fill for seven years, right? |
| 04:48:14 | 24 | **A**      Correct.  But we had an operational program in place |
| 04:48:19 | 25 | for that. |

**Polster (Cross by Lanier)**

04:48:19  1   **Q**   Ma'am, you said "to the best of our ability."

04:48:24  2       Do you remember that?

04:48:24  3   **A**   Yes.

04:48:24  4   **Q**   To the best of your ability, do you really want to say

04:48:28  5   that under oath, that you all gave those tools to the best

04:48:33  6   of your ability?

04:48:33  7   **A**   And I explained why we did not have that, because we

04:48:36  8   were changing computer systems.

04:48:39  9   **Q**   Ma'am, to the best of your ability, do you think you

04:48:43  10  gave those tools to those pharmacists --

04:48:45  11  **A**   Yeah.

04:48:46  12  **Q**   -- as soon as you could?

04:48:47  13  **A**   I did, and I'll tell you why.  Because a computer

04:48:51  14  enhancement takes a long time to put in place, so I would

04:48:54  15  not have been able to put that target drug good faith

04:48:58  16  dispensing checklist in place immediately.  It took months

04:49:02  17  and months and months to put that into an electronic format.

04:49:05  18  **Q**   Well, let's look at a test of that with beyond just

04:49:09  19  the computer system.  Let's look at the training that was

04:49:12  20  involved.

04:49:13  21       Was your company training to the best of its ability?

04:49:19  22  **A**   We trained our pharmacists.

04:49:22  23  **Q**   Wasn't my question.

04:49:23  24       Was the company training to the best of its ability?

04:49:29  25  **A**   My testimony is, yes, I felt that we were doing good

**Polster (Cross by Lanier)** 3265

04:49:34 1 work and doing good things for our pharmacists.

04:49:36 2 **Q** So when you noted that "there was no periodic training

04:49:40 3 for dispensing in 2010" -- that's Plaintiffs' Exhibit

04:49:46 4 1956 --

04:49:47 5 **A** Yes.

04:49:47 6 **Q** -- "no such training exists today."

04:49:51 7 Do you think you were training to the best of your

04:49:53 8 ability?

04:49:53 9 **A** We did because we trained our pharmacists on hire --

04:49:56 10 **Q** Could you have done periodic training of all

04:49:59 11 Walgreens' retail employees for dispensing controlled

04:50:04 12 substances?

04:50:04 13 **A** We could have.

04:50:04 14 **Q** You could have?

04:50:05 15 **A** Yeah.

04:50:05 16 **Q** And the fact that you did not sort of indicates you

04:50:09 17 weren't doing it to the best of your ability, doesn't it?

04:50:15 18 **A** I think we were doing the job that we were doing, we

04:50:18 19 were hiring our pharmacists, we were training them.

04:50:21 20 We could have done periodic training.  We did not have

04:50:25 21 periodic training in place in 2010.

04:50:26 22 **Q** And not only that, you agreed with the DEA to change

04:50:30 23 things in 2011, didn't you?

04:50:33 24 **A** Yes.

04:50:34 25 **Q** Doesn't that tell you that maybe you weren't doing

**Polster (Cross by Lanier)** 3266

04:50:37 1    them to the best of your ability?

04:50:38 2    **A**    To the best of the DEA's expectation, yes.

04:50:44 3    **Q**    Weren't -- no, weren't doing them to the best of your

04:50:48 4    ability.  Y'all were able to do better and agreed with the

04:50:53 5    DEA you would do better.  True?

04:50:56 6    **A**    True.

04:50:56 7    **Q**    And then the game changed in 2013, didn't it?

04:51:02 8    **A**    Yes.

04:51:04 9    **Q**    And that game change was another DEA problem, the

04:51:12 10   second one, right?

04:51:13 11   **A**    Yes.

04:51:13 12   **Q**    And that showed you some other areas where Walgreens

04:51:17 13   was not doing it to the best of its ability, correct?

04:51:20 14   **A**    Yes.

04:51:21 15   **Q**    And as a result, entered into a massive settlement

04:51:25 16   agreement with the DEA, true?

04:51:30 17   **A**    Yes.

04:51:30 18   **Q**    And then there are audit problems in 2014, true?

04:51:37 19   **A**    Yes.

04:51:37 20   **Q**    Which tells you that the company's not doing it to the

04:51:41 21   best of its ability in 2014, right?

04:51:43 22   **A**    It's telling me that the stores are not following

04:51:47 23   through with the expectations of the policies.

04:51:51 24   **Q**    And that has got to be a reflection of either hiring

04:51:56 25   bad people, not training people properly, not giving them

**Polster (Cross by Lanier)**

04:51:59  1   the tools, something associated with why it was happening,

04:52:04  2   right?

04:52:06  3   **A**    Yes.

04:52:08  4   **Q**    And so the store wasn't doing this to the best of its

04:52:11  5   ability in 2014, the company wasn't, was it?

04:52:14  6   **A**    The store was not following through, and the audit

04:52:18  7   showed it.  And we made changes accordingly.

04:52:22  8   **Q**    And then in 2015 there were still audit problems,

04:52:26  9   weren't there?

04:52:28  10  **A**    Yes.  We do follow-ups to ensure that our policies are

04:52:31  11  being followed.

04:52:32  12  **Q**    And in that regard, you were asked about Exhibit 15,

04:52:45  13  and specifically in Exhibit 15, that's the settlement

04:52:50  14  agreement.

04:52:51  15       Do you remember that?

04:52:51  16  **A**    Yes.

04:52:51  17  **Q**    You were asked by Ms. Swift on page 5, section B.

04:53:13  18       Let's go back and do it off the e-mail.  I think

04:53:15  19  that's the easier way to do it.

04:53:16  20       You were asked off the e-mail about Section 5.

04:53:29  21       Specifically you were asked, "I will only put the

04:53:32  22  sections we need to work on."

04:53:34  23       Do you remember that?

04:53:35  24  **A**    Yes.

04:53:35  25  **Q**    And so on page 5 -- all right, my copy -- you may get

04:53:51    1    out of this question because my copy's not finding the page.

04:53:54    2           Ma'am, do you remember where Ms. Platts indicated --

04:54:03    3    tell you what, it's going to be in my stack of stuff here,

04:54:06    4    and we're going to come to it later, and if not -- oh, here

04:54:10    5    it is.  Yes.

04:54:11    6           Section B you were asked about.  Do you remember this?

04:54:19    7    **A**    Yes.

04:54:20    8    **Q**    Ms. Platts said, "This program shall include

04:54:23    9    procedures to identify the common signs associated with

04:54:27   10    diversion, including, but not limited to, doctor shopping

04:54:30   11    and requests for early refills."

04:54:32   12           Ms. Platts said, "I could not find anything in our

04:54:38   13    procedures that addressed this request."

04:54:40   14    **A**    That's what she said.

04:54:42   15    **Q**    And you're telling the jury, oh, no, it was in there,

04:54:45   16    she just couldn't find it, right?

04:54:46   17    **A**    It was in our policy.  She was not looking at a

04:54:49   18    policy.

04:54:49   19    **Q**    Which tells you that even Debbie Platts, who's in

04:54:52   20    charge of some of this stuff, doesn't know what the policies

04:54:55   21    are, doesn't it?

04:54:55   22    **A**    She did not know it was in the policy, correct.

04:54:59   23    **Q**    And what was her job?

04:55:01   24    **A**    She was divisional healthcare supervisor.

04:55:12   25    **Q**    And if a divisional healthcare supervisor doesn't know

04:55:16  1  what's in the policies, don't you think you can do better?

04:55:22  2  **A**    Well, the divisional healthcare supervisor should know

04:55:24  3  at a high level, I would agree; however, they're not

04:55:28  4  dispensing the prescriptions.

04:55:29  5  **Q**    Wasn't my question, ma'am.

04:55:31  6       If the divisional healthcare supervisor doesn't know,

04:55:36  7  don't you think you can do better?

