3303

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION AT CLEVELAND

3       -------------------------------X
        IN RE:                         :   Case No. 1:17-md-2804
4                                      :
        NATIONAL PRESCRIPTION          :
5       OPIATE LITIGATION              :
                                       :   **VOLUME 13**
6       CASE TRACK THREE               :   JURY TRIAL
                                       :   *(Pages 3303 - 3595)*
7                                      :
                                       :
8                                      :
                                       :   *October 21, 2021*
9       -------------------------------X

10

11

12                TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>

13

14          HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16              SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20      Official Court Reporter:        Lance A. Boardman, RDR, CRR
                                        United States District Court
21                                      801 West Superior Avenue
                                        Court Reporters 7-189
22                                      Cleveland, Ohio 44113
                                        216.357.7019
23

24
        Proceedings recorded by mechanical stenography; transcript
25      produced by computer-aided transcription.

```
 1    APPEARANCES:

 2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                   SPANGENBERG, SHIBLEY & LIBER
 3                                 1001 Lakeside Avenue, Ste. 1700
                                   1900 East Ninth Street
 4                                 Cleveland, Ohio 44114
                                   216-696-3232
 5
                                   W. Mark Lanier, Esq.
 6                                 Rachel Lanier, Esq.
                                   THE LANIER LAW FIRM
 7                                 6810 FM 1960 West
                                   Houston, Texas 77069
 8                                 813-659-5200

 9                                 Frank L. Gallucci, III, Esq.
                                   PLEVIN & GALLUCCI COMPANY, LPA
10                                 The Illuminating Building
                                   Suite 2222
11                                 55 Public Square
                                   Cleveland, Ohio 44113
12                                 216-861-0804

13                                 Salvatore C. Badala, Esq.
                                   Maria Fleming, Esq.
14                                 NAPOLI SHKOLNIK
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York 10017
                                   212-397-1000
16

17
      For Walgreen Defendants:    Kaspar J. Stoffelmayr, Esq.
18                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
19                                 BARTLIT BECK LLP
                                   54 West Hubbard Street, Ste.300
20                                 Chicago, Illinois 60654
                                   312-494-4400
21

22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:          Graeme W. Bush, Esq.
                                   Eric R. Delinsky, Esq.
 3                                 Alexandra W. Miller, Esq.
                                   ZUCKERMAN SPAEDER - WASHINGTON
 4                                 Suite 1000
                                   1800 M Street, NW
 5                                 Washington, DC 20036
                                   202-778-1831
 6
      For HBC/Giant Eagle          Diane P. Sullivan, Esq.
 7    Defendants:                  Chantale Fiebig, Esq.
                                   WEIL GOTSHAL & MANGES
 8                                 Suite 600
                                   2001 M Street NW
 9                                 Washington, DC 20036
                                   202-682-7200
10
      For Walmart Defendants:      John M. Majoras, Esq.
11                                 JONES DAY - COLUMBUS
                                   Suite 600
12                                 325 John H. McConnell Blvd.
                                   Columbus, Ohio 43215
13                                 614-281-3835

14                                 Tara A. Fumerton, Esq.
                                   Tina M. Tabacchi, Esq.
15                                 JONES DAY - CHICAGO
                                   Suite 3500
16                                 77 West Wacker
                                   Chicago, Illinois 60601
17                                 312-782-3939

18
      ALSO PRESENT:                David Cohen, Special Master
19

20                                     - - - - -

21

22

23

24

25
```

1                           Table of Contents

2

3   Witnesses/Events                                    Page

4   NATASHA POLSTER (CONT'D)                            3320

5          Mr. Lanier - Cross (Cont'd)                  3320
           Ms. Swift - Redirect                         3405
6          Mr. Lanier - Recross                         3430
           Ms. Swift - Further Redirect                 3430

7
    G. CALEB ALEXANDER, MD                              3440
8
           Mr. Lanier - Direct                          3440
9          Ms. Sullivan - Cross                         3481
           Mr. Lanier - Redirect                        3545
10         Ms. Sullivan - Recross                       3566

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08:35:55    1                    (In open court at 8:47 a.m.)

08:47:51    2                    THE COURT:  Okay.  There were a couple things

08:47:52    3    I wanted to take up.

08:47:59    4         First some or all of the defendants moved to preclude

08:48:07    5    testimony from Nicole McCallion, who is a foster parent in

08:48:11    6    Lake County.  Both sides made some good arguments.

08:48:19    7         I'm going to allow Ms. McCallion to testify, the

08:48:23    8    reason being the plaintiffs have to prove the existence of a

08:48:29    9    public nuisance today in both of the plaintiff counts, Lake

08:48:34   10    and Trumbull.  Most of the testimony for a whole lot of

08:48:37   11    reasons goes back in time, but the plaintiffs have to prove

08:48:43   12    a public nuisance today, October of 2021.

08:48:51   13         One of the impacts of the public nuisance is a whole

08:48:54   14    lot of kids who lost one or both of their parents to opioid

08:49:00   15    addiction.  Doesn't matter how the person got addicted.  The

08:49:07   16    plaintiffs' theory is that at least one of the causes was

08:49:11   17    prescription opioid abuse, and there's testimony about it.

08:49:14   18    Whether the jury credits it or not is up to them.

08:49:19   19         So I looked at the excerpts that were provided to me

08:49:26   20    from Ms. McCallion's testimony, and she does detail that in

08:49:30   21    the first instance the responsibility for these children is

08:49:33   22    the county, Lake County Family Services.  And one of the

08:49:39   23    things the county tries to do is find foster parents, and

08:49:42   24    under the state system in order to be eligible for

08:49:45   25    compensation, which I believe is provided by the State of

08:49:48  1   Ohio, a foster parent must be licensed.  And it appears that

08:49:53  2   the county provides the training that a parent must go

08:50:02  3   through to get the license.

08:50:04  4        And so that's parts of the impact on the county, is

08:50:07  5   that the county has to pay for the personnel to do the

08:50:09  6   training.  And I think Ms. McCallion opines that in her

08:50:16  7   view, the training should be more extensive.

08:50:18  8        So the point is that's relevant, but I'm not going to

08:50:21  9   let her go on and on detailing all the issues and details

08:50:26  10  with each of the kids that she's been a foster parent for

08:50:30  11  because I think that ceases to be relevant and may just be

08:50:36  12  to try and appeal to the emotions of the jurors.

08:50:39  13       So I will allow the testimony but limit it in a way

08:50:42  14  that it's relevant to what the jury has to decide.

08:50:49  15       Then CVS made some objections to the special master's

08:50:58  16  ruling on some of the designations for CVS employee

08:51:01  17  Michelle Travassos, probably the right pronunciation,

08:51:08  18  T-R-A-V-A-S-S-O-S.

08:51:12  19       I have ruled as a general matter that -- I mean, you

08:51:15  20  can show a document to anyone, but if the witness has not

08:51:19  21  seen it, the document doesn't show that he or she sent it or

08:51:23  22  received it and says, I know nothing about it, that's going

08:51:27  23  to be the end of the testimony.  But there are times where

08:51:31  24  it's appropriate to have further examination of that

08:51:35  25  witness, of that document.

08:51:37    1           For example, if the person is responsible for

08:51:43    2    administering the monitoring system that that company has in

08:51:48    3    place for suspicious orders or suspicious prescriptions,

08:51:52    4    either help create or implement or design that program or is

08:51:56    5    monitoring it and has testified as to how it works, and you

08:52:01    6    have a document that in the ordinary course that person

08:52:04    7    should have received or at least the facts in that document

08:52:08    8    should have been brought to that person's attention, and it

08:52:11    9    wasn't, well, that's part of the plaintiffs' case.

08:52:14   10           The plaintiffs' case is that the system that each

08:52:20   11    defendant has was not adequate or, if the system looked to

08:52:24   12    be adequate, it really wasn't being used or effectuated

08:52:29   13    properly.  And so in those cases, sometimes a document, it's

08:52:35   14    relevant to show that here's something that this person

08:52:38   15    should have been notified about or told about or counseled.

08:52:45   16    And the fact that he or she wasn't, well, that shows that

08:52:47   17    the system was not adequate.  And it appears that may be the

08:52:50   18    case here.

08:52:51   19           Or if the witness is a knowledgeable, responsible

08:52:55   20    person and has testified, all right, this is how our system

08:52:59   21    worked, this is how -- who did what and this is how we were

08:53:02   22    notified of certain things and the document shows that it

08:53:05   23    didn't work that way, well, then it can be used to impeach

08:53:09   24    that person.

08:53:09   25           It looks like that's what is the situation with

08:53:16  1    Ms. Travassos.  And so I'm going to overrule the objections.

08:53:21  2    It appears to me that questioning about that document is

08:53:26  3    relevant with this witness.

08:53:33  4              MR. DELINSKY:  Your Honor, there's a second

08:53:34  5    issue as well.

08:53:35  6              THE COURT:  I saw the -- the second issue,

08:53:38  7    Mr. Delinsky, I really don't think that objection is

08:53:42  8    well-founded.  If the person -- you know, again, it's got to

08:53:50  9    be someone who's responsible for the program.  You can't

08:53:53  10   just bring in anyone.  But if you've got a person who's

08:53:57  11   responsible for designing the program, recommending or

08:54:03  12   implementing changes, obviously every defendant's program

08:54:07  13   evolved over a 10 or 15-year period.  And if you've got a

08:54:11  14   responsible person, part of the -- one of the plaintiffs'

08:54:16  15   argument is that each of the defendants did -- whatever they

08:54:21  16   did was too little, too late, or if they finally made a

08:54:25  17   change in 2015 or 2017, they could have done that five years

08:54:28  18   earlier with the knowledge that they had.  That's an

08:54:31  19   argument.  Whether the jury accepts it or not, we'll see.

08:54:36  20        And so things that are being considered or were

08:54:43  21   considered or were feasible or is relevant to what each

08:54:50  22   company did or didn't do in this respect.  Because, again,

08:54:56  23   no one's required to do something that is impossible or

08:55:04  24   impractical.  So, but if something is considered, it may

08:55:11  25   be -- you know, and was rejected, the question, why was it

08:55:15    1    rejected.  Or if it was implemented in 2019, why wasn't it

08:55:19    2    implemented earlier.

08:55:20    3        So, again, all that's relevant.  In and of itself, it

08:55:26    4    doesn't -- may not prove anything, but, again, the standard

08:55:28    5    for relevance is whether it tends to make something an issue

08:55:34    6    in dispute more likely or not.

08:55:36    7        And so --

08:55:38    8            MR. DELINSKY:  Your Honor, we're going to --

08:55:40    9    the plaintiffs just had raised an issue in their opposition

08:55:43   10    that we hadn't identified the exhibits and the page numbers.

08:55:46   11    It was a fair point.

08:55:47   12        We sent those over -- just so the record's clear,

08:55:50   13    we're going to put them on file, but I understand Your

08:55:52   14    Honor's ruling.

08:55:54   15            THE COURT:  You know, again --

08:55:55   16            MR. DELINSKY:  I don't think it changes your

08:55:56   17    ruling, Your Honor.

08:55:57   18            THE COURT:  Again, it's way too late to be

08:56:01   19    presenting these.  I'll say they're untimely.

08:56:04   20            MR. DELINSKY:  But, Your Honor, they were

08:56:06   21    object objected to --

08:56:07   22            THE COURT:  I know, but Mr. Delinsky, the fact

08:56:09   23    that something went to Special Master Cohen months ago,

08:56:12   24    you're raising it with me.

08:56:14   25            MR. DELINSKY:  No, Your Honor, they went in

08:56:15  1    the last week and they weren't ruled upon until Tuesday

08:56:18  2    night.

08:56:18  3                    THE COURT:  Yeah, and it wasn't identified.

08:56:20  4    So I'm fine, you've submitted them, but --

08:56:23  5                    MR. DELINSKY:  But we understand Your Honor's

08:56:25  6    ruling.

08:56:25  7                    THE COURT:  In the future if you're objecting

08:56:27  8    to something, you've got to be very specific to what you're

08:56:30  9    objecting to, a specific question and answer or examination

08:56:34  10   on a specific document and here it is and why.  So your --

08:56:38  11   it was -- in my opinion, it was too vague.

08:56:41  12                   MR. DELINSKY:  Okay.  Well, Your Honor, just

08:56:43  13   so the record's clear, and we'll just put a submission so

08:56:48  14   our objections are clear that we did do that on a

08:56:52  15   line-by-line -- page-by-page, document-by-document basis

08:56:54  16   with Special Master Cohen.  They were ruled upon Tuesday

08:56:57  17   night, so we proceeded to get just a few of the issues to

08:57:01  18   you as soon as possible.

08:57:01  19       Your Honor, there is a related issue though that I do

08:57:05  20   want to raise.  Your Honor's ruling is Your Honor's ruling

08:57:07  21   and Your Honor knows we object.  But there has been verbiage

08:57:11  22   in the case and not to call out Mr. Lanier, but regarding,

08:57:16  23   you know, we saw it yesterday about, you know, did you do

08:57:18  24   the very best you can.  And it does raise the concern that

08:57:25  25   that's improper argument in this case where the -- we're not

08:57:29  1    a negligence case.  You know, it's about, you know, did you

08:57:33  2    violate a certain law or did you act intentionally.

08:57:36  3         And this verbiage about did you do everything you

08:57:39  4    possibly could risks -- it's not the legal standard, and it

08:57:44  5    does risk confusion with the jury.

08:57:46  6              MR. LANIER:  What Mr. Delinsky may not

08:57:48  7    remember and may not note on the record, but what I believe

08:57:51  8    to be the case is, that was the witness's answer to one of

08:57:54  9    the earlier questions.  I didn't bring that standard up.

08:57:57  10   The witness said, we did the best we could.  And I

08:58:01  11   challenged her on that.  I said, was this the best you

08:58:04  12   could, was this the best you could, was this the best you

08:58:06  13   could.

08:58:06  14        I was cross-examining her on her comment and her

08:58:13  15   statement.  I was not trying to change the Court's standard

08:58:17  16   on anything at all that we have to prove.

08:58:20  17             THE COURT:  All right.  Well, I think that is

08:58:22  18   how, Mr. Delinsky, how that back and forth occurred.  So,

08:58:29  19   again, if a witness gives an answer in a certain way, that's

08:58:32  20   how -- and this is a responsible employee, that's how he or

08:58:36  21   she views his or her responsibility in this area, and those

08:58:44  22   are their words.

08:58:45  23        But I agree that that isn't the legal standard.  Doing

08:58:52  24   the best you could is not -- there's going to be no

08:58:55  25   instruction that uses those languages -- that language.  It

08:59:00  1    isn't there now, and I'm not -- it isn't going to be in the

08:59:04  2    instructions.

08:59:06  3         All right.  It's almost 9:00.  I may -- unless the --

08:59:11  4    I guess -- I don't want to forget to deal with the exhibits

08:59:16  5    of prior witnesses.  I don't know if you've got something I

08:59:21  6    can do quickly.  If not, I'll do it at the noon hour because

08:59:24  7    I don't have any other matters for other cases I need to

08:59:27  8    take up.

08:59:29  9         Maybe I can quickly deal with Tsipakis because there

08:59:34  10   are only a handful of exhibits.

08:59:37  11             MS. FIEBIG:  Yes, Your Honor, and we have no

08:59:39  12   objections to the Tsipakis exhibits.

08:59:43  13             MS. FLEMING:  Your Honor, we just have two

08:59:46  14   for Villanueva.

08:59:46  15             THE COURT:  Maybe I can take care of both of

08:59:50  16   those.  I just want to put these in the record.  These are

08:59:52  17   all admitted without objection.

08:59:54  18             MS. FIEBIG:  Your Honor, just before we go on,

08:59:56  19   we also have two for Villanueva.

08:59:58  20             THE COURT:  Okay.  I'll take care of the four.

09:00:02  21        P-00528, 09529, 09633, 09637, 09667, 09678, 09693,

09:00:19  22   11298, and 20654.

09:00:45  23        All right.  Plaintiffs are offering the following two

09:00:47  24   exhibits for Mr. Villanueva:  04600.

09:00:57  25             MR. SWANSON:  Your Honor, Brian Swanson for

09:00:59    1    Walgreens.

09:00:59    2         We do have an objection to that entire exhibit.

09:01:02    3              THE COURT:  Well, I think it should be only

09:01:04    4    the pages that were -- that he testified to should come in.

09:01:08    5              MR. SWANSON:  Correct.

09:01:08    6              THE COURT:  There's a whole a lot of other

09:01:10    7    stuff that I think is irrelevant and wasn't referred to.  So

09:01:13    8    if that's the objection, I'll sustain it.  That comes in,

09:01:18    9    just the pages he testified about.

09:01:23   10              MR. WEINBERGER:  Your Honor, with respect to

09:01:24   11    that exhibit, I just note for the record that the entire

09:01:32   12    OARRS report, which is pages 32, 33, 34, and 35, is

09:01:42   13    particularly what we would seek admission into the evidence.

09:01:47   14         As I understand it, the Court is allowing page 35,

09:01:53   15    which is the summary of the doctors and the pharmacies where

09:02:03   16    Winland had prescriptions filled.

09:02:11   17              THE COURT:  All right.  Well, page 35

09:02:13   18    definitely comes in.  There was extensive testimony about

09:02:17   19    that.

09:02:17   20              MR. WEINBERGER:  Right.

09:02:17   21              THE COURT:  I guess I don't see any problem

09:02:19   22    with the -- those three pages of the OARRS report coming in

09:02:23   23    too.

09:02:24   24              MR. SWANSON:  Your Honor, that's what we went

09:02:25   25    through over and over and over again, and you didn't allow

09:02:27   1   it.

09:02:31   2                    THE COURT:  All right.  Well, let's just limit

09:02:32   3   it -- just page 35 is what he testified to.  The OARRS

09:02:36   4   report is just confusing.

09:02:38   5                    MR. WEINBERGER:  Well, it is what he testified

09:02:39   6   to, but then when he got cross-examined and there was

09:02:45   7   reference to these other pages -- and as you know, we then

09:02:51   8   attempted to have him testify just going through those other

09:02:56   9   three pages to compile which pharmacies --

09:03:00  10                    THE COURT:  Well, that's the problem.  That

09:03:02  11   goes into -- you know, that's the testimony I didn't allow.

09:03:04  12   So we're limiting it to page 35.

09:03:07  13                    MR. LANIER:  Here's my concern, Your Honor, if

09:03:10  14   I might.

09:03:11  15       With this witness that's on the stand right now,

09:03:14  16   Ms. Polster, the defendants on their own put in an OARRS

09:03:20  17   report to try to exculpate themselves.

09:03:25  18                    MS. SWIFT:  We did not, Your Honor.  I

09:03:27  19   withdrew that.

09:03:28  20                    MR. LANIER:  It was never withdrawn formerly.

09:03:30  21   It was displayed on the screen.  And there were questions

09:03:35  22   asked and they were never stricken.

09:03:38  23       And so I think to show a different OARRS report that

09:03:43  24   shows the opposite of what the OARRS report shown by

09:03:48  25   Ms. Swift showed is now highly relevant and one that I would

09:03:55  1    hope I would be able to get into with this witness.

09:03:57  2                    MS. SWIFT:  During the side bar, Your Honor --

09:04:00  3                    THE COURT:  Well, you can cross-examine this

09:04:02  4    witness on an OARRS report.  I mean --

09:04:04  5                    MS. SWIFT:  Your Honor, during the side bar

09:04:06  6    you --

09:04:07  7                    THE COURT:  Well, I'm dealing with

09:04:11  8    Mr. Villanueva, and in my view with Villanueva, we're

09:04:14  9    just -- we're going to admit page 35.

09:04:18  10        Trumbull County Opioid Action Plan, 04598, any problem

09:04:22  11   with that?

09:04:23  12                   MR. SWANSON:  No objection, Your Honor.

09:04:26  13                   THE COURT:  Okay.  That's in.

09:04:27  14        Defendants are offering two documents.

09:04:31  15                   MR. SWANSON:  Your Honor, it's actually we

09:04:32  16   have four more, Your Honor, that I can review.

09:04:35  17                   THE COURT:  All right.  Have you asked the

09:04:36  18   plaintiffs if they have any objection to these?

09:04:38  19                   MR. SWANSON:  We sent them over.

09:04:40  20                   THE COURT:  1326, any objection to that?  I

09:04:44  21   think these were all used.

09:04:48  22                   MR. FIEBIG:  No plaintiffs are objecting to

09:04:50  23   that.

09:04:50  24                   MR. LANIER:  Are these Giant Eagle?

09:04:52  25                   MS. FIEBIG:  They're not.  The 01326 was

3318

09:04:56  1    offered by Giant Eagle.

09:04:57  2                    THE COURT:  01326 and 13097, any objection to

09:05:02  3    those?

09:05:03  4                    MS. FIEBIG:  No, plaintiffs represented they

09:05:05  5    have no objection to it.

09:05:07  6                    THE COURT:  All right.  They're in.

09:05:08  7                    MR. WEINBERGER:  Wait a minute.  Hold on for a

09:05:09  8    second.  When did we say that we had no objection?

09:05:11  9                    MS. SULLIVAN:  Yesterday I talked to Mark

09:05:13  10   about it.

09:05:14  11                   MR. WEINBERGER:  I'm sorry?

09:05:14  12                   MS. SULLIVAN:  I talked to Mr. Lanier about it

09:05:16  13   yesterday.

09:05:16  14                   MR. WEINBERGER:  So you have no objection to

09:05:18  15   the reports.

09:05:18  16                   MR. LANIER:  There were two documents you

09:05:19  17   offered yesterday, and I had no objection to them.

09:05:22  18                   THE COURT:  All right.  Now, there were some

09:05:24  19   other documents.

09:05:25  20                   MR. SWANSON:  Mark, these are okay?

09:05:26  21                   MR. LANIER:  Those three are fine.

09:05:28  22                   MR. SWANSON:  Those two are fine.

09:05:29  23                   THE COURT:  Then I'll just read them into the

09:05:31  24   record.  Thank you.

09:05:34  25        04964.

09:05:44    1              MR. SWANSON:  I guess there are two that are

09:05:46    2    objected to, Your Honor.

09:05:51    3              THE COURT:  Let's do it one by one.

09:05:52    4        04964, it's the guilty plea on Winland.  That should

09:05:56    5    come in.

09:05:57    6        There's no objection to that, is there?

09:05:59    7              MR. LANIER:  No objection, Judge.

09:06:01    8              THE COURT:  All right.  That's in.

09:06:02    9        And then 04965, that's the indictment of Winland.

09:06:06   10              MR. LANIER:  No objection, Judge.

09:06:07   11              THE COURT:  What others are there?

09:06:10   12              MR. SWANSON:  Your Honor, the others are two

09:06:13   13    exhibits, but it's an e-mail that went to Mr. Villanueva

09:06:18   14    that he testified about, and then it's a report that's

09:06:22   15    attached to that e-mail that he also testified about.

09:06:24   16              MR. LANIER:  And, Your Honor, I have no

09:06:26   17    objection to the e-mail.  My objection is to the attachment

09:06:28   18    because I don't think it's been proven up as anything -- he

09:06:32   19    couldn't prove it up as anything.  And it's like the other

09:06:39   20    Ohio Board of Pharmacy reports that we were trying to get

09:06:43   21    in, and I don't see that it comes in.

09:06:46   22              MR. SWANSON:  But, I mean, he's making an

09:06:48   23    authenticity objection.  The witness testified --

09:06:50   24              THE COURT:  Yeah, I'll allow this.  I'll allow

09:06:52   25    the attachment.  The attachment's -- looks like it's 13052,

| | | |
|---|---|---|
| 09:06:59 | 1 | so that can come in. |
| 09:07:05 | 2 | Thank you.  All right.  Then we can bring in our -- |
| 09:07:08 | 3 | bring in the jury. |
| 09:08:49 | 4 | (The jury is present at 9:08 a.m.) |
| 09:09:12 | 5 | THE COURT:  Please be seated, ladies and |
| 09:09:14 | 6 | gentlemen.  I hope you had a good evening. |
| 09:09:15 | 7 | And, Ms. Polster, you are still under oath. |
| 09:09:17 | 8 | So, Mr. Lanier, you may continue your questioning. |
| 09:09:20 | 9 | MR. LANIER:  Thank you, Your Honor.  May it |
| 09:09:21 | 10 | please this Court. |
| 09:09:22 | 11 | Ladies and gentlemen, good morning. |
| 09:09:25 | 12 | Ms. Polster, good morning to you as well. |
| 09:09:26 | 13 | THE WITNESS:  Good morning. |
| 09:09:28 | 14 | NATASHA POLSTER |
| 09:09:28 | 15 | - - - - - |
| 09:09:29 | 16 | CROSS-EXAMINATION (CONT'D) |
| 09:09:29 | 17 | BY MR. LANIER: |
| 09:09:29 | 18 | **Q**    We were well down the road.  We were dealing with |
| 09:09:31 | 19 | training and good faith dispensing.  I want to finish that |
| 09:09:40 | 20 | stop, two more stops and then I'll be finished.  Okay? |
| 09:09:45 | 21 | **A**    Okay. |
| 09:09:46 | 22 | **Q**    Let's start out with this box of refusal to fill that |
| 09:09:51 | 23 | you had back there. |
| 09:09:52 | 24 | Do you remember this box? |
| 09:09:53 | 25 | **A**    Yes. |

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 09:09:53 | 1 | **Q**    It looks like at least the copy as it was given to me |
| 09:09:55 | 2 | shows three Redwelds and various copies of prescriptions and |
| 09:10:05 | 3 | refusals to fill, right? |
| 09:10:06 | 4 | **A**    Right. |
| 09:10:06 | 5 | **Q**    Now, mechanically let's talk about this for just a |
| 09:10:20 | 6 | moment, please. |
| 09:10:22 | 7 |     These refusals to fill.  These concern, by my math, I |
| 09:10:28 | 8 | counted 646 of them. |
| 09:10:30 | 9 |     Does that seem about right with you? |
| 09:10:32 | 10 | **A**    I did not count every one of them, but there's quite a |
| 09:10:35 | 11 | few in here. |
| 09:10:35 | 12 | **Q**    About 646.  Those are from the 12 Lake and Trumbull |
| 09:10:43 | 13 | County Walgreens stores from 2009 to 2020.  Right? |
| 09:10:47 | 14 | **A**    That's my understanding. |
| 09:10:50 | 15 | **Q**    So that's roughly 53.8 per store, fair? |
| 09:10:56 | 16 | **A**    Approximately, yes. |
| 09:10:57 | 17 | **Q**    And that's about four and a half a year, maybe a |
| 09:11:01 | 18 | little different because maybe there's a year or two in |
| 09:11:04 | 19 | there where a store wasn't yet up and running or had closed? |
| 09:11:08 | 20 | **A**    Fair. |
| 09:11:08 | 21 | **Q**    But something on that order. |
| 09:11:12 | 22 |     So that's the statistic that you're looking at when |
| 09:11:15 | 23 | you look at the refusals to fill, correct? |
| 09:11:19 | 24 | **A**    By your math, but I have not looked at each one of |
| 09:11:22 | 25 | them nor have I looked at the dates of every one of them. |

**Polster (Cross by Lanier)**                                    3322

| | | |
|---|---|---|
| 09:11:25 | 1 | **Q**    And in fairness, this math was done by someone on my |
| 09:11:28 | 2 | team, so it wasn't my math either. |
| 09:11:31 | 3 | **A**    Great. |
| 09:11:31 | 4 | **Q**    But they're really good at math, so I'm willing to |
| 09:11:35 | 5 | bank on it.  Okay? |
| 09:11:37 | 6 |        Here's the reason I'm asking:  The real crux of the |
| 09:11:42 | 7 | matter is not this box.  Our issue is not with when the |
| 09:11:51 | 8 | company refused to fill.  Our issue is how many the company |
| 09:11:56 | 9 | did fill. |
| 09:11:57 | 10 |        You understand that? |
| 09:11:58 | 11 | **A**    I understand what you're saying. |
| 09:11:59 | 12 | **Q**    In other words, great that the company didn't fill |
| 09:12:05 | 13 | these stores on average four and a half per store per year, |
| 09:12:08 | 14 | once a quarter.  The question is, how many did they fill |
| 09:12:13 | 15 | that they shouldn't have. |
| 09:12:15 | 16 |        You follow? |
| 09:12:16 | 17 | **A**    I don't know how you know whether or not they |
| 09:12:18 | 18 | shouldn't have filled the prescription.  You were not the |
| 09:12:21 | 19 | pharmacist.  You didn't -- you were not exercising your |
| 09:12:24 | 20 | corresponding responsibility to ensure the prescription was |
| 09:12:26 | 21 | written for good faith, which is on the pharmacist |
| 09:12:30 | 22 | responsibility side. |
| 09:12:32 | 23 | **Q**    Can you please answer my question? |
| 09:12:35 | 24 | **A**    Your question was -- |
| 09:12:36 | 25 | **Q**    The issue in this case is not how many they didn't |

**Polster (Cross by Lanier)** 3323

| | | |
|---|---|---|
| 09:12:39 | 1 | fill.  The issue in this case is how many they did fill. |
| 09:12:43 | 2 | Do you understand that? |
| 09:12:44 | 3 | **A**   I understand you. |
| 09:12:46 | 4 | **Q**   And the issue in this case is maybe there ought to be |
| 09:12:49 | 5 | 20 boxes up there of refusals to fill instead of one. |
| 09:12:54 | 6 | MS. SWIFT:  Objection.  That's not the issue |
| 09:12:55 | 7 | in this case. |
| 09:12:58 | 8 | THE COURT:  Overruled. |
| 09:12:59 | 9 | **Q**   You understand? |
| 09:13:01 | 10 | **A**   I understand. |
| 09:13:01 | 11 | **Q**   And so did you go through those that were filled and |
| 09:13:07 | 12 | look at those good faith dispensing sheets? |
| 09:13:11 | 13 | **A**   The filled prescriptions are audited by multiple |
| 09:13:15 | 14 | people in our field.  Did I personally?  No.  But we rely on |
| 09:13:20 | 15 | our field leadership to go in and do their store walks, |
| 09:13:25 | 16 | their compliance checks ensuring that the good faith |
| 09:13:35 | 17 | dispensing checklists, which, by the way, are not a legal |
| 09:13:32 | 18 | requirement, were filled out per policy. |
| 09:13:37 | 19 | **Q**   Okay.  So in the midst of that answer is the answer to |
| 09:13:39 | 20 | my question no? |
| 09:13:41 | 21 | **A**   I did not personally go through all the filled |
| 09:13:43 | 22 | prescriptions and look at the checklists, no. |
| 09:13:45 | 23 | **Q**   Did you have someone do that? |
| 09:13:47 | 24 | **A**   Yes, the field leaders. |
| 09:13:50 | 25 | **Q**   Okay.  So you've got someone that you're relying on. |

**Polster (Cross by Lanier)**                                    3324

09:13:54  1    Did they give you a report for this jury?

09:13:57  2    **A**    I do not have a report, no.

09:14:00  3    **Q**    Did you get a report from them after they went through

09:14:02  4    it so that you could testify to what they found to the jury?

09:14:04  5    **A**    No.

09:14:05  6    **Q**    You just had them look at those that were filled and

09:14:14  7    give you a verbal report?

09:14:18  8    **A**    Part of the field leader's responsibility is to

09:14:22  9    escalate concerns that they have, and that is the process in

09:14:26  10   the field.  So we do rely on the eyes and ears of our field

09:14:29  11   leaders to let us know.

09:14:32  12       And, no, I did not get a report back up to my office.

09:14:36  13   **Q**    Okay.  But I'm not sure that I'm hearing you

09:14:41  14   correctly.

09:14:41  15       I'm asking you in terms of this case, you went and got

09:14:48  16   this box of refusals to fill; is that right?

09:14:52  17   **A**    We got copies of the refusal to fill from those

09:14:56  18   stores, yes.

09:14:56  19   **Q**    Okay.  By "we" was it you or was it someone else?

09:15:02  20   **A**    It was requested -- I mean, I saw the box when I came

09:15:05  21   here for the prep, so someone else.

09:15:08  22   **Q**    So this was done by the legal team, as far as you

09:15:12  23   know, not by you?

09:15:12  24   **A**    Not by me personally, no.

09:15:14  25   **Q**    Okay.  And my question to you was, in getting ready

**Polster (Cross by Lanier)** 3325

| | | |
|---|---|---|
| 09:15:17 | 1 | for this, in as you called it prep, did you have someone |
| 09:15:23 | 2 | look at the prescriptions that were filled and dispensed and |
| 09:15:29 | 3 | examine those sheets to see if they should have been? |
| 09:15:31 | 4 | **A**    No. |
| 09:15:32 | 5 | **Q**    Thank you. |
| 09:15:34 | 6 |      And so as we look through this box of documents -- and |
| 09:15:41 | 7 | I don't know how it was marked, so I'm going to pull out and |
| 09:15:44 | 8 | mark one of the documents as Plaintiffs' Exhibit 22946.  And |
| 09:15:52 | 9 | I don't know how you could best identify it, so I'm just |
| 09:15:57 | 10 | going to put it up here on the screen. |
| 09:15:59 | 11 |      22946 is one of these sheets that you've got.  And |
| 09:16:06 | 12 | it's one where there is a refusal to fill that's listed. |
| 09:16:21 | 13 | But if we look at each page on this, we've got the front |
| 09:16:25 | 14 | page.  Walgreens has got a number on it, a Bates stamp |
| 09:16:29 | 15 | number. |
| 09:16:30 | 16 |      For the record, we'll identify is as MDL01139001. |
| 09:16:37 | 17 | It's the document I've marked Plaintiffs' Exhibit 22946. |
| 09:16:43 | 18 |      Do you see that? |
| 09:16:44 | 19 | **A**    I do. |
| 09:16:45 | 20 | **Q**    And the front page has got a bunch of redacted |
| 09:16:47 | 21 | information.  I assume this is a screen grab of the screen. |
| 09:16:52 | 22 | **A**    Of our computer system, yes. |
| 09:16:54 | 23 |           MS. SWIFT:  I apologize for interrupting. |
| 09:16:55 | 24 |      Do you have a copy?  Is there a copy for us? |
| 09:17:00 | 25 |           MR. LANIER:  The copy -- this is what you gave |

**Polster (Cross by Lanier)**          3326

09:17:02  1    me yesterday, so I'm assuming you have it.

09:17:06  2              MS. SWIFT:  We can pull it out.  I was just

09:17:07  3    wondering if you had it.

09:17:09  4    BY MR. LANIER:

09:17:09  5    **Q**    It's got a second page with a screen; is that correct?

09:17:13  6    **A**    Yes.

09:17:13  7    **Q**    And then it's got a third page.  This is the OARRS

09:17:17  8    report, isn't it?

09:17:18  9    **A**    Correct.

09:17:19  10   **Q**    And so we can look at this and we can see Trumbull

09:17:26  11   Pharmacy filling four prescriptions, we can see Discount

09:17:30  12   Drug Mart, back to Trumbull, we can see Walgreens filling

09:17:33  13   three, we've got Rite Aid, we've got more Walgreens,

09:17:38  14   Discount Drug Mart, more Walgreens, Discount Drug Mart, more

09:17:42  15   Walgreens.

09:17:43  16       And we can walk through and see all of the different

09:17:46  17   pharmacies that have filled for this person already,

09:17:50  18   correct?

09:17:52  19   **A**    Yes.

09:17:53  20   **Q**    And you'll see repeatedly that Walgreens, four

09:17:58  21   different Walgreens stores have filled --

09:18:07  22              MR. LANIER:  What?  Oh, thank you, Juan.

09:18:14  23   Sorry.

09:18:15  24   **Q**    You'll see the synopsis page that you've got four

09:18:18  25   different Walgreens stores that had a number of

**Polster (Cross by Lanier)**                      3327

09:18:22   1   prescriptions filled, right?

09:18:23   2   **A**    Yes, there were prescriptions filled by some Walgreens

09:18:26   3   stores.

09:18:26   4   **Q**    And maybe one Walgreens store's refused to fill since

09:18:33   5   this was in the refusal to fill box, right?

09:18:39   6   **A**    Yes.

09:18:39   7   **Q**    Do you know when that Walgreens refuse to fill when it

09:18:48   8   just gives the prescription back to the person?

09:18:49   9   **A**    There should be a date on the -- either the checklist,

09:18:52   10  there's a date on the OARRS report, which was 3/19/09.

09:18:58   11         See that top right there?

09:19:03   12  **Q**    3/19/09, where I've marked it.  Highlighted it.

09:19:10   13  Right?

09:19:10   14         Do you see that?

09:19:10   15  **A**    I do.

09:19:11   16  **Q**    Okay.  And then we can go, and it looks like 3/19/09

09:19:18   17  you've got those three pages.  And then there's another

09:19:22   18  OARRS run-out.

09:19:24   19         Do you see that as well?

09:19:25   20  **A**    Yes.

09:19:25   21  **Q**    And this is a four-page OARRS run-out?

09:19:29   22  **A**    Yes.

09:19:29   23  **Q**    So this one's got a mixture of stores, including CVS

09:19:34   24  stores, right?

09:19:36   25  **A**    Yes.

**Polster (Cross by Lanier)**

09:19:36   1   **Q**    Now, my question to you then, ma'am, is -- we've got

09:19:45   2   those stores listed here.

09:19:46   3        My question to you is, after Walgreens refuses to fill

09:19:53   4   it this one time, what does Walgreens do with the

09:19:58   5   prescription?

09:19:58   6   **A**    So if the prescription is refused to fill, we keep a

09:20:05   7   copy of it.  It's refused for all Walgreens, so the

09:20:08   8   pharmacist is determining that that specific prescription at

09:20:14   9   that point in time is not -- doesn't pass Walgreens' good

09:20:19   10   faith dispensing policy, and therefore it's given back to

09:20:22   11   the patient and it is documented in our computer system that

09:20:26   12   that prescription on that day was refused.

09:20:29   13   **Q**    Okay.  And then what happens to the prescription?

09:20:32   14   **A**    The patient takes it.

09:20:35   15   **Q**    So you give it back to the patient?

09:20:36   16   **A**    We do.

09:20:37   17   **Q**    And your testimony is today that other Walgreens

09:20:44   18   stores would then refuse to fill the same one?

09:20:48   19   **A**    That is the way the policy is written, yes.

09:20:50   20   **Q**    In 2009?

09:20:53   21   **A**    I don't know the answer to that, no, because my policy

09:20:55   22   was -- started at the end of 2012.

09:20:57   23   **Q**    So this is 2009?

09:21:01   24   **A**    Correct.

09:21:01   25   **Q**    So it's possible that that prescription was taken to

**Polster (Cross by Lanier)**

09:21:04  1   another Walgreens store and filled then?

09:21:06  2   **A**     It is possible.

09:21:07  3   **Q**     That's a problem, isn't it?

09:21:13  4   **A**     The pharmacists -- their responsibility is to take

09:21:16  5   that prescription on each merit.  When we put that policy in

09:21:21  6   place, the point of the policy was to create consistency and

09:21:26  7   not have the pharmacists go through the work if one

09:21:29  8   pharmacist already chose to refuse it.

09:21:31  9   **Q**     But I'm looking at this.  How does another -- why was

09:21:37  10  this refused?

09:21:38  11  **A**     I don't know the information to that.

09:21:41  12  **Q**     Well, when you testified that these were refused for

09:21:44  13  proper reasons, there's nothing in here that even remotely

09:21:49  14  tells anyone why it's refused, is there?

09:21:52  15             MS. SWIFT:  Objection.  Mischaracterizes.

09:21:53  16             THE COURT:  Overruled.

09:21:55  17  **A**     I don't know why it's -- I don't know if that

09:21:57  18  information was redacted.  I don't know the reason.

09:21:59  19  **Q**     Well, I mean, look what was redacted.

09:22:03  20         The name.  You've got to figure that's probably not

09:22:07  21  the reason because y'all were filling a bunch of those with

09:22:10  22  the fellow having the same name, right, or lady?

09:22:13  23             MS. SWIFT:  Objection.

09:22:13  24             THE COURT:  Overruled.

09:22:17  25  **A**     Right.

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 09:22:17 | 1 | **Q**    I mean, this whole "Redacted-confidential PHI," that |
| 09:22:23 | 2 | means personal health information, right? |
| 09:22:24 | 3 | **A**    Correct. |
| 09:22:25 | 4 | **Q**    Primary phone number, birthday, address, and ZIP code. |
| 09:22:29 | 5 |          Now, y'all kept all of that data, right? |
| 09:22:33 | 6 | **A**    Yes. |
| 09:22:33 | 7 | **Q**    You just redacted it for this sheet to come into |
| 09:22:37 | 8 | court, fair? |
| 09:22:37 | 9 | **A**    Fair. |
| 09:22:38 | 10 | **Q**    And then the third-party plan, that's insurance |
| 09:22:44 | 11 | information.  That wouldn't be a reason to reject, would it? |
| 09:22:46 | 12 | **A**    It would depend if there was a third-party reject when |
| 09:22:49 | 13 | they were trying to process it. |
| 09:22:50 | 14 | **Q**    Good point.  So maybe the insurance just didn't pay |
| 09:22:53 | 15 | this one time, and so y'all rejected it for that reason? |
| 09:22:56 | 16 | **A**    Or they rejected for another reason, not payment. |
| 09:22:59 | 17 | **Q**    But, ma'am, I'm looking through here, and unless |
| 09:23:03 | 18 | you're telling me to look at another page, there's nothing |
| 09:23:05 | 19 | in here that's going to tell anyone why this was rejected, |
| 09:23:10 | 20 | is there? |
| 09:23:11 | 21 | **A**    But what might be a red flag to you may not be a red |
| 09:23:15 | 22 | flag to another pharmacist. |
| 09:23:18 | 23 | **Q**    That wasn't my question, ma'am.  Can you answer my |
| 09:23:20 | 24 | question, please? |
| 09:23:20 | 25 | **A**    There's nothing on here that I can see from these |

**Polster (Cross by Lanier)** 3331

09:23:23  1   papers that will tell you why this prescription was refused.

09:23:25  2   **Q**     And one thing we do know is Walgreens sure did fill a

09:23:30  3   lot of prescriptions for this person over the years, right?

09:23:33  4   **A**     If you look at the dates, they were filled on a

09:23:36  5   monthly cadence, and there were multiple prescriptions

09:23:40  6   filled.

09:23:40  7   **Q**     Now, in regards to this, without nitpicking each

09:23:54  8   prescription -- which, by the way, did you really look at

09:23:58  9   these carefully before you said they're filled on a monthly

09:24:02  10  cadence?

09:24:02  11  **A**     I was glancing through them at a high level, yes.

09:24:06  12  **Q**     Okay.  So, like, Lorazepam, you see that?

09:24:12  13  **A**     Yes.

09:24:12  14  **Q**     Two 30-day doses filled 10 days apart?

09:24:18  15  **A**     I see that.

09:24:19  16  **Q**     One at Walgreens, one at Rite Aid?

09:24:20  17  **A**     Yes.

09:24:21  18  **Q**     And yet not only are those two 30-day doses filled 10

09:24:26  19  days apart, but just 19 -- or nine days later another one

09:24:30  20  gets filled at another Walgreens for 30 more days?

09:24:33  21  **A**     It was the same Walgreens, but yes.

09:24:35  22  **Q**     The same Walgreens filled two 30-day prescriptions

09:24:39  23  within nine days of each other?

09:24:40  24  **A**     It is possible.  They would be having a conversation

09:24:44  25  with the patient and determining whether or not there was a

**Polster (Cross by Lanier)**                    3332

09:24:47  1    legitimate reason as to why they needed it.

09:24:49  2    **Q**    It's possible.  It's also possible they were messing

09:24:51  3    up, isn't it?

09:24:58  4    **A**    I was not the pharmacist there looking at it.  I

09:25:00  5    cannot answer that question.

09:25:01  6    **Q**    Well, you answered the earlier one and volunteered it

09:25:04  7    is possible that the pharmacist was talking to them.

09:25:05  8         You can't answer that either.  You were any the

09:25:07  9    pharmacist filling it, right?

09:25:08  10   **A**    I wasn't, correct.

09:25:09  11   **Q**    All right.  So we'll leave guessing where it belongs,

09:25:13  12   but let's look at what we don't have to guess at.

09:25:15  13        We don't have to guess that you got within 20 days of

09:25:22  14   each other at Walgreens and a Rite Aid you've got 90 days of

09:25:30  15   prescriptions filled.  Right?

09:25:32  16   **A**    Yes.

09:25:32  17   **Q**    If we were to look through this box -- let's do it

09:25:51  18   this way.

09:25:51  19        Have you bothered to check to see even some of the

09:26:02  20   prescriptions that were dispensed?

09:26:07  21   **A**    I have not looked at all the prescriptions that were

09:26:10  22   filled.  Maybe one or two, but I have not looked at them

09:26:13  23   all.

09:26:13  24   **Q**    You know Carmen Catizone, right?

09:26:15  25   **A**    I do.  I know who he is.

**Polster (Cross by Lanier)**                                          3333

09:26:18   1    **Q**    Did you ever read his expert report in this case?

09:26:21   2    **A**    Not in this case, no.

09:26:22   3    **Q**    He had a chance to look at all the prescriptions that

09:26:30   4    had red flags, that were selected out of a group, so it was

09:26:35   5    a model group, about 2,000 Walgreens prescriptions that were

09:26:39   6    randomly selected.

09:26:42   7          Did you know about that?

09:26:43   8    **A**    No.

09:26:43   9    **Q**    And he said it looked like 90 percent of those

09:26:47   10   prescriptions did not have adequate documentation.

09:26:49   11         Did you do any such check to see if your people were

09:26:53   12   adequately documenting these?

09:26:54   13   **A**    I did not check those prescriptions that he looked at,

09:26:56   14   no.

09:27:00   15   **Q**    So, for example, Plaintiffs' Exhibit 23678 --

09:27:07   16              MR. LANIER:  If we could pass that out,

09:27:09   17   please, 23678.

09:27:25   18   **Q**    While they are corralling 23678, oxycodone 10

09:27:36   19   milligram immediate release tablets, right?  You know what

09:27:41   20   those are, right?

09:27:42   21   **A**    I do.

09:27:42   22   **Q**    They are a controlled substance, aren't they?

09:27:44   23   **A**    They are.

09:27:45   24   **Q**    They are part of the targeted drugs, aren't they?

09:27:47   25   **A**    Yes.

**Polster (Cross by Lanier)**                                    3334

| | | |
|---|---|---|
| 09:27:48 | 1 | **Q**    And in -- all right, let's see if I can get a copy of |
| 09:28:07 | 2 | 23678 given to you and counsel. |
| 09:28:29 | 3 |            MR. LANIER:  23678, please, Rachel -- |
| 09:28:35 | 4 | Ms. Lanier. |
| 09:28:36 | 5 |      Sorry, Judge. |
| 09:28:48 | 6 | **Q**    Ma'am, we're going to keep moving in the interests of |
| 09:28:50 | 7 | time, and I'm going to come back to that, so put a pin in |
| 09:28:53 | 8 | it, okay? |
| 09:28:54 | 9 |      What I'll do instead is the jury heard about a |
| 09:29:18 | 10 | gentleman named Douglas Winland. |
| 09:29:24 | 11 |            MS. SWIFT:  Your Honor, can we go to side bar, |
| 09:29:26 | 12 | please? |
| 09:29:27 | 13 |            THE COURT:  Okay. |
| 09:29:28 | 14 |            (At side bar at 9:29 a.m.) |
| 09:29:45 | 15 |            MS. SWIFT:  Your Honor, I assume where |
| 09:29:47 | 16 | Mr. Lanier is going as to try to ask Ms. Polster about the |
| 09:29:51 | 17 | OARRS report in the Winland investigation file.  She's never |
| 09:29:54 | 18 | seen it, first. |
| 09:29:55 | 19 |      Second, when this came up in her direct, as soon as |
| 09:30:01 | 20 | Mr. Lanier asked for a side bar on the original OARRS |
| 09:30:05 | 21 | report, you gave me a choice whether I could keep going with |
| 09:30:09 | 22 | it and ask questions about it or not, and I chose not to. |
| 09:30:12 | 23 | It is not appropriate for him to get into with her an OARRS |
| 09:30:16 | 24 | report and an investigation file from law enforcement that |
| 09:30:18 | 25 | she has never seen and no Walgreens person has ever seen. |

**Polster (Cross by Lanier)** 3335

09:30:21  1          MR. LANIER:  Your Honor, hanging out there

09:30:24  2    right now is a box of refusals to fill that this witness

09:30:30  3    testified she had put together for this case, which --

09:30:34  4          MS. SWIFT:  She did not testify to that.

09:30:35  5          THE COURT:  Well, first of all, I don't know

09:30:37  6    what these are going to be offered or not.  I mean,

09:30:42  7    Ms. Swift, are you planning to offer this box?  I mean, as

09:30:47  8    evidence?

09:30:47  9          MS. SWIFT:  I think it's going to depend on

09:30:49  10   how the rest of the exam goes, Your Honor.

09:30:50  11          THE COURT:  I don't think they can come in

09:30:51  12   through her.

09:30:53  13          MS. SWIFT:  I'm sorry, I didn't hear what you

09:30:54  14   said, Judge.

09:30:54  15          THE COURT:  I don't think you can admit them

09:30:55  16   through her unless she's -- I mean -- well, all right,

09:31:04  17   Mr. Lanier, what questions are you going to ask this witness

09:31:05  18   about Winland?

09:31:07  19          MR. LANIER:  So my argument in this, Your

09:31:10  20   Honor --

09:31:10  21          THE COURT:  No, I just want to know what

09:31:11  22   questions you plan to ask her.

09:31:13  23          MR. LANIER:  Okay.  The question that I would

09:31:14  24   say is, first, you did not go through all of the ones that

09:31:19  25   were filled.  You did not look --

09:31:22    1                   THE COURT:  You already said that.

09:31:24    2                   MS. SWIFT:  You already said that.

09:31:24    3                   MR. LANIER:  -- at Doug Winland.  We have

09:31:30    4    heard about him.  If you had looked at his OARRS report, you

09:31:33    5    would have seen the following, and do you think that that

09:31:36    6    was good faith dispensing, which is what she's testified all

09:31:39    7    of these counties have done and all of these stores have

09:31:42    8    done.

09:31:43    9                   MS. SWIFT:  Your Honor, if I'm not mistaken,

09:31:46   10    the Winland OARRS report is from 2008.

09:31:50   11                   MR. LANIER:  2009 and 2010, the same date as

09:31:55   12    the one that I've just pulled out of her box.

09:31:59   13                   MS. SWIFT:  Regardless, it's a law enforcement

09:32:01   14    OARRS report in a law enforcement investigation.

09:32:04   15                   MR. LANIER:  There's no difference.

09:32:05   16                   MS. SWIFT:  There is a very large difference

09:32:08   17    in what law enforcement has access to.

09:32:09   18                   MR. LANIER:  No.

09:32:10   19                   THE COURT:  Everyone who looks at OARRS has

09:32:12   20    access to what prescriptions were filled.

09:32:14   21                   MS. SWIFT:  That's not accurate, Your Honor.

09:32:16   22                   THE COURT:  Well, that's the testimony.

09:32:18   23                   MR. LANIER:  That's the testimony and that's

09:32:19   24    right.

09:32:19   25                   MS. SWIFT:  The pharmacist has access to what

**Polster (Cross by Lanier)** 3337

09:32:21  1   the -- what is there for the patient that is in front of

09:32:24  2   them.

09:32:25  3              THE COURT:  Well, that's the only read for one

09:32:30  4   patient.

09:32:30  5              MR. LANIER:  Yeah.  It's the exact same OARRS

09:32:32  6   report, Your Honor.  It looks the exact same one that was in

09:32:34  7   the box that I've just looked at, it's the same time period,

09:32:37  8   the same year.  And it shows a different story than the

09:32:42  9   witness has sworn to under oath.

09:32:44  10             THE COURT:  Well, she --

09:32:47  11             MS. SWIFT:  Your Honor, again, I withdrew the

09:32:49  12  questions about the OARRS report because --

09:32:51  13             THE COURT:  Mr. Lanier, you can ask her if she

09:32:55  14  knows anything about Winland.  If she does, you can keep

09:32:57  15  going.  But we're not just going to -- if she says she knows

09:33:01  16  nothing about it and hasn't looked at it, then that's the

09:33:03  17  end of it.  You've established your point, all right?  If

09:33:08  18  she knows something about it, you can certainly question her

09:33:10  19  about it.  If she knows nothing about it, you've established

09:33:13  20  your point that she didn't even look at Winland.

09:33:16  21             MR. LANIER:  Okay.

09:33:23  22             (In open court at 9:33 a.m.)

09:33:39  23             MR. LANIER:  May I continue, Your Honor?

09:33:42  24             THE COURT:  Yes.

09:33:43  25             MR. LANIER:  Thank you.

**Polster  (Cross by Lanier)**                                    3338

09:33:43   1   BY MR. LANIER:

09:33:44   2   **Q**     Ma'am?

09:33:45   3   **A**     Yes.

09:33:45   4   **Q**     In your preparation for this case, when you looked at

09:33:51   5   the refusals to fill box, did anybody at any time at all

09:33:57   6   talk to you about Doug Winland and the fills that were done

09:34:03   7   by Walgreens on his OARRS report?

09:34:07   8   **A**     No.

09:34:07   9   **Q**     You don't know anything about that at all?

09:34:10  10   **A**     No.

09:34:11  11   **Q**     Nobody -- okay.  Nobody brought it to your attention

09:34:16  12   even without using his name about someone in 2009?

09:34:20  13              MS. SWIFT:  Objection, Your Honor.

09:34:23  14              THE COURT:  Overruled.

09:34:23  15   **A**     No.

09:34:24  16   **Q**     And I think we're ready to pass out -- almost ready to

09:34:33  17   pass out the document.

09:34:43  18        While I'm getting that ready to go, let's look at some

09:34:48  19   of the juror questions that we didn't get a chance to get to

09:34:54  20   yesterday.  Okay?

09:34:54  21   **A**     Okay.

09:34:54  22   **Q**     Here's one.

09:34:58  23        "Are any of the stores involved in this case part of

09:35:02  24   the 2,407 stores audited for completion of good faith

09:35:10  25   dispensing checklist?"

**Polster (Cross by Lanier)**                    3339

09:35:11    1         Are you able to answer that question?

09:35:13    2    **A**    I do not know.  I do know that we had our loss

09:35:20    3    prevention managers in every area of the country go into

09:35:25    4    random stores, but I do not know which stores that were

09:35:30    5    done.

09:35:31    6    **Q**    The results were on an Excel spreadsheet, correct?

09:35:37    7    **A**    You know, I don't know.  I saw the executive summary,

09:35:41    8    but I didn't see the raw data.

09:35:42    9    **Q**    I'll show you the raw data marked as Plaintiffs'

09:35:47   10    Exhibit 22945, pulling out the stores that were in this

09:35:53   11    region.

09:35:53   12         Does this look consistent with what you think that raw

09:35:59   13    data would look like?

09:36:00   14    **A**    I don't know.  I can't read that.

09:36:01   15    **Q**    Okay.  So I couldn't either so we can blow it up?

09:36:07   16              MS. SWIFT:  Objection.  Do you have a copy for

09:36:09   17    the witness so she can look at it?

09:36:11   18              THE WITNESS:  Here it is.

09:36:13   19              MS. SWIFT:  Thank you.

09:36:19   20    **Q**    Do you see the four stores that I've isolated out in

09:36:22   21    the spreadsheet?

09:36:22   22    **A**    Yes, I do.

09:36:23   23              MS. SWIFT:  Objection.  What is this document?

09:36:27   24              MR. LANIER:  This is the data -- Your Honor,

09:36:31   25    this is the Excel data of the BCI internal audit, isolating

**Polster (Cross by Lanier)**

09:36:41  1    out for the four stores that were looked at in this region.

09:36:46  2            THE COURT:  Well, why don't you ask her

09:36:48  3    recognizes those store numbers.

09:36:52  4    **Q**    Do you recognize these store numbers, ma'am?

09:36:55  5    **A**    Not off the top of my head I do not.

09:36:56  6            MS. SWIFT:  Your Honor, I don't believe this

09:36:58  7    document has been disclosed.  It doesn't have a Bates number

09:37:02  8    on it.  I don't know what it is.

09:37:03  9            THE COURT:  I don't know either.

09:37:04  10           MR. LANIER:  The Bates number is -- this is a

09:37:09  11   copy from the production that it came from.  It's an entire

09:37:11  12   database Excel spreadsheet, Your Honor, that's really long.

09:37:16  13           THE COURT:  Go on the headphones.

09:37:19  14           (At side bar at 9:37 a.m.)

09:37:31  15           THE COURT:  All right.  Mr. Lanier, I don't

09:37:33  16   have any doubt that this document is what you say it is, but

09:37:37  17   if the witness has no clue, I don't think you can just keep

09:37:41  18   examining her on it.  If she -- if you can give her

09:37:44  19   something and she can identify the store number as store

09:37:49  20   numbers that are involved in this case, fine, but otherwise

09:37:52  21   it's just your testimony.  I don't think it's appropriate.

09:37:55  22           MS. SWIFT:  Your Honor, my concern is that

09:37:56  23   this is something that the plaintiffs' lawyers created.

09:37:59  24   There's a column that says CT 3 store.

09:38:02  25           THE COURT:  That's okay -- it's okay who

**Polster (Cross by Lanier)**

09:38:08  1    created it, but unless the witness from her knowledge can

09:38:11  2    say that it's accurate, authentic, what it is, I'm not -- I

09:38:14  3    don't think it's fair examination.

09:38:15  4                    MR. LANIER:  I understand, Your Honor.

09:38:16  5                    THE COURT:  If she's able to do it by looking

09:38:17  6    at other things, that's fine.

09:38:19  7                    MR. LANIER:  My only concern, Your Honor, is I

09:38:22  8    don't want, then, Ms. Swift to get up and start asking

09:38:25  9    questions about this juror question if this witness is not

09:38:29  10   able to answer them when I ask them.

09:38:31  11                   MS. SWIFT:  Your Honor, if Mr. Lanier would

09:38:32  12   just ask the juror questions and then move on, we wouldn't

09:38:38  13   have a problem with that.

09:38:38  14                   MR. LANIER:  I started with that.

09:38:39  15                   MS. SWIFT:  That's not what he's doing now.

09:38:41  16                   MR. LANIER:  No, my first question was very

09:38:43  17   simply, did you -- you know, do you know the answer to this

09:38:48  18   juror question, I read it.  And she said, I don't know.

09:38:51  19                   MS. SWIFT:  And then that should have been it.

09:38:52  20   If you're just going to ask the juror questions and move on,

09:38:55  21   we don't have a problem with that.  This is something that

09:38:57  22   was never disclosed.  It looks like the lawyers created it.

09:38:59  23   I don't know what this is.

09:39:00  24                   MR. LANIER:  No, it's all part of

09:39:02  25   plaintiffs --

**Polster (Cross by Lanier)** 3342

09:39:02  1    THE COURT:  Hold it.  All right.  He asked the

09:39:03  2  question, that's fine, but he's entitled to ask other

09:39:05  3  questions, Ms. Swift, and he's entitled to take data and

09:39:12  4  create exhibits and it's okay to use them.  But the witness

09:39:15  5  has to be able to say, yeah, I recognize this, I know

09:39:18  6  something about it, this is accurate.  Otherwise it's not

09:39:23  7  proper.

09:39:23  8    MR. LANIER:  Got it.

09:39:23  9    THE COURT:  It's just not proper because then

09:39:25  10  it's Mr. Lanier testifying.

09:39:26  11    MR. LANIER:  I understand, Your Honor, and

09:39:27  12  I'll handle it accordingly.

09:39:28  13    THE COURT:  All right.  Thank you.

09:39:30  14    (In open court at 9:39 a.m.)

09:39:44  15  BY MR. LANIER:

09:39:44  16  **Q**    So, ma'am, do you recognize this spreadsheet as a fair

09:39:54  17  rendering of the Excel spreadsheet that would have been

09:39:59  18  generated as part of the data field, looking at the stores

09:40:05  19  to see what and where their numbers lie on the various

09:40:08  20  questions?

09:40:10  21    Do you recognize it?

09:40:11  22  **A**    I've never seen one of these spreadsheets before.

09:40:14  23  I've never seen the raw data.

09:40:16  24  **Q**    Okay.  So when you were testifying yesterday about

09:40:19  25  this and how you felt good about the data, nobody even

**Polster (Cross by Lanier)** 3343

| | | |
|---|---|---|
| 09:40:24 | 1 | showed you the data? |
| 09:40:26 | 2 | **A**    I did not see the individual data.  I saw the |
| 09:40:30 | 3 | aggregate data for the -- through the executive summary. |
| 09:40:33 | 4 | **Q**    So you didn't bother to look to see if the four stores |
| 09:40:36 | 5 | that were in these two counties, what their data was? |
| 09:40:40 | 6 | **A**    I did not. |
| 09:40:40 | 7 | **Q**    Let's -- I think Ms. Lanier tells me we are ready. |
| 09:40:58 | 8 |           MR. LANIER:  Plaintiffs' 23678, if that could |
| 09:41:01 | 9 | be passed out, please. |
| 09:41:06 | 10 | **Q**    Do you have 23678 in front of you? |
| 09:41:09 | 11 | **A**    I do. |
| 09:41:09 | 12 | **Q**    This is another Walgreens hard copy report. |
| 09:41:14 | 13 |           You're familiar with these, right? |
| 09:41:15 | 14 | **A**    Yes. |
| 09:41:15 | 15 | **Q**    This is one that has the good faith dispensing |
| 09:41:22 | 16 | checklist attached, correct? |
| 09:41:24 | 17 | **A**    Yes. |
| 09:41:24 | 18 | **Q**    Now, "valid Government ID, yes," right, or "known to |
| 09:41:38 | 19 | pharmacy staff," correct? |
| 09:41:39 | 20 | **A**    Yes. |
| 09:41:39 | 21 | **Q**    "No prior good faith refusal for this exact |
| 09:41:45 | 22 | prescription in patient comments.  If so, prescription must |
| 09:41:52 | 23 | not be dispensed." |
| 09:41:53 | 24 |           Look at the answer on that.  Says "no," doesn't it? |
| 09:42:00 | 25 | **A**    Yes. |

**Polster (Cross by Lanier)** 3344

09:42:00  1    So let me clarify what this exact prescription is.

09:42:03  2  It's the prescription written for that specific date.  So if

09:42:08  3  a patient comes into a Walgreens Pharmacy and fills a

09:42:12  4  prescription for today's date and it's refused, the

09:42:16  5  comments, per the policy, put into the patient's profile is

09:42:20  6  prescription for whatever the controlled substance is, on

09:42:26  7  today's date was refused by that pharmacist.

09:42:28  8    If they take that specific prescription into another

09:42:31  9  Walgreens, that prescription should not be filled.

09:42:36  10  **Q**    Yeah.  So "Party [sic] does not appear intoxicated or

09:42:42  11  under the influence of illicit drugs."

09:42:45  12    That should be checked yes if you're going to dispense

09:42:48  13  it, shouldn't it?

09:42:49  14  **A**    No.  It's asking for the pharmacist's interpretation

09:42:53  15  of the patient taking the medication.  If the patient is not

09:42:59  16  coming in and intoxicated and all of that, that does not --

09:43:05  17  I mean, a patient who is severely under the influence is

09:43:10  18  going to behave in a different way than a chronic pain

09:43:15  19  patient who has taken that medication before.

09:43:18  20  **Q**    Ma'am, all I'm saying is is according to your

09:43:20  21  checklist, this is a patient that evidently does appear

09:43:24  22  intoxicated or under the influence of illicit drugs, true?

09:43:30  23  **A**    No, you don't know that and neither do I.

09:43:32  24  **Q**    Well, that's what they checked.  They checked no,

09:43:36  25  didn't they?

**Polster (Cross by Lanier)**                                    3345

09:43:36  1   **A**     "Patient does not appear intoxicated or under the

09:43:41  2   influence of illicit drugs."

09:43:43  3   **Q**     Right.  They didn't say yes, that's true, patient does

09:43:45  4   not appear.  They said, no, that's not true.

09:43:48  5         Do you see that?

09:43:48  6   **A**     I see that.

09:43:49  7   **Q**     I mean, you've looked at hundreds, thousands of these

09:43:53  8   forms.  You know that that "no" there means they appear

09:43:57  9   intoxicated or under the influence of drugs, doesn't it?

09:44:02  10  **A**     That's what she marked, yes.

09:44:04  11  **Q**     Yes.  And then she dispenses the prescription anyway,

09:44:07  12  right?

09:44:07  13  **A**     Yes.

09:44:08  14  **Q**     Okay.  So you've got a form here, and the form says,

09:44:17  15  "No on a prior good faith refusal for this exact

09:44:21  16  prescription," and it says no for "appears intoxicated," and

09:44:28  17  it gets dispensed anyway, doesn't it?

09:44:30  18  **A**     I see that.

09:44:31  19  **Q**     Both of those before it's dispensed should be checked

09:44:36  20  "yes," shouldn't they?

09:44:38  21  **A**     Correct, I see what you're saying, yes.

09:44:39  22  **Q**     Yeah.  What I'm saying is is this one went out and it

09:44:44  23  sure shouldn't have based on this sheet at least, right?

09:44:45  24  **A**     Well, we don't know that, but, yes, based on this

09:44:47  25  sheet the way they marked it --

**Polster (Cross by Lanier)**                                    3346

09:44:49  1    **Q**    Yeah, it looks like this was -- this exact

09:44:51  2    prescription was already refused, and the patient appears

09:44:55  3    intoxicated and under the influence of illicit drugs, and

09:45:00  4    yet it goes out, right?

09:45:00  5    **A**    It was dispensed.

09:45:02  6    **Q**    And so we're clear, we're talking about this is a

09:45:07  7    local prescription in this county -- these counties in this

09:45:10  8    case, right?

09:45:11  9    **A**    That's what you're telling me, yes.

09:45:12  10   **Q**    Well, I'm thinking that's what I'm told.

09:45:16  11          The address for the plaintiff is Girard, Ohio.

09:45:21  12          Do you see that?

09:45:22  13   **A**    That's the prescriber, I think.

09:45:26  14   **Q**    Oh, you're right, the address of the prescriber is

09:45:32  15   Girard, Ohio, correct?

09:45:35  16   **A**    Yes.

09:45:35  17   **Q**    We don't have the specific data on the location of the

09:45:38  18   plaintiffs, right?  I mean patients.  Right?

09:45:45  19   **A**    No, you don't.  It's been redacted.

09:45:46  20   **Q**    But, look, we do have the Walgreens store?

09:45:48  21   **A**    Yes.

09:45:49  22   **Q**    So it's one in -- I believe that's Trumbull County,

09:45:53  23   isn't it?

09:45:53  24   **A**    You would have to tell me.

09:46:00  25   **Q**    So if we start looking not at the four and a half per

**Polster (Cross by Lanier)**                                    3347

09:46:03  1   year that were refused to fill but instead looking at the

09:46:06  2   prescriptions that were filled, we might get better

09:46:10  3   information of whether the company's pharmacists were

09:46:14  4   dispensing things improperly, fair?

09:46:17  5   **A**    I don't agree with you.  And the reason why I don't

09:46:22  6   agree with you is because the pharmacist on duty has to take

09:46:25  7   into the situation what's happening with the patient, what's

09:46:29  8   happening at that point in time with the patient,

09:46:32  9   understanding what their medical history is, understanding

09:46:35  10  why they're a chronic pain patient.  It's very gray.

09:46:40  11       I cannot answer that question yes or no.

09:46:41  12  **Q**    Well, but, ma'am, the whole reason you've got this

09:46:44  13  form is to document --

09:46:48  14  **A**    One of the reasons why I have that form is to create

09:46:51  15  consistency.

09:46:52  16       Can I tell you what was happening in that particular

09:46:54  17  instance?  Can I tell you whether or not that pharmacist

09:46:57  18  made a mistake?  I don't know.  Maybe they did not document

09:47:02  19  it correctly.  Human error happens all the time.

09:47:07  20  **Q**    So are you saying that they accidentally put "no"?

09:47:15  21  **A**    I'm saying it is possible.  I don't know.  I was not

09:47:16  22  there.

09:47:17  23  **Q**    But, ma'am, don't y'all train them?

09:47:22  24  **A**    We train our pharmacists, yes.

09:47:25  25  **Q**    And don't you trust them?

**Polster (Cross by Lanier)** 3348

| | | |
|---|---|---|
| 09:47:26 | 1 | **A**    Yes, we do. |
| 09:47:27 | 2 | **Q**    Don't you trust that this pharmacist was accurate? |
| 09:47:29 | 3 | **A**    Our pharmacists filled the prescription, and the |
| 09:47:33 | 4 | responsibility of filling the prescription is through her |
| 09:47:35 | 5 | corresponding responsibility. |
| 09:47:37 | 6 | **Q**    Please answer my question. |
| 09:47:39 | 7 | **A**    I trust our pharmacists, yes. |
| 09:47:40 | 8 | **Q**    Don't you trust that this pharmacist was accurate? |
| 09:47:44 | 9 | That was my question. |
| 09:47:44 | 10 | **A**    I trust that she used her good judgment when she |
| 09:47:48 | 11 | filled the prescription. |
| 09:47:49 | 12 | **Q**    And it may have been a he.  You don't know.  Y'all |
| 09:47:51 | 13 | have male pharmacists as well, right? |
| 09:47:54 | 14 | **A**    I don't know, I guess I thought that name said Karen, |
| 09:47:57 | 15 | but I don't know. |
| 09:47:59 | 16 | **Q**    May be. |
| 09:48:00 | 17 | **A**    I don't know. |
| 09:48:00 | 18 | **Q**    I don't know.  But how people -- yeah. |
| 09:48:06 | 19 |     Okay.  And again, you didn't go through and look at |
| 09:48:11 | 20 | such paperwork for these stores in these counties in this |
| 09:48:17 | 21 | case, true? |
| 09:48:18 | 22 | **A**    True. |
| 09:48:18 | 23 | **Q**    More juror questions, please. |
| 09:48:20 | 24 |     "If the area/district/store is not 100 percent in |
| 09:48:25 | 25 | following policy/procedure, what is an acceptable amount?" |

**Polster (Cross by Lanier)**

09:48:30  1   **A**     So, yeah, fair question.  So what would happen is is

09:48:35  2   the leader would go into the store, they would begin looking

09:48:38  3   through the files for compliance.  If they don't see

09:48:44  4   documentation that we're looking for per the policy, we

09:48:48  5   would -- they would begin with counseling the pharmacy

09:48:52  6   manager and the -- or the staff pharmacist and understanding

09:48:57  7   does everybody understand the policy, does everybody

09:49:00  8   understand what we're looking for.

09:49:02  9        Again, this is per policy, not legal requirement.  And

09:49:07  10  they would counsel to the policy and doing that.

09:49:12  11       The repercussions of not being compliant is it starts

09:49:17  12  with a verbal warning, then it goes to a written warning, it

09:49:21  13  goes to a final written warning, and it goes to termination.

09:49:25  14  And it depends on the situation.  If it's one specific

09:49:28  15  pharmacist or if it's pharmacy manager, if it's multiple

09:49:33  16  pharmacists, it would depend on the situation.

09:49:36  17  **Q**     Ma'am, I want to go back and press you a little bit on

09:49:38  18  the first question.

09:49:39  19       What is an acceptable amount?  I didn't hear your

09:49:41  20  answer.

09:49:41  21  **A**     I didn't answer that.  I can't answer an acceptable

09:49:46  22  amount until I understand the entire situation of what the

09:49:48  23  leader would need to be taking into account.

09:49:51  24  **Q**     Do you think someone caught this and did anything

09:49:54  25  about it?

09:49:55  1   **A**    I don't know the answer to that.

09:49:56  2   **Q**    "Prior to 2012, was the information available if the

09:50:06  3   patient has or had insurance?"

09:50:10  4   **A**    Yes.

09:50:12  5   **Q**    "How many prescriptions did you review from Lake and

09:50:16  6   Trumbull County?"

09:50:17  7   **A**    Boy, a handful of them.

09:50:19  8   **Q**    A handful, as in three, four, five?

09:50:26  9   **A**    Probably.  I looked through the box.  I did not look

09:50:32  10  through each one of them.

09:50:32  11  **Q**    And those are just the refusals to fill.  How many of

09:50:36  12  them that went out did you look at?

09:50:39  13  **A**    I don't know the answer to that.

09:50:40  14  **Q**    Well, I mean, more or less than five?

09:50:47  15  **A**    I really -- I truly do not know.

09:50:49  16  **Q**    I just showed you one.

09:50:51  17  **A**    You showed me one.

09:50:52  18  **Q**    I'll show you a bunch more in a minute if the Court

09:50:55  19  allows it.

09:50:55  20       But my question to you is, how many did you look at?

09:50:59  21  Did you look at any?  Let me ask that.

09:51:01  22  **A**    I did look at a few, yes, but I can't give you the

09:51:05  23  exact number and it's been a while.

09:51:06  24  **Q**    Can you tell if you looked at some from each store?

09:51:09  25  **A**    Not from each store, no.

**Polster (Cross by Lanier)** 3351

| | | |
|---|---|---|
| 09:51:11 | 1 | **Q**    Take back kiosks, you testified about those.  Do you |
| 09:51:17 | 2 | have them in the Lake and Trumbull County stores? |
| 09:51:20 | 3 | **A**    I'd have to check.  I don't know if I have any.  I'm |
| 09:51:23 | 4 | happy to look on that. |
| 09:51:24 | 5 | In terms of why or why not, we determined when we |
| 09:51:31 | 6 | first opened -- or when we first did the program, we tried |
| 09:51:34 | 7 | to put it in all of our 24-hour stores, and then we spread |
| 09:51:38 | 8 | them sporadically throughout the country.  And some stores |
| 09:51:44 | 9 | are not 24 hours and some stores that were 24 hours changed |
| 09:51:48 | 10 | 24 hours. |
| 09:51:49 | 11 | I would need to check on the Lake and Trumbull County. |
| 09:51:51 | 12 | **Q**    Next question.  "It seems as though there isn't a |
| 09:51:56 | 13 | standardized location where red flags" -- oh, I may have |
| 09:52:00 | 14 | asked this yesterday. |
| 09:52:01 | 15 | **A**    You did. |
| 09:52:01 | 16 | **Q**    You've been spared. |
| 09:52:08 | 17 | Now, I asked you yesterday two questions on this |
| 09:52:14 | 18 | sheet, but I did not ask you the bottom two questions, and I |
| 09:52:17 | 19 | didn't want to miss that. |
| 09:52:18 | 20 | So question number 3, "Is it required for refusal |
| 09:52:23 | 21 | comments to be entered in more than one field?  Or just the |
| 09:52:29 | 22 | target drug good faith dispensing comments?" |
| 09:52:33 | 23 | **A**    No, just one field.  They can do it in different |
| 09:52:36 | 24 | fields but just one field. |
| 09:52:38 | 25 | **Q**    All right.  So can do it in different, but one field |

**Polster (Cross by Lanier)**

09:52:42  1   is the designated field?

09:52:43  2   **A**     For the policy, yes, for that --

09:52:46  3   **Q**     And that's the designated field where you and I talked

09:52:48  4   about where you okayed deletions from prior prescriptions,

09:52:51  5   right?

09:52:51  6   **A**     Prior prescriptions, yes.

09:52:54  7   **Q**     "Are the hard copies in the refusal folder shared with

09:52:58  8   all Walgreens if the comment was deleted?"

09:53:02  9   **A**     No.  They are -- now, I do know that pharmacists do

09:53:06  10  speak to each other, both to the competition as well as to,

09:53:12  11  you know, Walgreens stores down the street.  I did it in

09:53:15  12  practice.  My field pharmacists did it in practice.  But

09:53:19  13  they are not posted anywhere or shared electronically, no.

09:53:24  14  **Q**     I am reminded of Mr. Joyce testifying on one script he

09:53:43  15  looked at from Dr. Veres where the question was did you

09:53:48  16  check with other pharmacies, and his reply was I didn't need

09:53:51  17  to.  I already know about Dr. Veres.

09:53:57  18      Do you train your pharmacists to always call other

09:54:02  19  pharmacists when they have a question?

09:54:04  20  **A**     The word "always" does not come into account, but it

09:54:09  21  is part of the practice of pharmacy.  They do sometimes

09:54:12  22  share information with their pharmacists, competition

09:54:19  23  friends across the street or with pharmacists at another

09:54:22  24  Walgreens.  It is a common practice that pharmacists do.

09:54:26  25  **Q**     So to be clear, though, you have no clue --

**Polster (Cross by Lanier)** 3353

09:54:30   1            MS. SWIFT:  Objection.  She wasn't finished

09:54:31   2    with her answer, I don't think.

09:54:32   3            MR. LANIER:  I'm sorry.  I thought she was.

09:54:34   4    **Q**    Go ahead, ma'am.  You said it's a common practice that

09:54:37   5    pharmacists do.

09:54:37   6    **A**    Right, in talking to their peers and talking to the

09:54:41   7    pharmacists across the street, the competition, about either

09:54:46   8    prescribers, prescribing patterns, patients, et cetera.

09:54:53   9    **Q**    And did you speak to the pharmacists in the stores in

09:54:55   10   these counties about their habits?

09:54:57   11   **A**    I did not.

09:54:58   12   **Q**    Do you know the pharmacists in these stores?

09:55:01   13   **A**    I do not.

09:55:02   14   **Q**    Do you know what their habit or practice is?

09:55:05   15   **A**    I do not.

09:55:06   16   **Q**    Do you know how frequently they do that?

09:55:09   17   **A**    No.

09:55:10   18   **Q**    Do you know how difficult they find it if they're

09:55:13   19   trying to get something done under 15 minutes if we go back

09:55:17   20   in time ten years?

09:55:23   21           MS. SWIFT:  Objection.  Could we have a side

09:55:29   22   bar, please, sir?

09:55:29   23           (At side bar at 9:55 a.m.)

09:55:39   24           MS. SWIFT:  Your Honor, I was preemptive.  My

09:55:43   25   objection was I thought Mr. Lanier was about to go into the

09:55:47    1    workload study that has been excluded from this case.  If

09:55:50    2    he's not going to do that, I just wanted to preemptively --

09:55:54    3                    MR. LANIER:  Well, I'm not going to do that.

09:55:55    4                    THE COURT:  Okay.

09:55:57    5                    MS. SWIFT:  Thank you.

09:56:04    6                    (In open court at 9:56 a.m.)

09:56:15    7    BY MR. LANIER:

09:56:16    8    **Q**    So, ma'am, I wanted to go back in time.  Let's go back

09:56:19    9    to 2009, 2010.  They're trying to get a prescription filled

09:56:26   10    in 15 minutes.  Not even the opiate prescription, another

09:56:29   11    one that comes in.  And they're taking time on the opiate

09:56:32   12    prescription to call or not call and do that kind of work.

09:56:42   13          Have you all done any kind of internal audit or study

09:56:45   14    to see how often the pharmacists call?

09:56:47   15    **A**    How often the pharmacists call what?

09:56:50   16    **Q**    Other pharmacists.

09:56:51   17    **A**    Not that I'm aware of.

09:56:52   18    **Q**    All right.  Next juror question.  "Where would a

09:56:58   19    refusal folder end up if a store had closed?"

09:57:02   20          Let's start there and then we'll read the next

09:57:05   21    question.

09:57:06   22    **A**    Sure.  So if a store closes, all of the prescription

09:57:09   23    records go to the store that's nearby, the next store.  So

09:57:12   24    that would follow, and it would be at that new store.

09:57:17   25          Generally, the patients are made aware that your

**Polster (Cross by Lanier)** 3355

09:57:20　1　prescription files have been transferred to this next store,

09:57:25　2　and all those paper records, everything goes to that other

09:57:29　3　location.

09:57:31　4　**Q**　Okay.  And then "How would a pharmacist get access to

09:57:37　5　that information," would those just be paper files?

09:57:39　6　**A**　Yes.

09:57:39　7　**Q**　So the paper files themselves are sent over?

09:57:42　8　**A**　Correct.

09:57:42　9　**Q**　And then at some point they go to Iron Mountain, don't

09:57:47　10　they?

09:57:47　11　**A**　You know, I'll be honest with you, I don't --

09:57:52　12　**Q**　I hope.

09:57:53　13　**A**　-- if the refusal folder goes to Iron Mountain.  And

09:57:58　14　the reason is is that that file folder is not generally kept

09:58:03　15　with the actual filled hard copy prescriptions in the file

09:58:08　16　drawer.  It's usually kept at a different section in the

09:58:11　17　stores.  And the pharmacists will box up, or the technician,

09:58:17　18　whatever, will box up old prescription files from years

09:58:20　19　previous.  They're in like this but big boxes.  And those go

09:58:26　20　to Iron Mountain, but I don't know if they also send the old

09:58:31　21　refusal folders.

09:58:32　22　**Q**　All right.  Ms. Polster, let's move past good faith

09:58:38　23　dispensing and the training and let's talk about the

09:58:41　24　computers for a little bit, okay?

09:58:42　25　**A**　Sure.

**Polster (Cross by Lanier)** 3356

| | | |
|---|---|---|
| 09:58:42 | 1 | **Q**    You talked about IntercomPlus yesterday, and you |
| 09:58:53 | 2 | talked about all of the information that it has.  Remember? |
| 09:58:59 | 3 | **A**    Yes. |
| 09:58:59 | 4 | **Q**    You went back into the early 2000s and said we've got |
| 09:59:04 | 5 | the patient's name and the patient's ZIP code and the |
| 09:59:07 | 6 | patient's diagnosis code and the drug that was prescribed |
| 09:59:12 | 7 | and the dosage and the doctor and all of that.  Remember? |
| 09:59:18 | 8 | **A**    Yes. |
| 09:59:18 | 9 | **Q**    What you didn't tell the jury is the reason y'all had |
| 09:59:23 | 10 | that in IntercomPlus was because y'all were selling all of |
| 09:59:26 | 11 | that information to IMS, weren't you? |
| 09:59:31 | 12 | MS. SWIFT:  Objection, Your Honor. |
| 09:59:34 | 13 | THE COURT:  Sustained. |
| 09:59:36 | 14 | **Q**    Ma'am, do you know what your company was doing selling |
| 09:59:40 | 15 | information? |
| 09:59:41 | 16 | **A**    I do not. |
| 09:59:42 | 17 | **Q**    Did your company ever tell you about the need for each |
| 09:59:48 | 18 | store to do due diligence in inputting this information |
| 09:59:54 | 19 | because it was being sold? |
| 09:59:55 | 20 | MS. SWIFT:  Objection.  This is beyond the |
| 09:59:56 | 21 | scope. |
| 09:59:56 | 22 | MR. LANIER:  No, this is -- |
| 09:59:57 | 23 | THE COURT:  Overruled. |
| 10:00:00 | 24 | **A**    There are certain elements of prescriptions and |
| 10:00:07 | 25 | records that are legally required for any prescription, and |

**Polster (Cross by Lanier)**                                              3357

| | | |
|---|---|---|
| 10:00:13 | 1 | so it's legally required to have that data in our computer |
| 10:00:18 | 2 | system when we dispense a prescription. |
| 10:00:20 | 3 | **Q**     Yes, ma'am, that wasn't my question though. |
| 10:00:22 | 4 |      My question was, did you know, in your job did you |
| 10:00:28 | 5 | know, in any of your jobs that you've held in the company, |
| 10:00:31 | 6 | did you know that your company was taking that data on each |
| 10:00:34 | 7 | patient, customer, and selling it to a third party? |
| 10:00:40 | 8 | **A**     I did not know it was being sold, no. |
| 10:00:41 | 9 | **Q**     Now, you also testified yesterday that the computer |
| 10:00:53 | 10 | system's been in place since 1984, and y'all have had |
| 10:00:59 | 11 | IntercomPlus in place since 1997.  True? |
| 10:01:03 | 12 | **A**     Yes. |
| 10:01:04 | 13 | **Q**     So IntercomPlus, is this the same system that the |
| 10:01:07 | 14 | president wouldn't let you use for electronic refusals to |
| 10:01:19 | 15 | fill entries for seven years? |
| 10:01:20 | 16 | **A**     Yes. |
| 10:01:20 | 17 | **Q**     And you've still got that system today, but now the |
| 10:01:22 | 18 | system will let you do it, right? |
| 10:01:24 | 19 | **A**     Yeah, we had -- we got the approval for the |
| 10:01:26 | 20 | enhancement to be filled, and what that enhancement has done |
| 10:01:32 | 21 | is made it very -- data more rapidly available to my team. |
| 10:01:39 | 22 | **Q**     Okay.  Next set of questions. |
| 10:01:41 | 23 |      You got asked by Ms. Swift about the Yaeger complaint. |
| 10:01:46 | 24 |      Do you remember that? |
| 10:01:47 | 25 | **A**     Yes. |

**Polster (Cross by Lanier)**                    3358

10:01:47   1   **Q**    That's Plaintiffs' Exhibit 17156, the document she

10:01:54   2   gave you.  And it's the write-up of the complaint and how it

10:01:59   3   was handled.

10:02:00   4      Do you remember this?

10:02:01   5   **A**    Yes.

10:02:01   6   **Q**    Did you actually read this?

10:02:04   7   **A**    I did read through it, but I didn't read every single

10:02:07   8   line.

10:02:07   9   **Q**    I'm sorry?

10:02:10  10   **A**    I read through it, but I did not read every single

10:02:13  11   line.

10:02:13  12   **Q**    So when you testified things like you did, do you know

10:02:22  13   if anybody got reprimanded for this?

10:02:23  14   **A**    That was my understanding, that the store managers got

10:02:31  15   counseled.  I don't know -- I'm not -- I do not have access

10:02:35  16   to HR records.  These reports are held very confidential

10:02:42  17   with the compliance department and the HR department and the

10:02:47  18   employee relations department.

10:02:49  19   **Q**    Well, there's a difference between being counseled and

10:02:52  20   being reprimanded, isn't there?

10:02:54  21   **A**    I don't know what -- yes, there is.

10:02:56  22   **Q**    And the counseling that is documented in here happens

10:03:03  23   months and months later, right?

10:03:06  24   **A**    This investigation was investigated thoroughly, and it

10:03:10  25   did take time based on employee schedules and people who

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:03:14 | 1 | were on leave, yes. |
| 10:03:18 | 2 | **Q**     And in fact, there is no reprimand that's listed in |
| 10:03:20 | 3 | here.  All there is is, oh, let's take advantage of a chance |
| 10:03:25 | 4 | to tell them to let the pharmacists do their job, |
| 10:03:29 | 5 | counseling, right? |
| 10:03:30 | 6 | **A**     But you don't know that and neither do I. |
| 10:03:32 | 7 | **Q**     Well, actually it says it in here, ma'am? |
| 10:03:34 | 8 | **A**     It might say that, but that doesn't mean that's not |
| 10:03:38 | 9 | what -- that the district -- or the leadership in the area |
| 10:03:42 | 10 | did not do a verbal warning or something like that. |
| 10:03:45 | 11 | **Q**     But, ma'am, it doesn't say that they did.  All it says |
| 10:03:48 | 12 | is what it says, right? |
| 10:03:49 | 13 | **A**     Well, I see what you're saying. |
| 10:03:52 | 14 | **Q**     It says on page 9, "She had a coaching conversation." |
| 10:04:00 | 15 | Do you see that? |
| 10:04:01 | 16 | **A**     I do. |
| 10:04:01 | 17 | **Q**     You want us to believe a coaching conversation is a |
| 10:04:06 | 18 | reprimand? |
| 10:04:07 | 19 | **A**     A coaching conversation can be used as the |
| 10:04:12 | 20 | documentation that they did start the path of discipline. |
| 10:04:20 | 21 | **Q**     Look at what it says. |
| 10:04:27 | 22 | **A**     I can't see your screen.  Can you bring it down a |
| 10:04:30 | 23 | little bit? |
| 10:04:30 | 24 | **Q**     Oh, I'm so sorry. |
| 10:04:31 | 25 | **A**     Thank you. |

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:04:31 | 1 | **Q**    That's my fault. |
| 10:04:32 | 2 | "Steps to resolve this matter with the registered |
| 10:04:39 | 3 | pharmacist, Mr. Yaeger." |
| 10:04:41 | 4 | The first step is recommended to inform the SM. |
| 10:04:45 | 5 | So those are store managers, right? |
| 10:04:47 | 6 | **A**    Yes. |
| 10:04:47 | 7 | **Q**    "In the district of their roles supporting pharmacists |
| 10:04:50 | 8 | with good faith dispensing regardless of possibility of |
| 10:04:55 | 9 | customer complaint, and that they should not be attempting |
| 10:04:58 | 10 | to influence the pharmacist's decision to fill |
| 10:05:02 | 11 | prescription." |
| 10:05:03 | 12 | **A**    Yes. |
| 10:05:03 | 13 | **Q**    Now, you and I agree that's good policy, isn't it? |
| 10:05:06 | 14 | **A**    Yes, and that's what we have always said. |
| 10:05:07 | 15 | **Q**    Well, no, ma'am, because in fairness, several years |
| 10:05:11 | 16 | before you told the management, maybe not on the store |
| 10:05:14 | 17 | manager level, a bump up, but you told them to sit down and |
| 10:05:18 | 18 | to go through those that aren't prescribing enough, right? |
| 10:05:24 | 19 | **A**    You are completely taking my testimony out of context. |
| 10:05:27 | 20 | They were to review the refusal folders to ensure that we |
| 10:05:31 | 21 | have the documentation, not to question why the prescription |
| 10:05:34 | 22 | wasn't filled. |
| 10:05:36 | 23 | **Q**    No, ma'am, you -- and I'm glad to pull the document |
| 10:05:40 | 24 | back up if you want me to. |
| 10:05:42 | 25 | The truth the matter is though, what you said is |

**Polster (Cross by Lanier)**                          3361

10:05:47  1    that we're going to get quarterly reports of those that

10:05:50  2    aren't filling enough, and the management needs to sit down

10:05:53  3    with the pharmacists and needs to go over this, if necessary

10:05:57  4    enroll them in education on pain management.

10:05:59  5         Do you not remember that?

10:06:00  6    **A**    I didn't -- I don't remember saying in pain

10:06:03  7    management.  But let me tell you why.

10:06:04  8         A pain management prescription --

10:06:06  9    **Q**    Ma'am, I'm asking you simply, do you remember saying

10:06:08  10   that in the document?

10:06:09  11   **A**    I remember saying that the leadership were to go in

10:06:14  12   and make -- have an understanding as to why the pharmacists

10:06:17  13   were not filling the prescriptions.

10:06:20  14        Again, they can't slough off that responsibility.  The

10:06:23  15   continuing education on chronic pain medication, that is an

10:06:27  16   education that, you know, we -- pharmacists want to have.

10:06:30  17   They're starting to see more chronic pain medication

10:06:34  18   prescriptions come in.  They need to understand why a

10:06:38  19   patient would need chronic pain medication.

10:06:47  20   **Q**    Okay.  Ma'am, let's get precise here.  Here's your

10:06:49  21   document.  It's Plaintiffs' 19607.

10:06:53  22        "What can I do?

10:06:56  23        "Review the refusals documented in the folder.

10:07:00  24        "Look for documentation the pharmacist used the tools

10:07:04  25   available as appropriate in making the decision to refuse,

**Polster (Cross by Lanier)** 3362

10:07:08  1    PDMP, reviewing the patient profile, speaking with the

10:07:11  2    patient or caregiver.

10:07:13  3         "Does the documentation support the decision?

10:07:16  4         "Have a conversation with the pharmacist.

10:07:19  5         "Ask them how they will follow good faith dispensing.

10:07:23  6         "Ask how they will decide to fill a control

10:07:27  7    prescription versus refuse.

10:07:28  8         "Review specific refused scripts to better understand

10:07:33  9    if the pharmacist was acting in the best interest of the

10:07:36  10   patient and their care."

10:07:41  11        You sent businesspeople in --

10:07:43  12   **A**    Yes.

10:07:43  13   **Q**    -- to have a conversation to examine the decision and

10:07:46  14   decide if it was appropriate, didn't you?

10:07:47  15   **A**    No, not to decide if it was appropriate, to

10:07:49  16   understand --

10:07:49  17   **Q**    Ma'am, that's exactly what you said.

10:07:51  18             MS. SWIFT:  Objection.  She didn't finish her

10:07:52  19   answer.

10:07:53  20   **A**    To understand if the pharmacists were just refusing to

10:07:58  21   fill all prescriptions or prescriptions they didn't feel

10:08:03  22   comfortable filling without the proper knowledge on how to

10:08:06  23   do it.

10:08:06  24        We had pharmacists that they're like, you know what,

10:08:09  25   I'm not going to fill this, I'm going to send it over to the

**Polster (Cross by Lanier)**                3363

10:08:11  1    next guy, I'm going to leave it for the next person.  We

10:08:15  2    want to make sure, okay, why are you refusing it?  Do you

10:08:19  3    have proper documentation?  Did you do your due diligence in

10:08:22  4    not filling the prescription?  Do you need education or

10:08:25  5    training around filling for chronic pain patients?

10:08:30  6         A chronic pain patient is not a bad person because

10:08:34  7    they need the pain medication.

10:08:37  8    **Q**    Ms. Polster, you understand you're under oath?

10:08:39  9    **A**    Yes, I do.

10:08:40  10   **Q**    I'd like to show you your testimony yesterday and

10:08:43  11   contrast it with what you just said today.

10:08:46  12        Yesterday I asked you this question:  "You sent the

10:08:53  13   businesspeople in to have a conversation to examine their

10:08:55  14   decision."

10:08:56  15        You said, "Exactly."

10:08:57  16        Do you see that?

10:08:59  17            MS. SWIFT:  Your Honor, that's improper

10:09:00  18   impeachment.  It's not inconsistent.

10:09:02  19            THE COURT:  Overruled.

10:09:04  20   **Q**    Do you see where you said that yesterday?

10:09:06  21   **A**    I do.

10:09:07  22   **Q**    And then I said, "And decide if it was appropriate,

10:09:10  23   didn't you?"

10:09:11  24        You said, "Exactly."

10:09:13  25        Do you see that?

**Polster (Cross by Lanier)** 3364

10:09:14  1   **A**   I did say that.

10:09:15  2   **Q**   And then I said, "And those businesspeople had no

10:09:19  3   business doing that, did they?"

10:09:20  4       And you said, "I completely disagree with you,"

10:09:24  5   yesterday, didn't you?

10:09:24  6   **A**   I did because you did not let me finish what I was

10:09:27  7   trying to say.

10:09:28  8       You know, you're doing a great job going question to

10:09:31  9   question.  I was not able to get out the full information

10:09:34  10  yesterday.

10:09:34  11  **Q**   Ma'am, you not only answered my questions, you

10:09:38  12  answered questions from Ms. Swift.

10:09:40  13  **A**   Yes, I did.

10:09:41  14  **Q**   I'm just asking you, yesterday you testified, "You

10:09:51  15  sent the businesspeople in to have a conversation to examine

10:09:54  16  their decision?"

10:09:55  17      "Exactly.

10:09:56  18      "Decide if it was appropriate, didn't you?

10:09:58  19      "Exactly."

10:09:59  20  **A**   Decide if it was appropriate that they had

10:10:02  21  documentation onto why they were not filling the

10:10:05  22  prescription for pain medication patients that were

10:10:09  23  legitimate patients coming into our stores that needed our

10:10:12  24  help.

10:10:12  25  **Q**   And then today I ask you --

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:10:16 | 1 | **A**   I can't read that, sorry. |
| 10:10:17 | 2 | **Q**   It's getting there.  Hold on. |
| 10:10:23 | 3 |    Today I ask you, "You sent businesspeople in. |
| 10:10:31 | 4 |    "Yes. |
| 10:10:31 | 5 |    "To have a conversation to examine the decision and |
| 10:10:34 | 6 | decide if it was appropriate, didn't you?" |
| 10:10:38 | 7 |    You said, "No, not to decide if it was appropriate." |
| 10:10:43 | 8 |    Do you see that? |
| 10:10:43 | 9 | **A**   I do. |
| 10:10:44 | 10 | **Q**   And yesterday I said, "You sent businesspeople in to |
| 10:10:48 | 11 | have a conversation to decide if it was appropriate?" |
| 10:10:53 | 12 |    You said, "Exactly." |
| 10:10:54 | 13 |    And when I said they don't have business doing it, you |
| 10:10:59 | 14 | disagreed. |
| 10:10:59 | 15 |    Do you see that? |
| 10:10:59 | 16 | **A**   Yes. |
| 10:11:00 | 17 | **Q**   So then let's go back to where we were when I was |
| 10:11:02 | 18 | asking you this question. |
| 10:11:06 | 19 |    Ma'am, what that businessperson did, that store |
| 10:11:10 | 20 | manager did, was in line with what you had put in as a |
| 10:11:14 | 21 | policy? |
| 10:11:15 | 22 | **A**   No, the businessperson was not the store manager. |
| 10:11:18 | 23 | **Q**   You don't think a store manager is a businessperson? |
| 10:11:20 | 24 |    MS. SWIFT:  Objection.  She wasn't finished |
| 10:11:22 | 25 | with her answer. |

**Polster (Cross by Lanier)** 3366

10:11:23　1　**A**　The businessperson that was in the complaint was not

10:11:27　2　who this was intended for.  This is pharmacy supervisors and

10:11:35　3　the market leaders.

10:11:37　4　　The complaint that you're referring to was a store

10:11:46　5　manager.

10:11:46　6　**Q**　And by the way, just to make sure the record's full,

10:11:49　7　you did say that the businessperson can -- should encourage

10:11:54　8　the pharmacist to obtain more information on pain

10:11:59　9　management, such as continuing education courses?

10:12:01　10　**A**　Yes.  We want our pharmacists to feel trained and

10:12:06　11　supported when they are filling all prescriptions.

10:12:12　12　**Q**　And your supporting documents there are to go look at

10:12:18　13　the continuing educations, which is where y'all have

10:12:23　14　these --

10:12:23　15　**A**　We do have continuing educations.  And I myself took

10:12:29　16　continuing education courses to better understand pain

10:12:32　17　management.  I attend conferences about understanding pain

10:12:38　18　management and also people with opioid addiction, trying to

10:12:40　19　figure out how can we best get information to our

10:12:44　20　pharmacists to make sure they're -- they feel supported and

10:12:48　21　properly trained.

10:12:49　22　**Q**　Now, ma'am, I was going to ask you, was there a policy

10:12:53　23　change after this, and I'm going to ask it specifically in

10:12:56　24　reference to what you testified yesterday.

10:12:57　25　　Did you have a policy change after the incident with

**Polster (Cross by Lanier)**                    3367

10:13:02  1    pharmacist Yaeger where you said businesspeople should not,

10:13:06  2    should not be doing the things you instructed them to do

10:13:09  3    years before?

10:13:10  4    **A**    I didn't make any policy changes.

10:13:14  5    **Q**    Okay.  This -- Mr. Yaeger's complaint that I pulled

10:13:18  6    out, that's not even remotely the only complaint that's out

10:13:21  7    there like this, is it?

10:13:22  8    **A**    That's the one that I'm aware of for this --

10:13:27  9    **Q**    You don't know, then, about Christy Porter?  Does that

10:13:37  10   name ring a bell?

10:13:38  11   **A**    No.

10:13:38  12   **Q**    Do you know who Hailey Park is?

10:13:42  13   **A**    Hailey Park was a pharmacy supervisor in California,

10:13:45  14   if it's the same Hailey Park.

10:13:50  15   **Q**    And you don't know anything about the complaints that

10:13:52  16   may have been made concerning that?

10:13:54  17   **A**    Not that I recall, I do not.

10:13:56  18   **Q**    All right.  That's the computer stop.

10:14:05  19        Last stop, store reports.

10:14:16  20        I did the refusals to fill already.  That was a lot of

10:14:21  21   this.  But it segued into what we were doing.  There are

10:14:28  22   some specific documents though that I want to talk about.

10:14:31  23        You were shown a document that was it looks like some

10:14:36  24   kind of a spreadsheet that was given to you by Ms. Swift.

10:14:43  25        Do you remember this?

**Polster (Cross by Lanier)**                                    3368

10:14:44   1   **A**      Yes.

10:14:46   2               MR. LANIER:  And I don't have mine with a

10:14:49   3   stamp of a number on it, so I'm not sure what the exhibit

10:14:54   4   number is, Your Honor?

10:14:56   5        Ms. Fleming, do you have any ready recall?

10:15:08   6               MS. SWIFT:  There were a couple of different

10:15:10   7   ones.  If you could help us know which one.

10:15:37   8               MR. LANIER:  My copy was an unmarked copy, but

10:15:40   9   we believe, Your Honor, it's 2005 is the exhibit number.

10:15:45  10               THE COURT:  Okay.  Thank you.

10:15:46  11   BY MR. LANIER:

10:15:47  12   **Q**      Do you remember testifying about this?

10:15:49  13   **A**      I do.

10:15:50  14   **Q**      And you said these are the reports for stores that you

10:15:52  15   all get, right?

10:15:53  16   **A**      Yes.

10:15:53  17   **Q**      My question to you is, what do you do with the

10:15:55  18   problems when you see these?

10:15:56  19   **A**      Well, there's a couple things that we look for.  We

10:16:03  20   look for the, like, high percent controlled substances to

10:16:11  21   noncontrolled substances.  And we will take steps through

10:16:16  22   field leadership.  They're our boots on the ground and our

10:16:21  23   eyes and our ears, to follow up with the store.  Sometimes

10:16:25  24   my team will call the store, call the pharmacy manager.  We

10:16:29  25   look to see where is the store located, does it -- is there

**Polster (Cross by Lanier)**                                    3369

10:16:32  1    a surgery center, is there a -- you know, what is around

10:16:36  2    that store, you know, is it a 24-hour store.

10:16:42  3         And we determine as best we can with the information

10:16:45  4    that we have, and then sometimes we'll, you know, ask the

10:16:49  5    field leadership or loss prevention to make a store visit.

10:16:54  6    **Q**    Okay.  Ma'am, the problems with these stores on this

10:17:00  7    sheet, did you y'all do anything at all?

10:17:03  8              MS. SWIFT:  Objection.  Mischaracterizes.

10:17:04  9    **A**    I couldn't tell you --

10:17:05  10             THE COURT:  Overruled.

10:17:05  11   **A**    I couldn't tell you if we did something specific at

10:17:09  12   this store at certain points in time.  I reviewed this data

10:17:13  13   for Trumbull County as I was looking through to get ready

10:17:19  14   for this.

10:17:19  15   **Q**    Yeah, someone ran this, and you told me before you

10:17:21  16   didn't know the store numbers, but you're trusting that

10:17:24  17   someone ran the right store numbers for Lake and Trumbull

10:17:27  18   County, right?

10:17:28  19   **A**    Yes.

10:17:28  20   **Q**    And you didn't see anything that alerted you on these

10:17:31  21   sheets?

10:17:32  22   **A**    I didn't see anything that was, you know, a big alert.

10:17:35  23   I saw that the opioid dispensing for these stores over the

10:17:40  24   course of the time was decreasing, which made sense with

10:17:44  25   what was happening in the industry.  I didn't see -- I

**Polster (Cross by Lanier)** 3370

10:17:52   1    didn't -- nothing jumped out to me on the page, no.

10:17:54   2    **Q**    Well, let's look at the page together.

10:17:59   3         2014, page 1.

10:18:04   4         Do you see that?

10:18:04   5    **A**    Yes.

10:18:05   6    **Q**    And this is one of the stores in Lake and Trumbull

10:18:10   7    County.

10:18:10   8         Do you see that?

10:18:10   9    **A**    Yes.

10:18:11   10   **Q**    And if you look on the right, you've got on the far

10:18:15   11   right "cash prescription percentage."

10:18:21   12        Do you see that?

10:18:21   13   **A**    I do.

10:18:22   14   **Q**    9 percent cash at that store for the prescriptions.

10:18:27   15        You see that?

10:18:28   16   **A**    Yes.

10:18:28   17   **Q**    Much higher than what you told me is expected in your

10:18:33   18   stores, right?

10:18:33   19   **A**    It is higher, but that doesn't mean that there's

10:18:36   20   something wrong.  You have to understand the community, you

10:18:38   21   have to understand what's happening in that area.

10:18:42   22   **Q**    Mm-hmm.  And then if you continue to look, right below

10:18:47   23   it, 7.5 percent at that store, much higher than the average

10:18:53   24   that you told me would -- you let me use 5, but you said it

10:18:57   25   was down to, like, 2 percent or something, right?

**Polster (Cross by Lanier)** 3371

| | | |
|---|---|---|
| 10:18:59 | 1 | **A**   Depends on the store and the location, yes. |
| 10:19:01 | 2 | **Q**   Yeah.  You know, and a lot of these are down low. |
| 10:19:06 | 3 | Look at this one.  7.7 percent. |
| 10:19:11 | 4 | Do you see that? |
| 10:19:11 | 5 | **A**   I do. |
| 10:19:12 | 6 | **Q**   And do you see how the percentage of oxy 15 and 30 is |
| 10:19:19 | 7 | higher than all of the stores around it? |
| 10:19:21 | 8 | **A**   Well, hold on, because I got to see -- first off, |
| 10:19:27 | 9 | that's not sorted by store. |
| 10:19:29 | 10 | **Q**   Well -- |
| 10:19:30 | 11 | **A**   It's not sorted by store, so you have to see -- so -- |
| 10:19:38 | 12 | **Q**   You're right, you're right.  Let's do it this way. |
| 10:19:42 | 13 | Let's do it this way. |
| 10:19:43 | 14 | Do you see how this entry 7.7 percent has an 18 |
| 10:19:50 | 15 | percent prescription control and 4.3 percent are these oxy |
| 10:19:58 | 16 | 15 and 30 tablets? |
| 10:20:00 | 17 | Do you see that? |
| 10:20:01 | 18 | **A**   4.3 percent of the controlled substances they fill, |
| 10:20:04 | 19 | yes. |
| 10:20:05 | 20 | **Q**   And if -- that's a big cash payment place, right?  7.7 |
| 10:20:10 | 21 | percent, unusually high, true? |
| 10:20:12 | 22 | **A**   There's a 7 percent, yes. |
| 10:20:15 | 23 | **Q**   And so you compare it just to the entry before.  And |
| 10:20:18 | 24 | I'll tell you if you can see on your sheet, but that's store |
| 10:20:22 | 25 | 5549. |

**Polster (Cross by Lanier)**                    3372

10:20:23   1          1.3 percent cash and a one-third amount of the oxy.

10:20:32   2          Do you see that?

10:20:32   3     **A**   I do.

10:20:33   4     **Q**   3.6 percent cash, no oxys.

10:20:36   5          Do you see that?

10:20:37   6     **A**   Yes.

10:20:37   7     **Q**   1.4 percent cash, 1 1/2 percent oxys, do you see that?

10:20:44   8     **A**   Yeah.

10:20:46   9     **Q**   You don't really get anything like that -- well,

10:20:48  10     you've got a 4.1.  That's getting close.  But you don't get

10:20:52  11     anything like that until you get up to this entry, 4.4

10:20:55  12     percent.

10:20:56  13          Do you see that as well?

10:20:57  14     **A**   Yes.

10:20:58  15     **Q**   And again, unusually high cash, right?

10:21:05  16     **A**   It's 9 percent cash.

10:21:07  17     **Q**   And if you look at it, that's the same store, 9077,

10:21:13  18     isn't it?

10:21:15  19     **A**   The 7 percent?

10:21:16  20     **Q**   Yes.

10:21:19  21     **A**   Yes.

10:21:19  22     **Q**   You can keep looking down the sheet.  You're going to

10:21:25  23     see -- by the way, some of these, for example, this 8.3

10:21:30  24     percent, has a low rate of oxys, doesn't it?

10:21:35  25     **A**   Yes.

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:21:35 | 1 | **Q**    But a pretty high rate of other controlled substances. |
| 10:21:41 | 2 | See that? |
| 10:21:42 | 3 | **A**    Yeah. |
| 10:21:43 | 4 | **Q**    You can keep looking down.  Here's another 7 1/2 |
| 10:21:46 | 5 | percent cash. |
| 10:21:48 | 6 | You've got 5.3 percent oxys.  Incredibly high |
| 10:21:57 | 7 | percentage. |
| 10:21:58 | 8 | Do you see that? |
| 10:21:59 | 9 | **A**    I see the number there, yes. |
| 10:22:01 | 10 | **Q**    And you keep going down, you'll see big cash payments |
| 10:22:06 | 11 | at a number of different stores with either big oxy or big |
| 10:22:10 | 12 | other percentages of controlled substances. |
| 10:22:12 | 13 | You see that as well? |
| 10:22:13 | 14 | **A**    I see the percents you're circling, yes. |
| 10:22:19 | 15 | **Q**    You can flip it to the next page.  You can see the |
| 10:22:22 | 16 | same thing.  You're going to see a lot of cash that is |
| 10:22:25 | 17 | unusually high and you're going to see a high volume of |
| 10:22:27 | 18 | controlled substances. |
| 10:22:29 | 19 | Do you see that as well? |
| 10:22:30 | 20 | **A**    I see the numbers you're circling. |
| 10:22:36 | 21 | **Q**    So when you put a sheet like this up to the jury and |
| 10:22:40 | 22 | you testify that, here, look, we did all of these checks, |
| 10:22:44 | 23 | look at all that we did, we were getting this data |
| 10:22:48 | 24 | regularly, you never even checked these stores before you |
| 10:22:51 | 25 | came in here, did you? |

**Polster (Cross by Lanier)**

10:22:52  1   **A**     I personally did not check these stores.  I oversee

10:22:57  2   the entire country.  We do --

10:22:59  3                   MS. SWIFT:  Objection.  She's still finishing

10:23:01  4   her answer.

10:23:02  5                   THE COURT:  Hold it, hold it, hold it.

10:23:03  6                   MR. LANIER:  Sorry.

10:23:04  7                   THE COURT:  Mr. Lanier, please let Ms. Polster

10:23:06  8   finish her answer.

10:23:06  9                   MR. LANIER:  My fault, Judge.  I don't see her

10:23:08  10  and I --

10:23:09  11  **A**     We do have multiple reports that go to the field

10:23:11  12  leaders.  We talked about that yesterday.  That was that

10:23:14  13  e-mail link that you had me testify about, you know, the

10:23:18  14  reports and all of that.

10:23:19  15      Within that link, those are specific reports that go

10:23:23  16  to the field leaders that give them this information that

10:23:27  17  they go in to check what's happening in their locations.

10:23:32  18  And those field leaders, again, they are eyes and ears, our

10:23:37  19  boots on the ground, and when one of the -- when something

10:23:42  20  would trigger on the report, whether it is the store is

10:23:49  21  dispensing for oxy than they had before and there was a

10:23:52  22  deterioration, that they do their due diligence to ensure

10:23:57  23  that why is that happening and understand that the business

10:24:01  24  that's happening for that store makes sense.

10:24:04  25  **Q**     Okay.  Ma'am, can you please answer my question?

**Polster (Cross by Lanier)**                    3375

10:24:06  1    **A**      Please ask it again.

10:24:09  2    **Q**      Yes, ma'am.

10:24:10  3           I said, "When you put a sheet like that up there to

10:24:19  4    the jury and you testify that, here, look, we did all of

10:24:22  5    these checks, look at all we did, we were getting this data

10:24:25  6    regularly," question, "You never even checked these stores

10:24:30  7    before you came in here, did you?"

10:24:34  8    **A**      For me personally, no.

10:24:35  9    **Q**      You didn't have it done, did you?

10:24:36  10   **A**      Oh, that's not true.

10:24:38  11   **Q**      Okay.  So you had someone go back and look through

10:24:41  12   those months with the high cash volumes and the high

10:24:45  13   percentage volumes and check to see if those were proper

10:24:49  14   dispensings?

10:24:49  15   **A**      Those reports go to the field leaders, and that is

10:24:54  16   part of their responsibility to make sure.

10:24:55  17   **Q**      That wasn't my question, ma'am.  I said before you

10:24:58  18   have came in here today -- before you came in here to

10:25:01  19   testify, did you look at those reports you were swearing to

10:25:06  20   and tell someone, hey, would you agree investigate and make

10:25:11  21   sure that I'm okay saying this on these cash payments?

10:25:15  22   **A**      Oh, no, no, I never said that.

10:25:18  23   **Q**      You never had anyone do that homework for you; is that

10:25:21  24   right?

10:25:21  25   **A**      But we had this report pulled for the Lake and

**Polster (Cross by Lanier)**

10:25:24  1   Trumbull Counties, but I didn't tell my stores or my people

10:25:32  2   to go in and check that, that's absurd.

10:25:34  3   **Q**    No, ma'am, if you're going to come in and testify that

10:25:37  4   these stores weren't doing anything wrong, don't you think

10:25:39  5   you should look?

10:25:40  6   **A**    No, you said -- that is not what -- read back what you

10:25:44  7   said.

10:25:47  8   **Q**    I said, "When you put a sheet up there" -- no, "When

10:25:51  9   you put a sheet like that up there the jury and you testify

10:25:54  10  that, here, look, we did all these checks, look at all we

10:25:59  11  did, we're getting this data regularly, you never even

10:26:03  12  checked these stores before you came in here, true?"

10:26:08  13  **A**    I checked these stores because I had my team pull the

10:26:14  14  data specific.

10:26:14  15       My team sees it for the entire country, and then each

10:26:18  16  field leader will get reports based on the stores that they

10:26:22  17  oversee.

10:26:24  18       Yes, I had them pull for this -- these stores so I

10:26:29  19  could understand, without looking at the entire country,

10:26:33  20  because the way it's sorted for the entire country is by

10:26:37  21  store number, which is numbers all over the country.  I have

10:26:39  22  to signal it out, otherwise there's too much data.

10:26:44  23  **Q**    So who did you have check the store reports for store

10:26:48  24  9077 for January of 2014?

10:26:52  25              MS. SWIFT:  Your Honor, could we take a side

10:26:54  1 | bar, please.

10:26:56  2 |                    (At side bar at 10:26 a.m.)

10:27:09  3 |           MS. SWIFT:  Your Honor, you've already said

10:27:12  4 | that you would instruct the jury that there was no

10:27:16  5 | obligation to prepare for testifying in this case.  We've

10:27:20  6 | let this go on with this witness a pretty long time.  We

10:27:23  7 | think there needs to be an instruction to the jury that she

10:27:25  8 | was not obligated to prepare by doing investigation into

10:27:27  9 | every store before coming to testify.

10:27:29  10 |           MR. LANIER:  I'm not suggesting it's an

10:27:31  11 | obligation, Your Honor.  What I'm saying is is she says --

10:27:34  12 |           MS. SWIFT:  He is suggesting there is an

10:27:36  13 | obligation.

10:27:36  14 |           THE COURT:  I think you're conflating two

10:27:38  15 | things, and I think the last question does suggest that she

10:27:43  16 | had some obligation before she testified to have someone

10:27:47  17 | check these stores, so she has no obligation.

10:27:54  18 |           MR. LANIER:  I'll clarify that, judge.

10:27:55  19 |           THE COURT:  And she said she personally didn't

10:27:58  20 | check the data contemporaneously.  She said it's the store

10:28:01  21 | manager's job.

10:28:02  22 |           MR. LANIER:  My problem with that, Your Honor,

10:28:03  23 | is she waffles and she gives this nonresponsive answer, and

10:28:06  24 | she makes it sounds like she had that work done before she

10:28:10  25 | came in here and what she's really saying --

**Polster (Cross by Lanier)** 3378

| | | |
|---|---|---|
| 10:28:10 | 1 | MS. SWIFT:  Your Honor, that's not fair.  She |
| 10:28:12 | 2 | did her best. |
| 10:28:12 | 3 | THE COURT:  I don't know that she said that. |
| 10:28:13 | 4 | MR. LANIER:  No, what she's really -- well, |
| 10:28:14 | 5 | she didn't -- the last answer conflated the two, and I just |
| 10:28:17 | 6 | want to separate out and make sure that we're clear, I'll |
| 10:28:20 | 7 | say you've got no obligation to do this. |
| 10:28:20 | 8 | MS. SWIFT:  No, you were going to ask that the |
| 10:28:24 | 9 | Judge do it. |
| 10:28:24 | 10 | THE COURT:  I want you to ask a -- |
| 10:28:28 | 11 | MR. LANIER:  Okay.  I'll ask it that way. |
| 10:28:30 | 12 | I'll clarify. |
| 10:28:31 | 13 | THE COURT:  I'll instruct the jury that a |
| 10:28:33 | 14 | witness has no obligation before testifying to review or |
| 10:28:36 | 15 | prepare anything. |
| 10:28:36 | 16 | MS. SWIFT:  Thank you, Your Honor. |
| 10:28:38 | 17 | THE COURT:  I said that before.  I'll say it |
| 10:28:40 | 18 | again. |
| 10:28:41 | 19 | So Mr. Lanier, what I want you to do is -- when you |
| 10:28:44 | 20 | ask the question, make sure you're asking her about what she |
| 10:28:47 | 21 | did as part of her job in 2014.  If it's 2014 data, what did |
| 10:28:52 | 22 | she do in 2014.  If it's 2015 data -- |
| 10:28:56 | 23 | MR. LANIER:  The problem I have with that, |
| 10:28:58 | 24 | Your Honor, is this is a sheet she never would have reviewed |
| 10:29:00 | 25 | in her job.  She reviewed -- |

| | |
|---|---|
| 10:29:01 | 1 |

THE COURT:  Well, I don't know that.

MR. LANIER:  Well, yes, she's already said that.  This is a sheet she reviewed to be prepared to testify in this case.

THE COURT:  Well, you can ask her that.  If she says that, then you can cross-examine her on it.

MR. LANIER:  Thank you.

THE COURT:  I don't think she said that.

MR. LANIER:  I think so, but I'll ask it.  And if I'm wrong, I'm wrong.

THE COURT:  Right, you can ask her that, and if she says yes, I reviewed it, well, then you can question her about it.

MR. LANIER:  Thank you, judge.

MS. SWIFT:  We would like the instruction from the judge first before that happens, please.

MR. LANIER:  I think that's improper comment at this point in time, Your Honor.  But, I mean, you're the judge.  I'm not going to --

(In open court at 10:29 a.m.)

THE COURT:  Ladies and gentlemen, I think I've told you before but I'll repeat it again, a witness who's called or subpoenaed to testify has no obligation other than to show up and answer everyone's questions truthfully to the best of their knowledge.  If they do prepare by reviewing

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 10:29:57 | 1 | things, they may, and counsel can ask them what, if |
| 10:30:01 | 2 | anything, they did to prepare.  But they have no obligation |
| 10:30:03 | 3 | to do it. |
| 10:30:07 | 4 | BY MR. LANIER: |
| 10:30:09 | 5 | **Q**     And in that regard, Ms. Polster, I want to be real |
| 10:30:11 | 6 | clear. |
| 10:30:14 | 7 |      Did you review Exhibit 2005 just routinely as part of |
| 10:30:19 | 8 | your job or did you review it specifically to testify in |
| 10:30:22 | 9 | this case? |
| 10:30:23 | 10 | **A**     For this case. |
| 10:30:26 | 11 | **Q**     So you did that prep work for the case to review this, |
| 10:30:30 | 12 | fair? |
| 10:30:30 | 13 | **A**     Yes. |
| 10:30:31 | 14 | **Q**     But you did not do the prep work for this case to go |
| 10:30:35 | 15 | back and to check to see what was going on in these stores, |
| 10:30:38 | 16 | fair? |
| 10:30:40 | 17 | **A**     Correct, because the field leaders are given that |
| 10:30:43 | 18 | information for them to do that for us. |
| 10:30:45 | 19 | **Q**     Well, are you talking about information the field |
| 10:30:48 | 20 | leaders did back in 2014 or for this trial? |
| 10:30:54 | 21 | **A**     No -- well, we give them the monthly reports for them |
| 10:30:57 | 22 | to follow up on, each month. |
| 10:31:00 | 23 | **Q**     Ma'am, I just want it clear.  Are you saying the field |
| 10:31:03 | 24 | people did it in preparation for this trial or you're just |
| 10:31:06 | 25 | relying upon what they did seven years ago? |

**Polster (Cross by Lanier)** 3381

10:31:09  1    **A**    I'm relying that they are doing -- that they are

10:31:12  2    following up on the information that we send them each

10:31:15  3    month.

10:31:16  4    **Q**    So seven years ago?

10:31:16  5    **A**    Seven years ago we -- each month we give them these

10:31:20  6    reports for them to follow up on.

10:31:25  7    **Q**    Okay.  Next, you were shown --

10:31:29  8                THE COURT:  All right, I think, Mr. Lanier, if

10:31:31  9    we're moving on to another document, it may be a good time

10:31:33  10   for a break.

10:31:34  11               MR. LANIER:  Okay, Your Honor.  Thank you.

10:31:36  12               THE COURT:  Okay.  Ladies and gentlemen, we'll

10:31:37  13   take our mid morning break.  Usual admonitions.

10:31:42  14        We'll resume in 15 minutes.  Thank you.

10:32:12  15               (Recess taken at 10:32 a.m.)

10:51:04  16               (The jury is present at 10:51 a.m.)

10:51:07  17               THE COURT:  Okay.  Please be seated.

10:51:08  18        And, Mr. Lanier, you may continue, and Ms. Polster,

10:51:12  19   you're still under oath.

10:51:13  20               MR. LANIER:  Thank you, Your Honor.

10:51:14  21   BY MR. LANIER:

10:51:15  22   **Q**    We are at the last stop of store reports.  And in that

10:51:18  23   regard, I've got a couple of juror notes that I see in

10:51:21  24   review I still haven't asked, and I'll put these up here as

10:51:24  25   well, okay?

**Polster (Cross by Lanier)** 3382

10:51:25  1   **A**    Okay.

10:51:29  2   **Q**    But let's start with the store report on coaching

10:51:31  3   opportunities.

10:51:32  4       Do you remember speaking about that and you showed the

10:51:34  5   jury Walgreens Exhibit -- give it a second -- 2347.

10:51:43  6       You had these coaching opportunities, remember?

10:51:46  7   **A**    Yes.

10:51:46  8   **Q**    Okay.  I tried to look at them, tried to check them

10:51:50  9   out.

10:51:50  10       Are these for the stores in this county?

10:51:53  11   **A**    I think they're just examples.  I don't know if

10:51:55  12   they're in this county or not.

10:51:56  13   **Q**    So we don't know if there's any coaching going on in

10:52:01  14   these counties?

10:52:02  15   **A**    I would have to -- well, I did not say that.  I

10:52:06  16   said -- you asked me --

10:52:07  17   **Q**    I said we don't know.

10:52:09  18   **A**    I don't know if there are stores in this report that

10:52:14  19   are for this county.

10:52:15  20   **Q**    Okay.  I looked at these, and I'm looking at the

10:52:24  21   dates.  Looks to me like this starts May 28 of 2020.

10:52:28  22       See that?

10:52:28  23   **A**    That's just an example of the reports, yes.

10:52:33  24   **Q**    Ma'am, that's all I'm saying is the exhibit that you

10:52:41  25   gave us that we showed the jury starts May 28, 2020,

**Polster (Cross by Lanier)** 3383

| | | |
|---|---|---|
| 10:52:45 | 1 | correct? |
| 10:52:46 | 2 | **A**    Yes. |
| 10:52:50 | 3 | **Q**    And it goes through July 31 of 2020. |
| 10:52:53 | 4 | **A**    Yes. |
| 10:52:53 | 5 | **Q**    Did you give us any coaching opportunity reports for |
| 10:53:00 | 6 | 2009? |
| 10:53:01 | 7 | **A**    I don't -- no, my team was not in place in 2009. |
| 10:53:11 | 8 | **Q**    You know, on the back of this cover page is another |
| 10:53:13 | 9 | sheets that I missed.  It's the first sheet.  So for the |
| 10:53:15 | 10 | record, to make sure we're clear, it actually starts May 3, |
| 10:53:19 | 11 | 2020, not May 28. |
| 10:53:20 | 12 | You see that? |
| 10:53:22 | 13 | **A**    Yes. |
| 10:53:28 | 14 | **Q**    So I asked you then, I said what about in '20 -- I do |
| 10:53:36 | 15 | have not realtime up. |
| 10:53:38 | 16 | Your Honor, our realtime has stopped on all tables, I |
| 10:53:44 | 17 | believe. |
| 10:53:46 | 18 | MS. SULLIVAN:  It's working here. |
| 10:53:53 | 19 | MR. LANIER:  I can do it off my brain.  Thank |
| 10:53:55 | 20 | you, Ms. Sullivan. |
| 10:53:57 | 21 | MS. SULLIVAN:  Mr. Lanier, you're welcome to |
| 10:53:59 | 22 | look at ours. |
| 10:54:01 | 23 | MR. LANIER:  Thank you. |
| 10:54:07 | 24 | **Q**    Let me just do it this way. |
| 10:54:08 | 25 | When did these coaching opportunity reports start? |

**Polster (Cross by Lanier)**                    3384

10:54:11   1   **A**     When I got into position, we started working with my

10:54:16   2   team to come up with ideas of information we could give our

10:54:20   3   stores that would be helpful for field supervision.  And so

10:54:23   4   they came in sometime in 2013 when my team was formed.

10:54:28   5   **Q**     Oh.  So you don't have them for 2012, 2011, 2010,

10:54:33   6   2009 --

10:54:34   7   **A**     Right.

10:54:34   8   **Q**     -- 2008, 2007, 2006, the years we're looking at?

10:54:39   9   **A**     Correct.

10:54:40   10  **Q**     By the same token, I noticed that even Exhibit 2005,

10:54:44   11  the one you'd said was prepared in a sense for this case,

10:54:53   12  that starts in -- the oldest I could find is 2014 going

10:54:59   13  through here.

10:54:59   14       Is that right?

10:55:02   15  **A**     That might be the time frame that that report was

10:55:04   16  pulled.

10:55:06   17  **Q**     Yeah, why did you not pull time framed reports for

10:55:12   18  2008, '9, '10, '11?

10:55:16   19  **A**     My team was not responsible for that information at

10:55:18   20  that time.  My team didn't exist.  And we pulled the report

10:55:23   21  during the time that my team wasn't in position.

10:55:27   22  **Q**     Okay.  You're saying it did not exist at that time?

10:55:29   23  **A**     My team.

10:55:31   24  **Q**     Right.  Did the report exist at that time?

10:55:36   25  **A**     I don't know what the previous departments measured or

**Polster (Cross by Lanier)** 3385

10:55:42 1  looked at.  I know that my team has an aggregate of data,

10:55:49 2  and the headers are there on the top.  I don't know if the

10:55:55 3  distribution centers ran reports like that.

10:56:00 4  **Q**    Okay.  So in terms of offering testimony to the jury

10:56:03 5  about what was being done in 2006, '7, '8, '9, '10, '11,

10:56:11 6  '12, you have none to offer on that; is that fair?

10:56:13 7  **A**    I believe I answered that we had a team that was

10:56:16 8  responsible in the distribution centers, but I do not know

10:56:20 9  all the steps that they took.

10:56:21 10  **Q**    Okay.  Can you answer my question, please?

10:56:25 11  **A**    I'll need you to reask it.

10:56:27 12  **Q**    Yes, ma'am.  Here it was.

10:56:29 13       "So in terms of offering testimony" -- whoops, let me

10:56:33 14  get it up there a little bit better.  Sorry.

10:56:36 15       "So in terms of offering testimony to the jury about

10:56:40 16  what was being done in 2006, '7, '8, '9, '10, '11, '12, you

10:56:48 17  have none to offer on that; is that fair?"

10:56:53 18  **A**    Correct.

10:56:53 19  **Q**    Thank you.

10:57:04 20       Now we got some more questions from the jury I'd like

10:57:06 21  to set before you that I did not get to yet.

10:57:09 22       "Does or did the individual pharmacist delete

10:57:14 23  comments, or did the company or someone in a supervisory

10:57:18 24  position?"

10:57:18 25  **A**    It would be a pharmacist at the store.  They would

**Polster (Cross by Lanier)** 3386

10:57:22  1  want to make sure that the most recent information for the

10:57:27  2  prescription that they're refusing is fit into the comment

10:57:30  3  field.

10:57:31  4      And, no, the company has never deleted records off of

10:57:36  5  a patient's profile.

10:57:37  6  **Q**  So it was the individual pharmacists who would delete

10:57:40  7  as they didn't have enough room to put in the new info?

10:57:43  8  **A**  At the store, correct.

10:57:44  9  **Q**  "For clarification purposes, did you say that the

10:57:50  10  threshold for the ordering of controlled substances,

10:57:54  11  Schedule II, were all set from the same point no matter the

10:57:57  12  size and/or amounts dispensed at each pharmacy?"

10:58:02  13  **A**  No.  So the way the ordering system works, it is on a

10:58:08  14  linear regression line, and the -- I'm going to do the best

10:58:14  15  I can to explain it because I didn't put the system

10:58:18  16  together.

10:58:19  17      So what happens is is that there is a ceiling for how

10:58:28  18  many bottles can be ordered at any one time, and then there

10:58:31  19  is the threshold that is the total quantity that can be sent

10:58:34  20  to the store over a six-week rolling period based on the

10:58:38  21  business, and it's compared to the peer stores that are the

10:58:43  22  like volume.

10:58:44  23      And so let me just read the question, make sure I'm

10:58:48  24  answering correctly.

10:58:53  25  **Q**  I think the thrust of the question may be --

**Polster (Cross by Lanier)**                    3387

10:58:55  1              MS. SWIFT:  Your Honor, she was trying to make

10:58:57  2     sure she answered the question completely.

10:58:59  3              THE COURT:  Let's make sure the witness is

10:59:01  4     finished.

10:59:04  5     **A**      So, no, it's not set for the same point.  It's a

10:59:09  6     rolling six-week period of time.  And like when one week

10:59:15  7     rolls off, the next week rolls on.  So it's continuous.

10:59:18  8          I'm not sure I'm answering your question, I'm sorry.

10:59:32  9     It's a rolling period of time.  The most recent week rolls

10:59:37  10    off as the next week rolls on, and it takes into account the

10:59:42  11    volume of the store, the prescriptions that are dispensed,

10:59:47  12    and it ensures that the store cannot build the inventory

10:59:55  13    that they do not need, that they are dispensing the

10:59:58  14    inventory that they need and they have -- for their patients

11:00:02  15    that they have.  And if they're running out of tablets and

11:00:06  16    the algorithm is not set correctly or it needs to be

11:00:09  17    adjusted, it cannot be done if they're exceeding the

11:00:13  18    threshold or the ceiling without filling out an override

11:00:17  19    form that goes to their district manager for review and then

11:00:21  20    to my team to review and then on to the like our wholesaler.

11:00:28  21    **Q**      So let me ask the question -- are you through with

11:00:31  22    your answer?

11:00:31  23    **A**      Yes.

11:00:31  24    **Q**      Let me ask the question this way and see if we can get

11:00:35  25    some good understanding on it.

**Polster (Cross by Lanier)**          3388

| | | |
|---|---|---|
| 11:00:37 | 1 | You've got a Walgreens store, and that Walgreens store |
| 11:00:47 | 2 | has 100 bottles of oxy? |
| 11:00:56 | 3 | **A**    We would not have 100 bottles of oxy in one store at |
| 11:01:01 | 4 | one time. |
| 11:01:01 | 5 | **Q**    Here.  One bottle of oxy. |
| 11:01:04 | 6 | **A**    Okay. |
| 11:01:04 | 7 | **Q**    The number is irrelevant for this illustration. |
| 11:01:06 | 8 | If that store has one bottle of oxy and then the next |
| 11:01:15 | 9 | week has sold that bottle and orders one more bottle, and |
| 11:01:21 | 10 | the next -- |
| 11:01:21 | 11 | **A**    I'm sorry, can I correct you? |
| 11:01:23 | 12 | **Q**    Yeah. |
| 11:01:23 | 13 | **A**    The store cannot order. |
| 11:01:26 | 14 | **Q**    Okay. |
| 11:01:26 | 15 | **A**    So it has to be -- the algorithm that comes from the |
| 11:01:31 | 16 | ordering system, we do not let the store just order the |
| 11:01:36 | 17 | merchandise.  We -- the system places the order on behalf of |
| 11:01:45 | 18 | the store.  And if that algorithm that is determined for |
| 11:01:48 | 19 | that location, based on their volume and their peers and all |
| 11:01:50 | 20 | that kind of stuff, if it is not accurate and they need more |
| 11:01:55 | 21 | than what the system has generated for them, then they have |
| 11:01:59 | 22 | to use an override form to get additional product. |
| 11:02:04 | 23 | **Q**    And so we're clear, you're talking about the way the |
| 11:02:06 | 24 | system works now? |
| 11:02:08 | 25 | **A**    Yes. |

**Polster (Cross by Lanier)**                               3389

| | | |
|---|---|---|
| 11:02:08 | 1 | **Q**    Because it used to be that the pharmacy managers could |
| 11:02:13 | 2 | order the pills, right? |
| 11:02:14 | 3 | **A**    Yeah, back when I was in pharmacy and I worked back |
| 11:02:17 | 4 | there, early -- you know, late '90s, yes. |
| 11:02:19 | 5 | **Q**    Well, even into the 2000s the pharmacy managers could |
| 11:02:23 | 6 | order the pills, right? |
| 11:02:24 | 7 | **A**    Yes, they placed it on paper forms that came for the |
| 11:02:27 | 8 | DEA, yes. |
| 11:02:28 | 9 | **Q**    So if I'm talking about back in the 2000 to 2010 |
| 11:02:36 | 10 | range, you don't have that algorithm in place yet, do you? |
| 11:02:40 | 11 | **A**    Correct. |
| 11:02:40 | 12 | **Q**    That doesn't come into play until 2014 or '13? |
| 11:02:46 | 13 | MS. SWIFT:  Objection, foundation. |
| 11:02:47 | 14 | THE COURT:  Overruled. |
| 11:02:49 | 15 | **A**    It was in place -- I know it was in place in 2012 |
| 11:02:55 | 16 | because I got trained on it. |
| 11:02:56 | 17 | **Q**    Okay.  That gives us an idea. |
| 11:02:58 | 18 | **A**    But I don't know how far before that, in fairness. |
| 11:03:01 | 19 | **Q**    Fair enough.  And so we'll leave the gap there.  We |
| 11:03:04 | 20 | know that the algorithm is here, we know the algorithm was |
| 11:03:08 | 21 | not here. |
| 11:03:09 | 22 | Fair? |
| 11:03:10 | 23 | **A**    Or a different algorithm, but yes. |
| 11:03:12 | 24 | **Q**    Different or no. |
| 11:03:16 | 25 | Now, whether the algorithm or a process orders the |

**Polster (Cross by Lanier)**                3390

11:03:24   1   bottle or a pharmacy orders the bottle, depending upon the

11:03:28   2   year, you get a bottle of oxy, and then you might need

11:03:34   3   another one because you sold it.  Right?

11:03:36   4   **A**   Correct.

11:03:36   5   **Q**   Might need another one because you sold it.  Right?

11:03:41   6   **A**   Yes.

11:03:41   7   **Q**   And the algorithm on a store-by-store basis keeps up

11:03:47   8   and tries to see whether or not there's an increase that's

11:03:53   9   unusual, right?

11:04:01  10       Does it look for unusual increases?

11:04:05  11   **A**   My algorithm does.  I cannot speak to what happened

11:04:11  12   before my team took over.

11:04:12  13   **Q**   Okay.  And that's some of the clarification I wanted.

11:04:16  14       So that line right there, we need to keep it down

11:04:20  15   coming this way.  Now it looks for unusual increases.  You

11:04:24  16   don't know if it did before, right?

11:04:25  17   **A**   Correct.

11:04:26  18   **Q**   Okay.  And if it looks for unusual increases, it does

11:04:31  19   that on a six-week rolling basis?

11:04:33  20   **A**   Mine does, yes.

11:04:34  21   **Q**   And I'll stay on your side of that line.

11:04:40  22       So it allows a gradual increase on a six-week rolling

11:04:45  23   basis but not a sharp increase, fair?

11:04:49  24   **A**   It will allow an increase to the threshold that was

11:04:57  25   determined for that store based on its peers and the

**Polster (Cross by Lanier)**                3391

11:05:02  1    prescriptions that has dispensing, but it won't go over that

11:05:06  2    threshold that is set for that store.  There's a maximum

11:05:08  3    amount that is set based on the volume of the store and the

11:05:14  4    peers' like stores in their group.

11:05:17  5    **Q**    All right.  Last juror question that I've been able to

11:05:21  6    find is this one that says, "Jonkman-systemic matter?  Based

11:05:31  7    on what?"

11:05:32  8    **A**    So he had made a comment because he had not seen the

11:05:35  9    aggregated data for that basic control initiative yet.  He

11:05:39  10   was hearing from, you know, like, people that he oversaw

11:05:43  11   because he worked in the asset -- or loss prevention

11:05:46  12   department at the time.  And he was seeing some of the data

11:05:49  13   come in.  He did not see all of the data come in.

11:05:53  14        So his comment to me in -- you know, in that hallway

11:05:58  15   conversation was, "I don't know if this is systemic or

11:06:03  16   what's happening yet.  I don't have all the data.  I'm just

11:06:05  17   giving you a heads up that this is what I've seen on a

11:06:09  18   couple of the reports that have come in."

11:06:12  19   **Q**    And in that regard, I went through the big box of --

11:06:16  20   Ms. Conroy went through the big box of refusals to fill, and

11:06:25  21   we found Walgreens 2604.00566.

11:06:31  22        It says, "Do we still have a good faith dispensing

11:06:35  23   refusal folder?  Couldn't find it."

11:06:37  24        Do you see that note?

11:06:39  25   **A**    I see it.

**Polster (Cross by Lanier)** 3392

| | | |
|---|---|---|
| 11:06:39 | 1 | **Q**    Let's understand it, please. |
| 11:06:42 | 2 |      GFD stands for good faith dispensing, right? |
| 11:06:48 | 3 | **A**    Yes. |
| 11:06:48 | 4 | **Q**    And that's the folder where these forms are supposed |
| 11:06:53 | 5 | to be, right? |
| 11:06:54 | 6 | **A**    Yes. |
| 11:06:54 | 7 | **Q**    And you've told us repeatedly the pharmacists can go |
| 11:06:59 | 8 | back and look in the folder, right? |
| 11:07:01 | 9 | **A**    Yes. |
| 11:07:01 | 10 | **Q**    And yet we have a note from one of these stores in |
| 11:07:06 | 11 | Ohio that says, do we still have such a folder?  I couldn't |
| 11:07:13 | 12 | find it. |
| 11:07:13 | 13 |      Do you see that that note? |
| 11:07:16 | 14 | **A**    I do see that. |
| 11:07:18 | 15 | **Q**    And so if we look at what was or was not dispensed or |
| 11:07:23 | 16 | what might be attached, the page doesn't tell us anything at |
| 11:07:26 | 17 | all, does it? |
| 11:07:27 | 18 | **A**    I don't know what that is. |
| 11:07:31 | 19 | **Q**    This was the way it was in your box you told us about. |
| 11:07:34 | 20 | You understand this is the copy of your box we got. |
| 11:07:36 | 21 | **A**    I understand that. |
| 11:07:37 | 22 | **Q**    Well, do you think that's a good thing if the store |
| 11:07:42 | 23 | people can't find the good faith dispensing refusal folder? |
| 11:07:47 | 24 | **A**    There could be all kinds of reasons why that |
| 11:07:51 | 25 | pharmacist couldn't find it.  They could have been on leave, |

**Polster (Cross by Lanier)**                    3393

| | | |
|---|---|---|
| 11:07:54 | 1 | they could have been on vacation, it could have gotten |
| 11:07:56 | 2 | moved, there could have been a new pharmacy manager that |
| 11:07:59 | 3 | moved it and didn't communicate to all their pharmacists.  I |
| 11:08:04 | 4 | mean, I don't know the reason why she wrote that. |
| 11:08:08 | 5 | **Q**    Then one of the last documents that I want to talk to |
| 11:08:11 | 6 | you about from Ms. Swift's direct examination of you is |
| 11:08:17 | 7 | Walgreens Exhibit 23625.  It's the one with Brian Joyce |
| 11:08:23 | 8 | talking about Dr. Veres. |
| 11:08:27 | 9 | Remember this? |
| 11:08:27 | 10 | **A**    Yes. |
| 11:08:28 | 11 | **Q**    And it's the one where as of 2018 and Giant Eagle have |
| 11:08:35 | 12 | stopped filling controls for that doctor.  Right? |
| 11:08:39 | 13 | **A**    Yes. |
| 11:08:39 | 14 | **Q**    Now, the jury's already heard Mr. Joyce testify that |
| 11:08:44 | 15 | he's known this guy was a problem for 20 or 25 years. |
| 11:08:49 | 16 | Did you know that? |
| 11:08:49 | 17 | **A**    You just told me. |
| 11:08:50 | 18 | **Q**    Okay.  But other than me telling you, did you know it? |
| 11:08:53 | 19 | **A**    Or the e-mail that he sent. |
| 11:08:56 | 20 | **Q**    Yeah.  Well, I mean, the e-mail doesn't say the 20 to |
| 11:08:59 | 21 | 25 years, but the e-mail does say, "See below.  Is there any |
| 11:09:05 | 22 | way we can refuse his scripts?  This doctor has been a |
| 11:09:08 | 23 | problem for a long time." |
| 11:09:10 | 24 | Do you see that? |
| 11:09:10 | 25 | **A**    I see that. |

**Polster (Cross by Lanier)**

| | | |
|---|---|---|
| 11:09:11 | 1 | **Q**     Well, I mean, it's possible to refuse his scripts. |
| 11:09:18 | 2 | Giant Eagle is doing it, right? |
| 11:09:23 | 3 | **A**     That's what it says. |
| 11:09:24 | 4 | **Q**     Walmart's doing it, right?  At this point in time. |
| 11:09:32 | 5 | **A**     Yes. |
| 11:09:32 | 6 | **Q**     But y'all's reply is, "We have to continue to adhere |
| 11:09:37 | 7 | to our good faith dispensing policy and guidelines.  If |
| 11:09:47 | 8 | they're refusing scripts and they feel this is a problem due |
| 11:09:49 | 9 | to poor prescribing behaviors, the store can contact the |
| 11:09:53 | 10 | Ohio Board of Medicine to report this prescriber.  Ensure if |
| 11:09:59 | 11 | they feel the doctor is not prescribing medications |
| 11:10:01 | 12 | appropriately, they need to have good documentation." |
| 11:10:04 | 13 |         Do you see that? |
| 11:10:04 | 14 | **A**     I do. |
| 11:10:05 | 15 | **Q**     It does not say, yes, let's refuse, does it? |
| 11:10:12 | 16 | **A**     No, we do not blanketly refuse all prescribers' |
| 11:10:17 | 17 | prescriptions. |
| 11:10:17 | 18 | **Q**     You all just review each prescription on its own |
| 11:10:20 | 19 | merit, right? |
| 11:10:21 | 20 | **A**     That is correct. |
| 11:10:21 | 21 | **Q**     And so I've got what I'll -- I have marked as |
| 11:10:25 | 22 | Plaintiffs' Exhibit 23676. |
| 11:10:31 | 23 |             MR. LANIER:  If you could pass that out, |
| 11:10:32 | 24 | please, ladies. |
| 11:10:48 | 25 | **Q**     Do you have that in front of you? |

**Polster (Cross by Lanier)**                                     3395

| | | |
|---|---|---|
| 11:10:50 | 1 | **A**    I do. |
| 11:10:50 | 2 | **Q**    This is a collection of prescriptions that Walmart's |
| 11:10:55 | 3 | filled -- |
| 11:10:58 | 4 | MS. SWIFT:  Walgreens. |
| 11:11:00 | 5 | MR. LANIER:  Excuse me.  Strike that, Your |
| 11:11:01 | 6 | Honor. |
| 11:11:01 | 7 | **Q**    This is a collection of prescriptions that Walgreens |
| 11:11:04 | 8 | filled over the years for Dr. Torres? |
| 11:11:09 | 9 | MS. SWIFT:  Objection.  No, it's not. |
| 11:11:13 | 10 | **Q**    Dr. Veres. |
| 11:11:14 | 11 | MR. LANIER:  Judge, I think I left my brain |
| 11:11:16 | 12 | during the break in the break room.  Let me try it again. |
| 11:11:20 | 13 | **Q**    What we have here are prescriptions that Walgreens |
| 11:11:27 | 14 | filled for Dr. Veres. |
| 11:11:34 | 15 | Do you see that? |
| 11:11:34 | 16 | **A**    I do. |
| 11:11:36 | 17 | **Q**    And so we can look through here, and we can see, for |
| 11:11:41 | 18 | example, where OARRS reports are run before filling them. |
| 11:11:45 | 19 | MS. SULLIVAN:  Your Honor, I'm sorry -- |
| 11:11:52 | 20 | THE COURT:  Hold it. |
| 11:11:52 | 21 | MS. SULLIVAN:  Your Honor, can we get on a |
| 11:11:54 | 22 | side bar and take that down? |
| 11:11:58 | 23 | (At side bar at 11:11 a.m.) |
| 11:12:07 | 24 | MS. SULLIVAN:  Your Honor, as I understand |
| 11:12:10 | 25 | Your Honor's ruling that he show this as to Walgreens |

**Polster (Cross by Lanier)** 3396

11:12:13 1   because Your Honor has decided they've opened the door, this

11:12:17 2   has Giant Eagle prescriptions on it.  And Your Honor's

11:12:19 3   ruling was clear that there's no individual prescription

11:12:21 4   data that should be admitted as against the other

11:12:24 5   defendants.

11:12:28 6               MS. SWIFT:  For the record, I don't believe

11:12:29 7   the judge has ruled that any door has opened as to

11:12:32 8   Walgreens.

11:12:33 9               THE COURT:  Well, first of all, the

11:12:36 10  representation is that these are prescriptions that

11:12:38 11  Walgreens refused to fill.  I'm not --

11:12:40 12              MR. LANIER:  No, that they did fill, Your

11:12:41 13  Honor.

11:12:41 14              THE COURT:  Oh, that they did fill.

11:12:43 15              MR. LANIER:  Yes.

11:12:43 16              THE COURT:  But I don't know how Walgreens

11:12:45 17  would have filled a Giant Eagle prescription.  So if there's

11:12:47 18  Giant Eagle in here, I don't think they should be.

11:12:51 19              MR. LANIER:  Well, Walgreens runs the OARRS

11:12:56 20  report.

11:12:56 21              THE COURT:  If it was generated -- if

11:12:57 22  Walgreens generated an OARRS report and the OARRS report

11:13:00 23  shows a Giant Eagle prescription, well, then that's still --

11:13:04 24  this Walgreens witness can be examined on it.

11:13:06 25              MR. LANIER:  And that's all I'll do, Your

11:13:08  1    Honor.  Thank you.

11:13:08  2              MS. SULLIVAN:  Your Honor, I would object that

11:13:09  3    she be examined on Giant Eagle prescriptions or that it be

11:13:12  4    shown consistent with your Your Honor's prior ruling.

11:13:15  5              THE COURT:  My prior ruling was different.  If

11:13:18  6    a Walgreens employee before filling a prescription runs an

11:13:23  7    OARRS report, the OARRS report's going to show maybe data

11:13:28  8    from a lot of pharmacies.  But that's -- that's admissible

11:13:31  9    if that's what the witness did or the pharmacist did.

11:13:36  10             MR. LANIER:  Thank you, Judge.

11:13:38  11             (In open court at 11:13 a.m.)

11:13:50  12   BY MR. LANIER:

11:13:51  13   **Q**    So, for example, we can look on page --

11:13:57  14             MR. LANIER:  The Bates number, Your Honor, for

11:13:58  15   the record, is 1094719.

11:14:03  16   **Q**    And we have here an OARRS report.

11:14:06  17         Do you recognize this?

11:14:07  18   **A**    I do.

11:14:08  19   **Q**    And this OARRS report is one that shows prescriptions

11:14:15  20   being filled by Dr. Frank Veres.

11:14:20  21         Do you see that?

11:14:20  22   **A**    Yes.

11:14:21  23   **Q**    And we've got Walgreens filling one there, we've got

11:14:26  24   Walgreens filling two, three more, four more, five more, six

11:14:31  25   more.

**Polster (Cross by Lanier)**                                              3398

11:14:32    1          You see that?

11:14:33    2     **A**    I do.

11:14:34    3     **Q**    You can continue to look through what Walmart did with

11:14:39    4     Dr. Veres --

11:14:40    5               THE COURT:  Walgreens.

11:14:41    6               MR. LANIER:  Walgreens.  Judge, I apologize.

11:14:43    7     **Q**    What Walgreens did for Dr. Veres.  And you've got, for

11:14:50    8     example, a sheet that ends in Bates number 1327.  It's got a

11:14:56    9     prescription by Frank Veres.

11:14:58   10          Do you see that?

11:14:58   11     **A**    Yes.

11:14:58   12     **Q**    Oxycodone, 15 milligram tablets, right?

11:15:03   13     **A**    Yes.

11:15:03   14     **Q**    Payment, cash.  127 bucks and change.

11:15:10   15          See that?

11:15:10   16     **A**    Yes.

11:15:13   17     **Q**    We can go through and see things like here's a good

11:15:16   18     faith dispensing checklist, on page 1328.  This is what your

11:15:21   19     people were trained to fill out, right?

11:15:24   20     **A**    Yes.

11:15:24   21     **Q**    And this one, did the pharmacist offer naloxone?  Says

11:15:34   22     no.  But maybe that's because it wasn't a big enough

11:15:38   23     prescription?

11:15:39   24     **A**    I don't know why they didn't do that.

11:15:41   25     **Q**    "Was there a valid Government photo ID copied and

**Polster (Cross by Lanier)**                                    3399

11:15:46   1   attached to a hard copy of the prescription?"  No.

11:15:52   2        Do you see that?

11:15:53   3   **A**   I do.

11:15:53   4   **Q**   Still dispensed though, right?

11:15:55   5   **A**   Doesn't mean that they didn't know the patient.

11:15:57   6   **Q**   Well, they don't circle that.

11:16:00   7   **A**   No, they didn't, but --

11:16:02   8   **Q**   And in fact, it says, "ID is optional for hospice,

11:16:09   9   oncology, bedside delivery, sickle cell patients, and

11:16:13  10   patients known, and the underlining is in the form itself,

11:16:17  11   right, to the pharmacy staff unless it's required by state."

11:16:21  12        So -- and "patients known," it's "no," isn't it?

11:16:28  13   **A**   They're answering no to -- well, the way I read it is

11:16:34  14   they're answering as a valid Government ID posted -- or

11:16:38  15   attached to the hard copy.  That's the way I read it.

11:16:40  16   Because they didn't circle known does not mean that they did

11:16:44  17   not know the patient.

11:16:45  18   **Q**   So your testimony is the way these forms are filled

11:16:47  19   out, it doesn't all have to be yes before it's a problem?

11:16:51  20   You expect to have nos on that --

11:16:52  21   **A**   I am expecting the pharmacists to do their due

11:16:57  22   diligence and fill out their documentation.

11:16:58  23   **Q**   But, ma'am, you are one of the ones who talks about

11:17:03  24   the training and reviewing their work.  This is a Dr. Veres

11:17:08  25   prescription that Walgreens fills in these counties, and it

**Polster (Cross by Lanier)** 3400

11:17:14   1   asks for a valid Government ID copied and attached, and it's

11:17:18   2   not done.

11:17:20   3        And there's no indication on here that the pharmacist

11:17:22   4   knew the patient, is there?

11:17:25   5   **A**     There's no indication on the form.

11:17:26   6   **Q**     There is room down below to put notes if the

11:17:31   7   pharmacist knows the patient, true?

11:17:33   8   **A**     The pharmacist -- it's up to the pharmacist on what

11:17:37   9   notes they want to put in there.

11:17:38  10   **Q**     That wasn't my question, ma'am.

11:17:39  11        I said there's room down below to put notes if the

11:17:43  12   pharmacist knows the patient.  True?

11:17:45  13   **A**     Yes, there's room for them to write notes.

11:17:48  14   **Q**     Thank you.

11:17:48  15        Continuing to look through this exhibit.  Bates Number

11:17:55  16   9681.

11:17:56  17        Here's another target good faith dispensing checklist.

11:17:59  18        Do you see this one?

11:18:00  19   **A**     Yes.

11:18:00  20   **Q**     "Valid Government photo ID copied."  Yes.

11:18:09  21        "No prior good faith for this refusal."  Yes.

11:18:13  22        "PDMP has been checked."  Yes.

11:18:15  23        "Patient has received this prescription from Walgreens

11:18:18  24   before."

11:18:26  25        What's the answer on that one?

**Polster (Cross by Lanier)**                    3401

11:18:27  1   **A**    They did not fill out the form.

11:18:29  2   **Q**    That's not right, is it?

11:18:32  3   **A**    We ask them to use the form as part of the policy and

11:18:38  4   use it for documentation.

11:18:40  5   **Q**    I said that's not right, is it?

11:18:42  6   **A**    Not right about what?

11:18:44  7   **Q**    That's not following policy, is it?

11:18:46  8   **A**    Correct.

11:18:46  9   **Q**    And yet the drug is dispensed, right?

11:18:53  10  **A**    Yes.

11:18:53  11  **Q**    Dr. Frank Veres, a doctor that Brian Joyce says he

11:18:59  12  doesn't need to make phone calls because everybody knows

11:19:02  13  this guy has been a problem for 20-plus years, right?

11:19:05  14  **A**    I can just tell you what was on the e-mail.

11:19:08  15  **Q**    Page 465.  Another dispensing checklist for Dr. Frank

11:19:16  16  Veres from this county.

11:19:18  17         Do you see this?

11:19:19  18  **A**    Yes.

11:19:19  19  **Q**    Yes here, and it looks like "known" was circled.

11:19:28  20         Yes.  Yes.

11:19:30  21         But look at number 9.  "Chronic prescription use can

11:19:36  22  be explained and is supported by documentation."

11:19:40  23         Do you see that?

11:19:41  24  **A**    I do.

11:19:42  25  **Q**    And what's checked there?

**Polster (Cross by Lanier)** 3402

| | | |
|---|---|---|
| 11:19:43 | 1 | **A**    They've got "no" on the checklist. |
| 11:19:45 | 2 | **Q**    And do they have any notes to explain why this -- |
| 11:19:49 | 3 |         MS. SWIFT:  Objection.  She didn't finish her |
| 11:19:51 | 4 | answer. |
| 11:19:51 | 5 | **A**    Do you have a prescription -- or a copy of the actual |
| 11:19:54 | 6 | hard copy prescription for this one? |
| 11:19:57 | 7 | **Q**    So what we've got is the page before it and the page |
| 11:20:04 | 8 | after it. |
| 11:20:05 | 9 | **A**    I'm sorry, could you put the page before it and remove |
| 11:20:07 | 10 | your thumb?  Okay. |
| 11:20:10 | 11 | **Q**    Oh, sorry. |
| 11:20:12 | 12 | **A**    Okay.  Thanks. |
| 11:20:13 | 13 | **Q**    No note on the prescription, is there? |
| 11:20:16 | 14 | **A**    Well, I don't know what that M25.9 is. |
| 11:20:21 | 15 | **Q**    Okay.  You know what oxycodone is? |
| 11:20:24 | 16 | **A**    I do, but I guess where my head is going is is the |
| 11:20:28 | 17 | M25.9 a diagnosis code that they called and got.  I don't |
| 11:20:35 | 18 | know.  It's not documented on the checklist as you |
| 11:20:39 | 19 | indicated, correct. |
| 11:20:39 | 20 | **Q**    I mean, we're looking at the checklist -- |
| 11:20:42 | 21 | **A**    It is not on the checklist, but if you recall, it |
| 11:20:44 | 22 | doesn't always have to be on the checklist.  They have |
| 11:20:46 | 23 | multiple places to put it.  I get it's not to policy, but |
| 11:20:50 | 24 | they have multiple places that they can enter information on |
| 11:20:54 | 25 | their hard copy, on the patient's profile. |

**Polster (Cross by Lanier)**                                          3403

11:20:57  1      But, yes, they marked that no, just exactly like you

11:21:00  2   said.

11:21:00  3   **Q**     You can look at page 4379 is the end of the Bates

11:21:09  4   number.

11:21:10  5      It looks like on this one everything's just done

11:21:15  6   "yes."

11:21:16  7      Then it says "refused" is checked?

11:21:19  8   **A**     No, I don't see that as refused checked.  They signed

11:21:22  9   on the top line.

11:21:25  10  **Q**     No, yeah, this is a dispensed drug.  I'm asking you,

11:21:28  11  do you think that looks like they checked refused?

11:21:32  12  **A**     I can't tell what they checked.  It looks to me like

11:21:35  13  the signature's higher, but I don't know.

11:21:45  14  **Q**     Page ending 9448, another Dr. Veres prescription

11:21:49  15  filled in this case in these counties.  We're in 2018.

11:21:59  16     Do you see this?

11:22:00  17  **A**     Yes.

11:22:00  18  **Q**     And here's your checklist.  "Patient does not appear

11:22:03  19  intoxicated or under the influence."  That got a "no."

11:22:07  20     Do you see that?

11:22:08  21  **A**     You know what this is telling me?  That I need to go

11:22:11  22  back and reword that question.  Because I'm wondering if our

11:22:14  23  pharmacists are reading it correctly.

11:22:17  24  **Q**     Well, either that -- well, I mean, the other ones had

11:22:19  25  no trouble answering solid yeses when they had solid yeses,

**Polster (Cross by Lanier)**                    3404

11:22:24  1    right?

11:22:24  2    **A**    Are those words exactly in the same place?  I'm sorry.

11:22:27  3    Okay.  Thank you.

11:22:28  4    **Q**    Yes.  Here is page 9355.  You'll see it's the exact

11:22:31  5    same form.

11:22:32  6    **A**    Got it.  Thank you.

11:22:33  7    **Q**    It is just, what, a month -- not even a month apart, a

11:22:39  8    few weeks apart.

11:22:40  9    **A**    Got it.

11:22:41  10   **Q**    Got it?

11:22:42  11         And all of the boxes are checked "yes," and this drug

11:22:49  12   is dispensed.

11:22:50  13         See that?

11:22:50  14   **A**    Yes.

11:22:50  15   **Q**    Here you've got one checked "no."

11:22:56  16         Right?

11:22:57  17   **A**    I see that.

11:22:58  18   **Q**    And yet it was dispensed, true?

11:23:01  19   **A**    You're telling me it's dispensed.  I --

11:23:07  20   **Q**    So when you put together all of this information, your

11:23:12  21   testimony is, we will still continue to fill prescriptions

11:23:17  22   based on a case-by-case basis even if it's someone that we

11:23:24  23   know is troublesome, even if it's someone we know the other

11:23:29  24   pharmacists will no longer fill for, Walgreens will keep

11:23:34  25   doing it, right?

11:23:35  1  **A**     Our policy is to evaluate each prescription and each

11:23:39  2  patient on its own merit.

11:23:41  3  **Q**     Okay.

11:23:42  4                    MR. LANIER:  I pass the witness, Your Honor.

11:23:44  5          Thank you, ma'am.

11:23:46  6                    MS. SWIFT:  Your Honor, if I could have just a

11:23:47  7  couple of minutes.  I do have some more questions.

11:23:53  8                    THE COURT:  Yes, sure, Ms. Swift.

11:23:57  9                    MS. SWIFT:  Thank you.

11:24:02  10                    (Pause in proceedings.)

11:24:43  11                    MR. LANIER:  Your Honor, may I approach

11:24:45  12  Mr. Pitts to give him back the notes?

11:24:47  13                    THE COURT:  Sure.

11:24:47  14                    MR. LANIER:  Thank you.

11:27:07  15                    MS. SWIFT:  Thank you for your patience.

11:27:08  16          Your Honor, may I proceed?

11:27:11  17                    THE COURT:  Yes, you may.

18                    MS. SWIFT:  Good morning, Ms. Polster.

19                    THE WITNESS:  Good morning.

20                    MS. SWIFT:  Thank you for your patience.  I'm

21  going to try to be as quick as I can.

22                         - - - - -

23                    REDIRECT EXAMINATION

24  BY MS. SWIFT:

11:27:17  25  **Q**     Good morning, Ms. Polster.  I'm going to try and be as

**Polster (Redirect by Swift)**

| | | |
|---|---|---|
| 11:27:20 | 1 | quick as I can. |
| 11:27:27 | 2 | This morning Mr. Lanier asked you about the refusals |
| 11:27:28 | 3 | to fill and the box that you saw.  Do you recall those |
| 11:27:31 | 4 | questions? |
| 11:27:31 | 5 | **A**   Yes. |
| 11:27:31 | 6 | **Q**   I think I heard you say that you didn't count them. |
| 11:27:34 | 7 | Do you know how many refusals there were for Lake and |
| 11:27:37 | 8 | Trumbull County in this -- in the time frame in this case? |
| 11:27:39 | 9 | **A**   I did not count them. |
| 11:27:41 | 10 | **Q**   Do you have any idea whether Mr. Lanier's math was |
| 11:27:44 | 11 | right? |
| 11:27:44 | 12 | **A**   I don't know. |
| 11:27:49 | 13 | **Q**   In your experience at Walgreens, is it fair to say |
| 11:27:51 | 14 | that some stores have refused more prescriptions than other |
| 11:27:54 | 15 | stores |
| 11:27:54 | 16 | **A**   Yes. |
| 11:27:54 | 17 | **Q**   Does the number of prescriptions a store refuses to |
| 11:27:58 | 18 | fill depend on the circumstances of that particular store? |
| 11:28:02 | 19 | **A**   Yes. |
| 11:28:02 | 20 | **Q**   Can you explain that briefly for the jury, why that |
| 11:28:05 | 21 | would be? |
| 11:28:05 | 22 | **A**   So, you know, there are some stores that receive more |
| 11:28:10 | 23 | controlled substances than others based on their geographic |
| 11:28:14 | 24 | location to, you know, prescribers that would write those |
| 11:28:19 | 25 | medications.  Not every prescriber will write an oxy.  A lot |

**Polster (Redirect by Swift)**

11:28:26  1    of -- you know, there's only a few prescribers in the

11:28:29  2    country that, you know, are trained in pain management and

11:28:33  3    that write it, so it's not super common to have a lot of

11:28:40  4    high dose controlled substance prescriptions come into

11:28:46  5    locations that a pharmacist would have concern with that

11:28:50  6    they would not be able to resolve the red flags.

11:28:52  7    **Q**    Is it fair to say that some stores might have more

11:28:56  8    high dose oxycodone prescriptions for good reason?

11:28:59  9    **A**    Yes.

11:28:59  10   **Q**    All right.  I want to ask some questions about the

11:29:12  11   example refusal that Mr. Lanier showed you this morning, and

11:29:15  12   I'll just try to identify -- I'm not sure I got the exhibit

11:29:19  13   number, but the Bates number on the first page is

11:29:26  14   WAG-MDL-01139001.  And it looks like --

11:29:30  15                MS. SWIFT:  If I could please have the ELMO,

11:29:32  16   I'll show you what it looks like on the front page.  Thank

11:29:36  17   you.

11:29:37  18   **Q**    Do you have that, Ms. Polster?

11:29:38  19   **A**    Yes.

11:29:38  20   **Q**    Does this example show you that Walgreens was -- their

11:29:45  21   pharmacists were running OARRS reports as far back as 2009

11:29:50  22   at least?

11:29:50  23   **A**    Yes.

11:29:50  24   **Q**    You see that there?

11:29:52  25   **A**    I do.

**Polster (Redirect by Swift)**

11:29:52    1    **Q**    Okay.  Why do you give a prescription back to the

11:30:02    2    patient when it's refused?  Is that required by law?

11:30:06    3              MR. WEINBERGER:  Objection.  Leading.

11:30:08    4              THE COURT:  Overruled.

11:30:10    5    **A**    We -- if we do not dispense the prescription, we do

11:30:16    6    give it back to the patient.  Generally, the only time it's

11:30:20    7    kept from the patient is if during the course of verifying

11:30:25    8    it, the prescriber will say, hey, I didn't write that

11:30:32    9    script, that's not a legitimate prescription.

11:30:36   10    But, yeah, we would give the prescription back to the

11:30:39   11    patient.

11:30:39   12    **Q**    Turning back to this example that Mr. Lanier showed

11:30:42   13    you, were you the pharmacist that refused this prescription?

11:30:47   14    **A**    No.

11:30:47   15    **Q**    Would you need to evaluate the circumstances of this

11:30:52   16    prescription as they appeared to the pharmacist at the

11:30:56   17    counter in order to determine whether to fill or refuse it?

11:30:59   18    **A**    Yes.

11:30:59   19    **Q**    I'd like to ask you a question about Exhibit 23678,

11:31:20   20    which is one of the ones that Mr. Lanier showed you this

11:31:22   21    morning.  I don't think I have my copy of it though.

11:31:35   22              MS. SWIFT:  If anyone has an extra copy, that

11:31:38   23    would be great.

11:31:42   24    I found it.

11:31:43   25              MR. LANIER:  I've got a copy if it helps,

11:31:45   1   Ms. Swift.

11:31:47   2              MS. SWIFT:  Thank you.  I've got it.

11:31:49   3   BY MS. SWIFT:

11:31:50   4   **Q**   Do you have it, Ms. Polster?

11:31:52   5   **A**   I don't.

11:31:52   6   **Q**   I'll show you it to you.  You see it says 23678?

11:31:55   7   **A**   Yes.

11:31:56   8   **Q**   This is another example Mr. Lanier showed you this

11:31:58   9   morning?

11:31:58  10   **A**   Yes.

11:31:58  11   **Q**   My only question for you on this one is, do you see on

11:32:10  12   the checklist that's been filled out, do you see where it

11:32:14  13   says "PDMP" and there's a check mark?

11:32:18  14   **A**   Yes.

11:32:21  15   **Q**   Okay.  If you could for me, this next series of

11:32:30  16   questions pull out for me in your stack Plaintiffs' Exhibit

11:32:36  17   15085 and Exhibit 2606, which is behind Tab 9 in your binder

11:32:41  18   that I gave you.

11:32:46  19   **A**   I'm sorry.  What was the first one?

11:32:48  20   **Q**   Sure.  It's 15085.  It's the presentation deck about

11:32:53  21   the BCI audit.

11:33:05  22   **A**   Okay.

11:33:14  23   **Q**   Okay.  And I want to show -- I want to first focus on

11:33:18  24   on the right side of the screen I've got Exhibit 2606, which

11:33:23  25   is the executive summary with the more detailed results.

**Polster (Redirect by Swift)**

| | | |
|---|---|---|
| 11:33:26 | 1 | Do you see that? |
| 11:33:26 | 2 | **A**    Yes. |
| 11:33:26 | 3 | **Q**    I'm going to call out -- well, first before I do that, |
| 11:33:30 | 4 | I want to go to the right page in your presentation. |
| 11:33:35 | 5 | All right.  I've got on the screen the page that shows |
| 11:33:40 | 6 | 1,432 stores, 59.5 percent compliance rate. |
| 11:33:43 | 7 | Do you see that there? |
| 11:33:44 | 8 | **A**    Yes. |
| 11:33:44 | 9 | **Q**    And what I'm going to do is call out question number 5 |
| 11:33:48 | 10 | on the other document, which is the executive summary. |
| 11:33:53 | 11 | Can you see that? |
| 11:33:53 | 12 | **A**    Yes. |
| 11:33:54 | 13 | **Q**    And just so that it's very clear, we saw in the slide |
| 11:34:02 | 14 | deck we've got 1,432 stores, right? |
| 11:34:05 | 15 | **A**    Yes. |
| 11:34:05 | 16 | **Q**    Then in the executive summary we've also got 1,432 |
| 11:34:10 | 17 | stores. |
| 11:34:10 | 18 | It's the same stores, right? |
| 11:34:12 | 19 | **A**    Yes. |
| 11:34:13 | 20 | **Q**    Okay.  You see 59.5 percent up here in the slide deck. |
| 11:34:20 | 21 | Do you see that? |
| 11:34:21 | 22 | **A**    Yes. |
| 11:34:21 | 23 | **Q**    And that's -- is it the same 59.5 percent that we see |
| 11:34:26 | 24 | down here? |
| 11:34:27 | 25 | **A**    Yes. |

**Polster (Redirect by Swift)** 3411

11:34:27   1   **Q**    All right.  Now, just to make sure it's clear what

11:34:33   2   we're looking at with this question within the BCI audit,

11:34:36   3   the slide says, "When target drug prescriptions are

11:34:40   4   dispensed, pharmacy team members are responsible for

11:34:42   5   completing the target drug good faith dispensing checklist."

11:34:46   6        Did I read that correctly so far?

11:34:47   7   **A**    Yes.

11:34:47   8   **Q**    And we've seen a number of target drug checklists

11:34:51   9   filled out, including with the examples that Mr. Lanier

11:34:53  10   marked with you today.

11:34:54  11        Do you recall those?

11:34:55  12   **A**    Yes.

11:34:55  13   **Q**    Then the question from the BCI audit is, "Number of

11:35:00  14   stores that correctly had a completed TD GFD checklist

11:35:07  15   attached to the filled TD prescription hard copies."

11:35:10  16        Right?

11:35:11  17   **A**    Yes.

11:35:11  18   **Q**    Does this mean that those 1,432 stores weren't missing

11:35:17  19   a single checklist?

11:35:19  20   **A**    Correct.

11:35:20  21   **Q**    Does this mean that those 1,432 stores were perfect,

11:35:27  22   with respect to this question?

11:35:27  23   **A**    Yes.

11:35:33  24   **Q**    The 59.5 percent is referring to a perfect compliance

11:35:37  25   rate, do I have that correct?

| | | |
|---|---|---|
| 11:35:40 | 1 | **A**    Right. |
| 11:35:40 | 2 | **Q**    Then you see for another 377 stores, am I right that |
| 11:35:49 | 3 | the loss prevention team that conducted this audit found |
| 11:35:54 | 4 | checklists on every target drug prescription they looked for |
| 11:35:57 | 5 | except for one? |
| 11:35:58 | 6 | **A**    Yes. |
| 11:35:59 | 7 | **Q**    And you remember when we talked about this yesterday |
| 11:36:06 | 8 | we added up the bottom two buckets and we got 5.9 percent. |
| 11:36:12 | 9 |         Do you remember that? |
| 11:36:12 | 10 | **A**    Yes. |
| 11:36:12 | 11 | **Q**    Do these results mean that 94.1 percent of the stores |
| 11:36:16 | 12 | were missing five checklists or fewer? |
| 11:36:18 | 13 | **A**    Yes. |
| 11:36:18 | 14 | **Q**    You reported to the field -- am I right that you |
| 11:36:23 | 15 | reported to the field just the 59.5 percent that were |
| 11:36:28 | 16 | perfectly compliant? |
| 11:36:29 | 17 | **A**    Correct. |
| 11:36:30 | 18 | **Q**    Was that because you strive for perfect compliance? |
| 11:36:33 | 19 | **A**    Yes. |
| 11:36:34 | 20 | **Q**    Was that because you were working hard to get the |
| 11:36:37 | 21 | field to do as good a job as they possibly could? |
| 11:36:39 | 22 |             MR. WEINBERGER:  Objection, Your Honor.  I |
| 11:36:42 | 23 | mean at some point -- |
| 11:36:42 | 24 |             THE COURT:  Sustained. |
| 11:36:44 | 25 | **Q**    All right.  Now I'm going to go to another question in |

| | | |
|---|---|---|
| 11:36:47 | 1 | the slide deck that you've been asked questions about. |
| 11:36:55 | 2 | Okay.  Do you see the 1,820 stores on this slide on |
| 11:36:59 | 3 | the left-hand side of the screen? |
| 11:37:00 | 4 | **A**    Yes. |
| 11:37:04 | 5 | **Q**    I'm going to call out question number 7 in the |
| 11:37:10 | 6 | executive summary so we can do the same thing. |
| 11:37:21 | 7 | Okay.  Just to make sure that we are literally on the |
| 11:37:25 | 8 | same page.  Let me see if I can get it there.  I think that |
| 11:37:27 | 9 | will do. |
| 11:37:27 | 10 | Do you see the 1,820 stores on the slide deck? |
| 11:37:31 | 11 | **A**    Yes. |
| 11:37:31 | 12 | **Q**    Is that the same 1,820 stores in the executive summary |
| 11:37:38 | 13 | that I've highlighted? |
| 11:37:39 | 14 | **A**    Yes. |
| 11:37:40 | 15 | **Q**    Okay.  Focusing on what the slide deck says, it says, |
| 11:37:51 | 16 | "If the pharmacist determines that the TD prescription does |
| 11:37:54 | 17 | not meet GFD requirements, a copy of the refused |
| 11:37:58 | 18 | prescription and completed TD GFD checklist must be in the |
| 11:38:01 | 19 | designated refusal file folder." |
| 11:38:03 | 20 | Did I read that right? |
| 11:38:05 | 21 | **A**    Yes. |
| 11:38:05 | 22 | **Q**    Then the question that's being asked is, "The number |
| 11:38:10 | 23 | of stores that correctly had completed TD Government |
| 11:38:13 | 24 | checklist attached to the refused TD prescription hard |
| 11:38:17 | 25 | copies or copies." |

**Polster (Redirect by Swift)**                    3414

| | | |
|---|---|---|
| 11:38:19 | 1 | Do you see that? |
| 11:38:20 | 2 | **A**  Yes. |
| 11:38:20 | 3 | **Q**  Does that mean that 1,820 stores had no refusals that |
| 11:38:29 | 4 | were missing checklists? |
| 11:38:30 | 5 | **A**  Correct. |
| 11:38:30 | 6 | **Q**  It doesn't mean they had no refusals.  Is that fair? |
| 11:38:35 | 7 | **A**  Fair. |
| 11:38:35 | 8 | **Q**  What it's looking at here is to find among the |
| 11:38:38 | 9 | refusals that we have, how many are missing checklists |
| 11:38:43 | 10 | attached to them that are supposed to have checklists? |
| 11:38:45 | 11 | MR. WEINBERGER:  Objection, Your Honor. |
| 11:38:46 | 12 | Leading the witness. |
| 11:38:46 | 13 | **Q**  Is that fair? |
| 11:38:49 | 14 | MS. SWIFT:  I'm just trying to make sure I |
| 11:38:51 | 15 | understand what the question is asking. |
| 11:38:52 | 16 | THE COURT:  Overruled. |
| 11:38:53 | 17 | **Q**  Let me try to do it again a little bit more clearly. |
| 11:38:56 | 18 | Does this mean that for 1,820 stores, every single |
| 11:39:00 | 19 | refused prescription for a target drug that they looked at |
| 11:39:05 | 20 | had a checklist attached? |
| 11:39:06 | 21 | **A**  Yes. |
| 11:39:06 | 22 | **Q**  Is it true that those 1,820 stores had perfect |
| 11:39:12 | 23 | compliance? |
| 11:39:14 | 24 | **A**  Yes.  For that question, yes. |
| 11:39:18 | 25 | **Q**  Then you can see there's another 216 stores below |

11:39:22    1    referenced.

11:39:22    2         Do you see that?

11:39:23    3    A    Yes.

11:39:23    4    Q    For those 216 stores, does this result mean that just

11:39:28    5    one refused prescription for a target drug was missing a

11:39:33    6    checklist?

11:39:33    7    A    Yes.

11:39:34    8    Q    Does that mean that for those 216 stores, every other

11:39:38    9    refused prescription for a target drug that they looked for

11:39:42   10    had a checklist attached?

11:39:44   11    A    Yes.

11:39:45   12    Q    Is it true that the only part of these results that

11:39:50   13    you reported was the number of stores with an absolutely

11:39:52   14    perfect compliance rate?

11:39:54   15    A    On this one, yes.

11:39:56   16    Q    And that's the 75.7 percent compliance rate that we

11:39:59   17    see on the slide?

11:40:00   18    A    Yes.

11:40:00   19    Q    And the same is true with respect to the slide we were

11:40:04   20    looking at before.  Am I right that you only reported the

11:40:08   21    results that were perfect for these questions?

11:40:09   22    A    Yes.

11:40:10   23    Q    Do you hold yourself and your team to high standards?

11:40:13   24    A    I do.

11:40:14   25    Q    Do you believe there's always room to improve even if

**Polster (Redirect by Swift)**

| | | |
|---|---|---|
| 11:40:17 | 1 | you're doing a good job? |
| 11:40:18 | 2 | **A**    Definitely. |
| 11:40:19 | 3 | **Q**    Was the target drug checklist ever a requirement of a |
| 11:40:24 | 4 | settlement agreement with the DEA? |
| 11:40:26 | 5 | MR. WEINBERGER:  Objection, Your Honor. |
| 11:40:28 | 6 | Improper redirect.  It was not covered in recross. |
| 11:40:39 | 7 | (At side bar at 11:40 a.m.) |
| 11:40:50 | 8 | THE COURT:  All right.  I'm going to sustain |
| 11:40:51 | 9 | the objection because I'm not sure this -- this witness |
| 11:40:56 | 10 | didn't negotiate that agreement. |
| 11:40:59 | 11 | MS. SWIFT:  She testified she had knowledge |
| 11:41:00 | 12 | about it, Your Honor, and -- |
| 11:41:01 | 13 | THE COURT:  She knows about it, but I don't |
| 11:41:05 | 14 | think she's testified that she's the one who was tasked |
| 11:41:13 | 15 | with -- |
| 11:41:14 | 16 | MS. SWIFT:  I'll move on, Your Honor. |
| 11:41:15 | 17 | THE COURT:  -- with specifically designing |
| 11:41:18 | 18 | programs, new programs or changing other ones to comply with |
| 11:41:24 | 19 | it.  If she was, I'd let her answer. |
| 11:41:26 | 20 | MS. SWIFT:  I'll move on, Your Honor. |
| 11:41:28 | 21 | THE COURT:  Okay.  Thank you. |
| 11:41:33 | 22 | (In open court at 11:41 a.m.) |
| 11:41:39 | 23 | BY MS. SWIFT: |
| 11:41:39 | 24 | **Q**    In your -- in the questioning about the BCI audit, the |
| 11:41:46 | 25 | focus has been on the questions related to the target drug |

11:41:51    1    checklist.  Is that a fair statement?

11:41:53    2    **A**     Yes.

11:41:53    3    **Q**     Do you recall that the BCI audit covered other topics

11:41:57    4    as well?

11:41:58    5    **A**     Yes.

11:41:58    6    **Q**     All right.  I'm going to turn to one of the things

11:42:04    7    that Mr. Lanier asked you about this morning.

11:42:08    8         Do you remember the questions about the e-mail back

11:42:11    9    and forth between Brian Joyce about Dr. Veres?

11:42:15   10    **A**     Yes.

11:42:16   11    **Q**     Do you know if the Ohio Board of Medicine ever had a

11:42:20   12    concern with this doctor or took his license way?

11:42:24   13    **A**     I don't know.

11:42:24   14              MR. WEINBERGER:  Objection.

11:42:25   15              THE COURT:  Overruled.

11:42:25   16    **Q**     Do you know how many prescriptions Walgreens stores in

11:42:29   17    Lake and Trumbull County filled for Dr. Veres?

11:42:30   18    **A**     No.

11:42:31   19    **Q**     Do you know how the number of prescriptions that

11:42:33   20    Walgreens filled for Dr. Veres compared to other pharmacies

11:42:38   21    in the area?

11:42:38   22    **A**     No.

11:42:38   23    **Q**     Would it be appropriate, in your view, as a pharmacist

11:42:42   24    and a leader at Walgreens, to refuse all prescriptions from

11:42:45   25    an individual doctor who is licensed in the state of Ohio to

**Polster (Redirect by Swift)** 3418

11:42:49  1   write controlled substances prescriptions where the

11:42:53  2   pharmacist has determined that the prescription is

11:42:57  3   legitimate?

11:42:58  4   **A**    If the prescriber holds active licenses, then it would

11:43:07  5   not be appropriate to just refuse their prescriptions.  The

11:43:13  6   pharmacists would make a decision based on what they have in

11:43:15  7   front of them with the patient and the prescription and the

11:43:18  8   prescriber.

11:43:19  9   **Q**    Do you recall the -- one of the examples Mr. Lanier

11:43:22  10  put in front of you had a note on it on the checklist that

11:43:27  11  said "M25.9," and you asked about it, you said you weren't

11:43:32  12  sure it was a diagnosis code or not.

11:43:34  13       Do you remember that?

11:43:35  14  **A**    Yes.

11:43:35  15  **Q**    Do you know whether or not M25.9 is a diagnosis code

11:43:40  16  for a joint disorder?  Does that jog your memory?

11:43:43  17                 MR. WEINBERGER:  Objection.

11:43:43  18                 THE COURT:  Sustained.

11:43:48  19  **Q**    If a pharmacist is filling out a checklist and they

11:43:52  20  check "no" to a particular question, does that all by itself

11:43:56  21  mean the pharmacist is supposed to refuse the prescription?

11:43:59  22  **A**    No.

11:43:59  23  **Q**    Is it just a flag to consider?

11:44:02  24  **A**    Yes.

11:44:02  25  **Q**    Switching topics.

**Polster (Redirect by Swift)** 3419

11:44:08   1      Do you know that if Walgreens ever sold data to a

11:44:14   2    third party, it would have had to be deidentified?

11:44:18   3    **A**     Yes.  Any data that leaves our organization must be

11:44:21   4    deidentified.

11:44:22   5    **Q**     What does it mean to deidentify prescription data?

11:44:26   6    **A**     You take away any chance of patient privacy being

11:44:32   7    exposed, so you would not -- you would not send any patient

11:44:38   8    information.  You would send the prescription information,

11:44:42   9    like the drug, for example, but not the patient info.

11:44:50   10    **Q**     All right.  Now I would like for you to take out Tab

11:44:52   11    19 of your binder, please.  This is Plaintiffs' Exhibit

11:44:58   12    17156.

11:45:07   13      And this is the investigation file for the pharmacist

11:45:10   14    in Long Beach complaint.

11:45:12   15      Do you remember that?

11:45:12   16    **A**     Yes.

11:45:21   17    **Q**     All right.  I'm going to take you to page 9.  If you

11:45:24   18    would turn there with me, please.

11:45:28   19    **A**     Okay.

11:45:29   20    **Q**     And I want to ask you about the box on this page that

11:45:38   21    is just beneath the one that Mr. Lanier asked you about.

11:45:42   22    I'll call it out for you.

11:45:45   23      Do you recall that Mr. Lanier asked you questions

11:45:47   24    about this gray box that I'm indicating with the cursor?

11:45:50   25    **A**     Yes.

**Polster (Redirect by Swift)**

| | | |
|---|---|---|
| 11:45:50 | 1 | **Q**    I'll call out the box beneath that one. |
| 11:45:56 | 2 | Do you see that it says, towards the top, and I'll |
| 11:46:01 | 3 | highlight it, Jonkman -- and remind you who Jonkman is. |
| 11:46:06 | 4 | **A**    Scott Jonkman was the -- he worked in -- or he works |
| 11:46:10 | 5 | in the compliance investigation department. |
| 11:46:15 | 6 | **Q**    Do you see what I've highlighted that says, "Jonkman |
| 11:46:18 | 7 | wanted to clarify that he believes the managers handling of |
| 11:46:21 | 8 | the issue to be an isolated incident and not a systemic |
| 11:46:25 | 9 | matter"? |
| 11:46:27 | 10 | **A**    Yes. |
| 11:46:27 | 11 | **Q**    Do you know how Mr. Jonkman reached that conclusion? |
| 11:46:30 | 12 | **A**    It would had to have been on experience. |
| 11:46:36 | 13 | MR. WEINBERGER:  Objection, Your Honor.  Pure |
| 11:46:41 | 14 | speculation. |
| 11:46:41 | 15 | THE COURT:  Sustained.  Sustained. |
| 11:46:43 | 16 | **Q**    Just yes or no, Ms. Polster, do you know how |
| 11:46:46 | 17 | Mr. Jonkman reached that conclusion? |
| 11:46:48 | 18 | **A**    No. |
| 11:46:49 | 19 | **Q**    Then towards the middle do you see where it says -- |
| 11:46:56 | 20 | I'll highlight it first -- "Manager Domenick believes that |
| 11:47:18 | 21 | there should be clarification from DPR, HCS, and DM -- first |
| 11:47:22 | 22 | of all, what is DPR, HCS, and DM? |
| 11:47:26 | 23 | **A**    They are field leader positions in our organization. |
| 11:47:31 | 24 | **Q**    Do you know what DPR stands for? |
| 11:47:33 | 25 | **A**    Director of pharmacy and retail operations. |

| | | |
|---|---|---|
| 11:47:39 | 1 | **Q** Do you know what HCS stands for? |
| 11:47:41 | 2 | **A** Healthcare supervisor. |
| 11:47:42 | 3 | **Q** Is DM district manager? |
| 11:47:43 | 4 | **A** Yes. |
| 11:47:44 | 5 | **Q** Is SM store manager? |
| 11:47:46 | 6 | **A** Yes. |
| 11:47:47 | 7 | **Q** It says, "Manager Domenick believes that there should |
| 11:47:52 | 8 | be clarification from DPR, HCS, and DM to SM regarding SM's |
| 11:47:57 | 9 | roles in supporting pharmacists with GFD regardless of |
| 11:48:01 | 10 | possibility of customer complaint." |
| 11:48:03 | 11 | Do you see that? |
| 11:48:03 | 12 | **A** Yes. |
| 11:48:03 | 13 | **Q** It says, "They should not be attempting to influence |
| 11:48:06 | 14 | the pharmacist's decision to fill a prescription." |
| 11:48:10 | 15 | Do you see that? |
| 11:48:11 | 16 | **A** Yes. |
| 11:48:11 | 17 | **Q** Then at the bottom here, do you see that it says, is |
| 11:48:19 | 18 | has been determined to be an isolated local matter.  Steps |
| 11:48:21 | 19 | have been taken to ensure that management knows their role |
| 11:48:24 | 20 | in supporting pharmacists and that the pharmacist should |
| 11:48:28 | 21 | inform compliance if there are any new incidents." |
| 11:48:31 | 22 | Did I read that correctly? |
| 11:48:32 | 23 | **A** Yes. |
| 11:48:32 | 24 | **Q** And if you'll turn to page 4 of this document with me, |
| 11:48:38 | 25 | please. |

| | | |
|---|---|---|
| 11:48:48 | 1 | Do you see on page 4 the big gray box at the bottom |
| 11:48:53 | 2 | that is the response to the pharmacist? |
| 11:48:55 | 3 | **A**    Yes. |
| 11:48:55 | 4 | **Q**    Do you see in the second paragraph where it says, "To |
| 11:49:22 | 5 | summarize your letter"? |
| 11:49:24 | 6 | **A**    Yes. |
| 11:49:24 | 7 | **Q**    Then what I actually wanted to ask you about is in the |
| 11:49:36 | 8 | next paragraph. |
| 11:49:42 | 9 | Do you see that it says, "We are aware that this |
| 11:49:45 | 10 | matter has taken a considerable time to review, and we |
| 11:49:47 | 11 | appreciate your patience.  Since your letter alleges |
| 11:49:50 | 12 | systemic concerns, it took additional time to review your |
| 11:49:53 | 13 | concerns." |
| 11:49:56 | 14 | Is that appropriate, in your view, as a senior |
| 11:49:59 | 15 | executive at Walgreens? |
| 11:50:01 | 16 | **A**    Yes. |
| 11:50:01 | 17 | **Q**    Do you see that it says, "We do not want our |
| 11:50:07 | 18 | pharmacists to feel that they must disregard their |
| 11:50:10 | 19 | professional judgment or to fail to follow our established |
| 11:50:16 | 20 | GFD guidelines"? |
| 11:50:17 | 21 | **A**    Yes. |
| 11:50:18 | 22 | **Q**    Okay.  And I'll call out the bottom paragraph on this |
| 11:50:28 | 23 | page. |
| 11:50:30 | 24 | Do you see that it says, "In our review of this |
| 11:50:33 | 25 | matter, we have found no evidence of a systemic issue |

**Polster (Redirect by Swift)**

| | | |
|---|---|---|
| 11:50:36 | 1 | regarding GFD policy compliance.  Further, we have not found |
| 11:50:40 | 2 | any adverse employment-related action taken against you in |
| 11:50:44 | 3 | regards to your decision as a pharmacist." |
| 11:50:46 | 4 |     Do you see that? |
| 11:50:47 | 5 | **A**   Yes. |
| 11:50:47 | 6 | **Q**   Okay.  Now I'd like to you turn to page 18 of this |
| 11:50:50 | 7 | document.  And I'll direct your attention to the March 16, |
| 11:50:57 | 8 | 2018, e-mail from Tiffany Huynh. |
| 11:51:15 | 9 |     Do you see that towards bottom of the page? |
| 11:51:16 | 10 | **A**   I do. |
| 11:51:17 | 11 | **Q**   She says, "Below is a recap of the phone conversation |
| 11:51:20 | 12 | with the pharmacist who complained, Serge Ahmad." |
| 11:51:25 | 13 |     Do you see that? |
| 11:51:26 | 14 | **A**   Yes. |
| 11:51:27 | 15 | **Q**   So she's providing a recap of her conversation. |
| 11:51:30 | 16 |     Do you know whether Mr. Ahmad was the asset protection |
| 11:51:33 | 17 | manager involved? |
| 11:51:35 | 18 | **A**   I do not. |
| 11:51:38 | 19 | **Q**   And you can see the statement that was provided by |
| 11:51:43 | 20 | Ms. Huynh based on her conversation with Mr. Ahmad and the |
| 11:51:46 | 21 | pharmacist. |
| 11:51:46 | 22 |     Do you see that? |
| 11:51:47 | 23 | **A**   Yes. |
| 11:51:48 | 24 | **Q**   All right.  Now if you'd turn back one page to the |
| 11:51:50 | 25 | bottom of page 17.  And the March 23, 2018, note at the |

**Polster (Redirect by Swift)** 3424

| | | |
|---|---|---|
| 11:51:57 | 1 | bottom of the page -- I'll call it out. |
| 11:52:18 | 2 | I'll see if I can find it on my hard copy.  That might |
| 11:52:21 | 3 | be easier. |
| 11:52:37 | 4 | I apologize.  It was the next page in the same note. |
| 11:52:40 | 5 | The bottom of the note I wanted to call your attention to. |
| 11:52:47 | 6 | Do you see that it says, "JSB said that we should go |
| 11:52:51 | 7 | back to the pharmacist and offer one last opportunity to |
| 11:52:53 | 8 | provide more details regarding his complaint.  If he does |
| 11:52:57 | 9 | not want to provide any more detail and just leave it at the |
| 11:53:00 | 10 | information in the letter, that is fine." |
| 11:53:03 | 11 | Do you see that? |
| 11:53:03 | 12 | **A**    Yes. |
| 11:53:03 | 13 | **Q**    Then the next note up on the page from April 4, do you |
| 11:53:26 | 14 | see that? |
| 11:53:26 | 15 | **A**    Yes. |
| 11:53:40 | 16 | **Q**    It includes an e-mail from Serge Ahmad dated March 20, |
| 11:53:44 | 17 | 2018, at 4:58 p.m. |
| 11:53:46 | 18 | Can you see that? |
| 11:53:47 | 19 | **A**    Yes. |
| 11:53:47 | 20 | **Q**    It says that "The pharmacist complaining complained |
| 11:53:51 | 21 | about security concerns due to recent robberies." |
| 11:53:54 | 22 | Do you see the reference to recent robberies in the |
| 11:53:56 | 23 | area? |
| 11:53:56 | 24 | **A**    Yes. |
| 11:53:56 | 25 | **Q**    Mr. Ahmad says, "I advised I would partner with you |

**Polster (Redirect by Swift)** 3425

11:54:11 1  and ensure we have assessed the store from a security

11:54:14 2  perspective to ensure we have proper measures in place if it

11:54:17 3  is needed.  Let me know if you want to discuss off-line, but

11:54:20 4  I want to just make sure we do our due diligence in

11:54:22 5  addressing this part of the complainant's concern."

11:54:28 6       Do you see that?

11:54:29 7  **A**   Yes.

11:54:29 8  **Q**   Now, I'd like you to take a look at the response just

11:54:32 9  above the e-mail I just called out for you, and I'll leave

11:54:35 10  it so you can see both.

11:54:36 11       Do you see the response where it says, "While

11:54:41 12  discussing personal safety with team members, no one

11:54:45 13  mentioned any safety concerns.  I drove around the

11:54:49 14  store/neighborhood, appears to be some areas may be lower

11:54:52 15  income, very little graffiti."

11:54:54 16       Do you see that?

11:54:55 17  **A**   Yes.

11:54:55 18  **Q**   Okay.  If you take a look at page 15, do you see the

11:55:05 19  e-mail on --

11:55:06 20            MR. WEINBERGER:  Your Honor, can we have a

11:55:11 21  side bar?

11:55:12 22            (At side bar at 11:55 a.m.)

11:55:25 23            MR. WEINBERGER:  Your Honor, we are so far

11:55:27 24  afield from anything that occurred during recross.

11:55:33 25            MS. SWIFT:  Mr. Lanier asked all sorts of

11:55:35  1    questions about this very document.  I'm allowed to

11:55:36  2    redirect, Your Honor.

11:55:37  3                    MR. WEINBERGER:  Only if it's relevant to the

11:55:39  4    case or --

11:55:40  5                    THE COURT:  Yeah, the stuff about safety

11:55:42  6    concerns I don't think is relevant, Ms. Swift, so I -- I

11:55:49  7    think -- I'm not sure there's anything more relevant that

11:55:53  8    you've got here, so -- I'm not saying you can't ask any more

11:55:57  9    questions, but if I don't see the relevance, I'll sustain

11:56:02  10   it -- I'll sustain objections.

11:56:04  11                   MS. SWIFT:  All right, Your Honor.  Thank you.

11:56:18  12                   (In open court at 11:56 a.m.)

11:56:26  13   BY MS. SWIFT:

11:56:26  14   **Q**     All right, Ms. Polster, turn to page 5 of this

11:56:30  15   investigation file if you would, please.

11:56:31  16   **A**     Okay.

11:56:32  17   **Q**     Do you see the e-mail from Tiffany Huynh again dated

11:56:49  18   August 27?

11:56:50  19   **A**     Yes.

11:56:52  20   **Q**     I'll call out two of the paragraphs there.

11:57:02  21          "I wanted to let you know that I was able to address

11:57:07  22   District 254 managers and RXMs at a town hall meeting on

11:57:12  23   8/23/18.  We discussed that each RPH is responsible for

11:57:15  24   making sure that GFD guideline is used for controlled

11:57:19  25   substance and proper documentation is crucial when

**Polster (Redirect by Swift)**

11:57:22  1   clinical/professional judgment is called upon."

11:57:25  2       Do you see that?

11:57:26  3   **A**   Yes.

11:57:26  4   **Q**   Do you know if you're addressing District 254 managers

11:57:32  5   and RXMs -- that's pharmacy managers, correct?

11:57:35  6   **A**   Yes.

11:57:36  7   **Q**   Roughly how many people that might be?

11:57:39  8   **A**   Depending on the size of the district, probably 40 to

11:57:45  9   60.

11:57:46  10  **Q**   The next paragraph says, "As for managers, I stressed

11:57:50  11  the importance of providing support to our pharmacists and

11:57:53  12  their GFD decisions.  Managers are not to pressure

11:57:57  13  pharmacists in filling controlled substances if they decided

11:58:00  14  that the prescription does not meet the GFD guideline."

11:58:05  15      Is that consistent with Walgreens' policy?

11:58:06  16  **A**   Yes.

11:58:06  17  **Q**   All right.  Changing topics again.

11:58:16  18      You were asked some questions about the control versus

11:58:23  19  noncontrol percentages in one of the Excel spreadsheets that

11:58:28  20  we talked about yesterday.

11:58:29  21      Do you remember those questions?

11:58:30  22  **A**   Yes.

11:58:30  23  **Q**   Did you see any cash percentages on that -- well, let

11:58:39  24  me ask it a different way.

11:58:40  25      Did you know that Carmen Catizone, when he came in and

**Polster (Redirect by Swift)** 3428

| | | |
|---|---|---|
| 11:58:44 | 1 | testified to this jury, he said that 5 to 10 percent of |
| 11:58:49 | 2 | patients don't have insurance? |
| 11:58:52 | 3 | **A**    Yes. |
| 11:58:52 | 4 | **Q**    If a pharmacist is caught stealing opioids from a |
| 11:59:07 | 5 | pharmacy or selling them illegally out the back door, would |
| 11:59:12 | 6 | that pharmacist be fired immediately? |
| 11:59:14 | 7 | MR. WEINBERGER:  Objection.  Improper. |
| 11:59:16 | 8 | THE COURT:  Sustained.  Sustained. |
| 11:59:25 | 9 | **Q**    All right.  We're almost done. |
| 11:59:28 | 10 | You were asked questions about the kiosks or drop |
| 11:59:33 | 11 | boxes that Walgreens has in some of its stores for the safe |
| 11:59:37 | 12 | disposal of unused medications like opioids. |
| 11:59:40 | 13 | Do you remember those questions? |
| 11:59:41 | 14 | **A**    Yes. |
| 11:59:41 | 15 | **Q**    If somebody wants to figure out which Walgreens stores |
| 11:59:51 | 16 | have kiosks or don't have kiosks, does Walgreens provide |
| 11:59:55 | 17 | that information publicly on its website for patients? |
| 11:59:58 | 18 | **A**    Yes. |
| 11:59:58 | 19 | **Q**    Does Walgreens also provide something called |
| 12:00:05 | 20 | DisposeRx? |
| 12:00:06 | 21 | **A**    Yes. |
| 12:00:07 | 22 | **Q**    What is DisposeRx? |
| 12:00:09 | 23 | MR. WEINBERGER:  Objection.  Improper |
| 12:00:11 | 24 | redirection. |
| 12:00:18 | 25 | MS. SWIFT:  It's related -- |

| | | |
|---|---|---|
| 12:00:19 | 1 | THE COURT:  Sustained. |
| 12:00:22 | 2 | **Q**     Does Walgreens provide other ways for patients to |
| 12:00:25 | 3 | safely dispose of medications in addition to the kiosks or |
| 12:00:30 | 4 | the drop boxes where you can drop off unused medication? |
| 12:00:33 | 5 | **A**     Yes. |
| 12:00:33 | 6 | MR. WEINBERGER:  Objection.  Improper |
| 12:00:34 | 7 | redirect. |
| 12:00:35 | 8 | THE COURT:  I'll allow the one question.  So |
| 12:00:36 | 9 | she answered yes. |
| 12:00:37 | 10 | **A**     Yes. |
| 12:00:38 | 11 | MS. SWIFT:  Thank you, Ms. Polster.  That's |
| 12:00:39 | 12 | all I have. |
| 12:00:46 | 13 | MR. LANIER:  Am I allowed two minutes or not? |
| 12:00:49 | 14 | THE COURT:  Well, if you take two minutes then |
| 12:00:51 | 15 | I've got keep going with Ms. Swift.  And if there's more |
| 12:00:56 | 16 | questioning, I guess I'll break for lunch and have |
| 12:00:58 | 17 | Ms. Polster come back.  If you two of you are about done, |
| 12:01:01 | 18 | let's -- |
| 12:01:02 | 19 | MR. LANIER:  Your Honor, I truly have two |
| 12:01:03 | 20 | questions I could ask right now and I'll be done. |
| 12:01:06 | 21 | MS. SWIFT:  I object to that, Your Honor. |
| 12:01:08 | 22 | THE COURT:  Well, that puts us two questions |
| 12:01:09 | 23 | back, all right? |
| 12:01:10 | 24 | So go ahead, two questions each.  That's it. |
| 12:01:14 | 25 | - - - - - |

12:01:15   1                    RECROSS-EXAMINATION

12:01:15   2   BY MR. LANIER:

12:01:16   3   **Q**    Question one:  Every store has a checklist attached to

12:01:20   4   the refusals to fill supposedly.

12:01:21   5        Did you see how many were missing in your box?

12:01:23   6   **A**    I did not look through every one of those.

12:01:25   7   **Q**    Question two:  Handing back prescriptions.

12:01:27   8        Did you say the law requires you to do that?

12:01:29   9   **A**    I did not answer that.

12:01:30  10                   MR. LANIER:  Thank you, Judge.

12:01:32  11                   MS. SWIFT:  May I ask a few follow-up

12:01:33  12   questions, Your Honor?

12:01:34  13                   THE COURT:  Two.

12:01:43  14                         - - - - -

12:01:44  15                 FURTHER REDIRECT EXAMINATION

12:01:44  16   BY MS. SWIFT:

12:01:44  17   **Q**    Ms. Polster, have you taken steps throughout your

12:01:46  18   career at Walgreens to make sure that the pharmacists and

12:01:48  19   field leaders who you oversee do what they're supposed to do

12:01:52  20   with respect to preventing diversion of controlled

12:01:54  21   substances?

12:01:54  22                   MR. WEINBERGER:  Objection.

12:01:55  23                   THE COURT:  I'll sustain that one.  It has to

12:01:57  24   be two related to the two that Mr. Lanier asked.

12:02:03  25   **Q**    Ms. Polster, did you in the examples that Mr. Lanier

| | | |
|---|---|---|
| 12:02:06 | 1 | showed you today see any prescription that had been filled |
| 12:02:11 | 2 | that you believed should not have been filled? |
| 12:02:16 | 3 | **A**    No. |
| 12:02:16 | 4 | MS. SWIFT:  Thank you. |
| 12:02:18 | 5 | THE COURT:  Okay.  Thank you very much, |
| 12:02:20 | 6 | Ms. Polster, for a long three days.  So you may be excused. |
| 12:02:26 | 7 | We'll break for lunch.  One hour, and we'll pick up |
| 12:02:29 | 8 | with the next witness. |
| 12:02:30 | 9 | Usual admonitions apply. |
| 12:03:12 | 10 | (The jury is not present.) |
| 12:03:13 | 11 | MR. LANIER:  Judge, you want some more |
| 12:03:14 | 12 | documents? |
| 12:03:15 | 13 | THE COURT:  No, I'm overflowing up here, so |
| 12:03:17 | 14 | I'm asking Robert to file them back. |
| 12:03:20 | 15 | MS. SWIFT:  Judge, can I address something |
| 12:03:24 | 16 | just real quickly before we get to the documents? |
| 12:03:27 | 17 | I just wanted to make sure that -- I think Ms. Polster |
| 12:03:30 | 18 | misspoke.  She said she heard Mr. Catizone's testimony.  We |
| 12:03:33 | 19 | haven't showed her that.  She absolutely hasn't seen that, |
| 12:03:36 | 20 | just for the record. |
| 12:03:37 | 21 | MR. LANIER:  But you asked the question.  The |
| 12:03:39 | 22 | question was, "Did you know" -- this is word for word.  "Did |
| 12:03:41 | 23 | you know that Carmen Catizone when he came in here and |
| 12:03:43 | 24 | testified to this jury, he said that 5 to 10 percent of |
| 12:03:48 | 25 | patients don't have insurance?" |

12:03:49   1              Answer, "Yes."

12:03:50   2                   MS. SWIFT:  And that's why I raised it, Your

12:03:51   3      Honor.  We didn't show it to her.  She hasn't seen it.

12:03:51   4                   MR. WEINBERGER:  So then why would you ask the

12:03:54   5      question?

12:03:54   6                   THE COURT:  Then why would you ask the

12:03:56   7      question, Ms. Swift?  Why would you ask the question?

12:04:00   8                   MS. SWIFT:  I assumed she was going to say no,

12:04:02   9      Your Honor.

12:04:02  10                   THE COURT:  I don't know why you asked it.

12:04:03  11      You shouldn't have asked it.  There was no objection.  I let

12:04:05  12      the witness answer, and she answered.

12:04:08  13          So how she knows, I mean, that's what she said.  How

12:04:12  14      she knows, I don't know how she knows.

12:04:14  15                   MS. SWIFT:  Well, I just wanted to make sure

12:04:15  16      that you understood we did not show it to her, she hasn't

12:04:18  17      read it.

12:04:18  18                   MR. LANIER:  And a similar objection that we

12:04:20  19      got is when Ms. Swift asked this question:  "Why do you give

12:04:23  20      a prescription back to the patient when it's refused?  Is it

12:04:26  21      required by law?"

12:04:28  22          We objected.  Obviously it's leading.  But the problem

12:04:31  23      with the leading question is, the law says they don't have

12:04:34  24      to give it back.

12:04:35  25                   THE COURT:  Well, she didn't answer the second

| 12:04:37 | 1 | half of the question. |
| 12:04:38 | 2 | MR. LANIER:  You're right. |
| 12:04:38 | 3 | THE COURT:  And I could have jumped in, but |
| 12:04:40 | 4 | since you had objected to the question in the first place, I |
| 12:04:44 | 5 | didn't press it. |
| 12:04:44 | 6 | MR. LANIER:  And you allowed me to redirect on |
| 12:04:46 | 7 | it. |
| 12:04:46 | 8 | THE COURT:  Right. |
| 12:04:47 | 9 | MR. LANIER:  So I should shut up and apologize |
| 12:04:49 | 10 | for taking your time.  Thank you, Judge. |
| 12:04:51 | 11 | MS. SULLIVAN:  Your Honor, there's one issue |
| 12:04:52 | 12 | with the next witness.  I'm happy to take it up after lunch. |
| 12:04:55 | 13 | It will be a couple minutes. |
| 12:04:57 | 14 | THE COURT:  I don't even know who the next |
| 12:04:58 | 15 | witness is at this point. |
| 12:04:59 | 16 | MS. SULLIVAN:  Alexander. |
| 12:04:59 | 17 | MR. LANIER:  It's Dr. Caleb Alexander, Your |
| 12:05:02 | 18 | Honor.  I'll be glad to talk to my friend. |
| 12:05:04 | 19 | MS. SULLIVAN:  Maybe it's not an issue and, |
| 12:05:06 | 20 | Your Honor, we can raise it after lunch. |
| 12:05:08 | 21 | THE COURT:  See if you can resolve it.  If |
| 12:05:10 | 22 | not, I'll have to take it up at 1:00. |
| 12:05:18 | 23 | (A luncheon recess was taken at 12:05 p.m.) |
|  | 24 |  |
|  | 25 |  |

12:05:18   1              A F T E R N O O N   S E S S I O N

01:04:13   2                         - - - - -

01:04:13   3              (In open court at 1:04 p.m.)

01:04:16   4              MS. SWIFT:  Kate Swift for Walgreens, Your

01:04:20   5    Honor.

01:04:20   6        We had an opportunity to speak with Ms. Polster at the

01:04:22   7    break, and she said that the reason she knew what

01:04:25   8    Mr. Catizone had said was because Mr. Lanier told her in a

01:04:28   9    question to her on October 19, during the cross-examination.

01:04:32  10    And I have the transcript cite here if you'd like me to read

01:04:38  11    it to you.  I just wanted to make sure that the record was

01:04:40  12    clear on that.

01:04:41  13              THE COURT:  All right.  She has a better

01:04:44  14    memory than I did, because I hadn't remembered that

01:04:46  15    question.

01:04:47  16              MS. SWIFT:  Same.  I didn't either, Your

01:04:50  17    Honor.

01:04:51  18              THE COURT:  All right.  Well, I mean --

01:04:54  19              MS. SULLIVAN:  Your Honor, one other issue

01:04:55  20    before the jury comes back related to the witness that's

01:04:59  21    coming up.

01:05:00  22        The witness who's next up is Dr. Alexander.  He is a

01:05:06  23    pharmacoepidemiologist and an internal medicine doctor.  He

01:05:09  24    by his own admission in his report is not an addiction

01:05:14  25    specialist, and he has an opinion in his report about the

01:05:17  1    gateway theory.  Mr. Lanier advised us that he does intend

01:05:22  2    to solicit that opinion.  We would object as outside of his

01:05:28  3    expertise.

01:05:28  4                    THE COURT:  It's a little late to have a -- I

01:05:30  5    mean, there was a -- *Daubert* challenges, Ms. Sullivan, was a

01:05:33  6    month or more than a month ago, and I addressed any

01:05:37  7    challenges in my opinion.

01:05:39  8                    MR. LANIER:  Yeah, and I think you covered

01:05:40  9    this, Your Honor.

01:05:41  10                   MS. SULLIVAN:  Your Honor, understood.  You as

01:05:43  11   the gatekeeper, Your Honor, can revisit that.  It's way

01:05:45  12   outside of this witness's expertise.

01:05:47  13                   THE COURT:  It's way too late to be making a

01:05:49  14   *Daubert* challenge.

01:05:51  15                   MS. SULLIVAN:  Your Honor, the other objection

01:05:53  16   is it's cumulative.  They had Dr. Lembke who is in fact an

01:05:56  17   addiction specialist, and she did testify about the gateway

01:05:58  18   theory.  They also frankly had every witness they've called

01:06:02  19   so far except the company witnesses talk about the gateway

01:06:04  20   theory, so we also object that it's cumulative, Your Honor.

01:06:10  21                   THE COURT:  Well, if there were nine or ten

01:06:12  22   experts, yes, but I don't think having the second one is

01:06:14  23   improper.  So it's overruled on that basis.

01:06:17  24                   MS. SULLIVAN:  Thank you, Your Honor.

01:06:19  25       And we also, Your Honor, have just minor objections to

01:06:21   1   the slides that they want to use with Dr. Alexander.

01:06:26   2            MS. FIEBIG:  We do.  We received disclosure of

01:06:28   3   their slides and noted our objections.  But in particular,

01:06:31   4   several of the slides include data from the entire United

01:06:33   5   States including rates of opioid overdose deaths through the

01:06:36   6   entire United States, which we think are irrelevant and also

01:06:39   7   prejudicial to be shown because especially as to Giant

01:06:42   8   Eagle, which is not a national company, it's going to be

01:06:44   9   highly misleading and confusing to the jury.

01:06:48  10            MR. LANIER:  Your Honor, those opinions

01:06:49  11   specifically address various indicia of the epidemic,

01:06:54  12   including the proportion, the way the volume of opioids

01:07:00  13   increased nationally with the corresponding

01:07:03  14   addiction-related harms and overdose deaths, and he does it

01:07:06  15   on a national level, and then he zooms down into Ohio and

01:07:09  16   uses the national to show how consistent Ohio is in these

01:07:11  17   counties.

01:07:13  18        And so it's proper for him.  It's part of what he

01:07:17  19   looks at in his opinion.

01:07:19  20            THE COURT:  Well, I think anyone would.  I

01:07:20  21   doubt if anyone, you know, is going to have a -- there's

01:07:25  22   been a lot of testimony about national policies, about the

01:07:30  23   national impact of the opioid crisis, and so long as it's

01:07:35  24   specifically tied to an opinion as to these counties, I'll

01:07:40  25   allow it.

01:07:42   1              MS. FIEBIG:  Right.  And there are slides

01:07:43   2    specifically about these counties.  The ones that we object

01:07:46   3    to are the ones that are not.

01:07:48   4              THE COURT:  I understand that.  But it can't

01:07:49   5    pull them out of the blue.  He's got to explain the basis

01:07:52   6    for his opinions.

01:07:53   7              MS. FIEBIG:  Right, which are separate and

01:07:55   8    apart from the national statistics.

01:07:56   9              THE COURT:  Well, that's what you're saying,

01:07:57  10    but if that's the case, well, maybe I'll scrutinize it, but

01:08:03  11    if it's going to be tied to an opinion on Lake and Trumbull

01:08:09  12    County, I'll allow it.

01:08:10  13              MR. LANIER:  Thank you, Your Honor.

01:08:12  14        It is -- one of the Daubert tests is his findings in

01:08:15  15    our counties consistent with what you would test it against

01:08:17  16    on a national level.  So it's appropriate.  And we'll tie it

01:08:21  17    accordingly.

01:08:22  18              MS. FIEBIG:  Then, Your Honor, our last

01:08:23  19    objection is just to one slide in particular which

01:08:25  20    references the rate of deaths from AIDS and gun violence in

01:08:32  21    the discussion relative to opioid deaths on a nationwide

01:08:34  22    basis, and we think that one is particularly inflammatory

01:08:38  23    and prejudicial.

01:08:39  24              MR. LANIER:  That's no different than the

01:08:40  25    slides we've been seeing in the PowerPoints that compare all

01:08:43    1    sorts of --

01:08:43    2              THE COURT:  Well, I think we've already seen

01:08:45    3    slides that either or both sides used that showed that

01:08:50    4    opioid deaths were number one -- the number one cause of

01:08:54    5    accidental deaths in the country, and there was a slide

01:08:56    6    comparing opioid deaths to automobile accidents and I think

01:09:01    7    gun violence.  So the jury has seen that.  I don't know --

01:09:05    8    it wasn't objected to.  I can't remember if the defense, I

01:09:10    9    mean, offered it or the plaintiffs, but they've seen that.

01:09:12   10         So if it's -- if it's directly tied to an opinion on

01:09:19   11    opioid deaths, fine.  If it's isolated, I mean, it's not

01:09:24   12    relevant.

01:09:26   13         So I haven't seen the slide.

01:09:28   14              MS. FIEBIG:  I'm happy to show it to you, Your

01:09:29   15    Honor.  Certainly Giant Eagle did not introduce any slides

01:09:32   16    relating to gun violence or AIDS deaths.

01:09:34   17              THE COURT:  Well, Ms. Fiebig, it came out

01:09:38   18    through the questioning of other defendants or through the

01:09:40   19    questioning of the plaintiffs, and there was no objection --

01:09:42   20    I know there was no objection to the demonstrative.  So

01:09:46   21    they've seen this information already.  And it's a fact

01:09:52   22    which no one's disputing.

01:09:53   23         So, again, if it's -- does the demonstrative include

01:09:59   24    opioid deaths?  If it doesn't, I don't think it's relevant.

01:10:02   25              MR. LANIER:  It does, Your Honor.  It came

01:10:04   1   straight from the CDC information.  And what the opinion

01:10:08   2   says is -- I'll put it up if Mr. Pitts wants to --

01:10:12   3                  THE COURT:  I just want to make sure the slide

01:10:14   4   is tied -- contains information about opioid deaths.

01:10:17   5                  MR. LANIER:  Yes, it does, Your Honor.

01:10:18   6      The slide is opinion 8 from his report.  It says, "In

01:10:22   7   2017 alone, an estimated 47,600 people died in the U.S. from

01:10:27   8   opioids, more than from motor vehicle accidents, suicide,

01:10:29   9   gun violence, or deaths at the peak of the AIDS epidemic."

01:10:33   10                  THE COURT:  All right.

01:10:34   11                  MR. LANIER:  And that's straight out of the

01:10:35   12   CDC.

01:10:36   13                  THE COURT:  All right.  Well, again, the

01:10:37   14   jury's heard this or something similar.  It's a fact.

01:10:42   15   There's no dispute as to it.  It's accurate.

01:10:46   16      So the objection's overruled.

01:10:48   17                  MS. FIEBIG:  Thank you, Your Honor.

01:10:53   18                  THE COURT:  Okay.  Anything else?

01:10:55   19      All right.  We can bring them in then.

01:12:38   20                  (Jury present in open court at 1:12 p.m.)

01:12:48   21                  THE COURT:  Okay.  Good afternoon.  Please be

01:12:49   22   seated.

01:12:52   23      Mr. Lanier, you may call your next witness who is

01:12:56   24   here.

01:12:56   25                  MR. LANIER:  Yes, Your Honor.  Our next

**Alexander (Direct by Lanier)** 3440

01:12:57  1    witness is Dr. Caleb Alexander.

01:13:00  2         And Dr. Alexander, I think the judge will have you

01:13:03  3    stand.

01:13:05  4              THE COURT:  Yes, sir.  If you could please

01:13:06  5    stand and raise your right hand.

01:13:09  6              (Witness sworn.)

01:13:15  7              THE COURT:  Okay.  Please be seated, sir.  And

01:13:17  8    you may remove your mask while testifying.

01:13:22  9              MR. LANIER:  All right.  May it please the

01:13:24  10   Court.

01:13:24  11        Ladies and gentlemen, good afternoon.

01:13:26  12              G. CALEB ALEXANDER, MD

01:13:26  13                   - - - - -

01:13:26  14              DIRECT EXAMINATION

01:13:26  15   BY MR. LANIER:

01:13:27  16   **Q**    Dr. Alexander, good afternoon.

01:13:28  17   **A**    Good afternoon.

01:13:28  18   **Q**    Will you please introduce yourself to the jury, tell

01:13:33  19   them your name and then we'll talk a little bit about who

01:13:36  20   you are.

01:13:36  21   **A**    Of course.  My name is Caleb Alexander.  My first name

01:13:39  22   is George, so my formal name is George Caleb Alexander.

01:13:43  23   **Q**    Nobody calls you George?

01:13:45  24   **A**    No.  I sometimes go by G. Caleb or just Caleb.

01:13:49  25   **Q**    All right.  Doctor, I call you doctor because you are

01:13:52  1   a doctor.

01:13:54  2   **A**    That's true.

01:13:54  3   **Q**    All right.  We'll get to that in a minute, but first

01:13:57  4   let me give you a road map of where we're going.

01:14:00  5        Background, work, and findings.  Okay?

01:14:02  6   **A**    Looks great.

01:14:03  7   **Q**    And it is 1:14 p.m. right now.  The goal:  I'm going

01:14:09  8   to pass you by 2:00.  All right?

01:14:11  9   **A**    Okay.

01:14:12  10  **Q**    Tomorrow.  No, I'm joking.  I'm joking.

01:14:17  11           MR. LANIER:  I'm joking, Your Honor.

01:14:19  12  **Q**    Today, all right?  So let's get moving.

01:14:21  13       First of all, you are -- tell the jury just what it is

01:14:26  14  you do for a living.

01:14:27  15  **A**    Well, I'm an epidemiologist or the formal field is

01:14:32  16  pharmacoepidemiology.  And so that's the study of the use

01:14:35  17  and safety and effectiveness of prescription drugs in large

01:14:39  18  populations.

01:14:43  19  **Q**    All right.  Epidemiology, use and safety and

01:14:54  20  effectiveness of drugs in large populations.

01:14:56  21  **A**    Correct.

01:14:56  22  **Q**    Give the jury an example of one of the most famous

01:15:01  23  times that an epidemiologist did something big.

01:15:05  24  **A**    Well, in my field, some of the most important work

01:15:09  25  that we do is to study using large databases particularly

01:15:14 1 safety concerns or particular questions about how uses of

01:15:19 2 medicines have changed over time.  And these have effects

01:15:24 3 for thousands or millions of people depending upon the drug.

01:15:27 4 So, for example, looking at the potential cardiac

01:15:33 5 risks associated with a medicine like Ibuprofen can have

01:15:38 6 applications for millions of Americans, so that's sort of

01:15:41 7 the work that we do.

01:15:43 8 **Q** Well, epidemiology -- by the way, you and I have had a

01:15:46 9 chance to visit for, I don't know, 30, 45 minutes at least

01:15:49 10 before your testimony.  Is that right?

01:15:50 11 **A** Yes.

01:15:52 12 **Q** You've been in town thinking you were going to take

01:15:55 13 the stand a couple of days, but we visited two nights ago or

01:15:58 14 something; is that right?

01:15:59 15 **A** Correct.

01:15:59 16 **Q** All right.  In that regard, I did not ask you, but my

01:16:05 17 memory tells me that somewhere over in England epidemiology

01:16:11 18 had some start with poisoned water or people getting some

01:16:14 19 sickness or something.

01:16:15 20 Do you know anything about that or is that just in my

01:16:17 21 memory bank?

01:16:18 22 **A** Well, no, that's true as well.  I mean, historically,

01:16:21 23 some of the most important work that epidemiologists have

01:16:24 24 done is to identify the determinants of infectious diseases.

01:16:33 25 So I think there was a very famous case that you may

**Alexander (Direct by Lanier)**

01:16:35  1   be alluding to or referring to that was focused on trying to

01:16:38  2   figure out why people were getting sick in England, a

01:16:41  3   cluster of illnesses were occurring.  And I think that

01:16:44  4   ultimately it was figured out that this was from the spread

01:16:46  5   of infection that was occurring, what, on the handle of a

01:16:50  6   water pump or something like that.

01:16:54  7   **Q**    Yeah, okay, good, I'm glad that -- now, you've got,

01:16:57  8   like most professionals in your business, you've got what in

01:17:00  9   Latin means what's around your life, the curriculum vitae,

01:17:06  10  but it's basically sophisticated for a resume.

01:17:10  11       Is that right?

01:17:11  12  **A**    Yes.

01:17:11  13  **Q**    All right.  And if I put your resume, and it's

01:17:17  14  demonstrative 40 for the record, if I put your CV or your

01:17:22  15  resume up here, it's got you as an MD.

01:17:24  16       Does that mean you're a medical doctor?

01:17:26  17  **A**    Yes.

01:17:26  18  **Q**    You went to medical school?

01:17:29  19  **A**    I did.

01:17:29  20  **Q**    Where did you go to medical school?

01:17:30  21  **A**    I went to Case Western Reserve University.

01:17:35  22  **Q**    As in down the road?

01:17:37  23  **A**    Yes.

01:17:37  24  **Q**    All right.  If we look at your education and training,

01:17:44  25  you've got it looks like a bachelor's degree from the

01:17:49   1    University of Pennsylvania.

01:17:51   2    **A**    Yes, that's right.

01:17:51   3    **Q**    And then Case Western Medical School.

01:17:56   4         Then internal medicine.  Can you explain what it means

01:17:59   5    to be an internal medicine doctor?

01:18:01   6    **A**    Well, internal medicine doctors provide general

01:18:05   7    medical care for adults.  And so I'm trained as a general

01:18:09   8    internist, so after that training at the University of

01:18:13   9    Pennsylvania, rather than specializing and becoming a heart

01:18:16  10    doctor, a cardiologist, a nephrologist, a kidney doctor, I

01:18:23  11    stayed as a generalist.

01:18:25  12         So I'm a primary care doctor for adults, and I

01:18:28  13    continue to provide primary care for about 250 or 300

01:18:31  14    individuals in the city of Baltimore.

01:18:33  15    **Q**    So you actually write prescriptions for people?

01:18:35  16    **A**    I do.

01:18:36  17    **Q**    Do you write opioid prescriptions?

01:18:39  18    **A**    I do.  I use them sparingly, but I certainly prescribe

01:18:46  19    opioids on occasion, yes.

01:18:48  20    **Q**    All right.  And when you do so, do you do it within

01:18:51  21    the professionalism and care of your medical training?

01:18:56  22    **A**    Yes, I do.

01:19:00  23    **Q**    All right.  If we continue to look, you're board

01:19:02  24    certified in internal medicine; is that right?

01:19:05  25    **A**    Correct.

**Alexander (Direct by Lanier)**                    3445

01:19:05  1    **Q**    And what does it mean to be board certified?

01:19:07  2    **A**    Well, there are standard tests that physicians are

01:19:15  3    allowed or have the opportunity to take that allow for them

01:19:20  4    to obtain board certification.  And so you can think of it

01:19:23  5    just like a standard.  It doesn't -- you know, so it just

01:19:28  6    designates that I've taken a test that's a comprehensive

01:19:31  7    test to assess my ability to provide medical care.  But you

01:19:38  8    don't have to be board certified in order to practice.  I

01:19:41  9    believe that that's the case.  I believe that board

01:19:43  10   certification isn't required for practice, but it's -- you

01:19:47  11   know, it's a measure of credibility to some degree, I

01:19:51  12   suppose.

01:19:51  13   **Q**    All right.  And if we look at the professional

01:19:55  14   experience, you've done work at the Veterans Affairs

01:20:01  15   Hospital Division of Medicine at the University of Chicago.

01:20:06  16        A number of different places; is that fair to say?

01:20:09  17   **A**    Yes.

01:20:10  18   **Q**    And as we continue, it looks like you have been at

01:20:14  19   Johns Hopkins for some time now.  Is that right?

01:20:16  20   **A**    Yes, I believe coming on a decade, 10 years.

01:20:18  21   **Q**    And can you explain, please, what it means to be the

01:20:22  22   founding codirector for the Johns Hopkins Center for Drug

01:20:28  23   Safety and Effectiveness?

01:20:32  24   **A**    Well, universities often have centers that are

01:20:36  25   opportunities for faculty to provide leadership and momentum

**Alexander (Direct by Lanier)**  3446

01:20:40  1  for a particular area of study.  And so as part of my

01:20:43  2  transition from Chicago to Baltimore to Johns Hopkins, I was

01:20:51  3  offered the opportunity to develop and build a center for

01:20:54  4  drug safety and effectiveness.

01:20:56  5      And so this is simply a group of faculty and students

01:21:00  6  that have a committed interest and dedication to doing this

01:21:05  7  type of work, understanding the use and safety and

01:21:08  8  effectiveness of drugs in large populations.

01:21:11  9  **Q**    All right.  A couple of things that I want to add as

01:21:18  10  we prove you up under the record to be an expert for the

01:21:20  11  questions I'm going to ask you later.

01:21:21  12      You've served on a number of noncommercial advisory

01:21:25  13  boards.

01:21:26  14      What does that mean, noncommercial?

01:21:29  15  **A**    That means that these were -- these were not advisory

01:21:31  16  boards for companies, for for-profit companies.  They were

01:21:36  17  advisory boards, for example, for the Food and Drug

01:21:40  18  Administration or for a professional society or for the

01:21:43  19  like.

01:21:43  20  **Q**    So the FDA has had you on advisory committees?

01:21:47  21  **A**    Yes.  I've both served on several and I've also served

01:21:50  22  as the chairperson of one particular committee most recently

01:21:57  23  that reviewed the Alzheimer's drug aducanumab.

01:22:02  24  **Q**    Is that the one where they voted and like not

01:22:04  25  everybody voted to approve it?

**Alexander (Direct by Lanier)**          3447

01:22:06   1   **A**     I believe 10 or 11 of us voted that there was not

01:22:10   2   evidence to approve the drug, and one of the 11 abstained

01:22:14   3   from voting.

01:22:18   4   **Q**     So you're one of the 10 that voted uh-uh?

01:22:22   5   **A**     I was.

01:22:22   6   **Q**     You've also spent some time testifying in

01:22:28   7   nonlitigation situations.  Is that fair to say?

01:22:31   8   **A**     Yes, that's true.

01:22:32   9   **Q**     And you've testified in front of the FDA?

01:22:38  10   **A**     Yes, I have.

01:22:38  11   **Q**     Veteran Affairs Committee at the U.S. Senate?

01:22:44  12   **A**     Yes.

01:22:45  13   **Q**     CDC?

01:22:46  14   **A**     Yes.

01:22:46  15   **Q**     Committee on Health and Government Operations in

01:22:49  16   Maryland?

01:22:49  17   **A**     Yes.

01:22:50  18   **Q**     National Academy of Sciences?

01:22:54  19   **A**     Yes.

01:22:55  20   **Q**     Now, there did you testify about the regulation of

01:22:58  21   opioids?

01:22:59  22   **A**     Yes, I did.

01:23:00  23   **Q**     And have you testified -- this is going back to

01:23:09  24   2016 -- on prescription opioids?

01:23:11  25   **A**     Yes, I did.

**Alexander (Direct by Lanier)**                    3448

01:23:11  1    **Q**    Did you testify going as far back as 2012 on drug

01:23:16  2    labeling for opioids?

01:23:17  3    **A**    Yes, I did.

01:23:17  4    **Q**    2017, did you testify in front of the U.S. House of

01:23:21  5    Representatives on the opioid epidemic?

01:23:24  6    **A**    Yes, I did.

01:23:27  7    **Q**    In addition to that, are you a peer reviewer where you

01:23:32  8    read scholastic articles to see if they're academically

01:23:36  9    rigorous enough for publication?

01:23:40  10   **A**    Yes, I have, and I continue to do so.

01:23:43  11   **Q**    And you've got a bunch of journals here where you've

01:23:46  12   done it on page 3 of your CV; is that right?

01:23:49  13   **A**    Yes.

01:23:50  14   **Q**    And a bunch more journals on page 4.  True?

01:24:01  15   **A**    Yes.

01:24:02  16   **Q**    I'm sorry.  I can't see that far without my glasses,

01:24:07  17   so I have no clue what you even look like right now, okay?

01:24:12  18   But I can't see this if I put on my glasses, so I've got to

01:24:17  19   hear you, all right?

01:24:18  20   **A**    Absolutely.

01:24:18  21   **Q**    I'm sorry.

01:24:19  22          Now, in addition to that, you've got a section on

01:24:25  23   honors and awards.  I know it's probably not your preference

01:24:28  24   to dwell on that, but it's helpful for the jury to hear some

01:24:35  25   of it.  Okay?

**Alexander (Direct by Lanier)**                                  3449

01:24:38  1    **A**    Okay.

01:24:39  2    **Q**    Let's see what might seem relevant.

01:24:42  3          2017, American Society of Health-System Pharmacy, Drug

01:24:51  4    Therapy Research Award for mentored research and a CV

01:24:57  5    publication.

01:24:58  6          Can you explain what that is, please?

01:25:00  7    **A**    Well, this was an award that was received for work

01:25:03  8    that I did with a master's or doctoral student or possibly a

01:25:08  9    fellow, some trainee at Johns Hopkins.  I would have to look

01:25:12  10   at my CV to recall the specific publication, but it appears

01:25:16  11   that we could do that if that was helpful.

01:25:18  12   **Q**    All right.  In addition to that, you have been elected

01:25:20  13   a fellow of the American College of Physicians.

01:25:25  14          What is that, sir?

01:25:26  15   **A**    Well, the American College of Physicians is a

01:25:29  16   professional society for physicians, so it provides

01:25:33  17   opportunities for continuing medical education and for

01:25:37  18   professional development, for professional networking.

01:25:44  19          And to be elected fellow is simply a designation of my

01:25:48  20   commitment to the field and my contributions to the field.

01:25:50  21   **Q**    And do you have over 300 publications that have been

01:25:54  22   peer reviewed?

01:25:57  23   **A**    I believe so, but I would want to look at my CV to be

01:26:01  24   sure what the current count is.

01:26:03  25   **Q**    All right.  I'll throw up on your -- on the ELMO

**Alexander (Direct by Lanier)** 3450

01:26:09  1   page -- or Wolfe Vision page 32, it looks to me like you've

01:26:13  2   got at least 320.  Hold on.  333.

01:26:21  3   **A**     Yes.  So some of those are under development or under

01:26:23  4   review, so essentially if you go back lower numbers, you'll

01:26:27  5   hit the ones that are not under review but, rather, pending

01:26:33  6   publication.  And that's where I would typically stop and

01:26:36  7   consider my publications to end.  So I believe it would be

01:26:38  8   fewer than 314.

01:26:41  9   **Q**     Okay.  So in other words, some of these are under --

01:26:46  10  like, number 303 is under revision.

01:26:49  11      What does that mean?

01:26:50  12  **A**     Well, I mean, 302 is where I would typically stop if I

01:26:54  13  was describing publications because that is a paper that has

01:26:56  14  been accepted and is forthcoming.

01:26:59  15      303 and onward are papers that are under review by

01:27:04  16  journals, so we've sent them to the journal, but the

01:27:07  17  journals don't respond immediately.  I mean, we can wait

01:27:10  18  weeks or sometimes months to hear back from the journals.

01:27:14  19      And so there's a fairly long process sometimes of

01:27:17  20  getting these things published.

01:27:20  21  **Q**     Fair enough.

01:27:20  22      Now, in addition to this type of background, you've

01:27:23  23  got a couple more things that are relevant in this case.

01:27:26  24  First of all, the first job you ever had.

01:27:36  25  **A**     Well, I mean, the first job was probably a paperboy.

**Alexander (Direct by Lanier)** 3451

| | | |
|---|---|---|
| 01:27:39 | 1 | **Q**    Second job you ever had. |
| 01:27:42 | 2 | **A**    The second may have been working at Giant Eagle, so |
| 01:27:45 | 3 | there was a Giant Eagle just down the street from where I |
| 01:27:48 | 4 | lived, and I bagged groceries there for a while as a |
| 01:27:51 | 5 | teenager. |
| 01:27:52 | 6 | **Q**    So you actually worked at -- Ms. Sullivan's going to |
| 01:27:57 | 7 | take the lead in cross-examining you, I believe.  She's the |
| 01:27:59 | 8 | Giant Eagle attorney that will be doing so.  She's going to |
| 01:28:04 | 9 | be cross-examining someone who knows how to bag groceries; |
| 01:28:08 | 10 | is that right? |
| 01:28:08 | 11 | **A**    I'm prepared if there's questions about, you know, |
| 01:28:10 | 12 | where the cans go. |
| 01:28:12 | 13 | **Q**    Not on top of the bread. |
| 01:28:15 | 14 | **A**    Right. |
| 01:28:15 | 15 | **Q**    All right.  Sir, you also do work with a company you |
| 01:28:21 | 16 | founded called Monument Analytics, right? |
| 01:28:27 | 17 | **A**    Yes, I cofounded the company. |
| 01:28:29 | 18 | **Q**    And that is the way we got to you in the opioid world. |
| 01:28:35 | 19 | With Monument Analytics, how much do you charge |
| 01:28:39 | 20 | personally per hour for your work? |
| 01:28:42 | 21 | **A**    $900 per hour. |
| 01:28:44 | 22 | **Q**    And you've got five staff people who work as well; is |
| 01:28:47 | 23 | that correct? |
| 01:28:47 | 24 | **A**    Well, the company has probably 15 to 20 people, but |
| 01:28:51 | 25 | about five of the 20 work on litigation-related matters |

**Alexander (Direct by Lanier)** 3452

01:28:55  1   primarily.

01:28:57  2   **Q**    And you are involved in this case in ways far beyond

01:29:03  3   what we're doing in the courtroom today; is that fair?

01:29:07  4   **A**    Yes, that's true.

01:29:08  5   **Q**    And the reason I say that is, you're getting paid

01:29:10  6   today for this work, but you've also been doing much more

01:29:14  7   extended work beyond this, right?

01:29:18  8   **A**    Yes, I think that the company, Monument Analytics, and

01:29:23  9   I have been involved in about a dozen opioid-related cases.

01:29:28  10  Several of these are in Federal Court in the -- you know,

01:29:31  11  the multidistrict litigation, and then others are in various

01:29:35  12  state courts.

01:29:36  13  **Q**    Okay.  And you put it all together, Monument Analytics

01:29:41  14  has billed in all of those litigations, not simply this

01:29:45  15  case, something in the range of how much?

01:29:46  16  **A**    I believe for the -- all of the litigation for the

01:29:51  17  entire company, I believe about $6 million over about four

01:29:55  18  or five years.

01:29:56  19  **Q**    All right.  And that's everybody that works at the

01:29:58  20  company?

01:29:58  21  **A**    Correct.

01:29:59  22  **Q**    And it's based on the billable time and those rates?

01:30:04  23  **A**    Correct, although the other people's rates, they're

01:30:07  24  generally master's and doctorally trained people, and their

01:30:11  25  rates are typically between 325 and $500 an hour.

01:30:15    1    **Q**    All right.  With that background information, I'd like

01:30:18    2    to talk to you about the work you've done.  And I want to

01:30:23    3    try to tailor it down to the work you've done for this case,

01:30:27    4    not the work you've done in other cases, though of course

01:30:30    5    you may get cross-examined on any of that.  Right?

01:30:32    6    **A**    Of course.

01:30:32    7    **Q**    All right.  So the work in this case, what did we ask

01:30:36    8    you to do?

01:30:39    9    **A**    I was asked to evaluate whether I felt there was an

01:30:42   10    epidemic, an opioid epidemic, in Lake and Trumbull Counties,

01:30:48   11    and, if so, whether I felt and how I felt further harms

01:30:51   12    could best be prevented.

01:31:02   13    **Q**    So as you tried to assess the epidemic in Lake and

01:31:07   14    Trumbull County, how did you go about doing that?

01:31:11   15          Explain to the jury the work that you did in that

01:31:14   16    regard, and then we'll look at your findings.

01:31:16   17    **A**    Well, the work relied upon my reviewing a large number

01:31:23   18    of materials from many different sources, and this included

01:31:25   19    information about the companies -- about the counties from

01:31:31   20    the Federal Government.  So, for example, the Centers For

01:31:36   21    Disease Control publishes overdose data that's available at

01:31:39   22    the county level.

01:31:42   23          It also involved my reviewing information about the

01:31:45   24    counties produced by the state, so the State of Ohio

01:31:48   25    produces county-specific reports, and so these included, for

01:31:52  1    example, reports from the Ohio Department of Public Health

01:31:59  2    and also the Hospital Council of Northwest Ohio, and I also

01:32:04  3    reviewed a lot of materials from the counties themselves,

01:32:07  4    information from the Lake County ADAMHS Board and the

01:32:13  5    Trumbull County Mental Health and Recovery Board.

01:32:15  6         I reviewed information from the -- I reviewed

01:32:19  7    information from the counties that was generated such as the

01:32:23  8    community health improvement plans and community health

01:32:26  9    assessments.  And I also spoke with people that are experts,

01:32:30  10   local experts, individuals such as Lauren Thorpe and

01:32:38  11   April Caraway and Kim Fraser.

01:32:40  12        And so it was through -- and then I used also

01:32:44  13   knowledge from the peer-reviewed literature.  There are

01:32:47  14   many, many hundreds of studies, thousands of studies about

01:32:49  15   the opioid epidemic.  And just because they may not have

01:32:54  16   taken place in these two counties doesn't mean that they're

01:32:57  17   not relevant.  And so I used these and those other sources

01:33:02  18   of information in order to reach the conclusions that I've

01:33:05  19   reached.

01:33:06  20   **Q**    The jury's going to hear from Ms. Fraser probably

01:33:09  21   tomorrow if timing works out right, but in addition to her

01:33:16  22   and the others that you have visited with, I assume that

01:33:19  23   means you've also been to the counties.

01:33:21  24   **A**    I have.  You know, I lived for four years in Cleveland

01:33:28  25   Heights, which I believe as the crow flies is less than 10

**Alexander (Direct by Lanier)**

01:33:32  1   miles from Lake County.  So I spent time in the county in

01:33:36  2   the context of being so close for four years during my

01:33:40  3   medical school training here.  I also grew up in Pittsburgh

01:33:44  4   and commuted from Pittsburgh to Cleveland regularly, and

01:33:48  5   that would take me through Trumbull County during that

01:33:51  6   transit.

01:33:51  7   **Q**    So but you're not a Steelers fan, I'm assuming?

01:33:55  8   **A**    You know, it's disappointing a bit.  I grew up in

01:33:58  9   Pittsburgh, went to med school in Cleveland, and now live in

01:34:01  10  Baltimore, so I try not to talk football when I can avoid

01:34:05  11  it.

01:34:08  12  **Q**    But tonight we're all Browns fans, right?

01:34:11  13  **A**    Fair enough.

01:34:11  14  **Q**    All right.  Any other significant work that you have

01:34:18  15  done to come to your conclusions?

01:34:20  16  **A**    Well, there are -- again, there are additional reports

01:34:30  17  and white papers that may not be published in the

01:34:33  18  peer-reviewed literature.

01:34:34  19       So whether I say peer-reviewed literature, that's sort

01:34:38  20  of -- that's a subset of all the information that's out

01:34:41  21  there.  That's essentially academic papers that are

01:34:43  22  published.  And there are additional reports that are

01:34:47  23  valuable and that I cite in my report that I submitted for

01:34:51  24  this case that may not be published in the peer-reviewed

01:34:54  25  literature but are still relevant.

01:34:56   1    But I think this captures it really.  There's

01:34:59   2    information about the counties from the Federal Government,

01:35:03   3    there's information about the counties from the State,

01:35:05   4    there's information about the counties that the counties

01:35:08   5    themselves have produced, and then there's just the sort of

01:35:11   6    the foundation of knowledge about the opioid epidemic.

01:35:16   7        And unfortunately, there are some striking

01:35:21   8    similarities, even though the counties are all different and

01:35:24   9    have their unique fabric, there are some real similarities

01:35:27   10   when you look at the epidemic in Trumbull County versus when

01:35:30   11   you look at it in another county, for example, in West

01:35:34   12   Virginia or another part of the country.

01:35:36   13   Q    Okay.  I'm going to be asking you some opinions.  When

01:35:42   14   I ask you an opinion, I'll ask you to limit your answer to

01:35:47   15   only what is reasonably probable within the ambit of your

01:35:54   16   expertise and profession.  Okay?

01:35:57   17   A    Yes, I'll do my best to do that.

01:35:59   18   Q    Yeah.  And in fact, you've got to do that because the

01:36:02   19   law says that the jury can only rely upon your opinions that

01:36:06   20   are reasonably probable.  All right?

01:36:08   21   A    Yes.

01:36:08   22   Q    Thank you.

01:36:10   23       And in that regard, I don't know how the judge will

01:36:13   24   charge the jury, but I suspect two things --

01:36:17   25            MS. SULLIVAN:  Objection, Your Honor.

**Alexander (Direct by Lanier)**                          3457

| | | |
|---|---|---|
| 01:36:20 | 1 | MR. LANIER:  I'm just framing my question for |
| 01:36:22 | 2 | him, Your Honor.  And I don't want to say -- |
| 01:36:23 | 3 | THE COURT:  Let's hear the question. |
| 01:36:26 | 4 | MR. LANIER:  Yeah. |
| 01:36:27 | 5 | **Q**    Sir, are you prepared to answer a question if the |
| 01:36:31 | 6 | issue arises, is there an epidemic related to opioids in |
| 01:36:41 | 7 | Lake and Trumbull Counties? |
| 01:36:43 | 8 | MS. SULLIVAN:  No objection, Your Honor. |
| 01:36:46 | 9 | **A**    Yes, I am prepared to answer that question. |
| 01:36:48 | 10 | **Q**    And then the second question I want to know if you can |
| 01:36:50 | 11 | answer is, is there something that can be done about it?  In |
| 01:36:57 | 12 | other words, are we stuck with it or can we do things to |
| 01:37:00 | 13 | make the world a better place in these counties vis-à-vis |
| 01:37:02 | 14 | the epidemic? |
| 01:37:07 | 15 | **A**    If I'm asked, I'm prepared to answer that question as |
| 01:37:11 | 16 | well. |
| 01:37:11 | 17 | **Q**    All right.  So with a focus on those two issues of |
| 01:37:17 | 18 | your work, I'd like to talk to you about your findings now, |
| 01:37:21 | 19 | the final stop on the road.  Okay? |
| 01:37:23 | 20 | **A**    Yes. |
| 01:37:23 | 21 | **Q**    You produced a report, correct? |
| 01:37:30 | 22 | **A**    Yes, I did. |
| 01:37:30 | 23 | **Q**    And you've given a deposition so that you could be |
| 01:37:36 | 24 | questioned on your report, fair? |
| 01:37:37 | 25 | **A**    Yes. |

**Alexander (Direct by Lanier)** 3458

01:37:37  1    **Q**    I have taken from your report several of your

01:37:42  2    opinions, I've provided these slides to opposing counsel.

01:37:46  3    I'd like to put them on the overhead and ask you whether or

01:37:50  4    not they are your opinions and then have you explain them.

01:37:52  5    Okay?

01:37:53  6    **A**    Yes.

01:37:53  7    **Q**    Opinion 1 that we gleaned from your report, "There is

01:37:59  8    an opioid epidemic in Lake and Trumbull Counties."

01:38:02  9         Is that your opinion?

01:38:04  10    **A**    Yes, it is.

01:38:04  11    **Q**    And what do you base -- I mean, why?  Tell us why.

01:38:09  12    **A**    Well, I base that on the -- broadly on the information

01:38:14  13    on the -- on the information that I reviewed and that I

01:38:18  14    described.  But specifically, the sorts of measures or the

01:38:24  15    sorts of indications that there's an epidemic are things

01:38:27  16    like rates of overdose death, for example, that have

01:38:30  17    increased from, say, 12 to 15 in Lake and Trumbull Counties,

01:38:37  18    you know, 15 years ago, plus or minus, to as high as, in

01:38:43  19    Trumbull County, 100 to 120 overdoses a year, and in Lake

01:38:51  20    County, 80 to 90 overdoses a year.

01:38:55  21         So when you have an increase of that magnitude, this

01:39:00  22    is one of the hallmarks and something that we see in

01:39:02  23    communities around the country as well as in these two

01:39:06  24    communities.

01:39:08  25         A second point.  The other measures of harms that are

**Alexander (Direct by Lanier)**                     3459

01:39:13    1    occurring from opioids, so, for example, rates of emergency

01:39:18    2    department utilization that has increased over time or

01:39:23    3    strains on the child welfare system where reports from the

01:39:27    4    Ohio, you know, Child and Family Services association or

01:39:35    5    agency suggest marked increases or marked strains in the

01:39:40    6    child welfare system related to opioids, increases or high

01:39:47    7    rates of nonmedical opioid use.

01:39:49    8         So in the community health improvement plans or

01:39:53    9    community health assessments, for example, in Trumbull

01:39:56   10    County, you have estimates that as many as four or five out

01:40:02   11    of a hundred adults are reporting nonmedical opioid use, not

01:40:05   12    just any drug but nonmedical opioid use within the past

01:40:10   13    year.  I mean, those numbers are off the charts compared

01:40:12   14    with what one would expect historically before the epidemic.

01:40:17   15         So there are many, many different measures that you

01:40:21   16    can use to understand the harms that are occurring.  And

01:40:26   17    these, by the way, they're not just -- it's not just the

01:40:28   18    data, the measures, it's also the reports on the ground.

01:40:33   19    And so experts such as those that are from the community

01:40:36   20    that I've had the opportunity to speak with, you know,

01:40:39   21    leaders of the ADAMHS board or the mental health and

01:40:45   22    recovery board have a unique vantage point and view of the

01:40:51   23    waterfront, if you will.  And my discussions with them also

01:40:54   24    affirm what I would conclude or what I would be led to

01:40:57   25    conclude otherwise, which is that these are all clear signs

01:41:02    1    of a current and serious opioid epidemic in the communities.

01:41:07    2    **Q**     All right.  Thank you.

01:41:09    3       Opinion number 2, you have said -- well, let me ask it

01:41:16    4    this way.

01:41:16    5       Is it your opinion that the epidemic is associated

01:41:19    6    with high rates of injury and death?

01:41:21    7    **A**     Yes, it is.  And I believe that I spoke to this a

01:41:27    8    little bit just in the last opinion in giving some of these

01:41:31    9    measures that are maybe most compelling.  You know, people

01:41:35   10    often look to the rates of overdose death, and indeed these

01:41:39   11    are stark.  I gave you the numbers, but we can also talk

01:41:44   12    about this in terms of rates and the rates have increased

01:41:48   13    markedly as I write in my report, you know, eight or tenfold

01:41:55   14    increases in the rates of overdose deaths over time.

01:41:58   15       But the overdoses -- the fatal overdoses are sort of

01:42:02   16    the tip of the iceberg, and there are many other measures of

01:42:05   17    harms that I -- that are important and that we look at when

01:42:09   18    we assess whether or not there's an epidemic.

01:42:11   19    **Q**     Okay.  Opinion number 3, you said "Between 1992 and

01:42:21   20    2010, the volume of opioids dispensed in the U.S. increased

01:42:27   21    by approximately 400 percent."

01:42:30   22       Do you hold this opinion?

01:42:31   23    **A**     Yes, I do.

01:42:32   24    **Q**     And why is this an important part of your assessment

01:42:37   25    of what's going on in Lake and Trumbull Counties?

**Alexander (Direct by Lanier)** 3461

01:42:41  1   **A**     Well, the same general trajectory and waves of the

01:42:48  2   epidemic that have been observed nationally have also played

01:42:51  3   out locally in the counties.  And one of the important

01:42:58  4   things to understand about the origins of the epidemic is

01:43:03  5   the oversupply and overdispensing of prescription opioids

01:43:08  6   that occurred largely between these years, although

01:43:15  7   prescription opioids continued to be prescribed and

01:43:18  8   dispensed in these counties and elsewhere at rates far

01:43:22  9   higher than pre-epidemic levels.

01:43:28  10      In other words, there were huge increases over this

01:43:31  11  time period in prescription -- prescribing and dispensing,

01:43:35  12  and then around 2010, 2011 the rates plateaued.  And since

01:43:40  13  then they've fortunately declined, modestly to moderately,

01:43:46  14  but they still remain very, very elevated.

01:43:50  15      And this is, you know, one of the fundamental pieces

01:43:57  16  that has driven the epidemic.

01:44:06  17  **Q**     All right.  Opinion number 4 we're going to set aside

01:44:11  18  for a moment and go to opinion number 5.

01:44:14  19      "Rates of addiction, overdose, and other

01:44:18  20  opioid-related harms increased in parallel."

01:44:21  21      Talk about it first in terms of generally, but then

01:44:27  22  with opinion 6 wants to talk about it in terms of Lake and

01:44:32  23  Trumbull Counties, please.

01:44:32  24  **A**     Sure.

01:44:35  25      So generally, this is an important observation for

**Alexander (Direct by Lanier)**                          3462

01:44:38   1   anybody that's trying to understand how the epidemic has

01:44:43   2   taken course and how it has played out.  And it makes sense.

01:44:47   3   I mean, I understand that this isn't just about common

01:44:50   4   sense, but if you have products that have significant risks,

01:44:54   5   which opioids do, and you dispense them in large quantities

01:44:59   6   among a population, which has happened nationally, it stands

01:45:03   7   to reason that you're going to see increases in the sorts of

01:45:07   8   harms that are associated with the products.

01:45:11   9       And this isn't just a sort of theory.  This actually

01:45:15  10   has been shown with data.

01:45:16  11       So I published a paper with others, Andrew Kolodny is

01:45:20  12   the first author, it was a review of the opioid epidemic.

01:45:24  13   And we cite a figure developed by the Centers For Disease

01:45:28  14   Control, I believe it the figure may be as something that

01:45:32  15   could be shown, but the bottom line is that if you look --

01:45:35  16   so what the CDC did was they looked at rates of prescribing

01:45:39  17   using what's called ARCOS data, data from the Drug

01:45:45  18   Enforcement Agency.  They looked at rates of addiction using

01:45:47  19   a federal study, the National Survey on Drug Use and Health,

01:45:51  20   and they looked at rates of fatal overdose using data from

01:45:55  21   CDC WONDER data.  That's a database on overdose.

01:45:59  22       So you have prescribing and dispensing, you have

01:46:05  23   addiction, and you have fatal overdose.

01:46:11  24       When I deliver -- when I talk and I show this graphic,

01:46:15  25   I often say you don't have to have biostatistics training

**Alexander (Direct by Lanier)**                        3463

01:46:17  1    because you just look at these lines and they're all going

01:46:20  2    in parallel.  So --

01:46:24  3    **Q**    I'm interrupting you, and I apologize, but I think

01:46:27  4    this may be the graph you're talking about, and I thought if

01:46:29  5    I put it up here you might explain it to the jury.  I've got

01:46:32  6    slide 11 of your sales, injuries, and deaths increased in

01:46:35  7    parallel.  Is this it?

01:46:36  8    **A**    It is, and that saves me, you know, too much further

01:46:39  9    belaboring of this point.

01:46:41  10         But this graphic on the bottom part shows the years

01:46:47  11   from 1999 to 2010.  And then on the vertical part, the Y

01:46:54  12   axis, it shows rates of these problems or these events.

01:46:59  13         And the numbers don't matter too much.  The rates go

01:47:03  14   from zero to 8, but you have to understand kind of -- you

01:47:06  15   know, I wouldn't worry about the rate so much as

01:47:09  16   understanding that the top line -- gosh, the colors may -- I

01:47:14  17   believe the top line is opioid sales and is actually green.

01:47:18  18   The middle line is opioid deaths and is red.  And the bottom

01:47:23  19   line is opioid treatment admissions and is blue.

01:47:28  20         And so this is what I was referring to.  And this is

01:47:30  21   one of many, many sources of information that show that

01:47:35  22   harms have occurred in lockstep with the volume of opioids

01:47:40  23   that have been prescribed and dispensed in the country.

01:47:47  24   **Q**    Okay.  Have I labeled those properly?

01:47:48  25   **A**    I believe so, but, again, the colors may be a little

**Alexander (Direct by Lanier)** 3464

01:47:51 1 tricky. I think deaths is clearly in the middle, and I

01:47:53 2 believe that sales is on top, yes.

01:47:56 3 **Q** Yeah. And it's hard to see with this machine, but

01:48:01 4 that's -- I'll represent to you that's green.

01:48:06 5 **A** Thank you.

01:48:07 6 **Q** Uh-huh. And that is blue. See if it brings it out

01:48:11 7 better if I put a mark next to it.

01:48:14 8 All right. So what does this tell you as an

01:48:22 9 epidemiologist in terms of overall relationship between

01:48:26 10 sales, deaths, and treatment?

01:48:27 11 **A** Well, these data alone wouldn't -- when these sorts of

01:48:36 12 data are presented like this, these are correlated, but it

01:48:39 13 doesn't necessarily mean that they are causally related, in

01:48:45 14 other words, that one is causing the other. And so we use

01:48:48 15 many other sorts of information to understand the

01:48:53 16 relationships of cause and effect between these.

01:48:58 17 But at a minimum, when I look at this as an

01:49:01 18 epidemiologist, I say, you know, it would make sense that

01:49:04 19 opioids have significant risks that we might see the effects

01:49:08 20 of those risks as sales increase, and it would certainly

01:49:11 21 make me want to do further study to understand if these are

01:49:15 22 connected by cause and effect.

01:49:17 23 **Q** All right. I want to put up two other opinions of

01:49:21 24 yours and then keep -- on a national scale, and then I want

01:49:25 25 to bring it in to Lake and Trumbull County, okay?

**Alexander (Direct by Lanier)** 3465

01:49:29  1      First I'll put up opinion 7.  You cited that "Between

01:49:34  2  1999 and 2009, nearly half a million individuals in the U.S.

01:49:37  3  died from an opioid overdose."

01:49:39  4      Where did you get that from?

01:49:40  5  **A**    That's from the CDC, the Centers For Disease Control

01:49:44  6  and Prevention.

01:49:47  7  **Q**    And then likewise you have opinion 8 that says, "In

01:49:51  8  2017 alone, 47,600 people died in the U.S. from opioids,

01:49:57  9  more than from motor vehicle accidents, suicide, gun

01:50:01  10  violence, or deaths at the peak of the AIDS epidemic."

01:50:04  11      Right?

01:50:05  12  **A**    Yes.

01:50:05  13  **Q**    Now, so we're clear on this, are these figures figures

01:50:12  14  that are prescription opioid deaths?

01:50:17  15  **A**    No, no.  These would include prescription and

01:50:21  16  nonprescription deaths.

01:50:22  17  **Q**    So this includes illegal opioids, like heroin?

01:50:28  18  **A**    Yes.

01:50:28  19  **Q**    Fentanyl, street fentanyl?

01:50:35  20  **A**    Yes.

01:50:36  21  **Q**    As well as prescription opioids; is that fair?

01:50:40  22  **A**    Yes.

01:50:40  23  **Q**    Okay.  Good.

01:50:44  24      And we'll discuss how those are related in a little

01:50:47  25  bit.

**Alexander (Direct by Lanier)**                3466

01:50:47   1          Next --

01:50:49   2                  MS. SULLIVAN:  Objection, Your Honor.

01:50:50   3                  MR. LANIER:  You're right.  Sorry.  I'll come

01:50:53   4      back to that.

01:50:54   5                  THE COURT:  I'll sustain the comment.  Just

01:50:56   6      ask the questions, please.

01:50:59   7          I'm going to sustain the objection to the comment.

01:51:01   8                  MR. LANIER:  Got it, Judge.

01:51:03   9      BY MR. LANIER:

01:51:03   10     **Q**    "Three Waves of the U.S. Opioid Epidemic."

01:51:09   11         Do you see this?

01:51:11   12     **A**    Yes, I do.

01:51:12   13     **Q**    Can you explain to us why you included this slide in

01:51:14   14     your report?

01:51:15   15     **A**    Well, again, this is, you know, somewhat -- I think

01:51:20   16     it's important if one is trying to understand the opioid

01:51:23   17     epidemic to understand these relationships and these

01:51:28   18     patterns.

01:51:29   19         And again, this is the sort of data that while

01:51:33   20     produced by the CDC at a national level, it has also played

01:51:36   21     out at a local level in cities and counties around the

01:51:40   22     country.

01:51:40   23     **Q**    Okay.  And in that regard, let's move local.

01:51:47   24         And have you prepared a slide that gives the rates of

01:51:50   25     fatal overdoses in Lake and Trumbull Counties?

**Alexander (Direct by Lanier)** 3467

01:51:54 1 **A** Yes, I have.

01:51:55 2 **Q** And can you explain this to the jury, please?

01:51:58 3 **A** Yes. So on the bottom here we have the years from

01:52:03 4 2001 to 2019. And on the Y axis, the vertical axis, we have

01:52:11 5 the death rates per 100,000 people.

01:52:16 6 And the reason that I report rates here is because I

01:52:18 7 wanted to show the -- about how many people were dying in

01:52:22 8 the United States out of the entire United States population

01:52:28 9 on the same slide as showing how many people were dying in

01:52:32 10 Ohio out of the Ohio population and in Lake and Trumbull

01:52:39 11 Counties out of the Lake and Trumbull County population.

01:52:39 12 **Q** Right.

01:52:43 13 **A** And I couldn't do that if I just provided the raw

01:52:46 14 numbers, right, because in the United States, let's say

01:52:49 15 50,000 people died, and so if the Y axis, if the vertical

01:52:52 16 axis went up to 50,000, it wouldn't let me show the rates in

01:52:55 17 these communities.

01:52:56 18 So you can think of rate as a sort of a measure of

01:53:01 19 intensity of harm, let's call it that.

01:53:03 20 So what this shows is that the bottom flattest line is

01:53:09 21 the United States, and the red, most jagged highest line is

01:53:15 22 Trumbull County. And the continuous line that is -- that

01:53:23 23 overlaps the United States is Ohio, and it starts all the

01:53:27 24 way at 2001. And then Lake County is sort of overlaying on

01:53:33 25 top of Ohio a little bit.

**Alexander (Direct by Lanier)**                    3468

01:53:36   1   **Q**    All right.  I'm going to -- let me make sure I've got

01:53:38   2   the lines right.

01:53:39   3        So I had done the gray line for the U.S., and then

01:53:43   4   this is the Ohio line that I'm outlining again here?

01:53:46   5   **A**    Correct.

01:53:47   6   **Q**    And then the red was Trumbull?

01:53:50   7   **A**    Correct.

01:53:50   8   **Q**    And that leaves Lake County with the blue; is that

01:53:54   9   right?

01:53:54  10   **A**    Yes.

01:53:56  11   **Q**    Why do you have a gap on Trumbull County?

01:54:00  12   **A**    Well, these data are from the CDC WONDER data.  And if

01:54:07  13   there are too few observations, the data is essentially

01:54:12  14   scrubbed.  In other words, the CDC won't report -- if the

01:54:16  15   observations are too few, the CDC gets concerned about both

01:54:22  16   perhaps the stability of the estimate, but also they will

01:54:26  17   not report values that are small enough.  And so that's why

01:54:34  18   there is not a continuous line for some of the counties.

01:54:38  19   **Q**    All right.  In addition to the graph, you've given us

01:54:41  20   some stats, some data.

01:54:44  21        Lake County.  Do you know the -- you've put in your

01:54:48  22   report, "The number of individuals dying from an opioid

01:54:52  23   overdose increased from less than 10 in 2001 to 37 people in

01:54:58  24   2010."

01:55:01  25        Is that your testimony?

**Alexander (Direct by Lanier)**                    3469

01:55:03  1   **A**     Yes, so more than a threefold increase.

01:55:05  2   **Q**     Where do you get that from?

01:55:07  3   **A**     That is from data from the CDC that's available at the

01:55:11  4   county level.

01:55:14  5   **Q**     Then in 2016, 90 people died of an opioid overdose.

01:55:21  6   2017, 88 people died.  Same source?

01:55:26  7   **A**     Correct.

01:55:26  8   **Q**     Now, when we're talking about opioids, are we talking

01:55:29  9   about both prescription and illegal, nonprescription

01:55:32  10  opioids?

01:55:33  11  **A**     Yes, this includes opioids of any type, whether

01:55:36  12  prescribed or illicit.

01:55:40  13  **Q**     All right.  So it includes prescriptions as well as

01:55:42  14  heroin and street drugs, opioids, right?

01:55:46  15  **A**     Correct.

01:55:46  16  **Q**     And then you've got in Trumbull County a similar set

01:55:54  17  for the statistics.  "The number of individuals dying from

01:55:56  18  an opioid overdose increased from less than 10 in 2001 to 38

01:56:02  19  in 2010."

01:56:04  20      Same information about that?

01:56:07  21  **A**     Yes.  And I'd like to say I believe this is from CDC

01:56:12  22  WONDER, although the state also reports some information

01:56:16  23  about the number of people dying from overdose at a county

01:56:20  24  level, so I would want to consult -- you know, to review my

01:56:23  25  report to be sure about the source.

**Alexander (Direct by Lanier)**

01:56:26   1      But in general, the conclusions that you reach if you

01:56:31   2   use the data that may be provided by the state or the county

01:56:33   3   versus the data that's rolled up and provided by the CDC at

01:56:37   4   a county level, the conclusions are very similar.  The

01:56:40   5   numbers may differ slightly, but the overall trajectory is

01:56:45   6   the same.

01:56:46   7   **Q**      And you've got -- can you give us the statistics for

01:56:49   8   2016 and 2017?

01:56:50   9   **A**      In 2016, in Trumbull County, 99 people died of an

01:56:56   10  opioid overdose, and in 2017, 119 people died.

01:57:02   11  **Q**      All right.  You've given us a slide of many other

01:57:05   12  impacts in Lake County.

01:57:08   13     Can you explain your first data point, 354 emergency

01:57:15   14  department visits for suspected drug overdose in 2019, most

01:57:19   15  involving opioids.

01:57:19   16  **A**      Yes.  Well, I mentioned at the outset when I was

01:57:24   17  talking about why I determined that there was an epidemic,

01:57:27   18  that it's not just about the overdoses.  Those are

01:57:31   19  important.  You can't forget about them.  But they're the

01:57:34   20  tip of the iceberg.

01:57:36   21     And so this is another measure.  I believe the source

01:57:39   22  for this is the Ohio Department of Health that I believe

01:57:42   23  provides county level information about emergency department

01:57:46   24  visits.  And so these matter.  I mean, these people

01:57:51   25  fortunately may not have succumbed, but they nevertheless

**Alexander (Direct by Lanier)** 3471

01:57:54  1    are a reflection of the toll that opioids have taken.

01:57:58  2    **Q**    There was an estimated 5,668 people suffering from

01:58:02  3    opioid addiction in Lake County.

01:58:05  4        Where did you get that from?

01:58:07  5    **A**    I believe that's -- again, I would want to refer to my

01:58:09  6    report to be sure, but I believe that's an estimate that was

01:58:13  7    derived by Katherine Keyes, who is an epidemiologist and who

01:58:20  8    used information from a variety of sources to estimate the

01:58:24  9    total population with addiction or opioid use disorder in

01:58:29  10   Lake County.

01:58:32  11   **Q**    And Katherine Keyes will be here to testify, we hope.

01:58:36  12       But meanwhile, you've got 28 babies born with neonatal

01:58:39  13   abstinence syndrome.

01:58:40  14       What is neonatal abstinence syndrome?

01:58:44  15   **A**    Well, I sometimes prefer to call this neonatal opioid

01:58:48  16   withdrawal syndrome, NOWS.  And you may see either.  You may

01:58:53  17   see it referred to as NAS or NOWS.

01:58:57  18       These babies aren't born addicted.  They don't have

01:59:01  19   addiction per say, but what they have is they have physical

01:59:05  20   dependence on opioids.  And the reason they do is because

01:59:07  21   their mothers, when they were pregnant, were using opioids

01:59:11  22   and they themselves had physical dependence.

01:59:15  23       And so these are babies that are born -- again, I

01:59:19  24   would not characterize them as born addicted.  I would

01:59:21  25   characterize them as born with opioid dependency.

**Alexander (Direct by Lanier)**

01:59:23  1    And it's yet another measure of harms from the

01:59:26  2  epidemic.

01:59:28  3  **Q**    Now, did you also give the same information or data

01:59:32  4  points for Trumbull County?

01:59:33  5  **A**    Yes.  And I believe there may be an additional one as

01:59:37  6  well, for example, the -- and Trumbull County is -- has had

01:59:42  7  greater intensity of harms than Lake County.

01:59:46  8    But, yes, these are similar data points with respect

01:59:51  9  to emergency department visits and, skipping to the bottom,

01:59:54  10  neonatal abstinence syndrome.

01:59:57  11    But in Trumbull, I also had the benefit of an estimate

02:00:01  12  of a number of individuals with nonmedical opioid use, and I

02:00:04  13  believe I've said this already this afternoon, but up to

02:00:08  14  four to five out of a hundred people reported having misused

02:00:12  15  are prescription opioids during the previous year.

02:00:15  16  **Q**    And so to get the numbers on the record, you've got

02:00:19  17  952 emergency department visits?

02:00:21  18  **A**    Yes.

02:00:22  19  **Q**    An estimated 7,221 people with opioid addiction?

02:00:28  20  **A**    Yes.

02:00:28  21  **Q**    And 55 babies with neonatal abstinence syndrome in

02:00:34  22  2018.  Fair?

02:00:35  23  **A**    Yes.

02:00:35  24  **Q**    Now, two last things to cover with you quickly in

02:00:41  25  regards to your opinions.

**Alexander (Direct by Lanier)**                    3473

02:00:42   1        First of all, all of these drug opinions you're giving

02:00:46   2   about overdoses involving opioids and emergency department

02:00:52   3   visits involving opioids, do all of them include drugs like

02:00:56   4   heroin and street fentanyl and the nonprescription opioids?

02:01:03   5   **A**    Yes, except for, you know, the statistic about

02:01:07   6   nonmedical use of opioids, of course, is referring to

02:01:10   7   prescription opioids.  But the estimates that I provide for

02:01:13   8   things like emergency department visits or neonatal

02:01:18   9   abstinence syndrome, that refers to opioid of any cause.  It

02:01:22  10   could be prescription, it could be nonprescription.

02:01:23  11   **Q**    You gave an opinion in your report of an association

02:01:27  12   between prescription and illicit opioids.  And I've taken

02:01:33  13   this language straight from your report, but would you

02:01:37  14   please explain -- read and explain the first bullet point.

02:01:41  15   **A**    "There is a clear link between nonmedical use of

02:01:45  16   prescription opioids and subsequent heroin or illicit

02:01:48  17   fentanyl use; heroin and fentanyl are close chemical analogs

02:01:54  18   to prescription opioids."

02:01:56  19   **Q**    Explain what you mean by this clear link.

02:01:59  20   **A**    Well, this again is a sort of basic knowledge about --

02:02:02  21   that a student of the opioid epidemic has to understand or

02:02:06  22   study, which is what's the relationship between prescription

02:02:10  23   opioids on the one hand and the use of these other products

02:02:13  24   on the other.

02:02:14  25        And I would just make three points.  The first is that

**Alexander (Direct by Lanier)** 3474

02:02:17 1  chemically, if you look at the structures of these drugs,

02:02:20 2  they're very similar.  So if you compare the chemical

02:02:23 3  structure of heroin versus OxyContin, they are -- they're

02:02:29 4  remarkably similar.  And so we shouldn't be surprised that

02:02:32 5  they have very similar effects on the brain and the body.

02:02:36 6      The second is that -- and I include in my report a

02:02:43 7  reference to a well-done paper in the New England Journal of

02:02:47 8  Medicine by Chris Jones and Grant Baldwin and Wilson Compton

02:02:51 9  that describes this.  But the second point is that most

02:02:55 10  people with chronic opioid use don't go on to use heroin and

02:02:59 11  illicit fentanyl.  So it's not like if you use prescription

02:03:02 12  opioids, that's it, you know, you're going to be shooting up

02:03:05 13  at some point.

02:03:06 14      Estimates range, depending upon the study, but I read

02:03:10 15  3 percent, 4 percent, 5 percent, 6 percent.  So most chronic

02:03:16 16  opioid users don't go on.

02:03:17 17      However, most people that use illicit opioids, heroin

02:03:21 18  or illicit fentanyl, report prior prescription opioid use.

02:03:27 19  And there are many different studies that demonstrate this

02:03:30 20  in many different settings, ranging from studies of people

02:03:34 21  that have died from overdose.

02:03:37 22      And if you look at people that have died from overdose

02:03:40 23  from fentanyl or heroin overdose and go back and look at

02:03:44 24  their prescription records, a significant number of them

02:03:48 25  have filled prescription for opioids and also there are many

**Alexander (Direct by Lanier)** 3475

02:03:54 1  studies that ask people, you know, they look at people when

02:03:56 2  they come in the door of a treatment facility and they ask,

02:03:59 3  you know, what sort of drug are you using now, what do you

02:04:01 4  like to use, what did you used to use.

02:04:03 5      Generally the estimates are 70 to 80 percent, plus or

02:04:07 6  minus, depending upon the study, 70 to 80 percent of people

02:04:11 7  using heroin or illicit fentanyl report prior prescription

02:04:16 8  opioid use.

02:04:20 9      And I included in my report a study from Ohio that

02:04:22 10  found as many as 90 percent, nine out of ten individuals.

02:04:26 11  These were individuals with moderate or severe opioid

02:04:29 12  addiction, and these were individuals that also reported, I

02:04:32 13  believe it was nonmedical buprenorphine use.

02:04:37 14      So there's a subset of all people with addiction.  But

02:04:40 15  the point is this third point is just that most people that

02:04:45 16  use heroin or illicit fentanyl in today's day and age and in

02:04:49 17  recent years have had prior prescription opioid exposure.

02:04:52 18  **Q**    All right.  You have covered then bullet points 2 and

02:04:55 19  3.  Did you have a third thing to say or have you got all

02:04:58 20  three of them out?

02:04:58 21  **A**    No, that's three.  So the three are that they're

02:05:01 22  remarkably similar chemically, that most people that

02:05:04 23  start -- most people taking chronic opioids do not progress,

02:05:09 24  but that most people that are on -- that take illicit

02:05:13 25  opioids have had prior prescription opioid exposure.

**Alexander (Direct by Lanier)**                    3476

02:05:16   1   **Q**    All right.  The last thing that I want -- well, I've

02:05:20   2   got to ask you two things.

02:05:21   3       One, can something be done about this?  Without

02:05:30   4   detailing any costs or anything like that, just in general,

02:05:33   5   can something be done?

02:05:34   6                   MS. SULLIVAN:  Your Honor, I'm sorry --

02:05:35   7                   THE COURT:  I want to go onto the headphones,

02:05:38   8   please.

02:05:38   9                   (At side bar at 2:05 p.m.)

02:05:50  10                   MS. SULLIVAN:  Your Honor, this is phase 2.

02:05:52  11   I'm going to object as improper in this phase of the trial.

02:05:55  12                   MR. LANIER:  Your Honor, the money would be

02:05:56  13   phase 2, but phase 1 I have to prove that the epidemic is

02:06:01  14   abatable, in other words, it's not just a problem that's

02:06:04  15   going to exist forever.  That's a required element.  So --

02:06:06  16                   THE COURT:  I wasn't aware of that.  I don't

02:06:08  17   know any instruction.

02:06:12  18                   MR. DELINSKY:  Yeah, Your Honor, that's a

02:06:13  19   phase 2 issue.

02:06:14  20                   THE COURT:  I don't -- I want to make sure the

02:06:16  21   defendants agree on this, that there's no requirement that

02:06:20  22   this jury decide whether if they find that there's an

02:06:25  23   epidemic, that they independently find that the epidemic is

02:06:29  24   abatable.

02:06:31  25                   MS. SULLIVAN:  Giant Eagle agrees, Your Honor.

**Alexander (Direct by Lanier)** 3477

02:06:32   1          MR. DELINSKY:  Your Honor, your prior

02:06:35   2   orders -- excuse me, Your Honor, your prior orders reserved

02:06:38   3   that issue for you if there's a phase 2.

02:06:40   4          THE COURT:  I just want to make sure that the

02:06:42   5   jury doesn't have to even find that the epidemic is,

02:06:46   6   quote/unquote, abatable.

02:06:48   7      Is that right?  Do all the defendants agree because I

02:06:53   8   don't want to get sandbagged here.

02:06:55   9          MS. SULLIVAN:  Giant Eagle agrees, Your Honor.

02:06:58  10          THE COURT:  If I don't hear from the

02:06:59  11   defendants, all of them, if I don't hear from everyone, I'll

02:07:02  12   let him ask it.

02:07:04  13          MR. STOFFELMAYR:  Walgreens agrees.  We're

02:07:06  14   just trying not to talk over each other.

02:07:09  15          MR. DELINSKY:  Same with CVS, Your Honor.

02:07:11  16          MR. MAJORAS:  Walmart also.

02:07:13  17          MR. WEINBERGER:  I'm as concerned as you are,

02:07:15  18   Your Honor, because for the remedy inequity, to remedy a

02:07:25  19   public nuisance, there has to be proof that this is

02:07:30  20   abatable.  And if everyone agrees, that's for the second

02:07:33  21   phase and not for this jury, which it appears to be the

02:07:38  22   case, we are satisfied.

02:07:41  23          THE COURT:  All right.  I think -- I believe

02:07:42  24   in phase 2, Mr. Weinberger, if there is a phase 2, you will

02:07:47  25   have to prove that it is abatable and then prove what the

**Alexander (Direct by Lanier)** 3478

02:07:51  1    abatement will require, and then monetary and nonmonetary

02:07:57  2    terms.

02:07:59  3         But all this jury has to decide is, one, is there an

02:08:04  4    epidemic now, presently, in Lake and Trumbull Counties, and,

02:08:09  5    if so, did any of these defendants substantially cause it.

02:08:18  6    And they're voting obviously independently.

02:08:21  7         But whether or if it's abatable is not for this jury

02:08:26  8    to decide.

02:08:27  9                   MR. WEINBERGER:  Thank you, Judge.

02:08:30  10                  MR. MAJORAS:  Your Honor.

02:08:31  11                  THE COURT:  Someone else had something?

02:08:32  12                  MR. WEINBERGER:  Wait, Mark.

02:08:33  13                  THE COURT:  Mr. Lanier, you better come back.

02:08:38  14                  MR. MAJORAS:  Your Honor, in your comments you

02:08:40  15   said that if it's proven that there's an epidemic.  I assume

02:08:43  16   that meant if it's proven that there's a public nuisance.

02:08:46  17                  THE COURT:  Correct, Mr. Majoras.

02:08:46  18                  MR. MAJORAS:  Thank you.

02:08:50  19                  THE COURT:  But the public nuisance is going

02:08:52  20   to be the opioid epidemic.  We're not talking about some

02:08:56  21   other public nuisance.

02:08:56  22                  MR. MAJORAS:  I understand, but it has to be

02:08:58  23   proved that it satisfies all the requirements of a public

02:09:01  24   nuisance, that's all.

02:09:04  25                  THE COURT:  Correct.

**Alexander (Direct by Lanier)**                    3479

| | | |
|---|---|---|
| 02:09:05 | 1 | MR. MAJORAS:  Thank you. |
| 02:09:22 | 2 | MR. WEINBERGER:  Your Honor, could we go back |
| 02:09:23 | 3 | on the record -- I mean side bar?  Excuse me. |
| 02:09:29 | 4 | So when Mr. Majoras just asked it has to be proved |
| 02:09:34 | 5 | that it satisfies all the requirements of the public |
| 02:09:38 | 6 | nuisance, I just want to make sure that in order to prove a |
| 02:09:43 | 7 | public nuisance, Walmart is not requiring us to demonstrate |
| 02:09:46 | 8 | that it's abatable. |
| 02:09:50 | 9 | MR. MAJORAS:  That's correct. |
| 02:09:50 | 10 | MR. WEINBERGER:  Okay. |
| 02:09:50 | 11 | THE COURT:  That was my understanding. |
| 02:09:52 | 12 | MR. WEINBERGER:  Okay.  Thank you. |
| 02:09:56 | 13 | (In open court at 2:09 p.m.) |
| 02:09:59 | 14 | BY MR. LANIER: |
| 02:10:00 | 15 | Q    Okay.  Then that means the last question I need to ask |
| 02:10:03 | 16 | you for an opinion on is COVID-19. |
| 02:10:05 | 17 | Has COVID-19 had an impact on the opioid epidemic in |
| 02:10:09 | 18 | Ohio that you believe would be relevant to Lake and Trumbull |
| 02:10:14 | 19 | Counties? |
| 02:10:14 | 20 | A    Yes, unfortunately, it has. |
| 02:10:16 | 21 | Q    And what is the impact it has had? |
| 02:10:21 | 22 | A    Well, there's no singular impact, but it's set back |
| 02:10:26 | 23 | efforts underway throughout the state to reduce further |
| 02:10:29 | 24 | harms. |
| 02:10:31 | 25 | You know, I'll mention three different reasons for |

02:10:34  1    that.  One is that early in the pandemic the illicit drug

02:10:40  2    supply, the black market, was disrupted, and so there was

02:10:43  3    more uncertainty about what was in a given bag.  And so

02:10:47  4    there was a spike in deaths because of that.  It essentially

02:10:50  5    shook up the drug markets and, you know, nobody knew what

02:10:54  6    they were getting.

02:10:55  7         The pandemic also has disrupted treatment.  So

02:11:01  8    treatment facilities early on, some of them closed

02:11:03  9    temporarily, some changed their policies.  And there were

02:11:07  10   efforts to counterbalance that, you know, doing more

02:11:12  11   telemedicine and stuff.  But the second way it's disrupted

02:11:17  12   things is that it's disrupted the delivery of treatment.

02:11:19  13        And the third, you know, which goes right to the

02:11:22  14   heart, is that if you believe that addiction is a disease of

02:11:26  15   isolation, which I do and which many do, and that's how

02:11:32  16   oftentimes you'll hear it defined sort of on the streets,

02:11:36  17   you know, the pandemic has been horrible because it has

02:11:39  18   isolated people that are trying to live in recovery.

02:11:42  19        And, you know, the recovery community needs each

02:11:46  20   other.  And the pandemic has made it harder for that

02:11:51  21   community to stay together.

02:11:52  22        So those are some of the ways.  And that's been borne

02:11:55  23   out in data.  This isn't just like a theoretical concern.

02:11:58  24   There's real data showing.

02:12:00  25        And I believe Attorney General Yost in Ohio reported

02:12:03   1    that, I believe it was maybe March and April or April and

02:12:07   2    May of 2020, that deaths were higher than ever before, than

02:12:11   3    even in 19 -- even in 2017.

02:12:16   4         So the pandemic has set back efforts but, you know,

02:12:19   5    there are many glimmers of hope as well.

02:12:21   6                   MR. LANIER:  All right.  Thank you very much.

02:12:22   7              Pass the witness, Your Honor.

02:12:26   8                   THE COURT:  Okay.  Cross-examination?

02:12:28   9                   MS. SULLIVAN:  May I, Your Honor?

02:12:29  10                   THE COURT:  Yes.

02:12:30  11                   MS. SULLIVAN:  Thank you.

02:12:46  12                           - - - - -

02:12:46  13                      CROSS-EXAMINATION

02:12:46  14    BY MS. SULLIVAN:

02:12:46  15    **Q**    Good afternoon, Dr. Alexander.  How are you?

02:12:48  16    **A**    Fine, thank you.  How are you?

02:12:50  17                   MS. SULLIVAN:  Good afternoon, Browns fans.

02:12:53  18    **Q**    Dr. Alexander, we haven't met.  I'm Diane Sullivan,

02:12:57  19    and I'm here for the folks at Giant Eagle, one of the

02:12:59  20    companies that's been sued in this case.  And I'm happy to

02:13:02  21    meet a former Giant Eagle employee.

02:13:04  22    **A**    Thank you.

02:13:05  23    **Q**    Dr. Alexander, looking at your expert report and your

02:13:09  24    reliance material, it looks like you didn't look at a single

02:13:12  25    company document for any of these four defendants in this

**Alexander (Cross by Sullivan)**                          3482

02:13:15  1    case?

02:13:18  2    **A**    I don't believe that I looked at materials produced by

02:13:21  3    the defendants, although I would -- you know, to be sure,

02:13:25  4    I'd want to ask the plaintiffs' counsel.  But I don't

02:13:27  5    believe so.

02:13:27  6    **Q**    Okay.  In other words, you haven't looked at any

02:13:30  7    prescription data for any of these defendants, any policies

02:13:32  8    or procedures for any of the defendants as part of your work

02:13:35  9    in this case?

02:13:36  10   **A**    Well, I've reviewed portions of other expert reports

02:13:40  11   such as Mr. Catizone's reports and Mr. McCann's reports, so

02:13:46  12   I think that has -- that gave me some window into, you know,

02:13:50  13   the actions of defendants.  But I haven't reviewed any

02:13:55  14   primary data myself.

02:13:56  15        I didn't do any data analyses, and I wasn't given

02:14:00  16   documents that I believe were provided directly by

02:14:02  17   defendants.

02:14:04  18   **Q**    Fair enough.  And Dr. Alexander, you have no evidence

02:14:07  19   that any of these defendants filled any prescription in Lake

02:14:14  20   or Trumbull County that was not legitimate?

02:14:15  21   **A**    Well, I don't.  I wasn't asked to look at that

02:14:19  22   evidence.  It wasn't required for what I was asked to do.

02:14:22  23   But I do not have that sort of evidence.

02:14:24  24   **Q**    And, Dr. Alexander, you also don't have any evidence

02:14:27  25   that any prescription filled by any of these defendants in

**Alexander (Cross by Sullivan)**                    3483

02:14:31   1   Lake or Trumbull County was diverted and caused harmed?

02:14:34   2   **A**      Again, I do not.  And that wasn't part of what I was

02:14:38   3   asked to do and wasn't required for me to answer the two

02:14:42   4   questions that I was asked to answer, which were presented

02:14:47   5   earlier.

02:14:48   6   **Q**      Dr. Alexander, did the plaintiffs' lawyers tell you

02:14:52   7   that Giant Eagle has never disputed that there's an opioid

02:14:55   8   epidemic in Lake and Trumbull County, that that's not in

02:14:59   9   dispute?

02:15:00  10   **A**      I don't know that I was told that specifically, but I

02:15:05  11   certainly have the sense that there's not a lot of

02:15:08  12   controversy about that statement.

02:15:11  13   **Q**      Okay.  And similarly, Dr. Alexander, did the

02:15:15  14   plaintiffs' lawyers tell you, and I'll let them speak for

02:15:18  15   themselves, but I don't believe any of the companies here

02:15:20  16   dispute that there's an opioid epidemic in Lake or Trumbull

02:15:23  17   County.

02:15:23  18          Do you know that?

02:15:25  19   **A**      Again, I don't know that I had a specific conversation

02:15:30  20   about what the -- what you and your colleagues, what the

02:15:35  21   defendants might believe is the case.  But I haven't gotten

02:15:38  22   the sense in preparing for my report or today that there was

02:15:42  23   a lot of controversy as to whether there was an epidemic.

02:15:46  24   **Q**      Fair enough, Doctor.

02:15:47  25          And, Dr. Alexander, as I understand it, you are an

**Alexander (Cross by Sullivan)**    3484

| | |
|---|---|
| 02:15:51 | 1 |

epidemiologist, a pharmacoepidemiologist, and you're also an

internal medicine doctor?

**A**    Yes.

**Q**    And you were not -- I think you were candid in your

expert report, you're not an addiction specialist, a

specialist in the treatment of people with opioid use

disorder?

**A**    Well, I'd like to see my report.  If I speak to that

in my report, then I would prefer to see my report, if

that's okay.

**Q**    Doctor, I think we gave you a binder.  And if you want

to look at Tab 2?

            MS. SULLIVAN:  And, Mr. Pitts, if I could have

the ELMO.

**Q**    Let me know when you have it.

**A**    Yes, I do.  Thank you.

**Q**    And it's on page 3?

**A**    Okay.

**Q**    And you were candid I think, Doctor, where you said,

"I do not specialize in the care of patients with opioid use

disorder.  I have patients in my practice with opioid use

disorder who I co-manage with addiction specialists."

    Right?

**A**    Yes.  "And I care for patients who have lost family

members to fatal overdoses," yes.

**Alexander (Cross by Sullivan)**     3485

02:17:01  1   **Q**     Yes, like a good doctor would.  But in other words,

02:17:04  2   you refer your patients out to a specialist who have opioid

02:17:06  3   use disorder, an addiction specialist?

02:17:09  4   **A**     Well, I have patients with addiction, and they -- you

02:17:14  5   know, I think the degree to which I co-manage with an

02:17:17  6   addiction specialist depends on the patient.  It's just like

02:17:20  7   a patient with heart failure or emphysema or bad arthritis,

02:17:25  8   there is a level at which I'm comfortable as a general

02:17:28  9   internist providing care, and then there's a level where I

02:17:31  10  say, you know, this is something where I want to be sure,

02:17:36  11  you know, all of us are smarter than any of us, and I

02:17:40  12  co-manage with an addiction specialist.

02:17:41  13      So it depends really on the patient whether or not I

02:17:44  14  care for them alone or whether a patient with opioid

02:17:48  15  addiction I co-manage with someone else.

02:17:51  16  **Q**     But you acknowledged in your report you're not a

02:17:55  17  specialist in the care of patients with opioid use disorder?

02:17:58  18  **A**     Correct, I wouldn't call myself an addiction

02:17:59  19  specialist.

02:18:01  20  **Q**     And, Doctor, you have -- and I think you testified to

02:18:05  21  this, but it's also that you've said it in your report and

02:18:10  22  to Congress, you believe that the opioid crisis is caused by

02:18:14  23  the oversupply of opioids?

02:18:17  24  **A**     Well, if this is in my testimony, I guess I would like

02:18:21  25  to review it so that I understand what you're referring to

02:18:26  1    in my Congressional testimony.

02:18:28  2    **Q**    Do you not agree, Doctor, that the opioid crisis is

02:18:32  3    driven by the oversupply of opioids?

02:18:34  4    **A**    I think the epidemic is a complex epidemic, and

02:18:38  5    there's not a single factor that has caused the epidemic.

02:18:43  6    But I think one of many important factors is the oversupply

02:18:48  7    and overdispensing of opioids in communities around the

02:18:51  8    country, including in Lake and Trumbull Counties.

02:18:54  9    **Q**    And, Doctor, if you could just turn to page 73 of your

02:18:58  10   expert report.  That would be Tab 2.

02:19:14  11   **A**    Okay.

02:19:14  12   **Q**    And do you see, Doctor, in your report -- and I assume

02:19:23  13   you wrote your report, right, sir?

02:19:24  14   **A**    Of course.

02:19:25  15   **Q**    Okay.  And you say that "the opioid epidemic is the

02:19:28  16   worst drug episode in our nation's history, and it has been

02:19:31  17   driven by large increases in the oversupply of prescription

02:19:35  18   opioids for the treatment of pain."

02:19:37  19        That was your conclusion, right?

02:19:39  20   **A**    Yeah, I stand I -- I'm sorry.  Go ahead.

02:19:43  21   **Q**    I didn't mean to interrupt you.

02:19:44  22   **A**    I stand by that.  And I would like to say that I take

02:19:47  23   full responsibility for the entirety of my report, and I

02:19:50  24   wrote -- I drafted, you know, most of it.  But it certainly

02:19:56  25   represents my views.

02:19:56   1    **Q**      Yeah.

02:19:57   2    **A**      But I think what I would say here about this is that I

02:20:01   3    would not say that it's been exclusively driven or only

02:20:04   4    driven or that this has been the only factor, but I believe

02:20:07   5    that it's been a very important factor, yes.

02:20:08   6    **Q**      At least in your expert report here you said nothing

02:20:13   7    else, you said it's driven by the oversupply of opioids,

02:20:15   8    fair?

02:20:16   9    **A**      Yes, that is what it says.

02:20:17  10    **Q**      And, Doctor, you have published about what drove that

02:20:22  11    oversupply, correct?

02:20:23  12    **A**      I believe so, yes.

02:20:27  13    **Q**      And you have -- and Mr. Lanier talked about how you

02:20:32  14    are serving as an expert in some other cases where

02:20:37  15    plaintiffs' lawyers and counties are suing for opioid

02:20:42  16    litigation, correct?

02:20:44  17    **A**      Well, yes, my role in cases has been to focus on

02:20:49  18    whether there's an epidemic and how the harms from the

02:20:52  19    epidemic can best be addressed.

02:20:53  20    **Q**      And in fact, Doctor, you have issued reports in

02:20:57  21    multiple cases or been named as an expert where plaintiffs'

02:21:01  22    lawyers are suing manufacturers of opioids saying that they

02:21:04  23    caused the opioid epidemic, correct?

02:21:07  24    **A**      Well, I don't -- I mean, I'm an expert in cases where

02:21:12  25    manufacturers are defendants.  I don't know the legal

**Alexander (Cross by Sullivan)** 3488

02:21:16  1  nuances of, you know, cause or exclusive cause or other

02:21:21  2  things.  But I am an expert in cases where there are

02:21:23  3  defendants that are manufacturers or distributors rather

02:21:28  4  than pharmacies.

02:21:28  5  **Q**    Yeah, in other words, Doctor, you are an expert in

02:21:31  6  many cases for the plaintiffs' lawyers where they're blaming

02:21:34  7  the manufacturers and national distributors for causing the

02:21:36  8  opioid crisis?

02:21:37  9  **A**    Well, again, you know, my --

02:21:39  10  **Q**    Are you able to answer that yes or no, sir?

02:21:41  11  **A**    I mean, what -- can you ask the question again,

02:21:46  12  please?

02:21:46  13  **Q**    Sure.

02:21:47  14      Mr. Lanier referred to the cases that you're an expert

02:21:49  15  in.  In those cases, Doctor, the plaintiffs' lawyers are

02:21:53  16  suing alleging that manufacturers and distributors caused

02:21:56  17  the opioid crisis, national distributors.

02:22:00  18  **A**    In those cases I'm working to advise the communities

02:22:04  19  and parties involved on how best to prevent further people

02:22:07  20  from getting injured or dying.

02:22:09  21  **Q**    And in those cases, the lawsuit is against the

02:22:12  22  manufacturers of opioids and national distributors of

02:22:16  23  opioids, like AmerisourceBergen, Cardinal Health, and

02:22:20  24  McKesson, where the plaintiffs' lawyers are blaming those

02:22:23  25  entities for causing the opioid epidemic, fair?

**Alexander (Cross by Sullivan)**          3489

| | | |
|---|---|---|
| 02:22:25 | 1 | **A**    I believe that's the case, but again, I prefer not to |
| 02:22:28 | 2 | get involved in the blame part because that's not what I was |
| 02:22:31 | 3 | asked to evaluate. |
| 02:22:33 | 4 | **Q**    And, Doctor, you have actually published on how Purdue |
| 02:22:39 | 5 | Pharmaceutical Company was a major cause of the opioid |
| 02:22:41 | 6 | crisis, right? |
| 02:22:42 | 7 | **A**    Well, again, it would be helpful to see the specific |
| 02:22:45 | 8 | reference. |
| 02:22:49 | 9 | **Q**    Sure.  If we could go to Tab 10 of the binder, |
| 02:22:52 | 10 | Dr. Alexander. |
| 02:23:02 | 11 | **A**    Okay. |
| 02:23:03 | 12 | **Q**    And this is HBC/GE Exhibit 1037? |
| 02:23:11 | 13 | **A**    Yes. |
| 02:23:11 | 14 | **Q**    And do you see, sir, that you're an author on this |
| 02:23:14 | 15 | paper? |
| 02:23:14 | 16 | **A**    Yes. |
| 02:23:14 | 17 | **Q**    And it was -- it's dated 2015. |
| 02:23:18 | 18 | Do you see that? |
| 02:23:19 | 19 | **A**    Yes, I do. |
| 02:23:22 | 20 | **Q**    Okay.  And if we look at your paper from 2015, this is |
| 02:23:29 | 21 | a paper where you give an overview of the opioid and heroin |
| 02:23:33 | 22 | crisis and talk about a public health approach to an |
| 02:23:38 | 23 | epidemic of addiction.  Right, sir? |
| 02:23:40 | 24 | **A**    Yes. |
| 02:23:40 | 25 | **Q**    And if we turn to page 3 but on the bottom it's page |

02:23:48  1    562, Doctor.

02:23:55  2    **A**    Okay.

02:23:55  3    **Q**    I want to talk about some of the things that you've

02:23:57  4    talked about.

02:23:58  5         So first on the prior page it talks about "History of

02:24:03  6    Opioid Addiction in the United States."  That's on page 561.

02:24:09  7    **A**    Yeah, I'm with you.

02:24:10  8    **Q**    Okay.  And then if you flip to page 562, you talk

02:24:19  9    about how "the rate of opioid use began accelerating rapidly

02:24:22  10   in 1996."

02:24:23  11        Do you see that?

02:24:25  12   **A**    If you could point out to me what paragraph, that

02:24:28  13   would be helpful.

02:24:29  14   **Q**    Do you see it on the monitor?

02:24:30  15   **A**    Oh, yes.  Yes, I do.

02:24:31  16   **Q**    And then you say, "This acceleration was fueled in

02:24:37  17   large part by the introduction in 1995 of OxyContin, an

02:24:41  18   extended release formula of oxycodone manufactured by Purdue

02:24:47  19   Pharma," right?

02:24:47  20   **A**    Yes, I believe that's true.

02:24:48  21   **Q**    So you and your co-authors on the paper are making

02:24:52  22   clear here that OxyContin and Purdue Pharma was what

02:24:59  23   accelerated rapidly the opioid crisis, right?

02:25:06  24   **A**    Well, I believe so.  Yeah, we're making the point that

02:25:11  25   the introduction of OxyContin and its widespread prescribing

02:25:19 1 and dispensing of that product was important in fueling the

02:25:27 2 increased opioid use that began in the late 1990s.

02:25:31 3 **Q** Yeah, in fact, you say that the use of opioids was

02:25:34 4 fueled in large part by the introduction of OxyContin,

02:25:36 5 right?

02:25:37 6 **A** Right.

02:25:37 7 **Q** And then you go on to talk about how Purdue Pharma

02:25:43 8 funded 20,000 pain-related educational programs and engaged

02:25:49 9 in other campaigns to try to convince people to use

02:25:54 10 OxyContin, or doctors to prescribe it, right?

02:26:01 11 **A** Yes.

02:26:05 12 **Q** And in fact, Doctor, you and your co-authors go on to

02:26:09 13 say -- and that's true, right, you know, Dr. Alexander, that

02:26:12 14 Purdue Pharma has pled guilty to a crime acknowledging that

02:26:15 15 they mislead the public about the risk of addiction from

02:26:18 16 OxyContin?

02:26:20 17 **A** I don't know the details of what they have pled guilty

02:26:24 18 to, but I believe that there are cases in bankruptcy court,

02:26:28 19 and I believe that they have admitted wrongdoing.

02:26:30 20 **Q** And, Doctor, you actually testified -- we can go to

02:26:36 21 it, but let's finish it with your paper -- how Purdue Pharma

02:26:43 22 and you allege other manufacturers misled doctors about the

02:26:46 23 risk of addiction from opioids like OxyContin, right?

02:26:49 24 **A** Where -- can you point out where I'm saying that?

02:26:52 25 **Q** Well, I'm asking you that.

**Alexander (Cross by Sullivan)** 3492

02:26:54   1      Haven't you written and said that, that Purdue Pharma

02:26:57   2   has misled doctors about the risk of addiction from

02:27:02   3   OxyContin?

02:27:02   4   **A**     Well, I think Purdue Pharma and other manufacturers

02:27:05   5   have contributed, importantly, to the opioid epidemic by

02:27:11   6   driving increased sales of their products.

02:27:16   7      But if you're asking for a specific statement about

02:27:20   8   Purdue Pharma misled X, then I guess it would be helpful for

02:27:24   9   me to see where I've said that.

02:27:25   10   **Q**     And I apologize, maybe my question wasn't clear.  I

02:27:28   11   wasn't asking for a specific statement.

02:27:29   12      That's your view, Doctor, that Purdue Pharma and other

02:27:33   13   manufacturers misled doctors about the risk of opioid

02:27:36   14   addiction?

02:27:39   15   **A**     I believe that opioids were -- have been heavily

02:27:42   16   marketed and promoted and that that marketing and promotion

02:27:46   17   has contributed to widespread underestimation of the risks

02:27:52   18   of opioids and overestimation of the benefits.  So I believe

02:27:55   19   that that's important as one of many different factors that

02:28:00   20   has created the situation that we're currently in.

02:28:04   21   **Q**     Marketing promoted by manufacturers like Purdue

02:28:08   22   Pharma?  Opioids were marketed and promoted by manufacturers

02:28:11   23   like Purdue Pharma?

02:28:12   24   **A**     Correct.

02:28:12   25   **Q**     And you talk here in your paper about how the

**Alexander (Cross by Sullivan)** 3493

02:28:18  1    president of the American Pain Society introduced a campaign

02:28:22  2    entitled "Pain is the Fifth Vital Sign," and that "encourage

02:28:27  3    healthcare professionals to assess pain with the same zeal

02:28:30  4    as they do vital signs and urge more aggressive use of

02:28:33  5    opioids for chronic noncancer pain."  Right?

02:28:40  6         Do you see that, sir?

02:28:41  7    **A**    Yes, I do.

02:28:42  8    **Q**    And in the paragraph above you talk about how

02:28:45  9    Purdue Pharma funded that effort.  In other words, they

02:28:48  10   funded the American Pain Society to try to convince people

02:28:53  11   to treat pain as a fifth vital sign and prescribe more

02:28:57  12   opioids, convince doctors to prescribe more opioids, right?

02:29:00  13   **A**    Well, yeah.  I mean, I don't know all the details of

02:29:04  14   the flow of dollars, but I think Purdue and perhaps other

02:29:09  15   manufacturers certainly supported these organizations that

02:29:12  16   helped to essentially enhance the sales of their products.

02:29:15  17   **Q**    This is your paper, right?  I didn't -- you wrote this

02:29:18  18   paper?

02:29:19  19   **A**    I did.  I did.

02:29:21  20   **Q**    Okay.  And in this paper you're talking about how

02:29:24  21   Purdue influenced the prescribing practices of doctors as it

02:29:29  22   relates to opioids?

02:29:30  23   **A**    I believe that's true.  I believe that they did.

02:29:32  24            MR. WEINBERGER:  Your Honor, can we have a

02:29:34  25   side bar for just a moment, please?

**Alexander (Cross by Sullivan)**                    3494

| | | |
|---|---|---|
| 02:29:35 | 1 | THE COURT:  Okay. |
| 02:29:36 | 2 | (At side bar at 2:29 p.m.) |
| 02:29:48 | 3 | MR. WEINBERGER:  Your Honor, it is very clear |
| 02:29:53 | 4 | from his direct examination and from his report that he is |
| 02:29:57 | 5 | not giving here to give opinion testimony on the causal |
| 02:30:04 | 6 | relationship between the conduct of these defendants or any |
| 02:30:10 | 7 | other nonparty defendants to the opioid epidemic. |
| 02:30:20 | 8 | If she's going to open up the door by asking all these |
| 02:30:25 | 9 | causal relationship questions, we intend to pursue that in |
| 02:30:31 | 10 | redirect. |
| 02:30:32 | 11 | THE COURT:  I agree, Ms. Sullivan.  I'm not |
| 02:30:34 | 12 | sure where you're going, but you've -- you've now elicited |
| 02:30:39 | 13 | from this witness a lot more than what -- what I thought |
| 02:30:46 | 14 | what he said on direct.  And once it's opened up -- |
| 02:30:49 | 15 | MS. SULLIVAN:  Well, Your Honor, the clear |
| 02:30:51 | 16 | import of his testimony with that prescription medicines |
| 02:30:54 | 17 | caused the opioid crisis and this is -- |
| 02:30:56 | 18 | THE COURT:  I've said what I've said. |
| 02:30:57 | 19 | MS. SULLIVAN:  Thank you, Your Honor. |
| 02:30:59 | 20 | THE COURT:  So it's open -- |
| 02:30:59 | 21 | MS. SULLIVAN:  Thank you, Your Honor. |
| 02:31:00 | 22 | THE COURT:  And he'll be on for a long time |
| 02:31:02 | 23 | now. |
| 02:31:08 | 24 | MR. DELINSKY:  Your Honor? |
| 02:31:09 | 25 | THE COURT:  Yes, Mr. Delinsky. |

02:31:10   1              MR. DELINSKY:  Your Honor, a portion of his

02:31:11   2    testimony and I believe of his direct testimony, and I

02:31:14   3    believe the transcript will bear this out, is that he did

02:31:17   4    testify that the epidemic was -- has been caused by the

02:31:23   5    overprescribing and overdispensing, and he did eke that in

02:31:28   6    on at least two occasions in response to questions by

02:31:31   7    Mr. Lanier.  So this isn't opening the door to anything that

02:31:37   8    Mr. Lanier's examination itself opened the door to or at

02:31:39   9    least --

02:31:40  10              THE COURT:  No, I think that overprescribing,

02:31:42  11    overdispensing came out in response to Ms. Sullivan's

02:31:45  12    questions.

02:31:46  13              MR. DELINSKY:  No, Your Honor, I think the

02:31:48  14    transcript will show it absolutely --

02:31:49  15              MS. SULLIVAN:  Yes, Your Honor, it came in

02:31:50  16    direct.

02:31:51  17              MR. DELINSKY:  Yes.

02:31:57  18              THE COURT:  Well, I'm not deciding here what

02:32:00  19    questions to ask on direct and what questions to ask on

02:32:03  20    cross.  I'm listening carefully.  And I'm just saying,

02:32:07  21    Ms. Sullivan, you ought to be very careful about what you're

02:32:11  22    asking because I'm going to allow Mr. Lanier to come back on

02:32:15  23    all these areas.

02:32:16  24              MS. SULLIVAN:  Understood, Your Honor.

02:32:17  25              THE COURT:  And if you want him to start

**Alexander (Cross by Sullivan)**

02:32:21    1    expressing his opinion on what Purdue did and didn't do and

02:32:23    2    what the four defendants here should have done knowing what

02:32:27    3    Purdue had done, then --

02:32:28    4               MS. SULLIVAN:  Your Honor, he's got no

02:32:30    5    information about the four defendants.  He's acknowledged

02:32:31    6    that.

02:32:32    7               THE COURT:  Trust me, he's got a lot of

02:32:33    8    information and a lot of opinions, and if you open the door,

02:32:39    9    Mr. Lanier's going to ask him about those.

02:32:43   10               MS. SULLIVAN:  Thank you, Your Honor.

02:32:54   11               (In open court at 2:32 p.m.)

02:32:54   12    BY MS. SULLIVAN:

02:32:56   13    Q    Dr. Alexander, going back to your paper here, talking

02:32:57   14    about the sharp rise in prescription opioid consumption, you

02:33:06   15    talk about how Purdue engaged in a campaign that exaggerated

02:33:12   16    the benefits of long-term opioid use, right?

02:33:20   17    A    Yes, opioid manufacturers and pain organizations.

02:33:23   18    Q    Yeah.  And you told -- and you go on to say on page 2

02:33:28   19    that what Purdue was telling people was not true, right?

02:33:32   20    A    I'm sorry.  Can you move the page down so that I can

02:33:35   21    see where you're referring to on page 2?

02:33:37   22    Q    Sure.  I'm sorry.

02:33:44   23    A    Correct, that the companies and professional societies

02:33:48   24    were promoting messages and suggesting evidence for

02:33:52   25    statements that really weren't -- where there wasn't the

**Alexander (Cross by Sullivan)**

02:33:54  1   evidence to support that.

02:33:55  2   **Q**    Yeah.  And so when you talked about what caused the

02:33:59  3   opioid epidemic in this paper, the rise in opioid

02:34:03  4   consumption, you talked about Purdue Pharma and its

02:34:08  5   campaign, spending millions of dollars, to try to convince

02:34:12  6   doctors to prescribe OxyContin in a way that you thought was

02:34:16  7   misleading?

02:34:18  8   **A**    Yes.  I mean, I don't know the millions, but, yes,

02:34:24  9   we're talking about the role of pharmaceutical manufacturers

02:34:27  10  in this paper.

02:34:28  11  **Q**    Well, specifically Purdue?

02:34:30  12  **A**    Well, I think in some places I refer to manufacturers

02:34:33  13  more broadly, but, you know, the paper wasn't about trying

02:34:37  14  to parse out who all of the contributors were to the opioid

02:34:41  15  epidemic or apportion responsibility across, that it was

02:34:46  16  focused on explaining how OxyContin in the late 1990s was

02:34:52  17  really, we believe, a driving force for early harms that

02:34:58  18  continued, you know, throughout many, many years.

02:35:01  19  **Q**    And, Dr. Alexander, in this paper you and your

02:35:04  20  colleagues do not mention pharmacies in any way as

02:35:08  21  contributing to the oversupply of opioids or the opioid

02:35:12  22  crisis?

02:35:13  23  **A**    I don't believe that we do nor may we mention other

02:35:18  24  factors that could contribute as well.  We only --

02:35:21  25  **Q**    Sir, could you just answer my question?

**Alexander (Cross by Sullivan)**                        3498

02:35:23  1        The truth is in this paper where you outline the cause

02:35:27  2   of the opioid epidemic, the cause of oversupply, you did not

02:35:31  3   mention pharmacies at all?

02:35:32  4   **A**   I believe that's true.

02:35:33  5   **Q**   And, Doctor, one of the other things you point to as a

02:35:42  6   cause of the oversupply, a cause of the opioid epidemic, is

02:35:47  7   the FDA and the role of the FDA in this opioid crisis,

02:35:50  8   right?

02:35:51  9   **A**   Yes, I think that's a good example of the fact that

02:35:54  10  there's not just one organization or entity that's involved

02:35:58  11  in this mix, that there are many.  And the FDA is one as

02:36:02  12  well, yes.

02:36:02  13  **Q**   Yes.  And in fact, you faulted -- Dr. Alexander, you

02:36:09  14  faulted the FDA for approving too many opioids and for not

02:36:12  15  being stricter on how they were labeled?

02:36:17  16  **A**   Well, again, I would prefer to review specific papers

02:36:20  17  if that's what you're referring to or testimony, but some of

02:36:22  18  the work that I've done examining the role of the FDA has

02:36:24  19  been to look at whether they are appropriately monitoring

02:36:30  20  and ensuring the safe use of opioids after they're approved.

02:36:35  21  And so that's an example of the type of shortcoming that I

02:36:38  22  and my colleagues have identified.

02:36:40  23  **Q**   Yeah, you and your colleagues have identified the fact

02:36:44  24  that, in your view, the FDA did not do their job here, that

02:36:47  25  they were responsible in part for the opioid crisis?

**Alexander (Cross by Sullivan)**

02:36:52  1   **A**    I believe that the FDA could have and still can

02:36:58  2   regulate opioids, you know, in better accordance with the

02:37:02  3   scientific evidence, that's true.

02:37:03  4   **Q**    Yeah.  And so in addition to Purdue Pharma, one of the

02:37:08  5   other entities you cite as driving oversupply and driving

02:37:13  6   the opioid epidemic is the Federal Drug Administration, the

02:37:20  7   FDA?

02:37:21  8   **A**    Yes, I think the FDA -- you know, it's a complex mix,

02:37:24  9   and there's lots of different organizations and parties that

02:37:27  10  have contributed to the current state of affairs, and the

02:37:32  11  FDA is one of them.

02:37:32  12  **Q**    And, Doctor, are you aware that the FDA approved 21

02:37:36  13  different opioids between 19 -- approved for sale 21

02:37:40  14  different opioids between 1990 and 2017?

02:37:46  15  **A**    I'm not, but it wouldn't surprise me.  And I think we

02:37:49  16  have published papers looking at the number approved.  And

02:37:53  17  you may be citing one of them, but it wouldn't surprise me.

02:37:56  18  **Q**    And, Doctor, one of the other things that you fault

02:38:00  19  for causing the opioid epidemic is the Drug Enforcement

02:38:08  20  Administration, correct?

02:38:08  21  **A**    Well, I haven't studied Drug Enforcement

02:38:11  22  Administration as closely, but I do believe that they also

02:38:14  23  are in the mix just as other parties are.

02:38:17  24  **Q**    And when you say they're "in the mix," you have

02:38:18  25  concluded that they are in the mix because they increased --

**Alexander (Cross by Sullivan)**                3500

02:38:23  1    just to back up, I think our jurors have heard that Drug

02:38:27  2    Enforcement Administration controls how much opioid can be

02:38:29  3    manufactured or imported each year into the United States,

02:38:33  4    right?

02:38:34  5    **A**    Not that I'm aware of, but this is my first afternoon

02:38:38  6    here, so I haven't -- I don't know what the jurors have

02:38:41  7    heard.

02:38:41  8    **Q**    Oh, fair enough.

02:38:42  9         But you know, Dr. Alexander, that the Drug Enforcement

02:38:46  10   Administration approves how much opioid can be manufactured

02:38:49  11   or imported in the United States each year?

02:38:52  12   **A**    Yes, I believe that's true.

02:38:53  13   **Q**    In other words, they set the levels.  They have -- the

02:38:55  14   Government, the Federal Government, has control over how

02:39:00  15   many opioids can be prescribed here because they set limits?

02:39:02  16   **A**    Well, they have control over the prescription opioid

02:39:07  17   market, tight control, or tighter control.  You know, the

02:39:12  18   illicit opioid market is another story, although that is

02:39:15  19   part of their purview as well.  But of course, you know,

02:39:18  20   opioids come across the borders.

02:39:21  21   **Q**    Right.  And in fact, in some of your papers you talk

02:39:24  22   about the problem with illicit drugs coming across the

02:39:27  23   borders, fentanyl, heroin, cocaine, drug cartels, that's

02:39:32  24   part of the opioid crisis?

02:39:33  25   **A**    Well, there's an incredible demand for illicit opioids

02:39:36  1    in the United States, and that demand drives the shipment of

02:39:44  2    opioids.

02:39:48  3    **Q**    From abroad?

02:39:48  4    **A**    Correct.

02:39:49  5    **Q**    Doctor, you know because you testified about it and

02:39:53  6    written about it that Drug Enforcement Administration

02:39:55  7    increased the amount of opioids that could be made in the

02:40:00  8    United States by -- for hydrocodone 50 percent and for

02:40:05  9    OxyContin 100 percent from 2015 to 2018?

02:40:09  10   **A**    Well, I think I was deposed and I was given something

02:40:12  11   and asked to read it, and I do recall something along those

02:40:17  12   lines, but it was not something that I would have known or

02:40:21  13   was aware of.

02:40:22  14       And again, I was reading back a document that I

02:40:25  15   believe that counsel gave me about quotas changing over

02:40:29  16   time.

02:40:29  17   **Q**    Doctor, do you have Tab 5 in your -- if you could turn

02:40:33  18   to Tab 5 in your binder for us.

02:40:43  19   **A**    Okay.

02:40:43  20   **Q**    And this, Doctor, is your 2017 testimony before

02:40:46  21   Congress on the issue of combatting the opioid crisis?

02:40:50  22   **A**    Okay.

02:40:51  23   **Q**    And I want to point you, sir -- bear with me.

02:41:03  24       I want to point you to page 88 on the top.  Let me

02:41:08  25   just show our jurors.

**Alexander (Cross by Sullivan)** 3502

| | | |
|---|---|---|
| 02:41:09 | 1 | This is Defense Exhibit HBC/GE 1329? |
| 02:41:15 | 2 | **A** Okay. |
| 02:41:15 | 3 | **Q** And this is your testimony -- or contains your |
| 02:41:18 | 4 | testimony in 2017 before Congress.  Right, sir? |
| 02:41:24 | 5 | **A** Yes. |
| 02:41:24 | 6 | **Q** And if we turn -- let me just get to the beginning so |
| 02:41:28 | 7 | we can confirm it's you. |
| 02:41:29 | 8 | And if we go to page 85, that's where your testimony |
| 02:41:34 | 9 | begins, right, sir? |
| 02:41:35 | 10 | **A** Yes. |
| 02:41:36 | 11 | **Q** And if we turn to page -- |
| 02:41:40 | 12 | THE COURT:  I think it starts on page 83.  At |
| 02:41:44 | 13 | least on my -- |
| 02:41:50 | 14 | MS. SULLIVAN:  Fair enough, Your Honor. |
| 02:41:52 | 15 | **Q** Looks like it starts on page 83. |
| 02:41:55 | 16 | **A** Thank you.  Yes. |
| 02:41:56 | 17 | **Q** And another piece of it on 85. |
| 02:41:58 | 18 | And if we could turn, Doctor, to page 88 of your |
| 02:42:03 | 19 | testimony. |
| 02:42:03 | 20 | **A** Yes. |
| 02:42:03 | 21 | **Q** And here you made clear, sir, that "the origins of the |
| 02:42:13 | 22 | epidemic are multiple but arise from within the healthcare |
| 02:42:16 | 23 | system, including unsubstantiated claims about the safety |
| 02:42:21 | 24 | and effectiveness of opioids, multifaceted campaigns by |
| 02:42:25 | 25 | pharmaceutical companies, and the failure of the FDA and DEA |

**Alexander (Cross by Sullivan)**                3503

02:42:28  1    to regulate these products appropriately."

02:42:31  2        Right?  That was your testimony before Congress?

02:42:36  3  **A**    Yes.  But -- yes.

02:42:37  4  **Q**    And, Doctor, if you could just try to listen to my

02:42:41  5    questions, that would be great.

02:42:42  6        And so what are you referring to here about the DEA's

02:42:47  7    failure?  You refer here to the DEA's failure to regulate

02:42:52  8    opioids appropriately, right?

02:42:53  9  **A**    Right.  I mean, I would just like to clarify my last

02:42:57  10   statement, which was that I'm not aware of having discussed

02:43:00  11   or testified regarding specific magnitude of change in DEA

02:43:07  12   quotas.  And I've studied the DEA and understand the DEA

02:43:11  13   less than I do the FDA, but I certainly stand by this

02:43:18  14   statement that the causes -- that the origins of the

02:43:28  15   epidemic are multiple and that the origins include the

02:43:33  16   failure of the FDA and DEA to regulate these products

02:43:36  17   appropriately.

02:43:38  18       I believe that that's -- those are both true

02:43:40  19   statements, I believe.

02:43:40  20  **Q**    Well, I hope so.  You testified under oath to

02:43:44  21   Congress, right?  I hope that they're true.

02:43:45  22  **A**    Correct.

02:43:46  23  **Q**    And when you're referring to the DEA, you're referring

02:43:47  24   to the fact that the DEA did not limit quotas appropriately?

02:43:54  25  **A**    I do not know.  I would want to take more time to

**Alexander (Cross by Sullivan)** 3504

02:43:58  1  understand what I -- what specific -- you know, what

02:44:03  2  specific regulatory action on the part of the DEA I was

02:44:07  3  referring to.

02:44:09  4       And there may be written -- if these are my spoken

02:44:14  5  comments, there may be written comments where I spell that

02:44:16  6  out.

02:44:16  7       And the other thing is that I also submitted the

02:44:18  8  report from evidence to impact --

02:44:22  9  **Q**     Yeah, we're going to look at that, sir.

02:44:24  10  **A**     And that may speak in more detail to what I was

02:44:26  11  thinking about with the DEA, with respect to the DEA.

02:44:29  12  **Q**     Fair enough.  But we can agree when you testified

02:44:31  13  before Congress, you faulted specifically pharmaceutical

02:44:36  14  manufacturers, the FDA, and the DEA for causing the opioid

02:44:41  15  epidemic, right?

02:44:42  16  **A**     Yes.

02:44:42  17  **Q**     What you did not mention in your Congressional

02:44:45  18  testimony here is anything that pharmaceutical -- I'm sorry.

02:44:47  19  What you did not mention in your Congressional testimony is

02:44:51  20  anything that these four pharmacies or any pharmacies did to

02:44:55  21  contribute to the opioid epidemic, fair?

02:44:57  22  **A**     Well, I believe in the report that accompanied this --

02:45:01  23  **Q**     Sir --

02:45:02  24           MR. LANIER:  Let him answer the question,

02:45:04  25  please.

**Alexander (Cross by Sullivan)** 3505

02:45:04  1             MS. SULLIVAN:  I'm sorry.  Go ahead.

02:45:06  2             THE COURT:  Let him answer the question,

02:45:07  3 please, Ms. Sullivan.

02:45:08  4             MS. SULLIVAN:  Sure.

02:45:08  5 **A**     I believe in the report from Johns Hopkins that

02:45:10  6 accompanied this testimony, I do speak -- we do speak to the

02:45:15  7 role of pharmacies, but in this specific paragraph I do not

02:45:18  8 discuss the role of pharmacies.

02:45:19  9 **Q**     We're going to look at that report.

02:45:21  10      But certainly in this testimony when you're talking

02:45:22  11 about what caused the opioid crisis, you talk about three

02:45:25  12 things, pharmaceutical manufacturers, the FDA, and the Drug

02:45:33  13 Enforcement Administration, correct, sir?

02:45:39  14 **A**     Yeah, unsubstantiated claims about safety and

02:45:43  15 effectiveness, campaigns by companies, and failure of

02:45:45  16 regulation, yes.

02:45:46  17 **Q**     And then when you're talking about unsubstantiated

02:45:48  18 claims about safety and effectiveness of opioids, you're

02:45:52  19 talking about manufacturers?

02:45:53  20 **A**     Well, I mean, there's really been a culture that's

02:45:55  21 permeated, you know, communities and the country about that,

02:46:03  22 you know, where the safety and effectiveness of these

02:46:06  23 products has been misconstrued.  But I think manufacturers

02:46:08  24 have been important drivers of that culture.

02:46:14  25 **Q**     And testifying before Congress, I take it it's kind of

**Alexander (Cross by Sullivan)**                            3506

| | | |
|---|---|---|
| 02:46:16 | 1 | a big deal, it's important. |
| 02:46:18 | 2 | **A**    It was an honor, and it was an honor to do, and I was |
| 02:46:22 | 3 | pleased that they were interested in focusing on the opioid |
| 02:46:25 | 4 | epidemic. |
| 02:46:26 | 5 | **Q**    And you try to get it right, right?  You try to get it |
| 02:46:29 | 6 | right when you testify before Congress? |
| 02:46:31 | 7 |             MR. WEINBERGER:  Objection, Your Honor.  This |
| 02:46:34 | 8 | is argumentative. |
| 02:46:34 | 9 |             THE COURT:  I'll allow that question. |
| 02:46:35 | 10 | **A**    Yes. |
| 02:46:36 | 11 | **Q**    And the three -- and what you mention here is |
| 02:46:40 | 12 | pharmaceutical companies and unsubstantiated campaigns, the |
| 02:46:44 | 13 | FDA, and the DEA, right, as the cause of the opioid |
| 02:46:47 | 14 | epidemic? |
| 02:46:48 | 15 | **A**    Yes. |
| 02:46:48 | 16 | **Q**    And you don't mention pharmacies? |
| 02:46:50 | 17 | **A**    Correct. |
| 02:46:51 | 18 | **Q**    And, Dr. Alexander, if we look further in your -- in |
| 02:47:06 | 19 | that same Congressional testimony, you were asked some |
| 02:47:12 | 20 | questions, sir.  If we look at page 97 and 98. |
| 02:47:23 | 21 |     Tell me when you've got there. |
| 02:47:26 | 22 | **A**    Yes, I'm there. |
| 02:47:27 | 23 | **Q**    Okay.  And some of the Congressmen and -women are |
| 02:47:30 | 24 | asking you some questions about your testimony, correct? |
| 02:47:32 | 25 | **A**    Yes. |

**Alexander (Cross by Sullivan)** 3507

02:47:33  1   **Q**    And you're asked by the chairman, "Dr. Alexander, you

02:47:42  2   mentioned overprescribing as being one of the -- kind of the

02:47:45  3   dual things that you would address first.  What are the

02:47:47  4   causes of overprescription?  Is it misdiagnosis?  Is it

02:47:51  5   failure to consider?  What are the root causes?"

02:47:54  6        Do you see that question?

02:47:56  7   **A**    Yes, I do.

02:47:57  8   **Q**    Okay.  And you talk about -- in your answer you talk

02:48:00  9   about this "widespread prevalence of pain and the notion

02:48:04  10  that pain needs to be fully abated," right?

02:48:06  11  **A**    Yes.

02:48:06  12  **Q**    And again, Doctor, you're talking about this campaign

02:48:13  13  that -- by Purdue Pharma and, as you say, other

02:48:18  14  manufacturers that convinced doctors that they should

02:48:22  15  prescribe opioids more aggressively?

02:48:26  16  **A**    Yes.

02:48:26  17  **Q**    Okay.  And you're also talking about how labeling is

02:48:31  18  also an issue?  Again, going to the FDA issues.

02:48:37  19  **A**    Yes.

02:48:37  20  **Q**    Okay.  And then you say it's a terrific question,

02:48:42  21  right?

02:48:44  22  **A**    Well, then I say, "There are many, many, many causes

02:48:47  23  that have contributed to the overprescribing."

02:48:50  24        And then I go on to say -- then I'm asked a new

02:48:54  25  question, and then I say, "Well, it's a terrific question."

**Alexander (Cross by Sullivan)** 3508

| | | |
|---|---|---|
| 02:48:59 | 1 | **Q**     But what happened as you outlined in your paper and |
| 02:49:02 | 2 | your testimony is that Purdue Pharma and, as you say, some |
| 02:49:04 | 3 | of these other manufacturers convinced doctors through this |
| 02:49:10 | 4 | campaign that you've identified as misleading to prescribe a |
| 02:49:13 | 5 | lot more opioids than they otherwise would have? |
| 02:49:15 | 6 | **A**     I think they have.  I think there are a lot of |
| 02:49:20 | 7 | different parties and organizations that have contributed to |
| 02:49:22 | 8 | the mix. |
| 02:49:22 | 9 | **Q**     That wasn't my question, sir. |
| 02:49:24 | 10 | **A**     I believe that Purdue Pharma was one of those. |
| 02:49:28 | 11 | **Q**     But in other words, doctors -- there's no dispute, I |
| 02:49:31 | 12 | think you told Mr. Lanier, prescriptions for opioids |
| 02:49:35 | 13 | increased by 400 million, right? |
| 02:49:37 | 14 | **A**     I believe it was 400 percent. |
| 02:49:39 | 15 | **Q**     400 percent, okay. |
| 02:49:40 | 16 |      By 400 percent, right? |
| 02:49:42 | 17 | **A**     Correct. |
| 02:49:42 | 18 | **Q**     And the reason for that, as you outline in your paper, |
| 02:49:48 | 19 | is that Purdue Pharma and, as you say, other manufacturers, |
| 02:49:52 | 20 | convinced doctors that they should be prescribing more |
| 02:49:54 | 21 | opioids, that they weren't as addictive as they previously |
| 02:49:57 | 22 | thought? |
| 02:49:57 | 23 | **A**     That's not the exclusive reason.  That's a reason.  As |
| 02:50:01 | 24 | I say here in this testimony that you're showing, there are |
| 02:50:03 | 25 | many, many causes for the overprescribing. |

**Alexander (Cross by Sullivan)**

| | | |
|---|---|---|
| 02:50:04 | 1 | **Q**    Yes.  But you don't have any evidence that Giant Eagle |
| 02:50:07 | 2 | did anything to convince that -- they weren't promoting |
| 02:50:10 | 3 | opioids.  They're not out there advertising opioids, they're |
| 02:50:13 | 4 | not a manufacturer.  You don't have any evidence like that? |
| 02:50:15 | 5 | **A**    Well, I wasn't asked in this case to evaluate or weigh |
| 02:50:20 | 6 | in on what Giant Eagle specifically did. |
| 02:50:25 | 7 | **Q**    Sir, my question was, you've looked at the opioid |
| 02:50:27 | 8 | crisis broadly. |
| 02:50:29 | 9 | You've never seen any evidence that Giant Eagle or any |
| 02:50:31 | 10 | of these defendants promoted, advertised opioids? |
| 02:50:37 | 11 | **A**    I'm not aware -- that's correct, I'm not aware that |
| 02:50:41 | 12 | Giant Eagle markets and promotes opioids. |
| 02:50:43 | 13 | **Q**    And so when you're talking about this campaign and |
| 02:50:46 | 14 | this overpromotion convincing doctors to prescribe, you're |
| 02:50:49 | 15 | talking about manufacturers? |
| 02:50:50 | 16 | **A**    Well, and professionals -- you know, and advocacy |
| 02:50:55 | 17 | organizations that they may have flown -- that they may |
| 02:50:59 | 18 | have, you know, sent money through -- not flown money |
| 02:51:02 | 19 | through but, you know, channeled money through as two |
| 02:51:08 | 20 | important drivers of that culture, yes, that's what I'm |
| 02:51:11 | 21 | referring to. |
| 02:51:11 | 22 | **Q**    And you were asked then in your testimony, |
| 02:51:14 | 23 | Dr. Alexander, "Are there certain specialties or |
| 02:51:17 | 24 | subspecialties where you've identified where the |
| 02:51:19 | 25 | overprescribing is more prevalent." |

**Alexander (Cross by Sullivan)**

02:51:22    1      Do you see that?

02:51:22    2   **A**    Yes, I do.

02:51:23    3   **Q**    And you go on to say that "it's within primary care

02:51:28    4   physicians but a small subset."

02:51:30    5      Do you see that?

02:51:31    6   **A**    Yes, prescribing is somewhat skewed.

02:51:35    7   **Q**    But what you go on to say is that they're not doing it

02:51:41    8   for ill intent.

02:51:43    9      In other words, these doctors prescribing opioids are

02:51:46   10   doing it for legitimate purposes, right?

02:51:48   11   **A**    Well, there's not -- I think both in this testimony

02:51:51   12   and today what I would say is there's not one type of

02:51:54   13   doctor.  There are some doctors and other prescribers that

02:51:58   14   are rogue and that are clearly way outside of the boundaries

02:52:02   15   of acceptable practice, you know, 300 patients a day, cash

02:52:08   16   only, you know, down on Main Street.

02:52:12   17      And then there are many other doctors that aren't

02:52:14   18   necessarily -- they may not be aware of the appropriate role

02:52:19   19   of opioids.  But I would never characterize them as rogue

02:52:23   20   or, you know, quote/unquote, bad doctors or something like

02:52:26   21   that.

02:52:26   22   **Q**    Yeah, what you're telling Congress here is that "most

02:52:31   23   prescribers that are contributing to the epidemic aren't

02:52:34   24   doing it out of ill intent," right?  Those were your words.

02:52:42   25      That's what you said?

**Alexander (Cross by Sullivan)** 3511

| | | |
|---|---|---|
| 02:52:43 | 1 | **A**     Well, I think I was referring to what Governor |
| 02:52:47 | 2 | Christie said.  And I think what I said is I think that |
| 02:52:50 | 3 | there is a very important point here.  And in fact, Governor |
| 02:52:53 | 4 | Christie spoke to it when he said that most prescribers that |
| 02:52:56 | 5 | are contributing to this epidemic aren't doing so out of ill |
| 02:52:59 | 6 | intent. |
| 02:53:00 | 7 | **Q**     Fair enough.  And you agree with that? |
| 02:53:01 | 8 | **A**     I do agree with that. |
| 02:53:02 | 9 | **Q**     In other words, most prescribers who were prescribing |
| 02:53:10 | 10 | opioids were doing it for legitimate reasons.  They |
| 02:53:13 | 11 | genuinely believed they were helping their patients? |
| 02:53:15 | 12 | **A**     Well, I have a little bit of the problem with the word |
| 02:53:17 | 13 | "legitimate" because I think it's been used in ways that |
| 02:53:20 | 14 | aren't -- at least when it is referring to legitimate pain, |
| 02:53:27 | 15 | I mean, that's a little bit of a side bar. |
| 02:53:29 | 16 | But what I would say is that most prescribers I |
| 02:53:32 | 17 | believe are trying to help their patients even if they may |
| 02:53:34 | 18 | be using opioids inappropriately. |
| 02:53:35 | 19 | **Q**     Yeah, they weren't doing it for bad reasons, they |
| 02:53:39 | 20 | weren't pill mills.  They were doctors trying to do their |
| 02:53:42 | 21 | job to help their patients when they were, as you say, |
| 02:53:45 | 22 | overprescribing opioids? |
| 02:53:46 | 23 | **A**     Yes. |
| 02:53:46 | 24 | **Q**     And if you look at the top of page 98, you go on to |
| 02:53:54 | 25 | say that these prescribers "were not flouting any standard |

02:54:00   1   of best medical practice, right?

02:54:11   2   **A**     Well, I'm saying that they're not necessarily just

02:54:14   3   flouting any standard of best medical practice.  So I'm not

02:54:19   4   saying that it's not -- that just because a prescriber may

02:54:22   5   be prescribing a certain opioid volume, it doesn't mean

02:54:25   6   automatically that they're, you know, throwing out the

02:54:27   7   window standards of medical practice.

02:54:28   8   **Q**     Yeah, going to your original point that most doctors

02:54:31   9   who are overprescribing these opioids, as you say, were

02:54:34   10  doing it for good reason.  They got duped by the misleading

02:54:37   11  campaign of Purdue and others, as you said, right?

02:54:41   12  **A**     Well, I mean, again, there's a very complex mix of

02:54:45   13  factors that have driven the overprescribing.  But Purdue

02:54:49   14  and manufacturers are in the mix.

02:54:52   15  **Q**     But what you're talking about here is the doctors were

02:54:56   16  misled, in other words, they were writing a lot more opioid

02:54:59   17  prescriptions, 400 percent more, most of them for good

02:55:01   18  reason.  They believed that these things were less

02:55:03   19  addictive.  That they were within the standard of care.

02:55:16   20  **A**     Can you please say that once more?

02:55:18   21  **Q**     Sure.  When you say that they weren't just flouting

02:55:20   22  any standard of best medical practice, the reason that

02:55:24   23  opioid prescriptions increased by 400 percent, as you say,

02:55:28   24  is that these doctors were just prescribing so many more

02:55:31   25  opioids?

**Alexander (Cross by Sullivan)** 3513

02:55:32  1  **A**      The reason -- I mean, there are several factors that

02:55:36  2  have driven the large increases in opioids over time.

02:55:43  3  Different factors.  Doctors, FDA, pharmacies, patients,

02:55:50  4  distributors, et cetera.

02:55:53  5  **Q**      But that wasn't my question, Doctor.

02:55:55  6          My question was about your testimony.  You're telling

02:55:57  7  Congress here that these -- so you can't get a -- you can't

02:56:02  8  pick up a prescription at a pharmacy unless a doctor writes

02:56:05  9  it, right?  Unless it's forged.

02:56:08  10 **A**      Well, or other licensed prescriber.

02:56:11  11 **Q**      Fair enough.  You have to be a licensed prescriber.

02:56:13  12         And what you're saying here is that the reason that

02:56:17  13 doctors were overprescribing was not because they were

02:56:20  14 flouting the standard of care, right?

02:56:23  15 **A**      Well, I'm answering a question from Chairman Gowdy

02:56:27  16 about whether there are certain specialties where

02:56:30  17 overprescribing is more prevalent.  And in doing so I make

02:56:35  18 the point that primary care physicians are important because

02:56:37  19 of the volume that they account for.  And I make the point

02:56:42  20 that the prescribing is skewed, so it's not like every

02:56:45  21 primary care provider prescribes exactly the same amount.

02:56:49  22         And then I make the point that not all of them have

02:56:52  23 gone rogue.

02:56:52  24         So I'm not trying to ascribe a certain amount of the

02:56:56  25 overuse to well-intentioned or poorly intentioned

**Alexander (Cross by Sullivan)**                    3514

02:57:00  1    prescribers.  I'm just trying to say, Chairman Gowdy and

02:57:04  2    members of the committee, this isn't just about the bad

02:57:07  3    apples.  We need to think about the systems that we're

02:57:10  4    putting in place that allow so many opioids to be prescribed

02:57:14  5    and dispensed.

02:57:15  6    **Q**    And, Doctor, you go on to say that, in fact, the rogue

02:57:24  7    doctors and the opioid shoppers are exceedingly rare, right?

02:57:27  8    **A**    Can you please point out where I say that?

02:57:29  9    **Q**    Sure.  It's just in the same page.  Chairman Gowdy

02:57:35  10   asks you, "Has there been any analysis of physicians who

02:57:38  11   write prescriptions for opioid after a patient has been

02:57:41  12   declined a prescription from another physician?  In other

02:57:43  13   words, doctor shopping?"

02:57:45  14        And our jurors have heard a fair amount about doctor

02:57:48  15   shopping.

02:57:48  16        Do you see that?

02:57:48  17   **A**    Right.  So I say that, and then I say, "this is not to

02:57:53  18   suggest that it's not vital that we identify and intervene

02:57:59  19   opioid shoppers.  So I'm making clear that it's not like we

02:58:03  20   shouldn't identify the people that may be going pharmacy to

02:58:05  21   pharmacy or may have other -- you know, other flags to

02:58:10  22   suggest that they are having concerning fill patterns or

02:58:13  23   something, but I'm just saying that it's not just about

02:58:16  24   opioid shoppers.  You also have to go after and try to

02:58:19  25   improve the quality of care for the broader population of

| | | |
|---|---|---|
| 02:58:23 | 1 | people that are -- you know, it may be a 65-year-old with |
| 02:58:27 | 2 | arthritis who is on OxyContin and, you know, thinks that |
| 02:58:31 | 3 | it's working for her but it's going to increase her |
| 02:58:33 | 4 | likelihood of a fall or something.  And so it's about that |
| 02:58:39 | 5 | as well. |
| 02:58:41 | 6 | MR. WEINBERGER:  Your Honor, it's 3:00. |
| 02:58:42 | 7 | THE COURT:  Well, I was going to wait until |
| 02:58:45 | 8 | Ms. Sullivan maybe finished this document and then take a |
| 02:58:47 | 9 | break. |
| 02:58:47 | 10 | MS. SULLIVAN:  I could ask one -- actually, |
| 02:58:49 | 11 | Your Honor, I'm fine taking a break if you want to. |
| 02:58:51 | 12 | THE COURT:  All right.  Well, you know, I |
| 02:58:52 | 13 | don't like to cut off counsel right in the middle of the |
| 02:58:54 | 14 | flow. |
| 02:58:55 | 15 | So if this is as good a time as any, Ms. Sullivan, |
| 02:58:58 | 16 | we'll take a break. |
| 02:58:59 | 17 | MS. SULLIVAN:  I'm fine taking a break.  I |
| 02:59:01 | 18 | think everybody could use it. |
| 02:59:02 | 19 | THE COURT:  All right.  Ladies and gentlemen, |
| 02:59:03 | 20 | we'll take our usual mid afternoon break. |
| 02:59:06 | 21 | The usual admonitions.  Thank you. |
| 02:59:12 | 22 | (Recess taken at 2:59 p.m.) |
| 03:21:34 | 23 | (Jury present in open court at 3:21 p.m.) |
| 03:21:37 | 24 | THE COURT:  Please be seated, ladies and |
| 03:21:38 | 25 | gentlemen. |

**Alexander (Cross by Sullivan)** 3516

03:21:39 1    Doctor, you're still under oath.

03:21:41 2    And Ms. Sullivan, you may continue.

03:21:44 3    MS. SULLIVAN:  Thank you, Your Honor.

03:21:46 4 BY MS. SULLIVAN:

03:21:46 5 **Q**    Dr. Alexander, we were looking at your Congressional

03:21:49 6 testimony on page 98.

03:21:52 7    And you were asked by the chairman about doctor

03:21:54 8 shopping, right?

03:21:55 9 **A**    Yes.

03:21:55 10 **Q**    And what you told Congress was that "opioid shoppers

03:22:02 11 are exceedingly rare," right?  That was your statement?

03:22:05 12 **A**    Yes.

03:22:05 13 **Q**    And then you go on to say that "other populations,

03:22:12 14 chronic opioid users that are at much higher risk on a

03:22:16 15 public health level" are essentially more important.

03:22:20 16 **A**    Yeah, and individuals filling combinations of opioids

03:22:23 17 and other medicines that put them at higher risk, such as

03:22:27 18 opioid and benzodiazapines.

03:22:31 19    MR. WEINBERGER:  You can take your mask off.

03:22:33 20    THE WITNESS:  Oh, thank you.

03:22:33 21 **Q**    So, Doctor, you responded to Congress, and our jurors

03:22:36 22 have heard a lot about opioid shoppers and rogue

03:22:39 23 prescribers.

03:22:39 24    And what you told Congress is that those are

03:22:42 25 exceedingly rare, right?

03:22:44  1   **A**      Rare, important to identify, and also less common than

03:22:52  2   other populations that can be screened for and identified,

03:22:57  3   such as individuals filling specific combinations of

03:23:01  4   medicines.

03:23:02  5   **Q**      And when you're talking about other populations,

03:23:04  6   you're talking about people who are obtaining legitimate

03:23:07  7   prescriptions as opposed to opioid shoppers and rogue

03:23:10  8   prescribers, right?

03:23:11  9   **A**      Well, again, I have a little bit of trouble with the

03:23:14  10  word "legitimate," but obtaining prescriptions without going

03:23:17  11  doctor to doctor or pharmacy to pharmacy, yes.

03:23:19  12  **Q**      Yeah.  So rogue prescribers and opioid shoppers, in

03:23:22  13  your view, are exceedingly rare?

03:23:27  14  **A**      Yes.  Important -- yes, relative to other populations

03:23:29  15  of potential concern.

03:23:30  16  **Q**      And if you want to go back, Doctor, to your expert

03:23:35  17  report, Tab 2 on page 11.

03:23:46  18  **A**      Okay.

03:23:47  19  **Q**      And here, Doctor, you're talking about "eliminating

03:23:51  20  common misconceptions about opioids and the ensuing

03:23:55  21  epidemic," right, paragraph 30?

03:23:57  22  **A**      Yes.

03:23:58  23  **Q**      And one of the misconceptions that you talk about is

03:24:01  24  that "the epidemic is largely driven by devious individuals

03:24:05  25  such as rogue physicians and patients who are doctor

**Alexander (Cross by Sullivan)**                    3518

03:24:08   1   shopping."

03:24:09   2         Do you see that?

03:24:10   3   **A**    Yes.

03:24:10   4   **Q**    And what you say is that "rogue physicians and doctor

03:24:14   5   shoppers, while very important to identify and manage,

03:24:16   6   account for a very small proportion of opioid-related

03:24:21   7   harms," right?

03:24:21   8   **A**    Yes.

03:24:21   9   **Q**    Doctor shoppers and rogue physicians, a small

03:24:30  10   proportion of opioid-related harms, okay.

03:24:34  11         Can you also, Doctor, turn to page -- I want to first

03:24:43  12   put up a slide that the plaintiffs' lawyer, Mr. Lanier,

03:24:46  13   showed you.

03:24:49  14         Do you see that, sir?  It was your opinion 3 that

03:24:52  15   says --

03:24:52  16   **A**    Yes.

03:24:53  17   **Q**    -- "Between 1992 and 2010, the volume of opioids

03:24:57  18   dispensed in the U.S. increased by approximately 400

03:25:00  19   percent."

03:25:00  20         Do you see that?

03:25:01  21   **A**    Yes.

03:25:01  22   **Q**    But if you look at your report on page 8, it says

03:25:09  23   something different, doesn't it, sir?

03:25:12  24   **A**    It would be helpful if you direct me to my report.

03:25:14  25   **Q**    On the --

**Alexander (Cross by Sullivan)**          3519

| | | |
|---|---|---|
| 03:25:15 | 1 | **A**    Oh, I see.  Thank you. |
| 03:25:16 | 2 | **Q**    Page 8.  So paragraph 20 of your report, it actually |
| 03:25:19 | 3 | has the exact same quote, but for our jury today you changed |
| 03:25:26 | 4 | what was in your report, "the volume of opioids prescribed |
| 03:25:30 | 5 | increased by approximately 400 percent" to "dispensed," |
| 03:25:34 | 6 | right?  Somebody changed that? |
| 03:25:35 | 7 | **A**    Yes.  I mean, every opioid that is -- |
| 03:25:37 | 8 | **Q**    My question, sir, is somebody changed your report |
| 03:25:39 | 9 | language.  This is the same quote, but you changed |
| 03:25:42 | 10 | "prescribed" to "dispensed" or -- |
| 03:25:44 | 11 | **A**    Yes. |
| 03:25:44 | 12 | **Q**    Did you do that or did the plaintiffs' lawyers do |
| 03:25:46 | 13 | that? |
| 03:25:46 | 14 | **A**    Well, I made these slides. |
| 03:25:49 | 15 | **Q**    Okay.  So you changed your report language for your |
| 03:25:53 | 16 | presentation today from "the volume of opioids prescribed |
| 03:25:57 | 17 | increased by 400 percent," meaning doctors prescribed 400 |
| 03:26:01 | 18 | percent more to "dispensed," right? |
| 03:26:07 | 19 | **A**    Yes. |
| 03:26:08 | 20 | **Q**    And one of the things I -- when I was talking to you, |
| 03:26:13 | 21 | Doctor, about your paper about Purdue Pharma, Defense |
| 03:26:19 | 22 | Exhibit HBC Exhibit 1037, one of the things I forgot to ask |
| 03:26:24 | 23 | you about was you told people in your paper that as a result |
| 03:26:29 | 24 | of Purdue's misleading campaign and funding, all of these |
| 03:26:33 | 25 | medical societies, in fact, insurance, Medicaid, Medicare, |

**Alexander (Cross by Sullivan)**

03:26:37  1    and private insurance changed the way they covered opioids,

03:26:40  2    right?

03:26:42  3    **A**    If you're referring to a specific place, thank you.

03:26:45  4    **Q**    Sure.  You talk about the Joint Commission and the

03:26:49  5    Veterans Affairs Health System?

03:26:57  6    **A**    Well, but those aren't insurers per say.

03:27:00  7    **Q**    Well, fair enough, but the Joint Commission is

03:27:02  8    followed by insurance companies in terms of what they cover

03:27:04  9    or what they don't?

03:27:05  10   **A**    So the Joint Commission is an accreditation

03:27:08  11   organization that -- you know that gives hospitals or

03:27:15  12   healthcare institutions a seal of approval, I believe, as it

03:27:19  13   were.

03:27:19  14   **Q**    Yeah.  And the Joint Commission's recommendations are

03:27:23  15   followed by many insurance carriers and by the Government,

03:27:26  16   Medicare and Medicaid, in terms of what's covered.  That's

03:27:28  17   why you're highlighting it here.

03:27:30  18   **A**    Well, but the -- the point that I'm making here is

03:27:34  19   that the Joint Commission embraced the concept of pain as

03:27:38  20   the fifth vital sign, so it wasn't that the Joint Commission

03:27:41  21   was saying you should cover more opioids.  It was that the

03:27:45  22   Joint Commission became -- was another organization that

03:27:47  23   embraced the concept that in addition to heart rate and

03:27:52  24   breathing rate and such, that pain should be considered a

03:27:55  25   fifth vital sign.

**Alexander (Cross by Sullivan)** 3521

03:27:56  1   **Q**    Right.  Which drove more prescribers to write opioid

03:27:59  2   prescriptions than they had in the past?

03:28:00  3   **A**    I believe that contributed, yes.

03:28:02  4   **Q**    Doctor, going back to -- if you want to just bear with

03:28:14  5   me for a second -- to your expert report.

03:28:23  6        I want to turn to Tab A and your paper that talks

03:28:27  7   about the opioid epidemic.

03:28:29  8        If you could find it for us.

03:28:30  9   **A**    Yes, I have it.

03:28:31  10  **Q**    Okay.  And this was the paper you were talking about

03:28:33  11  that was attached to your Congressional testimony, right?

03:28:36  12  **A**    Yes.  It's not -- I mean, I wouldn't -- it's not a

03:28:40  13  peer-reviewed publication, it wasn't sent to a journal, but

03:28:44  14  it's a white paper or a monograph that we produced, yes.

03:28:47  15  **Q**    But when you were talking to our jurors about there

03:28:49  16  was something attached to your Congressional testimony, this

03:28:51  17  is what you were referring to?

03:28:52  18  **A**    That's correct.

03:28:52  19  **Q**    And this was in 2017, Doctor?

03:28:55  20  **A**    Yes.

03:28:56  21  **Q**    And you talk -- I'm sorry about the focus, Doctor.

03:29:09  22  Bear with me here.

03:29:14  23       You talked, Doctor, in your paper on page 5 about

03:29:19  24  "prescription opioids serving an invaluable role for the

03:29:21  25  treatment of cancer pain and pain at the end of life,"

**Alexander (Cross by Sullivan)**

03:29:24  1   right?

03:29:24  2   **A**   Yes.

03:29:24  3   **Q**   And then talk about "how their overuse as well as the

03:29:30  4   increasing availability of heroin and illicit fentanyl have

03:29:32  5   contributed to the highest rates of overdose and opioid

03:29:36  6   addiction in U.S. history," right?

03:29:38  7   **A**   Yes.

03:29:38  8   **Q**   And further in your report, Doctor, you talk about

03:29:43  9   some of the other contributors to the opioid epidemic.  And

03:29:47  10  one of the things you talk about, sir, is people getting

03:29:53  11  prescriptions from stealing them out of medicine cabinets or

03:29:57  12  from family and friends and failure of people to dispose of

03:30:00  13  opioid properly, right?

03:30:01  14  **A**   Yes.

03:30:01  15  **Q**   In fact, you talk about in your paper that

03:30:06  16  approximately 70 percent of people who report nonmedical use

03:30:10  17  of prescription opioids state their most recently used drug

03:30:14  18  came from a friend or family member.  Right?  70 percent.

03:30:22  19  **A**   Yes, I believe so, yes.

03:30:24  20  **Q**   Okay.  And then you talk about how most people -- in

03:30:32  21  fact, Doctor, this has been an issue for you that you've

03:30:35  22  written about and talked about, that so many people don't

03:30:38  23  dispose of their unused opioid prescriptions properly?

03:30:42  24  **A**   I think that's important, and that features in

03:30:46  25  addressing the harms that continue to accrue.

03:30:49 1  **Q**    And we can look at it, but you've testified before

03:30:52 2  Congress thousands and thousands of prescriptions, I think

03:30:57 3  you even gave a tonnage, that are not disposed of properly

03:31:01 4  and make their way into the streets.

03:31:05 5  **A**    Well, again, for the specifics, I'd want to see that,

03:31:09 6  but I think it's true that there are -- that many opioids

03:31:12 7  aren't safely stored or disposed of, and that that is yet

03:31:16 8  another layer of the onion here.

03:31:18 9  **Q**    Yeah.  And the pharmacies, they're out of it by then.

03:31:22 10 They dispensed the medicine, they're not responsible for

03:31:25 11 people handing it to their friends or for people stealing it

03:31:28 12 out of medicine cabinets, fair?

03:31:29 13 **A**    Well, I think I've written and I would say that we

03:31:32 14 need to do a better job of getting those medicines back, so

03:31:40 15 to speak, but I think that may be beyond scope here.

03:31:42 16        Yes, after a medicine is dispensed, it's no longer

03:31:46 17 within the four walls of the pharmacy.

03:31:48 18 **Q**    Yeah.  And the truth is, Doctor, you don't know what

03:31:52 19 Giant Eagle or others have done on the effort to have kiosks

03:31:55 20 in their stores or otherwise help people dispose of unused

03:31:59 21 medicine?  You haven't reviewed that data?

03:32:02 22 **A**    I think that's somewhat not true.  In other words, I

03:32:05 23 have looked at take back programs, and I've looked at safe

03:32:12 24 disposal bags and I have looked at the regulatory policies

03:32:17 25 that may prohibit pharmacies from doing more take back, and

**Alexander (Cross by Sullivan)**

03:32:21  1    I've looked at many of those matters at a fairly high level.

03:32:25  2  **Q**    Okay.  I guess my question wasn't clear.

03:32:27  3         But you don't know what Giant Eagle or the other

03:32:29  4    pharmacies are doing in Lake and Trumbull County on these

03:32:34  5    take back programs?

03:32:36  6  **A**    That's correct, I don't think that I'd explored that

03:32:40  7    in detail in my report.

03:32:43  8  **Q**    But in your report you talk about how 70 percent of

03:32:45  9    the people who are getting nonmedical use prescription

03:32:49  10   opioids say they're getting them from friends or family

03:32:51  11   members?

03:32:51  12 **A**    I'm sorry, I meant in my expert report, so I'm sorry

03:32:54  13   if I confused the matter.

03:32:56  14        Can you please ask your question again?

03:32:58  15 **Q**    Sure, sure.

03:32:59  16        In your expert report you talk about how 70 percent of

03:33:02  17   people who report nonmedical use of prescription opioids

03:33:05  18   state their most recently used drug came from a friend or a

03:33:08  19   family member, not from a pharmacy.

03:33:10  20 **A**    This is not my expert report that we're reviewing.

03:33:12  21 **Q**    Your paper.  My bad.  Your paper.

03:33:15  22 **A**    I'm sorry, can you please ask the question?

03:33:16  23 **Q**    I'll try it one more time, Doctor.  It's late.

03:33:20  24        In your published -- in your paper that you attached

03:33:22  25   to your Congressional testimony, you tell Congress that 70

**Alexander (Cross by Sullivan)**                    3525

03:33:25  1  percent of people who report nonmedical use of prescription

03:33:31  2  opioids start their most recently used drug from friend or

03:33:33  3  family member.

03:33:34  4  **A**    Correct.  The most recently used opioid, yes.

03:33:38  5  **Q**    And you talk about how that prescription opioids are

03:33:46  6  diverted intentionally while in other cases they're used

03:33:48  7  without knowledge of the person for whom they were

03:33:50  8  prescribed, right?

03:33:51  9  **A**    Yes.

03:33:51  10  **Q**    In other words, people are stealing them out of their

03:33:54  11  medicine cabinets, out of their cars, et cetera?

03:33:55  12  **A**    They're given, they're taken, they're borrowed,

03:33:59  13  they're bartered.  So all of that is in the mix of the --

03:34:03  14  and contributes to some of the harms that we see from such

03:34:08  15  widespread prescribing and dispensing of opioids in

03:34:12  16  communities like Lake and Trumbull.

03:34:14  17  **Q**    Yeah, a major -- 70 percent, a major contributor

03:34:18  18  according to your paper to the opioid epidemic?

03:34:19  19  **A**    No, that 70 percent does not represent some fraction

03:34:23  20  of the epidemic that I think is because of the diversion of

03:34:27  21  opioids.  That's referring to a different matter.  It's not

03:34:30  22  referring to the amount of the harm that I think is from

03:34:33  23  this problem.  It's just referring to the fact that more

03:34:37  24  than half of the people, 70 percent of people at this time

03:34:41  25  that I gave this testimony, from the data that I used, about

**Alexander (Cross by Sullivan)**          3526

03:34:44  1   70 percent of people who reported that they were using

03:34:48  2   nonmedical opioid use reported that their most recent source

03:34:52  3   was from a friend or family member.

03:34:54  4   **Q**      And maybe my question wasn't clear, Doctor, but you're

03:34:57  5   highlighting it because it's a significant contributor to

03:34:59  6   the opioid epidemic, the fact that people are stealing it

03:35:01  7   from medicine cabinets and giving it to their friends?

03:35:03  8   **A**      Well, they may or may not be stolen.  They may be --

03:35:07  9   again, I mean, this isn't necessarily theft, but the point

03:35:10  10  here is that many people using opioids nonmedically,

03:35:17  11  prescription opioids nonmedically, get them from friends or

03:35:20  12  family members.

03:35:20  13  **Q**      And you say without the knowledge of the person for

03:35:23  14  whom they're prescribed?

03:35:24  15  **A**      That happens, yes.

03:35:32  16  **Q**      In your paper, Doctor, on page 19, you also talk about

03:35:41  17  how "prescription opioids have been demonstrated as being

03:35:55  18  efficacious for short-term treatment of chronic noncancer

03:35:59  19  pain such as caused by headaches, fibromyalgia, or lower

03:36:02  20  back pain."

03:36:03  21          Right, Doctor?

03:36:04  22  **A**      Yes.

03:36:08  23  **Q**      But then you go on to say in the last sentence, sir,

03:36:11  24  "that misperceptions on the part of prescribers and patients

03:36:15  25  regarding the appropriateness of opioids for chronic pain

**Alexander (Cross by Sullivan)**                              3527

03:36:18   1    persist," right?

03:36:22   2    **A**     I'm sorry, the last sentence.

03:36:25   3    **Q**     Persist?  "That misperceptions on the part of

03:36:29   4    prescribers and patients regarding the appropriateness of

03:36:31   5    opioids for chronic pain persist."

03:36:35   6    **A**     Yes.

03:36:35   7    **Q**     Okay.  In other words, doctors are still misperceiving

03:36:39   8    or not understanding the right way to prescribe opioids; is

03:36:43   9    that essentially what you're saying?

03:36:44  10    **A**     I mean, there's been a culture of -- there's been a

03:36:49  11    culture that has had lots of contributors that has

03:36:55  12    contributed to communities, doctors, patients others

03:36:59  13    believing that they're safer than they really are and that

03:37:01  14    they're more effective than they really are.

03:37:03  15    **Q**     Causing doctors to prescribe them for what they

03:37:06  16    believe is good reason, legitimate reason, when you say

03:37:10  17    they're wrong?

03:37:11  18    **A**     Well, I'm not saying any given doctor is wrong, but I

03:37:14  19    am saying that unfortunately, the prescribing and evidence

03:37:18  20    don't align well.

03:37:20  21    **Q**     Fair enough.

03:37:24  22          And, Doctor, I think you told our jury that your paper

03:37:28  23    here said something about pharmacies, and I want to just

03:37:32  24    turn to that if we could.  Or if you could point us to it.

03:37:44  25    **A**     Well, on page 14, under the third bullet I write,

**Alexander (Cross by Sullivan)** 3528

03:37:48 1 "Pharmacy benefits managers and pharmacies, two important

03:37:52 2 stakeholders in the supply chain whose policies and

03:37:55 3 procedures can reduce unsafe opioid use."

03:37:59 4 **Q** Yeah. And when we look at your expanded statement

03:38:02 5 about that, what you talk about is policy benefit managers

03:38:06 6 shouldn't be covering, should not be insuring for pharmacies

03:38:11 7 to dispense opioids, right?

03:38:18 8 MR. LANIER: I'm sorry. I am lost on the

03:38:19 9 page.

03:38:20 10 MS. SULLIVAN: I am trying to get it here.

03:38:21 11 **Q** Do you remember that statement, Doctor?

03:38:23 12 **A** It would be helpful to see where specifically you're

03:38:25 13 referring to.

03:38:33 14 **Q** Let me find it here. I'm trying to give it to you.

03:38:38 15 Give me one second.

03:38:41 16 MS. SULLIVAN: 25. Thank you, Chantale.

03:38:53 17 That wasn't the one I was thinking here. We'll go

03:38:55 18 back to that, Doctor. Oh, here we go.

03:39:05 19 **Q** Here we go. On page 16, Doctor.

03:39:12 20 **A** Okay.

03:39:12 21 **Q** Do you see that?

03:39:13 22 What you say is that "third-party healthcare payers

03:39:16 23 and their pharmacy benefit managers can intervene with

03:39:19 24 prescribers, dispensers, and patients."

03:39:23 25 Do you see that?

**Alexander (Cross by Sullivan)**

03:39:23  1   **A**     Yeah, there I'm referring to the use of prescription

03:39:26  2   monitoring data and making the point that payers and PBMs

03:39:30  3   can use that data to their advantage.

03:39:32  4   **Q**     Yeah, to stop paying for opioid prescriptions, right?

03:39:36  5   **A**     Well, I would say to more -- to ensure that people

03:39:40  6   getting opioids are -- to try to reduce the unsafe

03:39:46  7   prescribing and dispensing of opioids.

03:39:48  8   **Q**     Yeah, in other words, if PBMs don't cover it with

03:39:52  9   insurance, the patients, many patients won't be able to get

03:39:55  10  it, and prescribers will stop prescribing for those

03:39:59  11  patients, perhaps, and then pharmacies can't dispense it,

03:40:03  12  that's essentially what you're saying?

03:40:04  13  **A**     I mean, well, pharmacy benefits managers are another

03:40:07  14  important, you know, party in the mix is what I would say,

03:40:10  15  because they're designing the coverage for opioids.  And of

03:40:13  16  course, if they increase the out-of-pocket costs or, you

03:40:17  17  know, put opioids on a different tier, that can affect how

03:40:21  18  many people use them.

03:40:22  19      But, you know, it's also a tricky job because, you

03:40:27  20  know, there are unintended consequences of those sorts of

03:40:30  21  policies also.

03:40:31  22      But the point that I'm making here is that pharmacy

03:40:34  23  benefits managers, PBMs, are a party that has some role

03:40:38  24  here, just as pharmacies are and just as many other parties

03:40:41  25  that we discuss in this report.

**Alexander (Cross by Sullivan)**

| | | |
|---|---|---|
| 03:40:43 | 1 | **Q**    Doctor, one thing you never say in your papers or in |
| 03:40:47 | 2 | any of your testimony to Congress is that pharmacies |
| 03:40:50 | 3 | contributed to the opioid epidemic.  That's not in any of |
| 03:40:53 | 4 | your testimony or any of your papers, correct? |
| 03:41:00 | 5 | **A**    I don't know.  I don't believe it's in the testimony |
| 03:41:04 | 6 | of the -- the Congressional testimony, which I've reviewed |
| 03:41:08 | 7 | recently, but I don't know whether or not I've spoken |
| 03:41:12 | 8 | directly in my papers to the role that pharmacies themselves |
| 03:41:18 | 9 | sort of netting out PBMs and netting out rogue prescribers |
| 03:41:24 | 10 | and all of that, I don't know if I've spoken to the way that |
| 03:41:27 | 11 | pharmacies may or may not have contributed. |
| 03:41:32 | 12 | **Q**    Doctor, the truth is you have written extensively |
| 03:41:34 | 13 | about the opioid epidemic, you've testified before Congress |
| 03:41:37 | 14 | a bunch.  You have never once testified or concluded in any |
| 03:41:41 | 15 | of your papers that pharmacies contributed to the opioid |
| 03:41:45 | 16 | epidemic? |
| 03:41:46 | 17 | **A**    Well, I believe I answered that, and which is to say |
| 03:41:49 | 18 | that I don't believe in my Congressional testimony that I |
| 03:41:54 | 19 | discussed the role of pharmacies.  I wasn't asked to and I |
| 03:41:57 | 20 | didn't.  But I'm not -- I just can't confidently say whether |
| 03:42:04 | 21 | or not in the course of the papers that I've written about |
| 03:42:08 | 22 | opioids, whether or not I've touched upon pharmacies. |
| 03:42:14 | 23 | **Q**    You don't know.  Sitting here today you have no idea |
| 03:42:17 | 24 | whether you've ever done that in any of your papers? |
| 03:42:19 | 25 | **A**    Well, I -- I mean, there are some papers where I would |

**Alexander (Cross by Sullivan)** 3531

03:42:23  1   tend to look to see, but I can't say with confidence one way

03:42:28  2   or the other.

03:42:28  3   **Q**    And when you testified before Congress, you were

03:42:31  4   specifically talking about the opioid crisis and discussing

03:42:33  5   the causes of the opioid crisis.  We looked at some of that

03:42:35  6   testimony.

03:42:35  7   **A**    Well, I was -- I mean, I wanted to be forward thinking

03:42:38  8   with Congress because it was a unique opportunity to make

03:42:41  9   recommendations to Senators and Congresspeople about what I

03:42:49  10  thought should be done.  But I think it's helpful to begin

03:42:52  11  by briefly looking backwards before making recommendations

03:42:56  12  about where we should go from here.

03:42:58  13  **Q**    But, Dr. Alexander, you were candid with Congress

03:43:02  14  about pharmaceutical manufacturers being responsible for the

03:43:05  15  opioid crisis, the FDA being responsible, the DEA being

03:43:09  16  responsible.  What you never said was that pharmacies were

03:43:12  17  even a little bit responsible when you weren't testifying

03:43:14  18  for plaintiffs' lawyers, right?

03:43:17  19  **A**    Well, again, I mean, I think we've reviewed the way

03:43:23  20  that I framed the history of the epidemic.  I certainly have

03:43:28  21  written about and discussed the high -- the fact that many

03:43:36  22  people getting opioids are high risk individuals.  I've

03:43:40  23  written entire papers on identifying these high risk

03:43:45  24  individuals.  I've used claims, pharmacy claims, to identify

03:43:48  25  them.  I've used pharmacy claims to identify subgroups of

**Alexander (Cross by Sullivan)**                    3532

03:43:54  1  patients that I felt were at higher than average risk.

03:43:58  2      I don't think that I've focused on specifically what

03:44:00  3  pharmacies should have or didn't or did do to identify and

03:44:07  4  intervene upon those patients.

03:44:08  5  **Q**    Yeah.  After your extensive analysis of the

03:44:11  6  literature, your papers about causes of the opioid crisis,

03:44:15  7  never in your testimony to Congress, and I believe you

03:44:17  8  testified before Congress at least three times on the opioid

03:44:20  9  crisis, right?

03:44:20  10  **A**    I believe twice, once to the senate and once to the

03:44:24  11  U.S. House of Representatives.

03:44:25  12  **Q**    Fair enough.  And in neither of those times did you

03:44:27  13  even mention pharmacies as even a small contributor to the

03:44:30  14  opioid crisis, fair?

03:44:34  15  **A**    I think I mentioned that there were -- I would want to

03:44:38  16  see for sure, but I certainly have said, and I think we've

03:44:41  17  reviewed work that I've done highlighting that there are

03:44:43  18  multiple and complex causes of the epidemic.  And it wasn't

03:44:47  19  my purpose there to try to -- to list them all out and to

03:44:53  20  discuss the various contributions of the FDA versus

03:44:57  21  pharmaceutical companies versus patients that are trying to

03:45:02  22  pull one over on their doctor.

03:45:03  23  **Q**    And, Doctor, maybe my question isn't clear enough.

03:45:07  24      You did list out to the Congress what you believe were

03:45:10  25  the major causes of the opioid epidemic:  Manufacturers, the

**Alexander (Cross by Sullivan)** 3533

| | | |
|---|---|---|
| 03:45:13 | 1 | FDA, and the DEA. |
| 03:45:15 | 2 | You did not in any of your testimony mention |
| 03:45:19 | 3 | pharmacies in any way? |
| 03:45:20 | 4 | **A**    I believe that may be true. |
| 03:45:31 | 5 | **Q**    Okay.  Let's see if we can wrap this up here. |
| 03:45:34 | 6 | And, Doctor, you did also -- you also testified at a |
| 03:45:40 | 7 | committee meeting of the Veterans Affairs at the United |
| 03:45:44 | 8 | States Senate, Congress? |
| 03:45:46 | 9 | **A**    Yeah, that's my Senate testimony. |
| 03:45:50 | 10 | **Q**    And that's 7 in your binder? |
| 03:46:01 | 11 | **A**    Okay. |
| 03:46:01 | 12 | **Q**    And if we can look at page 41. |
| 03:46:10 | 13 | That's you, sir, right? |
| 03:46:11 | 14 | **A**    Yes. |
| 03:46:11 | 15 | **Q**    And here you were asked some recommendations about |
| 03:46:20 | 16 | what we can do to address the opioid epidemic, right? |
| 03:46:23 | 17 | You're talking about that? |
| 03:46:23 | 18 | **A**    Yes. |
| 03:46:23 | 19 | **Q**    And one of the things you say is we got to make these |
| 03:46:28 | 20 | prescribing doctors do better.  We've got to improve |
| 03:46:32 | 21 | prescribing practices, right? |
| 03:46:33 | 22 | **A**    Yes. |
| 03:46:34 | 23 | **Q**    And you also -- so that was the first thing.  Let's |
| 03:46:37 | 24 | improve prescribing practices. |
| 03:46:38 | 25 | And then you also say, we got to get people effective |

**Alexander (Cross by Sullivan)** 3534

| | | |
|---|---|---|
| 03:46:43 | 1 | treatment, right? |
| 03:46:47 | 2 | **A**     Yes.  I mean, when I speak -- and frankly, when I |
| 03:46:51 | 3 | speak to prescribing practices, the reason this took place, |
| 03:46:54 | 4 | I believe, was because of the number of individuals within a |
| 03:46:57 | 5 | particular veterans facility that were getting dangerous |
| 03:47:02 | 6 | combinations of opioids, benzodiazapines, and muscle |
| 03:47:06 | 7 | relaxants.  And I believe that at the time, maybe in |
| 03:47:09 | 8 | Wisconsin or somewhere, there was a very public death, a |
| 03:47:13 | 9 | tragic death of a veteran because of this combination of |
| 03:47:17 | 10 | drugs. |
| 03:47:17 | 11 | And so what I was saying here was registering my |
| 03:47:22 | 12 | agreement that we need to be sure that we reduce dangerous |
| 03:47:26 | 13 | combinations of medicines such as opioids, benzodiazapines, |
| 03:47:30 | 14 | and muscle relaxants. |
| 03:47:31 | 15 | **Q**     Yeah, that the doctors prescribing to these people |
| 03:47:34 | 16 | need to do better, right? |
| 03:47:36 | 17 | **A**     Correct. |
| 03:47:37 | 18 | **Q**     And second, that we need people who are addicted |
| 03:47:42 | 19 | access to treatment with medicines like -- can you pronounce |
| 03:47:47 | 20 | that for me, Doctor? |
| 03:47:48 | 21 | **A**     Well, buprenorphine. |
| 03:47:50 | 22 | **Q**     Buprenorphine and methadone, right? |
| 03:47:54 | 23 | **A**     Yes. |
| 03:47:54 | 24 | **Q**     Effective in helping individuals regain control over |
| 03:47:58 | 25 | their lives, right? |

03:47:59  1  **A**     Correct.

03:47:59  2  **Q**     And the third thing that you mentioned to try to

03:48:02  3  address the opioid crisis is to get rid of millions of

03:48:08  4  pounds of unwanted and unused medicines sitting in bathrooms

03:48:11  5  and cabinets and bedroom nightstands all over America,

03:48:14  6  right?

03:48:15  7  **A**     Correct.

03:48:34  8  **Q**     Doctor, I want to go back before I wrap up here to

03:48:37  9  some of the slides you looked at with Mr. Lanier.

03:48:39  10     And I think in fairness that you made clear, sir, that

03:48:42  11  these terrible death slides are all not just prescription

03:48:48  12  medicines, they're illicit fentanyl and heroin and other

03:48:50  13  opioids, right?

03:48:51  14  **A**     Yes.

03:48:51  15  **Q**     And that would be true for all of these slides that

03:48:56  16  we're looking at, the Lake and county -- the opioid death

03:49:04  17  numbers for Lake County and Trumbull County, that's not just

03:49:09  18  prescription medicines, that's illicit fentanyl and heroin

03:49:13  19  and other opioids, right?

03:49:14  20  **A**     It is.  And we have information about the proportion

03:49:18  21  of all of those individuals still that have prescription

03:49:25  22  opioids detectable at the time of death.

03:49:27  23     And so for example in the past three years, I believe

03:49:29  24  that about 15 to 17 percent of individuals on average in

03:49:35  25  Lake and Trumbull Counties that have died from opioids have

**Alexander (Cross by Sullivan)**                    3536

03:49:39   1   prescription opioids detectable in the mix, so to speak.

03:49:43   2        So, you know, illicit fentanyl and heroin are

03:49:46   3   important to address, prescription opioids are important to

03:49:50   4   address.  They're two sides of the same coin.

03:49:52   5   **Q**    And I think, Dr. Alexander, and we can look at it, but

03:49:57   6   in your report you talked about the three waves of the

03:49:59   7   opioid crisis, that from 2000 -- starting in 2010, heroin

03:50:03   8   became a more important problem than the prescription

03:50:07   9   medicines, and then starting in 2016 illicit fentanyl became

03:50:12   10   the problem in terms of causing deaths?

03:50:14   11   **A**    Yeah.  I mean, I would say it caused more deaths.  I

03:50:17   12   would probably not say it's a more important problem.

03:50:20   13   They're all really important problems but --

03:50:21   14   **Q**    Agreed, agreed.  Bad question.  Agreed.  All important

03:50:26   15   problems.

03:50:26   16        But in terms of the number of deaths caused by illicit

03:50:29   17   illegal fentanyl in Lake or Trumbull County, the

03:50:32   18   overwhelming majority of opioid deaths were in those

03:50:35   19   counties were reportedly from illicit fentanyl over the last

03:50:39   20   couple years?

03:50:39   21   **A**    Well, fentanyl is detectable in the people who have

03:50:43   22   died, but as I just -- the point that I was just making was

03:50:46   23   that prescription opioids are also detectable in an

03:50:49   24   important subset of those individuals, even recent deaths.

03:50:57   25   **Q**    And if we could just turn to -- and, Doctor, many of

03:51:05  1    those -- unfortunately, many of the deaths caused by

03:51:08  2    prescription opioids happen to people who got their

03:51:11  3    prescriptions from good doctors who were prescribing the

03:51:15  4    medicine legitimately, believing that the medicines weren't

03:51:19  5    addictive or that they could help their patients?

03:51:22  6    **A**    Well, I mean, people are dying from opioids

03:51:26  7    dispensed -- if you're looking just about people dying from

03:51:29  8    prescription opioids, there are people that are overdosing,

03:51:32  9    that are using the medicines as prescribed, and there are

03:51:36  10   others that are overdosing and dying that are using the

03:51:41  11   medicines nonmedically.

03:51:42  12        So I have a bit of a hard time generalizing in some

03:51:49  13   broad statement.  They're both important and we can do

03:51:51  14   better with both of these categories.  We can reduce

03:51:55  15   nonmedical use, but we can also improve the safe use of

03:51:59  16   opioids even among people that are using them as prescribed.

03:52:01  17   **Q**    Yeah, in other words, Doctor, many people who use them

03:52:03  18   as prescribed, legitimate prescriptions, die from opioid

03:52:06  19   addiction and overdose?

03:52:10  20   **A**    Well, I mean, someone that has opioid addiction is not

03:52:13  21   just taking, like, one Vicodin twice a day.  So I guess I'm

03:52:19  22   having a little bit of a hard time generalizing here.  I

03:52:25  23   mean, generally people with opioid addiction, addiction is

03:52:28  24   characterized by compulsive use, and in part to avoid the

03:52:31  25   bad unpleasant feelings of withdrawal.

**Alexander (Cross by Sullivan)** 3538

03:52:36 1    So I have a hard time -- I guess I didn't fully

03:52:38 2 understand your last statement.

03:52:39 3 **Q**    Yeah, we talked a little bit about rogue doctors and

03:52:42 4 doctor shoppers, which you testified were extremely or

03:52:46 5 exceedingly rare.

03:52:47 6    But my question relates to people who get their

03:52:50 7 prescriptions legitimately, in other words, they're not

03:52:53 8 doctor shopping, they're not getting them from rogue

03:52:56 9 prescribers, they're getting them from good doctors and they

03:52:59 10 become addicted.

03:53:00 11 **A**    So addiction does happen among individuals --

03:53:03 12 addiction is not a choice, any more than someone chooses to

03:53:08 13 have colon cancer or multiple sclerosis.  And addiction does

03:53:12 14 happen to people that are receiving opioids that are

03:53:14 15 prescribed by a doctor.  But, you know, sort of the

03:53:16 16 legitimate prescriptions and good doctors, I guess addiction

03:53:24 17 happens, there are many different pathways that lead to

03:53:26 18 addiction.

03:53:26 19 **Q**    And, Doctor, just going back to your expert report

03:53:31 20 briefly.

03:54:04 21    On page 8, Doctor.

03:54:06 22 **A**    Mm-hmm.

03:54:06 23 **Q**    I just want to --

03:54:09 24 **A**    Yes.

03:54:09 25 **Q**    I just want to get it so I can see it here.

**Alexander (Cross by Sullivan)**                          3539

| | | |
|---|---|---|
| 03:54:20 | 1 | On page 8, paragraph 21.  Do you see where you say, |
| 03:54:25 | 2 | "As observed nationally and within Ohio, there was a first |
| 03:54:28 | 3 | rise in prescription opioid-related deaths in the early |
| 03:54:31 | 4 | 2000s, followed by a rapid increase in heroin overdose |
| 03:54:35 | 5 | deaths beginning in 2010, and a sharp increase in fentanyl |
| 03:54:38 | 6 | overdose deaths in 2016."  Right? |
| 03:54:40 | 7 | **A**     Yes. |
| 03:54:41 | 8 | **Q**     And then you go on to say that "The impact of illicit |
| 03:54:45 | 9 | fentanyl has been especially severe in the communities |
| 03:54:48 | 10 | relative to other areas in the U.S.," right? |
| 03:54:51 | 11 | **A**     Yes. |
| 03:54:51 | 12 | **Q**     So the impact of illicit fentanyl in Lake and Trumbull |
| 03:54:55 | 13 | County, in your view, has been especially severe? |
| 03:54:56 | 14 | **A**     Yes. |
| 03:54:58 | 15 | **Q**     And that's not something that pharmacies prescribe. |
| 03:55:03 | 16 | Illicit fentanyl comes from foreign sources, drug cartels, |
| 03:55:05 | 17 | et cetera? |
| 03:55:05 | 18 | **A**     That's correct, although in the next sentence I talk |
| 03:55:08 | 19 | about the clear link between prescription opioids and the |
| 03:55:11 | 20 | use of illicit fentanyl and heroin. |
| 03:55:14 | 21 | **Q**     Which you talked to Mr. Lanier about.  But as you've |
| 03:55:16 | 22 | acknowledged, you're not a specialist in addiction |
| 03:55:19 | 23 | treatment? |
| 03:55:21 | 24 | **A**     Well, what I was referring to was whether I would call |
| 03:55:23 | 25 | myself a clinical addiction specialist.  And if I ran into |

**Alexander (Cross by Sullivan)** 3540

03:55:27  1  someone on the street and told them I was a doctor and they

03:55:29  2  said what kind, I would say I'm a general internist.  I

03:55:33  3  wouldn't describe myself first as an addiction specialist,

03:55:37  4  but I have lots of -- lots of the studies that I've

03:55:40  5  performed are focused on addiction.

03:55:43  6  **Q**     And, Doctor, reviewing papers, not treating patients

03:55:47  7  with addiction?

03:55:49  8  **A**     Unfortunately, I have seen many, many patients

03:55:52  9  impacted by this epidemic.

03:55:55  10  **Q**     And as you said in your expert report, you refer them

03:55:59  11  to addiction specialists?

03:56:00  12  **A**     Not universally.  As I believe I said earlier, it's

03:56:03  13  just like someone that comes to me with a stomachache.  You

03:56:06  14  know, if they have blood in their stool and they are anemic

03:56:09  15  and they look pale, I might send them immediately to a GI

03:56:15  16  specialist.  But if they -- you know, but if they look

03:56:18  17  pretty well and they want to try some treatment, like an

03:56:23  18  antacid, and I think it's safe and reasonable, then I might

03:56:25  19  not refer them.

03:56:26  20      So it's the same way that I would manage anything else

03:56:29  21  as when someone comes to me that I identify that has signs

03:56:31  22  of either nonmedical opioid use or opioid addiction.

03:56:35  23  **Q**     And, Dr. Alexander, you mention that you've made --

03:56:38  24  your company has made $6 million working for plaintiffs'

03:56:42  25  lawyers in opioid litigation?

**Alexander (Cross by Sullivan)** 3541

03:56:44  1    **A**    I believe over four or five years the company of 20,

03:56:47  2    which has about 20, which has about five individuals that

03:56:52  3    are master's and doctoral trained who have worked primarily

03:56:55  4    on opioid litigation matters, yes, that the company has made

03:56:59  5    $6 million.

03:57:00  6    **Q**    And you're an owner of the company?

03:57:02  7    **A**    I am a co-founder, and I'm one of three equity

03:57:08  8    holders.  So there are three of us that have the ownership

03:57:10  9    of the company.

03:57:11  10    **Q**    So you share in the profits of the company?

03:57:12  11    **A**    I do.

03:57:13  12    **Q**    That's not something you mentioned in your questioning

03:57:16  13    with Mr. Lanier, that you were an owner who shares in the

03:57:19  14    profit of the $6 million.

03:57:20  15    **A**    Well, I wasn't asked, but I'm happy for people to know

03:57:24  16    my role in the company.

03:57:29  17    **Q**    Just to wrap up, Doctor, in terms of the efforts by

03:57:32  18    these pharmacies to address the opioid crisis, have you

03:57:36  19    looked at what they've done to counsel patients who come and

03:57:40  20    pick up prescriptions, what Giant Eagle, Walgreens, Walmart,

03:57:46  21    CVS have done on that score, in Lake and Trumbull County?

03:57:55  22    **A**    Well, in the counties, my primary learning, my primary

03:57:58  23    exposure to what the pharmacies have done or not done has

03:58:04  24    been through a review of a portion of Mr. Catizone's report

03:58:08  25    and Mr., is it Manning's report?  I'm forgetting the other

03:58:12    1    gentleman, but --

03:58:13    2             MR. LANIER:  McCann.

03:58:14    3             THE WITNESS:  McCann, thank you.

03:58:15    4    **A**    So that's the way that I've learned what I've learned.

03:58:17    5    But that wasn't what I was asked to do in this case.

03:58:20    6    **Q**    And I think as you mentioned, you actually didn't look

03:58:22    7    at any documents for any of these companies?

03:58:25    8    **A**    I don't believe that I did because I didn't believe

03:58:27    9    and I believe the plaintiffs didn't believe that that was

03:58:30   10    important in order for me to be able to be of assistance to

03:58:35   11    the courts.

03:58:36   12    **Q**    So you have no evidence or opinion about how these

03:58:41   13    companies or specifically Giant Eagle set about policing

03:58:48   14    filling illegitimate prescriptions?

03:58:51   15    **A**    Well, I don't have a legal opinion in sort of in the

03:58:53   16    legal sense.  Again, I read portions of Mr. Catizone's

03:58:56   17    report and Mr. McCann's report, and so I have some beliefs

03:59:00   18    about that.  But I don't have a legal opinion about the

03:59:03   19    matters.

03:59:03   20    **Q**    In other words, you haven't actually reviewed the data

03:59:06   21    yourself?

03:59:06   22    **A**    Well, I haven't done statistical analyses on the raw

03:59:10   23    data, no.

03:59:11   24    **Q**    Okay.

03:59:12   25             MS. SULLIVAN:  I have nothing further.  Thank

03:59:14   1   you, Doctor.

03:59:17   2              THE WITNESS:  Thank you very much.

03:59:19   3              THE COURT:  Thank you, Ms. Sullivan.

03:59:21   4      Any of the other defendants wish to cross-examine

03:59:23   5   Dr. Alexander?

03:59:24   6              MR. DELINSKY:  No questions, Your Honor.

03:59:25   7              MR. MAJORAS:  No, Your Honor.

03:59:27   8              MR. SWANSON:  Nothing for Walgreens.

03:59:28   9              THE COURT:  Okay.  Then we'll have redirect.

03:59:30  10   But also I want to make sure if any of the jurors have

03:59:32  11   questions, they should provide those to Mr. Pitts who will

03:59:35  12   show them to all counsel.

03:59:42  13      (Juror question review.)

04:02:33  14              MS. FIEBIG:  Your Honor, could we have a side

04:02:35  15   bar?

04:03:08  16              (At side bar at 4:03 p.m.)

04:03:08  17              MS. FIEBIG:  Your Honor one of the juror

04:03:10  18   questions asked the expert what his recommendations were for

04:03:14  19   what pharmacies should do in order to -- I apologize for the

04:03:19  20   echo.

04:03:20  21      But I believe that it says --

04:03:24  22              MR. WEINBERGER:  Here, I'll read it if you

04:03:25  23   don't mind.

04:03:26  24              MS. FIEBIG:  I have it.  It says, "What is

04:03:28  25   your recommendation for pharmacy/companies to improve

04:03:30    1    policies/procedures to reduce the opioid epidemic?"

04:03:33    2        And the defendants would contend that that's out of

04:03:36    3    bounds for the litigation.

04:03:37    4              THE COURT:  Well, I told the jurors that not

04:03:38    5    all the questions are going to be asked, some may not be

04:03:41    6    relevant.  So no one should ask that question.

04:03:44    7              MS. FIEBIG:  Thank you, Your Honor.

04:04:00    8              (In open court at 4:04 p.m.)

04:04:01    9              MR. LANIER:  Your Honor, could you explain

04:04:02   10    that to the jury, please?

04:04:03   11              THE COURT:  All right.

04:04:05   12              MR. LANIER:  Thank you.

04:04:09   13              THE COURT:  Ladies and gentlemen, as I

04:04:09   14    indicated earlier, I have this practice of permitting jurors

04:04:12   15    to suggest questions which I give to counsel.  And they may

04:04:18   16    ask them, they may not.  If they don't, you're not to draw

04:04:22   17    any negative conclusion against any counsel or any party.

04:04:25   18    The question may be better or more appropriate for another

04:04:28   19    witness or it might be on something that's not relevant to

04:04:31   20    the case, so -- but we appreciate all of your questions.

04:04:44   21              MR. LANIER:  So as I understand it, Your

04:04:46   22    Honor, I can ask the other ones except for that one?

04:04:49   23              THE COURT:  Well, I didn't look at any of the

04:04:51   24    questions, so...

04:04:53   25              MR. LANIER:  Okay.

- - - - -

REDIRECT EXAMINATION

BY MR. LANIER:

**Q**    All right.  Dr. Alexander, road map, three stops:
Your opinions in this case, causes of the epidemic, and your
report.  Although I'm going to sprinkle in the jury
questions as I am allowed to, okay?

**A**    Great.

**Q**    Opinions in this case.  Well, they didn't really
attack any of those, did they?

          MS. SULLIVAN:  Objection, Your Honor.  That's
argumentative.

**Q**    Let me ask it this way.

          THE COURT:  I sustain the objection to that
question.

**Q**    I'll reask it.

     Sir, do you need to defend any of your opinions in
this case you have offered?

**A**    I don't believe so.

**Q**    Thank you.

     Next stop:  Causes of the epidemic.

     Did we hire you or retain you or ask you to testify
about causes of the epidemic?

**A**    No.

**Q**    If we had hired you, retained you, and asked you to

**Alexander (Redirect by Lanier)** 3546

04:06:01  1    research and to answer those questions that you were asked

04:06:04  2    by Ms. Sullivan, could you?

04:06:06  3    **A**    Yes.

04:06:07  4    **Q**    Ms. Sullivan pointed out your Congressional testimony,

04:06:13  5    but I fear some of what you said may have been gone over

04:06:17  6    rather quickly, and I'd like to look at it carefully,

04:06:19  7    please.

04:06:19  8             MS. SULLIVAN:  Objection, Your Honor, to the

04:06:21  9    preamble and the lawyer argument.

04:06:23  10            THE COURT:  Overruled.

04:06:25  11   **Q**    Do you have that in front of you or able to read the

04:06:28  12   monitor?

04:06:28  13   **A**    Yes, I can read the monitor.  Thank you.

04:06:30  14   **Q**    All right.  Page 88.  You said, "We are missing more

04:06:44  15   than half a million Americans from overdose that should be

04:06:48  16   with us today.  People like Steve Rummler and so many

04:06:55  17   others, incredibly more deaths from opioids are expected in

04:06:59  18   2017 than ever before.

04:07:02  19            "As the Commission's report makes clear, the origins

04:07:06  20   of the epidemic are," what's the word you used?

04:07:10  21   **A**    "Multiple."

04:07:13  22   **Q**    "But arise within the healthcare system, including

04:07:20  23   unsubstantiated claims about the safety and effectiveness,

04:07:24  24   multifaceted campaigns by pharmaceutical companies, and the

04:07:27  25   failure of the FDA and the DEA to regulate these products

**Alexander (Redirect by Lanier)**          3547

04:07:31  1    appropriately."

04:07:32  2          Do you stand by that testimony?

04:07:34  3    **A**    Yes, I do.

04:07:35  4    **Q**    Are the origins of the epidemic multiple?

04:07:40  5    **A**    Yes.

04:07:41  6    **Q**    Are there many causes?

04:07:44  7    **A**    Yes.

04:07:44  8    **Q**    In fact, you didn't just say many causes.  You said

04:07:49  9    something else, on page 97.

04:07:58  10         Was this you speaking, that where I've highlighted?

04:08:01  11   **A**    I think it was.

04:08:02  12   **Q**    "There are many, many, many causes that have

04:08:07  13   contributed to the overprescribing."

04:08:10  14         Do you stand by that testimony?

04:08:12  15   **A**    Yes, I do.

04:08:15  16   **Q**    If I were to ask you, sir, which card makes it a

04:08:27  17   straight flush, what would you tell me?

04:08:28  18   **A**    Well, I just have to look for a second, but -- I don't

04:08:32  19   play a lot of cards, but I think this is not that complex a

04:08:35  20   question.  And I would say it's the combination of the

04:08:37  21   cards.

04:08:37  22   **Q**    Takes all of them?

04:08:39  23   **A**    Correct.

04:08:40  24   **Q**    If I were to ask you, give you a cake recipe and ask

04:08:46  25   you which ingredient makes it a cake, what would your answer

**Alexander (Redirect by Lanier)** 3548

04:08:49  1  be?

04:08:49  2  **A**     Well, I'd say it's the combination of them.  It's not

04:08:53  3  a single ingredient.

04:08:54  4  **Q**     If I were to ask you to play Connect the Dots, can you

04:09:02  5  kind of guess what this might be just sort of looking?

04:09:04  6  **A**     Looks like a horse.

04:09:06  7  **Q**     Uh-huh.  But if you don't connect all of the dots, you

04:09:10  8  don't realize it's a horse with stripes.

04:09:13  9       What does a horse with stripes all of a sudden become?

04:09:16  10  **A**     A zebra.

04:09:18  11  **Q**     Is it important when analyzing the problems that have

04:09:24  12  the many, many, many causes of the epidemic, to quote you,

04:09:29  13  to examine all of them to get a full picture?

04:09:32  14  **A**     Well, it depends on what I'm -- what one is being

04:09:35  15  asked to do.  But if the question at hand is what are the

04:09:40  16  many, many causes, then one needs to examine the many, many

04:09:45  17  causes.  So it really depends upon the question at hand.

04:09:48  18  **Q**     And that's a great point.

04:09:51  19       What's your favorite fruit?

04:09:52  20  **A**     I like bananas a lot.

04:09:55  21  **Q**     Okay.  So you don't like bread?

04:09:56  22  **A**     I'm sorry?

04:09:57  23  **Q**     You don't like bread?

04:09:59  24  **A**     I like bread also.

04:10:01  25  **Q**     But why didn't you say bread?

**Alexander (Redirect by Lanier)**

| | | |
|---|---|---|
| 04:10:04 | 1 | **A**    I thought you asked me what my favorite fruit was. |
| 04:10:07 | 2 | **Q**    So the question makes a difference in what the answer |
| 04:10:10 | 3 | is? |
| 04:10:11 | 4 | **A**    Yes. |
| 04:10:12 | 5 | **Q**    So when you're asked questions to testify about this, |
| 04:10:15 | 6 | that, or the other, is it fair to take your answer there and |
| 04:10:20 | 7 | start talking about all the things you didn't say? |
| 04:10:24 | 8 | **A**    Well, I mean, I think it has -- the -- whatever I said |
| 04:10:28 | 9 | should be taken into context essentially. |
| 04:10:32 | 10 | **Q**    I agree. |
| 04:10:33 | 11 | So, for example, you got asked questions by |
| 04:10:38 | 12 | Ms. Sullivan about do you have any evidence that Giant Eagle |
| 04:10:41 | 13 | ever did anything wrong. |
| 04:10:42 | 14 | Remember? |
| 04:10:42 | 15 | **A**    Yes. |
| 04:10:44 | 16 | **Q**    Did you look at Giant Eagle's distribution policies? |
| 04:10:49 | 17 | **A**    No, I did not. |
| 04:10:49 | 18 | **Q**    Did you look at Giant Eagle's pharmacy training? |
| 04:10:54 | 19 | **A**    No, I did not. |
| 04:10:55 | 20 | **Q**    Did you look at Giant Eagle's dispensing policies? |
| 04:11:00 | 21 | **A**    I did not. |
| 04:11:01 | 22 | **Q**    Did you decide if Giant Eagle is one of the many, |
| 04:11:05 | 23 | many, many causes? |
| 04:11:08 | 24 | **A**    I wasn't asked to evaluate that. |
| 04:11:13 | 25 | **Q**    And if you had been asked, could you have been looked |

**Alexander (Redirect by Lanier)**

04:11:16  1   at these things and made a determination?

04:11:19  2   **A**    Yes.

04:11:23  3   **Q**    Is it fair to assume that you don't believe Giant

04:11:25  4   Eagle has any responsibility when you've never done your

04:11:28  5   homework to check?

04:11:29  6   **A**    No.

04:11:30  7   **Q**    Do you know what job Adam Zakin, the senior director

04:11:37  8   of pharmacy administration, at Giant Eagle had before they

04:11:40  9   hired him?

04:11:42  10  **A**    No, I do not.

04:11:42  11  **Q**    Would you want to do that kind of homework before you

04:11:45  12  came in and gave an opinion on causation?

04:11:50  13  **A**    Well, if I -- yes, if I was asked to evaluate the role

04:11:55  14  of Giant Eagle in the opioid epidemic in these communities,

04:11:58  15  I would want to evaluate a lot of materials about their

04:12:03  16  policies and procedures and about the steps that they took

04:12:07  17  to -- you know, to flag suspicious prescribing and, once it

04:12:17  18  was flagged, the steps they took to understand why those

04:12:20  19  flags were raised and how they resolved those flags and

04:12:23  20  documented it.

04:12:24  21  **Q**    Okay.  And I've been referred to repeatedly in this

04:12:27  22  case the last few days as the plaintiffs' lawyer, and you've

04:12:31  23  been asked about working for plaintiffs' lawyers.

04:12:33  24       Remember that?

04:12:34  25  **A**    Yes.

**Alexander (Redirect by Lanier)** 3551

04:12:34   1   **Q**     And a plaintiff is someone who's suing in a courtroom

04:12:39   2   civilly, right?

04:12:40   3   **A**     Yes.

04:12:41   4   **Q**     And I as a lawyer do represent people sometimes who

04:12:46   5   sue, and sometimes I represent people who get sued.  I'm a

04:12:50   6   defense lawyer.  I try cases.

04:12:51   7        You understand that?

04:12:53   8             MS. SULLIVAN:  Objection, Your Honor.

04:12:55   9   **Q**     Does that change?

04:12:56   10             MS. SULLIVAN:  Objection to the lawyer

04:12:57   11  colloquy, Your Honor.

04:12:58   12             THE COURT:  I'll sustain the objection the way

04:12:59   13  it was asked.

04:13:00   14  **Q**     Does it change your opinion one way or the other what

04:13:04   15  I do for a living?

04:13:06   16  **A**     My opinion about what?

04:13:08   17  **Q**     About anything you've testified on.

04:13:11   18  **A**     I mean, I'm -- I don't know if this answers your

04:13:14   19  question, but I view my role as serving first and foremost

04:13:17   20  the people of these communities and, secondly, the courts.

04:13:21   21       So I don't know if that answers your question, but,

04:13:27   22  you know, who you work for, you and others have asked for me

04:13:35   23  to do my best science, and that's what I've tried to do.

04:13:38   24  **Q**     Okay.  And the fact that I represent the citizens of

04:13:42   25  Lake and Trumbull County, does that matter at all to you?

04:13:47  1          MR. SWANSON:  Objection, Your Honor.

04:13:49  2   **A**     I mean, I don't -- again --

04:13:49  3          THE COURT:  Overruled.  Overruled.

04:13:53  4   **A**     I don't quite know how to answer that, but the bottom

04:13:55  5   line is that my opinions and the stuff that I've said is --

04:14:03  6   you know, it's what I believe to be the case based on my

04:14:06  7   professional judgment.

04:14:07  8   **Q**     Then you were directed to an article that you

04:14:10  9   published.  It was Exhibit 1037, "The Prescription Opioid

04:14:18  10  and Heroin Crisis:  A Public Health Approach to an Epidemic

04:14:23  11  of Addiction."

04:14:24  12         Do you remember that?

04:14:25  13  **A**     Yes, I do.

04:14:25  14  **Q**     And in that you were asked, do you ever put the blame

04:14:29  15  on the pharmacies.

04:14:30  16         Do you remember those questions?

04:14:31  17  **A**     Yes.

04:14:31  18  **Q**     And aside from just those individual questions, I'd

04:14:33  19  like you to look, please, at page 567 of your article.  I'll

04:14:38  20  put it up here.

04:14:41  21         "Opioid-addicted individuals may receive OPR."

04:14:49  22         What does that stand for?

04:14:51  23  **A**     Opioid pain relievers.

04:14:54  24  **Q**     "Prescriptions from multiple providers, a practice

04:14:58  25  referred to as doctor shopping.  Doctor shoppers can be

**Alexander (Redirect by Lanier)**          3553

04:15:02   1   identified through use of state prescription drug monitoring

04:15:11   2   programs."

04:15:12   3        Do you see that?

04:15:12   4   **A**    Yes, I do.

04:15:13   5   **Q**    Do you know about the Ohio requirement, now, that

04:15:24   6   pharmacies check the prescription drug monitoring program,

04:15:31   7   it's called OARRS in Ohio?

04:15:35   8   **A**    I'm familiar with OARRS.  I'm not familiar with the

04:15:37   9   details of when pharmacists are required to check, but I'm

04:15:41   10  certainly aware of a trend towards requiring both

04:15:44   11  prescribers and pharmacists from checking these monitoring

04:15:47   12  programs.

04:15:48   13  **Q**    And you write in here about prescribers being able to

04:15:51   14  consult their state PDMPs before prescribing.

04:15:57   15       Do you see that?

04:15:57   16  **A**    Yes.

04:15:58   17  **Q**    Is it equally important in your mind that the

04:16:01   18  pharmacies dispensing check these PDMPs and act responsibly

04:16:06   19  upon them?

04:16:06   20  **A**    Yes, I think pharmacies and pharmacists have a role as

04:16:11   21  well in that regard.

04:16:11   22  **Q**    Next, you were asked about your report and the causes

04:16:18   23  that you listed in your report.

04:16:19   24       Do you recall that?

04:16:21   25  **A**    Yes.

**Alexander (Redirect by Lanier)** 3554

04:16:21  1  **Q**    You attached Appendix F to your report, didn't you?

04:16:26  2  **A**    Yes, I did.

04:16:27  3  **Q**    This is part of the abate man plan.

04:16:30  4      And you entitled it, "Potential indicators of

04:16:35  5  high-risk opioid distribution."

04:16:36  6      Do you see that?

04:16:37  7  **A**    Yes, I do.

04:16:38  8  **Q**    And the very first paragraph of this appendix to your

04:16:43  9  report, you wrote the following:  "As described in this

04:16:52  10  appendix, these types of indicators" -- and you list them

04:16:55  11  below -- "these types of indicators rely on an extensive

04:17:00  12  evidence base that links them with an increased risk of

04:17:04  13  opioid-related adverse events, including addiction,

04:17:08  14  overdose, and death."

04:17:11  15      Do you see that?

04:17:11  16  **A**    Yes.

04:17:11  17  **Q**    And so these types of indicators that you list below,

04:17:20  18  do you believe that there's an extensive evidence base that

04:17:24  19  links them with these adverse events of addiction, overdose,

04:17:28  20  and death?

04:17:29  21  **A**    Yes, I do.

04:17:29  22  **Q**    Then let's look at one that's in paragraph 10.  "Role

04:17:37  23  of pharmacies and pharmacists in addressing the opioid

04:17:40  24  epidemic."

04:17:41  25      Do you see this?

**Alexander (Redirect by Lanier)** 3555

04:17:42 1   **A**   Yes.

04:17:42 2   **Q**   You wrote, "Pharmacies and pharmacists play an

04:17:47 3   important role in addressing the opioid epidemic given their

04:17:51 4   position within the pharmaceutical supply chain and

04:17:54 5   face-to-face interactions with patients."

04:17:59 6       Do you believe that to be true?

04:18:01 7   **A**   Yes, I do.

04:18:01 8   **Q**   "First and foremost, pharmacies and pharmacists should

04:18:07 9   follow up on indicators of opioid misuse, since they have

04:18:12 10   the authority to refuse prescription fills or to gather

04:18:16 11   further information so as to allow for the dispensing of

04:18:20 12   controlled substances under the safest conditions possible."

04:18:26 13       Do you believe that?

04:18:27 14   **A**   Yes, I do.

04:18:28 15   **Q**   And if we had asked you to go further and to research

04:18:38 16   the policies of Walgreens, of Giant Eagle, of Walmart/Sam's,

04:18:44 17   and of CVS, could you have done it?

04:18:46 18   **A**   Yes, I could have done so.

04:18:54 19   **Q**   You testified in front of Congress, both the Senate

04:18:58 20   and the House, correct?

04:18:59 21   **A**   Yes.

04:19:00 22   **Q**   And in both of those reports you were asked, did you

04:19:04 23   testify about pharmacies.  Remember?

04:19:06 24   **A**   Yes.

04:19:06 25   **Q**   And you indicated to Ms. Sullivan that what you did is

**Alexander (Redirect by Lanier)** 3556

04:19:10  1   you attached a report, correct?

04:19:16  2   **A**    Yes.

04:19:17  3   **Q**    And I think I saw that you attached it to both your

04:19:20  4   House and your Senate testimony.

04:19:22  5   **A**    Yeah, I was aware -- I certainly attached it to the

04:19:27  6   House, but it may be that I attached it to the Senate

04:19:29  7   testimony as well.

04:19:30  8   **Q**    Now, I don't suspect many of us have ever testified

04:19:37  9   before Congress.  Is it true that you have a time limit of

04:19:46  10  how long you're allowed to testify?

04:19:49  11  **A**    Yes, it is.

04:19:50  12  **Q**    I mean, do they bring you in and just give you the

04:19:55  13  floor to go on for hours and to give all your opinions?

04:19:59  14  **A**    I think I had maybe three minutes or possibly five.

04:20:04  15  **Q**    And so to say, but, look, in those three minutes or

04:20:08  16  possibly five, you didn't solo out pharmacies, is that what

04:20:15  17  you were there to do?

04:20:17  18  **A**    No, it is not.

04:20:18  19  **Q**    You did attach a report that's a lot longer than three

04:20:21  20  to five minutes of reading material, fair?

04:20:23  21  **A**    Yes.

04:20:23  22  **Q**    And so we can look at this report and we can see, for

04:20:27  23  example, on page 23 where you put in your report "Pharmacies

04:20:37  24  are also an important stakeholder in the healthcare supply

04:20:40  25  chain and distribution system for prescription opioids."

**Alexander (Redirect by Lanier)**          3557

04:20:44   1          True?

04:20:45   2   **A**     Yes, true.

04:20:45   3   **Q**     That "State and federal law govern some elements of

04:20:54   4   their conduct with respect to reducing nonmedical opioid use

04:20:57   5   and diversion," true?

04:21:00   6   **A**     Yes, that's true.

04:21:01   7   **Q**     And this isn't the part that was read to you by

04:21:03   8   Ms. Sullivan when she was talking about PBMs, but this is in

04:21:07   9   your report you submitted, isn't it?

04:21:09  10   **A**     Yes, it is.

04:21:15  11   **Q**     You put in your report the need to educate prescribers

04:21:19  12   and pharmacists about how to prevent, identify, and treat

04:21:23  13   opioid addiction.

04:21:24  14          Do you believe that to be true?

04:21:26  15   **A**     Yes, I do.

04:21:27  16   **Q**     Did you put that in your report for your written

04:21:30  17   testimony to Congress?

04:21:32  18   **A**     I do not believe that I did.

04:21:34  19   **Q**     Well, I mean, you gave them this report that I read it

04:21:37  20   from.

04:21:37  21   **A**     Well, that's true.  So it was part of my testimony --

04:21:40  22   it was part of the testimony that I provided, yes.

04:21:43  23   **Q**     Okay.  And by the same token, the Senate hearings that

04:21:53  24   you testified about, if we go to those, it was plaintiff --

04:21:55  25   I mean Giant Eagle's Exhibit 1328.  At the end of your

**Alexander (Redirect by Lanier)**                    3558

04:22:01  1    three, maybe five minutes, you've got "The prescription

04:22:09  2    opioid and heroin crisis:  A public health approach to an

04:22:13  3    epidemic of addiction appears in the Appendix."

04:22:17  4         Do you see that?

04:22:18  5    **A**    I do.

04:22:31  6    **Q**    Next stop:  Your report.

04:22:37  7         You were asked extensively about the role of doctors,

04:22:41  8    right?

04:22:42  9    **A**    Yes.

04:22:42  10   **Q**    By the way, let's go back to causes for one moment.

04:22:47  11        Many, many, many causes, right?

04:22:53  12   **A**    Yes.

04:22:54  13   **Q**    Manufacturers?

04:22:55  14   **A**    Yes.

04:22:56  15   **Q**    Distributors?

04:22:57  16   **A**    Yes.

04:22:58  17   **Q**    Doctors?

04:23:00  18   **A**    Yes.

04:23:01  19   **Q**    Drug cartels?

04:23:04  20   **A**    Yes.

04:23:04  21   **Q**    FDA?

04:23:06  22   **A**    Yes.

04:23:07  23   **Q**    DEA?

04:23:09  24   **A**    Yes.

04:23:11  25   **Q**    Sloppiness by people with medicines?

**Alexander (Redirect by Lanier)** 3559

04:23:15  1  **A**     Well, do you mean patients not paying attention to

04:23:18  2  what they're given or what do you mean by sloppiness?

04:23:22  3  **Q**     People who keep opioids available for high school kids

04:23:25  4  to take to a party.

04:23:27  5  **A**     Yes.

04:23:31  6  **Q**     Pharmacists?

04:23:31  7            MS. SULLIVAN:  Objection.  No foundation.

04:23:33  8  Beyond the scope.

04:23:33  9            THE COURT:  Overruled.  Overruled.

04:23:35  10  **A**     Yes.

04:23:35  11  **Q**     Pharmacies that set policies and give the pharmacists

04:23:38  12  tools?

04:23:38  13  **A**     Yes.

04:23:38  14  **Q**     All right.  Last stop then, your report.

04:23:47  15       You testified that most doctors aren't prescribing for

04:23:51  16  ill intent, right?

04:23:52  17  **A**     Yes.

04:23:53  18  **Q**     The statistic that Joe Rannazzisi, the DEA man, gave

04:23:57  19  was that 99 percent of the doctors seem to be legit in his

04:24:02  20  mind.

04:24:03  21  **A**     Okay.

04:24:03  22  **Q**     Do you fuss with that?

04:24:04  23  **A**     Well, I don't know the data -- I'm not sure if that

04:24:11  24  is -- I'm not sure the source of that estimate, but I think

04:24:13  25  that that's not an unreasonable suggestion, that one out of

04:24:19  1    a hundred doctors is sort of up to no good, sort of plus or

04:24:23  2    minus.

04:24:23  3    **Q**    So that means if we've got 30,000 doctors in Ohio,

04:24:27  4    you're looking at about 300 rogue doctors?

04:24:30  5    **A**    Yeah, but -- and these are -- to be fair, these are

04:24:34  6    doctors that are way -- I mean, these are the ones like 300

04:24:38  7    scripts, you know, no documentation, cash pay only,

04:24:40  8    et cetera.

04:24:41  9    **Q**    Okay.  And then you were asked in your report about

04:24:49  10    opinion 3 and putting the word "dispensed" in.

04:24:58  11         Do you see that?

04:24:59  12    **A**    Yes.

04:24:59  13    **Q**    As opposed to "prescribed."

04:25:03  14         Do you stand by this opinion and to the jury?

04:25:05  15    **A**    Yes, I do.

04:25:06  16    **Q**    Well, let me ask you this:  Do you believe the volume

04:25:10  17    of opioids prescribed increased 400 percent?

04:25:14  18    **A**    Yes, I do.

04:25:14  19    **Q**    Do you believe the volume of opioids dispensed

04:25:17  20    increased 400 percent?

04:25:18  21    **A**    Yes, I do.

04:25:19  22    **Q**    Would you please explain why that's not a

04:25:21  23    contribution?

04:25:22  24    **A**    Because the medicines that are -- I mean, I suppose

04:25:31  25    there could be a modest difference between these two

04:25:36 1  numbers, but essentially medicines that are prescribed are

04:25:41 2  typically dispensed. And frankly, if there was a large -- I

04:25:47 3  mean, there are a lot of medicines that are -- there are

04:25:52 4  people that don't pick up medicines, so there are -- there

04:25:55 5  may be some differences if you look at sort of the number of

04:25:57 6  actual prescriptions written, some prescriptions aren't

04:26:03 7  filled. So it may be that there are some medicines that are

04:26:06 8  prescribed but not actually filled.

04:26:08 9       But if you look at a population level, these data are

04:26:14 10  not -- the data that are -- that the CDC presents that show

04:26:17 11  these large increases, this is from prescriptions filled.

04:26:24 12  So these are all prescriptions that were dispensed, and they

04:26:27 13  had to be written before they were dispensed essentially.

04:26:29 14  **Q**    All right. We've got some juror questions that I can

04:26:31 15  read. I'd like to show them to you and have you answer

04:26:34 16  them, please. I'll put them on the screen.

04:26:36 17       "Congressional testimony-is healthcare also to blame?

04:26:42 18  And are pharmacies considered a step of healthcare?"

04:26:45 19  **A**    Well, I think it's a great question. And the

04:26:47 20  healthcare system has certainly contributed to the opioid

04:26:51 21  epidemic, so the healthcare system includes many of the

04:26:54 22  parties that we've discussed, doctors, other licensed

04:26:58 23  prescribers, patients, hospitals, you know, institutions,

04:27:05 24  long term care facilities. And pharmacists and pharmacies

04:27:09 25  are part of the healthcare system.

**Alexander (Redirect by Lanier)** 3562

04:27:10 1    You know, the healthcare system has -- there are many

04:27:15 2 different types of healthcare providers.  Pharmacists are a

04:27:19 3 type of healthcare provider.  And pharmacies are part of the

04:27:22 4 healthcare system, yes.

04:27:24 5 **Q**    Okay.  Thank you.

04:27:25 6    Next question.

04:27:30 7    "How does one properly dispose of unused prescription

04:27:36 8 pills, specifically controlled substances?"

04:27:38 9 **A**    Well, it's another outstanding question.  The common

04:27:44 10 sort of wisdom is to flush them down the toilet, and that's

04:27:47 11 not actually recommended or advised in most cases, although

04:27:52 12 as recently as a few years ago I believe for opioids, the

04:27:57 13 FDA suggested if you can't do any other -- if you don't have

04:28:00 14 another means of disposing them, that they should be

04:28:03 15 flushed.  But flushing them puts them into the groundwater

04:28:07 16 and the water system and the like.

04:28:08 17    So the preferred way to dispose them is either through

04:28:13 18 putting them in a disposal packet, which is a specific type

04:28:17 19 of packet that has chemicals that inactivate the drug.  Or

04:28:22 20 to bring them back to a pharmacy or to a hospital or health

04:28:27 21 system or some police departments now have drop-off boxes.

04:28:31 22    And so those medicines are then managed in batches of

04:28:35 23 thousands and tens of thousands of prescriptions, and they

04:28:40 24 are safely -- I believe they're ultimately incinerated,

04:28:42 25 they're burned.

**Alexander (Redirect by Lanier)**                    3563

04:28:44    1        But it's a really big problem, and unfortunately there

04:28:49    2    are -- as I've written, there are opioids in bedrooms and,

04:28:54    3    you know, bedroom nightstands and bathroom cabinets all over

04:28:57    4    the country, including in these two counties.

04:28:59    5    **Q**    I want to see if this relates in your mind to a

04:29:02    6    question you -- set of questions you were asked by

04:29:07    7    Ms. Sullivan about nonmedical acquisition, how people can

04:29:10    8    get them from neighbors or find them around the house or

04:29:15    9    something like that.

04:29:15   10        Remember those questions?

04:29:16   11    **A**    Yes, I do.

04:29:17   12    **Q**    Is this part of how oversupply, just oversupply fuels

04:29:24   13    the epidemic?

04:29:25   14    **A**    Yes, it is.

04:29:26   15    **Q**    How?

04:29:26   16    **A**    Because the opioids that end up being unused and that

04:29:32   17    are dispensed, prescribed and dispensed in large amounts,

04:29:36   18    and end up being unused in many cases end up being diverted.

04:29:42   19    They end up being given or sold or stolen or passed among

04:29:47   20    friends.  And so you end up with stunning statistics.

04:29:53   21        Several years ago there was a statistic that high

04:29:55   22    school students reported prescription drugs were second only

04:29:59   23    to marijuana in terms of ease of access.  And so it's a

04:30:02   24    really important problem that the overprescribing and

04:30:07   25    overdispensing of these pills ends up putting a pool or a

**Alexander (Redirect by Lanier)**    3564

04:30:11  1    reservoir of prescription drugs in the community or opioids

04:30:15  2    in the community that contribute to harm.

04:30:22  3    **Q**    Next set of questions.

04:30:24  4         "You said from 1992 to 2010 the amount of opioids

04:30:28  5    dispensed increased 400 percent and then leveled off.  How

04:30:32  6    much has dispensing decreased since 2010?"

04:30:36  7    **A**    Great question.  And it has decreased considerably.

04:30:41  8    So I believe nationally perhaps by as much as 30 to 35 or

04:30:46  9    maybe even 40 percent.  But that's from the peak.  So you're

04:30:52  10   going up like this, up, up, up, up, up, and then in 2010,

04:30:57  11   2011, it sort of plateaus, and now opioids have come down.

04:31:00  12   But we're way above the historic baselines.  We're still --

04:31:06  13   they're still being prescribed in quantities much, much

04:31:08  14   higher than they were before the epidemic began.

04:31:13  15   **Q**    "Does that number have a relationship with the DEA's

04:31:16  16   limits set on opioid manufacturing and importing?"

04:31:21  17   **A**    Well, it does, but we're back to the fact that there

04:31:24  18   are many factors that contribute to the ultimate volume of

04:31:27  19   opioids being put on the market.  And so the DEA quotas make

04:31:32  20   a difference, the behavior of doctors and patients makes a

04:31:35  21   difference, the behavior of pharmacists and pharmacies makes

04:31:39  22   a difference, and so on.

04:31:41  23   **Q**    Okay.  "Does that number have a relationship to pain

04:31:46  24   clinics?"

04:31:47  25   **A**    Well, pain clinics are -- pain clinics are part of

**Alexander (Redirect by Lanier)** 3565

04:31:51  1   what I would -- well, so there are legitimate -- I should be

04:31:54  2   careful about the use of the word "legitimate."

04:31:57  3       There are pain clinics that are practicing well within

04:31:59  4   the boundaries of normal medicine, and then there are some

04:32:03  5   pain clinics that are sort of where there are sort of rogue

04:32:07  6   prescribers.  And so I don't really know which one this

04:32:09  7   refers to, but the bottom line is that the reductions in

04:32:12  8   opioids that we've seen since 2010 are a result of many

04:32:18  9   factors, and some of them are tighter regulation of these

04:32:22  10  sorts of pain clinics and greater law enforcement activities

04:32:27  11  and greater use of prescription monitoring programs and use

04:32:32  12  of patient and provider education such as are taking place

04:32:36  13  in Lake and Trumbull Counties.

04:32:43  14  **Q**    And then, Doctor, you said in your report when you

04:32:47  15  were talking about the role of pharmacies and pharmacists in

04:32:49  16  addressing the opioid epidemic, you said, "pharmacists

04:32:54  17  report that time constraints that result from organizational

04:32:57  18  policies, such as those that arise from insufficient

04:33:00  19  staffing or time requirements for filling a prescription,

04:33:05  20  hinder their review of concerning patient behavior or

04:33:09  21  prescribing practices."

04:33:11  22      As we come to the end of the road, can you explain

04:33:15  23  what you meant by that?

04:33:17  24  **A**    Well, what I meant is that the sorts of steps that are

04:33:21  25  required in order to identify and respond to flags that are

04:33:25  1  triggered take time, and they take resources.  You need

04:33:29  2  people, and the people have to be trained and they have to

04:33:32  3  be supported and they have to have the time and authority

04:33:37  4  and supervision to respond appropriately and manage or --

04:33:44  5  manage these flags as they arise and document them

04:33:48  6  accordingly.

04:33:48  7       And so what I was pointing to was that there are

04:33:51  8  constraints that historically have made that difficult for

04:33:55  9  pharmacists to do.

04:33:58  10            MR. LANIER:  All right.  Thank you very much,

04:33:59  11  Doctor.

04:33:59  12       Your Honor, I will return the questions to Mr. Pitts.

04:34:02  13  Thank you.

04:34:03  14            THE WITNESS:  Thank you.

04:34:05  15            THE COURT:  All right.  Thank you, Mr. Lanier.

04:34:06  16       Ms. Sullivan.

04:34:07  17            MS. SULLIVAN:  Briefly, Your Honor.

04:34:16  18                  - - - - -

04:34:18  19                RECROSS-EXAMINATION

04:34:18  20  BY MS. SULLIVAN:

04:34:18  21  Q    Dr. Alexander, I'm not going to ask you about food or

04:34:20  22  elephants or zebras or bananas, but I am going to ask you

04:34:24  23  about some of the things you talked with Mr. Lanier about.

04:34:28  24       You had testified previously that you never in your

04:34:31  25  Congressional testimony said anything about pharmacies as

**Alexander (Recross by Sullivan)**

04:34:36  1    contributing to the opioid crisis, or in your other papers.

04:34:40  2    And Mr. Lanier showed you Plaintiffs' Exhibit -- I'm sorry,

04:34:44  3    Defense Exhibit HBC Exhibit 1037.  And he pointed you to the

04:34:48  4    part of your paper that talked about doctor shopping and

04:34:54  5    state PDMP programs, right?

04:34:58  6    **A**    Yes, I believe so.

04:34:58  7    **Q**    Yeah.  And that paragraph that you wrote related to

04:35:04  8    prescribers looking at prescription data monitoring

04:35:08  9    programs, correct?  Talks about prescriber's ability to

04:35:14  10   detect opioid addiction by using the PDMP, right?

04:35:17  11   **A**    Yes.

04:35:18  12   **Q**    It had nothing to do with pharmacies?

04:35:20  13   **A**    Well, I think the questioning was about whether

04:35:25  14   pharmacies also have access to that type of data.  But what

04:35:27  15   I wrote here was about prescribers, yes.

04:35:30  16   **Q**    Yeah, yeah.  So -- and the truth, Doctor, none of your

04:35:35  17   papers -- and to back up, Doctor, you have done -- I mean,

04:35:37  18   Mr. Lanier said you didn't do your homework.

04:35:39  19        You have done extensive analysis about the opioid

04:35:42  20   crisis and the causes of the opioid crisis.  One of the

04:35:46  21   reasons that Congress asked you to testify.  And the truth

04:35:48  22   is in none of your papers, in this extensive analysis, did

04:35:52  23   you ever say that pharmacies were even a little bit

04:35:55  24   responsible for the opioid crisis?

04:35:56  25             MR. LANIER:  Objection, Your Honor.  I never

04:35:57  1    said he didn't do his homework.

04:36:02  2             THE COURT:  Rephrase the question, please.

04:36:03  3             MS. SULLIVAN:  Sure.

04:36:04  4    **Q**    Dr. Alexander, you have done extensive analysis of the

04:36:07  5    opioid crisis, its causes, potential remedies, and so on.

04:36:13  6    You're an expert?

04:36:16  7    **A**    Well, I mean, my -- what I've prepared for this group

04:36:22  8    is based on what I was asked to do.  And had I been asked to

04:36:26  9    look carefully at the role of Giant Eagle or other parties

04:36:32  10   in this matter, there's a process that I would have used,

04:36:36  11   and I would have done my best to do so.

04:36:38  12   **Q**    Not my question, Doctor.

04:36:40  13           Unrelated to this litigation, you have looked at an

04:36:43  14   extensive amount of information and data and published

04:36:45  15   papers on the opioid crisis, testified before Congress on

04:36:49  16   the opioid crisis, talked about causes of the opioid crisis.

04:36:53  17           And the truth is never once in your papers or in your

04:36:56  18   Congressional testimony have you said that pharmacies were

04:36:59  19   responsible in any way for the opioid crisis?

04:37:02  20   **A**    Well, we -- I think we discussed this earlier.  I'm

04:37:05  21   not sure if that's true.  I think that we just reviewed some

04:37:08  22   settings in which, for example, in the report from evidence

04:37:12  23   to impact, I do discuss the role of pharmacies in addressing

04:37:16  24   the opioid epidemic.  And I wouldn't be discussing their

04:37:20  25   role in addressing them were they not one of many important

**Alexander (Recross by Sullivan)**

04:37:24  1    parties in this.

04:37:25  2    **Q**    Well, let's look at that.

04:37:26  3         Doctor, that paper says nothing about pharmacies being

04:37:31  4    a cause or even a contributor to the opioid crisis, fair?

04:37:36  5    **A**    I guess I would prefer to see if there's a particular

04:37:39  6    thing that you'd like for me to respond to.

04:37:41  7    **Q**    Well, let's look at what Mr. Lanier showed you, if I

04:37:46  8    could find it here.

04:37:47  9              MR. LANIER:  I used page 23, if that helps.

04:37:51  10             MS. SULLIVAN:  Thank you.

04:37:56  11   **Q**    Yes.  On page 23, Doctor, you say, "Pharmacies are an

04:38:00  12   important stakeholder," et cetera, et cetera, et cetera.

04:38:03  13        Nowhere here do you say that pharmacies were a cause

04:38:06  14   of the opioid crisis?

04:38:07  15   **A**    I'm sorry, what tab is this?

04:38:08  16   **Q**    This is page 21 of Tab A, sir.

04:38:12  17   **A**    A, as in apple?

04:38:14  18   **Q**    Yes, sir.

04:38:16  19             MR. LANIER:  Page 23, not 21.

04:38:19  20   **Q**    Page 23, sir.

04:38:24  21             THE COURT:  You're on page 23, Ms. Sullivan?

04:38:28  22             MS. SULLIVAN:  Yes, I am.

04:38:28  23   **Q**    In the second paragraph that Mr. Lanier showed you,

04:38:31  24   Dr. Alexander, the truth is that nowhere in that paragraph

04:38:34  25   does it say that pharmacies contributed or caused the opioid

**Alexander (Recross by Sullivan)**

04:38:36  1  crisis?

04:38:37  2  **A**    I think that's correct.

04:38:41  3  **Q**    So the two papers Mr. Lanier showed you say nothing

04:38:43  4  about pharmacies causing the opioid crisis, fair?

04:38:49  5  **A**    I believe that's correct.  I wasn't focused there in

04:38:53  6  enumerating all of the causes of the epidemic.

04:38:57  7  **Q**    And I think Mr. Lanier suggested that you didn't tell

04:39:01  8  Congress that pharmacies were a cause because you only had

04:39:03  9  three minutes, you didn't have enough time.

04:39:06  10      Do you remember that?

04:39:07  11  **A**    Well, that's his -- I mean, I -- I'm not comfortable

04:39:11  12  representing what he -- I mean, what I took his

04:39:17  13  questioning -- I took his questioning to point out that I

04:39:18  14  didn't have, you know, all the time in the world in front of

04:39:24  15  Congress, and that was true.

04:39:25  16  **Q**    But you submitted an appendix, right, and there were

04:39:28  17  written statements, correct?

04:39:28  18  **A**    Yes, an appendix in which I highlight the potential

04:39:31  19  role of many different parties, including pharmacies.

04:39:34  20  **Q**    Yeah.  And what Mr. Lanier didn't show you what you

04:39:37  21  said in the appendix because the truth is it doesn't say

04:39:39  22  that pharmacies contributed even a little bit to the opioid

04:39:42  23  crisis, does it, sir?

04:39:45  24  **A**    Well, we did review -- we did review the appendix

04:39:48  25  together just a minute ago.  The appendix was the Johns

**Alexander (Recross by Sullivan)**

04:39:51    1    Hopkins report from evidence to impact.

04:39:52    2    **Q**    The one that didn't say anything about pharmacies

04:39:56    3    contributing to the opioid crisis, right?

04:40:01    4    **A**    Yes.

04:40:06    5    **Q**    And you did tell Congress, as we looked at it on page

04:40:10    6    88 of Defense Exhibit 1329, things you thought did cause the

04:40:15    7    opioid crisis, and we looked at it, right, FDA -- I'm sorry,

04:40:18    8    Doctor, page 88.

04:40:20    9    **A**    Of what tab?

04:40:23   10    **Q**    This is tab -- that is a good question.

04:40:34   11        Tab 5, Doctor.

04:40:44   12    **A**    Okay.  Page 88, Tab 5.  I'm with you.

04:40:48   13    **Q**    Yes, sir.  And you did talk about causes of the opioid

04:40:51   14    crisis, and you talked about manufacturers, FDA, and DEA,

04:40:54   15    right?

04:40:55   16        MR. WEINBERGER:  Objection, Your Honor.  If

04:40:56   17    she's going to -- she has to be complete.

04:41:00   18    **Q**    Tell me where I'm wrong, Dr. Alexander.  Those are

04:41:02   19    things you talked about as a cause of the opioid crisis.

04:41:04   20        THE COURT:  Hold it, hold it, hold it, hold

04:41:06   21    it.

04:41:13   22        If you're asking Dr. Alexander about a specific

04:41:15   23    statement he made on page 88, Ms. Sullivan, read the

04:41:19   24    statement and ask him if this is what he said or what did he

04:41:21   25    mean and have a question.

04:41:22  1                    MS. SULLIVAN:  Sure.

04:41:23  2    BY MS. SULLIVAN:

04:41:24  3    **Q**    And Dr. Alexander, we've gone through this.  You talk

04:41:26  4    about the --

04:41:26  5                    (Court reporter interjection.)

04:41:38  6    **Q**    On page 88, Dr. Alexander, are you with me?

04:41:39  7    **A**    Yes, I am.

04:41:40  8    **Q**    Okay.  And Dr. Alexander, here you talk about "The

04:41:42  9    origins of the epidemic are multiple but arise from within

04:41:46  10   the healthcare system, including unsubstantiated claims

04:41:49  11   about the safety and effectiveness of opioids, multifaceted

04:41:53  12   campaigns by pharmaceutical companies, and failures by the

04:41:56  13   FDA and DEA to regulate the products appropriately," right?

04:42:00  14   **A**    Yes.  And this is the same testimony where in response

04:42:02  15   to a question about the causes, I say there are many, many,

04:42:05  16   many, I believe.

04:42:07  17   **Q**    Right.  You say many, many, many.  You single out some

04:42:11  18   major ones.  Never once in your Congressional testimony or

04:42:13  19   any of your papers, despite your extensive analysis of this

04:42:17  20   issue, did you ever say that pharmacies were a cause, even a

04:42:23  21   little cause of the opioid crisis?

04:42:24  22   **A**    I'm not sure that that's true, but I've already spoken

04:42:27  23   to that.  And the reason I'm not sure if it's true is

04:42:30  24   because I'm not -- I don't recall and I'm not able to

04:42:33  25   summarize a statement like that or verify it across 50 or

**Alexander (Recross by Sullivan)** 3573

04:42:38  1   more papers that I've published on the opioid epidemic.

04:42:41  2   **Q**     You can't cite the jury to a single statement you made

04:42:44  3   in any published paper or Congressional testimony where you

04:42:48  4   said that pharmacies were in any way responsible for the

04:42:50  5   opioid crisis?

04:42:52  6   **A**     Again, I can't, as I sit here, provide a specific

04:42:57  7   reference to a specific paper.  I have published some papers

04:43:03  8   about the use of automated methods such as can be used by

04:43:06  9   pharmacies to identify high risk dispensing, but I don't

04:43:12  10  know if in that process the degree to which I discussed the

04:43:16  11  role of pharmacies as a cause of the opioid epidemic.

04:43:21  12  **Q**     Never cited in any paper that you can cite the jury to

04:43:23  13  where pharmacies were a cause of the opioid crisis?

04:43:27  14  **A**     Well, that's not true.  I think -- I mean, I have some

04:43:31  15  suggestions of where to potentially look, and these are

04:43:33  16  papers that are referenced in my report.

04:43:38  17  **Q**     But you -- doctor, sitting here we can agree you

04:43:40  18  didn't tell Congress that pharmacies were a cause of the

04:43:43  19  opioid crisis, right?

04:43:46  20  **A**     Yes, in that statement to this Congressional panel, I

04:43:50  21  pulled out three causes that I felt were important to

04:43:54  22  emphasize to them, and those three causes, none of those

04:43:57  23  three causes were pharmacies.

04:43:59  24  **Q**     And we looked at your other Congressional testimony.

04:44:02  25  You didn't tell Congress that you thought pharmacies were a

**Alexander (Recross by Sullivan)**

04:44:05  1    cause of the opioid crisis?

04:44:06  2    **A**    Well, I think in both cases I would be surprised if I

04:44:11  3    didn't underscore that the epidemic is complex and

04:44:14  4    multifaceted, and that is that there are many causes that

04:44:17  5    have contributed.

04:44:18  6    **Q**    My question, Doctor, is pharmacies.  You singled out

04:44:21  7    manufacturers, DEA, FDA, prescribers.  Never singled out

04:44:25  8    pharmacies?

04:44:25  9    **A**    I believe that may be the case in the testimony.

04:44:30  10   **Q**    And Mr. Lanier didn't show you any papers where you

04:44:34  11   said pharmacies were a cause of the opioid crisis?

04:44:36  12   **A**    Well, I've --

04:44:37  13   **Q**    Sir, can you answer my question?  He showed you papers

04:44:40  14   that language was not --

04:44:42  15          THE COURT:  Hold it.

04:44:43  16      If you want to ask a question, let him look at the

04:44:45  17   document and then make his answer.

04:44:47  18          MS. SULLIVAN:  Sure, Your Honor.

04:44:49  19   **A**    Can you reask the question, please?

04:44:50  20   **Q**    Sure.  Mr. Lanier didn't show you -- he showed you two

04:44:55  21   papers, and neither one of them we looked at, this one

04:44:58  22   talked about doctors, your other one talked generally about

04:45:02  23   pharmacies.

04:45:02  24      Neither paper that Mr. Lanier showed you said that

04:45:05  25   pharmacies were in any way responsible for the opioid

**Alexander (Recross by Sullivan)**

04:45:07  1   crisis?

04:45:08  2   **A**    Well, I don't -- he did not show me a paper, that's

04:45:15  3   true, and I have written in multiple places about the

04:45:19  4   opportunities that we have to improve the safe use of

04:45:23  5   opioids in communities by improving the quality of

04:45:26  6   dispensing.  And that doesn't happen without pharmacies

04:45:30  7   playing a role, because if they didn't play a role, then I

04:45:34  8   wouldn't be recommending that we improve dispensing

04:45:36  9   processes in order to improve safe opioid use.

04:45:40  10  **Q**    And the truth is, Doctor, on Giant Eagle and the other

04:45:42  11  defendants here, you haven't looked at their dispensing

04:45:45  12  policies or procedures in any way to address that issue

04:45:50  13  about what they did wrong, what they did right, way to

04:45:52  14  improve.  So you have no idea, you didn't look at them?

04:45:55  15  **A**    I would have been happy to had I been asked, but I was

04:45:57  16  not asked to for this case, although I did see portions of

04:46:02  17  Mr. Catizone's and Mr. McCann's reports.

04:46:05  18  **Q**    And, Doctor, it's interesting that you have done a

04:46:07  19  lot -- fair to say you've done a lot of work in connection

04:46:10  20  with the opioid crisis.  You've done a lot of review, you've

04:46:13  21  done a lot of analysis, and you've written some papers?

04:46:15  22  **A**    Yes.

04:46:15  23  **Q**    Do you know why they didn't ask you to address the

04:46:19  24  issue of causation as it relates to pharmacies?

04:46:24  25           MR. WEINBERGER:  Objection, Your Honor.

04:46:30   1                    MS. SULLIVAN:  I'll withdraw it, Your Honor.

04:46:32   2                    MR. WEINBERGER:  She's withdrawing --

04:46:36   3                    THE COURT:  I still want to go on the

04:46:38   4    headphones.

04:46:40   5                    (At side bar at 4:46 p.m.)

04:46:52   6                    THE COURT:  All right.  Ms. Sullivan, I'd like

04:46:53   7    you to take a deep breath and slow down because that last

04:46:57   8    question was completely improper, all right?  So let's

04:47:02   9    hopefully wrap up with this witness on something that's

04:47:05  10    appropriate.

04:47:05  11                    MR. WEINBERGER:  Your Honor, I think this -- I

04:47:10  12    think you have to admonish her.

04:47:12  13                    THE COURT:  I just did.  No, I just said what

04:47:15  14    I'm going to say.

04:47:16  15                    MS. SULLIVAN:  Thank you, Your Honor.

04:47:18  16                    (In open court at 4:47 p.m.)

04:47:35  17    BY MS. SULLIVAN:

04:47:35  18    **Q**     Doctor, you were asked about time constraints for

04:47:37  19    pharmacies.

04:47:38  20          Are you aware that Giant Eagle has no time constraints

04:47:40  21    in terms of how long it takes to dispense a prescription?

04:47:45  22    **A**     Well, I mean, I haven't reviewed Giant Eagle's

04:47:49  23    policies, but it's hard -- I mean, when you have six people

04:47:52  24    in line behind the person that you're trying to serve, I

04:47:56  25    don't quite understand what that policy would mean but -- or

**Alexander (Recross by Sullivan)**

04:48:00  1   the sort of -- the implementation of it.  But I've not

04:48:03  2   reviewed Giant Eagle's policies in that regard.

04:48:06  3   **Q**     And same for the other defendants here.  You have no

04:48:09  4   idea what time constraints, if any, they put on

04:48:11  5   prescribing -- I mean dispensing prescriptions?

04:48:14  6   **A**     Correct.  That wasn't required for what I was asked to

04:48:17  7   do in this case.

04:48:17  8   **Q**     And Mr. Lanier asked you about the indicators for

04:48:22  9   suspicious prescriptions in your Appendix F?

04:48:29  10  **A**     Yeah, I mean, I don't know that I used the word

04:48:31  11  "suspicious," but he may have.  But I view it as indicators

04:48:34  12  of potential high risk dispensing.

04:48:37  13  **Q**     And this truth is you just got that are from

04:48:40  14  Dr. Catizone's expert report, right?

04:48:42  15  **A**     No.

04:48:42  16  **Q**     I reviewed the portion -- I'm looking at page 2 of

04:48:47  17  your appendix.

04:48:48  18  **A**     Right.

04:48:48  19  **Q**     "I reviewed the portion of Carmen Catizone's expert

04:48:53  20  report in which he identifies indicators that are triggered

04:48:55  21  based on information about prescriptions, patients,"

04:48:58  22  et cetera.  And these indicators are listed in Table 1

04:49:01  23  below, right?

04:49:01  24  **A**     Well, it's not -- I guess I responded quickly saying

04:49:04  25  no because it's not as if he just threw something over the

**Alexander (Recross by Sullivan)**

04:49:07  1    fence and I just started using it.  I mean, I have my own

04:49:11  2    knowledge base of the evidence here and the science, and I

04:49:15  3    looked at the indicators that Mr. Catizone was using, and I

04:49:22  4    provide those in Table 1.  It's not as if I just

04:49:28  5    reflexively, you know, just sort of -- he gave me, you know,

04:49:31  6    these ten things and said here and then I said, okay, you

04:49:34  7    know, no further thought or something.

04:49:36  8    **Q**    But that's what you say, that you took them from

04:49:38  9    Mr. Catizone --

04:49:39  10   **A**    Well, the ones in Table 1, but I discussed the science

04:49:42  11   and evidence base much more broadly in the paragraphs that

04:49:45  12   follow.

04:49:47  13   **Q**    And let's look at your Table 1.  And these are the

04:49:54  14   indicators of potential -- and, Doctor, you're not a

04:49:58  15   pharmacist, and you don't pretend to be an expert in

04:50:01  16   pharmacy practices and procedures, correct?

04:50:03  17   **A**    Well, I'm a pharmacoepidemiologist, which depends

04:50:08  18   crucially on understanding pharmacy, because that's part of

04:50:11  19   the field of what I do as a pharmacoepidemiologist, but I'm

04:50:18  20   not licensed to dispense prescription medicines.

04:50:21  21   **Q**    And so, for example, one of your indicators here is

04:50:25  22   distance traveled, right?

04:50:27  23   **A**    Yes.

04:50:27  24   **Q**    And you say it's an indicator of a potential issue

04:50:33  25   with a prescription if someone lives a significant distance

| | | |
|---|---|---|
| 04:50:35 | 1 | from a provider who issued the opioid prescription or a |
| 04:50:40 | 2 | pharmacy where it was filled, right? |
| 04:50:42 | 3 | **A**     Yes, could be. |
| 04:50:42 | 4 | **Q**     And then you have a footnote, right?  And it says, |
| 04:50:49 | 5 | "This distance will depend on geographic and demographic |
| 04:50:52 | 6 | factors such as rural density of pharmacies in a patient's |
| 04:50:58 | 7 | home ZIP code which can be incorporated into algorithms that |
| 04:51:01 | 8 | identify flags," right? |
| 04:51:03 | 9 | **A**     Yes. |
| 04:51:03 | 10 | **Q**     You don't have a mild cutoff.  You don't say if |
| 04:51:06 | 11 | they're more than 25 miles it's suspicious, right? |
| 04:51:09 | 12 | **A**     Well, it's not -- I mean, these are methods that have |
| 04:51:14 | 13 | an evidence base to support them, and there's not an all or |
| 04:51:18 | 14 | none level here that is universally it.  You know, they -- |
| 04:51:25 | 15 | everything has to be taken or interpreted in context. |
| 04:51:28 | 16 | **Q**     Fair enough.  In other words, this is -- this is |
| 04:51:30 | 17 | something that it's based on a judgment of a pharmacist. |
| 04:51:32 | 18 | It's not a mild cutoff.  You don't say if they're 25 miles |
| 04:51:36 | 19 | it's probably bad or if they're shorter it's probably good. |
| 04:51:39 | 20 | It's a matter of judgment? |
| 04:51:41 | 21 | **A**     Everything pharmacists are doing requires judgment as |
| 04:51:46 | 22 | well as facts, yes. |
| 04:51:47 | 23 | **Q**     And then, Doctor, the -- some of the other indicators |
| 04:51:52 | 24 | here, prescriber activity, using multiple prescribers, |
| 04:51:57 | 25 | multiple prescriptions from a single provider, number of |

**Alexander (Recross by Sullivan)**

04:52:00  1    pharmacies, that's the kind of doctor shopping or rogue

04:52:05  2    prescribers we were talking about earlier, correct?

04:52:07  3    **A**    Well, a lot of these flags have nothing to do with

04:52:10  4    opioid shoppers, to be clear.  I mean, the majority of them

04:52:13  5    are not, although opioid shopping is one type of flag.  But

04:52:16  6    there are many, many flags here that don't have anything to

04:52:18  7    do with opioid shopping.

04:52:21  8    **Q**    Fair enough.  But the -- to the extent you're applying

04:52:23  9    these to opioid shopping, we're talking about doctor

04:52:26  10   shopping here and rogue prescribers, right?

04:52:32  11   **A**    No, not necessarily.  I mean, they -- you may have a

04:52:36  12   prescriber that's -- I'm sorry, can you please not --

04:52:39  13   **Q**    I'm sorry.  I didn't know you didn't have it.

04:52:41  14   **A**    So one might have a prescriber that's consistently

04:52:44  15   prescribing a single type of opioid.  I mean, it raises a

04:52:48  16   flag, and the point is is that the flag then needs to be

04:52:50  17   reviewed and evaluated and a decision needs to be made by

04:52:57  18   the pharmacist, and it should be documented.

04:52:58  19        And so none of these are absolute, you know, always

04:53:02  20   bad, always good, but the point is that these are flags that

04:53:05  21   can help to improve the safe dispensing of these products.

04:53:09  22   **Q**    And, Doctor, looking at your misconceptions, you say

04:53:12  23   "rogue physicians and doctor shoppers while important to

04:53:16  24   identify and manage account for a small proportion of

04:53:21  25   opioid-related harms," right?

**Alexander (Recross by Sullivan)**

04:53:22  1    **A**    Yes, that's true.

04:53:23  2    **Q**    And on -- I think you said that you have to document

04:53:26  3    red flags.  Did you get that from Mr. Catizone's expert

04:53:30  4    report?

04:53:30  5                    MR. WEINBERGER:  Objection.

04:53:35  6                    MS. SULLIVAN:  I'll rephrase it, Your Honor.

04:53:37  7                    THE COURT:  Yes.  I'll sustain the objection.

04:53:43  8    **Q**    Dr. Alexander, you can't cite any law or regulation

04:53:45  9    that requires the documentation of red flags.  You've got to

04:53:49  10   evaluate them, but there's no regulation that requires

04:53:51  11   documentation, sir, is there?

04:53:52  12                   MR. WEINBERGER:  Objection.

04:53:54  13                   THE COURT:  You can ask him if he -- if he

04:53:59  14   knows, he can answer it.

04:54:00  15   **A**    Yeah, I didn't review carefully the laws and

04:54:03  16   regulations regarding what pharmacists have to document in

04:54:05  17   order to prepare for this case.

04:54:07  18                   MS. SULLIVAN:  Fair enough.

04:54:07  19       Thank you.  I have nothing further, Dr. Alexander.

04:54:10  20   Safe travels.

04:54:11  21                   THE WITNESS:  Thank you.

04:54:16  22                   THE COURT:  Maybe I shouldn't ask, but I --

04:54:21  23   you can have one or two questions, two at the most.

04:54:23  24                   MR. LANIER:  No further questions for the

04:54:25  25   plaintiffs, Your Honor.

04:54:25    1                THE COURT:  Thank you.

04:54:26    2          Doctor, you may be excused.

04:54:28    3                THE WITNESS:  Thank you very much.

04:54:29    4                (Witness excused.)

04:54:29    5                THE COURT:  All right.  Ladies and gentlemen,

04:54:30    6     first I want to compliment you all on those excellent

04:54:34    7     questions.  You know, I have this practice, but I've done it

04:54:40    8     in other trials.  I've never had such probing questions, and

04:54:44    9     it shows each of you has really been paying attention to

04:54:47   10     some very complex testimony.

04:54:50   11          It being 5 of 5:00, we're not going to start another

04:54:54   12     witness at this point.  So we'll recess for the evening.

04:54:57   13          Usual admonitions apply.  Don't encounter, read,

04:55:01   14     listen, view anything in the media, don't discuss this case

04:55:04   15     with anyone.

04:55:06   16          And I'll add if our football team shows the same

04:55:09   17     degree of attention and diligence to detail that you have,

04:55:13   18     we'll be in good shape, all right?  That's all I'll say.

04:55:16   19          Have a good evening, and I'll see you tomorrow

04:55:19   20     morning.

04:55:19   21                (Jury excused for the day at 4:55 p.m.)

04:55:48   22                THE COURT:  Please be seated for a minute.  I

04:55:50   23     just want to take care of a few administrative things.

04:55:52   24          I guess first, Mr. Lanier, who are you contemplating

04:55:56   25     for tomorrow?  Because obviously we're off schedule, but

04:55:59   1    that's okay.  Things have taken longer.

04:56:03   2                    MR. LANIER:  Well, we are a bit off schedule,

04:56:05   3    and so I would ask my elder statesman, Mr. Weinberger, who

04:56:11   4    we're putting on tomorrow.

04:56:13   5                    THE COURT:  You call him elder.  I think

04:56:15   6    Mr. Weinberger and I are almost exactly the same age, so --

04:56:18   7                    MR. WEINBERGER:  I think that's true, Your

04:56:19   8    Honor.

04:56:19   9                    MR. LANIER:  Judge, I turned 61 yesterday.  It

04:56:21   10   was my birthday.

04:56:22   11                   THE COURT:  Happy birthday.

04:56:23   12                   MR. LANIER:  I'm getting there.

04:56:25   13                   THE COURT:  It's a long rearview mirror for

04:56:28   14   me.

04:56:29   15                   MR. WEINBERGER:  I got him by almost 10 years.

04:56:34   16        Well, I think is Keyes in?  So that I know that we

04:56:41   17   intend or hope to put on Dr. Keyes tomorrow.

04:56:45   18                   THE COURT:  Keyes.  Oh, okay, who was on for

04:56:47   19   Friday.

04:56:48   20                   MR. WEINBERGER:  Yes.  And we actually

04:56:50   21   intended to play the deposition of Steve Kneller, which is

04:57:00   22   about two hours.

04:57:01   23                   MR. LANIER:  We've got a set of depositions,

04:57:03   24   Your Honor, we were hoping to play today.  There are three

04:57:05   25   of them.  And so our goal --

04:57:07 1        THE COURT:  Well, in some ways it's good to

04:57:09 2   break them up just for obvious reasons.

04:57:11 3        MR. LANIER:  Yes.  So we would maybe -- we

04:57:14 4   would love to get Keyes on and off the stand tomorrow, if

04:57:18 5   possible.

04:57:18 6        THE COURT:  All right.

04:57:19 7        MR. LANIER:  And other than that, we'll have

04:57:22 8   depos to play.

04:57:25 9        THE COURT:  All right.  That's fine.  You've

04:57:27 10  got all these depositions.  So it looks like in terms of

04:57:30 11  live witnesses for defendants' knowledge, it looks like it's

04:57:36 12  Dr. Keyes.

04:57:36 13        MR. LANIER:  Yes, Your Honor.

04:57:37 14        THE COURT:  All right.  Fine.

04:57:38 15      I guess I'd appreciate the parties working together to

04:57:45 16  get the list of exhibits you want to admit through our last

04:57:50 17  two witnesses, Ms. Polster and Dr. Alexander, and just

04:57:55 18  indicate to me where there are objections and I'll have to

04:57:58 19  take those up.  And I'll try and do it maybe sometime

04:58:02 20  tomorrow, either at 8:45 or at the lunch break.

04:58:10 21      There were a couple things filed, and I have not at

04:58:14 22  all forgotten about them.  I was waiting to see -- all

04:58:17 23  right, first, both sides have submitted a proposed

04:58:25 24  instruction or limiting instruction about these settlements.

04:58:31 25  And there are some differences.  I would greatly appreciate

04:58:35  1  if you can agree on one version.  If not, I'll have to come

04:58:40  2  up with one.

04:58:41  3      Are you contemplating me giving this during the trial

04:58:45  4  or at some particular point or in the final instructions?

04:58:48  5  It was unclear.

04:58:51  6              MR. DELINSKY:  Your Honor, I think it's the

04:58:53  7  defense request.  Two things on the table.  Number one, we

04:58:57  8  will, now that we have their competing instruction, we will

04:59:01  9  confer with them and see if we can find common ground.

04:59:03  10             THE COURT:  Okay.

04:59:04  11             MR. DELINSKY:  Okay, I can identify the

04:59:07  12 concept that they want introduced in it, I understand it, so

04:59:10  13 we will try.

04:59:11  14             THE COURT:  Okay.

04:59:13  15             MR. DELINSKY:  Number two, you raise a very

04:59:14  16 good caution, and I'd like to reserve on that and come back

04:59:17  17 to it.

04:59:17  18             THE COURT:  All right.  Well, as I said, I can

04:59:19  19 do both.

04:59:19  20             MR. DELINSKY:  Right.

04:59:19  21             THE COURT:  I mean, they're not mutually

04:59:23  22 exclusive, Mr. Delinsky.

04:59:25  23             MR. DELINSKY:  Right.

04:59:26  24             THE COURT:  There have been times where I've

04:59:27  25 said something during the trial, some instruction, which I

04:59:30  1   repeat in the final instructions.  I don't have a problem

04:59:33  2   doing both.  I just want to know what you're suggesting.

04:59:36  3              MR. DELINSKY:  I think that's where we'll end

04:59:38  4   up, but I certainly want to confer with my codefendants.

04:59:41  5              THE COURT:  All right.  That's fine.  You can

04:59:43  6   continue to work on that.

04:59:44  7        And there was -- well, jury instruction on CSA

04:59:52  8   regulations, so that was proposed by the defendants.  And

04:59:57  9   this was another thing that we had talked about a while ago

05:00:03  10  that I wanted the parties -- I thought it probably is a good

05:00:08  11  idea.

05:00:08  12       So again, try and -- you know, I'd like you -- you

05:00:11  13  should be able to agree on something.

05:00:16  14             MR. WEINBERGER:  Well, Your Honor, harkening

05:00:17  15  back to the status conference where we discussed this, your

05:00:19  16  suggestion was that we -- it not be a jury instruction but

05:00:24  17  rather by way of stipulation.

05:00:25  18             THE COURT:  Or a stipulation.

05:00:26  19             MR. WEINBERGER:  We got their draft that

05:00:29  20  you -- that has ultimately been submitted to you, and we

05:00:33  21  have lots of problems with that.  And we are preparing a

05:00:37  22  response to that.  I think it will probably get filed

05:00:43  23  tomorrow.

05:00:43  24             THE COURT:  All right.

05:00:45  25             MR. WEINBERGER:  And again, we'll try to

05:00:47   1   meet --

05:00:47   2              THE COURT:  You can file it, and then,

05:00:51   3   Mr. Weinberger, why don't you file it, and then why don't

05:00:53   4   you confer and, as you are with the proposed instruction or

05:01:01   5   stipulation on settlement agreements, and if you can come to

05:01:04   6   some agreement, I will -- obviously if it's a stipulation,

05:01:09   7   I'll read it whenever you want me to read it.

05:01:11   8              MR. WEINBERGER:  Okay.

05:01:12   9              THE COURT:  If you can't, then I'll have to

05:01:16  10   work on it.

05:01:16  11              MR. WEINBERGER:  Okay.

05:01:19  12              THE COURT:  Okay.  Was there anything else

05:01:22  13   that -- yes, Mr. Stoffelmayr.

05:01:25  14              MR. STOFFELMAYR:  Yes, Your Honor, Kaspar

05:01:27  15   Stoffelmayr for Walgreens.

05:01:28  16        Just one housekeeping question, I have a proposal, we

05:01:30  17   want to confirm it's okay with the Court for Rule 50

05:01:34  18   motions.  It looks like the plaintiffs will be resting early

05:01:37  19   next week.  I assume all defendants will want to file a Rule

05:01:41  20   50 motion.  What we would like to do, if it's okay with the

05:01:44  21   Court, is just move orally, you know, in court at the end of

05:01:47  22   the plaintiffs' case and then submit papers, say the

05:01:49  23   following day or whatever the Court's preference is.  And if

05:01:53  24   we could also have some flexibility to allocate our pages so

05:01:56  25   that common issues could be handled together in a single

05:01:59    1    paper rather than repeating them on a defendant-by-defendant

05:02:02    2    basis.  But we just want to make sure that proposal's

05:02:05    3    acceptable to the Court.

05:02:08    4            THE COURT:  Yeah, I mean, it's much better to

05:02:10    5    have one.  I mean, for a whole lot of reasons.  But it's

05:02:16    6    my intention to keep going.  I'll read it, I'll get a

05:02:19    7    defendants'/plaintiffs' response, but I'm not going to

05:02:23    8    interrupt the trial.

05:02:23    9            MR. STOFFELMAYR:  Well, understood.  We're not

05:02:24   10    proposing -- not suggesting that at all, it's just that it

05:02:27   11    would be an oral motion to be filed by papers.

05:02:29   12            THE COURT:  I think that's fine.  I'd like you

05:02:32   13    to work together.  It seems to me you could have one motion.

05:02:34   14    Obviously, there may be certain arguments that one defendant

05:02:37   15    makes and you highlight that.

05:02:37   16            MR. STOFFELMAYR:  We're hashing that out.

05:02:40   17            THE COURT:  There have to be some that you're

05:02:41   18    going to make together, and then it's easier for me to read

05:02:44   19    and the plaintiffs to respond.  That's fine.

05:02:45   20            MR. STOFFELMAYR:  Absolutely.  Thank you,

05:02:46   21    Judge.

05:02:46   22            THE COURT:  I'm not going to put a page limit

05:02:48   23    on it.  You know that the longer it is --

05:02:52   24            MR. STOFFELMAYR:  The less likely you'll read

05:02:53   25    it?

05:02:53    1              THE COURT:  No, it will all be read, but

05:02:56    2    you -- the longer it is, the more likely it is that your

05:03:00    3    good arguments may be submerged.  I'll leave it at that.

05:03:04    4              MR. STOFFELMAYR:  Understood completely.

05:03:05    5              MR. MAJORAS:  Your Honor, John Majoras.

05:03:07    6         Different issue.  On the experts, not surprisingly in

05:03:13    7    a lot of defense cases, many of our experts are responding

05:03:15    8    directly to experts that are being offered by the plaintiffs

05:03:19    9    and their testimony that would come in, which sometimes is

05:03:22   10    truncated for good reason from what's in the report,

05:03:24   11    sometimes it's different than what's in their report.

05:03:26   12    Certainly my -- what I've seen in courts is that our experts

05:03:30   13    are allowed to review their testimony so they can respond

05:03:33   14    efficiently and appropriately.  And I just want to make -- I

05:03:35   15    want to raise that with you to make sure you don't find that

05:03:38   16    as an issue with the sequestration order.

05:03:46   17              MR. WEINBERGER:  We have maintained a

05:03:50   18    separation of witnesses among our experts.  I don't know why

05:03:54   19    that should suddenly change.  And that was discussed at the

05:03:59   20    beginning of the case, and I don't think we should change

05:04:02   21    it.

05:04:03   22              THE COURT:  Well, this is a little different.

05:04:04   23    This is that -- well, this is new because -- let me ask you

05:04:25   24    this:  I am sure that the experts on both sides reviewed the

05:04:29   25    other side's expert reports.

05:04:32  1    MR. MAJORAS:  Yes, sir.

05:04:33  2    THE COURT:  And were often testified about

05:04:36  3  them or they agreed, they disagreed and you were examined on

05:04:39  4  it.

05:04:40  5    MR. LANIER:  True.

05:04:41  6    MR. WEINBERGER:  And, Your Honor, with respect

05:04:43  7  to our experts that they say they want to have their

05:04:48  8  witnesses review, if anything, our experts limited their

05:04:54  9  opinions.  They certainly didn't add additional opinions

05:05:01  10  that were not already disclosed either by way of --

05:05:04  11    THE COURT:  That was -- I was -- when an

05:05:06  12  objection was interposed that this wasn't in so and so's

05:05:09  13  report, I usually sustained the objection.

05:05:12  14    MR. MAJORAS:  But there are two issues, I

05:05:13  15  think, Your Honor.  One is from an efficiency standpoint, if

05:05:17  16  they haven't, I agree, they have truncated the testimony of

05:05:20  17  what they had.  I mean, these reports are massive.  Experts

05:05:24  18  haven't testified about it.  If I have an expert on a stand,

05:05:26  19  I don't want to be interrupted, say, oh, no, don't worry

05:05:28  20  about that, they withdrew that, otherwise they'd be talking

05:05:32  21  about something, making a criticism of the plaintiffs'

05:05:34  22  expert that was an opinion never even offered at trial.

05:05:36  23    And then the second thing --

05:05:42  24    THE COURT:  Mr. Majoras, I don't think it

05:05:43  25  makes sense for you to be using your time having your

05:05:47  1    witness respond or rebut to something that wasn't said by

05:05:51  2    the other side.  If they've got something affirmative, you

05:05:54  3    know, fine, but there's no point -- they may have been

05:05:58  4    prepared to respond to a whole lot of things, but if the

05:06:01  5    plaintiffs didn't choose to have their experts say it, you

05:06:05  6    don't need to respond to it.

05:06:06  7              MR. MAJORAS:  That's why I'm asking that they

05:06:07  8    be able to see the testimony of the opposing expert, that

05:06:10  9    way they know what the person has said.

05:06:12  10        And I'll point out, specifically with Mr. McCann, his

05:06:16  11   testimony, the funnel of that was put in, the numbers that

05:06:19  12   he used, we had that big dispute, it was never in his

05:06:22  13   report.  I don't know how I can make that -- I should be

05:06:25  14   able to make that available to my experts.

05:06:27  15             THE COURT:  Well, I'll say this.  If there was

05:06:29  16   something -- if there was something that one of the

05:06:33  17   plaintiffs' experts said that wasn't in his or her report

05:06:38  18   and you want your expert to respond to it, I think it's fair

05:06:40  19   to show that to your expert.

05:06:44  20        Do you disagree, Mr. Weinberger?

05:06:45  21             MR. WEINBERGER:  No, Your Honor.

05:06:46  22             THE COURT:  I mean, otherwise there's no way

05:06:48  23   to do it.

05:06:48  24        So there is an example that Mr. McCann hadn't actually

05:06:54  25   prepared that before, but he said it was derived from his

05:06:57  1    backup, et cetera.  You can show your expert that, and if he

05:07:01  2    wants to say, well, guess what, I do the math, whenever I

05:07:06  3    get something different or whatever.

05:07:08  4              MR. MAJORAS:  And I appreciate that.  But

05:07:09  5    there is a whole series, there are lengthy discussion by

05:07:13  6    Mr. McCann about those numbers, about the funnel, everything

05:07:16  7    that came in.  Without that background, it's going to be

05:07:20  8    extremely difficult for the expert to deal with that other

05:07:22  9    than if I start talking -- if the expert -- I don't want to

05:07:25  10   have to stand up in court and say if Mr. McCann said the

05:07:30  11   following, what do you think.  I should do it efficiently.

05:07:34  12             MR. LANIER:  Judge, the kind of questions he

05:07:35  13   should be asking are, you know, do you have an opinion on

05:07:39  14   how many numbers were this.  Yes.  What is your opinion.  I

05:07:43  15   mean, those are -- those questions get directed by a lawyer.

05:07:48  16   You don't just say to the witness, hey, how do you respond

05:07:51  17   to their expert.  I mean, that's not correct examination.

05:07:56  18        The examination needs to be you've got your report,

05:07:59  19   you've got your testimony, let me ask you this question, let

05:08:02  20   me ask you this question.

05:08:04  21             MR. MAJORAS:  I'm quite able to ask questions

05:08:06  22   appropriately, Your Honor.  But certainly being able to ask

05:08:09  23   a question, what is your response to the numbers that

05:08:13  24   Mr. McCann put up or the funnel that he used I think is

05:08:16  25   appropriate.

05:08:16  1          THE COURT:  As I said, Mr. Majoras, if you

05:08:20  2    believe that one of their experts gave testimony that was --

05:08:27  3    that wasn't in the report and you want to ask your witness

05:08:31  4    about it, you can show him that portion of the expert's

05:08:34  5    testimony, and so you can say, you know, here's what the

05:08:41  6    experts -- plaintiffs' experts said, you know, what's your

05:08:44  7    opinion, do you agree, do you disagree, where is he or she

05:08:47  8    wrong.  That's fair.

05:08:52  9       I don't know where that is, and I think you can -- you

05:08:55  10   know, you'll have to be accurate with that.  But most of

05:09:00  11   what the plaintiffs' experts said was right out of their

05:09:04  12   report because if you thought it was different, you

05:09:09  13   objected.  And so -- and I generally sustained those

05:09:12  14   objections.  So I think that's the way to do it.

05:09:16  15          MR. MAJORAS:  Thank you, Your Honor.

05:09:22  16          THE COURT:  Anything else?

05:09:24  17          MR. WEINBERGER:  Not for the plaintiffs.

05:09:29  18          THE COURT:  Have good evening.

05:09:31  19       I have 3 1/2 for the plaintiffs and 2 1/2 for the

05:09:35  20   defendants today.

05:09:36  21          MR. LANIER:  Your Honor, I just got a text

05:09:38  22   from Dr. Keyes that she's nervous about going tomorrow

05:09:41  23   because she's got to get done tomorrow, and she said when

05:09:45  24   she testified in West Virginia they crossed her for two days

05:09:49  25   and she's a little nervous about that.

| | | |
|---|---|---|
| 05:09:51 | 1 | THE COURT:  Well, I'd be nervous too. |
| 05:09:53 | 2 | MS. SWIFT:  It wasn't us. |
| 05:09:55 | 3 | MR. STOFFELMAYR:  Your Honor, I will commit to |
| 05:09:56 | 4 | the Court it will not be a two-day cross-examination. |
| 05:09:59 | 5 | THE COURT:  Well, no, I mean -- the sooner she |
| 05:10:02 | 6 | testifies, the sooner she'll get off.  So delaying it isn't |
| 05:10:06 | 7 | going to help. |
| 05:10:06 | 8 | Mr. Lanier, about how long do you expect direct to be? |
| 05:10:12 | 9 | MR. LANIER:  I would expect direct to be about |
| 05:10:14 | 10 | two hours, Your Honor. |
| 05:10:17 | 11 | THE COURT:  All right.  Well, I hope the cross |
| 05:10:19 | 12 | won't be more than two hours, but -- |
| 05:10:21 | 13 | MR. STOFFELMAYR:  I don't think so. |
| 05:10:22 | 14 | THE COURT:  Okay.  So we -- it will not be two |
| 05:10:25 | 15 | days. |
| 05:10:25 | 16 | MR. LANIER:  Thank you, Judge. |
| 05:10:26 | 17 | THE COURT:  I would have problem.  Normally I |
| 05:10:28 | 18 | don't, you know, get involved, but we shouldn't have a |
| 05:10:31 | 19 | two-hour cross of a two-hour direct. |
| 05:10:34 | 20 | MR. STOFFELMAYR:  Agreed. |
| 05:10:35 | 21 | THE COURT:  By either side. |
| 05:10:36 | 22 | MR. LANIER:  Thank you, Your Honor. |
| 05:10:37 | 23 | THE COURT:  Okay.  So tell Dr. Keyes that I |
| 05:10:39 | 24 | can't control it, but everyone's going to do our best to |
| 05:10:42 | 25 | have her on and off by the end of the day tomorrow. |

05:10:44  1              MR. LANIER:  We'll tell her you have it all

05:10:47  2    under control.

05:10:47  3              THE COURT:  Don't say that because then she'll

05:10:49  4    blame me.  I said we'll do our best.

05:10:49  5              MR. LANIER:  Thank you, Judge.  Understood.

05:10:52  6              THE COURT:  Have a good evening.

05:10:53  7              (Proceedings adjourned at 5:10 p.m.)

        8                        *  *  *  *  *

        9                   **C E R T I F I C A T E**

       10

       11        I certify that the foregoing is a correct transcript

       12    of the record of proceedings in the above-entitled matter

       13    prepared from my stenotype notes.

       14

       15             */s/ Lance A. Boardman*_____  *10-21-2021*
                     Lance A. Boardman, RDR, CRR                 DATE
       16

       17

       18

       19

       20

       21

       22

       23

       24

       25