<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION AT CLEVELAND

 3    ------------------------------X
      IN RE:                        :   Case No. 1:17-md-2804
 4                                  :
      NATIONAL PRESCRIPTION         :
 5    OPIATE LITIGATION             :
                                    :   VOLUME 14
 6    CASE TRACK THREE              :   JURY TRIAL
                                    :   (Pages 3596 - 3780)
 7                                  :
                                    :
 8                                  :
                                    :   October 22, 2021
 9    ------------------------------X

10

11

12             TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13

14        HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16            SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20    Official Court Reporter:        Lance A. Boardman, RDR, CRR
                                      United States District Court
21                                    801 West Superior Avenue
                                      Court Reporters 7-189
22                                    Cleveland, Ohio 44113
                                      216.357.7019
23

24
      Proceedings recorded by mechanical stenography; transcript
25    produced by computer-aided transcription.
</pre>

3597

```
 1    APPEARANCES:

 2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                   SPANGENBERG, SHIBLEY & LIBER
 3                                 1001 Lakeside Avenue, Ste. 1700
                                   1900 East Ninth Street
 4                                 Cleveland, Ohio 44114
                                   216-696-3232
 5
                                   W. Mark Lanier, Esq.
 6                                 Rachel Lanier, Esq.
                                   THE LANIER LAW FIRM
 7                                 6810 FM 1960 West
                                   Houston, Texas 77069
 8                                 813-659-5200

 9                                 Frank L. Gallucci, III, Esq.
                                   PLEVIN & GALLUCCI COMPANY, LPA
10                                 The Illuminating Building
                                   Suite 2222
11                                 55 Public Square
                                   Cleveland, Ohio 44113
12                                 216-861-0804

13                                 Salvatore C. Badala, Esq.
                                   Maria Fleming, Esq.
14                                 NAPOLI SHKOLNIK
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York 10017
                                   212-397-1000
16

17
      For Walgreen Defendants:    Kaspar J. Stoffelmayr, Esq.
18                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
19                                 BARTLIT BECK LLP
                                   54 West Hubbard Street, Ste.300
20                                 Chicago, Illinois 60654
                                   312-494-4400
21

22

23

24

25
```

3598

```
1    APPEARANCES (Cont'd):

2    For CVS Defendants:          Graeme W. Bush, Esq.
                                  Eric R. Delinsky, Esq.
3                                 Alexandra W. Miller, Esq.
                                  ZUCKERMAN SPAEDER - WASHINGTON
4                                 Suite 1000
                                  1800 M Street, NW
5                                 Washington, DC 20036
                                  202-778-1831
6
     For HBC/Giant Eagle          Diane P. Sullivan, Esq.
7    Defendants:                  Chantale Fiebig, Esq.
                                  WEIL GOTSHAL & MANGES
8                                 Suite 600
                                  2001 M Street NW
9                                 Washington, DC 20036
                                  202-682-7200
10
     For Walmart Defendants:      John M. Majoras, Esq.
11                                JONES DAY - COLUMBUS
                                  Suite 600
12                                325 John H. McConnell Blvd.
                                  Columbus, Ohio 43215
13                                614-281-3835

14                                Tara A. Fumerton, Esq.
                                  Tina M. Tabacchi, Esq.
15                                JONES DAY - CHICAGO
                                  Suite 3500
16                                77 West Wacker
                                  Chicago, Illinois 60601
17                                312-782-3939

18
     ALSO PRESENT:                David Cohen, Special Master
19

20                                    - - - - -

21

22

23

24

25
```

3599

1                              Table of Contents

2

3    Witnesses/Events                                        Page

4    KATHERINE M. KEYES, PhD                                 3612

5         Mr. Lanier - Direct                               3613
          Mr. Stoffelmayr - Cross                           3682
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08:40:27 1      (On the record at 8:46 a.m.)

08:47:49 2     THE COURT: Good morning everyone. I thought

08:47:54 3 unless there was anything else pressing, if you had a chance

08:47:57 4 to look -- to discuss the exhibits with the last two

08:48:01 5 witnesses, we could go through at least some of them.

08:48:10 6   If we're not ready for that, then we'll do it another

08:48:13 7 time.

08:48:15 8     MR. WEINBERGER: Your Honor, we -- as to

08:48:19 9 Ms. Polster, we have provided the defendants with the

08:48:23 10 exhibits that we seek admission.

08:48:30 11     MS. SWIFT: There are some that we don't

08:48:31 12 actually have that I was going to ask you about.

08:48:33 13     THE COURT: Well, we can put those aside.

08:48:35 14 It's a pretty long list. If you want a little more time to

08:48:40 15 look at them, that's fine.

08:48:41 16     MS. SWIFT: That would be great.

08:48:42 17     THE COURT: So this is a pretty long list. So

08:48:46 18 Ms. Swift, if you and your colleagues would look at them

08:48:48 19 and -- I mean, my general practice is we're going to admit

08:48:52 20 an exhibit about which there was any significant testimony,

08:48:57 21 but I'm generally going to limit it to the pages that were

08:49:01 22 used rather than if it's a hundred pages, I don't think it's

08:49:04 23 a good idea to just put 95 pages that no one ever talked

08:49:10 24 about.

08:49:10 25   If there's a strong objection or there's a strong

08:49:13  1    reason that it was really referred to, then we can talk

08:49:16  2    about that.

08:49:16  3                MS. SWIFT:  There are just a couple that were

08:49:18  4    handed out that I don't think I have I just wanted to talk

08:49:23  5    through.

08:49:23  6                MR. WEINBERGER:  So to address your last

08:49:25  7    comments, Your Honor, if I might.

08:49:30  8                THE COURT:  All right.

08:49:31  9                MR. WEINBERGER:  On the defendants' list of

08:49:33  10   exhibits that they intend to offer with Ms. Polster's

08:49:38  11   testimony, there is what is entitled GFD and TD GFD

08:49:47  12   policies, which obviously you and the jury heard about.

08:49:51  13               THE COURT:  Right.

08:49:52  14               MR. WEINBERGER:  There are 70 different

08:49:55  15   documents that they list, which I'm presuming are the

08:50:01  16   various versions of the policies in some chronological

08:50:10  17   fashion.

08:50:12  18       And I would note that unless my memory is failing me,

08:50:17  19   which it might be, there was no testimony about 70 different

08:50:23  20   documents of policies.  She was not shown these.  She did

08:50:28  21   not testify about them.  She testified generally that it was

08:50:35  22   a process that continually got modified, but those -- wait a

08:50:43  23   minute, let me just finish.

08:50:44  24       Those documents were not actually identified by her.

08:50:49  25   And except for a couple of them, there was no discussion by

08:50:52  1    her about how they changed from one to another.

08:50:58  2        Now, having said that, I think it would have been a

08:51:05  3    waste of time for us to require the witness to go through

08:51:10  4    each and every one of those.  They're from the defendants'

08:51:13  5    files.  I'm presuming that we got them in productions.  And

08:51:23  6    I don't think we should waste the Court's time or the jury's

08:51:25  7    time going through them with the witness.

08:51:29  8        Now, they presumably on final argument or with another

08:51:32  9    witness they might want to discuss one of these 70 documents

08:51:37  10   that have not been testified to by Ms. Polster, and frankly,

08:51:40  11   we wouldn't have a problem with that either.

08:51:44  12       But, on the other hand, two weeks ago I submitted to

08:51:50  13   Walgreens and the other defendants exhibits that we wanted

08:51:55  14   to have them stipulate to involving the contracts with IMS

08:52:06  15   where Walgreens and CVS and Walmart entered into contracts

08:52:10  16   through their corporate officers to sell the data.

08:52:14  17       These not only come from the defendants' files, but we

08:52:18  18   have a declaration from IMS IQVIA's counsel that these are

08:52:28  19   authentic documents from their perspective also.

08:52:30  20       Now, these documents, you know, a number of pages

08:52:37  21   long.  They contain terms.  They talk about what the data is

08:52:41  22   that's being sold and how much is being paid for it.

08:52:47  23       And when we had this colloquy about these documents a

08:52:50  24   couple weeks ago, what it came down to is, you know, you

08:52:54  25   need to have a corporate officer or somebody who was

08:52:59    1    involved in signing this document from -- let's just talk

08:53:03    2    about Walgreens, from Walgreens' perspective in order to get

08:53:07    3    the document into evidence.

08:53:08    4         So, you know, we can subpoena somebody and have a

08:53:19    5    videoconference set up and get somebody from corporate

08:53:22    6    office to identify this contract.  In Walgreens' case the

08:53:26    7    first then you I think was in 2010.

08:53:29    8              THE COURT:  All right.  Well, look, let's do

08:53:31    9    one thing at a time.

08:53:33    10             MR. WEINBERGER:  Okay.

08:53:38    11             THE COURT:  I mean, Ms. Polster testified to

08:53:40    12   some -- you know, that this was an evolving policy.  I

08:53:44    13   believe she was examined on maybe the latest one, 2020, and

08:53:48    14   she said that --

08:53:50    15             MS. SWIFT:  I asked her about a half a dozen

08:53:52    16   or so of them.

08:53:54    17             THE COURT:  All right.  There were some okay.

08:53:56    18             MS. SWIFT:  But I also asked her about the

08:53:58    19   other -- there was a Redweld with the rest of them with her,

08:54:01    20   and I asked her to look at them and tell me whether those

08:54:03    21   were all of the other versions of the policy.

08:54:07    22             THE COURT:  All right.  On that -- if she

08:54:09    23   identify them all, then I -- you know, they're authentic.

08:54:15    24   She said she got the ones at the beginning.  She talked

08:54:17    25   about the ones at the end.  I think she said they'd been

08:54:20  1    changing them.  I don't see a problem with that.

08:54:23  2        Now, on the other -- on the IQVIA IMS, whatever, if

08:54:36  3    the defendants insist that the plaintiffs, you know, bring

08:54:39  4    someone in either from their office or from IQVIA or IMS,

08:54:47  5    fine, they'll bring them in.  They shouldn't -- I mean, if

08:54:51  6    there's no doubt that they're authentic, I don't see why

08:54:54  7    we're wasting time on it and it can be played both ways.

08:54:57  8              MS. SWIFT:  I'm happy to talk to the

08:54:58  9    plaintiffs about it, Your Honor.  Candidly, it wasn't at the

08:55:01  10   top of my mind.  I didn't know they were going to raise that

08:55:05  11   today and didn't realize they wanted a stipulation on it.

08:55:08  12             THE COURT:  Again, if there's no question

08:55:09  13   about the authenticity, it seems a waste of everyone's time

08:55:12  14   just to have someone to come in and say yes, this is what it

08:55:15  15   is.  If there's really a question about authenticity, then,

08:55:18  16   yeah, sure, that's what we've got to do.

08:55:21  17             MR. WEINBERGER:  I mean, I understand, and I'm

08:55:23  18   mean looking at my colleague, Mr. Delinsky, I can sort of

08:55:25  19   read his mind through the mask.  I mean, he argued a couple

08:55:28  20   weeks ago that -- --

08:55:29  21             MR. DELINSKY:  I'll take it off.

08:55:31  22             MR. WEINBERGER:  -- there's an issue about

08:55:33  23   relevancy, and we can argue about that but --

08:55:37  24             THE COURT:  Well, I think there's been

08:55:39  25   testimony.  I think those documents are relevant, okay?

08:55:44   1   Both sides can argue how relevant they are and what they

08:55:47   2   show, but that's not a question of law.

08:55:52   3               MR. DELINSKY:  Your Honor, could we just have

08:55:53   4   the weekend to put something in on the relevance question?

08:55:56   5   It is significant, and I think in candor most of the

08:56:00   6   testimony, and I don't mean this in a pejorative way at all,

08:56:03   7   was from Mr. Lanier in opening rather than from any

08:56:05   8   witnesses.

08:56:07   9       And I think it's important to segregate where

08:56:09  10   information in the case has come from.  And I understand

08:56:14  11   where Your Honor is leaning on that question, but we haven't

08:56:16  12   put anything into paper yet.  We can get it in fast.

08:56:20  13               THE COURT:  I believe it is relevant if, in

08:56:23  14   fact, you know, defendants sold this information, you know?

08:56:30  15               MR. DELINSKY:  But, Your Honor, we would

08:56:31  16   like -- that's the issue.  That's an important issue.  We

08:56:34  17   think it's a big issue, and we think it deserves --

08:56:37  18               THE COURT:  There's been testimony on it.  Not

08:56:39  19   just -- Mr. Lanier isn't testimony.  There were questions

08:56:43  20   and --

08:56:43  21               MR. DELINSKY:  But there was no answers that

08:56:45  22   rendered it relevant.  And there was no answers that

08:56:53  23   established a link between whether those contracts show that

08:56:59  24   illegitimate prescriptions were filled.

08:57:02  25               MR. WEINBERGER:  No, that's not the purpose.

08:57:03  1            THE COURT:  No, they're not -- Mr. Delinsky,

08:57:05  2   they're not saying that you only sold legitimate

08:57:10  3   prescriptions or you only sold illegitimate prescriptions or

08:57:13  4   anything about them other than they are -- they were

08:57:16  5   deidentified prescription data from the defendants.

08:57:20  6            MR. DELINSKY:  But, Your Honor, that's why I

08:57:22  7   want the opportunity to reduce this to writing.  We are

08:57:31  8   bound in this case by two liability issues.  Number one is

08:57:33  9   did the defendants act intentionally to create a public

08:57:37  10  nuisance.  And I know I'm oversimplifying.

08:57:40  11       And number two is did they fill illegitimate

08:57:43  12  prescriptions in violation of either the Federal or Ohio

08:57:46  13  CSA.  Those are the two issues.

08:57:48  14       Selling of data doesn't bear on those issues, and

08:57:55  15  that's what we'd like to just have the opportunity to put

08:57:56  16  in --

08:57:56  17            THE COURT:  But that's on motive.  It

08:57:59  18  doesn't --

08:58:00  19            MR. WEINBERGER:  Well, actually it bears on

08:58:01  20  other issues.

08:58:02  21            THE COURT:  If you want to brief it, fine,

08:58:03  22  I'll get to it.

08:58:04  23            MR. WEINBERGER:  The issue is is they

08:58:07  24  accumulated data for 20 years, the very dispensing data that

08:58:15  25  they should have been analyzing for purposes of determining

08:58:19    1    whether there are red flags.  And they sold the data to a

08:58:23    2    company that they knew was selling the data to the

08:58:27    3    manufacturers.  And they knew that the manufacturers were

08:58:31    4    using the data to target marketing.

08:58:35    5            THE COURT:  Well, as I said, you know, if the

08:58:38    6    plaintiffs can tie that up, I'm letting it in, okay?

08:58:41    7        I'll read your brief, but that makes it relevant.

08:58:44    8    Now, they've got to have witnesses who are going to say all

08:58:47    9    that, but if they do, I am going to let it in.  If they

08:58:51    10   don't, it's not going to come in.

08:58:57    11           MS. FUMERTON:  Your Honor, just to make sure

08:58:59    12   that -- Your Honor, this is Tara Fumerton -- that the record

08:59:02    13   is clear, and I'm sure Pete didn't mean to misspeak, but

08:59:05    14   Walmart didn't sell its data.  There were other contracts

08:59:07    15   that were in place, but as Mr. Lanier even remarked in his

08:59:09    16   opening, Walmart was differently situated in the --

08:59:14    17           MR. WEINBERGER:  Yes, they exchanged their

08:59:16    18   data for data coming back to them, so they got consideration

08:59:19    19   for selling their data.

08:59:21    20       But in any event, one other issue, Your Honor.

08:59:27    21           MR. STOFFELMAYR:  Look, before we leave that

08:59:29    22   issue I just want, at least from our perspective, be as

08:59:31    23   clear as possible.  The entirety of the evidence on this has

08:59:33    24   been attorney argument.  There's zero, zip, not a word --

08:59:36    25           THE COURT:  I understand that.  So I think,

08:59:39  1    Mr. Weinberger, you're going to have to bring in witnesses

08:59:44  2    who are going to testify to all that.

08:59:45  3                    MR. WEINBERGER:  Understood.

08:59:46  4                    THE COURT:  Okay.  So if you are, then they're

08:59:48  5    going to be able to identify the documents.

08:59:50  6                    MR. WEINBERGER:  Understood.

08:59:51  7                    THE COURT:  So it may be a moot point as to

08:59:53  8    whether they stipulate as to authenticity because you can't

08:59:56  9    just have Mr. Lanier stand up and argue all that at the end.

09:00:00  10   You're going to have to have witnesses who discuss that,

09:00:04  11   either from the defendants' standpoint or from IMS, IQVIA,

09:00:13  12   whatever, who bought it, and then they can say what they did

09:00:17  13   with it and how it circled around.

09:00:19  14                   MR. WEINBERGER:  There's one other issue, Your

09:00:21  15   Honor.  Sorry to belabor.

09:00:22  16                   THE COURT:  All right.  So continue to work on

09:00:23  17   these exhibits with Ms. Polster.

09:00:24  18                   MR. WEINBERGER:  We will.

09:00:25  19                   THE COURT:  And then Dr. Alexander, okay?

09:00:33  20                   MR. WEINBERGER:  One other issue, separate

09:00:34  21   issue, Your Honor.  And I informed the defendants of this

09:00:37  22   last night.

09:00:38  23       With respect to the ARCOS data that was -- served the

09:00:47  24   basis for Dr. McCann's analysis, so that the record is

09:00:56  25   complete, we're moving to admit basically it's the thumb

09:00:59  1    drives of the underlying data, which is P-23212 --

09:01:05  2              THE COURT:  Are you admitting this through

09:01:06  3    Dr. Alexander?

09:01:07  4              MR. WEINBERGER:  No, through Dr. McCann.

09:01:09  5              THE COURT:  McCann.

09:01:12  6              MR. WEINBERGER:  In your *Daubert* ruling -- I'm

09:01:15  7    sorry, in your motion *in limine* ruling number 45, you ruled

09:01:21  8    that the underlying data, being McCann's processed ARCOS

09:01:25  9    data, defendants distributing and dispensing data and the

09:01:30  10   associated governmental data are admissible.  So I'm simply

09:01:34  11   for the record reflecting the exhibits that reflect those --

09:01:38  12             THE COURT:  What are those?

09:01:41  13             MS. SWIFT:  I object to this.

09:01:42  14             MS. FUMERTON:  We join in that objection.

09:01:45  15             THE COURT:  Overruled.  It's coming in.

09:01:46  16             MS. SWIFT:  Your Honor, the purpose of the

09:01:49  17   *in limine* ruling as we understood it was to get the 1006

09:01:51  18   summaries in.  They offered certain 1006 summaries with

09:01:55  19   Dr. McCann.  I don't even know what it means to admit the

09:01:58  20   thumb drive of the data.  I don't even know what that would

09:02:00  21   do for the jury to have that.

09:02:02  22             MR. WEINBERGER:  It doesn't do anything for

09:02:03  23   the jury.  It just -- it lays the foundation for the 1006s,

09:02:07  24   which they're --

09:02:08  25             THE COURT:  There are not objecting to the

09:02:09    1    1006.

09:02:10    2                   MS. SWIFT:  They've got the 1006.  We object

09:02:13    3    to the thumb drive coming in.

09:02:14    4                   MR. DELINSKY:  And, Your Honor, I believe the

09:02:16    5    1006s, and Pete will correct me if I'm wrong about this, I

09:02:19    6    think they were based on each defendant's dispensing data.

09:02:22    7    I do not believe they were based on the ARCOS data.

09:02:24    8                   THE COURT:  Look, I don't have time for this

09:02:25    9    now.  I mean, the summaries are in.

09:02:28   10                   MR. WEINBERGER:  I'm sorry, Your Honor, I

09:02:31   11    don't understand when you make a ruling that they're

09:02:32   12    admissible, okay, and we -- and we have e-mails going back

09:02:37   13    and forth with Ms. Swift that reflects the stipulation, and

09:02:41   14    we're talking about --

09:02:42   15                   THE COURT:  Well, if it's stipulated, then

09:02:45   16    it's in.

09:02:46   17                   MR. WEINBERGER:  We're talking about a just --

09:02:48   18    a couple of thumb drives just to make sure that the record

09:02:51   19    is complete for purposes of this trial.  I just don't

09:02:56   20    understand it.

09:02:59   21                   THE COURT:  I don't have time for this now.

09:03:01   22    Figure it out, or brief it, or do whatever you want.  I'm

09:03:04   23    moving on.

09:03:04   24        The summaries are in.  If I've already made a ruling

09:03:08   25    that the underlying documents are in, they're in.  If I

09:03:11  1  haven't, brief it, whatever.  I'm moving on.  All right?  I

09:03:14  2  mean, this is something candidly you all should have -- this

09:03:18  3  all should have been worked out.  If not --

09:03:20  4            MR. WEINBERGER:  Your Honor, we've been -- I'm

09:03:21  5  sorry, we've been trying.  We have been trying --

09:03:24  6            THE COURT:  I'll have Special Master Cohen

09:03:26  7  work on it.

09:03:26  8            MR. WEINBERGER:  -- to get agreements, but

09:03:28  9  they just aren't forthcoming.

09:03:31  10            THE COURT:  All right.  Well, get me the

09:03:32  11  documents or the agreements.  If it's already been ruled on,

09:03:34  12  I'll just rubber stamp what I've done before.  If not,

09:03:38  13  I'll -- if I need more briefing on it, you know, whatever.

09:03:41  14  But obviously the summaries are in.  McCann's testified.

09:03:45  15  His summaries have been admitted.  I don't know -- I'm not

09:03:50  16  sure why the -- but if it's important to have the underlying

09:03:54  17  data and it's ARCOS, it's authentic, all right?  There's no

09:03:58  18  question it's authentic.  So I'm not sure what the

09:04:00  19  defendants' objection --

09:04:01  20            MS. SWIFT:  Your Honor, Mr. Delinsky pointed

09:04:03  21  out what the objection is.

09:04:03  22            THE COURT:  What?

09:04:06  23            MS. SWIFT:  Dr. McCann laid a foundation for

09:04:08  24  certain summaries relating to dispensing data.  That was not

09:04:10  25  ARCOS data.  They had their opportunity to do this with that

09:04:14  1    witness and they did not do it.

09:04:16  2                MR. WEINBERGER:  It's the defendants' own

09:04:18  3    dispensing data, number one.  And secondly, the ARCOS data

09:04:21  4    was part of the mix.

09:04:22  5                THE COURT:  Look, I want to get on with this

09:04:25  6    next witness.  So, you know, if you can't work it out, brief

09:04:27  7    it, tell me whatever it is, get me the stuff, I'll look at

09:04:30  8    it whenever I have a chance.

09:04:33  9          All right.  Let's have the next witness, please.

09:06:42  10                (Jury present in open court at 9:06 a.m.)

09:06:43  11                THE COURT:  Please be seated.

09:06:44  12          So, ladies and gentlemen, if you are superstitious,

09:06:49  13    don't wash the shirts or sweatshirts, whatever you wore

09:06:53  14    yesterday, and save them for the next game.  They worked

09:06:55  15    well.

09:06:57  16          All right.  I hope you had a good evening.

09:06:59  17          Mr. Lanier, you may call your next witness.

09:07:01  18                MR. LANIER:  Your Honor, thank you so much.

09:07:03  19          We have Dr. Katherine, she goes by Kerry, Keyes that

09:07:09  20    we'll call to the stand now.

09:07:14  21                (Witness sworn.)

09:07:19  22                THE COURT:  Thank you.  You may remove your

09:07:21  23    mask while testifying.

09:07:22  24                THE WITNESS:  Thank you.

09:07:29  25                    KATHERINE M. KEYES, PhD

**Keyes (Direct by Lanier)** 3613

| | | |
|---|---|---|
| 09:07:29 | 1 | - - - - - |
| 09:07:29 | 2 | DIRECT EXAMINATION |
| 09:07:29 | 3 | BY MR. LANIER: |
| 09:07:30 | 4 | **Q**   Good morning. |
| 09:07:30 | 5 | **A**   Good morning. |
| 09:07:31 | 6 | **Q**   Because of the formality of Court, I cannot call you |
| 09:07:35 | 7 | Kerry.  I need to call you Dr. Keyes. |
| 09:07:38 | 8 | Is that okay? |
| 09:07:39 | 9 | **A**   That's fine. |
| 09:07:39 | 10 | **Q**   Would you take a moment, please, Dr. Keyes, and |
| 09:07:44 | 11 | introduce yourself to the jury? |
| 09:07:46 | 12 | **A**   Sure.  I'm Kerry Keyes.  I'm here testifying today |
| 09:07:49 | 13 | with my son, Aidan, who is very excited to watch.  We're |
| 09:07:54 | 14 | here from New York. |
| 09:07:57 | 15 | **Q**   Aidan is how old? |
| 09:07:59 | 16 | **A**   He's 11. |
| 09:08:00 | 17 | **Q**   Okay.  He's seen you do this before? |
| 09:08:02 | 18 | **A**   Not live. |
| 09:08:03 | 19 | **Q**   Oh, really? |
| 09:08:07 | 20 | Is he supposed to be in school? |
| 09:08:08 | 21 | **A**   Yes, he is.  He's mostly excited to not be in school |
| 09:08:13 | 22 | for this. |
| 09:08:14 | 23 | THE COURT:  I can give him an excuse. |
| 09:08:16 | 24 | **Q**   You can get a judicial note for him, I expect. |
| 09:08:20 | 25 | Dr. Keyes, thank you for being here.  I want to get a |

**Keyes (Direct by Lanier)** 3614

09:08:25  1   road map out here just so everybody knows where we are and

09:08:29  2   where we're going and gets a feel for it.  My hope is to

09:08:32  3   finish your testimony by lunch today, myself.  I know there

09:08:36  4   will be cross-examination.

09:08:38  5        But we're going to start with your background.  We're

09:08:41  6   going to then look at the work that you've done in this case

09:08:44  7   and explain it to the jury.  And then we'll end by going

09:08:47  8   through your opinions and have you explain to the jury how

09:08:50  9   you arrived at your opinions.

09:08:51  10       Okay?

09:08:53  11  **A**   Sure.

09:08:53  12  **Q**   All right.  So we start with background.  And I tend

09:08:58  13  to do this the same with each witness.  So, sorry, you get

09:09:02  14  the same treatment.

09:09:03  15       I have your CV.  It's demonstrative 42.

09:09:09  16       Can you tell everybody why you keep a really cool

09:09:15  17  resume going?

09:09:16  18  **A**   Sure.  This is pretty standard for academics.  We keep

09:09:22  19  track -- it's like a resume, but we keep track mostly of our

09:09:26  20  publications and committee work that we do, the mentoring of

09:09:29  21  students that I do.  I'm primarily a professor, so I teach a

09:09:33  22  lot of students, and so we keep a record of all of that.

09:09:37  23  **Q**   Now, as we look at it, you are Katherine Keyes.

09:09:39  24       Have you always gone by Kerry?

09:09:42  25  **A**   Yes.

**Keyes (Direct by Lanier)** 3615

| | | |
|---|---|---|
| 09:09:42 | 1 | **Q**   How do you spell Kerry? |
| 09:09:43 | 2 | **A**   K-E-R-R-Y. |
| 09:09:51 | 3 | **Q**   Where did you grow up, Kerry -- I mean Dr. Keyes? |
| 09:09:54 | 4 | **A**   In Minnesota. |
| 09:09:55 | 5 | **Q**   What part? |
| 09:09:56 | 6 | **A**   Minneapolis. |
| 09:09:59 | 7 | **Q**   And you are in the Department of Epidemiology right |
| 09:10:03 | 8 | now in Columbia as a PhD doctor. |
| 09:10:07 | 9 | What does that mean? |
| 09:10:11 | 10 | **A**   I received a doctoral degree in epidemiology from |
| 09:10:14 | 11 | Columbia. |
| 09:10:15 | 12 | **Q**   And the jury heard from a pharmacoepidemiologist |
| 09:10:19 | 13 | yesterday, Caleb Alexander.  But you are a bit -- well, you |
| 09:10:25 | 14 | are an epidemiologist as well.  Explain epidemiology. |
| 09:10:31 | 15 | **A**   Sure.  So epidemiology really is the study of kind of |
| 09:10:36 | 16 | what makes the communities sick, whereas a doctor will |
| 09:10:39 | 17 | diagnose a patient, epidemiologists try to diagnose |
| 09:10:44 | 18 | communities.  So our role is to kind of figure out what the |
| 09:10:48 | 19 | prevalence and incidence of different health conditions in a |
| 09:10:51 | 20 | population and what caused the prevalence and incidence.  So |
| 09:10:55 | 21 | rather than looking at a particular person's disease, we |
| 09:10:58 | 22 | kind of look at the entire community. |
| 09:11:01 | 23 | **Q**   Comes from three Greek words, *epi*, which means, do you |
| 09:11:07 | 24 | know? |
| 09:11:07 | 25 | **A**   Yes. |

**Keyes (Direct by Lanier)**

| | | |
|---|---|---|
| 09:11:07 | 1 | **Q**   What does it mean? |
| 09:11:08 | 2 | **A**   *Epi* is *omna*. |
| 09:11:08 | 3 | **Q**   Yeah.  Or upon. |
| 09:11:13 | 4 | **A**   And *demos* is people. |
| 09:11:14 | 5 | **Q**   *Demos* is people? |
| 09:11:16 | 6 | **A**   Yes. |
| 09:11:17 | 7 | **Q**   You know, ology comes from *logos,* which is study of |
| 09:11:22 | 8 | word or thought. |
| 09:11:23 | 9 | So you study what happens upon the people in Greek. |
| 09:11:28 | 10 | **A**   That's right. |
| 09:11:34 | 11 | **Q**   Okay.  Why did you become an epidemiologist? |
| 09:11:37 | 12 | **A**   Why? |
| 09:11:37 | 13 | **Q**   Yeah. |
| 09:11:38 | 14 | **A**   That's a good question. |
| 09:11:41 | 15 | I was -- I've always been really focused on addiction |
| 09:11:46 | 16 | and trying to understand what drives addiction and how to |
| 09:11:49 | 17 | help people who have addiction.  And I spent a lot of time |
| 09:11:53 | 18 | working clinically in New York helping people who were |
| 09:11:57 | 19 | recovering from addiction and particularly people who are |
| 09:12:00 | 20 | going through withdrawal from opioids. |
| 09:12:02 | 21 | **Q**   Put this into a time frame for me. |
| 09:12:04 | 22 | **A**   Sure.  That was in the early 2000s.  And I did that |
| 09:12:08 | 23 | work for several years and realized that what I wanted to do |
| 09:12:13 | 24 | was really help a lot of people, you know.  In a clinic you |
| 09:12:19 | 25 | are helping each person, but I was more interested in trying |

**Keyes (Direct by Lanier)**                                    3617

09:12:21  1   to understand the bigger picture of opioid addiction in

09:12:25  2   particular and addictions more generally.  And so in talking

09:12:28  3   to the people at the clinic, they said public health might

09:12:32  4   be a really good field for you because of your interests.

09:12:36  5        And I knew that Columbia had a good public health

09:12:40  6   program, and so I started getting -- I got a master's degree

09:12:43  7   in public health in epidemiology.  I didn't really know what

09:12:48  8   epidemiology was when I heard about public health.  It's

09:12:50  9   really when I took my first epidemiology class that it

09:12:53  10  really clicked, okay, this is what I want to do, it's

09:12:56  11  numbers, it's math, it's understanding causation in entire

09:13:03  12  populations.

09:13:04  13       And so after I took *Epi* 1, I was hooked.

09:13:08  14  **Q**    So this was your master's in public health and

09:13:11  15  epidemiology you got from Columbia in May '06?

09:13:15  16  **A**    That's right.

09:13:15  17  **Q**    And that's after getting a bachelor of arts degree in

09:13:18  18  theater arts?

09:13:19  19  **A**    Yes.

09:13:19  20  **Q**    So you are an epidemiologist with a dramatic flare?

09:13:23  21  **A**    Well, one could say, yes.

09:13:25  22  **Q**    All right.  No acting today though.  We need just the

09:13:28  23  unvarnished epidemiologist, okay?

09:13:30  24  **A**    I promise.

09:13:31  25  **Q**    All right.  After you got your master's degree, you

**Keyes (Direct by Lanier)** 3618

09:13:36    1    went on to get the doctor of philosophy, the PhD.  And you

09:13:40    2    did a thesis and all.

09:13:44    3       Explain what the difference is between a master's of

09:13:46    4    public health and a PhD.

09:13:48    5    **A**    Sure.  In the master's of public health it's really

09:13:55    6    skills focused.  You know, it's a lot of quantitative

09:13:58    7    statistics classes and methods classes, how do you design a

09:14:02    8    study if you want to, you know, know, you know, what causes

09:14:06    9    opioid use disorder, opioid addiction, how would you design

09:14:09   10    a study do that that.

09:14:11   11       Whereas the PhD is really much more focused on

09:14:15   12    developing your own identity as a scientist and conducting

09:14:19   13    your own studies and how do you really move from being able

09:14:23   14    to do epidemiology to really teaching epidemiology and

09:14:28   15    conducting your own research.

09:14:29   16    **Q**    Okay.  And in that regard, once you became an

09:14:37   17    academic -- well, along the way you've won quite a number of

09:14:40   18    honors and awards.  Can I brag on you for a minute?

09:14:44   19    **A**    Sure.

09:14:44   20    **Q**    Having four daughters, I'm especially interested in

09:14:47   21    your Women and Gender Junior Investigator Award.

09:14:51   22       Can you tell us about that?

09:14:55   23    **A**    Sure.  That's an award from a professional society

09:14:57   24    called the College on Problems of Drug Dependence, and they

09:15:01   25    give awards to people doing research in particular areas.

**Keyes (Direct by Lanier)**

09:15:06  1   And I've always been really focused on addiction in women

09:15:10  2   and understanding kind of addiction as a women's health

09:15:13  3   issue.  And so I had done a number of studies on risk

09:15:19  4   factors for addiction among women and received that award

09:15:21  5   for that work.

09:15:22  6   **Q**   Dr. Keyes, you and I met the first time a couple of

09:15:25  7   years ago, and we visited for about an hour; is that right?

09:15:28  8   **A**   Yes.

09:15:28  9   **Q**   And then you and I met again last night, and we

09:15:32  10  visited for 45 minutes to an hour?

09:15:35  11  **A**   That's right.

09:15:35  12  **Q**   And that's when I got to meet Aidan?

09:15:38  13  **A**   Yes.

09:15:38  14  **Q**   Got to feed him some junk food?

09:15:44  15  **A**   Yes.  I quickly turned around and saw him eating a

09:15:48  16  cookie about the size of his head, so thank you for that.

09:15:51  17  **Q**   He liked it.

09:15:52  18      In the process of talking to you last night, is it

09:15:56  19  fair to say that I said I would probably go through your CV

09:16:00  20  with you and pick out some things I found interesting and

09:16:03  21  ask you about them?

09:16:04  22  **A**   Yes.

09:16:04  23  **Q**   Okay.  I just found something interesting that we did

09:16:08  24  not discuss last night, so I have no clue about what I'm

09:16:10  25  about to ask you.  Okay?

**Keyes (Direct by Lanier)**

09:16:12  1    Robert Wood Johnson Health and Society Scholars

09:16:24  2  Fellowship Award declined.  Why did you decline that award?

09:16:27  3  **A**    That would have required me to move to Michigan, and I

09:16:30  4  received a competing offer to stay at Columbia.  And so that

09:16:34  5  was a prestigious fellowship that I was offered, but

09:16:36  6  Columbia wanted me to stay at Columbia, and so they matched

09:16:39  7  the fellowship offer and said if you don't take it, we'll

09:16:42  8  match it and you can stay at Columbia.

09:16:43  9  **Q**    So no sort of details about what they wanted you to do

09:16:46  10  or anything like that, it's just a better job?

09:16:50  11  **A**    It was a better job.

