UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>**BOARD OF EDUCATION OF THORNTON TOWNSHIP HIGH SCHOOLS, DISTRICT 205**, *et al.*, on behalf of themselves and others similarly situated,<br><br>v.<br><br>**CEPHALON, INC.,** *et al.*<br><br>**Defendants.**<br><br>and<br><br>**SCHOOL BOARD OF MIAMI-DADE COUNTY,**<br><br>v.<br><br>**ENDO HEALTH SOLUTIONS, INC.,** *et al.*<br><br>**Defendants.** | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>[1:20-op-45281-DAP, 1:19-op-45913 DAP]<br><br>Judge Dan Aaron Polster<br><br>**<u>CERTAIN PUBLIC SCHOOL DISTRICTS' MOTION FOR MODIFICATION OF THE JULY 23, 2021, CASE MANAGEMENT ORDER AND REQUEST FOR COURT-ORDERED MEDIATION [EXHIBIT A]</u>** |

Plaintiff Public School Districts,[1] having brought pending claims on behalf of putative

nationwide and statewide classes of public school districts, respectfully request that the Court

---

[1] Movants, referred to herein as "Public School Districts," include most of the public school districts which are named plaintiffs in the above entitled complaints, as follows: Board of Education of Minnetonka School District No. 276, Minnetonka, Minnesota; Board of Education of Mason County Public Schools, Point Pleasant, West Virginia; Baltimore City Board of School Commissioners, Baltimore, Maryland; Board of Education of Fayette County Public Schools, Lexington, Kentucky; Board of Education of LaRue County Public Schools, Hodgenville, Kentucky; Board of Education of Bullitt

clarify the application of its July 23, 2021 Case Management Order (ECF No. 3795) ("July 23 CMO") to public school districts and modify the CMO, as necessary, to expressly exclude them from its scope.

On July 21, 2021, four opioid defendants—three distributors and one manufacturer—announced a settlement framework ("Settlement Agreements") negotiated with the Plaintiffs Executive Committee ("PEC"), offering combined payments totaling approximately $26 billion to states and "General Purpose Governments," i.e., cities, counties, and townships.  These

---

County Public Schools, Shepherdsville, Kentucky; Board of Education of Breathitt County Public Schools, Jackson, Kentucky; Board of Education of Estill County Public Schools, Irvine, Kentucky; Board of Education of Harrison County Public Schools, Cynthiana, Kentucky; Board of Education of Hart County Public Schools, Munfordville, Kentucky; Board of Education of Jefferson County Public Schools, Louisville, Kentucky; Board of Education of Johnson County Public School District, Paintsville, Kentucky; Board of Education of Lawrence County Public Schools, Louisa, Kentucky; Board of Education of Martin County Public Schools, Inez, Kentucky; Board of Education of Menifee County Public Schools, Frenchburg, Kentucky; Board of Education of Owsley County Public Schools, Bonneville, Kentucky; Board of Education of Wolfe County Public Schools, Campton, Kentucky; Board of Education of Bangor School Department, Bangor, Maine; Board of Education of Cape Elizabeth School Department, Cape Elizabeth, Maine; Board of Education of Maine Regional School Unit ("RSU") 10, Rumworth, Maine; Board of Education of Maine RSU 13, Rockland, Maine; Board of Education of Maine RSU 25, Bucksport, Maine; Board of Education of Maine RSU 26, Orono, Maine; Board of Education of Maine RSU 29, Houlton, Maine; Board of Education of Maine RSU 34, Old Town, Maine; Board of Education of Maine RSU 40, Union, Maine; Board of Education of Maine RSU 50, Dyer Brook, Maine; Board of Education of Maine RSU 57, Waterboro, Maine; Board of Education of Maine RSU 60, North Berwick, Maine; Board of Education of Maine RSU 71, Belfast, Maine; Board of Education of Maine RSU 9, Farmington, Maine; Board of Education of Maine School Administrative District ("SAD") 11, Gardiner, Maine; Board of Education of Maine SAD 15, Cumberland, Maine; Board of Education of Maine SAD 28/Five Town Central School District, Camden, Maine; Board of Education of Maine SAD 35, Eliot, Maine;  Board of Education of Maine SAD 44, Bethel, Maine; Board of Education of Maine SAD 53, Pittsfield, Maine; Board of Education of Maine SAD 55, Hiram, Maine; Board of Education of Maine SAD 6, Buxton, Maine; Board of Education of Maine SAD 61, Bridgton, Maine; Board of Education of Maine SAD 72, Fryeburg, Maine; Board of Education of Portland School Department, Portland, Maine; Board of Education of Scarborough School Department, Scarborough, Maine; Board of Education of South Portland School Department, South Portland, Maine; Board of Education of St. George Municipal School District, St. George, Maine; Board of Education of Waterville School Department, Waterville, Maine; The Board of Education of Ellsworth School Department, Ellsworth, Maine; Board of Education of Goshen School District, Goshen, New Hampshire; Board of Education of Kearsarge RSU-School Administrative Unit 65, New London, New Hampshire; Board of Education of Lebanon School District, Lebanon, New Hampshire; Board of Education of Pittsfield School District, Pittsfield, New Hampshire; Board of Education of Tamworth School District, Tamworth, New Hampshire; The School Board of Miami-Dade County, Miami, Florida.

