# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>Track Three Cases | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

# DEFENDANTS' MOTION FOR MISTRIAL
# DUE TO JUROR MISCONDUCT

A juror violated what this Court called "probably the most important instruction" by doing outside internet research on an issue made relevant to the case by plaintiffs' cross-examination the day before. She then shared the results of her independent research with all of the other jurors. This misconduct requires a mistrial, as plaintiffs' counsel himself recognized in statements to the Court "in candor to the tribunal." While unfortunate at this stage of the proceedings, to deny a mistrial and complete a trial tainted by juror misconduct would only result in the waste of untold additional resources. *See In re Beverly Hills Fire Litig.*, 695 F.2d 207, 213-14 (6th Cir. 1982) (the Sixth Circuit "has not hesitated to declare mistrials" where misconduct by a juror "injected extraneous information into the trial").[1]

## BACKGROUND

In this case, two counties in Northeast Ohio seek to hold national and regional pharmacy chains—CVS, Giant Eagle, Walgreens, and Walmart—liable for the entire opioid crisis in their counties. From the start of trial, plaintiffs have characterized the pharmacies as seeking to profit from opioid addicts. Tr. at 51:3-9 ("[I]t's not surprising that there's room for people to ***profit*** from those folks, sell it when maybe they shouldn't, turn a blind eye to what they ought to be focusing on.").[2] Under plaintiffs' unfounded but unmistakable theory, the pharmacies oversupplied the counties with prescription opioid medication out of corporate greed; elected not to develop tools to help pharmacists identify illegitimate prescriptions; and chose whether to make changes to their systems, policies, and procedures entirely out of concern for their bottom lines. *Id.* at 92:25-93:7 ("It was not ***profitable*** to follow the law. The evidence is going to show

---

[1] All four of the pharmacy defendants join in this motion for mistrial, joining and incorporating by reference the motion for mistrial separately filed by Giant Eagle. Dkt. 4067.

[2] All emphases added unless otherwise noted. All transcript citations refer to the Track Three trial transcript for *In re National Prescription Opiate Litigation*.

1

you that they could *make money* by *selling*. They could *make money* by *selling the pills*, they could *make money* by *selling the data*, but to put the data together simply for their pharmacists to use, to reject people's purchases, to sell less, not more, that doesn't *make money*.").

This past Wednesday, counsel for the counties added to this long list of insinuations the proposition that Walgreens only offers naloxone (also known as Narcan)—a life-saving medication that can reverse an opioid overdose—to patients for profit:

> **Q** And down at the bottom it's got this provision, "Per CDC recommendation, Narcan was offered to the patient" -- naloxone, excuse me, which is Narcan, right?
> **A** Yes.
> **Q** "For CDC recommendation, naloxone was offered to the patient in case of an emergency in these prescriptions, right?
> **A** Yes.
> **Q** *It was offered not like here's some Narcan, it was offered like would you like to buy some Narcan, right?*
> **A** No, it was what that -- well, correct, they would have to purchase it, yes.
> **Q** *Yeah, in other words, the offer of Narcan, that's an offer to sell Narcan, right?*
> **A** It's an offer to let them know that it's available, that they can choose to get it or not.
> **Q** *Right, in other words, they can buy it or not, right?*
> **A** Yes, or bill it to their insurance, correct.
> **Q** Right. Well, I mean, *one of the jurors asked this question: "Was naloxone offered to patients for free when getting 50 MMEs?* If not, how much did it cost?"
> **A** I don't know the exact cost of Narcan.

*Id.* at 3292:3-24.

On Friday, the Court notified the parties that it had just learned that Juror 4 had "brought in . . . copies of an article regarding Narcan" and "began showing [it] to the jurors." Tr. at 3715:4-10. The Court promptly conducted *voir dire* of Juror 4. The questioning revealed that Juror 4—immediately after hearing the testimony about naloxone not being offered for free at

2

Walgreens—had gone home, done internet research, and returned the next morning with a stack of fliers listing programs in Northeast Ohio where nalaxone is made available free of charge. *See* Court Ex. 1. Juror 4 stated that she handed a copy to "each juror" and verbally informed them that naloxone is "free and available in Northeast Ohio." Tr. at 3717:11-3721:6. This conduct by Juror 4 was in direct violation of the Court's repeated admonitions to do no research and consider no outside sources of information on issues related to the case.

