1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION AT CLEVELAND

3     ------------------------------X
       IN RE:                        :   Case No. 1:17-md-2804
4                                    :
       NATIONAL PRESCRIPTION         :
5      OPIATE LITIGATION             :
                                     :   **VOLUME 15**
6      CASE TRACK THREE              :   JURY TRIAL
                                     :   *(Pages 3781 - 4028)*
7                                    :
                                     :
8                                    :
                                     :   *October 25, 2021*
9     ------------------------------X

10

11

12          TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>

13

14      HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16          SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:        Heather K. Newman, RMR, CRR
                                     United States District Court
21                                   801 West Superior Avenue
                                     Court Reporters 7-189
22                                   Cleveland, Ohio 44113
                                     216.357.7035.
23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

HEATHER K. NEWMAN, RMR, CRR

3782

```
 1    APPEARANCES:

 2    For the Plaintiffs:           Peter H. Weinberger, Esq.
                                     SPANGENBERG, SHIBLEY & LIBER
 3                                   1001 Lakeside Avenue, Ste. 1700
                                     1900 East Ninth Street
 4                                   Cleveland, Ohio 44114
                                     216-696-3232
 5
                                     W. Mark Lanier, Esq.
 6                                   Rachel Lanier, Esq.
                                     THE LANIER LAW FIRM
 7                                   6810 FM 1960 West
                                     Houston, Texas 77069
 8                                   813-659-5200

 9                                   Frank L. Gallucci, III, Esq.
                                     PLEVIN & GALLUCCI COMPANY, LPA
10                                   The Illuminating Building
                                     Suite 2222
11                                   55 Public Square
                                     Cleveland, Ohio 44113
12                                   216-861-0804

13                                   Salvatore C. Badala, Esq.
                                     Maria Fleming, Esq.
14                                   NAPOLI SHKOLNIK
                                     360 Lexington Ave., 11th Floor
15                                   New York, New York 10017
                                     212-397-1000
16

17
      For Walgreen Defendants:      Kaspar J. Stoffelmayr, Esq.
18                                   Brian C. Swanson, Esq.
                                     Katherine M. Swift, Esq.
19                                   BARTLIT BECK LLP
                                     54 West Hubbard Street, Ste.300
20                                   Chicago, Illinois 60654
                                     312-494-4400
21

22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:      Eric R. Delinsky, Esq.
                               Alexandra W. Miller, Esq.
 3                             ZUCKERMAN SPAEDER - WASHINGTON
                               Suite 1000
 4                             1800 M Street, NW
                               Washington, DC 20036
 5                             202-778-1831

 6    For HBC/Giant Eagle
      Defendants:              Diane P. Sullivan, Esq.
 7                             Chantale Fiebig, Esq.
                               WEIL GOTSHAL & MANGES
 8                             Suite 600
                               2001 M Street NW
 9                             Washington, DC 20036
                               202-682-7200
10
      For Walmart              John M. Majoras, Esq.
11    Defendants:              JONES DAY - COLUMBUS
                               Suite 600
12                             325 John H. McConnell Blvd.
                               Columbus, Ohio 43215
13                             614-281-3835

14                             Tara A. Fumerton, Esq.
                               Tina M. Tabacchi, Esq.
15                             JONES DAY - CHICAGO
                               Suite 3500
16                             77 West Wacker
                               Chicago, Illinois 60601
17                             312-782-3939

18
      ALSO PRESENT:            David Cohen, Special Master
19

20                                    - - - - -

21

22

23

24

25
```

3784

1                      **I N D E X**

2                                                    **PAGE**

3    APPEARANCES......................................3782

4    DEPOSITION TESTIMONY OF MARK ROBERT VERNAZZA.......3811

5    CROSS-EXAMINATION OF BRAD NELSON...................3850
     BY MR. LANIER
6
     DIRECT EXAMINATION OF BRAD NELSON..................3919
7    BY MR. MAJORAS

8    RECROSS-EXAMINATION OF BRAD NELSON.................3937
     BY MR. LANIER
9
     REDIRECT EXAMINATION OF BRAD NELSON................3953
10   BY MR. MAJORAS

11   DEPOSITION TESTIMONY OF MICHELLE LUCY TRAVASSOS....3956

12   AFTERNOON SESSION.................................3891

13   CERTIFICATE PAGE..................................4028

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court at 8:43 a.m.)

08:43:25  2          COURTROOM DEPUTY:  All rise.

08:43:26  3          THE COURT:  Okay.  Everyone can be seated.

08:43:45  4      (Brief pause in proceedings).

08:43:53  5          THE COURT:  All right.  I've read everyone's briefs

08:43:57  6  and the cases that both sides cited.  I have concluded that the

08:44:08  7  appropriate thing to do is bring each of the jurors in

08:44:15  8  individually as I did last Friday, instruct each juror that

08:44:23  9  they are completely -- to completely disregard anything that

08:44:29 10  former Juror No. 4 showed them or said to them and make sure

08:44:34 11  they can follow that instruction, and then ask them if anything

08:44:41 12  that that juror said or did leads them to believe they can no

08:44:48 13  longer be a fair and impartial juror.  Anyone who says yes is

08:44:53 14  out.  I'm not going to make any attempt to rehabilitate them.

08:44:57 15          I think as an added precaution I'll ask them that if

08:45:01 16  anything else that has occurred in the roughly one month since

08:45:05 17  they've been sworn causes them to doubt whether they can be

08:45:08 18  fair and impartial.  And then assuming we have an adequate

08:45:12 19  number of jurors, to proceed.

08:45:18 20          The cases that the defendants cited all deal with

08:45:22 21  situations after the fact when the extraneous information or

08:45:31 22  independent tests that a juror did improperly came to light

08:45:36 23  after the verdict.  And also in those situations the extraneous

08:45:48 24  information and/or test went to the heart of the case, and it

08:45:53 25  was clearly prejudicial.  It went -- you know, it went to the

08:45:56  1   heart of the case.  The speed of the automobile, the cause of

08:45:59  2   the fire, et cetera.  It was the -- what the offending juror

08:46:06  3   had did went to the essence of the issues in dispute.

08:46:13  4         This case is not going to be decided on Narcan or

08:46:17  5   naloxone.  I don't recall either side -- either side, the

08:46:20  6   plaintiffs or any of the four defendants mentioning this in

08:46:24  7   opening statement, and I don't think anyone's going to mention

08:46:26  8   it ---

08:46:28  9         Robert, I don't think this mic's on.  Can you take

08:46:32  10  care of it, please.

08:46:33  11        I don't think any of the defendants are even going to

08:46:35  12  mention it in final argument.  It's extraneous and it's

08:46:44  13  irrelevant as to whether or not the plaintiffs can prove their

08:46:47  14  public nuisance claims against any or all of the defendants.

08:46:51  15  And I'm confident from the answers of the jurors that most of

08:46:53  16  them ignored it, what this juror -- ex-Juror No. 4 said.

08:47:06  17        So it's clear from the case law a mistrial in the

08:47:12  18  middle of a trial is the very last resort, and if there are any

08:47:17  19  measures short of mistrial that the judge feels can address the

08:47:20  20  issue, that's what the judge should do.  And so that's what I'm

08:47:24  21  going to do.

08:47:31  22        MS. SULLIVAN:  And, Your Honor --

08:47:32  23        THE COURT:  I also want to point out what should be

08:47:35  24  obvious.  One of my responsibilities is the preservation of

08:47:40  25  judicial resources and the most effective and efficient use of

08:47:45  1    judicial resources.  It took us more than two months to pick

08:47:48  2    this jury.  I've been, you know, in the courtroom on one side

08:47:53  3    or the other for 45-plus years.  I've never seen a more

08:47:58  4    diligent or attentive jury in all my 45-plus years.

08:48:01  5            I have no idea what they're going do at the end, but I

08:48:04  6    know it's going to be based on attention and detail and doing

08:48:08  7    the right thing.  Because they're paying attention all the

08:48:13  8    time.  Every time I look at them, they are focused.  All right?

08:48:16  9    They're not daydreaming.  They're not wandering.  They're not

08:48:20  10   dozing.  Trust me, I've had that.  All right?  So -- and this

08:48:25  11   trial was postponed twice because of COVID.

08:48:28  12           I mean, none of the cases anyone cited, of course,

08:48:32  13   dealt with trials that were conducted during COVID because

08:48:34  14   fortunately that never happened before.  You know, a lot of

08:48:39  15   people said we couldn't pull this off and it was a foolish

08:48:45  16   thing to start this trial and try to do it when we did.  I felt

08:48:48  17   we could do it safely.  So far we haven't had any issues.  No

08:48:53  18   one has any idea what the course of this pandemic is going to

08:48:58  19   be.  Just about everyone's thoughts, predictions, prophecies

08:49:04  20   where been wrong.  Certainly mine were.  So, since no one can

08:49:09  21   predict the future and we've done pretty well so far, we're

08:49:13  22   halfway through, that's another reason to go forward and not

08:49:17  23   try to redo it.  Because given my professional commitments -- I

08:49:25  24   mean, I have a whole lot of criminal defendants who have been

08:49:27  25   waiting for over a year for a trial and they've been locked up

08:49:32　1　and I've got a constitutional obligation to give them their

08:49:35　2　trials.  Everyone else has professional obligations, personal

08:49:41　3　obligations.  I have no idea when we could retry this, and this

08:49:43　4　is a case of national importance because it's a Bellwether for

08:49:51　5　the pharmacies to really whether or not the plaintiffs' theory

08:49:55　6　of liability will resonate with a jury.  The plaintiffs think

08:49:59　7　it will; the defendants think it won't.  Well, we'll find out.

08:50:02　8　And it's important to find out, and so we're going to make

08:50:05　9　every effort to do that.

08:50:07　10　　　　　So that's what I plan to do and then assuming -- I

08:50:11　11　mean, we've got 13 jurors now.  We have way more than we need.

08:50:16　12　If we loss one or two, we loss one or two, I really don't think

08:50:23　13　we'll' loss any, but if any juror who says I doubt -- you know,

08:50:27　14　I have any concern I can be fair and impartial is going to be

08:50:29　15　out.  I'm not going to endeavor to rehabilitate anyone if an

08:50:32　16　answer is given like that.  So that's what I plan to do.

08:50:34　17　　　　　And then -- then we'll proceed with the plaintiffs'

08:50:40　18　next witness.  But I appreciate everyone's very thorough

08:50:44　19　briefing.

08:50:46　20　　　　　MS. SULLIVAN:  Your Honor, I understand you've ruled,

08:50:51　21　so just briefly, this is an issue that we do not believe can be

08:50:51　22　cured as acknowledged by the plaintiffs' counsel.  Everybody

08:50:54　23　was affected.  Clearly Juror No. 4 believes --

08:50:57　24　　　　　THE COURT:  Ms. Sullivan, you -- you don't need to say

08:50:59　25　anything further.  I understand -- I mean, you've made your

08:51:02  1  argument.  All right?

08:51:03  2          MS. SULLIVAN:  Thank you, Judge.  Thank you.

08:51:06  3          THE COURT:  I just, you know, I disagree, but, you

08:51:08  4  preserved your issue.

08:51:12  5          MR. LANIER:  And, Your Honor, for the record I put

08:51:13  6  this into writing in front of the Court, but in the midst of

08:51:19  7  trial to figure this all out and the immediate reaction, having

08:51:23  8  now a chance to research Sixth Circuit law, I speak on behalf

08:51:29  9  of the plaintiffs saying that this is not an incurable

08:51:32  10  situation, and we believe if you polled the jury, as you're

08:51:35  11  saying, as long as the jury commits that they can be fair and

08:51:38  12  independent, then we are absolutely fine proceeding.  And I

08:51:42  13  don't want anything I said on Friday to misdirect the Court or

08:51:46  14  any appellate court in that regard.

08:51:49  15          THE COURT:  That's okay.  I mean, Mr. Lanier, you said

08:51:53  16  what you said.  I encouraged everyone to think about it,

08:51:56  17  reflect, talk to their clients.  Everyone did that.  So

08:52:01  18  let's -- I mean, as I have.  I mean, I said some things.  I

08:52:07  19  thought about them some more.  I've looked at some cases.  Read

08:52:11  20  what everyone said, and then that's the way to make a decision

08:52:15  21  of this -- of consequence to take some time to reflect on it.

08:52:22  22  And that's what everyone's done and I appreciate that.

08:52:24  23          So I think what I will do, I'll ask Mr. Pitts to bring

08:52:28  24  in the jurors one by one as we did on Friday.

08:52:41  25          It's actually a couple minutes before 9:00 so I'll

**3790**

08:52:43  1  wait till 9:00.  Good point.

08:52:44  2          Since we have a couple minutes, I don't know if anyone

08:52:49  3  did any further work on the exhibits.  I think -- what have I

08:52:55  4  got here?  There was a list from the plaintiffs for

08:53:08  5  Tasha Polster.  Two pages, one and a half pages.

08:53:11  6          Do the defendants have any objection to any of those?

08:53:17  7          MS. SWIFT:  Your Honor, Kate Swift for Walgreens.  We

08:53:20  8  do have a couple of objections of that.  I'm happy to walk

08:53:21  9  through those right now.

08:53:21 10          THE COURT:  All right.  If we can do it quickly, I'll

08:53:22 11  take them up.  If not, we'll put them off.

08:53:23 12          Which ones?

08:53:24 13          MS. SWIFT:  Sure.  The first one is P19927, which is

08:53:28 14  Ms. Polster's personnel file, which was marked highly

08:53:32 15  confidential for perhaps obvious reasons.  We don't believe --

08:53:34 16          THE COURT:  Wait a minute.  Hold it.  One -- all

08:53:36 17  right.  Ms. Swift, I'm sorry, I've got on the list the

08:53:41 18  plaintiffs gave me, 19927 says an investigation report of

08:53:45 19  Douglas Winland.

08:53:47 20          MS. SWIFT:  I'm looking at the list that plaintiffs

08:53:49 21  gave me.

08:53:49 22          THE COURT:  All right.  Well, look, this isn't working

08:53:52 23  well already, so, see if you can get this straightened out and

08:53:55 24  then --

08:53:56 25          MS. SWIFT:  Sure.  Happy to.

08:53:57  1          THE COURT:  -- I'll do it another time.  I mean,

08:53:59  2   I'm -- I've got a list that was given to me last week by the

08:54:02  3   plaintiffs, and the first one is 19927.  It says investigation

08:54:07  4   report of Douglas Winland.

08:54:09  5          MS. SWIFT:  We object to that one too, but I don't

08:54:11  6   have that on the list right in front of me.

08:54:13  7          THE COURT:  All right, look --

08:54:15  8          MS. SWIFT:  We'll work with the plaintiffs on it.

08:54:17  9          THE COURT:  I'll give this back to the plaintiffs.

08:54:19  10  Figure it all out and we'll deal with it another time.

08:54:23  11          MR. WEINBERGER:  Your Honor, while we have some

08:54:25  12  time --

08:54:25  13          THE COURT:  Well, let me --

08:54:27  14          MR. WEINBERGER:  I'm sorry --

08:54:28  15          THE COURT:  So that needs work.

08:54:30  16          What about with Dr. Alexander?  Maybe we can take care

08:54:34  17  of that.  Any exhibits with Dr. Alexander.

08:54:39  18          MS. SWIFT:  Your Honor, before we move off

08:54:41  19  Ms. Polster, I just want to make clear.  Defendants have some

08:54:43  20  exhibits that we'd like to offer with her as well.

08:54:45  21          THE COURT:  Well, sure you do.  But have you gone over

08:54:46  22  those with the plaintiffs?

08:54:47  23          MS. SWIFT:  I have sent them to the plaintiffs, yes,

08:54:51  24  Your Honor.

08:54:51  25          THE COURT:  See if you can work this out, get me a

HEATHER K. NEWMAN, RMR, CRR

08:54:52  1  list of the exhibits that the plaintiffs are going to offer, a

08:54:55  2  list the defendants are going to offer and just some sort of a

08:54:57  3  mark where anyone objects and then I'll go through those.

08:55:01  4          MS. SWIFT:  We will, Your Honor.  Thank you.

08:55:02  5          THE COURT:  All right.  What about Dr. Alexander?

08:55:08  6          MR. WEINBERGER:  We have no exhibits to move --

08:55:09  7          THE COURT:  Okay.

08:55:12  8          MR. WEINBERGER:  -- into evidence.

08:55:13  9          THE COURT:  That's easy.

08:55:14  10          What the defendants?

08:55:18  11          MS. FIEBIG:  Giant Eagle has two exhibits that we were

08:55:18  12  hoping to admit through Dr. Alexander.  We've shared them with

08:55:19  13  plaintiffs.

08:55:19  14          THE COURT:  Let me see them, Ms. Fiebig.

08:55:24  15          With two, we may be able to get those done quickly.

08:55:26  16          Any of the other defendants have anything with

08:55:29  17  Dr. Alexander?

08:55:33  18          MR. SWANSON:  No, Your Honor.

08:55:34  19          THE COURT:  All right.  Well, we should be able to

08:55:36  20  take a quick look at these two.

08:55:46  21          All right.  We've got Exhibits 1328 and 1329.

08:55:53  22  They're -- looks like government hearings.  I don't know, are

08:55:59  23  you proposing to admit the whole thing, or just the portion of

08:56:04  24  Dr. Alexander's testimony?

08:56:07  25          MS. FIEBIG:  Yes, we have the page numbers that we can

08:56:10  1    offer for admission.

08:56:12  2            MR. WEINBERGER:  Your Honor, these are impeachment

08:56:14  3    materials and shouldn't be admit into evidence.  This is prior

08:56:20  4    testimony of his that they impeached him on or attempted to

08:56:23  5    impeach him on.  His testimony in court is the testimony to --

08:56:28  6    for the jury to consider, not --

08:56:30  7            THE COURT:  Well, I tend to agree.  I mean, you

08:56:32  8    cross-examined him on these and he didn't -- he didn't disavow

08:56:37  9    them.

08:56:38 10            MS. FIEBIG:  He didn't disavow them, but we think that

08:56:41 11    his --

08:56:42 12            THE COURT:  Do you think they're fundamentally

08:56:44 13    different than what he said?  Anything in here is fundamentally

08:56:47 14    different?  I think there is a rule of evidence that a prior

08:56:52 15    statement that's directly contradictory may be admissible under

08:56:57 16    certain circumstances, but I don't -- didn't recall that.

08:57:00 17            MS. FIEBIG:  That's right, Your Honor.  And that's

08:57:03 18    801(d)(1)(A).  We do think that this is an inconsistent

08:57:06 19    statement that he provided in a sworn hearing.

08:57:07 20            THE COURT:  Well, what specifically -- what page of --

08:57:11 21    you know, let's start with 1328.  Give me a page and where you

08:57:17 22    think something was directly inconsistent.

08:57:17 23            MS. FIEBIG:  Sure.  In 1328, on Page 41, which is

08:57:25 24    Bates stamped 132800045 --

08:57:29 25            THE COURT:  Hold it, please.  Well, Page 41 of the --

08:57:39  1            MS. FIEBIG:  The page number at the top.

08:57:40  2            THE COURT:  All right.  I've got it.  Now, what

08:57:42  3   statement?

08:57:42  4            MS. FIEBIG:  So you'll see starting in the middle of

08:57:45  5   the page he testified, "In my testimony I'd like to mention

08:57:47  6   three important steps to address this problem."  He started

08:57:49  7   with prescribing practices.

08:57:52  8            THE COURT:  Right.

08:57:53  9            MS. FIEBIG:  Talked about addiction.  And then how

08:57:57  10  people should properly dispose of opioids.

08:58:05  11           THE COURT:  Yeah.  Yes.  Well, I don't see anything

08:58:09  12  directly contradictory to what he said in court.

08:58:13  13           MS. FIEBIG:  It's not that it's directly contradictory

08:58:16  14  to what he said in court, it's that the statements that he

08:58:18  15  made --

08:58:19  16           THE COURT:  Well, that's the only basis that you could

08:58:21  17  possibly admit it.  So, without that, it's not coming in.

08:58:23  18           All right.  The next document is 1329?  What's

08:58:28  19  directly contradictory there?

08:58:29  20           MS. FIEBIG:  But there's actually a couple of other

08:58:31  21  pages in 1328.

08:58:32  22           THE COURT:  All right.

08:58:32  23           MS. FIEBIG:  And I'm happy to provide them to

08:58:34  24  plaintiffs and the Court --

08:58:36  25           THE COURT:  All right.  If you can -- if you can show

08:58:39  1   something in here that is directly contradictory to what he

08:58:43  2   said, I'll consider that, and that alone.  So show it to the

08:58:48  3   plaintiffs and if -- you know, the plaintiffs agree, fine, if

08:58:51  4   they disagree, then I'll deal with it.

08:58:53  5          MS. FIEBIG:  Understood, Your Honor.

08:58:54  6          THE COURT:  But unless it's directly contradictory it

08:58:59  7   doesn't come in.

08:59:10  8          All right.  And, Mr. Weinberger, you had something you

08:59:19  9   wanted to raise.

08:59:19 10          MR. WEINBERGER:  Your Honor, this motion we filed a

08:59:21 11   motion to admit.

08:59:22 12          THE COURT:  I saw that -- I'll wait -- this was

08:59:24 13   something I was hoping the parties could work out with

08:59:30 14   Special Master Cohen.  I don't know, I'd still like him to work

08:59:33 15   this out.  If he can't, I'll just have to deal with it, so, I

08:59:37 16   don't know if the defendants are objecting to it or not or on

08:59:41 17   what basis, but I had directed -- I think there's several

08:59:44 18   issues that I wanted you to --

08:59:46 19          MR. WEINBERGER:  Right.

08:59:46 20          THE COURT:  -- work on with Special Master Cohen.

08:59:49 21   This was one of them.  There were at least two others.

08:59:54 22          MS. FIEBIG:  Understood, Your Honor.

08:59:54 23          MR. WEINBERGER:  The other was the IMS contracts, and

08:59:57 24   I have --

08:59:58 25          THE COURT:  IMS CSA.

09:00:01  1            MR. WEINBERGER:  Right.  I have had discussions with

09:00:02  2   them about that.

09:00:03  3            THE COURT:  A stipulation or instruction on settlement

09:00:06  4   agreements.

09:00:06  5            MR. WEINBERGER:  Right.  We submitted a response.  We

09:00:10  6   haven't had a chance to discuss our response with the other

09:00:12  7   side, and as to the CSA, the general additional instructions on

09:00:18  8   the CSA, we are going to file this morning our own version.

09:00:23  9   Again, we will discuss --

09:00:26  10            THE COURT:  All right.  Well, I want you to keep

09:00:27  11   working on it.

09:00:28  12            MR. WEINBERGER:  -- with counsel.

09:00:29  13            THE COURT:  Use Special Master Cohen to assist you.

09:00:31  14   If parties can't agree, obviously I'll decide it.

09:00:36  15            MR. DELINSKY:  And, Your Honor, we'll be putting in

09:00:38  16   something shortly on the IMS today.

09:00:40  17            THE COURT:  All right.  Well, you can file it, but

09:00:42  18   again, I want you to try and -- you ought to be able to come

09:00:45  19   together on all three of these.

09:00:49  20            Okay.  Now we'll start bringing in the jurors, please.

09:00:56  21   One by one.

09:02:03  22       (Brief pause in proceedings).

09:02:15  23       (Juror returned to courtroom).

09:02:15  24            THE COURT:  Good morning, ma'am.

09:02:17  25            You can take your mask off.  This will be very quick.

HEATHER K. NEWMAN, RMR, CRR

09:02:20  1    I hope you had a good weekend.

09:02:22  2         First, I am instructing you that you are to completely

09:02:27  3    disregard anything that former Juror 4 showed to you or said to

09:02:34  4    you.

09:02:35  5         One, it was obviously improper that she did it, and

09:02:39  6    two, it has no relevance to the case.  So can you follow that

09:02:43  7    instruction?

09:02:43  8         A JUROR:  Yes.

09:02:44  9         THE COURT:  Okay.  Second, is there anything about

09:02:48  10   what former Juror No. 4 showed you or said to you that casts

09:02:54  11   any doubt in your mind as to whether you can continue to be a

09:02:58  12   fair and impartial juror in this case?

09:03:01  13        A JUROR:  No.  It didn't really change anything about

09:03:03  14   what I'm thinking about the case.

09:03:05  15        THE COURT:  Okay.  And just to be safe, is there

09:03:09  16   anything else that has occurred in the roughly one month since

09:03:14  17   I gave you the oath and swore you in with your fellow jurors

09:03:18  18   that casts any doubt in your mind as to whether you can

09:03:21  19   continue to be fair and impartial in this case?

09:03:23  20        A JUROR:  No.

09:03:24  21        THE COURT:  Okay.  Thank you.

09:03:25  22        A JUROR:  Thank you.

09:03:27  23     (Juror excused from courtroom).

09:04:10  24     (Juror returned to courtroom).

09:04:10  25        THE COURT:  Good morning, ma'am.  You can take your

| | | |
|---|---|---|
| 09:04:12 | 1 | mask off for a minute.  This won't take long. |
| 09:04:15 | 2 | A JUROR:  Good morning. |
| 09:04:16 | 3 | THE COURT:  Hope you had a good weekend. |
| 09:04:18 | 4 | A JUROR:  I did.  Thank you. |
| 09:04:19 | 5 | THE COURT:  I am instructing you that you must |
| 09:04:21 | 6 | completely ignore, disregard not consider anything that former |
| 09:04:27 | 7 | Juror No. 4 showed you or said to you. |
| 09:04:30 | 8 | Can you follow that instruction? |
| 09:04:32 | 9 | A JUROR:  Yes, I can. |
| 09:04:33 | 10 | THE COURT:  Obviously it was completely improper what |
| 09:04:36 | 11 | she did and said, and it's also not relevant to the issues in |
| 09:04:39 | 12 | this case. |
| 09:04:41 | 13 | Second, is there anything about what happened with |
| 09:04:45 | 14 | former Juror No. 4 that causes you to doubt whether you can |
| 09:04:51 | 15 | continue to be a fair and impartial juror in this case? |
| 09:04:53 | 16 | A JUROR:  No. |
| 09:04:54 | 17 | THE COURT:  All right.  And just to be sure, is there |
| 09:04:57 | 18 | anything else that has occurred in the roughly one month since |
| 09:05:01 | 19 | I gave you the oath that causes you to doubt whether you can |
| 09:05:06 | 20 | continue to be fair and impartial in this case to both sides? |
| 09:05:11 | 21 | Is that a no? |
| 09:05:13 | 22 | A JUROR:  I'm fine.  I can continue do this role. |
| 09:05:15 | 23 | THE COURT:  Okay.  You have no doubt of your ability |
| 09:05:19 | 24 | to be fair and impartial? |
| 09:05:19 | 25 | A JUROR:  I can be fair and impartial. |

**3799**

09:05:21  1          THE COURT:  Fair and impartial or -- I just want to
09:05:24  2   make sure --
09:05:25  3          A JUROR:  Fair and impartial.
09:05:26  4          THE COURT:  Okay.  All right.  Just wanted to be sure.
09:05:29  5   Thank you, ma'am.
09:05:29  6          A JUROR:  You're welcome.
09:05:29  7      (Juror excused from courtroom).
09:05:29  8      (Juror returned to courtroom).
09:06:12  9          THE COURT:  Good morning, ma'am.
09:06:13 10          A JUROR:  Good morning.
09:06:14 11          THE COURT:  Hope you had a good weekend.
09:06:16 12          I am instructing you that you must completely
09:06:20 13   disregard anything that former Juror No. 4 said or did.
09:06:25 14          A JUROR:  Yes, sir.
09:06:26 15          THE COURT:  Can you follow that instruction?
09:06:28 16          A JUROR:  Absolutely, sir.
09:06:29 17          THE COURT:  Okay.  It was improper what she did, and
09:06:31 18   it's not relevant to the issues you have to decide in this
09:06:35 19   case.
09:06:36 20          A JUROR:  Okay.
09:06:37 21          THE COURT:  Second, is there anything about what
09:06:40 22   former Juror No. 4 said or did that causes you to doubt whether
09:06:46 23   you could continue to be a fair and impartial jury -- juror in
09:06:50 24   this case?
09:06:50 25          A JUROR:  No.  I just -- I let it in one ear and out

**3800**

09:06:54  1    the other.

09:06:55  2              THE COURT:  All right.  That's fine.

09:06:56  3         And just to be sure, is there anything else that might

09:07:00  4    have occurred in the roughly one month since you took the oath

09:07:02  5    that causes you to doubt your ability to be fair and impartial

09:07:06  6    in this case?

09:07:07  7              A JUROR:  No.  Nothing.  Listening with open ears.

09:07:11  8              THE COURT:  Okay.  Good.  Thank you very much.

09:07:13  9              A JUROR:  You're welcome.

09:07:13 10         (Juror excused from courtroom).

09:07:48 11         (Juror returned to courtroom).

09:07:48 12              THE COURT:  Good morning, sir.

09:07:50 13              A JUROR:  Good morning.

09:07:51 14              THE COURT:  You can take off your mask, please.

09:07:53 15         I am instructing you that you must completely

09:07:58 16    disregard anything that former Juror No. 4 said or did.

09:08:00 17         Can you do that?

09:08:01 18              A JUROR:  Yes.

09:08:02 19              THE COURT:  All right.  Second, has anything that

09:08:08 20    former Juror No. 4 said or did cause you to doubt in any way

09:08:13 21    your ability to continue to be a fair and impartial juror in

09:08:16 22    this case?

09:08:17 23              A JUROR:  No.

09:08:19 24              THE COURT:  All right.  And just to be sure, is there

09:08:21 25    anything else that might have occurred over the last month or

09:08:24 1  so since you took the oath that causes you to be doubt your

09:08:28 2  ability to be a fair and impartial juror in this case?

09:08:33 3         A JUROR:  No, sir.

09:08:33 4         THE COURT:  All right.  Thank you.

09:08:35 5     (Juror excused from courtroom).

09:09:17 6     (Juror returned to courtroom).

09:09:17 7         THE COURT:  Good morning, ma'am.  You can take your

09:09:19 8  mask off for a minute while I -- this should just take a minute

09:09:22 9  or two.

09:09:22 10        First, I am instructing you that you must completely

09:09:26 11 disregard anything that former Juror No. 4 said or did.

09:09:31 12        Can you follow that instruction?

09:09:33 13        A JUROR:  Absolutely.

09:09:33 14        THE COURT:  And, second, is there anything that former

09:09:36 15 Juror No. 4 said or did that casts any doubt in your mind about

09:09:42 16 your ability to continue to be a fair and impartial juror in

09:09:48 17 this case?

09:09:48 18        A JUROR:  Absolutely not.

09:09:49 19        THE COURT:  And just to be sure, is there anything

09:09:51 20 else that might have occurred in the roughly one month since

09:09:54 21 you took the oath that causes you to doubt your ability to

09:09:55 22 continue to be a fair and impartial juror in this case?

09:09:58 23        A JUROR:  No, sir.

09:09:58 24        THE COURT:  All right.  Thank you very much, ma'am.

09:09:58 25    (Juror excused from courtroom).

09:10:38   1        (Juror returned to courtroom).

09:10:38   2              THE COURT:  Good morning, ma'am.  I hope you had a

09:10:41   3    good weekend, and you can take off your mask for a minute.

09:10:44   4              A JUROR:  Thank you.

09:10:45   5              THE COURT:  First, I am instructing you that you must

09:10:47   6    completely disregard anything that former Juror No. 4 said or

09:10:51   7    did.

09:10:51   8              Can you follow that instruction, ma'am?

09:10:53   9              A JUROR:  Yes.

09:10:54  10              THE COURT:  Second, is there anything that former

09:10:56  11    Juror No. 4 said or did that causes you to doubt in any way

09:11:01  12    your ability to continue to be a fair and impartial juror in

09:11:04  13    this case?

09:11:05  14              A JUROR:  No.

09:11:06  15              THE COURT:  And just to be sure, is there anything

09:11:08  16    else that might have occurred in the roughly one month since I

09:11:11  17    gave you the oath that causes you to doubt in any way your

09:11:15  18    ability to continue to be a fair and impartial juror in this

09:11:20  19    case?

09:11:20  20              A JUROR:  No.

09:11:20  21              THE COURT:  Thank you.

09:11:22  22        (Juror excused from courtroom).

09:11:55  23        (Juror returned to courtroom).

09:11:55  24              THE COURT:  Good morning, sir.

09:11:57  25              A JUROR:  Good morning.

09:11:58  1          THE COURT:  I am instructing you that you must
09:12:00  2  completely disregard anything that former Juror No. 4 said or
09:12:04  3  did.
09:12:05  4          Can you follow that instruction?
09:12:07  5          A JUROR:  Understood.  Yeah.  Absolutely.
09:12:09  6          THE COURT:  And, second, is there anything that former
09:12:11  7  Juror No. 4 said or did which causes you to doubt in any way
09:12:15  8  your ability to continue to be a fair and impartial juror in
09:12:19  9  this case?
09:12:20 10          A JUROR:  Absolutely not.
09:12:21 11          THE COURT:  All right.  And just to be sure, is there
09:12:23 12  anything else that might have occurred over the last month that
09:12:27 13  causes you to doubt in any way your ability to be -- to
09:12:31 14  continue to be a fair and impartial juror in this case?
09:12:34 15          A JUROR:  No, sir.
09:12:34 16          THE COURT:  All right.  Thank you.
09:12:36 17          A JUROR:  All right.  Thank you.
09:12:36 18      (Juror excused from courtroom).
09:13:12 19      (Juror returned to courtroom).
09:13:12 20          THE COURT:  Good morning, ma'am.  I hope you had a
09:13:14 21  good weekend.
09:13:15 22          A JUROR:  Good morning.
09:13:16 23          THE COURT:  First, I am instructing you that you must
09:13:18 24  completely disregard anything that former Juror No. 4 said or
09:13:22 25  did.

**3804**

09:13:22  1          Can you follow that instruction, ma'am?

09:13:24  2          A JUROR:  Yes.

09:13:25  3          THE COURT:  And, second, is there anything about what

09:13:28  4  former Juror 4 -- No. 4 said or did that causes you to doubt in

09:13:34  5  any way your ability to continue to be a fair and impartial

09:13:37  6  juror in this case?

09:13:38  7          A JUROR:  No.

09:13:39  8          THE COURT:  And just to be sure, is there anything

09:13:42  9  else that might have occurred over the roughly one month since

09:13:46 10  I gave you the oath that causes you to doubt in any way your

09:13:50 11  ability to continue to be a fair and impartial juror in this

09:13:53 12  case?

09:13:56 13          A JUROR:  No.

09:13:57 14          THE COURT:  Thank you very much.

09:13:58 15      (Juror excused from courtroom).

09:14:33 16      (Juror returned to courtroom).

09:14:33 17          THE COURT:  Good morning, ma'am.

09:14:35 18          A JUROR:  Good morning.

09:14:36 19          THE COURT:  I hope you had a good weekend, and you can

09:14:38 20  take off your mask for a minute, please.

09:14:40 21          I am instructing you that you must completely

09:14:42 22  disregard anything that former Juror No. 4 said or did.

09:14:46 23          Can you follow that instruction, ma'am?

09:14:49 24          A JUROR:  I understand, and I agree.

09:14:51 25          THE COURT:  Okay.  And, second, is there anything

09:14:53  1    about what former Juror No. 4 said or did that causes you to

09:14:58  2    doubt in any way your ability to continue to be a fair and

09:15:02  3    impartial juror in this case?

09:15:04  4              A JUROR:  None whatsoever.

09:15:05  5              THE COURT:  All right.  And just to be sure, is there

09:15:07  6    anything else that might have occurred over the roughly one

09:15:10  7    month since I gave you the oath that causes you to doubt your

09:15:14  8    ability to continue to be a fair and impartial juror in this

09:15:16  9    case?

09:15:17  10             A JUROR:  No.

09:15:18  11             THE COURT:  Thank you very much, ma'am.

09:15:19  12             A JUROR:  Thank you.

09:15:19  13        (Juror excused from courtroom).

09:15:57  14        (Juror returned to courtroom).

09:15:57  15             THE COURT:  Good morning, sir.

09:15:59  16             A JUROR:  Good morning.

09:15:59  17             THE COURT:  You can take your mask off for a minute,

09:16:02  18    please.

09:16:02  19             First, I am instructing you that you must completely

09:16:04  20    disregard anything that former Juror No. 4 said or did.

09:16:10  21             Can you follow that instruction, sir?

09:16:11  22             A JUROR:  Yes.

09:16:12  23             THE COURT:  Second, is there anything about what

09:16:13  24    former Juror No. 4 said or did that causes you to doubt in any

09:16:20  25    way your ability to be -- to continue to be fair and impartial

09:16:23  1    in this case?

09:16:25  2            A JUROR:  No.

09:16:26  3            THE COURT:  And just to be sure, is there anything

09:16:27  4    else that might have occurred over the roughly one month since

09:16:30  5    I gave you the oath that causes you any concern about

09:16:34  6    continuing to be a fair and impartial juror in this case?

09:16:37  7            A JUROR:  No.

09:16:38  8            THE COURT:  Thank you very much.

09:16:39  9            A JUROR:  All right.  Thank you.

09:16:39  10       (Juror excused from courtroom).

09:17:13  11       (Juror returned to courtroom).

09:17:13  12           THE COURT:  Good morning, ma'am.

09:17:14  13           A JUROR:  Good morning.

09:17:17  14           THE COURT:  First, I am instructing you that you must

09:17:20  15   completely disregard anything that former Juror No. 4 said or

09:17:25  16   did.

09:17:25  17           Can you do that?

09:17:26  18           A JUROR:  Yes.

09:17:28  19           THE COURT:  Second, is there anything about what

09:17:29  20   former Juror No. 4 said or did that causes you to doubt in any

09:17:35  21   way your ability to continue to be a fair and impartial juror

09:17:38  22   in this case?

09:17:39  23           A JUROR:  No.

09:17:40  24           THE COURT:  And just to be sure, is there anything

09:17:42  25   else that might have occurred in the roughly one month since I

HEATHER K. NEWMAN, RMR, CRR

09:17:46  1   gave you the oath that causes you to doubt in any way your

09:17:49  2   ability to continue to be a fair and impartial juror in this

09:17:52  3   case?

09:17:56  4           A JUROR:  No.

09:17:56  5           THE COURT:  Thank you very much.

09:17:57  6           A JUROR:  Thank you.

09:17:57  7       (Juror excused from courtroom).

09:18:34  8       (Juror returned to courtroom).

09:18:34  9           THE COURT:  Good morning, sir.  If you could take your

09:18:36  10  mask off for a minute, please.

09:18:37  11          A JUROR:  Sure.

09:18:38  12          THE COURT:  First, I am instructing you that you must

09:18:42  13  completely disregard anything that former Juror No. 4 said or

09:18:46  14  did.

09:18:46  15          Can you do that, sir?

09:18:48  16          A JUROR:  Yes, I can.

09:18:49  17          THE COURT:  Second, is there anything about what

09:18:52  18  former Juror No. 4 said or did that causes you to doubt in any

09:18:57  19  way your ability to continue to be a fair and impartial juror

09:19:00  20  in this case?

09:19:03  21          A JUROR:  No.

09:19:04  22          THE COURT:  And just to be sure, is there anything

09:19:06  23  else that might have occurred over the roughly one month since

09:19:09  24  I gave you the oath that causes you to doubt in any way your

09:19:12  25  ability to continue to be a fair and impartial juror in this

09:19:15  1   case?

09:19:16  2           A JUROR:  No.

09:19:17  3           THE COURT:  Thank you very much.

09:19:17  4       (Juror excused from courtroom).

09:20:00  5       (Juror returned to courtroom).

09:20:00  6           A JUROR:  Good morning.

09:20:00  7           THE COURT:  Good morning, sir.

09:20:06  8           I am instructing you that you must completely

09:20:08  9   disregard anything that former Juror No. 4 said or did.

09:20:14  10          Can you follow that instruction, sir?

09:20:16  11          A JUROR:  Yes.

09:20:17  12          THE COURT:  Okay.  Second, is there anything about

09:20:19  13  what former Juror No. 4 said or did that causes you to doubt in

09:20:25  14  any way your ability to continue to be a fair and impartial

09:20:28  15  juror in this case?

09:20:29  16          A JUROR:  No, Your Honor.

09:20:30  17          THE COURT:  And just to make sure, is there anything

09:20:33  18  else, sir, that might have occurred over the last month since I

09:20:36  19  gave you the oath that causes you to doubt in any way your

09:20:39  20  ability to continue to be a fair and impartial juror in this

09:20:43  21  case?

09:20:44  22          A JUROR:  No.

09:20:45  23          THE COURT:  Thank you.

09:20:45  24      (Juror excused from courtroom).

09:21:14  25      (Juror returned to courtroom).

09:21:14  1              COURTROOM DEPUTY:  That's all.

09:21:17  2              THE COURT:  Okay.  All right.  Well, based on each

09:21:22  3    juror's answer, I am confident that each juror can follow my

09:21:27  4    instruction to completely disregard what former Juror No. 4

09:21:31  5    said and did and that each juror doesn't feel that whatever

09:21:37  6    they remember or recall will affect their ability to be fair

09:21:43  7    and impartial or anything else that's occurred in the last

09:21:45  8    month would do so.  So I'm going to go forward.

09:21:49  9              Okay.  We can bring -- I assume the plaintiffs are

09:21:54 10    ready with its witness.  We're going to have a deposition, I

09:21:58 11    think.

09:21:58 12              MR. LANIER:  Yes, Your Honor, we have a deposition and

09:21:59 13    then after that we'll do the video hookup of Nelson.

09:22:04 14              THE COURT:  Okay.  All right.

09:22:07 15              MR. SWANSON:  Your Honor, before you do, Brian Swanson

09:22:09 16    for Walgreens.  Appreciate the process that you just undertook.

09:22:12 17    We believe that the prejudice to our client cannot be cured,

09:22:16 18    and so we believe that a mistrial is appropriate, but just

09:22:18 19    wanted to have that on the record.

09:22:20 20              Thank you.

09:22:21 21              THE COURT:  That's fine.

09:22:22 22              MR. MAJORAS:  Walmart joins, Your Honor.

09:22:26 23              MR. DELINSKY:  CVS as well, Your Honor.

09:22:32 24              MS. SULLIVAN:  Giant Eagle as well.

09:22:44 25              THE COURT:  I had asked clients to be on for this

| | |
|---|---|
| 09:22:47 | 1 |
| 09:22:49 | 2 |
| 09:24:36 | 3 |
| 09:25:19 | 4 |
| 09:25:19 | 5 |
| 09:25:22 | 6 |
| 09:25:25 | 7 |
| 09:25:26 | 8 |
| 09:25:26 | 9 |
| 09:25:30 | 10 |
| 09:25:30 | 11 |
| 09:25:35 | 12 |
| 09:25:41 | 13 |
| 09:25:46 | 14 |
| 09:25:56 | 15 |
| 09:26:00 | 16 |
| 09:26:03 | 17 |
| 09:26:07 | 18 |
| 09:26:11 | 19 |
| 09:26:16 | 20 |
| 09:26:20 | 21 |
| 09:26:25 | 22 |
| 09:26:31 | 23 |
| 09:26:33 | 24 |
| 09:26:33 | 25 |

portion.  They can stay on if they want but they're not required to be on, those who were on the phone.

(Brief pause in proceedings).

(Jury returned to courtroom at 9:24 a.m.)

THE COURT:  Good morning.  Please be seated.

All right.  Mr. Lanier, you may call your next witness, please.

MR. LANIER:  Thank you, Your Honor.

May it please the Court, ladies and gentlemen.  Good morning.

Your Honor, our -- my voice is a little rough.

Your Honor, our next witness is Mark Vernazza.  It will be a videotape deposition.  He spells his name V-e-r-n-a-z-z-a.  He is CVS's corporate counsel who testified in the deposition in what's called a 30(b)(6) capacity.  That means, in essence, he's speaking for the corporation because companies need someone to speak for them.  So he was designated by the company to speak for the company.

The whole deposition play, Your Honor, is an hour and 8 minutes.  37 of that is what we've designated as plaintiffs. 31 minutes is what CVS has designated as defendants, and with the Court's permission, we're ready to play it.

MR. DELINSKY:  Your Honor, may I just add one line to Mr. Lanier's --

THE COURT:  Yes, Mr. Delinsky.

—————Vernazza  (By Video Deposition)—————

09:26:35  1          MR. DELINSKY:  Good morning, ladies and gentlemen.

09:26:37  2          This deposition concerns the distribution issues in

09:26:41  3  the case, shipments from the warehouses to the farms.  It does

09:26:50  4  not concern what happens in the pharmacy when prescriptions are

09:26:55  5  presented.

09:26:55  6          Thank you.

09:26:57  7          MR. LANIER:  So, with that, Dan.

09:27:03  8          My name is Eric Kennedy.  We briefly met.

09:27:03  9          Can you please state full name for the record.

09:27:06 10          THE WITNESS:  My full name is --

09:27:08 11          MR. LANIER:  Pause.  We have no video.

09:27:12 12          Now we do.  Can we start all over again, please.

09:27:15 13          Thank you.

09:27:15 14      DEPOSITION TESTIMONY OF MARK ROBERT VERNAZZA

09:27:19 15  Q.  My name's Eric Kennedy.  We briefly met.

09:27:22 16          Could you please state your full name for the record.

09:27:24 17  A.  My full name is Mark Robert Vernazza.

09:27:28 18  Q.  And what is your current employer?

09:27:30 19  A.  CVS Pharmacy.

09:27:33 20  Q.  And what is your present position with CVS Pharmacy, Inc.?

09:27:37 21  A.  Senior legal counsel.

09:27:40 22  Q.  Tell me about your current duties and responsibilities.

09:27:44 23  A.  I assist the company primarily with respect to litigation

09:27:50 24  and government investigations.

09:27:52 25  Q.  I think you've indicated that you are here in response to

HEATHER K. NEWMAN, RMR, CRR

Vernazza (By Video Deposition)

09:27:55  1   those notices and you are speaking in behalf of CVS Indiana,

09:28:03  2   LLC; correct?

09:28:04  3   A.  Yes, and CVS RX Services, Inc.

09:28:07  4   Q.  That we're going to refer to as the CVS defendants as we

09:28:07  5   move forward.

09:28:11  6          The other entities that would have provided services

09:28:13  7   to the CVS defendants with respect to the creation and

09:28:16  8   management of suspicious ordering monitoring policies would

09:28:19  9   have been, number one, CVS Pharmacy, Inc., true?

09:28:23  10  A.  CVS Pharmacy, Inc., would have provided some of those

09:28:26  11  services, yes.

09:28:26  12  Q.  And CVS Pharmacy, Inc., would that be the parent or the

09:28:30  13  owner of the CVS defendants?

09:28:33  14  A.  Yes.

09:28:34  15  Q.  Can you tell me what efforts you or the CVS defendants have

09:28:41  16  made to provide you with information known or reasonably

09:28:43  17  available to the CVS defendants with respect to the topics that

09:28:46  18  you're going to testify on?

09:28:48  19  A.  Yes.  I have conducted interviews with the current and

09:29:00  20  former CVS personnel.  Those interviews number in excess of 40

09:29:14  21  different individuals that I have interviewed.  Many

09:29:17  22  individuals on multiple occasions.  I have undertaken a review

09:29:26  23  of a number of different documents in preparation for the

09:29:30  24  deposition.  I have sat with our current suspicious order

09:29:38  25  monitoring team and watched them perform their work for a good

HEATHER K. NEWMAN, RMR, CRR

Vernazza (By Video Deposition)

09:29:48  1  portion of a morning.  I have traveled to the Indianapolis

09:29:51  2  distribution center for the purposes of observing their

09:29:55  3  operations and conducting interviews with personnel at that

09:30:04  4  facility.  There may be more, but that's what comes to mind.

09:30:10  5  Q.  And can you tell me how much time you've put into educating

09:30:13  6  yourself or being educated with respect to the suspicious order

09:30:19  7  monitoring systems programs and procedures at the CVS

09:30:21  8  defendants?

09:30:22  9  A.  I can't put a precise time on it.  The best of my

09:30:26  10  estimation the amount of time I've spent preparing for this

09:30:30  11  deposition exceeds four weeks of business days.

09:30:36  12  Q.  And you understand, as a lawyer, that your testimony here

09:30:40  13  does not necessarily represent your knowledge but represents

09:30:43  14  the knowledge of the CVS defendants?  You understand that?

09:30:46  15  A.  I understand that as the 30(b)(6) deponent here today.

09:30:51  16  Q.  And you understand that your testimony here today

09:30:53  17  represents the positions of the CVS defendants on the topics

09:30:58  18  that we're going to talk about.

09:31:00  19       Do you understand that?

09:31:01  20  A.  I understand them being asked to provide corporate

09:31:03  21  testimony.

09:31:03  22  Q.  Now, with respect to hydrocodone drugs, HCPs.  I'm going to

09:31:03  23  call them hydrocodone drugs.  When I call them hydrocodone

09:31:12  24  drugs, I mean HCP's.  That's a Schedule III for the most part,

09:31:14  25  what we're going to talk about today, that's a Schedule III

—————— Vernazza (By Video Deposition) ——————

09:31:17  1   narcotic.

09:31:18  2            Is that true?

09:31:19  3   A.  Hydrocodone combination products, yes, were Schedule III

09:31:26  4   drugs up through October of 2014.

09:31:30  5   Q.  Did either of the CVS defendants ever distribute controlled

09:31:41  6   substances to any customer, any entity other than a CVS

09:31:47  7   Pharmacy between '06 and '14?

09:31:48  8   A.  No.

09:31:49  9   Q.  Between 2006 and '14, when a CVS Pharmacy wanted to order

09:32:01 10   hydrocodone drugs from a CVS distributor, tell me what the

09:32:04 11   process was.

09:32:06 12   A.  The general process for a CVS Pharmacy ordering a drug such

09:32:17 13   as hydrocodone combination product from a CVS distribution

09:32:23 14   center would begin with an automated program known as the AIMS

09:32:36 15   system, which would calculate a suggested order for that

09:32:39 16   pharmacy with respect to a particular drug for a particular

09:32:45 17   ordering period.

09:32:46 18            That suggested order would take into account certain

09:32:53 19   historical dispensing information as well as what the system

09:32:59 20   understood to be the balance on hand or inventory of the

09:33:05 21   product.  It would generate a suggested order to restore that

09:33:13 22   pharmacy's inventory level to what would be called the target

09:33:20 23   inventory level.  The pharmacy would have the ability to modify

09:33:27 24   that suggested order consistent with the needs of the pharmacy.

09:33:36 25            At that point, the order would get passed through the

─── Vernazza (By Video Deposition) ───

09:33:43 1 mainframe computer system within the company and then subject

09:33:50 2 to different suspicious order monitoring processes placed to

09:33:59 3 the warehouse for distribution.

09:34:01 4 Q. CVS Pharmacy, Inc., would I be correct that they own either

09:34:07 5 directly or indirectly all of the CVS pharmacies in the United

09:34:12 6 States?

09:34:12 7 A. To the best of my corporate knowledge, at this point in

09:34:15 8 time CVS Pharmacy, Inc. owns either directly or indirectly all

09:34:23 9 of the CVS retail pharmacies.

09:34:25 10 Q. CVS Pharmacy, Inc. owns directly or indirectly both the

09:34:31 11 distribution centers we're talking about and the CVS pharmacies

09:34:37 12 across the country; correct?

09:34:38 13 A. While this is not a topic that I undertook preparation on

09:34:42 14 for the purposes of this deposition, to the best of my

09:34:45 15 knowledge that is true.

09:34:46 16 Q. Now, the two CVS defendants both distribute controlled

09:34:53 17 substances; correct?

09:34:54 18 A. They do.

09:34:54 19 Q. To CVS pharmacies; correct?

09:34:56 20 A. Both of the CVS entities named as defendants in this case

09:35:02 21 are distributors of controlled substances.

09:35:06 22 Q. So --

09:35:07 23 A. They are now and have always been only distributors of

09:35:11 24 Schedule III through V controlled substances and have never

09:35:14 25 been distributors of Schedule II controlled substances.

─────────── Vernazza  (By Video Deposition) ───────────

09:35:23  1    Traditionally those entities have only distributed controlled

09:35:23  2    substances to CVS pharmacies, to the best of my corporate

09:35:26  3    knowledge.

09:35:27  4    Q.   Did CVS from 2006 to 2014, did they understand that

09:35:32  5    hydrocodone drugs, HCP's, were a highly addictive drug?

09:35:36  6    A.   CVS was familiar with those drugs as being controlled

09:35:43  7    substances in Schedule III.  CVS was also aware that controlled

09:35:51  8    substances could be abused or misused.  Beyond that, I'm not

09:35:54  9    sure I have corporate knowledge to answer your question.

09:35:58 10    Q.   When did CVS, the CVS defendants, first become aware of the

09:36:05 11    Controlled Substance Act of 1971?

09:36:07 12    A.   I have no corporate knowledge that CVS has ever been

09:36:11 13    unaware of the controlled substances acted.

09:36:13 14    Q.   Should they have been aware of it in 2006?

09:36:19 15    A.   I understand that in 2006 CVS was aware of the Controlled

09:36:27 16    Substances Act.

09:36:27 17    Q.   Do you know who Mr. Rannazzisi?

09:36:31 18    A.   I do.

09:36:31 19    Q.   And who is he?

09:36:34 20    A.   Mr. Rannazzisi is a former official with the DEA with

09:36:44 21    responsibilities for oversight over DEA's diversion control

09:36:50 22    organization.

09:36:51 23    Q.   Take a look at Exhibit 3.  That is a -- that is a letter,

09:36:55 24    is it not, from the United States Department of Justice Drug

09:37:04 25    Enforcement Administration which is the Drug Enforcement

HEATHER K. NEWMAN, RMR, CRR

─────── Vernazza  (By Video Deposition) ───────

09:37:05  1   Administration; correct?

09:37:05  2   A.   The Drug Enforcement Administration is what I would

09:37:10  3   consider to be the DEA, yes.

09:37:12  4   Q.   September 26th, 2006, is the date of this letter; true?

09:37:16  5   A.   The letter appears to be dated September 27, 2006.

09:37:19  6   Q.   CVS Indiana, LLC, one of the defendants in this case, it

09:37:24  7   appears as if they received this letter.  True?

09:37:25  8   A.   To the best of our corporate knowledge, that is true.

09:37:28  9   Q.   The letter, Exhibit 3, from the DEA to one of the CVS

09:37:35 10   defendants.  Let's look at the first sentence if we could.

09:37:42 11        It states "This letter is being sent to every

09:37:45 12   commercial entity in the United States registered with the Drug

09:37:50 13   Enforcement Administration, DEA, to distribute controlled

09:37:54 14   substances."

09:37:55 15        CVS Indiana at that point in time was a registrant;

09:37:59 16   correct?

09:37:59 17   A.   To my understanding, that's correct.

09:38:00 18   Q.   Look at the first sentence under background, if you would.

09:38:09 19        And does it state -- and this is the DEA to CVS

09:38:15 20   Indiana, "As each of you is undoubtedly aware, the abuse

09:38:21 21   non-medical use of controlled prescription drugs is a serious

09:38:24 22   and growing health problem in this country."

09:38:27 23        Do you see that statement?

09:38:29 24   A.   I do.

09:38:30 25   Q.   Was -- I'm assuming then CVS Indiana was aware of this

Vernazza (By Video Deposition)

09:38:39  1    statement, that statement by the DEA?

09:38:42  2    A.   To the best of my corporate knowledge, CVS received this

09:38:45  3    letter.  CVS Indiana received this letter and would have

09:38:49  4    reviewed its contents, including that sentence.

09:38:53  5    Q.   Do you know whether CVS Indiana or any other CVS entity

09:38:59  6    disagreed with that statement in 2006?

09:39:00  7    A.   I have no knowledge that CVS disagreed with that.

09:39:03  8    Q.   Let me ask you this.  Let's go on and read further and see

09:39:07  9    what the DEA was telling the CVS defendant from Indiana here.

09:39:11  10           It next states, "The registrant shall" -- you

09:39:15  11   understand -- "shall inform the field division of the

09:39:19  12   administration in his area of suspicious orders when discovered

09:39:25  13   by the registrant" -- and that would be CVS Indiana; correct?

09:39:29  14   A.   Yes.

09:39:30  15   Q.   -- "suspicious orders" -- this is coming from the

09:39:34  16   regulations -- "suspicious orders include orders of unusual

09:39:38  17   size, orders deviating substantially from a normal pattern and

09:39:44  18   orders of usual frequency."

09:39:45  19           CVS Indiana would have been aware of that statement

09:39:47  20   had they received and read this letter; correct?

09:39:52  21   A.   I believe that's correct.

09:39:53  22   Q.   Generally, pharmacies have certain responsibilities with

09:40:06  23   respect to filling prescriptions, certain requirements with

09:40:12  24   respect to attempting to prevent diversion, pharmacies have

09:40:19  25   those certain responsibilities.  Agreed?

Vernazza  (By Video Deposition)

09:40:21  1    A.   There are certain responsibilities under the Controlled

09:40:24  2    Substances Act that are incumbent upon pharmacies and

09:40:28  3    pharmacists with respect to the controlled substance.

09:40:32  4            Certainly one of those is the pharmacist's duty to

09:40:36  5    perform corresponding responsibilities or obligation of the law

09:40:41  6    to perform corresponding responsibility due diligence before

09:40:46  7    dispensing a prescription that's certainly consistent with

09:40:49  8    prevention and diversion.

09:40:51  9    Q.   Can we agree that just because the pharmacies have certain

09:40:54  10   responsibilities that you just described, can you agree that

09:40:57  11   just because those responsibilities exist on the part of a

09:41:00  12   pharmacy, those do not in any way diminish or negate the

09:41:04  13   responsibilities of the distributor with respect to monitoring

09:41:10  14   suspicious orders?

09:41:10  15   A.   Regulations and the Controlled Substance Act provide for

09:41:14  16   different obligations on behalf of pharmacies and distributors.

09:41:25  17   CVS undertakes to comply with both sets of obligations.

09:41:33  18   Q.   And one does not affect the other; correct?

09:41:35  19   A.   I don't know that I would agree with that.  A pharmacy

09:41:41  20   places orders for controlled substances that are shipped.

09:41:48  21   There can be any number of processes, procedures, safeguards in

09:41:56  22   place at the pharmacy that would result in the pharmacy not

09:42:00  23   placing orders that would be identified by a distributor as

09:42:08  24   suspicious.

09:42:09  25   Q.   Is it the position of the CVS defendants that because they

HEATHER K. NEWMAN, RMR, CRR

Vernazza  (By Video Deposition)

09:42:15  1   had pharmacy policies in place that their responsibility to

09:42:20  2   monitor suspicious orders was less?

09:42:25  3   A.   There was no less an obligation to monitor suspicious

09:42:31  4   orders.

09:42:31  5   Q.   The responsibility is not less; correct?

09:42:33  6   A.   It is relevant to the concept of knowing your customer, and

09:42:38  7   in the case of CVS pharmacies, CVS pharmacies had in place

09:42:44  8   policies and procedures requiring pharmacists to follow the

09:42:50  9   law, including corresponding responsibility.

09:42:56  10          There was also a system of field supervision of those

09:42:58  11  pharmacies, a system of loss prevention supervision of those

09:43:03  12  pharmacies, and other considerations that would be relevant to

09:43:09  13  understanding who you were shipping the -- your shipments to.

09:43:13  14          So is it relevant to the obligation of suspicious

09:43:20  15  order monitoring, we would say it is.  It does not mean that

09:43:26  16  the regulation doesn't say what the regulation says or that the

09:43:29  17  regulation doesn't apply to CVS distributors as a registrant.

09:43:34  18  Q.   Showing you Exhibit 65.  Have you seen this before?

09:43:38  19  A.   Allow me to just take a minute to review.

09:43:41  20  Q.   The title of this document is "CVS Distribution Center

09:43:44  21  Controlled Drug DEA Standard Operating Procedures Manual";

09:43:47  22  correct?

09:43:51  23  A.   I'm sorry.  I was still leafing through the back of the

09:43:57  24  document.  I'm not done reviewing it, but I can answer your

09:43:58  25  questions about the title.

HEATHER K. NEWMAN, RMR, CRR

Vernazza (By Video Deposition)

09:43:59  1  Q.  Right.  That's the title of this document; correct?

09:44:03  2  A.  That is the title of the document.

09:44:06  3  Q.  And if you'll go down -- this was -- this was written

09:44:12  4  either by or in behalf of the CVS distributors; correct?

09:44:18  5       Is that correct?

09:44:21  6  A.  To the best of my corporate knowledge, that's correct.

09:44:24  7  Q.  Let me ask you this: This is a document -- do you know who

09:44:28  8  made this document?

09:44:29  9       That would be CVS Pharmacy created it or paid to get

09:44:33 10  this document created, CVS Pharmacy, they would have done this;

09:44:37 11  right?  Is that true?

09:44:40 12  A.  To the best of my corporate knowledge, this document would

09:44:45 13  have been put together by individuals working for CVS Pharmacy

09:44:58 14  in connection with the distribution center entities.

09:45:02 15  Q.  All right.  And if we go down to that fifth paragraph, does

09:45:06 16  it state that "CVS is responsible for ensuring compliance with

09:45:10 17  DEA regulatory requirements and that responsibility cannot be

09:45:17 18  abdicated or transferred to anyone else."

09:45:20 19       Are those the words of CVS Pharmacy, Inc.?

09:45:24 20  A.  Those are the words that are here in this document.

09:45:28 21  Q.  Okay.  Let's look at -- let's look at what CVS -- the CVS

09:45:35 22  defendants did and CVS Pharmacy, Inc., did to fulfill their

09:45:39 23  duties with respect to the distribution of hydrocodone drugs;

09:45:44 24  all right?

09:45:44 25       January of '06, by January of '06 the Controlled

Vernazza  (By Video Deposition)

09:45:50  1  Substance Act is -- has been in place for over 30 years.  True?

09:45:56  2  A.  To the best of my recollection, that's correct.

09:46:00  3  Q.  I want to know what policies and procedures did CVS Indiana

09:46:05  4  have in place and functioning to monitor suspicious orders of

09:46:11  5  controlled substances that it was distributing in January of

09:46:18  6  '06.

09:46:18  7  A.  Just as a -- a little bit of context here may be -- may be

09:46:23  8  helpful to your understanding.

09:46:26  9      The CVS Indiana warehouse facility is a large facility

09:46:30  10  that ships to CVS stores.  It ships not just drugs, but also

09:46:40  11  front store items or what we call anything from paper towels to

09:46:47  12  anything that you would see in the front of the store.  Within

09:46:49  13  the warehouse there is a section dedicated to what we would

09:46:56  14  call "pharmacy items."

09:46:58  15      Within that section containing pharmacy items there's

09:47:05  16  a subsection that contains controlled substances.  Those

09:47:10  17  controlled substances are put in what's called a cage with

09:47:17  18  restricted access to only certain individuals.  When CVS

09:47:24  19  Indiana would have received an order for a controlled

09:47:29  20  substance, that controlled substance order would have gone to

09:47:33  21  individuals who work within the controlled substances cage.  We

09:47:39  22  sometimes refer to them as the pickers and packers because

09:47:41  23  they're the folks who actually pick the drugs, place them in

09:47:49  24  secured totes and see to it that those then are transferred for

09:47:56  25  loading on trucks.

HEATHER K. NEWMAN, RMR, CRR

**3823**

Vernazza  (By Video Deposition)

09:47:59  1        It has always been practice of the pickers and the

09:48:05  2   packers, it has always been the understanding of the pickers

09:48:11  3   and packers within that controlled drug cage to be aware of

09:48:21  4   unusual orders and when they were to identify an unusual order,

09:48:30  5   to escalate that for further review.  The pickers and the

09:48:35  6   packers have experience picking those controlled substances and

09:48:41  7   have experience picking the controlled substances for those

09:48:48  8   stores.

09:48:51  9   Q.   Have you finished your answer?

09:48:54  10  A.   I believe so.

09:48:54  11  Q.   That's what was in place in January of '06?

09:48:59  12  A.   There were also a number of systems that would have

09:49:12  13  complemented that practice that were based in the field, not

09:49:15  14  the least of which is a set of field supervisors over CVS

09:49:23  15  Pharmacy stores --

09:49:24  16  Q.   I'm not talking about --

09:49:25  17  A.   -- the least of which is loss prevention personnel with

09:49:34  18  specific duties to investigate diversion.  There were hundreds

09:49:42  19  of pharmacy supervisors and approximately 150 loss prevention

09:49:51  20  personnel.

09:49:52  21        The loss prevention organization also would run data

09:50:00  22  analysis that would look for certain indicators of diversion

09:50:10  23  with respect to store ordering practices.  For instance, the

09:50:17  24  report would look at what we would deem pharmacy growth, which

09:50:24  25  is a store that may be ordering more controlled substances than

Vernazza (By Video Deposition)

09:50:31  1  it was dispensing.  And that report verified over time in form
09:50:36  2  and substance, but would have included other potential indicia
09:50:45  3  of diversion that might prompt a field loss prevention officer
09:50:59  4  to conduct at the store level.
09:51:02  5  Q.  What was this report called?
09:51:03  6  A.  The PDMR report.  It may have changed names to some degrees
09:51:08  7  over the course of time, but that report was in place, to the
09:51:11  8  best of my corporate knowledge, in 2006.
09:51:13  9  Q.  And tell me the data information on the PDMR report.
09:51:19  10  A.  It would include orders.  To the best of my recollection,
09:51:26  11  it would include orders from warehouses and outside vendors.
09:51:32  12  It would include information about a store's dispensing.  It
09:51:34  13  may include information about instances in which a store would
09:51:42  14  have manually adjusted the suggested order through the AIMS
09:51:48  15  system, and it may have included, and I believe did include,
09:51:52  16  information where a store may have adjusted it's inventory
09:52:04  17  level in the computer system to reflect a different inventory
09:52:07  18  level than the computer system -- than the computer system had
09:52:16  19  on record.
09:52:16  20  Q.  Was the PDMR report reviewed prior to every single order
09:52:19  21  being placed for a hydrocodone drug in 2006?
09:52:24  22  A.  It was not.
09:52:28  23  Q.  Did the PDMR report provide an evaluation of whether or not
09:52:32  24  a specific order for a CVS Pharmacy for a hydrocodone product,
09:52:36  25  whether or not that was of unusual size for a specific order?

**3825**

Vernazza (By Video Deposition)

09:52:52 1 A. It could potentially. It looked at orders in the -- in the

09:52:57 2 aggregate to determine whether or not that store, among other

09:53:01 3 things, was receiving more than it was dispensing.

09:53:08 4 Q. Did it evaluate specific orders for hydrocodone products in

09:53:15 5 2006 with respect to whether or not it was unusual in size in

09:53:21 6 relation to other orders placed by that pharmacy?

09:53:25 7 A. Yeah, it -- as I said, it contained information about

09:53:30 8 orders that could be evaluated by loss prevention personnel to

09:53:37 9 determine whether or not there should be an investigation

09:53:45 10 undertaken with respect to the orders that were reflected on

09:53:49 11 that report.

09:53:50 12 Q. Are you talking about the VIPER reports? Is that what

09:53:54 13 you -- is that what this PDMR is?

09:53:56 14 A. It would come out of the VIPER system, that's correct.

09:53:58 15 Q. But the report itself did not analyze any specific order to

09:54:02 16 determine whether or not that order was unusual in size;

09:54:04 17 correct? We've all looked at the form.

09:54:07 18 A. The company did not consider the results that populated on

09:54:15 19 that report to be per se unusual in size. It was a tool that

09:54:19 20 was available to loss prevention personnel in determining

09:54:22 21 whether or not further investigation by loss prevention

09:54:26 22 personnel would be appropriate.

09:54:27 23 Q. That report doesn't even identify a specific single order;

09:54:32 24 correct? Doesn't even identify a specific order.

09:54:40 25 A. I don't recall whether specific orders are listed in the

**3826**

───── Vernazza  (By Video Deposition) ─────

09:54:47  1  report or whether it's an aggregate number at this point in

09:54:52  2  time.

09:54:54  3  Q.  Well, if you're saying that report is part of a suspicious

09:54:59  4  order monitoring program, isn't that something you should know?

09:55:02  5  A.  I don't think I said that that was our suspicious order

09:55:04  6  monitoring system, I said that it is a complementary to what

09:55:11  7  was occurring in our distribution centers and indeed the

09:55:17  8  metrics that would -- some of the metrics it looked at in that

09:55:21  9  report are consistent with some of the metrics that we look at

09:55:26  10  in our algorithms that we run.

09:55:29  11  Q.  And in your opinion on Exhibit 93, PDMR report, able to

09:55:36  12  show me the evaluation of a single specific order for size?

09:55:39  13        Are you able to do that?  You are not.

09:55:42  14  A.  Based on the information I have in front of me I'm not.

09:55:44  15  Q.  Thank you.

09:55:45  16        This report, the PDMR report, can you show the jury

09:55:49  17  anywhere on this report where the frequency of orders for

09:55:57  18  controlled substances is being evaluated, anywhere in this

09:56:00  19  report?  Can you show us that?

09:56:01  20  A.  Based on my corporate knowledge at this point in time I

09:56:03  21  cannot.

09:56:03  22  Q.  Can you show us anywhere on this report, the PDMR,

09:56:11  23  Exhibit 93, where an evaluation is done of a specific order as

09:56:13  24  it relates to the pattern of ordering of a controlled

09:56:19  25  substance?

Vernazza (By Video Deposition)

09:56:19 1 A.   Among the things that we consider in analysis of pattern is

09:56:29 2 whether or not the -- a particular store is ordering in more

09:56:34 3 than it's dispensing.  That remains part of the algorithms that

09:56:39 4 we run today.  That is reflected in this report.  It's, in

09:56:44 5 fact, the point of this report, so, to some degree this report

09:56:50 6 could be used to look at pattern.

09:56:56 7        But, again, as I testified, this report was not what

09:56:59 8 we deemed a suspicious order monitoring report.  It's relevant

09:57:04 9 to orders and order size and some degree order of pattern, but

09:57:12 10 the point of this was not to produce results for the purposes

09:57:15 11 of determining whether suspicious orders were made and

09:57:19 12 reporting those to the DEA.

09:57:20 13 Q.   You talked about the pickers and the packers.  Is it your

09:57:25 14 testimony that the pickers and the packers were responsible for

09:57:30 15 evaluating orders to determine whether or not they are

09:57:33 16 suspicious?

09:57:35 17 A.   The pickers and the packers would be aware of, as part of

09:57:45 18 their job responsibilities, to raise any orders that they

09:57:49 19 considered to be irregular based on their knowledge and

09:57:55 20 experience and to escalate those within the chain of command

09:58:06 21 within the warehouse and could involve a consultation with

09:58:14 22 field personnel.  Most commonly, to my corporate knowledge,

09:58:21 23 that would be a phone call to the pharmacy.

09:58:23 24        There were fairly -- there were a number of instances

09:58:35 25 where I understand the pickers and the packers would identify

HEATHER K. NEWMAN, RMR, CRR

**3828**

———— Vernazza  (By Video Deposition) ————

09:58:40  1   orders and initiate contact through supervisors to the store in

09:58:50  2   order to determine whether that order was one that the store

09:58:58  3   made by mistake, for instance.

09:59:02  4   Q.   Tell me this, what database, what information and knowledge

09:59:06  5   did a picker and a packer have in January of '06 to determine

09:59:11  6   whether or not a specific order for a specific pharmacy was of

09:59:16  7   unusual size?

09:59:17  8   A.   Their knowledge and experience of picking controlled orders

09:59:22  9   and exclusively controlled orders for many years for generally

09:59:31  10  speaking the same subset of stores.  They would then escalate

09:59:36  11  those orders for further review, which would most often include

09:59:43  12  a phone call to the store and I -- and I can't tell you, you

09:59:48  13  know, what each of those conversations may have included or

09:59:55  14  what information may have been provided by the store.

10:00:00  15  Q.   The -- let me ask you this: This pickers and the packers

10:00:09  16  and their just -- their general experience, is that what CVS

10:00:15  17  had in place as its system to disclose suspicious orders based

10:00:22  18  upon size, frequency, and pattern in '06?

10:00:27  19  A.   To the best of my corporate knowledge at this point in

10:00:29  20  time, yes.

10:00:30  21  Q.   From '06 to 2012, did a picker and a packer ever identify

10:00:36  22  an order that was stopped and determined to be suspicious and

10:00:38  23  reported to the DEA, ever?

10:00:41  24  A.   To the best of my corporate knowledge at this point in

10:00:47  25  time, we do not have record of any suspicious order being

**3829**

────── Vernazza (By Video Deposition) ──────

10:00:54  1  identified or reported to the DEA in 2006 from the Indianapolis

10:01:04  2  distribution center.

10:01:05  3  Q.  From January of '06 -- I want to talk about from January of

10:01:09  4  '06, because we've talked about January, from January of '06

10:01:12  5  until 12-1-07, when the first operating policy manual comes

10:01:16  6  into play, can you describe for me what suspicious order

10:01:22  7  monitoring policies and procedures were in place?

10:01:26  8  A.  The practice and procedure that I described to you with

10:01:29  9  respect to the controlled substances cage, pickers and packers

10:01:36 10  was in effect and remained in effect.

10:01:40 11       There were a number of other safeguards and diversion

10:01:47 12  at various places within the company, but with respect to the

10:01:52 13  identification of suspicious orders for reporting to the DEA,

10:02:02 14  to the best of my corporate knowledge at this point in time,

10:02:04 15  that was the primary practice that was in place.

10:02:11 16  Q.  Sir, you were shown Exhibit 6.  Is the subject "New RX DEA

10:02:16 17  SOP"?

10:02:17 18  A.  The subject of the e-mail at the bottom of the page is "New

10:02:22 19  RX DEA SOP."

10:02:24 20  Q.  Now, on this date, November 27, 2007, Amy Lynn Brown

10:02:33 21  states, "Good afternoon, in late August we met to review a new

10:02:37 22  SOP."

10:02:38 23       SOP, we understand to mean standard operating

10:02:40 24  procedure.  True?

10:02:43 25  A.  I'm familiar with that terminology being used that way,

Vernazza  (By Video Deposition)

10:02:46  1  yeah.

10:02:46  2  Q.  And let me ask you this: Who was the company authorizing

10:02:49  3  the SOP at this point in time?

10:02:59  4  A.  To the best of my corporate knowledge, the Buzzeo Group was

10:03:03  5  engaged in a consulting capacity and assisted in authoring this

10:03:14  6  document that's attached to the e-mail.

10:03:15  7  Q.  Do you agree with her statement here, "We are still in the

10:03:19  8  process of writing the suspicious order monitoring section of

10:03:23  9  this standard operating procedure."

10:03:26  10        As of this date, do you agree that it was still being

10:03:29  11  written in November of 2007?

10:03:31  12        Do you agree with that statement?

10:03:34  13  A.  To the best of my corporate knowledge, that is true.

10:03:38  14  Q.  Exhibit 14, please.

10:03:40  15        We were just talking about December of '07, so I want

10:03:46  16  to move forward now to September of '08.  So, ten months or so

10:03:53  17  later.  This is an e-mail, that being Exhibit 14, from Richard

10:04:09  18  Sonate (phonetic), correct?

10:04:10  19  A.  September 2008 from Richard Sonate, yep.

10:04:14  20  Q.  The standard operating procedures for the suspicious

10:04:17  21  monitoring are still being drafted, and we are in September of

10:04:21  22  '08; correct?

10:04:22  23  A.  To the best of my corporate knowledge that's true.

10:04:26  24  Q.  Let's move forward now to April 3rd of '09.  And that would

10:04:29  25  be Exhibit 7.  All right?

Vernazza (By Video Deposition)

10:04:34  1        Looking at the bottom e-mail from Amy Propatier.

10:04:39  2  She's employed at CVS Pharmacy, Inc.; correct?

10:04:43  3  A.  To the best of my knowledge that's true, yes.

10:04:46  4  Q.  And she would have been involved with establishing the

10:04:49  5  suspicious order monitoring policy and that section of the

10:04:55  6  standard operating procedures.  True?

10:04:55  7  A.  To the best of my knowledge, Mrs. Propatier was involved in

10:05:02  8  the standard operating procedure.

10:05:03  9  Q.  Now, it says, "Good morning, attached is the DEA SOP,

10:05:09  10  standard operating procedures, which was implemented in

10:05:12  11  December of 2007.  We have made some recent updates to the SOP.

10:05:18  12  Please note we have updated the record retention period from

10:05:21  13  five years to two years.

10:05:23  14        "Also, the SOM, suspicious order monitoring section,

10:05:29  15  is still it not included in the SOP.  In the event of an audit

10:05:34  16  and the question comes up, please direct them to corporate,

10:05:38  17  Frank or myself, for explanation of the program.  Please review

10:05:42  18  with your teams and forward to anyone I have missed."

10:05:47  19        We agree at this point in time now, it's April of '09,

10:05:52  20  and the standard, or, excuse me, the suspicious order

10:05:55  21  monitoring section is still not included in the standard

10:06:00  22  operating procedures; correct?

10:06:03  23  A.  The final version is not included in the standard operating

10:06:07  24  procedures being referenced by Mrs. Propatier in this e-mail.

10:06:12  25  Q.  Exhibit 49, let's look at CVS's -- whether or not they have

HEATHER K. NEWMAN, RMR, CRR

———Vernazza  (By Video Deposition)———

10:06:18  1   in procedures in place.

10:06:19  2           We have an e-mail dated 11-5-09.

10:06:24  3           Do you see that top e-mail?  Do you see that?  Does it

10:06:32  4   state November 5, 2009, an e-mail from Mr. Mortelliti; correct?

10:06:42  5   A.  That appears to be the date of the e-mail.  The subject of

10:06:46  6   the e-mail is November 10th, 2009.

10:06:48  7   Q.  Who is Mr. Mortelliti?

10:06:51  8   A.  Mr. Mortelliti was an individual within the CVS loss

10:07:00  9   prevention organization.

10:07:01  10  Q.  CVS Pharmacy, Incorporated; correct?

10:07:05  11  A.  To the best of my corporate knowledge that is correct.

10:07:08  12  Q.  And did he have significant responsibility for the

10:07:11  13  creation, the implementation of the suspicious order monitoring

10:07:14  14  policies?

10:07:20  15  A.  I believe Mr. Mortelliti had involvement in the

10:07:23  16  implementation of both the system that had been developed by

10:07:29  17  the Buzzeo Group as well as input perhaps, to the best of my

10:07:37  18  corporate knowledge, the policies.

10:07:40  19  Q.  Mr. Mortelliti, now we're in November of '09, he writes,

10:07:44  20  "Sounds good.  I am trying to get a rough draft of the

10:07:47  21  suspicious order monitoring standard operating procedure to you

10:07:53  22  prior to the meeting.  This is a big issue with CVS and the

10:07:59  23  DEA."

10:08:05  24          Do you agree that drafting and having written

10:08:09  25  suspicious order monitoring, a policy written and drafted now

HEATHER K. NEWMAN, RMR, CRR

Vernazza (By Video Deposition)

10:08:21  1   in November of '09 was a big issue, not only for CVS, but also

10:08:25  2   for the DEA at that point in time?

10:08:26  3         Would you agree with that statement on behalf of CVS?

10:08:29  4   A.  I don't know what Mr. Mortelliti's specifically addressing

10:08:39  5   here.  The context of the e-mail is not clear to me --

10:08:42  6   Q.  Let me go back and read it again.

10:08:43  7   A.  -- with CVS's compliance with DEA regulations is something

10:08:48  8   that CVS takes seriously.

10:08:50  9   Q.  In behalf of CVS, who you are here representing, would you

10:08:55  10  disagree that at this point in time the drafting of suspicious

10:09:02  11  order monitoring policies were a big issue for CVS and the DEA

10:09:06  12  at this point in time?  It's now November of 2009.

10:09:10  13  A.  In November of 2009, it's my understanding that CVS had the

10:09:17  14  Buzzeo algorithmic based system in place.  This references

10:09:26  15  drafting the suspicious order monitoring SOP prior to a

10:09:34  16  meeting, the context of which is unclear from the face of the

10:09:38  17  e-mail.

10:09:38  18        I have not reviewed this e-mail in preparation for

10:09:42  19  this deposition, nor have I had an opportunity to speak with

10:09:47  20  Mr. Mortelliti about what he was communicating here, so,

10:09:50  21  unfortunately, I don't have corporate knowledge as to exactly

10:09:53  22  what that means.

10:09:55  23  Q.  So summarize here, to catch up to where we're at, first

10:10:04  24  creation of standard operating procedures by CVS was 12-1-07.

10:10:10  25  This is an exhibit that we created.  The first one we looked

Vernazza (By Video Deposition)

10:10:13 1 at, the first operating procedures with respect to suspicious

10:10:16 2 order monitoring had a paragraph that we read saying, being

10:10:22 3 developed and written, did it not?

10:10:23 4 A.  I remember that language from the written policy that was

10:10:28 5 in draft form at that time.

10:10:30 6 Q.  Two years later the written policy, intended to be the

10:10:34 7 single document to describe these policies, two years later,

10:10:38 8 same thing, being developed and written; correct?

10:10:40 9        We looked at that, did we not?

10:10:41 10 A.  Again, with respect to the written document that we looked

10:10:46 11 at, I remember this language being included, I think as I

10:10:54 12 explained, there was a system.

10:10:57 13 Q.  January of '10, we just looked at that document, said the

10:11:01 14 same thing, being developed and written; correct?

10:11:05 15 A.  Again, I remember that language being included in that

10:11:11 16 written document that we looked at earlier.  I could again look

10:11:15 17 at the document and confirm.

10:11:18 18 Q.  So it's been over four years since the DEA wrote the first

10:11:23 19 letter, and by this point in time the DEA has written three

10:11:26 20 letters total, have they not, April of 2010, the DEA has

10:11:31 21 written three letters.  True?

10:11:33 22 A.  We have discussed three letters today that were apparently

10:11:42 23 written by the DEA that predated 4-30-2010.

10:11:51 24 Q.  This is April 2010.  Four months later things changed

10:12:00 25 quickly at CVS; correct?  In August of 2010 things changed

HEATHER K. NEWMAN, RMR, CRR

———— Vernazza  (By Video Deposition) ————

10:12:06  1  quickly for CVS with respect to its responsibility and creation

10:12:11  2  and implementation of a system to monitor suspicious orders.

10:12:18  3  A.   Based on my corporate knowledge that I have developed in

10:12:22  4  preparation for this deposition, I can't say that that's

10:12:28  5  correct.

10:12:29  6  Q.   Sir, you know and you understand very well that in August

10:12:35  7  of 2010 the DEA came knocking on CVS's door to do an inspection

10:12:44  8  and audit and to investigate; correct?

10:12:46  9  A.   I believe that our distribution facilities had undergone a

10:12:52 10  number of audits throughout the course of many years.  I am

10:13:00 11  aware of an audit that occurred in the Indianapolis

10:13:06 12  distribution center in approximately 2010 when suspicious order

10:13:18 13  monitoring was discussed with the company's personnel.

10:13:22 14  Q.   The DEA came knocking to your distribution centers in 2010

10:13:28 15  to inspect and to audit and to investigate; correct?

10:13:31 16        We're going to go through what they did, but that's

10:13:33 17  when had they came.

10:13:34 18  A.   My understanding was that it was an audit.  To the best of

10:13:38 19  my knowledge, the Indianapolis distribution center had gone

10:13:42 20  through what are essentially routine audits on a cyclical basis

10:13:50 21  essentially every three years since CVS owned the facility.

10:13:53 22  Q.   But this one was different.  This presented a problem for

10:13:57 23  CVS in August 2010, correct, because they asked -- they asked

10:14:02 24  for your suspicious order monitoring policies; right?

10:14:07 25        They asked for them, and they didn't have them in

———————— Vernazza  (By Video Deposition) ————————

10:14:09 1   place; correct?

10:14:11 2   A.   I'm not sure I have a clear corporate knowledge on the

10:14:17 3   policies that may or may not have been provided to the DEA.  At

10:14:26 4   that time I am aware that suspicious order monitoring was

10:14:28 5   discussed with the -- with the DEA and that the DEA made no

10:14:38 6   adverse findings with respect to the company's suspicious order

10:14:42 7   monitoring system.

10:14:45 8   Q.   So the answer to my question is yes, they asked for your

10:14:47 9   policies in August of 0 -- 2010.  They asked for them, do you

10:14:51 10  remember that?

10:14:51 11  A.   I remember that there has been a -- there was a discussion

10:14:54 12  about suspicious order monitoring at that time.

10:14:57 13  Q.   Maybe this will help you, sir.

10:15:00 14  A.   Consistent with my recollection that policies were asked

10:15:04 15  for and/or provided.  I don't believe I have more specific

10:15:09 16  recollection than that.

10:15:12 17  Q.   32, please.

10:15:19 18       32 looks like a memo with respect to the DEA

10:15:24 19  inspection in August of 2010.  The memo is to Frank Devlin, and

10:15:33 20  Frank Devlin, tell us his position.

10:15:34 21  A.   Mr. Devlin was a loss prevention -- one of loss prevention

10:15:48 22  personnel responsible for CVS distribution centers.

10:15:51 23  Q.   And he worked for CVS Pharmacy, Inc., would that be true?

10:15:54 24  A.   To the best of my understanding, that's true.

10:15:56 25  Q.   And who's Terrence Dugger?

Vernazza (By Video Deposition)

10:16:09  1    A.   To the best of my knowledge, Mr. Dugger was in loss

10:16:14  2    prevention at the Indianapolis distribution center.

10:16:14  3    Q.   And it says, "Results of the inspection, the DEA

10:16:16  4    inspectors, Madeline Kuzma and Elizabeth Stewart, was on site

10:16:21  5    at the Indianapolis facility on Tuesday, August 24, 2010,

10:16:25  6    through Thursday, 26, 2010, and again on Tuesday, August 31,

10:16:32  7    2010, and Wednesday, September 1, 2010."

10:16:34  8         Did I read that correctly?

10:16:36  9    A.   I believe you did.

10:16:38  10   Q.   "Their purpose was to conduct a full inspection.  Requested

10:16:43  11   information," you go on down, under requested information,

10:16:54  12   fourth bullet down is SOM SOP.  The DEA requested the

10:17:04  13   suspicious order monitoring standard operating procedure of CVS

10:17:10  14   in August of 2010.  True?

10:17:17  15   A.   Under requested information SOM SOP appears in this

10:17:20  16   document.

10:17:21  17   Q.   Let's see what CVS did when the DEA asked for their

10:17:25  18   policies.

10:17:26  19        Give me Exhibit 40, please.

10:17:28  20        Start at the bottom, because that's the first e-mail.

10:17:33  21   The bottom e-mail, Mr. Devlin, CVS Pharmacy, Inc., on

10:17:43  22   August 23, 2010, he's writing Mr. Mortelliti and Amy Propatier,

10:17:51  23   subject DEA SOP.  And he says, "Good morning, John," and this

10:17:55  24   is -- this is while the audit's going on, "can you work with

10:18:01  25   Amy to get the PSE IRR and the controlled drug IRR inserted

HEATHER K. NEWMAN, RMR, CRR

———— Vernazza  (By Video Deposition) ————

10:18:10  1   into our DEA standard operating procedure under suspicious

10:18:16  2   order monitoring?  We promised this to the DEA by Wednesday."

10:18:22  3          Did I read that correct?

10:18:24  4   A.  You did, although you mentioned that this was while the

10:18:27  5   audit was going on, and this e-mail is sent on August 23rd.

10:18:32  6   The notes of the inspection say that the inspection began on

10:18:35  7   August 24th, so I don't know that this was while the audit was

10:18:39  8   underway at the Indianapolis distribution center.

10:18:43  9   Q.  Well, this says --

10:18:44 10   A.  Mr. Devlin's e-mail was sent in response to a request from

10:18:48 11   the DEA in connection with its inspection of the Indianapolis

10:18:54 12   distribution center.

10:18:54 13   Q.  Is it your testimony that just by pure coincidence they

10:19:01 14   promised to give the DEA the suspicious order monitoring

10:19:05 15   section and the SOP's by Wednesday, that has nothing to do with

10:19:10 16   the audit.

10:19:11 17          Is that your testimony?  You think that was a

10:19:15 18   coincidence on this date?

10:19:16 19   A.  I don't have corporate knowledge that it was associated

10:19:18 20   with the audit.

10:19:19 21   Q.  So things must have been -- moved pretty fast, right?

10:19:23 22   Because a few days later Amy Propatier is sending an e-mail to

10:19:33 23   Annette Lamoureux, dated 8-26 -2010.  She is attaching the DEA

10:19:39 24   suspicious -- or, excuse me, standard operating procedure dated

10:19:43 25   8-25-10.

**3839**

—————Vernazza  (By Video Deposition)—————

10:19:45  1          Is that true?  Do you see those dates?  Are those

10:19:50  2   dates correct?

10:19:50  3   A.   The date of the e-mail?

10:19:50  4   Q.   Yes.

10:19:50  5   A.   Is 8-26-10.

10:19:53  6   Q.   And she states, "Can you please post we added the

10:19:57  7   suspicious order monitoring?"

10:19:59  8          Do you see that, sir?

10:20:00  9   A.   I see that in the e-mail.

10:20:02  10  Q.   And this is the first time that the suspicious order

10:20:06  11  monitoring procedures have been added to the standard operating

10:20:12  12  procedures at CVS, August of 2010?

10:20:22  13  A.   I'm sorry.  I'm just going to take a moment to review this.

10:20:25  14  Q.   We're going to go through it, sir, in detail.

10:20:27  15  A.   To the best of my corporate knowledge at this point in time

10:20:30  16  it is consistent that this document reflects the first revision

10:20:39  17  to the prior draft that we were looking at before.  I do not

10:20:47  18  know whether or not it was done in connection with the DEA

10:20:50  19  inspection.

10:20:51  20  Q.   This idea that you don't understand this is related to the

10:20:54  21  DEA that was there for four days within a day of this.  Let's

10:21:01  22  look at -- look at Exhibit 40.  This is Mr. Mortelliti, again.

10:21:08  23  He's writing to agreeing Greg Brantley.

10:21:16  24          Do you know who he is?

10:21:17  25  A.   I don't.

HEATHER K. NEWMAN, RMR, CRR

**3840**

———Vernazza (By Video Deposition)———

10:21:18  1   Q.   Copying Mr. Devlin who is involved with these procedures;

10:21:20  2   correct?

10:21:26  3   A.   He would have been.

10:21:27  4   Q.   And sent 8-25-2010, subject, drug control -- excuse me --

10:21:32  5   control drug IRR SOP; correct?  And that's suspicious order

10:21:35  6   monitoring.  True?

10:21:43  7          Is that true?

10:21:43  8   A.   The IRR was a report that was generated in connection with

10:21:46  9   our suspicious order monitoring process during that time.

10:21:48  10  Q.   And the attachment is -- this says, "Importance high";

10:21:52  11  right?  It says it's high importance?

10:21:54  12  A.   Yes.

10:21:55  13  Q.   The audit's going on with the DEA, right, 8-25-2010.  True?

10:22:03  14  A.   That is correct, according to the notes from Mr. Dugger

10:22:10  15  that you showed me in Exhibit 32.

10:22:12  16  Q.   This says, "Attachments controlled drug IRR draft 3 doc."

10:22:12  17          Do you see that?

10:22:19  18  A.   I do.

10:22:21  19  Q.   It says, "Greg, this needs to be implemented ASAP."

10:22:27  20          What's the big hurry on this date if it isn't the DEA,

10:22:30  21  sir?  What's the big hurry?  This is -- you've been drafting

10:22:33  22  this since 2007.  It's now 2010.  The DEA is there.  They

10:22:44  23  incorporate this into the SOP's for the first time and he's

10:22:50  24  sending it out saying you need to implement this ASAP.  Explain

10:22:55  25  to me, what's the hurry.

—————Vernazza  (By Video Deposition)—————

10:22:57  1   A.  I don't have corporate knowledge that would answer that

10:22:59  2   question.

10:23:00  3   Q.  Before you I believe is Exhibit 31.  Let's start at the

10:23:05  4   bottom so we can go in chronological order, these e-mails.

10:23:10  5           This is dated -- the first e-mail is from

10:23:13  6   Mr. Mortelliti; correct?  The one on the bottom dated

10:23:20  7   September 1, 2010, 10:45 a.m.  True?

10:23:23  8   A.  I believe that's correct, yes.

10:23:24  9   Q.  And he's sending it out to Dugger and Humphries, true?

10:23:29  10  A.  That's correct.

10:23:35  11  Q.  And the subject is "DEA speaking points."

10:23:37  12          Do you see that?

10:23:37  13  A.  I do.

10:23:37  14  Q.  The DEA is still inspecting, according to the e-mail memo

10:23:41  15  we saw, they were still incoming on 9-1-2010.  True?

10:23:50  16  A.  According to the memo of Exhibit 32, and the DEA was on

10:23:55  17  site in the Indianapolis distribution center on September 1st,

10:23:58  18  yes.

10:23:58  19  Q.  This says, "Terrence, this is for the DEA.  The corrections

10:24:06  20  listed below have been updated.  It is okay to review this with

10:24:09  21  the agents."

10:24:09  22          And he's talking about DEA agents, is he not?

10:24:19  23  A.  I don't know exactly what Mr. Mortelliti meant when he

10:24:20  24  wrote this e-mail, although that's sensible reading of the

10:24:24  25  e-mail.

HEATHER K. NEWMAN, RMR, CRR

—————— Vernazza  (By Video Deposition) ——————

10:24:25  1   Q.  He is -- Mr. Mortelliti is telling these two gentlemen

10:24:36  2   about a PowerPoint, about speaking points to the DEA with

10:24:38  3   respect to the suspicious order monitoring procedures, is he

10:24:41  4   not?

10:24:48  5   A.  This appears to address speaking points that were put

10:24:50  6   together and Mr. Mortelliti indicates in the second e-mail for

10:25:02  7   the DEA agents if they come to your facilities.

10:25:03  8   Q.  Sir, let's go to the second e-mail, up above,

10:25:06  9   Mr. Mortelliti, "John, this is 7 minutes later, September 1,

10:25:13 10   2010, now it's to a larger group of folks at CVS, subject, DEA

10:25:17 11   speaking points.  Importance, high.

10:25:21 12         "Team, these are the final approved speaking points

10:25:28 13   for the DEA agents if they come to one of your facilities and

10:25:32 14   request suspicious monitoring."

10:25:39 15         He states next: "It is okay to share this document."

10:25:48 16   Look what he says next to these CVS folks that are going to be

10:25:51 17   interacting to the DEA.  He says next, "Please be sure your

10:25:54 18   team understands it.  It is -- understands it before

10:26:00 19   presenting."

10:26:01 20         He's telling them that because they don't know

10:26:03 21   anything about your suspicious order monitoring policies at

10:26:07 22   this point; correct?

10:26:09 23         He's saying, "Read it, understand it, before you

10:26:11 24   present it."  Isn't that what he says?

10:26:15 25         Sir, is that what he says?

Vernazza  (By Video Deposition)

10:26:16  1   A.   Could you repeat your question?

10:26:17  2   Q.   Does he say, "Please be sure your team understands it

10:26:21  3   before presenting?"

10:26:23  4            And he's talking about the PowerPoint on suspicious

10:26:27  5   monitoring.   True?   Is that true?

10:26:29  6   A.   I don't know exactly what Mr. Mortelliti is referring to.

10:26:34  7   He seems to be referring to in this e-mail the PowerPoint that

10:26:41  8   he was attaching.

10:26:41  9   Q.   He does not.   So he says, please be sure your team

10:26:44  10  understands it before presenting so it doesn't look like a prop

10:26:50  11  instead of a tool."   Is that what he says --

10:26:58  12  A.   He does.

10:27:00  13  Q.   -- he wants to make sure the suspicious order monitoring

10:27:04  14  policies look like a tool instead of a prop in the eyes of the

10:27:11  15  DEA; right?   Is that what he says?

10:27:16  16  A.   I do not have corporate knowledge that that's what

10:27:18  17  Mr. Mortelliti was saying.   He says in this e-mail, which I

10:27:25  18  understand, "so it doesn't look like a prop" --

10:27:28  19  Q.   Right.

10:27:28  20  A.   -- "instead of a tool."

10:27:29  21  Q.   Right.   And a tool is something you use; right?

10:27:31  22  A.   Right.

10:27:32  23  Q.   And a prop is something make believe on the set of a play;

10:27:35  24  right?   Is that right, sir?

10:27:37  25  A.   I don't know if that's the way that Mr. Mortelliti was

Vernazza  (By Video Deposition)

10:27:39 1  using the word there.

10:27:40 2  Q.  Well, what do you think?  Tool is something you use; right?

10:27:43 3  A.  A tool can be something you use.

10:27:44 4  Q.  A prop is something that's kind of make believe that's on

10:27:47 5  the stage of a play, right?  Isn't that a common understanding?

10:27:50 6  A.  I'm familiar with that usage of the word.

10:27:54 7  Q.  And if Mr. Mortelliti wants the people at the distribution

10:27:57 8  centers to create the impression that these policies are

10:28:03 9  actually a tool instead of a prop, he's asking these folks to

10:28:10 10  mislead the DEA; correct?

10:28:12 11  A.  I don't have knowledge that that's the case.

10:28:15 12  Q.  They've never seen or used these policies before.  They're

10:28:18 13  not a tool.  They've never been used; right?  They've never

10:28:21 14  been used at this point in time, sir, these policies have never

10:28:25 15  been used.  True?

10:28:27 16  A.  That's inconsistent with my understanding of the process

10:28:31 17  that was in place.  Mr. Mortelliti had been reviewing and

10:28:34 18  conducting due diligence on potentially suspicious orders at

10:28:43 19  this point in time for, as I understand it, more than a year.

10:28:44 20       If you look at what was marked as Exhibit 9 -- sir, I

10:28:50 21  need to refer to this document in order to answer your question

10:28:53 22  because this document speaks to the process of reviewing the

10:28:59 23  IRR report, moving in September of 2010 from being centrally

10:28:59 24  reviewed in the Lumberton distribution center.

10:28:59 25  Q.  This is --

**3845**

—————— Vernazza  (By Video Deposition) ——————

10:29:10  1    A.  As I understand it, in the document we looked at in

10:29:12  2    Exhibit 9, a review the IRR report being moved from primarily

10:29:21  3    performed of the central location in New Jersey.  And then it

10:29:25  4    says, "During the month of September 2010 the report will be

10:29:28  5    transitioned to each pharmacy DC and the following procedures

10:29:34  6    will apply."

10:29:34  7            The procedures that I understand Mr. Mortelliti to

10:29:39  8    have sent out in -- at the end of August were procedures to be

10:29:42  9    followed by the individual personnel who were performing those

10:29:49  10   reviews in or around that time in the individual DC's.  Prior

10:29:57  11   to that time Mr. Mortelliti had been conducting that review

10:30:00  12   himself at the Lumberton distribution center.

10:30:04  13   Q.  Let's look now -- now, let's look at the PowerPoint that

10:30:08  14   was given to folks at the distribution center for their

10:30:17  15   representations to the DEA.  All right?  It's Exhibit 31.  It's

10:30:23  16   titled "Suspicious Order Monitoring For PSE/Controlled Drugs,"

10:30:26  17   and it's dated August 27, 2010; correct?

10:30:29  18   A.  Yes.  I understand from talking to Mr. Mortelliti that this

10:30:32  19   was a document that he put together for the purposes of

10:30:35  20   training personnel in the individual distribution centers to in

10:30:39  21   some capacity take over some of the responsibilities that he

10:30:42  22   had been performing at the Lumberton distribution center.

10:30:44  23   Q.  And I would -- August 25, 2010.  Would this be the first

10:30:49  24   time that the effective, actually in-place standard operating

10:31:00  25   procedures would have had an operable in effect section on

Vernazza  (By Video Deposition)

10:31:05 1  suspicious order monitoring?

10:31:07 2  A.   As I said, the process for reviewing suspicious order

10:31:12 3  monitoring -- or, excuse me -- the suspicious order monitoring

10:31:16 4  process was in place prior to this document.  Based on my

10:31:23 5  corporate understanding -- corporate knowledge, it is my

10:31:25 6  understanding that this document reflects the first time in

10:31:29 7  which the draft component of the written document that speaks

10:31:37 8  to suspicious order monitoring was taken out of draft form.

10:31:44 9  Q.   All right.  And let me ask you again.  I want you to listen

10:31:47 10  to my question very carefully if you would, please.  I'm not

10:31:50 11  asking you what's in place, what isn't in place.  I'm very

10:31:52 12  simply asking: The standard operating procedures dated 8-25-10,

10:31:58 13  would this be the first time that the standard operating

10:32:02 14  procedures have in place the suspicious order monitoring

10:32:08 15  procedures that are actually being utilized?

10:32:14 16  A.   It was the company's procedure to review the IRR reports

10:32:21 17  prior to this time.  This is the first time that the written

10:32:30 18  policy and procedure to my knowledge was updated to reflect

10:32:30 19  that process.

10:32:33 20  Q.   And the IRR report, that is the report that would provide a

10:32:37 21  scoring with respect to an order for a controlled substance;

10:32:42 22  correct?

10:32:45 23  A.   The IRR report was generated based on a number of

10:32:52 24  algorithms and would eventually combine some of those factors

10:32:55 25  and attributes to produce a score.  That item would then be

Vernazza  (By Video Deposition)

10:33:03  1   subject to manual review, consulting additional resources as

10:33:08  2   appropriate.

10:33:10  3   Q.  So the IRR report -- that's all I want to talk about at

10:33:14  4   this point.  We'll go step by step.  The IRR report, then,

10:33:19  5   reflects the evaluation and the scoring of a specific order for

10:33:23  6   a controlled substance; right?

10:33:25  7   A.  The IRR report would include specific orders of controlled

10:33:33  8   substance that met the criteria for conclusion on the report.

10:33:36  9   Q.  The IRR report then, again, what makes the IRR report is

10:33:39  10  something that's being flagged for some reason is passed

10:33:45  11  through the algorithms.  It appears that this is an order that

10:33:48  12  might potentially be suspicious, so now it appears in the IRR

10:33:59  13  report; is that correct?

10:33:59  14  A.  That sounds consistent with my understanding.

10:34:01  15  Q.  If we go to the item review report, Paragraph 4, it states,

10:34:12  16  "Currently the item review report, IRR, for controlled drugs is

10:34:12  17  being reviewed in a central location in New Jersey."

10:34:15  18           Is that what it states?

10:34:16  19  A.  It does.

10:34:22  20  Q.  Where in New Jersey?

10:34:23  21  A.  My understanding is the Lumberton, New Jersey distribution

10:34:27  22  center where Mr. Mortelliti was based.

10:34:29  23  Q.  And can you tell me unwritten policies and procedures, what

10:34:33  24  were in place with respect to the required due diligence review

10:34:38  25  of a flagged order on the IRR from '09 to early '10?

Vernazza (By Video Deposition)

10:34:45  1   A.   I understand that Mr. Mortelliti's practice would have been

10:34:47  2   to review the report on a daily basis and to determine whether

10:34:56  3   items on the report warranted further review and due diligence

10:35:03  4   and conduct that review and due diligence as he deemed

10:35:07  5   appropriate.

10:35:08  6   Q.   Was Mr. Mortelliti stopping orders that were flagged in the

10:35:12  7   IRR prior to the due diligence in '09 into '10?

10:35:18  8   A.   From what I understand, based on my discussions with

10:35:21  9   Mr. Mortelliti, if he had an order that he was conducting

10:35:30 10   further due diligence on and had not yet reached a conclusion

10:35:34 11   that it wasn't suspicious, he would call or e-mail, typically

10:35:43 12   call, the distribution center in order to have that order held

10:35:48 13   while the further due diligence was being conducted, and after

10:35:56 14   making a determination that the order was not suspicious, tell

10:36:00 15   the distribution center that they could release the order.

10:36:04 16   Q.   In '09 and '10, did Mr. Mortelliti or any -- anyone at CVS,

10:36:14 17   identify, stop and report to the DEA a suspicious order at any

10:36:19 18   time?

10:36:19 19   A.   I'm not aware during that time period that Mr. Mortelliti

10:36:26 20   identified any orders that were deemed suspicious and reported

10:36:30 21   to the DEA.

10:36:35 22         MR. LANIER:   Your Honor, that concludes the offer from

10:36:37 23   the lawyer -- in-house lawyer Mark Vernazza.

10:36:45 24         Our next witness is via live video hook-up.  He is in

10:36:49 25   Dallas to testify where part of our team is as well and we need

———Vernazza  (By Video Deposition)———

10:36:54  1   probably the time to test --

10:36:57  2           THE COURT:  We'll take -- five.  We'll take our

10:37:00  3   midmorning break, ladies and gentlemen.  15 minutes, usual

10:37:04  4   admonitions and then we'll pick up with the next witness by

10:37:07  5   video.

10:37:17  6       (Jury excused from courtroom)

10:50:06  7       (Recess was taken from 10:37 a.m. till 10:53 a.m.)

10:54:35  8       (Jury returned to courtroom at 10:54 a.m.)

10:54:35  9           THE COURT:  Okay.  Please be seated, ladies and

10:54:37 10   gentlemen.

10:54:37 11           Mr. Lanier, you may proceed.

10:54:39 12           MR. LANIER:  Thank you, Your Honor.

10:54:40 13           We are calling Mr. Brad Nelson back to the stand.

10:54:46 14   Mr. Nelson testified by deposition in I believe the first week

10:54:52 15   of trial.  He is in Dallas, Texas, right now at his lawyer's

10:54:56 16   office, and we see him on the video hook-up.

10:55:01 17           And, Your Honor, we are ready to go when you are.

10:55:06 18           THE COURT:  Okay.  All set.

10:55:15 19           MR. LANIER:  We do not have a court reporter there,

10:55:17 20   Your Honor, so you'll need to administer the oath from here.

10:55:19 21           THE COURT:  Oh, right.  Thank you.

10:55:21 22           All right.  Good morning, Mr. Nelson.

10:55:25 23           Can you hear me all right?  Can you hear me okay?

10:55:28 24           THE WITNESS:  Yes, sir.

10:55:29 25           THE COURT:  Okay.  If you could raise your right hand,

—Nelson (Cross by Lanier)—

10:55:31  1   sir.

10:55:32  2           Do you swear or affirm that the testimony you are

10:55:35  3   about to give will be the truth, the whole truth, and nothing

10:55:37  4   but the truth under pain and penalty of perjury?

10:55:41  5           THE WITNESS:  I do.

10:55:42  6           THE COURT:  Thank you very much.

10:55:42  7                 CROSS-EXAMINATION OF BRAD NELSON

10:55:46  8   BY MR. LANIER:

10:55:46  9   Q.  Mr. Nelson, I assume you don't -- are you -- you're not

10:55:51 10   able to see me, are you?

10:55:54 11   A.  There's a small window, sir, where I can see you in the

10:55:57 12   video screen in the right.

10:55:58 13   Q.  Okay.  Good.  I didn't know if you'd be able to see me or

10:56:02 14   not.

10:56:02 15           I met you once before.  My name is Mark Lanier.  I

10:56:07 16   think the video screen is in part this, but I took your

10:56:09 17   deposition in this case; is that right?

10:56:13 18   A.  That is correct.

10:56:14 19   Q.  And I see you've got Ms. Knight next to you,

10:56:18 20   Camille Knight.  She is your lawyer, and you are with her there

10:56:20 21   in her Dallas office today; is that correct?

10:56:24 22   A.  That is correct.

10:56:25 23   Q.  All right.  Well, thank you for taking time out.  I know

10:56:27 24   that you've got a limited amount of time today.  I've got a

10:56:30 25   very short road for you.  My goal is to spend no more than

—————— Nelson (Cross by Lanier) ——————

10:56:35   1   two hours with you.  The road is what I've called reminders and

10:56:43   2   then what I'm calling policies and actions.

10:56:45   3            Do you see that, sir?

10:56:47   4   A.   I do.

10:56:48   5   Q.   Okay.  And the reminders is just to help the jury remember

10:56:51   6   over the course of three or four weeks now they've heard a lot

10:56:55   7   of different witnesses, and they need to remember who you are

10:56:57   8   to help plug in to what you've already said so I don't need to

10:57:01   9   walk back through it all.

10:57:02  10            Does that make sense?

10:57:04  11   A.   I understand.

10:57:05  12   Q.   And then do you also understand that just in the last

10:57:08  13   couple of weeks, certainly since your deposition I should say,

10:57:12  14   we've gotten some more documents that have your name on them

10:57:16  15   and that is why the Court has entitled me to put you back on

10:57:19  16   the stand to ask you questions that those documents have called

10:57:24  17   forth.

10:57:25  18            Does that make sense?

10:57:28  19   A.   That's the way I understand it.

10:57:29  20   Q.   And I'm not suggesting to you or the jury or to anybody

10:57:32  21   that His Honor certainly not, that you had done anything remiss

10:57:37  22   in our receiving those documents after your deposition.  I

10:57:43  23   don't think you were the one in control of giving us the

10:57:45  24   documents.  Is that fair to say?

10:57:47  25   A.   That would be accurate.

—Nelson (Cross by Lanier)—

10:57:51  1  Q.  All right.  So what I've done is I've taken the notes that

10:57:54  2  you and I made -- well, I made the notes -- in the deposition.

10:58:00  3  They've been edited slightly to reflect what we played in

10:58:04  4  court, but I want to make sure as part of the reminders that we

10:58:07  5  just remember who you are and the points that we covered the

10:58:10  6  first time you gave your testimony in this case.  All right?

10:58:17  7  A.  Yes.

10:58:17  8  Q.  So this is one of those sheets that we made.  Your Walmart

10:58:24  9  career, you made the point in your deposition your professional

10:58:27 10  life was more than your Walmart career, but your Walmart career

10:58:31 11  was from 1983 through 2017.

10:58:36 12          Is that still who you are?

10:58:40 13  A.  That is correct.

10:58:44 14  Q.  All right.  And then we talked about your job at Walmart.

10:58:45 15  And you had different jobs over the year -- over the years

10:58:52 16  plural, but I focus with you as your job as the senior manager

10:58:59 17  for controlled substances for regulatory affairs.

10:59:04 18          Do you remember that?

10:59:04 19  A.  That is one of the jobs I held.

10:59:06 20  Q.  And in that regard I talked to you a lot.  In fact, I tried

10:59:09 21  to keep the exhibit that we used in your deposition about your

10:59:14 22  application for that job.

10:59:20 23          Do you recall those discussions we had?

10:59:21 24  A.  We had many discussions about the application process.

10:59:24 25  Q.  We did.  I went over it probably till you were having

HEATHER K. NEWMAN, RMR, CRR

———— Nelson (Cross by Lanier) ————

10:59:28  1   nightmares afterwards for weeks.

10:59:31  2          But my big question to you was whether or not you were

10:59:34  3   set up to fail because of your qualifications.  And I don't

10:59:38  4   mean to insinuate that you have failed, but I just question

10:59:43  5   whether or not the job as set out by Walmart was one that you

10:59:46  6   were the best fit for.

10:59:48  7          Do you remember those discussions?

10:59:50  8   A.  I remember those questions, yes.

10:59:52  9   Q.  And that's why we looked at what has been marked as

10:59:58 10   Plaintiffs' Exhibit 7174, and it was your job detail for the

11:00:08 11   job you applied for and ultimately won.

11:00:09 12          Do you remember that?

11:00:13 13   A.  I do remember that document.

11:00:14 14   Q.  And I've got Ms. Fleming passing it out to the opposing

11:00:24 15   counsel, so just bear with me for one moment while they get a

11:00:26 16   copy of it.

11:00:29 17          Thank you, Maria.

11:00:31 18          And in that, for the job requirements -- by the way,

11:00:35 19   you didn't write these job requirements, did you?

11:00:39 20   A.  No, sir.

11:00:40 21   Q.  This was done by the company and you just applied for the

11:00:45 22   job; right?

11:00:47 23   A.  I applied for the job, but I do not know who wrote that.

11:00:53 24   Q.  So the minimum qualifications by the company we're almost

11:00:56 25   through reviewing here, but it did not require that you had any

-------Nelson (Cross by Lanier)-------

11:01:00  1  DEA training.  True?

11:01:03  2  A.  I don't see that listed, sir.

11:01:06  3  Q.  Right.  And they didn't list here any kind of legal

11:01:10  4  training that you needed as well, did they?

11:01:13  5  A.  No, I don't see that listed either.

11:01:15  6  Q.  So you were put in charge of, in essence, a legal

11:01:20  7  compliance in part without legal training and DEA training.

11:01:25  8       Is that fair to say?

11:01:28  9       MR. MAJORAS:  Objection.

11:01:29  10       THE COURT:  Overruled.

11:01:33  11       THE WITNESS:  I don't know if I was put in charge of

11:01:35  12  that.  It was part of my responsibility.

11:01:38  13  BY MR. LANIER:

11:01:38  14  Q.  And -- okay.  That's fair.  That's fair.  That's fair.

11:01:43  15       I also -- in the process we talked -- we kind of put a

11:01:51  16  timeline together that I may go back and reference shortly, but

11:01:54  17  we looked at some of the requirements under the law that fell

11:01:57  18  under your umbrella of responsibility.

11:02:01  19       Do you remember that?

11:02:05  20  A.  We talked about many requirements.

11:02:06  21  Q.  Yes, sir.  Exactly.  We talked about the legal requirement

11:02:11  22  for corresponding responsibility.  We talked about professional

11:02:16  23  practice, and we talked about effective controls and

11:02:23  24  procedures, both with the federal government and with Ohio

11:02:26  25  regulations.

---

Nelson (Cross by Lanier)

11:02:26  1        You remember all of that?

11:02:28  2   A.   I do remember some of that, yes, sir.

11:02:29  3   Q.   Okay.  Thank you, sir.

11:02:31  4        And with that stroll down reminder lane, I next want

11:02:37  5   to just talk about policies and actions.  And I think these

11:02:42  6   documents that I'm showing you are all new documents that I did

11:02:46  7   not have at the time of your deposition, but they do echo a

11:02:54  8   theme of other documents that we looked at.  Okay?

11:02:59  9   A.   Okay.

11:03:01 10   Q.   In the timeline that we were working on, if I put it back

11:03:11 11   up, you were taking your new job and by January of 2013 you

11:03:19 12   were in that new job.  Is that fair to say?

11:03:24 13   A.   I was in that new job in January of 2011.

11:03:28 14   Q.   Okay.  So you had already been in that job -- oh, that's

11:03:34 15   why we had -- you had already been e-mailing about the CVS

11:03:37 16   problems on red flags; correct?

11:03:43 17   A.   Certainly we had some e-mails sent during the first

11:03:46 18   three years -- the first two years of my job, yes.

11:03:48 19   Q.   And you were there when the *Holiday* decision came out in

11:03:52 20   the federal register; right?

11:03:55 21   A.   Yes.  You reminded me it was called the *Holiday*.

11:03:58 22   Q.   And that was something that was notable, I mean, that was

11:04:01 23   something that brought to your attention certain obligations if

11:04:09 24   you didn't already know them; right?

11:04:12 25   A.   Is certainly brought up information that happened to that

---

HEATHER K. NEWMAN, RMR, CRR

—— Nelson (Cross by Lanier) ——

11:04:15  1    pharmacy or that chain.

11:04:16  2    Q.  And then in the timeline of your deposition, I had as

11:04:22  3    March 26th, 2013, this first quotation that "No blanket

11:04:27  4    refusals are allowed by boards of pharmacy."

11:04:31  5         Do you remember that?

11:04:34  6    A.  I don't know what the date is about, but that information

11:04:37  7    was consistent with Walmart policy from the time I took the job

11:04:40  8    to that point.

11:04:40  9    Q.  Yes.  And that's the key that I want to emphasize, what you

11:04:45  10   are here doing is expressing Walmart policy; is that right?

11:04:54  11   A.  I'm speaking about the policy that was in place when I was

11:04:56  12   in that role.

11:04:58  13   Q.  Right.  And that's a Walmart policy that was in place;

11:05:02  14   correct?

11:05:03  15   A.  That is correct.

11:05:05  16   Q.  Your job was to see that the company's policies were taught

11:05:11  17   and carried out.  Is that fair?

11:05:16  18   A.  Yeah, my responsibility in the process of policy was

11:05:19  19   communication and training.

11:05:20  20   Q.  In other words, the policies would be set by Walmart, you

11:05:25  21   were in charge of training people to make sure they followed

11:05:28  22   those policies and communicating those policies to the people.

11:05:32  23   Fair?

11:05:34  24   A.  My job was to communicate the policies and train them about

11:05:37  25   the policies.  It was not to enforce that they were followed.

―Nelson (Cross by Lanier)―

11:05:41  1   Q.  Got it.  Thank you.

11:05:44  2        Now, in that regard, you'll recall in your deposition

11:05:51  3   I kept going back to the way you would cut and paste the same

11:06:01  4   policy language into so many of your replies when people would

11:06:07  5   question you about how to do things.  Remember?

11:06:09  6   A.  Yes, sir, but I also want to remind you that it was not

11:06:12  7   just me sending out that information, my colleagues were also

11:06:16  8   sending that same information.

11:06:17  9   Q.  Right.  You had two people that worked with you in that

11:06:20 10   section; is that right?

11:06:24 11   A.  We both had -- all three of us had the same job

11:06:29 12   responsibilities, yes, sir.  They didn't work with me, they had

11:06:31 13   the same -- a different geographical remember.

11:06:34 14   Q.  But again -- I apologize.  I've got to be very careful not

11:06:37 15   to interrupt you, especially on video because it will mess

11:06:40 16   everything up and you won't know it.  So I'll be careful to

11:06:44 17   listen better.

11:06:44 18        But again, all three of you wore, I won't say the same

11:06:50 19   handcuffs, but all three of your hands were tied --

11:06:53 20        MR. MAJORAS:  Objection, Your Honor.

11:06:54 21   Q.  -- about whatever Walmart policy was.

11:06:56 22        THE COURT:  Yeah.  Sustained.  Sustained.

11:06:58 23   BY MR. LANIER:

11:06:58 24   Q.  Okay.  All three of you had to follow Walmart policy,

11:07:00 25   didn't you?

Nelson (Cross by Lanier)

11:07:01  1    A.  Yes, sir.

11:07:02  2    Q.  Okay.  So when you say they were in the same job as you,

11:07:06  3    they're also following Walmart policy, they're also training

11:07:10  4    others in how to follow that policy; is that right?

11:07:15  5    A.  I can't speak for the actual performance, but that is what

11:07:20  6    we were instructed to do, yes.

11:07:21  7    Q.  Okay.  In that regard, sir, Walmart had a policy of not

11:07:28  8    allowing a blanket refusal to fill at this time; right?

11:07:34  9    A.  That is the information that was being communicated at that

11:07:37  10   time.

11:07:37  11   Q.  And you were told that that's because the boards of

11:07:41  12   pharmacy would not allow it, weren't you?

11:07:45  13   A.  I don't know that I was told that, but that was the

11:07:47  14   guidance that we were being given.

11:07:48  15   Q.  All right.  But at least for your purposes, because I took

11:07:54  16   you to task on this and said, where did a board of pharmacy

11:07:57  17   ever say it to you, recognizing there are 50 boards of

11:08:02  18   pharmacies among the 50 states; right?

11:08:06  19   A.  That's correct.

11:08:07  20   Q.  And, so, within the framework of that, my question to you

11:08:12  21   was repeatedly, where did you get it from, and you got it from

11:08:16  22   others at Walmart, it was Walmart policy and understanding;

11:08:20  23   right?

11:08:22  24   A.  That is correct.

11:08:25  25   Q.  And, so, for example, I would like you to -- do you have a

———Nelson (Cross by Lanier)———

11:08:31  1    set -- I sent Rachel and Jessie there with a set of exhibits.

11:08:37  2              Do you have Plaintiffs' Exhibit 14643?

11:08:40  3              And, Ms. Fleming, if you would pass that out.

11:08:42  4              I've got it, I can put it on this overscreen so that

11:08:46  5    you can see it if you don't have ready access to it, sir.

11:08:53  6    A.   14643?

11:08:55  7    Q.   Yes, sir.  It's an e-mail from you that's dated

11:08:58  8    January 28th of 2013.  So we're back in this time period of

11:09:08  9    that Walmart policy.

11:09:16  10             Have you had a chance to grab that, sir, or can you

11:09:17  11   see it on the screen?

11:09:18  12   A.   Yes, sir, I have it.  There are several pages of that for

11:09:20  13   me.  Is it multiple copies, is that what I have?

11:09:23  14   Q.   I don't think you've got multiple copies.  I think what

11:09:26  15   happens is you've got the first page reference in the e-mail is

11:09:33  16   at the bottom of Page 2, and this is before you get added to

11:09:37  17   the e-mail chain.  It's from John -- how do I say -- do I say

11:09:42  18   his name Loranger?

11:09:45  19   A.   I believe.

11:09:46  20   Q.   To John Smasal and it's on Halloween, 2012.

11:09:57  21             Do you see that?

11:10:06  22   A.   Yes, sir.

11:10:06  23   Q.   I found that.

11:10:08  24             Yeah.  So this says that all of the registered

11:10:12  25   pharmacists are using the PMP website.

—————— Nelson (Cross by Lanier) ——————

11:10:18  1            What do you understand PMP to stand for?

11:10:27  2    A.   Prescription monitoring program.

11:10:28  3    Q.   And in Ohio it's called the OARRS program, but this is just

11:10:35  4    a common abbreviation used across the industry for those

11:10:39  5    programs; right?

11:10:40  6    A.   I believe that's accurate.

11:10:41  7    Q.   All right.  All registered pharmacists are using the

11:10:46  8    prescription monitoring program for all oxy 30 and any other

11:10:54  9    prescription fills that they deem necessary based on the

11:10:55 10    judgment.

11:10:56 11            Do you see that?

11:10:59 12    A.   That is what the document says.

11:11:08 13    Q.   And then it says -- well, they are noting there finding on

11:11:11 14    the prescription and in the patient notes as well, and it just

11:11:15 15    continues to look at a situation where ultimately it says, "In

11:11:20 16    speaking to the prescription staff, they do have concerns about

11:11:23 17    the prescribing practices of a few doctors."

11:11:27 18            Do you see that?

11:11:30 19    A.   I see what's highlighted, yes.

11:11:32 20    Q.   And the reply from John Loranger, up above, or the next

11:11:40 21    e-mail from John Loranger, is actually January 25th on this

11:11:44 22    chain.  So we're a couple of months later when he sends a

11:11:47 23    reply -- sends a follow up.

11:11:51 24            Do you see?  Are you able to see it, sir?

11:12:00 25    A.   I do see it.

─────Nelson (Cross by Lanier)─────

11:12:01  1  Q.  And in that follow up he says, "The grants pass

11:12:06  2  prescription is insisting that Dr. Linda Picker Johnson is like

11:12:10  3  a revolving door of scripts.  They're establishing patient

11:12:15  4  prescriber relations and they all seem to meet the

11:12:19  5  requirements, it's just the volume of narcotic scripts that

11:12:24  6  come from this office that is astonishing."

11:12:27  7          Do you see that, sir?

11:12:32  8  A.  I see what's written there, yes, sir.

11:12:33  9  Q.  And then the reply is, "This is one of the two stores that

11:12:38  10  we had concerns about the quantity of C-II."

11:12:45  11          Those are Schedule II controlled drugs; right?

11:12:48  12  A.  Yes, sir.

11:12:50  13  Q.  That would include Oxycontin and oxycodone, and then I

11:12:56  14  think October of 2014, hydro -- all the hydro was moved from

11:13:03  15  Schedule III to II, but at this point in time hydro is

11:13:07  16  Schedule III; correct?

11:13:08  17  A.  I believe that's accurate.

11:13:09  18  Q.  "This is one of the two stores we had concerns about the

11:13:12  19  quantity of C-II prescriptions being processed.  Can some

11:13:18  20  analysis be done to get an understanding of controlled

11:13:22  21  substance prescriptions coming from this doctor?  If the

11:13:27  22  pharmacists are feeling uncomfortable with this doctor's

11:13:30  23  prescribing habits, I will ask for your advice how to best

11:13:34  24  handle."

11:13:34  25          Do you see that?

HEATHER K. NEWMAN, RMR, CRR

—————— Nelson (Cross by Lanier) ——————

11:13:35  1   A.   That's what the document says.

11:13:36  2   Q.   All right.  And then we move to the front page where

11:13:38  3   ultimately you get called in on this and you send an e-mail out

11:13:44  4   about a week later.

11:13:46  5        Do you see that?  Are you able to see it?

11:13:55  6   A.   I see it.

11:13:57  7   Q.   You said, "Gentlemen, I hope you had a great weekend.  This

11:14:03  8   issue of heavy writers of C-II and other controlled substance

11:14:08  9   prescriptions comes up frequently across our trade area.  It's

11:14:11  10  impossible for any of us here in the home office, or for you as

11:14:14  11  regional and market directors, to make a determination of the

11:14:19  12  validity of these prescriptions."

11:14:21  13       Do you see where I'm reading?

11:14:24  14  A.   I see what you've highlighted, yes, sir.

11:14:28  15  Q.   "The state boards of pharmacies grant the pharmacists

11:14:32  16  professional judgment that can be exercised when the controlled

11:14:35  17  substance prescription is presented.  We have multiple POMs

11:14:40  18  available to assist the pharmacists in making such decisions."

11:14:43  19       Do you see that as well?

11:14:46  20  A.   I see what you've highlighted, sir.

11:14:48  21  Q.   Do you remember what POM stands for?

11:14:54  22  A.   Pharmacy operations manual.

11:14:57  23  Q.   And that's something that was -- the Walmart set of

11:15:02  24  policies; right?

11:15:07  25  A.   Walmart set of policies, yes, sir.

Nelson (Cross by Lanier)

11:15:11　1　Q.　You put in here this sentence that we see over and over,

11:15:17　2　they are not allowed to blanket refuse prescriptions from a

11:15:23　3　prescriber's office.  That authority is granted to only the

11:15:28　4　state medical board who will suspend a prescriber's license if

11:15:32　5　they believe the prescriber is a threat to public safety.

11:15:38　6　　　　　Did I read that correctly?

11:15:39　7　A.　That's what the document says.

11:15:39　8　Q.　And this is what you were told was Walmart policy; correct?

11:15:47　9　A.　That was my understanding of the policy.

11:15:49　10　Q.　And the reason you repeat this mantra over and over and

11:15:54　11　over again is because you're putting out there what Walmart

11:16:00　12　policy is; right?

11:16:02　13　A.　That was my understanding at the time, but again, I want to

11:16:04　14　remind you I'm not the only one sending that information out.

11:16:08　15　Q.　Right.  It's not as if you misunderstood Walmart policy;

11:16:12　16　right?

11:16:13　17　A.　That is correct.

11:16:14　18　Q.　So this is a blanket that I have drawn, and a blanket is

11:16:25　19　something that covers up other things; right?

11:16:35　20　A.　That may be your definition, sir.

11:16:37　21　Q.　Well, I mean, it's pretty decent.  You're in a -- you live

11:16:41　22　in Arkansas, don't you?

11:16:45　23　A.　Yes, sir.

11:16:46　24　Q.　Don't you all also call blankets covers?

11:16:56　25　A.　I don't know if it would be called a blanket.

─────── Nelson (Cross by Lanier) ───────

11:16:59  1  Q.  Doesn't matter.  My point is a blanket refusal to fill

11:17:04  2  means we are not going to fill any prescriptions from that

11:17:10  3  doctor; right?

11:17:15  4  A.  That is the definition.

11:17:22  5  Q.  So in a sense it says, based on our information, this is

11:17:25  6  not a doctor that we're comfortable filling prescriptions for

11:17:31  7  so we will issue a blanket refusal to fill; right?

11:17:40  8  A.  Again, we didn't have a blanket to refuse to fill policy or

11:17:43  9  program in place so I don't know what actually would have done.

11:17:45  10  Q.  And I understand that.  I'm just making sure we understand

11:17:47  11  that when you say they're not allowed to blanket refuse

11:17:50  12  prescriptions that's because your understanding of Walmart

11:17:55  13  policy and that of your cohorts was that it had to be done on a

11:18:00  14  prescription-by-prescription basis, it couldn't be done as

11:18:04  15  blanket for a full cover; right?

11:18:07  16  A.  That was the guidance that was being given at the time,

11:18:09  17  yes, sir.

11:18:09  18  Q.  And that guidance that was given at the time was given to

11:18:14  19  you and you were then passing it on to others.  Fair?

11:18:18  20  A.  I want to make it clear, again, that I'm not the only one

11:18:22  21  that had that information.  My colleagues did this as well.

11:18:24  22  Q.  And I don't mean to insinuate that you were the only one.

11:18:30  23  You're just the only one under oath right now, so you're the

11:18:33  24  only one I can ask about.  Okay?

11:18:36  25  A.  I understand.

—Nelson (Cross by Lanier)—

11:18:37  1   Q.  And you can continue -- I'm not trying to cut you off from

11:18:40  2   saying, hey, others were teaching the same policy.  I'm not

11:18:44  3   trying to cut you off.  I just want you to understand I'm not

11:18:47  4   insinuating anything with my questions.  Okay?

11:18:50  5   A.  I understand.

11:18:51  6   Q.  All right.  Great.

11:18:52  7         Now, as a result, look at the next month.  This is

11:18:58  8   Plaintiffs' Exhibit 26892.

11:18:59  9         Ms. Fleming, if you could give opposing counsel, and

11:19:04  10  Mr. Nelson, if you'd look, it's 26892.

11:19:28  11  A.  Okay.  I have it.

11:19:29  12  Q.  Got it?

11:19:30  13        Let's start this one.  This is a 4-page document.  The

11:19:35  14  first e-mail is on the third page, the bottom half, and that's

11:19:39  15  where we'll start, and we'll bring ourselves up current from

11:19:44  16  there.  Okay?

11:19:45  17  A.  Okay.

11:19:45  18  Q.  Now, it starts out February 21st of 2013, and again, you're

11:19:50  19  not on the initial e-mail.  It hasn't bumped to your level yet.

11:19:55  20  You get on it in a little bit.  You see?

11:19:59  21  A.  I see the first portion, yes.

11:20:02  22  Q.  It begins, "Hello, I'm sending this e-mail out because I

11:20:08  23  have great concern for a situation that could potentially

11:20:11  24  become bad.  The wellness clinic of Roland is continually write

11:20:21  25  prescription for large numbers of multiple narcotic pain

———— Nelson (Cross by Lanier) ————

11:20:23  1   relievers."

11:20:25  2           Do you see that, sir?

11:20:26  3   A.   That's what the document says.

11:20:27  4   Q.   Other chain and independent pharmacies in the area have

11:20:34  5   stopped accepting prescriptions from this clinic.  Now, the

11:20:41  6   sentence isn't over, but I want to pause there.

11:20:44  7           Do you see where I've paused?

11:20:45  8   A.   I see what you've underlined.

11:20:50  9   Q.   So this sentence is saying that others, unspecified chain

11:20:54  10  and independent pharmacies, but others have a blanket refusal

11:20:58  11  to fill; right?

11:21:04  12  A.   I don't know if they have a blanket refusal to fill or not,

11:21:07  13  sir.  It just says that these stores, according to this

11:21:10  14  pharmacy in that area, have stopped filling prescriptions for

11:21:12  15  that clinic.

11:21:13  16  Q.   All right.  Then I'm going to put that where I've written,

11:21:15  17  "Others have a blanket refusal to fill," I'm going to put

11:21:19  18  Mark Lanier on that because that's me saying it, but I'd like

11:21:22  19  to leave it on there because I want to challenge you a little

11:21:25  20  on it.

11:21:25  21          What would you, using Walmart terminology, what would

11:21:29  22  you call it if a chain or an independent pharmacy said we will

11:21:34  23  not accept any prescriptions from this clinic, period?

11:21:42  24          What would you call that?

11:21:43  25  A.   When you -- when you say you're not going to fill

Nelson (Cross by Lanier)

11:21:47  1   prescriptions from a clinic, I'm not real sure what that is

11:21:49  2   because we've been talking about blanket refusal for particular

11:21:53  3   doctors.  I don't know what a clinic means.

11:21:55  4   Q.  Well, in that situation, let's say that the clinic has one

11:21:58  5   doctor.  Would you call it a blanket refusal to fill from that

11:22:02  6   one doctor?

11:22:03  7   A.  If that -- if the document stated that I would, yes.

11:22:07  8   Q.  Would you -- what -- define for us, please, what a blanket

11:22:12  9   refusal to fill is in your terminology, Walmart's terminology.

11:22:18 10   A.  I can't speak to Walmart's terminology because there was

11:22:20 11   not a blanket authorization -- excuse me, a blanket refusal to

11:22:25 12   fill program in place when I was there, so I can't answer that

11:22:30 13   question on Walmart's behalf.

11:22:31 14   Q.  Sir, you've already -- we just looked at a document where

11:22:35 15   you specifically said that you're not allowed to issue a

11:22:41 16   blanket refusal on prescriptions.  Remember?

11:22:50 17   A.  That's true.

11:22:51 18   Q.  So that was your language.  What is a blanket refuse of

11:22:54 19   prescriptions?

11:22:56 20   A.  Again, I'll remind you, Mr. Lanier, that's not my language,

11:22:59 21   that's what Walmart guidance was at the time.

11:23:02 22   Q.  But you put it in there.  You said it, sir.  Plaintiffs'

11:23:09 23   Exhibit 14643 is your e-mail.

11:23:11 24        You're Brad Nelson, aren't you?

11:23:16 25   A.  I am, sir.

———Nelson (Cross by Lanier)———

11:23:16  1   Q.  And you said, "They are not allowed to blanket refuse

11:23:24  2   prescription from a prescriber's office."

11:23:25  3          Do you see that?

11:23:32  4   A.  That is what that document says.

11:23:32  5   Q.  That's what you said in that document, isn't it?

11:23:36  6   A.  I believe that information comes directly from the POM sir.

11:23:41  7   Q.  No, that wasn't my question, sir.  I said, that's what you

11:23:46  8   said in that document, isn't it?

11:23:46  9   A.  That's the information the POM said that I communicated in

11:23:50  10  this document, yes, sir.

11:23:51  11  Q.  In other words, yes, Mr. Lanier, that's what I said in the

11:23:55  12  document, I got it from Walmart, right?

11:24:02  13         MR. MAJORAS:  Objection.  Badgering.

11:24:03  14         THE COURT:  Overruled.  Overruled.

11:24:05  15         THE WITNESS:  Again, it looks like that information

11:24:09  16  came from the POM, and I put it in this e-mail.

11:24:11  17  BY MR. LANIER:

11:24:12  18  Q.  So when you said they are not allowed to blanket refuse

11:24:15  19  prescription from a prescriber's office, what did you mean?

11:24:23  20  A.  What the document states, they're not allowed to choose not

11:24:26  21  to fill prescriptions from a prescriber.

11:24:31  22  Q.  What -- but I'm asking you, when does it mean to blanket

11:24:37  23  refuse prescriptions from a prescriber's office?

11:24:46  24  A.  It would mean not to fill prescriptions for that

11:24:48  25  prescriber.

———— Nelson (Cross by Lanier) ————

11:24:49  1  Q.  I'm sorry, from that what?

11:24:51  2  A.  From that prescriber.

11:24:53  3  Q.  But you said from his office.  That would be like his

11:24:56  4  clinic.

11:24:58  5  A.  I would assume most doctors work out of an office, sir.

11:25:02  6  Q.  All right.  So let's go back to this e-mail.  "Other chain

11:25:07  7  and independent pharmacy in the area have stopped accepting

11:25:11  8  prescriptions from this clinic."

11:25:14  9       Do you see that?

11:25:16  10  A.  That's what the document says.

11:25:18  11  Q.  "Which is causing them to funnel in to our Walmart stores."

11:25:25  12       Y'all have become the funnel for these people.  Do you

11:25:29  13  see that?

11:25:30  14  A.  I see that that's that pharmacist's opinion.

11:25:38  15  Q.  "Although a rise in business is good, this isn't the type

11:25:41  16  of business we want.  A high percentage of these customers seem

11:25:44  17  suspicious and sometimes even lie about being short of

11:25:48  18  medication wasting our time having to check video on things.

11:25:51  19  We clearly double count and back count.  They also flood our

11:25:55  20  phone lines daily asking if we have sufficient quantities of

11:26:00  21  oxy, roxy such."

11:26:02  22       Do you see that?

11:26:08  23  A.  That is what the document says.

11:26:09  24  Q.  "Also, with the recent actions against the Walgreens

11:26:13  25  pharmacies in Florida, I, along with our colleagues" -- then it

HEATHER K. NEWMAN, RMR, CRR

—— Nelson (Cross by Lanier) ——

11:26:17  1   names four others.

11:26:18  2         Do you see that?

11:26:20  3   A.  That's what it says.

11:26:20  4   Q.  -- "feel that we need to stop accepting prescriptions from

11:26:24  5   this clinic."

11:26:28  6         Do you see that?

11:26:33  7   A.  Again, that's what it says.

11:26:34  8   Q.  The pharmacists in these Walgreens stores have been called

11:26:37  9   in front of the DEA to be questioned on why they felt there's a

11:26:40  10  legitimate medical need for such high quantities and multiple

11:26:43  11  prescriptions for these drugs.

11:26:45  12        Are you still tracking with me?

11:26:47  13  A.  That's what the document says.

11:26:49  14  Q.  And then the document's got all capital letters, "There is

11:26:53  15  not (other than feeding addiction and diversion), not a single

11:27:03  16  one of us ever feel comfortable about filling these

11:27:06  17  prescriptions, and if questioned, we would not be able to

11:27:10  18  justify this type of prescribing."

11:27:15  19        Do you see that, sir?

11:27:22  20  A.  That is what the document says.

11:27:22  21  Q.  "We continue to fill them because if we call to verify

11:27:25  22  doctor/patient relationship, they tell us bogus information."

11:27:30  23        Do you see that as well?

11:27:32  24  A.  That's what it says.

11:27:33  25  Q.  "At first, they would not even verify the relationship

—————— Nelson (Cross by Lanier) ——————

11:27:40  1  stating it was a HIPAA breach."

11:27:43  2         You know what HIPAA is, don't you?

11:27:45  3  A.  Yes, sir.

11:27:46  4  Q.  It's a requirement to keep confidential certain patient

11:27:50  5  identification information; right?

11:27:53  6  A.  That is one portion of it, yes, sir.

11:27:55  7  Q.  "We stopped filling the oxy 30 due to this and they

11:27:59  8  suddenly changed their tune about providing us information, and

11:28:03  9  we can't possibly fill out forms for when we deny each of these

11:28:07 10  patients."

11:28:08 11         Do you see that?

11:28:11 12  A.  That's what the document says.

11:28:12 13  Q.  Because Walmart policy was if you're going to deny it, you

11:28:14 14  have to fill out this long form; right?

11:28:18 15  A.  I don't know about a long form, but we asked them to fill

11:28:22 16  out a refuse to fill.

11:28:23 17  Q.  If you'll look at the end of her e-mail on the next page,

11:28:27 18  I've highlighted this paragraph, "I think if we continue to do

11:28:32 19  this we're going to be in serious trouble and quickly trigger

11:28:36 20  an investigation.  We don't want to continue filling from this

11:28:39 21  clinic.  Other pharmacies are stopping, and I feel it's

11:28:42 22  imperative with follow suit.  It will look bad if we're the

11:28:45 23  only -- if we are the ones allowing these drugs to be abused or

11:28:50 24  even on the street."

11:28:52 25         Did you see that?

——————Nelson (Cross by Lanier)——————

11:28:55  1   A.   That's what the document says.

11:28:56  2   Q.   And then this document gets sent to you with, "Brad, can

11:29:02  3   you give us some advice with this situation, please?"

11:29:05  4          Do you see that as well?

11:29:08  5   A.   I do see that.

11:29:10  6   Q.   And here is where you step into the picture and you send an

11:29:18  7   e-mail out February 22nd.

11:29:22  8          Do you see that e-mail?  It's Page 1.

11:29:29  9          Well, before we do that, let's go to Page 2 because

11:29:32 10   you've actually e-mailed previously.  Look at Page 2.

11:29:37 11          You said, "Here's a document we've used in the past to

11:29:41 12   assist stores and clubs when they're faced with fraudulent or

11:29:44 13   non-legitimate prescriptions being passed in their communities.

11:29:49 14   Feel free to use this and send to your market directors.  This

11:29:53 15   is in pdf format, so I think they can send it directly to their

11:29:59 16   stores for guidance on how to handle fraudulent prescriptions

11:30:02 17   or suspected forgeries.  State boards of pharmacy do not allow

11:30:07 18   for blanket refusals of all prescriptions from a prescriber.

11:30:13 19   They do allow the pharmacists to exercise their professional

11:30:16 20   judgment for individual prescriptions."

11:30:19 21          Do you see that?

11:30:22 22   A.   Yes, sir.

11:30:23 23   Q.   So when you got this e-mail for your advice on how others

11:30:29 24   have stopped accepting prescriptions from this clinic, of how

11:30:37 25   Walmart seems to be the only one that's doing it, you write

————Nelson (Cross by Lanier)————

11:30:40  1    back and say, we're not allowed to do that even though others

11:30:47  2    have?

11:30:52  3    A.   That's what the document says.

11:30:54  4    Q.   But you even here say this is -- here's some -- a pdf on

11:30:59  5    how to handle fraudulent prescriptions or suspected forgeries.

11:31:02  6    That wasn't the problem here.  These weren't fraudulent, they

11:31:06  7    weren't forgeries.  They were bad; right?

11:31:13  8    A.   In this pharmacist's opinion, yes, sir, they were.

11:31:16  9    Q.   In fact, you got a reply e-mail that said, "Brad, the thing

11:31:21 10    is, these aren't fraudulent or forged prescriptions.  The

11:31:25 11    clinic is very much real and is prescribing these.  But

11:31:31 12    professionally as a pharmacist the only reason these high

11:31:34 13    quantities would be needed are for addiction or diversion.  I

11:31:40 14    could not justify a patient need for these medications if

11:31:43 15    questioned in court or by the DEA.

11:31:48 16          "Also, I did fill out web forms last summer regarding

11:31:53 17    some fraudulent prescriptions from some other sources other

11:31:56 18    than this clinic.  I think I even have them on file in my

11:32:00 19    refusal fraudulent fill folder, along with the doctor -- some

11:32:05 20    doctor's statements.  It concerns me you didn't get these."

11:32:09 21          Do you see that?

11:32:11 22    A.   That's what that document says.

11:32:13 23    Q.   And she's referencing your comment in the earlier e-mail

11:32:16 24    that "In the two years since this pharmacy operation manual

11:32:20 25    section was introduced, Store 388 has not submitted any refusal

—————Nelson (Cross by Lanier)—————

11:32:26  1  to fill or fraudulent activity web forms, therefore, its DEA

11:32:30  2  has not been notified of any non-legitimate prescription

11:32:32  3  activity in the area."

11:32:35  4          She says, "Well, I've sent them."

11:32:41  5          Do you see that?

11:32:42  6  A.  I see what she says in the e-mail, yes, sir.

11:32:45  7  Q.  And then you reply, and you say, "Leann, if you refuse to

11:32:52  8  fill these prescriptions, then this pharmacy operation manual

11:32:56  9  section applies and the web form should completed.  If your

11:33:02  10  refusal to fill web forms were sent from Store 388, then there

11:33:06  11  may have been an error on the form which prevented the form

11:33:09  12  prosecute being submitted.  All fields have to be completed for

11:33:14  13  the web form to be transmitted."

11:33:20  14          Is that right?

11:33:21  15  A.  That is correct, sir.

11:33:21  16  Q.  So the pharmacist can be filling out a form and submitting

11:33:25  17  a form of a refusal to fill to Walmart, and if they left

11:33:30  18  anything blank and didn't understand that they needed to fill

11:33:33  19  everything in, it just doesn't get tallied?

11:33:41  20  A.  Well, the pharmacist is notified when the form is not

11:33:44  21  completed and says, you must complete -- this information is

11:33:48  22  required information.  This store must have missed that

11:33:55  23  information or chosen not to put it in there.

11:33:58  24  Q.  And you've got a system that doesn't accept the refusal to

11:34:02  25  fill forms if there's, like, something left blank, even if it's

———Nelson (Cross by Lanier)———

11:34:06  1   totally irrelevant?

11:34:09  2   A.  Well, it wouldn't be totally irrelevant if it's a required

11:34:12  3   field.

11:34:13  4   Q.  Okay.  Pharmacists are granted the ability to exercise

11:34:18  5   their professional judgment and choose to refuse -- choose to

11:34:23  6   refuse to fill any prescription if they feel -- and here's

11:34:27  7   where you just do that same mantra you do over and over and

11:34:30  8   over in reply to these; correct?

11:34:33  9   A.  Again, I'll repeat my information before.  I'm not the only

11:34:37 10   one that sends out that information.

11:34:38 11   Q.  Right.  This is where you selected that same mantra that

11:34:43 12   you cut and paste and put in all of these; correct?

11:34:46 13   A.  I put it in this particular response, yes, sir.

11:34:56 14   Q.  So we've got that in February of 2013.  Then you've got

11:34:59 15   another situation that arises a month later in Georgia.  This

11:35:03 16   is Plaintiffs' Exhibit 26822.

11:35:07 17        If we could pass that out, please, Ms. Fleming.

11:35:19 18        Do you have that document, sir?

11:35:21 19   A.  You said 26822; is that correct?

11:35:23 20   Q.  No.  I'm sorry.  It's 26882.

11:35:27 21   A.  There you go.

11:35:28 22   Q.  That's my mistake and that explains why Ms. Fleming's

11:35:31 23   wondering what I was drinking this morning.

11:35:42 24   A.  I have found that, sir.

11:35:43 25   Q.  Thank you.  Let me make sure that the Walmart lawyers get

─────Nelson (Cross by Lanier)─────

11:35:45  1   it in court.

11:35:46  2          Okay.  Now, this is one that starts on Page 2 there is

11:35:54  3   an e-mail from Melody Odom, March of 2013, about a doctor under

11:35:59  4   investigation.

11:36:01  5          Do you see that?

11:36:06  6   A.  That's what the e-mail is titled.

11:36:08  7   Q.  "Hello Marcey" -- or "Hey, Marcey" -- excuse me -- "thank

11:36:11  8   you for taking to the time talk with us about the refusal to

11:36:16  9   fill situation today.  We will be more vigilant about the

11:36:21  10  situations in the future.  Additionally, I recently heard about

11:36:30  11  Georgia starting up a PMP" --

11:36:31  12         That's a prescription monitoring program; right?

11:36:40  13  A.  That is correct.

11:36:40  14  Q.  -- "which will alleviate this situation greatly.  Just

11:36:42  15  wanted to send you the information on the medical practice and

11:36:45  16  physician that's overprescribing multiple C-II's oxycodone

11:36:53  17  30 milligrams in particular.  He's currently under

11:36:57  18  investigation.  We'll make every effort to fill these scripts

11:37:01  19  now unless overdosage amounts are prescribed."

11:37:05  20         Do you see that?

11:37:11  21  A.  That's what's written in that document.

11:37:13  22  Q.  So after y'all spoke with her, she says we'll make every

11:37:17  23  effort to fill these prescriptions unless it's an overdose

11:37:23  24  amount; right?

11:37:23  25  A.  Sir, I don't believe I've ever spoke to this individual

—— Nelson (Cross by Lanier) ——

11:37:25  1    directly.

11:37:25  2    Q.  Well, no, you didn't.  It looks like Marcey Cring did.

11:37:31  3          Do you know Marcey?

11:37:37  4    A.  I quite honestly don't recall Marcey.

11:37:41  5    Q.  Okay.  Well, she e-mailed it to you -- and we'll get to

11:37:46  6    your reply here in a moment.  But continue looking at this

11:37:46  7    e-mail that you got forwarded to you.  The practice in question

11:37:49  8    is listed.  The doctor who's currently indicted is listed.  The

11:37:57  9    doctor who's under investigation is listed, and it says, "As my

11:38:05 10    understanding goes, the DEA has attempted to shut down the

11:38:06 11    practice, but since it's not owned by the physicians they hire

11:38:13 12    they are having difficulty.  Also, they shut down a previous

11:38:16 13    location and the owners just opened up a new business somewhere

11:38:19 14    else in town.  They don't accept medical insurance.  If

11:38:24 15    patients are willing to pay a $500 office fee, the physician

11:38:27 16    will write you anything you want.  I've never been there

11:38:36 17    myself, but multiple patients have confirmed this for me."

11:38:40 18          Do you see that?

11:38:40 19    A.  That is what the document states.

11:38:42 20    Q.  And then it says "The Georgia DEA agent who advised me not

11:38:46 21    to fill and provide patients with his contact phone number if

11:38:51 22    they became aggressive is," and identifies that gentleman.

11:38:54 23          Do you see that?

11:38:57 24    A.  That's what it says.

11:38:58 25    Q.  So this is the -- these are the scripts that now we'll make

———Nelson (Cross by Lanier)———

11:39:06 1   every effort to fill.

11:39:08 2          Do you see that, sir?

11:39:09 3   A.  I see where it says they'll fill them only if they're not

11:39:13 4   considered overdoses.

11:39:15 5   Q.  Well, Marcey sends this to you and says, "Brad, I've asked

11:39:21 6   my manager in Augusta, Georgia to send me this information so I

11:39:26 7   could pass it on.  As I talked to the pharmacists at that

11:39:28 8   location, they advised me the local DEA agent specifically

11:39:31 9   asked them not to fill prescriptions from a particular

11:39:35 10  prescriber, and both the agent and provider information is

11:39:40 11  below.  For now, I advised them we cannot honor that request,

11:39:45 12  blanket refusals.  But I would share this with you for review

11:39:49 13  in case we wanted or needed to make an exception."

11:39:57 14         Do you see that?

11:39:59 15  A.  That's what Marcey wrote.

11:40:03 16  Q.  So with the idea that maybe if you wanted or needed to, an

11:40:08 17  exception to Walmart's policy could be made; right?

11:40:15 18  A.  That was Marcey's opinion.

11:40:16 19  Q.  And then you wrote her back, and you said, "You are wise

11:40:25 20  beyond your years.  You are 100 percent correct in stating

11:40:30 21  we're not offered the ability to blanket refuse prescriptions

11:40:33 22  from a practice or a prescriber.  If this prescriber is such a

11:40:39 23  danger to the public safety, then the DEA or medical board

11:40:44 24  pleads to suspend his registration or his license."

11:40:46 25         Do you see that?

Nelson (Cross by Lanier)

11:40:47  1    A.   That's what the document states.

11:40:49  2    Q.   And then you -- you can even tell it's a different type, a

11:40:53  3    different font, if you will.  You cut and paste and insert in

11:41:03  4    that same language you do frequently, "I would encourage you to

11:41:07  5    review these.  You're granted the ability to exercise your

11:41:10  6    professional judgment," on and on and on, "no blanket refusals

11:41:15  7    are allowed by boards of pharmacies," on and on and on.

11:41:18  8         Do you see that?

11:41:21  9    A.   I see that, but again, I'll remind you that I'm not the

11:41:23  10   only one who sends that out.

11:41:25  11   Q.   Right.  That's Walmart policy; right?

11:41:29  12   A.   That is the guidance that was being given at the time.

11:41:36  13   Q.   Now, let's go north.  Plaintiffs' Exhibit 26874.  If you

11:41:44  14   would pull that out, please.

11:41:48  15   A.   I apologize, I missed that number.  What was it again?

11:41:53  16   Q.   Sir, it is 26874.

11:42:11  17        Do you have that in front of you, sir?

11:42:14  18   A.   Yes, sir.

11:42:16  19   Q.   And what I'd like to do on this one is start on the very

11:42:22  20   last page, it's Page 5, an e-mail from Michael Schultz to

11:42:31  21   William Mobley, April 10th, 2013.

11:42:36  22        Do you see that?

11:42:42  23   A.   I see that.

11:42:42  24   Q.   I'm sorry, sir, what did you say?  You see that?

11:42:46  25   A.   I do see that.

—Nelson (Cross by Lanier)—

11:42:47  1    Q.   Okay.   Thank you.

11:42:53  2             It says, "Will, do we have a contact at the state of

11:42:55  3    Michigan?  I'm a local doctor that's been investigated by the

11:42:58  4    state.  According to a competitor, his license is not valid.

11:43:01  5    The problem is that the license verification information at the

11:43:05  6    state states his license status is disciplinary limited.   I

11:43:14  7    can't get confirmation as to what that specifically means.  The

11:43:20  8    e-mail -- or the state requires we request that information

11:43:21  9    through the Freedom of Information Act available through a

11:43:24 10    request via e-mail.  My Walmart e-mail doesn't allow me to

11:43:28 11    e-mail the state for clarification.  Also, I'm having trouble

11:43:33 12    gaining access to Relay Health.  Any ideas where to start so

11:43:41 13    we're legally correct in our response?"

11:43:45 14             Do you see that?

11:43:45 15    A.   That's what that document says.

11:43:48 16    Q.   And this makes it up the chain to you when William Mobley

11:43:51 17    on Page 2 sends it to you and says, "Brad, is the below string

11:43:56 18    something you can help with?  We've been notified by a

11:44:01 19    pharmacists at Walgreens in the area that a doctor has an issue

11:44:04 20    with his license and we shouldn't fill scripts.  We're having

11:44:08 21    difficulty verifying and getting enough information to ensure

11:44:12 22    we're correct in declining scripts.  Thank you for your help."

11:44:17 23             You write back, front page.

11:44:20 24             Do you see it?  Do you see it, sir?

11:44:26 25    A.   Yes, sir.  Yes, sir, I see that.

—————Nelson (Cross by Lanier)—————

11:44:28  1  Q.  You said, at this point, this prescriber still has all the

11:44:33  2  necessary credential to practice medicine.  And then you give

11:44:36  3  that same cut and paste section that you and others give;

11:44:42  4  correct?

11:44:45  5  A.  Yes, sir.

11:44:46  6  Q.  And you've got the screenshot from the DEA that indicates

11:44:52  7  this fellow's still got a license for DEA purposes; correct?

11:44:58  8  A.  Yes, sir.

11:45:07  9  Q.  Now, sir, the refusal to fill process was something that in

11:45:11 10  a sense you owned at Walmart; didn't you?

11:45:19 11        MR. MAJORAS:  Objection, form.

11:45:20 12        THE COURT:  Sustained.

11:45:21 13  BY MR. LANIER:

11:45:21 14  Q.  Okay.  Sir, pull Plaintiffs' Exhibit 14223.

11:45:29 15        And, Ms. Fleming, if you'd pass that out.

11:45:40 16        Do you have that in front of you, sir?

11:45:44 17  A.  Whoops, I think I pulled 14223A.  Hold on.

11:45:50 18  Q.  It should look like an e-mail on the cover, but then it's

11:45:55 19  got a PowerPoint attached, or at least some slides maybe from a

11:46:00 20  PowerPoint.

11:46:06 21  A.  I have that now.  Thank you.

11:46:07 22  Q.  Okay.  This is 2013, and it's a focus area deck maybe on

11:46:21 23  the suspicious order monitoring program.  It's SOMP.

11:46:24 24        Do you see that?

11:46:30 25  A.  I see what it says, yes, sir.

─────Nelson (Cross by Lanier)─────

11:46:31 1  Q.  What I'd like you to do is go to Page 4 of that document in

11:46:38 2  the lower right-hand corner, and it's got a section where it

11:46:42 3  talks about refusal to fill and it references you.

11:46:46 4       Do you see that?

11:46:53 5  A.  I see this particular slide deck, sir, but I don't know

11:46:56 6  where it came from.

11:46:58 7  Q.  Well, my question to you is simple.  Were you aware of the

11:47:03 8  fact that Walmart internally on refusal to fill, set out to

11:47:10 9  establish a process for the analysis of refusal to fill data

11:47:15 10 and reporting problematic prescribers or patients internally

11:47:20 11 and the owner is Brad Nelson.

11:47:24 12      Do you see that, sir?

11:47:27 13 A.  That is what the document says.

11:47:29 14 Q.  Okay.  So when I was saying you were the owner of this, I

11:47:33 15 was taking the language from Walmart's document.

11:47:36 16      Do you see that?

11:47:38 17 A.  I -- somebody created this slide deck.  I don't see Walmart

11:47:42 18 on it anywhere.

11:47:46 19 Q.  Well, if you look on the very front page, sent by Kristy

11:47:56 20 Spruell, JD, senior manager, strategy, compliance, safety, and

11:48:05 21 asset protection logistics, Walmart Stores, Bentonville,

11:48:11 22 Arkansas.

11:48:12 23      Do you see that?

11:48:13 24 A.  I see who sent the e-mail, yes, sir.

11:48:15 25 Q.  Okay.  So did anybody at Walmart ever tell you that they

─────────── Nelson (Cross by Lanier) ───────────

11:48:18  1   looked to you to own the establishing a process for the

11:48:23  2   analysis of refusal to fill data and reporting problematic

11:48:28  3   prescribers or patients internally?

11:48:31  4           Anybody ever tell you that?

11:48:34  5   A.   I don't recall that, sir.

11:48:36  6   Q.   Now, if we continue forward into 2015, there's a document,

11:48:44  7   if you would pull it, 14450.  14450.

11:49:02  8           Do you have that one yet, sir?

11:49:07  9   A.   Just about.  I apologize.  I pulled one too many forms.

11:49:12 10   Q.   Sir, you're doing a great job.  Don't worry about it --

11:49:16 11   A.   (Unintelligible).

11:49:16 12   Q.   Yeah, it's not easy to go through that box and find these.

11:49:19 13           Plaintiffs' 14450 is an e-mail that's from

11:49:28 14   Miranda Johnson to a number of people, including you, and it's

11:49:30 15   dated July 17, 2015.

11:49:33 16           Do you see that?

11:49:42 17           Do you see that e-mail?

11:49:43 18   A.   Yes.

11:49:45 19   Q.   And as of July 17, 2015, it says -- excuse me -- the

11:49:57 20   updates to pharmacy operation manual 1311 that we discussed a

11:50:02 21   few months ago are now posted.  Just as a reminder, the

11:50:09 22   pharmacy operation manual no longer prohibits blanket refusals.

11:50:16 23           Did I read that right?

11:50:20 24   A.   That is what that document says.

11:50:24 25   Q.   Do you have any reason to think that document's wrong?

————Nelson (Cross by Lanier)————

11:50:39  1   A.   That's what it says.

11:50:40  2   Q.   So we have a document saying, "As of July 17th, 2015, the

11:50:45  3   pharmacy operation manual for Walmart no longer prohibits

11:50:48  4   blanket refusals"; right?

11:51:01  5   A.   That's what the document says, yes, sir.

11:51:03  6   Q.   Then you hit a reply.  Look at your reply.  "Just FYI" --

11:51:12  7   that's for your information; right?

11:51:14  8   A.   Yes, sir.

11:51:14  9   Q.   -- "pharmacy operation manual 1311 on the wire is still

11:51:19  10  from March of 2011."

11:51:22  11          That would have been over 4 years earlier; right?

11:51:30  12  A.   That's what the document says.

11:51:31  13  Q.   "It does not show updated on our wire yet.  Sorry to say.

11:51:35  14  We are still looking for POM 813 as well, and it's not there.

11:51:41  15  All this was supposed to go live today for refusal to fill and

11:51:46  16  CSIR."

11:51:48  17          Do you see that?

11:51:50  18  A.   I do.

11:51:51  19  Q.   What is CSIR?

11:51:59  20  A.   I don't honestly recall.

11:52:10  21  Q.   And then you conclude by saying, "I'll walk over to ops and

11:52:12  22  find out what's up."

11:52:14  23          Do you remember going over to ops and finding out

11:52:16  24  what's up?

11:52:17  25  A.   Well, that's what the document states.

HEATHER K. NEWMAN, RMR, CRR

**3885**

—————Nelson (Cross by Lanier)—————

11:52:18  1   Q.  Do you remember what was up, why it was slow posting?

11:52:22  2   A.  I honestly do not recall, sir.

11:52:25  3   Q.  All right.  So we've got July 17th, 2015, the pharmacy

11:52:30  4   operation manual no longer prohibits blanket refusals.  Fair?

11:52:36  5   A.  That's what this e-mail states, but until it gets posted

11:52:39  6   and put out there on the wire, the communication to the stores

11:52:43  7   would still stand, and I clearly indicated on this document

11:52:46  8   that the one from March 2011 was still in place.

11:52:51  9   Q.  Yeah, because if we go to Plaintiffs' Exhibit 14540,

11:53:14  10  please. . .

11:53:25  11         Do you have that, sir?

11:53:28  12  A.  Yes, sir.

11:53:29  13  Q.  Okay.  This is one where Micah Charles has sent an e-mail

11:53:38  14  out on refusal to fill, and this is November 11th.  So we're

11:53:44  15  five months after that e-mail about the POM no longer prohibits

11:53:50  16  blanket refusals; right?

11:53:59  17  A.  It is after that date.

11:53:59  18  Q.  "Mickey, going forward we are denying all Dr. Ure

11:54:07  19  prescriptions.  Here's what I submitted on Archer."

11:54:09  20         Archer was your computer program that you had that

11:54:13  21  handled prescriptions; right?

11:54:14  22  A.  Archer was a software program that Walmart used to capture

11:54:20  23  incident recorded -- incidents that were recorded.

11:54:22  24  Q.  Yes.

11:54:22  25  A.  It did not fill prescriptions.

———Nelson (Cross by Lanier)———

11:54:24  1   Q.  Right, but incident reports pertaining to prescriptions;

11:54:27  2   right?

11:54:30  3   A.  That was one of the things in there, yes.

11:54:31  4   Q.  All right.  "Pharmacists, each time we're given a

11:54:35  5   prescription from Dr. Ure, we are to deny them due to an

11:54:40  6   inappropriate prescriber/patient relation and fill out an

11:54:43  7   Archer report."

11:54:47  8         And then in bold print it says, "No prescriptions are

11:54:50  9   to be filled from Dr. John Ure going forward."

11:54:55  10        Do you see that?

11:55:03  11  A.  That's what the pharmacist wrote.

11:55:03  12  Q.  And then there's an explanation down below about

11:55:06  13  experiencing suspicious activity with Dr. Ure.  "Similar

11:55:11  14  trouble a year or two ago, but then the patients quit coming

11:55:12  15  until recently.  He's prescribing numerous C-II prescriptions

11:55:19  16  for patients that we don't believe have a medical need for

11:55:22  17  them.  Since September 24th, we've filled seven C-II

11:55:28  18  prescriptions from Dr. Ure.  Prescriptions contained anywhere

11:55:29  19  from one to six prescriptions on each hard copy.  Each

11:55:33  20  prescription has all required information on it to make it a

11:55:37  21  legal fill, however, red flags are everywhere.  Dr. Ure

11:55:44  22  frequently calls ahead to see what C-IIs we have in stock,

11:55:48  23  always late in the evening.  He then writes a prescription and

11:55:51  24  the patient brings it in."

11:55:53  25        Do you see that?

HEATHER K. NEWMAN, RMR, CRR

Nelson (Cross by Lanier)

11:55:55 1   A.   That's what it -- that's what the pharmacist wrote.

11:55:58 2   Q.   "From the past history" -- or "From past history it's

11:56:02 3   usually a new patient to us, or patients that we know have been

11:56:04 4   fired from other doctors or have a history of abuse.  Most

11:56:10 5   either have some sort of Medicaid or pay cash."

11:56:14 6          Do you see that?

11:56:17 7   A.   That's what it says.

11:56:18 8   Q.   "He often places, quote/unquote, stolen narcotic

11:56:23 9   prescriptions for patients that we have no history of seeing

11:56:25 10   and he calls ahead to verify he's doing so and documents this

11:56:29 11   on the hard copy.  Three of these seven prescriptions note

11:56:33 12   they're one-time replacement due to theft.  Six of the seven

11:56:39 13   prescriptions are for patients brand new to us who don't live

11:56:42 14   in this town.  The seventh is for a local patient with a known

11:56:46 15   history of abuse who was recently fired from her previous

11:56:50 16   provider."

11:56:52 17          Do you see that?

11:56:56 18   A.   That's what the document says.

11:56:58 19   Q.   And it goes on and on and on ending with "We're going to

11:57:01 20   deny all Dr. Ure prescriptions going forward and we'll fill out

11:57:05 21   a web form each time.  You've got the pharmacy manager signing

11:57:10 22   this."

11:57:10 23          Do you see that?

11:57:14 24   A.   I do see that.

11:57:15 25   Q.   Now, you wrote a reply e-mail, didn't you?  Page 1.

─────Nelson (Cross by Lanier)─────

11:57:26  1          Do you see your reply?

11:57:28  2   A.   I see the e-mail from myself to Mickey Boles.

11:57:31  3   Q.   Your reply e-mail says, "Mickey, please share the best

11:57:39  4   practices regarding refusal to fill prescriptions.  The

11:57:46  5   communication from Micah indicates they are blank refusing to

11:57:49  6   fill prescriptions for a specific prescriber.  Understand that

11:57:53  7   this is not a best practice and boards of pharmacy grant

11:57:57  8   professional judgment for individual prescriptions and not for

11:58:00  9   prescribers.  The pharmacists may wish to file a complaint with

11:58:04  10  the state medical board to request an official inquiry into the

11:58:10  11  prescriber's prescription writing.  Prescriptions must be

11:58:12  12  evaluated on an individual basis and red flags identified.

11:58:16  13  Then the pharmacist can refuse to fill a prescription and

11:58:19  14  report a refusal to fill report in Archer.  This location has

11:58:25  15  reported four refusals to fill in 2015 and only one from

11:58:31  16  Dr. Ure.  This location has not displayed a pattern of an issue

11:58:35  17  with Dr. Ure.  Reporting just one refusal does not equate to

11:58:43  18  wanting to refuse all prescriptions from this prescriber."

11:58:47  19          Do you see that?

11:58:50  20  A.   That's what the document says.

11:58:52  21  Q.   That's what you said.  That's you writing, isn't it?

11:58:57  22  A.   That is my e-mail.

11:59:03  23  Q.   And then you send out your cut and paste section.

11:59:07  24          Do you see that?

11:59:12  25  A.   Yes, sir.

─────── Nelson (Cross by Lanier) ───────

11:59:13 1   Q.  And in your cut and paste section you e-mail, "No blanket

11:59:17 2   refusals are allowed by the boards of pharmacy."  You're still

11:59:22 3   saying that, aren't you?

11:59:22 4   A.  Yes, sir.

11:59:23 5   Q.  And, yet, this is five months after the POM no longer

11:59:28 6   prohibits blanket refusals; right?

11:59:35 7   A.  As I recall, the information was taken out of the POM, but

11:59:40 8   there was no information that said you could blanket refuse.

11:59:42 9   Q.  No, sir.  My point is you've got a horrendous situation.

11:59:45 10  You've got pharmacists that want to do a blanket refusal to

11:59:48 11  fill, you tell them they cannot, that no blanket refusals to

11:59:53 12  fill are allowed even though as of July 17th Walmart changed

11:59:58 13  their policy, didn't they?

12:00:04 14  A.  Walmart removed the information about blanket refusal from

12:00:08 15  the POM, but I don't recall their being information that told

12:00:11 16  them they could blanket refuse.

12:00:13 17  Q.  Plaintiffs' Exhibit --

12:00:14 18          MR. LANIER:  Oh, Your Honor, it is noon.  I don't know

12:00:15 19  how you want to do this.

12:00:17 20          THE COURT:  I -- if this is a convenient place to

12:00:20 21  stop, we will take our lunch break.

12:00:23 22          MR. LANIER:  Okay.  Thank you, Judge.

12:00:25 23          THE COURT:  So, Mr. Nelson, we're going to break for

12:00:28 24  lunch and pick up with your testimony promptly at 1 o'clock,

12:00:30 25  sir.

—————Nelson (Cross by Lanier)—————

12:00:31  1          So, ladies and gentlemen --

12:00:32  2          MR. LANIER:  This is 1 o'clock eastern time, so that's

12:00:34  3  noon your time.

12:00:35  4          THE COURT:  Would be one hour from now.

12:00:37  5          All right, ladies and gentlemen, we'll recess for

12:00:40  6  lunch.  Usually admonitions and then we'll pick up at 1 o'clock

12:00:43  7  with Mr. Nelson.

12:00:45  8      (Jury excused from courtroom)

12:04:43  9      (Recess was taken at 12:00 p.m.)

        10

        11

        12              PAGE LEFT INTENTIONALLY BLANK

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

────Nelson (Cross by Lanier)────

1          A F T E R N O O N   S E S S I O N

2                    - - - - -

01:00:03  3          (In open court at 12:58 p.m.)

01:00:03  4          COURTROOM DEPUTY:  All rise.

01:01:34  5      (Jury returned to courtroom at 1:01 p.m.)

01:01:52  6          THE COURT:  Please be seated, ladies and gentlemen.

01:01:57  7          And, Mr. Lanier, you may continue.  I want to make

01:02:00  8  sure we have our witness on.

01:02:04  9          MR. LANIER:  Okay.  There he is.

01:02:08 10          THE COURT:  All right.  And, Mr. Nelson, I just want

01:02:11 11  to make sure you understand you're still under oath from this

01:02:13 12  morning.

01:02:14 13          THE WITNESS:  I understand.

01:02:15 14          THE COURT:  Okay.  Thank you.

01:02:16 15          All right.  Mr. Lanier, you may continue.

01:02:17 16          MR. LANIER:  Thank you, Your Honor.  May it please

01:02:20 17  this Court.

01:02:21 18  BY MR. LANIER:

01:02:21 19  Q.  Mr. Nelson, you can still see and hear me okay?

01:02:26 20  A.  Yes, sir.

01:02:27 21  Q.  Great.  So we had talked about the July 17th, 2015, date as

01:02:34 22  the date when the pharmacy operation manual no longer

01:02:38 23  prohibited blanket refusals, and I had gotten us up to December

01:02:43 24  of that year with Plaintiffs' Exhibit 14552.  If I can impose

01:02:51 25  on you to grab that and Ms. Fleming to pass that out.

—————Nelson (Cross by Lanier)—————

01:03:08  1          Could you have that in front of you, sir?

01:03:10  2  A.   I do.

01:03:11  3  Q.   And you can see that we are about December of 2015 on this

01:03:18  4  document; right?

01:03:20  5  A.   December 4th.

01:03:21  6  Q.   Yes, sir.  And it concerns a Dr. Faizuddin Shareef.

01:03:26  7          Do you see that as well?

01:03:28  8  A.   That is the subject of the e-mail.

01:03:29  9  Q.   And the first e-mail is on the backside of this.  It says,

01:03:39 10  "It's come to our attention that we're one of the few stores in

01:03:43 11  the area currently accepting any prescriptions for Dr. Shareef.

01:03:47 12  This includes CVS, Walgreens, as well as some other local

01:03:51 13  Walmarts.  Dr. Shareef has several offices in the area that are

01:03:57 14  frequently staffed by individuals other than the doctor who

01:04:00 15  simply fill in the name of the patient and the date on

01:04:02 16  previously filled in prescriptions that contain the doctor's

01:04:05 17  signature.  Most of these prescriptions are for 30 milligrams

01:04:11 18  of Adderall, some sort of antianxiety medication such as

01:04:17 19  Klonopin and also various pain medications, usually for a

01:04:21 20  15-day supply."

01:04:21 21          Do you see that?

01:04:23 22  A.   That's what the document says.

01:04:24 23  Q.   "When patients present the prescription, they'll frequently

01:04:28 24  tell us they've not seen the doctor, just have the prescription

01:04:33 25  filled in by the nurse.  They'll also call ahead to see if

────── Nelson (Cross by Lanier) ──────

01:04:36  1    we'll fill their prescription.  They tell us the doctor's aware

01:04:41  2    that several stores will not take his prescriptions and advises

01:04:45  3    the patients to phone ahead.  They also tell us this is usually

01:04:48  4    a cash-based business.

01:04:52  5            "We do call the office and verify prescriptions when

01:04:58  6    the writing doesn't match.  We also check/inspect on each of

01:05:01  7    these patients.  We'd like to get some guidance on how to

01:05:07  8    handle these prescription going forward."

01:05:08  9            Do you see that?

01:05:09  10   A.   That's what the document says.

01:05:11  11   Q.   And then you wrote back and said, "I would provide them

01:05:18  12   with these best practices," and you cut and paste your usual

01:05:27  13   language.

01:05:28  14           Do you see that?

01:05:29  15   A.   I do.

01:05:29  16   Q.   And that included your insertion of the Walmart policy, "No

01:05:33  17   blanket refusals are allowed by boards of pharmacy."

01:05:35  18           Do you see that?

01:05:36  19   A.   I do.

01:05:38  20   Q.   "Even though, of course, we are five months after the

01:05:42  21   pharmacy operations manual no longer prohibits such blanket

01:05:47  22   refusals."  True?

01:05:49  23   A.   According to that first e-mail in July, that's what it

01:05:52  24   states, sir.  Again, I want to repeat that I'm not the only one

01:05:55  25   sending that information out.

HEATHER K. NEWMAN, RMR, CRR

—————Nelson (Cross by Lanier)—————

01:05:56   1    Q.  I understand that.

01:05:59   2             Plaintiffs' Exhibit 14662, if you would pull that out,

01:06:03   3    please, 14662.

01:06:19   4             Do you have it?

01:06:20   5    A.  I do.

01:06:24   6    Q.  I don't have the very bottom e-mail -- strike that.  I said

01:06:36   7    I don't have the very -- I have the very bottom e-mail, and

01:06:39   8    it's from a Thelma Mendez to John Marakas, and we are all way

01:06:46   9    into February of 2016.

01:06:49  10             Do you see that, sir?

01:06:54  11    A.  That is the date of this e-mail, yes.

01:06:56  12    Q.  "Hello.  Greetings.  A patient asked me about another

01:06:59  13    Walmart pharmacy telling them they will not be able to dispense

01:07:04  14    anymore their control medicines, Percocet."

01:07:07  15             That's a Schedule II opioid; right?

01:07:16  16    A.  Correct.

01:07:16  17    Q.  Soma.  You know what Soma is, don't you?

01:07:20  18    A.  Yes, sir.

01:07:20  19    Q.  And Valium.  This is the trinity cocktail, isn't it?

01:07:24  20    A.  It's definitely a cocktail.

01:07:29  21    Q.  So telling them they won't be able to dispense anymore

01:07:34  22    because it's considered a cocktail.  "Is this entirely on

01:07:37  23    pharmacist's judgment, or is there any legality involved here?

01:07:41  24    Please clarify.  Me, thank you again."

01:07:43  25             You see that?

Nelson (Cross by Lanier)

01:07:49  1          Do you see that, sir?

01:07:49  2   A.   Yes, sir.

01:07:49  3   Q.   Then it gets forwarded to you with the question, "Brad,

01:07:53  4   thoughts?"  Right?

01:07:58  5          Right?

01:07:58  6   A.   Correct.

01:07:58  7   Q.   Then you reply -- sorry.  You reply, "A cocktail is a red

01:08:04  8   flag that should alert the registered pharmacist to use their

01:08:09  9   professional judgment to refuse to fill the prescription.

01:08:12  10  There are some states that have made writing the cocktails

01:08:15  11  illegal for the prescriber, but there are no legal restrictions

01:08:18  12  for the pharmacist."

01:08:20  13         Do you see that?

01:08:24  14  A.   That is what the document says.

01:08:24  15  Q.   That's what you said; right?  You wrote that.

01:08:27  16  A.   That's what's in the e-mail, yes, sir.

01:08:30  17  Q.   So the Walmart policy that you're vocalizing here is it may

01:08:37  18  be illegal to write the prescription, but that doesn't mean

01:08:41  19  it's illegal to fill the prescription; right?

01:08:42  20  A.   That is not what it says.

01:08:43  21  Q.   It says, "There are some states that have made writing the

01:08:48  22  cocktails illegal for the prescriber."

01:08:54  23         Do you see that?

01:08:55  24  A.   That's correct.

01:08:55  25  Q.   "But there are no legal restrictions for the pharmacist";

────── Nelson (Cross by Lanier) ──────

01:09:00  1   right?

01:09:01  2   A.   That was my understanding, sir.

01:09:03  3   Q.   So the prescriber writes it -- writes the prescription;

01:09:08  4   right?

01:09:14  5   A.   Yes, sir.

01:09:18  6   Q.   The pharmacist fills the prescription; correct?

01:09:23  7   A.   That is a possibility if they don't decide not to.

01:09:27  8   Q.   Some states have made writing it illegal, but no legal

01:09:32  9   restrictions on filling it; right?

01:09:39 10   A.   At that time I'm not aware of any states that had that

01:09:42 11   requirement.

01:09:43 12   Q.   All right.  As we continue through 2016, we're now at June,

01:09:48 13   and that puts us a full year, or the 12th month past July 17th.

01:09:57 14        Do you see that?  Plaintiffs' Exhibit 26732 is the

01:10:04 15   document, sir.

01:10:05 16   A.   Okay.

01:10:34 17   Q.   So you've got Plaintiffs' Exhibit 26732.  We are one year

01:10:39 18   after this e-mail talking about the pharmacy operation manual;

01:10:45 19   correct?

01:10:49 20   A.   Yes, sir.  Again, I'm not sure exactly when it got posted,

01:10:54 21   sir.  We discussed that earlier.

01:10:55 22   Q.   I understand.  Talking about the e-mail saying that the POM

01:10:58 23   no longer prohibits blanket refusals; correct?

01:11:04 24   A.   Okay.

01:11:05 25   Q.   All right.  So here from Deborah Jenkins is an e-mail that

———Nelson (Cross by Lanier)———

01:11:11  1  says, "We've come across the following in the last few months,

01:11:17  2  Dr. Philip Berent, child and adolescent psychiatry, cash pay

01:11:22  3  only, rights for Xanax, oxycodone, Adderall, Oxycontin.

01:11:34  4  Patients, cash pay then prescription insurance."

01:11:42  5          Do you see that?

01:11:48  6  A.  I do.

01:11:49  7  Q.  Now, this says, "Gives patient cell phone numbers and

01:11:53  8  prefers texting for its most rapid response.  Available by

01:12:01  9  e-mail and does telepsychiatry via Skype."

01:12:05  10          Do you see that?

01:12:10  11  A.  That is what the document says.

01:12:12  12  Q.  Now, this is a child and adolescent psychiatrist, child, we

01:12:17  13  know what is, adolescent is up to the page of 18, isn't it?

01:12:23  14  A.  I believe that's correct.

01:12:30  15  Q.  And he's writing Xanax, oxycodone, Oxycontin.

01:12:34  16          Do you see that?

01:12:35  17  A.  That's what the e-mail says.

01:12:36  18  Q.  And he's doing it via Skype.  Do you see that as well?

01:12:44  19  A.  That's what this e-mail says.

01:12:46  20  Q.  He goes on to say -- he being the doctor -- he's "chosen to

01:12:50  21  be an out of network doctor.  Does not accept insurance.

01:12:55  22  Having a cash-based practice gives him the flexibility and

01:12:58  23  freedom to tailor a treatment plan that best serves each of his

01:13:04  24  patients."

01:13:04  25          Do you see that?

HEATHER K. NEWMAN, RMR, CRR

—————Nelson (Cross by Lanier)—————

01:13:06  1    A.   That's what the e-mail says.

01:13:08  2    Q.   And then you get this e-mail, "Hi, Brad, most of my stores

01:13:15  3    have brought to my attention the prescribing habits of the

01:13:19  4    below physician.  It's not just one store, but most of them in

01:13:22  5    my market.  We're filling out the refusal to fill forms and not

01:13:28  6    issuing any blanket refusals.  I just wanted to reach out to

01:13:32  7    you to see if there's anything else we should be doing or you

01:13:35  8    need any more information with all the discussion around the

01:13:39  9    DEA and prescribing dispensing of controlled substances.  Our

01:13:43  10   pharmacists are on edge about him and his patients."

01:13:47  11            Do you see that?

01:13:50  12   A.   That's what it says, yes, sir.

01:13:51  13   Q.   Now, you e-mail back and you say the same thing you put

01:13:59  14   into all of them with no blanket refusals are allowed; correct?

01:14:05  15   A.   That is what this document says, sir.

01:14:07  16   Q.   Yeah, that's the e-mail you sent; right?

01:14:10  17   A.   That is correct.

01:14:11  18   Q.   Okay.  And so we understand the significance of this, you

01:14:19  19   might have one Walmart store over here (indicating), you might

01:14:31  20   have another Walmart store over there (indicating), and if one

01:14:39  21   of the registered pharmacists at this store (indicating) here's

01:14:46  22   something -- that's an ear.  Here.

01:14:54  23            This pharmacist hears something bad.  If you have a

01:15:03  24   blanket refusal to fill, then it's in the computer system, and

01:15:12  25   it doesn't matter which Walmart the patient walks into, either

--------Nelson (Cross by Lanier)--------

01:15:15  1    one, a blanket is going to cover it, isn't it?

01:15:22  2    A.   Sir, I don't -- I don't know how a blanket -- or excuse

01:15:27  3    me -- a blanket refusal would have worked at Walmart because

01:15:31  4    there wasn't one there, so I don't know how it would have

01:15:33  5    worked.

01:15:34  6    Q.   No.  I'm saying if there was a blanket refusal to fill, it

01:15:37  7    would work in every Walmart; right?

01:15:38  8    A.   Sir, I don't know.  Like I said, I do not know how the

01:15:41  9    process would have worked.  I don't know if it was going to be

01:15:44  10   blocked in the computer system.  That's what you asked me.

01:15:46  11   Q.   Okay.

01:15:47  12   A.   I don't know that.

01:15:48  13   Q.   Well, you had a computer system, didn't you?

01:15:50  14   A.   Walmart did.

01:15:52  15   Q.   Yeah.  The Archer system that you had input to; right?

01:15:58  16   A.   No, sir, that is not correct.  We did not use Archer to

01:16:01  17   fill prescriptions.

01:16:02  18   Q.   Not to fill prescriptions, but didn't you have a computer

01:16:04  19   system that would pull up alerts?

01:16:11  20   A.   I'm not sure I understand the question.

01:16:12  21   Q.   Okay.  It's simple.  I'm not doing a good job asking it

01:16:15  22   then.  If someone, in 2016, came into a Walmart with a

01:16:21  23   prescription, was that Walmart pharmacist given the tool of a

01:16:27  24   computer with a program so that they could enter that

01:16:30  25   prescription information into the program and pull up

———— Nelson (Cross by Lanier) ————

01:16:34  1   information about it?

01:16:39  2   A.  If you're talking about the prescription monitoring

01:16:42  3   program, which is, I think, what you're asking me about, that

01:16:45  4   is done outside the prescription filling system.

01:16:49  5   Q.  No, sir, I'm talking about --

01:16:52  6   A.  -- the internet-based system.

01:16:53  7   Q.  The jury heard a lot about Walgreens has a refusal to fill

01:16:59  8   form and information that comes up on their computer screens

01:17:04  9   that Walgreens does or did.

01:17:07  10          Did Walmart have any type of a program that brought up

01:17:12  11  information so that you could tell, for example, if the

01:17:17  12  prescription had already been rejected?

01:17:23  13  A.  Not that I'm aware of.

01:17:25  14  Q.  Wow.  So this person could go into one Walmart store and

01:17:31  15  have their prescription rejected and then just go to another

01:17:35  16  Walmart store with the same prescription and get it filled.

01:17:44  17  A.  Like I said, I'm not aware of any system that you could put

01:17:47  18  information in about a prescription that you rejected.

01:17:52  19  Q.  Okay.  So let's look at another situation.  We're over a

01:18:10  20  year after this July 17th date.  It's Plaintiffs' Exhibit

01:18:16  21  26736.  If you'd pull that, please.

01:18:39  22          Are you able to find it okay?

01:18:40  23  A.  Yes, sir.

01:18:42  24  Q.  All right.  If you'll start on the second page, bottom

01:18:49  25  e-mail, "Hello Michael."

—————Nelson (Cross by Lanier)—————

01:18:53  1          Do you see where I'm reading?

01:18:54  2    A.  Yes, sir.

01:18:56  3    Q.  "Mekeda" -- who by the way I'm assuming is this person

01:19:00  4    that's copied on this e-mail.  See?  "Mekeda overheard several

01:19:09  5    of Dr. Garfield Samuel's patients complaining outside our

01:19:14  6    pharmacy that he doesn't examine them prior to writing

01:19:22  7    controlled substance Schedule II prescriptions."

01:19:23  8          Do you see that?

01:19:27  9    A.  That's what it says.

01:19:28  10   Q.  And C-II prescriptions, at this point in time, includes oxy

01:19:33  11   and hydro, among other opiates; right?

01:19:39  12   A.  And non-opiates, yes, sir.

01:19:42  13   Q.  "This is in addition to the other red flags the prescriber

01:19:46  14   already exhibits, such as his patients coming into the store in

01:19:51  15   clumps on certain days, and with similar prescriptions."

01:19:58  16          Are you reading with me?

01:20:00  17   A.  That's what it says, sir.

01:20:02  18   Q.  "Previously we had been calling the office and collecting

01:20:06  19   information to verify proper patient prescriber relationship,

01:20:13  20   but now we're concerned this information may be fabricated.  We

01:20:17  21   had also been consistently checking the patients' PMPs,"

01:20:22  22   prescription monitoring program.

01:20:23  23          Do you see that?

01:20:25  24   A.  Yes, sir.

01:20:27  25   Q.  "We're no longer comfortable filling controlled medications

───── Nelson (Cross by Lanier) ─────

01:20:31  1   from his office.

01:20:33  2          "Is there a proper way to go about letting our

01:20:37  3   patients know we'll no longer be filling his prescriptions, and

01:20:41  4   how do we handle our long-standing patients?  Any guidance is

01:20:46  5   appreciated."

01:20:46  6          Do you see that?

01:20:47  7   A.  Yes, sir.

01:20:47  8   Q.  And this makes its way to you, and you send a reply, don't

01:20:52  9   you?

01:20:53  10  A.  Yes, sir.

01:20:54  11  Q.  And in your reply, over a year past the change in policy at

01:20:59  12  Walmart, you said, "Here are best practices for refusing to

01:21:06  13  fill prescriptions.  Each prescription must be evaluated

01:21:08  14  individually.  Boards of pharmacy do not give the pharmacist

01:21:11  15  the authority to blanket refuse all prescriptions from a

01:21:15  16  prescriber."

01:21:17  17         And then you put in that same cut and paste you put

01:21:19  18  into every e-mail?

01:21:20  19         Do you see that?

01:21:22  20  A.  I do.

01:21:30  21  Q.  Now, at some point there was a concern about the system

01:21:37  22  y'all had, wasn't there, internally?

01:21:43  23  A.  I don't understand the question, the system.

01:21:47  24  Q.  Okay.  Let me do it this way.  I'm going to have -- if

01:21:51  25  you'll pull Plaintiffs' Exhibit 26737.

—————Nelson (Cross by Lanier)—————

01:22:17  1           Do you have it, sir?

01:22:18  2   A.   I do.

01:22:20  3   Q.   Now, instead of starting just at the bottom, I'm going to

01:22:24  4   start with the most recent e-mail from you because it's

01:22:28  5   important to see what you said.  You said, "See my response

01:22:32  6   below.  Comments are in blue."

01:22:37  7           Do you see that?

01:22:38  8   A.   That's what it says, yes, sir.

01:22:39  9   Q.   Now, the copy that we were given doesn't have blue

01:22:45 10   comments, and so we're going to have to try to figure out what

01:22:47 11   are your comments, but I think we can do that pretty well at

01:22:53 12   least for some of them.

01:22:54 13           So now go to the e-mail where you would have inserted

01:22:57 14   your comments.  It's from Kevin Matkaiti.

01:23:00 15           Do you see that?

01:23:06 16   A.   I see the e-mail, yes.

01:23:07 17   Q.   And this is October 4th, so we're well over a year after

01:23:12 18   the POM no longer prohibits blanket refusals.

01:23:16 19           Do you see that as well?

01:23:23 20   A.   Yes, sir.

01:23:24 21   Q.   All right.  "Steve, I've had two interesting conversations

01:23:27 22   with prescribers in the last two days, and I wanted to get

01:23:32 23   your/corporate compliance take on this."

01:23:40 24           Now, you would be corporate compliance; right?

01:23:47 25   A.   I was one of the people involved with compliance, but I

—Nelson (Cross by Lanier)—

01:23:51 1  certainly do not represent all of corporate compliance.

01:23:51 2  Q.  Right.  But that's -- that would be if you were talking

01:23:53 3  about this, you would have been talking about it in your role

01:23:57 4  as part of corporate compliance.  True?

01:24:02 5  A.  That was the pharmacist's opinion, yes.

01:24:05 6  Q.  Dr. Number 1, Sharon Johnson.  "I called her because I had

01:24:13 7  a patient dropping of a prescription for Percocet and

01:24:22 8  oxycodone."

01:24:22 9       Those are two prescriptions for to different opiates;

01:24:25 10  right?

01:24:30 11  A.  Correct.

01:24:30 12  Q.  "When I reviewed the prescription monitoring program, I see

01:24:36 13  he hasn't filled any narcotics in the last year other than one

01:24:41 14  prescription for what looks like Percocet the last month."

01:24:47 15       Right?

01:24:47 16  A.  That's what it says.

01:24:48 17  Q.  "I was curious to know why he's getting such high doses of

01:24:52 18  narcotics with zero history of use, so I went ahead and spoke

01:24:57 19  with the doctor.  She said that he was getting high doses of

01:25:01 20  pain medicines from a Dr. Poluhkin, a doctor who has a history

01:25:08 21  of questionable prescribing as well, one and a half to two

01:25:14 22  years ago, which is why she's prescribing this."

01:25:17 23       Do you see that, sir?

01:25:21 24  A.  That's what it says.

01:25:22 25  Q.  "This is by no means an acceptable response to me and makes

—Nelson (Cross by Lanier)—

01:25:25  1  me question any prescription she may prescribe.  If a patient's

01:25:29  2  opioid free for that long, she should not be jumping right back

01:25:32  3  in and prescribing high doses like this."

01:25:37  4         So you see that concern of Dr. 1?

01:25:45  5  A.  I do see that written in the document.

01:25:46  6  Q.  And then it's got Dr. 2, Mary Stahl.

01:25:52  7         Same situation as above.  "Patient was given

01:25:56  8  prescription for oxycodone, 5 milligrams at 120 tablets, but

01:25:59  9  had no history of opioid use based on the prescription

01:26:04  10  monitoring program. "

01:26:07  11         Do you see that?

01:26:11  12  A.  That's when it says.

01:26:12  13  Q.  "I called and spoke to the doctor to establish pain

01:26:16  14  management background.  She told me the patient doesn't have

01:26:18  15  any history but told her that she's been taking other people's

01:26:21  16  medication.  Again, this is absolutely not a reason to

01:26:23  17  prescribe an opioid medication to a patient and it's careless

01:26:29  18  prescribing in my opinion."

01:26:35  19         Do you see that?

01:26:35  20  A.  That is what if says.

01:26:36  21  Q.  Now, it looks like it's still the pharmacist here saying,

01:26:39  22  "I never really liked the idea of blanket refusals on certain

01:26:43  23  doctors because they may actually have patients that need pain

01:26:46  24  medication.  However, when I call and get answers like these,

01:26:52  25  it puts into question the doctor's competency.  I'm not sure I

HEATHER K. NEWMAN, RMR, CRR

—Nelson (Cross by Lanier)—

01:26:56  1  feel comfortable filling any prescription written by a doctor

01:26:58  2  who thinks it's okay to prescribe this way.  Pharmacists have

01:27:02  3  an obligation to ensure that controlled substances are being

01:27:05  4  used and prescribed appropriately.  The country's prescription

01:27:09  5  drug abuse problem is well documented and it's prescribers like

01:27:13  6  these that are at the heart of the problem."

01:27:16  7          Do you see that?

01:27:19  8  A.  That's that pharmacist's opinion, yes, sir.

01:27:21  9  Q.  And then look what else was that Walmart pharmacist's

01:27:25 10  opinion.  "We need to have a better system in place to protect

01:27:30 11  us as pharmacists and Walmart as a company from liability

01:27:36 12  associated with this type of prescribing.  I don't think

01:27:40 13  pharmacist discretion is enough to protect us."

01:27:45 14          Do you see that?

01:27:47 15  A.  Yes, the pharmacist wrote that, yes, sir.

01:27:53 16  Q.  And then here are the questions for you in compliance.  "Is

01:27:55 17  it okay to blanket refuse for a doctor who we have documented

01:27:58 18  evidence of competency and ethical concerns?"

01:28:02 19          Do you see that?

01:28:06 20  A.  Yes, sir.

01:28:07 21  Q.  Now, it's not in blue ink, but I'm going to suggest to you

01:28:12 22  that this inserted answer is yours, and you tell me if you

01:28:15 23  think I'm wrong.  "At this time there's not an option to

01:28:19 24  blanket refuse any prescriber.  Each prescription needs to be

01:28:22 25  evaluated on its own merits.  I would agree this Kevin's

—————————Nelson (Cross by Lanier)—————————

01:28:26  1  decision to not fill these two prescriptions."

01:28:30  2          Do you see that?

01:28:35  3  A.  I do see that.

01:28:36  4  Q.  Question 2 -- doesn't that look like something you'd have

01:28:40  5  written?

01:28:40  6  A.  I -- I honestly don't recall this particular e-mail.  I see

01:28:45  7  it's from me, so I don't know where the blue responses start or

01:28:47  8  stop.

01:28:48  9  Q.  Well, it continues with Question 2, "Can more be done to

01:28:54 10  protect us as pharmacists and Walmart as a company from

01:28:56 11  liability associated with prescriptions written by negligent

01:29:02 12  prescribers?"

01:29:03 13          And the reply says, "I'm not sure I understand what

01:29:05 14  liability Kevin is talking about; however, evaluating the red

01:29:10 15  flags associated with the prescription is the best way to

01:29:14 16  eliminate filling prescriptions not written for legitimate

01:29:15 17  medical purposes."

01:29:16 18          Do you see that?

01:29:18 19  A.  I see that's on the (unintelligible) document, yes, sir.

01:29:21 20  Q.  I'm sorry, sir.  Thank you.

01:29:23 21          "Can I create my own standardized form to send to the

01:29:26 22  doctor to better protect myself and my staff from liability?

01:29:31 23          "I'd rather have a corporate form, but I'll make my

01:29:34 24  own if needed."

01:29:34 25          And then you've got that information that you seem to

—Nelson (Cross by Lanier)—

01:29:38 1    cut and paste so often that includes "O blanket refusals are

01:29:47 2    allowed by the boards of pharmacy."

01:29:49 3            Do you see that as well?

01:29:50 4    A.  I don't see that whole thing put in there this time.  I

01:29:53 5    just see, "Follow POM 1703 and 1311."

01:29:58 6    Q.  Turn to the next page, sir.

01:30:01 7    A.  Oh.  Okay.  I apologize.

01:30:03 8    Q.  That's okay.  That's -- that's your cut and paste section,

01:30:09 9    isn't it?

01:30:09 10   A.  That is true.

01:30:14 11   Q.  Now, as we roll into 2017 we're getting near the end of

01:30:23 12   your employment, aren't we?

01:30:27 13   A.  That would be -- that's when I left Walmart, yes.

01:30:29 14   Q.  You left Walmart when?

01:30:35 15   A.  I don't recall the exact date, but I believe it was in

01:30:36 16   March of 2017.

01:30:38 17   Q.  Yep.  That seems to be consistent with me.  I'm going to

01:30:41 18   show you Plaintiffs' Exhibit 8037, and I'll represent --

01:30:48 19           Well, why don't you pull it out and we'll get a copy

01:30:51 20   to counsel.

01:31:07 21           Do you have that in front of you?

01:31:09 22   A.  Yes, sir.

01:31:09 23   Q.  It's an e-mail you sent February 24th of 2017.  You see?

01:31:22 24   A.  Yes, sir.

01:31:28 25   Q.  If you look at the back, it's talking about some bad

HEATHER K. NEWMAN, RMR, CRR

─────Nelson (Cross by Lanier)─────

01:31:31  1   doctors, or bad situation with a store tech, and question, "Can

01:31:39  2   we lobby for a home office blanket refusal for Justin Lamonda

01:31:45  3   so the refusal will show home office support?"

01:31:48  4           Do you see that?  It's on Page 3?

01:31:55  5   A.  I see it.

01:31:56  6   Q.  All right.  Then you said, in reply on Page 2, "That will

01:32:04  7   happen automatically if there are enough refusals to fill filed

01:32:09  8   for this prescriber, or multiple blanket refusals filed from

01:32:14  9   multiple locations."

01:32:17 10          So at this point y'all clearly can do a blanket

01:32:21 11   refusal, can't you?

01:32:29 12   A.  The document states what it is.  I was not involved in the

01:32:32 13   process of determining a blanket refusal, so I don't know all

01:32:35 14   the --

01:32:36 15   Q.  Right.  But that document saying that is from you?

01:32:40 16   A.  That was my understanding of how the process would work.

01:32:43 17   Q.  And then you get an e-mail back that says, "Brad, can you

01:32:49 18   look into where we are at refusals to fill for Dr. Lamonda at

01:32:54 19   Store 40.  I'm wondering how close we are to getting a home

01:32:57 20   office blanket refusal."

01:33:04 21          So there's a home office blanket refusal to fill

01:33:07 22   available, isn't there?

01:33:12 23   A.  I don't believe there's one for that doctor.

01:33:12 24   Q.  Right, but the company has an ability to do one in spite of

01:33:16 25   what you may have written two months before; right -- three

—————Nelson (Cross by Lanier)—————

01:33:20 1  months before?

01:33:23 2  A.  There was a process being implemented at that time which I

01:33:26 3  was not a part of.

01:33:27 4  Q.  Wait.  You said that was a process being implemented at

01:33:30 5  that time which I was not a part of?

01:33:33 6  A.  Correct, in February of 2017.

01:33:36 7  Q.  In fact, you say in the reply to that e-mail on the front,

01:33:42 8  "Josh, you can do that in Archer by putting his DEA number in

01:33:50 9  the search box and hitting enter.  I will tell you it takes

01:33:55 10  hundreds of refusals to fill to be considered for a corporate

01:34:01 11  block.  It's a huge deal and we only have a handful of DR's --

01:34:10 12  doctors -- that have been issued a corporate block"; correct?

01:34:17 13  A.  That is my understanding of the process at the time.

01:34:30 14  Q.  But if we go back to Plaintiffs' Exhibit 26736, for

01:34:35 15  example, this was the one you and I just covered, Dr. Sam --

01:34:43 16  Garfield Samuel, where one of the pharmacists overheard the

01:34:50 17  patients complaining outside the pharmacy, "He doesn't examine

01:34:54 18  them prior to writing the prescriptions.  This is in addition

01:34:57 19  to other red flags the prescriber already exhibits, such as

01:35:02 20  patients coming in the store in clumps in days with similar

01:35:08 21  prescriptions," et cetera.

01:35:08 22       You see that?

01:35:14 23  A.  That's what the document says.

01:35:15 24  Q.  Now, there's no way for the Walmart down the street to know

01:35:24 25  the experiences of this Walmart pharmacist, is there?

HEATHER K. NEWMAN, RMR, CRR

—Nelson (Cross by Lanier)—

01:35:31  1    A.   I don't know what you're asking.

01:35:34  2    Q.   Well, Mekeda overheard the patients complaining outside the

01:35:38  3    pharmacy that the doctor doesn't examine them prior to writing.

01:35:42  4         Do you see that?

01:35:47  5    A.   That's what she says in the e-mail.

01:35:49  6    Q.   So let's say Mekeda says I'm not going to fill the

01:35:52  7    prescriptions for the patients because of that, and the

01:35:54  8    patients go down to another Walmart.  Other Walmart hadn't

01:35:58  9    heard that conversation, have they?

01:36:02  10   A.   I don't know if they heard it or didn't.

01:36:04  11   Q.   Well, let's assume that the pharmacist for the other

01:36:08  12   Walmart 5 miles away wasn't also standing in the parking lot of

01:36:13  13   the first Walmart hearing the story.  Okay.

01:36:21  14        Are you with me?

01:36:21  15   A.   Well, but it's not unusual for pharmacists to contact other

01:36:23  16   pharmacists and tell them what their concerns are, especially

01:36:28  17   our Walmart pharmacy.

01:36:29  18   Q.   Right.  But if the pharmacist has got no reason for -- I

01:36:32  19   mean, what's the pharmacist going do, say, hey, did you try to

01:36:34  20   fill this at another Walmart pharmacy, and if so, which one so

01:36:39  21   I can call the pharmacist and find out why it was refused?

01:36:44  22        MR. MAJORAS:  Objection.  Speculation.  Hypothetical.

01:36:47  23        THE COURT:  Overruled.

01:36:48  24        THE WITNESS:  It's certainly not unusual for

01:36:51  25   pharmacists to contact other pharmacy to let them know, hey, I

———Nelson (Cross by Lanier)———

01:36:53  1   just refused to fill a prescription for so -- this particular

01:36:57  2   patient.  Don't know if they'll try to bring it to you or not,

01:37:02  3   but here was my concerns.  That was not unusual, and the

01:37:05  4   pharmacists grapevine, as I will call it, is pretty strong in

01:37:09  5   most communities.

01:37:10  6   Q.  So if the pharmacist had time and just started dialing

01:37:12  7   every pharmacy within a radius of however many miles, that

01:37:17  8   might be the only way that the other Walmart pharmacists will

01:37:23  9   know about this.  Is that what you're saying?

01:37:25  10  A.  Well, sir, from many of the other e-mails that you've

01:37:28  11  provided to me during this deposition, it clearly states I

01:37:32  12  talked to a pharmacist at this store, I talked to somebody at

01:37:35  13  that store, and you saw the e-mail chains from multiple Walmart

01:37:38  14  pharmacists to each other, so I believe they were communicating

01:37:40  15  to each other if they had concerns about a prescription that

01:37:43  16  they rejected.

01:37:45  17  Q.  Okay.  Just -- okay.  So they may have done it in one or

01:37:48  18  two or three or more occasions.  Do you think they did it in

01:37:52  19  every one?

01:37:53  20        Let me ask it this way.  Was it a Walmart policy when

01:37:57  21  a pharmacist refused to fill a prescription that the pharmacist

01:38:02  22  call every other pharmacist within some geographical range and

01:38:05  23  tell them?

01:38:08  24        Was that a policy?

01:38:09  25  A.  I'm not aware of that being in any written policy.

—Nelson (Cross by Lanier)—

01:38:11  1    Q.  Was it a suggestion that was in writing anywhere?

01:38:17  2    A.  Not that I'm aware of.

01:38:21  3    Q.  But if you'd put a corporate block in, then any pharmacist

01:38:26  4    in the Walmart system who had access to a computer, they could

01:38:30  5    plug -- run that prescription and know corporate has said don't

01:38:34  6    fill it; right?

01:38:36  7    A.  Well, I would not have been the one to put the corporate

01:38:39  8    block in, but if that's -- and I -- again, I do not know how

01:38:43  9    the process was going to work.

01:38:44 10    Q.  But that process came into place while you were still

01:38:49 11    there, didn't it?

01:38:52 12    A.  I personally did not know of any corporate block that was

01:38:55 13    put on the pharmacists before I -- excuse me, on a physician

01:38:58 14    before I left.  I was not involved in that.

01:39:00 15    Q.  Well, sir, there were a number of corporate blocks that

01:39:05 16    were put into place before you left.  They just didn't start

01:39:09 17    doing it until January of 2017; correct?

01:39:14 18    A.  Sir, I don't know.

01:39:15 19    Q.  Okay.

01:39:16 20    A.  I wasn't involved in that.

01:39:17 21    Q.  Look for Plaintiffs' Exhibit 21393.

01:39:40 22         Do you have that in front of you, sir?

01:39:43 23    A.  Yes, sir.

01:39:44 24    Q.  This is a list of prescribers that were blocked by Walmart

01:39:50 25    as of May 27th of 2020.

HEATHER K. NEWMAN, RMR, CRR

—Nelson (Cross by Lanier)—

01:39:55  1          You got it?

01:39:58  2  A.  Yes, sir, but I have no idea about this.

01:40:01  3  Q.  Well, that's -- that's the reason I'm asking you.  Because

01:40:06  4  a number of these were blocked while you were still head or one

01:40:11  5  of the guys in corporate compliance.  Did you know that?

01:40:19  6  A.  I'm telling you I never saw this list before, sir.

01:40:26  7  Q.  So you did not know that there was a list out where the

01:40:28  8  company was finally putting corporate blocks on people?

01:40:31  9          MR. MAJORAS:  Objection.  Foundation on this 2020

01:40:33 10  document.

01:40:33 11          MR. LANIER:  Judge, this is his area and this was

01:40:36 12  his --

01:40:36 13          THE COURT:  Well -- well, it's three years after he

01:40:39 14  left, so sustained.

01:40:40 15          MR. LANIER:  Okay.  But, Your Honor, what I would like

01:40:43 16  to ask him of is this sense:  So, for example, Harold Budhram,

01:40:49 17  B-u-d-h-r-a-m, he was blocked January 23rd, 2017.  That's while

01:40:58 18  you were still there, wasn't he?  Did you know about him?

01:41:06 19          THE WITNESS:  What was that doctor's name again, sir?

01:41:08 20  BY MR. LANIER:

01:41:08 21  Q.  His name was Harold Budhram, B-u-d-h-r-a-m, blocked

01:41:17 22  January 23rd, 2017?

01:41:33 23  A.  Sir, I never had a list of any kind which showed me which

01:41:35 24  doctors were blocked.

01:41:36 25  Q.  Did you know about Jason Brajer being block while you were

———Nelson (Cross by Lanier)———

01:41:41  1  still at the company, February 10th, 2017, spelled B-r-a-j-e-r?

01:41:52  2  A.  As I stated just a moment ago, I was never provided a list

01:41:54  3  of folks that were blocked, corporate politics, so I don't

01:41:59  4  know.

01:41:59  5  Q.  But my question is -- my question is different than that.

01:42:02  6  It's not did you get a list.  My question is do you know about

01:42:06  7  these people being blocked?  Did you know about Dr. Frank

01:42:09  8  Bynes, B-y-n-e-s, being blocked January 16th, 2017, while

01:42:14  9  you're still at the company?

01:42:17  10  A.  Not that I recall, sir.

01:42:24  11  Q.  Did you know Dr. Horace Davis being blocked while you were

01:42:28  12  still at the company on January 23rd, 2017?

01:42:39  13  A.  Again, not that I recall.  I don't recall knowing of

01:42:40  14  physicians that had corporate blocks.

01:42:42  15  Q.  Dr. Rasean, R-a-s-e-a-n, Hodge, blocked January 26th, 2017,

01:42:51  16  while you were still at the company.  Did you know about that

01:42:53  17  doctor?

01:43:02  18  A.  I do not recall.

01:43:02  19  Q.  And instead of going through the rest of these that were

01:43:05  20  blocked while you were still at the company, I want to ask you

01:43:07  21  a different set of questions.  There are a number of Ohio

01:43:13  22  doctors that the company, I believe, will get testimony from

01:43:17  23  later witnesses, the company ultimately blocked with a refusal

01:43:21  24  to fill.  If those doctors -- I'd like to ask you their names

01:43:27  25  with a representation to you that there were complaints about

Nelson (Cross by Lanier)

01:43:30  1   these doctors even while you were there.

01:43:33  2          MR. MAJORAS:  Objection to this leading the testimony.

01:43:37  3          THE COURT:  Well, let's hear the question first.

01:43:39  4   BY MR. LANIER:

01:43:39  5   Q.  Yeah.

01:43:39  6          My question is going to be this: With that

01:43:42  7   representation being made, do you have any memory of any of

01:43:48  8   these doctors and whether or not you stopped a blanket refusal

01:43:54  9   to fill earlier?  One --

01:44:01  10  A.  Sir, given the fact that Ohio was not my particular area of

01:44:06  11  supervision, it's very possible that someone could have sent me

01:44:09  12  an e-mail regarding a particular physician that at a later date

01:44:14  13  had a blanket refusal or, excuse me, had a blanket prescriber

01:44:18  14  block add to them.  I don't recall specifically any one of

01:44:21  15  those doctors and certainly didn't have access to a list.

01:44:25  16  Q.  Well, let me give you Plaintiffs' Exhibit 26890.

01:44:56  17         Do you have that document, sir?

01:44:57  18  A.  I do.

01:45:00  19  Q.  This is an e-mail to you dealing with an Ohio doctor.

01:45:06  20         You're Brad Nelson, aren't you?

01:45:12  21  A.  Yes, sir.

01:45:13  22  Q.  If you look on Page 2 it seems Dr. Lalli is evolving.  "I

01:45:21  23  just had a patient call for Norco from Dr. Lalli, along with

01:45:26  24  her Soma and Valium."  That's the trinity cocktail, isn't it?

01:45:31  25  A.  That is one of the cocktail, yes.

—Nelson (Cross by Lanier)—

01:45:33  1    Q.  "I know I can't tell the patients we don't fill for him, so

01:45:36  2    we've been filling some medications that are not the chronic

01:45:40  3    use of acute medication.  But this means we've been filling

01:45:45  4    controls from him, such as Adderall.  Of course this is after

01:45:49  5    an OARRS report.  We even had one patient go as far as having

01:45:54  6    his Percocet changed to oxycodone to get around the chronic use

01:45:59  7    of an acute medication.  We filled it because this patient also

01:46:05  8    sat and told me he'd been compiling a list of everyone,

01:46:09  9    pharmacist and pharmacy, who's refusing to fill his medications

01:46:12  10   and going back to Dr. Lalli with it."

01:46:15  11          Do you see that, sir?

01:46:21  12   A.  That's what the document says.

01:46:22  13   Q.  And this is from Cleveland, Ohio.

01:46:23  14          Do you see that as well?

01:46:29  15   A.  That's what it says.

01:46:29  16   Q.  And you're the one who gets the reply out on this, don't

01:46:35  17   you?

01:46:39  18   A.  That's -- Mark Miller sent it to me.

01:46:43  19   Q.  Yep.  And you sent back your cut and paste with your usual

01:46:47  20   language.

01:46:47  21          Do you see that?

01:46:49  22   A.  Yes, sir.

01:46:51  23   Q.  So my question to you, recognizing that you have had input

01:46:55  24   in Ohio doctors and problems with them, is whether or not these

01:47:00  25   names ring a bell as anybody you had ever had come across your

HEATHER K. NEWMAN, RMR, CRR

—————Nelson (Cross by Lanier)—————

01:47:06   1  radar screen.  Okay.

01:47:09   2          Doctor David Demangone, D-e-m-a-n-g-o-n-e.

01:47:17   3          Ring a bell?

01:47:19   4  A.  Does not.

01:47:22   5  Q.  Dr. Martin Escobar, E-s-c-o-b-a-r.  Ring a bell?

01:47:30   6  A.  It does not.

01:47:34   7  Q.  Dr. Frank Lazzerini, L-a-z-z-e-r-i-n-i.  Ring a bell?

01:47:45   8  A.  It does not.

01:47:48   9  Q.  James Prommersberger, P-r-o-m-m-e-r-s-b-e-r-g-e-r.  Ring a

01:47:58  10  bell?

01:47:59  11  A.  It does not.

01:48:02  12  Q.  Dr. Frank Veres, V-e-r-e-s.  Ring a bell?

01:48:10  13  A.  It does not.

01:48:20  14          MR. LANIER:  Your Honor, thank you for this time.

01:48:23  15          Mr. Nelson, thank you for this time.  That ends

01:48:28  16  policies and actions.  We've come to the end of the road, and

01:48:30  17  I'll pass the witness.

01:48:32  18          THE COURT:  All right.  Mr. Majoras, you are up if you

01:48:38  19  want.

01:48:40  20          MR. MAJORAS:  Thank you, Your Honor.  If I could just

01:48:42  21  have a moment.

01:48:46  22          MR. LANIER:  Your Honor, I took a COVID test and I'm

01:48:48  23  negative.  I've got some other cold, but I would definitely

01:48:52  24  urge everyone to -- I've been spitting up here, not on purpose,

01:48:55  25  but I'd urge someone to --

─────Nelson (Direct by Majoras)─────

01:48:56  1          THE COURT:  Okay.  I'll ask Mr. Pitts to clean.

01:49:01  2          MR. LANIER:  And I'm glad to do it myself, but --

01:49:05  3          THE COURT:  Okay.  I'll have Mr. Pitts do it.  That's

01:49:08  4   fine

01:49:08  5          MR. MAJORAS:  Okay.  I appreciate Mr. Pitts doing

01:49:10  6   that.  Thank you.

01:50:44  7       (Brief pause in proceedings).

01:50:45  8          MR. MAJORAS:  Thank you, Mr. Pitts.

01:51:09  9          I apologize in advance for everyone's ears.

01:51:20 10          May I proceed, Your Honor?

01:51:22 11          THE COURT:  Yes, Mr. Majoras.

01:51:24 12          MR. MAJORAS:  Good afternoon, folks.

01:51:24 13                 DIRECT EXAMINATION OF BRAD NELSON

01:51:26 14   BY MR. MAJORAS:

01:51:26 15   Q.  Good afternoon, Mr. Nelson.  I'm used to looking at a

01:51:29 16   witness stand, so I'll be looking down at where I can see you

01:51:34 17   on a screen.  If for any reason you're having any difficulty

01:51:36 18   hearing me, please let me know. I'll be happy to rephrase or

01:51:38 19   restart a question.

01:51:38 20          Can you hear me okay?

01:51:39 21   A.  I can hear you great.

01:51:40 22   Q.  Okay.  I'm going to -- you and I have not met before, have

01:51:43 23   we?

01:51:44 24   A.  Not that I'm aware of.

01:51:45 25   Q.  My name is John Majoras.  I'm one of the lawyers for

———Nelson (Direct by Majoras)———

01:51:48  1   Walmart, and I'm going to jump around just a little bit in

01:51:52  2   terms of some questions I have for you so if I lose track of

01:51:56  3   you somewhere, just please let me know and I'll start over.

01:51:59  4         Okay?

01:52:00  5   A.  Yes, sir.

01:52:03  6   Q.  I want to get a little bit of your back -- a little bit

01:52:05  7   more of your background than we heard earlier.  And I'm talking

01:52:11  8   specifically about when you were the senior -- when you were

01:52:13  9   one of the senior managers of controlled substances.  You were

01:52:18  10  not the only one in that position at Walmart, were you?

01:52:21  11  A.  At one point when the position was first created in 2011, I

01:52:25  12  was the first person put in that role and then two additional

01:52:29  13  resources were added to it.  I believe one 2012 and one in

01:52:34  14  2013.

01:52:35  15  Q.  And when you refer to resources, you're talking

01:52:37  16  specifically about two other individuals; right?

01:52:41  17  A.  Two individuals were added as well as some supportive

01:52:45  18  hourly staff.

01:52:45  19  Q.  So the two other people in the similar position to you

01:52:51  20  after a year or so since you've been in was Ms. Shelley

01:52:55  21  Tustison; is that correct?

01:52:56  22  A.  Shelley was the first one added in 2012.

01:52:59  23  Q.  And then the second was Caroline Riogi; correct?

01:53:02  24  A.  That is correct.  I believe she came on in 2013.

01:53:05  25  Q.  And when the three of you were in your positions, how did

─────Nelson (Direct by Majoras)─────

01:53:09   1   you divide up your responsibilities?
01:53:12   2   A.   It was divided up geographically by boards of pharmacy
01:53:20   3   jurisdictions, if you will, and so we had three directors that
01:53:24   4   oversaw the various states and so we just aligned with each one
01:53:27   5   of those directors.
01:53:28   6   Q.   So when you talk about boards of pharmacies, those are all
01:53:32   7   state level organizations?
01:53:34   8   A.   To the best of my knowledge with the exception of
01:53:36   9   Washington, D.C.
01:53:38  10   Q.   Okay.  Do you recall which states you were responsible for?
01:53:45  11   A.   I -- I remember most of them, but I would hate to provide
01:53:49  12   you a list because I'd probably forget one, but generally
01:53:52  13   speaking it was from Florida up to the Central Plains of the
01:53:55  14   United States, including Indiana, Michigan -- excuse me, not
01:54:00  15   Michigan -- but Montana and Minnesota, as I recall.
01:54:03  16   Q.   And I believe you told Mr. Lanier that Ohio was not one of
01:54:05  17   your states for which you were responsible; right?
01:54:09  18   A.   That is correct, although I would answer questions from
01:54:13  19   time to time.
01:54:13  20   Q.   Okay.  And who had the responsibility, when you had the
01:54:16  21   three people in that position, who had responsibility for Ohio?
01:54:20  22   A.   My recollection was that was Caroline Riogi and Rick Irby.
01:54:26  23   Q.   And so when Mr. Lanier read you a number of names of Ohio
01:54:29  24   doctors, is it surprising to you that you weren't familiar with
01:54:32  25   them?

HEATHER K. NEWMAN, RMR, CRR

---Nelson (Direct by Majoras)---

01:54:36  1    A.   In most situations I would not have recalled the specific

01:54:41  2    doctor involved.  My responsibility was to provide information

01:54:41  3    to the pharmacists so they could make their decision.  It

01:54:43  4    wasn't to digest the individual doctor name.

01:54:47  5    Q.   So during the period from -- when Ms. Riogi joined the

01:54:52  6    position at Walmart until the time that you left Walmart, was

01:54:56  7    she principally responsible for Ohio?

01:55:04  8    A.   That's my recollection.

01:55:05  9    Q.   Okay.  I'm going to switch topics here for a moment.

01:55:07  10             Mr. Lanier spoke to you about some language that he

01:55:09  11   referred to from time to time as a mantra or a cut and paste.

01:55:14  12   And you're familiar with that now -- by now, aren't you?

01:55:17  13   A.   Yes, sir.

01:55:17  14   Q.   So when you provided that information in response to

01:55:21  15   questions, why were you doing that?

01:55:21  16   A.   I --

01:55:28  17   Q.   And by questions, I mean -- I'm sorry to interrupt.  By

01:55:31  18   questions, I don't mean Mr. Lanier's questions, I mean, when

01:55:34  19   people while you were in your job were asking you questions,

01:55:36  20   why did you provide that information to them?

01:55:40  21   A.   Well, it was our decision to send out that information so

01:55:43  22   we were all getting out consistent information irregardless of

01:55:47  23   what area of the country would send in a request, they wanted

01:55:50  24   to make sure we referred them to the policies and procedures

01:55:53  25   and best practices.

—————Nelson (Direct by Majoras)—————

01:55:54  1   Q.  And do those policies and procedures that were part of that

01:55:58  2   information include how pharmacists were to go about their

01:56:01  3   decisions and whether to fill prescriptions?

01:56:04  4   A.  It certainly gave them plenty of information with regards

01:56:07  5   to determining a valid patient relationship, determining a

01:56:12  6   professional judgment of the pharmacist, evaluation of red

01:56:14  7   flags and what to do in the case if they determined that the

01:56:19  8   prescription was not legitimate.

01:56:20  9   Q.  And where would that information be found?

01:56:23 10   A.  In the POMs.

01:56:25 11   Q.  So the POMs are the procedural -- I'm sorry.  Even I got it

01:56:28 12   wrong.  The pharmacy operations manual?

01:56:32 13   A.  That is correct.

01:56:33 14   Q.  And those are -- a number of those are the numbers that you

01:56:38 15   referred to in that information that Mr. Lanier refers to as

01:56:40 16   your mantra or cut and paste; correct?

01:56:43 17   A.  That is correct.

01:56:44 18   Q.  Let's take a closer look at that if you would, please, and

01:56:47 19   I'm going to ask you to pull up a document that Mr. Lanier used

01:56:50 20   with you, which is Plaintiffs' Exhibit 14643.  It would have

01:56:54 21   been early in the process if you have them stacked.

01:56:58 22   A.  I do have them stacked.  14643?

01:57:01 23   Q.  Yes, sir.

01:57:03 24   A.  Okay.  I have it.

01:57:05 25   Q.  And we'll also have it up on the screen so if it's easier

———Nelson (Direct by Majoras)———

01:57:10  1  to see there, but either way you want to look at it.

01:57:13  2          Just to refresh everyone's recollection, this was an

01:57:15  3  e-mail from you to Mr. John Smasal dated January 28th, 2013;

01:57:24  4  correct?

01:57:24  5  A.  Correct.

01:57:26  6  Q.  So I want to look in that first paragraph, which it's a

01:57:28  7  fair amount of information, but I want to focus in particular

01:57:30  8  on something that Mr. Lanier did not read into the record.

01:57:34  9          Do you recall that he asked you about the company's

01:57:37  10  policies on blanket refusals to fill?

01:57:41  11  A.  Several times.

01:57:42  12  Q.  And -- and, in fact, on this particular one, I'll remind

01:57:45  13  you, he read the language about blanket refusals to fill in

01:57:48  14  that first paragraph.

01:57:49  15          Do you recall that?

01:57:51  16  A.  Yes, sir.

01:57:52  17  Q.  So now I'd like to direct your attention though to about

01:57:55  18  middle of that first paragraph, the sentence begins, "One of

01:57:59  19  the biggest mistakes."

01:58:02  20          Do you see where I am?  It's on the screen in front of

01:58:06  21  you if you can see that.

01:58:07  22  A.  Yes, sir, I see it.

01:58:08  23  Q.  Okay.  And then I'm going to take that all the way down to

01:58:11  24  where Mr. Lanier was reading about blanket refusals to fill, so

01:58:16  25  about four lines below that and it ends with "medical reasons."

————Nelson (Direct by Majoras)————

01:58:24 1    A.   Okay.

01:58:25 2    Q.   So rather than me do the reading, I'm going to ask you if

01:58:27 3    would you please read into the record this part of the material

01:58:32 4    that you were sending consistently in response to questions.

01:58:37 5    A.   "One of the biggest mistakes the pharmacist makes is the

01:58:40 6    belief that they're required to fill a prescription from the

01:58:43 7    prescriber once they have called and established that the

01:58:46 8    prescription was written by the prescriber.  That is not true.

01:58:49 9    The pharmacist is still able to refuse to fill a prescription

01:58:54 10   even after contacting the prescriber's office.  If they choose

01:58:58 11   not to fill a prescription, they must follow POM 1703 for

01:59:03 12   refusal to fill and fraudulent prescriptions.  Pharmacists are

01:59:07 13   encouraged to use -- to exercise their professional judgment

01:59:10 14   and refuse to fill prescriptions when they feel a prescription

01:59:13 15   is being written for other than legitimate medical reasons."

01:59:18 16   Q.   So when you get questions from pharmacists in the field or

01:59:21 17   perhaps a pharmacist -- pharmacy manager about how a pharmacist

01:59:25 18   should treat information on a prescription, what is your advice

01:59:29 19   to that pharmacist?

01:59:33 20   A.   Exercise their professional judgment, use all the

01:59:36 21   information available to them and the tools available to them

01:59:39 22   to determine whether or not they're comfortable filling a

01:59:42 23   prescription, and if not, they should refuse to fill the

01:59:45 24   prescription and create the documentation.

01:59:47 25   Q.   Have you ever provided any advice to a pharmacist that if

————Nelson (Direct by Majoras)————

01:59:51  1   they were uncomfortable in filling a prescription they should

01:59:54  2   go ahead and fill it anyway?

01:59:56  3   A.  Not that I am aware of.  I certainly don't recall that.

02:00:05  4   Q.  I'd like now to refer you to a document which is in the

02:00:12  5   binder that you would have from the defendants, from Walmart, I

02:00:17  6   believe.  It's a binder with tabs.  It goes all the way up to

02:00:19  7   Tab 20.

02:00:20  8          Do you have that, sir?

02:00:23  9   A.  I have one that has Tab 1 through 5.

02:00:26 10          MR. LANIER:  Your Honor, if they were going to use

02:00:28 11   documents --

02:00:28 12          THE COURT:  I agree.  They should be -- should have

02:00:30 13   been or should not be --

02:00:34 14          MR. MAJORAS:  This was placed on our exhibit list last

02:00:36 15   evening.  The document exhibit is Walmart MDL 01575.

02:00:45 16          MR. LANIER:  Your Honor, they were supposed to give us

02:00:46 17   a list of any documents they would use with this witness last

02:00:50 18   night under the rules.

02:00:51 19          MR. MAJORAS:  Your Honor, this is direct --

02:00:53 20   cross-examination responding to what Mr. Lanier brought up on

02:00:56 21   his direct examination.

02:01:13 22          MR. LANIER:  I mean, Your Honor, I don't know if you

02:01:35 23   want me to make my objections --

02:01:38 24          THE COURT:  All right.  We'll go on the headphones.

02:01:54 25      (At sidebar at 2:01 p.m.)

HEATHER K. NEWMAN, RMR, CRR

—Nelson (Direct by Majoras)—

02:01:54  1          MR. LANIER:  Your Honor, this morning I made note, I

02:01:57  2   went over to the table and I said, y'all never gave us a list

02:02:00  3   of documents that you might use in direct on your witness.  I

02:02:05  4   said I assume from that you're not going to be using any, I

02:02:08  5   mean, you know, and it was an, uh, shucks, uh, shucks.

02:02:12  6          The reason the provision was put into place that we've

02:02:15  7   adhered to every day of giving documents that we'll use on our

02:02:19  8   witnesses in direct is for this very reason.  So if you look at

02:02:24  9   this, for example, the first thing that jumps out at you is

02:02:28  10  there's an e-mail from William Dunn to Brad Nelson.  I don't

02:02:34  11  have any clue who William Dunn is, but it's clearly hearsay,

02:02:38  12  and I don't understand even remotely.  So he got an e-mail from

02:02:41  13  this guy named William Dunn.  I've had no chance to prepare my

02:02:45  14  objections to it, but it's hearsay, and he's just setting it

02:02:50  15  down in front, and what's particularly aggravating is he's been

02:02:54  16  given a notebook, evidently, of exhibits last night.

02:02:57  17         THE COURT:  Well, I want to -- I want to find out if

02:03:00  18  these documents were identified, Mr. Majoras, for the

02:03:06  19  plaintiffs that you were planning to use with Mr. Nelson.

02:03:08  20         MR. MAJORAS:  I did not identify specifically last

02:03:10  21  evening these documents would be used with Mr. Nelson.  I

02:03:13  22  believe that this goes directly to the cross-examination -- or

02:03:17  23  the direct examination that Mr. Lanier put on and I'm in

02:03:20  24  cross-examination mode.  These aren't your issues.

02:03:23  25         THE COURT:  No.  No.  This is not cross-examination.

—Nelson (Direct by Majoras)—

02:03:25  1   We went through this and this is really direct.  He's your
02:03:29  2   witness.  So these should have been provided.
02:03:40  3         MR. LANIER:  I mean, so this is clearly hearsay.
02:03:42  4   Evidently it was added to their exhibit list, though not
02:03:46  5   singled out to be used but at 11:45 last night, and, I mean,
02:03:52  6   this is -- this is ambush.
02:03:56  7         THE COURT:  I mean, we knew Mr. Nelson was going to be
02:03:58  8   called today several days ago, I mean, over a week ago.  We've
02:04:04  9   set aside today for that.
02:04:08 10         MR. MAJORAS:  And I'm getting their information last
02:04:10 11   night in terms of what their exam is going to be, and I've got
02:04:12 12   to form their response to that.
02:04:14 13         MR. LANIER:  No, no, no.  Ours was cross-examination.
02:04:16 14   We did not give you any info last night for cross-examination.
02:04:19 15   Cross-examination you're not required to.  So this is not, gee,
02:04:22 16   you got ours and you're responding.  This isn't at all.  All
02:04:25 17   we -- all I did is I took the documents that were late produced
02:04:28 18   to us and I used those ones that had Nelson's name on them.
02:04:33 19         THE COURT:  Those were the only ones that --
02:04:35 20         MR. LANIER:  That's all I used.
02:04:37 21         MR. MAJORAS:  No.  Mr. Lanier -- the majority of his
02:04:40 22   documents were not late produced documents, the majority --
02:04:43 23         MR. LANIER:  Absolutely were.  Oh, no.  Oh, no.
02:04:45 24         MR. MAJORAS:  We'd be happy to provide the Court
02:04:48 25   information on that one, Your Honor.

─────Nelson (Direct by Majoras)─────

02:04:49 1          MR. LANIER:  Yeah, I would too.

02:04:50 2          THE COURT:  All right.  Everyone's just using up --

02:04:52 3   this is all Walmart's time.  I don't -- you know -- how many --

02:04:59 4   how many documents are you going to use, Mr. Majoras, that you

02:05:02 5   didn't identify?  I mean, yes, this is hearsay.  It did go to

02:05:05 6   him.  Maybe he remembers it; maybe not.  I --

02:05:09 7          MR. MAJORAS:  No more than the hearsay we've been

02:05:12 8   hearing throughout this examination, Your Honor, but this I

02:05:16 9   believe is the only document that was not used in his exam

02:05:18 10  earlier that I plan to use.

02:05:20 11         THE COURT:  Well, all right.  I'll -- I will allow

02:05:22 12  you -- that's -- on that representation, I'll allow you to show

02:05:26 13  this witness the document.  If he remembers it, before you read

02:05:30 14  it to anyone, if he remembers it then -- then you can ask him

02:05:38 15  about it.  If he doesn't, then you got to move on.

02:05:40 16         MR. MAJORAS:  Okay.  Thank you.

02:05:42 17         MR. LANIER:  Thank you, Judge.

02:05:42 18      (In open court at 2:05 p.m.)

02:05:42 19  BY MR. MAJORAS:

02:06:05 20  Q.  So, Mr. Nelson, what I'm going to ask you to do is take

02:06:08 21  your binder with the five documents and turn to Tab 5 to the

02:06:12 22  binder.  I'm not going to ask you do anything in terms of

02:06:14 23  reading it out loud just yet.

02:06:18 24         For the record, this is Walmart Exhibit 01575.

02:06:23 25         Do you see that sticker on your document so that we're

**3930**

---Nelson (Direct by Majoras)---

02:06:26  1    looking at the same thing, sir?

02:06:27  2    A.   I do.

02:06:28  3    Q.   Okay.  If you would just read to yourself, it's a two-part

02:06:33  4    e-mail, just read the bottom e-mail and the top e-mail to

02:06:36  5    yourself.  My first question to you is simply do you recall

02:06:41  6    this document.

02:06:57  7    A.   It doesn't immediately ring any bells.

02:07:05  8    Q.   Do you know who Mr. Williams Dunn is?

02:07:15  9    A.   I don't have any recollection of Mr. Dunn.

02:07:16  10   Q.   Do you recall Mr. Dunn talking about an investigation of a

02:07:22  11   complaint that was made about his Walmart store in --

02:07:26  12            MR. LANIER:  Objection.

02:07:27  13            THE COURT:  Sustained.

02:07:34  14            MR. MAJORAS:  Okay.

02:07:36  15   BY MR. MAJORAS:

02:07:38  16   Q.   Mr. Nelson, go ahead and put that aside.  So keeping in

02:07:40  17   mind about the information what a pharmacist should do with an

02:07:45  18   individual prescription.  If a pharmacist were confronted with

02:07:48  19   multiple prescriptions from a particular prescriber, what is

02:07:50  20   the process that pharmacist should do under Walmart policies

02:07:55  21   when you were there prior to 2017?

02:08:02  22   A.   They should have been guided by using the POMs to determine

02:08:04  23   whether or not the prescription was written for legitimate

02:08:10  24   medical purposes by getting with the patient and the

02:08:16  25   prescriber, using the prescription monitoring programs and

---Nelson (Direct by Majoras)---

02:08:18 1    their experience as to determine whether or not there was some

02:08:21 2    reason that would spark red flags that couldn't be resolved and

02:08:28 3    then decide whether they should fill the prescription or not.

02:08:31 4    Q.  And if they had information from their own experience in

02:08:34 5    terms of what they had seen or heard at their store about a

02:08:37 6    prescriber, could they factor that into their analysis in using

02:08:42 7    professional judgment?

02:08:44 8    A.  I would assume they would do that.

02:08:45 9    Q.  You would expect it, wouldn't you?

02:08:47 10   A.  I would do that if it was me.

02:08:49 11   Q.  Sir, if a pharmacist were -- again, back to what I started.

02:08:54 12   If a pharmacist had multiple prescriptions from a prescriber

02:08:58 13   about which that pharmacist had some doubt, how should that

02:09:01 14   pharmacist treat each individual prescription?

02:09:05 15   A.  They should evaluate each prescription based on the way

02:09:08 16   it's written and what the particular patient's needs were and

02:09:11 17   then based on their professional judgment determine whether

02:09:15 18   they should fill or not fill that prescription.

02:09:18 19   Q.  And --

02:09:18 20   A.  Whether it's one prescription or six.

02:09:20 21   Q.  And did -- and was there any policy in place that you had,

02:09:23 22   or that you advised pharmacists about, concerning whether or

02:09:27 23   not they could refuse multiple prescriptions from the same

02:09:29 24   doctor?

02:09:32 25   A.  I am not aware of a policy that stated they could refuse

HEATHER K. NEWMAN, RMR, CRR

---Nelson (Direct by Majoras)---

1 multiple prescriptions at one time other than evaluating them

2 one at a time.

3 Q.  And once a pharmacist did refuse to fill a prescription,

4 what was the procedure that pharmacist should do?

5 A.  The outline of 1703, that POM requested them and required

6 them to fill out a refusal to fill documentation form, it was a

7 web form.

8 Q.  Okay.  Let's break that down a little bit.  Whether you say

9 a refusal to fill documents form, for those of us who don't

10 work at Walmart, what do you mean?

11 A.  It was a document that they had access to through their

12 computer system, it was a web-based, in other words,

13 internet-based and it would fill out this document, and once

14 they were complete with the document they would transmit it and

15 it was sent up to the home office.

16 Q.  And why did you want that?

17 A.  That document was requested to be sent to the DEA and we

18 compiled that information and sent it to the DEA on a daily

19 basis.

20 Q.  What was your specific role in sending Walmart's refusal to

21 fill documentation to the DEA?

22 A.  Each morning when I arrived at the office there would be an

23 inbox where all these web forms came to.  There was a process

24 where that web -- those web forms were converted to an Excel

25 spreadsheet.  I sorted the Excel spreadsheet by state or

──────Nelson (Direct by Majoras)──────

02:11:02  1   actually by DEA region and then would fax a copy of the refusal

02:11:09  2   to fill that came from that particular DEA's jurisdiction to

02:11:13  3   them on a daily basis.

02:11:16  4   Q.  And did you ever have any contact with the DEA about

02:11:19  5   refusals to fill, other than what you just described?

02:11:24  6   A.  Occasionally the DEA offices that we sent the information

02:11:28  7   to would contact us and request additional information or want

02:11:34  8   to talk to the pharmacist.

02:11:36  9   Q.  And what was your policy in responding to the DEA when you

02:11:38 10   got requests?

02:11:41 11   A.  Cooperate with them and provide what information they

02:11:43 12   needed.

02:11:44 13   Q.  And what about if they had -- did any ask you to get in

02:11:47 14   touch with the individual pharmacist?

02:11:50 15   A.  Occasionally that would occur.

02:11:52 16   Q.  And what would you do in that case, situation?

02:11:57 17   A.  My recollection was that each DEA agent acted a little bit

02:12:04 18   differently, but most of the time it was, will you please

02:12:06 19   contact this pharmacist and give them my contact information

02:12:10 20   because when they show up at a store it generally alarms the

02:12:13 21   pharmacist, and that was not their intent, they generally want

02:12:15 22   to just speak to them about the particular prescriber or the

02:12:20 23   particular patient.

02:12:23 24   Q.  I'm going to switch gears again.  Mr. Lanier asked you

02:12:26 25   questions about information in the Archer system.

—Nelson (Direct by Majoras)—

02:12:29  1           Do you recall that?

02:12:31  2    A.  Yes, sir.

02:12:32  3    Q.  The Archer system is one of the names that Walmart has had

02:12:35  4    over time for its systems that were made available within the

02:12:39  5    health and wellness division?

02:12:42  6    A.  That is correct.

02:12:44  7    Q.  And there may have been some confusion over whether it was

02:12:49  8    a blanket refusal to fill or a corporate, but I'm going to ask

02:12:52  9    you to pull out an exhibit he showed you which is plaintiffs'

02:12:55  10   08037.

02:13:05  11   A.  Yes, sir.  I have that.

02:13:07  12   Q.  So if you look -- if you look at the -- the top of the

02:13:11  13   second page, which is the e-mail to you from Mr. Billings, and

02:13:16  14   at the top, the very first question he asked you, "Can you look

02:13:19  15   into where we are at with RTS for Lamonda at Store 40?"

02:13:23  16           Do you see that, sir?

02:13:25  17   A.  I do.

02:13:26  18   Q.  And you respond, "Josh" -- back on the first page -- "Josh,

02:13:30  19   you can do that in Archer by putting his DEA number in the

02:13:34  20   search box and hitting enter."

02:13:37  21           Do you see that?

02:13:39  22   A.  I do.

02:13:39  23   Q.  And when you say by -- you can do that, what are you --

02:13:42  24   what are you telling him he could find out if he puts the DEA

02:13:45  25   number in Archer?

—Nelson (Direct by Majoras)—

02:13:48  1    A.  As I recall, it would bring up all of the refusal to fills

02:13:52  2    that were reported for that particular DEA number from all the

02:13:55  3    Walmart pharmacies.

02:13:57  4    Q.  So the refusals to fill would be the individual

02:14:00  5    prescriptions that a pharmacist, using their judgment, decided

02:14:04  6    not to fill; is that right?

02:14:07  7    A.  Yeah.  I guess I don't want to call them prescriptions, I

02:14:10  8    want to call them individual items that the pharmacist chose

02:14:14  9    not to fill because I don't want to call them a prescription if

02:14:18  10   they're not filled.

02:14:18  11   Q.  Okay.  But these were an attempt by someone to come to the

02:14:21  12   pharmacy to fill what they purported to believe was a

02:14:25  13   prescription.  Is that fair?

02:14:26  14   A.  That is correct.

02:14:27  15   Q.  Okay.  And is it your understanding, as you recall back to

02:14:32  16   your time at Walmart and Archer, that one can view the

02:14:37  17   different refusals to fill that Walmart had in its system

02:14:40  18   through the Archer system?

02:14:45  19   A.  Sir, that did become available at some point in time, but I

02:14:49  20   do not recall the exact date.

02:14:50  21   Q.  Okay.  When lawyers are searching for documents it means

02:15:11  22   I'm almost done, so that's good news for all of us.

02:15:13  23        Mr. Nelson, thinking back to your time, and in

02:15:18  24   particular as you responded to questions from pharmacists and

02:15:22  25   pharmacy directors, how did you go about your job in trying to

─────Nelson (Direct by Majoras)─────

02:15:27  1    respond to that?  What was your guiding principle?

02:15:32  2    A.  I viewed myself as a resource to provide information and

02:15:36  3    clarity on policies and procedures that were available to us at

02:15:40  4    Walmart.

02:15:42  5    Q.  And in terms of communicating that to the people who asked

02:15:46  6    you questions, what was your goal in those communications?

02:15:54  7    A.  To give consistent information that was accurate, and it

02:15:58  8    would guide the pharmacists and the market directors and

02:16:01  9    regional managers into filling prescriptions that were

02:16:06 10    legitimate and for refusing to fill prescriptions that they

02:16:09 11    felt were not legitimate by a prescriber.

02:16:14 12    Q.  Mr. Nelson, just as a reminder I think it may have come up

02:16:19 13    earlier in the trial, but you're actually a trained pharmacist;

02:16:22 14    correct?

02:16:22 15    A.  That is correct.

02:16:25 16         MR. MAJORAS:  Thank you, sir.  I have no further

02:16:26 17    questions at this time.

02:16:28 18         THE COURT:  Okay.  If any of the jurors have questions

02:16:33 19    that they wish posed to Mr. Nelson, if you could please write

02:16:36 20    them down, give them to Mr. Pitts and we'll show them to

02:16:40 21    counsel.

02:16:55 22       (Brief pause in proceedings).

02:19:14 23         MR. LANIER:  Mr. Nelson --

02:19:16 24         THE WITNESS:  Yes, sir.

02:19:18 25         MR. LANIER:  Let me grab one more thing.

———Nelson (Recross by Lanier)———

RECROSS-EXAMINATION OF BRAD NELSON

BY MR. LANIER:

Q.  I don't have a lot of questions for you.  The jury has a
number of questions for you, so I'm going to put them on the
screen so that you can more easily see them and I'll read them
out loud because they've got to go into the record, though,
obviously, we can all read it once it's on the screen, but this
way they're read into the record.

        "If Caroline Riogi was out of the office or on
vacation, who would handle her regions?"

A.  It was our practice at that time if one of the senior
directors or managers was out of the office, they would leave
an out-of-office response saying, "Please contact
Shelley Tustison or Brad Nelson."  It just depended upon
whoever would have made a request of at that time.

Q.  And in that regard, I had a couple of questions that I was
going to ask you about Ms. Riogi and Ms. Tustison, so I'll
throw them in here because they make sense with the juror's
question.

        Do you know what kind of training they had before they
took their jobs?

A.  Well, they were both registered pharmacists and they worked
as pharmacy managers at their prospective locations before they
were -- before they applied for and were promoted to this
position.  After they got in their role, they spent time with

—Nelson (Recross by Lanier)—

02:20:53  1  the other director or senior manager that was in place at the

02:20:57  2  time to get experience.

02:21:02  3  Q.   Okay.  And I think they were in their late twenties at the

02:21:05  4  time or something like that to give us an idea of how many

02:21:07  5  years they had been out of school.

02:21:09  6       Does that seem right?

02:21:10  7  A.   I honestly don't know their age at that particular point in

02:21:20  8  time.  They had probably be practicing four to five years in

02:21:22  9  their particular pharmacy, but I'm not exactly sure what their

02:21:26  10 birthdays were.

02:21:27  11 Q.   And to the best of your knowledge would they be giving the

02:21:30  12 same counsel that you were you or were you giving something

02:21:33  13 other than just Walmart policy?

02:21:39  14 A.   To my knowledge, we were all sending out that same

02:21:44  15 information that I sent out.  It was something that we used

02:21:47  16 together and gave consistent guidelines -- consistent guidance

02:21:52  17 that way.

02:21:53  18 Q.   All right.  Next question from a juror: "Prior to 2012,

02:22:01  19 would you have been responsible for the State of Ohio?"

02:22:10  20 A.   I guess the first year when I was the senior manager of

02:22:16  21 controlled substances I was helping in all states.  So, 2011,

02:22:22  22 2012, I was kind of over all states, I guess you would say.

02:22:25  23 Although most of the time the state issues were handled by the

02:22:30  24 senior directors, which were above my supervision level.

02:22:34  25 That's who handled it prior to 2011, would have been the senior

HEATHER K. NEWMAN, RMR, CRR

———Nelson (Recross by Lanier)———

02:22:39  1  directors.

02:22:40  2  Q.  All right.  The next question, I believe, is in reference

02:22:43  3  to the exhibit that I used with you where it showed with

02:22:52  4  Dr. Lalli, L-a-l-l-i, you responding to that Cleveland, Ohio,

02:22:57  5  situation.

02:22:59  6        And, so, within that framework or maybe another, and I

02:23:03  7  may just be wrong on trying to understand what the juror is

02:23:05  8  saying, but "If Mr. Nelson did not cover Ohio, why didn't you

02:23:10  9  refer to a colleague who might be more familiar with the

02:23:12 10  doctors in that state?"

02:23:18 11  A.  Do you remember which document that was?  I believe that

02:23:20 12  was the one where Mark Miller sent that to me?

02:23:24 13  Q.  It was Dr. Lalli, L-a-l-l-i.  I'll pull it up.

02:23:26 14  A.  I understand that.  Hold on.  I might have it right here.

02:23:29 15        Yes, I have it here, sir, and I believe that is 26890

02:23:35 16  is that document, and I can tell you that Mark Miller was an

02:23:40 17  individual who I hired out of pharmacy school to become a

02:23:45 18  pharmacy manager and then Mark Miller became a district manager

02:23:50 19  who worked out of the Ohio area.  And so Mark felt very

02:23:53 20  comfortable contacting me, so I assume -- and that's what this

02:23:56 21  is, an assumption, because I don't recall on June 18th of 2013,

02:24:01 22  if -- 2013, if Mr. Nocci (phonetic) was on vacation at that

02:24:08 23  time or not, or if it was just Mr. Miller who felt comfortable

02:24:11 24  contacting me directly because he had -- I think we have a

02:24:14 25  professional relationship and a personal relationship, and I

—Nelson (Recross by Lanier)—

02:24:16  1    assume that's why.

02:24:18  2    Q.  Okay.  And so that's why you're answering an Ohio situation

02:24:22  3    June of 2013, to the best of your measured thought.  Fair?

02:24:31  4    A.  Yes.  And in regards it would have been the same

02:24:35  5    information if Carol had sent it to him as well.

02:24:39  6    Q.  But again, did you say anything different than you believed

02:24:41  7    the other two people in your job would have been saying?

02:24:46  8    A.  I don't believe so.

02:24:47  9    Q.  Okay.  Next.  "Is Archer different than the computer system

02:24:53 10    a pharmacist would use to enter information about the

02:24:56 11    prescription?"

02:24:57 12            Why don't we stop there and then we'll keep going, but

02:25:00 13    first answer the first question --

02:25:02 14    A.  The answer to that question is Archer is a web-based

02:25:08 15    process software that they enter the information into.  You

02:25:12 16    could access it using the same computer system that we used to

02:25:16 17    fill prescriptions, but it was not in that same software where

02:25:20 18    the prescription filling is conducted.

02:25:23 19            Does that make sense?

02:25:25 20    Q.  I'm not sure.

02:25:28 21    A.  Okay.  Let me think about it.

02:25:35 22    Q.  Let's -- let's continue with the follow-up question and see

02:25:37 23    if that helps.  "So the pharmacist would look this up separate?

02:25:42 24    Did they have an Archer system and a separate system?"

02:25:50 25    A.  The second question is, yes, the pharmacist would look up

———Nelson (Recross by Lanier)———

02:25:54 1    information in Archer separately.

02:25:57 2    Q.   Okay.

02:25:58 3    A.   From the actual filling computer.

02:25:59 4    Q.   And then the third question, "Is Archer connected to the

02:26:07 5    PMP or is that separate yet again?"

02:26:10 6    A.   Yeah, the PMP is for prescriptions that were actually

02:26:13 7    filled and Archer is for notating prescriptions that were not

02:26:16 8    filled.  So they are separate systems.  One's operated by the

02:26:19 9    individual states, which is the PMP, and Archer was just a

02:26:22 10   software program that we used at Walmart to capture incident

02:26:25 11   information.

02:26:26 12   Q.   But I want to press you a little bit on that because the

02:26:29 13   PMPs are run by the pharmacists to help them determine whether

02:26:34 14   to fill.  True?

02:26:37 15           MR. MAJORAS:  Objection to form.

02:26:38 16           THE COURT:  Well, overruled.

02:26:41 17           THE WITNESS:  I'm not sure I understand completely,

02:26:43 18   but a PMP is operated by the state -- by the state.  It's not

02:26:48 19   operated by the pharmacist.

02:26:48 20   BY MR. LANIER:

02:26:49 21   Q.   Right.  So, for example -- I'm sorry.  For example, in

02:26:54 22   Ohio, as of 2011, if a pharmacist was going to fill a certain

02:27:00 23   prescription and there's only -- it was only mandatory under a

02:27:03 24   certain specific guideline, but if there was an oxy 30 that was

02:27:10 25   going to be filled, before the pharmacist fills it, the

———Nelson (Recross by Lanier)———

02:27:12  1   pharmacist was required to look up the PMP, it's called OARRS

02:27:16  2   in Ohio, and make a determination if there are any red flags or

02:27:24  3   issues.  So, in that sense, check the PMP before dispensing.

02:27:30  4          Are you tracking with me?

02:27:32  5   A.  I can't speak to whether that was OARRS or not, it may have

02:27:37  6   been.  In 2011, many states had that requirement as PMPs came

02:27:42  7   online.

02:27:43  8   Q.  But the point then, in terms of the juror's question for me

02:27:45  9   at least, would be Archer did not check the PMP either; the PMP

02:27:51 10   would have to be checked independently.  Is that fair?

02:27:53 11   A.  That is accurate.

02:27:55 12   Q.  Thank you.

02:27:56 13          And then the final set of juror questions at this

02:28:01 14   point is two on this sheet.  The first one says, "If there was

02:28:07 15   an update to the prescription -- I mean, the pharmacy operating

02:28:12 16   manual in regards to blanket refusals being prohibited, where

02:28:16 17   in the original does it state that Walmart had a policy

02:28:20 18   prohibiting blanket refusals and that it was stated by the

02:28:23 19   state medical board of pharmacy?  In other words, was there an

02:28:28 20   actual POM in writing?"

02:28:33 21   A.  Yes.  POM 1703 contained information saying that refusal to

02:28:39 22   fills -- or, excuse me, blanket refusals were prohibited.

02:28:44 23   Q.  I've got -- I've got a copy of POM 1703 as it existed in

02:28:53 24   July of 2015.  It's Plaintiffs' Exhibit 21090.

02:28:59 25          I did not know this would come up, so I don't think

──────Nelson (Recross by Lanier)──────

02:29:01  1  it's in your box, sir, but if you can look at the screen, and
02:29:05  2  I'm glad to turn the pages in any way, shape, form, or fashion
02:29:09  3  that you might want, but do you recognize at least the title
02:29:12  4  that this is POM 1703?
02:29:18  5  A.  That looks -- looks like the way a POM would have been
02:29:20  6  written.
02:29:21  7  Q.  And is it true that POM 1703 only dealt with, according to
02:29:26  8  the title, "Forged or fraudulent prescription procedures"?
02:29:33  9  A.  I believe it also covers refusal to fill.
02:29:37 10  Q.  But is it refusals to fill in a situation that are forged
02:29:41 11  or fraudulent?
02:29:46 12  A.  Don't recall.
02:29:47 13  Q.  If you look, you'll see it says, "Potential indicators of
02:29:51 14  fraudulent, forged, or altered prescriptions."  Then it gives a
02:29:56 15  host of bullet points.
02:29:59 16          Do you see that?
02:30:00 17  A.  Yes, sir.  I do.
02:30:02 18  Q.  "Prescriptions written in more than one color ink,
02:30:06 19  unusually high quantities or dosages which differ from usual
02:30:11 20  medical use, different handwriting styles or penmanship that's
02:30:15 21  too good or too legible, prescriptions written in full without
02:30:21 22  standard abbreviations.  See, these are all about fraudulent,
02:30:25 23  forged, or altered prescriptions."
02:30:27 24          Do you see that, sir?
02:30:31 25  A.  I see that's on the document, yes, sir.

────Nelson (Recross by Lanier)────

Q.   And then if we continue to look at the rest of the POM, it

does talk about if there's evidence of doctor shopping to

obtain prescriptions for controlled substances, it talks about

detect prescriptions that may have been forged and altered and

how to deal with that.

        Do you see that as well?

A.   It appears that that's included, yes, sir.

Q.   And then if you go to the third page of forged or

fraudulent prescription procedures, it talks about verifying

and reporting forged or altered prescriptions.

        Do you see that also?

A.   I do.

Q.   It says, in Point 4, "If the prescribing practitioner

validates that the prescription is legitimate, document in the

prescription note sections of CONEXIS."

        Is CONEXIS that other computer program you were

talking about independent of Archer?

A.   That is correct.

Q.   But, sir, within the confines of this, is there any place

we ought to be looking to see whether or not there's anything

at all about a blanket refusal to fill policy?

A.   Without a copy of it right in front of me, sir, I don't

remember where it's at.  It may be in that one or it could be a

different POM.

Q.   Okay.  Next juror question: "There was a mention as to the

—————Nelson (Recross by Lanier)—————

02:32:21  1 │ refusal to fill form not being filled correctly.  Who would

02:32:26  2 │ follow up to make sure that it was resubmitted and not just

02:32:29  3 │ left out and not reported and not considered for a block?

02:32:35  4 │        "What was the procedure, sir?"

02:32:38  5 │ A.  When the pharmacist filled out the web form, as they're

02:32:41  6 │ filling out the web form, if they left off a required field, it

02:32:47  7 │ would stop them when they submitted -- submitted -- or

02:32:50  8 │ attempted to submit it and say, you must fill in this

02:32:53  9 │ particular field.  Kind of like if you're buying something on

02:32:56 10 │ the internet and you try to put in your credit card number and

02:32:58 11 │ you leave off that little CV code at the end, it will stop you

02:33:01 12 │ and say, wait, time out, you got to put the CV code in.  That's

02:33:05 13 │ kind of what the web form did, is it stopped and put in red,

02:33:10 14 │ this information is required.  So the pharmacist filling out

02:33:13 15 │ the form would have been the individual that would have had to

02:33:16 16 │ correct it in order to submit it.

02:33:19 17 │ Q.  All right.  And then for my last set of questions from what

02:33:26 18 │ you were asked by Mr. Majoras, first of all, you were asked

02:33:32 19 │ about your form response in one of the exhibits that I used.

02:33:36 20 │ It was Exhibit 14643.

02:33:38 21 │        Do you recall that?

02:33:43 22 │ A.  Let me find it again, but go ahead.

02:33:45 23 │ Q.  Yeah, this is the one where Mr. Majoras pointed out that I

02:33:48 24 │ didn't read everything word for word, that I had left out this

02:33:51 25 │ section right here (indicating) and he didn't add it, but I

---Nelson (Recross by Lanier)---

02:33:55  1   also left out these sections down here (indicating).

02:33:57  2   Do you see that?

02:33:59  3   A.  Yes, sir.

02:34:00  4   Q.  I don't -- I don't want there to be any -- well, help me

02:34:04  5   understand if I've left out anything that's pertinent to what

02:34:06  6   we're talking about.  Okay?

02:34:10  7   What you say here, and I'll use a different color

02:34:14  8   highlighter to make it clear, that this is additional, is you

02:34:18  9   say, "One of the biggest mistakes the pharmacists make is a

02:34:22  10  belief they're required to fill a prescription from a

02:34:23  11  prescriber once they've called and established the prescription

02:34:27  12  was written by the prescriber."

02:34:29  13  Nobody fusses that; right?

02:34:32  14  A.  Correct.

02:34:34  15  Q.  This is not true.  The pharmacist is still able to refuse

02:34:39  16  to fill a prescription even after contacting the prescriber's

02:34:42  17  office.

02:34:42  18  No fuss on that either, right?

02:34:47  19  A.  Not from me.

02:34:48  20  Q.  If they choose to not fill a prescription, they must follow

02:34:51  21  POM 1703 for refusal to fill and fraudulent prescriptions.

02:34:57  22  Do you see that?

02:35:04  23  A.  I do.

02:35:04  24  Q.  And that's what we were looking at that talked about

02:35:06  25  potential indicators of fraudulent, forged, or altered

―Nelson (Recross by Lanier)―

02:35:09  1   prescriptions.  True?

02:35:13  2   A.  Well, that -- of the parts of the POM you've showed me,

02:35:18  3   sir --

02:35:18  4   Q.  And then --

02:35:18  5   A.  -- I mean, I don't know where it's all at, but yes, 1703 is

02:35:21  6   the document that should require --

02:35:23  7   Q.  Because you --

02:35:24  8   A.  -- require them to fill out a refusal to fill form.

02:35:25  9   Q.  Sorry.  Sorry.  Because you don't have the POM in front of

02:35:28 10   you, I want to see if there's a section here that slipped our

02:35:33 11   consideration so that we're accurate on the record.  Okay?  So

02:35:38 12   I'm going to just show each page and have you look at it.  If I

02:35:42 13   need to zoom in more than that we'll lose the page but I'll be

02:35:47 14   glad to.  The sections are written out in bold on the side

02:35:50 15   about verifying and reporting forged or altered prescriptions.

02:35:54 16        You see that?

02:35:54 17   A.  Okay.

02:35:55 18   Q.  And this is July of 2015; correct?  Do you see that?

02:36:02 19   A.  That's correct, sir.

02:36:04 20   Q.  And then we've got, on the next page, more information

02:36:08 21   about verifying and reporting forged or altered prescriptions.

02:36:13 22        Do you see that as well?

02:36:17 23   A.  Yes, sir.

02:36:18 24   Q.  And then if we flip to the next page, we've got more on

02:36:25 25   verifying and reporting forged or altered prescriptions.

─────Nelson (Recross by Lanier)─────

02:36:30  1          Do you see that as well?

02:36:32  2     A.   Yes.

02:36:33  3     Q.   And then we go to Page 5 where we've got more on verifying

02:36:40  4     and reporting forged or altered prescriptions.

02:36:44  5          Do you see that as well?

02:36:46  6     A.   Yes, sir.

02:36:47  7     Q.   Now, here, under point 10, it says -- and this is under

02:36:53  8     point 10 of verifying and reporting forged or altered

02:36:56  9     prescriptions, "In any circumstance where the pharmacist

02:36:58  10    declines to fill a prescription because the pharmacist has

02:37:03  11    concluded the prescription is forged, altered, or issued for

02:37:06  12    other than a legitimate medical purpose by a practitioner

02:37:11  13    acting outside the usual course of professional practice, and

02:37:19  14    that conclusion can be reached because of a written or verbal

02:37:22  15    statement by the prescriber or in the exercise of pharmacist's

02:37:25  16    professional judgment, a refusal to fill prescription report

02:37:29  17    shall be submit the -- a refusal to fill prescription report

02:37:35  18    shall be submit the."

02:37:40  19    A.   That's -- that's what it says.

02:37:41  20    Q.   Okay.  You got any clue what it was supposed to say?

02:37:47  21    A.   Sir, I don't know.  I'm assuming it should have said

02:37:50  22    something along the line of shall be submitted.  Report shall

02:37:56  23    be submitted.  I don't know.  It's obviously a typo of some

02:38:00  24    kind.

02:38:00  25    Q.   All right.  And then it says, "Please refer to the detailed

—Nelson (Recross by Lanier)—

02:38:04  1   instructions."  It looks like that might have been a link on

02:38:08  2   completing the refusal to fill form.  "Click here and select

02:38:11  3   Archer compliance.  This form provides important details of the

02:38:16  4   transaction so that practice compliance can -- may take

02:38:20  5   appropriate follow-up action.  In addition, the pharmacist

02:38:22  6   should retain a copy of the prescription in the forged

02:38:28  7   prescription file."

02:38:29  8            Do you see that?

02:38:30  9   A.  I do, sir.

02:38:30 10   Q.  Then it talks about what to do if you you've dispensed a

02:38:35 11   prescription that you find out later was forged or altered;

02:38:38 12   right?

02:38:41 13   A.  Yes, sir.

02:38:42 14   Q.  "Situations which could lead to the arrest of patients with

02:38:46 15   legitimate prescriptions."

02:38:47 16            See that?

02:38:48 17   A.  I do.

02:38:51 18   Q.  "Detention of persons presenting forged or altered

02:38:56 19   scripts."

02:38:56 20            That's just like you can't do that; right?

02:38:59 21   A.  I believe that's what the policy said.

02:39:02 22   Q.  "Identifying persons who drop off suspected forged or

02:39:06 23   altered prescriptions."

02:39:07 24            You see that as well?

02:39:09 25   A.  I do.

**3950**

─Nelson (Recross by Lanier)─

02:39:12  1  Q.  We're almost through with the POM.

02:39:18  2           "Request to file charges; request by law enforcement

02:39:23  3  to fill a forged or altered prescription; HIPAA regulations."

02:39:28  4           You got those sections; right?

02:39:30  5  A.  Yes, sir.

02:39:31  6  Q.  "Releasing documents to law enforcement; and then home

02:39:35  7  office contact numbers; and frequently asked questions."

02:39:39  8           That's it; right?

02:39:40  9  A.  Yeah.  I would like to point out that that POM that you

02:39:44 10  have in your hand is the new one that was published in July of

02:39:46 11  2015 that converted the process from the web form to Archer and

02:39:54 12  also took out any verbiage discussing blanket refusal.

02:39:58 13  Q.  Okay.  If we go back to Plaintiffs' Exhibit 14643, another

02:40:03 14  section that I didn't read to the jury is, "The pharmacist

02:40:06 15  should" -- excuse me, sir.

02:40:11 16           "The pharmacist should return the prescription back to

02:40:13 17  the patient and explain the reason they didn't feel comfortable

02:40:17 18  filling the prescription as written."

02:40:19 19           Do you see that?

02:40:22 20  A.  That is correct.

02:40:25 21  Q.  Now, that's Walmart policy, but there's -- do you know what

02:40:30 22  the law is on that?

02:40:33 23  A.  Well, if it's altered or forged it shouldn't be returned.

02:40:38 24  Q.  Yeah.  In fact, I don't -- do you know of any law that

02:40:41 25  requires the pharmacist to return it?

—————Nelson (Recross by Lanier)—————

02:40:46  1         MR. MAJORAS:  Objection.  Foundation.

02:40:48  2         THE COURT:  Overruled.

02:40:51  3         THE WITNESS:  I'm not aware of any particular law that

02:40:54  4  says that you're required to return a prescription to someone.

02:40:58  5  BY MR. LANIER:

02:40:59  6  Q.  Because if you return a prescription and they just take it

02:41:02  7  to the next place and they know why you didn't fill it, it's

02:41:06  8  kind of like a road map on how to get it filled, isn't it?

02:41:12  9  A.  Sir, I don't know.  Each pharmacist put their own

02:41:16 10  information and notations on prescriptions when they gave them

02:41:18 11  back -- gave them back to the patient, so. . .

02:41:20 12  Q.  Okay.  And then last but not least, you were also asked

02:41:25 13  questions by Mr. Majoras about reporting things to the FDA.

02:41:33 14         Do you remember that?

02:41:35 15         MR. MAJORAS:  The DEA.

02:41:37 16  BY MR. LANIER:

02:41:38 17  Q.  I mean, to the DEA.

02:41:39 18         Do you remember that?

02:41:39 19  A.  I do.

02:41:41 20  Q.  And this comes back to the exhibit I asked you about in

02:41:44 21  your deposition, Plaintiffs' 20852.  It won't be in there

02:41:48 22  because I didn't know it would come up, but this is the one

02:41:53 23  where you said, in essence, y'all were doing that because of

02:41:58 24  the memorandum of agreement that you had with the DEA.

02:42:01 25         Do you remember that?

Nelson (Recross by Lanier)

A.  That was part of our refusal to fill process, yes.

Q.  Under the DEA agreement, y'all had agreed that you would report those; correct?

A.  That's my understanding, yes.

Q.  Because you e-mailed and said that the MOA that requires the reporting of refusals to fill expires in 30 days.  You said, "We've not invested a great amount of effort in doing analysis on the data since the agreement's virtually over.  Driving sales and patient awareness is a far better use of our market directors' and market managers' time."

        Do you see that?

A.  Yes, sir.

Q.  And we all know what driving sales is, but patient awareness, that's a special term within Walmart, isn't it?

A.  I don't know if it's unique to Walmart or not.

Q.  Well, why don't you explain to the jury what you mean by "patient awareness."

A.  Well, I believe I testified earlier that it has to do with services available by the pharmacy such as immunization.

Q.  In other words, make the patient aware of what else you could sell to them; right?

A.  Potentially.

Q.  Okay.

        MR. LANIER:  Pass the witness.  Thank you.

        Thank you, Your Honor.

─────Nelson (Redirect by Majoras)─────

02:43:33 1              THE COURT:  Okay.  Thank you, Mr. Lanier.

02:43:34 2              Mr. Majoras, anything?

02:43:39 3              MR. MAJORAS:  Yes, sir.

02:43:39 4              THE COURT:  Okay.

02:43:52 5              MR. LANIER:  Your Honor, can I give these notes to

02:43:53 6    Mr. Pitts?

02:43:54 7              THE COURT:  Yes.  Thank you.

02:43:55 8              MR. LANIER:  Thank you.

02:44:00 9              MR. MAJORAS:  I keep looking at the witness stand but

02:44:02 10   you're on my screen.

02:44:02 11             REDIRECT EXAMINATION OF BRAD NELSON

02:44:05 12   BY MR. MAJORAS:

02:44:05 13   Q.  Mr. Nelson, Mr. Lanier showed you POM 1703.  Do you know

02:44:09 14   whether POM 1311 is the one that addresses the blanket refusals

02:44:12 15   to fill prior to it being changed in 2017?

02:44:18 16   A.  Sir, I don't recall specifically which POM said what

02:44:22 17   because it's been quite a few years and things have moved

02:44:26 18   through that time.  I do know that the blanket refusal

02:44:28 19   information was in one of the POMs.  I can't attest for sure

02:44:31 20   which one it was in.

02:44:32 21   Q.  Let me -- I'm going do this similar -- similarly to the way

02:44:36 22   Mr. Lanier did it since I don't have a copy in front of me, but

02:44:39 23   I'm going to ask our tech person if he'll put up POM 1311,

02:44:45 24   which is Walmart Exhibit 00558.  Put that up on the screen.

02:44:56 25             Sir, do you recognize this as a version of POM 1311?

─Nelson (Redirect by Majoras)─

02:45:01  1    If you look at the date, this one is dated March 2011.

02:45:07  2    A.  That certainly looks like one of the formats that we would

02:45:10  3    have used for POMs.

02:45:10  4    Q.  Okay.  Let's flip to Page 4, please.  And see if you can

02:45:24  5    make that a little bit bigger, the box, the gray box.

02:45:29  6    A.  I can see it.

02:45:30  7    Q.  In this gray box, POM 1311 at that time stated, "Blanket

02:45:34  8    refusals of prescriptions are not allowed.  A pharmacist must

02:45:37  9    make an individual assessment of each prescription and

02:45:41  10   determine that it was not issued based on a valid

02:45:45  11   prescriber/patient relationship or for a valid medical reason

02:45:48  12   before refusing to fill."

02:45:49  13            Do you see that, sir?

02:45:51  14   A.  I do.

02:45:52  15   Q.  And does that refresh your recollection as to where the

02:45:56  16   blanket refusal information was found in the Walmart POMs?

02:46:00  17   A.  In 2011, that's where it was at.

02:46:03  18            MR. MAJORAS:  Thank you, Your Honor.

02:46:04  19            Thank you, Mr. Nelson.

02:46:07  20            THE COURT:  Okay.  Mr. Nelson, thank you very much for

02:46:11  21   making yourself available and have a good day, sir.  You may be

02:46:16  22   excused.

02:46:17  23            THE WITNESS:  Thank you, Your Honor.

02:46:18  24       (Witness excused.)

02:46:18  25            THE COURT:  Ladies and gentlemen, we'll take our

02:46:20  1  mid-afternoon break a little early.  There's no point in

02:46:24  2  truncating the next witness.  So 15 minutes.  Usual admonitions

02:46:28  3  apply and then we'll pick up with the plaintiffs' next witness.

02:46:32  4      (Jury excused from courtroom).

02:46:56  5      (Recess was taken from 2:46 p.m. till 3:03 p.m.)

03:03:34  6          COURTROOM DEPUTY:  All rise.

03:06:01  7      (Jury returned to courtroom at 3:06 p.m.)

03:06:10  8          THE COURT:  Okay.  Please be seated, ladies and

03:06:12  9  gentlemen.

03:06:12 10          The next witness is by deposition; is that correct?

03:06:16 11          MR. LANIER:  That is correct, Your Honor.  My voice is

03:06:18 12  glad too.

03:06:18 13          The next witness, ladies and gentlemen, is Michelle

03:06:22 14  Travassos.  She spells it T-r-a-v, as in Victor, -a-s-s-o-s, I

03:06:32 15  think.  Michelle Travassos.  She also worked for CVS.  She was

03:06:39 16  their pharmacy professional services manager.

03:06:46 17          We won't make it through this whole deposition this

03:06:52 18  afternoon.  Your Honor has asked me to find a place to stop it

03:06:54 19  at around 5:15.  The deposition itself, the play for both

03:06:57 20  plaintiff and defendant, totals out to 2 hours and 45 minutes.

03:07:03 21  Both the witness and Mr. Elsner is the one who does questioning

03:07:07 22  for the plaintiffs.  He's not in here today, but you'll see him

03:07:09 23  at times in the back.  He's real soft-spoken so you're not

03:07:14 24  allowed to go to sleep.  Okay?  Just warning you, he's not like

03:07:19 25  me, and he'll just be soft spoken and not -- maybe a nice

———Travassos (By Video Deposition)———

03:07:25  1  relief for y'all.

03:07:26  2          But with that, Your Honor, we're ready to play the

03:07:29  3  deposition.

03:07:29  4          THE COURT:  Okay.  Very well.  Thank you.

03:07:31  5          MR. LANIER:  Thank you, Judge.

03:07:40  6          THE COURT:  I don't think the sound's working.

03:07:42  7          MR. LANIER:  Yeah.  There's no sound, Dan.

03:07:46  8          THE COURT:  That will be limited.

03:07:46  9      DEPOSITION TESTIMONY OF MICHELLE LUCY TRAVASSOS

03:07:56 10  Q.  Good morning, Miss Travassos.

03:07:59 11  A.  Good morning.

03:07:59 12  Q.  Can you please state for us your full name?

03:08:02 13  A.  Michelle Lucy Travassos.

03:08:03 14  Q.  Did you obtain a degree in pharmacy?

03:08:05 15  A.  Yes.

03:08:06 16  Q.  And where did you obtain that degree from?

03:08:10 17  A.  The University of Rhode Island.

03:08:13 18  Q.  In what year did you graduate?

03:08:15 19  A.  1990.

03:08:17 20  Q.  Did you obtain a license to practice as a pharmacist?

03:08:21 21  A.  Yes.

03:08:22 22  Q.  Do you maintain that license today?

03:08:25 23  A.  Yes.

03:08:28 24  Q.  Did you work as a pharmacist?

03:08:31 25  A.  Yes.

———Travassos (By Video Deposition)———

03:08:32  1   Q.   Where did you work as a pharmacist?

03:08:36  2   A.   I've always worked for CVS Pharmacy.

03:08:40  3   Q.   When did you begin working as a pharmacist for CVS?

03:08:45  4   A.   Upon graduation, 1990.

03:08:48  5   Q.   Over what years did you work as a pharmacist for CVS?

03:08:54  6   A.   Well, I'm still a pharmacist, but dispensing pharmacist, if

03:09:00  7   that's what you're referring to, would be from 1990 to 2001.

03:09:09  8   Q.   Is 2001 the last time you worked as a pharmacist dispensing

03:09:15  9   medications?

03:09:16 10   A.   Yes.

03:09:20 11   Q.   Who is your current employer?

03:09:24 12   A.   CVS Health still.

03:09:28 13   Q.   And in what -- and please explain to me the transition that

03:09:33 14   you made from a pharmacist to your next position at CVS in

03:09:39 15   2001.

03:09:40 16   A.   In 2001, I transitioned to be an analyst in health care

03:09:48 17   services at the corporate office.

03:09:50 18   Q.   I believe that you said that you were in that position from

03:09:54 19   2001 to roughly 2004 or 2005.

03:09:57 20        What was your next position at CVS?

03:10:01 21   A.   I worked in pharmacy operations.

03:10:05 22   Q.   And what was your -- and what year did you join pharmacy

03:10:10 23   operations?

03:10:11 24   A.   It was continuous so I moved from health care services to

03:10:19 25   pharmacy operations in -- again, I'm estimating maybe 2005.

──────Travassos (By Video Deposition)──────

03:10:22  1  Q.  And how long did you serve that role in pharmacy

03:10:24  2  operations?

03:10:24  3  A.  Until 2012.

03:10:29  4  Q.  Did CVS have a dedicated department or group prior to 2012

03:10:39  5  to field inquiries from pharmacists concerning prescribers of

03:10:44  6  concern or potential evidence of diversion?

03:10:48  7  A.  We've always had -- at the time it was loss prevention that

03:10:52  8  would field concerns of diversion, but I am not aware that

03:11:03  9  there was a dedicated group for prescribers at that time.

03:11:07  10  Q.  Did you receive any additional training or education when

03:11:15  11  joining the professional practice team?

03:11:22  12  A.  Nothing specifically provided.  It was more self-research.

03:11:29  13  Q.  In 2012, you became a manager in the pharmacy professional

03:11:35  14  services department at CVS; is that right?

03:11:37  15  A.  Yes.

03:11:38  16  Q.  Was this a new department at CVS in 2012, the pharmacy

03:11:45  17  professional services department?

03:11:48  18  A.  I'm not really aware of the year that it was formed.  Can't

03:11:57  19  say definitively.

03:11:59  20  Q.  Well, when you joined the department, how many people were

03:12:02  21  in it?

03:12:04  22  A.  It was probably relatively new because it was three

03:12:11  23  individuals at that time.

03:12:11  24  Q.  Okay.  And it was Nicci Harrington; is that right?

03:12:16  25  A.  She was not in the role yet.

─────Travassos (By Video Deposition)─────

03:12:19  1   Q.  Was it Papatya Tankut?

03:12:21  2   A.  Yes.

03:12:23  3   Q.  And was she the head of that department?

03:12:27  4   A.  Yes.

03:12:27  5   Q.  Did you report to her?

03:12:31  6   A.  Yes.  It was a brief time, but yes.

03:12:34  7   Q.  So it was Papatya Tankut and was it Dani Johnson?

03:12:41  8   A.  Yes.

03:12:42  9   Q.  And what was Dani Johnson's role?

03:12:46 10   A.  She was in analytics.

03:12:49 11   Q.  Do you have an understanding of why the pharmacy

03:12:52 12   professional services department was created?

03:13:02 13   A.  I don't know specifics about why it was created, but I know

03:13:07 14   that we -- you know, our focus is on controlled substances.

03:13:13 15   Q.  What aspect of controlled substances?

03:13:19 16   A.  Basically all aspects insofar as dispensing, ordering,

03:13:33 17   prescribing, and safer community aspects.

03:13:40 18   Q.  Prior to the creation of the pharmacy professional services

03:13:44 19   department, was there a group or department that was

03:13:49 20   responsible for controlled substances prior to this group?

03:13:51 21   A.  It was always the responsibility of the field leaders to

03:13:57 22   kind of monitor, you know, stores' performance.

03:14:05 23   Q.  So there was no corporate department at CVS responsible for

03:14:08 24   controlled substances prior to the creation of the pharmacy

03:14:11 25   professional services department; correct?

Travassos (By Video Deposition)

03:14:14  1    A.   There were other groups such as the inventory team and

03:14:21  2    pharmacy operations would have, I guess, overseen at a high

03:14:30  3    level in additional to field management.

03:14:32  4    Q.   What does the inventory team do?

03:14:34  5    A.   They're the department responsible for ordering and in

03:14:40  6    stock, et cetera.

03:14:41  7    Q.   So there was -- so there was a corporate office for

03:14:47  8    monitoring and managing general, but there was no department

03:14:52  9    responsible for dispensing, creating safer communities,

03:15:00  10   prescribers at the CVS corporate level before the development

03:15:04  11   of the pharmacy professional services department; correct?

03:15:06  12   A.   Those activities would have been monitored by field leaders

03:15:10  13   and pharmacy operations at a higher level, but no specific

03:15:16  14   department.

03:15:17  15   Q.   What was your understanding of your job responsibilities

03:15:22  16   when you joined the professional services department, the

03:15:25  17   pharmacy professional services department?

03:15:29  18   A.   Basically to learn the operations and support the programs

03:15:37  19   that were currently in place.

03:15:43  20   Q.   And what were the programs currently in place in 2012 when

03:15:48  21   you joined?

03:15:51  22   A.   Specifically what I remember is the store program,

03:16:00  23   controlled substances dispensing program, prescriber program,

03:16:06  24   and the ordering programs -- holding, canceled and MAQ.

03:16:17  25   Q.   So there was the prescriber monitoring program; is that

———Travassos (By Video Deposition)———

03:16:22 1  right?

03:16:22 2  A.  Yes.

03:16:22 3  Q.  And that monitored prescribers -- it compared prescribers

03:16:28 4  in particular regions in specialties to one another to

03:16:34 5  determine outlier prescribers, correct?

03:16:36 6  A.  There was an algorithm that would identify outliers based

03:16:41 7  on their prescribing, correct.

03:16:43 8  Q.  Okay.  And then you described the store program.  And what

03:16:47 9  was the store program?

03:16:50 10  A.  It was -- and still is -- a proactive program that looks at

03:16:59 11  the dispensing of stores over time to I think comparison within

03:17:05 12  a relative geography to identify stores that may fall outside

03:17:12 13  of the mean based upon specific dispensing characteristics.

03:17:16 14  Q.  And both those programs started in 2012 and 2013; correct?

03:17:23 15  A.  I don't really know when they started because they were

03:17:25 16  already there when I came on board in the summer of 2012.

03:17:34 17  Q.  But they were new programs; right?  They hadn't been there

03:17:37 18  for years; right?

03:17:38 19  A.  I don't believe so.  I think you're correct.

03:17:39 20  Q.  But at that time in January of 2013 there were potentially

03:17:45 21  three employees in the pharmacy professional services

03:17:48 22  department; is that right, Nicci Harrington, Dani Johnson, and

03:17:52 23  you?

03:17:59 24  A.  Yes.

03:17:59 25  Q.  And at that time in 2013 CVS had roughly 7,600 stores.

03:18:05 Does that sound roughly accurate to you?
03:18:07 A. I would say so, yes.
03:18:09 Q. Okay. So CVS had three dedicated employees in the pharmacy
03:18:13 professional services department to monitor 7,600 stores;
03:18:18 correct?
03:18:24 A. Yes.
03:18:24 Q. Why did CVS develop a professional -- a pharmacy
03:18:34 professional services department? What was its purpose?
03:18:38 A. I can't really say why they started the two because it
03:18:43 started before I, you know, came on board.
03:18:49 Q. One of the purposes was to try to understand what the DEA
03:18:55 was thinking; correct?
03:18:56 A. Not to my knowledge.
03:18:57 Q. All right. Ms. Travassos, this is a PowerPoint related to
03:19:02 the pharmacy professional practice team dated January 2013.
03:19:14 A. Yes.
03:19:14 Q. Ms. Travassos, if you turn to Page 9 under manager 1, it
03:19:17 lists in the second bullet, "Special focus on stores that have
03:19:22 a good working relationship with DEA officials to try to
03:19:25 understand how the DEA is thinking."
03:19:32 Did I read that correctly?
03:19:32 A. You did.
03:19:34 Q. Why was CVS focused on what the DEA was thinking?
03:19:38 A. I can't really say. I don't really remember this document.
03:19:43 Q. Well, in part it was to prevent enforcement actions and

────── Travassos (By Video Deposition) ──────

03:19:47 1 regulatory actions; correct?

03:19:48 2 A.   I think it was to have all the information at hand so that

03:19:52 3 we could, you know, provide tools to our pharmacists to support

03:20:00 4 them in their exercise of corresponding responsibility.

03:20:09 5 Q.   But with respect to what DEA officials enforcement actions

03:20:13 6 had been undertaken; correct?

03:20:15 7 A.   Again, I don't really remember this document to know what

03:20:18 8 the context was.

03:20:19 9 Q.   You were aware in 2012 that CVS had enforcement action

03:20:27 10 undertaken against it in Florida related to two of its

03:20:31 11 pharmacies; correct?

03:20:35 12 A.   Yes, I was aware of that.

03:20:36 13 Q.   And, in fact, the DEA suspended two CVS pharmacies from

03:20:41 14 dispensing controlled substances; correct?

03:20:47 15 A.   That is correct.

03:20:48 16 Q.   On Page 6, this is the -- this is sort of the working chart

03:20:59 17 of the pharmacy professional practices organization as of

03:21:02 18 January of 2013 and it lists Nicci as the director; correct?

03:21:06 19 A.   Yes.

03:21:06 20 Q.   And it lists Dani as the analyst?

03:21:10 21 A.   Yes.

03:21:10 22 Q.   And then you are listed as manager 2 day-to-day; correct?

03:21:15 23 A.   Yes.

03:21:16 24 Q.   Okay.  And at this time all these other positions were

03:21:21 25 vacant; is that right?

—————Travassos (By Video Deposition)—————

03:21:29 1   A.  It appears so.

03:21:31 2   Q.  And, so, at this time were you then responsible for all of

03:21:42 3   the programs that were being operated out of the pharmacy

03:21:47 4   professional practices organization?

03:21:48 5   A.  I assisted in managing them.  I wouldn't say that I was the

03:21:54 6   sole manager.

03:21:56 7   Q.  And who assisted you with that work?

03:22:02 8   A.  It would have been a collaboration of the three of us,

03:22:07 9   Nicci and Dani and myself.

03:22:09 10  Q.  Ms. Travassos, each CVS Pharmacy holds a DEA license to

03:22:14 11  dispense controlled substances; right?

03:22:20 12  A.  If they're going to dispense controlled substances, that's

03:22:23 13  correct.

03:22:23 14  Q.  Okay.  And all CVS pharmacies have a license to dispense

03:22:28 15  controlled substances.  Is that true?

03:22:32 16  A.  To my knowledge, there may be one that does not.

03:22:37 17  Q.  I'm just curious now.  Which one is that?

03:22:45 18  A.  I believe there's a pharmacy in California.

03:22:50 19  Q.  Is there a particular reason that that one does not?

03:22:59 20  A.  They voluntarily surrendered it.

03:23:05 21  Q.  Why?

03:23:11 22  A.  It was the result of a DEA visit to the store.

03:23:18 23  Q.  And a pharmacy cannot dispense a controlled substance

03:23:24 24  without a license; right?

03:23:26 25  A.  Correct.

─────Travassos  (By Video Deposition)─────

03:23:29 1   Q.  What is your understanding of why a license is needed to

03:23:31 2   dispense a controlled substance?

03:23:40 3   A.  Controlled substances are more closely regulated, so they

03:23:50 4   require a DEA license.

03:23:53 5   Q.  Why are controlled substances more closely regulated?

03:24:06 6   A.  Because there is more risk associated with misuse.

03:24:11 7   Q.  Risk of what?

03:24:15 8   A.  Risk of side effects, diversion.

03:24:24 9   Q.  You also -- you also said there was a risk associated with

03:24:29 10  misuse and you included diversion; is that right?

03:24:32 11  A.  Correct.

03:24:33 12  Q.  What is diversion?

03:24:38 13  A.  Diversion is when a prescription drug is used for something

03:24:50 14  it wasn't intended to be used for.

03:24:55 15  Q.  Like what?

03:24:58 16  A.  Like somebody other than who it was prescribed for takes

03:25:04 17  it.

03:25:07 18  Q.  All right.  Anything else?

03:25:11 19  A.  If it's obtained in fraudulent way.

03:25:24 20  Q.  All right.  Any other examples of diversion?

03:25:25 21  A.  There are -- I'm sure there are others, but theft.

03:25:32 22  Q.  Okay.  Do you agree that opioids that are diverted pose a

03:25:41 23  danger to the public?

03:25:42 24  A.  Anytime an opioid is used for something it's not intended

03:25:47 25  to be used for could be a risk to the public.

─────Travassos (By Video Deposition)─────

03:25:53  1  Q.  Does it -- okay.  And you said a risk to the public?

03:25:58  2  A.  Yes.

03:26:02  3  Q.  Do you believe that pharmacies play an important role to

03:26:06  4  detect, report, and prevent diversion of opioids?

03:26:10  5  A.  Pharmacists and pharmacy staff are trained to be alert to

03:26:15  6  signs of diversion.

03:26:17  7  Q.  And do they -- do they play an important role as the last

03:26:21  8  gatekeepers before a controlled substance is dispensed to a

03:26:29  9  patient?

03:26:29 10  A.  Again, they are trained to be alert to signs of diversion

03:26:41 11  to -- to make sure, to the best of their ability, that

03:26:43 12  prescriptions are legitimate.

03:26:46 13  Q.  And why is that important?

03:26:47 14  A.  Because we wouldn't want controlled substances to be

03:26:55 15  dispensed that weren't intended for legitimate use.

03:27:02 16  Q.  And why?

03:27:08 17  A.  If they're not dispensed for a legitimate use, there's a

03:27:14 18  risk of it getting into the wrong hands or being used for other

03:27:23 19  purposes.

03:27:26 20  Q.  Do they cause a danger to the public?

03:27:31 21  A.  Once they leave the pharmacy we don't know what people do

03:27:33 22  with them, but if -- you know, someone who it wasn't intended

03:27:42 23  for would get ahold of it and is using it for something that it

03:27:45 24  wasn't prescribed for them, it could cause a danger for them.

03:27:49 25  Q.  Okay.  Would you agree with me that pharmacies and

HEATHER K. NEWMAN, RMR, CRR

─────── Travassos (By Video Deposition) ───────

03:27:52  1  pharmacists are the last line of defense before the dispensing

03:27:57  2  of a controlled substance, like an opioid?

03:28:00  3  A.  Yes.  Prior to -- as they are the dispensers.

03:28:04  4  Q.  And do you agree that it's important for CVS to provide

03:28:07  5  guidance to its pharmacists to identify and prevent diversion?

03:28:10  6  A.  There is a lot of training to that matter.

03:28:13  7  Q.  But my question, ma'am, is, do you agree that it's

03:28:18  8  important for CVS to identify and prevent diversion?

03:28:26  9  A.  I can't speak to CVS.  I can speak to what I know in the

03:28:29 10  programs that I've been involved with that we do provide a lot

03:28:32 11  of training.

03:28:33 12  Q.  And this is one of your responsibilities at CVS, is to

03:28:37 13  provide guidance from corporate headquarters to CVS pharmacists

03:28:42 14  related to identifying and preventing diversion; right?

03:28:47 15  A.  In collaboration with others, yes, I do provide review of

03:28:53 16  trainings and documents to support the pharmacists in their

03:28:59 17  knowledge.

03:29:01 18  Q.  And do you think that performing this work is important to

03:29:05 19  public safety and public health?

03:29:07 20  A.  I think that all the work we do is important.

03:29:09 21  Q.  But is it important to patient safety and public health?

03:29:13 22  A.  I would agree with that.

03:29:17 23  Q.  Do you agree with me that there's an opioid epidemic in the

03:29:20 24  United States?

03:29:21 25  A.  I don't know what the exact definition of epidemic is.  I'm

HEATHER K. NEWMAN, RMR, CRR

Travassos (By Video Deposition)

03:29:27  1  not a medical doctor, but I do agree opioid misuse is a serious

03:29:32  2  issue.

03:29:34  3  Q.  And it impacts families in every state and all communities

03:29:38  4  across the country and in Ohio.  Would you agree with that?

03:29:40  5  A.  I would agree that it's an important issue for everyone to

03:29:44  6  be aware of.  Whether it impacts every city within every state,

03:29:52  7  I can't speak to.

03:29:53  8  Q.  Would you agree that the abuse of prescription drugs

03:29:57  9  transcends all walks of life and is present in all communities

03:30:00  10  across the country?

03:30:02  11  A.  It may have been characterized as such.

03:30:06  12  Q.  Do you agree with that?

03:30:08  13  A.  Again, I can't say definitively here today that it does,

03:30:13  14  but I know it has a large impact.

03:30:18  15  Q.  Ms. Travassos, this is an e-mail you wrote on April 25th,

03:30:22  16  2016; right?

03:30:23  17  A.  Yes.

03:30:24  18  Q.  Okay.  And in the first line of that e-mail it reads: "The

03:30:31  19  abuse of prescription drugs transcends all walks of life and is

03:30:37  20  present in all communities across the nation."

03:30:39  21        Is that what you wrote?

03:30:41  22  A.  So that is what is in this document.

03:30:44  23  Q.  Okay.  And this is the document that you e-mailed; correct?

03:30:49  24  A.  Correct.

03:30:50  25  Q.  It next states that "The Center for Disease Control and

Travassos (By Video Deposition)

03:30:53  1  prevention, the CDC, has determined that the United States is

03:30:58  2  undergoing an epidemic of deaths as the result of prescription

03:31:03  3  drug abuse."

03:31:03  4          Did I read that correctly?

03:31:05  5  A.  Yes.

03:31:06  6  Q.  Did CVS play a role in the opioid epidemic in Lake and

03:31:18  7  Trumbull counties in Ohio?

03:31:19  8  A.  I don't know.

03:31:20  9  Q.  Ms. Travassos, I'm going to have you pull back up

03:31:25  10  Exhibit 2 -- oh, no, I'm sorry, Exhibit 1, which is MR902.  We

03:31:29  11  looked at this previously.  And I'm going to have you turn to

03:31:41  12  Page 14 of the document which relates to your responsibilities.

03:31:44  13          It lists first PMP.  What is PMP?

03:31:49  14  A.  Prescription monitoring program.

03:31:53  15  Q.  And what is a prescription monitoring program?

03:31:57  16  A.  It is a statewide, state-run database that is a collection

03:32:06  17  of controlled substance prescriptions that have been dispensed

03:32:11  18  within the state for individuals.

03:32:13  19  Q.  All right.  And that was part of your responsibility

03:32:15  20  starting in 2013; is that right?

03:32:19  21  A.  My responsibility was to provide access to the pharmacists

03:32:27  22  as these various states were putting these PMP programs into

03:32:35  23  place.

03:32:38  24  Q.  And we're going to talk about this in more detail, but the

03:32:41  25  access that CVS provided to its pharmacists to access the PMP

─────Travassos (By Video Deposition)─────

03:32:49  1  system, was that through CVS's computer program or was it an

03:32:53  2  independent search on each state's PMP?

03:32:56  3  A.  There would have been a link on the CVS intranet.

03:33:02  4  Q.  Okay.  And that intranet, is that called RXNet?

03:33:07  5  A.  Yes.

03:33:08  6  Q.  And, in fact, the only way a CVS pharmacist was permitted

03:33:11  7  to access the PMP was through RXNet; is that right?

03:33:14  8  A.  At the time that is correct.

03:33:16  9  Q.  Why did CVS want its pharmacists to only access the PMP

03:33:21 10  through RXNet as opposed to just running a search on the

03:33:24 11  internet?

03:33:31 12  A.  I don't think they could access the internet from the

03:33:36 13  computer.

03:33:36 14  Q.  Okay.  So CVS pharmacists didn't have access to the

03:33:39 15  internet in their pharmacy, the only access that was permitted

03:33:43 16  was through CVS's intranet; is that right?

03:33:47 17  A.  There were various internet licensing based on RXNet, but

03:33:56 18  insofar as a search for anything, correct, they could not.

03:34:01 19  Q.  Do you think it would have been helpful for pharmacists to

03:34:03 20  be able to look up different information about prescribers

03:34:07 21  through the internet as part of their due diligence process?

03:34:11 22  A.  I don't know.

03:34:13 23  Q.  It's one of the tools that you used in the prescriber

03:34:16 24  monitoring program to access information on prescribers was to

03:34:18 25  look up public information on the internet; correct?

───Travassos (By Video Deposition)───

03:34:22  1   A.  Yeah, I only did that for a short while prior to that

03:34:26  2   program transitioning from me.

03:34:31  3   Q.  I understand that, but you -- but as part of the prescriber

03:34:34  4   monitoring program, you did access the internet to do searches

03:34:38  5   on prescribers for publicly available information; correct?

03:34:44  6   A.  Correct.

03:34:45  7   Q.  So it was a useful tool in the prescriber monitoring

03:34:51  8   program to collect information to see if a prescriber had been

03:34:52  9   indicted or if there was some investigation related to them, if

03:34:54  10  there were lawsuits related to their prescribing practices, all

03:35:00  11  of which could be available in public information; right?

03:35:02  12  A.  Yes.

03:35:02  13  Q.  And so that was information you used in the prescriber

03:35:06  14  monitoring program, but it was not information that the

03:35:09  15  pharmacists could access in the internet at CVS; correct?

03:35:11  16  A.  Yes.  I don't think they could access it through the

03:35:14  17  computer system.

03:35:15  18  Q.  If we go next, under Compliance, it lists RX regulatory

03:35:20  19  audit launch.

03:35:22  20         What is this program?

03:35:27  21  A.  This was a program that was related to compliance that

03:35:32  22  pharmacists would have to answer questions.

03:35:36  23  Q.  Questions related to what?

03:35:40  24  A.  Compliance.

03:35:43  25  Q.  Tell me what form these kind of audits would take.

─── Travassos (By Video Deposition) ───

03:35:46  1    A.   It was a computer audit, if you will.

03:35:50  2    Q.   So they had to -- was it like a test you had to do online?

03:35:57  3    A.   It was not a test.  It was asking the state of their

03:36:05  4    pharmacy practice within their store.

03:36:07  5    Q.   Okay.  And was that done internally by your department or

03:36:12  6    did you use an outside auditor?

03:36:20  7    A.   It evolved over time, so both.

03:36:24  8    Q.   Please explain to me that evolution.

03:36:30  9    A.   Initially --

03:36:32  10            MR. LANIER:  Your Honor -- Your Honor, I've asked Dan

03:36:36  11   to pause this.

03:36:38  12            I don't know if there's -- if Mr. Pitts able to take

03:36:43  13   out the empty courtroom seat and make the screen bigger.

03:36:48  14            COURTROOM DEPUTY:  I just -- I just texted the IT

03:36:52  15   person because I don't know if I touch something what will

03:36:54  16   happen, so he's going to come up.

03:36:55  17            THE COURT:  All right.  We'll try and work on it.

03:36:59  18            MR. LANIER:  Thank you, Judge.

03:37:00  19            THE COURT:  Okay.

03:37:01  20            MR. LANIER:  Just trying to see it.

03:37:18  21            THE WITNESS:  Initially, pharmacists would do the

03:37:20  22   audit and the pharmacy supervisor would also do the audit.  And

03:37:25  23   then over time the pharmacy supervisor's audit it was

03:37:30  24   transitioned to an out outside agency.

03:37:30  25   BY MR. LANIER:

─────Travassos (By Video Deposition)─────

03:37:35  1   Q.  What agency was that?

03:37:39  2   A.  Again, that was another evolution.  Initially it was two

03:37:42  3   agencies, Crossmark and ASM, and then over time it transitioned

03:37:51  4   to ASM, solely.

03:37:54  5   Q.  And when Crossmark and ASM performed an audit, would they

03:37:59  6   actually visit a store to conduct the audit?

03:38:03  7   A.  Yes.

03:38:05  8   Q.  And would they issue reports as a result of their audits?

03:38:10  9   A.  Yes.

03:38:11  10  Q.  How often were the audits performed?

03:38:14  11  A.  Monthly.

03:38:17  12  Q.  And who would have -- who would the reports be sent to when

03:38:22  13  they were completed?

03:38:28  14  A.  Let me clarify my last answer because it may have been

03:38:31  15  quarterly, so I don't want to say definitively it was monthly.

03:38:34  16  Q.  Okay.  I'm going to turn now to the controlled substance

03:38:40  17  dispensing program that you were responsible for at CVS.

03:38:47  18       Is it true that this -- when was this program

03:38:52  19  implemented at CVS?

03:38:53  20  A.  It was in place prior to myself joining the team.

03:38:58  21  Q.  So in 2012 it was in place; is that right?

03:39:03  22  A.  Correct.

03:39:03  23  Q.  Okay.  And this was a program to identify stores with risky

03:39:12  24  dispensing habits; is that right?

03:39:13  25  A.  I wouldn't characterize it that way.

———Travassos (By Video Deposition)———

03:39:17  1   Q.   Let me pull out MR83 for me, please.

03:39:23  2        If you see in the -- this is an overview of the

03:39:26  3   programs from February 21st, 2013.  If you see under stores, or

03:39:31  4   under Store, sorry, the objective reads, "To proactively

03:39:38  5   identify stores with risky dispensing habits based on multiple

03:39:42  6   red flags across a variety of metrics."

03:39:45  7        Did I read that correctly?

03:39:48  8   A.   You've read that correctly.

03:39:50  9   Q.   And this program came after the DEA had issued immediate

03:39:57 10   suspension orders that we discussed earlier for two CVS

03:40:02 11   pharmacies in Florida in 2012; correct?

03:40:07 12   A.   I'm not aware of that because I'm -- I joined the team, it

03:40:10 13   was already in place, so I don't know where -- when it started,

03:40:14 14   the specific date.

03:40:15 15   Q.   Can you describe for me your role with respect to the

03:40:20 16   controlled substance dispensing program?

03:40:21 17   A.   My role is to administer the program, to receive the

03:40:31 18   quarterly output and review the stores that were identified and

03:40:41 19   enter them into the program and make -- currently make sure the

03:40:46 20   field leaders -- currently it's DPPLs -- aware of what stores

03:40:51 21   need a visit and the information we need back as a result of

03:40:56 22   that visit.

03:40:58 23   Q.   And under the controlled substance dispensing program,

03:41:01 24   there's an algorithm that's run on a quarterly basis on all

03:41:06 25   stores dispensing opioids; correct?

─────── Travassos (By Video Deposition) ───────

03:41:08  1   A.   Correct.

03:41:11  2   Q.   And the recruiter to evaluate high risk stores included

03:41:17  3   volume; is that right?

03:41:18  4   A.   I wouldn't characterize them as high risk stores.  It's a

03:41:24  5   proactive program meant to identify stores with outlier

03:41:28  6   characteristics of dispensing.

03:41:30  7   Q.   Thank you.  I misspoke.

03:41:32  8        What I meant to say was that the criteria was to

03:41:35  9   evaluate high risk drugs for each store.  And in considering

03:41:40  10  those drugs, it would look at the volume of those drugs; is

03:41:48  11  that right?

03:41:48  12  A.   That is one of the metrics that is considered.

03:41:51  13  Q.   Okay.  And volume is how many drugs; right?

03:41:56  14  A.   How many units, yes, correct.

03:42:00  15  Q.   Okay.  And the high risk drugs included oxycodone and

03:42:05  16  hydrocodone; is that right?

03:42:08  17  A.   That is correct.

03:42:11  18  Q.   And so CVS recognized that these were high risk drugs that

03:42:15  19  required review of its stores' dispensing practices; correct?

03:42:22  20  A.   The program monitors these drugs of concern, if you will,

03:42:35  21  but I can't speak to CVS corporate.

03:42:42  22  Q.   Well, you were in charge of the program for CVS; right?

03:42:44  23  A.   Yes.  I administer the program.

03:42:47  24  Q.   You administer the program.  You were the person in charge.

03:42:50  25       And in addition to the volume of high risk drugs, the

HEATHER K. NEWMAN, RMR, CRR

―――――Travassos (By Video Deposition)―――――

03:42:56  1  algorithm also evaluated the share of those high-risk drugs

03:43:01  2  compared to the non-high-risk drugs; correct?

03:43:04  3  A.  To overall prescriptions, yes.

03:43:08  4  Q.  Okay.  And it also measured the growth of those high-risk

03:43:11  5  drugs over time; correct?

03:43:14  6  A.  Correct.

03:43:15  7  Q.  And would you agree with me that the program was seeking to

03:43:19  8  identify stores with dispensing programs that are -- that are

03:43:24  9  significantly outside of the median?

03:43:28 10  A.  It compares stores against other stores within their

03:43:33 11  relative geography to identify those outside of the mean.

03:43:39 12  Q.  But significantly outside the median; right?

03:43:41 13  A.  It uses statistical -- it uses a statistical method to --

03:43:47 14  to determine what is outside the mean, but I can't speak

03:43:51 15  specifically to that analytical aspect.

03:43:55 16  Q.  Well, let's look at MR915, please.

03:43:59 17          We'll mark this as Exhibit 6.

03:44:01 18          And I'm going to focus on the e-mail on the bottom,

03:44:05 19  which is dated October 30th, 2013, from Amanda -- is it Dubois?

03:44:12 20  A.  Dubois.

03:44:13 21  Q.  Dubois.

03:44:13 22          UNIDENTIFIED SPEAKER:  Work on your French.

03:44:13 23  BY MR. ELSNER:

03:44:13 24  Q.  I'm going to try to avoid saying that as often as I can.

03:44:24 25          I just asked you if the subject line was updates to

HEATHER K. NEWMAN, RMR, CRR

─────Travassos (By Video Deposition)─────

03:44:27  1  the CSDP for the SOP, correct?

03:44:27  2  A.  Yes, correct.

03:44:28  3  Q.  Okay.  And an SOP is a standard operating procedures;

03:44:34  4  right?

03:44:35  5  A.  Correct.

03:44:36  6  Q.  And if you go down to the third dash, it says, "Stores

03:44:47  7  significantly outside the median."  Correct?

03:44:53  8  A.  Correct.

03:44:54  9  Q.  Okay.  And these are stores with potential high-risk

03:45:00 10  dispensing behavior that enter the CSDP; correct?

03:45:08 11  A.  That's how it's characterized here.

03:45:10 12  Q.  And, in fact, it says, in the first line, "Hi, Cassandra,

03:45:15 13  please find our process for stores entering the CSDP below."

03:45:20 14       Do you see that?

03:45:21 15  A.  Yes.

03:45:22 16  Q.  Who is responsible for setting the algorithm to -- so that

03:45:28 17  it identified those significantly outside the median?

03:45:33 18  A.  The thresholds were reviewed occasionally to determine if

03:45:42 19  they needed to change.  It would have been collaboration.

03:45:46 20  Q.  But that decision was the decision CVS made; correct?

03:45:54 21  A.  It would have been a decision between analytics, myself,

03:45:59 22  and Nicci would have been aligned.

03:46:01 23  Q.  In April of 2013, the controlled substance dispensing

03:46:08 24  program flagged about 56 stores.

03:46:09 25       Does that sound about right?

**3978**

———Travassos (By Video Deposition)———

03:46:10  1   A.   Honestly I couldn't say, I don't remember.

03:46:14  2   Q.   Okay.  Well, let's look at MR918, and we will mark that as

03:46:19  3   Exhibit 7.

03:46:20  4            Ms. Travassos, this is a CVS memo, and I'm going to --

03:46:27  5   the subject line is "Quarter 2 stores entering the controlled

03:46:31  6   substance dispensing program."

03:46:31  7            Do you see that?

03:46:35  8   A.   I do.

03:46:36  9   Q.   Okay.  And you're listed as the contact person in

03:46:40  10  professional practices; correct?

03:46:42  11  A.   Correct.

03:46:43  12  Q.   And this is to all senior vice presidents and area vice

03:46:46  13  presidents of CVS?

03:46:51  14  A.   Yes.

03:46:52  15  Q.   Okay.  And it reads in the second paragraph, "Based on the

03:46:56  16  latest controlled substance dispensing review on April 1st,

03:47:01  17  2013, 56 stores have flagged as outliers in their dispensing of

03:47:06  18  one or more of the drugs of concern."

03:47:08  19            Did I read that correctly?

03:47:09  20  A.   You did.

03:47:12  21  Q.   And at the time, CVS had over 7,600 stores in 2013 as we

03:47:20  22  discussed earlier; correct?

03:47:21  23  A.   Correct.

03:47:21  24  Q.   So this is a very small number of stores, less than

03:47:25  25  1 percent of CVS stores being flagged through this program;

———Travassos (By Video Deposition)———

03:47:29 1  correct?

03:47:30 2  A.  Correct.

03:47:31 3  Q.  And the purpose of this program is to ensure that the

03:47:37 4  pharmacy team is following the CVS corporate dispensing

03:47:42 5  guidelines; is that right?

03:47:45 6  A.  Yes.  It's a program to proactively look at the processes

03:47:57 7  at the store level to make sure there aren't any gaps in

03:48:01 8  processes, and to understand the metrics and what is driving

03:48:05 9  them.

03:48:06 10 Q.  And to adhere to the corporate, CVS corporate, dispensing

03:48:11 11 guidelines?

03:48:12 12 A.  Yes.  That's fair.

03:48:13 13 Q.  Okay.  And that's what's written in the memo; correct?

03:48:19 14 A.  That's correct.

03:48:22 15 Q.  Okay.  So CVS created this program to measure and make sure

03:48:29 16 that its pharmacists were exercising their corresponding

03:48:33 17 responsibility according to CVS's corporate guidelines;

03:48:36 18 correct?

03:48:37 19 A.  The purpose of the program is to -- is one way to have --

03:48:44 20 you know, provide education to the pharmacists and have field

03:48:49 21 management review their -- their processes to ensure they're --

03:48:58 22 they are adhering to corporate dispensing guidelines and their

03:49:02 23 federal corresponding responsibility.

03:49:05 24 Q.  So when a store was flagged as an outlier under this

03:49:09 25 program, regional managers and then district managers received

—Travassos (By Video Deposition)—

03:49:14 1  some confidential information concerning the flagged store; is

03:49:17 2  that right?

03:49:17 3  A.   Yes.  They were made aware.

03:49:20 4  Q.   Okay.  And they were asked not to forward or distribute

03:49:35 5  this information to others; correct?

03:49:43 6  A.   Correct.

03:49:43 7  Q.   And the point was to keep that information about that

03:49:45 8  store's dispensing practices confidential; correct?

03:49:59 9  A.   I can't speak to why it was advised that we put that in

03:50:05 10  there.  That was something that was advised.

03:50:11 11  Q.   Okay.  And, in fact, the memo reads, "The attached file,"

03:50:15 12  and then it bold it says, "Do not forward or distribute.  List

03:50:18 13  each pharmacy identified with high-risk dispensing behavior";

03:50:28 14  correct?

03:50:28 15  A.   It does say that, yes.

03:50:30 16  Q.   And then attached to this document -- we're not going to go

03:50:32 17  through it necessarily in great detail now, but I just want to

03:50:35 18  make sure we're -- we discuss it.  Attached to this is a chart

03:50:43 19  which lists the varies store that were -- that were triggered

03:50:52 20  by the algorithm; correct?

03:50:55 21  A.   Yes.

03:51:02 22  Q.   Okay.  And this is the information that was not to be

03:51:04 23  forwarded or distributed; correct?

03:51:15 24  A.   Correct.

03:51:15 25  Q.   And for the stores that were entered into the tier 1

Travassos (By Video Deposition)

03:51:22 1  program as outliers, they -- the pharmacy supervisors and

03:51:28 2  regional loss prevention managers were required to attend a

03:51:32 3  one-hour webinar; correct?

03:51:36 4  A.  They were asked to attend, yes.

03:51:38 5  Q.  And then -- and the purpose of this presentation was to

03:51:47 6  instruct the pharmacy supervisors and regional loss prevention

03:51:52 7  managers of the corresponding responsibilities and describe the

03:51:56 8  controlled substances dispensing program; correct?

03:52:00 9  A.  The purpose the webinar was to provide education why the

03:52:03 10  store had been identified and what they were to do, correct.

03:52:08 11  Q.  And then they were required do a store visit; is that

03:52:12 12  right?

03:52:12 13  A.  That's right.

03:52:13 14  Q.  Okay.  And they were requested to perform a controlled

03:52:27 15  substance audit and education for the store team; is that

03:52:31 16  right?

03:52:31 17  A.  That's correct.

03:52:33 18  Q.  And then all of this information was due to be reported

03:52:35 19  back to the professional practice team and to you, in fact, in

03:52:39 20  30 days; right?

03:52:41 21  A.  Correct.

03:52:43 22  Q.  Now, if you look at the attachment to this document again

03:52:47 23  that we looked at, one of the stores about halfway down in the

03:52:51 24  program was from Warren, Ohio, Store 4606.

03:52:56 25          This is Store 4606 in Warren, Ohio.

HEATHER K. NEWMAN, RMR, CRR

─────────Travassos (By Video Deposition)─────────

03:52:59 1    Do you see that, Ms. Travassos?

03:53:01 2 A.  I do.

03:53:04 3 Q.  And if we go across the chart, this store was triggered --

03:53:14 4 triggered the algorithm based on its volume of high-risk drugs

03:53:19 5 of hydrocodone; correct?

03:53:22 6 A.  Based upon its volume, yes.

03:53:24 7 Q.  And the share of hydrocodone compared to non-controlled

03:53:29 8 drugs dispensed from that pharmacy; is that right?

03:53:31 9 A.  That's correct.

03:53:33 10 Q.  And then there were some red flags that were analyzed as

03:53:37 11 part of this process as well; correct?

03:53:40 12 A.  Potential red flags.

03:53:43 13 Q.  And for this particular store, it included in this

03:53:50 14 algorithm run age; is that right?

03:53:54 15 A.  Yes.

03:53:56 16 Q.  And what was the criteria for age under the program?

03:54:05 17 A.  The criteria for age is individuals between the ages of 18

03:54:11 18 and 35.

03:54:14 19 Q.  And why were individuals between the ages of 18 and 35

03:54:19 20 selected as potential red flags of diversion?

03:54:29 21 A.  That was deemed the age group where typically one can be

03:54:37 22 thought of as being relatively healthy.

03:54:40 23 Q.  And so if someone was in that age group, presumably they'd

03:54:44 24 be relatively healthy.  And if they were getting large numbers

03:54:47 25 of prescriptions for hydrocodone or other opioids, it may be an

—Travassos (By Video Deposition)—

03:54:51  1   indicator of diversion; correct?

03:54:53  2   A.   It may be an indicator that it would require follow-up.

03:54:58  3   Q.   Because it may be a sign of diversion; correct?

03:55:03  4   A.   Potentially that's fair.

03:55:06  5   Q.   Okay.  And that's what a red flag is; right?  It's a

03:55:09  6   potential sign of diversion; correct?

03:55:12  7   A.   A red flag is a potential sign of diversion, something

03:55:19  8   requiring following up, yes.

03:55:21  9   Q.   Okay.  And this particular store in Warren, Ohio, also

03:55:26 10   triggered the algorithm for cocktail; is that right?

03:55:32 11   A.   Yes, that is what this says.

03:55:35 12   Q.   And how is cocktail defined in the program?

03:55:42 13   A.   I don't know the specific definition of cocktail at the

03:55:48 14   time, as it's changed over time.

03:55:52 15   Q.   But would you agree that a cocktail would include an

03:55:55 16   opioid, a benzo, and a muscle relaxer?

03:55:59 17   A.   I would agree that is definitely a -- considered a

03:56:08 18   cocktail.  I'm not sure what the algorithm considered at this

03:56:11 19   time, though?

03:56:11 20   Q.   Okay.  And is a combination of those drugs together, does

03:56:15 21   that pose a danger to the patient?

03:56:23 22   A.   Potential.

03:56:25 23   Q.   Why?

03:56:32 24   A.   A cocktail or a combination of such medications can have

03:56:38 25   heightened side effects that could be an issue.

———Travassos (By Video Deposition)———

03:56:43  1   Q.   Such as?

03:56:44  2   A.   I can't say all of them, I'm not a doctor, but respiratory

03:56:50  3   depression, sedation.

03:56:52  4   Q.   What about an opioid and a benzo?  Would you agree that

03:56:59  5   that presents a respiratory risk to the patient and is a red

03:57:03  6   flag as well?

03:57:07  7   A.   I would agree it's a potential red flag, depending on the

03:57:11  8   circumstance.

03:57:13  9   Q.   And what about an opioid and a muscle relaxer together?  Is

03:57:17  10  that a red flag?

03:57:27  11  A.   Potentially.

03:57:28  12  Q.   Okay.  And so in addition to age and cocktail, this store

03:57:38  13  in Warren, Ohio, also triggered for only controls.

03:57:42  14        What does only controls refer to?

03:57:47  15  A.   Only controls refers to individuals that, over the course

03:57:58  16  that the algorithm -- the time period that the algorithm looks

03:58:01  17  at, would have filled only controls.  Medications.

03:58:08  18  Q.   All right.  Now, when this store was identified in the

03:58:16  19  controlled substance dispensing program, would a case be opened

03:58:19  20  related to this store in Archer?

03:58:21  21  A.   Yes.

03:58:22  22  Q.   Okay.  And were you responsible for opening those cases?

03:58:27  23  A.   It would have been myself or someone who worked with me.

03:58:33  24  Q.   What information would you enter into Archer related to

03:58:36  25  this program and each store in particular?

HEATHER K. NEWMAN, RMR, CRR

───────────Travassos (By Video Deposition)───────────

03:58:39 1 A.   I think it's fair to say it changed over time, but

03:58:48 2 typically you would enter in the store number, what the flag --

03:58:51 3 what drug had flagged in the algorithm, and the characteristics

03:58:57 4 that were considered outliers.

03:59:00 5 Q.   Were the results of the audit performed at the store that

03:59:03 6 was part of the program, would that be entered into Archer?

03:59:09 7 A.   It would be uploaded into Archer by the loss prevention

03:59:15 8 team.

03:59:18 9 Q.   Okay.  Any other information entered into Archer?  Is there

03:59:23 10 any kind of summary or report that's also entered?

03:59:32 11 A.   The pharmacy supervisor would make observations and

03:59:35 12 recommended actions.  There were affirmations of corresponding

03:59:45 13 responsibility uploaded, potentially a report related to the

03:59:51 14 store.  I'm sorry.

03:59:56 15 Q.   I'm sorry.  I thought you were finished.

03:59:59 16         Is that it?

04:00:00 17 A.   Yes.

04:00:00 18 Q.   Okay.  That affirmation of corresponding responsibility,

04:00:05 19 who was affirming?

04:00:10 20 A.   Each pharmacist.

04:00:11 21 Q.   So you had them sign a form that they -- that they what,

04:00:15 22 acknowledge their corresponding responsibility?

04:00:18 23 A.   That they understood their corresponding responsibility.

04:00:21 24 Q.   Okay.  So it's basically they just -- explain to me what's

04:00:26 25 on the form.

---

Travassos (By Video Deposition)

04:00:30  1  A.  I don't recall it word for word to say what's in "I

04:00:37  2  acknowledge" form related to their responsibility.

04:00:41  3  Q.  Okay.  So it's basically: I, whoever the pharmacist, I

04:00:44  4  acknowledge my corresponding responsibility under the

04:00:48  5  Controlled Substances Act, or something like that, and then

04:00:50  6  they sign their name.

04:00:52  7          Is that basically it?

04:00:53  8  A.  Yes, they sign it and print their name.

04:00:56  9  Q.  As a result of the program, the supervisors would do a

04:01:01 10  one-hour webinar.  Then there would be an audit of the store.

04:01:06 11  The pharmacist would promise to follow their corresponding

04:01:09 12  responsibilities and sign an affirmation.  The pharmacy

04:01:13 13  supervisor would make some kind of recommendation, and then the

04:01:16 14  file would be closed -- then they would -- the file would be

04:01:19 15  closed; is that right?

04:01:24 16  A.  No.  At the -- after the LP individual did the audit, the

04:01:31 17  pharmacy supervisor would provide education to the store team,

04:01:38 18  would, you know, review information with the pharmacists, and

04:01:43 19  together with the pharmacy manager, pharmacist in charge, they

04:01:49 20  would come up actionable items that the store could follow to

04:01:53 21  support, you know, the exercise of corresponding responsibility

04:01:59 22  in the form of an action plan.  And that information would be

04:02:04 23  forwarded to us to upload into Archer.

04:02:11 24  Q.  And then you would upload that into Archer; is that right?

04:02:14 25  A.  Correct.

---

HEATHER K. NEWMAN, RMR, CRR

─────Travassos (By Video Deposition)─────

04:02:14  1  Q.  And who has access to Archer at CVS?

04:02:25  2  A.  There are various groups that have access to Archer.  I

04:02:30  3  couldn't say all of the folks who have access.  There are

04:02:35  4  different levels of access.

04:02:37  5  Q.  Okay.  Well, the pharmacy professional practice team has

04:02:40  6  access; is that right?

04:02:45  7  A.  I don't know that everybody has access, but, yes.

04:02:49  8  Q.  Okay.  Fair enough.

04:02:50  9       What about individual pharmacists in the pharmacy?

04:02:53 10  Would they be able to access the Archer file on their pharmacy?

04:03:00 11  A.  No.

04:03:02 12  Q.  So the pharmacists wouldn't be able to access the

04:03:06 13  information related to their own pharmacy in the controlled

04:03:11 14  substance dispensing program; correct?

04:03:12 15  A.  They had access to the action plan that was created that

04:03:16 16  they would subsequently act on.

04:03:22 17  Q.  Did they have access to the audit?

04:03:31 18  A.  Not through Archer.

04:03:37 19  Q.  Did they have access to the data that triggered the

04:03:40 20  algorithm in the controlled substance dispensing program?

04:03:43 21  A.  Only from the standpoint of what the field leader would

04:03:48 22  discuss with them when they were in the store visit.

04:03:52 23  Q.  Okay.  But they couldn't access through Archer the report

04:03:55 24  on the algorithm and those factors which triggered their

04:04:01 25  entrance into the program through Archer; correct?

HEATHER K. NEWMAN, RMR, CRR

──────Travassos (By Video Deposition)──────

04:04:05  1    A.   Correct.

04:04:06  2    Q.   I want to turn to MR921, if we could.

04:04:13  3         This is Exhibit 8 to the deposition.

04:04:22  4         Can you describe for me what this report is?

04:04:34  5    A.   This report is a dashboard in relation to Store 4606.

04:04:44  6    Q.   And who would -- how would this report be generated, and

04:04:50  7    who would have access to it?

04:04:50  8    A.   It's generated through an analytical program.  Our team

04:04:57  9    would have access to it, and the pharmacy supervisor conducting

04:05:04  10   the visit and the RLPM conducting the visit would have been on

04:05:10  11   the same e-mail that received this dashboard.

04:05:16  12   Q.   And this is part of the confidential information that they

04:05:18  13   would have received; is that right?

04:05:20  14   A.   Yes.

04:05:22  15   Q.   And, so, if we look for Store 4606, it was entered into

04:05:33  16   tier 1 for hydro; is that right?

04:05:37  17   A.   Correct.

04:05:38  18   Q.   All right.  And the store percentile for volume was

04:05:42  19   97 percent; is that right?

04:05:44  20   A.   Correct.

04:05:45  21   Q.   And the store was triggered by the algorithm because its

04:05:48  22   share for hydrocodone, that opioid, was at the 99 percent; is

04:05:57  23   that right?

04:05:57  24   A.   Correct.

04:05:57  25   Q.   Okay.  And the growth here was at 87 percent; is that

**3989**

───── Travassos (By Video Deposition) ─────

04:06:05  1   right?

04:06:05  2   A.   Correct.

04:06:07  3   Q.   Cash was at 91 percent; is that right?

04:06:11  4   A.   Correct.

04:06:11  5   Q.   What does that mean, 91 percent?

04:06:16  6   A.   It's a statistical measurement of comparing this store

04:06:25  7   against other stores within the relative geography.  I don't

04:06:34  8   know the exact calculation to come up with the 91 percent.

04:06:39  9   Q.   Even if you did, I wouldn't ask you to list it.

04:06:43  10  A.   That's good.

04:06:45  11  Q.   But it is -- it is measuring and it is calculating what

04:06:50  12  percentage of cash transactions this store had to all other

04:06:56  13  stores in the same region; correct?

04:07:02  14  A.   Right.  That's not to say that 91 percent of the hydro

04:07:09  15  prescriptions were filled as cash.  It's a measurement against

04:07:11  16  the other stores in the relative region.

04:07:13  17  Q.   Right.  And compared to all of those other stores, this

04:07:16  18  store was in the 91st percentile; correct?

04:07:19  19  A.   Correct.

04:07:23  20  Q.   Okay.  And for age, it was in the 93rd percentile?

04:07:25  21  A.   Correct.

04:07:25  22  Q.   And for cocktail, in the 99th percentile?

04:07:30  23  A.   Correct.

04:07:31  24  Q.   And only controls, meaning only hydrocodone prescriptions,

04:07:37  25  was in the 96th percentile?

———Travassos (By Video Deposition)———

04:07:40  1   A.   Only controls is 96, correct.

04:07:49  2   Q.   I believe I misspoke.  I believe at this time in order to

04:07:53  3   qualify for a tier 1 store, the store must be in the 95th

04:07:57  4   percentile for pill volume, share, or relative growth.

04:08:00  5          Does that sound correct to you?

04:08:03  6   A.   I don't recall the specific threshold.

04:08:06  7   Q.   But these thresholds were set at -- by CVS; correct?

04:08:10  8   A.   These thresholds were initially set by AGI, I want to say,

04:08:18  9   and then over time, you know, in collaboration with analytics

04:08:23 10   and senior leaders, they have been adjusted.

04:08:28 11   Q.   AGI is an outside consulting group that CVS hired to

04:08:33 12   develop this algorithm; is that right?

04:08:38 13   A.   That's correct.

04:08:41 14   Q.   And -- but if CVS wanted to do so, they could have lowered

04:08:45 15   the volume share to 75 percent; right?

04:08:50 16   A.   In collaboration with analytics and, you know, senior

04:08:56 17   leadership, we could make adjustments if the group felt it was

04:09:02 18   necessary.

04:09:06 19   Q.   So you could have -- you could have lowered it to

04:09:11 20   80 percent if everyone agreed; correct?

04:09:14 21   A.   Theoretically, yes, we could have.

04:09:24 22   Q.   Ms. Travassos, you participated in an action plan for this

04:09:30 23   store, and I want to show you an e-mail related to that

04:09:32 24   investigation.  It's MR922, which I'll mark as Exhibit 9.

04:09:37 25          This is an e-mail from -- from you to -- dated

HEATHER K. NEWMAN, RMR, CRR

———Travassos (By Video Deposition)———

04:09:43 1   March 21st, 2014, related to Store 4606 and the controlled

04:09:51 2   substance dispensing program follow-up quarter 1.

04:09:53 3         Do you see that?

04:09:59 4   A.  Yes.

04:10:01 5   Q.  Okay.  And it's actually a follow-up to an e-mail that you

04:10:03 6   sent, which is just below it, on March 5th, 2014.

04:10:08 7         Do you see that?

04:10:14 8   A.  Yes.

04:10:16 9   Q.  And it reads in the second sentence, says, "Part of the

04:10:21 10   documentation, the RLPM," that's the regional loss prevention

04:10:28 11   manager, "listed, he called out two physicians of concern on

04:10:32 12   the audit sheet, Dr. Torres and Dr. Veres."

04:10:36 13         Do you see that?

04:10:36 14   A.  I do.

04:10:37 15   Q.  "And the comments were that these two physicians were

04:10:40 16   contributing 70, 80 percent of the store's hydrocodone volume."

04:10:43 17         Do you see that?

04:10:45 18   A.  Yes.

04:10:49 19   Q.  So for this store, the hydrocodone volume that we just

04:10:54 20   looked at was at the 97th percentile of all other stores in

04:10:59 21   that region, and these two prescribers were responsible for 70,

04:11:04 22   80 percent of all of those hydrocodone prescriptions; correct?

04:11:10 23   A.  That's -- that is what this e-mail states.

04:11:18 24   Q.  And then you wrote that "From a corporate perspective,

04:11:21 25   we'll review the metrics on these physicians," which is a few

─────Travassos (By Video Deposition)─────

04:11:26  1    sentences down.

04:11:27  2            Do you see that?

04:11:38  3    A.  Yes, I see that.

04:11:41  4    Q.  And so the store report that we looked at at this point in

04:11:45  5    time had not been shared with the pharmacists; correct?

04:11:52  6    A.  I can't say -- I wasn't on the visit -- whether it was

04:11:56  7    shared or not.

04:11:59  8    Q.  And CVS corporate didn't give the pharmacists in Store 4606

04:12:05  9    a specific warning regarding filling prescriptions for

04:12:10 10    Dr. Torres and Dr. Veres; correct?

04:12:13 11    A.  Typically, during a visit, physicians that contribute the

04:12:19 12    largest quantity of that drug that they're on the visit for

04:12:27 13    would be reviewed, so it may have been covered in that

04:12:36 14    instance, but I wasn't there so I don't know, you know,

04:12:41 15    specifically what was discussed.

04:12:42 16    Q.  There was nothing in this information that suggests that

04:12:45 17    the pharmacists were told to be on the lookout for

04:12:48 18    prescriptions from these two prescribers even though they were

04:12:55 19    contributing 70 to 80 percent of the store's total hydro

04:13:01 20    volume?

04:13:01 21    A.  They were told that they need to exercise corresponding

04:13:01 22    responsibility with every prescription that they dispense, and

04:13:03 23    if there's any concern that they should refuse to fill.

04:13:06 24    Q.  They were told what they were told all of the time by CVS

04:13:10 25    corporate, which is follow your corresponding responsibility

─────Travassos  (By Video Deposition)─────

04:13:13 1   with every single prescription, but they're not given any

04:13:16 2   specific warning here about Dr. Torres or Dr. Veres, it's just

04:13:20 3   the general "follow the corresponding responsibility"; right?

04:13:23 4   A.   And the indication that it would be passed to the

04:13:26 5   prescriber team for review.

04:13:28 6   Q.   Well, you told the pharmacy supervisor that, but there's no

04:13:34 7   indication that that was conveyed to the pharmacists; right?

04:13:42 8   A.   I can't say what was said at the visit, but the pharmacy

04:13:43 9   supervisors were made aware during the webinar that they, you

04:13:47 10  know, they should bubble up any concerns, you know, we -- the

04:13:57 11  prescribe outreach team, monitoring team, would review any

04:14:00 12  prescribers that arose that were of, you know, concern or

04:14:10 13  noteworthy, if you will.

04:14:11 14  Q.   Right.  But the guidance that you gave in your e-mail to

04:14:14 15  the pharmacy supervisor was general.  "It would be good to

04:14:18 16  remind the pharmacists that they must always exercise their

04:14:21 17  professional judgment with each and every prescription they

04:14:24 18  fill, particularly with controlled substances."

04:14:25 19          There's no specific instruction to the pharmacy

04:14:28 20  supervisor to -- to warn the pharmacists about Dr. Torres and

04:14:36 21  Dr. Veres given their high hydrocodone prescribing practices;

04:14:40 22  correct?

04:14:41 23  A.   Yeah, I -- I believe the intention was to let them know, to

04:14:45 24  let the pharmacy supervisor know, that these doctors were

04:14:49 25  distributing a high volume, but the pharmacists are responsible

—Travassos (By Video Deposition)—

04:14:54 1   to exercise corresponding responsibility.

04:15:00 2   Q.   And there's no instruction from CVS not to fill these

04:15:03 3   prescriptions, and there's no indication that these two

04:15:05 4   prescribers would be suspended by CVS.  You were merely going

04:15:08 5   to investigate them; correct?

04:15:09 6   A.   This communication was to inform the pharmacy supervisor

04:15:13 7   that these doctors would be passed to the prescriber monitoring

04:15:17 8   team for review, and the pharmacists would need to continue

04:15:25 9   exercising corresponding responsibility.

04:15:28 10  Q.   And your follow-up note to the pharmacy supervisor in the

04:15:34 11  e-mail above was, "Once you have a chance to reinforce with the

04:15:39 12  pharmacy team of Store 4606, once confirmed, we'll be able to

04:15:45 13  close out the case"; correct?

04:15:47 14  A.   That's what it states.

04:16:00 15  Q.   But this is not the first time that Store 4606 had been

04:16:01 16  identified by the controlled substance dispensing program.  If

04:16:05 17  we look at MR923, it was in the program earlier; correct?

04:16:33 18           This is Exhibit 10.  Mark it for the record, please.

04:16:37 19           Ms. Travassos, this is the analysis of new stores

04:16:40 20  entering the program in 2013.

04:16:42 21           Do you see that?

04:16:47 22  A.   I see that.

04:16:48 23  Q.   Okay.  And if we turn to the second page of this document,

04:16:56 24  in the first two columns, these are new stores entering the

04:16:59 25  CSDP in the second quarter of 2013, drugs of concern.  And

———Travassos (By Video Deposition)———

04:17:03  1  under hydrocodone, Store 4606 is listed in both charts.  This

04:17:13  2  indicates that this particular store had previously been in the

04:17:16  3  controlled substance dispensing program prior to 2014; correct?

04:17:24  4  A.  I don't think I've ever seen this document before, or I

04:17:29  5  don't recollect it, so I don't know exactly how it was

04:17:35  6  prepared.

04:17:36  7  Q.  Is that a fair characterization of the document, that Store

04:17:41  8  4606 is listed as a new store entering the CSDP in the second

04:17:44  9  quarter of 2013?

04:17:46  10  A.  I would say that's fair.

04:17:48  11  Q.  And if you could pull out MR925, please.

04:17:57  12       On the first page of this document, which we'll mark

04:18:00  13  as Exhibit 11, this is a loss prevention store report review

04:18:05  14  for Store 4606 dated July 12th, 2013.

04:18:10  15       Do you see that?

04:18:12  16  A.  I do.

04:18:13  17  Q.  Okay.  And this is that same store in Warren, Ohio?

04:18:19  18  A.  Yes.

04:18:19  19  Q.  Is this a report of the audit that would be conducted under

04:18:22  20  the controlled substance dispensing program by loss prevention?

04:18:27  21  A.  Yes.

04:18:28  22  Q.  And so this is an example of the type of audit report that

04:18:31  23  would be conducted as a component of the controlled substance

04:18:36  24  dispensing program; is that right?

04:18:39  25  A.  Yes, at the time.

—————Travassos  (By Video Deposition)—————

04:18:40  1   Q.   Okay.  I'm going to ask you to turn through the document

04:18:47  2   till about the third page in the physical document where it

04:18:50  3   lists prescribers across the top.  And the question, in 15, is,

04:18:55  4   "Do you have any concerns with any prescribers for your

04:18:58  5   patients?  Who and why?"

04:19:00  6        And the pharmacists list Dr. Veres.  This is the

04:19:06  7   pharmacist in charge, the PIC; correct?

04:19:10  8   A.   Correct.

04:19:12  9   Q.   "High unit amounts for hydrocodone scripts and Dr. Torres.

04:19:18 10   Both offices write scripts for pain meds, hydrocodone, ranging

04:19:22 11   from 90 to 160 tablets."

04:19:24 12        Did I read that correctly?

04:19:26 13   A.   Yes.

04:19:28 14   Q.   And the RPH1, who is that?

04:19:32 15   A.   That would have been another pharmacist on duty at the

04:19:36 16   time.

04:19:36 17   Q.   And that pharmacist made the same conclusions, that they

04:19:40 18   were concerned about the prescribers, Dr. Veres and Dr. Torres;

04:19:44 19   correct?

04:19:46 20   A.   Those are the doctors that they listed, yes.

04:19:49 21   Q.   Okay.  And so --

04:19:54 22        MR. WEINBERGER:  Is there some way we can expand the

04:19:56 23   screen because these documents are --

04:20:04 24   (Off-record discussion).

04:20:05 25        THE COURT:  All right.  We're trying to make the

————Travassos (By Video Deposition)————

04:20:07 1   adjustment.

04:20:18 2           MR. WEINBERGER:  Is it possible to pause for a minute

04:20:21 3   to see if we can get somebody from IT to --

04:20:25 4           COURTROOM DEPUTY:  There's something they need to do

04:20:26 5   downstairs on 15.  I just talked to them and they're downstairs

04:20:31 6   now, so I guess if we can pause for a couple minutes. . .

04:20:41 7           THE COURT:  Well, we can wait a couple minutes, but if

04:20:45 8   we can't, we'll just continue and do the best we can.

04:20:48 9           MR. LANIER:  Your Honor -- Your Honor -- I feel like

04:20:54 10  an adolescent boy with my voice cracking.

04:20:57 11          Your Honor, might this be an opportunity, really brief

04:21:00 12  two minutes for me to just run down the hall and use the

04:21:02 13  restroom?

04:21:03 14          THE COURT:  Yep.  That's fine.  We'll take a short

04:21:05 15  break.

04:21:15 16          We can take a short break and hopefully they'll get

04:21:18 17  this fixed.

04:21:34 18       (Recess was taken from 4:21 p.m. till 4:28 p.m.)

04:28:32 19          MR. WEINBERGER:  Thank you, Judge.  That's much

04:28:33 20  better.

04:28:34 21          THE COURT:  Yeah.  This seems better.

04:28:34 22          MR. WEINBERGER:  Thank you, Judge.

04:28:35 23          THE COURT:  Glad we got it fixed.

04:29:12 24          Okay.  We can continue.

04:29:17 25  BY MR. ELSNER:

Travassos (By Video Deposition)

04:29:18  1  Q.  If you turn to question 16, which is just under this, "Does

04:29:25  2  the store have a do not fill list?  Who is on it?"

04:29:29  3       What is a do not fill list?

04:29:36  4  A.  That's a characterization of a list that may have been at

04:29:44  5  store level for doctors that pharmacists may not fill for.

04:29:54  6  Q.  Okay.  So individual stores at this time could create their

04:29:57  7  own lists of prescribers that they would not fill prescriptions

04:30:01  8  for; is that correct?

04:30:06  9  A.  The do not fill lists were not necessarily encouraged or

04:30:10 10  directed from corporate at all.  Corporate -- or I should say

04:30:16 11  our group, not corporate -- but we advised pharmacists to

04:30:23 12  exercise corresponding responsibility with every prescription

04:30:26 13  that they receive, and if there are concerns, to resolve those

04:30:30 14  concerns.

04:30:32 15  Q.  On each individual prescription; correct?

04:30:36 16  A.  Correct.

04:30:37 17  Q.  And your department did not believe that blanket refusals

04:30:40 18  to fill lists at individual pharmacy were appropriate; right?

04:30:44 19  A.  I think so it's fair to say that we -- our group did not

04:30:50 20  want blanket policies in -- you know, at any one particular

04:31:01 21  pharmacy because that would allow pharmacies or anything to be

04:31:06 22  more stringent than, you know, what was CVS policy.

04:31:13 23  Q.  So even if the pharmacists in that particular store had

04:31:16 24  determined that a particular pharmacist was operating a pill

04:31:20 25  mill, they couldn't, in your department's view, have a do not

HEATHER K. NEWMAN, RMR, CRR

———Travassos (By Video Deposition)———

04:31:25  1  fill list for those prescribers.  They needed to evaluate each

04:31:30  2  individual prescription?

04:31:31  3  A.  If a pharmacist had knowledge that a prescriber was a pill

04:31:36  4  mill, that would be a concern they wouldn't be able to resolve,

04:31:41  5  so we would expect them to not fill that prescription.

04:31:45  6  Q.  But you would not permit them to have a do not fill list

04:31:52  7  with that prescriber's name in it; correct?

04:31:56  8  A.  We -- I think it's fair to say that the guidance was is

04:31:59  9  that you should not have a do not fill list, but if you were

04:32:05  10 uncomfortable with a prescription, that -- and you couldn't

04:32:07  11 resolve those concerns, that you couldn't fill.

04:32:12  12 Q.  And if we look at Question 22 related to cocktails, once

04:32:22  13 again, Dr. Torres and Dr. Veres were mentioned here as

04:32:30  14 prescribing cocktail drugs of concern to the pharmacists at

04:32:34  15 this store in Warren, Ohio; correct?

04:32:37  16 A.  It is characterized that Dr. Torres and Veres are listed to

04:32:42  17 the question about routinely prescribing cocktail.

04:32:48  18 Q.  I want to ask you to turn to question 34.  "Do a high

04:33:11  19 percentage of patients receiving hydrocodone fill their scripts

04:33:14  20 early?"

04:33:17  21       And the answer was: "15 to 20 percent attempt, but the

04:33:22  22 pharmacy will have a two-day policy on early refills."

04:33:27  23       So this indicates that almost one out of every four

04:33:32  24 hydrocodone prescription, a patient is attempting to fill it

04:33:36  25 before the refill date; correct?

**4000**

—Travassos (By Video Deposition)—

04:33:40 1 A.  What is written here, one pharmacist said 1 in 5, and the

04:33:48 2 other one said 10 to 15 percent.

04:33:50 3 Q.  And does that concern you from a compliance perspective,

04:33:54 4 that, you know, 15 percent or 20 percent of the patients with

04:34:02 5 hydrocodone prescriptions were trying to refill their

04:34:04 6 prescriptions early?

04:34:06 7 A.  It is something that we would expect the pharmacist to do

04:34:10 8 due diligence on and, you know, resolve any concerns that they

04:34:15 9 may have.

04:34:15 10 Q.  Well, I'm asking you, in your position, if this is

04:34:24 11 indication to you that there is potential abuse and diversion

04:34:31 12 occurring for Store 4606, when 97 percent -- where this store

04:34:38 13 is in the 97th percentile for volume for hydrocodone, 99th

04:34:43 14 percentile for share of hydrocodone, and you have patients 15

04:34:49 15 to 20 percent of the time with hydrocodone prescriptions trying

04:34:52 16 to refill those early.  Is that indication to you, in your

04:34:58 17 department, that diversion is occurring?

04:35:02 18 A.  Again, it's hard to characterize one question from an

04:35:05 19 entire visit.  If it was a concern, it would have been

04:35:13 20 addressed.

04:35:14 21 Q.  My question is, does it concern you in your position as the

04:35:17 22 head of this program?

04:35:19 23      I mean, you're looking for stores that are outliers.

04:35:22 24 You've identified a store that's an outlier.  And then within

04:35:26 25 that store, the patients who are prescribed these pills, one in

HEATHER K. NEWMAN, RMR, CRR

—————Travassos (By Video Deposition)—————

04:35:29　1　five of them is trying to get the prescription filled early.

04:35:32　2　　　　　　Is that an indication to you of potential diversion?

04:35:37　3　I mean, a red flag of diversion is trying to get a prescription

04:35:40　4　filled early; correct?

04:35:41　5　A.　I would say it's, you know, a potential red flag that would

04:35:46　6　need to be resolved.

04:35:50　7　Q.　And the reason it's a red flag is that someone coming to

04:35:54　8　the pharmacy to refill a prescription before their day's supply

04:35:58　9　has run out is indication that that person might be abused to

04:36:03　10　the medication, they might be addicted to the medication,

04:36:06　11　and/or they might be diverting the medication; correct?

04:36:09　12　That's -- that is the red flag.

04:36:11　13　A.　It really depends on the facts and circumstances.  Someone

04:36:14　14　may need their prescription early for legitimate reasons.

04:36:21　15　Q.　And I appreciate that.  There might be some small

04:36:23　16　percentages of times where, hey, I'm going on a trip and my

04:36:26　17　script's going to come in the day after I leave, but we're

04:36:29　18　talking about 10 to 20 percent of the prescriptions, not 1 or

04:36:35　19　2 percent of the prescriptions; right?

04:36:36　20　A.　That is what is characterized here.

04:36:38　21　Q.　Ms. Travassos, I want you to pull out MR924, if you would.

04:36:45　22　And we'll mark this as Exhibit 12.

04:36:47　23　　　　　　So this is the loss prevention store review report

04:36:51　24　dated February 14th, 2014, related to the second time that

04:36:58　25　Store 4606 in Warren, Ohio, was in the controlled substance

**4002**

—————Travassos (By Video Deposition)—————

04:37:04  1    dispensing program.

04:37:05  2            Do you see that?

04:37:06  3    A.   I do.

04:37:07  4    Q.   So this particular store went through the controlled

04:37:12  5    substance dispensing program in 2013, an audit was conducted,

04:37:17  6    the pharmacists were trained, they signed their corresponding

04:37:23  7    responsibility authorizations or attestations, and now they're

04:37:28  8    in the program again for a second time; correct?

04:37:31  9    A.   Correct.  Correct.

04:37:33  10   Q.   Okay.  And CVS sent the same regional loss prevention

04:37:38  11   manager to conduct this investigation in 2014, this audit; is

04:37:45  12   that right?

04:37:45  13   A.   Yes.

04:37:46  14   Q.   Okay.  And the questions are going to be largely the same.

04:37:51  15   We're going to look at some of those.

04:37:57  16            I want to turn first to -- in the pharmacy background

04:38:03  17   section, which is either the second or third page of the

04:38:06  18   document.

04:38:12  19            And the third question there is, "Has there been any

04:38:16  20   recent changes to the area, other pharmacies opened or closed?"

04:38:21  21            And the answer here is that "Walgreens has imposed

04:38:25  22   limits on hydrocodone/oxycodone.  They can't order once they

04:38:28  23   are at a specific threshold, causing patients to come."  I

04:38:34  24   assume to CVS.

04:38:35  25            And then the -- the second pharmacist reaches the same

─────Travassos (By Video Deposition)─────

04:38:42  1   conclusion.

04:38:42  2          Do you see that?

04:38:45  3   A.  I see that.

04:38:47  4   Q.  Would you agree with me that if Walgreens was exceeding its

04:38:52  5   threshold limits in this town, and if your store, CVS Store

04:38:59  6   4606, was in the 97th percentile for volume and 99th percentile

04:39:03  7   for share, that this may be an indication that there is

04:39:10  8   diversion occurring within this community?

04:39:13  9   A.  No, I can't say that because Walgreens has changed policies

04:39:18 10   over time, not necessarily specific to this area.

04:39:26 11   Q.  Understood.  But Walgreens has exceeded, apparently,

04:39:33 12   according to your pharmacists at 4606, exceeded its limits on

04:39:37 13   hydrocodone and oxycodone, and that's the reason that more

04:39:40 14   patient are coming to the CVS store.

04:39:42 15          Do you see that?

04:39:43 16   A.  I see what's written, but I'm not sure what that

04:39:47 17   characterization relates to.

04:39:51 18   Q.  And so if Walgreens had reached its limits in terms of its

04:39:57 19   dispensing of hydrocodone and oxycodone, and -- in this

04:40:03 20   community, and CVS 4606 was in the top 97th percentile for

04:40:09 21   volume and 99 percentile for share of hydrocodone, does it

04:40:15 22   concern you that there may be an oversupply of opioids into

04:40:19 23   this community?

04:40:20 24   A.  Again, I wasn't there, but the way I read this is that

04:40:24 25   Walgreens made a change to what they were allowing their

HEATHER K. NEWMAN, RMR, CRR

─── Travassos (By Video Deposition) ───

04:40:29  1  pharmacists to dispense.

04:40:35  2  Q.  And as a result, they placed a limit so that there would

04:40:39  3  not be more than the limit of opioids dispensed from their

04:40:44  4  stores in that community; right?

04:40:47  5  A.  I can't say to what the change was, but, you know, I wasn't

04:40:51  6  there.  I don't know the characterization.

04:40:54  7  Q.  Does it concern you, in the pharmacy professional practice

04:40:59  8  department, that you've got Walgreens and CVS, two of the

04:41:05  9  largest pharmacies in the country, both of which are reaching

04:41:09  10  the upper limits of their dispensing of opioids into that

04:41:15  11  community, that there may be an oversupply into that community?

04:41:21  12  A.  Again, I wasn't the one conducting the visit, so I can't

04:41:24  13  say what the discussion was behind these comments to understand

04:41:28  14  what they imply.

04:41:32  15  Q.  Well, but I'm asking you, having reviewed this from

04:41:37  16  corporate headquarters, is that a concern to you that that may

04:41:42  17  be occurring, which is, frankly -- isn't that the purpose of

04:41:46  18  the controlled substance dispensing program in part, is to make

04:41:49  19  sure that pills aren't being diverted into these communities?

04:41:57  20  A.  The purpose of the program is to review the practices at

04:42:00  21  the store to ensure -- to make sure that pharmacists have the

04:42:06  22  tools and the knowledge to exercise corresponding

04:42:10  23  responsibility appropriately.

04:42:12  24  Q.  Ms. Travassos, is the purpose of the corresponding

04:42:16  25  responsibility and the corporate guidance that CVS gave to its

─────────Travassos (By Video Deposition)─────────

04:42:22  1  pharmacists to help assist in preventing diversion of

04:42:28  2  controlled substances?

04:42:30  3  A.  I can tell you that CVS provides training on diversion, but

04:42:40  4  the goal of this program is to identify stores with outlying

04:42:48  5  characteristics of dispensing that -- to ensure correct store

04:42:56  6  processes were in place and pharmacists had the knowledge to

04:43:00  7  appropriately exercise corresponding responsibility.

04:43:05  8  Q.  And the training that was given to those pharmacists was

04:43:09  9  training in red flags of indicators of potential diversion;

04:43:14  10  correct?

04:43:17  11  A.  Training does provide information on potential red flags.

04:43:22  12  Q.  Red flags which were indicators of potential diversion;

04:43:25  13  correct?

04:43:27  14  A.  Potential red flags that could be of concern, depending on

04:43:34  15  the circumstance and the facts.

04:43:37  16  Q.  The audit report under drugs, hydrocodone, if you move

04:43:44  17  forward a couple more pages, two pages, again highlights the

04:43:58  18  prescribing practices of Dr. Veres and Dr. Torres.

04:44:05  19       Do you see that?

04:44:06  20  A.  I see them mentioned on the page, yes.

04:44:09  21  Q.  And they're mentioned as prescribers who prescribe the

04:44:13  22  majority of the hydrocodone scripts, in the second column

04:44:19  23  there?

04:44:25  24  A.  Yes, I see them mentioned.

04:44:27  25  Q.  Okay.  And they're also mentioned as prescribers who

**4006**

──────Travassos (By Video Deposition)──────

04:44:34  1   routinely prescribe hydrocodone, again, with other drugs, like

04:44:39  2   muscle relaxers; correct?

04:44:40  3   A.  I see that documented here.

04:44:43  4   Q.  In fact, the RPH1 pharmacist, in response to the question,

04:44:51  5   "What doctors do you verify scripts with because you're

04:44:54  6   concerned with clientele or total quality" -- sorry, "or total

04:45:01  7   quantity of hydrocodone scripts?" responded, "Torres and

04:45:07  8   Veres"; correct?

04:45:11  9        In the second column, Jon.

04:45:14 10   A.  That is correct.

04:45:20 11   Q.  And if we turn forward to -- under Pharmacist, which is a

04:45:33 12   few pages over, in the third from the bottom, "Does the

04:45:44 13   pharmacist refuse to fill the prescription after the

04:45:46 14   verification process if he or she is uncomfortable with a

04:45:53 15   prescriber's response? "

04:45:56 16        And in the first column it says they refused three on

04:45:59 17   the day of this investigation, "and will not script for

04:46:03 18   oxycodone 30 milligrams or over.  They will not carry it."

04:46:06 19        Do you see that?

04:46:09 20   A.  I see that written here, yes.

04:46:12 21   Q.  Okay.  And in the next column it says, "Refuse one to two

04:46:17 22   each day due to early refills or the need to verify through the

04:46:19 23   doctor and then refuse."

04:46:20 24        Do you see that?

04:46:22 25   A.  I do.

—Travassos (By Video Deposition)—

04:46:23  1    Q.  So according to these pharmacists in the second audit of

04:46:27  2    this particular store, nearly a year later after it first

04:46:31  3    entered the program, they were still refusing to fill around --

04:46:36  4    between one and three prescriptions a day; correct?

04:46:44  5    A.  That is what's documented here.  I wasn't there to have the

04:46:49  6    conversation, but that -- that is what is documented.

04:46:51  7    Q.  And, in fact, the situation was so acute that the

04:46:57  8    pharmacist in charge decided that they will not carry oxycodone

04:47:02  9    over 30 milligrams.

04:47:03  10            Do you see that?

04:47:04  11   A.  I see that written here, but, again, I wasn't there,

04:47:08  12   so. . .

04:47:10  13   Q.  Well, you keep saying that you weren't there, but this is

04:47:12  14   what was reported to you as part of the program; correct?

04:47:18  15   A.  This is what was reported, but I don't recall this specific

04:47:22  16   document.

04:47:24  17   Q.  Does it concern you, as the head of this program, that the

04:47:29  18   store that you're investigating had decided on its own that it

04:47:34  19   would refuse to carry prescriptions over 30 milligrams for

04:47:38  20   oxycodone?

04:47:39  21   A.  The fact that they're refusing to fill prescriptions shows

04:47:45  22   that they seem to be exercising corresponding responsibility.

04:47:48  23   Q.  Do pharmacists have the ability at CVS to decide that

04:47:52  24   they're going to refuse to carry prescription over a certain

04:47:57  25   dosage amount?

──────Travassos (By Video Deposition)──────

04:47:58  1  A.  Currently, no.

04:48:00  2  Q.  So I want to have you next turn two pages over to

04:48:11  3  prescribers.

04:48:16  4       And now the answer to the question that was asked in

04:48:18  5  2013, this -- the answer is now changed.  "Does the store have

04:48:23  6  a do not fill list?  And who is on it?"

04:48:26  7       And the answer now, as opposed to in 2013, is, yes,

04:48:30  8  and it lists these four prescribers.

04:48:33  9       Do you see that?

04:48:35  10  A.  Yes.

04:48:36  11  Q.  And so do different CVS stores have different do not fill

04:48:41  12  lists in 2013?

04:48:50  13  A.  I can't say definitively, you know, what their prevalence

04:48:57  14  was, if it existed.

04:49:00  15  Q.  Well, did -- was there a process for CVS pharmacists to

04:49:04  16  inform corporate headquarters that they had created a do not

04:49:08  17  fill list for certain prescribers?

04:49:15  18  A.  I'm not aware.  The only method I'm aware of is to inform

04:49:23  19  the prescriber monitoring team.

04:49:27  20  Q.  And an individual pharmacist could not institute a national

04:49:31  21  decision to block prescribers; correct?

04:49:35  22  A.  No, an individual -- well, pharmacists could raise

04:49:43  23  prescriber name to the prescriber monitoring team, and they can

04:49:48  24  refuse to fill from a prescriber if they're not comfortable.

04:49:52  25  Q.  CVS pharmacists did not have the discretion to block

─────Travassos (By Video Deposition)─────

04:49:58 1  prescribers on a national basis; correct?

04:50:01 2  A.  They could escalate the prescribers to the prescriber

04:50:04 3  monitoring team and refuse to fill if they were uncomfortable.

04:50:09 4  Q.  But they could not block on a national basis a prescriber;

04:50:14 5  correct?

04:50:15 6  A.  They could escalate them to the prescriber outreach team.

04:50:18 7  Q.  Ms. Travassos, do they have the authority to block them on

04:50:21 8  a national basis; yes or no?

04:50:24 9  A.  They could only escalate them to a prescriber outreach

04:50:28 10 program.

04:50:28 11 Q.  Okay.  And only the CVS governance committee could block a

04:50:32 12 prescriber on a national basis; correct?

04:50:34 13 A.  Correct.

04:50:35 14 Q.  In fact, CVS developed a policy that prohibited stores from

04:50:41 15 creating blanket refusals to fill lists; correct?

04:50:45 16 A.  It wasn't specific to that.  It was to any blanket policy.

04:50:51 17 Q.  So why don't we turn to MR946, which we'll mark as

04:50:57 18 Exhibit 16.

04:50:59 19         And this is an e-mail from you to Hilary Dudley,

04:51:05 20 cc'ing Nicole Harrington on June 8th, 2016.

04:51:10 21         Do you see that?

04:51:12 22 A.  Yes.

04:51:12 23 Q.  And then if we turn to the memo which is attached, the

04:51:18 24 subject line reads, "Store-level blanket policies concerning

04:51:22 25 controlled substances."

**4010**

──Travassos (By Video Deposition)──

04:51:22  1              Do you see that?

04:51:25  2  A.   Yes.

04:51:27  3  Q.   And then in the paragraph which is underlined in part, it

04:51:31  4  reads, "Stores must only follow company-approved policies.

04:51:39  5  Stores are not authorized to adopt their own store-specific

04:51:44  6  policies without the joint review and approval of their

04:51:46  7  pharmacy supervisor, CVS legal department, and pharmacy

04:51:51  8  professional services department."

04:51:52  9              Did I read that correctly?

04:51:54 10  A.   Yes.

04:51:56 11  Q.   Then it reads that "stores were directed to immediately

04:52:01 12  discontinue any store-implemented blanket policy pertaining to

04:52:06 13  controlled substances."

04:52:07 14              Correct?

04:52:08 15  A.   Correct.

04:52:09 16  Q.   And, so, even if a -- and we can -- and we sort of asked

04:52:16 17  this before.  But even if a pharmacy knows that a prescriber in

04:52:18 18  their area is operating a pill mill, they must review that

04:52:21 19  prescription to see if it individually, standing alone, could

04:52:24 20  be filled correctly; right?

04:52:26 21  A.   Again, if the pharmacist has knowledge that the prescriber

04:52:29 22  is a pill mill, that would be something they couldn't resolve,

04:52:33 23  so they would refuse to fill.

04:52:35 24  Q.   But they couldn't have a blanket list in the store to

04:52:39 25  indicate to all the other pharmacists in the store that this

─────Travassos (By Video Deposition)─────

04:52:44  1   particular prescriber should not -- we should not be filling

04:52:47  2   their prescriptions because they're a pill mill?

04:52:51  3   A.  Whether they did or they didn't, I cannot say, I can say

04:52:56  4   that if pharmacists had that knowledge, then they would refuse

04:53:00  5   to fill.

04:53:00  6   Q.  Do you know how many CVS stores had these blanket refusals

04:53:05  7   to fill lists?

04:53:09  8   A.  No.

04:53:11  9   Q.  We looked at one from the audit for the CVS store in

04:53:15 10   Warren, Ohio.  Were there other CVS stores in Ohio that had

04:53:19 11   these blanket refusals to fill lists?

04:53:25 12   A.  I do not know.

04:53:28 13   Q.  Can we turn to -- pull out Exhibit MR947.  This will be

04:53:32 14   Exhibit 17.

04:53:35 15        This is an e-mail from a particular CVS store.  This

04:53:43 16   is RX07686, and this is a store in Mentor, Ohio.  And this is

04:53:53 17   an e-mail to Amy Winchell, and the subject line reads "Pain

04:53:57 18   management doctor."

04:53:58 19        Do you see that?

04:54:01 20   A.  Yes.

04:54:03 21   Q.  Okay.  And the -- and the e-mail reads that "Currently

04:54:18 22   Stores 4351 and 4327 are not filling for him.  And I believe

04:54:27 23   that Willoughby Hills has stopped as well.  His office exhibits

04:54:31 24   many red flags of a pill mill, such as high quantity, same dose

04:54:34 25   and directions for numerous patients, accepting cash-only

———— Travassos (By Video Deposition) ————

04:54:37  1   payments."

04:54:39  2          But there -- and she says that "I verified that CVS

04:54:43  3   corporate is currently investigating this practice."

04:54:46  4          There's no -- there's no guidance to the pharmacy

04:54:51  5   about filling prescriptions for this particular doctor, other

04:54:57  6   than CVS corporate has been informed; correct?

04:55:01  7   A.   I haven't seen this before.  I'm not familiar with it to

04:55:04  8   know, other than what's here, what's said.

04:55:07  9   Q.   Was it common practice before CVS instituted this blanket

04:55:11  10  refusal -- you know, this prohibition on blanket refusals to

04:55:15  11  fill for pharmacy to create their own practices to prevent

04:55:22  12  prescriptions being filled for certain prescribers that they

04:55:25  13  believed were operating a pill mill?

04:55:29  14  A.   The blanket policy communication, if you will, was not

04:55:34  15  directed at do not fill lists.  It was all policies that were

04:55:44  16  at the store level that were more stringent than corporate

04:55:49  17  policy.  It wasn't specific to do not fill lists.

04:55:53  18  Q.   This particular e-mail to the store in Mentor, if we go to

04:56:03  19  the e-mail that just precedes this one, underneath, this is an

04:56:11  20  e-mail from Amy Winchell to -- I'm sorry, from this particular

04:56:17  21  store in Mentor to Amy Winchell, and it's in reference to

04:56:24  22  Dr. David Demangone.

04:56:26  23          Do you see that?

04:56:28  24  A.   Yes.

04:56:29  25  Q.   And so the pharmacist had heard that pain management doctor

Travassos (By Video Deposition)

04:56:33 1  in our area, that other stores in the area were refusing to

04:56:41 2  fill for him.  And that's what prompted this -- this e-mail and

04:56:44 3  the response that this store in Mentor received that there were

04:56:51 4  other CVS stores that were not filling for this doctor as well.

04:56:52 5          Do you see that?

04:56:55 6  A.  It doesn't say other CVS stores.  It just says other

04:57:01 7  stores, but yes.

04:57:02 8  Q.  Her reply says that "Currently, CVS Stores 4351 and 4327

04:57:08 9  are not filling for him.  I believe Willoughby Hills has

04:57:12 10  stopped as well."

04:57:12 11          Do you see that?

04:57:13 12  A.  I do.

04:57:15 13  Q.  Is there a dedicated place at CVS to send complaints of

04:57:20 14  this type, or requests for investigation of this type?

04:57:29 15  A.  Yes.

04:57:30 16  Q.  What did the policies and procedures say as to what a CVS

04:57:35 17  employee should do with this information?

04:57:43 18  A.  They -- that it would probably be escalated to the

04:57:47 19  prescriber monitoring team, but I can't say definitively where

04:57:51 20  she sent it.

04:57:52 21  Q.  So was there a policy and procedure at this time in 2014 of

04:57:57 22  where this information was to be sent, to whom to send it?

04:58:10 23  A.  I don't know if it was written in policy, but I'm sure it

04:58:13 24  was communicated.

04:58:15 25  Q.  Communicated how?  And what -- and how was it communicated?

─────Travassos (By Video Deposition)─────

04:58:21  1    A.  I can't say.

04:58:22  2    Q.  And who specifically was she supposed to send this

04:58:25  3    information to?

04:58:27  4    A.  If there was a concern with a prescriber, it should be sent

04:58:30  5    to the prescriber monitoring team.

04:58:36  6    Q.  If you see the response that Ms. Winchell gave to the CVS

04:58:42  7    store in Mentor, if we go down a little bit, Jon, she writes,

04:58:54  8    "These are all things that should be taken into consideration

04:58:57  9    before filling.  Can we verify legitimate purpose?  Filling

04:59:01  10   these scripts are completely up to you in your professional

04:59:04  11   judgment."

04:59:06  12          Did I read that correctly?

04:59:09  13   A.  Yes.

04:59:10  14   Q.  So when a particular store reached out to CVS supervisor

04:59:18  15   with the concerns about a particular pill mill doctor, the

04:59:22  16   response was just to use your best judgment; correct?

04:59:26  17   A.  It wasn't definitively known as a pill mill doctor.  I --

04:59:33  18   I'm not familiar with him or the situation, but she doesn't

04:59:36  19   characterize him as such.  She says he has associated red

04:59:42  20   flags, and pharmacists need to review prescriptions and to, you

04:59:47  21   know, take the information that they have, and if there is any

04:59:51  22   concerns, they need to, you know, satisfy those concerns prior

04:59:56  23   to dispensing.

04:59:59  24   Q.  Well, she actually writes that "his office exhibits many

05:00:02  25   red flags of a pill mill"; correct?

─────Travassos (By Video Deposition)─────

05:00:12 1   A.   That's what she wrote, but, again, I don't know the

05:00:14 2   characterization because I'm not familiar with this prescriber.

05:00:17 3   Q.   So the date of this -- of this document is December 1st,

05:00:23 4   2014.  If you could pull out MR948 for me, please.  This is

05:00:29 5   Exhibit 18.

05:00:30 6        Ms. Travassos, this is -- Exhibit 18 is interview

05:00:34 7   notes under the prescriber monitoring program related to David

05:00:40 8   Demangone.

05:00:41 9        Do you see that?

05:00:42 10  A.   I do.

05:00:42 11  Q.   Okay.  And this was April 17th, 2015.

05:00:45 12       Do you see the date?

05:00:48 13  A.   Yes.

05:00:50 14  Q.   This was over four months after the -- Amy Winchell had

05:00:57 15  raised David Demangone to CVS corporate headquarters to ensure

05:01:02 16  that he was being investigated; correct?

05:01:14 17  A.   That's when this was drafted, I guess.  Yes, that's when

05:01:17 18  the interview was, yep.

05:01:18 19  Q.   And the interview notes indicate that Dr. Demangone was

05:01:32 20  seeing -- one second.

05:01:33 21       Under the estimated number of patients the

05:01:38 22  practitioner sees daily, do you see that?

05:01:40 23       This practitioner was seeing between 65 to 70 patients

05:01:46 24  a day?

05:01:47 25       Do you see that?

**4016**

————Travassos (By Video Deposition)————

05:01:50  1  A.  I do see that written.

05:01:52  2  Q.  Would that be an indicator to you of a doctor who's

05:01:58  3  potentially engaged as a pill mill?

05:01:59  4  A.  I don't know.  As not being part of the team, I don't know

05:02:03  5  what usual is.

05:02:06  6  Q.  Does it seem high to you?

05:02:08  7  A.  Honestly, I can't say without, you know, being part of the

05:02:13  8  team that reviews this on a daily basis.

05:02:19  9  Q.  And under Protocols it says, "What is the highest quantity

05:02:22 10  of tablets that you write for oxycodone 30-milligram

05:02:26 11  prescriptions?"

05:02:27 12         And the answer is, "5/325, 553/1050, very high pill

05:02:36 13  volumes."

05:02:36 14         Do you see that?

05:02:39 15  A.  I don't know what that's referring to because it would seem

05:02:42 16  to me 5/325 is the strength of oxycodone, so I don't know if

05:02:48 17  that's referring to oxy 30 specifically.

05:02:52 18  Q.  But what's written there is very high pill volumes as well;

05:02:57 19  correct?

05:02:59 20  A.  That's written there, but I don't know what he's referring

05:03:02 21  to.

05:03:04 22  Q.  And the ultimate conclusion was to -- oh, and under the

05:03:08 23  notes on the second page, it says, "Dr. Demangone was obviously

05:03:13 24  disinterested in having this discussion."

05:03:14 25         Do you see that?

HEATHER K. NEWMAN, RMR, CRR

**4017**

───Travassos (By Video Deposition)───

05:03:17  1   A.   I do.

05:03:19  2   Q.   And the ultimate conclusion, though, was to keep him active

05:03:22  3   and continue to review; correct?

05:03:25  4   A.   That's what's marked here.

05:03:27  5   Q.   We were looking at the CVS store in Warren, Ohio, that had

05:03:31  6   been flagged on two separate occasions by the controlled

05:03:37  7   substance dispensing program that you ran.

05:03:38  8        It certainly wasn't the only store that was triggered

05:03:42  9   by the algorithm on multiple occasions; correct?

05:03:46  10  A.   That's correct.

05:03:47  11  Q.   Yes.

05:03:54  12  A.   That's what it's saying, but it wasn't that uncommon for a

05:03:57  13  store to flag in a subsequent algorithm because of the amount

05:04:02  14  of time or -- that the algorithm looked back, if you will.

05:04:07  15           MR. WEINBERGER:  Your Honor --

05:04:10  16           THE COURT:  Hold on a second.

05:04:11  17           MR. WEINBERGER:  This might be a good time to break if

05:04:14  18  that's okay.

05:04:14  19           THE COURT:  All right.  If this is a convenient time.

05:04:16  20           MR. WEINBERGER:  Yes, Your Honor.

05:04:17  21           THE COURT:  Okay.  All right.  Ladies and gentlemen,

05:04:23  22  we will break for the evening.

05:04:27  23           Usual admonitions apply.  Again, do not encounter,

05:04:33  24  review, read, see, watch anything in any sort of media about

05:04:37  25  this case.  Do not do any independent research or anything.  Do

HEATHER K. NEWMAN, RMR, CRR

05:04:41 1   not discuss the case with anyone, and we'll pick up -- we'll

05:04:46 2   finish this deposition and then have some more plaintiffs'

05:04:49 3   witnesses tomorrow.

05:04:50 4           Have a good evening.

05:04:53 5       (Jury excused from courtroom at 5:04 p.m.)

05:05:24 6           THE COURT:  All right.  Please be seated for a minute.

05:05:28 7           I don't want to get too far behind in the exhibits, so

05:05:32 8   I guess someone handed me a revised plaintiffs' list for Tasha

05:05:39 9   Polster, so I guess now that -- as I recall, there was an

05:05:46 10  objection to her personnel file, which is 19927.  I think first

05:05:53 11  we should only -- we shouldn't admit her whole personnel file.

05:05:59 12  There may have been one or two pages used.  So what pages are

05:06:02 13  you offering?

05:06:05 14          MR. LANIER:  Your Honor, we would -- we would only

05:06:11 15  offer -- we would only offer the pages we read into the record,

05:06:17 16  and I will commit to you that we can look through that tonight

05:06:21 17  and we'll offer those specific pages in the morning.

05:06:24 18          THE COURT:  All right.  With that modification, is

05:06:27 19  there any objection?

05:06:30 20          MS. SWIFT:  Well, I'd like to -- Kate Swift for

05:06:31 21  Walgreens, Your Honor.

05:06:31 22          THE COURT:  Okay.

05:06:33 23          MS. SWIFT:  I'd like to take a look at what they --

05:06:35 24  what they propose to offer, and we have other objections too

05:06:37 25  that I've submitted to them in writing.  We're happy to talk

05:06:40  1   about those with them before bringing anything to you if that's

05:06:43  2   helpful.

05:06:44  3            THE COURT:  All right.  Well, see if you -- see if you

05:06:46  4   can work these out and we'll address them in the morning.

05:06:55  5            Did anyone look -- there were two objections that

05:07:02  6   defendants' exhibits with Dr. Alexander.  I can't remember

05:07:07  7   even -- all right.

05:07:09  8            MS. SWIFT:  Yes, Your Honor.

05:07:09  9            THE COURT:  Have you -- have you discussed with the

05:07:11 10   plaintiffs the specific statements that you think are directly

05:07:15 11   contradictory to what Dr. Alexander said in court?

05:07:22 12            MS. FIEBIG:  We identified them for the plaintiffs.

05:07:24 13   Have you all had a chance to review?

05:07:25 14            MR. LANIER:  The ones that you identified to us seemed

05:07:27 15   to be entirely consistent with what you said.  I think you even

05:07:30 16   showed him those and he agreed that he had said that and I

05:07:33 17   didn't see how it was even remotely impeachment.

05:07:36 18            MS. FIEBIG:  We do think it's inconsistent,

05:07:38 19   Your Honor.  Dr. Alexander testified that overdispensing by

05:07:42 20   pharmacies was one of the fundamental pieces of driving the

05:07:45 21   opioid epidemic, and that was the first time he had offered

05:07:47 22   that testimony when he was in this court.

05:07:49 23            He's testified twice before to Congress, both times

05:07:52 24   about the causes and effects of the opioid epidemic and made no

05:07:56 25   mention of pharmacies or overdispensing.  He spoke exclusively

**4020**

05:08:01  1   about overprescribing, including the many, many, many causes of

05:08:05  2   overprescribing.

05:08:06  3         THE COURT:  I think that's correct.  What -- what

05:08:09  4   specifically -- hold it.

05:08:10  5         What specific statement are you offering?

05:08:12  6         MS. FIEBIG:  So there were five pages from his

05:08:15  7   Congressional testimony that we'd like to offer.

05:08:17  8         THE COURT:  We're not going to admit five pages.

05:08:19  9   There may be one statement that is where he says what the

05:08:25 10   causes are.  If there's a specific statement that says here are

05:08:28 11   the causes and he doesn't mention pharmacies, I may consider

05:08:32 12   admitting that statement.

05:08:33 13         MS. FIEBIG:  Sure.

05:08:34 14         THE COURT:  But the rest of it's not inconsistent.

05:08:36 15         MS. FIEBIG:  Okay.  Well let us offer you a couple

05:08:38 16   then.

05:08:38 17         THE COURT:  Well --

05:08:39 18         MS. FIEBIG:  In Exhibit 01329, on Page 88, he blames

05:08:46 19   manufacturers, the DEA, and the FDA for the opioid epidemic and

05:08:52 20   makes no mention of pharmacies or overdispensing.

05:08:56 21         THE COURT:  All right.  Well, let me look at this.

05:08:58 22   Where --

05:09:05 23         MR. WEINBERGER:  Your Honor, later on in --

05:09:07 24         THE COURT:  I don't even find this.  Hold on.

05:09:14 25         Well, this says multifaceted campaigns by

HEATHER K. NEWMAN, RMR, CRR

05:09:18  1   pharmaceutical companies.  That could be a lot of things.

05:09:21  2            MR. WEINBERGER:  Right.

05:09:21  3            THE COURT:  I don't see anything inconsistent there.

05:09:23  4            MS. FIEBIG:  But it doesn't have to be flatly

05:09:25  5   contradictory.

05:09:26  6            THE COURT:  Yes, it does, before I touch it.  All

05:09:28  7   right.  So, so far I don't see anything that should come in.

05:09:32  8            Again, if you can -- all right.  If you can show me

05:09:35  9   something very specifically that directly contradicts what he

05:09:40  10  says, I'll consider admitting it, but so far I haven't seen

05:09:44  11  anything, so. . .

05:09:46  12           MS. FIEBIG:  Understood.  Thank you, Your Honor.

05:09:48  13           THE COURT:  All right.  So that takes care of

05:09:52  14  Dr. Alexander.

05:09:53  15           The parties are still working on Tasha Polster.  Then

05:09:56  16  we have things with Vernazza, Nelson's new testimony, and

05:10:05  17  Travassos, so the parties can work with that.

05:10:07  18           What's all this?

05:10:14  19           Well, have you gone through these with the plaintiffs,

05:10:14  20  all these exhibits you want in?

05:10:17  21           MS. SWIFT:  I've submitted them all twice actually to

05:10:18  22  the plaintiffs, Your Honor.  I haven't -- other than what

05:10:22  23  Mr. Weinberger raised yesterday in court with you about the

05:10:24  24  additional good faith dispensing policies, I haven't received

05:10:28  25  any objections from plaintiffs.

HEATHER K. NEWMAN, RMR, CRR

**4022**

05:10:37 1          THE COURT:  Well, now they're like 50 or 60 good faith

05:10:42 2    dispensing and target policies.  I --

05:10:46 3          MS. SWIFT:  They're the same policies that I addressed

05:10:48 4    with her in her direct, Your Honor.

05:10:52 5          MR. WEINBERGER:  Well, you pointed her to a box.

05:10:54 6          THE COURT:  Yeah.

05:10:54 7          MR. WEINBERGER:  You didn't -- you didn't identify on

05:10:57 8    the record what the exhibit numbers were in the box.  She --

05:11:03 9    it's not like she went through the box and said these are

05:11:07 10   Exhibits X through Y that I've looked at.  The foundation was

05:11:12 11   not laid for that, Your Honor.

05:11:13 12         THE COURT:  Well --

05:11:14 13         MS. SWIFT:  Your Honor, I --

05:11:15 14         THE COURT:  There were some at the beginning and some

05:11:17 15   in the middle and some at the end.  I think we should --

05:11:21 16         MS. SWIFT:  There were two sets of exhibits.  The box

05:11:24 17   that Mr. Weinberger refers to, I believe, was the box of

05:11:28 18   refusals to fill, which we have not offered.  You already said

05:11:30 19   that those could not come in through her.

05:11:32 20         The policies were not in a box, and I did go through

05:11:36 21   them with her and I asked her to please look through and

05:11:39 22   confirm that everything in that Redweld was additional good

05:11:43 23   faith dispensing policies and she looked through them carefully

05:11:46 24   and said that they were.

05:11:47 25         MR. WEINBERGER:  No, she didn't.

05:11:48  1            THE COURT:  Hold it.

05:11:49  2            MR. WEINBERGER:  Your Honor --

05:11:49  3            THE COURT:  These are over what period of time?

05:11:51  4            MS. SWIFT:  They are between 1998 and 2020,

05:11:54  5    Your Honor.

05:11:55  6            MR. WEINBERGER:  There's 70 documents in that Redweld,

05:11:57  7    Your Honor, and -- and, look, we're prepared to be -- to

05:12:03  8    withdraw the objection to those, but, again, at every --

05:12:07  9            THE COURT:  Yeah, I think you're going to have to

05:12:10 10    reciprocate.  Defendants are going to have to reciprocate.

05:12:13 11            MS. SWIFT:  All right.  We'll continue to talk to the

05:12:15 12    plaintiffs about it.

05:12:16 13            THE COURT:  I'm going to keep the same strike zone.

05:12:18 14    So you're going to have to reciprocate probably with some of

05:12:21 15    the ARCOS data and some other things and they'll reciprocate.

05:12:24 16    But, otherwise, if we've got to be strict you're not getting

05:12:28 17    these 70 in.

05:12:29 18            MS. SWIFT:  Understood.  We'll keep talking to them

05:12:32 19    about it.  Thank you, Your Honor.

05:12:32 20            THE COURT:  All right.  So -- and then hopefully there

05:12:36 21    won't be too much disagreement on the ones with the

05:12:39 22    depositions.

05:12:39 23            Okay.  Mr. Lanier, Mr. Weinberger, who are -- after we

05:12:45 24    finish this deposition, which we're mostly through, who do you

05:12:50 25    envision for tomorrow?

**4024**

05:12:51 1        MR. LANIER:  Your Honor, our anticipation tomorrow is

05:12:53 2  to finish with Dr. Keys.

05:12:55 3        THE COURT:  Oh, right, right, Dr. Keyes from New York.

05:12:58 4        MR. LANIER:  Right.  And then we'll be putting on our

05:13:00 5  plaintiffs, and we've got two plaintiffs' witnesses we'll be

05:13:08 6  putting on, and then --

05:13:09 7        THE COURT:  And those are --

05:13:11 8        MR. LANIER:  Kim Fraser.

05:13:12 9        THE COURT:  Right, Ms. Fraser.

05:13:13 10        MR. LANIER:  And April Caraway.

05:13:15 11        THE COURT:  Right.

05:13:19 12        MR. LANIER:  And then, Your Honor, at that point in

05:13:21 13  time, the only witness we have left is Mr. Chunderlik, and he's

05:13:28 14  not available until video on Wednesday morning.  So we can rest

05:13:31 15  pursuant to putting him on Wednesday morning, or we can put him

05:13:36 16  on Wednesday and then rest after that, whatever the Court's

05:13:41 17  preference is, but I anticipate us being through with our

05:13:42 18  witnesses probably by about 2:00 or 3:00 tomorrow afternoon.

05:13:46 19        THE COURT:  All right.  Well, I -- my preference is to

05:13:49 20  keep going and not have a gap, so we'll -- defendants should

05:13:53 21  have their witness -- a witness ready to go when we're done

05:13:56 22  with Caraway, and then we'll have Chunderlik Wednesday morning

05:14:02 23  because that's when that one witness was available.

05:14:07 24        And again, we have -- doesn't really matter who's

05:14:10 25  calling the witnesses, the jury's paying attention to all of

HEATHER K. NEWMAN, RMR, CRR

05:14:13  1    them, so the defendant should have a -- one witness available,

05:14:17  2    either live, or if you have a deposition that's easier maybe

05:14:21  3    because we're -- it's a little loose so we don't have someone

05:14:25  4    tied up, you may want to start with a deposition that's --

05:14:27  5    that's fine.

05:14:29  6              MR. LANIER:  If -- if --

05:14:30  7              THE COURT:  Or two if they're short.  I don't know

05:14:32  8    what length these are.

05:14:33  9              MR. LANIER:  If we could find out who it is, that

05:14:35  10   would be very helpful to us.

05:14:37  11             THE COURT:  Well, defendants want to confer and let

05:14:39  12   plaintiffs know, that's fine.

05:14:42  13             MR. MAJORAS:  Your Honor, John Majoras.  We were just

05:14:44  14   processing this information as we're hearing it.  We'll be

05:14:46  15   happy to --

05:14:47  16             THE COURT:  Okay.  Okay.  Just let them know,

05:14:50  17   Mr. Majoras, who you're going to start off with.

05:14:52  18             MR. MAJORAS:  Your Honor, while I'm speaking, I just

05:14:54  19   wanted to note for the record, there -- in Mr. Lanier's

05:14:57  20   questioning of Mr. Nelson, there was some discussion about

05:15:00  21   recently produced documents.  There was also come colloquy

05:15:02  22   among counsel in our off-the-record -- I mean, in our sidebar

05:15:05  23   conversation, I just want to note for the record of the 18

05:15:08  24   documents that they used with Mr. Nelson, 12 of them were

05:15:12  25   produced prior to Mr. Nelson's deposition, which was March 23rd

**4026**

05:15:16 1   of this year, and if you need me to hand something up, I can do

05:15:21 2   that, Your Honor, but I just want to make that record.

05:15:22 3          MR. LANIER:  I would love to see that Your Honor

05:15:23 4   because the representation to me from my team was that almost

05:15:27 5   all of those were recently produced documents and so I would

05:15:33 6   like to see that, and I will address it.

05:15:34 7          THE COURT:  Well, I think you should discuss that with

05:15:36 8   Mr. Majoras because certainly that was the whole point of my

05:15:39 9   ordering --

05:15:40 10         MR. LANIER:  Agreed.

05:15:42 11         THE COURT:  -- him to testify and charging the time to

05:15:47 12  Walmart.  It wasn't to go into old documents.

05:15:52 13         MR. LANIER:  I agree, Your Honor, and the order I put

05:15:52 14  to my team was that those are the documents I wanted and --

05:15:54 15         THE COURT:  So -- so, look, he's testified.  If it

05:15:56 16  turns out that a number of those documents were -- had been

05:16:03 17  produced, I'm going to shift some of the time back to you.

05:16:05 18         MR. LANIER:  Understood, Your Honor.

05:16:06 19         THE COURT:  These were documents, so, you know,

05:16:09 20  there's no question they were authentic documents, but if --

05:16:14 21         MR. MAJORAS:  Your Honor, Ms. Fumerton will hand that

05:16:17 22  list to Mr. Lanier right now.

05:16:18 23         THE COURT:  All right.  Why don't you discuss this,

05:16:20 24  and if I need to reallocate some of the time back to the

05:16:23 25  plaintiffs, I'll do so.

05:16:23  1          MR. MAJORAS:  Thank you, Your Honor.

05:16:24  2          THE COURT:  Simple as that.

05:16:28  3          Because what I had, I kept a good total.  We had. . .

05:16:37  4  Mr. Lanier took 2 -- about 2 and a quarter hours and

05:16:44  5  Mr. Majoras, you took a half hour.  So if it turns out I've got

05:16:46  6  to shift some of Mr. Lanier's time back to the plaintiffs'

05:16:52  7  column, I mean, I'll do that, if there was documents that had

05:16:55  8  been produced.

05:16:58  9          Okay.  Anything else anyone needed to bring up?

05:17:05 10          MR. STOFFELMAYR:  Judge, if you have a handy subject

05:17:07 11  to this issue you just raised, do you have the total hour

05:17:10 12  count?

05:17:12 13          THE COURT:  Yes, Mr. Stoffelmayr.  All right.  This is

05:17:22 14  what I had before today.  As of Friday -- I'm going to have

05:17:35 15  to -- I have the total, but now I don't -- I don't have the

05:17:39 16  individual totals.  I'll have do that.  I'll take this home

05:17:46 17  tonight and get it.  I have the total, which was about 73 -- 73

05:17:53 18  and a quarter hours, but I realize I don't have the breakdown.

05:17:57 19          MR. STOFFELMAYR:  Thank you.

05:17:57 20          THE COURT:  I'll give it to you tomorrow.  Remind me.

05:18:00 21          MR. STOFFELMAYR:  Okay.  Thank you very much.

05:18:01 22          THE COURT:  Okay.  Anything else?

05:18:05 23          All right.  I wanted to see a small number of counsel

05:18:13 24  back in my chambers for about 5 minutes, and I want to keep the

05:18:17 25  number down, not to exclude anyone, but I guess I'd like

HEATHER K. NEWMAN, RMR, CRR

4028

05:18:21   1   Mr. Lanier and Mr. Weinberger and then two lawyers from each of

05:18:25   2   the four defendants.  I'd like to keep it to 10 for obvious

05:18:28   3   reasons.

05:18:38   4          It won't be long.  5 minutes or so.

05:18:48   5      (Proceedings adjourned at 5:18 p.m.)

6

7                        **C E R T I F I C A T E**

8          I certify that the foregoing is a correct transcript
        of the record of proceedings in the above-entitled matter
9       prepared from my stenotype notes.

10              */s/ Heather K. Newman*                  *10-25-2021*
                HEATHER K. NEWMAN, RMR, CRR                  DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25