**4029**

```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION AT CLEVELAND

3    ------------------------------X
     IN RE:                        :   Case No. 1:17-md-2804
4                                  :
     NATIONAL PRESCRIPTION         :
5    OPIATE LITIGATION             :
                                   :   VOLUME 16
6    CASE TRACK THREE              :   JURY TRIAL
                                   :   (Pages 4029 - 4330)
7                                  :
                                   :
8                                  :
                                   :
9                                      October 26, 2021
     ------------------------------X
10

11

12              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13

14         HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16              SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:        Heather K. Newman, RMR, CRR
                                     United States District Court
21                                   801 West Superior Avenue
                                     Court Reporters 7-189
22                                   Cleveland, Ohio 44113
                                     216.357.7035.
23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.
```

```
 1    APPEARANCES:

 2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                   SPANGENBERG, SHIBLEY & LIBER
 3                                 1001 Lakeside Avenue, Ste. 1700
                                   1900 East Ninth Street
 4                                 Cleveland, Ohio 44114
                                   216-696-3232
 5
                                   W. Mark Lanier, Esq.
 6                                 Rachel Lanier, Esq.
                                   THE LANIER LAW FIRM
 7                                 6810 FM 1960 West
                                   Houston, Texas 77069
 8                                 813-659-5200

 9                                 Frank L. Gallucci, III, Esq.
                                   PLEVIN & GALLUCCI COMPANY, LPA
10                                 The Illuminating Building
                                   Suite 2222
11                                 55 Public Square
                                   Cleveland, Ohio 44113
12                                 216-861-0804

13                                 Salvatore C. Badala, Esq.
                                   Maria Fleming, Esq.
14                                 NAPOLI SHKOLNIK
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York 10017
                                   212-397-1000
16

17
      For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
18                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
19                                 BARTLIT BECK LLP
                                   54 West Hubbard Street, Ste.300
20                                 Chicago, Illinois 60654
                                   312-494-4400
21

22

23

24

25
```

**4031**

```
 1   APPEARANCES (Cont'd):

 2   For CVS Defendants:            Eric R. Delinsky, Esq.
                                    Graeme W. Bush, Esq.
 3                                  Paul B. Hynes, Jr., Esq.
                                    ZUCKERMAN SPAEDER - WASHINGTON
 4                                  Suite 1000
                                    1800 M Street, NW
 5                                  Washington, DC 20036
                                    202-778-1831
 6
     For HBC/Giant Eagle           Diane P. Sullivan, Esq
 7   Defendants:                   Chantale Fiebig, Esq.
                                    WEIL GOTSHAL & MANGES
 8                                  Suite 600
                                    2001 M Street NW
 9                                  Washington, DC 20036
                                    202-682-7200
10
     For Walmart                   John M. Majoras, Esq.
11   Defendants:                   JONES DAY - COLUMBUS
                                    Suite 600
12                                  325 John H. McConnell Blvd.
                                    Columbus, Ohio 43215
13                                  614-281-3835

14                                  Tara A. Fumerton, Esq.
                                    Tina M. Tabacchi, Esq.
15                                  JONES DAY - CHICAGO
                                    Suite 3500
16                                  77 West Wacker
                                    Chicago, Illinois 60601
17                                  312-782-3939

18
     ALSO PRESENT:                 David Cohen, Special Master
19

20

21

22

23

24

25
```

1                        **I N D E X**

2                                                    **PAGE**

3      APPEARANCES......................................4030

4      DEPOSITION TESTIMONY OF MICHELLE LUCY TRAVASSOS....4046

5      CROSS-EXAMINATION OF KATHERINE M. KEYES, PHD ......4082
       (CONT'D)
6      BY MR. STOFFELMAYR

7      CROSS-EXAMINATION OF KATHERINE M. KEYES, PHD.......4139
       BY MS. SULLIVAN
8
       CROSS-EXAMINATION OF KATHERINE M. KEYES, PHD.......4160
9      BY MR. DELINSKY

10     REDIRECT EXAMINATION OF KATHERINE M. KEYES, PHD....4162
       BY MR. LANIER
11
       RECROSS-EXAMINATION OF KATHERINE M. KEYES, PHD.....4204
12     BY MR. STOFFELMAYR

13     RECROSS-EXAMINATION OF KATHERINE M. KEYES, PHD.....4212
       BY MR. DELINSKY
14
       DIRECT EXAMINATION OF APRIL CARAWAY................4222
15     BY MR. LANIER

16     CROSS-EXAMINATION OF APRIL CARAWAY.................4265
       BY MS. FIEBIG
17
       REDIRECT EXAMINATION OF APRIL CARAWAY..............4289
18     BY MR. LANIER

19     AFTERNOON SESSION.................................4148

20     CERTIFICATE.......................................4330

21

22

23                             - - - - -

24

25

1               (On the record at 8:47 a.m.)

08:47:50  2          COURTROOM DEPUTY:  All rise.

08:47:52  3          THE COURT:  Okay.  Please be seated.

08:47:59  4          Mr. Stoffelmayr asked me for my hour tally.  As of the

08:48:07  5  end of the day last Friday I had 49 and a quarter hours for

08:48:11  6  plaintiffs and 24 for defendants.

08:48:26  7          There was a motion that Giant Eagle filed.  Is this

08:48:31  8  something that you envision coming up in the plaintiffs' case

08:48:33  9  or something you envision in your case?  I didn't know where it

08:48:36 10  came.

08:48:39 11          MS. SULLIVAN:  Yes.  Your Honor, we had previously

08:48:40 12  spoken to the plaintiffs about these outside of Lake and

08:48:43 13  Trumbull County Board of Ohio settlements that don't contain

08:48:47 14  any admissions from Giant Eagle, and they had previously said

08:48:51 15  they didn't intend to use them, but then we got an exhibit for

08:48:53 16  one of them yesterday for tomorrow's witness, and, so, we filed

08:48:56 17  that the extent it assists the Court in ruling on the

08:49:01 18  admissibility of those, Your Honor.  And I'm happy to argue

08:49:03 19  them at an appropriate time.

08:49:04 20          THE COURT:  Well, I guess -- I don't quite understand

08:49:09 21  how they're relevant, but if the plaintiffs want to make a real

08:49:13 22  showing, fine.  I don't -- didn't think we had a Giant Eagle

08:49:17 23  witness come.

08:49:19 24          MR. LANIER:  The Giant Eagle witness is coming

08:49:22 25  tomorrow, Your Honor, via video, Mr. Chunderlik.

| | | |
|---|---|---|
| 08:49:25 | 1 | THE COURT:  All right. |
| 08:49:27 | 2 | MR. LANIER:  And if you'll give us till lunch, we'll |
| 08:49:30 | 3 | be glad to try and make a showing the relevance.  Thank you. |
| 08:49:36 | 4 | THE COURT:  All right.  It seems dubious to me, but -- |
| 08:49:39 | 5 | MR. LANIER:  Understood.  I'll wake up strained. |
| 08:49:40 | 6 | THE COURT:  I -- given what -- I made a ruling on CVS. |
| 08:49:44 | 7 | The case is not about theft, so, but I'll read what you have. |
| 08:49:56 | 8 | Were there any other of these -- these motions are |
| 08:50:00 | 9 | flying in.  It's very hard for me to keep track of them all. |
| 08:50:03 | 10 | Anything else that is imminent that needs a -- any |
| 08:50:07 | 11 | sort of an immediate ruling?  I didn't -- some of them have to |
| 08:50:12 | 12 | do with several issues I've asked Special Master Cohen to try |
| 08:50:15 | 13 | and get agreement on. |
| 08:50:21 | 14 | MR. WEINBERGER:  Your Honor, a number of those things |
| 08:50:22 | 15 | that are getting filed overnight and including a response that |
| 08:50:27 | 16 | we're making to the motion with respect to the IMS our issues |
| 08:50:32 | 17 | that I think we're intending to discuss with Special Master |
| 08:50:35 | 18 | Cohen at the close of today. |
| 08:50:37 | 19 | THE COURT:  All right. |
| 08:50:41 | 20 | MR. DELINSKY:  Your Honor, we put in a very short |
| 08:50:47 | 21 | submission last night seeking jury instruction that pertains to |
| 08:50:50 | 22 | the testimony that's continuing this morning. |
| 08:50:53 | 23 | THE COURT:  I didn't -- can someone give it to me?  I |
| 08:50:56 | 24 | didn't see that.  I have no idea what that is. |
| 08:51:01 | 25 | MR. DELINSKY:  We'll get it, Your Honor.  I think |

08:51:04  1    accidently we walked out of the office without it in hand, so

08:51:08  2    we'll get it for you.

08:51:12  3             THE COURT:  Is this on. . .

08:51:20  4             All right.  I didn't see it, and, Mr. Delinsky, I

08:51:24  5    really don't know what you're referring to.  But we're not

08:51:27  6    dealing with any jury instructions quite now, so --

08:51:31  7             MR. DELINSKY:  I'm sorry, Your Honor.  It was for a

08:51:33  8    limiting instruction, just to be clear.

08:51:34  9             THE COURT:  Well, if someone wants to hand it -- do

08:51:36 10    plaintiffs know what this is about?

08:51:38 11             MR. WEINBERGER:  Yeah, I happened to open it up early

08:51:41 12    this morning, Your Honor.  It's a -- it's a request with

08:51:44 13    respect to the Travassos deposition that we're in the midst of

08:51:50 14    playing that the Court instruct the jury that having a system

08:51:55 15    in place to monitor prescribers -- I'm paraphrasing -- is not

08:52:05 16    required by the law.

08:52:12 17             We obviously would oppose that instruction.

08:52:14 18             THE COURT:  Well, I'm -- it isn't -- I'm not sure if

08:52:20 19    it's required by the law or not, so I'm not inclined to give

08:52:24 20    any such instruction.  That's hotly disputed whether -- I think

08:52:33 21    a system is required.  What that system is, I mean, I've

08:52:37 22    already -- I've already denied the Motions to Dismiss.  If I

08:52:41 23    had agreed -- if I had felt that no system's required, then I

08:52:45 24    think I would have dismissed this case.

08:52:49 25             The contours of that system are -- they just have to

08:52:54  1  be effective.  What that is, that's for the -- that's

08:52:56  2  ultimately for the jury to decide, whether the systems each

08:53:01  3  defendant has in place was effective.  It doesn't have to be

08:53:03  4  perfect, but it has to be effective to -- has to be effective

08:53:13  5  to help the pharmacists exercise their corresponding

08:53:17  6  responsibility and to monitor whether or not they're doing it,

08:53:23  7  so. . .

08:53:24  8       MR. WEINBERGER:  Yes, Your Honor.  Actually, it's

08:53:29  9  13.01.71 that says that regulations require effective controls.

08:53:32  10       THE COURT:  All right.  I'm not going to give that

08:53:33  11  such instruction.

08:53:34  12       MR. DELINSKY:  All right.  We'd just note our

08:53:36  13  objection, Your Honor.

08:53:37  14       THE COURT:  All right.  Fine.  I mean, Mr. Delinsky,

08:53:38  15  if I had agreed with that the case never would have started.

08:53:43  16  Okay.  So --

08:53:43  17       MR. DELINSKY:  We recognize the irony in the filing,

08:53:46  18  but it is an important issue to us and just -- the -- I think

08:53:50  19  the core dispute is that the CVS position is that the effective

08:53:56  20  controls against diversion regulation does not pertain to the

08:53:59  21  dispensing side of this.

08:54:01  22       THE COURT:  All right, I dis- -- you know, if the

08:54:03  23  Supreme Court overrules me, they'll overrule me, okay, it's --

08:54:07  24  if it gets that far, but I -- but consistent with my ruling on

08:54:14  25  the Motions to Dismiss, I'm not going to give that limiting

08:54:15 1    instruction.

08:54:17 2         All right.  We've got a few minutes.  Can we -- are we

08:54:22 3    able to deal with any of these exhibits?  Because if they --

08:54:27 4    mound these up too much longer there won't be any way to deal

08:54:31 5    with them everything.

08:54:32 6         MS. SWIFT:  Your Honor, Kate Swift for Walgreens.

08:54:34 7         I believe we've narrowed all of the disputes.  With

08:54:38 8    respect to Ms. Polster's exhibits, I've narrowed down the list

08:54:41 9    that we are offering to 11 exhibits.  I have not heard of any

08:54:45 10   objection to those exhibits, so I've removed the big list of

08:54:49 11   policies and procedures and left only the ones that I actually

08:54:53 12   asked her about in detail on the stand.

08:54:56 13        And I can hand up that list of 11 if you don't have it

08:54:59 14   handy, Your Honor.

08:55:01 15        MR. WEINBERGER:  Well, I appreciate the fact that you

08:55:04 16   sent an e-mail last night.  With everything that was going on

08:55:08 17   this morning, we haven't had a chance to --

08:55:10 18        THE COURT:  All right.

08:55:11 19        MR. WEINBERGER:  -- look at it.

08:55:13 20        MS. SWIFT:  Okay.

08:55:13 21        THE COURT:  We'll put that aside.

08:55:15 22        MS. SWIFT:  With respect to the exhibits that

08:55:17 23   plaintiffs are offering with Ms. Polster, we've narrowed it

08:55:21 24   down to objections to five of them.

08:55:22 25        THE COURT:  All right.  I -- maybe I can deal with

**4038**

08:55:25  1    those quickly.  Which ones do you object to?

08:55:29  2              MS. SWIFT:  This is -- I've -- we've removed our

08:55:32  3    objection to P19927, which is the personnel file, as Mr. Lanier

08:55:37  4    has represented that they only seek to offer the first two

08:55:40  5    pages.

08:55:41  6              THE COURT:  All right.  So that comes in, the first

08:55:45  7    two pages.

08:55:47  8              MS. SWIFT:  We object to P15317, which is a 2011

08:55:53  9    Settlement Agreement regarding a San Diego store.  It's

08:55:57  10   irrelevant, unduly prejudicial.  Settlement Agreement with no

08:56:01  11   admission in it.

08:56:04  12             THE COURT:  Well, there was testimony about that, and

08:56:07  13   I -- and I let it in, so that's in over objection.

08:56:11  14             MS. SWIFT:  The next one is P22946.  This is -- I

08:56:21  15   believe this is one of the refusals to fill that she testified

08:56:25  16   she had no knowledge about.  Hold on.  Let me confirm that.

08:56:29  17       (Brief pause in proceedings).

08:56:33  18             MS. SWIFT:  Yes, that's exactly what it is.  There was

08:56:39  19   no foundation, no personal knowledge on 22946.

08:56:43  20             THE COURT:  All right.  Any response from the

08:56:45  21   plaintiffs?

08:56:45  22             MR. WEINBERGER:  Yes.  This was -- this was in that

08:56:48  23   box of refusals to fill that she had with her and testified had

08:56:56  24   been compiled for her.

08:57:00  25             MS. SWIFT:  I asked her about one of those refusals.

**4039**

08:57:06   1          MR. WEINBERGER:  But the -- but the --

08:57:10   2          MS. SWIFT:  If I may.

08:57:12   3          THE COURT:  The defendants aren't offering the

08:57:14   4   agreements.

08:57:14   5          MS. SWIFT:  And we objected to that.

08:57:16   6          MR. DELINSKY:  And so is CVS.

08:57:18   7          MS. FUMERTON:  And Walmart joins in the objection.

08:57:19   8          THE COURT:  What?  I don't see this on the plaintiffs'

08:57:22   9   list, the whole box.

08:57:23  10          MR. WEINBERGER:  Yes, it's at the bottom of our list,

08:57:25  11   entire box of refusals to fill.

08:57:27  12          MS. SWIFT:  Your Honor, plaintiffs objected to my

08:57:29  13   offering the set of policies.

08:57:29  14          THE COURT:  Yeah, I mean, I'm sorry, I'm not going to

08:57:31  15   allow that in.  It didn't -- there wasn't any testimony.

08:57:34  16          MR. WEINBERGER:  Well, there was testimony,

08:57:36  17   Your Honor.  She testified that the entire box was compiled by

08:57:42  18   the team for this case.

08:57:45  19          MS. SWIFT:  She offered far more detailed testimony on

08:57:48  20   that with respect to the set of policies.  Plaintiffs objected

08:57:51  21   to that.  I withdrew that list.  She testified in detail about

08:57:54  22   one refusal to fill that I asked her about, and then Mr. Lanier

08:57:57  23   ask her about other refusals to fill and established that she

08:58:00  24   did not have personal knowledge about the rest of the box.  And

08:58:04  25   we withdrew it on the understanding that --

08:58:07  1              MR. LANIER:  Your Honor --

08:58:07  2              MS. SWIFT:  Excuse me, Mr. Lanier.

08:58:09  3              THE COURT:  You're going to have to brief this.  I --

08:58:12  4  this is --

08:58:15  5              MR. WEINBERGER:  I have the actual transcript of her

08:58:17  6  testimony regarding this.

08:58:19  7              THE COURT:  Well, I don't have time for it.  Send me

08:58:21  8  briefs.  I mean, I don't -- I can't remember that with any

08:58:24  9  detail.  I mean. . .

08:58:28 10              MS. SWIFT:  There are two more that we -- well, three

08:58:30 11  if you include the entire box.

08:58:30 12              THE COURT:  Well, first of all, if the whole box comes

08:58:32 13  in, then these other two documents are in it.  I mean --

08:58:36 14              MR. WEINBERGER:  Correct.

08:58:37 15              MS. SWIFT:  And she testified unequivocally with

08:58:39 16  respect to one of them, I don't know what this is.  Transcript

08:58:44 17  at 3392, 18.

08:58:46 18              THE COURT:  I mean, did she identify any of these,

08:58:49 19  Mr. Weinberger?

08:58:50 20              MR. WEINBERGER:  Here's what -- at Page 3324 of the

08:58:52 21  transcript, I -- here's the question:  I am asking you in terms

08:58:56 22  of this case, you went and got this box of refusals to fill; is

08:59:00 23  that right?

08:59:00 24              Answer:  Yes, we got copies of the refusals to fill

08:59:04 25  from those stores.  Yes.

08:59:07  1          By we, was it you or was it someone else?

08:59:09  2          Answer:  It was requested -- I mean, I saw the box

08:59:12  3   when I came here for the prep, so someone else.

08:59:15  4          Obviously it was somebody on the -- on her team, on

08:59:18  5   the legal team.

08:59:19  6          MS. SWIFT:  And then she --

08:59:20  7          MR. WEINBERGER:  So my question is, in getting ready

08:59:22  8   for this, as you called it in prep -- called it prep, did you

08:59:27  9   have someone look at the prescriptions that were filled and

08:59:29 10   dispensed and examined these sheets to see if they should have

08:59:32 11   been?

08:59:32 12          And she said, answer, no.

08:59:34 13          And then we went -- took her through the box of

08:59:37 14   documents and took out 22946 and -- and asked her about that.

08:59:43 15          MS. SWIFT:  And she testified she hadn't seen it.

08:59:46 16          THE COURT:  Right.  I mean, she didn't -- this isn't

08:59:48 17   anything she did.  The lawyers did.  I don't know -- they're

08:59:55 18   not tied to anything.

08:59:57 19          MR. WEINBERGER:  Well, they're tied to the stores.

08:59:59 20   These are there -- these are there --

09:00:02 21          THE COURT:  They may be, Mr. Weinberger, but --

09:00:05 22          MR. WEINBERGER:  -- in CT 3.

09:00:07 23          THE COURT:  Well, I don't -- hey haven't been

09:00:10 24   authenticated.  She didn't do it herself.  She didn't even say

09:00:12 25   she reviewed them for her testimony.  Some -- the lawyers --

**4042**

09:00:17  1          MR. WEINBERGER:  Your Honor, let's -- think back to

09:00:19  2    the scene.

09:00:20  3          THE COURT:  But what is the relevance?  I mean,

09:00:21  4    there's been no testimony about them.

09:00:26  5          MR. LANIER:  Your Honor, I'm going to be rude and grab

09:00:29  6    the microphone.  There's absolute relevance, dead-on relevance.

09:00:32  7          THE COURT:  Both sides are going to have to brief

09:00:34  8    this.

09:00:34  9          MR. LANIER:  We'll brief it, Your Honor.  We'll brief

09:00:36  10   it.

09:00:36  11         THE COURT:  Both sides.  Spend as much time as you

09:00:38  12   want.  Because I don't -- I don't think there was --

09:00:41  13         MR. LANIER:  We'll brief it.

09:00:42  14         THE COURT:  I don't think -- I don't think this

09:00:43  15   witness identified what they are, said what they -- or the

09:00:50  16   relevance of it.

09:00:52  17         MR. WEINBERGER:  I think -- we'll get her direct

09:00:54  18   testimony.

09:00:54  19         THE COURT:  All right.  Fine.  Send me -- brief them

09:00:57  20   as long as you want.  And this is just going nowhere.

09:01:03  21         MR. WEINBERGER:  Well --

09:01:04  22         THE COURT:  All right.  It's going nowhere.  I mean,

09:01:06  23   mound up, by the end of this trial I won't remember which

09:01:09  24   documents come in and which won't.

09:01:11  25         Can we do any witness?  Can we accomplish any witness

HEATHER K. NEWMAN, RMR, CRR

09:01:15  1    or do we just keep mounding them up.

09:01:18  2            What about Vernazza?  Any objections to these?

09:01:20  3            MS. SWIFT:  Your Honor -- actually, I apologize for

09:01:21  4    interrupting you, Your Honor.  There are two other with respect

09:01:23  5    to Ms. Polster that we object to in addition to the Walgreens

09:01:28  6    2604, which is the box of refusals to fill which we object to.

09:01:32  7            We also object to -- Plaintiffs' 23676, which a

09:01:37  8    collection of prescriptions from Dr. Veres that Ms. Polster

09:01:41  9    testified she had no personal knowledge of and had never seen.

09:01:45 10    And also Plaintiffs' --

09:01:46 11            THE COURT:  Well, let's stop.  I mean, if she

09:01:51 12    didn't -- she knew nothing about them, I don't see how -- I

09:01:55 13    mean, how you get them in through her.

09:02:02 14            All right.  So those aren't coming in.

09:02:05 15            MS. SWIFT:  And the last --

09:02:06 16            THE COURT:  What's the other objection?

09:02:07 17            MS. SWIFT:  The last one, I believe Mr. Lanier

09:02:09 18    identified it as Plaintiffs' 3000 in -- during her testimony.

09:02:15 19    Plaintiffs subsequently changed the number to Plaintiffs' 431.

09:02:19 20    This is the notes from Brian Joyce's computer that she

09:02:24 21    testified she had never seen before, didn't know anything

09:02:26 22    about.

09:02:29 23            MR. WEINBERGER:  These are the notes that were -- that

09:02:31 24    were produced overnight from his personal computer that should

09:02:36 25    have been produced --

09:02:37  1          THE COURT:  Yeah, those will come in -- those will

09:02:39  2   come in over objection, because there was testimony that, you

09:02:42  3   know -- those come in because Mr. Joyce testified specifically

09:02:51  4   that he kept on his personal computer the notes he made from

09:02:55  5   his walkthrough, so if they've been produced, that's why they

09:03:02  6   come in.

09:03:04  7          All right.  So the other documents can come in without

09:03:08  8   objection; is that right?

09:03:10  9          MS. SWIFT:  Aside from the ones that I've listed.

09:03:12 10          THE COURT:  All right.  So that's 19566, 19821, 19529,

09:03:19 11   25631, 00027, 17177, 20639, 19607, 17254, 25621, 25492, 15085,

09:03:40 12   19574, 20795, 14746, 20803. . . well, 23678, 17156. . . all

09:03:40 13   right.

09:03:40 14          MR. HYNES:  Your Honor.

09:03:40 15          THE COURT:  Yes.

09:04:26 16          MR. HYNES:  Paul Hynes for CVS, just to put on the

09:04:28 17   record, P14746, which is one of documents that you just listed,

09:04:33 18   plaintiffs and CVS have agreed to a redaction to that document.

09:04:37 19   We just wanted to put that on the record.

09:04:38 20          THE COURT:  All right.  Which is that.

09:04:40 21          MR. HYNES:  P14746, and I can hand a copy up if you'd

09:04:46 22   like to see the redaction.

09:04:49 23          THE COURT:  All right.

09:04:50 24          MS. SWIFT:  Similarly, Your Honor, plaintiffs also

09:04:52 25   agreed to a redaction we requested to Plaintiffs' 27.

```
09:05:01   1              THE COURT:  I don't even -- are these one of the
09:05:03   2   ones --
09:05:03   3              MS. SWIFT:  It was also on your list of the ones you
09:05:05   4   just admitted, Your Honor.
09:05:06   5              THE COURT:  27?  Oh, all right.  Okay.  All right.
09:05:20   6              All right.  So we've got to complete the ones for
09:05:22   7   Ms. Polster.  We've got Vernazza, Nelson, and Travassos to do
09:05:32   8   still.  I guess the plaintiffs have given me lists on Nelson
09:05:35   9   and Vernazza, so I just need to know from the defendants if
09:05:38  10   there are any objections and if there are any that they want.
09:05:41  11              MR. HYNES:  Your Honor, Paul Hynes for CVS.
09:05:42  12              Miss Fitzpatrick for plaintiffs just -- we just spoke
09:05:46  13   and decided that we would discuss Vernazza and deal with it
09:05:50  14   this afternoon, if that's okay.
09:05:56  15              THE COURT:  Okay.
09:05:56  16              MS. FUMERTON:  And, Your Honor, with respect to
09:05:56  17   Mr. Nelson --
09:05:56  18              [Reporter clarification.]
09:05:56  19              MS. FUMERTON:  I'm sorry.  Tara Fumerton for Walmart.
09:05:57  20              I would request that plaintiffs give a copy of what
09:05:59  21   they gave to you so we could see it, because we sent over last
09:06:02  22   night -- there was some errors in what plaintiffs sent to us.
09:06:04  23   So I'm not sure what they sent to you.  Otherwise, I think we
09:06:08  24   can resolve it if we have some discussion this afternoon.
09:06:10  25              MR. WEINBERGER:  On Brad Nelson, you mean?
```

────────── Travassos (By Video Deposition) ──────────

09:06:13  1          MS. FUMERTON:  Yes.

09:06:14  2          MR. WEINBERGER:  Do we have an extra copy for her?

09:06:14  3          THE COURT:  This is what -- I've got one --

09:06:16  4   Ms. Fumerton, the first one I have is 14643 on my list.  I

09:06:20  5   don't know what --

09:06:20  6          MS. FUMERTON:  Your Honor, I think that's different.

09:06:22  7   I think if we talk, we can probably work this out.

09:06:24  8          THE COURT:  All right.  Fine.

09:06:27  9          All right.  Let's bring the jury in, please.

09:08:14 10      (Jury returned to courtroom at 9:08 a.m.)

09:08:24 11          THE COURT:  Okay.  Good morning.  Please be seated.

09:08:29 12          All right.  We can finish that deposition of

09:08:36 13   Ms. Travassos.

09:08:36 14       DEPOSITION TESTIMONY OF MICHELLE LUCY TRAVASSOS

09:08:36 15   BY MR. ELSNER:

09:09:05 16   Q.  I want to turn to red flags for a moment, and do you agree

09:09:09 17   with me, Ms. Travassos, that every red flag must be resolved

09:09:15 18   before a prescription for a controlled substance is filled?

09:09:19 19   A.  If it's an identified red flag.  Yes, not every definition

09:09:28 20   is a red flag.  A potential red flag, but not always.

09:09:32 21   Q.  Well, every red flag that a pharmacist identifies with a

09:09:36 22   prescription must be resolved before the pharmacist can fill

09:09:39 23   the prescription; correct?

09:09:40 24   A.  Yes.

09:09:40 25   Q.  Okay.  And CVS corporate programs, there was a program

─────Travassos (By Video Deposition)─────

09:09:50  1   started, at least as early as 2013, called a red flag RxConnect

09:09:57  2   program that you were involved with.  What was that program?

09:10:03  3   A.  It was an effort to determine if we were able to flag

09:10:13  4   certain characteristics based upon information being entered

09:10:20  5   into the computer at the time of filling a prescription.

09:10:25  6   Q.  And that program that you were working on was paused or

09:10:30  7   suspended in 2013; correct?

09:10:33  8   A.  Yes.

09:10:33  9   Q.  Okay.  And the idea was to provide some realtime assistance

09:10:38 10   to the pharmacists when presented with a prescription which

09:10:42 11   identified potential red flags; correct?

09:10:46 12   A.  Yes.

09:10:52 13   Q.  And why was that program paused in 2013?

09:10:55 14   A.  Honestly, I don't know.

09:10:59 15   Q.  Okay.  That was not your decision, though?

09:11:02 16   A.  Correct.

09:11:03 17   Q.  Is there a forced note required to resolve each of the red

09:11:07 18   flags before a prescription can be filled?

09:11:09 19   A.  I think pharmacists have the ability to make a note, a

09:11:13 20   forced note.  And I believe that in regards to the forgery

09:11:21 21   program, there may be forced notes added to a patient profile.

09:11:29 22   Q.  Aside from forgery, are there forced notes that CVS

09:11:34 23   corporate imposed with respect to red flags -- the red flags

09:11:37 24   listed in this controlled substance review?  Cash, store

09:11:40 25   shopping, age, cocktail, distance, among others?

Travassos (By Video Deposition)

09:11:44  1   A.   No, not that I'm aware of.

09:11:47  2   Q.   So if we could go back to talking about the written

09:11:50  3   prescription and notes kept on the written prescription, did

09:11:53  4   CVS have a system in place to electronically capture the notes

09:12:00  5   written on the back of the prescription?

09:12:01  6   A.   On the back, I would say no.

09:12:03  7   Q.   So if a pharmacist wanted to see if anyone had a particular

09:12:09  8   concern or resolved a particular red flag related to a prior

09:12:13  9   prescription that a patient received, and those notes were only

09:12:18  10  contained on the back of the prescription, how would that

09:12:21  11  pharmacist access that information, if at all?

09:12:24  12  A.   They would need to refer to the hard copy.

09:12:26  13  Q.   Where would the hard copies be kept in the pharmacy?

09:12:34  14  A.   They were organized into books and stored in a filing

09:12:41  15  cabinet.

09:12:43  16  Q.   And they were stored by -- in what manner?  By number?  By

09:12:47  17  name?  Date?

09:12:50  18  A.   Prescription number, I believe.

09:12:53  19  Q.   If you wanted to see if a particular patient's prescription

09:12:58  20  in the past had a red flag concern resolved related to it, you

09:13:04  21  would need to go back and try to locate that prescription by

09:13:09  22  prescription number in the notebooks, if there was not any

09:13:15  23  documentation in RxConnect; is that right?

09:13:19  24  A.   That's correct.

09:13:20  25  Q.   So if there was information that was only contained on the

─────Travassos (By Video Deposition)─────

09:13:23  1  back of a prescription, there would be no electronic system in

09:13:26  2  place at CVS to retrieve that information; correct?

09:13:31  3  A.  Not that I'm aware of.

09:13:36  4  Q.  And, plaintiffs, this is an e-mail that you were cc'd on in

09:13:41  5  April of 2018, and it includes documentation of controlled

09:13:49  6  substance review on -- and it's also called documentation pilot

09:13:54  7  outline.

09:13:54  8         Do you see that?

09:13:58  9  A.  Yes.

09:13:59 10  Q.  Is this part of the pilot program that you were discussing?

09:14:07 11  A.  Let me just take a quick look.

09:14:10 12         Yes.

09:14:11 13  Q.  Okay.  And on the very last page there's a timeline for the

09:14:14 14  documentation of the review pilot rollout.

09:14:17 15         Do you see that?  Are you with me, ma'am?

09:14:19 16  A.  I am.

09:14:19 17  Q.  Okay.  And so there was a rollout to 181 different stores

09:14:24 18  in May of 2018.

09:14:25 19         Did that take place?

09:14:27 20  A.  I'm not sure if it actually happened in accordance to these

09:14:35 21  dates here.

09:14:35 22  Q.  And there were some time studies conducted with respect to

09:14:39 23  the program, if you see that in the middle of the timeline,

09:14:44 24  April 27th, 2018?

09:14:45 25  A.  Yes, I see that.

————Travassos (By Video Deposition)————

09:14:48   1   Q.  And did you measure -- or was it measured by CVS the amount

09:14:53   2   of time it was taking for pharmacists to complete this

09:14:56   3   information?

09:15:03   4   A.  Our team worked with the workforce team to -- to understand

09:15:11   5   from stores, based upon their feedback, and also -- yeah, I

09:15:18   6   guess it was in-store, to kind of watch the whole thing take

09:15:21   7   place.

09:15:21   8   Q.  Okay.  And the workforce team, what does that refer to?

09:15:27   9   A.  The team that takes into account all the different steps

09:15:34  10   that different roles do to kind of determine appropriate

09:15:42  11   hours --

09:15:43  12   Q.  Is it fair to say that it kind of measures the amount of

09:15:45  13   time it takes to do each process?

09:15:47  14   A.  To the best of my knowledge, yes.

09:15:49  15   Q.  The feedback from the stores related to this pilot was that

09:15:52  16   it was -- it was taking too much time; right?

09:15:55  17   A.  I don't remember a specific feedback from stores.

09:16:01  18   Q.  Well, do you remember generally that it was taking too much

09:16:03  19   time to complete this form?

09:16:05  20   A.  I remember them feeling it was duplicative because we were

09:16:09  21   asking them to fill out a form and also document in RxConnect.

09:16:15  22   Q.  And the feedback from the stores was in the -- right in the

09:16:19  23   middle of the document it says, the time to complete is five to

09:16:23  24   seven minutes.

09:16:24  25          Do you see that?

───────Travassos (By Video Deposition)───────

09:16:26  1    A.  I do.

09:16:30  2    Q.  And next to that, a negative of this program was the

09:16:34  3    difficulty meeting WeCARE scores when filling the form out; is

09:16:42  4    that right?

09:16:42  5    A.  I see that here, yes.

09:16:44  6    Q.  What is a WeCARE score?

09:16:59  7    A.  That's a program operated by pharmacy or store operations,

09:17:01  8    but I don't know the details of it.

09:17:10  9    Q.  Are you aware that pharmacists receive bonuses and

09:17:13  10   compensation based upon their WeCARE scores?

09:17:16  11   A.  I'm not aware.

09:17:16  12   Q.  So one of the complaints about the -- this pilot program to

09:17:19  13   document controlled substances was that it was taking five to

09:17:25  14   seven minutes to complete, and that that was interfering with

09:17:30  15   their we scores.

09:17:40  16        Do you believe that that was taking too much time for

09:17:44  17   a pharmacist to complete their controlled substance review

09:17:46  18   documentation?

09:17:46  19   A.  Are you referring to the five to seven minutes?

09:17:49  20   Q.  Yes.

09:17:57  21   A.  I would say that's one individual's characterization, and I

09:18:06  22   don't know the context behind that, if there was a call to the

09:18:09  23   prescriber that they were waiting for them to get back to them.

09:18:09  24   It's hard for me to characterize that.

09:18:13  25   Q.  And did CVS implement this program, or not implement the

HEATHER K. NEWMAN, RMR, CRR

———Travassos (By Video Deposition)———

09:18:16 1  program?

09:18:21 2  A.  Beyond the pilot?

09:18:23 3  Q.  Yes.

09:18:27 4  A.  No, it did not move beyond pilot.

09:18:33 5  Q.  And -- I have one question.  Beneath the time, five to

09:18:39 6  seven minutes, there's a note there, it says, difficult to keep

09:18:44 7  track of refusals to fill.

09:18:47 8          What was the process for documenting refusals to fill

09:18:51 9  at CVS at this time, if any?

09:18:59 10  A.  If the patient had a profile, a pharmacist could document

09:19:02 11  it there.

09:19:04 12  Q.  You said could document it.

09:19:07 13          Was it required to document a refusal to fill at CVS?

09:19:12 14  A.  Not to my knowledge.

09:19:14 15  Q.  Was there a requirement that they inform CVS corporate

09:19:18 16  headquarters of a refusal to fill?

09:19:24 17  A.  Not to my knowledge.

09:19:25 18  Q.  Was there a corporate list of all refusals to fill at CVS?

09:19:33 19  A.  I am not aware.

09:19:33 20  Q.  When a pharmacist decided not to fill a prescription,

09:19:38 21  was -- did the pharmacist give that prescription back to the

09:19:41 22  patient or did the pharmacist retain that prescription?

09:19:46 23  A.  I think it would depend on the circumstance.

09:19:49 24  Q.  Well, was there a requirement of CVS that the pharmacist

09:19:53 25  must retain a copy of that prescription that they refused to

─────Travassos (By Video Deposition)─────

09:19:56  1   fill?

09:20:02  2   A.   Not that I'm aware.

09:20:04  3   Q.   So it's possible, and perhaps even likely, that a

09:20:08  4   pharmacist might return that prescription to the patient, and

09:20:11  5   that patient may take that prescription to another pharmacy to

09:20:14  6   have it filled; correct?

09:20:15  7   A.   I don't know.

09:20:16  8   Q.   Ms. Travassos, this program, this pilot program that we

09:20:21  9   were discussing in 2018, that was not implemented at CVS;

09:20:24  10  correct?

09:20:24  11  A.   The pilot program was not implemented chain-wide.

09:20:28  12  Q.   At this time, at least as of 2018, there was no -- this was

09:20:32  13  the second time that CVS, to your knowledge, had developed a

09:20:35  14  program to document specific red flag information at the store

09:20:40  15  level; correct?

09:20:41  16  A.   Again, I believe this was -- I know that this program is no

09:20:49  17  longer in any store.  And to my recollection, it was due to the

09:20:54  18  duplicative nature of the work.

09:20:57  19  Q.   So there was nothing at CVS like this one-page form which

09:21:01  20  we just looked at which captured in one place all of the

09:21:04  21  information to resolve red flags related to a particular

09:21:08  22  prescription; correct?

09:21:12  23  A.   To my knowledge, that is correct.

09:21:15  24  Q.   And if you look at MR933, which we'll mark as the next

09:21:20  25  exhibit, 24, thank you, this is an e-mail sent to you in 2015,

─── Travassos (By Video Deposition) ───

09:21:30 1 and the subject is red flags charter. And there's an

09:21:36 2 attachment, the controlled substance management-project

09:21:43 3 charter.

09:21:44 4 And there was a request for information related to the

09:21:49 5 red flag program that you had worked on in 2013 at CVS trying

09:21:53 6 to integrate red flags into RxConnect; right?

09:21:57 7 A. Potential red flags, yes.

09:21:59 8 Q. So in 2015, they were looking again at implementing a red

09:22:06 9 flag program into RxConnect that you started working at back in

09:22:11 10 2013; right?

09:22:16 11 A. It was being revisited, yes.

09:22:18 12 Q. Okay. And the program that you developed was very far

09:22:22 13 along in 2013; right?

09:22:28 14 If you turn to Page -- Page 6 of the attachment, under

09:22:42 15 2.2, the program had -- was built to have the capacity to flag

09:22:53 16 and alert and block situations of concern, correct, under

09:22:57 17 Number 1?

09:22:58 18 A. Yes, that is written there.

09:23:01 19 Q. And it would also -- was designed to capture feedback from

09:23:07 20 the pharmacist's decision and documentation related to --

09:23:10 21 related to the flags; correct?

09:23:15 22 A. That's correct.

09:23:16 23 Q. It would even schedule outreach to the prescriber when

09:23:20 24 there were situations of concern?

09:23:23 25 A. Yeah. These are potential requirements for the project.

─────Travassos (By Video Deposition)─────

09:23:28  1  Q.  That you had -- that you had developed in 2013; correct?

09:23:33  2  A.  That I had worked on in 2013.

09:23:37  3  Q.  And were contained in this roughly 29-page manual; correct?

09:23:46  4  A.  Yes.

09:23:47  5  Q.  Okay.  There was also some external and internal reporting

09:23:54  6  that was built into the program as it was designed in 2013.  If

09:23:58  7  you could turn to Page 14.

09:24:07  8          It would be external report -- reporting on a weekly

09:24:12  9  basis, script flagging for RX supervisors, and even a dashboard

09:24:17  10  for red flags and alert trending; correct?

09:24:19  11  A.  That was a proposed requirement.

09:24:22  12  Q.  And another proposed requirement was also some internal

09:24:25  13  reporting, which was the RxDW data capture of red flag alerts

09:24:34  14  and the ability to retrieve and query that data; correct?

09:24:40  15  A.  Yes, that's listed as a requirement.

09:24:42  16  Q.  Was this implemented and reinstituted in 2015?

09:24:44  17  A.  No.

09:24:49  18  Q.  The -- the project sponsor, on the very last page of this

09:24:54  19  document, was Tom Davis; is that right.

09:25:04  20          If you look at the last page on Page 29 of 29.

09:25:10  21  A.  Yes, that's listed here.

09:25:11  22  Q.  It's listed that Tom Davis is the project sponsor; correct?

09:25:15  23  A.  Correct.

09:25:16  24  Q.  And Nicole Harrington was one of the business directors of

09:25:19  25  this project?

─────Travassos (By Video Deposition)─────

09:25:20 1  A.  Yeah, one of two.

09:25:21 2  Q.  One of two.  And you were listed as one of four of the

09:25:26 3  business project leads; correct?

09:25:28 4  A.  Correct.

09:25:32 5  Q.  Was this program instituted in 2018 at CVS?

09:25:44 6  A.  No.  There may have been portions that were.  I would have

09:25:52 7  to go through the whole document.

09:25:53 8  Q.  In 2020, you were asked to take lead on a project called

09:26:01 9  WaVe 2.0.

09:26:03 10       What is WaVe 2.0?

09:26:08 11  A.  That is a project that will alert the pharmacist as part of

09:26:24 12  warning verification when certain characteristics are present

09:26:29 13  on a prescription that they're filling.

09:26:31 14  Q.  And those characteristics are red flags; correct?

09:26:39 15  A.  Potential red flags.

09:26:47 16  Q.  And, in general, this is the same type of program that you

09:26:50 17  first worked on in 2013 that was suspended; correct?

09:26:54 18  A.  Similar.

09:26:55 19  Q.  Sorry, could I see 3016?

09:26:59 20       And this was a tool for pharmacists to use in

09:27:03 21  exercising their corresponding responsibility to alert them to

09:27:09 22  the presence of controlled substance red flags systemically and

09:27:16 23  require documentation of those red flags prior to filling the

09:27:21 24  prescription; correct?

09:27:21 25  A.  It's a tool to provide more information to the pharmacists

————Travassos  (By Video Deposition)————

09:27:25  1  to make them aware of certain characteristics in support of

09:27:31  2  their exercising corresponding responsibility.

09:27:35  3  Q.  Well, if you -- if you'd pull out MR3016.  This is your

09:27:41  4  mid-year review of 2020.

09:27:43  5       Do you see that?

09:27:43  6  A.  I do.

09:27:45  7  Q.  And I'm going to have you turn to Page 3 of 9 in this

09:27:50  8  report.

09:27:59  9       And if -- you see on the right-hand column there it

09:28:03  10  says, create a new tool to aid pharmacists in the exercising of

09:28:09  11  corresponding responsibility -- sorry -- corresponding

09:28:19  12  responsibility to alert of the presence of controlled substance

09:28:22  13  red flags systematically and require the documentation or

09:28:25  14  resolution prior to fill.

09:28:26  15       Did I read that correctly?

09:28:27  16  A.  You did.

09:28:28  17  Q.  So the program was going to alert pharmacists when there's

09:28:31  18  a red flag and stop them from filling the prescription until

09:28:36  19  they document the resolution of that flag; correct?

09:28:39  20  A.  Yes.  It was designed to alert them when certain

09:28:42  21  characteristics, potential red flags, were present, to allow

09:28:47  22  them to review those characteristics.

09:28:50  23  Q.  And to document the resolution of those characteristics

09:28:53  24  prior to filling the prescription; correct?

09:28:58  25  A.  Yes.  At the time, that was the requirement.

─────Travassos (By Video Deposition)─────

09:29:03  1  Q.  Okay.  And at that time, that was in 2020, so just -- just

09:29:11  2  last year, in August; correct?

09:29:21  3  A.  This is August.  Yes.

09:29:23  4  Q.  So as of August of 2020, this still was -- had not been

09:29:29  5  implemented at CVS; correct?

09:29:32  6  A.  Correct.

09:29:33  7  Q.  And if we go back to your annual review -- and I believe

09:29:36  8  that was Exhibit 20 -- was it 24?  25?  The 2020 mid-year

09:29:45  9  review, Exhibit 25, MR3016.  If we go again to Page 3 of 9, at

09:29:56  10 the very top, it reads, as of the mid-year point, this program

09:30:01  11 build into WaVe is on hold.  In the initial part of the year,

09:30:07  12 considerable time and effort were expanded to draft the red

09:30:10  13 flags and attend required -- requirement session to define

09:30:14  14 workflow.  Ultimately, 27 alerts were developed that

09:30:17  15 encompassed patient, prescriber, and script attributes of

09:30:21  16 potential concern.

09:30:22  17         Did I read that correctly?

09:30:23  18 A.  Yes.

09:30:25  19 Q.  Why was the program put on hold?

09:30:27  20 A.  I don't know the specific reason.

09:30:33  21 Q.  Well, one of the reasons described in this document was

09:30:35  22 that there were 460 stores that were getting over 20 alerts a

09:30:40  23 day; right?

09:30:40  24 A.  I think there was also a concern with building the rules in

09:30:44  25 the engine, so they needed a data scientist.  But you are

─────Travassos (By Video Deposition)─────

09:30:52  1    correct in your projections for all of the rules if they were

09:30:57  2    implemented.

09:30:58  3    Q.  So CVS had conducted a study of the number of alerts that

09:31:03  4    would occur potentially in the stores if these 27 red flag

09:31:10  5    alerts were developed; correct?

09:31:12  6    A.  There was what was considered a sizing of potential flags,

09:31:17  7    yes.

09:31:19  8    Q.  And it says that the highest flagging store would be

09:31:22  9    flagged 96 times on a high-volume day; correct?

09:31:26 10    A.  Yes.

09:31:27 11    Q.  Is this program in place today, the WaVe 2.0 program at

09:31:32 12    CVS?

09:31:33 13    A.  We're getting ready to pilot in a store.

09:31:36 14    Q.  What store are you going to pilot in?

09:31:39 15    A.  That hasn't been determined yet.

09:31:42 16    Q.  And is there a manual that describes what the WaVe.20

09:31:47 17    program is today?

09:31:50 18    A.  You mean insofar as to the red flags, what will be in the

09:31:57 19    red flags today?

09:31:57 20    Q.  Yes.  What the red flags are.

09:32:00 21    A.  I wouldn't call it a manual, but there have been -- it has

09:32:06 22    been agreed upon what the pilot will look like.

09:32:09 23    Q.  Okay.  And does it provide an alert to pharmacists for red

09:32:16 24    flags?

09:32:16 25    A.  Yes.

─────Travassos (By Video Deposition)─────

09:32:18  1  Q.  Does it require that the pharmacist document the resolution

09:32:22  2  of that potential red flag before the prescription is filled?

09:32:27  3  A.  It requires the pharmacist to choose if they're going to

09:32:32  4  fill or not fill.

09:32:34  5  Q.  But it doesn't state -- it doesn't require the pharmacist

09:32:37  6  to state the reasons that they have decided to fill the

09:32:42  7  prescription or not fill the prescription?

09:32:49  8  A.  Not in the proposed pilot form.

09:32:54  9  Q.  Is it a hard stop that the pharmacist can't fill the

09:33:01 10  prescription until they've checked the box that they have

09:33:08 11  decided to fill or not fill that prescription?

09:33:13 12  A.  Yes.

09:33:14 13  Q.  Does it require any other information other than fill or

09:33:17 14  not fill before the prescription can be filled?

09:33:24 15  A.  I don't believe so.  It was going to require documentation,

09:33:28 16  but I believe that has been removed.

09:33:31 17  Q.  Were you in favor of the removal of that requirement?

09:33:36 18  A.  I -- I don't have an issue with it.

09:33:38 19  Q.  Would you prefer the documentation be included?

09:33:40 20  A.  Pharmacists are not required to document.  It's not part of

09:33:45 21  exercising corresponding responsibility.  It's helpful, so I --

09:33:52 22  I don't have an issue with the decision.

09:33:54 23  Q.  In 2013, you were in favor of including the documentation,

09:34:01 24  created a program -- a controlled substance review program in

09:34:04 25  2018 requiring documentation, in fact, put stars next to where

─────Travassos (By Video Deposition)─────

09:34:11 1  it should be documented, and in the initial draft of the WaVe

09:34:17 2  2.0 program that you were working on, you suggested

09:34:21 3  documentation.  But in the pilot program today it's not

09:34:28 4  included; correct?

09:34:28 5  A.  Correct.

09:34:30 6  Q.  The 27 red flags, is there a list of each of those red

09:34:36 7  flags?

09:34:36 8  A.  There is a list of the 27 flags as originally designed in

09:34:42 9  2020.

09:34:44 10 Q.  Okay.  And are all 27 of those flags included in the pilot

09:34:49 11 program to release soon?

09:34:54 12 A.  No.

09:34:55 13 Q.  How many flags are included in the pilot program?

09:35:00 14 A.  We are piloting with three.

09:35:03 15 Q.  What are the three flags that you're piloting with?

09:35:09 16 A.  The three flags are age, cash, and distance as potential

09:35:15 17 red flags.

09:35:21 18 Q.  So it does not include cocktail; correct?

09:35:26 19 A.  Not for the pilot, correct.

09:35:29 20 Q.  It does not include pattern prescribing; correct?

09:35:37 21 A.  No, it does not.

09:35:38 22 Q.  It does not include early refills; correct?

09:35:52 23 A.  We have another system in place that alerts the pharmacist

09:35:55 24 for early refills.

09:35:58 25 Q.  And if we look at your mid-year 2020 review, we again look

————Travassos (By Video Deposition)————

09:36:10 1 at Page 3.9 of that document just beneath where we're looking

09:36:16 2 now, Jon.

09:36:17 3 　　　　It says at the end of that first paragraph, on the far

09:36:21 4 right, we may come to realize that a high volume of red flags

09:36:26 5 may create too large of an impact on work flow.  As a result,

09:36:31 6 may call for our team to integrate these flags within our

09:36:34 7 monitoring programs and identify prescriptions of concern of a

09:36:41 8 wider scale?

09:36:42 9 　　　　Did I read that correctly?

09:36:51 10 A.　Yes.

09:36:51 11 Q.　So one of the concerns about having 27 red flags that were

09:36:56 12 originally developed for the WaVe 2.0 program was that it might

09:37:03 13 have too large of an impact on pharmacy work flow; correct?

09:37:08 14 A.　There was the potential for that.

09:37:16 15 Q.　And the pilot program now calls for the review of only

09:37:20 16 three flags; correct?

09:37:22 17 A.　To understand if it's going to be something meaningful to

09:37:27 18 the pharmacist.

09:37:30 19 Q.　You're going to examine three flags instead of 27; correct?

09:37:34 20 A.　Correct.

09:37:36 21 Q.　Ms. Travassos, would you agree with me that checking a

09:37:39 22 State's PMP is an invaluable tool for pharmacists to prevent

09:37:45 23 controlled substances from being diverted?

09:37:48 24 A.　It is a great tool for pharmacists to use to provide more

09:37:52 25 context around filling controlled substance.

Travassos (By Video Deposition)

09:37:56  1   Q.  Well, do you agree that it's an invaluable tool to prevent

09:38:01  2   controlled substances from being diverted?

09:38:03  3   A.  I do agree that it's another tool that a pharmacist can use

09:38:07  4   when exercising corresponding responsibility.

09:38:11  5   Q.  Ms. Travassos, if you'd look at the second sentence in the

09:38:14  6   overview, would you agree with me that it reads, the PMP is an

09:38:19  7   invaluable tool for pharmacists to prevent controlled

09:38:24  8   substances from being diverted?

09:38:28  9   A.  It does say that, yes.

09:38:30  10  Q.  CVS's first policy related to the prescription monitoring

09:38:35  11  program was in April of 2012; is that right?

09:38:44  12  A.  Yes.

09:38:45  13  Q.  And I'll have you pull out MR3003.

09:38:51  14  A.  Yes, I have it.

09:38:52  15  Q.  Okay.  And this is the -- CVS's first policy for the

09:38:56  16  prescription drug monitoring program; correct?

09:39:03  17  A.  Correct.

09:39:04  18  Q.  Well, would you agree with me that a PMP program promotes

09:39:08  19  patient safety?

09:39:09  20  A.  It does give the pharmacist additional information when

09:39:13  21  dispensing controlled substances.

09:39:13  22  Q.  Because they can identify situations where a patient may be

09:39:16  23  filling prescriptions in combination with other prescriptions

09:39:20  24  which may cause a risk to the patient's health; correct?

09:39:25  25  A.  If it's a controlled substance, they would be able to see

─────Travassos (By Video Deposition)─────

09:39:28  1    that.

09:39:29  2    Q.   And it helps identify situations where there might be

09:39:35  3    doctor shopping occurring by the patient; is that right?

09:39:38  4    A.   That's correct.

09:39:39  5    Q.   And pharmacy shopping by a patient?

09:39:43  6    A.   That's correct.

09:39:45  7    Q.   Yeah.  There was no requirement in this policy that a

09:39:48  8    pharmacist was required to check the PMP for a controlled

09:39:53  9    substance prescription unless it was required by state law; is

09:39:59 10    that right?

09:39:59 11    A.   Right.  It's saying you should use it when you need

09:40:05 12    additional information but it doesn't say you have to.

09:40:07 13    Q.   I may have misread it.  Where in the policy does it say

09:40:10 14    that in 2012, that they should use it?

09:40:12 15    A.   It says the -- the information contained within the state

09:40:15 16    prescription drug monitoring program should be used to augment

09:40:19 17    your professional judgment when evaluating each controlled

09:40:24 18    prescription and should not be used as your sole determinant

09:40:28 19    for filling or not filling.

09:40:29 20    Q.   If we turn back to the policy that we looked at in

09:40:42 21    Exhibit 27 dated September 23rd, 2015, MR3005, this is the

09:40:49 22    first time that it says that a pharmacist must access and

09:40:54 23    review PMP data.  And I'm on the second page of the document,

09:41:00 24    second bullet.

09:41:04 25             Sorry.  Sorry, Jon.  The second bullet under deciding

─────Travassos (By Video Deposition)─────

09:41:08  1   to access PMP database.

09:41:15  2          It says, pharmacists must also access and review PMP

09:41:18  3   data wherever they identify red flags that are not able to be

09:41:23  4   resolved or are reasonably certain that a person may be

09:41:25  5   attempting to obtain a Schedule II through V controlled

09:41:30  6   substance for fraudulent, illegal, or medically inappropriate

09:41:33  7   purpose.

09:41:33  8          Did I read that correctly?

09:41:35  9   A.   Yes.

09:41:36  10  Q.   Pharmacists must access under the policy the PMP data

09:41:44  11  wherever they identify red flags that are not able to be

09:41:49  12  resolved; is that correct?

09:41:57  13  A.   That's correct.

09:41:57  14  Q.   Okay.  So if there are no red flags, then a pharmacist --

09:42:01  15  that a pharmacist sees, then a pharmacist is not required under

09:42:04  16  CVS's policy to check the PMP data; correct?

09:42:09  17  A.   No.  Unless it's required by the state.

09:42:12  18  Q.   Unless it's required by the state.

09:42:14  19         And, so, the only time that a pharmacist must access

09:42:18  20  the PMP data is when they identify a red flag that they cannot

09:42:22  21  resolve, or they're already reasonably certain that a person is

09:42:27  22  attempting to obtain a controlled substance for a fraudulent,

09:42:31  23  illegal, or medical inappropriate purpose; right?

09:42:35  24  A.   It's another tool to help them resolve red flags.  So if

09:42:39  25  they haven't been able to resolve through other means, then

────────── Travassos  (By Video Deposition) ──────────

09:42:44  1    they're directed to access the PMP.

09:42:47  2    Q.  Ohio, like many other states, has its own PMP program.

09:42:52  3         Are you aware of that?

09:42:55  4    A.  Yes.

09:42:57  5    Q.  And Ohio developed it's PMP program in 2011, before CVS's

09:43:06  6    first PMP policy.

09:43:08  7         Were you aware of that?

09:43:10  8    A.  No, I was not aware of the date.

09:43:12  9    Q.  If you could pull out MR637, please.

09:43:16 10         This is Exhibit 29, and this is an e-mail that you

09:43:21 11    sent in March of 2013.  The subject is more PMP communications.

09:43:29 12         Do you see that?

09:43:31 13    A.  Yes, I do.

09:43:32 14    Q.  Okay.  I'm going to ask you to look at the -- maybe the

09:43:35 15    last -- the fifth to last page in the document.

09:43:39 16         There's a description of Ohio's OARRS prescribing

09:43:47 17    monitoring program.  So, Miss Travassos, this appears to me,

09:43:51 18    even though we don't have all the pages, that you're providing

09:43:54 19    information about each State's specific prescriber monitoring

09:43:56 20    program as of 2013; correct?

09:43:59 21    A.  Yes.

09:44:01 22    Q.  And this particular page, 9206, refers to Ohio's program,

09:44:07 23    and it reads in the first sentence, since October 24th, 2011,

09:44:11 24    the Ohio Board of Pharmacy requires pharmacists have access to

09:44:15 25    OARRS.  They must run an OARRS report if the patient is being

─────Travassos (By Video Deposition)─────

09:44:19  1  treated with an OARRS reportable drug for greater than 12 weeks

09:44:24  2  or if certain red flag issues occur during the fill process.

09:44:28  3  　　　　Do you see that?

09:44:29  4  A.  I do.

09:44:29  5  Q.  Okay.  So at the time that Ohio developed its prescriber

09:44:33  6  monitoring program, CVS did not have a policy for its

09:44:39  7  pharmacists related to a prescriber monitoring program;

09:44:43  8  correct?

09:44:43  9  A.  They didn't have a written policy.

09:44:47  10  Q.  Okay.  Now, this particular requirement in Ohio as of 2011

09:44:58  11  required that OARRS be checked, the prescriber monitoring be

09:45:04  12  checked, when there is abuse or overuse --

09:45:11  13  　　　　Jon, if you look at those bullets underneath the

09:45:13  14  overview.

09:45:14  15  　　　　-- is that right?

09:45:22  16  A.  Yes, I see that.

09:45:24  17  Q.  Okay.  And if a patient is coming from outside their normal

09:45:27  18  area to fill.

09:45:28  19  　　　　Do you see that?

09:45:29  20  A.  Yes.

09:45:30  21  Q.  Or if the prescriber is from outside your normal fill area?

09:45:35  22  A.  Yes.

09:45:36  23  Q.  Or if a patient appears impaired upon deliver of a script?

09:45:40  24  A.  Yes.

09:45:43  25  Q.  Or if a patient asks for certain drugs by color or

HEATHER K. NEWMAN, RMR, CRR

─────Travassos (By Video Deposition)─────

09:45:47 1   tradename or markings; correct?

09:45:49 2   A.   Correct.

09:45:49 3   Q.   Or if the patient is being treated with an OARRS reputable

09:45:52 4   drug by multiple prescribers; is that right?  The top one?

09:46:02 5   A.   Oh, yes.

09:46:03 6   Q.   And in the next paragraph, prior to dispensing a

09:46:08 7   prescription that meets one of the above criteria, at a

09:46:12 8   minimum, the pharmacist shall receive request and review an

09:46:18 9   OARRS report covering at least a one-year time period and/or

09:46:23 10  another State's report where applicable and available.

09:46:25 11        Do you see that?

09:46:26 12  A.   I do.

09:46:26 13  Q.   Okay.  Was there any alert or any kind of system in place

09:46:32 14  at CVS that would alert the pharmacist that they are to check

09:46:38 15  the PMP system in Ohio related to any of these criteria?

09:46:46 16  A.   I don't know if that exists.

09:46:49 17  Q.   And the pharmacist then would have to recognize that a

09:47:00 18  prescription met one of these criteria in order to conduct the

09:47:05 19  search on their own.  There would be nothing that would warn

09:47:09 20  them of that fact; correct?

09:47:10 21  A.   Again, I don't know what the computer can alert in regards

09:47:15 22  to PMP.

09:47:17 23  Q.   Does RXNet track whether a pharmacist has checked the PMP?

09:47:23 24  A.   No.

09:47:24 25  Q.   Do you know whether State's boards of pharmacy have the

─────Travassos (By Video Deposition)─────

09:47:28  1  capacity to track whether a check has been made of the PMP

09:47:33  2  system?

09:47:38  3  A.  I have heard that some do, but I don't know specifically.

09:47:41  4  Q.  If we go back to Exhibit 29 that we were just looking at,

09:47:49  5  it reads, a little down, after obtaining an initially OARRS

09:47:53  6  report on a patient, the pharmacist must note the following in

09:48:00  7  the patient parole:  The date the report was obtained, the

09:48:05  8  reason the report was obtained, the notes fields during

09:48:09  9  prescription filling should be utilized and include at a

09:48:12 10  minimum the date the OARRS report was generated, reviewed, and

09:48:15 11  actions taken by the pharmacist, if any.

09:48:18 12           Did I read that correctly?

09:48:19 13  A.  Yes.

09:48:21 14  Q.  Ms. Travassos, I'm going to have you turn to the next page

09:48:23 15  of the document.

09:48:31 16           Under important notes, it reads, you may only access

09:48:37 17  the OARRS report when one of these six listed scenarios occurs.

09:48:43 18           Do you see that?

09:48:44 19  A.  I do.

09:48:45 20  Q.  So at the time that the communication went out, the

09:48:49 21  instruction to CVS pharmacists is that you could only access

09:48:52 22  the OARRS report when one of these six listed scenarios occurs;

09:48:56 23  correct?

09:48:56 24  A.  That's what it says here.

09:48:59 25  Q.  And if a store reached 100 percent of its maximum allowable

───Travassos (By Video Deposition)───

09:49:04 1    order quantity, then the program would prohibit the drug from

09:49:10 2    being shipped; is that right?

09:49:14 3    A.   For the remainder of the cycle.

09:49:18 4    Q.   Did CVS, to your knowledge, report any pharmacies to the

09:49:36 5    DEA for either ordering oxycodone or hydrocodone orders as

09:49:40 6    potentially suspicious of diversion?

09:49:42 7    A.   Our team didn't have a responsibility to report suspicious

09:49:47 8    orders.  That would have been the distribution side.

09:49:54 9    Q.   Are you aware of any suspicious orders being reported for

09:49:56 10   any stores in Ohio?

09:49:58 11   A.   I am not.

09:50:12 12        MR. LANIER:  I think it's their turn to offer,

09:50:15 13   Your Honor.

09:50:27 14   Q.   Good morning, Miss Travassos.  I just have a few questions

09:50:29 15   for you.

09:50:29 16        I believe you testified earlier that you joined the

09:50:32 17   professional practices group in 2012; is that correct?

09:50:35 18   A.   That's correct.

09:50:37 19   Q.   And I believe you testified that around that time you began

09:50:40 20   working on CVS's controlled substance dispensing program; is

09:50:46 21   that correct?

09:50:46 22   A.   That is correct.

09:50:48 23   Q.   Are you aware of any other pharmacy having a similar

09:50:55 24   program at that time?

09:50:56 25   A.   No.

─────Travassos (By Video Deposition)─────

09:50:56  1  Q.  And is it your understanding that that program was

09:50:59  2  developed by CVS?

09:51:01  3  A.  Yes.

09:51:04  4  Q.  Okay.  And do you recall earlier Mr. Elsner asking you how

09:51:10  5  many employees CVS had in the professional practices group when

09:51:14  6  you joined it in 2012?

09:51:15  7  A.  Yes.

09:51:16  8  Q.  And how many employees were in the group at that time?

09:51:20  9  A.  Three.

09:51:21 10  Q.  Okay.  And at that time did CVS have other groups that were

09:51:27 11  responsible for supervising CVS pharmacies?

09:51:32 12  A.  Yes, there was a serious of field management, supervisors,

09:51:36 13  district managers, regional managers, and EVPs, as well as

09:51:46 14  pharmacy operations and LP, loss prevention.

09:51:50 15  Q.  Thank you.

09:51:55 16          Do you recall Mr. Elsner asking you about blanket

09:51:57 17  policies?

09:51:59 18  A.  Yes.

09:52:00 19  Q.  Okay.  Can we turn to Exhibit 16, which is the one marked

09:52:07 20  MR946.

09:52:11 21          Do you have it?

09:52:11 22  A.  I do.

09:52:12 23  Q.  Okay.  And can you turn -- it's the third page of the

09:52:14 24  document.  The Bates number is 123573.

09:52:21 25  A.  Yes.

─────Travassos (By Video Deposition)─────

09:52:21  1  Q.  Do you see halfway down the page where it cites three

09:52:25  2  examples of so-called blanket policies?

09:52:36  3  A.  Yes.

09:52:37  4  Q.  Do any of those examples include do not fill lists for

09:52:43  5  certain prescribers?

09:52:44  6  A.  No.

09:52:48  7  Q.  Did this communication to the prohibit pharmacies stores

09:52:56  8  from unilaterally not filling prescriptions written by

09:53:06  9  prescribers who pharmacies believed were writing prescriptions

09:53:06 10  that were not for legitimate medical purposes?

09:53:08 11  A.  No.

09:53:09 12  Q.  All right.  Kyle, can you put up Defendants' Exhibit 1, CVS

09:53:14 13  Exhibit 1.

09:53:15 14       And just for the record, this is Bates number CVS-MDL

09:53:23 15  T1-000081566, and we'll mark this as CVS Exhibit 1.

09:53:29 16       Ms. Travassos, do you see the document on the screen?

09:53:32 17  A.  I do.

09:53:34 18  Q.  Okay.  Kyle, can we scroll to the last page?

09:53:40 19       Ms. Travassos, can you tell us the date of this

09:53:44 20  document?

09:53:45 21  A.  January 4th, 2012.

09:53:47 22  Q.  Okay.  And, Kyle, can you scroll back up to the top?

09:53:51 23       And can you tell us the title?

09:53:55 24  A.  Protocol for dispensing narcotic drugs for pain treatment.

09:53:59 25  Q.  And would it be fair to say that this is a written standard

─────Travassos (By Video Deposition)─────

09:54:02 1  operating procedure?

09:54:03 2  A.  Yes.

09:54:05 3  Q.  About a third of the way down the page, it says, below are

09:54:08 4  some important guidelines for pharmacists.

09:54:11 5          Do you see that?

09:54:11 6  A.  Yes.

09:54:12 7  Q.  Can you read number one for us, please?

09:54:14 8  A.  You should suspend filling all the controlled substance

09:54:18 9  prescriptions from practitioners you believe or have reason to

09:54:22 10  doubt are issuing prescriptions for legitimate medical purposes

09:54:27 11  in the course of a valid doctor/patient relationship.  Notify

09:54:32 12  your pharmacy supervisor of such action.

09:54:35 13  Q.  Is it your understanding that that language is directing

09:54:39 14  pharmacies to suspend filling controlled substance

09:54:42 15  prescriptions for any prescribers who they believe are writing

09:54:45 16  prescriptions that are not issued for legitimate medical

09:54:47 17  purpose?

09:54:48 18  A.  That is correct.

09:54:49 19  Q.  Okay.  Kyle, can we pull up CVS Exhibit 2, please.

09:54:59 20          Ms. Travassos, what is the date of this document?

09:55:03 21          And, Ms. Travassos -- I'm sorry, the Bates number for

09:55:06 22  this is CVS-NYAG-10665, and we'll mark this as CVS Exhibit 2.

09:55:14 23          Miss Travassos, can you tell us the title of this

09:55:16 24  document, please?

09:55:17 25  A.  Guidelines for dispensing controlled substances.

———Travassos (By Video Deposition)———

09:55:21  1  Q.  Okay.  And if we could scroll to the end of the document,

09:55:26  2  can you please tell me the date of this document?

09:55:30  3  A.  July 10th, 2018.

09:55:33  4  Q.  Okay.  And if we scroll up to the previous page, going down

09:55:40  5  to the bottom, what is the first date that appears in the

09:55:47  6  revision history?

09:55:50  7  A.  January 4th, 2012.

09:55:53  8  Q.  So would you agree that this is the updated version of this

09:55:58  9  policy as of 2018 -- updated version of the policy as of 2018

09:56:03  10  that we just reviewed in the previous exhibit?

09:56:05  11  A.  Yes.

09:56:06  12  Q.  Okay.  And if we could scroll up to the first page, under

09:56:17  13  policy it says, below are some important guidelines for

09:56:20  14  pharmacists.

09:56:20  15        Can you read what Number 1 says, please?

09:56:22  16  A.  You should suspend filling all controlled substance

09:56:25  17  prescriptions from practitioners you believe or have reason to

09:56:30  18  suspect are not issuing prescriptions for legitimate medical

09:56:33  19  purposes in the course of a valid doctor/patient relationship.

09:56:37  20  Notify your field, district leader, or pharmacy supervisor and

09:56:43  21  divisional professional practice leader of such action.

09:56:46  22  Q.  Ms. Travassos, do you recall Mr. Elsner asking you about

09:56:51  23  state prescription monitoring grams?

09:56:54  24  A.  Yes.

09:56:57  25  Q.  Kyle, can you put up CVS Exhibit 3?

**4075**

──────Travassos (By Video Deposition)──────

09:57:01  1        This is Bates numbered CVS-NYAG-0000306893 and we'll

09:57:15  2   mark it as CVS Exhibit 3.

09:57:17  3        Ms. Travassos, can you tell us what this document

09:57:19  4   appears to be?

09:57:22  5   A.  It was the biannual compliance training intended for

09:57:27  6   pharmacists and interns.

09:57:28  7   Q.  Okay.  Kyle, can we go down to Page 35 of 60?  And that is

09:57:35  8   Bates CVS-NYAG-003727.

09:57:39  9        And I want to draw your attention, Ms. Travassos, to

09:57:48  10  the prescription monitoring program section in the middle of

09:57:50  11  the page.

09:57:50  12       Do you see that?

09:57:52  13  A.  I do.

09:57:54  14  Q.  And can you read us the first sentence of that section?

09:58:00  15  A.  A growing majority of states have implemented prescription

09:58:04  16  monitoring programs that require pharmacies to report

09:58:09  17  prescriptions for controlled substances and other drugs.

09:58:12  18  Q.  Okay.  And then down under important, can you read that

09:58:18  19  language for us?

09:58:19  20  A.  Pharmacists should exercise professional judgment with

09:58:23  21  regard to the use of these databases in dispensing

09:58:26  22  prescriptions and should consult the databases, if available,

09:58:29  23  in situations where you believe it is appropriate to do so to

09:58:34  24  validate a prescription.

09:58:35  25  Q.  Thank you.

─────Travassos  (By Video Deposition)─────

09:58:36 1          Kyle, please scroll up to the first page, to the top

09:58:43 2   of the first page, I apologize.

09:58:45 3          Ms. Travassos, what's the date of this training?

09:58:48 4   A.  It's March 2011.

09:58:50 5   Q.  Okay.  So would you agree that in March 2011 this training

09:58:54 6   is directing CVS pharmacists to exercise -- to access state PMP

09:59:00 7   programs, when necessary, in the exercise of their professional

09:59:03 8   judgment?

09:59:04 9   A.  Yes.

09:59:08 10  Q.  Kyle, take that document down.

09:59:10 11         Ms. Travassos, do you remember Mr. Elsner asking you

09:59:15 12  about the WaVe 2.0 program?

09:59:17 13  A.  Yes.

09:59:18 14  Q.  And do you remember when he asked you about the flags that

09:59:22 15  are part of the current pilot that might be implemented?

09:59:27 16  A.  Yes.

09:59:28 17  Q.  Okay.  And what were those flags again?

09:59:33 18  A.  That we're piloting are age, cash, and distance.

09:59:39 19  Q.  Okay.  Is there any other functionality within RxConnect to

09:59:43 20  flag or alert pharmacists to cocktail prescriptions?

09:59:48 21  A.  Yes.  There's the opioid risk module.

09:59:53 22         MR. HYNES:  Thank you.  I have no further questions.

10:00:05 23  BY MR. ELSNER:

10:00:05 24  Q.  Ms. Travassos, I'm going to have you pull up MR937.  E-mail

10:00:13 25  to you from Nicole Harrington dated April 19th, 2013; is that

HEATHER K. NEWMAN, RMR, CRR

**4077**

──────Travassos (By Video Deposition)──────

10:00:17  1  right?

10:00:17  2  A.  That's right.

10:00:18  3  Q.  And this is the professional practice three-year road map

10:00:21  4  dated June 2013?

10:00:23  5  A.  Yes.

10:00:24  6  Q.  Okay.  And if you turn to Page 2 of the document, it says,

10:00:29  7  our objectives to -- are two, and then Number 2, it reads,

10:00:34  8  broaden our ability to exercise corporate -- corporate

10:00:37  9  corresponding responsibility to further support our stores.

10:00:41 10          Did I read that correctly?

10:00:45 11  A.  You did.

10:00:46 12  Q.  Okay.

10:00:49 13  A.  That's what it says here.

10:00:52 14  Q.  And if we look at exhibit -- Defense Exhibit 2, which is

10:01:02 15  MR998, that Mr. Hynes just showed to you --

10:01:12 16  A.  Okay.

10:01:13 17  Q.  -- this is the guidelines for dispensing controlled

10:01:16 18  substances that we just reviewed for CVS; correct?

10:01:19 19  A.  Correct.

10:01:21 20  Q.  And under Number 2, it says, you should exercise particular

10:01:28 21  caution before filling a prescription.

10:01:33 22          Do you see where I'm at?

10:01:34 23  A.  Yes.

10:01:34 24  Q.  Okay.  This document doesn't refer to red flags.  It just

10:01:37 25  refers to exercising particular caution; correct?

—————Travassos (By Video Deposition)—————

10:01:41  1  A.  It doesn't say the word red flags, but there are some, you

10:01:45  2  know, potential red flags listed here.

10:01:49  3  Q.  Right.  And if we look down at number -- or the letter B,

10:01:53  4  for instance, it says, you should exercise particular caution

10:01:55  5  for practitioners who prescribe the same medication and the

10:01:59  6  same dosage amount to most or all of their patients.

10:02:01  7       Did I read that correctly?

10:02:05  8  A.  Yes.

10:02:07  9  Q.  What does to most or all of their patients mean?

10:02:09  10  A.  I think that would mean that to the extent that the

10:02:14  11  pharmacy was familiar with the prescriber, what their

10:02:20  12  prescribing habits were.

10:02:24  13  Q.  Is most or all 50 percent?  60 percent?  90 percent?

10:02:29  14  What -- what -- how would you characterize it?

10:02:33  15  A.  There's no percentage attached to it.  It's in their

10:02:35  16  professional opinion.

10:02:37  17  Q.  And this is not one of the flags that CVS has included in

10:02:43  18  the WaVe 2.0 pilot program; correct?

10:02:45  19  A.  Correct.

10:02:47  20  Q.  If we turn to Defense Exhibit 1, which was MR962, which is

10:02:54  21  the prior version of this policy -- I think the language is the

10:02:59  22  same -- if we look under item C, it instructs the pharmacist to

10:03:06  23  exercise caution from practitioners who routine ly prescribe

10:03:11  24  the same combination of drugs for pain treatment for most or

10:03:14  25  all of their patients, particularly where the DEA has

**4079**

—Travassos (By Video Deposition)—

10:03:17  1   identified that same combination as potentially abused.

10:03:20  2          Do you see that?

10:03:24  3   A.   Yes.

10:03:26  4   Q.   What does routinely prescribe the same combination of drugs

10:03:30  5   for pain treatment mean?

10:03:37  6   A.   Again, that would be to the pharmacist's discretion and

10:03:40  7   knowledge of the patient -- of the prescriber and their

10:03:44  8   prescribing habits.

10:03:46  9   Q.   Ms. Travassos, did you believe that a trinity combination

10:03:51  10  of pills such as described here is appropriate to be filled by

10:03:59  11  a pharmacist?  The combination of drugs for pain treatments,

10:04:05  12  including the combination as potentially abused, oxycodone

10:04:09  13  alprazolam and Soma.

10:04:11  14         Do you believe that it's appropriate for a pharmacist

10:04:13  15  to dispense this combination, sometimes referred to as the holy

10:04:18  16  trinity of cocktail drugs?

10:04:22  17  A.   It would depend on the facts and the circumstances.

10:04:27  18  Q.   Well, do you personally believe that there is a

10:04:30  19  circumstance where that is warranted?

10:04:32  20  A.   There may be, depending on the facts and circumstances.

10:04:35  21  Q.   Let me ask you to pull MR935 for me.

10:04:40  22  A.   I see it.

10:04:41  23  Q.   Okay.  If you could go to the last e-mail, which is the

10:04:45  24  earliest e-mail but the last one on the page that you sent to

10:04:51  25  Alexa dated December 12th, 2016.

─────Travassos  (By Video Deposition)─────

10:04:54  1          Do you see that?

10:04:55  2  A.   I do.

10:04:56  3  Q.   It says, in thinking of what forced note you might want to

10:05:00  4  enter into the EED cocktail program, what do you think about

10:05:03  5  the following?

10:05:04  6          My question is, were you entering -- were you

10:05:06  7  considering entering a forced note related to cocktail

10:05:10  8  prescriptions at CVS in 2016?

10:05:16  9  A.   Yes, it was under consideration.

10:05:17  10  Q.   And, in fact, Alexa respond to your suggestion of the

10:05:24  11  forced note 45 minutes later, and her response was, the only

10:05:31  12  thing I'm thinking is if it is multiple prescribers and saying

10:05:36  13  M.D.s and ensuring the prescribers are aligned, too.

10:05:39  14          And then you respond, okay.  I will incorporate and

10:05:43  15  run by Todd tomorrow.  I don't think we can say do not fill,

10:05:47  16  even though we would like to?

10:05:49  17          Is that what you wrote?

10:05:51  18  A.   Yes.

10:05:51  19  Q.   And Alexis agreed with you.  I agree.  I wish, three

10:05:55  20  explanation marks; correct?

10:05:58  21  A.   Yes.

10:05:59  22  Q.   Why would you not be permitted to include the do not fill

10:06:03  23  for this holy trinity cocktail combination?

10:06:06  24  A.   We came to understand over time that there were patients

10:06:11  25  who had legitimate medical need for such combinations.

HEATHER K. NEWMAN, RMR, CRR

———Travassos (By Video Deposition)———

10:06:18 1  Q.  But you didn't think there was a legitimate medical need

10:06:22 2  for that; correct?

10:06:23 3  A.  No.  I do understand there is a legitimate medical need.

10:06:30 4  Q.  And if you pull up MR936, you wrote to Nicole Harrington as

10:06:38 5  early as 2014 the following:  My concern is this statement:

10:06:45 6  Most medical experts agree that there is no legitimate reason

10:06:48 7  for a doctor to prescribe these medications together.

10:06:52 8       Did I read that correctly?

10:06:56 9  A.  Yes.

10:06:57 10  Q.  Ms. Travassos, this is an example of the efforts you

10:07:00 11  undertook at CVS to try to enhance the -- the corporate

10:07:12 12  corresponding responsibility at CVS; correct?

10:07:14 13  A.  CVS doesn't have a corresponding responsibility.  It was an

10:07:17 14  effort to train our pharmacists to have the tools that they

10:07:22 15  need to exercise their corresponding responsibility.

10:07:27 16  Q.  So you disagree with the statement in Ms. Harrington's

10:07:31 17  program that CVS as a goal or objective for your group was to

10:07:39 18  broaden your ability to exercise corporate corresponding

10:07:41 19  responsibility; correct?

10:07:44 20  A.  I can't characterize what she wrote, but I know that CVS

10:07:47 21  doesn't have its own corresponding responsibility.

10:07:54 22  Q.  But the head of your department, Nicole Harrington, if we

10:08:00 23  look back at MR937, under Item 2, wrote, broaden our ability to

10:08:06 24  exercise corporate corresponding responsibility to further

10:08:08 25  support our stores; correct?

─────Keyes (Cross by Stoffelmayr)─────

10:08:12  1    A.   That's what this document says.

10:08:19  2          MR. LANIER:  Your Honor, that concludes our offer.

10:08:26  3          THE COURT:  You're losing your voice more than

10:08:29  4    yesterday.

10:08:29  5          MR. LANIER:  Yes, Your Honor.  It seems to have

10:08:31  6    settled in between here and here, but I've learned American

10:08:35  7    Sign Language overnight so I'm going to be okay.

10:08:44  8          Okay.  Then we can have your next witness, please.

10:08:47  9          MR. LANIER:  Your Honor, we are ready for Dr. Keyes to

10:08:49 10    return to the stand.

10:09:46 11          THE COURT:  Good morning, Doctor.  I just want to

10:09:48 12    remind you you're still under oath from last week.

10:09:51 13          THE WITNESS:  Thank you.

10:10:08 14

10:10:08 15          CROSS-EXAMINATION OF KATHERINE M. KEYES, PhD (Cont'd)

10:10:08 16    BY MR. STOFFELMAYR:

10:10:08 17    Q.   All right, good morning -- is this on?  Hello?

10:10:16 18          Good morning, Professor.  Welcome back to Cleveland.

10:10:18 19    A.   Thank you.

10:10:22 20    Q.   So I apologize for the interruption in our conversation,

10:10:28 21    but I want to pick up where we left off, if I could.

10:10:34 22          You remember, we were talking about the relationship

10:10:38 23    between opioid prescribing and OUD; correct?

10:10:42 24    A.   Yes.

10:10:43 25    Q.   And OUD, just to make sure everyone's back on the same

Keyes (Cross by Stoffelmayr)

10:10:47  1  page, is opioid use disorder, and at least in its severe forms

10:10:51  2  we can equate that with addiction?

10:10:55  3  A.  In any form I think you can equate it with addiction.

10:10:58  4  Q.  Okay.  Okay.  But opioid use disorder is a more clinical

10:11:03  5  term for what we would colloquially call addiction.

10:11:07  6  A.  That's right.

10:11:08  7  Q.  And so one of the things we were talking about is the data

10:11:14  8  on the relationship between opioid -- prescription opioid use

10:11:20  9  and OUD, I think the way you put it is dose dependent.  People

10:11:26  10  who are on higher doses or longer periods of time have a higher

10:11:30  11  risk of OUD and people on smaller doses for a shorter period of

10:11:35  12  time have a lower risk the OUD; correct?

10:11:37  13  A.  That's right.

10:11:38  14  Q.  And we talked -- looked at some studies, or at least one

10:11:42  15  study, the Edlund paper, where they distinguished people who

10:11:45  16  were -- had a chronic prescription for more than 90 days from

10:11:49  17  the acute people who had a prescription that lasted less than

10:11:52  18  90 days; correct?

10:11:53  19  A.  That's the definition in Edlund.

10:11:56  20  Q.  And that's -- one thing I think we talked about is it's

10:11:59  21  not -- it's fairly typical in your field to distinguish chronic

10:12:02  22  patients from acute patients with reference to a 90-day cutoff,

10:12:07  23  although exactly how that's defined may vary from study to

10:12:10  24  study; is that right?

10:12:13  25  A.  Yeah.  There are studies that have looked at dose and

—Keyes (Cross by Stoffelmayr)—

10:12:16  1    duration of prescription opioid use and 90 days has been a

10:12:21  2    cutoff that is has been used in other studies.

10:12:25  3    Q.  And then one of the things -- did you have -- I think I put

10:12:27  4    it back up for you, the binder we were using last week.

10:12:30  5         Do you have that back?

10:12:31  6    A.  I do.

10:12:31  7    Q.  Excellent.  Great.

10:12:33  8         So one of the documents we looked at was that CDC

10:12:38  9    document.  I'll put it up on the screen as well.

10:12:45  10        This one.  And do you remember we were looking at

10:12:48  11   supplemental table A, which is about a hundred pages in?

10:12:51  12   A.  Yes.

10:12:52  13        Can you remind me what -- oh, here it is.

10:12:54  14   Q.  I'm sorry, it's Tab 2.

10:12:56  15   A.  Tab 2.

10:13:00  16   Q.  And also, if you need it for reference, I believe your

10:13:02  17   report is Tab 1 in there.

10:13:04  18   A.  I saw that.

10:13:05  19   Q.  Okay.  Great.

10:13:06  20   A.  Thank you.

10:13:19  21   Q.  And so one thing we were looking at in the CDC document is

10:13:24  22   average -- average length of an opioid prescription in the

10:13:27  23   United States over several years, and I know you said you

10:13:32  24   hadn't seen these exact or this exact document before, and you

10:13:34  25   referred to a paper by Schreiber that had some data like this;

─────Keyes (Cross by Stoffelmayr)─────

10:13:40  1   correct?

10:13:40  2   A.  Yes.

10:13:41  3   Q.  All right.  We were able to use the extra time to grab a

10:13:50  4   copy of the Schreiber paper, so if, Your Honor, if I could

10:13:53  5   approach, I'll hand a copy to the witness and counsel.

10:14:10  6          Professor, I'm just going to reach over the top if

10:14:16  7   that's okay.

10:14:24  8   A.  Do you also have the supplemental tables for the -- this

10:14:27  9   paper?

10:14:28  10  Q.  I do not.  Are there supplemental tables?

10:14:30  11  A.  Yes, and that's where it provides the state specific

10:14:32  12  information.

10:14:33  13  Q.  Okay.  We will look for those.  Let me see if we can find

10:14:40  14  those, but let me -- let me start with what we do have.

10:14:48  15          There's a map in there that I was going to ask you

10:14:50  16  about that is maybe not the same state specific information

10:14:54  17  you're thinking about but has some of that.

10:14:56  18  A.  Okay.

10:14:56  19  Q.  But let's start with the table in Schreiber.  It's on the

10:15:05  20  fourth page.  These are national numbers; correct, in Table 1

10:15:14  21  on Schreiber?

10:15:24  22  A.  Yes.  This is the information from all states that are

10:15:26  23  included in the acute data.

10:15:28  24  Q.  And if we go to the fourth column over we see description

10:15:35  25  duration information as reported in Schreiber?

Keyes (Cross by Stoffelmayr)

10:15:39 1   A.  Yes.

10:15:39 2   Q.  And what we see here are -- looks to me to be the same

10:15:42 3   numbers or almost exactly the same numbers we saw in the CDC

10:15:46 4   document, except the CDC document I think had one additional

10:15:49 5   year, 2018?

10:15:57 6   A.  I haven't compared them.

10:15:57 7   Q.  Well, you don't need to --

10:15:58 8   A.  Okay.

10:15:59 9   Q.  -- I guess, worry about the decimal places, but it's in the

10:16:01 10  same range, 50 -- or 14 or 19 days; correct?

10:16:05 11  A.  Yes.

10:16:05 12  Q.  All right.  So one thing I wanted to ask you about on the

10:16:08 13  next page in the Schreiber paper, and I don't know if this is

10:16:11 14  what you were thinking of, are these maps.

10:16:20 15       And do you see there a little -- maybe I'll need to

10:16:23 16  make them bigger.

10:16:32 17       So there's a map here that shows, in 2006, for other

10:16:37 18  years too, there's some geographic variation in the mean

10:16:41 19  duration per prescription; right?

10:16:43 20  A.  Yes.

10:16:45 21  Q.  And mean, we can call that average; correct?

10:16:50 22  A.  Yes.

10:16:50 23  Q.  All right.  So in 2006 if we look at Ohio, this is in the

10:16:59 24  lower group, the less than 14 days group, compared to some

10:17:02 25  states that were -- not a lot, but some states that were a bit

———Keyes (Cross by Stoffelmayr)———

10:17:05  1    higher and at least one state quite a bit higher?

10:17:08  2    A.  Yes.

10:17:15  3    Q.  Then we'll go down to the next -- let me see if we can get

10:17:22  4    both of these in one.

10:17:23  5           If we look at 2010, 2017, Ohio is 2010 call is in the

10:17:27  6    middle group and by 2017 in the higher group relative to other

10:17:31  7    states?

10:17:32  8    A.  Yes.

10:17:34  9    Q.  Why is that that doctors in Ohio are prescribing opioids

10:17:38  10   for longer durations than their peers in other states?

10:17:44  11   A.  That information is not -- they don't do a risk factor

10:17:48  12   analysis in this paper, and that's not something I've

10:17:50  13   undertaken an analysis of.

10:17:56  14   Q.  It's not your opinion, I take it, that it's because

10:18:00  15   chain -- Walgreens pharmacies, CVS pharmacies, change

10:18:03  16   pharmacies or any different in the State of Ohio than they are

10:18:05  17   in New York or Illinois for that matter?  You're not offering

10:18:10  18   that opinion?

10:18:10  19   A.  Yeah.  I have not done an analysis of the pharmacies

10:18:17  20   contribution there.

10:18:19  21   Q.  All right.  Let me go to one of the charts that you went

10:18:25  22   through with Mr. Lanier.  I'm going to put it up on the screen.

10:18:28  23   I think you'll recognize it.

10:18:38  24          Do you recognize that as one of the charts you

10:18:38  25   discussed with Mr. Lanier?

———Keyes (Cross by Stoffelmayr)———

10:18:39  1   A.   I do.

10:18:39  2   Q.   And so this is overdose death rates for all opioids;

10:18:44  3   correct?

10:18:45  4   A.   That's right.

10:18:45  5   Q.   So that's including, obviously, heroin and illicit fentanyl

10:18:51  6   as well as prescription opioids; correct?

10:18:52  7   A.   Yes.

10:18:53  8   Q.   And that's including prescription opioids, whether it's an

10:18:56  9   overdose by somebody who unfortunately had an overdose while

10:18:59 10   using the medication as prescribed and also people who are

10:19:03 11   misusing the drugs, not under a doctor's orders; correct?

10:19:06 12   A.   Yes.

10:19:08 13   Q.   And what we can see here, right, is that the numbers for

10:19:13 14   Lake County and Ohio are higher than national averages and for

10:19:17 15   Trumbull County, quite a bit higher still; correct?

10:19:22 16   A.   That's right.  Well, especially in the later years, in the

10:19:26 17   earlier years, Lake County is considerably higher than the

10:19:30 18   national average.

10:19:31 19   Q.   And why is that?  Why are overdose death rates so much

10:19:34 20   higher in these two counties than the national average?

10:19:38 21   A.   The analysis that have been done certainly link to the

10:19:41 22   availability of prescription opioids by county in the U.S.

10:19:45 23   Q.   Well let me ask it this way then:  Why -- your -- have you

10:19:49 24   done any analysis of why it is that prescription opioids are

10:19:54 25   more available in Lake and Trumbull Counties versus elsewhere

HEATHER K. NEWMAN, RMR, CRR

─Keyes (Cross by Stoffelmayr)─

10:19:59  1    in the U.S.?

10:19:59  2    A.   I have not undertaken the analysis of why the prescription

10:20:03  3    opioids -- why there was a greater supply in those particular

10:20:08  4    areas, but the county level data that has been published

10:20:14  5    indicates that the supply of prescription opioids is associated

10:20:16  6    with the overdose deaths.

10:20:17  7    Q.   And supply -- we talked about this a little bit before.

10:20:21  8    Supply, as a general matter, can come from lots of different

10:20:24  9    sources; correct?

10:20:25  10   A.   The supply of prescription opioids?

10:20:26  11   Q.   Yes.

10:20:29  12   A.   Sure.

10:20:31  13   Q.   And maybe you haven't said this today or even last week,

10:20:36  14   but my understanding is that in this case you have opinions

10:20:39  15   about pharmacies generally but not about any specific pharmacy

10:20:45  16   change or pharmacy location; is that correct?

10:20:47  17   A.   That's correct.

10:20:50  18   Q.   And in your report, your report is 60-some pages, single

10:20:55  19   spaced?

10:20:55  20   A.   Yes.

10:20:56  21   Q.   And your report doesn't mention by name at any point

10:21:02  22   Walgreens, CVS, Giant Eagle or Walmart; correct?

10:21:07  23   A.   That's right.

10:21:10  24   Q.   All right.  Let me pull up Page 24 of your report, and like

10:21:15  25   I said, you've got it in front of you if that's easier, and

**4090**

———Keyes (Cross by Stoffelmayr)———

10:21:20  1  I'll put it on the screen.

10:21:28  2            Now, do you have Page 24?

10:21:30  3  A.  Yes.

10:21:31  4  Q.  All right.  What I want to focus on is this section

10:21:34  5  (indicating).

10:21:37  6            You say as sort of the header, pervasive

10:21:41  7  overprescribing resulted in unused prescribed opioid

10:21:44  8  medications diverted for monetary value, barter for, for no

10:21:50  9  cost among family and individuals in a shared social network.

10:21:53 10            Do you see that, from your report?

10:21:54 11  A.  Yes.

10:21:56 12  Q.  And it's true from what I understand, there really is an

10:22:00 13  extraordinary number of unused opioids out there from people

10:22:04 14  who have filled a regular prescription but haven't used all the

10:22:07 15  pills?

10:22:09 16  A.  There are unused opioids, yes.  There's an extraordinary

10:22:13 17  amount of unused opioids.

10:22:15 18  Q.  And then they end up, I think you said last week, sort of

10:22:18 19  the medicine cabinet, generally speaking, around the house?

10:22:21 20            They end up in places where they are available to

10:22:25 21  family, to friends, to people who may come into our home to,

10:22:30 22  you know, work -- work on your kitchen, something like that;

10:22:33 23  correct?

10:22:34 24  A.  That can happen.

10:22:40 25  Q.  You would agree it's one of the primary ways that people

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Stoffelmayr)

10:22:43  1  get pills that they abuse is from a friend or a family member?

10:22:47  2  A.  That is one primary source, yes.

10:22:51  3  Q.  So I want to look a little bit at some of these numbers

10:22:55  4  about where these pills -- or how many of these pills we're

10:22:59  5  actually talking about.

10:23:02  6          You say in that same paragraph, a little further

10:23:05  7  down -- let me just make sure I've got the whole thing.

10:23:08  8          Available estimates indicate that 90 percent of

10:23:15  9  patients prescribed opioids after surgery have unused

10:23:19  10  medication.  That's something you conclude from the literature;

10:23:26  11  correct?

10:23:27  12  A.  Yes.

10:23:27  13  Q.  And you go on to say, most of that is not disposed of or

10:23:30  14  stored safely; correct?

10:23:32  15  A.  That's right.

10:23:33  16  Q.  What do you mean by that -- what is it that people are

10:23:36  17  supposed to do that they're not doing?

10:23:38  18  A.  You -- there are -- there are safe ways to dispose of

10:23:43  19  medication through, for example, turning them back into the

10:23:47  20  pharmacy, some pharmacies have boxes where you can put unused

10:23:51  21  medication, for example.

10:23:52  22  Q.  Kind of looks like a mail -- like an old-fashioned mailbox

10:23:56  23  on the street?

10:23:56  24  A.  That's right.

10:23:57  25  Q.  And you're also familiar with those little packets that you

HEATHER K. NEWMAN, RMR, CRR

———Keyes (Cross by Stoffelmayr)———

10:24:00  1  can get at the pharmacy sometimes and you put your pills in

10:24:02  2  there and shake it up and it inactivates the medication?

10:24:05  3  A.   Yes.

10:24:11  4  Q.   Let me ask you to look at Tab 7 in your binder.  There's a

10:24:16  5  paper, by I believe it's pronounced Maughan, the lead author.

10:24:41  6       Did I get it right, is it Tab 7, or I can double-check

10:24:45  7  that?

10:24:45  8  A.   Yes.

10:24:54  9  Q.   And this Maughan paper is one of the ones you rely on your

10:24:58  10  report; correct, that's one of the ones you cited for that

10:24:59  11  sentence we just looked at?

10:25:00  12  A.   Yes.

10:25:01  13  Q.   This is some findings I discussed a little bit with the

10:25:03  14  jury during the opening statement, and I want to go through it

10:25:05  15  with you at this point.

10:25:10  16       So what they looked at in the Maughan paper were

10:25:15  17  people who got a tooth extraction, got a tooth pulled out,

10:25:18  18  correct?

10:25:18  19  A.   Yes.  Outpatient dental surgery.

10:25:22  20  Q.   Yeah, God forbid you have to have inpatient dental surgery,

10:25:25  21  but these are the regular tooth extractions; correct?

10:25:29  22  A.   I think for the -- I'm just trying to familiarize myself

10:25:33  23  with the --

10:25:34  24  Q.   Yeah, I know they exclude something called dry socket

10:25:37  25  extractions?

Keyes (Cross by Stoffelmayr)

10:25:38  1   A.   Right.

10:25:38  2   Q.   I don't know what that means, but my impression is these

10:25:40  3   are the regular tooth extractions, not the severe tooth

10:25:43  4   extractions, for lack of a better word?

10:25:45  5   A.   Yes, elective surgical extraction of one or more impacted

10:25:52  6   teeth.

10:25:52  7   Q.   And if we go to their discussion, I'm looking on Page 5, we

10:25:57  8   see this:  Do you see Section 4.1, on Page -- it's the fifth

10:26:10  9   page of the paper.  I'm not sure what the page number is on the

10:26:15  10  bottom.

10:26:16  11  A.   Yes, I see that.

10:26:17  12  Q.   And what they found is that 54 percent of the pills

10:26:25  13  prescribed to patients in this study, again, excluding dry

10:26:29  14  socket, whatever that means exactly, were left unused after

10:26:32  15  surgery.

10:26:33  16       Do you see that?

10:26:34  17  A.   I do.

10:26:35  18  Q.   And then they extrapolate that say, the results suggest

10:26:41  19  that more than 100 million opioid analgesic pills are left

10:26:49  20  unused following surgical tooth extractions in the United

10:26:52  21  States every year.

10:26:53  22       Do you see that?

10:26:54  23  A.   Yes.

10:26:54  24  Q.   And you, I take it, don't take issue with their

10:26:58  25  extrapolation that that would total up to about a hundred

—Keyes (Cross by Stoffelmayr)—

10:27:04  1 | million pills every year?
10:27:04  2 | A.  It's an estimate.  I mean, this is a small study.  It just
10:27:05  3 | should be -- you know, they didn't measure a hundred million
10:27:08  4 | prescriptions; they're just saying if you kind of zoom these
10:27:11  5 | results out to a national level, if the same pattern held, that
10:27:15  6 | 54 percent of the pills were unused, that would be about a
10:27:20  7 | hundred million pills.
10:27:21  8 | Q.  But again, you don't take issue with it?  You don't think
10:27:24  9 | they've done it wrong?  Obviously it's an estimate, but you
10:27:26 10 | don't take issue with what they've said here?
10:27:29 11 | A.  No, I don't take issue with that estimate from the study
10:27:33 12 | just kind of qualifying it in terms of, you know, this is --
10:27:38 13 | this was not directly measured.
10:27:40 14 | Q.  So the correct number could be less than a hundred million
10:27:42 15 | or it could be more than a hundred million for all we know?
10:27:46 16 | A.  That's right.
10:27:46 17 | Q.  But a hundred million's not a bad -- based on the data they
10:27:49 18 | had to say it suggests a hundred million, not a bad
10:27:51 19 | extrapolation?
10:27:52 20 | A.  It's an extrapolation.
10:27:58 21 | Q.  Okay.  Let's look at another paper.  That you considered.
10:28:06 22 | This is this paper by Hill and some others; correct?
10:28:10 23 | A.  Yes.
10:28:10 24 | Q.  This would be, I'm sorry, Tab 4 of the binder if you want
10:28:12 25 | to look at the hard copy.

—Keyes (Cross by Stoffelmayr)—

10:28:30  1          This is another one of the papers you considered?

10:28:32  2   A.   Yes.

10:28:33  3   Q.   And these are some authors at the Dartmouth University

10:28:40  4   Medical Center; correct?  I think it's the footnote or the note

10:28:42  5   at the bottom of the first page says that.

10:28:43  6   A.   Yes.

10:28:45  7   Q.   And that's a -- again, that's a well-respected academic

10:28:50  8   medical center; correct?

10:28:52  9   A.   Yes.

10:28:54 10   Q.   And what they did is they looked at the five most common

10:29:03 11   outpatient surgical procedures that were being done at

10:29:10 12   Dartmouth; correct?

10:29:10 13   A.   Yes.

10:29:11 14   Q.   And then they list them.  There's lymph -- I'm sorry,

10:29:16 15   mastectomies, different kinds, there's hernia repairs, they

10:29:19 16   listed the five most common ones, and the conclusion they

10:29:23 17   drew -- I'm looking at -- I'm going to go to Table 2 now, is

10:29:31 18   this, correct?

10:29:34 19          Do you have Table 2?

10:29:36 20   A.   Yes.

10:29:37 21   Q.   So they -- oops.  They give the numbers for all of the

10:29:40 22   different procedures, and then they total them up and the

10:29:44 23   conclusion they drew was that 71.3 percent of the pills were

10:29:50 24   unused by these patients; correct?

10:29:52 25   A.   Yes.

———Keyes (Cross by Stoffelmayr)———

10:29:55  1    Q.  And that, I think, is what you're talking about when you

10:29:58  2    said -- we saw in your report there's, you know, pervasive

10:30:03  3    overprescribing, prescribing in these cases -- well, let me

10:30:06  4    step back.

10:30:07  5         I think so it's fair to say, isn't it, these are not

10:30:09  6    patients who -- for whom it was inappropriate to prescribe pain

10:30:12  7    relief, they just got way more pills than they needed probably;

10:30:17  8    right?

10:30:18  9    A.  I think that you could make a case that the prescribing

10:30:22 10    wasn't inappropriate given that none of the pills were used.

10:30:26 11    Q.  Okay.  We're looking at -- so to go back.

10:30:32 12         When you say pervasive overprescribing you know led to

10:30:36 13    a lot of unused pills, it's this kind of data we're talking

10:30:40 14    about, that there is high prescribing, either prescribing to

10:30:43 15    patients who didn't need it or prescribing more pills than

10:30:46 16    people needed, and that leads to a lot of pills in the

10:30:49 17    quote/unquote medicine cabinet; correct?

10:30:53 18    A.  I guess I'm not understanding the question.

10:30:55 19    Q.  Oh, sure.

10:30:56 20    A.  The question is there are unused -- there are people who

10:30:58 21    are prescribed opioids who don't use them, and those pills end

10:31:02 22    up at home or in other places.

10:31:04 23    Q.  I'm probably asking a -- or meaning to ask a simpler

10:31:07 24    question --

10:31:08 25    A.  Okay.

Keyes (Cross by Stoffelmayr)

10:31:08  1    Q.  -- than I actually am.

10:31:09  2            What I was getting at is, these kind of studies that

10:31:13  3    we just looked at, these studies and some others like it are

10:31:17  4    the basis for the first part of your statement here that

10:31:22  5    pervasive overprescribing resulted in unused prescribed opioid

10:31:27  6    medications.  It's studies like these that lead you to that

10:31:30  7    conclusion; correct?

10:31:31  8    A.  These and others.

10:31:32  9    Q.  Yes.  I understand there are others, you -- I'm sure you

10:31:35  10   want to get home before the end of the day, so we won't look at

10:31:38  11   all of them.

10:31:41  12           And what you go on to say is, further down in the

10:31:50  13   paragraph, data from the national survey -- I'll highlight it

10:31:53  14   so we can all see it -- on drug use and health, indicates that

10:32:00  15   among non-medical opioid users interviewed about where they

10:32:04  16   obtained their opioids, 50.5 percent report from a friend or

10:32:08  17   relative; correct?

10:32:09  18   A.  That's right.  It's the last -- the last place that each

10:32:15  19   respondent obtained their opioids.

10:32:16  20   Q.  Right.  And maybe this is clear, but to make sure

10:32:19  21   everyone's on the same page, non-medical opioid users

10:32:23  22   interviewed are people who are using opioid pills for reasons

10:32:26  23   other than they're following the doctor's prescription?

10:32:29  24   A.  That's right.

10:32:30  25   Q.  Could be the same person who had a prescription -- who got

Keyes (Cross by Stoffelmayr)

10:32:33  1  the prescription but they're just using more pills or using the

10:32:35  2  pills of six months later, or it could be someone who never had

10:32:39  3  a prescription; correct?

10:32:42  4  A.  Yes.

10:32:42  5  Q.  And you cite -- your citation there is article 82.  I

10:32:46  6  believe that is the Lipari paper; correct?

10:32:50  7          Feel free to check.  The reference list is back there.

10:32:53  8  Should be attached.

10:32:54  9  A.  Yes.

10:32:55 10  Q.  Let me pull that up.  This should be at Tab 6 of your

10:33:12 11  binder.

10:33:15 12  A.  Yes.

10:33:15 13  Q.  So this is an article by Dr. Lipari and Mr. Hughes, and

10:33:22 14  they go right to this question that you just referred to:  How

10:33:25 15  do people obtain the prescription pain relievers they misuse;

10:33:31 16  correct?

10:33:31 17  A.  Yes.

10:33:31 18  Q.  And on Page 2 of this article there's a pie chart that, at

10:33:35 19  least if you read this literature, you see reproduced fairly

10:33:39 20  often; correct?  Maybe with slightly different numbers

10:33:42 21  depending on the year.

10:33:46 22  A.  There are other studies that have similar patterns.

10:33:50 23  Q.  So I want to just spend a minute looking at the pie chart

10:33:54 24  from Lipari, and again, I think you said this, what they did is

10:33:57 25  they surveyed -- this is a big survey, the NSDUH survey; right?

Keyes (Cross by Stoffelmayr)

10:34:04  1   A.   Yes.

10:34:04  2   Q.   And it's relied on by lots of researchers for lots of

10:34:09  3   different purposes; correct?

10:34:10  4   A.   Yes.

10:34:10  5   Q.   So one of the many things they looked at in this survey is

10:34:13  6   they asked people who misused pills, where did you get your

10:34:17  7   pills the last time you misused them; correct?

10:34:19  8   A.   Yes.

10:34:19  9   Q.   So they might have said a year ago I used to buy them from

10:34:23 10   a drug dealer, but most recently I got them from a family

10:34:26 11   member, and they would then check the box for a family member;

10:34:29 12   right?

10:34:29 13   A.   Correct.

10:34:30 14   Q.   So I just want to go around this.  First is the number you

10:34:33 15   pointed to, 50.5 percent reported that they got it from a

10:34:39 16   friend or a relative for free; correct?

10:34:41 17   A.   Yes.

10:34:41 18   Q.   Is this -- we mentioned this last week when we talked.

10:34:45 19   This is a -- I think what you and other articles have called

10:34:48 20   social network diversion among friends, family members,

10:34:53 21   acquaintances, that sort of thing?

10:34:54 22   A.   Yes.

10:34:55 23   Q.   So more than half the time they get it for free, 22 percent

10:34:58 24   of the time they get it from one doctor; correct?

10:35:00 25   A.   That's right.

─────Keyes (Cross by Stoffelmayr)─────

10:35:01 1   Q.  And then just to skip ahead, there's a kind of pink, purple

10:35:09 2   wedge that says from more than one doctor, that was 3.1 percent

10:35:12 3   of the time; correct?

10:35:13 4   A.  That's right.

10:35:15 5   Q.  Would I be right in understanding that to understand this,

10:35:17 6   when they say from a doctor, they might mean they got it

10:35:21 7   actually at the doctor's office if the doctor was providing

10:35:25 8   pills, or they may mean they took a prescription from a doctor

10:35:29 9   to a pharmacy.

10:35:30 10          Could be either one of those would fall into this

10:35:32 11  category?

10:35:32 12  A.  Yes.  They don't distinguish -- the questions are just, did

10:35:36 13  you receive it from a doctor, but presumably a pharmacy could

10:35:40 14  be an intermediary.

10:35:41 15  Q.  I mean, I noticed that because I didn't see a category from

10:35:43 16  a pharmacy, and I was sure the answer wasn't zero, so I'm

10:35:46 17  guessing.  Okay, good.

10:35:48 18          But it is -- you're aware there are times when doctors

10:35:52 19  dispense right out of the doctor's office, and the law on that

10:35:55 20  has changed over time.  But even today there are circumstances

10:35:57 21  where a doctor or dentist can provide pills inside the doctor's

10:36:07 22  office; correct?

10:36:08 23  A.  Yes.

10:36:08 24  Q.  Okay.  Moving over.  11 percent, they bought it from a

10:36:11 25  friend or relative.

HEATHER K. NEWMAN, RMR, CRR

—Keyes (Cross by Stoffelmayr)—

10:36:12  1          So they're, again, getting it inside the social

10:36:15  2   network, but they're paying some kind of money for it; correct?

10:36:17  3   A.   Yes.

10:36:18  4   Q.   Next one, they took it from a friend or relative.

10:36:21  5          So basically they stole it from grandma's medicine

10:36:25  6   cabinet or their good friend's medicine cabinet, we don't know;

10:36:26  7   correct?

10:36:26  8   A.   From someone's possession.

10:36:27  9   Q.   4.8 percent of the time they buy it from a drug dealer or

10:36:31  10  other stranger; correct?

10:36:32  11  A.   Yes.

10:36:34  12  Q.   As an aside, I wondered how can you buy it from a stranger

10:36:38  13  who is not a drug dealer?  What kind of person is that, but we

10:36:42  14  don't know.  Doesn't matter.

10:36:44  15         More than one doctor.  And then other, that would

10:36:46  16  include just flat out theft, for example; correct, if you broke

10:36:48  17  into a pharmacy, if you mugged somebody going down the street.

10:36:51  18  Those would all fall into the other category?

10:36:55  19  A.   I would -- I would imagine that that would fall into the

10:36:58  20  other category, but the survey didn't specifically cite that.

10:37:06  21  Q.   This is data that you've relied on in your report.  We can

10:37:09  22  take this as relatively reliable data on this question, where

10:37:12  23  do they get the pills they misuse?

10:37:14  24  A.   The most recent time they misused.  Yes, this is -- there

10:37:17  25  are a few limitations to the NSDUH data that I could go over if

─────Keyes (Cross by Stoffelmayr)─────

10:37:21  1  that would be helpful.

10:37:22  2  Q.  But in your field, I mean, there's no study that doesn't

10:37:25  3  have some limitation; right?  I've never read a paper in your

10:37:29  4  field that doesn't have a paragraph at the end where they say

10:37:32  5  here are the limitations of our study.  That's just the nature

10:37:35  6  of the beast; correct?

10:37:35  7  A.  That's right.

10:37:37  8  Q.  All right.  Let me shift gears completely.

10:37:39  9        Judge, did you want to take our morning break soon?

10:37:42  10       THE COURT:  Yeah, I was just going to suggest if

10:37:43  11  it's -- sounds like a good time for a mid-morning break, so

10:37:48  12  15 minutes, usual admonitions, and then we'll pick up with the

10:37:52  13  balance of Dr. Keyes' testimony.

10:46:07  14     (Jury excused from courtroom.)

10:46:09  15     (Recess was taken at 10:37 a.m.)

10:56:41  16     (Jury returned to courtroom at 10:56 a.m.)

10:56:56  17       THE COURT:  Okay.  Please be seated.

10:56:57  18       And, Doctor, you're still under oath.

10:56:59  19       And, Mr. Stoffelmayr, you may continue.

10:57:02  20       MR. STOFFELMAYR:  Thank you, Judge.

10:57:06  21  BY MR. STOFFELMAYR:

10:57:06  22  Q.  Professor, when I showed you the Schreiber paper you asked

10:57:10  23  if I had the supplemental tables and I was embarrassed that I

10:57:13  24  did not, but I have them now.

10:57:15  25  A.  Okay.

─────Keyes (Cross by Stoffelmayr)─────

10:57:15  1    Q.  So we can look at those real quick.

10:57:29  2            MR. STOFFELMAYR:  Judge, if I may approach, I've got a

10:57:31  3    copy for the witness.

10:57:48  4            THE WITNESS:  Thank you.

10:58:01  5    BY MR. STOFFELMAYR:

10:58:02  6    Q.  And this is what you were asking about, right, supplemental

10:58:05  7    tables that include state-by-state data?

10:58:07  8    A.  Yes.

10:58:07  9    Q.  So I think the one you were looking for, but you can tell

10:58:09 10    me, was Table 2 or E Table 2 that begins on Page 6.

10:58:16 11    A.  Yes.  I just wasn't sure whether a question would come up

10:58:19 12    about state various variations.

10:58:25 13    Q.  Well, it's helpful because now we can look at data specific

10:58:28 14    to Ohio.

10:58:28 15    A.  Exactly.

10:58:29 16    Q.  Not just the national averages; correct?

10:58:32 17    A.  Exactly.

10:58:34 18            MR. STOFFELMAYR:  So, Mr. Pitts, if I could have the

10:58:37 19    ELMO for a minute, please.

10:58:41 20    BY MR. STOFFELMAYR:

10:58:41 21    Q.  So at the top of Table 2, again, this is duration of an

10:58:45 22    opioid prescription in days; correct?

10:58:48 23    A.  Yes.

10:58:49 24    Q.  And, so, the U.S. averages are the ones we looked at

10:58:53 25    before, this just shows the beginning year and the ending year,

—Keyes (Cross by Stoffelmayr)—

10:58:56  1  but it's 13.3 days in 2006 and has gone up but to under 19 days

10:59:03  2  in 2017; correct?

10:59:06  3  A.  Yes.  And I don't know if they note the median on here, but

10:59:11  4  it's also important to compare the mean with the median in

10:59:15  5  these examples.  So I can describe why, if that's helpful.

10:59:19  6  Q.  I will tell you, I don't see the median, but if you see it

10:59:22  7  in there or -- and you think it's useful, I'm happy to take a

10:59:27  8  look at it.

10:59:27  9  A.  Okay.  I don't --

10:59:29 10  Q.  What I --

10:59:30 11  A.  They have the median for the national average in Table 2 of

10:59:33 12  the main paper, but I don't see it in the supplemental.  So we

10:59:40 13  can't say for sure what the median is for Ohio, but --

10:59:44 14  Q.  So median, I just -- I've had to have this explained to me

10:59:48 15  God knows how many times.

10:59:50 16          The mean is the average and the median is kind of the

10:59:52 17  midpoint where we've got an equal number above and then an

10:59:56 18  equal number below?

10:59:57 19  A.  That's right.  And the median in -- for days of prescribing

11:00:00 20  is lower than the mean, which is important for interpreting

11:00:05 21  centrality.

11:00:05 22  Q.  So if -- so let's say -- take 2017, just so we have a year

11:00:10 23  to look at, 2017, the mean is 18 days; correct?

11:00:15 24  A.  Yes.

11:00:17 25  Q.  Nationwide?

---

Keyes (Cross by Stoffelmayr)

11:00:20  1   A.   Sorry.  Say that again.

11:00:21  2   Q.   In 2017, the mean is 18 days nationwide?

11:00:23  3   A.   Yes.

11:00:24  4   Q.   So that's the average.  But the median could be lower?

11:00:26  5   A.   The median could be lower.

11:00:28  6   Q.   Meaning that even though that's the average, more than half

11:00:32  7   of prescriptions were actually written for less than 18 days?

11:00:38  8   A.   It means that you have a large tail on the right-hand side.

11:00:42  9   So there is a large number of prescriptions that are written

11:00:45 10   for a much longer time than the average.  So that's -- when you

11:00:49 11   have a median that's lower than the mean, it means that you

11:00:52 12   have a long -- there's many observations that are at the

11:00:55 13   extreme end, so it kind of pulls the median -- pulls the mean

11:01:01 14   away from the median.

11:01:02 15   Q.   So I think I'm understanding this.  We have lots and lots

11:01:05 16   of prescriptions for relatively short durations, could be as

11:01:08 17   short as 2, 3, 5 days, and then a smaller number of

11:01:11 18   prescriptions, but maybe for extraordinarily long time periods

11:01:15 19   at the far end, which is pulling our mean, the average, high,

11:01:19 20   but the median tells us that that's because of these ones that

11:01:23 21   are way out there?

11:01:23 22   A.   That's right.

11:01:25 23   Q.   What I wanted to do here is just confirm that the numbers

11:01:28 24   for Ohio are not drastically out of sync with the national

11:01:33 25   numbers, so again, our numbers, 2006, 13.3, and 2017, 18.3;

─────Keyes (Cross by Stoffelmayr)─────

11:01:41 1  correct?

11:01:42 2  A.  Yes.

11:01:42 3  Q.  And if we flip to the next page, we see at the bottom,

11:01:49 4  towards the bottom, the Ohio numbers; correct?

11:01:52 5  A.  Yes.

11:01:53 6  Q.  And 2016, it's 13.9.  So that's a little bit higher than

11:01:58 7  the national average; correct?

11:02:00 8  A.  Correct.

11:02:00 9  Q.  And 2017, I think that's exactly the same as the national

11:02:05 10  average; correct?

11:02:05 11  A.  That's right.

11:02:06 12  Q.  So this reassures us that at least looking at this

11:02:10 13  question, the question of average length, Ohio is not totally

11:02:13 14  out of sync with the country as a whole?

11:02:17 15  A.  Yes.

11:02:17 16  Q.  Great.  Thank you.

11:02:22 17          All right.  Mr. Pitts, I'll go back to the computer,

11:02:25 18  please.

11:02:27 19          All right.  I wanted to shift gears completely now and

11:02:33 20  talk a little bit about causation in your field.  Okay?

11:02:37 21  A.  Sure.

11:02:39 22  Q.  Everyone always says -- and it's true but maybe not that

11:02:42 23  interesting -- association and causation are not the same

11:02:46 24  thing, obviously; correct?

11:02:48 25  A.  Causation is a subset of associations.

—Keyes (Cross by Stoffelmayr)—

11:02:50  1   Q.   Some associations are causal and some are not?

11:02:54  2   A.   That's right.

11:02:55  3   Q.   And sometimes causation is really easy to figure out.  I

11:03:02  4   mean, if it's raining outside and my coat is wet.  It doesn't

11:03:05  5   take an epidemiologist to figure out that my coat is wet

11:03:10  6   because that was caused by the rain outside; correct?

11:03:12  7   A.   That seems like a fair inference.

11:03:14  8   Q.   I don't want to downplay your field, but we don't need

11:03:21  9   epidemiology for every causal inference; right?

11:03:23  10  A.   Yes.

11:03:24  11  Q.   And this is where I think epidemiology, you know, can --

11:03:28  12  plays a bigger role.  For example, the relationship between

11:03:31  13  smoking and cancer; correct, lung cancer?

11:03:34  14  A.   That's right.

11:03:34  15  Q.   There was a time when it was at least unknown or

11:03:38  16  controversial whether smoking causes lung cancer and now that's

11:03:43  17  pretty widely accepted, I think; correct?

11:03:45  18  A.   Yes.

11:03:46  19  Q.   But we also know that a lot of smokers don't get lung

11:03:50  20  cancer.  It's not because you smoke, you're necessarily going

11:03:52  21  to get lung cancer; correct?

11:03:54  22  A.   That's right.

11:03:55  23  Q.   I saw somewhere about 15 percent of smokers get lung

11:03:58  24  cancer; is that right?

11:03:59  25  A.   Well, similarly to prescription opioids, there's a

—Keyes (Cross by Stoffelmayr)—

11:04:02  1    relationship between dose and duration of use.

11:04:05  2    Q.   Okay.  But just overall, the point I'm making, it's not as

11:04:09  3    if 80, 90 percent of smokers get lung cancers; it's on the

11:04:14  4    whole something like 15 percent; correct?

11:04:16  5    A.   Again, are we talking about people who just used one

11:04:19  6    cigarette there their life, people who are regular smokers?

11:04:21  7              I think the way I would characterize it -- and not to

11:04:26  8    be -- you know, the more you smoke, the more likely it is that

11:04:28  9    you'll develop health problems related to smoking.

11:04:30  10   Q.   But certainly, again, I guess what I'm getting at --

11:04:34  11   A.   There are some people who smoke their entire lives and

11:04:37  12   never get lung cancer.

11:04:38  13   Q.   Actually, quite a lot of people.

11:04:38  14              A lot of people smoke their whole lives and don't get

11:04:41  15   lung cancer, but we don't say, therefore, ah-ha, there's no

11:04:44  16   connection; right?

11:04:45  17   A.   Right.  Right.

11:04:47  18   Q.   And the flip side of that, or a flip side, is there are

11:04:50  19   people who are never touch a cigarette who get lung cancer.

11:04:54  20              That can happen too?

11:04:55  21   A.   Yes.

11:04:56  22   Q.   Now, I did -- Mr. Lanier made a joke about whether your

11:05:00  23   books were, in fact, top sellers and what that meant in your

11:05:03  24   field.  I did purchase the books.

11:05:05  25   A.   Thank you.  Appreciate that.

—Keyes (Cross by Stoffelmayr)—

11:05:06  1  Q.  So that kicks -- I don't know if the royalties are -- how

11:05:09  2  lucrative that is, but we did what we could.  I got both of

11:05:13  3  them.  If there's a third book, we'll get that one too.

11:05:17  4          But you had an example I thought in one of the books

11:05:20  5  that was interesting, and it was about the relationship between

11:05:23  6  people who eat a lot of green, leafy vegetables and health

11:05:31  7  outcomes.

11:05:32  8          Do you remember that example from the book?

11:05:33  9  A.  It was a while ago.

11:05:34  10  Q.  You probably didn't read the book to come here.

11:05:36  11  A.  Sure.  But I trust that I used a green, leafy vegetable

11:05:40  12  example.

11:05:41  13  Q.  And I think this is the point you were making in the book.

11:05:43  14          We know that people who eat a lot of green, leafy

11:05:46  15  vegetables tend to be health earlier; correct?

11:05:48  16  A.  Yes.

11:05:48  17  Q.  We also know that green, leafy vegetables are good; they

11:05:52  18  have a positive impact on your health; correct?

11:05:54  19  A.  Yes.

11:05:55  20  Q.  But we also know that the people who eat -- who tend to eat

11:05:58  21  a lot of green vegetables also tend to have health earlier

11:06:02  22  habits in lots of other ways.  They're more likely to exercise

11:06:04  23  for example; correct?

11:06:06  24  A.  That's right.

11:06:07  25  Q.  And the kind of people who eat tons of green, leafy

—Keyes (Cross by Stoffelmayr)—

11:06:10 1  vegetables are also less likely to have super unhealthy habits.

11:06:14 2  They're less likely to eat is a lot of fries and chicken wings;

11:06:18 3  correct?

11:06:18 4  A.  Right.  Yes.

11:06:19 5  Q.  So I guess what that tells us is we can all agree that

11:06:23 6  green, leafy vegetables are good for health, but just how much

11:06:27 7  difference they're making versus these other factors is a

11:06:30 8  complicated question.

11:06:32 9  A.  It requires epidemiological methods to sort of correlation

11:06:38 10  from causation in that example.

11:06:39 11  Q.  Right, that would take some difficult work.  And we could

11:06:41 12  even say well we know there's some causation from green, leafy

11:06:44 13  vegetables, but you've still got to tease out how much of the

11:06:47 14  extra health is from the vegetables versus the exercise in

11:06:50 15  those people because both of those things are good; right?

11:06:52 16  A.  Both of those things are good, and you need to use

11:06:57 17  epidemiological methods that I describe in the book to tease

11:07:00 18  them apart.  I mean, it's possible to tease those things apart

11:07:02 19  is what the point of the book is.

11:07:03 20  Q.  No, and I don't doubt that research can be done.  But this

11:07:06 21  is a lot more complicated than it's raining and my coat is wet?

11:07:11 22  A.  I don't know that I'd necessarily agree.  It certainly

11:07:15 23  requires some methodological thinking.  Any causal inference

11:07:19 24  requires methodological thinking.

11:07:22 25  Q.  And walking right in off the street, it is completely --

HEATHER K. NEWMAN, RMR, CRR

—Keyes (Cross by Stoffelmayr)—

11:07:24  1  without doing that kind of epidemiological research, no one can

11:07:28  2  just say based on common sense, yeah, I know that green, leafy

11:07:32  3  vegetables are 20 percent of why some people are healthier and

11:07:36  4  exercise is 50 percent.  You'd need to do a study to help you

11:07:39  5  understand that?

11:07:39  6  A.  You would need to do a study.

11:07:41  7  Q.  Okay.  So I want to move from that to some of your opinions

11:07:46  8  about t he causal relationships between use of prescription

11:07:51  9  opioids and then use of heroin.  Okay?

11:07:53 10  A.  Sure.

11:07:53 11  Q.  Now, I think everyone has heard stories about somebody who

11:07:58 12  is prescribed an opioid pill, becomes addicted to the pills,

11:08:03 13  and then at some point isn't able to get the pills or they

11:08:08 14  become too expensive or hard to get and switches to heroin.

11:08:11 15          You know that kind of stories I'm talking about?

11:08:13 16  A.  Yes.

11:08:13 17  Q.  And part of what I think -- the reason those stories, you

11:08:17 18  know, seem very reasonable is that someone who has become

11:08:22 19  addicted to an opioid -- we heard a little bit about this

11:08:25 20  before -- will begin to suffer really very, very difficult

11:08:30 21  withdrawal symptoms if they aren't able to get their hands on

11:08:33 22  something that will satisfy the addiction; correct?

11:08:37 23  A.  That -- that happens.

11:08:38 24  Q.  Are these withdrawal symptoms could be -- they can be

11:08:41 25  awful.  They be very, very difficult -- very, very unpleasant

HEATHER K. NEWMAN, RMR, CRR

———Keyes (Cross by Stoffelmayr)———

11:08:44 1 undersells, from what I understand, undersells how bad they can

11:08:49 2 be for the people suffering; correct?

11:08:50 3 A.  Yes.

11:08:50 4 Q.  So you can understand how somebody, you know, feeling that

11:08:53 5 way, they can't just chug a beer and feel better.  They need

11:08:57 6 that molecule; correct?  They need an opioid to feel better?

11:09:02 7 A.  Yes.  A substitute opioid will relieve the symptoms of

11:09:07 8 withdrawal.

11:09:08 9 Q.  So that's obviously -- that can be -- we don't -- we'll get

11:09:10 10 to the numbers later, but that can be one pathway where

11:09:13 11 somebody goes from using pills to using heroin; correct?

11:09:19 12 A.  That is one pathway.

11:09:21 13 Q.  Now, there are other people who go from pills to using

11:09:24 14 heroin who were never addicted to the pills, they just used

11:09:27 15 pills in January, maybe used cocaine in February, and used

11:09:30 16 heroin in March.  There are people whose path is less direct;

11:09:34 17 correct?

11:09:35 18 A.  I guess I don't understand the question.  There is people

11:09:38 19 who -- again, I guess I would say there's a relationship

11:09:42 20 between dose and duration and heroin use.

11:09:45 21       So there are people who use prescription opioids who

11:09:47 22 don't have opioid use disorder who would then use heroin.  That

11:09:52 23 can occur.

11:09:53 24 Q.  And there are other reasons people start using heroin

11:09:56 25 unrelated to opioid use disorder from pills; correct?

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Stoffelmayr)

11:10:05 1   A.   There are people -- prescription opioid use can cause

11:10:09 2   heroin use in pathways that don't include opioid use disorder,

11:10:13 3   yes.

11:10:13 4   Q.   But there are people who have never touched a prescription

11:10:16 5   opioid who start using heroin?

11:10:18 6   A.   Yes.

11:10:19 7   Q.   There are. . . would you agree that if we took just a

11:10:33 8   random group of call them 25-year-olds, in any age group, a

11:10:37 9   random group of people who are otherwise similar, some of them

11:10:41 10  are at greater risk for starting heroin than others unrelated

11:10:45 11  to pill use.  There are other risk factors for heroin use, not

11:10:48 12  just pill use?

11:10:49 13  A.   Heroin use has risk factors that has a number of different

11:10:55 14  risk factors, and some of those risk factors are not

11:10:59 15  prescription opioid use.

11:10:59 16  Q.   Some of them are genetic; correct?

11:11:02 17  A.   That's right.

11:11:02 18  Q.   Some of them are environmental in other ways rather than

11:11:06 19  access to prescription pills?

11:11:11 20  A.   Yes.

11:11:11 21  Q.   And same thing.  If we took a group of people and looked at

11:11:14 22  a group of people who all try drugs, any, pick a drug, could be

11:11:17 23  a pill, could be heroin, could be cocaine, they're not all at

11:11:21 24  the same risk for becoming addicted; correct?

11:11:25 25  A.   That's right.

—————Keyes (Cross by Stoffelmayr)—————

11:11:26  1   Q.  There are individual factors that affect your risk of

11:11:30  2   becoming addicted, totally unrelated to whether you've used

11:11:33  3   pills or not; correct?

11:11:34  4   A.  Yes.

11:11:36  5   Q.  And some of those, again, are going to be genetic factors?

11:11:39  6   A.  There could be genetic, environmental factors that increase

11:11:45  7   vulnerability.

11:11:46  8   Q.  When you say vulnerability, you're talking about the risk

11:11:49  9   that you become addicted; correct?

11:11:51  10  A.  Sure.  The risk that you become addicted.

11:11:53  11  Q.  And when we think about how heroin use has changed -- well,

11:11:59  12  let me start over.

11:12:00  13        Heroin use is certainly increased in Ohio and

11:12:05  14  nationwide in the last 10, 15 years; correct?

11:12:08  15  A.  Yes.

11:12:09  16  Q.  And one of the reasons that heroin use has increased is

11:12:14  17  because heroin is cheaper and easier to get today than it used

11:12:19  18  to be.  That's one reason, isn't it?

11:12:20  19  A.  That has been hypothesized that there have been changes in

11:12:25  20  the distribution networks of heroin.

11:12:38  21  Q.  Let me ask you to look at -- I'll tell you what number it

11:12:40  22  is in your binder -- this Compton paper.  It's at Tab 11 in

11:12:51  23  your binder.

11:12:52  24        Do you have that?

11:12:53  25  A.  Yes.

Keyes (Cross by Stoffelmayr)

11:12:54  1   Q.  And this is one of the papers you cite and rely on in your

11:12:58  2   expert report?

11:12:59  3   A.  Yes.

11:13:00  4   Q.  It was published in the New England Journal of Medicine;

11:13:06  5   correct?

11:13:06  6   A.  Yes.

11:13:07  7   Q.  And among medical journals that's the top of the top for

11:13:10  8   prestige, isn't it?

11:13:11  9   A.  It's a very high prestige journal.

11:13:28  10  Q.  And one of the things that Compton and the others say is

11:13:37  11  that -- this is in 2016 this paper was published; correct?

11:13:41  12  A.  Yes.

11:13:41  13  Q.  So when he says recent, he means recent as of 2016;

11:13:46  14  correct?

11:13:47  15  A.  Yes.

11:13:48  16  Q.  And one of the things he says is that a key factor

11:13:52  17  underlying the recent increases in rates of heroin use and

11:13:57  18  overdose may be the low cost and high purity of heroin.

11:14:01  19          Do you see that?

11:14:03  20  A.  I'm just trying to find where in the paper --

11:14:05  21  Q.  Oh, I'm sorry.

11:14:07  22          MR. LANIER:  Page 5.

11:14:10  23  BY MR. STOFFELMAYR:

11:14:10  24  Q.  It's Page 5 of the paper document, if you're flipping

11:14:13  25  through the pages.

HEATHER K. NEWMAN, RMR, CRR

———Keyes (Cross by Stoffelmayr)———

11:14:17  1   A.   Yes.  I see the paragraph.

11:14:20  2   Q.   And -- well, one -- you agree with this statement?

11:14:31  3   A.   Which -- the -- there may be a role of the low cost and

11:14:38  4   high purity of heroin that are increasing rates of use in

11:14:42  5   addition to prescription opioid use, which is mentioned in the

11:14:44  6   previous paragraph.

11:14:45  7   Q.   Right.  But he says this is a key factor.  This is not

11:14:48  8   irrelevant to the analysis if we want to understand what's

11:14:50  9   going on?

11:14:51 10   A.   It's a hypothesis.  A key factor may be the low cost and

11:14:55 11   high purity of heroin use.

11:14:56 12   Q.   And you don't disagree that that's an important hypothesis?

11:14:59 13   A.   It's a -- yes, I agree that it's an important hypothesis.

11:15:03 14   Q.   And you would agree that as of 2016 compared to earlier

11:15:07 15   years, the cost of heroin had gone down and the purity had gone

11:15:11 16   up?

11:15:12 17   A.   That's right.

11:15:22 18   Q.   So you've -- I don't think you've given a number, but

11:15:24 19   you've said, I think, a number of different times and different

11:15:28 20   ways, that many people who use heroin have in some point in the

11:15:34 21   past used a prescription opioid; correct?

11:15:36 22   A.   About 75 percent, yes.

11:15:38 23   Q.   Okay.  75 percent of people using heroin at some point in

11:15:44 24   the past used a prescription opioid.  That doesn't mean they

11:15:46 25   were at some point addicted to a prescription opioid?

————— Keyes (Cross by Stoffelmayr) —————

11:15:50  1    A.   Right.  It means that the first opioid in the sequence of

11:15:53  2    opioid use was prescription opioids.

11:15:56  3    Q.   But that doesn't tell us if they used an opioid, you know,

11:16:02  4    the week before they started heroin or the last time was two

11:16:06  5    years before they started heroin; it just means at some point

11:16:09  6    in the past, in the sequence, they had exposure to a

11:16:12  7    prescription opioid?

11:16:13  8    A.   Yes.  There are studies that estimate that that discrete

11:16:18  9    time series that we could look at if that's helpful, but the

11:16:21 10    75 percent is just overall most people start with prescription

11:16:24 11    opioids before they use heroin.

11:16:25 12    Q.   Okay.  I think we're going to look at one of those studies.

11:16:28 13    A.   Okay.

11:16:29 14    Q.   We'll find out.

11:16:30 15         Now, you're obviously aware, prescription opioids are

11:16:34 16    pretty widely used medicines in America; correct?

11:16:37 17    A.   Yes.

11:16:38 18    Q.   We heard testimony, I guess it was last week, maybe

11:16:42 19    earlier, that hydrocodone is the single most widely prescribed

11:16:46 20    medicine in America.

11:16:48 21         Does that sound right to you?

11:16:50 22    A.   I'm not -- I haven't undertaken an analysis of that, but I

11:16:55 23    trust that that's the testimony that was offered.

11:16:56 24    Q.   And you don't disagree with that statement, do you?

11:16:58 25    A.   I don't know of another medicine that is prescribed more

Keyes (Cross by Stoffelmayr)

1  widely.

2  Q.   And do you have any basis to say if we looked at the

3  general population, not just heroin users, but if we looked at

4  the general population, whether more or less than 75 percent of

5  Americans have used a prescription opioid at some point in the

6  past?

7  A.   Less than -- wait.  So the question is what percentage of

8  Americans have used a prescription opioid?

9  Q.   Yeah.  Whether it's less -- more or less than that

10  75 percent number you told us for heroin users.

11  A.   I believe it's less.

12  Q.   Okay.  Let me ask it this way:  Do you have any basis to

13  say whether, if you looked at the general adult population,

14  their lifetime use of opioids, more or less than 80 percent

15  have used a prescription opioid?

16  A.   I'm not sure.

17  Q.   So based on that, is it fair to conclude that you're not

18  entirely sure if the percentage of heroin users who have used

19  an opioid in the past is any different than the percentage of

20  nonheroin users who have used a prescription opioid in the

21  past?

22  A.   It's higher.

23  Q.   What's the basis for that higher?

24  A.   The risk factor studies that have been done that show that

25  prescription opioid use is a strong risk factor for heroin use.

Keyes (Cross by Stoffelmayr)

11:18:28  1    You have a much higher proportion of prescription opioid use

11:18:32  2    among heroin users than among people who have not used heroin,

11:18:35  3    and most people in the United States have not used heroin.

11:18:38  4    Q.  Are you aware of any data that would tell us what

11:18:42  5    percentage of people in the United States have used a

11:18:46  6    prescription opioid at some point in the past?

11:18:49  7    A.  The NSDUH data does estimate that, and I believe it is

11:18:53  8    cited in my report in the section on overprescribing.  We

11:18:56  9    can -- we can look at that.

11:18:57 10    Q.  Why don't you point me to that, because I don't remember

11:19:00 11    that.

11:19:08 12    A.  So this -- in that section it says 98 million Americans

11:19:14 13    receive prescription pain relievers every year.  So we could --

11:19:18 14    Q.  So my question is not how many people get a prescription

11:19:20 15    every year.

11:19:21 16    A.  Right.

11:19:21 17    Q.  I understand we have data for that.  I'm looking for data,

11:19:25 18    how many Americans have ever at some point gotten a

11:19:29 19    prescription opioid in the past.

11:19:31 20    A.  I don't know the answer to that.

11:19:46 21    Q.  The number you gave us a few minutes ago that 75 percent of

11:19:51 22    heroin users at some point in the past used a prescription

11:19:55 23    opioid, that figure has changed over time; correct?

11:19:59 24    A.  Yes.

11:20:00 25    Q.  I think you cite a paper by a Professor Cicero that shows

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Stoffelmayr)

11:20:04 1  in the 1970s the number was very different, for example?

11:20:07 2  A.  That's right.

11:20:07 3  Q.  So the 1970s, it was a smaller percentage of heroin users

11:20:12 4  who had a history with prescription opioids than in the early

11:20:16 5  2000s, for example?

11:20:17 6  A.  Yes.  Most people who used heroin in the '70s didn't start

11:20:22 7  with prescription opioids because they weren't widely

11:20:24 8  prescribed.  And then that percentage progressively increased

11:20:28 9  throughout the '90s and the 2000s, up to 75 percent.

11:20:34 10 Q.  All right.  Let approximate me ask you -- find my cheat

11:20:40 11 sheet here -- let me ask you to flip to Tab 13 of your binder.

11:20:58 12       Do you have that?

11:20:59 13 A.  I do.

11:20:59 14 Q.  This is a different paper, also by Professor Cicero on this

11:21:06 15 question of which drug do people use first, or which opioid do

11:21:10 16 people use first; correct?

11:21:11 17 A.  Yes.

11:21:13 18 Q.  And if we look at this paper, what he concludes -- when is

11:21:16 19 this -- this paper is from 2018; correct?

11:21:20 20 A.  Yes.

11:21:25 21 Q.  And I want to look at his result section.  It's on the

11:21:28 22 second page.

11:21:31 23       And what Professor Cicero, who did some of that

11:21:34 24 research about the '70s versus the 2000s, what he said in 2018

11:21:43 25 was that heroin as the first opioid -- I'm sorry, heroin use as

—Keyes (Cross by Stoffelmayr)—

11:21:50  1    the first opioid grew sharply from 8.7 percent in 2005 to

11:21:56  2    31.6 percent in 2015; correct?

11:21:59  3    A.   Right.  That's the complement.  So 70 percent started with

11:22:03  4    prescription opioids, 30 percent started with heroin.

11:22:06  5    Q.   And that is a -- that is a considerable shift from 2005 to

11:22:14  6    2015; correct?

11:22:17  7    A.   It's a -- it -- the number goes up from 10 percent in 2005

11:22:23  8    to 30 percent in 2015.  Still consistent with the 75 percent.

11:22:29  9    Q.   But what that's -- I understand that, the math, but just so

11:22:33  10   we're all clear on what to conclude, one thing you can conclude

11:22:36  11   from this is that by 2015, a third of people using heroin had

11:22:43  12   never touched a prescription opioid?

11:22:45  13   A.   That's right.  That's the 75 percent.

11:22:47  14   Q.   Let me ask you this:  If -- do you have any analysis that

11:22:52  15   could tell us of people who are using heroin today, in 2021, of

11:22:58  16   people who are using heroin today, how many of them were using

11:23:02  17   any kind of opioid 10 years ago versus people who started in

11:23:05  18   the last 10 years?

11:23:08  19   A.   I'm sorry, so the question is if I -- is there any data

11:23:12  20   from 2021 that estimates the probability that someone who uses

11:23:19  21   heroin today used an opioid 10 years ago?

11:23:22  22   Q.   I think that's one way to think of the same question.  It's

11:23:25  23   not how I asked it, but I think it comes to the same thing.

11:23:27  24   A.   I don't know of data collected in 2021 that's been

11:23:30  25   published yet.  There are some studies that have looked at that

Keyes (Cross by Stoffelmayr)

1   from previous data.

2   Q.   Okay.   What could you tell us -- if we assume previous data

3   was still applicable, if we wanted to know -- here's my

4   question:   I want to know, of all the people in Lake and

5   Trumbull Counties who are using heroin today, how many of them

6   were using an opioid 10 years ago, already, versus people who

7   started more recently, how would I figure that out?

8   A.   So I would point to -- in the report there are a number of

9   studies that assess kind of timing, when a prescription opioid

10  is first initiated, which is typically in adolescence and early

11  adulthood and then those who are still using heroin, which can

12  be a more chronic condition.

13       So I would look to those studies.   I think there are

14  about 10 to 15 cited in the report.

15  Q.   Can you give us an estimate for what the percentage would

16  be, what percentage of those current heroin users were already

17  using heroin 10 years ago?

18  A.   Using heroin or prescription opioids?

19  Q.   I'm sorry, using any opioid.   Good catch.   I didn't mean to

20  ask it that way.   Let me ask it again so I ask it the right

21  way.

22       Can you tell us, can you give us your estimate, what

23  percentage of people in Lake and Trumbull Counties who are

24  using heroin today were already using any opioid, including

25  heroin, 10 years ago?

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Stoffelmayr)

11:24:45  1    A.  I don't know of that estimate for Lake and Trumbull today.

11:24:50  2    Q.  Do you know that estimate for any part of the country

11:24:52  3    today?

11:24:56  4    A.  I would say a majority were using an opioid 10 years ago.

11:25:00  5    Q.  Could you tell us anything more precise than a majority?

11:25:03  6    A.  I think that's about as precise as I could -- I could be at

11:25:07  7    this time without undertaking that specific analysis.

11:25:11  8    Q.  All right.  Let's shift back to the -- to what we do have

11:25:15  9    in the studies.

11:25:17  10        You've talked a lot about the percent of people who

11:25:22  11   are using heroin who started with prescription opioids;

11:25:27  12   correct?

11:25:28  13   A.  Yes.

11:25:29  14   Q.  And one of the studies you rely on that has maybe some

11:25:35  15   additional findings on topics that the others don't go into is

11:25:39  16   a study by Muhuri, I think it's pronounced; is that right?

11:25:42  17   A.  Yes.

11:25:43  18   Q.  It should be at Tab 8 of your binder, and I'll put it on

11:25:46  19   the screen.

11:25:53  20        And this is a study using that same National Survey on

11:25:59  21   Drug Use and Health; correct?

11:26:00  22   A.  Yes.

11:26:01  23   Q.  And I think you said this a minute ago, it's a large, large

11:26:06  24   study that provides data that researchers can use for lots of

11:26:10  25   different purposes; correct?

———Keyes (Cross by Stoffelmayr)———

11:26:11 1   A.   That's right.

11:26:18 2   Q.   And if we look down at that introduction -- well, the title

11:26:24 3   of this article is exactly what I think we've been talking

11:26:27 4   about, Associations of Non-Medical Pain Reliever Use and

11:26:31 5   Initiation of Heroin Use in the United States; correct?

11:26:33 6   A.   Well, it's a little bit what we've been talking about.

11:26:36 7   This article just focuses on non-medical use.  That's also

11:26:40 8   pathways for medical use.

11:26:41 9   Q.   Fair.  We have talked about more than one thing.

11:26:44 10         This does talk about the association between

11:26:47 11  non-medical use, so not as prescribed by your doctor, and

11:26:49 12  heroin; correct?

11:26:50 13  A.   Correct.

11:26:50 14  Q.   And as we look at this article, I'm sure you'll remember

11:26:54 15  this, they use the term NM -- sorry, yeah, NMPR over and over

11:27:00 16  again, and they mean non-medical pain reliever use; correct?

11:27:05 17  A.   That's right.

11:27:06 18  Q.   And in the context of this paper that means misusing

11:27:08 19  prescription opioids?

11:27:09 20  A.   Yes.

11:27:09 21  Q.   I mean, they're not talking about non-medical use of

11:27:12 22  Tylenol, they mean specifically opioid pain relievers?

11:27:16 23  A.   Yes.

11:27:27 24  Q.   And if we go down a bit to the introduction, they tell us a

11:27:28 25  little bit about the sample.

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Stoffelmayr)

11:27:31  1                And -- I'm not using it.

11:27:39  2                I meant to be looking here.  So Page 3 is the data and

11:27:42  3    method section.  Blow that up a little bit.

11:27:47  4                Do you see that?

11:27:48  5    A.   Yes.

11:27:50  6    Q.   Again, they describe the NSDUH and they describe the size

11:27:55  7    of the sample.  It was a sample size of 609,000 respondents,

11:28:03  8    age 12 to 49, at risk for heroin initiation?

11:28:08  9    A.   Yes.

11:28:08 10    Q.   And that's a -- you would count that as a large sample,

11:28:12 11    609,000 vs. some of the other studies we looked at that missed

11:28:15 12    a few hundred people?

11:28:16 13    A.   Yes.  That's a large sample.

11:28:20 14    Q.   And in your field, bigger samples give you better

11:28:23 15    statistical precision?

11:28:25 16    A.   Bigger samples give you smaller standard errors I would

11:28:29 17    say.  They're not necessarily providing better estimates.

11:28:35 18    Q.   Explain what you mean by smaller standard errors.

11:28:38 19    A.   Sure.  When we conduct -- when we do a sample of the

11:28:41 20    population, if we take a random sample, there is some error.  I

11:28:47 21    might just happen to take a random sample of the population

11:28:49 22    where I get way more heroin users than there really are in the

11:28:53 23    general population just by chance.  And, so, if we can do a

11:28:58 24    thought experiment where we generate infinite numbers of random

11:29:03 25    samples from the population, and we think about all of the

———Keyes (Cross by Stoffelmayr)———

1  prevalences of heroin use that we would get from those infinite

2  numbers of random samples, the range of those percentages is

3  the standard error.

4       And as the sample size gets bigger, I'm taking more

5  and more people from the actual population, so I have more and

6  more certainty that I'm not getting a weird sample that just

7  happens to be all heroin users, I'm actually getting the true

8  population prevalence.  So as the sample size increases, the

9  sample error gets smaller.

10  Q.  Would this be a fair way to think about it?  If we went

11  down to the street and pulled off 20 people and interviewed

12  them about heroin use and concluded none of them had used

13  heroin, you wouldn't say, ah-ha, now I know no one in Cleveland

14  has ever used heroin just because the 20 people walking down

15  the street happened never to have used heroin.  You would want

16  a much bigger sample of people in Cleveland before you drew

17  that conclusion?

18  A.  The more people I got in Cleveland, the better my

19  conclusion would be about the prevalence of heroin use.

20  Q.  So from that perspective, having a large sample like

21  609,000 would be better than having a sample of 20 or even 200?

22  A.  For the purpose of the standard error.

23  Q.  Yes.  Understood.

24  A.  But, you know, going out on the street here and taking 20

25  people is not a random sample, so even if we took a hundred

——————Keyes (Cross by Stoffelmayr)——————

11:30:23  1   people out on the street here, you would probably get a biased

11:30:27  2   estimate, so. . .

11:30:30  3   Q.  All right.  Let's -- make sure -- let's go to the Figure 6,

11:30:35  4   if you would.  That is on Page 13 of the printout.  And I'll

11:30:44  5   blow it up on the screen as well.

11:30:54  6           Do you have that?

11:30:54  7   A.  Yes.

11:30:56  8   Q.  Okay.  So the total is almost written in the English

11:31:02  9   language.  Let's just go through it, what that means.

11:31:04  10          Percentage of heroin initiates.  That means people who

11:31:08  11  started heroin in the study period; correct?

11:31:10  12  A.  That's right.

11:31:11  13  Q.  Okay.  Percentage of people who started heroin during the

11:31:14  14  period -- in the study time.  They were looking at people aged

11:31:18  15  12 to 49.  And they break them up by prior and past year

11:31:27  16  dependence/abuse of we could call it prescription opioids;

11:31:30  17  correct?

11:31:30  18  A.  That's right.

11:31:31  19  Q.  And they're looking at this time period 2002 to 2011, which

11:31:35  20  is what the data -- the set of data they were looking at;

11:31:38  21  right?

11:31:38  22  A.  Yes.

11:31:40  23  Q.  All right.  So these are -- again, so they've broken the

11:31:44  24  people who started heroin into three groups; correct?

11:31:48  25  A.  Yes.

Keyes (Cross by Stoffelmayr)

11:31:49  1   Q.   And this group over here (indicating) at the -- we'll start

11:31:54  2   with the easiest one, maybe, 20 percent of the people had never

11:32:00  3   misused a pill at all?

11:32:01  4   A.   That's right.

11:32:02  5   Q.   Then we've got almost 80 percent -- and this you said

11:32:07  6   75 percent, in this study it was a little bit higher -- almost

11:32:11  7   80 percent of the people who did use or did misuse a

11:32:14  8   prescription opioid before starting heroin; correct?

11:32:17  9   A.   Yes.

11:32:19  10  Q.   And if we start in the left -- go to the left 30 percent of

11:32:26  11  them, 31.3 percent, started heroin, and in the last year they

11:32:33  12  had shown dependence or abuse or prescription opioids; correct?

11:32:37  13  A.   That's right.

11:32:38  14  Q.   That means the year before they started heroin?

11:32:46  15  A.   Yes.  Well, I think it could have been within the same

11:32:48  16  calendar year, but. . .

11:32:49  17  Q.   But close in time to when they started heroin?

11:32:51  18  A.   Close in time to the initiation of heroin.

11:32:53  19  Q.   And they tell us that this -- the way they calculated or

11:32:57  20  the way they decided who was dependent on or abusing these

11:33:01  21  drugs was based on the fourth edition of the Diagnostic and

11:33:07  22  Statistical Manual?

11:33:07  23  A.   Yes.

11:33:08  24  Q.   And I think the jury heard at one point about a fifth

11:33:12  25  edition, but at the time period Muhuri was writing, fourth

Keyes (Cross by Stoffelmayr)

11:33:17 1  edition was the right one to be using; correct?

11:33:20 2          He didn't screw up and use the wrong version of the

11:33:23 3  DSM, I assume?

11:33:24 4  A.  I don't remember what year this was published, but --

11:33:31 5  Q.  Maybe make it simpler.  That's a good reference work for

11:33:35 6  deciding who should be counted as having dependence or abuse?

11:33:39 7  A.  Based on DSM-IV criteria.  There was some changes in DSM-V,

11:33:44 8  but DSM-IV is one indicator of opioid use disorder.

11:33:48 9  Q.  And you don't fault these folks or using the DSM-IV

11:33:52 10 criteria in their study?

11:33:53 11 A.  I don't -- I don't fault them.  I mean, DSM-V, I think,

11:33:57 12 would have been more accurate, but I don't know that DSM-V

11:34:00 13 diagnoses were available in these data going that far back.

11:34:03 14 Q.  Then we've got the biggest bar in the middle, and those are

11:34:08 15 the people who started heroin at some point in the past they

11:34:17 16 had used -- misused a prescription opioid, but in the year

11:34:20 17 before they started heroin they weren't dependent on

11:34:24 18 prescription opioids or abusing them; correct?

11:34:26 19 A.  Well, they didn't meet DSM-IV criteria for abuse or

11:34:30 20 dependence.

11:34:31 21 Q.  Which is what they were measuring?

11:34:33 22 A.  Right.

11:34:33 23 Q.  So, I mean, based on this study, if you assume that the

11:34:38 24 DSM-IV criteria are, you know, useful for helpful, if we're

11:34:45 25 looking at the people who started -- who started heroin, maybe

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Stoffelmayr)

11:34:51  1  a third of them were addicted to pills at the time they started

11:34:54  2  heroin, that 31.3 percent?

11:34:58  3  A.  A third of -- 31.3 percent met DSM-IV criteria, I would

11:35:04  4  say.

11:35:04  5  Q.  For addiction?

11:35:04  6  A.  For opioid use disorder, which --

11:35:06  7  Q.  Which we can think of as addiction?

11:35:08  8  A.  Yes.

11:35:09  9  Q.  And 48.2 percent did not meet the criteria for opioid use

11:35:19  10  disorder; correct?

11:35:19  11  A.  That's right.

11:35:19  12  Q.  And 20.5 percent had never been touched a pill; correct?

11:35:22  13  A.  That's not correct.  This is non-medical use only.  They

11:35:25  14  may have been exposed medically to opioids but had not misused

11:35:29  15  them.

11:35:29  16  Q.  20 percent had never misused a pill, they had only used

11:35:34  17  pills according to doctor's directions?

11:35:36  18  A.  That's right.

11:35:40  19  Q.  All right.  Let's move, I think it's technically back a

11:35:47  20  page, to Table 3 in the Muhuri paper, and I'm going to try to

11:35:54  21  blow up the top and then the boxes I wanted to look at so it

11:35:59  22  would be easier to -- easier to match up.  So those are almost

11:36:17  23  lined up.

11:36:18  24          Do you see what I did?

11:36:21  25  A.  I see, yes.

Keyes (Cross by Stoffelmayr)

11:36:22 1  Q.  So they look at all these people and they look at it in

11:36:26 2  different time periods, but if we go over to the very end we

11:36:29 3  see the data for the full time period, 2002 to 2011; correct?

11:36:34 4  A.  Yes.

11:36:35 5  Q.  All right.  So this is what I wanted to look at with you.

11:36:42 6  If you go down towards the bottom, I guess I've already

11:36:46 7  highlighted, so I'll just point with the cursor, maybe, 79 --

11:36:49 8  what this is telling us is that 79.5 percent of the people who

11:36:55 9  used heroin had at some point in the past misused a pill;

11:36:59 10 correct?

11:36:59 11 A.  Yes.

11:37:01 12 Q.  And then this is actually the same number we saw a minute

11:37:04 13 ago, above there, 20.5 percent of the people who started heroin

11:37:08 14 had never misused a pill; correct?

11:37:12 15 A.  Had never -- yeah, used non-medically, that's correct.

11:37:17 16 Q.  Okay.  When I say misuse, I'm trying to say the same thing.

11:37:21 17 A.  Yes.  Yes.  I'm just making sure I understand.

11:37:25 18 Q.  So let's stick with these people.  The people who tried

11:37:28 19 heroin -- or started heroin but did not have a history of

11:37:31 20 misusing pills, 1.1 percent of them had no prior illicit drug

11:37:39 21 use at all.  So these people had never tried a drug in their

11:37:42 22 lives, improperly, misused a drug in their lives until they

11:37:45 23 started heroin?

11:37:46 24 A.  Not quite.  They're looking at four substances in

11:37:48 25 particular, so it's not any drug.

HEATHER K. NEWMAN, RMR, CRR

—Keyes (Cross by Stoffelmayr)—

11:37:50  1   Q.  Okay.  They're looking at -- yeah, why don't we --

11:37:52  2   A.  It's footnote 2.

11:37:54  3   Q.  It's footnote 2, and I don't want to lose my hard work

11:37:57  4   lining up the columns, but I do want to make sure we got this

11:38:01  5   right.

11:38:11  6           It is, as I recall Maryland/hashish is one of them;

11:38:15  7   right?

11:38:15  8   A.  Marijuana?

11:38:16  9   Q.  I'm sorry.  I did not mean to disparage the good people of

11:38:20  10  Baltimore.

11:38:20  11          First, so there's a group of illicit drugs they ask

11:38:27  12  people about?  One was marijuana/hashish; correct?

11:38:28  13  A.  That's right.

11:38:28  14  Q.  One is cocaine, including crack cocaine?

11:38:30  15  A.  That's right.

11:38:33  16  Q.  One is hallucinogens; correct?

11:38:37  17  A.  Yes.

11:38:38  18  Q.  So that would include LSD, mushrooms, things like that?

11:38:41  19  A.  Yes.

11:38:42  20  Q.  And the last one is inhalants; right?

11:38:44  21  A.  Yes.

11:38:45  22  Q.  So what does that include in a study like this?

11:38:47  23  A.  Like huffing, people can huff glue, for example, whippets,

11:38:53  24  people can inhale vapors essentially that temporarily cause

11:38:57  25  euphoria.

HEATHER K. NEWMAN, RMR, CRR

———Keyes (Cross by Stoffelmayr)———

11:38:57 1  Q.  Okay.  So limiting, obviously, the study is limited to
11:39:00 2  those -- they only asked about those drugs, it appears.  So,
11:39:02 3  again, we've got 20.5 percent of people start heroin.  No prior
11:39:08 4  misuse of pills, and a few of them, very few of them, had never
11:39:12 5  used any of these other drugs either; correct?
11:39:14 6  A.  Correct.
11:39:15 7  Q.  Then we've got a much larger group, still in this subset,
11:39:19 8  people with no use of pills, no prior misuse of pills who had
11:39:25 9  not used pills but had used these other drugs, it's
11:39:30 10  19.4 percent of everybody; correct?
11:39:32 11  A.  That's right.
11:39:32 12  Q.  So those are people who might have used cocaine, they might
11:39:37 13  have used hashish or marijuana or inhalants, but never misused
11:39:41 14  a pill before they tried heroin?
11:39:43 15  A.  Right.  So, I mean, just to be clear, of the people who had
11:39:47 16  no prior medical misuse, 99 percent had used Cannabis or some
11:39:53 17  inhalants are very commonly used.  99 percent of the people who
11:39:53 18  didn't use a non-medical prescription opioid had used another
11:39:56 19  drug.
11:39:56 20  Q.  And when you say 99 percent, that's because 19.4 is
11:40:01 21  99 percent of 20.5?
11:40:03 22  A.  That's right.
11:40:03 23  Q.  And if you did that in your head, that's pretty cool.
11:40:07 24  Okay.  Not cool for you, that's cool for us.
11:40:11 25          THE COURT:  Boy, could I do that.

———Keyes (Cross by Stoffelmayr)———

11:40:15  1      MR. WEINBERGER:  I can do that, Judge.

11:40:18  2      MR. STOFFELMAYR:  The problem is she works surrounded

11:40:21  3  by people who can all do that, so it's not impressive.

11:40:24  4      THE WITNESS:  I know.

11:40:24  5      MR. STOFFELMAYR:  In our world, it's impressive.

11:40:24  6  BY MR. STOFFELMAYR:

11:40:25  7  Q.  All right.  Let's move down to the next box.

11:40:31  8      These are the people who did have some prior use of

11:40:35  9  misuse, sorry, did have some prior misuse of pills before they

11:40:41  10  started heroin; correct?

11:40:43  11  A.  Yes.

11:40:43  12  Q.  And as it turns out, basically every single one of them --

11:40:48  13  it's the same number -- had not only misused pills, but had

11:40:51  14  used these other drugs too?

11:40:54  15  A.  Yes, have used at least one other illicit drug.

11:40:57  16  Q.  And so if we wanted to ask this question, I think it's

11:41:02  17  right, if we wanted to say, okay, I understand -- I see the

11:41:05  18  data about prior misuse of pills, but I'm interested in of all

11:41:09  19  the people who started heroin, how many of them had used these

11:41:14  20  other illicit drugs, whether -- you know, some used pills, some

11:41:18  21  didn't.  We've looked at that.  Of all people who started

11:41:21  22  heroin how many used that category other illicit drugs:

11:41:24  23  marijuana, hashish, cocaine, crack cocaine, inhalants,

11:41:29  24  hallucinogens, what we'd want to do, I think, is add up

11:41:33  25  19.4 percent and 79.5 centers correct?

────── Keyes (Cross by Stoffelmayr) ──────

11:41:37  1   A.   That's right.

11:41:37  2   Q.   And so what that would give us, at least in the Muhuri

11:41:43  3   data, 97.7 percent of people who started heroin have used other

11:41:49  4   illicit drugs besides prescription opioid pills before starting

11:41:52  5   heroin?

11:41:52  6   A.   That's right.  Marijuana being the most common.

11:41:59  7   Q.   I don't know if it makes a difference, but in the time

11:42:01  8   period we're talking about here, 2002 to 2011, marijuana was

11:42:05  9   still illegal in every state except maybe Colorado, wasn't it?

11:42:09  10  A.   There were states that had allowances for medical use over

11:42:12  11  that time.

11:42:12  12  Q.   Medical use.  Good point.  I hadn't thought of that.  Thank

11:42:16  13  you.  I think this is interesting.  We may want to come back to

11:42:32  14  this.

11:42:32  15       So, Mr. Pitts, if I could have the ELMO again for a

11:42:35  16  minute.

11:42:41  17       I want to put all these numbers in one place so we can

11:42:44  18  come back to them.  So if we're looking at, again, just in the

11:42:50  19  Muhuri study -- I understand different studies might give you

11:42:53  20  different numbers -- but in the Muhuri study, the percent of

11:42:57  21  people who start heroin who previously had no prior drug use,

11:43:00  22  and you've pointed out that that's not all drugs, it's the way

11:43:03  23  they define illicit drugs; correct?

11:43:11  24  A.   Right.  So they're looking at four illicit drugs there.

11:43:20  25  Q.   I did not do as well in first grade as some of the other

Keyes (Cross by Stoffelmayr)

11:43:23  1   lawyers here so my handwriting is not quite up to snuff -- but

11:43:26  2   had no prior illicit, as they use is in the paper, drug use,

11:43:31  3   meaning not prescription opioids or misuse -- get it right --

11:43:38  4   A.  Right.

11:43:39  5   Q.  -- or other illicit drugs as they define it; correct?

11:43:42  6        That would be the 1.1 percent number?

11:43:45  7   A.  1.1 percent of the people had not used prescription opioids

11:43:51  8   non-medically and had not used marijuana, cocaine,

11:43:55  9   hallucinogens or inhalants.

11:44:00 10   Q.  Then the next thing I want to make sure we have, the people

11:44:03 11   who had misused a prescription opioid, that would be the

11:44:06 12   79.5 percent number?

11:44:11 13   A.  Yes.

11:44:19 14   Q.  And then the last one is the one we just talked about who

11:44:23 15   had used the other -- and I'll put this in quotes because we're

11:44:27 16   only talking about as defined in the paper -- have used other

11:44:30 17   illicit drugs, whether or not they used pills, that was the

11:44:35 18   98.9 percent number?

11:44:38 19   A.  Sorry.  Say that again.

11:44:40 20   Q.  So looking at -- if we want to look at Muhuri and say who

11:44:44 21   are all the people who started heroin after using one of his

11:44:49 22   quote/unquote illicit drugs, even if they used pills or if they

11:44:53 23   didn't use pills, that was, we added those up --

11:44:56 24   A.  I see.

11:44:57 25   Q.  -- to get 98.9 percent; correct?

Keyes (Cross by Stoffelmayr)

11:44:59  1    A.   Correct.

11:45:11  2    Q.   All right.  Last topics before lunch and before I sit down,

11:45:15  3    don't worry, I'm not coming back after lunch.

11:45:17  4             If I could have the computer back, Mr. Pitts.

11:45:25  5             So we've been talking about if you look at the world

11:45:27  6    of people who are using heroin, how many of them started out

11:45:31  7    misusing prescription opioids; correct?

11:45:33  8    A.   Using or misusing.

11:45:34  9    Q.   Using or misusing.

11:45:36  10            The Muhuri study was specifically misusing, but there

11:45:39  11   are other studies that ask the broader question?

11:45:41  12   A.   That's right.

11:45:41  13   Q.   Okay.  So we've been talking about how many people start

11:45:45  14   with prescription opioids, either using them the right way or

11:45:48  15   the wrong way, and what percentages of those people end up

11:45:53  16   trying heroin at some point; correct?

11:45:55  17   A.   I wouldn't use the terms right and wrong, but, you know, in

11:45:58  18   public health we don't really --

11:45:59  19   Q.   Okay.

11:46:00  20   A.   But they use them medically or non-medically.

11:46:02  21   Q.   According to doctors' orders or not according to doctors'

11:46:06  22   orders?

11:46:06  23   A.   Right.

11:46:06  24   Q.   And what percentage of those people -- I'm sorry.  We've

11:46:11  25   been looking at how many people on heroin were using pills in

Keyes (Cross by Stoffelmayr)

11:46:15 1  the past.  The other direction is how many people who have --

11:46:18 2  who use pills end up trying heroin.  It's a different question.

11:46:23 3  Related but different question.

11:46:24 4  A.   That's right.

11:46:25 5  Q.   Going the other direction.  Because there are many, many

11:46:28 6  more people who are prescribed opioid pills than ever try

11:46:30 7  heroin in their lives; correct?

11:46:32 8  A.   That's right.

11:46:35 9  Q.   And what I -- I think you say in your report is it's a

11:46:40 10  small but significant proportion; correct?

11:46:43 11  A.   About 3.5 percent, yes.

11:46:45 12  Q.   Okay.  So 3.5 percent of people who use a prescription

11:46:51 13  opioid will at some point try heroin; correct?

11:46:54 14  A.   Approximately.

11:46:55 15  Q.   And of people who try heroin, how many of them develop an

11:46:58 16  addiction to heroin?  Do we know that?

11:47:03 17  A.   Many more people try heroin than develop an addiction to

11:47:05 18  heroin.

11:47:08 19  Q.   So the flip side of 3.5 percent, maybe I'm stating the

11:47:12 20  obvious, is that, what, 96.5 percent of people who try a pill,

11:47:21 21  or use a pill, will never try heroin?

11:47:23 22  A.   Correct.

11:47:24 23  Q.   All right.  Thank you very much, professor.  That's all I

11:47:27 24  have.

11:47:31 25            MS. SULLIVAN:  Your Honor, I have some.  I don't know

─────────Keyes (Cross by Sullivan)─────────

11:47:33  1   if you prefer me --

11:47:34  2           THE COURT:  Okay.  Why don't we -- why don't we start.

11:47:36  3   That's fine, Ms. Sullivan.

11:47:41  4           MS. SULLIVAN:  Thank you.

11:48:01  5           And, Mr. Pitts, if I could have the ELMO.  Thank you.

11:48:01  6

11:48:01  7           CROSS-EXAMINATION OF KATHERINE M. KEYES, PhD

11:48:04  8   BY MS. SULLIVAN:

11:48:04  9   Q.  Good morning, Dr. Keyes.

11:48:07 10           Good morning, jurors.

11:48:09 11           Good to meet you.  I'm Diane Sullivan, and I represent

11:48:12 12   the folks at Giant Eagle who have been sued here too.  I just

11:48:16 13   have a few questions for you this morning.

11:48:17 14           Dr. Keyes, you talked about overprescribing by

11:48:23 15   physicians causing the opioid crisis, and I want to ask you

11:48:27 16   about some of the causes of that overprescribing if I may.

11:48:31 17   A.  Sure.

11:48:31 18   Q.  And you were asked last week about manufacturers being a

11:48:36 19   cause of the opioid crisis and you agreed that they were.

11:48:40 20           And could you explain to our jurors why manufacturers

11:48:43 21   caused overprescribing by physicians?

11:48:47 22   A.  The manufacturers made the pills, and the pills were then

11:48:52 23   disseminated in extraordinary quantities to counties, including

11:48:59 24   Lake and Trumbull County, and so if the pills were never made

11:49:01 25   and were never distributed, we wouldn't have the opioid crisis.

———————————Keyes (Cross by Sullivan)———————————

11:49:06  1   Q.  And is that one of the reasons, Dr. Keyes, that you believe

11:49:10  2   that pharmaceutical manufacturers of opioids were a substantial

11:49:14  3   cause of the opioid crisis?

11:49:16  4   A.  Yes.

11:49:16  5   Q.  And, Doctor, I think you talk about the manufacturers' role

11:49:21  6   in causing the opioid crisis in your expert report, and we have

11:49:27  7   that for you in case you don't have it on -- in Tab 2 of the

11:49:31  8   binder.

11:49:32  9   A.  Is this the new binder?

11:49:34  10  Q.  Yes.  Yes.

11:49:35  11  A.  Okay.  Gotcha.

11:49:40  12  Q.  And then, Doctor, if we could look at -- if you'd be good

11:49:44  13  enough to look at Page 14 of your expert report in this case.

11:50:00  14          Let me know if you have it?

11:50:00  15  A.  I do.

11:50:00  16  Q.  Okay.  And what we've put on the screen, Doctor, is you're

11:50:05  17  outlining the phenomena of Purdue Pharma and OxyContin as

11:50:11  18  triggering the opioid epidemic; correct?

11:50:14  19  A.  That's one cause of the opioid epidemic.

11:50:17  20  Q.  Yeah.  And you say, in your report, in 1995, the year

11:50:22  21  OxyContin entered the market, the number of opioid

11:50:25  22  prescriptions filled in the United States increased by 7

11:50:28  23  million and continued to increase over the next two decades

11:50:31  24  before peaking in the fourth quarter of 2012 at 62 million

11:50:35  25  dispensed; right?

Keyes (Cross by Sullivan)

11:50:36 1   A.   That's right.

11:50:37 2   Q.   And talk about how from 1997 to 2002 prescriptions for

11:50:44 3   OxyContin for non-cancer pain increased from approximately

11:50:48 4   670,000 in 1997 to about 6.2 million in 2002; right?

11:50:53 5   A.   Yes.

11:50:55 6   Q.   And you go on to say that the increase in opioid

11:50:59 7   prescribing was driven by a multiple of factors including

11:51:02 8   direct marketing to physicians using data that underestimated

11:51:06 9   opioid use disorder risk in patients, which you detail in

11:51:09 10  section B.

11:51:10 11        Can you talk to our jurors about what manufacturers

11:51:13 12  were doing in terms of promotion in your view there that drove

11:51:18 13  overprescribing by physicians of opioids?

11:51:20 14  A.   Sure.  The -- among the data that I review in this report,

11:51:28 15  there is substantial evidence that pharmaceutical manufacturers

11:51:34 16  engaged in direct marketing to physicians of opioid

11:51:39 17  prescriptions and that that is associated not only with sales

11:51:43 18  of opioids as -- as marketing is intended to, but also

11:51:48 19  correlates with overdose deaths.  We can correlate the dollars

11:51:52 20  in marketing efforts to physicians with overdose deaths by

11:51:59 21  counties in the United States.

11:52:00 22  Q.   In other words, if I understand your testimony, Dr. Keyes,

11:52:03 23  pharmaceutical manufacturers engage in extensive marketing of

11:52:06 24  opioids that drove prescriptions of opioids way up?

11:52:11 25  A.   Yes.

Keyes (Cross by Sullivan)

11:52:12  1  Q.  And you talk in the bottom of your report -- and, actually,

11:52:19  2  Doctor, if we could just go to the middle, you relate this

11:52:25  3  increase, rapid increase in total opioid prescribing to the

11:52:28  4  introduction of OxyContin in 1996?

11:52:35  5  A.  That is one contribution, OxyContin.  Obviously there are

11:52:39  6  other products that are marketed and for which sales increased,

11:52:42  7  but the -- everything increased after 1996, which was the

11:52:49  8  introduction of OxyContin.

11:52:49  9  Q.  Yeah.  And, in fact, you say that the introduction of

11:52:52  10  OxyContin in 1996 correlates with marketing of opioids to

11:52:57  11  physicians which downplayed the risk of harms association with

11:53:00  12  these drugs; right?

11:53:01  13  A.  That's right.

11:53:01  14  Q.  And a lot of folks in your business and elsewhere point to

11:53:04  15  OxyContin and Purdue's marketing of OxyContin as the trigger of

11:53:07  16  the opioid epidemic.  Fair?

11:53:10  17  A.  I think the consensus in my field is that it's really a

11:53:14  18  confluence of factors.  I mean that's the consensus of

11:53:19  19  epidemiologists.

11:53:19  20  Q.  But at least in your report here you talk about OxyContin

11:53:22  21  and its introduction correlating with marketing of opioids to

11:53:25  22  physicians which downplayed the risks associated with

11:53:28  23  prescribing; right?

11:53:29  24  A.  That's one part of the report.

11:53:31  25  Q.  And at the bottom of Page 14, Doctor, you talk about,

Keyes (Cross by Sullivan)

11:53:39  1    again, the marketing of materials to physicians by

11:53:43  2    pharmaceutical manufacturers that underestimated the addiction

11:53:46  3    potential of prescription opioids; right?

11:53:49  4    A.   That's right.

11:53:49  5    Q.   Yeah.  So one of the -- so in your view, a substantial

11:53:52  6    cause of the opioid epidemic was manufacturers misleading

11:53:58  7    doctors about the risk of addiction as it related to opioids?

11:54:02  8    A.   That is one contributing factor, yes.

11:54:04  9    Q.   And convincing doctors, or influencing doctors, to

11:54:08  10   prescribe what they believe were legitimate prescriptions?

11:54:12  11   A.   Yes.

11:54:16  12   Q.   And, Doctor, you talk -- and, actually, you've written --

11:54:25  13   even though for some of us you're relative young -- you've

11:54:28  14   written a bunch of papers, and I want to talk to you about one

11:54:31  15   of your impressive papers, if I may, Dr. Keyes, and that is

11:54:37  16   Defense Exhibit 11611, and it is Tab 3 in your binder.

11:55:03  17            Do you have it?

11:55:04  18   A.   Yes.

11:55:04  19   Q.   Oh, sorry.

11:55:05  20            And if we could -- and, Doctor, this is one of your

11:55:10  21   papers?

11:55:11  22   A.   Yes.

11:55:11  23   Q.   And it's a review of the social and behavioral

11:55:16  24   contributions to the opioid epidemic; right?

11:55:19  25   A.   Overdose epidemic, yes.

─────── Keyes (Cross by Sullivan) ───────

11:55:20  1    Q.  Overdose epidemic.  Fair enough.

11:55:21  2            And in the paper you talk about some of the causes of

11:55:24  3    the overdose -- the opioid overdose epidemic?

11:55:26  4    A.  That's right.

11:55:27  5    Q.  And we can look at -- Doctor, if you look at Page 97 of

11:55:33  6    your study, of your paper, if we could.  And one of the things

11:55:43  7    you say, that supply drivers of the opioid epidemic include the

11:55:48  8    proliferation of opioid prescribing to treat chronic pain as

11:55:52  9    well as changes in the heroin and illegally manufactured opioid

11:55:56  10   synthetic markets; right?

11:55:58  11   A.  Yes.

11:55:58  12   Q.  Those are the three things you cite as supply drivers

11:56:03  13   causing the overdose epidemic; right?

11:56:05  14   A.  By three, you mean opioid prescribing, heroin markets, and

11:56:10  15   synthetic opioid markets?

11:56:14  16   Q.  Yes, Doctor.

11:56:15  17   A.  Yes.

11:56:16  18   Q.  And when you say proliferation of opioid prescribing,

11:56:19  19   you're talking about doctors writing more and more

11:56:21  20   prescriptions for opioids?

11:56:21  21   A.  That's right.

11:56:22  22   Q.  And you go on in your paper to talk about a shift in

11:56:26  23   treatment approaching for non- -- for chronic non-cancer pain;

11:56:32  24   right?

11:56:32  25   A.  Yes.

Keyes (Cross by Sullivan)

11:56:33  1   Q.  And what you're talking about there, and you can explain it

11:56:36  2   certainly better than I can, but there was a shift in the 1990s

11:56:43  3   on the standard of care of treatment guidelines that advised

11:56:48  4   doctors that they could prescribe opioids for chronic pain,

11:56:51  5   wherein the past the prescription practices had been more

11:56:54  6   limited?

11:56:59  7   A.  There was a concerted effort to -- and in large part

11:57:05  8   formulated from the manufacturers -- to change the perception

11:57:08  9   of pain treatment in the United States.

11:57:09  10  Q.  Yeah.  Fair enough.

11:57:11  11       So the pharmaceutical manufacturers of opioids, in

11:57:15  12  your view, influenced prescribing guidelines and changed the

11:57:20  13  standard of care for doctors when they were prescribing

11:57:23  14  opioids?

11:57:24  15  A.  Yes.

11:57:26  16  Q.  And so what happened in this shift is that doctors, based

11:57:31  17  on what you outline as this campaign by pharmaceutical

11:57:36  18  manufacturers, started to prescribe, consistent with the

11:57:39  19  standard of care way, way more opioids than they had in the

11:57:42  20  past?

11:57:42  21  A.  Well, they also prescribed inconsistent with the standard

11:57:44  22  of care.  The prescribing increased both within changing

11:57:50  23  viewpoints about the standard of care and then just more

11:57:54  24  generally in ways that were inappropriate.

11:57:57  25  Q.  But, Dr. Keyes, what you talk about in your paper is how

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Sullivan)

11:58:01 1  the standard of care organizations changed their standards in

11:58:05 2  terms of opioid prescribing.

11:58:07 3  A.  That is true.

11:58:08 4  Q.  Okay.

11:58:09 5  A.  I'm just -- there was also a broader shift towards

11:58:12 6  prescribing that was well outside standard of care as well.

11:58:14 7  Q.  But in your -- at least in your paper, you're talking about

11:58:17 8  how the legitimate standards of care changed in the 1990s,

11:58:23 9  encouraging doctors to prescribe more opioids consistent with

11:58:25 10  the standard of care?

11:58:27 11  A.  That is -- that's one part of the supply side, yes.

11:58:30 12  Q.  And, in fact, because of these changes in the standard of

11:58:33 13  care, insurance companies in the '90s started covering

11:58:37 14  prescriptions of opioids for chronic pain which they had not in

11:58:41 15  the past, also driving up the prescribing for opioids?

11:58:46 16  A.  That also occurred.

11:58:54 17  Q.  You also, Doctor, talked --

11:58:56 18          THE COURT:  Ms. Sullivan, if you're -- I'd like to you

11:58:59 19  pick a convenient time to break for lunch.

11:59:02 20          MS. SULLIVAN:  Great time, Your Honor.

11:59:03 21          THE COURT:  Okay.

11:59:04 22          All right, ladies and gentlemen, we'll take our lunch

11:59:06 23  recess.  Usual admonitions apply, and then we'll pick up with

11:59:10 24  the balance of Dr. Keyes at 1 o'clock.

11:59:13 25          Have a good lunch.

———————Keyes (Cross by Sullivan)———————

11:59:15   1        (Jury excused from courtroom.)

11:59:15   2        (Recess was taken from 11:59 a.m. till 1:04 p.m.)

        3

        4

        5

        6

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

———————Keyes (Cross by Sullivan)———————

11:59:15  1                    AFTERNOON SESSION

11:59:15  2      (In open court at 1:04 p.m.)

01:04:03  3           COURTROOM DEPUTY:  All rise.

01:05:35  4      (Jury returned to courtroom at 1:05 p.m.)

01:05:50  5           THE COURT:  Okay.  Good afternoon.  Please be seated.

01:05:53  6           And, Doctor, you're still under oath from this

01:05:57  7  morning.

01:06:03  8           You may continue, Ms. Sullivan.

01:06:07  9           MS. SULLIVAN:  Thank you, Your Honor.

01:06:09 10  BY MS. SULLIVAN

01:06:09 11  Q.  Welcome back, Dr. Keyes.  Good afternoon, jurors.

01:06:13 12           Mr. Pitts, if I could get my -- you got me.  Thank

01:06:13 13  you.

01:06:16 14           So, Dr. Keyes, when we broke for lunch, we were

01:06:19 15  talking about some of the things that caused the

01:06:24 16  overprescribing of doctors which led to the opioid crisis, and

01:06:30 17  I want to turn back to your paper if you've still got it.  It

01:06:33 18  should be tab --

01:06:34 19  A.  Yes, I have it.

01:06:35 20  Q.  3.  Great.  Thank you.

01:06:37 21           And looking more at your paper under the section

01:06:42 22  supply drivers of the overdose epidemic.  We discussed how

01:06:47 23  prescribing standards changed, including the joint commission,

01:06:51 24  the nation's largest accrediting body for health care

01:06:54 25  organizations, considering pain is the fifth vital sign and

———————Keyes (Cross by Sullivan)———————

01:06:58  1  these pain associations, the American Academy of Pain Medicine,

01:07:03  2  releasing a consensus statement endorsing the use of opioids to

01:07:07  3  treat chronic non-cancer pain arguing that the risk of

01:07:12  4  addiction was low; right?

01:07:13  5  A.  Yes.

01:07:13  6  Q.  And you also again talk about, in your paper, how the

01:07:16  7  pharmaceutical industry, their concerted efforts to advocate

01:07:20  8  for long-term use of opioids as safe, non-addictive and humane

01:07:26  9  influenced doctors to prescribe more and more opioids?

01:07:35  10  A.  Yes.

01:07:36  11  Q.  And, again, you walk through, in 1995, for example,

01:07:41  12  Purdue Pharma introduced OxyContin, an extended release

01:07:45  13  formulation of oxycodone marketed as a non-addictive and

01:07:49  14  effective medicine for treatment of chronic pain, and then you

01:07:52  15  go on to discuss what we already talked about, all of the money

01:07:55  16  that Purdue Pharma, and as you say, other manufacturers spent,

01:08:00  17  to try to change doctors' prescribing behavior; right?

01:08:06  18  A.  Not only to change doctors' prescribing behavior, but to

01:08:10  19  promote the use of opioids more generally.

01:08:12  20  Q.  Yeah.  Yeah.  Which is what led you to conclude that

01:08:16  21  pharmaceutical companies who made opioids were a big cause, a

01:08:20  22  substantial cause, of the opioid epidemic for the reasons you

01:08:22  23  outline in your paper?

01:08:24  24  A.  Manufacturers are a cause, but the pharmaceutical industry

01:08:28  25  is broader than manufacturers.

———Keyes (Cross by Sullivan)———

01:08:30  1    Q.  But here you're talking about the Purdue -- Purdue Pharma

01:08:36  2    who is a manufacturer?

01:08:37  3    A.  On the previous page we were talking about Purdue Pharma.

01:08:40  4    Q.  Yeah.

01:08:40  5    A.  Those two examples from Purdue Pharma, yes.

01:08:44  6    Q.  Yeah.  And you don't have any evidence that Giant Eagle was

01:08:47  7    out promoting and marketing opioids?

01:08:52  8    A.  The examples we give here are related to Purdue Pharma and

01:08:56  9    the other manufacturers, but the pharmaceutical industry as a

01:08:58  10   whole is implicated in the opioid crisis, and that would

01:09:02  11   include pharmacies.

01:09:04  12   Q.  Yeah, but, Dr. Keyes, my question is, you don't have any

01:09:06  13   evidence that Giant Eagle was out promoting opioids?

01:09:10  14   A.  I don't review Giant Eagle specific contribution in this

01:09:15  15   paper.

01:09:15  16   Q.  And the things that you outline in your paper related

01:09:17  17   specifically to opioid manufacturers like Purdue Pharma?

01:09:20  18   A.  That's right.  The example given are for Purdue Pharma.

01:09:28  19   Q.  And, Doctor, I think last week you talked about how state

01:09:32  20   medical boards were also responsible for the opioid crisis.

01:09:36  21   Can you -- can you explain that?

01:09:38  22   A.  Sure.  I mean, the general principle that we use in public

01:09:42  23   health and epidemiology is we look at the supply change and all

01:09:49  24   of the varies entities on the supply change that either

01:09:52  25   promoted or didn't stop kind of the flow of opioids.

——————— Keyes (Cross by Sullivan) ———————

01:09:54  1       I mean, kind of using the analogy of John Snow and the

01:09:58  2  pump handle, like, you can either turn off the pump or you can

01:10:01  3  prime the pump, and so at all these points along the supply

01:10:04  4  channel there was priming and turning off, and the state

01:10:07  5  medical boards were one that could have prevented the

01:10:12  6  oversupply of prescription opioids.

01:10:13  7  Q.  In what way, Dr. Keyes, were the state medical boards, in

01:10:17  8  your view, responsible for the opioid crisis?

01:10:20  9  A.  In my view, there could have been additional advice given

01:10:23 10  to doctors about standards of treatment as well as pharmacists,

01:10:28 11  you know, appropriate prescribing and ensuring that too many

01:10:32 12  pills weren't going out of the pharmacies as well as the

01:10:35 13  doctors' offices.

01:10:36 14  Q.  And in your view, the state medical boards failed to do

01:10:39 15  that, failed to do anything to change the standard of care in

01:10:42 16  terms of prescribing opioids?

01:10:43 17  A.  To be honest with you, I haven't reviewed the Ohio State

01:10:48 18  Medical Board's in detail, and so I don't want to testify to

01:10:50 19  something that I haven't reviewed in detail, but generally, you

01:10:54 20  know, I think medical schools, medical boards, there could have

01:10:58 21  been more oversight in those various -- and the discipline of

01:11:03 22  epidemiology, you know, kind of looking back on things, of

01:11:05 23  course, you can see different points along the road in which

01:11:08 24  the evidence could have been used to stop the epidemic that

01:11:12 25  occurred.

─────── Keyes (Cross by Sullivan) ───────

01:11:13  1   Q.   And, Dr. Keyes, you had mentioned the FDA having

01:11:16  2   responsibility here.  I wanted to talk more about that.

01:11:21  3        You agree that the FDA has substantial responsible for

01:11:25  4   the opioid crisis?

01:11:27  5   A.   Yes.

01:11:28  6   Q.   And as I understand it, Dr. Keyes, the FDA controls what

01:11:35  7   opioids get approved for legal prescribing in the United

01:11:38  8   States?

01:11:38  9   A.   That's right.

01:11:39  10  Q.   In other words, if the FDA doesn't approve a manufacturer's

01:11:43  11  medicine, a doctor can't legally prescribe it?

01:11:45  12  A.   That's right.

01:11:46  13  Q.   And you're aware, I take it, because you've done some

01:11:49  14  extensive review of this issue, that the FDA, between 1995 into

01:11:55  15  2015 or '16 approved 21 different opioids for sale in the

01:12:00  16  United States; right?

01:12:02  17  A.   I trust that that number is accurate.  I didn't review that

01:12:04  18  in my report, but --

01:12:06  19  Q.   Fair enough.

01:12:07  20  A.   I'm sure that you have that information.

01:12:08  21  Q.   Fair enough.  But you know that they approved a -- the FDA

01:12:12  22  approved a lot of opioids for sale over -- in that time period,

01:12:15  23  over that 20-year time period?

01:12:17  24  A.   I would trust that it's 21.

01:12:18  25  Q.   And one of the things that you concluded is that the FDA

Keyes (Cross by Sullivan)

01:12:23  1   let down the American people in that they just let too many

01:12:27  2   opioids get approved for sale in the United States?

01:12:30  3   A.   That is my view.

01:12:31  4   Q.   And if the FDA, Dr. Keyes, had done its job, they could

01:12:36  5   have stopped this epidemic?

01:12:39  6   A.   My view is that the opioids -- the -- there were too

01:12:44  7   many -- that the approval process did not have sufficient

01:12:48  8   oversight, kind of back to the pump example, that was an

01:12:52  9   example where the pump could have been turned down.

01:12:54 10   Q.   And the FDA is sort of at the start of the pump, right?

01:12:58 11         The FDA, had they done their job for the American

01:13:01 12   people, could have prevented the opioid crisis?

01:13:03 13   A.   My view is that the manufacturers are at the start of the

01:13:05 14   pump.

01:13:05 15   Q.   Fair enough.  So had the manufacturer, in your view, acted

01:13:10 16   more responsibly and had the FDA done its job and not approved

01:13:13 17   21 different opioids in that time frame, we would not have an

01:13:17 18   opioid crisis?  Fair enough?

01:13:19 19   A.   Yes.

01:13:21 20   Q.   And, Doctor, you also had mentioned DEA, the Drug

01:13:28 21   Enforcement Administration, as having responsibility for

01:13:31 22   causing the opioid crisis.

01:13:32 23         Can you explain that a little more?

01:13:34 24   A.   I think I would go back to my pump analogy, if that works

01:13:37 25   for the jury, that, you know, these -- if at all the points

——————— Keyes (Cross by Sullivan) ———————

01:13:42  1   along the pump there were various people who are -- or various

01:13:45  2   entities, various companies, that could have turned that pump

01:13:48  3   down.

01:13:49  4        And so when we think about things in public health, we

01:13:51  5   think about kind of the interaction of many factors, and so

01:13:54  6   there's not one company or one entity that's solely responsible

01:13:57  7   for the opioid crisis, but the DEA bears some responsibility,

01:14:01  8   the FDA, the manufacturers, and the pharmacies.

01:14:04  9   Q.   The -- and in fairness, Dr. Keyes, you were candid last

01:14:10 10   week that you actually haven't examined what role, if any,

01:14:13 11   these pharmacies played in the opioid crisis?

01:14:15 12   A.   That -- there -- there is information in the report on the

01:14:19 13   specific pharmacies that is the consensus of my field.  I have

01:14:23 14   not done an evaluation of each pharmacy company represented

01:14:26 15   here.

01:14:26 16   Q.   Yeah.  In other words, you haven't looked at any

01:14:29 17   Giant Eagle documents to come to any conclusions on that score?

01:14:30 18   A.   That's right.

01:14:31 19   Q.   And fair to say that's true of the other pharmaceutical

01:14:34 20   companies here?  I mean, the other pharmacy companies here.

01:14:37 21   A.   I have not looked at their documents.  I've reviewed the

01:14:39 22   scientific evidence.

01:14:40 23   Q.   And, Doctor, has -- as part of your review, did you look at

01:14:44 24   the Drug Enforcement Administration for how many or how much

01:14:50 25   opioid could be imported or manufactured in the United States?

Keyes (Cross by Sullivan)

01:14:53  1    A.   I'm generally familiar with the quota system, but I haven't

01:14:57  2    evaluated any specific quotas.

01:14:58  3    Q.   So if I showed -- have you looked at how they -- how the

01:15:01  4    DEA increased their quotas over the years for opioids?

01:15:05  5    A.   I'm generally familiar about it, but I didn't review the

01:15:07  6    DEA's material from my report.

01:15:09  7    Q.   Okay.

01:15:10  8    A.   I only relied on the scientific evidence.

01:15:11  9    Q.   So without -- I mean, I'm happy to show it to you, but you

01:15:14  10   know that generally the Drug Enforcement Administration, for

01:15:17  11   example, increased the amount of OxyContin that could be

01:15:21  12   manufactured and sold in the United States by 50 percent in

01:15:25  13   this time period?

01:15:26  14   A.   I haven't evaluated that.

01:15:29  15   Q.   Fair enough.

01:15:30  16        Doctor, just to kind of finish up, when we talk about

01:15:35  17   causes of the opioid epidemic, you talked about last week how

01:15:39  18   you were also an expert for plaintiffs in the lawsuits against

01:15:45  19   the manufacturers; correct?

01:15:47  20   A.   Yes.

01:15:47  21   Q.   And you did an expert report in the lawsuits where the

01:15:52  22   plaintiffs blame the manufacturers for the opioid crisis;

01:15:54  23   correct?

01:15:55  24   A.   I'm sorry.  Say that --

01:15:57  25   Q.   Sure.  You did an expert report in the lawsuits where the

──────── Keyes (Cross by Sullivan) ────────

01:15:59  1  plaintiffs blame the manufacturers for the opioid crisis;

01:16:02  2  right?

01:16:03  3  A.   There were other plaintiffs in those -- I've been -- I've

01:16:06  4  been an expert in a number of opioid-related cases with various

01:16:11  5  plaintiffs.

01:16:11  6  Q.   Yes.  And in -- and you -- and in the lawsuits where the

01:16:14  7  plaintiffs were blaming the manufacturers for causing the

01:16:17  8  opioid crisis you prepared expert reports?

01:16:20  9  A.   I have prepared other expert reports when manufacturers

01:16:24  10  have been defendants.

01:16:24  11  Q.   And I wanted to show you, in Tab 8 if we could, Dr. Keyes,

01:16:29  12  your expert report in a lawsuit against the manufacturers.

01:16:36  13       If you could pull that up for us.

01:16:47  14       Do you have it?

01:16:48  15  A.   Yes.

01:16:48  16  Q.   Okay.  And this is an expert report that you prepared --

01:16:52  17       MR. LANIER:  Your Honor -- Your Honor, before she goes

01:16:54  18  into detail and displays this, I'd ask --

01:16:58  19       THE COURT:  Let's let -- go on the headphones.

01:17:10  20    (Proceedings at sidebar out of the hearing of the jury:)

01:17:12  21       THE COURT:  All right.  What's the objection?

01:17:15  22       MR. LANIER:  I would ask, is this impeachment with a

01:17:17  23  prior inconsistent statement?  I don't understand why she

01:17:22  24  doesn't just ask her questions, why she's showing her a

01:17:24  25  previous writing, that -- I mean, this doesn't come in unless

————— Keyes (Cross by Sullivan) —————

01:17:28 1  it's impeachment and --

01:17:30 2          THE COURT:  That's a good point.  I don't know why

01:17:32 3  we're bringing in a lawsuit against the manufacturers,

01:17:37 4  Ms. Sullivan.

01:17:37 5          MS. SULLIVAN:  Well, Your Honor, the Court has given

01:17:40 6  plaintiffs' lawyers a lot of leeway in using expert reports.  I

01:17:43 7  just wanted to show her something she had said and ask her a

01:17:46 8  question about it.

01:17:47 9          MR. LANIER:  I haven't used any.

01:17:48 10         THE COURT:  Well, is this inconsistent with what she

01:17:51 11  said here?

01:17:53 12         MS. SULLIVAN:  Yes, Your Honor.

01:17:55 13         MR. LANIER:  Where?

01:17:56 14         THE COURT:  Where?  What's -- where is an

01:18:00 15  inconsistency?

01:18:00 16         MS. SULLIVAN:  Your Honor, you know what, to save time

01:18:02 17  I'll just ask her the question.

01:18:04 18         THE COURT:  Okay.

01:18:19 19      (In open court at 1:18 p.m.)

01:18:19 20  BY MS. SULLIVAN:

01:18:19 21  Q.  Dr. Keyes, our jurors have heard a lot about doctor

01:18:22 22  shoppers, people that go from pharmacy to pharmacy trying to

01:18:27 23  get and opioid prescription filled.

01:18:29 24         You're familiar with that phenomena; correct?

01:18:31 25  A.  Yes.

HEATHER K. NEWMAN, RMR, CRR

Keyes (Cross by Sullivan)

01:18:31  1   Q.  And, in fact, you've written about that in some of your

01:18:34  2   expert reports?

01:18:35  3   A.  Yes.

01:18:35  4   Q.  And, Doctor, you would agree that doctor shopping to fill

01:18:43  5   opioid prescriptions is rare across states; correct?

01:18:49  6   A.  Well, it's a bit more nuanced than that.  I think you're

01:18:54  7   quoting a report, but I can provide some more context for that

01:18:56  8   it that would be helpful to the jury.

01:18:58  9          MS. SULLIVAN:  Your Honor, may I use the report?

01:19:07  10          THE COURT:  Well, if this is the report she's

01:19:09  11   referring to, you can ask her if this is the report.

01:19:11  12          MS. SULLIVAN:  Okay.

01:19:11  13   BY MS. SULLIVAN:

01:19:12  14   Q.  And, Doctor, I'm showing one of your expert reports in

01:19:16  15   lawsuits against the pharmaceutical manufacturers; correct?

01:19:19  16   A.  I -- I believe this -- this -- I just -- I believe

01:19:26  17   pharmacies were included in this lawsuit as well at some point.

01:19:31  18   Q.  Okay.  I'm not sure that's right, but we don't have to

01:19:35  19   fight about that.

01:19:35  20          Can you turn to Page 18?  And, Doctor, on Page 18 you

01:19:46  21   do talk -- you talk about doctor shopping; right?

01:19:48  22   A.  Yes.

01:19:48  23   Q.  And opioid shoppers.  And you cite a study by McDonald and

01:19:54  24   Carlson?

01:19:55  25   A.  That's right.

HEATHER K. NEWMAN, RMR, CRR

─────────────── Keyes (Cross by Sullivan) ───────────────

01:19:55  1   Q.  And you say that doctor shopping overall remain rare across

01:20:00  2   states within a mean of less than 1 per 1,000 individuals

01:20:05  3   across states.  That was your statement; right?

01:20:07  4   A.  That's right.

01:20:07  5   Q.  And you also talk about -- so doctor shopping, at least

01:20:10  6   what you said in this report, was rare across the states with

01:20:16  7   less than 1 person per 1,000; right?

01:20:19  8   A.  That's in comparison to the overall rate of prescribing, so

01:20:22  9   just to make clear that within the state -- that that's

01:20:26 10   relative to the overall level of prescribing.  However, pill

01:20:30 11   mills and doctor shoppers can contribute in a significant way

01:20:32 12   within any particular state.  It's just that there were so many

01:20:36 13   opioid prescriptions that these particular forms of prescribing

01:20:40 14   were relatively rare relative to the other forms of

01:20:43 15   prescribing.

01:20:44 16   Q.  At least in your expert report here you say it's rare

01:20:47 17   across states with less than 1 percent out of a thousand;

01:20:50 18   right?  That's what you say here?

01:20:51 19   A.  That's right.

01:20:51 20   Q.  And you also say here, Doctor, that pill mills do not

01:20:56 21   explain in any significant way the expansion of opioid

01:21:01 22   prescribing and opioid-related harms in the United States.

01:21:03 23   That was your statement in a prior report where the

01:21:07 24   manufacturers were the defendants; right?

01:21:09 25   A.  Again, I believe there were other defendants in this case,

HEATHER K. NEWMAN, RMR, CRR

—— Keyes (Cross by Delinsky) ——

01:21:12  1  but I -- that -- that is the finding in the literature,

01:21:16  2  relative to overall prescribing, pill mills are a small portion

01:21:20  3  of the supply of opioids.

01:21:22  4          MS. SULLIVAN:  Thank you, Doctor.  I have nothing

01:21:24  5  further.

01:21:27  6          THE COURT:  Okay.  Any -- any other defense counsel

01:21:30  7  wish to ask any questions?

01:21:38  8          MR. STOFFELMAYR:  Your Honor, could I have one second?

01:21:39  9          THE COURT:  Sure.

01:21:41  10      (Counsel conferring).

01:21:59  11          MR. DELINSKY:  May it please the Court, Your Honor, I

01:22:01  12  just have a few questions.

01:22:02  13          THE COURT:  Yes, Mr. Delinsky, for CVS.

01:22:02  14          CROSS-EXAMINATION OF KATHERINE M. KEYES, PhD

01:22:02  15  BY MR. DELINSKY:

01:22:15  16  Q.  Professor Keyes, my name is Eric Delinsky and I represent

01:22:18  17  CVS.  I just have a very small number of questions.

01:22:21  18          Do you recall when Mr. Stoffelmayr asked you

01:22:26  19  questions, and I'm sure I'll get the name wrong, regarding the

01:22:30  20  Muhuri study?

01:22:32  21  A.  Yes.

01:22:33  22  Q.  Okay.  And that was the study of individuals who engaged in

01:22:42  23  non-medical use of prescription opioids before using heroin;

01:22:47  24  correct?

01:22:48  25  A.  Yes.

———————Keyes (Cross by Delinsky)———————

01:22:55  1    Q.  And in that study the authors concluded that approximately

01:23:01  2    3.5 percent of the individuals who were the subject of the

01:23:07  3    study, who used prescription opioids non-medically, went on to

01:23:15  4    use heroin; correct?

01:23:17  5    A.  Yes.

01:23:19  6    Q.  So the --

01:23:20  7    A.  I'm sorry, went on to -- yes.  I think -- in general,

01:23:24  8    the -- it's about the initiation of heroin, not the prevalence

01:23:28  9    of heroin.

01:23:29 10    Q.  Correct.  But the 3.5 percent of individuals who used

01:23:37 11    prescription opioids that you testified about were all

01:23:42 12    individuals who used prescription opioids non-medically;

01:23:46 13    correct?

01:23:48 14    A.  Yes.

01:23:48 15    Q.  Okay.

01:23:51 16           MR. DELINSKY:  That's all I have.  Thank you very

01:23:53 17    much.

01:23:55 18           THE COURT:  Anything for Walmart?

01:23:58 19           MR. MAJORAS:  No, Your Honor.

01:23:59 20           THE COURT:  All right.  Thank you, Mr. Majoras.

01:24:01 21           All right.  Before we go to Mr. Lanier, if any of the

01:24:03 22    jurors have any questions for this witness, if you could

01:24:06 23    provide them to Mr. Pitts.

01:24:56 24       (Brief pause in proceedings).

01:24:56 25

Keyes (Redirect by Lanier)

<pre>
01:24:56   1        REDIRECT EXAMINATION OF KATHERINE M. KEYES, PhD
01:27:01   2   BY MR. LANIER:
01:27:01   3   Q.  Okay.  Dr. Keyes, we're going to see how this works.  My
01:27:05   4   voice works in a certain threshold of frequency.  The problem
01:27:09   5   is, in my heart I want to talk loud and bold, so I can't keep
01:27:12   6   it in that register.  But if this doesn't drive you crazy and
01:27:17   7   it doesn't bother the jury or His Honor too much -- I don't
01:27:22   8   care about them -- if it doesn't bother the jury and His Honor
01:27:25   9   too much, I'm going to try and make it through like this.
01:27:27  10   Okay?
01:27:28  11   A.  Okay.
01:27:28  12   Q.  And the good thing is the jury's -- if I talk down here I
01:27:31  13   do better -- the jury has written a bunch of these good
01:27:35  14   questions, and so I'm just going to put them on here and have
01:27:37  15   you read them into the record because they need to be read into
01:27:40  16   the record, and then you give the answer.  Okay?
01:27:42  17   A.  Okay.
01:27:43  18   Q.  Okay.  Here's the -- I don't have them in any order, it's
01:27:46  19   just the order that we got them.
01:27:48  20   A.  Okay.  I believe Dr. Keyes stated on Friday that sometimes
01:27:53  21   people switch from prescription opioids to heroin because it's
01:27:56  22   a more cost effective option.  In her research, have economic
01:27:59  23   trends in Lake/Trumbull Counties affected when prescription
01:28:06  24   opioids were used for non-medical use versus heroin use i.e.
01:28:10  25   times of higher unemployment versus lower unemployment?  If
</pre>

Keyes (Redirect by Lanier)

01:28:15  1    yes, are there any specific years that stood out that confirm

01:28:19  2    this relationship?

01:28:20  3            That's a phenomenal question, and I feel like that

01:28:25  4    would be a great study that we should do.

01:28:27  5            I can tell you certainly what we know about the

01:28:30  6    transition from prescription opioid use to heroin use.  The

01:28:34  7    studies that have been done have -- have -- certainly I don't

01:28:39  8    know of any studies that are specific to Lake and Trumbull

01:28:44  9    County in terms of the timing from when people switched from

01:28:47 10    prescription opioid use to heroin use.

01:28:48 11            What we do know is that the transition is more likely

01:28:50 12    to occur when the supply of prescription opioids becomes more

01:28:55 13    constricted as it does, for example, after the introduction of

01:29:00 14    prescription drug monitoring programs we saw an increase in

01:29:05 15    fatal heroin overdose, for example.

01:29:08 16            Actually, it's -- one of the reasons this is a great

01:29:11 17    question is because some have hypothesized that the increase in

01:29:15 18    heroin use that we saw in the U.S. as a whole really started

01:29:17 19    after the 2008/2009 recession that we saw in the United States

01:29:22 20    that really did affect millions of families economically, and

01:29:27 21    it was right around that time that we started to see the

01:29:30 22    increase in heroin use that we saw.  So that's correlation, not

01:29:34 23    causation, so I kind of place it as a hypothesis.  You know,

01:29:39 24    certainly the timing of it is -- coincides with more economic

01:29:46 25    factors restricting family income, but I don't know of a really

──────Keyes (Redirect by Lanier)──────

01:29:50  1   specific, clear study that's given a causal -- enough of a

01:29:57  2   causal link to make the conclusion at this point.

01:29:59  3   Q.   Thank you, Dr. Keyes.

01:30:00  4        If you could read the next one in the record and then

01:30:03  5   answer it, please.

01:30:04  6   A.   Sure.

01:30:05  7        We have heard a lot about medicine cabinet diversion.

01:30:10  8   Obviously, medicine cabinets don't have an endless supply.  Can

01:30:14  9   you please explain in your opinion how medicine cabinets are

01:30:17 10   part of the chain in opioid use disorder?

01:30:21 11        That's another great question, and I think the issue

01:30:29 12   of -- in terms of medicine cabinet supply, no one medicine

01:30:32 13   cabinet has an endless supply, but when we take the medicine

01:30:36 14   cabinet's diversion idea kind of at a population level, there

01:30:41 15   was an immense supply, you know, we had about 245 million

01:30:45 16   prescriptions per year for opioids written in the United

01:30:48 17   States, and enough opioids really to medicate really every

01:30:52 18   American.

01:30:52 19        And so because of that, and because 80 percent of the

01:30:54 20   pills went unused, there was just an extraordinary amount of

01:31:00 21   unused medication in people's homes that were not stored safely

01:31:03 22   and not disposed of safely.

01:31:06 23        So that medicine cabinet diversion is often how -- at

01:31:10 24   least, you know, for young people -- people start abusing

01:31:14 25   opioids typically in adolescence and young adulthood, and

———Keyes (Redirect by Lanier)———

01:31:18  1   that's where most young adults report getting their first

01:31:21  2   opioids is from home, from family or friends.

01:31:25  3          So that's -- that's where we see the first opioid use

01:31:29  4   happening and that's the predominant source for especially

01:31:33  5   kids, you know, adolescents/teenagers, when they're first

01:31:37  6   starting to abuse prescription medication.

01:31:39  7   Q.  So, in that regard, that dovetails with a question I was

01:31:43  8   going to ask you so I'm going to insert it here.

01:31:47  9          You talk about over -- the -- the lawyers for the

01:31:53 10   companies talked about oversupply issues and talked about your

01:31:56 11   report in that regard, and I found interesting this comment you

01:32:01 12   made on Page 14 of your report.  If you would elucidate, could

01:32:08 13   you first read what I've highlighted and then explain why this

01:32:11 14   is significant and why it dovetails from this?

01:32:15 15          MS. SULLIVAN:  Your Honor, this was Mr. Lanier's

01:32:16 16   objection to my use of the report.  I'm happy for him to use

01:32:17 17   it, but, you know, it's sort of inconsistent.

01:32:19 18          MR. LANIER:  No, this is --

01:32:20 19          THE COURT:  Overruled.  He can ask the question.

01:32:21 20          MR. LANIER:  Thank you.

01:32:24 21          THE WITNESS:  So, this is actually a quote from this

01:32:28 22   reference that we talked about earlier, the Schreiber study,

01:32:31 23   that has reviewed trends in opioid prescribing.  And before --

01:32:37 24   my paraphrasing of the study is that in 2017, there remained a

01:32:43 25   high level of opioid prescribing in the United States with over

———Keyes (Redirect by Lanier)———

01:32:48  1   191 million prescriptions dispensed, leading the authors,

01:32:52  2   that's the authors of this study here, to conclude that still

01:32:57  3   in 2017 -- and, again, this is after the peak of opioid

01:33:01  4   prescribing in 2010 -- but still in 2017, pharmacies filled

01:33:05  5   enough opioid prescriptions to theoretically provide every U.S.

01:33:09  6   resident with 5 milligrams of hydrocodone bar to trade every

01:33:19  7   4 hours around the clock for 3 weeks, which is an extraordinary

01:33:20  8   amount of opioids to just be in -- available kind of in the

01:33:25  9   supply for diversion.  There's no reason for that amount of

01:33:28  10  opioids to be -- you know, not every U.S. resident needs

01:33:36  11  Vicodin every 4 hours or 3 weeks all year round, you know.  So

01:33:40  12  that's just indicative of the vast oversupply.

01:33:43  13          And I think, if I can say, indicative of, you know,

01:33:47  14  when we're thinking about pill mills and doctor shoppers versus

01:33:52  15  this tidal wave of all of these opioid prescriptions, you know,

01:33:59  16  they're each contributing in their own way.  But the total

01:34:03  17  amount of prescriptions that are being dispensed by the

01:34:05  18  pharmacies is just extraordinary still.

01:34:07  19  Q.  All right.  Next sheet has two questions.  If you'd do them

01:34:10  20  one at a time so your answer doesn't get lost, please.

01:34:14  21  A.  Sure.

01:34:15  22          When was the Edlund study conducted?

01:34:20  23          I should double check.  I'm going to say 2009, but

01:34:25  24  let's see if I'm right -- 2014.  I think there was a different

01:34:31  25  Edlund study that was done in 2009.

---

Keyes (Redirect by Lanier)

01:34:35  1           And then the second question is:  Post-index patients

01:34:39  2   diagnosed with OUD, would they only be diagnosed after they had

01:34:43  3   stopped taking prescription opioids?

01:34:45  4           That's a great question.  No, not necessarily.  People

01:34:52  5   can still be prescribed opioids even with opioid use disorder.

01:34:56  6   Q.  Next.

01:34:59  7   A.  Is it true that the amount of opioids -- I think that's

01:35:04  8   produced -- is driven by demand, so it's a game of supply and

01:35:10  9   demand?

01:35:13  10          That's a great question.  These are -- these are much

01:35:15  11  harder questions than I received from the lawyers, but --

01:35:20  12  Q.  Watch it.  Watch it.

01:35:21  13  A.  Sorry.

01:35:23  14  Q.  Watch it.

01:35:23  15  A.  Actually, in the paper, the annual review's a public health

01:35:27  16  paper that we talked about earlier, and I can -- I can pull it

01:35:29  17  up.  That's exactly how we described the causes of the opioid

01:35:33  18  epidemic, as a functioning of supply factors and demand

01:35:39  19  factors.  So what are the demand factors?

01:35:41  20          Certainly one demand factor is people who are -- need

01:35:47  21  end-of-life pain management, need, you know, other kind -- have

01:35:51  22  acute reasons, you know, major surgeries for which opioids are

01:35:56  23  indicated.  That's one demand factor.  But that hasn't really

01:36:01  24  changed over time, right, the prevalence of those demand

01:36:04  25  factors.

---

———Keyes (Redirect by Lanier)———

01:36:05  1         Other demand factors include all the kinds of, you

01:36:08  2   know, vulnerabilities that we talked about earlier, people who

01:36:11  3   have underlying vulnerability to addiction, whether that's due

01:36:14  4   to genetic factors, environmental factors, traumatic events

01:36:19  5   that people experienced in their lives, all of those increase

01:36:22  6   the risk that someone will develop an opioid use disorder or

01:36:25  7   have an increased demand for opioids.

01:36:29  8         That is coupled with this big push on the supply side,

01:36:34  9   part of it being manufacturers who want to increase the sale of

01:36:37 10   opioids and other supply-level factors that I document in that

01:36:42 11   study.  Both of which were kind of going back and forth.  You

01:36:47 12   know, the demand is pushing the supply and the supply then is

01:36:50 13   creating new demand when opioid prescriptions go up so much

01:36:54 14   that a lot of people are using opioids, a portion of them

01:36:57 15   develop opioid use disorder, that, then, is what we call kind

01:37:00 16   of a reinforcing effect of, then, demand is driving supply and

01:37:04 17   vice versa.

01:37:06 18   Q.   Okay.

01:37:09 19   A.   And so then what is the average length of time that a

01:37:12 20   person is on pain medication, opioids?

01:37:16 21         So to answer that question I'll go back to this study,

01:37:21 22   the Schreiber study that we talked about earlier, that it's

01:37:23 23   changed over time, but in the most recent data published here

01:37:28 24   in 2017, the mean duration of any single opioid prescription

01:37:35 25   was about 16 days.

Keyes (Redirect by Lanier)

01:37:38 1          And if I could just expand on why that's important to

01:37:41 2  some of my opinions.

01:37:41 3  Q.  It's supposed to be Q and A, so I'll say, why is that

01:37:45 4  important?  Expand.

01:37:47 5  A.  I can -- I tend to get professorial.

01:37:51 6  Q.  Go all professor on us, save my voice.  Expand.

01:37:55 7  A.  Okay.  So why the 16 days is important exactly relates to

01:37:59 8  the Edlund study, the 2014 Edlund study, because we know that

01:38:04 9  these short -- the short duration opioid prescriptions,

01:38:08 10 14 days, for example, it increases the risk that someone

01:38:12 11 develops opioid use disorder, but not as much as 90-day or more

01:38:16 12 prescriptions.

01:38:16 13         But because so many prescriptions are written for that

01:38:19 14 short duration, it means that even though the risk is small, it

01:38:24 15 translates into a big public health issue, because if you've

01:38:28 16 got a small risk -- and in the Edlund study, it increases your

01:38:33 17 risk three times, having a prescription that's on average

01:38:36 18 14 days, about three times as many people will develop opioid

01:38:40 19 use disorder than people who never are prescribed opioids,

01:38:44 20 that's in comparison to 122 times for people taking opioids for

01:38:48 21 more than 90 days at a high dose.  But most people are getting

01:38:51 22 the shorter duration opioid prescriptions.  But because so many

01:38:55 23 people are getting it, that means that you have a whole lot of

01:38:59 24 people who develop opioid use disorder from opioid

01:39:02 25 prescriptions.

Keyes (Redirect by Lanier)

01:39:03  1          So it's kind of this trade-off between risk and

01:39:07  2  prevalence.  You can have a risk that is small, but if the

01:39:10  3  prevalence is big, it contributes to public health.  Or you can

01:39:14  4  have a risk that is big and if the prevalence is small, like

01:39:19  5  high dose opioid prescriptions, it contributes to a public

01:39:21  6  health problem.  So we kind of have both of those with the

01:39:25  7  prescription opioid crisis.

01:39:27  8  Q.  Thank you.

01:39:30  9          Next question.

01:39:32 10  A.  In regards to take-back program that pharmacies do versus

01:39:36 11  the liquid or powder that destroys the activation in the

01:39:40 12  medication, how are those destroyed?

01:39:43 13          I actually don't know the answer to that question, how

01:39:47 14  medications, once you -- once they're given to -- back to the

01:39:52 15  pharmacy, how the pharmacy then safely disposes of them.  I

01:39:55 16  assume they have methods for that, but I actually -- I don't

01:39:57 17  know.  That's a really good question.

01:39:59 18  Q.  There's got to be a law that says they can't just like

01:40:02 19  reuse them or something; right?

01:40:03 20  A.  Yeah.  I don't think they can reuse them.

01:40:06 21  Q.  I mean, it's like returning your food to the restaurant,

01:40:09 22  they're not going to bring the breadbasket back out for the

01:40:13 23  next table.

01:40:14 24  A.  No.  But it's actually a good question.  I don't know

01:40:17 25  how -- that's a great question.

Keyes (Redirect by Lanier)

01:40:18  1  Q.  Yeah.

01:40:18  2  A.  Given the data that you looked at, was life expectancy

01:40:26  3  affected all [sic] in Lake and Trumbull Counties.

01:40:31  4      This is a great question.  I have -- certainly life

01:40:33  5  expectancy was affected in Lake and Trumbull County.  There's

01:40:37  6  no doubt.  Opioid overdoses claim lives relatively early in the

01:40:42  7  life course in terms of premature mortality, and that's what

01:40:45  8  has the biggest impact on life expectancy is causes of death

01:40:49  9  that prematurely take life at a younger age.  And because of

01:40:52  10  the increase we saw in overdose, that would have certainly

01:40:58  11  substantial impact on life expectancy.

01:41:00  12      We do know nationally that because of the drug

01:41:04  13  overdose crisis, we had, in the United States, the first -- we

01:41:09  14  had every single year gains in life expectancy for Americans

01:41:12  15  for basically the entirety of the 20th century really in --

01:41:18  16  especially after 1950.

01:41:20  17      We are now seeing reversals where life expectancy is

01:41:23  18  going down for Americans for the first time in a hundred years,

01:41:28  19  and that's almost wholly attributable to drug overdose.

01:41:36  20  Q.  Last two questions from the jurors.

01:41:41  21  A.  How many people develop opioid use disorder each year?

01:41:45  22      That's a great question, and I'll just say one for

01:41:49  23  which epidemiologists -- and we have entire meetings with how

01:41:57  24  many people develop opioid use disorders every year, and it's a

01:42:00  25  complicated question because we don't have a registry system,

—Keyes (Redirect by Lanier)—

01:42:03  1    right, we have to estimate this.  It's not like we know when

01:42:06  2    someone develops opioid use disorders, we have to come up with

01:42:10  3    ways to count the number of people with opioid use disorder in

01:42:13  4    the United States.  And various people have various ways of

01:42:17  5    counting how many people develop opioid use disorder in the

01:42:20  6    United States.  I would say that my opinion, based on my review

01:42:26  7    of the evidence, is that on average in a given year about 4 to

01:42:32  8    5 million people in the U.S. have opioid use disorder, and the

01:42:35  9    number of new -- the number of those opioid use disorder cases

01:42:39  10   that would be new cases of opioid use disorder that just

01:42:42  11   started that year, I actually don't know of a method that's

01:42:47  12   tried to estimate just the number of new cases, but in any

01:42:51  13   given year, you're -- we're -- we think there's about 4 to 5

01:42:55  14   million people with opioid use disorder.

01:42:58  15   Q.  All right.  Last question.

01:43:00  16   A.  How many people in Trumbull and Lake County develop opioid

01:43:06  17   use disorder each year?

01:43:07  18          So that is a good question.  Again, focusing on

01:43:11  19   prevalence because that's where I feel most comfortable with

01:43:14  20   the data we have, I actually estimated that in my report, and I

01:43:18  21   estimated that the prevalence of opioid use disorder in

01:43:24  22   Lake County -- well, the number of people in 2019 with opioid

01:43:28  23   use disorder that I estimated in Lake County was about 6,000.

01:43:34  24   About 6,000 people with opioid use disorder in Lake County, and

01:43:38  25   about 7,500 people in Trumbull County.  And that, given the

─────Keyes (Redirect by Lanier)─────

01:43:44　1　population size of Lake and Trumbull, is going to translate

01:43:49　2　into about 3 to 4 percent of the population of Lake and

01:43:54　3　Trumbull County who have opioid use disorder.  And that's

01:43:56　4　fairly slightly higher, but fairly consistent with the U.S. as

01:43:59　5　a whole, but we have -- about -- estimate about 3 to 4 percent.

01:44:03　6　　　　Now, I also estimate in the report the proportion of

01:44:06　7　those people who developed opioid use disorder, or I should

01:44:11　8　say -- well, what I estimate in the report was the number of

01:44:13　9　people who use heroin in the counties after first using

01:44:19　10　prescription opioids, and that is about -- in Ohio -- let's

01:44:23　11　see, actually, let me take that back.  I only did it for Ohio

01:44:26　12　as a whole because I only had data for Ohio as a whole in order

01:44:29　13　to estimate the heroin initiation.  But I estimate that about

01:44:34　14　36,000 people in Ohio developed heroin use after having used

01:44:41　15　prescription opioids.  And so if we scale that down to the

01:44:43　16　proportion of people who live in Ohio who are in Lake and

01:44:49　17　Trumbull County, you know, it's quite a substantial proportion

01:44:51　18　of the people with opioid use disorder.

01:44:53　19　Q.  All right.  With that, I'll commence my redirect.

01:44:58　20　　　　I did a road map.  I want to talk to about causes, the

01:45:04　21　questions from all of the counsel I've just combined them

01:45:06　22　together for cause questions.  Okay?

01:45:09　23　A.  Okay.

01:45:09　24　Q.  Then we're going to talk about opioid harms, and then I'll

01:45:14　25　save those exciting, exhilarating papers for the end.  Okay?

Keyes (Redirect by Lanier)

01:45:21  1          Let's start with causes.  And I've got the questions

01:45:26  2   that I was writing out at counsel table last Friday as well as

01:45:30  3   the ones I've written out today, so we got to go back in time

01:45:35  4   for some of this.  Okay?

01:45:37  5          First one from today, manufacturers, you said, are at

01:45:44  6   the start of the pump.  Then you talked about how the FDA and

01:45:49  7   others turned the pump down.

01:45:51  8   A.  They could have.

01:45:51  9   Q.  Could have.  Failed to.

01:45:55  10          Question:  The pharmacies have been called by people

01:46:00  11  inside pharma as well as the government the last line of

01:46:04  12  defense.  How does that integrate with your pump analogy?

01:46:12  13  A.  Yes.  I think that that's absolutely right.  Certainly the

01:46:15  14  pharmacies would be part who could turn off the pump exactly

01:46:24  15  right.  At the end of the pump where the spout is there, there

01:46:27  16  is that potential to reduce the harm associated with opioid

01:46:30  17  use, and in my opinion the pharmacies did not do that.

01:46:37  18  Q.  Next, Mr. Stoffelmayr today was quizzing you on a healthy

01:46:40  19  lifestyle and green, leafy veggies.

01:46:44  20          Remember that?

01:46:44  21  A.  I do.

01:46:53  22  Q.  Is there one cause to the opioid crisis and only one?

01:46:55  23  A.  No.

01:46:55  24  Q.  Is there one cause or many causes to good health?

01:46:59  25  A.  There are many causes of good health.

─────Keyes (Redirect by Lanier)─────

01:47:04  1          MR. LANIER:  Your Honor, may I step out from the

01:47:06  2   podium for a moment?

01:47:07  3          THE COURT:  Sure.

01:47:12  4   BY MR. LANIER:

01:47:13  5   Q.  Okay.  See this suit?

01:47:13  6   A.  I do.

01:47:14  7   Q.  When I started this trial, it buttoned.  Do I blame that on

01:47:23  8   one chocolate chip cookie or you think there may have been more

01:47:27  9   causes to this than one chocolate chip cookie?

01:47:31 10   A.  I think there may have been a few chocolate chip cookies.

01:47:35 11   Q.  Is it fair when you're looking at something that's

01:47:38 12   complicated to blame it all on one thing if there are other

01:47:41 13   factors that are also significant contributing factors?

01:47:44 14   A.  Well, in fact, that's what the book, Epidemiology Matters

01:47:48 15   is about, is basically how epidemiology is a discipline -- our

01:47:53 16   discipline was founded on that very idea, that causes of many

01:47:56 17   chronic health out comes are what we call multifactorial, just

01:48:01 18   meaning, like, that there's more than one thing that causes

01:48:04 19   heart disease, that causes cancer.  It's not one thing that you

01:48:08 20   did, it's an interaction.  You might have a family history of a

01:48:11 21   particular, you know, heart disease or cancer or any kind of

01:48:14 22   chronic health outcome and that's then going to interact with

01:48:18 23   your diet, your exercise, the networks that you're exposed to,

01:48:24 24   where you live, what pollution you're exposed to.  All of those

01:48:28 25   things are going to interact, and it's going to cause your

Keyes (Redirect by Lanier)

01:48:30  1  heart disease, or someone's heart disease, hopefully not anyone

01:48:34  2  in this room, at the particular time it occurs.  That's what

01:48:38  3  all of our epidemiological methods are designed to tease apart

01:48:41  4  is how do we figure out when something is causing it, when and

01:48:45  5  how it happened.

01:48:46  6  Q.  And so from an epidemiological standpoint, can you explain

01:48:50  7  the difference between something being a cause, or being the

01:48:56  8  only cause?

01:48:56  9  A.  Yes.  We tend to think -- the definition of cause in

01:49:04  10  epidemiology is something without which the outcome would not

01:49:06  11  have occurred when and how it did.  So if you slip and fall on

01:49:11  12  the sidewalk, for example, there's a bunch of things that

01:49:13  13  probably caused it.  Maybe the sidewalk was icy.  Maybe you

01:49:17  14  were wearing your, like, fancy shoes that don't have good

01:49:20  15  traction on them; right?  Maybe you didn't get good sleep the

01:49:24  16  night before so you were kind of distracted.

01:49:26  17       And so when we talk in epidemiology about a cause,

01:49:29  18  you're saying you would not have fallen on the ice -- you would

01:49:33  19  not have fallen on the sidewalk if it wasn't icy, if you were

01:49:37  20  wearing better shoes or if you were concentrating more.  All of

01:49:39  21  those three things are causes of your fall.  And so we apply

01:49:42  22  that same logic to even major events like the opioid crisis.

01:49:48  23  Would the opioid crisis have occurred when and how it did if

01:49:52  24  not for the action of the pharmacies, the action of the

01:49:59  25  manufacturers, the -- the heroin markets, you know, all of the

HEATHER K. NEWMAN, RMR, CRR

─────Keyes (Redirect by Lanier)─────

01:50:03  1   things that we talked about earlier?  We would say those are

01:50:06  2   all causes because without those various factors, the turns on

01:50:10  3   of the pump, the turning off of the pump, we would not have had

01:50:13  4   the crisis that we had.

01:50:14  5   Q.  My next question was so much more brilliant Friday when I

01:50:18  6   wrote it out.  Let's go now.  The Cleveland Browns won Thursday

01:50:24  7   night.

01:50:25  8   A.  Okay.

01:50:26  9   Q.  What was the cause?  Because it Case Keenum stepping in for

01:50:33  10  Mayfield and going 21 for 33 with a touchdown?  Was it D'Ernest

01:50:38  11  Johnson's 22 carries for 146 yards?  Johnny Stanton's TD

01:50:43  12  reception?  Was it that stifling defense?  Was it the offensive

01:50:47  13  line that protected Case Keenum?  Was it the fans and the

01:50:49  14  community support that were ra-ra'ing and wearing the shirts?

01:50:53  15  Was it the coach?

01:50:54  16      How do you say there's one cause?

01:50:57  17  A.  Can I tell you something, actually?  I'm in a fantasy

01:51:00  18  football league with other epidemiologists and they're so into

01:51:06  19  this.  I mean, they are so into this question, we have like a

01:51:10  20  group chat going, and I don't understand.  You know, I don't

01:51:14  21  really follow -- I did my fantasy draft.  My team is not doing

01:51:17  22  well.  But these people, I mean, they analyze all of those

01:51:22  23  factors, you know, like they're do statistical analyses every

01:51:26  24  single week to win at epidemiologist fantasy football.  So I'm

01:51:32  25  sure if you need an expert in that area, I can recommend

Keyes (Redirect by Lanier)

01:51:34  1   someone.

01:51:34  2   Q.  Okay.  And you have never told me that before.  This was

01:51:37  3   not a planted question.  Is that fair?

01:51:38  4   A.  No.  Every single week I just have, like, shame because my

01:51:42  5   team doesn't do well, but. . .

01:51:43  6   Q.  Well, maybe they're on opioids.

01:51:45  7   A.  I don't know.

01:51:50  8   Q.  Okay.  You got asked questions about a prior expert report

01:51:54  9   that you did by Ms. Sullivan just now.

01:51:56  10          Do you remember those questions?

01:51:58  11  A.  Yes.

01:51:58  12  Q.  And as I'm looking at it, was that when you were working

01:52:01  13  for the fine folks of Summit and Cuyahoga County, is that what

01:52:06  14  that case was?

01:52:08  15  A.  Yes.

01:52:08  16  Q.  And today you're here on behalf of the fine folks of Lake

01:52:13  17  and Trumbull County?

01:52:13  18  A.  That's right.

01:52:13  19  Q.  Okay.  Next question.  Heroin use and risk factors.

01:52:24  20          Is prescription opioid addiction a risk factor for

01:52:29  21  heroin use?

01:52:31  22  A.  Yes.

01:52:39  23  Q.  Is it a significant one?

01:52:41  24  A.  Of all the risk factors that we study for heroin use,

01:52:43  25  prescription opioid use is the strongest risk factor.

Keyes (Redirect by Lanier)

01:52:50  1   Q.  And what does that mean, it's the strongest?

01:52:52  2   A.  It's the -- it's the highest magnitude.  So as we're

01:52:56  3   talking about risk factors and these interactions, so things

01:53:00  4   like using marijuana, that's a risk factor for using other

01:53:03  5   drugs, including heroin use, right?  We talked earlier about

01:53:07  6   the Muhuri study, and many people who use heroin have also in

01:53:12  7   the past have also used marijuana.  But the probability that

01:53:15  8   you'll go on to use heroin given that you've marijuana is much

01:53:21  9   smaller than the probability that you'll go on to use heroin if

01:53:24 10   you use prescription opioids.

01:53:25 11   Q.  You testified doctor shoppers have contributed to the

01:53:29 12   burden.

01:53:30 13   A.  Yes.

01:53:30 14   Q.  Do you remember that?

01:53:33 15       Does that make pharmacy data important?

01:53:36 16   A.  Pharmacy data is incredibly important.

01:53:38 17   Q.  Why?

01:53:41 18   A.  So that we can identify people who are at risk for

01:53:46 19   developing opioid use disorder based on being prescribed

01:53:50 20   opioids.

01:53:50 21   Q.  And if the pharmacist has an ability, if provided the right

01:53:58 22   tools, has an ability to determine oftentimes when -- whether

01:54:01 23   there's a doctor shopper, is there a difference between

01:54:05 24   enabling and not enabling?

01:54:10 25       MR. STOFFELMAYR:  Judge, I'm going to object.  I think

────Keyes (Redirect by Lanier)────

01:54:12 1   this goes beyond her expertise.

01:54:14 2          MR. LANIER:  Yeah, judge, it's a bad question anyway.

01:54:16 3   I'll withdraw it.

01:54:16 4          THE COURT:  All right.  Question is withdrawn.  The

01:54:18 5   jury is to disregard it.

01:54:19 6          MR. LANIER:  I didn't say it right.

01:54:34 7   BY MR. LANIER:

01:54:34 8   Q.  A lot of these you've answered from the jury so I'm

01:54:36 9   flipping through them.

01:54:40 10         Okay.  You got asked a lot about the numbers of

01:54:45 11  overdose deaths.

01:54:46 12         Do you remember those questions?

01:54:47 13  A.  Yes.

01:54:48 14  Q.  And I know you deal with statistics, but you got your start

01:54:51 15  dealing with people.

01:54:53 16  A.  I got -- sorry.  Say that again.

01:54:55 17  Q.  You got your start in this by dealing with people.

01:54:58 18  A.  Yes.

01:54:59 19  Q.  All of those numbers that are just thrown up here on charts

01:55:02 20  and graphs?

01:55:04 21  A.  Those are people.

01:55:05 22  Q.  Every one of them?

01:55:06 23  A.  Yes.  And in my opinion and the opinion -- the consensus of

01:55:11 24  my field is that every overdose death is preventable.

01:55:18 25  Q.  You were asked this question, supply of prescription

─────Keyes (Redirect by Lanier)─────

01:55:22  1   opioids can come from a variety of sources.  You answered,

01:55:26  2   sure.  After, I could see your thought, sure.  Explain your

01:55:32  3   answer, please.

01:55:34  4   A.   The supply of prescription opioids -- I mean, I believe the

01:55:40  5   context in which I was answering that question was questions

01:55:43  6   about where people obtain prescription opioids to use

01:55:47  7   non-medically.  Many people get them from family and friends.

01:55:50  8   Many people obtain them via a prescription from a doctor.  You

01:55:55  9   know, there is many different ways that someone can obtain a

01:55:57  10  prescription opioids, and that includes illicit sources, you

01:56:01  11  know, buying them from a drug dealer, for example, is one way

01:56:04  12  people can obtain prescription opioids.  So certainly there is

01:56:07  13  a variety sources.  The modal source being obtaining a

01:56:10  14  prescription from a doctor that's filled at a pharmacy.

01:56:25  15  Q.   All right.  Let's move down the road.  Opioid harms.  Short

01:56:31  16  stop, but you said every overdose death is preventable.  You

01:56:35  17  just referenced that again.

01:56:37  18          Can you explain why?

01:56:44  19  A.   In the field of public health, that's really kind of what

01:56:48  20  our focus is.  There's no reason for people to overdose on

01:56:51  21  prescription opioids or heroin or any other type of opioid.  We

01:56:55  22  know there's this relationship between dose and duration of use

01:56:58  23  with overdose, and because overdose takes people at such a

01:57:02  24  young age, what we do in public health is try to advocate for

01:57:09  25  policies and control measures that ensure that no one dies of

HEATHER K. NEWMAN, RMR, CRR

───Keyes (Redirect by Lanier)───

01:57:13  1   an overdose.  You know, it's simply unnecessary for us to have

01:57:17  2   and maintain that level of mortality in the U.S. that it's

01:57:21  3   literally affecting our nation's life expectancy.

01:57:25  4           There are a number of different ways to prevent

01:57:28  5   overdose, and we divide them into three different buckets:

01:57:32  6   primary prevention, secondary prevention, tertiary prevention.

01:57:37  7   And I would place a lot of factors we've been talking about

01:57:39  8   today in terms of the pump, in terms of primary prevention.

01:57:45  9   Someone won't die of an overdose if they're not given a

01:57:48 10   prescription opioid.  If they're not introduced to opioids,

01:57:51 11   they will never die of an opioid overdose.  And so we really

01:57:55 12   try to focus on primary prevention, ensuring that people aren't

01:57:59 13   using prescription opioids unnecessarily and developing opioid

01:58:03 14   use disorder unnecessarily as one way to prevent an eventual

01:58:08 15   overdose.

01:58:10 16           I can go through secondary and tertiary prevention

01:58:13 17   too, if you'd like.

01:58:14 18   Q.  I was going to ask you, so tell me where to put this,

01:58:21 19   pharmacies not doing their corresponding responsibility when

01:58:28 20   they dispense opioids, where would you put that in terms of

01:58:31 21   prevention?

01:58:33 22           MR. STOFFELMAYR:  Judge, I'm going to object to that.

01:58:34 23   Lack of foundation.

01:58:41 24           MR. LANIER:  I can ask it differently.

01:58:42 25           THE COURT:  Let's rephrase that.

HEATHER K. NEWMAN, RMR, CRR

──Keyes (Redirect by Lanier)──

01:58:43  1          MR. LANIER:  Yeah.

01:58:51  2   BY MR. LANIER:

01:58:51  3   Q.  If the determination is made that pharmacies are failing in

01:58:56  4   their corresponding responsibilities to inhibit the flow of

01:59:06  5   these prescription opioids on to the public thoroughfare, does

01:59:14  6   that fit into one of your buckets of prevention, and if so,

01:59:17  7   where?

01:59:18  8          MR. STOFFELMAYR:  Objection.  Same objection.

01:59:19  9          THE COURT:  Overruled.

01:59:21 10          THE WITNESS:  I would say it falls into two of the

01:59:25 11   buckets.  Certainly primary prevention, you know, because if

01:59:30 12   someone doesn't receive an opioid, they can't overdose on it.

01:59:35 13          And secondary prevention is also really critically

01:59:39 14   important in public health.  And secondary prevention is

01:59:44 15   really, you know, kind of preventing people with opioid

01:59:47 16   disorder, opioid use disorder or addiction, from having

01:59:51 17   consequences of that condition.

01:59:54 18          So, for example, if you have someone who's doctor

01:59:57 19   shopping in order to obtain enough opioids to maintain an

02:00:00 20   addiction, that would be -- and we prevented that person from

02:00:03 21   obtaining opioids, that would be secondary prevention.  It's

02:00:07 22   not primary because the person already has opioid use disorder,

02:00:09 23   but now we're focused on preventing them from overdosing now

02:00:15 24   that they have opioid use disorder.  So preventing people who

02:00:18 25   have opioid use disorder from using more opioids or encouraging

Keyes (Redirect by Lanier)

02:00:21  1    them to seek recovery services, for example, with the use of

02:00:24  2    medications for opioid use disorder, that would fall under the

02:00:27  3    bucket of secondary prevention.

02:00:34  4    Q.  Have you in your reports where you represent different

02:00:37  5    groups of people, have you had reason to study the

02:00:43  6    distributors, those companies that are distributing from, say,

02:00:46  7    the manufacturers to the pharmacies?

02:00:49  8    A.  Yes.

02:00:51  9    Q.  The jury has heard evidence that all of these defendants

02:00:54 10    here were at some time or another distributors to themselves.

02:01:00 11         Are you able to put distributors who may not be

02:01:03 12    adequately monitoring suspicious orders, can you put them into

02:01:07 13    one of your three buckets, and if so, where?

02:01:13 14         MR. MAJORAS:  Objection.  Scope.

02:01:14 15         THE COURT:  Overruled.

02:01:15 16         THE WITNESS:  I would also put distributors into

02:01:18 17    primary and secondary prevention.

02:01:26 18    BY MR. LANIER:

02:01:27 19    Q.  Okay.  I'm not hitting anything in the tertiary prevention

02:01:33 20    bucket.

02:01:33 21    A.  Yeah.  I'm thinking about that.  I mean, so tertiary

02:01:36 22    prevention is usually kind of when an overdose is occurring,

02:01:40 23    how can we stop that overdose from causing someone to die, for

02:01:43 24    example.  So the use of naloxone.  That's why I'm thinking,

02:01:47 25    well, actually, distributors probably fall into every single

Keyes (Redirect by Lanier)

02:01:49  1   bucket, as well as pharmacies, because if there's overdose

02:01:52  2   prevention efforts -- you know, so, emergency services will

02:01:55  3   also be tertiary prevention, you know, how quickly can an

02:01:58  4   emergency service get to someone who's experiencing an overdose

02:02:02  5   in order to treat that person, for example.

02:02:04  6   Q.  All right.

02:02:04  7   A.  But also medications like Narcan would fall under tertiary

02:02:10  8   prevention.  So in that sense, the pharmacies and the

02:02:14  9   distributors would be involved in tertiary prevention as well.

02:02:16 10   Q.  Okay.  Let's move down the road and let's talk about these

02:02:19 11   papers.  I've tried to use each paper that was brought to you,

02:02:27 12   but my questions are pretty simple.

02:02:32 13        The Vowles paper that you were shown last Friday, it

02:02:40 14   was WAG-DEMO14, is it consistent with your opinions in this

02:02:46 15   case?

02:02:46 16   A.  Yes.

02:02:46 17   Q.  Did anything about that change anything you've said?

02:02:50 18   A.  No.  I cite the Vowles paper quite a bit in my -- in my

02:02:57 19   report.

02:02:57 20   Q.  The Edlund study of 2014, was WAG -- Walgreens

02:03:11 21   demonstrative 7, does it change any of your opinions?

02:03:13 22   A.  No.  I think it's a really key study when we're trying to

02:03:16 23   understand risk.

02:03:18 24   Q.  Did you know about the paper before it was shown to you?

02:03:21 25   A.  Yes.

—Keyes (Redirect by Lanier)—

02:03:26  1    Q.  Tell us about it.  Why is it important?

02:03:29  2    A.  There's a couple things about the Edlund study that make it

02:03:33  3    a really useful study, again, kind of thinking about causation

02:03:36  4    and how we can't ever rely on any one study to prove causation

02:03:41  5    typically.  We have to rely on a bunch of studies.  But Edlund

02:03:45  6    checks a lot of boxes.

02:03:47  7         For one, one thing that I think that study did really

02:03:50  8    well, and because it had a large sample size it could really do

02:03:53  9    this well, is examine dose and duration of use.  Some of the

02:03:58  10   studies that were cited in Vowles, for example, looked at, you

02:04:02  11   know, kind of use of prescription opioid, yes, no.  And that's

02:04:07  12   helpful in that we can kind of establish overall risk patterns,

02:04:11  13   but when we know there's this dose and duration pattern, having

02:04:14  14   data that really separates out dose and duration and associate

02:04:19  15   with opioid use disorder is really helpful.

02:04:21  16        The other thing I think the Edlund study does very

02:04:25  17   well is that issue of temporality.  So in the Edlund study they

02:04:30  18   ensured that everyone who was starting the study didn't have a

02:04:32  19   history of opioid use disorder.  So among those with no history

02:04:37  20   of opioid use disorder, how is the dose and duration of opioids

02:04:41  21   that were prescribed to them associated with the development of

02:04:44  22   addiction.  And what we find is that, really, any level of

02:04:49  23   prescription opioid use is associated with an increase in risk

02:04:53  24   from the lowest level, short duration prescription, for a low

02:04:59  25   MME, it's associated with about three times the risk, up to

————Keyes (Redirect by Lanier)————

02:05:03  1    more than 90-day prescription, very high level of MME

02:05:07  2    associated with 122 times the risk.

02:05:11  3           But I just want to say that the reason that I wouldn't

02:05:14  4    say you only need Edlund, that's the only study you need is A,

02:05:21  5    because one study is never enough to prove causation, and two,

02:05:24  6    because the Vowles' review, for example, which doesn't -- it

02:05:28  7    doesn't rule out people with a prior history of opioid use

02:05:31  8    disorder is actually very telling, because the prevalence of

02:05:36  9    opioid use disorder in Vowles is high, and these are all people

02:05:41 10    using prescribed opioids, which means that the opioids that

02:05:43 11    they're using are either causing them to be addicted or

02:05:48 12    maintaining their addictions in the long-term.  And both of

02:05:50 13    those are high contributors to morbidity and mortality.

02:05:55 14    Q.  I looked at the section in the Edlund paper that dealt with

02:05:59 15    limitations, and one of the limitations -- limitations that I

02:06:04 16    found interesting was the ninth one they list, our data were

02:06:12 17    from 2000 to 2005 and much may have changed in the opioid

02:06:17 18    prescribing environment since then.

02:06:19 19           Are there limitations to Edlund as well?

02:06:23 20    A.  Yes, although I would say the biggest limitation of the

02:06:28 21    Edlund study is that it probably underestimates opioid use

02:06:32 22    disorder quite a lot because they're relying on the clinician

02:06:35 23    to code opioid use disorder in someone's chart.  They're not

02:06:37 24    interviewing every single person about their symptoms of opioid

02:06:40 25    use disorder.  And we know in medical charts that doctors can

———Keyes (Redirect by Lanier)———

02:06:45  1   miss opioid use disorder, and, so, to me, that is the biggest

02:06:49  2   reason why we need additional studies, is I think the Edlund

02:06:53  3   study probably really underestimates the risks.

02:06:55  4   Q.   Okay.   Thank you.

02:06:57  5        Next, you were asked about the Schreiber article, and

02:07:02  6   that was Defendants' 06077.

02:07:10  7        Do you remember this?

02:07:10  8   A.   Yes.

02:07:10  9   Q.   All right.  Does this change your opinions and why or why

02:07:15  10  not?

02:07:17  11  A.   No.  None of the questions changed my opinions.  I

02:07:23  12  definitely rely on the Schreiber article in my report,

02:07:25  13  particularly because it has this really nice supplement with

02:07:29  14  the state data, and so I can get really granular estimates for

02:07:32  15  each state, which you can't do in a lot of studies.

02:07:40  16  Q.   That was the one where you pointed out to Mr. Stoffelmayr,

02:07:42  17  do you have the supplement?

02:07:43  18  A.   Right.

02:07:44  19  Q.   Next.  The Maughan study, this was the dental study.

02:07:58  20        You remember that, Walgreens Number 11?

02:08:00  21  A.   Yes.

02:08:01  22  Q.   So does this change anything you've said in any of your

02:08:06  23  testimony?

02:08:07  24  A.   No.  Again, that's a study that I use in my report, that I

02:08:11  25  cite in my report.

─────Keyes (Redirect by Lanier)─────

02:08:12  1   Q.   Okay.  Next, the court reporter does an incredible job, as

02:08:21  2   her two predecessors have, of typing up everything you say and

02:08:25  3   it appears on a monitor right in front of us.  But I wonder if

02:08:28  4   something may have gotten lost because of the sound system in

02:08:31  5   here, so I wrote down what was typed up, but we've got to have

02:08:33  6   a pristine record.  And so I want to make sure that she's got

02:08:38  7   this right, and if not that we fix it.  Okay?

02:08:40  8   A.   Okay.

02:08:40  9   Q.   She typed up, you saying, I think you could make a case

02:08:46  10  that the prescribing wasn't inappropriate given that none of

02:08:50  11  the pills were used.

02:08:54  12  A.   Right, that should be was inappropriate.

02:08:55  13  Q.   Okay.  Yeah.  The way you said wasn't inappropriate?

02:09:00  14  A.   I probably tripped over my words.  I apologize.

02:09:03  15  Q.   Well, just -- the NT and the N there, she's got to do her

02:09:08  16  best, but -- okay.  So, for clarity sake, for the record, what

02:09:13  17  should that say?

02:09:15  18  A.   I think you could make a case that the prescribing was

02:09:18  19  inappropriate given that none of the pills were used.

02:09:22  20  Q.   Okay.  Now, can you explain what you were talking about

02:09:24  21  when you said that, please?  I think it may have been a

02:09:29  22  reference to Walgreens demonstrative 8, the Hill article, and

02:09:37  23  if I've got it right, it may have been a reference to --

02:09:41  24  A.   Yeah.  If you could pull up the table.

02:09:43  25  Q.   The table, opioid pills taken?

—Keyes (Redirect by Lanier)—

A.  Right.

Q.  Table 2.  Could you explain, please, what you meant?

A.  So, basically, in the study, if -- across the five conditions for which opioids were most commonly prescribed, if you look at the last column, among the pills prescribed they examined the actual pills that were used, and 71 percent of the pills that were prescribed for these five very common procedures were not used.  So my opinion is that that 71 percent of pills at least should not have been prescribed. They clearly weren't medically necessary in order to control pain because if they were, they would have been used.

Q.  Okay.  Thank you.

        Next, the Muhuri paper, and the DSM-IV criteria.  This is kind of a general question for epidemiology anyway.  And how important is it to use a proper population for sampling?

A.  It's critical.  I mean, if you're going to try to make recommendations to a target population, for example, Lake and Trumbull County, you want to make sure that the data you're using are generalizable to those areas.  And if you're trying to make recommendations to the U.S. as a whole, you want to make sure the data you're using are generalizable.  And one way we do that is through proper sampling, which is what epidemiologists do.  We design studies that get the right sample.

Q.  To illustrate this point, if I wanted to estimate how many

Keyes (Redirect by Lanier)

02:11:30  1    males in Cleveland have beards, would it be proper for me to go

02:11:35  2    down to the third grade class and check it out with the boys

02:11:38  3    and use that as a population to extrapolate from?

02:11:42  4    A.  No.

02:11:43  5    Q.  Okay.  So when you talk about whether or not the proper

02:11:50  6    criteria and the proper population is used, can that make all

02:11:54  7    the difference in the world in the results?

02:11:55  8    A.  Absolutely.

02:11:57  9    Q.  Having said that, with the Muhuri paper, is there anything

02:12:02  10   about it that changes your opinions?

02:12:05  11   A.  No.  Again, I use this -- I have relied on this study in my

02:12:11  12   report in forming my opinions.

02:12:12  13   Q.  Look at the part that I highlighted in the kind of an

02:12:17  14   opening general results.  It says, the study finds that the

02:12:23  15   recent 12-month preceding interview -- and this is from 2002 to

02:12:30  16   2011 -- heroin incident rate was 19 times higher among those

02:12:33  17   who reported prior non-medical pain reliever.

02:12:38  18          Do you see that?

02:12:39  19   A.  I do.

02:12:39  20   Q.  So if we're really trying to hone in on those years of

02:12:45  21   2006, '7, '8, '9, '10, '11, is that an important factor for us

02:12:51  22   to look at?

02:12:52  23   A.  Absolutely.

02:12:54  24   Q.  And then if we just fast-forward to today, in contrast, the

02:12:59  25   recent incidents rate was almost two times higher among those

Keyes (Redirect by Lanier)

1    who reported prior non-heroin use than who did not.

2          Is that still significant?

3    A.  Yes.  I think what they're showing there is that the

4    pathway between prescription opioid use to heroin use is really

5    strong and because so many people use prescription opioids

6    first, the kind of reverse relationship of heroin to

7    prescription opioids, while still present, is not as strong as

8    the relationship between prescription opioid use to heroin use.

9    Q.  Strong, but not as strong as it was?

10   A.  Correct.

11   Q.  Okay.  Thank you.

12          The Lipari article, this is the one that said

13   50.5 percent obtained their opioids from a friend or a

14   relative.  It is Walgreens demonstrative Number 10.

15          Do you remember this article?

16   A.  Yes.

17   Q.  Can you explain why it's important that the jury understand

18   from Lipari and that statistic?

19   A.  Sure.  I mean, in my report, I kind of outline how people

20   obtain -- among people who use prescription opioids, both

21   medically and non-medically, and, in fact, there's a lot of

22   overlap between those two groups, but I tried to outline in the

23   report what the common ways that people obtain prescription

24   opioids are who use them non-medically.

25          And this issue of unused medication really looms large

———Keyes (Redirect by Lanier)———

02:14:46  1   in terms of non-medical use given that, you know, about half of

02:14:51  2   people who -- now, they're reporting on the last time they used

02:14:55  3   prescription opioids, so it's not every time they've used

02:14:59  4   prescription opioids, but the last time they used prescription

02:15:01  5   opioids, about half received those opioids from a friend or

02:15:05  6   relative.

02:15:05  7   Q.   I was looking at the front page of this Lipari report and

02:15:11  8   it's got this section that says, in brief, do you see that?

02:15:15  9   A.   Yes.

02:15:16  10  Q.   And the bottom bullet point I'll blow up so we can all look

02:15:21  11  at it together.  I'd like you to read it and then explain what

02:15:26  12  it is and what it's talking about, please, and why it might be

02:15:29  13  important or not.

02:15:30  14  A.   Okay.  Recent initiates, occasional users, and frequent

02:15:34  15  users were all most likely to get the drugs they misused from a

02:15:37  16  friend or relative for free and from one doctor.  However,

02:15:41  17  frequent users were more likely than recent initiates and

02:15:48  18  occasional users to obtain their most recently misused pain

02:15:49  19  relievers by buying them from a friend or relative, by buying

02:15:52  20  them from a drug dealer or other stranger, or by obtaining them

02:15:56  21  from more than one doctor.

02:15:58  22  Q.   Okay.  What is the difference then between occasional users

02:16:02  23  and initiates and frequent users here?

02:16:10  24  A.   We can look in the paper to see how they define it, but I'm

02:16:14  25  assuming that they're defined frequent users by the, you know,

HEATHER K. NEWMAN, RMR, CRR

———Keyes (Redirect by Lanier)———

02:16:18  1   the number of times in the past year -- the NSDUH data, which

02:16:23  2   we use a lot, has a measure of the number of times in the last

02:16:25  3   year that you misused prescription opioids.

02:16:28  4         So some people maybe misuse once or twice, tried it

02:16:31  5   from a friend or relative, and other people misuse every day or

02:16:35  6   more frequently.  And so the frequent users -- I'm not sure

02:16:38  7   exactly what the definition is in that paper.  It varies from

02:16:41  8   paper to paper, but it would mean someone who's not just using

02:16:45  9   a couple times.

02:16:46  10  Q.   Okay.  So when we look at the pie chart, source of

02:16:53  11  prescription pain relievers for the most recent medical use

02:17:00  12  among past year users age 12 or older, does it affect that

02:17:05  13  depending upon whether you're talking about brand new users or

02:17:09  14  whether you're talking about long-term users?

02:17:11  15  A.   Yes.  This figure is for anyone who misused a prescription

02:17:15  16  opioid at least once, or even once, in the U.S. population.  So

02:17:21  17  this chart refers to all prescription opioid misuse, but I

02:17:26  18  think what you're describing is that the pattern of where

02:17:30  19  people obtain prescription opioids differs based on whether

02:17:33  20  you're using only occasionally or whether you're using

02:17:37  21  frequently.

02:17:38  22  Q.   And then further, this idea that what they were checking

02:17:43  23  here is the respondents who misused prescription pain relievers

02:17:51  24  were asked to identify where they obtained the prescription

02:17:55  25  pain relievers that they had most recently misused, and then

—Keyes (Redirect by Lanier)—

02:18:01  1  we've got this chart.

02:18:02  2       Does that mean that's where they got all of theirs?

02:18:04  3  A.  No.  In fact, we know that most people who misuse

02:18:09  4  prescription opioids also use medically, that there's -- for

02:18:14  5  people who misuse prescription opioids, there is this overlap

02:18:19  6  and this interplay between receiving a medication from a doctor

02:18:21  7  and then misusing the medication.  So most of the people who

02:18:25  8  misused their medication likely also, at some point in their

02:18:31  9  lives, received prescription opioids from a doctor.

02:18:33  10  Q.  Can you walk through this pie chart that Mr. Stoffelmayr

02:18:36  11  showed you, and let's just start with the biggest chunk of pie,

02:18:45  12  and tell me how many of these, based on your research and work,

02:18:49  13  would have had a pharmacy somewhere in there dispensing the

02:18:54  14  medicine?

02:18:55  15       Can you help us identify?  Start with this first

02:18:59  16  (indicating), if they got it from a friend or relative.

02:19:02  17       MR. STOFFELMAYR:  Judge, objection.  This goes well

02:19:04  18  beyond anything in her report.

02:19:05  19       MR. LANIER:  No.  This is what he asked her, Judge.

02:19:08  20       MR. STOFFELMAYR:  I did not ask her that.  There's

02:19:10  21  nothing in her report --

02:19:12  22       THE COURT:  Let's go on the headphones a minute.

02:19:37  23     (Proceedings at sidebar out of the hearing of the jury:)

02:19:37  24       MR. STOFFELMAYR:  Judge, it's Kaspar Stoffelmayr.

02:19:39  25  There is nothing in her report to suggest any analysis of where

---Keyes (Redirect by Lanier)---

```
02:19:43  1  drug dealers get their pills versus where friends and families
02:19:46  2  originally got their pills versus any of this.  We can all make
02:19:50  3  guesses based on common sense, but that's all that's going on
02:19:53  4  at this point.  There's nothing to do with any opinion
02:19:55  5  disclosed in her report for which she has any particular
02:19:58  6  expertise.
02:19:59  7          MR. LANIER:  With due respect to Mr. Stoffelmayr, he
02:20:01  8  put this chart up there --
02:20:01  9          MR. STOFFELMAYR:  I understand that.  I understand
02:20:01 10  that.
02:20:02 11          MR. LANIER:  -- and insinuated that it's not
02:20:05 12  pharmacies.
02:20:05 13          MR. STOFFELMAYR:  I absolutely did not.
02:20:06 14          THE COURT:  Well, hold it.  Hold it.  Hold it.
02:20:10 15          Mr. Stoffelmayr, you cross-examined her on this chart,
02:20:14 16  so -- Mr. Lanier can ask questions.  But I'm only going to let
02:20:21 17  her answer if she's done some study, some analysis.
02:20:24 18          MR. LANIER:  Fair enough.
02:20:25 19          THE COURT:  If she's just looking at it, I mean, I can
02:20:27 20  look at it too and spout something off, but that's not
02:20:29 21  appropriate.
02:20:31 22          MR. STOFFELMAYR:  Just one thing --
02:20:31 23          MR. LANIER:  I got it, Judge.  I'll lay a foundation
02:20:35 24  or move on.
02:20:35 25          THE COURT:  All right.
```

HEATHER K. NEWMAN, RMR, CRR

—Keyes (Redirect by Lanier)—

02:20:42  1          (In open court at 2:20 p.m.)

02:20:42  2     BY MR. LANIER:

02:20:43  3     Q.   Dr. Keyes, in your research and your work, have you had to

02:20:49  4     figure out at times where the pills come from, or where the

02:20:54  5     opiates come from?

02:20:55  6     A.   Yes.

02:20:56  7     Q.   Have you done the necessary research to where you can give

02:21:05  8     us something that's probable in this from the perspective of an

02:21:10  9     epidemiologist who's worked in this her professional career

02:21:14 10     when I ask you the questions about whether or not a pharmacy

02:21:18 11     would likely be involved in the process of understanding this

02:21:22 12     pie chart that you were asked about?

02:21:24 13     A.   Yes.

02:21:26 14     Q.   Then I would ask you, from a friend or relative for free,

02:21:31 15     more likely than not would a pharmacy be involved in dispensing

02:21:35 16     those medicines at some point?

02:21:38 17     A.   Yes.   The pills that people are obtaining from a friend or

02:21:43 18     relative would either be counterfeit pills that are produced

02:21:47 19     and sold, and we talked about those on Friday, a bit, that

02:21:51 20     there are counterfeit prescription opioids that are, you know,

02:21:56 21     illicitly trafficked in the U.S., but that's a very small

02:22:00 22     proportion of the overall opioids that are in the U.S. and a

02:22:03 23     very small proportion of what would be, you know, in that pie

02:22:07 24     chart from a friend or relative for free.   Those would

02:22:11 25     predominantly be legally manufactured prescription opioids that

─── Keyes (Redirect by Lanier) ───

02:22:17 1    are predominantly dispensed by pharmacies.

02:22:20 2    Q.   What about the next big piece, from one doctor.  Would --

02:22:24 3    same question.

02:22:26 4    A.   Right.  I would say even more so that those be probably be

02:22:30 5    dispensed by pharmacies.  I'm sure there are doctors that give

02:22:35 6    people counterfeit opioids, but I would imagine that's an

02:22:38 7    exceedingly small proportion.

02:22:40 8    Q.   Bought from friend or relative.

02:22:45 9    A.   I would imagine the same.

02:22:45 10   Q.   And whether you say imagine. . .

02:22:49 11   A.   I would estimate.

02:22:49 12   Q.   Okay.  Thank you.

02:22:50 13   A.   From my experience I would estimate that the opioids that

02:22:53 14   are being bought from a friend or relative would primarily be

02:22:57 15   legally manufactured opioids, although not exclusively.

02:23:01 16   Q.   Took from friend or relative without asking?

02:23:04 17   A.   Same.

02:23:07 18   Q.   Bought from drug dealer or other stranger?

02:23:11 19   A.   There I would say the probability that you're going to get

02:23:14 20   a counterfeit opioid is more likely because they're illegally

02:23:20 21   manufactured and trafficked into the U.S., so I would say for

02:23:25 22   that group I can't -- I can't estimate the proportion that are

02:23:29 23   legal versus counterfeit.

02:23:30 24   Q.   All right.  Let me -- it's better to say no answer.

02:23:35 25            From more than one doctor?

Keyes (Redirect by Lanier)

02:23:39  1   A.   I would -- I would estimate that those are largely legal,

02:23:43  2   opioids that are distributed by pharmacies.

02:23:45  3   Q.   And not knowing what other is, I won't ask you on that one.

02:23:49  4        Okay.  Next paper you were asked about is the Compton

02:23:54  5   paper.  And the Compton paper was Walgreens demonstrative 26.

02:24:06  6        Do you vaguely remember that, or do you know that?

02:24:10  7   A.   Yes.

02:24:10  8   Q.   All right.  I want to ask you this question.  I'm going to

02:24:13  9   show you the language you were shown before, but when I show it

02:24:16 10   to you, this is my question, what's the difference between may

02:24:21 11   be and is when you, as a scientist, read a paper like this and

02:24:27 12   here was the sentence that Mr. Stoffelmayr pointed out:  A key

02:24:32 13   factor underlying the recent increases in rates of heroin use

02:24:36 14   and overdose may be the low cost and high purity of heroin.

02:24:41 15        So is there a difference between may be and is?

02:24:46 16   A.   Yes.

02:24:47 17   Q.   How does this fit with your opinions -- or, well, first,

02:24:51 18   explain the difference and then how does it fit?

02:24:53 19   A.   I mean, typically, we use that when we're in a scientific

02:24:56 20   paper trying to propose hypotheses that, you know, we want to

02:25:00 21   test or that we think -- that we think might explain some of

02:25:04 22   our patterns or results, but we don't have data really to

02:25:07 23   confirm it.  We say, oh, it may be this, it I may be, you know,

02:25:12 24   something else.  And so when I read that in Dr. Compton's

02:25:15 25   paper, I'm reading that the authors are suggesting that this is

Keyes (Redirect by Lanier)

02:25:19  1   a potential hypothesis that should be tested.

02:25:22  2   Q.   Okay.  How does that fit with your opinions?

02:25:25  3   A.   It fits very well with my opinions.  I don't disagree.

02:25:29  4   Q.   Okay.

02:25:30  5   A.   With that hypothesis.

02:25:31  6   Q.   Great.  Next, the Cicero paper.

02:25:36  7          Now, I want to ask -- it was Walgreens Exhibit

02:25:42  8   Number 28.  I want to ask you about it, but I've got to be

02:25:45  9   careful to lay a foundation as I do this because you've got

02:25:47 10   to -- if you're not able to testify about it by your experience

02:25:53 11   and knowledge and expertise, you need to tell me and -- okay?

02:25:57 12   A.   Okay.

02:25:57 13   Q.   So in that regard, the Cicero paper, it has some statistics

02:26:04 14   about the rising number of heroin first users.  True?

02:26:09 15   A.   True.

02:26:10 16   Q.   Here's my first question:  Has the prescription opioid

02:26:17 17   market had an effect on heroin demand or availability?  Before

02:26:23 18   you answer it, tell me, are you qualified to answer that

02:26:26 19   question?

02:26:27 20   A.   Yes.

02:26:27 21   Q.   Why?

02:26:29 22   A.   This is a question that has been a major question in

02:26:35 23   epidemiology.  As soon as we started to see the increase in

02:26:37 24   heroin use, a natural question -- especially an increase in

02:26:41 25   heroin use among people who had never used a prescription

———Keyes (Redirect by Lanier)———

02:26:45  1  opioid, a natural first question was, well, what's driving that

02:26:48  2  increase?  What effect could -- you know, could there be a

02:26:54  3  potential effect of the prescription opioid market on this

02:26:57  4  increase in heroin use that we haven't never seen before in

02:27:07  5  recent history in the U.S.?

02:27:07  6       MR. STOFFELMAYR:  Judge, I have to interject here.

02:27:07  7    (Proceedings at sidebar out of the hearing of the jury:)

02:27:17  8       MR. STOFFELMAYR:  Judge, this is another completely

02:27:19  9  undisclosed opinion and one that was disclosed by Dr. Cutler

02:27:23  10  who, you know, is free to show up and testify about it.  I

02:27:26  11  understand he may not be coming after all, but this is no part

02:27:29  12  of Dr. Keyes' report and way beyond the subject of

02:27:39  13  cross-examination of what created changes in the availability

02:27:40  14  of heroin.

02:27:41  15       The only question on cross-examination is whether she

02:27:43  16  agrees that lower cost has -- and has contributed to people's

02:27:47  17  use of heroin, which is obviously correct.  But this idea that

02:27:50  18  prior prescription drug abuse has not only led people to use

02:27:55  19  heroin but has completely changed the -- changed the market for

02:27:58  20  heroin it's an economics question on which Dr. Cutler is

02:28:04  21  presumably qualified to testified about.  It's important.  But

02:28:07  22  there's nothing in Dr. Keyes' report on this.

02:28:10  23       MR. LANIER:  Two things, Your Honor:  Number one, my

02:28:11  24  daughter, who is not on the headset, has just written me a note

02:28:14  25  that says she can hear Kaspar Stoffelmayr quite well.

Keyes (Redirect by Lanier)

02:28:17  1          MR. STOFFELMAYR:  Oh, I apologize.

02:28:18  2          MR. LANIER:  So I'd ask that he not speak loud enough

02:28:21  3  for the jury to hear over white noise.

02:28:25  4          MR. STOFFELMAYR:  I'm pretty sure it's the white

02:28:25  5  noise.  That's not me.  I'm sorry.

02:28:25  6          MR. LANIER:  And number two, he asked her at least

02:28:27  7  six, seven, eight minutes of questions about this very thing on

02:28:32  8  this very study.  This is the document he brought forward.

02:28:34  9          MR. STOFFELMAYR:  Two questions about this study.

02:28:36 10          MR. LANIER:  He -- no.  You pushed hard on this,

02:28:38 11  heroin first time users.

02:28:39 12          MR. STOFFELMAYR:  I read her that sentence and asked

02:28:41 13  her if she agreed.

02:28:42 14          MR. LANIER:  Yeah, well, okay.  I'm allowed to ask her

02:28:44 15  then.  That's my whole point.  This is redirect.

02:28:46 16          THE COURT:  Right.  As I said, this was far afield

02:28:49 17  from what she started on, but, Mr. Stoffelmayr, you went into

02:28:54 18  this on your cross, so I'm going to allow it because you

02:28:58 19  started it.  She can. . .

02:29:02 20          MR. LANIER:  It's very brief.  This is all I've got is

02:29:04 21  this one.

02:29:04 22          THE COURT:  Very, very -- one question, and that's it.

02:29:06 23          MR. LANIER:  And that's all I've got, Judge.  Thank

02:29:09 24  you.

02:29:09 25      (In open court at 2:29 p.m.)

**4203**

—Keyes (Redirect by Lanier)—

02:29:09 1  BY MR. LANIER:

02:29:18 2  Q.   Okay.  Dr. Keyes, would you please answer the question?

02:29:23 3  A.   Yes.  There is epidemiological data that is germane to this

02:29:28 4  question that I have reviewed which supports the opinion that

02:29:34 5  because the prescription opioid oversupply affected not only

02:29:42 6  prescription opioid misuse but transitioned to heroin use,

02:29:47 7  suddenly you had a lot more heroin users in the U.S. than you

02:29:50 8  did previously.  And as we talked before, there's this

02:29:55 9  interplay between supply and demand.

02:29:58 10          So once there was more demand for heroin, more heroin

02:30:02 11  supply trafficked into the United States, and with that

02:30:08 12  increased supply, you had this big group of people who were

02:30:12 13  using heroin and then it gravitated from there, so that with

02:30:19 14  all of this increase in heroin in the United States, people who

02:30:22 15  previously had not used prescription opioids then started to

02:30:26 16  use heroin as well.

02:30:27 17  Q.   And, Doctor, that brings me to the end of the road.  Thank

02:30:32 18  you from our side and from the counties of Lake and Trumbull.

02:30:34 19          MR. LANIER:  I'll pass the witness, Your Honor.

02:30:38 20          THE COURT:  Okay.  Any recross?

02:30:41 21          MR. STOFFELMAYR:  I do have some, Your Honor.  Would

02:30:43 22  you like me to start or --

02:30:47 23          THE COURT:  Why don't we see if we can conclude this

02:30:49 24  witness.

02:30:50 25          MR. STOFFELMAYR:  Great.  Thank you, Your Honor.

──────Keyes (Recross by Stoffelmayr)──────

02:31:35 1          MR. LANIER:  Your Honor, I'm going to give the papers

02:31:38 2  back to Mr. Pitts.

02:31:40 3          THE COURT:  Yes.

02:31:41 4          MR. LANIER:  Thank you.

02:31:41 5

02:31:41 6          RECROSS-EXAMINATION OF KATHERINE M. KEYES, PhD

02:31:44 7  BY MR. STOFFELMAYR:

02:31:44 8  Q.  Professor Keyes, hi, again.  I'll try to be quick, but I

02:31:49 9  want to hit on a few points Mr. Lanier touched on you.  One at

02:31:52 10 the beginning, I don't know if it was meant to be a joke or

02:31:54 11 not, about reusing medicine in those take-back kiosks.

02:31:58 12         You understand those medicines are destroyed by

02:32:00 13 incineration and DEA certified facilities; right?

02:32:03 14         MR. LANIER:  And I'll stipulate to that, Your Honor.

02:32:04 15 I apologize if I made light of something I shouldn't have.

02:32:09 16 BY MR. STOFFELMAYR:

02:32:09 17 Q.  You didn't mean to suggest --

02:32:11 18 A.  I didn't mean to suggest that they are reused.

02:32:13 19 Q.  Okay.  Just so everyone's comfortable, they are incinerated

02:32:16 20 in DEA certified facilities.  No one is reusing them.

02:32:19 21         And when you take -- go to the pharmacy and get one of

02:32:21 22 those packets that you can get the pills in, they are rendered

02:32:24 23 inactive and safe so toss in your trash; correct?

02:32:26 24 A.  That's my understanding.

02:32:28 25 Q.  One of the juror questions was about -- I don't remember

HEATHER K. NEWMAN, RMR, CRR

—————Keyes (Recross by Stoffelmayr)—————

02:32:34  1   how the question was worded, but you were very careful --

02:32:37  2   correct I don't mean in a bad way -- I mean correctly careful

02:32:39  3   in your response to describe the prevalence of OUD in Lake and

02:32:46  4   Trumbull Counties.  And I think you wrote, you said 6,000,

02:32:49  5   people in Lake and 7.5 thousand people in Trumbull.

02:32:52  6          Does that sound right?

02:32:53  7   A.   That sounds right, for 2019.

02:32:55  8   Q.   And just so there's no confusion anywhere about what

02:32:59  9   prevalence means, that doesn't mean each year 6,000 people

02:33:03  10  develop OUD, that's the total number of people living with OUD

02:33:08  11  today -- or in 2019?

02:33:09  12  A.   That's right.

02:33:17  13  Q.   Mr. Lanier asked you some questions, and he used the phrase

02:33:23  14  corresponding responsibility.

02:33:24  15          Is that a term you've used in your own work as an

02:33:32  16  epidemiologist?

02:33:32  17  A.   No.

02:33:33  18  Q.   Do you have any particular sense of when a pharmacist is

02:33:36  19  exercising their corresponding responsibility correctly versus

02:33:39  20  when they have failed to, what the standards are?

02:33:41  21  A.   I have a general knowledge of it, but I am not a pharmacist

02:33:45  22  and I don't hold expertise in particular pharmacists'

02:33:50  23  responsibilities.

02:33:51  24  Q.   Okay.  I'll come back to that in a second.  But just kind

02:33:54  25  of got my notes in order just from the questions you were

HEATHER K. NEWMAN, RMR, CRR

Keyes (Recross by Stoffelmayr)

02:33:56  1    asked.

02:33:57  2           Remember, you talked about primary prevention,

02:34:01  3    secondary prevention, and tertiary prevention?

02:34:04  4    A.   Yes.

02:34:05  5    Q.   Drug disposal and drug take-back efforts, where do they fit

02:34:10  6    in?  Is that a kind of prevention?

02:34:11  7    A.   That would be a kind of prevention, yes.

02:34:13  8    Q.   Primarily, secondary, or tertiary?

02:34:16  9    A.   I would say probably it falls mostly in the primary and

02:34:20 10    secondary prevention buckets.

02:34:22 11    Q.   So when pharmacies are doing things to assist with drug

02:34:27 12    disposal or drug take-back, they are participating positively

02:34:30 13    in primary or secondary prevention?

02:34:33 14    A.   Sure.  Yes.

02:34:41 15    Q.   There were a couple questions, and I didn't know what they

02:34:43 16    were meant to suggest, but just so everyone's clear, Mr. Lanier

02:34:48 17    asked you if you had seen that Edlund 2014 paper.  I asked you,

02:34:52 18    and you told me that it's discussed in your report.

02:34:55 19           I didn't try to confuse you about that, did I?  I

02:34:58 20    apologize if I did.

02:34:58 21    A.   I was not confused about the Edlund study.

02:35:01 22    Q.   Okay.  Same thing with the Schreiber paper, you pointed out

02:35:04 23    there was a supplement, and I did give it to you, right?  I

02:35:07 24    didn't try to prevent you from testifying about it?

02:35:08 25    A.   You did not.

Keyes (Recross by Stoffelmayr)

02:35:09  1    Q.  I did give it to you; correct?

02:35:10  2    A.  You gave it to me.

02:35:12  3    Q.  Good.

02:35:12  4        All right.  There was some questions about the Muhuri

02:35:16  5    study and then some questions about if you asked third grade

02:35:20  6    boys if they had beards.  You didn't certainly mean to suggest

02:35:24  7    that the Muhuri authors did such a bad job choosing their

02:35:28  8    sample that it would be like going to a third grade classroom

02:35:30  9    and looking for beards?  Right?  They did a good job.

02:35:35 10    A.  The Muhuri study is based on -- well, it's a little bit of

02:35:42 11    a complicated question, but the NSDUH data, the national

02:35:45 12    household survey -- now it's called the National Survey on Drug

02:35:49 13    Use is primarily drawn from households, and why that is a

02:35:53 14    limitation -- I don't know if that's where you were going.

02:35:56 15    Q.  I think I know where you were going.  I can't testify, you

02:35:59 16    got to say the answer, yes.

02:36:01 17    A.  Okay.  Is that it excludes from their sampling frame, the

02:36:05 18    people they're trying to recruit from, those at highest risk

02:36:08 19    for opioid use disorder.  So, for example, unhoused people,

02:36:12 20    incarcerated people are not included in the sampling frame of

02:36:17 21    the National Survey on Drug Use and Health.  And so it

02:36:20 22    underestimates both opioid use disorder and the probability of

02:36:26 23    transitioning to heroin use based on prescription opioid use.

02:36:30 24        Because to participate in the national survey, it's

02:36:35 25    predominantly people who are living in households, who are at

HEATHER K. NEWMAN, RMR, CRR

Keyes (Recross by Stoffelmayr)

02:36:38  1   home during the day, who are answering questions and might

02:36:40  2   exclude the most vulnerable.

02:36:42  3   Q.  As I understand it, the three big populations not included

02:36:45  4   in that survey are people in jail, people homeless, and people

02:36:48  5   in the military; is that right?

02:36:50  6   A.  Those are three -- three populations.

02:36:53  7   Q.  But, I mean, that -- every -- you know, every dataset has

02:36:58  8   limitations, but you told me earlier, I think, that you

02:37:00  9   consider Muhuri reliable.  That doesn't make it a bad study, it

02:37:04  10  just means it has the limitation based on just the population

02:37:07  11  they looked at?

02:37:08  12  A.  The way we would describe it in epi is it's a brick, you

02:37:12  13  know.  You've got to -- it's one brick.  It's a useful piece of

02:37:16  14  information, and you take with it what you can, and you think

02:37:18  15  about the limitations really carefully, and then you try to

02:37:21  16  find other studies.  For example, we do studies among

02:37:25  17  incarcerated people so that we can try to put that brick into

02:37:27  18  the wall as well.

02:37:28  19  Q.  And I think you said this, this is a dataset that you've

02:37:33  20  used as well in some of your own work; correct?

02:37:35  21  A.  Yes.

02:37:35  22  Q.  And the choice by the Muhuri people to -- and it -- to look

02:37:39  23  at this very big dataset, I mean, this is not nearly as

02:37:43  24  clownish as going to a third grade classroom to figure out how

02:37:46  25  many people have beards.  You didn't mean to suggest anything

—Keyes  (Recross by Stoffelmayr)—

02:37:50  1   like that when you say there are limitations; correct?

02:37:52  2   A.   I mean, we wouldn't use clownish as a term in our field,

02:37:56  3   but I think that the Muhuri study, their sampling is less bad

02:38:01  4   than trying to estimate the prevalence of beards by going to a

02:38:03  5   third grade classroom.

02:38:04  6   Q.   If you had a grad student and they said I want to do

02:38:08  7   research on the prevalence of beards and I'm going to a third

02:38:12  8   grade classroom, this would not be one of your star students;

02:38:12  9   correct?

02:38:15  10  A.   That's correct.

02:38:16  11  Q.   Muhuri and his authors are working at a higher level than

02:38:19  12  that?

02:38:19  13  A.   Yes.  I think the study is a very valuable piece of

02:38:22  14  information.  That's why I cited it in the report and relied on

02:38:24  15  it in my opinions.

02:38:26  16  Q.   All right.  Last thing -- let's go back to our pie chart.

02:39:08  17        All right.  Obviously, Mr. Lanier asked you a whole

02:39:11  18  bunch of questions about our pie chart; correct?

02:39:13  19  A.   Yes.

02:39:13  20  Q.   And, Ms. Guzman, do you know why there's a little V?  I

02:39:27  21  don't mind it, but other things being equal. . .

02:39:30  22        Cool.  Thank you.  Appreciate it.

02:39:31  23        My skill set has limits, obviously, with the computer.

02:39:43  24        That's fine.  Don't worry about it.  Thank you.

02:39:43  25        So we started with that group from a friend or

———— Keyes (Recross by Stoffelmayr) ————

02:39:46  1  relative for free.  And I -- going from my notes, so you can

02:39:52  2  feel free to tell me what you -- how you said it, but that you

02:39:56  3  thought those friends or relatives originally got the pills by

02:40:02  4  filling a prescription at a pharmacy; is that right?

02:40:05  5  A.  The available data that we have would suggest that that

02:40:08  6  would be the modal source for those prescriptions.

02:40:12  7  Q.  What do you mean by modal?

02:40:14  8  A.  Most common.  Sorry.  That was jargoning.  Most common.

02:40:18  9  Q.  So some of them -- the most common -- that 50.5 percent,

02:40:22 10  just to focus on that group, the most common way they got the

02:40:26 11  pills to start with was at a pharmacy, but some group of them,

02:40:30 12  less than half of them, got the pills from not a pharmacy.  We

02:40:33 13  don't know how many?

02:40:34 14  A.  A very small proportion I would estimate based on what we

02:40:38 15  know about the opioid supply in the United States would be from

02:40:41 16  non-pharmacy sources.

02:40:43 17  Q.  Okay.  And when those friends or relatives got the pills by

02:40:47 18  filling them at a pharmacy, what percentage of the time was the

02:40:54 19  pharmacist acting properly filling a legitimate prescription

02:40:58 20  versus blowing it and filling a prescription they shouldn't

02:41:02 21  have filled?

02:41:03 22  A.  I don't have information to estimate that.

02:41:05 23  Q.  I mean, as far as we know -- well, strike that.

02:41:09 24       We don't -- from one doctor, next one down, you told

02:41:12 25  Mr. Lanier pharmacies involved; you told me, though, that

Keyes (Recross by Stoffelmayr)

02:41:16  1    doctors do their own dispensing sometimes; correct?

02:41:18  2    A.   Sure.

02:41:19  3    Q.   So from one doctor, again, what data do you have, if any,

02:41:24  4    on how much of the time those are pills that the doctor

02:41:27  5    provided in the office versus somebody got at a pharmacy?

02:41:31  6    A.   Just based on what we know about the proportion of opioids

02:41:34  7    in the U.S. that are dispensed from pharmacies of the total

02:41:39  8    opioid supply, I would estimate that it would be a large

02:41:41  9    portion of those -- of that piece of the pie was dispensed from

02:41:46  10   a pharmacy.

02:41:47  11   Q.   In this time period they're looking at 2013 to 2014.  Do

02:41:51  12   you have any data on what percentage of opioid pills were being

02:41:55  13   dispensed directly at pharmacies or at clinics or pain clinics?

02:42:00  14   A.   Off the top of my head, I don't remember.  I know -- that

02:42:04  15   data exists in the epidemiological literature, and I know that

02:42:09  16   the vast majority are pharmacy dispensed.

02:42:11  17   Q.   What if we went back a few years to 2010, before the pill

02:42:15  18   mill laws were enacted, if we went back to 2010, what

02:42:18  19   percentage of opioids were being dispensed out of pharmacies

02:42:21  20   versus pain clinics, other clinics, and doctors' offices?

02:42:26  21   A.   Again, I don't know off the top of my head.  It would be a

02:42:30  22   slightly different proportion, but my understanding is still

02:42:32  23   the vast majority are dispensed by pharmacies.

02:42:35  24   Q.   Okay.  And for all the -- I won't go through these one by

02:42:38  25   one again, but for all the other categories, if I asked you

─────Keyes (Recross by Delinsky)─────

02:42:41  1   that question, when the pills came from a pharmacy, how often

02:42:46  2   was it a pharmacist trying to do their job filling a legitimate

02:42:50  3   prescription written by a legitimate doctor versus a pharmacist

02:42:54  4   who made a mistake and filled a prescription that shouldn't

02:42:56  5   have filled?

02:42:57  6          Do you have any data on that?

02:42:58  7   A.   No.

02:42:59  8          MR. STOFFELMAYR:  All right.  Thank you so much,

02:43:01  9   Doctor.  That's all I have.

02:43:06 10          THE COURT:  Okay.  Any other recross?

02:43:11 11          MS. SULLIVAN:  No, Your Honor.

02:43:12 12          THE COURT:  Okay.  I guess Mr. Delinsky, you're up.

02:43:28 13          MR. STOFFELMAYR:  Mr. Delinsky, before you do

02:43:29 14   anything, can I grab my mask?  Before you take your mask off.

02:43:36 15          Careful of the mic.

02:43:44 16

02:43:44 17          RECROSS-EXAMINATION OF KATHERINE M. KEYES, PhD

02:43:45 18   BY MR. DELINSKY:

02:43:45 19   Q.   Dr. Keyes, hello again.  Just a few questions on some of

02:43:53 20   the testimony you provided in response to Mr. Lanier's

02:43:57 21   questions on dose and duration, supply, demand, the pills in

02:44:10 22   the medicine cabinet.  They all tied together.  And do you

02:44:13 23   remember, there was different strains of testimony so I'm not

02:44:15 24   asking -- I'll tie it up for you, but --

02:44:18 25   A.   Okay.

──────Keyes (Recross by Delinsky)──────

02:44:18  1   Q.   -- that's the general subject.

02:44:20  2          The decision to write a prescription for an opioid

02:44:29  3   medication for a patient is made by a doctor; correct?

02:44:36  4   A.   Yes.

02:44:37  5   Q.   Not a pharmacist?

02:44:39  6   A.   That's right.

02:44:39  7   Q.   Okay.  The decision about which particular opioid

02:44:47  8   medication, hydrocodone, oxycodone, 5 milligrams,

02:44:57  9   10 milligrams, is made by the doctor; correct?

02:44:59 10   A.   Yes.

02:45:00 11   Q.   Not a pharmacist?

02:45:03 12   A.   That's right.

02:45:05 13   Q.   The decision about how many pills should be included in the

02:45:13 14   prescription for the patient is a decision, again, made by the

02:45:20 15   doctor; correct?

02:45:23 16   A.   Sure.  I mean, the prescription is written by the doctor,

02:45:26 17   and then when it gets to the level of pharmacy, then there are

02:45:31 18   additional considerations that the pharmacist needs to make.

02:45:33 19   That's why they're trained.

02:45:34 20   Q.   We'll get there.

02:45:36 21   A.   But the prescription originally is written by a doctor.

02:45:38 22   It's then reviewed by the pharmacist.  So I would say that both

02:45:42 23   probably contribute to, you know, those -- those types of

02:45:45 24   questions.

02:45:46 25   Q.   We're going to get -- we're going to go all the way through

--------Keyes (Recross by Delinsky)--------

02:45:49  1    the chain.

02:45:49  2    A.   Okay.

02:45:50  3    Q.   Okay?  In as few questions as I can possibly do so everyone

02:45:53  4    can hopefully take a break.

02:45:55  5         Let's go to the number of pills, because that was a

02:45:58  6    key part of your testimony.  The number of pills filled in on

02:46:03  7    the prescription is determined by the doctor?

02:46:07  8    A.   Yes.

02:46:08  9    Q.   Not the pharmacist?

02:46:09  10   A.   On the prescription, what's written is written there by the

02:46:12  11   physician.

02:46:12  12   Q.   So when we talk about dose and duration, those are set in

02:46:19  13   the -- those are set in the prescription by the doctor?

02:46:23  14   A.   On the prescription, those are written -- the person who

02:46:26  15   writes the prescription is the doctor for -- in terms of dose

02:46:29  16   and duration.

02:46:29  17   Q.   And not the pharmacist; correct?

02:46:31  18   A.   That's right.

02:46:32  19   Q.   Okay.  Now let's move -- let's move down the chain.  Okay?

02:46:40  20        And you are exactly right, no one will dispute that in

02:46:46  21   certain instances it is appropriate, required for a pharmacist

02:46:52  22   to say, no, that's not a prescription that can be filled.  We

02:46:57  23   all agree on that; right?

02:46:59  24   A.   I agree.

02:47:00  25   Q.   Okay.  But that's the matter that you -- you're not an

─────── Keyes  (Recross by Delinsky) ───────

02:47:07  1   expert in when and where and how that should occur; correct?
02:47:13  2   A.   Right.  I -- I -- I mean, I generally have knowledge of
02:47:19  3   pharmacists' responsibilities.
02:47:23  4   Q.   So you know --
02:47:24  5   A.   In general.
02:47:25  6   Q.   You know --
02:47:26  7   A.   And the regulations thereof.
02:47:29  8   Q.   So you know that a pharmacist should not fill one of these
02:47:32  9   prescriptions we've been talking about if the pharmacist knows
02:47:34 10   it wasn't written for a medical reason?  You know that?
02:47:36 11   A.   That's right.
02:47:39 12   Q.   You may not know when a pharmacist should fill a
02:47:45 13   prescription and when a pharmacist cannot second guess a
02:47:48 14   prescription.  Am I right about that?  That's outside your
02:47:52 15   expertise?
02:47:52 16   A.   I don't think I understand the question.
02:47:54 17   Q.   Well, you know that there's many instances where a
02:47:58 18   pharmacist should fill a prescription?
02:48:02 19   A.   Right.
02:48:03 20   Q.   Okay.  And where that calibration is and when a pharmacist
02:48:08 21   is obligated to fill a prescription and should in order to
02:48:12 22   provide the medication to a patient that that patient's doctor
02:48:15 23   said she needs, that's not the area of your expertise; correct?
02:48:21 24   A.   I would say that the -- included in my area of expertise is
02:48:25 25   a general understanding that the pharmacists have -- and the

───────Keyes (Recross by Delinsky)───────

02:48:30  1  pharmacies have a number of responsibilities in terms of

02:48:32  2  ensuring that medications that are not supposed to go to some

02:48:36  3  people don't go to those people.  And so I would say that's --

02:48:40  4  my general -- that's included in the general area of

02:48:43  5  epidemiology, and, in fact, there's been a number of studies in

02:48:45  6  my report on that topic.  So I would say it's included in my

02:48:49  7  area.

02:48:50  8  Q.  And there's instances when the pharmacist should stop it;

02:48:55  9  there's instances where the pharmacist should not; correct?  If

02:48:59  10  it's a prescription --

02:49:00  11  A.  Right.

02:49:00  12  Q.  -- written for legitimate medical reason, a doctor -- a

02:49:03  13  pharmacist should not stand in the way of filling that

02:49:06  14  prescription; correct?

02:49:07  15  A.  I think the pharmacist's responsibilities go slightly

02:49:11  16  beyond that in terms of ensuring that the patient completely

02:49:14  17  understands the risk and benefits of a particular medication.

02:49:18  18  So even if a physician writes it for a supposedly legitimate

02:49:20  19  medical purpose, the pharmacist still -- the pharmacist's

02:49:23  20  responsibility does not end there.

02:49:24  21  Q.  Okay.  And you surely are not suggesting that the

02:49:27  22  pharmacist has the same expertise as the doctor or the same

02:49:32  23  information as the doctor because the pharmacist has a

02:49:38  24  different kind of expertise and a different basis of

02:49:40  25  information; is that correct?

──────Keyes (Recross by Delinsky)──────

02:49:43  1    A.  That's right.

02:49:43  2    Q.  But you do know that if in the first instance the doctor

02:49:48  3    doesn't write the prescription then it never gets to the

02:49:55  4    pharmacist and there's not even a decision to be made; correct?

02:49:58  5    A.  Right.  I think in terms of the pump analogy, that's --

02:50:02  6    those are different points in the pump.

02:50:03  7    Q.  Okay.  So if the doctor doesn't write it, it never reaches

02:50:06  8    the pharmacy?

02:50:08  9    A.  That's right.

02:50:08 10    Q.  Okay.

02:50:10 11         MR. DELINSKY:  Thank you very much, I appreciate it.

02:50:12 12    Professor Keyes.

02:50:16 13         THE COURT:  Mr. Majoras, anything on your part?

02:50:19 14         MR. MAJORAS:  No, thank you, Your Honor.

02:50:20 15         THE COURT:  Okay.

02:50:21 16         Thank you very much, Doctor.  I appreciate your coming

02:50:24 17    back, and have a safe trip back to the east coast.

02:50:27 18         THE WITNESS:  Thank you very much.

02:50:28 19      (Witness excused.)

02:50:31 20         THE COURT:  Okay.  Ladies and gentlemen, we'll take

02:50:33 21    our mid-afternoon break rather than chopping up the next

02:50:38 22    witness.  Usual admonitions, and we'll pick up in 15 minutes

02:50:42 23    with the next witness.

02:50:44 24      (Jury excused from courtroom at 2:50 p.m.)

02:51:19 25         MR. DELINSKY:  Your Honor, before we go off the

02:51:21 1    record, may I just quickly flag an issue?

02:51:28 2            THE COURT:  Everyone be seated.  Sure.

02:51:30 3            MR. DELINSKY:  Your Honor, the next two witnesses are

02:51:32 4    the witnesses that were the subject of one of the motions we

02:51:36 5    had filed on and discussed.  There -- they work for the

02:51:45 6    respective ADAMHS boards for each county, and in their

02:51:48 7    depositions -- and I -- and, if you want, Your Honor, I can

02:51:51 8    pass up the excerpts we've compiled -- they testified that the

02:51:56 9    basis of their knowledge -- obviously not completely but to a

02:52:00 10   very large extent, and particularly about gateway issues,

02:52:04 11   derives from what people have told them and what they've heard.

02:52:11 12           And that line can be really tricky, Your Honor, to

02:52:16 13   devine because they can state this is -- this is my

02:52:20 14   understanding without saying someone told me so, but it's still

02:52:26 15   reflective of hearsay.  And it's still inadmissible.  They

02:52:33 16   can't, in other words, cloak hearsay by saying this is my

02:52:35 17   understanding or my perspective.  And it's going to be a little

02:52:38 18   tricky to navigate, but I wanted to just alert Your Honor that

02:52:42 19   those are the witnesses we're coming to.  And again, if it

02:52:46 20   would be helpful, I can just hand up the pleading we filed

02:52:49 21   which in bullet points sort of excerpts some of the testimony

02:52:54 22   to illustrate the conundrum.

02:52:56 23           MR. LANIER:  Judge, I don't plan or asking any hearsay

02:53:00 24   questions.  My admonition would be to defense counsel to be

02:53:03 25   very careful not to open that door and them ask what's your

HEATHER K. NEWMAN, RMR, CRR

02:53:06 1   basis for believing or something like that, but I'm not getting

02:53:09 2   into any hearsay at all. I don't think I'll ask a question in

02:53:11 3   the world that is properly objectionable. I've got a carefully

02:53:17 4   quick examination of both.

02:53:19 5        MR. DELINSKY: But, Your Honor, I think Mr. Lanier

02:53:21 6   just illustrated the problem. If the basis for believing

02:53:24 7   something is what someone told you, it's inadmissible

02:53:27 8   testimony.

02:53:27 9        THE COURT: Well, these are people who's profession --

02:53:30 10   they're on the ADAMHS Board, okay, so they do a lot of work in

02:53:34 11   this area and so they can -- they can -- they can -- if they

02:53:42 12   have an understanding based upon their years of work, they can

02:53:47 13   testify to that. They can't relate individual anecdotes or

02:53:54 14   what some person told them or what another person told them,

02:53:57 15   but if they have general knowledge from their work, they can

02:54:00 16   testify about their work. I don't know what -- exactly what

02:54:03 17   Mr. Lanier plans to elicit from these two people.

02:54:07 18        MR. LANIER: It won't be rocket science.

02:54:10 19        THE COURT: Well. . .

02:54:11 20        MR. DELINSKY: Okay. Well, Your Honor, we're

02:54:13 21   concerned about it, and we may have to assert a --

02:54:15 22        THE COURT: All right. Mr. Delinsky, if you think --

02:54:18 23   if you think a question should be objected to, object. Okay?

02:54:21 24        MR. DELINSKY: Okay.

02:54:22 25        THE COURT: I mean, I -- that's your obligation and

**4220**

02:54:27 1   right and I'm not going to hold it against you.  If you feel

02:54:29 2   that basically he's trying to sneak in hearsay, then object and

02:54:32 3   I'll figure it out.

02:54:32 4        MR. DELINSKY:  The concern, Your Honor -- and we

02:54:36 5   will -- but the concern is that there's no professional

02:54:38 6   experience exception to the hearsay rule.  If they can't --

02:54:41 7   Mr. Lanier can't cloak testimony in, well, this is your

02:54:44 8   experience if it's based on what other people have told the

02:54:49 9   witness.  There's no such exception to hearsay and that's --

02:54:51 10  this is tricky, Your Honor, and I guess we'll take it question

02:54:56 11  by question, but I did want to just alert the Court that this

02:55:01 12  is a precarious -- potentially precarious examination.

02:55:06 13        THE COURT:  All right.  Well these witnesses are

02:55:08 14  called as experts.  There is a lay opinion rule, all right, and

02:55:11 15  sometimes the line is not crystal clear.  So I'll have to

02:55:14 16  navigate it.

02:55:16 17        Again, I don't know what -- what the questions are

02:55:19 18  going to be of these witnesses, so we'll see and we'll deal

02:55:23 19  with them one by one if necessary.

02:55:25 20        MR. LANIER:  Thank you, Judge.

02:55:26 21        MR. DELINSKY:  Thank you for hearing me out,

02:55:28 22  Your Honor.

02:55:28 23        THE COURT:  Okay.

02:55:29 24     (Recess was taken from 2:55 p.m. till 3:11 p.m.)

03:11:28 25        COURTROOM DEPUTY:  All rise.

03:11:39  1          MS. FIEBIG:  Your Honor, before we bring in the jury,

03:11:41  2  could we just raise one quick issue?

03:11:42  3          THE COURT:  Yes.

03:11:43  4          MS. FIEBIG:  Just in advance of the next witness being

03:11:45  5  called, we received last night copies of the demonstratives

03:11:48  6  that the plaintiffs propose to use, one of which appears to be

03:11:51  7  just an image of two Jack Russells.

03:11:53  8          THE COURT:  Two what?  I'm sorry.  Two what?

03:11:55  9          MR. LANIER:  Beagles.

03:11:55 10          MS. FIEBIG:  Dogs.  Could be beagles, doesn't matter.

03:11:59 11  They're two puppies, and, Your Honor, at this date and hour, we

03:12:02 12  think that it's both irrelevant and a plain waste of time, so

03:12:05 13  we would ask that that demonstrative not be used.

03:12:09 14          MR. LANIER:  It's just introducing who she is.  She

03:12:12 15  doesn't have children, she's got two rescue beagles.  It's a

03:12:16 16  way the jury can remember who she is and hold her out, oh,

03:12:20 17  yeah, that's the lady with the beagles.

03:12:22 18          THE COURT:  Well, I -- I tend to agree.  I think we

03:12:26 19  should dispense with that.

03:12:28 20          MS. FIEBIG:  Thank you, Your Honor.

03:12:29 21          MR. LANIER:  I have no trouble, as long as -- you

03:12:32 22  know, it's a strike zone like that.

03:13:20 23      (Brief pause in proceedings).

03:14:14 24          THE COURT:  Okay.  Please be seated, ladies and

03:14:16 25  gentlemen.

─────Caraway (Direct by Lanier)─────

03:14:16　1　　　　　And, Mr. Lanier, you may call your next witness,

03:14:18　2　please.

03:14:21　3　　　　　MR. LANIER:  Thank you, Your Honor.

03:14:21　4　　　　　The plaintiffs would call April Caraway to the stand,

03:14:26　5　please.

03:14:37　6　　　　　THE COURT:  Good afternoon, Ms. Caraway.  If you could

03:14:39　7　raise your right hand, please.

03:14:40　8　　　　　Do you swear or affirm that the testimony you are

03:14:42　9　about to give will be the truth, the whole truth, and nothing

03:14:46　10　but the truth under pain and penalty of perjury?

03:14:48　11　　　　　THE WITNESS:  I do.

03:14:49　12　　　　　THE COURT:  Thank you.  And you can remove your mask

03:14:52　13　while testifying, please.

03:14:58　14　　　　　THE WITNESS:  I think I should lift the seat.

03:15:11　15　　　(Brief pause in proceedings).

03:15:49　16　　　　　MR. LANIER:  Ms. Caraway, you can pull the microphone

03:15:51　17　down?  Yeah.  That works great.  Thank you.

03:15:55　18

03:15:55　19　　　　　　　DIRECT EXAMINATION OF APRIL CARAWAY

03:15:56　20　BY MR. LANIER:

03:15:56　21　Q.  Ms. Caraway, would you please introduce yourself to the

03:15:59　22　jury?

03:16:00　23　A.  My name's April Caraway.  I'm the executive director of the

03:16:04　24　Trumbull County Mental Health and Recovery Board.

03:16:14　25　Q.  Ms. Caraway, you asked me last night when I was talked to

—Caraway (Direct by Lanier)—

03:16:23 1  you if you were allowed to be nervous.

03:16:24 2  A.  Yes, sir.

03:16:26 3  Q.  You don't have to say sir to me.  Are you nervous?

03:16:30 4  A.  Yes, I am.

03:16:31 5  Q.  All right.  You don't need to be.  These are your

03:16:36 6  neighbors.  They just need to hear you tell you -- what you

03:16:38 7  know about this case.  All right?

03:16:40 8  A.  Okay.

03:16:41 9  Q.  I did a road map.  It's a road map to Trumbull County.  I'm

03:16:48 10 going to talk to you about some personal information about you.

03:16:52 11 Then I want the jury to hear a little bit about your work

03:16:56 12 history.  And then we're going to talk about the opioids in

03:17:00 13 Trumbull County from your perspective.

03:17:07 14     (Brief pause in proceedings).

03:17:39 15 BY MR. LANIER:

03:17:42 16 Q.  So, Ms. Caraway, let's start with just some personal

03:17:46 17 information about you.

03:17:48 18         Tell the jury where you live.

03:17:51 19 A.  I live in Girard, Ohio, in Trumbull County.  I've been

03:17:56 20 there about 7 years.  I grew up in Warren, Ohio, went to --

03:18:03 21     (External announcement).

03:18:03 22         MR. LANIER:  Hold on.

03:18:05 23         If there's a shooting going on, let us know.

03:18:09 24         THE WITNESS:  So I grew up in Warren, Ohio, and I

03:18:13 25 lived in Warren most of my life except when I went to school,

———Caraway (Direct by Lanier)———

03:18:16  1   and then I lived in New Jersey for a year and a half, and I've

03:18:20  2   been in Girard for about 7 years.

03:18:24  3   BY MR. LANIER:

03:18:24  4   Q.  All right.  You're single?

03:18:25  5   A.  I was married.  I'm not now.

03:18:26  6   Q.  But you do have two dogs?

03:18:30  7   A.  I have two beagles that I rescued, Luke and Chase.  The

03:18:35  8   house came with a couple of cats, so I trapped them and got

03:18:39  9   them spade and neutered, and I feed them outside.

03:18:44  10  Q.  Those are your kids?

03:18:46  11  A.  Yes.

03:18:48  12  Q.  You do have an affection for and a desire to work with

03:18:54  13  children historically in your life.  Is that fair to say?

03:18:57  14  A.  Yes.  That's fair to say.  I went to school wanting to help

03:19:00  15  kids, work with kids, and I did that much of my life.

03:19:04  16  Q.  Well, you got your first degree, a bachelor's of arts in

03:19:09  17  1987 from Mount Vernon Nazarene University; is that right?

03:19:18  18  A.  That's right.

03:19:18  19  Q.  Where is that located?

03:19:19  20  A.  It's about an hour from Columbus, Ohio.  It's a small,

03:19:23  21  private, Nazarene school.

03:19:25  22  Q.  All right what was your bachelor's agree in?

03:19:27  23  A.  Sociology, and I had a Spanish minor.

03:19:31  24  Q.  Hablo solo español?

03:19:33  25  A.  Un pocito.

—————Caraway (Direct by Lanier)—————

03:19:37  1    Q.   Sociology.  And then you ultimately went and got a master's

03:19:47  2    in science degree, but before that, were you a licensed social

03:19:52  3    worker?

03:19:53  4    A.   Yes.  I got my social work license -- I worked at

03:19:58  5    Children's Services in Trumbull County for a while and I got my

03:20:01  6    social work license around that time.

03:20:03  7    Q.   What was involved in getting your social work license?

03:20:07  8    A.   I had to take another class and study for the exam and pass

03:20:13  9    the exam to get the license.  And I have to get 30 continuing

03:20:17 10    hours of what we call CEUs, continuing education every year to

03:20:21 11    keep the license up -- every two years, I'm sorry, to keep up

03:20:24 12    the license.

03:20:25 13    Q.   And do you have family in Trumbull County?

03:20:28 14    A.   I do.  My family's in Trumbull County, most of them.  My

03:20:32 15    brother lives in Painesville, and his wife, and my mom is just

03:20:36 16    like another town over from me, and my aunt worked at

03:20:41 17    Children's Services too, kind of was a mentor of mine, so

03:20:44 18    that's one of the reasons I want to go into the field and ended

03:20:48 19    up getting a job there as well.

03:20:49 20    Q.   How often do you see your mom?

03:20:51 21    A.   Oh, a few times a week.

03:20:53 22    Q.   She's convalescing right now from --

03:20:56 23    A.   Yeah, she fell and broke her hip about a week ago, so we've

03:21:00 24    had a bunch of stuff with that, and my stepdad died about

03:21:03 25    6 weeks ago, so it's been a lot.

—Caraway (Direct by Lanier)—

03:21:05  1  Q.  All right.  Well, with all of that, I've left out something

03:21:10  2  else.  You went back and got a master's degree; is that right?

03:21:14  3  A.  Yes.  Youngstown State University.

03:21:16  4  Q.  And that's a master of science degree?

03:21:19  5  A.  Yes.  And I was focused on school counseling with that.  I

03:21:23  6  worked in Warren City Schools for 8 years.  Actually, the

03:21:26  7  system I graduated from, so --

03:21:28  8  Q.  All right.

03:21:29  9  A.  -- I got my master's.

03:21:30  10  Q.  So you have a master's of science degree in education?

03:21:33  11  A.  Yes.

03:21:34  12  Q.  And you went back to the school system you graduated from.

03:21:37  13          What were you looking to do?

03:21:38  14  A.  I did prevention work with the kids, wrote grants, we did

03:21:45  15  drug/alcohol prevention, pregnancy prevention programs, and

03:21:46  16  then I was promoted to outreach manager, so I was in charge of

03:21:52  17  the nurses and assisting with the school community liaisons

03:21:58  18  and guidance counselors.  Anything related to kids and crisis,

03:22:02  19  I handled.

03:22:02  20  Q.  Well, we're working down the road, and we've just managed

03:22:06  21  to leave the personal information and get a little bit into

03:22:09  22  your work history.

03:22:09  23          I've got an exhibit here that is demonstrative 67.

03:22:15  24  A.  Okay.

03:22:15  25  Q.  Because it's got an easy way for you to explain some of

—Caraway (Direct by Lanier)—

03:22:19  1  your work history for us.

03:22:22  2  A.  You know what, I forgot my glasses.  Could I get those?

03:22:25  3  I'm sorry.

03:22:25  4  Q.  Well, I'm going to below to up so big you won't need it.

03:22:32  5  Maybe?

03:22:33  6  A.  Okay.

03:22:33  7  Q.  Are your glasses down here where we can pass them up to

03:22:36  8  you.

03:22:36  9  A.  In my purse.  Kim can pull them out.

03:22:39  10  Q.  Yeah.  Just take the purse up there.  Thank you.

03:22:43  11  A.  Sorry.  I said I was nervous.

03:22:47  12          THE COURT:  That's okay.  You see a lot better without

03:22:48  13  your glasses than I do, ma'am.

03:22:52  14          THE WITNESS:  They're reading.  Okay.

03:22:56  15  BY MR. LANIER:

03:22:57  16  Q.  Got them?

03:22:57  17  A.  Yes.

03:22:57  18  Q.  Okay.  What I'd like do is I want to go through your

03:23:00  19  employment history, but before I do that, I'd like the jury to

03:23:05  20  get an idea of some of things you've done in the community and

03:23:09  21  in the state in your -- in your -- kind of your personal

03:23:13  22  background story for that.  So that's on Page 3 of your resume

03:23:18  23  or CV.

03:23:20  24          Founding member of the Alliance for Substance Abuse

03:23:30  25  Prevention.

—————Caraway (Direct by Lanier)—————

03:23:31  1      Can you explain what that is please?

03:23:32  2  A.  Yes, we've had -- it's like a drug-free coalition.  We put

03:23:37  3  that together about 20 years ago, even when I was working at a

03:23:40  4  different place.  A group of pastors came to us asking for help

03:23:43  5  because they were seeing the opiate crisis starting and they

03:23:47  6  didn't know how to help that parishioners and get them into

03:23:51  7  treatment.  So we started it then.  And then later on we

03:23:53  8  actually changed the name to the ASAP Opiate Task Force.

03:23:58  9  Q.  You're a member of the Trumbull County opiate death review

03:24:03 10  committee.  What is that?

03:24:04 11  A.  Not all counties have these.  In Ohio, there's 88 counties

03:24:09 12  and 50 boards.  So we are a single county board, Trumbull

03:24:14 13  county is.  Some of the counties have multiple -- or boards

03:24:15 14  have multiple counties they're over.  But in ours, we worked

03:24:18 15  with the health department, the coroner's office, police

03:24:21 16  departments, and several others to look at these overdose

03:24:25 17  deaths, the epidemiologists from the health department, who is

03:24:30 18  a registered nurse, goes over the reports with us.

03:24:33 19      And the whole goal is, what could we have done to

03:24:35 20  prevent this?  So we're looking at were they in treatment and

03:24:39 21  then they relapsed?  What was their history?  Is there a

03:24:43 22  history of mental health issues?  Things like that.  And then

03:24:45 23  we're trying to find new ways to combat the crisis to stop the

03:24:49 24  deaths.

03:24:50 25  Q.  Okay.  You're a 26-year member of the Trumbull County

Caraway (Direct by Lanier)

03:24:58  1  Family and Children First Council, currently vice chair person

03:25:00  2  and fiscal agent.

03:25:02  3          Can you explain what that is, please?

03:25:03  4  A.  The -- yes, Family and Children First Council, every

03:25:06  5  community has one.  There's a State Department that gives us a

03:25:10  6  little bit of funding so we have a coordinator of that, and our

03:25:14  7  agency is the fiscal agent of that, so I'm her supervisor.  And

03:25:19  8  every month we get any child serving agencies in the community

03:25:24  9  who want to join come to the table and we talk about issues

03:25:27  10 like trauma, work that's going in the schools, drug and alcohol

03:25:31  11 prevention, we look at reports that we've done such as pride

03:25:35  12 surveys, things like that.  We share information.  Then we work

03:25:39  13 on ways together to get the information we all have out to the

03:25:43  14 parents in the community, because it's no good if nobody knows

03:25:46  15 what's going on.

03:25:48  16 Q.  You are a member of the county human services community

03:25:54  17 planning committee.  Would you tell us about that, please?

03:25:56  18 A.  That's our job and family services.  And so board director

03:26:01  19 is actually a mandated member of that, so I go to their

03:26:05  20 meetings every other month, and they review all their fiscal

03:26:08  21 information, what programs they're doing such as work programs.

03:26:13  22 They get different types of funding, and we look at those

03:26:15  23 reports, and if the money's not spent, we can ask questions,

03:26:18  24 well, why didn't you spend it, you know, or maybe there was

03:26:21  25 another way.  And -- I'm just all about get people together,

———Caraway (Direct by Lanier)———

03:26:25  1    keep communicating because we all have to share resources.  We

03:26:30  2    all have to do what we can, for any problem in our community.

03:26:34  3    Q.  You're a member Trumbull County Child Fatality Review

03:26:41  4    Board.  Explain that please.

03:26:42  5    A.  Yeah.  That's a bad one.  We meet quarterly, and again,

03:26:45  6    it's an Ohio Revised Code where the director of the mental

03:26:48  7    health recovery board is a mandated member of that, and we look

03:26:52  8    at the autopsies and coroner reports of anyone under 18 who has

03:26:58  9    died, and there's a separate subcommittee with lawyers and

03:27:01  10   police and the doctor's office who will do investigations if it

03:27:04  11   wasn't an accident.  And the rest of us review and sign off on

03:27:08  12   the reports and give our opinion as to, yes, makes sense, it's

03:27:12  13   an accident, or we ask questions.  We'll - what happened here

03:27:17  14   and, again, we -- from that, we're like what can we do to

03:27:21  15   prevent things.  So we've' done a lot of campaigns with

03:27:24  16   billboards about safe sleep, you know, making sure your pool --

03:27:28  17   kids can't get in the pool and drown, things like that.

03:27:31  18   Q.  Steering committee member of the veterans program

03:27:36  19   committee.  Great responsibility there.

03:27:39  20           Tell us, please, about that.

03:27:41  21   A.  Yes.  Our probate court judge is really passionate about

03:27:46  22   veterans issues, and so I sit on that steering committee and

03:27:50  23   they peer -- they put veterans who have gotten in trouble in

03:27:54  24   even any court in our community, like if they got a DUI, the

03:27:57  25   judge can refer them if they want to go to the veterans court.

———Caraway (Direct by Lanier)———

03:28:01  1   And then they work with a counselor, they work on what are the

03:28:04  2   issues?  Do they need to get into treatment for alcohol use?

03:28:08  3   Do they need help with getting a job?  Things like that.  So

03:28:10  4   it's more of a help thing, and if they complete the veterans

03:28:13  5   court, then the -- if it's a DUI, say, they don't have that on

03:28:18  6   their record, it gets expunged, I guess is the word.

03:28:24  7   Q.  You're an executive committee member of the Trumbull

03:28:29  8   Advocacy and Protection Network.

03:28:30  9           What is that, ma'am?

03:28:30 10   A.  That was a group for seniors, and again, we would look at

03:28:34 11   hoarding situations, sometimes abuse/neglect situations, but

03:28:39 12   the coordinator passed away so that group hasn't met in awhile.

03:28:44 13   Q.  Member of the Youngstown Warren Regional Chamber of

03:28:49 14   Commerce.  I think we know what that is by and large.

03:28:52 15           Mental Health Leader of Community Crisis Response

03:28:56 16   Team.

03:28:57 17           What would that be?

03:28:58 18   A.  We work with law enforcement to talk about issues, training

03:29:04 19   issues, we do CIT crisis intervention training with them,

03:29:08 20   things like that.

03:29:09 21   Q.  Member of the Ohio Association of County Behavioral Health

03:29:16 22   Authorities.  You're both on the ex stiff committee and chair

03:29:20 23   of the PAC.

03:29:21 24   A.  Yes.

03:29:21 25   Q.  Explain that, please.

—Caraway (Direct by Lanier)—

A.   With the 88 counties, I had mentioned there's 50 boards, so
the 50 board directors, we get together, now via Zoom, but
before lots of trips to Columbus, and we talk about issues that
affect the entire state, such as the opiate epidemic, lots of
training through them.

       We've had recovery summits and rallies, and I'm on the
executive committee, so that's another meeting a month and
chair of the -- the PAC is the political action committee,
where members can contribute and then that's a separate branch
to do lobbying with legislatures.

Q.   Member of the Heartland Behavioral Health committee?

A.   I actually chair that group now too.  The state Ohio
Department Mental Health and Addiction Services has divided
Ohio up in six regions, and the Heartland region is the one I'm
in, because anyone who has a severe and persistent mental
illness goes to Heartland Hospital, so we're in the Heartland
region.

       So we talk about issues with our high-need clients,
getting them in and out of the state hospital, and again, maybe
I'll learn what's worked in Stark County that I hadn't tried
before to prevent somebody from decompensating and ending up
having to get that level of treatment.

Q.   Member of the Partner Solutions Oversight committee.

       What is that?

A.   So we contract with Partner Solutions as well as 11 other

---Caraway (Direct by Lanier)---

03:30:49  1  boards to do our billing, and that's how our agencies get paid.

03:30:53  2  We only have -- I'm only one of nine staff.  We have really a

03:30:57  3  small staff.  Our funding goes out to treatment agencies to

03:31:02  4  provide the direct service, and so in order to pay them, I

03:31:04  5  don't have the staff to do all that billing and stuff.  It's a

03:31:06  6  contract for that.

03:31:08  7  Q.  Chairperson of the all saints community church board back

03:31:15  8  in '05 to '07, I guess.  I think people would -- that makes

03:31:23  9  sense.

03:31:23  10          Former member of the Trumbull County AIDS Task Force.

03:31:27  11          What were you doing there?

03:31:28  12  A.  I was an educator in the schools, so I went out and talked

03:31:30  13  to kids about how you can get HIV and how you cannot and

03:31:35  14  encouraged safe practices.

03:31:36  15  Q.  Former chair of the Trumbull County transportation

03:31:40  16  committee.  I think that makes sense.

03:31:42  17          Former member of Governor John Kasich's, state opiate

03:31:48  18  task force.

03:31:48  19          When was that?

03:31:50  20  A.  A long time ago.  I'm not sure the year, but several board

03:31:56  21  directors were appointed to be part of Governor Kasich's task

03:32:02  22  force, and we would go to state meetings and look at data, get

03:32:05  23  information about trends and then give feedback about what was

03:32:09  24  happening in our own communities.

03:32:10  25  Q.  All right.  Within the framework of this, you testified

HEATHER K. NEWMAN, RMR, CRR

—Caraway (Direct by Lanier)—

03:32:15  1    briefly about some of your jobs before you did work with child

03:32:19  2    welfare caseworker.

03:32:24  3         Can you tell us about that briefly?

03:32:26  4    A.   Yeah.  The first job at Children's Services I worked with

03:32:31  5    kids and families in the home, and there were times when I had

03:32:33  6    to remove a child because of abuse happening and get them to

03:32:39  7    the hospital to be checked out and get them into a foster care

03:32:43  8    situation and then work with the family to do whatever they

03:32:46  9    needed on their treatment plan so they could get their kids

03:32:49 10    back.

03:32:54 11    Q.   The next one I wanted to talk to you about was your work

03:32:57 12    with the Trumbull County Board of Alcohol, Drug and Mental

03:33:01 13    Health as a prevention coordinator.

03:33:03 14         Can you explain briefly what you were doing there and

03:33:06 15    how you had involved kids or whatever it was?

03:33:08 16    A.   Yes.  So the mental health and recovery board oddly enough

03:33:11 17    that I work for now got a grant to do prevention in the

03:33:16 18    schools, and that's how my role doing that in the schools

03:33:18 19    started.  It was paid for by this grant.

03:33:21 20         So I developed all of these programs that are listed,

03:33:24 21    the summer recreation program, afterschool program, and then we

03:33:28 22    would target, you know, latchkey kids, high-risk kids to attend

03:33:32 23    those, and we'd do a lot of -- you know, we'd do their

03:33:35 24    homework, but we'd also make sure that they learned about the

03:33:38 25    dangers of drugs and, you know, histories of trauma.  We'd work

—Caraway (Direct by Lanier)—

03:33:43 1  with the children service agency at that point in time if we

03:33:46 2  needed to to make referrals and so forth.  But it was more

03:33:49 3  about, you know, educating and mentoring the kids.

03:33:52 4       And when the grant ran out, the schools took over my

03:33:57 5  position, like, they hired me to continue in that role because

03:34:00 6  I had created a bunch of programs for them.

03:34:04 7  Q.  At some point then you went to work for the Warren City

03:34:08 8  Schools?

03:34:08 9  A.  Yeah.

03:34:09 10  Q.  Prevention coordinator and outreach manager.  Is that the

03:34:14 11  stuff you were telling us about earlier?

03:34:15 12  A.  Right.  That's the job that I started under that grant and

03:34:18 13  then they hired me full time in the Warren City Schools.

03:34:21 14  Q.  All right.  And then from January of '04, '7, almost

03:34:29 15  18 years ago, to present, you went to work for the Trumbull

03:34:38 16  County Mental Health and Recovery Board.

03:34:38 17  A.  Yes.

03:34:38 18  Q.  Can you please walk through the three basic jobs you had

03:34:43 19  there.

03:34:44 20  A.  Well, I started out as the planner and evaluator, and I was

03:34:48 21  focused on kids programs again.  And then that -- I oversaw the

03:34:54 22  agencies they contracted with who did the children's

03:34:58 23  programming, and we made sure that we got information so that

03:35:02 24  if we were paying the providers, the agencies would call on the

03:35:06 25  providers, that the work was being done.

Caraway (Direct by Lanier)

03:35:08  1          Back then it wasn't all automatic -- automated like it
03:35:13  2   is now, so I would collect, you know, 14 kids came to this
03:35:17  3   program at the Rebecca Williams Community Center, okay, and
03:35:20  4   then what did you teach them, and just make sure they were
03:35:23  5   using evidence-based practices, things like that, and help with
03:35:27  6   creating of the budgets.  And we have an 18-member board that
03:35:29  7   oversees us.  I'd prepare reports for the board on the programs
03:35:33  8   that I -- were under me.
03:35:35  9   Q.  Okay.  And then you moved on to become the director of
03:35:39 10   programs and community outreach.
03:35:42 11          Could you fill that in for us a little bit?
03:35:46 12   A.  Sure.  Then they hired a full-time children's coordinator,
03:35:48 13   so some of those duties that I was doing directly went to that
03:35:52 14   person.  So I supervised that person.  I supervised our
03:35:58 15   wraparound coordinator that works very closely with our Family
03:36:02 16   and Children First Council and mostly kids who are in and out
03:36:03 17   of foster care, residential programs with trauma issues, and
03:36:06 18   then I started getting more heavily involved in the
03:36:11 19   drug/alcohol programming for adults also.  So it -- you know,
03:36:15 20   not just kids but adults, families, and we -- I'm a grant
03:36:20 21   writer, so I wrote for several grants, again, to increase that
03:36:23 22   kind of programming in our community.
03:36:25 23   Q.  And then 12-plus years ago you became the executive
03:36:29 24   director of the Trumbull County Mental Health and Recovery
03:36:35 25   Board.  Explain, please, in as much detail as you can, what you

——Caraway (Direct by Lanier)——

03:36:40  1    do, and do it with an eye towards how it will marry up to the

03:36:45  2    opioid questions I'm going to be asking you about next, please.

03:36:48  3    A.   Okay.  So all boards -- you know, it says in the Ohio

03:36:54  4    Revised Code we're here to fund and oversee and plan for and

03:36:58  5    develop programs in the community that are going to help people

03:37:04  6    with mental health issues, with addiction issues.

03:37:08  7         And it gets much broader because we can't do any of

03:37:11  8    that unless we're partnering with all the other agencies in our

03:37:16  9    community and systems to that kind of work.  So, you know,

03:37:20  10   professional meeting goers is part of my job description, but

03:37:24  11   it's important to be on those meetings, because on those

03:37:27  12   meetings I was hearing about how the opiate crisis was

03:37:34  13   devastating to law enforcement, was devastating to our

03:37:41  14   workforce, and people couldn't get people to pass drug screens.

03:37:43  15   And we worked with the hospitals and continue to because of

03:37:47  16   people coming into the hospitals with an overdose.  We work

03:37:51  17   with first responders and we set up --

03:37:56  18            MR. DELINSKY:  Objection, Your Honor.

03:37:57  19            May we go on the headset?

03:38:16  20      (Proceedings at sidebar out of the hearing of the jury:)

03:38:20  21            MR. DELINSKY:  Your Honor, this is that territory that

03:38:22  22   I identified to the Court.  She testified that it's important

03:38:24  23   to be on in these meetings because I was hearing about how the

03:38:30  24   opiate crisis was devastating.

03:38:32  25            THE COURT:  Well, this is her job.  She can testify to

HEATHER K. NEWMAN, RMR, CRR

—Caraway (Direct by Lanier)—

03:38:34  1  what she does and how her agency spends the $6 million and

03:38:40  2  where it goes.  I'm not going to let her go into anecdotal

03:38:45  3  evidence, but --

03:38:47  4          MR. LANIER:  Yeah, and I won't ask that.

03:38:49  5          THE COURT:  -- she can talk about the impact on the

03:38:52  6  opioid crisis in Trumbull County as she -- as her agency tries

03:38:57  7  to address it.

03:38:59  8          MR. DELINSKY:  But, Your Honor, she's not talking

03:39:00  9  about what -- where the monies goes.  She's talking about,

03:39:03 10  Your Honor, like here's the direct quote, people couldn't get

03:39:06 11  people to pass drug screens.

03:39:07 12          THE COURT:  I agree that that -- that -- all right.

03:39:11 13          MR. DELINSKY:  You know people coming into hospitals

03:39:13 14  with an overdose.  She's not in the hospitals.  I mean, this is

03:39:16 15  all secondhand.

03:39:17 16          THE COURT:  Well, no, that's a fact.  People came in

03:39:19 17  with overdoses and they had to deal with them.  That's not

03:39:22 18  hearsay.  That's fact.

03:39:23 19          MR. LANIER:  I'll try and ask more detailed --

03:39:25 20  questions.  I'll try and ask more sculpted questions.

03:39:26 21          THE COURT:  Yeah.  I want -- yes.  I think partly is

03:39:29 22  the general questions, Mr. Lanier.

03:39:30 23          MR. LANIER:  Yeah, and that's on me, Judge.  I was

03:39:32 24  just doing that for my voice.  I apologize.

03:39:34 25          MR. MAJORAS:  Your Honor, John Majoras.

—Caraway (Direct by Lanier)—

03:39:34  1          THE COURT:  Yes.

03:39:36  2          MR. MAJORAS:  Only because this issue may come up as

03:39:38  3  well.  If she gets into any testimony where she is talking

03:39:43  4  about coroner's reports and medical examiner reports --

03:39:46  5          MR. LANIER:  She's not going to.

03:39:48  6          MR. MAJORAS:  -- if that's the case, that's fine

03:39:49  7  because we were precluded from getting evidence on that.

03:39:52  8          MR. LANIER:  No, she's not going to.  I'm not asking

03:39:54  9  that level of detail.

03:39:55 10          MR. MAJORAS:  Thank you, Your Honor.

03:39:56 11          THE COURT:  Okay.

03:40:11 12      (In open court at 3:40 p.m.)

03:40:11 13  BY MR. LANIER:

03:40:12 14  Q.  Ms. Caraway, I want to try and narrow the focus down

03:40:18 15  specifically to some of the things that you did that are listed

03:40:23 16  here on your CV within -- or your resume within the context of

03:40:28 17  that opioid issue, and then we'll start looking at some

03:40:31 18  specific documents that will help us.  Okay?

03:40:38 19          You provide oversight of mental health and addiction

03:40:41 20  services in Trumbull County; is that right?

03:40:43 21  A.  That's right.

03:40:44 22  Q.  Do those addiction services include for opiate addiction?

03:40:48 23  A.  Yes, they do.

03:40:49 24  Q.  And is opioid addiction a problem in Trumbull County?

03:40:53 25  A.  Yes, it is.

—Caraway (Direct by Lanier)—

03:40:59  1   Q.  And how long has it been a problem?

03:41:01  2   A.  Probably, you know, at least 20 years.  We've been watching

03:41:04  3   it mount, watching it grow.  Our worst year was 2017, but this

03:41:08  4   year's probably going to be worse than then.

03:41:10  5   Q.  Well, why do you say 2017 was the worst year?

03:41:14  6   A.  In 2017, we get -- so our board, we get data.  We look at

03:41:22  7   all this data and then we make funding decisions based on the

03:41:25  8   data.  And so when people come to us and say, hey --

03:41:31  9        MS. FIEBIG:  Objection, Your Honor.

03:41:32  10        MR. LANIER:  You can't say what people say to you, so

03:41:34  11   just --

03:41:35  12        MS. FIEBIG:  Can we be heard, Your Honor?

03:41:43  13        MR. LANIER:  Oh.

03:41:47  14        MS. FIEBIG:  Your Honor, when we raised an

03:41:49  15   objection --

03:41:49  16        THE COURT:  Hold it.  Hold it.  We're not on the -- on

03:41:54  17   the white noise.

03:41:56  18     (Proceedings at sidebar out of the hearing of the jury:)

03:41:57  19        MS. FIEBIG:  Your Honor, I just wanted to underscore

03:42:00  20   that this, again, is clear hearsay where she's reporting on

03:42:02  21   what others have told to her, and also, Your Honor, when we

03:42:05  22   raise an objection, it's not appropriate that the response be

03:42:06  23   to coach the witness.

03:42:10  24        MR. LANIER:  Your Honor, it's very appropriate with a

03:42:12  25   fact witness who's nervous on the stand for me to say please --

─────Caraway (Direct by Lanier)─────

03:42:15  1   to limit my question.

03:42:17  2            MS. FIEBIG:  Mark, we'd ask that you refrain until the

03:42:19  3   Judge rules on the objection.

03:42:20  4            MR. LANIER:  And I get to argue the objection before

03:42:23  5   the Judge rules, and I'd appreciate just addressing through the

03:42:26  6   Court instead of me individually.

03:42:28  7            And so, Your Honor, my response to Ms. Fiebig is to

03:42:32  8   say that I do think it's appropriate for me to tell this

03:42:36  9   witness, who's nervous, that she needs to limit her answer and

03:42:40 10   not tell me what people have said.

03:42:41 11            THE COURT:  Right.  That's perfectly appropriate.  I

03:42:43 12   would say the same thing, so that's not objectionable.

03:42:46 13            MR. LANIER:  Thank you.

03:42:46 14            THE COURT:  That's just what everyone wants.

03:42:48 15            MR. LANIER:  Thank you.

03:42:48 16            THE COURT:  This is not a lawyer.  She doesn't know

03:42:50 17   that she can't couch her answer that way.

03:42:55 18            MR. LANIER:  Thank you.

03:42:55 19            THE COURT:  I'll -- what was the -- what was the

03:42:58 20   question that was objected to?

03:43:02 21            MR. LANIER:  I said, why do you say 2017 was the worst

03:43:05 22   year, and that's what she objected to.

03:43:08 23            MS. FIEBIG:  No, Your Honor.  I objected to the

03:43:09 24   response, in which the witness began --

03:43:13 25            MR. LANIER:  We get data.  We look at this data and

Caraway (Direct by Lanier)

03:43:15  1  then we make funding decisions based on the data.

03:43:18  2          THE COURT:  That's perfectly acceptable.

03:43:20  3          MS. FIEBIG:  And so when people come to us and say,

03:43:22  4  hey --

03:43:23  5          THE COURT:  All right.  Well, then Mr. Lanier was

03:43:25  6  right, to tell her she can't -- she can't testify to what other

03:43:29  7  people come.  She just has to say what she does.

03:43:32  8          MS. FIEBIG:  Understood, Your Honor, but that was

03:43:34  9  after we had objected.

03:43:35  10         THE COURT:  Well, then that's perfectly appropriate to

03:43:39  11  give a response.  I would have said the same thing.

03:43:40  12         MS. FIEBIG:  Okay.  Thank you, Your Honor.

03:43:49  13     (In open court at 3:43 p.m.)

03:43:49  14  BY MR. LANIER:

03:43:50  15  Q.  I want you to please continue your answer.  I'll go back

03:43:52  16  and start it, but when you answer, you can't say what other

03:43:56  17  people say to you because that's considered hearsay.

03:44:00  18  A.  Understood.

03:44:00  19  Q.  You can just say what decisions you're making and why

03:44:03  20  you're making them, but not relate other conversations.  Okay.

03:44:07  21         All right.  So here was my question.  I asked you, why

03:44:17  22  do you say 2017 was the worst year, and you started answering

03:44:23  23  and you said, we get data.  We look at all this data and then

03:44:28  24  we make funding decisions based on the data.  And so when

03:44:32  25  people come to us and say -- we can't hear what people come to

—————Caraway (Direct by Lanier)—————

03:44:37  1   you and say, but within the framework of that, why was 2017 the

03:44:40  2   worst year?

03:44:43  3   A.   Maybe a different -- better way to have said that, we get

03:44:46  4   funding requests.  We put out an RFP, which is a request for

03:44:50  5   funding, and we get funding requests.  And then we look at the

03:44:53  6   data and read the requests on why they're saying there's a need

03:44:59  7   and they ask the board will you fund certain programs, but it's

03:45:04  8   based on that funding request.

03:45:05  9   Q.   And so when you get these funding requests, which aren't

03:45:10  10  into evidence, and I don't want you to tell us what they say,

03:45:13  11  is it based upon the data research that you do in order to

03:45:18  12  determine what gets funding that causes you to say 2017 was the

03:45:23  13  worst year?

03:45:24  14  A.   Yes.  We get data from the coroner's office and from the

03:45:28  15  health department, and in 2017 we had 135 overdose deaths and

03:45:36  16  we had 1,250 overdoses, and that's reported to our health

03:45:46  17  department from our local hospitals.  So if someone goes --

03:45:51  18  gets revived with naloxone and Narcan and they go to the

03:45:57  19  hospital, we have access to that data from our health

03:45:58  20  department.  We don't have access to any information if an

03:46:03  21  ambulance company revives someone and they refuse to go to the

03:46:07  22  hospital, if a family member might have done that and they

03:46:10  23  don't go to the hospital.  So in my experience, over time, the

03:46:14  24  numbers are much higher.

03:46:16  25  Q.   Okay.  So those are the numbers that made 2017 the worst

—Caraway (Direct by Lanier)—

03:46:23 1  year?

03:46:23 2  A.  Yes.

03:46:23 3  Q.  I think you started your answer by saying you believe this

03:46:25 4  year will be different?

03:46:27 5  A.  Worse.

03:46:27 6  Q.  Worse.  Why would this year be -- not why.  How will this

03:46:32 7  year be worse, ma'am?

03:46:33 8  A.  Based on the number of overdoses we've had so far, deaths,

03:46:39 9  we're on track to be higher than the 135.

03:46:43 10  Q.  Okay.  And in your job, are you doing things that you

03:46:53 11  perceive will try to help this situation?

03:46:56 12  A.  Every day.

03:47:01 13  Q.  I'd like the jury to get some ideas of some of the things

03:47:05 14  that you do.  And in that regard, I'd like to first show you

03:47:16 15  Plaintiffs' Exhibit 4568 and ask you about this.

03:47:31 16          Do you have that document in front -- oh, wait.  We're

03:47:35 17  getting it.  Sorry.

03:47:36 18          May I approach, Your Honor?

03:47:41 19          THE COURT:  Yes.

03:47:56 20  BY MR. LANIER:

03:47:57 21  Q.  Do you have that document, ma'am?

03:47:58 22  A.  Yes.

03:48:00 23  Q.  This is your board resolution, Trumbull County Mental

03:48:08 24  Health and Recovery Board.  That's the -- where you are

03:48:10 25  executive director; is that right?

—Caraway (Direct by Lanier)—

03:48:11  1    A.   Yes.

03:48:13  2    Q.   It's a resolution responding to Ohio's opiate epidemic.

03:48:19  3            Do you see that as well?

03:48:20  4    A.   Yes.

03:48:22  5    Q.   Would you please read us the first paragraph into the

03:48:25  6    record?

03:48:25  7    A.   Whereas, the members of the Alliance For Substance Abuse

03:48:34  8    Prevention ASAP opiate task force are committed to leading

03:48:36  9    Trumbull County in advancing recovery to achieve health and

03:48:38  10   wellness.

03:48:38  11   Q.   And ASAP is that that organization of which you were a

03:48:44  12   founding member?

03:48:44  13   A.   Yes.

03:48:46  14   Q.   Would you read the next paragraph, please?

03:48:48  15   A.   Whereas, Ohio leads the nation in opioid overdose deaths,

03:48:53  16   and --

03:48:54  17   Q.   The next paragraph, please.

03:48:55  18   A.   Whereas, the number of fentanyl related drug overdose

03:48:59  19   deaths throughout Ohio continues to increase each year from 84

03:49:04  20   in 2013, to 503 in 2014, to 1,155 in 2015, and --

03:49:11  21   Q.   And I'm going to pause for a moment.

03:49:13  22            Do you know whether or not these opioid overdose

03:49:16  23   deaths and these drug overdose deaths include not only

03:49:21  24   prescription but also illicit opioids like heroin and fentanyl?

03:49:26  25   A.   They would include all of them.

Caraway (Direct by Lanier)

03:49:37  1    Q.   And then the next paragraph, ma'am?

03:49:39  2    A.   Whereas, in Trumbull County, there were 254 overdose deaths

03:49:44  3    in 2014, 87 overdose deaths in 2015, and 106 overdose deaths in

03:49:51  4    2016.

03:49:52  5    Q.   And the next paragraph?

03:49:55  6    A.   And whereas, an average of 8 people die as a result of a

03:49:58  7    drug overdose each day in Ohio, one death every 3 hours.

03:50:01  8    Q.   And the next?

03:50:02  9    A.   And whereas, in the first quarter of 2017, 307 Trumbull

03:50:08  10   County residents overdosed from opiates and 39 people died.

03:50:12  11   Q.   And then the resolution at the end, would you read that for

03:50:15  12   the jury, please, in the record?

03:50:17  13   A.   Therefore, be it resolved that the members of the Alliance

03:50:21  14   For Substance Abuse Prevention, ASAP Opiate Task Force, urge

03:50:24  15   the governor of the State of Ohio, the Ohio General Assembly

03:50:27  16   and Ohio's Congressional Delegation to declare the opiate

03:50:33  17   epidemic an emergency prioritizing the needs of Ohioans impact

03:50:35  18   by opiate addiction by dramatically increasing investments in

03:50:38  19   prevention, treatment, recovery support, education, and

03:50:41  20   interdiction efforts to end this epidemic.

03:50:44  21   Q.   And the date on this?

03:50:46  22   A.   Ratified on the 18th day of April, 2017.

03:50:50  23   Q.   Now, I started this line of questioning before I showed you

03:50:55  24   this by asking what you and your board are doing about the

03:51:03  25   epidemic in Trumbull County and Greater Ohio.  And I show you

———Caraway (Direct by Lanier)———

03:51:07 1  this to ask the question about this, why did you and your board

03:51:12 2  seek this intervention help?

03:51:15 3  A.  We needed -- we were sounding the alarm.  We were so

03:51:21 4  inundated in our county with deaths that we had to buy

03:51:28 5  autopsies from the coroner's office.  For the first time in

03:51:31 6  history, my board gave our coroner's office $70,000 to help pay

03:51:36 7  for those kinds of things.  It was like we were hit with a

03:51:41 8  tsunami, and we were just pulling the bodies out of the water.

03:51:44 9         We were doing everything that we could think of and

03:51:47 10  that we read in the research to make an impact and to stop the

03:51:51 11  epidemic in our community, and this was just one more thing.

03:51:55 12  But it was sounding the alarm, saying, we are struggling and we

03:51:58 13  need help on every level.

03:52:00 14  Q.  As we continue to talk about some of the innovative and

03:52:04 15  outstanding ways you and your people have worked on this, I

03:52:07 16  want to show you demonstrative Number 65 and have you explain

03:52:12 17  to the jury what this is.

03:52:15 18  A.  That's a Deterra bag, and if you put --

03:52:18 19  Q.  It's a what?

03:52:19 20  A.  A Deterra bag.  It's to dissolve pills.

03:52:27 21  Q.  I've got some. . .

03:52:46 22         Thank you, Maria.

03:52:48 23         Would you take them out and would you explain to the

03:52:50 24  jury what those are, and then I'll ask you about why you've got

03:52:53 25  them.

HEATHER K. NEWMAN, RMR, CRR

Caraway (Direct by Lanier)

03:52:54 1   A.  So these -- the chemicals in here -- and I made sure that

03:53:00 2   they were environmental safe before we started accepting them,

03:53:06 3   buying them, distributing them, some were donated to our board

03:53:09 4   to give out in the community.  We ended up purchasing a lot of

03:53:12 5   them because we had put forth a huge campaign with billboards

03:53:19 6   and working with the schools, and all the speech -- speaking

03:53:23 7   engagements I do to get people to get their prescription

03:53:27 8   opioids out of their medicine cabinets, because all of the data

03:53:30 9   we were looking at suggested that's where a lot of people first

03:53:34 10  started, especially young people, was getting it out of a

03:53:38 11  medicine cabinet.

03:53:39 12          And, so, we bought a lot of these and we sent them --

03:53:44 13  like Meals on Wheels we have in our community.  So we sent them

03:53:48 14  home to people, mostly seniors, or those with disabilities who

03:53:51 15  can't get out to one of the drop boxes.  And that was another

03:53:54 16  initiative, we partnered with our police departments to put up,

03:53:59 17  I think we're at 14 drop boxes right now throughout the county.

03:54:02 18          So we encourage people, dispose of your meds, and for

03:54:05 19  those who were homebound, we made sure that they got these so

03:54:08 20  they could put the medicine in here, dissolve it, throw it

03:54:12 21  away.  And again, it's environmentally safe if it ends up in

03:54:18 22  the landfill.  And we worked with our Metropolitan Housing

03:54:23 23  Authority, all our senior housing.  You know, we really tried

03:54:24 24  to focus efforts on people who couldn't get out.

03:54:26 25  Q.  You've done fliers.  Tell the jury about the fliers you've

—————Caraway (Direct by Lanier)—————

03:54:29  1    done.

03:54:30  2    A.   We've done -- specific to this or in general?

03:54:33  3    Q.   Specific to this, the opioid issues.

03:54:36  4    A.   Okay.  Not the Deterra bags.

03:54:40  5    Q.   Well, those are opioid related.  Do both.

03:54:42  6    A.   So we educated and did fliers, of course, about the Deterra

03:54:46  7    bags and about the -- we created these brochures saying where

03:54:50  8    all the drop boxes are in the county, and we actually mailed

03:54:53  9    postcards home to some of the rural areas because we were going

03:54:56 10    out and putting these brochures, anything -- anyplace we could

03:55:00 11    think of.  I have a box in my trunk.  And one of the years, all

03:55:05 12    of the ASAP, the Alliance For Substance Abuse Prevention task

03:55:10 13    force members, we took a list and we focused on taking them to

03:55:15 14    doctors' offices and pharmacies.  And I personally delivered to

03:55:20 15    pharmacies and asked them to please put these out to educate

03:55:23 16    people to get rid of their medications.

03:55:26 17    Q.   Did you take them to any of the pharmacies in this case?

03:55:30 18    A.   I took them to Walgreens.

03:55:33 19    Q.   Okay.

03:55:33 20    A.   And one of my staff took them to Giant Eagle.

03:55:36 21    Q.   The ones that you took, were you able to go back and see if

03:55:39 22    they were out and --

03:55:42 23    A.   When I took it to Walgreens -- and I don't know if it was a

03:55:45 24    pharmacist or a tech --

03:55:47 25    Q.   And you can't say anything that Walgreens said to you in

HEATHER K. NEWMAN, RMR, CRR

—Caraway (Direct by Lanier)—

03:55:48  1   your answer, please.  That would be hearsay.

03:55:50  2   A.   I didn't see them out again.

03:55:51  3   Q.   Okay.  In addition to these bags, in addition to the

03:56:02  4   community service you're talking about, do you make

03:56:05  5   presentations yourself?

03:56:06  6   A.   All the time.

03:56:07  7   Q.   And give the jury a feel for where you're making the

03:56:11  8   presentations and why?

03:56:14  9   A.   So I get requests, I've spoken to the Republican Women's

03:56:21 10   Group, the Democratic Party, Rotarians, Kiwanis, lots of

03:56:26 11   schools, lot of parent nights, lots of senior groups through

03:56:31 12   the Trumbull Metropolitan Housing Authority.  We've targeted --

03:56:36 13   I've spoken in a lot of churches, taken them resources,

03:56:40 14   learning from them not just going in and speaking, but spending

03:56:43 15   time with them and learning how's this opiate crisis affecting

03:56:50 16   you, let's say, in the church, and how can we work together to

03:56:52 17   get you the resources that you need.  I -- I -- I don't -- I

03:56:57 18   don't have a number, but a hundred.  A lot.

03:56:59 19   Q.   Okay.  Now, the jury has already seen Plaintiffs'

03:57:05 20   Exhibit 4598 because we had Officer Villanueva in here to

03:57:10 21   testify about things, but I'd like to show it to you and to

03:57:13 22   walk through some of these provisions that were in here that

03:57:23 23   were a little outside of his area but maybe more into yours.

03:57:26 24        We talked with Officer Villanueva, Captain Villanueva

03:57:35 25   about law enforcement personnel and Good Samaritan laws and

HEATHER K. NEWMAN, RMR, CRR

—————Caraway (Direct by Lanier)—————

03:57:35  1   monitoring on probation.  So I'll leave that alone with you.

03:57:46  2   Ditto with this and the street crime.

03:57:48  3         But let's get started down here.  Reduce -- first of

03:57:56  4   all, are you familiar with this document?

03:57:57  5   A.   Yes.  I put it together.

03:57:59  6   Q.   You actually put the document together?

03:58:01  7   A.   Yes, sir.

03:58:02  8   Q.   Can you explain to the jury why?

03:58:05  9   A.   So through our fatality review board, when we were

03:58:13 10   gathering information, looking at data, when we talked about

03:58:17 11   putting together an action plan, and, so, it started in that

03:58:21 12   committee and it's carried over into our ASAP coalition.  And

03:58:26 13   I've shared this with state people and county people and

03:58:29 14   anybody really who wants it.  And then we add to it as people

03:58:32 15   say, well, I did this, then we'll add it on to the action plan.

03:58:36 16         And then I share it with other counties because I want

03:58:39 17   to find out what did we -- what did we forget?  Are you doing

03:58:43 18   something in your community that we maybe can try here, and

03:58:47 19   vice versa.  They, you know, borrow information off of mine.

03:58:50 20   So it's a working document.  We continue to update it all the

03:58:53 21   time.

03:58:53 22   Q.   Okay.  In that regard, I'd like to ask you about some of

03:58:55 23   the things you've put on here.

03:58:57 24         On Page 6 you have increase access to prescription

03:59:04 25   medication disposal sites.

—Caraway (Direct by Lanier)—

03:59:08  1  A.   Yes.

03:59:08  2  Q.   Can you tell the jury about these and what you were talking

03:59:12  3  about?

03:59:16  4  A.   Yeah.  So when this was done -- okay.  We're up to 15 now.

03:59:23  5  I said 14.  So we worked with the local police departments

03:59:27  6  because we can't take medication or narcotics, you know, we

03:59:31  7  don't have -- we're not allowed.  The police have to take it in

03:59:35  8  and dispose of it, and, so, the police agreed, and we bought

03:59:40  9  the boxes, to put into their stations, and they actually bolt

03:59:46  10  them into the floor and then they work to disintegrate when the

03:59:53  11  boxes fill up.  And we did the billboards and the posters and

03:59:56  12  the postcards to, again -- and, you know, I've been on TV, done

04:00:01  13  commercials, to encourage people to use them.  So that was one

04:00:03  14  of the initiatives.

04:00:05  15  Q.   The results I find interesting.  Can you read those into

04:00:09  16  the record and speak of those, please?

04:00:14  17  A.   The number of permanent sites, or are you talking the drug

04:00:17  18  take-back events?

04:00:18  19  Q.   The drug take-back events with the sheriff's department and

04:00:22  20  the Solid Waste Management District and ASAP.

04:00:25  21  A.   Yeah.  So in addition to putting these stationary sites, we

04:00:30  22  worked with our law enforcement -- you've maybe seen on TV it's

04:00:36  23  drug take-back day.  So we participate in a number of those to

04:00:39  24  collect pills back and, again, get them out of people's

04:00:42  25  medicine cabinets.

Caraway (Direct by Lanier)

04:00:45  1      And in May of '17, 3,770 pills were collected, and

04:00:52  2  then they -- they say there was too much to count so they

04:00:55  3  started just weighing them.  So the police officers were there

04:00:58  4  and some volunteers from the ASAP coalition to help, and in

04:01:04  5  2017 of September we had 199 pounds.  Then in May 9th of '18,

04:01:11  6  151 pounds.  September 12th of '18, 120 pounds.  April 6th of

04:01:19  7  '19, 164 pounds of pills.  620 -- I'm sorry, June 28th of '19,

04:01:27  8  119.5 pounds, and the last -- this was last updated in February

04:01:31  9  of '21, so we've had another one since then, but in June 6th of

04:01:35 10  '20, we had 176 pounds.  And that's actually our highest ever.

04:01:41 11  Q.  Okay.  Go priority Number 2, Goal Number 2 in your action

04:01:48 12  plan is to increase the number of persons with addiction

04:01:55 13  receiving evidence based inpatient and outpatient drug

04:01:59 14  treatment by enhancing the capacity and funding for accredited

04:02:02 15  drug treatment centers.

04:02:04 16      Can you explain that, please?

04:02:06 17  A.  Yes.  So the state only would allow 16 detox beds at an

04:02:11 18  agency.  And when the epidemic was just out of control, I

04:02:17 19  didn't have any beds in Trumbull County.  None of the agencies

04:02:20 20  provided detox.  So I was -- again, we buy services, so I was

04:02:25 21  buying detox beds from two places in Pennsylvania, several

04:02:29 22  places in Mahoning County, which is right next door to Trumbull

04:02:34 23  County, and so one of our agencies opened 16 beds which filled

04:02:39 24  immediately.  And now since then we've had other agencies open,

04:02:43 25  but we did some work with the state because we didn't

**4254**

———Caraway (Direct by Lanier)———

04:02:46  1  understand why they were only allowed to have 16 beds when the

04:02:49  2  need was so much greater.

04:02:52  3  Q.  Okay.  And then another measurable objective was to

04:02:59  4  increase the number of overdose placement -- overdose patients

04:03:02  5  that were placed from hospital emergency departments to detox

04:03:05  6  or outpatient treatment.

04:03:07  7          Can you explain that need?

04:03:11  8  A.  Yes.  So let's take 2017, which was that biggest year, you

04:03:18  9  know, they had 1,250 people come to the emergency room after

04:03:22  10  being revived with naloxone, and we wanted to put them in a

04:03:27  11  program.  We don't want them to just go back out, you know, and

04:03:31  12  if you don't help them with their withdrawal and help them with

04:03:34  13  their disorder, they're going to use again.  And at some point

04:03:39  14  they're going to die.

04:03:40  15          So we started really closely partnering with our

04:03:43  16  emergency departments to try and get people from there out.  So

04:03:49  17  our board pays Coleman to actually embed staff right in the

04:03:53  18  emergency department so that if this happens, a staff member

04:03:57  19  can go and meet with that person, and, yes, they can leave on

04:04:00  20  their own, but we really try to just say, okay, let me call

04:04:05  21  this place and get you a bed.  Let's get you into treatment

04:04:09  22  right now.  Because if we don't get into treatment right now,

04:04:11  23  the withdrawal is too great and they're just going to go out

04:04:14  24  and use again.

04:04:17  25  Q.  As we continue to look at your objectives here for the

Caraway (Direct by Lanier)

04:04:21 1 second of increasing treatment, you've got increase linkage of

04:04:27 2 overdose victim with peer support and recovery coaches.

04:04:29 3 Can you explain that, please?

04:04:32 4 A. Yeah. So one of the initiatives the state really started

04:04:35 5 getting into was funding trainings to get people who were in

04:04:39 6 recovery into these jobs as a peer supporter recovery coach,

04:04:46 7 because people with a substance abuse disorder can relate

04:04:49 8 better to someone in recovery from a substance abuse disorder.

04:04:53 9 So we've helped our agencies by funding several of

04:04:55 10 those positions, and we've sponsored a lot of those trainings.

04:05:01 11 Q. Okay. As we continue to look at some of these measurable

04:05:06 12 objectives, you've got increase access to treatment and detox.

04:05:12 13 Has there been a need for that in your county, and if

04:05:15 14 so, explain what you're charting here?

04:05:18 15 A. Yeah. So at the beginning we didn't have any detox beds

04:05:22 16 and we needed that. So I had already mentioned about the one

04:05:28 17 agency putting 16 beds and then another 16, but as this was

04:05:33 18 going on, detox isn't enough, and we learned that pretty early

04:05:37 19 on. And you can't just say, okay -- because detox averages at

04:05:43 20 about 8 days. We need a place to do step-down. So they need a

04:05:47 21 stepdown into what we call intake -- inpatient treatment, and

04:05:51 22 then from there our board started funding these recovery

04:05:56 23 houses. And they were run -- not always, but most of the time

04:05:59 24 by someone who's been in long-term recovery who wants to help

04:06:02 25 people get to recovery. And so there's males houses -- men

HEATHER K. NEWMAN, RMR, CRR

—Caraway (Direct by Lanier)—

04:06:07  1   houses and female houses, and we fund those as well.

04:06:12  2           And so I have a lot of grant writers on staff.  We

04:06:15  3   kept writing for grants, you know, trying to bring funding in

04:06:18  4   to pay for more of these, because every time we build a

04:06:23  5   program, it would fill up.  There just -- the need is so great.

04:06:33  6   Q.   Another area that you've set a goal on is reducing

04:06:39  7   physician prescribing of opiates.

04:06:41  8   A.   Yes.

04:06:42  9   Q.   Can you talk about that, please?

04:06:46 10   A.   So we started working, you know, with doctors and dentists

04:06:51 11   on, again, learning from them and then coming up with a plan to

04:06:55 12   help.  So Mercy Health is a big health system in our community,

04:07:01 13   and they got a grant to do screening brief intervention and

04:07:05 14   referrals to treatment.  It's called SBIRT.  And so they were

04:07:09 15   training their physicians to do this four, five questions, ask

04:07:14 16   the person just to see if they were at risk of developing

04:07:21 17   substance abuse disorder to the opiate.  That was just one of

04:07:26 18   the tools in this particular toolbox.  So we then did a

04:07:30 19   mailing.  I signed it and our health commissioner from the

04:07:34 20   health department, and we mailed letters to all of the

04:07:37 21   physicians asking them to use titration protocols, meaning

04:07:44 22   don't just abruptly stop someone's prescription, but wean them

04:07:48 23   off of it, because when you abruptly stop it, they go into

04:07:52 24   withdrawal and then they'll turn to street drugs.

04:07:54 25           And we gave them brochures on all the agencies that

Caraway (Direct by Lanier)

04:07:58  1  were out here that could help people if the doctor, you know,

04:08:01  2  would refer the patient.  So, again, we're always looking at,

04:08:05  3  you know, different prongs to one problem.

04:08:09  4  Q.  And the same objective on the next page.  You've got the

04:08:15  5  action step of advocate for mandated use of Ohio Automated

04:08:23  6  Prescription Reporting System, OARRS, by doctors and

04:08:28  7  pharmacies.

04:08:28  8  A.  Which page are you on?

04:08:29  9  Q.  I'm on Page 12 of 21.  The top of Page 12.

04:08:41 10  A.  Okay.

04:08:42 11  Q.  Is that part of your action plan as well, action step?

04:08:46 12  A.  Yes.

04:08:50 13       So we stand -- we did, again, campaigns, media work,

04:08:56 14  brochures, asking doctors to use the OARRS system, and, you

04:09:04 15  know, pharmacies to use the OARRS system so that anyone who

04:09:09 16  might be getting too much prescriptions for whatever reason so

04:09:13 17  that we could stop that.

04:09:16 18  Q.  You've posted on here partner with the Eastern Ohio Area

04:09:22 19  Health Education Center to reduce prescribing of opioids.  And

04:09:27 20  it looks like y'all posted six videos on YouTube; is that

04:09:33 21  right?

04:09:33 22  A.  Yes.  We did these -- I didn't do them, but we had kids

04:09:40 23  who -- that's the thing I learned awhile ago, kids are better

04:09:43 24  at -- young people, teenagers, and college age at developing

04:09:46 25  things that other people that age group are going to watch.

HEATHER K. NEWMAN, RMR, CRR

Caraway (Direct by Lanier)

04:09:49 1  And so we had them target some and then we used other ones that

04:09:53 2  were kind of canned things, but things talking about the

04:09:57 3  addictive brain, the importance of addressing addiction,

04:10:01 4  reducing barriers to healthy pregnancies and healthy babies.

04:10:04 5  So they were educational campaigns.

04:10:08 6          And our board has two social media accounts.  We have

04:10:08 7  an ASAP coalition Facebook page and our board Facebook page,

04:10:13 8  and so we push things out through both of those.

04:10:16 9  Q.  To reduce prescribing against opioids, the Trumbull County

04:10:22 10  commissioners filed a lawsuit against pharmaceutical companies.

04:10:29 11  Expected to go to trial October 2021.  That's this; right?

04:10:33 12  A.  Yes.

04:10:34 13  Q.  Again, an effort to try and reduce prescribing?

04:10:37 14  A.  Yes.

04:10:42 15  Q.  The next measurable objective was to increase access to

04:10:48 16  recovery housing.

04:10:50 17          Explain what recovery housing is and why there's a

04:10:53 18  need for that in your county?

04:10:56 19  A.  So the recovery houses that we contract with, again, a

04:11:04 20  female owner, and other counties are different, but this is how

04:11:11 21  our board contracts with them; female owner has a female

04:11:15 22  recovery house, male owner, male recovery house, and they give

04:11:17 23  them a bed, they give them support.  They have what they call,

04:11:21 24  you know, the house meetings.  They encourage 12-step

04:11:27 25  participation, going to Narcotics Anonymous and other things.

—————Caraway (Direct by Lanier)—————

04:11:31  1  They help them with getting jobs, getting to the job.  Anything

04:11:35  2  they can do to help fix the family unit, because by the time

04:11:39  3  someone ends up going through detox and treatment and into

04:11:42  4  recovery house, lots have gone on with their families.  It's

04:11:46  5  the number one issue.  And so, again, multiple pronged approach

04:11:50  6  to get people successful in their recovery.

04:11:54  7      So there's a certifying board out of Columbus, Ohio

04:12:04  8  Recovery Housing, and so we only use owners who get that

04:12:07  9  certification to make sure that they are at a standard they

04:12:10 10  should be for housing this very vulnerable population.  So

04:12:13 11  every year our board has paid money to help them pay their rent

04:12:15 12  because most people who go there don't have a job, and then

04:12:19 13  we'll pay it -- at this point, we pay half the rent for five

04:12:23 14  months, and if they stay for the 6th month, we pay that full

04:12:26 15  month because we know the longer they stay in that recovery

04:12:28 16  house, the more likely they're going to stay in long-term

04:12:32 17  recovery.

04:12:32 18      So we've changed that over time.  Again, it's like I

04:12:35 19  always -- I say, we're building this train as it's going down

04:12:39 20  the track, so we're just trying to learn, okay, this didn't

04:12:42 21  work, let's try something else, but that's -- that's our model

04:12:46 22  right now.

04:12:46 23  Q.  Okay.  Next you've got a measurable objective of reducing

04:12:52 24  substance abuse.

04:12:54 25      Can you explain that?

HEATHER K. NEWMAN, RMR, CRR

—————Caraway (Direct by Lanier)—————

04:12:59  1   A.  Well, this is a big one.  This is the -- all the prevention

04:13:02  2   work that we do, all of the -- you know, let's say, marketing

04:13:08  3   campaigns, our ASAP coalition, we've done these educational

04:13:14  4   drug summits every year.  We do a recovery rally every year.

04:13:18  5   At this last recovery rally, we had 650 people come, and we

04:13:22  6   celebrate those who have made it into recovery.  And we also

04:13:25  7   read off the names of people who died that year and didn't make

04:13:27  8   it to recovery.

04:13:30  9        We work with our churches because a lot of them are

04:13:34 10   doing some faith-based programs and they're allowing 12-step

04:13:38 11   meetings in their basement.

04:13:39 12        So again, it's just anybody in the community, how can

04:13:41 13   we get you involved in this process.

04:13:44 14        We do these pride surveys in the schools and they

04:13:47 15   measure -- so it's 6th, 8th and 10th grade, and we do it every

04:13:53 16   other year, so we're looking at longitudinal over time how are

04:13:57 17   these kids doing.  And it doesn't just measure are they using,

04:14:00 18   and it measures tobacco, alcohol, marijuana, and opiates.  So

04:14:04 19   are they using, but then another indicator is perception of

04:14:07 20   harm.  Do the kids think it's harmful.

04:14:10 21        And when marijuana was legalized as for medical

04:14:13 22   purpose, the next time we did the study, the perception of harm

04:14:16 23   of marijuana just plummeted because they saw it as medicine.

04:14:22 24        Another thing we measure is what does your parents'

04:14:24 25   perception, and from that we found that if the parents are

—————Caraway (Direct by Lanier)—————

04:14:29 1  saying I don't want you to use drugs and here's why, the kids

04:14:31 2  are less likely to use.

04:14:32 3         So again, it's gathering information and then we share

04:14:35 4  that back with the schools to say, how -- let us help you

04:14:40 5  target prevention programs because you have this specific need

04:14:43 6  in this specific school system.  We have 22 school systems in

04:14:48 7  Trumbull County, so it's a lot.

04:14:51 8  Q.  As you continue on that, one of the things I found

04:14:55 9  interesting was identify neighborhoods with highest incidents

04:15:01 10 of overdoses and provide resources to those neighborhoods.

04:15:06 11        Are you able to find some neighborhoods that are worse

04:15:10 12 off than others?

04:15:11 13 A.  Yes.  The information that we get from the health

04:15:15 14 department and the coroner's office is broken down by ZIP code,

04:15:18 15 and we have three ZIP code areas in the Warren area, and Niles

04:15:22 16 is always Number 4 with the highest incidences of overdoses and

04:15:27 17 overdose deaths.  So we actually made a door hanger and it had

04:15:31 18 a foot on it with a toe tag, I mean, we were thinking, what can

04:15:35 19 we do to get people's attention, and we put on the back of it,

04:15:39 20 the risk of using opiates, what the potential result could be,

04:15:42 21 and then where to get help.

04:15:45 22 Q.  You have -- as you continue through here, an action step

04:15:53 23 promote how to help children, the trauma of witnessing an

04:15:58 24 opioid overdose brochure.

04:16:02 25        Now, you can't tell me what people have told you, and

——Caraway (Direct by Lanier)——

04:16:04  1   I want to underscore that, but within the framework of that

04:16:11  2   admonition --

04:16:12  3   A.   Can you tell me what number you're on?

04:16:13  4   Q.   Yes, ma'am.  I'm on Page 16 of 21.

04:16:15  5   A.   Okay.

04:16:18  6   Q.   Third box down under action steps.

04:16:21  7   A.   Got it.

04:16:21  8   Q.   So you can't tell me what anybody said to you or anything

04:16:25  9   like that, but I do think you could tell us, please, what is

04:16:30  10  this brochure and why is it an important brochure?

04:16:35  11  A.   Yeah.  So we knew the need because we had a 40 percent

04:16:42  12  increase of children ending up in foster care in our community

04:16:46  13  as a result of their parents' opiate issues.  Sometimes it was

04:16:51  14  a death.  Sometimes it was just long-term use and they became a

04:16:55  15  dependent child.

04:16:57  16       We had a 65 percent increase of our children going

04:17:00  17  into kinship care, mostly being raised by grandparents,

04:17:05  18  sometimes by, you know, an aunt, uncle or somebody else.  And

04:17:11  19  we had made these brochures -- again, got it from somewhere

04:17:15  20  else, but the information on trauma.  And what this trauma of

04:17:19  21  witnessing an overdose can do to a child, signs to look for if

04:17:23  22  that child is in crisis, encouraging.  Obviously, if they were

04:17:28  23  in foster care, all of these children got counseling, but we

04:17:31  24  worked with the schools.  We put it on our website.  We promote

04:17:34  25  it to the community for those who, you know, because of stigma

———Caraway (Direct by Lanier)———

04:17:38  1  maybe weren't talking about the issue, to explain especially to

04:17:42  2  grandparents who are raising these kids, you know, they could

04:17:45  3  have long-term consequences if we don't work with them now to

04:17:48  4  deal with these trauma issues of what they've experienced

04:17:51  5  either being left alone or witnessing an overdose.  And we've

04:17:55  6  had a lot of -- on the news, the trauma, they're always -- you

04:18:02  7  know, for years they're reporting people crashing their car

04:18:05  8  because of an overdose.

04:18:06  9  Q.  Let me interrupt you there because that is --

04:18:09 10  A.  Okay.

04:18:09 11  Q.  That's hearsay and I can't get that on the record.

04:18:12 12  A.  Okay.

04:18:12 13  Q.  So let me ask this:  The third priority and goal is to

04:18:17 14  increase support for first responders.  I think this is pretty

04:18:23 15  cool.  So I want you to tell the jury what kind of stuff y'all

04:18:26 16  are doing for those first responders.

04:18:30 17  A.  So again, in 2017 we were averaging three overdose deaths a

04:18:37 18  day -- or in most, thank God, were brought back with naloxone.

04:18:43 19  But our first responders were just, you know, day in and day

04:18:46 20  out.  And we're talking police, fire, EMTs, the hospital staff.

04:18:50 21  So we started some initiatives, and this was actually a

04:18:55 22  statewide effort, appreciation weeks.  So we took them

04:18:59 23  doughnuts or coffees or, you know, there were videos made.  We

04:19:05 24  featured some of the first responders in a commercial thanking

04:19:09 25  them, thanking them for what they were doing day in and day out

——Caraway (Direct by Lanier)——

04:19:12  1   dealing with this crisis.  And we also made sure that they all

04:19:16  2   knew where they could get free confidential help if they

04:19:19  3   themselves were, you know, experiencing burnout because of what

04:19:24  4   they had been witnessing day in and day out.  And a lot of them

04:19:27  5   took us up on that.

04:19:34  6   Q.  You were here today to listen to testimony, and I know

04:19:38  7   you've been in here a few days of the trial.  In addition to

04:19:46  8   that, are you doing the best you can to try and address the

04:19:50  9   opioid problem in Trumbull County?

04:19:52 10   A.  Yes, I'm doing the best I can.  I -- you know, I'm on 24/7

04:20:00 11   call and, you know, I -- I'm always researching what else can

04:20:06 12   we try differently.  I know I'm my own worst critic because

04:20:11 13   people are still impacted and dying, so I know there's more

04:20:15 14   that needs done.

04:20:15 15   Q.  And when you say you're on 24/7 call, you're not just using

04:20:21 16   an expression, you get calls 24/7?

04:20:24 17   A.  Yes, I do.

04:20:25 18   Q.  All right.  Thank you for all you're doing.

04:20:27 19          Your Honor, I'll pass the witness.

04:20:33 20          THE COURT:  Okay.  Any cross-examination?

04:20:34 21          Yes, Ms. Fiebig.

04:20:37 22          MS. FIEBIG:  Thank you, Your Honor.

         23

         24

         25

─────────────Caraway (Cross by Fiebig)─────────────

04:20:37  1                CROSS-EXAMINATION OF APRIL CARAWAY

04:21:03  2    BY MS. FIEBIG:

04:21:03  3    Q.  Good afternoon, ladies and gentlemen of the jury.

04:21:06  4            Good afternoon, Ms. Caraway.  My name is

04:21:11  5    Chantale Fiebig, and I'm one of the lawyers representing Giant

04:21:13  6    Eagle.  Everyone here appreciates the hard work that you and

04:21:15  7    your organization do for the people of Trumbull County.

04:21:18  8            I have just a few questions for you today.

04:21:20  9    A.  Okay.

04:21:22  10   Q.  So I understand that you're a licensed social worker?

04:21:24  11   A.  Yes.

04:21:25  12   Q.  And you've been with the Trumbull County Mental Health and

04:21:32  13   Recovery Board since 2004; correct?

04:21:34  14   A.  Yes.

04:21:34  15   Q.  And you've been the executive director since 2009?

04:21:38  16   A.  Yes.

04:21:38  17   Q.  But you're not a medical doctor; right?

04:21:40  18   A.  No.

04:21:41  19   Q.  And you're also not a pharmacist or trained in pharmacy?

04:21:44  20   A.  No.

04:21:46  21   Q.  You don't actually treat patients who are suffering from

04:21:49  22   addiction; is that right?

04:21:50  23   A.  That's correct.

04:21:52  24   Q.  So do you have any knowledge or -- I understand that you

04:21:55  25   don't have any knowledge of the policies or practices or laws

HEATHER K. NEWMAN, RMR, CRR

—————————Caraway (Cross by Fiebig)—————————

04:22:00  1   that govern the dispensing of opioids by pharmacists; is that

04:22:05  2   correct?

04:22:05  3   A.   That is correct.

04:22:08  4   Q.   I'd like to talk with you a little bit about your job.

04:22:12  5        My impression is that the Trumbull County Mental

04:22:17  6   Health and Recovery Board services a wide range of people

04:22:19  7   suffering from all sorts of addictions; is that right?

04:22:22  8   A.   That's correct.

04:22:23  9   Q.   And it helps citizens who are addicted to things other than

04:22:28 10   opioids, like alcohol; correct?

04:22:29 11   A.   Yes.

04:22:30 12   Q.   And also amphetamines?

04:22:33 13   A.   Yes.

04:22:33 14   Q.   And cocaine?

04:22:34 15   A.   Yes.

04:22:35 16   Q.   And illicit fentanyl?

04:22:37 17   A.   Yes.

04:22:38 18   Q.   And heroin; right?

04:22:39 19   A.   Yes.

04:22:41 20   Q.   And would you agree that all of those drugs that I just

04:22:45 21   named are all causing addiction and death and health problems

04:22:48 22   in Trumbull County today?

04:22:52 23   A.   Those are all substances that people are addicted to in

04:22:56 24   Trumbull County.  Not all of them cause death.

04:23:01 25   Q.   But would you agree that some of them do, like heroin and

———— Caraway (Cross by Fiebig) ————

04:23:06　1　illicit fentanyl?

04:23:06　2　A.  Yes, definitely.

04:23:07　3　Q.  And I understand that you're always on the alert for new

04:23:10　4　threats and trends in drug use so that you're prepared to lead

04:23:13　5　and respond to those threats; is that right?

04:23:15　6　A.  Yes.

04:23:16　7　Q.  And would you agree that the spread of illicit fentanyl

04:23:20　8　through Trumbull County is a relatively recent trend?

04:23:28　9　A.  Recent -- I mean, it's growing, but we've started seeing it

04:23:34　10　the most after prescription opioids started to go down, the

04:23:42　11　heroin went up, and then for whatever reason heroin wasn't as

04:23:48　12　available and fentanyl came in, and it just came in hard.

04:23:52　13　Q.  So just so it's clear for the jury, I understand that there

04:23:55　14　are sort of two types of fentanyl, there is a prescription form

04:23:58　15　of fentanyl that's often prescribed in a patch and then there's

04:24:01　16　an illicit form of fentanyl that is not dispensed at

04:24:07　17　pharmacies.

04:24:08　18　　　　　Would you agree?

04:24:08　19　A.  Yes.

04:24:08　20　Q.  I believe we have a binder for you.  Let me see if we can

04:24:13　21　get that to you.  There's just a couple of documents I was

04:24:15　22　hoping to review with you.

04:24:19　23　　　　　And the first -- so that we can bring it up on the

04:24:24　24　screen -- is Bates stamped DEF MDL 13106.

04:24:35　25　　　　　And, Ms. Caraway, I believe that's in Tab 4.

─────────────── Caraway (Cross by Fiebig) ───────────────

04:24:38  1   A.   I'm sorry, what?

04:24:39  2   Q.   I believe that will be in Tab 4 for you.

04:24:43  3        We'll just pause while we get a copy to counsel.

04:25:03  4        And, Ms. Caraway, is Tab 4 in your binder an e-mail

04:25:08  5   forwarded from you?

04:25:09  6   A.   Yes.

04:25:09  7   Q.   Okay.  And do you recognize that e-mail?

04:25:11  8   A.   I do.

04:25:15  9        MS. FIEBIG:  Can we bring that up, please?

04:25:20 10   BY MS. FIEBIG:

04:25:21 11   Q.   Okay.  So Ms. Caraway, this e-mail is dated September 21st,

04:25:24 12   2018; correct?

04:25:25 13   A.   Yes.

04:25:27 14   Q.   And you've written there --

04:25:31 15        MR. LANIER:  Your Honor, I do want to put an objection

04:25:32 16   down.

04:25:32 17        THE COURT:  Let's -- we'll go on the headphones.

04:25:47 18     (Proceedings at sidebar out of the hearing of the jury:)

04:25:51 19        MR. LANIER:  Your Honor, this is the very kind of

04:25:54 20   thing that I was told by defendants, including --

04:25:58 21        THE COURT:  Well, what's the document that is now off

04:26:02 22   the screen?  Where is --

04:26:04 23        MS. FIEBIG:  It should be in Tab 4, Your Honor.

04:26:16 24        MS. SULLIVAN:  And, Your Honor, I would submit, this

04:26:16 25   is very different.  She is actually on this e-mail.  This isn't

———— Caraway (Cross by Fiebig) ————

04:26:16  1 | hearsay.

04:26:17  2 |         THE COURT:  Well --

04:26:17  3 |         MR. LANIER:  Well, no.  The hearsay is the one that --

04:26:19  4 | this came from one of our agency doctors.  I had a very

04:26:22  5 | revealing talk with one of my clients.  He's a savvy,

04:26:24  6 | experienced addict and dealer.  What he told me was both

04:26:27  7 | revealing and frightening among the things he said.

04:26:30  8 |         THE COURT:  Well, what is --

04:26:34  9 |         MS. FIEBIG:  Your Honor, if I could just respond.

04:26:35 10 |         Under Federal Rule of Evidence 801(d)(2)(B), this is a

04:26:39 11 | statement by a party opponent that she manifested she believed

04:26:43 12 | to be true by forwarding it to her agents and partners.

04:26:46 13 |         MR. LANIER:  With due respect, I don't think that this

04:26:48 14 | client, who's an experienced addict and dealer, is her or one

04:26:52 15 | of the counties which is what would be called in by that rule

04:26:58 16 | of evidence.  It's not an admission of a party opponent; it's

04:27:02 17 | admission of an experienced addict and dealer talking about how

04:27:06 18 | easy it is to buy fentanyl on the dark web and what the price

04:27:09 19 | is.  This is --

04:27:10 20 |         THE COURT:  All right.  Let me ask you, why is this

04:27:12 21 | relevant, Ms. Fiebig?  Where are we going with this?  I mean,

04:27:16 22 | this is already -- everyone knows there's a lot of fentanyl and

04:27:19 23 | a lot of it's illegal.  I mean, when you start getting into

04:27:23 24 | hearsay, I'll let Mr. Lanier bring in hearsay also.

04:27:26 25 |         MS. FIEBIG:  Your Honor, I'm having a hard time

———Caraway (Cross by Fiebig)———

04:27:27   1   hearing you, but I believe that you asked where am I going with

04:27:30   2   this.

04:27:31   3           THE COURT:  Yeah.  I mean, if you start bringing in

04:27:34   4   all this hearsay, I'll let Mr. Lanier bring in more hearsay on

04:27:37   5   redirect.

04:27:37   6           MS. FIEBIG:  Well, Your Honor, we would contend that

04:27:40   7   this is not hearsay under the federal rules.

04:27:42   8           THE COURT:  It is hearsay, what some doctor -- what

04:27:44   9   some drug dealer said to some doctor is absolutely hearsay.

04:27:47  10           MS. FIEBIG:  Well, we can ask Ms. Caraway about what

04:27:49  11   she understood this information to be and the significance of

04:27:52  12   it.

04:27:52  13           THE COURT:  Well, what is the -- what is the point of

04:27:54  14   this whole line of questioning?  That's what I want to know.

04:27:57  15           MS. FIEBIG:  So she was asked during direct whether

04:27:59  16   the number of opioid deaths that she testified about included

04:28:02  17   both licit and illicit opioids.

04:28:06  18           THE COURT:  And she said yes.

04:28:07  19           MS. FIEBIG:  And -- correct.  And this explains the

04:28:09  20   prevalence of illicit fentanyl in the market, the ease of its

04:28:14  21   availability, and it also says that in many instances where

04:28:16  22   there are overdose deaths, those are due to the presence of

04:28:19  23   illicit fentanyl.

04:28:20  24           And she has forwarded that along and asked judges and

04:28:23  25   others to ensure that there's fentanyl testing for any of those

Caraway (Cross by Fiebig)

04:28:26 1    cases.

04:28:27 2         MR. LANIER:  That doesn't change anything that she's

04:28:31 3    testified to in this case.  I don't see it's relevance.

04:28:33 4         THE COURT:  Well, she said all that.  I mean, you can

04:28:34 5    ask letter if that's the case, and if she doesn't, you can show

04:28:37 6    her this document.  But the problem is getting into all this

04:28:40 7    hearsay.

04:28:42 8         And, you know, you've correctly pointed out that

04:28:45 9    Mr. Lanier couldn't do it, but you start, there's no end to it.

04:28:49 10   So just -- if you want to ask her the question and if she

04:28:52 11   denies it -- I mean, if she says that's not happening, well,

04:28:55 12   then, you can impeach her with this.

04:28:57 13        MS. FIEBIG:  Understood, Your Honor.

04:28:58 14        MR. LANIER:  And in that regard, I would underscore

04:29:00 15   for the record it's particularly stringent -- strident hearsay

04:29:05 16   when she wants it for the truth of the matter asserted, which

04:29:09 17   is what she's saying this is to prove how available it is.  So

04:29:13 18   with that, I'll --

04:29:13 19        THE COURT:  The thing is, the witness has already said

04:29:15 20   it's available.

04:29:15 21        MR. LANIER:  Agreed.

04:29:16 22        THE COURT:  So --

04:29:17 23        MR. LANIER:  So it's pointless.

04:29:18 24        THE COURT:  So -- but if you want to emphasize it with

04:29:20 25   a question, just ask the question.

HEATHER K. NEWMAN, RMR, CRR

─────Caraway (Cross by Fiebig)─────

04:29:23  1          MS. FIEBIG:  Thank you, Your Honor.  Will do.

04:29:23  2      (In open court at 4:29 p.m.)

04:29:23  3  BY MS. FIEBIG:

04:29:36  4  Q.  Okay.  Ms. Caraway, we had just being discussing illicit

04:29:41  5  fentanyl, correct?

04:29:41  6  A.  Yes.

04:29:42  7  Q.  And I recall that you testified during direct that some of

04:29:45  8  the opioid harms that citizens in Trumbull County are

04:29:49  9  experiencing due to the presence of illicit fentanyl; correct?

04:29:51 10  A.  Yes.

04:29:52 11  Q.  And are you aware whether there are also counterfeit

04:29:55 12  prescription pills that are available to citizens of Trumbull

04:29:59 13  County?

04:29:59 14  A.  I've been told there are.

04:30:00 15  Q.  And do you know where those pills originate from?

04:30:05 16  A.  We know -- well, I don't know if that's hearsay.  I was

04:30:09 17  told they're coming from Mexico and China.

04:30:13 18  Q.  Well, do you understand that they are not dispensed at

04:30:17 19  pharmacies, the counterfeit prescription pills that are in

04:30:20 20  Trumbull County today?

04:30:21 21  A.  Yes.  Correct.

04:30:30 22  Q.  I'd like to show you another document that should be in

04:30:39 23  your Tab 5.

04:30:39 24          Do you have that document?

04:30:40 25  A.  I do.

Caraway (Cross by Fiebig)

04:30:41 1    Q.  And does that appear to be an e-mail chain --

04:30:45 2            MR. WEINBERGER:  Can we have the document first before

04:30:48 3    you ask her?

04:30:48 4            MS. FIEBIG:  It's on its way.

04:30:50 5            MR. WEINBERGER:  Thank you.

04:30:53 6            MR. LANIER:  Before you ask questions.  Thank you.

04:30:55 7    BY MS. FIEBIG:

04:30:57 8    Q.  Ms. Caraway, do you understand -- do you see that that's an

04:30:59 9    e-mail?

04:30:59 10   A.  Yes.

04:30:59 11   Q.  Do you recognize that e-mail?

04:31:00 12   A.  I do.

04:31:01 13   Q.  And who are the parties to that e-mail?

04:31:02 14   A.  So Kathy Meszaros worked at the coroner's office, and I --

04:31:11 15   she and I were e-mailing back and forth.

04:31:14 16   Q.  And this e-mail is dated April of 2019; is that correct?

04:31:18 17   A.  Yes.

04:31:19 18   Q.  Okay.

04:31:20 19           MS. FIEBIG:  Can we go ahead and display that

04:31:22 20   document, please.

04:31:26 21           THE COURT:  Well, let's go on the headphones again.

04:31:37 22      (Proceedings at sidebar out of the hearing of the jury:)

04:31:37 23           THE COURT:  All right.  Ms. Fiebig, I'm not going to

04:31:42 24   cut you off, but if you bring in these documents, I'll let

04:31:45 25   Mr. Lanier bring in all sorts of other documents that people

—————————— Caraway (Cross by Fiebig) ——————————

04:31:48  1   showed to her, stuff from reporters or what not.

04:31:52  2          I mean, I don't think that this is at all relevant,

04:31:54  3   but if you think it is, then I'll let the plaintiffs counter

04:31:57  4   with whatever they've got.  So I just want to let you know

04:32:02  5   that.

04:32:02  6          MS. FIEBIG:  For the record, Your Honor, we do think

04:32:04  7   it's relevant.  We also think that these are just standard

04:32:06  8   business records.  This is how she conducts her business is

04:32:09  9   through e-mail, and she's testified already today that she had

04:32:11  10  extensive communications with the coroner's office.  She's

04:32:14  11  taking a position in this document that we think we should be

04:32:16  12  able to ask her about.

04:32:17  13         MR. LANIER:  Well, this -- it's standard way of doing

04:32:21  14  business, why that child's witness their parent with a needle

04:32:26  15  in the arm died of an overdose, and I stayed away from that.

04:32:30  16         THE COURT:  All right.  I'm just saying you can ask

04:32:32  17  the questions, particularly if you think that what she said

04:32:35  18  isn't accurate, and if she says something which you believe

04:32:40  19  isn't accurate, you can show her a document, but I'm just

04:32:43  20  saying you start putting in all these documents with all this

04:32:46  21  hearsay, I'll let Mr. Lanier do the same thing on redirect.

04:32:50  22         MS. FIEBIG:  Okay.  We'll just ask the question.

04:32:52  23  Thank you, Your Honor.

04:33:00  24      (In open court at 4:33 p.m.)

04:33:00  25  BY MS. FIEBIG:

Caraway (Cross by Fiebig)

04:33:02  1    Q.  Thank you four your patience, Ms. Caraway.

04:33:05  2         So in 2009, did you have an understanding that illicit

04:33:16  3    fentanyl was a cause of many of the harms?

04:33:19  4         MR. LANIER:  Objection, Your Honor.  I think she means

04:33:20  5    2009.

04:33:22  6         MS. FIEBIG:  I did, thank you.

04:33:23  7         THE COURT:  She asked 2009.  If you meant 2009, we'll

04:33:26  8    correct it.

04:33:26  9    BY MS. FIEBIG:

04:33:27 10    Q.  I did mean 2019, Ms. Caraway.

04:33:29 11         In 2019, did you have an understanding that illicit

04:33:34 12    fentanyl was a cause of many of the harms that you've testified

04:33:36 13    to today.

04:33:37 14    A.  Yes.

04:33:38 15    Q.  And did you state that publicly when asked by the media?

04:33:42 16    A.  Yes.  From our opiate overdose death review committee we

04:33:47 17    looked at the data and I would get information from the

04:33:49 18    coroner's office to back that up.  I wouldn't just -- you know,

04:33:53 19    I got it from them, um-hmm.

04:33:55 20    Q.  And would you agree that there are drug dealers in Trumbull

04:33:59 21    County who are lacing many drugs, including cocaine and

04:34:02 22    methamphetamines, with illicit fentanyl today?

04:34:05 23    A.  That's what's been reported.

04:34:06 24    Q.  And they do this because they know that it will get their

04:34:10 25    clients addicted to the illicit fentanyl; correct?

HEATHER K. NEWMAN, RMR, CRR

Caraway (Cross by Fiebig)

04:34:12  1    A.  Yes.  That's what's been --

04:34:15  2                MR. LANIER:  Object.

04:34:22  3                THE COURT:  Well. . .

04:34:28  4        (Proceedings at sidebar out of the hearing of the jury:)

04:34:28  5                THE COURT:  All right.  Ms. Fiebig, you are opening

04:34:31  6    the door to all sorts of testimony from this witness that she

04:34:35  7    hasn't given on direct, but she'll be on for a long time on

04:34:40  8    redirect.  Trust me, Mr. Lanier has hours of testimony he will

04:34:43  9    now be able to bring out through this witness.

04:34:46  10               MR. LANIER:  Especially if we're able to go into state

04:34:48  11   of mind of a drug dealer.

04:34:50  12               THE COURT:  Yeah.  It will be all sorts of things.  I

04:34:52  13   mean, I -- this witness gave very limited testimony.  If you

04:34:54  14   want to keep her on for a whole lot of things, that's fine.

04:34:57  15   She'll be on all tomorrow.

04:34:58  16               MS. FIEBIG:  Your Honor, we'll move on.

04:35:00  17               THE COURT:  All right.

04:35:00  18               MS. FIEBIG:  Thank you.

04:35:12  19        (In open court at 4:35 p.m.)

04:35:12  20   BY MS. FIEBIG:

04:35:20  21   Q.  Ms. Caraway, I'd like to talk about earlier in your tenure

04:35:23  22   at the Trumbull County Health and Recovery Board.

04:35:25  23               Do you agree that before the synthetic or illicit

04:35:32  24   fentanyl and even before prescription opioids, heroin has

04:35:33  25   always been a problem in Trumbull County?

HEATHER K. NEWMAN, RMR, CRR

Caraway (Cross by Fiebig)

04:35:39  1    A.   I know from reports from folks that heroin has always been

04:35:44  2    around, but it wasn't the problem that we see today with the

04:35:49  3    prescription opioids and then people going into the heroin use.

04:35:53  4    It just seems to have exploded.

04:35:56  5    Q.   But you've -- you've talked about how significant heroin

04:36:00  6    has been in some communities in Trumbull County before, right,

04:36:04  7    including in some of our talks at the churches that you

04:36:06  8    referenced during your direct testimony?

04:36:08  9    A.   Definitely.  Especially in our African American churches.

04:36:15  10   Again, like I said, when I go out and talk, I listen and I --

04:36:19  11   you know, get some education.  And I was told by not just them,

04:36:23  12   I have a couple of African American board members on my board

04:36:29  13   who have said that when it was a problem in the communities of

04:36:35  14   color, people didn't pay attention and people either died or

04:36:36  15   ended up going to jail.  And they told me that once it became a

04:36:40  16   problem in the suburbs with the Caucasian kids and affluent

04:36:48  17   families everybody started paying attention.  So I had to

04:36:50  18   listen to that and own it and make steps to make sure that we

04:36:53  19   were addressing that specifically with people of color.

04:36:57  20   Because I don't want them to feel like they can't get the help

04:37:01  21   they need or they're being, you know, in their words, ignored.

04:37:05  22   The problem was ignored back then, but we're not ignoring it

04:37:08  23   now.

04:37:08  24        So we've done a lot of outreach, educational efforts,

04:37:16  25   again, looking at data to make sure that our communities of

**4278**

———Caraway (Cross by Fiebig)———

04:37:18  1    colors are engaged in treatment and getting the help that they

04:37:20  2    need.  So definitely it was a bigger problem in the minority

04:37:26  3    community.  You know, one of my board members is 40 years sober

04:37:30  4    from being on heroin and so I've learned a lot from her.

04:37:34  5    Q.  Right.  And when heroin was such an issue in the community

04:37:36  6    of color you've said that no one really paid much attention to

04:37:39  7    that; right?

04:37:39  8    A.  That's what I was told.

04:37:40  9    Q.  Right, and it wasn't until the prescription pills became

04:37:45 10    attractive to suburban white children that more attention was

04:37:50 11    paid; correct?

04:37:51 12    A.  That's what I was told.

04:37:54 13    Q.  And it was only at that point that lawsuits like this were

04:37:54 14    filed; right?

04:37:55 15    A.  I don't know about that.

04:37:57 16          MR. WEINBERGER:  Objection, Your Honor.

04:37:58 17          THE COURT:  Sustained.

04:38:01 18    BY MS. FIEBIG:

04:38:01 19    Q.  Ms. Caraway, you were asked about a document that is titled

04:38:05 20    P04598, or that's the Bate stamp.  It's the Trumbull County

04:38:12 21    Opiate Action Plan.

04:38:13 22          Do you still have that?

04:38:13 23    A.  I do.

04:38:14 24    Q.  Can I ask you to take a look at that again?

04:38:18 25          We can display that for the jury as well, please.

Caraway (Cross by Fiebig)

04:38:22  1          And the caption there says that that's the opiate

04:38:25  2   action plan from 2017 to 2021; right?

04:38:29  3   A.  Yes.

04:38:30  4   Q.  And I'd ask you to take a look at Page. . . it's 12 of 21

04:38:40  5   in the lower left-hand corner.

04:38:48  6   A.  Yes.

04:38:48  7   Q.  And just to help orient you, on Page 7 of 21 it identifies

04:38:59  8   priority 2 and it says, reduce drug overdoses.

04:39:03  9          Do you see that?

04:39:05 10   A.  Page 7 of 21?

04:39:07 11   Q.  Page 7 identifies priority 2 --

04:39:10 12   A.  Yes, reduce drug overdose deaths in the county.

04:39:12 13   Q.  Right.  And then if you skip ahead to Page 12, we're still

04:39:15 14   in priority 2, and in the left-hand column, the measurable

04:39:24 15   objective is to reduce prescription prescribing of opiates.

04:39:27 16          Do you see that?

04:39:28 17   A.  I do.

04:39:28 18   Q.  And that's been a goal since 2017; correct?

04:39:31 19   A.  Yes.

04:39:31 20   Q.  Okay.  And at the very bottom of the second column under

04:39:35 21   action steps, it says there that Trumbull County commissioners

04:39:40 22   filed a lawsuit against pharmaceutical companies.

04:39:44 23          Do you see that?

04:39:44 24   A.  I do.

04:39:46 25   Q.  And are you aware of that lawsuit?

Caraway (Cross by Fiebig)

04:39:48  1  A.  Yes.  I first read about it in the newspaper.

04:39:51  2  Q.  Okay.  I'd like to ask you a few questions about that

04:39:55  3  lawsuit, and that should be in Tab 3 of your binder.

04:40:05  4          Mr. Pitts, if I could have the ELMO, please.

04:40:11  5          MR. WEINBERGER:  Your Honor, can we -- before we

04:40:13  6  publish it, can we have a sidebar, please?

04:40:16  7          THE COURT:  I think it's a good idea.

04:40:18  8     (Proceedings at sidebar out of the hearing of the jury:)

04:40:29  9          MR. WEINBERGER:  You were --

04:40:30  10          THE COURT:  I want to know -- Ms. Fiebig, you want to

04:40:35  11  get on the headphones, please.

04:40:37  12          MS. FIEBIG:  I am on the headphones, sir.

04:40:41  13          THE COURT:  All right.  Well, after that last foray, I

04:40:41  14  need to know where exactly are you going, please?

04:40:44  15          MS. FIEBIG:  Sure.  So in the lawsuit that was filed

04:40:46  16  in 2017, which we understand to be part and parcel of the

04:40:49  17  opioid action plan to reduce prescribing, the lawsuit was filed

04:40:53  18  that named as defendants manufacturers, the big three

04:40:58  19  distributors, as you know, and a handful of doctors, and

04:41:01  20  pharmacists were not named, and we'd like to look at the

04:41:04  21  allegations which we believe are judicial admissions of a party

04:41:06  22  in this case.  And she's the corporate representative for the

04:41:12  23  plaintiffs here, so we'd like to ask her about the position

04:41:14  24  that the plaintiffs have taken in this case.

04:41:18  25          MR. WEINBERGER:  First of all, she's not a corporate

Caraway (Cross by Fiebig)

04:41:20  1    rep.

04:41:20  2              Secondly, she's testified in deposition that she was

04:41:23  3    not involved in any way in the decision to sue -- to file the

04:41:28  4    lawsuit in this case.  And you have ruled on opening statement

04:41:33  5    that the complaint cannot be shown to the jury.

04:41:40  6              MS. SULLIVAN:  That's not true.  There was no ruling,

04:41:42  7    Your Honor.

04:41:42  8              THE COURT:  I didn't rule on the opening statement,

04:41:43  9    but I -- all right.

04:41:52  10             MS. FIEBIG:  Your Honor, this is our opportunity to

04:41:52  11   question someone from the county.

04:41:53  12             THE COURT:  Well, you can call anyone you want from

04:41:56  13   the county.  If this witness has -- has knowledge of -- you

04:42:03  14   know, she was involved in filing the lawsuit, and if she was

04:42:05  15   involved in amending the lawsuit, you can ask her about.  If

04:42:12  16   she has knowledge, she can testify to it.  If she doesn't, you

04:42:15  17   can't ask her to guess or speculate.  So I don't -- I don't

04:42:19  18   know -- I haven't read her deposition.

04:42:22  19             MS. SULLIVAN:  Your Honor, this isn't -- I'm sorry.

04:42:22  20   Go ahead.

04:42:22  21             MS. FIEBIG:  Go ahead.

04:42:24  22             MS. SULLIVAN:  Your Honor, this is a document that

04:42:25  23   should come in even without a witness.  It's their pleading in

04:42:28  24   the case.  It's -- it's a party opponent's statement.  It's

04:42:31  25   their position.

Caraway (Cross by Fiebig)

04:42:33  1          MS. FIEBIG:  And it's on the exhibit list.

04:42:37  2          THE COURT:  Whether it's admissible or not is not the

04:42:39  3  issue here.  It's the questions.  You can -- you can question a

04:42:44  4  witness.  If she has knowledge about -- she said she knows

04:42:54  5  about this lawsuit, okay.  I'll allow some questions, but

04:42:56  6  you've got to -- she's got to exhibit some knowledge to --

04:42:59  7  she's not going to guess or speculate as to --

04:43:02  8          MR. WEINBERGER:  Your Honor, whether or not -- so the

04:43:04  9  lawsuit that they -- the paper that they put in front of her is

04:43:11  10  the original lawsuit before the pharmacies were joined in the

04:43:13  11  case.

04:43:14  12          THE COURT:  Well, fine.  If she knows that she -- if

04:43:18  13  she knows about the original lawsuit, if she knows about when

04:43:21  14  the pharmacies were added, I mean --

04:43:23  15          MR. WEINBERGER:  But what relevance does it have to

04:43:25  16  this case, Your Honor?

04:43:26  17          THE COURT:  Well, she's a representative of the

04:43:28  18  county, so she --

04:43:30  19          MR. WEINBERGER:  But whether or not she -- if they

04:43:33  20  try --

04:43:33  21          THE COURT:  I will allow questioning if she knows.

04:43:35  22  I'm not going to allow just the lawyer to be testifying or

04:43:40  23  speculating.

04:43:40  24          MR. MAJORAS:  Your Honor, John Majoras.  In terms of

04:43:42  25  Mr. Weinberger's question about the relevance, Mr. Lanier

HEATHER K. NEWMAN, RMR, CRR

Caraway (Cross by Fiebig)

04:43:44  1  highlighted this in his direct exam.

04:43:48  2  　　　　　THE COURT:  But I -- as I said, I will allow

04:43:50  3  questioning if you can establish the witness has knowledge.

04:43:54  4  But I'm not going to allow a lot of just gratuitous questioning

04:44:00  5  if it's clear the witness has no knowledge of it.

04:44:03  6  　　　　　MS. FIEBIG:  Thank you, Your Honor.

04:44:12  7  　　(In open court at 4:44 p.m.)

04:44:12  8  BY MS. FIEBIG:

04:44:13  9  Q.  So, Ms. Caraway, I believe that you testified that you were

04:44:14  10 familiar with the lawsuit that was filed by Trumbull County in

04:44:17  11 2017; is that right?

04:44:18  12 A.  I read about it in the paper.

04:44:20  13 Q.  And did you understand that it was a lawsuit filed against

04:44:23  14 manufacturers, pharmaceutical manufacturers?

04:44:25  15 　　　　　MR. WEINBERGER:  Objection.

04:44:26  16 　　　　　THE COURT:  Well, overruled.

04:44:29  17 　　　　　THE WITNESS:  From what I read in the paper.

04:44:32  18 BY MS. FIEBIG:

04:44:33  19 Q.  Well, and what about what's stated in the opiate action

04:44:36  20 plan where it says, Trumbull County commissioners filed a

04:44:39  21 lawsuit against pharmaceutical companies?

04:44:40  22 A.  Right.  So I put this together at our committee meetings

04:44:45  23 and everybody reports out, what have you done to impact the

04:44:50  24 opiate epidemic, so that was reported out at one of the

04:44:52  25 meetings, so it went on the action plan.

Caraway (Cross by Fiebig)

04:44:53  1    Q.   Um-hmm.  And did you understand that in that lawsuit the

04:45:00  2    pharmaceutical manufacturers were alleged to have deceived

04:45:05  3    doctors and others about opioids?

04:45:08  4    A.   I don't really know the details of the lawsuit.

04:45:11  5    Q.   Are you aware that when the lawsuit was filed in 2017, no

04:45:16  6    pharmacies were named by Trumbull County as defendants?

04:45:19  7           MR. WEINBERGER:  Objection.

04:45:20  8           THE COURT:  Overruled.

04:45:22  9           THE WITNESS:  I don't know.  I don't know who was in

04:45:24 10    there.

04:45:24 11    BY MS. FIEBIG:

04:45:25 12    Q.   So you weren't aware that the pharmacies weren't added

04:45:27 13    for -- until 2019?

04:45:28 14           THE COURT:  Sustained.

04:45:29 15           MR. WEINBERGER:  Objection.

04:45:30 16           THE COURT:  Sustained.

04:45:42 17    BY MS. FIEBIG:

04:45:43 18    Q.   Ms. Caraway, you've testified about the importance of

04:45:45 19    disposing of opioids; correct?

04:45:46 20    A.   Yes.

04:45:47 21    Q.   And would you agree that that's important?

04:45:48 22    A.   Yes.

04:45:49 23    Q.   And whether you say that, do you mean it's important for

04:45:51 24    individuals to properly dispose of their opioids?

04:45:57 25    A.   It's important for all of us and to make sure that we're

Caraway (Cross by Fiebig)

04:46:00 1   sharing that information because we know that, especially with

04:46:02 2   young people, if they try an opiate, they're likely to get --

04:46:07 3   to want more, you know, get addicted and it keeps the problem

04:46:11 4   going.

04:46:12 5   Q.   Right.  And if someone hasn't properly disposed of their

04:46:15 6   opioids, it's possible that a young person would have access to

04:46:18 7   it; is that right?

04:46:19 8   A.   That is very possible, yes.

04:46:21 9   Q.   So would you agree that things like drug take-back days are

04:46:24 10  valuable to the community?

04:46:26 11  A.   Yes.

04:46:26 12  Q.   And would you agree that counseling on proper disposal of

04:46:30 13  opioids are valuable to the community?

04:46:32 14  A.   Yes.

04:46:32 15  Q.   And are you aware whether the four pharmacy companies that

04:46:37 16  are represented here today participate or offer drug take-back

04:46:41 17  days?

04:46:42 18  A.   I'm not aware if they do.

04:46:44 19  Q.   But if they did, you would agree that that would be a good

04:46:47 20  thing for Trumbull County?

04:46:48 21  A.   Yes, it would be.

04:46:49 22  Q.   And are you aware whether the four pharmacy companies that

04:46:51 23  are represented here today offer counseling and guidance on how

04:46:54 24  to properly dispose of opioids?

04:46:57 25  A.   I don't know if they do that or not.

—Caraway (Cross by Fiebig)—

04:46:59  1   Q.  But if they did, you would agree that that would be a good

04:47:03  2   thing for Trumbull County?

04:47:03  3   A.  Yes.

04:47:04  4          MS. FIEBIG:  Thank you, Ms. Caraway.

04:47:11  5          THE COURT:  Any other cross-examination?

04:47:16  6          MR. WEINBERGER:  No, Your Honor.  Thank you.

04:47:18  7          MR. MAJORAS:  No, thank you, Your Honor.

04:47:20  8          MR. DELINSKY:  No, Your Honor.

04:47:22  9          MR. WEINBERGER:  Your Honor, can we have a sidebar,

04:47:24  10  please?

04:47:26  11         THE COURT:  I'll see also if any of the jurors have

04:47:27  12  any questions.

04:47:28  13         MR. WEINBERGER:  Sure.

04:47:29  14     (Proceedings at sidebar out of the hearing of the jury:)

04:47:32  15         MR. WEINBERGER:  Your Honor, there were multiple

04:47:35  16  examples of counsel, knowing full well that she was asking

04:47:41  17  questions that were improper after this witness testified that

04:47:45  18  she had no knowledge of what was in the lawsuit, to -- to ask

04:47:51  19  questions that suggested the answer ignored your rulings.

04:47:56  20         THE COURT:  I agree.

04:47:58  21         MR. WEINBERGER:  And we would ask for a curative

04:48:00  22  instruction to the jury.

04:48:02  23         THE COURT:  Well, I don't know what curative

04:48:04  24  instruction at this point.

04:48:06  25         MR. WEINBERGER:  That the jury should not -- that with

Caraway (Cross by Fiebig)

04:48:08  1   respect to questions sustained, that the jury should not make

04:48:11  2   any assumptions or take anything from that.

04:48:15  3              THE COURT:  All right, I'll --

04:48:17  4              MS. FIEBIG:  Your Honor --

04:48:18  5              THE COURT:  I will give that instruction, that if I

04:48:19  6   sustained an objection, the jury's to disregard the question,

04:48:22  7   and if I sustained the objection to the answer, the jury's to

04:48:27  8   disregard the answer.

04:48:28  9              MR. WEINBERGER:  Thank you, Your Honor.

04:48:34 10     (In open court at 4:48 p.m.)

04:48:34 11              THE COURT:  All right.  Ladies and gentlemen, it

04:48:35 12   should be clear already, but if I -- if there's an objection

04:48:39 13   made to a question and I sustained the objection to the

04:48:42 14   question, you're to just ignore the question.

04:48:45 15              If the objection is made to the answer and I sustain

04:48:47 16   the objection to the answer, you're just to ignore it,

04:48:51 17   disregard it.  That goes for whichever lawyer asks the question

04:48:54 18   or whenever a witness gives the answer.

04:49:01 19     (Brief pause in proceedings).

04:51:49 20              MS. FIEBIG:  Your Honor, may we discuss with you?

04:51:52 21              THE COURT:  All right.  Well, I. . . you'll have to

04:51:56 22   give me the questions if there's something you want.

04:52:01 23              MR. LANIER:  This is the one that she wants to

04:52:03 24   discuss.

04:52:08 25              MS. SULLIVAN:  Your Honor, Mr. Lanier --

HEATHER K. NEWMAN, RMR, CRR

Caraway (Cross by Fiebig)

04:52:09  1          THE COURT:  Let's go on the headphones please.

04:52:12  2       (Proceedings at sidebar out of hearing of the jury:)

04:52:12  3          MS. SULLIVAN:  Your Honor, Mr. Lanier just announced

04:52:13  4   in front of the jury this is the one she doesn't want you to

04:52:15  5   ask.  I mean, that's completely improper.

04:52:18  6          MR. LANIER:  I said this is the one we want to

04:52:21  7   discuss.

04:52:22  8          THE COURT:  All right.  I'm going to rein in everyone

04:52:23  9   real fast.  This is getting out of control and both sides got

04:52:26 10   to shape up or else everyone's going to have real problems with

04:52:29 11   me.

04:52:36 12          MR. LANIER:  Your Honor, I think -- all I said was

04:52:39 13   this is the one we want to discuss.

04:52:40 14          THE COURT:  All right.

04:52:41 15          MR. LANIER:  I'm sorry.

04:52:41 16          THE COURT:  I don't -- I don't think this question

04:52:43 17   should be asked.

04:52:46 18          MS. FIEBIG:  Thank you, Your Honor.

04:52:46 19          THE COURT:  And so I don't think either side should

04:52:49 20   ask this question.

04:52:49 21          MR. LANIER:  We did not plan on asking it, but we had

04:52:53 22   an agreement -- yeah, we had an agreement on that.

04:52:55 23          THE COURT:  All right.

04:52:55 24          MR. LANIER:  May it please the Court.

04:52:55 25          THE COURT:  All right.

─Caraway (Redirect by Lanier)─

REDIRECT EXAMINATION OF APRIL CARAWAY

BY MR. LANIER:

Q.  Ms. Caraway, I don't have any follow-up questions myself,
but some jurors do, so I'd like to put the questions on here.
If you would read them out loud into the record and then answer
each one.

A.  Okay.

Q.  And you're able.

        Here's the first one.

A.  Can someone who is a past user who is not currently using
still get into a support program?

        Absolutely.  We have all levels of support from
intensive outpatient to group therapy, individual therapy,
counseling, 12-step programs, and many go on to work in the
field afterward.

        Are the recovery programs funded by the state or by
the county?

        That's a good question, too.  We get levy dollars, we
actually have a levy in our county, not all boards do, so I get
about a $3.2 million in levy funds, and we get state money and
we get federal money.  The state and federal money are always
specifically earmarked but to pay for certain things, and we're
also the Mental Health and Recovery Addiction Board, so we have
to use our funding based on what it's for.  So a lot of our
levy dollars go to these other services that the state and

─────Caraway (Redirect by Lanier)─────

04:54:31  1  federal monies don't go to, like the recovery housing, like

04:54:35  2  work and employment programs, training and education, things

04:54:39  3  like that.

04:54:41  4          Do you have to be a county resident to get into a

04:54:44  5  program?

04:54:44  6          No.  What we found by recovery community is that they

04:54:52  7  move around a lot and their mom might live up here in Cuyahoga

04:54:59  8  County but they're down in Trumbull County and vice versa.  I

04:55:04  9  have people that go to Cuyahoga County.  And there's a stale

04:55:05  10 rule, and I'm not saying everyone who's got a substance abuse

04:55:08  11 issue is homeless, but there's a state rule, if they're

04:55:11  12 homeless in your county, no matter where they came from, you're

04:55:14  13 to serve them.  So we just put that across the board.  If

04:55:17  14 anybody shows up in our county, I don't care where they live,

04:55:19  15 we're going to get them into a program and we're going to get

04:55:21  16 them the help that they need.

04:55:22  17 Q.  Thank you.  Next question.

04:55:26  18 A.  Do you know what chemical is used in the Deterra bags?  Is

04:55:31  19 it environmentally friendly.

04:55:33  20         I don't know the name of the chemical, but I did make

04:55:36  21 sure that we did the research and looked it all up and made

04:55:39  22 sure that it was environmentally friendly, so when that goes

04:55:42  23 into the landfill it's not going to cause any problems.

04:55:48  24         Are other programs being negatively affected

04:55:52  25 financially by the opioid crisis?

———Caraway (Redirect by Lanier)———

04:55:57  1          That's a good question, and that's a broad question.

04:56:02  2  So many people can't hire people because they can't pass the

04:56:08  3  drug test.  We know that our suicide rates have gone up in

04:56:19  4  direct correlation and people graduating, that's been affected,

04:56:23  5  people getting into other, you know, long-term vocational

04:56:26  6  things.  We know that our jail is full.  Our other mental

04:56:33  7  health and addiction, you know, treatment programs are full

04:56:35  8  with wait lists.  So yeah, it's affected across the community.

04:56:45  9          How many places are there in Trumbull County, recovery

04:56:49 10  houses, treatment facilities, number of beds today?

04:56:52 11          Let's see, good question.  We've got about 110

04:56:58 12  recovery house beds.  One of our agencies has 32 detox beds.

04:57:04 13  We have another center that just opened with 50 long-term men's

04:57:10 14  beds.  They call that a 3.1 house.  And we're still buying some

04:57:16 15  programs in Mahoning County.  So we have, how many, 32 detox

04:57:23 16  beds over there that we're using.  So it's not just in our

04:57:27 17  county because, you know, we're right on the border there with

04:57:30 18  Mahoning County so we share a lot of those services.

04:57:33 19          How many were there 20 years ago or 10 years ago?

04:57:37 20          20 and 10 years ago we had no detox beds.  I know

04:57:42 21  10 years ago there were some recovery houses out there.  They

04:57:46 22  weren't funded by the board, but good people trying to do the

04:57:49 23  work and get people into sober housing.  Whether it comes to

04:57:54 24  long-term treatment beds, which are the most expensive, that's

04:57:58 25  where we're really lacking.  We do send some folks up to

─────Caraway (Redirect by Lanier)─────

04:58:02  1    Glenbeigh Rock Creek up in Ashtabula County for some long-term

04:58:12  2    treatment, but that's only about 30 days.

04:58:16  3         Have you seen any drug return or drop-off bags at any

04:58:24  4    of the defendants' locations?

04:58:26  5         I've not seen any.

04:58:31  6         Did you have any meetings, discussions, or

04:58:34  7    relationships with any of the defendant with regards to your

04:58:39  8    opioid problem?  Reaction if so.

04:58:45  9         Well, I took brochures out to Walgreens myself and

04:58:51  10   asked that they be put out, and the person at the pharmacy that

04:58:55  11   was for the drug disposals, and then where to get help, and the

04:59:01  12   person at the pharmacy asked me can you dispose of

04:59:05  13   prescribed -- or expired medications in your drug drop-off

04:59:08  14   sites, and I said, you know, no, we wouldn't have the capacity

04:59:11  15   to do that.

04:59:15  16        With the drug return bags, do you know percentage of

04:59:21  17   opioids to non-opioids?

04:59:25  18        I don't.  I'm sorry.

04:59:28  19        MR. LANIER:  Your Honor, that tenders the juror

04:59:30  20   questions that we can ask, and I've got no additional questions

04:59:33  21   myself.

04:59:36  22        THE COURT:  Okay.  I guess any questions from any of

04:59:41  23   the defendants based on that?

04:59:43  24        MS. FIEBIG:  Not from us, Your Honor.  Thank you.

04:59:45  25        Thank you, Ms. Caraway.

**4293**

—————Caraway (Redirect by Lanier)—————

04:59:46  1           THE WITNESS:  Thank you.

04:59:48  2           MR. SWANSON:  Nothing, Your Honor, thank you.

04:59:49  3           MR. MAJORAS:  No, Your Honor.

04:59:50  4           THE COURT:  Okay.  Thank you very much, ma'am.  You

04:59:52  5  may be excused.

04:59:53  6           THE WITNESS:  Thank you, Judge.

04:59:57  7           Should I take all this stuff with me?

04:59:59  8           THE COURT:  No.  You can leave all that.

05:00:00  9           THE WITNESS:  Okay.

05:00:01 10           THE COURT:  Thank you very much, ma'am.

05:00:03 11      (Witness excused.)

05:00:13 12           THE COURT:  Let's just go on headsets for a second.

05:00:20 13           All right.  I'm not inclined to start a witness unless

05:00:24 14  it's really short, so I think we should conclude for the day

05:00:27 15  unless someone feels strongly to the contrary.

05:00:32 16           MR. WEINBERGER:  Plaintiffs agree.

05:00:33 17           MS. SULLIVAN:  I agree, Your Honor, as long as -- will

05:00:35 18  the plaintiffs be able to start with Mr. Chunderlik and then

05:00:38 19  put their corporate rep on later in the day?  Sounds good.

05:00:41 20           Thank you.

05:00:48 21           THE COURT:  Okay.  All right, ladies and gentlemen,

05:00:51 22  we're not going to start another witness at 5:00 so we shall

05:00:55 23  adjourn.

05:00:55 24           Usual admonitions.  If you encounter anything

05:01:00 25  whatsoever about this case or the subject matter of this case

05:01:04  1   in any of the media just put it aside, turn the page, channel,

05:01:10  2   media, whatever.  Do not discuss this case with anyone.  No

05:01:14  3   independent research or checking.

05:01:17  4        Have a good evening, and we'll pick up tomorrow

05:01:19  5   morning at 9:00 account next witness.

05:01:22  6     (Jury excused from courtroom at 5:01 p.m.)

05:01:56  7        THE COURT:  All right.  Everyone can be seated for a

05:01:57  8   bit.

05:02:03  9        All right.  Before we start dealing -- well, can

05:02:07 10   someone close the backdoor, please?  That's the CSO's to close

05:02:13 11   it.

05:02:17 12        All right.  Before we start dealing with exhibits,

05:02:27 13   motions, whatever, Ms. Fiebig, there were two occasions where

05:02:38 14   you went way, way, way over the line and there are judges who

05:02:42 15   would have held you in contempt for, if not one, certainly both

05:02:46 16   of them that I'm -- first, I don't know where you were going,

05:02:54 17   but to inject race into this case was unbelievably out of

05:03:00 18   bounds.  And I'm not sure what I'm going to do to cure that.

05:03:06 19        MS. SULLIVAN:  Your Honor, in fairness to my

05:03:06 20   colleagues, that was precisely Ms. Caraway's testimony in her

05:03:10 21   deposition.  It was precisely her testimony.  Precisely.  She

05:03:11 22   injected it in her deposition and felt bad obviously that the

05:03:14 23   same problem happened 40 years ago and no one cared.

05:03:17 24        THE COURT:  No one talked about her deposition.

05:03:18 25        MS. SULLIVAN:  Well, that's what she was recounting

05:03:20  1    and that's what led to the question.

05:03:25  2            MR. WEINBERGER:  Now, wait.  She --

05:03:25  3            THE COURT:  Wait a minute.  But the question, the way

05:03:27  4    you -- you -- you -- not only implied, you challenged her in

05:03:32  5    her question that basically they only cared about this when

05:03:36  6    white people --

05:03:38  7            MS. SULLIVAN:  Your Honor, that was her precise

05:03:40  8    testimony in her deposition, and in here, and in here.  She

05:03:43  9    said it here too.

05:03:46  10            THE COURT:  She didn't say that.

05:03:46  11            MR. WEINBERGER:  Your Honor, in her discovery

05:03:48  12    deposition she volunteered the fact that she became aware of

05:03:54  13    concerns within the black community about how the county dealt

05:03:58  14    with the African American community in the original --

05:04:03  15            THE COURT:  But she recounted it, but that's -- the

05:04:06  16    question and the way you ask it.

05:04:08  17            MR. WEINBERGER:  And -- and on top of that, she asked

05:04:10  18    the question, it wasn't -- and after you found out about it,

05:04:13  19    you filed the lawsuit on behalf of basically -- basically on

05:04:17  20    behalf of the Caucasian --

05:04:18  21            THE COURT:  But the question the way you --

05:04:21  22            MR. LANIER:  -- on behalf of the wealthy Caucasians.

05:04:24  23            THE COURT:  The way you asked the question was

05:04:26  24    completely out of bounds, and it implied that the county and

05:04:30  25    this lawsuit was racially motivated.

05:04:33  1          MS. SULLIVAN:  Your Honor, I respectfully disagree.

05:04:34  2     Her trial testimony --

05:04:35  3          THE COURT:  Well, you can disagree.  I heard it.  I

05:04:35  4     heard it.

05:04:36  5          MS. SULLIVAN:  Your Honor, the trial testimony of this

05:04:38  6     witness, it was clear that she was ashamed, frankly, that they

05:04:41  7     didn't act 40 years ago or 30 years ago --

05:04:43  8          THE COURT:  Well, fine.

05:04:44  9          MS. SULLIVAN:  -- when black kids were dying.

05:04:45  10          THE COURT:  That's fine.  That's fine.  She

05:04:46  11     acknowledged regret, okay, that they didn't act sooner, but

05:04:49  12     your question implied what was going on today with this

05:04:53  13     lawsuit.  All right?  And that was a hundred percent false, and

05:04:57  14     it injects race into this lawsuits, and I'm going to have to

05:05:01  15     study it, and if I decide I need to say something, I'll say it.

05:05:05  16          MS. SULLIVAN:  May I offer --

05:05:06  17          THE COURT:  So we're not going to have anything

05:05:07  18     remotely close to that again from anyone.

05:05:10  19          And second, I specifically told you -- I have gave you

05:05:16  20     a little bit of latitude with that questioning about the 2017

05:05:21  21     lawsuit and, you know, all that came out is I read it in the

05:05:25  22     paper and I know nothing about it, and then you asked one more

05:05:28  23     question to try to put in exactly what I had cautioned you

05:05:32  24     against.

05:05:34  25          So everyone's on notice.  All right?  I mean, you

05:05:41  1   don't want to test me, test me.

05:05:43  2          MS. SULLIVAN:  We understand your ruling, Your Honor.

05:05:45  3   It is their lawsuit in this case.

05:05:46  4          THE COURT:  Ms. Sullivan.

05:05:47  5          MS. SULLIVAN:  I understand your ruling, Your Honor.

05:05:48  6          THE COURT:  Ms. Sullivan, you don't want to -- I mean,

05:05:50  7   you want to keep going, keep going.

05:05:52  8          MS. SULLIVAN:  I understand your ruling, Your Honor.

05:05:55  9          THE COURT:  All right.  Now, let's start if I see if

05:06:00  10  we can deal with a few exhibits.  I mean, I -- we're still back

05:06:07  11  I think with Ms. Polster.  I can't even remember these this far

05:06:12  12  back.

05:06:13  13         Can we conclude this or are we still having some

05:06:16  14  issues?

05:06:20  15         MS. SWIFT:  Your Honor, we've worked it out.  Kate

05:06:22  16  Swift for Walgreens.  There are just a handful left that we're

05:06:25  17  still talking about.  We're almost there.

05:06:26  18         THE COURT:  All right.  Well, we'll wait on that till

05:06:29  19  tomorrow morning.

05:06:30  20         MS. SWIFT:  Thank you, Your Honor.

05:06:41  21         THE COURT:  So I can try and go in order.

05:06:56  22         All right.  What about Vernazza?  Can we --

05:07:02  23         MR. DELINSKY:  Your Honor, I don't believe there's

05:07:03  24  going to be many issues on Vernazza, but plaintiffs identified

05:07:06  25  just maybe an additional document this morning.  We'd just like

05:07:09 1    to wait until tomorrow morning.

05:07:10 2                THE COURT:  All right.  All right.

05:07:14 3                Nelson.

05:07:16 4                UNIDENTIFIED SPEAKER:  We'll be here all day, Mark.

05:07:16 5                MR. DELINSKY:  I can only be in so many places --

05:07:19 6                THE COURT:  All right.  Then we're still -- we need

05:07:22 7    Polster, Vernazza, Nelson, and then Travassos and Keyes.

05:07:27 8                I really don't want to get much more behind or else,

05:07:30 9    quite frankly, it won't be any way to do it in a coherent way.

05:07:34 10               MS. SWIFT:  Your Honor, Kate Swift for Walgreens.  If

05:07:36 11   it's helpful, there are a number of the Polster exhibits that

05:07:41 12   we offered that plaintiffs have told me they don't object to.

05:07:43 13   I'm happy to tell you which ones those are, if that would be

05:07:45 14   helpful to move the ball forward.

05:07:49 15               THE COURT:  All right.  Which of those?

05:07:54 16               MS. SWIFT:  WAG-MDL 18, WAG-MDL 71, WAG-MDL 211.

05:08:13 17               THE COURT:  Right.  All these are in without

05:08:15 18   objection.  Okay.

05:08:16 19               MS. SWIFT:  WAG-MDL 304, WAG-MDL 547, WAG-MDL 2606,

05:08:36 20   WAG-MDL 2626, WAG-MDL 2005, and WAG-MDL 2347 with thanks to

05:08:52 21   plaintiffs' counsel for working with me on that today.  I

05:08:55 22   appreciate it.

05:09:00 23               THE COURT:  All right.  So we've got -- we'll finish

05:09:03 24   up Ms. Polster.  Then we've got Vernazza, Nelson, Travassos,

05:09:12 25   Keyes.  Now we've got this witness.

05:09:16  1          MR. WEINBERGER:  I think we're ready to deal with the

05:09:18  2  Nelson exhibits.

05:09:20  3          MS. FUMERTON:  Yes, Your Honor.

05:09:20  4          THE COURT:  All right.  If you've got --

05:09:30  5          I've got about 10 or 12 that the plaintiffs are

05:09:33  6  offering with Nelson.

05:09:37  7          MS. FUMERTON:  Yes, Your Honor.  This is

05:09:41  8  Tara Fumerton.

05:09:42  9          So I think we are on the list the plaintiffs gave you,

05:09:44 10  plaintiffs agreed to withdraw P21393.  It's the third from the

05:09:53 11  bottom.

05:09:53 12          THE COURT:  All right.  Is that right, plaintiffs are

05:09:55 13  withdrawing that?

05:09:56 14          MR. WEINBERGER:  That's correct.

05:09:56 15          THE COURT:  Okay.

05:09:57 16          MS. FUMERTON:  And then there's two issues, one is

05:10:04 17  we're reserving generally our objection or preserving our

05:10:07 18  objection to documents discussing incidents outside of the

05:10:10 19  scope of the jurisdiction, but we understand Your Honor's

05:10:12 20  already ruled on that, so --

05:10:14 21          THE COURT:  I just indicate it's coming in over

05:10:16 22  objection, Ms. Fumerton.

05:10:18 23          MS. FUMERTON:  Yeah.

05:10:19 24          THE COURT:  Which one is that?

05:10:20 25          MS. FUMERTON:  So that would be P26882 -- well, that

05:10:24 1  might be actually easier, Your Honor, to say which ones it

05:10:27 2  doesn't involve, or do you want me to go through each one?

05:10:29 3       THE COURT:  Let's just go through it.  All right

05:10:36 4  14643, any objection?

05:10:36 5       MS. FUMERTON:  So it comes in over objection from

05:10:37 6  outside the scope.

05:10:37 7       THE COURT:  Okay.  26892.

05:10:41 8       MS. FUMERTON:  Same.  Over objection, although there

05:10:44 9  is a hearsay issue with respect to Walgreens.

05:10:46 10      THE COURT:  Well, it's in.

05:10:48 11      All right.  26882?

05:10:50 12      MS. FUMERTON:  Over objection.  It comes in for the

05:10:56 13  scope.

05:10:56 14      THE COURT:  All right.  26874.

05:11:07 15      MS. FUMERTON:  Same, Your Honor.  Over our objection

05:11:10 16  to the geographic scope.

05:11:12 17      THE COURT:  All right.  Comes in over objection.

05:11:14 18      14223?

05:11:16 19      MS. FUMERTON:  Your Honor, that's the one we do have

05:11:18 20  an objection to.  So this is a document which Mr. Nelson is not

05:11:23 21  a recipient.  He was shown the document.  He did not know what

05:11:28 22  it was.  He testified that he didn't even know who sent it and

05:11:32 23  wasn't sure what it was saying.

05:11:34 24      MR. WEINBERGER:  Your Honor, this is the -- this is

05:11:36 25  the PowerPoint that he was shown where he -- Mr. Lanier asked

| | | |
|---|---|---|
| 05:11:40 | 1 | him whether or not he owned -- he was the owner of the program |
| 05:11:44 | 2 | regarding refusals to fill.  On the fourth page of this exhibit |
| 05:11:51 | 3 | he -- his name is listed.  Obviously, this is a document that |
| 05:11:57 | 4 | comes from the Walgreens' files. |
| 05:12:00 | 5 | THE COURT:  All right.  Let me see it.  If it's -- he |
| 05:12:07 | 6 | acknowledged some connection to it. |
| 05:12:08 | 7 | MS. FUMERTON:  He said Walgreens -- it's a Walmart |
| 05:12:11 | 8 | document, Your Honor, but -- |
| 05:12:12 | 9 | MR. WEINBERGER:  Walmart.  I'm sorry. |
| 05:12:13 | 10 | MS. FUMERTON:  -- it's from Kristy Spruell to David |
| 05:12:15 | 11 | Winfrey attaching a PowerPoint presentation that could have |
| 05:12:19 | 12 | been a draft or it could not have been a draft.  Mr. Nelson |
| 05:12:22 | 13 | testified he had never seen it before. |
| 05:12:23 | 14 | THE COURT:  All right.  This comes in.  It says owner |
| 05:12:28 | 15 | Brad Nelson and he -- all right. |
| 05:12:29 | 16 | MS. FUMERTON:  But he testified that nobody ever told |
| 05:12:32 | 17 | him that that was written.  And he's not on -- |
| 05:12:33 | 18 | THE COURT:  He's acknowledged that it was, so it comes |
| 05:12:35 | 19 | in. |
| 05:12:35 | 20 | MS. FUMERTON:  Your Honor, could we just have that one |
| 05:12:37 | 21 | page come in then?  It's an e-mail with a larger presentation. |
| 05:12:41 | 22 | MR. WEINBERGER:  There has to be context to it. |
| 05:12:42 | 23 | THE COURT:  Well, right.  One page doesn't make sense. |
| 05:12:46 | 24 | MS. FUMERTON:  Well, that's the only thing they asked |
| 05:12:47 | 25 | him, if you're listed as the owner of the refusals to fill |

HEATHER K. NEWMAN, RMR, CRR

05:12:51 1  process.  He said he wasn't aware that anybody had put that in

05:12:54 2  the presentation.

05:12:55 3       Ell, THE COURT:  Is the rest of it somehow

05:12:56 4  prejudicial?  It's a Walmart document.  It's your suspicion

05:13:00 5  order monitoring program with whatever date of it.

05:13:02 6       MS. FUMERTON:  Yes, Your Honor, but there's been no

05:13:04 7  testimony at all with respect to any of the other aspects of

05:13:06 8  this document, all of which deal with aspects of a program that

05:13:08 9  has not been discussed.

05:13:09 10       THE COURT:  It's put in one page.  It's not like a CV

05:13:12 11  or a resume or something, so that can come in.

05:13:15 12       All right.  13 -- I'm sorry, 14450.

05:13:20 13       MS. FUMERTON:  No objection.

05:13:22 14       THE COURT:  14540.

05:13:24 15       MS. FUMERTON:  We have objection to the geographic

05:13:26 16  scope, but over objection it can come in.

05:13:28 17       THE COURT:  All right.  14552.

05:13:32 18       MS. FUMERTON:  Over geographic objection.  There's the

05:13:35 19  hearsay -- oh, go ahead.

05:13:38 20       MR. DELINSKY:  And, Your Honor, CVS has an independent

05:13:40 21  objection to that one.  There's a line of hearsay in that that

05:13:42 22  if document were to come in, it should be redacted.  It's

05:13:45 23  information about a line of information about CVS.  I don't

05:13:49 24  even understand it.  We don't know where it came from.  It

05:13:51 25  can't be subject to cross-examination.

05:13:52  1          MR. WEINBERGER:  It's not hearsay.  It's not in their

05:13:54  2    for the truth of the matter.  It's information that's been

05:13:58  3    given to the --

05:14:01  4          THE COURT:  Right.  It was given -- right.  It's in

05:14:03  5    the document.  Okay?

05:14:05  6          MR. DELINSKY:  But it's not a Walmart business

05:14:09  7    communications.  It's a communication about another company

05:14:11  8    that's in -- Walmart.  It reflects hearsay coming from

05:14:14  9    somewhere to Walmart.

05:14:15  10          THE COURT:  Well, it's a Walmart business document and

05:14:17  11    it came to them.  All right?  I mean, it's -- that's why it's

05:14:22  12    in, because of what was reported from a pharmacist up the

05:14:27  13    chain.  What's reported could be accurate, it might not be

05:14:29  14    accurate.

05:14:31  15          All right.  14662.

05:14:35  16          MS. FUMERTON:  Subject to our objection for geographic

05:14:37  17    scope, Your Honor.

05:14:38  18          THE COURT:  All right.  It's in.

05:14:42  19          26732.

05:14:43  20          MS. FUMERTON:  Same objection.

05:14:45  21          THE COURT:  All right.  And 26736.

05:14:49  22          MS. FUMERTON:  Same objection.

05:14:50  23          THE COURT:  All right.  26737?

05:14:55  24          MS. FUMERTON:  Same objection.

05:14:59  25          THE COURT:  26890?

05:15:01  1          MS. FUMERTON:  No objection.

05:15:02  2          THE COURT:  All right.  And I assume there's no

05:15:05  3  objection to POM 1703, 21090.

05:15:09  4          MS. FUMERTON:  Yeah, no objection, Your Honor.  And

05:15:10  5  then we had one document to offer.

05:15:12  6          THE COURT:  Okay.

05:15:12  7          MS. FUMERTON:  And plaintiffs didn't have an

05:15:14  8  objection.

05:15:14  9          THE COURT:  Okay.

05:15:15 10          MS. FUMERTON:  It's WMT_MDL_00558.  It's the POM 1311,

05:15:23 11  the March 2011 version.

05:15:28 12          THE COURT:  Okay.  That can come in.

05:15:31 13          All right.  We took care of Nelson then.  Okay.  So

05:15:37 14  we'll finish up with Polster.  We have Vernazza, Travassos,

05:15:40 15  Keyes, and then this current witness, Ms. Caraway that we'll

05:15:49 16  take up.

05:15:54 17          All right.  All right.  There's some motions I have to

05:16:07 18  deal with because it's coming up with witnesses.

05:16:09 19          First, Giant Eagle basically filed a bench brief, I

05:16:23 20  think, seeking to exclude references to some board of pharmacy

05:16:29 21  adjudications, and I've -- obviously I've read the plaintiffs'

05:16:36 22  response.

05:16:37 23          I think, Ms. Sullivan, you -- you opened the door to

05:16:40 24  this by the statements you made in opening statement that

05:16:45 25  basically said your client has never had any issues or problems

05:16:50  1   with the Ohio Board of Pharmacy.

05:16:52  2          MS. SULLIVAN:  And, Your Honor, I can pull you up the

05:16:53  3   slide where I was making that comment.  It was clear I was

05:16:55  4   talking about Lake and Trumbull County.  It was absolutely

05:16:59  5   clear it was limited to Lake and Trumbull County.  These events

05:17:02  6   are outside of Lake and Trumbull County.  They relate to

05:17:04  7   thefts, which has nothing to do with the allegations in the

05:17:06  8   case.  They also don't have any statement or admissions of

05:17:09  9   liability by Giant Eagle.  So consistent with your prior ruling

05:17:12 10   on CVS, we can bring the slides, Your Honor.  We can probably

05:17:16 11   print it here, and I can show in the transcript when I made

05:17:19 12   those comments on the slide, it was inspections in Lake and

05:17:22 13   Trumbull County, Your Honor.

05:17:23 14          THE COURT:  Well, I'm going to study that.  I -- I --

05:17:30 15   you may have had a slide up, okay, but your statements were a

05:17:36 16   lot broader.

05:17:37 17          MS. SULLIVAN:  And the total number of inspections

05:17:39 18   were just those in Lake and Trumbull County, Your Honor.

05:17:42 19          THE COURT:  Well --

05:17:42 20          MS. SULLIVAN:  These are far afield from the

05:17:45 21   allegations.  They're not even in the county.

05:17:46 22          THE COURT:  Right, and ordinarily they wouldn't be

05:17:48 23   admissible.  All right?  They are far afield, and I didn't

05:17:51 24   allow similar actions against, I think it was CVS, because I'm

05:18:00 25   limiting it to the conduct that the plaintiffs are alleging

05:18:03  1    caused the public nuisance, and they aren't alleging that

05:18:07  2    isolated thefts.

05:18:09  3            MS. SULLIVAN:  And, Your Honor, two of the

05:18:10  4    allegation -- two of the settlements don't even relate to

05:18:12  5    Giant Eagle, they're for the specific individual pharmacists.

05:18:16  6    Giant Eagle had nothing to do with those two.

05:18:17  7            THE COURT:  Well, but again, you -- you made some very

05:18:21  8    broad statements about your pharmacists, all right, and that's

05:18:25  9    the problem, Ms. Sullivan, and I -- and it is -- these are

05:18:30 10    relevant to counter what you said.  And I don't think --

05:18:40 11            MS. SULLIVAN:  I understand Your Honor ruling,

05:18:42 12    Your Honor.  We'll make --

05:18:43 13            THE COURT:  And I don't think your -- the problem is

05:18:45 14    your statements were limited.  You may have had some slide up

05:18:48 15    there, but --

05:18:51 16            MS. SULLIVAN:  They were clearly referring to the

05:18:52 17    inspections in Lake and Trumbull County, Your Honor.  That's

05:18:54 18    what I was speaking about, the 88 inspections on the slide,

05:18:58 19    and, Your Honor, we can provide the slide to you that those

05:19:00 20    with the comments.

05:19:07 21            MR. WEINBERGER:  I think we need to go back to the

05:19:09 22    transcript of the opening statement.

05:19:10 23            THE COURT:  I'm looking at the transcript.

05:19:12 24            Giant Eagle has been here for the people of Ohio for

05:19:14 25    over 80 years.  All right?  We've been here for the people of

05:19:18  1   Ohio for over 80 years through the Great Depression, et cetera.

05:19:23  2   One of the best employers in the State of Ohio.  They employ

05:19:27  3   19,000 people, and by and large I think they're going to be --

05:19:30  4   you say they're a good company.  I mean, they -- what they said

05:19:34  5   about Giant Eagle, they talked about other pharmacies don't

05:19:38  6   apply to Giant Eagle.  I mean, that's the problem.

05:19:41  7           MS. SULLIVAN:  Well, that's the DEA settlement,

05:19:43  8   Your Honor, and that's true, we have never had a --

05:19:46  9           THE COURT:  Ms. Sullivan, the problem is, you gave a

05:19:48  10  testimonial about your client in opening statement.  All right?

05:19:53  11          MS. SULLIVAN:  I didn't say there were never --

05:19:53  12          THE COURT:  You didn't have to do it, you chose to do

05:19:55  13  it.  That's okay.

05:19:56  14          MS. SULLIVAN:  I understand your ruling, Your Honor.

05:19:58  15          I never said that we never violated any law anywhere.

05:20:00  16  I never said there were never any settlements anywhere.  I

05:20:03  17  limited it to the board inspections on the slide where those

05:20:06  18  comments were made, but I understand Your Honor's ruling.

05:20:10  19          THE COURT:  Well. . . well, what about this:  And

05:20:22  20  you're going to hear some of that evidence, some of the

05:20:25  21  testimony that they had better controls, more or better

05:20:28  22  controls than required by law.  This is from the board of

05:20:32  23  pharmacy.  Complied with Ohio security and recordkeeping.

05:20:36  24  Complied with the law.  Operated lawfully.  Some testimony from

05:20:40  25  a government agency -- agent who inspected Giant Eagle

05:20:43 1   facilities, you'll hear.

05:20:44 2           He was asked, did you at any time believe that Giant

05:20:48 3   Eagle was itself violating any of the pharmacy rules and

05:20:51 4   regulations and causing diversions?

05:20:54 5           No.  It's easy to bring high price experts in.

05:20:57 6           MS. SULLIVAN:  That goes to Lake and Trumbull County,

05:20:59 7   again, Your Honor.

05:21:00 8           THE COURT:  Well, independent government witnesses who

05:21:03 9   were on the ground looking at Giant Eagle trying to protect the

05:21:05 10  citizens of Ohio, finding that they complied with the law.

05:21:09 11          So I think you opened the door, but I will -- I will

05:21:12 12  give a limiting instruction on this, and it's because it's --

05:21:18 13  and --

05:21:18 14          MS. SULLIVAN:  And Your Honor is going to let --

05:21:20 15          THE COURT:  I'd like the parties to work together on a

05:21:21 16  limiting -- and how exactly are you going to bring this in?

05:21:26 17          MR. LANIER:  Your Honor, I would anticipate doing it

05:21:31 18  in a very succinct fashion.  I'm not going to get into the

05:21:38 19  bloody details.

05:21:38 20          THE COURT:  With who?

05:21:40 21          MR. LANIER:  Tomorrow is George Chunderlik who was the

05:21:42 22  man who was in charge of the safety program at -- the pharmacy

05:21:45 23  safety compliance program at Giant Eagle until he retired in

05:21:52 24  2019 or 2020.  And so I would just say to him, you know, not

05:21:58 25  all pharmacists are great, you've got some wonderful ones,

05:22:01  1   you've also had some that weren't so wonderful.  And I don't

05:22:05  2   even know that I need to get into the specifics with him as

05:22:08  3   long as he'll agree with me.  I'm not trying to sow any error

05:22:11  4   in the case.

05:22:11  5          THE COURT:  Well, I -- that's fine.  I mean, quite

05:22:14  6   frankly, if he'll say that a few of them have run afoul of, you

05:22:18  7   know, the Ohio Board of Pharmacy, that's fine, you don't have

05:22:21  8   to get into specifics.

05:22:22  9          MR. LANIER:  Exactly.

05:22:23  10          MS. SULLIVAN:  Outside of Lake and Trumbull County,

05:22:25  11  Your Honor.  I mean, this is really far afield, Your Honor, but

05:22:28  12  I understand your ruling.

05:22:30  13          THE COURT:  Well, Ms. Sullivan, your opening was far

05:22:32  14  afield.  Okay.  I didn't write it.

05:22:35  15          All right.  If you want to --

05:22:37  16          MR. LANIER:  That's all I'll do, Your Honor.

05:22:40  17          THE COURT:  See if you can elicit it just sort of, you

05:22:43  18  know, generally, that's fine.

05:22:43  19          MR. LANIER:  And I don't have trouble saying it was in

05:22:46  20  Ohio but outside of Lake and Trumbull.  I mean, that's real --

05:22:50  21          THE COURT:  All right.  That's fine.  That's fine.

05:22:51  22          MR. LANIER:  I'll say that as well.

05:22:53  23          THE COURT:  All right.  CVS has moved to exclude --

05:23:00  24  well, evidence of IMS contracts, and I don't know if -- is this

05:23:04  25  just with CVS?  Are they the only ones who sold things to IMS?

05:23:09  1          MR. DELINSKY:  We're the ones they're picking on,

05:23:11  2  Judge, so I think they're sort of the lead.

05:23:13  3          THE COURT:  Well, no.  I --

05:23:13  4          MR. LANIER:  They're not the only ones that sold,

05:23:15  5  Your Honor.

05:23:15  6          THE COURT:  Okay.

05:23:16  7          MR. LANIER:  And it becomes --

05:23:16  8          MR. WEINBERGER:  Walgreens had a similar contract.

05:23:21  9  Walmart traded services.

05:23:22 10          MS. FUMERTON:  But, Your Honor, to the extent they're

05:23:24 11  looking for a particular IMS contract, I'm not aware that they

05:23:27 12  even identified it for us.  So I would say that.

05:23:29 13          MR. WEINBERGER:  Yes, we have.

05:23:29 14          MS. FUMERTON:  Well --

05:23:30 15          MR. WEINBERGER:  We have, Your Honor.

05:23:31 16          THE COURT:  Okay.  Well, as I said, I believe that

05:23:34 17  evidence that any of the defendants sold this data or exchanged

05:23:41 18  it for something of value is relevant.

05:23:45 19          MR. DELINSKY:  Judge --

05:23:47 20          THE COURT:  Because they had it, and they were selling

05:23:49 21  it.

05:23:49 22          MR. DELINSKY:  Judge, we put in a reply brief right

05:23:54 23  before court, which I'm sure Your Honor hasn't read.

05:23:56 24          THE COURT:  Well, I read it.  I did read it.

05:23:58 25          MR. DELINSKY:  Okay.  But I would like to note,

HEATHER K. NEWMAN, RMR, CRR

05:24:01  1    Your Honor, that there's two aspects of the contracts and what

05:24:07  2    plaintiffs could use them for.  Number one is, did we possess

05:24:17  3    the data, and plaintiffs' argument is if you possessed it and

05:24:22  4    didn't use it, didn't use it effectively, that's probative to

05:24:26  5    the claims in this case.  That is an uncontroverted fact that

05:24:31  6    we possessed that data.  We will stipulate to the fact we

05:24:34  7    possessed that data.  We produced it to them.  They've already

05:24:38  8    produced summary charts on it.  We produce it to OARRS.  We'll

05:24:43  9    stipulate to it.

05:24:45 10         The next link is selling it.  Selling it has no

05:24:51 11    additional probative value that doesn't exist by the fact of

05:24:58 12    the possession.  It doesn't bear on did we use it to help our

05:25:03 13    pharmacies.  And what it does is it inflames passions,

05:25:08 14    Your Honor, this is a hot button issue today by selling data.

05:25:11 15    It inflames passions --

05:25:13 16         THE COURT:  Well, first ever all, it's -- the

05:25:15 17    plaintiffs need to make clear, they have so far made clear, it

05:25:19 18    was de-identified in aggregate, so no HIPAA was violated.  All

05:25:22 19    right?  That's come out, and if there's -- if it's used again,

05:25:26 20    that has to be made clear.  All right?

05:25:29 21         And it's not -- there was no HIPAA violations and

05:25:32 22    there's nothing illegal about selling it.  All right?  They're

05:25:35 23    just making the point that you profited off the data.  Okay?

05:25:44 24    So that's --

05:25:44 25         MR. DELINSKY:  Your Honor, we'd ask that we get an

05:25:46 1  instruction on that, an appropriate -- well, there's another

05:25:48 2  issue on that too, Your Honor, by the way.  They don't have a

05:25:51 3  witness.  They don't have -- they haven't identified anybody on

05:25:52 4  any of their witness lists, by the way, so that creates a

05:25:52 5  problem of unfair surprise.  They don't --

05:25:53 6          THE COURT:  Well --

05:25:54 7          MR. DELINSKY:  -- have -- they haven't identified

05:25:55 8  anybody on any of their witness lists, by the way, so that

05:25:58 9  creates a problem of unfair surprise.  Multiple witness lists

05:26:00 10 have been exchanged in this case.  One was 100.  One was 50.

05:26:06 11 Then it was filed to make it official.  It was still 50.  Your

05:26:07 12 Honor's scheduling orders say you cannot expand that witness

05:26:13 13 list absent due cause.  This is not an issue we raised.  This

05:26:16 14 is not -- we never uttered a word about this.

05:26:18 15         THE COURT:  All right.  Well, I mean, I assume they're

05:26:20 16 going to try and use this with one of your witnesses.

05:26:22 17         MR. WEINBERGER:  Your Honor, that is correct.

05:26:23 18         THE COURT:  Okay.  And if the witness --

05:26:25 19         MR. WEINBERGER:  If I can --

05:26:26 20         THE COURT:  I mean, if the witness knows about it,

05:26:27 21 fine.  If the witness knows nothing about it, I mean, you

05:26:30 22 know --

05:26:32 23         MR. WEINBERGER:  Well, Mr. Davis has already

05:26:33 24 testified.

05:26:33 25         THE COURT:  Well, that's the point.  Davis knew about

05:26:37 1    it.

05:26:37 2              MR. WEINBERGER:  Right.

05:26:37 3              THE COURT:  So it's been -- it's been -- it's in the

05:26:39 4    testimony.

05:26:41 5              MR. DELINSKY:  That's different from admitting the

05:26:43 6    document, Your Honor.

05:26:44 7              THE COURT:  And the document can come in because Davis

05:26:46 8    said -- he testified that the program existed and that the data

05:26:48 9    was sold.

05:26:50 10             MR. DELINSKY:  But he had no knowledge of the -- nor

05:26:52 11   was he asked if he had knowledge of the contracts themselves.

05:26:55 12             THE COURT:  Well, that's a good point.  What is the --

05:26:57 13   what does the contract show?

05:26:59 14             MR. WEINBERGER:  The contract is -- basically, I hate

05:27:03 15   to use this word, speaks for itself.  What it says is, is that

05:27:06 16   they're turning over the date for 4 and a half or $5 million a

05:27:13 17   year to IQVIA.  IQVIA represents in the contract that they

05:27:18 18   intend to use it to sell it to assist companies like

05:27:24 19   manufacturers -- I'm paraphrasing -- to market, to use for

05:27:29 20   marketing.

05:27:29 21             THE COURT:  Yeah.  That's why it's relevance.  It's

05:27:31 22   relevant for two things:  One the amount of money, and two that

05:27:33 23   you were --

05:27:34 24             MR. DELINSKY:  No, Your Honor.

05:27:36 25             THE COURT:  You were -- hold it.  You were assisting

05:27:37 1    the manufacturers in marketing their products.

05:27:40 2            MR. DELINSKY:  And, Your Honor, I don't say this

05:27:42 3    lightly, but this is reversible.  That's what this is.  To

05:27:46 4    include dollar amounts in there, this is so far afield from

05:27:50 5    this case, Your Honor, and --

05:27:52 6            THE COURT:  All right.  Maybe the dollar amount, but

05:27:54 7    the point is that you were -- you were selling it to assist the

05:27:58 8    manufacturers.

05:27:59 9            MR. DELINSKY:  No.

05:28:00 10           THE COURT:  It ties you -- it ties your client to the

05:28:02 11   manufacturers.

05:28:03 12           MR. DELINSKY:  But, Your Honor, we've already had

05:28:06 13   testimony in this case that CDC obtains the data, that

05:28:09 14   Dr. Keyes, I believe --

05:28:10 15           THE COURT:  No one's saying it's illegal to

05:28:13 16   disseminate the data, Mr. Delinsky.

05:28:14 17           MR. DELINSKY:  But this cannot be introduced without a

05:28:17 18   witness who --

05:28:18 19           THE COURT:  We had a witness, Mr. Davis said -- Mr.

05:28:20 20   Davis said that this is what --

05:28:21 21           MR. DELINSKY:  No, he did not, Your Honor.  He did not

05:28:23 22   say that it is for manufacturers to assist them in marketing.

05:28:28 23   By no stretch of the imagination did he say that.

05:28:31 24           MR. WEINBERGER:  No, but the document says it.

05:28:33 25           MR. DELINSKY:  And this is why you need a witness

HEATHER K. NEWMAN, RMR, CRR

05:28:34 1    because you can't --

05:28:36 2         THE COURT:  All right.  Well, we'll see.  You can --

05:28:37 3    you're going to ask everybody -- any CVS witness who comes on,

05:28:40 4    they're going to ask them about it.

05:28:42 5         MR. WEINBERGER:  And it has further relevancy so --

05:28:44 6         THE COURT:  We'll see -- we'll see what the CVS

05:28:46 7    witnesses know.  I mean, I'll allow you to use -- I'll allow

05:28:50 8    with the same latitude.  I mean, if the witness knows anything

05:28:54 9    about it, fine.  If the witness says I know nothing about it,

05:28:56 10   you can't, you know, just read the document in.

05:28:59 11        MR. WEINBERGER:  In our brief in opposition,

05:29:00 12   Your Honor, I think we've demonstrated why even without a

05:29:02 13   witness --

05:29:05 14        THE COURT:  Well --

05:29:05 15        MR. WEINBERGER:  -- we don't need -- this document is

05:29:08 16   very clear as to what the terms are.  It's been authenticated

05:29:12 17   both by IQVIA, and it comes from CVS's and Walgreens' and

05:29:18 18   Walmart's own files, and it is clear what the document does,

05:29:23 19   and with respect to --

05:29:24 20        THE COURT:  Let's just -- I'm going to see what any

05:29:27 21   other CVS witness knows about it and you can -- you can

05:29:33 22   cross-examine CVS witnesses about it.  Mr. Davis already

05:29:38 23   testified that it existed.

05:29:42 24        All right.  The ARCOS data -- let me ask you this:

05:29:51 25   What -- what do you think the jury's going to do with this

05:29:57  1    thumb drive of --

05:29:57  2              MR. WEINBERGER:  Nothing.

05:29:59  3              THE COURT:  -- I don't know, millions of documents.

05:30:00  4              MR. WEINBERGER:  Nothing.

05:30:01  5              The whole purpose of our moving for admission of these

05:30:05  6    exhibits is to make sure that for purposes of appeal we have

05:30:11  7    that underlying data, process data from both ARCOS statewide

05:30:18  8    and ARCOS nationally with respect to these defendants, and

05:30:21  9    their dispensing data, that serves the basis for 1006

05:30:28  10   documents.

05:30:28  11             MR. DELINSKY:  Well, Your Honor, no 1006 documents on

05:30:32  12   the ARCOS data have been admitted -- have been offered.

05:30:34  13             MR. WEINBERGER:  Well, there are plenty of 1006

05:30:36  14   documents that we have submitted to you that are -- that are

05:30:38  15   based on ARCOS data.

05:30:40  16             MR. DELINSKY:  But none that have been admitted.

05:30:42  17             MR. WEINBERGER:  Well, not yet.

05:30:43  18             MR. DELINSKY:  But your witness, Dr. McCann, was here,

05:30:46  19   and he was the vehicle for which you would be --

05:30:48  20             THE COURT:  Wait a minute.  I don't -- I mean, not --

05:30:52  21             MR. WEINBERGER:  Your own --

05:30:53  22             THE COURT:  Hold it.  Hold it.

05:30:54  23             MR. WEINBERGER:  Your own -- their own experts have

05:30:56  24   relied on McCann's ARCOS data analyst and have created lots of

05:31:02  25   charges based upon that process data, Your Honor.

05:31:06   1          MR. DELINSKY:  But none of those have been admitted

05:31:08   2   yet, Pete.

05:31:09   3          THE COURT:  Well, they will be.

05:31:12   4          MR. DELINSKY:  They might not be.  They might not

05:31:14   5   offer them.  We may not offer them.

05:31:14   6          THE COURT:  Well, they've got -- I mean, I don't know

05:31:16   7   if -- some of these -- we haven't gotten to documents with

05:31:21   8   some -- all these experts.  I don't -- I think we've admitted

05:31:24   9   some documents, some charts with experts, plaintiffs' experts,

05:31:29  10   so I don't know if these are the -- if these are the charts

05:31:32  11   you're talking about.

05:31:34  12          MR. WEINBERGER:  Well, we've admitted -- there have

05:31:37  13   been -- there's a chart, there's a series of charts for each of

05:31:40  14   the four defendants that are 1006 charts that were.

05:31:43  15       (Simultaneous crosstalk).

05:31:43  16          THE COURT:  The documents are authentic and it may be

05:31:51  17   better to have them as part of the record.  Okay.  I mean, they

05:31:55  18   are authentic and --

05:31:56  19          MR. DELINSKY:  But, Your Honor, we've been deprived of

05:31:58  20   the opportunity for cross-examination.  If they were going to

05:31:59  21   put in some --

05:32:00  22          THE COURT:  No, no, you haven't been deprived.  The

05:32:02  23   witness testified --

05:32:02  24          MR. WEINBERGER:  We laid the foundation in his

05:32:04  25   testimony.

**4318**

05:32:07  1            THE COURT:  The witness testified they relied on it.

05:32:08  2  The witness testified they relied on it.

05:32:08  3            MR. DELINSKY:  No, he didn't, Your Honor, because he

05:32:10  4  didn't propose any analysis based on ARCOS.  He explained that

05:32:13  5  he has worked with ARCOS as -- when Mark was qualifying him and

05:32:19  6  explaining why his fees were so high, but he didn't offer any

05:32:22  7  work, opinions, summaries.

05:32:24  8            THE COURT:  Well, I disagree.  All of his testimony

05:32:26  9  was based on --

05:32:27 10            MR. DELINSKY:  No, it wasn't, Your Honor, every single

05:32:29 11  chart he admitted was based exclusively on each of our

05:32:32 12  dispensing data.

05:32:34 13            MR. WEINBERGER:  There is -- there are -- there are 6

05:32:37 14  or 7 pages of testimony where he explained to the jury what he

05:32:40 15  did with the ARCOS data and how he processed it.

05:32:45 16            MR. DELINSKY:  Right, but not -- but he then didn't

05:32:47 17  proffer any information about what it contained.

05:32:50 18            MR. WEINBERGER:  It doesn't -- so all we're trying to

05:32:52 19  do -- so we're taking that foundational testimony and we're

05:32:55 20  seeking admission of the --

05:32:55 21            THE COURT:  All right.  It's coming in.

05:32:56 22            MR. DELINSKY:  All right.  But, Your Honor, we have

05:32:58 23  been deprived of cross-examination.

05:32:59 24            THE COURT:  You want to bring him back, bring him

05:33:01 25  back.

05:33:01  1          MR. DELINSKY:  They should on their time.

05:33:03  2          MS. SWIFT:  Your Honor --

05:33:06  3      (Simultaneous crosstalk).

05:33:06  4          THE COURT:  No.  You want to bring him back, you can

05:33:08  5  call him.

05:33:09  6          MS. SWIFT:  I'm sorry, Kate Swift, for Walgreens.

05:33:12  7          Your Honor, I tried to ask Dr. McCann about one of his

05:33:15  8  ARCOS charts.  Mr. Weinberger objected and said this is ARCOS,

05:33:19  9  and that objection was sustained.  I didn't get to ask him

05:33:21 10  about it.

05:33:22 11          MR. WEINBERGER:  No, that's -- you're taking that

05:33:24 12  completely out of context.

05:33:26 13          MS. SWIFT:  I'm not.  I mean, the --

05:33:27 14          MR. WEINBERGER:  Well, I'm sorry, I think you are.

05:33:29 15          MS. SWIFT:  We didn't have an opportunity to

05:33:31 16  cross-examine him.

05:33:31 17          MR. WEINBERGER:  We'll have to go back and look at the

05:33:32 18  record.

05:33:32 19          THE COURT:  Well, look, look, look, if -- you know, if

05:33:35 20  the defendants want to -- want to cross-examine McCann or, you

05:33:41 21  know, whatever, we'll bring him back and you can cross-examine

05:33:43 22  him on the ARCOS data.  I'm not -- you know, I have no problem

05:33:47 23  with that.  He'll be made -- I'll order him to be -- to come

05:33:49 24  whenever you want.

05:33:50 25          MR. WEINBERGER:  We'll make him available, Your Honor,

05:33:52   1    if that's --

05:33:52   2            MR. DELINSKY:  Your Honor, we object to any summary

05:33:54   3    charts then coming in based on the ARCOS data because those

05:33:57   4    would have to -- somebody has to testify about who prepared

05:34:00   5    them and how --

05:34:01   6            THE COURT:  Well, I don't know what -- if there are

05:34:02   7    any more summary charts that we're talking about.  No one's --

05:34:06   8    no one's proposed any charts that I know of.

05:34:10   9            MR. WEINBERGER:  We've exchanged tons of 1006 --

05:34:13  10            MR. DELINSKY:  Yeah, but you didn't offer them, Pete.

05:34:15  11    You got to offer them.  This isn't about exchanging witness

05:34:19  12    lists.  We all have 6,000 documents --

05:34:19  13            THE COURT:  All right.  I think we better get McCann

05:34:21  14    back.  All right?  And if you want documents specifically

05:34:24  15    offered through him, you got to identify them -- are these the

05:34:28  16    charts that he testified to?

05:34:31  17            MR. WEINBERGER:  These --

05:34:31  18            THE COURT:  No.  Pete -- Pete -- Mr. Weinberger --

05:34:31  19            MR. WEINBERGER:  Yes.

05:34:32  20            THE COURT:  Are these the charts -- let me see the --

05:34:34  21    let me see these 1,000 -- these charts.

05:34:38  22            MR. WEINBERGER:  They've been admitted into evidence,

05:34:40  23    Your Honor.  I'll give you the --

05:34:40  24            THE COURT:  Well, I don't know if they've been.

05:34:41  25            MR. WEINBERGER:  Yes, they have.

05:34:42  1          MS. SWIFT:  The dispensing data charts have been

05:34:44  2   admitted into evidence, not the ARCOS charts.

05:34:46  3          MR. WEINBERGER:  There are four charts.

05:34:47  4          THE COURT:  Let me see the charts that have been

05:34:48  5   admitted.

05:34:49  6          MR. WEINBERGER:  Okay.

05:34:49  7          THE COURT:  Let me just sit it.

05:34:49  8          MS. SWIFT:  I don't know that I have them at any

05:34:52  9   fingerprints right now but. . . I'm sure I don't right this

05:34:58 10   very second, Your Honor.  But -- but the point --

05:35:01 11          THE COURT:  Let me -- I -- we're in this.  I want to

05:35:03 12   see the charts that have been admitted.

05:35:11 13          Do the defendants have them?  I mean -- see these

05:35:14 14   charts, whatever they are.

05:35:29 15      (Brief pause in proceedings).

05:35:29 16          MS. SWIFT:  The three exhibits that plaintiffs offered

05:35:32 17   with Dr. McCann are 26319, 26320, and 26322.  Those are all

05:35:41 18   plaintiffs.

05:35:42 19          MR. WEINBERGER:  And we offered one through Mr. Joyce.

05:35:45 20          MS. SWIFT:  Also a dispensing data exhibit.

05:35:47 21          MR. WEINBERGER:  I understand.

05:35:48 22          THE COURT:  What was the fourth one with Joyce?

05:36:12 23          MR. WEINBERGER:  26321.

05:36:12 24          MS. SWIFT:  And just to be clear, Your Honor, the four

05:36:15 25   exhibits that we're talking about right now relate to

05:36:17  1   dispensing data, which is a completely different thing from

05:36:21  2   ARCOS shipping data.  The dispute that we have is that

05:36:25  3   plaintiffs have not offered any charts showing ARCOS shipping

05:36:30  4   data, and our position is they should not be allowed to offer

05:36:34  5   the data itself instead.

05:36:43  6          MR. WEINBERGER:  So we have submitted --

05:36:44  7          THE COURT:  Well, I want to know -- all right.  Did

05:36:46  8   McCann -- did McCann testify to any summary charts on

05:36:55  9   distribution data, ARCOS distribution data?

05:36:57 10          MR. WEINBERGER:  No, he did not.

05:36:58 11          MS. SWIFT:  No, he did not.

05:36:59 12          THE COURT:  Okay.  Well, then why -- you don't need --

05:37:02 13   you don't need it as part of the record.

05:37:04 14          MR. WEINBERGER:  We have created 1006s based upon

05:37:09 15   ARCOS data that we may use in cross-examining witnesses in the

05:37:12 16   defendants' case.

05:37:13 17          THE COURT:  Well, fine but --

05:37:15 18          MR. WEINBERGER:  And the defendants -- as I said, the

05:37:18 19   defendants have run their own charts based upon his analysis of

05:37:21 20   the ARCOS data.

05:37:23 21          MS. FUMERTON:  Your Honor, I think the defense here is

05:37:25 22   that if we are to -- and I can't speak for the other

05:37:27 23   defendants -- propose any Rule 1006 summaries, we will have a

05:37:30 24   witness here to describe how they did it and what it

05:37:34 25   represents.  And if we're talking --

05:37:35  1          THE COURT:  And if it relied on the ARCOS data, then

05:37:38  2     we'll admit the ARCOS data through your witness.

05:37:40  3          MS. FUMERTON:  Well, and, Your Honor, I'd just also

05:37:41  4     like to say about that, that's the whole purpose of 1006

05:37:42  5     summaries is to have voluminous information like ARCOS that you

05:37:45  6     can't even open up the data --

05:37:47  7          THE COURT:  Fine, but it's not prejudicial to put the

05:37:49  8     data in.  If they want to make the record complete, if there's

05:37:52  9     test- -- the point is, if there's testimony from a witness who

05:37:58 10     said I reviewed this -- this ARCOS distribution data and I

05:38:04 11     prepared this chart, then there's no problem admitting the

05:38:08 12     underlying data.

05:38:09 13          MS. FUMERTON:  So, Your Honor, I think the problem is

05:38:10 14     it's not the entire data, right?  So, I mean, the ARCOS data

05:38:13 15     that we're talking about here is so big that you can't open it

05:38:15 16     up on your computer.  I can't open it up in an Excel, and what

05:38:18 17     we're talking about here is it's millions of rows of data and

05:38:21 18     the summaries are summarizing a portion of that.  They're not

05:38:24 19     necessarily summarizing the entire thing.  And if you look at

05:38:26 20     the case law, the case law specifically says the underlying

05:38:29 21     data does not need to come in, that's the purpose of the

05:38:31 22     Rule 1006 process and the Rule 1006 summary.  And I think our

05:38:35 23     briefs that we submitted say that.

05:38:36 24          THE COURT:  If the jury even access it, it makes no

05:38:39 25     sense.

HEATHER K. NEWMAN, RMR, CRR

4324

05:38:39  1           MR. WEINBERGER:  It's only for purposes of the record,

05:38:42  2    Your Honor.

05:38:42  3           THE COURT:  But there's no -- no one has challenged

05:38:45  4    the admissibility of the summaries.

05:38:48  5           MR. WEINBERGER:  So what's the purpose -- so nobody --

05:38:50  6    what's -- is there a real rationale for opposing the admission

05:38:55  7    of the -- of the raw data -- of the process data just for

05:39:01  8    purposes of the record?

05:39:03  9           MR. STOFFELMAYR:  Well, Judge, can I make very -- it's

05:39:05  10   Kaspar Stoffelmayr -- very clear our position.

05:39:06  11           Whether -- or --

05:39:08  12           THE COURT:  What is the -- what is the -- is the only

05:39:10  13   objection to admitting the raw data that the jury can't even

05:39:13  14   access it and they'll -- may it all confused if they put that

05:39:16  15   thumb drive in and go --

05:39:18  16           MR. STOFFELMAYR:  Well, I have two objections.  One is

05:39:21  17   it is raw data that has never been -- it is completely

05:39:26  18   inaccessible to the jurors on a thumb drive and it is not -- it

05:39:30  19   is also not the basis for any evidence actually before the jury

05:39:34  20   at this point in time.  That might change, I don't know.  But

05:39:35  21   the other thing that I want be really clear about is whether

05:39:39  22   you let this in or not, I don't want there to be any doubt on

05:39:42  23   the record that our position is that quote/unquote evidence in

05:39:45  24   a format that is per se unreadable to the jury, the idea that

05:39:49  25   that could protect the record on appeal is an oxymoron.

05:39:57  1          THE COURT:  Well, I'm not going to agree with that.

05:39:57  2      (Simultaneous crosstalk).

05:39:57  3          THE COURT:  If the evidence is inaccessible to a jury,

05:39:59  4  it's not going to come in because it's confusing.

05:40:02  5          MR. WEINBERGER:  We're not suggesting that it would go

05:40:04  6  into the jury room, but it's just for purposes of the appellate

05:40:06  7  record.

05:40:06  8          THE COURT:  Well, wait a minute.  Wait a minute.  The

05:40:08  9  only -- all the evidence that comes in goes to the jury room.

05:40:11  10  That's the whole point of it.  And -- and only the evidence

05:40:16  11  that is admitted goes in.  It's -- it works both ways.  Not --

05:40:20  12  not part of it and nothing that's not admitted goes in.  So if

05:40:26  13  it is inaccessible to anyone, it's not going in.  Because all

05:40:32  14  it can do is confuse people.  I don't want to question you,

05:40:35  15  what's this, how do we access this, and I say, well don't

05:40:38  16  bother because you can't?  I mean, so -- so, on that basis it

05:40:43  17  shouldn't come in.

05:40:44  18          No one is challenging -- no one is -- has challenged

05:40:46  19  any summary based on, A, we don't have the data, no one gave us

05:40:53  20  the data, the data isn't authentic.  There's been no basis, so

05:40:58  21  we don't need it in.  If you want to identify it, identify it

05:41:02  22  and mark it as an exhibit so it's officially there, so if

05:41:06  23  someone ever raises it on appeal, the Court of Appeals doesn't

05:41:10  24  say, well, we don't even know what it is, that's fine.  Okay?

05:41:13  25  And we can -- we can mark it that this is the -- this is, you

05:41:18  1    know -- this is the ARCOS -- the ARCOS whether you want to call

05:41:23  2    it shipping or distribution data --

05:41:25  3              MR. WEINBERGER:  Distribution, yes.

05:41:26  4              THE COURT:  Fine, we can mark it as an exhibit, a

05:41:28  5    court exhibit, fine.  But doesn't go back to the jury because

05:41:30  6    it's not needed and it's going to be confusing and

05:41:33  7    inaccessible.

05:41:35  8              MR. LANIER:  Thank you, Judge.

05:41:35  9              THE COURT:  So if you want to mark it right now in

05:41:37 10    some way, we can make it --

05:41:40 11              MR. WEINBERGER:  We have a P number associated with

05:41:42 12    it.

05:41:42 13              THE COURT:  All right.  Well, what -- what number do

05:41:45 14    we have, Mr. Weinberger?

05:41:53 15              MR. WEINBERGER:  It's P23212.

05:41:56 16              THE COURT:  Okay.

05:41:57 17              MR. WEINBERGER:  Which is the United States processed

05:42:00 18    ARCOS, and P232 --

05:42:00 19              THE COURT:  Hold it.  Hold it.  Now I'm confused

05:42:00 20    232 --

05:42:09 21              MR. WEINBERGER:  23213, which is the Ohio processed

05:42:16 22    ARCOS data.

05:42:17 23              THE COURT:  I just want to make -- the first number

05:42:19 24    you gave I wrote -- only wrote down five digits.  Did I miss

05:42:23 25    one?

**4327**

05:42:24  1          MR. LANIER:  P23212.

05:42:26  2          THE COURT:  All right.  That was five digits.  That's

05:42:28  3    the U.S. processed ARCOS date.

05:42:30  4          MR. WEINBERGER:  Right.  And the next one is just the

05:42:32  5    3 at the end.  Same number.

05:42:34  6          THE COURT:  P232 --

05:42:36  7          MR. WEINBERGER:  13.

05:42:38  8          THE COURT:  13.

05:42:39  9          MR. WEINBERGER:  Correct.

05:42:39 10          THE COURT:  And that's the Ohio processed data.  Those

05:42:42 11    are marked for identification.  They're in the record.  They

05:42:44 12    will not be -- go back to the jury, but they're marked, they're

05:42:54 13    authenticated so everyone knows what they are.

05:42:57 14          MR. DELINSKY:  Pete, did one of those include the

05:43:00 15    dispensing data, the second one did, or were both --

05:43:02 16          MR. WEINBERGER:  No.  Those are just ARCOS.

05:43:03 17          THE COURT:  No.  This is all --

05:43:06 18          MR. DELINSKY:  All right.  Understood.

05:43:07 19          THE COURT:  Mr. Delinsky, this is all -- I don't know

05:43:09 20    if you want to call it shipping data or distribution data.

05:43:12 21          MS. SWIFT:  I don't believe we do.

05:43:13 22          MS. FUMERTON:  Yeah, I don't think we have copies

05:43:15 23    here.

05:43:16 24          MR. STOFFELMAYR:  We need copies please, Your Honor,

05:43:17 25    of the thumb drives.

05:43:18  1          THE COURT:  All right.  Well, that's fine.  They can

05:43:20  2   be provided.

05:43:20  3          MR. STOFFELMAYR:  Thank you.

05:43:21  4          MR. WEINBERGER:  I think it's actually going to have

05:43:24  5   be to in a link.  I think it's too big for thumb drive.

05:43:27  6          MR. STOFFELMAYR:  How does the Court put them in the

05:43:28  7   record, then?

05:43:28  8          MR. WEINBERGER:  Huh?

05:43:28  9          MR. STOFFELMAYR:  How does the Court put them in the

05:43:29 10   record?

05:43:29 11          MR. WEINBERGER:  Well, we'll figure something out.

05:43:31 12          MR. STOFFELMAYR:  Yeah.  I mean, you need like a hard

05:43:33 13   drive.

05:43:36 14          THE COURT:  All right.  I think that takes care of

05:43:45 15   everything I've got.

05:43:47 16          So tomorrow we're going to have -- we're going to

05:43:51 17   start with Mr. Chunderlik?

05:43:52 18          MR. WEINBERGER:  Correct.

05:43:53 19          THE COURT:  On --

05:43:55 20          MR. WEINBERGER:  By video conference.

05:43:57 21          THE COURT:  -- remote, and then we'll have a -- the

05:44:00 22   final plaintiffs' witness.

05:44:01 23          MR. WEINBERGER:  Kim Fraser.

05:44:03 24          THE COURT:  Ms. Fraser.  And then the plaintiffs will

05:44:04 25   rest, and then we'll start in with the defense case.  So the

**4329**

05:44:07  1    defendants are ready.

05:44:08  2            Who do we envision for the defense starting off?

05:44:11  3            MR. STOFFELMAYR:  Deposition tomorrow.

05:44:13  4            MR. DELINSKY:  I think -- we probably -- in looking

05:44:16  5    around, this is a tough balance, but I think we anticipate that

05:44:18  6    the two witnesses may take us through the end of the day.

05:44:21  7            THE COURT:  Mr. Chunderlik and Ms. Fraser?

05:44:26  8            MR. DELINSKY:  Yeah.

05:44:26  9            THE COURT:  All right.  Well, you should have at least

05:44:28  10   a deposition available.

05:44:29  11           MR. DELINSKY:  We will.  We'll have something

05:44:31  12   available, Your Honor.

05:44:31  13           THE COURT:  Because I want to keep things -- I think

05:44:32  14   it's best if the jury doesn't have big gaps.  I think they'll

05:44:35  15   keep focused better.

05:44:38  16           Okay.  All right.  We'll see everyone tomorrow.

05:44:41  17           MR. MAJORAS:  Your Honor, I'm sorry, John Majoras,

05:44:44  18   last, quick question.  On Friday -- on some Fridays we've ended

05:44:46  19   a bit early and this matters a little bit in terms of our

05:44:49  20   lineup of witnesses.  Do you have a particular plan on Friday?

05:44:51  21           THE COURT:  Well, I planned to go to the regular time,

05:44:53  22   and I think it's -- I think we should do that.  I want to keep

05:44:59  23   this trial on focus, so that's my -- that's my intent.

05:45:05  24           MR. MAJORAS:  Thank you, Your Honor.

05:45:06  25           THE COURT:  Okay.  Last Friday was -- we didn't plan

05:45:13  1    to end early.

05:45:14  2              MR. MAJORAS:  Yes, sir.

3              THE COURT:  All right.  I mean, okay.

4                  (Proceedings adjourned at 5:45 p.m.)

5

6                    **C E R T I F I C A T E**

7          I certify that the foregoing is a correct transcript
of the record of proceedings in the above-entitled matter
8    prepared from my stenotype notes.

9              */s/ Heather K. Newman*              *10-26-2021*
              HEATHER K. NEWMAN, RMR, CRR              DATE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25