1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION AT CLEVELAND

3    ------------------------------X
      IN RE:                        :   Case No. 1:17-md-2804
4                                   :
     NATIONAL PRESCRIPTION          :
5    OPIATE LITIGATION              :
                                    :   **VOLUME 17**
6    CASE TRACK THREE               :   JURY TRIAL
                                    :   *(Pages 4331 - 4487)*
7                                   :
                                    :
8                                   :
                                    :
9                                       *October 27, 2021*
     ------------------------------X
10

11

12            TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>

13

14      HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16            SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:         Heather K. Newman, RMR, CRR
                                      United States District Court
21                                    801 West Superior Avenue
                                      Court Reporters 7-189
22                                    Cleveland, Ohio 44113
                                      216.357.7035.
23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.

```
 1    APPEARANCES:

 2    For the Plaintiffs:              Peter H. Weinberger, Esq.
                                       SPANGENBERG, SHIBLEY & LIBER
 3                                     1001 Lakeside Avenue, Ste. 1700
                                       1900 East Ninth Street
 4                                     Cleveland, Ohio 44114
                                       216-696-3232
 5
                                       W. Mark Lanier, Esq.
 6                                     Rachel Lanier, Esq.
                                       Mildred Conroy, Esq.
 7                                     THE LANIER LAW FIRM
                                       6810 FM 1960 West
 8                                     Houston, Texas 77069
                                       813-659-5200
 9
                                       Frank L. Gallucci, III, Esq.
10                                     PLEVIN & GALLUCCI COMPANY, LPA
                                       The Illuminating Building
11                                     Suite 2222
                                       55 Public Square
12                                     Cleveland, Ohio 44113
                                       216-861-0804
13
                                       Salvatore C. Badala, Esq.
14                                     Maria Fleming, Esq.
                                       NAPOLI SHKOLNIK
15                                     360 Lexington Ave., 11th Floor
                                       New York, New York 10017
16                                     212-397-1000

17                                     Laura S. Fitzpatrick, Esq.
                                       SIMMONS HANLY CONROY
18                                     112 Madison Avenue, 7th Floor
                                       New York, NY 10016
19                                     (212) 784-6400

20

21    For Walgreen Defendants:         Kaspar J. Stoffelmayr, Esq.
                                       Brian C. Swanson, Esq.
22                                     Katherine M. Swift, Esq.
                                       BARTLIT BECK LLP
23                                     54 West Hubbard Street, Ste.300
                                       Chicago, Illinois 60654
24                                     312-494-4400

25
```

**4333**

```
 1   APPEARANCES (Cont'd):

 2   For CVS Defendants:            Eric R. Delinsky, Esq.
                                    Kyle A. Crawford, Esq.
 3                                  Alexandra W. Miller, Esq.
                                    ZUCKERMAN SPAEDER - WASHINGTON
 4                                  Suite 1000
                                    1800 M Street, NW
 5                                  Washington, DC 20036
                                    202-778-1831
 6
     For HBC/Giant Eagle           Diane P. Sullivan, Esq
 7   Defendants:                   Chantale Fiebig, Esq.
                                    WEIL GOTSHAL & MANGES
 8                                  Suite 600
                                    2001 M Street NW
 9                                  Washington, DC 20036
                                    202-682-7200
10
     For Walmart                   John M. Majoras, Esq.
11   Defendants:                   JONES DAY - COLUMBUS
                                    Suite 600
12                                  325 John H. McConnell Blvd.
                                    Columbus, Ohio 43215
13                                  614-281-3835

14                                  Tara A. Fumerton, Esq.
                                    Tina M. Tabacchi, Esq.
15                                  JONES DAY - CHICAGO
                                    Suite 3500
16                                  77 West Wacker
                                    Chicago, Illinois 60601
17                                  312-782-3939

18
     ALSO PRESENT:                 David Cohen, Special Master
19
                                    Bernard D. Marcus,
20                                  Marcus & Shapira LLP

21
                                      - - - - -
22

23

24

25
```

HEATHER K. NEWMAN, RMR, CRR

4334

1                          **I N D E X**

2                                                    **PAGE**

3       APPEARANCES.......................................4332

4       DIRECT EXAMINATION OF KIM FRASER...................4348
        BY MR. LANIER
5
        CROSS-EXAMINATION OF KIM FRASER....................4383
6       BY MR. DELINSKY

7       REDIRECT EXAMINATION OF KIM FRASER.................4399
        BY MR. LANIER
8
        DEPOSITION TESTIMONY OF THERESA TOIGA..............
9                                                        4421
        AFTERNOON SESSION.................................4414
10
        CERTIFICATE.......................................4487

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**4335**

| | |
|---|---|
| 08:44:52 | 1 |
| 08:46:28 | 2 |
| 08:46:31 | 3 |
| 08:46:33 | 4 |
| 08:46:36 | 5 |
| 08:46:38 | 6 |
| 08:46:42 | 7 |
| 08:46:44 | 8 |
| 08:46:47 | 9 |
| 08:46:56 | 10 |
| 08:47:01 | 11 |
| 08:47:04 | 12 |
| 08:47:11 | 13 |
| 08:47:17 | 14 |
| 08:47:22 | 15 |
| 08:47:30 | 16 |
| 08:47:34 | 17 |
| 08:47:37 | 18 |
| 08:47:43 | 19 |
| 08:47:46 | 20 |
| 08:47:47 | 21 |
| 08:47:50 | 22 |
| 08:47:52 | 23 |
| 08:47:57 | 24 |
| 08:48:01 | 25 |

1           (On the record at 8:44 a.m.)

2           THE COURT:  Okay.  Everyone can be seated.

3           Mr. Lanier, how's your voice today?

4           MR. LANIER:  Your Honor, I'm not ready to sing, but

5    I'm doing a lot better.

6           THE COURT:  It's better than yesterday.

7           MR. LANIER:  Much better.  Thank you for your

8    indulgence yesterday when it was so tough.

9           THE COURT:  Oh, okay.  I've had that.  It's not good.

10          All right.  Giant Eagle filed an additional brief

11   regarding the admissibility of Ohio Board of Pharmacy

12   settlements.  I read it carefully.  This was right on the edge.

13   I've decided since employee theft has nothing to do with this

14   case I'm not going to let the plaintiffs go into it with

15   Mr. Chunderlik.  However, Giant Eagle, you are -- you need to

16   be extraordinarily careful with any Giant Eagle witness you

17   call in your case, and if you elicit any testimony about the

18   Ohio Board of Pharmacy you've got to clearly limit it to Lake

19   and Trumbull County and diversion actions.

20          MS. SULLIVAN:  Understood, Your Honor.

21          THE COURT:  If it gets anywhere strayed from that, I'm

22   going to let the plaintiffs cross-examine that witness about

23   these actions against three pharmacies over the last 10 years

24   or so involving employee theft.  So you have to be

25   extraordinarily careful.  You're right on the edge.

08:48:06  1              MS. SULLIVAN:  Understood, Your Honor.

08:48:06  2              THE COURT:  Is that clear?

08:48:08  3              MS. SULLIVAN:  Understood, Your Honor.  Thank you.

08:48:10  4              THE COURT:  Anything we do with exhibits on prior

08:48:15  5      witnesses?  Start with April Caraway.

08:48:26  6              MR. LANIER:  That's easy.  Plaintiffs are only

08:48:27  7      offering one exhibit, P04568.

08:48:32  8              Any objection to that?

08:48:34  9              MS. FIEBIG:  No objection, Your Honor.

08:48:35 10              THE COURT:  All right.  Are the defendant offering

08:48:37 11      anything with Ms. Caraway?

08:48:39 12              MS. FIEBIG:  No, Your Honor.

08:48:41 13              MR. WEINBERGER:  Can I interrupt your agenda for a

08:48:43 14      moment.

08:48:44 15              THE COURT:  Yeah.  Anything more on Caraway?

08:48:45 16              MR. WEINBERGER:  No.

08:48:46 17              THE COURT:  Okay.  All right.  Then I'll put aside the

08:48:48 18      exhibits.

08:48:48 19              MR. WEINBERGER:  Your Honor, if we could -- if

08:48:54 20      Mr. Marcus, who represents Giant Eagle, and I could have a

08:48:57 21      moment with you in chambers. . .

08:49:01 22              THE COURT:  All right.  Yeah.  Let me just -- all

08:49:10 23      right.  I'll put aside these -- well, let me just finish with

08:49:15 24      these exhibits.  The plaintiffs have handed me a page and a

08:49:19 25      half list of exhibits with Michelle Travassos.

08:49:23  1          Do the defendants have any objection to these, any of

08:49:26  2    the these?

08:49:26  3          MR. DELINSKY:  We do have an objection to one,

08:49:29  4    Your Honor.

08:49:29  5          THE COURT:  All right.  One.  We'll take up one, yes,

08:49:31  6    Mr. Delinsky.

08:49:32  7          MR. DELINSKY:  P10245.

08:49:35  8          THE COURT:  Hold it.  Must be on the second page.

08:49:45  9          MR. WEINBERGER:  What's the number, Eric?

08:49:46 10          THE COURT:  Mr. Delinsky, I'm missing this.  I don't

08:49:49 11    see -- I don't see that on their list.

08:49:51 12          MR. DELINSKY:  Was 10245 not on your list, Pete?  I

08:49:58 13    thought it was.

08:49:58 14          MR. LANIER:  No, we objected to your objection.

08:50:01 15          THE COURT:  Eric, I don't see it on their list.

08:50:04 16          MR. DELINSKY:  Well, if it's not on their list, I have

08:50:07 17    nothing to object to.

08:50:08 18          THE COURT:  Fair enough.  Okay.  So all these are in

08:50:11 19    without objection.

08:50:14 20          MR. DELINSKY:  I apologize for the confusion.

08:50:16 21          THE COURT:  No problem.  Do you have any anything

08:50:18 22    you're offering with her?

08:50:20 23          MR. DELINSKY:  No.

08:50:20 24          THE COURT:  Okay.  So that takes care of Caraway and

08:50:28 25    Travassos.  Let me just --

**4338**

08:50:34  1         MR. DELINSKY:  Oh, Your Honor, I'm sorry, I was wrong.

08:50:37  2         THE COURT:  Yes, you do have one.  What?

08:50:39  3         MR. DELINSKY:  I've new been wrong twice in the span

08:50:42  4  of 30 seconds.  It won't be the last time.  We are -- there are

08:50:45  5  three exhibits we are offering.

08:50:47  6         THE COURT:  Okay.  What are those CVS?

08:50:51  7         MR. DELINSKY:  CVS MDL --

08:50:51  8         THE COURT:  This is with Caraway?

08:50:52  9         MR. DELINSKY:  No, I'm sorry, with Miss Travassos.

08:50:58 10         THE COURT:  All right.  Robert, did I just give you

08:50:58 11  that?

08:50:59 12         All right.  Which ones for the defendant?

08:51:01 13         MR. DELINSKY:  CVS MDL 00266.

08:51:08 14         THE COURT:  All right.  Why list them and I'll see if

08:51:10 15  there are any objections.

08:51:11 16         MR. DELINSKY:  P08334.

08:51:17 17         THE COURT:  Okay.

08:51:18 18         MR. DELINSKY:  P15632.

08:51:20 19         THE COURT:  Any objection to those?

08:51:23 20         MR. WEINBERGER:  No objection, Your Honor.

08:51:23 21         THE COURT:  Okay.  All right.

08:51:26 22         All right.  So it took care of two, so we still have

08:51:29 23  to deal with Ms. Polster, Vernazza, and Keyes.  Okay.

08:51:34 24         All right.  All right.  Anything else anyone needed to

08:51:42 25  bring up, and then I'll meet with Mr. Weinberger.

08:51:45 1        Okay.

08:51:50 2        (Recess was taken at 8:51 a.m.)

08:54:40 3        (In open court at 8:54 a.m.)

09:08:08 4            THE COURT:  Okay.  Everyone can be seated.

09:08:42 5        All right.  I've -- I feel I need to address something

09:08:49 6    that came up at the end of the questioning of the last witness,

09:08:56 7    Ms. Caraway.  This was the sequence, two questions in a row:

09:09:04 8    And this is after Ms. Caraway recounted that she had heard from

09:09:14 9    African Americans that they felt when the heroin epidemic

09:09:19 10    started 20 -- 25 years ago no one really cared and it wasn't

09:09:24 11    until white people were affected that more attention was paid.

09:09:29 12        And so here is the question:  And it wasn't until the

09:09:31 13    prescription pills became attractive to suburban white children

09:09:39 14    that more attention was paid; correct?

09:09:41 15        Answer:  That's what I was told.

09:09:43 16        Then the follow-up question:  And it was only at that

09:09:46 17    point that lawsuits like this were filed; right?

09:09:49 18        And she said, I don't know about that.  There was an

09:09:53 19    immediate objection which I sustained.

09:09:54 20        All right.  The question was 100 percent out of

09:10:00 21    bounds, and what I proposed to instruct the jury that the

09:10:08 22    parties agree that race has nothing to do with the plaintiffs'

09:10:12 23    claims or the defendants' defenses.

09:10:15 24        Does anyone have an objection to my just saying that?

09:10:18 25    I'm not going to tie it to anything, I'm just going to instruct

09:10:21  1    the jury on that.

09:10:22  2             MS. SULLIVAN:  Your Honor, Giant Eagle would object to

09:10:23  3    that.  It was Ms. Caraway that injected race into the case with

09:10:26  4    her testimony initially, and so we don't think that

09:10:29  5    instruction --

09:10:30  6             THE COURT:  Ms. Sullivan, she did not inject race.

09:10:33  7    She recounted something.  It was the question that you --

09:10:42  8    Ms. Fiebig tied with her question -- with her question tied

09:10:45  9    race to the filing of these lawsuits, all right, and that was a

09:10:50  10   hundred percent out of bounds, and I'm sure she didn't mean to

09:10:53  11   do it, but that's how it came out, okay, and it was wrong, a

09:10:56  12   hundred percent.  And I feel, you know, you want to object,

09:11:01  13   fine.  I really don't care.

09:11:02  14            How about the other defendant, do you object?

09:11:06  15            MR. DELINSKY:  Your Honor. . .

09:11:15  16            THE COURT:  And I'm not going to recount the testimony

09:11:17  17   or anything, I'm just going to make the statement.

09:11:19  18            MR. DELINSKY:  No, Your Honor.  What I'm concerned

09:11:21  19   about is the portion of the instruction that talks about what

09:11:26  20   the parties believe.  It's a very complicated issue, and I

09:11:33  21   don't feel comfortable --

09:11:34  22            THE COURT:  Fine.  Does anyone object if I simply say,

09:11:36  23   I'm instructing you that race has nothing to do with the

09:11:39  24   plaintiffs' claims or the defendants' defenses?

09:11:44  25            Someone wants to object, I'd like to hear their

09:11:47  1   objection, put it on the record.  You don't have to say what

09:11:50  2   the parties agree.

09:11:52  3        MR. STOFFELMAYR:  As stated that way, not for

09:11:55  4   Walgreens.

09:11:58  5        MR. MAJORAS:  Again, no objection to that language you

09:12:01  6   just read, Your Honor.

09:12:02  7        THE COURT:  Thank you, Mr. Majoras.

09:12:03  8        Mr. Delinsky, any problem with that?

09:12:05  9        MR. DELINSKY:  Your Honor, we don't intend to raise

09:12:07 10   race in the issue.

09:12:08 11        THE COURT:  I know that.

09:12:09 12        MR. DELINSKY:  But I do have a hitch about saying for

09:12:11 13   all time that it's not a -- not an issue.  So on -- for that

09:12:17 14   reason, I object.  Not that I intend to make it an issue, I

09:12:21 15   just don't know what it means to say that it has nothing to do

09:12:25 16   with it and not prepared to agree to that statement.

09:12:27 17        THE COURT:  Well, okay.

09:12:30 18        MR. WEINBERGER:  And, Your Honor, the concern that we

09:12:34 19   have is that the implication of the question was that the

09:12:40 20   plaintiffs were racially motivated in some way for the timing

09:12:46 21   of the filing of the lawsuit, and so removing the part that you

09:12:53 22   were going to say about the fact that the parties all agree

09:12:58 23   that race played no part in the filing of the lawsuit is

09:13:04 24   extremely important to us and to our clients.

09:13:10 25        MS. SULLIVAN:  We just note --

09:13:11  1          MR. WEINBERGER:  Because nothing could be further from

09:13:14  2    the truth of the matter.

09:13:16  3          MS. SULLIVAN:  We just note, Your Honor, that wasn't

09:13:18  4    the import of the question.

09:13:20  5          THE COURT:  Ms. Sullivan, the question was a hundred

09:13:22  6    percent out of bounds, and it was only at that point that

09:13:28  7    lawsuits like this were filed, right?  There's no other way

09:13:31  8    anyone could take that.

09:13:32  9          MS. SULLIVAN:  But Your Honor referred back to the

09:13:34  10   action plan that she testified about and then she went on to

09:13:37  11   say that we didn't do anything -- the witness injected it

09:13:43  12   originally, Your Honor.

09:13:43  13         THE COURT:  Ms. Sullivan, the question -- the more you

09:13:43  14   speak, the more I'm going to say -- the more I'm going to say

09:13:46  15   to this jury, and I may have to focus on Giant Eagle.  All

09:13:50  16   right?  That's what you want me to do, leave the other

09:13:52  17   defendants out.  That's what you want me to do, I'll give an

09:13:57  18   instruction on Giant Eagle alone, leave the other defendants

09:14:00  19   out.

09:14:01  20         MS. SULLIVAN:  We believe that would be reversible

09:14:03  21   error, but you'll do what --

09:14:05  22         THE COURT:  Not the way you're going because you're

09:14:07  23   objecting.  You're the one who injected race into this case.  I

09:14:10  24   didn't.  The other defendants didn't.

09:14:22  25         MS. SULLIVAN:  Understood, Your Honor.

**4343**

09:14:31 1          MR. DELINSKY:  Your Honor, I don't know mean to put

09:14:33 2     the Court cross wise with me, I just don't know where this case

09:14:38 3     could go.  There's multiple potential phases depending on what

09:14:42 4     happens and I just -- without talking to my client, I'm just

09:14:44 5     worried about representing what our positions would be.  We do

09:14:46 6     not intend to make it a --

09:14:51 7          THE COURT:  Well, I'm going to say something, and if

09:14:53 8     the parties don't agree, I'll just say it.  You can appeal if

09:14:55 9     you want.  I'm trying to do this simply.

09:14:58 10          MR. LANIER:  We think it's imperative that this jury

09:15:00 11     be instructed.  There's no evidence --

09:15:03 12          THE COURT:  Oh, I will -- I'll instruct them.  But I

09:15:05 13     can't instruct them that the parties agree if the defendants

09:15:07 14     don't agree, so. . . I instruct them, it doesn't matter what

09:15:13 15     anyone agrees to.  They've got to -- I mean, that's the law.

09:15:29 16          MR. DELINSKY:  Your Honor, could we just have a minute

09:15:31 17     to confer?

09:15:32 18          THE COURT:  All right.

09:15:33 19          MR. DELINSKY:  Thank you.

09:16:02 20     (Counsel conferring).

09:17:31 21          THE COURT:  Well, here's another thought.  What if I

09:17:34 22     say the parties agree that race had nothing to do with the

09:17:38 23     filing of this lawsuit?  Don't have to say anything about the

09:17:42 24     defendants' defenses because no one's raised it with the

09:17:46 25     defendants' defenses.

**4344**

09:18:00  1          MR. STOFFELMAYR:  I mean, speaking only for myself and

09:18:02  2     Walgreens, we would be much more comfortable with the language

09:18:04  3     you proposed a few minutes ago about what's relevant to the

09:18:08  4     claims and defenses.  I don't want to take any position on what

09:18:16  5     motivated who, when, how.  I can speculate on a lot of

09:18:18  6     things --

09:18:18  7          THE COURT:  Well, if all the defendants agree to my

09:18:21  8     first statement, the parties agree that race has nothing to do

09:18:25  9     with the plaintiffs' claims or the defendants' defenses, I'll

09:18:27 10     go with that.  It's a neutral -- it seems neutral, and it

09:18:27 11     seems --

09:18:31 12         (Simultaneous crosstalk).

09:18:31 13          MR. STOFFELMAYR:  -- a second formulation where you

09:18:32 14     just instructed them that it has --

09:18:34 15          THE COURT:  Well, I know, but the plaintiffs -- I

09:18:38 16     understand where the plaintiffs are coming from and the

09:18:40 17     attention was drawn as to the motivation for their lawsuit so

09:18:42 18     I'd rather -- either I've got to go specifically and simply say

09:18:46 19     the parties agree that race had nothing to do with the filing

09:18:50 20     of this lawsuit, or just a neutral, that the parties agree that

09:18:53 21     race has nothing to do with the plaintiffs' claims or the

09:18:56 22     defendants' defenses.  I'd rather do that because I want them

09:18:59 23     to understand that race has zero to do with what they're

09:19:06 24     supposed to decide in this case.

09:19:08 25          MR. MAJORAS:  Your Honor, John Majoras.

09:19:09 1          One of my concerns as we look forward, we have a

09:19:12 2   number of experts who talk about causation, breakdown, various

09:19:17 3   usages whether it's gender, economic groups, age, and at times

09:19:21 4   race, and to say a blanket -- it would call into question if

09:19:28 5   someone were to include some of that information in their

09:19:30 6   report that that's out of bounds that they were to do that.

09:19:35 7          So I'm concerned --

09:19:36 8          THE COURT:  I don't think so.  I mean, you're not

09:19:37 9   saying you're defending the case on race.

09:19:39 10         MR. MAJORAS:  We're not, Your Honor.

09:19:41 11         THE COURT:  If you want to say that certain groups

09:19:43 12  have been more adversely affected whether they're male or

09:19:46 13  female or young or old or black or white, I mean, that's not

09:19:50 14  your defense.  If it's a fact based on the facts, it's the

09:19:54 15  facts.

09:19:54 16         MR. MAJORAS:  I agree, Your Honor, which was why my

09:19:58 17  initial reaction to your second proposal was what it was, but I

09:20:02 18  want to make sure that I'm not going to run afoul if I were to

09:20:04 19  have an expert that talks about those issues.

09:20:06 20         THE COURT:  An expert testifies that here's what the

09:20:08 21  numbers show, you know. . .

09:20:11 22         MR. WEINBERGER:  Your Honor, let me suggest this as a

09:20:14 23  compromise, because it is -- this is extremely important.  I've

09:20:22 24  just talked with Frank and he's been talking to the clients and

09:20:25 25  this is very critical to this -- where we are in this matter.

09:20:32  1          What about a statement from you, Your Honor, that

09:20:37  2  Giant Eagle did not mean to imply the following -- the filing

09:20:41  3  of this lawsuit was based on racial factors.

09:20:47  4          MS. SULLIVAN:  We would object, Your Honor.  Your

09:20:48  5  Honor, after consulting with Mr. Marcus your original proposal

09:20:51  6  is okay with Giant Eagle; that is, that race has nothing to do

09:20:54  7  with the plaintiffs' claims or the defendants' defenses -- the

09:20:59  8  parties' defenses.

09:20:59  9          MR. WEINBERGER:  Nor would -- well, if we add nor

09:21:01 10  would the decision on whether or not -- nor with the decision

09:21:04 11  on when or whether to file this lawsuit.

09:21:08 12          THE COURT:  I don't -- I mean, I'm not going to go

09:21:10 13  into those details.  All right?  I --

09:21:14 14          All right.  All right.  I can't give an instruction,

09:21:22 15  the parties agree that race has nothing to do with the

09:21:25 16  plaintiffs' claims or the defendants' defenses if any of the

09:21:28 17  defendants object.

09:21:29 18          So does any defendant object to my giving that

09:21:32 19  instruction?

09:21:36 20          MR. DELINSKY:  Could you read it again, Your Honor,

09:21:38 21  please?

09:21:38 22          THE COURT:  The parties agree that race has nothing to

09:21:41 23  do with the plaintiffs' claims or the defendants' defenses.

09:21:45 24          MS. SULLIVAN:  Agreed for Giant Eagle, Your Honor.

09:21:52 25          MR. MAJORAS:  Walmart agrees, Your Honor.

09:21:55 1          MR. STOFFELMAYR:  Your Honor, Kaspar Stoffelmayr.

09:21:56 2   That's fine as you just raised it for Walgreens.

09:22:08 3          MR. DELINSKY:  Your Honor, this is a real difficult

09:22:10 4   issue.  We will agree so as to move past this issue, but I am

09:22:14 5   not remotely comfortable with that instruction.

09:22:18 6          THE COURT:  I appreciate that.

09:22:18 7          MR. DELINSKY:  Not that we intend to raise it, but I

09:22:21 8   am not comfortable.

09:22:22 9          THE COURT:  Understood.  Look, I very appreciate what

09:22:24 10  you're saying, Mr. Delinsky, and your accommodation, so that's

09:22:26 11  all --

09:22:28 12         MR. WEINBERGER:  And we're comfortable with that on

09:22:30 13  behalf of the plaintiffs, Your Honor.

09:22:31 14         THE COURT:  All right.  Then that's all we'll do.

09:22:32 15         Okay.  Then you can bring in the jury.

09:22:46 16     (Brief pause in proceedings).

09:24:27 17     (Jury returned to courtroom at 9:22 a.m.)

09:24:27 18         THE COURT:  Okay.  Please be seated, ladies and

09:24:29 19  gentlemen.  Hope you had a good evening.

09:24:35 20         Before we start with the plaintiffs' next witness, I

09:24:38 21  want to instruct you that the parties agree that race has

09:24:42 22  nothing to do with the plaintiffs' claims or the defendants'

09:24:46 23  defenses.

09:24:48 24         Okay, Mr. Lanier, you may call your next witness.

09:24:51 25         MR. LANIER:  Thank you, Your Honor.

Fraser (Direct by Lanier)

09:24:52  1          Ladies and gentlemen, I'm back.  Not a hundred
09:24:58  2   percent, but good enough to where it may not be fingernails on
09:25:01  3   a chalkboard.
09:25:02  4          Your Honor, our next witness we would call is
09:25:07  5   Kim Fraser to the stand, please.
09:25:17  6          THE COURT:  Good morning, Ms. Fraser.  If you'd raise
09:25:22  7   your right hand, please.
09:25:22  8          Do you swear or affirm that the testimony you are
09:25:22  9   about to give will be truth, the whole truth, and nothing but
09:25:25 10   the truth, under pain and pennately of perjury.
09:25:25 11          THE WITNESS:  Yes, I do.
09:25:27 12          THE COURT:  Thank you.  And you may remove your mask,
09:25:29 13   please, while testifying.
09:25:30 14          THE WITNESS:  Thank you.
09:25:30 15              DIRECT EXAMINATION OF KIM FRASER
09:25:37 16   BY MR. LANIER:
09:25:37 17   Q.  Good morning, Ms. Fraser.
09:25:41 18   A.  Good morning.
09:25:42 19   Q.  Will you tell the jury and the Court your name, put it on
09:25:46 20   the record, please, and tell them a little bit about you?
09:25:48 21   A.  Sure.  My name is Kim Fraser, I am the executive director
09:25:54 22   of the Lake County ADAHMS board.  ADAHMS is an acronym.  It
09:25:57 23   stands for alcohol, drug addiction, and mental health services.
09:26:10 24   Q.  You are doing that for Lake County; is that right?
09:26:15 25   A.  Yes.  Yes.

─────── Fraser (Direct by Lanier) ───────

09:26:15  1  Q.  So our Lake County road has got three stops in it today.

09:26:20  2  We're going to talk about you personally, we're going to talk a

09:26:24  3  little bit about your work history, and then we're going to

09:26:25  4  talk about the opioids in the county.

09:26:27  5  A.  Okay.  Very good.

09:26:28  6  Q.  So personally, where did you grew up?

09:26:30  7  A.  I actually grew up in Cuyahoga County, but I have been a

09:26:34  8  Lake County resident for over 20 years.  My husband and I live

09:26:37  9  in Mentor with my daughter, who is 17, so we've raised her up

09:26:41 10  in Lake County.  I've worked in Lake County for almost 30 years

09:26:48 11  in the behavioral health system, so Lake County is my roots,

09:26:53 12  it's my home.

09:26:53 13  Q.  Your daughter came to court I know one day because I got to

09:26:57 14  meet her.

09:26:57 15  A.  Yes.

09:26:58 16  Q.  She's not here today to watch you testify?

09:27:00 17  A.  She is not.  She had -- she had to go to school today.

09:27:02 18  Q.  All right.  That's fair and important.

09:27:05 19       Now, you live in Lake County.  You work in

09:27:11 20  Lake County, but tell us a little bit about growing up.

09:27:13 21       You graduated from high school where?

09:27:15 22  A.  I graduated from Orange High School, and went on to college

09:27:22 23  at Syracuse University.

09:27:24 24  Q.  Where Pete Weinberger went.

09:27:27 25  A.  Yes.  Yes.

──────Fraser (Direct by Lanier)──────

09:27:27  1  Q.  But he's old enough to be your dad?

09:27:30  2  A.  A fellow Orangeman, yes.

09:27:32  3  Q.  And in that regard, you took an interesting degree.  Tell

09:27:37  4  the jury about your degree.

09:27:38  5  A.  Yes.  I have a bachelor's in fine arts in theater, which my

09:27:43  6  father would have equated to a bachelor's in basket weaving,

09:27:48  7  which is about how far it got me.

09:27:50  8  Q.  Yeah.  Yeah.  Did you see yourself in Broadway or L.A., the

09:28:01  9  movies?

09:28:01  10  A.  Yeah.  I was sort of the stereotypical Ohio girl to moved

09:28:05  11  out to L.A. to make it big, lived there for about a year and

09:28:09  12  realized I was not going to make it big in theater.  So I moved

09:28:12  13  back home and went to school and pursued my master's.

09:28:15  14  Q.  And what did you get your master's in?

09:28:17  15  A.  I got my master's in counseling from John Carroll

09:28:20  16  University, and then I went on and got my post master's in

09:28:25  17  clinical counseling.  So I am an LPCC, a licensed professional

09:28:31  18  clinical counselor.

09:28:31  19  Q.  An LP -- oops, one "l" in counseling.

09:28:32  20         LPCC.  Licensed professional clinical counselor?

09:28:35  21  A.  That's correct.

09:28:36  22  Q.  All right.  Well, let's transition then into your work

09:28:38  23  history.

09:28:39  24         Did you ever work as a professional counselor?

09:28:42  25  A.  I did.  Actually, I have -- almost my whole career has been

HEATHER K. NEWMAN, RMR, CRR

──────Fraser (Direct by Lanier)──────

09:28:46  1   in Lake County, so I started out at one of the provider

09:28:50  2   organizations that our ADAHMS board now funds, so I was boots

09:28:54  3   on the ground.  I was a crisis counselor, which meant I worked

09:28:58  4   with individuals who had mental illness or substance use

09:29:03  5   disorders.  I worked with them when they were in sort of their

09:29:05  6   most acute state, when they were in a crisis situation.

