Message

**From:** Bratton, Edward [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WALGREENS.ONMICROSOFT.COM-54052-BRATTON, EDWARD J. (EJB4E7BB377]
**Sent:** 2/19/2018 2:43:09 PM
**To:** Stahmann, Eric [eric.stahmann@walgreens.com]
**Subject:** RE: incident at store 7832

yes

**Edward Bratton**
Manager - Pharmaceutical Integrity
Walgreen Co.
Office: 847-315-2689
Cell: 224-226-9494

**From:** Stahmann, Eric
**Sent:** Monday, February 19, 2018 2:17 PM
**To:** Bratton, Edward <edward.bratton@walgreens.com>
**Subject:** FW: incident at store 7832

Is this the same one Tasha is talking about?

**From:** Polster, Natasha
**Sent:** Monday, February 19, 2018 2:08 PM
**To:** Stahmann, Eric <eric.stahmann@walgreens.com>
**Subject:** RE: incident at store 7832

Is this the one that Ed was pulled into and compliance for a call?

**From:** Stahmann, Eric
**Sent:** Monday, February 19, 2018 2:07 PM
**To:** Polster, Natasha <tasha.polster@walgreens.com>
**Subject:** FW: incident at store 7832

FYI
There's a call this afternoon regarding this incident. I'll update you after the meeting. The (lengthy) complaint is at the bottom of the e-mail chain.

Eric

**From:** Domenick, Lisa
**Sent:** Monday, February 19, 2018 1:13 PM
**To:** Bratton, Edward <edward.bratton@walgreens.com>
**Subject:** FW: incident at store 7832

Hi Edward,

PLAINTIFFS TRIAL EXHIBIT
P-17254_00001

HIGHLY CONFIDENTIAL

WAGCASF00086509

P-17254 _ 00001

Thanks for your call. You will find the complaint at the bottom of this email chain.

Best regards,

**Lisa L. Domenick**
**Manager, Investigations & Internal Audit**

**Walgreens Boots Alliance** | 1417 Lake Cook Road, MS #L146, Deerfield, IL 60015
Telephone +1 847 964 4830

---

**From:** Martuszewski, Margaret
**Sent:** Monday, February 19, 2018 9:39 AM
**To:** Untch, Daniel <dan.untch@walgreens.com>; Malusa, Sherry <sherry.malusa@walgreens.com>; Domenick, Lisa <lisa.domenick@walgreens.com>
**Cc:** Young, Sean <sean.young@wba.com>
**Subject:** RE: incident at store 7832

Lisa,

We should probably have RxIntegrity on the call as well.

Thank you,
Margaret

**Margaret Martuszewski, RPh., PharmD, M.Ed.**
**Manager, Pharmacy Operations Compliance**

**Walgreen Co.** | 104 Wilmot Rd., MS# 1419, Deerfield, IL 60015
Telephone: 847 964 6450 | Mobile: 847 224 4986

**Member of Walgreens Boots Alliance**

This email message, including attachments, may contain information that is proprietary, confidential, privileged and/or exempt from disclosure. Please hold it in confidence to protect privilege and confidentiality. If you are not the intended recipient, then please notify the sender and delete this message. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is prohibited and may constitute a violation of the Electronic Communications Privacy Act.

---

**From:** Untch, Daniel
**Sent:** Monday, February 19, 2018 9:12 AM
**To:** Malusa, Sherry <sherry.malusa@walgreens.com>; Domenick, Lisa <lisa.domenick@walgreens.com>
**Cc:** Young, Sean <sean.young@wba.com>; Martuszewski, Margaret <margaret.martuszewski@walgreens.com>
**Subject:** RE: incident at store 7832

Thanks. I can participate in the call.

Dan

HIGHLY CONFIDENTIAL

WAGCASF00086510

P-17254 _ 00002

**From:** Malusa, Sherry
**Sent:** Monday, February 19, 2018 9:09 AM
**To:** Domenick, Lisa <lisa.domenick@walgreens.com>
**Cc:** Young, Sean <sean.young@wba.com>; Untch, Daniel <dan.untch@walgreens.com>; Martuszewski, Margaret <margaret.martuszewski@walgreens.com>
**Subject:** RE: incident at store 7832

