# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

     *County of Lake, Ohio v. Purdue*
     *Pharma L.P., et al.*,
       Case No. 18-op-45032 (N.D. Ohio)

     *County of Trumbull, Ohio v. Purdue*
     *Pharma, L.P., et al.*,
       Case No. 18-op-45079 (N.D. Ohio)

"Track 3 Cases"

**MDL No. 2804**
**Case No. 17-md-2804**
**Judge Dan Aaron Polster**

# WALMART INC.'S MOTION FOR
## JUDGMENT AS A MATTER OF LAW UNDER RULE 50(A)
### AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

I.      PLAINTIFFS LACK EVIDENCE OF ANY UNLAWFUL OR INTENTIONAL
        CONDUCT THAT COULD SUPPORT NUISANCE LIABILITY. ................................. 3

        A.    The Court Should Grant Judgment as a Matter of Law as to Walmart's
            Distribution Conduct............................................................................................ 3

            1.    Plaintiffs have not presented legally sufficient evidence of unlawful
                distribution conduct. ........................................................................... 3

            2.    Plaintiffs have not shown that Walmart's distribution conduct caused
                their alleged harm. .............................................................................. 4

        B.    The Court Should Grant Judgment as a Matter of Law as to Walmart's
            Dispensing Conduct. ........................................................................................... 6

            1.    Plaintiffs have not presented legally sufficient evidence of unlawful
                dispensing conduct.............................................................................. 6

            2.    Plaintiffs have not shown that Walmart's dispensing conduct caused
                the alleged harm. .............................................................................. 11

        C.    Plaintiffs Lack Legally Sufficient Evidence of Intentional and Culpable
            Conduct. ............................................................................................................. 13

CONCLUSION................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006).................................................................................................................13

*Arizona v. United States*,
    567 U.S. 387 (2012).................................................................................................................14

*Barnett v. Carr*,
    No. CA2000-11-219, 2001 WL 1078980 (Ohio Ct. App. Sept. 17, 2001)................................3

*Burnworth v. Harper*,
    672 N.E.2d 241 (Ohio Ct. App. 1996)...................................................................................12

*Chaney v. Dreyfus Serv. Corp.*,
    595 F.3d 219 (5th Cir. 2010) ...................................................................................................7

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
    863 F.3d 474 (6th Cir. 2017) ...................................................................................................4

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
    690 F. Supp. 256 (S.D.N.Y. 1988) ..........................................................................................7

*Gaines v. Vill. of Wyo.*,
    72 N.E.2d 369 (Ohio 1947).......................................................................................................4

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)...........................................................................................................6, 11

*Gonzales v. Raich*,
    545 U.S. 1 (2005)...................................................................................................................17

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ...................................................................................................7

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ...............................................................................................7

*Pang v. Minch*,
    559 N.E.2d 1313 (Ohio 1990).................................................................................................12

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011).................................................................................................................7

*Sutowski v. Eli Lilly & Co.*,
    696 N.E.2d 187 (Ohio 1998)...................................................................................................12

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010).................................................................................................7

*Woodmont, Inc. v. Daniels*,
    274 F.2d 132 (10th Cir. 1959) .................................................................................................7

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

STATUTES

21 U.S.C. § 823 ..................................................................................................................3

OTHER AUTHORITIES

Black's Law Dictionary (11th ed. 2019)...............................................................................3, 6

21 C.F.R. § 1301.74 .............................................................................................................3

Fed. R. Civ. P. 50 ................................................................................................................1

Restatement (Second) of Torts § 834 (1979)........................................................................4, 16

G. Williams, Criminal Law § 57 (2d ed. 1961) ..................................................................6

## INTRODUCTION

Walmart is entitled to judgment as a matter of law under Rule 50(a) for all the reasons offered in Defendants' joint brief, *see* Joint Brief Dkt. #4098, which Walmart incorporates by reference. Walmart is also entitled to judgment as a matter of law for the following additional reasons.[1]

*First*, Plaintiffs have not produced legally sufficient evidence of illegal distribution conduct that caused Plaintiffs' harm.  In fact, Plaintiffs have offered no evidence whatsoever regarding what Walmart's suspicious order monitoring system even *was*, let alone how they contend it was deficient.  Nor have they offered a shred of evidence regarding the volume of opioids Walmart self-distributed into Plaintiffs' Counties.  Walmart can hardly be held liable for causing oversupply and diversion of opioids through distribution when there is no evidence of how many opioids it even distributed.  And Plaintiffs have not offered any evidence of particular orders they claim should not have been shipped into Plaintiff Counties, or why Plaintiffs allege any orders shipped into Plaintiff Counties were suspicious.

