```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION AT CLEVELAND

3      ------------------------------X
        IN RE:                        :    Case No. 1:17-md-2804
4                                     :
        NATIONAL PRESCRIPTION          :
5       OPIATE LITIGATION              :
                                      :    VOLUME 18
6       CASE TRACK THREE               :    JURY TRIAL
                                      :    (Pages 4488 - 4764)
7                                     :
                                      :
8                                     :
                                      :
9                                     :    October 28, 2021
       ------------------------------X
10

11

12              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13

14         HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16              SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:          Heather K. Newman, RMR, CRR
                                        United States District Court
21                                      801 West Superior Avenue
                                        Court Reporters 7-189
22                                      Cleveland, Ohio 44113
                                        216.357.7035.
23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.
```

4489

```
 1    APPEARANCES:

 2    For the Plaintiffs:            Peter H. Weinberger, Esq.
                                     SPANGENBERG, SHIBLEY & LIBER
 3                                   1001 Lakeside Avenue, Ste. 1700
                                     1900 East Ninth Street
 4                                   Cleveland, Ohio 44114
                                     216-696-3232
 5
                                     W. Mark Lanier, Esq.
 6                                   THE LANIER LAW FIRM
                                     6810 FM 1960 West
 7                                   Houston, Texas 77069
                                     813-659-5200
 8
                                     Frank L. Gallucci, III, Esq.
 9                                   PLEVIN & GALLUCCI COMPANY, LPA
                                     The Illuminating Building
10                                   Suite 2222
                                     55 Public Square
11                                   Cleveland, Ohio 44113
                                     216-861-0804
12
                                     Salvatore C. Badala, Esq.
13                                   Maria Fleming, Esq.
                                     NAPOLI SHKOLNIK
14                                   360 Lexington Ave., 11th Floor
                                     New York, New York 10017
15                                   212-397-1000

16

17    For Walgreen Defendants:       Kaspar J. Stoffelmayr, Esq.
                                     Brian C. Swanson, Esq.
18                                   Katherine M. Swift, Esq.
                                     BARTLIT BECK LLP
19                                   54 West Hubbard Street, Ste.300
                                     Chicago, Illinois 60654
20                                   312-494-4400

21

22

23

24

25
```

4490

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:          Eric R. Delinsky, Esq.
                                   Graeme W. Bush, Esq.
 3                                 Paul B. Hynes, Jr., Esq.
                                   Alexandra W. Miller, Esq.
 4                                 ZUCKERMAN SPAEDER - WASHINGTON
                                   Suite 1000
 5                                 1800 M Street, NW
                                   Washington, DC 20036
 6                                 202-778-1831

 7    For Walmart                  John M. Majoras, Esq.
      Defendants:                  JONES DAY - COLUMBUS
 8                                 Suite 600
                                   325 John H. McConnell Blvd.
 9                                 Columbus, Ohio 43215
                                   614-281-3835
10
                                   Tara A. Fumerton, Esq.
11                                 Tina M. Tabacchi, Esq.
                                   JONES DAY - CHICAGO
12                                 Suite 3500
                                   77 West Wacker
13                                 Chicago, Illinois 60601
                                   312-782-3939
14

15    ALSO PRESENT:                David Cohen, Special Master

16

17                        - - - - -

18

19

20

21

22

23

24

25
```

1                                   **I N D E X**

2                                                                   **PAGE**

3      APPEARANCES......................................4489

4      DIRECT EXAMINATION OF GEORGE P. PAVLICH...........4506
       BY MR. SWANSON
5
       CROSS-EXAMINATION OF GEORGE P. PAVLICH.............4587
6      BY MR. WEINBERGER

7      REDIRECT EXAMINATION OF GEORGE P. PAVLICH..........4635
       BY MR. SWANSON
8
       RECROSS-EXAMINATION OF GEORGE P. PAVLICH...........4651
9      BY MR. WEINBERGER

10     DIRECT EXAMINATION OF ROBERT E. WAILES, M.D........4656
       BY MR. MAJORAS
11
       AFTERNOON SESSION.................................4609
12
       CERTIFICATE......................................4764
13

14

15

16

17

18

19

20

21

22

23

24

25

1              (On the record at 8:45 a.m.)

2              COURTROOM DEPUTY:  All rise.

3              THE COURT:  Everyone can be seated.

4        I think I got an e-mail that defendants have a motion

08:45:54 5   that they wanted to make.

6              MR. DELINSKY:  Yes, Your Honor.  Eric Delinsky

7        for CVS.

8        Your Honor, this pertains to directed verdict, and we

9        took to heart your comments yesterday on timing, and we are

08:46:13 10  going to be submitting motions that set forth the ground I

11       want to talk to you about as well as many other grounds, but

12       there is a -- an immediacy to one ground that's important to

13       what the remainder of trial looks like, which is why we

14       wanted to bring it to your attention as promptly as

08:46:37 15  possible.

16       And the issue, Your Honor, are the distribution

17       claims.  Under Rule 50, of course, directed verdict can be

18       granted on an issue, and this is one of the issues in the

19       case, and I think on behalf of all defendants, all three of

08:46:54 20  us, we do move, and we'll supplement in our motion, which

21       will include other grounds for directed verdict on

22       distribution grounds.  And here's the bases, Your Honor.

23       It's 60 seconds.

24       Number one, I think as Your Honor remembers, there was

08:47:10 25  an expert on distribution who not only opined on systems, on

1    each of our systems, but also set forth metrics to identify

2    potentially suspicious orders.  That expert was not called.

3    His opinions are not in evidence.  That was Mr. Rafalski.

4         The other piece of evidence that we saw in the

08:47:38  5    build-up to trial was the testimony of Dr. McCann, who then

6    in his expert reports would run those metrics to identify

7    potentially suspicious orders that Mr. Rafalski has set and

8    opined on in his expertise as a former DEA diversion

9    investigator.  Dr. McCann did not testify about any orders

08:48:04  10   or any particular shipments, and he didn't apply

11   Mr. Rafalski's metrics to identify potentially suspicious

12   orders.

13        And then finally, pertinent to the discussion that we

14   had I believe it was the -- 2 nights ago, 2 evenings ago, no

08:48:27  15   summaries of shipment data from the ARCOS database were

16   submitted into evidence.  All that was admitted through

17   Mr. McCann was summaries of dispensing data and dispensing.

18        So, Your Honor, I think you'll understand why we are

19   raising it.  There is a situation of it, absent of proof

08:48:52  20   here, that's so basic that there isn't even evidence that

21   any defendant shipped into the two counties to any pharmacy

22   in the county because there is no evidence of a single

23   shipment, much less one that could be characterized as

24   suspicious.

08:49:09  25        So, Your Honor, that's the basis was.  There really is

1    no more to it.  I'm happy to answer questions, and I imagine

2    that Pete or Mark will have something to say about that, but

3    it's that simple, Your Honor.

4         And, Your Honor, there is one other add-on point --

08:49:22   5         And I'm sorry, Pete.  I'm sorry.  I wasn't quite done.

6         -- and it's not a point of legal analysis, it's a

7    point of practicality, and this is what compels us to make

8    this motion this morning.  This impacts the remainder of

9    trial.  It impacts, obviously, jury instructions, and it

08:49:41  10   impacts what defendants do in their defense, who they call,

11   what they ask witnesses about, what they ask experts about,

12   so we think there's a -- we think it's important to raise

13   this issue and obtain the Court's views in a timely way.  It

14   could streamline things moving forward.

08:50:05  15       And I just -- before I stop talking, Your Honor,

16   there's one added issue, is at least one of the notes in my

17   read of it from the jurors has reflected some confusion.  It

18   talked about a duty to report prescriptions.  I don't think

19   they used suspicious prescriptions to DEA, that seemed to be

08:50:27  20   transposing the SOM requirement in the CFR on the

21   dispensing-based requirements.  It's totally understandable

22   confusion.  I don't mean to be disparaging or derogatory of

23   any jurors in any way whatsoever.  I think most normal

24   people would confuse that.  But it's yet another reason why

08:50:45  25   if it's not in the case and there's no evidence to support

1    it, and we believe there isn't, it's very important for

2    simplicity and clarity to the jury to get it out right now.

3                    THE COURT:  All right.

4                    MR. STOFFELMAYR:  Kaspar Stoffelmayr for

08:51:06  5    Walgreens.

6         You know, we join Mr. Delinsky's motion, and all I

7    would add is I think based on the record we have today,

8    perhaps I would disagree, but perhaps, you know, you could

9    say, we'll argue night and day -- based on evidence entirely

08:51:21 10    from fact witnesses so far -- but we'll argue night and day

11    about whether Walgreens' systems are the right ones, whether

12    they did a good enough job to detect orders, to report

13    orders, to hold orders, to do due diligence, again, we

14    could, you know, maybe have that argument, but the bottom

08:51:36 15    line is there is exactly zero evidence about any supposedly

16    suspicious order being shipped to anywhere in Ohio,

17    certainly not these two counties.  There were experts who

18    were supposed to present that kind of evidence.  They

19    weren't called.

08:51:50 20         So at this point we're just sort of left, like, why

21    would we bring witnesses or call witnesses to talk about

22    systems intended to block shipments of which there is no

23    evidence in the first place?

24                    MR. MAJORAS:  Your Honor, John Majoras.

08:52:08 25         As for Walmart, we also join the motion for the same

08:52:21

08:52:38

08:52:54

08:53:23

08:53:42

1   reasons, and I'll point out specifically to Walmart, there's

2   not been a single piece of evidence or testimony even

3   related to our distribution system.  No one would know --

4   even know where our distributors are located based on the

5   evidence that's come into the record.  So certainly in our

6   case, and likewise with the other defendants, but in our

7   case, there's just been no evidence whatsoever.  The only

8   Walmart witness called to testify is Mr. Nelson.  He's only

9   on the dispensing side.  Those were the only questions he

10  had.  There's zero evidence with respect to our systems and

11  with respect to distribution.

12              THE COURT:  All right.  Well, I guess if the

13  plaintiffs want to briefly respond, I think I'm going to

14  want a written response from the plaintiffs highlighting

15  what evidence they believe is in the record on distribution.

16      I agree, the overwhelming amount of the evidence has

17  focused on -- on prescribing practices and prescriptions

18  filled.  All right?  And I said, you know, a year ago

19  that most likely there's no independent harm from shipping

20  to yourself, because if all that happens is the pills stay

21  in a warehouse or a pharmacy, nothing happens.  The only way

22  anything gets out in the community is if they're either

23  stolen, and that's not what the case is about, or they're

24  dispensed.  So the harm is clearly going from the

25  dispensing, but I agree, there hasn't been much testimony

4497

1    about anything relating to the shipments other than the

2    pharmacies shipped to themselves.

3        So I -- if the plaintiffs want to briefly respond, I

4    want to, you know, move forward at 9 o'clock, but I think

08:53:59  5    I'm going to want a written response from the plaintiffs as

6    to whether they're still pursuing their -- the distribution

7    claims and what evidence they have that they've put in that

8    the distribution claims were illegal or intentionally

9    defective or inadequate.

08:54:25  10        MR. WEINBERGER:  Your Honor, we will provide a

11    written response.

12        Do you want to give us a time frame within which you

13    would like to have it?

14            THE COURT:  Well, seems to me no later than

08:54:40  15    Monday morning.

16            MR. WEINBERGER:  That's fine.

17            THE COURT:  But you should strongly consider

18    if you're -- I mean --

19            MR. WEINBERGER:  I will say, Your Honor, that

08:54:49  20    what is unique about the distribution case, unlike the big 3

21    distributors, of course, is that these defendants were

22    distributing to themselves primarily hydrocodone from --

23            THE COURT:  Well, I understand that, but I --

24    I have -- I don't recall any evidence -- any evidence from

08:55:08  25    fact witnesses identifying suspicious shipments, orders or

4498

1     shipments.

2                    MR. WEINBERGER:  That's exactly the point,

3     Your Honor.

4                    THE COURT:  Or even in total.

08:55:20  5                    MR. WEINBERGER:  They had systems in place

6     that didn't identify them, and there was -- there is

7     evidence in the record for substantial periods of time from

8     2006 until 2012 with respect to these defendants that they

9     didn't have an operating system that was in compliance with

08:55:42 10     the letters issued by Mr. Rannazzisi in 2006 and 2007, but

11     as I said, we'll give you the details on that.

12                    THE COURT:  Well, if that's -- basically their

13     claim is, hey, you were required to have a system and the

14     evidence is you had no system at all, well, that could be

08:56:00 15     enough.  I mean, if you have no system at all, it can't be

16     inadequate -- it can't be an adequate one.

17                    MR. DELINSKY:  Your Honor --

18                    THE COURT:  I mean, that's their -- if that's

19     their claim, then I'll -- but --

08:56:11 20                    MR. DELINSKY:  But, Your Honor, I think our

21     rejoinder to that, and I understand we'll receive briefing

22     on that and I want to speak to it, but our rejoinder to that

23     is you still need evidence of an order.

24                    THE COURT:  Well, there has been evidence of

08:56:24 25     an order.

|  |  |
|---|---|
| 1 | MR. DELINSKY:  No, Your Honor, there hasn't. |
| 2 | There's not a shred of evidence attached to CVS that CVS |
| 3 | shipped an order into Lake or Trumbull County. |
| 4 | THE COURT:  Yes, there has been.  The witness |
| 08:56:35  5 | has testified that that's how all the pharmacies got |
| 6 | their -- |
| 7 | MR. DELINSKY:  No.  Your Honor -- |
| 8 | MR. MAJORAS:  Your Honor, we'll brief this. |
| 9 | THE COURT:  All right.  Fine.  I mean, that -- |
| 08:56:44  10 | you're not going to win on that.  There's evidence that |
| 11 | that's how all these -- all these drugs got into the |
| 12 | defendants' pharmacies, that they were shipped by |
| 13 | themselves, by their corporate -- corporate distribution |
| 14 | chain. |
| 08:56:58  15 | MR. STOFFELMAYR:  Judge, if I may -- |
| 16 | THE COURT:  There hasn't been any -- I agree, |
| 17 | there's been no evidence that any particular order or |
| 18 | shipment was defective, inadequate, et cetera, there's |
| 19 | been -- so -- but there certainly has been testimony that |
| 08:57:13  20 | that's how all the pharmacies got these -- got the drugs. |
| 21 | MR. STOFFELMAYR:  Judge, may I explain that I |
| 22 | think where we're coming from? |
| 23 | We're not denying that orders were shipped to |
| 24 | pharmacies.  If the claim is -- let's say hypothetically -- |
| 08:57:24  25 | I don't want to engage in the part where there's a -- let's |

1    say hypothetical there was no system -- which is not

2    correct -- let's say hypothetically there was no, zero, just

3    zip for systems and half the orders should have been

4    identified and blocked but were not.  No one has said that.

08:57:40  5    No one has said how many orders should have been identified

6    and blocked but we're were.

7        But let's say someone came in and said there was no

8    system and I figured out that as a consequence half of your

9    orders should never have been shipped.  Even if somebody

08:57:53  10   were able to come in and say that, which they haven't, no

11   one has said that the orders that went to Lake and Trumbull

12   Counties were in the half that it should not have been

13   shipped or the half that it was fine to ship.

14       That's the missing -- from our perspective, that's the

08:58:08  15   clear gap in the evidence.  Everything else maybe we can

16   argue about, but that last part, there's just -- no one has

17   even tried to say that.

18             MR. LANIER:  With due respect, Your Honor

19   we'll brief this.

08:58:18  20             THE COURT:  All right, well --

21             MR. LANIER:  But it's not -- our whole point

22   is is that these stores were putting out pills in volumes

23   they shouldn't have been putting them out, should have

24   alerted them as distributors, should have alerted them as

08:58:31  25   pharmacists, and, frankly, they ignored it on both levels.

1          And the whole point of distribution is that it's

2    supposed to keep in check these stores from putting out

3    massive amounts of pills.  It did not, and they didn't have

4    a system.

08:58:43  5          THE COURT:  That may be sufficient to go

6    forward, but -- all right, so --

7          MR. MAJORAS:  Your Honor, just from Walmart's

8    perspective --

9          THE COURT:  Well, I'll just say a response by

08:58:53 10    Monday morning and then --

11          MR. LANIER:  That would be great, Judge.

12          THE COURT:  -- when do the defendants want

13    to -- I mean, it's an oral motion.  I don't -- I mean, I

14    don't know if you want to -- I mean, you've made it orally.

08:59:07 15    Why don't you just say when do you want to have your reply

16    rather than --

17          MR. DELINSKY:  Your Honor --

18          THE COURT:  Your reply will be focused.

19          MR. DELINSKY:  Here's the complexity,

08:59:16 20    Your Honor, is this could impact Monday witnesses.

21          THE COURT:  Well, I can't help that,

22    Mr. Delinsky.  All right?

23          MR. DELINSKY:  What I'm asking is could we

24    expedite the briefing?  We can turn around something

08:59:22 25    really --

1          THE COURT:  No.  This is important enough, I

2     want it -- I want a thorough response.  All right?  All

3     right?  I think I've crystalized the issue.  There has not

4     been any testimony -- there's no dispute, there's been no

08:59:34  5     testimony identifying any particular order or shipment as

6     suspicious.  The plaintiffs -- you know, they're not going

7     to say that in their brief because there hasn't been any.

8     We know that.  So they're not relying on any particular

9     shipment or order.  It's the -- so --

08:59:55 10          When do you want to respond?  You tell me.  You'll get

11     their -- you'll get their brief on Monday morning.

12          MR. DELINSKY:  We'll respond in 24 hours,

13     Your Honor.

14          May we reserve the right to recall witnesses who may

09:00:07 15     be called on Monday --

16          THE COURT:  Sure.

17          MR. DELINSKY:  -- depending on the Court's

18     ruling.

19          THE COURT:  I -- I have no problem -- I don't

09:00:13 20     even think you need my permission.

21          MR. DELINSKY:  Okay.  I just wanted to --

22          THE COURT:  As long as they're you're people.

23          MR. DELINSKY:  Okay.

24          THE COURT:  And as long as it's not

09:00:19 25     repetitive.

```
 1                    MR. DELINSKY:  No.

 2                    THE COURT:  But it wouldn't be.  If you -- you

 3       can always recall someone if something new comes up.

 4                    MR. DELINSKY:  Okay.

 5                    THE COURT:  Either side.  I don't think

 6       there's -- I'm not aware of a rule that prohibits that, is

 7       there?

 8                    MR. DELINSKY:  No.  No, Your Honor.  Okay.

 9       Thank you, Your Honor.

10                    THE COURT:  That's fine.

11                    MR. DELINSKY:  Is 24 -- I'm looking at my

12       co-defendants.

13           Does 24 hours --

14                    THE COURT:  I mean, if you want --

15                    MR. DELINSKY:  No, Your Honor.  24 hours.

16                    MR. MAJORAS:  There's no evidence of Walmart,

17       Your Honor.  I should be able to respond quickly.

18                    THE COURT:  Okay.  So we'll have the

19       plaintiffs' response on -- by Monday morning and Tuesday

20       morning the defendants, and then I will -- I will address

21       it.

22                    MR. DELINSKY:  Thank you, Your Honor, and

23       thank you for hearing us.

24                    THE COURT:  Okay.  Did you look at the

25       exhibits for Ms. Toiga?  If not we can take it up later.
```

  1      That's the only one that --

  2                  MR. DELINSKY:  I believe. . . I'm looking at

  3      Maria.

  4          Was anything sent over to you?  Was a proposal sent

09:01:20  5      over to you?

  6                  MS. FLEMING:  We got something.  We're waiting

  7      to hear back from Laura.

  8                  MR. DELINSKY:  Okay.  Yeah, so we sent over

  9      something last night, Your Honor, and I don't think it's

09:01:25 10      fair to ask plaintiffs to respond.  So why don't we --

 11                  THE COURT:  All right.  You're still working

 12      on it.

 13                  MR. DELINSKY:  Yes.

 14                  THE COURT:  All right.  My view is if the

09:01:33 15      document was -- if she was shown it in the deposition and

 16      she knew something about it, presumptively it should come

 17      in.  There has to be something redacted, fine.

 18          Okay.  Okay.  I think we can bring in the -- bring in

 19      the jury then.

09:01:56 20          And I'll just say that my -- I have been working on

 21      the jury instructions, and I'm going to think later today

 22      we'll send the latest draft out to counsel.

 23                  MR. WEINBERGER:  We actually got something

 24      from --

09:02:10 25                  THE COURT:  Oh, was it sent?

1           SPECIAL MASTER COHEN:  Yeah.  I sent it last

2    night, Judge.  There were some minor tweaks -- minor

3    tweaks --

4           THE COURT:  All right.  It was sent last

09:02:17  5    night.  So, again, you should --

6           MR. LANIER:  You're so fast you're ahead of

7    yourself.

8           THE COURT:  Yeah.  Well, Special Master Cohen

9    is.

09:02:25 10       At this point all I want from counsel, if you there's

11    a 6th Circuit or Supreme Court or Ohio Supreme Court case

12    that says that what I propose to say is wrong, I certainly

13    want to know about it, or if you think that something just

14    isn't clear and it would -- and the language confuses the

09:02:46 15    jury.  I want to hear about that.  Okay.

16           (Jury returned to courtroom at 9:04).

17           THE COURT:  Good morning.  Please be seated,

18    ladies and gentlemen.

19       All right.  Defendants may call their next witness,

09:04:39 20    please.

21           MR. SWANSON:  Good morning, Your Honor.

22       Walgreens calls Mr. George Pavlich, a former agent for

23    the Ohio Board of Pharmacy who we're calling over Zoom.

24       And if I may, Your Honor, I have a transcript and some

09:04:55 25    exhibits for the Court and for the record.

4506

**Pavlich (Direct by Swanson)**

```
           1              THE COURT:  All right.  Very good.  Thank you,
           2     Mr. Swanson.
           3              Okay.  Good morning, sir.  Can you hear me
           4     okay, Mr. Pavlich?
09:05:31   5              THE WITNESS:  I can.
           6              THE COURT:  Okay.
           7              THE WITNESS:  I can.
           8              THE COURT:  Okay.  Good morning.  Thank you
           9     for getting available.  If you could raise your right hand,
09:05:36  10     sir.
          11         Do you swear or affirm that the testimony you are
          12     about to give will be the truth, the whole truth, and
          13     nothing but the truth under pain and penalty of perjury?
          14              THE WITNESS:  I do.
09:05:46  15              THE COURT:  Thank you very much.
          16         All right, Mr. Swanson.  You may proceed.
          17              MR. SWANSON:  Good morning, Your Honor.
          18         Good morning, members of the jury.
          19         May it please the Court.  May I proceed, Your Honor?
09:05:55  20              THE COURT:  Yes.
          21              MR. SWANSON:  Thank you.
          22            DIRECT EXAMINATION OF GEORGE P. PAVLICH
          23     BY MR. SWANSON:
          24     **Q**    Good morning, Mr. Pavlich.  Could you please state
09:05:59  25     your full name for the jury?
```

**Pavlich (Direct by Swanson)**

1    **A**    George Paul Pavlich, P-a-v-l-i-c-h.

2    **Q**    Mr. Pavlich, my name is Brian Swanson and I represent

3    Walgreens.

4         How are you this morning, sir?

09:06:13  5    **A**    I'm alive and well.

6    **Q**    We'll take it, right?

7         Sir, you and I have not met before; is that right?

8    **A**    Not that I recall.

9    **Q**    Well, not that I recall either, so we're on the same

09:06:25 10    page there, at least.

11         And, in fact, we haven't even spoken before about a

12    minute ago; is that right?

13    **A**    Yes.

14    **Q**    Okay.  Well, sir, I appreciate you getting online and

09:06:39 15    speaking with us today.  I understand you're calling in from

16    your home?

17    **A**    Yes, I am.  My office in my home.

18    **Q**    Okay.  Your home office, in, is it Poland, Ohio?

19    **A**    Yes, it is.

09:06:53 20    **Q**    And just to be sure, can you see and hear me okay?  I

21    can see you just fine, but can you see me?

22    **A**    I see someone standing at -- yes.  I can see you.

23    **Q**    All right.  That's me.  I'm the one -- I'm the one

24    talking to you.

09:07:09 25         And I hope that you've been joined by one of my

4508

**Pavlich (Direct by Swanson)**

1    colleagues who's there to pitch in with some documents or

2    other assistance if you need it.

3    **A**      Gabe?

4    **Q**      Yeah.  I hope Gabe Levin is there.  He left before

09:07:22  5    light this morning.  Did he make it?

6    **A**      Yes.  Him and Rachel are both here.

7    **Q**      Okay.  Terrific.  Thank you.

8         And I'm going to do my best as we get into some

9    documents to put them on the screen and make sure you can

09:07:34 10    see them clearly, but if you want to look at a paper

11    document or at the screen, that's totally your choice.

12         Okay?

13    **A**      Okay.  I have paper documents here too.

14    **Q**      Terrific.  Well, this is sort of new for everyone, so

09:07:49 15    if there are any issues, you just give us a shout.  Okay?

16    **A**      Okay.

17    **Q**      All right.  Let's -- let's get going.

18         I understand, sir, that your currently retired; is

19    that right?

09:07:59 20    **A**      Yes, since 2012.

21    **Q**      Okay.  2012.  Can you tell us where you retired from?

22    **A**      The Ohio State Board of Pharmacy.  I was an agent

23    assigned to Northeast Ohio.

24    **Q**      And can you tell us how long -- so is it a field

09:08:18 25    agent, was that your title?

4509

**Pavlich (Direct by Swanson)**

1   **A**    Yes.  I worked in the field.  I was with the

2   Youngstown Police Department 10 years, 8 of it in narcotics,

3   and then in 1987 I took a position with the Ohio State Board

4   of Pharmacy and worked primarily in Northeast Ohio but I was

09:08:38 5   sent all over the state.  And I retired in March 1st, 2012.

6   **Q**    Okay.  So let me pause there and maybe we can back up

7   and take it chronologically.  And I want to go back to start

8   in college, if I may.

9        You have a degree from Youngstown State University; is

09:09:00 10   that right?

11   **A**    Yes, in criminal justice.

12   **Q**    Youngstown State Penguins, I understand, is that. . .

13   **A**    Yep.  They're still the Penguins.

14   **Q**    I looked it up this morning.  I was -- do you know why

09:09:12 15   they're the Penguins?

16   **A**    The only thing I know is they had a penguin on campus

17   when I went to school there.

18   **Q**    All right.

19   **A**    Other than that, I have no idea.

09:09:23 20   **Q**    Like a live one?

21   **A**    A live one.

22   **Q**    Got it.

23   **A**    No.  It was a live one.

24   **Q**    Okay.  And I think I heard your major you said was

09:09:31 25   criminal justice?

4510

**Pavlich (Direct by Swanson)**

1    **A**    Yes.

2    **Q**    What year was that?

3    **A**    '74.

4    **Q**    '74.  Your first job out of college?

09:09:43  5    **A**    First job in law enforcement was with the Youngstown

6    Police Department in 1980 -- no, 1977.

7    **Q**    And what was your first position with the Youngstown

8    PD?

9    **A**    I was a patrolman in parole division for approximately

09:10:00 10    two years.

11    **Q**    After those two years as a patrolman, is that when you

12    got into the narcotics division?

13    **A**    I had a short term in the juvenile division, and then

14    I went to the special investigation strike force narcotics

09:10:16 15    unit.  I remained there until I left in '87.

16    **Q**    So that was in or around '79 or '80 you became a

17    member of the narcotics team?

18    **A**    Yeah.  '79.

19    **Q**    Got it.  Were you a plain clothes officer?

09:10:37 20    **A**    Yes.

21    **Q**    Did you have a special focus with the narcotics team,

22    were you into --

23    **A**    Pharmaceuticals was my special focus.

24    **Q**    And was that in the Youngstown area you were focused

09:10:52 25    on pharmaceutical investigations?

4511

**Pavlich (Direct by Swanson)**

1    **A**      Youngstown primarily, but it expanded into all of

2    Mahoning County.  I had a commission with them during that

3    time.

4    **Q**      And can you tell us what you do as a plain clothes

09:11:10 5    officer doing pharmaceutical drug investigations?

6    **A**      Pretty much follow up on complaints as an

7    investigative officer, write search warrants, provide

8    documents to prosecutors, and with their assistance, try to

9    obtain a conviction.

09:11:36 10    **Q**      All right.  I think if my timeline is correct, you

11    held that position with the narcotics group for about

12    8 years in Youngstown?

13    **A**      Yes.  10 years total with Youngstown Police

14    Department.

09:11:48 15    **Q**      You joined the Ohio State Board of Pharmacy in 1987?

16    **A**      That is correct.

17    **Q**      And I think you said you retired as a field agent.

18          Was that the job also that you were hired into?

19    **A**      Yes.

09:12:03 20    **Q**      And if my math right, that's about 25 years you spent

21    with the Ohio Board of Pharmacy?

22    **A**      Yes, 35 total.

23    **Q**      35 total in law enforcement, 25 of which was at the

24    Ohio Board of Pharmacy?

09:12:17 25    **A**      Correct.

**Pavlich (Direct by Swanson)**

1    **Q**    Thank you.

2          And I want to pause here for a moment because the jury

3    here has heard about the Board of Pharmacy, but they haven't

4    yet heard from a field agent.

09:12:33  5          And the work, sir, that you do, so I want to ask you

6    both about the Board of Pharmacy and also your role within

7    the Board of Pharmacy.  Okay?

8    **A**    Sure.

9    **Q**    Terrific.

09:12:46 10          Starting with the Board of Pharmacy, is the Ohio Board

11   of Pharmacy responsible for administering and enforcing the

12   Drug Laws of Ohio?

13   **A**    Yes, they are.

14   **Q**    Is the Ohio Board of Pharmacy charged with preventing,

09:13:04 15  detecting, and investigating diversion of dangerous drugs,

16   including controlled substances?

17   **A**    Yes.

18   **Q**    And we've heard a lot about diversion, but I'm

19   interested from a field agent, what's your definition of

09:13:19 20  diversion of legal drugs?

21   **A**    The prescribing, the dispensing, the administering,

22   and the use of narcotics or dangerous drugs, which would be

23   prescription drugs for illicit purposes.

24   **Q**    And we talked about some of the roles of the Board of

09:13:48 25  Pharmacy in preventing, detecting, and investigative

4513

**Pavlich (Direct by Swanson)**

1     diversion.

2          Are there other roles, in your 25 years there for the

3     Board of Pharmacy, that you think are important to relate or

4     articulate for us?

09:14:03 5  **A**     I can't speak of the Board of Pharmacy as of today,

6     but during my career we had strong enforcement, we conducted

7     inspections of all licensed facilities, whether it be a

8     pharmacy, a doctor's office, a fire department.  We licensed

9     these facilities, and we also strongly investigated street

09:14:30 10  people, the very common person who would pass a bad

11    prescription, things of that sort.  We're quite involved.

12    **Q**     Thank you.

13               MR. SWANSON:  Your Honor, this is new to me.

14    There's apparently a call coming in -- okay.

09:14:46 15  BY MR. SWANSON:

16    **Q**     Sorry, Mr. Pavlich.  We had a little technical glitch

17    there, but I think I heard your answer and I want to follow

18    up.

19         This case, as you may know, focuses on pharmacies, so

09:14:57 20  most of my questions are going to focus on pharmacies and

21    pharmacists and the role of the Board of Pharmacy vis-a-vis

22    those entities.  Okay?

23    **A**     Sure.

24    **Q**     I think you said that the Ohio Board of Pharmacy

09:15:15 25  licenses pharmacies.

4514

**Pavlich (Direct by Swanson)**

1       Did I hear that right?

2   **A**     Yes.

3   **Q**     So in order to dispense a medication, including a

4   Class 2 medication like an opioid medication, a pharmacy has

09:15:28 5   to be licensed by the Board of Pharmacy; right?

6   **A**     Yes.  They would have a terminal distributor's license

7   and they would also have a federal license for purposes of

8   the controlled substance.

9   **Q**     I've heard -- I've seen that term in some documents, a

09:15:42 10   terminal distributor license.  Is that just the same thing

11   as a pharmacy, or are there differences?

12   **A**     No.  A terminal distributor license would be one for

13   the terminal use of the drug.  In other words, they bring it

14   into the pharmacy and it terminates when it goes to the

09:16:05 15   patient.

16   **Q**     Understood.

17       So a pharmacy, I think you said, not only has to be

18   licensed in Ohio by the Ohio Board of Pharmacy, but also by

19   a federal entity, and that's the DEA, they register with the

09:16:15 20   DEA?

21   **A**     Yes.

22   **Q**     The license that a pharmacy in Ohio has with the Board

23   of Pharmacy, does that need to be periodically renewed?

24   **A**     Yes.  I believe it's every year, but I don't know as

09:16:30 25   of current status.

**Pavlich (Direct by Swanson)**

1    **Q**    At least when you were there up until 2012, a pharmacy

2    had to renew their license with the board every year?

3                    MR. WEINBERGER:  Objection, Your Honor.  I'm

4    being liberal, but there's a lot of leading questions here.

09:16:46  5                    THE COURT:  Well --

6                    MR. SWANSON:  I can ask it again.

7                    THE COURT:  I think they've been okay so far,

8    but I'll watch.

9         You can answer, sir.

09:17:01 10   BY MR. SWANSON:

11   **Q**    My question, sir, is up until the time you left the

12   board of pharmacy in 2012, did a pharmacy need to renew its

13   license with the Board of Pharmacy every year?

14   **A**    Yes, they did.

09:17:11 15   **Q**    Do you know what was required for the Board of

16   Pharmacy to license a pharmacy in Ohio?

17   **A**    There were a lot of requirements, from security to a

18   licensed pharmacist professional signing for the license,

19   to, you know, a structure, recordkeeping, numerous

09:17:39 20   requirements.

21   **Q**    I think we're going to touch on some of those as we

22   proceed, so if others come to mind as we're talking about

23   those, you just go ahead and raise those.  Okay?

24   **A**    Okay.

09:17:50 25   **Q**    Does the -- does the Board of Pharmacy also license

4516

**Pavlich (Direct by Swanson)**

1    pharmacists?

2    **A**    They do.

3    **Q**    Can you tell us what the requirements are from the

4    Board of Pharmacy at least while you were there to license a

09:18:04  5    pharmacist?

6    **A**    They were required to graduate from a licensed

7    university with a degree in pharmacy, and then it became

8    PharmD degree, I think that was a 6-year degree, the other

9    one was a 5-year degree when I was there.  They would have

09:18:32 10    to pass their board prior to being licensed and then they

11    had CE -- or continuing education requirements to maintain

12    that license.

13    **Q**    Did the pharmacists need to have their license renewed

14    or was it as long as they were consistent with their

09:18:52 15    continuing education requirements they could reup?

16    Do you know?

17    **A**    I don't remember if it was every year or every two

18    years, every three years, the pharmacists would relicense.

19    I believe it was in September.  It was possibly every year,

09:19:09 20    but I'm not clear on it.

21    **Q**    Did the -- did the Ohio Board of Pharmacy and in your

22    role, did you perform inspections of pharmacies?

23    **A**    Yes.  We were required to do a specific number every

24    year on top of all of our investigations and other

09:19:34 25    administrative regulatory requirements.

**Pavlich (Direct by Swanson)**

1    **Q**    Do you remember what that number was, sir?

2    **A**    I want to say 50, but I'm to the sure.

3    **Q**    Okay.  Well, we'll take -- we'll take 50.

4          And I just want to make one point of clarification.

09:19:52 5    You mentioned inspections, and we're going to talk about the

6    inspections that you performed.  And you said that was on

7    top of investigations.  Can you just -- and we'll get into

8    investigations, too, I think, but can you just give the jury

9    a sense of that distinction?

09:20:08 10   **A**    Well, an inspection is you go in and administratively

11   you review everything, from their computer, to their manual

12   recordkeeping system, which would be their prescriptions,

13   their drug stock, their accountability, their biannual

14   inventories.  You look at everything.  And that pretty much

09:20:40 15   entailed one agent inspecting pharmacies in his geographic,

16   or other geographics if they're sent there.

17          And in investigations, I used to carry maybe 30, 40,

18   sometimes 50 cases at a time, and they could be simple

19   things like an error in dispensing, you know, you gave the

09:21:06 20   wrong drug, the count was wrong to actually drug

21   trafficking, illegal processing.  I did a lot of physician

22   cases that resulted in prosecution and conviction, probably

23   80, 90 plus.

24   **Q**    Okay.  And we'll talk about one or two of those as

09:21:30 25   well, but do I understand that an investigation sort of ran

4518

**Pavlich (Direct by Swanson)**

1    the gamut from there was an error in dispensing all the way

2    through there was criminal activity that led to

3    prosecutions?  Is that kind of a fair assessment of the

4    spectrum?

09:21:47  5   **A**    No.  An error in dispensing, it would have to be a

6    very, very serious error in dispensing that resulted in a

7    death of someone, possibly.  Most errors in dispensing --

8    you know, a lot of times people that were getting controlled

9    substances, the bad people, would say, I didn't get my 120

09:22:13  10   tablets, I only got a hundred.  You know, and they're

11   calling in to question and then they file a complaint, and I

12   would have to go and try to see what the issue was.

13   **Q**    Okay.  So when we're talking about investigations, it

14   sounds like we're talking about criminal activity or

09:22:32  15   attempted criminal activity?

16   **A**    Investigations could be administrative and they could

17   be criminal.

18   **Q**    Okay.

19   **A**    I handled both ends of it.

09:22:42  20   **Q**    How many -- just talking a bit more about the field

21   agent position.  How many field agents were there positioned

22   across the State of Ohio when you were there?  And let's

23   take it from say 2005 to 2012 time frame.

24        Do you recall?

09:23:03  25   **A**    Nowhere near what they have now.  I think we had,

4519

**Pavlich (Direct by Swanson)**

1    like, 16 agents and maybe seven specialists.  Those are

2    pharmacists.  The specialists are licensed pharmacists that

3    are agent specialists with the Board of Pharmacy, and the

4    agents like myself, a field agent, usually were law

09:23:31  5    enforcement background.  So 16 and seven or eight.

6    **Q**    Yeah.  Yeah.  And were they sort of divided up by

7    territory in the state?

8        I understand you were in the northeast part of the

9    state; is that right?

09:23:45 10    **A**    Yes.  There was -- like, I was in Youngstown.  There

11    was one up in Geauga County, there was two in Cleveland, one

12    in Akron, you know, spread out.

13    **Q**    Did your responsibilities or coverage area include

14    Trumbull County?

09:24:07 15    **A**    Yes.

16    **Q**    Did it include Lake County?

17    **A**    No, but I was sent up there a number of times.

18    **Q**    So there were times there might be an investigation

19    where you would pitch in and head to other areas,

09:24:22 20    territories?

21    **A**    Yeah.  I was pretty much the most senior field agent,

22    especially toward the end of my career, and my field

23    supervisor and my supervisor in Columbus would send me to

24    different geographics to lend a hand.

09:24:42 25    **Q**    It sounds like your days and weeks were largely filled

4520

**Pavlich (Direct by Swanson)**

1    with either inspections or investigations or pitching in on

2    investigations.

3         Was there other substantive worked that occupied your

4    time as a field agent?

09:25:01  5    **A**    Yes.  Answering the phone.  I would probably have 30

6    phone calls waiting for me.  You got to understand, I had

7    four counties myself for regulatory and investigative

8    responsibility, four counties.  You can just imagine how

9    many licensed facilities are in four counties and how many

09:25:24 10    street crimes or pharmaceutical crimes were occurring.  I

11    was pretty busy.

12    **Q**    And I guess most of this was in the days before cell

13    phones; right?  So you'd come back to the office and have a

14    stack of messages or. . .

09:25:38 15    **A**    Well, even when I had cell phones, I didn't really

16    give that number out except for maybe a supervisor of a

17    chain or someone that I needed to talk to.  If I would have

18    gave that phone out it would have never stopped.  It was

19    always on my recorder in my office.

09:25:57 20    **Q**    Understood.

21         We've talked a bit about licensing.  Did the Board of

22    Pharmacy license prescribers?

23    **A**    Yes.  There were prescribers that were being licensed

24    by the Board of Pharmacy.

09:26:12 25    **Q**    I think you mentioned that a fair amount of your time

4521

**Pavlich (Direct by Swanson)**

|  |  |
|---|---|
| 1 | was spent doing investigations.  That included |
| 2 | investigations of physicians? |
| 3 | **A**    Yes.  I probably did more than any field agent during |
| 4 | my time with the board, 80, 90 plus. |
| 09:26:34  5 | **Q**    And you also -- I'm sorry.  I didn't mean to |
| 6 | interrupt.  You said 80 or 90 plus? |
| 7 | **A**    Yes, investigations where I wrote probably the |
| 8 | majority of the investigative reports and search warrants |
| 9 | that resulted in criminal prosecution and convictions. |
| 09:26:52  10 | **Q**    I want to -- I want to switch topics a bit, and I want |
| 11 | to focus on pharmacists and your interactions with |
| 12 | pharmacists.  And to start off on that, I want to ask you |
| 13 | about a concept that we've heard about here in court, and |
| 14 | that is the pharmacists' corresponding responsibility. |
| 09:27:15  15 | Are you familiar with that? |
| 16 | **A**    Sure.  That's in 4729-5 of the manner of issuance. |
| 17 | They have a corresponding responsibility to a physician. |
| 18 | **Q**    And if you'll bear with me, you just -- you just |
| 19 | referenced a provision of the code that I want to -- that I |
| 09:27:38  20 | want to pull up, but I didn't do a good job of putting it |
| 21 | into my outline, so I'm going to see if we can. . . and this |
| 22 | will be our first test of whether you can see the document |
| 23 | that I'm putting up. |
| 24 | Is that something you can see, sir? |
| 09:27:54  25 | **A**    Right, and I pretty much guessed it except for the |

4522

**Pavlich (Direct by Swanson)**

1       last -21.  That's it.

2       **Q**    I was going to say, you impressed us all.  This is

3       Tab 2 in your binder if you'd like to look at the hard copy.

4       Okay?

09:28:10  5    **A**    Right.  Yeah.  That would be here.

6            I have it.

7       **Q**    Terrific.  So you have correctly identified the

8       provision in the Ohio Administrative Code that deals with

9       the corresponding responsibility, and I just want to spend a

09:28:27 10   moment looking at the language here.  So I'm going to blow

11      up on my screen so folks can see better section A of Ohio

12      Administrative Code 4729-5-21.

13           Do you see that okay, sir?

14      **A**    I see it very clear.

09:28:46 15   **Q**    Okay.  It reads, a prescription, to be valid, must be

16      issued for a legitimate medical purpose by an individual

17      prescriber acting in the usual course of his/her

18      professional practice.

19           Do you see that?

09:29:04 20   **A**    Yes, I do.

21      **Q**    And just in this provision, does that describe the

22      responsibilities and the obligations of the prescriber?

23      **A**    Yes, it does.  I referred to this many times in my

24      investigations.

09:29:20 25   **Q**    Okay.  The second sentence there reads, the

4523

**Pavlich (Direct by Swanson)**

1    responsibility for the proper prescribing is upon the

2    prescriber, but a corresponding responsibility rests with

3    the pharmacist who dispenses the prescription.

4         Right?

09:29:39  5    **A**    That is correct.

6    **Q**    And that provision, just to be clear, that describes

7    the obligations and responsibilities of the pharmacist;

8    right?

9    **A**    Yes.

09:29:50 10    **Q**    Okay.  I want to focus, if we could, then, on the last

11   sentence.  It says, an order purporting to be a prescription

12   issued not in the usual course of bona fide treatment of a

13   patient is not a prescription, and the person knowingly

14   dispensing such a purported prescription, as well as the

09:30:16 15   person having issued it, shall be subject to the penalties

16   of the law.

17        Do you see that?

18   **A**    Yes, I do.

19   **Q**    And based on your 25 years enforcing the pharmacy laws

09:30:34 20   in Ohio, what does the word "knowingly" mean, when it says

21   knowingly dispensing?

22              MR. WEINBERGER:  Objection.

23              THE COURT:  Let's go on the headphones a

24   minute.

09:31:00 25              (Proceedings at sidebar.)

4524

**Pavlich (Direct by Swanson)**

1              THE COURT:  All right.  Mr. Swanson, are you

2        asking this witness how he interpreted the law when he

3        initiated an investigation or a prosecution?  Is that

4        what -- is that what you're trying to get at?

09:31:29  5              MR. SWANSON:  Yeah.  That's absolutely right,

6        Your Honor.

7            He spent 25 years making decisions about

8        investigations to pursue against pharmacy -- against

9        pharmacists based on a violation of this code, and so I

09:31:40 10       think we're entitled to know what his view was of when he

11       would make that decision or when he would recommend --

12              THE COURT:  Well, that's a different question.

13       If you want to ask him --

14              MR. SWANSON:  His understanding.

09:31:53 15              THE COURT:  If you want to ask him what kind

16       of evidence was he looking for when he opened an

17       investigation, that's -- that's a fair question, but that's

18       not asking him to interpret the law, that's asking him how

19       he did his job, and I'll allow that.

09:32:08 20              MR. SWANSON:  Sure.

21              THE COURT:  So if you rephase it in that way,

22       I'll permit it.

23              MR. DELINSKY:  Your Honor --

24              MR. SWANSON:  Thank you.

09:32:12 25              MR. DELINSKY:  Your Honor, before we leave,

**Pavlich (Direct by Swanson)**

1     Eric Delinsky on behalf of CVS.

2               THE COURT:  Okay.

3               MR. DELINSKY:  I just want to assert and sort

4     of defend the wording as currently worded.  We received

09:32:26  5     extensive factor system from Joe Rannazzisi about red flags,

6     what they are, how they should be handled, how they fit into

7     the four corners of the federal analogue to this statute,

8     and we made a lot of the same objections calling for a legal

9     conclusion, and we were overruled.  And the limitation Your

09:32:42 10     Honor put on is the exact limitation that Mr. Swanson led

11     with, which is his experience at the agency and --

12               THE COURT:  Well --

13               MR. SWANSON:  That's why I asked it that way,

14     Your Honor.

09:32:52 15               THE COURT:  Well, that would be a different

16     question.  I think -- I think it's fair to ask him how he

17     understood the Ohio Board of Pharmacy to interpret that or

18     construe it in his direction.  It's the same way, you know,

19     I allowed Mr. Rannazzisi to testify about what his

09:33:16 20     understanding of what DEA did.

21               MR. SWANSON:  Sure.  I can reword it.

22               THE COURT:  All right.  So you -- that's a

23     slightly different question.

24               MR. SWANSON:  Yeah.

09:33:23 25               THE COURT:  But it's -- I think they're both

**Pavlich (Direct by Swanson)**

1    permissible.

2               MR. SWANSON:  Okay.  Thank you.

3                (In open court at 9:33 a.m.)

4    BY MR. SWANSON:

09:33:37  5    **Q**   Mr. Pavlich, I want to ask you a slightly different

6    question, but again, focusing on this -- on this concept of

7    knowingly dispensing.

8        Based on your 25 years at the Ohio Board of Pharmacy,

9    what was your understanding of how the Board of Pharmacy

09:33:54 10    understood and interpreted that word in making decisions

11    about whether to pursue investigations, the word

12    "knowingly"?

13    **A**   Well, it's one of the culpable mental states,

14    purposely, knowingly, recklessly, negligently.

09:34:15 15        I could easily explain this highlighted section that

16    you're talking about in this way:  If a dentist writes a

17    controlled substance for -- an amphetamine for weight loss

18    and hands it to a patient and that patient takes that

19    prescription to a pharmacy, and the pharmacist sees it's a

09:34:39 20    dentist and it's an amphetamine, and especially if it's for

21    weight loss, and they dispense it, both parties are wrong

22    criminally and administratively based on knowingly

23    dispensing and prescribing.

24    **Q**   So you talked about -- and I want to make sure this

09:35:01 25    was the Board of Pharmacy's understanding.  You talked

1       about -- you talked about different states of mind and you

2       mentioned purposefully and knowingly.

3           Can you help me understand how the Board of

4       Pharmacy -- were those high standards of culpability -- or

09:35:19  5       of mens rea --

6                   MR. WEINBERGER:  Objection.

7       BY MR. SWANSON:

8       **Q**     -- mental state?  According to the Board of Pharmacy.

9       **A**     Answer?

09:35:32 10       **Q**     Yes, please.

11                   THE COURT:  Well. . .

12                   MR. SWANSON:  Oh, I'm sorry.

13                   THE COURT:  I think it's a compound question.

14       If you can break it down, I think it may be easier.

09:35:39 15                   MR. SWANSON:  Sure.

16       BY MR. SWANSON:

17       **Q**     According to the -- your understanding of the Board of

18       Pharmacy, was the knowingly standard a pretty high

19       requirement of an individual's mental state?

09:35:54 20                   MR. WEINBERGER:  Objection.

21                   THE COURT:  Overruled.

22                   THE WITNESS:  Knowingly is the second highest

23       requirement.

24       BY MR. SWANSON:

09:36:01 25       **Q**     So just under purposefully?

### Pavlich (Direct by Swanson)

1          MR. WEINBERGER:  Objection.

2          THE WITNESS:  Just under you purposefully.

3          MR. WEINBERGER:  Objection.

4          THE COURT:  Overruled.

09:36:10  5    BY MR. SWANSON:

6     **Q**    I want to look at the -- at section B now of the code

7     that we were just looking at and ask you some questions

8     about that.  I don't want to highlight it.  I want to blow

9     it up.

09:36:33 10         Okay.  Focus now on section B of the code here, sir.

11    As a -- as a former agent of the Board of Pharmacy, does

12    this section B -- is it your understanding this outlines the

13    obligations of a pharmacist in dispensing medications?

14    **A**    To the best of my knowledge, yes.

09:36:57 15    **Q**    So, you know, the jury and we can all read it, I

16    wanted to ask you about a couple of these, one or two of

17    these obligations.

18         The second one says that a pharmacist, when dispensing

19    a prescription, must perform prospective drug utilization

09:37:17 20    review pursuant to a section of the code.

21         Do you see that?

22    **A**    Yes.

23    **Q**    Can you tell us what prospective drug utilization

24    review is?

09:37:29 25    **A**    Simply a pharmacist will look at a patient's profile

**Pavlich (Direct by Swanson)**

1     of all medications dispensed in the profile on the computer

2     screen and determine if there is something contraindicated

3     for that patient, or more simply, they're getting their

4     controlled substance or their other medication too early, or

09:37:57  5     they're seeing another doctor for a similar drug.  These --

6          This is the drug utilization review, that a pharmacist

7     uses their expertise to determine to continue dispensing

8     what is now in front of them being requested to be

9     dispensed.

09:38:14  10     **Q**     Okay.  The -- I want to see.  If I pull down a

11     document, can we get the -- does the witness come back up to

12     the. . .

13          I'm sorry, sir.  There's just some technical details

14     we're dealing with on our end.  That's why there's a pause

09:38:37  15     here.

16     **A**     Okay.

17     **Q**     Well, let me continue and see if we can -- there you

18     go.  You were in a little box.  We wanted you back in the

19     big box, so welcome back.

09:38:55  20          The jurors in this case have heard a lot of testimony

21     about so-called red flags relating to individual

22     prescriptions.

23          Red flags, is that a term that you're familiar with or

24     that you used in your time at the Ohio Board of Pharmacy?

09:39:13  25     **A**     I'm familiar with the term.  Whether I used it or not,

**Pavlich (Direct by Swanson)**

1    I don't think it was a common term that I used.

2    **Q**    The -- well, I guess the concept, and tell me if we're

3    on the same page, was that a patient might present with a

4    prescription and there might be questions, or concerns about

09:39:36  5    the prescription that the pharmacist should try to address

6    in ensuring that the prescription was written for a

7    legitimate medical purpose.

8         You understand that concept?

9    **A**    I understand.

09:39:48 10    **Q**    Okay.  So whether -- you might call it a red flag, you

11    might call it a concern, sort of talking about the same

12    thing?

13    **A**    Yes.

14    **Q**    And if a prescription, like the one I described, is

09:40:05 15    presented to a pharmacist and the pharmacist has concerns or

16    thinks it's a red flag, the pharmacist should do something

17    to try to address those concerns or that red flag.

18         Is that fair?

19    **A**    Yes, that's fair.

09:40:19 20    **Q**    Can you give me -- was -- when you were at the Board

21    of Pharmacy, was there, like, a list of concerns or a list

22    of red flags that you provided to pharmacists to make sure

23    that they were checking every box on red flags or not?

24         Do you recall?

09:40:38 25    **A**    There was the Drug Laws of Ohio law book.  In that law

4531

**Pavlich (Direct by Swanson)**

1        book, there was a lot of so-called red flags, legitimate

2        medical purpose, issues to address.  Too numerous for me to

3        think about at this time in my life.  But I would bring up

4        things to the attention of a pharmacist if I saw something

09:41:02  5      that needed to be addressed.  A prescription that looked

6        like it was altered from maybe 10 tablets, someone put a 0.

7        That's an example.

8        **Q**    Okay.  So an altered or a fraudulent prescription,

9        that's obviously a red flag or a concern that needs to be

09:41:23 10     addressed; is that -- that's fair; right?

11       **A**    That's one of the many.

12       **Q**    Okay.  Let me give you another example that the jurors

13       have heard testimony in this case, that if a prescription

14       comes from a prescriber who lives -- or who's -- who re --

09:41:40 15     who's office is more than 25 miles from where the patient

16       resides, that's a red flag; in every instance it needs to be

17       resolved by the pharmacist.

18            Was that your experience, sir, when you were at the

19       Board of Pharmacy, that there was a hardline of 25 miles?

09:41:58 20            MR. WEINBERGER:  Objection.

21       Mischaracterization of prior testimony.

22            THE COURT:  Yeah, I -- sustained.

23       BY MR. SWANSON:

24       **Q**    Let me just ask you more generally, sir.

09:42:09 25           Was there -- when we're talking about distance between

4532

**Pavlich (Direct by Swanson)**

1    a physician and a patient, where the patient lives, was

2    there some kind of hardline that you enforced at the Ohio

3    Board of Pharmacy that said if a doctor is more than X miles

4    away, that's a red flag that needs to be resolved?

09:42:26  5              MR. WEINBERGER:  Objection.

6    BY MR. SWANSON:

7    **Q**    Was that something you did?

8              MR. WEINBERGER:  There's no foundation laid,

9    Your Honor.

09:42:30 10              THE COURT:  Well, I --- overruled.  He can ask

11    the question.

12    BY MR. SWANSON:

13    **Q**    Go ahead and answer, sir.

14    **A**    There was -- there was no specific mileage per se, but

09:42:47 15    if I saw -- for an example, one of the last major cases I

16    worked, there was a doctor in Geauga County.  None of the

17    pharmacies near him were really filling his scripts.  The

18    patients were all driving 35 minutes south to a pharmacy in

19    Trumbull County, an independent pharmacy, mind you, and they

09:43:11 20    were filling their scripts there.  That is an example of

21    beyond the limit.

22              Now, if I was in a pharmacy and I saw one prescription

23    from a patient -- from a doctor in Cleveland and it was in a

24    pharmacy in Trumbull County, you know, it might have been a

09:43:34 25    specialist, they might have gone up there to see this doctor

**Pavlich (Direct by Swanson)**

1    for something, one, two, three, is not a major concern.  But

2    when you see a lot, a real lot, from a -- one particular

3    doctor in particular, then red flags, as you say, go up.

4    **Q**    And I think you're talking about Dr. Franklin and

09:43:59 5    Overholt's Pharmacy; is that right?

6    **A**    Yes.  I wrote the investigative report and the search

7    warrant --

8    **Q**    Yep.

9    **A**    -- and conducted that investigation.

09:44:06 10    **Q**    Yeah, and I want to talk to you more about that in a

11    little bit, but it's good that that's fresh in your mind

12    because we're going to return to that.

13        Let me just ask you more generally.  When you were an

14    agent at the Board of Pharmacy, did you expect that

09:44:22 15    pharmacists would exercise professional judgment in filling

16    a prescription?

17    **A**    I required it.

18    **Q**    More generally, working in Trumbull County where there

19    are some smaller towns, smaller communities, did, in your

09:44:39 20    experience, did you find that pharmacists and the pharmacies

21    there would often get to know the patients who came in,

22    develop relationships with them?

23    **A**    Yes.

24    **Q**    Would the pharmacists tend to know the physicians and

09:44:55 25    the practices who were working in the community?

4534

**Pavlich (Direct by Swanson)**

1    **A**     Yes.  Most of my information came from pharmacists.

2    **Q**     And what do you mean by that, most of your information

3    came from pharmacists?

4    **A**     Where they had, as you say, red flags about something,

09:45:16  5    concerns about a patient, they would call me and I would

6    respond.

7    **Q**     So when you're talking about getting calls from

8    pharmacists alerting you to maybe questionable physicians or

9    practices, does that include calls from pharmacists at

09:45:35  10   Walgreens?

11   **A**     Oh, absolutely.

12   **Q**     Does that include calls from pharmacists at CVS?

13   **A**     Absolutely.

14   **Q**     Does that include calls from pharmacists at Walmart?

09:45:51  15   **A**     Absolutely.

16   **Q**     So were those three pharmacies and the pharmacists who

17   worked there, in your experience, were trying to reach out

18   to you to help you in your job of going after physicians who

19   were maybe didn't have the best practices?

09:46:10  20   **A**     I received a lot of help from pharmacists at those

21   three chains, at numerous chains.  I always received total

22   cooperation.

23   **Q**     I want to talk to you a little bit about documentation

24   and the documentation that a pharmacist might do.

09:46:33  25        Are there certain things that a pharmacist, in your

4535

**Pavlich (Direct by Swanson)**

1    experience, would be expected to document when filling out a

2    prescription, like how many pills are being dispensed, or

3    whether a patient has allergies, that sort of thing?

4    **A**    Yes.

09:46:53  5    **Q**    And you would expect that for those things that a

6    pharmacist would -- would document that those -- that he or

7    she had evaluated, had done the right thing with the number

8    and had alerted the patient to whether there were allergies

9    or drug interactions?

09:47:11  10    **A**    Yes.  My quote to pharmacists was, your prescription

11    is your Bible.  If you got something you want to bring to my

12    attention regarding a prescription, write it on the

13    prescription.  When they dispense it, they put their manual

14    initials.  I know who dispensed that prescription.

09:47:30  15    **Q**    Got it.  So to go back to an example you gave before,

16    a patient -- or a pharmacist might write, I dispensed a

17    hundred pills.  Then if the patient came to you and said,

18    hey, I only got 50 pills, you could take that to the

19    pharmacist and the pharmacist could say, no, I wrote right

09:47:49  20    here on the prescription that was a hundred pills.

21         Is that an example of what you're talking about?

22    **A**    Yes.  That -- that's a -- an example of what they

23    document.  Not saying that, you know, we're all human.  We

24    could miscount, but in the majority of times I found I would

09:48:13  25    trust the pharmacist's recordkeeping more so than a person

**Pavlich (Direct by Swanson)**

1    calling me up saying I didn't get 20 of my controlled

2    substance pills.  You'd have to have a lot better proof than

3    that for me.

4    **Q**    Okay.  And to go back to another example that you gave

09:48:28  5    to me, you said, well, if there was a -- or a pharmacy in

6    Trumbull County, and you saw that there was a prescription

7    that had been filled by a specialist in Cleveland, in your

8    view as an agent for the Board of Pharmacy, that to you

9    wouldn't constitute a red flag if it was just, you know, one

09:48:49 10    or two scripts.

11        Is that fair?

12            MR. WEINBERGER:  Objection.  Your Honor --

13            THE COURT:  That's sustained.

14            MR. SWANSON:  Well, I'm trying to ask you

09:48:56 15    about, do you remember giving me the example of a pharmacist

16    in Trumbull that's filled a prescription that came from the

17    Cleveland Clinic from a specialist there?

18            MR. WEINBERGER:  Objection.

19            THE WITNESS:  I did.

09:49:08 20            THE COURT:  Well, overruled.

21    BY MR. SWANSON:

22    **Q**    And in your view, when you gave me that example, is

23    that example -- an example of what you consider to be a red

24    flag or not a red flag?

09:49:18 25    **A**    Not a red flag for a limited number.

**Pavlich (Direct by Swanson)**

1    **Q**     Okay.  And so for that limited number, you wouldn't

2    have an expectation -- well, I don't want to put words in

3    your mouth.

4        For those prescriptions at the pharmacy -- at the

09:49:35  5    pharmacy, would you expect that there would be documentation

6    to -- on that regarding the specialist or where it came from

7    or whether there was a conversation with the physician?

8    **A**     I might bring it up to the attention of the pharmacist

9    and they would usually expand upon it because they would

09:49:57  10    have firsthand knowledge, but like I say, unless it was an

11    expensive repetitive quantity, a number of prescriptions,

12    wasn't really a red flag.

13    **Q**     Was there any -- was there any legal requirement in

14    the Ohio code that required a pharmacist to document when he

09:50:20  15    or she had resolved a red flag in a prescription, legal

16    requirement?

17    **A**     I'm not certain on -- I know they have the

18    corresponding responsibility and they have to document what

19    they dispense to an accurate accounting for what's on the

09:50:48  20    prescription, or if it's less, to document that.  Where it

21    is in the code, it's been a long time.

22    **Q**     Okay.  But I -- and I appreciate that, and if your

23    memory doesn't call everything up, that's understandable to

24    everybody here, but I just want to make sure when you were

09:51:08  25    just talking about documentation, were you talking about

|  |  |
|---|---|
| 1 | documenting, for example, the number of pills that were |
| 2 | dispensed? |
| 3 | **A**     Yeah.  That would be -- before computers, it was |
| 4 | manually generated on the prescription.  After computers |
| 09:51:25  5 | came out, there was a label affixed, and it would show a |
| 6 | hundred prescriptions prescribed -- or hundred tablets |
| 7 | prescribed, a hundred tablets dispensed on the black label |
| 8 | that's affixed to the prescription, which would be also on |
| 9 | the patient's bottle that was dispensed to the patient, and |
| 09:51:42 10 | in the accountability records, at the end of the day, that |
| 11 | they would generate, and I could refer to all these |
| 12 | recordkeeping methods to make an accurate determination if I |
| 13 | didn't have to do an audit. |
| 14 | **Q**     But to return, again, to your example of the Cleveland |
| 09:52:01 15 | Clinic and the pharmacy in Trumbull, I think -- and you can |
| 16 | correct me if I misheard you, but I think what you said is |
| 17 | you might go in and the pharmacist would know the |
| 18 | prescription or know the patient and so could explain to you |
| 19 | why that prescription had been filled. |
| 09:52:17 20 | Did I accurately capture what you were saying? |
| 21 | **A**     Yeah.  The pharmacist would know better than me. |
| 22 | **Q**     Okay.  I want to turn now, if I could, sir, to |
| 23 | something that we touched on briefly before, and that's |
| 24 | inspections of pharmacies.  Okay? |
| 09:52:36 25 | **A**     Go ahead. |

**Pavlich (Direct by Swanson)**

1    **Q**     And -- thanks.  And one of the -- I think this is

2    clear, but I just need to make sure we have a record.

3          During your tenure at the Board of Pharmacy, you

4    conducted investigations of chain pharmacies in Trumbull

09:52:50  5    County; right?

6    **A**     I did.

7    **Q**     And I misspoke, and thankfully I have a team here

8    helping me.  I said investigations.  I meant to say

9    inspections.  So let me reask --

09:53:03  10   **A**     I did that too.

11   **Q**     Is that how you --

12   **A**     I did that too.

13   **Q**     Okay.  So let me ask you, you conducted inspections of

14   all of -- of pharmacies in Trumbull County; right?

09:53:13  15   **A**     Yes.

16   **Q**     That includes inspections of the chain pharmacies in

17   this case, Walgreens, Walmart, and CVS?

18   **A**     Something happened.

19   **Q**     Can you -- can you hear me?

09:53:28  20   **A**     All right.  You're back.

21   **Q**     Okay.

22   **A**     Yeah, that included chained pharmacies, too.

23         It paused on me.

24   **Q**     Do you know, did you conduct inspections of every

09:53:38  25   Walgreens pharmacy in Trumbull County over the course of

Pavlich (Direct by Swanson)

1    your career?

2    **A**    Yes.  I would say at least once.

3    **Q**    Maybe more; right?

4    **A**    Oh, probably a lot more.

09:53:52  5    **Q**    Okay.

6    **A**    But at least one.

7    **Q**    And is that the same answer for CVS?

8    **A**    The same for all chains and all independents.  I had a

9    requirement, and I would look at the geographic and I would

09:54:05 10    see I hadn't been in there a year, and I would do my best to

11    go there and look things over.

12    **Q**    And I take it from your answer that these inspections

13    that we're talking about, they were conducted on-site at the

14    pharmacy itself?

09:54:20 15    **A**    Yes.  I would be physically there.

16    **Q**    How long would these inspections typically last?

17    **A**    I was pretty thorough.  I would say mine averaged

18    3 hours, minimum 2 hours.  I mean, there might be something

19    I was just in the pharmacy to retrieve a prescription or

09:54:46 20    look at something not that relevant to an investigation so

21    it would be short.  But if I was doing a full inspection in

22    a pharmacy, I would say about 3 hours, 3 and a half.

23    **Q**    I'm sorry, 2 and a half to 3 hours on average?

24    **A**    Yeah, I'm -- a full inspection.

09:55:07 25    **Q**    Was one of the purposes of your inspections to ensure

### Pavlich (Direct by Swanson)

1    that the pharmacy was complying with the rules around

2    dispensing of prescription medications like opioids?

3    **A**    That was one of the reasons.

4    **Q**    Was one of the purposes to ensure that pharmacies were

09:55:27 5    adhering to the code requirements with respect to effective

6    controls and procedures to detect and prevent theft and

7    diversion?

8                 MR. WEINBERGER:  Your Honor --

9                 THE COURT:  This -- I'm going to sustain --

09:55:41 10    that's too much -- too leading, Mr. Swanson.

11                 MR. SWANSON:  Okay.

12    BY MR. SWANSON:

13    **Q**    Can you tell us -- you've mentioned one of the

14    purposes of your inspection.  Can you tell us some of the

09:55:52 15    other purposes of the -- of your inspections of pharmacies

16    in Trumbull County?

17    **A**    There was many purposes.  Regulatory compliance,

18    recordkeeping, accountability, get to know the pharmacists

19    who are working there, find out what's going on in their

09:56:22 20    geographic.

21        I mean, inspections involve hands-on learning what

22    only you can learn by speaking to people that are there all

23    the time.  They're your -- as -- as a street cop would tell

24    you, they're your informants.  They're the ones that supply

09:56:45 25    you with knowledge that you wouldn't have if they didn't

4542

**Pavlich (Direct by Swanson)**

1      tell you.

2      **Q**     And by they, you're talking about the pharmacists and

3      the staff at the pharmacies that you were inspecting?

4      **A**     Primarily the pharmacists.

09:56:58 5     **Q**     During your inspections, would you look at whether the

6      pharmacists were conducting drug utilization reviews,

7      something we just talked about?

8      **A**     Yes, I would.  They would sign off on those.

9      **Q**     I think you mentioned this before, but I want to make

09:57:14 10    sure I heard you correctly.

11          During these inspections, would you look at the

12     pharmacies' dispensing systems that the pharmacists used?

13     **A**     Defensing [sic] system?

14     **Q**     I'm sorry, dispensing.  The computers.

09:57:30 15    **A**     Oh, I thought you said defensing.

16          Yes, I would look at their dispensing accountability.

17     **Q**     And through your inspections of Walgreens, Walmart,

18     and CVS, did you become generally familiar with the computer

19     systems at those -- that those companies' pharmacies used?

09:57:46 20    **A**     Well, I was far from being an expert, but I had a

21     working knowledge.

22     **Q**     Did you have the knowledge that you felt you needed as

23     a Board of Pharmacy agent to conduct a thorough inspection?

24                    MR. WEINBERGER:  Objection.

09:57:59 25                    THE COURT:  Overruled.

## Pavlich (Direct by Swanson)

1          THE WITNESS:  I did.

2    BY MR. SWANSON:

3    **Q**    Do you know, does the Board of Pharmacy have to

4    approve each pharmacy's computer system that they use for

09:58:13 5    dispensing?

6    **A**    They did.

7    **Q**    When you went in and did these inspections, would you

8    look at the actual physical prescriptions that the pharmacy

9    had filled?

09:58:32 10   **A**    I always did.

11   **Q**    And when you did that, did you have access -- and I'm

12   talking about at Walgreens, Walmart, CVS -- when you did

13   that, did you have -- did you have access to the entire file

14   of prescriptions, or did you just look at one or two?

09:58:53 15   **A**    Oh, I never looked at one or two.  I had access to, I

16   think as the rules require, three years of accountability,

17   but most pharmacies maintained at least, I believe it was

18   7 years because of IRS requirements.  But three years, I

19   think, was in the law at the state Board of Pharmacy law

09:59:19 20   book.

21   **Q**    So when you went in to -- my client is Walgreens.

22          When you went into a Walgreens pharmacy for an

23   inspection, you had access to three years of prescriptions.

24          Is that true?

09:59:33 25   **A**    That is true.

4544

**Pavlich (Direct by Swanson)**

1   **Q**     And I -- did you consider yourself to be a pretty

2   thorough investigator?

3   **A**     I thought I was very thorough.

4   **Q**     During your inspections, would you look at the actual

09:59:48  5   patients who were coming in with prescriptions to have

6   filled?

7   **A**     Well, if they were standing there in the pharmacy I

8   did.

9   **Q**     Okay.

09:59:57 10   **A**     But if they weren't there, I might ask a question of

11   the pharmacist.  If -- if this patient is getting an

12   exorbitant amount of medication -- and I can think of two

13   right away -- I would say, what's this guy look like?  You

14   know, how is this guy functioning based on what you're

10:00:24 15   dispensing to him?  And I'd look for an answer from these

16   pharmacists and see if I got a little stuttering, to say the

17   least.

18   **Q**     Which might raise your suspicion?

19   **A**     No.  I had a pharmacist that used to stutter every

10:00:44 20   time he lied to me, so, yeah, that raised my suspicions.

21   **Q**     The police officer in you would come out in those

22   situations, I take it?

23   **A**     Yes, it did.

24   **Q**     And for these inspections that we're talking about,

10:00:59 25   were they something where you'd call up the pharmacy and

4545

**Pavlich (Direct by Swanson)**

1    say, hey, I'm going to be there in a couple weeks, or would

2    you just show up?

3         How did that work?

4    **A**    Surprise, I'm here.  I never called, unless I had

10:01:18  5    called and said I need a specific profile printed on Jimmy

6    Bob Smith or Joey Davis and they would have it ready, and I

7    said, I'll pick it up in an hour or two, and they would

8    provide it for me and I would go.  But that really wasn't an

9    inspection.  I might leave an inspection sheet that says I

10:01:42 10    obtained a profile, but I never called when I did a full

11    inspection.  I just arrived.

12    **Q**    I take it you wanted to be sure that the pharmacies

13    you were inspecting couldn't prepare for your visit.  You

14    wanted to see how they were actually functioning in real

10:01:59 15    time?

16    **A**    That's for sure.

17    **Q**    And if you were doing an inspection and you found

18    areas where the pharmacy or the pharmacists were falling

19    short, would you let them know?

10:02:11 20    **A**    I would let them know orally or written on an

21    inspection sheet.  If I felt -- you know, pharmacists are

22    very intelligent and they do a great job and they got a lot

23    of things to take care of, including all the insurance, and,

24    you know, if they didn't put their initial, on, you know, a

10:02:41 25    script but did the majority, or they didn't sign off on a

4546

**Pavlich (Direct by Swanson)**

1    log but did the majority signing off, or something like

2    that, misfiled a controlled substance prescription with a

3    dangerous drug prescription, I'm not going to write them up

4    and send a report to Columbus that said, oh, my, look at

10:02:59 5    this, I caught them with three prescriptions misfiled.

6        It was usually written up for something that I wanted

7    to directly bring it to their attention and you better cease

8    and desist.  I was pretty -- pharmacists were cooperative

9    with me, and I was cooperative with them to the point of

10:03:22 10    working well together.

11    **Q**    Was it important to you, in doing these inspections,

12    to ensure that pharmacists and pharmacies that you inspected

13    were complying with the Board of Pharmacy's rules and

14    regulations?

10:03:36 15    **A**    Yes.  I mean, if there was something that needed

16    attention, it was written and documented it needed

17    attention.

18    **Q**    And if you found evidence of diversion or suspected

19    diversion, I take it that's something that you would alert

10:03:50 20    the pharmacy and your superiors to?

21    **A**    Yes, and I will add, the majority of the time, chain

22    pharmacists or chain pharmacies, pretty much all of them,

23    were the most compliant.  The least compliant was always I

24    would find in independent stores.  Not saying that chains

10:04:15 25    didn't have some bad apples in there and I went after them,

4547

**Pavlich (Direct by Swanson)**

1    but not specifically regulatorily.  They were pretty

2    uniformed as to how they documented and did things, pretty

3    much all of them.

4    **Q**    And by chain pharmacies, just so my record is clear,

10:04:35  5    Walgreens, Walmart, and CVS, in your view, in your

6    experience, were very compliant with the laws of Ohio?

7    **A**    Well, in my opinion -- I'll say it this way.  I was

8    with the Board of Pharmacy for 25 years.  I do not recall

9    one chain pharmacy that had a revocation of the license for

10:05:02  10    that chain pharmacy that I was involved in.  Not one.  But I

11    could tell you there were numerous independent ones.

12    **Q**    And what leads --

13    **A**    So --

14    **Q**    I didn't mean to interrupt.

10:05:16  15    **A**    No.  So, I think that explains it.

16    **Q**    I want to get into a -- into a specific report, just

17    to give the jury a sense for the work that did you.

18        But let me ask you first, we've talked about some of

19    the reasons that you would do inspections and some of the

10:05:39  20    things that you would look for.  Was that, in your view,

21    consistent across the other agents with the Board of

22    Pharmacy that you interacted with?

23    **A**    Well, it was required, but not everybody did

24    everything the same way.  Some -- some agents weren't as

10:06:04  25    thorough, if I may use the word.  Some agents weren't as

4548

**Pavlich (Direct by Swanson)**

1    capable at doing large investigations as other agents.  It

2    varied, but we were required to be thorough.  Doesn't mean

3    everybody was.

4    **Q**    If you could turn in your folder, sir, to Tab No. 1.

10:06:29 5    I want to ask you about what I believe to be one of the

6    inspection reports that you completed of a Walgreens.

7    **A**    Yes, that's my signature.

8    **Q**    Okay.  So I want to make sure we're looking at the

9    same thing.  I've called up for the jury here an inspection

10:06:58 10    report, and just to orient us here, I'm going to blow up

11    briefly on the bottom.

12        You can see this is signed and dated August 9th of

13    2006; right?

14    **A**    That is correct.  That's my signature next to it.

10:07:12 15    **Q**    Okay.  Right -- right here (indicating).

16    **A**    Right there.

17    **Q**    That's you.  Okay.

18        Now, I want to ask you, at the top there, you give

19    some details about the inspection.  It shows that you

10:07:37 20    arrived at the Walgreens at 11:15 and you were out at 2:45.

21    So that's about 2 and a half hours, which is consistent with

22    what you said before?

23    **A**    1:45.  Not 2:45.

24    **Q**    Oh, I gave you an hour.  What I meant to say is 1:45

10:07:58 25    equals 2 and a half hours?

**Pavlich (Direct by Swanson)**

1    **A**    Yeah.  And that's pretty much what I said, 2 and a

2    half, 3 hours.

3    **Q**    Correct.  And you can see, there's a line there for

4    responsible person, and it shows a pharmacist there named

10:08:14  5    Brian Joyce.

6         Do you remember a Brian Joyce who was a pharmacist at

7    Walgreens?

8    **A**    I remember Brian Joyce very well.  He was an excellent

9    pharmacist.

10:08:24 10    **Q**    Okay.  And the jury's actually heard him testify in

11    this case at this -- in this trial.

12         When you say he was an excellent pharmacist, what made

13    him an excellent pharmacist?

14    **A**    I knew Brian Joyce as far back as when I was with the

10:08:45 15    Youngstown Police Department and he worked at an independent

16    pharmacy.  Through his career with Walgreens, when he became

17    a supervisor eventually, I never, ever, that I recall, have

18    a major issue with Mr. Joyce, ever.  He was always

19    responsible.  He was always compliant.  He always called me

10:09:11 20    if he had issues or concerns.  He was excellent.

21    **Q**    All right.  Was he a guy who would tolerate

22    pharmacists or pharm techs who weren't responsible?

23    **A**    Not that I'm aware of, no.

24    **Q**    Was he someone who would call you if he suspected

10:09:35 25    there were doctors who weren't doing things the right way?

Pavlich (Direct by Swanson)

1    **A**    Yes.

2               MR. WEINBERGER:  Objection, Your Honor.

3    Objection.

4               THE COURT:  That's sustained.

10:09:45  5    BY MR. SWANSON:

6    **Q**    Did you ever receive calls from Mr. Joyce?

7    **A**    Many.

8    **Q**    And what are some of the reasons Mr. Joyce would call

9    you?

10:10:02  10    **A**    Doctor shopping.  This is before the OARRS electronic

11    database system.  He would call me and say, hey, I was

12    talking to Jim up at Rite Aid and they said this patient

13    that I got was also in their store with a different doctor

14    getting the same controlled substance.  That's an example.

10:10:22  15    Or someone came in with an altered prescription.  Brian

16    called me all the time.  I knew him very well.

17    **Q**    Was -- was Mr. Joyce the kind of pharmacist who would

18    put profits over safety at his pharmacies?

19               MR. WEINBERGER:  Objection.

10:10:38  20               THE WITNESS:  No.

21               THE COURT:  Sustained.  The jury is to

22    disregard the question and the answer.

23    BY MR. SWANSON:

24    **Q**    During your inspections of pharmacies, would you talk

10:10:48  25    to pharmacists and their staff and their technicians?

4551

**Pavlich (Direct by Swanson)**

1   **A**     Yes.

2   **Q**     Would you discuss the policies and procedures that the

3   pharmacies had in place?

4   **A**     Yes.

10:11:01 5   **Q**     And you recall you did that at Walgreens?

6   **A**     I was there 2 and a half hours, I would say yes.

7   **Q**     I want to ask you, if I can, sort of go through this

8   report piece by piece.  On the left-hand side there is --

9   there are a number of, I don't know, call them issues or --

10:11:27 10   well, I'll call them issues because I can't think of another

11   word, but maybe you can tell me what these 37 numbered

12   issues are.

13        Call them what you want to, but can you tell us what

14   you -- what I'm showing there?

10:11:42 15   **A**     These 37 items are standards to conduct an inspection,

16   starting off with licensing.  Do they have the federal?  Do

17   they have the state license?  Do they have their personal

18   pharmacist license?  Today, do the technicians have their

19   licenses?  And so on and so forth all the ways down to

10:12:08 20   counseling.  Are they providing counselling to the patients

21   at the time when the prescription is being dispensed?  Is

22   there a recordkeeping file available that documents this?

23   Guidelines.  Not that you have to check each block, it's --

24   it's a guide.

10:12:30 25   **Q**     Can I just ask you about a few that I had questions

Pavlich (Direct by Swanson)

1      about, if you can help clarify them for me.

2           You see Number 6 there, there's an item, security?

3      **A**    Yes.

4      **Q**    What does that mean?  What were you checking when you

10:12:46  5    have that item for security?

6      **A**    Well, I was making certain that the pharmacy was

7      barricaded in the respect that if a pharmacist left the

8      store and the store was still open, is it secured, either by

9      electronic means -- an alarm system -- or a physical

10:13:07  10   barricade -- sealing it off.  Were all the drugs stock

11     within the barricade?  Was all the recordkeeping secured so

12     no one could, for an example, a front-end clerk go into the

13     backroom and look through various RX files and see what

14     Jimmy Bob Smith was setting security.

10:13:34  15   **Q**    Did security looking at the security of the computer

16     systems that the pharmacy might have in place?

17     **A**    I wasn't really adept at computers.  Security would

18     mean with the computers that were -- they were maintained

19     within the environment of the pharmacy.  There was no access

10:14:01  20   to it outside.  As far as it blocking down and everything

21     else, beyond my capabilities.

22     **Q**    Okay.  And you see look at cleanliness.  What about

23     Number 11 here, improper dispensing.  What did that -- what

24     did that item refer to?

10:14:28  25   **A**    Pretty much what it says, were there prescriptions on

**Pavlich (Direct by Swanson)**

1    file for an example that shows 10 prescriptions were

2    prescribed by the doctor in blue ink, and then I see a black

3    circle next to it showing a hundred and they dispensed a

4    hundred.

10:14:43  5    Now, to me, that would say you're not paying attention

6    and you dispensed a hundred instead of 10 as written by the

7    doctor.  I mean, that's a -- a very broad example of

8    something, but anything that's improperly dispensed would

9    come under that category.

10:15:01  10  **Q**   And I guess we talked a bit before about a

11   pharmacist's corresponding responsibility, and we had some

12   questions and answers about that.  Is the -- is that

13   improper dispensing item, is that where you would evaluate

14   whether the pharmacists were exercising their corresponding

10:15:17  15  responsibility?

16   **A**   Yeah, that would be one of the categories.

17   **Q**   And if a pharmacist at a Walgreens, Walmart, CVS were

18   failing to exercise their corresponding responsibility,

19   would you note that in the inspection report?

10:15:31  20  **A**   I would.

21   **Q**   Again, I don't want to look at all of these, but there

22   were some I had -- I had questions on.

23   Number 20, improper prescriptions.  Can you tell us

24   what that means?

10:15:48  25  **A**   It's similar to what Number 11 is, improper

4554

**Pavlich (Direct by Swanson)**

1    dispensing.  Improper prescriptions could also be when a

2    telephone prescription is being called into the pharmacy

3    from a doctor's office and they're not using the proper

4    standards to document that, like for an example. . . they're

10:16:19  5    not documenting the full name of the person calling in the

6    prescription, they're just putting Jimmy Bob, but not Jimmy

7    Bob Smith, and that's required.  So that would be an

8    improper RX.  You're not documenting the full requirements

9    of that prescription telephoned into your pharmacy.

10:16:40 10   **Q**    All right.  Just one or two more that I wanted to ask

11    you about.

12          Number 26 here, RX or prescription files.  What was

13    that item that you would look at when you did these

14    inspections?

10:16:55 15   **A**    I would look at their manual documentation file.

16    There would be, obviously, Schedule II controlled substances

17    were filed separate.  Schedule III, IV, and V were in a

18    separate files, the actual prescriptions, and then the

19    legend route, which are still prescriptions but they're not

10:17:25 20    controlled would be in a third file, and those are the RX

21    files that I would manually look at every time I did a full

22    inspection.

23    **Q**    Okay.  And you've talked about this before.  It sounds

24    as though this were -- this was a pretty important part of

10:17:42 25    the inspections you'd conduct?

1    **A**    It was probably one of the most important.

2    **Q**    And I was going to ask, I mean, if you're -- if 2 and

3    a half, 3 hours was sort of your standard for an inspection,

4    how long, in general, if you can recall, would you spend

10:17:58 5    going through the prescription files and looking at

6    individual prescriptions?

7    **A**    Well, I'd spend a long time.  I would spend at least a

8    half an hour on each controlled substance.  So half an hour

9    on the II's and half an hour on the III, IV, and V

10:18:23 10    prescriptions, and not quite as long on the not quite as

11    long on the regular prescription drugs.

12        It all depended on what their volume was in the

13    pharmacies.  I mean, some pharmacies would do 50 scripts a

14    day, some would do 500 scripts a day, so I would spend a lot

10:18:47 15    more time in the one that did 500 than the one that did 50.

16    **Q**    And in those hour, hour and a half you were looking at

17    actual physical prescriptions, if you had questions, was a

18    pharmacist there to answer questions for you?

19    **A**    Yes, he was, or she was.

10:19:04 20    **Q**    And if that pharmacy were maintaining prescription

21    files that didn't comply with the state or federal

22    regulations, is that something you'd write up?

23    **A**    Oh, yeah, yes, I would.

24    **Q**    All right.  Let me ask you, just below that list that

10:19:24 25    we just looked at there's a box there that says pink sheet

**Pavlich (Direct by Swanson)**

1    issued for numbers, and then it leaves a line where you can

2    put in numbers.

3         Can you tell us what that is?

4    **A**   A pink sheet is, in my day, a manually required reply

10:19:49 5    to issues that I note by numbers.  For an example, Number 1,

6    licensing, I would put Number 1 in the line next to it and

7    above that, within the body of the inspection report, I

8    would have Number 1, couldn't find terminal distributor

9    license, and that would be a pink sheet.

10:20:18 10        Then I would give them a copy of the pink sheet and

11   their regular inspection sheet, and the pink sheet would

12   have to be sent to Columbus within 20 days or something like

13   that with a reply stating we do have a terminal

14   distributor's license, here's a copy of it, it was misfiled

10:20:42 15   or whatever, but they have to write a written reply and send

16   it to Columbus because I had special intentions for them to

17   show me an answer for that.

18   **Q**   It looks like, for the -- for the prescription that

19   we're looking at -- and I should have said, just for the

10:21:02 20   record, if you'll excuse me, Mr. Pavlich, this is

21   Defendants' Exhibit WAG-MDL-1110A.  It looks like for the

22   prescription -- or for the inspection report we're looking

23   at there was no pink sheet issued.

24        Is that fair?

10:21:24 25   **A**   It's not marked on the first page.  Let me look

**Pavlich (Direct by Swanson)**

1    through this.

2    **Q**    Sure.

3    **A**    No, there was no pink sheet issued.  If you go through

4    it and you look at Page 4, again, it's not a pink sheet,

10:21:50  5    it's kind of a note for the RPh.  I make a note about first

6    and last name of the agent, which was, for -- as an example,

7    what I said was, for that category that you talked about, I

8    note RPh, the receiving of prescriptions via telephone

9    requires the RPh document first and last name of the agent,

10:22:13 10    nurse calling in, the prescriber RX, see 4729-5-30 ORC.

11       So, again, that was an example of something that I

12    saw, and it wasn't extensive, it wasn't to the point that I

13    needed a written reply.  I was bringing it to the attention

14    of the three pharmacists and the intern working in that

10:22:41 15    store and saying, let's do a little better job here.

16    **Q**    Okay.  And I think I caught up to you.  You were

17    saying on the fourth page there was a note of something that

18    you saw that wasn't in perfect compliance, you wanted to

19    bring it to the attention of the pharmacy but it didn't rise

10:22:57 20    to the level of a pink sheet.

21       Is that fair?

22    **A**    That's fair, and it probably was, you know, not

23    extensive or I would have pink sheet.

24    **Q**    Okay.

10:23:09 25    **A**    There was some -- there was some documentation that

**Pavlich (Direct by Swanson)**

1    needed to be brought to their attention, and I write it down

2    like that because I'm there with -- oh, God, I can't even

3    pronounce his name -- pharmacist that's listed first on that

4    inspection report, but I want to make sure that the other

10:23:30  5    pharmacists that aren't there see this on the inspection

6    report and address it when they're in the pharmacy.

7    **Q**    So that's an -- I don't know this person, it looks

8    like Enouha?  Is that the pharmacist?

9    **A**    You got me.  He uses the initials EEO.

10:23:48  10    **Q**    All right.

11    **A**    I can't pronounce that.

12    **Q**    Well, let's agree that's the right pronunciation, but

13    that's the person then that you would say, hey, you know,

14    make sure this gets corrected at your pharmacy?

10:23:59  15    **A**    Yeah.  It was brought to their attention and for the

16    attention of the other pharmacists.  Not in a written

17    requirement to reply back to me, just pay attention.  That's

18    all.

19    **Q**    Okay.  And I want to, if I can, ask you about a couple

10:24:18  20    of these.

21    You see there on the first page the pharmacy has

22    IntercomPlus software with five patient dispensing computer

23    screens.

24    Do you see that?

10:24:33  25    **A**    Yes.

**Pavlich (Direct by Swanson)**

1    **Q**    And do I understand correctly, that's a reference to

2    the Intercom Plus dispensing system that Walgreens was

3    using?

4    **A**    Yeah, I believe at that time that's what they had.

10:24:45  5    **Q**    Okay.  And by five patient dispensing screens, does

6    that mean they had five different computers that pharmacists

7    or techs could use to enter data?

8    **A**    Yes.

9    **Q**    The -- I take it that -- well, was every Walgreens

10:25:11  10    inspection that you did perfect?

11    **A**    Nobody's perfect, including me.

12    **Q**    Okay.  Would you sometimes find reason to issue a pink

13    sheet to a Walgreens pharmacy?

14    **A**    I'm sure I have.  You know, for me to recall -- I'm

10:25:37  15    sure I have.  But I wasn't one -- I wasn't one -- I didn't

16    have to show a pharmacist that I'm not a pharmacist, but I

17    sure as heck can figure out what's going on in this

18    pharmacy.

19        I think my reputation followed me around, and they

10:25:55  20    knew if I was there, I meant business and I wanted a

21    standard met.  And I used to tell pharmacists, whether they

22    were in a chain or they were in an independent store, you

23    have to comply the same as a chain does, the same as an

24    independent does.  I don't pull favorites.  Everybody got to

10:26:21  25    do the same thing.  If you're not, you got to answer to me

4560

**Pavlich (Direct by Swanson)**

1    because you're a reflection of me out here in the field.

2         And I used to put this straight across to them and

3    they -- they understood.

4    **Q**    Let me ask you if you can recall more generally, what

10:26:37 5    was the expectation if you did have to issue a pink sheet to

6    a pharmacy, what was the expectation that you required from

7    the pharmacy or the pharmacist?

8    **A**    If I issued a pink sheet?

9    **Q**    Yes, sir.

10:26:53 10    **A**    They would have a certain number of days to -- oh,

11    it's right on the inspection sheet.  20 days to reply

12    manually on the back of the pink sheet, forward it to

13    Columbus, and then Columbus would send their reply back to

14    me and I would look at it.  And if their reply was this

10:27:24 15    agent doesn't know what he's talking about, he's not even a

16    pharmacist, which I had that said one time, I would go

17    back --

18    **Q**    Not by Walgreens, I hope.

19    **A**    -- I would end up back in that pharmacy very shortly

10:27:35 20    after that.

21         But 99 percent of the time they would say, we're doing

22    our best.  We are going to comply.  This was an oversight,

23    so on and so forth.

24    **Q**    Okay.  Thank you.

10:27:46 25              MR. SWANSON:  Your Honor, I'm being to move to

**Pavlich (Direct by Swanson)**

1    a new topic.

2                    THE COURT:  Okay.  That's fine.  I was going

3    to suggest a time for our break.

4         Ladies and gentlemen, we'll take our mid-morning

10:27:57  5    break, 15 minutes, and then we'll continue with this

6    witness' testimony.

7                    (Jury excused from courtroom.)

8         (Recess was taken from 10:28 a.m. till 10:48 a.m.)

9                    COURTROOM DEPUTY:  All rise.

10:50:20  10        (Jury returned to courtroom at 10:50 a.m.)

11                    THE COURT:  Okay.  Please be seated, and

12    Mr. Pavlich, I just want to remind you you're still under

13    oath from before the break.

14         And, Mr. Swanson, you may proceed.

10:50:36  15                    MR. SWANSON:  Thank you, Your Honor.

16    BY MR. SWANSON:

17    **Q**    Welcome back, Mr. Pavlich.

18         Before we broke, we were talking about the inspections

19    that you had performed at Walgreens pharmacies in Trumbull

10:50:50  20    County, and I just have a few follow-up questions on that

21    topic.

22         Do you recall, sir, in all of the years that you

23    conducted inspections of Walgreens pharmacies in Trumbull

24    County ever having any issues with the systems that

10:51:07  25    Walgreens used to dispense prescription medications, like

4562

**Pavlich (Direct by Swanson)**

1    opioid medications?

2    **A**    I don't recall.  I don't recall any -- any problems.

3    **Q**    Is that the same answer for CVS?

4    **A**    Yeah, I don't recall any with CVS either.

10:51:30 5    **Q**    And same for Walmart, sir?

6    **A**    And I don't recall any problems with Walmart system

7    either.

8    **Q**    And did you ever have any issues with the systems that

9    Walgreens used for maintaining records and data?

10:51:49 10    **A**    No.

11    **Q**    Same answer for CVS?

12    **A**    Yes.

13    **Q**    And same answer for Walmart?

14    **A**    Yes.

10:52:03 15    **Q**    Are you aware of any Walgreens, a pharmacy in Trumbull

16    County, ever being subjected to criminal or a civil

17    investigations due to improper dispensing?

18    **A**    As I earlier testified, I don't recall any specific

19    chain, any, ever having a revocation of their license for a

10:52:28 20    criminal for administrative case.  I recall pharmacists, but

21    not the chain.

22    **Q**    Okay.  And let me follow up because you've mentioned a

23    couple of times that we have the chain pharmacies like

24    Walgreens and CVS and Walmart, and then you've mentioned

10:52:47 25    independent pharmacies.

Pavlich (Direct by Swanson)

1          Can you tell us what independent pharmacies are and

2     what's the distinction you're making there?

3     **A**     Chain pharmacists [sic] is owned by a corporation

4     that, for an example, would have numerous pharmacies,

10:53:08 5     Walgreens, CVS, Walmart, Giant Eagle, numerous.

6          An independent pharmacy is one that is owned -- it

7     might be set up as a corporation, but by individuals

8     pharmacist or pharmacists with the express purpose of having

9     one store, maybe two, maybe three, but not to the extent of

10:53:36 10     a chain pharmacy.  So there was a big difference between the

11     two where pharmacists worked, big difference.

12     **Q**     I'd like to -- I'd like to pivot now and -- and talk

13     to you a little bit about pharmaceutical diversion in

14     Northeast Ohio.  And diversion is the topic that you defined

10:54:05 15     for us earlier today.

16          If you could turn to Tab 3 of your notebook, I want to

17     ask you about a specific document.

18     **A**     Okay.

19     **Q**     I've put up on the screen, it's in your tab, what I've

10:54:30 20     marked as Defendants' MDL 12052, that's the Exhibit Number.

21     It's An Ohio Prescription Substance Abuse Task Force.

22          Were you aware when you were at the Board of Pharmacy

23     that the governor of Ohio had brought together a task force

24     to look into the issue of prescription drug abuse in the

10:54:53 25     state?

**Pavlich (Direct by Swanson)**

1   **A**    Well, first of all, I don't remember ever seeing this

2   booklet, and as far as the task force, I worked with

3   Trumbull County Drug Task Force, Mahoning County Drug Task

4   Force, and Columbiana County Drug Task Force, but nothing

10:55:19  5   out of the governor's office that I remember.

6   **Q**    If you can look, I flipped to Page 9 --

7             MR. WEINBERGER:  Objection, Your Honor.

8             THE COURT:  Well. . .

9   Let's go on the headphones for a minute.

10:55:48  10            (Proceedings at sidebar.)

11             THE COURT:  All right.  Mr. Swanson, the

12   witness said he doesn't remember anything about this.  If

13   there's something on that -- you believe this witness had

14   anything to do with this task force and he's just forgotten

10:55:57  15   and there's something about this page that will prompt his

16   memory?  I mean, he's deposed.

17             MR. SWANSON:  Yeah.  He wasn't deposed on

18   this.  I was just going to ask him, the head of the BOP was

19   on the task force, and so I just wanted to see if he -- if

10:56:09  20   he doesn't know, I'll take it down.  But I just wanted to

21   ask, because the head of the BOP was a member of the task

22   force, if it was something he ever discussed.  And if not

23   I'll move on.

24             MR. WEINBERGER:  He's already testified he has

10:56:19  25   no knowledge of this document.

4565

**Pavlich (Direct by Swanson)**

1              THE COURT:  Well, I don't -- no.  He can show

2       him who -- I mean, who was on it and does -- all right.  If

3       you want to ask him -- fine, you can ask him that one

4       question.

10:56:29  5              MR. SWANSON:  That's fine.  Yeah.  I'll move

6       on if he's not --

7              THE COURT:  Yeah.

8                (In open court at 10:56 a.m.)

9       BY MR. SWANSON:

10:56:43 10     **Q**     So, Mr. Pavlich, I've put up from the exhibit here a

11      list of the task force members, and I just wanted to ask you

12      one question.

13          If you look in the lower right-hand corner, one of the

14      task force members was William Winsley.

10:57:03 15         Are you familiar with him?

16      **A**     Yes.  He was the executive director of the Board of

17      Pharmacy.

18      **Q**     Okay.

19      **A**     He was a pharmacist also.

10:57:12 20     **Q**     Okay.  And he was on the task force, but you don't

21      have any recollection of ever seeing this document or

22      discussing it?

23      **A**     I don't recall ever seeing this document, and as far

24      as him being on this task force, I didn't know about it.

10:57:27 25     **Q**     Okay.  Then I'm not --

**Pavlich (Direct by Swanson)**

1    **A**    That I recall.

2    **Q**    All right.  Then I'm not going to ask you about it.

3          But I do want to ask you some general questions

4    about -- again, about diversion in Northeast Ohio.

10:57:40  5          Are you familiar internet pharmacies that existed

6    while you were at the Board of Pharmacy?

7    **A**    I'm very aware.  I did a large investigation on one.

8    **Q**    Can you tell the members of the jury what an internet

9    pharmacy is when you use that term?

10:58:04  10   **A**    A pharmacy that has a retail setting.  In my

11   particular case was an independent pharmacy, and they were

12   receiving electronic data-generated prescriptions over the

13   internet into their pharmacy and then preparing prescription

14   medication and FedEx, UPS, whatever, sending it out to

10:58:36  15   patients without a face-to-face examination by a physician

16   to a patient, which is one of the requirements -- at least

17   it was when I was working -- for a physician to have a face

18   to face with a patient, not fill out a form and we'll send

19   you prescription drugs.  That's an internet prescription.

10:58:58  20   **Q**    Yeah.  And I think you said that you conduct -- excuse

21   me -- conducted an investigation into an internet pharmacy

22   in Ohio?

23   **A**    Yes.  It involved a million, and I believe, a quarter

24   prescription doses.

10:59:14  25   **Q**    And million and a quarter, you said?

4567

**Pavlich (Direct by Swanson)**

1    **A**    Approximately around that number.

2    **Q**    Where was the -- where was the pharmacy?

3    **A**    In Mahoning County.

4    **Q**    And you said that was an independent pharmacy?

10:59:27  5    **A**    Yes.  It lost its license and he lost his license, and

6    convicted of felonies.

7    **Q**    Did you investigate other internet pharmacies while

8    you were a member of the Board of Pharmacy?  An agent for

9    the Board of Pharmacy, excuse me.

10:59:41  10    **A**    No.  That was the -- that was primarily the only one

11    that I did, and it took a while.

12    **Q**    Do you recall what year it was that you shut down that

13    pharmacy?

14    **A**    As a matter of fact, it went right toward the end of

10:59:59  15    my career, the administrative and criminal conclusion.  So

16    that would have been to -- the end of 2011 -- the fall of

17    2011, and I believe he pled in January of 2012 or February

18    of 2012.

19    **Q**    Another topic that I think we at least mentioned, but

11:00:28  20    if not we will now, were pill mills in Ohio.

21    Are you familiar with pill mills and what they are?

22    **A**    I am.

23    **Q**    Can you tell us, how do you describe or define a pill

24    mill?

11:00:46  25    **A**    The excessive prescribing, dispensing of controlled

4568

**Pavlich (Direct by Swanson)**

1    and/or legend prescription medication with no manner of

2    issuance and legitimate medical purpose as a standard.

3    **Q**    Was there a time when you were an agent for the Board

4    of Pharmacy that there existed doctors who could set up an

11:01:17  5    office and see patients, write prescriptions for the

6    patients, and then dispense those prescriptions from the

7    same office?

8    **A**    Yeah, there was some that were doing that.

9    **Q**    And would that -- would you consider that to be a pill

11:01:34  10    mill or possibly a pill mill when you saw that sort of

11    activity?

12    **A**    You know, not necessarily a physician dispensing

13    medication out of his office would be a pill mill.  Some --

14    you know, I can think of one down in a rural area down in

11:01:56  15    Columbia, and they said we did it for the convenience of the

16    patient not having to drive a distance to a pharmacy.

17    Whether I believed all that, I don't know, and I don't

18    recall the profit they would make an dispensing of meds, but

19    that is not a blanket answer for a pill mill.

11:02:19  20    **Q**    Right.  But if you saw that sort of situation maybe

21    where the prescriber would take only cash payments to see

22    the patient, might not do a thorough exam and would just

23    write a prescription for an opioid and then dispense it from

24    his or her office, would that be a sort of definition of a

11:02:40  25    pill mill, in your view?

4569

**Pavlich (Direct by Swanson)**

1   **A**   Yes.  I had a large case involving a diet doctor doing

2   that.

3   **Q**   Okay.  What about -- you said a diet doctor.  Was the

4   diet doctor prescribing opioids or diet pills?

11:02:58  5   **A**   He was prescribing amphetamines.

6   **Q**   Did -- what about the situation where doctors were

7   prescribing opioid pills, was that something you ever came

8   across in your career at the BOP?

9   **A**   I had doctors prescribing lots of things in my career

11:03:16  10   at the BOP.

11   **Q**   Let me --

12   **A**   Opiates included.

13   **Q**   All right.  Let me turn to something that we talked

14   about a bit before, you touched on a bit before that I now

11:03:33  15   want to dive into a bit, and that is the jury's heard about

16   and we've now mentioned a former doctor in Ohio named

17   Peter Franklin.

18        You remember him?

19   **A**   Very well.

11:03:44  20   **Q**   And we've heard about a pharmacy in Trumbull County

21   called Overholt's Pharmacy.  You're familiar with that

22   pharmacy when it existed?

23   **A**   Very well.

24   **Q**   Were you, sir, involved in an investigation into the

11:04:00  25   activities of Dr. Franklin in the 2008 time frame?

Pavlich (Direct by Swanson)

1    **A**    I was.

2    **Q**    Were you also involved in an investigation in the

3    activities of Overholt's Pharmacy in that same time frame?

4    **A**    I was.  I wrote the primary investigative reports and

11:04:22  5    search warrants.

6    **Q**    Can you tell us why it was that you were -- you began

7    or undertook an investigation, first, of Dr. Franklin?

8    **A**    Well, Dr. Franklin -- and I believe his office was up

9    in Geauga County which wasn't one of the counties I was

11:04:43 10    responsible for, it was another agent.

11    My understanding was numerous pharmacists up there had

12    complained about this doctor and nothing was being

13    apparently done.  So I received a call from a specialist in

14    my office, her name was Joanne Perdina (phonetic), who was

11:05:03 15    at it was either Lake -- I think it was at Lake County jail

16    about a patient that's in there and he was getting --

17    MR. WEINBERGER:  Objection to hearsay.

18    THE COURT:  Well, yeah.  Sustained as to all

19    this hearsay.

11:05:17 20    THE WITNESS:  Okay.  Sorry.

21    BY MR. SWANSON:

22    **Q**    No.  That's okay.  I need to ask better questions to

23    make sure that we're eliciting only responses that you're

24    able to give.

11:05:27 25    Did you learn anything about Dr. Franklin's

4571

**Pavlich (Direct by Swanson)**

1    prescribing habits that led you to investigate him?

2    **A**    I did.

3    **Q**    What did you learn?

4    **A**    I learned he was -- my direct information was that he

11:05:45  5    was heavily prescribing controlled substances to a number of

6    patients.

7    **Q**    And can -- prescribing controlled substance isn't in

8    and of itself unlawful.  Was there something about his

9    prescribing that led you to your investigation?

11:06:04  10    **A**    His prescribing didn't even come close to legitimate

11    medical purpose.  He was prescribing exorbitant amounts,

12    numbers I have never seen in my life, to patients controlled

13    substances.

14    **Q**    Can you give us a sense for what it means to you as an

11:06:26  15    investigator, what constitutes an exorbitant amount of

16    opioids?

17    **A**    Well, there was one patient, I'll refer to him as

18    Joey, he was getting 900 tablets of Dilaudid, 8-milligram,

19    top strength, a month.  That's 30 tablets of Dilaudid,

11:06:53  20    8-milligram, a month.  Not counting oxycodone, methadone,

21    might have been hydrocodone in there and Valium.  Enough to

22    kill a herd of elephants, in my opinion, much less a

23    patient.  That's one case.

24         And there was another I could think of, a patient in

11:07:16  25    there, last name started with a V.  He was getting 3

4572

**Pavlich (Direct by Swanson)**

1    strengths of Duragesic patches to apply two patches at a

2    time of each strength, so that's six patches of Duragesic,

3    which is fentanyl, and he was also getting prescribed, I

4    believe, oxycodone or methadone and something else along

11:07:41  5    with it.  Enough to kill an elephant also in my opinion.

6    **Q**    So --

7    **A**    Those are two examples of Peter Franklin.

8    **Q**    Okay.  And I appreciate that.

9         What about -- why was it that you were also

11:07:55  10    investigating Overholt's Pharmacy at that same time?

11    **A**    I wasn't.  I -- I was tied up at that time also on the

12    internet case, which took a lot of work.  I received a call

13    from another agent -- specialist in my office and said, look

14    at this profile, and it was Joey's.  I -- I couldn't believe

11:08:23  15    it.  I -- I -- I said, there's something wrong here.  And I

16    found out, the profile was from Overholt's Pharmacy, which

17    immediately I shifted into first gear and decided I got to

18    go up there and look at this, which I did.

19    **Q**    Did the -- did the Board of Pharmacy combine its

11:08:48  20    investigation that you were conducting of Dr. Franklin with

21    its investigation of Overholt's?

22    **A**    What happened was my field supervisor -- well, my

23    agent supervisor in Columbus, Bob Cole, and then my field

24    supervisor for Northeast Ohio, Jim Rye met me and said you

11:09:09  25    know you're leaving --

**Pavlich (Direct by Swanson)**

```
             1              MR. WEINBERGER:  Objection.  Objection,

             2    Your Honor.

             3              MR. SWANSON:  Let me --

             4    BY MR. SWANSON:

11:09:16     5    Q    And again, I apologize, Mr. Pavlich.  I need to ask

             6    you sort of questions to lead to these answers.

             7              So my first question is just generally, were the

             8    investigations of Dr. Franklin and Overholt's Pharmacy, were

             9    they ultimately combined?

11:09:31    10    A    Yes.

            11    Q    Were you -- was that unusual that an investigation of

            12    a doctor and a separate pharmacy would be combined into one?

            13    A    It was unusual because it was two counties and one of

            14    which I was not responsible for.

11:09:51    15    Q    Were you the lead investigator into this investigation

            16    into Dr. Franklin and Overholt's?

            17    A    I was.

            18    Q    And what was the connection between Dr. Franklin and

            19    Overholt's Pharmacy that led the BOP to combine those two

11:10:05    20    investigations into a single one?

            21    A    I guess my ability to put big cases like that

            22    together.  I was assigned, and one of the -- the pharmacy

            23    was in my county, so the doctor was in another agent's

            24    county, but I got the task.

11:10:25    25    Q    But was there -- was there some connection between
```

4574

**Pavlich (Direct by Swanson)**

| | | |
|---|---|---|
| | 1 | Dr. Franklin and Overholt's that made it make sense to |
| | 2 | investigate those two together? |
| | 3 | **A**   Yes. |
| | 4 | **Q**   What was that? |
| 11:10:39 | 5 | **A**   Dr. Franklin's office in Geauga -- there was numerous |
| | 6 | pharmacies around his office.  I believe there was a |
| | 7 | Giant Eagle across the street, there was a Rite Aid down the |
| | 8 | street, there -- there might have been a Walgreens up there |
| | 9 | and another big pharmacy.  The patients were not going to |
| 11:11:04 | 10 | these pharmacies; they were driving -- I'm guessing if I |
| | 11 | recall -- 35 minutes south to Trumbull County in Champion, |
| | 12 | Ohio, and filling their prescriptions at that independent |
| | 13 | pharmacy.  That was the connection. |
| | 14 | **Q**   In your investigation, did you learn why it was that |
| 11:11:27 | 15 | the patients or many of the patients were taking |
| | 16 | prescriptions from Dr. Franklin to Overholt's? |
| | 17 |                   MR. WEINBERGER:  Objection. |
| | 18 |                   THE COURT:  Yeah.  Sustained. |
| | 19 | BY MR. SWANSON: |
| 11:11:40 | 20 | **Q**   Did -- did you, in this investigation, did you -- did |
| | 21 | you collect evidence? |
| | 22 | **A**   A lot of it. |
| | 23 | **Q**   Did you collect prescriptions from Dr. Franklin's |
| | 24 | office? |
| 11:11:55 | 25 | **A**   A lot of them. |

### Pavlich (Direct by Swanson)

1  **Q**    Did you collect prescriptions from Overholt's

2  Pharmacy?

3  **A**    I didn't -- backing up.  I didn't collect

4  prescriptions from Dr. Franklin's office, patient records.

11:12:10  5  Overholt's Pharmacy, I collected prescriptions.

6  **Q**    And did you learn anything, as you went through the

7  prescriptions, that connected Overholt's Pharmacy to

8  Dr. Franklin?

9  **A**    Yes.

11:12:23  10  **Q**    What did you learn?

11  **A**    That they were not questioning anything prescribed,

12  they were just dispensing them --

13              MR. WEINBERGER:  Objection -- objection.

14  Hearsay, Your Honor.

11:12:37  15              THE COURT:  Sustained.

16  BY MR. SWANSON:

17  **Q**    Well, let me see if I can show you --

18              THE COURT:  Well, let's go on the headphones a

19  minute.

11:12:44  20              MR. SWANSON:  Yeah.

21                  (Proceedings at sidebar.)

22              THE COURT:  All right.  Mr. Swanson, I don't

23  know exactly where this is going.  If this witness conducted

24  an investigation that led to a prosecution of Overholt's or

11:13:09  25  Franklin or --

## Pavlich (Direct by Swanson)

1          MR. SWANSON:  Correct.

2          THE COURT:  -- a disciplinary proceeding of

3   Overholt's or Franklin, you can bring that out from him.

4          MR. SWANSON:  Yes.

11:13:17  5          THE COURT:  All right.  But -- but -- I'm not

6   going to let him relate what people told him and --

7          MR. SWANSON:  Here's the thing that's

8   important, Your Honor, that I think is admissible.  The --

9   Dr. Franklin, he's testified in his deposition, so I know

11:13:30  10   this to be true.  Dr. Franklin was writing prescriptions and

11   he was writing on the prescriptions, fill only, fill only at

12   Overholt's.  That's what he was writing on the

13   prescriptions.  That's the testimony that I want to elicit

14   from this witness because I think it's important.

11:13:51  15          THE COURT:  Well, was -- well, was the

16   prosecution of Franklin tied to Overholt's?  Were there two

17   separate prosecutions?

18          MR. SWANSON:  Whether the prosecutions were

19   tied, I don't know, but the investigation was tied.

11:14:04  20          THE COURT:  Well, he's already said it was a

21   joint investigation.

22          MR. SWANSON:  Correct, and I'm trying to

23   establish the connection, why it was that he was looking at

24   both Overholt's and at Dr. Franklin.

11:14:14  25      And separately, I want to say, I have a --

4577
**Pavlich (Direct by Swanson)**

1              THE COURT:  Well, if -- he -- you can ask

2        him -- I mean, do you know why the investigations were

3        consolidated, and if he says yes -- I'm not going to let him

4        relate what people told him, but if he found or was given a

11:14:37 5        whole bunch of prescriptions that Franklin's patients filled

6        at Overholt's, that's the reason why the two were tied

7        together, and he can testify that's what he found.

8              MR. SWANSON:  Right.  But, Your Honor, he

9        saw -- here's what I want to ask him.  He saw the

11:14:50 10        prescription that said from Dr. Franklin, direction, fill

11        only at Overholt's.  I want to elicit that testimony.  I

12        think I'm entitled to.

13              THE COURT:  Well, if he -- if he uncovered

14        that in his investigation, then you can bring that out.  If

11:15:03 15        that's what he personally uncovered --

16              MR. SWANSON:  So can I ask -- I don't want to

17        run afoul.  Can I ask him, did you learn that Dr. Franklin

18        was directing his patients to go to Overholt's?

19          I have a good faith basis to ask that question because

11:15:15 20        he testified to that in his deposition.

21              THE COURT:  Well, it's leading.

22              MR. WEINBERGER:  It's still hearsay.  It

23        doesn't cure it that he --

24              THE COURT:  Well, no, that isn't hearsay.  If

11:15:24 25        he found it -- Mr. Weinberger, if he actually uncovered the

4578
**Pavlich (Direct by Swanson)**

1    prescriptions which said that, he can say I, you know, here

2    are the prescriptions and this is -- I followed this lead.

3    So -- so --

4                    MR. WEINBERGER:  Okay.

11:15:39  5                    MR. SWANSON:  If I can ask him that question,

6    I can move off --

7                    THE COURT:  Why don't you do it this way:  Ask

8    him, as part of your investigation, did you -- did you look

9    at prescriptions that were filled at Overholt's, yes or no?

11:15:53 10   All right?  Did you look at which doctors, you know, wrote

11   them?  All right?  Was one of them Franklin, or something

12   like that?  I mean, he can testify to what he personally

13   investigated.

14                    MR. SWANSON:  Right.  But he's already

11:16:09 15   testified to that.  What I want to elicit is the testimony

16   that they were directed to go to Overholt's.

17                    THE COURT:  Well, he doesn't know if they were

18   directed.

19                    MR. SWANSON:  Sure he does.

11:16:18 20                    THE COURT:  If he's got -- if he saw

21   documents, and the document says fill only at such and such,

22   he can say what the document said.

23                    MR. SWANSON:  Your Honor, I have a search

24   warrant that he wrote where he puts that in the search

11:16:29 25   warrant, so I can just put that in if that's the way to do

4579

**Pavlich (Direct by Swanson)**

```
              1    it.  I'm fine with doing that.

              2                 THE COURT:  Okay.

              3                 MR. WEINBERGER:  But it's still hearsay.

              4                 MR. SWANSON:  No, it's not.

11:16:37     5                 MR. WEINBERGER:  Whether it's a --

              6                 THE COURT:  You can elicit from him that one

              7    of the reasons two investigations were put together is that

              8    he found in the course of his investigation a significant

              9    number of prescriptions at Overholt's -- that were written

11:16:54    10    from Franklin's office, fill only at Overholt's.  You can --

             11    you can bring that out.

             12                 MR. SWANSON:  I can ask that.  Okay.

             13                 THE COURT:  Yes.

             14                 MR. SWANSON:  Thank you.

11:17:19    15                    (In open court at 11:16 a.m.)

             16    BY MR. SWANSON:

             17    Q    Mr. Pavlich, returning to your testimony, I believe

             18    you said that as part of your investigation you pulled

             19    prescriptions written by Dr. Franklin that were filled at

11:17:32    20    Overholt's.

             21         Is that -- is that fair?

             22    A    Correct.

             23    Q    And it sounds like you reviewed a number of those

             24    prescriptions in your investigation?

11:17:44    25    A    I did.
```

4580

**Pavlich (Direct by Swanson)**

1    **Q**    In looking through those prescriptions, did you see

2    any prescriptions that stated that the prescription should

3    be filled only at Overholt's?

4                    MR. WEINBERGER:  Objection, Your Honor.

11:17:56  5                    THE COURT:  Overruled.

6                    THE WITNESS:  I did.

7    BY MR. SWANSON:

8    **Q**    Was that just on one prescription or was that on many

9    prescriptions?

11:18:07 10    **A**    I don't recall how many, but I saw them on numerous

11   prescriptions.

12   **Q**    And was that suspicious to you in any way?

13   **A**    Absolutely.

14   **Q**    The -- as part of your investigation into Dr. Franklin

11:18:26 15   and Overholt's, did you retain or did the Board of Pharmacy

16   retain any medical experts to help you evaluate the

17   legitimacy of the prescriptions you were looking at?

18   **A**    I did.

19   **Q**    I've heard mention of a doctor named Dr. Piszel.

11:18:47 20        Do you know him?

21   **A**    He was medical expert for me on that case.  I believe

22   he was a pain management specialist out of Lake County.

23   **Q**    But when you say that case, is Dr. Piszel someone that

24   you or the Board of Pharmacy retained to help you

11:19:09 25   investigate Overholt's and Dr. Franklin?

4581

**Pavlich (Direct by Swanson)**

1    **A**    I asked him to look at prescriptions and patient

2    profiles for numerous patients of Dr. Franklin dispensed out

3    of Overholt's Pharmacy.

4    **Q**    And you considered Dr. Piszel to be an expert in pain

11:19:28  5    management and evaluating legitimate prescriptions?

6    **A**    I did.

7    **Q**    Did -- well, I want to be careful.  Let me look at my

8    notes.

9         Do you recall having -- in your investigation of

11:19:51 10    Overholt's and Dr. Franklin, do you recall having

11    discussions with pharmacists at the chain pharmacies

12    regarding what they were seeing coming in from Dr. Franklin?

13    **A**    I did interview chain pharmacists, yes.

14    **Q**    Do you remember a Walgreens pharmacist by the name of

11:20:15 15    Doug Stossel?

16    **A**    No.  I can't say I do.

17    **Q**    Let me -- let me see if I can just refresh you.  I'm

18    not going to put the document up, but if you look at what's

19    marked behind Tab 4 in your binder.

11:20:41 20    **A**    Okay.

21    **Q**    And does this look like the search warrant you wrote

22    up regarding your investigation of Dr. Franklin and

23    Overholt's?

24    **A**    Yes, sir.  This is it.

11:20:54 25    **Q**    Okay.  And it's a long document, but if you turn to

4582

Pavlich (Direct by Swanson)

1   Page 31, at the very bottom and the top of Page 32, can you

2   just go ahead and read that to yourself and see if that

3   refreshes your recollection?

4   **A**   Wait a minute.

11:21:11  5   **Q**   Yeah, please take your time.

6   **A**   Wait a minute.  I'm trying to find the page numbers

7   here.

8        Where's the page numbers here?

9   **Q**   You know, we may have different numbers?

11:21:19  10  **A**   Oh, I see it.  I see it.  I see it now.

11       So which numbers?

12  **Q**   Page 31 and top of 32.

13  **A**   31.  32.

14       Okay.

11:21:38  15  **Q**   And if you just read -- read that your yourself, I

16  just want to ask you if reading that refreshes your

17  recollection of interacting with a pharmacist at Walgreens

18  named Doug Stossel.

19            (Brief pause in proceedings).

11:22:23  20            THE WITNESS:  I sort of remember this

21  conversation, and I had this with other pharmacists, too.

22  BY MR. SWANSON:

23  **Q**   Well, let me ask you --

24            MR. WEINBERGER:  Objection.

11:22:31  25            MR. SWANSON:  I didn't ask with about a

4583

**Pavlich (Direct by Swanson)**

1    conversation.

2    BY MR. SWANSON:

3    **Q**    Just let me take it piece by piece, Mr. Pavlich.

4         Did you have in -- during your investigation, did you

11:22:43   5    have discussions with pharmacists, including Mr. Stossel at

6    Walgreens?

7    **A**    Yes.

8    **Q**    Do you recall that there were questions that were

9    coming to you from pharmacists about what they should do if

11:22:59  10    they were presented with a prescription from -- well -- I'm

11    sorry, let me take a step back.

12         Did you learn in your investigation that pharmacists,

13    including pharmacists at the chain pharmacies, were

14    questioning prescriptions that they were getting from

11:23:15  15    Mr. Franklin -- Dr. Franklin?

16                   MR. WEINBERGER:  Objection.

17                   THE COURT:  Overruled.

18                   THE WITNESS:  Yes, they were questioning them.

19    BY MR. SWANSON:

11:23:23  20    **Q**    And were they asking you what -- what, as a Board of

21    Pharmacy agent, what they should do with the prescriptions

22    that they were getting from Dr. Franklin?

23    **A**    Yes.

24    **Q**    Did you -- and was Doug Stossel one of those

11:23:43  25    pharmacists?

4584

**Pavlich (Direct by Swanson)**

1    **A**    I documented it, yes.

2    **Q**    And did you tell pharmacists at the chain pharmacies

3    who had this question that they could continue to fill

4    prescriptions --

11:23:56  5              THE COURT:  Let's see if we can do this in a

6    non-leading way.  First establish if he gave him the advice.

7              MR. SWANSON:  Thank you, Your Honor, and I'll

8    do that.

9    BY MR. SWANSON:

11:24:05  10   **Q**    When they asked you this question, what did you tell

11   them they should do?

12   **A**    I told them dispense prescriptions from any

13   prescribers if you have legitimate medical purpose.  But if

14   you have concerns, don't dispense.  You have a corresponding

11:24:23  15  responsibility.  My set answer to numerous questions about

16   things like that.

17   **Q**    Okay.  And what -- do you recall what Doug Stossel

18   concluded?

19              MR. WEINBERGER:  Objection.

11:24:34  20             THE COURT:  Sustained.

21   BY MR. SWANSON:

22   **Q**    The -- let me ask you a different question.

23        When you told -- when you told pharmacists that they

24   could continue to fill prescriptions if they thought they

11:24:54  25  had a legitimate medical purpose, did that include

**Pavlich (Direct by Swanson)**

1    prescriptions that came from Dr. Franklin?

2    **A**    Yes.  There were some.

3    **Q**    So even though you had concluded -- or were

4    investigating what you considered to be potentially criminal

11:25:11  5    prescribing from Dr. Franklin, was it your view that he was

6    also writing some prescriptions for patients that had a

7    legitimate medical need?

8    **A**    Yes.

9    **Q**    Was Dr. Franklin, was he eventually indicted, do you

11:25:33  10    recall?

11    **A**    What I recall was I was preparing the Indictment with

12    the Geauga County prosecutor in conjunction to my

13    investigation, and Dr. Franklin was stabbed to death by his

14    office manager wife.

11:25:54  15    **Q**    And --

16    **A**    And that concluded that.

17    **Q**    So he was -- I interrupted you at the part that was

18    important.  So it sounds like he was murdered by his office

19    manager, ex-wife?

11:26:06  20    **A**    His office manager and actual wife.  Not ex.

21    **Q**    Not ex.  Okay.  And that was before he could be

22    indicted?

23    **A**    Yes.

24    **Q**    What about -- what happened to Overholt's Pharmacy?

11:26:20  25    **A**    Well, at that point in time, I always go after the

4586

**Pavlich (Direct by Swanson)**

1    prescriber first and then pharmacists after or stores after,

2    so I was putting the case together as one.  I went after the

3    pharmacy and the pharmacist and brought it to the attention

4    of Dennis Watkins, Trumbull County prosecutor.

11:26:45  5    **Q**    Do you know what ultimately became of Overholt's

6    Pharmacy?

7    **A**    They lost their license and all three pharmacists lost

8    their personal practicing license and they were all

9    convicted of felonies.

11:26:58  10    **Q**    As an agent for the Board of Pharmacy, do you have a

11    view of whether Dr. Franklin's activities contributed to the

12    opioid problem in Northeast Ohio?

13                    MR. WEINBERGER:  Objection.

14                    THE COURT:  Overruled.

11:27:19  15                    THE WITNESS:  I do believe they contributed

16    greatly to the activity in that county and counties.

17    BY MR. SWANSON:

18    **Q**    And as a member of the Ohio State Board of Pharmacy,

19    do you have a view of whether the conduct of Overholt's

11:27:31  20    Pharmacy contributed to the opioid problem in Northeast

21    Ohio?

22                    MR. WEINBERGER:  Objection.

23                    THE COURT:  Overruled.

24                    THE WITNESS:  I do agree.

11:27:40  25                    MR. SWANSON:  Mr. Pavlich, thank you very much

4587

**Pavlich (Cross by Weinberger)**

1    for answering my questions.  I'm going to pass you off now

2    to the plaintiffs' lawyer.

3            THE COURT:  Okay.  I just want to make sure

4    there weren't any other questions from any of the other

11:27:58  5    defendants.

6            MS. FUMERTON:  No, Your Honor.

7            MR. DELINSKY:  No, Your Honor.

8            THE COURT:  Okay.  All right.

9        Mr. Weinberger.

11:28:49  10        CROSS-EXAMINATION OF GEORGE P. PAVLICH

11   BY MR. WEINBERGER:

12   **Q**    Mr. Pavlich, good morning.  Can you see me?

13   **A**    I can.

14   **Q**    Okay.  My name is Peter Weinberger.  We had a chance

11:28:56  15   to meet on Zoom when a number of the defense counsel and I

16   took your deposition some time ago.

17        Do you remember that?

18   **A**    I do.

19   **Q**    So, first of all, you have not been employed by the

11:29:12  20   Ohio Board of Pharmacy since 2012; right?

21   **A**    March 1st, correct.

22   **Q**    Right.  Now, you had a long and storied career there

23   for 25 years, and we all certainly appreciate the service

24   that you rendered on behalf of the Ohio Board of Pharmacy.

11:29:32  25        I want to go directly to your testimony about

**Pavlich (Cross by Weinberger)**

1       Dr. Franklin.

2           Now, you testified that you pulled the prescriptions

3       from his office and from the Overholt's Pharmacy as part of

4       your investigation; correct?

11:29:49 5    **A**    No.  I corrected that.  I said I obtained patient

6       records from his office and pulled prescriptions from

7       Overholt's Pharmacy.

8       **Q**    Right.  And I'm assuming that as a good and competent

9       investigator investigating now 90 doctors or so over your

11:30:09 10   career, you would have also wanted to know whether or not --

11      or what the prescriptions that were filled at other

12      pharmacies from Dr. Franklin would have looked like; right?

13      **A**    Yes.

14      **Q**    And so I'm assuming that you pulled the prescriptions

11:30:26 15   that Dr. Franklin wrote from the Walgreens stores in

16      Trumbull County; right?

17      **A**    I don't recall if I pulled them.  I surveyed the files

18      at all the pharmacies up in Geauga County and did not find

19      anything that would result in me, I believe, pulling

11:30:48 20   prescriptions.

21      **Q**    Well, I'm not talking about Geauga County where

22      Dr. Franklin was, because you told us that your concern was,

23      or the thing that flagged or raised concerns initially was

24      here it was Dr. Franklin, who was in Geauga County, his

11:31:07 25   patients were going elsewhere outside of Geauga County,

**Pavlich (Cross by Weinberger)**

1    including to Trumbull County; right?

2    **A**    Yes.

3    **Q**    So that's my question.  Did you go to the Trumbull

4    County pharmacies of these defendants, CVS, Walgreens, and

11:31:26  5    Walmart, and ask for their -- the prescriptions that they

6    filled on behalf of Dr. Franklin's patients?

7    **A**    I surveyed numerous pharmacies in Trumbull County,

8    yes.

9    **Q**    Okay.  Well, surveying is different than pulling the

11:31:46 10    prescriptions, sir.  I mean, I understand -- wait.  Let me

11    finish.

12         I understand that, for example, when you did

13    inspections, you did this -- you surveyed their files, and

14    we'll get to that later.  My question is, as part of your

11:32:00 15    investigation that led ultimately to the downfall of

16    Dr. Franklin, did you actually ask the Walgreens pharmacy,

17    for example, in Trumbull County, for copies of their scripts

18    that they filled on behalf of Dr. Franklin's patients?

19    **A**    I don't recall pulling -- original prescriptions out

11:32:25 20    of any other pharmacies related to Dr. Franklin.  I looked

21    at other pharmacies, but only pulled them from Overholt's

22    Pharmacy because that's where they all were.

23    **Q**    Well, that's not true, is it, sir?  There were a lot

24    of -- there were a lot of prescriptions filled by Trumbull

11:32:47 25    County Walgreens stores written by Dr. Franklin.

1       Isn't that true?

2               MR. SWANSON:  Objection, Your Honor.

3               THE COURT:  Overruled.

4               MR. SWANSON:  Foundation.

11:32:58  5               THE COURT:  Overruled.

6               THE WITNESS:  Not to the extent of what I saw

7    at Overholt's Pharmacy or the manner of issuance versus

8    quantity and specific patients.

9    BY MR. WEINBERGER:

11:33:11  10   **Q**    Well, sir, did your investigation reveal that between

11   2006 and 2009 that Walgreens filled 1,250 Franklin

12   prescriptions totaling over a hundred thousand pills?

13               MR. SWANSON:  Objection, Your Honor.

14               THE COURT:  Overruled.

11:33:37  15               THE WITNESS:  A hundred thousand pills are not

16   that much if you think about it.  If a patient's getting six

17   tablets a day --

18               THE COURT:  Well, first of all --

19               THE WITNESS:  -- 4 hours for pain.

11:33:48  20               THE COURT:  Hold it.  Hold it.  Hold it, sir.

21         Can you answer the question?

22               THE WITNESS:  Yeah.  I -- I don't know what

23   he's talking about.  I would have pulled the prescriptions

24   if I found a legitimate -- illegitimate medical purpose.

11:34:02  25   BY MR. WEINBERGER:

4591

**Pavlich (Cross by Weinberger)**

1   **Q**    Well, you just told me that you surveyed the

2   prescriptions, the Dr. Franklin prescriptions, but you

3   didn't pull any; right, from Trumbull County, from the

4   Walgreens store in Trumbull County?

11:34:15  5   **A**    Yes.

6   **Q**    Right?  That was your testimony; right?

7   **A**    Yes.

8   **Q**    Okay.  So are you aware of the fact that in this case

9   the defendants were required to turn over their dispensing

11:34:28 10   records and their data for their stores in Trumbull County?

11        Are you aware of that?

12   **A**    Turn them over to who?

13   **Q**    To us.  To the plaintiffs' lawyers in this case on

14   behalf of these two counties, Lake and Trumbull County.

11:34:44 15        You understand that's who we're representing sir?

16   **A**    Yes, I understand who you're representing.

17   **Q**    All right.

18   **A**    And I understand you have records.  Okay.

19   **Q**    Okay.  All right.  So let me show you --

11:34:59 20        If we can get the Wolfe Vision up and operating.

21            (Brief pause in proceedings).

22            MR. WEINBERGER:  Mr. Joyce, we're having some

23   technical difficulties -- I mean, Mr. Pavlich, we're having

24   some technical difficulties.

11:36:25 25            THE COURT:  We're trying to show you a

**Pavlich (Cross by Weinberger)**

1   document, sir.

2             MR. WEINBERGER:  I'm sorry?

3             THE COURT:  I'm just telling the witness we're

4   trying to show him a document.

11:36:36  5             MR. WEINBERGER:  There we go.

6   BY MR. WEINBERGER:

7   **Q**    So this is demo 071, sir.  And what I'd like you to

8   look at is this -- this is information that we got from the

9   dispensing records of these three defendants.

11:36:58 10             MR. SWANSON:  Objection, Your Honor.

11      Can we be heard on this?

12             MR. STOFFELMAYR:  Take it down, please.

13             MS. FUMERTON:  Would you take it down?

14               (Proceedings at sidebar.)

11:37:31 15             MR. SWANSON:  Your Honor, I showed the witness

16   an official task force report that Mr. Weinberger objected

17   to.  He said he's never seen it.  So I asked the witness if

18   he had seen it and he said no and I took it down.

19      They're now trying to show him documents that were

11:37:47 20   created for litigation by an expert that he -- I can promise

21   you has never seen before.

22             THE COURT:  Well, I -- look, you --

23   Mr. Weinberger, you asked him do you know -- did you --

24   first of all, he said he didn't pull any of those records.

11:38:03 25   All right?  He said he didn't -- he didn't pull them.  All

**Pavlich (Cross by Weinberger)**

1 right?  You asked him about, you know -- do you know that

2 these other pharmacies filled prescriptions -- 1,250

3 prescriptions, that's just Walgreens --

4    MR. WEINBERGER:  Yes, Your Honor.

11:38:22 5    THE COURT:  -- filled 1,250 prescriptions,

6 over a hundred thousand pills.  He said a hundred thousand

7 pills aren't that much.  Basically he said he doesn't know

8 that.

9  So I don't think you can show this document.  You've

11:38:32 10 established that he didn't -- he didn't care enough to even

11 pull them, so, that's it.

12    MR. SWANSON:  And, Your Honor, can I add that

13 I think it's improper to suggest in a question that evidence

14 doesn't exist for which the witness has no foundation.  It's

11:38:44 15 not a proper question to say, did you know there were 1,250

16 prescriptions filled if there's no foundation for it.  You

17 can say, do you know how many prescription were filled, and

18 when he says no, you can't then suggest the answer because

19 there's no foundation.  I think that's improper.

11:38:58 20    MR. WEINBERGER:  Your Honor, this is --

21    THE COURT:  Mr. Weinberger has his foundation.

22 He knows it for a fact that they were filled, so he can ask

23 the -- I mean --

24    MR. SWANSON:  But the witness needs the

11:39:07 25 foundation, not Mr. Weinberger.

**Pavlich (Cross by Weinberger)**

1          THE COURT:  Well, the witness would have had a

2     foundation if he pulled it, so -- and maybe he looked, I

3     don't know, so I think -- I think you pretty much exhausted

4     this subject with this witness, Mr. Weinberger.

11:39:17  5          MR. SWANSON:  Thank you, Your Honor.

6               (In open court at 11:39 a.m.)

7     BY MR. WEINBERGER:

8     **Q**     Mr. Pavlich, do you know where Walgreens Store 11730

9     is?

11:39:42 10   **A**     No.

11    **Q**     Do you know that it's in Trumbull County -- well, let

12    me ask you this.  Assume it's in Trumbull County, okay?

13    Assume that for the moment.

14    **A**     Okay.

11:39:54 15   **Q**     Now, you testified earlier that you knew

16    Mr. Brian Joyce; right?

17    **A**     Correct.

18    **Q**     And you testified about you thought he was a good

19    pharmacist and the work that he did and your relationship

11:40:05 20   with him; correct?

21    **A**     Correct.

22    **Q**     I want you to assume that he was the pharmacy

23    supervisor for this particular store in Trumbull County in

24    2006 to 2009.

11:40:22 25        Fair enough?  Will you assume that for me?

**Pavlich (Cross by Weinberger)**

1    **A**    Okay.

2    **Q**    So at any point in time did you have any -- while you

3    were doing the investigation of Dr. Franklin, did you ask

4    Brian Joyce, as the pharmacy supervisor for Walgreens,

11:40:39  5    whether he or any of the pharmacists in his store had any

6    experience filling Dr. Franklin's prescriptions?

7    **A**    I don't recall a conversation.

8    **Q**    Well, are you familiar with a Dr. Feres [sic],

9    F-e-r-e-s?

11:41:07  10    **A**    It doesn't strike a bell with me.

11    **Q**    We heard testimony from Mr. Joyce that Dr. Feres, for

12    25 years, was a high-volume prescriber of opioids in

13    Trumbull County.

14        Did Dr. Joyce -- did Mr. Joyce ever tell you that --

11:41:30  15    Dr. Veres is the doctor's name we're talking about.

16                    THE COURT:  Veres?

17                    MR. WEINBERGER:  V-e-r-e-s.

18                    THE COURT:  V-e-r-e-s, sir.

19                    THE WITNESS:  I recall a Dr. Veres, yes.

11:41:42  20    BY MR. WEINBERGER:

21    **Q**    Well, did you ever investigate Dr. Veres?

22    **A**    I believe myself and another specialist went to his

23    office a number of times, yes.

24    **Q**    And did you learn that he was a high-volume prescriber

11:41:56  25    of opioids?

4596

**Pavlich (Cross by Weinberger)**

1    **A**    I don't remember what I learned at that point.

2    **Q**    Did you ask Mr. Joyce to pull the prescriptions from

3    Walgreens that were filled from Dr. Veres' prescriptions?

4    **A**    I may have.  I don't recall.

11:42:18  5    **Q**    So you don't recall anything more about this

6    investigation of Dr. Veres, other than the fact you visited

7    his office on a couple of occasions?

8    **A**    Yeah.  I -- I know I didn't pursue a criminal case,

9    so --

11:42:34  10    **Q**    Did you become -- did you become aware of the fact

11    that CVS and Walmart at some point in time refused to fill

12    prescriptions written by Dr. Veres?

13    **A**    No, I don't recall.

14    **Q**    Did -- do you recall learning from Mr. Joyce that

11:42:55  15    despite the fact that CVS and Walmart were not going to fill

16    any more prescriptions of Dr. Veres, that Walgreens,

17    nonetheless, continued to fill those prescriptions?

18    **A**    I don't recall.

19    **Q**    So, I understand from your testimony, sir, you were --

11:43:25  20    you were a very busy field agent for the Ohio Board of

21    Pharmacy during your tenure there; right?

22    **A**    I was.

23    **Q**    Received lots of calls pharmacists; right?

24    **A**    Right.

11:43:41  25    **Q**    Investigated 80 or 90 doctors; right?

**Pavlich (Cross by Weinberger)**

<table>
<tr><td>1</td><td>A</td><td>Prescribers, yes.</td></tr>
<tr><td>2</td><td>Q</td><td>Right.  Well, doctors, prescribers, right.  And did --</td></tr>
<tr><td>3</td><td></td><td>was this all encompassed within your territory; sir?</td></tr>
<tr><td>4</td><td>A</td><td>No.</td></tr>
<tr><td>5</td><td>Q</td><td>So you investigated doctors outside of your territory?</td></tr>
<tr><td>6</td><td>A</td><td>Yes.</td></tr>
<tr><td>7</td><td>Q</td><td>How far out -- let's, first of all, talk about your</td></tr>
<tr><td>8</td><td></td><td>territory.</td></tr>
<tr><td>9</td><td></td><td>What was your territory during your tenure as a field</td></tr>
<tr><td>10</td><td></td><td>agent?</td></tr>
<tr><td>11</td><td>A</td><td>During my entire tenure or just the last few years?</td></tr>
<tr><td>12</td><td>Q</td><td>Well, let's talk about the last 10 years.</td></tr>
<tr><td>13</td><td>A</td><td>Trumbull, Mahoning, Columbiana, and Jefferson County.</td></tr>
<tr><td>14</td><td>Q</td><td>How many pharmacies -- how many individual pharmacy</td></tr>
<tr><td>15</td><td></td><td>stores are there in that four-county area?</td></tr>
<tr><td>16</td><td>A</td><td>I have no idea.  I'd be guessing.</td></tr>
<tr><td>17</td><td>Q</td><td>Well, you did -- you told us that you did 50</td></tr>
<tr><td>18</td><td></td><td>inspections a year, or you were supposed to, right?</td></tr>
<tr><td>19</td><td>A</td><td>I was supposed to.</td></tr>
<tr><td>20</td><td>Q</td><td>Well, was there some years that you weren't able to do</td></tr>
<tr><td>21</td><td></td><td>the full 50?</td></tr>
<tr><td>22</td><td>A</td><td>Yes.</td></tr>
<tr><td>23</td><td>Q</td><td>Because you were busy with other things and other</td></tr>
<tr><td>24</td><td></td><td>investigations.  True?</td></tr>
<tr><td>25</td><td>A</td><td>True.</td></tr>
</table>

Timestamps: 11:44:00 (line 5), 11:44:12 (line 10), 11:44:35 (line 15), 11:44:50 (line 20), 11:44:58 (line 25)

**Pavlich (Cross by Weinberger)**

1    **Q**    Well, are there more than 50 -- were there more than

2    50 pharmacy stores or pharmacy locations within your

3    four-county area?

4    **A**    Yes.

11:45:12  5    **Q**    So would it be fair to say that you -- even in the

6    years where you were able to do 50 inspections, you did not

7    inspect, on an annual basis, every store within your

8    territory; correct?

9    **A**    Absolutely correct.

11:45:31  10   **Q**    Um-hmm.  There were some stores where it would be

11   maybe 18 months or two years before you would inspect them;

12   right?

13   **A**    Could be.

14   **Q**    And when you first started out at the Ohio Board of

11:45:44  15   Pharmacy, there were only eight field agents; right?

16   **A**    That's probably accurate, yes.

17   **Q**    So you were spread even thinner back at that time;

18   right?

19   **A**    Yes.

11:45:58  20   **Q**    And then as years went by, there were additional field

21   agents that were hired, and I think you said at the point of

22   your retirement there were about 15 field agents; right?

23   **A**    Yeah, I'm approximating about that much.

24   **Q**    Um-hmm.  And when you left in 2012, in March of 2012,

11:46:21  25   isn't it true that you and the other field agents felt you

4599

**Pavlich (Cross by Weinberger)**

1      were -- that they were overworked, that you and they were

2      overworked?

3      **A**      I don't know -- I don't have an answer for that.

4      **Q**      Well, do you remember about a month before you left

11:46:46 5      the Ohio Board of Pharmacy there was a survey sent out by

6      the Ohio board surveying the field agents?

7      **A**      No, I don't recall that.

8      **Q**      Um-hmm.  So didn't you feel, from your perspective,

9      that the Ohio Board of Pharmacy should hire more field

11:47:03 10      agents so that you could concentrate more within your

11      counties that you were assigned to and do the job that you

12      were tasked to do?

13      **A**      I would say that would be correct.

14      **Q**      Um-hmm.  Now, you told us that your inspections -- the

11:47:26 15      full inspections, the 50 or fewer that you would perform

16      every year, would take about 2 and a half to 3 hours;

17      correct?

18      **A**      Normally.  Not all the time.

19      **Q**      And so sometimes it would be more, but sometimes it

11:47:43 20      would be less; right?

21      **A**      Right.

22      **Q**      And would it be fair to characterize these inspections

23      as a 2 and a half to 3-hour snapshot of the conditions at

24      that pharmacy?

11:48:03 25      **A**      Yes.

4600

**Pavlich (Cross by Weinberger)**

1    **Q**    A 2 and a half hour -- 2 and a half hour to 3-hour

2    snapshot once, perhaps for that particular store, every

3    year, 18 months, two years; right?

4    **A**    Yes.

11:48:24    5    **Q**    So you're not suggesting, are you, sir, that that 2

6    and a half to 3-hour inspection provides us with a complete

7    and accurate picture of how the pharmacy operates on the

8    other 364 days or more; right?

9    **A**    I'm not suggesting anything.

11:48:50    10    **Q**    Okay.  Now, you told us that your inspection includes

11    inspecting whether or not there was appropriate security;

12    right?

13    **A**    Correct.

14    **Q**    Whether or not there were barricades; right?

11:49:06    15    **A**    Correct.

16    **Q**    And you told us -- and I wrote this down -- that you

17    also looked at the controlled substance prescription files;

18    right?

19    **A**    Yes.

11:49:25    20    **Q**    And there were separate files for the C-IIs and then

21    separate files for the C-IIIs, IV, and Vs; right?

22    **A**    Correct.

23    **Q**    And you told that us during this 2 and a half hour to

24    3-hour inspection, you would look at the separate files for

11:49:45    25    the C-II controlled substances and you would spend about a

**Pavlich (Cross by Weinberger)**

1    half hour looking at those files; right?

2                MR. SWANSON:  Objection.  Mischaracterizes.

3                MR. WEINBERGER:  I thought.  Maybe I wrote it

4    down wrong.  I thought you looked at each of the C-II

11:49:58  5    files --

6                THE COURT:  Well, overruled.  You can ask him

7    if that's what he said.  If it's different, it's different.

8                MR. WEINBERGER:  I'll withdraw the question.

9    Let me ask it.

11:50:05  10    BY MR. WEINBERGER:

11    **Q**    With respect to the Class II scripts, which are the

12    OxyContins, the oxycodones and the like, you would take

13    about a half hour to look at these files; right?

14    **A**    I'm approximating it on a normal basis.

11:50:25  15    **Q**    Right, and this is a half hour out of the 2 and a half

16    hour to 3-hour inspection; right?

17    **A**    Yes.

18    **Q**    And you told us that you had 3 years of scripts to

19    look at?

11:50:48  20    **A**    I told you that the pharmacy was required to maintain

21    records for a minimum of three years.

22    **Q**    Well, when you would do this review, how big were

23    these -- these record files that you were looking at?

24    **A**    It all depends how many prescriptions they dispensed

11:51:11  25    on a daily basis in that pharmacy.

**Pavlich (Cross by Weinberger)**

1    **Q**     Well, were you looking at a day's worth of

2    prescriptions of controlled substance prescriptions or more

3    than a day?

4    **A**     I would go back as far as I felt necessary to get a

11:51:25  5    good picture of what they were dispensing.

6    **Q**     Well, so would you go back a week?  2 weeks?  A month?

7    A year?  How long?  How far back?

8    **A**     All of the above probably.

9    **Q**     Well, you know, if -- if the store -- you said

11:51:48 10    sometimes fill 500 controlled substance prescriptions a day;

11    right?

12    **A**     Right.

13    **Q**     So when you would go to your -- to do your 2 and a

14    half hour inspection, I'm assuming you would have to go to

11:52:03 15    file cabinets worth of scripts in those stores to really

16    look at them carefully; right?

17    **A**     That's right.

18    **Q**     So that's what you would do, you would look through

19    file cabinets of stores -- of scripts?

11:52:21 20    **A**     Right.

21    **Q**     And tell me your process for doing that.

22          Did you -- did you just kind of leaf through and pull

23    out one or two scripts and look at them?

24    **A**     I would take packets of prescriptions from that day

11:52:41 25    and then leaf through them for different periods of time,

**Pavlich (Cross by Weinberger)**

1    maybe the next day, maybe the next week, maybe the next

2    month, maybe 6 months.  It varied.

3    **Q**    Okay.

4    **A**    But I would get a snapshot of what was going on.

11:52:58  5    **Q**    So did you keep any records, Mr. Pavlich, of your

6    doing -- of specifically what you did that we could look at

7    and see the documentation for the inspection, other than

8    these inspection reports?

9        Did you actually compile information or statistics or

11:53:19 10   data as to what you were looking at?

11   **A**    Yes.  When I conducted a criminal investigation, the

12   prescriptions were listed in the criminal investigation.

13   **Q**    Okay.  Well, we're not talking about a criminal

14   investigation, we're talking about your 2 and a half hour

11:53:38 15   inspection that you would do every year or two years for

16   let's just say the Walgreens store in Trumbull County.

17       Did you keep any records, sir, of how many scripts you

18   actually looked at when you were looking through these

19   files?

11:53:52 20   **A**    No.

21   **Q**    Well, you told us that some of these pharmacies

22   dispensed 500 or more controlled substance prescriptions a

23   day; right?

24   **A**    That was just a number I threw out there.

11:54:12 25   **Q**    Well, was it a right -- correct number or was it not

## Pavlich (Cross by Weinberger)

1     correct?

2     **A**     Well, there was some pharmacies that probably

3     dispensed more than that, and there was a lot of pharmacies

4     that dispensed less than that, and the half an hour time

11:54:26  5     that I talked about looking at C-IIs depended on the volume

6     of prescriptions, which I believe I testified to.

7     **Q**     So did you ever look or obtain any information as to

8     the actual volume of opioid pills dispensed at a particular

9     store on, say, a monthly or yearly basis?

11:54:58  10     **A**     If I was doing an audit I would.

11     **Q**     Well, how -- what's an audit?

12     **A**     A total accountability for all the prescription

13     medication that I specifically look at during a set period

14     of time, usually a controlled substance.

11:55:17  15     **Q**     How many audits would you perform a year?

16     **A**     10.

17             MR. SWANSON:  Your Honor, I'm sorry to

18     interrupt.  We've lost our realtime.  I think everybody has.

19             THE COURT:  All right.  Robert, can you see if

11:55:31  20     you can fix this?

21             (Court reporter clarification.)

22             MR. WEINBERGER:  May I proceed?

23             THE COURT:  Yes.

24     BY MR. WEINBERGER:

11:55:50  25     **Q**     So 10 audits per year for your territory or beyond

**Pavlich (Cross by Weinberger)**

1    your territory?

2    **A**    That's a number I'm giving.  It -- I would assist in

3    other agent's audits, not mine specific.  I mean, it could

4    be 5 a year, it could be 10.  It varied.  Depends what kind

11:56:12  5    of investigation I'm conducting.  I didn't do it just to do

6    it.

7    **Q**    Well, in order for you to determine the validity of

8    your inspection of these hard copies of the scripts at a

9    particular store, wouldn't you want to know some idea --

11:56:33 10    have some idea of the volume of controlled substances

11    prescriptions for that store?

12    **A**    Sure.  I could easily see that.

13    **Q**    Well, would you -- would you know what the volume

14    of any of the Walgreens stores in Trumbull County were on an

11:56:54 15    annual basis?

16    **A**    An annual basis?

17    **Q**    Sure.

18    **A**    I would have to do some extensive review to get that.

19    **Q**    Which you never did, did you?

11:57:13 20    **A**    I conducted audits in Walgreens for drugs.

21    **Q**    My question is --

22    **A**    I don't recall.  I don't recall.

23    **Q**    Okay.  So let's talk about -- let's talk about --

24    you've talked a little bit about your 2 and a half or 3-hour

11:57:35 25    inspections.  Let's talk about what it might not have

**Pavlich (Cross by Weinberger)**

1    included.  Okay.

2         Did your investigation or your inspections include a

3    review of the pharmacy's written dispensing policies for

4    controlled substances?

11:58:03  5    **A**    I don't recall seeing written dispensing policies.

6    **Q**    So the answer would be no, you didn't -- you didn't

7    look at Walgreens or CVS's or Walmart's --

8    **A**    I don't know.

9              MR. SWANSON:  Objection, Your Honor.

11:58:15 10              THE WITNESS:  I don't recall.  That's --

11              THE COURT:  Overruled.

12   BY MR. WEINBERGER:

13   **Q**    Did you --

14   **A**    I don't recall.

11:58:20 15   **Q**    Did your inspection include a review of any of the

16   training programs that Walgreens or CVS or Walmart had for

17   their pharmacists?

18   **A**    No.

19   **Q**    Did you ever ask Walgreens or CVS or Walmart to

11:58:44 20   provide you with dispensing data records regarding the

21   volumes of opioids filled in their stores?

22   **A**    I asked for records a lot.  I don't recall anything

23   specific, though.

24   **Q**    So you would not have had any accurate picture, during

11:59:15 25   your inspections, of what the trends were in terms of the

1    volume of opioid pills dispensed out of any one particular

2    store of these three defendants; right?

3    **A**    Wrong.

4    **Q**    So you would have some idea, in your mind, but you

11:59:33 5    hadn't -- you didn't have actual statistical evidence to

6    reach any conclusions about volume -- volumes of pills

7    dispensed trending -- trends; correct?

8    **A**    No.

9    **Q**    Okay.  Now -- correct?  So you agree with that

11:59:54 10    statement?

11    **A**    No.  I don't agree.  I don't agree.  If I would have

12    saw volumes of pills at a certain location, whether it was a

13    chain or an independent, I would have done something.

14    **Q**    All right.  Well, do you have any records that you can

12:00:04 15    share with us today that reflects your study of data of

16    trends of volumes of pills in any of the stores in Trumbull

17    County that you were in charge of inspecting?

18    **A**    I'm lucky to have my memory from 10 years ago.  I

19    don't have any records.

12:00:27 20    **Q**    Fair enough, sir.

21        Do you have any records -- or let me ask you this:

22    Are you familiar with the concept of opioids prescribed in

23    combination with benzodiazapines or a muscle relaxant?

24    **A**    Yes.  It enhances the effect, from my knowledge.

12:00:56 25    **Q**    Not only does it enhance the effect, it's very

**Pavlich (Cross by Weinberger)**

1    dangerous to the patient; right?

2    **A**    I -- I agree.

3    **Q**    Okay.  Now, in the course of your doing these spot

4    inspections, looking through these controlled substances

5    files, did you look for prescriptions to the same patient

6    involving all three of those classes of drugs?

7    **A**    I'm sure I looked for it.  I don't recall any specific

8    patient, though.

9    **Q**    Okay.

10                MR. WEINBERGER:  Your Honor, maybe this is a

11   good time for us to break.

12                THE COURT:  Okay.  I was going to suggest it.

13        Okay.  Ladies and gentlemen, we'll take our noon hour

14   lunch break.  One hour.  All the standard admonitions apply.

15        Have a good lunch and then we'll pick up with the

16   balance of Mr. Pavlich.

17        So, Mr. Pavlich, you can take a lunch break.  Please

18   come back at 1 o'clock.  Okay?

19                THE WITNESS:  Thank you.

20                THE COURT:  Thank you.

21                THE WITNESS:  Yes, sir.

22                (Jury excused from courtroom.)

23        (Recess was taken from 12:02 p.m. till 1:00 p.m.)

24

25

## Pavlich (Cross by Weinberger)

|   |   |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | (In open court at 1:00 p.m.) |
| 3 | MR. LANIER:  Your Honor, when it's |
| 4 | appropriate, there's a concern I've got I'd like to put on |
| 13:00:17 5 | the record. |
| 6 | THE COURT:  All right. |
| 7 | MR. LANIER:  It will take 1 minute. |
| 8 | I'm trying to understand the boundaries, recognizing |
| 9 | I've got a cross coming up.  The witness that's on the stand |
| 13:00:29 10 | right now is a fact witness.  He's an investigator.  Much |
| 11 | like Tony Villaneuva was a fact witness and an investigator, |
| 12 | but we weren't allowed to get into Mr. Villanueva's |
| 13 | investigations that involved the parties in this case, |
| 14 | whereas he's allowed to get into investigations that involve |
| 13:00:50 15 | parties that aren't in this case. |
| 16 | THE COURT:  I'm confused.  I've allowed |
| 17 | both -- know, we're on cross-examination.  I've allowed |
| 18 | Mr. Weinberger to ask, you know -- |
| 19 | MR. LANIER:  Okay. |
| 13:01:03 20 | THE COURT:  -- his questions. |
| 21 | MR. LANIER:  Okay.  I'm trying to -- I don't |
| 22 | where to object and where not to object because they're |
| 23 | doing the things with their witnesses that I wasn't allowed |
| 24 | do with mine.  And that's my concern is they've got a guy |
| 13:01:17 25 | who's saying I went and investigated all the these |

**Pavlich (Cross by Weinberger)**

1    pharmacies and everything was great, and here's the horrible

2    thing that happened and the guy got killed by his wife, and

3    yet I can't put on an investigation file of my fellow and

4    what he did who's hands on in the county as an investigator.

13:01:31  5    And so I'm just trying to figure it out, but I'll keep

6    working on it.

7    MR. SWANSON:  Your Honor, I asked about -- I

8    didn't put a file in.

9    (Court reporter clarification.)

13:01:42 10    MR. SWANSON:  I'm sorry.  Brian Swanson for

11    Walgreens.

12    I didn't put an investigation file in.  Just like he

13    did with Villanueva, I asked about an investigation that he

14    had direct knowledge of.  It's the same thing.

13:01:49 15    MR. LANIER:  I wasn't allowed to ask about the

16    investigation.

17    MR. SWANSON:  Sure you were, and you did.

18    MR. LANIER:  All right.  Then maybe I was just

19    brain dead.

13:01:58 20    All right.  Thank you, Judge.

21    (Brief pause in proceedings).

22    (Jury returned to courtroom at 1:03 p.m.)

23    THE COURT:  Please be seated, Mr. Pavlich.  I

24    want to remind you you're still under oath.

13:04:00 25    And, Mr. Weinberger, you may continue.

**Pavlich (Cross by Weinberger)**

1    BY MR. WEINBERGER:

2    **Q**    Mr. Pavlich, can you see me and hear me?

3    **A**    I can.

4    **Q**    Okay.  In your direct testimony you talked about an

13:04:17  5    extensive lengthy investigation of an internet pharmacy.

6         Do you recall that?

7    **A**    Yes.

8    **Q**    And how much time it took up of your time as a field

9    agent investigator; right?

13:04:34  10    **A**    Yes.

11    **Q**    And you talked about how it involved one and a half --

12    I think one and a half million scripts or pills that were

13    not for legitimate medical purpose?

14    **A**    One and a quarter doses.

13:04:51  15    **Q**    Okay.  So -- one and a quarter doses, a lot more

16    pills?

17    **A**    Well, doses are pills, yes.

18    **Q**    Okay.  Sorry.

19         So you weren't meaning to imply, were you, that this

13:05:07  20    internet pharmacy investigation that -- and the pharmacy

21    that you shut down involved opioids, were you?

22    **A**    No.  I was just talking about -- I was asked about an

23    internet case.

24    **Q**    Right.  So Mr. Swanson asked you about an internet

13:05:23  25    case involving one and quarter dosages or pills, and that

**Pavlich (Cross by Weinberger)**

1    has nothing to do with the opioid crisis, or had nothing to

2    do with the opioid crisis in Northeastern Ohio; right?

3    **A**    They weren't opioids.

4    **Q**    So you agree with what I just said; right?  It had

13:05:47 5    nothing to do with the opioid crisis?

6    **A**    Yeah.  Yeah, I agree.  I agree that it had nothing to

7    do with opiate cases.

8    **Q**    Okay.  Well, I just didn't want the jury to get the

9    wrong impression of that particular investigation.

13:05:59 10    So as I understand what got you into investigating

11    Dr. Franklin and Overholt's was you got a tip; right?

12    **A**    I got assigned.

13    **Q**    You got assigned as a result of a tip that came in;

14    right?

13:06:24 15    **A**    I didn't get the direct at this point.  I got assigned

16    by my supervisors to meet the pharmacist.  That's how it

17    happened.

18    **Q**    Well, Overholt's was in your district; right?

19    **A**    Yes, it was.

13:06:38 20    **Q**    And I'm assuming that before this assignment came into

21    you that you had visited the Overholt's Pharmacy for

22    inspections; right?

23    **A**    I don't recall prior to when I went there on this

24    investigation when I had been there prior to that.

13:07:01 25    **Q**    But you had been there?

### Pavlich (Cross by Weinberger)

1    **A**    Oh, I -- yes, I had been there.

2    **Q**    Multiple times; right?

3    **A**    Probably.

4    **Q**    Doing your usual 2 and a half to 3-hour investigation;

13:07:17  5    right -- or inspection, right?

6    **A**    Not all the time.  I might have been there for some

7    other reason, I don't know.  I don't recall the last time I

8    was there other than when I went for this investigation.

9    **Q**    Well, when you would have done your inspection, you

13:07:31  10   would have done your usual thorough job of looking at the

11   script files for the controlled substances; right?

12   **A**    If I was doing a full inspection, yes.

13   **Q**    And you would have been looking at the actually

14   physical scripts; right?

13:07:48  15   **A**    If I was doing a full inspection, yes.

16   **Q**    And so if you had -- if you had been to Overholt's and

17   had done your usual investigation, I guess you would have

18   seen that the Dr. Franklin scripts had notated on them, only

19   fill at Overholt's; right?

13:08:08  20            MR. SWANSON:  Objection.

21            THE COURT:  Overruled.

22            THE WITNESS:  If I would have saw them, I

23   would have taken action.

24   BY MR. WEINBERGER:

13:08:19  25   **Q**    So maybe you were there and you were going through

4614

**Pavlich (Cross by Weinberger)**

1 this file of scripts and you just didn't see a Franklin

2 prescription that said fill only at Overholt's.  Maybe you

3 just didn't see it; right?

4 **A** No.  I don't agree with that comment.

13:08:40 5 **Q** All right.  So when you do do these inspections that

6 includes the review of these hard copy scripts in this file,

7 tell me what you're looking at.  Is it one document per

8 script?  What do you look at?

9 **A** Well, one prescription equals one medication specific

13:09:09 10 doses and specific directions for a specific patient on a

11 specific date.

12 **Q** Okay.  So you're -- are you looking at the actual

13 prescription itself that got filled?

14 **A** If I'm looking at the prescription files, yes.

13:09:27 15 **Q** All right.  And is there anything -- any other

16 documentation attached to that written prescription that

17 you're looking at in the C-II files?

18 **A** There would have been a dispensing computer-generated

19 label affixed to it.

13:09:45 20 **Q** Anything else?

21 **A** Manual initials of the dispensing pharmacist.

22 **Q** Anything else?

23 **A** Not off the top of my head, no.

24 **Q** So you're familiar with the red flag or concern known

13:10:05 25 as doctor shopping?

4615

**Pavlich (Cross by Weinberger)**

1    **A**    I'm familiar with doctor shopping.

2    **Q**    Okay.  There's no way to determine whether or not the

3    patient whose script was filled that is contained in that

4    file, whether there was a concern about doctor shopping;

13:10:25  5    right?  No way to tell from looking at that file; right?

6    **A**    From looking at the original prescription file you're

7    saying?

8    **Q**    Yep.

9    **A**    No.  I wouldn't be able to determine that.

13:10:39 10    **Q**    Okay.

11    **A**    Unless -- unless the pharmacist made a note of some

12    sort about the patient being at another pharmacy or other

13    doctors, I've seen that.

14    **Q**    Right.  But if such a note was made, you would expect

13:10:56 15    to be some -- be some -- some documentation of the

16    resolution of that concern on the script; right?

17    **A**    The pharmacist would probably make a notation as to

18    their finding.

19    **Q**    Um-hmm.  And if you looked at just an individual

13:11:18 20    script, as you've described it, in the file, you wouldn't be

21    able to tell whether or not the patient was involved with

22    pharmacy shopping; right?

23    **A**    No, I would not, unless there was a note.

24    **Q**    And if you just looked at this particular script, you

13:11:34 25    wouldn't be able to tell whether or not the patient paid

**Pavlich (Cross by Weinberger)**

1   cash for it; right?

2   **A**   Well. . . let me think about that.

3       I believe in some dispensing systems the label that

4   was generated by the computer and affixed to the

13:12:01   5   prescription would sometimes indicate an insurance pay or a

6   cash pay.

7   **Q**   Well, you're just --

8   **A**   Not in all cases but I recall -- I recall something

9   like that.

13:12:14   10   **Q**   Seldom happened; right?  Seldom noted on the script

11   that you were looking at; right?

12   **A**   I wouldn't use the word "seldom."

13   **Q**   All right.  Well, you wouldn't be able to tell from

14   the physical script whether or not it was an early refill,

13:12:38   15   right, of a prior script?

16   **A**   Just by looking at the original --

17   **Q**   We're talking about the files that you reviewed during

18   your 2 and a half hour inspection.  You know, you said you

19   had access back three years, potentially.

13:13:01   20       Could you -- could you tell whether or not there was

21   an early refill?

22   **A**   I can tell if you looked back to the prescription

23   prior to that, yes.

24   **Q**   Well, that would require you to find the prescription

13:13:14   25   for that patient in this file cabinet of physical scripts;

**Pavlich (Cross by Weinberger)**

1       right?

2       **A**      No, that's not how I would do it.

3       **Q**      Well, how would you do it, sir?

4       **A**      Well, I would go in the computer and run that

13:13:30  5     patient's name and see when was the last prescription that

6       they got prior to that one and then I would know the number

7       and I could find the original prescription.  That's how.

8       **Q**      So -- but there would be nothing in this physical file

9       of scripts to alert you that, hey, this is a patient who I

13:13:52 10     got to go to the computer -- and by the way, you said -- you

11      told us you're not particularly computer savvy, but let's

12      assume you could use the computer, what would trigger you,

13      looking at a physical script, to say, hum, maybe this is

14      somebody I should look up for a potential early refill red

13:14:14 15     flag?

16      **A**      Well, there would be a couple of things:  Number one,

17      like I told you, I had lots of phone calls on lots of

18      things.  And if I recall the name, that would be a reason

19      that would pique my interest.  If I would see a prescription

13:14:33 20     for 900 Dilaudid in a month, that would pique my interest.

21      Various things would pique my interest.

22          If I saw an alteration on the prescription, that would

23      pique my interest.  If I saw a doctor that I might have some

24      information on that I was concerned about, that would pique

13:14:54 25     my interest.  Numerous things.

4618

**Pavlich (Cross by Weinberger)**

1      **Q**      And when you would do this, would you document

2      anywhere on your inspection report or in your own

3      documentation that, you know, I looked -- I looked through

4      these big file of scripts, and hey, there was a patient

13:15:17  5      there that I recall from somewhere, so I'm going to go to

6      the computer, I'm going to run that patient's name, and I'm

7      going to look for prior scripts?

8           Any documentation of that during your inspections?

9      **A**      Oh, yeah.  There was documentation of that during my

13:15:36  10      inspections.

11      **Q**      And where would we find that documentation, sir?

12      **A**      Well, sometimes I made manual notes on a notepad.

13      Sometimes I made notes on inspection reports.  If you look

14      at the Overholt's inspections, there's lots of notes like

13:15:54  15      that.

16      **Q**      Sir, the trilogy cocktail, let's talk about that.

17           So first of all, would benzodiazapines and muscle

18      relaxants, scripts for them, would they be the C-II file?

19      **A**      They're not C-IIs, I don't believe, so they would not

13:16:27  20      be in the C-II file.

21      **Q**      Do you know, are they C-IIs or not?

22      **A**      I don't believe they are, but again, I'm 10 years out.

23      **Q**      Yeah, so -- so everything that you've testified about

24      that you've -- that you did as a field investigator does not

13:16:47  25      apply to this case from 2012 to now, right, because you were

4619

**Pavlich (Cross by Weinberger)**

1    no longer at the Ohio Board of Pharmacy; correct?

2    **A**    That is correct.

3    **Q**    Okay.  So you locate an OxyContin script in the C-II

4    file for patient Joe Jones.  The benzodiazapines would not

13:17:16 5    be in that file; right?

6    **A**    No, it would not.

7    **Q**    The carisoprodol, the muscle relaxant, would not be in

8    that file; right?

9    **A**    No, it would not.

13:17:36 10    **Q**    Now, are you familiar with the concept of refusal to

11    fill?

12    **A**    Yeah.  I'm familiar.

13    **Q**    And are you aware of the fact that there were times

14    when a pharmacy would refuse to fill a prescription of an

13:17:59 15    opioid?

16    **A**    Absolutely.

17    **Q**    And did the pharmacies that you inspected keep

18    separate file folders for refusals to fill?

19    **A**    No.  If they had a patient walk in with a prescription

13:18:17 20    and they refused to fill it, they would not keep the

21    prescription, they would hand it back to the patient.  It's

22    not their property.

23    **Q**    So when you would look through and do your inspection,

24    and you would be looking through the C-II files and the

13:18:39 25    C-III to C-V files, you wouldn't see any scripts where the

4620

**Pavlich (Cross by Weinberger)**

1    pharmacy or the pharmacist refused to fill; right?

2    **A**    No.  They would have no reason to be in there.

3    **Q**    So when a patient goes to a pharmacy and there's

4    something about that script that raises concerns that cannot

13:19:05  5    be resolved and the pharmacist makes a decision not to fill,

6    would that be important information, indeed, would it be a

7    red flag when that same patient arrives at that same

8    pharmacy trying to fill a similar prescription?

9    **A**    Yeah.  If they refused it once, they should refuse it

13:19:34  10    constantly.

11    **Q**    But when you did your inspections, Mr. Pavlich, you

12    never looked at that issue; right?

13    **A**    Well, if I didn't see a prescription, how would I look

14    at it?

13:19:46  15    **Q**    So the answer is, right, you never -- right,

16    Mr. Weinberger, you never looked at that issue during your

17    inspections; right?

18    **A**    Right, Mr. Weinberger.  That's impossible to see.

19    **Q**    Very good.  Thank you, Mr. Pavlich.

13:20:04  20        When you were looking at the physical script file that

21    was kept at that pharmacy, that would be information -- the

22    filling of those scripts would be information that only that

23    pharmacy would have; right?

24    **A**    The original prescription would remain in that

13:20:41  25    pharmacy, yes.

**Pavlich (Cross by Weinberger)**

1   **Q**   All right.

2   **A**   But the information in the chain must be also at their

3   HQ, if that's what you're asking.

4   **Q**   Yeah.  You mean at their headquarters; right?

13:20:51  5   **A**   Yes.

6   **Q**   When you say "HQ"?

7   **A**   Yes.  Yes.

8   **Q**   Okay.  Now, you told us -- you told us in answer to

9   question on direct examination that, you know, for example,

13:21:07 10   with respect to Walgreens, you made a notation that they use

11   IntercomPlus for their -- as their system for filling

12   scripts.

13   Do you recall that?

14   **A**   Yeah, I believe that was written on there.  I don't

13:21:29 15   recall what I --

16   **Q**   Okay.

17   **A**   It was on the -- it was on the inspection sheet, their

18   computer software at that time, yes.

19   **Q**   Right.  But as far as you were concerned, since you're

13:21:40 20   not particularly computer savvy, you have no idea how that

21   system works; right?

22   **A**   None.  Absolutely none.

23   **Q**   All right.  So let's move to the next subject,

24   Mr. Pavlich, which is OARRS.

13:22:00 25   You're familiar with the fact that OARRS is the Ohio

**Pavlich (Cross by Weinberger)**

1    Prescription Drug Monitoring Program; right?

2    **A**    Yes.  It came into existence when I was there.

3    **Q**    Right.  Actually, it began in about 2006.

4         Does that jog your memory, sir?

13:22:18  5    **A**    I don't remember the date, but it came into existence

6    while I was still there, yes.

7    **Q**    You understand that the laws of the State of Ohio

8    required pharmacies to send their dispensing data for

9    opioids dispensed at the pharmacy to the State of Ohio so

13:22:36 10    that it could be inputted into OARRS?

11    **A**    I know that it was downloaded to the Board of

12    Pharmacy, but I had nothing to do with that.

13    **Q**    And you began using OARRS in your investigation of

14    doctors, patients, and pharmacies; right?

13:22:55 15    **A**    Probably a year after it was first started I began to

16    use it because it was a quick and easy method to look for

17    doctor shoppers for an example.

18    **Q**    Right.  In fact, you found it, I think you told us in

19    deposition, using your words, that it was an enlightening

13:23:20 20    experience --

21              MR. SWANSON:  Objection, Your Honor.

22              MR. WEINBERGER:  I'll rephrase.

23              MR. SWANSON:  Objection, Your Honor.

24              MR. WEINBERGER:  I'll rephrase.

13:23:29 25              THE COURT:  Okay.

**Pavlich (Cross by Weinberger)**

BY MR. WEINBERGER:

1

**Q**     You found it to be an enlightening experience; right?

2

**A**     Very much so.

3

**Q**     Best tool you ever had?

4

13:23:40 5     **A**     I would say it was the best tool I had for purposes of

6     doctor shopping and profile reconstruction, yes.

7     **Q**     Profile reconstruction not only with respect to the

8     doctor's profile and prescribing patterns, but also with

9     respect to the patient's profile and behavior; right?

13:24:09 10     **A**     Yeah, that is.

11     **Q**     Now, let's be clear, you as someone from the Ohio

12     Board of Pharmacy, could use OARRS to run information about

13     a particular prescriber; right?

14     **A**     I'm not sure exactly in the beginning if we were able

13:24:31 15     to do that or just patients initially, but eventually we

16     were able do it, yes.

17     **Q**     Right.  Something that the pharmacies could not do.

18     They couldn't look at --

19     **A**     No.

13:24:41 20     **Q**     -- doctor profiles, they could only look at patient

21     profiles; correct?

22     **A**     Patient profiles specific to them.

23     **Q**     Right.

24     **A**     They didn't have that actual access at that time.

13:24:55 25     **Q**     Right.  So --

**Pavlich (Cross by Weinberger)**

1    **A**    That came after, I think, I retired.

2    **Q**    Right.  But you could see -- you could see from the --

3    from OARRS evidence of doctor shopping; right?

4    **A**    Yeah, I could.

13:25:07  5    **Q**    Cash payments versus insurance; right?

6    **A**    I believe, yes.

7    **Q**    The trilogy, you could see evidence of the prescribing

8    and dispensing of the three drugs to a particular patient;

9    right?

13:25:30  10    **A**    If I was running that particular doctor or patient

11    yes.  This didn't jump up in my computer and say, hey, look

12    at me.  I had to enter stuff to find it.

13    **Q**    I'm sorry, I. . . could -- but you could run a -- you

14    could run a doctor's profile and figure out --

13:26:01  15    **A**    Oh --

16    **Q**    -- and figure out what the propensity was for the

17    doctor to prescribe the three drugs in the trilogy to a

18    number of patients; right?

19    **A**    Yeah.  At one time during OARRS established dates we

13:26:23  20    were able do that as agents and specialists, yes.

21    **Q**    All right.  And you could tell whether or not there

22    was an early refill for a particular patient; right?

23    **A**    Yeah.  It would show patient specific, drug specific,

24    dates dispensed, next date dispensed, so yes, the answer is

13:26:53  25    yes.

## Pavlich (Cross by Weinberger)

1    **Q**    So you could actually tell from OARRS, from their

2    OARRS report, if a prescription was legitimate or not.

3    True?

4                        MR. SWANSON:  Objection.

13:27:06  5                        THE COURT:  Well, let go on the headphones.

6                        (Proceedings at sidebar.)

7                        MR. SWANSON:  Your Honor, the objection is

8    he's trying to get in expert testimony through a lay witness

9    who is not a pharmacist.  He's saying he wants to support

13:27:45 10    the work that Mr. Catizone did by suggesting through this

11    witness you can identify a red flag just by looking at

12    aggregate data.

13                        MR. WEINBERGER:  Your Honor, I didn't --

14                        THE COURT:  I'm not sure what he's doing.

13:27:56 15                        MR. SWANSON:  Well, I guess I'm not either.

16    That's my best guess and that's the objection.

17                        MR. WEINBERGER:  Your Honor, that's a direct

18    quote from his deposition testimony.  It was such a good

19    tool that he could determine from an OARRS report whether a

13:28:09 20    prescription was legitimate or not.  I didn't just pull this

21    out of the air.

22                        MR. SWANSON:  That's not the issue.  I mean,

23    just because he says something at a deposition doesn't mean

24    it's admissible.

13:28:17 25                        THE COURT:  Well, if he used it as an

### Pavlich (Cross by Weinberger)

1    investigative tool and that's how he decided whether a

2    prescription was legitimate, he can say, that's how I

3    decided, I used OARRS -- I consulted OARRS.

4         I mean, so it sort of came out a little bit out of the

13:28:36 5    blue, but if this is somehow tied to --

6         If you can bring out, Mr. Weinberger, that when he was

7    conducting an investigation he used OARRS and that's how he

8    decided if a prescription was legitimate or not, then he can

9    talk about what he did as an investigator.

13:28:57 10              MR. SWANSON:  Correct, but it's not one could

11   do this or one could do that --

12              THE COURT:  It's what he did.  All right.

13   Okay.

14              MR. SWANSON:  Yes.  That's the objection,

13:29:02 15   correct.

16              THE COURT:  Okay.  That's fine.  It's got to

17   be couched in what he did as part of his job and then

18   it's -- then it's permissible as opposed to just some --

19   some blanket use.

13:29:14 20              MR. SWANSON:  Your Honor --

21                   (In open court at 1:29 p.m.)

22   BY MR. WEINBERGER:

23   **Q**    Mr. Pavlich, would you use OARRS to -- in the course

24   of your investigation of prescribers or patients?

13:29:45 25   **A**    Yes.

**Pavlich (Cross by Weinberger)**

1    **Q**    And when you got an OARRS report during the course of

2    your investigation, you could actually tell from the report

3    whether or not a prescription was legitimate or not.  True?

4    **A**    No, not all the time.

13:30:05  5    **Q**    But sometimes --

6    **A**    If it was altered, if it was written for 10 doses of

7    oxycodone and a patient changed it to a hundred and the

8    pharmacist didn't catch it, OARRS wouldn't catch it.

9    **Q**    Right.  We're not talking about that situation.

13:30:23  10    But there were situations when you could use OARRS and

11    the data and information you got from OARRS to tell whether

12    a prescription was legitimate or not; right?

13    **A**    In certain situations, yes.

14    **Q**    Okay.

13:30:38  15    **A**    Not all.

16    **Q**    Right.  And if a prescription is determined to be not

17    legitimate but was nonetheless dispensed, that could lead to

18    diversion; right?

19                    MR. SWANSON:  Objection.

13:30:59  20                    THE COURT:  Sustained.

21    BY MR. WEINBERGER:

22    **Q**    That would be evidence of diversion, wouldn't it?

23                    MR. SWANSON:  Objection.

24                    THE COURT:  Sustained.

13:31:09  25    BY MR. WEINBERGER:

4628

**Pavlich (Cross by Weinberger)**

1    **Q**    So we've talked about the pharmacists at some point in

2    time early in OARRS limitation in terms of not being able to

3    see or look up the prescriber profiles to look for pattern

4    prescribing or volume prescribing or things like that.

13:31:34  5        You recall a few minutes ago talking about that?

6    **A**    Yes.  The pharmacists didn't have electronic database

7    like myself as an agent.  They had other pharmacists would

8    call them about things, but. . .

9    **Q**    Right.

13:31:47 10  **A**    Not electronic database.

11   **Q**    Right.  So -- but you did tell us earlier that at

12   headquarters, there was data -- at the headquarters of these

13   chain pharmacies there was data from the dispensing of

14   opioids from every one of the stores owned by that chain;

13:32:12 15  right?

16            MR. SWANSON:  Objection.  Mischaracterizes

17   what he said.

18            THE COURT:  Overruled.

19            THE WITNESS:  I'm pretty much guessing on that

13:32:22 20  because I never was in an HQ and saw that.

21   BY MR. WEINBERGER:

22   **Q**    All right.  Fair enough.

23   **A**    I'm just make an assumption.

24   **Q**    But we can agree that OARRS takes the dispensing data

13:32:37 25  for the chain pharmacies and can evaluate, or help people

4629

**Pavlich (Cross by Weinberger)**

1    evaluate the -- the prescribing habits of doctors and

2    prescribers -- and other prescribers; right?

3    **A**    I'm not sure as to the extent when a pharmacist in a

4    store who has access to OARRS can see.  I know an agent and

13:33:12  5    a specialist could, but I'm not certain on what they could

6    see because I had retired when they got access.

7    **Q**    Okay.  I'm sorry.  I -- that was a bad question.

8    Poorly phrased question.

9        You talked about earlier, from your perspective, that

13:33:30  10    you could use -- that the dispensing data from the

11    pharmacies went to OARRS, and from your perspective, you

12    could use that dispensing data to look at the behavior of

13    doctors and prescribers; right?

14    **A**    Yes.  If I punched in specific information, I could

13:33:53  15    look at specific details.

16    **Q**    For these large chain pharmacies, looking at their own

17    dispensing data at their headquarters, do you know whether

18    or not they could look at their own -- the prescribers whose

19    prescriptions were filled across the country to look for the

13:34:15  20    patterns of behavior of prescribers?

21    **A**    I am not aware of what they could do with their

22    systems.

23    **Q**    Prior to 2011, did your inspections, your 2 and a half

24    hour inspection once every year or two for a particular

13:34:42  25    pharmacy, look for evidence that OARRS was checked by the

4630

**Pavlich (Cross by Weinberger)**

1    pharmacist?

2    **A**    I don't recall when the pharmacists had access to

3    OARRS, so I'm not certain if they had access when I was

4    still working.

13:35:03  5    **Q**    Okay.  Are you aware of the fact that in 2011, in

6    October of 2011, the Ohio Board of Pharmacy regulations were

7    changed to make it mandatory that pharmacists check OARRS

8    under certain circumstances?

9         Are you aware of that?

13:35:26  10    **A**    October of 2011?

11    **Q**    Yes, sir.

12    **A**    That was probably 5 months before I retired.  I don't

13    recall that.  Sorry.

14    **Q**    So if it was -- just to -- stay with me for just a

13:35:44  15    minute.  As Mr. Lanier would say, just track with me for a

16    moment.  Okay?

17         If it was mandatory under certain circumstances as of

18    October of 2011 that a pharmacist check OARRS, did any of

19    your inspections, between October of 2011 and March 1st,

13:36:07  20    2012, when you retired, include looking at records to see

21    whether or not the pharmacists for these chains checked

22    OARRS?

23    **A**    Again, I don't recall when they had access, and I

24    don't even think if they looked in the OARRS system that it

13:36:29  25    would reflect on something unless there's a paperwork that

**Pavlich (Cross by Weinberger)**

1    was generated that they went into OARRS that I would see.  I

2    don't recall ever seeing paperwork like that.

3    **Q**    Certainly when you did your inspection of the hard

4    copies and these files at the individual pharmacies, you

13:36:50 5    didn't see an OARRS report stapled to or appended to the

6    script; right?

7    **A**    I don't specifically recall, no.

8    **Q**    Now, we talked about earlier that you -- that you knew

9    Brian Joyce who was the pharmacy supervisor for the Trumbull

13:37:13 10   stores for Walgreens; right?

11   **A**    Yes.  Correct.

12   **Q**    Were you aware that Mr. Joyce served on the board of

13   the Ohio Board of Pharmacy?

14   **A**    Yes.  When I was still there.

13:37:25 15   **Q**    Um-hmm.  And were you made aware by Mr. Joyce in your

16   conversations with him that when the Ohio Board of Pharmacy

17   made a proposal to make OARRS mandatory under certain

18   circumstances, that Mr. Joyce, as a board member, opposed

19   that change?

13:37:45 20           MR. SWANSON:  Objection, Your Honor.

21           THE WITNESS:  Can I answer?

22           THE COURT:  Sustained.

23           MR. WEINBERGER:  You cannot answer.  The Judge

24   sustained the objection.

13:38:01 25           THE WITNESS:  I heard.

4632

**Pavlich (Cross by Weinberger)**

1    BY MR. WEINBERGER:

2    **Q**    Did you ever -- did you ever have any conversations

3    with Mr. Joyce about his being a board member of the Ohio

4    Board of Pharmacy?

13:38:16  5    **A**    Yeah, I'm sure I congratulated him.

6    **Q**    Right.  I'm sure you did.

7         And did you ever have a conversation with Mr. Joyce in

8    which he expressed his feelings about OARRS, about the use

9    of OARRS?

13:38:38 10    **A**    Not that I recall.

11    **Q**    Are you familiar with the term "blanket refusal to

12    fill"?

13    **A**    Yeah, I would say I heard of that phrase.  Not one

14    that I would use, but I've heard of it.

13:39:17 15    **Q**    What do you understand blanket refusal to fill to

16    mean?

17    **A**    No matter what prescriptions from specific prescriber

18    comes in, we don't fill it.

19    **Q**    And you --

13:39:31 20    **A**    Blanket.

21    **Q**    And you were aware that as to some of the pharmacies

22    in your district there were blanket refusals to fill with

23    respect to certain prescribers?

24    **A**    I can't think of specific ones, but I recall up in

13:39:49 25    Geauga County, yes.

## Pavlich (Cross by Weinberger)

1    **Q**    All right.  Just to sort of wrap things up, sir.  As

2    you sit here today, you have no specific knowledge of the

3    volume of pills -- of opioid pills dispensed in Trumbull

4    County or any of the other counties where you were in charge

13:40:19  5    of inspecting pharmacies, you have no idea of the volumes of

6    pills during your tenure; right?

7    **A**    No, I have no knowledge.

8              MR. WEINBERGER:  Thank you, Your Honor.  I

9    pass the witness.

13:40:34  10             THE COURT:  Objection.  Before we have

11   redirect, if any of the jurors have questions, if you'd give

12   them to Mr. Pitts and I'll give them to counsel.

13        Thank you.

14             (Brief pause in proceedings).

13:44:15  15             (Proceedings at sidebar.)

16             THE COURT:  I don't have any of these

17   questions.

18             MR. SWANSON:  Oh, I'm sorry.  Well, let me --

19             THE COURT:  I mean, you can read them to me if

13:44:22  20   there's a concern about, you know, what you can ask or you

21   can't, well --

22             MR. WEINBERGER:  I'm sorry, I can't hear.

23        Wait a minute.  Okay.  We can now.  Sorry.

24             MR. SWANSON:  Your Honor, I was just going to

13:44:33  25   read -- I think they all look like they're okay questions.

**Pavlich (Cross by Weinberger)**

1              THE COURT:  All right.

2              MR. SWANSON:  I was going to read the one that

3     we think isn't.

4              THE COURT:  All right.  Which one are you

13:44:40 5    concerned about?

6              MR. SWANSON:  So there was a question, it

7     says, with your expertise, do you believe the defendants

8     were as a corporate responsible for --

9              THE COURT:  Right.  We're obviously not asking

13:44:52 10   any question like that of any witness.

11             MR. SWANSON:  Okay.

12             THE COURT:  Maybe an expert, but certainly not

13    with this witness.

14             MR. SWANSON:  And I think that was the only

13:45:03 15   one that we thought was not proper.  But as I'm reading

16    them, there are literally a dozen of them, so if I come up

17    with another, I'll approach.

18         Is that okay?

19             THE COURT:  That's fine.  That's fine.

13:45:15 20             MR. SWANSON:  Okay.  And again, Mr. Swanson,

21    you don't -- you're not required to ask them.  I mean,

22    it's -- that's not -- I give them to both counsel so that if

23    you want to ask them, that's fine.  If you think it's better

24    with another witness, that's fine.  If you think it's

13:45:30 25   irrelevant, that's fine.

**Pavlich (Redirect by Swanson)**

```
            1              MR. SWANSON:  Okay.

            2              THE COURT:  But I agree, if there's one that

            3       you're concerned about whether it's proper, this is the way

            4       to proceed.

13:45:38    5              MR. SWANSON:  I appreciate that, Your Honor.

            6       I'll proceed in that manner.

            7              THE COURT:  Okay.

            8              MR. SWANSON:  Okay.  Thank you.

            9              (In open court at 1:45 p.m.)

13:45:44   10            REDIRECT EXAMINATION OF GEORGE P. PAVLICH

           11       BY MR. SWANSON:

           12    Q     Hi, Mr. Pavlich.

           13    A     Hello.

           14    Q     I don't have a lot of follow-up for you, but we did

13:46:18   15       get a whole bunch of questions from the jurors.  They're

           16       allowed to write down questions that they would like

           17       answered, and I'm going to go through and ask -- ask them to

           18       you.  If you can answer them, that's terrific.  If you think

           19       that for some reason you can't, you can just say, I don't

13:46:37   20       know the answer to that.  It's all fair.  Okay?

           21    A     Okay.

           22    Q     So first there's a question, out of the -- maybe I can

           23       put it on the. . .

           24            There was a question, out of the chain versus

13:47:06   25       independent pharmacies, which ones were issued more
```

# Pavlich (Redirect by Swanson)

1      quote/unquote pink slips?

2            And I think that comes from your inspection report,

3      the pink sheets.

4      **A**    Well, obviously there's more chain pharmacies, so

13:47:25  5   based on that alone, they probably got more pink sheets.

6      **Q**    And when you say there are more chains, are you

7      talking if you put all the individual -- or all the

8      independents together, were there still more chains?

9      **A**    I think so.  There are more chain stores than there

13:47:47  10  are independents, but. . . that's -- that's just a guess.

11     **Q**    What about when a --

12     **A**    Best I can say.

13     **Q**    Sorry.  I didn't mean to interrupt.  Are you all

14     right?

13:48:03  15  **A**    What?  Wait a minute.

16           My screen reduced.  I didn't know what you were doing.

17     **Q**    Sorry.  I picked it up.

18     **A**    There we go.  There we go.

19     **Q**    Let me ask you, instead of just the volume you're

13:48:19  20  talking about as a percentage, so did the chains versus the

21     independents at a store level tend to have more pink sheets?

22           Do you understand that distinction?

23     **A**    More extensive pink sheets for violations, I would say

24     independents.

13:48:41  25  **Q**    Okay.  The next is a question about audits.

**Pavlich (Redirect by Swanson)**

1        It says, audits were only done if an investigation was

2    opened?

3    **A**    Yes, because that required a lot of work.  I mean,

4    you're covering everything that's purchased, dispensed, and

13:49:09  5    in stock, and you're crunching all the numbers to come up

6    with a zero balance accountability, and I didn't just do it

7    to do it.

8    **Q**    By the way, when it came to pink slips, or excuse me,

9    pink sheets I guess they're called, did you issue pink

13:49:30  10   sheets for anything from very egregious violations to

11   violations that you felt were necessary that the pharmacy

12   put their attention to but that weren't, you know, serious,

13   there's, you know, potentially criminal activity going on

14   here level?

13:49:48  15   **A**    Yeah.  If I saw a number of administrative things that

16   were -- I'm viewing in the pharmacy, I would document it on

17   a pink sheet and ask for a reply.  It all depends.  If there

18   was just one thing, like a few scripts didn't have manual

19   initials, no, I wouldn't issue a pink slip in that case.

13:50:19  20   **Q**    Okay.  The next question is, did any of your

21   investigations ever require you to pull physical scripts

22   from any of the defendants?

23   **A**    Yeah, I pulled scripts from probably every pharmacy

24   store in my geographic at one time or another for various

13:50:42  25   reasons.

4638

**Pavlich (Redirect by Swanson)**

1    **Q**    And, so, can you give us a reason why you might go

2    into a chain pharmacy and ask for prescriptions?

3    **A**    Most of the time it involved doctor shopping, patients

4    going to multiple doctors and going to multiple pharmacies,

13:51:03  5    and this is a lot of times before OARRS came into existence.

6    I would manually have to search all this out.  So every

7    pharmacy at some time during my career with the Board of

8    Pharmacy had me pull something out of there.

9    **Q**    Would the pharmacists at Walgreens, Walmart, CVS,

13:51:30 10    sometimes gives you a call and say, hey, we have some

11    suspicions here based on this prescription, why don't you

12    come down and then you'd give them the -- they'd give you

13    the prescription, you'd pull that?

14    **A**    Sure.

13:51:54 15    **Q**    Here's a question:  During your years as a field

16    agent, from 1987 to 2012, did you notice a large increase in

17    the dispensing of prescription opioids in your geographic

18    area?

19        What year was it the highest?

13:52:18 20    **A**    That's a good question.

21        Well. . . I would say the year it was the highest is

22    when I did Overholt's Pharmacy.  That was the most extensive

23    dispensing I ever saw coming out of a pharmacy for specific

24    patients.  So I'll say that year, 2008 and '09.

13:52:57 25    **Q**    Okay.

**Pavlich (Redirect by Swanson)**

1  **A**  '07.  They had scripts from '07.  So during that

2  period probably.  There was some other large things going

3  on, but that one just jumps out at me.

4  That's a good question.

13:53:17  5  **Q**  I had a question here from a juror that I had -- that

6  was sort of in my mind too.  When I was asking you about the

7  inspections that you would perform at pharmacies and the

8  things that you would do and the things that you would look

9  at, I thought you had said -- and maybe I'm wrong -- but I

13:53:36 10  thought you had said you can see the dispensing policies for

11  the stores.

12  Do you remember that?

13  **A**  You know, I might have said that, and I might have

14  seen the dispensing policies and training manuals.  I mean,

13:53:50 15  in pharmacies, there is so much paperwork that they got to

16  keep track of and books they have in there, sure, but for me

17  to inspect them and look at them, I don't recall ever doing

18  that.

19  **Q**  Did you ever have discussions with the pharmacists or

13:54:05 20  the pharmacy leadership about what sort of policies they had

21  in place regarding dispensing of controlled substances?

22  **A**  I'm sure I engaged -- I'm sure I engaged pharmacists

23  in a conversation about dispensing of controlled substances.

24  **Q**  Okay.  So the question which this juror asked is if

13:54:39 25  dispensing policies were not reviewed on a regular basis,

**Pavlich (Redirect by Swanson)**

1    how could it be determined the pharmacy that were doing

2    their jobs and/or our due diligence in dispensing of

3    opioids?

4    **A**    Regardless of what a policy or procedure or a

13:55:01  5    corporate or an independent book says for a pharmacist to

6    do, I mean, they could say fill everything, blanket

7    prescriptions, from any doctor in any one, no questions

8    asked.  That's irrelevant to me.  What was relevant to me

9    was the drug laws of the State of Ohio, the law book, that

13:55:23 10    had the federal, state, administrative, and criminal code in

11    it.  That's what I would look and make this determination.

12    Their policy's irrelevant to me.

13    **Q**    You were asked a question by Mr. Weinberger about when

14    a patient would come in and the pharmacy would refuse to

13:55:53 15    fill the prescription, they would give -- the pharmacist

16    would give the prescription back to the patient.

17        Do you recall that?

18    **A**    Yes.

19    **Q**    And why was it that the pharmacist would give the

13:56:05 20    prescription back to the patient?

21    **A**    Well, corresponding responsibility to the prescribing

22    of the medication.  If they're not comfortable dispensing

23    it, I never in my career would tell a pharmacist fill

24    something if you don't feel good about it.

13:56:29 25    **Q**    Yeah, and I appreciate that.  I think my question

4641

**Pavlich (Redirect by Swanson)**

1  wasn't clear.

2      I was wondering why would the pharmacist give the

3  prescription back to the -- back to the patient if the

4  pharmacist had decided not to fill the prescription?

13:56:42  5  **A**    Oh.  Oh, I'm sorry.  I went on a tandrum [sic] there.

6      They would give it back -- I think I testified a

7  prescription issued by a prescriber to a patient is now the

8  property of the patient.  The patient brings it to the

9  pharmacy.  If they present it and it's not dispensed, it

13:57:03  10  remains as the property of the patient, not the pharmacy.

11  **Q**    Yeah.  And do you know if any of the chain pharmacies

12  before handing the prescription back to the patient would

13  make a copy of the prescription so they had a record that

14  they would refuse to fill?

13:57:25  15  **A**    Yeah, I was going to say that.  I've had that happen,

16  and then need call me.  Some even kept the prescription,

17  but, you know, a pharmacist doesn't want to get into a

18  confrontation in the middle of the store.  So a copy worked.

19  **Q**    Yeah.  So just to make sure that I'm clear in the way

13:57:46  20  I'm thinking about this, if a patient comes in to the

21  pharmacist and gives the prescription to the pharmacist, and

22  at least in my experience the pharmacist will then take it

23  and go back and look at it in the pharmacy, and could the

24  pharmacist copy that prescription, make a determination that

13:58:04  25  he or she wasn't going to fill that prescription, give the

**Pavlich (Redirect by Swanson)**

1    original prescription back to the patient and maintain a

2    file of the copy?

3         Was that, in your experience, something that happened?

4              MR. WEINBERGER:  Objection, Your Honor.

13:58:16  5              THE COURT:  Yeah.

6              MR. LANIER:  Leading.

7              THE COURT:  I'll sustain that.

8    BY MR. SWANSON:

9    **Q**    Do you have any memory of any of the chain pharmacies

13:58:24  10   keeping files of copies of prescriptions that they had

11   refused to fill?

12   **A**    Now that I don't recall, but I recall copies being

13   made and given to me.

14   **Q**    So you don't have a recollection of pharmacy keeping

13:58:50  15   copies of prescriptions they had refused to fill?

16              MR. WEINBERGER:  Objection, Your Honor.  Asked

17   and answered.

18              THE COURT:  I'll allow that one question.

19              THE WITNESS:  No, I don't recall of any files

13:58:57  20   with prescriptions of that sort.

21              MR. WEINBERGER:  I'll withdraw the objection,

22   Your Honor.

23   BY MR. SWANSON:

24   **Q**    I think this was -- at least part of this might have

13:59:15  25   been asked by Mr. Weinberger, but did you do an inspection

1    at Overholt's Pharmacy every year?  For how many years?  How

2    many pink sheets per inspection?

3    **A**     I know I had not done an inspection at Overholt's

4    Pharmacy for, oh, it was at least a year or two prior to

13:59:41 5    when I went in there on the Dr. Franklin investigation.  I

6    was not aware the extent of what they were doing in there.

7    I was -- I was pretty busy.

8          I would probably not be in pharmacies every year.  It

9    was just -- I mean, we had -- we had so many sites to

14:00:07 10    inspect, not just pharmacies.  You name it, nursing homes,

11    fire stations, ambulance.  We were busy.  So I did the best

12    I could.

13          And with Overholt's, yes, if I would have been in

14    there every year, I might have spotted those prescriptions,

14:00:27 15    but. . . good question.

16          And how many pink sheets per inspection?  That

17    would -- it would vary, you know.  If I didn't see anything,

18    no pink sheet was issued.

19    **Q**     Okay.  Is there a rule when writing a prescription

14:00:53 20    that the number of pills be written in Roman numerals

21    instead of the Number 3 or also write out in text the word

22    three?

23    **A**     Prescribers would write in various formats.  I mean,

24    there was the Latin, and the TID, BID.  Yeah, there was

14:01:21 25    different code formats for things to be written.

**Pavlich (Redirect by Swanson)**

1     Non-pharmacists like me like the layman's way of writing it,

2     longhand, 3, instead of Roman numerals or something.  But as

3     long as a pharmacist can decipher what's written, it was

4     good to go.

14:01:42  5     **Q**     Okay.  The question here is -- it's a series of

6     questions, and I'll just read them and let you answer.

7          How do you choose which pharmacies to inspect?

8          How many pharmacies were in your geographic area?

9     Just an estimate -- let me just stop there.  I guess that's

14:02:23 10     easier?

11     **A**     Okay.  I would choose pharmacies based on the last

12     time I was in a pharmacy.  So if I wasn't in a pharmacy for

13     two years -- to do a full inspection, not just to run in,

14     pull a script out or something, ask them a question about

14:02:45 15     something.  We were supposed to do 50 pharmacies a year.  I

16     didn't always meet that.  I was pretty busy.

17          How many pharmacies were in. . . I'm going to guess

18     just pharmacies in my geographic for four counties, I'm

19     guessing 150, maybe more, 180.  I'm guessing.

14:03:16 20     **Q**     And how many field agents like yourself covered those

21     counties?

22     **A**     Well, toward the end of my career I had four counties:

23     Trumbull, Mahoning, Columbiana, and Jefferson County.

24          At the beginning of my career I went from the eastern

14:03:40 25     border on the northeast of Ohio, from Ashtabula on down to

**Pavlich (Redirect by Swanson)**

1  Columbiana all the ways across to Wayne and Medina County,

2  excluding Cleveland and Cuyahoga County and Lake County, I

3  had everything else.

4  **Q**   What about as far as --

14:04:01  5  **A**   And that was a -- that was a lot of pharmacies.

6  **Q**   It sounds like a lot.

7      What about when you got into the 2006, '7, '8, you

8  know, more towards the end of your career, did you have --

9  it sounds like you had a smaller geographic area.

14:04:17  10     Did you have more help in conducting inspections?

11  **A**   Well, I had less facilities to take care of.  So,

12  obviously, it was less of a burden to do those four counties

13  versus 10 counties, obviously.

14  **Q**   Did an inspection sheet get submitted somewhere for

14:04:46  15  each inspection?

16  **A**   Yes.  If an inspection was conducted in a pharmacy, a

17  nursing home, a fire station, an EMS, there was an

18  inspection sheet.  If we went in there on our official

19  capacity to look at regulatory things, a sheet would be

14:05:09  20  issued.

21  **Q**   Yeah, and the last question on this form, if you wrote

22  a note, something you wanted to improve but not write up --

23  and at least my interpretation is in a pink sheet -- how

24  would you follow up to make sure there was this improvement

14:05:26  25  that you sought?

**Pavlich (Redirect by Swanson)**

1    **A**      If I saw something major, obviously I issued the pink

2    sheet.  If I saw something minor, I would note it on the

3    inspection sheet, manually initial your prescriptions, and I

4    would communicate to the pharmacist working that this is

14:05:57  5    what I want addressed.  And next time, if I was in the

6    pharmacy, those inspection sheets were in the store, so I

7    can always go back and look at those inspection sheets in a

8    3-year, 7-year recall.  They maintained them in a file.  And

9    I would do that at times to see -- you know, I couldn't

14:06:23 10    remember everything I noted, and I would go in there and

11    look at them and say, hum.  Then if I saw it again, then

12    they'd get a pink.

13    **Q**      Okay.  Did you ever, during your routine inspections,

14    look at any of the defendant -- defendants' pharmacists'

14:06:50 15    dispensing computer for any of the fields?  And it says

16    regarding red flags.

17         Did you look at the computer systems in your

18    inspections?

19    **A**      You know, I didn't really go into the pharmacy,

14:07:06 20    independent or chain pharmacy computers myself per se.  I

21    would ask the pharmacist or the technician to assist me.

22    Because obviously I wasn't savvy with all these different

23    software systems.  And I don't recall any fields regarding

24    red flags in the computer.  I mean, there might have been.

14:07:39 25    I -- I just don't recall.

**Pavlich (Redirect by Swanson)**

1    **Q**    So I want to make sure I'm understanding this.  The --

2    it sounds like when you would do these inspections, you

3    wouldn't go and sit down and start, you know, rooting around

4    in the computer, but if you had questions or wanted to see

14:07:56  5    the computer, was it available to you through the pharm tech

6    or the pharmacists to see what they were doing with their

7    dispensing software?

8         Was that an option for you you could look into?

9    **A**    Oh, yeah.  All I had to do was ask.  I mean, if I

14:08:11  10   asked, I received 99.9 percent of the time.  There was very

11   few occasions when someone would refuse to cooperate.

12   **Q**    I don't doubt that, sir.

13              MR. SWANSON:  I think, with that, those are

14   all the questions that I have for you.  I, again, appreciate

14:08:31  15   your time in answering my questions.

16        And maybe, Your Honor, if we could take a quick

17   sidebar.

18              THE COURT:  Okay.

19                 (Proceedings at sidebar.)

14:08:58  20              MR. SWANSON:  Your Honor, just a couple of

21   points on some questions.

22              THE COURT:  Okay.

23              MR. SWANSON:  We talked about the one that I

24   obviously didn't read.

14:09:04  25              THE COURT:  Right.

4648

**Pavlich (Redirect by Swanson)**

1          MR. SWANSON:  There was one above it, it said,

2     did a pharmacist ever ask him to contact corporate

3     supervisors with regards to being forced to continue to

4     dispense scripts for customers that might have possible red

14:09:18  5     flags?

6          I don't think there was any testimony about anybody

7     being forced to continue to fill, so I just didn't ask that

8     question.

9          THE COURT:  Right.  There is -- he certainly

14:09:28  10    gave no testimony about that, so I think you should probably

11    let that sit.

12         What does the plaintiff think?  I mean, there's been

13    no testimony about it.  It's coming out of the blue.

14    Certainly not from this witness.

14:09:45  15         MR. WEINBERGER:  I think it's a relevant

16    question, but, you know, with this witness and where he

17    might or might not go --

18         THE COURT:  Well, that's the point.  That's

19    the point.

14:09:57  20         MR. WEINBERGER:  I'm --

21         Mr. Swanson, maybe the only time you and I agree,

22    so. . .

23         THE COURT:  Okay.  I agree.  I agree.  We'll

24    let that one sit.

14:10:07  25         MR. SWANSON:  And then there were two that

**Pavlich (Redirect by Swanson)**

1    were specific to Walgreens that I didn't ask, and I wanted

2    to make sure Mr. Weinberger knows, because there was a

3    question, during your inspections, did you look over

4    Walgreens' good faith dispensing forms?  And he was gone --

14:10:22  5    he had retired by the time those came out, so I thought it

6    would be misleading to ask him about those.

7              MR. WEINBERGER:  I agree with the timing of

8    that.

9              THE COURT:  Yep.  Yep.

14:10:30 10              MR. SWANSON:  Two or two.  I'm going for the

11    clean sweep here.

12         He said, did Walgreens give you access to their

13    refusal to fill folder when you did an inspection?

14         And when I asked him the question he said he wasn't

14:10:43 15    aware that those forms existed, so I thought it would be

16    misleading to ask that question as well.

17              MR. WEINBERGER:  Well, he was aware that they

18    made copies, but he did testify that he was never shown the

19    files that contained the refusal to fill scripts.

14:10:58 20              MR. SWANSON:  Well, then the question's been

21    answered, I guess.

22              THE COURT:  Yeah.  I mean, I suppose can could

23    ask him -- I mean, maybe -- did he ever ask to see them --

24              MR. WEINBERGER:  Right.

14:11:08 25              THE COURT:  -- would be the relevant question,

**Pavlich (Redirect by Swanson)**

1    not which -- someone could ask him that.  I mean --

2                    MR. WEINBERGER:  Well, I'm going to ask him

3    that.

4                    THE COURT:  But he could be -- someone could

14:11:14  5    ask him, did you ever ask to see them, and then if he never

6    asked, well, then he would never have been shown them.

7    There would have been no reason to show him if he never

8    asked.  So I would --

9                    MR. SWANSON:  Okay.

14:11:24 10                    THE COURT:  If we're going do it, I would ask

11    it that way.

12                    MR. SWANSON:  Okay.  Can I just ask that last

13    question, and then I'm done.

14                    THE COURT:  Sure.

14:11:48 15                        (In open court at 2:11 p.m.)

16    BY MR. SWANSON:

17    **Q**    Sorry, Mr. Pavlich.  I have, I hope, just one more

18    question.

19    **A**    Okay.

14:11:51 20    **Q**    When you were doing your inspections at Walgreens, did

21    you ever ask to see their refusal to fill folders?

22    **A**    No.  I didn't even know they had them that I recall.

23    I mean, I could have seen them, but I don't recall ever

24    seeing that, anywhere.

14:12:10 25    **Q**    Do you recall any circumstance at Walgreens where you

## Pavlich (Recross by Weinberger)

1    asked to see something that the pharmacist wouldn't let you

2    see?

3    **A**    Oh, no.  Never.

4    **Q**    Okay.

14:12:20 5    **A**    Never happened.

6              MR. SWANSON:  Thank you very much, sir.

7         I will ask -- see if my colleagues have anything, or

8    Mr. Weinberger.

9              THE COURT:  Okay.  Well, let's first see if

14:12:29 10   any of the other two defendants have any -- any follow-up

11   questions for this witness.

12             MS. FUMERTON:  None for Walmart, sir.

13             MR. DELINSKY:  Nothing for CVS, Your Honor.

14             THE COURT:  Okey-doke.

14:12:43 15        Then you're up, Mr. Weinberger.

16             RECROSS-EXAMINATION OF GEORGE P. PAVLICH

17   BY MR. WEINBERGER:

18   **Q**    Mr. Pavlich, you talked about -- when you were asked

19   about the written policies of the pharmacies that -- and

14:13:05 20  whether or not you inspected and looked at those, you said,

21   in my opinion, the policies are irrelevant.  They have to

22   follow the law books that are there.

23        I mean, I'm paraphrasing your question -- your answer;

24   right?

14:13:19 25  **A**    Right.  Right.  Right.

4652

**Pavlich (Recross by Weinberger)**

1    **Q**    So you understand that in the pharmacy world, the

2    pharmacists are employed by the pharmacies; right?

3    **A**    Okay.

4    **Q**    Just track with me for a minute here.

14:13:44  5         And so like any employer, the pharmacies issue --

6    might issue written policies on rules that the pharmacists

7    should follow in dispensing controlled substances.

8         Understood?

9    **A**    Okay.

14:14:08 10   **Q**    And those are the policies that you never looked at;

11   right?

12   **A**    Not that I recall.

13   **Q**    And so you didn't look at those policies to determine

14   whether or not they conformed with your understanding of

14:14:23 15   either the federal Controlled Substances Act or the state

16   regulations; right?

17   **A**    I don't recall looking at those policies.

18   **Q**    Okay.  Now, just one more line of questioning

19   regarding Overholt's.

14:14:40 20        Overholt's was closed down as a result of your

21   investigation in 2008; right?

22   **A**    Pretty much so, yes.  It continued on until they --

23   they sold it to another independent, but the pharmacists,

24   the three pharmacists working there lost their licenses.

14:14:59 25   **Q**    Right.  So presumably Dr. Franklin and others had

**Pavlich (Recross by Weinberger)**

1    patients who had their prescriptions filled at the

2    Overholt's Pharmacy and then at some point in time couldn't

3    fill them there anymore; right?

4    **A**    They couldn't fill them anywhere.  I went everywhere

14:15:21 5    and told everyone what was going on.

6    **Q**    Well, did you have a list of the patients of

7    Dr. Franklin's whose prescriptions were filled at

8    Overholt's?

9              MR. SWANSON:  Your Honor, this is beyond the

14:15:39 10   scope of -- I just asked questions from the jurors.

11             THE COURT:  Yeah.  Overruled.

12             THE WITNESS:  Repeat that question.

13    BY MR. WEINBERGER:

14    **Q**    Did you have a list of the individuals, the patients

14:15:53 15   of Dr. Franklin, who had their scripts filled at Overholt's

16    before it was shut down?

17    **A**    Yes, I did have a list.

18    **Q**    And did you take that list of patients -- and how big

19    was the list?

14:16:14 20   **A**    If I recall correctly, I, working with two specialists

21    from my office, set a number at 100.  Then I broke it down

22    to 50 of the worst.  Then I broke it down to 15 of the

23    extreme worst, and that's where I targeted the

24    investigation.

14:16:41 25   **Q**    And those 15 patients were responsible for or received

**Pavlich (Recross by Weinberger)**

1    from Dr. Franklin how many prescriptions?

2    **A**    They received a lot of doses of medication.

3    **Q**    What -- in the whole investigation that you went

4    through from 2006 until 2008, isn't it true that it involved

14:17:11  5    about 15,000 prescriptions?

6    **A**    I don't recall how many prescriptions were involved.

7    There were a lot.

8    **Q**    Well, does 15,000 sound right?  I mean, I can pull

9    your deposition up.

14:17:25  10    **A**    Yeah.  I'm -- I'm going to agree with you.  There was

11    a lot of prescriptions that were pulled, but I broke it down

12    to 15 patients at the end for purposes of criminal and

13    administrative hearings.

14    **Q**    Okay.

14:17:40  15              MR. WEINBERGER:  Thank you, Your Honor.

16    That's all I have.  Pass the witness.

17              THE COURT:  Okay.

18              MR. DELINSKY:  Your Honor, may I just ask one

19    question?

14:17:46  20              THE COURT:  Absolutely, Mr. Delinsky.

21         Well, wait a minute.  Hold it, no.

22              MR. WEINBERGER:  That's recross.

23              THE COURT:  Right.  I think that's --

24              MR. DELINSKY:  Okay.  I was a follow-up to

14:17:55  25    Mr. Weinberger's question, but that's fine, Your Honor.

**Pavlich (Recross by Weinberger)**

1         THE COURT:  I think -- I think we're

2    concluded.

3         MR. DELINSKY:  Fair enough.

4         THE COURT:  Okay.  Thank you very much,

14:18:04  5    Mr. Pavlich.  We appreciate your appearance, and enjoy the

6    rest the day.  You may be excused.

7         THE WITNESS:  Thank you, Your Honor, I

8    appreciate it.

9         THE COURT:  Okay.

14:18:13 10              (Witness excused.)

11         THE COURT:  Okay.  Defendants may call their

12    next witness, please.

13         MR. MAJORAS:  Your Honor, John Majoras for

14    Walmart.

14:18:25 15      The defendants call Dr. Robert Wailes.  Dr. Wailes

16    will be testifying as an expert witness.  He is a pain

17    management specialist.  And he will be talking about the

18    standard of care using opioids in treatment, its

19    relationships between pharmacists and physicians, and he

14:18:44 20    will have opinions about the red flag analysis that were

21    previously offered by Mr. Catizone.

22         MR. SWANSON:  Your Honor, if I may.

23         THE COURT:  Okay.  Thank you, Mr. Swanson.

24         Doctor, if you could raise your right hand,

14:19:17 25    please.

4656

**Wailes (Direct by Majoras)**

1    Do you swear or affirm that the testimony you are

2    about to give will be the truth, the whole truth, and

3    nothing but the truth under pain and penalty of perjury?

4          THE WITNESS:  I do.

14:19:26  5          THE COURT:  Okay.  Thank you.  And you can be

6    seated, and if you will please remove your mask while you're

7    testifying.  Thank you.

8          MR. MAJORAS:  Your Honor, if I may.

9          THE COURT:  Yes, Mr. Majoras.

14:19:46 10       DIRECT EXAMINATION OF ROBERT E. WAILES, M.D.

11   BY MR. MAJORAS:

12   **Q**    Good afternoon, folks.

13        Good afternoon, Dr. Wailes.  As you know, my name is

14   John Majoras.  I'm one of the lawyers for Walmart, and what

14:19:56 15  I'd like you to do to start is if you would please introduce

16   yourself briefly to the jury and tell them a little bit

17   about yourself.

18   **A**    My name is Bob Wailes.  I'm a practicing pain medicine

19   physician in California.  I have a small medical practice of

14:20:12 20  six practitioners, of three PAs, and three doctors, and have

21   been working in the field for 37 years.

22   **Q**    Now, Dr. Wailes, what I'd like to do is spend some

23   time talking about your background and essentially how you

24   got to where you are today.

14:20:26 25       And in your work in this case, you have given us --

**Wailes (Direct by Majoras)**

1          MR. MAJORAS:  And, Mr. Pitts, if I could get

2     the ELMO, please.  Let me center this a little better.

3     BY MR. MAJORAS:

4     **Q**     Dr. Pitts -- Dr. Pitts -- I was just giving Mr. Pitts

14:20:50  5     a new title.

6          Dr. Wailes, would you agree that what I'm showing you

7     on the screen right now is your CV, which is essentially

8     your resume that you have compiled throughout your years in

9     your field?

14:21:08 10    **A**     Yes, it is.

11    **Q**     Okay.  I'd like to take you through that a little bit.

12         Before we do that, though, you had worked with me to

13    put together some slides to aid you in your testimony; is

14    that right?

14:21:20 15    **A**     That's correct.

16    **Q**     And would that help you explain what you're going to

17    offer opinions on to the jury?

18    **A**     Certainly would.

19    **Q**     So let's just simply begin first with your education.

14:21:29 20        Please take us through that.

21    **A**     I did my undergraduate work at UC Berkeley, and then

22    went on to medical school at Wake Forrest University in

23    North Carolina, and following that, went to my postgraduate

24    work in San Diego, at -- basically a one-year internship, it

14:21:50 25    was a flexible rotating internship, and then a residency in

**Wailes (Direct by Majoras)**

anesthesia and pain management at UC San Diego.

**Q**    And just so we're clear, when you say "UC," you mean
the University of California school system; correct?

**A**    Correct.  Thank you.

**Q**    Talk to me -- or please tell us a little bit about
your training as it led to your specialty in pain
medication.

**A**    Well, back when I was in school -- and it was quite a
while ago.  I finished all this 37 years ago -- pain
management was a very new field.  It was an emerging field,
and it was an outgrowth an anesthesiology.

And anesthesia was famous for using different
procedures, we do different injection procedures to numb up
parts of the body, and so we're used to using needles.  And
some of those same techniques apply to, like, cancer
patients to maybe kill nerves.  It also applies to spine
injuries where you can inject maybe steroids on nerves in
the spine.  We're used to doing a lot of spinal injections.
It also lended itself with medications.

Certainly opioids we use in the operating room every
day, all day.  We use opioids to anesthetize patients and
make them have less pain, and we also manage their pain
after surgery in the recovery room and in their immediate
postoperative period.

And at that time, when I was a resident, there were

4659

**Wailes (Direct by Majoras)**

1    changes out there where there was much greater

2    recognition -- this is in the '80s.  It was actually the

3    early '80s.  There was more recognition about the

4    undertreatment of pain, and so it was the natural outgrowth

14:23:34    5    of anesthesia to get more involved in that since we had some

6    of the tools.  And I really enjoyed being able to do

7    procedures as well as talking more with patients.

8         In general, anesthesia doesn't talk a lot with

9    patients, and I was kind of a gregarious person, so for me

14:23:52   10    it was kind of a good fit to have that combination of

11    procedures and being able to talk with patients.

12         And then really for me the concept was being able to

13    help patients.  I know that sounds a little hokey, you know,

14    doctors all in your med school interview you say you want to

14:24:07   15    help patients, but what can really be better than to try to

16    relieve pain.  And so that combined with it was a brand new

17    field, it was a challenge, it was fun because it was new,

18    and no one else was really doing it much at that time.  It

19    was a brand new specialty, motivated me to get to going.

14:24:27   20    **Q**    In looking back over the -- well, let me ask you

21    first.  How many years have you been in this field since you

22    graduated?

23    **A**    Since I finished, 37 years.

24    **Q**    So looking back over your 37 years, how does that work

14:24:37   25    out with what you anticipated when you first started?

1    **A**    Well, I had no idea exactly what would transpire in

2    the next few decades.  And luckily, we made tremendous

3    progress over those years, both procedurally with the

4    procedures I do as well as medications.

14:24:54  5    So the field has really evolved over that long period

6    of time, and it's been a fun ride.  It's been really

7    interesting.  The technology and the pharmacology and what

8    we've been able to do for patients has really improved over

9    that time.

14:25:12  10    **Q**    So if I can take you back to the beginning, could you

11    please explain a bit more about your education specifically

12    as it related to pain management?

13    **A**    And so certainly in medical school you get some of

14    this, not enough, I believe.  Now they do more pain

14:25:31  15    management training in medical school in terms of our

16    4 years of curriculum that includes basic pharmacology,

17    advanced pharmacology, all the biochemistry and everything

18    else.

19    Then you get practical application exposure to pain

14:25:46  20    management training from all the different specialties you

21    visit in school.  Because most specialties have some aspect

22    of pain management.  They all prescribe medications and

23    painkillers.  Not all, but most prescribe pain medications

24    and painkillers for all the surgical specialties, of course,

14:26:06  25    and most of the primary care specialties need to be

**Wailes (Direct by Majoras)**

1    conversive in how to use pain management tools.

2         And then certainly as a resident we got deeply into

3    the fine details of pharmacology regarding all the

4    anesthesia drugs, of which, of course, opioids are at issue

14:26:24  5    here.  That was certainly one of the most common drugs we

6    use every day in anesthesia, and then as well as other

7    pharmacology, and then as well as the procedures.  And so

8    you learn how to do procedures throughout the entire

9    training in anesthesiology, and that's a big part of my

14:26:43  10    specialty now, is doing minor procedures.

11         That evolved over time.  At first, you know, when you

12    think about surgical anesthesia, it's just like spinal

13    injections or perhaps epidurals for women in labor and so

14    forth.  That evolved to much more.  When I was a resident,

14:27:01  15    it was a new concept, but now very commonplace to put

16    catheters, little tubes in the spinal canal.  That's what an

17    epidural catheter is for labor.  But now we found that we

18    can do the same thing for cancer.  And so we put these

19    tubes -- these small catheters in the spinal canal, but we

14:27:18  20    put -- make them permanent.  We tunnel them under the skin,

21    so instead of just one day of labor, you can leave them in

22    for the rest of their life in cancer patients and deliver

23    medicine directly to the spine.

24         That was a huge kind of a transition point for me

14:27:33  25    because that was so definitive and can make such a

4662

**Wailes (Direct by Majoras)**

1  difference in people's lives.  That was very motivating for

2  me to go into the field when I started learning that

3  technique as a resident.

4  And then from that, after I've been in private

14:27:48  5  practice, there's a number of other innovations that came

6  around.  And I shouldn't go into too much detail probably,

7  but --

8  **Q**  I think we'll cover those in some detail, Dr. Wailes.

9  Let me just take you back so we can get you -- everyone can

14:28:01  10  understand why you're able to be here today.

11  You're -- after the training that you took and the

12  school that you went through, your internships, you become a

13  licensed doctor; is that correct?

14  **A**  That's correct.

14:28:12  15  MR. SWANSON:  And then perhaps, Mr. Ferry, if

16  he could put the slides up, please.

17  Everyone apparently can see it but me.  I'm sorry.

18  Oh, here we go.  Let's go past.  I think the jury can

19  see Dr. Wailes in person.

14:28:38  20  BY MR. SWANSON:

21  **Q**  So, Dr. Wailes, I'd like to talk to you a little bit

22  about some of the things once you became a practicing

23  physician.

24  Are you board-certified?

14:28:50  25  **A**  Yes, I am.

**Wailes (Direct by Majoras)**

1    **Q**    And what does that mean, and who certifies you?

2    **A**    What it means is -- to be board-certified means you

3    have to take a special -- special training and have special

4    background threshold training, like a residency and so

14:29:07  5    forth, to qualify to take testing, and then you take testing

6    to become certified.  And they're usually one or two-day

7    tests and very difficult and complicated, and the question

8    is who is my certified by, the American Board of Pain

9    Medicine.  I'm certified by the American Board of

14:29:31 10    Anesthesiology, and both -- I have a board-certification in

11    anesthesiology, and then I have what's called subspecialty

12    certification in pain medicine.

13    **Q**    And when you say a subspecialty, what do you mean?

14    **A**    That's -- they look at it as anesthesia is a

14:29:51 15    specialist, and then I'm a subspecialty, which means a

16    sub -- a fraction of an anesthesiologist, just a part of the

17    specialty who specializes specifically in pain management.

18    So there has to be separate testing and certification in

19    that to prove my abilities.

14:30:10 20    **Q**    In terms of your certification, do you have to

21    maintain that in certain ways?

22    **A**    Yes, I do.

23    **Q**    How do you do that?

24    **A**    For the American Board of Anesthesiology

14:30:22 25    certification, specialty certification, I have to be tested

4664

**Wailes (Direct by Majoras)**

1    at a minimum of every 10 years to make sure that we're up to

2    date and current with our specialty.

3    **Q**    And are you currently certified still as a pain

4    management doctor?

14:30:39 5    **A**    Yes, I am.

6    **Q**    We've heard quite a bit about the DEA during this case

7    already.  So are you a DEA registered doctor -- or I'm

8    sorry -- DEA licensed doctor?

9    **A**    Yes, I am.

14:30:49 10    **Q**    And how long have you been with that registration?

11    **A**    That's been since 1982.

12    **Q**    Earlier you talked about the field that you're in

13    being relative new, at least when you started.

14         Do you know when board-certification first became

14:31:04 15    available for pain management specialists?

16    **A**    It was in the early '90s.  It -- I believe it was in

17    the early '90s, late '80s or early '90s is when it first

18    became available.

19    **Q**    And then I'd like to turn a bit.

14:31:24 20         You are a practicing doctor; is that correct?

21    **A**    That's correct.

22    **Q**    And by that, what do we mean?

23    **A**    That means I see patients for a living.

24    **Q**    How long have you been doing that?

14:31:31 25    **A**    For 37 years, ever since I finished my residency.

4665

**Wailes (Direct by Majoras)**

1    **Q**     And is that primarily what you do on a day-to-day

2    basis as a practicing physician?

3    **A**     Well, it's a combination of things.  I also oversee --

4    we have three PAs in our practice, so there's medical

14:31:47  5    supervision of that, and at my age now, I do a lot of

6    administrative work and oversight work in our practice as

7    well.

8    **Q**     And as we can see in our slide, there's a reference to

9    the Pacific Pain Medicine Consultants.

14:32:00  10    What is that?

11    **A**     That's the name of my medical group.

12    **Q**     And by medical group, that's the organization you just

13    described with the PAs and the -- other doctors?

14    **A**     That's my practice of six providers, three doctors,

14:32:12  15    and three PAs, yes.

16    **Q**     And who uses your practice?  Who comes to you?

17    **A**     Well, we see all kinds of patients.  We're in north

18    San Diego County, and we mostly get referrals, but we also

19    take patients on direct referral and coming in to see me on

14:32:25  20    their own volition.  So we see all kinds of patients from

21    all kinds of different sources.  So it's a pretty wide

22    variety.

23    **Q**     And I'm sorry if I didn't hear this, but when did the

24    Pacific Pain Medicine Consultants practice start?

14:32:40  25    **A**     That started in 1985.  I think it was the year

1    after -- year after I started private practice, we

2    incorporated.

3    **Q**    And in addition to the work that you've done with that

4    organization, the Pacific Pain Medicine Consultants, what

14:32:56  5    other clinical work have you done in your career?

6    **A**    I --

7    **Q**    I'm going to jog your memory.  Have you been involved

8    with the Scripps Hospital?

9    **A**    Oh, well, it's still the same practice.

14:33:11  10    **Q**    I'm sorry.

11    **A**    Yeah.  That's -- my Pacific Pain Medicine Consultants

12    is the name of our group and our company.  I've worked at a

13    different locations.  For example, we have two offices.

14    I've also had -- I've been on the medical staffs of a couple

14:33:30  15    local hospitals, one of those is Scripps Hospital, which is

16    a very well-known private institution in San Diego County,

17    as well as Tri-City Medical Center.

18         So as part of the pain management practice, we're not

19    hired by hospitals.  In California, they don't hire doctors

14:33:49  20    directly.  It's a little bit different in other states, but

21    we work as consultants.  So if there's patients in the

22    hospital that need pain management services, our specialty,

23    they would call us up, and we would go in and see the

24    patient and do consultation and sometimes procedures and

14:34:07  25    medication management.

**Wailes (Direct by Majoras)**

1    **Q**    And can you tell us about the work you've done with

2    the Pacific Surgery Center during your career?

3    **A**    Again, part of -- a big part of my specialty is doing

4    procedures.  It's not just medication management and patient

14:34:21  5    management in the clinic.  Part of what we do are different

6    procedures, a lot of different injection procedures in the

7    spine.  We do -- again, we kill nerves.  We also do

8    different implants where we actually insert different

9    devices in the body, and those need to be done at a surgery

14:34:39  10    center with a sterile environment and sterile clean

11    conditions and frequently with anesthesiologist who is

12    taking care of the patient while I'm doing the work with the

13    procedure.

14        And I created -- the Pacific Surgery Center was

14:34:53  15    something that I started in 1990 to create a good

16    environment for my pain patients.

17    **Q**    So when talking about the surgery and the surgical

18    procedures that you perform there, do those all relate to

19    pain management?

14:35:09  20    **A**    Correct.  This particular surgery center is just

21    exclusively pain management.  Most surgery centers you may

22    have been exposed to, they usually see orthopedics and

23    OB/GYN and other specialties, but this is just a single

24    specialty surgery center for us.

14:35:24  25    **Q**    Okay.  I'd like to talk to you now a little bit about

**Wailes (Direct by Majoras)**

 1    some of the medical associations that you've been involved

 2    with.  And if we could go to our next slide.

 3         The first is the American Medical Association?

 4         Tell us about your work with the AMA.

14:35:38  5    **A**    So I've been a member of the AMA through I'm sure most

 6    of my career, but I got to be more intimately involved with

 7    the AMA working with the American Academy of Pain Medicine.

 8    That's an organization -- a professional service

 9    organization of just pain specialists, and they needed

14:36:01 10    representation at the AMA, and to make a long story short, I

11    became first the alternate delegate and then delegate over

12    the last 10 years or so and have really enjoyed my liaison

13    work there.

14         So what that means is I go to their meetings.  They

14:36:20 15    have meetings twice a year, the house of delegates is what

16    they're called, and that's where they establish policy.

17         The AMA is the largest physician organization in the

18    United States and their influence is significant.  And so

19    it's important to have pain management representation there

14:36:39 20    to discuss some of the vital issues that come up in regular

21    meetings.

22    **Q**    And how long have you been a delegate with the AMA?

23    **A**    Again, alternate and delegate for 10 years.

24    **Q**    Give us some sense.  How -- when we talk about the

14:36:52 25    delegation or the group that you're in, how big is that?

**Wailes (Direct by Majoras)**

1   **A**     It's huge.  It's about 800 doctors, not counting the

2   alternates.  It's a huge organization and gathering for the

3   conventions.  And they have representatives from all the

4   specialties and they also have geographic representation,

14:37:10 5   but it's a large, very representative group.

6   **Q**     And so those are the delegates.  Do you know how large

7   the American Medical Association is in terms of doctor

8   members?

9   **A**     You know, I'm not sure of the exact size.  I

14:37:20 10   apologize, I don't know the numbers exactly.  It's not as

11   member -- many members as we'd like.  We always want more

12   members.

13   **Q**     You had mentioned one of the ways you got involved

14   with the AMA is through your work with the pain management

14:37:34 15   medical -- I'm sorry -- the American Academy of Pain

16   Medicine, which is at the bottom of our screen.

17        Tell us more about that, please.

18   **A**     And so every specialty has their own organizations.

19   And this is probably the preeminent organization within pain

14:37:51 20   medicine.  There are others, and it's been my pleasure to

21   attend many of their meetings and educational sessions, and

22   most of these professional service organizations provide a

23   lot of educational services, so people within the field stay

24   up to date and are current in what's going on in the

14:38:14 25   specialty.  It's hard.

4670

**Wailes (Direct by Majoras)**

 1    In medicine, that's one of the real challenges, and

 2   that's actually one of the reasons why I went into it, is

 3   that you don't get bored.  There's always changes.  You have

 4   to continue continuing medical education, and, in fact, it's

14:38:27  5   mandated for licensure.  You have to have many hours on a

 6   regular basis every year, but it's part the fun.  And I

 7   really enjoy and have enjoyed for -- since the '90 attending

 8   the meetings for the American Academy of Pain Medicine.

 9    And then, as time went on, I got more involved in the

14:38:44 10   leadership and have been on for the last 8 years on the

11   board of directors for the American Academy of Pain

12   Medicine.

13   **Q**    And can you just briefly tell us what it means to be

14   on the board of directors of that organization?

14:38:58 15   **A**    So, that's the leadership of the organization.  And

16   it's the board that decides and oversees the functions.  And

17   so within that board, we make assignments and oversee the

18   educational sessions that come up.  We oversee other

19   services we may want to provide the membership.  We have a

14:39:18 20   journal and we have to oversee the administration and the

21   work involved in the journal.  It's a peer reviewed journal,

22   which means that there's a lot of physician time spent

23   reviewing articles before they're admitted to the journal.

24    Anyway, there's a lot of work within the specialty

14:39:35 25   that the board of directors has to address.

**Wailes (Direct by Majoras)**

1    **Q**     In the last -- last item we have on this slide is your

2    work with the Medical Board of California.

3         Tell us what that is.

4    **A**     So the Medical Board of California is very similar to

14:39:48 5    the Medical Board of Ohio.  And this is the board that is

6    tasked with the licensure and -- how should I say, the

7    enforcement of the medical regulations and laws for

8    physicians.  And so you go through the medical board to get

9    a license.  And then you also pay attention to the medical

14:40:12 10    board.  They have certain mandates.  They have a ton of

11    different regulations for the practice of medicine.  Again,

12    very similar in both states.

13         Every state has a medical board, and as part of the

14    regulatory function of the board, they do investigations

14:40:30 15    into physicians.  That's one of their really important

16    functions.  And if there's complaints of any type, it can

17    come from patients, pharmacists, it can come from law

18    enforcement.  If you get a felony, it automatically goes to

19    the medical board.  A lot of different types of complaints

14:40:47 20    go to the medical board.

21         And then -- I probably shouldn't go into too much

22    detail, but they investigate the complaint of an individual

23    physician, and if rises to the level where it requires a

24    doctor to review the case, then they have specialists like

14:41:07 25    myself who review the case.  And so I review the case in

1    great detail and make -- usually come to conclusions that I

2    forward to the medical board regarding the standard of care.

3    That's what we look at.  We look at was the physician in

4    question practicing within the standard of care.

14:41:28  5    **Q**    Now, how do you as a reviewer, an expert reviewer for

6    the Medical Board of California, how do you go about

7    performing that function?

8    **A**    To make a long story short, it's a very long and

9    tedious function.  What they need to do is forward all the

14:41:44 10    medical records associated with the complaint, and typically

11    medical records tend to be very large and very thorough.

12    This would include all the pharmacy records, all laboratory

13    records, the X-ray records, all doctors' notes, hopefully in

14    electronic form, but sometimes written, which is really

14:42:08 15    hard, and you have to review those notes, and you have to

16    review the issues that are brought up by the medical board.

17        They'll have a reason for the complaint.  It may be,

18    you know, any number of things.  It could be documentation.

19    It could be bad outcomes.  It could be personality oriented.

14:42:26 20    There could be a number of different things that the board

21    might be investigating, and I would have to go through and

22    review the case and make some judgment on the -- on how that

23    individual practitioner does compared to the standard of

24    care.

14:42:42 25    **Q**    In your role as a reviewer, are you looking primarily

**Wailes (Direct by Majoras)**

1    at cases that involve pain management issues?

2    **A**    Yes, that's absolutely true.

3    **Q**    And I looked down in my slide, and I skipped over one

4    that I don't want to miss.

14:42:55  5        You are actually the president of the California

6    Medical Association; is that correct?

7    **A**    I am.  Yes, I am.

8    **Q**    When did you become the president of that

9    organization?

14:43:02 10   **A**    Last Saturday night.

11   **Q**    And have you accomplished a lot in your 4 days?  I

12   won't -- I'll withdraw that question.

13        Give us -- could you talk to us about what the

14   California Medical Association does and maybe contrast that

14:43:19 15   a bit with the AMA, the nationwide American Medical

16   Association?

17   **A**    Okay.  The California Medical Association, like Ohio,

18   is an association of physicians within the state, and we do

19   a number of different functions.

14:43:35 20       Our mission statement covers the public health, the

21   science and art of medicine, and also social equity and

22   justice.  And so a good example is just kind of the things

23   we did last year, we dealt intimately with creating policy

24   for the governor of California, working directly with him

14:43:55 25   and his associates in the Department of Human Health and

4674

**Wailes (Direct by Majoras)**

1    also the public health departments on the whole COVID issue

2    as well vaccine rollouts.

3         We have a public health arm.  We have -- part of the

4    CMA actually administers scholarships for doctors going to

14:44:16  5    underserved areas.  We have a loan forgiveness program for

6    doctors who are trained in lower income areas and areas of

7    need.  We're trying to do our best to improve the

8    maldistribution of doctors and caretakers.

9         We do many other things.  We help individual doctors'

14:44:38  10   offices with administrative things like electronic medical

11   records and so forth.

12        We also do a lot of advocacy work.  If there's certain

13   issues, and certainly a lot of the vaccine issues required

14   legislation and a lot of the public health issues require

14:44:58  15   legislation, so we're very active in that field as well.

16        Most medical issues, many of them come before the

17   legislature, so we spend a lot of time there.  And also we

18   deal with the medical board and their rules and regulation

19   and so forth.

14:45:13  20   **Q**    So as you think about these associations and boards

21   that you've been a part of, are these volunteer

22   organizations or are you getting paid for those roles?

23   **A**    Basically, they're all volunteer with the exception of

24   the California Medical Association.  It's been volunteer up

14:45:29  25   until just a few years ago, and I've risen to a level of

1    leadership where they have a stipend that goes along with my

2    work at the California Medical -- everything else is all

3    volunteer.

4    **Q**    What are the stipends that you receive from the

14:45:44  5    California Medical Association?

6    **A**    Yeah.  It was, I think, $50,000 as chairman of the

7    board for two years.  The year before that it was 35,000,

8    and for president-elect, this last 12 months prior to

9    Saturday night, I was president-elect and that was 75,000,

14:46:05  10    and then for CMA president, which is a huge commitment of

11    time, it's 150,000.

12    **Q**    So if you look at the time commitment you have to

13    spend now with the California Medical Association versus

14    your practice, how does that work out?

14:46:18  15    **A**    It will take a tremendous amount of time.  It's

16    estimated -- and every year is different.  Being president,

17    there's different issues every year and stuff, but it will

18    probably take approximately anywhere between a fourth -- 25

19    to 50 percent of my time.

14:46:31  20    **Q**    And if --

21            MR. MAJORAS:  Mr. Pitts, if I can go back to

22    the ELMO.

23        Thank you.

24    **Q**    Dr. Wailes, the last thing I want to talk to you about

14:46:44  25    on your CV are research projects, and we see that on the

**Wailes (Direct by Majoras)**

1    screen in front of us.  And without going through each of

2    those, could you tell us, generally, what your involvement

3    has been in research projects?

4    **A**    I have done some research.  I'm, again, mostly just

14:46:59  5    patient care has been my emphasis and my practice.  But over

6    the many years we have done some projects.  Most of them are

7    related to procedures and devices.  Anywhere where you see

8    implant or catheter, those are different devices that we're

9    testing out.  I've really enjoyed my time with research,

14:47:22  10    though, because it's -- patients really like to be involved

11    in research, and it's very interesting work.

12    **Q**    And you talked about we sometimes in your description.

13    Who are you working with on these research projects?

14    **A**    So primarily it's my office, but the way these

14:47:37  15    research projects -- I think every one of these is, I'm just

16    an investigator.  I'm not -- I haven't led any specific

17    research projects myself as the primary investigator.

18    Most research projects like this are multicenter

19    research projects, so they want to get as many as patients

14:47:59  20    as they can, and the way they do is they try to recruit as

21    many medical practices or centers so they can build up a

22    large number of patients.  And so, again, I'm not academic

23    like a professor.  I'm kind of a worker bee, and so -- but

24    they would come to me because we have a large patient

14:48:15  25    population that they would be interested in and I would be

4677

**Wailes (Direct by Majoras)**

| | | |
|---|---|---|
| | 1 | involved as an investigator. |
| | 2 | MR. MAJORAS:  Thank you, Mr. Pitts, and if we |
| | 3 | can go back to our slides. |
| | 4 | BY MR. MAJORAS: |
| 14:48:25 | 5 | **Q**    I want to talk a little bit more -- be more specific |
| | 6 | in our discussion about what a pain management specialist |
| | 7 | does.  And you've helped me with this slide. |
| | 8 | Can you take us through -- the first you talk -- you |
| | 9 | point out is patients with high complexity needs. |
| 14:48:40 | 10 | What does that mean? |
| | 11 | **A**    Well, in our specialty, we deal with the challenges |
| | 12 | that are not easily taken care of.  Most pain management |
| | 13 | problems you probably all realize are taken care of by |
| | 14 | primary care doctors. |
| 14:48:54 | 15 | **Q**    What's the difference?  What's a primary care doctor |
| | 16 | versus like what you do? |
| | 17 | **A**    So a primary care doctor is a general practice doctor |
| | 18 | or an internist or someone you go to see in an urgent care |
| | 19 | or express care, emergency room, someone who you see |
| 14:49:10 | 20 | initially and who takes care of basic problems. |
| | 21 | A specialist like myself are ones that take care of |
| | 22 | more complicated problems.  And so I would be getting -- it |
| | 23 | says high complexity needs.  I see the patients that the |
| | 24 | primary care doctor is challenged by, they're not happy with |
| 14:49:28 | 25 | how that patient is doing for any number of reasons.  It |

4678

**Wailes (Direct by Majoras)**

1    might be based on the severity of their pain and they can't

2    function.  It might -- meaning that they need help with

3    medication management.  It may be the nature of the problem.

4    But we deal with the most challenging patients.

14:49:45  5        So, again, routine patients, most -- hopefully, I

6    always tell me when they ask me what I do, I say I'm a pain

7    management doctor, and I say I hope you never need me.  I

8    hope you don't, because it would imply that there's

9    something pretty serious going on, and not just something

14:50:01 10    routine that can be taken care of at a regular office.

11  **Q**    And then you have here that you evaluate and diagnose

12    causes of patients' pain.

13        I think that makes some sense, but if you could

14    explain that a bit.

14:50:16 15  **A**    Sure.  Sometimes it's not perfectly clear what's going

16    on with a patient.  Statistically the most common diagnosis

17    area that I deal with is back problems, and all of us know,

18    80 percent of Americans have problems with their back at

19    some point.  And I'm specialized in evaluating the exact

14:50:32 20    cause of the back problem.  Sometimes it's just muscle

21    spasm.  Frequently it's much more advanced than that.  When

22    the back problem doesn't get better, that's when they send

23    patients to me, and it's part of my specialty to diagnose

24    and evaluate through different imaging, test, MRIs, and so

14:50:50 25    forth, as well as physical examination, history, and all of

**Wailes (Direct by Majoras)**

1    that that goes toward diagnosing the problem so I can have a

2    very specific treatment plan hopefully designed to alleviate

3    their symptoms or cure their problem, if possible.

4    **Q**    I know it can be difficult to describe what pain feels

5    like, but can you give the jury a little bit of background

6    on how severe the pain is that -- in the patients that

7    you're generally treating?

8    **A**    Yeah.  I guess one look at our waiting room before

9    COVID, now we don't have very many patients in our waiting

10   room, but you would extent of the type of patients we deal

11   with.  Many are in wheelchairs.  Many have canes.  There's

12   many severe problems that I deal with on a regular basis.

13   Multiple sclerosis.  Spine injuries.  Brain injuries after

14   auto accidents.  Broken bones that never healed up correctly

15   despite good orthopedic surgery.  People that have had prior

16   back surgeries is a really common patient for me.

17        And these are not patients that live a normal life.

18   These are patients that are suffering and in miserable pain

19   and need help.  They're not able to get around.  It's like I

20   say, that's why they need wheelchairs or canes.  Getting to

21   the doctor's office for some of my patients is the only

22   activity they do getting out of the house on a monthly

23   basis.  So I deal with the most complex and uncomfortable

24   patients routinely.

25   **Q**    As we look down the list in front of us, there's some

4680

**Wailes (Direct by Majoras)**

1      discussion about some of the things you do to treat the pain

2      that you see in your patients.

3          What do you mean by procedural interventions?

4      **A**     I was alluding to some of that earlier.  And so I do a

14:52:35 5      number of different procedures, like injections into the

6      spine of different medicines trying to alleviate injured

7      nerves.  Obviously for back pain, herniated disks and things

8      like that, that can be helpful.  For severe arthritis we do

9      procedures, and sometimes we treat the nerves that go to the

14:52:53 10      specific joint.

11          We use other things that most people are not familiar

12      with but are common in our specialty, spinal cord

13      stimulation.  It's a fancy name for inserting a tiny wire in

14      the spinal canal and using electricity to block the pain

14:53:12 15      instead of medicines.  We also insert pumps underneath the

16      skin that deliver medicine directly to the spine.  And so

17      there's different techniques that we use with procedures to

18      try to help people manage their pain.

19      **Q**     Are these procedures that you described, are those

14:53:28 20      ones that you actually perform?

21      **A**     Yes, I do those procedures.

22      **Q**     You also have here that opioids are one of the tools

23      you have to manage pain.

24          Tell us about that.

14:53:39 25      **A**     Well, the reason why I phrase it like that is, opioids

4681

## Wailes (Direct by Majoras)

1    is just one of the tools that we have.  Now, obviously, in

2    many cases, we are using opioids because it's a painkiller.

3    I mean, it's rather intuitive that if you have pain that's

4    not resolved with other ways, that's one of the tools we

14:53:58  5    use.

6         But certainly we try many other things first.  I mean,

7    you would always want to use easier techniques.  You would

8    want to use physical therapy, you'd want to use exercise.

9    We have psychological -- like, use -- we refer to psychology

14:54:11 10    a lot.  There's psychological techniques that can be very

11    helpful.  But medication management is part and parcel with

12    our practice every day, of course, because our patients are

13    complicated.  Many of them by the time they've seen me have

14    already exhausted, if you will, the less invasive, easier

14:54:28 15    techniques, and then we use opioids as one of our tools in

16    treating our patients.

17  **Q**    And could you tell us a little bit more, perhaps with

18    examples, obviously not using any names, we don't want to

19    have any personal information here, but can you give us

14:54:42 20    examples of how you might distinguish in terms of your

21    treatment whether opioids or some other type of procedure is

22    the appropriate method of treatment?

23  **A**    Yeah.  Good question, and complicated.

24         And what it deals with is kind of the real issues in

14:54:59 25    our specialty of how do you best optimally treat a patient.

1    And it has to do with the type of pain they have.  Some

2    types of pain respond better with opioids or other

3    medications.  Frequently the types of pain, there may be

4    nerve pain or may be muscle pain, there's different types of

14:55:18  5    pain, may respond better to physical therapy and exercise.

6    Sometimes there's no good options.

7         I deal with patients, like, with spinal cord injuries

8    that have scar tissue on their spinal cord, and it can be

9    devastating.  It can cause some paralysis.  It can cause

14:55:38 10    loss of urinary function and bladder function and severe

11    pain in their lower extremities.  And you do the best you

12    can.  You see what's available.  You try the easier things

13    first, and opioids are one of those tools that you go to

14    when necessary, and sometimes it's the best tool to treat

14:55:59 15    severe refractory pain when you've exhausted all the other

16    easier choices.

17    **Q**    What's refractory pain?

18    **A**    Refractory, I'm sorry.

19    **Q**    What is that?

14:56:08 20    **A**    Refractory pain is pain that's not resolved with

21    anything else.  It means that you've tried the easy stuff

22    and nothing else works, and you still have pain and you're

23    looking for solutions.

24         Again, for me, this is a big part of our practice, is

14:56:28 25    that patients come to us this way and you need to do your

**Wailes (Direct by Majoras)**

1    best.  It's a severe problem.  You want to do the best to

2    make sure that they can have some quality of life to try to

3    at least be able to get up for meals or at least try to help

4    themselves around the house.  But many of my patients don't

14:56:44  5    do chores or can't really get outside very much, and so you

6    do the best you can to increase their function.

7    **Q**    When you determine that an opioid treatment is the

8    appropriate method of treating a patient, do you provide the

9    patients with information about opioids and what they can

14:57:01  10   do?

11   **A**    Oh, yes.  It's a big part of our practice is informing

12   consent and discussions about the pros and cons, the risks,

13   the benefits of opioid therapy.  We're very thorough about

14   that, especially as a specialist.  But most doctors now are

14:57:20  15   so aware of the pros and cons with opioids, it's been in our

16   continuing medical education so much in the last 10,

17   20 years that really most doctors are very familiar with the

18   risks and benefits.

19        And so, yes, we even have opioid agreements where we

14:57:38  20   detail out exactly, well, pros and cons, risks and benefits.

21   But managing expectations is also a big part of what we do.

22   Managing expectations, I think, is really critical.  And

23   part of that managing expectations and current day use of

24   opioids is letting them know that it's not going to be

14:57:59  25   perfect pain relief.  It's not going to be a hundred percent

4684

**Wailes (Direct by Majoras)**

1  pain relief, but we want to help them to the extent that it

2  will increase their activities, it will increase their

3  functional level.  And that's kind of a change over time.

4  That's evolved over time.  But that's part of the

14:58:15  5  expectations that we try to work with.

6  **Q**    In addition to talking to your patients about opioids,

7  do you do anything to mitigate the potential that the

8  patient will run into use problems with the opioids?

9  **A**    That's a whole big subject of which I think we'll talk

14:58:36  10  more about later probably and -- but the answer to that

11  question is before we even consider opioids, you go through

12  a significant screening process.  And this involves a number

13  of different things.  And so in the decision-making that

14  goes toward starting an opioid or continuing an opioid, for

14:58:54  15  that matter, is, first, the patient history and a thorough

16  knowledge of their family history regarding drugs of abuse

17  and so forth and addiction.

18      You also deal with their history and any red flags.

19  You do a very thorough history regarding a number of issues

14:59:12  20  that we know are risk factors for misuse.

21      And then furthermore, we also get laboratory testing

22  on all of our patients on opioids.  From the first visit on,

23  we do urinary drug testing.

24      We also check the PDMP.  That's the prescription

14:59:32  25  medicine database that every state has.  It's OARRS in Ohio.

**Wailes (Direct by Majoras)**

1      So it's a -- it monitors the -- what prescriptions have been

2      given to the patient by every doctor.  So it's a specific

3      database so I know the dose, frequency, and who gave them

4      controlled substances over the last year, or longer if I

14:59:57  5      need it, but -- so that's important information.

6          So a lot of investigation and work goes into knowing

7      their risk factors and so forth before we would start the

8      use of opioids.

9    **Q**     The last two things I'd like to cover on this slide,

15:00:11 10      the point toward the bottom, behavioral interventions.

11          You may have mentioned some of those already, but what

12      do you mean by that in terms of your toolkit in treating

13      patients?

14    **A**     Yeah.  The ideal type of chronic pain management --

15:00:24 15      and again, this doesn't apply to acute pain -- but for

16      chronic pain management that's long-term in duration,

17      behavioral interventions are really helpful.  And what that

18      means is referral to primarily psychology, but occasionally

19      psychology for two really good reasons.

15:00:42 20          One reason is that psychologists have many tools to

21      specifically help with pain management.  It's everything

22      from self-hypnosis to biofeedback to meditation, relax

23      techniques, behavioral cognitive therapy, it's a fancy name

24      for a technique to help have patients tolerate their pain

15:01:04 25      better on a day-to-day basis.

**Wailes (Direct by Majoras)**

1     The second reason to refer for behavioral

2    interventions is that a high percentage of my patients

3    suffer from depression and anxiety and other side effects of

4    their chronic pain.  It's part of the disability that goes

15:01:22  5    with pain and suffering.  It affects every aspect of your

6    life.  And so behavioral interventions can be helpful with

7    that as well.

8    **Q**     And lastly on this slide in front of the jury, you

9    wanted me to include the -- what's in the blue box at the

15:01:38 10    bottom, compensation is not linked to opioid prescribing.

11     Could you tell me what you mean by that and why you

12    wanted to make that point?

13    **A**     I put that in there because I think there might be a

14    misunderstanding, and again, everyone may or may not have a

15:01:52 15    friend or relative who is a provider or a physician, but

16    doctors don't get paid for writing prescriptions.  There's

17    no kickback or anything.  I mean, we get paid for our

18    cognitive services or procedures.  There's no reimbursement.

19    There's no -- there's no incentive financially to prescribe

15:02:17 20    medicines.  In fact, there's a greater financial incentive

21    to do procedures because procedures are more lucrative.

22    That's why surgeons get blamed for doing too many procedures

23    sometimes.

24     But just as a way of understanding, we get paid for

15:02:31 25    office visits based basically on the length and complexity.

4687

**Wailes (Direct by Majoras)**

1    It's easier for us not to prescribe medications, because

2    every time we prescribe a medication, there's a lot more

3    documentation and stuff that's required.

4         But just to make that clear, because I know it's

15:02:47  5    confusing for some if you're not involved in medical

6    billing, I wouldn't expect you to know that, but if you see

7    your explanation of benefits that come across your desk,

8    you'll see that there's never a specific bill -- the

9    medications are all typically not a hundred percent, but

15:03:02  10    typically all dispensed in a pharmacy.

11                   MR. MAJORAS:  Your Honor, this would be an

12    appropriate place.

13                   THE COURT:  I was going to suggest that.

14    Thank you, Mr. Majoras.

15:03:11  15         All right, ladies and gentlemen, we'll take our

16    afternoon break.  Usual admonitions apply.  We'll pick up in

17    15 minutes with more testimony from Dr. Wailes.

18         And you can step down and also take a break, Doctor.

19                   (Jury excused from courtroom.)

15:21:29  20    (Recess was taken from 3:03 p.m. till 3:20 p.m.)

21                   COURTROOM DEPUTY:  All rise.

22              (Jury returned to courtroom at 3:23 p.m.)

23                   THE COURT:  Okay.  Please be seated.

24    Doctor, you're still under oath.

15:23:38  25         And, Mr. Majoras, you may continue, please.

**Wailes (Direct by Majoras)**

1          MR. MAJORAS:  Thank you, Your Honor.

2       Good afternoon, folks.

3       Good afternoon, Dr. Wailes.

4    BY MR. MAJORAS

15:23:48  5    **Q**    I'd like to ask you in the period of time in which

6    you've been practicing as a pain management specialist, have

7    you had the opportunity to interact with pharmacists?

8    **A**    I have.  On a regular basis, I have.

9    **Q**    Why is that?

15:24:05 10    **A**    In the course of a regular practice, pharmacists have

11    an important rule, and they evaluate my prescriptions to

12    make sure they're valid, to make sure they're -- there's no

13    fraud, to make sure that there's no significant drug

14    interactions or allergies, and I get calls occasionally to

15:24:25 15    make sure that the information I wrote on my prescription

16    was valid.

17    **Q**    And what's your reaction to calls like that?

18    **A**    Well, it's certainly understandable, and I actually

19    appreciate it.  Historically, another reason why I used to

15:24:41 20    get calls were they would say a patient came in here with a

21    prescription from you and it doesn't look like your

22    signature.  So they would be helpful.  They would be helpful

23    for fraud, and I always appreciate calls like that.

24       Pharmacists have the patient's best interest in mind,

15:24:59 25    and so I usually appreciate seeing what their concerns are.

**Wailes (Direct by Majoras)**

1    **Q**    Do you look at pharmacists as someone who can give a

2    second opinion on your patients?

3    **A**    No.  No.  That's -- that's not part of their role.

4    They don't have the medical training or diagnostic tools and

15:25:20  5    medical decision making that physicians have, and so I don't

6    see that as part of their role.

7    **Q**    Okay.  We'll talk about that in a little more detail,

8    but before we do, you mentioned that you have occasionally

9    been involved in administrative proceedings before the

15:25:36  10    California Medical Board.

11    Have you ever testified in a case like this with all

12    of this in front of us?

13    **A**    I have testified -- for the medical board you're

14    asking?

15:25:46  15    **Q**    In any respect.

16    **A**    For medical/legal cases?

17    **Q**    Yes.

18    **A**    Yes.  I have a total of three cases over my career

19    where I've testified in court.

15:25:57  20    **Q**    Is serving as an expert witness a substantial part of

21    your professional practice?

22    **A**    No.  It's not at all.

23    **Q**    And we've had a number of experts who have come here

24    and spoken to the jury about their background and their

15:26:10  25    opinions and have talked about their compensation that

**Wailes (Direct by Majoras)**

1    they're being compensated for the time this they spent.

2        Is that the same with you as well?

3    **A**    I'm sorry, I didn't understand the question.

4    **Q**    I'm sorry.  Sometimes I go too quickly on the end and

15:26:24  5    the court reporter is laughing because she tells me that all

6    the time, so I'll try to slow down.

7        I think I started with, we've had a number of experts

8    who have testified and have been compensated for their time.

9        Are you being compensated for the time that you have

15:26:38  10    spent on this case?

11    **A**    Yes.

12    **Q**    And do you know what your hourly rate is?

13    **A**    I believe I do.  I believe my hourly rate for review

14    and consultation is 729.  For deposition it's 1,275.  For

15:26:57  15    trial testimony it's 1,395, I believe.

16    **Q**    And in terms of the work that you've done in this

17    case, could you give us -- give the jury some understanding,

18    you know, once we contacted you and asked you to take a look

19    at it, could you explain the type of work you've done to

15:27:14  20    date?

21    **A**    Well, first, I was given a lot of information, and so

22    I've reviewed testimony -- I've reviewed depositions, expert

23    reports, different documents that were forwarded to me and

24    also consulted with attorneys regarding the issues involved.

15:27:36  25    So it's been many, many hours of work.

**Wailes (Direct by Majoras)**

```
  1    Q    And in terms of the material you reviewed of other

  2    experts, what have you done?

  3    A    I've reviewed depositions and other expert reports.

  4    Q    And one of the opinions I'm going to ask you about

15:27:50  5    relates to Mr. Catizone.

  6         You understand he was one of the plaintiffs' experts

  7    in this case?

  8    A    Yes, I do.

  9    Q    And you've read his report; correct?

15:27:57 10    A    Yes, I have.

 11    Q    Now, you haven't been able to see his testimony, but

 12    as I ask questions about him, I'd like you to assume that he

 13    testified consistently with the report you've seen.

 14         Can you do that?

15:28:08 15    A    Yes, I can.

 16    Q    All right.  And in terms of your final product, aside

 17    from testifying here today, you also wrote a report; right?

 18    A    Yes, I did.

 19    Q    It was about 50 pages, single-spaced?

15:28:20 20    A    Yes.

 21    Q    And in that report you explained the opinions that

 22    you've reached in this case?

 23    A    Correct.

 24    Q    And are you prepared to offer those opinions today?

15:28:28 25    A    Yes, I am.
```

**Wailes (Direct by Majoras)**

1   **Q**   In terms of the total amount of time that you've spent

2   in this case and looking as what you estimate as your total

3   compensation for this case, it's a little over $201,000;

4   correct?

15:28:44  5   **A**   That's correct.

6   **Q**   Sir, do you consider yourself to be an expert in the

7   field of pain management and the prescribing of opioids?

8   **A**   Yes, I do.

9   **Q**   And you are here today to share with the jury your

15:28:57  10   opinions on the evolving treatment of pain; is that right?

11   **A**   Yes.

12   **Q**   You're also going to offer your opinions on the

13   appropriate use of opioids; is that correct?

14   **A**   Yes.

15:29:06  15   **Q**   And that's based on your experience as well as your

16   certifications and background work you've done as a pain

17   specialist?

18   **A**   Yes.

19   **Q**   I'm sorry, pain management specialist.

15:29:18  20   **A**   Yes.

21   **Q**   Yes.  As well as being an anesthesiologist?

22   **A**   Correct.

23   **Q**   And I just mentioned the work you did with respect to

24   Mr. Catizone, which we'll hear about.

15:29:31  25        In doing so, in asking you your opinions, I'm going to

**Wailes (Direct by Majoras)**

1    ask you to be very carefully in your responses and ask you

2    to only provide opinions about which you have a reasonable

3    degree of professional certainty for someone in your field

4    and with your level of experience.

15:29:46   5    Can you do that for us?

6    **A**    Yes, I can.

7    **Q**    And so if you are offering opinions, it will be based

8    on your experience and the 37 years that you have spent in

9    this specialty.

15:29:56  10    Do you understand that?

11    **A**    Yes, I do.

12    **Q**    And are you prepared to offer those opinions?

13    **A**    I am.

14    **Q**    Let's go through some of them.

15:30:03  15    One of the -- one of the things you mentioned earlier,

16    and we've heard a little bit about in this case is, you

17    talked about chronic pain and then there's also acute pain.

18    And if we could go back to our slide.  We're going to

19    start on slide 5.

15:30:23  20    Dr. Wailes, can you tell us about the difference

21    between chronic and acute pain and treatment issues with

22    respect to those?

23    **A**    Yes.  Most people are familiar with acute pain.

24    That's the most common thing physicians see, and it's pain

15:30:35  25    of -- usually from a trauma or a surgery or a procedure.  It

4694

**Wailes (Direct by Majoras)**

1    can be from any number of circumstances.  It can be kidney

2    stones.  It can be sickle cell.  And these types of pain

3    problems typically get better within days, sometimes weeks.

4    And that would be acute pain.  That's what most of the

15:30:57  5    public are familiar with.

6         Chronic pain is different.  That's usually of three or

7    more months duration, and the more nuanced definition would

8    say that chronic pain is pain that persists beyond the time

9    of expected healing.

15:31:12  10        So, for example, after surgery, you may have ongoing

11    pain despite you've -- looks like you've healed from your

12    wounds, but there may be nerve injuries or other injuries

13    that don't heal that you can't necessarily see even, but

14    persist.  So that would be chronic pain.

15:31:30  15  **Q**    We've had some testimony in this case about chronic

16    being -- equating to a certain number of days or months.

17         How do you look at it?

18  **A**    There's no technically right or wrong answer there.

19         Again, chronic used to be thought to be over

15:31:45  20  six months in general and now we say probably over three

21    months in general, but as practitioners in the field, it's

22    basically pain that persists longer than you expect it to.

23  **Q**    If we could turn to our next slide.

24         You have talked about some of these issues already in

15:32:05  25  terms of the patients you have seen, but here you're talking

**Wailes (Direct by Majoras)**

1    specifically about some of the consequences of chronic pain;

2    is that right?

3    **A**    Yes.

4    **Q**    And the word "devastating" is in here.

15:32:16   5    Can you explain why you used that word?

6    **A**    Yes.  Pain has a serious impact on patients.  And

7    again, I'm not talking about simple pain from a sprained

8    ankle or pain after a wisdom tooth was removed.

9    We're talking about severe pain that persists that

15:32:32  10    affects people's lives in a terrible way.  And if you're in

11    chronic pain from a severe back injury, neck injury, nerve

12    injury, multiple sclerosis, severe arthritis, brain injury,

13    spinal cord injury, these are things that cause disability.

14    And it is devastating.  It affects every aspect of your

15:32:55  15    life.  It affects your family relations.  It affects your

16    ability to work.  It causes a tremendous amount of

17    disability.  It affects your mood.  It causes a lot of

18    depression and anxiety.  So it certainly has huge economic

19    effects.

15:33:11  20    This list is -- covers some of the things that you

21    expect in chronic pain.  Now there's a wide variation.  Some

22    are worse than others, but these are things I see every day.

23    You have impaired mental functioning when all you can

24    concentrate on is the pain that you're having and it makes

15:33:29  25    it difficult to do other things.

**Wailes (Direct by Majoras)**

1    Your quality of life is frequently not very good

2   because you're limited in what you can do in terms of your

3   activities.  You can't get outside.  You can't exercise as

4   much as you want.  You can't be with your family in the ways

15:33:43  5   you're used to.  You can't take your kids to school.

6    Impaired productivity.  If you have significant

7   chronic pain, you're not going to be able to work, be it

8   from a nerve injury or just the pain itself can be

9   devastating.

15:33:58  10    Unemployment is part of that, and I'm sorry to say

11   that chronic pain is associated, especially poorly treated

12   chronic pain, is associated with double the rate of suicide

13   that we have in our population.

14    So that's just a measure of how severe chronic pain

15:34:15  15   is.

16   **Q**    As patients come to you with their chronic pain, is it

17   your purpose to cure the pain?

18   **A**    No.  That's really not our usual goal, and, in fact,

19   I -- it would be extremely rare to be able to cure someone's

15:34:32  20   problem with chronic pain.  Almost by definition, rarely are

21   they curable.  It's usually management.  So -- because we're

22   talking about situations -- and I just went through that

23   long list.  If you have multiple sclerosis, it doesn't go

24   away.  If you've had a spinal cord injury, it doesn't go

15:34:51  25   away.  If you have scar tissue on the nerves of your spine,

**Wailes (Direct by Majoras)**

1    it doesn't go away.

2        There's -- these are patients where surgery is not

3    available to fix your particular problem.  We refer to

4    surgery for some patients and some problems can be improved

15:35:07 5    with surgery, but they're the chronic pain patients.

6    They're the ones who have a successful surgery.  So it's a

7    very challenging population.

8    **Q**    Okay.  I'd like to turn now to standard of care.

9        Are you familiar with that concept in the medical

15:35:24 10    field?

11    **A**    Yes, I am.

12    **Q**    Can you explain it to all of us?

13    **A**    Yeah.  The standard of care would be what the

14    predominant majority of physicians do in the regular course

15:35:35 15    and practice of treating patients within their specialty.

16    **Q**    How does a doctor know what the standard of care is?

17    **A**    Well, doctors spend a lot of time in continuing

18    medical education, and so we're constantly being updated,

19    which is necessary and important because the standard of

15:35:55 20    care changes over time.

21        Obviously, we learn new techniques, we learn new

22    medicines as medicines become available through research.

23    We follow research to see what's on the forefront, and so,

24    yes, the standard of care does change and evolve over time.

15:36:12 25    There's many different examples of that.

**Wailes (Direct by Majoras)**

1    **Q**     And how does a doctor or a healthcare professional

2    know at any particular time what the standard of care is?

3         Is it written down somewhere?

4    **A**     No.  There's no federal guidelines that dictate

15:36:25  5    standard of care.  There's no regulation that dictates

6    standard of care, and so basically it's a familiarity with

7    what your colleagues and other people within your specialty

8    and your level of expertise are doing on a regular basis.

9    And frequently that's through meetings, it's through

15:36:42  10   publications.  Heaven knows we all read a number of journals

11   as part of our life as a physician, and frequently

12   continuing medical education, CME, is a big part of that as

13   well.

14   **Q**     CME is continuing medical education?

15:36:55  15   **A**     Medical education, right.

16   **Q**     I did not say legal, since that's what I'm used to.

17        We have heard previously about opioids within the

18   standard of care for treating certain types of pain,

19   including acute pain and cancer pain, cancer-related pain.

15:37:18  20        Are prescription opioids within the standard of care

21   for treating chronic pain?

22   **A**     Yes.  Absolutely.

23   **Q**     Before we go there, do you agree in terms of acute

24   pain whether prescription opioids are appropriate treatments

15:37:33  25   for acute pain?

**Wailes (Direct by Majoras)**

1    **A**    Yes, they are.

2    **Q**    And what about cancer pain?

3    **A**    Absolutely.

4    **Q**    And tell us a little bit more about cancer pain and

15:37:41  5   what that is and the affects over time.

6    **A**    Cancer, everyone has a general idea of what cancer is,

7    but it manifests itself in many different ways.  The

8    majority of cancer patients, though, have some pain,

9    especially in a terminal illness with cancer.  We're not

15:37:58 10  talking about skin cancers or something like that, but in

11   significant cancer that's life threatening and frequently

12   takes life, there's a high percentage of patients that have

13   pain as their primary problem.

14       Cancer tends to spread and go to the bones and other

15:38:13 15  parts of the body, and that can be extremely painful.  And

16   so there's many different types of pain associated with

17   cancer pain, but there's -- it's -- it can be devastating.

18   And so there's a whole field of medicine oncology that

19   oversees the treatment of cancer patients, and we work with

15:38:34 20  oncologists a lot in my field to try to help patients with

21   their severe pain.

22   **Q**    Is there something known as end-of-life care when it

23   comes to pain?

24   **A**    Yes.  End-of-life care can take many different forms,

15:38:47 25  but hospice is a common type of end-of-life care, and those

4700

**Wailes (Direct by Majoras)**

1    are organizations that take care of patients with terminal

2    illness.  It may not be cancer.  There's many types of

3    things that may fall into the end-of-life care.

4        To be a hospice candidate, your life expectancy is

15:39:08  5    expected to be one year or less, and that applies to people

6    with end-stage heart disease, end-stage lung disease, many

7    different conditions in addition to cancer, but it's usually

8    caring for them for the last year of their life, and pain is

9    usually a significant part of that treatment.  So -- or

15:39:27  10   situation that requires opioids and other medicines.

11   **Q**    Shifting a little bit back, again, kind of over the

12   scope of your career, the 37 years, has the medical

13   community's focus on addressing untreated pain shifted over

14   that time?

15:39:44  15   **A**    Oh, absolutely.  That was one of the, again, primary

16   drivers for me getting involved in pain medicine.  It was a

17   new field.  And in the '80s it was very clear that untreated

18   pain was a huge terrible situation.  And doctors were

19   becoming more aware that so much suffering was out there and

15:40:07  20   they needed treatment of some type.  And part of that was

21   procedural treatments that I was part of as well, part of

22   that was opioids, part of it was other medicines, part of it

23   is greater recognition using psychological techniques.  So

24   the field really has evolved since the '80s and '90s.

15:40:28  25   **Q**    And what about specifically the use of opioids in

4701

**Wailes (Direct by Majoras)**

1    treating pain and chronic pain, has that been a part of the

2    standard of care during the entire time you've been

3    practicing?

4    **A**    Yes.  I had excellent training, like I think most

15:40:43 5    other doctors in medical school.  We knew that there's

6    problems with opioids, but they were throughout my entire

7    career, from the '80s on, part of the treatment.  It's not

8    the only treatment, of course.  We've talk a lot about other

9    things, but it was definitely part of the treatment for

15:40:59 10    chronic pain.

11    **Q**    You mentioned problems with opioids.

12         What do you mean?

13    **A**    All medications have side effects and risks.  Every

14    single one.  And opioids is no exception to that.  And so

15:41:11 15    there are side effects and risks.  We have to counsel

16    patients on this all the time.  In fact, even for short

17    duration of use of opioids usually you hear about the common

18    things that can occur, everything from nausea and

19    constipation, dizziness, sedation.  Those are all easy,

15:41:29 20    simple risks, and there are other risks that can also occur

21    with longer use.  You can have overdose.  You can have

22    opioid use disorder or addiction problems is possible as

23    well.  There's a number of different potential side effects

24    with opioids.

15:41:46 25    **Q**    Yesterday we had a witness who testified on a video

**Wailes (Direct by Majoras)**

1    who is a former -- either former or current FDA official, I

2    can't recall, and she talked about FDA approvals.

3        But I'd like to have you briefly talk about what your

4    knowledge is of FDA approvals of opioids.

15:42:05  5    **A**    Well, the FDA has approved opioids, and they go

6    through the process.  This is a list of opioids that most

7    people might be familiar with some of those medical names,

8    and we'll go through them a little bit later.

9        But the bottom line is the FDA goes through a process

15:42:23 10    of approval for opioids, or any other medicine.  Every

11    single medicine has to go through an approval process.  And

12    some of us are remotely familiar with that with vaccines

13    now.  That was for emergency use authorization.  They don't

14    do that for most medications, but it's a scientific panels

15:42:41 15    get together and study necessary research -- there's a lot

16    of research that has to be done before you can get any

17    medication approved, and the scientific panels look at the

18    research, the outcomes and all the information.  They look

19    at safety and efficacy.  And it takes quite a bit.  You can

15:43:00 20    ask a number of companies how hard it is to get approval

21    through the FDA for medications, but it's a tedious process.

22    But that's in a nutshell what it is.

23    **Q**    So as a prescriber of medications that are approved by

24    the FDA, what is the FDA approval mean to you in your use of

15:43:18 25    those products?

4703

**Wailes (Direct by Majoras)**

1    **A**    Well, number one, it's necessary for me to feel -- for

2    me to prescribe something, it's going to have to be FDA

3    approved for some indication, and it gives me a sense of

4    confidence.  It gives me a sense of confidence that it's

15:43:34    5    been looked at for safety and efficacy.

6    **Q**    Now, you understand that there are eight types of

7    opioids that have been identified in this case at issue; is

8    that right?

9    **A**    Yes.

15:43:42    10    **Q**    And on the screen we have those in front of you.  And

11    I don't need you to go through each of those, but do you

12    agree that each of these, when used appropriately, are

13    appropriate treatments for a doctor prescribing treatment

14    for pain?

15:44:00    15    **A**    Yes.  Each one of these can be a part of a pain

16    management program, yes.

17    **Q**    Have you prescribed each of these opioids during your

18    practice?

19    **A**    Yes, I have.

15:44:10    20    **Q**    One that stands out a bit because we've heard of a

21    number of different times is fentanyl.

22    What is fentanyl and -- just what is fentanyl?

23    **A**    Fentanyl is a -- what we call a synthetic opioid.

24    That means it's manufactured.  It's not derived from the

15:44:26    25    opium plant.  And it just so happens it's really, really

**Wailes (Direct by Majoras)**

1    potent, and so my initial exposure was in anesthesia.  We

2    use it in the operating room, and it's very good to put

3    people to sleep.  It's also -- it is an opioid, so it's a

4    very strong painkiller and has been used as an analgesic

15:44:49  5    usually in patches, it comes in 3-day patch for use for

6    outpatients, as well as some other formulations that are

7    occasionally used for cancer patients.

8    **Q**    For the FDA approved fentanyl, particularly the

9    patches, why is that useful for cancer patients?

15:45:05 10    **A**    Again, fentanyl is very potent.  The other thing about

11    fentanyl, just in terms of why it's useful, is while it's

12    super potent and strong, it sometimes has fewer side effects

13    of the itchiness and nausea and some of those minor side

14    effects that can occur with opioids, so it is a useful

15:45:29 15    alternative.  Again, every patient is different and you have

16    to individualize therapy, but fentanyl can be very helpful

17    for cancer patients.

18    **Q**    Now, you're also aware that there is fentanyl forms

19    that are available as street drugs?

15:45:43 20    **A**    Yes, I am.

21    **Q**    Can you tell us the difference between the types of

22    fentanyl that you may prescribe as a pain specialist and the

23    street types of fentanyl?

24    **A**    Well, there's a world of difference because one is

15:45:58 25    medically regulated and you know the exact dose and exactly

4705

**Wailes (Direct by Majoras)**

1    what you're getting in the bottle or in the patch.

2        What you get on the street, you don't know anything

3    about the dose or the purity or what it's mixed with, and

4    it's been devastating.  The illicit opioid epidemic has been

15:46:19 5    devastating on -- and fentanyl, in particular, as we've all

6    looked at the curves of increased opioid deaths, fentanyl

7    has had a huge part of that in the last 10 years.

8    **Q**    You mentioned dose.  When you talk about fentanyl as a

9    street drug, what's a dose?

15:46:34 10    **A**    The dose is the strength.  That's how strong.  And you

11    can think of it in milligrams.  Fentanyl is measured in

12    micrograms.  It's 100 times stronger than morphine.  So on a

13    milligram-per-milligram basis, it's 100 times stronger.

14    **Q**    And what's the significance of that?

15:46:53 15    **A**    It's significant because it doesn't take very much to

16    be off in your dosing.  Since it's so potent and so -- you

17    need so few micrograms to get an effect, if it's in a street

18    drug, that's where you hear about so much of the problems,

19    they mix it with heroin and cocaine and other things, and it

15:47:16 20    can be very fatal.  Because these are not pharmacists making

21    up these street drugs.  These are done on the street by

22    whoever is cutting the drug with certain other chemicals.

23    And it's unregulated and just devastating to our public.

24    **Q**    The jury has also heard in this case about

15:47:36 25    benzodiazapines, and on the screen in front of you we have a

4706

**Wailes (Direct by Majoras)**

1    number of them.

2            Can you tell us, just first, what is the purpose of a

3    benzodiazapine in terms of appropriate prescribing?

4    **A**    Right.  Benzodiazapines, the most common, by example,

15:47:54  5    would be Valium.  Most people have heard of Valium.  There's

6    many others on this list.  Valium is diazepam.  Alprazolam

7    is Xanax, that's a common one.  Lorazepam is Ativan.  Some

8    of those you may have heard of.  And the question was what

9    are -- what is this class of medicine used for.

15:48:15 10            These are used for many different indications, but the

11    big picture is they're used for anxiety.  They relax you and

12    mellow you in a way that can be very helpful for people with

13    anxiety.  They're also used for treatment of panic attacks.

14    They're very commonly used in our veterans for PTSD, which

15:48:37 15    is Post-Traumatic Stress Disorder, and that's a very common

16    condition.  It's used for many different indications by a

17    host -- frankly psychiatrists use it the most.  They

18    specialize in mental health, of course, and they use a lot

19    of benzodiazapines.  We use it a lot at end of life with the

15:48:58 20    anxiety and problems there.  It's used in many different

21    specialties.

22    **Q**    And you say we use it, are you talking specifically

23    about pain management specialists?

24    **A**    No.  I was kind of a global we as physicians use it in

15:49:11 25    many different specialties.

**Wailes (Direct by Majoras)**

1    **Q**    What about in your practice?  Have you prescribed the

2    benzodiazapines that are shown on the chart in front of us?

3    **A**    Yes, most of them.  Not all of them, but most of those

4    I have prescribed.

15:49:22  5    **Q**    And I don't want you to repeat what you've already

6    told us, but the times that you've prescribed it, can you

7    give us examples why?

8    **A**    Many examples.  It's the diagnoses that I just went

9    through.  Sometimes I use it just short term.  For example,

15:49:38  10    before an operation, before a procedure, we use a number of

11    different medications to relax patients.  It might be given

12    in a shot or it might be a pill beforehand.

13         So if someone's coming in for a procedure, it's very

14    kind to premedicate them to help with just the temporary

15:49:56  15    anxiety.

16         We also treat anxiety and PTSD usually in conjunction

17    with other doctors, but also in our own format too.

18         We refer a lot to psychiatry to work together and

19    co-manage many of our patients.

15:50:12  20    **Q**    The jury's also heard a bit about muscle relaxants,

21    and on the screen we have four of those.

22         Do you recognize these pharmaceutical products?

23    **A**    Yes.  Those are all four different muscle relaxants,

24    yes.

15:50:25  25    **Q**    What is the treatment, or what is one trying to treat

**Wailes (Direct by Majoras)**

1     with these types of drugs?

2     **A**     Specifically muscle spasm or spasticity, and that's a

3     condition that can occur with any muscle injury or nerve

4     injury.  When you have an injury to the body, what the body

15:50:44  5     normally does is it splints whatever, it can be an arm, it

6     can be a leg, it can be a spine, it splints it, which means

7     it causes severe muscle contraction so it doesn't move.

8     It's the body's defense mechanism.  To make a long story

9     short, these medicines are specifically designed to try to

15:51:04 10     relax tight, spasming muscles.

11     **Q**     In terms of your use of these -- of medications with

12     your patients, is it exclusively one or the other in terms

13     of the classes, muscle relaxant or a benzo or an opioid?

14     **A**     No.  Like most things, all medical care is

15:51:22 15     individualized.  And, so, I certainly don't use all

16     medicines in everybody.  You have to -- everybody single

17     case is different.  And so you usually use a balance of

18     medications.  Again, it's always the least amount is best,

19     we all know that.  No one likes to take medicines if they

15:51:42 20     don't have to.

21         But if someone has two different distinct problems

22     that can be relieved with two different distinct drugs, yes,

23     we use a combination of benzodiazapines and whatever

24     other -- you know, opioid or opioid and muscle relaxant.  To

15:51:56 25     use all three together is uncommon.  It is very uncommon.

4709

**Wailes (Direct by Majoras)**

1    But occasionally in certain conditions you may have to use

2    all three.  I can go through examples, but sometimes you use

3    all of them.

4    **Q**    If you could, give us example -- an example of a

15:52:10  5    condition in which you might prescribe all three of these

6    type of medications.

7    **A**    One example would be spinal cord injury.  So when you

8    have a spinal cord injury, by definition it's going to cause

9    pain.  You're going to have pain in the lower body or below

15:52:24  10   wherever you have the spinal cord injury.  Furthermore,

11   you're going to have muscle spasm and spasticity.  It goes

12   along when you have a nerve injury, the body's response, if

13   the muscle is not getting the normal nerve signal that it's

14   used to, it will react differently and spasm and not

15:52:42  15   function correctly.  It can cause spasticity where the

16   muscles actually contract and get small, and that's very

17   uncomfortable and painful when you have that muscle spasm.

18   And frequently they're going to have some type of anxiety

19   disorder as well, and so you're going to help them with the

15:53:00  20   benzodiazapines.

21       Another example -- and again, I'll try not to take too

22   much time with all this, but -- would be cancer patients.

23   Clearly, cancer patients -- the percentage of cancer

24   patients that receive both an opioid and a benzodiazapine at

15:53:16  25   end of life is regular.  One statistic I can throw out to

4710

**Wailes (Direct by Majoras)**

1    you that I'm familiar with because it was in my report was a

2    study that looked at hospice patients at end of lie.  And

3    for their cancer patients, 99.8 percent of them all had

4    opioids and 91 percent of them had benzodiazapines.

15:53:40  5        So in cancer, combination therapies are very common.

6    So that's 9 out of 10 patients had both benzodiazapines and

7    muscle -- and opioids.  And I'm sure a few of those probably

8    had muscle relaxants as well.

9    **Q**    Switching back to the FDA for a moment.

15:53:59 10        Do you know what an FDA label is, or a label approved

11   by the FDA?

12   **A**    Yes, I do.

13   **Q**    What is that?

14   **A**    That's necessary documentation that must accompany a

15:54:10 15  prescription.

16   **Q**    And if I can interrupt for just a second.  When I

17   think of label, I think of what's stuck on my medicine

18   bottle.  Maybe contrast it with that.

19   **A**    So this is that small little piece of paper that comes

15:54:21 20  in the box.  It's a small piece of paper with a -- well, I

21   don't about small, it has tiny, tiny printing on it, and it

22   has to come with each of the medicines that you're

23   prescribed.  Most people throw away, but it has very

24   important information on it.

15:54:37 25        So this piece of paper -- and it may be more than one

**Wailes (Direct by Majoras)**

1    page, it can be multiple pages -- has information that's

2    required by the FDA as part of informed consent and

3    disclosure.  So when you get that medicine, ideally you look

4    at that paper.  And it has a lot of science in it, a lot of

15:54:56  5    details, but it also uses some language, you know, that

6    everyone can sort of understand.  It's complicated

7    sometimes, but it talks about the risks and side effects

8    that require this disclosure with every prescription, even

9    if it's just a blood pressure medicine or anything else.

15:55:14  10   **Q**    So as a doctor who prescribes these medications that

11   have an FDA label, you may prescribe them multiple times,

12   when a new product comes out, what is the significance of

13   the label to a prescribing physician such as yourself?

14   **A**    Well, we need to pay attention to it.  We need to be

15:55:34  15   aware of what's on it.  It's very relevant because it's, in

16   essence, FDA's communication to the patient, and physician

17   for that matter, about the pros and cons, risks/benefits and

18   side effects of that medication.

19   **Q**    And do the FDA labels for opioids all warn about the

15:55:51  20   risk of addiction and misuse?

21   **A**    Yes, they do.

22   **Q**    How long have they been doing that -- how long have

23   the labels been doing that?

24   **A**    As long as I've been in practice, at least.

15:56:04  25   **Q**    Switching gears a bit, I think you've shared with the

**Wailes (Direct by Majoras)**

1    jury your use or why you think opioids are appropriate

2    treatments in managing pain.

3        How do you measure whether you're successful?

4    **A**    That's a great question because that's changed over

15:56:22  5    time.  So if I'm dealing with pain, you're obviously going

6    to have some metric or some measure of success based on how

7    much better they feel, and that's really important, so

8    that's part of it.

9        We also really measure in our field -- and this has

15:56:38  10   been one of the things that's changed over the years -- with

11   chronic pain, we don't expect perfection.  We don't expect

12   the pain to go away a hundred percent, so a probably better

13   measurement is their level of activity.  And that comes in a

14   variety of different measurements.

15:56:55  15       So in some patients, just being able to get up in the

16   morning and use the restroom by themselves is a success.  If

17   they could do that on a medicine and they could not do it

18   when they are off the medicine, that's a success.  For some

19   patients it's being able to go to physical therapy.  For

15:57:15  20   some patients it's being able to cook their own meals.  For

21   some patients it might be able to do some minimal chores.

22   But we measure the success in opioids now largely based on a

23   combination of pain relief, some measure of pain relief, and

24   increased function.

15:57:30  25   **Q**    As you see patients over time, how do you actually

**Wailes (Direct by Majoras)**

1    assess that?

2    **A**    Yeah, we see patients frequently, on a regular basis.

3    For chronic pain, it's necessary and helpful to be a really

4    supportive role to see them on a regular basis.  So our

15:57:45 5    patients are seen on at least a monthly basis.  Routinely,

6    it would be unusual not to see that.  So at monthly visits

7    we try to accomplish many things, and monitoring their

8    activity, physical activity, as well their emotional health

9    and many other things is an important part of our function

15:58:02 10    to monitor them.

11    **Q**    Give us a little more detail.  How do you do that?

12         What are you talking or testing patients on when they

13    come back to determine their increased functioning?

14    **A**    Well, it's mostly history, and it can be from the

15:58:17 15    patient and their family and their activity level.  And

16    that's part of our plan.  It's a part of our treatment plan.

17    And we actually document that in the chart, and we have a

18    level of expectation that the treatment that we're giving

19    them is helping.  And so we ask them verbally and actually

15:58:38 20    look also physically at how they're moving, if they're

21    walking better, if their physical exam has improved, and

22    their report of physical activities at home is a good way to

23    measure that.

24    **Q**    One of the things you mentioned earlier was physical

15:58:54 25    therapy.  How does physical therapy tie in with pain

**Wailes (Direct by Majoras)**

1    management?

2    **A**    A great -- great question.

3         Because it turns out that in our field -- and it's

4    true for really most medical problems, that the best

15:59:11 5    outcomes usually come with increased activity and exercise.

6    We all hear it from all of our doctors, you know, exercise,

7    exercise, exercise, but it's really true, especially in

8    chronic pain.  And when you have any disability, the more

9    active you can be, the more you can move the muscles, the

15:59:29 10    more you can move the joints, get range of motion, get more

11    activity, the better they're going to be.

12         And so that's part of our plan, is to make

13    circumstances, design a treatment program where they can

14    have increased activity, and just the increased activity --

15:59:49 15    and physical therapy is a key part of that because they help

16    you with increasing activity.  They'll move your leg for you

17    to get you warmed up.  They'll work on your range of motion.

18    They'll train you how to exercise.  So it's very important

19    in chronic pain to include physical therapy and any exercise

16:00:07 20    that's possible.  Not everyone's able to exercise well, but

21    even in bed you can do exercises.  So we emphasize that a

22    lot because that's -- that can make a big difference in the

23    quality of life.

24    **Q**    So as you look at patients and who they encounter

16:00:22 25    during their treatment of their pain, a doctor such as

4715

**Wailes (Direct by Majoras)**

1    yourself, perhaps a nurse in your office, a receptionist in

2    your office, the pharmacist who may fill a prescription,

3    who's best situated to make those assessments that you just

4    talked about?

16:00:37  5    **A**    Well, those are kind of medical decision-making issues

6    and so as a physician, I need to quarterback those types of

7    activities, and I have access to all the information in

8    terms of, you know, who I referred them to, what medications

9    they are using and why I'm using them and what their history

16:00:55 10   is in the past and response to a variety of different

11   medicines.  And so you're kind of talking about medical

12   decision-making with as much information that we have

13   available to us is critical and that's -- the physician is

14   in the best place to do that.

16:01:11 15   **Q**    What about your experience over time, does that

16   matter?

17   **A**    I think so.  I think experience helps.

18   **Q**    And similar question with respect to assessing the

19   foreseeable risks that you talked about with opioids versus

16:01:24 20   the benefits a patient might achieve.

21         Who's in the best position to make that assessment?

22   **A**    Well, again, you're referring to medical

23   decision-making in terms of knowing the pros and cons and

24   risks of prescribing any medication, and especially opioids.

16:01:39 25        It's very important to have all the information

**Wailes (Direct by Majoras)**

1    available because genetics plays an important part of it, so

2    you need to know their family history, you have to know

3    their personal history of what they've done in the past,

4    what they've been exposed to, how they've responded to

16:01:56  5    medications and so forth.  So you're talking about all the

6    information that goes into the medical decision making for

7    the physician.

8    **Q**    In your experience, are you familiar with the risks of

9    addiction and opioid use disorder?

16:02:06  10   **A**    Yes.

11   **Q**    Okay.  Tell us just a bit about -- because we've heard

12   quite a bit already.  From your standpoint, what is the

13   concerns that you have in prescribing opioids -- the

14   concerns you may have in prescribing opioids with either

16:02:20  15   addiction or opioid use disorder?

16   **A**    We are all aware, all physicians are aware that

17   opioids can be addictive.  They can cause problems with

18   misuse, which is what we use typically as a term for less

19   severe problems where they may just run out of their

16:02:39  20   medicines early on a regular basis or other things, but

21   there's a risk of misuse and addiction.

22        Now, addiction is a severe problem.  It's a

23   psychobehavioral problem which is a severe problem that

24   needs significant attention.  So we are very careful in,

16:02:59  25   number one, screening our patients before they're started on

4717

**Wailes (Direct by Majoras)**

1    opioids to make sure that they're good candidates, and then

2    most importantly, you monitor them on a regular basis.  And

3    there's many tools that we use to monitor them for that.

4         One is the regular visits, that we see them on a

16:03:18  5    regular basis.  Urine drug testing is really important to

6    make sure that, number one, the drug is there and that

7    there's not other illicit drugs present in there.

8         We do a lot of different monitoring, everything from

9    pill counts to talking to other family members, seeing how

16:03:36 10    the patient's physical examination is, many different things

11    that we do to monitor how a patient is responding so you can

12    avoid getting opioid addiction.

13         Also, expectation management and counseling is really

14    an important part of that.

16:03:54 15    **Q**    How do you monitor your patients for possible

16    physiologic dependence?

17    **A**    Well, physiologic dependence is not specifically

18    related to addiction.

19    **Q**    Maybe I should start with, why don't you tell us what

16:04:11 20    physiologic dependence is?

21    **A**    Yeah, that's a characteristic of many different

22    medications, and it's just a medical term.  If you're

23    dependent on a medication, it means that if you have an

24    abrupt stop of that medicine, if it's stopped abruptly, you

16:04:28 25    will go through physical problems.  So that happens in many

4718

**Wailes (Direct by Majoras)**

1    different medications.

2         It happens with insulin.  If you stop insulin, you

3    have terrible -- you could die.

4         If you stopped steroids that you're on for different

16:04:43  5    medical educations [sic], you can actually have a fatal

6    reaction.

7         If you stop opioids, you can go through withdraw, and

8    withdrawals are -- a very bad thing.  It can be devastating,

9    and in some cases fatal.

16:04:56  10         So dependence is just a term saying that if you stop

11    something, there will be physical manifestations.  It's not

12    the same as addiction.  You can have someone who has no

13    addictive qualities at all with an opioid or another

14    medicine, and if you stop it abruptly, inappropriately, I

16:05:16  15    would add, because you never want to stop an opioid abruptly

16    because predictably, if they're on enough of it to cause

17    dependency, you're going to have withdrawal symptoms.

18    **Q**    How do you know if your patient is becoming addicted

19    to opioid treatment?

16:05:38  20    **A**    Well, the definition of addiction has a number of

21    different things that you look for.  There's actually, by

22    the DSM-5, it's a -- the psychiatric definition that's

23    widely accepted, there's 11 different determining factors.

24         And so you look at each one of these as, if they're

16:06:01  25    positive or not, as going toward the syndrome of addiction

**Wailes (Direct by Majoras)**

1    or opiate use disorder.  Those are both used pretty

2    interchangeably.

3         So addiction has these different qualities, and I

4    think you've probably already talked about them, but I --

16:06:17  5    just from -- in a nutshell, addiction is most well

6    represented by cravings, compulsive behavior, and lack of

7    control, and doing self-harm socially, family, economically

8    and so forth.  So addiction is allowing self-harm in that

9    setting and being out of control.

16:06:46 10  **Q**    Given the consequences that you just described, how

11   important is it to you in treating your patients to watch or

12   addiction in your patients?

13  **A**    It's severely important.  It's part of our routine

14   office visits all the time.  Every time we see a patient

16:07:03 15   who's maintained on opioids we address issues that pertain

16   to any of the risk factors for addiction are something

17   that's really important.  We take opiate prescribing very

18   seriously, and I think that's common for most doctors.  It

19   would -- we're all aware of the significant risks.  And so

16:07:24 20   that's why we monitor our patients.  And I think we really

21   improved their dramatic --

22              MR. LANIER:  Your Honor, I'll object to him

23   testifying for all doctors.

24              THE COURT:  Well. . . all right.

16:07:37 25       If you could, Doctor, speak for what you do in your

**Wailes (Direct by Majoras)**

1    practice, or you can refer to the standard of care.

2    BY MR. MAJORAS:

3    **Q**    This goes back to what I asked you at the outset, as

4    you offer opinions, I'd like to make sure you offer it

16:07:52  5    within a reasonable degree of certainty within your

6    specialty and standard of care.

7         So let me ask you first, the things that you're

8    talking about, do those fit within the standard of care for

9    your specialty?

16:08:01  10   **A**    Yes.

11   **Q**    Okay.  And if there's more to your answer, please

12   continue.

13   **A**    So one of the -- we were talking about monitoring and

14   avoiding addiction.  And part of the monitoring process --

16:08:17  15   again, there's multiple different steps and considerations,

16   but if you pay close attention to a patient, you will pick

17   up any potential problems early.  I'm not saying doctors are

18   perfect at diagnosing addiction, they're not.  It's a very

19   difficult syndrome, and there's a lot of variation.

16:08:34  20        But the bottom line is with good attention to detail

21   and monitoring your patients with a lot of the things that

22   I've said, from urinary drug testing and frequent visits,

23   pill counts, you can do other things in terms of following

24   the PDMP to make sure they're not doctor shopping and so

16:08:55  25   forth, watching their behaviors carefully, the incidence of

4721

**Wailes (Direct by Majoras)**

1      addiction in our practice is rare.

2      **Q**     When you say rare, do you have any specific number you

3      can put on it?

4      **A**     I can't put a specific number, but in our practice it

16:09:09  5      would be less than 5 percent.

6      **Q**     I'd like to compare a bit to the types of patients

7      you're talking about and that you're seeing and the

8      monitoring that you feel like you need to do versus a

9      prescription for opioids for short-term duration, such as

16:09:28  10      dental care or things of that nature.

11            Are they the same for both?

12      **A**     You're asking by the risks involved for addiction?

13      **Q**     Yes, sir.  The risks and the need for monitoring.

14      **A**     No.  So if you've just gotten the short-term thing

16:09:43  15      from the emergency room or your dentist or something like

16      that, you're not going to be experiencing any of these other

17      more advanced techniques.  It's a short term.

18            While there is some debate about having addictive

19      possibilities with short term, it's extremely uncommon and

16:10:02  20      the risks of addiction increase with the higher -- or longer

21      duration of use of opioids as well as higher doses.  You can

22      have increased risks over time.

23      **Q**     So we talked about the benefits you've seen from

24      opioids, and we just talked about certainly some of the

16:10:22  25      risks.

**Wailes (Direct by Majoras)**

1      Are there consequences in treating pain and managing

2  pain with focusing only online abuse issues?

3  **A**     Well, the DEA has made comments about that that I put

4  in my report, and the fact is you should not -- yeah,

16:10:40  5  focusing only on the abuse potential of a drug could

6  erroneously lead to the conclusion they should be avoided.

7  And so clearly the vast majority of my patients don't suffer

8  from opiate use disorder or addiction, and so I find the

9  medication, and many other doctors do as well, very useful

16:11:04  10  in chronic pain.  And that's being aware of the fact that

11  there are risks.

12  **Q**     In looking at the quote that you put up, this is from

13  materials in your report that you cite; is that right?

14  **A**     That's correct.

16:11:15  15  **Q**     And who issued this statement?

16  **A**     The DEA in combination with 21 other organizations.

17  **Q**     It was part of a longer report; correct?

18  **A**     Correct.  It's a consensus statement, yes.

19  **Q**     Just going to the end of it, the part you didn't read,

16:11:31  20  and I'll just do the whole thing.  Focusing only on the

21  abuse potential of a drug could erroneously lead to the

22  conclusion that these drugs should be avoided when medically

23  indicated -- which you just talked about -- generating a

24  sense of fear rather than a legitimate respect for their

16:11:48  25  properties.

**Wailes (Direct by Majoras)**

1          What's the fear?

2     **A**     Well, there's been so much press and publicity about

3     opioid addiction that many of our patients, and physicians

4     for that matter, are very fearful for using opioids.  And if

16:12:07  5     they don't have significant experience and training

6     regarding that, that can be fearful.  And I think that's

7     very common.

8     **Q**     When you have patients -- well, let me ask first.

9     Have you had patients who have expressed that type of fear?

16:12:21  10    **A**     Yes, I have.

11    **Q**     And what is your advice that you give to patients when

12    you're discussing that issue?

13    **A**     I always give them a choice.  It's always up to the

14    patient whether they want to try opioid therapy, and it's

16:12:35  15    based on a conversation of -- with informed consent about

16    the risks and benefits.  And it's not right for everybody.

17    And a lot of my patients -- not a lot, but a certain

18    percentage of patients will refuse an opioid, and that's

19    okay.  That's, again, totally up to the patient to decide.

16:12:53  20    But I give them the risks and benefits to let them make the

21    decision.

22    **Q**     So it a patient refuses your recommended treatment of

23    an opioid, is that give-up time?  What do you do?

24    **A**     No.  No.  We never give up on patients, but we would

16:13:07  25    have to consider other alternatives.  I mean, there's always

4724

**Wailes (Direct by Majoras)**

1    other alternatives.  Some of that can be supportive therapy.

2    It can be a revisit to other treatments we've tried in the

3    past and maybe things have changed.  It can be using other

4    medicines to help as best we can.  But we don't give up on

16:13:23  5    patients actually.  We try our best not to abandon our

6    patients.

7    **Q**    We've spoken quite a bit about chronic pain.  I'd like

8    to turn to acute pain.

9         In your practice over the 37 years you've been doing

16:13:35 10    this, do you treat both types?

11    **A**    Yes, I do.

12    **Q**    Sir, what is acute pain?

13    **A**    Well, acute pain is that short -- a pain that it's

14    expected to last a short duration.

16:13:46 15    **Q**    And how are prescription opioids viewed within the

16    standard of care in treating acute pain today?

17    **A**    Well, there's no question that for acute pain, and --

18    I could go through the long list, we've talked about it a

19    little bit already -- there's no question that opioids can

16:14:03 20    be very useful in acute pain.

21    **Q**    And when did that first become part of this, looking

22    back over your time and as a pain specialist, when did

23    opioids first become within that standard of care?

24    **A**    It's always been part of the standard of care during

16:14:18 25    my career, and to my knowledge, way before then for the

**Wailes (Direct by Majoras)**

1    treatment of acute pain.

2    **Q**    So opioids carry the same value for all patients?

3    **A**    Yes.

4    **Q**    And by value, I'm not talking about a monetary value,

16:14:39 5    I'm talking a value in treating the pain.

6    **A**    That varies among patients and their medical

7    condition.  So opioids are not right for everybody.

8    **Q**    What do you mean?

9    **A**    Some patients have problems with side effects of

16:14:54 10    opioids and just don't tolerate them.  They can have

11    terrible nausea and vomiting.  They may get sedated or have

12    dizziness or have other side effects.  Constipation can be

13    intolerable, and they may not be appropriate for everybody.

14    **Q**    Do opioids have any medical benefits in treating

16:15:23 15    non-pain conditions?

16    **A**    Yes.  There's at least two non-pain conditions where

17    the treatment of choice are opioids.  One is sleep hunger,

18    and -- I'm sorry. . . I'm sorry, I'm flashing on the name,

19    but air hunger is what I was looking for, and that's a

16:15:48 20    condition that's most common at the end of life where people

21    are gasping for breath, and that specific syndrome can be

22    associated with a number of different conditions.  It can be

23    end-stage respiratory problems, it can also be related to

24    even anxiety associated with end of life, and the treatment

16:16:08 25    of choice for that are opioids.  And again, that's not pain.

**Wailes (Direct by Majoras)**

1    There's no pain involved at all, but opioids are the

2    treatment of choice for air hunger.  It can be a devastating

3    picture if you have a family member suffering from that.

4          The other condition of which opioids are the treatment

16:16:23  5    of choice is addiction.  Addiction's best outcome is what we

6    call medication assisted therapy, and the treatment -- the

7    medical treatment for addiction currently is the use of

8    opioids long-term.

9    **Q**    We talked a bit about opioids and the benzodiazapines,

16:16:52  10   and you talked about how there are times when they can be

11   prescribed together appropriately; is that right?

12   **A**    Yes.

13   **Q**    How commonly are opioids or benzodiazapines prescribed

14   to patients at the end of life?

16:17:07  15   **A**    Frequently.  I threw out those numbers before and this

16   slide, for example, shows the recommended medications --

17   **Q**    If I could just interrupt you for a second.

18   **A**    Sure.

19   **Q**    Let's be sure everyone understands what we're seeing

16:17:21  20   here on this slide.  Could you explain it a bit?

21   **A**    Yeah.  This slide was a list of medications requested

22   by the World Health Organization and developed by the

23   International Association For Hospice and Palliative Care.

24          So this is a list of medicines that are commonly used

16:17:38  25   for hospice, and again, we talked about hospice as being

4727

**Wailes (Direct by Majoras)**

1    end-of-life care.  And on that list there are a number of

2    opioids and benzodiazapines, which are so commonly used

3    together.  I mentioned those statistics earlier.

4         Just in all hospice patients, I mentioned cancer, if

16:17:56  5    you have cancer in hospice that it was 98 percent opioids

6    and 91 percent benzos -- for -- if you take all patients for

7    end of life, even outside of cancer, in this same study on

8    hospice patients, 84 percent were receiving opioids and

9    84 percent were receiving benzodiazapines.  So, again,

16:18:15  10    another example where co-prescribing of those two

11    medications is common.

12    **Q**    If a patient doesn't have the ability to have opioids

13    prescribed in these end-of-life situations, or benzos, what

14    is the result?

16:18:32  15    **A**    Unnecessary suffering.  It would be -- it would be

16    terrible.

17    **Q**    Are they only prescribed in end-of-life treatment?

18    **A**    No.  No.  These same medications that we're talking

19    about are the same ones that we use -- many physicians use

16:18:50  20    on a regular basis and in our practice we use on a regular

21    basis alone or in combination.

22    **Q**    If we could turn to the next slide, just following up

23    your comment about many practices, are these some of the

24    specialties that prescribe opioids?

16:19:04  25    **A**    Yeah.  This is not a complete list, of course, but

**Wailes (Direct by Majoras)**

1    these are just some of the specialties that routinely

2    prescribe the opioids on a regular basis as well as

3    addiction medicine would be on that list as well and any

4    other procedural specialty and many others.

16:19:19  5    **Q**    And we've talked about already the primary care

6    providers, hospice providers, pain management doctors, and

7    oncologists, doctors who treat cancer.

8         Give me just a brief outline of these other

9    specialties and why they are prescribing opioids for pain

16:19:39 10    treatment.

11         So start with emergency medicine.

12    **A**    Sure.  Well, emergency medicine by definition, they're

13    seeing urgent cases, and one of the most frequently

14    described problems arrive in the emergency room are painful.

16:19:53 15    It's pain.  But it may be pain related to a broken injury, a

16    sprained ankle, a terrible back.  Pain is probably the most

17    common presenting symptom in emergency rooms.  So they use

18    opioids routinely all day long.

19    **Q**    How about urgent care?  It sounds like that may be the

16:20:14 20    same category.

21    **A**    Urgent care, express care, yes, same thing.

22    **Q**    You've talked about surgical specialties I believe

23    already.  One you haven't talked about is OB/GYN's.

24         How are opioids used in those practices?

16:20:27 25    **A**    Well, women will always know better than men how

**Wailes (Direct by Majoras)**

1    painful delivering a baby is.

2    **Q**    And you may have mentioned some of this already, I

3    apologize, but please go ahead.

4    **A**    And so pain after a delivery, and, of course, any

16:20:41 5    gynecological procedures are frequently painful, so any

6    physician that does procedures on patients, typically

7    there's going to be pain after that procedure.  If they have

8    to cut the skin or whatever they're doing, and opioids are

9    used routinely for pain after procedures.

16:21:02 10    **Q**    And I think we've picked up on some of the others.

11    The last one I'll ask you about on this list or podiatrists.

12    **A**    Right.  Those are foot doctors, if you will, and

13    they're trained to do treatment, including surgery of the

14    feet, and they treat everything from bunions to hammer toe

16:21:20 15    and a lot of other things, and so they also do procedures

16    that are painful and require the use of opioids.

17    **Q**    And if you were to break down this list, I'm going to

18    ask you whether you can break down this list between the

19    types of practices that are generally prescribing for acute

16:21:34 20    pain versus chronic or possibly both, how would you do that?

21    **A**    Well, clearly, most are acute pain, kind of short-term

22    treatment, but certainly oncologists and pain management

23    doctors and hospice providers, those three would be

24    classically treating both acute and chronic.

16:21:59 25    **Q**    So I'd like to turn back now to standard of care

**Wailes (Direct by Majoras)**

1   generally within your profession and the treatment of pain.

2       Have you seen that evolve over time, especially with

3   respect to using opioids?

4   **A**   Yes, it's changed significantly over the decades of my

16:22:15  5   practice.

6   **Q**   We've heard some testimony earlier in this case about

7   a paradigm shift in that regard.  Would you agree with that

8   statement -- with that -- I'm sorry.  Would you agree with

9   that characterization?

16:22:28  10   **A**   I would.  There's been a significant change in

11   attitude regarding the treatment of -- treatment of pain,

12   especially chronic pain, over the last few decades.

13   **Q**   And with respect specifically to opioids, has there

14   been a paradigm shift?

16:22:43  15   **A**   Yes.  Yes.  Very true.

16   **Q**   We're going to talk about that in some detail.  But

17   could you give us an example of simply what you mean by

18   standard of care changing or evolving over time?

19   **A**   Well, again, that's reflective of the practice of the

16:23:00  20   majority of physicians regarding certain conditions.  And

21   the bottom line is we became more aware in the '80s and '90s

22   about the amount of untreated pain.

23       And so there became a lot of work and a lot of

24   actually organizations that helped with continuing medical

16:23:23  25   education and awareness, everything from the Joint

4731

**Wailes (Direct by Majoras)**

1    Commission For Accreditation to the Veterans Administration,

2    and even the DEA was making physicians more aware of

3    treatment options and the undertreatment of pain.

4        So that was an evolution that occurred over many, many

16:23:45  5    years.  And this started at least as -- when I was in

6    training.

7    **Q**    And, Doctor, I'm sorry, I didn't mean to interrupt,

8    but Dr. Wailes, as you talk about that shift in pain

9    treatment, how does that compare to just generally how

16:23:58 10    standards of care shift within the medical profession?

11   **A**    Well, certainly they occur frequently.  There's many

12   different examples of changing the standard of care.

13   Everything from the position of a baby in a crib all the way

14   to the use of insulin.

16:24:13 15       Here's an example.  Baby in a crib.  When my children

16   were born, all babies were face down in a crib so you would

17   avoid sudden infant death syndrome, and they were religious

18   about it.  Both my wife and I complied with that just

19   religiously for our three children, and then about 10 years

16:24:32 20   later, all that standard of care for children changed

21   completely, and any one of you know -- around any babies

22   now, they only let them go to sleep on their back.  That's

23   just one example.

24       There's many other examples about the change in care

16:24:45 25   over time for standards of practice.  Everything from

4732

**Wailes (Direct by Majoras)**

1      treating diabetics with insulin has changed over time.

2      Aggressive treatment of heart conditions have treated --

3      changed over time.  The evolution of medicine hopefully and

4      luckily does improve over time.

16:25:05  5      **Q**      So shifting back to what you were talking about before

6      I interrupted, and again, I apologize for that, you were

7      talking about the changing standard of care and using --

8      treating pain with opioids.

9           Are you familiar with the phrase pain is the fifth

16:25:22 10      vital sign?

11      **A**      Yes, I am.

12      **Q**      Before we talk about the fifth one, what are the first

13      four?

14      **A**      Well, the first four are regular -- what we call

16:25:30 15      regular vital signs:  It's blood pressure, pulse,

16      temperature and heart rate -- or respiratory rate.

17      **Q**      And you said you're familiar with pain as the fifth

18      vital sign.  What is that in reference to?

19      **A**      Well, that was a new concept that came about in the --

16:25:45 20      I believe it was the '90s, and it was a recognition that

21      that was something else that's vital to how a patient's

22      doing and should be measured.  So that's why it was called a

23      vital sign.

24           Vital signs are those numbers that I just said, the

16:26:00 25      four standard things of blood pressure and so forth, are

**Wailes (Direct by Majoras)**

1    things that are routinely measured at your doctor's office

2    and certainly routinely measured by nurses in a hospital.

3    They check your vital signs on a regular basis.  And pain

4    was never routinely measured, and so there was a move at

16:26:18 5    that time to make pain measurement more common.  And by

6    making pain the fifth vital sign, it made it part of

7    institutionally hospitals and other healthcare providers so

8    it would get the more important and necessary recognition.

9    **Q**    Let's take a look at some of those publications that

16:26:40 10    came out.  The first is I'd like to refer you to exhibit

11    WAG-MDL-2457.

12         If you can bring that up so. . .

13         Do you recognize this document that is on the screen

14    in front of you?

16:27:08 15    **A**    Yes, I do.

16    **Q**    I'm sorry.  We'll wait till everybody has a chance to

17    have a copy.

18         So first question is, do you recognize this -- the

19    first page of this document in front of you?

16:27:23 20    **A**    Yes -- yes, I do.

21    **Q**    Okay.  What is it?

22    **A**    It's a document produced by the Department of Veteran

23    Affairs that's reflecting -- it's a toolkit to help people

24    utilize pain as the fifth vital sign.

16:27:41 25    **Q**    This is dated October 2000?

**Wailes (Direct by Majoras)**

1     **A**     Correct.

2     **Q**     Do you recall when this came out?

3     **A**     In general terms.  I don't remember the exact date,

4     but it was -- yes, in general terms, yes.

16:27:51  5     **Q**     Why do you remember it?  Why do you remember generally

6     the fifth vital sign material coming out into publications?

7     **A**     Well, it was part of that trend toward greater

8     recognition of the undertreatment of pain.  There's a huge

9     trend, and this was part of it, and again, this kind of made

16:28:07  10    it more common for people to pay attention and brought it to

11    the attention of many, many other physicians and as well as

12    patients.

13    **Q**     A little bit earlier in your answers you talked about

14    the joint commission.

16:28:22  15          Do you recall that?

16    **A**     Yes, I do.

17    **Q**     What is the joint commission?

18    **A**     The joint commission basically accredits hospitals and

19    other healthcare institutions, and they're tasked with

16:28:38  20    making sure that there's quality, and that involves

21    everything from sterile operating rooms and appropriate

22    nursing conditions for them to be certified and to be able

23    to take care of inpatients.

24    **Q**     And did the joint commission lend support to the idea

16:28:55  25    that pain is the fifth vital sign?

4735

**Wailes (Direct by Majoras)**

1    **A**    Yes, they did.

2    **Q**    I'm going to ask you to take a look at another

3    document.  This is exhibit WAG-MDL-1005.  We'll wait till it

4    gets passed out.

16:29:11  5         It's already been passed out.

6         And, Dr. Wailes, you may have -- you have that on the

7    screen in front of you.  You may also have the paper copy if

8    you prefer it, if you want.  Screen works?

9    **A**    I see it, yes.

16:29:22  10   **Q**    Okay.  Could you tell us what this is on the screen in

11   front of you right now?

12   **A**    Yeah.  This is an explanation of the joint commission

13   and what they're looking at in terms of utilizing the

14   measurement of pain.

16:29:40  15   **Q**    And the date of this is December 18, 2001?

16   **A**    Correct.

17   **Q**    Do you recall when this document was released by the

18   joint commission?

19   **A**    Only in general terms.  I don't remember the specific

16:29:51  20   date, but I remember in general terms it coming out.

21   **Q**    If we could go to Page 12, which scares me because it

22   says 1 of 10 at the top.

23        But magically here we are.  And in particular, can you

24   tell us what the joint commission in this document is saying

16:30:16  25   in terms of pain being the fifth vital sign?

**Wailes (Direct by Majoras)**

1          I believe it comes under -- right in the middle of the

2     document.

3     **A**     Yeah.  It actually is in two sections there.  The top

4     section -- actually, it says, pain can be a common part of

16:30:30  5     the patient experience.

6     **Q**     Just if I could stop you just a moment.  We'll blow

7     this up a little bit so everyone can see it.

8          Okay.  Go ahead.  If you want to read that, go ahead.

9     **A**     Yeah.  Thank you.

16:30:37  10          And unrelieved pain has adverse physical and

11     psychological effects, and they're making the very clear

12     point that the patient's right to pain management is

13     respected and supported.

14          And then the next section goes into --

16:30:50  15     **Q**     Let's stop just a bit.  We'll blow it up.  And I'll

16     ask you as we're reading, since we all tend to get fast when

17     we read, if you can just do it slowly, please.

18     **A**     I apologize for that.

19          In this section they talk about the fifth vital sign,

16:31:03  20     using the measurement of pain as the fifth vital sign.

21     **Q**     And you talk about the evolving standard the care.

22          How does pain being the fifth vital sign of the types

23     of documents we're seeing impact the standard of care during

24     this time period?

16:31:19  25     **A**     So with greater recognition and people paying

**Wailes (Direct by Majoras)**

1    attention to pain, there certainly is going to be more

2    treatment of that pain.  So when you assess somebody and

3    they're uncomfortable, you want to give them choices of how

4    they can improve their pain and give them options for

16:31:37  5    treatment.  And so that's -- that's part of the evolution,

6    this -- again, understanding the undertreatment of pain, a

7    lot more attention toward what was going on in patients'

8    lives, in the hospital, other places, drew more attention

9    and in response to that, they received more treatment.

16:31:58 10    **Q**    Let's look at a few more -- or at least one more

11    example of this.

12        In particular I'd ask that exhibit WAG-MDL-1355 be

13    pulled up.

14        This is a document you cite in your report as

16:32:20 15    something you've relied upon; is that right?

16    **A**    Yes.

17    **Q**    What is the significance of this document, and perhaps

18    the part that we now see blown up -- well, go ahead, please

19    leave that there.

16:32:32 20        Mr. Ferry, would you please blow up that portion of

21    the document?  Thank you.

22        What effect does this document have as you reviewed it

23    for your report?

24    **A**    Yes.  This is a document that we did refer to earlier,

16:32:47 25    which is the DEA in conjunction with 21 other organizations

4738

**Wailes (Direct by Majoras)**

1        doing a consensus statement, and this shows the section, the

2        first part is it recognizes that drug abuse is a serious

3        problem, and then it goes on to say what we quoted earlier,

4        is that focusing only on the abuse potential of a drug,

16:33:12  5        however, could erroneously lead to the conclusion that these

6        medications should be avoided when medically indicated.

7              And, anyway, it was a statement that was, in essence,

8        endorsing the appropriate treatment, and that can include

9        opioids, for pain.

16:33:32  10  **Q**     So as you look at the evolving standard of care for

11        treating pain, particularly as to opioids, what have you

12        observed in your practice and the work you've done in these

13        medical associations about the use of opioids over time by

14        prescribers?

16:33:50  15  **A**     Well, I would recognize what we've all been exposed to

16        probably in graphs.  I've seen the graphs of the increased

17        use of opioids over time and it's a -- it's a significant

18        increase over time from, in essence, the '80s all the way to

19        2011, and then after 2011, prescription opioids have fallen

16:34:12  20        43 percent until 2019.

21              And I haven't seen as much data since then, but that's

22        been the course, specifically the evolution of increased use

23        of opioids over many years, and then the last 9 years, or

24        10 years, the number of prescriptions have fallen off.

16:34:32  25  **Q**     And in your opinion, the increase that you saw and

4739

**Wailes (Direct by Majoras)**

1    then the decrease --

2    **A**    Correct.

3    **Q**    -- that you saw in prescribing, was that consistent

4    with the standard of care in the treatment of pain over the

16:34:44 5    time period you've talked about?

6    **A**    Yes, it was, and it reflects many different

7    considerations.  The standard of care in the '80s, '90s, and

8    2000's included the use of opioids.  We're talking

9    specifically about opioids now, but other pain treatments

16:35:01 10    were also going concurrently.  But the use of opioids during

11    those times increased dramatically, and that had to do with

12    greater recognition, it had to do with greater awareness and

13    knowing there was an undertreatment of opioids.  It also

14    came along with a different concept of how to prescribe

16:35:22 15    opioids.

16         For most physicians, using opioids was not very

17    familiar because historically in the -- in days and

18    months -- or I'm sorry, in decades previously, opioids were

19    not used as often.  And so I think that there was also a

16:35:40 20    learning period during that time where physicians became

21    more aware of opioids and their usefulness, and we also

22    became more aware of the risks of misuse and the risk of

23    addiction.  And -- and because of those -- that awareness,

24    the standard of care changed, and with that increased

16:36:03 25    awareness and education, there became fewer opioid

1    prescriptions.  And again, it's fallen off 43 percent in the

2    last 9 or 10 years.

3    **Q**    Do you recognize the name Joe Rannazzisi, a former DEA

4    official?

16:36:21  5    **A**    Yes, I do.

6    **Q**    In fact, you cite some testimony of his in your

7    report; is that correct?

8    **A**    Yes.

9    **Q**    And I'll tell you, at trial a couple weeks earlier

16:36:29 10    when he testified, he acknowledged that when he testified

11    before Congress in 2012, he said that 99 percent of doctors

12    were perfect.

13        What's your reaction to that?

14    **A**    My reaction is thank you, and I think that's a

16:36:45 15    recognition that most doctors are really legitimate and

16    appropriate and well-trained and are doing the right thing.

17    **Q**    And have you run across doctors that you believe fall

18    within that 1 percent?

19    **A**    It's extremely rare, but yes, I have.

16:37:01 20    **Q**    And has that been as part of your work with the

21    California Medical Association?

22    **A**    California Medical Board.

23    **Q**    I'm sorry, California Medical Board.

24    **A**    Yeah.

16:37:09 25    **Q**    That's the one in which you review cases brought

1    against prescribers from time to time; right?

2    **A**    That's correct.

3    **Q**    You mentioned earlier in your testimony using a PDMP.

4    And you're licensed in California; right?

16:37:34 5    **A**    That's correct.

6    **Q**    I think you acknowledged that you knew the Ohio PDMP

7    is known at OARRS?

8    **A**    Correct.

9    **Q**    What's the California system?

16:37:41 10    **A**    It's CURES.

11    **Q**    CURES.  C-U-R-E-S?

12    **A**    Yep.  That's it.

13    **Q**    It's easier to remember than OARRS.

14          Tell us the significance in your practice as treating

16:37:55 15    pain of using PDPM systems, like CURES in California?

16    **A**    Well, PDMP, this OARRS in Ohio, has been required for

17    our use.  It's been available -- in Ohio I think it first

18    came out in 2006 and has been required for use by statute in

19    2015 for all physicians, and pharmacists use it as well.

16:38:20 20    And what it is is the database that looks at all the other

21    prescriptions for controlled substances, including opioids.

22          So how you -- I use it in my practice is we use it

23    routinely.  On every single patient basically every single

24    visit, we pull that report up.  And what it allows us to do

16:38:40 25    is to see if they're getting some other sources of opioids

**Wailes (Direct by Majoras)**

1    from other physicians.  They may have had a trip to the

2    emergency room or something else, and we'll ask about that.

3    And so we do pay attention to that.  And I think that's

4    important.  It's not the -- you can't just use that one

16:38:59 5    measure.

6        In fact, in my report I cite a number of studies that

7    show that just that one measure alone isn't very good for

8    screening for doctor shopping, but it's one of the things we

9    use to look at the history of the patient and keep up with

16:39:12 10    their other prescriptions.

11    **Q**    You've spoken about the interactions -- I'm going to

12    switch gears here.  You've spoken about the interactions you

13    have had with pharmacists during your career treating

14    patients.  I want to do -- I want to take a closer look at

16:39:26 15    that.

16        Who has the responsibility for treating a patient,

17    according to medical judgment?

18    **A**    That would be physicians.

19    **Q**    And if we look at slide 21.

16:39:51 20        It's okay.  While we're searching for slide 21, it's

21    pretty easy.  I can read this.  Would you agree with the

22    following statement:  It is up to each -- it's now on the

23    screen.

24        It is up to each DEA registered practitioner to treat

16:40:03 25    a patient according to his or her professional medical

**Wailes (Direct by Majoras)**

1    judgment as long as it is generally recognized and accepted

2    in the United States?

3         Do you see that?

4    **A**    Yes, I do.

16:40:13 5    **Q**    Now, do you know what that's from?

6    **A**    I believe that's from the DEA.

7    **Q**    And when the phrase is generally recognized and

8    accepted, is that the same that you've been talking about in

9    terms of what the standard of care is for a physician?

16:40:26 10   **A**    In essence, yes.

11   **Q**    And if a doctor is prescribing opioids consistent with

12   that standard of care, do you consider that to be legitimate

13   medicine?

14   **A**    Absolutely.  It would be a legitimate prescription,

16:40:42 15   legitimate practice of medicine, yes, it's within the

16   standard of care.

17   **Q**    Based on your review and in your experience from the

18   perspective of a doctor, what are the pharmacists'

19   responsibilities as they relate to prescriber and patient?

16:41:00 20        Slide 23, please.

21   **A**    Yeah.  The pharmacist has a very important function,

22   and this slide outlines some of them, not all, but it is

23   really important for screening the prescription for overt

24   errors.  It could just literally just be a decimal point or

16:41:19 25   something wrong if it's digital or bad handwriting,

4744

**Wailes (Direct by Majoras)**

1        potential allergies, adverse medical interactions, forgery,

2        fraud, and diversion.  Those are important functions of the

3        pharmacist.

4            And another one I would just throw in there as well, I

16:41:34  5        think it's important, is counseling.

6        **Q**    What do you mean by counseling?

7        **A**    Giving the patient the opportunity to get more

8        information about the drugs they're receiving, because

9        they're willing to do that for any prescription they provide

16:41:46 10        typically.  They're willing to do it.  They don't routinely

11        do it necessarily, but -- and again, I'm not a pharmacist,

12        so. . .

13        **Q**    You already told us that you as a doctor talk to them

14        about the risks and benefits of the products.

16:41:59 15        **A**    It is critically important that doctors cover that.

16        That's a necessary and vital function of physicians to cover

17        those items, yes.  Informed consent.

18        **Q**    And do you have a -- an expert opinion based on your

19        review and experience as to whether it is appropriate for

16:42:18 20        pharmacies or pharmacists to make decisions about whether a

21        patient's disease or condition deserves or warrants a

22        prescription prescribed by a doctor?

23        **A**    I have strong feelings about that, that that's medical

24        decision-making and very important that the physician who

16:42:37 25        has all the information, they have the history, the

4745

**Wailes (Direct by Majoras)**

1    physical, the background, the labs, the experience, and all

2    the information that it takes to make a medical decision

3    should be solely with the physician.

4    **Q**    Do you believe it is ever appropriate for a pharmacist

16:42:55 5    to refuse to fill an opioid prescription that is written by

6    a doctor?

7    **A**    Yes.  I think the doctor -- the pharmacist always has

8    the right to refuse a prescription.  That's -- I think

9    pretty much everyone agrees with that.  They have to be the

16:43:12 10    final judge, and it's based on all the factors that they

11    have exposure to.  So there are examples where the

12    pharmacist would have responsibile action refusing a

13    prescription.

14    **Q**    You mentioned that you have had pretty regular contact

16:43:31 15    with pharmacists in relation to your prescribing of opioids;

16    is that right?

17    **A**    Intermittently, yes.

18    **Q**    In terms of --

19                THE COURT:  Mr. Majoras, there's some slides

16:43:42 20    on here, and I'm not sure where they're coming from.

21                MR. MAJORAS:  Let's take those down, please.

22                THE COURT:  Thank you.

23    BY MR. MAJORAS:

24    **Q**    Okay.  You said intermittently.  And I think it was

16:43:54 25    time for my question, so I'll ask the question.

4746

**Wailes (Direct by Majoras)**

1    In terms of your discussions with pharmacists, have

2    they raised with you the appropriateness, in their view, of

3    prescriptions you've written?

4    **A**    That would be very uncommon.  It was more common many

16:44:10 5    years ago for a brief period of time, but currently, that's

6    not a regular occurrence at all.

7    **Q**    Are you well known in the San Diego area as a pain

8    specialist?

9    **A**    I believe so.

16:44:29 10    **Q**    Are there risks in delaying or denying an opioid

11    prescription that has been appropriately written to treat a

12    medical condition?

13    **A**    Absolutely.

14    **Q**    What are they?

16:44:41 15    **A**    Yeah.  That's -- even the delay of a prescription that

16    can cause withdrawal symptoms can be devastating.  So to

17    deny or delay a prescription for an opioid where a patient

18    needs them on a regular basis can initiate withdrawal and

19    can be devastating and even life threatening.  So that is a

16:45:02 20    serious problem.

21    **Q**    And are there consequences to abruptly reducing or

22    stopping a patient's opioid medication just generally?

23    **A**    Yeah.  If they're on a certain amount of opioid where

24    they're going to have withdrawal symptoms by stopping it

16:45:17 25    abruptly, then yes, that's a serious problem of delaying or

## Wailes (Direct by Majoras)

1    denying and they -- again, it can be devastating.  It can

2    cause severe patient harm and even death if an opioid is

3    acutely, suddenly withdrawn or even delayed.

4    **Q**    Let's take a look at a couple of additional materials

16:45:39  5    that you cite in your report.  The first is Exhibit

6    DEF-MDL-11040.  If we just wait a moment while that's handed

7    out.

8         They've already got it.  Thank you.

9         So if we could put the -- that exhibit up, the first

16:46:05 10    page of that exhibit.

11         We have technical issues on that exhibit.  Let's go to

12    a different one.  Thank you.  Thank you, Mr. Carter.  Let's

13    do a different exhibit.

14         Let's look at Exhibit DEF-MDL-11963.  If we could pull

16:46:36 15    that up to Page 1.

16         First, before we get into any of the specifics, could

17    you tell us what this document is and why you cited it in

18    your report?

19    **A**    Yeah.  This is a reprint of an article that -- where

16:47:01 20    the CDC came out and tried to correct some misapplication to

21    their guidelines which came out in 2016.

22    **Q**    And if we look to -- the CDC is the Center for Disease

23    Control, I think?

24    **A**    That's correct.

16:47:19 25    **Q**    All of us now know what that means over the last two

1    years; is that correct?

2    **A**    Thank you.  Yes, it is.

3    **Q**    And if we look to I believe the third bullet point.

4         If we can blow that up, please.

16:47:31  5    And how does this bullet point relate to what you were

6    just testifying about?

7    **A**    It basically reiterates exactly what I was saying,

8    that no one suggests the abrupt tapering or sudden

9    discontinuation of opioids.  The risks of abrupt changes can

16:47:51 10   be devastating and very harmful to patients.

11   **Q**    I said to a witness earlier, when I'm flipping pages,

12   that's always a good sign.

13        And the opinions that you've been offering about the

14   standard of care, is it your opinion that that's the

16:48:25 15   standard of care throughout the United States?

16   **A**    Yes.

17   **Q**    And would your opinions about how a pharmacist should

18   handle prescriptions written by a prescriber like yourself

19   differ from state to state?

16:48:41 20   **A**    I don't believe so.

21   **Q**    Okay.  I'm going to now switch to another part of your

22   opinions in this case, and this relates specifically to red

23   flags.

24        I believe I mentioned earlier that in your report and

16:48:55 25   the opinions you've offered in this case, you've taken a

4749

**Wailes (Direct by Majoras)**

1   look at the opinions put forth by Mr. Catizone about red

2   flags; is that right?

3   **A**    That's correct.

4   **Q**    So I would like to ask you as a pain management doctor

16:49:09   5   who regularly prescribes opioids, your opinions on some of

6   the elements or characteristics of Mr. Catizone's red flags;

7   okay?

8   **A**    Okay.

9   **Q**    And I think you said you reviewed all of his red flags

16:49:23  10   at the time you wrote your report?

11   **A**    Yes, I did.

12   **Q**    And I will just remind you that his testimony in this

13   case was consistent with what was in his report about the

14   red flags.  Okay?

16:49:31  15   **A**    Okay.

16   **Q**    Before we get into any individual red flags, can you

17   tell us generally what your view is of how the red flags as

18   described by Mr. Catizone would impact the practice of pain

19   management?

16:49:51  20   **A**    To answer that question I first have to distinguish

21   how his red flags -- Catizone's red flags are very different

22   than what a normal red flag is.

23        A red flag is just a concept.  We're all kind of

24   familiar with what a red flag might be.  It's something that

16:50:08  25   draws your attention to an issue.  So there could be red

4750

## Wailes (Direct by Majoras)

1    flags in any industry, but -- so a red flag is something

2    that draws your attention and needs -- needs to be addressed

3    in some way to make you more comfortable.  We see that in

4    all of our prescribing, as we prescribe.  If there's

16:50:30  5    something we're worried about, that would be in general

6    terms a red flag.

7         But this is in sharp distinction from Catizone's red

8    flags.  Luckily they're not anything like that in practice

9    today, but what he's proposing is a situation where all of

16:50:49 10    his red flags -- and we'll go through some of those -- have

11    to be applied and have to be resolved or the prescription

12    should not be dispensed.  That's huge.

13         What that means is that it's not just a prompt or

14    something to get your attention, it means this is a

16:51:12 15    mechanical way or an algorithm -- like an algorithm of how

16    to dispense medications.  And if in your algorithm, in this

17    system, you can't check the box, that you've cleared up this

18    red flag, then you cannot dispense.  He's very absolute and

19    strong about it in his report about not dispensing that.

16:51:38 20    And that is a significant problem that we need to address.

21    And I'm happy to talk more about that now.

22    **Q**    So, first, though, before we go to that, are you

23    saying that there should never be any concerns that a

24    pharmacist can raise about a prescription that he or she

16:51:52 25    sees in front of her?

4751

**Wailes (Direct by Majoras)**

1    **A**    No, I'm not saying that at all.  Again, I believe red

2    flags are legitimate, and pharmacists are trained, I'm told,

3    to look for different red flags.  And there are a variety of

4    things that you would see that might prompt you to do more

16:52:05  5    research or have concerns or, again, be aware of and address

6    in some way.  And we'll go through lots of examples of that.

7    So I believe in red flags.  Red flags, the concept is

8    important.  Is it means they're using their judgment and

9    caution.  And I believe in pharmacists using their judgment,

16:52:26  10   and luckily they do now.  But what Catizone's red flags are

11   suggesting is that if for some reason they can't resolve

12   it -- and we can talk about how they don't resolve it -- if

13   they call the doctor's office and the doctor's closed and

14   they can't get a hold of an on-call doctor, if the doctor

16:52:45  15   tries to call back to the pharmacist and the pharmacy is

16   closed, there's many different circumstances where they may

17   not get a hundred percent resolution of his Catizone red

18   flags, and if that's true, he's saying don't dispense the

19   medicine.

16:53:05  20   And we'll go through the examples of his red flags and

21   I'll be able to show you that so many of them are

22   commonplace, normal situations, but he's flagging them and

23   saying do not dispense unless it's completely resolved.

24   **Q**    What is the consequence to you as a doctor treating

16:53:23  25   pain if legitimate prescriptions get caught up in the

**Wailes (Direct by Majoras)**

1      mechanical process that you just described?

2      **A**    What it means is that my patients can be harmed.  If

3      my patients are on opioids and they're delayed or denied,

4      and just delayed is enough, they're going to go through

16:53:47 5    withdrawals.  And that is devastating.  Patients under my

6      care I would never, ever want it that to happen.  That --

7      that's significant patient harm that's unnecessary.

8      **Q**    And in your opinion, do you have an opinion as to

9      whether or not the mechanical red flags that Mr. Catizone

16:54:04 10   describes and then are applied by a computer program --

11     wait.  Let me start over.

12          Do you have an opinion as to whether or not the

13     mechanical red flags and the way that they're then applied

14     through a computer program interrupt the flow of legitimate

16:54:24 15   treatment of pain management?

16               MR. LANIER:  Objection, Your Honor.  Doesn't

17     reflect testimony with the computer.

18               MR. MAJORAS:  I'll switch, Your Honor.

19               THE COURT:  All right.

16:54:35 20  BY MR. MAJORAS:

21     **Q**    Your Honor -- Your Honor.

22               MR. MAJORAS:  I'm not going to ask Your Honor

23     any questions.  Thank you.

24               THE COURT:  Well, I'm not qualified to answer

16:54:42 25   the ones that this doctor is answering, that's for sure.

**Wailes (Direct by Majoras)**

```
 1              MR. MAJORAS:  I'm having trouble just forming

 2    a question.  I don't have many answers.

 3    BY MR. MAJORAS:

 4    Q     Dr. Wailes, in all seriousness, do you know who, I

 5    believe it was Dr. McCann, it might be Mr. McCann, is who

 6    testified earlier in this case?

 7    A     Yes.

 8    Q     And is it your understanding that what Mr. Catizone

 9    did was spell out what they thought the red flags were and

10    then Mr. McCann, who I believe was described -- and I don't

11    mean this negatively at all -- as a math geek, took those

12    red flags and applied them across a group of prescriptions?

13    A     That's my understanding, yes.

14    Q     So using that method, whatever we want to call that,

15    using that method, is it your -- do you have an opinion as

16    to whether that method of identifying and searching for red

17    flags will catch up legitimate prescriptions in that

18    process?

19    A     Yes, I do.  My opinion is that he, through his

20    harvesting of red flags, they caught approximately

21    20 percent of all opioid prescriptions reflect, and assuming

22    that 99 percent of doctors are legitimate prescribing --

23    legitimately prescribing medication stuff, that is going to

24    capture -- and we'll talk more details about it -- but that

25    will capture a lot of legitimate prescriptions that don't
```

4754

**Wailes (Direct by Majoras)**

1    require full resolution or do not give.

2         Again, red flags by themselves are all right, but if

3    they capture 20 percent, that means it's oversensitive.

4    There's a lot of false positives.

16:56:20  5   **Q**    What do you know by false positives?

6    **A**    What I mean by that is that you're screening for

7    something.  His red flags screen for certain conditions.  It

8    might be a dosage.  It might be the distance the patient

9    traveled, and if those measures are overly sensitive, what

16:56:41 10  that means is they'll pick up a lot of normal situations.

11   They'll pick up a lot of normal conditions, and those are

12   false positives.  So false in that they're called as a

13   positive red flag, but they shouldn't be a red flag at all.

14   And that's a false positive.  And if -- if the measures you

16:57:00 15  have are too sensitive, if they pick up way too many

16   patients, then it's not useful.

17   **Q**    So would it be helpful to you in explaining what you

18   just said by going through some examples as you look at the

19   specific red flags that Mr. Catizone identified?

16:57:16 20  **A**    Yes.

21   **Q**    Okay.  Let's go to slide 28, please.

22        Now, this is -- well, let me just ask you to explain.

23        What do you mean by dose thresholds and what you are

24   describing this slide as it relates to Mr. Catizone's flags?

16:57:36 25  **A**    So, what Mr. Catizone described as a red flag were the

**Wailes (Direct by Majoras)**

1    dose of a medication in terms of morphine milliequivalents a

2    day, morphine milligram equivalents a day.  So that's the

3    strength of how much opioid per day that you're getting.

4       And so what he did in this situation is he screened

16:58:02 5    for certain amounts.  Now, I need to say from the get-go

6    that when he screened for these certain amounts, he didn't

7    segregate out patients that had cancer.  He didn't segregate

8    out patients at end of life.  He didn't segregate out

9    patients that were on the same dose for the last three years

16:58:22 10    that had chronic pain.

11       He applied these standards to a hundred percent of the

12    prescriptions he reviewed, which were all patients.  And --

13    I can go into how he came up with these numbers.  They were

14    based on -- and he states in his report, they were based on

16:58:43 15    the CDC guidelines that were put out in 2016 for use by

16    primary care doctors in chronic pain only.  So he misapplied

17    guidelines for the use of opioids, the doses of opioids,

18    that were meant only to apply to primary care doctors for

19    chronic pain, and those guidelines were not an absolute

16:59:12 20    number at all.  They were just suggested recommendations on

21    how to prescribe.  They were not meant to be weaponized as

22    an absolute bright line not to exceed.  That was not in the

23    language of the CDC guidelines.

24       And also, those guidelines did not apply,

16:59:32 25    specifically, to oncologists, end-of-life care, other types

## Wailes (Direct by Majoras)

1    of doctors.  It was only specifically for primary care

2    doctors and chronic pain.

3    **Q**    So let's break that down a little bit if we could.

4         When the flags that he identifies talk about dose

16:59:49  5    thresholds, they are triggered or flagged if certain upper

6    limits of prescription are met; correct?

7    **A**    That's correct.

8    **Q**    Okay.  You made it -- you distinguished in your answer

9    the CDC guidelines or guidance as it related to primary

17:00:08 10    care.  Why does that matter to you?  Tell us why that's

11    important.

12    **A**    Well, the only reason why it's important is he fell

13    back on that document to create these numbers, and that's

14    not appropriate because these numbers are being applied to

17:00:19 15    every type of doctor and every type of pain.  And so I use

16    that because he used it as foundational for coming up with

17    these numbers.

18    **Q**    So, for example, you specifically said that he didn't

19    call out patients with cancer and end-of-life care, and then

17:00:37 20    I couldn't write notes as quickly beyond that.

21         Why do those types of patients matter when you're

22    talking about pain -- I'm sorry -- dose thresholds?

23    **A**    Very important to know that with acute pain,

24    frequently you can get by with smaller doses, but it varies

17:00:54 25    tremendously, but you can get by with smaller doses.

**Wailes (Direct by Majoras)**

1     Most patients with cancer pain, it's usually severe,

2     moderate to severe, and require large doses.  Everyone in

3     the medical field knows that by treating and being exposed

4     to cancer patients.  It can be devastating when the disease

17:01:12  5     spreads to your bones and other parts of your body.  And

6     same with hospice, end-of-life care from non-cancer

7     conditions, and certainly with complicated pain management

8     conditions, they're going to require higher doses than what

9     you would typically use for someone who's just starting

17:01:34 10     treatment with opioids or someone who's just being treated

11     for an acute pain.

12  **Q**     Let's take a look at the CDC guideline that you talked

13     about, and this is Exhibit DEF-MDL-05689.

14     Oh, got the wrong -- no, I'm sorry, that's correct.

17:02:05 15          MR. MAJORAS:  So, first of all, Your Honor,

16     just for recordkeeping purposes -- nope.  We made the

17     correction.  I'm sorry, Your Honor.

18  BY MR. MAJORAS:

19  **Q**     Okay.  Dr. Wailes, back to you.

17:02:17 20     In terms of what you described to us as the guidelines

21     about primary care clinicians, where do we find that in this

22     document?

23  **A**     On the very top it describes, in the verbiage there,

24     in specific terms it says, for primary care providers

17:02:41 25     treating adults 18 plus with chronic pain, greater than

4758

**Wailes (Direct by Majoras)**

1    three months, excluding cancer, palliative, and end-of-life

2    care.

3    **Q**    So even the CDC says those types of pain patients, the

4    cancer, the palliative care, and end-of-life care wouldn't

17:02:59  5    be part of this guideline; right?

6    **A**    That's correct.

7    **Q**    And if you -- if we could take that down, please, and

8    we'll go to slide 30.

9        What are we seeing on slide 30 what you reference in

17:03:41 10    your report?

11    **A**    Yeah.  That's a reprint of an article from the CDC

12    trying to correct the misapplication of their guidelines to

13    the medical profession and the public stating that many of

14    their guidelines, including what we just heard about, were

17:04:00 15    misapplied.  They were not meant to be standards.  They were

16    not meant to be hard line thresholds not to exceed.  And

17    reading the text of the guidelines, you see that.  And I'm

18    sorry to say that Mr. Catizone did not use those guidelines

19    as intended.  He made it general for all -- all conditions

17:04:23 20    and all prescriptions and applied that guideline to all of

21    his prescriptions.

22    **Q**    Let's move to another one of Mr. Catizone's flags.

23        You recall that his first and second flags related to

24    distance traveled between the pharmacy or prescriber or the

17:04:41 25    prescriber and the patient?

4759

**Wailes (Direct by Majoras)**

1    **A**      Yes.

2    **Q**      Okay.  And if we go to slide 31, please.  And we've

3    seen testimony on this, but the distance he identifies is

4    cut off as 25 miles.

17:04:55 5       Do you recall that?

6    **A**      Yes, I do.

7    **Q**      What's your reaction to that particular flag and how

8    it could impact the treatment of -- appropriate treatment of

9    pain management?

17:05:05 10   **A**      In my experience and my understanding of multiple

11   other practices that traveling 25 miles is not uncommon at

12   all.  Certainly from Lake and Trumbull Counties, it's over

13   25 miles to a number of facilities, including for most of

14   Lake County, it would be to the Cleveland Clinic, or

17:05:28 15  University Hospital, certainly to University of Pittsburgh

16   Medical Center.

17       It's very common to travel more than 25 miles.  I

18   think about how many of my workers commute more than

19   25 miles to work in my office.  Likewise, patients travel

17:05:45 20  more than 25 miles to see their physician.  One reason they

21   may see their physicians while they're at work.  Others,

22   they may have to see a specialist.  Others, they've moved

23   recently and they want to stay with their doctors so they're

24   willing to travel a little extra distance.  So an arbitrary

17:06:04 25  25-mile distance would be exceeded numerous times.

## Wailes (Direct by Majoras)

```
 1    Q     Let's go to slide 34, please.

 2               MR. MAJORAS:  Your Honor, this part of the

 3    exam takes a little bit of time.

 4               THE COURT:  Yeah, I was going to -- I feel

 5    badly to cut off -- cut you and the doctor off in the

 6    middle, but I think it's -- if you're going through a number

 7    of these, if this is as good a time as any to stop, we

 8    should stop.

 9               MR. MAJORAS:  I think it's a good time,

10    Your Honor.

11               THE COURT:  All right.

12          Okay.  Thank you.

13          Ladies and gentlemen, we will recess for the day.

14    Usual admonitions apply.  Do not read, watch, listen to

15    anything you might encounter about this case or anything

16    remotely like it in the media.

17          Do not discuss the case with anyone.

18          Have a good evening, and we'll pick up tomorrow

19    morning at 9:00 with more of the doctor's testimony.

20             (Jury excused from courtroom at 5:07 p.m.)

21               THE COURT:  Okay.  Please be seated.  If you

22    just close the backdoor.

23          Doctor, you may be excused.  Have a good evening, and

24    I guess it's West Coast time, you can still do your

25    president of the medical association business now.
```

Timestamps in left margin:
17:06:23 (line 5), 17:06:35 (line 10), 17:06:49 (line 15), 17:07:02 (line 20), 17:07:48 (line 25)

1                    THE WITNESS:  Thank you.

2                         (Witness excused.)

3                    THE COURT:  Okay.  I don't know if anyone had

4      gone through any of the exhibits for Ms. Toiga or

17:08:02  5      Mr. Pavlich.  If we've got those, fine.  If not, we'll just

6      put them off till tomorrow.

7                    MS. FLEMING:  Your Honor, this is

8      Maria Fleming for plaintiffs.

9           Yes, we've already reviewed them.  No objections to

17:08:13 10      them.

11                    THE COURT:  All right.  Well, we -- can I

12      just -- I'll just read them in the record then.  That's

13      fine.

14                    MS. FLEMING:  Okay.

17:08:22 15                    THE COURT:  If we've got --

16                    MS. FLEMING:  It's the defendants' --

17                    MR. DELINSKY:  Do you want me to read them,

18      Your Honor?

19                    THE COURT:  Sure.  Mr. Delinsky, if you've got

17:08:28 20      them.  That's just as --

21                    MR. DELINSKY:  Sure.

22           It's Defendant MDL-11039, Defendant MDL-11038,

23      Defendant MDL-12271, Defendant MDL-12071.

24           And the only caveat, Your Honor, is I got every one

17:09:08 25      wrong yesterday, so I really am trying, but I think these

1    are right for Toiga.

2              THE COURT:  Okay.  Thank you.

3         All right.  So we'll -- if you can, you know,

4    overnight look at Mr. Pavlich, that's fine.

17:09:24  5         Okay.

6              MR. DELINSKY:  And, Your Honor, am I correct

7    for the record those are admitted?

8              THE COURT:  Yeah, admitted without objection,

9    those four.  Thank you.

17:09:30  10             MR. DELINSKY:  Thank you, Your Honor.

11             THE COURT:  Okay.  All right.  I guess for

12   today I had 1.25 for the plaintiffs and 5.25 for the

13   defense.

14        When the -- Mr. Weinberger or Mr. Lanier, I know

17:09:48  15   you're going to be looking hard at that issue with

16   distribution claims.  I've looked at the jury instructions.

17   The defendant -- the jury's not going to be asked to vote

18   separately on claims at all.  It's whether the defendants

19   committed an intentional and/or illegal action that was a

17:10:06  20   significant cause of a public nuisance in Lake -- one set --

21   Trumbull.

22        Candidly, there has not been, my recollection, much,

23   if any, testimony on illegal or improper orders, or red

24   flags on orders, or -- I just don't recall much, you know,

17:10:34  25   testimony at all about orders per se.  And as I pointed out

1    to everyone over a year ago, even if there are improper

2    orders, unless it's coupled with improper dispensing, there

3    can't be a harm because the drugs just stay in the pharmacy.

4    All right?

17:10:53  5    So. . . it may make this trial shorter and simpler

6    without distribution claims.  So, again, if you disagree,

7    then, you know, you'll file it, but I'm just -- I've given

8    it a lot -- some thoughts since the defendants raised their

9    motion, so. . .

17:11:12  10    Okay.  Anything else that anyone wants to bring up?

11    Obviously tomorrow we're, you know, however long it takes

12    with this witness and then we'll keep going.

13         MR. MAJORAS:  Your Honor, the only thing I

14    will note, and I have not discussed this with the

17:11:26  15    plaintiffs' counsel yet, our second witness tomorrow,

16    Dr. Murphy, is one that if -- if he goes through to the end

17    of the day and there's carryover, we'll have to break it

18    apart somewhat the way we did with Dr. Keyes, which seems --

19         THE COURT:  It may be easier to do a bunch

17:11:43  20    of -- some videos --

21         MR. MAJORAS:  We're going to look at that very

22    closely, Your Honor.

23         THE COURT:  All right.  I mean, that's -- you

24    know, again, particularly since there's a weekend, it may be

17:11:50  25    more coherent to just do some, you know, shorter depositions

4764

1    even though I know people tend to glaze if you have multiple

2    depositions.

3                    MR. MAJORAS:  These are fascinating,

4    Your Honor.

17:12:03  5                    THE COURT:  Fair enough.  But I -- you know,

6    it may be better to do that than to break someone up over

7    the weekend.

8                    MR. MAJORAS:  Thank you.

9                    THE COURT:  So you can work with the

17:12:13  10    plaintiffs on that.

11                    MR. LANIER:  Will you let us know tonight,

12    please?

13                    MR. MAJORAS:  Yes.

14                    MR. LANIER:  Thank you.

17:12:17  15                    THE COURT:  Okay.  Anything else?

16          Okay.  Have a good evening, everyone.

17                    COUNSEL EN MASSE:  Thank you, Your Honor.

18                    (Proceedings adjourned at 5:21 p.m.)

19

20                    **C E R T I F I C A T E**

21          I certify that the foregoing is a correct transcript
      of the record of proceedings in the above-entitled matter
22    prepared from my stenotype notes.

23          */s/ Heather K. Newman*                    *10-28-2021*
            HEATHER K. NEWMAN, RMR, CRR                    DATE

24

25