**4765**

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION AT CLEVELAND

 3      ------------------------------X
         IN RE:                       :    Case No. 1:17-md-2804
 4                                    :
         NATIONAL PRESCRIPTION        :
 5       OPIATE LITIGATION            :
                                      :    VOLUME 19
 6       CASE TRACK THREE             :    JURY TRIAL
                                      :    (Pages 4765 - 5048)
 7                                    :
                                      :
 8                                    :
                                      :
 9                                    :    October 29, 2021
        ------------------------------X
10

11

12                  TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13

14          HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16               SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20      Official Court Reporter:          Heather K. Newman, RMR, CRR
                                          United States District Court
21                                        801 West Superior Avenue
                                          Court Reporters 7-189
22                                        Cleveland, Ohio 44113
                                          216.357.7035.
23

24

25      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:          Peter H. Weinberger, Esq.
                                  SPANGENBERG, SHIBLEY & LIBER
 3                                1001 Lakeside Avenue, Ste. 1700
                                  1900 East Ninth Street
 4                                Cleveland, Ohio 44114
                                  216-696-3232
 5
                                  W. Mark Lanier, Esq.
 6                                Rachel Lanier, Esq.
                                  THE LANIER LAW FIRM
 7                                6810 FM 1960 West
                                  Houston, Texas 77069
 8                                813-659-5200

 9                                Frank L. Gallucci, III, Esq.
                                  PLEVIN & GALLUCCI COMPANY, LPA
10                                The Illuminating Building
                                  Suite 2222
11                                55 Public Square
                                  Cleveland, Ohio 44113
12                                216-861-0804

13                                Salvatore C. Badala, Esq.
                                  Maria Fleming, Esq.
14                                NAPOLI SHKOLNIK
                                  360 Lexington Ave., 11th Floor
15                                New York, New York 10017
                                  212-397-1000
16

17
     For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
18                                Brian C. Swanson, Esq.
                                  Katherine M. Swift, Esq.
19                                BARTLIT BECK LLP
                                  54 West Hubbard Street, Ste.300
20                                Chicago, Illinois 60654
                                  312-494-4400
21

22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:              Eric R. Delinsky, Esq.
                                       Graeme W. Bush, Esq.
 3                                     Paul B. Hynes, Jr., Esq.
                                       Alexandra W. Miller, Esq.
 4                                     ZUCKERMAN SPAEDER - WASHINGTON
                                       Suite 1000
 5                                     1800 M Street, NW
                                       Washington, DC 20036
 6                                     202-778-1831

 7    For Walmart                     John M. Majoras, Esq.
      Defendants:                     JONES DAY - COLUMBUS
 8                                     Suite 600
                                       325 John H. McConnell Blvd.
 9                                     Columbus, Ohio 43215
                                       614-281-3835
10
                                       Tara A. Fumerton, Esq.
11                                     Tina M. Tabacchi, Esq.
                                       JONES DAY - CHICAGO
12                                     Suite 3500
                                       77 West Wacker
13                                     Chicago, Illinois 60601
                                       312-782-3939
14

15    ALSO PRESENT:                    David Cohen, Special Master

16

17                        - - - - -

18

19

20

21

22

23

24

25
```

4768

1                          **I N D E X**

2                                                          **PAGE**

3    APPEARANCES......................................4766

4    DIRECT EXAMINATION OF ROBERT E. WAILES, ...........4782
     M.D.(CONT'D)
5    BY MR. MAJORAS

6    CROSS-EXAMINATION OF ROBERT E. WAILES, M.D. .......4816
     BY MR. LANIER
7
     REDIRECT EXAMINATION OF ROBERT E. WAILES, M.D......4983
8    BY MR. MAJORAS

9    RECROSS-EXAMINATION OF ROBERT E. WAILES, M.D. .....5009
     BY MR. LANIER
10
     DEPOSITION TESTIMONY OF STACY HARPER-AVILLA........5022
11
     AFTERNOON SESSION.................................4899
12
     CERTIFICATE......................................5048
13
14

15

16

17

18

19

20

21

22

23

24

25

         1              (In open court at 8:48 a.m.)

         2         THE COURT:  All right.  Everyone can be seated.

         3         Okay.  Everyone can be seated.

         4         Okay.  Do we have the exhibits for Mr. Pavlich and --

08:48:35 5    I guess he's the only one we have.  Okay.

         6         Any exhibits from either side with him?

         7              MR. SWANSON:  I'm sorry, Your Honor, for

         8    Pavlich, Your Honor?

         9              THE COURT:  Pavlich.

08:48:45 10              MR. SWANSON:  Yeah, Brian Swanson for the

        11    Walgreens.

        12         We admitted just -- or moved in just one exhibit.

        13    It's WAG-MDL-0111A, and I believe that's in without

        14    objection.

08:49:01 15              MR. WEINBERGER:  No objection, Your Honor.

        16              THE COURT:  Okay.  That's in without

        17    objection.

        18         Were the plaintiffs offering any with him?

        19              MR. WEINBERGER:  No, Your Honor.

08:49:08 20              THE COURT:  Okay.  That's easy enough.

        21         Okay.

        22              MR. WEINBERGER:  We're going to offer a

        23    photograph of the basement of his house.

        24              MR. SWANSON:  We object to the Steelers

08:49:24 25    garbage can, Your Honor.

4770

              MR. WEINBERGER:  I don't know if you noticed
but he had a Pittsburgh Steeler flag in the background.
              THE COURT:  I was focusing on his treadmill
but I didn't look at the trash can.
08:49:35        MR. LANIER:  All I know is my daughter said
she was glad the defense lawyer was there.  It made her feel
safer.
              THE COURT:  We'll see what the jurors are
wearing today.  If they kept their sweatshirts and things
08:49:46  from last Thursday night.
              MR. MAJORAS:  Your Honor, John Majoras.
        I have an issue to raise whenever you're done with --
              THE COURT:  Okay.  I was going to raise some,
but go ahead, Mr. Majoras.
08:49:55        MR. MAJORAS:  May I approach to hand up an
exhibit?
              THE COURT:  Sure.
              MR. MAJORAS:  Plaintiffs' 2848.
              MR. WEINBERGER:  Which one is that?
08:50:13        MR. MAJORAS:  Your Honor, I've handed up
Plaintiffs' Exhibit 2848.  I will hand one to Mr. Lanier.
        These are actually documents -- part of a document --
set of exhibits that were given to us last night.  This is
as -- it's pretty plain, actually an appeal of a divorce
08:50:33  proceeding between --

4771

```
                          MR. LANIER:  Your Honor, we're not using this.
  1
  2            Your Honor, Mark Lanier.  We're not using this.  We
  3   don't need to waste your time.
  4                  MR. MAJORAS:  Your Honor, it's just outrageous
08:50:42 5   that we even had to receive this.  And I'm looking at this
  6   this morning and having a debate how I might have to handle
  7   it with this witness.
  8                  MR. LANIER:  I didn't know anything about it,
  9   Judge.  I won't use this.
08:50:47 10                  THE COURT:  Hold it.  Let's slow down.  One
 11   person at a time speak.
 12                  MR. MAJORAS:  So if I may finish, Your Honor.
 13   This document is apparent on its face.  It's only a 2-page
 14   document.  It's a court proceeding.  If you look -- although
08:50:59 15   the name Robert Wailes is at the top, if you look the second
 16   paragraph on the bottom talks about a husband is a
 17   46-year-old in good health, a CPA working for a national
 18   accounting firm.  This is in Alabama.
 19            Clearly there are some allegations in this particular
08:51:15 20   divorce, which has nothing to do with this witness that in
 21   any case would not have been admissible or useful, but the
 22   fact we're getting this the night before while a witness is
 23   on the stand I believe is an outrage use of a document like
 24   this.
08:51:30 25                  MR. LANIER:  Judge, Mark Lanier here.
```

4772

1    A, I know nothing about this.  B, I'll represent to

2    the Court Pete knows nothing about this.  C, we'll find out

3    who among the abundance of lawyers that work on this MDL may

4    have done this and I'll have a talk with them.

08:51:49    5    But I have no intention of using anything like this

6    and would never use anything like this.  This is outrageous.

7    And if Mr. Majoras would have come to me with it, we could

8    have ended it without even taking the Court's time.

9                 MR. MAJORAS:  I saw it 15 minutes ago, or

08:52:03    10    15 minutes before I arrived here, Your Honor.

11                 THE COURT:  All right.  Well, look, this was

12    inappropriate.  It wouldn't have been. . . -- it has to do

13    with some other Robert Wailes.  Candidly, even if it had

14    been this Dr. Wailes, I don't think it would have been

08:52:18    15    admissible and it's -- I don't know if it's some sort of a

16    joke, but --

17                 MR. LANIER:  I -- I --

18                 THE COURT:  Well, I'm actually more

19    troubled --

08:52:26    20    I mean, Mr. Lanier, Mr. Weinberger, I -- no -- no one

21    should be handing documents or things to defense and vice

22    versa that you don't know about.  I'm actually more troubled

23    by that.

24                 MR. LANIER:  And I am as well, Your Honor.

08:52:44    25                 THE COURT:  Then someone --

```
 1                    MR. LANIER:  And I am as well.

 2                    THE COURT:  Someone gave it to them.  It

 3        didn't come out of the ceiling.

 4                    MR. LANIER:  And will find out, Your Honor,

08:52:53  5        and we will deal with it internally.

 6                    THE COURT:  No more -- no more -- because if

 7        it's given to them or they give something to you, the

 8        presumption is that either side is planning to use it at

 9        some point.  Otherwise, you know, why would you give it?

08:53:06 10        Why would you give it?

11               I would feel the same way if I were Mr. Majoras.

12                    MR. LANIER:  Yeah, and candidly, when he

13        handed me the document just now, I didn't realize it was a

14        different Robert Wailes.  When I was standing up saying --

08:53:16 15                    THE COURT:  Well, right.

16                    MR. LANIER:  -- I won't use it, I wouldn't

17        have used it if it was the right Robert Wailes.  That's not

18        a proper use, and I'm not that kind of lawyer, and I would

19        not have done that.  But I will chase down how this happened

08:53:28 20        and I will take care of it internally.

21                    THE COURT:  I don't want any more things like

22        that.

23               All right.

24                    MR. MAJORAS:  Thank you, Your Honor.

08:53:37 25                    THE COURT:  I have been sort of looking
```

4774

1   forward to the schedule for the remainder of the trial and

2   figuring out the best way to conclude it efficiently.  If

3   everyone uses all of their hours, remaining hours, we

4   will -- we'll conclude this trial on Wednesday,

08:54:01  5   November 10th.

6        Now, everyone may not use all their hours, but if they

7   do, that's what -- we'll end on Wednesday the 10th.  There's

8   going to be no court on Thursday the 11th because that's

9   Veteran's Day.  Unless there's a strong consensus to the

08:54:22 10   contrary, I don't think it's -- it's ideal to do final

11   arguments and jury instructions on Friday, finish at about 5

12   or 5:30 on Friday.

13        Now, you know, the jury may decide they want to

14   deliberate Friday night and all weekend.  I mean, I don't

08:54:41 15   set their rules.  I mean, I set them when we're in trial.

16   Once they deliberate, they decide when they start and when

17   they leave.  There's only one rule, they don't start

18   deliberating until everyone's there, but they set hours.

19   But typically it's been my experience that jurors tend to

08:54:58 20   keep roughly the same hours that they've been keeping.  So

21   they're likely to want to break for the weekend and --

22   without doing much deliberating, so I -- unless everyone

23   feels strongly to the contrary, I would just give everyone

24   Friday off, you could prepare your final arguments, and then

08:55:18 25   we would charge the jury and have final arguments on Monday,

1    I guess that's November 15th.  I'm going to fit it all into

2    one day.  We'll figure out everyone's time.  With three

3    defendants, it shouldn't be hard.

4         Now, if -- so that's my -- that's my thought if

08:55:38 5    everyone uses all their hours.  I mean, what does everyone

6    think about that?  I mean, if -- you know, there's strong

7    consensus is that we just -- you know, you have Thursday off

8    to prepare your arguments and then we do it on Friday, I'm

9    fine with that, but I just -- with a trial of this

08:55:57 10   magnitude, to have a 2-day break right after the arguments

11   and instructions, I don't think's ideal, but, it's your case

12   so you can think about that.

13                    MR. WEINBERGER:  Your Honor --

14                    THE COURT:  Now, if we -- if people don't use

08:56:11 15   all their hours and we finish on Monday or Tuesday, at that

16   point in time -- I don't think it's a good idea to have

17   people have -- jury have 5 days off, and so I would then,

18   you know, do closing arguments and instructions Thursday --

19   Wednesday, Thursday's off and then they start deliberating

08:56:34 20   Friday.  That's my -- that's my thought.

21        But again, you know, if there's an agreement on -- for

22   everyone by something else, I don't have a problem with it.

23   So you can think about it.  You don't have to decide right

24   now, but I think it makes sense to -- for everyone's

08:56:49 25   planning to start thinking about that.

1          MR. WEINBERGER:  Well, Your Honor, I would

2    like to address one aspect of what you've talked about at

3    the risk of. . . some displeasure perhaps on your part.

4          In terms of where we are in terms of the time that

08:57:07 5    we've used, I think we have about 17 hours left and. . .

6    could we have used our hours more efficiently?  Perhaps some

7    might suggest that to be the case.

8          We have tried carefully within the confines of what we

9    have to do to prune down our case substantially, including

08:57:36 10   the number of expert witnesses, and as the Court pointed out

11   yesterday, it actually impacted somewhat on our presentation

12   of the distribution side of the case.

13         I have no idea what defendants' intent is in terms of

14   the presentation of their defense.  If -- if they present

08:58:05 15   the witnesses that appear to be what their plan is, actually

16   it was my intent on Monday to request that we be given some

17   additional time, with additional time granted to the defense

18   also, for use in addressing the defendants' part of the

19   case, realizing also that it's always been this Court's goal

08:58:44 20   to ensure that this case ends before Thanksgiving.  And I'm

21   not --

22              THE COURT:  And with enough time to deliberate

23   before Thanksgiving.

24              MR. WEINBERGER:  Right.  Right.  And, so, I'm

08:58:56 25   not making a specific request at this point in time, but I

1       didn't want to, in light of what you've presented this

2       morning, I didn't want to not tell you what our concerns

3       are.  And I'm happy to put it in writing and explain the

4       basis for it and get it to you Monday morning, but I just

08:59:21  5       wanted the Court to understand that that's what we're

6       considering.

7                    MR. STOFFELMAYR:  Judge, may I saw a few words

8       about that?  Kaspar Stoffelmayr for Walgreens.

9            This would be -- the unfairness of this proposal is

08:59:37  10      impossible to state.  We objected to the Court's time

11      limits.  Plaintiffs endorsed them.  You imposed them over

12      our objection.  We have planned every day and every element

13      of our case around the time limits that we understood to be

14      the rules that all parties would have to play by.

08:59:58  15           If we are going to say, no, never mind, that wasn't

16      serious, we would -- every day of this trial would have been

17      different.  I can't even get my head around the idea that

18      that was just -- the 75 hours was just a suggestion and

19      if --

09:00:14  20                  THE COURT:  It was no suggestion.

21                    MR. DELINSKY:  And, Your Honor, if I could

22      add, there has been no person who has said less in this

23      trial than me, including starting with the very first

24      witness who was our own asking maybe three or four questions

09:00:32  25      to time again standing up and saying no questions for CVS

1    because we were budgeting for our case for the future.  That

2    bell can't be unrung.

3         And, Your Honor, if they are granted more time because

4    they did not exert the discipline that we excerpted, that's

09:00:49  5    a mistrial, and we will be seeking a mistrial.  We can't

6    change it.  Their case is over.  We cannot go back in time

7    and now recapture the additional hours that we would have

8    taken to make their case less compelling to the jury as it

9    was coming in.  That's a -- that's lost.  And we can't

09:01:09 10    change the rules now.  We absolutely can't.  And I would

11    reiterate what Mr. Stoffelmayr said, Your Honor, nobody has

12    been more vocal as well than my law firm and CVS in

13    objecting to the 75 hours to the point, Your Honor, where

14    Your Honor's last order on that called us -- said that our

09:01:27 15    argument bordered on frivolity when we continued to

16    challenge the time limits and were seeking around that.

17         And to at this point, after we've objected to, but --

18    and then accommodated, to say plaintiffs get extra

19    accommodation in a way that -- we can't rescue this trial

09:01:47 20    from that now.  We were too far along.  If this were raised

21    the first day, at our Pretrial Conference, that would have

22    been a different matter, but their case is over and the

23    prejudice here would be just immeasurable, and it would be a

24    mistrial, Your Honor.

09:02:00 25                   MR. MAJORAS:  Your Honor, John Majoras for

1    Walmart.

2         We join in all these well-stated objections.

3             THE COURT:  All right.  Well, I think

4    defendants have raised some very good points, that it's

09:02:24  5    really -- it would be -- I think it would be unfair to

6    change the rules at this point in time.  I mean, if you're

7    talking about an hour or two or each side, I mean the

8    difference between 75 and 76 or 77 for each side is not

9    dramatic, but if you're talking about any significant

09:02:40 10    change -- and I assume you are or else you wouldn't raise

11    it -- I'd have to think long and hard about doing it, and

12    the defendants have made some serious points.

13         So I -- you know, I -- I felt the time limits were

14    fair when I made them.  I mean, I've been a trial lawyer and

09:02:59 15    I think -- candidly, I think both sides have benefitted by

16    this because, you know, people have been efficient, and this

17    trial's moving along and the jury -- I mean, we have an

18    excellent jury, but I think part of the reason they're so

19    attentive is because the case has moved along, and we

09:03:16 20    haven't had a lot of repetitive questions.  The defendants

21    have been, you know -- they have only needed one person to

22    ask a question, so. . . so I'm -- the plaintiffs can make

23    their request, but I -- defendants have made some very good

24    arguments, and I would have to think long and hard about

09:03:37 25    whether it's fair to change things in any appreciable way at

4780

1    this point.

2        So I think people should operate on the assumption

3    that that 75 hours, and if everyone uses all 75 of their

4    hours, that's when we're going to end.  I mean, everyone can

09:03:56   5    do the addition the same way I have.

6        I guess, you know, does anyone have a reaction?  I

7    mean, you can that about that.  If everyone thinks, you

8    know, we should just -- if we end Wednesday, Thursday is off

9    and we do final arguments Friday, that's fine.  I'm just

09:04:16 10    thinking as a trial lawyer and, you know, as a judge,

11    that's -- ideally you want the jury to at least begin their

12    deliberations after you do the instructions and the closing

13    arguments and not have a 48-hour break, but, there have been

14    cases where it's happened that way.  So you can think about

09:04:37 15    it.

16        Okay.

17            MR. MAJORAS:  Your Honor, speaking only for

18    Walmart.  If that timing works out the way you're now

19    imagining it terms of the time, if we do end on Wednesday,

09:04:49 20    my initial reaction is, only on behalf Walmart, is that

21    makes sense in terms of what you described.  I think as we

22    go through next week we can have a better sense of the

23    likely end date and we can adjust, but if you're looking for

24    immediate reactions that's my immediate reaction.

09:05:06 25            MR. DELINSKY:  And, Your Honor, CVS concurs in

1    that.

2              MR. STOFFELMAYR:  I think we're in the same

3    place, although we haven't had a chance to discuss it among

4    ourselves.

09:05:14  5              THE COURT:  All right.  Well, you know, you

6    can think about it and talk to the plaintiffs, and, again

7    I -- I mean, this is obviously when it's in my discretion

8    what to do, but I -- it makes sense.  It's your case that

9    you're trying, it's not my case.

09:05:28  10         Okay.  And we can talk about that more next week and

11   get a sense, and, again, candidly, that -- in my view,

12   that's another reason that the trial may be just more

13   efficient at this point without distribution claims.

14         I don't -- the -- it would just take some minor

09:05:52  15   adjustment in the instructions, just basically deleting the

16   reference to distribution, but there are a lot of reasons

17   why that makes sense, but again, I'll see what the --

18   plaintiffs have to decide what they want to do.

19         Okay.

09:06:09  20             MR. MAJORAS:  Get the witness, Your Honor?

21             THE COURT:  Yes.  We can bring in the jury and

22   have Dr. Wailes come back.

23                 (Brief pause in proceedings.)

24             (Jury returned to courtroom at 9:08 a.m.)

09:09:01  25             THE COURT:  Good morning, ladies and

**Wailes (Direct by Majoras)**

1    gentlemen.  Please be seated.  I see you all have on your

2    Browns lucky shirts and sweatshirts, so hope that they work.

3        All right, Doctor, I just want to remind you you're

4    still under oath from yesterday.

09:09:13 5        And, Mr. Majoras, you may continue.

6            MR. MAJORAS:  Thank you, Your Honor.

7        Good morning, folks.

8        Good morning, Dr. Wailes.

9            THE WITNESS:  Good morning.

09:09:20 10      DIRECT EXAMINATION OF ROBERT E. WAILES, M.D.(CONT'D)

11   BY MR. MAJORAS:

12   **Q**    Let's just reorient ourselves just a bit to where we

13   were yesterday when we broke for the day yesterday, and you

14   were testifying about your concerns about Mr. Catizone's red

09:09:31 15   flags; is that right?

16   **A**    Yes.

17   **Q**    And if you could just explain to us again, why is this

18   important or of significance to you as a prescribing doctor

19   specializing in pain management?

09:09:45 20   **A**    Well, there's at least a couple reasons why it's

21   important.

22       Number one, Catizone specific red flags as compared to

23   general red flags capture so many patients of mine that

24   would apply to my patient population and apply to many

09:10:02 25   different groups, like oncologists and end-of-life care, and

4783

**Wailes (Direct by Majoras)**

1    so it's an overbroad set of red flags that is not specific

2    for terrible problems.  They're very overbroad.  So the fact

3    that it catches 19.4 percent or approximately 1 out of 5 of

4    all prescriptions means that it's not really very specific

09:10:27  5    at all.

6         Secondly, the fact that he clearly states that all red

7    flags must be resolved is problematic.  I believe it should

8    not be a mechanical stop like that, it should not be an

9    absolute, it should -- you should allow pharmacists'

09:10:47 10    judgment in whether to fill a prescription or not.  It

11    shouldn't be a bright line in the sand.

12         He makes very clear, and for at least two of his red

13    flags, that the prescription should never be given for the

14    combination of opioids and benzodiazapines, and then for the

09:11:11 15    combination of three drugs, that would be opioids,

16    benzodiazapines, and a muscle relaxant.  And I've already

17    given examples where those are used in my practice, not

18    frequently, but occasionally.  So you can't apply absolutes

19    to those.

09:11:32 20         Furthermore, by him saying that they must be resolved

21    implies that if there is a question -- and it's legitimate

22    for pharmacists to have questions -- if they cannot be

23    resolved, you, of course, would want to call the doctor or

24    get in touch, and there are examples where that doesn't

09:11:50 25    always work.  There's examples where the doctor may not be

4784

**Wailes (Direct by Majoras)**

1    available at the time of the call.  If he has to call an

2    orthopedic surgeon and they're in surgery replacing a hip,

3    they're not going to be out of surgery until 6:00 in the

4    evening.  Some pharmacies close at 5:00.  They may call the

09:12:08  5    doctor and they may not get the doctor until the on-call

6    doctor gets back.  There's plenty of examples where they may

7    not be able to clearly resolve any of these -- some of the

8    even simple red flags.  And if they can't resolve them, it's

9    my opinion that the pharmacist must have the patient's best

09:12:29 10    interest in mind and not cause patient harm.

11        The consequence of delaying or denying prescriptions

12    is significant.  It has the potential to have patients go

13    through withdrawal, and this can be very, very difficult.

14        So those are the main reasons why I'm opposed to

09:12:53 15    Catizone's red flags as he presents them.

16    **Q**    So let's go back to where we were yesterday where you

17    were talking about some of the specific red flags, and I'd

18    ask if Slide 34 could be put on the screen for you.

19        Could you explain what you mean in the information

09:13:10 20    you're providing here?

21    **A**    Yes.  This is reflective of one of his red flags, and

22    it's a red flag for when there's two different -- two or

23    more different prescribers or doctors that are providing a

24    controlled substance, and opioid in this case, and there's

09:13:31 25    an overlap.  And what that means by an overlap, it means

**Wailes (Direct by Majoras)**

1    that if I write a 30-day prescription and someone refills it

2    on a day or two or three, let's say three days early, that

3    would be an overlap.  If a different provider refilled that

4    within the three days before -- so, for example, if I wrote

09:13:56  5    a regular routine prescription for a 30-day supply, and then

6    the patient's scheduled to come back, we always have them

7    come back before they run out of medicine, so you never come

8    back on the day you run out, that would not be wise --

9    **Q**    Dr. Wailes, I apologize for interrupting, but you put

09:14:14  10    some slides together specifically on this top.  Would you

11    like --

12    **A**    Yes.  Yes, I did.

13    **Q**    If we can go to the next slide, please.

14    **A**    This shows a graphic of what I was going through.  If

09:14:24  15    a doctor gets -- or the patient gets a prescription on day 1

16    and the prescription's for 30 days from the physician, they

17    come back and follow-up -- we can go to the next slide,

18    please -- and the patient follows up with my PA or nurse

19    practitioner.  Very common scenario.  That would flag --

09:14:47  20    that would cause this red flag to occur, and again, this is

21    a very common scenario.  There's an overlap and they get a

22    prescription from someone -- a different prescriber.  In our

23    office we frequently share patients.  If I'm in the surgery

24    center doing procedures, my physician assistants frequently

09:15:05  25    help me write prescriptions for follow-up cases.  So this --

4786

**Wailes (Direct by Majoras)**

1    and the next slide please -- would show a list of things

2    that happen.

3        I need to let you know, this is a very common

4    occurrence, to have two different doctors prescribe within,

09:15:19  5    for example, the same month or the same period.  Every

6    patient that's referred to me, every patient that's referred

7    to me, they're going to get a prescription from two

8    different -- for opioids from two different doctors.  I'm

9    going to write them a new prescription.  So by definition,

09:15:35  10   they're going to have another prescription from a different

11   doctor.  That's two doctors that are going to be

12   overlapping.

13        Again, we never want patients to come back on the last

14   day of their prescription because the pharmacy may close,

09:15:49  15   they may get sick and not be able to go pick it up.

16   There's -- the pharmacy may not have that medication in

17   stock.  It's just not a wise thing to put yourself out like

18   that.

19        Other examples are any of the emergency room visits.

09:16:02  20   Emergency doctors and urgent cares are trained now to give

21   very small doses of medicine.  So if you go to an urgent

22   care now, you're not going to get many days supply.  You're

23   going to get a few days' supply, 3 to 7 days probably, and

24   you're going to want to follow up with your general practice

09:16:18  25   doctor, internist, whatever your primary doctor is, or an

4787

**Wailes (Direct by Majoras)**

1    orthopedic surgeon, whatever the follow-up is, you're going

2    to want to follow up before that few days' supply runs out

3    if you're still having problems.

4        If you're injured when you're out of town you'll

09:16:35 5    definitely get a prescription from a different doctor and

6    come back and see your own doctor.

7        And also if you go to an academic institution -- this

8    is very common.  If you go to the Cleveland Clinic or

9    University Hospital or University of Pittsburgh from Lake or

09:16:51 10   Trumbull Counties, it's very common you're not going to have

11   the same doctor write you the prescription each time.

12   You're going to go to the Clinic, you may see the attending

13   physician, the next time you may see the fellow or the

14   resident or the intern.  There's frequently at academic

09:17:06 15   centers different people writing for the prescription.

16   **Q**    Let's move to the next topic on -- in terms of your

17   comments about the red flags, and this relates to

18   short-acting opioids being received on the same day.  If we

19   can go to the next slide.

09:17:23 20       So I need to -- before you get into your concern about

21   this, let's do a little definition building if we could.

22       First, what is a short-acting opioid?

23   **A**    A short-acting opioid is one that has a relatively

24   short duration.  It's usually 4 to 6 hours.  More frequently

09:17:43 25   4 hours of active life.  And that would be the most common

4788

**Wailes (Direct by Majoras)**

1    things that you may be exposed to.  I think we have a slide

2    on the next -- our next slide shows some of the common drugs

3    for this.

4         These are call generic names.  You may be more

09:17:57  5    familiar with just the terms Vicodin or Percocet, Tylenol

6    with codeine or Tylenol Number 3.  Those are all examples of

7    short-acting opioids that don't have a long duration as

8    compared to extended-release types of medications.

9    **Q**    So in terms of treatment, if you have a short acting,

09:18:18 10    and then I'm going to assume there's a long-acting opioid or

11    there are long-acting opioids, is that right?

12    **A**    Correct.  There's many long-acting opioids, yes.

13    **Q**    So describe -- well, first of all, let's go back to

14    the previous slide if you would, please.

09:18:32 15         What is your concern about this particular red flag

16    that Mr. Catizone identifies, receiving two short-acting

17    opioids on the same day?

18    **A**    Well, like other of Catizone's red flags, there's just

19    a number of examples of things where it doesn't apply, or

09:18:49 20    maybe I should say it applies and it really shouldn't.  It

21    shouldn't be a red flag if it's in the normal course of a --

22    the practice of medicine.  And one clear example is if you

23    have cancer patients, you frequently need to supply them

24    different formulations of opioids to get through the day.

09:19:08 25         So, for example, if you have severe pain from any type

4789

**Wailes (Direct by Majoras)**

1    of cancer, you're going to get probably a short acting, you

2    may be getting a long acting also, we'll go through that in

3    the near future, so you may be getting too different types

4    of medications there, but on the short-acting medicine

09:19:27  5    that's what you're using for flare-ups in pain, for

6    intermittent pain that comes up.  If you're taking

7    chemotherapy, you may have terrible nausea and vomiting and

8    side effects from that chemotherapy.  So it's very common

9    for the oncologist, and sometimes in my case, to supply a

09:19:44  10    prescription for those patients to not just have pills to

11    take, but also use rectal suppositories.  That's actually a

12    really good way to provide medicines for people who have bad

13    nausea and vomiting.

14        Other examples where you may do two short-actings to

09:20:01  15    have alternatives is just realizing -- this is a little

16    wonky, it's a little technical, but many of the short-acting

17    medicines that you saw on that list come in two different

18    formulations.  One of the formulations is mixed with

19    Tylenol, so the Percocet, Vicodin, Norco, Percodan, they're

09:20:21  20    mixed with some other medicine, either Tylenol or aspirin,

21    and that's the most common -- commonly used formulations.

22    But if it has Tylenol in it, you don't want to give too much

23    Tylenol.  Actually, there's risks -- significant risks with

24    using too much Tylenol on a regular basis.

09:20:40  25        So if someone's on a fairly significant dose of

4790

**Wailes (Direct by Majoras)**

1    short-acting medicine with the Tylenol, a lot of time the

2    use of that medicine is limited by how much Tylenol you can

3    give in a day.  So if I want to bump this patient on a dose

4    of short-acting medicines to a little bit higher dose, I may

09:21:04  5  use a formulation that has no Tylenol in it at all.  So I

6    may have them on 10 milligrams of Norco or a Vicodin or a

7    Percocet, and those are all mixed with Tylenol, but if

8    they're taking maybe more than four or six of those a day

9    and I want to bump them up with a little bit more of the

09:21:25 10  opioid, I would give them a plain opioid without the

11   Tylenol.  And that would be the same drug in two different

12   formulations.  And that's another example where you may use

13   two different short-actings at the same time.

14   **Q**    So if in fact one is looking to determine whether a

09:21:47 15  patient has been prescribed two short-acting opioids is it

16   important to understand whether those medications are in

17   fact short or long-acting opioids?

18   **A**    That's correct.

19   **Q**    So let's go to the next slide.  There was a -- during

09:21:59 20  the testimony of Mr. Catizone -- I'm sorry, one more

21   slide -- during the testimony of Mr. Catizone there were

22   questions that we raised with him as to whether methadone is

23   a short-acting or long-acting opioid.  So I'll put the same

24   question to you.

09:22:15 25  **A**    Methadone is a long-acting opioid.  There's no

**Wailes (Direct by Majoras)**

1    question about this.  It is -- FDA defines it as that.

2    Every medical textbook and pharmacy reference and journal

3    article would describe opioid -- I mean, methadone as a long

4    acting.  It's half-life is approximately 24 hours.  It's a

09:22:32  5    long-acting medication.

6    **Q**    Now, there are multiple formulations of methadone; is

7    that right?

8    **A**    Correct, there --

9    **Q**    What --

09:22:38  10   **A**    Even immediate release.  It still is a long-acting

11   opioid no matter what formulations it's coming in.

12   **Q**    So if a red flag were to identify methadone as one of

13   the short-acting prescriptions that has been given, what is

14   your opinion of that?

09:22:54  15   **A**    That's clearly a mistake.

16   **Q**    Okay.  Let's move to the next slide, please.

17       This is another one of your comments -- examples that

18   you're giving with your concerns with Mr. Catizone's red

19   flags; is that right?

09:23:08  20   **A**    Yes, it is.

21   **Q**    Could you explain it, please?

22   **A**    So, I'm not sure how he came up with this, but in

23   essence what this is is a 200-day supply, just think about

24   210 days as 7 months, right, it's 30 times 7, and he's

09:23:25  25   saying within 6 months, which is, let's say, 180 days, so 6

4792

**Wailes (Direct by Majoras)**

1    times 30, and this would trip up multiple times just with

2    normal prescribing.  And I'll just explain the scenario

3    where this applies most easily, and then I'll go on to

4    explain other ways that it gets tripped up.

09:23:41  5    So if I give a regular prescription every month, and

6    some months have 31 days, by the way, but a month

7    prescription, every day on day 1 of when the prescription's

8    due, after 6 months the patient would be due for their 7th

9    month prescription, right?  So on a day 180, let's say,

09:24:05  10   they're due for their next prescription for the seventh

11   month.  Now, this -- that seventh month prescription,

12   especially if it's 31 days or you've had 31 days in any of

13   the months preceding, you're already going to have more

14   than -- for the seventh month it's already going to be more

09:24:26  15   than a 210-day day supply.

16   Okay.  So already by definition if you have 31-day

17   months and you do a 7-month supply, it's going to be more

18   than 210 days, and, again, you would always fill the seventh

19   month before the end of the sixth month, even if it's one

09:24:48  20   day before.  You don't want to fill the prescription after

21   you run out or on the very last day.  So just filling the

22   last month prescription a day before the end of the sixth

23   month is going to trigger this.

24   Now -- so that's one clear easy example.  Another

09:25:06  25   example --

4793

**Wailes (Direct by Majoras)**

1  **Q**    I'm sorry, Dr. Wailes.  I interrupt you from time to

2  time, I apologize.

3      Before you move on, though, I want to ask you, in

4  terms of the example that you just spoke about, can you give

09:25:15 5  the jury some sense as to whether that's just some far-out

6  example I came up with or whether it actually fits within

7  your practice and experience?

8  **A**    In my practice and experience this happens maybe the

9  majority of the time on routine prescribing.  Again, it's

09:25:32 10  every month you're going to give the seventh month, which

11  gets you over the 210-day supply.  You're going to give that

12  before the end of the sixth month.  So it's common.

13  **Q**    Okay.  Now, I'll try to bring you back to where I

14  interrupted you.  You were going to talk about another

09:25:47 15  example which I think you have a slide on.

16  **A**    Right.  So, also, within this red flag, he counts all

17  opioids prescribed.  And so if you count all opioids

18  prescribed and they happen to be getting two different

19  opioids -- and I'm going to run this through example to

09:26:06 20  explain why it's common to have two different opioids --

21  then you're going to trip up the 7-month supply in less than

22  6 months very quickly because he's counting for both of

23  those opioids.  And let me go through the example and then

24  I'll come back and try to tie that up.

09:26:24 25      So what I want to show you, I want to tell you the

4794

**Wailes (Direct by Majoras)**

1    punch line first, but this is going to demonstrate where

2    it's very common to use a long acting and a short acting

3    together, and this is very true for many of my patients with

4    chronic pain or cancer pain and end-of-life pain, which is

09:26:43 5    fairly constant throughout the day with variation.  And this

6    graphic is meant to show -- the red is the pain that the

7    patient's experiencing.  And there's some baseline pain all

8    the time in the patients that I just described, and within

9    the baseline, they always have some pain, but if they do

09:27:01 10    activities, such as going to physical therapy or trying to

11    garden in this example, or whatever activity, it may be

12    trying to prepare a meal, it may be trying to go for a short

13    walk, they're going to have increased pain during that time.

14        So -- next slide, please -- one way to treat that is

09:27:20 15    to provide them a long-acting opioid, and again, this is for

16    that patient population.  This is not for simple acute pain

17    or something like that, but if they have baseline pain, the

18    long-acting opioid is kind of shown in green here, overlaps

19    that baseline pain, and that can be very useful, and

09:27:39 20    long-acting opioids are very useful in helping chronic pain

21    and cancer pain and end-of-life pain.

22        But how do we cover those other areas of pain?  What

23    we do -- next slide, please -- is we add intermittent or

24    occasional -- thank you -- short acting, and that's what the

09:27:59 25    little green humps are designed to show, those are short

1   acting, of short duration, but they try to cover -- and it's

2   not perfect, never is perfect -- but it tries to cover those

3   times when you may be more active.  And we counsel our

4   patients to -- if you know you're going to physical therapy

09:28:14  5   or you know you're going to go for a short walk or you're

6   going to have increased pain, try to anticipate it and take

7   it ahead of time.

8        Again, our goal with medication therapy is to increase

9   the patient's activity.  The more they can exercise and be

09:28:30  10   active, the better outcome they're going to be, so that's an

11   important way to look at this.

12        So, many of our patients -- to tie it up and -- is

13   that many of our patients are on two opioids at a time, and

14   his particular red flag would count the long-term opioid

09:28:46  15   every month and then he would count the short-term monthly

16   supply also every month and, so, on paper, you would go

17   through 7 months of medications in 3 and a half months

18   because, again, there's two different opioids.  And that's

19   just, again, examples of common clinical scenarios that

09:29:08  20   would be a positive red flag under Catizone's red flag

21   criteria.

22   **Q**   If we could then turn to our next slide and one of

23   your -- and your comments about Mr. Catizone's red flags,

24   this relates to -- and we heard testimony about this --

09:29:28  25   whether a patient pays cash or doesn't use insurance for

4796

**Wailes (Direct by Majoras)**

1    filling a prescription.

2         What is your concern about that red flag?

3    **A**    I'm very concerned about that because many of my

4    patients are uninsured.  In the United States, over

09:29:42  5    10 percent of the population doesn't have insurance, doesn't

6    have Medicare, doesn't have Medicaid, doesn't have any

7    insurance.  Those patients have to pay cash.

8         In addition, the Medicare program historically has had

9    what's called a donut hole, and I can go into as much detail

09:30:01 10    as wanted, as desired.

11    **Q**    Why don't you do that briefly.

12    **A**    I'll try.  It's a complicated and not a very logical

13    scenario and the good news there is it's been phased out

14    literally this year, but up till this year Medicare Part

09:30:19 15    D -- again, there's different parts of Medicare, but for the

16    Medicare prescription coverage is called Part D, and if

17    Medicare patients pay -- and it's usually extra for Part

18    D -- if they pay for that, they get prescription coverage.

19    Sounds good.  And they only have co-pays up until a certain

09:30:45 20    amount of cost is expended, and in each year that certain

21    amount changed until 2001 when it went away -- 2021.  I'm

22    sorry, just this year.

23         So you got to get a co-pay up until a certain time.

24    And then, at that time, you had to pay cash for your

09:31:03 25    medications.  So it was a limited insurance, and you had to

**Wailes (Direct by Majoras)**

1      pay cash for your medications after you reached a certain

2      threshold.  And so many patients with Medicare would exceed

3      that threshold and have to pay cash for their medicines.

4           Now, Medicare not only covers the elderly, it also

09:31:22 5      covers the disabled.  If you're disabled for 2 or more

6      years, you're eligible for Medicare coverage, and many of my

7      patients that are chronic pain patients are medically

8      disabled and have Medicare as well.  And this applies to

9      them.  And so the donut hole is that period of time where

09:31:42 10      you have to pay cash for all your drugs.

11           The reason why it's called a donut hole is after you

12      go to a next threshold, it's maybe $2,000 more or something,

13      and it varied every year, until you reach that next

14      threshold, you paid cash, but once you reach the next

09:32:02 15      threshold then they had what's called catastrophic coverage

16      and they would kick in coverage again where you would have a

17      co-pay and the insurance would cover the rest.

18           So, anyway, that's a weird situation, but it applies

19      to Medicare patients, and Medicare patients that get

09:32:20 20      medicines on a regular basis know all about the donut hole

21      and having to pay cash for that.

22      **Q**     And is that information you provided -- which, thank

23      you, was very clear to me -- is that something that you have

24      to discuss with your patients from time to time?

09:32:33 25      **A**     Occasionally it comes up because if they're paying

4798

**Wailes (Direct by Majoras)**

1 cash, they're always asking me how much does the drug cost,

2 and I think that's -- those are relevant questions, yeah.

3 **Q** Let's move to your next slide, which is 46 by my

4 count.  And this is -- this is another comment you had with

09:32:52 5 respect to Mr. Catizone's flags 5 through 8, so there were

6 four different red flags that he talked about here.

7  We've had -- we've had a fair amount of discussion, in

8 fact you and I have had some discussion about the use of

9 opioids, benzodiazapines, and muscle relaxers.

09:33:12 10  Are you familiar with the phrase "trinity"?

11 **A** I am familiar with that, yes.

12 **Q** And when you talk about trinity, at least with respect

13 to these products, that's the combination we're talking

14 about, these three products on the screen?

09:33:22 15 **A** Right.  The trinity describes all three at the same

16 time, yes.

17 **Q** So what is your concern about Mr. Catizone's red flags

18 in this regard?

19 **A** Well, again, I'm concerned about his mechanistic

09:33:34 20 rigidity regarding this.  I've already given examples -- we

21 talked about spinal cord injuries, stroke, and other --

22 multiple sclerosis, severe types of problems that

23 occasionally, not frequently, but occasionally need to have

24 all three of these drugs together.  I've also talked about

09:33:52 25 end-of-life issues and hospice and cancer patients where

**Wailes (Direct by Majoras)**

1 opioids where benzodiazapines are used in combination. And

2 what I'm concerned about is that there are clinical

3 situations, and they're not many as I say, but there are

4 definitely clinical situations where you need to give all

09:34:12 5 three medications. And I'm concerned when I read

6 Mr. Catizone's report that he clearly and overtly states

7 that that's not appropriate and not right.

8   On Page 38 of this supplemental report he says that

9 the -- this trinity of three different medications is not

09:34:35 10 medically legitimate prescription. And if I've written

11 that, and I've have, he's calling my prescriptions not

12 medically legitimate.

13   Now, frankly, that sounds to me like a medical

14 opinion. I practice within the standard of care, and I

09:34:55 15 think they're medically legitimate prescriptions. He says

16 that they should never be utilized, likewise, on just the

17 combination of an opioid and a benzodiazapine, which I've

18 told you is used very commonly, and in my practice it's used

19 not uncommonly. We know there's risks, we know -- we can

09:35:16 20 talk about the risks, we can talk about the fact that it's

21 more common in overdoses, but in the appropriate dosing and

22 medical supervision and monitoring, it can be a very useful

23 combination for specific conditions.

24     MR. WEINBERGER: Your Honor, objection.

09:35:30 25   Can we have a sidebar?

**Wailes (Direct by Majoras)**

1           (Proceedings at sidebar.)

2           Your Honor, the reason for the objection is

3    that he is -- with respect to the opinion that Catizone

4    testified that the two -- combination of two out of the

09:36:01  5    three is not a legitimate prescription is absolutely

6    incorrect and a misstatement of the record.  It is clearly a

7    red flag, but he never testified that just two out of the

8    three was medically illegitimate.  You know, it's one thing

9    to have one expert testify about his criticisms of another

09:36:31 10    expert.  You know, he has done that multiple times in this

11    and I question the appropriateness of that, but be that as

12    it may, a -- this misquoting of a -- what's contained in a

13    report is absolutely improper.

14           THE COURT:  Well, I don't know that it's

09:36:53 15    intentional, I don't know if it's a mistake, but you can

16    certainly cross-examine him on it and shake him.

17           MR. MAJORAS:  Your Honor -- I'm sorry,

18    Your Honor.

19        In -- obviously he doesn't know the testimony.  We've

09:37:04 20    been restricted from showing him the actual testimony.  He

21    made a specific reference to the supplemental report of

22    Mr. Catizone, and if they want to bring that report out and

23    show him it's wrong, then obviously they can do that in

24    cross-examination.

09:37:18 25        With respect to --

**Wailes (Direct by Majoras)**

1      THE COURT:  Has this within seen the

2  supplement report of Catizone?

3      MR. MAJORAS:  Yes, he has seen the reports of

4  Mr. Catizone.

09:37:26  5      THE COURT:  All right.  Maybe he's made a

6  mistake.

7      And so, Mr. Weinberger, you can point out that he's,

8  you know, has been wrong, not precise, not careful, whatever

9  you're going to say and shake him that way.  That's fine.

09:37:41  10  But, I mean, he said what he said.  If he's wrong, he's

11  wrong, and you can point that out.

12      MR. MAJORAS:  And it's -- it's also consistent

13  with what Mr. Catizone actually did testify, which is that

14  the red flag, the trinity red flag, cannot be cleared.  His

09:37:57  15  testimony as to how --

16      MR. WEINBERGER:  Your Honor, okay.

17      MR. MAJORAS:  -- as to how two different

18  medications are used is simply his testimony as to how we

19  use them.

09:38:05  20      MR. WEINBERGER:  Your Honor, that's totally

21  incorrect, but that's okay, we'll cross on this.

22      THE COURT:  You can cross him and you can show

23  him Catizone's report, which is what he's testifying about.

24  And if he's wrong about Catizone's report, you can point

09:38:16  25  that out to the jury.  That's fine.

**Wailes (Direct by Majoras)**

1     MR. STOFFELMAYR:  Judge, before we wrap up,

2  Mr. Lanier pointed this out to me the other day.  It appears

3  the jurors can hear Mr. Weinberger.  Obviously, I'm sure --

4  I know it's unintentional, but we all just need to be

09:38:30  5  careful about that.

6     THE COURT:  Mr. Pitts, maybe we'll get white

7  noise louder.  All right?  Please, let's make the white

8  noise louder.

9     MR. LANIER:  Your Honor, my argument was not

09:38:45 10  that Mr. Weinberger could be heard, his voice projects away

11  from the panel.  My comment was that Mr. Stoffelmayr could

12  be heard.

13     THE COURT:  All right.  Well, I've asked

14  Mr. -- everyone should keep their voices down.

09:38:58 15     MR. MAJORAS:  I'm at the kid's table,

16  Your Honor.

17     THE COURT:  But we're going to get the white

18  noise louder.

19     All right.  Thank you.

09:39:21 20     (In open court at 9:39 a.m.)

21  BY MR. MAJORAS:

22  **Q**    Dr. Wailes, frankly, it's unclear to me as to whether

23  you may have been interrupted in what you were saying.  Had

24  you completed your answer?

09:39:28 25  **A**    Not exactly.

**Wailes (Direct by Majoras)**

1    **Q**    Please do.

2    **A**    I think I was in the part about just the combination

3    of an opioid and a benzodiazapine.  We've already talked

4    about the trinity, but just the two of them, again, do apply

09:39:41  5    in my practice, and in his supplemental report he uses the

6    phrase that this combination is contraindicated is the word

7    he used.  In medical parlance, that means should never be

8    used.  And again, I think that's a medical decision as to

9    when it's appropriate to use these particular two

09:40:03  10    medications together, and I take that very seriously and

11    everyone does when prescribing.  They look at the pros and

12    cons and risk and benefits, and that seems to be a medical

13    decision.  So I'm not comfortable with saying that all

14    patients who use those two medicines together is

09:40:23  15    contraindicated.

16        And I'm also really concerned about patient safety.

17    If he was or other pharmacists were to deny prescriptions

18    for those patients, again, they could go through withdrawal

19    and have terrible problems.  And so it all boils down to

09:40:38  20    patient safety.

21    **Q**    Dr. Wailes, I just want to make sure a couple things

22    are clear here.  You've not had the opportunity to either

23    watch Mr. Catizone's testimony or read it, have you?

24    **A**    No.  I was talking about his report.  I --

09:40:51  25    **Q**    That's where I want to go just so we're clear.  When

4804

**Wailes (Direct by Majoras)**

1    you talk about the report, these are the reports that expert

2    witnesses such as yourself and Mr. Catizone submit during

3    the course of the case; right?

4    **A**    Correct.  Yes.

09:41:03  5    **Q**    And he had -- he had multiple reports, one of which is

6    called the supplemental report?

7    **A**    Yes.  Correct.

8    **Q**    And that's what you're referring to; is that right?

9    **A**    Yes, it is.

09:41:10  10    **Q**    Okay.  Let's go to our next slide, which by my count

11    should be 48.  I think we talked about 47.

12        This now goes to Mr. Catizone's flags Number 12 and 13

13    which relate to the same strength medication and multiple

14    patients receiving a similar prescription if not identical

09:41:35  15    prescription in a one-hour period.

16        What's your concern?

17    **A**    Right.  This is, again, kind of a strange red flag

18    because it applies to certain types of situations that do

19    occur on not infrequent basis.  And again, if you're a

09:41:52  20    practicing pharmacist you would see this occasionally.

21        And if you can go to the next slide, there's many

22    different examples where doctors are -- have a routine.  I

23    mean, the easiest example would be an orthopedic surgeon.

24    You can do the next part of that slide if you want.  But

09:42:09  25    arthroscopies, they'll line up 4, 5, 6, 10 arthroscopies in

**Wailes (Direct by Majoras)**

|  |  |
|---|---|
| 1 | the same day, and they have the same routine for |
| 2 | postoperative pain for arthroscopies.  They're going to give |
| 3 | a certain number of Vicodin for a certain number of days. |
| 4 | It's just a routine that they do. |
| 09:42:23  5 | **Q**    Dr. Wailes, just so we're clear on some terminology -- |
| 6 | I unfortunately have direct experience -- but could you |
| 7 | explain what an arthroscopy is? |
| 8 | **A**    It's where you put a scope into the knee to do repair |
| 9 | work on the inside of the knee.  So you may have a meniscus |
| 09:42:38  10 | tear or something like that.  It's very common with |
| 11 | arthritis and athletic injuries to have knee problems, and |
| 12 | this is oftentimes the first approach to trying to repair a |
| 13 | knee problem is what's called a knee arthroscopy.  I |
| 14 | apologize, I throw medical terms out easily. |
| 09:42:56  15 | And so many surgeons have routine procedures that they |
| 16 | do.  Another example would be an oral surgeon doing wisdom |
| 17 | teeth.  That's common.  We all know about that.  And I |
| 18 | guarantee you they just have a routine that they use for |
| 19 | postoperative pain relief.  They'll give a certain number of |
| 09:43:14  20 | pills, the certain -- same pills, same number, and I'm not |
| 21 | sure how Mr. Catizone came up with the hour thing.  I guess |
| 22 | that's when they arrive at the pharmacy, because |
| 23 | prescriptions don't have a time written when we write them. |
| 24 | They have the date, of course, but it doesn't say when we |
| 09:43:31  25 | write them.  So the hour, I guess, is if all the patients |

**Wailes (Direct by Majoras)**

1    show up within one half or happen to be at the same pharmacy

2    within an hour, that's where he would be concerned.  And so

3    there may be four patients from urgent care, they have

4    routines for what they see for minor injuries and may use,

09:43:46  5    again, the same drug and the same dose.

6         Burn doctors, rheumatologists, see routine arthritis

7    problems.  And rheumatologists are similar to my specialty

8    because they deal with a lot of chronic pain.

9    Rheumatologists are arthritis doctors, and there's many

09:44:05 10   types of arthritis.  So they deal with a lot of chronic pain

11   because arthritis is an example where people have long-term

12   duration pain.

13        And, of course, pain management doctors, some of us

14   have routines also.  I don't use the same medications for

09:44:19 15   every patient, but in the course of a day, there may be four

16   patients that actually get the same month supply of Vicodin,

17   certain prescription, and they could show up at the same

18   time.  So it's just examples of -- examples of what we call

19   pattern prescribing, is that some doctors just have routines

09:44:38 20   and apply it to multiple patients.

21   **Q**    Is pattern prescribing a potential issue?

22   **A**    Not usually, no.

23   **Q**    I'd like to change topics now if I could, Dr. Wailes.

24        Do doctors -- in your experience, do doctors interact

09:44:56 25   from time to time with pharmaceutical manufacturers?

4807

**Wailes (Direct by Majoras)**

1    **A**    That's possible, yes.

2    **Q**    How about manufacturers of devices that you may use in

3    your practice?

4    **A**    Yes.

09:45:09  5    **Q**    Have you done that?

6    **A**    Could you rephrase the question?

7    **Q**    Sure.  And I'm -- I just used the word interact.

8        So, from time to time do physicians such as yourself

9    interact with either representatives of manufacturers of

09:45:25  10    pharmaceutical products or devices that you may use in your

11    practice?

12    **A**    Yes.

13    **Q**    And why do you do that?

14    **A**    I guess probably the most common interaction that we

09:45:35  15    would have is they may bring us lunch and tell us what the

16    latest, you know, changes are in their equipment or

17    medications.  They may try to give us updates or something

18    like that, educate us as to what's new or different or

19    information about their product, whatever it is.

09:45:52  20    **Q**    And from your perspective, what is the value or not in

21    those interactions?

22    **A**    I think it's interesting.  Most lunch conversations

23    are 5 or 10 minutes as we kind of just, you know, throw a

24    sandwich down or something like that.  It doesn't happen

09:46:06  25    very often for me.  Actually, we don't have that many reps

4808

**Wailes (Direct by Majoras)**

1    come by for lunch, but I sometimes find it useful

2    information, but mostly it just reaffirms what I've already

3    got through my continuing medical education and other

4    sources of information.

09:46:23  5    **Q**    So that was -- and I was going to ask you, how do you

6    go about evaluating what you were hearing from someone who

7    is actually making the product and talking to you about it?

8    **A**    Well, it's based on your experience and training and

9    other exposure to the same material.  And, so, again, we're

09:46:39 10   required to do continuing medical education, and so we go to

11   continuing medical education courses, we read journal

12   articles routinely in our specialty to keep up to date with

13   what's going on, and, so, really, at all points in time, I

14   have a pretty good feel for the market of different choices

09:46:57 15   of medications and of different devices that I use, and I

16   know there's pros and cons with each one.  I know the risks

17   and benefits that's up to me as a physician making decisions

18   to be well informed.

19   **Q**    And you have heard -- we had some discussion in this

09:47:14 20   case about Purdue Pharma, and I'm just going to ask you a

21   simple question.  You have heard that Purdue Pharma had been

22   investigated and pled guilty to federal charges at some

23   point in time?

24   **A**    I have a general understanding of that, yes.

09:47:26 25   **Q**    You earlier described some professional associations

4809

**Wailes (Direct by Majoras)**

1    that you've been involved with; right?

2    **A**    Yes.

3    **Q**    Looking back over time in your interaction and your

4    work in those associations, do you have concerns about

09:47:38  5    whether any of those organizations were collaborating with

6    drug manufacturers to mislead doctors?

7    **A**    There's a long history of support from device

8    companies -- in my specialty -- I'm going to talk about my

9    specialty -- there's a long history of support for

09:48:00  10   organizations from many of the device companies and

11   pharmaceutical companies and so forth for our educational

12   meetings, other -- mostly just educational meetings, I

13   think, is probably the most common thing that they would

14   donate money to.  And we have very strict disclaimers,

09:48:20  15   lecturers have to disclose if they're a paid lecturer for a

16   company.  They have to disclose that.  And so we usually

17   know up front if they're, if you will, on the payroll of a

18   thing.

19       Most slides have to be vetted by the company and they

09:48:42  20   get vetted by our association to make sure there's not bias.

21   In fact, to qualify for CME now, we have to be surveyed

22   after taking a course and one of the main -- I think it's a

23   standard question because I see it pretty much every time, I

24   think, is was there commercial bias in the presentation.

09:49:02  25       So back to your question, though, is that I think it's

4810

**Wailes (Direct by Majoras)**

1    common for organizations that put on educational meetings to

2    look for support, and I think they get that support from a

3    number of different places, including pharmaceutical

4    companies and device companies.

09:49:17  5    **Q**    And you had mentioned that you were aware of the legal

6    issues that Purdue Pharma had been facing at various times.

7    How does that impact or factor into your analysis of

8    products they may manufacture?

9    **A**    Well, it's my general understanding, and I'm not

09:49:34  10   expert in what happened with that litigation or the

11   settlement involved, I'm not expert in that, but it's my

12   understanding that they admitted to excessive marketing and

13   some marketing that was not accurate, wasn't all

14   scientifically based.  That's my understanding of what they

09:49:55  15   got in trouble for.

16   **Q**    And to be clear, my question wasn't what so much your

17   understanding was, the question is does it have any impact

18   on you as a prescribing physician that has used opioid

19   products to treat your patients over the 37 years you've

09:50:09  20   been doing it?

21   **A**    Yeah.  None of that money went directly to me, you

22   know, so I wasn't paid to do stuff.  I'm not a key opinion

23   leader.  I didn't do lectures for Pharma.  I was -- I did go

24   to meetings where they were one of the supporters of the

09:50:26  25   educational foundation -- or the education and so forth, but

4811

**Wailes (Direct by Majoras)**

1    even on the board of directors now at the American Academy

2    of Pain Medicine, there's no direct payments or any money

3    goes directly to any board member or leader within the

4    organization unless you're a consultant for the company, and

09:50:47 5    there are some, but most are not.

6         So for me personally, I never felt a significant

7    influence that way.  I was aware of their marketing, and

8    they did market very aggressively, I think, in the --

9    especially in the mid 2000s when OxyContin came out, and so

09:51:05 10   I was aware of that, but still, every decision that I make

11   as a physician is based on the individual patient's needs

12   and what I think is going to be best for them.

13   **Q**    And in terms, again, of the experience you have, the

14   37 years of working with -- I won't even ask you to identify

09:51:21 15   how many patients you've treated over that time -- what have

16   you been able to observe in terms of the effectiveness of

17   opioid treatment in your patients?

18   **A**    Well, clearly, ever since the start of my career in

19   1984, we've known that opioids help pain.  And so it's been

09:51:41 20   clear that it's been very useful for all types of pain.  It

21   needs to be applied carefully.  Opioids, like every other

22   medicines, have side effects.  But in my population, over

23   the course of my career, they've been an important part of

24   my treatment plan for chronic pain patients -- chronic and

09:52:00 25   other pain patients.

**Wailes (Direct by Majoras)**

1    **Q**    So, Dr. Wailes, as we sort of wrap my portion of the

2    questioning of this up, I want to try to see if we can pull

3    all this together, the conversations we had today and

4    yesterday.  And you've put together some slides outlining

09:52:15 5    your specific opinions in this case.  So let's see if we can

6    go through those quickly.  I'm not going to ask you a lot of

7    detail, but if there's something you see you want to

8    explain, please do.

9        So if we can go to Slide 50, please.

09:52:27 10       And is this one of the opinions that you want the jury

11    to take from your testimony?

12    **A**    Yes, and clearly restating what we've just said is

13    that the use of opioids has been standard of care for

14    treating acute and chronic pain for many years, even though

09:52:45 15    we know the risks are there for significant side effects,

16    including addiction and overdose.  We've -- those have been

17    well known throughout my entire career.  Since medical

18    school I've known about those serious risks.  Yet, luckily,

19    the benefits outweigh the risks the vast majority of the

09:53:06 20    time.

21    **Q**    If we can go to your next opinion.

22        You talk about the risk mitigating measures used in

23    clinical practice have evolved over time which has helped to

24    address the risk of abuse and diversion, but the clinical

09:53:23 25    benefits of opioids have not fluctuated.

**Wailes (Direct by Majoras)**

1        Is that your opinion, sir?

2    **A**    Yes, it is.

3    **Q**    Just so we're clear, when you talk about risk

4    mitigation or risk mitigating matters, could you tell us

09:53:34  5    briefly what that is?

6    **A**    So those are the measures that we use to try to

7    prevent or sometimes decrease the harm in patients that may

8    be at risk of addiction or overuse.  And so those are things

9    that we do now, and many of these we didn't do very

09:53:54 10    frequently in the past so this is part of the evolution that

11    we have learned over time.

12        And some of those things are like urinary drug

13    testing.  Really important to see if they have illicit drugs

14    or what else is going on in their life with testing.

09:54:06 15        The use of OARRS in Ohio, or the prescription

16    monitoring drug program, where you can see who else is

17    prescribing for the patient and make sure that you know

18    exactly what they're taking in terms of prescription drugs.

19        The frequent office visits where you actually monitor

09:54:24 20    the patient, you see them, you make sure that they're not

21    running out of medicines early.  We do a lot of controls

22    that we can assess how a patient's doing and try to minimize

23    the risk.

24        We also have much better informed consent now.  We

09:54:42 25    manage expectations better now in terms of what to expect

4814

**Wailes (Direct by Majoras)**

1    with their opioid prescription.  We recommend lock boxes.

2    There's a lot of -- for their medications so their kids or

3    the house cleaner doesn't steal their medicines and avoid

4    diversion.

09:55:00  5        We do a lot of things to try to decrease the risk of

6    misuse and addiction.

7    **Q**    And you mention in this slide about the clinical

8    practice and using risk mitigation factors or measures has

9    evolved over time.  This evolution over time, does that

09:55:18  10   relate to the standard of care that you've testified about?

11   **A**    Yes, just like the standard of care has evolved over

12   time, some of that involves using these different items to

13   decrease the risk.  Those have come into being more

14   recently.  For example, just the urinary drug testing was

09:55:35  15   really since 2010 has it really gained wide acceptance and

16   how found out useful that is.

17   **Q**    Okay.

18   **A**    So it's been over time, yes.

19   **Q**    I'm sorry.  And I think that leads into your next

09:55:45  20   opinion that you've summarized.  If you could -- if you

21   could read that to us, please.

22   **A**    Yeah.  I'm going to go in reverse order and read the

23   bottom first.

24        There was recognition in the 1990s that pain was being

09:55:57  25   undertreated and patients were suffering.  And the standard

4815

**Wailes (Direct by Majoras)**

|   |   |
|---|---|
| 1 | of care on how to treat pain, particularly chronic pain, has |
| 2 | evolved over the past several decades. |
| 3 | **Q**    And is that one of the opinions that you want to leave |
| 4 | with the jury as you testify in this case? |
| 09:56:13  5 | **A**    Yes. |
| 6 | **Q**    If we could turn to the next slide, please. |
| 7 |     Again, I'll ask you if you would read this. |
| 8 | **A**    It says, pharmacists cannot diagnosis a patient or |
| 9 | practice medicine. |
| 09:56:25  10 |     It says, refusals or delays to dispense a legitimate |
| 11 | prescription are dangerous and can be life threatening.  And |
| 12 | that relates, of course, to the potential to go through |
| 13 | withdrawal, even with a delay, to go through withdrawal, and |
| 14 | that really can affect patient safety. |
| 09:56:44  15 | **Q**    And the final summary of your opinions that you have |
| 16 | offered from your position as an expert in pain management |
| 17 | and practicing specialist in that over the last 37 years, we |
| 18 | talked this morning and yesterday afternoon about |
| 19 | Mr. Catizone's red flags. |
| 09:57:02  20 |     Could you please read this opinion? |
| 21 | **A**    This kind of summarizes that my comments and opinion |
| 22 | that Mr. Catizone's red flags capture a host of prescribing |
| 23 | circumstances that fall well within the medical standard of |
| 24 | care.  That's kind of what I've been talking about this |
| 09:57:18  25 | morning and at the end of yesterday. |

4816

**Wailes (Cross by Lanier)**

1        And if his -- Mr. Catizone's red flags were

2    implemented in clinical practice, it would significantly

3    interfere with legitimate patient care and safety.

4                    MR. MAJORAS:  Thank you, Dr. Wailes.

09:57:34  5        Your Honor, I pass the witness.

6                    THE COURT:  Okay.

7                    MR. LANIER:  Your Honor, is it plaintiffs'

8    turn or do the other defendants --

9                    THE COURT:  Well, I'll inquire.  I'm assuming

09:57:52  10    they don't, but I always should inquire, you're right.

11                    Mr. Swanson?

12                    MR. SWANSON:  Nothing for Walgreens.  Thank

13    you, Your Honor.

14                    THE COURT:  Okay.  Then you're up, Mr. Lanier.

09:58:16  15                    MR. LANIER:  Thank you, Judge.

16        May it please the Court.

17        Ladies and gentlemen, may it please you as well.

18        CROSS-EXAMINATION OF ROBERT E. WAILES, M.D.

19    BY MR. LANIER:

09:58:22  20    **Q**    Sir, my name is Mark Lanier.  You and I have had not

21    the pleasure of meeting.  Is that true?

22    **A**    That's true.

23    **Q**    Welcome from California.

24    **A**    Thank you.

09:58:30  25    **Q**    I've got a lot of questions to ask you.  I think what

**Wailes (Cross by Lanier)**

1      you've said is very serious thing and I really want to

2      challenge you on some stuff.  Okay?

3          I've got a road map for you, but before we get to the

4      road map, I want to ask you some general questions that

09:58:46  5  we'll use later on, just simple true/false questions.

6          That's you, isn't it?  Did I get the right picture?

7  **A**    That's me.

8  **Q**    All right.  Always want to do that right.

9          True or false.  Recognizing possible red flags for

09:59:11 10  invalid opioid prescriptions is a pharmacist's

11     responsibility.  True or false?

12 **A**    Generic red flags, that would be true.

13 **Q**    Not stepping in to investigate or resolve red flags

14     can lead to legal action under the Controlled Substances

09:59:39 15  Act.  True or false?

16 **A**    I'm not sure how to interpret that.  I don't -- could

17     you explain the question a little bit better, please?

18 **Q**    Yes, sir.  Take the two together, recognizing possible

19     red flags for invalid opioid prescription is a pharmacist's

09:59:52 20  responsibility, and not stepping in to investigate or

21     resolve red flags can lead to legal action under the

22     Controlled Substances Act.  True or false?

23              MR. MAJORAS:  Objection.  Scope.  Expertise.

24              THE COURT:  Let's go on the headphones.

10:00:13 25                (Proceedings at sidebar.)

**Wailes (Cross by Lanier)**

1              THE COURT:  Well, I heard the objection,

2    Mr. Majoras.  Obviously this witness has testified that he

3    himself was a registrant, so he's got to know at least what

4    a doctor's obligations under the CSA is, and I assume he

10:00:39 5    knows what a pharmacist's obligation, but --

6              MR. WEINBERGER:  Well, not -- you don't have

7    to just assume it.  I mean, he -- his whole testimony is

8    centered around the pharmacist's conduct.  So to --

9              THE COURT:  Well, that's what I -- I'll allow

10:00:54 10   the question.  I figure he should know this.

11              (In open court at 10:00 a.m.)

12   BY MR. LANIER:

13   **Q**    Please answer the question, sir.  True or false?

14   **A**    It's my understanding -- and I apologize, I don't

10:01:14 15   think red flags, that term, is used in the Controlled

16   Substances Act, so I'm not sure how this specifically

17   applies.  I'm not an attorney, so I am familiar with some of

18   the Controlled Substances Act, but I'm not familiar with any

19   reference to red flags in that act.

10:01:31 20   **Q**    So is your answer I don't know?

21              MR. MAJORAS:  Objection.  His answer is what

22   his answer is.

23              THE COURT:  Overruled.

24         You can answer that question, sir.

10:01:46 25              THE WITNESS:  I'm not familiar with the

## Wailes (Cross by Lanier)

1    requirement to investigate specific red flags in the

2    Controlled Substances Act.  I'm not familiar with it.

3    BY MR. LANIER:

4    **Q**    So you don't know.  That's fair to say?

10:01:57  5    **A**    I'm not clear on that question.

6    **Q**    I'll put not clear.

7          Is that fair?

8    **A**    Yes.

9    **Q**    Okay.  Next, I'd like to go through a list of red

10:02:12  10   flags and see if you would agree that these are red flags.

11         Opioid prescription concerns:  Red flags.

12         True or false?

13         Agree, don't agree, whatever you want to do on the

14   answer.

10:02:25  15        Multiple customers with prescriptions written by one

16   prescriber for the same drugs in the same quantities.  Red

17   flag or not?

18   **A**    How are you defining red flag?

19   **Q**    A red flag is something that is a pharmacist's

10:02:45  20   responsibility to identify where the pharmacist needs to

21   step in to investigate or resolve or it could lead to legal

22   action under the Controlled Substances Act.

23   **A**    So my answer to that is that it is possible to have

24   concern over this, but it's certainly not one of -- not a

10:03:08  25   legitimate red line in the sand where you would not fill a

4820

**Wailes (Cross by Lanier)**

1    prescription if you know -- if you know the prescriber and

2    you know what they do in the regular course of their

3    practice.  So you would need more information to know if

4    this is a legitimate red flag or not.

10:03:24    5    **Q**    You understand the concept of red flag is given by

6    Dr. Catizone, as given my witnesses for the defendants.  The

7    idea of a red flag is stop, be on alert, resolve the red

8    flag, and then either fill or refuse to fill.

9         You understand that's what a red flag is?  It's stop,

10:03:49    10    be alert, and then resolve it, investigate it.

11    **A**    My concept of a red flag --

12                   MR. DELINSKY:  Objection, Your Honor.

13    Objection, Your Honor.

14                   THE COURT:  Let's go on the headphones.

10:04:05    15                      (Proceedings at sidebar.)

16                   THE COURT:  What's the objection?

17                   MR. DELINSKY:  Your Honor, the objection was

18    that testimony of what testimony -- Mr. Lanier's testimony

19    in his question about what the question in trial has been

10:04:20    20    and what positions the defendants hold or not hold.

21                   THE COURT:  All right.  I'll sustain that.

22    You can ask -- I'll sustain that question, so ask another

23    one, please.

24                      (In open court at 10:04 a.m.)

10:04:43    25    BY MR. LANIER:

4821

**Wailes (Cross by Lanier)**

1    **Q**    You understand that a red flag, as a concept of stop,

2    don't just fill it, investigate it, resolve the red flag,

3    and then either fill or refuse to fill.  That's the concept

4    of a red flag.

10:05:01  5         Now, with that definition, is this a red flag?

6    **A**    That's not my understanding of red flag, so I think we

7    have a slightly different concept of red flags.  That's what

8    I'm challenged with.

9    **Q**    All right.  Let's write down your definition.  What do

10:05:16  10   you think to a pharmacist a red flag means?  So let's make

11   sure we're clear.  We're talking to a pharmacist, you've

12   been testifying about that quite a bit, to a pharmacist, a

13   red flag on an opioid prescription is what?

14   **A**    It's a prompt for further consideration to see if the

10:05:47  15   prescription is valid and appropriate -- valid and. . . how

16   should I say. . . not fraudulent. . . and written by a

17   licensed physician in the regular course of their practice.

18   **Q**    Anything else?

19   **A**    I think that's in general terms what a red flag

10:06:28  20   concept is.

21   **Q**    Did I write it right?

22        MR. MAJORAS:  Objection.  This isn't the

23   record.

24        Is that a question?

10:06:47  25        MR. LANIER:  I'm going to come back with this

4822

**Wailes (Cross by Lanier)**

1    to you.  I want to make sure I've accurately represented it

2    to you.

3                    THE COURT:  That's a fair question.

4         Overruled.

10:06:58  5                    THE WITNESS:  Yes, that's -- that's fair, I

6    believe.

7    BY MR. LANIER:

8    **Q**    So then within the framework of how you believe a

9    pharmacist defines a red flag is multiple customers with

10:07:18 10   prescriptions written by one prescriber for the same drugs

11   in the same quantities, is that a red flag?

12   **A**    Not routinely, but possibly.

13   **Q**    Customers with the same last name and street address

14   presenting similar prescriptions on the same day or within a

10:07:46 15   short time span.

16        Red flag or not?

17   **A**    Possible red flag.

18   **Q**    Two short-acting opiates prescribed together.

19        Red flag or not?

10:08:02 20   **A**    Possible red flag.

21   **Q**    Patients traveling long distances to fill

22   prescriptions.  The prescriber's located far from the

23   pharmacy.

24        Red flag or not?

10:08:16 25   **A**    Possible.

**Wailes (Cross by Lanier)**

1    **Q**    Unusually large quantity of a controlled substance.

2         Red flag or not?

3    **A**    Could you define that better, please?

4    **Q**    No.  That's the definition at it -- that's all I got.

10:08:34   5    **A**    I'm not sure what that is.  I don't know what large

6    quantity is.

7    **Q**    Well, you know what the CDC says in terms of size,

8    don't you?

9    **A**    I'm sorry.  Repeat the question.

10:08:43  10    **Q**    You know what the CDC policy is on what size should be

11    for dosing and what's considered large; right?

12    **A**    No, I don't.

13    **Q**    Okay.  So on this one you'll just say I can't answer.

14    Fair?

10:08:54  15    **A**    Correct.

16    **Q**    A pattern prescribing.  For example, a dentist writes

17    the same prescription for oxycodone for all patients

18    regardless of the procedure.

19    **A**    That would not usually be a red flag.

10:09:22  20    **Q**    Irregular dosing instructions.

21         Red flag?

22    **A**    Don't know how to interpret that.  I would need more

23    information.

24    **Q**    All right.  I'll say can't answer.

10:09:30  25              MR. MAJORAS:  Objection.  That's not -- that's

1      not his testimony.

2      BY MR. LANIER:

3      **Q**     Without more info.  Is that not your thing?

4      **A**     Yes.

10:09:42  5      **Q**     Lack of individualized therapy or dosing.

6            Red flag or not?

7      **A**     I would need more information.  I don't really

8      understand what that means.

9      **Q**     Early fills or refills.

10:09:58  10          Red flag?

11     **A**     Possible.

12     **Q**     Other pharmacies' refusal to fill the prescriptions.

13          Red flag?

14     **A**     Possible.

10:10:17  15     **Q**     Do you know what ER and LA stand for in a formulation?

16     **A**     Yes.

17     **Q**     Why don't you tell us, early relief --

18     **A**     Extended relief or long acting.

19     **Q**     Extended relief long-acting formulation for a patient

10:10:33  20     with no history of opioid prescription use based on

21     interview and PDMP.

22          Red flag?

23     **A**     Possible.

24     **Q**     The PDM report shows overlapping dates on

10:10:49  25     prescriptions.

4825

**Wailes (Cross by Lanier)**

1          Red flag?

2     **A**     Only possible.

3     **Q**     The PDM report shows multiple prescribers or

4     pharmacies.

10:11:05  5          Red flag?

6     **A**     Possible.

7     **Q**     Patient uses cash rather than insurance.  I think

8     you've already told us you don't agree with that red flag;

9     right?

10:11:18 10    **A**     What I said is there's numerous examples where it

11    doesn't apply and there's -- it's frequently legitimate

12    reasons for explaining that.

13    **Q**     Red flags can be resolved?

14    **A**     Yes, they can.

10:11:30 15    **Q**     My question is, should a pharmacist look into it?

16    **A**     Possible, yes.

17    **Q**     Prescription is inconsistent with the prescriber's

18    practice area.

19         Red flag or not?

10:11:48 20    **A**     Possible.

21    **Q**     Indication on a prescription is different from the

22    patient's description.

23         Red flag or not?

24    **A**     I'm not sure what you mean by that.

10:12:07 25    **Q**     Don't follow, or don't understand?

4826

**Wailes (Cross by Lanier)**

1    **A**    Correct.  I would need more information.

2    **Q**    Dosage is above guideline recommendations.

3         Red flag?

4    **A**    Possible.

10:12:24  5    **Q**    A potentially dangerous combination is prescribed,

6    opioid with a benzodiazapine and/or another central nervous

7    system depressant and/or a stimulant.

8         Red flag?

9    **A**    Possible.

10:12:41  10    **Q**    The prescriber's DEA number does not match records.

11         Red flag?

12    **A**    So doesn't match records?  You're saying that a -- the

13    prescriber doesn't have a -- has the wrong DEA number?

14    **Q**    Um-hmm.

10:13:04  15    **A**    That would probably be a red flag.

16    **Q**    Prescription is not presented within a reasonable time

17    for the indication, i.e., prescription for acute injury or

18    surgery dated several days earlier.

19         Red flag?

10:13:16  20    **A**    Possible.

21    **Q**    Illegible questionable abbreviations, signatures

22    different from that on file, different ink.

23         Red flag?

24    **A**    Yes.

10:13:37  25    **Q**    So if these red flags -- well, first of all, let me

4827

**Wailes (Cross by Lanier)**

1   ask you this:  On the ones that are possible, what do you

2   believe the pharmacist should do?

3   **A**     That would depend completely on the pharmacist's

4   judgment and situation of which we haven't really -- these

10:13:59 5   are hypotheticals, of course, in very broad terms, and it

6   doesn't talk about the specific information that the

7   pharmacist has available right in front of them so --

8   **Q**     Let me ask it this way:  Should the pharmacist resolve

9   the red flag before -- or the possible red flag before

10:14:18 10   dispensing the drug?

11   **A**     That's where the judgment comes in, and in many times

12   resolving -- I believe in red flags.  I mean, that's kind of

13   the bottom line here is the concept of a red flag is very

14   appropriate, I think we all agree on that.  Having rigid

10:14:38 15   limits utilizing red flags and denying or delaying

16   prescriptions I don't agree with.  And there can be examples

17   where, in the possibles that were there, there can be

18   examples where there's a red flag that you have some

19   concerns about and you may not be able to resolve it for one

10:14:58 20   reason or another --

21   **Q**     Right, you said like maybe it's after hours and the

22   doctor's not available.

23   **A**     There may be times like that, and where I differ

24   from --

10:15:07 25   **Q**     So what ---

4828

## Wailes (Cross by Lanier)

1    **A**      -- Mr. Catizone is that's where I believe a

2    pharmacist's judgment should come into play.  There may be

3    times when you cannot resolve a specific quote/unquote

4    general red flag where they still should allow the patient

10:15:24   5    to get it for patient safety.  That's where we differ in

6    some degree, and I -- and the examples would be things like

7    maybe it's not a very big dose of medicine, but it exceeds

8    what an arbitrary threshold might be, it might be just over

9    some dose, it's not a large enough dose to cause harm, but

10:15:46  10    if he can't get a hold of the doctor to verify that it's

11    correct, to deny that patient that dose of medicine would

12    cause harm, so I want the -- I want the pharmacist -- and

13    luckily currently this is how they practice, to have

14    judgment and have -- use their decision-making and the

10:16:07  15    information that's available to them to do the best thing

16    for the patient.

17    **Q**      So if I'm running drugs and I've got the prescription

18    or I'm diverting them, the secret under your plan is I just

19    go after hours where they can't contact the doctor and the

10:16:27  20    pharmacist can give it to me because the doctor doesn't

21    answer the call; right?

22    **A**      No.  I don't think that's a very simple scenario at

23    all.

24    **Q**      All right.  Spoiler alert, I'm going to get to your

10:16:38  25    exam now, but this list of red flags that you're saying are

**Wailes (Cross by Lanier)**

1    possible red flags and these statements about red flags that

2    you weren't clear on -- or at least one of them -- they come

3    from word for word from another expert hired by the

4    defendants in this case.

10:16:56  5        Do you know Kimberly Burns?

6    **A**    No, I don't.

7    **Q**    She's their expert who's a lawyer and a registered

8    pharmacist.

9            MR. MAJORAS:  Objection, Your Honor.

10:17:06  10    BY MR. LANIER:

11    **Q**    Have you read her report?

12            MR. MAJORAS:  Can we go to the headphones?

13            THE COURT:  I'll sustain that statement.  You

14    can certainly ask a statement, Mr. Lanier.

10:17:15  15    BY MR. LANIER:

16    **Q**    Yeah.  Have you read her report?

17            MR. MAJORAS:  Objection, Your Honor.

18            THE COURT:  Overruled.

19            MR. MAJORAS:  Can we go to the headphones,

10:17:22  20    please?

21            MR. LANIER:  Please don't clock my time on the

22    headphones.

23              (Proceedings at sidebar.)

24            THE COURT:  All right.  What's the objection?

10:17:32  25            MR. MAJORAS:  We have not called Ms. Burns and

**Wailes (Cross by Lanier)**

1    it's not clear that we will call.

2              THE COURT:  It doesn't matter.  He can --

3    Mr. Lanier can ask this witness what if anything he did to

4    prepare or work or do his expert report or prepare for

10:17:45 5    testimony.  If he says no, he says no.  If he says yes,

6    well, then, we'll see.

7              MR. MAJORAS:  Well, and I think he should be

8    asked, first of all, whether he's even see the report

9    because I don't know that that was asked.

10:17:56 10              THE COURT:  That was the question.  That was

11   the question.  Has he seen or read the report.  That was it.

12              MR. MAJORAS:  Okay.

13              (In open court at 10:18 a.m.)

14   BY MR. LANIER:

10:18:06 15   **Q**    I'll repeat the question.  Have you read her report?

16   **A**    I don't believe so.

17   **Q**    Because I've got your report and I read all of the

18   different things that were supplied to you by the legal

19   teams that represent these defendants.

10:18:21 20       To your memory, you were never supplied the report of

21   Kimberly Burns, Registered Pharmacist, JD?

22   **A**    Yeah, I apologize, I don't recall.  I'd have to -- I

23   could look at my report to see if it's on the list, but I

24   don't recall the information.

10:18:42 25   **Q**    And then my last review questions before I get into

4831

**Wailes (Cross by Lanier)**

1     your road map, you said lots of good things about opioids.

2            Fair?

3     **A**    Fair.

4     **Q**    Now, you know the plaintiffs, the people in these

10:18:54  5    counties we represent, they're not saying all opioids are

6     bad.

7            You understand that; right?

8     **A**    I don't know what people have been testifying.  I

9     apologize.

10:19:04  10   **Q**    Well, you've read our reports.

11    **A**    Yes, I've read your reports.

12    **Q**    Yeah.  You've -- you know our witnesses.

13           You said you knew Joe Rannazzisi; right?

14    **A**    I don't know him personally, I'm familiar with

10:19:19  15   comments that have been presented in front of me, some of

16    his excerpts.

17    **Q**    So is it a surprise to you that we're not saying all

18    opioids are bad?  Does that surprise you?

19    **A**    No, it shouldn't surprise me.

10:19:35  20   **Q**    Do you believe there's been an opioid epidemic?

21    **A**    I believe there's an illicit opioid epidemic

22    currently.

23    **Q**    Do you believe there has been a prescription opioid

24    epidemic in the United States of America at in point in time

10:19:50  25   since the year 2000?

**Wailes (Cross by Lanier)**

1    **A**    I believe that has been described as an opioid

2    epidemic, yes.

3    **Q**    So we have had a prescription opioid epidemic in this

4    country, according to you as well; right?

10:20:05  5    **A**    We have.  I would state that it has changed and since

6    prescribing ---

7    **Q**    Sir, I'm not asking you that.  Please hang on to my

8    questions.  Please.

9                    MR. MAJORAS:  Objection to the interruption,

10:20:18  10    Your Honor.

11                    THE COURT:  Overruled.

12    BY MR. LANIER:

13    **Q**    Did you see the numbers in these counties of overdose

14    and deaths?

10:20:25  15    **A**    I believe I have seen those.

16    **Q**    You have?

17    **A**    I believe so.

18    **Q**    Then we'll talk about those later.

19            All right.  Here's your road map.  I've got three

10:20:39  20    things I want to talk to you about, or I've divided it up

21    into three areas.

22            The first is who you are.  I'd like to get into it in

23    a little more detail.  Okay?

24            The second is vision limits, and by that I mean what

10:20:53  25    you've looked at and what you haven't.  Okay?

**Wailes (Cross by Lanier)**

                     And then the third thing I'd like to talk about is the

bigger picture.  All right?

                     Are you with me?

**A**     I am.

**Q**     Let's start with who is Robert Wailes.

                     Now, I got your CV when it was handed to me yesterday

as you started to testify; right?

                     Do you remember that?

**A**     I don't remember you being handed the CV.

**Q**     I got handed one.  You may not have been looking.

                     But I also downloaded your CV from the internet from

your pain clinic you run; right?

                     I'm assuming you keep that one accurate; don't you?

**A**     It's not as up to date as the one that was presented

in this case.

**Q**     I'm going to show you demo Number 76.  It is what's

listed on your website for your pain clinic as your CV.

                     Do you have 76 in front of you?

**A**     I believe. . .

**Q**     Does that look like your CV as the founder, co-owner,

and medical director of your pain clinic?

**A**     I believe so.

**Q**     By the way, we've heard a lot about pain clinics in

this trial, some of them even back used to dispense the

opioids themselves in your pain clinics.

4834

**Wailes (Cross by Lanier)**

1          Did y'all do that in your pain clinic?

2    **A**    For about two years we did for Workers' Compensation

3    patients on a very small basis.

4    **Q**    So yes?

10:22:56  5    **A**    Yes.

6    **Q**    Okay.  Just curious.

7          So you've got what is basically a 2-page resume.  I

8    guess it sort of goes on to the third page or 2-page CV; is

9    that right?

10:23:08  10    **A**    I believe so.

11    **Q**    And then you've got research publications down here.

12          Do you see those research publications?

13          Do you see it -- do you see that section?

14    **A**    I don't have that on my --

10:23:33  15    **Q**    Down on the bottom of Page 1.

16    **A**    No, I don't have that.

17                THE COURT:  I don't either, Mr. Lanier.

18                THE WITNESS:  I don't have it.

19                MR. LANIER:  CT exhibit demo 76.

10:23:48  20                MR. MAJORAS:  Correct.

21                THE COURT:  It's not on the one I have, so

22    it's probably not on the witness's either.

23    BY MR. LANIER:

24    **Q**    I'll put it up on the screen in the interest of time.

10:24:04  25          Do you see this?

**Wailes (Cross by Lanier)**

| | | |
|---|---|---|
| 1 | **A** | I do. |
| 2 | **Q** | Research publications. |
| 3 | | Do you see that? |
| 4 | **A** | Yes. |
| 10:24:12  5 | **Q** | Occipital Nerve Stimulation For the Treatment of |
| 6 | | Intractable Chronic Migraine Headache, a feasibility study. |
| 7 | | Do you see that as well? |
| 8 | **A** | Yes. |
| 9 | **Q** | Now, you did not right that, did you? |
| 10:24:35 10 | **A** | I was a co-author on that article. |
| 11 | **Q** | No, sir, you were not.  You swore under oath in this |
| 12 | | trial you were, in your deposition, you said, I was one of |
| 13 | | the co-authors; right? |
| 14 | **A** | Yes. |
| 10:24:47 15 | **Q** | I've got the article, sir.  We'll mark the article as |
| 16 | | CT demo 75. |
| 17 | | If we could pass that out, please. |
| 18 | | Do you have that article in front of you? |
| 19 | **A** | Yes, I do. |
| 10:25:14 20 | **Q** | Let make sure it's the same.  Occipital Nerve |
| 21 | | Stimulation For the Treatment of Intractable Chronic |
| 22 | | Migraine Headache:  ONSTIM feasibility study. |
| 23 | | Do you see that? |
| 24 | **A** | Yes.  This is not the article I was co-author in. |
| 10:25:33 25 | **Q** | It's what? |

**Wailes (Cross by Lanier)**

1    **A**    This is not the article I was co-author in.  This is

2    an article by Joel Saper, who's a headache specialist, but

3    he's not an interventional pain medicine physician like

4    myself.  This is a different article.

10:25:46  5    **Q**    Well, if you'll look, this is the one that's listed on

6    your CV, isn't it?

7    **A**    It may have used the same title, but this is not the

8    article that I was co-author for.

9    **Q**    Well, actually, that's on Page 2 of your CV, where it

10:25:59 10    continues.  It is the Saper article.  It's the exact same

11    article.  And you didn't write it, your an investigator, one

12    of many; right?

13    **A**    I have to apologize.  I did not put that on the CV

14    myself on the internet, and that's why it's not included in

10:26:19 15    the CV that was presented at this trial, and that appears to

16    be a mistake.

17        I have seen the article that I'm a co-author on.  It's

18    not in the journal Cephalalgia, and so my associate who put

19    together the website and wanted to be comprehensive about my

10:26:34 20    work appears to have made a mistake.

21    **Q**    Tell us where your article is published.  What

22    peer-reviewed journal.

23    **A**    I apologize, I don't specifically remember the name of

24    the journal, but it was a -- it was a headache journal.  It

10:26:49 25    was not Cephalagia, and I apologize.

4837

**Wailes (Cross by Lanier)**

1  **Q**    But you've got one publication to your entire 37-year

2  history.

3       Can you not remember where it was published?

4  **A**    I'm not a research specialist and so --

10:27:04  5  **Q**    That wasn't my question.

6  **A**    So the answer is no, I actually do not know the name

7  of that periodical.

8  **Q**    But the article that you got on the internet on your

9  CV is certainly not one you were an author of.

10:27:21  10       Fair?

11  **A**    It appears that that's accurate.

12  **Q**    No.  It appears that it's accurate that you got

13  something false on your CV; right?

14  **A**    The CV on the internet, which I didn't testify to

10:27:32  15  during the deposition, is --

16  **Q**    Well, it's not just on the internet --

17               MR. MAJORAS:  Objection, Your Honor.

18               THE COURT:  Hold.  Hold it.  Hold.  Let the

19  witness finish his answer and then you can ask another

10:27:42  20  question.

21               THE WITNESS:  -- appears to -- I'm sorry.

22               THE COURT:  You may finish your answer.

23               THE WITNESS:  -- appears to have a mistake.

24  BY MR. LANIER:

10:27:47  25  **Q**    And this isn't just on the internet, this is on the

**Wailes (Cross by Lanier)**

1    website for your pain clinic information about we can go get

2    your CV; right?

3    **A**    Yes.  I believe what you're saying is you got this off

4    the internet.

10:27:59 5    **Q**    I got it off your website.

6    **A**    I understand what you're saying, yes.

7    **Q**    I mean, this isn't like cruising through the mysteries

8    of the web.  This is go to your pain clinic, look you up and

9    see what it says about you.

10:28:15 10    Do you understand?

11    **A**    I understand.

12    **Q**    And what it says about you, it's got everything you've

13    done.  It just gives you research publications you didn't

14    write; correct?

10:28:26 15    **A**    That is a mistake, that's correct.

16    **Q**    And the one that you are claiming under oath to have

17    written and published in a peer-reviewed journal, you just

18    don't remember what it was?

19    **A**    That's correct.

10:28:38 20    **Q**    I'm sure we'll find it and I'll get to ask you on

21    redirect.  Let's keep going about who you are.

22    I took your CV and I compared it to Carmen Catizone's.

23    You read his report, didn't you?

24    **A**    Yes.

10:28:59 25    **Q**    You read his CV, which was attached to his report,

## Wailes (Cross by Lanier)

1    didn't you?

2    **A**    I glanced at it.

3    **Q**    It's pretty impressive, isn't it?

4    **A**    He has a lot of history.

10:29:11  5    **Q**    Oh, no, it's not just that, I mean, look, do you see

6    all of his presentations?

7                    MR. MAJORAS:  Objection.  Scope.

8                    THE COURT:  Overruled.

9                    THE WITNESS:  Again, I glanced at his CV.  It

10:29:24  10    had quite a few entries.

11    BY MR. LANIER:

12    **Q**    Standard of Regulatory Approach Presentation at the

13    Virginia Board of Pharmacy.

14          Have they ever invited you to speak?

10:29:33  15    **A**    No.

16    **Q**    Understanding Corresponding Responsibility and Red

17    Flags in Pharmacy Cases, presentation at the DEA Federal

18    Pharmaceutical Drug Investigation and Prosecution Training.

19          Have you ever been asked to speak there on red flags

10:29:51  20    and corresponding responsibility?

21    **A**    No.

22    **Q**    The National Heroin Task Force Subcommittee Meeting in

23    DC.

24          Were you asked to speak there?

10:30:02  25    **A**    No.

**Wailes (Cross by Lanier)**

1    **Q**    The Prescription Opioid Abuse, Misuse and Diversion,

2    Try Regulator Collaborative Boards of Directors Meeting that

3    had the Federation of State Medical Boards, National

4    Association of Boards of Pharmacy, and National Council of

10:30:18  5    State Boards of Nursing.

6         Were you asked to speak there?

7    **A**    No, sir.

8    **Q**    Expert testimony.  Has the United States ever called

9    you to be their expert witness?

10:30:30 10    **A**    No, sir.

11    **Q**    In fact, you're testifying against them by these --

12    two of these same pharmacies have hired you in Florida to

13    testify, haven't they?

14    **A**    I am working on another case in Florida.

10:30:42 15    **Q**    Yeah, against the government; right?

16              MR. MAJORAS:  Objection, Your Honor.  Headset,

17    please.

18                   (Proceedings at sidebar.)

19              MR. DELINSKY:  Your Honor, fair cross is fair

10:31:00 20    cross, but stating inaccuracies is not.

21              THE COURT:  Well, let's -- well, I don't know

22    what the facts are here.

23              MR. DELINSKY:  There's no case by the --

24              THE COURT:  Hold it.  Hold it.  Hold it.

10:31:11 25         Mr. Lanier, you asked the question.  What's the case

4841

**Wailes (Cross by Lanier)**

1    you are cross-examining on?

2              MR. LANIER:  There's a Florida case that he

3    has issued a report on against, I believe is the DEA is the

4    branch of the government.

10:31:21  5              MR. DELINSKY:  False.

6              MR. MAJORAS:  False.

7              MR. LANIER:  I'll put the report.

8              THE COURT:  You represented a case.  Is there

9    a case been filed?

10:31:28 10              MR. LANIER:  Your Honor, yes.  He's issued a

11   report.  He's gone against Professor Doering's opinions.

12              THE COURT:  I just want to know, what is the

13   case.

14              MR. DELINSKY:  It's the A.G. case, Your Honor.

10:31:40 15   It's the Florida State A.G. case against the Walgreens and

16   CVS.  It's not by the United States.  It's not by DEA.

17              THE COURT:  Well, it's a state -- all right.

18   Then you've got to clarify the question.  If it's the State

19   of Florida against some of the pharmacies, then you can't

10:31:50 20   represent it has the U.S. Government or DEA.

21              MR. DELINSKY:  And, Your Honor --

22              MR. LANIER:  And then that's fair, Your Honor.

23              THE COURT:  Hold it.

24              MR. LANIER:  I'll clarify it.

10:31:57 25              THE COURT:  So let's just get the facts.

4842

**Wailes (Cross by Lanier)**

1              MR. LANIER:  I had said against the

2       government.  I'll make it clear.  I mean, the government of

3       the State of Florida.

4              MR. DELINSKY:  Okay.  But, Your Honor --

10:32:02  5              MR. MAJORAS:  He stated the United States

6       Government.

7              MR. DELINSKY:  Your Honor, that corrects the

8       misstatement.  It does not address the 402 and 403 --

9              THE COURT:  Well, Mr. Lanier, will just say I

10:32:14 10     made a mistake.

11             MR. DELINSKY:  No, but, Your Honor, there's

12      a -- there's a deeper issue here --

13             THE COURT:  What is the deeper issue?

14             MR. DELINSKY:  -- which is whether the state

10:32:22 15     A.G. of Florida has brought a case against CVS and Walgreens

16      is irrelevant and it's prejudicial.

17             MR. LANIER:  Not when they bring the same

18      expert and he's issued a report there, and I've got his

19      opinions in those reports and it bears --

10:32:35 20             THE COURT:  Hold it.  Hold it.  Hold it.

21         I'm not going to allow Mr. Lanier to get into any

22      allegations in this case.  But the fact that this witness

23      has been hired by the defendants to represent them or to

24      testify for them in a case brought by the State of Florida,

10:32:52 25     that's relevant.

4843

**Wailes (Cross by Lanier)**

1          MR. DELINSKY:  All right.  We object to that,

2     Your Honor.  We ask for a curative instruction -- or a

3     limiting instruction as to the purpose for which that can be

4     used and a corrective instruction on the United States

10:33:03  5     issue.

6          THE COURT:  Well, first, Mr. Lanier is going

7     to correct the question.  All right?  He'll simply just say,

8     I misspoke.  Here's the case, and if you want, what do you

9     propose I say?

10:33:10 10          MR. DELINSKY:  Well, Your Honor, I want to

11     think about it, but I will say this --

12          THE COURT:  Well, think about it, and then --

13          MR. DELINSKY:  No, Your Honor, I'm not done

14     yet.  I will say this for the record.  Florida has become a

10:33:16 15     hot-button issue in this case.

16               [Court reporter clarification.]

17          MR. DELINSKY:  Over our -- over our objection.

18     It is -- what has come in about Florida to begin with has

19     been extraneous and now it's being compounded.

10:33:28 20          Your Honor, this is --

21          THE COURT:  Mr. Delinsky --

22          MR. DELINSKY:  -- we are in the land --

23          THE COURT:  Mr. Delinsky, you all called this

24     witness, okay?  You had him do a whole lot of testifying.

10:33:36 25     This is fair cross-examination.  You should have known it

4844

**Wailes (Cross by Lanier)**

1    was going to come up.  I'll instruct the jury that they

2    can -- you want me to say they can consider it on bias?  You

3    tell me what you want to say and I'll consider it.  Until

4    now -- until then, I'm not going to say you anything.  You

10:33:56  5    propose something.

6                    MR. DELINSKY:  We will draft a limiting

7    instruction.

8                    THE COURT:  All right.  Fine.

9                    MR. WEINBERGER:  Your Honor, can we --

10:33:59  10                    MR. DELINSKY:  Over -- but our objection

11    stands.

12                    THE COURT:  I'm moving on.  I'm moving on.

13                    MR. WEINBERGER:  Your Honor, can we begin to

14    take --

10:34:03  15                    THE COURT:  I've moved on.

16                    MR. WEINBERGER:  Can we keep track of the

17    time, please?

18                    (In open court at 10:34 a.m.)

19    BY MR. LANIER:

10:34:17  20    **Q**    Sir, let me be clear.  I say government, the

21    government brought it.  It's the State of Florida.  That's

22    the government.  It's the state government of Florida.  I

23    don't want there to be a misunderstanding that I'm talking

24    about the U.S. Government.  Okay?

10:34:29  25                    MR. DELINSKY:  Objection, Your Honor.

**Wailes (Cross by Lanier)**

1        THE COURT:  Overruled.

2    BY MR. LANIER:

3    **Q**    You've been hired by two of these pharmacy, Walgreens

4    and CVS; is that right?

10:34:35 5    **A**    I believe so.

6    **Q**    So CVS and Walgreens have hired you in the State of

7    Florida to issue opinions very similar to the ones that

8    you've issued here; right?

9        MR. DELINSKY:  Objection, Your Honor.

10:34:46 10        THE COURT:  Overruled.

11        THE WITNESS:  Can I -- I have a question.

12    I have some confidentiality agreements with the case.

13    Am I -- I'm not sure if I'm able to talk about that or

14    not.

10:35:00 15        THE COURT:  Okay.  Well that's your answer

16    then.

17    BY MR. LANIER:

18    **Q**    Congressional testimony by Dr. Catizone, on and on and

19    on for pages.

10:35:10 20    Have you been ever asked to give Congressional expert

21    testimony on the issue -- on any issue?

22    **A**    No, sir.

23        MR. MAJORAS:  Your Honor, I object to the

24    continuing reference of Dr. Catizone.  He's Mr., he's not a

10:35:25 25    doctor.

1          MR. LANIER:  He has an honorary doctorate,

2     Your Honor.  I think that's clear on the record.  It's been

3     said.

4          MR. MAJORAS:  Honorary doctor?

10:35:29  5          THE COURT:  Let's go with Mr. Catizone.  All

6     right?

7          MR. LANIER:  And I'm fine doing that.

8     BY MR. LANIER:

9     **Q**    You were just calling him Catizone.  I just hate to do

10:35:37 10    that.  Mr. Catizone.

11         Is that fair?

12    **A**    That's fair.

13    **Q**    He's worked with the DEA.

14         Have you ever worked with the DEA?

10:35:48 15    **A**    Only through the Medical Board of California

16    investigations.

17    **Q**    Testified on behalf of -- well, I -- that's getting

18    redundant.  Hold on.

19         His chapters he's put in books and articles, have you

10:36:12 20    done any of that, other than that one article you don't

21    remember?

22    **A**    Is it possible for me to refer back to that article

23    for just one moment?

24    **Q**    To your article?

10:36:25 25    **A**    Yes.

4847

**Wailes (Cross by Lanier)**

1    **Q**    Well, just answer this question first.  I'm sure we'll

2    have a chance to dig out the other article later.  I want to

3    get the one that's the right one for you to look at, but

4    let's look at this, chapters and books and articles.

10:36:39  5        Do you have any?

6    **A**    Again, I'll -- I still have one article.  It's not the

7    one presented to me, but my name actually is in that

8    article.

9    **Q**    Oh, yeah.  I -- I said to you that --

10:36:52  10  **A**    I don't have any other articles.

11   **Q**    Demonstrative 75, you're listed in the back -- first

12   of all, authors are listed on the front, and that's a big

13   prestigious deal, isn't it?

14   **A**    I understand.

10:37:06  15  **Q**    And authors have to give all of their conflicts and

16   potential conflicts; right?

17   **A**    Usually.

18   **Q**    Authors get credit for that and get to list it on

19   their CVs; correct?

10:37:18  20  **A**    I understand.

21   **Q**    And you're here in the back under acknowledgements.

22   It's the little back section right before the references.

23       Do you see that?

24   **A**    I understand that.  And I would say that any research

10:37:37  25  study has multiple different publications that result from

4848

**Wailes (Cross by Lanier)**

1    the research, and this was one of those that I was not

2    directly involved in the article.

3    **Q**    The authors acknowledge the contributions of the

4    investigators who participated in the study, and -- along

10:37:54  5    with all of these other folks, you're listed, Robert Wailes;

6    right?

7    **A**    Yes.

8    **Q**    But that's not an author, those are the author's

9    acknowledging you and a bunch of others who contributed data

10:38:11  10   for their paper; correct?

11   **A**    That's correct.  It was another article that I was

12   co-author on.

13   **Q**    Yeah.  We'll find that and talk about it.

14         Now, another big difference between you and

10:38:24  15   Mr. Catizone -- and so we're clear, master of science,

16   registered pharmacist, and a doctor of pharmacy.

17         Do you see that?

18   **A**    I do see that.

19   **Q**    The other difference between you and him is he came in

10:38:40  20   here and he was charging 300 bucks an hour; right?

21   **A**    I don't know that, but I believe you.

22   **Q**    Yeah.  And you're -- you said yesterday you were

23   basically 14 hundred bucks.

24         Is that a day?

10:38:57  25   **A**    $1,395 for witness testimony an hour.

**Wailes (Cross by Lanier)**

|  |  |  |
|---|---|---|
| 1 | **Q** | An hour.  So you make over 10 grand a day doing this? |
| 2 | **A** | If I testify for that long, I would. |
| 3 | **Q** | So -- well, let's compare you to another doctor. |
| 4 | | You know Dr. Lembke; right? |
| 5 | **A** | I know who she is. |
| 6 | **Q** | You saw her expert report, didn't you? |
| 7 | **A** | Yes, I did. |
| 8 | **Q** | You got a chance to see our addiction specialist and |
| 9 | | her opinions; right? |
| 10 | **A** | Yes, I did. |
| 11 | **Q** | And you saw attached to that report her CV, which was |
| 12 | | demonstrative 18 for the jury; right. |
| 13 | | And she's -- it's pretty impressive too, isn't it? |
| 14 | **A** | She has an impressive CV. |
| 15 | **Q** | I mean, this is someone who's at Stanford University |
| 16 | | School of Medicine. |
| 17 | | That's a good medical school, isn't it? |
| 18 | **A** | Yes, it is. |
| 19 | | MR. MAJORAS:  Objection to continuing to march |
| 20 | | through other's CVs. |
| 21 | | THE COURT:  Overruled. |
| 22 | | BY MR. LANIER: |
| 23 | **Q** | She teaches at Stanford University.  That's a good -- |
| 24 | | that's a notable position, isn't it? |
| 25 | **A** | That's an important academic position. |

10:39:28 5

10:39:39 10

10:40:03 15

10:40:13 20

10:40:22 25

4850

**Wailes (Cross by Lanier)**

1    **Q**    And not only that, she does clinic work there.

2         Did you know that?

3    **A**    I was aware that she does some -- some part of her

4    career a clinic.

10:40:36  5    **Q**    Oh, yeah, she sees patient routinely.

6         Did you know that?

7    **A**    I do now.

8    **Q**    Ad hoc manuscript and report review.

9         Did you see all of the different journals that turn to

10:40:50 10    her for her expert opinion and her expert work on the state

11    of knowledge?

12    **A**    I have scanned that.

13    **Q**    And you say that you know what you know because you go

14    to these important continuing medical education things and

10:41:07 15    the drug reps come into your office and that's where you get

16    your new knowledge; right?

17    **A**    That doesn't state my source of information.  I have

18    37 years of practice and experience and a wide variety of

19    educational exposures, a wide variety of studying and work

10:41:30 20    to educate myself and to be up to date.  I spend a lot of

21    time at different meetings and working with different

22    colleagues and people around the country and keep up to date

23    in many different ways.

24    **Q**    But the ones you mentioned when you were being quizzed

10:41:47 25    by the Walmart lawyer, Mr. Majoras, was you do a continuing

**Wailes (Cross by Lanier)**

1    medical education and the drug companies send people into

2    your office with lunch; right?

3    **A**    I don't understand your question.

4    **Q**    That's what you mentioned for your up-to-date

10:42:09 5    training.

6                    MR. MAJORAS:  Objection.  Misstates.

7                    THE COURT:  Overruled.

8                    THE WITNESS:  I don't believe I was limiting

9    myself to those two types of education.  I --

10:42:20 10   BY MR. LANIER:

11    **Q**    Good.

12    **A**    I don't recall that --

13                   THE COURT:  Hold it.  Hold it, Mr. Lanier.

14                   MR. LANIER:  I'm sorry, Judge.

10:42:24 15                   THE COURT:  Let the doctor finish his

16    question.

17                   MR. LANIER:  Yeah, I need to put my glasses on

18    so I can see him.  I'm sorry.

19                   THE WITNESS:  I don't recall that being the

10:42:31 20   entirety of a response to an open-ended question about what

21    is my exposure to continuing medical education.

22    BY MR. LANIER:

23    **Q**    Because I'm hoping you're reading some of these

24    journals that Dr. Lembke is making sure have good articles.

10:42:45 25   **A**    We have different specialties, and so there would be

1     some crossover, but I do spend a lot of time reading journal

2     articles.

3     **Q**     And her scholarly work, have you bothered to read any

4     of her books?

10:42:58  5     **A**     I have not read any of her books.  I have read part of

6     that first one that you just highlighted, but --

7     **Q**     Drug Dealer M.D.:  How Doctors Were Duped, Patients

8     Got Hooked and Why It's So Hard to Stop, you read part of

9     that?

10:43:11  10     **A**     Yes.

11     **Q**     You knew some of the people in that, didn't you?

12     **A**     Not directly.  I don't remember who -- which people

13     you're referring to.  I don't know.

14     **Q**     Well, you've got some good experience with

10:43:22  15     Purdue Pharma yourself beyond what you've already testified

16     to, don't you?

17     **A**     Not significant, no.

18     **Q**     You understand we've got their records too?

19     **A**     Absolutely.

10:43:36  20     **Q**     All right.  We'll deal with that in a little bit.

21          Have you gone to any of the peer-reviewed courses that

22     Dr. Lembke has led on Prescription Drug Misuse and

23     Addiction, Tapering Patients Off of Chronic Opioid Therapy?

24          Have you done to any of those?

10:43:59  25     **A**     I haven't been to any of those Stanford courses, no.

**Wailes (Cross by Lanier)**

1    **Q**    Have you been to -- have you read any of her

2    peer-reviewed original research articles?

3    **A**    I don't believe so.

4    **Q**    Even the ones that are relevant to what you do, like

10:44:14  5    Use of Opioid Agonist Therapy -- oops -- for Medicare

6    Patients?

7         Didn't bother to read that one?

8    **A**    Oh, there's many different articles related to that.

9    We have a world of literature, and I did not read that

10:44:27  10    particular article in 2013.

11    **Q**    But just for your own practice, though, have you read

12    about Reasons For Benzodiazapine Use Among Persons Seeking

13    Opioid Detoxification?

14         Have you read about that?

10:44:41  15    **A**    Not that -- the answer is yes, I've read about that,

16    but not that particular article.

17    **Q**    All right.  And so we're clear, you do have opioid

18    addicts at -- in your pain clinic as patients, don't you?

19    **A**    We have a small percentage of patients that have a

10:44:56  20    diagnosis of opioid use disorder, yes.

21    **Q**    Um-hmm.  And even beyond the official diagnosis, you

22    have other people that are clearly opioid dependent, don't

23    you?

24    **A**    Opioid dependence is a medical condition, as I

10:45:10  25    discussed during my testimony, and that does not reflect

4854

**Wailes (Cross by Lanier)**

1    addiction.  Opioid dependence is a completely different

2    concept and the two should not be confused.

3    **Q**    All right.  In the interest of time, sir, let me

4    finish with Dr. Lembke real quick.

10:45:26  5                    MR. DELINSKY:  Your Honor, I would object and

6    ask that Dr. Wailes be given the opportunity to complete his

7    answer.

8                    THE COURT:  Well, I think he did finish that

9    answer.

10:45:32 10         Did you finish your answer?

11                   THE WITNESS:  That's fine.

12                   THE COURT:  Okay.  That's what I thought.

13   BY MR. LANIER:

14   **Q**    Peer-reviewed book chapters, other publications,

10:45:42 15  invited lectures all over the world on this stuff, you've

16   never come across Dr. Lembke in any way other than the

17   limited stuff you've told us about thus far?

18   **A**    That's correct.

19   **Q**    And she doesn't charge $1,400 or 1,395 an hour, she

10:46:01 20  was $500 an hour.

21         Did you understand that?

22   **A**    I'm learning that right now.

23   **Q**    Okay.

24                   MR. LANIER:  Your Honor, this is a good time

10:46:10 25  for the break.

**Wailes (Cross by Lanier)**

1               THE WITNESS:  Okay.  I was going to suggest

2    one.

3               MR. LANIER:  Thank you, Judge.

4               THE COURT:  Ladies and gentlemen, we'll take

10:46:16  5    our usual mid-morning break, usual admonitions and then

6    we'll pick up with Dr. Wailes.

7                  (Jury excused from courtroom.)

8               THE COURT:  Did someone say something?

9               COUNSEL EN MASSE:  No.

10:54:35 10       (Recess was taken at 10:47 a.m. till 11:04 a.m.)

11               COURTROOM DEPUTY:  All rise.

12                 (Jury returned to courtroom.)

13               THE COURT:  Please be seated.

14       And, Doctor, you're still under oath.

11:06:14 15       Mr. Lanier, you may continue.

16               MR. LANIER:  Thank you.

17    BY MR. LANIER:

18    **Q**    To keep us oriented, we're still asking about who is

19    Robert Wailes.  All right?

11:06:24 20       I want to discuss more of who you are.

21       I know you said you charged about 200,000 so far.  I

22    don't know that I've seen all of those bills, but I did see

23    one bill.  It was Exhibit 1 to your deposition, for $95,000;

24    is that right?

11:06:44 25    **A**    Yes.

**Wailes (Cross by Lanier)**

1    **Q**    Is this a correct copy of that bill?

2    **A**    I believe it reflects my billing, yes.

3    **Q**    Yeah.  It's interesting.  Your bill was submitted by

4    IMS Consulting & Expert Services.  Persuasion strategy.

11:07:15  5    Expert witness.  Jury consulting.  Trial graphics.  Trial

6    presentation.

7         Do you see that, sir?

8    **A**    I do.

9    **Q**    Is IMS Consulting & Expert Services a point of contact

11:07:33  10   for you in this case?

11   **A**    Yes, it is.

12   **Q**    I had a chance to go on their website.

13        Have you ever been on their website?

14   **A**    No, I have not.

11:07:43  15   **Q**    Okay.  Did you know they hold themselves out as

16   consultative trial and expert services?

17        Did you know that?

18   **A**    I'm not really familiar with their background.

19   **Q**    Did you know that -- well, first of all, that wasn't

11:08:04  20   my question.

21        My question was, did you know they hold themselves out

22   as consultative trial and expert services?

23   **A**    I'm not familiar with that term, so I guess I'm not

24   familiar.

11:08:15  25   **Q**    Did you know they claim to have 20,000-plus cases

4857

**Wailes (Cross by Lanier)**

1    spanning practices with 95 percent of their business coming

2    from repeat clients?

3         Did you know about that?

4    **A**    No, I don't.

11:08:32  5    **Q**    Nobody indicated to you if you do well, you might get

6    repeat business?

7    **A**    That hasn't been part of my exposure to them.

8    **Q**    Did you know that they have an entire group dedicated

9    to persuasion strategy?

11:08:52  10   **A**    No, I'm not familiar with that.

11   **Q**    That they do mental mining strategy sessions to create

12   our, quote, story, closed quote for the jury.

13        Did you know about that?

14   **A**    Not familiar with that.

11:09:10  15   **Q**    Did you know that they claim to work with you and your

16   experts formulate the best strategy for structuring reports

17   and trial testimony?

18        Did you know about that?

19   **A**    They have had no interaction with me on my work in

11:09:30  20   this case other than billing.

21   **Q**    Other than what?

22   **A**    So I'm not -- other than billing.  I am not familiar

23   with any of that.

24   **Q**    So did you really prepare those slides yourself?

11:09:41  25   **A**    Yes, those are -- that's my -- that is my work.

**Wailes (Cross by Lanier)**

1    **Q**    So I could give you a computer and you could -- I

2    could pull up PowerPoint and you could reproduce some of

3    those technical slides with the graphs and all by yourself?

4    **A**    I've had some assistance with those, but that's my

11:09:58  5    work.

6    **Q**    Okay.  Well, now, wait a minute.  I've had some

7    assistance with those, or I do those by myself?

8    **A**    I did not do those by myself.  I directed all of those

9    by myself.  That's information directed by me.

11:10:14  10    **Q**    Our jury consulting team assists with witness

11    preparation so opinions are communicated clearly.

12         You've prepared for this, haven't you?

13    **A**    Are we still talking about IMS?

14    **Q**    Yes, sir, I read that from that -- yes, sir.

11:10:33  15    **A**    They have not had any training or service to me

16    regarding my testimony or report.

17    **Q**    So have you done any preparation for testifying before

18    you got here?

19    **A**    Yes, but not through IMS.

11:10:44  20    **Q**    Do you know who it was in the room with you?

21    **A**    Yes.

22    **Q**    And there were no jury consultants at all?

23    **A**    I'm not sure what you're asking.  I'm sorry.  It kind

24    of vague.

11:11:00  25    **Q**    Our graphic -- back to IMS.

4859

**Wailes (Cross by Lanier)**

1          Did you know their graphic designers create graphics

2     for both the report and trial that assists witnesses with

3     teaching and persuading factfinders?

4          Did you know about that?

11:11:21  5     **A**     I was not aware about that.

6     **Q**     Their work on how to appeal to jury emotions.

7          Did you know about that?

8     **A**     I have no exposure to that.

9     **Q**     Their ability to enhance the clarity and confidence of

11:11:33 10     expert witness testimony at trial.

11          Did you know about that?

12     **A**     Again, I have had not had any exposure to that from

13     IMS.

14     **Q**     So you just have them send out your bills and they pay

11:11:48 15     you and that's it?

16     **A**     No.  That doesn't state my relationship with them.

17     **Q**     Well, I mean, this is your bill, isn't it?

18     **A**     That's actually not my bill, that's reflective of my

19     billing, I believe, but that's not my bill.

11:12:11 20     **Q**     Who did you give your time to?

21     **A**     The process is I fill out an Excel spreadsheet with

22     the hours that I've worked and my charges and then I send

23     that Excel spreadsheet with my charges to IMS.

24     **Q**     Okay.  So you send to IMS how you get your -- however

11:12:33 25     much money it is, and then these expert witness persuasion

4860

**Wailes (Cross by Lanier)**

1    tragedy folks submit.

2        Does it -- does payment come straight to you or does

3    it go to IMS first?

4            MR. STOFFELMAYR:  Judge, may we have a

11:12:49  5    sidebar, please?

6                (Proceedings at sidebar.)

7            MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr

8    for Walgreens.

9        The parties, in the Motion in Limine stage, stipulated

11:13:15 10    that there would be no reference in front of the jury to

11    parties' or counsels' use of jury consultants, mock juries

12    or related trial resources.

13        If this is permissible, I want to talk about

14    Mr. Lanier's shadow jury.

11:13:27 15            MR. LANIER:  Well, Your Honor, first of all,

16    you won't find my shadow jury in here.  I don't have a

17    shadow jury in here.  I have nothing like that.

18            MR. STOFFELMAYR:  They're not in the room.  We

19    know that.

11:13:37 20            THE COURT:  Well -- well, I --

21            MR. LANIER:  I've just got -- I'm asking this

22    guy.  I haven't gone into those questions.  I haven't asked

23    him about the lady who's sitting back there.  I have --

24            THE COURT:  Right.  Right.  Right.  Right.

11:13:48 25            MR. LANIER:  I don't plan on it.

**Wailes (Cross by Lanier)**

1        MR. STOFFELMAYR:  He's made 20 references

2    to -- not 20 -- he's made five references to jury

3    consultants who have nothing to do Dr. Wailes.

4                THE COURT:  Well, I don't know what they do.

11:13:58  5    It's very unusual that this man's billing goes through

6    someone else, and I think it's fair cross-examination.

7                MR. STOFFELMAYR:  It would be fair if every

8    question didn't use the word "jury consultant" when the

9    parties have stipulated that that's of limits.

11:14:10  10                THE COURT:  All right.  All right.  I agree.

11                MR. LANIER:  I'm almost through with this,

12    Judge.  I'm moving on.

13                THE COURT:  I think we have had enough.

14    You've made your point --

11:14:14  15                MR. LANIER:  Yeah, I agree.

16                THE COURT:  -- Mr. Lanier.  So let's move on

17    from this.

18                (In open court at 11:14 a.m.)

19    BY MR. LANIER:

11:14:28  20    **Q**    So the last question was, does the money come straight

21    to you or does it go through IMS?

22    **A**    I'm not sure exactly where that's coming from, but I

23    send my bill to IMS, then I believe they charge the clients,

24    the attorneys involved in the case or their -- who they're

11:14:49  25    representing.  I believe IMS gets paid, and then I believe

4862

**Wailes (Cross by Lanier)**

1      IMS sends a check to my office.

2      **Q**    Okay.  Let's go back in time a little bit, please.

3           By the way, historically, how many of your patients,

4      percentage, if you can do, are end-of-life cancer patients?

11:15:30  5    **A**    That's varied throughout my career and I can't give

6      you a specific percentage based on any data that I can pull

7      out.  I don't have that data at the top of my head, but it

8      was more common early in my career and a little bit less

9      common now.

11:15:48 10    **Q**    What about -- give me an idea back in the early 2000s.

11     **A**    It would only be an estimate, but maybe 10 percent of

12     my practice.

13     **Q**    Did you know -- you're familiar with a company called

14     Cephalon, right, or it's Cephalon.

11:16:20 15         How do you pronounce it?

16     **A**    I think it's Cephalon.

17     **Q**    Cephalon.  Sorry.  You're familiar with that company,

18     aren't you?

19     **A**    I have -- I have heard of it, yes.

11:16:28 20    **Q**    Well, not just I have heard of it.  You know them,

21     don't you?

22     **A**    I wish I could say I know them better, but they've

23     interacted with my practice, but I -- I'm guessing I'm going

24     to hear my history about what they've done with our

11:16:45 25    practice.

4863

**Wailes (Cross by Lanier)**

1    **Q**    Well, did you know they considered, back in 2003,

2    their relationship to you to be important and that you were

3    one of their target physicians in 2003?

4                    MR. MAJORAS:  Objection.  Foundation.

11:17:00  5                    THE WITNESS:  Yeah, I'm --

6                    THE COURT:  Overruled.

7                    THE WITNESS:  I'm not aware of being a target

8    physician.  I'm not familiar with that term, but I suspect

9    that -- yeah, I'm just not familiar with that term.

11:17:15 10  BY MR. LANIER:

11   **Q**    Did you know they maintained records on you noting you

12   are a big golfer.

13        Are you a big golfer?

14   **A**    I enjoy playing golf, like many other people.

11:17:27 15  **Q**    And this drug company Cephalon, they make an opioid --

16   make opioid products, don't they?

17   **A**    I suspect they do.

18   **Q**    No, you don't suspect they do, you know they do, don't

19   you?

11:17:43 20  **A**    I apologize.  I don't know the exact product line that

21   Cephalon has.  I'm sure they have a product line.  I

22   apologize, I don't know it.

23   **Q**    Well, are you -- you are familiar with ACTIQ,

24   A-c-t-i-q, aren't you?

11:18:02 25  **A**    Yes.

4864

**Wailes (Cross by Lanier)**

| | | |
|---|---|---|
| | 1 | **Q**   The lollipops? |
| | 2 | **A**   Yes. |
| | 3 | **Q**   Made by Cephalon? |
| | 4 | **A**   Thank you. |
| 11:18:08 | 5 | **Q**   You didn't know that? |
| | 6 | **A**   I could not pull that off the top of my head, no. |
| | 7 | **Q**   Did you know that you were one of their top 10 |
| | 8 | prescribers of ACTIQ back in 2003? |
| | 9 | **A**   Was not aware of that. |
| 11:18:22 | 10 | **Q**   That they list you with 43 percent of the market share |
| | 11 | back in 1983? |
| | 12 | MR. MAJORAS:  Objection. |
| | 13 | BY MR. LANIER: |
| | 14 | **Q**   And I'm sure that's in your area. |
| 11:18:33 | 15 | THE COURT:  Overruled. |
| | 16 | BY MR. LANIER: |
| | 17 | **Q**   Did you know that? |
| | 18 | **A**   Yeah, I don't know at all what 43 percent of what |
| | 19 | denominator.  So no, I'm not aware of what that means. |
| 11:18:41 | 20 | **Q**   But you know that you would not be using ACTIQ |
| | 21 | properly under the FDA if you were giving it to people who |
| | 22 | were not dealing with breakthrough cancer pain and already |
| | 23 | tolerant to opioid therapy; right? |
| | 24 | **A**   I am aware of that indication. |
| 11:19:08 | 25 | **Q**   And yet my question to you, sir, under oath, did you |

**Wailes (Cross by Lanier)**

1    ever prescribe ACTIQ to a patient other than a -- someone

2    trying to manage breakthrough cancer pain already receiving

3    intolerant to opioid therapy?

4    **A**    I think that's very likely that I used the medication

11:19:32  5    what we call off-label, which we do for many different

6    medications.

7    **Q**    So that I've got a chart I can refer to later, ACTIQ,

8    that's the drug we're talking about, and it's like a little

9    lollipop on a stick; right?

11:19:57 10    **A**    Yes.

11    **Q**    Except that lollipop has fentanyl, one of the most

12    potent opioids as you've already testified; right?

13    **A**    Correct.

14    **Q**    And the FDA made it real clear that this is indicated

11:20:20 15    only for the management of breakthrough cancer pain in

16    patients with malignancies -- malignancies is cancer; right,

17    tumors?

18    **A**    Yes.

19    **Q**    Who were already receiving intolerant to opioid

11:21:01 20    therapy; right?

21    **A**    Yes.

22    **Q**    Now, that is not just the FDA approval for ACTIQ back

23    when you were prescribing it, but that's in what's called a

24    black box warning; right?

11:21:27 25    **A**    I believe so.

**Wailes (Cross by Lanier)**

1    **Q**    In other words, it's front and center, that's what it

2    was approved for; correct?

3    **A**    I believe so.

4    **Q**    And yet you would prescribe ACTIQ for reasons not

11:21:40  5    approved by the FDA, wouldn't you?

6    **A**    I used it off-label is what we call it, and there were

7    probably circumstances where that is true.

8    **Q**    When you say I used it off-label, that means you used

9    it for something it had not been approved for by the FDA,

11:22:05  10    doesn't it?

11    **A**    In the regular of course of a physician's practice,

12    this is not uncommon to use a well-known medication for

13    other applications than the specific research showed FDA

14    approved indications.

11:22:25  15        So, yes, I did use it off-label.  An FDA drug can be

16    used off-label --

17    **Q**    That wasn't my question, sir?

18    **A**    -- in the appropriate way.

19    **Q**    Yeah.  My question was not is it appropriate to do it

11:22:36  20    and are you going to go to jail.  My question was --

21                MR. MAJORAS:  Objection, Your Honor.

22                THE COURT:  Overruled.

23    BY MR. LANIER:

24    **Q**    My question was, when you say I used it off-label,

11:22:45  25    that means you used it in a way it had not been approved for

**Wailes (Cross by Lanier)**

1    use by the FDA; correct?

2    **A**    Yes.

3    **Q**    Thank you.

4         Now, did you know that Cephalon, this company, who

11:23:10  5    made this wound up having to enter a plea with the

6    government for off-label marketing and pay a hefty fine?

7         Did you know about that?

8    **A**    I was aware they did get in trouble for some type of

9    problem.  I'm not familiar with the specifics of it.

11:23:45 10  **Q**    They allegedly promoted the drug for noncancer

11    patients used for such maladies as migraines, sickle cell

12    pain crisis, injuries, and in anticipation of changing wound

13    dressings or radiation therapy?

14         If that is the truth, sir, you were one of the

11:24:03 15  physicians who was actually prescribing it for some of those

16    reasons, weren't you?

17    **A**    I don't recall specifically prescribing it for those

18    reasons, but my guess is they were in trouble for their

19    marketing efforts and not for the actual use of the

11:24:19 20  medication, but they probably got in trouble for how they

21    promoted it.

22    **Q**    Yeah, they pleaded guilty for promoting it off-label,

23    which is the kind of usage you had with it, isn't it?

24    **A**    Some of my usage could have been off-label, yes.

11:24:39 25  **Q**    Okay.  Now, that's -- we started that question with me

**Wailes (Cross by Lanier)**

1    asking you if you knew whether or not you were listed as one

2    of their top prescribers in an important relationship to

3    maintain abid call for all of that.

4          Remember?

11:24:59  5    **A**    Yes.

6    **Q**    But that's not the only opioid company that you've

7    done work with -- or that you've been important to.

8          Is that fair?

9    **A**    I'm sure I'm important to many different companies.

11:25:07  10    **Q**    Well, you're familiar with the drug Duragesic, aren't

11    you?

12    **A**    Yes.

13    **Q**    Duragesic is another opiate, isn't it?

14    **A**    Yes.

11:25:23  15    **Q**    It's made by Janssen, a division of Johnson & Johnson;

16    right?

17    **A**    That's my understanding.

18    **Q**    And what kind of opiate is Duragesic?

19    **A**    It's fentanyl.  It's a fentanyl patch.

11:25:39  20    **Q**    It's a fentanyl what?

21    **A**    Patch.

22    **Q**    Whether you talked about fentanyl yesterday, you told

23    us it was typically in a patch; right?

24    **A**    Yes.

11:25:47  25    **Q**    Did you mention the lollipops that you were -- that

**Wailes (Cross by Lanier)**

1   you and I were discussing a few minutes ago yesterday?

2   **A**    I didn't mention that because it's a very small part

3   of the use of fentanyl.  It's mostly --

4   **Q**    Today it is, but back in the early 2000s when you were

11:26:03  5   using it quite a bit it was a lot more prominent, wasn't it?

6   **A**    Duragesic has always been the primary way to provide

7   fentanyl products.  It's a patch for 3 days, and it's always

8   had the biggest market share, I'm sure.

9   **Q**    Now, Duragesic, the fentanyl patch by

11:26:23  10   Johnson & Johnson -- well, by Janssen, one of their

11   companies -- aren't there two S's in Janssen?  I think so.

12   **A**    I'm not sure.

13   **Q**    All right.  I'm putting it in there.  I may be wrong.

14   You were -- well, early today you were asked did you

11:26:49  15   have any funding relationships with any of the opioid

16   questions.

17   Do you remember those questions?

18   **A**    Yes, and --

19   **Q**    Did this one slip your mind?

11:27:01  20   **A**    It may have.  I suspect I'm going to learn something

21   about it.  The only thing I didn't say that I did reveal in

22   my deposition, and I've thought about since you asked that

23   question, is we did have some educational programs and some

24   of -- during the early 2000s, I believe, and some of those

11:27:20  25   educational programs probably got some partial funding from

4870

**Wailes (Cross by Lanier)**

1    pharmaceutical companies.

2    **Q**    Yeah, it's not just that, you were specifically a

3    Duragesic speaker.  For example, you did a speaking engage

4    at Tri-City Medical Center March of 2004.

11:27:41  5    Do you remember that?

6    **A**    Not specifically, no.

7    **Q**    No memory of being a Duragesic speaker?

8    **A**    Not specifically.

9    **Q**    Do you remember the idea that you were also recognized

11:27:56  10    as a Duragesic advocate?

11    **A**    I don't remember that term.

12    **Q**    That they -- do you remember that for you to give the

13    speeches they required -- they, the Janssen, the opioid

14    company, required you to go through online training with

11:28:19  15    them?

16    **A**    Again, I apologize, I don't specifically remember, but

17    that would be reasonable.

18    **Q**    So it's possible that you were a Duragesic speaker, a

19    Duragesic advocate, who did online training with the company

11:28:40  20    and got paid to make speeches, including at the Tri-City

21    Medical Center in 2004?  Possible, you just don't remember.

22    Fair?

23    **A**    Fair.

24    **Q**    Now, you're not alone in your clinic.  You've got

11:28:59  25    other people who work there, right, and co-own it with you?

**Wailes (Cross by Lanier)**

                1    **A**    Yes.

                2    **Q**    Am I correct that one of them is Jeremy Adler?

                3    **A**    Yes.

                4    **Q**    Is he a doctor?

11:29:19        5    **A**    He has a doctorate degree, but he's a practicing

                6    physician assistant.

                7    **Q**    He's actually got a publication to his name, doesn't

                8    he, at least one?

                9    **A**    I believe he has published more than one article.

11:29:34       10    **Q**    On Clinical Guidelines For the Use of Chronic Opioid

               11    Therapy; right?

               12    **A**    Yes.

               13    **Q**    Now, this gentleman, you called him a physician's

               14    assistant?

11:29:48       15    **A**    Yes.

               16    **Q**    He also speaks or has been a speaker for Endo

               17    Pharmaceuticals.

               18          Did you know that?

               19    **A**    I know that he works with some companies.  I'm not

11:29:58       20    familiar with what lectures he's actually given.

               21    **Q**    So your -- is he one of the co-owners?  I don't

               22    remember what your answer was.

               23    **A**    Yes, he is.

               24    **Q**    So he's not a medical doctor, but he's still a

11:30:09       25    co-owner of the pain clinic?

4872

**Wailes (Cross by Lanier)**

1    **A**    That's correct.

2    **Q**    And as one of your co-owners of the pain clinic has

3    been given speeches or been retained by Endo to do work for

4    them?

11:30:20  5    **A**    I honestly don't know the relationship that he has

6    with Endo.

7    **Q**    But you do know that he's spoken for them before;

8    right?

9    **A**    I know that he does lectures.  He does some lectures

11:30:30  10    and training for people.

11    **Q**    And so we're clear on this relationship as well, Endo

12    is an opioid manufacturer, isn't it?

13    **A**    I believe so.

14    **Q**    Well, you don't believe so, you know they are, don't

11:30:45  15    you?

16    **A**    I apologize, I don't work with -- I don't have a great

17    working knowledge with manufacturers on a day-to-day basis.

18    I prescribe medicines, and it just doesn't cross my path

19    very much.  I'm sure in the past I've talked to many

11:31:01  20    different reps from different companies, and I probably know

21    the rep names better than the company names, but clearly

22    I've been exposed to these names and companies and drugs,

23    and I apologize, I'm just not very conversive with it.

24    **Q**    With all due respect, sir, you sought out Purdue and

11:31:19  25    asked them to hire you to be a speaker, didn't you?

**Wailes (Cross by Lanier)**

1       **A**     I have no recall of that.

2       **Q**     Let me see if I can refresh your memory.

3             January 31st, 2011.  Do you recall whether or not you,

4       with the Foundation For Pain Medicine, were going to be a

11:31:47 5      speaker at a February national leadership roundtable?

6       **A**     I don't have a specific recollection for that.  I'm

7       not even sure of the organization, the Foundation For Pain

8       Medicine?

9       **Q**     Um-hmm.  Yeah.  That's what it was listed as.

11:32:11 10     **A**     I may have had interaction with them.  It sounds like

11      it's perhaps part of another association or something.

12      Foundations usually are charitable organizations that

13      promote education, but I don't have any specific call of

14      this.

11:32:30 15     **Q**     Would you have any specific recall of why or how

16      Purdue came to get your CV?

17      **A**     No, but I think my CV's probably pretty readily

18      accessible.

19      **Q**     Yeah.  And you don't have any recall yourself of

11:32:56 20     seeking out speaking positions for Purdue or Endo?

21      **A**     I don't have any specific recall of that at all.

22      **Q**     Do you know Brett Michelin?

23      **A**     That name is familiar.

24      **Q**     Do you know Carol Lee?

11:33:35 25     **A**     Yes.

4874

**Wailes (Cross by Lanier)**

1    **Q**    Do you recall meeting with the Endo people with

2    Carol Lee about whether or not e-prescribing can be a holdup

3    for scheduled medications like C-IIs?

4    **A**    I don't remember a specific meeting with that

11:34:07  5    circumstance, but at least now I under- -- I know what

6    organization we're talking about now.

7    **Q**    Did you privately share with anybody that some of

8    these pain society meetings need new speakers at the

9    podiums, especially for the corporate supported symposiums?

11:34:23  10    **A**    I don't have any recall of comments like that.

11    **Q**    And do you recall whether or not you were lobbying for

12    yourself to be one of the new speakers?

13    **A**    I do not have any recall for that.

14    **Q**    And you say you don't really know Endo.

11:34:35  15          Would you be shocked to find out that Endo claims they

16    know you very well?

17    **A**    No comment.

18    **Q**    Okay.  Now, I found this interesting in light of your

19    Slide Number 4, what is a pain management specialist?  And

11:35:04  20    you said, compensation is not linked to opiate prescribing.

21          Do you see that?

22    **A**    Yes.

23    **Q**    Now, of course, you're familiar with a lot of pain

24    clinics that were shut down by the government; right?

11:35:18  25    **A**    I'm familiar with some, that concept, yes, absolutely.

**Wailes (Cross by Lanier)**

1    **Q**    Well, I noticed even one of the documents in your

2    reliance materials was a PowerPoint by Joe Rannazzisi.

3         Do you remember having that in your materials?

4    **A**    Yes.

11:35:36  5    **Q**    And I think in that PowerPoint Mr. Rannazzisi talks

6    about the migration of pain clinics from Florida over across

7    into the California.

8         Do you remember that?

9    **A**    I do remember seeing a slide with arrows to

11:35:49  10   California.

11   **Q**    Yeah.  Well, when you say compensation is not linked

12   to opioid prescribing, would you agree with me that

13   compensation is linked to patients coming in and using your

14   pain clinic?

11:36:12  15   **A**    Yes.  We get paid for office visits and consultations

16   and cognitive services as well as procedures, yes.

17   **Q**    And I know that you said you have a really good

18   reputation in the San Diego area; right?

19   **A**    I believe so.

11:36:24  20   **Q**    Have you looked at the internet reviews on you and

21   your practice?

22   **A**    I have not.  Not recently.

23   **Q**    Okay.  So when you say you've got a good reputation,

24   you're basing that on what people are saying to you?

11:36:37  25   **A**    Yes.

4876

**Wailes (Cross by Lanier)**

1    **Q**     Okay.  But whether patients use your pain clinic, that

2    is directly linked to compensation, isn't it?

3    **A**     Not directly -- not directly linked to writing

4    prescriptions, no.

11:36:54  5    **Q**     That wasn't my question, sir.

6          Patients use your pain clinic, that's linked to

7    compensation, isn't it?

8    **A**     Correct.  We get paid by seeing patients.

9    **Q**     Here.  We can do this real easy.

11:37:10  10         You've got a pain clinic and people go into that pain

11   clinic; right?

12   **A**     Yes, they do.

13   **Q**     And something happens before they leave, and that is

14   they get examined and treated and maybe has a prescription

11:37:41  15   issued and they pay for the visit somehow.  Fair?

16   **A**     That's correct.

17   **Q**     And so the more people that go in, or the more often

18   they go in, the more you make.  True?

19   **A**     That's correct.

11:38:04  20   **Q**     Now, at this point in our United States of America a

21   lot more attention is paid when it comes to prescribing

22   opiates; right?

23   **A**     Yes, that's true.

24   **Q**     And so if you were going to give opiates, you do what

11:38:24  25   you call closely monitor; right?

4877

**Wailes (Cross by Lanier)**

1    **A**    Yes.

2    **Q**    So you write these opioid prescriptions and you tell

3    these people that if they're going to give the opioid

4    prescriptions, you've got to see them again, and again, and

11:38:42 5    again, don't you?

6    **A**    All of our chronic pain patients, whether they receive

7    opiates or not, have regular office visits, yes.

8    **Q**    But with the opiates, they don't just have regular

9    office visits, they've got a lot of other things you do as

11:38:57 10    well.

11        You do the urine test, you've got to do all these

12    other things; right?

13    **A**    They -- we do urine testing, but I don't know what you

14    mean by all these other things.

11:39:05 15    **Q**    Well, you talked about --

16    **A**    They're not income producing other things.

17    **Q**    So y'all do the urine test for free?

18    **A**    No, I said other things -- we don't do other things

19    for -- collect income.  We have a small fee, I think it's $8

11:39:22 20    or something, for the urine test because we send it out, so

21    that's a handling charge.  But there's not other things that

22    we're deriving income from on our regular office visit

23    patients.

24    **Q**    And as these patients come in and become, what did you

11:39:40 25    call it, instead of addicted, you called it opiate

**Wailes (Cross by Lanier)**

1    dependent?

2                    MR. MAJORAS:  Objection.  Misstates the

3    testimony.

4    BY MR. LANIER:

11:39:49  5    **Q**    Well, that's what I'm asking.  Is that what you called

6    it?

7    **A**    I'm not sure what -- your foundation of the question.

8        Could you repeat it?

9    **Q**    Yes, sir.  That was good legal terminology there,

11:40:00  10   foundation.

11       Opioid dependent, is that the word you used right

12   before our break?

13   **A**    I have said opiate -- we've talked about opiate

14   dependence, yes, we have.

11:40:15  15   **Q**    And you've got a lot of patients who are opiate

16   dependent, don't you?

17   **A**    We do have many patients that are opiate dependent,

18   yes.

19   **Q**    And by opiate dependent, it means they've got to get

11:40:27  20   their opiates; right?

21   **A**    Excuse me, one more time.

22   **Q**    And so you've got a lot of people that just keep

23   coming back, and back, and back, don't you?

24   **A**    Yes.  We have a lot of our patients come back and see

11:40:41  25   us on a regular basis.

4879

**Wailes (Cross by Lanier)**

1    **Q**    So when you say compensation is not linked to opioid

2    prescribing, maybe it might be fair to say you're not

3    getting a cut of each opioid prescription that gets filled,

4    but there's certainly a link, isn't there?

11:41:01  5    **A**    Very indirectly because we don't have any difference

6    in pay whether we prescribe an opioid or not.

7    **Q**    Well, if you prescribe Advil, do they have to come

8    back over and over to get the Advil prescription?

9    **A**    It depends on the severity of their problem.  If they

11:41:17  10   have a severe problem, they may not tolerate opioids or

11   whatever.  We see -- all of our -- not 100 percent, but most

12   of our chronic pain patients we need to see on a regular

13   basis for more than just prescriptions.

14   **Q**    Wasn't my question, sir.  Can you answer my question?

11:41:32  15   **A**    Is we may need to see patients even on Advil on a

16   regular basis.

17   **Q**    You may need to.  There's a difference between may

18   need to and must, isn't there?

19   **A**    Yes.

11:41:45  20   **Q**    You don't have the same follow-up with patients that

21   you say, hey, take some Advil, make it a prescription level,

22   800 milligrams, okay, go take some Advil and come back and

23   see us if you don't feel better in a couple of weeks.

24   **A**    That doesn't reflect my practice.  I understand what

11:42:07  25   you're alluding to.  In my practice, we don't typically see

**Wailes (Cross by Lanier)**

1    patients who just need Advil and can come in when necessary.

2    That would be more of a primary care practice scenario.

3    Patients that we see are typically much more severe and need

4    regular follow-up and maintenance.

11:42:26 5    **Q**    Look, I'm not fussing that.  Almost all of yours need

6    opiates; right?

7    **A**    Not all of them, no.

8    **Q**    Most of them do, don't they?

9    **A**    The majority do.

11:42:42 10   **Q**    All right.  We're almost through with the first stop,

11   but we got a few more things we got to clarify.

12        Let's try and get through this stop before lunch.

13   Okay?

14   **A**    Okay.

11:43:04 15   **Q**    You talked yesterday about your important role with

16   the American Association of Pain Management; right?

17   **A**    No.  It's --

18   **Q**    You didn't?

19   **A**    No.

11:43:20 20   **Q**    AAPM.  What does that stand for?

21   **A**    It's the American Academy of Pain Medicine.

22   **Q**    Oh, okay.  My mistake.  Let me get it right.

23        AAPM is the American Academy of Pain Management?

24   **A**    Medicine.

11:43:46 25   **Q**    Medicine.  Thank you.

## Wailes (Cross by Lanier)

1    All right.  And you talked about how notable it was

2    that you're a trustee or something?

3  **A**    I'm on their board of directors.

4  **Q**    Board of directors.

11:44:02  5    And you have been a member for how long?

6  **A**    Since the early 1990s.

7  **Q**    And how long have you been active in it?

8  **A**    I've been more involved with leadership over the last

9    10 years.

11:44:22  10  **Q**    Okay.  So you know Phillip Saigh, S-a-i-g-h?

11  **A**    Yes.

12         MR. LANIER:  Plaintiffs' Exhibit 21857, can we

13    pass that out, please?

14         (Brief pause in proceedings.)

11:45:14  15  BY MR. LANIER:

16  **Q**    Do you have that, sir?

17  **A**    Yes, I do.

18  **Q**    I think this is just one example of something that you

19    might have been involved in, I don't know.  It's an e-mail

11:45:24  20  from Phil Saigh to a number of others about the AAPM

21    delegates to the AMA dinner.

22    Do you see that?

23  **A**    I'm just looking at it now.  I'm trying to read what

24    it says.

11:45:45  25  **Q**    Do you recall it, now that you're looking at it, sir?

**Wailes (Cross by Lanier)**

1    **A**    I. . . don't recall the specific e-mail, but I

2    remember -- I think I recall the circumstance.

3    **Q**    Well, and so that I'm not playing gotcha, you are one

4    of the recipients of the e-mail?

11:46:06  5    **A**    Correct.

6    **Q**    You're not fussing the e-mail for the content thereof;

7    right?

8    **A**    No, not at all.

9    **Q**    All right.  So you were involved in 2011 at least

11:46:16  10    going to some of the dinners.  Is that fair to say?

11    **A**    There was at least one dinner here that I was involved

12    with.

13    **Q**    I'm assuming it wasn't the only one.  Didn't you go to

14    other dinners?

11:46:28  15    **A**    This is, I think, the first year that I probably

16    started getting involved and it was 10 years ago.

17    **Q**    All right.

18    **A**    So. . .

19    **Q**    And in that regard were you a member of the AAP --

11:46:50  20    well, let me ask it this way:  Mr. Majoras, lawyer for

21    Walmart, asked you about Purdue.

22        Remember those questions?

23    **A**    I believe so, yes.

24    **Q**    And he asked you whether or not Purdue had ever

11:47:08  25    supported some of your entities or some of the things that

**Wailes (Cross by Lanier)**

1    you were affiliated with.

2         Do you remember that as well?

3    **A**    I don't remember the specific contest, but Purdue has

4    definitely been a supporter for the American Academy of Pain

11:47:20  5    Medicine.

6    **Q**    Well, not just a supporter, your American Academy of

7    Pain Medicine, in 2001, wrote a letter to the DEA about

8    Purdue.

9         Did you know about that?

11:47:34 10    **A**    I'm not familiar with that.

11    **Q**    Do you know whether or not the AAPM, your AAPM, ever

12    told the federal government that Purdue is one of the most

13    ethical pharmaceutical companies in the United States?

14                   MR. MAJORAS:  Objection.

11:48:00 15         May I be heard, Your Honor?

16                        (Proceedings at sidebar.)

17                   MR. MAJORAS:  Your Honor, my issue here is

18    that Mr. Lanier is just asking questions without any

19    foundation whatsoever, and in particular, I believe he's

11:48:31 20    referring to a document in this most recent line of

21    questions that dates back to 2001, yet he's referring to

22    2011 when Dr. Wailes was there.  And it's an inappropriate

23    question.

24                   THE COURT:  Well --

11:48:44 25                   MR. LANIER:  Wailes was there.

**Wailes (Cross by Lanier)**

```
          1              THE COURT:  Well, hold it.  If this document

          2   is from 2010 or '11 on when the doctor said he's been in

          3   leadership, I think that's fair.  If it's something from

          4   2001, I think it's not relevant.

11:49:02  5              MR. WEINBERGER:  Your Honor, Mr. Majoras put

          6   up a slide touting the fact that he was a member of the AAPM

          7   without any limitation whatsoever, and then --

          8              THE COURT:  Well, let me see -- let me see --

          9   what is the argument -- what is the foundation for this

11:49:21 10   question?

         11              MR. LANIER:  The foundation for this,

         12   Your Honor --

         13              THE COURT:  It started with an e-mail 21857.

         14   That's 2011.  This something else.

11:49:32 15              MR. LANIER:  This is something totally

         16   different, Your Honor.

         17              THE COURT:  Let me see the basis of it.

         18              MR. LANIER:  Okay.  Let me hand it up to you.

         19              MR. MAJORAS:  But his testimony is he's not

11:49:37 20   familiar with this.

         21              THE COURT:  Well, I want to see what it is.

         22              MR. MAJORAS:  May I see it too, please?

         23       Your Honor, I'm not sure what's been handed up.

         24              MR. LANIER:  It's the 2001 you were talking

11:49:56 25   about.
```

|            |     |                                                          |
|------------|-----|----------------------------------------------------------|
|            | 1   | MR. MAJORAS:  Thank you.                                  |
|            | 2   | MR. LANIER:  Yeah.                                        |
|            | 3   | Your Honor, I don't mean to interrupt your reading,      |
|            | 4   | but I'd like to say something when you're done.          |
| 11:50:31   | 5   | THE COURT:  Well, tell you what, this is the             |
|            | 6   | way to do this, rather than -- you know, show him the    |
|            | 7   | article and ask him, as now one of the leaders, does he  |
|            | 8   | agree with it.                                           |
|            | 9   | MR. LANIER:  That's great.  I'll do it that              |
| 11:50:48   | 10  | way.                                                      |
|            | 11  | THE COURT:  Just do it that way.  I read it,             |
|            | 12  | and, you know, I think then that's a fair way to do it.  |
|            | 13  | MR. LANIER:  Okay.                                        |
|            | 14  | MR. MAJORAS:  May I get a copy, Your Honor?              |
| 11:50:54   | 15  | THE COURT:  I thought you had one.                       |
|            | 16  | MR. MAJORAS:  I don't.                                    |
|            | 17  | THE COURT:  Make sure Mr. Majoras has a copy             |
|            | 18  | of this.                                                 |
|            | 19  | (In open court at 11:50 a.m.)                            |
| 11:51:07   | 20  | MR. LANIER:  And we'll give the witness a copy           |
|            | 21  | as well, Judge.                                          |
|            | 22  | BY MR. LANIER:                                           |
|            | 23  | **Q**   All right.  You got 20 -- Plaintiffs' 28217 in front |
|            | 24  | of you.                                                  |
| 11:51:46   | 25  | Do you have it, sir?                                     |

4886

**Wailes (Cross by Lanier)**

|  |  |
|---|---|
| 1 | MR. MAJORAS:  I ask that it not be displayed |
| 2 | until foundation is laid, Your Honor. |
| 3 | THE COURT:  All right. |
| 4 | BY MR. LANIER: |
| 11:51:55 5 | **Q**    Do you have Plaintiffs' Exhibit 28217 in front of you, |
| 6 | sir? |
| 7 | **A**    Yes, I do. |
| 8 | **Q**    And you'll see it's on American Academy of Pain |
| 9 | Management letterhead. |
| 11:52:03 10 | Do you see that? |
| 11 | **A**    Yes, I do. |
| 12 | **Q**    And you recognize that, don't you? |
| 13 | **A**    No.  That's not the organization I'm a member of. |
| 14 | **Q**    The American Academy of Pain Management? |
| 11:52:14 15 | **A**    That's -- I'm not a member of that organization. |
| 16 | **Q**    The American Academy of Pain Management is different |
| 17 | than Pain Medication? |
| 18 | **A**    Yes.  They're two different organizations.  They're |
| 19 | completely different. |
| 11:52:31 20 | **Q**    Have they ever been related to each other? |
| 21 | **A**    No.  No.  They're -- no, they've never been related, |
| 22 | and American Academy of Pain Management is no longer in |
| 23 | existence. |
| 24 | **Q**    Were you ever a member of the American Academy of Pain |
| 11:52:46 25 | Management? |

4887

**Wailes (Cross by Lanier)**

1    **A**    I believe in the 1990s it was one of the first

2    organizations, and I initially did join it, yes.

3    **Q**    And were you a member for how long?

4    **A**    I don't remember.  It was a brief number of years.

11:53:01  5    **Q**    Well, I mean, were you a member in 2001 -- I mean, we

6    can go back and look.  We've got the membership roles.

7         Were you a member?

8    **A**    I do not recall.

9    **Q**    Do you recall if you were a member when they ceased to

11:53:16  10    exist?

11    **A**    No, I was not a member then.

12    **Q**    Do you recall why they ceased to exist?

13    **A**    Not being a member, I'm not completely sure.  So I

14    guess I can't claim knowledge of that.

11:53:29  15    **Q**    All right.  That's fair enough.

16         So I go back to my time line of now we're in the

17    2011/2012/2013 timeline, go fast-forward 10 years from that

18    document.

19              MR. STOFFELMAYR:  Judge, could we have the

11:53:47  20    slide fixed since that quote comes from a different

21    organization?

22              THE COURT:  That slide should come out.

23              MR. MAJORAS:  A different organization,

24    different quote, everything, Your Honor.

11:53:53  25              THE COURT:  All right.  Mr. Lanier, please

4888

**Wailes (Cross by Lanier)**

1    take the slide down.

2              MR. LANIER:  Well, this is not -- oh, I see,

3    the Purdue.  Yeah, that does not -- let's. . . there we go.

4    BY MR. LANIER:

11:54:09  5   **Q**    So we're going to stick with the American Academy of

6    Pain Medicine; okay?

7         Do you recall if while you were active, since 2011, if

8    at any point in time, maybe November of 2013, you applied to

9    become a clinical investigator for Purdue Pharma?

11:54:37 10  **A**    I don't remember the specifics of that.

11   **Q**    Don't remember the specifics, or do you remember at

12   least generally applying to be an investigator for Purdue

13   Pharma?

14   **A**    I do not recall that, no.

11:54:57 15  **Q**    American Academy of Pain Management -- no, Pain

16   Medicine.  Got to get it right.

17        Ms. Lanier and Ms. Fleming, would you y'all please

18   pass out Plaintiffs' Exhibit 18314.

19        I'll represent to you, sir, this is United States

11:55:42 20  Senate committee on finance record.

21        Do you have it in front of you?

22   **A**    Yes, I do.

23   **Q**    Are you familiar with the investigation behind opioid

24   manufacturers' financial relationships with groups including

11:56:11 25  the American Academy of Pain Medicine?

4889

**Wailes (Cross by Lanier)**

1  **A**    I'm not sure which investigation you're referring to.

2  I know that's come as an issue regarding Purdue

3  Pharmaceuticals, yes.

4  **Q**    Well, if you will look on Page 28 of this document,

11:56:29 5  you will see a chart for the American Academy of Pain

6  Medicine.

7      Do you see that?

8  **A**    Yes, I do.

9  **Q**    And that is the American Academy of Pain Medicine of

11:56:48 10  which you are on the board.  True?

11  **A**    Yes.

12  **Q**    And in this investigation, it lists various companies

13  that had given money to the academy of which you are

14  leadership.  True?

11:57:10 15  **A**    Yes, I believe so.

16  **Q**    And these are in your leadership years, but let's look

17  at these and just look at how many of them were opiate

18  companies.

19      Allergan, is that opiates?

11:57:31 20  **A**    I apologize, I'm not very conversive about

21  pharmaceutical companies and their medications, so I

22  apologize, I'm not going to be able to --

23  **Q**    Well, let's pick out the ones you certainly know,.

24      Cephalon, we have already discussed that; right?

11:57:47 25  **A**    Yes.

<b>Wailes (Cross by Lanier)</b>

| | | |
|---|---|---|
| 1 | **Q** | 120,000. |
| 2 | | Endo, we have already discussed that, 224,000? |
| 3 | **A** | Yes. |
| 4 | **Q** | Janssen and Johnson & Johnson? |
| 11:58:01  5 | **A** | Janssen I'm familiar with.  I'm not sure what the |
| 6 | | mother company Johnson & Johnson has. |
| 7 | **Q** | But you understand that's the mother company; right? |
| 8 | **A** | Yes. |
| 9 | **Q** | So 83 and 7,500; right? |
| 11:58:11 10 | | Looking at the next page, Purdue Pharma. |
| 11 | | Do you see that, sir? |
| 12 | **A** | I'm trying to get to it. |
| 13 | **Q** | It's the very next page, Page 29. |
| 14 | **A** | Yes, I see that. |
| 11:58:41 15 | **Q** | And you know Teva to be also an opiate manufacturer, |
| 16 | | don't you? |
| 17 | **A** | I believe so. |
| 18 | **Q** | Yeah.  So we start looking at how drug companies |
| 19 | | pumped almost $6 million into this entity over just that |
| 11:59:00 20 | | time period, pursuant to the investigation of the U.S. |
| 21 | | Senate. |
| 22 | | Do you see that, sir? |
| 23 | **A** | I -- I see the charts and those numbers, yes. |
| 24 | **Q** | And if you look at some more specific -- well, let's |
| 11:59:23 25 | | do it this way.  In addition to the money paid to that |

4891

**Wailes (Cross by Lanier)**

1    entity, if we were to go through this report and look at the

2    other entities -- by the way, did you know that before this

3    report came out?

4    **A**    I don't have any knowledge of the actual numbers and

11:59:48 5    the cumulative amount.  I was aware that our association, as

6    all associations, seek funds from multiple different, call

7    them vendors, people that are interested in our specialty

8    and to exhibit at the exhibit hall and to help sponsor our

9    educational function.

12:00:13 10    **Q**    Yeah, so when we look at a document like you put in

11    front of the jury yesterday, we've marked ours Plaintiffs'

12    Exhibit 2999, but it had a different mark when you used it

13    yesterday, the Joint Statement on Pain from the DEA, do you

14    remember this?

12:00:25 15    **A**    Yes, I do.

16    **Q**    And this is something you cite and you had a slide to

17    it.  This was your slide.  It was Slide Number 14.  Focusing

18    only on the abuse potential could erroneously lead to the

19    conclusion these drugs should be avoided when medically

12:00:40 20    indicated generating a sense of fear rather than a

21    legitimate respect for their properties.

22         Do you remember that?

23    **A**    Yes, I do.

24    **Q**    And that was a joint statement between the DEA, but

12:00:54 25    also 21 health organizations.

**Wailes (Cross by Lanier)**

1          Do you see that as well?

2     **A**     Yes.

3     **Q**     Those health organizations included the ones that were

4     being funded, by and large, or at least to a great degree,

12:01:10 5     by the companies that made the opioids; right?

6     **A**     I think the DEA would be an exception to that.

7     **Q**     You think what?

8     **A**     I think the DEA was not receiving funds from the

9     opioid manufacturers.

12:01:23 10     **Q**     Oh, I'm not fussing that point.  I'm talking about the

11     21 health organizations, American Pain Society.

12          You know who they were, don't you?

13     **A**     Yes.

14     **Q**     They were tight, tight, tight with Purdue Pharma,

12:01:40 15     weren't they?

16     **A**     Again, I think most pain organizations received

17     funding from multiple sources, including many of them Purdue

18     Pharma.

19     **Q**     American Pain Foundation, tight with the opioid

12:01:55 20     manufacturers; right?

21     **A**     Again, I don't know the exact relation, but, again,

22     I'm assuming that most pain organizations, to support their

23     educational meetings and all that, recruited funds from a

24     number of different pharmaceutical companies, including

12:02:09 25     Purdue.

1   **Q**    $5 million to the American Academy of Pain Medicine

2   over less than a decade.

3        Y'all must have tremendous educational programs.

4   **A**    That supports a lot of meetings.  The meetings are

12:02:29 5   very expensive, and yes.

6   **Q**    And then at these meetings you've also got money

7   coming from the drug manufacturers, don't you?

8   **A**    I think you need to be more specific in that question.

9   I'm not sure what you mean.

12:02:40 10  **Q**    Well, did you know, in 2001 and -- hold on.

11       Did you know Jeff Engle?

12  **A**    That rings bells.

13  **Q**    Now, Purdue was I think even throwing money into the

14  California Medical Association where you are, right?

12:03:11 15  **A**    It's possible.  Again, every medical organization

16  seeks funding for their programs and pharmaceutical

17  companies are frequent funders for educational programs.

18  **Q**    So -- sorry.  So if we look at Plaintiffs' 21873,

19  would you agree with me that -- getting this out -- that the

12:03:33 20  drugs companies aren't just funding this for nothing, they

21  expect to get something out of it; right?

22  **A**    They want something out of it, yes.

23  **Q**    Yeah, they want -- they want close touches with you

24  prescribers, don't they?

12:03:46 25  **A**    They want to get their name out there as advertising,

4894

**Wailes (Cross by Lanier)**

1    I believe.

2    **Q**    Well, it's not just that.  They want -- they want to

3    have VIP seats; right?

4                    MR. MAJORAS:  Objection, Your Honor.

12:04:13  5              THE COURT:  Overruled.

6                    THE WITNESS:  I'm not sure how to answer that.

7    BY MR. LANIER:

8    **Q**    All right.  Let me ask it this way: Take a look at

9    21873.  This is your American Academy of Pain Medicine.

12:04:23  10   It's on your website where you're on the board of trustees.

11        Do you see that?

12   **A**    You're referring to the website?  I have a document in

13   front of me.  What -- I'm not sure what you're saying.

14   **Q**    I pulled this off the website.  It's the section on

12:04:40  15   how to be a corporate supporter of your American Academy of

16   Pain Medicine.

17        Do you see that?

18   **A**    I see the heading on it, and it's not part of the

19   website I would frequent, so I have not seen this before.

12:04:54  20   **Q**    Well, you're on the board of directors.  See if this

21   information seems foreign to you or if it reflects the

22   policy.

23        AAPM offers opportunities to engage leaders in pain

24   medicine, untrue?

12:05:18  25   **A**    You're read that from someplace, I'm sure.

## Wailes (Cross by Lanier)

1  **Q**    But is it factual, sir?  Is it an accurate reflection

2  of the truth?

3  **A**    I'm sorry.  Could you repeat the question?

4  **Q**    Yes.  Does the AAPM offer opportunities to engage in

12:05:31  5  leaders in pain medicine to corporate supporters?

6  **A**    At some broad indirect level, yes.

7  **Q**    Are there ways to reach your audience, including

8  advertising in your eNews, the Academy's official

9  newsletter?

12:05:51  10    Do y'all offer that opportunity?

11  **A**    That's probably one of the opportunities they have.

12  **Q**    At the annual meeting do you offer commercial

13  opportunities and pre-conferences that includes satellite

14  symposia, sponsorship, supporting fellows and residents to

12:06:12  15  attend the meeting and exhibit?  True?

16  **A**    That sounds like our educational sessions.

17  **Q**    And via the corporate relations council, have you ever

18  served on that?

19  **A**    No, I have not.

12:06:24  20  **Q**    Benefits of participating in the corporate relations

21  council on various levels include special meetings with AAPM

22  leaders.

23    Have you had special meetings with these opioid

24  manufacturers?

12:06:40  25  **A**    I don't believe so, but again, I'm not one of the

**Wailes (Cross by Lanier)**

1    leaders, per se, but I'm on the board of directors.

2    **Q**    Invitations to the AAPM president's reception.

3          Have you ever been to the AAPM's president reception?

4    **A**    Yes, I have.

12:06:53  5    **Q**    Did you see the opioid manufacturers there?

6    **A**    I have no specific recall.  They're rather large

7    receptions.

8    **Q**    Opportunities for visibility and communication.

9          Those opportunities may be there, but you're saying

12:07:09  10    you've just never seen them?

11    **A**    I'm not saying that.  I'm saying I have no specific

12    recall of seeing them at a large reception.

13    **Q**    And I asked you about VIP seats because of this

14    slide -- I mean, this page.  That highlighter is mine, by

12:07:21  15    the way.  It was not highlighted on the web.  I don't want

16    to misrepresent that.

17          But you see those VIP seats?

18    **A**    Yes, I do.

19    **Q**    Throughout the year, AAPM offers year-round

12:07:34  20    opportunities for supporting various programs and

21    initiatives.

22          Do you see that?

23    **A**    Yes, I do.

24    **Q**    The corporate relations council.  Reserve your seat.

12:07:54  25    Benefits of partnering with AAPM offers many opportunities

**Wailes (Cross by Lanier)**

1    to interact with the leading pain physicians and clinicians

2    of pain management treatment teams.

3        Do you see that?

4    **A**    Yes, I see this.

12:08:08   5    **Q**    This is a format for establishing and building

6    relationships.

7        Do you see that as well?

8    **A**    Yes.

9    **Q**    And then we have the corporate relations council of

12:08:25  10    the American Academy of Pain Medicine partners in seeking

11    new advances in the specialty of pain management and optimum

12    quality of life for pain patients.  The council enables you

13    to connect in a more significant way with the leaders in

14    pain management.

12:08:42  15        I'm basically almost through with this, but do you see

16    that as well?

17    **A**    Yes, I do.

18    **Q**    And you can do it on different levels, the premier

19    level, or the associate level; right?

12:08:51  20    **A**    Yes.

21    **Q**    And that's where you'll find companies, including

22    Teva, whom you know to be an opiate company; right?

23    **A**    Yes.

24    **Q**    And that's still today going on, isn't it?

12:09:04  25    **A**    I believe so.

**Wailes (Cross by Lanier)**

1            MR. LANIER:  Your Honor, I lost track of time,

2      and I apologize, and I apologize to the jury.

3            THE COURT:  Well, I didn't want to cut you off

4      in the middle but this is a good place to stop.

12:09:12  5            MR. LANIER:  You're very kind, Judge.  I'm

6      sorry, and I'm sorry to the jury.

7            THE COURT:  Ladies and gentlemen, we'll break

8      for lunch until 1:10, usual admonitions apply, and then

9      we'll pick up with the balance of the doctor's testimony.

12:09:25 10            (Jury excused from courtroom.)

11            (Recess was taken at 12:09 p.m.)

12

13

14

15                 PAGE LEFT INTENTIONALLY BLANK

16

17

18

19

20

21

22

23

24

25

**Wailes (Cross by Lanier)**

|  |  |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | (In open court at 1:12 p.m.) |
| 3 | COURTROOM DEPUTY:  All rise. |
| 4 | (Jury returned to courtroom.) |
| 13:13:50 5 | THE COURT:  Okay.  Please be seated. |
| 6 | Doctor, you're still under oath. |
| 7 | And, Mr. Lanier, you may continue, please. |
| 8 | MR. LANIER:  Thank you, Your Honor. |
| 9 | May it please the Court, ladies and gentlemen. . . |
| 13:14:04 10 | BY MR. LANIER: |
| 11 | **Q**   Sir, I think the jury may have heard a reference, some |
| 12 | may already know, what PubMed is. |
| 13 | **A**   Yes. |
| 14 | **Q**   Do you know? |
| 13:14:15 15 | **A**   Yes, I do. |
| 16 | **Q**   PubMed is the database of medical publications; right? |
| 17 | **A**   It is a database for medical publications. |
| 18 | **Q**   And you can type in a name of an author and pull up |
| 19 | any publications by that author.  True? |
| 13:14:28 20 | **A**   It doesn't contain all publications, but it does |
| 21 | contain most publications, yes. |
| 22 | **Q**   Did you have a chance over lunch to go to PubMed and |
| 23 | to look up, or did you remind yourself of your article? |
| 24 | **A**   I did not personally look it up over lunch. |
| 13:14:46 25 | **Q**   Okay.  Do you remember now what your article was or |

**Wailes (Cross by Lanier)**

1    where it was published?

2    **A**    I have no further recall from what I discussed before.

3    **Q**    Okay.  That's all I was checking.

4    A couple other things to clean up.

13:15:00 5    I want make sure the record is right.  When we looked

6    at Plaintiffs' Exhibit 18314, which was the money that was

7    contributed by all these different opioid companies to your

8    pain -- American Academy of Pain Medicine, I forgot to note

9    for the record this important footnote, that during final

13:15:27 10    stages of the committee's investigation -- to make it big

11    enough to read, I'm going to have to do some movement

12    here -- AAPM provided additional data showing millions of

13    dollars in additional payments from opioid manufacturers to

14    AAPM and an affiliated entity, the American Academy of Pain

13:15:50 15    Medicine Foundation.

16    So in addition to the nearly 6 million AAPM received

17    directly from opioid manufacturers, the organization

18    reported 1.1 million in revenue from the foundation during

19    those years 2013 to 2017?

13:16:13 20    Do you see that as well?

21    **A**    Yes, I do.

22    **Q**    And then the data shows the foundation got a million

23    dollars in payments from opioid manufacturers from 2013 to

24    '19.

13:16:26 25    Do you see that also?

**Wailes (Cross by Lanier)**

| | | |
|---|---|---|
| | 1 | **A**   I do. |
| | 2 | **Q**   Now -- a second matter to clean up. |
| | 3 | That dinner that we talked about you going to, |
| | 4 | Plaintiffs' Exhibit 21857, remember the dinner? |
| 13:16:50 | 5 | **A**   I remember the e-mail that you showed me. |
| | 6 | **Q**   Right.  You did not remember the dinner. |
| | 7 | Here's what I failed to point out.  And Dr. David |
| | 8 | Haddox, do you know him? |
| | 9 | **A**   I -- acquainted with him, yes. |
| 13:17:09 | 10 | **Q**   Yeah, this fellow who's doing the dinner things with |
| | 11 | y'all is with Purdue.  He was a vice president for Purdue, |
| | 12 | wasn't he? |
| | 13 | **A**   I knew he was somewhere up in the organization of |
| | 14 | Purdue, yes. |
| 13:17:24 | 15 | **Q**   So the dinner that your AAPM delegate dinner with the |
| | 16 | AMA is one that Purdue's going to be at, vice president it |
| | 17 | seems. |
| | 18 | Does that ring a bell to you as to whether or not you |
| | 19 | remember the dinner? |
| 13:17:40 | 20 | **A**   Vaguely, yes. |
| | 21 | **Q**   Now, in your slide presentations to this jury you gave |
| | 22 | this slide about your qualifications.  It was Slide Number |
| | 23 | 2. |
| | 24 | Do you recall that? |
| 13:17:59 | 25 | **A**   I do recall that. |

### Wailes (Cross by Lanier)

1  **Q**    And that is a slide which says you are a

2  board-certified pain management doctor; correct?

3  **A**    That's correct.

4  **Q**    So we're clear, you list that on your CV as well,

13:18:17  5  don't you?

6  **A**    Yes.

7  **Q**    In fact, your CV -- I'm putting up demo 76 -- has

8  three different boards that have certified you; is that

9  right?

13:18:29  10  **A**    That's correct.

11  **Q**    The American Board of Pain Medicine.  That's your AAPM

12  that we've been talking about; correct?

13  **A**    It's an affiliate with the AAPM.

14  **Q**    And then you claim on your resume, on your CV, to be

13:19:01  15  board-certified by that other group that you have slightly

16  familiarity with and don't know if you've got anything to do

17  with them now or not.

18       Remember?

19  **A**    I recall that, and they were the first pain

13:19:10  20  organization to have a board certification in the early

21  '90s, and that was the first test that was available, and so

22  I did take that test and join their organization.

23  **Q**    So you still have it on your CV?

24  **A**    Yes.

13:19:25  25  **Q**    This is what you post on your website?

4903

**Wailes (Cross by Lanier)**

1    **A**    Yes.  I'm still officially certified with them even

2    though the organization itself is no longer present.

3    **Q**    So you've got a board certification that you advise on

4    your website that doesn't even exist anymore?

13:19:43  5    **A**    The company that initially gave that to me no longer

6    exists.

7    **Q**    So you're board-certified, does it -- with someone who

8    is non-existent?

9    **A**    Concurrently non-existent.

13:20:04  10    **Q**    You understand the California Medical Board has rules

11    of ethics, right?

12    **A**    Yes.

13    **Q**    And you understand those rules of ethics have to do

14    with how you advise in your web space, doesn't you?

13:20:15  15    **A**    Yes.

16    **Q**    And you know it's no small thing to put something

17    false on your web space.  Don't you?

18    **A**    I'm sure that's true.

19    **Q**    In fact, it's an ethical violation, isn't it?

13:20:27  20    **A**    It would be -- false advertising is not good.

21    **Q**    Well, not only not good, it's subject to sanctions;

22    right?

23    **A**    It may be.

24    **Q**    No, not may be, it is; isn't it?

13:20:37  25    **A**    I don't -- I'm not certain of that, but I would not be

**Wailes (Cross by Lanier)**

1    surprised.

2    **Q**    So you've got a resume telling me come see me because

3    of who I am that lists an article that you're not an author

4    on and that claims to be board-certified by an entity that

13:20:58 5    doesn't even exist anymore; right?

6    **A**    That is true.  The article I still -- I apologize,

7    that's not the right article.  I still recall of being an

8    author, not the first author, but an author on an article

9    regarding the same subject.

13:21:16 10    **Q**    Do you remember your PubMed login where I could put it

11    up here and we could all login together to PubMed and type

12    in your name see if anything comes up?

13    **A**    I go to PubMed easily just by going to PubMed.

14    **Q**    You don't have to log in.  So we could --

13:21:38 15         Rachel, my iPad is right down there.

16         So we could go up here, and what do I type in, what

17    are we looking for, PubMed?

18    **A**    Yes.

19    **Q**    And you spell your name R-o-b-e-r-t, W-a-i-l-e-s; is

13:22:26 20    that right?

21    **A**    Yes.

22    **Q**    Now look what it pulls up.  It pulls up that very

23    article where you're not an author but you're listed as a

24    collaborator because you're part of the investigation team,

13:22:47 25    Robert Wailes.

**Wailes (Cross by Lanier)**

1          Do you see that?

2     **A**     Yes.

3     **Q**     Not an author, are you?

4     **A**     Not in this, no.

13:22:54   5     **Q**     Found one result for Robert Wailes, and is it still

6     your testimony under oath that you're published somewhere

7     with another article of this study?

8     **A**     I believe so, yes.

9     **Q**     Okay.  Now, on the board certification issue, before

13:23:19  10     we leave that, there is an organization that crosses all of

11     the medical professions that certifies people for a board

12     certification; right?

13     **A**     I believe so.

14     **Q**     You're familiar with the American Board of Medical

13:23:47  15     Specialties?

16     **A**     Yes.

17          MR. LANIER:  Rachel, would you please pass out

18     21871 and 21872?

19     BY MR. LANIER:

13:24:24  20     **Q**     Do you have those in front of you, sir?

21     **A**     Yes, I do.

22     **Q**     21871 is a general page that gives information about

23     the American Board of Medical Specialties.

24          Do you see that?

13:24:40  25     **A**     Yes.

**Wailes (Cross by Lanier)**

1    **Q**    Higher standards.  Better care.  And that's what's

2    generally meant by board certification in the medical world.

3          Fair?

4    **A**    Correct.

13:24:49    5    **Q**    And those people board-certify in a lot of different

6    areas, that's Plaintiffs' Exhibit 21872, and these are the

7    different areas where you can get board-certified like most

8    doctors mean when they say they're board-certified; right?

9               MR. MAJORAS:  Objection to form as to what

13:25:14    10    other doctors mean.

11               THE COURT:  Well. . . all right.  Sustained as

12    to form.

13               MR. LANIER:  Okay.

14    BY MR. LANIER:

13:25:21    15    **Q**    In your medical parlance that you commonly use or hear

16    others use, the idea of being board-certified in the general

17    broader medical community is talking about someone with a

18    board certification by the American Board of Medical

19    Specialties; right?

13:25:41    20    **A**    In general that's true.  In California, they actually

21    do certify other boards as well.

22    **Q**    Okay.  That's fair.

23          Now, there's a whole different area -- areas where

24    someone can be board-certified; correct?

13:25:59    25    **A**    Yes.

4907

**Wailes (Cross by Lanier)**

1    **Q**     And you have one of those board certifications, don't

2    you?

3    **A**     Yes, I do.

4    **Q**     That's your American Board of Anesthesiology with the

13:26:06  5    subspecialty certification that I've highlighted in blue;

6    right?

7    **A**     That's correct.

8    **Q**     But these other things that you list as a board

9    certification, these are, shall -- well, let's go to the

13:26:18  10   first one.  This is just kind of its own certification

11   within the organization.  It's not accredited certification

12   by the American Board of Medical Specialties; true?

13   **A**     It is recognized throughout the country in many

14   states, and the state of California recognizes it as a

13:26:43  15   scientifically based and valid board certification.

16   **Q**     That wasn't my question, sir.

17        I said that's not part of the American Board of

18   Medical Specialties that board certifies doctors; right?

19   **A**     That's correct.

13:26:57  20   **Q**     Thank you.

21        And then the other one, of course, we've already

22   covered.  They don't even exist anymore; right?

23   **A**     That's correct.

24   **Q**     Before I leave the first stop, my last set of

13:27:10  25   questions is hopefully pretty quick and simple.

**Wailes (Cross by Lanier)**

1              We've talked about who you are.  I'd like to now,

2      before we move on, talk about who you are not.

3              Are you able to see that okay?

4      **A**      Yes, I can.

13:27:43  5      **Q**      You're not a primary care doctor, are you?

6      **A**      No, I am not.

7      **Q**      And you're not an emergency medical doctor; right?

8      **A**      No.

9      **Q**      You're not an urgent care doctor?

13:27:55 10      **A**      Nope.

11      **Q**      You're not a general surgery doctor?

12      **A**      No, sir.

13      **Q**      You're not an OB/GYN doctor?

14      **A**      No, sir.

13:28:04 15      **Q**      You're not an oncologist?

16      **A**      Nope.

17      **Q**      You're not hospice provider?

18      **A**      No, sir.

19      **Q**      You're not a dentist?

13:28:14 20      **A**      I'm hospice provider.  I have cared for hospice

21      patients in the past as part of my practice, so I'm not a

22      hospice specialist, but I have provided care for hospice

23      patients.

24      **Q**      Oh, and I bet you delivered babies while you were in

13:28:27 25      medical school at some point.

**Wailes (Cross by Lanier)**

1    **A**    No, this is during my practice in my career as pain

2    management.

3    **Q**    Yeah, and I'm not fussing that.  I'm asking, is that

4    your area of specialty?  Are you a hospice provider?

13:28:39  5    **A**    I am a hospice provider, I am not a hospice

6    specialist.

7    **Q**    Okay.  All right.  Yes.  I'll put yes.

8          Are you a dentist?

9    **A**    No.

13:28:50  10    **Q**    Are you a podiatrist?

11    **A**    No.

12    **Q**    Are you a psychiatrist?

13    **A**    No.

14    **Q**    Are you a board-certified addiction doctor?

13:28:58  15    **A**    No.

16    **Q**    And I left one out.  Are you a pharmacist?

17    **A**    No.

18    **Q**    So you testified in this area about the work that

19    primary care doctors do, but you're not a primary care

13:29:33  20    doctor.  Fair?

21    **A**    I am not a primary care doctor, correct.

22    **Q**    And whether you testified about what emergency

23    medicine doctors do, that's not you either; is it?

24    **A**    I am not an emergency medicine doctor.

13:29:43  25    **Q**    Whether you testified about what urgent care doctors

**Wailes (Cross by Lanier)**

1    do, you're not one of those, are you?

2    **A**    No, I am not.

3    **Q**    All surgical specialties.  I put general surgery.

4    That's not you either, is it?

13:29:55  5    **A**    I'm a surgical subspecialty.

6    **Q**    Right, but all surgical specialties.  That means are

7    you -- do you do knee replacements?

8    **A**    No, I don't.

9    **Q**    Hip replacements?

13:30:07 10    **A**    No, I don't.

11    **Q**    Do you do herniated nucleus pulposis?

12    **A**    Yes.

13    **Q**    Okay.  So do you do fusions or do you do

14    laminectomies?

13:30:17 15    **A**    Neither.

16    **Q**    So when I say herniated nucleus pulposus, in terms of

17    treating them as an orthopedic surgeon or neurologist, do

18    you do that?

19    **A**    Neurologist don't treat those.

13:30:30 20    **Q**    Well, they do if they are in the neck.

21          Did you not know that?

22    **A**    Neurosurgery does, not neurologists.

23    **Q**    Neurosurgery is a type of --

24                [Court reporter clarification.]

25

**Wailes (Cross by Lanier)**

1    BY MR. LANIER:

2    **Q**    All right.  And I apologize.  Sir, I don't want to

3    spend the time fussing over this.  We can fuss about this

4    outside.

13:30:43  5        But my question is, are you all surgical specialties?

6    **A**    No, I am not.

7    **Q**    And yet you testified about them too, didn't you?

8    **A**    Yes, I did.

9    **Q**    Are you an OB/GYN?

13:30:54  10   **A**    No, I'm not.

11   **Q**    And you testified about that, right?

12   **A**    Yes.

13   **Q**    You testified about oncologists, didn't you?

14   **A**    Yes, I did.

13:31:00  15   **Q**    Testified about hospice providers, of which you are

16   one?

17   **A**    Yes.

18   **Q**    Testified about dentists and what they do.  That's not

19   you either?

13:31:07  20   **A**    That's correct.

21   **Q**    Testified about podiatrists and what they do.  That's

22   not you either?

23   **A**    Correct.

24   **Q**    Testified to some degree about psychiatrists, but

13:31:16  25   you're not one of those?

**Wailes (Cross by Lanier)**

1    **A**    That's correct.

2    **Q**    Testified to some degree about board-certified

3    addiction doctors, like Dr. Lembke.  You're not one of

4    those?

13:31:25  5    **A**    That's correct.

6    **Q**    Testified about pharmacists all day long, and you're

7    not one of those?

8    **A**    My opinions are based on the relationship between a

9    prescriber and pharmacists.

13:31:34  10    **Q**    Because what you are is you are a high-volume

11    opioid-prescribing, pain clinic owning doctor from Southern

12    California; right?

13    **A**    No.  In fact, we're famous for not being high volume.

14    The fastest office visit we have is 20 minutes, so we are

13:32:10  15    not a high volume.  We're actually known for being

16    comprehensive care and not having a large volume of patients

17    going through and see us.

18    **Q**    So let me define high volume my way and see if I need

19    to modify it on here.  You tell me the right word.

13:32:24  20    Most of your patients get opioids, don't they?

21    **A**    The majority of our patients do receive opioids.

22    **Q**    So what would you call that if not high volume?

23    **A**    I think the two are very unrelated.  We take opioid

24    prescribing very seriously.  We're not a high volume

13:32:38  25    practice.  We don't see people every 5 minutes, every

4913

**Wailes (Cross by Lanier)**

1    10 minutes, or even every 15 minutes.  It takes time to do

2    the type of practice that I aspire to.

3    **Q**     How about high percentage?

4    **A**     If you say a high percentage opiates, that would be

13:32:55  5    accurate.

6    **Q**     Okay.  Because, I mean, you understand you got hired

7    in this case, and you got hired in Florida, but there are a

8    lot of doctors between Cleveland and California that got

9    passed over to get to you; right?

13:33:12  10    **A**     That's true.

11    **Q**     And it's not because you've well-published in this

12    field.  You haven't published anything, have you?

13    **A**     I'm not from the ivory tower, no.  I'm a person who

14    sees patients.

13:33:24  15    **Q**     Well, so does the people who published, but I'm not --

16    I mean, you're not fussing Dr. Lembke sees patients multiple

17    days a week, are you?

18    **A**     I don't know her schedule.

19    **Q**     Okay.  Some doctors have time to see patients and

13:33:39  20    publish, don't they?

21    **A**     That's true.

22    **Q**     Did it -- did you question why are you coming here to

23    California to find me to testify about all of these

24    different areas when I'm not one of those?

13:33:58  25    **A**     I don't think this case is only about academic

**Wailes (Cross by Lanier)**

1      opinions, and so I think I offer a different perspective.

2      **Q**    You offer the perspective of someone who prescribes

3      opioids and has done so for most of his life.  Fair?

4      **A**    I think my perspective also includes my experience

13:34:15  5    with the Medical Board of California in looking at the

6      standard of care as well as having national awareness of all

7      the specialties at the house of delegates for the AMA as

8      well as within my own specialty at the American Academy of

9      Pain Medicine, so I'm offering --

13:34:32  10   **Q**    With due respect, your California--

11     **A**    Can I finish?

12     **Q**    Oh, I'm sorry.  I was -- I'm sorry.  Go ahead.

13     **A**    Offers me a perspective about my specialty throughout

14     the entire country.  And I've certainly met a lot of

13:34:47  15   doctors, especially from -- including from Ohio and the

16     Cleveland Clinic specifically and it's been a good

17     experience and provides background along with my 37 years of

18     practice.

19     **Q**    Great.  And we're going to talk about some of those

13:34:59  20   Ohio doctors and see what you're familiarity is now as we

21     move down the road.  Okay?

22     **A**    Okay.

23     **Q**    So let's move from who is Robert Wailes to vision

24     limits.  All right?

13:35:28  25        Now, on vision limits, I've drawn up another little

4915

**Wailes (Cross by Lanier)**

1    road stop for us on it.  I want to do two things.  I want to

2    talk about things that you've seen and relied on and things

3    you have not seen and that's how we'll cover this vision

4    limit stop.  Okay?

13:35:50  5    **A**    Okay.

6    **Q**    All right.  I saw in your reliance materials some DEA

7    PowerPoints; fair?

8    **A**    Yes.

9    **Q**    I saw in your reliance materials that you've relied

13:36:02  10    upon some regulations.  Fair?

11    **A**    Yes.

12    **Q**    I want to talk about what I did not see in your

13    reliance materials with you.  First of all, as a general

14    concept, would you agree with me that it's important to get

13:36:17  15    data, to get information?

16    **A**    I'm not sure the context of what you're asking about,

17    but --

18    **Q**    Almost any, but certainly if you're going to express

19    an opinion you want to do your homework first, don't you?

13:36:32  20    **A**    Information's important when providing opinions.

21    **Q**    You don't go treat a patient without finding out who

22    they are first; right?

23    **A**    That's correct.

24    **Q**    You don't treat a patient without doing an

13:36:43  25    examination, do you?

**Wailes (Cross by Lanier)**

```
          1    A     That's correct.

          2    Q     You want to go to medical school before you practice

          3    medicine; right?

          4    A     Absolutely.

13:36:52  5    Q     You want to train to do surgery before you do surgery;

          6    right?

          7    A     Yes.

          8    Q     So it's important to gather information before you

          9    come in for a chance to testify; right?

13:37:07 10    A     Yes.

         11    Q     Now, during your information gathering you weren't

         12    making -- charging the 14 hundred or whatever it is an hour,

         13    it's less for that; right?

         14    A     Yes.

13:37:16 15    Q     What was your hourly rate for your information

         16    gathering?

         17    A     $729.

         18    Q     729?

         19    A     Yes.

13:37:27 20    Q     Why don't you just do 750, 730?

         21               MR. MAJORAS:  Objection, Your Honor.

         22    BY MR. LANIER:

         23    Q     You did 729.

         24               THE COURT:  Overruled.

13:37:36 25               THE WITNESS:  Those are the prevailing rates
```

4917

**Wailes (Cross by Lanier)**

1       among colleagues of my in Southern California, and those

2       have the been the rates I've had for quite a while and

3       commensurate with other doctors I'm familiar with.

4       BY MR. LANIER:

13:37:51  5     **Q**      729 is the prevailing rate.  Okay.  So let's go

6       through this and see what you didn't see.  All right?

7              First of all, did anybody put handcuffs on you about

8       what you could or couldn't see?

9       **A**      No handcuffs.

13:38:06 10     **Q**      Okay.  So the world was open; right?

11      **A**      I suppose so.

12      **Q**      All right.  But you never looked at Walgreens'

13      policies, did you?

14      **A**      Not specifically, no.

13:38:19 15     **Q**      Before you came and testified about red flags, you

16      never looked at Walgreens' company expectations on red

17      flags, did you?

18      **A**      Not specifically, no.

19      **Q**      Before you came and testified about what is a red flag

13:38:33 20     and what's not a red flag, you never looked at Walgreens'

21      company expectations on that, did you?

22      **A**      No.

23      **Q**      So if Walgreens lists --

24              MR. LANIER:  Well, Your Honor, I'd ask to be

13:38:47 25     able to publish Plaintiffs' Exhibit 19616.

**Wailes (Cross by Lanier)**

BY MR. LANIER:

**Q**     Do you have a copy of Walgreens -- I mean, of
Plaintiffs' 19616, sir?

**A**     I believe so.

**Q**     If you will look on the fourth page you'll see the
start of the PowerPoint where Walgreens talks about good
fate dispensing training.

        Do you see that?

**A**     Yes.

**Q**     And this is all about prescription integrity.

        Do you see that as well?

**A**     I see that written on the page, yes.

**Q**     And you can see from the front we're in the years
2017, so this is about 4 years ago, at least the e-mail to
which this is attached.

        Do you see that?

**A**     I see the e-mail address, yes.

**Q**     And the timestamp on the e-mail; right?

**A**     Yes.

**Q**     If you'll look at Slide Number 10, which is Page 12 of
the document, here are the company expectations for
Walgreens.

        In your groups, make a list of red flags that may
indicate a prescription is not legitimate.  You got
2 minutes.  At the end of 2 minutes, be prepared to share

## Wailes (Cross by Lanier)

1      your list.  This is a training session.

2           Do you see that?

3    **A**    I see that, yes.

4    **Q**    And then look at what the next slide is.  Here are the

13:40:33 5    company expectations.

6           Red flags.

7           Do you see those?

8    **A**    I will soon.

9    **Q**    It's Slide 11, Number 13 -- Page 13.

13:40:48 10          You got it?  Do you have it, sir?

11   **A**    Not yet, but I'm -- there's different page numbers on

12   the paper and the slides.

13   **Q**    Yes, it's Slide 11, it's Page 13.

14          Slide 11.  Page 13.

13:41:13 15          Tell me when you're there.

16   **A**    I see.

17   **Q**    Do you see it?

18   **A**    Yes.

19   **Q**    All right.  Now, in that regard, sir, look at what the

13:41:30 20   company expectations are around red flags.

21          Do you see that?

22   **A**    I'm looking at that now, yes.

23   **Q**    And we can compare it with some of these that I pulled

24   from a different document of an expert, but when you compare

13:41:53 25   it, these are a lot of ones where you said possibly and even

4920

**Wailes (Cross by Lanier)**

1    not usually.

2         Do you see that?

3    **A**    Yes.  I don't --

4    **Q**    So you disagree with Walgreens' training program where

13:42:06  5    they are they're training their pharmacists that large

6    quantities of prescription or large number of controlled

7    substances prescriptions are a red flag, not possibly, they

8    are.

9         You disagree; right?

13:42:16 10  **A**    That's incorrect, and that misstates my testimony.

11   **Q**    So do you agree?

12   **A**    I've always --

13              MR. MAJORAS:  Objection.  May he finish?

14              THE COURT:  Hold.  Hold it.  Let the doctor

13:42:25 15  finish his answer.  Then, Mr. Lanier, you can ask another

16   question.

17              MR. LANIER:  Yes, sir.  I'm sorry, Judge.

18              THE WITNESS:  I've been clear that red flags

19   are appropriate and useful prompts, but not the Catizone red

13:42:35 20  flags, and I've been specific about what objections I have

21   with his red flags.

22   BY MR. LANIER:

23   **Q**    Well, sir, this second red flag that is here is one

24   that you were criticizing Mr. Catizone for, cocktails,

13:42:52 25  opiate, benzodiazapines, and muscle relaxant combos.

4921

**Wailes (Cross by Lanier)**

1          Do you see that?

2    **A**    I see that.

3    **Q**    And that's one you criticized Dr. Catizone -- or

4    Mr. Catizone over, wasn't it?

13:43:00  5    **A**    Yes, for very specific reasons, and I would do it

6    again gladly.

7    **Q**    So when the company expects their pharmacists to

8    recognize this as a red flag, you disagree with the company,

9    don't you?

13:43:11  10    **A**    No.  That's out of context.  Again, my objections with

11    Mr. Catizone were not general red flags.  My objection was

12    his algorithmic -- the mechanical way that he approaches red

13    flags and specifically on the trinity that he in his report

14    said that it was no prescriptions for the trinity were

13:43:34  15    medically legitimate prescriptions, and I disagree with

16    that.  There are occasions where it is legitimate.

17          I disagreed that it has to be resolved -- in this

18    particular case he has no resolution because he says no --

19    it's -- that it's not legitimate.  So that's where we

13:43:52  20    differ.  Is it a general red flag?  Yes, it is.  I think

21    we're in agreement that many of these things should bring

22    special attention for a pharmacist, and I support that.

23    **Q**    So now you'll agree that all of these possibles are,

24    in fact, red flags; you just challenge how you deal with a

13:44:12  25    red flag; right?

4922

**Wailes (Cross by Lanier)**

1    **A**     In essence, yes.

2    **Q**     So if we look at the testimony that's been offered in

3    this case, for example, from Michelle Travassos with CVS,

4    she testified in front of this jury, question:  Every red

13:44:29 5    flag that a pharmacist identifies --

6                    MR. DELINSKY:  Objection.  Objection,

7    Your Honor.

8                    (Proceedings at sidebar.)

9                    MR. DELINSKY:  Your Honor, my understanding is

13:44:48 10    that it has not been permitted to show witnesses testimony

11    from earlier in trial.  We have been abiding by that rule

12    certainly with our -- with our own experts, and I believe

13    that's the rule that's been followed --

14                    THE COURT:  He's not showing it.  He can

13:45:02 15    ask -- you can ask any witness whether you agree or disagree

16    with what another witness said, and he said I agree or she's

17    wrong.

18                    MR. LANIER:  And the whole reason that rule

19    exists is so that you can't question people live without

13:45:18 20    them having been prepped around this kind of stuff.

21                    THE COURT:  So it's a fair question.  Said

22    now, here's what so-and-so said, as long as that is what the

23    person said.

24        (Simultaneous crosstalk.)

13:45:25 25                    MR. DELINSKY:  But, Your Honor, here's another

**Wailes (Cross by Lanier)**

1   problem with it, it is -- this is horribly misleading out of

2   context.  Miss Travassos was crystal clear that there are

3   potential -- there's a differentiation between red flags and

4   then red flags.  The rule CVS follows, and by showing one

13:45:42   5   excerpt without the others is horribly misleading and

6   inappropriate.  That's why you don't ask witnesses about

7   passages from testimony --

8                  MR. LANIER:  No.  No.

9                  MR. DELINSKY:  -- that are stripped of their

13:45:52  10   context.

11                  MR. LANIER:  Well, he can redirect, Judge, if

12   I even remotely do anything wrong.

13                  THE COURT:  If it's -- you know --

14                  MR. LANIER:  I've got it, Judge.

13:45:59  15                  THE COURT:  I'm relying on both counsel to be

16   honest about this.

17                  MR. LANIER:  Yeah.  I've got it.

18                  THE COURT:  If not, you're going to be shown

19   to this jury as being dishonest, and I don't think anyone

13:46:08  20   wants that if you're a lawyer.

21                  MR. LANIER:  I got it, Judge.  And I'll tie it

22   in specifically to CVS's published red flags in just a

23   moment.

24                       (In open court at 1:46 p.m.)

13:46:25  25   BY MR. LANIER:

**Wailes (Cross by Lanier)**

1    **Q**    I'll represent to you that the question asked

2    Ms. Travassos with CVS was, well, every red flag that a

3    pharmacist identifies with a prescription must be resolved

4    before the pharmacist can fill the prescription; correct?

13:46:54  5         Answer:  Yes.

6         You disagree with Ms. Travassos -- Travassos, the

7    witness for CVS.  True?

8    **A**    If that's how she feels absolutely, then that gives no

9    judgment at all to the pharmacist, so I would disagree.

13:47:13 10   **Q**    Well, of course it gives judgment to the pharmacist

11   because the pharmacist can decide to do the due diligence

12   and decide to resolve it; correct?

13   **A**    They can do their best to resolve it, but there are

14   times when they will not be able to resolve it if they can't

13:47:27 15   get all the questions answered.

16   **Q**    And if they --

17   **A**    And they won't have the same information that the

18   prescriber has.

19   **Q**    Yeah.

13:47:34 20   **A**    The prescriber has all the medical background, the

21   medical decision-making and all that before even writing the

22   prescription, and if it's within the standard of care, and

23   99 percent of doctors or more are within the standard of

24   care, if they cannot resolve it, then I think it should err

13:47:52 25   on patient safety.  And that may mean, again, in the

4925

**Wailes (Cross by Lanier)**

1       judgment of the pharmacist, of providing the prescription.

2    **Q**    Well, but --

3    **A**    Or dispensing the prescription.

4    **Q**    There's still judgment.  If, for example, let's look

13:48:06  5   at CVS's red flags that they publish in Plaintiffs' 15656.

6       BY MR. LANIER:

7    **Q**    Have you got that, sir?

8    **A**    I believe I have 15656.

9    **Q**    Yeah.  You'll notice on the very front it says

13:48:43  10  awareness of red flags associated with the non-legitimate

11      use of controlled substances.

12          Do you see that?

13   **A**    Yes, I do.

14   **Q**    And if you'll flip toward the back, it's got on Page 4

13:48:54  15  of the document, prescriber controlled substance red flags.

16          Do you see that?

17   **A**    Yes, I do.

18   **Q**    Prescription is written by a prescriber located

19      outside of the pharmacy's local area.  Red flag.

13:49:16  20         Do you see?

21   **A**    I see that, yes.

22   **Q**    Now, if Ms. Travassos is correct that a pharmacist

23      should not be filling that until they resolve it, it doesn't

24      mean that the pharmacist's judgment is gone, because you can

13:49:33  25  ask the patient why they're traveling outside the local area

4926

**Wailes (Cross by Lanier)**

1    to visit the prescriber, can't you?

2    **A**    That's possible, yes.

3    **Q**    You can resolve this red flag by simple things like

4    that and hear them say, I'm going to the Cleveland Clinic

13:49:49  5    for a specialist?

6    **A**    That's very appropriate.

7    **Q**    And then you've resolved the red flag, you document

8    it, you dispense the drug?

9    **A**    Understood.

13:49:58  10    **Q**    It involves discretion and judgment of the pharmacist,

11    but you still resolve the red flag first.  You see?

12    **A**    In this case that you described it is, but what I was

13    bringing up and my specific objection is not this, but

14    rather when they cannot resolve it.  That's the issue that I

13:50:16  15    raise.

16    **Q**    So when they ask the patient why are you traveling

17    outside the local area and the patient says, uh, I don't

18    want to answer that, you think, well, prescribe it, that's

19    standard of care?

13:50:31  20    **A**    See, there's not enough information to answer your

21    question specifically.  Obviously, I don't know what the

22    case is or anything else, but I'm talking about those

23    challenging cases where they've perhaps have talked to the

24    patient and yet they need to speak with the doctor to get a

13:50:45  25    better understanding of what's going on.  And there are

**Wailes (Cross by Lanier)**

1    cases where they may not -- and again, it's not this

2    hypothetical that you gave me there because if they do

3    resolve it, that's great.  I'm talking about the cases where

4    they can't resolve it.

13:50:59    5    **Q**    You're talking about cases where individuals have been

6    known to travel great distances to visit prescribers who are

7    willing to write prescription for non-legitimate purposes.

8          Did you know that's happened?

9    **A**    I'm aware that that's a -- definitely has happened in

13:51:14   10    the past, and the bottom line is some things -- again, I

11    feel strongly that -- I'm -- the experience of pharmacists

12    in my background, my experience and background, tells me

13    that pharmacists are very diligent about looking at the

14    prescriptions closely.  But there may be circumstances where

13:51:33   15    they are not able to resolve it.  And if they're not able to

16    resolve any of their concerns or a hundred percent of their

17    concerns, it's at that time that they need to use their

18    clinical judgment.

19    **Q**    And yet that's what Ms. Travassos for Walgreens, at

13:51:49   20    least said, was not the -- I mean, for CVS, at least, said

21    was not the case.  The rule is don't issue; right?

22    **A**    We probably interpret that differently, yes.

23    **Q**    Okay.  And we can look at more of them.  They -- but

24    it's the same stuff.  We could look at, you know, patient

13:52:13   25    insists on paying cash for controlled substances.  Will not

**Wailes (Cross by Lanier)**

1    use insurance even if available.  You see?

2    **A**    Again, that's a red flag.

3    **Q**    And it's one that according to Ms. Travassos must be

4    resolved to the satisfaction of the pharmacist and

13:52:30  5    documented.  Fair?

6    **A**    I think the pharmacist should make every effort,

7    absolutely.  That's a good example of a red flag where the

8    pharmacist should be able to get to an answer.

9    **Q**    And -- all right.  With that we look at CVS.  Let's go

13:52:50  10   back to Walgreens.  Walgreens has these red flags that I've

11   got up here.

12       Do you see that?

13   **A**    Yes.

14   **Q**    And I think Walgreens witness on this was Brian Joyce

13:53:03  15   that the jury got to meet.

16       Mr. Joyce was asked, so it's a red flag that needs to

17   be investigated and resolved before the prescription is

18   filled; right?

19       Answer:  Yeah.

13:53:20  20       You resolve these things before you fill them.  Did

21   you know that from Walgreens' perspective?

22   **A**    Again, I would have to take it into context of the

23   exact situation, and my objection is very specific.  I'm

24   happy to go through it again, but I understand Walgreens --

13:53:38  25   how you explain the testimony.

4929

**Wailes (Cross by Lanier)**

1    **Q**     Well, not wanting to leave out Walmart.  Tasha Polster

2    from Walmart --

3                    MR. MAJORAS:  Objection, Your Honor.

4                    MR. LANIER:  I'm sorry, excuse me.  My brain

13:53:58  5    is fried, Judge.  I'm going to hold on to that and wait in a

6    minute anyway.  I want to do something else.

7    BY MR. LANIER:

8    **Q**     Sir, you didn't look at Walgreens' policies, you

9    didn't look at Walmart's policies, you didn't look at CVS's

13:54:13 10    policies.  True?

11   **A**     True.

12   **Q**     You didn't look at the fill histories in this case

13   that are relevant, did you?

14   **A**     I'm not sure exactly what a fill history is.

13:54:22 15   **Q**     Well, a fill history in the pharmaceutical world is

16   which prescriptions did they fill.

17        Did you know they have to keep those records?

18   **A**     I'm not familiar with the internal workings, so no, I

19   was not specifically familiar with that.

13:54:37 20   **Q**     Wait a minute.  You've been testifying about the

21   standard of care of pharmacists, and you did not know that

22   they had to keep records of prescriptions they filled for

23   controlled substances?

24                   MR. MAJORAS:  Objection.  He's testified about

13:54:51 25   the standard of care for physicians.

**Wailes (Cross by Lanier)**

1          MR. LANIER:  No, pharmacists.

2          THE COURT:  Overruled.  Overruled.

3          THE WITNESS:  No, I have not been testifying

4    regarding the standard of care for pharmacists.  I am not a

13:55:01  5    pharmacist, but I will testify to the relationship between a

6    physician writing a prescription and a pharmacist.

7    BY MR. LANIER:

8    **Q**     Sir, we've got your PowerPoint slides, and before I

9    even go there, we've got your expert report.

13:55:18 10         In your expert report you opined on the standard of

11   care of a pharmacist, didn't you?

12   **A**     You'd have to point out that area specifically for me

13   to comment on that.

14   **Q**     Well, you wrote your report, didn't you?

13:55:29 15   **A**     Yes, I did.

16   **Q**     And do you recall commenting and having an opinion on

17   the standard of care of pharmacists?

18   **A**     Not specifically.  I'm sure there may have been

19   inferences, but I do not hold myself out as a pharmacist so

13:55:50 20   I would not directly comment on that.

21   **Q**     You surprised me on this one so I got to pull your

22   report up.

23         I've got a copy, but it doesn't have a mark on it.

24   Does anybody -- do -- I'll put it on the ELMO so everybody

13:56:21 25   can see it on the Wolfe Vision.

**Wailes (Cross by Lanier)**

1              Is this your report, Robert Wailes, M.D.?

2     **A**    Yes, it is.

3     **Q**    And this is the opinions you listed in your report?

4     **A**    That's the first page of the index, yes.

13:56:37  5   **Q**    And do you talk about how pharmacists are trained to

6     evaluate prescriptions --

7                    MR. LANIER:  Your Honor, we'll mark this as

8     demo 106.

9                    THE WITNESS:  Yes.

13:56:52 10   BY MR. LANIER:

11    **Q**    But pharmacists are not, however, appropriately

12    trained or well-positioned to assess whether a prescriber

13    has prescribed any medication in accordance with then

14    prevailing medical standard of care.

13:57:13 15          Do you see that as well?

16    **A**    Yes.  I'm very happy to discuss the medical standard

17    of care.

18    **Q**    So when you offer a report where you speak about these

19    different aspects of pharmacists and their training and

13:57:37 20   their lack of training, is it safe to say you didn't even

21    know what their training involves as far as keeping records?

22    **A**    I actually specifically inquired as to their training,

23    and so I am aware of their training requirements.

24    **Q**    You --

13:57:57 25   **A**    I'm very aware of --

**Wailes (Cross by Lanier)**

1          THE COURT:  Let the doctor finish his answer.

2          MR. LANIER:  I'm sorry, Judge.  I hear it and

3    it short circuits.

4          THE WITNESS:  And I'm very aware of

13:58:06  5    physicians' training and what's required to be a physician,

6    and I'm aware of the differences in our training and

7    experiences that lead up to our professional roles.

8          And so my opinions come out of my medical expertise

9    and the relationship between physicians and pharmacists.

13:58:28 10   BY MR. LANIER:

11   **Q**    And in that regard -- well, let's just go back to

12   where we were.

13         So you don't know that they have to keep records of

14   fill histories?

13:58:41 15   **A**    I don't have that information, no.

16   **Q**    And I'm assuming did -- with all of your knowledge of

17   Ohio doctors, pain doctors, did you do any research on

18   Dr. Franklin?

19   **A**    I did not do any specific research on Dr. Franklin.

13:58:59 20   **Q**    Do you know of Dr. Franklin and his history writing

21   opioid prescriptions in this area?

22   **A**    I believe he was mentioned in one of the expert

23   reports, but I don't have any recall specifically about what

24   he did.

13:59:10 25   **Q**    And so in the reliance materials you relied on you saw

1    a mention of him, but you don't recall what it was?

2    **A**    I don't recall the specifics, correct.

3    **Q**    Do you approve of a doctor who overwrites and

4    overwrites and overwrites opiates?

13:59:25 5    **A**    To answer that question I'd have to have more

6    background information.  I do review doctors for the medical

7    board and I'm used to looking at those questions, but they

8    do require a lot of investigation before making that

9    determination.

13:59:36 10    **Q**    And no one hired -- and no one saw fit to have you do

11    that before you testified about what was going on up here in

12    Northeastern Ohio.  Fair?

13    **A**    No, that was not my job to investigate Dr. Franklin.

14    **Q**    How about Dr. Veres?  Did you look at anything of

13:59:55 15    Dr. Veres?

16    **A**    Same comments.

17    **Q**    Same comments.  So if he's overprescribing and they're

18    overfilling, you got no knowledge of that.  Fair?

19    **A**    Again, I did not do any investigation of Dr. Veres.

14:00:05 20    **Q**    So you have no knowledge of that.  Fair?

21    **A**    Correct.

22    **Q**    Dr. Torres, same set of questions.  Any knowledge

23    about him?

24    **A**    No difference.

14:00:13 25    **Q**    Dr. Lazzarini, does that ring a bell?  Did you ever

**Wailes (Cross by Lanier)**

1    hear of him?

2    **A**    I can't remember any specific information about his

3    case, so no.

4    **Q**    When he would -- all right.  Please keep going.

14:00:28 5    **A**    That's it.  I'm finished.

6    **Q**    When he was sentenced for overwriting prescriptions to

7    prison, he was -- the judge called him Dr. Frankenstein.

8        Did you hear anything about that?

9    **A**    That rings some bells, but I don't have any specific

14:00:43 10    recall of the case.

11    **Q**    And so did you look to see if the pharmacies in this

12    room were properly filling his prescriptions?

13    **A**    No, I did not.

14    **Q**    Did you look at the Ohio Board of Pharmacy statements

14:00:57 15    on red flags and the responsibility of the pharmacist?

16    **A**    I have reviewed some of that information in broad

17    terms.

18    **Q**    Plaintiffs' 21867.  Let's see if this is one you

19    reviewed, sir.

14:01:47 20        Do you have Plaintiffs' 21876 in front of you?

21    **A**    Yes, I do.

22    **Q**    State Medical Board of Ohio red flags signs of

23    prescription drug abuse.

24        Do you see those?

14:01:59 25    **A**    I do see this, yes.

4935

**Wailes (Cross by Lanier)**

1    **Q**    The need to look and listen and check.

2         Did you review this before you testified?

3    **A**    I have not seen this particular document, no.

4    **Q**    The red flags that they talk about, you haven't

14:02:18 5    reviewed those as well.  Fair?

6    **A**    That's fair.

7    **Q**    The National Association of Boards of Pharmacies,

8    which is the collection -- the association of -- the board

9    of pharmacy in each state around the country.

14:02:38 10         Did you review any of their materials?

11   **A**    I don't have any specific recall.

12   **Q**    You don't have any specific recall?

13   **A**    Correct.

14   **Q**    Plaintiffs' Exhibit 26403.

14:03:29 15         Do you have it in front of you?

16   **A**    Yes, I do, if it's 26403.

17   **Q**    You know, this is actually a follow-up stakeholder

18   meeting on prescribing and dispensing and it involved not

19   only the National Association of Pharmacies, but the

14:03:45 20   American Medical Association as well.

21         Do you see that?

22              MR. MAJORAS:  Objection.  Can we establish

23   foundation first?

24              THE COURT:  Well, why don't you just ask him

14:03:54 25   if he's seen it or knows anything about it?

**Wailes (Cross by Lanier)**

BY MR. LANIER:

1

**Q**    Yeah.  Well that's -- that's my question, sir.

2

Have you seen it?  Do you know anything about it?

3

**A**    I haven't had time to review what this document is.

4

14:04:06  5    **Q**    I'd like you to look specifically at the PowerPoint

6    that's attached, at least on Page 65, that talks about some

7    legal obligations.

8    Do you see that, sir?

9    **A**    Mine goes to Page 46 and then changes to a PowerPoint.

14:04:38 10   **Q**    Yeah.  It's the PowerPoint, and it -- go to the

11   PowerPoint now and look at Slide 63 of the PowerPoint.

12   Should have Page 65 in the lower corner.

13                   THE COURT:  Doctor, if you want to -- I think

14   I have it.  I'll just --

14:04:59 15                   MR. DELINSKY:  Your Honor, objection.

16           Can we go on the headset, Your Honor?

17                   THE COURT:  All right.

18                     (Proceedings at sidebar.)

19                   MR. DELINSKY:  Your Honor, I believe, and

14:05:16 20   Mr. Lanier will correct me if I'm wrong, but we're going to

21   another reference to the *Holiday*/CVS case in Florida, and we

22   obviously object on 402 and 403 grounds.  We understand

23   we've lost 402 --

24                   THE COURT:  We're not going to touch *Holiday*.

14:05:31 25   I think -- if this can be shown or referred to without

**Wailes (Cross by Lanier)**

|         |    |                                                                    |
|---------|----|--------------------------------------------------------------------|
|         | 1  | mentioning that, he can be -- the doctor can be asked about        |
|         | 2  | this statement about, question raised by the red flag was          |
|         | 3  | not resolved conclusively prior to dispensing.  I assume           |
|         | 4  | that's where Mr. Lanier is going.                                  |
| 14:05:50 | 5  | MR. LANIER:  Yeah.                                          |
|         | 6  | THE COURT:  So if you can do it without --                         |
|         | 7  | MR. LANIER:  Got it.                                               |
|         | 8  | THE COURT:  *Holiday*'s relevant here.                             |
|         | 9  | MR. LANIER:  Got it.                                               |
| 14:05:55 | 10 | MR. DELINSKY:  Can we mask the top of the                  |
|         | 11 | page, Mark?                                                        |
|         | 12 | MR. LANIER:  Yeah, and trust me, I was trying                     |
|         | 13 | to do it without going to *Holiday* here, but I do want to say     |
|         | 14 | that I did have on my list has he seen the *Holiday* case,         |
| 14:06:06 | 15 | because the *Holiday* case gives a different legal standard |
|         | 16 | than he's giving, and that he never looked at that before he       |
|         | 17 | got up here and said what pharmacists should and shouldn't         |
|         | 18 | do, I do think is notable.                                         |
|         | 19 | THE COURT:  Well, I'll tell you what, why                         |
| 14:06:19 | 20 | don't you -- you're making a point, but I'd rather not have |
|         | 21 | specific references.                                               |
|         | 22 | MR. LANIER:  Got it.                                               |
|         | 23 | THE COURT:  You can ask him if he is, in                          |
|         | 24 | preparation for his testimony did he look at any legal             |
| 14:06:29 | 25 | actions or any settlements with any other defendants,      |

**Wailes (Cross by Lanier)**

          1    period.

          2                      MR. LANIER:  Okay.  I can do that.

          3                      THE COURT:  And I assume he's going to say no.

          4                      MR. LANIER:  Okay.  Got it, Judge.

14:06:37  5                      MR. DELINSKY:  Mark, you'll cover up the top

          6    of this page?

          7                      MR. LANIER:  Yeah.  Eric, I probably won't

          8    even show it.  I'm not trying to mess you guys around.  I'm

          9    just trying to get to the testimony that I can get to.

14:06:46 10         Okay?

         11                      MR. DELINSKY:  All right.  Thank you, Mark.

         12                      (In open court at 2:06 p.m.)

         13    BY MR. LANIER:

         14    **Q**     Sir, do you have that Slide 63?

14:07:00 15    **A**     Yes, I do.

         16    **Q**     The reference to this slide speaking of the violation

         17    of corresponding responsibility in administrative case

         18    required delivery of a controlled substance, a red flag was

         19    or should have been recognized, and the question raised by

14:07:24 20    the red flag was not resolved conclusively prior to

         21    dispensing, that being held to be a violation of the law.

         22         Were you familiar with it?

         23    **A**     I am not at all familiar with the context of this

         24    case.  I am familiar with that part of the Controlled

14:07:44 25    Substance Act, but I'm not familiar with what this refers

**Wailes (Cross by Lanier)**

1    to.

2    **Q**    Suffice it to say, you have not done legal research

3    such that you are able to look at what the law requires on

4    this; right?

14:08:03 5    **A**    I have reviewed -- I'm not an attorney.

6    **Q**    Good.

7    **A**    And I have reviewed the Controlled Substance Act in

8    this context, but I can't comment on this individual case,

9    *Holiday*/CVS, what this certain slide is.  I just don't have

14:08:19 10    the context do that.

11    **Q**    Let's keep moving on, sir.  California State Board of

12    Pharmacy.

13    Did you check what the California State Board of

14    Pharmacy rules were on red flags?

14:08:28 15    **A**    No, I did not.

16    **Q**    The National Association of Chain Pharmacies, did you

17    check what their national association's rules or comments

18    are on red flags?

19    **A**    No, I did not.

14:08:40 20    **Q**    The CDC documents on red flags.

21    Did you look at what the CDC says on red flags?

22    **A**    No.

23    **Q**    The settlement agreements that have been entered into

24    by a number of pharmacies around the United States, did you

14:08:56 25    look into those?

**Wailes (Cross by Lanier)**

1      **A**      No.

2      **Q**      So when you start testifying about what should or

3      shouldn't be done, what's right and proper to do, would you

4      at least agree with me there is a whole lot of limits on

14:09:14  5      your information, your vision?

6      **A**      I was unable to examine the world of information from

7      the history of pharmaceutical -- pharmacies and interactions

8      with the law, but I spent specific time looking at

9      Mr. Catizone's red flags.  We're in agreement about the red

14:09:31  10      flags, but I spent my time focused on the complaint and

11      Catizone's specific red flags.

12      **Q**      Well, but in that regard, I think you must have failed

13      to read his footnotes and to see all the authority for

14      everything that he said.

14:09:46  15          Did you cite check him?

16      **A**      I looked at many of his footnotes and I looked at what

17      he -- what -- some of his supporting material, and I was

18      very underwhelmed.

19      **Q**      So how could you say you looked at it if you never

14:10:02  20      looked at any of these things which form the bulk of his

21      supporting material?

22      **A**      The difference in what we looked at in my

23      understanding as a physician is there is no statute that

24      underlines required red flags.  There's no regulation that

14:10:21  25      requires specific red flags.  We're all in agreement that

**Wailes (Cross by Lanier)**

1    red flags are appropriate and good and they're very

2    important prompts to look at prescribing, and that's

3    important, we agree on that.  I don't agree with

4    Mr. Catizone's overbroad red flags and how he applies them.

14:10:42  5    **Q**    So you didn't go to law school; right?

6    **A**    Correct.

7    **Q**    Has your touches with the law in your life,

8    testifying, whatever it may be, not taught you that there's

9    codified law in a statute, there's law in regulations that's

14:11:04  10   written down, but there's also law that's established by

11   cases.

12         Did you know about that?

13   **A**    I only have a vague knowledge of how that applies to

14   regulations and laws, yes.

14:11:14  15   **Q**    So you don't know, really understand the legal

16   requirements that comes out of cases that have been

17   interpreting the written law.

18         Is that fair?

19   **A**    That's fair.

14:11:25  20   **Q**    So if the cases that interpret the law speak of red

21   flags and the obligation to resolve those before you

22   dispense it, brand new to you.  Fair?

23   **A**    I am not familiar with the legal cases.  I'm not

24   familiar with that, specifically.

14:11:42  25   **Q**    And if Mr. Catizone cited those and explained that,

**Wailes (Cross by Lanier)**

1    and those are explained in his footnotes, those are just

2    footnotes you never went to.  Fair?

3    **A**    That's possible, but I did look at some of his

4    supporting material and still had issues.

14:11:58  5    **Q**    Well, let's add here case law, the law as it's been

6    developed through various cases in court.

7         You never looked at that, did you?

8    **A**    I don't remember reviewing specific cases.  I do have

9    one pleading on my expert report.

14:12:20 10    **Q**    That's a pleading, though, that's not a judgment or an

11    opinion or a finding.  You just looked at a complaint that's

12    been filed in Northern California; right?

13    **A**    That's correct.

14    **Q**    All right.  Let's move down the road.

14:12:40 15         I want to now look at the bigger picture with you and

16    then I'll be done.  All right?

17         Let's start with this.  You said that the work of the

18    pharmacist should be to make sure a prescription is valid,

19    there's no fraud, no significant drug interactions,

14:13:22 20    occasionally to see if the information is valid, but not to

21    offer second opinions on the medical treatment; right?

22    **A**    I'm not sure that states all of my testimony, but I'm

23    not sure what you mean by second opinions.

24    **Q**    Well, I think your suggestion was that the pharmacist

14:13:38 25    should not be second-guessing the doctor on the treatment.

4943

**Wailes (Cross by Lanier)**

1        But I may be wrong.  You tell me.  I want to get it right.

2             Is that the role of the pharmacist in your opinion?

3             If not, let's make it right.  I got a red marker.  I'm

4        ready.

14:13:53 5        **A**     So the point that I was making about -- I never

6        remember saying anything about second opinions, is that what

7        I was saying is that the training for pharmacists and

8        physicians is very different, and the physician's in a

9        position with so much more information and background and

14:14:10 10       materials to make determinations about what's a legitimate

11       prescription.  That takes medical judgment.  It takes the

12       background and training of a physician.  That is not part of

13       the training and experience for a pharmacist, so they would

14       not be able to make those types of determinations -- if it's

14:14:36 15       a doctor practicing within the standard of care, then the

16       prescription, by definition, would be legitimate.

17             And Mr. Catizone takes umbrage with that.  He doesn't

18       agree with that, specifically in two of his red flags where

19       he doesn't think there should ever been prescriptions for

14:14:56 20       three medicines of one type or even two medicines, an opioid

21       and a benzodiazapine.  And I think those are expressing

22       medical opinions to make -- to call those not legitimate is

23       a medical determination, and I don't agree with that.

24       **Q**     Okay.  So my daughter's just pulled up the daily copy.

14:15:21 25       This is where I got it from.

## Wailes (Cross by Lanier)

1      Question by Mr. Majoras this morning:  Do you look at

2   pharmacists as someone who can give a second opinion on your

3   patients?

4      No.  No.  That's not part of their role.

14:15:35  5      Do you see that?

6   **A**    I do see that.

7   **Q**    So can I -- can I erase my red mark through no second

8   opinions, or are you changing your testimony?

9           MR. MAJORAS:  Your Honor, can I have the full

14:15:46  10  testimony read that Mr. Lanier had up there?

11          MR. LANIER:  Well, I don't have her password.

12          MR. MAJORAS:  Rule of completeness, the

13  question he answered.

14          THE COURT:  Well, all right.

14:15:54  15          MR. LANIER:  I don't care, Judge.

16          THE COURT:  I agree you should read the full

17  sentence or the full answer.

18          MR. LANIER:  And I'm being told it was from

19  yesterday, not today.

14:16:02  20      No.  No.  That's not part of their role.  They don't

21  have the medical training or diagnostic tools and medical

22  decision-making that physicians have, and so I don't see

23  that as part of their role.

24      Now, that's my question then, unless you want me to

14:16:19  25  read more.

**Wailes (Cross by Lanier)**

1          MR. MAJORAS:  No.  I think you cleared it up.

2     BY MR. LANIER:

3     **Q**     Now, my question is, can I erase no second opinions

4     because you said that, or are you changing your testimony?

14:16:29  5     **A**     No, they should not have any second medical opinions.

6     **Q**     Okay.

7          MR. LANIER:  Here you go, Rache.

8     BY MR. LANIER:

9     **Q**     So for you, the pharmacist is just supposed to make

14:16:44 10     sure, hey, is this legitimate, did the doctor write it, does

11     it conflict with another drug.  And then occasionally say,

12     you know, is this really your name or something like that;

13     right?

14     **A**     No.

14:16:56 15     **Q**     I mean, don't you agree that there are doctors who are

16     bad doctors who write bad prescriptions?

17     **A**     Yes, there are.

18     **Q**     Don't you agree that there are opioid dispensing

19     doctors that are a serious problem and have been in our

14:17:09 20     communities?

21     **A**     Especially in our history, that's true.

22     **Q**     Don't you agree with me that pharmacists have a role

23     as the last line of defense of keeping these bad doctors'

24     prescriptions from going out on the street?

14:17:22 25     **A**     Pharmacists have a very important role.  They always

**Wailes (Cross by Lanier)**

1          have the right and professional responsibility to refuse a

2          prescription for any number of reasons.  Every pharmacist

3          has that right.  They can always refuse it.  But when you

4          just -- you blur the picture between second guessing or

14:17:42  5          maybe trying to do a second opinion on some prescription

6          that may be medically legitimate, that's where we differ.

7                So the role of a pharmacist is more than what you just

8          outlined here.  They also look for allergies, they're

9          important in counseling patients.  They do a number of

14:18:01 10          functions.  It's -- and I want them to provide good services

11          and be able to use their professional judgment as to

12          dispensing opioids.

13     **Q**     You understand they go to like 5 or 6 years of school?

14     **A**     I understand that.

14:18:16 15     **Q**     You understand they take more pharmacy classes and

16          drug classes than most medical doctors?

17     **A**     They may do that.

18     **Q**     You understand that they are the last line of defense

19          at stopping illegitimate doctor prescriptions from going out

14:18:30 20          on the street?

21     **A**     They are the last person in the prescription

22          distribution, yes.

23     **Q**     And that they have a responsibility to make sure that

24          it's not a quack doctor writing quack prescriptions; right?

14:18:44 25     **A**     Their corresponding responsibility states that they

**Wailes (Cross by Lanier)**

1    need to monitor physicians, they need to make sure that the

2    prescription is from physicians, licensed physicians that

3    are working in the normal course and usual part of their

4    specialty.

14:19:07    5    **Q**    You understand quack doctors -- that's probably not

6    politically correct.

7                   MR. LANIER:  And, Your Honor, I apologize on

8    the record.

9    BY MR. LANIER:

14:19:14    10    **Q**    But you understand these doctors, these. . . these

11    doctors that are writing prescriptions have valid licenses?

12         You understand that?

13    **A**    That's correct, but --

14    **Q**    And you understand that these doctors writing these

14:19:31    15    prescriptions --

16                   MR. MAJORAS:  Your Honor, objection.

17                   MR. LANIER:  What's the objection?

18                   MR. MAJORAS:  Let him finish with his answer.

19                   THE COURT:  Well, I guess you're right.  I

14:19:40    20    guess --

21         Doctor, you --

22         I think the doctor had more of an answer.

23                   MR. LANIER:  Okay.

24                   THE COURT:  Let him finish.

25

**Wailes (Cross by Lanier)**

1    BY MR. LANIER:

2    **Q**    Okay.  I'll reask the question.

3         You understand they have valid licenses?  The answer

4    was yes or no.

14:19:52 5    **A**    My question is yes, but the important thing to

6    consider here in the context of your question is that the

7    enforcement of -- for bad doctors doesn't rest solely on the

8    shoulders of the pharmacist, but rather, that is the

9    function -- in fact, they can't do investigations the way --

14:20:09 10   the boards that are supposed to take care of that, they

11   should call the board of pharmacy, they should call the

12   medical board, they should call the DEA, they can even call

13   law enforcement, and those are the organizations that are --

14   that they're designed to investigate and look at the bad

14:20:28 15   doctors and get rid of them.

16   **Q**    Okay.  Sir, my question was, you understand that

17   doctors have a valid license?  Did you -- can you answer

18   that, please?  That's a yes or no.

19   **A**    It is the responsibility of a pharmacist to check

14:20:40 20   that, yes.

21   **Q**    But, no, I said, you understand that these doctors do

22   have a valid license most of the time that are writing

23   these?

24   **A**    I believe so.

14:20:46 25   **Q**    Okay.  And now your testimony, if we take the other

 1    part you were answering that I hadn't asked yet, your

 2    testimony is that the pharmacist should go ahead and fill

 3    the prescription of the pill mill, just report it to the DEA

 4    and let the government take its course, keep filling them,

14:21:08   5    though, the whole time, keep pumping them out and selling

 6    them.

 7         Is that your testimony?

 8                   MR. MAJORAS:  Objection.  Misstates testimony.

 9                   THE COURT:  Sustained.

14:21:19  10    BY MR. LANIER:

11    **Q**    Okay.  I mean, are you saying that they're supposed to

12    fill these things?

13    **A**    No, I'm not, I'm saying that --

14                   MR. DELINSKY:  Wait.  Objection, Your Honor.

14:21:28  15                   MR. LANIER:  Well, these are yes/no questions,

16    Judge.

17                   THE COURT:  Maybe they are, maybe they aren't,

18    Mr. Lanier.

19                   MR. LANIER:  All right.

14:21:32  20                   THE COURT:  But you've got to let the doctor

21    finish his answer, however he wants to answer.

22                   MR. LANIER:  Okay.

23                   THE WITNESS:  Can you repeat the question,

24    please?

14:21:44  25    BY MR. LANIER:

| | |
|---|---|
| 1 | **Q**     Yes, sir.  Let me look it up. |
| 2 |      Are you saying that the pharmacists are supposed to |
| 3 | fill a prescription from a valid doctor even if they believe |
| 4 | it's a pill mill doctor? |
| 14:21:57  5 | **A**     I believe that -- |
| 6 | **Q**     Yes or no? |
| 7 | **A**     The answer is no, it's not mandatory, but they have to |
| 8 | look at each case as individuals.  They need to use their |
| 9 | judgment. |
| 14:22:05 10 | **Q**     Okay.  And resolve the red flags; right? |
| 11 | **A**     They need to do their best to resolve every red flag. |
| 12 | **Q**     All right.  Couple of true or false questions for you. |
| 13 | See if we can get an agreement with me on some of these. |
| 14 |      Pharmacies have a role to play in the oversight of |
| 14:22:30 15 | prescriptions for controlled substance and opioid analgesics |
| 16 | in particular.  True? |
| 17 | **A**     Yes. |
| 18 | **Q**     Pharmacists must evaluate patients to ensure the |
| 19 | appropriateness of any controlled substance prescription? |
| 14:22:47 20 |           MR. DELINSKY:  Objection, Your Honor. |
| 21 | BY MR. LANIER: |
| 22 | **Q**     True? |
| 23 |           THE COURT:  Overruled. |
| 24 |           THE WITNESS:  I don't understand what you mean |
| 14:22:58 25 | by appropriateness.  Could you be more specific? |

**Wailes (Cross by Lanier)**

1    BY MR. LANIER:

2    **Q**    No, just take it in the general sense that you would

3    as a medical doctor.

4    **A**    I'm not sure how to interpret that because some of

14:23:12  5    that sounds like a second opinion.  So if it was

6    Catizone's -- Catizone's red flags, it would be just a

7    slightly elevated dose which the patient may have been

8    getting on a monthly basis for years and would he be -- so

9    who then decides on the appropriateness of that if it's a

14:23:32  10   red flag?

11   **Q**    So your answer is, I can't answer it.  Fair?

12   **A**    I guess I need more specific information regarding

13   what you mean by appropriateness.  Because if it involves

14   medical decision making, no.

14:23:47  15   **Q**    I'm going to put, can't answer without more info.

16   Fair?

17   **A**    Yes.

18   **Q**    All right.  Pharmacists have an ethical duty backed by

19   both federal and state law to ensure that a prescription for

14:24:00  20   a controlled substance is appropriate.

21             MR. DELINSKY:  Objection.  Objection,

22   Your Honor.  Scope.

23             THE COURT:  Overruled.

24             THE WITNESS:  I don't. . . I do believe that

14:24:22  25   pharmacists have an ethical duty to do the best they can to

**Wailes (Cross by Lanier)**

1    make sure that a controlled substance is appropriate.

2    BY MR. LANIER:

3    **Q**    So just best they can?

4    **A**    Absolutely.  They have to make every best effort.

14:24:39  5    **Q**    All right.  Team, if y'all would pass down Plaintiffs'

6    Exhibit 21.

7         Sir, I took these quotes from a *New England Journal of*

8    *Medicine* article.

9         Do you remember read the *New England Journal of*

14:24:57  10    *Medicine*?

11    **A**    Occasionally.

12    **Q**    One of the most premier medical journals in the United

13    States, isn't it?

14    **A**    Yes, it is.

14:25:03  15    **Q**    In fact, I think it's typically ranked numero uno;

16    right?

17    **A**    I apologize, I don't know the specific rankings.

18    **Q**    That's okay.  I'm going to show you an article, it's

19    Plaintiffs' Exhibit 21, Abusive Prescribing of Controlled

14:25:18  20    Substances-a Pharmacy View.

21            MR. DELINSKY:  Your Honor, no foundation's

22    been laid yet.

23            MR. LANIER:  Well, he recognizes the journal.

24            THE COURT:  Overruled.  Overruled.

14:25:26  25    BY MR. LANIER:

**Wailes (Cross by Lanier)**

1    **Q**    You recognize the *New England Journal of Medicine* as

2    an authoritative journal, don't you?

3    **A**    Yes, I do.

4    **Q**    All right.  This is September 2013.  Have you ever

14:25:37 5    come across this article before?

6    **A**    I don't believe so.

7    **Q**    I want to see if you agree with some of things in it.

8    Let's first make sure we're clear on whose writing it.

9    Mitch Betses, a registered pharmacist, and Troyen Brennan, a

14:25:54 10    medical doctor with a master's in public health.

11        Have you ever heard of either?  Do you know them?

12    **A**    No, I don't.

13    **Q**    You'll see their information down below, but I think

14    you'll find that they -- one of them at least, works with --

14:26:11 15    works for CVS in this case.

16        Did you know that?

17    **A**    No.

18    **Q**    And the CVS-authored perspective here, and the

19    paragraphs after talking about Florida's pain clinics being

14:26:36 20    closed, said, pharmacies have a role to play in the

21    oversight of prescriptions for controlled substances and

22    opioid analgesics in particular.

23        That was my first statement that you agreed with;

24    right?

14:26:49 25    **A**    Yes.

4954

**Wailes (Cross by Lanier)**

1    **Q**    But you couldn't answer the second without more info,

2    so let's see what info you'd have got if you'd have read it

3    in the journal.

4          Under the Controlled Substances Act, pharmacists must

14:27:02  5    evaluate patients to ensure the appropriateness of any

6    controlled substance prescription.

7          Do you see where I read that?

8    **A**    The context of this article is what I have to note.  I

9    want to first note that this is an editorial.  It's not a

14:27:19 10    scientifically peer-reviewed article, so this is the opinion

11    of the authors, and I agree that they need to evaluate

12    patients.  That certainly is something very agreeable.  I'm

13    not sure the context, just the legal definition, how they're

14    scientifically using appropriate.  I just don't know exactly

14:27:39 15    that context.

16    **Q**    So if you had been reading this in the *New England*

17    *Journal of Medicine* when you came across that you'd say,

18    well, I don't understand that?

19    **A**    I would read the entire article and I would try to put

14:27:59 20    it in context of what points they're trying to pursue or be

21    persuasive about and try to understand and comprehend the

22    meaning of that after reviewing the whole article.

23    **Q**    And if you go toward the end, a couple of more things

24    of note in this article.  It says, as we noted, pharmacists

14:28:21 25    have an ethical duty, backed by both federal and state law,

4955

**Wailes (Cross by Lanier)**

1 to ensure that a prescription for a controlled substance is

2 appropriate.  A young person traveling a good distance to

3 fill a prescription and paying cash should raise some

4 concern for the pharmacist.

14:28:38 5 Do you see that?

6 **A** I do see that.

7 **Q** If the prescription is valid, the pharmacist might

8 have limited grounds on which to deny medication to someone

9 who might be in pain.

14:28:50 10 You agree with that, don't you?

11 **A** Yes.

12 **Q** Yet the DEA has now identified both pharmaceutical

13 distributors and chain pharmacies as part of the problem,

14 encouraging our industry to develop new programs to reduce

14:29:05 15 inappropriate use.

16   MR. MAJORAS:  Objection to that.  Hearsay.

17 BY MR. LANIER:

18 **Q** Did you know about that?

19   THE COURT:  Hold it.

14:29:16 20 Let's go on the headphones a minute.

21   (Proceedings at sidebar.)

22   THE COURT:  All right.  Mr. Lanier, I thought

23 the point of showing this article was to -- there's specific

24 statements that the authors make.  You can ask the witness

14:29:39 25 does he agree with them, does he disagree with them.

1              MR. LANIER:  That's fine, Judge.

2              THE COURT:  But what the DEA has identified,

3      this isn't something that there's would be an opinion about.

4              MR. LANIER:  That's fine, Judge.  I'll put

14:29:51  5    that down.  Thank you.

6                    (In open court at 2:30 p.m.)

7      BY MR. LANIER:

8      **Q**    Last thing I would note here, article cites Anna

9      Lembke, an article by Dr. Lembke on why doctors prescribe

14:30:17  10   opioids to known opioid abusers.

11         Did you ever read that article?

12     **A**    I have not.

13     **Q**    Okay.  Now, I want to talk to you about the trinity

14     prescription.

14:30:48  15       You remember you've testified about how that can be

16     valid at times?

17     **A**    Yes.

18     **Q**    And that's the opioids at issue in this case combined

19     with benzodiazapines combined with muscle relaxants; right?

14:31:05  20   **A**    Correct.

21     **Q**    And your example was a spinal cord compression victim

22     who was spasming and depressed followed by cancer victims at

23     end of life; right?

24     **A**    Yes, I believe so.

14:31:20  25   **Q**    First of all, can we agree that the spinal cord

**Wailes (Cross by Lanier)**

1    compression victim who is spasming and depressed needs to be

2    under constant medical attention if they're going to receive

3    these three?

4    **A**    Depends on what you mean by constant medical

14:31:34  5    attention, and it also depends on the dosages that we're

6    using.  If you use a small enough dose, it may not have

7    significant danger, though, of course, whenever you combine

8    medications there is greater danger.  That's where medical

9    judgment comes into play.

14:31:50 10   **Q**    So I looked at your report to try to figure out what

11   your authority was for this.  Do you want to tell the jury

12   what your authority is for your opinion that you can do

13   these three all at once and that it's appropriate standard

14   of care?

14:32:07 15   **A**    It's my experience and judgment over 37 years of

16   practice as well as my experience and discussions with other

17   physicians across the country and my continuing medical

18   education and meetings that I go to as well as journal

19   articles and other information.

14:32:24 20   **Q**    Yeah, give me something that's a little more evidence

21   that we can look at that's standard of care in terms of, you

22   know, best practices.  Give me an article.

23   **A**    Best practices is a different subject.  We're talking

24   about standard of care.

14:32:40 25   **Q**    Why don't you give me a --

4958

**Wailes (Cross by Lanier)**

1    **A**      One of the ways to look at it is to look at Catizone's

2    red flags and then Mr. McCann's disclosure that so many of

3    these trinity prescriptions were out there.  And if you

4    assume that most physicians are legitimate and writing

14:32:57  5    legitimate prescription, there's a reason why there's so

6    many in Lake and Trumbull.  Not all of those doctors are bad

7    doctors.

8    **Q**      Sir, I said give me an article.  Give me a reference

9    that says it's okay to do it.  Jury's already seen many

14:33:14  10   people who are saying it's not.  Give us someone who says it

11   is, other than you, at $1,400 an hour.

12   **A**      I don't have any specific article that you describe.

13   **Q**      In your report you actually do cite one.  You just

14   miscite it.  Page 46 of your report.

14:33:42  15        Despite the increased clinical risk associated with

16   prescribing multiple classes of controlled substances

17   concurrently, prescribers do, in fact, concurrently

18   prescribe an opioid with a muscle relaxant and/or a

19   benzodiazapine in order to provide optimal care to certain

14:34:05  20   patients.  CDC acknowledges the legitimacy of this in its

21   2016 guidance for primary care providers.

22        Do you see that?

23   **A**      Yes, I do.

24   **Q**      And then you say footnote 167, and you cite the CDC

14:34:22  25   guideline from 2016, experts agreed that there are

**Wailes (Cross by Lanier)**

1    circumstances where it might -- when it might be appropriate

2    to prescribe opioids to a patient receiving benzodiazapines.

3         Do you see that?

4    **A**    Yes.

14:34:38 5    **Q**    What do those three dots mean?

6    **A**    That there's probably some verbiage between that.

7    **Q**    Yeah.  And you wrote this yourself, didn't you?

8    **A**    Yes.

9    **Q**    And this wasn't the guy who did your resume on the

14:34:53 10   internet, on your website; right?

11   **A**    That's correct.

12   **Q**    So we ought to be able to go to that article and find

13   it saying what you say it says, shouldn't we?

14   **A**    Yes.

14:35:08 15   **Q**    I'm sorry?

16   **A**    Yes.

17   **Q**    Okay.  That article is demonstrative 68, please,

18   Rachel, if you could pass that out, and Ms. Fleming.

19        Do you have that in front of you, sir?

14:35:51 20   **A**    Yes, I do.

21   **Q**    All right.  Let's start out with Page 2 -- well, let's

22   first identify it for the jury so they know.

23        This is the CDC reference that you're citing in your

24   report; correct?

14:36:11 25   **A**    I want to be sure it's in the right periodical.  In --

**Wailes (Cross by Lanier)**

1       this looks like the CDC guidelines.

2       **Q**     Here.  Let me --

3       **A**     The citation looks like it may be another MMWR --

4       yeah, it --

14:36:31  5    **Q**     I'll represent to you that this was given to us by the

6       lawyers that have hired you as supplemental materials that

7       you relied on, if that helps.

8       **A**     That would help.

9       **Q**     In other words, I'm not playing gotcha.

14:36:44 10    **A**     Okay.

11      **Q**     I don't think they are either.

12            Do you see?

13      **A**     Yes, I see it.

14      **Q**     It says, Dowell Haegerich, Chou:  Dowell Haegerich,

14:36:56 15    Chou:  CDC Guideline For Prescribing Opioids.  That's what

16      it is.  2016.

17            2016.

18            Recommendations report and reports.

19            Recommendations and reports.

14:37:16 20    **A**     I see that, yes.

21      **Q**     Number 65, Page 1, 1 through 49.  And I'm sure since

22      you wrote the report you're recognizing it now, right?

23      **A**     Well, I definitely recognize the report.  It just --

24      I've looked at it in different context in different versions

14:37:35 25    of the report because it's been published in many different

**Wailes (Cross by Lanier)**

1    formats.

2    **Q**    Page 2, rationale.

3          Do you see that, sir?

4    **A**    Yes.

14:37:50 5    **Q**    This CDC guideline offers clarity on recommendations

6    based on the most recent scientific evidence informed by

7    expert opinion and stakeholder and public input.  Scientific

8    research has identified high-risk prescribing practices that

9    have contributed to the overdose epidemic, e.g., high-dose

14:38:15 10    prescribing, overlapping opioid and benzodiazapine

11    prescriptions, and extended-release, long-acting opioids for

12    acute pain.

13          Using guidelines to address problematic prescribing

14    has the potential to optimize care and improve patient

14:38:38 15    safety based on evidence-based practice, as well as reverse

16    the cycle of opioid pain medication misuse that contributes

17    to the overdose epidemic.

18          Now that's not language you cited in your report, but

19    it's from the source.

14:38:55 20          Do you see that?

21    **A**    Yes, I do.

22    **Q**    If you'll go now to Page 8.

23          Regarding co-prescription of opioids with

24    benzodiazapines, epidemiologic studies suggest that

14:39:21 25    concurrent use of benzodiazapines and opioids might put

**Wailes (Cross by Lanier)**

1    patients at greater risk for potentially fatal overdose.

2         Three studies of fatal overdose deaths found evidence

3    of concurrent benzodiazapine use in 31 percent to 61 percent

4    of decedents.

14:39:43   5         And those are footnotes so you can go check out the

6    references; right?

7    **A**    Yes.

8    **Q**    In one of these studies -- 67 -- among decedents who

9    had received an opioid prescription, those whose deaths were

14:39:57  10   related to opioids were more likely to have obtained opioid

11   from multiple physicians and pharmacies than decedents whose

12   deaths were not related to opioids.

13        Do you see that?

14   **A**    Yes.

14:40:09  15   **Q**    Okay.  Again, part of the report, but not a part you

16   put into yours.  Fair?

17   **A**    Correct.

18   **Q**    Page 16.  Bullet point 3.  Clinicians should avoid

19   prescribing opioids and benzodiazapines concurrently

14:40:40  20   whenever possible.  Clinicians should communicate with

21   others managing the patient to discuss the patient's needs,

22   prioritize patient goals, weigh risks of concurrent

23   benzodiazapines and opioid exposure, and coordinate care.

24        Do you see that?

14:40:58  25   **A**    I do.

**Wailes (Cross by Lanier)**

1    **Q**    Now, so that we're keeping this clear, that is a

2    two-drug cocktail, it is opiate plus benzo; right?  That's a

3    two-drug cocktail; right?

4    **A**    Yes.

14:41:29  5    **Q**    But the trinity is a three-drug cocktail, opioids and

6    a benzo and a muscle relaxant; right?

7    **A**    Yes.

8    **Q**    And that's what's often referred to as the trinity.

9    Some even call it the holy trinity, though, I won't go

14:41:51  10    there.  All right?  You got that?

11    **A**    Yes.

12    **Q**    Just so we're on the same page because that becomes

13    important in a minute.

14    So what we're told in this bullet point in the article

14:42:05  15    you cite is that this should be avoided whenever possible;

16    right?

17    **A**    That's correct.

18    **Q**    Something you did not put in your report, but it's

19    here.  True?

14:42:22  20    **A**    Yes.

21    **Q**    One of the red flags of Carmen Catizone.  True?

22    **A**    Yes.

23    **Q**    That looks more like a hockey stick.

24    Let's continue.  Concurrent use of opiate pain

14:42:47  25    medications with other opiate medications, benzos, or heroin

4964

**Wailes (Cross by Lanier)**

1    can increase the patient's risk for overdose.  True?

2    **A**    Absolutely.

3    **Q**    And then we go to Page 17.  Look at Point 11.  It

4    expands.  Clinicians should avoid prescribing opioid pain

14:43:19 5    medication and benzodiazapines concurrently whenever

6    possible.  That's Point 11 that we're about to read about.

7         Do you see that?

8         Do you see it?

9    **A**    Yes.

14:43:30 10   **Q**    So let's be real clear.  This is Point 11, the

11   two-drug cocktail; right?

12   **A**    Yes.

13   **Q**    I don't want to leave anything out, so I'm going to

14   read a little quicker on stuff that's not really relevant,

14:43:56 15   but let's get through this.  Clinical evidence reviewed did

16   not address risks of benzodiazapine co-prescription among

17   patients prescribed opioids.  However, the contextual

18   evidence review found evidence in epidemiologic series of

19   concurrent benzo use in large proportions of opioid-related

14:44:17 20   overdose deaths, and a case cohort study found concurrent

21   benzo prescription with opioid prescription to be associated

22   with a near quadrupling of risk for overdose deaths compared

23   with opioid prescription alone.

24        Now, I read it quickly, but you're tracking with that

14:44:37 25   because you're a medical doctor who's spent his life doing

**Wailes (Cross by Lanier)**

1      this; right?

2      **A**      Yes.

3      **Q**      Still talking, Point 11, but the two-drug cocktail.

4      True?

14:44:45  5      **A**      Yes.

6      **Q**      Experts agree that although there are circumstances

7      when it might be appropriate to prescribe opioids to a

8      patient receiving benzodiazapines, example, severe acute

9      pain in a patient taking long-term, stable low-dose

14:45:05 10     benzodiazapine therapy, clinicians should avoid prescribing

11     opioids and benzodiazapines concurrently wherever possible.

12          Do you see that?

13     **A**      Yes.  That's very consistent with my testimony.

14     **Q**      Well, now we've gotten to your quote, so let's look at

14:45:22 15     it.

16          Experts agreed there are circumstances where it might

17     be appropriate to prescribe opioids to a patient receiving

18     benzodiazapines.

19          Do you see that?

14:45:35 20     **A**      I see that, yes.

21     **Q**      That's what you've quoted.  And those dot dot dots,

22     experts agreed that, what you left out is, although there

23     are circumstances.

24          Do you see that?

14:45:58 25     **A**      Yes.

**Wailes (Cross by Lanier)**

1    **Q**    You just put three dots in there and took out the word

2    "although."

3    **A**    Correct.

4    **Q**    Didn't you?

14:46:05  5    **A**    Correct.

6    **Q**    And if you put the word although in there, all of a

7    sudden you need to say something that's a little different.

8         Experts agreed that although there are circumstances

9    when it might be appropriate to prescribe opioids to a

14:46:25  10    patient receiving benzodiazapines, and then look what

11    finishes the sentence, clinicians should avoid prescribing

12    opioids and benzodiazapines concurrently wherever possible?

13         Do you see that?

14    **A**    I see it, and I agree with it.

14:46:49  15    **Q**    And yet you left that out as well, didn't you?

16    **A**    The whole point in my quotation --

17    **Q**    Answer my question, please, sir, and then you can

18    expound all want, but you left that out, didn't you?

19    **A**    I left out although, yes.

14:47:05  20    **Q**    No, not just the although, you left out the end of the

21    sentence.

22    **A**    I left out other parts of the sentence, yes.

23    **Q**    I mean, understand the end of the sentence is

24    important?

14:47:12  25    **A**    It is important.

4967

**Wailes (Cross by Lanier)**

1    **Q**    It was a beautiful day.  And then the tornado hit.

2    You want the end of the sentence; right?

3    **A**    I can't argue with you on that.

4    **Q**    Yeah.  It was the best of times, it was the worst

14:47:23  5    of --

6    **A**    But I was not able to include the entire --

7                   MR. DELINSKY:  Objection, Your Honor.

8                   THE WITNESS:  But I was not able to include

9    the entire context of the paper, which was specifically for

14:47:35  10   primary care doctors and managing chronic pain.  But I

11   agree, and I think my testimony reflects, the combination of

12   drugs is definitely more dangerous.  There's no debate about

13   that.

14   BY MR. LANIER:

14:47:48  15   **Q**    Well, sir, I'm going to take you to task a little bit

16   more on this because not only do you not give the full

17   citation down here and you avoid -- you leave out the avoid

18   it whenever possible, but you have put in your title that

19   this is opioids concurrently with muscle relaxants and/or

14:48:09  20   benzos.  So you're including and here; correct?

21   **A**    I see the verbiage that you're referring to, but that

22   specific citation is the or.

23   **Q**    You don't have an and.  You cite -- miscite, I would

24   argue, but you miscite --

14:48:26  25                  MR. MAJORAS:  Objection.

4968

**Wailes (Cross by Lanier)**

1              MR. LANIER:  I'll take it back, Judge.

2              THE COURT:  Overruled.

3              MR. LANIER:  I'll still take it back,

4     Your Honor.  I don't want to muddy it.

14:48:30  5     BY MR. LANIER:

6     **Q**    Sir, your citation, for right or wrong, that is

7     supposedly for this section, is one that deals with and/or.

8          Do you see that?

9     **A**    I'd like to see the rest of the section to make sure

14:48:52 10    what context that's in.

11    **Q**    What do you mean?

12    **A**    Well, again, there's more information on there than

13    just that -- those four lines under that category.

14    **Q**    Oh, you mean on your report?

14:49:08 15    **A**    Yes, on my report.

16    **Q**    I was trying to figure out, do you want to read the

17    rest of the article?

18    **A**    Oh, yeah.

19    **Q**    You've got a little bit more section, and there's not

14:49:16 20    one citation to anything else, not one journal article.  Not

21    one reference.  No citation anywhere else.

22          Do you see that?

23    **A**    There are other relevant citations within my report

24    regarding the concurrent use of benzodiazapines and opioids

14:49:34 25    together, and that would be in the SARA articles.

**Wailes (Cross by Lanier)**

1    **Q**    Well, the other section that I can find is on Page 15

2    of your report, and here you say, the standard of care for

3    prescribing opioids allow for concurrent prescribing of

4    other medications, including benzos and muscle relaxants.

14:50:07  5    You see that?

6    **A**    That's correct.

7    **Q**    And in all that you've got saying that this is the

8    standard of care, you've one footnote, it's 49.

9    Do you see that?

14:50:17  10   **A**    I see that.

11   **Q**    And 49 doesn't anymore say that than the man in the

12   moon, does it?

13   **A**    So I'm not sure of your question.

14   **Q**    Yes, sir.  My question is, you don't have a medical

14:50:50  15   support for this standard of care in this paragraph

16   (indicating) either, do you, or section either, do you?

17   **A**    My basis for making my comments about this include the

18   fact that even the CDC guidelines says that it's possible

19   that there are situations where it may be necessary or

14:51:14  20   suggested.

21   It's not frequent, we agree on that.  Is it more

22   dangerous?  Yes.  Wherever you mix medicines, it's more

23   dangerous.  And I think I was clear on that.  The trinity is

24   even more dangerous than just two medicines, but there can

14:51:30  25   be circumstances, and the CDC guidelines even allow for

**Wailes (Cross by Lanier)**

1    that, where it is possible where you may need to and it's

2    appropriate to do that.

3    **Q**    Where does the CDC say it?  Why do they say it, sir?

4         This whole section is on the two-drug cocktail that

14:51:50  5    they say avoid wherever possible.  But where do they ever

6    say the three-drug cocktail is standard of care?

7    **A**    Again, the -- it does not specifically relate -- the

8    CDC guidelines don't deal with that specifically.

9    **Q**    And so when you cite it as a footnote to support it,

14:52:08  10    you're misciting it, aren't you?

11    **A**    I support the or in my sentence.

12    **Q**    You put an and in your sentence, sir (indicating).

13    You described both the two and the three-drug cocktail.

14         Do you see that?

14:52:20  15    **A**    I do see that.

16    **Q**    Your report miscites this article, doesn't it?

17    **A**    I think you're taking that out of context, and I think

18    that --

19    **Q**    Where?

14:52:32  20    **A**    Because it does respond to the or.  It responds to the

21    or, so I don't know about being argumentative about this,

22    but I think the CDC guidelines show some allowance.  Is it

23    suggested?  No.  My point in this whole section is that

24    there may be circumstances, as in the hospice patients in

14:52:55  25    the SARA article, where -- and just all hospice patients,

**Wailes (Cross by Lanier)**

1   84 percent receive both opioids and benzodiazapines.  So

2   there are circumstances where it is appropriate, and the CDC

3   guidelines does comment to that.

4   **Q**   Where, sir, is the and part of your report, the

14:53:15   5   trinity, the three-drug cocktail?

6   **A**   It was not part of that citation.

7   **Q**   Do you have any medical citation to substantiate your

8   claim that this is okay other than the citation you put down

9   here that doesn't cover it if you read it?

14:53:35   10   **A**   I have my years experience and clinical activity and

11   meetings that I've gone to.  I do not have any citation.

12   **Q**   These are the meetings funded by Purdue?

13           MR. MAJORAS:  Objection.

14   BY MR. LANIER:

14:53:49   15   **Q**   Right?

16           THE COURT:  Overruled.

17           THE WITNESS:  Some meetings have some funding

18   with Purdue among other pharmaceutical and other device reps

19   and other vendors.

14:54:08   20   BY MR. LANIER:

21   **Q**   Now I wanted to talk to you about some of your

22   comments on Carmen Catizone.  Okay?  You commented that

23   Carmen Catizone is saying that the two-drug cocktail is

24   always wrong.

14:54:33   25           Do you remember that?

**Wailes (Cross by Lanier)**

1     **A**     The term he used in the report was contraindicated.

2     **Q**     And you said contraindication in medical parlance

3     means should never be used, Page 34 of the transcript today,

4     Line 24.

14:54:45  5     **A**     I can't comment on the pages, but, yes, that's what I

6     said.

7     **Q**     Well, that's wrong too, isn't it?

8     **A**     In the context of how he put it in his report, that's

9     what he was saying.

14:55:00  10     **Q**     Have you looked up contraindication in a medical

11     resource to see what it says, medical dictionary or medical

12     resource?

13     **A**     I have.

14     **Q**     And there are two kinds of contraindications, one is

14:55:11  15     an absolute contraindication which makes a particular

16     treatment or procedure absolutely inadvisable.  Fair?

17     **A**     Yes.

18     **Q**     And the other is a relative contraindication which is

19     a condition that makes a particular treatment possibly

14:55:27  20     inadvisable.  Correct?

21     **A**     I see the definition there.  He did not use any of the

22     descriptors and contraindication by itself in medical

23     training is very clear, you never go there.

24     **Q**     Well, actually, you say that.  Where is your reference

14:55:44  25     for that?  Because I looked up medical resources from

**Wailes (Cross by Lanier)**

1    legitimate medical sources on the internet and I get this

2    story.

3              MR. MAJORAS:  Objection to testifying.

4    BY MR. LANIER:

14:55:55 5    **Q**    Well, let me ask it this way.

6              THE COURT:  Rephrase it, please.

7              MR. LANIER:  I'll rephrase it, Judge.

8    BY MR. LANIER:

9    **Q**    Where did you get that from?

14:56:00 10   **A**    I did a Google -- I actually verified it with a Google

11   search on contraindication.

12   **Q**    Okay.  Because now we did practice the same way, do

13   the same thing.  Don't look at my password.

14        All right.  So let's do a Google search, contra --

14:56:26 15   medical definition of medical contraindication.  Why don't

16   we hit that.  Boom.

17        Contraindication.  Medical definition by Charles

18   Patrick Davis, M.D., Ph.D.

19        Do you see that?

14:56:40 20   **A**    Well, you pulled up the same definition that you've

21   looked up already, but there's other definitions that didn't

22   pop up first for me, but just contraindication alone would

23   probably state something a little bit differently, more like

24   the first bullet.

14:56:56 25   **Q**    Well, all I looked up was contraindication of

**Wailes (Cross by Lanier)**

1    medical -- here, we'll go back.

2    **A**    Well, you know how Google works, right?

3    **Q**    Yes, as a matter of fact, I'm suing them right now.

4    **A**    And if you've been to that site before, it's going to

14:57:10  5    go right to it again.  It's going to be the top responder

6    for your search.

7    **Q**    Here.  Well, let's go to one.  Here you want to do

8    this one, NCI Dictionary of Cancer Terms.  We need something

9    better.  We need a medical dictionary.  How about this?

14:57:28  10    MedlinePlus, U.S. National Library of Medicine.  That sounds

11    significant.  Doesn't it?

12    **A**    Yes, it does.

13    **Q**    That's the National Institute's of Health, federal

14    government; right?

14:57:41  15    **A**    Yes.

16    **Q**    All right.  Contraindication.  There are two types of

17    contraindication, relative and absolute.  One I've never

18    looked at before says the same thing, doesn't it?

19    **A**    It does.

14:57:57  20    **Q**    So when you say contraindication in medical parlance

21    means, I got you 2 to nothing so far on this, don't I?

22                   MR. MAJORAS:  Objection, Your Honor.

23                   THE COURT:  Overruled.

24                   THE WITNESS:  I don't agree with that.

14:58:12  25    BY MR. LANIER:

**Wailes (Cross by Lanier)**

1    **Q**     All right.

2    **A**     From a physician's point of view, if you don't qualify

3    it with relative, then our experience and training would say

4    that it's absolute.  A contraindication means you should

14:58:22 5    never go there.  If he had said relative contraindication, I

6    suppose you would say, you shouldn't go there most of the

7    time, but he didn't say relative contraindication, he said

8    contraindication.  And if you look up --

9    **Q**     Relative and half --

14:58:39 10    **A**     -- more definitions --

11    **Q**     So you just assumed he meant absolute because you

12    think even though the NIH, the dictionaries, and the

13    MedlinePlus mean contraindication, there are two types, you

14    just jumped to the conclusion that he meant something else.

14:58:55 15          And you swore under oath to that?

16    **A**     Yes, I did, and I'm comfortable with that

17    interpretation.

18                    MR. MAJORAS:  Objection.  Rule of completeness

19    Your Honor.  I'd like to have the first line read of what

14:59:05 20    was just shown.

21                    MR. LANIER:  I'd be glad to, Judge.

22                    THE COURT:  All right.  All right.

23                    MR. LANIER:  Hold on.  It got no trouble with

24    that.  Hold on.

14:59:12 25                    THE COURT:  Read the first line.

1    MR. LANIER:  A contraindication is a specific

2    situation in which a drug, a procedure, or surgery should

3    not be used because it may be harmful to the person.

4        You don't disagree with that, do you?

14:59:30  5            THE WITNESS:  No.

6    BY MR. LANIER:

7    **Q**    There are two types of contraindications:  Relative

8    contraindication means caution should be used when two drugs

9    or procedures are used together.  It's acceptable to do so

14:59:43  10   if the benefits outweigh the risk.

11       Do you see that?

12   **A**    I see that.

13   **Q**    Absolute contraindication means the event or substance

14   could cause a life-threatening situation.  A procedure, or

14:59:55  15   medicine that falls under this category must be avoided.

16       Do you see that?

17   **A**    I do.

18            THE COURT:  All right.  Mr. Lanier, if we're

19   going to go -- if you're finished with that series of

15:00:17  20   questions, I think it's a good time to take a break.

21            MR. LANIER:  I am, Your Honor, and I'm almost

22   through with the witness too, but I do lack 15 or 20 minutes

23   probably.

24            THE COURT:  All right, then --

15:00:26  25            MR. LANIER:  Thank you.

**Wailes (Cross by Lanier)**

1    THE COURT:  All right.  Ladies and gentlemen,

2    we will take our usual mid-afternoon recess, 15 minutes.

3    Usual admonitions, and then we'll pick up with more of

4    Dr. Wailes' testimony.

15:00:38  5    Thank you.

6    (Jury excused from courtroom at 3:00 p.m.)

7    THE COURT:  Please be seated for a minute.

8    Close the back door, please.

9    All right.  I just want to take a minute.  CVS and

15:01:19  10    Walgreens have --

11    Oh, Doctor, you can step down.  This is a legal issue.

12    -- have proposed a very long limiting instruction.  I

13    assume they've given it to the plaintiffs.  I'm not inclined

14    to give that.  I am willing to give the following

15:01:36  15    instruction if CVS and Walgreens wants me to give it.

16    MR. WEINBERGER:  Excuse me, Your Honor.

17    When -- was this transmitted to us?

18    THE COURT:  Well, it was e-mailed to me.  I --

19    it shows Peter and Mark on it.

15:01:49  20    MR. WEINBERGER:  When was it?

21    THE COURT:  Well, 1:03.

22    MR. LANIER:  I've kind of been busy.

23    THE COURT:  So was I, but I checked --

24    MR. WEINBERGER:  1:03 this morning?

15:01:58  25    THE COURT:  No, no, no.  1:03 this afternoon.

**Wailes (Cross by Lanier)**

1     1:03.

2                     MR. WEINBERGER:  I turn my phone off when the

3     testimony --

4                     THE COURT:  Well, that's fine, but I'm

15:02:05 5  checking because I get case-related stuff, and here was one.

6     All right?

7                     MR. LANIER:  I'm going to start e-mailing you

8     while I examine.

9                     THE COURT:  Well, to be fair, this was not

15:02:13 10 during the doctor's testimony.  It was at 1:03.  He didn't

11    start until about 1:10.

12                    MR. WEINBERGER:  7 minutes before.

13                    THE COURT:  Right.  All right.  This is what

14    I'm willing to give it Walgreens and CVS want it.

15:02:25 15     You heard testimony this morning that CVS and

16    Walgreens engaged Dr. Wailes in opioid litigation involving

17    another government plaintiff.  You may consider this

18    testimony only if you find that it bears on Dr. Wailes'

19    credibility.  You may not consider the existence of this

15:02:43 20 other litigation as evidence on the merits of plaintiffs'

21    claims.

22                    MR. DELINSKY:  We'll discuss over break,

23    Your Honor.

24                    THE COURT:  All right.  I think that gets to

15:02:59 25 it.  It's limited.

## Wailes (Cross by Lanier)

1      The other, I think, went on and on, and this says what

2  you can consider it for and it's not going to the merits.

3      So if you want to think about that, if you've got

4  better language, fine, but I'm not going to give the long

15:03:15  5  language that the defendants suggested.

6              MR. STOFFELMAYR:  Judge, may I raise one other

7  issue before --

8              THE COURT:  Okay.  Go ahead.

9              [Court reporter clarification.]

15:03:22  10              MR. STOFFELMAYR:  Oh, I'm sorry.

11      I'd like to raise one other issue before the exam

12  continues after the break.  There was a question to

13  Dr. Wailes about --

14      Am I doing that?

15:03:41  15              MR. DELINSKY:  Do you have your phone in

16  your --

17              MR. STOFFELMAYR:  No, it's turned off.

18      -- he made a remark about having, you know, reviewed

19  doctors as part of his work on the California Medical Board,

15:03:51  20  and the question was, why didn't they ask you to review

21  Dr. Franklin and all these others.  Ms. Sullivan asked

22  essentially the same question of Dr. Alexander, and you had

23  very sharp words for her.  So I understood questions like

24  that were completely out of bounds.  So I want to make sure

15:04:07  25  we all know what the rules are.  You know, why didn't the

4980

**Wailes (Cross by Lanier)**

1 | lawyers ask you to perform an investigation that you haven't

2 | performed.

3 | THE COURT:  Well, look, it's been a long

4 | trial, Mr. Stoffelmayr.  I try to keep the same strike zone

15:04:22 5 | for both sides.

6 | MR. LANIER:  I don't --

7 | THE COURT:  There wasn't an objection here.

8 | MR. STOFFELMAYR:  No, I didn't want to -- it

9 | wasn't the kind of thing where you want to get up and grind

15:04:34 10 | everything to a halt.

11 | MR. WEINBERGER:  Are you kidding me?

12 | THE COURT:  Well, if you would have -- if you

13 | would have objected --

14 | MR. WEINBERGER:  There's been so many

15:04:38 15 | objections.

16 | THE COURT:  Hold it.  Hold it.  Hold it.

17 | If you would have objected, I very well might have

18 | sustained it.

19 | MR. STOFFELMAYR:  Well, the same thing with

15:04:46 20 | Ms. Sullivan.  There was no objection at the time and you

21 | about had her -- well, you had very sharp words for her at

22 | the end of the day when there was a complaint about it.

23 | MR. LANIER:  I'll pull it, and if that's way,

24 | Your Honor, I'll apologize to the Court and to the opponent.

15:04:55 25 | I do not remember this at all.

4981

**Wailes (Cross by Lanier)**

1          MR. STOFFELMAYR:  I'm not interested in trying

2     to strike the testimony retroactively.  I'm just asking that

3     we all be clear on what the rules were.

4          MR. LANIER:  I don't think that that's what --

15:05:04  5          THE COURT:  All right.  All right.

6          MR. LANIER:  I will be stunned if that's it,

7     and if so, I will apologize dead up.

8          THE COURT:  Well. . .

9          MR. LANIER:  But I don't think that's it.

15:05:20 10          THE COURT:  The problem is really the way you

11     ask it.  It's obviously appropriate to ask a witness if he

12     reviewed anything, but when you say, well, did the lawyers

13     show you this, did the lawyers show you that, that, I don't

14     think, is appropriate.  What they chose to review, what they

15:05:37 15     looked at --

16          MR. STOFFELMAYR:  This was even worse.  The

17     question was did they ask you to perform an investigation.

18          THE COURT:  All right.  Well, that --

19          MR. STOFFELMAYR:  I'll look at the transcript.

15:05:49 20     I'm not asking to strike anything.  I'm just asking that the

21     rules be fair.

22          THE COURT:  All right.  All right.  I don't --

23     I think -- I think that's an improper question, what they

24     asked -- did they ask you to do this, did that ask you to do

15:05:57 25     that.  All right?  What you did, what you did.  You didn't

**Wailes (Cross by Lanier)**

1    do this, you didn't do that, that's fine.  But what the

2    lawyers asked you to do isn't -- is -- both sides should

3    stay away from questions like that.

4                    MR. STOFFELMAYR:  Thank you, Judge.

15:06:11  5                    THE COURT:  And if I was inconsistent, that's

6    on me.

7                    MR. STOFFELMAYR:  Well, you weren't because

8    nobody objected.  I just wanted to --

9                    THE COURT:  All right.  Well, I'm glad you --

15:06:17  10   in my view, that -- no one should be asking questions

11   phrased like that.

12                    MR. LANIER:  Judge, I'm looking at the record.

13                    THE COURT:  Well, all right.  Look, I --

14                    MR. LANIER:  It doesn't matter.

15:06:31  15                    THE COURT:  Since it wasn't objected to, but

16   in the future, going forward, everyone should be careful

17   about phrasing questions like that.

18        (Recess was taken from 3:06 p.m. till 3:22 p.m.)

19                    COURTROOM DEPUTY:  All rise.

15:22:44  20                      (Jury returned to courtroom.)

21                    THE COURT:  Okay.  Please be seated.  Doctor,

22   you're still under oath.

23        And, Mr. Lanier, you may continue, please.

24                    MR. LANIER:  Your Honor, ladies and gentlemen,

15:23:58  25   sir, I've reached the end of the road.  I'm done.  I'll pass

## Wailes (Redirect by Majoras)

```
 1    the witness.
 2                    THE COURT:  I guess we should -- if any of the
 3    jurors have any questions, they should give those to
 4    Mr. Pitts and I'll show them to the lawyers.
 5                      (Brief pause in proceedings.)
 6                    MR. MAJORAS:  May I proceed, Your Honor?
 7                    THE COURT:  Yeah, Mr. Joyce.
 8                    MR. MAJORAS:  Thank you.
 9            REDIRECT EXAMINATION OF ROBERT E. WAILES, M.D.
10    BY MR. MAJORAS:
11    Q     Good afternoon, Dr. Wailes.
12          Ladies and gentlemen.
13          Dr. Wailes, you may not be aware of that this, but in
14    this case Judge Polster has asked the jurors if they have
15    questions, to write them out.  The lawyers can look at them
16    to see what may or may not be appropriate then and make
17    decisions on what to ask.
18          We have just done that, and I apologize for the delay.
19    I'm going to -- I'm going to read these to you rather than
20    put them on the screen because sometimes there's multiple
21    parts, and I think I can make these -- to the extent they
22    need any kind of tweaks to them, I can do that for you.  So
23    let me just -- in no particular order.
24          And sir, if you have an answer, please give it.  If
25    you don't, let us know that.
```

15:24:22    15:31:55    15:32:04    15:32:16    15:32:32

4984

**Wailes (Redirect by Majoras)**

1    You stated you have some appointments that only take

2    20 minutes.  Are those patients ones to whom you may

3    prescribe opioids?

4    **A**    Yes.  Good question, and thank you for the opportunity

15:32:48  5    to answer questions.  I appreciate that.

6    20 minutes is the briefest office visit that I have.

7    New patients are typically an hour.  And so the point that I

8    was making in the context of this is many offices, and

9    really busy offices that have high volume was the question

15:33:11  10    presented to me, see patients literally every 5 or

11    10 minutes, or 15 even.  We are really the exception in that

12    we are not a high-volume practice.  The shortest time that

13    we see follow-ups, not new patients, but for follow-ups, the

14    shortest time is 20 minutes.  So that was the context of

15:33:28  15    that.

16    Did that answer the question?

17    **Q**    Sir, your answer is your answer.

18    **A**    Okay.

19    **Q**    I'll go to the next question.

15:33:36  20    You stated that you counsel patients very extensively

21    prior to prescriptions for opioids.  If the patient has a

22    pre-disposed situation, or has the likelihood to become

23    addicted, do you prescribe for long-term use knowing they

24    may probably become addicted?

15:33:55  25    **A**    Another great question, and a difficult judgment.

**Wailes (Redirect by Majoras)**

1    You're absolutely right that I have to go through a

2    lot of processes to evaluate to see if a patient is a good

3    candidate for starting an opioid or even continuing an

4    opioid, since many patients come to me on opioids, but it's

15:34:17  5    a similar evaluation.  So many different factors go into

6    that.  And so there's no yes-or-no answer to that question.

7    It depends on how great their needs are.  It depends

8    how I'm able to monitor them going forward.  There are

9    patients that I get that are the highest risk.  That is

15:34:37  10   rarely, but occasionally, I get opioid addicts sent to me to

11   help with their pain relief.  Those are the ones I'm most

12   cautious about, take the most deliberate care, monitor the

13   very most.  But even opioid addicts can have pain.  They can

14   have acute pain from an injury.  They can have surgery.

15:35:02  15   They still need some pain management needs, and that is

16   possible.

17   And even the plaintiffs' expert, Dr. Lembke, has

18   agreed on that point in her expert report, that occasionally

19   even people with known opioid misuse or addiction still

15:35:21  20   require some treatment, but boy, do we watch them very, very

21   closely.

22   **Q**    Following up the examples, and quote, so I believe

23   these are the examples of red flag discussion you had, you

24   may interpret it differently.

15:35:39  25   The examples you have given are resolutions to red

**Wailes (Redirect by Majoras)**

1    flags, so can a pharmacist resolve and dispense in those

2    situations; is that right?

3    **A**     That's correct.  The point that I was making in

4    talking about how some of those red flags are easy to

15:36:02  5    dismiss is that they flag too many things.  If one fifth of

6    all your prescriptions, 19.4 percent in Mr. Catizone's case,

7    if 1 out of 5 of all your prescriptions are flag -- flagged,

8    you can get alert overdose, if you will.  You can get alert

9    fatigue.  If there's too many alerts, then you don't pay

15:36:23 10    much attention to it.  It's overbroad and captures a lot of

11    things that I talked about inappropriately, because those

12    really -- many of those shouldn't be red flags.

13              MR. WEINBERGER:  Your Honor, can we have a

14    sidebar for a moment, please?

15:36:37 15                   (Proceedings at sidebar.)

16              MR. WEINBERGER:  Your Honor, this is the first

17    witness who takes a question, answers it initially and then

18    proceeds to go off on tangents that have nothing to do with

19    the question and simply reiterates an already stated

15:37:09 20    opinion.

21              THE COURT:  Well, I -- I don't think he went

22    on and on.  He answered the question.  So let's -- it's what

23    he said before.

24              MR. WEINBERGER:  Well, this isn't an

15:37:20 25    opportunity for him to reiterate --

### Wailes (Redirect by Majoras)

1           THE COURT:  All right.  Look, Mr. Weinberger,

2     Mr. Majoras read the juror's questions, so I just -- I'll

3     just caution just -- tell the witness to just answer the

4     questions succinctly if he can.  If he can't, they can't.

15:37:38   5           MR. MAJORAS:  Thank you.

6           MR. WEINBERGER:  Thank you, Judge.

7               (In open court at 3:37 p.m.)

8     BY MR. MAJORAS:

9     **Q**    Dr. Wailes, I've got a number of additional questions

15:37:55  10     that have been written here, and I'll just ask you to as

11     succinctly as possible to respond to the questions being

12     asked.  If the lawyers have follow-up, we can do that.

13          Fair enough?

14     **A**    Thank you.  I apologize.  That's not my gift.

15:38:08  15     **Q**    And just a reminder to you that your answers to these

16     questions, just like the ones the lawyer asks, should be

17     within a reasonable agree of certainty within your

18     profession as a pain management specialist.

19          Okay?

15:38:22  20     **A**    Thank you.

21     **Q**    All right.  Next question:  A rep -- I think this

22     means a company representative -- a rep comes to your

23     office, buys your staff lunch.  The rep presents a product

24     or drug.

15:38:34  25          Do you, as the doctor, take the word of the rep of the

1    pros and cons of the product or drug because the rep made it

2    sound great?

3    **A**    Another good question.  I view that as I do all

4    information that comes my way.  In medical school we learned

15:38:52 5    to be scientists, and we have to be critical of everything

6    that comes our way because everything has a bias.

7        What you're describing, someone bring me lunch, and I

8    know they have an agenda and I know they have a product to

9    sell, so the way I would answer that is that as a physician

15:39:08 10    and scientist I try to be very critical of the information I

11    receive and put it and balance it against other information

12    and other sources, so there's always other sources of

13    information to review as well.

14    **Q**    Next question:  Does your clinic have the same header

15:39:27 15    on the prescription pad?

16        And then there's a follow-up question, so maybe it

17    makes more sense if I read them together.

18        So do all of the providers in your clinic use the same

19    prescription pad with all of the names on it from your

15:39:42 20    clinic?

21    **A**    Historically we have.  Now we use electronic

22    prescribing, but historically we have had a prescription pad

23    with everyone's name on it.

24    **Q**    Since when have you been using electronic prescribing?

15:39:55 25    **A**    We started using some electronic prescribing probably

4989

**Wailes (Redirect by Majoras)**

1    8 -- 8 years ago, approximately, and we've switched to

2    opioid medical prescribing for the last approximately two

3    years.

4    **Q**    Next question is, generally with respect to all

15:40:14 5    opioids, what do you suggest a pharmacist do when they feel

6    there are legitimate red flags with a prescription that need

7    to be resolved before they feel comfortable to dispense the

8    opioid prescription, but can't get in contact with the

9    prescriber?

15:40:32 10    **A**    Great question.  That's kind of the crux of the

11    difficulty in this situation.  And the pharmacist has to do

12    everything within their power, which means investigating as

13    best they can.  And then they have to use their judgment.

14    If they can't get a hold of the doctors, then I think they

15:40:52 15    should use their judgment.  They always have the right to

16    not dispense, and there are reasons why they may not want to

17    dispense.  There could be good reasons.  When they are 1 on

18    1 with the patient and assess the situation.  And my point

19    that I made in my discussion today is that it should be

15:41:13 20    the -- at the discretion, the ultimate decision really

21    should be up to the pharmacist, since they're the last

22    gatekeeper, as to whether to give it or not.  If there is

23    that unusual but significant situation where there's no full

24    resolution, he'll need to make a decision.

15:41:32 25    **Q**    Now, and I think you've answered this in your answer,

4990

**Wailes (Redirect by Majoras)**

1        you can tell me, but I'll ask the question that's written.

2            Should the pharmacist still dispense even though he or

3        she can't get in contact with the provider or prescriber?

4        **A**        And on that I would say it's a case-by-case basis.

15:41:47  5   I'm not going to say blanket yes, because there may be

6        situations where the pharmacist sees the patient and they're

7        intoxicated.  That's no good.  That's not good.

8            There may be other examples where the pharmacist uses

9        their professional judgment.  So it depends.  Again, I want

15:42:06 10  to rely on the pharmacist to use their good judgment and not

11       have just an algorithm or mechanical way to make decisions.

12       **Q**        Additional questions:  The first one relates to PDMPs.

13       Are the PDMPs information all connected no matter what state

14       your prescriptions are prescribed in or dispensed?  In other

15:42:29 15  words, can the Ohio -- or can someone, through the Ohio

16       OARRS system, see California information in the CURES

17       system?

18       **A**        Another great question, and the bottom line is no,

19       someone from OARRS can't see what's in California, and

15:42:47 20  California can't see what's in OARRS here.  But OARRS does

21       have a multistate agreement of where they share the similar

22       software platform and can see opiate prescriptions from

23       multiple states.

24       **Q**        And this is my question:  Do you know whether the

15:43:04 25  access among those systems has changed over time?

**Wailes (Redirect by Majoras)**

1    **A**    It has changed dramatically over time.  It's changed

2    tremendously because these systems are relatively new within

3    the last 15 or so years.  That's when OARRS started here was

4    in 2006, but it's been improving and more sharing of

15:43:23  5    information over time.

6    **Q**    Back to my list of questions.  If a person is addicted

7    to an opioid, why would another opioid be helpful for their

8    addiction and recovery?

9    **A**    I was expecting that question.  It's a complex issue.

15:43:42  10   The simplest answer that I can provide is that addiction

11   specialists have done lots of research, lots of

12   investigations, and they have found that if they use certain

13   types of long-acting opioids it can reduce the cravings for

14   opioids.  That makes sense.  But why would you give an

15:44:08  15   opioid to someone who is addicted to it?  The explanation

16   for that is they describe harm reduction.  That's a term

17   that we use, harm reduction.  Because it's a terrible

18   situation.  But by using medication assisted treatment, they

19   reduce the deaths, suicide, and overdoses return to

15:44:34  20   addictive behavior profoundly.  I can't give you the exact

21   statistic, but it's really significant.

22        So even though it's not real logical to give someone

23   the same drug, it is effective in reducing or improving

24   outcomes.  It's not perfect, but it's better than not using

15:44:49  25   it.

**Wailes (Redirect by Majoras)**

1    **Q**     How can you measure the level of pain a person may

2    have?  Wouldn't it -- or couldn't it just come down to being

3    based on the patient's word?

4    **A**     Another good question.  That's part of the real crux

15:45:06  5    of my specialty is trying to evaluate pain.  And we use

6    multiple tools.  But it is imperfect.

7         Firstly, I generally trend to believe patients and

8    their histories.  Patients with pain oftentimes suffer from

9    stigma because some of the pain is not obvious.  It's not

15:45:25 10    like a broken leg or they don't have a cast on, per se, so

11    it's not always obvious.  But you use our measures as well.

12    You look at their behaviors.  You get reports from family

13    members.  You look at your physical examination.  And that's

14    really helpful.  You also watch them over time and see how

15:45:43 15    things change, how consistent they are.  You try to

16    understand how honest they are in your evaluation.  It's a

17    difficult thing, but I think most of the time we get it

18    pretty right.

19    **Q**     Let me make sure I've got everything.

15:46:04 20         Okay.  Pretty -- very straightforward question.

21         Did you testify that opioid addiction is all in the

22    head?

23    **A**     No.

24    **Q**     Is there any research to find different ways to

15:46:21 25    control pain without the use of opioids?

**Wailes (Redirect by Majoras)**

1    **A**     Thank goodness, yes, and again, that's a huge part of

2    my specialty, and I've always said the majority of my

3    patients have opioids, but a significant don't get any

4    opioids at all.  And we use other medicines, we use other

15:46:41  5    procedures, and the question was about research, yes.  We're

6    always looking for, and we do have some better drugs on the

7    forefront that we hope will be useful to replace opioids.

8    So far we haven't got those in clinical use, but we're

9    definitely doing research looking for that.

15:46:58  10    **Q**     What is the difference between oxycodone and

11    OxyContin?

12    **A**     That's a straightforward question I'm happy to answer.

13         Oxycodone is a drug and it comes in different

14    formulations.

15:47:12  15         OxyContin is a brand name for the extended-release

16    formulation.  There are other extended-release long-acting

17    oxycodone products, but oxycodone is the name of the drug

18    and OxyContin is a brand of extended-release oxycodone.

19    **Q**     And next question is, is the use of -- and I'm going

15:47:37  20    to insert my word -- is the use of prescription opioids over

21    time -- let me start over.

22         Has the use of prescription opioids over time become

23    less effective?

24    **A**     I'm going to try to answer that two ways because I'm

15:47:55  25    not sure exactly where it's coming from, but throughout my

## Wailes (Redirect by Majoras)

1    practice it's always been -- opioids have always been good

2    for chronic pain.  There's been no change in that.  How we

3    prescribed it and how we monitored it and our expertise has

4    increased over the decades I've been working at it.

15:48:16  5    I think that might be a question that's alluding to

6    tolerance.  That's -- if I interpret that question, if you

7    take the same dose for a long time, there is a potential for

8    tolerance, which the medical definition of tolerance is that

9    for the same dose, you get less effective over time.

15:48:33 10    Luckily in most chronic pain patients, that's not a

11    common occurrence, but it can occur, and it's just something

12    we have to monitor very closely.

13  **Q**    How long have behavioral and testing -- I'm sorry --

14    behavioral testing and interventions been in practice with

15:48:53 15    regard to prescribing opioids to your patients?

16  **A**    Well, we've had behavioral interventions throughout my

17    entire career, but likewise, that has evolved dramatically

18    in terms of what psychologists and psychiatrists are able to

19    do, both with other medicines besides opioids and other

15:49:20 20    psychological techniques.

21    Interventions would talk about the range of other

22    activities besides opioids, which would include all the

23    procedures that we do, and that has advanced dramatically

24    over time.  So that has also improved.  So luckily, opioids

15:49:38 25    are not the only choice.

4995

**Wailes (Redirect by Majoras)**

1    **Q**    Another question about PDMP programs.

2        What other tools are useful for doctor to -- let me

3    add in a word.

4        What other tools are useful to identify doctor

15:49:52 5    shopping other than a PDMP program?

6    **A**    Well, the first thing is always the history and just

7    talking to the patient, and a lot of times there's a simple

8    explanation why there may be someone else on the PDMP who

9    gave them opioids.  Sometimes not.  But that's what you talk

15:50:08 10    to the patient about.  So we actually look at the PDMP

11    before we see the patient, but we don't bring that up.  We

12    just ask the patient.

13        So asking the patient's probably the most valuable

14    source because they're the ones who know the actual history

15:50:22 15    and what they've been through and what to expect in terms of

16    other ways.  The PDMP is a good source for that, though.

17    **Q**    How many times have you prescribed the trinity series

18    of medications in the last 25 years?

19    **A**    I don't have a number from that -- for that, but I'll

15:50:44 20    be honest with you, it's very rare.  I don't use the trinity

21    very much.  It's a very uncommon situation.  But if I use it

22    even 1 in a hundred times, that 1 in a hundred times, I take

23    very seriously, and I'm very deliberate about what I do with

24    prescriptions.  I'm very careful, and I think most

15:51:03 25    responsible doctors would be as well.  And so it is rare.

4996

**Wailes (Redirect by Majoras)**

1       Now, the use of -- I'll leave it at that.

2   **Q**    How often have pharmacists contacted you regarding

3   trinity prescriptions, when you've made them?

4   **A**    Not very commonly.  Luckily, most pharmacists kind of

15:51:25  5   know the doctors in their area, and I've been there for a

6   long time, so in some ways we have a relationship even

7   though we don't cross paths very much.  So it's unusual for

8   me to get calls on the trinity.

9   **Q**    We're about to the end of these questions.

15:51:45  10      How many patients that have been treated in your

11  clinic have become addicted?

12  **A**    Another tough question.  I don't have a specific

13  answer for that.  It's very rare in your clinic because we

14  monitor them so closely.  I know that we don't always pick

15:52:02  15  up every addicted patient, though.  Honestly sometimes they

16  fool us or they get around some way, and so I'm sure there's

17  patients that I've treated that have left the practice and

18  have become addicted or are addicted.  It's a very low

19  percentage of patients, luckily, again, because we monitor

15:52:22  20  them very carefully for the exact signs and symptoms for

21  addiction.

22  **Q**    And to the extent you have become aware that patients

23  treated in your clinic have become addicted, are you aware

24  of any who have died in relationship to that addiction?

15:52:39  25  **A**    No, I'm not aware of any deaths from that.

**Wailes (Redirect by Majoras)**

1    **Q**     Those are the jurors questions.  I have a few of my

2    own.  I always hesitate to ask my own after reading so many

3    good ones there.

4         I'd like to go to just a few things that Mr. Lanier

15:52:53  5    covered with you.

6         First, do you remember going through Dr. Lembke's CV?

7    **A**     Briefly, yes.

8    **Q**     He showed you the various publications and the

9    testifying that she's done.

15:53:06 10         Do you remember that?

11   **A**     Yes.  Yes, I do remember.

12   **Q**     Why haven't you written more publications?

13   **A**     My career has not been in the ivory tower.  My

14   pursuit for my -- my calling and my pursuit is to treat

15:53:21 15   patients, and so I don't have a lot of academic credentials,

16   I just don't.  And so my desire in my career was to see

17   patients, and it's been very satisfying.

18   **Q**     Is your answer the same as to why you didn't become a

19   professor or an educator?

15:53:37 20   **A**     Yes, same answer.

21   **Q**     Do you have any regrets looking back over the 37 years

22   you've been in practice of the choice you made about doing

23   the work that you've been doing?

24   **A**     No.  I'm very happy with my decision.

15:53:48 25   **Q**     You also were shown the resume of Mr. Catizone.

**Wailes (Redirect by Majoras)**

1          Do you remember that?

2     **A**     Yes, I do.

3     **Q**     And Mr. Catizone has been -- well, let me ask it this

4     way.

15:54:02  5          Mr. Lanier pointed out times that Mr. Catizone has

6     testified in various places; right?

7     **A**     Yes.

8     **Q**     And other things that Mr. Catizone has accomplished in

9     his career; correct?

15:54:10 10   **A**     Correct.

11    **Q**     Looking back, again, at your 37 years, any regrets

12    that you have done the practice you have been in rather than

13    being an administrator of an organization?

14    **A**     I'm very happy with my career and it's trajectory,

15:54:29 15   yes.

16    **Q**     Also want to ask you a couple questions that

17    Mr. Lanier asked you concerning Dr. Lembke's publication and

18    as to whether you had read any of them.  And do you have a

19    copy of your report with you?

15:54:39 20   **A**     Yes, I do.

21    **Q**     Now, you actually cite Dr. Lembke a couple of times in

22    your report, don't you?

23    **A**     Oh, yes.  I have read some of other work, but not the

24    works that he quoted.

15:54:50 25   **Q**     And, in fact, in your report, you quote Dr. Lembke;

**Wailes (Redirect by Majoras)**

1    correct?

2    **A**    I do quote her in my report, yes.

3    **Q**    So I'm going to put up on the screen Page 19 of your

4    report, and in particular you can see that I've highlighted

15:55:09  5    the footnote, to the note 59.

6    **A**    Yes.

7    **Q**    Now, do you understand that that's the same Dr. Lembke

8    that testified -- or who testified earlier in this case?

9    **A**    That's what I understand.

15:55:20  10    **Q**    And in this particular instance you quote her to say

11    that Dr. Lembke conceded elsewhere in 2016 that chronic

12    opioid therapy benefits some patients with chronic pain and

13    that benefit is indicated by improvement in function.

14    And then you cite an article that she wrote with a

15:55:38  15    number of other folks; right?

16    **A**    That's correct.

17    **Q**    I'm going to ask you to turn to Page 23 of your

18    report, which, again, I also have on the screen, and here

19    you again cite Dr. Lembke, and you write, as written by

15:55:58  20    Dr. Lembke herself, even in cases where opioid misuse is

21    detected by a prescriber who is treating a patient for

22    chronic pain, opioids do not necessarily need to be

23    discontinued in such cases but rather interventions should

24    be performed to change the patient's behavior.

15:56:16  25    Do you see that?

**Wailes (Redirect by Majoras)**

1    **A**    I do see that.

2    **Q**    And what do you cite as the basis for putting that in

3    your report?

4    **A**    Her article in footnote 76.

15:56:25   5    **Q**    And that's an article that has Dr. Lembke as the lead

6    author; is that right?

7    **A**    Yes, that's correct.

8              THE COURT:  If you could take that off the

9    screen.

15:56:49   10             MR. MAJORAS:  Oh.  Sorry.  Everyone does that.

11        If I can go back to counsel table, Your Honor.  I

12    think I left something there.

13             THE COURT:  Okay.

14             (Brief pause in proceedings.)

15:57:20   15             MR. MAJORAS:  Thank you, Your Honor.

16    BY MR. MAJORAS:

17    **Q**    So, Dr. Wailes, switching gears to a bit, there was a

18    fair amount of discussion with Mr. Lanier about an article

19    or a publication that's cited in one of your resumes.

15:57:35   20        Do you recall that?

21    **A**    Yes.

22    **Q**    And, in fact, Mr. Lanier showed you in the actual

23    article that's cited that you are, in fact, acknowledged --

24    and I'm putting it up on the stand.  This is page -- let me

15:57:56   25    identify it.  Page 284.  It's CT3 demo 075.

**Wailes (Redirect by Majoras)**

1          This is the occipital nerve stimulation study; is that

2    right?

3    **A**      Yes, it is.

4    **Q**      And Mr. Lanier showed you in the acknowledgements

15:58:13  5    where you are identified as an investigator who participated

6    in the study; is that right?

7    **A**      That's correct.

8    **Q**      And I believe you were even acknowledged earlier in

9    the article; is that right?

15:58:22 10    **A**      That's correct.

11    **Q**      So let's take a look at what you wrote.

12          So this is the CV that you were shown P21865, Page 1.

13          The first part of the reference here is the title of

14    the article; right?

15:58:41 15    **A**      Yes.

16    **Q**      We go to the second page, here you provide more

17    information about the article; right, at the top?

18    **A**      That's correct.

19    **Q**      And you identify very specifically the authors; right?

15:58:58 20    **A**      That's correct.

21    **Q**      That would be Saper -- I won't list them because I'll

22    mistaken their name and I apologize for that.  Let do it

23    this way.

24          In citing an article typically as an article in a

15:59:11 25    medical journal or publication, are the authors listed

### Wailes (Redirect by Majoras)

1    usually in the order in which they participate -- I'm

2    sorry -- the principal authors of that article?

3    **A**    Typically, yes.

4    **Q**    So you would assume this article, the principal

15:59:26  5    author, but with help from others, was JR Saper as

6    identified here?

7    **A**    Yes.

8    **Q**    Now, in your resume, you say, ONSTIM investigator, and

9    then in boldface you have your name, Robert Wailes; correct?

15:59:43  10    **A**    Correct.

11    **Q**    Is that the same Robert Wailes who is the investigator

12    acknowledged in the article?

13    **A**    Yes.

14    **Q**    You had some questions about off-label use of

15:59:58  15    medications.

16         Do you recall those?

17    **A**    Yes.

18    **Q**    Please describe -- briefly, if you can -- please

19    describe what it means to prescribe a medication that's

16:00:10  20    off-label.

21    **A**    The FDA goes through an extensive evaluation of drugs

22    to get FDA approval, and it will typically list specific

23    indications that have been researched and studied and used

24    for that drug.  And that is a very long and difficult

16:00:31  25    process.  Once a drug is FDA approved, over time it may come

## Wailes (Redirect by Majoras)

1    and be utilized for other applications.  And I can describe

2    that same situation with many antidepressants that we

3    actually use for pain specifically.  I can describe that for

4    seizure medicines that are no longer used for seizure

16:00:54 5    medicines but are used for pain, and many times, if not

6    most, I don't know the percentage of the manufacturers of

7    those drugs don't go through the trouble of getting FDA and

8    FDA indication, because it's not required.

9        The FDA has already said that it's safe and

16:01:19 10   efficacious for one thing, and you have to be very aware and

11   be cautious if you use it for something else, but you look

12   into the pros and cons -- it's not against the law or

13   against regulation.  It's a widely accepted practice for

14   many medicines.  You still have to weigh the pros and cons

16:01:41 15  and be very familiar to that drug to make sure that it

16   applies to any other use that you're thinking of.

17   **Q**    Does the FDA itself provide guidance on off-label use

18   and when it's appropriate?

19   **A**    I suspect it does, but I can't quote that.

16:01:54 20  **Q**    Well, let's see if we can.

21       If he can hand this out to counsel and to Mr. --

22   Dr. Wailes, please, and the Court.

23               MR. WEINBERGER:  Your Honor, can we go on the

24   headset?  Sorry.

16:02:22 25               (Proceedings at sidebar.)

**Wailes (Redirect by Majoras)**

1    MR. WEINBERGER:  Your Honor, his testimony is

2    clear.  He's unaware of whether the FDA has provided

3    guidance for off-label use.  They can't just hand him a

4    document --

16:02:40  5    THE COURT:  Well, look, I -- he said I suspect

6    it does, but I can't quote that.  I think Mr. Majoras,

7    without putting this on the screen, you can show this to him

8    and say, have you ever read this.  All right?  If he says

9    no, then that's the end of it.  If he says yes, I have read

16:03:01 10    this, well, then, you can use it.  He's a doctor, okay,

11    so --

12    MR. MAJORAS:  I will do that, Your Honor.

13    I will note, though, that that we've been doing

14    internet searches live with this witness and identifying

16:03:17 15    information from the FDA website if he knows that is, in

16    fact, what that is and that's a source that relies on.  I

17    think it would be appropriate --

18    THE COURT:  He didn't say he relied on it.

19    That's the point.

16:03:27 20    MR. LANIER:  Yeah.  That's cross-examination.

21    This is leading by definition.

22    THE COURT:  Well, I will allow -- I will allow

23    you to show it to him without putting them on the screen.

24    If he says he's read or received this in the course of his

16:03:41 25    practice, well then it's fine.  He's been a doctor for

**Wailes (Redirect by Majoras)**

1    37 years.  If he says he hasn't, well, then he hasn't.

2                    MR. MAJORAS:  Thank you, Your Honor.

3                    (In open court at 4:03 p.m.)

4    BY MR. MAJORAS:

16:04:04  5    **Q**    So, Dr. Wailes, without testifying at all about the

6    document in front of you, have you had a chance to look it

7    over as you've sat there at the witness stand?

8    **A**    I have glanced at it, yes.

9    **Q**    Have you seen this document, this information from the

16:04:14 10    FDA before?

11    **A**    I have not -- I don't have any recall of this specific

12    format, but I have looked at similar type of information

13    from the FDA in the past.

14    **Q**    And where would -- where does one find as a

16:04:25 15    practitioner information from the FDA?

16    **A**    Probably on the FDA website is the easiest place to

17    go.

18    **Q**    Have you done that yourself?

19    **A**    I have done that in the past.

16:04:34 20                    MR. MAJORAS:  Your Honor, at this point, I'd

21    like to put the document before the witness.

22                    MR. WEINBERGER:  Objection.

23                    THE COURT:  Sustained.

24    BY MR. MAJORAS:

16:04:48 25    **Q**    You had some testimony earlier about the ACTIQ

**Wailes (Redirect by Majoras)**

1    lollipops.

2         Do you recall that?

3    **A**    Yes, I do recall.

4    **Q**    I want to make sure that it -- we understand or the

5    jury understands what a lollipop is in this situation.

6         Could you explain that, please?

7    **A**    It's a mode of administration.  It's the way the

8    medication comes.  It's unusual.  It's very unusual.  It

9    historically has come in a patch where it's slowly absorbed

10   over three days.  Sometimes you get other medicines that

11   comes in pills.  Well, this particular formulation comes in

12   a hard kind of sweet lollipop.  It's on the end of a stick,

13   and the reason is that it's absorbed very quickly when

14   applied to the inside of your mouth.  It's absorbed very

15   quickly, and you can have more quick effects for treating

16   breakthrough pain.

17   **Q**    Are there particular patients that you would prescribe

18   the lollipop drug that you just talked about?

19   **A**    Yes.

20   **Q**    What types?

21   **A**    The -- some of the examples would be a severe

22   refractory headache that would typically -- that would not

23   respond to anything else and would typically require the

24   patient to go to the emergency room.

25        And as a last resort, and again, after having tried

**Wailes (Redirect by Majoras)**

1   many other treatments and techniques, we may consider this.

2   Again, very -- it was very uncommonly used for this type of

3   thing, but it could save a patient a trip to the emergency

4   room by effectively treating a sudden onset of acute

16:06:32  5   headache.  That's one example.

6       There would be other examples of acute onset of pain

7   in patients that are opioid tolerant.  You need to typically

8   be on other opioids because this is very potent, but if they

9   have severe breakthrough pain that comes on really suddenly,

16:06:53  10   this potentially is useful for that.

11  **Q**   Mr. Lanier asked you some questions on your CV, again,

12  about a board certification of the American Academy of Pain

13  Management.

14       Do you recall that?

16:07:06  15  **A**   Yes, I do.

16  **Q**   That's the organization that has gone out of business?

17  **A**   Yes.

18  **Q**   Is it at all false that you passed the certification

19  requirements from the American Academy of Pain Management

16:07:18  20  when they were administering it?

21  **A**   It is not false.  It's true that I did pass it.

22  **Q**   And when they went out of business, did anyone call

23  you and say you're certification is revoked?

24               MR. WEINBERGER:  Objection.  That's --

16:07:31  25  hearsay.

1         THE COURT:  Overruled.

2         MR. WEINBERGER:  Hearsay, Your Honor.

3         THE WITNESS:  No, no one called me --

4         MR. WEINBERGER:  I'll withdraw it.

16:07:38  5         THE COURT:  All right.  Hold on a second.

6         MR. MAJORAS:  I can rephrase, Your Honor.

7         THE COURT:  All right.  If you'd -- rephrase

8    the question.

9    By MR. MAJORAS:

16:07:42 10   **Q**    Have you ever received information from anyone that as

11   a result of the American Academy of Pain Management no

12   longer being in business your certification has been

13   revoked?

14   **A**    No.

16:07:58 15   **Q**    And my last question -- or lawyers are famous or

16   saying last question, so I'll be careful.  My last question

17   relates to your discussion on judgment and the use of

18   judgment.

19        With respect to making judgments about patients for

16:08:15 20   treatment of care, or for treatment, and prescribing, whose

21   judgment is the most appropriate for making those

22   discussions between a pharmacist and a doctor?

23   **A**    Well, treatment decisions should be made by

24   physicians.

16:08:33 25   **Q**    And what are those made on, very briefly?

## Wailes (Recross by Lanier)

1    Why is it the physician is in the place to do that?

2    **A**    Well, one, they're medically -- or legally licensed to

3    do that, and that's part of the scope of practice of a

4    physician by statute and regulation, and the practice of

16:08:51  5    medicine is not included in the statute or regulation for

6    pharmacists.  They have different training and background

7    and that would be inappropriate.

8              MR. MAJORAS:  Thank you, Dr. Wailes.

9         Your Honor, I pass the witness.

16:09:05  10         Your Honor, may I just approach Mr. Pitts just to hand

11    up the questions?

12              THE COURT:  Yeah.

13              MR. LANIER:  Very, very brief, and then you'll

14    be done, Doctor, I suspect, unless the Judge says otherwise.

16:09:29  15         RECROSS-EXAMINATION OF ROBERT E. WAILES, M.D.

16    BY MR. LANIER:

17    **Q**    We're going to go in reverse order, start at the end

18    and work forward.  Okay?

19         Board certification.  American Academy of Pain

16:09:45  20    Management you listed on your resume as something you

21    currently hold; right?

22    **A**    It is on my resume.

23    **Q**    Tell jurors when you passed that exam and got it.

24    **A**    It was a very long time ago, in the early '90s.

16:09:59  25    **Q**    30 years ago?

1   **A**   Could be 30 years.  It was early '90s, yeah.

2   **Q**   And do you think it just lasts forever?

3   **A**   It depends.  When you ask about board certification,

4   some board certification does last forever and there's no

16:10:22  5   way to recertify or process.  Other boards, more currently

6   typically have recertification parts to it.

7   **Q**   Yeah.  You've heard the expression of jank,

8   something's jank?

9   **A**   No, I'm not familiar with that.

16:10:37  10   **Q**   All right.  Normal boards that you're certified by

11   make you reup periodically and still show you're there?

12   Do you know what I'm talking about?

13   **A**   I think that the American Board an Anesthesiology is

14   very credible.  I think they're part of the American -- I

16:11:00  15   forget the exact initials, but the American association of

16   boards that you quoted that are certified, and they, in

17   fact, don't require recertification for my anesthesiology.

18   So it depends on what board and what the parameters are.  It

19   is more current -- the more current you're board-certified,

16:11:28  20   it is more frequent.  And like my subspecialty in pain

21   medicine, I do have to recertify on that at least every

22   10 years.

23   **Q**   Tell the jury why the organization is gone.

24   **A**   I told you I haven't been part of that organization

16:11:39  25   for a very long time, so I --

**Wailes (Recross by Lanier)**

|  |  |
|---|---|
| 1 | **Q**   Tell them why it's gone. |
| 2 | **A**   I don't know the specifics. |
| 3 | **Q**   Do you know that it was related to all of the opioid |
| 4 | issues? |
| 16:11:48  5 | **A**   I don't -- no, I don't know any of the specifics about |
| 6 | why it went away. |
| 7 | **Q**   Tell the jury how long you think they certify you. |
| 8 | **A**   I'm -- are you referring to the American Academy of |
| 9 | Pain Management? |
| 16:12:02  10 | **Q**   Yeah.  In other words, this -- you say today you're |
| 11 | board-certified by them, but they don't exist today.  But |
| 12 | you passed the test 30 years ago.  I mean, wouldn't it be |
| 13 | better to say that it's a former board certification?  A lot |
| 14 | of people list those, you know? |
| 16:12:21  15 | **A**   I think that's semantics. |
| 16 | **Q**   Okay. |
| 17 | **A**   I -- |
| 18 | **Q**   Next.  I want to rely on the pharmacist to use their |
| 19 | good judgment and not just have an algorithm or mechanical |
| 16:12:42  20 | way to make decisions. |
| 21 | Do you see that? |
| 22 | **A**   I do. |
| 23 | **Q**   Do you understand nobody fusses that point at all? |
| 24 | **A**   Good. |
| 16:12:50  25 | **Q**   You understand Mr. Catizone says they need to use |

**Wailes (Recross by Lanier)**

1    their good judgment, but an algorithm and a mechanical way

2    may show them that there's a red flag that needs to be

3    looked at.

4         You don't have a problem with that, do you?

16:13:02  5   **A**    It was a long question.

6    **Q**    Let me back it up and take it apart.

7         To use an algorithm to help you identify a red flag to

8    look at and decide how to address, nothing wrong with that,

9    is there?

16:13:17  10  **A**    That's correct.

11   **Q**    To use a mechanical way to make a decision as to

12   whether or not a red flag is present so you could then use

13   your judgment to decide what to do, nothing wrong with that;

14   right?

16:13:31  15  **A**    That -- I agree, that's not -- was not my point.

16   **Q**    You understand, that's what Carmen Catizone's point

17   is, he's just saying use every tool you've got to identify

18   red flags and then resolve them before you give the drug

19   out.

16:13:47  20       You don't really have a problem with that, do you?

21   **A**    I have a problem with Catizone's red flags.  I don't

22   think that actually states my interpretation of his red

23   flags.

24   **Q**    But I went through those red flags of the defendants'

16:14:00  25  and they mirror Carmen Catizone's.

**Wailes (Recross by Lanier)**

1          Did you not see that?

2                    MR. MAJORAS:  Objection, scope.

3                    MR. DELINSKY:  Objection, Your Honor.

4                    THE COURT:  Overruled.  He can answer the

16:14:13  5    question.

6                    THE WITNESS:  So, my interpret --

7    interpretation is that red flags in general are very good

8    and very important.  My specific objections with

9    Mr. Catizone's is that, number one, they're overbroad and

16:14:27 10    capture way too many false positives of appropriate

11    legitimate medical prescribing, so they're not useful in the

12    context that he puts them in.  And other objections that I

13    have regarding his is his hard line that he draws by if the

14    red flag cannot be resolved, they should not be dispensed.

16:14:50 15    And I argue that in those cases where they cannot be

16    resolved that it is up to the judgment.  They may choose not

17    to dispense, but it should be up to the judgment of the

18    pharmacist.  And further, on two of his red flags he is very

19    absolute in his terms about them not being medically

16:15:10 20    legitimate.

21    BY MR. LANIER:

22    **Q**     Did you hear my question?

23    **A**     You could repeat the question to make sure.

24                    MR. DELINSKY:  Objection, Your Honor.

16:15:23 25                    THE COURT:  Sustained.

1    BY MR. LANIER:

2    **Q**    Sir, I asked you when I went through the red flags of

3    the defendants, to some degree, they mirrored

4    Carmen Catizone's red flags, didn't they?

16:15:32 5    **A**    And I was disagreeing with that.  To some degree, yes,

6    but I was being clear -- I think your question wanted a

7    simple yes or no when they are similar in many ways, they're

8    both red flags, and I discussed the way that they're

9    different.

16:15:49 10    **Q**    But your fuss is with the application of the red flag,

11    not whether or not it's a red flag; right?

12    **A**    In essence that's true.  Now --

13    **Q**    Okay.

14    **A**    -- the specific red flags, again, I don't -- I don't

16:16:02 15    appreciate at all that they capture 20 percent of all of the

16    legitimate prescriptions, but I'm not arguing about having

17    red flags.  I think it's important.

18    **Q**    And you understand that 20 percent, to just give a

19    good close examination before the drugs go out, these

16:16:21 20    dangerous drugs that have historically been abused in

21    America to the detriment of our communities, you understand

22    to give a close inspection on those before you send them out

23    is not a bad thing?

24            MR. DELINSKY:  Objection, Your Honor, to the

16:16:36 25    testimony.

**Wailes (Recross by Lanier)**

1          THE COURT:  Overruled -- overruled.

2          THE WITNESS:  Yeah.  I think it's an

3    obligation of the pharmacist to have close scrutiny of all

4    prescriptions.

16:16:45  5    BY MR. LANIER:

6    **Q**    Thank you.

7          Next subject.  You keep saying you spend time in

8    practice, not an ivory tower; right?

9    **A**    Yes.

16:16:54 10   **Q**    But, I mean, in fairness, you don't spend all your

11   time in practice; right?

12   **A**    That's correct.

13   **Q**    Because, I mean, you're like -- you're doing the AAPM

14   board meeting stuff and trustees for decade plus, going to

16:17:05 15   the dinners, the AMA function, all of that; right?

16   **A**    I do have many other activities.

17   **Q**    And you've been dealing with the drug companies on

18   giving speeches on their behalf; right?

19          MR. MAJORAS:  Objection.  That misstates

16:17:17 20   testimony.

21          MR. LANIER:  No.  He doesn't remember which

22   ones, but you've done it.

23          THE COURT:  Well --

24          THE WITNESS:  I honestly don't remember --

16:17:22 25          THE COURT:  -- overruled.

                    THE WITNESS:  I honestly don't remember in the
last 10 years doing that.
BY MR. LANIER:
**Q**    All right, maybe not the last 10.
**A**    Or before that, I don't have any specific recall.
**Q**    Okay.  You're spending time testifying, aren't you?
**A**    Yes, I am.
**Q**    This is time away from your practice?
**A**    Yes, it is.
**Q**    This is time you could be spent write an article?
**A**    That's possible.
**Q**    You could have spent your time at the meetings for the
AAPM writing articles?
**A**    That's possible.
**Q**    You could be spending your medical association time
writing articles?
**A**    This is true.
**Q**    And when you cite Dr. Lembke as being in an ivory
tower, are you being -- some might take that. . . in a kind
of -- as an insult.
         You're not insulting her, are you?
**A**    No.  I have the highest respect for Dr. Lembke.
**Q**    Okay.  And when you say you haven't done it because
you've been spending your time treating patients, that
sounds very noble, and I appreciate the fact you're a

1    medical doctor treating patients, but you find time to do a

2    whole lot of other things professionally, don't you?

3    **A**    A lot of other things, yes.

4    **Q**    In fact, the job you're doing right now for 150,000 a

16:18:37  5    year or whatever you're getting out there, you said that's

6    30 percent of your time, didn't you?

7    **A**    I'm not sure what context that came in.

8    **Q**    I thought you said you spend like 30 percent of your

9    time as the president of the CMA?

16:18:52  10    **A**    Oh, the CMA, this coming year may take 25 to

11    50 percent of my time, possibly.

12    **Q**    And that's time you could have spent writing articles

13    or in the pain clinic treating people; right?

14    **A**    That's correct.

16:19:08  15    **Q**    And then last thing, on your article and your resume,

16    sir, we started that not only by referencing the article,

17    but I questioned you on your examination under oath in this

18    case?

19             MR. MAJORAS:  Improper impeachment objection.

16:19:29  20             MR. LANIER:  No.  I already did this.

21             THE COURT:  Overruled.

22    BY MR. LANIER:

23    **Q**    Where you said, I know the Occipital Nerve Simulator

24    Trial For Refractory Headaches in 2007 in '9 did come out

16:19:39  25    for a paper of which I was one of the -- what's that word

**Wailes (Recross by Lanier)**

1    you used under oath?

2    **A**    Co-authors.

3    **Q**    And that is a false statement under oath, isn't it?

4    **A**    I still believe there may be another manuscript.  I

16:19:53 5    have a specific recall of seeing my name under a long list

6    of authors on a different -- it's not the same heading, it's

7    not the same study.  It was not in PubMed, I agree, but I

8    still have a specific recall of seeing my name as a

9    co-author of --

16:20:09 10   **Q**    Of a publication nobody can find.

11                   MR. LANIER:  Pass the witness, Judge.  Thank

12   you.

13                   THE COURT:  Okay.  Doctor, you may be excused.

14         Thank you very much.  Have a good trip back.

16:20:25 15                   THE WITNESS:  Should I leave all this

16   paperwork here?

17                   THE COURT:  Yes, you can leave it all there.

18                        (Witness excused.)

19                   THE COURT:  And let's go on the headphones for

16:20:33 20   a second.

21                        (Proceedings at sidebar.)

22                   THE COURT:  All right, first is CVS and

23   Walgreens want me to read the limiting instruction that I

24   proposed?  This would be the appropriate time.

16:20:53 25                   MR. DELINSKY:  Your Honor, we don't at this

1    point.

2                    THE COURT:  Okay.

3                    MR. DELINSKY:  We are concerned the

4    instruction doesn't capture it and will simultaneously

16:21:01  5    remind the jury of the issue.  We would ask that moving

6    forward, the plaintiffs not repeat that testimony, or repeat

7    that Q and A.  It's in the record once.  That's fine.  But

8    we'd like the prejudice not to be compounded.

9                    THE COURT:  Well, it won't be in because, I

16:21:20 10    mean, it -- this had to do with some specific work, current

11    work that Dr. Wailes was hired to do.

12                    MR. DELINSKY:  Well, my point is, I'm trusting

13    Mr. Weinberger or Mr. Lanier in closing arguments not to

14    inappropriately advertise the existence of another lawsuit

16:21:42 15    in another place.

16                    MR. LANIER:  I'll have a ton more to do in

17    closing argument than that, Your Honor.  I give you my word.

18                    THE COURT:  All right.  I just want to make it

19    clear that -- I mean, I would give this instruction.  If the

16:21:53 20    defendants are requesting that I not give it, I certainly

21    won't.

22                    THE DEFENDANT:  We don't think it would be

23    helpful at this point in time, Your Honor.

24                    THE COURT:  Okay.  Then I won't.

16:22:00 25                    MR. DELINSKY:  Thank you.

          1           THE COURT:  All right.  Is there a very short

          2   deposition or should we end for the day?  What's -- I guess

          3   what's next up for the defendants?

          4           MR. DELINSKY:  Your Honor, we don't have a

16:22:12  5   very short one.  We do have one that runs approximately an

          6   hour of deposition time, maybe a little less.

          7       I will tell you for one, it's been a long week and I'm

          8   exhausted, and I personally would prefer to stop, but I know

          9   I don't have any vote in the matter.  But I just --

16:22:25 10           THE COURT:  Well, if it's less than an hour, I

         11   think we should have it.  I mean, it is what it is.  No one

         12   has to ask any questions, so I think we should play one.  If

         13   it's less than an hour, that gets us done around 5:15, 5:20,

         14   which is what I was going to end by.

16:22:42 15           MR. DELINSKY:  All right.  This is not the

         16   most entertaining --

         17           THE COURT:  Mr. Delinsky, depositions are

         18   never entertaining.

         19           MR. DELINSKY:  Okay.

16:22:51 20           MR. LANIER:  I resemble that, Your Honor.

         21           THE COURT:  And, in fact -- okay.  But. . .

         22            (In open court at 4:33 p.m.)

         23           THE COURT:  All right.  Ladies and gentlemen,

         24   we're going to have one -- one more witness this week by

16:23:03 25   deposition.  It's not -- it's not real long, and so we'll be

1    able to conclude around our normal adjournment time.

2              MR. DELINSKY:  Your Honor, may I introduce the

3    witness briefly?

4              THE COURT:  Sure.

16:23:18  5              MR. DELINSKY:  Good afternoon, ladies and

6    gentlemen of the jury, and my sincere apologies that we have

7    to end a long week with a deposition.

8         This is another deposition, and I'll give you official

9    title in a sec, but let me just reduce it to lay terms.

16:23:35 10         This is a deposition of another DEA -- actually, this

11    will be our first Drug Enforcement Administration deponent.

12         The person who we'll be hearing from is named Stacy

13    Harper-Avilla, and among her responsibilities is the setting

14    of the quotas we previously heard testimony about on the

16:24:02 15    manufacture of opioids and other drugs, and I believe we

16    heard that from Mr. Rannazzisi.

17         Let read to you her official title.  Ms. Harper-Avilla

18    is the section chief of the United Nations Reporting and

19    Quota Section at the U.S. DEA.  She testified on behalf of

16:24:24 20    the agency on this specific topic of the quotas that DEA

21    sets each year.

22         And for Your Honor's information and for the jury's

23    unfortunate information, this runs approximately 50 minutes.

24         Your Honor, for timekeeping purposes, it's 29 and a

16:24:46 25    half minutes for defendants and 18 and a half minutes for

5022

**Harper-Avilla (By Video Deposition)**

|   |   |
|---|---|
| 1 | plaintiffs. |
| 2 | THE COURT:  Okay.  Thank you, Mr. Delinsky. |
| 3 | DEPOSITION TESTIMONY OF STACY HARPER-AVILLA |
| 4 | THE VIDEOGRAPHER:  Will the court reporter |
| 16:25:02  5 | please swear in the witness. |
| 6 | COURT REPORTER:  Do you solemnly swear that |
| 7 | the testimony you shall give in the cause now before this |
| 8 | Court shall be the truth, the whole truth, and nothing but |
| 9 | the truth, so help you God? |
| 16:25:10 10 | **Q**    Ms. Avilla, good morning. |
| 11 | **A**    Good morning. |
| 12 | **Q**    Would you just state your full name for the record? |
| 13 | **A**    Stacy Harper-Avilla. |
| 14 | **Q**    And you understand that today you're providing |
| 16:25:18 15 | testimony on behalf of the DEA? |
| 16 | **A**    Yes. |
| 17 | THE COURT:  I think we need to improve the |
| 18 | sound on this, please.  Turn it up. |
| 19 | **Q**    Exhibit 1, and this is a notice of deposition. |
| 16:25:48 20 | Have you ever seen this document before? |
| 21 | **A**    Yes. |
| 22 | THE COURT:  Can we turn the sound up, please? |
| 23 | UNIDENTIFIED SPEAKER:  That's better. |
| 24 | THE COURT:  Good.  Thank you. |
| 16:25:52 25 | **Q**    Okay.  Let's go ahead and turn to Page 6, and I direct |

**Harper-Avilla (By Video Deposition)**

1    your attention to topic 13.

2        It says:  Topic 13.  Your practices and procedures

3    related to the establishment of opioid procurement quotas

4    and opioid production quotas for prescription opioids.

16:27:07  5        Are you authorized by the DEA to testify regarding

6    that topic today?

7    **A**    Yes.

8    **Q**    And I now direct your attention to topic 14, the basis

9    for opioid procurement quotas and opioid production quotas

16:27:29 10    for prescriptions from 1995 to 2018.

11        Are you authorized by the DEA to provide testimony

12    regarding that topic today?

13    **A**    Yes.

14    **Q**    If you could turn to Page 9 of that same document.

16:27:45 15        And look at topic 3, which reads:  DEA's establishment

16    quotas for the production of opioids in the United States

17    including aggregate production quotas, individual quotas and

18    procurement quotas, disclosure of quota to registrants

19    communications with registrants regarding quota requests,

16:28:13 20    and the disposition of quota requests and the relationship

21    between quota, suspicion orders, diversion, and lawful

22    medical scientific or industrial channels or use.

23        Did I read that correctly?

24    **A**    Yes.

16:28:30 25    **Q**    And are you authorized by DEA to provide testimony on

**Harper-Avilla (By Video Deposition)**

1    that topic today?

2    **A**    Yes.

3    **Q**    So when I ask a question, unless I specifically

4    indicate that I'm asking for your personal opinion, I'm

16:28:47  5    going to be asking for the DEA's answer to that question.

6    Does that make sense?

7    **A**    Yes.

8    **Q**    All right.  Ms. Avilla, what is your concurrent role

9    at DEA?

16:28:58 10    **A**    I am the section chief of the United Nations Reporting

11    and Quota Section.

12    **Q**    So am I correct that you joined the Drug Enforcement

13    Administration in 2008?

14    **A**    Correct.

16:29:08 15    **Q**    Okay.  And since that time your work has included work

16    on quota-related matters?

17    **A**    Yes.

18    **Q**    In your roles as unit chief and now section chief, did

19    you come to have an understanding of the DEA's practices and

16:29:33 20    procedures related to the establishment of quotas?

21    **A**    Yes.

22    **Q**    Did that include -- and did your understanding include

23    the procedures and practices specifically related aggregate

24    production quota?

16:29:52 25    **A**    Yes.

5025

**Harper-Avilla (By Video Deposition)**

1    **Q**     And does it also include practices and procedures

2    related to the procurement quota process?

3    **A**     Yes.

4    **Q**     And does it also include individual manufacturing

16:30:11  5    quota?

6    **A**     Yes.

7    **Q**     In those positions did you also gain an understanding

8    of the basis or the reasons why those quotas were set where

9    they were?

16:30:24 10    **A**     Yes.

11    **Q**     And in any given year during your time at DEA, you

12    understood the reasons the quota was set at the level that

13    it was set at.  Is that fair?

14    **A**     Yes.

16:30:41 15             UNIDENTIFIED SPEAKER:  Objection.  Vague.

16    **Q**     Do manufacturers need to request a quota grant before

17    they can produce controlled substances?

18    **A**     Yes.

19    **Q**     Okay.  Are manufacturers permitted to manufacture any

16:31:01 20    more of a controlled substance than DEA permits through its

21    quota process?

22    **A**     No.

23    **Q**     So in your role, are you involved with the

24    consideration and approval of quota requests?

16:31:21 25    **A**     Yes.

**Harper-Avilla (By Video Deposition)**

1    **Q**    Are you required to approve every request?

2    **A**    No.

3    **Q**    And that's because the DEA does not -- is not required

4    to approve every request; correct?

16:31:45  5    **A**    Correct.

6    **Q**    Is there any statute that grants the Drug Enforcement

7    Administration the authority to set quota for controlled

8    substances?

9    **A**    Yes.

16:31:56 10    **Q**    Okay.  Are you familiar with that statute?

11    **A**    Yes.

12    **Q**    Okay.  And are there any regulations that DEA has

13    promulgated that set forth the process for setting the quota

14    for controlled substances?

16:32:26 15    **A**    Yes.

16    **Q**    And in your role as unit chief and then section chief,

17    was one of your responsibilities to apply the processes that

18    were described by statute and regulation in determining the

19    amount of quota?

16:32:53 20    **A**    Yes.

21    **Q**    Are you familiar with the term "segregate production

22    quota"?

23    **A**    Yes.

24    **Q**    What does that term mean?

16:33:05 25    **A**    In summary, it is the maximum amount that the United

**Harper-Avilla (By Video Deposition)**

1      States actually needs for its domestic needs, for

2      legitimate, medical, scientific research needs, exportation

3      needs, and inventory allowances.

4      **Q**     Is Drug Enforcement Administration responsible for

16:33:24  5      determining the aggregate production quota?

6      **A**     Drug Enforcement Administration is the agency that

7      publishes it, but we work in concert with other agencies.

8      **Q**     Okay.  What other agencies do you work with?

9      **A**     FDA.

16:33:44 10     **Q**     Okay.  Any other agencies?

11     **A**     When necessary, yes.

12     **Q**     Okay.  What would those other agencies be?

13     **A**     Those within the bounds of DOJ and HHS.

14     **Q**     Were there any other agencies or departments with HHS

16:34:00 15     that DEA communicated with on quota issues?

16     **A**     There would have been SAMSHA at the time probably.

17     **Q**     Okay.  And what is SAMSHA?

18     **A**     I don't remember the full name.

19     **Q**     Fair enough.  Fair enough.

16:34:12 20             Do you know, generally speaking, what SAMSHA does?

21     **A**     Substance abuse and mental health.

22     **Q**     Would DEA consider the FDA's input when determining

23     the aggregate production quota?

24     **A**     Yes.

16:34:27 25     **Q**     Okay.  And would DEA consider SAMSHA's input when

5028

**Harper-Avilla (By Video Deposition)**

1    determining the agent production quota?

2    **A**    Yes, whether it was there.

3    **Q**    Okay.  What else would DEA consider when determining

4    the agent production quota?

16:34:46  5    **A**    DEA would also consider the manufacturer's quota

6    applications, changes in marketplace, manufacturer's changes

7    to their processes, export requirements. . . inventory

8    allowances that needed to be done, new indications, removal

9    of indications, changes in FDA approval, or changes in --

16:35:37  10    yeah, changes in FDA approval.

11    **Q**    Okay.  Between 1995 and 2018, did the DEA consider all

12    those factors when setting quota?

13    **A**    Yes, that's part of the whole statement.

14    **Q**    DEA sets aggregate production quotas for each

16:35:58  15    individual class of controlled substances.

16         Is that fair?

17    **A**    DEA sets quota for each class of Schedule I or

18    Schedule II controlled substance.

19    **Q**    Fair enough.

16:36:15  20         And what do you mean when you say class of controlled

21    substance?

22    **A**    A class is the basic substance.

23    **Q**    Would that include things like oxycodone?

24    **A**    Yes.

16:36:36  25    **Q**    Okay.  Hydrocodone?

**Harper-Avilla (By Video Deposition)**

1    **A**    Yes.

2    **Q**    Hydromorphone?

3    **A**    Yes.

4    **Q**    Morphine?

16:36:43  5    **A**    Yes.

6    **Q**    Oxymorphone?

7    **A**    Yes.

8    **Q**    What do you understand the term "manufacturing quota"

9    to mean?

16:36:58 10    **A**    It is the quota granted to a bulk manufacture who

11    synthesizes or extracts aggregate -- active pharmaceutical

12    ingredients from either a noncontrolled substance or a plant

13    or from one controlled substance into another.

14    **Q**    How does DEA determine what manufacturing quotas to

16:37:22 15    grant?

16    **A**    For the manufacturing quota, it is built on their

17    customers and their manufacturing processes, as well as

18    inventory allowances and any other FDA notifications that

19    we've received.

16:37:44 20    **Q**    Fair enough.

21    Would it be legal for a manufacturer to produce more

22    of a controlled substance than permitted by its DEA quota?

23    **A**    Not to my knowledge, it's not legal.

24    **Q**    Are you familiar with the term "procurement quota"?

16:38:06 25    **A**    Yes.

**Harper-Avilla (By Video Deposition)**

1    **Q**     What is procurement quota?

2    **A**     Procurement quota is the maximum amount of quota -- of

3    maximum amount of material a manufacturer can obtain.

4    **Q**     DEA sets the procurement quota for each manufacturer;

16:38:30  5    correct?

6    **A**     Of a Schedule I or II controlled substance, yes.

7    **Q**     How does D.A. determine the procurement quota for any

8    given registrant?

9    **A**     It would be based on their business activity which is

16:38:50 10    individual to the manufacturer.

11   **Q**     Okay.  When you say business activity, what do you

12   mean?

13   **A**     It is based on the rationale that they provide DEA on

14   the reason why they need quota.

16:39:07 15   **Q**     Okay.  What is -- is it fair to say that one of the

16   purposes of granting procurement quota is to ensure an

17   adequate and uninterrupted supply of medications?

18   **A**     It is one purpose.

19   **Q**     So, for example, there would be a specific procurement

16:39:31 20   quota grant to a manufacturer for oxycodone?

21   **A**     Correct.

22   **Q**     And that would be separate from any procurement grant

23   for hydrocodone?

24   **A**     Correct.

16:39:42 25   **Q**     And DEA would make an assessment about the appropriate

5031

**Harper-Avilla (By Video Deposition)**

1    procurement quota for each molecule separately?

2    **A**    Yes.

3    **Q**    Were there any years between 1995 and 2018 that DEA

4    did not consider the actual use and need for the material?

16:40:04 5    **A**    It's still a factor.

6    **Q**    Were there any years in which DEA did not consider

7    known diversion when determining the aggregate production

8    quota?

9    **A**    It's still a factor.

16:40:21 10    **Q**    And were there any years between 1995 and 2018 in

11    which DEA did not consider known abuse when setting

12    aggregate production quota?

13    **A**    True abuse lay with the FDA, so it's a factor once

14    again.

16:40:38 15    **Q**    Between 1998 and 2018, did the DEA consider changes in

16    the currently accepted medical use and treatment with the

17    class when considering or setting the aggregate production

18    quota?

19    **A**    As set forth by FDA, yes.

16:41:04 20    **Q**    Who at DEA was responsible for communicating with the

21    FDA regarding aggregate production quota?

22    **A**    The DEA sent a letter signed by Mr. Rannazzisi to FDA.

23    **Q**    Okay.

24    **A**    Requesting the information.

16:41:30 25    **Q**    On the occasions that Mr. Rannazzisi requested the

5032

**Harper-Avilla (By Video Deposition)**

1      information, did FDA respond?

2      **A**     Yes, in a letter form back.

3      **Q**     But for all those classes of controlled substances

4      that are FDA approved, DEA considered IMS Health or IQVIA

16:41:55  5   data when setting the aggregate production quota; correct?

6      **A**     Only for domestic prescription data, yes.

7      **Q**     And they considered that in every year from at least

8      2008 to the present; correct?

9      **A**     Prescription data would be considered as a one point,

16:42:19  10  one single factor in a multifactored system, yes.

11     **Q**     And it -- did DEA consider data from ARCOS in each

12     year between 1995 and 2018 when determining the aggregate

13     production quota?

14     **A**     Yes.

16:42:45  15  **Q**     Did the DEA consider any other estimates of the

16     projected medical, scientific, and reserve stock needs

17     besides the ones provided by FDA when determining aggregate

18     production quota?

19     **A**     Yes.  Those provided by the companies themselves.

16:43:21  20  **Q**     In addition to estimates provided to DEA of the

21     projected, medical, scientific and reserve stock needs, did

22     DEA come to its own determination of the projected medical

23     scientific and reserve stock need when considering aggregate

24     production quota?

16:43:46  25  **A**     DEA took into account the manufacturing needs in order

**Harper-Avilla (By Video Deposition)**

1    to make those projected accounts from FDA.

2    **Q**    So in addition to the estimates provided by FDA, the

3    DEA also considered the amounts needed to account for yield

4    or loss in production?

16:44:05   5    **A**    Yes.

6    **Q**    Is that fair?

7    Okay.  All right.  And is it fair to say that under

8    the regulations regarding quota, DEA was responsible for

9    setting quota at a level that was consistent with the

16:44:31   10    medical, scientific, and industrial needs of the United

11    States?

12    **A**    Yes.  And the reserve stock.

13    **Q**    When setting the agent production quotas, what data on

14    diversion did the agency use?

16:45:01   15    **A**    Internal data.

16    **Q**    What sorts of internal data?

17    **A**    Known quantifiable seizure data, known quantifiable

18    information received from state and local law enforcement

19    agencies or labs.

16:45:24   20    **Q**    And to the extent DEA had data on diversion that was

21    quantifiable, did it consider that data in connection with

22    setting the aggregate production quotas for opioids?

23    **A**    Yes.

24    **Q**    And did it consider that data in setting the aggregate

16:45:43   25    production quota for opioids in each and every year between

**Harper-Avilla (By Video Deposition)**

1   1995 and 2018?

2   **A**    Where it existed, yes.

3   **Q**    Were there any years during that time period where, to

4   your knowledge, the data did not exist?

16:46:02   5   **A**    There are years where the data was not broken out by

6   controlled substance, so we could not quantify it per

7   controlled substance, and that led to other issues.

8   **Q**    Okay.  Where the data could not be broken out by

9   controlled substance, did the DEA still consider that

16:46:22  10   information when setting aggregate production quota?

11   **A**    It could not be attributed to a specific controlled

12   substance, so no.

13   **Q**    Are you aware of any year between '95 -- 1995 and 2018

14   in which diversion data regarding oxycodone was not

16:46:52  15   considered when setting the oxycodone aggregate production

16   quota?

17   **A**    I am not aware when it was not considered.

18   **Q**    Are you aware of any year between 1995 and 2018 in

19   which diversion data regarding hydrocodone was not

16:47:16  20   considered when setting the hydrocodone agent production

21   quota?

22   **A**    I'm not aware of when it was not considered.

23   **Q**    Are you aware of any year between 1995 and 2018 in

24   which diversion data regarding any other opioid product was

16:47:40  25   not considered when setting aggregate production quotas?

**Harper-Avilla (By Video Deposition)**

1    **A**    I am not.  If it spelled out a controlled substance,

2    then we considered it.

3    **Q**    And, Ms. Harper-Avilla, have you reviewed this

4    document before?

16:48:17  5    **A**    Yes.

6    **Q**    And is all the information contained in it accurate?

7    **A**    Yes.

8    **Q**    Okay.  I'm going to just mark this Exhibit 4.

9         And just so I understand, this document lists the

16:48:31 10    individuals at DEA who were required to review and approve

11    aggregate production quota before it was published in the

12    federal register; is that correct?

13    **A**    Yes.

14    **Q**    While you were unit chief and then section chief, did

16:48:51 15    you also have to approve the quota numbers before they were

16    published in the federal register?

17    **A**    Yes.

18    **Q**    During any year in which you approved those numbers,

19    did you feel that they did not reflect the legitimate

16:49:13 20    medical, scientific, and industrial needs of the United

21    States?

22    **A**    No.

23    **Q**    I'm going to mark two documents here as Exhibits 7 and

24    8.

16:49:27 25         Ms. Harper-Avilla, these are documents that appeared

5036

**Harper-Avilla (By Video Deposition)**

1   on DEA's website.

2   **A**   Okay.

3   **Q**   Starting with Number 7, which reflects the aggregate

4   production quota history for selected substance between 2000

16:49:45  5   and 2010.

6        Do you see that?

7   **A**   Yes.

8   **Q**   Okay.  Do you recognize this chart?

9   **A**   I recognize the format of the chart, yes.

16:49:56  10  **Q**   Okay.  And do you agree that it reflects the aggregate

11  production quota history for the substance listed here on

12  the left?

13  **A**   With the exception of 2010, it reflects the aggregate

14  production quota as finalized from 2000 to 2009.

16:50:15  15  **Q**   Okay.  And with respect to 2010, what does it reflect?

16  **A**   It would reflect the established.

17  **Q**   And is it fair to state the established quota might

18  change over the course of the year?

19  **A**   Correct.

16:50:31  20  **Q**   Okay.  Let's look at Number 8, Exhibit 8.

21  **A**   Yes.

22  **Q**   And do you agree that this reflects the aggregate

23  production quota history for the substances listed on the

24  left between the years 2009 through at least 2018?

16:50:56  25  **A**   The final aggregate production quota, yes.

5037

**Harper-Avilla (By Video Deposition)**

1    **Q**    Yes.  So just to make sure I'm reading this correctly,

2    if we look in the column 2008, the number is for oxycodone,

3    sale, 70,000.

4        What does that 70,000 represent?

16:51:24  5    **A**    The 70,000 represents the DEA's estimated final number

6    of the amount of oxycodone for sale that may be required to

7    fulfill legitimate, scientific, medical, research,

8    industrial needs, export, as well as inventory requirements.

9    **Q**    Okay.  And in coming to that number, did DEA take into

16:51:48  10    account the factors that it was required to consider under

11    the Controlled Substances Act?

12    **A**    Yes.

13    **Q**    And in coming to that number, did DEA consider the

14    factors it was required to under the regulation related to

16:52:05  15    aggregate production quota?

16    **A**    Yes.

17    **Q**    And with respect to the numbers listed for the other

18    substances here, did the DEA consider all of the factors it

19    was required to consider under the Controlled Substances Act

16:52:28  20    in determining those numbers?

21    **A**    So far as the factors related to that substance, then

22    yes.

23    **Q**    And just to address the counsel's objection to scope,

24    with respect to all the numbers listed in Exhibits 7 and 8

16:52:48  25    that are opioids, did the DEA consider all of the factors

5038

**Harper-Avilla (By Video Deposition)**

1    that it was required to consider by the Controlled

2    Substances Act?

3    **A**    Where appropriate, yes.

4    **Q**    Would you agree that with respect to aggregate

16:53:11  5    production quota for oxycodone, that DEA considered the

6    factors it was legally required to consider?

7    **A**    Yes.

8    **Q**    Okay.  With respect to hydromorphone, in each of the

9    years listed here, do you agree that with respect to

16:53:28 10    aggregate production quota, DEA considered the factors it

11    was legally required to consider?

12    **A**    Yes.

13    **Q**    Now, with respect to hydrocodone, in each of the years

14    listed, do you that with respect to aggregate production

16:53:48 15    quota, DEA considered the factors it was legally required to

16    consider?

17    **A**    Yes.

18    **Q**    With respect to oxymorphone, in setting the aggregate

19    production quota in each of the years listed, do you agree

16:54:02 20    that DEA considered the factors it was legally required to

21    consider?

22    **A**    Yes.

23    **Q**    With respect to fentanyl, in setting the aggregate

24    production quota for the years listed here, did DEA consider

16:54:19 25    the factors it was legally required to consider?

5039

**Harper-Avilla (By Video Deposition)**

1   **A**   Yes.

2   **Q**   With respect to morphine, in setting the aggregate

3   production quota, did DEA consider all of the factors it was

4   legally required to consider?

16:54:37 5   **A**   Yes.

6   **Q**   In the numbers that are ultimately published as the

7   aggregate production quota for each of these substance are

8   determined by DEA; correct?

9   **A**   With assistance from other agencies, yes.

16:54:56 10   **Q**   Does DEA set an aggregate production quota for the

11   total amount of hydrocodone that can be manufactured in a

12   given year?

13   **A**   Yes.

14   **Q**   So when hydrocodone is used in a combination product,

16:55:16 15   like Vicodin, the amount of hydrocodone used counts again

16   the quota amount; correct?

17   **A**   Yes.

18   **Q**   And that was true when hydrocodone combination

19   products were list as Schedule III controlled substances;

16:55:35 20   correct?

21   **A**   Yes.

22   **Q**   Let me -- let me pick up where Mr. O'Connor just left

23   off.  He asked you a question referring to Exhibit 7 and 8.

24   He asked you, and I'll just read it right from the record.

16:55:58 25   He said, so just -- just to make sure I'm reading this

**Harper-Avilla (By Video Deposition)**

1    correctly, if we look at the column 2008, the number for

2    oxycodone sales, 70,000, what does that 70,000 represent?

3         And your testimony, ma'am, your answer, that 70,000

4    represents the DEA's estimated final number of the amount of

16:56:21  5    oxycodone for sale that may be required to fulfill

6    legitimate, scientific, medical research, industrial needs

7    as well as inventory requirements.

8         Do you remember providing that testimony, ma'am?

9    **A**    Yes.

16:56:36 10    **Q**    And do -- would your answer be the same for every year

11    reflected on Exhibit 7 and 8?

12    **A**    It would -- it would be for legitimate medical needs,

13    scientific research, industrial im- -- export, as well as

14    inventory needs, yes, and then the manufacturing losses that

16:57:02 15    are necessary to make those final figures.

16    **Q**    Thank you.

17         And is it also true for every opioid that's listed on

18    Exhibit 7 and 8?

19    **A**    It would -- it would work for those that are -- have

16:57:17 20    FDA approved products.  Those that do not, no.

21    **Q**    And which ones have FDA approved products, ma'am?

22    **A**    That, I can't -- I couldn't cite all of those.

23    **Q**    Well, oxycodone is one of them; correct?

24    **A**    Correct.

16:57:29 25    **Q**    Hydrocodone?

**Harper-Avilla (By Video Deposition)**

1    **A**    Yes.

2    **Q**    Hydromorphone?

3    **A**    Yes.

4    **Q**    Morphine?

16:57:34 5    **A**    Yes.

6    **Q**    Fentanyl?

7    **A**    Yes.

8    **Q**    Do any others comes to mind after we just reviewed

9    five?

16:57:47 10    Oxymorphone, for example?

11    **A**    Correct.

12    **Q**    And pharmacy chains, such as CVS, Walgreens, Rite Aid,

13    Walmart, Giant Eagle, HBC, they also don't provide any

14    information to DEA that is used to set the quotas; correct?

16:58:03 15    **A**    The list of companies you just provided do not receive

16    quota and therefore are not considered for aggregate

17    production quotas.

18    **Q**    And DEA does not consult chain pharmacies, such as

19    CVS, Walgreens, Rite Aid, Walmart, Giant Eagle, HBC, when

16:58:20 20    DEA sets quotas for controlled substances?

21    **A**    Correct.

22    **Q**    And pharmacy chains, such as CVS, Walgreens, Rite Aid,

23    Walmart, Giant Eagle, HBC, they also do not apply to DEA for

24    quotas; correct?

16:58:34 25    **A**    Correct.

5042

**Harper-Avilla (By Video Deposition)**

1    **Q**      There are a number of statutes and regulations that

2    govern the process DEA must follow and the considerations

3    DEA must consider in establishing quotas for controlled

4    substances?

16:58:47  5    **A**      Correct.

6    **Q**      Now, DEA endeavors to comply with these statutes and

7    regulations governing the establishment of quotas for

8    controlled substances; correct?

9    **A**      Correct.

16:59:00 10    **Q**      In following these statutes and regulations, the

11    aggregate production quota reflects the estimated medical,

12    scientific research, and industrial needs of the United

13    States; correct?

14    **A**      Along with export requirements and inventory

16:59:16 15    requirements and manufacturing yield and losses counted in,

16    yes.

17              MR. LANIER:  Your Honor, majority of the

18    tender from this point forward is part that we were

19    tendering on behalf of the plaintiffs.  I've read ahead and

16:59:35 20    I'm going to waive the tender of that.  So that will

21    conclude the offer.

22        I've confirmed this with defense counsel, because

23    there's one or two short segments that were their tenders,

24    and we've let Special Master David Cohen know as well that

16:59:50 25    we're not just delaying the play, we're waiving the play.

1            THE COURT:  Okay.

2            MR. LANIER:  And we'll get new adjusted times

3    to you for time purposes at the right time, Your Honor.

4            THE COURT:  Okay.

16:59:58 5            MR. LANIER:  Thank you.

6        Thank you, all.

7            THE COURT:  All right.

8        All right.  Ladies and gentlemen, we will recess for

9    the week.  Usual admonitions.  Again, don't read, review,

17:00:11 10   listen, encounter anything whatsoever about this case in any

11   form of media or anything remotely connected to this case.

12   No independent research whatsoever.

13       Do not discuss this case with anyone, and we'll pick

14   up Monday morning at 9:00 a.m. with the next defense

17:00:29 15   witness, and have a great weekend.

16            (Jury excused from courtroom at 5:00 p.m.)

17            THE COURT:  Okay.  If someone just close the

18   backdoor, please.

19       Okay.  So I guess Monday morning we'll deal with any

17:01:16 20   exhibits from Dr. Wailes and with the DEA witness.

21       Special Master Cohen gave me this letter that came

22   from the plaintiffs proposing that I strike the designated

23   deposition testimony for a former Walgreens' employee,

24   Deb Bish, and a former Walmart employee, Debbie Mack, and

17:01:49 25   for an order compelling the defendants to call these

1    witnesses to testify live at trial.

2        I mean, I -- I'm not inclined to do anything like

3    this.  I -- I mean, people can call anyone they want.  You

4    agreed on the depositions, that's fine.

17:02:11  5        If the plaintiffs still have time and you want to use

6    rebuttal, you can certainly call these people by video to

7    ask them any additional questions.  That's fair rebuttal.

8    So you can call new witnesses or you can call some of the

9    same witnesses.  So I guess those two individuals should be

17:02:32  10   alerted that we may need them not next week, but the

11   following week remotely.

12       Okay.  Anything else anyone wanted to bring up?  It's

13   been a long week, but I --

14               MR. LANIER:  Your Honor, Mark Lanier for

17:02:54  15   plaintiffs.

16       It would be helpful to know which witnesses are --

17               THE COURT:  All right.  I was -- thank you,

18   Mark, I was -- that was the main thing I wanted to ask and I

19   didn't write it down.

17:03:03  20       So, do the defendants have an idea who they're going

21   to call or play on Monday?

22               MR. MAJORAS:  Your Honor, at this point in

23   time we are juggling still things with --

24               THE COURT:  Understood.

17:03:12  25               MR. MAJORAS:  In part because of Dr. Murphy's

1    schedule.  We will get to plaintiffs, as we typically do,

2    very soon, our disclosures as required under the protocols

3    we have.

4                    THE COURT:  Okay.  So I know Dr. Murphy is on

17:03:24  5    and there may be others.  All right.  Well, let the

6    plaintiffs know as soon as you can.

7                    MR. MAJORAS:  We will do that, Your Honor.

8                    THE COURT:  All right.  Anything else?

9                    MR. STOFFELMAYR:  Do you have an update just

17:03:41  10   on time?

11                    THE COURT:  Yeah, what I -- I basically

12   charged the defendants half an hour for -- it was roughly

13   half an hour for Ms. Avilla and nothing for the plaintiffs

14   because they didn't play anything.  So this is what I --

17:03:57  15   this is what I had for today.  Today I had 4.25 for the

16   plaintiffs and 2.25 for the defendants.  And so for the week

17   I had, if my math is right, 13.25 for the plaintiffs and

18   14.75 for the defendants totaling 28.  So that's what I had.

19                    MR. MAJORAS:  Your Honor, there's still the

17:04:34  20   issue on the Nelson.

21                    THE COURT:  Well, I hadn't heard.

22                    MR. MAJORAS:  I have a proposal to the

23   plaintiffs.  If they tell me yes or no, then that will

24   dictate whether I have to file something with you, Judge, so

17:04:44  25   I've asked.  Maybe they know.

1                  THE COURT:  All right.  On Nelson, the

2       representation was that plaintiffs got 2 hours to question

3       him on documents which had not been timely produced.  And

4       Mr. Majoras has represented that a significant number of the

17:05:00 5       documents that plaintiffs questioned Nelson on had, in fact,

6       been produced before his deposition, and if that's the case,

7       then it's appropriate to allocate some of that time.  If it

8       was roughly half of them, I'll move an hour -- I mean, I

9       don't -- I don't know.  So that's what -- that to me is

17:05:20 10      fair.

11                  MR. MAJORAS:  It was two-thirds, Your Honor.

12      I have a specific number I've offered to plaintiffs.  If

13      they could tell me, it will save all of us some time.

14                  THE COURT:  Again, I don't know, and I don't

17:05:29 15      want to have a long hearing about when these were produced.

16                  MR. LANIER:  Judge, we've got it detailed.

17      They fall into three buckets.  There are a couple that were

18      just referenced quickly as set-up documents so that it put

19      into context the new documents in light of the old

17:05:40 20      deposition, and obviously those we wouldn't have needed to

21      do if we hadn't had the new documents.

22             And then there's the new documents.

23             Then there's a third bucket of documents that

24      evidently were produced right before the deposition, and

17:05:54 25      shame on us, we did not -- in the plethora of documents out

1      there, we didn't find them beforehand and -- because they

2      were just produced in the weeks before.  And so -- as part

3      of the big rolling production.

4           And so we've tried to negotiate something with

17:06:10  5      Mr. Majoras.  I think he's got a proposal in front of Pete

6      and -- Mr. Weinberger, excuse me -- and I think that

7      Mr. Weinberger is in a position to do something with that,

8      but I'm not sure exactly what it is.

9                    THE COURT:  I'll let you try and figure this

17:06:24 10      out over the weekend.  If not, I'll just -- you know, you

11      give me the -- give me the facts and I'm make a decision.

12      That will be that.

13                   MR. MAJORAS:  Thank you, Your Honor.

14                   THE COURT:  But I'd rather you work it out.  I

17:06:34 15      mean, you look at -- I mean, I --

16                   MR. WEINBERGER:  Your Honor, it's not as if

17      we're not prepared to. . .

18                   THE COURT:  Understood.

19           But what I had was that Mr. Nelson was questioned for

17:06:49 20      basically 1.75 hours on -- it was 1.75 by Mr. Lanier.  Then

21      Mr. Majoras had half an hour, and Mr. Lanier had another

22      half an hour.  So I'm mainly concerned about the first --

23      the 1.75 that was -- all right.  That -- I'm not worried

24      about, you know, cross and rebuttal or redirect, whatever,

17:07:15 25      but we'll focus on that first part and see if you can come

1    to some agreement.

2                    MR. MAJORAS:  We will try to do that,

3    Your Honor.

4                    MR. LANIER:  We will work on it, Judge.

17:07:23  5        Thank you very much.

6                    THE COURT:  All right.  Have a good weekend.

7    Everyone.

8                 (Proceedings adjourned at 5:07 p.m.)

9

10                   **C E R T I F I C A T E**

11        I certify that the foregoing is a correct transcript
     of the record of proceedings in the above-entitled matter
12   prepared from my stenotype notes.

13        */s/ Heather K. Newman*                    *10-29-2021*
          HEATHER K. NEWMAN, RMR, CRR                  DATE

14

15

16

17

18

19

20

21

22

23

24

25