04:55:38  8  **A**    Okay.

04:55:42  9  **Q**    Next, calling the doctor in 1998 was not deemed

04:55:57  10 adequate anymore.

04:55:59  11      Remember?

04:55:59  12 **A**    Yes.

04:55:59  13 **Q**    That was the policy in 1998, wasn't it?

04:56:02  14 **A**    Yes.

04:56:03  15 **Q**    And the policy didn't change until when?

04:56:08  16 **A**    I don't know the exact date that the policy changed,

04:56:11  17 but I bet you've got it in front of you there that you can

04:56:14  18 remind me.

04:56:15  19 **Q**    Well, I'll bet that you put it into a PowerPoint where

04:56:18  20 you said calling the doctor is no longer adequate anymore.

04:56:21  21 **A**    I did.  When we were going through the changes of what

04:56:25  22 was happening in the industry, we did discuss that with our

04:56:29  23 field leaders.

04:56:29  24 **Q**    Was it about 2013?

04:56:31  25 **A**    January of 2013, correct.

**Polster (Cross by Lanier)**

04:56:33  1   **Q**     And so while the epidemic rages -- we looked at it

04:56:39  2   from a PowerPoint from 2000 to 2009 -- your company policy

04:56:45  3   is calling the doctor is adequate.  But the truth of the

04:56:50  4   matter is it never should have been considered adequate,

04:56:53  5   should it?

04:56:53  6   **A**     I believe you're taking the calling the doctor a bit

04:56:57  7   out of context but --

04:57:00  8   **Q**     Well, we can look at it.

04:57:02  9   **A**     I know we can, but you were not in the meeting, you

04:57:05  10  were not there when I discussed it with the field, and you

04:57:07  11  were not there when I explained to the field leaders why and

04:57:10  12  what the process was for validating a prescription and

04:57:13  13  ensuring that the pharmacist is doing their corresponding

04:57:18  14  responsibility.

04:57:18  15  **Q**     Now, Ms. Polster, when you proposed that you would

04:57:21  16  need a full team complement of 12 for each region --

04:57:27  17  **A**     No.

04:57:27  18  **Q**     I mean, 12 total, that you needed a full team

04:57:31  19  complement for each region, right?

04:57:32  20          You didn't get permission to hire all 12 at once

04:57:35  21  because of budget concerns, true?

04:57:38  22  **A**     No, I did get permission when --

04:57:40  23  **Q**     You were not able to fill all of those jobs at once

04:57:43  24  because of budget considerations, right?

04:57:45  25  **A**     I don't remember budget consideration, but I was

**Polster (Cross by Lanier)**                                    3271

04:57:48  1   allowed to hire, and I did get my full complement.

04:57:52  2   **Q**      Eventually, within -- but it took six months?  How

04:57:56  3   long did it take?

04:57:56  4   **A**      It might have.  It takes a while to find good

04:57:59  5   candidates, yes.

04:57:59  6   **Q**      Well, it wasn't to find good candidates.  At first you

04:58:03  7   don't recall the budget issue?

04:58:04  8   **A**      I recall requesting -- a request for head count, which

04:58:08  9   is the normal procedures that go into place.  When you're

04:58:11  10  adding additional head count to a team, you have to get

04:58:14  11  approval to do that.

04:58:16  12          But I was allowed to hire prior to that.

04:58:21  13  **Q**      They just weren't allowed to start working until --

04:58:23  14  **A**      It's just I was in the process of hiring,

04:58:27  15  interviewing, finding the right candidates.

04:58:28  16  **Q**      Let me -- I don't have that with me.  We'll look at

04:58:40  17  that in a moment, if I've got time.

04:58:42  18          Now, in this regard, I have a question.  You talked

04:58:48  19  when pharmacists get fired, remember?

04:58:53  20  **A**      Yes.

04:58:53  21  **Q**      You said they get fired for not following the law,

04:58:55  22  right?

04:58:57  23  **A**      Yes.

04:58:58  24  **Q**      And so you can tell us which got fired after the

04:59:03  25  memorandum of authority, right?

**Polster (Cross by Lanier)**

04:59:05　1　**A**　I cannot tell you who specifically --

04:59:09　2　**Q**　Memorandum of agreement.

04:59:11　3　**A**　-- has been fired, no.

04:59:13　4　**Q**　Order to show cause, can you tell us which ones got

04:59:16　5　fired?

04:59:17　6　**A**　I can't tell you any specific pharmacist.  We have a

04:59:21　7　discipline process in our company that is a step discipline

04:59:24　8　process through verbal, written, and final written, and then

04:59:30　9　termination.  We have that policy in place for our people.

04:59:43　10　**Q**　Now, as we look at the memorandum of agreement --

04:59:49　11　remember that?

04:59:49　12　**A**　Yes.

04:59:49　13　**Q**　That's something where y'all had to follow those

04:59:57　14　agreements, right?

04:59:57　15　**A**　Yes.

04:59:58　16　**Q**　And so you stated in reference to the memorandum of

05:00:05　17　agreement that the company executed those pieces that you

05:00:09　18　spoke of, right?

05:00:10　19　**A**　Yes.

05:00:10　20　**Q**　But the company didn't execute everything perfectly,

05:00:14　21　did it?

05:00:15　22　**A**　Oh, there's always something that we may find later

05:00:18　23　that we need to improve on, yes.

05:00:20　24　**Q**　Well, yeah, I mean, we can just look at the 2011

05:00:23　25　agreement and see that y'all got into more trouble again,

**Polster (Cross by Lanier)** 3273

| | | |
|---|---|---|
| 05:00:27 | 1 | you had to enter into another agreement in 2013, right? |
| 05:00:30 | 2 | MS. SWIFT:  Objection, Your Honor. |
| 05:00:31 | 3 | THE COURT:  Overruled. |
| 05:00:32 | 4 | **A**   Yes. |
| 05:00:32 | 5 | **Q**   Now, the sentences that are in here that you say y'all |
| 05:00:39 | 6 | were already doing, do you remember those sentences? |
| 05:00:42 | 7 | **A**   I remember discussing that. |
| 05:00:43 | 8 | **Q**   Why do most of those sentences have such long or more |
| 05:00:50 | 9 | than one explanation if there are delivered policies and |
| 05:00:57 | 10 | procedures already? |
| 05:00:57 | 11 | **A**   You'll have to be specific.  I'm not understanding |
| 05:00:59 | 12 | your question. |
| 05:01:00 | 13 | **Q**   Well, I'm -- I didn't write the question, but I think |
| 05:01:04 | 14 | I understand it.  I'm going to give it a shot. |
| 05:01:11 | 15 | The administrative memorandum of agreement, for |
| 05:01:16 | 16 | example.  And I've pulled the one from 2011.  Okay? |
| 05:01:22 | 17 | **A**   Okay. |
| 05:01:23 | 18 | **Q**   2011 one.  "Walgreens agrees to maintain a compliance |
| 05:01:30 | 19 | program to detect and prevent diversion as required." |
| 05:01:33 | 20 | Do you see that? |
| 05:01:34 | 21 | **A**   Yes. |
| 05:01:34 | 22 | **Q**   Now, if that's already being done, the sentence could |
| 05:01:37 | 23 | stop there, couldn't it? |
| 05:01:40 | 24 | **A**   Yes. |
| 05:01:40 | 25 | **Q**   But instead, the sentence -- or the paragraph goes on. |