09:16:51  12  **Q**    Got it.  Oh, well.

09:16:54  13    You have gotten awards from, like, some that just seem

09:17:02  14  pretty unusual.  The Michele Tansella Award From the World

09:17:08  15  Psychiatric Association, what is that?

09:17:14  16  **A**    Michele Tansella was a really exceptional psychiatric

09:17:18  17  epidemiologist in Italy and a really long standing member of

09:17:22  18  a section that I'm now on the executive board, the World

09:17:27  19  Psychiatric Association Epidemiology section.  And when

09:17:28  20  Dr. Tansella passed, his family created an award in his

09:17:31  21  name.  And it's given each year to a scholar early in their

09:17:37  22  career who is making an outstanding contribution to science.

09:17:39  23  **Q**    Okay.  One of the things that I'd like you to talk to

09:17:45  24  the jury about is you've written a bunch of stuff.  I mean,

09:17:47  25  you've got articles after articles after articles.  Fair?

09:17:51   1    **A**      Fair.

09:17:51   2    **Q**      And you've written some books, right?

09:17:53   3    **A**      Yes.

09:17:53   4    **Q**      Okay.  One of your books is truly like "the book" on

09:17:59   5    this, isn't it?

09:18:00   6    **A**      Yes.

09:18:00   7    **Q**      It's a textbook used in at least 20 schools?

09:18:04   8    **A**      That's right.

09:18:04   9    **Q**      Okay.  Tell us about it.

09:18:06   10   **A**      It's a textbook that provides an overview of how to do

09:18:14   11   epidemiological studies.  It's a textbook that reviews how

09:18:18   12   we come to causal conclusions as epidemiologists and how we

09:18:22   13   design studies and look at the literature in order to form

09:18:26   14   causal conclusions.

09:18:28   15   **Q**      I'm going to pause and interrupt for a moment.  When

09:18:32   16   you say "causal conclusions," you're using epidemiology buzz

09:18:35   17   words.

09:18:36   18   **A**      Sure, yes.

09:18:37   19   **Q**      But I want to make sure the record is real clear on

09:18:40   20   what those buzz words are to normal people.

09:18:43   21          Explain what you mean by causal conclusions?

09:18:46   22   **A**      That's where when we look at a study and we see

09:18:49   23   something is associated, you know, there's kind of that old

09:18:53   24   saying, correlation, not causation.  And so it's

09:18:58   25   epidemiologists who make decisions about whether a

**Keyes (Direct by Lanier)**                    3622

09:19:00   1   correlation is causation or whether two things are

09:19:05   2   associated just because they happen to be associated in a

09:19:08   3   study.

09:19:08   4   **Q**    In other words, are you able to assess or explain how

09:19:12   5   the proper procedure is to decide if one thing causes

09:19:17   6   another?

09:19:18   7   **A**    That's right.

09:19:18   8   **Q**    Can you give us an illustration of the difference

09:19:21   9   between something that causes something else and something

09:19:26  10   that's merely associated with something else?

09:19:28  11   **A**    Sure.  There are lots of examples of that in the

09:19:35  12   epidemiological literature.  So I'm trying to think of one

09:19:41  13   of the classic examples.

09:19:43  14        You know, so you might see in a study that, you know,

09:19:51  15   let's say -- I'm trying to think of something that would fit

09:19:55  16   the bill.

09:19:56  17        So you might see, for example, that people who have

09:20:00  18   less economic resources are more likely to have a certain

09:20:04  19   health condition.  So poverty is associated with a certain

09:20:08  20   health condition.

09:20:09  21        And so what an epidemiologist would do would see

09:20:12  22   whether poverty is a cause of that health condition or if

09:20:15  23   there are other kinds of that are associated with poverty

09:20:19  24   that are instead what's actually causing the health outcome,

09:20:23  25   that it's not that factor that's correlated with it, it's

**Keyes (Direct by Lanier)** 3623

09:20:26 1 something else that's causing the health outcome.

09:20:29 2 **Q** All right. So to put it into perhaps an opioid issue.

09:20:35 3 **A** Sure.

09:20:35 4 **Q** We've got increased deaths and suicides and overdoses

09:20:43 5 that the jury's already heard about from other witnesses.

09:20:46 6 Okay?

09:20:46 7 Are you able to decide whether or not opioid -- the

09:20:51 8 opioid epidemic caused that or whether that was just part of

09:20:57 9 something that happened from depression, from economic

09:21:01 10 turmoil, from the Cleveland Browns being terrible season

09:21:04 11 after season without a quarterback? I mean, can you draw

09:21:08 12 the difference between something that's associated and

09:21:12 13 something that's caused?

09:21:13 14 **A** Yes. That's what an -- that's what our discipline

09:21:17 15 is -- trains us to do, it's exactly that.

09:21:19 16 **Q** And that's what you wrote the book on; is that fair?

09:21:22 17 **A** Yes.

09:21:22 18 **Q** And is the book -- which one is it? Is it --

09:21:26 19 **A** Well, I wrote two books on that topic.

09:21:29 20 **Q** Okay. Which is the one that's getting used

09:21:35 21 everywhere?

09:21:36 22 **A** "Epidemiology Matters: A new introduction to

09:21:42 23 methodological foundations."

09:21:42 24 **Q** And there are -- that's used in graduate schools in at

09:21:47 25 least 22 universities worldwide; is that right?

**Keyes (Direct by Lanier)**                                    3624

09:21:49  1    **A**    Yes.

09:21:49  2    **Q**    "Highest-selling epidemiology title in 2014."

09:21:55  3          Now, in all candor, that could mean like 50 copies,

09:21:59  4    right?

09:21:59  5    **A**    Right.

09:22:00  6    **Q**    Okay.  That's assuming your mom bought half of them.

09:22:08  7          Okay.  These are going to be important matters as we

09:22:12  8    work through your opinions, and that's the reason I'm

09:22:15  9    illustrating them right now.

09:22:16  10          There was one other thing, though, that I saw in your

09:22:19  11    CV that I think the jury will find important and the judge

09:22:22  12    might as we work through this.  And that I've got a star on

09:22:25  13    right here.  It is in a section of your CV that's entitled

09:22:35  14    "Active Research Funding."

09:22:39  15          Do you see that section?

09:22:41  16    **A**    Yes.

09:22:41  17    **Q**    And before we get to that specific project, explain

09:22:43  18    what this is in an academic resume like yours.

09:22:47  19    **A**    Yes.  So I'm expected to get grant funding to fund new

09:22:55  20    studies to conduct research.  And so I apply for and compete

09:22:59  21    for grant funding through the National Institute of Health,

09:23:03  22    the Centers For Disease Control and Prevention, and that's

09:23:05  23    what funds the actual studies that I do.

09:23:09  24    **Q**    Is that easy to get?

09:23:11  25    **A**    No.

**Keyes (Direct by Lanier)**                                    3625

| | | |
|---|---|---|
| 09:23:11 | 1 | **Q**    Is it a competitive process? |
| 09:23:14 | 2 | **A**    Very. |
| 09:23:14 | 3 | **Q**    In other words, all the other academics out there are |
| 09:23:18 | 4 | competing for the same money? |
| 09:23:20 | 5 | **A**    That's right. |
| 09:23:20 | 6 | **Q**    All right.  One of the ones that you got is the one |
| 09:23:24 | 7 | that I have a star next to.  It says CHASE:  "An Innovative |
| 09:23:33 | 8 | County-Level Public Health Response to the Opioid Epidemic |
| 09:23:37 | 9 | in New York State." |
| 09:23:42 | 10 | It looks like your funding for that was -- or not |
| 09:23:45 | 11 | costs for that were $22 million. |
| 09:23:48 | 12 | **A**    That's right. |
| 09:23:49 | 13 | **Q**    Funder:  National Institute of Drug Abuse. |
| 09:23:55 | 14 | Can you tell us why this is a noteworthy project? |
| 09:23:57 | 15 | **A**    Yes.  It's part of an initiative through the National |
| 09:24:02 | 16 | Institute of Health called the HEALing Communities Study, |
| 09:24:05 | 17 | and HEAL is an acronym that stands for Helping End Addiction |
| 09:24:08 | 18 | Long-term.  And states actually competed, universities |
| 09:24:13 | 19 | competed on behalf of states for the HEAL project funding. |
| 09:24:18 | 20 | And the NIH selected four states to be part of this major |
| 09:24:22 | 21 | initiative called the HEALing Communities Study. |
| 09:24:26 | 22 | And New York State and Columbia University was one of |
| 09:24:31 | 23 | the institutions and states chosen.  Ohio was also a state |
| 09:24:34 | 24 | that is in the HEALing Communities Study. |
| 09:24:36 | 25 | And the goal of the study is to work with communities, |

**Keyes (Direct by Lanier)**                                    3626

09:24:40  1   with community stakeholders, to develop interventions with

09:24:44  2   the goal of reducing opioid overdose by 40 percent.  So it's

09:24:48  3   really, like, let's put a major investment in this, let's go

09:24:51  4   to communities, let's ask them what they need, you know,

09:24:55  5   work with people on the ground.

09:24:56  6        And so we've collaborated quite closely with our

09:24:59  7   colleagues in Ohio and in two other states as well to do the

09:25:03  8   study that's going on right now.

09:25:05  9   **Q**    All right.  Last question on background and then I'll

09:25:08 10   qualify you to give opinions and we'll move down the road.

09:25:11 11        When I visited with you a couple of years ago for an

09:25:19 12   hour, you told me some story that I tried to use with

09:25:25 13   Dr. Alexander yesterday.  I threw him a curve ball, and he

09:25:28 14   kind of got the story, but you told it to me, so I would

09:25:32 15   like you to tell it to the jury, about epidemiology and that

09:25:35 16   water stuff that happened over in London in the 1800s or

09:25:39 17   whenever it was.

09:25:39 18   **A**    Sure.  This is a story we tell all of our -- it's like

09:25:45 19   your first semester epidemiology, you know, probably

09:25:48 20   everyone on this jury could probably, like, pass

09:25:51 21   epidemiology at this point from all you've heard in this

09:25:53 22   case.

09:25:53 23        But we always talk about John Snow.

09:25:57 24   **Q**    John Snow?

09:25:58 25   **A**    Right, not from Game of Thrones.

09:26:00  1  **Q**    From Game of Thrones?  All right.

09:26:02  2  **A**    So he was an anesthesiologist actually in London.  And

09:26:07  3  he conducted -- in addition to his anesthesiology work, he

09:26:13  4  did some of the first what we now regard as epidemiological

09:26:17  5  studies.  There was a cholera outbreak in London.

09:26:20  6  **Q**    Cholera?

09:26:21  7  **A**    Cholera.

09:26:21  8  **Q**    Okay.

09:26:22  9  **A**    And no one could figure out what was causing the

09:26:24  10  outbreak.  The predominant theory at the time was that it

09:26:29  11  was airborne, it was something about the air, you know,

09:26:32  12  something infectious in the air that people were breathing

09:26:37  13  that was causing cholera.

09:26:38  14       But John Snow didn't think that it was airborne, and

09:26:41  15  he went and went to every single house in London and created

09:26:45  16  these maps where he colored in the houses where people had

09:26:50  17  cholera and the houses where people didn't have cholera.

09:26:54  18       And then he looked at risk factors, you know,

09:26:58  19  predictors, what predicted the houses that had cholera

09:27:01  20  versus the houses that didn't have cholera.

09:27:03  21       And what he figured out was that all the houses that

09:27:05  22  had cholera were fed by one water source, and all the houses

09:27:10  23  where people didn't have cholera were fed by a different

09:27:12  24  water source.

09:27:17  25       And he came to the conclusion that the cholera was

**Keyes (Direct by Lanier)**

| | | |
|---|---|---|
| 09:27:19 | 1 | being transmitted in the water.  And he famously went to the |
| 09:27:22 | 2 | Broad Street Pump in London, and if you go to London you can |
| 09:27:25 | 3 | go to the John Snow Pub and every epidemiologist who goes to |
| 09:27:29 | 4 | London has to take a picture next to the Broad Street Pump. |
| 09:27:32 | 5 | And he went and he removed the pump handle and reduced the |
| 09:27:39 | 6 | population's risk of drinking this tainted water by |
| 09:27:42 | 7 | physically taking the pump handle off so people couldn't |
| 09:27:45 | 8 | drink the water.  The John Snow story. |
| 09:27:49 | 9 | So if you go to London, you have to go to the Broad |
| 09:27:52 | 10 | Street Pump and take a picture. |
| 09:27:53 | 11 | **Q** Fair. |
| 09:27:54 | 12 | All right.  Let's move down the road now, and as we |
| 09:27:57 | 13 | move into your work and your opinions, legally I need to do |
| 09:28:01 | 14 | a bit of housekeeping. |
| 09:28:02 | 15 | I'm going to ask you about your opinions in your |
| 09:28:06 | 16 | testimony today, okay? |
| 09:28:07 | 17 | **A** Yes. |
| 09:28:08 | 18 | **Q** I would ask you now to make sure that you only give us |
| 09:28:12 | 19 | opinions that are based upon reasonable probabilities of |
| 09:28:18 | 20 | your scientific profession.  Okay? |
| 09:28:20 | 21 | **A** Yes. |
| 09:28:20 | 22 | **Q** In other words, no guessing, no maybes that are, well, |
| 09:28:25 | 23 | it might.  It's got to at least be reasonably probable |
| 09:28:29 | 24 | according to the science of epidemiology.  Okay? |
| 09:28:31 | 25 | **A** Okay. |

**Keyes (Direct by Lanier)**                                    3629

09:28:32   1   **Q**     Great.  With that, let's move to your work.

09:28:39   2          Now, what did we hire you to do in this case?

09:28:43   3   **A**     I was hired to evaluate the burden of opioid use and

09:28:48   4   consequences related to opioid use, such as overdose,

09:28:55   5   hospitalization, opioid use disorder.

09:28:58   6          I was hired to assess the burden of that in Lake and

09:29:02   7   Trumbull County and then do an evaluation of what caused

09:29:03   8   that burden, what caused the prevalence of these

09:29:11   9   opioid-related outcomes in Lake and Trumbull County.

09:29:13  10   **Q**     So we're going to ask you both about the burden, how

09:29:20  11   bad is the problem.  Fair?

09:29:23  12   **A**     Yes.

09:29:23  13   **Q**     And then we're going to ask you what caused it.  Fair?

09:29:28  14   **A**     Yes.

09:29:28  15   **Q**     And in the process of coming to the opinions that

09:29:32  16   we'll be asking you about, you did a lot of work.

09:29:40  17          Would you tell the jury how you went about answering

09:29:42  18   these questions we asked you to answer?

09:29:44  19   **A**     Sure.  I used data.  There are a number of data

09:29:51  20   sources that those of us who study opioid use disorder and

09:29:56  21   addiction routinely use to evaluate how bad the problem is

09:30:00  22   in a particular community, so I used available data sources

09:30:05  23   that had information about Lake and Trumbull County to

09:30:08  24   evaluate, you know, the extent of the problem.

09:30:12  25          And then I went to the scientific literature and

**Keyes (Direct by Lanier)**

09:30:18  1    reviewed that and did reviews and evaluations of the studies

09:30:22  2    that have been conducted on causes of opioid use disorder

09:30:25  3    and overdose to draw conclusions about causation.

09:30:30  4    **Q**    All right.  And when I was asking you about this

09:30:33  5    process last night, you told me that you envision it like a

09:30:39  6    LEGOs or --

09:30:40  7    **A**    Brick in a wall.

09:30:41  8    **Q**    Yeah, brick in a wall.

09:30:42  9         Explain what you were trying to tell me in that

09:30:44  10   process for the jury, please.

09:30:47  11   **A**    Sure.  Epidemiologists, we like to think of ourselves

09:30:50  12   as the people who look at the wall, where in every study

09:30:55  13   that's done on a particular topic is a brick.  You know, so

09:30:58  14   each study assesses an association, for example, or assesses

09:31:01  15   kind of one piece of the puzzle.  And then what

09:31:05  16   epidemiologists do is put all those bricks together and get

09:31:08  17   a complete picture of what's going on to diagnose a

09:31:14  18   community.

09:31:15  19        So that each study alone probably is insufficient to

09:31:18  20   draw a conclusion, but when you have many studies, all with

09:31:21  21   different pieces of evidence, you can take a step back and

09:31:23  22   look at the whole wall.  So that's what epidemiologists do,

09:31:27  23   look at the wall.

09:31:27  24   **Q**    All right.  Last process question before we move to

09:31:30  25   your opinions.

09:31:33  1    I'm going to be asking you, in fact, I've got a slide

09:31:36  2    prepared of what are called Bradford Hill criteria.  And

09:31:41  3    this is part of our legal obligation, I think, but I want to

09:31:46  4    have you just in general explain to the jury, you don't need

09:31:51  5    to detail all of the elements, but who was Bradford Hill or

09:31:56  6    what are his criteria and how are they used, just a general

09:32:00  7    idea.

09:32:01  8    **A**    Sure.  Bradford Hill was an epidemiologist and

09:32:04  9    published this paper, this influential paper, where he in

09:32:09  10   the 1950s where he kind of outlined, all right, this is how

09:32:13  11   epidemiologists make decisions about causation.  These are

09:32:15  12   the different factors we use to decide if an association is

09:32:20  13   causation.  And he outlined kind of nine different factors

09:32:24  14   that epidemiologists use when making these decisions.  And

09:32:29  15   they've come to be known over time as the Bradford Hill

09:32:33  16   criteria.  And they're kind of signposts or guide points

09:32:37  17   that when you're evaluating a literature, you're more

09:32:41  18   certain that an association is causation when they're

09:32:44  19   meeting various Bradford Hill criteria.

09:32:48  20   **Q**    All right.  I want to give you an example that I would

09:32:57  21   like a personal answer to as a problem to help illustrate

09:33:02  22   this, okay?

09:33:03  23       There are these studies out that say if you drink diet

09:33:14  24   soda, of which I am fond, you are more likely to have health

09:33:25  25   problems.  And they actually say to die early, but I'm not

**Keyes (Direct by Lanier)** 3632

09:33:30  1    writing that.

09:33:33  2        Are you familiar with these studies that just pop up

09:33:36  3    on the Internet and tell you this at times?

09:33:39  4    **A**    Yes.

09:33:40  5    **Q**    Would that -- just because you drink diet soda and

09:33:51  6    let's say the study has like a hundred people who drink diet

09:33:54  7    soda.

09:33:54  8        You got me?

09:33:54  9    **A**    I got you.

09:33:55  10   **Q**    And those hundred people who drink Diet Dr. Pepper

09:34:05  11   happen to have more health problems than a hundred people

09:34:09  12   who don't.

09:34:09  13       You with me?

09:34:10  14   **A**    Yes.

09:34:10  15   **Q**    Well, it's possible those hundred people have other

09:34:14  16   health issues that make them drink diet soda, right?

09:34:19  17   **A**    That could -- that's possible.

09:34:21  18   **Q**    So those may be associated, drinking Diet Dr. Pepper

09:34:28  19   with health problems, but that doesn't mean drinking

09:34:30  20   Dr. Pepper's causing it, does it?

09:34:33  21   **A**    That's right.

09:34:33  22   **Q**    So are you able to use Bradford Hill criteria to

09:34:36  23   decide if something's more than just related to it and

09:34:39  24   associated with it and actually causes it?

09:34:43  25   **A**    Yes.

**Keyes (Direct by Lanier)** 3633

| | | |
|---|---|---|
| 09:34:44 | 1 | **Q**    I do not want your opinion on Diet Dr. Pepper, we're |
| 09:34:48 | 2 | going to leave that alone, but I do want your opinions in |
| 09:34:50 | 3 | this case, all right?  Let's go to those now. |
| 09:34:59 | 4 |      I went through your expert report.  And by the way, |
| 09:35:01 | 5 | you have produced an expert report in this case, right? |
| 09:35:04 | 6 | **A**    Yes. |
| 09:35:04 | 7 | **Q**    You know what I left out?  You've testified in opioid |
| 09:35:10 | 8 | matters before, right? |
| 09:35:12 | 9 | **A**    Yes. |
| 09:35:12 | 10 | **Q**    We're not the first to retain you, are we? |
| 09:35:15 | 11 | **A**    No. |
| 09:35:15 | 12 | **Q**    You've done this in West Virginia and in New York that |
| 09:35:19 | 13 | I know of.  Right? |
| 09:35:20 | 14 | **A**    Yes. |
| 09:35:21 | 15 | **Q**    Anywhere else? |
| 09:35:22 | 16 | **A**    No. |
| 09:35:22 | 17 | **Q**    All right.  We pay you for your time? |
| 09:35:25 | 18 | **A**    Yes. |
| 09:35:25 | 19 | **Q**    And what's your hourly rate? |
| 09:35:27 | 20 | **A**    $550 an hour for preparing reports and 650 for |
| 09:35:34 | 21 | testifying. |
| 09:35:34 | 22 | **Q**    So you charge me more to do this than you did to do |
| 09:35:37 | 23 | this? |
| 09:35:37 | 24 | **A**    Yes. |
| 09:35:38 | 25 | **Q**    But this is so much more fun.  All right. |

**Keyes (Direct by Lanier)**

09:35:42  1      Dr. Keyes, the jury should know, they're entitled to

09:35:48  2  know, as everybody else is, how much have you charged in

09:35:53  3  this case?

09:35:53  4  **A**    $34,000.

09:35:55  5  **Q**    Okay.  And overall in all of the opioid work you've

09:35:58  6  done yourself, how much?

09:36:01  7  **A**    About $250,000.  Yes, $250,000.

09:36:09  8  **Q**    Thank you.  Now, I went through your report, and I

09:36:12  9  pulled out your opinions, and I tried to keep your wording

09:36:15  10  as tight as I could, but I put them on note cards for the

09:36:18  11  jury to see.

09:36:21  12      Your opinions -- let me make this note first.

09:36:25  13      Your opinions, can we divide them into two groups

09:36:30  14  broadly, those that are general and those that are specific

09:36:35  15  to Lake and Trumbull?

09:36:38  16  **A**    Yes.

09:36:38  17  **Q**    All right.  I want to start with your general

09:36:43  18  opinions, and then we're going to go to Lake and Trumbull

09:36:47  19  specific opinions.  Start big and work down, okay?

09:36:50  20  **A**    Okay.

09:36:52  21          (Cell phone interruption.)

09:36:52  22          MR. LANIER:  If it's for me, Ms. Sullivan,

09:36:55  23  tell them I can't talk.

09:36:56  24          MS. SULLIVAN:  Got it.

09:36:59  25  **Q**    General Opinion 1:  "Distribution, sales, and

**Keyes (Direct by Lanier)**                                      3635

09:37:04  1    marketing of opioids increased in the 1990s."

09:37:09  2         The jury's heard this ad nauseam.  I won't ask you to

09:37:12  3    spend a long time on it, but tell us first, is that your

09:37:16  4    opinion?

09:37:16  5    **A**    That is my opinion.

09:37:17  6    **Q**    And how did you arrive at that opinion?

09:37:20  7    **A**    I looked at data on distribution of opioids and sales

09:37:24  8    of opioids, and I reviewed epidemiological studies about

09:37:28  9    marketing.

09:37:34  10   **Q**    Any doubt in your mind about Opinion 1?

09:37:37  11   **A**    No.

09:37:37  12   **Q**    Opinion 2, General Opinion 2:  "Opioids were diverted

09:37:48  13   and used by individuals with opioid use disorder and for

09:37:53  14   nonmedical use."

09:37:55  15        Is that your opinion?

09:37:57  16   **A**    Yes.

09:37:59  17   **Q**    What do you base that -- well, first, what do you mean

09:38:02  18   by that?

09:38:03  19   **A**    So we -- in epidemiology, especially with regard to

09:38:09  20   opioid use disorder talking about diversion which is where

09:38:12  21   people are using opioids in a way that was not prescribed by

09:38:14  22   a doctor.

09:38:17  23   **Q**    And what brought you to -- what's the basis for your

09:38:19  24   Opinion Number 2?

09:38:21  25   **A**    There are -- there's a wealth of evidence in

**Keyes (Direct by Lanier)**                    3636

09:38:25  1   epidemiology about nonmedical opioid use and that people use

09:38:30  2   opioids nonmedically, both people who were prescribed to use

09:38:33  3   opioids and people who were never prescribed to use opioids.

09:38:35  4   They used in ways that a doctor didn't intend for them

09:38:39  5   Tuesday.

09:38:41  6   **Q**   The jury has heard, for example, about a study that

09:38:45  7   shows a lot of people get their opioids from medicine

09:38:52  8   cabinets of friends and families.

09:38:54  9   **A**   That's right.  Part of the epidemiological literature

09:38:59  10  is evaluating where people obtain opioids, and a significant

09:39:03  11  proportion obtain them from friends and family.

09:39:08  12  **Q**   Do you know the literature on that?

09:39:11  13  **A**   I do.

09:39:11  14  **Q**   So there's this wealth of evidence out there that

09:39:15  15  opioids were diverted and used by individuals with opioid

09:39:20  16  use disorder and for nonmedical use.

09:39:21  17     Now, you're not a medical doctor, fair?

09:39:24  18  **A**   That's fair.

09:39:24  19  **Q**   So you can't testify about medically what opioid use

09:39:29  20  disorder is, like the medical doctors we've had.  Fair?

09:39:33  21  **A**   Right.  I don't -- I don't diagnose people with opioid

09:39:37  22  use disorder.

09:39:37  23  **Q**   But you have been actively involved with people with

09:39:40  24  opioid use disorder for how many years?

09:39:42  25  **A**   20.  Over 20.

**Keyes (Direct by Lanier)**

| | | |
|---|---|---|
| 09:39:45 | 1 | **Q**    So when you were doing the addiction work in New York |
| 09:39:49 | 2 | in the early 2000s, did you have opioid addiction people you |
| 09:39:54 | 3 | were dealing with? |
| 09:39:55 | 4 | **A**    Yes, primarily, people who were suffering from |
| 09:40:00 | 5 | withdrawal when they stopped using opioids. |
| 09:40:03 | 6 | **Q**    And give us a time range on that so it helps us put |
| 09:40:06 | 7 | this into perspective. |
| 09:40:07 | 8 | **A**    So in the time I was working clinically, that was in |
| 09:40:11 | 9 | about 2001, 2002, in that time frame. |
| 09:40:14 | 10 | **Q**    During what's been called the start of the first wave? |
| 09:40:20 | 11 | Have you heard that terminology? |
| 09:40:22 | 12 | **A**    Yes.  And we saw it in the clinic.  I mean, people who |
| 09:40:27 | 13 | had prescription opioid use disorder, addiction to |
| 09:40:29 | 14 | prescription opioids were coming in droves to the clinic |
| 09:40:31 | 15 | suffering from withdrawal. |
| 09:40:32 | 16 | **Q**    All right.  And then we've got General Opinion Number |
| 09:40:38 | 17 | 3:  "The incidence and prevalence of both medical and |
| 09:40:44 | 18 | nonmedical opioid use increased in concert with the |
| 09:40:48 | 19 | increased supply of opioids." |
| 09:40:51 | 20 |     Is that your opinion? |
| 09:40:53 | 21 | **A**    Yes. |
| 09:40:53 | 22 | **Q**    Explain what you mean by that opinion, and then I'll |
| 09:40:57 | 23 | ask you your basis for it. |
| 09:40:58 | 24 | **A**    Sure.  In epidemiology, the two kind of main -- two of |
| 09:41:06 | 25 | the main things that we try to estimate in populations are |

**Keyes (Direct by Lanier)**                    3638

09:41:10  1   incidence and prevalence.

09:41:12  2        Incidence means how many people who didn't have an

09:41:14  3   addiction to opioids developed it over a certain period of

09:41:18  4   time, and prevalence being how many people have it right

09:41:21  5   now.  So it sounds simple, but it's hard to do, is to count

09:41:26  6   how many people got a new addiction over the course of a

09:41:30  7   year or two years or three years, and then at any point in

09:41:35  8   time how many people have opioid addiction right now.

09:41:36  9        And then once we have those two pieces of information,

09:41:39  10  we can say, all right, what places have more -- a higher

09:41:43  11  prevalence than other places and what's correlated with

09:41:46  12  certain communities having a higher prevalence of opioid

09:41:48  13  addiction than others.

09:41:50  14       And what we found in the epidemiological literature

09:41:53  15  was that opioid addiction was much higher where there were

09:41:57  16  more opioids.  And so when there was an increased supply of

09:42:00  17  opioids to a particular community, we saw more addiction

09:42:03  18  related to opioids in those communities.

09:42:09  19  **Q**    And was that across the board in all of the different

09:42:13  20  areas you looked on a grand scale, the increased supply,

09:42:19  21  increased the nonmedical opioid use?

09:42:25  22  **A**    That's right.  Wherever there were more opioids, we

09:42:28  23  saw more nonmedical use of opioids as well as opioid use

09:42:32  24  disorder or addiction and overdose and increase in the

09:42:40  25  hospitalization for opioid-related causes.

**Keyes (Direct by Lanier)**

| | |
|---|---|
| 09:42:43 | 1 |
| 09:42:48 | 2 |
| 09:42:56 | 3 |
| 09:43:02 | 4 |
| 09:43:07 | 5 |
| 09:43:13 | 6 |
| 09:43:15 | 7 |
| 09:43:16 | 8 |
| 09:43:16 | 9 |
| 09:43:20 | 10 |
| 09:43:25 | 11 |
| 09:43:29 | 12 |
| 09:43:34 | 13 |
| 09:43:39 | 14 |
| 09:43:42 | 15 |
| 09:43:45 | 16 |
| 09:43:49 | 17 |
| 09:43:57 | 18 |
| 09:44:00 | 19 |
| 09:44:05 | 20 |
| 09:44:09 | 21 |
| 09:44:12 | 22 |
| 09:44:15 | 23 |
| 09:44:21 | 24 |
| 09:44:25 | 25 |

**Q**    Okay.  General Opinion Number 4:  "The increase in the prescription opioid supply, coupled with opioid use disorders and increases in nonmedical use and nonmedical use opioid disorder, result in an exponential increase in prescription opioid overdose as well as many other nonfatal consequences."

Is that your opinion?

**A**    Yes.

**Q**    Can you explain that to the jury, please?

**A**    Yes.  I think this couples well with Opinion 3, again, which is where when we see an increase in the opioid supply. And this goes for -- I think this opinion ties into both medical and nonmedical use.  When we saw an increase in medical opioid supply, even people using opioids because a doctor prescribed them, had an increased risk of developing opioid addiction.  And in those communities, there was also an increased risk in nonmedical use of opioids and in what we call morbidity and mortality, morbidity getting sick, so that's addiction, having a nonfatal overdose, neonatal abstinence syndrome, and other consequences of heavy opioid use, as well as mortality, death, primarily from drug poisoning or overdose but a wide range of other causes of death to result from both medical and nonmedical opioid use.

**Q**    You have given us a demonstrative that is a part of this set of demonstratives that was in your report that had

09:44:30   1   overdose death rates more all opioids.

09:44:34   2        Do you see this?

09:44:35   3   **A**   Yes.

09:44:37   4   **Q**   Now, all opioids, so these statistics will include

09:44:40   5   illegal opiates like heroin; is that right?

09:44:44   6   **A**   Yes.

09:44:50   7   **Q**   Street fentanyl, things like that?

09:44:52   8   **A**   Yes.

09:44:53   9   **Q**   As well as prescription opioids?

09:44:56  10   **A**   That's right.

09:44:57  11   **Q**   As well as opioids that should be given by a

09:45:01  12   prescription though they may have been bought illegally?

09:45:04  13   **A**   Yes.

09:45:05  14   **Q**   And in that regard, you've got a black line that shows

09:45:11  15   the national overdose death rates for all opioids.

09:45:17  16        Is that the black line that I've highlighted?

09:45:21  17   **A**   Yes.

09:45:21  18   **Q**   And then you've got Ohio as an orange line which I'll

09:45:31  19   just trace out as orange.

09:45:44  20        That's Ohio, true?

09:45:45  21   **A**   True.

09:45:45  22   **Q**   And then -- hold on.  I've got an orange highlighter.

09:45:53  23   Let's go big.

09:45:55  24        And then you've got a blue line that is Lake County

09:46:04  25   that I'll highlight in purple.

**Keyes (Direct by Lanier)**                3641

09:46:07  1      Is that right?

09:46:08  2  **A**    That's right.

09:46:08  3  **Q**    And then you've got a green line that's Trumbull

09:46:15  4  County.  Fair?

09:46:16  5  **A**    Yes.

09:46:16  6  **Q**    Now, if we go back to your opinion, the increase in

09:46:28  7  the prescription opioid supply coupled with opioid use

09:46:34  8  disorders and increases in nonmedical use and nonmedical use

09:46:37  9  disorder resulted in an exponential increase in prescription

09:46:43  10  opioid overdose as well as many other nonfatal consequences.

09:46:50  11      What are the bases from which you're able to tell us

09:46:53  12  this opinion?

09:46:54  13  **A**    Yes, the data that you're looking at there is from the

09:46:57  14  Centers For Disease Control.  They maintain a data set

09:47:02  15  called the National Vital Statistics System which is every

09:47:05  16  death in the United States that gets recorded in the

09:47:08  17  National Vital Statistics System.  And it's publicly

09:47:11  18  available.  Anyone can go and look up the causes of death in

09:47:13  19  their community.  And we use it for research all the time

09:47:16  20  because we want to document the burden of causes of death in

09:47:20  21  communities.

09:47:21  22      And so these are the publicly available CDC data on

09:47:28  23  opioid overdose deaths in Lake and Trumbull Counties showing

09:47:31  24  an exponential increase in overdose deaths from 1999 through

09:47:36  25  2019.

**Keyes (Direct by Lanier)**            3642

09:47:36   1    **Q**    Okay.  As we look at this and look at all of the

09:47:41   2    opioids that are included in this chart you had put into

09:47:44   3    your report, it fits in well with General Opinion Number 5

09:47:52   4    that I'd like to ask you about next.

09:47:54   5         "Polydrug use on toxicology and drug overdose deaths:

09:47:59   6    Implications for causal attribution."

09:48:03   7         Do you see that opinion?

09:48:04   8    **A**    Yes.

09:48:04   9    **Q**    And it fits with Opinion 6 that says, "Prescription

09:48:10   10   opioid use is causally related to heroin use."  Right?

09:48:16   11   **A**    Yes.

09:48:17   12   **Q**    All right.  I know you are not fond of the word

09:48:19   13   "gateway."  You've got a different set of language that you

09:48:24   14   use for this.  Would you tell us how you believe that

09:48:29   15   prescription opioid use is causally related to heroin use?

09:48:35   16   **A**    Yes.  In epidemiological jargon, we call it a "risk

09:48:43   17   factor."  And in my report I detailed all of the studies

09:48:46   18   that have been conducted that have shown the increase in

09:48:49   19   risk of heroin use among people who have used prescription

09:48:54   20   opioids, both medically and nonmedically, and what the

09:48:58   21   increase in risk is for subsequent use of heroin.

09:49:02   22        And in every study that's been conducted, using

09:49:06   23   prescription opioids, both medically and nonmedically, is

09:49:09   24   associated with an increased risk of transition to heroin

09:49:13   25   use.

**Keyes (Direct by Lanier)**                    3643

09:49:16   1   **Q**    I'm opening up your report.

09:49:18   2        By the way, do you have a copy of your report up

09:49:21   3   there?

09:49:22   4   **A**    No.

09:49:22   5   **Q**    Okay.  We'll get you one if we question you on it.

09:49:29   6        But if I look at your report, you start -- you have an

09:49:33   7   entire section on this starting on page 34.  Is that right?

09:49:36   8   **A**    Yes.

09:49:36   9   **Q**    You say, "Available evidence from national

09:49:41  10   epidemiological studies confirmed via local data including

09:49:48  11   data drawn from Ohio, indicates that in the early days of

09:49:51  12   the epidemic, mid to late '90s, opioid overdose deaths

09:49:57  13   primarily involved prescription opioids."