Settlement Agreements, while laudatory in other respects, provide nothing certain, and in all likelihood nothing at all, to the nation's approximately 14,000 public school districts.

Two days later, the Court entered the July 23 CMO imposing production obligations on "eligible Subdivision[s] that choose[] not to participate in the Settlement Agreements." (ECF No. 3795 at 1 n.2.). Public School Districts were not included in efforts to negotiate the Settlement Agreements, had no notice that the Court was considering a possible settlement-related CMO, and, thus, had no opportunity to address the Court in the short time before the July 23 CMO was docketed. For this reason, it remains unclear whether the Court intended the CMO to apply to them. In addition, the application of the July 23 CMO to school districts is facially unclear, as it states, "[a]ny capitalized terms used but not otherwise defined in this CMO shall have the same meaning as in the Distributor Settlement Agreement." (ECF No. 3795 at 1). But the July 23 CMO applies to political subdivisions that decline to participate in *both* the Distributor Settlement Agreement and the Manufacturer Settlement Agreement, and the two agreements define "Subdivision" differently: the Distributor Settlement Agreement defines "Subdivision" to include Public School Districts along with all General Purpose Governments,[2] while the Manufacturer Settlement Agreement—released after the July 23 CMO—specifically defines "Subdivision" to *exclude* Public School Districts.[3] This difference in the scope of the two underlying Settlement Agreements raises a question, in turn, about the intended scope of the July 23 CMO.

As explained below, Public School Districts, having been excluded from Settlement discussions, with no representation on the PEC, and having their own independent claims,

---

[2] Distributor Settlement Agreement, ¶ I.XXX.
[3] Manufacturer Settlement Agreement, ¶ I.76.

separate from other governmental claims, should not be treated the same as the cities and counties, which are represented by the PEC, for purposes of the July 23 CMO.[4]

The Settlement Agreements do not treat school districts like cities and counties. Most importantly, the Settlement Agreements specifically allocate funds to cities and counties but not to school districts yet anticipate school districts release claims without consideration. The Settlements admirably focus on abatement but unlike the Purdue and Mallinckrodt Ch. 11 plans, which each include a grant-making Trust for school districts, the core abatement strategies exclude one of the most essential aspects of any abatement plan—deploying Public School Districts to provide special education services to children adversely impacted *in utero* by opioids. Unlike cities and counties, under the Settlement Agreements, school districts are not offered, much less guaranteed, *anything*.[5] Nonetheless, the July 23 CMO, as written, treats Public School Districts, who do not opt in, identically to other local governmental units that had representatives seated at the negotiating table and thereby secured for themselves eligibility for an allocation of funds from the settlement proceeds but still choose not to participate. Based on these key differences between Public School Districts and other governmental units, Public School Districts ask the Court to modify its CMO to exclude them from its scope, and further request that the Court order mediation among the Public School Districts and relevant stakeholders to address the issues raised herein.

---

[4] The opt-in provisions cited in the July 23 CMO were negotiated by cities and counties. That was in line with the former negotiation class—cities and counties—as reflected in the "Exclusion Request Form" (ECF No. 2583) that required an averment "that the city or county official has the authority to submit the exclusion request." *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 532, 555 (N.D. Ohio 2019).