After dismissing Juror 4 from the jury, the Court proceeded to conduct *voir dire* of each of the remaining 13 jurors and alternates, one by one. Every single juror confirmed that Juror 4 had handed out a flier about the availability of naloxone. Almost half reported having looked at the paper. At least six explicitly volunteered that the paper—or Juror 4 verbally—had alerted them to the fact that naloxone was available for "free." Several provided even more detail about what Juror 4 had told them, reporting that she said "we all needed to know that you can get it for free," *id.* at 3734:14-17, and that "Narcan was available, that you didn't have to get it at the pharmacies," *id.* at 3741:24-3742:2. In short, there is no question that most if not all of the jurors were made aware of the fact, content, and relevance of Juror 4's outside research.

## ARGUMENT

"It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process." *Waldorf v. Shuta*, 3 F.3d 705, 709 (3rd Cir. 1993). For this reason, the Sixth Circuit "has not hesitated to declare mistrials" where misconduct by a juror "injected extraneous information into the trial" and the juror's act was "a response to the facts of the case at hand." *Beverly Hills*, 695 F.2d at 213-14. Indeed, "a juror introducing extraneous information into deliberations 'can rarely be viewed as harmless.'" *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 758 (6th Cir. 2021) (quoting *Beverly Hills*, 695 F.2d at 215).

3

In *Beverly Hills*, a juror went home and investigated a factual question that came up at trial—prompted entirely, the Court noted, by genuine safety concerns—before coming back and sharing the results with the other jurors.  695 F.2d at 211-15.  When the juror's misconduct came to light after the verdict, the Sixth Circuit held that "[t]he jury's receipt of such extraneous information '***requires that the verdict be set aside, unless entirely devoid of any proven influence or the probability of such influence*** upon the jury's deliberations or verdict.'"  *Id.* at 215 (quoting *Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir. 1954)).  The Court explained that the error was "particularly grievous because a unanimous verdict was required and the juror communicated his findings to other jurors."  *Id.*  It further noted that it "has not hesitated to declare mistrials" in other cases involving misconduct by jurors.  *Id.* at 214; *see also, e.g.*, *Dassault Systèmes, SA v. Childress*, 828 F. App'x 229, 246-48 (6th Cir. 2020) (juror shared information about the defendant's income and settlement posture, which were not at issue in the case but had "a negative impact on the jury's attitude" toward the defendant); *Overbee v. Van Waters & Rogers*, 706 F.2d 768, 770-71 (6th Cir. 1983) (juror looked through his son's electric welding manual to identify safety precautions for welding near explosives); *Aluminum Co. of Am. v. Loveday*, 273 F.2d 499, 499-500 (6th Cir. 1959) (juror traveled to plaintiff's property to view cattle at issue in the trial, reporting back to the jury that they were "about the best looking he had seen in a long time"); *Stiles*, 211 F.2d at 190 (juror brought into jury room a manual showing the length of skid marks made by automobiles at different speeds).

The same result is required here.  "This is not the rare case where the introduction of extraneous information was harmless."  *Nian*, 994 F.3d at 758.  To the contrary, this is the rare case where **both sides** agreed that the introduction of extraneous material was prejudicial, would necessarily affect the jury's deliberations, and that a mistrial is appropriate.

As counsel for Walgreens noted, "a big deal was made" during cross-examination of a Walgreens witness "of the fact we charge money and make a profit from selling Narcan," and now "the jury is thinking . . . that we're selling something -- that we're essentially tricking people" because "they can get something for free and we're mak[ing] a profit from it." Tr. at 3766:23-3767:22. Or as counsel for Giant Eagle put it, "[i]t's clear we had a juror who violated the Court's order, who communicated information damaging to the defense, to all of her co-jurors," and "[i]t's clearly prejudicial to the companies here that you could get it for free, isn't it terrible that these companies are charging for it." *Id.* at 3764:25-3765:15.