09:29:10  7          I worked mostly with folks in their homes, because

09:29:12  8   when somebody's in crisis, they're not necessarily going to

09:29:15  9   come into a mental health agency and look for help.  So I would

09:29:19  10  go into their homes, I would work with these individuals, work

09:29:22  11  with their families.  Our goal was always to help keep them out

09:29:27  12  of the hospital, help stabilize them in the community and help

09:29:30  13  them kind of get back on their feet.

09:29:34  14         And I did that for about 5 years.  And then I moved

09:29:38  15  into a management position within that same agency where I

09:29:42  16  actually ran our housing services.  So I ran our 24/7

09:29:48  17  residential treatment facility.  So sometimes that meant

09:29:51  18  working the overnight shift and being in the home with

09:29:55  19  individuals who were in need of our services, kind of round the

09:30:01  20  clock, and I also ran our homeless outreach program.

09:30:04  21         So that involved a lot of finding individuals who were

09:30:08  22  not connected to our system but who maybe because of their

09:30:12  23  mental illness or their substance use disorder found themselves

09:30:17  24  homeless in our community.  So we would literally go out and

09:30:21  25  talk to people on the streets, talk to folks who unfortunately

Fraser (Direct by Lanier)

09:30:24  1  were living maybe under the bridges who were really suffering

09:30:29  2  and try and help connect them with services, because, again,

09:30:33  3  not everyone who has a mental illness or substance use disorder

09:30:38  4  is willing to stand up and say, yeah, I need help.  We really

09:30:42  5  needed to meet folks where they were at.

09:30:44  6  Q.  Okay.  I'm going to ask you a question -- by the way, you

09:30:48  7  and I have spoken twice before about your testimony.

09:30:51  8         Is that fair?

09:30:51  9  A.  That's correct.

09:30:52  10  Q.  I mean, we've spoken a lot in court of how are you, is this

09:30:55  11  your daughter, that kind of stuff.  But I met with you a number

09:30:58  12  of months back.

09:30:59  13  A.  Yes.

09:31:00  14  Q.  And talked to you for about 45 minutes one day.  And I

09:31:06  15  don't remember if we were in Lake or Trumbull at the time.

09:31:08  16         Do you remember where we were?

09:31:09  17  A.  We were in Trumbull, yes.

09:31:10  18  Q.  Okay.  And then I met with you a couple of nights ago just

09:31:14  19  to remind you to come on, tell you about the road map, tell you

09:31:18  20  to tell the truth, and here you are.

09:31:20  21  A.  Yes.

09:31:20  22  Q.  Okay?  So I've never asked you this before, but I'm really

09:31:25  23  curious hearing your experience.  Many of us, at least in

09:31:31  24  Houston, we see people under the bridge, we see people with

09:31:35  25  signs at intersections?

Fraser (Direct by Lanier)

09:31:36  1          MR. DELINSKY:  Objection, Your Honor.

09:31:38  2          MR. LANIER:  Well, this is a good question, Judge.  If

09:31:40  3  I could try it.

09:31:41  4          MR. DELINSKY:  You're testifying, Mark.

09:31:43  5          MR. LANIER:  No, no, no, I'm not.  Trust me.

09:31:46  6          I'll start all over, brand new.

09:31:48  7          THE COURT:  All right.

09:31:48  8  BY MR. LANIER:

09:31:49  9  Q.  Question:  Do you think when you see people with those

09:31:51 10  signs, give me money for food, God bless, or something like

09:31:54 11  that, what do you teach people about whether or not to give

09:31:57 12  them money or whether or not to help them?

09:31:59 13          What do you do?

09:32:01 14  A.  You know, that's a good question, and there's not --

09:32:04 15  there's not a black-and-white answer to that.  The fact is is

09:32:11 16  that nobody ever woke up one day and said, boy, I think I

09:32:15 17  really want to become a drug addict today.  It's never

09:32:18 18  happened.  So people who find themselves in that situation,

09:32:27 19  maybe they're going to use the money for good purposes, maybe

09:32:31 20  they're going to use the money to continue to support the

09:32:33 21  addiction that is a brain disease that is driving them.

09:32:38 22          I think being able to connect those individuals with

09:32:41 23  services, being able to connect with the supports that they

09:32:46 24  need to turn their lives around, offering support as much as

09:32:51 25  offering $5, the support is what they need.  No -- nobody wants

HEATHER K. NEWMAN, RMR, CRR

———— Fraser (Direct by Lanier) ————

09:32:57  1    to be in that situation.  Nobody wants to be homeless.  Nobody

09:33:01  2    wants to be living with an addiction, but there's so much shame

09:33:08  3    and so much stigma that's attached to it that I think, in my

09:33:12  4    view, and why I got into this field is I think we have a

09:33:14  5    responsibility to help the people around us, to lift them up

09:33:19  6    and to help them find that quality of life so that they can

09:33:25  7    change, so that they can improve the life that they're living.

09:33:29  8    Q.   Ms. Fraser, is that some of what you were doing with your

09:33:33  9    homeless outreach program?

09:33:36 10    A.   It you absolutely it is.  It was about breaking down

09:33:40 11    stigmas, breaking down barriers, breaking down the shame that

09:33:44 12    is so often involved for people who have substance use

09:33:48 13    disorder, and that's -- that's been a huge piece of what we've

09:33:52 14    seen even in this opiate epidemic is that when individuals

09:33:57 15    start on a prescription and they think, I'm not doing anything

09:34:01 16    wrong, this came in a little prescription bottle, this must be

09:34:04 17    safe and then that leads into addiction which leads into

09:34:10 18    families being torn apart, children being pulled away from

09:34:13 19    their parents, people losing their jobs, people losing their

09:34:18 20    homes.  There's so much shame and stigma that's attached to

09:34:22 21    that and so helping to break that down and helping to identify

09:34:28 22    that these are individuals that, you know, were it not for that

09:34:34 23    first step, that first prescription, that first little orange

09:34:37 24    bottle, they wouldn't have -- have experienced the trauma that

09:34:44 25    is just impacting so many people in our community.

**4355**

---

─────Fraser (Direct by Lanier)─────

09:34:50  1   Q.  Okay.

09:34:51  2          MR. DELINSKY:  Your Honor, may we go on the headset,

09:34:53  3   please?

09:34:55  4      (Proceedings at sidebar.)

09:35:07  5          MR. DELINSKY:  Your Honor, that last answer in it's

09:35:10  6   entirety was based on hearsay.  It also reflected opinion

09:35:14  7   testimony that addiction results from that first bottle.  She

09:35:23  8   has not been designated as an expert and lay opinion requires

09:35:27  9   personal knowledge.  She doesn't have that.  This is -- these

09:35:30 10   are -- if -- these are stories being relayed to you, but that

09:35:34 11   was way out of bounds, Your Honor.  It was all hearsay based,

09:35:37 12   and it was an expert opinion that has not been discussed.

09:35:40 13          MR. LANIER:  And, Your Honor, my reply is A, it was

09:35:42 14   not hearsay based.  This is her work experience.  This is what

09:35:45 15   she's done.

09:35:48 16          B, it explains the stigma point that she was trying to

09:35:51 17   make, that this is a stigma issue because people feel this

09:35:56 18   responsibility.

09:35:57 19          C, it is certainly within the realm of her experience

09:36:01 20   to be able to testify to these things.  This is why she gave a

09:36:07 21   deposition.  This is why she's here.

09:36:09 22          THE COURT:  Well. . . the problem is, Mr. Lanier, that

09:36:15 23   some of that answer was proper and some wasn't.  She's

09:36:25 24   certainly competent and qualified from her experience to talk

09:36:27 25   about the shame and stigma of addiction and what her county,

---

HEATHER K. NEWMAN, RMR, CRR

———Fraser (Direct by Lanier)———

09:36:33  1   Lake County, has had to do to try and help and support these

09:36:36  2   people.  I assume that's why she's here.

09:36:39  3          MR. LANIER:  Right.

09:36:40  4          THE COURT:  She's not qualified to talk about

09:36:43  5   causation.

09:36:45  6          MR. LANIER:  Understood.

09:36:45  7          THE COURT:  And -- and Mr. Delinsky is correct that

09:36:49  8   some of that answer included that, that whole sequence about

09:36:56  9   starting with the pill, they thought they did nothing wrong,

09:36:59 10   they got it from a doctor and it led to their lives are ruined.

09:37:03 11          Now, that certainly happened with some people, but she

09:37:10 12   has no idea how most of the people got addicted and many became

09:37:16 13   addicted in some other way, and the point is she's not here to

09:37:18 14   give that testimony.  So I'm not sure what to do about it at

09:37:23 15   this point in time.

09:37:23 16          MR. LANIER:  Your Honor, I will tell you that I will

09:37:24 17   try to ask more focused questions and try to stop her from

09:37:31 18   doing that.

09:37:31 19          THE COURT:  Well, I think your -- maybe she's got

09:37:46 20   to -- I don't know.

09:37:47 21          Mr. Delinsky, I can, you know, instruct the jury to

09:37:49 22   disregard that last answer and Mr. Lanier can start again.

09:37:55 23          MR. DELINSKY:  That's -- we would -- we would make

09:37:58 24   that request, Your Honor.

09:38:00 25          MR. MAJORAS:  Walmart joins, Your Honor.

**4357**

─────────Fraser  (Direct by Lanier)─────────

09:38:01  1          THE COURT:  All right.  Then that's what I'll do.

09:38:01  2      (In open court at 9:38 a.m.)

09:38:07  3          THE COURT:  All right.  The jury's instructed -- I'm

09:38:09  4  instructing you to disregard entirely Ms. Fraser's last answer.

09:38:17  5  BY MR. LANIER:

09:38:17  6  Q.  Ms. Fraser, I'm going to ask you some more questions, but

09:38:27  7  as you answer them we've got to be real careful not to -- not

09:38:31  8  to say something that someone else has said to you as to how

09:38:34  9  things have occurred, just your perception of things from your

09:38:39 10  experience.

09:38:40 11          Does that make sense?

09:38:41 12  A.  I understand.

09:38:42 13  Q.  And I'll do a better job at trying to make sure the

09:38:46 14  questions are asked in a way because I -- you're not a lawyer

09:38:49 15  and you're not supposed to be, so don't worry about it.

09:38:52 16          All right?

09:38:52 17  A.  I understand.

09:38:52 18  Q.  All right.  I want to go back to the question I asked you.

09:39:00 19          Your homeless outreach program you had, was that

09:39:03 20  something to try and help with homeless people that we see on

09:39:06 21  the streets and under bridges?

09:39:09 22  A.  Absolutely.  We have homeless individuals in Lake County.

09:39:13 23  Q.  And how long did you work -- let's put some timing into

09:39:17 24  this.  When were you a crisis counselor working in homes?

09:39:21 25  A.  That was 1993 /'94 is when I started.

HEATHER K. NEWMAN, RMR, CRR

Fraser (Direct by Lanier)

09:39:34  1  Q.  And when did you take on the management position on the

09:39:37  2  housing and homeless outreach program?

09:39:40  3  A.  I think 1996/'97.

09:39:50  4  Q.  Walk us through your work history after that, please.

09:39:52  5  A.  So I remained with the organization until 1999.  So I was,

09:39:56  6  again, boots on the ground through '99, and then a position

09:40:01  7  became open at the ADAHMS board.  The ADAHMS board oversees the

09:40:08  8  behavioral health agencies, the behavioral health network in

09:40:12  9  the county.  Right now, we fund -- we investigate in 15

09:40:17  10  agencies throughout Lake County, so --

09:40:20  11  Q.  And again, just so the record's clear --

09:40:22  12  A.  Yes.

09:40:22  13  Q.  ADAHMS is that alcohol, drug addiction, mental health

09:40:26  14  board?

09:40:26  15  A.  Exactly.  Exactly.  There are 50 ADAHMS boards around the

09:40:31  16  state.  Not everyone has the same name.  So some are referred

09:40:35  17  to as a mental health and recovery board, some are referred to

09:40:38  18  as an ADM board, but essentially we have the same

09:40:41  19  responsibility, which is to plan, fund, monitor, and evaluate

09:40:44  20  our county's mental health and addiction recovery system.

09:40:50  21        So we're sort of that behavioral health safety net.

09:40:55  22  Our job is to make sure any person in our county, regardless of

09:40:58  23  age, regardless of gender, regardless of ability to pay, has

09:41:03  24  access to the best mental health and addiction recovery

09:41:07  25  services when and where they want to receive those.  And we

Fraser (Direct by Lanier)

09:41:12  1  offer some support services through the board, but the clinical

09:41:16  2  services are offered through this network of provider agencies.

09:41:19  3  So I had worked at one of the providers.  I moved into the

09:41:23  4  position of director of quality improvement at the ADAHMS board

09:41:27  5  in 1999.

09:41:29  6  Q.  And as the director of quality improvement, what were your

09:41:33  7  hands-on tasks then?  What were you doing day-to-day?

09:41:37  8  A.  So I worked with the provider organizations to look at the

09:41:45  9  clinical standards and the quality standards for the services

09:41:49  10  that were offered through those agencies.  So things like

09:41:52  11  client rights, making sure that client's rights were being

09:41:55  12  adhered to.  Make sure that services met evidence-based

09:42:01  13  practices, so they met clinical standards and quality standards

09:42:06  14  that were established.  Making sure we were delivering the best

09:42:08  15  services possible.  I helped to develop new programs.

09:42:12  16        So if we saw a gap in services, part of my job was to

09:42:17  17  bring recommendation to the board about what kind of new

09:42:22  18  services we might want to offer, and it was really to partner

09:42:24  19  with the agencies so when there were challenges, when there

09:42:28  20  were problems, to help them problem solve those things.

09:42:32  21  Q.  And did you progress in your work there beyond -- or next

09:42:38  22  to director of quality improvement?

09:42:40  23  A.  Yes.  In 2007, I became the executive director of the

09:42:44  24  organization.  So that puts me in the position of really

09:42:50  25  leading our local behavioral health system.

———Fraser (Direct by Lanier)———

09:42:53  1    Q.   And as the executive director, have you had hands-on

09:42:59  2    experience with how the county has been affected by the opioid

09:43:03  3    epidemic?

09:43:04  4    A.   Absolutely.  And enormous amount of my job in the last

09:43:11  5    decade has had to do with the impact of opioids on our

09:43:16  6    community.

09:43:18  7    Q.   I would like to walk through that as we go to the next stop

09:43:22  8    and we consider the affect of opioids on the community.

09:43:25  9          And what I'd like to do is ask Ms. Fleming and

09:43:33  10   Ms. Lanier to please pass out plaintiffs' 4511.

09:44:04  11   BY MR. LANIER:

09:44:05  12   Q.   And do you have Plaintiffs' 4511 in front of you?

09:44:09  13   A.   Yes, I do.

09:44:09  14   Q.   Will you sort of identify it -- first of all, do you

09:44:14  15   recognize this?

09:44:14  16   A.   Yes, I do.

09:44:15  17   Q.   This is some -- an e-mail of yours it looks like

09:44:20  18   originally; right?

09:44:20  19   A.   Yes.

09:44:20  20   Q.   And then you sent it to yourself; is that right?

09:44:26  21   A.   Well, yes.  I -- when I mail -- when I e-mail things out, I

09:44:33  22   blind cc the whole group so it looks like it's just from me to

09:44:36  23   me, but it's to the entire task force.

09:44:38  24   Q.   Okay.  So you had a bunch of blind copies of this and that

09:44:42  25   keeps other people from hitting a reply all and --

HEATHER K. NEWMAN, RMR, CRR

———————Fraser (Direct by Lanier)———————

09:44:46  1   A.   Frankly, yeah, that's exactly what it does.  Yeah.

09:44:49  2   Q.   Okay.  I got it.  I got it.

09:44:51  3        I'd like to look at this document to make some sense

09:44:58  4   of what you have done, and as I do it we're going to be filling

09:45:01  5   in the opioid stop of your road map.  All right?

09:45:04  6   A.   Yes.

09:45:08  7   Q.   Good afternoon, all.  As the lead for the county H-U-B

09:45:13  8   program --

09:45:14  9        What's the HUB program?

09:45:15 10   A.   So the county HUB program to combat opioid addiction.  That

09:45:22 11   is actually part now of state statute.  In, I believe, 2017,

09:45:31 12   the state legislature identified that each county needed a HUB,

09:45:42 13   like a central organization to make sure that services and

09:45:44 14   supports for individuals with opioid use disorder were provided

09:45:47 15   in the county.  We were fortunate because we had already

09:45:52 16   created our Lake County opiate task force many years earlier.

09:45:57 17   We created that in 2010, so that essentially served as our

09:46:03 18   county HUB.  But ADAHMS boards were given the responsibility

09:46:11 19   through the Ohio Revised Code, through statute, that we had to

09:46:12 20   have a HUB.

09:46:13 21   Q.   So the county task force from 2010, was that an opiate

09:46:16 22   county task force?

09:46:17 23   A.   Yes.

09:46:23 24   Q.   Was the problem bad enough in 2010 to already need a task

09:46:27 25   force?

———— Fraser (Direct by Lanier) ————

09:46:28  1   A.  Yes, it was.  I believe Lake County was one of the first

09:46:32  2   counties in the state to establish a task force -- an opiate

09:46:37  3   task force, but yes, we were absolutely in 2010 seeing the

09:46:41  4   increase in demand or services and supports.

09:46:44  5   Q.  All right.

09:46:45  6   A.  Relative to opioids.

09:46:47  7   Q.  If we go back to Plaintiffs' 4511.  You said as the lead

09:46:51  8   for the county HUB program to combat opiate addiction.  And

09:46:55  9   this, by the way, is in 2018?

09:46:58  10  A.  Correct.

09:47:01  11  Q.  The ADAHMS board is responsible for compiling a

09:47:07  12  comprehensive report detailing how our county is addressing the

09:47:12  13  opiate epidemic.

09:47:13  14        Can you tell us how you came about -- how your ADAHMS

09:47:16  15  board became responsible for compiling this comprehensive

09:47:20  16  report?

09:47:20  17  A.  Well, again, through the state statute, the state said

09:47:24  18  every county must have a HUB for -- to combat opiate addiction.

09:47:30  19  The responsibility of that rested with the ADAMHS board, and

09:47:35  20  among the rules in that statute, the final rule was that every

09:47:40  21  board had to submit a comprehensive report by January 1st of

09:47:49  22  2020.

09:47:54  23        We proactively said let's do a baseline report now, in

09:47:58  24  2018, and then we'll do another one the following year to

09:48:02  25  see -- to measure how much more we've done in this progression.

———— Fraser (Direct by Lanier) ————

09:48:06  1    But again, the things that we put in this report we started

09:48:12  2    doing back in 2010.  This was just sweeping it all into a pile.

09:48:18  3    Q.  And that's one of the reasons I want to use this report.

09:48:23  4    The jury needs to hear and we've got to put on the record the

09:48:27  5    affects the epidemic had on the county, and that's what you're

09:48:30  6    here to do.

09:48:31  7         As I walk through this report will this be able to

09:48:34  8    give us a good feel of the opioid affect on your county?

09:48:38  9    A.  Yes, it will.  It is not all inclusive and the epidemic

09:48:42  10   continues, so there is more beyond what's even in this report

09:48:46  11   that we're doing today.

09:48:47  12   Q.  After we go through the report, I'll ask you what is also

09:48:53  13   part of the problem either historically or now and let you

09:48:56  14   identify that as well.

09:48:56  15   A.  Understood.

09:48:56  16   Q.  You said this is lengthy, contains extensive information

09:48:58  17   about the multitude of ways we collaborate, innovate and

09:49:04  18   respond to community needs.  Please take a moment to look

09:49:07  19   through it and feel free to share.

09:49:09  20         Is that right?

09:49:09  21   A.  Yes.

09:49:09  22   Q.  Now, I want to back up for a moment.  You met your husband

09:49:16  23   through your job in a sense; is that right?

09:49:18  24   A.  I did.  I did.

09:49:20  25   Q.  So tell the jury what your husband was doing when you met

HEATHER K. NEWMAN, RMR, CRR

──────Fraser (Direct by Lanier)──────

09:49:23  1  him.

09:49:25  2  A.   So my husband worked outside of the behavioral health

09:49:29  3  system, but he had volunteered on the board of one of the

09:49:32  4  provider organizations within the ADAMHS network and he'd been

09:49:38  5  on the board for about probably a decade or longer and he was

09:49:43  6  currently --- when we met he was serving as the board chair for

09:49:47  7  one of the provider agencies, so our paths crossed because I

09:49:50  8  was the director of quality improvement, I was working with the

09:49:53  9  agency, he was the board chair, we met, and after our second

09:49:58 10  date he stepped down off the board because it was a conflict of

09:50:02 11  interest and -- and so he no longer serves on those boards.

09:50:06 12  Q.   Wait.  After the second date?

09:50:07 13  A.   Yes.

09:50:07 14  Q.   So he wasn't, like, sure enough after the first one?

09:50:09 15  A.   No.  The first date didn't -- didn't do the trick.  The

09:50:13 16  second date, he stepped down.

09:50:14 17  Q.   All right.  All right.  Second date arose to the level of a

09:50:19 18  conflict of interest.

09:50:20 19  A.   Yes.  Yes.  Exactly.

09:50:22 20  Q.   All right.  Let's go through this, please.  Because he's --

09:50:28 21  came to my mind because of what he did on the board.

09:50:31 22        What type of stakeholders are involved with this

09:50:36 23  county HUB program?  Check all that apply.

09:50:41 24        And what I'd like to do is go through these and have

09:50:44 25  you give us a brief explanation of how the epidemic has

─────────────── Fraser (Direct by Lanier) ───────────────

09:50:50　1　affected your county such that these services are applied.

09:50:55　2　When you answer, don't tell us about anything that someone's

09:51:00　3　told you, please.

09:51:01　4　A.  I understand.

09:51:01　5　Q.  All right.  Your perceptions are fine, but what others are

09:51:04　6　telling you is not.

09:51:05　7　A.  Understand.

09:51:06　8　Q.  Let's start with public Children's Services.

09:51:10　9　　　　　How has the epidemic affected your county such that

09:51:13　10　they're involved?

09:51:16　11　A.  We have more children in foster care because their parents,

09:51:22　12　their caregivers have been impacted by opioids and are unable

09:51:28　13　to take care of their kids.  We have nearly a hundred

09:51:31　14　grandparents raising their grandchildren because the family

09:51:37　15　member, because the parent is not able to care for their

09:51:40　16　children.  We have more children today than ever in residential

09:51:45　17　treatment, which is paid for by Children's Services by the

09:51:50　18　ADAMHS board, by local levy dollars, because the children have

09:51:56　19　such acute symptoms as a result of their trauma that they're

09:52:02　20　pulled out of their homes and placed into residential

09:52:04　21　treatment.

09:52:06　22　　　　　We have programs specific to caring for babies who are

09:52:12　23　born in withdrawal because of the paternal opiate use disorder.

09:52:20　24　It's a huge, huge impact on our community because of what's

09:52:27　25　happening with these children and these babies.

─────Fraser (Direct by Lanier)─────

09:52:31  1          The Children's Services is working with schools,

09:52:35  2    behavioral health systems --

09:52:36  3          MR. DELINSKY:  Your Honor -- Your Honor, I'm sorry to

09:52:38  4    interrupt, but could we go on the headset again?

09:52:44  5        (Proceedings at sidebar.)

09:52:57  6          MR. DELINSKY:  I apologize for the interruption, but

09:52:58  7    there's no conceivable basis for this testimony other than

09:53:02  8    based on what people have told her.

09:53:04  9          THE COURT:  Well, I disagree.  This is her job.  She's

09:53:07  10   funding this.  She's providing the funds.  So this is -- this

09:53:11  11   is -- she knows this from her work and she's a -- someone's got

09:53:15  12   to be able to testify about this.  She hasn't -- this isn't

09:53:20  13   causation testimony as to how these people became addicted.

09:53:24  14   It's a fact they're addicted, their children need help.  So, I

09:53:29  15   disagree.  This is not --

09:53:31  16          MR. DELINSKY:  Your Honor, we would just note that the

09:53:33  17   fact that she knows it through her work doesn't transform what

09:53:38  18   she's heard from other people into admissible testimony.  She's

09:53:42  19   provided specific testimony about grandparents, specifically

09:53:45  20   symptoms being encountered by children.

09:53:48  21          THE COURT:  This is a fact.  There are a hundred --

09:53:50  22   the ADAMHS board is providing funding for, you know, a hundred

09:53:54  23   children who can't -- who are being cared for by their

09:53:58  24   grandparents.

09:53:59  25          MR. DELINSKY:  But the testimony goes beyond that into

———Fraser (Direct by Lanier)———

09:54:01  1   the particular experience and symptoms that those children are

09:54:04  2   suffering which she can't possibly know.  I have no objection

09:54:07  3   to the --

09:54:08  4          THE COURT:  Well, it's not going into symptoms.  All

09:54:10  5   right?  The objection's overruled.  This is proper testimony.

09:54:19  6      (In open court at 9:54 a.m.)

09:54:21  7   BY MR. LANIER:

09:54:21  8   Q.  Ma'am, please continue.  You were talking about how the

09:54:32  9   churn's services is working with schools.  Explain, please.

09:54:35 10   A.  The schools are requesting more --

09:54:39 11   Q.  Don't say what they're asking.  Just tell how they're

09:54:43 12   working with the schools.

09:54:44 13   A.  Children's Services and the behavioral health system are

09:54:47 14   embedded in many of the schools to provide additional supports

09:54:51 15   to the educators, to the students because of the trauma

09:54:57 16   experienced as a result of the epidemic.

09:54:59 17   Q.  Thank you very much.

09:55:00 18          What do the county commissioners have to do with all

09:55:04 19   of this?  Why are they a stakeholder involved with the county

09:55:09 20   HUB program?

09:55:12 21   A.  Clearly the commissioners oversee the operations of the

09:55:18 22   county.  They also oversee the levies that are placed on the

09:55:25 23   ballot.  The economic cost for the services that are delivered

09:55:34 24   for opioid use disorder.

09:55:36 25   Q.  Are you able to tell me -- in Texas, we don't have levies.

———Fraser (Direct by Lanier)———

09:55:38 1   What is a levy?  I mean, levy for us means you keep the water

09:55:42 2   from flowing out of the bayou.

09:55:45 3   A.   Yeah.  So levies are dollars that are assessed to property,

09:55:51 4   which is a fancy way of saying if I'm a property owner, part of

09:55:55 5   what I pay in taxes is money to support Social Services,

09:56:03 6   different services.  So we're all asked every few years to

09:56:06 7   vote, and we can vote for a levy or against a levy.

09:56:12 8         The ADAMHS board has two levies on the ballot, each

09:56:17 9   goes 10 years, and they've been in existence since 1979 and

09:56:23 10  1986, so -- and they've continued to be renewed or replaced.

09:56:27 11  But those are based on your property value and based on that a

09:56:31 12  percentage -- a dollar amount goes towards supporting, in my

09:56:37 13  case, the ADAMHS board services.

09:56:38 14  Q.   Got it.  Thank you.

09:56:40 15  A.   And the commissioners have to -- are responsible for

09:56:44 16  allowing those levies to go on the ballot.  So that's a role

09:56:51 17  that they play.

09:56:56 18  Q.   Explain how the county health departments are stakeholders

09:57:00 19  in working through this epidemic.

09:57:01 20  A.   The biggest role that our local health department has in

09:57:05 21  Lake County is one, helping to keep statistics on the impact,

09:57:14 22  the death statistics.  They head up our overdose death review

09:57:19 23  committee, which I sit on.  So looking at that impact, the

09:57:24 24  people whose lives have been lost.  Our county health

09:57:27 25  department also operates Project DAWN, which is the program

———— Fraser (Direct by Lanier) ————

09:57:32  1   that dispenses Narcan in our community.  So another important

09:57:37  2   role in addressing consequences of the opioid epidemic.

09:57:45  3   Q.  And the Department of Job and Family Services, why are they

09:57:50  4   a stakeholder in this opiate epidemic in Lake County?

09:57:54  5   A.  In Lake County, the Department of Job and Family Services

09:57:58  6   is the umbrella under which Children's Services exists, so

09:58:03  7   they're part -- Children's Services is part of Job and Family

09:58:06  8   Services, but beyond that, Job and Family Services does things

09:58:09  9   like help people determine eligibility for Medicaid.

09:58:15  10      So if an individual needs those benefits in order to

09:58:21  11  receive services, they would apply through -- we all them JFS.

09:58:26  12  They also are the hub for our workforce initiative.  So when

09:58:36  13  people are looking for employment, they can work with Job and

09:58:39  14  Family Services to seek employment, and we certainly know that

09:58:43  15  the opioid epidemic has had a tremendous impact on our

09:58:48  16  workforce.

09:58:48  17  Q.  Okay.  Law enforcement, can you explain that with the

09:59:04  18  epidemic?

09:59:04  19  A.  Absolutely.  Crime rates have increased in our county.

09:59:07  20  Theft, breaking and entering, crime associated with seeking

09:59:16  21  opioids, prescription opioids.  So law enforcement needs to be

09:59:20  22  at the table and needs to help with the problem solving for a

09:59:27  23  how we address the epidemic.

09:59:29  24      MR. DELINSKY:  Your Honor, headset for one more

09:59:31  25  second.

─────Fraser (Direct by Lanier)─────

09:59:32 1        (Proceedings at sidebar.)

09:59:44 2             MR. DELINSKY:  Your Honor, I just need your help and

09:59:46 3    guidance here.  Every a -- massive portions of this testimony

09:59:51 4    are, number one, outside the scope of the ADAMHS board, law

09:59:57 5    enforcement, for instance.  Any information she would have

09:59:59 6    regarding crime associated with opioids would be coming from

10:00:03 7    police officers, the police department.  It's not what

10:00:08 8    Ms. Fraser does.

10:00:08 9             There was testimony prior to that about how this has

10:00:14 10   impacted the workforce, which is -- obviously would turn on

10:00:20 11   information provided by employers, or employees of, you know,

10:00:25 12   in businesses throughout the county that she cannot possibly

10:00:27 13   have personal knowledge of.  It's all hearsay.  We object to it

10:00:31 14   all.

10:00:31 15            I don't want to continue interrupting, so the reason I

10:00:34 16   asked for the sidebar, I want to avoid these and just see if I

10:00:38 17   can have a running objection to the entirety of this testimony.

10:00:40 18            I don't know how else to do it to not be disruptive,

10:00:44 19   but also to preserve our objection for the Court of Appeals on

10:00:48 20   this testimony.

10:00:51 21            MR. LANIER:  And, Your Honor, I don't object to him

10:00:53 22   having a running objection.

10:00:54 23            THE COURT:  Yeah, well, but, Mr. Lanier, some of this

10:00:57 24   is -- it's not in here area of professional knowledge and

10:01:02 25   really is hearsay.