Lisa –

Thanks for forwarding.  I'd be happy to participate in a call this afternoon, but I also recommend that someone from our pharmacy/healthcare compliance team join the call since they have a better understanding of the actual processes that occur in the pharmacy.  I will forward the invitation to Dan Untch and Margaret Martuszewski (both copied on this response).  Hopefully one or both of them can join.
Thanks.
Sherry

**Sherry Malusa,** CHC/CCEP
**Sr. Director, Compliance Operations**

Walgreen Co. | 104 Wilmot Road, Mail Stop 1419, Deerfield, IL 60015
Telephone 847 964 4108 | Mobile 847 924 4579


**Member of Walgreens Boots Alliance**

This email message, including attachments, may contain information that is proprietary, confidential, privileged and/or exempt from disclosure. Please hold it in confidence to protect privilege and confidentiality. If you are not the intended recipient, then please notify the sender and delete this message. Any viewing, copying, publishing, disclosure, distribution of this information, or the taking of any action in reliance on the contents of this message by unintended recipients is prohibited and may constitute a violation of the Electronic Communications Privacy Act.

**From:** Domenick, Lisa
**Sent:** Monday, February 19, 2018 8:59 AM
**To:** Malusa, Sherry <sherry.malusa@walgreens.com>
**Cc:** Young, Sean <sean.young@wba.com>
**Subject:** FW: incident at store 7832

Hi Sherry,

To briefly introduce myself, I am new to WBA and will be focusing primarily on investigations, reporting into Sean Young.  We recently received the complaint below, which includes various allegations, such as good faith dispensing issues and retaliation.  Would you have a few minutes to discuss next steps and routing to the appropriate parties?  I'll send an invitation shortly, but feel free to propose another time if that is not convenient.

Best regards,

**Lisa L. Domenick**
**Manager, Investigations & Internal Audit**

Walgreens Boots Alliance | 1417 Lake Cook Road, MS #L146, Deerfield, IL 60015
Telephone +1 847 964 4830

HIGHLY CONFIDENTIAL

WAGCASF00086511

P-17254 _ 00003

**From:** Young, Sean
**Sent:** Friday, February 16, 2018 1:29 PM
**To:** Domenick, Lisa <lisa.domenick@walgreens.com>
**Subject:** FW: incident at store 7832

Can you review and give me your thoughts on next steps?

---

**From:** Kelly, Troy
**Sent:** Friday, February 16, 2018 1:18 PM
**To:** Young, Sean <sean.young@wba.com>
**Subject:** FW: incident at store 7832

Please address this complaint as appropriate.

Thank you,

T

---

**From:** Robert Jaeger [mailto:imnotafret@yahoo.com]
**Sent:** Friday, February 16, 2018 5:00 AM
**To:** Kelly, Troy <troy.kelly@wba.com>
**Subject:** incident at store 7832

I am writing to inform you of an incident that took place at store 7832 in Long Beach, CA on January 15, 2018 at approximately 3:50PM. Earlier in the day I had refused to fill a prescription for a C2 medication and thought to my knowledge that I correctly followed the Company's policy regarding good faith dispensing. The customer was upset about the situation and continued to make numerous complaints to the company. On the day the complaints were made we just so happened to have many store managers and our district manager present for a Frontier meeting.

One store manager in particular, James Wang of nearby store 7870, decided to take the situation upon himself and inquired as to why I had refused to fill a prescription due to our GFD policy. He began to argue with Jansen Filio, my pharmacy manager at 7832, about when and why we should use the GFD policy to refuse to fill a prescription. Scott Hanson, store manager at 6903, was also present and backed up the arguments of James and also contributed to debating what constitutes a GFD failure. Another manager was also present, Mohammed Oasgas of 5650, but he did not contribute to the conversation, nor did he contradict the other two managers.

James Wang who took the lead with Scott Hanson backing up his arguments proceeded to inform Jansen that "unless a prescription is too early to fill, then it doesn't fail GFD." Jansen stated that the patient's behavior and other red flags can contribute to failing GFD. James' reply: "A patient's behavior doesn't have anything to do with good faith dispensing. Only if the patient personally threatens you in a violent manner can you refuse a prescription. That is the only time behavior would come into play." Scott Hanson was in agreement with this statement. James' and Scott's reasoning was that when you perform a Target Drug Good Faith Dispensing Checklist and check-off all questions as "yes" you have to fill the prescription because the prescription meets Walgreens' good faith guidelines.