*Second*, Plaintiffs have not produced legally sufficient evidence of illegal dispensing conduct that caused a public nuisance in Plaintiffs' Counties.  Walmart has repeatedly taken steps to ensure proper dispensing and has worked tirelessly to help its pharmacists carry out their corresponding responsibility.  Plaintiffs argue that Walmart should still be held liable for not following a particular "red flags" dispensing protocol, but that protocol has no basis in the CSA, its governing regulations, or Ohio law.  Even more, Plaintiffs have offered no evidence that any of

---

[1] Walmart incorporates the arguments regarding the legal deficiencies in Plaintiffs' nuisance claim from the Joint Brief by reference.  Walmart does not waive its objections to the Court's prior rulings or jury instructions by advancing arguments based on them.  Those objections are stated in the Joint Brief and in Defendants' prior filings, and will be stated again in Defendants' submission on the Court's final jury instructions.

the "so-called" red flag prescriptions that Walmart had filled were *in fact* medically inappropriate or that those same specific prescriptions led to the alleged harm in Plaintiffs' Counties.

Plaintiffs also argue that Walmart should be held liable for: (1) an early policy that required its pharmacists to evaluate each prescription on a prescription-by-prescription basis, and exercise their professional judgment to determine whether or not they should fill each prescription, rather than deciding in advance that they did not wish to fill any prescription for a particular prescriber (in other words not allowing a "blanket refusal-to-fill"); and (2) not adopting a system in which its pharmacies shared refusal-to-fill data with one another.  Those arguments fail legally and factually. Neither the CSA nor its regulations requires any such policy or system, and this Court's prior rulings have made that clear.  In any event, the evidence shows that Walmart *did* have a policy of not filling illegitimate prescriptions (as determined by the pharmacist's professional judgment after reviewing the particular prescription at issue) and a system (Archer) for sharing refusal-to-fill information among Walmart pharmacies and pharmacists.

As for causation, Plaintiffs could not "identify any specific prescription that was filled by any of the [Walmart] pharmacists in Lake or Trumbull County that was, in fact, diverted," or any specific individual at Walmart who did anything wrong.  Dkt. 4005 at 57 (Oct. 7 trial tr., vol. 4).[2] That leaves Plaintiffs well short of proving Walmart's five stores in Plaintiffs' Counties were a substantial factor in causing a public nuisance.

*Third*, Plaintiffs have produced no evidence sufficient to justify a verdict against Walmart based on the "intentional" prong of public nuisance.  As discussed in Defendants' joint brief, liability under that prong of the nuisance standard must rest on lawful conduct, *not regulated by the Controlled Substances Act* ("CSA"), through which Walmart intentionally and culpably caused

---

[2] All trial citations are to ECF daily transcripts.

an oversupply and diversion of opioid medications in Lake and Trumbull Counties. *See id.* Plaintiffs have produced no evidence of any such conduct.

## ARGUMENT

Plaintiffs have not shown that Walmart engaged in either unlawful or intentional and culpable conduct. Nor have they introduced any evidence sufficient to meet their burden on causation as to Walmart.

## I. PLAINTIFFS LACK EVIDENCE OF ANY UNLAWFUL OR INTENTIONAL CONDUCT THAT COULD SUPPORT NUISANCE LIABILITY.

Plaintiffs have not introduced sufficient evidence from which a reasonable jury could find Walmart liable—specifically that Walmart acted unlawfully or acted intentionally and culpably. *See, e.g.*, *Barnett v. Carr*, No. CA2000-11-219, 2001 WL 1078980, at *10–11 (Ohio Ct. App. Sept. 17, 2001); Black's Law Dictionary (11th ed. 2019) (defining "culpable" as "guilty," "blameworthy," or "involving the breach of a duty").