**Polster (Cross by Lanier)**                    3274

| | | |
|---|---|---|
| 05:01:46 | 1 | "This program shall include," and y'all are given |
| 05:01:50 | 2 | "procedures to identify the common signs associated with the |
| 05:01:52 | 3 | diversion of controlled substances, "including, but not |
| 05:01:56 | 4 | limited to, doctor shopping and requests for early refills." |
| 05:01:59 | 5 | It goes on to talk about what the program will include about |
| 05:02:02 | 6 | routine and periodic training. |
| 05:02:04 | 7 | You see all of that? |
| 05:02:05 | 8 | **A**    Yes. |
| 05:02:05 | 9 | **Q**    I mean, if y'all were already doing that, those are |
| 05:02:08 | 10 | pretty irrelevant sentences, aren't they? |
| 05:02:11 | 11 | **A**    Well, if they didn't have the exact words the DEA was |
| 05:02:13 | 12 | looking for, they had every right to tell us what they |
| 05:02:16 | 13 | thought should be added in there. |
| 05:02:17 | 14 | **Q**    All right.  By the way, on firing people, if Walgreens |
| 05:02:32 | 15 | is going to fire a registered pharmacist who violates the |
| 05:02:35 | 16 | law, what does the investigation process look like? |
| 05:02:40 | 17 | **A**    I can tell you high level, if it comes through a |
| 05:02:44 | 18 | hotline, it would go through our compliance department.  If |
| 05:02:47 | 19 | it goes through our district leaders, it would go through a |
| 05:02:53 | 20 | process of a verbal warning, a written warning, a final |
| 05:02:58 | 21 | written warning, and then a termination. |
| 05:03:02 | 22 | **Q**    And this process, what does Walgreens identify as |
| 05:03:10 | 23 | warning signs? |
| 05:03:11 | 24 | **A**    It's going to change by instance.  I wouldn't be able |
| 05:03:14 | 25 | to tell you a specific. |

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 05:03:17 | 1 | **Q**    All right.  Now, Plaintiffs' Exhibit 19927 is your |
| 05:03:35 | 2 | personnel file. |
| 05:03:37 | 3 |      Do you remember we talked about that yesterday in the |
| 05:03:39 | 4 | early, early going? |
| 05:03:41 | 5 | **A**    Yes. |
| 05:03:41 | 6 | **Q**    I blacked out your e-mail address, your phone numbers, |
| 05:03:44 | 7 | and your physical address, so anybody who's in court can't |
| 05:03:50 | 8 | call you.  All right? |
| 05:03:51 | 9 | **A**    Okay. |
| 05:03:51 | 10 | **Q**    But there's something I didn't black out, and that's |
| 05:03:54 | 11 | the comments on page 31. |
| 05:03:57 | 12 |      Can you read that? |
| 05:03:58 | 13 | **A**    Yes. |
| 05:04:01 | 14 | **Q**    "Natasha Polster, (self).  9 out of the 12 employees |
| 05:04:08 | 15 | were hired for the team before the hiring freeze came down." |
| 05:04:11 | 16 |      Do you see that? |
| 05:04:12 | 17 | **A**    Yes. |
| 05:04:15 | 18 | **Q**    So when I asked you if you recall whether or not you |
| 05:04:17 | 19 | were able to hire all 12 immediately and you said yes, does |
| 05:04:21 | 20 | this refresh your recollection that maybe 9 out of the 12 |
| 05:04:25 | 21 | were hired and then there was a hiring freeze? |
| 05:04:28 | 22 | **A**    You're right. |
| 05:04:29 | 23 |           MS. SWIFT:  Objection.  Mischaracterizes. |
| 05:04:30 | 24 |           MR. LANIER:  She just said I was right. |
| 05:04:32 | 25 |           THE COURT:  Overruled. |

**Polster (Cross by Lanier)**                                    3276

05:04:33   1   **A**      You're right.  I forgot about the hiring freeze that

05:04:35   2   happened.  I did not feel that I was not supported in

05:04:39   3   getting that full team.  We were able to do what we needed

05:04:41   4   to do.

05:04:42   5   **Q**      I understand.  It's just it was a question from the

05:04:44   6   jury that I was asking you.

05:04:45   7   **A**      That's fair.

05:04:49   8   **Q**      Now, here is, then, Plaintiffs' Exhibit 20639.  And

05:04:56   9   this is the one that tells us what your policy really was

05:04:59  10   before this DEA agreement, doesn't it?

05:05:03  11   **A**      That is my speaker notes that I referred to when I

05:05:11  12   gave the presentation, yes.

05:05:12  13   **Q**      Well, you not only referred to them, you type them

05:05:15  14   into the computer, don't you?

05:05:16  15   **A**      Well, I typed them into my computer, yes, or the notes

05:05:19  16   that my team gave.  I don't know who gave this one.

05:05:21  17   **Q**      Well, you type them in.  You said they were your

05:05:26  18   notes.  "We have learned more about the DEA's expectations

05:05:32  19   around good faith dispensing."

05:05:34  20   **A**      Yes.

05:05:34  21   **Q**      "We felt the steps we were taking did not go far

05:05:37  22   enough."

05:05:39  23           Do you see that?

05:05:39  24   **A**      Yes.

05:05:39  25   **Q**      Do you really think you were doing the best you could

**Polster (Cross by Lanier)**

05:05:43  1  when your steps didn't go far enough?

05:05:44  2  **A**    With the information that we had prior to all of that,

05:05:47  3  yes.

05:05:47  4  **Q**    Well, even you believe that by this point in time --

05:05:51  5  this is 2013 -- by this point in time you think the pain

05:05:56  6  clinics have been shut down and y'all are seeing this

05:06:00  7  onslaught of new prescriptions.

05:06:03  8      Remember?

05:06:04  9  **A**    Yes.

05:06:04  10  **Q**    And then, "The game has changed.  We can no longer

05:06:11  11  rely on the, quote, I spoke to the prescriber and he or she

05:06:15  12  said it was okay."

05:06:18  13  **A**    That's right.

05:06:19  14  **Q**    Well, you could have made that change years before,

05:06:22  15  couldn't you?

05:06:23  16  **A**    We could have, and we didn't change the actual

05:06:26  17  verbiage, but that didn't mean that the pharmacist wasn't

05:06:30  18  checking through and doing their good faith dispensing.

05:06:33  19      Our policy did not change the words, but we supported

05:06:36  20  our pharmacists.  When they called and talked to the

05:06:40  21  prescriber and the prescriber said that they wrote the

05:06:44  22  prescription but they still felt that they shouldn't fill

05:06:46  23  it, our pharmacists were supported to not fill the

05:06:49  24  prescription.

05:06:50  25  **Q**    And then Ms. Swift asked you about slide number 10 on

| | | |
|---|---|---|
| 05:06:57 | 1 | that slide deck. |
| 05:06:57 | 2 | **A**    Yes. |
| 05:06:58 | 3 | **Q**    And what you meant by your notes down below. |
| 05:07:04 | 4 | Remember? |
| 05:07:05 | 5 | **A**    Yes. |
| 05:07:05 | 6 | **Q**    You said to these businesspeople, "Realistically, |
| 05:07:10 | 7 | bottom line, yes, sales are going to be impacted." |
| 05:07:13 | 8 | **A**    Yes. |
| 05:07:14 | 9 | **Q**    "How is this going to impact my sales, what's it going |
| 05:07:18 | 10 | to do to my good customers' numbers so we can address the |
| 05:07:23 | 11 | issue without significantly impacting our other business." |
| 05:07:27 | 12 | [As read] |
| 05:07:30 | 13 | Do you see that? |
| 05:07:30 | 14 | **A**    Yes. |
| 05:07:30 | 15 | **Q**    And you can say what that means, but the bottom line |
| 05:07:33 | 16 | is is you're having to address how this is going to impact |
| 05:07:38 | 17 | sales, aren't you? |
| 05:07:39 | 18 | **A**    Yes, I am explaining to the field leaders that we are |
| 05:07:41 | 19 | expecting for them to support their pharmacists to not fill |
| 05:07:45 | 20 | prescriptions if the pharmacists feel that they shouldn't |
| 05:07:47 | 21 | fill it. |
| 05:07:49 | 22 | **Q**    All right.  And then you were asked about the poll, |
| 05:07:53 | 23 | the audit information.  Remember those questions? |
| 05:07:56 | 24 | **A**    Refresh me which one you're talking about. |
| 05:07:59 | 25 | **Q**    Yes, ma'am.  You gave the BCI executive summary? |

05:08:01  1  **A**     Yes.