09:50:02  14        Is that accurate?

09:50:04  15   **A**    That's accurate, yes.

09:50:05  16   **Q**    And you give the cites for all of these things you say

09:50:08  17   in your report?

09:50:09  18   **A**    Yes.

09:50:09  19   **Q**    These footnotes, in other words, like Footnote 145, we

09:50:14  20   can go to the back of your report, look up Footnote 145, and

09:50:19  21   it's like you had said, Centers For Disease Control and

09:50:25  22   Prevention as reported in the Morbidity Mortality Weekly

09:50:34  23   Report, right?

09:50:35  24   **A**    That's right.

09:50:36  25   **Q**    Okay.  So as you put this report together and you put

**Keyes (Direct by Lanier)**

09:50:39  1    your research and opinions together into these forms,

09:50:41  2    explain what happened timewise between the early '90s when

09:50:48  3    almost all of the deaths were prescription-related and what

09:50:55  4    happened later.  Walk us through that, please.

09:50:56  5    **A**    Sure.  So there are different phases that -- we've

09:51:05  6    come to term them as different phases of the opioid

09:51:08  7    epidemic.  And kind of the first phase of the opioid

09:51:13  8    epidemic was this wave of prescription opioid addiction and

09:51:17  9    overdose deaths.  And that, you know, happened throughout

09:51:19  10   the early 2000s and in the late 1990s.

09:51:23  11        In around 2010 there was a shift, and we saw an

09:51:28  12   increase in prescription opioid deaths that involved heroin

09:51:31  13   as well as increased transition to heroin use among people

09:51:36  14   who used prescription opioids as well as just an increase in

09:51:41  15   heroin prevalence more generally in the United States.  And

09:51:43  16   we saw a shift, then, in the overdose deaths where more

09:51:47  17   people were dying due to heroin and polydrug use, poly just

09:51:52  18   meaning more than one drug.  So people dying of prescription

09:51:56  19   opioid and heroin use.

09:51:57  20        Then there was a third shift that happened around

09:52:01  21   2014, 2015, depending on the location — for some it happened

09:52:08  22   a little bit later —  where we saw the introduction of these

09:52:11  23   highly potent synthetic opioids, fentanyl being the one that

09:52:15  24   people have probably heard the most about.

09:52:18  25        And in that phase 3, we saw, again, a shift in

**Keyes (Direct by Lanier)**

09:52:23  1    polydrug use toxicity, meaning what was in people's systems

09:52:28  2    when they died, where fentanyl and other synthetic opioids

09:52:42  3    were causing a lot of deaths and a lot of harm in

09:52:38  4    communities.

09:52:44  5    **Q**    Someone who's really sharp picked up that I misspelled

09:52:49  6    causally.

09:52:50  7    **A**    It happens a lot.

09:52:51  8    **Q**    I made it casually.  It's not casually related.

09:52:56  9    **A**    It's not casually related to heroin use.  It is

09:52:59  10   causally related.

09:53:00  11   **Q**    Let's fix this before His Honor throws me into

09:53:07  12   spelling penitentiary.

09:53:08  13       Causally, the "U" needs to go there, right?  I mean,

09:53:11  14   yes.

09:53:13  15       Do I have it right now?

09:53:15  16   **A**    Yes.

09:53:15  17   **Q**    Thank you.  That may have been from your son.  I

09:53:22  18   didn't see who passed it up.

09:53:23  19       All right.  So phase 1, phase 2, phase 3.  When we get

09:53:28  20   to the Bradford Hill criteria, I'm going to ask you if it

09:53:33  21   makes sense that the opioid prescription oversupply would

09:53:42  22   lead to these other phases in the shifts and let you explain

09:53:46  23   why, unless you want to do it right now.

09:53:48  24   **A**    It's up to you.

09:53:48  25   **Q**    Yeah, throw it out there, and then we'll just refer

**Keyes (Direct by Lanier)**

09:53:54  1    back to it.

09:53:54  2    **A**    Sure.

09:53:57  3    **Q**    Why does this make sense is my question.

09:54:00  4    **A**    Right.  So there's nine Bradford Hill criteria, and

09:54:03  5    essentially, and it's actually somewhat unique I think for

09:54:09  6    prescription opioid use and heroin use in that almost all of

09:54:12  7    the Bradford Hill criteria are met, which is a pretty strong

09:54:15  8    indication to an epidemiologist that this is causation and

09:54:20  9    not correlation.

09:54:23  10         Some of the Bradford Hill criteria include things like

09:54:25  11   dose response, so something is more likely to be causal if

09:54:30  12   there's a dose-response relationship.  So when they're -- if

09:54:33  13   someone is using more prescription opioids, is there a

09:54:35  14   higher risk of death than someone uses prescription opioids

09:54:40  15   less.

09:54:42  16        And that's true.  We have a number of different

09:54:45  17   studies where you can clearly see an escalating risk of

09:54:48  18   overdose and death and an escalating risk of opioid use

09:54:52  19   disorder with increased use of prescription opioids.

09:54:55  20   **Q**    Doctor, I'm going to interrupt you, and let's just go

09:54:59  21   ahead, and it's a different order than I had planned on

09:55:03  22   doing this, but I think it's a better order.

09:55:06  23        You talked about the Bradford Hill criteria, this

09:55:12  24   epidemiologist in the 1950s who helped figure out if

09:55:15  25   something actually causes something or if it's just

09:55:17   1   associated with something, right?

09:55:19   2   **A**     Right.

09:55:19   3   **Q**     And then I did a slide last night talking to you to

09:55:26   4   list out these nine Bradford Hill criteria.

09:55:32   5          Do you see these?

09:55:33   6   **A**     Yes.

09:55:34   7   **Q**     And you told me last night that this is, like,

09:55:42   8   taught -- tell the jury how common it is to teach this in

09:55:46   9   epidemiology?

09:55:46  10   **A**     Every fall semester I teach the Bradford Hill criteria

09:55:49  11   to our incoming graduate students.

09:55:52  12   **Q**     Okay.

09:55:52  13   **A**     And you'll find it in every epidemiology class in the

09:55:57  14   country.

09:55:57  15   **Q**     All right.  So this is like 101 for grad school?

09:56:01  16   **A**     Yes.

09:56:01  17   **Q**     Okay.  Then these nine criteria, first of all, the

09:56:06  18   fact they're called criteria, does it mean you have to have

09:56:11  19   all nine of them met to be a cause of something?

09:56:17  20   **A**     No.

09:56:18  21   **Q**     How many of them have to be met to be a cause?

09:56:21  22   **A**     Well, there's only one that is -- you have to

09:56:26  23   demonstrate every single time, and that's temporality.  The

09:56:29  24   cause should precede the outcome.  That has to be there.

09:56:34  25          For the rest of the criteria, and actually in Bradford

**Keyes (Direct by Lanier)**                                3648

09:56:38  1    Hill's original study he called them viewpoints, but now,

09:56:42  2    you know, people call them criteria.  That's what's commonly

09:56:45  3    used.  But Bradford Hill called them viewpoints.

09:56:50  4         And there are certainly causal associations that are

09:56:53  5    not dose response, for example.  Some, you know, toxin

09:56:57  6    exposures you have to reach a certain level.  There's a

09:57:00  7    threshold.  So you don't get a dose-response relationship.

09:57:02  8    It's just more likely something is causal if there's a

09:57:05  9    dose-response relationship than not.

09:57:07  10        Same for all of the other criteria.  I mean, one --

09:57:10  11   the one that's not met with prescription opioid use and

09:57:13  12   heroin use is specificity.  The specificity criteria is that

09:57:18  13   something's more likely to be causal if there's, like, one

09:57:21  14   thing it causes.  Like, if you can identify the one thing

09:57:25  15   that something causes, it's a very specific association.

09:57:29  16   That gives you more clues that something is causal.

09:57:31  17        But for prescription opioid use, there's not

09:57:34  18   specificity because it causes all kinds of bad things.  So

09:57:38  19   we don't have specificity for prescription opioid use

09:57:41  20   because there's a lot of bad outcomes when people use a lot

09:57:46  21   of prescription opioids.

09:57:47  22        But for everything else, we do meet the Bradford Hill

09:57:51  23   criteria for prescription opioid use and its causal

09:57:55  24   relationship with opioid use disorder or addiction as well

09:57:59  25   as heroin use.

**Keyes (Direct by Lanier)**

09:58:05  1    **Q**    So explain these nine criteria.  We'll do it one at a

09:58:08  2    time.  We probably already have a couple of jurors who

09:58:11  3    already know this stuff, but it's helpful for all of us and

09:58:15  4    we have to put it on the record anyway.

09:58:16  5         So would you please explain what it means to say

09:58:19  6    strength?

09:58:20  7    **A**    Right.  So something is more likely to be causal if

09:58:22  8    there's a really strong association than if you've got an

09:58:27  9    association that's kind of weak.

09:58:31  10        And for prescription opioid use, for example, there's

09:58:34  11   a really strong association between increased use of

09:58:38  12   prescription opioids and subsequent experiences of addiction

09:58:42  13   and transition to heroin use.

09:58:44  14        For example, I mean, I would just point to one study

09:58:48  15   that I reviewed in the paper where for people who used

09:58:52  16   opioids for more than 90 days prescribed by a doctor more

09:58:56  17   than 90 days at a high level, they were 122 times more

09:59:00  18   likely to have an opioid use disorder diagnosis in their

09:59:04  19   chart than if they didn't use prescription opioids.

09:59:07  20        So when you're an epidemiologist and you see an odds

09:59:10  21   ratio of 122, that is a really strong indicator that there's

09:59:15  22   a causal relationship here.

09:59:16  23   **Q**    All right.  What is consistency or reproducibility?

09:59:21  24   **A**    Well, I think that's a good example.  If I just had

09:59:24  25   that one study and I had an odds ratio of 122, that's not

**Keyes (Direct by Lanier)**                    3650

09:59:28  1    enough.  It's just one study.  You have to show the same

09:59:31  2    association in multiple studies across multiple populations

09:59:36  3    by independent research groups in order to be more confident

09:59:40  4    that something is causal.

09:59:41  5         And so the association between prescription opioid use

09:59:44  6    and addiction as well as heroin use has been shown time and

09:59:49  7    time and time again in lots of different populations, in

09:59:53  8    lots of different countries, in lots of different cities by

09:59:56  9    many different research groups.

09:59:58  10   **Q**    And then specificity, you said that means it's more

10:00:01  11   likely if it's one cause, but here the opioid use causes all

10:00:10  12   kinds of bad things, right?

10:00:11  13   **A**    Right.

10:00:12  14   **Q**    And that's the one element that you're not sure, the

10:00:15  15   one viewpoint that you're not sure should apply in that

10:00:18  16   situation, fair?

10:00:23  17   **A**    Yes, in that, yes.  Specificity is most often met

10:00:26  18   infectious disease circumstances where you can kind of, like

10:00:28  19   in cholera in John Snow's example, I mean, if you can

10:00:31  20   identify the bug that's causing the problem, it's a really

10:00:35  21   specific cause, because usually it's just one bug that's

10:00:38  22   causing a bunch of symptoms.

10:00:41  23        But for more chronic disease outcomes like addiction,

10:00:45  24   you usually don't have specificity as a criteria.

10:00:47  25   **Q**    All right.  Temporality, the -- you've got to have the

10:00:57   1    cause before the outcome?

10:00:57   2    **A**    Yes, that's the only necessary criteria.

10:01:01   3    **Q**    You don't have that one, you don't have a cause?

10:01:03   4    **A**    Correct.

10:01:10   5    **Q**    Biological gradient (dose-response relationship), can

10:01:15   6    you explain what that viewpoint is?

10:01:16   7    **A**    Right.  I think I talked about that earlier, that you

10:01:19   8    want to -- if something's more likely to be causal, if you

10:01:22   9    can really show a gradient, you know, if at each level of an

10:01:26   10   increase in the exposure, you get more and more and more of

10:01:31   11   the outcome.

10:01:34   12   **Q**    So, for example, if you've got -- let me finish

10:01:40   13   writing what you just said.

10:01:41   14        For example, if you've got one person who takes a

10:01:48   15   couple of opioids after a root canal and nothing happens,

10:01:58   16   they took it, they're fine, life goes on, but you've got

10:02:02   17   someone who takes opioids for six months and those that take

10:02:09   18   it six months have a higher percentage that go on to buy

10:02:16   19   cheaper, easier to get street drugs that are opiates, in

10:02:22   20   that situation is that a dose-response relationship?

10:02:25   21   **A**    That's right.

10:02:26   22   **Q**    Is such a situation present in the literature?  In

10:02:31   23   other words, have y'all found that to be true?

10:02:33   24   **A**    In many studies, yes.  Time and time again, there's a

10:02:37   25   dose-response relationship between prescription opioid use

**Keyes (Direct by Lanier)**

10:02:39  1    and opioid use disorder, heroin use, morbidity, mortality.

10:02:45  2    **Q**    All right.  Plausibility, what is plausibility?

10:02:48  3    **A**    Is it biologically plausible, is it biologically

10:02:55  4    plausible that using prescription opioids could lead

10:02:58  5    someone, for example, to heroin use.

10:03:00  6    **Q**    How is that biologically plausible?

10:03:03  7    **A**    It's biologically plausible because heroin and

10:03:07  8    prescription opioids have very similar pharmacological

10:03:10  9    properties.  So people who are addicted to prescription

10:03:12  10   opioids, they can get the same feeling that they get from

10:03:16  11   prescription opioids by using heroin.  So it's very

10:03:22  12   biologically plausible that use of those two drugs could be

10:03:25  13   causally related.

10:03:25  14   **Q**    All right.  Coherence, can you explain coherence,

10:03:28  15   please?

10:03:31  16   **A**    Right, coherence, and I would put this under -- it's

10:03:34  17   got to be coherent with known facts about the world.  And

10:03:37  18   also you have to rule out alternative explanations.

10:03:41  19         So this is like the example of the diet soda and the

10:03:45  20   health problems, is it because of the diet soda that people

10:03:47  21   have health problems or are people who drink diet soda doing

10:03:51  22   other things that can cause health problems.  You have to

10:03:53  23   establish that for prescription opioid use and heroin use.

10:03:56  24         People who use heroin are more likely to have other

10:03:59  25   psychiatric disorders, for example.  So is it prescription

**Keyes (Direct by Lanier)** 3653

10:04:02 1 opioid use that's causing heroin use or is it depression or

10:04:06 2 other conditions, other drug use. You know, people who use

10:04:10 3 prescription opioids are more likely to use marijuana. Is

10:04:14 4 it marijuana use that's leading to the heroin use or is it

10:04:17 5 prescription opioids?

10:04:17 6 And what we've established in the epidemiological

10:04:21 7 studies is trying to rule out all of those alternative

10:04:25 8 explanations. So we statistically control for them and we

10:04:29 9 design studies in which those factors can't influence the

10:04:31 10 outcome, and we try to see, well, once we rule out other

10:04:35 11 drug use, mental illness, age, gender, other medical

10:04:40 12 conditions, do we still see an association between

10:04:43 13 prescription opioid use and heroin use.

10:04:44 14 **Q**    And do you?

10:04:45 15 **A**    Not only do we see it, when you compare all of the

10:04:49 16 different risk factors for heroin use, prescription opioid

10:04:52 17 use is the strongest risk factor. It's a much stronger risk

10:04:55 18 factor than using marijuana, for example, or age or gender

10:04:59 19 or other medical conditions.

10:05:01 20 **Q**    Socioeconomic conditions?

10:05:03 21 **A**    It's a much stronger risk factor for heroin use than

10:05:06 22 socioeconomic conditions.

10:05:07 23 **Q**    Experiment, how do you do an experiment on this one?

10:05:13 24 **A**    Experiment, I mean, in Hill's causal criteria,

10:05:19 25 something's more likely to be causal if we can

**Keyes (Direct by Lanier)**          3654

10:05:22   1    experimentally manipulate it and show that there's an

10:05:28   2    association.

10:05:29   3         We can't do that for a prescription opioid use because

10:05:31   4    it's unethical.  We know that prescription opioids cause

10:05:33   5    harm, so we can't randomize people to using prescription

10:05:40   6    opioids at this point.

10:05:40   7    **Q**    Yeah, you couldn't enroll people into a study and say

10:05:44   8    we're going to give you prescription opioids for six months

10:05:46   9    and see how many of y'all move to heroin when it becomes too

10:05:50  10    expensive to get your prescription opioids?

10:05:51  11    **A**    That's right.  That would be unethical.

10:05:54  12    **Q**    All right.  Analogy.

10:05:58  13    **A**    So analogy is I think kind of an artful Bradford Hill

10:06:05  14    criteria because are there analogies that we can use from

10:06:08  15    other literatures that inform our understanding of this

10:06:14  16    causal relationship.

10:06:14  17         And for prescription opioid use, there are many

10:06:17  18    analogies in other fields of addiction.

10:06:22  19         So we know, for example, that if you make an addictive

10:06:25  20    substance available at a cheaper price, people use more of

10:06:30  21    it.  You can see that for alcohol use, for example.  If you

10:06:32  22    make alcohol cheaper, you have happy hour, if you have

10:06:35  23    two-for-one specials, people drink more alcohol because it's

10:06:38  24    cheaper and it's more readily available.

10:06:40  25         And similarly with prescription opioids, when you make

**Keyes (Direct by Lanier)** 3655

10:06:42　1　prescription opioids cheaper and more readily available,

10:06:46　2　people use more.  So that's kind of an analogy that we use

10:06:49　3　in the epidemiological literature.

10:06:51　4　**Q**　Okay.  So as we went through this, I put a box around

10:07:00　5　number 4, which as you said is the critical one that must be

10:07:03　6　present.  I put X's by 3, specificity, and 8, experiment,

10:07:11　7　the ones that you don't necessarily see or, in the case of

10:07:14　8　specificity, that you don't see in the case of experiment

10:07:17　9　that you can't do, you can't see.

10:07:21　10　　I want to make sure we're real clear.  Do you have to

10:07:26　11　have all nine of these to draw a causation opinion?

10:07:31　12　**A**　No.

10:07:31　13　**Q**　Which -- when you look at it and you've got seven of

10:07:40　14　the nine and it's these seven, and the only reason you don't

10:07:44　15　have experiment is because you can't, and specificity

10:07:49　16　because there's lots of problems, in that type of a

10:07:54　17　situation, how do you arrive at causality?  How good do you

10:08:00　18　think it is?

10:08:02　19　**A**　In 20 years of epidemiology, I think I haven't seen as

10:08:07　20　strong of evidence for a causal relationship than for

10:08:13　21　prescription opioids.  It's the evidence, again, looking at

10:08:15　22　the wall.  Each of the studies you can't really draw

10:08:17　23　conclusions from any one study alone, but when you see

10:08:20　24　overwhelmingly consistent evidence of a dose-response

10:08:23　25　relationship with such strong associations that are much

**Keyes (Direct by Lanier)** 3656

10:08:27    1    stronger than any other risk factor, I think it's quite

10:08:31    2    clear that there is a causal relationship.

10:08:37    3    **Q**    So with that behind General Opinion 6, does that

10:08:40    4    explain each of those phases?

10:08:43    5    **A**    Yes.

10:08:45    6    **Q**    So explain how it explains the difference between

10:08:49    7    phase 1, phase 2, and phase 3, please.

10:08:51    8    **A**    So in phase 1 we had a flooding of opioids into

10:08:56    9    communities. With phase 1 you saw an increase in medical

10:09:01    10    and nonmedical use, and you started to see this really rapid

10:09:05    11    increase in opioid overdose deaths due to prescription

10:09:09    12    opioids.

10:09:09    13    Then in around 2010, 2011, 2012 we really saw a shift

10:09:15    14    where people who were using prescription opioids who were

10:09:19    15    introduced to opioids through prescriptions, and about 75

10:09:25    16    percent of people who use heroin, for example, started with

10:09:27    17    prescription opioids. We started to see this transition to

10:09:31    18    heroin use, as well as what I would say is, you know, the

10:09:35    19    creation of this opioid-rich environment where there was

10:09:38    20    just an increased vulnerability. You had a much more bigger

10:09:41    21    pool of people who were open to trying heroin because it was

10:09:44    22    cheaper, more readily available, than prescription opioids.

10:09:48    23    So then you had this introduction of heroin into the market

10:09:50    24    that was caused by the flood of opioids and the creation of

10:09:56    25    this kind of very vulnerable population. And so then you

| | | |
|---|---|---|
| 10:10:00 | 1 | saw an increase in heroin use and an increase in heroin |
| 10:10:02 | 2 | overdose as well. |
| 10:10:04 | 3 | And then once you had a population of people that was |
| 10:10:07 | 4 | more vulnerable to heroin use, you saw this introduction of |
| 10:10:10 | 5 | synthetic opioids into the heroin supply.  And that has been |
| 10:10:13 | 6 | very, very dangerous and absolutely devastating for public |
| 10:10:18 | 7 | health, because these synthetic opioids are much more potent |
| 10:10:22 | 8 | than heroin. |
| 10:10:24 | 9 | You know, if someone who's naive to opioids uses even |
| 10:10:29 | 10 | a tiny amount of fentanyl, you'll die of an overdose.  I |
| 10:10:33 | 11 | mean, it's the equivalent of two grains of salt.  And so you |
| 10:10:36 | 12 | had this flood of fentanyl into the heroin supply for people |
| 10:10:41 | 13 | who were already using heroin, and that then transitioned us |
| 10:10:45 | 14 | into phase 3, which has been the most deadly part of the |
| 10:10:48 | 15 | epidemic.  But it really is all connected to kind of that |
| 10:10:54 | 16 | start of the prescription opioid supply that created this |
| 10:10:57 | 17 | opioid-rich environment. |
| 10:10:59 | 18 | **Q**    All right.  Just a few more general opinions. |
| 10:11:01 | 19 | General Opinion 7:  "The impact of diverted opioids |
| 10:11:08 | 20 | was not random but part of a complex system that involved |
| 10:11:13 | 21 | community level economic conditions." |
| 10:11:18 | 22 | Is that part of your opinion? |
| 10:11:19 | 23 | **A**    Yes. |
| 10:11:19 | 24 | **Q**    Can you explain it, please? |
| 10:11:20 | 25 | **A**    Sure.  We know from the epidemiological literature |

**Keyes (Direct by Lanier)**                                          3658

10:11:28   1   that this opioid supply, this oversupply of opioids to

10:11:33   2   communities, wasn't random.  Communities that were suffering

10:11:38   3   economically had an increase in the opioid supply compared

10:11:41   4   to other kinds of communities.  And those communities had

10:11:46   5   populations that had a greater prevalence of other risk

10:11:50   6   factors for opioid use disorder and addiction, like low

10:11:56   7   socioeconomic status, other kinds of psychiatric disorders,

10:11:59   8   other risk factors for using heroin, using other drugs, and

10:12:02   9   developing addiction.

10:12:03  10        So you really had two factors that involved the kind

10:12:05  11   of economic conditions of counties, one that the

10:12:10  12   prescription opioid supply was more likely to go to those

10:12:12  13   communities and, two, that there was an increased underlying

10:12:16  14   vulnerability to addiction and other drug use.

10:12:19  15        So we call that kind of part of a complex system that

10:12:24  16   opioid -- you know, I think there's a good analogy that I've

10:12:29  17   heard other epidemiologists and other researchers make,

10:12:33  18   which is that, you know, economic conditions are like kind

10:12:37  19   of the tinder, and the opioid supply was just pouring

10:12:41  20   gasoline all over it, and so you had these communities that

10:12:44  21   were already vulnerable, and then you poured gasoline and

10:12:47  22   lit a match.

10:12:47  23        So overall when we look at the epidemiological

10:12:50  24   literature, the economic conditions play a relatively minor

10:12:53  25   role, but an important one, and the prescription opioid

**Keyes (Direct by Lanier)**

10:12:57  1  supply is really just the gasoline that was poured over

10:13:01  2  those communities.

10:13:09  3  **Q**    Okay.  General Opinion Number 8:  "Availability

10:13:12  4  principles and the relationship with harms related to

10:13:16  5  prescription opioids."

10:13:23  6      Would you walk through with us what you mean by this?

10:13:25  7  **A**    Yes.  I think I -- you know, when talking about

10:13:28  8  analogy in the Bradford Hill criteria, that's where there's

10:13:31  9  just a well-known public health principle called the

10:13:35  10  availability principle, which is pretty simple.  You know,

10:13:39  11  which is what I said.  When you make an addictive substance

10:13:42  12  more available, more people use it, and you'll have more

10:13:46  13  harms associated with use as availability goes up.

10:13:51  14      And that's true for all kinds of products, not just

10:13:55  15  opioids.  That's true, like I said, for alcohol, other kinds

10:14:01  16  of drugs.  The more available you make the product, the more

10:14:03  17  addiction you will see.

10:14:07  18  **Q**    So if you make addictive substances more available,

10:14:12  19  you're going to have more use and more harm.  Is that what

10:14:17  20  you just said?

10:14:18  21  **A**    That's right.

10:14:19  22  **Q**    And analogy, you said tons of them?

10:14:25  23  **A**    Right.

10:14:25  24  **Q**    General Opinion Number 9, the last general opinion

10:14:33  25  before we start honing in on Lake and Trumbull County.

**Keyes (Direct by Lanier)**                                    3660

10:14:36   1        You put "Comparison of deaths due to prescription

10:14:41   2   opioids with NSAIDs."

10:14:44   3        Let's pause for a moment.  NSAID stands for?

10:14:50   4   **A**   Nonsteroidal anti-inflammatory drugs.

10:14:55   5   **Q**   You can get a steroid shot and that will reduce

10:14:58   6   swelling or inflammation.

10:15:01   7        But there are other ways to do it that are not

10:15:04   8   steroids, right?

10:15:04   9   **A**   Yes.

10:15:04   10  **Q**   Nonsteroidal anti-inflammatory, that means no

10:15:13   11  inflammation, no -- right?

10:15:15   12  **A**   That's right.

10:15:23   13  **Q**   Anti-inflammatory drugs.

10:15:24   14       Common example?

10:15:25   15  **A**   There are many -- there are -- most people have taken

10:15:32   16  an NSAID in their life.  There's many products.

10:15:36   17  **Q**   Advil, Motrin?

10:15:38   18  **A**   Sure, yes.

10:15:39   19  **Q**   Whatever name you want to give to it.  But ibuprofen I

10:15:44   20  guess we often take.  I'm sure there are others I'm not

10:15:53   21  thinking of.  But that's what you're talking about here?

10:15:55   22  **A**   Right.

10:15:56   23  **Q**   Now, comparing deaths due to prescription opioids

10:15:59   24  which try to deal with pain, with these nonsteroidal

10:16:04   25  anti-inflammatory pain drugs, with that as background

**Keyes (Direct by Lanier)**                    3661

10:16:12   1    information, explain what you mean by comparing.

10:16:14   2    **A**    Yeah, so I did an analysis in the report where I

10:16:17   3    compared deaths and other kinds of morbidity with

10:16:23   4    prescription opioids to another common pain reliever, which

10:16:29   5    is NSAIDs, that's nonsteroidal anti-inflammatory drugs,

10:16:33   6    which are known to have health risks associated with them,

10:16:36   7    especially gastrointestinal health risks.  And so I wanted

10:16:41   8    to know whether, you know, are the health risks associated

10:16:44   9    with using prescription opioids, are they similar to the

10:16:47  10    risk you take in taking any pain reliever.

10:16:51  11         And, no, there's a number of studies that have

10:16:53  12    compared the health outcomes of using prescription opioids

10:16:57  13    to using other pain relievers, and there is a strong

10:17:02  14    increase in risk of stroke, heart problems, overdose, even

10:17:11  15    using prescription opioids medically, patients are putting

10:17:14  16    themselves at strong increases in risk for a number of

10:17:17  17    different health outcomes, not just overdose, and much

10:17:21  18    more -- and it's much more likely that people using

10:17:24  19    prescription opioids will experience those harms than if

10:17:26  20    they use other kinds of pain relievers.

10:17:30  21    **Q**    Okay.  Now, those are General Opinions 1 through 9.

10:17:40  22    I'd like to focus now on your Lake and Trumbull specific

10:17:46  23    opinions, okay?

10:17:48  24    **A**    Sure.

10:17:48  25    **Q**    First of all, have you ever been to Lake and Trumbull

**Keyes (Direct by Lanier)** 3662

10:17:51  1  County?

10:17:51  2  **A**    You know, I wrote this report in the spring of 2020,

10:17:54  3  and it was a time where travel was quite restricted, so most

10:18:01  4  of my interaction with Lake and Trumbull County was over

10:18:03  5  Zoom, unfortunately.

10:18:05  6  **Q**    Okay.  So you went there via Zoom?

10:18:08  7  **A**    I Zoomed in to Lake and Trumbull County only because

10:18:12  8  COVID.

10:18:12  9  **Q**    All right.  Would you please explain to the jury what

10:18:16  10  work you did specifically to be attentive and give your

10:18:21  11  opinions that we're about to go through on Lake and Trumbull

10:18:24  12  County?

10:18:24  13  **A**    Yes.  So I went to the data sources that I knew were

10:18:30  14  available for Lake and Trumbull County, like the vital

10:18:38  15  statistics data, as well as other publicly available county

10:18:42  16  data that anyone can look up about the health of their

10:18:44  17  communities.

10:18:49  18      And I took in as much information as I could about the

10:18:52  19  burden of opioid use and then the trends over time, and then

10:18:55  20  tried to talk to people in Lake and Trumbull County, medical

10:18:58  21  examiners, other people working on the ground, helping

10:19:01  22  people with addiction and making sure, you know, this is

10:19:03  23  what I'm seeing in the data, does this reflect what you're

10:19:06  24  seeing day to day in these communities, and then combining

10:19:09  25  those two together to try to paint an overall picture of the

1    burden of opioid use in Lake and Trumbull Counties.

2    **Q**    So even though you might have been talking to the

3    medical examiner via Zoom instead of sitting down in the

4    medical examiner's office, were you comfortable that you

5    were able to get all of the information you needed to not

6    only write a report but to testify to the jury today?

7    **A**    Yes.

8    **Q**    Then with that background, let's look at your specific

9    opinions for Lake and Trumbull Counties.

10         Opinion 1:  "Opioid-related harm in Lake and Trumbull

11   Counties, and Ohio, have increased greatly between 1999 and

12   2019, including the death rates due to prescription

13   opioids."

14         Is that your opinion?

15   **A**    Yes.

16   **Q**    Can you explain it and tell us why it's your opinion?

17   **A**    So, again, I looked at -- for example, in the vital

18   statistics data, we have codes we can use to figure out when

19   someone died if prescription opioids contributed as a cause

20   of that death.  And so I looked at county level data and

21   graphed the prescription opioid death rates for Lake and

22   Trumbull County over time and saw that they increased.  I

23   did a statistical analysis and saw that it went up

24   considerably in those communities.

25         I also estimated the prevalence of opioid use disorder

**Keyes (Direct by Lanier)** 3664

10:20:49　1　in Lake and Trumbull County and examined that over time, how

10:20:53　2　many people are addicted to opioids in Lake and Trumbull,

10:20:56　3　how can we estimate that.  And I showed how that increased

10:20:59　4　over time as well.

10:21:00　5　　　　I also looked at other kinds of health outcomes, again

10:21:03　6　using the available data and in conversations with people in

10:21:06　7　Lake and Trumbull County so that I could understand things

10:21:08　8　like neonatal abstinence syndrome and documented all of that

10:21:13　9　in the report and it was all increasing.

10:21:16　10　**Q**　And are you able based on your expertise and the

10:21:21　11　Bradford Hill criteria to correlate in Lake and Trumbull

10:21:24　12　Counties these increased opium-related harms to the

10:21:31　13　oversupply of prescription opioids in those counties?

10:21:36　14　**A**　Yes, I examined the supply of prescription opioids to

10:21:39　15　Lake and Trumbull Counties and came to the conclusion that

10:21:42　16　the increases in harms in Lake and Trumbull County, just

10:21:46　17　like many communities in the United States, increased in

10:21:50　18　concert with the increase in the supply of prescription

10:21:54　19　opioids.  That still remains high in Lake and Trumbull.

10:21:58　20　**Q**　All right.  The next two opinions kind of mirror

10:22:06　21　Opinion 1, and they're broken out as subpoints in your

10:22:09　22　report, but I wanted to make sure we focused on each, so I

10:22:12　23　listed them each as an opinion.

10:22:13　24　　　　Opinion Number 2 I've listed as "Rates of

10:22:19　25　opioid-related harm in Ohio have largely been increasing

**Keyes (Direct by Lanier)**

| | | |
|---|---|---|
| 10:22:22 | 1 | since 1999." |
| 10:22:23 | 2 | Is that part of your opinion? |
| 10:22:26 | 3 | **A**    Yes. |
| 10:22:26 | 4 | **Q**    Why is that important even in a case dealing with Lake |
| 10:22:33 | 5 | and Trumbull Counties? |
| 10:22:33 | 6 | **A**    Because Lake and Trumbull Counties are part of Ohio, |
| 10:22:36 | 7 | and as part of my role as an epidemiologist, I'm kind of |
| 10:22:41 | 8 | assessing the broader communities, you know, in order to |
| 10:22:44 | 9 | provide, again, just this overall picture of what's going on |
| 10:22:48 | 10 | in these particular communities and their surrounding |
| 10:22:52 | 11 | communities and then across the nation. |
| 10:22:54 | 12 | I also document, you know, what's going on in the U.S. |
| 10:22:57 | 13 | as a whole, so it's kind of zooming out and then narrowing |
| 10:23:01 | 14 | in. |
| 10:23:01 | 15 | **Q**    When one looks at, for example, the opioid supply in |
| 10:23:06 | 16 | Lake and Trumbull Counties, is it appropriate to look even |
| 10:23:10 | 17 | beyond those county boundaries for where people may be able |
| 10:23:13 | 18 | to access prescription opioids? |
| 10:23:15 | 19 | **A**    Yes. |
| 10:23:15 | 20 | **Q**    Why is that? |
| 10:23:16 | 21 | **A**    You can leave your county and see a doctor in another |
| 10:23:23 | 22 | county, for example, people have social networks that |
| 10:23:27 | 23 | don't -- aren't constrained by your county boundaries.  So, |
| 10:23:33 | 24 | you know, people leave their counties. |
| 10:23:34 | 25 | **Q**    All right.  Lake and Trumbull Opinion 3, which is |

**Keyes (Direct by Lanier)** 3666

| | | |
|---|---|---|
| 10:23:39 | 1 | similarly related but not simply Ohio says:  "Rates of |
| 10:23:45 | 2 | opioid-related harm in Lake and Trumbull County have also |
| 10:23:49 | 3 | increased since 1999." |
| 10:23:52 | 4 | Is that true? |
| 10:23:53 | 5 | **A**    That is true. |
| 10:23:54 | 6 | **Q**    You've given us a chart in your report.  We've already |
| 10:23:58 | 7 | looked at one that had Figure 5, the overdose death rates |
| 10:24:03 | 8 | for all opioids.  But Figure 12 in your report was the |
| 10:24:11 | 9 | prevalence of opioid use disorder in the United States, in |
| 10:24:14 | 10 | Ohio, in Lake County, and in Trumbull County. |
| 10:24:17 | 11 | Do you see this? |
| 10:24:18 | 12 | **A**    Yes. |
| 10:24:18 | 13 | **Q**    Can you explain what opioid use disorder is as opposed |
| 10:24:24 | 14 | to overdose death? |
| 10:24:26 | 15 | **A**    Opioid use disorder, you know, we use the term "opioid |
| 10:24:31 | 16 | use disorder" I think, you know, in more -- most people say |
| 10:24:37 | 17 | "addiction."  We don't use addiction as a clinical |
| 10:24:40 | 18 | diagnosis.  We use opioid use disorder.  But it's a similar |
| 10:24:43 | 19 | concept. |
| 10:24:44 | 20 | So opioid use disorder or addiction would be a |
| 10:24:47 | 21 | condition, health condition, that places people at higher |
| 10:24:51 | 22 | risk for overdose.  And it involves, you know, a heavy |
| 10:24:58 | 23 | pattern of use of opioids that continues despite |
| 10:25:03 | 24 | consequences, social consequences, family consequences, |
| 10:25:05 | 25 | medical consequences, continued and compulsive use of |

**Keyes (Direct by Lanier)** 3667

10:25:09  1   opioids.