**BACKGROUND**

America's public schools are a critical constituency in the national opioid litigation as their efforts are essential for effective abatement and mitigation of the opioid epidemic. By federal mandate, public school districts must teach and care for children who suffer developmental and learning disabilities from exposure to opioids *in utero*. School districts are required to provide both special education services to all children who need them, pursuant to the Individuals with Educational Disabilities Act ("IDEA"), and additional services, pursuant to Section 504 of the Rehabilitation Act of 1973. 24 C.F.R. §§ 104.35, 300.20-24; 20 U.S.C. § 1412(a)(10).

Thousands of children are born every year with Neonatal Opioid Withdrawal Syndrome ("NOWS," also known as Neonatal Abstinence Syndrome, or "NAS"). NOWS is associated with permanent neurodevelopmental damage. Many of these children require special education or related services, which raises the cost of their education and drains school resources. Public School Districts bear that budgetary and economic strain, to the tune of billions of dollars. Public School Districts are legally obligated and committed to abating and mitigating the opioid epidemic's tragic consequences.

In November 2019, the Chicago Public Schools filed a nationwide class action on behalf of America's public school districts as well as a statewide class action on behalf of Illinois public school districts. *Bd. of Educ. of the City of Chi., Sch. Dist. No. 299 v. Cephalon, Inc., et al.*, 1:19-op-46042-DAP, ECF No. 1 (N.D. Ohio Nov. 20, 2019). Since then, dozens of other Public School Districts have also filed claims, with statewide class allegations. *See Bd. of Educ. of Thornton Township High Schools, Dist. 205, et al. v. Cephalon, Inc. et al.*, No. 1:20-op-45281,

ECF No. 1 (N.D. Ohio Dec. 16, 2020).[6]  All of these school district claims are distinct from those of cities and counties.  But like city and county claims, Public School District damages "are not recoverable by any other party."  (*See* ECF No. 1203 at 10.)

The undersigned counsel have taken the lead nationally in addressing the unique damages sustained by public school districts, investing significant resources and identifying nationally-renowned, published experts to address the links between Neonatal Opioid Withdrawal Syndrome and increased special education needs, obligations, and costs.

Public School Districts serve *ex officio* on unsecured creditor committees in the Purdue Pharma and Mallinckrodt bankruptcies.  Their undersigned counsel mediated and reached agreements with both the Purdue and Mallinckrodt debtors to establish a Public School District Special Education Trust focused exclusively on abatement through special education and related services.  *See In re Purdue Pharma L.P.*, 19-23649, ECF No. 3120 (Bankr. S.D.N.Y. July 7, 2021); *In re Mallinckrodt PLC, et al.*, 20-12522-JTD, ECF No. 3410 (Bankr. Dist. Del. July 23, 2021).

Most recently, Judge Charles Breyer appointed Public School Districts' undersigned counsel, Cyrus Mehri,[7] to represent them on the Plaintiffs' Steering Committee in the McKinsey MDL.  *See In re McKinsey & Co. Nat'l Prescription Opiate Consultant Litig.*, 21-MD-02996-CRB, ECF No. 2996 (N.D. Cal. Aug. 16, 2021).

---

[6] Public School Districts sought leave to file an amended consolidated complaint on November 5, 2020 (ECF No. 3547)—including on behalf of the School Board of Miami-Dade County—but that request was denied without prejudice by this Court on December 9, 2020, because of the moratorium on substantive filings (ECF No. 3578).

[7] With respect to MDL 2804, Mr. Mehri worked directly with this Court and the three largest Pharmacy Benefit Managers, in the Judge's chambers, to align their default formularies with CDC guidelines. *In re: Nat'l Prescription Opiate Litig.*, 17-md-2804-DAP, ECF No. 1848 (N.D. Ohio July 15, 2019).

**ARGUMENT**

Public School Districts ask the Court to clarify and modify the July 23 CMO to exclude them from its scope because Public School Districts are not like cities and counties in this litigation and should not be treated as though they are.

As outlined above, public school districts are a separate category of plaintiffs with unique damages and claims independent of those of any other governmental unit. Nonetheless, no public school districts are represented on the PEC since the PEC was formed prior to the filing of the first Public School District complaint. The PEC initially focused on a proposed negotiation class for subdivisions that did not include schools. Since that time, the role of public schools as an essential component of effective abatement has been recognized in other forums. Nobody representing public school interests participated in the settlement negotiations that produced the Settlement Agreements. The Settlement Agreements negotiated by the PEC expressly allocate funds to the states and the General Purpose Governments (e.g., cities and counties), but not to public school districts.