Lead trial counsel for plaintiffs likewise explained to the Court the relevance and obvious prejudice of the outside information Juror 4 shared with the rest of the jury. He immediately voiced concerns about "continuing a case where we know that the jury has been discussing **something that is an issue in the case** that has been questioned." *Id.* at 3723:13-15. He noted "[w]e had a juror question on the issue of whether or not Walgreens charged for Narcan" and that the extraneous information researched and circulated by Juror 4 showed "Walgreens is charging for something that's . . . available for free." *Id.* at 3722:24-3723:12. He acknowledged that could not see how the information hurt plaintiffs. *Id.* at 3723:7-12.

After *voir dire* had concluded, plaintiffs' counsel went further: "I'll be candid, Your Honor, **I think that it affects this jury**, I think it affects everybody **whether they recognize it or not**, and I think that the **mistrial is appropriate**." *Id.* at 3769:12-15. He reiterated "[i]t's not anything I say lightly," but "I just want to tell the Court I think that the mistrial is appropriate. That's my candor to the tribunal which I owe under my ethical obligation." *Id.* at 3769:24-3770:3. While counsel for plaintiffs may have been overruled by his clients as a matter of their litigation strategy—an implicit recognition of the prejudice to the pharmacies by continuing the trial—his unscripted and candid statements to the Court on Friday were accurate.

5

No instruction can cure this misconduct. When a juror violated what this Court deemed "probably the most important instruction I give," *id.* at 3754:13-14, only one juror reported it to the Court, and belatedly at that. While the hour-and-a-half of trial time expended on this issue presumably impressed on the remaining jurors the importance of those instructions, it will also necessarily magnify in their minds the significance of the Narcan issue in a manner that no instruction can meaningfully undo.

In moving for a mistrial, each of the pharmacies recognizes the immense resources that have been expended on this trial as it approaches the halfway point—not only by the parties but also by the Court, its staff, and the remaining jurors. But far more resources will be wasted if the case proceeds for another three or four weeks—not counting the time and expense of an abatement phase, should the counties prevail here—to a verdict despite plain reversible error. There is no benefit to a bellwether verdict tainted by juror misconduct.

## CONCLUSION

The Court should order a mistrial.

Dated: October 24, 2021     Respectfully submitted,

/s/ Eric R. Delinsky      /s/ Kaspar J. Stoffelmayr
Eric R. Delinsky        Kaspar J. Stoffelmayr
Alexandra W. Miller       Brian C. Swanson
Graeme W. Bush         Katherine M. Swift
Paul B. Hynes, Jr.        Sharon Desh
ZUCKERMAN SPAEDER LLP     Sten Jernudd
1800 M Street NW, Suite 1000   BARTLIT BECK LLP
Washington, DC  20036      54 West Hubbard Street
Tel: (202) 778-1800       Chicago, IL 60654
E-mail: edelinsky@zuckerman.com  Tel: (312) 494-4400
E-mail: smiller@zuckerman.com   Fax: (312) 494-4440
E-mail: gbush@zucerkman.com    kaspar.stoffelmayr@bartlitbeck.com
E-mail: phynes@zuckerman.com   brian.swanson@bartlitbeck.com
                kate.swift@bartlitbeck.com

6

*Counsel for CVS Pharmacy, Inc., Ohio CVS Stores, L.L.C., CVS TN Distribution, L.L.C., CVS Rx Services, Inc., and CVS Indiana, L.L.C.*

/s/ *John M. Majoras*
John M. Majoras
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
Phone: (202) 879-3939
Fax: (202) 626-1700
Email: jmmajoras@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

sharon.desh@bartlitbeck.com
sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co., Inc.*

/s/ *Diane Sullivan*
Diane Sullivan
WEIL, GOTSHAL & MANGES LLP
17 Hulfish Street, Suite 201
Princeton, New Jersey 08540
E-mail: Diane.Sullivan@Weil.com
Telephone: (212) 310-8897

Chantale Fiebig
2001 M Street NW, Suite 600
Washington, DC 20036
E-mail: Chantale.Fiebig@Weil.com
Telephone: (202) 682-7200

Robert M. Barnes
Scott D. Livingston
Joshua A. Kobrin
MARCUS & SHAPIRA, LLP
35th Floor, One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
Phone: (412) 471-3490
Fax: (412) 391-8758
E-mail: rbarnes@marcus-shapira.com
E-mail: livingston@marcus-shapira.com
E-mail: kobrin@marcus-shapira.com

*Attorneys for Giant Eagle, Inc., and HBC Service Company*