———— Fraser (Direct by Lanier) ————

10:01:03   1        MR. LANIER:  Well, my concern, Your Honor, is this is

10:01:05   2   her document, she is in charge of this HUB, she pulled these

10:01:09   3   people together for this meeting.

10:01:12   4        THE COURT:  I understand that, but --

10:01:13   5        MR. LANIER:  And I want to be able to ask her why she

10:01:15   6   pulled them in for the meeting.

10:01:16   7        THE COURT:  Well, if she wants to simply say that

10:01:23   8   there's been an impact on drug -- on the police, fine.  Period.

10:01:27   9   I mean, but to go into these details, it is all hearsay.

10:01:34  10   When -- when -- dealing with mental health and counseling and

10:01:39  11   the things that the ADAMHS board directly provides funding, I

10:01:43  12   think she -- I'm allowing that, but, you know, her research

10:01:51  13   into talking to local businesses and what they told her,

10:01:54  14   that -- that really is hearsay.

10:01:56  15        MR. WEINBERGER:  Your Honor, she's also on the opioid

10:01:59  16   task force for Lake County and -- which is a task force set up

10:02:08  17   to deal with issues of the abatement.

10:02:10  18        THE COURT:  I understand that.  If Mr. Lanier wants to

10:02:12  19   bring -- well, we're not dealing with details of abatement in

10:02:18  20   this case.  It's simply liability.  So if she wants to say that

10:02:23  21   she put together this report and it documents that there's been

10:02:26  22   an impact in these areas, you can bring that out.  But to go

10:02:30  23   into the details, I agree with Mr. Delinsky, that -- that

10:02:33  24   really is hearsay, and it's not -- and it's not necessary to

10:02:39  25   establish liability.  You can show the -- you know, there's

─────── Fraser (Direct by Lanier) ───────

10:02:42  1   been an impact in all these areas in Lake County, period.

10:02:45  2   That's all you need to show.

10:02:48  3           MR. LANIER:  So if I'm hearing right, I should just

10:02:50  4   ask, has there been an impact in law enforcement?  Yes.  Has

10:02:55  5   there been an impact in -- and just walk through each one --

10:03:01  6           THE COURT:  Right.

10:03:01  7           MR. LANIER:  -- but not say what the impact is?

10:03:03  8           THE COURT:  I think that's -- I think that's right.

10:03:04  9           MR. LANIER:  And that should be adequate for an

10:03:06  10  appellate record on the scope of the epidemic?

10:03:09  11          I fear that that's not enough for my appellate record,

10:03:11  12  and I think that I should be entitled to ask her why did you

10:03:15  13  invite these people as a stakeholder?  What were your reason as

10:03:19  14  the, you know, person who's not only the founding member of the

10:03:24  15  task force, but running it?

10:03:26  16          THE COURT:  Well, but, and then she can say because I

10:03:28  17  believe that it had -- there was an impact in that area,

10:03:32  18  period.  That's it.

10:03:33  19          But, you know, she can't go into all the details of

10:03:36  20  what they told her.  That's not -- it's -- I don't -- it's not

10:03:41  21  relevant to establishing the existence.  Again, you have to

10:03:46  22  establish the existence of a public nuisance today in

10:03:49  23  Lake County, all right, and you're establishing it.  There's

10:03:53  24  been an impact on EMS fire, on drug courts, Department of

10:03:57  25  Corrections.  I think that's fair.  But to go into all the

─────────Fraser (Direct by Lanier)─────────

10:04:00  1   details of what people told her, I -- I don't think -- it's not

10:04:05  2   necessary, and it is all hearsay.  And it would only be in to

10:04:10  3   show the proof of the matter asserted, which is hearsay.

10:04:13  4          MR. LANIER:  Well, I understand, Your Honor, and, I

10:04:16  5   mean, here's the frustrating line I'm walking.  I'm reminded of

10:04:22  6   an early trial in my life where the question, what is your name

10:04:25  7   was objected to as hearsay because the person was told what

10:04:29  8   their name was by their parent when they were growing up and

10:04:33  9   they never really knew what -- you know, hadn't seen their

10:04:35  10  birth certificate so it's hearsay.

10:04:37  11         I mean, at some point our life is informed by the

10:04:39  12  people we interact with and what we do, and I'm not asking for

10:04:43  13  hearsay per se, what I am asking her is why are these people

10:04:48  14  involved -- you know, you're every seeing this money that's

10:04:50  15  going out and these committees, what is it that's causing you

10:04:55  16  to push money in that direction or push money in that

10:04:58  17  direction, or how are they involved such that you need them at

10:05:02  18  the table?  I -- I think that's okay, but I'll try to do it as

10:05:06  19  lightly as I can.

10:05:06  20         THE COURT:  She can say because they've been impacted.

10:05:09  21  That's it.

10:05:09  22         MR. LANIER:  Understood.

10:05:10  23         THE COURT:  That's what you have to establish, that

10:05:12  24  they have been impacted.

10:05:14  25         MR. LANIER:  Well, I'll ask --

———Fraser (Direct by Lanier)———

10:05:16  1          THE COURT:  So I'm allowing that testimony.  I don't

10:05:17  2   know if Mr. Delinsky would object to that, but if he does, I'll

10:05:21  3   overrule that objection.

10:05:22  4          MR. LANIER:  All right.  And, Your Honor, to some

10:05:24  5   degree I may have to ask some leading questions.

10:05:27  6          THE COURT:  All right.

10:05:31  7          MR. DELINSKY:  -- to do that.  Okay.

10:05:32  8          THE COURT:  All right.  That's fine.

10:05:42  9      (In open court at 10:05 a.m.)

10:05:42  10  BY MR. LANIER:

10:05:42  11  Q.  All right.  Ms. Fraser, in addition to law enforcement,

10:05:47  12  have EMS and fire been affected by the opioid epidemic?

10:05:55  13  A.  Yes.

10:05:56  14  Q.  Time out.  Without going into a lot of detail, why?

10:06:00  15          Are they the first responders many times to a lot of

10:06:04  16  circumstances and situations?

10:06:05  17  A.  Yes, they are.

10:06:06  18  Q.  Was it important to have them involved in the county HUB

10:06:10  19  program?

10:06:10  20  A.  Absolutely.

10:06:12  21  Q.  Okay.  And do you interact with them routinely on these

10:06:15  22  issues?

10:06:16  23  A.  Absolutely.

10:06:18  24  Q.  The drug courts and probation services, are they also

10:06:23  25  affected by the opioid epidemic?

─────────────────── Fraser (Direct by Lanier) ───────────────────

10:06:26  1    A.   Tremendously.

10:06:28  2    Q.   Does it affect their workload?

10:06:30  3    A.   Yes, it does.

10:06:30  4    Q.   Does it affect what they have -- their time that they can

10:06:38  5    spend?

10:06:39  6    A.   Yes, it does.

10:06:39  7    Q.   Okay.  The Department of Corrections, have they been

10:06:46  8    involved also in Lake County?

10:06:47  9    A.   Yes, they have.

10:06:48  10   Q.   And have they been affected by the opioid epidemic?

10:06:52  11   A.   They have, yes.

10:06:57  12   Q.   Does it affect the incarceration rate?

10:06:59  13   A.   Yes, it does.

10:06:59  14   Q.   Does it affect how they handle populations at prisons based

10:07:03  15   on your experience?

10:07:04  16   A.   Yes, it does.

10:07:04  17   Q.   Are there other government agencies that are not listed

10:07:06  18   here that have been affected by the opioid epidemic in

10:07:11  19   Lake County?

10:07:11  20   A.   Yes, there are.

10:07:12  21   Q.   Do any agencies come to mind?

10:07:23  22   A.   I'm just going to review this to see who is listed and who

10:07:27  23   is not.

10:07:27  24   Q.   Yeah.  Take your time, please.

10:07:38  25   A.   So our educational services center, for example.

HEATHER K. NEWMAN, RMR, CRR

─────Fraser (Direct by Lanier)─────

10:07:44  1    Q.   They have been affected as well?

10:07:45  2    A.   Yes, they have.

10:07:46  3    Q.   All right.  Anything else come to mind that we haven't

10:07:49  4    listed so far in terms of these governmental entities?

10:07:57  5    A.   All of our court systems have been impacted, not just the

10:08:02  6    drug courts.

10:08:02  7    Q.   Not just the drug courts.

10:08:04  8             Family courts have been impacted?

10:08:05  9    A.   Yes.

10:08:06  10   Q.   Okay.  Criminal courts have been impacted?

10:08:10  11   A.   Yes.

10:08:12  12   Q.   And when the courts are impacted, are the court personnel

10:08:16  13   and the -- the amount of time and expense they have to spend on

10:08:22  14   matters, to your knowledge, has that been impacted?

10:08:24  15   A.   Absolutely.

10:08:26  16   Q.   Nonprofit agencies.  Can you think of any nonprofit

10:08:30  17   agencies -- well, I guess we're going to look at a bunch of

10:08:34  18   them, so we'll come back to that if there are some that aren't

10:08:37  19   listed.  Okay?

10:08:43  20   A.   Yes, but of note is every provider agency with whom the

10:08:47  21   ADAMHS board contracts is a nonprofit agency.

10:08:48  22   Q.   And when you say every provider agency, what do these

10:08:51  23   agencies provide, or better yet, what are the descriptions of

10:08:57  24   the agencies?  How do we describe them, or give their name?

10:09:00  25   A.   Our mental health and substance use disorder agencies.

Fraser (Direct by Lanier)

10:09:08  1    Q.   Mental health and what?

10:09:09  2    A.   And substance use disorder.

10:09:12  3    Q.   And they're affected by the opioid epidemic in Lake County?

10:09:15  4    A.   Yes, they are.

10:09:16  5    Q.   Okay.  Who -- who else?

10:09:18  6    A.   Our housing agency.

10:09:22  7    Q.   And they're affected because of the need for housing?

10:09:25  8    A.   Absolutely.

10:09:26  9    Q.   And who else?

10:09:27 10    A.   Our youth mentoring agency.

10:09:36 11    Q.   And they're trying to mentor, do they mentor youths who are

10:09:40 12    suffering from addiction or monitor youths who are affected by

10:09:44 13    familial addiction?

10:09:45 14    A.   Both.

10:09:45 15    Q.   Okay.  Anybody else?

10:09:48 16    A.   Our peer support agency.

10:09:50 17    Q.   What is a peer support agency?

10:09:53 18    A.   A peer support agency is an agency that is operated by an

10:10:02 19    individual with a mental illness or a substance use disorder

10:10:05 20    and it provides peer-to-peer services and supports for

10:10:10 21    individuals who are in recovery.

10:10:10 22    Q.   Okay.  Any other provider agencies?

10:10:16 23    A.   Our information and referral agency in the county.

10:10:24 24    Q.   What is an information and referral agency?

10:10:28 25    A.   This is the agency that assists in linking individuals with

---

Fraser (Direct by Lanier)

10:10:35  1   services such as food assistance, heating bills being paid.

10:10:43  2   They're the home of our 211 information line.

10:10:47  3   Q.   Okay.   Any other nonprofit agencies, provider agencies

10:10:53  4   before we move on?

10:10:55  5   A.   Those are the ones that come to mind.

10:10:57  6   Q.   Thank you.

10:10:58  7           Now, on the healthcare organizations, can you give us

10:11:03  8   an idea of what healthcare organizations have been affected?

10:11:11  9   A.   One is our local hospital system.

10:11:21  10   Q.   Has it affected the expense associated with running that

10:11:25  11   hospital?

10:11:25  12   A.   Yes, it has.

10:11:27  13   Q.   The workload of that hospital?

10:11:29  14   A.   Absolutely.

10:11:34  15   Q.   The charitable care that has to be given by the hospital?

10:11:38  16   A.   Absolutely.

10:11:39  17   Q.   Okay.   What about provider organizations?

10:11:44  18   A.   Again, those are -- those are also our nonprofit agencies.

10:11:51  19   So those are organizations within the ADAMHS network.

10:11:54  20   Q.   Okay.   Pharmacies as stakeholders.   I'm going to -- well,

10:12:08  21   why are they listed here?

10:12:10  22   A.   One of the significant initiatives of our opiate task force

10:12:17  23   as outlined on our strategic plan was to establish permanent

10:12:23  24   drug drop boxes throughout our county and to distribute

10:12:29  25   information about those drop boxes so that citizens know where

HEATHER K. NEWMAN, RMR, CRR

─────────── Fraser (Direct by Lanier) ───────────

10:12:34  1   they could dispose of their medications.

10:12:38  2   Q.   You mentioned -- or not you, Ms. Caraway yesterday

10:12:41  3   mentioned those bag -- what are they called?

10:12:45  4   A.   Yes.  They're actually right here still.

10:12:48  5   Q.   Oh, yeah.  I think those are ones you brought, and I pulled

10:12:51  6   them from you to use with Ms. Caraway to explain.

10:12:53  7   A.   Yes.

10:12:53  8   Q.   Can you tell the jury about those, please.

10:12:56  9   A.   So this was sort of phase 2 of our initiative.  We

10:13:00  10  established the permanent drop boxes, drug drop boxes in 2011

10:13:07  11  throughout the county, through police departments, including

10:13:10  12  our local community college, so -- and we would distribute

10:13:15  13  information, literature, everywhere we could to let folks know

10:13:21  14  where they could dispose of their medications.  One of those

10:13:26  15  places was we had cards that we took to pharmacies, thus,

10:13:32  16  they're on that list.

10:13:34  17       But by 2017, these bags became available, which was a

10:13:40  18  safe alternative, particularly for individuals who were not

10:13:44  19  mobile, who could not leave their home to go to the drop boxes.

10:13:52  20  So we began distributing these.  I take them to senior centers.

10:13:55  21  I take them to libraries.  I take them to -- any -- anywhere I

10:14:03  22  can to get these out so that in -- folks can dispose of their

10:14:07  23  medications safely and get them out of the medicine cabinets.

10:14:11  24  Q.   Okay.  Very good.

10:14:12  25       Local businesses.  How have you engaged local

———— Fraser (Direct by Lanier) ————

10:14:16  1   businesses in addressing the opioid epidemic or -- yeah.

10:14:21  2   A.   A large part of our opiate task force is outreaching to the

10:14:27  3   community and presenting on the opiate epidemic and the impact

10:14:34  4   on our community.

10:14:35  5   Q.   I'm going to interrupt there and ask my wonderful

10:14:40  6   compatriots to pass out Plaintiffs' Exhibit 4516.

10:15:08  7           Do you have 4516 in front of you?

10:15:10  8   A.   Yes, I do.

10:15:11  9   Q.   And are you familiar with this document?

10:15:14  10          MR. DELINSKY:  Excuse me.  We do object to displaying

10:15:17  11  this document.

10:15:17  12          THE COURT:  Will someone give me a copy, please?

10:15:41  13          Robert, will you give me the white noise?

10:15:59  14          MR. LANIER:  Sorry, Judge.

10:16:01  15      (Proceedings at sidebar.)

10:16:06  16          THE COURT:  All right.  There's an objection to this

10:16:09  17  document.  And what is it, please?

10:16:11  18          MR. DELINSKY:  Your Honor, the objection first and

10:16:13  19  foremost is hearsay with regard to the attachment.  It is based

10:16:20  20  on information that is outside the scope of Ms. Fraser's

10:16:30  21  knowledge.  By definition it speaks of national numbers.  We

10:16:32  22  object to that as well.  It talks about what American employers

10:16:37  23  are losing annually, again outside the scope of her knowledge.

10:16:41  24  So it's a combined 803, 402, and 403 exception.

10:16:44  25          THE COURT:  Well, there -- what's jumping out at me on

───────Fraser (Direct by Lanier)───────

10:16:48   1   this flier, there's a statement, 4 to 5 heroin addictions began

10:16:52   2   with the use of prescription drugs, so that's hearsay and it's

10:16:58   3   potentially expert testimony and I -- I'm not going to allow

10:17:02   4   that in, and I don't see the general relevance.  She's already

10:17:08   5   talked about the need to have a whole lot of social services to

10:17:11   6   help people in Lake County, so I'll sustain the objection.

10:17:14   7            MR. LANIER:  Your Honor, may I offer as a salvo, if I

10:17:21   8   don't do the attachment I just do the exhibit to show that

10:17:24   9   they're out there making presentations to businesses?  I mean,

10:17:29  10   that's -- to me, the relevance --

10:17:30  11            THE COURT:  You can just ask her.  She's already said

10:17:32  12   they make -- they do outreach to businesses.  She's already

10:17:36  13   said that.

10:17:36  14            MR. LANIER:  Okay.

10:17:39  15            THE COURT:  In your outreach to businesses you're

10:17:43  16   making presentations.

10:17:44  17            MR. LANIER:  Okay.  Understood your ruling.

10:17:59  18            THE COURT:  Maybe we'll just take our mid-morning

10:18:04  19   break at this point in time.

10:18:04  20        (In open court at 10:18 a.m.)

10:18:05  21            THE COURT:  Ladies and gentlemen, we'll take 15

10:18:06  22   minutes, and then we'll -- usual admonitions and then we'll

10:18:09  23   pick up with the balance of Ms. Fraser.

10:18:13  24        (Jury excused from courtroom at 10:18 a.m.)

10:41:44  25            THE COURT:  Okay.  Please be seated.

—————Fraser (Direct by Lanier)—————

10:41:45  1          And, Ms. Fraser, I just want to remind you you're

10:41:48  2   still under oath from this morning.

10:41:50  3          And, Mr. Lanier, you may continue, please.

10:41:51  4          MR. LANIER:  Thank you, Your Honor, may it please, the

10:41:54  5   Court, ladies and gentlemen, counsel, and Ms. Fraser.

10:41:57  6   BY MR. DELINSKY:

10:41:58  7   Q.  Ms. Fraser, I'm trying to figure out how to condense down,

10:42:02  8   timewise your testimony.  And so what I'd like to do is take

10:42:05  9   all of these different entities that you've testified about as

10:42:09  10  having been impacted by the opioid epidemic and ask you this

10:42:13  11  question:  Have these impacts been incidental or have they been

10:42:16  12  significant?

10:42:16  13  A.  The impacts --

10:42:23  14          MR. DELINSKY:  Objection, Your Honor.

10:42:25  15          THE COURT:  Yeah.  Sustained.

10:42:29  16  BY MR. LANIER:

10:42:30  17  Q.  Have these been notable impacts?

10:42:34  18  A.  The impacts on our community have been significant.

10:42:39  19  Q.  Okay.  Thank you.

10:42:40  20          MR. DELINSKY:  Objection, Your Honor.

10:42:41  21          THE COURT:  Well, I'll sustain -- I'll sustain the

10:42:45  22  objection and the answer because that wasn't -- it wasn't an

10:42:47  23  answer to the question.

10:42:50  24  BY MR. LANIER:

10:42:51  25  Q.  Have these been notable impacts?

──────Fraser (Cross by Delinsky)──────

10:42:59  1    A.   Yes, they've been notable.

10:43:04  2    Q.   All right.  Ms. Fraser, your job involves opioid-related

10:43:15  3    issues.  Can you give us an idea of how much of your time and

10:43:24  4    your efforts are suspended -- are encapsulated in dealing with

10:43:30  5    the opioid epidemic in Lake and -- Lake County?

10:43:34  6    A.   Over the last decade I would say fully 75 percent of my job

10:43:41  7    has been related to the opiate epidemic.

10:43:44  8    Q.   Great.  Thank you very much.

10:43:46  9         Your Honor, I'll pass the witness.

10:43:49  10        THE COURT:  Okay.

10:44:46  11        MR. DELINSKY:  May it please the Court.

10:44:47  12        THE COURT:  Yes, Mr. Delinsky.

10:44:47  13             CROSS-EXAMINATION OF KIM FRASER

10:44:49  14   BY MR. DELINSKY:

10:44:49  15   Q.   Good morning, Ms. Fraser.  Good morning, jurors.  My name

10:44:51  16   is Eric Delinsky.

10:44:53  17        I think we shook hands one day earlier in the trial.

10:44:55  18   I represent CVS.

10:44:57  19   A.   Good morning.

10:44:57  20   Q.   Thanks for answering my questions this morning.  It's nice

10:45:00  21   to see you without a mask.

10:45:02  22   A.   Yes.

10:45:05  23   Q.   Ms. Fraser, Mr. Lanier usually is careful to draw the

10:45:12  24   distinction between prescription opioids and illicit opioids.

10:45:17  25   I think it was probably just an oversight this morning, but am

─── Fraser (Cross by Delinsky) ───

10:45:24  1    I right when you refer to the opioid epidemic and the opioid

10:45:27  2    issues in Lake County that you're encapsulating both?

10:45:32  3    A.   Yes, in that it has evolved.

10:45:35  4    Q.   Okay.  So when we talk about the opioid epidemic, simply as

10:45:41  5    a matter of the substances that are involved, it includes

10:45:45  6    prescription opioids; correct?

10:45:47  7    A.   That's correct.

10:45:47  8    Q.   Those are the opioids that are approved by the FDA,

10:45:52  9    prescribed by doctors, dispensed by pharmacies; correct?

10:45:56 10    A.   That's correct.

10:45:56 11    Q.   Okay.  They also include unlawful opioids, like heroin;

10:46:06 12    correct?

10:46:06 13    A.   That's correct.

10:46:06 14    Q.   And fentanyl as well; correct?

10:46:08 15    A.   That's correct.

10:46:09 16    Q.   They include also the counterfeit pills we've heard about,

10:46:14 17    the counterfeit opioid pills; correct?

10:46:16 18    A.   Yes.

10:46:16 19    Q.   Okay.  And focusing on just heroin for a moment, the heroin

10:46:28 20    part -- and I understand there's multiple parts -- but the

10:46:32 21    heroin part of the opioid crisis in Lake County, those date

10:46:39 22    back a long way as well; correct?

10:46:45 23    A.   The epidemic as I observed it began with the prescriptions

10:46:53 24    and then progressed into illicit opioids.

10:47:01 25    Q.   I -- I do understand your testimony on that, but my

———— Fraser (Cross by Delinsky)————

10:47:08  1  understanding is that when -- from the documents coming out of

10:47:12  2  the opioid task force -- and let's take a step back and do a

10:47:15  3  hard stop there.

10:47:16  4          Lake County's opioid task force was formed in 2010;

10:47:21  5  correct?

10:47:21  6  A.   That's correct.

10:47:22  7  Q.   And when the task force was founded, it was looking at

10:47:32  8  certainly prescription opioid drugs; correct?

10:47:35  9  A.   That's correct.

10:47:36 10  Q.   But even back then it also was looking at the heroin

10:47:41 11  problem in the communities too; correct?

10:47:46 12  A.   When we established the task force, initially we were

10:47:54 13  trying to figure out what exactly was impacting so

10:48:01 14  significantly our citizens, and as it evolved we realized the

10:48:11 15  crux of the issue was the prescriptions flooding our streets.

10:48:18 16  Q.   I understand your testimony on that, but heroin was still

10:48:23 17  in the community and creating problems in 2010; correct?

10:48:27 18  A.   Heroin was in the community creating a problem, but not to

10:48:32 19  the extent that the prescription opioids were.

10:48:35 20  Q.   And heroin, I imagine you understand from your work in this

10:48:42 21  field for a long time in this community, heroin's been around a

10:48:48 22  long time; correct?

10:48:49 23  A.   Yes, it has.

10:48:50 24  Q.   Okay.  I'd like to focus briefly on the ADAMHS board and

10:48:58 25  your work for it.  And I'm very mindful of your testimony about

————Fraser (Cross by Delinsky)————

10:49:04  1  your perceptions of how things have progressed, okay, so just

10:49:09  2  putting that aside for a moment, the ADAMHS board, of course,

10:49:12  3  is focused on opioids; correct?

10:49:14  4  A.  Correct.

10:49:15  5  Q.  Prescription opioids; correct?

10:49:18  6  A.  Correct.

10:49:20  7  Q.  Heroin; correct?

10:49:21  8  A.  Yes.

10:49:22  9  Q.  And fentanyl; correct?

10:49:23  10  A.  Yes.

10:49:24  11  Q.  The counterfeit pressed opioid pills that are on the

10:49:29  12  illegal market; correct?

10:49:31  13  A.  Yes.

10:49:31  14  Q.  Okay.  But in addition to that, the ADAMHS board also helps

10:49:35  15  patients or, to be more precise, guides providers who help

10:49:40  16  patients who are suffering from alcohol abuse; correct?

10:49:45  17  A.  Yes, but to be clear, we -- we also work directly with, we

10:49:53  18  call them consumers, individuals who need and use our services,

10:49:56  19  in addition to funding those providers to provide those

10:49:59  20  clinical services.

10:50:00  21  Q.  Fair enough, and I apologize for getting that wrong.

10:50:02  22  That's on me.

10:50:03  23         So -- but the ADAMHS board is helping with alcohol

10:50:09  24  problems; correct?

10:50:10  25  A.  Absolutely.

─────Fraser (Cross by Delinsky)─────

10:50:11  1    Q.   Methamphetamine abuse and addiction?

10:50:13  2    A.   Yes.

10:50:14  3    Q.   Correct?

10:50:15  4         Cocaine abuse and addiction as well?

10:50:18  5    A.   Yes.

10:50:20  6    Q.   And that includes crack cocaine as well; correct?

10:50:27  7    A.   Yes.

10:50:28  8    Q.   Okay.  And at least as of -- I want to see if I can

10:50:38  9    remember the date -- December 2019, the ADAMHS board, your

10:50:43 10    agency, was reporting that in its -- both in its residential

10:50:51 11    facilities and in its outpatient facilities more than half of

10:51:01 12    the individuals it was helping and serving were suffering from

10:51:08 13    substance use or alcohol use disorders that were not opioids;

10:51:15 14    correct?

10:51:19 15    A.   I don't have the exact data committed to -- I don't know if

10:51:22 16    there's a document that I can look at. . .

10:51:25 17    Q.   Okay.  Let me go get it.  I let it at my table, so bear

10:51:31 18    with me for one moment.

10:51:44 19         Ms. Fraser, I'd ask you to look at CVS MDL 04963.  I

10:51:54 20    believe it's in what lawyers call the Redweld.

10:52:04 21    A.   I'm sorry, the number one more time?

10:52:05 22    Q.   I know.  They're awfully long.  04963.

10:52:12 23    A.   Okay.

10:52:21 24    Q.   Now, I believe Mr. Lanier asked you about a document that

10:52:25 25    looked like this; correct?

———Fraser  (Cross by Delinsky)———

10:52:27  1    A.   Correct.

10:52:28  2    Q.   It was the HUB document that the ADAMHS board prepares;

10:52:31  3    correct?

10:52:31  4    A.   Correct.

10:52:32  5    Q.   Mr. Lanier showed you the 2018 version; correct?

10:52:37  6    A.   Correct.

10:52:37  7    Q.   And I believe you testified how -- how your ADAMHS board

10:52:42  8    was actually ahead of the requirements for filing these

10:52:46  9    reports; correct?

10:52:47  10   A.   Correct.

10:52:47  11   Q.   You were ahead of where the state wanted you to be and

10:52:49  12   where other ADAMHS boards were?

10:52:52  13   A.   Um-hmm.

10:52:53  14   Q.   And you actually referred to -- there was a follow-up

10:52:55  15   report for 2019, and that's what this is; correct?

10:52:59  16   A.   Yes.

10:53:00  17   Q.   Okay.  I'd like to turn your attention to the very last

10:53:07  18   page of the report.

10:53:15  19        Mr. Lanier, can I borrow one of your highlighters,

10:53:18  20   please?

10:53:22  21      (Counsel conferring).

10:53:24  22        MR. DELINSKY:  And could I have the ELMO, Mr. Pitts?

10:53:27  23        MR. LANIER:  I can't give you that.

10:53:29  24        MR. DELINSKY:  Thank you.

10:53:32  25   BY MR. DELINSKY:

Fraser (Cross by Delinsky)

10:53:32  1   Q.  And you didn't write this entire report yourself, but you

10:53:34  2   participated in writing it; correct?

10:53:36  3   A.  Yes.

10:53:36  4   Q.  You approved it; correct?

10:53:38  5   A.  Correct.

10:53:38  6   Q.  And it was -- the purpose of this was to submit to the

10:53:41  7   State of Ohio; correct?

10:53:43  8   A.  Correct.

10:53:43  9   Q.  Okay.  And I'm focused on this -- the very last paragraph

10:53:49  10  of the report, it looks like it's Paragraph 18 on Page 18

10:53:53  11  coincidently, and it says, since 2017, opioid use appears to be

10:54:01  12  holding steady among clients.

10:54:05  13          That was true; correct?

10:54:06  14  A.  Correct.

10:54:07  15  Q.  Okay.  And then it goes on to say, however, the use/abuse

10:54:14  16  of amphetamines, methamphetamines, and cocaine has increased

10:54:18  17  significantly-showing a large spike in use since the beginning

10:54:23  18  of 2019.

10:54:25  19          Correct?

10:54:26  20  A.  Yes.

10:54:26  21  Q.  True fact, correct.

10:54:29  22  A.  That's what we were observing, yes.

10:54:31  23  Q.  Okay.  Cannabis, and I think we all know this now given how

10:54:40  24  this has evolved in the last 5 years, that's marijuana; right?

10:54:43  25  A.  Correct.

—Fraser (Cross by Delinsky)—

10:54:43 1    Q.  Cannabis has also been following this trend; right?

10:54:47 2    A.  Yes.

10:54:48 3    Q.  Okay.  Just out of curiosity, does the ADAMHS board see

10:54:54 4    many patients suffering from marijuana?  I don't know if

10:54:57 5    there's such a thing as marijuana use disorder or marijuana

10:54:59 6    addiction.

10:55:00 7    A.  Yes, and yes.  Individuals with all types of substance use

10:55:05 8    disorders come into our system.

10:55:07 9    Q.  Okay.  And I asked you about some.  We obviously dealt with

10:55:10 10   the opioids, both prescription and illicit.  We talked about

10:55:13 11   now marijuana, alcohol, methamphetamines.  Now we have

10:55:21 12   amphetamines.  What did I forget?  Cocaine.

10:55:23 13           Are there any others?

10:55:26 14   A.  I mean, we see some new psychoactive substances, so kind of

10:55:33 15   new manufactured drugs that might be combinations of different

10:55:38 16   things.

10:55:39 17   Q.  Um-hmm.

10:55:39 18   A.  Have come in.

10:55:41 19   Q.  Any other street drugs -- and I don't mean that, any other

10:55:44 20   illegal drugs or did we sort of cover the territory?

10:55:48 21           I don't mean this to be a pop quiz or anything.

10:55:50 22   A.  We talked about hallucinogens.

10:55:57 23   Q.  And what are hallucinogens, is that -- I think of like, I

10:56:02 24   don't know, LSD?

10:56:03 25   A.  Right.  Exactly.