The whole time this conversation was occurring I got my pen out and took notes of the conversation so as to have accurate details and quotes. Please check the camera tapes and you will see me perform this note taking. I still possess the notes. After James and Scott mentioned that after checking off "yes" on all points on the list you basically have an obligation to fill the prescription, I jumped into the conversation. I asked them to clarify this last point so as to assure that I understood them both correctly. They both confirmed that this is how GFD work. They said that if the prescription is not being filled early and the dose is within safe limits, you cannot not refuse to fill the prescription. At this point I informed them that I was writing all of this down. Once Scott heard me say that I was documenting the conversation, he contributed no more and quickly left with Mohammed.

The position from both James and Scott was that they, acting as my superior, are in authority when it comes to deciding when a prescription passes or fails GFD. Collectively and individually, they were extremely intimidating and persuasive. At one point in the conversation James even said: "I don't have a problem with that," as if we need to get his approval and guidance on when or when not to fill a prescription for a controlled substance. In other words, he clearly

HIGHLY CONFIDENTIAL

WAGCASF00086512

P-17254 _ 00004

took the position that he, a store manager representing the Walgreens Company and my superior, is the authority in cases of determining when to fill prescriptions for controlled substances including opiates.

So with Scott departed and Jansen having to take her lunch break, James took it upon himself to continue the conversation with me.  Once again, please review the camera tapes.  He came back into the pharmacy and logged into the computer next to me in order to respond to the complaint from the patient.  Before he called the patient he wanted to know if I told the patient the reason I had refused to fill the prescription.  I told him that I used the wording in our corporate policy basically saying that the prescription does not meet our good faith dispensing guidelines and that the prescription could not be filled at our Walgreens or any other Walgreens.  I added notes in the computer under the patient's comments.  I added documentation to the Target Drug Good Faith Dispensing Checklist and filed it in our GFD folder.  James demanded that I tell the patient the reason for not filling the prescription.  He claimed that by using the company policy verbiage was, to put it in his own words, a "cop out."  When I told him that I did not believe that I was required to tell the patient the specific reasons for refusing to fill a prescription, he demanded that I tell him why so that he could give the patient a reason.  He insisted on knowing if I would fill the prescription for the opiate presumably next month when it was assumed the patient would get another prescription from his pain management doctor.  I told him to read my documentation on the Target Drug Good Faith Dispensing Checklist.  One of the red flags I mentioned is that the patient threatened me that he was going to complain to Corporate unless I filled his prescription and demanded me to give him the phone number to my supervisor.  James argued that this type of behavior from the patient should be disregarded because the customer is just upset that I did not fill his prescription.  However, in a publication of the US Department of Justice DEA Diversion Control Division it states as one of the "Common Characteristics of the Drug Abuser: " that a drug abuser may exhibit "Assertive personality, often demanding immediate action."  Part of our responsibilities in the GFD policy is that we clear red flags.  It is my understanding that both identifying and justifying red flags should be determined by the professional judgment of the pharmacist.  Nowhere does it state in our policy that I need the approval of one of my superiors to make this determination.

There were several witnesses to this incident.