### A. The Court Should Grant Judgment as a Matter of Law as to Walmart's Distribution Conduct.

#### 1. Plaintiffs have not presented legally sufficient evidence of unlawful distribution conduct.

Plaintiffs have not produced sufficient evidence from which a reasonable jury could conclude that Walmart's distribution activities did not comply with the CSA. Under the CSA, distributors are required to maintain "effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels," 21 U.S.C. § 823(b)(1), (e)(1), including by "design[ing] and operat[ing] a system" to monitor suspicious orders, 21 C.F.R. § 1301.74(b). Defendants' joint brief explains that Plaintiffs have offered no testimony about *what Walmart's suspicious order monitoring system even involved*, let alone how

it was allegedly flawed and how those alleged flaws violated the CSA.  *See* Joint Brief Section I.A.1.

The jury has no information about what issues Walmart investigated before shipping controlled substances and what issues it did not.  They heard nothing about what issues Walmart reported to DEA and what issues it did not.  The jury does not even know where Walmart's distribution centers were located or what was shipped out of them.  Nor do they have any basis to identify whether a particular order was of an unusual size or otherwise suspicious.  Plaintiffs have thus not entered sufficient facts into evidence that could support a reasonable jury finding that Walmart self-distributed opioids in an unlawful manner.

### 2. Plaintiffs have not shown that Walmart's distribution conduct caused their alleged harm.

Defendants' joint brief describes the many ways in which Plaintiffs' theory of causation is legally deficient.  *See* Joint Brief Sections I.A.2, I.B.2.  This brief establishes additional reasons why no reasonable jury could find that Walmart was a substantial factor in causing Plaintiffs' alleged injuries.  A nuisance plaintiff must show that any violation *substantially* interfered with public health and safety, *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 479 (6th Cir. 2017) (emphasis added), and that the defendant was a "*substantial* factor" in causing the alleged harm, Restatement (Second) of Torts § 834 cmt. d (1979) (emphasis added).  And even then, "to support a verdict and judgment" for public nuisance, a plaintiff must "show[] by the evidence that the injury incurred was the *proximate result* of the maintenance of such nuisance." *Gaines v. Vill. of Wyo.*, 72 N.E.2d 369, 373 (Ohio 1947) (emphasis added).

First, Plaintiffs have offered *no* evidence regarding how many opioids Walmart distributed to itself.  As a result, there is *no* basis for a juror to determine whether and how Walmart's self-distribution contributed to the alleged "massive increases in the supply of prescription opioids"

into Lake and Trumbull counties, as required by this Court's rulings.[3]  Dkt. 2561 at 8 (Order Denying Distributors' Motions for Summary Judgment on Causation).  That alone is a sufficient reason to grant judgment as a matter of law on purportedly "unlawful" distribution conduct.

Second, Plaintiffs have offered no evidence that any alleged (and unproven) flaws in Walmart's suspicious order monitoring ("SOM") system caused any orders to be shipped into Plaintiffs' Counties that would not have otherwise been shipped.  Plaintiffs have not identified a single allegedly "suspicious" order that they claim the CSA prohibited Walmart from shipping to Plaintiffs' Counties (or anywhere else, for that matter).  They certainly have not identified how pills from any such "suspicious" order ended up being diverted within Plaintiffs' Counties.

Third, Walmart distributed only to its own stores.  *See* Dkt. 4041 at 34 (Oct. 18 trial tr., vol. 10).  Even if Plaintiffs could show that Walmart should have distributed fewer opioids to certain Walmart pharmacies (and again, they cannot), that alone would be insufficient to show diversion if every prescription filled at those pharmacies was legitimate.  If Walmart's own stores properly *dispensed* the controlled substances they received from Walmart's distribution, then its distribution could not have caused the alleged harm.  Plaintiffs' distribution claim is thus necessarily derivative of their dispensing claim.  Without a dispensing violation, there is no way to show how any medications were in fact diverted.  And, as discussed below, there is no evidence that a *dispensing* violation caused Plaintiffs' alleged harm.

For each of these three, independent causal reasons, Plaintiffs' distribution-based theory of liability must fail.

---

[3] Because Walmart received its Schedule II controlled substances both from its own self-distribution channels and from other distributors, dispensing data alone cannot prove the amount of Walmart's own self-distribution.