05:08:01  2  **Q**     And said -- I think you said --

05:08:03  3  **A**     These were the questions that those loss prevention

05:08:06  4  people did, yes.

05:08:07  5  **Q**     Yeah, here's the way Ms. Swift asked the question.  I

05:08:11  6  tried to write it down word for word.

05:08:12  7        She said, "That sounds pretty good.  Were you happy

05:08:16  8  with these results?"

05:08:18  9        Do you remember that?

05:08:18  10  **A**     Yes.

05:08:19  11  **Q**     Let's leave no question about it.  You were not happy

05:08:23  12  with these results, were you?

05:08:24  13  **A**     I was not happy that we were not a hundred percent.

05:08:27  14  **Q**     Not only that, you were in -- you were very concerned

05:08:32  15  about these results because they're bad results.  True?

05:08:35  16  **A**     I was concerned that we did not have a hundred percent

05:08:38  17  execution, yes.

05:08:39  18  **Q**     Well, we go a step further than that.

05:08:43  19            MR. LANIER:  If we show, please, Rachel and

05:08:50  20  Maria, Plaintiffs' 20803.

05:09:08  21  **Q**     Do you have that document in front of you?

05:09:10  22  **A**     I do.

05:09:10  23  **Q**     Do you remember this document?

05:09:11  24  **A**     Yes.

05:09:11  25  **Q**     This is the one that's got on the front page your

Polster (Cross by Lanier)                    3280

05:09:14  1  e-mail.

05:09:16  2  **A**     Yes.

05:09:17  3  **Q**     "Okay, guys, put your seat belts on."

05:09:21  4  **A**     Yes.

05:09:21  5  **Q**     "I had a brief hallway discussion with Scott Jonkman

05:09:26  6  the other day about how these audits were going, and he said

05:09:32  7  they are not going great."

05:09:34  8  **A**     Yes.

05:09:34  9  **Q**     Ms. Swift --

05:09:39  10  **A**     I had not seen --

05:09:41  11  **Q**     -- "that sounds pretty good, were you happy with these

05:09:44  12  results?"

05:09:44  13  **A**     I had not seen the results -- when I talked to Scott,

05:09:48  14  he had not gotten all the results back.

05:09:51  15  **Q**     Ma'am, I haven't asked my question.

05:09:52  16  **A**     Sorry.

05:09:53  17  **Q**     That's okay.

05:09:53  18      Ms. Swift: "That sounds pretty good.  Were you happy

05:09:56  19  with these results" is a bit in contrast to you, "okay,

05:10:01  20  guys, put your seat belts on.  I had a brief discussion.  He

05:10:04  21  said they're not going great."

05:10:06  22      Different spin, right?

05:10:07  23  **A**     Yes.

05:10:07  24  **Q**     "Given this bit of news, that concerns me.  We will

05:10:13  25  have to get a mitigation plan together on what we will do

**Polster (Cross by Lanier)** 3281

| | | |
|---|---|---|
| 05:10:17 | 1 | with the results to satisfy the MOA for any noncompliance." |
| 05:10:24 | 2 | Do you see that? |
| 05:10:25 | 3 | **A** Yes. |
| 05:10:25 | 4 | **Q** Because what you were doing there was part of the |
| 05:10:28 | 5 | agreement you'd entered into with the DEA, right? |
| 05:10:32 | 6 | **A** What I was doing in terms of the BCI was following up |
| 05:10:35 | 7 | to ensure that we were compliant. |
| 05:10:38 | 8 | **Q** Exactly. |
| 05:10:39 | 9 | **A** There was a piece in the MOA that said that we had |
| 05:10:45 | 10 | compliance checks in place. That was one of them. We did |
| 05:10:48 | 11 | not get a hundred percent compliance. |
| 05:10:51 | 12 | And when Scott talked to me in the hallway, he had |
| 05:10:56 | 13 | said, you know, we're getting results back, we're not seeing |
| 05:11:00 | 14 | a hundred percent compliance, that concerned me, yes. |
| 05:11:01 | 15 | **Q** And when Ms. Swift asked you whether or not the DEA |
| 05:11:07 | 16 | ever reported it or got written up or something like that, |
| 05:11:12 | 17 | do you remember those questions? |
| 05:11:15 | 18 | Did the DEA ever tell you you weren't in compliance? |
| 05:11:19 | 19 | MS. SWIFT: Objection. I don't recall asking |
| 05:11:20 | 20 | that question. |
| 05:11:20 | 21 | MR. LANIER: I think she did, but I'll ask it |
| 05:11:22 | 22 | a different way. |
| 05:11:23 | 23 | THE COURT: Overruled. Overruled. |
| 05:11:25 | 24 | **Q** Do you remember being asked about whether or not the |
| 05:11:27 | 25 | DEA ever said y'all weren't compliant? |

**Polster (Cross by Lanier)**                          3282

| | | |
|---|---|---|
| 05:11:30 | 1 | **A**    I don't remember that question. |
| 05:11:32 | 2 | **Q**    Well, let's make it real clear. |
| 05:11:33 | 3 | **A**    Okay. |
| 05:11:34 | 4 | **Q**    You never sent the BCI results to the DEA, did you? |
| 05:11:38 | 5 | **A**    No, but we don't send results of audits to the DEA. |
| 05:11:40 | 6 | **Q**    You never sent the results of an audit to see if |
| 05:11:44 | 7 | you're complying with the agreement you had with the |
| 05:11:47 | 8 | Department of Justice that showed you did not comply with |
| 05:11:47 | 9 | it? |
| 05:11:47 | 10 |           MS. SWIFT:  Objection. |
| 05:11:53 | 11 | **Q**    You didn't send that, did you? |
| 05:11:55 | 12 | **A**    We don't send that information to the DEA. |
| 05:11:57 | 13 | **Q**    So the DEA doesn't come scold you for being |
| 05:12:00 | 14 | noncompliant -- here, let's get the wording exactly right. |
| 05:12:02 | 15 |      "Has the DEA ever put you on notice that it believed |
| 05:12:07 | 16 | Walgreens was not in compliance with this agreement?" |
| 05:12:11 | 17 |      Now do you remember being asked? |
| 05:12:13 | 18 | **A**    Were we talking about the 2013 agreement? |
| 05:12:15 | 19 | **Q**    Yes, ma'am. |
| 05:12:16 | 20 |      Now do you remember being asked? |
| 05:12:18 | 21 | **A**    Yes, that was my understanding, yes. |
| 05:12:20 | 22 | **Q**    Well, you never told the DEA y'all were failing in |
| 05:12:26 | 23 | compliance, did you? |
| 05:12:28 | 24 |           MS. SWIFT:  Objection. |
| 05:12:29 | 25 |           THE COURT:  Overruled. |

**Polster (Cross by Lanier)**

05:12:29  1   **A**    We don't send compliance audit information to the DEA.

05:12:39  2   **Q**    In fact, even -- well --

05:12:46  3        "We'll have to get a mission together about what we'll

05:12:50  4   do with the results to satisfy the memorandum of agreement

05:12:53  5   for any noncompliance we may have seen from the audit.  I do

05:12:58  6   not want to miss valuable working time, so as soon as we get

05:13:01  7   this, I would like you guys to get started on a

05:13:03  8   recommendation.  I'm anticipating the worst.  I hope the

05:13:06  9   results are not as bad as I'm thinking they will be."

05:13:11  10       Do you see that?

05:13:11  11  **A**    Yes.

05:13:11  12  **Q**    Then the reply.  "I can only imagine what we're going

05:13:16  13  to find out.  Scott told me a few stores had broken C-II

05:13:19  14  cabinets that didn't lock and never submitted a service

05:13:24  15  ticket to get them fixed."

05:13:26  16  **A**    Yes.