10:25:10  2   **Q**    In that regard, you gave a figure in your report which

10:25:16  3   obviously is not to scale.  I want to emphasize that for the

10:25:20  4   jury and for His Honor.

10:25:22  5        But it's got these three concentric circles, and it's

10:25:29  6   got "Total of opioid treated patients" in the big outer

10:25:38  7   circle.

10:25:38  8        Do you see that?

10:25:39  9   **A**    Yes.

10:25:39  10  **Q**    Explain why you produced this estimate -- well, first

10:25:43  11  of all, you agree this is not to scale, fair?

10:25:46  12  **A**    Fair.

10:25:47  13  **Q**    All right.  Now, along with that, explain why it's

10:25:49  14  important for us to see these three different circles.

10:25:52  15  **A**    So the purpose of the figure is kind of if you think

10:25:56  16  about everyone who is prescribed an opioid, right, there's a

10:26:00  17  universe of people, millions every year, who are prescribed

10:26:03  18  an opioid from a doctor.

10:26:07  19       Among those -- that whole universe of people who are

10:26:09  20  prescribed an opioid, many studies have tried to examine

10:26:13  21  what the prevalence of addiction is in those people.  And so

10:26:19  22  the available studies for people who are using opioids for

10:26:22  23  chronic noncancer pain, for example, indicate that about 21

10:26:26  24  to 29 percent of people will experience at least mild

10:26:31  25  symptoms of opioid use disorder when using opioids.

**Keyes (Direct by Lanier)**                                    3668

10:26:37   1   **Q**    All right.  What I'd like to do is first of all make

10:26:41   2   sure that we're all using these words the same way.

10:26:43   3        We've heard chronic defined.  Can you tell me how

10:26:50   4   you're defining chronic here?

10:26:52   5   **A**    Long-term, people who have pain that lasts a long

10:26:54   6   time.

10:26:54   7   **Q**    I think it was either 90 days or 120 days or something

10:27:03   8   like that, but there's some -- or maybe it's six months, I

10:27:08   9   don't remember what anybody else has said, but not

10:27:11  10   short-term, long-term?

10:27:11  11   **A**    Long-term.  It's defined variously in different

10:27:14  12   studies, but, you know, it just means if you have chronic

10:27:17  13   pain, it's not pain that goes away.

10:27:22  14   **Q**    Well, I'll show you where my brain lives.  I'm going

10:27:25  15   to redraw your statistics in my chart, but I'm going to make

10:27:28  16   it a pie.

10:27:32  17        So this is a pie, and the pie's got "Total opioid

10:27:37  18   treated patients," okay?  You with me?

10:27:40  19   **A**    I'm with you.

10:27:41  20   **Q**    And if we do this as a pie chart to kind of keep it in

10:27:47  21   scale, those that will develop opioid use disorder,

10:27:51  22   somewhere between mild and severe, is how much of the pie?

10:27:54  23   **A**    About a quarter.

10:27:55  24   **Q**    So that would be --

10:27:58  25   **A**    A quarter to a third.

**Keyes (Direct by Lanier)**

| | | |
|---|---|---|
| 10:27:59 | 1 | **Q**    A little bit more -- all right. |
| 10:28:03 | 2 |      And those are mild to severe? |
| 10:28:05 | 3 | **A**    That's right. |
| 10:28:05 | 4 | **Q**    And then you've got those that have moderate to severe |
| 10:28:16 | 5 | are what percentage? |
| 10:28:19 | 6 | **A**    8 to 12 percent. |
| 10:28:21 | 7 | **Q**    So that would be about a little less than half that |
| 10:28:25 | 8 | slice -- |
| 10:28:27 | 9 | **A**    Right. |
| 10:28:27 | 10 | **Q**    -- is going to be moderate to severe. |
| 10:28:38 | 11 |      All right.  Bear with me because we've got to make the |
| 10:28:41 | 12 | record precise. |
| 10:28:42 | 13 |      So mild to severe I'll do with the green because it's |
| 10:28:47 | 14 | that whole big slice, both slices; is that fair? |
| 10:28:53 | 15 | **A**    That's right. |
| 10:28:53 | 16 | **Q**    And then moderate to severe, we'll do it the light |
| 10:28:58 | 17 | purple, that's a subset of mild to severe, fair? |
| 10:29:02 | 18 | **A**    Fair. |
| 10:29:02 | 19 | **Q**    Okay.  So if those are our percentages, then we've |
| 10:29:10 | 20 | also got from you on opioid use disorder in the U.S., Ohio, |
| 10:29:17 | 21 | Lake County, and Trumbull County, national is the black |
| 10:29:23 | 22 | line, right? |
| 10:29:24 | 23 | **A**    That's right. |
| 10:29:24 | 24 | **Q**    So we've got dots, and somehow we've got a line. |
| 10:29:34 | 25 |      What's the difference between the dots and the line? |

**Keyes (Direct by Lanier)** 3670

10:29:36  1    **A**    The line is what we call a moving average, which we

10:29:42  2    often do in epidemiology.  We'll kind of, you know, each of

10:29:47  3    these dots if you just true a line through the dots, there

10:29:50  4    would be up and down, you'd have a lot of variation by year

10:29:53  5    in those dots, so we kind of fit a smooth line to it to even

10:29:57  6    out the error that's associated with a dot being really high

10:30:00  7    versus really low from year to year.

10:30:03  8    **Q**    So, for example, in 2007 to '8, you've got a massive

10:30:11  9    spike in Trumbull County.  You don't draw the line all the

10:30:13  10   way up?

10:30:13  11   **A**    I think those are two different counties.  Oh, I'm

10:30:16  12   sorry.  Withdraw -- okay, that dot and the other green dot,

10:30:24  13   yeah.

10:30:24  14   **Q**    The problem is, this projector doesn't keep the colors

10:30:28  15   so clean, and that's why I'm trying to rehighlight them.

10:30:31  16   **A**    Right.

10:30:32  17   **Q**    Let's go through each one.

10:30:33  18        So Lake County, instead of just looking for the blue

10:30:36  19   dots --

10:30:37  20   **A**    You can just look at the blue line.

10:30:39  21   **Q**    Blue line.

10:30:40  22        So Lake County.  Does this mean it's above the

10:30:47  23   national average?

10:30:48  24   **A**    That's right.

10:30:48  25   **Q**    Worse in Lake County than in the national average?

**Keyes (Direct by Lanier)**                                    3671

| | | | |
|---|---|---|---|
| 10:30:54 | 1 | **A** | Yes. |
| 10:30:54 | 2 | **Q** | Ohio, at times worse in Lake County than in Ohio? |
| 10:31:07 | 3 | **A** | That's right. |
| 10:31:07 | 4 | **Q** | But is Ohio worse than the nation? |
| 10:31:10 | 5 | **A** | Yes. |
| 10:31:10 | 6 | **Q** | And then we've got Trumbull County in green.  Is that |
| 10:31:23 | 7 | | right? |
| 10:31:23 | 8 | **A** | That's right. |
| 10:31:24 | 9 | **Q** | Worse than Ohio? |
| 10:31:27 | 10 | **A** | Yes. |
| 10:31:27 | 11 | **Q** | Worse than the national average? |
| 10:31:30 | 12 | **A** | Yes. |
| 10:31:33 | 13 | **Q** | Does this bear out your opinion that rates of opioid |
| 10:31:37 | 14 | | related harm in Lake County and in Trumbull County have |
| 10:31:40 | 15 | | increased since 1999? |
| 10:31:42 | 16 | **A** | Yes. |
| 10:31:42 | 17 | **Q** | Did this crisis start in 2011 or '12 or did -- |
| 10:31:52 | 18 | **A** | No. |
| 10:31:53 | 19 | **Q** | Huh? |
| 10:31:53 | 20 | **A** | No, it did not start in 2011. |
| 10:31:56 | 21 | **Q** | If we continue, you've got Opinion Number 4. |
| 10:32:08 | 22 | | Opinion Number 4 -- I'm being told it's break time. |
| 10:32:17 | 23 | | THE COURT:  Well, it's a question of when it's |
| 10:32:20 | 24 | | convenient. |
| 10:32:22 | 25 | | MR. LANIER:  Judge, I'm moving to another |

**Keyes (Direct by Lanier)**

| | | |
|---|---|---|
| 10:32:23 | 1 | opinion.  This is a great time.  I want to be sensitive. |
| 10:32:27 | 2 | THE COURT:  All right.  Thank you, Mr. Lanier. |
| 10:32:28 | 3 | All right.  We'll take our mid morning break.  Usual |
| 10:32:32 | 4 | admonitions.  And we'll pick up in 15 minutes. |
| 10:32:36 | 5 | Thank you. |
| 10:33:10 | 6 | (Recess taken at 10:33 a.m.) |
| 10:56:14 | 7 | (Jury present in open court at 10:56 a.m.) |
| 10:56:15 | 8 | THE COURT:  Okay.  Please be seated. |
| 10:56:16 | 9 | And Dr. Keyes, I just want to remind you you're still |
| 10:56:20 | 10 | under oath. |
| 10:56:20 | 11 | So you may continue, Mr. Lanier. |
| 10:56:22 | 12 | MR. LANIER:  Thank you, Your Honor. |
| 10:56:23 | 13 | BY MR. LANIER: |
| 10:56:24 | 14 | **Q**    All right.  Ms. Keyes, I think before the break we |
| 10:56:29 | 15 | were moving to Lake/Trumbull specific Opinion Number 4. |
| 10:56:35 | 16 | Now, I'm going to read this once through for the |
| 10:56:39 | 17 | record and for you and for the jury, but then I want to |
| 10:56:46 | 18 | break it apart to ask you the questions.  Okay? |
| 10:56:48 | 19 | **A**    Sure. |
| 10:56:48 | 20 | **Q**    This says, "Increases in neonatal abstinence syndrome, |
| 10:56:56 | 21 | emergency department visits, admissions for treatment, and |
| 10:57:00 | 22 | nonmedical opioid use among adults and adolescents are |
| 10:57:05 | 23 | additional key harms due to opioids in the population." |
| 10:57:11 | 24 | Is that your opinion? |
| 10:57:12 | 25 | **A**    Yes. |

**Keyes (Direct by Lanier)** 3673

| | | |
|---|---|---|
| 10:57:12 | 1 | **Q**    All right.  I'd like to you explain it and give us the |
| 10:57:16 | 2 | basis for it. |
| 10:57:19 | 3 |      Let's start with neonatal abstinence syndrome. |
| 10:57:23 | 4 |      Can you explain what that is? |
| 10:57:25 | 5 | **A**    Sure. |
| 10:57:26 | 6 |      This is a condition that occurs in newborn infants who |
| 10:57:31 | 7 | have been exposed to opioids in utero or in the womb, and it |
| 10:57:39 | 8 | can be a quite painful condition for newborns.  It involves |
| 10:57:43 | 9 | various symptoms, you know, psychomotor symptoms -- |
| 10:57:49 | 10 | **Q**    Psycho what? |
| 10:57:50 | 11 | **A**    You know, tremors. |
| 10:57:52 | 12 | **Q**    Tremors, okay. |
| 10:57:53 | 13 | **A**    For example, or restlessness, a lot of anxiety.  You |
| 10:58:00 | 14 | know, in a newborn, sensitivity, photosensitivity, light |
| 10:58:03 | 15 | sensitivity, you know, and a lot of distress for a newborn |
| 10:58:07 | 16 | infant due to exposure to opioids in the womb. |
| 10:58:10 | 17 |      And so I documented, you know, there is surveillance |
| 10:58:13 | 18 | in Ohio of the number of infants born with neonatal |
| 10:58:19 | 19 | abstinence syndrome, and so I documented the number of cases |
| 10:58:21 | 20 | of neonatal abstinence syndrome in Ohio and in Lake and |
| 10:58:27 | 21 | Trumbull County. |
| 10:58:27 | 22 |      Emergency department visits -- |
| 10:58:28 | 23 | **Q**    Well, before we leave the babies, how do you document |
| 10:58:32 | 24 | something like that?  Where do you get your data from? |
| 10:58:34 | 25 | **A**    There are databases where if a clinician records -- |

**Keyes (Direct by Lanier)**                                      3674

10:58:42    1    there are diagnosis codes for neonatal abstinence syndrome.

10:58:46    2    So if a clinician records that a newborn baby has neonatal

10:58:52    3    abstinence syndrome, then it gets compiled in administrative

10:58:54    4    records from hospitals that are then filtered to available

10:58:57    5    databases for research.

10:58:59    6    Q    Okay.  All right.  In addition to that harm, emergency

10:59:07    7    department visits, tell us about that.

10:59:09    8    A    So emergency department visits due to opioid use would

10:59:12    9    primarily involve an overdose.  If someone overdoses from

10:59:16   10    excessive use of opioids and some of those overdoses would

10:59:23   11    require emergency department services in order to revive

10:59:27   12    someone who's experiencing an overdose and to ensure that

10:59:31   13    someone is kept alive after an overdose.

10:59:35   14         And so people go to the emergency department for other

10:59:39   15    reasons related to opioids, falls, for example, you know,

10:59:45   16    other conditions that can occur when you're using opioids.

10:59:48   17    Cardiac conditions, strokes.

10:59:50   18    Q    Okay.  Admissions for treatment, explain that and

10:59:57   19    where you get your data from.

10:59:59   20    A    Sure.  So admissions for treatment would be if someone

11:00:04   21    wants to stop using opioids and requires medical services in

11:00:07   22    order to do so, like the clinic that I worked at in the

11:00:10   23    early 2000s, we helped people -- when you stop using

11:00:15   24    opioids, when you've been using a lot of opioids, you

11:00:18   25    experience very medically serious withdrawal symptoms that

**Keyes (Direct by Lanier)**          3675

11:00:22    1    are very uncomfortable, so people usually require medical

11:00:25    2    services in order to detox from opioids and then require

11:00:31    3    services ongoing if people want to remain abstinent from

11:00:35    4    opioids, you know, addiction treatment services.

11:00:36    5         And so we record when there are admissions for

11:00:40    6    treatment for the people who want to stop using opioids, we

11:00:45    7    record in administrative databases how many people are going

11:00:47    8    to treatment, what kinds of treatments they're getting, and

11:00:52    9    what drugs they're requiring services for, whether it's

11:01:00   10    opioids or another kind of drug.

11:01:02   11    Q    And explain what you mean when you say that

11:01:06   12    "nonmedical opioid use among adults and adolescents as an

11:01:11   13    additional key harm due to opioids."

11:01:14   14    A    So that would just be use of opioids without a

11:01:16   15    doctor's prescription.  So an additional potential harm that

11:01:19   16    we track in populations is how many people are using opioids

11:01:23   17    nonmedically, which is an indicator of diversion and

11:01:25   18    oversupply and is, you know, kind of a warning sign or a

11:01:30   19    flag that a community might be experiencing harms due to

11:01:34   20    oversupply of opioids, if there is a high level of

11:01:37   21    nonmedical use.

11:01:38   22    Q    And if there is an underground market for such things

11:01:42   23    at that point in time, all that comes with that, is that a

11:01:50   24    measurable harm or is that a harm caused in a sense by this

11:01:54   25    same problem of oversupply you've cited?

**Keyes (Direct by Lanier)**                                    3676

11:01:56  1    **A**    That's right.

11:01:57  2    **Q**    So the crime rates associated with an underground

11:02:01  3    market, the unsavory side of our society, the communities

11:02:07  4    where we live?

11:02:08  5    **A**    Yes.

11:02:08  6    **Q**    Okay.  Lake and Trumbull specific Opinion Number 5:

11:02:22  7    "There is a need for treatment in Lake and Trumbull

11:02:25  8    Counties."

11:02:25  9          Do you believe that to be true?

11:02:26  10   **A**    Yes.

11:02:26  11   **Q**    Explain how treatment -- you know, with fairness,

11:02:34  12   we've got at least part of our jury that knows this very

11:02:38  13   well, but others may not.

11:02:40  14         Explain the importance of treatment, please.

11:02:44  15   **A**    So like as I mentioned, people, you know, who stop

11:02:47  16   using opioids, a lot of people will require some medical

11:02:50  17   services for that -- for really the immediate period when

11:02:52  18   you stop using opioids, and you may have withdrawal symptoms

11:02:55  19   that are associated with it.  And then many people will need

11:02:58  20   ongoing treatment services to help maintain abstinence, and

11:03:02  21   that can include medication, there are medications for

11:03:06  22   opioid use disorder that help people so that they can remain

11:03:10  23   abstinent from opioids, and then there's also other kinds of

11:03:15  24   services, psychosocial types of treatment, you know, talking

11:03:18  25   to a counselor, having group therapy, that help people who

**Keyes (Direct by Lanier)**                                    3677

11:03:21   1   want to remain abstinent from whatever drug that they're

11:03:25   2   doing, including opioids.

11:03:31   3   **Q**     All right.  Great.  And does that treatment make a

11:03:33   4   real difference?

11:03:34   5   **A**     Absolutely.  It's lifesaving.

11:03:39   6   **Q**     You give another specific opinion for Lake and

11:03:42   7   Trumbull County that concentrates on children here.  It

11:03:45   8   says, "Consequences of opioid use disorder and overdose for

11:03:51   9   children in the counties."

11:03:57  10       Can you explain how this affects children beyond

11:03:59  11   simply the neonatal abstinence syndrome you've already

11:04:04  12   discussed, please?

11:04:04  13   **A**     Sure.  Well, specifically regarding neonatal

11:04:08  14   abstinence syndrome, it should just be noted that a lot of

11:04:11  15   children who experience neonatal abstinence syndrome will

11:04:13  16   need ongoing care, may have learning disabilities when

11:04:16  17   they're at school age, other kinds of developmental delays

11:04:22  18   that are associated with having had neonatal abstinence

11:04:24  19   syndrome.  So that's part of kind of the harm to children in

11:04:26  20   communities.

11:04:26  21       But beyond that, children who have parents who use

11:04:30  22   drugs, for example, experience a lot of adverse childhood

11:04:35  23   events that increase risk for psychiatric disorders,

11:04:39  24   learning disabilities, and other kinds of struggles that

11:04:42  25   children are going to have if they have parental loss,

**Keyes (Direct by Lanier)** 3678

11:04:45 | 1 | parental death, and parental addiction, parental

11:04:49 | 2 | incarceration.  All of those are increases in risk when a

11:04:51 | 3 | parent has an opioid use disorder.

11:04:53 | 4 | And so children in the community are affected by the

11:04:58 | 5 | burden of opioid use in the community beyond just their

11:05:03 | 6 | direct exposure to opioids but also having parents and other

11:05:06 | 7 | family members who have opioid use disorder.

11:05:08 | 8 | **Q**   So if I'm hearing you correctly, you're saying that,

11:05:13 | 9 | for example, the neonatal abstinence syndrome, that actually

11:05:22 | 10 | can affect intellectual development and other brain

11:05:29 | 11 | developments that affect social skills and things like

11:05:32 | 12 | that --

11:05:32 | 13 | **A**   That's right.

11:05:32 | 14 | **Q**   -- in little babies?

11:05:34 | 15 | **A**   That's right.

11:05:35 | 16 | **Q**   And in that regard, do communities continue to see

11:05:45 | 17 | results of these harms even 10 and 15 and 20 years later?

11:05:51 | 18 | **A**   Absolutely.

11:05:55 | 19 | **Q**   Can you explain how problems in the 2000s can create

11:06:00 | 20 | community problems still today?

11:06:01 | 21 | **A**   There are numerous ways for that to occur.

11:06:06 | 22 | Generations of communities are affected by the overdose

11:06:11 | 23 | epidemic and the opioid epidemic.  You know, children,

11:06:14 | 24 | again, who are at school age, high school, and now adults

11:06:19 | 25 | who experienced a burden of parental opioid use and other

**Keyes (Direct by Lanier)**

11:06:23  1    family members who used opioids, there's a lot of loss

11:06:26  2    that's occurred in these communities.  And people who have

11:06:29  3    opioid use disorder can have a chronic and relapsing

11:06:33  4    condition, and so once you have opioid use disorder, even if

11:06:37  5    you use treatment services, there's no guarantee that you

11:06:40  6    won't continue to experience symptoms of opioid use

11:06:44  7    disorder, relapse using opioids.

11:06:46  8         And so for the communities, this is an ongoing issue.

11:06:50  9    **Q**    Okay.  Lake and Trumbull Opinion Number 7:  "Quantify

11:07:00  10   the proportion of opioid death attributable to prescription

11:07:06  11   opioids."

11:07:07  12        How on earth can you do that?

11:07:09  13   **A**    Sure.  Well, the -- how we do that in epidemiology is

11:07:14  14   really in two different ways.  One way is that of the opioid

11:07:20  15   deaths that have occurred in Lake and Trumbull County, some

11:07:23  16   portion of them are directly attributable to prescription

11:07:26  17   opioids.  People who overdose have -- from use of

11:07:32  18   prescription opioids directly, for example.

11:07:34  19        And then there's a portion of deaths that are

11:07:37  20   indirectly attributable to prescription opioids.  That's,

11:07:40  21   for example, people who overdose on heroin after they

11:07:44  22   started using prescription opioids and then transitioned

11:07:48  23   from prescription opioids to heroin.  So that death is

11:07:53  24   still, in epidemiological determines, causally attributable

11:07:56  25   to prescription opioids if the sequence of opioid use was

**Keyes (Direct by Lanier)**

1  prescription opioid to heroin use.

2  And so I estimated in this report the proportion of

3  deaths that are in Lake and Trumbull County that are

4  directly attributable to prescription opioids because

5  someone overdosed having used prescription opioids, and then

6  the proportion that were indirectly attributable.

7  **Q**    And what were your findings in that regard?

8  **A**    The findings in that regard are that, you know, a

9  majority of opioid deaths in Lake and Trumbull County are in

10  some way attributable to prescription opioids, either

11  because there is a prescription opioid that is a

12  contributing cause of death on the death certificate, which

13  is a substantial proportion, and then if you estimate the

14  proportion of people who didn't have a prescription opioid

15  at the time of death but likely used prescription opioids as

16  the first opioid in their -- in the sequence of drugs that

17  they used.  It's a majority of them.

18  **Q**    All right.  As we have worked through your opinions, I

19  have not asked you to comment on the specific role of

20  different folks who may have been involved in causing this

21  problem at this point, have I?

22  **A**    No.

23  **Q**    Okay.  That's not the primary reason I've asked you

24  here today, but if you are to be examined over that, do you

25  have opinions on that?

**Keyes (Direct by Lanier)** 3681

| | | |
|---|---|---|
| 11:09:25 | 1 | **A**    Do I have opinions about -- say that again. |
| 11:09:30 | 2 | **Q**    I just -- I want to try and get an idea of whether or |
| 11:09:35 | 3 | not you have opinions on the responsibility of pharmacies, |
| 11:09:39 | 4 | of manufacturers, of distributors, things like that. |
| 11:09:46 | 5 | **A**    Yes. |
| 11:09:46 | 6 | MR. LANIER:  Okay.  Not what I've asked you to |
| 11:09:48 | 7 | be here to testify about today, so I'll let opposing counsel |
| 11:09:52 | 8 | question you on those if they want to.  But for my purposes, |
| 11:09:55 | 9 | thank you very much, Dr. Keyes. |
| 11:09:56 | 10 | I wish you and Aidan a great day, although I do get to |
| 11:10:00 | 11 | talk to you again in a little bit. |
| 11:10:02 | 12 | I pass the witness, Your Honor. |
| 11:10:04 | 13 | THE COURT:  Okay. |
| 11:10:09 | 14 | MR. STOFFELMAYR:  Judge, may we have just one |
| 11:10:11 | 15 | minute to get set up? |
| 11:10:16 | 16 | (Pause in proceedings.) |
| 11:10:16 | 17 | THE COURT:  Yes, Mr. Stoffelmayr. |
| 11:11:35 | 18 | MR. STOFFELMAYR:  Good morning, Professor |
| 11:11:36 | 19 | Keyes. |
| 11:11:37 | 20 | May I begin, Your Honor? |
| 11:11:38 | 21 | THE COURT:  Yes, you may. |
| 11:11:39 | 22 | MR. STOFFELMAYR:  Good morning, ladies and |
| 11:11:40 | 23 | gentlemen.  I'm back. |
| | 24 | |
| | 25 | |

**Keyes (Cross by Stoffelmayr)**                                    3682

| | | |
|---|---|---|
| 11:11:19 | 1 | - - - - - |
| 11:11:34 | 2 | CROSS-EXAMINATION |
| 11:11:34 | 3 | BY MR. STOFFELMAYR: |
| 11:11:44 | 4 | **Q**    Professor Keyes, good morning. |
| 11:11:46 | 5 | Did we lose Aidan?  Is he looking for cookies? |
| 11:11:48 | 6 | **A**    He did.  He said that this was more boring than math |
| 11:11:51 | 7 | class. |
| 11:11:52 | 8 | **Q**    Did not live up to its billing.  I'm sorry for that. |
| 11:11:54 | 9 | This is -- obviously we joke around, but this is |
| 11:11:57 | 10 | obviously very serious stuff, correct? |
| 11:11:59 | 11 | **A**    Yes. |
| 11:11:59 | 12 | **Q**    You agree with that. |
| 11:12:00 | 13 | One of the first things Mr. Lanier asked you about, I |
| 11:12:09 | 14 | heard him speak before, it sounds like you and Mr. Lanier |
| 11:12:12 | 15 | had snacks last night, you met at some point in the past. |
| 11:12:15 | 16 | But just so it's not confusing to anybody, other than |
| 11:12:19 | 17 | Mr. Lanier, you have met with other lawyers about this case |
| 11:12:23 | 18 | either recently or in the past.  He's not the only person |
| 11:12:25 | 19 | you've ever encountered, right? |
| 11:12:28 | 20 | **A**    That's right. |
| 11:12:29 | 21 | **Q**    I know Mr. Lanier asked you, you said you're not a |
| 11:12:34 | 22 | medical doctor.  So that means when it comes to a particular |
| 11:12:37 | 23 | patient, you wouldn't be involved in making a decision about |
| 11:12:40 | 24 | which medicine to use to treat that person's pain, correct? |
| 11:12:43 | 25 | **A**    Not in an individual patient decision.  I evaluate the |

11:12:49  1    literature on which drug to give which patients and advise

11:12:52  2    doctors, but I don't make the decision.

11:12:54  3    **Q**     Would it be kind of the right way to think about it

11:12:56  4    that as an epidemiologist you look at things at sort of a

11:13:00  5    population level, on a large level, not at the level of an

11:13:02  6    individual person?

11:13:03  7    **A**     That's right.

11:13:03  8    **Q**     I think I heard you say, and there's a couple places

11:13:13  9    where I made notes during your testimony, and don't let me

11:13:16  10   put words in your mouth.  If I say I think I heard you say

11:13:19  11   A, B, and C, and it's not right, you know, correct me.

11:13:22  12   Okay?

11:13:22  13   **A**     Okay.

11:13:23  14   **Q**     I think I heard you say that you were going to offer

11:13:27  15   two opinions.  One was -- maybe it went in reverse order as

11:13:31  16   they came out, but one is what is the burden in these two

11:13:34  17   counties, and the second opinion or maybe the first in order

11:13:37  18   is what caused that burden.  Right?

11:13:40  19   **A**     That's right.

11:13:40  20   **Q**     And the second opinion is one where, as I looked back

11:13:44  21   I wasn't sure what your answer was.

11:13:46  22         What did cause the burden in Lake and Trumbull

11:13:48  23   Counties, in your opinion?

11:13:49  24   **A**     The supply of prescription opioids.

11:13:52  25   **Q**     Okay.  Anything else or is just that it?

**Keyes (Cross by Stoffelmayr)** 3684

| | | |
|---|---|---|
| 11:13:56 | 1 | **A**     That is the -- a substantial contributing factor.  But |
| 11:14:00 | 2 | certainly as I discussed, it's a complex system.  It |
| 11:14:04 | 3 | interacts with individual vulnerabilities, other community |
| 11:14:08 | 4 | level factors, but the supply of prescription opioids was |
| 11:14:11 | 5 | the necessary factor for the opioid epidemic to occur. |
| 11:14:20 | 6 | **Q**     What about the supply of nonprescriptions or illicit |
| 11:14:24 | 7 | opioids, is that relevant to the burden? |
| 11:14:28 | 8 | **A**     It is relevant to the burden, yes. |
| 11:14:28 | 9 | **Q**     Also causally connected to the burden in Lake and |
| 11:14:31 | 10 | Trumbull Counties? |
| 11:14:31 | 11 | **A**     Can you just restate, are illicit opioids contributing |
| 11:14:36 | 12 | to the epidemic, is that -- |
| 11:14:37 | 13 | **Q**     Yeah. |
| 11:14:38 | 14 | **A**     Yes, illicit opioids do contribute. |
| 11:14:40 | 15 | **Q**     I mean, it would be -- if you think of the burden -- |
| 11:14:45 | 16 | well, let me ask you this way. |
| 11:14:47 | 17 |      Is it fair to think of the burden in terms of the |
| 11:14:49 | 18 | opioid crisis, that's what we're talking about, that's the |
| 11:14:52 | 19 | burden that Lake and Trumbull Counties are bearing, the |
| 11:14:54 | 20 | burden of the crisis? |
| 11:14:56 | 21 | **A**     I mean, I would think of it in terms of the specific |
| 11:15:01 | 22 | outcomes, like overdose.  I mean, I think saying the opioid |
| 11:15:03 | 23 | crisis is kind of an organizing term that we could use, but |
| 11:15:07 | 24 | within that there's many different health conditions and |
| 11:15:09 | 25 | mortality to consider. |

**Keyes (Cross by Stoffelmayr)** 3685

| | | |
|---|---|---|
| 11:15:11 | 1 | **Q**    Okay.  Let's talk in terms of the overdose burden.  It |
| 11:15:15 | 2 | sounds sort of unpleasantly clinical to call a death an |
| 11:15:18 | 3 | overdose burden or someone going to the emergency room, but |
| 11:15:21 | 4 | is that an okay way to talk about it in your field? |
| 11:15:23 | 5 | **A**    Yes. |
| 11:15:23 | 6 | **Q**    It would be correct to say that, I mean, heroin is one |
| 11:15:30 | 7 | cause of the overdose burden in Lake and Trumbull Counties, |
| 11:15:33 | 8 | correct? |
| 11:15:34 | 9 | **A**    Yes. |
| 11:15:35 | 10 | **Q**    Heroin for the most part comes originally from Mexico |
| 11:15:41 | 11 | or China or elsewhere out of the country? |
| 11:15:44 | 12 | **A**    In large part, it is trafficked into the United |
| 11:15:48 | 13 | States, yes. |
| 11:15:49 | 14 | **Q**    Fentanyl is a significant cause of the overdose burden |
| 11:15:53 | 15 | in those two counties? |
| 11:15:55 | 16 | **A**    In recent years, yes. |
| 11:15:56 | 17 | **Q**    And again, fentanyl, the kind of fentanyl that's most |
| 11:16:02 | 18 | often abused, is illicit fentanyl that often comes from |
| 11:16:05 | 19 | Mexico or China as well? |
| 11:16:06 | 20 | **A**    There's unregulated and prescription versions of |
| 11:16:12 | 21 | fentanyl, and we actually don't know based on the death |
| 11:16:14 | 22 | certificates whether the fentanyl that someone used when |
| 11:16:22 | 23 | they overdosed was prescription fentanyl or unregulated |
| 11:16:25 | 24 | fentanyl. |
| 11:16:25 | 25 | **Q**    But you don't disagree, as we've heard from others, |

**Keyes (Cross by Stoffelmayr)**

| | | |
|---|---|---|
| 11:16:28 | 1 | very often when someone overdoses and they discover fentanyl |
| 11:16:33 | 2 | in that person's system, the origin was illicit fentanyl |
| 11:16:36 | 3 | that was introduced with heroin or cocaine or another drug, |
| 11:16:39 | 4 | correct? |
| 11:16:40 | 5 | **A**    That can occur, yes. |
| 11:16:42 | 6 | **Q**    Do you have any information on whether when it comes |
| 11:16:49 | 7 | to, say, overdose fatalities, whether it's more often |
| 11:16:53 | 8 | illicit fentanyl or the kind of fentanyl that doctors |
| 11:16:56 | 9 | prescribe? |
| 11:16:57 | 10 | **A**    That's not recorded in the death certificate. |
| 11:16:59 | 11 | **Q**    Do you have any other information about that? |
| 11:17:01 | 12 | **A**    I estimated in the report.  I tried to do my best to |
| 11:17:06 | 13 | figure out, you know, the proportion of deaths or the number |
| 11:17:10 | 14 | of deaths in Lake and Trumbull County that were due to a |
| 11:17:14 | 15 | prescription fentanyl versus illicit fentanyl.  But it's an |
| 11:17:17 | 16 | estimate. |
| 11:17:17 | 17 | **Q**    What's the estimate? |
| 11:17:18 | 18 | **A**    The estimate of the number of deaths? |
| 11:17:21 | 19 | **Q**    The proportion of illicit fentanyl versus the kind of |
| 11:17:25 | 20 | fentanyl that doctors prescribe. |
| 11:17:26 | 21 | **A**    It depends on the year in terms of the number of |
| 11:17:32 | 22 | deaths.  I can tell you exactly in the report.  But it's a |
| 11:17:37 | 23 | minority of deaths that are due to prescription fentanyl, |
| 11:17:41 | 24 | but certainly they occur every year. |
| 11:17:42 | 25 | **Q**    Okay.  That's really where I was going.  And we don't |

11:17:46  1    need to spend too much longer trying to get at the exact

11:17:49  2    number, although if you want to go back to your report,

11:17:52  3    you're free to.

11:17:52  4    **A**     Yeah.

11:17:52  5    **Q**     But more often it's the illicit kind of fentanyl than

11:17:57  6    the fentanyl that doctors prescribe?

11:17:58  7    **A**     We believe so, or I believe so, I guess, but again,

11:18:04  8    it's not in the death certificate, so I just want to be

11:18:07  9    clear that we don't know what kind of fentanyl someone used

11:18:10  10   when they overdosed.  But based on prescription patterns,

11:18:13  11   and really what I used to estimate it as kind of, you know,

11:18:16  12   pre-2015 patterns of fentanyl overdose to try to estimate

11:18:20  13   how many people overdosed due to a prescription.  And it's a

11:18:24  14   small but, you know, every death, overdose death is

11:18:31  15   preventable.

11:18:32  16   **Q**     But the fentanyl accounts for the majority of those

11:18:35  17   cases.  I asked you this earlier, and I apologize if you

11:18:37  18   answered it and I just missed it, for the most part that

11:18:39  19   comes from China or Mexico?

11:18:40  20   **A**     I'm sorry, say that again.

11:18:42  21   **Q**     The illicit fentanyl, not the kind the doctors

11:18:45  22   prescribe but the illicit fentanyl that accounts for the

11:18:48  23   majority of overdose deaths with fentanyl, the illicit

11:18:51  24   fentanyl generally comes from China or Mexico?

11:18:53  25   **A**     That is my understanding based on -- based on analyses

**Keyes (Cross by Stoffelmayr)** 3688

11:18:58  1  that have been published in the literature that those --

11:19:00  2  that they're primarily trafficked from outside the United

11:19:03  3  States, including from China and Mexico.