The Settlement Agreements' default allocation gives 15% to *General Purpose Governments* (which includes cities and counties but not school districts), 15% to the states, and 70% to the states to spend on opioid abatement strategies. Notably, cities and counties are prohibited from allocating any of their funds to public school districts.[8] Special education is not recognized among the opioid abatement strategies mentioned in the Settlement Agreements. The crucial services provided only by school districts appear nowhere in the enumerated list of approved abatement strategies, thus denying public school districts a key role in abating the opioid crisis.[9] And, while theoretically some states might share settlement proceeds with schools

---

[8] Distributor Settlement, ¶ V.D.4.d; J&J Settlement, ¶ VI.D.4.d.
[9] Distributor Settlement, Ex. E.; J&J Settlement, Ex. E.

to support such services, *no known state agreement addresses special education or earmarks monies for school districts for any purpose*. Judge Moore discussed the uncertainty of local entities relying on the discretion of others in her dissent in support of this Court's earlier negotiation class order:

> [H]istory has made clear that "it is simply untrue that states generously give cities the resources earned from plaintiff-side litigation." In the 1990s, states' attorneys general reached a global settlement of $246 billion with tobacco companies, but "very little of that money ultimately went to cities" even though cities and counties "incurred significant financial losses as a result of tobacco's adverse health consequences."

*In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 708 (6th Cir. 2020) (citations omitted).

In sum, Public School Districts that do not opt into the Settlement Agreements should not be treated identically to other local governmental units, which, unlike the Public School Districts, were actively represented in negotiating the Settlement Agreements and, thereby, have secured a recovery allocation. This Court should therefore exclude Public School Districts from the scope of the Courts' July 23 CMO.

In addition, Public School Districts would welcome engaging in Court-ordered mediation with the relevant stakeholders in the Settlement Agreements to address resolution of their unique, distinct, and as yet unaddressed, claims.[10]  In particular, the Public School Districts request that the Court order a mediation to allow Public School Districts an opportunity to work with the relevant stakeholders to (i) address the concerns of the Public School Districts outlined in this Motion and (ii) develop a proposed CMO tailored to the circumstances of Public School Districts should the parties be unable to resolve said concerns.

---

[10] In the Purdue Bankruptcy, Judge Robert Drain ordered a one-day mediation with Kenneth Feinberg, which resulted in an agreement for the creation of Public Schools' Special Education Initiative. *In re Purdue Pharma L.P.*, 19-23649, ECF No. 2879 (Bankr. S.D.N.Y. May 18, 2021).

**CONCLUSION**

For the foregoing reasons, Public School Districts respectfully request that the Court rule that the July 23 CMO does not apply to Public School Districts. In addition, Public School Districts request that the Court order mediation among the Public School Districts and the relevant stakeholders.

Dated: October 22, 2021						Respectfully submitted,

							*/s/ Cyrus Mehri*

							One of the Attorneys for Plaintiffs

| | |
|---|---|
| Cyrus Mehri | Matthew J. Piers |
| cmehri@findjustice.com | mpiers@hsplegal.com |
| Steve Skalet | Charles D. Wysong |
| sskalet@findjustice.com | cwysong@hsplegal.com |
| Joshua Karsh | Emily R. Brown |
| jkarsh@findjustice.com | ebrown@hsplegal.com |
| Ezra Bronstein | Margaret E. Truesdale |
| ebronstein@findjustice.com | mtruesdale@hsplegal.com |
| MEHRI & SKALET, PLLC | HUGHES SOCOL PIERS |
| 2000 K Street, N.W., Suite 325 | RESNICK & DYM, LTD. |
| Washington, D.C. 20006 | 70 W. Madison Street, Suite 4000 |
| 202.822.5100 | Chicago, IL 60602 |
| | 312.580.0100 |
| Neil Henrichsen | Wayne Hogan |
| nhenrichsen@hslawyers.com | hogan@terrellhogan.com |
| HENRICHSEN SIEGAL, PLLC | Leslie A. Goller |
| 301 W. Bay Street, Suite 1400 | lgoller@terrellhogan.com |
| Jacksonville, FL 32202 | TERREL HOGAN YEGELWEL, P.A. |
| 904.381.8183 | 233 E. Bay Street, Suite 800 |
| | Jacksonville, FL 32202 |
| | 904.722.2228 |

							*Attorneys for the Proposed Classes*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of October 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

        */s/ Cyrus Mehri*

        One of the Attorneys for Plaintiff Public School Districts