HEATHER K. NEWMAN, RMR, CRR

─────Fraser (Cross by Delinsky)─────

10:56:04  1   Q.  All right.  Is that more or less the territory?  We won't

10:56:08  2   hold you to it.

10:56:09  3   A.  Yes.

10:56:09  4   Q.  Okay.  All right.  Let's go back to our Exhibit CVS MDL

10:56:19  5   04963, and where we were is as of December 2019 opioids had

10:56:26  6   held steady and amphetamines -- methamphetamines, cocaine, and

10:56:31  7   marijuana had been on the -- had been spiking; correct?

10:56:35  8   A.  Yes, that's what we observed.

10:56:37  9   Q.  Okay.  The next line is in our residential treatment

10:56:44  10  programs, we had over 55 percent of clients' drugs of choice or

10:56:49  11  diagnosis been other drugs besides opioid -- opiates.  And I'll

10:56:57  12  stop there.

10:56:58  13       Correct?

10:56:59  14  A.  That was the progression that we saw from the prescription

10:57:03  15  pills to other drugs.

10:57:05  16  Q.  And I -- and again, I do understand your testimony.  I

10:57:09  17  don't necessarily agree with it, but I certainly understand.

10:57:12  18       MR. WEINBERGER:  Objection to the comments of counsel.

10:57:15  19       THE COURT:  That -- sustained.

10:57:16  20       MR. DELINSKY:  I apologize.

10:57:18  21  BY MR. DELINSKY:

10:57:19  22  Q.  But just focusing on just the substances that your agency

10:57:28  23  is dealing with in the here and now, putting the progression

10:57:31  24  aside, as of this report, less than half, less than 45 percent

10:57:41  25  of what your agency was treating, either directly or indirectly

—————Fraser (Cross by Delinsky)—————

10:57:48  1    in its residential programs, were patients who at the time were

10:57:54  2    suffering from a substance use issue other than opioids?

10:58:09  3    A.  Again, just to be clear, this is as the clients reported to

10:58:14  4    us.

10:58:16  5    Q.  Um-hmm.

10:58:16  6    A.  So overwhelmingly, polysubstance abuse, using more than one

10:58:25  7    drug was very common.  Individuals in this situation were

10:58:31  8    coming to us and saying --

10:58:36  9    Q.  Yeah, we can't --

10:58:37  10   A.  I'm being very careful of my language.

10:58:39  11   Q.  Yeah.

10:58:40  12        MR. WEINBERGER:  Your Honor, he opened up the door.

10:58:42  13   She shouldn't be limited to --

10:58:43  14        THE COURT:  I agree.  The witness can complete her

10:58:45  15   answer.

10:58:46  16        MR. DELINSKY:  Well, Your Honor, can we go on the

10:58:47  17   headset, please?

10:58:48  18        THE WITNESS:  Thank you.

10:58:52  19      (Proceedings at sidebar.)

10:59:04  20        MR. DELINSKY:  Your Honor, I don't open the door to

10:59:06  21   hearsay because -- through examining her on her own words in

10:59:10  22   her own document.

10:59:11  23        THE COURT:  You are, Mr. Delinsky.  I don't know why

10:59:13  24   you're asking some of these questions, but if you ask a

10:59:15  25   question, you've got to let the witness answer.  Okay?  If you

──────Fraser (Cross by Delinsky)──────

10:59:19  1   want to withdraw the question, then move on, fine.  You

10:59:24  2   asked -- you've asked a bunch of questions.  I'm not sure why

10:59:28  3   you've asked them, but you're entitled to ask them.  But when

10:59:30  4   you do, you've got to let the witness answer.

10:59:38  5            MR. DELINSKY:  Thank you.

11:00:00  6   BY MR. DELINSKY:

11:00:01  7   Q.  Ms. Fraser --

11:00:01  8            MR. WEINBERGER:  She hasn't finished her question.

11:00:03  9            THE COURT:  Have you withdrawn -- are you withdrawing

11:00:06 10   the question?

11:00:06 11            MR. DELINSKY:  I withdraw the question, Your Honor.

11:00:08 12            THE COURT:  Okay.  Fine.

11:00:13 13   BY MR. DELINSKY:

11:00:14 14   Q.  Ms. Fraser, you provided testimony about take-backs or the

11:00:17 15   bags through which you can depose prescription and other types

11:00:23 16   of drugs; correct?

11:00:24 17   A.  Yes.

11:00:25 18   Q.  Okay.  And the importance of those efforts is to -- is

11:00:37 19   because a significant piece -- not the whole piece, but a piece

11:00:43 20   of the problem is that excess pills reside in medicine cabinets

11:00:49 21   and friends, family, visitors to a home can go in and take them

11:00:54 22   and then use them for nonmedical reasons; correct?

11:00:58 23   A.  That is a piece of the epidemic, yes.

11:01:02 24   Q.  Okay.  And the value of the bags to encourage people if

11:01:09 25   they have excess pills that they've received through a

─────Fraser (Cross by Delinsky)─────

11:01:14  1  prescription from their doctor, to get them out of the house so

11:01:17  2  no one can take them, no one can misuse them; correct?

11:01:21  3  A.  Our efforts were to get this flood of prescription pills

11:01:26  4  out of our community, off our streets.

11:01:29  5  Q.  And in addition to the bags, you can also have actual

11:01:42  6  boxes, right, secured boxes that a person can go to and drop

11:01:45  7  them off; right?

11:01:46  8  A.  That's correct.

11:01:46  9  Q.  Okay.  And they're oftentimes in police stations; correct?

11:01:51 10  A.  When -- in Lake County, when we established that program in

11:01:55 11  2011, we put seven permanent drop boxes in police departments,

11:02:01 12  as I think I said before, including in our community college

11:02:08 13  where individuals could take those medications, take what was

11:02:11 14  in their medicine cabinets and have those properly disposed of.

11:02:20 15  Q.  And you know as well that those drop boxes can be in

11:02:24 16  pharmacies too; correct?

11:02:26 17  A.  To my knowledge, at the time that we established this in

11:02:31 18  2011, we were the only ones doing it in the county.

11:02:34 19  Q.  Okay.  And do you know that it actually wasn't until much

11:02:39 20  more recently that the law didn't allow pharmacies to have

11:02:41 21  them, or is that outside your knowledge?

11:02:43 22          MR. WEINBERGER:  Objection, Your Honor.

11:02:49 23          THE COURT:  Sustained.

11:02:51 24  BY MR. DELINSKY:

11:02:52 25  Q.  Focusing on the present, you know that CVS pharmacies in

———Fraser (Cross by Delinsky)———

11:02:55  1    Lake County have these drop off boxes.

11:03:00  2    A.   I'm not aware of that.

11:03:01  3    Q.   Okay.  Are you familiar with Lake Shore Boulevard CVS in

11:03:09  4    Mentor?

11:03:09  5    A.   I have driven by it.

11:03:11  6    Q.   Okay.  Never -- how about the SOM Center Road in

11:03:15  7    Willoughby?

11:03:16  8    A.   I've driven by that as well.

11:03:17  9    Q.   Not in it?

11:03:18 10    A.   Not in it.

11:03:19 11    Q.   North Ridge Road in Painesville?  No?

11:03:21 12    A.   You're going outside my circle, no.

11:03:24 13    Q.   Okay.  Sorry about that.  Well, maybe this one's in Chardon

11:03:29 14    Road in Willoughby Hills?

11:03:31 15    A.   I have not been.

11:03:33 16    Q.   You haven't been to them.  Fair enough.

11:03:35 17         One last question, Ms. Fraser.  You did provide some

11:03:39 18    testimony on the potential transition, you've already testified

11:03:46 19    to this, of patients from prescription opioids to illegal

11:03:56 20    opioids; correct?

11:03:58 21    A.   That has -- we have seen that transition, yes.

11:04:02 22    Q.   You don't have data from Lake County that would inform us

11:04:10 23    on the extent to which the person -- the individual who

11:04:15 24    progressed received the opioid pursuant to a prescription from

11:04:19 25    their doctor or rather received it in an illegitimate way;

———Fraser (Cross by Delinsky)———

11:04:30  1  correct?

11:04:38  2  A.   The information I have is from doing my job, collecting

11:04:45  3  data, speaking with stakeholders, speaking with my community.

11:04:51  4  Q.   Okay.  And you understand that even the prescription pills

11:04:58  5  can be obtained through illegitimate means; correct?

11:05:03  6  A.   Certainly, yes.

11:05:04  7  Q.   And we talked about one, the medicine cabinet; correct?

11:05:07  8  A.   Yes.

11:05:08  9  Q.   Okay.  That they can be obtained from drug dealers on the

11:05:13  10  street as well; correct?

11:05:21  11  A.   The prescriptions that I'm aware of are by and large coming

11:05:29  12  out of the pharmacies.

11:05:31  13  Q.   Oh -- yeah, we'll -- I'm sorry.

11:05:35  14  A.   Perhaps I misunderstood.

11:05:38  15  Q.   No.  No.  No.  That's me.  I'm not the model of clarity

11:05:41  16  this morning.  You're absolutely right.

11:05:42  17         Prescriptions are filled by pharmacies and people can

11:05:45  18  get prescription opioids if they're prescribed by their doctor

11:05:49  19  and those prescriptions are presented at a pharmacy and a

11:05:51  20  pharmacy fills them; correct?

11:05:52  21  A.   That's where they're coming from, yes.

11:05:55  22  Q.   No doubt about it.

11:05:56  23         But they also -- a person who misuses prescription

11:06:04  24  opioids also can obtain them in illegitimate ways other than

11:06:07  25  through a prescription from their doctor?

───────Fraser (Cross by Delinsky)───────

11:06:08  1   A.   That does happen to support the addiction, yes.

11:06:11  2   Q.   Yeah, okay.

11:06:12  3        MR. DELINSKY:  Thank you, Ms. Fraser.  I have nothing

11:06:14  4   further.  I appreciate you answering my questions.

11:06:25  5        THE COURT:  Anything from any of the other defendants?

11:06:27  6        MR. MAJORAS:  Nothing from Walmart, Your Honor.

11:06:28  7        THE COURT:  Thank you, Mr. Majoras.

11:06:30  8        MS. SULLIVAN:  Nothing from Giant Eagle.

11:06:30  9        THE COURT:  Thank you, Ms. Sullivan.

11:06:31 10        MR. SWANSON:  Nothing from Walgreens.

11:06:31 11        THE COURT:  Thank you, Mr. Swanson.

11:06:34 12        All right.  Before we have redirect, we'll see if any

11:06:36 13   of the jurors have any follow-up questions for Ms. Fraser.

11:07:53 14      (Brief pause in proceedings).

11:10:56 15        MR. WEINBERGER:  Your Honor, I think we need a

11:10:58 16   sidebar.

11:10:59 17        THE COURT:  All right.

11:11:05 18      (Proceedings at sidebar.)

11:11:25 19        MR. LANIER:  Your Honor, the plaintiffs are fine

11:11:26 20   asking any of the questions.

11:11:27 21        THE COURT:  Well --

11:11:28 22        MR. LANIER:  But there's a sheet that had three on it

11:11:31 23   that the defendants have agreed to.

11:11:32 24        THE COURT:  Well, some of those shouldn't be asked.

11:11:34 25        MR. LANIER:  Okay. Just let me know which ones are

**4398**

———Fraser (Cross by Delinsky)———

11:11:36  1    okay and I'll ask them.

11:11:42  2              THE COURT:  Number 2 should not be asked.  This

11:11:45  3    witness isn't an expert to opine as to what percentage of the

11:11:48  4    epidemic was caused by prescription opioids, counterfeit pills,

11:11:52  5    et cetera, so don't touch Number 2.

11:11:55  6              I don't have a problem with Number 3, how secure are

11:11:59  7    the drop boxes.

11:12:04  8              The first one, in what sense has the opioid epidemic

11:12:11  9    affected the workforce in Lake County, again, this gets into a

11:12:16 10    lot of hearsay, and I don't -- I don't think we should go

11:12:24 11    there.  So I -- you can ask Number 3 by the drop boxes and then

11:12:30 12    the other question about what year did Lake County experience

11:12:34 13    the opioid-related overdoses, if she knows, she can answer

11:12:38 14    that.

11:12:40 15              Statistics about the increase or decrease in opioid

11:12:48 16    trend, she's not an expert, so stay away from that.  So just go

11:12:52 17    with those two, I think.

11:12:53 18              MR. WEINBERGER:  Your Honor, could you instruct the --

11:12:55 19    inform the jury again that you rule on what questions are

11:12:59 20    appropriate for this witness.

11:13:01 21              THE COURT:  All right.

11:13:02 22              MR. WEINBERGER:  Thank you.

11:13:13 23         (In open court at 11:13 a.m.)

11:13:13 24              THE COURT:  All right.  Ladies and gentlemen, given

11:13:14 25    these -- the questions have been given to counsel.  As I

—————— Fraser (Redirect by Lanier) ——————

11:13:17  1    indicated, it's up to counsel what questions to ask.  Sometimes

11:13:23  2    there's discussion with me.  If we determine that a case --

11:13:27  3    that a question isn't relevant or is outside the scope of the

11:13:31  4    witness's knowledge, it won't be asked.  It may be asked with

11:13:34  5    another -- another witness, but all questions are appreciated.

11:13:44  6            MR. LANIER:  Just making sure I've got the right ones,

11:13:50  7    Judge.

11:13:50  8                  REDIRECT EXAMINATION OF KIM FRASER

11:14:07  9    BY MR. LANIER:

11:14:07 10    Q.  Ms. Fraser, I think there are just a couple of juror

11:14:10 11    questions for you.

11:14:11 12    A.  Okay.

11:14:11 13    Q.  So that we can put on here.

11:14:14 14            First, how secure are these drop boxes?  Can the

11:14:19 15    medications somehow be diverted, especially the ones that are

11:14:22 16    located in colleges?

11:14:27 17    A.  Yeah, that's a very good question because this was

11:14:29 18    something that our opiate task force took very seriously.  The

11:14:34 19    boxes are extremely secure, and they are not emptied by us,

11:14:41 20    they are emptied by the Lake County Sheriff's Office.

11:14:45 21    Everything that is in those is taken to a discreet site, I

11:14:49 22    don't even know where it is, where those are incinerated.  But

11:14:55 23    yeah, the security of those boxes is assured by our sheriff's

11:15:06 24    office and the police departments they reside in.

11:15:09 25            MR. LANIER:  Your Honor. . . I'm not sure on this.

HEATHER K. NEWMAN, RMR, CRR

———— Fraser (Redirect by Lanier) ————

11:15:16  1          THE COURT:  All right.  Go back on the headphones a

11:15:17  2  minute.

11:15:18  3          MR. LANIER:  I just need a. . .

11:15:30  4      (Proceedings at sidebar.)

11:15:30  5          MR. LANIER:  You said no on statistics, and I don't

11:15:32  6  know if that's included in statistics or not.

11:15:34  7          THE COURT:  Well, this juror question, in what year

11:15:36  8  did Lake County experience the most opioid-related overdoses, I

11:15:42  9  have no problem with that question unless any of the defendants

11:15:45 10  object.  She may know.  She may not.  It's a neutral question.

11:15:49 11  She's testified to overdoses, so --

11:15:52 12          MR. LANIER:  Understood, Your Honor.  Thank you,

11:15:54 13  Judge.

11:15:54 14          THE COURT:  Any of the defendants have a problem with

11:15:55 15  that general question?

11:15:59 16          Hearing none, you may ask that one, Mr. Lanier.

11:16:02 17          MR. LANIER:  Thank you.

11:16:15 18      (In open court at 11:16 a.m.)

11:16:15 19  BY MR. LANIER:

11:16:16 20  Q.  And then the other one is, in what year -- and obviously

11:16:20 21  this is if you know -- in what year did Lake County experience

11:16:24 22  the most opioid-related overdoses?

11:16:27 23  A.  Our peak was in 2017.  We've lost over 400 people in the

11:16:34 24  last 5 years, but the peak was in 2017.

11:16:39 25  Q.  Thank you.

─────── Fraser (Redirect by Lanier) ───────

11:16:39  1        MR. LANIER:  And Your Honor, for my own purposes, I

11:16:42  2  have no redirect of this witness.

11:16:47  3        THE WITNESS:  Okay.  Any follow-up questions from

11:16:49  4  Mr. Delinsky or any other counsel?

11:16:51  5        MR. DELINSKY:  No, thank you, Judge.

11:16:54  6        MR. MAJORAS:  No, thank you, Your Honor.

11:16:55  7        MS. SULLIVAN:  Nothing for Giant Eagle, Your Honor.

11:16:59  8        MR. SWANSON:  No, thank you, Your Honor.

11:17:00  9        THE COURT:  All right.  Thank you very much,

11:17:01 10  Ms. Fraser, you may return to your seat.  Thank you.

11:17:03 11        THE WITNESS:  Thank you.

11:17:04 12     (Witness excused.)

11:17:27 13        THE COURT:  All right.  Mr. Lanier, you may proceed.

11:17:30 14        MR. WEINBERGER:  Your Honor, at this point in time, on

11:17:34 15  behalf of the plaintiffs, I think it's appropriate for us to

11:17:38 16  take a recess to discuss legal issues.

11:17:45 17        THE COURT:  All right.  Ladies and gentlemen, we'll

11:17:46 18  take a brief recess.  I'd rather not do it on the headphones,

11:17:50 19  so if you could just go back to the jury room and then we'll

11:17:54 20  call you as soon as we're ready.

11:17:56 21     (Jury excused from courtroom at 11:17 a.m.)

11:18:38 22        THE COURT:  Okay.  Please be seated.

11:18:55 23        MR. WEINBERGER:  Your Honor, at this point in time, I

11:18:55 24  believe --

11:19:00 25        Mr. Marcus, am I correct?

HEATHER K. NEWMAN, RMR, CRR

11:19:02  1          Okay.  I believe Mr. Marcus is prepared to make a

11:19:05  2     statement for the record on behalf of Giant Eagle.

11:19:09  3          THE COURT:  All right.  Mr. Marcus, if you want to

11:19:12  4     come forward please and identify yourself, and you can take

11:19:15  5     your mask off while speaking, sir.

11:19:17  6          MR. MARCUS:  Thank you, Your Honor.

11:19:18  7          Bernie Marcus representing Giant Eagle, along with

11:19:23  8     Ms. Sullivan and Ms. Fiebig.

11:19:26  9          Your Honor, I know there's been some discussion in

11:19:31 10     court and then in chambers about some questioning of the

11:19:38 11     witnesses here, and I want to state for the record that

11:19:43 12     Giant Eagle in no way intended to suggest that these -- that

11:19:49 13     the complaint against Giant Eagle was filed for any improper

11:19:55 14     purpose.  And I want that to be very clear on the record.

11:20:00 15          There were circumstances that came out yesterday that

11:20:04 16     the questioning went on and on, and I guess some people thought

11:20:08 17     differently about what those questions and answers meant, but

11:20:13 18     Giant Eagle did not intend any improper conduct on the part of

11:20:20 19     plaintiffs in filing the claim.  And they apologize to the

11:20:26 20     extent anybody was offended.

11:20:29 21          THE COURT:  Okay.  Thank you very much, sir.

11:20:35 22          MR. WEINBERGER:  If I may just have a moment,

11:20:37 23     Your Honor.

11:20:37 24          THE COURT:  Okay.

11:20:38 25          (Counsel conferring).

11:21:51  1          MR. WEINBERGER:  Your Honor, I'm sorry.  I'm a little
11:21:56  2  bit of a quandary as to how to proceed at this point in point,
11:21:59  3  and with the Court's indulgence, I would request an in-chambers
11:22:07  4  conference.  I'm sorry.  I apologize.
11:22:08  5          THE COURT:  All right.  Well, we're going to have to
11:22:10  6  charge this time to the plaintiffs, so we're moving on, but all
11:22:13  7  right.
11:22:14  8          MR. WEINBERGER:  Well --
11:22:15  9          THE COURT:  Well, who do you want to confer with?
11:22:19  10          MR. WEINBERGER:  With you and with Mr. Marcus and --
11:22:23  11  it has to do with the --
11:22:25  12          THE COURT:  All right.  All right.  Well, we'll charge
11:22:26  13  the time to the plaintiff at this point in time.
11:22:29  14          MR. WEINBERGER:  All right.  Well --
11:22:30  15          THE COURT:  All right.  Well, I -- let's go.
11:22:36  16          MR. STOFFELMAYR:  Judge, I don't want to -- I'm sorry.
11:22:37  17          I don't want to, obviously, interfere with the
11:22:38  18  conference, but if you could just keep in mind when you come
11:22:40  19  back, there are a lot of people here who have no idea what's
11:22:42  20  going on.
11:22:42  21          THE COURT:  No, I understand that.
11:22:44  22          MR. STOFFELMAYR:  And they're very confused.
11:22:46  23          THE COURT:  But I'm charging the time to the
11:22:48  24  plaintiffs.  They want to -- these two defendants [sic] want to
11:22:51  25  confer, I'm doing it.

11:22:53  1          MR. STOFFELMAYR:  Understood, Your Honor.

11:22:54  2          THE COURT:  Understood.

11:22:56  3      (Recess was taken at 11:22 a.m.)

11:28:07  4      (In open court at 11:28 a.m.)

11:28:07  5          THE COURT:  All right.  Everyone can be seated.

11:28:21  6          Okay.  Mr. Lanier, Mr. Weinberger, how to you wish to

11:28:25  7  proceed?

11:28:25  8          MR. WEINBERGER:  Your Honor, subject to the -- our

11:28:29  9  moving for the admission of some outstanding exhibits and

11:28:34 10  reading some answers to interrogatories pertinent to the case,

11:28:40 11  plaintiffs are prepared to rest.

11:28:44 12          THE COURT:  Okay.  Very good.

11:28:47 13          I guess the defendants wanted to make some oral

11:28:53 14  motions which you're going to supplement in writing.

11:28:56 15          Is that -- is that the understanding?

11:28:57 16          MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr.

11:28:59 17          I think at this point in time our plan is just to file

11:29:01 18  a Rule 50 motion in writing.

11:29:03 19          THE COURT:  Oh, all right.

11:29:06 20          MR. STOFFELMAYR:  Probably not immediately, but

11:29:07 21  certainly before the jury would deliberate.

11:29:12 22          THE COURT:  Okay.  That's fine.

11:29:13 23          MR. DELINSKY:  Your Honor, the same.

11:29:15 24          We -- I mean, if it's important for you to hear us say

11:29:18 25  we move under Rule 50, we do, but we'll put in something in

**4405**

11:29:22 1   writing shortly.

11:29:23 2           THE COURT:  It's timely.  Okay?  I mean, you can

11:29:24 3   always move for it at any time, so. . .

11:29:26 4           MR. DELINSKY:  You probably have to poll the other

11:29:30 5   defendants on this, but I'd like to come back to scheduling,

11:29:33 6   Your Honor, because this is unexpected on our part.

11:29:35 7           THE COURT:  Well -- all right, so we'll have Rule 50

11:29:40 8   motions, and you can file them whenever you want.

11:29:44 9           0MR. MAJORAS:  Your Honor, John Majoras.  Just so I'm

11:29:45 10  not left out of this, Walmart likewise will be filing Rule 50

11:29:49 11  motions.

11:29:49 12          THE COURT:  Okay.  All right.

11:29:53 13          MR. WEINBERGER:  Your Honor, with -- I think we need

11:29:55 14  to have some reasonable deadline for the filing of the motions

11:30:00 15  only because we need an opportunity to respond.

11:30:04 16          THE COURT:  Well, that's a good -- well, the point

11:30:08 17  is --

11:30:09 18          MR. WEINBERGER:  And we need sufficient time for that,

11:30:11 19  Your Honor.

11:30:11 20          THE COURT:  The longer the delay is, the more

11:30:12 21  meaningless they are because we're proceeding, so, I mean --

11:30:17 22  and it's pretty clear that I'm not going to stop the trial.

11:30:21 23  I'm not stopping the trial.  So -- but I agree there --

11:30:26 24  there's -- I do need to put a deadline on them, if -- if -- I

11:30:31 25  mean, if you want them considered, okay, so what are you

11:30:36  1  proposing?

11:30:38  2          MR. STOFFELMAYR:  Judge, I think they can be filed any

11:30:41  3  time before the jury you retires to deliberate.

11:30:43  4          THE COURT:  Sure, but if you want them considered in a

11:30:45  5  meaningful way. . .

11:30:47  6          MR. STOFFELMAYR:  Understood.  But I think that's, you

11:30:50  7  know, a decision we'd like to make.

11:30:51  8          THE COURT:  All right.

11:30:51  9          MR. STOFFELMAYR:  I understand you'll let

11:30:54 10  plaintiffs -- whenever we fill them, I'm sure you will give

11:30:57 11  plaintiffs ample time to respond.  I think as a practical

11:31:00 12  matter, they are unlikely to be fully briefed and decided

11:31:00 13  before the jury begins to deliberate anyway.  We're going to

11:31:04 14  have the next few weeks of trial, and that trial may be getting

11:31:08 15  shorter as things develop.

11:31:10 16          THE COURT:  I'm not going to touch them while the jury

11:31:12 17  is deliberating, Mr. Stoffelmayr.

11:31:15 18          MR. STOFFELMAYR:  Understood.  I guess what I'm saying

11:31:16 19  is, let's say we filed them, you know, tomorrow, plaintiffs

11:31:19 20  said we'd like 2 weeks to respond, we'd file reply briefs.

11:31:24 21  You're not going to be deciding them until -- unless we, you

11:31:26 22  know, want to give you a 2-pager.

11:31:28 23          THE COURT:  Look, candidly, I don't really care.  They

11:31:29 24  don't matter in my -- I mean, in my humble opinion they don't

11:31:33 25  really matter.  Okay?  You can file them whenever you want.  If

11:31:36  1  you wait till the very last day of trial, then, you know, you
11:31:40  2  know, at that point -- at that point they'll be moot.  I mean,
11:31:44  3  if you file something after a verdict, if there is one, then
11:31:47  4  you can fill something then.  So I -- I really -- you can file
11:31:52  5  them whatever you want.
11:31:53  6          Okay.  So --
11:31:55  7          MR. MAJORAS:  Your Honor, we'll file expeditiously.
11:31:57  8          THE COURT:  Okay.  That's fine.
11:32:00  9          All right.  Well, I don't want to -- we'll deal with
11:32:04  10  exhibits when people are ready to deal with exhibits, so I
11:32:07  11  think we should just, you know, proceed with the defendants'
11:32:10  12  case.
11:32:12  13          MR. DELINSKY:  Your Honor, we'd ask that as soon as
11:32:14  14  the plaintiffs close, that we recess for the day.  This has --
11:32:20  15          THE COURT:  No.  That's denied.
11:32:21  16          MR. DELINSKY:  Your Honor, could I please be heard on
11:32:22  17  this?
11:32:28  18          This has been a difficult week for us because several
11:32:31  19  witnesses have dropped off, whether it was Professor Cutler.
11:32:37  20          THE COURT:  Well, we knew Cutler wasn't coming.  I
11:32:37  21  mean --
11:32:39  22          MR. DELINSKY:  Well, we didn't know till the very end
11:32:41  23  of last week.  It was Ms. Highland, now it's Mr. Chunderlik,
11:32:49  24  and it has -- we are in a bind and we do not have witnesses for
11:32:55  25  the rest of the week.  We couldn't have predicted this, and we

**4408**

| | |
|---|---|
| 11:33:00 | 1 |
| 11:33:03 | 2 |
| 11:33:06 | 3 |
| 11:33:09 | 4 |
| 11:33:12 | 5 |
| 11:33:14 | 6 |
| 11:33:16 | 7 |
| 11:33:19 | 8 |
| 11:33:20 | 9 |
| 11:33:22 | 10 |
| 11:33:23 | 11 |
| 11:33:24 | 12 |
| 11:33:27 | 13 |
| 11:33:31 | 14 |
| 11:33:31 | 15 |
| 11:33:32 | 16 |
| 11:33:35 | 17 |
| 11:33:39 | 18 |
| 11:33:43 | 19 |
| 11:33:46 | 20 |
| 11:33:50 | 21 |
| 11:33:53 | 22 |
| 11:33:57 | 23 |
| 11:33:59 | 24 |
| 11:34:00 | 25 |

were in a vulnerable position because of the witnesses dropping off at the beginning of the week and we were hustling, and we thought we had done the best we could for that.  But now this, it was entirely unexpected.  We couldn't have foreseen this, Your Honor, so we ask --

THE COURT:  Well, wait a minute.  I mean, the most -- we had one more witness, Mr. Chunderlik.

MR. DELINSKY:  And our understanding was that that would be for the rest of the day.  I think we represented that on the record yesterday.

THE COURT:  Well, I made it -- it was unclear and I made it clear you had to have at least one deposition ready, and I know that Mr. Majoras said that you'll have a deposition ready, so --

MR. DELINSKY:  Right.  We do have a deposition ready, Your Honor, but that's not going to -- we, at this point, we can't fill out the remainder of the week.  So we think what makes the most sense is to recess after the plaintiffs close. We'll come back tomorrow morning.  We'll finish the whole week.

There have been one or two occasions, I think two at least, in the trial where accommodations were made to plaintiffs' side to end early on a day -- on more than one day where -- one was on a Friday, one was because they didn't have a witness.

THE COURT:  Well, that was both sides wanted a recess

11:34:01  1  for Friday.  Okay?

11:34:02  2          MR. DELINSKY:  No.  There were other times as well

11:34:04  3  where that wasn't the case.  And, look, there's just a

11:34:07  4  logistics issue here, Your Honor, and we tried other very best,

11:34:11  5  we were ready to go, but this -- we just can't do it.  We just

11:34:14  6  can't.

11:34:17  7          MR. MAJORAS:  Your Honor, if I -- John Majoras.  If I

11:34:19  8  can -- I can add to that.  In particular, with Mr. Chunderlik,

11:34:21  9  as you might recall, he was originally going to be called the

11:34:24 10  very first week of trial, and it kept getting pushed back.

11:34:28 11          We -- other than Giant Eagle, and I don't know what

11:34:31 12  Giant Eagle knows, I know Ms. Sullivan has not been attuned

11:34:35 13  with some of the other things that have been happening, but

11:34:38 14  until two minutes ago, we didn't know Mr. Chunderlik wasn't

11:34:40 15  going to be called.  I think our -- the information to us was

11:34:45 16  very clear, he would run the course of the day and he was still

11:34:49 17  scheduled as of last night.  We all heard that from the

11:34:52 18  plaintiffs' side.

11:34:54 19          THE COURT:  But we had this discussion yesterday and

11:34:55 20  there was -- I made it clear you were to have at least one

11:34:57 21  deposition ready and you said you would, so let's have at least

11:35:00 22  one.

11:35:01 23          MR. MAJORAS:  Your Honor, if we need --

11:35:02 24          THE COURT:  If you have only one, then I guess we'll

11:35:04 25  have to stop after one.