I cannot understand for sure the motive for both Scott and particularly James considering this is not their home store, but for certain they were asserting their authority over me as my superiors and also as my superiors were acting as agents representing the Walgreens Company determining when to fill and when to refuse a prescription for an opiate-based medication based on their interpretation of the good faith dispensing policy.  They specifically said - and I made them clarify it so they had a fair opportunity to clear up any misunderstandings - that by answering "yes" to all the questions on the Target Drug Good Faith Dispensing Checklist and if the dose of the medication is reasonable, then we must fill the prescription because that is what the good faith dispensing policy mandates.  **This constitutes a corporate policy for the dispensing of controlled substances and averts the professional judgment of the pharmacist.**  The store manager, in the role of my superior, is representing the Walgreens Company and is responsible for interpreting and executing the policies of the Company.  As I mentioned previously, I don't understand their motivation.  Maybe they wanted to impress their boss who happened to be at the store at that time?  Show the boss how to handle customer complaints and at the same time to correct the pharmacist so this doesn't happen again to improve our NPS score?  Whatever their motivation, there had to be some perceived personal gain in asserting their authority.  It reminds me of the famous Stanford Prison Experiment in which the psychological effects of perceived power when people are given authority over others and left unchecked, they are bound to abuse that power of authority.  This is what happens when store managers are left alone with this kind of authority.  As the Experiment concluded, there is a situational attribution to behavior.  **As long as Walgreens allows their pharmacists to be evaluated by store managers (who are trained by the Company to be concerned with profit, customer service, and resolving customer complaints), store managers will assert their authority over the pharmacists and will naturally confuse good faith dispensing issues with customer service issues.  This is a clear conflict of interest.**  In Walgreens' Code of Conduct and Business Ethics it states: "members of management have additional responsibilities.  Members of management are expected to lead by example and act as role models. As a manager you must: create a culture of compliance in which employees understand their responsibilities and feel comfortable raising concerns without fear of retaliation:  encourage ethical conduct and compliance with the law by personally leading compliance efforts:  consider compliance efforts when evaluating and rewarding employees: and ensure that employees understand that business results are never more important than ethical conduct and compliance with WBA policies.  Walgreens, in its [REDACTED] settlement with the DEA, was found to have rewarded management for the dispensing of controlled substances.  The DEA determined there was a system in place to promote the dispensing of controlled substances.  **There is still a system in place that allows for the dispensing of controlled substances without scrutiny.**  It can be argued that steps have been taken to ensure that store managers are not directly rewarded when controlled substances are dispensed, however, store managers perceive that they are being punished if their pharmacists refuse to fill controlled substances.  How?  Customers complain and this counts against their NPS score (a score we are constantly measured by and reminded of through communications such as emails), and also the store loses business and this affects the bottom line.  You can argue that we do not count controlled medication prescriptions into our numbers, but you can never take away from the store manager the perception that refusing a patient's prescription is not good for business, and they will naturally assert their authority to step in and

HIGHLY CONFIDENTIAL

influence the pharmacist's decision on when to refuse to fill prescriptions. In an atmosphere in which store managers cringe whenever their store gets a complaint, they will do anything to avoid making a customer unsatisfied. Complaints are read by their district manager. A complaint of any kind is still a complaint, no matter the reason. A complaint means that a customer is unsatisfied and once again, store managers are trained to take care of the customer. It is therefore in the best interest (NPS is part of their bonus) of the store manager to make sure that prescriptions are not refused for the sake of "taking care of the customer" (which is ingrained in the training of store managers).

Store managers can easily retaliate against their pharmacists. Pharmacists are evaluated by their store manager. They also help decide who gets promoted to pharmacy manager. Please don't make the mistake of thinking this is just the case of a few "bad apples." There is a problem with the system. This is institutional. This is not the first time I have had a manager berating me for refusing to fill a controlled prescription. A few years back I refused to fill a prescription for #100 Norco and #100 Xanax for a young person prescribed by an unfamiliar MD with a practice 30 miles away from my store. I checked cures and the patient had never taken either medication before. He told me he could have the doctor call me directly because he had the MD's private number. I refused to fill the prescription because of the multitude of red flags. After the customer complained, my store manager said I had bad customer service skills. When I resisted I was threatened that I was going to be written up for insubordination. This case is well-documented, and I might add that nothing really changed. My store manager was still left in charge of me and still has influence over my evaluations. How might this affect my evaluation if I continue to use our good faith dispensing policy in order to deny filling prescriptions for controlled substances? Let's face it - our evaluations are highly subjective. I would also like to point out another form of retaliation, and that is the determination of promoting a staff pharmacist to pharmacy manager. After the incident mentioned above occurred, the pharmacy manager position at my store became available. I applied even though I was not certain that I would accept the position. I was not even given the chance. I was interviewed not by the store manager mentioned above (which I am sure would have been awkward), but by two of her friends who were also store managers. I thought it a strange and unconventional situation to not have the store manager present when applying for a position at her very own store, but I am sure that they wanted to take away anything that might appear on the surface to be some form of retaliation. I was not offered the position because they said the first candidate had more 24 hour store experience (even though I worked in a 24 hour store for over 15 years) and also when answering a question about resolving a customer complaint, I didn't offer to give the customer bonus Balance Rewards Points. The position was ultimately awarded to someone with less experience, fewer business skills, and **who didn't even apply for the position at my store**. I also want to point out that I was not encouraged to apply for the other many pharmacy manager positions that have opened up since. Finally, there were two meetings at my store to explain Frontier and although I worked on both days that the meetings were held, I was not invited to participate in either meeting.