**B.      The Court Should Grant Judgment as a Matter of Law as to Walmart's Dispensing Conduct.**

      **1.      Plaintiffs have not presented legally sufficient evidence of unlawful dispensing conduct.**

Plaintiffs likewise have not produced legally sufficient evidence of unlawful dispensing conduct.  Any dispensing duties imposed on Walmart must derive from the CSA's text or its regulations.  At the motion-to-dismiss stage, however, this Court held that Walmart is subject to additional dispensing-related duties at the corporate level, including "an affirmative obligation to protect not only against diversion via theft but also other forms of diversion more broadly."  *See* Dkt. 3403 at 25; Dkt. 3499 at 15.  Walmart continues to disagree with that ruling.  *See, e.g.*, Dkt. 3439.  Even assuming that the law imposes those additional requirements, however, Plaintiffs have not produced any evidence to show that Walmart violated them.  As the Court has recognized, Plaintiffs face a steep hurdle in showing a breach of dispensing-related duty: They must show that Walmart acted with "deliberate ignorance" or "willful blindness," not merely recklessly or negligently.  Dkt. 3499 at 7.

To meet the high threshold of willful blindness, a defendant must have taken "deliberate actions to avoid confirming a high probability of wrongdoing[.]"  *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (citing G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961)); *see also* Black's Law Dictionary ("Deliberate avoidance of knowledge.").  The defendant must have essentially "actually known the critical facts"—by "subjectively believ[ing] that there is a high probability that a fact exists" and by taking "deliberate actions to avoid learning of that fact."  *Glob.-Tech Appliances*, 563 U.S. at 769.  Plaintiffs thus must have evidence that Walmart (1) believed its pharmacists were violating the CSA and (2) intentionally took actions to avoid learning about it.  *See id*.

Plaintiffs cannot carry that steep burden through a theory of "aggregate knowledge" across all Walmart employees.  The  Supreme Court has explained that "the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011).  That is, in seeking to establish corporate liability, Plaintiffs cannot rely on the mental states of disparate employees who played no role in the transaction or conduct in question.

Because "[a] corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual," *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988), courts in many contexts have rejected using collective knowledge to establish corporate liability.  For example, the Fifth Circuit holds "as a general rule" that if "an essentially subjective state of mind is an element of a cause of action," it cannot "be met by a corporation's collective knowledge."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241 (5th Cir. 2010).  Instead, that "state of mind" must "'actually exist' in at least one individual and not be imputed on the basis of general principles of agency."  *Id.*  Likewise, the D.C. Circuit has explained that the "collective knowledge" or "collective pool of information" possessed by a corporation's agents "provides an inappropriate basis for proof of scienter," and "expressed a good deal of skepticism about corporate intent theories that rely on aggregating the states of mind of multiple individuals."  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1273–74, 1276 (D.C. Cir. 2010); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 477 (6th Cir. 2014) (rejecting collective knowledge in securities law context); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008) (looking to mental states of individual corporate officials); *Woodmont, Inc. v. Daniels*, 274 F.2d 132, 137 (10th Cir. 1959) (rejecting "composite knowledge" where state of mind was "essential").  Plaintiffs therefore must produce evidence that

individual Walmart employees were willfully blind to diversion, not that they would have been willfully blind if they knew what every other Walmart employee knew at a given moment in time.

The evidence at trial established that Walmart has repeatedly taken steps to ensure proper dispensing and has worked tirelessly to help its pharmacists carry out their corresponding responsibility—ensuring that Walmart pharmacists were not willfully blind. Testimony from a compliance manager at Walmart, Brad Nelson, established as much. Nelson testified that Walmart required its pharmacists to exercise their professional judgment using all the information available to them and to not fill any prescriptions they believed were inappropriate. Dkt. 4041 at 159 (Oct. 18 trial tr., vol. 10); Dkt. 4078 at 143 (Oct. 25 trial tr., vol. 15). This included Walmart's support for pharmacists who, exercising their professional judgment, refused to fill all controlled substance prescriptions from a physician, so long as the refusal was properly documented. Dkt. 4041 at 159 (Oct. 18 trial tr., vol. 10). And Walmart gave its pharmacists the necessary tools to exercise this professional responsibility effectively: It provided guidance documents that listed red flags that pharmacists should monitor and resolve to determine whether the prescription was not legitimate. *Id.* at 158; Dkt. 4078 at 143 (Oct. 25 trial tr., vol. 15). Walmart further provided its pharmacists access to Ohio's prescription drug monitoring program. Dkt. 4041 at 47(Oct. 18 trial tr., vol. 10); Dkt. 4078 at 143 (Oct. 25 trial tr., vol. 15). Walmart introduced the Archer system, which kept a record of prescriptions that pharmacists, in their professional judgment, refused to fill. Dkt. 4078 at 152, 155, 161 (Oct. 25 trial tr., vol. 15). Walmart also provided training programs and seminars on how to fill prescriptions in a way that promoted patient safety, which was its top priority. Dkt. 4041 at 158, 178 (Oct. 18 trial tr., vol. 10). That is not willfully ignoring violations; it is consciously trying to prevent them.