05:13:27  17  **Q**    Do you see that?

05:13:28  18  **A**    Yes.

05:13:28  19  **Q**    Huge problem, isn't it?

05:13:31  20  **A**    It is a concern.  We definitely want to make sure that

05:13:33  21  our narcotic cabinets had working locks, yes.

05:13:37  22  **Q**    Not it is a concern.  It's illegal, isn't it?

05:13:41  23  **A**    It is illegal that a controlled substance cabinet is

05:13:44  24  not locked, yes.

05:13:45  25  **Q**    Yeah.  So it's not, well, it's a bit of a concern.

| | | |
|---|---|---|
| 05:13:48 | 1 | It's not a bit of a concern or a concern, it's wrong, isn't |
| 05:13:55 | 2 | it? |
| 05:13:55 | 3 | **A**    Yes, we -- and we took steps to ensure that we don't |
| 05:13:58 | 4 | have controlled substance cabinets anymore.  We went to |
| 05:14:00 | 5 | safes. |
| 05:14:02 | 6 | **Q**    Your reply? |
| 05:14:04 | 7 | **A**    Yes. |
| 05:14:05 | 8 | **Q**    "Sigh, dot, dot, dot, dot"? |
| 05:14:07 | 9 | **A**    I was extremely disappointed.  Our pharmacy managers |
| 05:14:10 | 10 | should know that they need to get that corrected |
| 05:14:12 | 11 | immediately. |
| 05:14:14 | 12 | **Q**    And so then we look at the executive summary of this. |
| 05:14:19 | 13 |      Do you see this? |
| 05:14:20 | 14 | **A**    Yes. |
| 05:14:20 | 15 | **Q**    Now, not making your PowerPoint at all was issue |
| 05:14:24 | 16 | number 1, "Number of C-II prescription that are not |
| 05:14:30 | 17 | stickered." |
| 05:14:31 | 18 |      They're all supposed to be stickered, aren't they? |
| 05:14:33 | 19 | **A**    So things have changed with the memorandum of |
| 05:14:35 | 20 | agreement, and we did not have to sticker controlled |
| 05:14:40 | 21 | substances, and we did have to change that practice.  And |
| 05:14:42 | 22 | that was the beginning of the change. |
| 05:14:44 | 23 | **Q**    No, ma'am, are you saying under the agreement you did |
| 05:14:47 | 24 | not have to sticker? |
| 05:14:49 | 25 | **A**    So, no, no, we did once the agreement came into place. |

05:14:54  1    **Q**    That's my point.

05:14:55  2         So as of 2013 when the agreement comes into place, you

05:14:58  3    have to sticker, right?

05:15:00  4    **A**    Yes.

05:15:00  5    **Q**    And so this is another area where y'all were not in

05:15:04  6    compliance with the agreement, because you had a number of

05:15:07  7    stores that failed to sticker once, a number 10 or less, and

05:15:14  8    a number 11 or more.

05:15:15  9         Do you see that?

05:15:15  10   **A**    I do.

05:15:16  11   **Q**    And those numbers look, well, you know, what's one?

05:15:21  12   But this is just from a random file folder.

05:15:25  13        Do you see that?

05:15:26  14   **A**    Yes.

05:15:26  15   **Q**    It's not examining every one, is it?

05:15:29  16   **A**    Correct.

05:15:29  17   **Q**    And you had C-III and IV prescriptions, and that's

05:15:38  18   where hydrocodone was at the time, true?

05:15:40  19   **A**    I don't remember the year that it went to Schedule II,

05:15:43  20   but yes.

05:15:43  21   **Q**    2014, does that ring a bell?

05:15:45  22   **A**    Thank you.

05:15:46  23        And when was this audit done, '15?

05:15:49  24   **Q**    It's written up -- I think it was done in '14, but

05:15:55  25   you've got an internal audit report.  I don't want to

**Polster (Cross by Lanier)** 3286

05:15:57  1   misrepresent it.  I'm not positive.

05:15:58  2   **A**   Okay.

05:15:58  3   **Q**   But you've still got controlled substances there,

05:16:01  4   don't you, Schedule III?

05:16:03  5   **A**   Yes.

05:16:03  6   **Q**   Those were supposed to be stickered under the

05:16:08  7   agreement, right?

05:16:09  8   **A**   Yes.

05:16:09  9   **Q**   And those have got stores that don't comply, correct?

05:16:12  10  **A**   Yes.

05:16:13  11  **Q**   So that you've got 35 percent not complying with the

05:16:18  12  DEA there.  And again, that's just from a random sample.

05:16:21  13  That's not looking at every one, right?

05:16:23  14  **A**   Yes.

05:16:23  15  **Q**   So you've got 35 percent not complying with the DEA

05:16:27  16  here, you've got 10.5 percent not complying here, you've got

05:16:36  17  a problem of several percent, that's a rounding error, 2.9

05:16:40  18  percent maybe, not complying there.  You've got 40.5 percent

05:16:47  19  not complying here.

05:16:52  20       And by the way, you can say, well, but it's just --

05:16:55  21  you know, it wasn't a lot of noncompliance, right?

05:17:01  22  **A**   I agreed that we should have had compliance, and I

05:17:05  23  took action to work on that.

05:17:06  24  **Q**   I just don't want it minimized for the jury by

05:17:09  25  Ms. Swift in asking you questions.

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 05:17:12 | 1 | MS. SWIFT:  Objection, Your Honor. |
| 05:17:13 | 2 | **Q**    This idea that -- no, this idea of the question being, |
| 05:17:16 | 3 | you know, that's pretty good, isn't it?  It's not. |
| 05:17:20 | 4 | **A**    For that one question, she was pointing out that.  But |
| 05:17:25 | 5 | we want a hundred percent compliance.  That's the point. |
| 05:17:27 | 6 | **Q**    That's the law. |
| 05:17:29 | 7 | MS. SWIFT:  Objection.  Argumentative. |
| 05:17:31 | 8 | MR. LANIER:  Okay, I'll pull it down, Judge. |
| 05:17:33 | 9 | THE COURT:  I'll sustain that. |
| 05:17:34 | 10 | MR. LANIER:  Yeah, I'll pull it down. |
| 05:17:37 | 11 | **Q**    Ma'am, that was the agreement you had with the DEA, |
| 05:17:40 | 12 | wasn't it? |
| 05:17:40 | 13 | **A**    Yes. |
| 05:17:41 | 14 | **Q**    Next.  Let's talk about refusals to fill and red |
| 05:17:48 | 15 | flags. |
| 05:17:54 | 16 | Now, the jury had some questions on this, and I want |
| 05:17:56 | 17 | to make sure I recognize them all. |
| 05:18:03 | 18 | MR. LANIER:  Judge, am I allowed to display |
| 05:18:06 | 19 | the juror question on the screen so she can read it, the |
| 05:18:10 | 20 | witness? |
| 05:18:11 | 21 | THE COURT:  Okay. |
| 05:18:11 | 22 | MR. LANIER:  Thank you. |
| 05:18:12 | 23 | **Q**    "It seems as though there isn't a standardized |
| 05:18:15 | 24 | location where red flags or resolved red flags are |
| 05:18:19 | 25 | documented.  Doesn't this make it more difficult for the |

**Polster (Cross by Lanier)**

05:18:22   1   pharmacists to be able to do their due diligence in a timely

05:18:24   2   manner, especially if notes or prior notes in the system can

05:18:30   3   or are deleted due to space limitations?"

05:18:33   4        Do you see that?

05:18:33   5   **A**   Yes.

05:18:34   6   **Q**   Let's be clear.  There's not a standardized location

05:18:38   7   where all resolved red flags are documented, true?

05:18:42   8   **A**   Correct.

05:18:42   9   **Q**   And wouldn't you agree it does make it more difficult

05:18:47  10   for the pharmacist?

05:18:48  11             MS. SWIFT:  Objection, Your Honor.  Could she

05:18:50  12   be allowed to answer the juror's question?