11:19:05  4  **Q**    What about counterfeit pills?  Is that a cause of the

11:19:09  5  burden in Lake and Trumbull Counties?

11:19:12  6  **A**    Yes.

11:19:12  7  **Q**    And counterfeit pills might look just like a real,

11:19:16  8  say, oxycodone pill, but it was actually made illegally on

11:19:23  9  the street, so to speak, but not in a pharmaceutical

11:19:26  10  factory, correct?

11:19:27  11  **A**    That's right.

11:19:27  12  **Q**    Doctor shoppers, have they contributed to the burden

11:19:33  13  in Lake and Trumbull Counties?

11:19:35  14  **A**    Sorry, doctor shoppers you said?

11:19:37  15  **Q**    Yes, so patients who go around tricking multiple

11:19:40  16  doctors in their writing prescriptions.

11:19:41  17  **A**    Yes, I don't know that I would use those words, but,

11:19:46  18  yes, there are people who have obtained multiple

11:19:50  19  prescriptions from providers who are at increased risk of

11:19:53  20  opioid use disorder.

11:19:54  21  **Q**    And that's a -- that behavior has contributed to the

11:19:59  22  burden in Lake and Trumbull Counties?

11:20:02  23  **A**    Sure, yes.

11:20:03  24  **Q**    What about like a -- it's a colloquialism, but we've

11:20:10  25  heard it during the trial, pill mill doctors who just write

| | | |
|---|---|---|
| 11:20:17 | 1 | prescriptions for cash, have they contributed to the burden |
| 11:20:18 | 2 | in Lake and Trumbull? |
| 11:20:19 | 3 | **A**     Yes, high volume prescribers have contributed to the |
| 11:20:22 | 4 | opioid epidemic. |
| 11:20:23 | 5 | **Q**     I've seen in some of your writing the term "social |
| 11:20:27 | 6 | network diversion."  Can you explain to us what social |
| 11:20:30 | 7 | network diversion means? |
| 11:20:31 | 8 | **A**     So, you know, kind of I would say it's, you know, |
| 11:20:34 | 9 | medicine cabinet diversion, so if someone has extra pills |
| 11:20:37 | 10 | that have been prescribed to them and they trade them or |
| 11:20:39 | 11 | sell them in their -- among family and friends, for example, |
| 11:20:44 | 12 | that type of diversion is very common with unused |
| 11:20:47 | 13 | medication. |
| 11:20:47 | 14 | **Q**     Is that sometimes colloquially called medicine cabinet |
| 11:20:51 | 15 | diversion? |
| 11:20:52 | 16 | **A**     Yes. |
| 11:20:53 | 17 | **Q**     Okay.  And could be the medicine cabinet, could be the |
| 11:20:55 | 18 | nightstand, could be the kitchen drawer, but people just |
| 11:20:57 | 19 | call it kind of medicine cabinet diversion, pills sitting |
| 11:21:00 | 20 | around the house that can get traded inside a network of |
| 11:21:03 | 21 | friends and family? |
| 11:21:04 | 22 | **A**     That occurs, yes. |
| 11:21:05 | 23 | **Q**     And that also has contributed to the burden in Lake |
| 11:21:10 | 24 | and Trumbull Counties, correct? |
| 11:21:11 | 25 | **A**     Yes. |

**Keyes (Cross by Stoffelmayr)**                    3690

| | | |
|---|---|---|
| 11:21:11 | 1 | **Q**     Theft, theft from a medicine cabinet or from a retail |
| 11:21:17 | 2 | outlet, that's, I assume, contributed to the burden in the |
| 11:21:20 | 3 | two counties? |
| 11:21:20 | 4 | **A**     Yes. |
| 11:21:21 | 5 | **Q**     Would you agree that Government entities like the FDA |
| 11:21:30 | 6 | or state medical boards, that their conduct has contributed |
| 11:21:33 | 7 | to the burden in the two counties? |
| 11:21:35 | 8 | **A**     Yes. |
| 11:21:35 | 9 | **Q**     Explain that.  How has the FDA contributed to the |
| 11:21:40 | 10 | burden in Lake and Trumbull Counties? |
| 11:21:41 | 11 | **A**     When you're examining a crisis like this that has |
| 11:21:51 | 12 | caused so much death, at every point where there's a |
| 11:21:54 | 13 | regulatory action or a check that could have been done to |
| 11:21:57 | 14 | prevent this amount of suffering, I think you have to |
| 11:21:59 | 15 | examine it.  And so the FDA's conduct in -- anything that |
| 11:22:05 | 16 | kind of increased access to opioids and the oversupply of |
| 11:22:09 | 17 | opioids, I think that was a point where we could have |
| 11:22:12 | 18 | prevented a lot of harm.  And so I would say -- I would look |
| 11:22:16 | 19 | at the DEA and the FDA as points in that kind of access |
| 11:22:22 | 20 | pathway where if there had been more -- you know, been a |
| 11:22:32 | 21 | stronger restriction on opioids, then there wouldn't have |
| 11:22:35 | 22 | been such an oversupply. |
| 11:22:36 | 23 | **Q**     I asked you about the FDA, but I think you said both |
| 11:22:39 | 24 | the FDA and the DEA in your mind contributed to the burden |
| 11:22:42 | 25 | in the two counties? |

**Keyes (Cross by Stoffelmayr)**

11:22:43  1   **A**    Yes.

11:22:43  2   **Q**    Would you say the same of the state medical board?

11:22:48  3   **A**    Yes.

11:22:48  4   **Q**    What about county government?  Would you go that far?

11:22:53  5   **A**    I don't -- I haven't evaluated the actions of county

11:23:00  6   government, so I'm not sure what role they have played.

11:23:03  7   But, again, you know, any kind of -- any company that

11:23:08  8   increased access to opioids I think we should look at as

11:23:13  9   potential causes of the opioid epidemic.

11:23:14  10  **Q**    You've testified in other cases, as Mr. Lanier said,

11:23:19  11  but those cases didn't involve Lake and Trumbull Counties,

11:23:21  12  correct?

11:23:22  13  **A**    That's right.

11:23:23  14  **Q**    One involved some local areas in West Virginia, and

11:23:27  15  another one New York State?

11:23:31  16  **A**    Yes.

11:23:31  17  **Q**    In those cases, you testified about some other

11:23:36  18  entities that were substantial factors, I think in the

11:23:40  19  crisis locally there.  For example, major wholesale

11:23:45  20  distributors like Cardinal, McKesson, AmerisourceBergen.

11:23:49  21       Would you say they were also causal factors in the

11:23:54  22  crisis in Lake and Trumbull Counties?

11:23:55  23  **A**    Yes.

11:23:55  24  **Q**    And in the New York case I think you also talked about

11:23:59  25  manufacturers being causally -- having causally contributed

**Keyes (Cross by Stoffelmayr)**

| | | |
|---|---|---|
| 11:24:03 | 1 | to the crisis in New York State. |
| 11:24:05 | 2 | Would you say the same, that manufacturers have |
| 11:24:08 | 3 | causally contributed to the burden in Lake and Trumbull |
| 11:24:11 | 4 | Counties? |
| 11:24:11 | 5 | **A** Yes. |
| 11:24:12 | 6 | **Q** And I can't be the only person to get up and not say |
| 11:24:18 | 7 | something about the Browns game. |
| 11:24:20 | 8 | The Cleveland Browns, we can all agree, bear no |
| 11:24:23 | 9 | responsibility. Is that fair? |
| 11:24:26 | 10 | **A** That's fair. |
| 11:24:27 | 11 | **Q** Thank you. Didn't want to be left out. |
| 11:24:29 | 12 | You talked I think early on in your testimony this |
| 11:24:48 | 13 | morning about the link between availability of opioids and |
| 11:24:52 | 14 | opioid use disorder, correct? |
| 11:24:52 | 15 | **A** Yes. |
| 11:24:53 | 16 | **Q** If I slip up and say addiction, will we understand |
| 11:24:57 | 17 | that in your terms, in medical terms, it's opioid use |
| 11:25:02 | 18 | disorder, the same thing? |
| 11:25:03 | 19 | **A** Yes. We use the term "opioid use disorder," but I |
| 11:25:07 | 20 | think addiction is what people kind of commonly -- outside |
| 11:25:11 | 21 | research and epidemiology, commonly hear. |
| 11:25:14 | 22 | **Q** I will try to do the same. |
| 11:25:17 | 23 | You can get opioid use disorder even if you're using |
| 11:25:21 | 24 | your pills exactly as recommended by your doctor, correct? |
| 11:25:25 | 25 | **A** Yes. |

**Keyes (Cross by Stoffelmayr)** 3693

| | | |
|---|---|---|
| 11:25:25 | 1 | **Q**    And even if you have a good well-meaning doctor trying |
| 11:25:30 | 2 | to do the right thing when that doctor writes the |
| 11:25:33 | 3 | prescription and you take the pills exactly as prescribed by |
| 11:25:36 | 4 | the doctor, you can still get opioid use disorder, get |
| 11:25:40 | 5 | addicted to the pills, correct? |
| 11:25:44 | 6 | **A**    That's right. |
| 11:25:44 | 7 | **Q**    Would you agree that the opioid crisis as we know it, |
| 11:25:52 | 8 | it would not have occurred if prescribing opioids had not |
| 11:25:57 | 9 | become standard practice for managing pain? |
| 11:26:02 | 10 | **A**    If -- so you're saying -- the question is, if opioids |
| 11:26:07 | 11 | hadn't been prescribed as they were prescribed, would the |
| 11:26:11 | 12 | opioid crisis have occurred? |
| 11:26:12 | 13 | **Q**    A little bit different related question.  Let me try |
| 11:26:15 | 14 | again. |
| 11:26:15 | 15 | Is it your view that the opioid crisis would not have |
| 11:26:20 | 16 | occurred if prescribing opioids had not become a standard |
| 11:26:24 | 17 | practice for managing pain in patients? |
| 11:26:27 | 18 | **A**    Yes, my opinion is that the prescribing of opioids as |
| 11:26:34 | 19 | it occurred in the United States led to the opioid crisis. |
| 11:26:37 | 20 | **Q**    I don't think you mentioned any specific studies by |
| 11:26:46 | 21 | name in your testimony this morning, but I do want to go |
| 11:26:48 | 22 | through some of the studies you cite in your report. |
| 11:26:50 | 23 | Do you have a copy of your report handy or can I give |
| 11:26:53 | 24 | you one? |
| 11:26:53 | 25 | **A**    I have it. |

**Keyes (Cross by Stoffelmayr)** 3694

| | | |
|---|---|---|
| 11:26:54 | 1 | **Q**    Great.  There's a paper you discuss in your report by |
| 11:27:02 | 2 | an author, and I don't know, perhaps you know the |
| 11:27:04 | 3 | researcher, it's Vowles or Vowles.  How do I say that? |
| 11:27:08 | 4 | **A**    Vowles. |
| 11:27:08 | 5 | **Q**    Vowles, okay.  And I think you say the Vowles paper, |
| 11:27:11 | 6 | well, it's a systematic review, correct? |
| 11:27:15 | 7 | **A**    Yes.  Do you have a copy of the paper? |
| 11:27:16 | 8 | **Q**    I can pull one out, but I can give you one as well. |
| 11:27:19 | 9 | Let me pull it up on the screen.  I'll be happy to hand you |
| 11:27:23 | 10 | a copy. |
| 11:27:24 | 11 | **A**    Thank you. |
| 11:27:47 | 12 | MR. STOFFELMAYR:  Sorry.  Just one second. |
| 11:27:54 | 13 | **Q**    Ms. Lanier is going to give you a binder with like |
| 11:27:57 | 14 | five or ten studies that we may refer to over the course of |
| 11:28:03 | 15 | our discussion. |
| 11:28:03 | 16 | **A**    Okay. |
| 11:28:04 | 17 | **Q**    And it includes the Vowles paper at Tab 10.  I've got |
| 11:28:07 | 18 | it on the screen as well, but read whichever version is |
| 11:28:10 | 19 | easier for you. |
| 11:28:11 | 20 | **A**    Thank you. |
| 11:28:14 | 21 | **Q**    So this is the Vowles paper you discussed in your |
| 11:28:18 | 22 | expert report, correct? |
| 11:28:19 | 23 | **A**    Yes. |
| 11:28:21 | 24 | **Q**    And it's what in your field you call a systematic |
| 11:28:25 | 25 | review, meaning it's not like an original study but they |

11:28:27   1    look at a whole bunch of studies and try to bring together

11:28:31   2    the results in one place?

11:28:32   3    **A**     That's fair.

11:28:34   4    **Q**     There's a better way to describe it, you know, you're

11:28:37   5    the epidemiologist here, so feel free to describe it in a

11:28:41   6    better way.

11:28:41   7    **A**     Sure.  I can tell -- if you'd like, I don't -- but the

11:28:45   8    systematic reviews, they're actually really valuable as, you

11:28:50   9    know, epidemiologists when you want to look at the wall and

11:28:52  10    you've got all the bricks, systematic reviews kind of put

11:28:55  11    all the bricks together for you.  And, you know, I do

11:28:59  12    systematic reviews all the time in my work and will kind of

11:29:01  13    put everything together and say, okay, here's the

11:29:03  14    conclusions we can come to by looking at a whole body of

11:29:07  15    literature rather than each study one by one.  So systematic

11:29:12  16    reviews are kind of how we go from the bricks to the wall.

11:29:14  17    **Q**     And the Vowles paper I think is the source of those

11:29:19  18    numbers that you went through with Mr. Lanier, there were

11:29:21  19    some circles and then there was a pie chart?  You know what

11:29:24  20    I'm talking about?

11:29:25  21    **A**     Yes.

11:29:25  22    **Q**     And I think what you said is that if you look at

11:29:32  23    these -- well, I should say this.

11:29:33  24          The Vowles study concerns opioid use disorder in

11:29:37  25    chronic pain patients, correct?

**Keyes (Cross by Stoffelmayr)**

| | | |
|---|---|---|
| 11:29:39 | 1 | **A**    That's right. |
| 11:29:39 | 2 | **Q**    They were very specifically focused on chronic pain |
| 11:29:42 | 3 | patients, not people who were getting an opioid for a |
| 11:29:45 | 4 | toothache and needed it for two days or something, right? |
| 11:29:49 | 5 | **A**    That's right. |
| 11:29:50 | 6 | **Q**    And in this chronic pain group, I think your testimony |
| 11:29:52 | 7 | was, somewhere between 21 and 29 percent of chronic pain |
| 11:29:56 | 8 | patients will misuse opioids according to what Vowles |
| 11:30:00 | 9 | concluded? |
| 11:30:00 | 10 | **A**    Not exactly.  My -- will experience opioid use |
| 11:30:06 | 11 | disorder from mild to severe. |
| 11:30:07 | 12 | **Q**    Okay.  That's something I wanted to clarify.  Vowles, |
| 11:30:11 | 13 | the term they use is "misuse" in the paper, correct? |
| 11:30:13 | 14 | **A**    Yes. |
| 11:30:13 | 15 | **Q**    And let me make sure I got this right. |
| 11:30:31 | 16 | So this is what they say in the paper.  They're |
| 11:30:33 | 17 | looking at -- or one of the things they look at is misuse. |
| 11:30:36 | 18 | And they define that as "opioid use contrary to the directed |
| 11:30:40 | 19 | or prescribed pattern of use, regardless of the presence or |
| 11:30:44 | 20 | absence of harm or adverse effects." |
| 11:30:46 | 21 | Right, that's what they say? |
| 11:30:48 | 22 | **A**    Yes. |
| 11:30:48 | 23 | **Q**    And then what you said is well if you go and look at |
| 11:30:50 | 24 | the papers themselves, kind of pretty much the same thing as |
| 11:30:54 | 25 | mild OUD? |

11:30:57  1    **A**     So I went to the studies that comprise the Vowles

11:31:02  2    systematic review and looked at the actual instruments that

11:31:04  3    they used to estimate opioid use disorder in the patients

11:31:14  4    and determined that those instruments were capturing at

11:31:17  5    least mild opioid use disorder.

11:31:18  6    **Q**     But that's an analysis that you added.  The Vowles

11:31:21  7    author, Professor Vowles and his co-authors, or her

11:31:25  8    co-authors, I don't know, they didn't make that second step

11:31:28  9    to say that all these misuse papers, it's at least mild OUD.

11:31:32  10   They just left it at misuse defined the way they do here,

11:31:36  11   right?

11:31:36  12   **A**     That's right.

11:31:37  13   **Q**     Okay.  And then there's a smaller group, 8 to 12

11:31:41  14   percent of these chronic pain patients who actually develop

11:31:44  15   I think you describe it as -- I think Vowles calls it

11:31:48  16   addiction.  You call that moderate to severe OUD; is that

11:31:51  17   right?

11:31:51  18   **A**     That's right.

11:31:56  19   **Q**     It was mentioned a minute ago, the Vowles paper, the

11:32:00  20   studies they looked at for the systematic review are chronic

11:32:04  21   pain studies, correct?

11:32:07  22   **A**     Yes.

11:32:07  23   **Q**     And, well, let's look at it.

11:32:29  24          I don't need to look for it.  But chronic pain they

11:32:32  25   define as pain that lasts for three months or longer,

11:32:34  1    correct?

11:32:36  2    **A**    I trust your --

11:32:40  3    **Q**    I can show it to you, but it sounds about right.

11:32:43  4         Very often in your field, chronic pain and acute pain

11:32:45  5    are distinguished in terms of a 90-day cut off, correct?

11:32:48  6    **A**    Yes.  I actually found it right here.  "Persistent

11:32:51  7    pain lasting longer than three months."

11:32:53  8    **Q**    And these are really noncancer --

11:32:53  9              (Court reporter interjection.)

11:33:01  10   **Q**    Well, who knows what I said exactly.

11:33:03  11        What I meant to say was, these are patients with

11:33:07  12   noncancer pain, they didn't look at people who had pain

11:33:10  13   because they had cancer?

11:33:11  14   **A**    That's right.

11:33:12  15   **Q**    So for these chronic pain people or patients, I don't

11:33:23  16   want to sound like I'm being disrespectful, for the chronic

11:33:26  17   pain patients they looked at in Vowles, we have these

11:33:28  18   numbers, 8 to 12 percent for addiction, 21 to 29 percent for

11:33:33  19   mild OUD or misuse, depending how you look at it.

11:33:37  20        But when it comes to people with chronic pain, there's

11:33:41  21   still a risk of OUD, right, just because -- let me start

11:33:44  22   over.  That made no sense, did it?

11:33:46  23        When it comes to people with acute pain who are taking

11:33:50  24   pills for a shorter period of time than 90 days, there's

11:33:53  25   still a risk of OUD of course, right?

| | | |
|---|---|---|
| 11:33:55 | 1 | **A**     That's right. |
| 11:33:56 | 2 | **Q**     But it's a considerably, considerably lower risk of |
| 11:34:01 | 3 | OUD if you have acute pain treatment than if you have |
| 11:34:04 | 4 | chronic pain treatment, correct? |
| 11:34:05 | 5 | **A**     There's a relationship between dose and duration, so |
| 11:34:10 | 6 | the higher the dose and the longer duration, the higher the |
| 11:34:13 | 7 | risk of OUD.  So those with acute prescriptions for opioids |
| 11:34:19 | 8 | have about three times the risk of OUD in studies compared |
| 11:34:23 | 9 | to those who aren't prescribed.  But those who are |
| 11:34:25 | 10 | prescribed for long periods of time have multiple full |
| 11:34:29 | 11 | higher risk than that. |
| 11:34:30 | 12 | **Q**     I think we're saying the same thing, but just so we're |
| 11:34:33 | 13 | clear, it goes both ways, right?  As the dose and duration |
| 11:34:36 | 14 | are higher, the risk is higher.  And the flip side is when |
| 11:34:39 | 15 | the dose is lower or the duration is shorter, the risk is |
| 11:34:44 | 16 | lower? |
| 11:34:44 | 17 | **A**     That's right. |
| 11:34:45 | 18 | **Q**     Goes both directions obviously, right? |
| 11:34:46 | 19 | **A**     That's right. |
| 11:34:48 | 20 | **Q**     Okay.  There's a paper by an author called Edlund that |
| 11:34:54 | 21 | looks at this, right? |
| 11:34:56 | 22 | **A**     Yes. |
| 11:34:56 | 23 | **Q**     And this is a paper you rely on and discuss in your |
| 11:35:00 | 24 | report? |
| 11:35:00 | 25 | **A**     That's right. |

11:35:00  1    **Q**    Okay.  It should be at Tab 3 in that binder I gave

11:35:05  2    you.  If it's not, let me know, we'll sort it out.

11:35:24  3         Do you have that in front of you?

11:35:26  4    **A**    I do.

11:35:26  5    **Q**    I've got it on the screen too, whatever is easier for

11:35:29  6    you.

11:35:29  7         In Edlund they looked at both acute pain patients and

11:35:35  8    chronic pain patients, correct?

11:35:36  9    **A**    Yes.

11:35:37  10   **Q**    This is an original study.  Edlund is not combining

11:35:40  11   research other people did.  This is an original study that

11:35:42  12   Edlund and the other authors performed?

11:35:46  13   **A**    That's right.

11:35:47  14   **Q**    And when they -- so they broke people into really

11:35:51  15   three groups -- well, actually they broke people into seven

11:35:55  16   groups, but I want to take it step by step.

11:35:56  17        One group is people who never got an opioid at all,

11:35:59  18   right?

11:36:00  19   **A**    That's right.  During the study period.

11:36:02  20   **Q**    Yes, oh, yes, during the study period.

11:36:04  21        So one group never got an opioid, and then there are

11:36:06  22   six other groups, correct?

11:36:08  23   **A**    That's right.

11:36:08  24   **Q**    And to get those six other groups, first we broke

11:36:12  25   people -- not we, Professor Edlund broke people into two

| | | |
|---|---|---|
| 11:36:17 | 1 | camps, chronic pain patients and acute pain patients, |
| 11:36:22 | 2 | correct? |
| 11:36:22 | 3 | **A**    It wasn't -- the acute and chronic was the dose of |
| 11:36:28 | 4 | opioids rather than the pain. |
| 11:36:29 | 5 | **Q**    Oh, okay.  I understand. |
| 11:36:30 | 6 | People with -- well, he -- we'll just I think describe |
| 11:36:35 | 7 | it the way he does. |
| 11:36:36 | 8 | His acute group are people who had pills for less than |
| 11:36:38 | 9 | 90 days, correct? |
| 11:36:40 | 10 | **A**    Yes. |
| 11:36:40 | 11 | **Q**    And his chronic group are people who had pills for |
| 11:36:43 | 12 | more than 90 days? |
| 11:36:45 | 13 | **A**    Right. |
| 11:36:45 | 14 | **Q**    Okay.  And then in each of those groups there are |
| 11:36:49 | 15 | three subgroups, whether the dose they got was low, medium, |
| 11:36:53 | 16 | or high in terms of how many MME per day they were getting? |
| 11:36:57 | 17 | **A**    Yes.  And MME is morphine milligram equivalent, just |
| 11:37:01 | 18 | to -- |
| 11:37:01 | 19 | **Q**    There may be some jurors who are getting sick of |
| 11:37:04 | 20 | having MME explained to them. |
| 11:37:05 | 21 | **A**    Oh, I'm sure they have heard it. |
| 11:37:07 | 22 | **Q**    But it can't hurt to go over it one more time. |
| 11:37:09 | 23 | It's a way of describing how potent a pill is, |
| 11:37:12 | 24 | correct? |
| 11:37:12 | 25 | **A**    That's right. |

**Keyes (Cross by Stoffelmayr)**

| | | |
|---|---|---|
| 11:37:13 | 1 | **Q**     Okay.  And so the fact that one person got one pill |
| 11:37:15 | 2 | and one person got three pills might be a lot less |
| 11:37:18 | 3 | interesting than whether one pill was super high MME versus |
| 11:37:24 | 4 | three really low MME pills, right? |
| 11:37:30 | 5 | **A**     Right. |
| 11:37:31 | 6 | **Q**     So in Edlund we've got these different groups, |
| 11:37:34 | 7 | chronic, low, medium, high dose, and acute low, medium, high |
| 11:37:38 | 8 | dose, correct? |
| 11:37:39 | 9 | **A**     Yes. |
| 11:37:48 | 10 | **Q**     So I want to go over some of the Edlund findings.  And |
| 11:37:53 | 11 | I think it's page 3 if you're flipping through pages or I |
| 11:37:56 | 12 | think it's page 559 if you're looking at actual page |
| 11:37:59 | 13 | numbers.  I'm going to blow this up, one, because it's tiny |
| 11:38:14 | 14 | and, two, because it's a little hard to follow unless we go |
| 11:38:18 | 15 | slowly. |
| 11:38:22 | 16 | So what Edlund shows us or what they find is that the |
| 11:38:27 | 17 | total group of people, 497, had a new diagnosis of OUD in |
| 11:38:34 | 18 | the postindex period. |
| 11:38:36 | 19 | Correct? |
| 11:38:37 | 20 | **A**     That's right. |
| 11:38:37 | 21 | **Q**     What does postindex mean in a paper like this? |
| 11:38:41 | 22 | **A**     So these are people who had a doctor record a |
| 11:38:44 | 23 | diagnosis of OUD after they were prescribed opioids, which |
| 11:38:50 | 24 | is the minority of people who have opioid use disorder, but |
| 11:38:53 | 25 | these are the ones that were recorded by a physician in the |

| | |
|---|---|
| 11:38:56 | 1 |
| 11:38:56 | 2 |
| 11:38:58 | 3 |
| 11:39:03 | 4 |
| 11:39:05 | 5 |
| 11:39:06 | 6 |
| 11:39:07 | 7 |
| 11:39:10 | 8 |
| 11:39:15 | 9 |
| 11:39:18 | 10 |
| 11:39:21 | 11 |
| 11:39:24 | 12 |
| 11:39:25 | 13 |
| 11:39:32 | 14 |
| 11:39:37 | 15 |
| 11:39:45 | 16 |
| 11:39:45 | 17 |
| 11:39:46 | 18 |
| 11:39:49 | 19 |
| 11:39:51 | 20 |
| 11:39:53 | 21 |
| 11:39:53 | 22 |
| 11:39:58 | 23 |
| 11:40:01 | 24 |
| 11:40:04 | 25 |

1  chart.

2  **Q**    All right.  So if you were prescribed with OUD before

3  you even got a prescription, you're not part of this study,

4  or you're not part of this number I should say?

5  **A**    They're not part of that number.

6  **Q**    Gotcha.

7  **A**    But they do control for prior -- you know, prior

8  substance use and dependence.

9  **Q**    But the ones Edlund is interested in, he's interested

10  in of those people who later got a prescription and then

11  later got OUD, how many fall into which bucket?

12  **A**    That's right.

13  **Q**    Okay.  Then what he discovers is the unadjusted rate

14  of postindex OUD diagnosis, what we just talked about, for

15  the various categories was 0.21 percent for low dose, acute,

16  correct?

17  **A**    Yes.

18  **Q**    Now, that -- to be fair, that is higher than the

19  number for the group of people who never got a prescription,

20  right?  They were at lower risk still?

21  **A**    Right.

22  **Q**    I mean, it seems common sense but it's worth saying,

23  if you don't get a prescription for an opioid, your odds of

24  getting opioid use disorder are lower than if you do get a

25  prescription, right?

11:40:05   1   **A**     Yes.

11:40:05   2   **Q**     So that's the low dose, acute group.

11:40:11   3         Now, for the low dose, chronic group, the next one,

11:40:15   4   it's .72.  So it's considerably higher, right, for the

11:40:19   5   chronic group, the same low dose?

11:40:23   6   **A**     Yes.

11:40:24   7   **Q**     And following along, for the medium dose, acute group,

11:40:31   8   it's actually the same as the low dose, acute group, right,

11:40:37   9   .012?

11:40:37  10   **A**     That's right.

11:40:38  11   **Q**     But when we get to the medium dose, chronic group,

11:40:40  12   it's gone up -- now we're at 1.28 percent.  It's gone up a

11:40:44  13   lot, right?

11:40:45  14   **A**     Yes.

11:40:45  15   **Q**     In relative terms.  I don't know what's a lot.  In

11:40:48  16   relative terms?

11:40:49  17   **A**     That's right.

11:40:50  18   **Q**     All right.  And then last one -- you know, I didn't do

11:40:53  19   a great job highlighting that.  Let my try again.

11:41:03  20         And then for it's be high dose, acute, it's still 0.12

11:41:13  21   percent, correct?

11:41:14  22   **A**     Yes.

11:41:14  23   **Q**     But when you get to the high dose, chronic group,

11:41:17  24   that's the highest number by far for all of them, correct?

11:41:20  25   **A**     Yes.

**Keyes (Cross by Stoffelmayr)**

| | | |
|---|---|---|
| 11:41:26 | 1 | **Q**    And one of the things Edlund concludes from this -- |
| 11:41:30 | 2 | I'll jump forward a couple pages.  It's 562 of the paper |
| 11:41:34 | 3 | version. |
| 11:41:46 | 4 |     One of the things the Edlund authors conclude is that |
| 11:41:49 | 5 | their findings have important clinical implications and they |
| 11:41:53 | 6 | suggest that the risk of an incident OUD is relatively small |
| 11:42:00 | 7 | for an acute trial of opioids. |
| 11:42:02 | 8 |     Do you see that? |
| 11:42:02 | 9 | **A**    I do. |
| 11:42:02 | 10 | **Q**    Would you agree with that? |
| 11:42:03 | 11 | **A**    Yes, yeah. |
| 11:42:06 | 12 | **Q**    Have you had -- this is not something about Edlund |
| 11:42:11 | 13 | that you discussed in your report, but maybe you know it or |
| 11:42:14 | 14 | we can look at it. |
| 11:42:14 | 15 |     Do you have a sense in all those Edlund people that |
| 11:42:18 | 16 | they looked at how many of the patients were on that chronic |
| 11:42:23 | 17 | dose or, sorry, the chronic, you know, pill regimen versus |
| 11:42:27 | 18 | the shorter acute regimen?  How do they break down? |
| 11:42:30 | 19 | **A**    The high dose, chronic group was 378 people. |
| 11:42:35 | 20 | **Q**    Actually, what I was getting at -- I apologize if I |
| 11:42:37 | 21 | didn't ask clearly. |
| 11:42:38 | 22 |     Let me look at the table.  It's in Table 2.  Maybe it |
| 11:42:42 | 23 | will be easier to explain what I mean. |
| 11:42:50 | 24 |     That is not Table 2.  It will be easier to ask you a |
| 11:42:55 | 25 | question about Table 2 if we were looking at it. |

11:43:03    1          And what I was getting at is how the population they

11:43:08    2    were looking at, how it breaks down between people who were

11:43:12    3    in the acute group versus the chronic group.

11:43:15    4          Do you see that?

11:43:16    5    **A**    I do.

11:43:16    6    **Q**    When they were recruiting people to be in this

11:43:20    7    study -- or I don't know how they did it, but when they were

11:43:22    8    figuring out who to put in the study, did they intentionally

11:43:26    9    want the chronic group to be smaller than the acute group or

11:43:29   10    the other way around or anything like that?

11:43:31   11    **A**    No.  This was based on the prescribing pattern in --

11:43:34   12    they used a data set of hospital records, so it was just

11:43:39   13    based on the number of people who were prescribed that

11:43:41   14    amount.

11:43:41   15    **Q**    So was this pretty much a randomly selected group

11:43:44   16    within those hospital records?

11:43:45   17    **A**    It's not -- we use the term "random selection" very

11:43:52   18    specifically in epidemiology.

11:43:53   19    **Q**    Keep me honest.  I don't want you to lose your

11:43:56   20    epidemiology card if I trick you into using the wrong word.

11:44:00   21    So, please, how would you describe this, what they did if

11:44:02   22    it's not random?

11:44:03   23    **A**    Right, I would say -- we call it a purpose of sample,

11:44:06   24    but essentially it's an observational study.  It's what

11:44:09   25    people happen to be prescribed in a hospital setting.  They

11:44:14   1   weren't selected because they were prescribed a certain

11:44:16   2   amount.

11:44:17   3   **Q**     Right.  So they didn't say, let's go find 50 high dose

11:44:20   4   people, 50 low dose people.  They just said let's look at

11:44:23   5   everyone we have data for?

11:44:24   6   **A**     Right.

11:44:25   7   **Q**     Okay.  So looking at everyone they had data for, it's

11:44:30   8   apparent from these numbers a lot more of them were in the

11:44:33   9   acute group than the chronic group, right?

11:44:37   10  **A**     That's exactly the problem with the acute.  That's why

11:44:39   11  a low rate of addiction among acute users creates big

11:44:42   12  problems, because most of the people have acute

11:44:45   13  prescriptions.

11:44:46   14  **Q**     Sure, sure, right.  If one in 10,000 people gets

11:44:50   15  addicted, that's a lot of people, big picture, right?

11:44:54   16  That's still -- I'm not saying it's not a problem, right?

11:44:58   17  **A**     But if 65 million people are prescribed, yes, you can

11:45:00   18  have --

11:45:01   19  **Q**     Understood.  Understood.  But what I'm getting at here

11:45:04   20  though in this group, just so we understand who these people

11:45:07   21  are, I did the math, and you can tell me if this is -- you

11:45:12   22  know, I'm sure you're a better math than I am.  But when I

11:45:15   23  did the math, we concluded that in this population that they

11:45:19   24  had records for, of the people who got an opioid

11:45:23   25  prescription, like some people who never saw an opioid,

11:45:27 1 putting those people aside, of the people who got an opioid

11:45:30 2 prescription, 94 percent of them were in the acute group and

11:45:33 3 only 6 percent were in the chronic group.

11:45:36 4 Does that look right when you look at the numbers?

11:45:38 5 **A** Yeah, I think that's approximately -- that's

11:45:42 6 approximately right, yeah.

11:45:42 7 **Q** And is that about right, just in America in general,

11:45:48 8 that when people get opioids, 94 percent of the time they're

11:45:53 9 getting a prescription that would be for less than 90 days,

11:45:58 10 this acute group, versus more than 90 days?

11:46:01 11 **A** It really depends. I don't think that we can

11:46:03 12 generalize that to the U.S. because prescribing practices

11:46:06 13 really differ across different jurisdictions, and they

11:46:09 14 differ across time quite a bit too.

11:46:10 15 **Q** Are you familiar with any data on what the average

11:46:14 16 length of an opioid prescription is in the United States?

11:46:16 17 **A** I believe the Schreiber study that I cited in here

11:46:22 18 provides that information over time. We can -- off the top

11:46:24 19 of my head, I don't remember what the medium length of time

11:46:27 20 is, but we can pull that study. It should be in the binder

11:46:31 21 somewhere.

11:46:31 22 **Q** I messed up. It's not in your binder but we've got a

11:46:35 23 copy somewhere.

11:46:35 24 Let me ask you to look at Tab 2 in the binder, see if

11:46:39 25 this answers the question. If not, we can look for that

11:46:42   1   other paper.

11:46:52   2        Do you have that in front of you, the annual

11:46:54   3   surveillance report of drug-related risks and outcomes from

11:46:57   4   the CDC?

11:46:57   5   **A**    Yes.

11:46:58   6   **Q**    Are you familiar with this publication from your work?

11:47:03   7   **A**    I don't believe I cited this in my report.

11:47:09   8   **Q**    You did not cite it in your report, that's correct.

11:47:11   9   I'm just wondering if, you know, from the work you do in

11:47:14   10  general this is a reference that you sometimes, you know,

11:47:17   11  look to or have used in the past?

11:47:19   12  **A**    I don't think I have used this specific publication in

11:47:25   13  the past.

11:47:26   14  **Q**    Are you familiar with it or this is new?

11:47:27   15  **A**    This is new.

11:47:30   16  **Q**    All right.  Well, you can see that it's published by

11:47:33   17  the Centers For Disease Control and Prevention, correct?