**4410**

11:35:06  1              MR. MAJORAS:  And, Your Honor, if we need to play a

11:35:07  2       deposition, we do have a deposition as we talked about

11:35:09  3       yesterday.

11:35:09  4              THE COURT:  Well --

11:35:10  5              MR. MAJORAS:  One other issue related to the

11:35:13  6       plaintiffs' resting, they mentioned that they were planning to

11:35:16  7       call or read interrogatory responses into the record.  I think

11:35:22  8       that should be done immediately.  We believe in a number of

11:35:25  9       instances they haven't made any showing of proof on certain of

11:35:28  10      their claims, and perhaps the interrogatories will go to that,

11:35:32  11      I don't know, but we're entitled to hear that before they rest.

11:35:36  12              THE COURT:  Well, I don't know what these

11:35:37  13      interrogatories are.

11:35:38  14              MR. MAJORAS:  I don't either.

11:35:40  15              THE COURT:  We'll read the interrogatories and then

11:35:42  16      we'll -- you know, it may be time for a lunch break, and then

11:35:45  17      we'll have the -- who's the -- who's the deponent we're going

11:35:49  18      to play?

11:35:51  19              Well, you can decide.  It doesn't matter.  We've

11:35:53  20      got --

11:35:53  21              MR. DELINSKY:  I'm sorry, Your Honor.  Do you mean

11:35:54  22      who's the -- I misunderstood.  You mean the deposition we're

11:35:58  23      going to play?

11:35:58  24              THE COURT:  Deponent, right.

11:36:00  25              MR. DELINSKY:  Theresa Toigo, I believe, from the Food

11:36:04  1    and Drug Administration.

11:36:04  2              THE COURT:  Okay.

11:36:09  3              All right.  Do we have these interrogatories that

11:36:12  4    we're going to introduce?  I think Mr. Majoras is right.

11:36:16  5    That's -- this is the appropriate time.

11:36:22  6              MR. LANIER:  Mr. Weinberger is el jefe on that, and he

11:36:27  7    is, I think, grabbing them as we speak, or he's going to the

11:36:36  8    men's room.

11:36:59  9              MR. WEINBERGER:  Your Honor, we're going to have to

11:37:01 10    get our act together and organize which interrogatory answers

11:37:06 11    we need read into the record.  I apologize.  I'll take full

11:37:09 12    responsibility for it.

11:37:16 13              THE COURT:  How long is this going to take?

11:37:22 14              MR. WEINBERGER:  I think -- I think a few minutes.

11:37:25 15              THE COURT:  Oh, all right.

11:37:26 16              MR. WEINBERGER:  15 minutes or. . . or we can take our

11:37:29 17    lunch break now and come back.

11:37:32 18              THE COURT:  All right.  Yeah.  I. . . all right.  I'm

11:37:39 19    going to charge this time to the plaintiff.  If we're going

11:37:43 20    to -- we'll recess for lunch and come back at 1 o'clock, and

11:37:46 21    what we'll do is at that point -- I mean -- these have to be

11:37:52 22    relevant.  They're entitled to put in answers to

11:37:57 23    interrogatories as admissions, but at least the defendants need

11:38:00 24    to know what you're going to put in.  If there's any

11:38:03 25    objections, I'll hear briefly, then you'll read the

11:38:06  1    objections -- read the interrogatories -- or I guess I read.

11:38:09  2            How do you want to do this?  I don't -- do I read them

11:38:12  3    or do you --

11:38:12  4            MR. WEINBERGER:  No.  We'd be happy to read them, and

11:38:15  5    Your Honor, that will give -- that's a great suggestion.  We'll

11:38:18  6    confer with -- we'll select them, confer with each of the

11:38:22  7    defendants and be prepared to move expeditiously.  And again, I

11:38:25  8    apologize.

11:38:25  9            THE COURT:  All right.  Well -- all right.  And

11:38:28  10   then -- I mean, obviously that's part of your case, that's part

11:38:30  11   of your time, and then we'll have Ms. Toigo's deposition.

11:38:35  12           Okay.

11:38:36  13           MR. DELINSKY:  Your Honor, it's T-o-i-g-o.  I'm not

11:38:39  14   exactly sure how to pronounce it either.

11:38:43  15           MR. WEINBERGER:  Toigo.

11:38:44  16           THE COURT:  Toigo.  Okay.  Thank you.  I want to

11:38:45  17   pronounce her correctly.

11:38:48  18           Okay.  All right.  Well, that -- we'll bring the jury

11:38:51  19   back in, Mr. Pitts.

11:40:21  20       (Jury returned to courtroom at 10:40 a.m.)

11:40:21  21           THE COURT:  Okay.  Please be seated, ladies and

11:40:23  22   gentlemen.  I apologize for the delay.  There are a few more

11:40:25  23   legal matters, and by the time we take -- finish those, it will

11:40:29  24   be lunchtime, and there's no point you delaying, so I'll give

11:40:32  25   you a slightly longer lunch for today.  We'll recess, reconvene

11:40:37  1   promptly at 1 o'clock.

11:40:38  2          Have a good lunch.  Again, usual admonitions apply.

11:40:42  3   Don't encounter anything with the media.  Don't do any

11:40:46  4   research.  Don't discuss the case, and we'll resume at

11:40:51  5   1 o'clock.  Have a good lunch.

11:40:52  6      (Jury excused from courtroom at 11:40 a.m.)

11:41:27  7          THE COURT:  Okay.  Unless there was anything anyone

11:41:32  8   wanted to bring up, we'll just take a slightly longer lunch.

11:41:36  9   You can work on the interrogatories.

11:41:39 10          MR. LANIER:  Thank you, Judge.

         11          COUNSEL EN MASSE:  Thank you, Your Honor.

         12      (Recess was taken from 11:41 a.m. till 1:02 p.m.)

         13

         14

         15          PAGE LEFT INTENTIONALLY BLANK

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

|  | |
|---|---|
| 1 | AFTERNOON SESSION |
| 01:02:02 2 | (In open court at 1:02 p.m.) |
| 01:02:02 3 | COURTROOM DEPUTY:  All rise. |
| 01:02:09 4 | THE COURT:  All right.  Please be seated. |
| 01:02:23 5 | All right.  Mr. Weinberger, Mr. Lanier, how to you |
| 01:02:27 6 | wish to proceed? |
| 01:02:28 7 | MR. WEINBERGER:  Your Honor, at this time, we are |
| 01:02:34 8 | announcing that we have reached a resolution with Giant Eagle, |
| 01:02:44 9 | and they -- |
| 01:02:50 10 | THE COURT:  All right.  Well, I'll deal with that in a |
| 01:02:52 11 | minute.  Are you -- are you offering any interrogatories or |
| 01:02:55 12 | anything else? |
| 01:03:00 13 | MR. WEINBERGER:  We have made a decision not to read |
| 01:03:02 14 | any interrogatory answers and, subject to admission of some |
| 01:03:08 15 | additional exhibits, we are prepared to rest. |
| 01:03:12 16 | THE COURT:  All right.  I was handed a couple of |
| 01:03:15 17 | documents.  I have no idea what these are. |
| 01:03:17 18 | MR. WEINBERGER:  So, Your Honor, those are ours. |
| 01:03:20 19 | As you recall, there's been discussion about the IMS |
| 01:03:23 20 | contracts, and this is simply a list of all of them with P |
| 01:03:30 21 | numbers, and the declaration that goes with them is the |
| 01:03:34 22 | declaration from IQVIA/IMS that also deals with each of those |
| 01:03:47 23 | defendants. |
| 01:03:49 24 | MR. DELINSKY:  And, Your Honor, I believe where we |
| 01:03:51 25 | left off last night was that these could not be admitted on the |

01:03:54  1    current record.  It would be a matter of seeing where it goes

01:03:56  2    with defense witnesses, since there isn't a witness who's

01:03:59  3    testified to any of these.

01:04:00  4            THE COURT:  All right.  Well, these can all be used

01:04:02  5    with defense witnesses for sure.

01:04:04  6            All right.

01:04:08  7            MR. WEINBERGER:  Well, we're going to move for

01:04:10  8    admission, and then, you know, obviously the Court can rule.

01:04:12  9            THE COURT:  I mean, there's a number of exhibits I'm

01:04:14 10    going to have to rule on.

01:04:15 11            MR. WEINBERGER:  Sure.

01:04:16 12            THE COURT:  I think I already dealt with these.  They

01:04:18 13    can all be used -- all right.  None of them have been

01:04:22 14    identified or authenticated.  There's been testimony by one

01:04:30 15    witness so I'm sure -- I'm sure they'll come up with a lot of

01:04:34 16    other defense witnesses, CVS witnesses.

01:04:36 17            MR. WEINBERGER:  Yes, Your Honor.

01:04:36 18            THE COURT:  All right.  This is what I propose to tell

01:04:38 19    the jury.  If any of the defendants want to tweak the language,

01:04:44 20    I would say Giant Eagle is no longer part of this case.  The

01:04:51 21    fact that Giant Eagle started in this case and is no longer in

01:04:55 22    the case has no bearing on plaintiffs' allegations against the

01:04:59 23    other three defendants.  You should not consider it in way in

01:05:08 24    deciding whether or not plaintiffs have proved this case --

01:05:11 25    proved their case against Walmart, Walgreens, or CVS.

01:05:13  1          How does that sound to everyone?

01:05:19  2          MR. DELINSKY:  Can we have one moment, Your Honor?

01:05:22  3          THE COURT:  Sure.

01:05:25  4          MR. WEINBERGER:  So, we have some comments.

01:05:26  5          THE COURT:  Let them -- let them --

01:05:28  6          MR. WEINBERGER:  Okay.

01:05:29  7          THE COURT:  Confer.

01:05:34  8       (Counsel conferring).

01:05:36  9          MR. MARCUS:  Your Honor, if I may, I want to say

01:05:38 10  good-bye and I thank you for your indulgence.  I know I've been

01:05:40 11  a little bit of a pain for you, but I did what had to be done.

01:05:44 12          THE COURT:  All right.  Well, thank you, Mr. Marcus.

01:06:35 13       (Brief pause in proceedings).

01:06:45 14          MR. MAJORAS:  Your Honor, John Majoras from Walmart.

01:06:48 15          THE COURT:  Yes.

01:06:49 16          MR. MAJORAS:  The defendants believe that the

01:06:51 17  notification to the jury should be plainer and can be done a

01:06:55 18  little simpler but saying the same thing.  I'll outline some

01:06:59 19  language.

01:07:00 20          THE COURT:  I'm open to suggestions.  It's not a --

01:07:02 21  you know.

01:07:03 22          MR. MAJORAS:  I'll read some language and then if you

01:07:04 23  need me to, I don't have it written or typed out.

01:07:07 24          THE COURT:  All right.  What do you suggest?

01:07:09 25          MR. MAJORAS:  Giant Eagle -- I'll read the whole thing

HEATHER K. NEWMAN, RMR, CRR

**4417**

01:07:12  1    and then I can go back slowly, Your Honor.

01:07:12  2              THE COURT:  Okay.

01:07:13  3              MR. MAJORAS:  Giant Eagle is no longer a part of this

01:07:16  4    case.  You should not consider that fact nor speculate about

01:07:20  5    the reasons why Giant Eagle is no longer involved in this case.

01:07:22  6    You should not draw any inferences for or against any of the

01:07:25  7    remaining parties by reason of the departure of one of the

01:07:29  8    parties.

01:07:31  9              MR. LANIER:  That sounds great to us, Your Honor.

01:07:32 10              THE COURT:  That sounds fine.  I don't think it's --

01:07:36 11    it's longer than mine, but I -- but I actually like it better,

01:07:41 12    so -- all right.

01:07:44 13              MR. STOFFELMAYR:  Do you need it in writing,

01:07:46 14    Your Honor, or --

01:07:47 15              THE COURT:  Well, if you have it, that's great.

01:07:49 16              MR. MAJORAS:  I could write it out for Your Honor, I

01:07:51 17    will.  Give me just a moment.

01:07:52 18              THE COURT:  Okay.  Well, I mean, Giant Eagle is no

01:07:54 19    longer part of this case.  I got that.  That was my first

01:07:56 20    sentence.  You should not consider that fact. . .

01:07:59 21              MR. DELINSKY:  Judge, you could read it from --

01:08:05 22              MR. STOFFELMAYR:  Well, there is somebody writing

01:08:06 23    everything down.

01:08:07 24              THE COURT:  Well, someone have it?

01:08:11 25              SPECIAL MASTER COHEN:  It's on your sametime.

01:08:12  1           THE COURT:  Well, I know, but I'll --

01:08:14  2           MR. MAJORAS:  I can go through it with Your Honor if

01:08:16  3  you'd like.

01:08:17  4           THE COURT:  Giant Eagle is no longer part of this

01:08:19  5  case.  You should not consider that fact.

01:08:21  6           MR. MAJORAS:  Nor speculate about the reasons why

01:08:25  7  Giant Eagle is no longer involved in this case.  You should not

01:08:35  8  draw any inferences for or against any of the remaining parties

01:08:48  9  because of the departure of Giant Eagle.

01:08:54  10          I -- I tweaked that a bit from when I first read it,

01:08:57  11  Your Honor.

01:08:57  12          THE COURT:  All right.  That's fine.

01:09:00  13          MR. LANIER:  The plaintiffs have no objection,

01:09:01  14  Your Honor.

01:09:02  15          THE COURT:  Okay.  Thank you for the suggestion,

01:09:03  16  I'll -- I will give that instruction.

01:09:12  17          Okay.  And you can bring the jury in please.

01:09:16  18          MR. DELINSKY:  Your Honor, may I just address a brief

01:09:18  19  housekeeping matter before then?

01:09:19  20          THE COURT:  Okay.

01:09:19  21          MR. DELINSKY:  We have for the duration of trial been

01:09:22  22  sitting in seats where we can't see the witness.  We don't need

01:09:24  23  to move today since it's only been --

01:09:27  24          THE COURT:  Anyone can --

01:09:28  25          MR. DELINSKY:  Could we move starting tomorrow?

01:09:30  1          THE COURT:  Yeah.  You can go into that table.

01:09:31  2          MR. DELINSKY:  Okay.  Thank you, Your Honor.

01:09:32  3          THE COURT:  Okay.  All right.

01:09:40  4      (Brief pause in proceedings).

01:11:25  5      (Jury returned to courtroom at 1:11 p.m.)

01:11:25  6          THE COURT:  Good afternoon.  Please be seated.

01:11:28  7          All right.  Ladies and gentlemen, I'm advising you

01:11:34  8  that Giant Eagle is no longer part of this case.  You should

01:11:38  9  not consider that fact nor should you speculate about the

01:11:43 10  reasons why Giant Eagle is no longer involved in this case.

01:11:47 11  You should not draw any inferences for or against any of the

01:11:50 12  remaining parties because of the departure of Giant Eagle.

01:11:56 13          All right.  The plaintiffs having rested.  Now it is

01:12:00 14  time for the defendants' case, or cases, plural.

01:12:07 15          You should give the defendants and their witnesses the

01:12:09 16  same terrific attention that you've been giving to all of the

01:12:20 17  plaintiffs' witnesses.

01:12:21 18          Okay.  Who wants to proceed?

01:12:24 19          MR. DELINSKY:  I'm just looking at Mr. Weinberger and

01:12:29 20  Mr. Lanier, did -- I don't -- are you ready for us to go?

01:12:33 21          MR. LANIER:  Oh, yeah.  Your Honor, formally, pursuant

01:12:38 22  to putting in exhibits and housekeeping, we rest.

01:12:42 23          THE COURT:  I think you rested -- all right.  Maybe --

01:12:45 24          MR. LANIER:  For clarity sake, we rest.

01:12:48 25          THE COURT:  The plaintiffs have rested subject to the

**4420**

01:12:49  1   admission of exhibits, so it's time for the defense case.

01:12:52  2          Okay.

01:12:54  3          MR. DELINSKY:  Good afternoon, ladies and gentlemen.

01:12:55  4   Again, Eric Delinsky on behalf of CVS.  The defense will now

01:13:01  5   start its case.

01:13:02  6          Our first witness is an official with the United

01:13:07  7   States Food and Drug Administration which has been referred to

01:13:10  8   throughout the case as the FDA.  Unfortunately, it's not a live

01:13:15  9   witness, it's another one of those depositions.  I'm sorry

01:13:20 10   about that.  This one only runs about 1 hour in length for the

01:13:26 11   questions from the defendants and the questions from the

01:13:30 12   plaintiffs.

01:13:30 13          And let me introduce the witness to you.  Her name is

01:13:36 14   Miss Theresa Toiga.  She is the associate director of drug

01:13:42 15   safety operations for the US FDA.

01:13:50 16          Oh, yes, and she works in the FDA Center For Drug

01:13:57 17   Evaluation and Research within the office of new drugs.

01:13:59 18   There's apparently a lot of bureaucracy in the FDA.

01:14:03 19          As you will hear, she's been with FDA since 1984.

01:14:08 20   She's been in her current role since 2010, and she was

01:14:12 21   authorized by the FDA to provide deposition testimony in this

01:14:17 22   case on certain topics.

01:14:21 23          THE COURT:  Okay.  Thank you, Mr. Delinsky.

         24

         25

—— Toiga (By Video Deposition) ——

01:14:21  1          DEPOSITION TESTIMONY OF THERESA TOIGA

01:14:31  2  Q.  Good morning, Ms. Toiga.  My name is Graeme Bush.  We

01:14:36  3  introduced each other off the record, and as you heard, I'm

01:14:38  4  counsel for CVS and I will be taking your testimony here today?

01:14:43  5          Can you take a look at Exhibit 20?

01:14:57  6  A.  Okay.

01:14:57  7  Q.  Have you seen that before?

01:14:58  8  A.  Yes, I have.

01:14:59  9  Q.  Okay.  And this is what's known as a *Touhy* letter, is

01:15:03 10  that -- do you understand that this is what it is called?

01:15:07 11  A.  Yes, I do.

01:15:08 12  Q.  And does this authorize you to testify -- it's an

01:15:14 13  authorization for you to testify from the Food and Drug

01:15:19 14  Administration on certain topics; is that right?

01:15:22 15  A.  Yes.

01:15:23 16  Q.  And those topics are listed on Page 2 of Exhibit 20?

01:15:29 17  A.  Yes, they are.

01:15:35 18  Q.  And they include the roles and responsibilities of FDA and

01:15:38 19  its organizational structure; FDA's role, responsibility, and

01:15:42 20  processes for approving prescription drugs; FDA's role,

01:15:46 21  responsibility, and processes for monitoring approved drugs;

01:15:49 22  and FDA's approval and monitoring of opioids, benzodiazapines

01:15:55 23  and muscle relaxers; is that right?

01:15:56 24  A.  Yes.

01:16:01 25  Q.  And we have been informed that you are knowledgeable about

─── Toiga (By Video Deposition) ───

01:16:08 1  these subjects.

01:16:10 2          Are you?

01:16:14 3  A.  Yes.

01:16:16 4  Q.  What's the basis of your knowledge?

01:16:20 5  A.  I've worked at FDA in this -- in the Center For Drugs since

01:16:26 6  2010.  I've worked at FDA since 1984 in various roles, so I

01:16:36 7  have an understanding of its organization and its roles and

01:16:38 8  responsibilities.

01:16:40 9  Q.  What was your first job at FDA?

01:16:44 10 A.  Consumer safety officer.

01:16:46 11 Q.  And what office within FDA was that position in?

01:16:54 12 A.  It was in the Office of New Drugs.  I believe that's what

01:16:58 13 it was called in 1984.

01:17:01 14 Q.  So what were the general responsibilities of the Office of

01:17:04 15 New Drugs at that point in time in 1984?

01:17:08 16 A.  To review and approve and monitor the safety of new drug --

01:17:13 17 of prescription drug products, over-the-counter products.

01:17:19 18 Q.  Where is that functioning located now in FDA?

01:17:23 19 A.  It's within the office -- the Center For Drug Evaluation

01:17:27 20 and Research within the Office of New Drugs.

01:17:30 21 Q.  And is the -- is that center known by its acronym, CDER?

01:17:37 22 A.  Yes.

01:17:37 23 Q.  Is that where you work now?

01:17:39 24 A.  Yes, I do.

01:17:46 25 Q.  When did you begin working at CDER?

Toiga (By Video Deposition)

01:17:55  1   A.   2010.

01:17:56  2   Q.   What was your position when you started?

01:17:57  3   A.   My current position, associate director of drug safety

01:18:01  4   operations.

01:18:05  5   Q.   So can you give us a general account of what CDER's

01:18:11  6   responsibilities are within FDA?

01:18:15  7   A.   CDER is responsible for the -- monitoring the public health

01:18:22  8   and the safety related -- safety and approval of new drugs.  So

01:18:27  9   we review new drugs, we review drugs, we approve drugs, and we

01:18:31 10   monitor their safety after approval.

01:18:37 11   Q.   And what kinds of backgrounds -- I assume there's a variety

01:18:40 12   of different backgrounds that people employed at CDER have, but

01:18:44 13   in general, what are the different kind of backgrounds that

01:18:46 14   people have?

01:18:46 15   A.   There are medical officers.  There are pharmacologists,

01:18:51 16   toxicologists, statisticians, pharmacists, chemists,

01:19:00 17   microbiologists, and a variety of administrative personnel.

01:19:04 18   There is project management specialists.  There's lawyers.

01:19:11 19   There's many, many people doing a lot of different things.

01:19:14 20   Q.   Am I correct that the FDA is responsible in the United

01:19:21 21   States for approving any drug before it can be prescribed,

01:19:28 22   marketed, dispensed, and sold?

01:19:33 23   A.   Yes.  That's FDA's responsibility.

01:19:37 24   Q.   Does FDA review and approve opioids?

01:19:45 25   A.   Yes.

———— Toiga (By Video Deposition) ————

01:19:46 1    Q.   Does it review and approve benzodiazapines?

01:19:54 2    A.   Yes.

01:19:54 3    Q.   Does it approve -- review and approve muscle relaxers?

01:19:57 4    A.   Yes.

01:20:03 5    Q.   What is -- what does the FDA need to do, what is the

01:20:06 6    conclusion it needs to reach in order to approve a drug?

01:20:15 7    A.   It's a benefit/risk assessment, and the benefits of the

01:20:20 8    drugs outweigh its risks.

01:20:23 9    Q.   Does it have to conclude that the drug is effective to

01:20:27 10   treat whatever condition it's proposed to treat?

01:20:34 11   A.   It approves that it's effective at -- for the indication

01:20:38 12   approved in the labeling, yes.

01:20:40 13   Q.   And it indicate -- where's the indication in the labeling

01:20:44 14   come from, from the applicant or some other place?

01:20:49 15   A.   Studies are done.  FDA reviews the studies to determine

01:20:54 16   whether they've met the standards or safe -- a safe and

01:20:59 17   effective drug.

01:21:02 18   Q.   All right.  That was -- that was the other question I was

01:21:04 19   going to ask you.  Is part of this approval -- does part of

01:21:08 20   this approval involve making a determination that the drug is

01:21:11 21   safe if used as indicated on the label?

01:21:18 22   A.   Yes.  As described in the label, with warnings,

01:21:25 23   precautions, yes.

01:21:33 24   Q.   And I think you already mentioned the risk and benefit

01:21:36 25   analysis.  Can you describe what that entails for the FDA to

Toiga (By Video Deposition)

01:21:42 1    approve a prescription drug?

01:21:44 2    A.  Yes.  FDA reviews the clinical data to determine that the

01:21:50 3    drug is effective, and then it looks at the data that's

01:21:54 4    associated with adverse events that occur during a clinical

01:21:59 5    trial.  It looks at where -- where -- what therapist are

01:22:04 6    available for any -- for -- a particular condition.  It's part

01:22:14 7    of a benefit/risk assessment that is described in a document

01:22:20 8    that is available, and it has a list of questions and

01:22:24 9    considerations that reviewers take into account when helping to

01:22:29 10   decide whether the benefits outweigh the risks.

01:22:34 11   Q.  And in that process, does it consider possible side effects

01:22:37 12   from the use of the drug?

01:22:39 13   A.  Yes, it does.

01:22:41 14   Q.  Does it consider potential interactions with other drugs?

01:22:48 15   A.  It does, to the extent that they're known.

01:22:52 16   Q.  Does --

01:22:53 17   A.  They do describe --

01:22:56 18   Q.  All right.  Didn't mean to interrupt you.

01:22:59 19   A.  They do describe -- those drug interactions would be

01:23:03 20   described in the labeling.

01:23:05 21   Q.  And does it consider potential interactions with other

01:23:10 22   substances, like alcohol or perhaps other substances that

01:23:14 23   somebody might take that aren't drugs?

01:23:18 24   A.  Yes.

01:23:24 25   Q.  Does the risk/benefit analysis consider the effects that

———— Toiga (By Video Deposition) ————

01:23:31  1   could come from people taking the drug in ways that it was not

01:23:36  2   prescribed or indicated for?

01:23:40  3   A.   Yes, when -- when that's known.

01:23:45  4   Q.   Does -- in the risk/benefit analysis, does the FDA take

01:23:49  5   into account risks to public health?

01:23:55  6   A.   Yes, it does.  That's part of our analysis.

01:23:58  7   Q.   And are those risks -- do those risks including risks that

01:24:03  8   come from inappropriate use of the drug?

01:24:08  9   A.   When that's known, yes.

01:24:12  10  Q.   And does -- does it also take into account the impact on

01:24:22  11  public health from the potential nonmedical use of the drug?

01:24:30  12  A.   When that's known, that's described in our guidance, how

01:24:33  13  we -- we've -- if it's known for the particular therapeutic

01:24:38  14  class.

01:24:39  15  Q.   And with respect to opioids in particular, does the FDA

01:24:43  16  take into account these types of impacts on public health that

01:24:47  17  I've just asked you about?

01:24:50  18  A.   Yes, that is described in our guidance.

01:24:57  19  Q.   And on the benefit side, I think you mentioned that -- some

01:25:06  20  of the things that are considered, but one of them would be the

01:25:09  21  conditions that the drug addresses or treats; is that right?

01:25:15  22  A.   Yes.

01:25:16  23  Q.   Would it also include whether there are alternative

01:25:19  24  treatments available for that condition?

01:25:22  25  A.   Yes.

─── Toiga (By Video Deposition) ───

01:25:23  1   Q.  When it's considering the benefits in weighing the risks

01:25:27  2   and benefits, does it take account of how effective the drug is

01:25:33  3   in treating whatever condition it's indicated for?

01:25:38  4   A.  Yes.  That's part of the risk/benefit determination.

01:25:43  5   Q.  Does the approval also include approval of the labeling and

01:25:52  6   package inserts for a drug?

01:25:55  7   A.  Yes, that's part of the approval process.

01:25:58  8   Q.  Okay.  Does it include information about the recommended

01:26:05  9   doses?

01:26:08  10  A.  Yes, it does.

01:26:09  11  Q.  Does it include information about the starting dose that's

01:26:14  12  recommended?

01:26:17  13  A.  Yes, generally.

01:26:20  14  Q.  Does it include recommendations about the duration of use

01:26:26  15  of the drug?

01:26:30  16  A.  Generally.

01:26:35  17  Q.  Does it include information about the monitoring of the

01:26:42  18  patient during the time the drug is being taken?

01:26:49  19  A.  Yes.

01:26:57  20  Q.  And, specifically, with respect to opioid drugs -- and I'm

01:27:01  21  talking about as a class now, not any particular opioid drug --

01:27:05  22  are all those factors part of the labeling that the FDA reviews

01:27:12  23  and approves?

01:27:16  24  A.  They are.  The labeling is revised as FDA gets additional

01:27:28  25  information, so there's labeling and approval and there's

─────── Toiga (By Video Deposition) ───────

01:27:31 1    labeling at any point in time.

01:27:33 2    Q.  All right.  Now, I think you said before that one of the

01:27:36 3    things or subjects that might be in a label are warnings and

01:27:41 4    information from clinical trials.

01:27:43 5         With respect to opioids, are warnings a part of the

01:27:49 6    labeling, again, opioids as a class?

01:27:52 7    A.  Yes.

01:27:54 8    Q.  And is information from clinical trials with respect to any

01:28:05 9    opioid also a part of the labeling?

01:28:10 10   A.  Yes.

01:28:11 11   Q.  If there's a general description of what kinds of -- what

01:28:14 12   we mean or what you mean when you're talking about clinical

01:28:17 13   information, I would appreciate it if you could tell the jury

01:28:22 14   about it.

01:28:25 15   A.  The labeling will describe the clinical trials that were

01:28:30 16   conducted to support the approval of the drug, so it will

01:28:35 17   describe the number of trials, the patients that were included

01:28:38 18   in the trials, what was found in the trials, how long the

01:28:43 19   trials lasted.  It will -- they'll be a full description of the

01:28:48 20   adverse events that were observed during the trial.  If some of

01:28:52 21   those adverse events are serious, they'll be described in

01:28:56 22   varying levels in the labeling between warnings and

01:29:01 23   precautions, adverse events, boxed warnings.  It depends.

01:29:07 24   Q.  What is a boxed warning?

01:29:11 25   A.  A boxed warning is a -- describe a -- generally, a serious

——— Toiga (By Video Deposition) ———

01:29:19  1  adverse event.  It's one that we think -- that FDA believes

01:29:23  2  that if a healthcare provider may be able to prevent an adverse

01:29:30  3  event, if that's described in the labeling -- we have a

01:29:32  4  guidance that describes it.  I think there's three criteria.

01:29:35  5  And I could find it and read it to you, but it's -- I don't --

01:29:38  6  I can't -- I don't know the exact three criteria.  But it's the

01:29:42  7  highest level of concern about a particular adverse event.

01:29:47  8  Q.  And what is the -- withdrawn.

01:29:50  9        The information in the label, or on the label, that is

01:29:58  10  available to a prescriber; is that right?

01:30:02  11  A.  Yes, it is.

01:30:04  12  Q.  And a package insert, that's different from the label.

01:30:08  13        Is that also right?

01:30:10  14  A.  The prescribing information is in the package insert.

01:30:16  15  That's part of the labeling of the drug.  A labeling is another

01:30:20  16  piece of that component.  I'm at -- a lawyer is probably better

01:30:26  17  and is able to describe all of the different components of

01:30:29  18  labeling, but prescribing information is a package insert, and

01:30:36  19  the prescribing information is what FDA approves.

01:30:40  20  Q.  And the prescribing information on the package insert is

01:30:43  21  available to a prescriber who's deciding whether or not to

01:30:46  22  prescribe any particular drug; is that right?

01:30:50  23  A.  Yes.

01:30:51  24  Q.  Including opioids?

01:30:53  25  A.  Including opioids.