The problem is that store managers are trained to keep their customers happy. **Store managers confuse good faith dispensing issues with customer service issues.** It is in the DNA of Walgreens to take care of their customers and if a store manager is rewarded based on a good NPS score, it is in the store manager's best interest to keep their customers happy, even if this means applying pressure on their pharmacists to fill controlled substances, even if they are not for a legitimate medical purpose. What both James and Scott were saying is that as long as the prescription is being filled on time and that the dose is reasonable, we have an obligation to fill the prescription. This is what I refer to as keeping it "under the radar" of the DEA. It all looks good on paper, so to speak. It looks like we did our due diligence. That is what a whole new crop of pain management doctors are doing. They keep things "under the radar." Here in Long Beach we have 2 to 3 pain doctors who are in the top 10 prescribers of opiates in the state of California, and let's face it, this is a big state. They are just pumping out prescriptions for controlled medications and profit by seeing patients in volume. Following James' and Scott's interpretation of our GFD policy on when to fill prescriptions does not take into account many other red flags, nor does it factor in the other part of state and federal laws, and that is determining if the medication is for a legitimate medical purpose. This is taken from a publication from the California State Board of Pharmacy: "Just say No. A pharmacist has a right and responsibility to deny a prescription if it does not seem legitimate. Once verified with the prescriber, if a pharmacist still does not feel comfortable, refuse to fill the prescription." Note that is says "a right and a responsibility to deny a prescription**." James and Scott, who represent the Walgreens company as authority figures over the pharmacist and acting as superiors to the pharmacist in a chain of command system designed by the Walgreens Company, by dictating a policy for pharmacists on when to fill prescriptions, even to the extent that a system is in place which contributes and facilitates a store manager to influence the professional judgment of a pharmacist in the furnishing of controlled substances, and to ignore a patient's behavior as a red flag and to ignore whether a prescription is for a legitimate medical purpose, are in reality telling their pharmacist to break the law.** What I really don't understand is why Walgreens has given store managers the authority over their pharmacist when they as pharmacy technicians do not have the training to access whether a prescription for a controlled substance should or should not be filled or does not make sense in a specific treatment of a patient. **By giving store managers the authority to evaluate pharmacists and by giving store managers the authority to help determine who is promoted to pharmacy manager, Walgreens is contributing to a system in which store managers have influence over the profession judgment of a pharmacist and thus controlled substances are being filled "under the radar" of the DEA and without any regards as to whether or not**

HIGHLY CONFIDENTIAL

WAGCASF00086514

P-17254 _ 00006

they are being filled for a legitimate medical purpose and thus are responsible for contributing to the opioid crisis in this country.

What is really distressing for a Walgreens pharmacist is that in our Controlled Substance Prescriptions & Good Faith Dispensing Policy it states: "Any pharmacist who fails to meet his/her "corresponding responsibility" obligation when dispensing a prescription for a controlled substance, or does not follow the validation procedures outlined below, is subject to disciplinary action up to and including termination of employment." So as a pharmacist for Walgreens I have to follow what is written on paper in our policy manual or risk being fired, but **there is a second policy that is transmitted orally through a system of management ordering me or at least influencing me to not question prescriptions written for controlled medications and to disregard my professional judgment for the sake of customer service and company profitability or otherwise I will face retaliation through a subjective system of evaluation which will affect my salary.** This is clearly a mixed message in which I am damned if I do fill a control substance which goes against my professional judgment and I am damned if I don't fill a controlled substance which goes against my professional judgment. Certainly though, I stand to receive a better evaluation and not be subjected to retaliation and there will be much less resistance if I just go ahead and fill prescriptions for controlled substances, even if I don't feel comfortable doing so.

**I am hereby bringing it to the attention of the Walgreens Boots Alliance, Inc. that there is a system in place that is contributing to pharmacists recklessly dispensing controlled substances and that this is directly contributing to the proliferation of controlled substances and the crisis of drug overdose deaths in our country. This is due to a conflict of interest by placing a store manager, trained to safeguard profit, in a position of authority over a pharmacist who is trained to safeguard the health of patients, which includes the responsible and ethical dispensing of controlled substances. Put simply: if Walgreens Boots Alliance, Inc. keeps in place a system in which a store manager is allowed to evaluate a pharmacist, it can be reasonably determined that a store manager will have influence over the pharmacist to fill prescriptions for purposes of profit and disregarding the health and the safety of the patient and the community.**