Defendants' joint brief explains why the two categories of evidence that Plaintiffs have purported to offer to establish scienter—the lack of a data-sharing requirement and the lack of a "red-flags" documentation requirement—have no basis in the CSA and do not remotely suggest that Defendants acted with willful blindness.  *See* Joint Brief Section I.B.1.  Those arguments are incorporated here.

Plaintiffs, through their expert Dr. Craig McCann, have also introduced data regarding prescriptions with "red flags" that Walmart allegedly filled without proper documentation.  But Plaintiffs have offered no evidence at all that those particular prescriptions (or any individual prescriptions) were illegitimate.  In fact, Plaintiffs' own experts have testified that just because a prescription has one of Plaintiffs' "red flags" does not reveal that it was written for an illegitimate medical purpose or should not have been filled.  Dkt. 4008 at 116–17 (Oct. 8 trial tr., vol. 5).  Plaintiffs never even investigated these Walmart prescriptions on which they rely (or even a sample of them) to determine what portion, if any, should have been refused.  *Id.* at 198–99.  Nor do they have any evidence that those prescriptions would not have been dispensed if only Walmart's pharmacists had documented prescriptions as Catizone testified they should have.  *See id.* at 198 (Catizone testifying that he "did not see any [] information" about Walmart's refusals-to-fill).  Plaintiffs thus rely on nothing but conjecture to suggest that *some unknown number* of "red-flag" Walmart prescriptions *must have been* improper.  And, if that were not enough, Plaintiffs have failed to show that these very same prescriptions caused the alleged harm in Lake and Trumbull Counties.

Plaintiffs also argue that Walmart's dispensing policies were legally deficient because they did not allow pharmacists to execute advance blanket refusals-to-fill for particular providers and instead required pharmacists to exercise their corresponding responsibility for each individual

prescription presented from the physician. *See, e.g.*, Dkt. 4078 at 76 (Oct. 25 trial tr., vol. 15). But again, the CSA and its regulations do not mandate a particular system for handling refusals-to-fill. And in any event, Plaintiffs have not shown that pharmacists—let alone pharmacists in Plaintiffs' Counties—declined to use their professional judgment and filled prescriptions they believed were likely be diverted. Indeed, almost all of the evidence that Plaintiffs presented on Walmart's policy against blanket refusals-to-fill involved doctors and pharmacies far outside of Ohio. *See id.* at 112–31. Plaintiffs have offered no evidence that prescriptions from any of these doctors made their way to Ohio or that they were diverted within Plaintiffs' Counties. And Plaintiffs have offered no evidence that Walmart's pharmacies in Lake County or Trumbull County filled any opioid prescription from the one Ohio doctor mentioned in Nelson's emails, Dr. Lalli, that was not in fact medically necessary, much less that a pharmacist did so in violation of his or her corresponding responsibility. *See id.* at 136–37. More to the point, Plaintiffs have not offered evidence that if any Dr. Lalli prescription was filled by Walmart, it caused any harm in Lake County or Trumbull County.

As for data-sharing, Plaintiffs have suggested that Walmart violated the CSA by not sharing details of individual refusal-to-fill incidents from one pharmacy to another. *See, e.g.*, *id.* at 130 ("Q: Now, there's no way for the Walmart down the street to know the experiences of this Walmart pharmacist, is there?"). That argument is unfounded. For one thing, this Court has expressly disavowed the claim that the CSA requires computerized data-sharing, at least as a general matter. *See* Dkt. 3499 at 7 ("[T]here is no absolute requirement, for example, that a pharmacy must conduct a computerized red-flag analysis of each prescription before filling it.").