05:18:52  13             MR. LANIER:  That's what I'm asking.

05:18:53  14             THE COURT:  Why don't you just --

05:18:55  15        Can you answer the question, ma'am?

05:18:56  16             THE WITNESS:  Yes.  Yes, I can.

05:18:59  17   **A**   So, yes, having a standardized process was part of the

05:19:02  18   reason why a target drug good faith dispensing checklist was

05:19:06  19   done.  Having notes in the system or notes that can be

05:19:09  20   deleted, you need to understand that controlled substance

05:19:13  21   prescriptions can only be -- they're only valid for a

05:19:16  22   certain period of time.  It depends on the state, depends on

05:19:21  23   the regulation in that state, but a controlled substance

05:19:25  24   C-II prescription could expire as soon as seven days or it

05:19:28  25   could be a month or in some cases some states allow it to be

05:19:34   1   longer.

05:19:36   2       If the requirement of the policy is to have a

05:19:43   3   controlled substance -- a note in the prescription for

05:19:45   4   the -- or a note in the computer system for the specific

05:19:48   5   prescription in front of him, a prescription that was, you

05:19:53   6   know, refused or a note about a prescription a year prior

05:19:55   7   could be deleted because that prescription is not even valid

05:19:58   8   anymore.

05:20:00   9       So, yes, I understand your question.  You know, it

05:20:05   10  makes sense to have a standardized process, which is what

05:20:08   11  the point of the checklist was supposed to be doing.  But

05:20:11   12  also, that there are multiple places in the computer system

05:20:16   13  where a pharmacist would need to perhaps look to ensure that

05:20:20   14  they're doing their good faith, whether there's a health

05:20:24   15  condition with that patient as to why they need those

05:20:27   16  medications, whether or not there's an allergy to

05:20:30   17  medications, all of these are different fields in the

05:20:33   18  computer system.

05:20:35   19  **Q**   So, ma'am, I want to hone in on this part of the

05:20:38   20  question, and I'll ask you this.

05:20:39   21      Doesn't it make it more difficult for the pharmacists

05:20:45   22  to be able to do their due diligence in a timely manner,

05:20:49   23  especially if notes or prior notes in the system can and are

05:20:51   24  deleted due to space limitations?

05:20:55   25      True, right?

**Polster (Cross by Lanier)**

05:20:57  1    **A**    I would agree that there are different places in the

05:21:00  2    system that a pharmacist might need to look, but they're

05:21:03  3    looking for it for different reasons.  And so that was the

05:21:08  4    part of the checklist as well as allowing notes to be put

05:21:11  5    into the computer --

05:21:17  6    **Q**    I'm getting notes from both ends asking me to be sure

05:21:20  7    and remember to ask you if 15 minutes is still the metric of

05:21:26  8    time that they're trying to fill this in at the time?

05:21:32  9    **A**    I need to explain the 15 minutes.

05:21:34  10   **Q**    And I'm going to pause on that, and we'll see if I've

05:21:36  11   got time for that, because I'd like you to.  But I've got it

05:21:39  12   in another place in here, so we'll get to it in a minute.

05:21:42  13   Okay?  If I've got time.

05:21:45  14        Now, in regards to this, ma'am, there is a need to

05:21:51  15   document red flags, right?

05:21:52  16   **A**    That is the best practice, to document red flags if

05:21:56  17   it's a red flag to the pharmacist.

05:21:57  18   **Q**    And you don't dispense without documenting the red

05:21:59  19   flag, true?

05:21:59  20   **A**    That's what our policy says.

05:22:01  21   **Q**    Each red flag must be resolved before dispensing,

05:22:05  22   true?

05:22:05  23   **A**    If it's a red flag to the pharmacist, yes.

05:22:07  24   **Q**    Now, you've got good faith dispensing policies in

05:22:17  25   place since 1989, true?

**Polster (Cross by Lanier)**

05:22:23  1   **A**   Yes.

05:22:23  2   **Q**   But those dispensing policies were not considered

05:22:28  3   adequate by the DEA under your memorandum of agreement,

05:22:33  4   true?

05:22:34  5   **A**   Yes.

05:22:34  6   **Q**   And you said prior to 2012 other groups handled the

05:22:40  7   function of your group, right?

05:22:41  8   **A**   Yes.

05:22:42  9   **Q**   You talked about the loss prevention folks?

05:22:44  10  **A**   Yes.

05:22:44  11  **Q**   Loss prevention is trying to stop theft, isn't it?

05:22:51  12  **A**   That's one of their functions, yes.

05:22:53  13  **Q**   That's the main function, isn't it?

05:22:55  14  **A**   Yes.

05:22:55  15  **Q**   Okay.  And then you were asked was this checklist

05:23:03  16  required by law.

05:23:03  17       Do you see that?

05:23:05  18  **A**   Yes.

05:23:05  19  **Q**   But the truth of the matter is, the checklist was --

05:23:09  20  came out of the agreement terms in the settlement with the

05:23:13  21  law, right?

05:23:14  22  **A**   The truth of the matter is is that I needed

05:23:17  23  consistency across all of our stores, and the working team

05:23:21  24  came up with the checklist.

05:23:24  25  **Q**   And so we've got that target good faith dispensing

**Polster (Cross by Lanier)**                    3292

05:23:27  1  checklist, right?

05:23:29  2  **A**    Yes.

05:23:30  3  **Q**    And down at the bottom it's got this provision, "Per

05:23:37  4  CDC recommendation, Narcan was offered to the patient" --

05:23:43  5  naloxone, excuse me, which is Narcan, right?

05:23:45  6  **A**    Yes.

05:23:46  7  **Q**    "For CDC recommendation, naloxone was offered to the

05:23:51  8  patient in case of an emergency in these prescriptions,

05:23:55  9  right?

05:23:55  10  **A**    Yes.

05:23:55  11  **Q**    It was offered not like here's some Narcan, it was

05:23:59  12  offered like would you like to buy some Narcan, right?

05:24:02  13  **A**    No, it was what that -- well, correct, they would have

05:24:07  14  to purchase it, yes.

05:24:08  15  **Q**    Yeah, in other words, the offer of Narcan, that's an

05:24:13  16  offer to sell Narcan, right?

05:24:14  17  **A**    It's an offer to let them know that it's available,

05:24:17  18  that they can choose to get it or not.

05:24:18  19  **Q**    Right, in other words, they can buy it or not, right?

05:24:21  20  **A**    Yes, or bill it to their insurance, correct.

05:24:23  21  **Q**    Right.  Well, I mean, one of the jurors asked this

05:24:26  22  question:  "Was naloxone offered to patients for free when

05:24:33  23  getting 50 MMEs?  If not, how much did it cost?"

05:24:37  24  **A**    I don't know the exact cost of Narcan.  It is covered

05:24:43  25  on every insurance that I'm aware of, every federally

| | | |
|---|---|---|
| 05:24:46 | 1 | funded, like a Medicaid plan, as well as like a Medicare |
| 05:24:52 | 2 | plan. |
| 05:24:53 | 3 | Additionally, we have -- Walgreens has had on occasion |
| 05:25:01 | 4 | worked with departments of health to help distribute Narcan |
| 05:25:10 | 5 | to members in their community, so the departments of health |
| 05:25:15 | 6 | would give their Narcan to a Walgreens pharmacy and ask them |
| 05:25:24 | 7 | to distribute it to patients who are asking for it, and |
| 05:25:27 | 8 | those would be free of charge. |
| 05:25:29 | 9 | **Q**     All right.  Fair.  Thank you for that further answer. |
| 05:25:37 | 10 | By the way, even insurance, a lot of us have co-pay on |
| 05:25:40 | 11 | our insurance with pharmacies, right? |
| 05:25:43 | 12 | **A**     Yes. |
| 05:25:43 | 13 | **Q**     It's not like insurance just covers Narcan.  You're |
| 05:25:46 | 14 | not saying they cover it with no co-pay? |
| 05:25:48 | 15 | **A**     Not all of them do. |
| 05:25:49 | 16 | **Q**     All right.  Then you showed the jury the 2020 good |
| 05:25:54 | 17 | faith dispensing policy.  It's like pages now, isn't it? |
| 05:25:56 | 18 | **A**     Yes. |
| 05:25:56 | 19 | **Q**     Let's be real clear.  You could have done that |
| 05:25:58 | 20 | earlier, couldn't you? |
| 05:25:59 | 21 | **A**     Yes, we had a -- we got a new compliance department, |
| 05:26:02 | 22 | and we had a new chief compliance and ethics officer that |
| 05:26:12 | 23 | changed all of our policies to fit into this format. |
| 05:26:15 | 24 | **Q**     And this was after we filed this lawsuit, right? |
| 05:26:18 | 25 | **A**     Yes, uh-huh. |