11:47:40   18  **A**    Yes.  Well, yes, the injury prevention and control

11:47:43   19  area.

11:47:43   20  **Q**    That's a part of the CDC, correct?

11:47:45   21  **A**    That's a part of the CDC.

11:47:47   22  **Q**    And CDC is obviously a highly respected Government

11:47:49   23  agency.

11:47:51   24        I don't want to sound political.  It's a Government

11:47:54   25  agency?

| | | |
|---|---|---|
| 11:47:54 | 1 | **A**    It's a Government agency. |
| 11:47:56 | 2 | **Q**    It's highly respected by some people? |
| 11:47:58 | 3 | **A**    Yes. |
| 11:47:59 | 4 | **Q**    All right.  Whatever you have to say about the CDC, |
| 11:48:05 | 5 | they are known -- one of the things they do a lot of is |
| 11:48:08 | 6 | collect data, correct? |
| 11:48:11 | 7 | **A**    The CDC does collect some data. |
| 11:48:16 | 8 | Looking at this, it looks like the -- most of what |
| 11:48:18 | 9 | they are reporting here is not data the CDC collected. |
| 11:48:23 | 10 | **Q**    Oh, I see.  They're reporting data they got from other |
| 11:48:25 | 11 | sources? |
| 11:48:26 | 12 | **A**    Yes. |
| 11:48:27 | 13 | **Q**    Okay.  What I wanted to ask you to look at is -- |
| 11:48:31 | 14 | actually it's supplemental Table 1A.  And you'll see why in |
| 11:48:35 | 15 | a minute. |
| 11:48:35 | 16 | I can tell you it's page 115 of the PDF, if that does |
| 11:48:39 | 17 | you any good.  I'm going to put it on the screen as well. |
| 11:49:01 | 18 | Did you have that?  Did you manage to find it? |
| 11:49:03 | 19 | **A**    I do. |
| 11:49:04 | 20 | **Q**    So supplemental Table 1A shows numbers going back to |
| 11:49:11 | 21 | 2006 up to 2018, correct? |
| 11:49:14 | 22 | **A**    Correct. |
| 11:49:14 | 23 | **Q**    And one of the things they report here is that bottom |
| 11:49:23 | 24 | row -- I did that wrong. |
| 11:49:38 | 25 | Average day's supply for prescription filled, correct? |

11:49:41   1   **A**     Yes.

11:49:42   2   **Q**     And we're talking about opioids here, right,

11:49:45   3   prescription opioids?

11:49:46   4   **A**     That's what the title says.  Again, I haven't reviewed

11:49:48   5   this, so I don't --

11:49:51   6   **Q**     Okay.  Okay.

11:49:51   7   **A**     The title of the supplemental table is "Opioid

11:49:54   8   prescriptions filled."

11:49:56   9   **Q**     Okay.  Whether you like the CDC or not, they hopefully

11:49:59  10   get the titles right more often than not, correct?

11:50:01  11   **A**     I haven't undertaken an analysis of the CDC.

11:50:06  12   **Q**     You're a scientist, you want data, fair enough.

11:50:10  13         What they've got at the bottom here is for each of

11:50:13  14   those years, average day's supply per prescription filled,

11:50:19  15   correct?

11:50:19  16   **A**     Yes.

11:50:19  17   **Q**     And we see in 2006 it says 13.3 days, correct?

11:50:24  18   **A**     Yes.

11:50:25  19   **Q**     And by 2018 it's gone up to 18.4 days, correct?

11:50:31  20   **A**     Yes.

11:50:33  21   **Q**     And the last number shows you that that's obviously

11:50:35  22   increased from 2006 to 2018 by I think they say 37.6

11:50:41  23   percent, right?

11:50:42  24   **A**     Yes.

11:50:42  25   **Q**     So if these numbers are to be trusted, the average

**Keyes (Cross by Stoffelmayr)**                    3712

11:50:47    1    length of an opioid prescription in the United States,

11:50:50    2    depending on the year, has varied from 13 to 19 days?

11:50:57    3    **A**    Based on the IQVIA data, which is -- yes, that's

11:51:04    4    what -- the prescriptions that are included in the IQVIA

11:51:06    5    data as analyzed here, which I have not reviewed, indicates

11:51:10    6    an increase from 13.3 to 18.4.

11:51:14    7    **Q**    And the name IQVIA has come and gone once or twice

11:51:17    8    quickly in this trial.

11:51:18    9          That's an outfit that aggregates all sorts of

11:51:23    10   prescription drug type data, correct?

11:51:25    11   **A**    Retail pharmacy sales.

11:51:26    12   **Q**    Sales data.  And it's available to, among other

11:51:30    13   people, researches use it sometimes, correct?

11:51:31    14   **A**    Yes.  I use the IQVIA data quite often.

11:51:35    15   **Q**    What kind of purposes do you use the IQVIA data for?

11:51:39    16   **A**    To understand patterns of retail pharmacy sales.

11:51:43    17   **Q**    Prescribing as well or just sales?

11:51:47    18   **A**    The IQVIA data I think is based on retail pharmacy

11:51:51    19   prescribing patterns.

11:51:52    20   **Q**    Maybe this comes to the same thing.

11:51:54    21          If a prescription drug is sold at a retail pharmacy,

11:52:00    22   somebody prescribed it, right?

11:52:01    23   **A**    Yes.

11:52:01    24   **Q**    So if you look at the sales data, you're also looking

11:52:04    25   at prescribing data sort of by a different name?

11:52:07  1   **A**     Right.

11:52:27  2   **Q**     Do you have any concern that these numbers based on

11:52:30  3   the IQVIA data that the CDC has reported, the 13 to 19 days,

11:52:33  4   do you have any concern that that's inaccurate?

11:52:35  5   **A**     You know, just -- having not seen it before, I haven't

11:52:39  6   read the methodology, I just -- as a scientist, you know, we

11:52:42  7   like to dig into details, and so I just -- because I have

11:52:48  8   not seen any of the methodology they used to come up with

11:52:52  9   this table, I don't testify to its validity, I guess, but

11:52:58  10  it's a table in a publication.

11:53:00  11  **Q**     You don't look at it and say holy cow, that's got to

11:53:03  12  be wrong, it should be closer to 3 or it should be closer to

11:53:06  13  150 or something like that?

11:53:07  14  **A**     Yeah, I don't look at it and say holy cow this must be

11:53:11  15  wrong.

11:53:12  16          MR. STOFFELMAYR:  Judge, I'm at a transition

11:53:14  17  point.  I'm happy to keep going, but I know we're coming up

11:53:16  18  on the lunch hour.

11:53:17  19          THE COURT:  All right.  If this,

11:53:19  20  Mr. Stoffelmayr, is a good time to stop, then that's fine.

11:53:22  21  We'll do so.  We'll take our noon recess, pick up at 1:00

11:53:27  22  with Ms. Keyes' testimony.

11:53:31  23      And Ms. Keyes, I trust you'll make sure your son gets

11:53:37  24  a reasonably healthy lunch.

11:53:39  25          THE WITNESS:  Reasonably.

**Keyes (Cross by Stoffelmayr)**                    3714

11:53:40  1          THE COURT:  Okay.  I'm sorry our cafeteria is

11:53:42  2    closed or else I could ensure there would be something good

11:53:45  3    in the courthouse.

11:54:19  4                (A luncheon recess was taken at 11:54 a.m.)

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

| | | |
|---|---|---|
| 12:54:18 | 1 | A F T E R N O O N   S E S S I O N |
| 12:57:55 | 2 | - - - - - |
| 12:57:55 | 3 | (In open court at 12:57 p.m.) |
| 12:58:02 | 4 | THE COURT:  All right.  I had a more eventful |
| 12:58:05 | 5 | lunch hour than anticipated.  In addition to taking care of |
| 12:58:08 | 6 | two criminal matters, my courtroom deputy advised me that |
| 12:58:15 | 7 | earlier today one of the jurors informed him that another |
| 12:58:20 | 8 | juror had brought in this morning copies of an article |
| 12:58:28 | 9 | regarding Narcan, which he began showing to the jurors, |
| 12:58:35 | 10 | others. |
| 12:58:37 | 11 | This juror was told immediately that this wasn't |
| 12:58:39 | 12 | appropriate and it was to stop. |
| 12:58:46 | 13 | So what I'm proposing to do is to bring in the juror |
| 12:58:49 | 14 | who reportedly had these articles, question her.  It's Juror |
| 12:59:01 | 15 | Number 4.  And then take it from there.  So that's what I'm |
| 12:59:03 | 16 | proposing to do. |
| 12:59:04 | 17 | Does anyone have any objections? |
| 12:59:06 | 18 | MS. SULLIVAN:  Your Honor, first of all, Your |
| 12:59:08 | 19 | Honor, we'd have to talk to our client about a mistrial. |
| 12:59:11 | 20 | But at a minimum -- |
| 12:59:12 | 21 | THE COURT:  This is what -- this is what I |
| 12:59:13 | 22 | propose to do to find out the facts. |
| 12:59:16 | 23 | MS. SULLIVAN:  Your Honor, at a minimum that |
| 12:59:18 | 24 | juror should be disqualified. |
| 12:59:21 | 25 | THE COURT:  Ms. Sullivan, I'm going one step |

| | | |
|---|---|---|
| 12:59:24 | 1 | at a time to determine what the facts are, so the only way |
| 12:59:28 | 2 | to determine what the facts are to question the juror.  I |
| 12:59:31 | 3 | don't want to question the juror who reported it because I |
| 12:59:33 | 4 | don't -- for obvious reasons.  I'm going to question the |
| 12:59:35 | 5 | juror who reportedly brought this article in and find out |
| 12:59:40 | 6 | what she did and hopefully make -- she probably has a copy |
| 12:59:43 | 7 | of it and we can look at it.  Absolutely if I find out that |
| 12:59:46 | 8 | any juror has violated an instruction, she's summarily -- |
| 12:59:49 | 9 | I'm going to propose to summarily excuse her. |
| 12:59:52 | 10 | MS. SULLIVAN:  Agreed, Your Honor.  Thank you. |
| 12:59:53 | 11 | THE COURT:  But we should find out the facts. |
| 12:59:58 | 12 | MR. LANIER:  Your Honor, our proposal would be |
| 12:59:59 | 13 | that the Court does so *in camera* within chambers.  I don't |
| 01:00:04 | 14 | think it's appropriate for counsel necessarily to be present |
| 01:00:07 | 15 | during this examination.  We'll have it on record so we can |
| 01:00:11 | 16 | read it, but I think that our presence in the presence of |
| 01:00:14 | 17 | the juror with these examinations by the Court is not in |
| 01:00:16 | 18 | best propriety. |
| 01:00:19 | 19 | MR. MAJORAS:  I disagree with that, Your |
| 01:00:21 | 20 | Honor.  I think if you were to do it in chambers, a more |
| 01:00:23 | 21 | limited group perhaps like we did in voir dire.  But we have |
| 01:00:26 | 22 | the opportunity to see the demeanor of the witness while |
| 01:00:28 | 23 | responding to questions would be appropriate. |
| 01:00:38 | 24 | THE COURT:  I think it's serious enough.  I |
| 01:00:40 | 25 | think everyone should be here.  So I'm going to do it -- I'm |

01:00:43  1    proposing to do it in the courtroom.

01:00:47  2                    MS. SULLIVAN:  Thank you, Your Honor.

01:00:48  3                    THE COURT:  Yes, Mr. Delinsky?

01:00:49  4                    MR. DELINSKY:  It sounds like it's already on

01:00:50  5    your radar screen, but one important thing would be to get a

01:00:54  6    copy or a citation of --

01:00:55  7                    THE COURT:  Well, I'm hoping that the juror

01:00:57  8    has a copy of what she brought in, all right?

01:01:01  9        I'm assuming since it was today that she did, unless

01:01:04  10   she, you know, was told it was bad and destroyed them all

01:01:09  11   and maybe she did, but I'll at least find out, hopefully

01:01:12  12   she's got what she has.

01:01:15  13                   MR. MAJORAS:  And if this is the only

01:01:16  14   instance, of course, Your Honor.

01:01:17  15                   MS. SULLIVAN:  And thank you, Mr. Pitts, and

01:01:19  16   Your Honor for taking it to our attention.

01:01:21  17                   THE COURT:  You're welcome.  That's what you

01:01:23  18   do, okay?

01:01:25  19       So all right.  So we want to bring in, Mr. Pitts,

01:01:38  20   Juror Number 4.

01:02:25  21       (Juror present.)

01:02:37  22                   THE COURT:  Okay.  Good afternoon, ma'am.  You

01:02:39  23   can take off your mask.  We'd like to be able to see because

01:02:44  24   I'm going to ask you some questions.

01:02:45  25       All right.

01:02:54   1          Ma'am, it's been reported to me that earlier this

01:02:56   2   morning you brought in an article, copies of an article

01:02:59   3   which you showed to the other jurors.

01:03:03   4               THE JUROR:  Oh, about the Narcan.

01:03:06   5               THE COURT:  Well, just so you did bring in

01:03:08   6   something, an article you showed to jurors?

01:03:10   7               THE JUROR:  Not an article.  It was just about

01:03:15   8   Project DAWN and how it's --

01:03:17   9               THE COURT:  I'm sorry, what?

01:03:18  10               THE JUROR:  About Project DAWN.

01:03:26  11               THE COURT:  What did you bring?  Was it an

01:03:27  12   article, was it electronic?  Was it a piece of paper?  What

01:03:30  13   was it, ma'am?

01:03:31  14               THE JUROR:  It was a piece of paper.

01:03:33  15               THE COURT:  Do you have what you brought in?

01:03:44  16               THE JUROR:  It's in the other room.  Do you

01:03:46  17   want me to go get it?

01:03:47  18               THE COURT:  Well, I'd like to see what you

01:03:49  19   brought in, ma'am.

01:03:56  20               THE JUROR:  So when we left the other day and

01:03:59  21   there was a conversation about Walgreens and the price of

01:04:03  22   Narcan and that how you have to pay for Narcan unless it's

01:04:06  23   covered by insurance.  And so as a mental health

01:04:11  24   professional I felt very strongly that I didn't want anyone

01:04:13  25   to think that they had to pay for Narcan.  So I printed out

01:04:18  1   the information about Project DAWN, which is the free

01:04:21  2   service that offers Narcan kits, and told the jury I want

01:04:27  3   everyone to be very clear about this, that you can get

01:04:29  4   Narcan for free.  And that's it.

01:04:32  5              THE COURT:  All right.  Ma'am, I want you

01:04:34  6   to -- can you get the material you showed to people?

01:04:41  7              THE JUROR:  Sure.

01:05:14  8              (Pause in proceedings.)

01:05:31  9              THE COURT:  All right.  The juror has handed

01:05:32  10  me one piece of paper, has text at the top "Northeast Ohio

01:05:40  11  free naloxone (Narcan) is available.  Project DAWN."  It

01:05:46  12  gives an address, times.

01:05:53  13      All right.  Did you bring in multiple copies of this

01:05:57  14  or just this one piece of paper, ma'am?

01:06:00  15             THE JUROR:  I handed it out to each juror.

01:06:03  16             THE COURT:  All right.  Ma'am, you were

01:06:07  17  present when I instructed you, were you not, that you were

01:06:13  18  not to be doing any independent research whatsoever about

01:06:20  19  anything you heard about in this trial?  You were present

01:06:25  20  when you heard that?

01:06:26  21             THE JUROR:  Yes.

01:06:29  22             THE COURT:  And you had the ability to ask

01:06:34  23  questions.  You've seen that a number of jurors have asked

01:06:37  24  questions, and I think in almost all cases one lawyer or the

01:06:39  25  other asked the question, right?

01:06:43   1          THE JUROR:  Okay.

01:06:46   2          THE COURT:  So and yet you took it on yourself

01:06:54   3    to just decide -- you were to educate the jurors about the

01:06:57   4    fact that naloxone is available for free?

01:07:02   5          THE JUROR:  To me, this feels bigger than this

01:07:04   6    case.  We're talking about people's lives.  And I didn't

01:07:08   7    want people to think they had to pay for a Narcan kit.  I

01:07:13   8    mean, that seems like basic knowledge we should all have.

01:07:18   9          THE COURT:  Well --

01:07:20  10          THE JUROR:  And for all of you too.

01:07:21  11          THE COURT:  Well, I appreciate that -- why you

01:07:27  12    would want people to know that Narcan is available and that

01:07:30  13    it's available for free to people who need it, but that

01:07:33  14    really isn't the point.

01:07:35  15        The problem is this is something that came up in the

01:07:37  16    trial.  There was testimony about Narcan and naloxone.  And

01:07:45  17    I have instructed you I don't know how many times that

01:07:47  18    you're not to do any independent research on your own,

01:07:52  19    you're not to bring in things from outside the courtroom

01:07:58  20    about anything whatsoever connected to this trial while the

01:08:02  21    trial is going on.  After the trial, you can do whatever you

01:08:04  22    want.

01:08:07  23        And you violated that instruction, and it's a huge

01:08:10  24    problem, and it should be apparent that it's a huge problem

01:08:13  25    because the fact that I'm questioning you now.

01:08:19   1          All right.  So you gave a copy of this to everyone?

01:08:25   2                  THE JUROR:  Yes.

01:08:26   3                  THE COURT:  What did you say in addition to

01:08:30   4   handing them this piece of paper?

01:08:33   5                  THE JUROR:  Know that Narcan is free and

01:08:35   6   available in Northeast Ohio through Project DAWN.

01:08:39   7                  THE COURT:  All right.  I'm curious, did any

01:08:42   8   of the other jurors say that, hey, this is exactly what

01:08:46   9   we're not supposed to be doing?

01:08:47  10                  THE JUROR:  It wasn't really discussed further

01:08:49  11   than that.  It was like, okay, and everybody moved on.

01:08:53  12                  THE COURT:  All right.  And this was this

01:08:55  13   morning that this happened?

01:08:57  14                  THE JUROR:  Yesterday morning.

01:08:58  15                  THE COURT:  It was yesterday morning.  Okay.

01:09:08  16          All right.  Any other counsel, any counsel wish to

01:09:12  17   question this juror any further?

01:09:15  18                  MR. LANIER:  Not the plaintiff, Your Honor.

01:09:18  19                  MR. STOFFELMAYR:  No, thank you, Your Honor.

01:09:20  20                  MR. MAJORAS:  No, Your Honor.

01:09:23  21                  MR. DELINSKY:  Nothing, Your Honor.

01:09:25  22                  MS. SULLIVAN:  Nothing, Your Honor.

01:09:26  23                  THE COURT:  Mr. Pitts, I'd like you to have

01:09:29  24   this juror go into -- is one of the witness rooms empty?

01:09:32  25                  MR. STOFFELMAYR:  I think both of the ones

01:09:34  1    here are being used.

01:09:36  2                THE COURT:  All right.  Well, take her back

01:09:38  3    into my chambers.  You can sit in my office.

01:09:59  4          (Juror out.)

01:10:02  5                THE COURT:  All right.  It's my strong

01:10:06  6    recommendation that this juror be summarily excused.

01:10:09  7          Does anyone have an objection to that?

01:10:11  8                MS. SULLIVAN:  I agree, Your Honor.

01:10:12  9          And, Your Honor, I didn't want to ask her in front of

01:10:15  10   everyone in case she wasn't going to be dismissed to

01:10:18  11   prejudice my client, but if the Court would be good enough

01:10:21  12   to ask her if she's discussed anything else about the case

01:10:24  13   with other jurors.

01:10:25  14         Thank you, Your Honor.

01:10:26  15               THE COURT:  That's a good point, Ms. Sullivan.

01:10:30  16               MR. DELINSKY:  We had the same concern, Your

01:10:33  17   Honor.

01:10:33  18               MR. SWANSON:  Same with us, Your Honor.

01:10:34  19               MR. LANIER:  Your Honor, may I be seated while

01:10:35  20   I talk so I'm at the microphone?

01:10:37  21               THE COURT:  Sure.

01:10:44  22               MR. LANIER:  I mean no disrespect.  I'm

01:10:47  23   troubled and perplexed and I care deeply about this record

01:10:50  24   that we're going to be taking up on appeal.  We had a juror

01:10:55  25   question on the issue of whether or not Walgreens charged

01:10:58   1   for Narcan because there was the reference on the target

01:11:04   2   drug good faith dispensing checklist to ask if they wanted

01:11:07   3   Narcan.

01:11:10   4        Project DAWN is a project that does supply Narcan, but

01:11:14   5   it's not supplying it through Walgreens.  Walgreens charges

01:11:20   6   when they dispense Narcan.

01:11:23   7        I don't know how to read this with this juror.  I

01:11:27   8   don't know if this is something in my favor because

01:11:30   9   Walgreens is charging for something that's commercially

01:11:32  10   available for free.  I don't know if it's something against

01:11:35  11   me because maybe the witness -- I don't see how it could be

01:11:42  12   against me, candidly.

01:11:44  13        But I don't -- I am concerned about continuing a case

01:11:51  14   where we know that the jury has been discussing something

01:11:56  15   that is an issue in the case that has been questioned.

01:12:00  16                  THE COURT:  Well, let's take this one step at

01:12:03  17   a time.

01:12:03  18        Do you have any objection to dismissing this juror?

01:12:06  19                  MR. LANIER:  Zero.

01:12:07  20                  THE COURT:  Okay.  All right.  Well, the juror

01:12:09  21   will be dismissed, but I'd like her brought back.  I'm going

01:12:12  22   to ask her if she has brought anything else I guess outside

01:12:18  23   of the record into the courtroom, either in writing or

01:12:24  24   orally.

01:12:26  25        So, all right, Mr. Pitts, if you can bring her back,

01:12:29    1    please.

01:12:35    2        And then I think once I do this, I'm going to have to

01:12:38    3    bring the rest of the jurors in and find out, you know --

01:12:45    4    you know, talk to them collectively, I guess.

01:13:45    5        (Juror present.)

01:13:47    6            THE COURT:  Ma'am, I need to ask you a few

01:13:49    7    more questions.

01:13:50    8        Obviously this trial has been going for now three or

01:13:52    9    four weeks.  Have you bought anything else into the jury

01:13:59   10    room, either in writing or orally --

01:14:06   11            THE JUROR:  No.

01:14:08   12            THE COURT:  -- about this case, about this

01:14:09   13    trial, about the subject matter, about witnesses, anything

01:14:12   14    like this on any other occasion?

01:14:14   15            THE JUROR:  No.

01:14:15   16            THE COURT:  Are you absolutely confident of

01:14:16   17    that?

01:14:19   18            THE JUROR:  Yes, I'm confident in that.

01:14:22   19            THE COURT:  All right.  Has any other juror

01:14:29   20    brought anything into the jury deliberation room of the

01:14:35   21    nature that you did, something in writing or providing

01:14:38   22    information orally about what a witness said or what --

01:14:43   23    anything related to the trial?

01:14:45   24            THE JUROR:  No.

01:14:48   25            THE COURT:  Okay.  Anyone want to ask anything

01:14:53  1    further on that?

01:15:00  2              MR. SWANSON:  No, thank you, Judge.

01:15:02  3              MR. MAJORAS:  No, thank you.

01:15:03  4              THE COURT:  Ma'am, I've discussed this with

01:15:05  5    counsel, and we need to excuse you from this jury.  This was

01:15:10  6    a very serious violation of my instructions.  I think I

01:15:15  7    understand your motivation, but candidly, it doesn't matter.

01:15:20  8    This is -- so you can no longer sit on this jury.

01:15:26  9        I do not want you discussing this case at all with

01:15:29  10   anyone until you find out that the case is over.

01:15:33  11       Is that clear?

01:15:35  12             THE JUROR:  Is there any way that I can stay?

01:15:37  13             THE COURT:  No, there's not.  No, there's not.

01:15:42  14       I've never -- I've been a judge 22-some years.  I've

01:15:47  15   never had a juror, to my knowledge, do anything like this,

01:15:49  16   so there is absolutely no way.  And that's all I can say.

01:15:57  17       So you are to immediately collect whatever you have in

01:16:01  18   the jury room.

01:16:03  19       Mr. Pitts, does she need to report to the jury

01:16:06  20   department?

01:16:10  21             THE COURTROOM DEPUTY:  No.

01:16:10  22             THE COURT:  Then you can go back home, go back

01:16:12  23   to work, you're free.  But I'm ordering you not to discuss

01:16:15  24   this case with anyone until the -- you learn that the trial

01:16:22  25   is over.

01:16:22    1          Is that clear?

01:16:56    2                    THE JUROR:  May I speak to you privately?

01:16:59    3                    THE COURT:  Not now, ma'am.  At some

01:17:03    4      subsequent time maybe, but not now.  My decision's final.

01:17:07    5      There's nothing you can say that's going to change it.

01:17:11    6                    THE JUROR:  Okay.  Thank you.

01:17:13    7                    THE COURT:  All right.

01:17:20    8          (Juror out.)

01:17:42    9                    MS. SULLIVAN:  Your Honor, we're trying to

01:17:43   10      reach our client about the motion for a mistrial in light of

01:17:47   11      the egregious breach of jury protocol here in violation of

01:17:51   12      the Court's instructions.

01:17:52   13                    THE COURT:  What I now propose to do is bring

01:17:53   14      in the remaining 13 jurors.  First I'm obviously going to --

01:18:01   15      if anyone has a copy of this, I'm going to collect it.

01:18:09   16          I'm going to again advise all of them of the

01:18:12   17      importance of following the instructions.  I'll try and

01:18:17   18      determine what, if any, conversation there was about this

01:18:20   19      document, and then if any other lawyer wants to ask any

01:18:32   20      questions of the group, that's what I'm going to try to find

01:18:36   21      out, in there was a -- any -- what, if any, discussion there

01:18:42   22      was about this, and I'm going to find -- and I'm going to

01:18:45   23      ask the other 13 the same question I asked the juror at the

01:18:49   24      end, is this the first and only time in the last three weeks

01:18:53   25      that anything like this occurred.

01:18:58  1                    MR. WEINBERGER:  Your Honor, having

01:18:59  2   experienced something like this I think once in my career,

01:19:04  3   it might be preferential to do this one by one rather than

01:19:11  4   as a group.

01:19:13  5                    MR. SWANSON:  We concur, Your Honor.

01:19:15  6                    THE COURT:  All right.  Okay.  That's probably

01:19:16  7   a good suggestion.

01:19:17  8        All right, Mr. Pitts, I guess bring them in one by

01:19:21  9   one.

01:19:30  10        That's a good idea.

01:20:05  11        (Juror present.)

01:20:12  12                    THE COURT:  Ma'am, you can take a seat please.

01:20:14  13   And you can take your mask off.

01:20:32  14        It's my understanding that yesterday one of the other

01:20:35  15   jurors shared some information about Project DAWN and

01:20:40  16   Narcan.

01:20:40  17        Is that right?

01:20:45  18                    THE JUROR:  Yes.  I saw a paper about it in

01:20:47  19   the --

01:20:47  20                    THE COURT:  Okay.  Were you given a piece of

01:20:51  21   paper?  Did she give you a copy of the piece of paper?

01:20:55  22                    THE JUROR:  Yes, it was laying on my notebook

01:20:58  23   when I walked in yesterday.

01:20:59  24                    THE COURT:  Do you still have it?

01:21:01  25                    THE JUROR:  I believe I left it behind.  I

01:21:02  1   didn't really pay much attention to it.

01:21:06  2                   THE COURT:  Did you read it at all?

01:21:08  3                   THE JUROR:  I skimmed it.

01:21:09  4                   THE COURT:  What do you remember that you

01:21:10  5   read?

01:21:11  6                   THE JUROR:  Something about free Narcan, I

01:21:17  7   believe.

01:21:17  8                   THE COURT:  Did the juror say anything more

01:21:19  9   about the subject?

01:21:21  10  THE JUROR:  No, I wasn't really sure where the

01:21:23  11  paper came from.  I just kind of skimmed it and left it

01:21:28  12  there..

01:21:31  13                  THE COURT:  I'm curious, did you or any other

01:21:34  14  jurors say to this one juror, hey, we're not supposed to be

01:21:37  15  doing this?

01:21:39  16                  THE JUROR:  I honestly didn't hear anything

01:21:41  17  about that.  I walked in kind of late yesterday, so it was

01:21:44  18  just sitting there.  I didn't hear any of the conversation

01:21:46  19  about it.

01:21:48  20                  THE COURT:  Okay.  All right.  You understand

01:21:50  21  the importance of the instruction I gave you that no one is

01:21:54  22  to do any independent research about anything having to do

01:22:00  23  with this trial, right?

01:22:03  24                  THE JUROR:  Yes.  I have personally not done

01:22:04  25  any.

01:22:05  1          THE COURT:  All right.  You've been been

01:22:13  2     seated for three weeks.  Have there been any other instances

01:22:15  3     where a juror brought in something, in writing or relayed

01:22:23  4     orally, his or her knowledge about something they learned

01:22:25  5     outside of the courtroom or some knowledge outside of the

01:22:28  6     courtroom of any of the subject matter of this trial?

01:22:33  7          THE JUROR:  Not that I've heard, just the

01:22:34  8     paper yesterday.

01:22:35  9          THE COURT:  Okay.  All right.  Well, you

01:22:40  10    should know we have dismissed that juror.  She's no longer

01:22:43  11    on the jury.  And it's extremely important that everyone

01:22:49  12    follow this instruction, okay?

01:22:52  13          THE JUROR:  Okay.

01:22:53  14          THE COURT:  Anyone want to -- any questions?

01:22:57  15          MR. LANIER:  Not for plaintiff, Your Honor.

01:22:59  16          MR. STOFFELMAYR:  No, thank you, Judge.

01:23:01  17          MS. SWIFT:  No, thank you.

01:23:02  18          MS. SULLIVAN:  No, thank you.

01:23:03  19          MR. DELINSKY:  No, thank you.

01:23:06  20          THE COURT:  All right.  Thank you, ma'am.

01:23:15  21          THE JUROR:  Thank you.

01:23:17  22        (Juror out.)

01:23:17  23          MR. DELINSKY:  Your Honor, before we seat

01:23:18  24    another one, I think your admonitions to the jury included

01:23:23  25    no discussion of the case until --

01:23:27   1                  THE COURT:  Right.

01:23:28   2                  MR. DELINSKY:  If we could add that question,

01:23:30   3     it would be helpful from my perspective.

01:23:37   4            And the reason I suggest that, Your Honor --

01:23:42   5                  THE COURT:  All right.  I'll follow that.

01:23:52   6            (Juror present.)

01:23:53   7                  THE COURT:  All right.  All right, ma'am.

01:23:54   8     Good afternoon.  You can take your mask off while I'm doing

01:23:57   9     this.

01:23:57  10            All right.  It's been brought to our attention that

01:24:02  11     yesterday morning one of your other jurors brought something

01:24:09  12     in in writing, a piece of paper, and shared it with some of

01:24:14  13     you about Narcan, naloxone.

01:24:18  14            Do you remember anything like that?

01:24:19  15                  THE JUROR:  Yes.

01:24:20  16                  THE COURT:  All right.  Were you given a piece

01:24:22  17     of paper?

01:24:22  18                  THE JUROR:  Yes.

01:24:22  19                  THE COURT:  Do you still have it?

01:24:24  20                  THE JUROR:  I just folded it up and threw it

01:24:26  21     in my book.  I didn't even look at it.

01:24:28  22                  THE COURT:  All right.  Did the juror say

01:24:32  23     anything?

01:24:34  24                  THE JUROR:  Just that she knew there were free

01:24:38  25     programs.  I really didn't pay that much attention to it.  I

01:24:41  1   mean --

01:24:42  2              THE COURT:  Was there any other discussion by

01:24:44  3   you or any of the other jurors, to your knowledge, about

01:24:47  4   that with her?

01:24:47  5              THE JUROR:  No.

01:24:48  6              THE COURT:  Okay.  All right.

01:24:52  7       You've been seated for exactly three weeks.  Is this

01:24:55  8   the first and only time that anyone -- or anyone on the jury

01:25:02  9   has brought in something in writing or relayed something

01:25:06  10  orally about some checking on research they'd done about

01:25:12  11  anything relayed during the trial?

01:25:15  12             THE JUROR:  Nobody else has done anything.

01:25:17  13             THE COURT:  Okay.  You understand that there's

01:25:22  14  a very important instruction -- we've dismissed that juror,

01:25:25  15  she's no longer on the jury, for violating my instructions.

01:25:29  16  And it's extremely important that everyone comply with that.

01:25:32  17             THE JUROR:  Absolutely.

01:25:33  18             THE COURT:  Everything you need to learn about

01:25:34  19  this case is in the courtroom, and of course jurors have the

01:25:36  20  ability to ask questions and you've all asked some very good

01:25:40  21  ones and the witnesses have answered them.

01:25:42  22       I mean, if someone had a question about Narcan,

01:25:45  23  naloxone, with a witness, they could have asked it and the

01:25:47  24  witness would have answered to the best of his or her

01:25:50  25  knowledge.

01:25:51  1                    THE JUROR:  Me personally, I'm learning a lot.

01:25:55  2                    THE COURT:  Well, that's fine.  But as I've

01:25:59  3    said, what you need to learn to decide at the end of the

01:26:01  4    case you're going to get right here.  I'll make sure of

01:26:04  5    that.

01:26:04  6                    THE JUROR:  Yeah.

01:26:05  7                    THE COURT:  And again, if you have a question,

01:26:06  8    you have the ability to ask one.  But you're not supposed to

01:26:08  9    go out and whatever and bring things in.  And that's --

01:26:13  10                   THE JUROR:  Yesterday, I wrote down a couple

01:26:14  11   other questions and then I decided that they weren't

01:26:16  12   relevant and didn't need to be asked and I tore up the piece

01:26:19  13   of paper and threw it away.

01:26:20  14                   THE COURT:  Okay.  Well, that's fine.  But I

01:26:22  15   want you to tear this up and just throw it in the trash,

01:26:28  16   don't even read it.

01:26:30  17                   THE JUROR:  Okay.

01:26:30  18                   THE COURT:  I've also instructed the jury that

01:26:31  19   you're not to, you know, discuss this case, discuss the

01:26:35  20   witnesses, discuss the testimony until the case is over,

01:26:38  21   which it's obviously not.

01:26:41  22        Have people been discussing the case in violation of

01:26:44  23   that instruction?

01:26:45  24                   THE JUROR:  No.

01:26:45  25                   THE COURT:  All right.  Okay.

01:26:50  1       Anything anyone else wants to ask?

01:26:52  2               MR. LANIER:  Not for plaintiffs, Your Honor.

01:26:53  3               MR. MAJORAS:  No, Your Honor.

01:26:54  4               MS. SULLIVAN:  No, Your Honor.  Thank you.

01:26:57  5               THE COURT:  Okay.  Thank you, ma'am.

01:26:59  6               THE JUROR:  Thank you.

01:27:04  7        (Juror out.)

01:27:35  8        (Juror present.)

01:27:40  9               THE COURT:  Good afternoon, ma'am.

01:27:41  10              THE JUROR:  Good afternoon.

01:27:41  11              THE COURT:  You can take your mask off while I

01:27:44  12   talk to you briefly.

01:27:47  13       Ma'am, it's come to our attention that yesterday

01:27:49  14   morning one of your fellow jurors brought in some piece of

01:27:57  15   paper concerning Narcan, naloxone, Project DAWN, something

01:28:02  16   like that.

01:28:02  17       Do you recall that?

01:28:04  18              THE JUROR:  I do.

01:28:05  19              THE COURT:  Were you given a piece of paper?

01:28:07  20              THE JUROR:  The papers were set on the table

01:28:08  21   for us to look at it if we wanted to, but I didn't feel like

01:28:12  22   it was the right thing to do since we're not supposed to be

01:28:15  23   researching anything in the case.

01:28:16  24              THE COURT:  Well, you're absolutely right.