———— Toiga (By Video Deposition) ————

01:30:55  1   Q.  And what is a medication guide?  I just want to make sure

01:30:59  2   I --

01:31:00  3   A.  Medication -- a medication guide is -- is when there's

01:31:06  4   particular risks that FDA thinks would be important to convey

01:31:11  5   to a patient, those risks are described.  And, again, the

01:31:16  6   specifics are described in the regulations, what's required to

01:31:19  7   be included in a med guide.  But it's really to help ensure the

01:31:23  8   safe use of the drug for a patient.  It's written -- some are

01:31:28  9   better than others in terms of understanding -- you know, it's

01:31:32  10  understandable language to the patient.

01:31:39  11  Q.  And that medication guide, if there is one for a particular

01:31:44  12  drug, is available to the patient when the patient picks up a

01:31:49  13  prescription?

01:31:49  14  A.  Yes.

01:31:51  15  Q.  And that's true for opioids as well as other drugs, other

01:31:54  16  prescription drugs?

01:31:56  17  A.  Yes.

01:31:58  18  Q.  So would it be accurate to say that the FDA has concluded

01:32:08  19  that -- and again, I'm talking about the class, the class of

01:32:11  20  opioids -- are -- they're effective to treat the conditions

01:32:18  21  that are specified in the application?

01:32:23  22  A.  Yes.

01:32:25  23  Q.  And the FDA has also, again, for the class of opioids,

01:32:31  24  concluded that opioids are safe when used to treat the

01:32:35  25  conditions that are specified in the -- on the label?

─── Toiga (By Video Deposition) ───

01:32:41  1    A.   Yes.

01:32:42  2    Q.   The FDA has made the determination that the benefits of

01:32:47  3    opioids as a class outweigh the risk that they pose?

01:32:52  4    A.   That's correct.

01:32:53  5    Q.   Now, after a drug has been approved by the FDA, I think

01:32:58  6    you've already mentioned this, but there's a role that FDA has

01:33:01  7    in monitoring the drug after it's on the market; is that right?

01:33:06  8    A.   Yes.

01:33:06  9    Q.   One of the tools that the FDA has is the FDA Adverse Event

01:33:13  10   Reporting System; is that right?

01:33:15  11   A.   Yes, FAERS.

01:33:17  12   Q.   FAERS, right.  And how does FAERS work?

01:33:22  13   A.   FAERS is a voluntary -- healthcare practitioners submit on

01:33:31  14   adverse events to FAERS.  Consumers can submit adverse event to

01:33:36  15   FAERS.  Manufacturers are required under the regulations to

01:33:40  16   submit on a certain adverse events report -- event reports of

01:33:45  17   serious and unexpected adverse events.  There's specifications

01:33:49  18   or industry.  And then for healthcare professionals and

01:33:53  19   patients it's a voluntarily system.

01:33:54  20   Q.   What does FDA do with the FAERS reports it receives?

01:34:03  21   A.   Our safety evaluators review the adverse event reports that

01:34:07  22   are submitted.

01:34:07  23   Q.   And what do they do after they review them?  I know it

01:34:14  24   depends, but in general, what do they do?

01:34:16  25   A.   Right.  They're reviewing to determine whether or not the

———— Toiga (By Video Deposition) ————

01:34:19 1   labeling needs to be updated, whether there's a change in the

01:34:22 2   adverse event, whether there's a change in the safety profile

01:34:27 3   of the drug, whether we need to, you know, reevaluate where --

01:34:37 4   where -- what -- what our -- the benefit/risk assessment for a

01:34:44 5   particular drug.

01:34:47 6   Q.  Would it be accurate to say this is one way to gather

01:34:50 7   information about the effects of the drug, including risks or

01:34:56 8   benefits that were not available to FDA at the time that the

01:35:00 9   drug application was approved?

01:35:04 10  A.  Yes.  That's one way of gathering information after

01:35:08 11  approval.

01:35:11 12  Q.  What other ways are there?  And, again, at this point, I'm

01:35:16 13  just asking in general.  What other ways does the FDA have to

01:35:19 14  gather post-approval information about how the drug is being

01:35:22 15  used and what its impact is?

01:35:24 16  A.  FDA reviewers read the literature, so there may be

01:35:28 17  published studies.  The manufacturers submit annual reports, so

01:35:33 18  there -- they may submit some of the same publications.  They

01:35:38 19  may submit summary safety reports.  It's an ongoing evaluation

01:35:47 20  of the safety of the drug after marketing.

01:35:50 21  Q.  Okay.  Do you recall that FDA was asked to help implement a

01:35:56 22  national PDMP program and decided not to do that?

01:36:05 23  A.  In that public -- was that in the public meeting, that

01:36:10 24  discussion about a -- a -- I believe that was a

01:36:13 25  recommendation -- one of the proposals that was made during

—— Toiga (By Video Deposition) ——

01:36:16  1  that public meeting.

01:36:17  2  Q.   And did the FDA decide not to pursue that through an REMS?

01:36:26  3  A.   That -- yes.  Correct.

01:36:28  4  Q.   Has the FDA received any citizens' petitions with regard to

01:36:33  5  opioids?

01:36:35  6  A.   Yes.

01:36:42  7  Q.   And are you familiar with a request from -- I'm forgetting

01:36:50  8  what the acronym stands for.  Are you familiar with an

01:36:53  9  organization called -- the acronym is PROP?

01:36:57  10  A.   Yes.

01:36:59  11  Q.   Did the FDA receive a citizen petition from PROP?

01:37:07  12  A.   Yes.

01:37:08  13  Q.   Can I ask you to take a look at exhibit -- it's been

01:37:13  14  premarked Exhibit 10.  And -- well, I guess you have the hard

01:37:16  15  copy so you can rifle through it to make sure you know what

01:37:21  16  it's about.

01:37:21  17          But is this the FDA's decision on the citizens'

01:37:26  18  petition from physicians for responsible opioid prescribing,

01:37:31  19  for PROP?

01:37:32  20  A.   Yes, it is.

01:37:41  21  Q.   And the -- let me ask you to take a look at Page 11 of the

01:37:49  22  document.

01:37:50  23          Are you there?

01:37:51  24  A.   Yes, um-hmm.

01:37:52  25  Q.   At the bottom of the page it says, the agency declines to

──── Toiga (By Video Deposition) ────

01:37:55  1  specify or recommend a maximum daily dose or duration of use

01:37:59  2  for any opioid at this time.

01:38:01  3          Did PROP propose that the FDA impose a maximum daily

01:38:09  4  dosage limit?

01:38:12  5          Let me ask you this.  Independently of -- first of

01:38:16  6  all, do you recognize this document?

01:38:17  7          Did you ever see the decision of the FDA on the PROP

01:38:21  8  citizens' petition?

01:38:22  9  A.  Yes, I did.

01:38:24 10  Q.  And is this the decision?  I thought you said -- testified

01:38:29 11  it is, but is this the decision?

01:38:32 12  A.  If -- if this was our response to the petition, this is our

01:38:36 13  decision.

01:38:39 14  Q.  Well, I direct your attention -- I'm sorry to make you go

01:38:42 15  back to the first page, but I'd ask you to go back to the first

01:38:45 16  page.

01:38:45 17          But the first sentence says, this letter responds to

01:38:49 18  the citizens' petition submitted by physicians for responsible

01:38:53 19  opioid prescribing, PROP, which was received by FDA on

01:38:57 20  July 26th, 2012?

01:39:00 21          So. . . this is the decision, isn't it?

01:39:03 22  A.  Yes, this was FDA's response to the citizen petition.

01:39:08 23  Q.  Let me direct your attention to the bottom of Page 11.

01:39:12 24          It says, PROP requests that FDA add a maximum daily

01:39:15 25  goes of the equivalent of 100 milligrams of morphine,

HEATHER K. NEWMAN, RMR, CRR

—————— Toiga (By Video Deposition) ——————

01:39:23  1   100-milligram morphine equivalent dose, MED, to opioids

01:39:29  2   (petition at 2).

01:39:30  3        Do you understand that sometime in 2012 PROP had asked

01:39:35  4   for a maximum daily dose, as it's set forth in this document?

01:39:43  5   A.  Yes, I recall the PROP petition.

01:39:47  6   Q.  But let me direct your attention to Page -- the first

01:39:51  7   sentence under Section 4.

01:39:53  8        The agency declines to specify or recommend a maximum

01:39:57  9   daily dose or duration of use for any opioid at this time for

01:40:00 10   the reason described below.

01:40:03 11        Does that refresh your recollection about what FDA did

01:40:07 12   with respect to the request in the PROP citizens' petition to

01:40:12 13   set a maximum daily dose?

01:40:19 14   A.  I remember the petition and the response, yes.

01:40:24 15   Q.  Take a look at Exhibit 15, if you would.  And let me know

01:40:38 16   when you have the document.

01:40:40 17   A.  I have the document.

01:40:41 18   Q.  This appears to be a letter from the FDA to Senator Maggie

01:40:50 19   Hassan.  And my first question is, have you seen this document

01:40:57 20   before?

01:40:58 21   A.  Yes, I have.

01:41:08 22   Q.  Did you work on it or provide any input to it?

01:41:11 23   A.  I did.

01:41:15 24   Q.  Would you take a look at Page 13, and I'd like to direct

01:41:19 25   your attention to the second full paragraph.

——— Toiga (By Video Deposition) ———

01:41:26 1        It says, FDA has expressed concerns about the use of a

01:41:29 2  specific dose of opioids as a bright line to identify risk.

01:41:39 3  A.  I'm reading the paragraph.

01:41:41 4  Q.  Is it your recollection that FDA had concerns about

01:41:45 5  specifying a bright line dosage limit for opioids?

01:41:52 6  A.  Yes.

01:41:56 7  Q.  And it says further at the bottom, in other words, factors

01:42:00 8  such as mental health diagnoses or family history of substance

01:42:04 9  abuse may be more closely related to risk of overdose than the

01:42:07 10  dose a patient is taking.

01:42:11 11        Do you recall that that was FDA's view at the time

01:42:14 12  they sent this letter to Senator Hassan?

01:42:21 13  A.  This isn't a final letter.  I didn't work on this

01:42:23 14  particular part of it.

01:42:24 15  Q.  Did you recall that this was the FDA's position, whether

01:42:27 16  you worked on this language or not?

01:42:32 17  A.  I -- yes.

01:42:33 18  Q.  And the -- was it your understanding that this position was

01:42:37 19  based on a review of the data?  And I refer you to the second

01:42:41 20  sentence of the paragraph, our review of the data.

01:42:49 21  A.  This would have been the review by epidemiologists, yes,

01:42:54 22  and the clinical team.

01:42:56 23  Q.  One of the tools that FDA has post-approval is to remove

01:43:02 24  drugs, including opioids, from the market if post-approval data

01:43:07 25  suggests that's the right thing to do?

———— Toiga (By Video Deposition) ————

01:43:10  1  A.  Yes.

01:43:12  2  Q.  And that would be if post-approval data suggests that the

01:43:17  3  risk/benefit analysis that was made at the time of approval

01:43:22  4  needs to be reconsidered and perhaps the risks outweigh the

01:43:25  5  benefits; is that right?

01:43:26  6  A.  That's correct.

01:43:28  7  Q.  And has FDA ever removed any opioid drugs that it had

01:43:33  8  previously approved?

01:43:35  9  A.  Yes, it has.

01:43:37  10  Q.  And FDA has not sought to remove oxycodone from the market,

01:43:48  11  is that right?

01:43:48  12  A.  No.  Correct.

01:43:49  13  Q.  It's not right or it's not correct?

01:43:51  14  A.  FDA has not sought to remove oxycodone from the market.

01:43:56  15  Q.  And it also hasn't sought to remove hydrocodone from the

01:44:01  16  market?

01:44:03  17  A.  We have not sought to remove hydrocodone from the market.

01:44:06  18  Q.  Including hydrocodone combination products; is that right?

01:44:12  19  A.  That's right.

01:44:14  20  Q.  Has the FDA considered whether opioids are appropriate to

01:44:22  21  use for the treatment of chronic pain?

01:44:29  22  A.  I don't actually know what the current labeling says.  I'd

01:44:34  23  have to look at see what the currently labeling says, but we --

01:44:39  24  FDA -- opioids are used for chronic pain.

01:44:47  25  Q.  And has FDA, to your knowledge, ever made a determination

———— Toiga (By Video Deposition) ————

01:44:50  1    that they're not appropriate for -- to use to treat chronic

01:44:55  2    pain?

01:44:56  3    A.  No, not that I'm aware.

01:45:07  4    Q.  Let's go -- look back at Exhibit 10, which we were looking

01:45:13  5    at before.

01:45:13  6         This is the FDA letter responding to the PROP citizen

01:45:18  7    petition, and I want to direct your attention to Page 14.

01:45:24  8         And I guess before I ask you about that specific page,

01:45:32  9    has any, I'll call them, stakeholders come to the FDA and asked

01:45:37  10   that it restrict the use of opioids to preclude the

01:45:44  11   treatment -- use of opioids to treat chronic pain?

01:45:53  12   A.  I believe so, but I -- I -- it's a topic of a lot of

01:45:57  13   discussion.  I don't -- I don't remember specifically who has

01:46:03  14   asked us to -- to do something.

01:46:11  15   Q.  So let me direct your attention to Page 14.

01:46:14  16        It says, the PROP petition requests that FDA add a

01:46:18  17   maximum duration of 90 days for a continuous daily use.

01:46:27  18        And it then goes on to say that, after review of the

01:46:33  19   literature cited in the petition and an assessment of other

01:46:36  20   relevant information discussed below, FDA has determined that

01:46:39  21   limiting the duration of use for opioid therapy to 90 days is

01:46:44  22   not supportable.  Thus, the agency denies this request.

01:46:51  23        Do you recall that that was the agency's decision on

01:46:58  24   PROP's request that there be a maximum duration of 90 days for

01:47:04  25   daily use of opioid medications?

———— Toiga (By Video Deposition) ————

01:47:09  1   A.   That was our response in this petition, so that was our

01:47:12  2   position.

01:47:13  3   Q.   And to your knowledge, has FDA, since that time, in 2013,

01:47:24  4   limited the use -- the daily use of opioid medications to

01:47:34  5   90 days or less?

01:47:38  6   A.   No.   FDA has not revised the labeling, to my knowledge,

01:47:44  7   that changed anything on -- that -- to add this to the

01:47:49  8   labeling.

01:47:49  9   Q.   This appears to be the FDA's response to a citizen petition

01:47:53  10  from Pharmaceutical Manufacturing Research Services.

01:48:00  11          Is that what it is?

01:48:02  12  A.   Yes, it is.

01:48:03  13  Q.   And have you seen this document before?

01:48:14  14  A.   No.   I don't think I've seen this specific response.

01:48:17  15  Q.   So going back to this, and I get that you maybe don't

01:48:22  16  recall the specific petitions, but -- so let me see if I can

01:48:29  17  just wrap this up at this point.

01:48:31  18          Are you aware of the FDA granting any citizen's

01:48:42  19  petition that suggested that FDA stop approving new drug

01:48:47  20  applications for opioids with an indication to treat chronic

01:48:51  21  pain?

01:48:55  22  A.   No, not to my recollection.

01:48:58  23  Q.   I guess let me ask one other question.   I used the

01:49:02  24  language, management of moderate to severe pain when a

01:49:05  25  continuous around the clock analgesic is needed for an extended

──────── Toiga (By Video Deposition) ────────

01:49:09　1　period of time.

01:49:10　2　　　　　Is that the kind of technical language that is used to

01:49:14　3　describe treatment for chronic pain?

01:49:17　4　A.　I believe that's in our -- in the current labeling.

01:49:25　5　Q.　So going back to the general topic of what's in FDA's

01:49:28　6　toolbox post-approval for opioids to monitor and take actions

01:49:32　7　when appropriate with respect to already approved opioids, I --

01:49:37　8　is it -- is it accurate to say that one of the tools is to

01:49:41　9　issue warning letters if manufacturers are minimizing safety

01:49:46　10　risks in marketing or in promotional labeling?

01:49:51　11　A.　Yes, that's a tool.

01:49:53　12　Q.　Okay.  And is that a tool that the FDA has used from time

01:50:00　13　to time with respect to opioids?

01:50:02　14　A.　Yes, we have.

01:50:04　15　Q.　And is issuing a public health advisory when there are

01:50:09　16　concerns based on the experience with the drug after it's been

01:50:13　17　approved one of the tools in the toolbox?

01:50:17　18　A.　Are you referring to a drug safety communication?

01:50:23　19　Q.　That would be one, yeah.

01:50:25　20　A.　Yes, we use drug safety communications.

01:50:30　21　Q.　On --

01:50:31　22　A.　To -- to inform mostly healthcare providers and patients

01:50:37　23　about safety issues.

01:50:40　24　Q.　Okay.  Has the FDA issued any drug safety communication

01:50:44　25　with respect to any opioid medications?

—— Toiga (By Video Deposition) ——

01:50:47  1    A.  Yes, we have.

01:50:49  2    Q.  And how does the FDA come to a decision whether to issue a

01:50:58  3    safety communication?

01:51:01  4    A.  So when FDA receives -- identifies a safety signal, a

01:51:09  5    safety issue, generally a multi-disciplinary team is looking at

01:51:16  6    the data.  They are determining whether there is a safety

01:51:23  7    concern about -- for which either we're looking at and going to

01:51:28  8    have to get more information, and that might be an early drug

01:51:33  9    safety communication, but we think it's important enough to let

01:51:36  10   the public know, or it might be after we've done a complete

01:51:39  11   evaluation and then we have -- we know the answer, or based on

01:51:44  12   the information available at that time, and we'll issue a drug

01:51:47  13   safety communication to convey the information to the public.

01:51:53  14   Mostly -- there is -- if the -- the drug safety communications

01:51:56  15   have a section for healthcare providers and a section for

01:52:00  16   patients.

01:52:01  17   Q.  Okay.  And what's the process that the FDA goes through

01:52:05  18   that leads to the issuance of a warning letter?

01:52:11  19   A.  I'm not as familiar with the details of that because I

01:52:15  20   haven't worked in that area, but basically most of the warning

01:52:19  21   letters -- are you referring to the -- those issued through the

01:52:23  22   Office of Prescription Drug Promotion?

01:52:28  23          Is that the warning letters you're -- for advertising?

01:52:31  24   Q.  Yes.

01:52:32  25   A.  So as the FDA gathers information from a variety of sources

─── Toiga (By Video Deposition) ───

01:52:38  1   and determines whether or not there's a violation -- again, I'm

01:52:44  2   not a lawyer, but the -- it's described in a warning letter

01:52:50  3   what the issues were that were identified.

01:52:52  4   Q.   To whom does the warning letter go, again, generically.

01:52:56  5   I'm not asking about any particular warning letter.

01:52:59  6   A.   To the manufacturer, the application holder.

01:53:02  7   Q.   Is one of the tools in the toolbox post-approval to require

01:53:09  8   changes in the labeling for drugs that have already been

01:53:11  9   approved?

01:53:12 10   A.   Yes, it is.

01:53:13 11   Q.   And is there such a thing as a classwide labeling change?

01:53:20 12   A.   Yes.

01:53:21 13   Q.   Has the FDA issued a classwide labeling change with respect

01:53:24 14   to opioids?

01:53:26 15   A.   Yes, we have.

01:53:29 16   Q.   One?  More than one?  What?  How many?

01:53:34 17   A.   I -- I don't know how many.  I know -- I believe one in

01:53:38 18   2013, and I think one in 2016, and probably more, but I -- I --

01:53:47 19   you know, I just -- I don't -- I can't answer that, how many.

01:53:50 20   Q.   Okay.  And do you recall what the class labeling change was

01:54:01 21   in 2016?  I think you said there was one around then.

01:54:05 22   A.   I believe it was to put a boxed warning on the

01:54:08 23   immediate-release opioid -- opioid drugs.

01:54:30 24        I may have my dates wrong, but there was a classwide

01:54:33 25   labeling change for the boxed warning on immediate release.

Toiga (By Video Deposition)

01:54:37  1  Q.  Do you recall that there was a classwide labeling change in

01:54:40  2  2020, this year, regarding prescriptions of naloxone for people

01:54:49  3  with opioid use disorder?

01:54:54  4  A.  Yes.

01:54:54  5  Q.  What's the purpose of the labeling changes?  What does FDA

01:54:59  6  expect to happen when a labeling change is made?

01:55:03  7  A.  It's to provide information to the prescribers and

01:55:13  8  healthcare providers to use the drug safely and for the -- you

01:55:21  9  know, it describes the uses for which FDA has data to show how

01:55:25 10  the drug was effective, but there's a lot of information

01:55:28 11  related to using the drug safely.

01:55:31 12  Q.  To your knowledge, is the FDA aware of risks that come from

01:55:38 13  prescriptions of the combinations of opioids and benzos and/or

01:55:46 14  muscle relaxers?

01:55:47 15  A.  Yes, it's described in the labeling.

01:56:02 16  Q.  And is the labeling that has been approved by FDA that

01:56:04 17  describes those risks a result of a process to analyze what

01:56:11 18  those risks are?

01:56:13 19  A.  Yes.

01:56:15 20  Q.  You can answer.  I mean, if yes is your answer, that's

01:56:19 21  fine.

01:56:20 22  A.  Yes.  I mean, one of them was in a classwide labeling

01:56:25 23  change.

01:56:27 24  Q.  Do you recall when that was?

01:56:30 25  A.  I think that one was in 2016 as well, and then there was

HEATHER K. NEWMAN, RMR, CRR

──── Toiga (By Video Deposition) ────

01:56:36   1   another one in 2020.

01:56:47   2   Q.   My name is Hunter Shkolnik.  I'm with the law firm  Napoli

01:56:47   3   Shkolnik.

01:56:54   4           Ms. Toiga, I understand you've been with FDA for it

01:56:57   5   seems like your whole career, like, from school on.

01:57:01   6           Am I correct?

01:57:03   7   A.   Most of it.

01:57:04   8   Q.   As a life-timer at the FDA, would it be fair to say you

01:57:10   9   have seen a lot happen between the '80s and what's going on

01:57:15  10   today in 2020 at FDA?  You've seen a lot of changes and a lot

01:57:21  11   of drugs and go, so to speak; correct?

01:57:25  12   A.   Correct.

01:57:26  13   Q.   Have you ever heard the phrase "opioid epidemic" utilized?

01:57:33  14   A.   Yes.

01:57:34  15   Q.   Why don't you tell the Court -- and this is something we do

01:57:38  16   because your testimony is going to be used at trial.

01:57:40  17           Why don't you tell the court and jury what you

01:57:42  18   understand the opioid epidemic to be.

01:57:49  19   A.   What I understand it to be is the concerns about the abuse,

01:57:57  20   misuse, overdose, and deaths associated with the use of

01:58:03  21   opioids, and, so, I mean, that's the specifics related from an

01:58:07  22   FDA perspective, but the impact of the misuse and abuse of

01:58:13  23   opioids from a public health -- as a public health concern for

01:58:19  24   the American public.

01:58:20  25   Q.   Was there an opioid epidemic in the 1990s when you were at

─────── Toiga (By Video Deposition) ───────

01:58:24  1  FDA?

01:58:25  2  A.  Not that I'm aware of, no.

01:58:27  3  Q.  Something happened in the 1990s and thereafter that

01:58:33  4  developed into an opioid epidemic.  Is that a fair statement?

01:58:37  5  A.  From an FDA perspective, we -- I mean, we began receiving

01:58:48  6  reports of concerns about opioids in the -- in the '90s, I

01:58:56  7  believe.

01:58:56  8  Q.  The latter part of the '90s.  Would that be a fair

01:58:59  9  statement?

01:58:59 10  A.  Yes.

01:59:00 11  Q.  Would I be correct in stating that FDA does not oversee the

01:59:04 12  chain pharmacies?

01:59:08 13  A.  FDA does not regulate the chain pharmacies, no.

01:59:15 14  Q.  And FDA does not oversee the actual pharmacists in the

01:59:19 15  stores; correct?

01:59:19 16  A.  FDA -- that's right.

01:59:23 17  Q.  FDA does not determine whether or not a pharmacy properly

01:59:29 18  dispenses these opioids; correct?

01:59:34 19  A.  Correct.

01:59:35 20  Q.  FDA does not oversee whether or not a distributor properly

01:59:42 21  distributes opioids; correct?

01:59:44 22  A.  I believe that's correct, yes.

01:59:46 23  Q.  The one thing FDA does do is it approves opioids for use.

01:59:53 24       Fair statement?

01:59:56 25  A.  Correct.  Yes.

HEATHER K. NEWMAN, RMR, CRR

**4446**

——Toiga (By Video Deposition)——

01:59:57  1   Q.  You approve the labeling that goes with the opioids.

02:00:01  2          Fair statement?

02:00:02  3   A.  Yes.  Yes.  Yes.

02:00:04  4   Q.  You would approve any changes to labeling of an approved

02:00:09  5   opioid.

02:00:09  6          Fair statement?

02:00:11  7   A.  Yes.

02:00:12  8   Q.  You have a -- you have an office that would oversee whether

02:00:18  9   or not a manufacturer properly markets their drug within the

02:00:22  10  approval package or labeling; correct?

02:00:26  11  A.  Yes.

02:00:28  12  Q.  And you have had situations, have you not, over the course

02:00:33  13  of years from the late 1990s up until the late '20 teens where

02:00:41  14  manufacturers of opioids have inappropriately marketed their

02:00:45  15  opioids.

02:00:45  16          Is that a fair statement?

02:00:46  17  A.  Yes.

02:00:48  18          UNIDENTIFED SPEAKER:  Objection.

02:00:49  19          THE WITNESS:  Based on warning letters.

02:00:51  20  Q.  You've had warning letters; correct?

02:00:53  21  A.  Yes, and some untitled letters, I believe, but, yes,

02:00:56  22  letters that address your question.

02:00:58  23  Q.  And you have also had situations where you have implemented

02:01:06  24  or made changes to the approved labeling over the years for

02:01:11  25  opioids.

**4447**

──── Toiga (By Video Deposition) ────

02:01:11  1          Fair statement?

02:01:13  2   A.   Yes.

02:01:14  3   Q.   And you have had manufacturers who have had approved drugs,

02:01:22  4   opioid drugs, inappropriately market them, been indicted for

02:01:27  5   that and pled guilty for that.

02:01:29  6          Fair statement?

02:01:33  7   A.   Yeah.

02:01:36  8   Q.   Purdue, in fact, just recently pled guilty for a second

02:01:41  9   time for inappropriate marketing of opioids.

02:01:43  10          Fair statement?

02:01:45  11  A.   I believe so.  I'm not familiar with the details, but, yes.

02:01:50  12  Q.   You're aware they pled guilty in the 2007 time frame,

02:01:59  13  aren't you?

02:02:00  14  A.   I can't recall.

02:02:02  15  Q.   You're aware that they did plead guilty once before and

02:02:07  16  some of their executives?

02:02:10  17  A.   Yes, I believe so.

02:02:11  18  Q.   And do you recall that FDA, in early 2000s, around 2001,

02:02:18  19  made Purdue change its labeling and its marketing because of

02:02:23  20  inappropriate marketing of their OxyContin?

02:02:27  21  A.   Yes.

02:02:27  22  Q.   FDA is limited in what it can do and can't do with respect

02:02:32  23  to the drugs, the opioids you approve once they're on the

02:02:37  24  market.

02:02:37  25          Fair statement?

──────── Toiga (By Video Deposition) ────────

02:02:39 1    A.  Yes.

02:02:40 2    Q.  The limitations are such that you could make

02:02:45 3    recommendations, you can request changes to the label, but it's

02:02:48 4    very difficult to pull a drug that's been approved off the

02:02:53 5    market.

02:02:53 6         Fair statement?

02:02:55 7    A.  There is a process for approval of the drug from the

02:02:58 8    market, yes.

02:02:58 9    Q.  Very few are ever pulled from the market once approved by

02:03:03 10   FDA.

02:03:04 11        Fair statement?

02:03:04 12   A.  Yes.

02:03:05 13   Q.  And what FDA does have the power to do is to change or

02:03:10 14   recommend changes to a label once the drug is approved so that

02:03:16 15   the use and the prescription of the drug can be made safer.

02:03:21 16        Fair statement?

02:03:23 17   A.  Yes.

02:03:24 18   Q.  FDA has done that for the last 20 years with respect to

02:03:30 19   opioids.

02:03:30 20        Fair statement?

02:03:32 21   A.  Yes.

02:03:33 22   Q.  You've tried to make it safer and safer for both the

02:03:37 23   prescriber to prescribe and the patient to use.

02:03:42 24        Fair statement?

02:03:44 25   A.  Yes.

──── Toiga (By Video Deposition) ────

02:03:45  1   Q.  And you did that within the limitations that the law places

02:03:48  2   on the FDA once these drugs have been approved and put into the

02:03:53  3   market.

02:03:53  4         Fair statement?

02:03:56  5   A.  Yes.  We use the tools available to us.

02:04:02  6   Q.  You've had pushback by many groups.  Many groups have

02:04:05  7   not -- that are also referred to as stakeholders, we have tried

02:04:08  8   to limit opioids and their availability?

02:04:10  9         Fair statement?

02:04:15 10   A.  Yes.

02:04:16 11   Q.  Yet FDA has continued to take steps over the years to try

02:04:21 12   to make the prescription of and the availability of opioids

02:04:26 13   both available and safer.

02:04:29 14         Fair statement?

02:04:33 15   A.  Yes.  We try to balance access to med -- the pain and

02:04:39 16   making sure that it's -- the drugs are safe to use, yes.

02:04:45 17   Q.  You oversee the marketing of opioids -- when I say you, FDA

02:04:51 18   oversees the marketing of opioids by manufacturers; correct?

02:04:55 19   A.  Correct.

02:04:56 20   Q.  Does FDA oversee marketing activities of chain pharmacies?

02:05:07 21   A.  I don't believe we have regulatory authority over chain

02:05:15 22   pharmacies.  I -- but again, I don't -- you know, we regulate

02:05:18 23   the application holder, and the application holder is the

02:05:22 24   manufacturers, and we use the labeling as the basis for what

02:05:25 25   can be marketed, what can be promoted.  I don't -- I mean,

**4450**

──── Toiga (By Video Deposition) ────

02:05:31 1  that's -- that's my understanding.  That's the extent of my

02:05:34 2  knowledge.

02:05:34 3  Q.  So FDA -- as you're sitting here today, you're not

02:05:40 4  rendering any opinions as to whether or not these chain

02:05:45 5  pharmacies effectively complied with Section 823 and whether or

02:05:50 6  not they maintained effective control against diversion.

02:05:53 7          Fair statement?

02:05:54 8  A.  That -- that's outside the scope of my responsibility and

02:06:00 9  knowledge.

02:06:00 10  Q.  So just so it's clear, FDA in its role as a monitoring of

02:06:10 11  opioids and benzodiazapines and must relaxers and combined

02:06:15 12  prescriptions of those that you were asked about before, that

02:06:16 13  does not include any monitoring as it relates to whether or not

02:06:19 14  these chain pharmacies maintained effective control against

02:06:24 15  diversion of those controlled substances.