What explanation is there for James Wang, Scott Hanson, and previously my store manager to create resistance when I felt it necessary in the spirit of both state and federal laws to refuse to fill a prescription? What system has been designed and is still in place that would make them think, even for a moment, that as technicians they are obligated as authority figures to get justification from a pharmacist for refusing to fill a prescription for a controlled substance? Is the system designed in such a way that although our official written policy looks good on paper because it acknowledges that the professional judgment of a pharmacist ultimately determines when to fill and when not to fill a controlled medication, but another system is left in place which opposes that written policy – a force in which power is granted to a store manager, who does not risk having their license revoked, in the form of having authority over the pharmacist and is responsible for evaluating and thereby determining the salary of the pharmacist, and because of this are able to use their authority to influence the judgment of the pharmacist.

Filling controlled prescriptions "under the radar" can be quite profitable, and James and Scott used their positions of authority to steer me into using this method of filling prescriptions mainly because it is good for business and good for customer service. This is a conflict of interest that must stop. As pharmacists we are required to use our professional judgment. It is due to the fact that Walgreens allows others, such as store managers, who perceive they are being rewarded by having their pharmacists fill controlled substances, to influence the pharmacist's professional judgment for the sake of customer service and helping the profitability of the company, that the conflict of interest arises. Almost all pharmacists I have talked to feel the influence of management when it comes to dispensing controlled substances. Most just go ahead and fill recklessly because they don't want to be hassled with the consequences, have their hours reduced, scheduled to work far from their home, or blacklisted. They have student loans and mortgages to pay and cannot afford to be fired or have their hours cut.

It is interesting to note that James Wang is the store manager at 7870, which is the closest store to mine. That store has the reputation for filling a disproportionate amount of controlled substances. Many of the floating pharmacists have mentioned this to me. That store was also told to reduce the amount of controls it was filling during the time of the settlement with the DEA, the reason I presume for fear that the quantity of controlled medications being dispensed by that store created a red flag. Also curious to note that Scott Hanson, mentioned above, was the previous store manager at this very same store. **This demonstrates the power and influence that store managers have over their pharmacists. When James Wang and Scott Hanson, acting as agents of the Walgreens Company, are dictating to pharmacists in an authoritative manner when to fill prescriptions for controlled substances, it directly results in a store that recklessly fills a disproportional amount of controlled substances.** When the caps were placed on stores on how many controls they could order, many of the patients from 7870 came to my store when 7870 ran out of controlled substances. My store is consistently under the capped amount. **This defeats the purpose of capping a store's supply of controlled medication when the prescriptions just end up being filled at the nearest local Walgreens who is under the cap.** This is an example of profiting from the filling of controlled prescriptions while keeping it under the

HIGHLY CONFIDENTIAL

WAGCASF00086515

P-17254 _ 00007

radar of the DEA.  Does Walgreens have a system in place to investigate why this store (and many others) are even reaching their caps on controlled substances?  Is keeping a cap on the ordering of controlled substances amount to keeping a store under the radar of the DEA and keeping a store from becoming a red flag?  I have been pulled into the office by management to discuss why I refused to fill a controlled substance.  I have never been pulled into the office when I filled a controlled substance with questionable legitimacy.  When you review the Most Frequent Prescriber report for store 7870, there are two top prescribing doctors on their list that I refuse to fill controlled medications from.  One of the prescribers I had a store manager from Costco mention to me that when the California State Board of Pharmacy inspected her store, they asked specifically whether they filled medications from that MD.  The other MD of 7870's top ten prescribers is extremely questionable.  I don't fill prescriptions from this MD.  I almost never even see prescriptions from this MD.  Yet, 7870, a store less than 3 miles away from my store, has this MD in their **top ten** prescriber list.  What would make the pharmacists at 7870 look the other way when there is an obvious pattern of drug diversion?  From the U.S. Department of Justice Drug Enforcement Administration section of Diversion Control Division is states:  "You have a responsibility to protect your practice from becoming an easy target for drug diversion.  You must become aware of potential situations where drug diversion can occur and safe-guards that can be enacted to prevent this diversion," and "You have a legal and ethical responsibility to uphold the law and to help protect society from drug abuse."