For another thing, Walmart *did* share such information from one pharmacy to another. Again, Walmart provided its pharmacists access to Ohio's prescription drug monitoring program,

10

which catalogued all controlled substance dispensing. Dkt. 4041 at 47 (Oct. 18 trial tr., vol. 10); Dkt. 4078 at 143 (Oct. 25 trial tr., vol. 15). Walmart also provided its pharmacists access to the Archer system, which kept a record of prescriptions that pharmacists, in their professional judgment, refused to fill. Dkt. 4078 at 155, 161 (Oct. 25 trial tr., vol. 15). At a certain point after Archer was launched, Walmart pharmacists could put a prescriber's DEA number into Archer and see all of the prescriptions that Walmart pharmacists had refused to fill from that prescriber. *Id.* at 130. While Plaintiffs seem to imply that these tools were not sufficiently user-friendly, it does not violate the CSA to place resources in different electronic locations. Finally, there were low-tech lines of communication as well. For example, it was common practice for Walmart pharmacists to contact other Walmart pharmacists in the area to relay their concerns. *Id.* at 130–31.

All of this is relevant only to the question of whether Walmart's pharmacists acted with the scienter this Court has held is required: willful blindness. Just because there may be an extra step Walmart could have taken to even more effectively mitigate diversion, that does not establish that the steps that Walmart's pharmacists did take were "deliberate actions" to "avoid confirming a high probability of wrongdoing." *Glob.-Tech Appliances*, 563 U.S. at 769. And, again, Plaintiffs must identify a particular employee who acted with willful blindness; they cannot rely upon aggregating knowledge across individuals. They have not cleared either of those hurdles.

Because Plaintiffs have not offered any legally sufficient evidence that Walmart engaged in unlawful dispensing conduct, judgment as a matter of law is warranted.

### 2. Plaintiffs have not shown that Walmart's dispensing conduct caused the alleged harm.

Even if Plaintiffs could establish that Walmart's dispensing conduct violated the CSA, their case would still fail because they have not established causation.

11

*No evidence of any particular Walmart wrongful prescriptions dispensed*.  Plaintiffs state that Walmart's failure to identify illegitimate prescriptions caused their alleged harm.  But they introduced no evidence of any particular illegitimate prescriptions—and no evidence, at any rate, of what would have happened if Walmart had investigated and attempted to resolve "red flags" for any particular prescription flagged by Plaintiffs' experts.  Without this evidence, Plaintiffs cannot "establish[] proximate cause":  They cannot show that Walmart "would have detected the presence" of illegitimate prescriptions, even assuming some existed.  *Burnworth v. Harper*, 672 N.E.2d 241, 245 (Ohio Ct. App. 1996).

*No evidence of any diverted Walmart prescriptions*.  Even if they had evidence of suspicious prescriptions that Walmart theoretically could have detected, Plaintiffs did not introduce evidence that any of those prescriptions were in fact diverted.  Diversion is a key chain in Plaintiffs' alleged causal chain.  Therefore, without evidence that substances from *Walmart's* pharmacies were diverted, Plaintiffs cannot establish causation as to Walmart.  And Plaintiffs must additionally establish proximate cause separately for each defendant.  *See Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187, 190 (Ohio 1998); *Pang v. Minch*, 559 N.E.2d 1313, 1324 (Ohio 1990) (Plaintiffs must establish proximate cause separately for each defendant).  Whatever is true of the other pharmacies, it is clear that Plaintiffs cannot show actual diversion from Walmart's pharmacies, and cannot prove that a single pill left a single Walmart pharmacy illegally (*i.e.*, with knowledge or willful blindness to the fact that it was improper).