| | | |
|---|---|---|
| 05:26:18 | 1 | **Q**   Excuse me? |
| 05:26:20 | 2 | **A**   Yes. |
| 05:26:20 | 3 | **Q**   Yes. |
| 05:26:27 | 4 | Now, there's a box -- |
| 05:26:29 | 5 | THE COURT:  Mr. Lanier, I was hoping we could |
| 05:26:30 | 6 | conclude with this witness today, but it doesn't look like |
| 05:26:34 | 7 | it's going to be possible, so I'm thinking we should break |
| 05:26:37 | 8 | for the evening. |
| 05:26:37 | 9 | MR. LANIER:  Yes, sir. |
| 05:26:40 | 10 | THE COURT:  All right.  Ladies and gentlemen, |
| 05:26:41 | 11 | I appreciate your patience for a long afternoon session.  We |
| 05:26:46 | 12 | will break for the evening. |
| 05:26:47 | 13 | Usual admonitions.  Don't encounter anything in the |
| 05:26:51 | 14 | media and don't discuss this case with anyone. |
| 05:26:54 | 15 | We'll pick up at 9:00 with the balance of |
| 05:26:56 | 16 | Ms. Polster's testimony.  Have a good evening. |
| 05:27:32 | 17 | (Jury excused for the day at 5:27 p.m.) |
| 05:27:33 | 18 | THE COURT:  All right.  Please be seated for a |
| 05:27:34 | 19 | minute.  It's late so I don't want to stay and deal with |
| 05:27:37 | 20 | exhibits. |
| 05:27:37 | 21 | What I'd like -- I'm trying to take it up at 8:45 |
| 05:27:41 | 22 | tomorrow, the few exhibits with Mr. Tsipakis, hopefully you |
| 05:27:50 | 23 | can agree on it.  I just need to know what's being offered |
| 05:27:54 | 24 | by each side and if there are any objections, the same thing |
| 05:27:56 | 25 | with Captain Villanueva.  We'll put Ms. Polster's exhibits |

```
05:27:59    1    off till she's concluded.
05:28:03    2                MR. DELINSKY:  Your Honor, may I just request
05:28:05    3    guidance on an issue?  It can wait if you'd like to wait
05:28:09    4    till 8:45.
05:28:10    5                THE COURT:  If it's quick, what is it?
05:28:13    6                MR. DELINSKY:  On the deposition designations,
05:28:14    7    we're bringing very few to Your Honor's --
05:28:18    8                THE COURT:  You can be excused, ma'am.
05:28:19    9                THE WITNESS:  Thank you.
05:28:20   10                (Witness excused.)
05:28:20   11                MR. DELINSKY:  We're bringing very few to Your
05:28:22   12    Honor's attention.  When we have overruled objections, we
05:28:28   13    believe they're preserved when the Special Master rules on
05:28:30   14    them, and the vast majority we're not bringing to you, but
05:28:33   15    there's a small number that are important.  And out of an
05:28:39   16    abundance of caution, we do want to make a record of them.
05:28:43   17    But we understand they're upsetting to you --
05:28:49   18                THE COURT:  They're coming out of the blue.  I
05:28:51   19    don't know the context, I mean -- so, and it's almost
05:28:54   20    impossible to -- for me to deal with them in a coherent way.
05:29:01   21                MR. DELINSKY:  My question, Your Honor, is
05:29:02   22    what -- because we -- we're hearing you, it is unwieldy.
05:29:08   23    We're trying to find the best process for this.  We're
05:29:10   24    really trimming back.  We're bringing very few to you.
05:29:15   25    They're the ones that we think are particularly important,
```

05:29:18　1　　and we just want to make sure that on one hand we're

05:29:23　2　　protecting our client's interests in making the objections

05:29:27　3　　we should, and on the other hand, we're making it easy for

05:29:32　4　　you and not introducing another burden.

05:29:33　5　　　　　　　　THE COURT:  I mean, on those things that I was

05:29:35　6　　dealing with earlier today, it's not a big deal either way.

05:29:38　7　　There's nothing in there that hasn't been in before, some

05:29:43　8　　brief mention about the memorandums of understanding or the

05:29:47　9　　settlement agreements.  There's nothing new, and it's short.

05:29:51　10　　So I don't think it matters, all right?

05:29:53　11　　　　　And I don't think the plaintiffs need it, but it's not

05:29:56　12　　so -- at this point, it's not prejudicial to have a couple

05:30:01　13　　questions on it.  But I think it should be streamlined.  If

05:30:04　14　　there's -- if the reason to have it is that the plaintiffs

05:30:08　15　　simply want to point out that this was publicly available to

05:30:12　16　　everyone, fine, maybe that can be in one question.  It's

05:30:16　17　　publicly available.

05:30:17　18　　　　　Or maybe we'll have a stipulation that these things

05:30:20　19　　were published, everyone knew about them.  Clearly everyone

05:30:23　20　　knew about them.  We've had testimony, everyone -- every

05:30:26　21　　defendant knew about everyone else's settlement agreements,

05:30:30　22　　all right?  Or orders to show cause.  They're public.

05:30:32　23　　　　　But so if you can come to some agreement, fine.  If

05:30:39　24　　there's still an objection, I'll deal with it.  If it's real

05:30:42　25　　important, obviously that's my job, I'll deal with it.  I

05:30:45  1    mean, if it takes time, I'll deal with it, I'll simply

05:30:49  2    charge it to both sides like I've been doing, but I will

05:30:51  3    address them, okay?  That's how it works.  I'm the judge.  I

05:30:54  4    understand that.

05:30:54  5                 MR. DELINSKY:  We'll make every effort to

05:30:56  6    streamline it further.

05:30:57  7                 THE COURT:  But, you know, if there's

05:30:58  8    something that you can't agree on and it's real important,

05:31:01  9    obviously I'll -- that's -- I'm the judge, I'll do it.

05:31:05  10   However long it takes, I'll do it.

05:31:07  11                 MS. SULLIVAN:  Your Honor, one other quick

05:31:08  12   thing on scheduling for tomorrow.  We had offered

05:31:12  13   Mr. Chunderlik, our former employee, first thing in the

05:31:14  14   morning.  He's taken now two days off as I mentioned before

05:31:18  15   because they originally wanted him Tuesday.  I would just

05:31:20  16   like to get him on and off tomorrow.  I don't know what the

05:31:22  17   plaintiffs --

05:31:23  18                 THE COURT:  Obviously both sides thought that

05:31:25  19   Ms. Polster would be on and off long before now.  But again,

05:31:29  20   I'm not answering the questions on either side -- or asking

05:31:31  21   them, I'm sorry.

05:31:32  22                 MR. LANIER:  I was asked by the lawyer for

05:31:34  23   Giant Eagle if it would be okay to put him on Tuesday of

05:31:37  24   next week.  I'm fine with that.  That would be out of -- I

05:31:41  25   will have rested by then.  As long as the Court would allow

05:31:46    1    me to keep my case open as to Giant Eagle until after he

05:31:48    2    takes the stand Tuesday, I have no problem doing it on

05:31:51    3    Tuesday.