01:28:18  25       I'm curious, did you say something to that juror that,

01:28:20  1   hey, this is exactly what the judge has been telling us

01:28:26  2   every day not to do?

01:28:26  3          THE JUROR:  I did not say anything to her, but

01:28:28  4   someone in the room did.

01:28:29  5          THE COURT:  Oh, okay.  All right.

01:28:31  6      Did she say anything other than leaving -- you know,

01:28:38  7   but did she talk to anyone about this?

01:28:41  8          THE JUROR:  I can't remember who all was in

01:28:43  9   the room at that time, but there were a few of us in the

01:28:46  10  room.  One of the other jurors did tell her like, you know,

01:28:48  11  you really shouldn't have -- I don't think you should have

01:28:51  12  printed that out or even researched it or anything.  And

01:28:53  13  she's like, well, something along the lines of this wasn't

01:28:56  14  verbatim but it was like, I didn't feel -- I just felt like

01:28:58  15  we all needed to know that you can get it for free, and I

01:29:01  16  just wanted to give us all that information or something

01:29:03  17  like that.  But the papers were placed on the table and

01:29:06  18  maybe one or two people picked it up, but no one really

01:29:09  19  looked at it.

01:29:10  20         THE COURT:  Okay.  All right.  Whichever juror

01:29:12  21  said that that was a wrong thing to do was absolutely right.

01:29:18  22  I have dismissed that juror, the juror who brought in the

01:29:21  23  papers, because it was a hundred percent wrong.

01:29:28  24     And, you know, everything you need to know to make a

01:29:31  25  decision at the end of the case, you're going to get in this

01:29:34    1    courtroom from the witnesses and the documents and the

01:29:38    2    instructions.  And it's absolutely wrong and improper to be

01:29:42    3    bringing anything in.

01:29:43    4         So I want to make sure that everyone really

01:29:47    5    understands that instruction.

01:29:50    6         Is this the only time in the last three weeks that

01:29:54    7    anyone has done anything like that?

01:29:56    8                   THE JUROR:  Correct, that is.

01:29:57    9                   THE COURT:  Okay.  And I've also instructed

01:30:00   10    everyone, you know, not to discuss this case, not to be

01:30:03   11    discussing who said what or what witnesses you credit or

01:30:06   12    whatever or making conclusions, anything like that, until

01:30:09   13    the case is over.

01:30:10   14         Has anyone been violating that instruction?

01:30:13   15                   THE JUROR:  Not that I'm aware of.

01:30:14   16                   THE COURT:  Okay.  All right.

01:30:20   17         And thank you very much, ma'am.

01:30:22   18                   THE JUROR:  You're welcome.

01:30:23   19                   THE COURT:  And again, if you happen to find

01:30:25   20    that you kept that piece of paper or have it in your

01:30:28   21    notebook, just make sure to throw it out.

01:30:31   22                   THE JUROR:  I didn't even pick it up or look

01:30:32   23    at it.

01:30:33   24                   THE COURT:  Okay.  Thank you.

01:30:37   25                   THE JUROR:  You're welcome.

01:30:41   1            (Juror out.)

01:30:59   2            THE COURT: I'm just asking Special Master

01:31:01   3   Cohen to show the lawyers the document that the juror said

01:31:06   4   she brought in, this flier on free naloxone just so you can

01:31:11   5   see it.

01:31:26   6            (Juror present.)

01:31:32   7            THE COURT: Good afternoon, ma'am.

01:31:34   8       It's come to our attention, ma'am, that yesterday

01:31:37   9   morning one of your fellow jurors brought in a piece of

01:31:43   10   paper, copies of a piece of paper, having something to do

01:31:46   11   with free Narcan, free naloxone, something like that.

01:31:49   12       You can be seated.

01:31:50   13       Do you recall that, something like that happened?

01:31:55   14            THE JUROR: Yes.

01:31:56   15            THE COURT: All right. What happened, to your

01:31:58   16   recollection?

01:31:59   17            THE JUROR: A piece of paper was brought in

01:32:03   18   and just told that just in case so everybody knows that if

01:32:05   19   you want -- if somebody needed the -- whatever it was.

01:32:11   20            THE COURT: Narcan, naloxone?

01:32:13   21            THE JUROR: Yeah, Narcan, that it was

01:32:15   22   available for free.

01:32:15   23            THE COURT: Okay. Did you take one of the

01:32:19   24   pieces of paper?

01:32:20   25            THE JUROR: No, I did not.

01:32:21  1          THE COURT:  Okay.  I'm curious, did anyone say

01:32:27  2  to that juror, hey, you know, the judge told us not to be

01:32:31  3  doing this?

01:32:34  4          THE JUROR:  Not that I recall.

01:32:34  5          THE COURT:  Okay.  Did the juror say

01:32:38  6  anything -- do you recall anything else -- anything that the

01:32:41  7  juror said to the group?

01:32:42  8          THE JUROR:  No, just that, that, you know, it

01:32:45  9  was available at no cost if needed, and we just started

01:32:48  10  conversating about other things.

01:32:50  11          THE COURT:  Okay.  All right.  Look, I've said

01:32:53  12  I don't know how many times that no one is to be doing any

01:32:58  13  independent research and bringing things in that they

01:33:01  14  learned or heard or read or were told outside the courtroom

01:33:05  15  about anything that we've talked about here.

01:33:08  16          THE JUROR:  Correct.

01:33:09  17          THE COURT:  I mean, everything you need to

01:33:10  18  know you're going to get here.  And obviously jurors have

01:33:13  19  the ability to ask questions of witnesses.  If they think,

01:33:19  20  you know, something's been left out or they can say, hey,

01:33:22  21  you know, I think the witness was wrong, you can put that in

01:33:26  22  question.  And we've had good questions.

01:33:28  23      So this is the only time over the last three weeks

01:33:34  24  that anything like this has happened?

01:33:36  25          THE JUROR:  That is correct.

01:33:37    1          THE COURT:  All right.  Well, it's very

01:33:38    2  important.  You should know we have dismissed that juror.

01:33:42    3  She's no longer one of the jurors because of a serious

01:33:49    4  violation of the rule.

01:33:50    5      And I've also instructed you not to discuss this case,

01:33:55    6  the details of the case, you know, which witnesses you like,

01:33:58    7  which -- anything about that until the case is over and

01:34:01    8  you've had all the evidence and my instructions.

01:34:04    9          Has anyone been violating that?

01:34:06   10              THE JUROR:  No.

01:34:07   11          THE COURT:  All right.  Okay.  All right.

01:34:12   12  Thank you, ma'am.

01:34:17   13      (Juror out.)

01:34:51   14      (Juror present.)

01:34:55   15              THE COURT:  Good afternoon, ma'am.  You can

01:34:56   16  take your mask off while we're conversing.

01:34:59   17      It's been brought to our attention that yesterday

01:35:04   18  morning one of the jurors brought in some piece of paper or

01:35:07   19  some fliers, whatever, regarding Narcan or naloxone.

01:35:10   20              THE JUROR:  Mm-hmm.

01:35:11   21              THE COURT:  So that something like that

01:35:14   22  happened.

01:35:14   23      What do you recall happened?

01:35:16   24              THE JUROR:  I just remember there being a

01:35:17   25  paper about, like, the availability of Narcan from different

01:35:21   1   projects, but that was it.

01:35:23   2               THE COURT:  That one of the jurors brought in

01:35:24   3   and just left it on the table?

01:35:25   4               THE JUROR:  As far as I know, yes.

01:35:26   5               THE COURT:  All right.  Did you take one of

01:35:27   6   the copies?

01:35:29   7               THE JUROR:  I think it was in my notebook.

01:35:31   8               THE COURT:  All right.  Do you still have it?

01:35:33   9               THE JUROR:  I honestly don't know.  I would

01:35:35   10  have to check my purse.

01:35:36   11              THE COURT:  All right.  Well, if you do, I

01:35:37   12  want you to throw it out.

01:35:38   13              THE JUROR:  Okay.

01:35:41   14              THE COURT:  I'm curious, did you or anyone say

01:35:44   15  to that juror, hey, this is exactly what the judge told us

01:35:48   16  not to be doing?

01:35:50   17              THE JUROR:  I think we all wondered, but I

01:35:52   18  don't know if anyone said, like, specifically we're not

01:35:53   19  supposed to.  I think we all wondered about that though.

01:35:55   20              THE COURT:  Well, if you were wondering, you

01:35:57   21  were wondering correctly, because that's exactly what you're

01:36:01   22  not allowed to do, and we have dismissed that juror.

01:36:05   23              THE JUROR:  Okay.

01:36:05   24              THE COURT:  She's no longer on this jury for a

01:36:08   25  serious violation of my instruction.

01:36:11  1       And everything you need to know to decide this case

01:36:14  2  you're going to get right here in this courtroom from all

01:36:16  3  these witnesses and all these documents and then my

01:36:19  4  instructions.  And you're absolutely not to be trying to

01:36:25  5  supplement in any way.  And as you've all seen, you know, if

01:36:30  6  you have a question of a witness you think he or she has

01:36:33  7  left something out or if something's confusing, you have the

01:36:35  8  ability to ask a question of that witness and he or she will

01:36:37  9  answer it, and you'll have it not only everyone will have

01:36:41  10  it, you'll have the same thing.

01:36:43  11       So to your knowledge, this is the only time any of the

01:36:48  12  jurors have done anything like this?

01:36:50  13               THE JUROR:  Yes, that's the only thing.

01:36:52  14               THE COURT:  All right.  It's extremely

01:36:54  15  important.  No one does anything remotely like this again.

01:36:57  16  And if you have that piece paper, just throw it out.

01:37:00  17               THE JUROR:  Okay.

01:37:01  18               THE COURT:  An also, I've instructed all of

01:37:02  19  you not to discuss the case, you know, which witness you

01:37:08  20  think you agree with, which you don't, anything like that,

01:37:12  21  forming conclusions.

01:37:12  22       Has anything like that been going on?

01:37:15  23               THE JUROR:  No.

01:37:16  24               THE COURT:  All right.  Well, it's important,

01:37:18  25  again, you wait till the end of the case because we're,

01:37:21    1    like, in the middle.  It's not fair to be, you know, even

01:37:24    2    making preliminary conclusions before you've heard

01:37:27    3    everything.

01:37:28    4         Okay, thank you.

01:37:32    5         (Juror out.)

01:38:10    6         (Juror present.)

01:38:10    7              THE COURT:  Good afternoon, sir.  You can take

01:38:11    8    your mask off while I'm speaking to you.

01:38:14    9              THE JUROR:  Sure.

01:38:14   10              THE COURT:  It's come to our attention that

01:38:16   11    yesterday morning one of the jurors brought in some fliers,

01:38:21   12    pieces of paper, whatever, regarding Narcan/naloxone.

01:38:27   13              THE JUROR:  Yes.

01:38:27   14              THE COURT:  So you recall that happened?

01:38:28   15              THE JUROR:  Yes, sir.

01:38:29   16              THE COURT:  What happened, to your

01:38:31   17    recollection?

01:38:31   18              THE JUROR:  She came in out of the -- I'm

01:38:33   19    sorry, the juror came in, handed the papers out.  I took the

01:38:39   20    paper, folded it up, never looked at it, and put it in my

01:38:43   21    bag.  There was no real conversation about it after that.

01:38:46   22              THE COURT:  Did she say anything about it or

01:38:47   23    what she was trying to do?

01:38:49   24              THE JUROR:  Just to let everybody know that

01:38:51   25    Narcan was available, that you didn't have to get it at the

01:38:54  1     pharmacies, that it was available if you needed it for any

01:38:57  2     reason.

01:38:57  3          THE COURT:  Okay.  Did any -- I'm curious, did

01:39:00  4     you or anyone say to that juror, hey, I think this is just

01:39:05  5     what the judge told us not to do, to be bringing things in

01:39:08  6     doing research, bringing things in about the subject matter

01:39:13  7     or what comes up in the testimony, doing this on our own?

01:39:17  8          THE JUROR:  Yes, there was one juror that

01:39:18  9     said, hey, we don't think this is the right thing to do, and

01:39:21  10    that's when everybody folded it up and put it in the bag.

01:39:24  11         THE COURT:  All right.  Well, if you still

01:39:25  12    have it, I want you to just throw it out, don't look at it.

01:39:28  13         THE JUROR:  It's home destroyed already.

01:39:31  14         THE COURT:  All right.  That's fine.  That

01:39:32  15    juror who said that was absolutely right.  And the juror who

01:39:35  16    did this you should know is no longer on this jury because I

01:39:39  17    was crystal clear, and she violated a direct order.

01:39:45  18         THE JUROR:  Okay.

01:39:45  19         THE COURT:  So it's extremely important that

01:39:48  20    everyone follows that.

01:39:49  21       Now, is this the only instance of anything like this

01:39:51  22    that's occurred in the last three weeks or has there been

01:39:54  23    anything else like this?

01:39:55  24         THE JUROR:  No, this is the only one and it

01:39:57  25    happened yesterday.

| | | |
|---|---|---|
| 01:39:57 | 1 | THE COURT:  Well, I want you to make sure to |
| 01:40:01 | 2 | the best extent you can that it doesn't happen again. |
| 01:40:06 | 3 | THE JUROR:  I will. |
| 01:40:07 | 4 | THE COURT:  I can't impress on you more that |
| 01:40:09 | 5 | you just can't do this.  Everything you need to know about |
| 01:40:11 | 6 | this case you're going to get right here.  And if you -- |
| 01:40:15 | 7 | someone has a question, obviously we've had a lot of good |
| 01:40:19 | 8 | questions asked.  Someone could have asked a question about |
| 01:40:21 | 9 | Narcan, whatever. |
| 01:40:22 | 10 | So it's also extremely important that people not be |
| 01:40:26 | 11 | discussing this case, even reaching tentative conclusions |
| 01:40:31 | 12 | that you're sharing, because you're right in the middle of |
| 01:40:33 | 13 | the case. |
| 01:40:33 | 14 | Has anyone been doing that? |
| 01:40:37 | 15 | THE JUROR:  No, sir. |
| 01:40:37 | 16 | THE COURT:  Well, that's important too because |
| 01:40:39 | 17 | it's not fair to either side to be really deliberating -- |
| 01:40:42 | 18 | first, you only do it when all 12 of you are there, and, |
| 01:40:45 | 19 | second, it's in the middle of the case.  You haven't heard |
| 01:40:47 | 20 | all the evidence. |
| 01:40:49 | 21 | Okay.  Thank you, sir. |
| 01:40:51 | 22 | THE JUROR:  All right.  Thank you. |
| 01:40:52 | 23 | (Juror out.) |
| 01:41:26 | 24 | (Juror present.) |
| 01:41:34 | 25 | THE COURT:  Good afternoon, ma'am.  You can |

01:41:36  1   have seat, and you can take your mask off while I'm talking

01:41:39  2   to you.

01:41:40  3        It's come to our attention that yesterday morning I

01:41:43  4   believe one of the other jurors brought in some pieces of

01:41:48  5   paper, placed them on the table and said, hey, something

01:41:53  6   about Narcan/naloxone.

01:41:56  7        Do you recall anything like that?

01:41:58  8                  THE JUROR:  Yes.

01:41:58  9                  THE COURT:  All right.  What occurred?

01:42:00  10                 THE JUROR:  Okay.  So the juror came in with a

01:42:03  11  stack of papers, was like, hey, I researched this about

01:42:08  12  Narcan, and we're like, we're pretty sure you can't do that.

01:42:11  13  And she's like, all right, well, I did.  And we're like,

01:42:14  14  okay.  And pretty much the stack of papers she was

01:42:18  15  attempting to hand them out, but then we're like, ah, we

01:42:21  16  don't want that, and she kind of -- she sat down.

01:42:24  17                 THE COURT:  Okay.  Did you take one of the

01:42:25  18  pieces of paper?

01:42:26  19                 THE JUROR:  I did not.

01:42:27  20                 THE COURT:  Okay.  Well, whoever said that, if

01:42:30  21  you were one of them, you were a hundred percent right,

01:42:33  22  because that's -- I have given that instruction I don't know

01:42:37  23  how many times.  And that juror is no longer a juror.  I

01:42:42  24  summarily excused her for violating an order.

01:42:48  25        And everything you need to learn and know to decide

01:42:51 1  this case you're going to get right here in this courtroom

01:42:54 2  from all these witnesses and all these documents and then

01:42:57 3  the instructions I give you.  And no one's to do any

01:43:05 4  supplementing on your own.  And obviously if people have a

01:43:08 5  question of a witness, you can ask the questions and they're

01:43:10 6  generally being asked and so that's how you get your

01:43:12 7  questions answered, not by going off freelancing and then

01:43:16 8  certainly bringing it in and sharing it.

01:43:18 9      Has there been anything like this at all other than

01:43:23 10  this one episode the last three weeks?

01:43:25 11              THE JUROR:  No.

01:43:26 12              THE COURT:  All right.  Well, I want you to do

01:43:28 13  whatever you can to make sure that it doesn't happen again.

01:43:32 14              THE JUROR:  Roger that.

01:43:34 15              THE COURT:  All right.  Also, I've instructed

01:43:38 16  everyone not to discuss, deliberate the case before it's

01:43:43 17  done, so I don't want anyone discussing the case, discussing

01:43:48 18  witnesses, documents, whatever, until you're all together

01:43:51 19  and all the evidence is in.

01:43:53 20      Have people been doing that?

01:43:55 21              THE JUROR:  No, not in detail or anything of

01:43:59 22  what happened.

01:43:59 23              THE COURT:  Well, they shouldn't be doing it

01:44:01 24  at all, okay?

01:44:02 25              THE JUROR:  Gotcha.

01:44:03   1          THE COURT:  If people start, you say, hey,

01:44:05   2   this is what the judge said not to do, the case isn't over

01:44:07   3   and we're not all here.  Okay?  We're in the middle.

01:44:11   4       So, I mean, you know, someone may say some isolated

01:44:15   5   thing, but there should be no substantive discussions about

01:44:18   6   the case, who you think -- you know, which witness you

01:44:22   7   liked, which you didn't, any of that stuff, all right?

01:44:27   8       You mentioned there's been some isolated -- I mean,

01:44:30   9   what kind of isolated discussions have there been?

01:44:34   10          THE JUROR:  Pretty much just the -- I would

01:44:36   11   say the -- not to be crass or anything, but maybe comments

01:44:43   12   on what people wear, that's it.  The --

01:44:47   13          THE COURT:  Well, I mean --

01:44:48   14          THE JUROR:  We've got to keep it light.

01:44:50   15          THE COURT:  That's okay.  I mean, seriously,

01:44:52   16   I'm not --

01:44:52   17          MS. SULLIVAN:  Your Honor, I object to that.

01:44:54   18          MR. LANIER:  That's funny.

01:44:55   19          THE COURT:  Well, so --

01:44:57   20          MR. STOFFELMAYR:  Can we get any feedback?

01:45:03   21          THE COURT:  Look, not that that's great, and

01:45:07   22   it obviously has zero to do with the merits or the substance

01:45:10   23   and I think everyone knows that, but the key is you don't

01:45:13   24   talk about the substance of the case because you're right in

01:45:15   25   the middle, and it's not fair to either side.

01:45:18  1      You can talk about what I wear, what I look like.

01:45:22  2  That's fine, okay?  Seriously, talk about me because you're

01:45:26  3  stuck with me and I'm not taking any sides, so you can say

01:45:30  4  whatever you want about me.

01:45:32  5      All right.  Well, thank you, ma'am.

01:45:34  6              THE JUROR:  Thank you.

01:45:39  7      (Juror out.)

01:46:16  8      (Juror present.)

01:46:22  9              THE COURT:  Good afternoon, ma'am.

01:46:25  10             THE JUROR:  Good afternoon.

01:46:25  11             THE COURT:  It's come to our attention that

01:46:30  12 yesterday morning one of the jurors brought in some pieces

01:46:33  13 of papers, fliers, whatever, having something to do with

01:46:38  14 Narcan/naloxone.

01:46:39  15     Do you remember something like that?  That's a "yes"?

01:46:43  16             THE JUROR:  Yes.

01:46:44  17             THE COURT:  Okay.  What happened?  What do you

01:46:45  18 recall?

01:46:46  19             THE JUROR:  She just said she thought it was

01:46:48  20 important and for general information, if I recall.  I

01:46:52  21 didn't talk about it with her.

01:46:53  22             THE COURT:  All right.  Did you pick up one of

01:46:55  23 the fliers or the piece of paper?

01:46:57  24             THE JUROR:  I looked at it and put it down.

01:46:58  25             THE COURT:  Okay.  What do you recall seeing

01:47:03  1   on the piece of paper?

01:47:04  2                    THE JUROR:  That there was a program for an

01:47:09  3   area, somewhere in this area, Northeast Ohio, to get free

01:47:14  4   Narcan.

01:47:15  5                    THE COURT:  Okay.  Well, I'm curious, did

01:47:18  6   anyone say to that juror, hey, I think this is just what the

01:47:21  7   judge told us we're not supposed to be doing?

01:47:23  8                    THE JUROR:  I didn't hear that.

01:47:25  9                    THE COURT:  Okay.  Well, you should know that

01:47:28  10  that juror is no longer on the jury.  I summarily dismissed

01:47:32  11  her for violating a very important order.

01:47:36  12      Everything you need to know to decide this case you're

01:47:40  13  going to get in this courtroom.  That's my job, to make sure

01:47:44  14  you hear all the witnesses, see the documents, get accurate

01:47:48  15  instructions.  No one's to be supplementing or adding or

01:47:53  16  doing independent research or whatever and bringing it in.

01:47:56  17  That's a hundred percent wrong and improper.

01:47:58  18                    THE JUROR:  I understand.

01:47:59  19                    THE COURT:  Have there been any other

01:48:03  20  instances of this in the last three weeks where someone's

01:48:05  21  brought anything else in?

01:48:11  22                    THE JUROR:  Not that I'm aware of.

01:48:12  23                    THE COURT:  All right.  I want you to make

01:48:14  24  sure you do whatever you can to make sure it doesn't happen.

01:48:16  25  Obviously I'm talking to each juror independently, one by

01:48:19   1   one, so everyone is hearing exactly the same thing.  But

01:48:21   2   this is, you know, exactly what no one was to do, and I

01:48:27   3   can't really fathom why this juror did what she did, but

01:48:34   4   it's a serious problem.

01:48:35   5       So also, I have instructed you not to be discussing

01:48:40   6   the details of this case, the testimony of the witnesses,

01:48:44   7   the documents, until the case is over.

01:48:47   8                     THE JUROR:  Correct.

01:48:48   9                     THE COURT:  Have people been following that

01:48:50  10   instruction?

01:48:50  11                     THE JUROR:  Yes.

01:48:51  12                     THE COURT:  All right.  That's also very

01:48:52  13   important because, first, you're not to discuss this case

01:48:56  14   unless all 12 of you or 13 or 14, however many there are,

01:49:00  15   until you're all present.  And second, you're not to start

01:49:03  16   that until you have all the evidence.  It's not fair to

01:49:06  17   either side to do it in the middle, start making decisions

01:49:08  18   when you've only heard part of the case.

01:49:12  19       Okay.

01:49:14  20                     THE JUROR:  I understand.

01:49:15  21                     THE COURT:  Okay.  Thank you, ma'am.

01:49:16  22                     THE JUROR:  Thank you.

01:49:18  23       (Juror out.)

01:49:54  24       (Juror present.)

01:49:55  25                     THE COURT:  Good afternoon, sir.  You can take

| | | |
|---|---|---|
| 01:49:56 | 1 | your mask off while I'm talking to you for a few minutes. |
| 01:49:59 | 2 | It's come to my attention that yesterday morning one |
| 01:50:05 | 3 | of your fellow jurors brought in some pieces of paper and |
| 01:50:08 | 4 | having to do with Narcan, naloxone, whatever, and left them |
| 01:50:12 | 5 | for everyone. |
| 01:50:14 | 6 | THE JUROR:  Yes. |
| 01:50:14 | 7 | THE COURT:  All right.  What do you recall |
| 01:50:16 | 8 | about that? |
| 01:50:17 | 9 | THE JUROR:  She handed me one and just said it |
| 01:50:20 | 10 | was about Narcan, and that was about it. |
| 01:50:23 | 11 | THE COURT:  All right.  Do you still have the |
| 01:50:24 | 12 | piece of paper? |
| 01:50:25 | 13 | THE JUROR:  I don't believe so. |
| 01:50:26 | 14 | THE COURT:  All right.  Well, if you have it, |
| 01:50:28 | 15 | I want you to throw it out, okay? |
| 01:50:29 | 16 | THE JUROR:  Okay. |
| 01:50:30 | 17 | THE COURT:  I mean, did you read it?  I'm |
| 01:50:31 | 18 | curious, did you read it, look at it? |
| 01:50:34 | 19 | THE JUROR:  I didn't read it.  I looked at it, |
| 01:50:36 | 20 | and then I just put it in my bag. |
| 01:50:38 | 21 | THE COURT:  Do you recall what it said? |
| 01:50:40 | 22 | THE JUROR:  I don't. |
| 01:50:42 | 23 | THE COURT:  I'm curious, did you or anyone |
| 01:50:43 | 24 | else say anything to that juror about, hey, this is exactly |
| 01:50:46 | 25 | what this be mean, bad judge told us not to do? |

01:50:51  1                    THE JUROR:  I believe somebody did.  I think

01:50:53  2    they asked if that was allowed.  I don't remember who it was

01:50:57  3    though.

01:50:58  4                    THE COURT:  Well, whoever asked the question

01:50:59  5    was right, it's not allowed.

01:51:01  6                    THE JUROR:  Okay.

01:51:02  7                    THE COURT:  You should know that that juror is

01:51:03  8    no longer a juror.

01:51:05  9                    THE JUROR:  All right.

01:51:06  10                   THE COURT:  I threw her off.  I mean, a few

01:51:08  11   minutes ago.

01:51:08  12                   THE JUROR:  Okay.

01:51:11  13                   THE COURT:  And I certainly thought I was --

01:51:16  14   had been crystal clear about the fact that no one is to be

01:51:20  15   supplementing their knowledge by doing independent research

01:51:24  16   or bringing stuff in.  Everything you need to know to decide

01:51:28  17   this case you're going to get right here, from the lawyers,

01:51:30  18   the documents, the witnesses, my instructions.

01:51:34  19       And if you have a question, obviously you have the

01:51:36  20   ability to ask any witness any question.  I think the

01:51:39  21   lawyers have been asking almost all of them.  So if someone

01:51:42  22   had had a question about Narcan/naloxone, how it's provided,

01:51:46  23   who pays for it, whatever, they could have asked that

01:51:50  24   question.  If they thought the witness was incorrect, they

01:51:52  25   could have asked a follow-up.  But that's the way to do it,

01:51:54  1    not anything like this.

01:51:56  2                    THE JUROR:  Okay.

01:51:57  3                    THE COURT:  Has anything like this happened

01:51:59  4    any other time in the last three weeks?

01:52:00  5                    THE JUROR:  No.

01:52:01  6                    THE COURT:  All right.  Well, I want you to do

01:52:04  7    whatever you can do to make sure it doesn't happen again,

01:52:06  8    okay?

01:52:07  9                    THE JUROR:  Okay.

01:52:07  10                    THE COURT:  Because it's a big problem.

01:52:09  11                    THE JUROR:  All right.

01:52:10  12                    THE COURT:  And also, it's extremely important

01:52:13  13    that you not discuss this case, discuss the witnesses, the

01:52:16  14    testimony, the documents, start making even tentative

01:52:19  15    conclusions before the case is over.

01:52:22  16        To your knowledge, has anyone been doing that?

01:52:23  17                    THE JUROR:  No.

01:52:24  18                    THE COURT:  All right.  Because it would be

01:52:26  19    wrong and unfair, first because not all 12 of you are there

01:52:30  20    and second we're in the middle of the case.  Someone had to

01:52:33  21    go first, so the plaintiffs have gone first.  You haven't

01:52:37  22    heard the defense side.  You don't make important decisions

01:52:40  23    without hearing everything, right?

01:52:42  24                    THE JUROR:  Right.

01:52:43  25                    THE COURT:  Okay.  Thank you.

01:52:44   1            THE JUROR:  All right.  Thank you.

01:52:45   2        (Juror out.)

01:53:25   3        (Juror present.)

01:53:26   4            THE COURT:  Good afternoon, ma'am.  You can

01:53:27   5    take your mask off while I'm talking to you.

01:53:30   6            THE JUROR:  Okay.

01:53:30   7            THE COURT:  It's come to our attention that

01:53:32   8    yesterday morning one of your fellow jurors brought in some

01:53:37   9    pieces of paper and put them on the table and started

01:53:41  10    talking about them, something to do with Narcan/naloxone.

01:53:45  11        Do you remember anything like that?

01:53:46  12            THE JUROR:  So I got here a little later

01:53:48  13    yesterday, so by the time I had come in the room, there was

01:53:52  14    a paper in my juror book where I take notes.  And I say, oh,

01:53:57  15    is this from the Court?  And she replied, no, I put that in

01:54:00  16    there.  And so I said, well, you can't do that, and she

01:54:03  17    said, well, I was uncomfortable.  And then that was it.  I

01:54:08  18    just left it on the table.

01:54:10  19            THE COURT:  Okay.  So you didn't even look at

01:54:12  20    it?

01:54:12  21            THE JUROR:  I saw the -- it didn't have Narcan

01:54:15  22    but it had the --

01:54:15  23            THE COURT:  Naloxone?

01:54:16  24            THE JUROR:  Yeah.  And that's all I saw.

01:54:19  25            THE COURT:  Okay.  All right.  Well, you were

01:54:20  1   absolutely right to do that because that juror is no longer

01:54:25  2   a juror.  I mean, I was very clear about none of you in any

01:54:32  3   way trying to supplement your knowledge by doing research or

01:54:37  4   bringing things in or educating the jurors on your own.

01:54:43  5   Everything you need to know you're going to get right here

01:54:45  6   from the documents and the witnesses and my instructions.

01:54:48  7               THE JUROR:  I understand.

01:54:48  8               THE COURT:  All right.  Has anyone done

01:54:50  9   anything like this in the other three weeks we've been here?

01:54:56  10              THE JUROR:  Not outside that one juror, no.

01:54:58  11              THE COURT:  Okay.  Well, I want you to do

01:55:01  12  whatever you can to make sure it doesn't happen again,

01:55:03  13  because it's -- you know, it's probably the most important

01:55:07  14  instruction I give, because it's completely improper.  And I

01:55:12  15  mean no one -- if someone brings something in, there's no

01:55:14  16  way to test it, it may be accurate, half of you hear it,

01:55:18  17  half of you don't.  It's a hundred percent improper.

01:55:22  18              THE JUROR:  Right.  I think I was really

01:55:23  19  uncomfortable with it, and I think -- I'm sure other jurors

01:55:25  20  were too, so --

01:55:27  21              THE COURT:  All right.  Well, the juror did

01:55:30  22  it.  She's no longer a juror.

01:55:33  23      So it's also very important, I know I've instructed

01:55:37  24  you not to discuss the substance of this case at all, the

01:55:41  25  witnesses, the documents, until you've heard all the

01:55:43  1   evidence.

01:55:44  2       So I want to make sure that hasn't been happening.  Is

01:55:48  3   that right?

01:55:49  4               THE JUROR:  Yeah, yeah.

01:55:52  5               THE COURT:  That's extremely important.

01:55:53  6   Someone had to go first.  Both sides couldn't proceed

01:56:07  7   simultaneously, so the plaintiffs have gone first, but

01:55:59  8   you've got to hear all the evidence that the defendants

01:56:02  9   bring in.

01:56:02  10              THE JUROR:  I understand.

01:56:03  11              THE COURT:  All right.  Thank you, ma'am.

01:56:04  12              THE JUROR:  Thank you.

01:56:12  13       (Juror out.)

01:56:23  14              MR. WEINBERGER:  Your Honor, one of the

01:56:25  15   questions that -- the question you asked, "Has anyone done

01:56:27  16   anything like this in the other three weeks we've been

01:56:31  17   here?"  And her answer was, "Not outside that one juror,

01:56:37  18   no."  Which begs the question --

01:56:45  19       (Juror present.)

01:56:46  20              THE COURT:  All right, sir, you can take your

01:56:48  21   mask off.

01:56:50  22       It's come to our attention that yesterday morning one

01:56:53  23   of your fellow jurors brought in some pieces of paper about

01:56:58  24   Narcan/naloxone, whatever, and started talking about them.

01:57:01  25       Were you present when that occurred?

01:57:04  1                    THE JUROR:  Yes, I was.

01:57:05  2                    THE COURT:  Okay.  What do you recall

01:57:06  3    happening?

01:57:07  4                    THE JUROR:  She just had a piece of paper and

01:57:10  5    laid it down and says there's a place where you can get free

01:57:14  6    Narcan.  That was it.

01:57:15  7                    THE COURT:  Okay.  Did you take one of the

01:57:17  8    pieces of paper?

01:57:18  9                    THE JUROR:  No.

01:57:18  10                   THE COURT:  Okay.  Did you read it at all?

01:57:20  11                   THE JUROR:  No.

01:57:21  12                   THE COURT:  All right.  I'm curious --

01:57:25  13                   THE JUROR:  I know where to get it if I needed

01:57:29  14   it.  I worked at a hospital.

01:57:32  15                   THE COURT:  Got it.  Got it.

01:57:35  16         I'm curious, sir, did anyone tell that juror, hey,

01:57:38  17   we're not supposed to be doing this, we're not supposed to

01:57:41  18   be bringing things in from outside into the Court?

01:57:44  19                   THE JUROR:  No, nobody said a word.

01:57:46  20                   THE COURT:  All right.  Well, they should

01:57:48  21   have, all right, because it's a hundred percent wrong, and

01:57:49  22   that juror's no longer a juror.  I dismissed her.

01:57:55  23         Has anything like this occurred the other three weeks,

01:58:00  24   any other time?

01:58:01  25                   THE JUROR:  No.

01:58:02  1              THE COURT:  All right.  Is the only time that

01:58:04  2    someone's tried to bring in something outside the

01:58:08  3    courtroom -- from outside the courtroom?

01:58:11  4              THE JUROR:  Not that I know of.

01:58:13  5              THE COURT:  Is this the only time that this

01:58:14  6    juror did anything like this?

01:58:16  7              THE JUROR:  Yes.

01:58:18  8              THE COURT:  All right.  I can't emphasize any

01:58:27  9    more than I have how important it is that everyone follow

01:58:29  10   this instruction.  It's a big problem that it was violated.

01:58:32  11   And so everything you need to know you're going to get here.

01:58:35  12   And if you have a question, you have the ability to ask

01:58:37  13   questions, you know, and you can ask it of a witness.  You

01:58:41  14   don't bring this something from outside, and then everyone

01:58:46  15   can hear the answer, okay?  That's how it works.

01:58:51  16       All right.  It's also extremely important that you not

01:58:53  17   discuss this case, do not even make preliminary or tentative

01:58:58  18   conclusions or decisions until you've heard all the

01:59:01  19   evidence.

01:59:01  20       Is that clear?

01:59:02  21              THE JUROR:  Clear.

01:59:03  22              THE COURT:  Has anyone been doing that, to

01:59:04  23   your knowledge?

01:59:05  24              THE JUROR:  No.  Mostly the conversations that

01:59:09  25   go on are about movies and stuff like that.

01:59:12   1          THE COURT:  That's fine.  That's fine.  That's

01:59:13   2   what -- I mean, you get to know each other.  But that's

01:59:17   3   exactly what you should be doing, and wait until you've

01:59:20   4   heard all the evidence and the instructions and then you're

01:59:24   5   all together and that's when you start talking about the

01:59:26   6   case but not until then.

01:59:28   7       All right.  Thank you very much, sir.

01:59:31   8          THE JUROR:  Thank you.

01:59:32   9       (Juror out.)