02:06:28 16          Fair statement?

02:06:30 17  A.  Yes.  To my knowledge, that's a fair statement.

02:06:34 18  Q.  You were asked questions by counsel, within the scope of

02:06:38 19  FDA's approval and, quote, monitoring of opioids,

02:06:44 20  benzodiazapines, and muscle relaxants, and the either

02:06:50 21  individual or combined prescriptions of those, from your

02:06:52 22  knowledge, did FDA, in any way, oversee the requirements set

02:06:57 23  forth in part 1301.71 that registrants shall provide effective

02:07:03 24  controls and procedures to guard against diversion of

02:07:07 25  controlled substances in order to determine whether a

HEATHER K. NEWMAN, RMR, CRR

——— Toiga (By Video Deposition) ———

02:07:10  1    registrant has provided effective controls against diversion?

02:07:15  2            Is that something FDA oversaw as it relates to these

02:07:21  3    chain pharmacies, CVS, Walgreens, Walmart, Rite Aid,

02:07:25  4    Giant Eagle, or any of the other ones?

02:07:28  5    A.  I -- I don't believe we enforce these regulations, but I'm

02:07:32  6    not -- I'm not involved in this -- this -- in this area.

02:07:39  7    Q.  Whether or not any of these chain pharmacies violated

02:07:45  8    1301.71 by failing to provide effective controls and procedures

02:07:48  9    to guard against diversion as either a distributor or a

02:07:53  10   dispenser, you just don't know whether that occurred.

02:07:57  11           Fair statement?

02:08:03  12   A.  I -- I don't know.

02:08:05  13   Q.  And you would not be able to give any opinions or any

02:08:08  14   answers as to whether or not there was, in fact, diversion or a

02:08:13  15   failure to comply with 1301.71 as it relates to distributors

02:08:21  16   and dispensers of controlled substances failure to maintain

02:08:26  17   adequate controls as it relates to the opioid epidemic?

02:08:29  18           You don't have an opinion one way or the other;

02:08:33  19   correct?

02:08:33  20   A.  I -- I -- I can't speak to this, no.

02:08:35  21   Q.  And you would not know whether or not a failure to comply

02:08:39  22   with 1301 was one of the causes of the opioid epidemic?

02:08:44  23           You wouldn't know one way or the other, would you?

02:08:47  24   A.  I would not.

02:08:49  25   Q.  If a chain pharmacy engaged in some marketing activities as

**4452**

———— Toiga (By Video Deposition) ————

02:08:54 1   it relates to opioids, is that something FDA oversees?

02:09:02 2   A.  I don't believe so.  We oversee the manufacturer.

02:09:05 3   Q.  So if there were agreements between a manufacturer and a

02:09:10 4   chain pharmacy to market opioids in some way, you would oversee

02:09:18 5   what the manufacturer did, but you wouldn't -- or FDA wouldn't

02:09:25 6   oversee what the pharmacy, the chain pharmacy did.

02:09:29 7           Fair statement?

02:09:32 8   A.  I believe that's correct, but I'm not an expert in that

02:09:36 9   area.

02:09:38 10  Q.  I mean, as far as you know is the point -- the point I'm

02:09:41 11  making.

02:09:41 12          As far as you know, you have never seen FDA overseeing

02:09:44 13  how a chain pharmacy may market a -- an opioid?

02:09:49 14  A.  Not to my knowledge, no.

02:09:52 15  Q.  And through all the time that you've been with FDA, you

02:09:55 16  have never seen FDA oversee how a chain pharmacy dispenses,

02:10:02 17  actually does its job in dispensing opioids.

02:10:06 18          Fair statement?

02:10:10 19  A.  Correct.  Yes.

02:10:20 20  Q.  Some of the pushback you -- you have gotten some -- you,

02:10:24 21  being FDA, has gotten some pushback against overly restricting

02:10:30 22  the availability of opioids from people who need opioids to

02:10:34 23  treat their pain, haven't you?

02:10:37 24  A.  Yes, we have.

02:10:39 25  Q.  And one of the mandates that you have at FDA is to make

─── Toiga (By Video Deposition) ───

02:10:44  1   sure that people who need medications, including opioids, have

02:10:48  2   access to those medications consistent with your risk/benefit

02:10:54  3   analysis; right?

02:10:56  4   A.   That's correct.

02:10:58  5   Q.   And so FDA has been very reluctant to put hard limits on

02:11:05  6   opioids because of the fear that it would unduly restrict the

02:11:16  7   individualized treatment of patients who may need opioids to

02:11:19  8   treat their pain?

02:11:20  9   A.   That's correct.

02:11:20  10  Q.   And rather than have a one-size-fits-all restriction on how

02:11:26  11  opioids can be used, FDA has concluded that the better course

02:11:33  12  is to allow doctors to be able to make individual therapeutic

02:11:40  13  determinations in deciding how to treat pain, or to treat their

02:11:43  14  patients generally?

02:11:46  15  A.   That's correct.

02:11:48  16  Q.   Mr. Shkolnik also asked you some questions -- actually, a

02:11:53  17  lot of questions -- about who, in the big universe out there,

02:12:01  18  FDA regulates -- and one of the questions was with whether or

02:12:07  19  not FDA oversees physicians.

02:12:09  20         Do you remember that series of questions, but that one

02:12:13  21  in particular?

02:12:15  22  A.   Yes, I do.

02:12:19  23  Q.   What FDA does do, and I think maybe you referred to this a

02:12:23  24  little bit in your answer about REMS, it does collect

02:12:27  25  information about what's happening to opioids out in the market

──── Toiga (By Video Deposition) ────

02:12:32  1  when it's assessing the public health impact of opioids,

02:12:37  2  doesn't it?

02:12:39  3  A.  Yes.  Our statistic -- we gather our information from our

02:12:43  4  assessments on REMS.

02:12:45  5  Q.  And, in fact, at least some of the REMS covering opioids

02:12:53  6  tried to implement a program to provide education to

02:12:56  7  prescribers and healthcare practitioners; right?

02:13:02  8  A.  Yes.  Correct.

02:13:04  9  Q.  So FDA did put in place programs to assist doctors and

02:13:12  10  other prescribers in making their therapeutic determinations

02:13:17  11  about when and how to prescribe opioids?

02:13:21  12  A.  FDA, through the REMS, mandated sponsors to develop

02:13:30  13  continuing education programs using our FDA blueprint.

02:13:37  14  Q.  And although you don't oversee doctors and regulate them

02:13:42  15  directly, you do oversee the process by which the labeling for

02:13:50  16  the drugs the doctors may prescribe is created and formulated;

02:13:55  17  right?

02:13:57  18  A.  Yes, we do.

02:13:58  19  Q.  And when you see something post-approval that suggests that

02:14:05  20  the prescribing guidelines in those materials should be

02:14:10  21  altered, you alter them and make them available to prescribers?

02:14:15  22  A.  Yes, we do.

02:14:23  23  Q.  And you also collect information about how opioids are

02:14:36  24  being used once they've been approved and evaluate those in

02:14:44  25  connection with, for example, submissions to the advisory

—— Toiga (By Video Deposition) ——

02:14:49  1  committees?

02:14:50  2  A.  Yes, we do.

02:14:58  3       MR. DELINSKY:  And, Your Honor, I believe that's

02:15:00  4  concludes the deposition.

02:15:02  5       THE COURT:  All right.  Let's go on the headphones for

02:15:04  6  a minute.

02:15:05  7     (Proceedings at sidebar.)

02:15:14  8       THE COURT:  All right.  It's only 2:15 -- only 2:15.

02:15:20  9       Are there any other depositions we can play from the

02:15:23 10  defense?

02:15:25 11       MR. MAJORAS:  We do not have -- Your Honor,

02:15:27 12  John Majoras.  We do not have any more finalized at this point

02:15:31 13  in time.  We expect more as the week continues.

02:15:34 14       THE COURT:  And I take it you don't have any live

02:15:36 15  witnesses or witnesses by video?

02:15:41 16       MR. MAJORAS:  No, sir.  This was the hole we talked

02:15:44 17  about earlier in terms of the GE witness -- Giant Eagle witness

02:15:47 18  that was expected.

02:15:49 19       THE COURT:  All right.  Well, I will very reluctantly

02:15:53 20  recess the jury for the day.  We'll spend some time -- I'm

02:15:57 21  going to finalize the exhibits with the prior witnesses, and I

02:16:02 22  mean, if there are any other holes like this, I'm going to just

02:16:05 23  charge the time to the defendants.  It's -- we had talked about

02:16:10 24  this.  It was unexpected Mr. Chunderlik wouldn't testify, but

02:16:15 25  the defendants are now on notice, it's their case, and we're

———— Toiga (By Video Deposition) ————

02:16:18  1  going to go through with full days until defendants' case is

02:16:22  2  done.

02:16:22  3          Is that clear to everyone?

02:16:23  4          MR. MAJORAS:  We absolutely understand, Your Honor.

02:16:27  5          MR. DELINSKY:  Thank you, Judge.

02:16:28  6          MR. STOFFELMAYR:  Thank you, Your Honor.

02:16:28  7          THE COURT:  Okay.  All right.

02:16:33  8      (In open court at 2:16 p.m.)

02:16:33  9          THE COURT:  All right.  Ladies and gentlemen, it's

02:16:38  10  always difficult in a trial like this to predict exactly how

02:16:43  11  long certain witnesses are going to take, and no one wants to

02:16:47  12  have people fly in from out of town and sit around, so

02:16:54  13  basically there is not another witness available, either live

02:16:59  14  or by deposition.  So we're going to take the rest of the

02:17:02  15  afternoon and deal with some exhibits.  There's no reason for

02:17:05  16  you to stick around, so we're going to adjourn you early.  I

02:17:10  17  know no one's going to be violently upset.  You all have a lot

02:17:13  18  of better things -- or -- rather, other things, not better

02:17:16  19  things, other things do, some personal matters, that's fine.

02:17:21  20          So, again, very important that you not see, read,

02:17:26  21  view, listen to anything on any media about this case or

02:17:30  22  anything remotely concerning it.  No independent research,

02:17:34  23  checking anything out.  Everything you'll need to know to

02:17:37  24  decide this case you're getting right here.

02:17:39  25          Don't discuss this case with anyone.  Again, tell them

— Toiga (By Video Deposition) —

02:17:43  1  this judge is pretty mean and has ordered me not to talk to

02:17:46  2  anyone about it till the case is over, and then we'll pick up

02:17:50  3  tomorrow morning promptly at 9:00 a.m. with the next defense

02:17:53  4  witness.

02:17:53  5          So have a good evening.

02:17:55  6      (Jury excused from courtroom at 2:17 p.m.)

02:18:34  7          THE COURT:  All right.  Well, why don't we take a

02:18:35  8  short break and then we'll come back and hopefully clean up all

02:18:40  9  the remaining exhibits.

02:18:44 10          MR. WEINBERGER:  Your Honor. . .

02:18:53 11          THE COURT:  We'll take a short break and. . .

02:18:53 12      (Recess was taken at 2:18 p.m.)

02:36:17 13      (In open court at 2:36 p.m.)

02:36:17 14          COURTROOM DEPUTY:  All rise.

02:36:19 15          THE COURT:  Everyone can be seated.

02:36:21 16          MR. LANIER:  May I introduce to you Ms. Laura

02:36:26 17  Fitzpatrick.

02:36:27 18          THE COURT:  Sure.  Hello, Miss Fitzpatrick.  How do

02:36:30 19  you do?

02:36:30 20          MS. FITZPATRICK:  Good morning, Judge Polster.  How

02:36:32 21  are you?

02:36:33 22          MR. LANIER:  She is in charge of exhibits.

02:36:33 23          THE COURT:  I've seen Miss Fitzpatrick working at

02:36:36 24  least as hard as everyone else, so --

02:36:38 25          MR. LANIER:  She works harder.

Toiga (By Video Deposition)

02:36:41  1          MR. DELINSKY:  Yeah, Judge, for the record, she works

02:36:43  2    double as hard as everybody else.

02:36:45  3          MR. LANIER:  Like, Your Honor, between her and

02:36:47  4    Ms. Conroy, who is Jane Conroy's daughter --

02:36:47  5          THE COURT:  I was wondering.  I know your mom, so say

02:36:50  6    hello to her for me.

02:36:51  7          MR. LANIER:  Yes.  Between those two lawyers and

02:36:53  8    Ms. Fleming here and my daughter Rachel Lanier, they have total

02:37:00  9    control and authority over exhibits.

02:37:00  10         THE COURT:  Well, you're lucky to have good people to

02:37:02  11   help you, as I do, so I'd be not good if I were on my own.

02:37:06  12         MR. LANIER:  Amen.

02:37:07  13         And so my request is recognizing we've got witnesses

02:37:12  14   tomorrow --

02:37:12  15         THE COURT:  Well, they can -- yeah, all right.

02:37:15  16         MR. LANIER:  Can Pete and I bail?

02:37:19  17         MS. SWIFT:  Your Honor, I told Kaspar he had to stay.

02:37:21  18         THE COURT:  Yeah, but I want to make sure -- you may

02:37:23  19   object -- I'm going through exhibits, so I want to make sure

02:37:26  20   that --

02:37:26  21         MR. LANIER:  They have full short.

02:37:28  22         THE COURT:  They have full authority?  Okay.

02:37:31  23         MR. LANIER:  They know the case better than I do.

02:37:33  24         THE COURT:  I don't know about that, but if they know

02:37:34  25   the exhibits.  So, anyway, defendants should know -- you're

HEATHER K. NEWMAN, RMR, CRR

—— Toiga (By Video Deposition) ——

02:37:39  1   fortunate, I had a certain esteemed colleague who had a rule,

02:37:42  2   which you wouldn't find in the Rules of Evidence or the Rules

02:37:46  3   of Criminal Or Civil Procedure called the involuntarily rested

02:37:50  4   rule.  If you ran out of witnesses, you were involuntarily

02:37:54  5   rested, and he enforced it.

02:37:56  6            UNIDENTIFIED SPEAKER:  Wow.

02:37:58  7            MR. MAJORAS:  Your Honor, we would have ended on day

02:38:00  8   one, I think.

02:38:01  9            THE COURT:  Well, so -- but things occur, and I

02:38:04  10  understood everyone thought Mr. Chunderlik was testifying and

02:38:07  11  it would have been several hours, so that's understood.

02:38:11  12            MR. MAJORAS:  We do appreciate that, Your Honor.

02:38:12  13            THE COURT:  All right.  So we can go -- we can go in

02:38:19  14  order of the oldest first, so why don't -- why don't we start

02:38:26  15  with Tasha Polster.  And we admitted -- I'm trying to -- I

02:38:43  16  think the issue came down to the box of refusals to fill.

02:38:47  17            Are we -- and I put that off.  I actually said further

02:38:52  18  briefing on that, so I guess that's --

02:38:56  19            MR. LANIER:  Here was our concern on that, having

02:38:59  20  left.

02:39:02  21            THE COURT:  Didn't -- Mark, you really disappeared.

02:39:06  22            MS. LANIER:  Yeah.  Yeah.

02:39:06  23            MS. FITZPATRICK:  Judge Polster, may I be excused

02:39:07  24  then?

02:39:08  25            MR. LANIER:  No, here is our concern on that, and then

─── Toiga (By Video Deposition) ───

02:39:10  1    I really will leave.

02:39:13  2           The witness -- and I know nothing except candor, so

02:39:18  3    this is just candor.  The witness was asked, do you have a box

02:39:21  4    there, yes, is -- are those the refusals to fill, yes, and did

02:39:30  5    you get them from the store, yes.

02:39:32  6           And then I peppered here on those.  I used three, I

02:39:36  7    believe, as examples, but the big issue for me was this is a

02:39:41  8    company that says all of their ducks are in a row and all of

02:39:45  9    their houses in order and they have all these refusals to fill,

02:39:49  10   and yet their policy says every one of them should have stapled

02:39:52  11   to it a target drug good faith refusal to fill checklist that

02:39:57  12   was filled out.

02:39:58  13          MS. SWIFT:  That's incorrect, as a matter of fact.

02:40:01  14          THE COURT:  That's for argument, and so, you know, the

02:40:03  15   question is is there a problem -- the defendants are offering

02:40:07  16   them all?

02:40:08  17          MS. SWIFT:  No, Your Honor.

02:40:09  18          MR. LANIER:  No, they don't want to offer them.  I

02:40:11  19   want to offer them.

02:40:11  20          MS. SWIFT:  And, Your Honor, you already said in the

02:40:13  21   middle of her testimony these are not coming in through her

02:40:15  22   because she testified she did not look at all of them, she had

02:40:18  23   never seen the ones that Mr. Lanier pulled out of the box.  You

02:40:22  24   asked me whether I was going to offer them, and I said it was

02:40:25  25   going to depend on how the exam went.  She testified she didn't

———— Toiga (By Video Deposition) ————

02:40:28  1  have personal knowledge, that she hadn't put together the box

02:40:31  2  herself, and I did not offer them.

02:40:34  3      I had planned to offer one of them, the one I talked

02:40:37  4  to her about and asked her about in detail.  I understand

02:40:43  5  separate from the box there were two that plaintiffs initially

02:40:46  6  had -- two lit slices that plaintiffs had intended to offer and

02:40:50  7  what I was about to say to Ms. Fitzpatrick was, we will

02:40:54  8  withdraw our one if you will withdraw your two slices.  And we

02:40:59  9  do not believe it's appropriate at all for the entire box to

02:41:01  10  come in it through her because she testified she didn't have

02:41:03  11  personal knowledge.

02:41:04  12      MR. LANIER:  My concern is, then, why does Ms. Swift

02:41:09  13  indicate is there a box, does it have all of the refusals to

02:41:13  14  fill from these stores if, in fact, the witness did not have

02:41:18  15  knowledge of that fact?  And if --

02:41:21  16      MR. SWIFT:  It's sort of neither here nor there.

02:41:22  17      MR. LANIER:  And to reference a box like that in front

02:41:24  18  of jury and then say, but we don't want the jury to look in the

02:41:27  19  box, to me, is disingenuous.

02:41:27  20      THE COURT:  Well, look --

02:41:27  21          [Court reporter clarification.]

02:41:33  22      THE COURT:  There will be other Walgreens witnesses,

02:41:34  23  and if --

02:41:35  24      And, Mr. Lanier, if you want to use anything in that

02:41:38  25  box, with any Walgreens witness, you can do that.

**4462**

———Toiga (By Video Deposition)———

02:41:41   1            MR. LANIER:  Fair enough.

02:41:41   2            THE COURT:  And, again, you can ask them about that

02:41:46   3    policy and show them -- just pull one out and say, where is the

02:41:49   4    prescription, where is the prescription, but -- but -- since

02:41:54   5    the -- since this witness had nothing to do with assembling the

02:41:59   6    box, she testified she had nothing to do with it, the box

02:42:01   7    doesn't come in.

02:42:02   8            Now, there are -- there are two -- on the plaintiffs'

02:42:11   9    list there are refusal to fill notes, or forms, that have been

02:42:16  10    identified.  I don't know if these come from the plaintiff or

02:42:18  11    the defendant.

02:42:18  12            MS. FITZPATRICK:  Yes, Your Honor, Laura Fitzpatrick.

02:42:23  13            Those are the two slices, Your Honor, that Ms. Swift

02:42:27  14    was referring to, and I think Ms. Swift correct --

02:42:30  15            THE COURT:  If the defendant is withdrawing those,

02:42:32  16    then they're out and the box is out.

02:42:36  17            MS. FITZPATRICK:  Well what -- Your Honor,

02:42:37  18    respectfully what I was going to suggest, perhaps, with

02:42:39  19    Ms. Swift is that if plaintiffs at this time are not moving

02:42:41  20    into evidence the entire box, it is very important to

02:42:44  21    plaintiffs that we be allowed to enter into evidence those two.

02:42:47  22    We've been referring to these slices.

02:42:49  23            THE COURT:  I have no problem with those two.

02:42:51  24            MS. SWIFT:  We object to that, Your Honor.

02:42:52  25            THE COURT:  Well, she testified about them.

                          HEATHER K. NEWMAN, RMR, CRR

─────Toiga (By Video Deposition)─────

02:42:53  1            MR. SWIFT:  She specifically testified --

02:42:53  2            MS. FITZPATRICK:  She did testify to them.

02:42:55  3            MR. SWIFT:  She testified that she had no knowledge to

02:42:56  4     them.  One of them, I believe the exact words were, I've never

02:42:59  5     seen this.

02:43:00  6            MS. FITZPATRICK:  She did testify, Your Honor.

02:43:01  7            THE COURT:  I'm going to let those two in because they

02:43:04  8     were -- they were questioned with them.

02:43:04  9            MS. SWIFT:  I believe other defendants also had

02:43:06 10     objections to those, Your Honor.

02:43:07 11            MS. FITZPATRICK:  Thank you, Your Honor.

02:43:08 12            MR. DELINSKY:  Yes, Your Honor --

02:43:09 13            THE COURT:  Another defendants objects?

02:43:11 14            MS. SWIFT:  Yes, Your Honor.

02:43:11 15            MR. DELINSKY:  Yes, we do, Your Honor.

02:43:13 16            One of the issues here is that on one of those

02:43:15 17     exhibits it was not the subject of any cautions or testimony.

02:43:23 18     An OARRS report was attached.  We didn't even have the box in

02:43:26 19     realtime, so we saw it as it flashed up on the screen and it

02:43:29 20     was immediately taken off, and --

02:43:32 21            THE COURT:  Let me see these exhibits.  All right?

02:43:34 22     I --

02:43:39 23            MS. FITZPATRICK:  Your Honor, I believe someone is

02:43:40 24     pulling a copy now of plaintiffs' -- the two plaintiffs plan to

02:43:43 25     offer.

———Toiga (By Video Deposition)———

02:43:43  1          THE COURT:  22946 and Walgreens 2604.00566.

02:43:51  2          MS. SWIFT:  That's correct, Your Honor.

02:43:53  3          THE COURT:  All right.  I'd like to see them.

02:43:55  4          MS. FITZPATRICK:  Your Honor, I know -- I apologize.

02:43:58  5          Your Honor, I know at least one of them, I believe,

02:44:00  6  does not attach the OARRS report.  It is the one that simply --

02:44:04  7  where they pharmacist said she could not find the refusal to

02:44:07  8  fill -- the refusal to fill folder, but with respect --

02:44:13  9          THE COURT:  Well, let me just start with -- all right.

02:44:16 10  22946.  All right.  I remember this one.

02:45:04 11          MS. FITZPATRICK:  Your Honor, if I may, the pharmacies

02:45:07 12  that are listed on 224 -- 22946 that are not Walgreens are no

02:45:16 13  longer parties to this action as of this morning.  There are

02:45:20 14  Rite Aid's on here and there are Giant Eagle's.

02:45:21 15          But I'm not sure that Mr. Delinsky has standing to

02:45:23 16  object here given that -- unless my eyes deceive me, I don't

02:45:27 17  see CVS having filled for this particular patient, and I

02:45:31 18  certainly don't see Walmart on here.

02:45:34 19          MR. DELINSKY:  Well, I certainly don't mean to object

02:45:37 20  on the --

02:45:38 21          THE COURT:  Well, I see CVS at the very -- some CVS

02:45:43 22  stores at the bottom of the -- it says Page 2 of 4.  It's a

02:45:48 23  March 19th '09 OARRS report.  I see a --

02:45:54 24          MS. FITZPATRICK:  22946?

02:45:55 25          MR. DELINSKY:  Um-hmm.

———— Toiga (By Video Deposition) ————

02:45:56  1            THE COURT:  I see CVS at the bottom of what is marked

02:46:00  2     on mine Page 2 of 4.

02:46:04  3            MS. FITZPATRICK:  Judge, I'm afraid we may be looking

02:46:06  4     at different documents, although mine is stamped 22946, so I'm

02:46:10  5     not sure what the --

02:46:11  6            THE COURT:  So's mine, so -- I'm --

02:46:18  7            MS. SWIFT:  For the record --

02:46:19  8            THE COURT:  Without the OARRS report, there's nothing

02:46:20  9     on this document.  It just says, redacted confidential, so

02:46:25 10     there's nothing -- all this document is is an OARRS report.

02:46:28 11            MS. SWIFT:  And just so that it's clear for the

02:46:31 12     record, what Walgreens understand P22946 to be is WAG -- the

02:46:37 13     Bates numbers on that document as we understand it or

02:46:42 14     WAG-MDL-01139001.

02:46:45 15            THE COURT:  Right.

02:46:46 16            MS. SWIFT:  Through --

02:46:49 17            THE COURT:  0 --

02:46:51 18            MS. SWIFT:  009, I believe, Your Honor.  Yeah.

02:46:53 19            THE COURT:  Right.

02:46:54 20            MS. SWIFT:  That's what we have as -- if plaintiffs

02:46:56 21     have something else, then I'm confused.

02:47:01 22            MS. FITZPATRICK:  Here.  As soon as Tara is done with

02:47:03 23     this keep, copy, Kate --

02:47:04 24            THE COURT:  And all it is is an OARRS report.

02:47:06 25            MS. SWIFT:  Correct, Your Honor.

—— Toiga (By Video Deposition) ——

02:47:09  1          THE COURT:  It has -- the cover page is meaningless.

02:47:11  2  It says, redacted confidential PHI.  So all there is is an

02:47:16  3  OARRS report.  I don't see the -- I don't see the relevance of

02:47:24  4  this OARRS report, so I'm not going to let in 22946.

02:47:30  5          MS. FITZPATRICK:  Your Honor, may I be permitted to

02:47:33  6  respond?

02:47:33  7          THE COURT:  All right, well --

02:47:37  8          MS. FITZPATRICK:  What Mr. Lanier questioned

02:47:38  9  Ms. Polster about and was permitted to question Ms. Polster

02:47:41 10  about in front of the jury was the fact that there were

02:47:43 11  multiple -- as found -- and I apologize, I'm not sure why we

02:47:46 12  have different pages, but on the mine it's 229465, and there

02:47:53 13  are some PHI -- confidential PHI redacted, but what Mr. Lanier

02:47:57 14  went through with Ms. Polster was the fact that although the

02:48:03 15  particular Walgreens store within the counties that this

02:48:07 16  document -- this refusal to fill form was offered for, which by

02:48:12 17  its nature attaches the OARRS report, shows that, in fact,

02:48:16 18  other Walgreens Stores 44094, 44060, 44485 have been filling

02:48:25 19  for this patient, and so the idea --

02:48:30 20          MS. SWIFT:  Laura, I don't think we have the same

02:48:31 21  document.

02:48:31 22          THE COURT:  All right.  I --

02:48:33 23          MS. FITZPATRICK:  I can -- here.  I have an extra

02:48:34 24  copy.

02:48:35 25          THE COURT:  My problem is is that if that's all you're

**4467**

———— Toiga (By Video Deposition) ————

02:48:39  1   putting in, then maybe we just excise this and focus on the

02:48:44  2   Walgreens, because it's -- it's --

02:48:47  3            MS. FITZPATRICK:  Your Honor, that would be fine with

02:48:48  4   the plaintiffs.

02:48:49  5            THE COURT:  -- unintelligible otherwise.  And there is

02:48:50  6   a reference to a CVS on my document.

02:48:52  7            MS. FITZPATRICK:  And I do see that now, Your Honor.

02:48:54  8   That's on the next page at the top, and plaintiffs would be

02:48:56  9   fine to redact that, because I don't believe that Mr. Lanier

02:48:59 10   questioned Ms. Polster about that portion of this document, so

02:49:02 11   that's --

02:49:03 12            THE COURT:  The only reference -- the only meaningful

02:49:05 13   reference for this is that there were other Walgreens stores on

02:49:10 14   the OARRS report.

02:49:11 15            MS. FITZPATRICK:  That were filling for this patient.

02:49:12 16            THE COURT:  That were filling -- obviously, that's the

02:49:14 17   only reason it would be on the OARRS report, so I --

02:49:16 18            MS. FITZPATRICK:  Yes, Your Honor.

02:49:18 19            MS. SWIFT:  So if I understand what plaintiffs are

02:49:19 20   suggesting, are you suggesting just Page 5, Laura?

02:49:24 21            MS. FITZPATRICK:  I'm suggesting that we would be

02:49:26 22   offering the cover page, that we would be offering the pages 1,

02:49:36 23   2, 3, 4 --

02:49:39 24            THE COURT:  Well, why don't we just offer the summary

02:49:43 25   page which is, which is --

─── Toiga (By Video Deposition) ───

02:49:46  1         MS. FITZPATRICK:  -- and 5.

02:49:46  2         THE COURT:  That's what she -- that was up on the

02:49:47  3  screen for most of her testimony, which I --

02:49:48  4         MS. SWIFT:  Which page are you referring to?

02:49:50  5         THE COURT:  00005.

02:49:53  6         MS. SWIFT:  Got it.

02:49:53  7         THE COURT:  Which, it says, pharmacies that dispensed

02:49:56  8  prescriptions listed and identifies -- I guess, DDM is a

02:50:00  9  Discount Drug Mart.  I don't know what -- oh, a couple Rite

02:50:00  10  Aid's.

02:50:07  11        MS. FITZPATRICK:  Your Honor --

02:50:09  12        THE COURT:  I don't know what the next one is and then

02:50:10  13  four Walgreens.

02:50:11  14        MS. FITZPATRICK:  The only reason I am pressing this

02:50:13  15  issue is because it references the prescriptions listed.  I

02:50:16  16  think it may be important to show the two prior pages that list

02:50:20  17  the prescriptions listed because it shows that they're opioids

02:50:24  18  and cocktails.  Otherwise, Your Honor, I agree.

02:50:27  19        MS. SWIFT:  And we object to that, Your Honor.

02:50:30  20        THE COURT:  Well, it's only relevant that it's

02:50:33  21  opioids, okay, otherwise -- I mean, all of these are opioids,

02:50:36  22  so I'll -- I will admit the -- I will admit -- I guess the

02:50:42  23  cover page and then what I'm calling the summary page, which is

02:50:47  24  the document that was really used with her testimony which is

02:50:52  25  Page 5.

HEATHER K. NEWMAN, RMR, CRR

─────Toiga (By Video Deposition)─────

02:50:54 1          MS. SWIFT:  Then, Your Honor --

02:50:55 2          MS. FITZPATRICK:  Thank you, Your Honor.

02:50:55 3          THE COURT:  So let's -- let's -- I'm going to make a

02:50:58 4   note.  It's. . .

02:51:10 5          All right.  Now let me look at the other one.

02:51:13 6          MS. SWIFT:  If I may, Your Honor, if that one is

02:51:15 7   coming in, then Walgreens moves to admit the one that was

02:51:19 8   Number 6 on my list, which is WAG-MDL-2604, pages 897 to 901.

02:51:28 9   It's the refusal to fill that I asked her about in detail

02:51:31 10  during her testimony.