    The other day I refused to fill a controlled prescription for a patient for obvious multiple red flags.  I made documentation and I flagged the patient's profile so as to prevent other Walgreens pharmacies from filling it.  I even told the patient his prescription would not be welcomed by any Walgreens.  It got filled anyway at a Walgreens pharmacy, against company policy.  It did not get filled at 6903 (Scott Hanson's store), but when I ran cures it was curious to note that this patient with obvious multiple red flags was frequently furnished controlled substances at 6903.

    Is Walgreens Boots Alliance, Inc., with multiple amounts of information at its fingertips, monitoring stores that perpetually reach their caps of ordering controlled substances to search for reasons why a store is furnishing controlled substances to the public in a disproportionate amount, or is the Company relying upon the caps themselves to keep their pharmacies under the radar of the DEA to monitor whether or not their pharmacists are making sure that: "You have a responsibility to protect your practice from becoming an easy target for drug diversion." What role does the store manager play?

    Once again please do not mistake this as an isolated event and treat it as such.  I have now recently had 3 store managers, a district manager, and a pharmacy supervisor lay down resistance when I refused to fill a prescription.  I was even threatened with being insubordinate when I resisted.  I also know many other pharmacists, both currently working for the Company and others who have since left, who have felt the same pressure, either by being directly told or to have resistance placed on them, to fill prescriptions that went against their own professional judgment.  All pharmacists were also given training at the district office to offer guidance on good faith dispensing.  Some who led the discussion were not even pharmacists, but rather were people in a position of authority who also perceive personal gain and profit for the Company if the pharmacists continue to fill controlled substances without questioning their legitimacy.  The take home message of the meeting was to lean more toward dispensing and not refusing to fill prescriptions for controlled substances.  Let me point out that during the meeting there were several scenarios that were given in which a prescription for a controlled substance was brought into the pharmacy.  Some scenarios had "red flags."  In all but one scenario it was concluded by the people conducting the meeting that we should just go ahead and fill the prescription.  The only scenario in which we could not fill the prescription was because CURES was down and it's our policy that we have to check CURES.  That customer just had to wait until CURES came back up.  By having people in authority, some not even pharmacists, leading the audience of pharmacists to the decision to fill a prescription for a controlled substance can be termed "steering."  Once again please do not consider this as an isolated training issue.  It is too widespread to limit the affront to something trivial.  There is a conflict of interest buried deep inside the system that must be fixed.  James and Scott were by no means being instructional.  They were being authoritative.  This cannot be written off as a training issue either.  Both are experienced store managers who manage high-volume stores.  James' primary concern was the customer complaint and whether or not we would be able to fill the patient's controlled medication next month so that we would not have any further complaints.

    This was not handled correctly the first time I brought it to the attention of the Company.  Although I received an apology, the reality is that nothing has changed and the problem inherent in the system was not corrected.  It was treated as an isolated incident. **It is my expectation that Walgreens Boots Alliance, Inc. upholds its own policies and adheres to its Code of Conduct and Business Ethics and does the right thing by correcting this conflict of interest because it directly contributes to the diversion of controlled substances and to the deaths of tens of thousands of Americans from drug overdose abusing dangerous prescription drugs.  How many of these deaths can be accounted for by controlled substances furnished at a Walgreens Pharmacy?**

Robert Yagar, RPh
7832

HIGHLY CONFIDENTIAL

This e-mail (including any attachments) is confidential and may be privileged or otherwise protected. It may be read, copied and used only by the intended recipient. If you are not the intended recipient you should not copy it or use it for any purpose or disclose its contents to another person. If you have received this message in error, please notify us and remove it from your system. Messages sent to and from companies in the Walgreens Boots Alliance group may be monitored to ensure compliance with internal policies and to protect our business. Emails are not secure and cannot be guaranteed to be error free. We cannot accept liability for any damage you incur as a result of virus infection.

This e-mail (including any attachments) is confidential and may be privileged or otherwise protected. It may be read, copied and used only by the intended recipient. If you are not the intended recipient you should not copy it or use it for any purpose or disclose its contents to another person. If you have received this message in error, please notify us and remove it from your system. Messages sent to and from companies in the Walgreens Boots Alliance group may be monitored to ensure compliance with internal policies and to protect our business. Emails are not secure and cannot be guaranteed to be error free. We cannot accept liability for any damage you incur as a result of virus infection.

HIGHLY CONFIDENTIAL

WAGCASF00086517

P-17254 _ 00009