This omission is especially glaring given the trial evidence regarding independent causes of overdose burden in Lake and Trumbull Counties.  For example, Dr. Katherine Keyes testified that illicit opioids, including heroin, fentanyl, and counterfeit pills (largely trafficked into the United States from China and Mexico) independently contributed to the burden in Lake and

Trumbull Counties.  *See, e.g.*, Dkt. 4065 at 89–93 (Oct. 22 trial tr., vol. 14).  "Doctors shoppers," "medicine cabinet diversion," and theft also played a significant role.  *Id.* at 93–94; Dkt. 4090 at 62 (Oct. 26 trial tr., vol. 16).  Keyes even admitted that if the opioid manufacturers had "acted more responsibly" and FDA had "done its job," there would not have been an opioid crisis.  Dkt. 4090 at 125 (Oct. 26 trial tr., vol. 16).  Plaintiffs' expert Dr. Caleb Alexander, for his part, agreed that he had testified that "the origins of the epidemic are multiple [] including unsubstantiated claims about the safety and effectiveness of opioids, multifaceted campaigns by pharmaceutical companies, and the failure of the FDA and DEA."  Dkt. 4064 at 203 (Oct. 21 trial tr., vol. 13).  Thus, Walmart's dispensing cannot be the proximate cause of Plaintiffs' asserted injuries.  *See, e.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

These confounding factors simply underscore the importance of establishing a specific causal link between Walmart's conduct and Plaintiffs' alleged harm.  Plaintiffs have failed to do so.  *See, e.g.*, Dkt. 4090 at 61 (Oct. 26 trial tr., vol. 16) (Keyes agreeing that her opinions are "about pharmacies generally and not about any specific pharmacy").

### C.    Plaintiffs Lack Legally Sufficient Evidence of Intentional and Culpable Conduct.

Finally, the Court should only instruct the jury that it may find Walmart liable for either intentional or unlawful conduct if it first finds there is sufficient evidence that Walmart engaged in *intentional but lawful* conduct.  Throughout this litigation, however, Plaintiffs have focused their case on proving that Walmart acted unlawfully by violating the CSA.  *See, e.g.*, Dkt. 3366 at 18–34.  Plaintiffs have continued to press that theory at trial.  *See, e.g.*, Dkt. 3991 at 48, 52, 54 (Oct. 4 trial tr., vol. 1).  Plaintiffs' theory of the case thus depends on proving a violation of the CSA.

Any other approach would not be legally viable.  Penalizing Walmart for dispensing or distribution conduct that in fact complied with the CSA would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and thus would be preempted by federal law.  *Arizona v. United States*, 567 U.S. 387, at 399–400 (2012).  Nor would Ohio nuisance law itself allow for such second-guessing of federal policy.  These arguments are explained more fully in Defendants' joint brief and are incorporated here.  *See* Joint Brief Section I.C.

Plaintiffs' claims regarding distributing and dispensing conduct must be decided under the "unlawfulness" prong of the nuisance standard.  Plaintiffs have submitted no evidence that could support a reasonable conclusion that, by doing something that is not regulated by the CSA, Walmart intentionally created an "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels," as required to sustain a theory under this prong.  *See* Track 3 Verdict Form.  Their three attempts to do so fail as a matter of law:

*First*, Plaintiffs' expert, Dr. Anna Lembke, testified that at times Purdue Pharma "worked[] with some of the major chain pharmacies," including Walmart.  Dkt. 4000 at 98 (Oct. 6 trial tr., vol. 3).  Dr. Lembke testified that Walmart participated in Purdue's "New Trends course program," which was a "continuing medical course taught by Purdue Pharma's key opinion leader," through which Purdue allegedly offered "misleading messages about opioids" to Walmart pharmacists.  *Id.* at 164–65.

This cannot possibly establish Walmart's intent to oversupply opioids.  The only evidence presented at trial related to the Purdue–Walmart continuing education program was from the "late 1990s," well before anybody, including Walmart, knew that Purdue might be making

misrepresentations.  *Id.* at 24.  Even Dr. Lembke conceded that Walmart might as well not have known "that Purdue or any other manufacturers were making [] misrepresentations," but simply insisted that "it's not necessarily important[.]"  *Id.* at 25.  To prove intentional, culpable conduct, the state of mind of the individuals who organized the programs regarding whether the statements made to Walmart's pharmacists during those programs were true or false is not only important; it is *foundational*.