05:31:51    4                MS. SULLIVAN:  Your Honor, we would prefer

05:31:51    5    just putting him on before they rest, and he's ready to go

05:31:51    6    tomorrow.  Is there a reason we can't get him on and off

05:31:56    7    tomorrow?

05:31:56    8                MR. LANIER:  Yes, as I explained to

05:31:58    9    Ms. Sullivan, I've got two witnesses that have been here for

05:32:00   10    two days that I've got to get on the stand that have been

05:32:02   11    ready to go.  And I've got to get them on and off.  I

05:32:06   12    just -- if it were just Mr. Chunderlik, that would be fine,

05:32:10   13    but Ms. Sullivan told me she has three hours of direct with

05:32:13   14    him.

05:32:13   15                MS. SULLIVAN:  I can cut it down to two.

05:32:14   16                MR. LANIER:  Which still means that I wouldn't

05:32:16   17    be able to get my witnesses on and off the stand tomorrow

05:32:18   18    which I need to do to be able to rest.

05:32:20   19        So I just think Tuesday works as long as, Judge,

05:32:24   20    you'll let me --

05:32:25   21                THE COURT:  I don't have -- I've said a long

05:32:27   22    time ago that we'll accommodate witnesses and, you know, for

05:32:32   23    whatever reason to take people out of order.  So we -- you

05:32:36   24    know, it's a six-week trial, things come up.  So --

05:32:42   25                MS. SULLIVAN:  Your Honor, my only concern is

05:32:44  1    he shouldn't rest until he puts my witness on, and he's

05:32:48  2    ready to go tomorrow.  And if he's on Tuesday, fine, he'd

05:32:52  3    let him rest after he puts our witness on.

05:32:54  4              THE COURT:  We're not going to have a gap of a

05:32:59  5    day and a half, Ms. Sullivan, that isn't happening, okay?  I

05:33:02  6    don't operate that way.  So we're going straight through.

05:33:05  7    We're not taking gaps in the middle of the trial.

05:33:11  8         So it doesn't really matter who's calling who and when

05:33:15  9    they are.  The jury's listening to every one and they're

05:33:17  10   going to take everything in regardless of who asks the

05:33:19  11   question, all right?

05:33:20  12        I mean, the plaintiffs are calling, you know,

05:33:22  13   corporate employees in their case, but they could -- you

05:33:27  14   could have called them too, and the order doesn't matter.

05:33:30  15             MS. SULLIVAN:  I understand, Your Honor.  As

05:33:31  16   long as we can -- it's just been so unfair to this guy who

05:33:34  17   keeps taking days off because the plaintiffs keep changing

05:33:36  18   the day they want him, so I'm just asking that he be --

05:33:39  19             THE COURT:  Look, Ms. Sullivan, I don't think

05:33:44  20   Mr. Lanier has been trying to disrupt Mr. Chunderlik's life.

05:33:48  21   Okay?  Everyone thought that this witness was going to be on

05:33:49  22   and off by now.  I'm not blaming anyone.  The testimony took

05:33:52  23   longer.

05:33:53  24             MS. SULLIVAN:  Your Honor, he had asked for

05:33:54  25   him on Tuesday, then they changed their mind, but I

| | | |
|---|---|---|
| 05:33:55 | 1 | understand Your Honor's ruling. |
| 05:33:56 | 2 | The only other point, Your Honor, in fairness, I'm |
| 05:33:58 | 3 | hoping that if we get juror questions in the defense case, |
| 05:34:01 | 4 | we'll get to ask the questions as opposed to plaintiffs' |
| 05:34:04 | 5 | lawyers? |
| 05:34:05 | 6 | There is a fairness issue that the juror -- you know, |
| 05:34:07 | 7 | with the plaintiffs appearing to be helping the jurors by |
| 05:34:09 | 8 | asking their questions, and so a way to remedy that is that |
| 05:34:13 | 9 | we do it in the defense case. |
| 05:34:16 | 10 | THE COURT:  Look, I will simply -- Mr. Lanier |
| 05:34:18 | 11 | got up first.  I mean, he might have asked them. |
| 05:34:21 | 12 | MS. SULLIVAN:  But it's been that way |
| 05:34:22 | 13 | throughout his case, Your Honor, and there is a basic |
| 05:34:25 | 14 | fairness issue in terms of appearance. |
| 05:34:26 | 15 | THE COURT:  Well, it's going to be the other |
| 05:34:28 | 16 | way around, Ms. Sullivan, when it's your side because you'll |
| 05:34:30 | 17 | be up first. |
| 05:34:31 | 18 | MS. SULLIVAN:  That was my only question, Your |
| 05:34:33 | 19 | Honor.  Thank you, Your Honor. |
| 05:34:34 | 20 | MR. LANIER:  I'm not going to be fussy about |
| 05:34:36 | 21 | that. |
| 05:34:36 | 22 | THE COURT:  No. You will be up first on |
| 05:34:39 | 23 | redirect, so you'll have the first crack at asking the |
| 05:34:41 | 24 | questions.  That's the way it works. |
| 05:34:42 | 25 | MS. SULLIVAN:  Thank you, Your Honor. |

05:34:42    1              MR. LANIER:  In that regard, Your Honor, if I

05:34:43    2      could take one more minute of your time.

05:34:45    3          I have at this point marked with a Post-it Note, a

05:34:49    4      little sticky, the three questions I think I've asked.  I

05:34:52    5      may have asked a couple more, but they're several questions

05:34:55    6      on a page.  I'm not just not sure.  I've talked to

05:34:58    7      Ms. Swift.  What we would ask the Court jointly is could we

05:35:02    8      leave the originals with Mr. Pitts but could we take

05:35:06    9      pictures of them so that we're both able to work on them

05:35:09   10      tonight?

05:35:09   11              THE COURT:  Sure, you can copy, sure.

05:35:11   12              MR. LANIER:  Thank you, Your Honor.

05:35:12   13              MS. SWIFT:  Thank you, Your Honor.

05:35:17   14              THE COURT:  All right.  And today, I had 3 1/2

05:35:19   15      hours for each side by my computation, so --

05:35:22   16              MR. LANIER:  Judge, I have tried cases from

05:35:24   17      coast to coast.  I've never met a harder working judge.  You

05:35:27   18      get seven hours of testimony in a day, that's like a record.

05:35:31   19              THE COURT:  I mean, my commitment to you --

05:35:34   20      everyone's working real hard -- my commitment to you and my

05:35:37   21      commitment to the jury is that whatever other court business

05:35:39   22      I have I squeeze into the noon hour.  And I had two matters

05:35:44   23      during the noon hour, so --

05:35:46   24              MR. LANIER:  I've never seen this before.

05:35:48   25      It's killing me, but I'm in respect and awe.

05:35:52  1          THE COURT:  I appreciate that, Mr. Lanier.  I

05:35:55  2  think it --

05:35:55  3          MR. LANIER:  It's crazy.

05:35:57  4          THE COURT:  The smoother this goes, the more

05:36:00  5  the jury is able to focus and keep their attention, and I

05:36:02  6  think that's the fairest to the plaintiffs and to the

05:36:05  7  defendants.

05:36:05  8          MR. LANIER:  Both sides, that's right.

05:36:06  9          THE COURT:  It's my experience as a trial

05:36:08  10  lawyer which I had 22 years of.

05:36:10  11      Okay.  Have a good evening.

05:36:13  12          COUNSEL EN MASSE:  Thank you, Your Honor.

05:36:13  13          (Proceedings adjourned at 5:36 p.m.)

14                      *  *  *  *  *

15                   **C E R T I F I C A T E**

16

17      I certify that the foregoing is a correct transcript

18  of the record of proceedings in the above-entitled matter

19  prepared from my stenotype notes.

20

21      */s/ Lance A. Boardman                10-20-2021*
            Lance A. Boardman, RDR, CRR            DATE
22

23

24

25