02:00:23  10       (Juror present.)

02:00:25  11          THE COURT:  Good afternoon, sir.  You can take

02:00:26  12   your mask off while I'm talking to you.

02:00:29  13       It's come to our attention that yesterday morning one

02:00:32  14   of your fellow jurors brought in some pieces of paper having

02:00:37  15   to do with Narcan/naloxone and left them for people.

02:00:42  16       Do you recall that?

02:00:45  17          THE JUROR:  Yes.

02:00:46  18          THE COURT:  Okay.  What do you recall about

02:00:47  19   it?

02:00:48  20          THE JUROR:  It was just a -- I don't know, it

02:00:50  21   looked like the top one was a link to a website.  I don't

02:00:54  22   know what the bottom two were because -- I don't know -- all

02:01:00  23   I know is when I came out of the bathroom, it was in front

02:01:02  24   of my notepad.

02:01:04  25          THE COURT:  Okay.  Did you keep one of the

| | | |
|---|---|---|
| 02:01:06 | 1 | fliers? |
| 02:01:06 | 2 | THE JUROR:  No, I threw it out. |
| 02:01:08 | 3 | THE COURT:  Okay.  Do you recall if the |
| 02:01:11 | 4 | juror -- what the juror said, if anything, about it? |
| 02:01:15 | 5 | THE JUROR:  She said, I thought this might be |
| 02:01:18 | 6 | helpful or something along those lines.  I don't exactly |
| 02:01:21 | 7 | recall because in my mind I was already going to throw it |
| 02:01:24 | 8 | out. |
| 02:01:25 | 9 | THE COURT:  All right.  I'm curious, did |
| 02:01:26 | 10 | anyone say to that juror, hey, this is -- we're not supposed |
| 02:01:28 | 11 | to be doing this, that's what the judge has told us? |
| 02:01:31 | 12 | THE JUROR:  Yes. |
| 02:01:32 | 13 | THE COURT:  All right.  Well, whoever said it |
| 02:01:33 | 14 | was right, because it was a hundred percent wrong, and the |
| 02:01:38 | 15 | juror who did this is no longer a juror.  I threw her out a |
| 02:01:44 | 16 | few minutes ago. |
| 02:01:46 | 17 | And has there been any other episode like this in the |
| 02:01:49 | 18 | last three weeks? |
| 02:01:50 | 19 | THE JUROR:  No. |
| 02:01:51 | 20 | THE COURT:  All right.  Well, it's extremely |
| 02:01:53 | 21 | important that there not be, and I want you to do everything |
| 02:01:56 | 22 | in your power to ensure it doesn't happen again, because |
| 02:01:58 | 23 | it's not fair to either side.  And everything you need to |
| 02:02:02 | 24 | know to decide this case you're going to get right here, |
| 02:02:05 | 25 | from the lawyers, the documents, the witnesses, the |

02:02:07   1   instructions.

02:02:09   2       And obviously if someone has a question, you have the

02:02:11   3   ability to ask a question, and then everyone will hear the

02:02:14   4   answer, okay?  And they'll know what it is and the witness

02:02:18   5   can be asked for follow-up, whatever.

02:02:23   6       It's also imperative, essential, that no one be

02:02:27   7   discussing the details of this case, you know, two or three

02:02:31   8   of you or even ten of you, whatever, and starting to form

02:02:35   9   even tentative conclusions until the case is completely

02:02:37  10  over.

02:02:37  11       You understand that?

02:02:38  12             THE JUROR:  Yes.

02:02:39  13             THE COURT:  Has anyone been doing that?

02:02:40  14             THE JUROR:  No.

02:02:41  15             THE COURT:  All right.  Because again, it's

02:02:42  16  not fair.  Someone has to go first.  Both sides can't go at

02:02:45  17  the same time.  The plaintiffs went first, but it's going to

02:02:48  18  be soon the defendants' turn.  And you can't be making

02:02:52  19  decisions or even discussing the details until you've heard

02:02:55  20  everyone's witnesses.

02:02:56  21       You got it?

02:02:57  22             THE JUROR:  Yes, sir.

02:02:57  23             THE COURT:  Okay.  Thanks very much.

02:03:01  24     (Juror out.)

02:03:37  25     (Juror present.)

| | | |
|---|---|---|
| 02:03:38 | 1 | THE COURT: Good afternoon, sir. |
| 02:03:39 | 2 | THE JUROR: Good afternoon. |
| 02:03:40 | 3 | THE COURT: It's come to our attention that |
| 02:03:42 | 4 | yesterday morning one of your fellow jurors brought in |
| 02:03:48 | 5 | fliers, piece of paper, whatever, having to do with |
| 02:03:51 | 6 | Narcan/naloxone. |
| 02:03:52 | 7 | Do you recall something like that? |
| 02:03:53 | 8 | THE JUROR: Yes, I do. |
| 02:03:54 | 9 | THE COURT: What do you remember happening? |
| 02:03:55 | 10 | THE JUROR: I didn't look at it. |
| 02:03:58 | 11 | THE COURT: Okay. Well, that's good. That's |
| 02:03:59 | 12 | good. But what -- do you recall what she said or did? |
| 02:04:03 | 13 | THE JUROR: She said, I did some research and |
| 02:04:09 | 14 | something about this is supplied somewhere, somewhere, |
| 02:04:12 | 15 | somewhere. |
| 02:04:14 | 16 | I ignored it because we're here. |
| 02:04:18 | 17 | THE COURT: Well, good, I'm glad. You did the |
| 02:04:20 | 18 | right thing. |
| 02:04:21 | 19 | I'm curious, sir, did you or anyone say to that juror, |
| 02:04:24 | 20 | hey, this is exactly what the judge told us not to be doing? |
| 02:04:30 | 21 | THE JUROR: As I was getting up to leave, I |
| 02:04:32 | 22 | said this is what we're not supposed to do, and I walked out |
| 02:04:34 | 23 | to the little -- |
| 02:04:36 | 24 | THE COURT: Right, okay. |
| 02:04:37 | 25 | Did she say anything? |

02:04:40    1                    THE JUROR:  She didn't -- she says, I just

02:04:44    2    want us to know what was going on.

02:04:46    3                    THE COURT:  You did exactly the right thing.

02:04:47    4    And you should know that juror is no longer a juror.  I

02:04:49    5    threw her out because she violated a very, very important

02:04:53    6    order, probably the most important instruction I give in the

02:04:56    7    case.

02:04:56    8                    THE JUROR:  I was -- I was taken aback to see

02:05:00    9    it, and a couple other people --

02:05:02    10                   THE COURT:  I can tell you I was too, and I

02:05:05    11   reacted quickly.

02:05:06    12       You've been here for three weeks.  Anything like this

02:05:09    13   happen any other time in the last three weeks?

02:05:12    14                   THE JUROR:  No.  Not that I can --

02:05:14    15                   THE COURT:  Is this the only time this juror

02:05:15    16   brought anything in?

02:05:20    17                   THE JUROR:  I don't recall.

02:05:20    18                   THE COURT:  Do you recall her bringing in

02:05:22    19   something else?

02:05:23    20                   THE JUROR:  I don't recall it.

02:05:24    21                   THE COURT:  Okay.  All right.  Do you recall

02:05:27    22   any other juror bringing in anything like this?

02:05:31    23                   THE JUROR:  No, I don't -- no.  Mostly they're

02:05:39    24   making fun of people out here.

02:05:42    25                   THE COURT:  All right.  Tell them they should

02:05:45  1    make fun of people.

02:05:47  2              THE JUROR:  No, they respect you a little bit

02:05:49  3    more than they respect them.

02:05:51  4              THE COURT:  All right.  We'll leave it at

02:05:53  5    that.  That's okay.  That's fine.  People can -- the point

02:05:57  6    is it's fine to do -- to talk like that.  You're not talking

02:06:01  7    about the substance of this case.  And I was going to get to

02:06:03  8    that.

02:06:03  9        It's extremely important that you not discuss the

02:06:06  10   substance of the case until all the evidence is in.  I mean,

02:06:10  11   both sides couldn't proceed at the same time, so the

02:06:12  12   plaintiffs had to go first.  Well, it's going to be the

02:06:14  13   defendants' turn soon.  You've got to listen to all their

02:06:17  14   witnesses and their documents.

02:06:20  15       All right.  Well, I want you to, you know, do whatever

02:06:26  16   you can to make sure -- obviously you won't violate this,

02:06:28  17   but that no one else does.  And I'm obviously talking to

02:06:32  18   each juror individually to impress upon each and every one

02:06:35  19   of you this.

02:06:36  20             THE JUROR:  I think you've shown to them that

02:06:40  21   this is a serious matter.

02:06:42  22             THE COURT:  All right.  Well, that -- I mean,

02:06:44  23   I'm sorry it took this, and I would -- you know, I'll take

02:06:47  24   it on myself.  I certainly thought I had been pretty darn

02:06:51  25   clear, but things happen.  So I want to make sure they don't

02:06:56   1   happen anywhere -- anything remotely like this again, okay?

02:07:01   2        All right.  Thank you, sir.

02:07:03   3        (Juror out.)

02:07:17   4             THE COURT:  Okay.  Well, I am satisfied that

02:07:23   5   this was the only episode like this over the last three

02:07:29   6   weeks.  Fortunately, it appears to be on something that is

02:07:39   7   really not relevant to anything the jurors have to decide.

02:07:42   8   I mean, whether or not -- whether you have to pay for Narcan

02:07:46   9   or whatever is very tangential.  But I think I've impressed

02:07:54  10   upon each of them that this is an absolute, absolute no-no.

02:07:58  11        So I plan to go forward.

02:08:02  12             MS. SULLIVAN:  Your Honor, I appreciate the

02:08:04  13   Court undertaking that inquiry and Mr. Pitts and you

02:08:08  14   bringing it to our attention.

02:08:10  15             THE COURT:  All right.  Before I forget,

02:08:12  16   Ms. Sullivan, I'm going to mark this --

02:08:14  17        Mr. Pitts, if you'd mark this as Court's Exhibit 1

02:08:18  18   with today's date, just so we have it.  This is the flier,

02:08:23  19   the piece of paper, whatever, that Juror Number 4 brought

02:08:31  20   in.  So just so the record -- we've got it in the record.

02:08:34  21             MS. SULLIVAN:  Thank you, Your Honor.

02:08:34  22        And Your Honor, despite the Court's hard work in this

02:08:37  23   matter and the hard work of all the lawyers here, I think we

02:08:40  24   have an incurable real problem now in terms of jury taint.

02:08:44  25   We've got a juror who purposely researched, made 14 -- at

02:08:49  1    least 14 copies of a Narcan informational document, handed

02:08:53  2    it out to each juror.  Some of the jurors clearly stated

02:08:56  3    they read it, all of them got it, it was an issue in the

02:09:00  4    case, it was part of the examination of the Walgreens

02:09:04  5    witness.  The Walgreens witness said that somebody had to

02:09:06  6    pay for it, and this juror showed that, you know, basically

02:09:10  7    they're making a profit.  It's clearly prejudicial to the

02:09:14  8    companies here that you could get it for free, isn't it

02:09:16  9    terrible that these companies are charging for it.  Even

02:09:19  10   plaintiffs' lawyer acknowledged he can't figure out how it

02:09:22  11   could be bad for him.

02:09:23  12       It's clear we had a juror who violated the Court's

02:09:28  13   order, who communicated information damaging to the defense,

02:09:31  14   to all of her co-jurors, and you can't unring that bell,

02:09:34  15   Your Honor.

02:09:35  16       There was questions about Narcan, it featured in the

02:09:38  17   testimony, and so at this time Giant Eagle moves for a

02:09:41  18   mistrial, notwithstanding Your Honor's hard work and efforts

02:09:44  19   to inquire of the jurors.

02:09:45  20       Thank you, Your Honor.

02:09:47  21           THE COURT:  Let me just see if any of the

02:09:49  22   other defendants are moving for a mistrial.

02:09:52  23           MR. MAJORAS:  Your Honor, John Majoras.  I

02:09:55  24   would actually request if we could have a few minutes.  I

02:09:57  25   would like to confer.

| | | |
|---|---|---|
| 02:09:58 | 1 | And also, we really need to talk -- we'd like to talk |
| 02:10:00 | 2 | to our client.  They're aware of what's happening.  I can do |
| 02:10:04 | 3 | that quickly.  But there's been a lot invested in this case, |
| 02:10:07 | 4 | and I think that they should be allowed to be involved in |
| 02:10:09 | 5 | that decision, sir. |
| 02:10:10 | 6 | THE COURT:  You can move -- |
| 02:10:10 | 7 | MR. MAJORAS:  I just want to spend some time. |
| 02:10:11 | 8 | THE COURT:  You can move for mistrial at any |
| 02:10:12 | 9 | point.  I mean, I'm not -- I'm denying it at this point, but |
| 02:10:16 | 10 | you can all -- you can renew it, and you don't have to make |
| 02:10:20 | 11 | a snap decision.  If you want to make a thoughtful one and |
| 02:10:23 | 12 | whatever, I mean -- I'm proceeding with this trial because I |
| 02:10:31 | 13 | don't -- and I'm going to suggest that counsel work |
| 02:10:36 | 14 | together, among the other things you're working together.  I |
| 02:10:38 | 15 | do want to give something more on Narcan, all right, just so |
| 02:10:44 | 16 | I don't -- I mean, again, I don't think it is ultimately |
| 02:10:51 | 17 | relevant at all to what the jurors have to decide, how you |
| 02:10:57 | 18 | get Narcan or who pays for it.  But I will give some |
| 02:11:00 | 19 | instruction about it. |
| 02:11:02 | 20 | MS. SULLIVAN:  It makes it worse, Your Honor. |
| 02:11:04 | 21 | MR. SWANSON:  Your Honor, Brian Swanson for |
| 02:11:05 | 22 | Walgreens. |
| 02:11:06 | 23 | The issue that we have is that during the |
| 02:11:08 | 24 | cross-examination of Ms. Polster, a big deal was made of the |
| 02:11:12 | 25 | fact that we charge money and make a profit from selling |

02:11:15     1    Narcan.  And it apparently angered that juror enough that

02:11:19     2    she not only went back to do research but came into the jury

02:11:23     3    room and said, hey, you can get it for free, right after

02:11:26     4    they'd had a witness who was berated -- well, who was -- I'm

02:11:30     5    sorry, who was cross-examined for the fact that we charge

02:11:37     6    for Narcan and make a profit.

02:11:39     7         And so it may be irrelevant to the case, but for

02:11:43     8    Walgreens, it's clearly not irrelevant.

02:11:48     9                   THE COURT:  Well --

02:11:48    10                   MR. STOFFELMAYR:  It's become relevant.

02:11:49    11                   THE COURT:  Well, I can cure that by saying

02:11:52    12    that it's -- that it's not -- well, whether or not Walgreens

02:12:00    13    or any of the other defendants sell it or -- they're

02:12:05    14    entitled to sell it, all right?  It's certainly permissible

02:12:08    15    to sell it.  If you sell anything, you can make a profit.

02:12:12    16    So -- it has no bearing on whether or not the plaintiffs can

02:12:18    17    prove a public nuisance.

02:12:20    18                   MR. SWANSON:  But what the jury is thinking is

02:12:21    19    that we're selling something -- that we're essentially

02:12:24    20    tricking people they can get something for free and we're

02:12:28    21    make a profit from it.  There was five minutes of

02:12:31    22    cross-examination on that very point.

02:12:32    23                   THE COURT:  But they might have known that

02:12:33    24    anyway.

02:12:34    25                   MR. SWANSON:  Well, they might have, but now

02:12:35   1    they certainly do.

02:12:37   2              THE COURT:  Well, fine.  I can tell them

02:12:39   3    that's irrelevant.

02:12:40   4              MR. SWANSON:  It's all because of what this

02:12:42   5    juror did.

02:12:43   6              THE COURT:  Well, I can tell them -- well,

02:12:45   7    first of all, I can't recall if it was -- the testimony was

02:12:50   8    objected to.  I mean, I don't know why it even came in

02:12:52   9    whether someone was selling it.  But I can instruct the jury

02:12:57  10    that --

02:12:59  11              MR. SWANSON:  I think it was probably a

02:13:00  12    question from that juror.  As I recall, it was a juror

02:13:04  13    question.

02:13:04  14              MR. LANIER:  It was a juror question, Your

02:13:06  15    Honor.

02:13:07  16              THE COURT:  Well, in retrospect, we probably

02:13:09  17    shouldn't have gotten into it at all.  But --

02:13:13  18              MR. LANIER:  It's on the good faith dispensing

02:13:17  19    target checklist, there's a specific question, did we offer

02:13:20  20    them Narcan.

02:13:22  21              THE COURT:  Oh, right, right, because if

02:13:25  22    the --

02:13:25  23              MR. LANIER:  The dosage.

02:13:26  24              THE COURT:  The concern that -- right, to make

02:13:29  25    sure that if they're getting a dosage that creates any

02:13:31  1   concern about overdose, that the person has the Narcan

02:13:36  2   there.

02:13:37  3              MR. LANIER:  And then the question became from

02:13:38  4   the juror, well, yeah, but are you selling it, is this a

02:13:41  5   sales opportunity, or are you giving it away.  And so that

02:13:44  6   was the question that was displayed and asked of the

02:13:48  7   witness, and then the witness gave the answer where she

02:13:51  8   hedged on it, and then I pressed the witness not to hedge,

02:13:53  9   and the witness said, well, yes, we sell it.

02:14:01  10             MR. SWANSON:  She didn't hedge.

02:14:01  11             MR. LANIER:  In my vocabulary.

02:14:05  12        And I'll be candid, Your Honor, I think that it

02:14:08  13   affects this jury, I think it affects everybody whether they

02:14:11  14   recognize it or not, and I think that the mistrial is

02:14:16  15   appropriate.

02:14:17  16        And it's in your discretion, but that's my concern.

02:14:26  17             THE COURT:  Well, I want everyone to know, if

02:14:28  18   there's a mistrial, I have no idea when I'm going to try

02:14:31  19   this again.  It's not going to be for a while.

02:14:33  20             MR. LANIER:  It is not my preference, Your

02:14:36  21   Honor.  I don't -- but it is my concern, and I just --

02:14:43  22   obviously we've invested -- I've been here for seven solid

02:14:47  23   weeks.  We've invested a lot of time and energy and money in

02:14:50  24   this.  It's not anything I say lightly.

02:14:53  25        But before I spend another four weeks here with a case

02:14:56  1    that's going up, I just want to tell the Court I think that

02:15:01  2    the mistrial is appropriate.  That's my candor to the

02:15:04  3    tribunal which I owe under my ethical obligation.

02:15:12  4              THE COURT:  Well, then I -- I guess what I'm

02:15:20  5    going to suggest is that defendants take the rest of the day

02:15:25  6    and the weekend to confer with their clients and decide if

02:15:29  7    they want to join in the motion.

02:15:33  8              MR. SWANSON:  Thank you, Judge.

02:15:34  9              MS. SULLIVAN:  Your Honor, obviously Giant

02:15:36  10   Eagle --

02:15:37  11             THE COURT:  And you don't have to make --

02:15:39  12        And, Ms. Sullivan, I suggest maybe you talk to your

02:15:41  13   client, you know, maybe there will be four -- well, there

02:15:45  14   can't be four different decisions, it's either yes or no.

02:15:48  15   Each client can decide independently.

02:15:50  16             MS. SULLIVAN:  And, Your Honor, Ms. Fiebig did

02:15:53  17   talk to our client, and I agree with Mr. Lanier, we don't

02:15:56  18   want to waste time Your Honor's respectfully here for

02:15:59  19   another month when this record is incurably tainted in our

02:16:03  20   view.

02:16:09  21             THE COURT:  Well, we'll see what the other

02:16:10  22   defendants think.  But, you know, as I said, I have no idea

02:16:16  23   when I'm going to try it again.  I'm not making any

02:16:19  24   commitment to either side to -- when that will be or that

02:16:24  25   I'll push everything else I have aside to do it.

02:16:27   1      So everyone understands that, if this -- if we have to

02:16:30   2   stop the trial, we have to stop the trial, but I don't know

02:16:32   3   when it will be -- we'll do it again.  It will be a long

02:16:38   4   time, I can tell you that.

02:16:41   5              MR. STOFFELMAYR:  I think everyone understands

02:16:43   6   that --

02:16:44   7              THE COURT:  And maybe I won't do it.  We've

02:16:45   8   got five others, five other Bellwethers.  I may just say all

02:16:50   9   right, let those judges have at it.  I may very well -- that

02:16:54  10   may make more sense at this point and just -- we've got what

02:16:57  11   we've got, and people can use this maybe as a vehicle to

02:17:01  12   have some serious discussions.  And if you want to have

02:17:06  13   them, you want to have them.  If not, you try the other

02:17:08  14   five.  That may be what we do.

02:17:11  15      So I suggest, Mr. Lanier, Mr. Weinberger, you -- I

02:17:16  16   mean, you shouldn't make a snap decision.

02:17:19  17              MR. LANIER:  Agreed, Your Honor.

02:17:20  18              THE COURT:  And you ought to talk to your

02:17:22  19   clients too.

02:17:22  20              MR. LANIER:  Agreed, Your Honor.

02:17:23  21              THE COURT:  You do have -- no, I'm being not

02:17:31  22   being facetious, the plaintiffs have clients too.  They're

02:17:34  23   public officials.

02:17:35  24              MR. WEINBERGER:  Your Honor, as you know, we

02:17:36  25   have a unique obligation not just to these clients --

02:17:41  1          THE COURT:  Got it.  Of course.

02:17:41  2          MR. WEINBERGER:  -- but to the entire PEC.

02:17:41  3          THE COURT:  Right.

02:17:46  4          MR. WEINBERGER:  So we will certainly confer,

02:17:47  5    Your Honor.

02:17:48  6          MR. LANIER:  And I don't want you to think,

02:17:50  7    Your Honor, that I just made this decision in a vacuum

02:17:52  8    freewheeling.  We have been on burning up the text messages

02:17:56  9    and we have been in dialogue, Mr. Weinberger and myself, in

02:18:00  10   this regard.  We'll certainly talk to the clients.

02:18:01  11       And if all the defendants will agree to go forward,

02:18:04  12   then there may be a good path forward.  That's just where we

02:18:07  13   land.

02:18:08  14          THE COURT:  Well, I think you should, you

02:18:10  15   know, obviously talk first to your clients, talk to each

02:18:12  16   other.

02:18:17  17       Candidly, I don't think -- I mean, I think I can cure

02:18:21  18   whatever -- you know, this thing with Narcan, of all the

02:18:27  19   very important things that have occurred in this trial for

02:18:29  20   three weeks and will occur the next three weeks, I can't

02:18:33  21   imagine that any juror is going to make his or her mind up

02:18:36  22   over whether anyone charges for Narcan.  All right?  And I

02:18:41  23   think I can make that clear.

02:18:42  24       But, again, if everyone thinks there should be a

02:18:50  25   mistrial, I've never seen a case where a judge says, well,

02:18:53  1    everyone's wrong and we can go ahead.  There may be one, but

02:19:01  2    I --

02:19:02  3        But again, everyone should understand that I have a

02:19:08  4    lot of other cases, I have a lot of other responsibilities.

02:19:10  5    This took a huge amount of time even to get this jury, and I

02:19:14  6    really have no idea as to if we have to stop this trial,

02:19:19  7    when or if I'll do it again, and I may just decide, I'll let

02:19:22  8    the other five judges do it.  And quite frankly, people have

02:19:25  9    probably seen enough that if the parties want to use this as

02:19:32  10   an opportunity to work on a resolution, fine.  If not, you

02:19:35  11   can try the other five cases over the next three or four

02:19:37  12   years.  That's fine.  I mean, that may make more sense.

02:19:45  13   It's not my preference.  My preference is to see this

02:19:48  14   through, and I think we have a very good jury.  Actually,

02:19:54  15   this is an extremely attentive jury.  I can't imagine we'd

02:19:58  16   ever find a better one.  And, you know, I don't think this

02:20:01  17   juror was -- intended to cause a mistrial, but she sure as

02:20:08  18   heck should have known better.

02:20:09  19       But anyway, I think the problem can be cured, and I

02:20:13  20   don't think these other individuals are going to make up

02:20:20  21   their mind based on, I mean, who's paying for Narcan.

02:20:25  22       So I really think you ought to discuss this with your

02:20:28  23   clients.

02:20:30  24             MR. LANIER:  We will, Your Honor.

02:20:31  25             THE COURT:  I'm sure everyone has a sense of

02:20:34   1   who's doing well and who's not.  I can tell you from my

02:20:37   2   side, I have no clue what this jury's going to do at the

02:20:43   3   end, and they're going to have to be unanimous.  And I think

02:20:46   4   plaintiffs are going to make good arguments, the defendants

02:20:50   5   have going to make good arguments.  I think this is as good

02:20:52   6   a case as any to see it through.

02:20:54   7        But you ought to, you know, really think it through.

02:21:00   8   I mean, obviously, if you really think that this jury will

02:21:03   9   not be able to decide this case fairly based on the

02:21:07  10   evidence, then you ought to move for a mistrial.  But if

02:21:11  11   you're doing it for tactical reasons, I don't think either

02:21:14  12   side should do it for tactical reasons.

02:21:18  13             MR. MAJORAS:  Your Honor, John Majoras.

02:21:20  14        If the parties were to reach a consensus just in our

02:21:23  15   views on the motion before the end of the weekend, do you

02:21:25  16   want us to inform the Court perhaps through Special Master

02:21:28  17   Cohen just so you'll know what to expect on Monday morning?

02:21:32  18             THE COURT:  That's probably a good idea.  I

02:21:34  19   mean, you know, the jury's going to come in anyway because I

02:21:43  20   would -- if we have to end the trial, I certainly would talk

02:21:47  21   to them and let them know.  If they've got any questions,

02:21:50  22   whatever, I always do that at the end of the trial.  I

02:21:52  23   wouldn't just say bye, don't come in.

02:21:55  24             MR. LANIER:  Your Honor, in that regard, of

02:21:58  25   course my brain's wheeling on what might happen if we

02:22:01   1   don't -- if everybody will agree to continue and we can

02:22:05   2   continue this trial, right now we're set to take by video

02:22:10   3   Nelson at 9:00 a.m. on Monday.  He'll be in Dallas.  If I

02:22:16   4   can call his counsel and bump that to right after lunch as a

02:22:19   5   start time so that if we go Monday, we'll begin with videos.

02:22:22   6        I can't bring Dr. Keyes back Monday, but I can bring

02:22:26   7   her back Tuesday.  So we could play a video Monday

02:22:32   8   morning --

02:22:32   9             THE COURT:  That probably makes sense.  I

02:22:39  10   mean, I don't have a problem with that.

02:22:40  11             MR. MAJORAS:  Your Honor, we don't -- we'll be

02:22:42  12   in touch with Mr. Lanier in terms of making contact with

02:22:46  13   Mr. Nelson's counsel, and that's obviously going to be their

02:22:48  14   call.  That's fine with us.  I'd just ask as we've been

02:22:52  15   doing that maybe before we leave today we have some clear

02:22:55  16   understanding, just order of witnesses as we go into next

02:22:57  17   week.

02:22:58  18             MR. LANIER:  All right.  We'll do that.

02:22:59  19             THE COURT:  And either way, I mean, I want

02:23:04  20   everyone here Monday morning.  If we're not going forward,

02:23:06  21   obviously I have to put some things on the record.  If we

02:23:09  22   are, we'll see however we are.

02:23:18  23        Well, I think what I'll do, then, is -- well, let me

02:23:31  24   ask you this:  Why don't we finish up with Ms. Keyes?  She's

02:23:34  25   here, all right?  I mean, she's here.  I mean, I assume we

02:23:37   1   can finish up with her and then be done.  I don't -- you

02:23:41   2   know, does anyone have a problem with that?

02:23:45   3               MR. MAJORAS:  No objection, Your Honor.

02:23:47   4               MR. LANIER:  I'm rather concerned about the

02:23:51   5   distraction level of the jury right now in light of

02:23:53   6   everything we've been through, Your Honor.

02:23:55   7        It's our expense to bring her back.  I'd much rather

02:23:58   8   bring her back on Tuesday morning.  I commit that obviously

02:24:02   9   none of us will talk to her about her testimony or anything

02:24:04  10   like that.  But we've got an extremely distracted jury

02:24:09  11   that's been in here one at a time, and frankly, I think that

02:24:15  12   this is not on a Friday afternoon, mid afternoon, a time to

02:24:21  13   put them back into the wringer on this.  That's my opinion.

02:24:25  14   Two more hours of testimony after this, I think they'd be

02:24:28  15   quite distracted.

02:24:31  16        I'll do as the Court's pleasure.

02:24:35  17               MR. STOFFELMAYR:  Your Honor, as the

02:24:37  18   questioner, I'm happy either way.  If the Court wants to

02:24:39  19   continue, we're happy to continue.  If the Court thinks it

02:24:41  20   makes more sense to wait till Tuesday morning, that's fine

02:24:44  21   as well, from our perspective.

02:24:49  22               THE COURT:  Well, my thought is, you know, the

02:24:52  23   jury knows this was serious, okay?  I mean, but, you know, I

02:24:58  24   think it's -- if I just dismiss them out, I don't know what

02:25:06  25   they're going to be thinking.  I think it's better candidly

| | |
|---|---|
| 02:25:10 | 1 |
| 02:25:13 | 2 |
| 02:25:16 | 3 |
| 02:25:18 | 4 |
| 02:25:19 | 5 |
| 02:25:21 | 6 |
| 02:25:24 | 7 |
| 02:25:27 | 8 |
| 02:25:31 | 9 |
| 02:25:31 | 10 |
| 02:25:32 | 11 |
| 02:25:37 | 12 |
| 02:25:41 | 13 |
| 02:25:46 | 14 |
| 02:25:47 | 15 |
| 02:25:51 | 16 |
| 02:25:53 | 17 |
| 02:25:58 | 18 |
| 02:26:06 | 19 |
| 02:26:09 | 20 |
| 02:26:15 | 21 |
| 02:26:19 | 22 |
| 02:26:20 | 23 |
| 02:26:23 | 24 |
| 02:26:26 | 25 |

1  that they just -- you know, they know why we had this break

2  and what we did and that we're proceeding.  If it turns out

3  that this is their last day in the trial, so be it.

4          MS. SULLIVAN:  Your Honor, obviously you're

5  the judge, anything you decide, but it seems a shame to

6  waste these -- I mean, these people have taken so much time

7  out of their lives, if we're all going to agree on a

8  mistrial to have them sit through another afternoon for no

9  reason.

10          THE COURT:  I don't know if we're going to

11  agree on a mistrial.  If your clients really all think that,

12  knowing that you may never try this case or it may be a year

13  or something -- I don't think anyone should make that

14  decision lightly.

15      So, look, if everyone thinks we should just break for

16  the day, it's all right with me.  I think actually it's

17  going to be -- the jury's going to leave with a lot more

18  questions than answers, but --

19          MR. LANIER:  Your Honor, we'll do whatever the

20  Court thinks is best.  We'll do whatever the Court thinks is

21  best.

22          MR. MAJORAS:  Your Honor, Mr. Lanier has

23  actually convinced Walmart that the distraction may be

24  significantly strong this afternoon, that coming back on

25  Tuesday would make more sense.

02:26:29   1          THE COURT:  All right.  Well, then I'll just

02:26:33   2   excuse them, and I won't say much other than my usual

02:26:36   3   admonitions.  I'll just say we've determined that the best

02:26:39   4   thing to do is to conclude today and to come back 9:00 a.m.

02:26:47   5   Monday morning.

02:26:49   6          MR. LANIER:  I think that might even

02:26:51   7   underscore the gravitas of what happened, Your Honor.  And

02:26:54   8   if we can continue the trial, I think it better ensures

02:26:58   9   juror behavior.

02:27:01   10          THE COURT:  Okay.  All right.  We'll bring the

02:27:03   11   jury back then.

02:29:37   12          (Jury present in open court at 2:29 p.m.)

02:29:42   13          THE COURT:  All right.  Please be seated,

02:29:43   14   ladies and gentlemen.

02:29:43   15      Because of the matter that has taken up all of our

02:29:55   16   time the last hour and a half, we have decided the best

02:29:58   17   thing to do is to recess for the week.  So I'm going to send

02:30:03   18   you home a little early today.

02:30:08   19      I'm going to reemphasize everything I've said, and I'm

02:30:11   20   going to -- I thought everyone was paying close attention,

02:30:14   21   but clearly at least one person wasn't.

02:30:21   22          You are absolutely not to do any independent research,

02:30:24   23   checking whatsoever about any of these witnesses, the

02:30:27   24   subject matter, anything remotely connected to this trial.

02:30:31   25   Everything you'll need you're going to learn in this

02:30:34  1    courtroom.

02:30:35  2         You're not to discuss this case among anyone.  Just

02:30:39  3    tell them that the judge has ordered me not to discuss it.

02:30:43  4         Have good weekend, and we'll see you at 9:00 a.m. on

02:30:46  5    Monday.

02:30:50  6                   (Jury excused for the day at 2:30 p.m.)

02:31:18  7              THE COURT:  All right.  Just close the door in

02:31:24  8    the back, please.

02:31:25  9         Everyone just be seated for one minute.

02:31:30  10        All right.  Well, obviously each party needs to figure

02:31:33  11   out what you want to do, but I really want to emphasize what

02:31:36  12   I said.  If we have to stop this trial, I'm not making any

02:31:42  13   commitment as to when or if I will retry the case.  I just

02:31:49  14   want everyone to understand that.

02:31:51  15        I've obviously put aside -- pushed aside all of my

02:31:55  16   other obligations, but I cannot in good faith continue to do

02:32:00  17   that.  I've got a whole lot of criminal defendants who have

02:32:03  18   been sitting in jail for over a year.  I've got to deal with

02:32:06  19   them.  I have a number of other commitments.  So it will be

02:32:09  20   a long time, if at all.

02:32:12  21        But, and again, I may decide just not to do it.  And

02:32:18  22   again, the whole purpose of this was to, in my opinion, give

02:32:23  23   a test case so everyone could see and to use it as a vehicle

02:32:27  24   for some resolution, because clearly no one can try these

02:32:30  25   cases for 10 years or 50 years or 100 years.

02:32:41  1      So I may just decide I'll let the other five go

02:32:44  2  forward and, you know, we've got what we got on this.  I

02:32:49  3  don't know.  So I haven't -- I just want everyone to

02:32:52  4  understand that.  No one should assume this was -- this

02:32:55  5  trial will go forward again in any -- in the near future it

02:33:01  6  won't, and when or if, I'm not making any commitment to

02:33:05  7  anyone.  I think I've fulfilled my obligations.

02:33:08  8      Okay.

02:33:11  9          MR. DELINSKY:  Your Honor, I just -- on behalf

02:33:14  10  of my client and our team, I'd just like to thank you for

02:33:17  11  the care that you've taken on this issue regardless of how

02:33:19  12  it turns out.

02:33:20  13          THE COURT:  You're welcome, Mr. Delinsky.

02:33:21  14      I think I've conducted a fair trial.  That's my

02:33:23  15  commitment to everyone.  I mean, I've made rulings that, you

02:33:29  16  know, no one liked, certainly half didn't, but that's how it

02:33:32  17  goes.

02:33:33  18      But I think I've had the same strike zone for both

02:33:36  19  sides, and that's what I'll continue to do if we resume this

02:33:41  20  or whenever.

02:33:43  21      Okay.  Well, have a good weekend.

02:33:46  22          (Proceedings adjourned at 2:33 p.m.)
                                  * * * * *
23                     **C E R T I F I C A T E**
           I certify that the foregoing is a correct transcript
24  of the record of proceedings in the above-entitled matter
    prepared from my stenotype notes.
25          _/s/ Lance A. Boardman_____     _10-22-2021_
            Lance A. Boardman, RDR, CRR              DATE