02:51:35 11         MS. FITZPATRICK:  Kate, do you have a copy of that

02:51:36 12  just so I can make sure we have a goose gander rule here?

02:51:38 13         MS. SWIFT:  I'm afraid I gave it to Judge Polster or

02:51:42 14  else I lost my copy.  I apologize, Laura.  I'll get you a copy.

02:51:45 15         MS. FITZPATRICK:  Your Honor, to the extent that what

02:51:47 16  Ms. Swift is moving into evidence has the same limitations that

02:51:50 17  you imposed with respect to 22946, we will have no objection.

02:51:52 18         THE COURT:  Is there a summary page on that?  I

02:51:54 19  can't -- your memory is probably better than mine.  If there

02:51:57 20  was, then it should come in too.

02:52:29 21         MS. SWIFT:  We're getting additional copies of that

02:52:31 22  one, Your Honor, if you wanted to move to the last of the

02:52:33 23  plaintiffs'.

02:52:33 24         THE COURT:  All right.  Well, let me look at -- 17260,

02:52:37 25  there was testimony about this note.

**4470**

——— Toiga (By Video Deposition) ———

02:52:39  1           Do we still have a GFD refusal folder, couldn't find

02:52:45  2   it.  And then there's a, you know, this document -- and it also

02:52:52  3   has an OARRS report.  I'm trying to see if there's a -- there's

02:52:59  4   no summary page like there was with the other documents.

02:52:59  5           MR. SWIFT:  Your Honor --

02:53:03  6           MS. FITZPATRICK:  That's right, Your Honor.

02:53:03  7           I'm sorry, Kate.  Go ahead.

02:53:05  8           MS. SWIFT:  I'm just trying to figure out what the

02:53:06  9   Judge has in his hand.  Is that one of the ones I handed you,

02:53:10  10  Your Honor?  It may be the one that I'm looking for.

02:53:12  11          Does it say at the bottom, Exhibit 2604?

02:53:14  12          THE COURT:  No.  This is -- oh, yes.  This does say

02:53:18  13  2604.

02:53:19  14          MS. SWIFT:  Is it 2604897 to --

02:53:24  15          THE COURT:  Well, you handed me -- all right.  This

02:53:27  16  may be the confusion.

02:53:28  17          MS. SWIFT:  I apologize, Your Honor.

02:53:29  18          THE COURT:  You handed me 17260, which was -- which is

02:53:35  19  simply -- all it says is, do we still have a GFD refusal

02:53:41  20  folder, couldn't find it.

02:53:42  21          MS. SWIFT:  That is one of -- that is the last of

02:53:44  22  plaintiffs' exhibits.

02:53:44  23          THE COURT:  Right.  But that's all there is to it.

02:53:47  24  Then you also handed me -- under it was, I think, Walgreens

02:53:52  25  1138860.

——— Toiga (By Video Deposition) ———

02:53:55  1              MS. FITZPATRICK:  Your Honor, all that plaintiffs

02:53:56  2     are -- the second exhibit that plaintiffs are offering is the

02:54:00  3     17260 that you have that you're correct, Your Honor, it is just

02:54:03  4     the one page.

02:54:04  5              THE COURT:  All right.

02:54:05  6              MS. FITZPATRICK:  And that is all that we're offering

02:54:07  7     at this time.

02:54:07  8              THE COURT:  All right.  Well, this should come --

02:54:09  9     there was testimony about it.

02:54:10 10              MS. SWIFT:  Your Honor, my understanding -- and

02:54:12 11     Ms. Patrick, I'm sure will correct me -- Ms. Fitzpatrick will

02:54:14 12     correct me if I'm wrong, if 17260 and 23 -- I'm sorry -- the

02:54:24 13     last one we were speaking about, the other of the two slices,

02:54:29 14     if those two are coming in, my understanding is that plaintiffs

02:54:31 15     do not object to our introducing 2604, pages 897 to 901, which

02:54:39 16     is the one that we -- that I can't find that we're trying to

02:54:42 17     print copies of.  But if there's no objection to it, I don't

02:54:44 18     know that we need the copies.

02:54:45 19              THE COURT:  All right.

02:54:46 20              MS. FITZPATRICK:  I just need to see the pages to

02:54:46 21     ensure that the restrictions we have are the same restrictions

02:54:48 22     that you have.

02:54:48 23              THE COURT:  That may be this.  That may be this one.

02:55:01 24     It says 2604.

02:55:01 25              MS. SWIFT:  Yes, this is it.

———— Toiga (By Video Deposition) ————

02:55:03  1          THE COURT:  All right.  Well, show it to plaintiffs.

02:55:13  2      (Counsel conferring).

02:55:56  3          MS. FITZPATRICK:  Your Honor, I think the good news is

02:55:57  4   we just worked it out.

02:55:58  5          THE COURT:  All right.  So what's coming -- these

02:56:00  6   three documents are coming in?

02:56:03  7          MS. FITZPATRICK:  In redacted fashion.

02:56:04  8          THE COURT:  All right.  Fine.

02:56:05  9          MS. FITZPATRICK:  For two of them, Your Honor.

02:56:06 10          THE COURT:  Okay.

02:56:08 11          MS. SWIFT:  That's correct, Your Honor.

02:56:09 12          THE COURT:  All right.  We'll just work out the

02:56:11 13   redactions.

02:56:12 14          MS. FITZPATRICK:  Yes, Your Honor.

02:56:12 15          THE COURT:  All right.  So we're. . . all right.

02:56:20 16          So that takes care of the documents with Tasha

02:56:25 17   Polster, so I can cross that off.

02:56:32 18          MS. FITZPATRICK:  Kate, don't we need to deal with 27,

02:56:34 19   or do you need to just say we have an agreement?

02:56:36 20          MS. SWIFT:  I think we just need to say we have an

02:56:38 21   agreement on the redactions, but let me -- I need to look at

02:56:46 22   68.

02:56:49 23          THE COURT:  I lost my list.

02:56:58 24          All right.  I've got exhibits used by plaintiffs for

02:57:03 25   Vernazza.

—— Toiga (By Video Deposition) ——

| | | |
|---|---|---|
| 02:57:05 | 1 | MS. FITZPATRICK:  Yes, Your Honor. |
| 02:57:05 | 2 | THE COURT:  All right.  Are there any objections to |
| 02:57:07 | 3 | these by the defendants? |
| 02:57:09 | 4 | MR. DELINSKY:  To only one, Your Honor. |
| 02:57:10 | 5 | THE COURT:  All right.  Which one? |
| 02:57:11 | 6 | MR. DELINSKY:  P10234.  This was an e-mail about DEA |
| 02:57:18 | 7 | speaking points and the objections are under -- |
| 02:57:22 | 8 | THE COURT:  Well, I don't have this on my list. |
| 02:57:24 | 9 | MS. FITZPATRICK:  Judge, I believe -- I think |
| 02:57:26 | 10 | Mr. Delinsky did what I do often, which is invert the number. |
| 02:57:29 | 11 | Did you mean 10243? |
| 02:57:32 | 12 | MR. DELINSKY:  Is that the -- |
| 02:57:32 | 13 | [Court reporter clarification.] |
| 02:57:44 | 14 | MR. DELINSKY:  I will take that compliment.  It's one |
| 02:57:46 | 15 | of the only times I've ever received that. |
| 02:57:51 | 16 | MS. FITZPATRICK:  Your Honor, I believe what |
| 02:57:52 | 17 | Mr. Delinsky is referring to is the last on your list, which is |
| 02:57:55 | 18 | P10245. |
| 02:57:59 | 19 | THE COURT:  DEA speaking points? |
| 02:58:00 | 20 | MR. DELINSKY:  Correct, Your Honor. |
| 02:58:01 | 21 | MS. FITZPATRICK:  Yes, Your Honor. |
| 02:58:02 | 22 | MR. DELINSKY:  And the objection is that the witness |
| 02:58:04 | 23 | testified that he did not acknowledge about that document, what |
| 02:58:08 | 24 | was meant in it.  The cover -- it was the cover e-mail. |
| 02:58:12 | 25 | MS. FITZPATRICK:  Your Honor, this is the -- |

———— Toiga (By Video Deposition) ————

02:58:14   1          THE COURT:  Can I see the document?  I'll make a quick

02:58:19   2   ruling on that.

02:58:23   3          MS. FITZPATRICK:  One second, Your Honor.

02:58:24   4          THE COURT:  I'm just going to read these.  These can

02:58:26   5   come in without objection, 10101, 10121, 10243, 10144, 10180,

02:58:40   6   10179, 10290, 10262, 10299, 10297, and 10198.  So the one we're

02:58:55   7   talking about is 10245.

02:58:58   8          MS. FITZPATRICK:  Yes -- yes, Your Honor.

02:58:58   9          And my understanding, although maybe I misunderstood,

02:59:01  10   was simply that counsel for CVS was going to be noting their

02:59:05  11   objection for the record, not that we would be arguing this,

02:59:09  12   but if I'm wrong, we -- happy to argue it, but --

02:59:13  13          MR. DELINSKY:  No -- no --

02:59:16  14          MS. FITZPATRICK:  I believe this is one, like

02:59:19  15   Ms. Fumerton the other day, where it was coming in over their

02:59:22  16   objection.

02:59:22  17          Correct, Eric?

02:59:23  18          MR. DELINSKY:  That's correct.

02:59:24  19          MS. FITZPATRICK:  Thank you.

02:59:24  20          THE COURT:  All right.  Well, this comes in over

02:59:26  21   objection.

02:59:26  22          MS. FITZPATRICK:  Thank you.

02:59:30  23          THE COURT:  All right.  Eric, are you offering

02:59:32  24   anything or any of the defendants offering anything with

02:59:35  25   Vernazza?

**4475**

──── Toiga (By Video Deposition) ────

02:59:36  1          MR. DELINSKY:  I think we did -- did we not read those

02:59:40  2     this morning?

02:59:43  3          THE COURT:  I don't think so because I would have it.

02:59:45  4          MR. DELINSKY:  Yeah.

02:59:49  5          Your Honor, no, nothing further --

02:59:50  6          THE COURT:  Okay.

02:59:50  7          MR. DELINSKY:  -- on Mr. Vernazza.

02:59:52  8          THE COURT:  All right.  Now I've lost my list, and I

02:59:58  9     want to get back to. . .

03:00:06  10          I know we had Nelson.  I know we had Keyes.  Let

03:00:12  11     me. . .

03:00:14  12          Travassos?

03:00:15  13          MR. DELINSKY:  Your Honor, can --

03:00:17  14          THE COURT:  Let me just make I've got -- and then we

03:00:24  15     had --

03:00:25  16          Robert, did we get -- did we take care of Caraway

03:00:28  17     documents?  Do you have all that?

03:00:30  18          COURTROOM DEPUTY:  Yeah.  Just one document for

03:00:36  19     Caraway.

03:00:37  20          THE COURT:  Okay.  And I think the remaining ones we

03:00:47  21     have to cover are Nelson, Nelson's second appearance, his live

03:00:54  22     one.  Dr. Keyes, Travassos, and Fraser.

03:00:54  23          MS. FUMERTON:  Your Honor --

03:00:54  24          MR. SWIFT:  Your Honor, I believe --

03:00:58  25          Oh, go ahead, Tara.  Please, go ahead.

———Toiga (By Video Deposition)———

03:00:58  1          MS. FUMERTON:  I was going say, I believe we covered

03:01:00  2  Nelson in its entirety.

03:01:01  3          THE COURT:  We did?  All right.

03:01:02  4          MS. SWIFT:  If I may, Your Honor, with respect to the

03:01:04  5  Nelson exhibits, there is one, which is 8068, that

03:01:08  6  Ms. Fitzpatrick and I just worked out a couple of redactions

03:01:11  7  to.  I just wanted to make that clear, the redactions as to

03:01:16  8  Walgreens in exhibit Plaintiffs' 8068.

03:01:25  9          MS. FITZPATRICK:  To just to be clear, Kate, that is a

03:01:30 10  Nelson exhibit from the deposition play, so not what was dealt

03:01:33 11  with yesterday but what was dealt with --

03:01:36 12          MS. SWIFT:  Understood.  Thank you.

03:01:38 13          MS. FITZPATRICK:  -- a week or so ago?

03:01:38 14          MR. SWIFT:  Yeah.

03:01:43 15          MS. FITZPATRICK:  So the record is clear.

03:01:43 16          MS. SWIFT:  Thank you.

03:01:44 17          THE COURT:  Robert, do we have a sheet with Nelson?

03:01:45 18          All right.  So we did Nelson.  Okay.

03:01:48 19          All right.  Anything with Dr. Keyes?

03:01:53 20          MS. FITZPATRICK:  No, Your Honor.

03:01:54 21          THE COURT:  Anything from the defense with Dr. Keyes?

03:02:07 22          MR. STOFFELMAYR:  No.  I'm sorry, Your Honor.  We have

03:02:09 23  no exhibits we're offering with Dr. Keyes.  I apologize.

03:02:12 24          THE COURT:  All right.  Good.  No problem.

03:02:13 25          MS. SWIFT:  Thank you.

HEATHER K. NEWMAN, RMR, CRR

─── Toiga (By Video Deposition) ───

03:02:16  1           THE COURT:  Travassos we did?

03:02:16  2           UNIDENTIFIED SPEAKER:  We did that this morning.

03:02:19  3           MS. FITZPATRICK:  Yes, Your Honor, but I believe

03:02:20  4    counsel for CVS may have something to clarify.  I'm not exactly

03:02:24  5    sure, but --

03:02:24  6           MR. DELINSKY:  Yep.  Your Honor, in the spirit of I

03:02:28  7    never should be allowed to handle exhibits, I screwed that up,

03:02:31  8    and Ms. Fitzpatrick was kind enough to let us go back on the

03:02:36  9    record and put some objections to the exhibits plaintiffs are

03:02:38 10    offering on the record.

03:02:39 11           THE COURT:  All right.  Let me have -- let me have

03:02:41 12    this.

03:02:43 13           MS. FITZPATRICK:  But to be clear, Eric, simply this

03:02:45 14    is agreeing to admission over your objection.

03:02:48 15           MR. DELINSKY:  Right.  And I can just run through the

03:02:50 16    particular ones, Your Honor.

03:02:51 17           THE COURT:  Okay.

03:02:53 18           MR. DELINSKY:  P06272.  This was a slide deck, and the

03:02:57 19    objection is 602, as Ms. Travassos was not on the document,

03:03:02 20    wasn't familiar with it.

03:03:03 21           THE COURT:  Wait.  Let me -- I'm not even. . . oh, the

03:03:11 22    first one.  Okay.

03:03:12 23           MR. DELINSKY:  Correct.

03:03:13 24           MS. FITZPATRICK:  And, Your Honor, to be clear, I

03:03:15 25    don't believe Mr. Delinsky is asking you to reconsider your

——— Toiga (By Video Deposition) ———

03:03:16  1   ruling, just noting his objection.

03:03:18  2          THE COURT:  All right.  So I'm putting in -- 06272

03:03:20  3   comes in over objection.

03:03:21  4          All right.  Which other ones?

03:03:23  5          MR. DELINSKY:  Your Honor, 06325, I think we have an

03:03:26  6   agreement with the plaintiffs to redact the top e-mail.  With

03:03:30  7   that redaction, there's no objection.

03:03:33  8          MS. FITZPATRICK:  That is correct.

03:03:35  9          MR. DELINSKY:  0656 --

03:03:36  10          THE COURT:  Hold it.  I'm not even finding that.

03:03:38  11          MR. DELINSKY:  Oh, I'm sorry.

03:03:39  12          THE COURT:  06325.  Okay.  Redacted.  All right.

03:03:44  13          Okay.

03:03:45  14          MR. DELINSKY:  06566.  This was an e-mail from field

03:03:51  15   people in Lake County regarding Dr. Demangone.  Ms. Travassos

03:03:55  16   was not on the e-mail, wasn't familiar with it, so it's a 602

03:03:59  17   objection for the record.

03:04:00  18          THE COURT:  Okay.  Over objection that comes in.

03:04:03  19          MR. DELINSKY:  I'm going to lump two documents

03:04:07  20   together, Your Honor.

03:04:07  21          THE COURT:  Okay.

03:04:08  22          MR. DELINSKY:  Actually, I'm going to lump four

03:04:11  23   together in the interests of time because the objections are

03:04:13  24   the same.

03:04:14  25          THE COURT:  All right.

——— Toiga (By Video Deposition) ———

03:04:14  1           MR. DELINSKY:  6510, 6457, 8402, and 6612.  Those were

03:04:36  2  e-mails and attachments about programs and alerts that were

03:04:42  3  explored and not implemented, and we've asserted to Your Honor

03:04:46  4  prior objections to those based on Rule 402, 404.

03:04:52  5           THE COURT:  Okay.  So those come in over objection.

03:04:54  6           MR. DELINSKY:  Only one more, Your Honor, and that is

03:04:57  7  06672.

03:05:01  8           THE COURT:  Mid-year performance check-in.

03:05:04  9           MR. DELINSKY:  Correct.  And it is -- there are --

03:05:06 10  again, same objections, 402 and 403 objections to the excerpts

03:05:11 11  that discusses the programs being explored for possible

03:05:16 12  implementation.

03:05:16 13           THE COURT:  All right.  So that comes in over

03:05:18 14  objection.

03:05:18 15           MR. DELINSKY:  Okay.  And, Your Honor, I think that

03:05:20 16  because that's a personnel file, we will --

03:05:22 17           THE COURT:  Yeah.  That should be redacted.

03:05:23 18           MR. DELINSKY:  Yes.

03:05:24 19           THE COURT:  I don't want any personal identifying data

03:05:28 20  in there.

03:05:30 21           MS. FITZPATRICK:  Yes, Your Honor, and that's not

03:05:31 22  going to be a problem.

03:05:32 23           THE COURT:  Okay.  All right.  Are --

03:05:41 24           MR. DELINSKY:  Thank you, Your Honor.

03:05:44 25           THE COURT:  All right.  So we took care of -- let me

**4480**

——— Toiga (By Video Deposition) ———

03:05:49  1  just -- I got to make sure we're -- oh.

03:06:03  2        MS. FITZPATRICK:  Your Honor, I believe that would

03:06:04  3  only leave Kim Fraser, and I believe plaintiffs are only

03:06:08  4  offering one exhibit.  If defendants would like to wait until

03:06:11  5  tomorrow to deal with that, we can, but --

03:06:13  6        THE COURT:  We can deal with it now then we won't

03:06:15  7  forget.

03:06:16  8        We took care of Alexander?  I think so, but I want to

03:06:20  9  make sure we did.  Everyone else was caught up.

03:06:24  10        MS. FITZPATRICK:  Yes, Your Honor, plaintiffs did not

03:06:25  11  offer any exhibits with Alexander.

03:06:27  12        THE COURT:  All right.  Then what -- what -- any

03:06:29  13  documents with Ms. Fraser?

03:06:31  14        MS. FITZPATRICK:  Yes, Your Honor.  Plaintiffs would

03:06:33  15  offer P04511, the e-mail with the opioid task force related to

03:06:42  16  the opioid task force.

03:06:46  17        THE COURT:  Any objection to that?

03:06:47  18        MR. DELINSKY:  Well, Your Honor, I'd like to tee up

03:06:49  19  our exhibit because they're different years of the same thing.

03:06:53  20        THE COURT:  Well, it seems to me they both should come

03:06:55  21  in.  One was a 2018 and one was a 2019.

03:06:59  22        MS. FITZPATRICK:  Your Honor, I think that's probably

03:07:01  23  fine, but if you don't mind, I would like to just take a look

03:07:04  24  at it, and I apologize.

03:07:06  25        THE COURT:  That's what was represented to the

**4481**

──── Toiga (By Video Deposition) ────

03:07:07  1   witness, and she identified 2019 is the updated version of the

03:07:11  2   2018.

03:07:17  3          MS. FITZPATRICK:  Your Honor, no objection to this

03:07:19  4   exhibit.

03:07:19  5          THE COURT:  All right.  So they both come in.

03:07:21  6          MS. FITZPATRICK:  Yes, Your Honor.

03:07:21  7          THE COURT:  Just which -- for the record, one -- the

03:07:25  8   2018 is 04511?

03:07:27  9          MR. DELINSKY:  Correct.

03:07:28  10         THE COURT:  And what's the 2019, Eric?

03:07:30  11         MS. FITZPATRICK:  CVS --

03:07:32  12         May I?

03:07:32  13         -- CVS-MDL-04963, Your Honor.

03:07:36  14         THE COURT:  Okay.  Those both come in.

03:07:39  15         MS. FITZPATRICK:  Thank you, Judge.

03:07:41  16         THE COURT:  All right.  Then any documents with

03:07:48  17  Ms. Toiga?

03:07:50  18         MR. DELINSKY:  Your Honor, could we -- that is a very

03:07:52  19  good question, and I think we will have documents, but can

03:07:55  20  we --

03:07:55  21         THE COURT:  Well, why don't you confer over the

03:07:58  22  evening and see if you can come to some agreement --

03:08:00  23         MR. DELINSKY:  Okay.

03:08:00  24         THE COURT:  -- as so what comes in with her.

03:08:03  25         MR. DELINSKY:  Will do.

**4482**

──────── Toiga (By Video Deposition) ────────

03:08:04  1          THE COURT:  And I think that -- so -- I think that

03:08:08  2  concludes all the plaintiffs' exhibits, so that's good.  We've

03:08:11  3  got that done.

03:08:12  4          MS. FITZPATRICK:  Thank you, Your Honor.  And thank

03:08:13  5  you for your patience with this.

03:08:15  6          THE COURT:  All right.  Sure.  All right.  Well, you

03:08:17  7  know, I've learned, I would -- you know, had long cases as a --

03:08:20  8  as a lawyer and as a judge, and if you let things go too long,

03:08:25  9  then it's impossible to deal with them in an intelligent way,

03:08:30  10  so this is better.

03:08:32  11          All right.  Just for everyone's -- who -- who do we

03:08:36  12  expect for tomorrow?

03:08:39  13          MS. SWIFT:  Tomorrow we have George Pavlich,

03:08:41  14  Your Honor.  He'll be testifying remotely.

03:08:43  15          THE COURT:  George Pavlich?

03:08:45  16          MS. SWIFT:  P-a-v -- as in Victor -- l-i-c-h.

03:08:48  17          THE COURT:  Okay.  And who is he with?

03:08:50  18          MS. SWIFT:  He's a former board of pharmacy agent for

03:08:54  19  Trumbull County.

03:08:55  20          THE COURT:  Ohio Board of Pharmacy?

03:08:56  21          MS. SWIFT:  Correct.

03:08:57  22          THE COURT:  Okay.  And he's remote.  Okay.

03:08:59  23          MS. SWIFT:  Yes.  And then after that we'll have

03:09:01  24  Dr. Wailes, W-a-i-l-e-s, who is an expert.

03:09:06  25          THE COURT:  Okay.  And you expect those two to take

HEATHER K. NEWMAN, RMR, CRR

Toiga (By Video Deposition)

03:09:11　1　the full day?

03:09:12　2　　　　　MS. SWIFT:  It might, and if it doesn't, we'll have a

03:09:15　3　deposition to play.

03:09:15　4　　　　　THE COURT:  Okay.  Very good.

03:09:17　5　　　　　MS. FITZPATRICK:  Kate, if you know, will that be

03:09:22　6　Ashley or Harper Adilla?

03:09:24　7　　　　　MS. SWIFT:  I'm not sure.

03:09:27　8　　　　　MS. FITZPATRICK:  Can I count on it being at least one

03:09:28　9　of the two?

03:09:28　10　　　　　MR. SWIFT:  I think so, yes.

03:09:28　11　　　　　MR. DELINSKY:  One of the two.  Which one, we don't

03:09:29　12　know.

03:09:29　13　　　　　THE COURT:  I know Ms. Ashley is a DEA person.  Who is

03:09:33　14　the other one?

03:09:33　15　　　　　MS. SWIFT:  She is also a DEA person.

03:09:36　16　　　　　MR. DELINSKY:  It's Harper Adilla, A-d-i-l-l-a.

03:09:39　17　　　　　MS. FITZPATRICK:  And those would be after the two

03:09:40　18　live witnesses, correct?

03:09:42　19　　　　　MS. SWIFT:  Correct.

03:09:43　20　　　　　MS. FITZPATRICK:  Thanks.

03:09:44　21　　　　　MR. MAJORAS:  If needed.

03:09:44　22　　　　　THE COURT:  Okay.  All right.

03:09:46　23　　　　　MR. MAJORAS:  If needed.

03:09:46　24　　　　　MS. FITZPATRICK:  Yes.  Thank you.  Thanks.

03:09:50　25　　　　　And then do we know yet for Friday?

**4484**

———— Toiga (By Video Deposition) ————

03:09:54   1          MR. MAJORAS:  I disclosed to Mr. Lanier that it's

03:09:57   2   Dr. Murphy, and then again depositions if needed.

03:10:02   3          THE COURT:  Dr. Murphy.

03:10:05   4          MS. FITZPATRICK:  Okay.  Do we -- okay.

03:10:06   5          We can talk offline about if there are depos ready.

03:10:11   6          MR. DELINSKY:  We may use depositions to fill the

03:10:12   7   time.

03:10:12   8          MS. FITZPATRICK:  Yeah.  Yeah.  Understand.

03:10:13   9   Understood.  Just trying to get you what you need.

03:10:15  10          THE COURT:  Okay.  So, again, it's important for a

03:10:16  11   whole lot of reasons to get full days in because I want the

03:10:20  12   jury to keep focused.  I don't them to think it's, you know,

03:10:25  13   just, you know, hit or miss, but also I -- I've scheduled this

03:10:28  14   in a certain way so it gets done at a certain time, well before

03:10:34  15   Thanksgiving, and that's important.  So the jury has plenty of

03:10:38  16   time to deliberate before Thanksgiving.

03:10:41  17          MR. MAJORAS:  We're well on that pace, Your Honor.

03:10:43  18          THE COURT:  Okay.  All right.  Anything else that

03:10:45  19   anyone thinks we ought to bring up?

03:10:47  20          MS. SWIFT:  Not for us, Your Honor.

03:10:48  21          Thank you very much.

03:10:48  22          MR. DELINSKY:  Thank you, Your Honor.  Nothing

03:10:48  23   further.

03:10:50  24          MS. FITZPATRICK:  Thank you.

03:10:50  25          MR. MAJORAS:  I have an off-the-record question when

─── Toiga (By Video Deposition) ───

03:10:54 1    we finish.

03:10:54 2         THE COURT:  And the CVS folks can move into that table

03:10:57 3    so you can see better.

03:10:58 4         MR. DELINSKY:  We've already started moving.

03:10:59 5         THE COURT:  Oh, I see your name tag.  Good.  All

03:11:02 6    right.

03:11:02 7         MR. DELINSKY:  We've been waiting.

03:11:03 8         THE COURT:  Well, I'm sorry that you were sort of --

03:11:07 9    sort of blocked.  There was no --

03:11:09 10        MR. DELINSKY:  That's okay.  Yeah.

03:11:11 11        THE COURT:  Just so everyone knows, I had 16 tables

03:11:16 12   when in my Amish beard case because I had 16 defendants, so I

03:11:21 13   needed -- obviously there was just a -- one -- one lawyer with

03:11:25 14   each defendant, but I had 16 separate tables.  They were

03:11:31 15   smaller tables and they were like this (indicating).

03:11:34 16        MR. STOFFELMAYR:  This is before COVID.

03:11:36 17        THE COURT:  Yes.

03:11:38 18        MR. MAJORAS:  Did that cause COVID, Your Honor?

03:11:39 19        THE COURT:  Well before COVID, obviously.

03:11:41 20        Okay.

03:11:44 21        MS. FITZPATRICK:  Your Honor, plaintiffs are happy to

03:11:45 22   see CVS front and center for the jury now.

03:11:48 23        THE COURT:  Oh, I -- oh, I might as well -- this is

03:11:51 24   what I have for the time for this week.

03:11:55 25        For Monday, I had 2.5 hours for the plaintiffs, 3.25

———Toiga (By Video Deposition)———

03:12:00  1    for the defense.

03:12:03  2           Yesterday I had 2.75 for the plaintiffs, 3.25 for

03:12:08  3    defendants.

03:12:10  4           Today was a short day, just 2 and a half hours for the

03:12:13  5    plaintiffs and .75 for the defendants.

03:12:18  6           MR. MAJORAS:  Your Honor, I am still in discussion

03:12:19  7    with Mr. Lanier and Mr. Weinberger about the clawback time on

03:12:23  8    the Nelson redone --

03:12:24  9           THE COURT:  All right.

03:12:24  10          MR. MAJORAS:  -- but I -- we should have an agreement

03:12:26  11   or teed up to you soon.

03:12:27  12          THE COURT:  All right.  If it turns out that, you

03:12:31  13   know, a significant number of those documents were -- had been

03:12:36  14   produced in a timely way, then that should be charged to the

03:12:40  15   plaintiffs for that proportionate share.

03:12:42  16          MR. MAJORAS:  We hope to have an agreement on that.

03:12:44  17          THE COURT:  Okay.

03:12:44  18          MR. DELINSKY:  Your Honor, do you have your totals

03:12:46  19   readily available?  If not, we have them from before.

03:12:49  20          THE COURT:  I -- yes.  Yes.  You want to look at -- we

03:12:51  21   don't need all this on the record, right?

03:12:54  22          Do you have a question on a particular day or what?

03:12:57  23          MR. DELINSKY:  No, I mean just the grand total.  We

03:12:59  24   can check because you've been giving us updates.

03:13:02  25          THE COURT:  Well, I can tell you that through --

HEATHER K. NEWMAN, RMR, CRR

03:13:05  1   through last week it was 49.25 for the plaintiffs and 24 for

03:13:10  2   the defendants.  So that was through Friday.  Now if there's

03:13:18  3   going to be -- that's through Friday.

03:13:21  4           MR. DELINSKY:  Okay.

03:13:21  5           THE COURT:  And then I just gave you Monday, Tuesday

03:13:24  6   and Wednesday.  If it turns out that there's some adjustment

03:13:27  7   because of Nelson, then the Monday -- Monday hours could change

03:13:30  8   a bit.

03:13:32  9           MR. DELINSKY:  Thank you, Your Honor.

03:13:41  10          THE COURT:  Okey-doke.  Then I guess we're adjourned.

03:13:44  11          MS. FITZPATRICK:  Thank you, Your Honor.

03:13:46  12          MS. SWIFT:  Thank you, Your Honor.

03:13:47  13      (Proceedings adjourned at 3:13 p.m.)

          14

          15                    **C E R T I F I C A T E**

          16      I certify that the foregoing is a correct transcript
             of the record of proceedings in the above-entitled matter
          17  prepared from my stenotype notes.

          18      */s/ Heather K. Newman*              *10-27-2021*
                  HEATHER K. NEWMAN, RMR, CRR                    DATE

03:15:05  19

          20

          21

          22

          23

          24

          25