In fact Dr. Lembke conceded that the "pharmacists themselves were . . . duped" by the Purdue programs.  *Id.* at 165.  Likewise, she testified that in 2001, several years after the "New Trends" program, it was "not clear" to *her*—an addiction expert—that some of Purdue's claims were untrue.  Dkt. 4005 at 24 (Oct. 7 trial tr., vol. 4).  Plaintiffs cannot possibly establish that Walmart acted intentionally to create an oversupply of opioids by pointing to a continuing education course in the late 1990s that may or may not have included misinformation—misinformation that "duped" even pharmacists and experts in the field—and that by all accounts Walmart likely did not know was misleading.

*Second*, Plaintiffs seem to claim that Walmart violated the "intentional conduct" prong of the absolute nuisance test by using customer surveys that Plaintiffs' expert, Carmen Catizone, surmised could create a "bad incentive" by encouraging pharmacists "to take actions that's against the standard of care or against regulations in dispensing prescriptions."  Dkt. 4008 at 27 (Oct. 8 trial tr., vol. 5).  Catizone also testified that Walmart had a "Management Incentive Plan" in place for a period of time that provided additional compensation to each eligible associate if a store exceeded 190,000 total prescriptions in a year (including prescriptions for non-controlled substances), along with other requirements.  *Id.* at 27–28.  According to Catizone's unfounded

speculation, this system could discourage pharmacists from conducting their due diligence and rejecting improper prescriptions.  *Id.* at 28–29.

A jury verdict cannot rely on such thin conjecture.  Plaintiffs must provide legally sufficient evidence that Walmart acted with culpable intent to create an oversupply and diversion of opioids, and that such intentional conduct was a "substantial factor" in causing the alleged harm suffered in Lake and Trumbull counties as a result of the opioid crisis.  Restatement (Second) of Torts § 834 cmt. d.  The mere fact that Walmart used commonplace business practices to reward productivity and to ensure customer satisfaction is not evidence that it intended to do so at a reduced standard of care, or that it set those policies knowing they would increase diversion in Plaintiffs' Counties. Indeed, Plaintiffs have produced no evidence that these incentives motivated a single pharmacist to change his or her dispensing habits generally, let alone his or her practice in dispensing opioids. *See* Dkt. 4008 at 200 (Oct. 8, trial tr., vol. 5) (Catizone agreeing that he did not "know one way or another whether or not pharmacists were incentivized" to overlook red flags); *Id.* at 200–01 (Catizone agreeing that "Walmart pharmacists could exercise their professional judgment and not fill a single prescription" even with the incentive programs).   Without more specific evidence, no reasonable juror could conclude that a pharmacist risked losing his or her professional license by filling improper prescriptions for such marginal personal benefit.  It is no surprise, then, that Plaintiffs cannot point to a single prescription that was improperly dispensed as a result of customer surveys, let alone a sufficient number of prescriptions that could have proximately caused the alleged harms in Plaintiffs' Counties.

*Third*, Plaintiffs argue that Walmart acted intentionally by not permitting blanket refusal-to-fill policies for a period of time.  *See, e.g.*, Dkt. 4078 at 76 (Oct. 25 trial tr., vol. 15).  But this argument is squarely aimed at Walmart's dispensing of controlled substances and thus must be

channeled through the CSA as an example of intentional, unlawful conduct. *See Gonzales v. Raich*, 545 U.S. 1, 13 (2005) ("Congress devised a closed regulatory system making it unlawful to [] dispense [] any controlled substance except in a manner authorized by the CSA.")  And as already explained, Walmart's restriction on blanket refusal-to-fill policies did not violate the CSA. *See supra* Section I.B.1.

In short, Plaintiffs have submitted no evidence that could support a reasonable conclusion that Walmart culpably and intentionally created conditions that unreasonably interfere with public health and safety.  For that reason, the Court should grant judgment to Walmart on the intentional prong of absolute public liability and remove any reference to it from the jury instructions and jury verdict form.  Otherwise the "intentional" instruction will only confuse the jurors and lead them to believe they can award damages for preempted theories of liability based on conduct that is governed by and complies with the CSA.

## CONCLUSION

For these reasons, the Court should grant judgment as a matter of law in favor of Walmart.

17

Dated:  October 29, 2021          Respectfully submitted,

/s/  John M. Majoras
John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system on all counsel of record on October 29, 2021.


/s/  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*