<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION AT CLEVELAND

 3      ------------------------------X
        IN RE:                        :  Case No. 1:17-md-2804
 4                                     :
        NATIONAL PRESCRIPTION          :
 5      OPIATE LITIGATION              :
                                       :  VOLUME 20
 6      CASE TRACK THREE               :  JURY TRIAL
                                       :  (Pages 5049 - 5326)
 7                                     :
                                       :
 8                                     :
                                       :  November 1, 2021
 9      ------------------------------X

10

11

12            TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13

14        HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16            SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20      Official Court Reporter:      Lance A. Boardman, RDR, CRR
                                       United States District Court
21                                     801 West Superior Avenue
                                       Court Reporters 7-189
22                                     Cleveland, Ohio 44113
                                       216.357.7019
23

24
        Proceedings recorded by mechanical stenography; transcript
25      produced by computer-aided transcription.
</pre>

```
 1    APPEARANCES:

 2    For the Plaintiffs:        Peter H. Weinberger, Esq.
                                 SPANGENBERG, SHIBLEY & LIBER
 3                               1001 Lakeside Avenue, Ste. 1700
                                 1900 East Ninth Street
 4                               Cleveland, Ohio 44114
                                 216-696-3232
 5
                                 W. Mark Lanier, Esq.
 6                               Rachel Lanier, Esq.
                                 THE LANIER LAW FIRM
 7                               6810 FM 1960 West
                                 Houston, Texas 77069
 8                               813-659-5200

 9                               Frank L. Gallucci, III, Esq.
                                 PLEVIN & GALLUCCI COMPANY, LPA
10                               The Illuminating Building
                                 Suite 2222
11                               55 Public Square
                                 Cleveland, Ohio 44113
12                               216-861-0804

13                               Salvatore C. Badala, Esq.
                                 Maria Fleming, Esq.
14                               NAPOLI SHKOLNIK
                                 360 Lexington Ave., 11th Floor
15                               New York, New York 10017
                                 212-397-1000

16

17
      For Walgreens Defendants: Kaspar J. Stoffelmayr, Esq.
18                               Brian C. Swanson, Esq.
                                 Katherine M. Swift, Esq.
19                               BARTLIT BECK LLP
                                 54 West Hubbard Street, Ste.300
20                               Chicago, Illinois 60654
                                 312-494-4400
21

22    For CVS Defendants:        Graeme W. Bush, Esq.
                                 Eric R. Delinsky, Esq.
23                               Alexandra W. Miller, Esq.
                                 ZUCKERMAN SPAEDER - WASHINGTON
24                               Suite 1000
                                 1800 M Street, NW
25                               Washington, DC 20036
                                 202-778-183
```

```
 1   For Walmart Defendants:    John M. Majoras, Esq.
                                JONES DAY - COLUMBUS
 2                              Suite 600
                                325 John H. McConnell Blvd.
 3                              Columbus, Ohio 43215
                                614-281-3835
 4
                                Tara A. Fumerton, Esq.
 5                              Tina M. Tabacchi, Esq.
                                JONES DAY - CHICAGO
 6                              Suite 3500
                                77 West Wacker
 7                              Chicago, Illinois 60601
                                312-782-3939
 8

 9
     ALSO PRESENT:              David Cohen, Special Master
10

11                                  - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          Table of Contents

2

3    Witnesses/Events                                       Page

4    SUSANNE HILAND                                         5061

5         Ms. Fumerton - Direct                             5061
          Mr. Lanier - Cross                                5186
6         Ms. Fumerton - Redirect                           5246
          Mr. Lanier - Recross                              5265
7
     TREY EDWARDS                                           5282
8
          Mr. Swanson - Direct                              5282
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court at 8:50 a.m.)

 2              THE COURT:  Good morning.  Please be seated.

 3         This morning when Ms. King came in, there was a note

 4    on the jury table.  It said on the outside, "Ask if

 5    allowed."  None of the jurors gave it to her.  This isn't

 6    substantive.  It's not a problem like the other juror

 7    raised, but I thought I would just read it.

 8         It says on the outside, "If this is allowed to be

 9    asked, please ask."  So this is what the juror said.  It's

10    Juror Number 2.

11         "Your Honor, as a juror, I feel very privileged to

12    allow questions to be heard.  It is understood that this is

13    a courtesy, and this note is not meant to be disrespectful.

14         "My observation, the defense is not uniform in the way

15    the questions were asked by the plaintiff.  Please give some

16    clarification.  I am concerned some questions may be, quote,

17    twisted, unquote, parentheses, lack of better words,

18    unquote.  Thank you.  Juror Number 2."

19         So I don't -- I'm going to tell Ms. King that she gave

20    it to me and I read it to the lawyers, and that's all I plan

21    to do.

22         Unless anyone have any problem with that?

23              DEFENSE COUNSEL:  No.  Thank you, Judge.

24              THE COURT:  Fine.  That's what I figured.  But

25    again, that's -- I believe I should -- anything that the
```

1    jurors send to me, unless it's just procedural, I'm going to

2    pass on to you.

3        Okay.

4        All right.  Exhibit used by plaintiff for -- with

5    Dr. Wailes, do the defendants have any objection to these?

6    I assume there will be some from the defendants because it

7    was your exhibit, but -- your witness, but maybe not.

8            MR. MAJORAS:  Your Honor, John Majoras.  I

9    think from what I read, we sent some objections over last

10    night.  I think we need a little more time to work back and

11    forth with the plaintiffs.

12            THE COURT:  All right.  That's fine, I'll put

13    this aside.

14        Were there any exhibits from Stacy Avilla?  You're

15    still working on --

16            MR. LANIER:  Not for plaintiff, Your Honor.

17            MR. DELINSKY:  Yes, Your Honor, again, my

18    Achilles.

19        There were three.  We sent them over to Maria last

20    night.  I don't know if she's had a chance to look at them.

21    Probably in fairness she hasn't.

22            THE COURT:  All right.  I'll hold off.  So

23    I'll just make a note there are three for defendants, none

24    for plaintiffs.

25            MR. DELINSKY:  I can give you the numbers if

 1    it's helpful, Judge, but --

 2                 THE COURT:  Well, it's all right.  Why don't

 3    you talk to Maria and see --

 4                 MS. FLEMING:  Your Honor, plaintiffs have no

 5    objections to those exhibits.

 6                 THE COURT:  Oh, okay.  Thank you, Maria.

 7                 MR. DELINSKY:  Do you want me to read them in?

 8                 THE COURT:  Yes, we should put those in.

 9                 MR. DELINSKY:  Defendants MDL 01469.

10    Defendant MDL 01472.  Defendant MDL 01473.

11                 THE COURT:  Okay.  Those three are in without

12    objection.  And we'll just -- we'll come back to the

13    exhibits for Dr. Wailes.

14         All right.  Late yesterday I went through all these

15    e-mails that came flying in.  Look, it's not for me to

16    decide how the plaintiffs prove their case, how the

17    defendants defend it.

18         It's my recollection that with Mr. Nelson there was

19    discussion about one or two sections of the pharmacy

20    operation manual, POM, maybe 3.  I don't know, if the

21    defendants, if Walmart wants to bring in, they think there

22    are 44 relevant sections, they can bring in testimony on all

23    44.  And you know, I did the math, and I did it longhand

24    because I'm not going to make the kind of mistakes I make

25    when I don't, but it looks like most of these 44 sections

1    were amended each year, because if you do the math, you come

2    out about the same.

3         So if Walmart wants to go through Ms. Hiland with all

4    44 sections and she can say what they are and go through all

5    the challenges, that's fine.

6         I did the math again, and that's going to take

7    liberally or conservatively, at 15 minutes per section, and

8    that seems pretty fast with all the amendments, that will

9    take a couple of days, so that will give the plaintiffs

10   plenty of time to prepare for cross-examination.

11             MS. FUMERTON:  Your Honor, if I may comment on

12   that.  We had prepared, again, for those for two reasons.

13   One, they have these three binders that represent the

14   relevant sections of the relevant POMs.  She helped create

15   those and put those together, to just sort of show the

16   volume of the POMs.  We do not intend to go in-depth in all

17   of them.

18        We also were just going to highlight a few of them.

19   You know, we appreciate that if Your Honor's not going to

20   let them in in that way that, you know, it's fine, and then

21   we'll just highlight the ones that we think we need to

22   highlight.

23             THE COURT:  Yeah, I mean, Ms. Fumerton, I

24   don't think it's appropriate for you to say, hey, we're a

25   big company, we do, you know, over 13 years, look at all the

1    hard work we did, here's three binders.  That's not

2    appropriate.  I mean, if all 44 sections are relevant to

3    your defense, that's fine.  I mean, you can -- she can say,

4    this is what we do here and this is what we do here and this

5    is what we do here, and guess what, we don't just keep

6    things the same.  Each year we look at this and we look at

7    that, and we've made these adjustments.  That's fine.

8              MS. FUMERTON:  And I think, Your Honor, the

9    second point and the reason why we did that is again, these

10   are sort of the most relevant sections of the POM, and we

11   wanted to make sure since they would be here in court, that

12   we had disclosed them to plaintiffs, so that there wasn't

13   any question on redirect if we have them here because we

14   need to go over something that plaintiff said we hadn't

15   disclosed it to them.  So we were trying to be forthcoming.

16             THE COURT:  All right.  Well, these were --

17   it's no secret, Walmart, these are -- this is Walmart's POM,

18   POM or POMs, and they change it over time.

19        But, again, we're not going to just admit binders

20   wholesale.  If there's testimony about anything then

21   presumptively that comes in.

22        So presumably the plaintiff has gone through Walmart's

23   POM exhaustively.  They found only two sections they thought

24   were relevant with Mr. Nelson.  I think they brought out a

25   couple of changes over time.  So presumably plaintiffs have

```
 1    gone through it, so -- I'm not -- I don't plan to do

 2    anything.

 3         But again, I don't want to have, you know, 10 or 12

 4    e-mails every night now through next Wednesday over problems

 5    with exhibits.  I think, you know, people can do this

 6    professionally so people can prepare for cross-examination

 7    and things go smoothly, and we don't have a lot of

 8    interruptions.

 9              MR. MAJORAS:  Your Honor?

10              THE COURT:  Yes.

11              MR. MAJORAS:  John Majoras again.  Different

12    topic.

13         Over the weekend I reached an agreement with

14    Mr. Lanier and Mr. Weinberger about the timing of

15    Mr. Nelson's time on the stand, and we have agreed that an

16    hour of that time will be attributed to plaintiffs, and the

17    remaining hour and 45 total will stay with the defense side.

18              THE COURT:  All right.  So that --

19              MR. MAJORAS:  I think it's pull one off the --

20              THE COURT:  All right.  What I'll do is just

21    move 1 hour from the defendants -- from the -- well, from

22    the defendants to the plaintiffs.

23              MR. MAJORAS:  Yes, sir.

24              THE COURT:  Okay.  So I will make that

25    adjustment.
```

1           Is that correct, Mr. Lanier, Mr. Weinberger?

2                    MR. WEINBERGER:  That is correct, Your Honor.

3                    THE COURT:  Okay.  Thank you.  I appreciate

4     everyone working that out.

5           Anything else anyone wanted to bring up before we

6     begin?

7                    MR. WEINBERGER:  Your Honor, you're going to

8     do the instruction on --

9                    THE COURT:  Oh, right, yes.  Thank you,

10    Mr. Weinberger.  I had that out right here.  So I shall do

11    that first thing when they come in.

12          I'm going to read the following:  "During this trial,

13    plaintiffs have presented evidence on the defendants'

14    conduct both as distributors and dispensers of prescription

15    opioids.  Plaintiffs have elected to go forward solely with

16    their public nuisance claim against the defendants as

17    dispensers."

18          I think that gets the essence.  It's enough to say and

19    not too much to say.  Okay?

20          All right.  I guess, Mr. Pitts, it's 9:00.  If we're

21    set, our jurors can start.

22                   (The jury is present at 9:02 a.m.)

23                   THE COURT:  Please be seated, ladies and

24    gentlemen.  I hope you had a good weekend.  I suggest you

25    wash your Browns shirts and sweatshirts multiple times,

1   multiple times, and see if that changes things.

2       Okay.  Before we begin, during this trial, plaintiffs

3   have presented evidence on the defendants' conduct both as

4   distributors and dispensers of prescription opioids.

5   Plaintiffs have elected to go forward solely with their

6   public nuisance claim against the defendants as dispensers.

7       Okay.  Defendants may call their next witness, please.

8       Yes, Ms. Fumerton.

9           MS. FUMERTON:  Thank you, Your Honor.

10      Walmart calls next Susanne Hiland.  Ms. Hiland has

11  been a Walmart employee for over 30 years.  She started as a

12  pharmacist and worked her way up to the home office, and has

13  now been at the home office for several years, and will

14  describe Walmart's dispensing policies and procedures, and

15  the various training that it offers its pharmacists.

16          THE COURT:  Okay.  Thank you.

17      Good morning, Ms. Hiland.

18          (Witness sworn.)

19          THE COURT:  You may remove your mask while

20  testifying, please.

21          MS. FUMERTON:  Your Honor, may I approach the

22  witness just to distribute some binders?

23          THE COURT:  Yes, sure.

24          MS. FUMERTON:  May it please the Court.

25          THE COURT:  Yes, you may continue -- or you

1    may begin.  Sorry.

2              MS. FUMERTON:  Ladies and gentlemen of the

3    jury, good morning.  As a reminder, my name is Tara

4    Fumerton.  I'm one of the attorneys for Walmart.

5                        SUSANNE HILAND

6                          - - - - -

7                      DIRECT EXAMINATION

8    BY MS. FUMERTON:

9    **Q**    Good morning, Ms. Hiland.

10   **A**    Good morning.

11   **Q**    Please introduce yourself to the jury.

12   **A**    I'm Susanne Hiland.  I'm a pharmacist.  I'm senior

13   director for Walmart's patient safety organization, and I've

14   been with Walmart for 32 years.

15   **Q**    And we're going to be talking about your time at

16   Walmart in more depth in a little bit, but first I want to

17   ask you, what made you want to be a pharmacist?

18   **A**    I grew up in southeast Nebraska next to a pharmacist

19   and their family.  I babysat for their children, and my

20   first job, real job was in the pharmacy during the summer,

21   cleaning the shelves in the over-the-counter or OTC area of

22   that pharmacy.  And I found myself always curious about what

23   was going on behind the counter, so I had a great interest

24   there.

25              I also had interest in the medications that my

1  grandfather was taking.  And so it really was my only career

2  choice as I went through high school, having had an interest

3  in science as well.

4  **Q**    Were you the first pharmacist in your family?

5  **A**    Yes.

6  **Q**    Did others follow suit?

7  **A**    Yes.  I have a nephew who's a pharmacist, and my

8  daughter and my son-in-law are both pharmacists.

9  **Q**    Where do you currently live?

10  **A**    I live in Bentonville, Arkansas.

11  **Q**    And what is in Bentonville, Arkansas?

12  **A**    It's the corporate office for Walmart.

13  **Q**    And is that where you grew up?

14  **A**    No.  I grew up in a small town in southeast Nebraska,

15  Tucumseh, Nebraska.

16  **Q**    We're going to talk about how you get from Nebraska to

17  Bentonville in just a few minutes, but I want to talk about

18  your pharmacist education.

19       Where did you get your pharmacist's degree?

20  **A**    I went to the University of Nebraska Medical Center

21  College of Pharmacy in Omaha, Nebraska.

22  **Q**    And the jury has heard a lot about corresponding

23  responsibility.  Is that something that you were taught in

24  pharmacy school when you attended?

25  **A**    Yes.  One of the courses that we had was on

1     jurisprudence, and so state and federal law, including the

2     Controlled Substances Act, which included corresponding

3     responsibility.

4     **Q**     And just to round out your education, did you ever

5     obtain any other degrees?

6     **A**     Yes.  I obtained an MBA from Harding University in

7     Searcy, Arkansas, in 2013.

8     **Q**     And I want to talk about your employment history, but

9     with 30 years, that's quite a long time.

10          So did you work with me to create some demonstratives

11    to aid the jury trial in understanding your testimony today?

12    **A**     Yes.

13    **Q**     Okay.  Great.

14               MS. FUMERTON:  Let's put up slide 1, please.

15    **Q**     Do you see that, Ms. Hiland?

16    **A**     Yes.

17               THE WITNESS:  This isn't working.

18               MS. FUMERTON:  Oh, we need that to be working.

19          For your background it's not quite as important, we

20    can get through it, but once we start looking at some

21    documents, I want to make sure you can see them.

22          Working now?

23               THE WITNESS:  Yes.

24               MS. FUMERTON:  Okay, great.

25    **Q**     Before you joined Walmart, you were in the military,

**Hiland - (Direct by Fumerton)**

1    right?

2    **A**    Yes.

3    **Q**    Can you please describe your military service to the

4    jury.

5    **A**    While I was in pharmacy school, I enlisted in the

6    Nebraska Army National Guard, and so I've served in the

7    Guard during pharmacy school.  And then when I graduated,

8    there were no pharmacist billets or pharmacist positions in

9    the Nebraska National Guard.  And so I still had a

10   three-year commitment on that original enlistment, and I

11   could serve it out in any one of the services, and so I

12   chose the Navy.

13         I was commissioned as a Lieutenant Junior Grade, which

14   is an Officer 2, and I went on active duty in the Navy

15   stationed at the Naval Hospital, Jacksonville, Florida.

16   **Q**    And so is this in the late 1980s?

17   **A**    This was in 1986 that I went on active duty.

18   **Q**    Why the Navy?

19   **A**    For a Nebraska girl, it just seemed kind of

20   attractive, so I thought it would get me to Florida, so why

21   not.

22   **Q**    Have you ever been on an aircraft carrier?

23   **A**    Just to tour.  I did not do any sea duty.

24   **Q**    Was your husband in the Navy as well?

25   **A**    Yes.  I met my husband at the Naval Hospital in

**Hiland - (Direct by Fumerton)**

1  Jacksonville.  He was formerly a Navy pilot, but at the time

2  that I met him he was a hospital administrator.  And he did

3  20 years, so he retired from the Navy.

4  **Q**    Was he a pharmacist, too?

5  **A**    No.  He was -- worked on the administrative side of

6  the medical service corps.

7  **Q**    And why did you decide to leave the military?

8  **A**    So in 1989, when my original orders were up, the

9  pharmacy staff just generally was very short staffed, and

10  the Navy wanted me to stay in Jacksonville.  But I had a

11  daughter, she was just a few months old, and my husband was

12  up for permanent orders.  He had been accepted to the

13  Army-Baylor program to complete his MBA, and that was in San

14  Antonio.  So my choice was stay in Jacksonville with my

15  daughter with my husband in Texas, or to leave, and so I

16  chose to leave and go with my husband to San Antonio.

17  **Q**    And what was your rank when you left the Navy?

18  **A**    I was a lieutenant, which was O-3.

19  **Q**    And did you receive an honorable discharge?

20  **A**    I did, yes.

21  **Q**    Okay.  So does that bring you to Walmart?

22  **A**    It does.

23  **Q**    All right.  So tell us about your start at Walmart.

24  **A**    So in 1989, I had a Nebraska pharmacist's license.  I

25  also had a Florida pharmacist's license.  And I reciprocated

**Hiland - (Direct by Fumerton)**

1    that Nebraska license to Texas, so I took the Texas law,

2    obtained my Texas license, and then joined Walmart part-time

3    in August of 1989.

4    **Q**    And were you promoted at some point?

5    **A**    I was.  I became full-time, and then as we moved duty

6    stations with my husband, I was mostly a staff pharmacist

7    for a few years; but I -- when we were transferred, then, to

8    Orlando, I was promoted to pharmacy manager of our pharmacy

9    in Mount Dora, Florida.

10    **Q**    Once you joined Walmart in 1989, have you been with

11    Walmart ever since?

12    **A**    Yes.

13    **Q**    And of your about 32 years at Walmart, how many years

14    were spent as a practicing pharmacist behind the bench?

15    **A**    Around 9 or 10.

16    **Q**    And what states did you practice in?

17    **A**    I practiced in Florida and Texas.

18    **Q**    Are you still a licensed pharmacist today?

19    **A**    Yes.  I still hold my original Nebraska license and my

20    original Florida license.

21    **Q**    And when you transferred from behind the counter, what

22    role did you transition to?

23    **A**    I was promoted to district manager in 1998.

24    **Q**    And I see on the chart that you created field

25    leadership.  What does that designate?

**Hiland - (Direct by Fumerton)**

1    **A**    So anyone that is tied to the stores, so working in

2    the store level, is considered in the field.  It's just

3    terminology that we use, versus if you're working from the

4    corporate office or we call it the home office.

5    **Q**    At some point did you move from field leadership to

6    Walmart's home office?

7    **A**    Yes.  Actually when I was promoted to regional

8    manager, we were required to be based at the home office.

9    So in 2002 I moved to Bentonville from Orlando.  And then

10   after three years as a regional manager, I joined the

11   Professional Services team, which is considered a support

12   function.  And that would have been the home office role.

13   **Q**    Has that function been referred to as different terms

14   over the years?

15   **A**    Yes.  It was professional services when I first joined

16   in 2005.  I was promoted in 2009 to lead that team, so I was

17   senior director, and we changed the name to the Regulatory

18   Affairs team, and then it now is referred to as Practice

19   Compliance.

20   **Q**    At that time, what background or training did you have

21   in compliance?

22   **A**    Well, I certainly had -- I'd taken three law exams.  I

23   had my training from pharmacy school, but also --

24   **Q**    And just to interrupt you for one second.

25         You said three law exams, but you're not a lawyer,

1    correct?

2    **A**     No, I am not.

3    **Q**     So what law exams are you referring to?

4    **A**     So with each state license, any license that a

5    pharmacist obtains, there's a national exam referred to as

6    NAPLEX, and so that's the baseline clinical knowledge that a

7    pharmacist has to pass.  But then each state has a

8    jurisprudence or a law exam, and so I took the Nebraska law,

9    I took the Florida law, and I took the Texas law exams.

10   **Q**     As a pharmacist and a pharmacy manager, did you gain

11   any experience with compliance?

12   **A**     Yes.  Certainly, my responsibilities were to follow

13   the laws of the states that I was practicing in.  As a

14   pharmacy manager I had responsibility for making sure that

15   the pharmacy operated according to those state and federal

16   requirements.  And then I would interact with Board of

17   Pharmacy inspectors and the Board of Pharmacy on inspections

18   or, you know, questions, those types of things.

19   **Q**     What about as a district and regional manager?

20   **A**     So the role expanded a little bit.  A district manager

21   has a responsibility for multiple stores.  As a district

22   manager, I had anywhere from 12 to 16 pharmacies that I

23   supervised, and my alignment changed.  But I was responsible

24   for making sure that the pharmacies that I supervised and

25   the pharmacists that reported to me were all following

**Hiland - (Direct by Fumerton)**

1    regulation, state and federal.

2         And I interacted with inspectors in a variety of ways.

3    When we opened stores, we would have store inspections, we

4    would have annual inspections.  And so if -- and then if

5    there was any question about, you know, anything that

6    Walmart's programs were about, I would interact with the

7    inspectors then.

8         And then as a regional manager, that responsibility

9    expanded because I had multiple states.  I supervised

10   Alabama, Louisiana, Mississippi, and Texas, as a regional.

11   **Q**    Do all states have the same pharmacy laws?

12   **A**    No.

13   **Q**    How does Walmart account for when states have

14   different requirements?

15   **A**    So that's really the role of that Professional

16   Services, the now Practice Compliance team.

17        All pharmacists on the team that -- are responsible

18   for understanding by their state alignment what the state

19   requirements are.  And so just as an example, when we would

20   have a new project or a new program that we were rolling

21   out, our -- the Practice Compliance team would research

22   state regulation to determine what the requirements were.

23   And then the approach that we took over time really was to

24   find out what the highest standard was, and then we would

25   set our policy to that to make sure that we didn't, you

**Hiland - (Direct by Fumerton)**

1   know, across multiple states have any gap in the way that we

2   were executing those programs.

3   **Q**    Looking back at this slide, it looks like you've

4   divided your positions at Walmart's home office into three

5   buckets.

6        At a high level, could you briefly explain what each

7   of these are?

8   **A**    Sure.

9        So regulatory compliance really, I had -- I first had

10   responsibility as a director for state compliance based on

11   the alignment that I was assigned, as well as interactions

12   with the DEA regarding controlled substance issues at that

13   local store level.

14        And then I was promoted to lead the team, so as a

15   senior director I had responsibility for the team, and also

16   I had broader federal responsibilities.

17        I also had a period of time where I had responsibility

18   for our HIPAA compliance, our billing compliance, and some

19   FDA issues, broader kind of federal issues.

20        And then when I moved into the next role, I had

21   responsibility for quality improvement, so our Patient

22   Safety program, as well as Clinical Services.

23        And you'll see Professional Relations listed there.  I

24   was responsible for the relationships that we had not only

25   with our pharmacists and their professional practice and how

**Hiland - (Direct by Fumerton)**

1    they were able to practice at Walmart, but also for our

2    optometrists, because within Health and Wellness we also

3    included our vision centers.

4        And then today I have responsibility for our Patient

5    Safety organization for Walmart.

6    **Q**    And today you are still a senior director; is that

7    right?

8        What is the difference between a director and a senior

9    director?

10   **A**    Well, it's -- so they're step level roles, and really

11   I think probably the biggest difference is a senior director

12   is a bit more strategic, and so you're charged with kind of

13   looking forward and trying to ensure that the programs that

14   we execute are not only meeting requirements, but kind of

15   looking at what's next.

16   **Q**    Before we leave the slide, I want to focus on the 2010

17   to 2011 time frame when you were a senior director of

18   Regulatory Affairs.

19       Did you take any action at that time to expand your

20   team?

21   **A**    Yes.  We looked at the team -- and so when I was

22   promoted we replaced my director position, and shortly after

23   that, we added a fourth -- so there were three, when I was a

24   director there were three of us at the time that I was

25   promoted, and so we replaced that director position, and

1    then we hired a fourth director on the team.  And then we

2    started to hire senior managers.

3        We looked at what the directors were doing from a

4    state board perspective, but also what their requirements

5    were around DEA and some of the administrative work that we

6    had, and we started to build the team under the directors.

7        So the plan at that time was for each director to have

8    a senior manager and then an administrative support person.

9    And so we did hire that first senior manager in that time

10   frame.

11   **Q**    And ultimately how many senior managers in that role

12   did you hire?

13   **A**    We hired three.

14   **Q**    And who were those individuals?

15   **A**    The first one that we hired was Brad Nelson, followed

16   by Shelley Tustison, and then Caroline Riogi.

17   **Q**    How were their responsibilities generally divided?

18   **A**    So by alignment, when we first brought Brad in, we put

19   him on some projects, even though he was aligned to Tim

20   Koch, who was the director that he reported to, and Tim had

21   a specific alignment.  But each of the directors had a

22   geographic alignment that they were responsible for.

23   **Q**    And generally speaking, how did that work?  Was the

24   country divided?

25   **A**    I'm sorry, I --

**Hiland - (Direct by Fumerton)**

1    **Q**    Was the country divided up into territories?

2    **A**    Yes.  We looked at -- so the National Association of

3    Boards of Pharmacy has districts, and so they're groups of

4    states that they are geographically aligned.  So we aligned

5    our directors with the NABP districts so that they could

6    attend and start to build relationships with those different

7    sets of regulators.

8    **Q**    And you mentioned Brad Nelson, Shelley Tustison, and

9    Caroline Riogi.  To whom did they report?

10   **A**    They reported to the directors, so Brad reported to

11   Tim Koch, Shelley Tustison reported to Debbie Mack, and

12   Caroline Riogi reported to -- we had four directors.  I

13   believe she reported to Dadrion Gaston to begin with.  We

14   also had a fourth director, George Chapman, but George was

15   ultimately promoted to replace me when I went into the

16   Quality role.

17   **Q**    And which of the senior managers had responsibility

18   for Ohio?

19   **A**    That would be Caroline.

20   **Q**    So summing up your history at Walmart, in your various

21   roles did you have involvement in creating and reviewing

22   Walmart's policies?

23   **A**    Yes.

24   **Q**    Did your responsibilities include at the home office,

25   as well, interacting with state boards of pharmacy?

**Hiland - (Direct by Fumerton)**

1    **A**    Yes.  On a regular basis, if we had questions we would

2    reach out to the Board and ask questions.

3    **Q**    And did your role as field leadership and at the home

4    office include assisting other pharmacists in the field with

5    questions they may have?

6    **A**    Yes.  So field leadership, their role is to support

7    the associate, so "associate" to us in Walmart's terms means

8    employee.  So field leadership supports what's happening in

9    the stores.  And then from the home office perspective, our

10   role really is to make sure that the programs and the

11   resources for the associates in the field, so the

12   pharmacists and technicians, are appropriate, and then to be

13   a resource for them.

14       We have a very open culture at Walmart, and so

15   pharmacists would call and reach out directly to any one of

16   us on a regular basis.

17   **Q**    Did your -- during this time period, did you have

18   involvement with training?

19   **A**    Yes.  So I had -- in 2012 I had responsibility for our

20   training function.  And even in the prior role in

21   Compliance, we would write -- I would write policy, and that

22   would become part of a training plan.

23   **Q**    And this may seem like a silly question, but who are

24   you training?

25   **A**    Everyone from cashiers, technicians, pharmacists; and

**Hiland - (Direct by Fumerton)**

1    then field leadership, we did training for them as well.

2    **Q**    Okay.  I want to switch topics a little bit and talk

3    about Walmart's business and culture.

4         Now, I'm assuming most people have heard of Walmart

5    and maybe even been to one at one point in time, but how

6    many retail stores does Walmart have in the United States?

7    **A**    About 4600, maybe a little more.

8    **Q**    Does every one of those stores have a pharmacy?

9    **A**    No.

10   **Q**    Do you consider Walmart to primarily be a pharmacy?

11   **A**    No.

12   **Q**    How would you describe Walmart?

13   **A**    So Walmart is a publicly-held company, referred to as

14   a big box retailer or a mass merchandiser, so a large retail

15   organization.

16   **Q**    And why did Walmart go into the pharmacy business; do

17   you know?

18   **A**    My understanding, and because Walmart's had pharmacies

19   for over 40 years, was it really aligns with service to our

20   customers in providing access to quality services and in a

21   way that's affordable for the public.  So Walmart's general

22   mission on the retail side really aligned well with

23   providing pharmacy services.

24   **Q**    And how does Walmart's pharmacy services fit within

25   the larger business organization?

**Hiland - (Direct by Fumerton)**

1    **A**    So several years ago, meaning more than a decade ago,

2    Pharmacy was considered a special division, just a

3    department within the larger store and the larger

4    organization.

5         Today, all of Walmart's healthcare services are under

6    the umbrella of Health and Wellness, but Pharmacy fits

7    within that and is a smaller part of the larger

8    organization.

9    **Q**    And so you mentioned the healthcare services.

10        Other than prescription medications, what sort of

11   things fall under Health and Wellness?

12   **A**    So from a pharmacy perspective, there's the

13   over-the-counter section, so the medications that are

14   available, like Tylenol and cold medications, out in front

15   of the pharmacy that the pharmacist does from time to time

16   recommend.  Within that section there's durable medical

17   equipment, there are diabetic supplies.

18        We offer additional services.  Pharmacist services are

19   expanding, and so we offer immunizations, we offer testing.

20   It's referred to as point-of-care testing, so things like

21   lipids, cholesterol testing, blood glucose testing, COVID

22   testing.  So there are a number of services that pharmacists

23   are providing.

24   **Q**    What about optical?

25   **A**    There's also the Optical division, and then we also

1   now have stood up our primary care clinics, referred to as

2   Walmart Health.

3   **Q**    With respect to prescription medications, do you have

4   a sense of what percentage of prescriptions that Walmart

5   fills are controlled substances?

6   **A**    Yeah.  I don't know exactly, but my -- because it's

7   changed over time, and it even changes seasonally, but it's

8   somewhere around half of the pharmacy sales and services are

9   prescription versus the over-the-counter.

10  **Q**    And I apologize, I might have asked a bad question.  I

11  wasn't focusing on prescriptions versus over-the-counter,

12  which I think you just said was about 50 percent.

13      Within the prescription medications themselves, do you

14  have a sense of what percentage of those are controlled

15  substances versus noncontrolled substances?

16  **A**    I think it's around 10 percent on average.  It would

17  vary store to store, but somewhere around 10 percent.

18  **Q**    How would you describe the business culture at

19  Walmart?

20  **A**    So from the very first time that I joined, the culture

21  for Walmart has been based in what we refer to as our basic

22  beliefs.  And those are service to the customer, respect for

23  the individual, and striving for excellence; all of that

24  based in a foundation of integrity.

25      And for me, that was important.  I always wanted to

1    find somewhere to work, and I think it's why I've been with

2    Walmart as long as I have, because those values are very

3    clear.  When you're part of Walmart, you know that those are

4    basic beliefs, and they are talked about, they are lived at

5    the corporate office, and it's part of how we communicate to

6    all of our associates.

7         So I think that's an important part of how we've

8    approached business, is based on the culture that's been

9    there.

10                  MR. WEINBERGER:  Your Honor, can we have a

11   short side bar, please?

12                  THE COURT:  All right.

13                  (At side bar at 9:30 a.m.)

14                  MR. WEINBERGER:  Your Honor, with respect to

15   this last answer that's based upon a foundation of integrity

16   at Walmart, in view of that testimony, we believe that the

17   door is opening to the Department of Justice complaint that

18   was filed in Texas that you have excluded from this case,

19   because that bears directly on the issue of their corporate

20   culture and whether or not they in fact have a foundation of

21   integrity.

22                  MS. FUMERTON:  Your Honor, we obviously

23   strenuously disagree with that.

24                  THE COURT:  Well, why did you ask that last

25   question and elicit that answer, Ms. Fumerton?

1          MS. FUMERTON:  Well, I asked just about what
2     the corporate culture was at Walmart, and they have various
3     values that are within --
4          THE COURT:  That's the whole point.  I thought
5     that both sides were going to pretty much stay away from
6     that.
7          You want to put your corporate culture and integrity
8     in play, then I'll let the plaintiffs bring out whatever
9     they want.
10          MS. FUMERTON:  Well, again, Your Honor, I
11     think that the prejudice that would be --
12          THE COURT:  Well, you started it, all right?
13     Everyone knew what was out there and everyone was -- I
14     thought everyone agreed to stay away from either the
15     defendants sort of promoting their general corporate
16     integrity or the plaintiffs just firing away gratuitous
17     shots at it, because it's not relevant, but you've now put
18     this in through this witness.
19          MS. FUMERTON:  Well, Your Honor, again, I
20     think this is just sort of general foundational background.
21     I don't think we've gone into --
22          THE COURT:  No, this is a lot more than
23     foundational background.  This was what you were bringing
24     out about the pharmacy, the history of the pharmacies, the
25     amount of sales, all that, who reports to who.  That's all

**Hiland - (Direct by Fumerton)**

1    appropriate.  And then bringing out that Walmart's, you

2    know, policy is customer service, that's fine, but this went

3    beyond that.

4              MS. FUMERTON:  Well, again, I don't understand

5    how if the idea is to say that essentially they strive --

6              THE COURT:  Fine.  You want me to tell the

7    jury they're to disregard that last answer, I'll do it.

8              MS. FUMERTON:  Sure.

9              THE COURT:  All right.  And I don't want

10   anything touching this, all right?

11             MS. FUMERTON:  I understand.

12             THE COURT:  For any of the defendants.  You

13   start -- you want to just, you know, put in and promote your

14   company's general culture or general integrity, that's fine,

15   you can do it, but I'll let the plaintiffs bring out

16   whatever they want on the other side.

17        Is that clear to everyone?

18             MS. FUMERTON:  Yes, Your Honor.

19             THE COURT:  Is it clear to the other

20   defendants?

21             MR. DELINSKY:  Yes, sir, Your Honor.

22        We can only go so far in controlling -- we'll ask her

23   our questions very carefully.

24             THE COURT:  Be very careful about the

25   questions.

 1              MR. DELINSKY:  We'll ask very carefully, Your

 2   Honor.

 3              THE COURT:  All right.  Thank you.

 4              (In open court at 9:33 a.m.)

 5              THE COURT:  All right.  Ladies and gentlemen,

 6   I'm going to direct you to completely disregard the

 7   witness's last answer.

 8        Thank you.

 9   BY MS. FUMERTON:

10   Q    Switching subjects, Ms. Hiland, the jury has heard

11   about some of the different computer systems and tools that

12   Walmart provides its pharmacists to assist them in

13   dispensing prescriptions, and I'm hoping to ask about some

14   of those in more depth to you.

15              MS. FUMERTON:  Can we please have slide 2.

16   Q    We will walk through each of these in more depth in a

17   minute, but at high level, what are we seeing here?

18   A    So this is Walmart's computer system, which is

19   Connexus, and it's the software system that our pharmacists

20   use to process prescriptions.

21        And then this is an illustration of some of the

22   additional resources and links that are available to our

23   pharmacists to access from their workstation.

24   Q    Who created Connexus?

25   A    Walmart.

**Hiland - (Direct by Fumerton)**

1   **Q**     When was it created?

2   **A**     It was started in around -- around 1998 in tests, and

3   it was rolled out to all of our pharmacies in 2002.

4   **Q**     Generally speaking, what does a pharmacist use

5   Connexus for?

6   **A**     It's really to -- it's a work flow management system,

7   so it processes the prescription and moves it through all of

8   the different stations to be able to dispense the finished

9   prescription at the end.

10  **Q**     Did Walmart have to obtain any regulatory approval

11  when it began using Connexus as its prescription management

12  system?

13  **A**     Yes.  Each Board of Pharmacy was contacted for

14  approval to use Connexus.

15  **Q**     Was Connexus approved by the Ohio Board of Pharmacy?

16  **A**     Yes.

17  **Q**     Okay.  I want to talk about Connexus first, and then

18  we'll talk about all the other tools.

19          So let's look at the next slide.

20          Could you describe what we are looking at here?

21  **A**     So this is the start of the prescription fill process,

22  drop-off.  You can see at the dark gray bar at the very top

23  left that it describes what station this is.

24          So this is the point at which the prescription would

25  come in, and a technician would begin to select the patient

**Hiland - (Direct by Fumerton)**

1    and scan the prescription to begin the process.

2    **Q**    So I see a name here, Jane Doe.  Is that a real

3    person?

4    **A**    No.  This is a test box.

5    **Q**    Okay.  And you talked about the process flow.  What is

6    being depicted on the left-hand side of the screen?

7    **A**    So each of those are the individual steps and what we

8    call SOP or standard operating procedure that are the steps

9    included in the filling process.

10   **Q**    What type of information on this drop-off screen is

11   available to the Walmart pharmacist?

12   **A**    So at the very top, the patient information is

13   available.  There's a file folder that's just to the

14   immediate right that when clicked goes deeper into the

15   information that we have on the patient.  We call it the

16   patient maintenance screen.

17         And then when the patient is selected, it gives a

18   brief history of the prescriptions, and the technician

19   that's working drop-off would scan the prescription and they

20   start to populate that blue box or aqua box at the top is

21   showing the prescriptions that are either scanned or that

22   are queued up for fill.

23   **Q**    And we're going look at that yellow file folder that

24   you mentioned in a second, but I want to focus down at the

25   bottom of the screen.

**Hiland - (Direct by Fumerton)**

1          What is the prescription history?

2     **A**     The prescription history is the fills that the patient

3     has had.  This shows the most recent prescriptions on this

4     screen.  There are at the very top right, just to the right

5     of the words "prescription history," a pharmacist or

6     technician could click on that "show full profile," and it

7     would open up another screen that showed not just the most

8     recent, but every prescription that the patient had filled

9     in that pharmacy.

10          And then the box further to the right, "show host

11    profile," would open up the fill history for every

12    prescription at any Walmart pharmacy.

13    **Q**     So this screen shot shows four prescriptions, but more

14    would be available to the pharmacist if more were in the

15    patient profile; is that right?

16    **A**     Yes.  They could see it by clicking either one of

17    those boxes.

18    **Q**     Okay.  You mentioned clicking on that yellow folder,

19    so let's turn to the next slide.

20          What is depicted here?

21    **A**     So this is the information that is carried with every

22    prescription about the patient, so it's demographic

23    information and how to contact them, what their preferences

24    are for certain programs, their insurance information,

25    allergies, and then it's a spot that contains medical

**Hiland - (Direct by Fumerton)**

1   conditions that can be added.

2   **Q**   Can a Walmart pharmacist add notes to a particular

3   patient profile?

4   **A**   Yes.  At the bottom, to the right of the red box, the

5   "pharmacy notes" is an area where they can add notes, but

6   they also can see notes about the patient that have already

7   been entered.

8   **Q**   And already been entered by whom?

9   **A**   By technicians or other pharmacists.

10  **Q**   Let's look at another step in the process.

11          MS. FUMERTON:  Can we go to the next slide.

12  **Q**   What is being depicted here?

13  **A**   So this is our input station, so this is primarily a

14  technician function.  So the prescription has been imaged.

15  You can see the image there on the right-hand side.  And the

16  technician is transcribing the information from the hard

17  copy prescription as it will appear on the prescription

18  label.

19  **Q**   Is a prescription, a copy of the hard copy

20  prescription always scanned at this stage?

21  **A**   If it's dropped off, a hard copy is scanned.  If it's

22  e-prescribed, which is more common now, then the image of

23  the e-prescription is shown in that area.

24  **Q**   And I see a box at the bottom left-hand corner that

25  has "prescriber" written.  What is that reflecting?

1    **A**    So that is the point at which the technician would

2    select the prescriber that appears on the hard copy, and

3    they can search from that point to find the prescriber

4    that's attached to the prescription.

5    **Q**    How does Walmart obtain its prescriber information?

6    **A**    We use a third-party vendor service to populate the

7    information about our prescribers.

8    **Q**    Does that provide licensure status?

9    **A**    It does.

10    **Q**    And if you'd look at the top of the screen, I see

11    File, Search, Work Queue, Current Rx, View, Tools, Reports.

12        I want to start with reports.  What does that allow

13    pharmacists to do?

14    **A**    There are several ad hoc reports that pharmacists can

15    run, anything from what's in any station, they can run a

16    list of, as an example, what's in the ready-for-pickup in

17    what we call the will-call bin.

18        They can run inventory reports to see medications that

19    need to be pulled as outdates, they can run reports on drug

20    movement.  They can look by drug or by drug class, what

21    prescriptions have been filled, and they could search a

22    prescriber to see what prescriptions have been filled from a

23    particular prescriber.

24    **Q**    And would that be limited to a single patient?

25    **A**    No, you could see everything.  You could search a

1    patient, but you could find that from the profile.

2    **Q**    And if a pharmacist wanted to search for more than one

3    patient and find out what prescriber has written for those

4    patients, how would a pharmacist do that?

5              MR. WEINBERGER:  Your Honor, sorry to

6    interrupt.

7         Can we have a side bar, please?

8              (At side bar at 9:43 a.m.)

9              MR. WEINBERGER:  Your Honor, this system has

10   evolved over a number of years.  There has been no testimony

11   as to when this -- what she's talking about was in effect.

12             THE COURT:  All right.  Well, then if that's

13   the case, Ms. Fumerton, I think you need to specify with

14   this witness what she's talking about.  If she's talking

15   about, you know, November 1, 2021, this is what Connexus

16   looks like, fine.  If she's referring to it over time, she's

17   got to say when, put a time frame on what she's testifying

18   to.

19             MS. FUMERTON:  Yes, Your Honor.  I can lay

20   some additional foundation on that.

21             THE COURT:  All right.  It's important, if it

22   has changed, that it's clear what the witness is referring

23   to when she's testifying, what system, what version.

24             MS. FUMERTON:  Understood.

25             (In open court at 9:44 a.m.)

**Hiland - (Direct by Fumerton)**

1    BY MS. FUMERTON:

2    **Q**    Ms. Hiland, I believe you testified earlier that

3    Walmart began using Connexus in the late '90s, early 2000s;

4    is that correct?

5    **A**    Yes.  It went chain-wide in 2002.

6    **Q**    And the particular sort of version of -- well, let me

7    ask it this way.

8        Has Connexus evolved over time?

9    **A**    Yes.

10    **Q**    Has the general functionality remained the same?

11    **A**    Generally it has, but we've actually added

12    functionality.

13    **Q**    And the specific screen shots that we've been looking

14    at over the last few minutes, what time frame is this

15    applicable to?

16    **A**    I believe these were from 2012.

17    **Q**    And we just talked about these reports that could be

18    run.  Was that a functionality that just began in 2012?

19    **A**    No.  We actually had the ability -- I ran drug

20    movement reports, the reports that were used in the system

21    that I practiced on were pulled over.  And so I ran drug

22    movement reports when I was a practicing pharmacist, and

23    those drug movement reports have been in Connexus as an

24    option since the time that we released it.

25    **Q**    And we're covering a large time frame in this case,

**Hiland - (Direct by Fumerton)**

```
 1    and so as I go through with my questions, if there's some

 2    sort of change that has occurred, I'll try to remember to

 3    ask you that, but if you could also point that out, that

 4    would be helpful.

 5    A    Sure.

 6    Q    Okay.  So I think we were just talking about the

 7    prescriber reports that could be run within Connexus.

 8         How would pharmacists use these reports?

 9              MR. WEINBERGER:  Objection.  Same --

10    Q    We'll start with 2012, since that's the time frame

11    we're looking at, and I'll ask --

12              MR. WEINBERGER:  That wasn't made clear by

13    the --

14              THE COURT:  Well, let's be specific with a

15    time frame for every question, please.

16              MS. FUMERTON:  Yes, Your Honor.

17    Q    So it's 2012, which I think you just testified was

18    when these screen shots -- well, is the time frame that's

19    reflected here.

20         How would a pharmacist use these reports?

21    A    In my experience, what I would see them do is often

22    use those to look up a history related to how inventory was

23    dispensed, so to verify on-hands or to look at, again, just

24    kind of the use and the history of a drug, in that manner.

25    Q    The jury has heard some testimony about DUR.  What is
```

**Hiland - (Direct by Fumerton)**

1  a DUR?

2  **A**    Drug utilization review is really the clinical

3  assessment that the pharmacist completes.  It's probably one

4  of the most important functions that the pharmacist

5  completes when they're looking at dispensing prescriptions.

6  **Q**    For how long have Walmart pharmacists performed drug

7  utilization reviews?

8  **A**    It's a requirement, so for as long as I've practiced,

9  drug utilization review has definitely been part of the

10  practice.

11  **Q**    Is Connexus used by pharmacists to aid them in their

12  drug utilization review?  And let's start from when Connexus

13  first started until today.

14  **A**    Sure.  So there is a step, I don't think -- it's not

15  reflected on the screen here, but it occurs at the point of

16  input verification or four-point check.

17      So when the pharmacist is verifying that what the

18  technician input is accurate, they also go through drug

19  utilization review, and that is aided by Connexus.  We have

20  changed it over time, but it looks at drug interactions, it

21  looks at allergies to medications that might be prescribed.

22      And so it's a service that we purchase from a vendor

23  that provides the clinical expertise and takes into account

24  the information that we have about the patient to aid the

25  pharmacist.

**Hiland - (Direct by Fumerton)**

1    **Q**    And so again, starting with the 2012 time frame, did

2    Walmart's district managers or regional managers use these

3    report functions within Connexus?

4    **A**    Yes.  I know that they have access to them, and all of

5    our market directors have access to Connexus.

6    **Q**    And did they have access to that prior to 2012?

7    **A**    Yes.

8    **Q**    Did they have access to that beginning in -- when

9    Connexus first started being used by Walmart?

10   **A**    Yes.

11   **Q**    And what about today?

12   **A**    Yes, today as well.

13   **Q**    I now want to focus on this tools function at the top

14   of the screen.

15         What does that allow a pharmacist to do, starting

16   in -- let's use 2012.  Mr. Weinberger wants to make sure

17   we're set on the time.

18   **A**    Sure.  In -- and I'm not sure that I can reflect by

19   time frame exactly when all of the tools came into play, but

20   generally the use of the tools section is to access external

21   sites.  And so it's to be able to bring into Connexus

22   additional resources for the pharmacist to access from their

23   workstation.

24              MR. WEINBERGER:  Objection.  Move to strike,

25   Your Honor.  Nonresponsive.

**Hiland - (Direct by Fumerton)**

1                THE COURT:  I'll agree.

2          The jury is to disregard that answer.

3    **Q**    Ms. Hiland, we're going to look at some specific tools

4    in a minute, but can you talk, generally speaking, about

5    what type of information or how a pharmacist could use the

6    tools function if not what specific tools were available

7    during that time?

8    **A**    It's intended to be an easy link for the pharmacist to

9    access external resources.

10   **Q**    And there are other items on the screen that I've

11   already mentioned, work queue, current Rx, view, and help.

12         Are those all additional drop-down menus that allow a

13   pharmacist to navigate through Connexus?

14                MR. WEINBERGER:  Objection.  No time frame.

15   **Q**    Starting in -- let's talk about 2012 since we're --

16                THE COURT:  Let's assume, the questions and

17   the answers, we're talking about 2012.  If there's any other

18   time change, then, Ms. Fumerton, you need to direct the

19   witness to another time.

20                MS. FUMERTON:  Yes, Your Honor.  Thank you.

21   **A**    Yes.  So, those are -- from a computer functionality,

22   those are what I would consider quick links to additional

23   information that the pharmacist can use.

24   **Q**    And I just want to give the jury a sense of the volume

25   of information that is contained within Connexus.

**Hiland - (Direct by Fumerton)**

1      If we wanted to walk through all the different screens

2  and all of the different menus, how long would that take?

3  **A**    I think it would take several days.

4  **Q**    Well, we're going to spare everybody that, but I want

5  to highlight a few other points within that.

6          MS. FUMERTON:  Let's look at the next screen.

7  The next slide.  Thank you.

8  **Q**    And what is being depicted here, Ms. Hiland?

9  **A**    This is the counseling screen.

10 **Q**    And what is counseling?

11 **A**    Counseling is the interaction with the patient to

12 educate them on their medication.

13 **Q**    And what's Walmart's current policy with respect to

14 counseling of patients for controlled substances?

15 **A**    So our policy is that new therapy is counseled, so if

16 it's new to the patient, it's counseled for each time new

17 therapy is introduced.  If it's a refill or a continuation,

18 then it's every six months for controlled substances.

19 **Q**    And do controlled -- let's talk specifically about

20 Schedule II controlled substances.

21      Are refills allowed on Schedule II controlled

22 substances?

23 **A**    No, they're not.

24 **Q**    And so what does that mean as far as Walmart's

25 counseling policy?

**Hiland - (Direct by Fumerton)**

1   **A**    So each new prescription would be considered to be new

2   therapy, and so as --

3            (Cell phone interruption.)

4   **Q**    I'm sorry, Ms. Hiland, if you could repeat your

5   question.

6   **A**    For Schedule II, counseling is required for each

7   prescription.

8   **Q**    Do you know for how long that's been the case?

9   **A**    Our counseling policy generally has been counsel on

10  new prescriptions, again, for as long as I can remember.  We

11  did make some changes to noncontrolled substances or

12  non-C-IIs, but it's been new prescriptions require

13  counseling.

14  **Q**    And so that would be for every Schedule II

15  prescription there would be counseling since you were a

16  pharmacist at Walmart; is that right?

17  **A**    Correct.

18  **Q**    And just before we leave this screen, how would a

19  pharmacist use this screen within Connexus?

20  **A**    It's intended to give them just a reminder of

21  everything that is being dispensed and then some just quick

22  counseling reminders.  They can also see any notes that were

23  made throughout the filling process because the pharmacist

24  that filled and approved the prescription isn't necessarily

25  the one that would be counseling.  So it's really a

**Hiland - (Direct by Fumerton)**

1  communication tool and a reminder to the pharmacist what

2  they're counseling on.

3          MS. FUMERTON:  Okay.  Let's go back to the

4  overview of the computer system and tools, please.

5  **Q**  Okay.  I want to talk about some of the tools that are

6  depicted here.  And let's talk specifically, too, about the

7  time frames that are available.  But first let's start in

8  the left-hand corner.

9      What is Archer?

10 **A**  Archer is a computer program that Walmart uses to log

11 compliance activity from the stores.

12 **Q**  Can you give an example of some of the information

13 that would be contained within Archer?

14 **A**  Sure.  So we use Archer for the stores to be able to

15 report if they have an inventory discrepancy of a controlled

16 substance, that goes right to the Practice Compliance team.

17 And we also use it to report -- since 2015.  Refusal to fill

18 and blanket refusal to fill, that started in 2017.

19 **Q**  Is Archer accessible to Walmart pharmacists through

20 their computer system?

21 **A**  Yes.  Today they have, and from the time that Archer

22 was used, they have --

23 **Q**  That was 2015?

24 **A**  2015.  They are able to access Archer through the

25 Tools function.

1       We also added a quick link to the prescriber file that

2   shows refusal to fill and blanket refusal to fill that's

3   populated from Archer, and then that began in 2018.

4   **Q**   Okay.  So stating in 2015, what information was

5   available to Walmart pharmacists about refusals to fill and

6   Archer?

7   **A**   They could see refusal to fills that were filed from

8   other pharmacies, they could see what their pharmacies had

9   filed, they could also see what other pharmacies had filed,

10  based on prescriber or patient if they had that information.

11  **Q**   So if there's a pharmacist in a store in Trumbull

12  County, could that pharmacist look in Archer to see if a

13  refusal to fill had been filed by a store in Lake County?

14          MR. WEINBERGER:  Objection.  No time frame,

15  Your Honor.

16          MR. FUMERTON:  2015.  I can't --

17          THE COURT:  I think it's 2015.  But I think

18  you're right, we need to be specific, because we moved off

19  2012.

20          MS. FUMERTON:  Right.

21  **Q**   So Archer began -- let's just make it clear, because

22  we're talking about Archer.

23      When was Archer available to a pharmacist through the

24  Tools function in Connexus?

25  **A**   We started to use Archer in 2015 for refusal to fills.

**Hiland - (Direct by Fumerton)**

1  **Q**    So all my questions about Archer in looking up

2  refusals to fill would be from 2015 forward.

3       So starting in 2015, what could a pharmacist in Lake

4  County see about refusals to fill?

5       Could a pharmacist in Lake County see refusal-to-fill

6  information from a pharmacist in Trumbull County?

7  **A**    Yes, they could search for that information.

8  **Q**    And how do pharmacists look up refusal-to-fill

9  information in Archer beginning in 2015?

10  **A**    So they could go to the system and they could look for

11  whatever -- whatever information was entered into the

12  refusal to fill, so prescriber name, they could see the

13  store that had refused to fill, what the medications were;

14  so the information that was populated in the form.

15  **Q**    Moving around on the screen, what is The Wire?

16  **A**    The Wire is Walmart's intranet, our internal

17  communication platform.

18  **Q**    How long has Walmart had The Wire?

19  **A**    There's always been a version and the name has changed

20  over time.  When I was practicing, it was called The

21  Pipeline.  I don't know exactly the date that it

22  transitioned to The Wire, but today it's called OneWalmart,

23  so the name has changed over time.

24  **Q**    Was it called The Wire for the bulk of your time at

25  Walmart's home office?

1    **A**    Yes.

2    **Q**    And what type of information would be on The Wire?

3    And if that changed over time, please let us know.

4    **A**    So again, it's the communication vehicle.  It would be

5    information about any changes to programs.  It has resources

6    for pharmacists, including any required references from

7    state boards of pharmacy.  It has links to clinical

8    references.

9        It has all of our policies.  It has state-specific

10   information.  It houses tool kits which are -- we take

11   certain programs and package them, and put all of the

12   policies or all of the links and information to make it

13   easier for our pharmacists to find in tool kits.  It has

14   access to their training programs.

15       So it literally is the place that they go for

16   information about the company and any of the resources that

17   we have.

18   **Q**    I apologize, Ms. Hiland.

19       You mentioned their training -- now I forgot the word

20   that you said, but you mentioned their training.

21       What were you referring to?

22   **A**    So we've had a learning management system, and again,

23   that's changed.  For the bulk of this time it was called

24   GLMS, Global Learning Management System.  Today it's called

25   ULearn, and it's housed out on The Wire.

1      And their training plan are all of the training

2  modules that are specific to their job.  So a technician has

3  a specific training plan with work that they need to

4  complete, and a pharmacist has another training plan, and a

5  pharmacy manager has something that's different.  So every

6  associate at Walmart has a training plan based on the role

7  that they're in.

8  **Q**      Does Walmart track whether the associate completes

9  that training plan?

10  **A**      Yes.  And that's always been the case.  It's tracked

11  within the system, and it's followed up on by the stores

12  have -- I'm not sure if this is still the name, but the

13  training coordinator at the store would follow up to make

14  sure that people were completing their training in a timely

15  manner and then working with the market director or the

16  supervisor to make sure that if someone didn't complete it,

17  that it did get done.

18  **Q**      I think one of the other things you mentioned that was

19  available on The Wire were clinical references.

20      What were you referring to there?

21  **A**      We provide access to several clinical references for

22  our pharmacists, so that if they need to research something,

23  we use something called Facts and Comparisons or eFacts

24  because it's electronic now, and we also provide them with a

25  resource that is Pharmacist's Letter that has information

1    that has current information, but also can be quick

2    references for our pharmacists.  And then also continuing

3    education programs that are provided through Pharmacist's

4    Letter.

5    **Q**    Moving on to the State PMP.  And the jury has already

6    heard a lot about specifically OARRS, the Ohio State PMP.

7         How do Walmart pharmacists access the various state

8    PMPs?

9    **A**    So they can access it through The Wire, and there are

10   links in our policies, but they're also on that Tools

11   drop-down.  They can get out to those state prescription

12   monitoring programs from there.

13   **Q**    And specific to OARRS, did Walmart issue any policies

14   regarding when its pharmacists must check OARRS?

15   **A**    Yes.  So in -- as prescription monitoring programs

16   came online, we made those available around the 2010, we

17   actually had some a little bit earlier than that, so we made

18   the access to the prescription monitoring programs

19   available.

20        So when Ohio required pharmacists to access OARRS in

21   2011, we were ready, and we provided that direction to our

22   pharmacists about getting access.

23   **Q**    Can you please turn to page -- I'm sorry -- Tab 16 in

24   the binder that I handed you.

25        And for the record, this is Exhibit WMT-MDL-01194.

1           And Ms. Hiland, let me know when you get to that

2      document, and it will be published on the screen as well.

3           Do you have it?

4   **A**   Yes.

5   **Q**   Do you recognize this document?

6   **A**   Yes.

7   **Q**   Okay.  Can you please describe to the jury what it is?

8               MS. FUMERTON:  And I think we need to turn to

9      the second page.

10  **A**   So this is a request to publish on The Wire a notice

11     to our Ohio pharmacists of the recent change regarding --

12     from the Ohio Board of Pharmacy regarding the requirement to

13     check OARRS under certain circumstances.

14  **Q**   And what was the date of this request?

15  **A**   It was October 19, 2011.

16  **Q**   And if you look to the second paragraph on this page,

17     it says "Action required."

18          Do you see that?

19  **A**   Yes.

20              MS. FUMERTON:  Can we just blow up that first

21     sentence.

22  **Q**   And can you read that for the jury, please?

23          Could you please read that for the jury?

24  **A**   Yes.  Sorry.

25          "If you are not already a registered user of the OARRS

**Hiland - (Direct by Fumerton)**

1    reporting system, please visit the following website to

2    register and/or to access the OARRS reporting system."

3    **Q**    So what was Walmart directing its pharmacies -- or I

4    should say what was Walmart requiring its pharmacists to do

5    at this time?

6    **A**    To make sure that they were registered so that they

7    could meet this requirement that the Board put in place.

8            MS. FUMERTON:  We can take that down.  Thank

9    you.

10   **Q**    Let's go back to the slide depicting the various tools

11   that can be accessed within the computer system.

12           Last but not least, we have NarxCare.

13           Could you please describe for the jury what NarxCare

14   is?

15   **A**    NarxCare is, in my knowledge, the closest thing that

16   there is to a national prescription drug monitoring program.

17   So it takes information from participating states and

18   creates an aggregated report for the pharmacists to view

19   based on the patient's fill history.

20   **Q**    How is NarxCare different from the State PMP?

21   **A**    NarxCare takes information from other states and

22   considers that as it brings together the report.

23   **Q**    When did NarxCare become available, do you know?

24   **A**    I'm not exactly sure when NarxCare became available,

25   but we adopted it in 2018.

**Hiland - (Direct by Fumerton)**

1    **Q**    Is that something that Walmart pharmacists can also

2    access through Connexus?

3    **A**    Yes.  So when -- so we wrote rules so that -- one of

4    the things that NarxCare does is it looks at active

5    prescriptions, and it looks at the number of pharmacies that

6    a patient has used and it looks at the number of

7    prescribers, and it calculates a proprietary score around

8    risk, including risk of potential overdose.  And that's --

9    and so that risk score is what we populate into Connexus.

10        And then the pharmacist can -- regardless of what the

11    risk score is, they can go in and pull the report down from

12    that Tools section.

13    **Q**    We've just talked about four different tools that

14    Walmart provides its pharmacists through Connexus.  Are

15    those all the tools that are available to a Walmart

16    pharmacist through Connexus?

17    **A**    No, there's several others.

18    **Q**    Switching subjects.

19        I want to talk about the structure of Walmart's

20    pharmacy operations.  We discussed the various computer

21    system and tools that Walmart provided its pharmacists.

22        Does Walmart also provide personnel to support its

23    pharmacists?

24    **A**    Yes.

25    **Q**    And did you help prepare a slide to depict that

 1    support?

 2    **A**    Yes.

 3              MS. FUMERTON:  Could we put up the slide.

 4    **Q**    Please describe what we are looking at.

 5    **A**    So this is -- this has been the structure for as long

 6    as I've been with Walmart around the reporting structure,

 7    from the associates in the store, in the pharmacies, up to

 8    the leadership in the corporate office.

 9    **Q**    How do the folks within the structure communicate?

10    **A**    So today, and I'm not -- I'm actually not sure how

11    long we -- we definitely have e-mail.  Phone calls have

12    always been an option, but the market directors are in their

13    pharmacies on a regular basis.  They have what we call tour

14    routines that they go through, and so their job is to be in

15    their pharmacies working with their teams.

16              And then the regional directors also tour.  They have

17    much larger areas, but they do go out and tour.  They spend

18    time with their market directors and visit stores, as do the

19    divisional directors.

20    **Q**    So Walmart pharmacies are located within Walmarts; is

21    that right?

22    **A**    Yes.

23    **Q**    Do pharmacy managers report to the Walmart store

24    managers?

25    **A**    No.  They report to the market directors.

**Hiland - (Direct by Fumerton)**

1    **Q**    And how many stores does a market director typically

2    have responsibility for?

3    **A**    So it varies.  I would say on average it's 12 to 14,

4    but it could be more or less, depending on sometimes

5    geography.

6    **Q**    What about regional directors?  How many market

7    directors typically report to them?

8    **A**    Again, it can vary, but it's around 10 to 12.

9    **Q**    Does Walmart also provide support to its pharmacists

10   from the home office?

11   **A**    Yes.  And again, various ways that the pharmacy

12   managers can -- any pharmacist, not just pharmacy manager,

13   but can reach out and get support.

14   **Q**    Let's look at that home office support.

15          Can you please describe what's being depicted here?

16   **A**    Sure.  So these are some, these are not all of the

17   teams that are at the home office for support.

18          So we do have compliance teams, both the Practice

19   Compliance and then what I described earlier as kind of the

20   broader compliance around HIPAA and other compliance issues.

21          We have a team that's responsible for communications,

22   so that posting that we showed, the example of that Wire

23   request, that would go to the Operations Communications

24   team.

25          They manage not only communication but they manage

1    schedules and events that are occurring in the stores to try

2    to make sure that there aren't too many initiatives or too

3    many communications going out.  And that has been the case,

4    we've had an Operations Communications team, again, for as

5    long as I've worked for Walmart.

6        We have a Training team.  We have corporate training,

7    but we also have professional clinical training that's

8    managed in different ways, but there's the training plans

9    that I mentioned.

10        The Patient Safety group or Quality Assurance team is

11   actively involved with not just the stores and the

12   pharmacists, but with leadership as well.

13        We have an Innovations team that works with the field.

14   So any of the updates to Connexus that occur come through

15   that Innovations team, and so there's a team that tests

16   changes to Connexus in a mock pharmacy that's been in place

17   at least since 2009, and then those changes are brought

18   through the Innovations team.

19        And then Clinical Services is more recent.  That team

20   started in -- the function of the team started around 2013,

21   and but we formally pulled the team together in 2014.  And

22   they're responsible for the clinical programs that our

23   pharmacists provide.

24   **Q**    If we add the field leadership back on this screen, do

25   these groups work together?

**Hiland - (Direct by Fumerton)**

1    **A**    Yes.  You know, the divisional -- the teams in the

2    home office, the divisional directors, and some of the

3    regional directors, sit in the same area, and then we have

4    meetings and phone calls.  And again, support to the field

5    has always been a priority in the way that we communicate

6    among teams.

7    **Q**    Thank you, Ms. Hiland.

8         We can take down that slide.

9         Switching subjects again.

10        Does Walmart support pharmacists in the exercise of

11    their professional judgment?

12    **A**    Yes.

13    **Q**    Has that always been the case in your 32 years at

14    Walmart?

15    **A**    Yes.

16    **Q**    How does Walmart convey that to its pharmacists?

17    **A**    Through policy, through communication and training.

18    **Q**    You mentioned communications.  Could you give some

19    examples?

20    **A**    So it could be -- it could be the market director

21    interacting with their teams, or the regionals or

22    divisionals on store visits, talking about policy and just

23    talking to the pharmacists about practice.  It's what I did

24    as a regional -- as I went out and visited stores.

25        We use The Wire to communicate changes in policy and

**Hiland - (Direct by Fumerton)**

1      programs.  And then we have other vehicles that we use,

2      sometimes broadcasts or recorded messages, those types of

3      things, to talk to the pharmacists and provide information.

4      **Q**      Are you familiar with something referred to as the

5      2013 Leadership Message on Controlled Substances?

6      **A**      Yes.

7      **Q**      Can you turn to Tab 4 of your binder, please.

8              And for the record, this has been marked as Exhibit

9      WMT-MDL-01155.

10              Are you there, Ms. Hiland?

11     **A**      Yes.

12     **Q**      Do you recognize this document?

13     **A**      Yes.

14     **Q**      What is it?

15     **A**      This is the speaking script for a video that we

16     recorded.

17     **Q**      And how are you familiar with this document?

18     **A**      I wrote it.

19     **Q**      And were you involved in the video process as well?

20     **A**      Yes.  So the way that the video recording occurs,

21     Walmart has a TV studio, and so I worked with the TV

22     engineers to arrange the schedules to work with Paul and

23     Jill on the script.  I wrote it, and then they -- they made

24     changes so that the verbiage sounded comfortable for them.

25     And then I worked with the team to get the script so that we

**Hiland - (Direct by Fumerton)**

1    would have prompters for Paul and Jill.

2          The recording, I took the recording and then worked

3    with The Wire and the Training teams to get it published and

4    available to the field.

5    **Q**    You mentioned Paul and Jill, and so I want to ask who

6    those folks are.

7          Who's Paul?

8    **A**    Paul Beahm from, gosh -- I reported to Paul in 2007

9    through probably sometime in 2018.  But Paul at the time, in

10   2013, was senior vice president for Pharmacy Operations, so

11   the divisionals reported to Paul.

12   **Q**    And who is Jill?

13   **A**    Jill was Paul's counterpart on the Sam's Club side.

14   **Q**    Were these senior executives within Walmart Health and

15   Wellness?

16   **A**    Yes, both senior vice presidents.

17   **Q**    Were they also pharmacists?

18   **A**    Yes.

19   **Q**    And I think you discussed a little bit about how this

20   message was provided to pharmacists, but I want to make sure

21   the record is clear.  How was this information transmitted,

22   was it via video broadcast, via The Wire, some other method?

23   **A**    So for this message, we recorded it and then made it

24   required viewing for all of our pharmacists.

25   **Q**    Do you know why such senior executives were chosen to

1    communicate this message?

2    **A**    I just think the importance.  Again, this wasn't

3    unusual.  We would do live TV broadcasts with Paul and Jill

4    on different subjects because I think that they felt, and

5    it's always been part of our culture, that they heard from

6    the top leadership on these issues.

7            THE COURT:  Ms. Fumerton, I don't see a date

8    on this document.  If you could specify when this was

9    recorded and disseminated, please.

10           MS. FUMERTON:  Yes, Your Honor.

11   **Q**    Ms. Hiland, when was this message conveyed to

12   pharmacists?

13   **A**    It was in 2013.  I don't know the exact date.

14   **Q**    And I want to look at some of what was communicated in

15   this message.  Let's look at the third full paragraph on the

16   first page here.

17           Can you please read to the jury the paragraph that

18   begins with "As pharmacists ourselves"?

19   **A**    Yes.

20           "As pharmacists ourselves, we appreciate the

21   opportunity to lead and serve you as you serve your [sic]

22   patients.  And we know that while many regulations and laws

23   are black and white, a decision to dispense a highly abused

24   controlled substance is often not black and white.  In fact,

25   it can be complicated."

**Hiland - (Direct by Fumerton)**

1    **Q**    I'm going to stop you actually right there.  I just

2    asked you to read the whole thing, but I'm asking you a

3    different question now.

4          Why can it be complicated?

5    **A**    Because you're having to strike a balance between

6    understanding the need for the medication, understanding

7    that you're there to provide healthcare services; that, you

8    know, in this case, some of the medications that we dispense

9    can be abused.

10   **Q**    Please go on and read.  I think I stopped you right

11   before "The exercise of."

12   **A**    "The exercise of professional judgment is perhaps the

13   most important of your responsibilities as healthcare

14   professionals, licensed pharmacists, and Walmart and Sam's

15   Club associates.

16         "As highly trusted medication experts, pharmacists are

17   integral to the healthcare team's responsibility to ensure

18   that prescribed therapy is safe and appropriate for the

19   patient.  Patient care and safety are our highest priority."

20   **Q**    Was patient care and safety your highest priority

21   during your more than 32 years at Walmart?

22   **A**    Yes.

23   **Q**    And please turn to the second page.

24         And I want to turn your attention to the middle of the

25   first full paragraph where it begins, "We must balance."

**Hiland - (Direct by Fumerton)**

1          Can you read that sentence, please?

2     **A**     Yes.

3          "We must balance the sad fact that the abuse of

4     controlled substances in the U.S. has increased

5     significantly and at a concerning rate over the past ten

6     years with a patient's legitimate need for palliative care."

7     **Q**     What's being communicated there?

8     **A**     It's really saying that, again, pharmacists are there

9     to take care of patients, but there has been abuse of

10    controlled substances that's occurring.

11    **Q**     Let's look at the first -- on that same page, I want

12    to look at the numbered paragraphs.

13         Could you please read the first numbered paragraph?

14    **A**     Yes.

15         Number 1, "First, we expect you to evaluate each and

16    every prescription to ensure it is appropriate therapy for

17    the patient and is written in the best interest of the

18    patient.  This holds true for every prescription but

19    especially for controlled substances."

20    **Q**     Can you please read the first sentence of the next

21    paragraph, paragraph 2.

22    **A**     2.  "Second, we expect you to never fill a

23    prescription that you believe in the exercise of your

24    professional judgment is either not in the best interest of

25    the patient or has not been issued for a legitimate medical

1   purpose."

2   **Q**     Has that been Walmart's policy throughout your 32

3   years with the company?

4   **A**     Yes.

5   **Q**     Let's go to the third paragraph.

6           Can you read the highlighted portion, which is the

7   first -- should be the first sentence.

8   **A**     "Third, you must always follow up and work to

9   understand or find resolution to any red flags before

10  filling any controlled substance prescription."

11  **Q**     And the next page, we turn to paragraph 4.  Numbered

12  paragraph 4, I should say.

13          Can you please read the highlighted portion beginning

14  with "Never fill" and ending with "patient."

15  **A**     "Never fill a controlled substance prescription to

16  meet a business metric or objective.  This is such an

17  important point to understand and to know how we feel about.

18  The expectations and obligations we have are to our patients

19  and to the regulatory requirements that we adhere to.

20  Business outcomes always come after we serve the patient and

21  follow the applicable laws, not before.  Your first

22  obligation is to the safety, health, and well-being of your

23  patient."

24  **Q**     And please read the sixth paragraph.

25  **A**     "Most importantly, we expect you to exercise your

1    professional judgment and to care for your patients

2    accordingly.  There is no substitute for professional

3    judgment.  Walmart and Sam's Club leadership supports

4    pharmacists who exercise professional judgment, and we will

5    stand behind our pharmacists who exercise professional

6    judgment in evaluating and deciding whether or not to fill a

7    controlled substance prescription.  Use the tools we have

8    made available to you to assist you in exercising your

9    judgment and to fill prescriptions responsibly.  If you

10   follow our POMs and use the tools we have made available to

11   you, it should not be necessary to decline to stock these

12   controlled substances of concern."

13   **Q**    And what is that referencing?

14   **A**    Well, we have occasion -- again, this is a complicated

15   issue, and our pharmacies exist to serve the needs -- the

16   healthcare needs of our patients, and what we saw happening

17   were our pharmacists just refusing to stock medication, so

18   that they weren't available for legitimate healthcare needs.

19   And that was -- we saw that as not exercising their

20   professional judgment.  We saw that as just not

21   participating in healthcare.

22   **Q**    And why don't you go ahead and read the rest of that

23   paragraph.

24   **A**    "Refusing to stock prescriptions for certain

25   medications is as much an abdication of the exercise of

1    professional judgment as filling all prescriptions without

2    appropriate verification, and it could harm legitimate

3    patients in medical distress."

4    **Q**    And finally, can you read -- if we turn the page one

5    more time, can you read the first two paragraphs -- I'm

6    sorry, the first two sentences of the first paragraph.

7    **A**    "The most important measure of our success as

8    pharmacists is the level of quality patient care we deliver.

9    Patient care is our first priority."

10   **Q**    And the next one.

11   **A**    "Improving patient outcomes and ensuring they have a

12   quality experience while in our care is what we stand for in

13   our Health and Wellness businesses."

14   **Q**    If someone were to suggest to you that Walmart puts

15   profits over safety, how would you respond?

16   **A**    That's just not true.

17   **Q**    Why do you say that?

18   **A**    That's not my experience.  Everything that I have ever

19   experienced at Walmart from the time that I was hired was

20   around serving the patient and putting the patient's needs

21   and safety above any business metric or -- and the reason

22   for that is, it was mentioned earlier in this, is if we take

23   care of the patient in a way that is quality and safe, if we

24   do it in a compliant way, then that will build a sustainable

25   business.

1     And so that's the approach that I was always taught

2     and that we always, in my experience, have always

3     communicated.

4     **Q**     All right.  Are the expectations that were being

5     communicated to Walmart pharmacists in this video new?

6     **A**     No.

7     **Q**     For how long have you heard them?

8     **A**     Again, I feel as though different leaders in different

9     roles throughout the time that I have worked for Walmart,

10    but I've heard this same message, again, rooted in our

11    corporate culture and focused on patient safety and access.

12                    MR. WEINBERGER:  Your Honor, can we have a

13    side bar?

14                    MS. FUMERTON:  Your Honor, I was also going to

15    suggest this is a good time to take a break, but we can go

16    to side bar first.

17                    THE COURT:  Well, we'll see.

18                    (At side bar at 10:28 a.m.)

19                    MR. WEINBERGER:  Your Honor, this is back to

20    corporate culture regarding their integrity.  The door is

21    wide open.  We can't unring this bell.

22                    THE COURT:  I think that's true, all right?

23    Ms. Fumerton, I told you not to go there, and you went back

24    there.  So I think I want to figure out, Mr. Weinberger, and

25    Mr. Lanier, you need to advise me how you plan to use that

1    DOJ once it's cross-examination.

2              MR. LANIER:  Your Honor, Mark Lanier.  I'll be

3    doing the cross.

4        I want to be very careful how I use it.  I don't want

5    to go too far into it in any way that pushes anything beyond

6    the open door.  So what I'd like to do is probably look at

7    the language carefully during the break, but my question

8    would likely be something like, "Ma'am, that is your opinion

9    as you sit here as a Walmart employee, but you know

10   currently the Department of Justice is pursuing an action

11   against Walmart, making allegations that are entirely

12   opposite," and I'd probably try and limit it to something

13   like that.

14             MR. MAJORAS:  Your Honor, John Majoras.  We'd

15   certainly object to that.

16             THE COURT:  Mr. Majoras, we've been -- I

17   warned you, okay?  You didn't have to go back there.

18             MR. MAJORAS:  The plaintiffs have been

19   challenging throughout this case as to whether or not the

20   company and the individuals as they are exercising their

21   professional responsibilities are doing that in an

22   appropriate way or being supported.  The testimony went

23   specifically to that.  Any mention of the DOJ is --

24             THE COURT:  Hold it.  I've allowed all that.

25   I allowed this witness to detail the ways that Walmart

1    corporate is supporting their pharmacists to go through the

2    computer program.  I let her put on the video and to put in

3    the instructions that she and Walmart corporate gave to

4    pharmacists.  That's appropriate.  But then you went farther

5    and had her express her opinion about how Walmart has always

6    put, you know, patient safety above profit for 30-plus

7    years.

8         I warned you, so I'm going to allow the plaintiffs

9    to -- I think to use that DOJ lawsuit in a limited way, and

10   she can say whatever she wants to say about it.  She can say

11   the Department of Justice is a hundred percent wrong in her

12   opinion, that's fine.  She can say whatever she says, and

13   I'm not going to allow any more back and forth on it.

14              MR. MAJORAS:  Your Honor, again, you allowed

15   questions on patient safety, which is what these answers

16   went to.  Any mention of the DOJ lawsuit is clear error

17   under Rule 403.

18              THE COURT:  I don't believe so, not because --

19              MR. MAJORAS:  And I will move accordingly.

20              THE COURT:  Fine, do all you want, sir.  I

21   warned you, okay? And I went through it.  And I could have

22   done it the first time that the door was opened, but I

23   decided to be cautious, and I just had the jury disregard

24   the answer, and I went through, and every defendant

25   understood.  And you went back at it, so this is the

**Hiland - (Direct by Fumerton)**

```
 1    consequence.  The record's very clear.  All right?

 2                    (In open court at 10:31 a.m.)

 3                    THE COURT:  All right.  Ladies and gentlemen,

 4    it's a good time to take our mid morning break.  Usual

 5    admonitions apply.

 6        I'll pick up in 15 minutes with more of Ms. Hiland's

 7    testimony.  Thank you.

 8                    (Recess taken at 10:32 a.m.)

 9                    (In open court at 10:48 a.m.)

10                    MR. MAJORAS:  Your Honor, before the jury

11    comes in, we've done this before with some other witnesses,

12    because I want to make sure the witness understands not to

13    go into certain topics.  We would ask permission to just

14    note to the witness not to talk about general corporate

15    ethics and values in her remaining testimony.

16                    THE COURT:  Okay.  That's fine.  You can tell

17    her that.

18                    MR. MAJORAS:  Ms. Fumerton will do that, Your

19    Honor.

20                    (The jury is present at 10:50 a.m.)

21                    THE COURT:  Okay.  Please be seated, ladies

22    and gentlemen.

23        Ms. Hiland, you're still under oath.

24        And Ms. Fumerton, you may proceed, please.

25                    MS. FUMERTON:  Are you ready, Ms. Hiland?
```

```
 1                    THE WITNESS:  Yes.
 2   BY MS. FUMERTON:
 3   Q     Could you please turn to Tab 5 in your binder.
 4         And for the record, this is Exhibit WMT-MDL-01027.
 5         Do you have it, Ms. Hiland?
 6   A     Yes.
 7   Q     Do you recognize this document?
 8   A     Yes.
 9   Q     What is it?
10   A     This was a request to publish our red flags document
11   under the -- one of our tool kits, the C-II toolkit on The
12   Wire.
13   Q     Let's turn to the second page, where the substance, I
14   believe, begins.
15         How are you familiar with this document?
16   A     I wrote it or pulled it together for publication.
17   Q     And what was the purpose of this document?
18   A     Again, a resource for our pharmacists as they were
19   exercising corresponding responsibility.
20   Q     So I want to turn -- actually, the middle of that
21   first page, where it talks about "To help you evaluate each
22   controlled substance prescription, the red flags are divided
23   into three categories."
24         Do you see that?
25   A     Yes.
```

**Hiland - (Direct by Fumerton)**

1    **Q**    What red flags are being discussed here?

2    **A**    These are red flags that were identified from DEA

3    enforcement activities.

4    **Q**    And it's divided into three groups; is that right?

5    **A**    Yes.

6    **Q**    Why is it divided that way?

7    **A**    I think it was categorized to try to help the

8    pharmacists think about the different areas that could be of

9    concern.

10   **Q**    And can you please read that last paragraph that

11   begins with "Each"?

12   **A**    Sure.

13        "Each red flag listed has been identified previously

14   by the DEA in connection with one or more investigations in

15   diversion cases.  This is not an all-inclusive list of

16   considerations for appropriate dispensing of controlled

17   substances but, rather, a starting point as you apply your

18   professional judgment in the course of your practice to

19   thoroughly evaluate all controlled substance prescriptions."

20   **Q**    And if we turn to the next page, so page 2, there's --

21   I guess it will be page 3.  One more.  Thank you.

22        We see "DEA red flags."

23        Do you know why they're referred to as DEA red flags

24   in this document?

25   **A**    Again, because they were identified by the DEA as red

**Hiland - (Direct by Fumerton)**

1   flags.

2   **Q**    And I want to focus on just one other thing before we

3   get into those red flags.

4        If you look under pharmacist obligations, which is

5   just above, there is item number 3 is what I want to focus

6   on.

7        And it states, "Report all denied prescriptions using

8   the forged or fraudulent prescription activity Webform on

9   The Wire."

10       Do you see that?

11  **A**    Yes.

12  **Q**    What is the date of this document, do you recall?

13  **A**    This was November 15, 2013.

14  **Q**    And November 15, 2013, how was Walmart collecting

15  information relating to refusals to fill?

16  **A**    We were using Webforms.

17  **Q**    And can you briefly describe what a Webform is to the

18  jury?

19  **A**    It was a -- it was just a form that the -- that was

20  prepopulated with information, and so the pharmacist just

21  could fill out information in specific categories and then

22  forward it on to the home office.

23  **Q**    Was the Webform process replaced by the Archer process

24  that you described earlier to the jury?

25  **A**    Yes, it was.

1   **Q**    And that was in 2015; is that right?

2   **A**    2015, yes.

3   **Q**    So going back to the section that reads "DEA red

4   flags," could you please read those two paragraphs to the

5   jury.

6   **A**    "In the table below, DEA-identified red flags are

7   highlighted along with important considerations and

8   resources that should be evaluated when evaluating

9   controlled substance prescriptions.

10        "For each red flag, use your professional judgment and

11   the available resources to determine if there is a valid

12   reason for the presence of the red flag and if the red flag

13   is indeed indicative of a potentially inappropriate

14   prescription.  All red flags should be evaluated and

15   resolved prior to dispensing a controlled substance

16   prescription."

17   **Q**    And this is the message that's being communicated to

18   pharmacists in 2013; is that right?

19   **A**    Yes.

20   **Q**    Let's look at the next page.

21        And it looks like -- and actually, if you can flip on

22   the screen so the jury can get the sense of this, on this

23   page and following on the next two pages it looks like

24   there's a chart.

25        Let go back to the first part of the chart.

1        Can you describe, Ms. Hiland, what is being depicted

2    here on this chart?

3    **A**    So these are the red flags by the categories,

4    prescriber, patient, and prescription; the type of red flag,

5    and then the consideration for the pharmacist to think about

6    if they identify that the red flag is present.  And then we

7    provided reference to a policy or a resource that they could

8    use to help them to clear the red flag.

9    **Q**    Is that what's being reflected on the second column of

10   this chart?

11   **A**    Yes, the part that says "Use," this resource

12   basically.

13   **Q**    We're not going to walk through all of these red

14   flags, but I want to go through at least one example just to

15   see how this document can be used.

16       So let's start with the first one.  What is the first

17   one that's listed on this page here?

18   **A**    Under the Prescriber Factors, it's "Prescription is

19   written by a prescriber outside of the pharmacy's trade

20   area."

21   **Q**    What's a pharmacy's trade area?

22   **A**    It would be the typical area that their patient base

23   is based out of.

24   **Q**    Is there a particular mileage distance that defines

25   when a prescriber is outside the pharmacy's trade area?

1    **A**    Not to my knowledge.  In my experience, I've seen it

2    vary rather broadly, depending on the pharmacy.

3    **Q**    And why is there not a specific mileage amount listed

4    here?

5    **A**    Again, because I think it really depends on, you know,

6    what the pharmacist knows about their practice and where

7    availability of healthcare resources are for that patient

8    base, how far they have to travel.  And it sometimes really

9    comes into light around specialties, medical specialists.

10   **Q**    And you mentioned that this chart reflects

11   considerations for the pharmacist to consider.  I think you

12   just maybe just summarized those two for this one, but is

13   that what's reflected under the "Ask"?

14   **A**    Yes, it's things for the pharmacist to think about.

15   **Q**    And if we look over at the Use section for this

16   potential red flag, what is listed there?

17   **A**    So we list two policies and then the fact that you

18   could check the patient profile to see if the patient had

19   seen that prescriber before, and then also the fact that

20   they could call the physician and get more information about

21   the patient.

22   **Q**    And I think the jury has heard this before, but there

23   are a lot of acronyms in this case.

24        What does POM stand for?

25   **A**    It's our Pharmacy Operations Manual, which is what

1    houses our policies.

2    **Q**    How is it organized, generally speaking?

3    **A**    By category.  Again, it's available on The Wire, and

4    so the first number, if you think about it in hundreds,

5    they're categorized.  So the 1300 series would be

6    regulatory, just as an example.

7    **Q**    Does it make sense to think of each POM number as a

8    different section of the Pharmacy Operations Manual, or how

9    do you think about it?

10   **A**    So dividing by hundreds, starting at 200 with

11   orientation, and so each section then has -- it's really

12   arranged so that the pharmacists can find what they are

13   looking for.  And then each policy is named, again, to try

14   to help the pharmacist dive a little bit deeper into the

15   information that they're looking for.

16   **Q**    And talking more generally about red flags, is whether

17   or not something's a red flag fact-specific?

18   **A**    I'm sorry, did you say fact-specific?

19   **Q**    I did.

20   **A**    Yes.  I think it's definitely situational.

21   **Q**    Can you explain what you mean by that?

22   **A**    So what the pharmacist knows and what the pharmacists

23   experience is something that factors in.  And so what may be

24   a potential red flag for one pharmacist may not be for

25   another one, just given what their experience, their

  1    knowledge is of the patient, the situation, or the

  2    prescriber.  So it really just depends on the situation

  3    that's presented at the time that the prescription's being

  4    evaluated.

  5    **Q**     And I'd like to direct your attention to the bottom of

  6    page 5, where the chart ends.  Specifically, the paragraph

  7    that begins "This list."

  8          Could you please read that bolded paragraph.

  9    **A**     "This list does not cover all situations you may

 10    encounter in your practice; in all cases, use your

 11    professional judgment and available resources to determine

 12    the appropriateness of any controlled substance prescription

 13    before you make the decision to dispense the medication."

 14    **Q**     And beneath that there are available resources listed;

 15    is that right?

 16    **A**     Yes.

 17    **Q**     And you referenced the Pharmacy Operations Manual that

 18    we just discussed?

 19    **A**     Yes.

 20    **Q**     And if we turn the page, you'll see additional

 21    resources listed; is that right?

 22    **A**     Yes.

 23    **Q**     State prescription monitoring programs, we've talked

 24    about that, right?

 25    **A**     Yes.

**Hiland - (Direct by Fumerton)**

1    **Q**    Connexus patient profiles, we've discussed that?

2    **A**    Yes.

3    **Q**    What is peer pharmacist consultation?

4    **A**    That would be talking to other pharmacists to see what

5    they know about the patient or the prescriber.

6    **Q**    How could that help you determine whether something is

7    a red flag?

8    **A**    Again, based on their experience or their knowledge of

9    the situation, that may just provide additional information

10    for the pharmacist.

11    **Q**    The next one listed is prescriber consultation.  What

12    is that referring to?

13    **A**    That would be having a discussion with the prescriber

14    to understand the relationship, to gain additional

15    information about the prescriber or the patient.

16    **Q**    The next one listed is patient consultation.  How does

17    that help a Walmart pharmacist or how could that help a

18    pharmacist identify or resolve a potential red flag?

19    **A**    I mean, sometimes you can just simply ask the patient.

20    In the example that we gave, you know, someone's -- a

21    prescriber's a distance from the pharmacy.  Why did you

22    visit that prescriber?

23          Or the opposite, if the patient lives outside of what

24    would normally be the service area for the pharmacy, you

25    know, why are you here.  And sometimes that's enough to

**Hiland - (Direct by Fumerton)**

```
 1    satisfy the pharmacist's question.

 2    Q    And then the next resource is listed as market Health

 3    and Wellness director.  We talked with the jurors about this

 4    earlier, correct?

 5    A    Yes.

 6    Q    And then Health and Wellness, Practice Compliance, and

 7    that's what you were describing earlier as well; is that

 8    right?

 9    A    Yes.

10    Q    Are Walmart pharmacists expected to use all of these

11    resources?

12    A    They should exercise their judgment and use whatever

13    resources they need to be able to make the judgment.

14    Q    I want to talk about some specific POMs now.

15         Do you have a sense of how many individual sections

16    are within the Pharmacy Operations Manual?

17    A    I don't know today.  At one time, in around 2008, we

18    had over 200.

19    Q    We're not going to look at all 200 today, but I want

20    to focus on a few of them.

21         Can you please turn to what has been marked as -- or

22    what is behind Tab 27.

23         And for the record, this is WMT-MDL-00318.

24         Do you recognize this document, Ms. Hiland?

25    A    Yes.
```

**Hiland - (Direct by Fumerton)**

 1   **Q**    And could you please describe what it is to the jury.

 2   **A**    So this is POM 20, which is in our first section of

 3   our policy manual, orientation.  And it talks about what the

 4   pharmacist's responsibility is and what Walmart's

 5   expectations are for them working in a Walmart pharmacy.

 6   **Q**    And in the bottom left-hand corner I see there's a

 7   date, June 2015.

 8   **A**    Yes.

 9   **Q**    Do you see that?

10          What does that signify?

11   **A**    That's generally the date that the policy was revised

12   or it's a working date for the version.

13   **Q**    Are Walmart's policies revised frequently?

14   **A**    Yes.  We -- I think, again, as -- going back to at

15   least 2008, we've had a review schedule so that each policy

16   is reviewed at least annually and kept track of that review.

17   **Q**    You mentioned this particular one indicates it was

18   revised on June 2015.  Was this a new policy at that time?

19   **A**    No.

20   **Q**    And does this policy still exist?

21   **A**    Yes.

22   **Q**    Can you read the second paragraph under the

23   introduction.

24   **A**    "In addition, professional judgment is an important

25   element of any pharmacist's practice.  Not all situations

1    and decisions are clearly outlined in federal and state law,

2    and federal and state law do not address every situation in

3    a straightforward manner.  Pharmacists must exercise sound

4    professional judgment in meeting the standard of care to the

5    patient and in making many decisions in the pharmacy."

6    **Q**    And we're not going to go through this entire policy,

7    but generally speaking, what is this policy intended to do?

8    **A**    It's intended for -- to set the tone for what the

9    expectations are, to practice as a Walmart pharmacist, and

10   to outline some of those expectations.

11   **Q**    Broadly speaking, how are the Walmart pharmacy

12   responsibilities broken out in this document?  I think it

13   starts down at the bottom of the page.

14   **A**    So there's a section that is detailed "Responsibility

15   to the patient," and then "Responsibility to other

16   healthcare providers," and then finally Responsibility to

17   Walmart.

18   **Q**    And can you read the -- if we go to the last page, can

19   you read the conclusion of this document?

20   **A**    "Wal-Mart Stores, Inc., supports pharmacists who

21   exercise sound and appropriate professional judgment.

22   Professional judgment must be used to provide the best

23   quality care for our patients at all times."

24   **Q**    Thank you.  You can put that document away.

25        And can you turn to -- we're going to switch to

 1    another policy -- to Tab 11.

 2          And for the record, this is WMT-MDL-00134.

 3    **A**    I have it.

 4    **Q**    Do you recognize this document?

 5    **A**    Yes.

 6    **Q**    Please describe it for the jury.

 7    **A**    So this is POM 1311.  It's under the Practice

 8    Compliance section of the policies, and it's entitled

 9    "Corresponding Responsibility-Proper Prescriber-Patient

10    Relationship."

11    **Q**    And if you look in the bottom left-hand corner, is

12    there a date associated with it?

13    **A**    Yes.  February 2017.

14    **Q**    And what does that signify?

15    **A**    That would be the revision date for this policy.

16    **Q**    And how are you familiar with this policy?

17    **A**    So the original policy was one that I developed.

18    **Q**    Do you recall when that was developed?

19    **A**    I think it was 2009.

20    **Q**    And I believe the jury actually saw a version of this

21    before, but we're going to spend a little bit of time with

22    this document.

23          At a high level, what information does this policy

24    convey?

25    **A**    So this is describing corresponding responsibility,

**Hiland - (Direct by Fumerton)**

1    reminding pharmacists of their corresponding responsibility.

2         In this version, it's calling out some of the red

3    flags and then directing pharmacists what to do as they

4    evaluate those red flags.  And then this is the version that

5    goes on to describe blanket refusals to fill in our

6    corporate blocks of prescribers.

7    **Q**    I want to talk about that a little bit more in-depth

8    in just a second, but before we get there, are the red flags

9    that are listed in this particular document similar to the

10   ones that we were just looking at from 2013?

11   **A**    They're similar, but I believe they've been updated

12   somewhat in this version.

13   **Q**    If a pharmacist identifies one or more red flags for a

14   specific prescription, what does POM 1311 instruct them to

15   do?

16   **A**    That they should work to resolve the red flag, and if

17   they cannot, that they should refuse to fill and then file a

18   refusal to fill report.

19   **Q**    So let's talk about refusals to fill.

20        On page 5 of the policy -- I'm sorry.  On page 4 of

21   the policy -- we're going to do a high level overview here

22   and circle back -- I see a reference to refusing to fill a

23   prescription.

24             MS. FUMERTON:  Can you just highlight that?

25   **A**    Yes.

**Hiland - (Direct by Fumerton)**

1    **Q**    And then if we go to page 5, there's a reference to

2    blanket refusal to fill.

3        And then on page 6, I see a reference to "Centrally

4    Blocked Prescribers."

5        The jury has heard some references to those terms, but

6    I would like you to explain to them how each of these terms

7    is used at Walmart.

8        So let's start with refusal to fill, what is that?

9    **A**    So a refusal to fill is the pharmacist's individual

10   exercise of their professional judgment related to a

11   specific prescription, where they've determined that they

12   would not dispense the prescription.  They made a

13   determination that it has not been -- they made a

14   determination it has not been issued for a legitimate

15   medical purpose or they've identified red flags that they

16   cannot resolve and, therefore, are exercising their judgment

17   not to dispense.

18   **Q**    Have Walmart pharmacists always had the ability to

19   refuse to fill a prescription that they felt were not

20   legitimate for whatever reason?

21   **A**    Yes.

22   **Q**    Is that true since you were a Walmart pharmacist in

23   the late '80s and early '90s?

24   **A**    Yes.

25   **Q**    What is a blanket refusal to fill?

```
 1    A      So a blanket refusal to fill is --

 2                MR. WEINBERGER:  Your Honor, I'm sorry, can we

 3    have a side bar for just a moment?

 4                (At side bar at 11:13 a.m.)

 5                MR. WEINBERGER:  Your Honor, I wanted to alert

 6    you to an issue that involves hearsay issues.

 7          You will recall that Mr. Nelson testified that there

 8    was -- that he had learned that some boards of pharmacies

 9    refused to allow or prohibited blanket refusals to fill.

10                THE COURT:  You mean that as his reason or the

11    company's reason for refusing to allow --

12                MR. WEINBERGER:  Correct.  And as the evidence

13    has developed in this case, any communication from the Board

14    of Pharmacy, and I think there's -- Walmart claims that it's

15    Texas and a couple of other states, is pure unadulterated

16    hearsay.

17          There is no document from any Board of Pharmacy that

18    confirms that.  There are some internal Walmart memos about

19    that.  There's a witness by the name of Deborah Mack who

20    testified that she knew that there were some Boards of

21    Pharmacies that prohibited it, but she couldn't identify the

22    person, the date, or any document that reflected that.

23          So I just wanted to make sure that we don't get into

24    that area with this witness when she starts talking about

25    blanket refusals to fill and when they were or were not
```

 1    allowed by some unknown person.

 2              THE COURT:  Well, look, I don't know what

 3    she's going to say.  This document, I don't think

 4    Ms. Fumerton's pointed out yet, it's February of 2017.  I

 5    think it's been testimony from Mr. Nelson that sometime in

 6    2017 the Walmart policy changed --

 7              MR. WEINBERGER:  Correct.

 8              THE COURT:  -- to permit blanket refusals to

 9    fill.  He didn't give a reason for why it changed.  He said

10    it changed.  Well, here it is.

11         You know, this witness -- if the witness knows, and

12    presumably she does know, that this was a change in 2017,

13    and she knows why Walmart changed the policy, she can say

14    it.

15              MR. WEINBERGER:  Well, as long as it's not

16    based upon some hearsay statement from some Board of

17    Pharmacy who's not testifying in this case.

18              THE COURT:  Well, she says that she did it as

19    a result of -- she can testify as to why Walmart did it, and

20    if Walmart did it as a result of a communication from

21    someone, she can say it.  If she can't substantiate it by a

22    document, that can be used to impeach her.  But she's

23    allowed to say, if she knows, why the company changed its

24    policy.  And if it was based on a communication from

25    someone, she can say that's my -- that's why we did it.

1           MR. WEINBERGER:  If it is a -- if, as you've

2     stated, it is a communication from someone, that's hearsay.

3           THE COURT:  Well, the fact that she got a

4     communication is not hearsay.  If she can't provide any

5     proof of it, that's going to impeach her.  You can

6     cross-examine her on that; you know, was this in writing,

7     was it over the phone?  And if she doesn't know, she looks

8     pretty bad.

9          But she can testify, a knowledgeable corporate witness

10    can testify why she or the corporation created a policy or

11    changed a policy.  And if it was based on something that

12    someone else said or did, she can say that.  She can't

13    relate the communication.  That's hearsay.

14          MR. LANIER:  And that's the key, Your Honor.

15    She can't give the context -- I mean, give the content --

16          THE COURT:  No, she can't give the content,

17    but she can say, you know, this is -- we got a

18    communication, it was based on a communication we got from

19    someone, and she can say that, because that's -- that

20    explains why they did it.

21          The reason why they did it is not hearsay.  The

22    communication itself, the contents of the communication,

23    would be hearsay.

24          MR. DELINSKY:  Your Honor, before we depart on

25    this issue, this is an issue that other defendants have a

1    running interest in.

2        This isn't hearsay because it goes to state of mind;

3    or if it is hearsay, then we have to strike from the record

4    all the CVS settlements that were admitted into evidence.

5    The basis Your Honor admitted those settlements was because

6    they provide notice and provide a state of mind, evidence of

7    a --

8            THE COURT:  Listen, I said if the witness

9    believes that the reason Walmart created a policy in, when,

10   2010, or changed the policy in 2017, was it communication

11   from someone else?  She can say, We got a communication from

12   Ohio Board of Pharmacy or DEA, or DOJ, or whatever.  She

13   can't relate the contents of it.  That's hearsay.

14           MR. DELINSKY:  But the plaintiffs have been

15   permitted to relate the contents of the settlements, Your

16   Honor, and that's the difference.  It's the same kind of

17   evidence because it goes, as Your Honor has held --

18           THE COURT:  Well, if she actually has the

19   document, if it was in writing, the document would be

20   produced.

21           MS. FUMERTON:  Your Honor, whether the

22   documents or whether the communication was in writing or

23   whether it was orally is irrelevant to whether or not --

24           THE COURT:  If she wants to testify, I had a

25   conversation on February 10, 2017, with someone from the

1    Ohio Board of Pharmacy, she can say that with that detail.

2    I'm not sure she can, you know, give the exact words, but if

3    it was said to her, she might be able to.  I mean, if she's

4    going to give it with that precision, that she's the one who

5    had a communication with someone from the Ohio Board of

6    Pharmacy who said, Look, you can't have blanket refusals,

7    she can say, I had that conversation.

8              MS. FUMERTON:  And Your Honor, obviously the

9    statements -- and I think you're in the right direction on

10   this -- are not being offered for the truth of the matter

11   asserted, but it does explain why Walmart had a policy and

12   why Walmart policies evolved.

13             THE COURT:  As I said, if she's the one who

14   had a communication, she can say on February 10 I spoke to

15   someone at the Ohio Board of Pharmacy, and here's his or her

16   name, all right?  And that's why we did what we did.  Bingo,

17   all right?

18        If she's the one.  I don't think she can relate a lot

19   of details from someone else to her.

20             MS. FUMERTON:  Well, Your Honor, I think there

21   is a little bit of a fine line there.  She is one of the

22   people who has had personal conversations, but she also

23   worked very closely with other people, Debbie Mack being one

24   of them, who provided deposition testimony explaining all

25   the different boards of pharmacies with whom she had this

1    conversation.

2              THE COURT:  Well, I'm not going to allow her

3    to testify to the details and contents of some phone

4    conversation that Debbie Mack said.

5              MS. FUMERTON:  Sure.

6              THE COURT:  Again, if she says that Walmart

7    changed the policy because of the communication from the

8    Ohio Board of Pharmacy, she can say that.

9              MS. FUMERTON:  Yes, Your Honor.  Understood.

10             (In open court at 11:20 a.m.)

11   BY MS. FUMERTON:

12   Q    Ms. Hiland, now I have to remember where we were.  I

13   think we were about to talk about blanket refusals to fill.

14        What is a blanket refusal to fill?

15   A    A blanket refusal to fill is a decision made by a

16   pharmacist that based on the experience that they've had

17   with the pattern of prescribing of a specific prescriber,

18   that they will not fill any future controlled substance

19   prescriptions for that prescriber.  So they're making a

20   decision about anything that's presented in the future based

21   on the experience they've had in the past.

22   Q    Does Walmart allow blanket refusals today?

23   A    Yes.

24   Q    Has Walmart always had a process for blanket refusals?

25   A    No, we have not.

1    **Q**     Which of the Walmart policies previously prohibited

2    blanket refusals?

3    **A**     It was this policy, 1311.

4    **Q**     When was the language prohibiting blanket refusals to

5    fill removed from POM 1311?

6    **A**     In 2015.

7    **Q**     Why did Walmart prohibit blanket refusals prior to

8    2015?

9                    MR. WEINBERGER:  Objection.

10                   THE COURT:  Well, why don't you first ask this

11   witness if she knows.

12   **Q**     Ms. Hiland, do you know why Walmart prohibited blanket

13   refusals prior to 2015?

14   **A**     Yes.

15   **Q**     Why?

16   **A**     So our understanding of guidance from boards of

17   pharmacy --

18                   MR. WEINBERGER:  Objection.

19                   THE COURT:  Let's go on the headphones.

20                   (At side bar at 11:22 a.m.)

21                   THE COURT:  All right.  Ms. Fumerton, what do

22   you believe the witness's answer is going to be?

23                   MS. FUMERTON:  Well, Your Honor --

24                   THE COURT:  What -- you've talked to her.

25   What do you believe she's going to say?

1              MS. FUMERTON:  I believe that she is aware of

2     conversations that Walmart had.  I wasn't going to elicit

3     specific information about the conversations but simply that

4     Walmart had an understanding that various boards of

5     pharmacies prohibited blanket refusals to fill or disfavored

6     them, and communicated that to Walmart.

7          We saw that language in numerous documents that

8     Mr. Lanier used with Mr. Nelson, so this is not a new

9     concept.  That was repeatedly stated over and over again

10    through Mr. Lanier's questioning, and so I think she gets

11    the opportunity to explain that.

12             THE COURT:  Is she going to indicate -- were

13    any of these communications to her?

14             MS. FUMERTON:  Your Honor, I do believe that

15    she had some communications specifically or they were

16    communicated to people that were reporting to her.

17             THE COURT:  Why don't we start with that.  Why

18    don't we --

19             MS. FUMERTON:  Your Honor, I simply was going

20    to ask her, you know, did -- you know, why, and she could

21    say that she understands, you know, that boards of

22    pharmacies prohibit it, and I can say what's the basis for

23    your understanding.

24             MR. WEINBERGER:  Your Honor, that's putting

25    the cart before the horse.

          1                THE COURT:  No, yeah, I -- why don't you ask

          2    her this.  The question was why, all right?  So --

          3                MS. FUMERTON:  I'm also trying not to lead

          4    her, Your Honor.

          5                THE COURT:  Why don't you say this.  Why don't

          6    we start with this.  Let's go one step at a time.

          7         Ask her if she knows who made the decision, all right?

          8    Who made the -- why don't we go step by step.

          9         Does she know when the first POM that prohibited

         10    blanket refusals, the first version of the POM 1311 that

         11    prohibited blanket refusals, was?

         12                MS. FUMERTON:  Yes, she actually testified

         13    just a few minutes ago that she wrote -- was involved in

         14    writing that policy.

         15                THE COURT:  All right.  Why don't you identify

         16    that, all right?  And if she wrote it, that's fine.  Then we

         17    can ask her, all right, why did she write it.  And if she

         18    starts with "My understanding from," stop her and say "Did

         19    you have any communication with any Ohio Board of Pharmacy,"

         20    and see if she did.  If she says yes, you can ask her which

         21    one and when.

         22                MR. WEINBERGER:  Well, what's interesting,

         23    Your Honor, is I don't believe there's any evidence that

         24    she -- that anyone ever had any conversation with the Ohio

         25    Board of Pharmacy.

1            THE COURT:  Well, find out, Mr. Weinberger.

2   Maybe there is.  Maybe she's going to say that.

3            MR. WEINBERGER:  I don't think she is.  She's

4   going to talk about a couple other states, but not Ohio.

5            THE COURT:  Fine.  If she identifies another

6   state, that's fine.  She can say, I had a conversation with

7   Nebraska Board of Pharmacy in 2005 or whatever.  We'll find

8   out what -- first, what she had, all right?  And then if she

9   had none, if the basis is a communication that was made by a

10  specific Board to someone else at Walmart, she can say

11  that's the basis, because again, she's the one who wrote the

12  policy, so she can say why she did it.  I'll allow it.

13       If she's the one who wrote that first policy that's

14  prohibited blanket refusals, it's not hearsay as to why she

15  did it.  That's her firsthand knowledge, her firsthand basis

16  for her own action.  She can say that.

17            (In open court at 11:26 a.m.)

18  BY MS. FUMERTON:

19  **Q**    Ms. Hiland, we'll get through blanket refusals to

20  fill, I promise.

21       All right.  Let's circle back.  I think you testified

22  to this, but I know we've been taking some sidebars here.

23       So going back to POM 1311, I believe you testified

24  that this POM 1311 previously prohibited blanket refusals.

25  Is that right?

1    **A**      Yes.

2    **Q**      And that you were -- do you recall when that language

3    was included in POM 1311?

4    **A**      It was included starting with the first version in

5    2009.

6    **Q**      Did you write that first version of POM 1311 in 2009?

7    **A**      Yes.

8    **Q**      Why did you include language that indicated blanket

9    refusals to fill were prohibited?

10                    MR. WEINBERGER:  Objection.

11                    THE COURT:  Overruled.

12   **A**      We had had a pharmacist --

13                    MR. WEINBERGER:  Objection.

14                    THE COURT:  Well, overruled, so far.

15   **A**      So we had a pharmacist who was sanctioned, I

16   believe --

17                    MR. WEINBERGER:  Objection, Your Honor.

18                    THE COURT:  Let's on the headphones.

19                    (At side bar at 11:28 a.m.)

20                    THE COURT:  All right.  Ms. Fumerton, this was

21   not anything that you -- when I asked you how do you think

22   she's going to answer, I didn't -- you didn't say anything

23   that she was going to relate that some pharmacist was

24   apparently disciplined.

25                    MS. FUMERTON:  So, Your Honor, that's the

1   foundation for it, I believe it's the Indiana Board of

2   Pharmacy, for issuing refusal to fill from any particular

3   prescriber, and she has personal knowledge for that, and

4   that's why it was one of the bases for it.

5              THE COURT:  Are you saying that the Indiana

6   Board of Pharmacy in 2009 disciplined a Walmart pharmacist

7   for having a blanket refusal to fill of a prescriber in

8   Indiana?

9              MS. FUMERTON:  I believe it was before 2009,

10  Your Honor.  I can't recall the specific date, but

11  Ms. Hiland would know, or at least the approximate time.

12             THE COURT:  Have you provided the documents of

13  this discipline to the plaintiffs?  Do they know what this

14  is about?

15     Mr. Weinberger and Mr. Lanier, do we know what this is

16  about?

17             MR. WEINBERGER:  No.  Your Honor, I think we

18  need to have this witness voir dired outside the presence of

19  the jury.

20             MS. FUMERTON:  Your Honor, this witness

21  testified as Walmart's 30(b)(6) witness.  Mr. Weinberger

22  asked her questions about refusal to fill and blanket

23  refusals to fill, and he could have --

24             THE COURT:  Wait a minute.  Darn it, this is

25  exactly why you're supposed to turn over documents.  If a

**Hiland - (Direct by Fumerton)**

```
1    discipline of a Walmart pharmacist in Indiana in 2006, '7,

2    '8, '9, whatever, was the basis for the policy, this

3    document should have been turned over.

4             MS. FUMERTON:  Your Honor, two points here.

5    One, she hasn't been able to get out two words, so she

6    hasn't been able to explain her bases, but that was one of

7    them.  There was also several conversations.

8         As I said, plaintiffs have, and this is why they

9    didn't want Ms. Mack's deposition to be played, because

10   Ms. Mack goes into detail about all the 17 different boards

11   of pharmacy that she had conversations with that told her

12   that blanket refusals were --

13            THE COURT:  Wait a minute.  You could play

14   Ms. Mack's deposition.

15            MS. FUMERTON:  Yes.  And Your Honor, Ms. Mack

16   reported to Ms. Hiland, and Ms. Hiland was also involved in

17   some other conversations.  It wasn't just one singular act

18   that --

19            THE COURT:  Hold it.  I thought this is where

20   we were going, that you were going to -- Ms. Hiland was

21   going to say that either that she had personal

22   communications with one or more state boards of pharmacy or

23   someone under her direction had them and reported to her,

24   and I would allow that general testimony, but we're now into

25   something else.
```

**Hiland - (Direct by Fumerton)**

1          MS. FUMERTON:  Well, Your Honor, respectfully,

2     they're related.  It's not something else.  And this is how

3     she explains why she wrote the policy in 2009, that blanket

4     refusals to fill were prohibited.

5          THE COURT:  Do you have documents that reflect

6     this discipline of a Walmart pharmacist in -- what year was

7     it?

8          MS. FUMERTON:  Your Honor, I cannot recall the

9     year that that occurred.

10         THE COURT:  Does this witness have the

11     documentation?  Has she brought -- I mean, these documents

12     haven't been turned over to the plaintiffs?

13         MS. FUMERTON:  Your Honor, I don't know that

14     the document still exists from over a decade ago with

15     respect to this.  I certainly know that with respect to the

16     boards of pharmacy communications, those were done orally.

17     This was a question that plaintiff asked in depositions, and

18     this was explained to them that these conversations were

19     oral.  They were not documents.  There are internal Walmart

20     documents reflecting those communications.  They're not

21     documents between, to my knowledge --

22         THE COURT:  Let's just start out -- is she

23     going to relate a communication that she had with someone

24     from the Indiana Board of Pharmacy, that she had herself?

25         MS. FUMERTON:  Your Honor, I don't know if she

 1    had the conversation --

 2                    THE COURT:  Why don't we start just one step

 3    at a time.  Ask her if she had any communications with any

 4    outside party that led her to create that policy.  Let's

 5    just --

 6                    MS. FUMERTON:  Understood, Your Honor.  We can

 7    start there.

 8                    THE COURT:  Then we can see where it goes.

 9    I'll go one question at a time.

10                    MS. FUMERTON:  Yes, Your Honor.

11                    (In open court at 11:33 a.m.)

12    BY MS. FUMERTON:

13    **Q**    Ms. Hiland, speaking about blanket refusals to fill, I

14    think you just testified that you wrote the policy in 2009

15    that stated that blanket refusals to fill were prohibited.

16         Did you have any conversations with any outside

17    individuals that informed that understanding?

18    **A**    Yes.

19    **Q**    Can you please identify the individuals or the

20    entities with whom you had those conversations?

21    **A**    So I personally spoke to the Texas Board of Pharmacy,

22    the executive director and the attorney for the Board of

23    Pharmacy, regarding the ability of our pharmacists to

24    blanket refuse prescriptions.

25    **Q**    What were their names?

**Hiland - (Direct by Fumerton)**

 1   **A**    It would have been Gay Dodson and Kerstin Arnold.

 2   **Q**    When was this?

 3   **A**    So it was before the policy was written.  The best

 4   recollection that I have is around 2007.

 5   **Q**    And you covered Texas as one of your areas at the

 6   time, correct?

 7   **A**    I did, yes, and I was a regional -- I was a regional

 8   manager for Texas as well.

 9   **Q**    Were there any other conversations that you had with

10   outside individuals that informed your understanding and was

11   the basis for you writing that statement in 2009?

12   **A**    I didn't have a conversation, but I supervised the

13   team when we had another interaction with the Board of

14   Pharmacy, and so I got the report of the other interaction

15   from the Board of Pharmacy.

16   **Q**    From whom did you receive that report?

17   **A**    I believe it would have been Tim Koch.

18   **Q**    And what did -- who did Tim Koch speak with on this

19   issue?

20                  MR. WEINBERGER:  Objection.

21                  THE COURT:  Overruled.  If Ms. Hiland knows

22   who Mr. Koch spoke with and the approximate date, then she

23   can relate it.

24   **A**    So my recollection and the experience that also added

25   to developing this policy was that we had -- so --

**Hiland - (Direct by Fumerton)**

 1                    THE COURT:  Let's stick with the question,

 2     ma'am.

 3     **A**     So it would have been I believe it was the Indiana

 4     Board of Pharmacy that fined one of our pharmacists for

 5     blanket refusing to fill.

 6                    MR. WEINBERGER:  Objection.  Move to strike.

 7                    THE COURT:  The jury is to disregard that.

 8          Ma'am, you were asked about -- you started to say

 9     Mr. Koch spoke to someone.  Who did he speak to, and when?

10                    THE WITNESS:  It would have been at a Board of

11     Pharmacy hearing in Indiana, and it would have been around

12     the same time frame, 2006 or 2007.

13     BY MS. FUMERTON:

14     **Q**     And just so that the record is clear, what did

15     Mr. Koch convey to you?

16                    MR. WEINBERGER:  Objection.

17                    THE COURT:  Sustained.

18     **Q**     What did you learn that informed the basis for you

19     including the blanket refusal to fill prohibition from

20     Mr. Koch?

21                    MR. WEINBERGER:  Objection.

22                    THE COURT:  Sustained.

23     **Q**     You've testified about these conversations -- or about

24     this information that you learned.  Are those the bases for

25     the inclusion of the blanket refusal to fill prohibition in

```
 1   2009?

 2                MR. WEINBERGER:  Objection.

 3                THE COURT:  Overruled.

 4   A     Yes.

 5   Q     Are you aware of any other communications with other

 6   boards of pharmacies that informed your inclusion of the

 7   blanket refusal to fill policy -- or the blanket refusal to

 8   fill language in the policy you wrote?

 9   A     No.

10   Q     And just so, again, the record is clear since we've

11   had many breaks during this testimony with respect to what a

12   blanket refusal to fill is, did Walmart remove that

13   prohibition from its POM 1311 at some point in time?

14   A     Yes.

15   Q     And when was that?

16   A     In 2015.

17   Q     Okay.  I also want to be very clear about something.

18         You earlier testified that a pharmacist can refuse to

19   fill any prescription from any prescriber.  Is that correct?

20   A     Yes.

21   Q     Is there a limit on how many times a pharmacist can

22   refuse to fill from a particular prescriber?

23   A     No.

24   Q     If a pharmacist wanted to refuse to fill every single

25   controlled substance prescription from a particular
```

**Hiland - (Direct by Fumerton)**

1    prescriber, could they do so?

2    **A**    Yes.

3    **Q**    And for how long has that been true?

4    **A**    In my experience, for the entire time I've been with

5    Walmart.

6    **Q**    Since this policy that we're looking at in February

7    2017, when Walmart had a formal process for reporting

8    blanket refusals to fill, are you aware of any feedback from

9    boards of pharmacy?

10             MR. WEINBERGER:  Objection.

11             THE COURT:  Overruled.

12   **A**    Yes.

13   **Q**    What are you aware of?

14             MR. WEINBERGER:  Objection.  Same issue, Your

15   Honor.

16             THE COURT:  Let's start out, ma'am, were any

17   of these communications with you?

18             THE WITNESS:  No.

19             THE COURT:  Let's go on the headphones again.

20             (At side bar at 11:40 a.m.)

21             THE COURT:  All right.  At this point, I think

22   if it's not tied to any action she made, then it's hearsay.

23   I don't know -- I mean, the reason I allowed the other

24   questions is that this was an action that Ms. Hiland took,

25   and I allowed her to explain the basis for her action.  You

```
 1    haven't asked her, Ms. Fumerton, has she done anything with

 2    respect to POM 1311 since 2017.  If you do and she says, "I

 3    did, I did this change," and it was because it was from some

 4    communication from some state Board of Pharmacy, I'll allow

 5    her to say that that was the reason.  But there's no --

 6    there's no predicate for these questions.

 7              MS. FUMERTON:  Understood, Your Honor.  I'll

 8    move on.

 9              THE COURT:  Okay.

10              (In open court at 11:41 a.m.)

11    BY MS. FUMERTON:

12    Q    Ms. Hiland, I want to turn to corporate blocks now.

13         What is a corporate block?

14    A    A corporate block is a decision by the organization to

15    block the ability of our pharmacists to fill any controlled

16    substance prescription from a prescriber.

17    Q    For how long has Walmart -- is a corporate block also

18    sometimes referred to as a central block?

19    A    Yes.

20    Q    For how long has Walmart had a policy in place to

21    centrally block prescribers?

22    A    I believe January of 2017.

23    Q    And is that the process that's outlined on page 6 of

24    this policy?

25    A    Yes.
```

1   **Q**    Do you understand why Walmart did not have a central

2   block process prior to that time?

3   **A**    Well, I think it's a complicated issue and one that we

4   weighed very carefully.  To completely block a prescriber

5   anticipates that, you know, none of the patients or the

6   prescriptions that they write are valid, and sometimes

7   that's just not the case.  And so it wasn't something that

8   we entered into lightly.

9   **Q**    Since instituting the corporate block process, are you

10  personally aware of any resistance it has received from any

11  state boards of pharmacy?

12  **A**    Yes.

13  **Q**    Has any state board of pharmacy taken action against

14  Walmart for blocking a prescriber?

15  **A**    Yes.

16  **Q**    You said it's a decision not to be taken lightly.  Why

17  don't you just err on the side of corporately blocking or

18  blanketly refusing a prescriber if there are concerns with

19  that prescriber's controlled substances prescription

20  practices?

21  **A**    Yeah, I think it's an issue, again, of making a

22  judgment that none of the prescriptions that the prescriber

23  is issuing are valid.  When we block a prescriber, they're a

24  state-licensed prescriber, they hold a DEA registration, and

25  so one of -- one of the first I guess priorities that we

 1   have is to provide access to care.  And so it's making a

 2   decision that every patient and every prescription is not

 3   valid, and it's blocking access, even in the situation where

 4   some of those prescriptions may actually be valid.

 5        And so, again, it's a big decision, and it's an

 6   important decision.  And so, again, it's weighed very

 7   carefully.

 8   **Q**    I've got 15 minutes to lunch, and I am going to try to

 9   plow through a few policies to get everybody to lunch.

10             THE COURT:  Well, we'll get to lunch either

11   way.

12             MS. FUMERTON:  Fair enough, Your Honor.

13             THE COURT:  That's an editorial comment.  You

14   have to disregard it.

15             MS. FUMERTON:  We'll look quickly at a couple

16   of the other policies.

17        Can you please turn to Tab 6 in your binder.

18        And for the record, this is WMT-MDL-00142.

19   BY MS. FUMERTON:

20   **Q**    Do you recognize this document?

21   **A**    Yes.

22   **Q**    And what is it?

23   **A**    It is our POM 1703, and it is related to how to handle

24   forged or fraudulent prescriptions.

25   **Q**    And what steps does -- well, let me ask you first,

```
 1    does it list out potential indicators of fraudulent, forged,

 2    or altered prescriptions?

 3  A      Yes.

 4  Q      And this particular version is dated September 2016;

 5    is that right?

 6  A      Yes.

 7  Q      Did this exist prior to September 2016?

 8  A      Yes.

 9  Q      Does it exist today?

10  A      Yes.

11  Q      And what steps does POM 1703 at a very high level

12    require a pharmacist to take with respect to a prescription

13    with indicators of fraud?

14  A      To evaluate a prescription, and if an -- if there are

15    indications that the prescription has been forged or is

16    fraudulent in any way, to reach out to the prescriber for

17    validation.  And then once they receive that validation that

18    the prescription was not issued by the prescriber, there are

19    steps to follow to contact law enforcement and then also

20    report the refusal to fill.

21  Q      Okay.  Please turn to Tab 15 of your binder.  This is

22    going to be the policy speed-round.

23          And for the record, this is WMT-MDL-00568.

24          Are you there, Ms. Hiland?

25  A      Yes.
```

**Hiland - (Direct by Fumerton)**

1   **Q**    Please -- I don't think we're quite there on the

2   screen yet.  There we go.

3        Could you please describe for the jury what this

4   document is?

5   **A**    This is our POM 1316, and it is around the use of

6   prescription monitoring programs.

7   **Q**    And looking down in the left-hand corner, what is the

8   date of this document?

9   **A**    February 2010.

10  **Q**    And I see there's a, in parentheses, an SMH next to

11  that.

12       What does that refer to?

13  **A**    Those are my initials.

14  **Q**    I won't ask you your middle name, but that's you,

15  Susanne Hiland.

16       And what does that indicate?

17  **A**    It's the person that in this case, I believe this was

18  the original policy, who authored it or who was responsible

19  for the updates.

20  **Q**    And I don't think if we look back at all the other

21  policies, and we don't need to take time to do that now,

22  there aren't always initials by that, right?

23  **A**    No, once we started to use -- it was about the time

24  that we started to use the Archer system.  The tracking and

25  the responsibilities are inherent in the way that the Archer

**Hiland - (Direct by Fumerton)**

1  system works.

2  **Q**   And has this document been revised over time?

3  **A**   Yes.

4  **Q**   But does a version of it still exist today?

5  **A**   Yes.

6  **Q**   And looking at this document, I want to just focus

7  down on the "How to access PMP databases."

8       And it states -- no, one more below that.

9       It says, "PMP data is accessible via state-specific

10  PMP websites.  Click here for specific PMP information."

11       What is that telling the pharmacist?

12  **A**   That how to access their individual states.  It would

13  take them out to a state listing that showed how to access

14  individual states that were active at that time.

15  **Q**   Did state PMP programs come online at various times?

16  **A**   Yes.

17  **Q**   Generally speaking, what was Walmart's policy when a

18  state PMP became available in a particular state?

19  **A**   So just immediately prior to this time, we used Wire

20  postings to notify state -- pharmacists in states that had

21  active PMPs.  And through this policy we -- we made access

22  to those PMPs available as they came online.

23  **Q**   And we looked at one of those earlier this morning

24  specific to the State of Ohio; is that right?

25  **A**   Yes.

**Hiland - (Direct by Fumerton)**

1   **Q**    And that was in 2011 that Walmart issued that guidance

2   to its pharmacists?

3   **A**    Yes.

4   **Q**    Okay.  Please turn to Tab 12.

5          And for the record, this exhibit is WMT-MDL-00575.

6          Do you recognize this document, Ms. Hiland?

7   **A**    Yes.

8   **Q**    And if you look down in the lower right-hand corner,

9   we see a date and we see your initials again; is that right?

10  **A**    Yes.

11  **Q**    And what is the date of this particular document?

12  **A**    March 2011.

13  **Q**    Does this POM still exist today?

14  **A**    Yes.

15  **Q**    And what is this POM -- and I apologize if it's

16  already been said, but this is POM 1317; is that right?

17  **A**    Yes.

18  **Q**    And what does this POM convey to pharmacists?

19  **A**    It talks about considerations and responsibilities for

20  prescriptions written by out-of-state prescribers.

21  **Q**    And let's look at the paragraph on this page for best

22  practices.

23         And can you please read the first paragraph and then

24  the second paragraph; so the first paragraph that's

25  highlighted.

**Hiland - (Direct by Fumerton)**

1   **A**   "Pharmacists have a duty to ensure that a prescription

2   was issued for a legitimate medical purpose to a patient

3   with an appropriate doctor-patient relationship.

4   Pharmacists must not dispense a prescription that they know

5   or believe, in the exercise of their professional judgment,

6   to be issued otherwise."

7   **Q**   And then the second paragraph underneath that.

8   **A**   "There are some reasons why a prescriber may issue a

9   legitimate controlled substance prescription to a patient

10   who does not reside in the same state.  Likewise, there are

11   legitimate reasons a patient from out of state may have a

12   need to fill a prescription in your pharmacy."

13   **Q**   Could you give an example of a situation in which it

14   could be legitimate for a prescription to be written by an

15   out-of-state prescriber?

16   **A**   Probably the one that I'm most familiar with in my

17   practice, I practiced in Florida, and we had winter

18   residents or snowbirds that would come from northern states,

19   and so I often had prescriptions that were coming from

20   out-of-state doctors.  And sometimes the address of the

21   patient would be listed as an out-of-state address, even

22   though they were local for part of the year.

23   **Q**   And if you knew that patient and you knew that they

24   wintered in Florida each year, would that even be a red flag

25   when you see that prescription from them?

1    **A**    No.

2    **Q**    And if we turn to the next page, you'll see something

3    that says "State-Specific restrictions for out-of-state

4    prescriptions."

5         Do you see that?

6    **A**    Yes.

7    **Q**    And what is that directing a Walmart pharmacist to?

8    **A**    So there were individual states that had specific

9    rules around out-of-state prescribers.  Not every state did.

10   So this was a link to the state requirement, where it

11   existed.

12   **Q**    And if you look down at "Additional resources," you'll

13   see there's POM 1311 and POM 1703 discussed.  Correct?

14   **A**    Yes.

15   **Q**    And those are two of the POMs that we just looked at?

16   **A**    Yes.

17   **Q**    And this particular document is from 2011, so does

18   that indicate to you that these were at least in existence

19   at 2011 as well?

20   **A**    Yes.

21   **Q**    They say you should never ask a question you don't

22   know the answer to, but I'm asking a question anyway.

23        This says Regulatory Affairs director, and it gives a

24   number.  Are you the Regulatory Affairs director?

25   **A**    That number was to my assistant.

1    **Q**    So how would the information or questions -- or how

2    would your assistant relay information to you?

3    **A**    So she would determine what state the pharmacist was

4    calling from, and then she would route it to the appropriate

5    director.

6    **Q**    And can we now turn to Tab 28.

7         For the record, this is WMT-MDL-03997.

8         Are you there, Ms. Hiland?

9    **A**    Yes.

10   **Q**    Do you recognize this document?

11   **A**    Yes.

12   **Q**    And what is it?

13   **A**    It is information about -- the title is prescriber

14   information, but it's information about the various

15   identification numbers that are assigned to physicians and

16   how to use them.

17   **Q**    And looking down in the left-hand corner, what is the

18   date of this particular version?

19   **A**    July 2014.

20   **Q**    Do you believe this was the first version of this

21   document?

22   **A**    I don't recall.

23   **Q**    What about do you know if it exists still today?

24   **A**    Yes.

25   **Q**    And what type of information is being conveyed in this

**Hiland - (Direct by Fumerton)**

1    policy?

2    **A**    So it directs the pharmacists about appropriate use of

3    the different numbers, some for billing, some for authority

4    to prescribe controlled substances, and then what the

5    different databases are that feed into Connexus, so that the

6    pharmacist knows where to go for additional information if

7    they have any question about those numbers or their

8    authority.

9            MS. FUMERTON:  So, Your Honor, I'm embarrassed

10   to say that I actually have one other section to turn to

11   that will take more than a few minutes, so it might make

12   sense to break for lunch now.

13           THE COURT:  Okay.  Very good.

14       Ladies and gentlemen, we'll take our noon recess.

15   Usual admonitions apply.  Have a good lunch, and we'll pick

16   up at 1:00 with the balance of Ms. Hiland's testimony.

17   Thank you.

18           (The jury is not present.)

19           MS. FUMERTON:  Your Honor, may Ms. Hiland be

20   excused?

21           THE COURT:  Yes.  Ms. Hiland, you're

22   definitely excused for lunch.

23           THE WITNESS:  Thank you.

24           THE COURT:  As is everyone.

25           (A luncheon recess was taken at 11:58 a.m.)

```
 1              A F T E R N O O N   S E S S I O N
 2                        - - - - -
 3                (In open court at 1:04 p.m.)
 4              MR. WEINBERGER:  Can I just raise something
 5   for the record?
 6              MR. MAJORAS:  I have something as well, Your
 7   Honor.
 8              THE COURT:  All right.  We can be seated then.
 9              MR. WEINBERGER:  Your Honor, at page 107 of
10   today's transcript Ms. Fumerton asked the following
11   questions of this witness:  Since instituting the corporate
12   block process, are you personally aware of any resistance it
13   has received from any state boards of pharmacy?"
14         I did not object because that appeared to be within
15   the parameters of what you set forth.
16         She answered:  Yes.
17         Next question:  Has any state Board of Pharmacy taken
18   action against Walmart for blocking a prescriber?
19         Her answer was:  Yes.
20         As you know, Walmart has produced a large quantity of
21   documents since Mr. Nelson's deposition was taken.  We have
22   not received any document reflecting any state Board of
23   Pharmacy taking action against Walmart for blocking a
24   prescriber, which is the way the question was asked and was
25   answered in the affirmative.
```

**Hiland - (Direct by Fumerton)**

1      If a state Board of Pharmacy has taken action, one

2    would think that there is some document that reflects that.

3             THE COURT:  One would think so, and you can

4    ask her.  And in nothing -- you know, if she doesn't have a

5    good answer, well, she'll be impeached by it.  Maybe there's

6    no document.  I don't know what her answer is.

7             MS. FUMERTON:  Your Honor, I can hand up the

8    document.  It's actually -- it's been produced.  It's

9    actually on our exhibit list.

10            THE COURT:  Well, what's the document?

11            MS. FUMERTON:  It's WMT-MDL-01334.  It's from

12   the -- this particular one is from the Wisconsin Examining

13   Board, and then we also have information from the Idaho

14   Board of Pharmacy as well, and that was WMT-MDL-01345.

15       And I don't have multiple copies.  I can hand Your

16   Honor my copy now.  Actually, I think we might have copies

17   someplace, but my trusted colleague is out of the room with

18   the witness, who would know where those are.  But I can hand

19   those to you.

20            THE COURT:  It's more important to hand them

21   to the plaintiffs.  They say they didn't have them.  I don't

22   know what's going on.

23            MR. LANIER:  Yeah, and my concern is if we're

24   getting into these very deeply, this is a trial within a

25   trial at this point, because, for example, the Idaho one is,

1    based on our Internet search, not looking at the document,

2    but it's one that concerns a person who actually was a

3    Walmart employee who had a Walmart-specific insurance issue.

4    And there was no explanation given to the Walmart employee

5    of why the Walmart stores were blocking.  The doctor wasn't

6    given a chance to respond.

7        There's a whole lot of issues that are involved in how

8    the corporate block process was in place.  And to devolve

9    this case into one where we're trying those issues,

10   especially with our time limitations, is I don't think a

11   proper use of this Court.  And it's certainly not the issue

12   in front of this jury that they're supposed to be

13   addressing.

14           MS. FUMERTON:  Your Honor, I'm pretty sure

15   these were produced, and I can confirm that, before

16   Ms. Hiland' 30(b)(6) issue.

17           THE COURT:  I'm going to move on.  I'm going

18   to charge both sides with all this time.  I'm moving on.

19   You can -- you know, if these documents weren't produced,

20   Walmart --

21           MS. FUMERTON:  Your Honor, they absolutely

22   were produced.

23           THE COURT:  All right.  The plaintiffs have

24   them and they can cross-examine Ms. Hiland with them.  I

25   don't know candidly how important it is what Walmart did in

1   2018 with this, with corporate blocks, but if it is, you

2   know, you can pursue it, both of you.

3        All right.  Mr. Majoras, there was something you

4   wanted to raise?

5             MR. MAJORAS:  Two issues.  The first, Your

6   Honor, actually is somewhat related to this.  We would like

7   to make an offer of proof as to what this witness would have

8   said if permitted to respond to the questions about the

9   information that motivated the change in policy.  We can do

10  that through a lawyer proffer.  If we were to do a voir dire

11  outside the jury's hearing, we'd want to do that quickly

12  just so that she can leave today.  So I don't know if the

13  Court has a preference.

14            THE COURT:  I mean, I allowed her to say that

15  she and/or her staff received communications from two boards

16  of pharmacy.

17            MR. MAJORAS:  I think in particular the issue

18  related to the Indiana, which she was not able to explore.

19       As I said, we could do a short attorney proffer, and

20  I'm just making that for the record, Your Honor.

21            THE COURT:  Well, why don't you give it to me.

22  What would she say and why do you think it would be

23  admissible, the details?

24            MS. FUMERTON:  So, Your Honor, she would say

25  that there was a pharmacist in Indiana who was disciplined

```
 1    by the Indiana state board for doing a blanket refusal, this

 2    time with respect to a patient.  But the same guidance was

 3    given, which was that you have to evaluate each individual

 4    prescription that comes before you.

 5              THE COURT:  So this pharmacist broke Walmart

 6    policy?

 7              MS. FUMERTON:  No, no -- well --

 8              THE COURT:  Well, yes.  It was a Walmart

 9    policy not to do it, so this pharmacist broke Walmart policy

10    and --

11              MS. FUMERTON:  Your Honor, it's a nuanced

12    issue.  This particular pharmacist, and I think Ms. Hiland

13    testified, there's always been the ability for a particular

14    pharmacist to refuse to fill any prescription.

15              THE COURT:  Right.

16              MS. FUMERTON:  This particular pharmacist had

17    refused to fill all prescriptions for a particular patient.

18    The Indiana Board of Pharmacy said, no, you can't do that,

19    you have to look at each individual prescription that comes

20    before you.  That information was conveyed to Mr. Tim Koch,

21    who was at that time reporting to Ms. Hiland, and relayed

22    that information.

23         It's one of the additional reasons in addition to sort

24    of the Texas Board of Pharmacy conversations that she had

25    personally.
```

1          She also --

2                    THE COURT:  Is there any documentation that

3      this pharmacist -- what discipline, what discipline did the

4      Board of Pharmacy impose on this pharmacist?

5                    MS. FUMERTON:  Your Honor, I don't know

6      specifically what that was.  I know it was communicated

7      from -- well, Ms. Hiland has told us about what was

8      communicated to her from her subordinate.

9                    THE COURT:  Well, is there any documents that

10     reflects this pharmacist and when he or she was disciplined?

11                   MS. FUMERTON:  Not that I'm aware of, Your

12     Honor.

13                   THE COURT:  Has Walmart produced any documents

14     about this discipline?

15                   MS. FUMERTON:  Not that I'm aware of, Your

16     Honor.

17                   THE COURT:  Well, that's another reason why I

18     don't think it's appropriate for her to go into it.  I mean,

19     if the documents had been produced, she can say, you know,

20     here it is, this pharmacist was disciplined, this pharmacist

21     had their license suspended.  That wouldn't be hearsay.

22     That would be a fact, okay?

23                   MS. FUMERTON:  And Your Honor, I know this is

24     stating the obvious, but obviously the only type of evidence

25     isn't documents.  I mean, her experience and communications

 1    is also evidence, and her testimony is evidence.

 2                THE COURT:  So she's going to say an Indiana

 3    pharmacist was disciplined by the Indiana Board of Pharmacy

 4    for instituting a blanket refusal on a certain prescriber,

 5    even though Walmart prohibited it, so the pharmacist went

 6    and did it.

 7                MS. FUMERTON:  So in this particular instance

 8    it was with respect to a patient, not a prescriber, but then

 9    the same information was relayed, which was --

10                THE COURT:  What do you mean, a patient?

11    That's different.

12                MS. FUMERTON:  It's slightly different, but

13    the guidance that was given back was the same, which was

14    that you have to evaluate each individual prescription on

15    its own.

16                THE COURT:  Now you're saying the pharmacist

17    wouldn't refuse any prescriptions from, you know, Mrs. Smith

18    who came in, regardless of who the prescriber was.

19        Is that what happened?

20                MS. FUMERTON:  No, no, refused to fill any

21    prescriptions for a particular patient.  So refusals to fill

22    can be given by --

23                THE COURT:  So it was not for a prescriber, it

24    was for a particular patient.  So this pharmacist said, I'm

25    not going to fill -- Ms. Smith, I'm not filling any more of

1    your prescriptions, okay?  So that's what the pharmacist

2    did?

3                    MS. FUMERTON:  That's my understanding, Your

4    Honor.  But the guidance that came back, which is the

5    guidance that you saw in Mr. Nelson's e-mail that Mr. Lanier

6    keeps highlighting over and over and over again, was that

7    the guidance that Walmart has been receiving is that each

8    individual prescription must be evaluated when it is being

9    presented and that you can't sort of make these blanket

10   judgments with respect to anybody as to whether or not to --

11                   THE COURT:  And this was an oral statement

12   from someone at the Ohio Board of Pharmacy to --

13                   MR. WEINBERGER:  Indiana, not Ohio, Your

14   Honor.

15                   THE COURT:  Indiana Board of Pharmacy to

16   Mr. Koch?

17                   MS. FUMERTON:  Yes, Your Honor.  And at that

18   time, Mr. Koch was reporting to Ms. Hiland.

19                   THE COURT:  Well, I've allowed her --

20   candidly, the jury thinks that it related to a blanket

21   refusal for a prescriber.  That's how it came in, even

22   though that wasn't the case.  But I've allowed them -- you

23   know, I've allowed them to hear that this came from someone

24   at the Ohio -- the Indiana Board of Pharmacy in 2006 or 2007

25   to Mr. Koch.

1          MS. FUMERTON:  So, Your Honor, I think there's

2     a few things.  I think actually the record is clear with

3     what Ms. Hiland said, and that was about Texas.  So

4     Ms. Hiland personally had communications with the -- I think

5     it was the director of the Texas Board of Pharmacy.

6          THE COURT:  I allowed her to say she got it

7     from Koch.

8          MS. FUMERTON:  No, no, no, there's multiple.

9     This wasn't a singular, this is I think the point.  I might

10    be not be commuting well.

11         There were multiple communications.  Ms. Hiland was

12    permitted to testify about her personal conversation with

13    the Texas Board of Pharmacy and the Texas Board of Pharmacy

14    lawyer.  She identified those by name on the record.

15         THE COURT:  Right.

16         MS. FUMERTON:  And those were prior to, I

17    think she said around 2006, 2007.

18         What she was not permitted to get into was the

19    communication that was relayed from Mr. Koch about the

20    Indiana situation.

21         And our point is --

22         THE COURT:  No, she wasn't able to give the

23    contents because it's hearsay and it wasn't to her.  But I

24    allowed her to testify that there was a communication from

25    someone at the Indiana Board of Pharmacy in 2006 or 2007 to

1    Mr. Koch that led her to believe that that Board of Pharmacy

2    wouldn't permit blanket refusals.  That's what she said.

3    And these were the two bases.

4         Then you asked her, and she said there were no other

5    communications from state board of pharmacies other than

6    Texas, which was to her, and Indiana, which was to Mr. Koch.

7    And she testified to that.

8         Now, all you're adding -- you're adding in some

9    details which she personally doesn't even know.

10        Does she have personal knowledge of the discipline of

11   their pharmacist in Indiana?  If she does, I mean, if she

12   has personal knowledge of it, I think she can testify to

13   that.  That's not -- in other words, what happened isn't

14   hearsay.  If she has personal knowledge that one of our

15   pharmacists was disciplined for doing -- what, for --

16             MS. FUMERTON:  For not evaluating each

17   individual prescription that was presented.

18             MR. WEINBERGER:  Your Honor, one of the

19   reasons for the hearsay rule is that the degree of

20   reliability is in question.

21             THE COURT:  Mr. Weinberger, you can

22   cross-examine her on that, but the point is if she

23   investigated this and she knows --

24             MR. WEINBERGER:  She didn't.

25             THE COURT:  Well, maybe she did, maybe she

1    didn't.

2              MR. WEINBERGER:  But, Your Honor, this starts

3    with the refusal to fill with respect to a patient, and now

4    layered on top of that is Ms. Fumerton's representation that

5    when they heard back from Indiana regarding this pharmacist,

6    it was broadly expanded to include refusals to fill with

7    respect to doctors.

8              THE COURT:  Well, that's -- I'm not going to

9    allow that because, I mean, this is the problem that it's

10   hearsay, all right?

11             MS. FUMERTON:  Your Honor, that's not what we

12   were going to suggest.  What we were going to suggest is,

13   you know, exactly what she would have -- my understanding

14   she would have testified to.

15             THE COURT:  Does she have personal knowledge

16   of the discipline of a Walmart pharmacist by the Indiana

17   Board?  If she does, you know, for having a blanket refusal,

18   whether it's a blanket refusal of a prescriber or a blanket

19   refusal of a doctor.  If she has personal knowledge, she can

20   say one of our pharmacists got disciplined for doing X.

21   Okay, she can say that.

22             MR. WEINBERGER:  But she testified the

23   information came from not directly, but from her colleague.

24             THE COURT:  Well, I don't know,

25   Mr. Weinberger.  She said the communication which led her to

1    do it, okay, and that -- and that's all she said.  No one

2    asked her about was someone disciplined, what were they --

3    you know, that's not hearsay.  If a Walmart pharmacist was

4    disciplined for something and she knows about it, she can

5    say that.  If she doesn't know about it, then she can't.

6                 MR. MAJORAS:  Thank you, Your Honor.

7          My other issue, sir --

8                 MR. WEINBERGER:  So where do we stand?  Are we

9    doing a voir dire or are we --

10                THE COURT:  No.  I mean, if she has --

11   Ms. Fumerton can ask her -- well, you can't lead her and do

12   a leading question.  I guess you can say --

13                MS. FUMERTON:  Your Honor, what if I just

14   asked her, Ms. Hiland, are you aware of a Walmart pharmacist

15   who was disciplined for a blanket refusing to fill for a

16   particular patient.

17                MR. WEINBERGER:  Your Honor, I ask that you go

18   back to page 101 of the transcript.

19                THE COURT:  I don't have the transcript.  I

20   mean, I -- I took good notes.  I know what Ms. Hiland said,

21   all right?  I know what she said.  I know what she was

22   asked, I know what she said.

23                MR. MAJORAS:  Your Honor, there's some mention

24   of the Indiana action on the record already.

25                THE COURT:  I know that.

1            MR. MAJORAS:  Well, I'll make a suggestion.

2     If Ms. Fumerton were simply to say "We heard some discussion

3     about an action in the Indiana Board of Pharmacy.  Do you

4     know about the facts of that?"  And if she says yes, then

5     she can ask what the facts are.  If she says no, then we

6     move on.

7            MR. WEINBERGER:  Here's what she said.  She

8     said, so it would have -- it would have been, I believe it

9     was the Indiana Board of Pharmacy that fined one of our

10    pharmacists for blanket refusing to fill.

11        I objected and moved to strike.

12        The Court:  The jury is to disregard that.

13        Ma'am, you were asked about, you started to say

14    Mr. Koch spoke to someone.  Who did he speak to and when?

15        It would have been a Board of Pharmacy hearing in

16    Indiana, and it would have been around the same time frame,

17    2006 or 2007.

18        Then the question was asked:  Just so the record is

19    clear, what did Mr. Koch convey to you?

20        You sustained the objection.

21        What did you learn that informed the basis for your

22    including the blanket refusal to fill prohibition from

23    Mr. Koch?

24        You sustained my objection.

25            THE COURT:  Well, because I thought that was

1    going to be hearsay, what Mr. -- if Mr. Koch were --

2              MR. WEINBERGER:  It is hearsay.

3              THE COURT:  Well, if Mr. Koch was relating

4    something from the Indiana Board of Pharmacy said to him,

5    that's hearsay.  But if --

6         All right.  What about you ask her this:  Did the

7    conduct of any Walmart employee have anything to do with

8    your decision in whatever year it was, 2013 or whatever,

9    when she wrote the prohibition on blanket refusal to fill,

10   all right, did the conduct -- the conduct or the discipline

11   of any Walmart employee have anything to do with your

12   decision.  All right?

13        If she says no, that's it.  If she says yes, then what

14   was the conduct.  And just do it in a nonleading way and a

15   nonhearsay way.  If she knows the conduct, then she can

16   relate the conduct, all right?

17             MS. FUMERTON:  Yes, Your Honor.

18             MR. MAJORAS:  Thank you, Your Honor.

19        My other issue, Your Honor, is really trying to avoid

20   future sidebars as we get into the cross-examination, I'd

21   just like to make a full record relating to any questions

22   about the DOJ lawsuit.

23        The DOJ lawsuit, as the Court has previously

24   addressed, clearly contains allegations that are necessarily

25   unproven.  They're very broad, they're very lengthy.

1        Mr. Lanier talked about having a trial within a trial

2   over a simple Board action in Idaho.  The trial within a

3   trial of a multi, over 100-page complaint certainly dwarfs

4   that and causes prejudice in and of itself.

5        The prejudice far outweighs the probative value of any

6   testimony in this regard and should not be permitted under

7   Federal Rule of Evidence 403.

8        The question that Ms. Fumerton asked of the witness

9   was whether -- how she'd respond to allegations or an

10  allegation that the company put profits over patient safety,

11  and she gave her opinion.  That's the same question that

12  Mr. Lanier asked repeatedly of Mr. Nelson.  The fact that

13  her answers are different from Mr. Nelson's shouldn't make

14  any impact on whether a door was opened.

15       And moreover, the bell cannot be unrung in this case.

16  The fact of the unproven allegations were brought by the DOJ

17  gives heightened concern when brought to the jury's

18  attention.

19       We would object to that.  And if that comes up, Your

20  Honor, we'll simply make an objection, and that's what the

21  basis will be.

22            THE COURT:  Well, I mean, I've made the

23  record.  I gave Ms. Fumerton the benefit of the doubt the

24  first time and simply sustained the objection and asked the

25  jury to disregard the witness's answer, and I made it

1    crystal clear to all lawyers, and they all acknowledged they

2    understood what I was saying, that no one was to get into

3    general corporate character testimony.

4              MR. MAJORAS:  I don't think this did, Your

5    Honor.  I don't think it opened the door.

6              THE COURT:  Trust me, it did, Mr. Majoras, it

7    did.  So I will allow a very limited question from

8    Mr. Lanier.  It's not going to go into any details or any

9    specific allegations, but it's essentially basically saying

10   that the Department of Justice filed a complaint alleging

11   the opposite, that Walmart put corporate profit over safety;

12   are you aware of it; Bingo.  And if she says -- whatever she

13   says, yes, no, that's the end of it.  I'm not going to allow

14   a follow-up question, just one question, and that's it.

15             MR. MAJORAS:  I certainly object to that

16   characterization, Your Honor, but you have my objection,

17   sir.

18             THE COURT:  What do you --

19             MR. MAJORAS:  I don't think it can be done.

20             THE COURT:  Well, it's going to be done

21   because you've opened the door twice, and I gave you the

22   benefit of the doubt once.  So if there's a better way to do

23   it --

24             MR. MAJORAS:  Well, I think in terms of the

25   profits, this is the theme of the plaintiffs in this case,

**Hiland - (Direct by Fumerton)**

1    is profits over patients, I think a broader "The DOJ has

2    made allegations regarding Walmart's pharmacy practices" or

3    something of that nature --

4                THE COURT:  All right, fine.  I guess it's a

5    little bit -- just crystallize it, that they put profits

6    over safety, that's a little prejudicial and charged.

7         That they filed a -- Mr. Lanier, how are you going to

8    phrase it?

9                MR. LANIER:  I've got options.  One option is

10   I've got the complaint now in front of me.  I could say,

11   "Ma'am, when you talked about your corporate culture and

12   referenced how it's affected what you do and how y'all

13   support your pharmacists, in truth, are you aware" --

14               THE COURT:  Leave out the "in truth," just say

15   "are you aware."

16               MR. LANIER:  Are you aware that the Department

17   of Justice, United States of America Department of Justice,

18   has currently pending a complaint against Walmart that their

19   Compliance unit chose not to give its pharmacists the

20   information and authority it knew they needed to comply with

21   the rules."

22        Now, that's word for word part of the complaint, and I

23   could do it that way.

24               THE COURT:  All right.  That's a neutral way

25   of saying the complaint, and that's it, and she can say

1    whatever she says, yes, no, I don't know, and that's it.

2    I'm not going to permit any follow-up.

3                    MR. LANIER:  I'll leave it there.  Understood.

4    Thank you, Judge.

5                    MR. MAJORAS:  And you'll understand the nature

6    of my objection when I make it, Judge?

7                    THE COURT:  Fine.

8                    MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr

9    for Walgreens.

10       Just so it's clear on the record, we object as well,

11   just because it's difficult, perhaps unrealistic, for jurors

12   to, you know, draw distinctions among defendants, to say

13   nothing of the similarity in names, you know, which has

14   given rise to some mirth over the course the trial.

15       We obviously haven't opened the door to anything, and

16   we'd noted our objection for the record.

17       Thank you.

18                   THE COURT:  She's not going to say anything

19   about Walmart -- I mean Walgreens.  Now you've got me.  Now

20   you've got me, I'm sorry.  I mean, I'm not making light of

21   the fact that obviously W-A-L is in both names, and so a lot

22   of us have tripped over it.

23       But in this, one, she's a career Walmart person.

24   Everyone knows that.  She's a Walmart lifer.  She's only

25   testified about Walmart.  She's said zero about Walgreens.

1           The plaintiffs are not going to ask her anything about

2      Walgreens unless, I don't know, there's some specific

3      prescription or something where someone went to both of

4      them, whatever.  She hasn't testified to that.

5                 MR. DELINSKY:  Your Honor, I know you don't

6      want to hear any more on this.  I'm sorry.  I would just

7      like to note that this is complex because there was the

8      questioning last week, and I'm sorry, Your Honor, I'm

9      getting older, I can't remember the exact witness, about the

10     Florida -- oh, it was Dr. Wailes, about the Government has

11     brought a case against CVS and Walgreens in Florida, and

12     there is room for confusion here.  So we would join in the

13     objection.

14                THE COURT:  Well, I'll make it clear that,

15     Mr. Lanier, when you ask the question, make it clear it's

16     Walmart only, all right?

17                MR. LANIER:  Walmart only, and it stems out of

18     actions in Texas.

19                THE COURT:  All right.  Fine.  All right.

20          So it's clear that it has nothing to do with Walgreens

21     and zero to do with CVS.  And again, there are general

22     ground rules.  And we set -- you know, this was in these

23     motions in limine, that the case was not going to be tried

24     on whether any of these corporations had good cultures or

25     bad cultures.  The issue is very specific having to do with

**Hiland - (Direct by Fumerton)**

1    dispensing practices and policies, all right?  So that's

2    what we were focusing on.

3         So, all right.  So I'm going to charge a half an hour

4    to Walmart, and let's proceed hopefully expeditiously with

5    Ms. Hiland, the balance of her testimony.

6              (The jury is present at 1:30 p.m.)

7              THE COURT:  Please be seated, ladies and

8    gentlemen.

9         I apologize for the delay.  We had some legal issues

10   we needed to take up before we continued with Ms. Hiland.

11        Good afternoon, Ms. Hiland.  And I just want to remind

12   you, you are still under oath from this morning.

13        Okay, Ms. Fumerton, you may proceed, please.

14   BY MS. FUMERTON:

15   **Q**    You ready, Ms. Hiland?

16   **A**    Yes.

17   **Q**    Okay.  Last topic, and it will be quick, I hope.

18        The jury has heard some testimony about more-recent

19   practices for the safe disposal of opioids.  I want to focus

20   on the 2010 to 2011 time frame.

21        What actions, if any, did Walmart take around that

22   time to promote the safe disposal of opioids?

23   **A**    We parented with the U.S. Fish and Wildlife Service on

24   a campaign that they called Safe Rx Disposal.  And in doing

25   that, we advertised that disposal on our website, we

1    distributed information in our pharmacies, and we printed

2    disposal information and links to that website on our

3    prescription bags.

4    **Q**    Do you recall what that printed disposal information

5    contained generally?

6    **A**    It was around getting -- cleaning out old medication,

7    but how to do it in a way that was environmentally safe,

8    which included -- I think there were three different options

9    for disposal that they recommended.

10   **Q**    Do you recall any of those?

11   **A**    One was coffee ground -- mixing the contents, the

12   medication that you were disposing of, with coffee grounds

13   or cat litter, and I don't remember the third, and enclosing

14   it in a sealed plastic bag before disposing of it in any

15   trash container.

16   **Q**    Do you recall approximately how long Walmart partnered

17   with that organization on that environmentally safe way to

18   dispose of opioid medications?

19   **A**    I don't recall exactly how long.  I know the campaign

20   is still in place.  I don't know how long we had it on our

21   website.

22        I know that there was information in the stores, if I

23   recall, maybe for a couple of years.  As I would go out and

24   tour I would still see it, but I don't recall exactly how

25   long.

```
 1               MS. FUMERTON:  Thank you, Ms. Hiland.

 2          I'm going to pass the witness.

 3                       - - - - -

 4                    CROSS-EXAMINATION

 5     BY MR. LANIER:

 6     Q     Good afternoon, Ms. Hiland.  My name is Mark Lanier.

 7     You and I have not met before, but I'm one of the lawyers

 8     for the folks in Lake and Trumbull Counties here in Ohio.

 9          I believe Mr. Weinberger, who's at counsel table with

10     me, took your deposition by video, but you and I have not

11     met before, have we?

12     A     No, sir.

13     Q     All right.  Well, my timing on this is going to be to

14     try to get you finished from my perspective within one hour

15     and five minutes.  Okay?

16     A     Okay.

17     Q     All right.  We're under time limits of sorts, and

18     that's how much I've got dedicated for you, so I'll work

19     hard to get there.  And just know if I'm a little more brief

20     than normal, that will be why.  Okay?

21     A     Okay.

22     Q     All right.  I have a road map for you.  My road map is

23     three stops, if we have time for them:  Too little, too

24     late; priorities, and attitude.  Those are the three areas

25     I've grouped my cross-examination in, okay?
```

**Hiland - (Cross by Lanier)**

```
 1   A     Okay.

 2   Q     Before I do that, I am remiss, especially considering

 3   the fact I've got two Marines here with me.  I am remiss if

 4   I don't say thank you for the service to your country, you

 5   and your husband both, with Veterans Day coming up next

 6   week.

 7   A     Thank you.

 8   Q     All right.  Now, let's get to too little, too late.

 9         You know how important timing is, don't you?

10   A     Yes.

11   Q     You can do the right thing, but it's important to do

12   the right thing at the right time, right?

13   A     Yes, I agree.

14   Q     Okay.  I've got the start of a timeline.  We may wind

15   up using it at least to reference a few things, but let's

16   start by some questions you were asked by Ms. Fumerton.

17         "Does Walmart support the registered pharmacists?"

18         You said, "Yes, we support them through policy,

19   communication, and training."

20         Do you remember that?

21   A     Yes.

22   Q     And then in the process of that, I don't think you

23   told the jury about the settlement agreement that prompted

24   so many of those documents and policies and trainings you

25   talked about.
```

**Hiland - (Cross by Lanier)**

1          You know what I'm referencing?

2   **A**     I know about the DOJ settlement, I believe.

3   **Q**     Yeah.  The DOJ settlement that happened, do you

4   remember when?  2011?

5   **A**     We had a -- yes, an MOA in 2011.

6   **Q**     And this arose out of California originally, but it

7   applied all across the United States, including Ohio, right?

8   **A**     Yes, it was from our store in San Diego.

9   **Q**     And it was entered into in a formal Memorandum of

10  Agreement between Walmart and the Federal Government about

11  what Walmart would do, correct?

12  **A**     Yes.

13  **Q**     And so when we look at documents like your Walmart MDL

14  1155, this 2013 document Ms. Fumerton showed where you had

15  this written-out speech that was given, I guess; correct?

16  **A**     Yes.  It was a recorded broadcast.

17  **Q**     And you were asked, "Why did the executives do this,

18  why executives?"  And you said, "Because we just think these

19  things are so important, and it's important to hear from the

20  top."

21         Remember that?

22  **A**     Yes.

23  **Q**     Well, truth be told, this is all part of what y'all

24  were required to do by the Government, isn't it?

25  **A**     Do you mean the broadcast?  I'm not sure I'm

1    following.  I apologize.

2    **Q**    Let me do it this way.  Let me move these out of the

3    way.

4         The whole idea of the training and the communication

5    and the policies that y'all were putting in place were

6    required by the Government, weren't they?

7    **A**    I don't know that any of them were specifically

8    required.  These were policies and in some cases reiteration

9    of policies and expectations that had been in place for a

10   number of years.

11   **Q**    Well, we're in 2013 when you did this, right?

12   **A**    That's correct.

13   **Q**    And this was part of training, wasn't it?

14   **A**    It was one part of our training, yes.

15   **Q**    So we've got training by the executives giving a,

16   what, it looks like four pages, three and a half pages of

17   recorded content?

18   **A**    Yes.

19   **Q**    And this training in 2013 includes this comment on

20   page 3, "In the coming weeks, we will be providing

21   additional details regarding red flags that may indicate a

22   controlled substance prescription was not issued for a

23   legitimate medical purpose and which must be resolved before

24   dispensing the prescription."

25        See that?

**Hiland - (Cross by Lanier)**

1    **A**    Yes.

2    **Q**    So this whole idea in 2013, this training, says red

3    flags will be coming, we'll be talking about red flags and

4    teaching you about red flags.  Right?

5    **A**    That was part of the communication.

6    **Q**    And we are two calendar years, at least, after the

7    agreement's already been entered into with the Federal

8    Government, aren't we?

9    **A**    It was two years after that agreement.

10   **Q**    And so if we go back to that agreement, which the

11   jury's heard about as Plaintiffs' 14711, you've seen the

12   agreement before, haven't you?

13   **A**    Yes.

14   **Q**    And we can go to that agreement.  And it's, by the

15   way, signed by corporate vice president level, right?

16   **A**    Yes.

17   **Q**    Senior vice president.

18         But we can go to that agreement.  And this is an

19   agreement that says whatever y'all had been doing up to that

20   point had not been working.  Fair?

21              MS. FUMERTON:  Objection.

22              THE COURT:  Yes, I'll sustain that.

23   **Q**    Well, this agreement specifically says that Walmart

24   stores dispensed controlled substances to individuals that

25   Walmart knew or should have known were diverting the

**Hiland - (Cross by Lanier)**

```
 1    controlled substances?

 2                   MS. FUMERTON:  Objection.

 3    Q     Do you see that?

 4                   THE COURT:  Overruled.  That's what it says.

 5                   MS. FUMERTON:  Your Honor, can we side bar?

 6                   MR. LANIER:  Can it not be assessed against my

 7    time?

 8                   (At side bar at 1:41 p.m.)

 9                   THE COURT:  What's the objection?

10                   MS. FUMERTON:  Your Honor, these were

11    allegations.  There was specifically no finding or admission

12    of liability with respect to this agreement, and so, you

13    know, obviously we have no issue if the --

14                   THE COURT:  That's a good point.

15         Mr. Lanier, the question that prompted this was her

16    suggestion that Walmart did these things in 2013, the

17    training, et cetera, of pharmacists because of this, because

18    the Government ordered it.  So you better -- the allegations

19    don't address that.  The agreement might if there's a

20    paragraph of the agreement that says what Walmart's to do

21    going forward.

22                   MR. LANIER:  And there is, Judge.

23                   THE COURT:  Well, then let's use that.

24                   MR. LANIER:  I will.  I was setting the

25    foundation for it.  I'll go straight to it.
```

**Hiland - (Cross by Lanier)**

 1              THE COURT:  Well, there doesn't need to be a

 2     foundation for that.

 3              MR. LANIER:  Thank you.

 4              (In open court at 1:42 p.m.)

 5     BY MR. LANIER:

 6     **Q**     Ma'am, you had read this agreement, hadn't you?

 7     **A**     I have read it.

 8     **Q**     And you've read the obligations that Walmart had under

 9     this agreement, didn't you?

10     **A**     Yes.

11     **Q**     And those obligations included updating as necessary

12     the compliance program designed to -- wait, let me start

13     from the beginning.

14              "Walmart agrees to maintain a compliance program,

15     updated as necessary, designed to detect and prevent

16     diversion of controlled substances as required by the

17     Controlled Substances Act."  Do you see that?

18     **A**     Yes.

19     **Q**     This was Walmart's agreement coming out of this

20     settlement, right?

21     **A**     That's what the document reads.

22     **Q**     And "This program," specifically, "This program shall

23     include procedures to identify the common signs associated

24     with the diversion of controlled substances, including but

25     not limited to doctor shopping, requests for early refills,

**Hiland - (Cross by Lanier)**

1  altered or forged prescriptions, prescriptions written by

2  doctors not licensed to practice medicine in the

3  jurisdiction where the patient's located, prescriptions

4  written for other than a legitimate medical purpose by an

5  individual practitioner acting outside the usual scope [sic]

6  of his or her professional practice."

7     Do you see that?

8  **A**    Yes.

9  **Q**    Those were agreements that Walmart entered into to

10  resolve this dispute with the Federal Government, wasn't it?

11  **A**    Well, those were the obligations I -- in my experience

12  we had programs in place to address many of these

13  obligations and to meet our obligations under the Controlled

14  Substances Act.

15  **Q**    Well, in fact, we'll look at the programs you had in

16  place, but if you go back to this Walmart 1155, where we

17  started this dialogue, this is the one where you

18  specifically say, "We will be providing additional details

19  regarding red flags that may indicate a prescription not

20  issued for a legitimate medical purpose," and then gives

21  examples that are straight out of the settlement agreement.

22     See?

23  **A**    I see that.

24  **Q**    It doesn't say, We've done this before already, just

25  follow standard policy, does it?

**Hiland - (Cross by Lanier)**

1    **A**    Those words aren't in this training document.

2    **Q**    And if we go back to the agreement with the Federal

3    Government, it says that "The program will also include

4    procedures to report thefts, significant losses, and the

5    routine and periodic training of all Walmart employees,

6    including new employees, responsible for controlled

7    substances regarding their responsibilities under the CSA.

8        "This compliance program shall apply to all current

9    and future Walmart pharmacies registered in the DEA.  And

10   these obligations don't fulfill the totality of its

11   obligations."

12       Do you see that?

13   **A**    Yes.

14   **Q**    So can you agree with me that these wonderful

15   things -- and it's not just this one little message y'all

16   recorded and typed out, but the other things that you talked

17   about, they were a direct consequence of an agreement

18   arising out of allegedly bad behavior before, correct?

19   **A**    I don't think I agree with that statement.

20   **Q**    Okay.  Well, you've got a memo of agreement that tells

21   you you've got to have a compliance program, it's got to be

22   updated as necessary; it's got to identify common signs,

23   what have become known as red flags; it's got to teach and

24   train, and it's got to apply all over the U.S.

25       That was the agreement, right?

 1   **A**    Those were elements in the agreement.

 2   **Q**    And the agreement was to span for four years?

 3   **A**    Yes.

 4   **Q**    And the jury's already heard from Mr. Nelson the fact

 5   that toward the end of the running out of the agreement,

 6   there wasn't as much of a need to document things because

 7   the agreement was almost over.

 8          Did you know about that?

 9              MS. FUMERTON:  Objection.  Misstates

10   testimony.

11              THE COURT:  Overruled.

12              MR. LANIER:  Thank you.

13   **Q**    Did you know about that, ma'am?

14   **A**    No, I don't --

15   **Q**    But one of the keys for me is, how many years before

16   all of this had Walmart been selling controlled substances?

17   **A**    I'm sorry.  Is that a question?

18   **Q**    Yes, ma'am.  How many years before this had Walmart

19   been selling controlled substances, opiates?

20   **A**    So I think I testified previously, we've had

21   pharmacies for about 40 years.

22   **Q**    So that would have been since the 1980s?

23   **A**    I think.  Maybe '70s.

24   **Q**    Let's do 1970s, slash, '80s.

25          How's that?

1        And so when we look at this, there seems to be a bit

2   of a difference, at least at one point, with what happened

3   in 2011 in Walmart policies.  Would you agree?

4   **A**    Well, we definitely were updating our policies, but we

5   had policies in place, we had a compliance program in place.

6   We were continually updating policies.  And we had policies

7   that spoke to the possibility that prescriptions could be

8   fraudulent.  We used the term "indicators."

9        And so throughout at least my time with Walmart,

10  compliance with regulation and the expectations were

11  definitely in place, and we had policies that addressed

12  these things.

13            MR. LANIER:  In that regard, I'd ask my team

14  to please pass out Plaintiffs' 14645.

15  BY MR. LANIER:

16  **Q**    Do you remember a Dr. Glinkowski?  It's going to

17  pretty far back.

18  **A**    I'm not sure I'm familiar.

19  **Q**    All right.  Ms. Fleming's going to give you a copy of

20  Plaintiffs' 14645.

21        Do you have that?

22        If you'll look at the bottom of page 1, that's where

23  the e-mail chain starts.

24        "Bob, we have a pain clinic opened on West Bellfort,

25  across the street from our drive thru.  Dr. Glinkowski is

```
 1    the doctor who specializes or specials in lower back pain.

 2    The office has been writing many Lorcet, Lortab, Norco,

 3    soma, Xanax prescriptions.  Every patient that leaves the

 4    office has one control of pain, 120 tablets; soma, 120

 5    tablets; and Xanax, 2 milligrams, 30 to 60 tablets.

 6         "I'm really afraid of filling them.  Over the weekend

 7    I was completely wiped out of Lorcet and low on Lortab and

 8    almost all soma and Xanax.  I don't have extra to fill any

 9    Dr. Ellington.  (I did not, Binsu warned me ahead of time.)

10         "Basically, as a team at the store, we are getting

11    really uncomfortable in filling these high quantity of

12    controlled.  All of our patients came through the office are

13    legit."  In other words, they had their IDs in place,

14    et cetera.

15         All prescriptions are legit, written by a doctor.

16         "They are just so much.  I'm not a pain specialist.

17    Can I refuse?  How shall I approach in this case?  Please

18    advise.

19         "We are so busy with Dr. Glinkowski's patients we do

20    not have the extra to fill Dr. Ellington.  So we did not

21    fill any over the weekend."

22         Does that ring a bell?

23    A    I see that I'm on this e-mail string, but I don't

24    specifically remember this.

25    Q    Yeah.  This fellow who got that e-mail sent it to you
```

**Hiland - (Cross by Lanier)**

1  and said "Any suggestions," and your response was, "I'm not

2  sure what the concern is other than having enough stock.  I

3  don't understand the Dr. Ellington issue.  In her statement,

4  Lorinda says all prescriptions and patients were legit.  If

5  that's the case, we should not be refusing to fill.  Pain

6  clinics with legitimate practices will produce a lot of

7  controlled substance prescriptions.  They should increase

8  their on-hands to accommodate legitimate business.  If there

9  is an issue or concern with forgeries, dosage, patient ID,

10  early refill, they can use their professional judgment to

11  resolve the issue."

12        Do you see that?

13  **A**    Yes.

14             MS. FUMERTON:  Objection.  He misread the

15  document.

16             THE COURT:  Overruled.

17  **Q**    Do you see that, ma'am?

18  **A**    Yes.

19  **Q**    So that's back in 2007, but we can go back in '07.  By

20  the way, that drug cocktail that was being talked about, is

21  that what's known as the trinity?

22  **A**    Yes, I've heard it referred that way.

23  **Q**    And so back in '07 with the trinity, your reply was

24  just get more stock on hand to sell?

25  **A**    No.  My reply was that they should establish whether

1    or not the prescription is legitimate, and where there is

2    legitimate need, that the pharmacist should be serving the

3    patient.

4    **Q**    But "legitimate" back then for Walmart meant is it a

5    real prescription written by a doctor with a real patient.

6    "Legitimate" back then did not take into account red flags

7    like the holy trinity, right?

8    **A**    Well, our documents provided indications that a

9    prescription may not be legitimate.  And they also

10   instructed pharmacists not to fill prescriptions if they did

11   not believe that they were issued for a legitimate purpose.

12   **Q**    Ma'am, that wasn't my question.  Can you answer my

13   question?

14   **A**    I'm sorry, I thought I did.

15        Could you repeat your question?

16   **Q**    Sure.  "Legitimate" back then for Walmart meant is it

17   a real prescription written by a doctor with a real patient?

18   "Legitimate" back then did not take into account red flags

19   like the trinity, correct?

20   **A**    I don't know that we named the trinity in any document

21   or training document that we had, but we did expect our

22   pharmacists to use their professional judgment to determine

23   legitimate prescriptions.

24   **Q**    But if we fast-forward to 2013, now we've got

25   documents like Ms. Fumerton used with you, Walmart 1027,

**Hiland - (Cross by Lanier)**

1    which is the one where y'all talked about all of these

2    different red flags.  Remember?

3    **A**    Yes.

4    **Q**    But these are all, again, part of your agreement with

5    the DEA for four years to do something different than you'd

6    done before.  Right?

7    **A**    The MOA had the requirements that you walked through,

8    and that didn't necessarily mean different than what we were

9    doing before.  It meant meet the obligations that were

10   within the MOA.

11   **Q**    Okay.  So we can look at the POM as it existed before

12   the Memorandum of Agreement, and we'll see all of the same

13   red flags that were there after the agreement; is that what

14   you're telling us?

15   **A**    No, I'm -- no, that's not what I testified.

16   **Q**    Because that's not true, is it?

17   **A**    We did not list the red flags until 2013.

18   **Q**    Until after the DEA action, right?

19   **A**    In timing, yes, it was after the MOA.

20   **Q**    Yeah.  So the MOA said you've got to do it, and y'all

21   did it.  And when you're in here telling everybody, look

22   what we did, you're just responding to the DEA's order or

23   agreement, right?

24   **A**    No.  I mean, that had been two years down the line,

25   and we had other training and communication that went out to

**Hiland - (Cross by Lanier)**

```
 1   our pharmacists over time.
 2   Q    We're going to talk about why it took two years to do
 3   it and what you did in the interim.  That's why I've got a
 4   timeline up here.
 5        But this that Ms. Fumerton used with you is two years
 6   down the road, right?
 7   A    It is.
 8   Q    By the way, do you know a Dr. Robert Wailes, a pain
 9   doctor from California?
10   A    Not -- no, not that I recall.
11   Q    Ms. Fumerton's partner, Mr. Majoras, last Thursday had
12   him on the stand, and this is an excerpt of Walmart's that
13   said that nobody should have a policy that red flags have to
14   be resolved before dispensing a drug.
15        I thought Walmart's policy and understanding was you
16   had to resolve red flags before you dispense a drug.  Don't
17   you?
18                  MS. FUMERTON:  Objection.
19                  THE COURT:  Overruled.
20   A    I don't know what the testimony was or what the
21   circumstance was, but our policies do tell our pharmacists
22   that if they identify a red flag, they should resolve the
23   red flag before dispensing the medication.
24   Q    So the idea that that's some zany concept from Carmen
25   Catizone -- do you know Dr. Catizone?
```

1    **A**    Yes.

2    **Q**    He's a good guy, isn't he?

3    **A**    I've known him for a while.  I think he's a good guy.

4    **Q**    All right.  Here's what I'd like to do.  I've prepared

5    a little chart, if His Honor would let me do this.  Let me

6    show you what it is.

7           I have listed down the left side red flags.  And what

8    I've done is I've tried to list those red flags, and I've

9    put dates where I've seen the DOJ in essence get after folks

10   for not honoring these red flags.  And I've tried to give

11   the sources for where the DOJ did that.

12          And then my question for you is going to be, for

13   example, your POM 1311, that's your red flag POM, right?

14   **A**    Yes.  That's where they eventually were recorded.

15   **Q**    So in 2009 you've got a POM for red flags.  It's

16   Plaintiffs' Exhibit 21228, and this is 2009.

17          Do you know that or do I need to give you a copy of

18   it?

19   **A**    No, I would like to see a copy, please.

20   **Q**    All right.  Ms. Fleming's got you one on the way.

21          And this is so we can look at this.  And what I'm

22   going to do is ask you, you've got some red flags.  They're

23   not called red flags at this point, but that's what they get

24   called later, that are on page 2.

25          Do you see those?

**Hiland - (Cross by Lanier)**

 1   **A**    Yes.

 2   **Q**    Prescription is from a doctor outside the U.S. printed

 3   without -- or from an Internet link with a rubber-stamped

 4   signature.  Prescriber writing outside the scope of the

 5   customary practice.  Prescription's from an unfamiliar

 6   prescriber or practice, or the pharmacist knows the person's

 7   dead who wrote it, or retired.  It's for a large quantity,

 8   large number of a particular strength.  Writings that would

 9   indicate it was rejected by another pharmacy.  Or it's

10   dropped off at times where you can't really verify it.

11        See them?

12   **A**    Yes.

13   **Q**    All right.  So let's see in 2009 which ones -- when

14   these other folks had gotten in trouble for some of these,

15   which ones Walmart already had covered in its policies,

16   okay?

17             MS. FUMERTON:  Objection to the demonstrative

18   and lack of foundation.

19             THE COURT:  I'm going to sustain that at this

20   point.

21             MR. LANIER:  Okay.  How about if I cover it as

22   I go along?

23             THE COURT:  You can ask her about the red

24   flags in Walmart 1311.

25             MS. FUMERTON:  Objection, Your Honor.  That

**Hiland - (Cross by Lanier)**

```
 1    did not cure my objection.  My objection is to the source.

 2    There's no foundation for it.

 3    BY MR. LANIER:

 4    Q    I mean, ma'am, you're aware of the various --

 5                THE COURT:  You can ask her the question.  If

 6    she can verify it, fine.  If not, you've got to cross it

 7    off.

 8                MR. LANIER:  No trouble, Your Honor.

 9    BY MR. LANIER:

10    Q    Ma'am, you keep up with the regulations, including the

11    cases that interpret those regulations, don't you?

12    A    I saw some casework.  I didn't see all of the historic

13    cases.

14    Q    Okay.  But, I mean, that's -- I've got your personnel

15    file.  That's part of your job, isn't it?

16    A    Well, it's to meet the regulatory requirements.

17    Q    Yeah.  In other words, you've got to meet the

18    regulatory requirements and make sure that your company

19    does, right?

20    A    Yes.

21    Q    So I would assume you got to know them if you're going

22    to meet them, but maybe that's a bad assumption.

23                MS. FUMERTON:  Objection.

24    Q    Do you know them?

25                THE COURT:  Overruled.
```

**Hiland - (Cross by Lanier)**

1    **A**    Yes, within the CSA.

2    **Q**    Well, within the CSA and how it's interpreted and

3    applied, correct?

4    **A**    Yes, from our experience.

5    **Q**    Well, not just from your experience, ma'am.  I'm sure

6    you've read the *Holiday* case, haven't you?

7    **A**    Yes, I have.

8    **Q**    I'm sure you've read the *East Main* Ohio pharmacy case,

9    haven't you?

10   **A**    I'm not sure.  I don't remember all of the cases that

11   I saw or reviewed.

12   **Q**    Are you familiar with the *Townwood Pharmacy* case that

13   says you've got to take into account how the patient

14   conducts themselves and how they answer questions?

15   **A**    I don't know if I'm familiar with that case, but I

16   know that our policies do address that.

17   **Q**    And when did your policies start addressing that?

18   I'll take out that case source.

19         When did your policies start addressing that?

20   **A**    I believe -- I'd have to find it, but within our

21   diversion policies, as well as there were some other

22   expectations that called that out at least as early as 2005,

23   maybe earlier.

24   **Q**    Well, here's February 2009, which is the POM that

25   you've testified deals with red flags.

1        My question to you is, is it listed there?

2    **A**    It's not listed there, but there are other policies

3    that would apply.

4              MS. FUMERTON:  Your Honor, I still object to

5    the demonstrative and this date column.  He should cross

6    that off, too.

7              MR. LANIER:  All right.  Fine.

8              THE COURT:  All right.  That's out.

9    **Q**    How about, did you ever read *United Prescription*

10   *Services* in 2007?

11   **A**    I don't recall.

12   **Q**    Ma'am, do you recall if you read anything about *East*

13   *Main*, Ohio, that listed a bunch of red flags?

14   **A**    I don't recall.

15   **Q**    How about your own case, *Walmart* in San Diego that

16   listed red flags?

17   **A**    Yes.

18   **Q**    And those are the ones that were in 2011, correct?

19   **A**    The San Diego case was 2011.

20   **Q**    And those are the ones that you didn't change your POM

21   1311 on until 2013, correct?

22   **A**    The policy was updated in 2013 to first use the term

23   "red flags."

24   **Q**    So the Memorandum of Agreement 2011, but there were a

25   number of things missing from your POM in 2011, weren't

1  there?

2  **A**    Well, I do know that the policy did reference that the

3  list is not all inclusive.

4  **Q**    Is that a "yes" answer?

5          MR. LANIER:  Rachel and Maria, could y'all

6  please pass out Plaintiffs' 7381.

7  **Q**    Ma'am, my question was, there were a number of things

8  missing from your POM as of 2011, right?

9  **A**    There were some indicators that were not specifically

10  called out in policy.

11  **Q**    Brad Nelson specifically singled out some common signs

12  associated with diversion that needed to be added as early

13  as February of 2011, didn't he?

14  **A**    I don't recall.

15  **Q**    Well, in the interest of time I'm going to pop it up

16  here while they're looking for it, and see if you can see

17  it.  It's just one page, so there's nothing extra to be

18  involved on it.

19          Are you able to read that, ma'am?

20  **A**    Yes.

21  **Q**    And this is Brad Nelson.  He reported to you, correct?

22  **A**    He reported to Tim Koch, I believe, but he was on my

23  team.

24  **Q**    Who reported to you?

25  **A**    Yes.

**Hiland - (Cross by Lanier)**

1    **Q**    So he's like not a kid, he's a grand kid, kind of

2    thing.  I mean, two steps down?

3    **A**    He was on my team.

4    **Q**    Got it.

5         "Common signs of diversion in the POM 1703 and 1311."

6         Do you see that?

7    **A**    Yes.

8    **Q**    E-mail goes to you, Susanne.

9         "Upon review of these Pharmacy Operation Manuals there

10   are a few common signs of diversion spelled out in the MOA.

11        That's the Memorandum of Agreement with the Federal

12   Government, right?

13   **A**    Yes.

14   **Q**    But not mentioned in the POMs.  "Common signs

15   associated with diversion that need to be added included

16   doctor shopping, requests for early refills, prescriptions

17   by doctors not licensed to practice in the jurisdiction

18   where the patient is located."

19        Do you see that?

20   **A**    Yes.

21   **Q**    And those were to be added to the POMs, correct?

22   **A**    Yes, that's what this e-mail is about.

23   **Q**    All right.  So in February of '11 -- or February of

24   2011, at least three needed to be added.  Fair?

25   **A**    There were three on the list.

1    **Q**    And yet, instead of adding those immediately, your

2    company just kept on doing business, didn't it?

3    **A**    The policy wasn't updated until 2013.

4    **Q**    Well, the policy got rewritten the next month,

5    February of '11, and that's POM 1311, Plaintiffs' Exhibit

6    2300.

7         You wrote it yourself, remember?

8              MS. FUMERTON:  Your Honor, could the witness

9    have a copy, please?

10              MR. LANIER:  Yeah, this is actually the one

11    you used and gave to me.

12              THE COURT:  I think the witness should get a

13    copy.

14              MS. FUMERTON:  If she has it, that's fine, but

15    please direct her to where she has it.

16              MR. LANIER:  This is I believe the POM that

17    was given to us from them.

18              MS. FUMERTON:  I don't think it actually was,

19    Mr. Lanier.

20              MR. LANIER:  Okay.

21    BY MR. LANIER:

22    **Q**    While they pull that, ma'am, we're going to come back

23    to this in a little bit.

24         What we'll do right now instead is we will go to your

25    exhibit that dealt with Connexus.

1          Remember that exhibit?

2     **A**     Yes.

3     **Q**     All right.  Hold on one second.

4          You mentioned that --

5               MR. LANIER:  Rachel, these are the other ones

6     that I want to use.  Thank you.

7     **Q**     Connexus, you said it rolled out in 2002.

8          Remember?

9     **A**     Yes.

10    **Q**     And you had this real pretty picture in your

11    demonstratives of Connexus.

12         I want to be real clear on this while we're at the too

13    little, too late stop, okay?

14         You're not saying that Archer was readable by Connexus

15    in 2002, are you?

16    **A**     No.  I testified that Archer became available in 2015.

17    **Q**     2015.  And at that point in time, was it available and

18    accessible through Connexus?

19    **A**     Through the Tools section, yes.

20    **Q**     Okay.  You're not saying The Wire was available on

21    Connexus in 2002, are you?

22    **A**     There was a link to The Wire within the workstation.

23    **Q**     But The Wire did not exist in that form in 2002, did

24    it?

25    **A**     I don't recall exactly when updates were made to The

1    Wire.  It has been an iteration over time.

2    **Q**    And you're not saying that the State PMPs were

3    accessible as of 2002, are you?

4    **A**    No, I don't think any states had PMPs in 2002.

5    **Q**    Not only did no states have them, your company wasn't

6    quite thrilled over them when they first came out, was it?

7    **A**    I don't think that's true.

8    **Q**    Okay.  I'll show you a document marked Plaintiffs'

9    Exhibit 26697.

10        Do you have 20 -- it's coming to you -- 26697, ma'am?

11   **A**    Yes, I have it.

12   **Q**    Bottom of page 1 is where this e-mail starts.  It's

13   talking about the Ohio system.  I wanted to go to the one in

14   this state, okay?

15   **A**    Yes.

16   **Q**    "Website access for Ohio Automated Reporting System."

17        That's the OARRS program, right?

18   **A**    Yes.

19   **Q**    If you'll look, it says, "Several years ago, the State

20   of Kentucky activated a system called KASPAR, which is a

21   centralized computer clearinghouse that gathers information

22   regarding controlled drugs dispensing across the state."

23        That's a PMP, a prescription monitoring program, true?

24   **A**    Yes.

25   **Q**    "It was designed to track controlled-drug abusers who

**Hiland - (Cross by Lanier)**

1    used multiple prescribers and multiple pharmacies.  Any

2    health professional could access the site and gather

3    information about suspected prescription drug abusers."

4         Do you see that?

5    **A**    Yes.

6    **Q**    "Recently, Ohio has started a similar system called

7    OARRS.  Soon pharmacists will be able to submit requests for

8    patients' drug histories in Ohio as well."

9         Do you see that?

10   **A**    Yes.

11   **Q**    Look at this next sentence, 2007.  "Our pharmacists

12   cannot utilize this system unless they can access the OARRS

13   website from the Connexus computer system.

14        "They're currently allowing pharmacy registrations,

15   and several of my stores have requested the ability to use

16   this site."

17        Do you see that?

18   **A**    Yes.

19   **Q**    And that e-mail got forwarded to you from Shannon

20   Borkowski, and she said to you, "Is this something you think

21   the stores need to have?"

22        Remember?

23   **A**    I see that.

24   **Q**    And then you replied -- that's you, Susanne Hiland,

25   right?

**Hiland - (Cross by Lanier)**

1    **A**    Yes.

2    **Q**    -- "Shannon, there are several states that allow

3    access to the monitoring program information.  We met with

4    several operators, including Ron last summer, and it was

5    decided we would get a legal determination of whether or not

6    to provide or allow this access in our stores.  This

7    includes in Ohio.  The opinion has been that we will not

8    grant access to these databases.  So far, there are no

9    programs that require a pharmacist to check the information

10   before dispensing a prescription, and we have not identified

11   any penalties or onus on the pharmacists in any case for not

12   utilizing the information.  Additionally, we have concerns

13   about misuse."

14        Do you see that?

15   **A**    Yes.

16   **Q**    So in truth, we know that at least back in 2007, OARRS

17   wasn't going to be used in the Connexus system, true?

18   **A**    It was not available in 2007, but we did sometime

19   after that open up access to all the states that had --

20   **Q**    Well, I mean, even that was hesitant.  It wasn't

21   immediate, was it?

22   **A**    Well, again, you can see in the e-mail that some of

23   the conversations that we were having, we were considering

24   access to the programs.  Many of them were brand new.  Many

25   of them, unlike Ohio, didn't allow pharmacists to access the

**Hiland - (Cross by Lanier)**

1    information, so we were trying to make the best

2    determination about use.

3    **Q**    Ma'am, my question was, it wasn't immediate, was it?

4    **A**    No, it wasn't immediate to this e-mail.

5    **Q**    In fact, if we go forward several years --

6            MR. LANIER:  Rachel, 21884, please.

7    **Q**    If we go forward several years to June of 2009, you're

8    still not using it, are you?

9    **A**    I don't know when we actually accessed it.

10   **Q**    Do you have Plaintiffs' 21884 in front of you?

11   **A**    Yes.

12   **Q**    Here's the e-mail.  Sent to you.  We're now in June of

13   2009.

14          "The number of states with prescription monitoring

15   program reporting requirements has grown from 3 in 2006 to

16   39 at the end of 2008.  In 2006, the professional services

17   directors sought legal opinion on risks and/or requirements

18   to grant access to these databases at the pharmacy level.

19   Based on that opinion and discussions with the Operations

20   group, it was decided no access would be granted."

21          You see that?

22   **A**    Yes.

23   **Q**    "Today, the directors in Regulatory Affairs are seeing

24   more and more movement toward mandating access and use of

25   these databases.

**Hiland - (Cross by Lanier)**

1        "This meeting is being called to discuss the issue and

2    determine what our position on access would be going

3    forward."

4        Do you see that?

5    **A**    Yes.

6    **Q**    So for years, plural, as the states grew from 3 to 38,

7    you all still didn't have state access on the computers, did

8    you?

9    **A**    Not at this point of the e-mail.

10    **Q**    In fact, the first time I can find it is in that

11    exhibit that Ms. Fumerton showed, Walmart's 568, which you

12    seem to have written in February of 2010.

13        Is that correct?

14    **A**    So the policy -- that's the first time that the policy

15    appeared, but we -- I know that there were individual state

16    announcements, state-specific communication that went out as

17    we opened up access even ahead of this, which is a practice

18    that we often put into place.  If we had a state

19    requirement, we would announce that to the state.  And then

20    as more and more states came online, we would memorialize it

21    in a broader policy.

22    **Q**    In other words, "Correct, we didn't have a policy

23    until 2010, but in the couple of months before that we

24    started telling people, Hey, it's coming out and available

25    in your state."  Fair?

**Hiland - (Cross by Lanier)**

1    **A**    So it would have been between this meeting to

2    establish the policy in 2009, so mid 2009 we would have

3    started opening up those websites, and then the policy would

4    have been memorialized.

5    **Q**    Right.  And that was in June of 2009.  So that's why

6    I'm saying it would have been in the months before February

7    of 2010, right?

8    **A**    Yes, it would have been in that time period.

9    **Q**    Okay.  So the idea that was painted to the jury of,

10    look, you know, we've got this system, we've got the OARRS,

11    we've got all of this, that OARRS didn't link into the

12    system until much later, did it?

13    **A**    It was available in 2011.  I don't know how early

14    before that, but it was definitely available at least in

15    2011, when the Ohio Board of Pharmacy set forth some

16    requirements for it.  So we were ready and actually had

17    access available.

18    **Q**    Did you know in 2018 Archer was still having trouble

19    connecting to Connexus, that the two didn't talk together as

20    of 2018?

21    **A**    I'm not sure what you mean.  I know that in 2018, we

22    began to pull some of the Archer information forward so that

23    it actually showed in the fill sequence for the pharmacist.

24    It shortened a step so that they didn't have to actually go

25    out and look in Archer, but it popped forward for them.

**Hiland - (Cross by Lanier)**

1   **Q**    Well, ma'am, what I'm referencing here is Plaintiffs'

2   266681.  It's February 2018.

3             MS. LANIER:  26681.  Sorry.  I gave the wrong

4   number.

5   **Q**    Do you have that, ma'am?

6   **A**    I do.

7   **Q**    This is refusal to fill in Connexus.

8             "After the analysis, we've determined this is possible

9   and within the scope of Rapid Response.  However, this will

10  be a rather large undertaking.  Currently, there's no feed

11  established between Archer (where refusals to fill are

12  stored) and Connexus.  To create a direct feed would

13  probably fall out of Rapid's scope due to the level of

14  effort."

15            So the idea that there was this easy hookup in 2015

16  between Archer and Connexus, not really right, is it?

17  **A**    No, it is right.

18  **Q**    Ma'am, is it true that as of 2018, there is no feed

19  established between Archer and Connexus?  Is that a true

20  statement?

21  **A**    So what that's referring to is what I just described.

22  This project took the Archer information and actually linked

23  it to the physician's profile so that when the pharmacy was

24  reviewing prescriptions, they could see attached to that

25  prescriber the information -- the aggregate information from

**Hiland - (Cross by Lanier)**

1    Archer.

2         The preparation that we made is that the link to the

3    Archer system for research was available through that Tools

4    drop-down, just like you would go into a different window on

5    any computer system.  And so this was actually trying to

6    make it easier for the pharmacist to see, but they still had

7    access in 2015.

8    **Q**    "There is no feed established between Archer and

9    Connexus."  My question is simply, is that true?

10   **A**    Not to display it on the prescriber screen, so it's a

11   bit imprecise.

12   **Q**    And that's what you've actually got displayed here,

13   don't you?

14   **A**    That the access to Archer is available through

15   Connexus.  And I did testify that it's available through

16   that Tools link.  It was in 2015.

17   **Q**    But it's not just the -- that's fine.  In 2015, I

18   don't want to quibble at that point in time anyway, so let's

19   move on.

20        Refusals to fill, blanket refusals to fill; remember

21   those questions?

22   **A**    Yes.

23   **Q**    Now, ma'am, you testified about certain inability to

24   refuse to fill based upon, for lack of a better way of

25   saying it, hearsay.  Right?

1   **A**    It wasn't hearsay.

2   **Q**    It what?

3   **A**    It was not hearsay.

4   **Q**    Oh, it's not what someone said to you?

5              MS. FUMERTON:  Objection.

6              THE COURT:  Sustained.

7   **Q**    Ma'am, I don't know your legal -- you told us about

8   the legal training you had.  By hearsay, I mean something

9   someone said to you that I can't cross-examine.

10       Isn't your testimony about we're not allowed to do a

11  refusal to fill out of Texas based upon what you say someone

12  said to you?

13  **A**    It was a conversation and an exchange that I

14  personally had.

15  **Q**    Right.  And you understand that there are a lot of

16  people who contest the validity of what you're saying there,

17  right?

18             MS. FUMERTON:  Objection.

19             THE COURT:  Let's go on the headphones a

20  minute.

21             (At side bar at 2:23 p.m.)

22             THE COURT:  Mr. Lanier, I'm inclined to

23  sustain that objection.  I mean, how would she know there

24  are a lot of people who are contesting it?

25             MR. LANIER:  Because Allison Benz, the

**Hiland - (Cross by Lanier)**

1   executive director of the State Board of Pharmacy, went

2   public and said, quote, "Texas has no rules that would

3   prohibit a pharmacy chain, like Walmart, from instituting a

4   corporate block or blanket refusal to fill," close quote.

5        It was quoted in the *ProPublica* article, which I'm not

6   going to get into, but it's certainly common knowledge.  I

7   have no doubt she's read that article.  And so before she

8   gets up there and says something like that, I think I ought

9   to be able to ask if people take issue with it, "Do you know

10  who Allison Benz is" --

11           MS. FUMERTON:  Your Honor, a couple comments

12  to this.  One, obviously *ProPublica* was in 2020 --

13           THE COURT:  No, not the *ProPublica,* but if the

14  Texas Board of Pharmacy has stated, you know --

15           MR. LANIER:  Publicly.

16           THE COURT:  -- publicly that they never told

17  any pharmacy they couldn't have a blanket refusal, I think

18  that's relevant because that's what Walmart's relying on.

19           MS. FUMERTON:  So a few things, Your Honor.

20       First of all, you have to establish temporal scope

21  here, so 2020 is not 2006.

22           THE COURT:  Well, that's true.  I'm don't know

23  what she's saying.

24           MR. LANIER:  And I'll put it into temporal

25  scope.

**Hiland - (Cross by Lanier)**

1          MS. FUMERTON:  Mr. Lanier is constantly

2     confusing the jury by using the terms "refusal to fill" and

3     "blanket refusals to fill" incorrectly.  His question to

4     Ms. Hiland was, you know, did Texas refuse to --

5          THE COURT:  First of all, I don't know what --

6     the problem is, this person from Texas isn't here, and I

7     don't know what the time frame for that alleged statement

8     is.

9          I mean, what -- this witness testified that she got a

10    communication from -- she herself got a communication from

11    Texas in 2006 or '7, so that's not hearsay.  She's relating,

12    she can relate a conversation she had.  She said, I mean,

13    that she got it.

14         Now, someone in 2020 is commenting on what was or

15    wasn't said in 2006, I doubt that.

16         MR. LANIER:  Judge, first of all, I do want

17    the record to reflect I think it is per se hearsay, if

18    someone told me something.

19         THE COURT:  I didn't allow the contents, but

20    the fact that she had -- she herself had a conversation

21    wasn't hearsay, the fact that she got it, so she said that.

22    Now, when is this -- when --

23         MR. LANIER:  This came out in 2020, Your

24    Honor.  And Allison Benz, I've got the direct quote in front

25    of me, and it does not put it into a time frame that links

```
 1    it back to 2006.  It doesn't put it into any time frame at
 2    all.  It just says Texas has no rules.
 3         And, you know, she's left the impression that not only
 4    did those rules exist in 2006, but after all of this they've
 5    still got people being sanctioned because evidently states
 6    don't allow this.
 7         And it's just wrong.
 8              THE COURT:  I'm not going to -- a statement
 9    from Ms. Benz in 2020 doesn't impeach what may have been
10    said in 2006.
11              MR. LANIER:  Well, I'll go a step further,
12    Your Honor, and I'll tell you that the complaint that was
13    filed by the DOJ that's pending in Texas has multiple pages
14    and paragraphs that set this out as well, and say there's
15    never been any basis in Texas for saying that at all, and
16    decrying the fact that Walmart's hidden behind what they
17    call in the complaint a cut-and-paste job, saying they're
18    not allowed to do refusals to fill in Texas, blanket
19    refusals.
20              THE COURT:  I think you've already established
21    that the basis for this is pretty darn weak.  I'm not going
22    to allow you to ask her about a statement that someone in
23    Texas made in 2020 because it's not -- it doesn't tie back
24    to 2006 or '7.  There may not be any -- who knows what there
25    is in 2020 in Texas.  The issue is what there was in 2006 or
```

1    '7.

2         So I'll sustain the objection the way the question was

3    asked.

4                   (In open court at 2:27 p.m.)

5    BY MR. LANIER:

6    **Q**    Ma'am, let's at least do it like this.

7         Will you agree with me that you have never seen any

8    written policy from Texas that says you can't do a corporate

9    block or corporate refusal to fill?

10   **A**    So I thought we were talking about blanket refusals,

11   but I haven't seen anything related to corporate blocks.

12   **Q**    Or blanket refusals to fill, ma'am.  You've not seen

13   anything that is a written policy from Texas that says a

14   pharmacy cannot enter into a blanket refusal to fill, true?

15   **A**    I believe there -- not true.  And the way that I think

16   about this, I believe what does exist, and I believe we used

17   it in some communication, where the tenets of what the

18   expectations for pharmacists were, which is the individual

19   exercise of professional judgment.  So that's --

20   **Q**    Ma'am, I'm not fussing any of that.  I'm not fussing

21   any of that.

22        I'm asking you about what you have adopted as a

23   corporate policy that you wrote up.  And I'm asking you, was

24   there ever anything in Texas that substantiated in writing

25   that required that corporate policy, that said, a

**Hiland - (Cross by Lanier)**                5224

1    corporation is not allowed to issue a blanket refusal to

2    fill?

3    **A**    No, the word of the Board was enough to me that we --

4    to be able to implement that policy.

5    **Q**    Time out, ma'am.  That wasn't my question.

6          My question was, did you ever see a written policy

7    that says it anywhere in Texas or out of Texas?

8    **A**    Again, the policies that I -- the regulation that I

9    would refer to would be what the requirements of the

10   pharmacists are to exercise their individual professional

11   judgment.

12   **Q**    Now let's go to the Midwest, and let's ask you about

13   Ohio.

14         You've never heard, talked to, smelled, seen, or

15   remotely come upon anything in Ohio that says a company

16   cannot issue a blanket refusal to fill of a controlled

17   substance, true?

18              MS. FUMERTON:  Objection.

19              THE COURT:  Overruled.

20   **A**    No, I've not seen a policy from Ohio.

21   **Q**    All right.  In the interest of time, we're going to

22   move down the road.

23         I'm going to talk to you -- at least sum up.

24         Ma'am, would you agree with me, if you've been selling

25   these things for decades, that y'all ought to have these

**Hiland - (Cross by Lanier)**

1    policies in place before the Federal Government makes you

2    put them into place by agreement?

3    **A**    So we have had policies in place, and we've worked to

4    update them over time, so there's been a continuous process

5    of update.

6    **Q**    Ma'am, that wasn't my question, with all due respect.

7        Can you please answer my question.

8    **A**    I don't understand what you mean by "these policies."

9    We had policies that addressed the requirement to follow

10   state and federal law.

11   **Q**    Ma'am, I'm talking about things like Plaintiffs'

12   20852.

13       MS. FUMERTON:  Can you please show the

14   witness?  She probably doesn't have a memory.

15   **Q**    Brad Nelson, the jury heard this through his

16   testimony.

17       "The MOA," that's the agreement through the Federal

18   Government, right," that requires the reporting of the

19   refusals to fill expires in 30 days.  We have not invested a

20   great amount of effort doing analysis on the data since the

21   agreement's voluntarily over.  Driving sales and patient

22   awareness is a far better use of our market director and

23   market manager's time? "

24       MS. FUMERTON:  Your Honor, request that the

25   witness be given a copy of this.

**Hiland - (Cross by Lanier)**

```
 1    Q      Do you see that?

 2                  THE COURT:  Does she have a copy?

 3                  MR. LANIER:  Oh, I thought she asked me to

 4    display it.  I'm sorry, Your Honor.

 5                  THE COURT:  All right.

 6    Q      Do you see that, ma'am?

 7    A      Yes.

 8    Q      It is true that your company did things differently as

 9    required by the Memorandum of Agreement, isn't it?

10    A      We followed the Memorandum of Agreement.

11    Q      You rewrote a lot of your policies, didn't you?

12    A      We updated some of the policies.

13    Q      Oh, you didn't just update.  You wrote brand new

14    policies because of the Memorandum of Agreement, didn't you?

15    A      There were policies that were created in this time

16    frame, and there were policies that were updated, and they

17    continued to be updated over time.

18    Q      Ma'am, you wrote specific new policies because of

19    this, didn't you?

20    A      We had some policies that were new in the time frame

21    of the MOA.

22    Q      In other words, the answer's yes, we wrote specific

23    new policies because of the agreement, correct?

24    A      Yes.

25    Q      Okay.  Next stop on the road, ma'am, is priorities.
```

**Hiland - (Cross by Lanier)**

```
 1    And we'll get back into some of these same subjects, but I
 2    want to look at them by looking at priorities, okay?
 3         You tracking with me?
 4    A    Yes.
 5    Q    Good.
 6         First of all, you said this morning that Walmart --
 7    you were quizzed about Walmart's business and culture.
 8         Do you remember those questions?
 9    A    Yes.
10    Q    Now, first of all, this should be a business and
11    culture of no excuses, right?
12    A    Yeah, I don't -- yes.  I don't know what you're
13    referring to.
14    Q    Walmart shouldn't be making excuses for what they've
15    done wrong, fair?
16    A    Yes.
17    Q    Walmart should be a leader in this field, right?
18    A    Yes.
19    Q    Walmart shouldn't be the tail wagging the dog.  They
20    should be the dog wagging the tail.  Fair?
21         That may be a bad expression here.  I don't know.  Let
22    me try it this way.
23    A    I don't understand.
24    Q    Walmart is not supposed to just wait until they're
25    forced to do things because they've been caught doing things
```

**Hiland - (Cross by Lanier)**

1    they shouldn't.  Walmart should actually be aggressively

2    leading the way at being the best, right?

3    **A**    I agree.

4    **Q**    It shouldn't be, Well, we don't want to institute this

5    program because it costs too much.  That shouldn't be a

6    consideration, should it?

7    **A**    Well, I think it depends on what the program is.

8    **Q**    If the program is one that deals with safety and

9    following the law, it shouldn't be a consideration, should

10   it?

11   **A**    I agree.

12   **Q**    I mean, Walmart should provide their pharmacists with

13   the resources for doing first-rate work, correct?

14   **A**    I believe we provide our pharmacists with resources so

15   that they can do their job.

16   **Q**    Well, you were asked, Does Walmart ever put profits

17   over safety, and you said, Walmart doesn't put profits over

18   safety ever.

19        Do you remember that?

20   **A**    I don't know if I said "ever," but I don't believe in

21   my experience that that's what Walmart has done.  That's not

22   the way that we approach business.

23   **Q**    But you know even today Walmart is under close

24   examination for this, right?

25   **A**    I mean, in this trial?  I don't --

**Hiland - (Cross by Lanier)**

1  **Q**    I'm referencing you know for a fact that the

2  Department of Justice right now has a 160-page complaint on

3  file against Walmart alleging that the Compliance unit chose

4  not to give its pharmacists the information and authority it

5  knew they needed to comply with the rules.

6         You know that's out there right now, don't you?

7                MS. FUMERTON:  Objection.

8                THE COURT:  Overruled.

9  **A**    I know that there's a DOJ complaint.  I don't know the

10  specifics.

11  **Q**    And you know if we go back in time to even 2013,

12  Walmart was being seen as the funnel for these various

13  prescriptions to be filled because other folks wouldn't fill

14  them, right?

15  **A**    I don't know that.

16                MR. LANIER:  Plaintiffs' 20829, please, Maria

17  and Rachel, 20829.

18  **Q**    Do you have that, ma'am?

19  **A**    Yes.

20  **Q**    In our timeline, we're in 2013 with this document,

21  aren't we?

22  **A**    Yes.

23  **Q**    Brad Nelson gets an e-mail.  "I spent part of

24  yesterday with an inspector, and he wanted to give me a

25  heads-up that the inspectors collectively feel Walmart is

**Hiland - (Cross by Lanier)**

1    starting to become a funnel with C-IIs" -- those are opiates

2    are included in that, right?

3    **A**    Yes.

4    **Q**    -- "due to more liberal policies on dispensing pain

5    medicines.  King Soopers, Walgreens, Safeway, and Target all

6    have algorithms that determine whether or not they dispense

7    a C-II.  Walgreens and King's are required to check PMP on

8    all oxy and hydromorphone medication.  Target is restricting

9    the quantities each month they can order."

10         Do you see that?

11   **A**    Yes.

12   **Q**    This was a concern about Walmart becoming a funnel,

13   and that's not the only time you'll hear that language, is

14   it?

15              MS. FUMERTON:  Objection.

16              THE COURT:  Yeah, I'll sustain the question

17   the way it was asked.

18   **Q**    Okay.  You saw this concern about Walmart becoming a

19   funnel, true?

20   **A**    I see the verbiage that was in this e-mail.

21   **Q**    And that's not the only time you've heard that concept

22   of Walmart being a funnel, true?

23   **A**    I'm not recalling any instance.

24   **Q**    Ma'am, you did an opioid stewardship video.

25              MR. LANIER:  Your Honor, in the interests of

**Hiland - (Cross by Lanier)**

1    time, I'm going to skip it.

2         I'll withdraw that question, ma'am.

3    **Q**    All right, let's say in this time range of 2011 to

4    2013 when we're at priorities, and I want to examine this

5    arena, this area right here.  Okay?

6    **A**    Okay.

7              MR. LANIER:  Rachel, please, 17527 and 14442.

8    **Q**    So there was a number of different programs y'all were

9    putting into place to try and address the Memorandum of

10   Agreement, right?

11   **A**    We did put programs in place.  The one that I

12   specifically recall that was new was the reporting of the

13   refusal to fills.

14   **Q**    Uh-huh.  But y'all were also looking at diversion

15   software.

16        Do you remember that?

17   **A**    Yes, I remember.

18   **Q**    And so if you've got Plaintiffs' 17527 in front of

19   you, you'll see an e-mail that says copied to you, talks

20   about this need for diversion software, and how could you

21   justify spending the money on it.

22        Remember?

23   **A**    I see that.

24   **Q**    It says, "I have given this the best possible shot

25   based on our conversations and your input."

**Hiland - (Cross by Lanier)**

1          And if you see what this is, it's the return on

2     investment for this project that says, "Here's the best way

3     we can say will" -- the project will pay for itself.  All

4     right?  That's what return on investment is, right?

5     **A**     Yes.

6     **Q**     "I have given this the best possible shot," explaining

7     how this program would pay for itself.  "You have provided

8     sound advice and have been very patient in the process.  I

9     appreciate your support.  The exact science and document

10    history around pharmacy diversion is still in development,

11    which makes it very difficult at best to make projections,"

12    talking about projecting how much money might be saved, or

13    cost, right?

14    **A**     I think it could.  I'm not sure if he's specific about

15    what projections are.

16    **Q**     All right, "because the environment's constantly

17    shifting and changing.

18          "However, the attached provides the best snapshot I

19    could put together based on available public information.

20    Some information the company does not want widely

21    distributed due to legal concerns.

22          "I have also copied Susanne Hiland, senior director

23    Pharmacy Compliance, who provided as much information as

24    possible to lend support."

25          Does that help you remember what this may have been?

**Hiland - (Cross by Lanier)**

1    **A**    I remember this project.

2    **Q**    Yeah.  And the bottom line is decisions had to be made

3    about which projects to do and which projects not to do

4    because of money, right?

5    **A**    Well, it was money and other resources, resources to

6    be able to pull the technology together.

7    **Q**    Well, if you'll go to the next document, Plaintiffs'

8    14442, it talks about this and the need to do it within the

9    Connexus system that you're talking about.

10         And the e-mail on the back side says Mr. Mitchell or

11   Ms. Mitchell, I don't know which, "JC Mitchell and Josh

12   Leffler provided me with a list of compliance projects," you

13   see that?

14   **A**    Yes.

15   **Q**    And "compliance" means complying with the law, right,

16   or the Memorandum of Agreement?

17   **A**    Compliance with regulation in general, I believe.

18   **Q**    Yep, "from the business, in order to validate.

19   Additionally, the total capital ask is sitting at $40

20   million, and I have been told (as of yesterday -- not sure

21   if that has changed) that the guidance for the compliance

22   bucket is 25 million.

23         "With all that in mind, could you help me with two

24   things?  Give me a short description of the project and

25   identify if it's high, medium, or low risk."

**Hiland - (Cross by Lanier)**

1            And it's got the projects, including the work on

2      Connexus, and things of that nature.

3            Do you see that?

4      **A**     Yes.

5      **Q**     And then Jeff Brown writes back and says to several

6      people, including you, "I need your attention with high

7      urgency.  I can't stress enough how difficult development

8      dollars are about to be gathered.  Please see the enclosed

9      spreadsheet.  What I need is for you to both take a look at

10     and advise on four columns, D, J, K, and P.  Are these

11     compliance projects, and does the description make sense,

12     and then identify it.

13           "Currently, where we stand is that Opex -- what's

14     Opex, operation expenditures?

15     **A**     Yes.

16     **Q**     Money for operations, right?

17     **A**     Yes.

18     **Q**     "Opex for the entire US business in ISD" -- what's

19     ISD?

20     **A**     Our Information Security Division, so it's the

21     technology division.

22     **Q**     -- "has been lowered to 11 million, just enough to

23     cover compliance projects, and then all development will

24     have to be evaluated on a project-by-project basis."

25           Do you see that?

1    **A**    Yes.

2    **Q**    Then ultimately at the top, you send this e-mail.

3    "Jeff, my comments are attached except this one.  This is

4    like *Sophie's Choice*.  I find it difficult to select one

5    high-need project over another, although I understand that's

6    what we're required to do.  I'm curious on a couple of these

7    though.  Aren't DO and prescriber file set to be completed

8    this year?"  You ask about a few other things as well.

9         Y'all were having to make choices based upon limited

10    dollars during this time period, true?

11    **A**    Well, as a business, each year we had a budget not

12    only of money, but of resources.  There are limits on the

13    number of people that can execute any project.  And as it's

14    stated here, we always prioritized compliance projects

15    highest, and as stated in the memo, those compliance

16    projects were covered.

17    **Q**    Is that a "yes" answer or a "no"?

18         MS. FUMERTON:  Objection.  She's answered the

19    question.

20         MR. LANIER:  No, Your Honor, she --

21         THE COURT:  Overruled.

22    **Q**    Y'all were having to make choices based on limited

23    dollars during this time period, true?

24    **A**    Yes.  I said dollars and people.

25         MR. LANIER:  Rachel, please, Plaintiffs' 7846.

**Hiland - (Cross by Lanier)**

1   **Q**    Do you have that document in front of you, ma'am?

2   **A**    Yes.

3   **Q**    I wanted to bring this back on the efforts of

4   priorities and other things, to talk about the DEA

5   Memorandum of Agreement back in 2011.  We'll finish this

6   time zone up with this, I hope.

7          Look at slide number 9, page 9.

8          This is specifically out of a PowerPoint of Wal-Mart

9   Stores and the DEA Memorandum of Agreement obligations and

10  expectations.

11         Do you see that?

12  **A**    Yes.

13  **Q**    This is one you were giving as a presenter, correct?

14  **A**    Yes.

15  **Q**    And when you said that we had these policies in place

16  already and I was pushing you and saying, "No, you wrote

17  these policies because of the Memorandum of Agreement.  Are

18  you updating because of the Memorandum of Agreement?"

19         Do you remember that?

20  **A**    Yes.

21  **Q**    Look at slide 9 and see if it doesn't show exactly

22  what I was saying.

23         "Updated and new policies."

24  **A**    Yes.

25  **Q**    Part of your obligation and expectation was to update

**Hiland - (Cross by Lanier)**

```
 1    that POM on red flags, wasn't it?

 2    A    Yes, the policy was updated.

 3    Q    Update the monthly C-II audit policy, correct?

 4    A    We did update it.

 5    Q    Update the prescription monitoring program, correct?

 6    A    Yes.

 7    Q    Update the forged or altered prescriptions, correct?

 8    A    Yes.

 9    Q    And then write brand new policies on proper

10    identification, POM 1313, correct?

11    A    Yes.

12    Q    Write new policies on out-of-state prescribers,

13    correct?

14    A    Yes.

15    Q    Write new policies on early refills, true?

16    A    Yes.

17    Q    Write new policies on pharmacy-added prescriber ID,

18    also true?

19    A    Yes.

20    Q    And then make the Connexus enhancements that I was

21    suggesting were also done because of this.  That's on slide

22    12.

23         Do you have page 12?

24    A    Yes.

25    Q    "Connexus enhancements will roll out throughout the
```

**Hiland - (Cross by Lanier)**                              5238

```
 1    year to further enhance requirements of the MOA."

 2         Do you see that?

 3  A    Yes.

 4  Q    And that's what your company continued to do at least

 5    until the four years was over.  Fair?

 6  A    Yes.

 7  Q    So to stand up here and just say, We're a great

 8    company, look at all of the things we were doing, a little

 9    bit out of context if you don't understand that you were

10    being forced to do it.  Agree?

11  A    Well, again, some of these were updates, and these

12    were enhancements to the program.  And we were working to

13    meet the requirements of the MOA that we agreed to.

14  Q    But, ma'am, if you look --

15         MR. LANIER:  Please, Rachel, do we have

16    Plaintiffs' 14585?

17  Q    Your compliance was still having some trouble, wasn't

18    it?

19         You know who Jim Langman is, don't you?

20  A    Yes.

21  Q    He's in your division, isn't he?

22  A    Yes.  Well, he was in the Compliance organization.

23  Q    Of Health and Wellness, right?

24  A    Yes.

25  Q    March 19, 2014.  Health and Wellness Compliance.
```

**Hiland - (Cross by Lanier)**

 1      Look at that slide on page 8.

 2      Do you see that?

 3  **A**   Yes.

 4  **Q**   Have you seen the video that goes with this snapshot?

 5  **A**   Yes.

 6  **Q**   "As I noted, one of the compliance program priority

 7  areas noted in the exercise was in the area of controlled

 8  substances/DEA compliance.

 9      "An illustration of the risk is depicted in this

10  picture taken last July."

11      That would have been 2013, right?  Actually, no, it's

12  July 2012.  Excuse me.

13      See it up there?

14  **A**   Yes.

15  **Q**   "We began to assess our processes after we learned of

16  lines forming for scripts beginning at 7 a.m.  The pharmacy

17  opened at 9:00.  The ensuing investigation discovered a very

18  high number of prescriptions for oxycodone.  This situation

19  gave us the opportunity to put some additional operation

20  controls in place to mitigate the risk of our pharmacies

21  becoming the pharmacy of choice for pill mills."

22      Do you see that?

23  **A**   Yes.

24  **Q**   And you've seen the video.  It's pretty atrocious,

25  isn't it?

**Hiland - (Cross by Lanier)**

1   **A**    It's a line of people standing waiting at the

2   pharmacy.

3   **Q**    Forming two hours early, right?

4   **A**    Yes.  And so we did take that information and, as Jim

5   Langman notes, we did address it.

6   **Q**    All right.  Ma'am, I was going to talk to you about --

7   let's just do --

8              MR. LANIER:  Mr. Weinberger, am I out of time?

9              MR. WEINBERGER:  Pretty close.

10             MR. LANIER:  Okay.

11  **Q**    One last stop on the road is attitude.

12         Ma'am, it's not that y'all had trouble with the

13  information and gathering information, fair?

14         Let me take a step back.

15         Your computers were able to gather information and did

16  it routinely, from way early on, right?

17  **A**    Our Connexus stores the information that's required

18  for dispensing.

19  **Q**    Well, it not just stores the information.  You know

20  y'all were selling that information to IMS, right?

21             MS. FUMERTON:  Objection.

22             THE COURT:  Overruled.

23  **A**    I don't know that.

24  **Q**    You don't know anything about the agreement for

25  Walmart to ship information to IMS in return for IMS giving

**Hiland - (Cross by Lanier)**

1    Walmart information?

2    **A**    No, I don't know that.

3                MR. LANIER:  Your Honor, I'm going to pass the

4    witness at this point in time.

5                THE COURT:  Okay.  Ladies and gentlemen, I

6    think what we'll do is this:

7          Do any of the jurors have any questions for

8    Ms. Hiland?  I think what we'll do is if you do, if you can

9    give those to Mr. Pitts and then we'll take a break, and the

10   lawyers can look at those questions and decide what to do on

11   their next round, because we're almost at 3:00.

12         Do you have them all?

13         We'll take our mid afternoon break.  Usual admonitions

14   apply.  We'll come back in about 15 minutes for the balance

15   of Ms. Hiland's testimony.

16                (Recess taken at 2:55 p.m.)

17                (In open court at 3:16 p.m.)

18                MS. FUMERTON:  Your Honor, I believe

19   Mr. Lanier had an objection to one of the juror

20   questionnaires that we need to address.

21                THE COURT:  No one has to ask a question, but

22   does someone want to raise something?

23                MS. FUMERTON:  Your Honor, I think I would ask

24   the question if permitted to do so.

25                THE COURT:  Let me see the question, please.

1          MS. FUMERTON:  Sure.  May I approach?

2          THE COURT:  Yes.

3          MR. LANIER:  I think this question is

4     indicative of the problem we've got.

5          THE COURT:  Let me just see the question,

6     please.

7          This is the question:

8          MR. MAJORAS:  I don't think the witness should

9     be here for this.

10         THE COURT:  All right.  Fine.

11         (Witness not present.)

12         THE COURT:  All right.  Everybody can be

13    seated for a minute.

14         The question is:  What states have taken action

15    against Walmart for a corporate block?

16         No states have taken action against Walmart for a

17    corporate block, so the question shouldn't be asked.

18         MS. FUMERTON:  So, Your Honor, this is

19    something -- I'm happy to disseminate this document at this

20    point because there seems to be some confusion.  This was

21    produced in discovery.  This was on our exhibit list.

22         Mr. Zao, would you mind -- Your Honor, can he

23    approach?

24         THE COURT:  Yes.  If there's a document, let's

25    see it.

**Hiland - (Cross by Lanier)**

1    The witness didn't say there was any action taken

2    against Walmart for a corporate block.

3         MS. FUMERTON:  I think actually I didn't ask

4    the question specifically in that way, Your Honor, so I

5    think that's correct.  I did ask if they had gotten any

6    pushback from the state boards of pharmacy.

7         THE COURT:  Right.  I think there was a

8    general, yes.

9    All right.  This document looks like Administrative

10   Warning, State of Wisconsin.  There is evidence of

11   professional misconduct by Walmart Pharmacy, Number 10-1650.

12   On May 17, 2017, this pharmacy informed a local clinic that

13   the pharmacy would no longer fill controlled substance

14   prescriptions from that clinic due to concerns of

15   overprescribing.  The broad prohibition above deterred

16   pharmacists at the pharmacy from exercising their

17   independent clinical judgment regarding dispensing

18   controlled substance pursuant to a prescription order.

19   It says it's a minor violation of Wisconsin

20   Administrative Code, et cetera, and issuance of this

21   administrative warning will adequately protect the public,

22   and no further action is warranted.

23   December 6, 2018.

24        MR. LANIER:  Of note, Your Honor, if I'm not

25   interrupting your train of thought.

**Hiland - (Cross by Lanier)**

```
1              THE COURT:  Okay.
2              MR. LANIER:  There's two things.  Number one,
3    this is a clinic.  It was not a block of a doctor.  Point
4    number one.
5         Point number two, obviously December 6, 2018, has got
6    scant relevance, if any, to our case and our allegations
7    about what policies were back in the day.
8              THE COURT:  Well, it's not being offered for
9    that.  I think the -- I mean, there has been general
10   testimony about -- I mean, we know when Walmart changed its
11   policy, and there was a question, has there been any
12   pushback.  All right, I guess this would be considered a
13   pushback.
14             MR. LANIER:  Then I'll lapse back to my first
15   argument, which this is a clinic, things not a doctor.
16             THE COURT:  They were a prescriber, all right?
17   That's -- it's a prescriber.
18             MR. LANIER:  Well, no.
19             THE COURT:  Well, it's a prescriber.  This
20   clinic is a prescriber, and at least the Wisconsin Board of
21   Pharmacy found that Walmart had issued a blanket refusal to
22   fill controlled substance prescriptions from that clinic due
23   to concerns of overprescribing.
24        And this Board said that that interfered with the
25   individual pharmacists' ability to exercise their
```

**Hiland - (Cross by Lanier)**

1      independent clinical judgment.

2           So I'll allow you, Ms. Fumerton, to ask this -- ask

3      the witness if she knows anything about this.  If she does,

4      you know, fine.  She can say, well, this happened, all

5      right?  And if she doesn't, she doesn't.  But I don't want

6      you asking this question of the juror because this was not

7      a -- there's been no testimony that states have taken any

8      action against Walmart for a corporate block.

9           But you can elicit this, if she knows something about

10     this action against this Walmart pharmacist in Wisconsin,

11     then make sure it's clear it's December 2018 if you use it.

12     I'll allow that.

13               MS. FUMERTON:  Thank you, Your Honor.

14          And with respect to the juror question, especially in

15     light of the comment that was left on the table this morning

16     that you brought to everyone's attention, I think it would

17     be helpful to sort of explain, and frankly, I think, you

18     know, maybe it's just generally one of the parties, but

19     there seems to be an implication that somehow the defendants

20     are not reading the questions in the same way that

21     plaintiffs were.

22          And given that this is an objection from Mr. Lanier, I

23     don't want it to seem as if I'm not asking the question

24     because I've chosen not to do so.

25               MR. WEINBERGER:  Well, the fact of the matter

1    is that on several occasions Mr. Majoras rephrased the

2    question and did not ask the question directly with respect

3    to questions that they --

4              THE COURT:  I'm not going to say anything more

5    about questions.  You know, that was one juror.  You know, I

6    read it so counsel could hear it.  At least one juror has a

7    problem with the way counsel was asking questions, okay?  So

8    I read it, so everyone knows, and you can do whatever you

9    want with it.

10         So let's bring the witness back in, please.

11                   (Witness is present.)

12                   (The jury is present at 3:26 p.m.)

13              THE COURT:  Please be seated.

14         Ms. Hiland, you're still under oath.

15         Ms. Fumerton, you can commence your redirect, please.

16                   - - - - -

17                   REDIRECT EXAMINATION

18   BY MS. FUMERTON:

19   Q    Ms. Hiland, the jury has asked -- is permitted to ask

20   a number of questions, and they have written those questions

21   out that I'm going to go over with you briefly.

22         I will say that to preview, a number of them have to

23   do with refusals to fill, blanket refusals to fill, and

24   corporate blocks.  And so before I get to the questions, I

25   want to one more time make it clear to everybody that I

1    think Mr. Lanier may have accidentally used some incorrect

2    terminology.

3        "What is a refusal to fill?"

4    **A**    That is an individual assessment of a prescription

5    that it's presented to the pharmacist where the pharmacist

6    determines that they will not dispense that prescription

7    based on the exercise of their personal judgment.

8    **Q**    And have pharmacists always had the ability at Walmart

9    to refuse to fill?

10   **A**    Yes.

11   **Q**    What is a blanket refusal to fill?

12   **A**    A blanket refusal to fill is a decision by a

13   pharmacist based on a pattern that they have experienced

14   with a prescriber, where they make the decision that they

15   will no longer fill any controlled substance prescriptions

16   for that prescriber.

17   **Q**    And that policy -- and blanket refusals to fill were

18   prohibited prior to July 2015, and then the policy changed,

19   correct?

20   **A**    Correct.

21   **Q**    And what is a corporate block?

22   **A**    A corporate block is a decision by Walmart to block

23   all controlled substance prescriptions for a specific

24   prescriber, and so it makes it so that it's not possible to

25   fill the prescription within our Connexus system.

1    **Q**    Thank you.

2              MS. FUMERTON:  Mr. Pitts, could I have the

3    ELMO, please?

4              THE COURTROOM DEPUTY:  It's still on.

5    **Q**    All right.  So here are our questions.

6         The first one:  "What year was the corporate block

7    instituted in the Walmart policy?"

8    **A**    So in the policy, the first policy, it appeared in

9    January of 2017.  We had previously blocked -- instituted a

10   block in late 2016, but the policy reflected it in 2017.

11   **Q**    Next question, and I'm just going to cover it so we

12   can do one at a time here.

13        "When a central block is put in place, does it only

14   apply to controlled substances?"

15   **A**    Yes.

16   **Q**    "Prior to 2015, how were refusals to fill documented?"

17   **A**    So before 2015, so starting in 2011, we used a Webform

18   that the pharmacist accessed to register their refusal to

19   fill, and so those were sent to the office and aggregated

20   from that Webform process.

21   **Q**    The second question is:  "Are these shared between

22   stores in the area?"

23   **A**    So the refusal to fill information in Archer, any

24   pharmacist can go in and search for that information.

25        In the 2011 time frame we did provide aggregate

1    reporting to the leadership, but we didn't push that down to

2    the stores.  But the market directors, regionals, did get

3    aggregate reports based on what was submitted from their

4    area.

5    **Q**    What was the expectation by providing that information

6    to the regional and market directors?

7    **A**    So the requirement and obligation under the MOA was

8    that we report refusal to fills to the DEA.  That isn't a

9    requirement and hadn't been a prior requirement.  And so we

10   were providing that information to the DEA, and we expected

11   our market directors and regionals, and even the

12   divisionals, to go out and talk about the policy and the

13   expectation, and just make sure that the teams understood

14   the requirement and that they were participating in filling

15   those out as they were refusing to fill.

16   **Q**    "If one pharmacist issues a blanket refusal, does that

17   prohibit all pharmacists at all Walmarts from filling that

18   prescriber?"

19   **A**    No.  So the blanket refusal to fill, it is an

20   individual pharmacist decision based on their professional

21   judgment and the experience that they've had with that

22   prescriber.

23        We do ask that when a blanket refusal to fill is

24   issued that the pharmacists in that pharmacy discuss it,

25   that the pharmacy manager is notified if they're not the

**Hiland - (Redirect by Fumerton)**

1    pharmacy manager, and then all of the pharmacists in that

2    pharmacy are made aware of a pharmacist's decision to

3    blanket refuse, and then it's up to each individual

4    pharmacist to make their own professional assessment.

5    **Q**    I think this one was asked or at least a version of it

6    was asked, but I'm going to ask it anyway just to make sure

7    that we're clear.

8         "How were refusal to fill prescriptions reported prior

9    to the e-mail 1/15/2013?"

10   **A**    So refusal to fills were from 2011, when we

11   implemented the program, until we brought Archer online in

12   2015, were collected through the Webform.  And so that was a

13   form that the pharmacist could populate on The Wire, and

14   then it was transmitted to the office.

15   **Q**    "Do Walmart pharmacies give the refusal to fill

16   prescription back to the patient?"

17        So I think the jury has heard some testimony about if

18   a prescription has been refused, what should the pharmacist

19   do.

20   **A**    Sure.  So it somewhat depends on the reason that they

21   refuse to fill.  In our policy that you've heard us talk

22   about, POM 1703, which is forged and fraudulent, if the

23   pharmacist refuses to fill because they've verified that

24   it's a forgery or a fraudulent prescription, that means that

25   the prescriber says I didn't issue that prescription.  And

1    those are not returned unless the pharmacist feels

2    threatened in any way, and then we tell them, you know, just

3    be safe in that case.

4        I mean, we -- in that instance, we also -- we copy the

5    prescription even if it is handed back so that we have that

6    to share with law enforcement when they're notified.

7        If the refusal to fill is based on the pharmacist's

8    professional judgment or they're not able to clear a red

9    flag, we do return the prescription because, again, there

10   may be -- the patient has seen the physician, they've sought

11   medical care.  There may be more information that can be

12   gathered later that would clear the red flag.  And so the

13   prescription is returned to the patient.

14   **Q**    And I think you might have answered this, but with --

15   with your last answer, but "If so, why is this done?"

16       Would you like to elaborate at all on that?

17   **A**    Yeah, I think it's the distinction.  Again, these are

18   complicated decisions and complicated issues, and it's

19   generally returned because the patient and the physician are

20   saying it's valid, and the pharmacist has the information

21   that they have, but there may be other information that

22   someone can gather later that would allow the prescription

23   to be filled.

24   **Q**    "How was it known to other pharmacists/pharmacies the

25   patient had a refusal to fill?"

**Hiland - (Redirect by Fumerton)**

1    **A**    So from a patient perspective, there wasn't a clear

2    transfer of information.  There is some information that can

3    be gathered within Archer, but it would be conversations.

4    And the same concept applies.  A pharmacist could blanket

5    refuse to fill for a patient as well, but it's just less

6    common.

7    **Q**    Are there other places within Connexus that a

8    pharmacist could note that information?

9    **A**    There are.

10    So from the patient profile there are pharmacy notes,

11    and then within the filling process, each step of the way

12    has Rx notes.  There are counseling comments that can be

13    made as well.  So at whatever step the prescription got to,

14    there's at least a profile note that can be made if there's

15    something that was refused.

16    **Q**    "Is a notation made on the prescription as to it being

17    refused to be filled?"

18    **A**    No, there's no -- we don't have a requirement to make

19    a note on the prescription itself.

20    **Q**    Is that also true if it's a forged or fraudulent -- if

21    it's considered a forged or fraudulent prescription?

22    **A**    So that's -- again, that's kind of a different

23    scenario, but pharmacists often do make some notation.  We

24    didn't direct it in policy, but pharmacists would draw a

25    line across it or make a note that said, you know, presented

1   at, you know, another pharmacy on this date, just so that

2   another pharmacist might know.

3   **Q**    This is a good question that's going to require me to

4   try to pull something up.

5        "Why doesn't the POM 203 have a date along with a

6   revised extension?  For example, June 2015, Revision 1, as

7   without it we can only think that it is a new policy."

8                    MR. WEINBERGER:  You didn't show the whole --

9                    MS. FUMERTON:  Oh, I'm sorry.  Thank you,

10  Mr. Weinberger.

11  **A**    That's a really great question and maybe something

12  that we need to adopt, but we just always have kind of

13  updated what's the most recent one.  And then The Wire team

14  kept track of when it was posted so that we would know when

15  that version of the policy was in effect.

16       And so I think from our standpoint, we just always

17  published to the field what was current at that time.  And

18  then they could also tell, you know, I've looked at this,

19  you know, it's a year old or whatever.  They would kind of

20  know a time frame of when they might have last read the

21  policy to know if they'd seen the changes.

22  **Q**    And specific to this POM, 203, I think the version

23  that I did show you was from 2015.

24       Do you recall, was that a new policy at that time?

25  **A**    No, that was a policy that had been in place for quite

 1    some time.

 2    **Q**    Switching subjects.

 3         "How long do notes stay in the patient profile?"

 4    **A**    Once they're entered, they're there forever.

 5    **Q**    And are there additional places other than patient

 6    profile where a pharmacist could make notes?

 7    **A**    Yes.  There are Rx notes and then there are counseling

 8    notes as well.

 9    **Q**    And that's all within Connexus; is that correct?

10    **A**    It is all within Connexus.  And the Rx notes option

11    is -- shows up in every screen, so that if a pharmacist is

12    working in one screen, there would be Rx notes, but then

13    when they go to the next screen, that would come up again.

14    So they have the opportunity to document at different spots.

15    **Q**    I feel like the jurors have coordinated on their

16    questions because they're flowing very nicely from your last

17    answer.

18         "Does the pharmacist have more than one monitor in

19    front of them to be able to see and look up information

20    without losing the original screen info?"

21    **A**    Generally, no.  There are some locations that are dual

22    screens, but it's usually because of the way that the

23    computer is used, whether it's intended to be

24    counseling-only because there's another window close by.

25         So the way that the computer system works, if you're

**Hiland - (Redirect by Fumerton)**

1    within Connexus, it's flowing, and you can access different

2    information from some of those drop-downs or there may be

3    links that would take you directly to a service or a

4    different resource.  But there's something called a toggle

5    that the pharmacist can go back and forth from one screen to

6    the next and have multiple screens kind of open in the

7    background, and they can move between them.  But they

8    generally can't see two different pieces of information.

9         One of the reasons we do that is when they're filling,

10   we really want them focused on filling and not distracted by

11   something else that's open on their screen.

12   **Q**    And while we're on the subject of the Connexus screen,

13   I just wanted to follow up on one question that Mr. Lanier

14   asked.

15        And so this is a screen that you testified about

16   before.  And do you recall Mr. Lanier asking you a series of

17   questions about Archer and how pharmacists could access

18   Archer through Connexus?

19   **A**    Yes.

20   **Q**    And you mentioned the Tools drop-down.

21        Is that depicted here on the screen?

22   **A**    Yes.  It's in the very upper bar.  And that's a link

23   that provides a drop-down that shows the different access

24   points to the different systems.

25   **Q**    So is this what a pharmacist would click on to access

1    Archer starting in 2015?

2    **A**    Yes.

3    **Q**    "How many Memorandum of Agreements have been issued

4    against Walmart, and where?"

5         And I think this question is a follow-up from the 2011

6    MOA that Mr. Lanier asked you a series of questions about.

7    **A**    So the MOA was an individual agreement that was --

8    that covered the U.S., and so that was a different type of

9    agreement.

10   **Q**    Is that the only agreement of that type that Walmart

11   has entered into?

12   **A**    That's the only nationwide agreement that we've had.

13   **Q**    I want to talk some more about that 2011 MOA.

14        2011 was repeated often by Mr. Lanier in his series of

15   questions to you, specifically with respect to the date of

16   various Walmart policies and different e-mails that we

17   looked at.

18        Did Walmart do updates to Connexus before the 2011

19   MOA?

20   **A**    Yes.

21   **Q**    Did Walmart update its policies prior to the 2011 MOA?

22   **A**    Yes.

23   **Q**    Once the MOA expired, did Walmart continue to update

24   Connexus?

25   **A**    Yes.

1    **Q**    Similarly, once the MOA expired, did Walmart continue

2    to update its policies?

3    **A**    Yes.

4    **Q**    And in your testimony in response to these questions,

5    you told Mr. Lanier that you had already various programs,

6    training, and policies in place prior to the 2011 MOA.  What

7    were those?  And please be as specific as possible.

8    **A**    So we had -- as I testified, at one point we had over

9    200 policies in place.  And I know those weren't all

10   specific to controlled substances, but we had -- you've seen

11   POM 203, the pharmacist's responsibility.  We have a policy

12   that is 205, that is around professional ethics.

13        We have a series of policies in a different section,

14   the 900 section, that's around diversion and asset

15   protection.

16   **Q**    And I'm going to stop you because I actually might

17   have that handy.

18        So is this the POM that you're referring to?

19   **A**    Yes, that's one of them.

20   **Q**    It's not quite high enough.

21   **A**    That's one of the early --

22             MS. FUMERTON:  It's in Tab 8 in your binder.

23             MR. LANIER:  Thank you.

24   **Q**    Ms. Hiland, it's in Tab 8 of your binder if you want

25   to look at it more specifically, but for the record, this is

**Hiland - (Redirect by Fumerton)**

1      WMT-MDL-00299.

2           And so what is POM 912?

3      **A**    Can you repeat the tab?  I'm sorry.

4      **Q**    Yes.  Tab 8.

5      **A**    8.  Okay.  Thank you.

6           So POM 912 was in the 900 series, which was our asset

7      protection or loss prevention -- again, those names changed

8      over time -- series of policies, and this was specific to

9      the pharmacists' obligations to guard against diversion.

10          And this specifically used -- well, it didn't say red

11     flags, used something called indicators that a prescription

12     may not have been issued for a legitimate purpose.

13          To the best of my knowledge and the way that I used it

14     and referenced it, this list and the list as it appeared in

15     1703 and initially in 1311 were from the Pharmacist's

16     Manual, the DEA Pharmacist's Manual on prescription fraud.

17          There was a version that was issued for most of the

18     time that I was in Compliance, there was a version that we

19     used.  And I know this because we always referred to

20     Appendix O, and we would send Appendix O out to our

21     pharmacists as part of communication if they ever had a

22     question or they suspected that they had some diversion

23     activity in their pharmacy, however we were communicating,

24     and we relied on that DEA document for that information.

25     **Q**    And you mentioned Appendix O, and that was to the DEA

1    Pharmacist's Manual?  Is that what you said?

2    **A**    Yes.  It was specifically called the DEA Pharmacist's

3    Manual, and I think the subtext was on prescription fraud,

4    or something close to that.  It's been a while since I've

5    looked at it.

6    **Q**    Do you recall when you first looked at that or what

7    specific version of the DEA Pharmacist's Manual you saw that

8    in and that you were circulating to Walmart's pharmacists?

9    **A**    I had a paper copy.  The most -- again, the most

10   common version I used was the 2001 version of that manual,

11   and I actually had the manual in my office.

12   **Q**    And have you looked at DEA Pharmacist's Manuals since

13   that time to see if there are similar indicators in that

14   manual?

15   **A**    I know that there was a version in 2010 that that was

16   updated.  I can't remember how they updated it.

17        I did take a look -- I haven't used the manual, but I

18   did take a look to see if red flags are referenced, and

19   they're not.  It still says "Indications that a prescription

20   may not be valid."

21   **Q**    And is that a reason why when you were involved in

22   drafting policies, Walmart similarly used the term

23   "indications"?

24   **A**    In my experience, the reference that we used was

25   trying to mirror the guidance from the DEA.

1   **Q**    And just -- I'm on the ELMO here, but just so the jury

2   can see, what is the date of this particular document?

3   **A**    January 28, 2005.

4   **Q**    So that's before 2011, correct?

5   **A**    Yes.

6   **Q**    And you mentioned 1311, and we've talked about that a

7   lot, but I want to look specifically at Plaintiffs' Exhibit

8   P-21228.  If we pull it down here, this is POM 1311.  Are

9   you familiar with this document?  I think you've already

10   testified about it.

11   **A**    Yes.

12   **Q**    And just to remind the jury, what's the date of this

13   document?

14   **A**    February 2009.

15   **Q**    And that's before 2011 too?

16   **A**    Yes.

17   **Q**    Mr. Lanier also asked you a series of questions about

18   some Walmart e-mails relating to PMP access.

19        Do you recall that?

20   **A**    Yes.

21   **Q**    And specifically, some e-mails where -- I'm not trying

22   to put words in your mouth, so you can describe it how you

23   want -- where there were some concerns expressed about the

24   PMP in the early days.  Is that fair?

25   **A**    Yes.

**Hiland - (Redirect by Fumerton)**

 1   **Q**    Can you please explain to the jury what those concerns

 2   were?

 3   **A**    So as prescription monitoring programs were coming

 4   online, we were seeing states do different things with

 5   access and expectations around the use of them.  And we were

 6   concerned that opening access, it's possible that someone

 7   could look into someone's controlled substance history while

 8   they're not looking to, you know, make a determination about

 9   a prescription.  So there were some early concerns about

10   patient privacy.  It was just too new for us to really

11   understand how it would be used, and so that's what that was

12   referring to.

13   **Q**    And you can look at Tab 15, if you want to, to see the

14   particular Walmart POM that deals with PMPs.

15       But can you tell the jury when that POM went into

16   place?

17   **A**    February of 2010.

18   **Q**    That's before 2011, right?

19   **A**    Yes.

20   **Q**    Last question -- well, famous last words.  I'm not

21   going to say it.

22       Ms. Hiland, one last topic I should say.

23       Mr. Lanier asked you if you had seen any document

24   evidence of a state not approving of blanket refusals to

25   fill.  And I think you testified that the Texas Board's word

1    was good enough for you.

2         I would like to show you what has been marked as

3    WMT-MDL-01334.  I think Mr. Zao will approach.

4         Have you seen this document before, Ms. Hiland?

5    **A**    Yes.

6    **Q**    Okay.  And I'm going to turn to I think it's the third

7    page of this document.

8         Could you please describe for the jury what this

9    document is?

10   **A**    It's what I would call a Board sanction.  It's listed

11   as an administrative warning from the Board of Pharmacy in

12   Wisconsin.

13   **Q**    And looking at that more specifically, the first

14   paragraph said, "This administrative warning is issued by

15   the Pharmacy Examining Board to Walmart Pharmacy 10-1650,"

16   and then it lists an address, "pursuant to a Wisconsin

17   statute.  The Board makes the following findings."

18        Could you please read what the first finding is,

19   including A and B?

20   **A**    "1, there is evidence of professional misconduct by

21   Walmart Pharmacy Number 10-1650, to wit:  A, on May 17,

22   2017, Walmart Pharmacy Number 10-1650 (Pharmacy) informed a

23   local clinic that the pharmacy would no longer fill

24   controlled substance prescriptions from that clinic due to

25   concerns of overprescribing."

1    And, "B, the broad prohibition above deterred

2    pharmacists at the pharmacy from exercising their

3    independent clinical judgment regarding dispensing

4    controlled substances pursuant to a prescription order."

5    **Q**    And can you please read the last paragraph, starting

6    with "The Board."

7    **A**    "The Board issues this administrative warning and

8    hereby puts Walmart Pharmacy Number 10-1650 on notice that

9    any subsequent similar violation may result in disciplinary

10    action.  The investigation of this matter, Case Number 17

11    PHM 095, is closed."

12    **Q**    Is this an example of what you were referring to

13    earlier as pushback that Walmart has received from state

14    boards of pharmacy for instituting blanket refusals to fill

15    or corporate blocks?

16    **A**    Yes.

17    **Q**    And how does that put Walmart in a difficult position?

18                MR. WEINBERGER:  Objection.

19                THE COURT:  Let's go on the headphones a

20    minute.

21                (At side bar at 3:54 p.m.)

22                THE COURT:  First of all, it's leading.  The

23    witness hasn't said anything about putting Walmart in a

24    difficult position at all.

25                And second, you know, this is redirect.  So I'm going

1    to sustain the objection to the question as asked.  I've

2    allowed you to bring it out.  It's -- you know, it's a

3    written statement that you can sanction against a Walmart

4    pharmacist.  I think it's the only one that she mentioned,

5    but -- so I'm going to sustain the objection to the question

6    you asked.

7                    (In open court at 3:55 p.m.)

8    BY MS. FUMERTON:

9    Q    Ms. Hiland, are you aware of any other instances where

10   a state Board of Pharmacy has pushed back on Walmart's

11   corporate block or blanket refusal to fill policies?

12                   MR. WEINBERGER:  Objection.

13                   THE COURT:  Overruled.

14   A    Yes.

15   Q    Could you please explain to the jury what other

16   pushback Walmart has received?

17                   THE COURT:  Well, hold on.  Let's go back on

18   the --

19                   (At side bar at 3:56 p.m.)

20                   THE COURT:  If there's a -- if there's a

21   document, that's how we got into this.  There actually was a

22   document, and so she wasn't relating hearsay.

23        How is she -- if her knowledge is hearsay, I'm not

24   going to permit it.  If there's a document, she can say,

25   here's the document.  If someone called her, she can relate

```
 1    that, you know, some Board of Pharmacy called me.

 2         But what's the basis of her knowledge?  What do you

 3    expect her to say, Ms. Fumerton?

 4              MS. FUMERTON:  Your Honor, we'll move on.

 5              THE COURT:  Okay.  All right.

 6              (In open court at 3:57 p.m.)

 7              MS. FUMERTON:  Ms. Hiland, thank you for your

 8    time.  That's all the questions I have.

 9         Right now, I'll pass the witness.

10              MR. LANIER:  All right, Your Honor, may it

11    please the Court, ladies and gentlemen.

12         Ms. Hiland, I've got a handful of subjects, but

13    they'll be very brief, okay?

14                        - - - - -

15                   RECROSS-EXAMINATION

16    BY MR. LANIER:

17    Q    Let's start with refusals to fill.

18         You got asked a number of questions by jurors about

19    the refusals to fill and how easy they are to access.

20         Do you remember those questions?

21    A    Yes.

22    Q    They're not that easy to access in the system

23    historically, fair?

24    A    The links took them to a system that required them to

25    fill out forms, and so it did take time for our pharmacists
```

 1    to fill those out.

 2    **Q**    Okay.

 3                  MR. LANIER:  Rachel, please, 20849.

 4                  MS. FUMERTON:  Your Honor, this is --

 5    **Q**    Ma'am, do you have 20849 in front of you?

 6    **A**    Yes.

 7    **Q**    You'll see on the second page an e-mail from Miranda

 8    Johnson, 2016, about refusal to fill reporting.

 9          A little inconsistent with what you said, isn't it?

10                  MS. FUMERTON:  Objection.  Scope.

11                  MR. LANIER:  Well, it's a juror note, Judge.

12                  MS. FUMERTON:  It's also recross.

13                  THE COURT:  Overruled.

14    **Q**    Says, "I've gotten several requests from regionals for

15    access to refusal to fill reporting.  Do we have

16    representative at Paul's staff meeting that could bring this

17    up and ask for approval to allow regionals to access the

18    Archer dashboard?"

19          That's in 2016, isn't it?

20    **A**    Yes, that is the regionals.  The regionals didn't have

21    the same access as the pharmacists.

22    **Q**    And if we roll into 2018, the data is still very

23    difficult to find in there, isn't it?

24                  MR. LANIER:  Rachel, 26705, please.

25          Thank you, Maria.

**Hiland - (Recross by Lanier)**

1    **Q**    Do you have that, ma'am?

2    **A**    Yes.

3    **Q**    If you look at it, you'll see in 2018, July of 2018,

4    this e-mail that says, "Currently in the pharmacies, if the

5    pharmacist makes a professional judgment based on identified

6    red flags to not fill a prescription for a controlled

7    substance, the pharmacist submits a refusal to fill form in

8    Archer."

9        Do you agree so far?  That's consistent with what you

10   said, right?

11   **A**    Yes.

12   **Q**    But look what it says.  "These forms are collected and

13   stored in Archer."

14       Still agree with you, right?

15       You agree with that so far, right?

16   **A**    Yes.

17   **Q**    "However, pharmacists do not have easy access to this

18   information, especially if the pharmacist is from another

19   store."

20               MS. FUMERTON:  Objection.

21               THE COURT:  Hold it.

22       All right.  Overruled.  It's overruled.

23   **Q**    "This information could be used to clear red flags or

24   identify red flags that may indicate the prescription was

25   not issued for a legitimate medical purpose.  In order to

 1    ensure the pharmacist is equipped to make the most

 2    appropriate decision, this information needs to be readily

 3    available.

 4         "Currently, pharmacists do not have easy access to

 5    this information to utilize in their professional judgment.

 6    The need is to get this project into the hands of the

 7    pharmacists as soon as we can."

 8         Did I read that correctly?

 9    **A**    Yes.

10    **Q**    And that's 2018, isn't it?

11    **A**    Yes.  That describes the effort to bring the forms

12    that were searchable and accessible to the pharmacists into

13    the Connexus screen so that they could see the information

14    tied to the prescriber.

15    **Q**    But this is part of the concern that's been out there

16    for years at this point, as you saw in the previous e-mail,

17    correct, that we looked at?

18    **A**    So again, the previous e-mail talked about the access

19    that the regional directors have.  Different -- Archer

20    access is role-based, and so it's different for the

21    regionals.  And this is actually talking about the project

22    where we were looking to streamline the information.

23         They did have access, and they could find the

24    information within the Archer system.

25    **Q**    But -- all right.  So in response to the jurors'

1    questions, maybe the fuller answer might be that there was

2    concern within the company as late as 2018 that there wasn't

3    easy access to pulling up the refusals to fill, fair?

4              MS. FUMERTON:  Objection.

5              THE COURT:  Overruled.

6    **Q**    Fair?

7    **A**    Well, again, the project was to streamline it in 2018,

8    but the information was there.  And the pharmacists did have

9    access to that information, as we described.

10   **Q**    That wasn't my question.

11         My question was, they don't have easy access to the

12   information, and the information needs to be readily

13   available, and we need to do this as soon as we can.  True?

14   **A**    That's all reflected in this document.

15   **Q**    All right.  Next subject.

16         The action that happened up in Wisconsin.  This was

17   Walmart Exhibit Number 13334.

18         Remember this?

19   **A**    Yes.

20   **Q**    This is a finding that the Board made of professional

21   misconduct.  It's a minor violation of Wisconsin

22   Administrative Code Section 10.03(2).

23         Have you ever read that?

24   **A**    No.

25   **Q**    So before you testified to the jury that this was a

1    pharmacist or the company getting in trouble because of a

2    refusal -- a blanket refusal to fill, you never read the

3    statute that's the basis of this violation?

4    **A**    No, it would be -- the basis would be misconduct

5    that's represented, saying it's professional misconduct.

6    **Q**    Misconduct of Section 10.03(2), right?

7    **A**    Correct.

8    **Q**    Did you know that what that sets up is an opportunity

9    for the company to come in and to show the Board all of the

10   reasons why the refusal to fill was in place, so that the

11   Board gets a reporting of it.

12          Did you know about that?

13   **A**    I didn't look at this process.

14   **Q**    So when you say you support your pharmacists, did you

15   ever send to the Board all of the information that caused

16   the pharmacist to issue the refusals to fill?

17   **A**    I don't personally know.  That would have been the

18   interaction of the Practice Compliance team.

19   **Q**    All right.  Next subject.

20          The 2001 Memorandum of Agreement.  Do you remember

21   that?

22   **A**    Yes.

23   **Q**    You got asked this question by a juror:  How many more

24   MOAs have been issued against Walmart, and where?

25          You talked about the national scope of this one being

**Hiland - (Recross by Lanier)**

 1    unique, but let's be clear.  Has Walmart entered into more

 2    settlement agreements with the DOJ over controlled

 3    substances than just this one?

 4               MS. FUMERTON:  Scope.  Objection.

 5               MR. LANIER:  It's a juror --

 6               THE COURT:  Overruled.

 7    **A**    There have been settlements on individual pharmacies.

 8    **Q**    That have applied, in a sense -- that have been

 9    settlements with Walmart the parent company, right?

10    **A**    Yes, related to the activity at a single store.

11    **Q**    So do you have an ability to answer the juror's

12    questions of how many of those settlements have been issued

13    against Walmart and where?

14    **A**    I believe I know of four settlement -- I think I'm

15    aware of four settlements.

16               I don't recall the time frame.  There was one in our

17    store in Covina, California.  There was one related to some

18    controlled substance losses out of the Houston area.  There

19    was one related to -- for a pharmacy in Rhode Island.  And

20    then there was one I think in Los Angeles County, but I

21    don't know the specific details.

22    **Q**    Next subject.

23               POM 912.  It was Walmart Exhibit 299 that you were

24    just asked about.

25               Do you remember?

1    **A**    Yes.

2    **Q**    Now, it says Loss Prevention Diversion.  It's dated

3    2005.

4         But in all candor with the jury, this is basically

5    about people stealing stuff, isn't it?

6    **A**    It's talking about indications that a prescription may

7    not be valid, so it's talking about the general -- the

8    broader definition that's been come to used for diversion,

9    meaning it actually does discuss prescription misuse.

10   **Q**    It's got that part about identifying prescription

11   fraud and fraudulent prescriptions.

12        But the diversion part about this is basically talking

13   about employees stealing stuff, isn't it?

14   **A**    There is -- and I need -- if I -- I don't remember

15   what tab that was under.

16             MS. FUMERTON:  For the witness's benefit, it's

17   Tab 8.

18             THE WITNESS:  Thank you.

19   **A**    It talks about even the abuse -- if you look at the

20   very introduction, it talks about abuse of legitimately

21   prescribed prescriptions is also a form of diversion, so I

22   think it covers broader subject.

23   **Q**    I'm not fussing that, but I'm saying in the main, this

24   is talking about theft, isn't it?  Employee theft, people

25   stealing.

1    **A**     So that is under the best practices, but under the

2    inconsistencies on identifying prescription fraud, again,

3    those that were used and taken, I believe, from the

4    Pharmacist's Manual, it also talks about prescription

5    inconsistencies, prescriptions that are not written

6    appropriately.  It talks about unusual patient behavior.

7    Those are -- those all go beyond theft in our stores.

8    **Q**     I understand, ma'am.

9                    MS. FUMERTON:  Your Honor, I would ask that

10   the page that the witness is describing be displayed while

11   she's --

12                   MR. LANIER:  Your Honor, I'm asking her with

13   my time about my questions.

14                   THE COURT:  All right.  We just want to

15   identify the document so that's clear for the record.

16                   MR. LANIER:  Yes, Your Honor.  The document is

17   Walmart Exhibit 299 that was shown to the witness during

18   Ms. Fumerton's redirect.

19                   THE COURT:  Okay.

20   BY MR. LANIER:

21   **Q**     And, ma'am, under this section of controlling pharmacy

22   diversion, do you see where it talks about the need to do

23   inventory to make sure that invoices for the days they were

24   off duty are reviewed?

25   **A**     I see that, but you're under a section on page 4.

 1   **Q**    Ma'am, I'm under a real short a time.  If you could

 2   just track with me for a moment, it would be a big help,

 3   okay?

 4        Do you see where it talks about "Enforce procedures

 5   regarding personal items in the pharmacy"?

 6   **A**    Yes, I see that.

 7   **Q**    That's talking about preventing theft by the

 8   employees, isn't it?

 9   **A**    That's right, because you're on page 4 of the document

10   that's talking about specifically controlling pharmacy

11   diversion.  The prior sections of the policy talk about

12   prescriptions and what the pharmacists should look for

13   there.

14   **Q**    Ma'am, again, I'm not fussing any of that.

15        This talks about the diversion section that you've

16   already discussed, but it says, "Pharmacy diversion can

17   result from both internal theft and external theft."

18        Do you see that?

19   **A**    Yes.  And I see right below it that it also talks

20   about prescription medication diversion.

21   **Q**    Yeah, it informs people, "One form occurs when

22   legitimate pharmacy substances are diverted from their

23   lawful purposes into illegal drug traffic."

24        That can happen when someone steals it and goes out

25   and sells it, can't it?

**Hiland - (Recross by Lanier)**

1    **A**    It can.  And if you continue on, we talk about

2   prescription fraud.

3    **Q**    Ma'am, I've already covered that with you.  We're not

4   talking about prescription fraud and using fraudulent

5   prescriptions.  I'm talking about the diversion section and

6   asking you, isn't that really talking about, in 2005

7   language for Walmart, it's talking about theft, isn't it?

8    **A**    The second half of that policy does talk about theft.

9   We had very --

10   **Q**    I mean, pharmacy smocks --

11              MS. FUMERTON:  Your Honor, I request that she

12   be permitted to finish her answer.

13              MR. LANIER:  I apologize, Judge.  I thought

14   she was.

15              THE COURT:  Ma'am, you can finish your answer.

16   **A**    We had many policies that discuss security of the

17   inventory in the pharmacy.  This was one of them.  This is

18   one section of this policy.  But the prior section does give

19   those indicators that a prescription may not be valid.

20   **Q**    Ma'am, the controlling diversion talks about "Pharmacy

21   smocks should not leave the pharmacy area, and associates

22   should empty their smock pockets" -- smart pockets is like

23   this really nasty little thing you eat -- "smock pockets

24   before taking smocks home for laundering."

25              Do you see that?

1    **A**    Yes.

2    **Q**    "Associate purchases are to be kept in lockers or in

3    vehicles.  Pharmacists may not keep bags of personal

4    purchases in the pharmacy area."

5          You see that?

6    **A**    Yes.  We took the security of our pharmacies very

7    seriously.

8    **Q**    And if we want to see the POM that deals with

9    diversion directly with red flags, that's POM 1311, isn't

10   it?

11   **A**    It's not the only policy that we had that dealt with

12   security and -- security of controlled substances and our

13   responsibilities related to the Controlled Substances Act.

14   **Q**    Ma'am, it's the one that y'all refer everybody to,

15   that and 1703.  In all of your things, if you've got any

16   questions about red flags, you always send them to 1311 and

17   1703, don't you?

18   **A**    Along with another -- a broader list of policies.

19   **Q**    On red flags, which policies do you send people to

20   today other than those two?

21   **A**    Well, today as we're talking, we do, but within the

22   policies and within the timeline --

23   **Q**    Ma'am, please answer my question.

24         Today, which ones other than those two do you send

25   them to?

**Hiland - (Recross by Lanier)**

1    **A**    We send them to 203, we send them to -- I'd have to

2    look through the list, but there are others that we referred

3    our pharmacists to and used as the core list of

4    responsibilities related to controlled substances.

5    **Q**    And did you know, can you tell the jury when your red

6    flag POM 1311 finally included the trinity combination?

7    **A**    I'm not familiar with that date.  I don't --

8    **Q**    You don't know when this red flag was finally included

9    in POM 1311?

10   **A**    I don't know specifically without referring to the

11   different versions.

12   **Q**    Would you be shocked to find out it's 2017?

13              MS. FUMERTON:  Scope, Your Honor.  Objection.

14              THE COURT:  Overruled.

15   **A**    No, I'm not shocked.  We updated our policies and

16   provided resources to our pharmacists over time.

17   **Q**    Last set of questions.

18              PMPs.  You were asked why y'all were so slow -- no,

19   not why y'all were so slow, why there was the delay in

20   accessing the PMPs for your pharmacists.

21              Remember those questions?

22   **A**    Yes.

23   **Q**    And you said, states do different things with access

24   and expectations, and y'all were worried about privacy of

25   people's information.

1          Remember that?

2    **A**    Yes.

3    **Q**    But you've taken an oath not just to tell the truth,

4    but to tell the whole truth, right?

5    **A**    Yes.

6    **Q**    And you left out part of it there, didn't you?

7    **A**    I don't know what you're talking about.

8    **Q**    I'm talking about the cost that y'all thought would be

9    associated with it.

10         Do you remember that?

11              MR. LANIER:  Rachel, 26671.

12   **Q**    Do you remember that, ma'am?

13   **A**    I'll look at the document.

14              MS. FUMERTON:  Objection.  Scope.

15              THE COURT:  Overruled.

16   **Q**    Do you have 26671 in front of you?

17   **A**    Yes.

18   **Q**    This is the Ohio law change that was going to make it

19   mandatory for pharmacists to check OARRS in certain

20   circumstances.

21         Do you remember that?

22   **A**    Yes.

23   **Q**    2011, an e-mail to you.

24         "Dear Friends, please review the proposed rule changes

25   by the State of Ohio Board of Pharmacy.  I would

1    specifically refer you to," and it's got the language about

2    controlled substances.

3          "In the change, pharmacists will be required to review

4    an OARRS report on patients that fall within several

5    categories."

6          Do you see that?

7    **A**    Yes.

8    **Q**    "I believe this will present a significant burden and

9    liability to our pharmacists and an unjustified delay to our

10   patients."

11         Do you see that?

12   **A**    Yes.

13   **Q**    So when you were discussing the attitude of the

14   company toward these PMPs, you said, Well, we were just

15   wanting to see how it all fell out, the whole truth includes

16   a concern of a significant burden, liability, and

17   unjustified delay.  True?

18   **A**    Well, I think you have to put this in context.

19   Mr. Miller was not in the corporate office.  He was not part

20   of the decision-making process related to whether or not we

21   participated in prescription monitoring programs.

22         And just -- the jury has seen, and I've testified to,

23   just a month later we actually published the information to

24   our pharmacists about this new law, and we already had given

25   them access.

**Hiland - (Recross by Lanier)**

1    **Q**    You had no choice.

2    **A**    We had already given them access.

3    **Q**    But you had no choice.

4    **A**    We did have a choice.

5    **Q**    The law was coming into effect.

6    **A**    We had -- we gave them access --

7              THE COURT:  Let the witness finish her answer,

8    please.

9    **A**    We gave our pharmacists access before the law went

10   into effect.  And if you refer back to The Wire posting, it

11   was about actually getting their credentials.  They had had

12   access, but it was about ensuring they had credentials in

13   time for the law to come in.

14        So the access was already in place before the law went

15   into effect.

16   **Q**    But you only put that access into place after the law

17   had passed that was going to make it mandatory and you were

18   in the transition time.  True?

19   **A**    No, sir.  That's just not true.  That's just not true.

20   **Q**    Well, when do you think you made the access point

21   available?

22   **A**    I don't know exactly when we made it available.  It

23   would have been in that 2010 time frame that the policy

24   was -- the 1316 was implemented, which was in 2010, which

25   was ahead of that requirement by the Ohio Board of Pharmacy.

**Hiland - (Recross by Lanier)**

1  **Q**    And yet the quality insurance senior manager within

2  Health and Wellness for the Great Lakes Division up here in

3  Ohio, Mark Miller, writes and tells you that he believes

4  this is going to present a significant burden and liability

5  to the pharmacists and an unjustified delay to the patients.

6  True?

7  **A**    So you're right, Mr. Miller did express his individual

8  thought.  That's not what the company did.

9               MR. LANIER:  Thank you, Your Honor.  That's

10  all I have.

11               THE COURT:  Okay.  Thank you very much,

12  Ms. Hiland.  I hope you have a safe trip back to Arkansas.

13               THE WITNESS:  Me too.

14               THE COURT:  You may be excused.

15               MR. LANIER:  Your Honor, for the record, I've

16  returned the notes to Mr. Pitts.

17               THE COURT:  Okay.  Thank you, Mr. Lanier.

18       All right.  The defendants may call their next

19  witness, please.

20               MR. DELINSKY:  Your Honor, could the defense

21  just huddle for a moment to --

22               THE COURT:  Nothing wrong with that.

23               (Pause in proceedings.)

24               MR. SWANSON:  Thank you, Your Honor.  The

25  defendant call Trey Edwards as their next witness.  He is a

 1    Board of Pharmacy witness.

 2        If I may, while he's coming in, Your Honor, can I hand

 3    up some exhibits I'm going to be using?

 4            THE COURT:  Okay.  Sure.

 5        Good afternoon, Mr. Edwards.

 6            (Witness sworn.)

 7            THE COURT:  Thanks.  And you may remove your

 8    mask while testifying.

 9            THE WITNESS:  Okay.  Thank you.

10            MR. SWANSON:  May I proceed, Your Honor?

11            THE COURT:  Yes, Mr. Swanson.

12            MR. SWANSON:  Good afternoon.  Good afternoon,

13    members of the jury.

14                    TREY EDWARDS

15                    - - - - -

16                  DIRECT EXAMINATION

17    BY MR. SWANSON:

18    **Q**    Sir, could you please introduce yourself to the

19    members of the jury?

20    **A**    Sure.  My name is Trey Edwards.  I'm an agent with the

21    Ohio State Board of Pharmacy.

22    **Q**    Agent Edwards, Mr. Edwards, which do you prefer?

23    **A**    Either will be fine.

24    **Q**    Agent Edwards, my name is Brian Swanson.  I represent

25    Walgreens.  You and I met for the first time earlier today

**Edwards - (Direct by Swanson)**

```
 1   out in the hallway.  I know you've been a long time waiting

 2   out there.  We appreciate your patience, and I'll be as

 3   efficient as I can be with my time and my questions to get

 4   through this exam.  And I do appreciate your coming in and

 5   speaking with us, I do.

 6        I want to start by just talking a bit about your

 7   background, and I'm going to ask you questions at kind of a

 8   high level just so we can get a sense for your profession,

 9   and then we'll drill down a bit as we proceed.

10        Does that sound okay?

11   A    Sure.

12   Q    All right.  So you said that you're currently employed

13   by the Ohio Board of Pharmacy, and you said as an agent?

14   A    Correct.

15   Q    And is that just your title, agent, special agent?

16   A    Agent, yeah, compliance agent it's sometimes referred

17   to.

18   Q    Okay.  How long have you worked for the Ohio Board of

19   Pharmacy?

20   A    Since 2008.

21   Q    So 12, 13 years or so?

22   A    Mm-hmm.

23   Q    The jury heard I guess it was late last week from

24   George Pavlich.  You know Mr. Pavlich?

25   A    Yes.
```

1    **Q**    Was he somebody that you worked with for a time at the

2   Board of Pharmacy?

3    **A**    Yes, yup.

4    **Q**    And Mr. Pavlich was focused, his area when he was at

5   the Board of Pharmacy was focused more in Trumbull County

6   and that area.

7         Do you have a certain area of focus at the Board of

8   Pharmacy?

9    **A**    Correct.  Well, when I was initially hired, it was the

10   northeast part of the state, specifically Lake, Geauga,

11   Ashtabula, Portage.  And over time it's changed based on the

12   needs of the agency.

13         Currently, I work on an intervention grant program, so

14   I cover the whole state.  I don't work regionally like the

15   majority of our agents do.

16    **Q**    And when did you begin working in that program?

17    **A**    2018.

18    **Q**    Okay.  Prior to joining the Board of Pharmacy, where

19   did you work?

20    **A**    Lake County Narcotics Agency.

21    **Q**    What was your position at the -- well, let me ask you

22   first, what's the Lake County Narcotics Agency?

23    **A**    It's essentially like a drug task force.  It's set up

24   a little differently than a drug task force because all of

25   the employees are employed by Lake County as special deputy

**Edwards - (Direct by Swanson)**

```
 1    sheriffs.  So it operates much like a drug task force.  It's

 2    a law enforcement agency, but it's governed by an executive

 3    board in Lake County.

 4    Q    What was your position with the Lake County Narcotics

 5    Agency?

 6    A    I was an agent.

 7    Q    Did you have any special focus?

 8    A    Prescription drugs, yes.  I was a pharmacy diversion

 9    agent.

10    Q    How long were you employed by the Lake County

11    Narcotics Agency?

12    A    From 2000 until 2008, when I left for the Pharmacy

13    Board.

14    Q    So you joined in 2000?

15    A    Yes.

16    Q    Do you have a college degree, sir?

17    A    I do.

18    Q    Where did you go to college?

19    A    I have a criminology degree from Ohio State.

20    Q    What year did you obtain that degree?

21    A    1998.

22    Q    So about two years before you joined the Lake County

23    Narcotics Agency?

24    A    Correct.

25    Q    What did you do upon graduation?
```

 1    **A**    I worked as a waiter for a short period of time, then

 2    I went to the police academy in '99, and as soon as I got

 3    out of the police academy I started with Lake County.

 4    **Q**    So is your time at the police academy was about a

 5    year, year and a half?

 6    **A**    No, not quite.  It was less than -- more like six

 7    months.

 8    **Q**    Got it.  So it was essentially college, police

 9    academy, Lake County?

10    **A**    Essentially, yes.

11    **Q**    Got it.  So I wanted to talk now about your career

12    starting at the Lake County Narcotics Agency, then we'll

13    move to the Board of Pharmacy phase, okay?

14    **A**    Okay.

15    **Q**    You gave a brief description of the agency.  Do you

16    know when the Lake County Narcotics Agency was established?

17    **A**    I want to say -- I want to say in the '80s, sometime

18    in the '80s.

19    **Q**    What's the purpose of the -- I call it the LCNA, just

20    because that's how I see it written.

21    **A**    Sure, yeah, that's fine.

22    **Q**    So you'll understand.

23    **A**    Sure.

24    **Q**    And we can save some time.

25    **A**    Yeah.

1   **Q**    What's the purpose of the LCNA?

2   **A**    It's -- they're a drug agency.  They enforce drug laws

3   of the State of Ohio.

4   **Q**    And you mentioned that while you were there, you were

5   involved in prescription or pharmaceutical drug diversion?

6   **A**    Correct.

7   **Q**    Did the LCNA also investigate illicit or illegal drugs

8   while you were there?

9   **A**    Yes.  There were essentially two shifts, the

10  prescription drug shift, which was me and one other agent,

11  sometimes two agents, and then the other group which was

12  more agents that did the street drug investigations.

13  **Q**    Okay.  So there was a group at the LCNA that

14  investigated heroin, cocaine, marijuana, methamphetamines?

15  **A**    Yes, correct.

16  **Q**    Were all of those drugs a problem in Lake County when

17  you joined the LCNA in 2000?

18  **A**    Yeah.

19  **Q**    How many agents did the LCNA have that were focused on

20  illegal drugs versus the pharmaceutical diversion that you

21  worked on?

22  **A**    I would say around five or six, somewhere in that

23  ballpark.

24  **Q**    You mentioned one or two other agents who worked on

25  prescription diversion.  What were their names?

1    **A**    Well, when I started, Jim Snyder and Judy Pugh were my

2    partners, and there was three of us.  And they retired, and

3    it was myself and Agent Chris Begley.

4    **Q**    When -- how did you decide out of the police academy

5    that you wanted to join the Lake County Narcotics Agency?

6    **A**    Well, they posted an opening at our police academy,

7    and I applied for it and got it.

8    **Q**    I should have asked, where was the police academy that

9    you attended?

10   **A**    Cleveland Heights.

11   **Q**    Okay.  And when you joined the LCNA, was it your

12   objective to get into pharmaceutical drug diversion or did

13   that just kind of happen by happenstance?

14   **A**    It just kind of happened, yeah.  I had -- I was

15   interviewing with other police agencies in northeast Ohio

16   and taking tests to be a -- you know, a regular patrol

17   police officer, and then that position became available, so

18   I applied for it.  And that's what I ended up choosing.

19   **Q**    Through the police academy, did you have a special

20   interest in illegal drugs or the drug trade, or anything

21   like that?

22   **A**    No, not necessarily.

23   **Q**    And can you tell me, when you were focused on

24   prescription drug diversion, were there specific statutory

25   violations that you were out trying to enforce?

**Edwards - (Direct by Swanson)**

1   **A**    Yes.  Specifically deception to obtain dangerous

2   drugs, which is Ohio Revised Code 2925.22, and illegal

3   processing of drug documents, which is 2925.23.  Those were

4   by far the vast majority of our investigations.

5        We also did some occasional thefts or tampering with

6   drugs at nursing homes and things like, that.  But the first

7   two I mentioned were primarily what we investigated.

8   **Q**    Okay.  And it was deception to obtain, is that what

9   you called it?

10  **A**    Deception to obtain and illegal processing.

11  **Q**    And I think the jury's heard about these maybe under

12  different terms.  But is deception to obtain, is that like

13  doctor shopping, that sort of thing?

14  **A**    Yes, yup.

15  **Q**    So if a patient is going out to multiple doctors

16  trying to get prescriptions filled that overlap, that

17  suggested that that patient might be out trying to divert

18  pharmaceuticals?

19  **A**    Correct, yes.

20  **Q**    All right.  And the other, I can't remember the term,

21  but was it basically forgeries?

22  **A**    Illegal processing, yeah; somebody writing their own

23  prescription or calling in their own prescription at a

24  pharmacy.

25  **Q**    Stealing a prescription pad from a doctor?

**Edwards - (Direct by Swanson)**

1    **A**    Yeah.

2    **Q**    Was one more common than the other in those eight

3    years when you were at --

4    **A**    I would say probably deception to obtain was more

5    common.

6    **Q**    So doctor shopping was a bigger --

7    **A**    Yes, yes.

8    **Q**    Did you -- when you were working at LCNA and working

9    on doctor shopping cases and forgeries, were you undercover?

10   How did the process work for your investigations?

11   **A**    Typically, the way an investigation would work, a

12   doctor shopping investigation was not something undercover.

13   That was more or less we would get a tip from a pharmacy

14   that some -- or elsewhere that somebody was going to

15   multiple doctors, and we would then contact the pharmacies

16   and obtain patient profiles, and determine where exactly

17   they were going.

18        Now, I'm sure everybody's familiar with OARRS, the

19   OARRS database.

20   **Q**    We have heard of OARRS, yes.

21   **A**    When I started at LCNA, there was no OARRS, so it was

22   all -- we did a bunch of leg work, sending lists to

23   pharmacies and, you know, of people who we had received

24   complaints on, and then they would send us the profiles

25   back.

1          So what you can do with a click of a button today

2     would take us weeks to accumulate the same amount of data.

3     **Q**     Was it 2006 when OARRS entered the picture for you as

4     an investigative tool?

5     **A**     Yes, yeah.  That's when it first started.

6     **Q**     And how many -- just to give us a sense, how many

7     active investigations would you have at any one time while

8     you were at LCNA?

9     **A**     I don't recall how many I would have at one time, but

10    I know that we made approximately 50 to 60 arrests a year

11    between myself and my partner.  And that's just for the

12    pharmaceutical cases, that doesn't include the other folks.

13    **Q**     That's not the heroin and cocaine?

14    **A**     Right.

15    **Q**     That's just the doctor shoppers and forgeries?

16    **A**     Correct.

17    **Q**     When you were at LCNA, did you investigate pharmacies?

18    Was that part of your --

19    **A**     Not so much.

20    **Q**     What about prescribers?

21    **A**     Occasionally complaints would come in, but our main

22    focus was the general public, the individuals who were

23    committing, you know, those two crimes that I mentioned.

24    **Q**     And it sounds like if I heard you correctly, you

25    didn't have a lot of background in drug laws or pharmacy

1    laws that you obtained through the police academy.

2    **A**    Correct.  Everything was on the job.

3    **Q**    All right.  So did you receive specific training into

4    the laws regarding pharmacies and dispensing, and that sort

5    of thing, at LCNA?

6    **A**    The specific Ohio laws you're referring to?

7    **Q**    Yes, sir.

8    **A**    I mean, it was on-the-job training basically.  I

9    didn't go to specific classes on those two crimes that we

10   enforce, but, I mean, I did take some classes, like DEA

11   Diversion School and National Association of Drug Diversion

12   Investigators had some trainings, but it wasn't specific to

13   Ohio's laws.

14   **Q**    Got it.  But then when you joined the LCNA, you got to

15   work with more senior folks, and that's sort of how you

16   learned about the laws --

17   **A**    Correct.

18   **Q**    -- regarding pharmaceutical diversion, pharmacies,

19   et cetera?

20   **A**    Yes.

21   **Q**    Got it.  And I take it you actively and aggressively

22   pursued those individuals who you felt were out there

23   breaking the law either by passing fraudulent scripts or

24   doctor shopping?

25   **A**    Yes.

**Edwards - (Direct by Swanson)**

1    **Q**    You mentioned in an answer a couple moments ago that

2    you did a lot of -- well, that you worked with pharmacies as

3    part of your investigations?

4    **A**    Yes.

5    **Q**    Can you describe for us how you worked with local

6    pharmacies as part of your investigations?

7    **A**    That was the majority of our tips, when pharmacists

8    would call us to tell us, you know, Oh, hey, there's a guy

9    in here who something's up, this prescription doesn't look

10   right, I think it's fake, and, you know, we would go and

11   arrest the person.  Or, you know, just talked to the

12   pharmacy down the street, and this guy was there yesterday

13   filling a prescription, you know, I think he's doctor

14   shopping, and then we would -- they would make it on our

15   list.

16        So we essentially had like a monthly list of, like, 20

17   to 30 names that we would send out to the pharmacies, and

18   they would reply, you know, whether or not the people were

19   customers at that store and if they were getting controlled

20   substances.

21   **Q**    Okay.  And I mentioned at the outset I represent

22   Walgreens.  We're a defendant in this case along with

23   Walmart and CVS.  And so I want to ask you more

24   specifically, were the pharmacists at Walgreens, at Walmart,

25   at CVS, were they instrumental in helping you obtain leads

 1     while you were an investigator at LCNA?

 2                  MR. WEINBERGER:  Objection.  I mean, there's

 3     been a lot of leading, Your Honor.

 4                  THE COURT:  Overruled.

 5     **A**     I would say all the pharmacies in the county were

 6     instrumental.  I mean, it -- we had a good relationship with

 7     all of the pharmacies.  We would go in, you know, and do

 8     visits, got to know pretty much all the pharmacies.

 9          We had a really -- in Lake County, I would say that

10     we, LCNA, had a very unique -- not many police departments

11     had anything like that or task forces had anything like a

12     pharmacy diversion unit.  So ourselves and Cincinnati Police

13     Department I think were the only two that specialized in

14     pharmaceutical diversion cases.  So we had the time and the

15     manpower to go out and visit the pharmacies and, you know,

16     learn the pharmacists' names, and conduct continuing

17     educations for them.  They were the main source of our tips.

18     **Q**     And so specific to my client, Walgreens, did you have

19     a good working relationship with the pharmacists at

20     Walgreens in Lake County?

21     **A**     Yes.

22     **Q**     Did you have a good working relationship with the

23     pharmacists at CVS in Lake County?

24     **A**     Yes.

25     **Q**     And did you have a good working relationship with the

**Edwards - (Direct by Swanson)**

1   pharmacists at Walmart in Lake County?

2   **A**    Yes.

3   **Q**    While you were at LCNA, did you do inspections of

4   pharmacies?  Was that part of your job?

5   **A**    Well, we called them inspections.  They were more or

6   less PR visits.  Knowing what I know now, after working for

7   the Board of Pharmacy, Board of Pharmacy, that's really an

8   inspection.  But when we used to do it at Lake County, LCNA,

9   it was more or less a visit, you know, talk to the

10  pharmacists, you know, bring up some names, ask them about

11  trends, what they're seeing, what's going on, and that sort

12  of thing.

13  **Q**    Understood.

14       I'd like to talk to you a bit more about some specific

15  work that you did with pharmacists during your

16  investigations at LCNA, including with my client at

17  Walgreens.

18  **A**    Sure.

19  **Q**    So I gave you I think a binder of some documents.  If

20  you could pull that up and look behind Tab 1, please.

21  **A**    I've got two binders here.  Which binder?

22            MR. WEINBERGER:  One is your deposition.

23  **Q**    It's the hardcover binder.  Sorry about that.

24       So Tab 1 is a document, Defendants' Exhibit

25  WAG-MDL-1307.

**Edwards - (Direct by Swanson)**

1       Is that the one you have there?

2  **A**   Yes.

3  **Q**   Do you recognize this form of document as a

4  presentence report?

5  **A**   Yes.

6  **Q**   And do you see that this one is -- it's a presentence

7  report dated November 21, 2008?

8       MR. WEINBERGER:  Your Honor, I'm sorry,

9  there's been no foundation laid.

10       MR. SWANSON:  That's what I'm trying to do.

11       MR. WEINBERGER:  Well, this is not his

12  document.

13       MR. SWANSON:  Your Honor, I think --

14       THE COURT:  Well, he can ask him if he

15  recognizes it.

16       THE WITNESS:  I do recognize it.

17  **Q**   Okay.  And it's a November 21, 2008, presentence

18  report?

19  **A**   Yes.

20  **Q**   And it's a presentence report on --

21       THE COURT:  Well, let's see if we can do this

22  without so much leading, please, Mr. Swanson.

23       MR. SWANSON:  Sure, yeah.

24  **Q**   Who is the defendant in this case for this presentence

25  report?

1    **A**    Joseph Anthony Sosenko.

2    **Q**    And do you recall an investigation into Mr. Sosenko?

3    **A**    I remember the name.  I don't remember the details of

4    the investigation.

5    **Q**    Sure.  Why don't you -- if you flip to the second

6    page, do you see there there's a section entitled --

7              MR. WEINBERGER:  Your Honor, can we have a

8    side bar?

9              THE COURT:  Yeah, I agree, I think we need

10   one.

11             (At side bar at 4:39 p.m.)

12             MR. WEINBERGER:  Your Honor --

13             THE COURT:  Hold it.

14        Mr. Swanson, where are you going with this?  The

15   witness said he doesn't recall much, if anything, about the

16   investigation.  Are you going to refresh him that he was

17   involved in the investigation?  Where are you going with

18   this?

19             MR. SWANSON:  Yeah, Your Honor.  So if you'll

20   see in the second page, there's a long narrative that he

21   provided in the presentence report that describes the

22   investigation that he himself undertook, including contacts

23   that he had with Walgreens' pharmacists.

24             THE COURT:  Wait a minute.  I'm trying to

25   find --

1           MR. SWANSON:  Yes, sir.

2           THE COURT:  On the second page, where does it

3   say that --

4           MR. SWANSON:  You see that the very first

5   words of text say, "I, Investigator William Trey Edwards."

6       So this is a report that he provided, and I want to

7   ask him about the content and his interactions with the

8   Walgreens pharmacists.

9       And I know there's going to be a hearsay objection,

10  but under Rule 803(8) -- excuse me, 803(8)(A)(ii), this

11  document is an official report that is an exception to the

12  hearsay rule and can come in under that exception.

13      I'm happy to hand it up to Your Honor if you'd like.

14          MR. WEINBERGER:  Your Honor, with respect

15  to --

16          THE COURT:  Let me just -- all right.

17      Again, a lot of these contents are hearsay.  I don't

18  know if the presentence report is an official document of

19  the State.  This is a professor who made this.  In fact,

20  this is a confidential document; it would be in Federal

21  Court.

22      So the point is, if you want to elicit that he --

23  first, you have to refresh his recollection that he

24  remembers anything about it.  He doesn't even remember it.

25  And it looks like he was the investigative agent, and he

1    received information from Walgreens, a Walgreens pharmacist,

2    which led to the conviction of someone for diversion.

3         I guess you can elicit that fact, but I don't think

4    it's appropriate to be reading in what some pharmacist told

5    him.

6                   MR. SWANSON:  But, Your Honor, again, under

7    803(8)(A), it's "A record or statement of a public office,"

8    such as the prosecutor's office, and it sets out "a matter

9    observed while under a legal duty to report, but not

10   including, in a criminal case" -- wait, I'm not reading it

11   right.

12                  THE COURT:  This is a criminal case.

13                  MR. SWANSON:  (iii), excuse me, "in a civil

14   case or against the government in a criminal case, factual

15   findings from a" --

16                  THE COURT:  Specifically against the

17   Government in a criminal case.  That's my point.

18        This is something that's brought by the Government.

19                  MR. SWANSON:  This is a civil case that we're

20   in.

21                  THE COURT:  I don't know what it is --

22                  MR. SWANSON:  And it's factual findings from a

23   legally authorized --

24                  THE COURT:  Hold it.  A presentence report is

25   a criminal case.  This man is a criminal investigator.  It's

**Edwards - (Direct by Swanson)**

1    a criminal case, 08-cr-642.  This is a criminal case.

2              MR. SWANSON:  How about this, Your Honor.  Can

3    I use it to refresh his recollection and ask him questions

4    without the document?

5              MR. WEINBERGER:  Your Honor, it's not his

6    document.  This is a document from the probation department.

7    But I'm not -- I have to put this on the record.

8              THE COURT:  All right.

9              MR. WEINBERGER:  With respect to Commander

10   Villanueva, who testified from the same agency, early on in

11   this case we were prohibited from going into reports from

12   TAG on the basis that this was hearsay.  In fact, I've got

13   the transcript where Mr. Swanson objected to our going into

14   this.

15             THE COURT:  All right.  Let me see that.  If

16   that's the case, I'm not going to allow it.

17             MR. SWANSON:  You allowed the report from

18   Villanueva to come in.  You didn't allow all the extraneous

19   stuff to come in, and the reason was different.  It was

20   because they hadn't identified those as prescriptions that

21   we shouldn't have filled.  That was the whole dispute about

22   OARRS, Your Honor, not about whether the report came in.

23             THE COURT:  Well, first of all, Mr. Swanson,

24   you've already established that your pharmacists were a

25   regular source of tips for him.  I mean, that's fine.  I

1    allowed that in.  I'm not sure, if you start going into

2    specific cases, no one knows what the facts of these cases

3    are, or why -- why is it relevant?

4              MR. SWANSON:  Well, because, it shows a couple

5    of things.  It shows our -- you know, our pharmacists are

6    being accused of ignoring red flags and doing nothing except

7    selling pills.  And this is a specific example of our

8    pharmacists being attentive to suspicious activity, not only

9    not filling the prescription, but calling up law enforcement

10   so that they can assist in the investigation.  And I think

11   some specific information like that is relevant given the

12   way that they've portrayed our pharmacists in this case.

13             THE COURT:  Let me see what was allowed and

14   not allowed with Villanueva.

15        What's been referred to me is sort of general gateway

16   testimony.  I don't --

17             MR. SWANSON:  That's what Mr. Weinberger said.

18   I'm not sure what anybody's looking at.

19             MR. GALLUCCI:  Your Honor, Frank Gallucci for

20   the plaintiffs.

21        If you look at the testimony there, there's

22   specifically the attempt to use Mr. Villanueva's

23   investigation.  And Mr. Swanson, when we attempted to use

24   the investigation, the report from Commander Villanueva,

25   objects and says it's pure hearsay.

1              MR. STOFFELMAYR:  We don't know what anyone is

2    talking about.  Could we have the page numbers you're

3    showing to the judge?

4              THE COURT:  I'm not sure either.  I don't see

5    it here.

6              MR. SWANSON:  Can I just ask him if he's

7    refreshed about these specific instances and then we can

8    move on?

9              MR. WEINBERGER:  You can't refresh --

10             MR. SWANSON:  What do you mean I can't

11   refresh, Mr. Weinberger?

12             MR. WEINBERGER:  Not on a document that's not

13   his.

14             MR. SWANSON:  Sure, I can use a ham sandwich

15   to refresh him.

16             THE COURT:  If he now says I remember this

17   investigation, if you want to elicit that his one time where

18   a tip from a Walmart pharmacist led to a conviction -- I

19   assume it led to a conviction, all right -- fine, I'll allow

20   that, but I'm not going to let you go into a lot of hearsay

21   from what a pharmacist says.

22             MR. SWANSON:  Appreciate it.  Thank you, Your

23   Honor.

24             (In open court at 4:47 p.m.)

25   BY MR. SWANSON:

**Edwards - (Direct by Swanson)**

1    **Q**    Agent Edwards, have you had a chance -- I apologize

2    for that delay.  During that delay have you had a chance to

3    look at the document that we were referring to?

4    **A**    Yes.

5    **Q**    And in looking at that, did that refresh your

6    recollection about that investigation you undertook about

7    Mr. Sosenko?

8    **A**    Yes.

9    **Q**    And can you tell us how the -- how the tip first came

10   in to you that you should investigate this individual?

11   **A**    Yes.  Pharmacist Diane Morris at the Walgreens in

12   Eastlake called and reported it.

13   **Q**    And I'm not going to ask you what was said.

14       Was there a suspicion that this was an individual who

15   was illegally seeking an opioid?

16   **A**    Yes.

17   **Q**    And did you then go and visit the Walgreens pharmacy

18   where this call had come in from?

19   **A**    Yes.

20   **Q**    And when you were there, did you meet a pharmacist

21   named Julie Demay from Walgreens?

22   **A**    Yes.

23   **Q**    Do you recall more generally working with Ms. Demay on

24   any investigations you conducted?

25   **A**    I don't recall specific investigations, no.

1  **Q**    Okay.  But in looking at this, do you recall

2  interacting with her as part of your investigation?

3  **A**    Yes, now that I see the report.  Yes.

4  **Q**    And did Ms. Demay provide you with information that

5  was useful in your investigation of Mr. Sosenko?

6  **A**    It appears so, yes.

7  **Q**    All right.  And then did you visit as part of this

8  investigation another Walgreens pharmacy in Lake County, in

9  Mentor-on-the-Lake?

10  **A**    What page is that on?

11  **Q**    It's the bottom -- well, let me ask you this:

12       Do you remember a pharmacist at Walgreens by the name

13  of Doug Stossel?

14  **A**    Yes.

15  **Q**    And if you look at the middle paragraph there, do you

16  recall interviewing or visiting with --

17            THE COURT:  You can do this without leading.

18  This supposedly is his investigation.

19            MR. SWANSON:  Okay.

20  **Q**    Did you meet with Mr. Stossel as part of this

21  investigation?

22  **A**    Yes, I see that I did.

23  **Q**    And what did you learn, if anything, from Mr. Stossel?

24            THE COURT:  I'll sustain that.

25            MR. SWANSON:  I'm sorry, Your Honor, I missed

 1    the --

 2                   THE COURT:  I'm sustaining the objection on

 3    what he learned from Mr. Stossel.

 4                   MR. SWANSON:  Oh, okay.

 5    Q    So you said you had an interaction with Mr. Stossel?

 6                   MR. WEINBERGER:  Objection.  That's not what

 7    he said.  He's reading from a document.  That's not what he

 8    said.

 9                   THE COURT:  Let's ask one more question, then

10    move on, please.

11    BY MR. SWANSON:

12    Q    Let me step away from this document.

13         Did you have -- when you were at the LCNA, did you

14    have more frequent interactions with Mr. Stossel?

15    A    Yes.

16    Q    All right.  And I understand Mr. Stossel recently

17    passed away.  Is that true?

18    A    Yes.

19    Q    How would you describe Mr. Stossel as a pharmacist,

20    based on your experience at LCNA and the Board of Pharmacy?

21    A    He was a good pharmacist.  Everything I remember about

22    him, was he was a good pharmacist.  He was diligent.  He

23    called anytime he had an issue or suspected a problem.

24    Q    Was he someone who would provide you leads at LCNA?

25    A    Yes.

1    **Q**    Do you know his wife?

2    **A**    I do.

3    **Q**    What does she do?

4    **A**    She's also a pharmacist.

5    **Q**    Pharmacist for whom?

6    **A**    For Walgreens.

7    **Q**    Okay.  Is that Amy?

8    **A**    Yes.

9    **Q**    Is she -- how do you view her as a pharmacist?

10   **A**    The same as Doug.  I have had interactions with her.

11   I don't remember any specific cases or, you know, anything

12   that she called me about, but I just generally have had

13   positive interactions with her.

14              THE COURT:  All right.  I want to go back on

15   the headphones.

16              (At side bar at 4:50 p.m.)

17              THE COURT:  All right.  Mr. Swanson, I didn't

18   permit this very method -- this method of inquiry to get

19   into testimony about Walgreens' pharmacists and their

20   spouses, so I'm going to end it.

21        If you want to just elicit that this Walgreens

22   provided a tip and it led to a conviction of someone, fine,

23   but this is way far afield.

24              MR. WEINBERGER:  Your Honor, and I want the

25   record to reflect, I mean, I could have objected to the last

```
 1    10 or 12 questions, but I didn't want to appear obstructive.
 2               THE COURT:  I understand that, so I finally
 3    jumped in.  This has got to end.
 4               MR. SWANSON:  But, Your Honor, all that I'm --
 5    again, all that I'm trying to establish, it's one thing for
 6    him to say, yeah, yeah, yeah, they helped us out every now
 7    and again.  But if the jury can hear specific examples, it
 8    runs counter to the narrative that they're hearing from the
 9    plaintiffs that the pharmacists --
10               THE COURT:  Hold it, hold it, hold it.
11         Mr. Swanson, I said you could bring out succinctly
12    that here in 2007 or 2008, whatever, a Walgreens pharmacist
13    gave me a tip about, you know, diversion or whatever that
14    led to the prosecution and conviction of someone, period.
15    But to get into testimony about this pharmacist is a good
16    person and so is his wife, I mean, this is not germane.
17               MR. SWANSON:  I guess what I'm getting at,
18    Your Honor, is I have some other specific examples that I'd
19    certainly like to go through with him if I may, but I don't
20    want to have to, you know, keep coming back to sidebars if
21    we're going to have objections.
22         But my goal was to spend two minutes going through
23    here's an e-mail from another Walgreens pharmacist, here's
24    another one, here's another one, three examples, and move
25    on.  That's all I want to do.
```

**Edwards - (Direct by Swanson)**

```
 1                    THE COURT:  Are they -- are these e-mails
 2   that -- and tips that led to prosecutions and convictions?
 3                    MR. SWANSON:  Well, they led to
 4   investigations, which is, you know, the important thing.  I
 5   guess I don't know.
 6                    THE COURT:  That's the point.  Here the
 7   purpose -- I mean, you had the general testimony that they
 8   had a good working relationship with your pharmacists, the
 9   pharmacists of the other defendants.  They got tips, they
10   got information.
11        I'm allowing you to elicit this specific instance
12   because it led to a conviction.  Okay?  But it was all the
13   other stuff that is not relevant to this.
14                    MR. SWANSON:  Understood.  Understood.
15                    (In open court at 4:53 p.m.)
16   BY MR. SWANSON:
17   Q    Agent Edwards, let me move to I think it was 2008.
18   You said that you took a job with the Ohio Board of
19   Pharmacy.  Do I have that date right?
20   A    Yes.
21   Q    You were hired as -- is it called a general compliance
22   agent?
23   A    Compliance agent or just agent.
24   Q    And can you describe for the jury what that is, what
25   that role is with the Board of Pharmacy?
```

1   **A**   Sure.  It's -- our agency -- it's a law enforcement

2   agency.  It's also a regulatory agency.  So the regulatory

3   administrative function that we have is to administer

4   licenses to folks who manufacture, deliver, store, sell,

5   dangerous drugs and controlled substances.  And then also

6   enforce the Administrative Rules of the Ohio Administrative

7   Code.  And then also enforce the ORC laws that pertain to

8   prescription drugs and conduct criminal investigations.

9   **Q**   Okay.  So basically three things you've got at the

10  BOP.  You've got licensing, you've got administering, and

11  then enforcing.  Is that accurate?

12  **A**   Yes.

13  **Q**   And as an agent, do you -- are you responsible for all

14  three of those areas or do you focus on one more than

15  another?

16  **A**   No, at various times you're responsible for all of

17  those areas.

18  **Q**   Why is it that you decided to move on from the Lake

19  County Narcotics Agency over to the Board of Pharmacy?

20  **A**   Well, it was a pay raise, and the agent that I worked

21  with at the Board of Pharmacy was retiring, and there was

22  not a lot of turnover at that agency in the time that I had

23  been at Lake County, so I kind of looked at it as an

24  opportunity.  If I ever wanted to do that, that was the time

25  to do it.  So I often say I left one good job for another

1    good job.

2    **Q**    That's great.

3         And who is the agent that you replaced?

4    **A**    His name was Frank Bodi.

5    **Q**    So along with the agents at the Board of Pharmacy, did

6    the Board of Pharmacy also employ what I've seen called

7    specialists?

8    **A**    Yes.  They are pharmacists.

9    **Q**    And can you tell us what the role of the specialists

10   was at the Board of Pharmacy?

11   **A**    Specialists handle more of the clinical issues that

12   come up.  They handle the errors in dispensing, they handle

13   anything -- anything of a clinical situation, like, for

14   instance, hospital.  Like if there's issues at hospital

15   pharmacies or nursing homes, or any -- any type of clinical

16   setting, the specialists handle those investigations.

17   **Q**    And when we spoke to Mr. Pavlich, we learned a bit

18   about there were inspections of pharmacies that the agents

19   did and then there were investigations into criminal

20   activity --

21   **A**    Correct.

22   **Q**    -- so to speak.

23        And did you fill both those roles for the Lake County

24   Board -- or in Lake County for the Board of Pharmacy?

25   **A**    Yes.

1    **Q**    And these specialists who were pharmacists, would they

2    help you out in your inspections of pharmacies?

3    **A**    Yes, occasionally.

4    **Q**    Would they help you out in your investigations?

5    **A**    Yes, occasionally.  Not every investigation, but the

6    more technical, you know, investigations where we needed

7    prescriptions reviewed for clinical reasons, they would

8    assist.

9    **Q**    And how about during inspections, how would they help

10   you out during inspections?

11   **A**    It varied.  If there were -- they didn't always go on

12   inspections, but if it was at a place like a nursing home or

13   like a hospital, or somewhere like that, they would always

14   be present.  The agents kind of concentrated on the retail

15   setting, and then the specialists sometimes helped with

16   that, but more often concentrated in the clinical setting.

17   **Q**    Got it.  And we'll talk about some inspections of the

18   retail chain pharmacies.  It sounds like that was more the

19   agents and not the specialists.

20   **A**    Correct.

21   **Q**    When you were doing your investigations at the Board

22   of Pharmacy, did you work with the LCNA?

23   **A**    Occasionally.

24   **Q**    And how did that work?  How would you decide if you

25   were going to partner -- work with them or not work with

**Edwards - (Direct by Swanson)**

1  them?

2  **A**    Well, it depended -- it depended on the case.  If it

3  was something in Lake County, I would call my former partner

4  and just, you know, de-conflict, see if they were working

5  the same case, or if they knew of the case.  Kind of, you

6  know, put our heads together and decide who was going to

7  work it.

8  **Q**    When you joined the Board of Pharmacy, did you receive

9  any additional training into pharmacy laws, dispensing laws,

10  anything like that?

11  **A**    I had training in-house on the -- you know, like when

12  I first started, like a probationary period of, you know,

13  learning how they do things and what they do.

14  **Q**    Either through working with superiors or more formal

15  training, you were trained on the laws that pertain to

16  pharmacies and pharmacists?

17  **A**    Correct.

18          MR. WEINBERGER:  Your Honor, can we have,

19  like, direct examination here?

20          THE COURT:  I think there is a little too much

21  leading here, Mr. Swanson, so...

22          MR. SWANSON:  Okay.  Let me see if I can

23  reform that question.  I'll just -- I'll move on.

24  **Q**    When you became an agent with the Board of Pharmacy,

25  and I want to set aside the inspections and focus for a

```
 1    minute on the investigations.

 2    A      Mm-hmm.

 3    Q      When you became an agent for the Board of Pharmacy,

 4    did you have any interactions with pharmacies and

 5    pharmacists?

 6    A      Yes.

 7    Q      On the investigation side, I mean.

 8    A      Yes.

 9    Q      Did you continue -- did you interact with the

10    pharmacists at the retail chain pharmacies, including

11    Walgreens, Walmart, and CVS?

12    A      Yes.

13    Q      And what sorts of interactions would you have with

14    those pharmacists when you were at the Board of Pharmacy?

15    A      Similar to when I worked for Lake County, would

16    conduct more thorough inspections with the Board of

17    Pharmacy.  The routine inspections, and then also would

18    conduct criminal investigations that would lead us to the

19    pharmacies to pull prescriptions as evidence, get other

20    documentation from the pharmacies to support our

21    investigation.

22    Q      I'm sorry if you said it and I missed it.  Did the

23    pharmacists at Walgreens, CVS, and Walmart, when you were at

24    the Board of Pharmacy did they provide leads to the Board of

25    Pharmacy on suspicious activities?
```

1    **A**    Yes.

2    **Q**    When you were at the, I guess at both the Lake County

3    Narcotics Agency but later at the Board of Pharmacy, did you

4    conduct investigations into prescribers?

5    **A**    Yes, sometimes.

6    **Q**    All right.  And in general, what sorts of

7    investigations would you -- if you were looking at a

8    prescriber, what sorts of activities were you investigating?

9    **A**    Questionable prescribing, overprescribing.  There were

10   some administrative things that we would look into in

11   conjunction with the Medical Board.  It varied.

12   **Q**    And talk about investigations into prescribers or

13   physicians.

14        When you were at the Board of Pharmacy, can you give

15   us a sense for how many investigations you might have going

16   at any one time?

17   **A**    Oh, it varied.  I mean, 20, approximately.

18   **Q**    And when you were investigating a doctor or a

19   prescriber for potential unlawful activity, was it your

20   practice to notify the pharmacists in the area that they

21   shouldn't fill that doctor's prescription?

22   **A**    No.

23   **Q**    Why not?

24   **A**    Well, if we were investigating a prescriber, we would

25   keep it close to the vest and not want word out that we were

1    investigating that prescriber.  So we wouldn't broadcast to

2    pharmacists that we were investigating a particular

3    prescriber.

4        I mean, they could figure it out if we're pulling

5    prescriptions from their pharmacy for a certain prescriber,

6    they might figure that out, but we didn't broadcast it.

7    Q    What was your expectation as to how pharmacists should

8    interact with a prescription from a prescriber that you were

9    investigating?

10                   MR. WEINBERGER:  Objection.

11                   THE COURT:  That's sustained.

12   Q    Did you have an expectation as to how pharmacists

13   should react if they were presented with a prescription from

14   a physician that you happened to be investigating?

15                   MR. WEINBERGER:  Objection.

16                   THE COURT:  Let's go on the headphones a

17   minute.

18                   (At side bar at 5:03 p.m.)

19                   THE COURT:  All right.  Mr. Swanson, I'm going

20   to sustain the objection.  If you want to ask this witness

21   did he give specific instructions to pharmacists, he can

22   testify to what he did, but he can't talk about their state

23   of mind.  But if he told them what he wanted them to do, you

24   can elicit that.

25                   MR. SWANSON:  I thought I got an objection to

**Edwards - (Direct by Swanson)**

```
 1    that question, frankly, so I can --

 2                  THE COURT:  Well, if there is an objection,

 3    I'll overrule it.  He can testify to what he told people to

 4    do or not to do as part of his investigation.

 5                  MR. WEINBERGER:  That wasn't the question that

 6    was asked.

 7                  THE COURT:  I know.  That's why --

 8                  MR. SWANSON:  Yeah, got it.

 9                  (In open court at 5:04 p.m.)

10    BY MR. SWANSON:

11    Q     Agent Edwards, when you were conducting at the Board

12    of Pharmacy investigations into prescribers in Lake County,

13    did you give any direction to the pharmacists in the area

14    about what they should do if presented with a prescription

15    from that physician?

16    A     No.

17    Q     Okay.  Let me ask you more generally, when you would

18    undertake an investigation of a doctor who, say, you might

19    have thought was overprescribing -- let me withdraw that and

20    ask you a different question.

21          We've heard a lot about doctors in this case who were

22    high prescribers or had high volume prescriptions.

23          Did the fact that a doctor was a high volume

24    prescriber, did that immediately elicit suspicion in the

25    Board of Pharmacy when you were there as an agent?
```

1    **A**    I wouldn't say immediately, no, because there's

2   doctors who specialize in different things that would by the

3   very nature of their specialty would write more, higher

4   volume or, you know, higher quantity prescriptions than

5   another doctor.

6    **Q**    And can you give us a sense for what some of those

7   specialties might be where they'd write higher volumes?

8    **A**    Like a pain management doctor would obviously write

9   for more opiates than a primary care doctor.

10   **Q**    And did you have pain management doctors in Lake

11  County when you were -- well, I guess even today?

12   **A**    Yes.

13   **Q**    But are there pain management doctors in Lake County?

14   **A**    Yes.  While I was at the Board of Pharmacy, they -- in

15  2011 they required prescribers to be certified -- I don't

16  know if certified is the word, but to be a pain management

17  prescriber, like they had to get an -- file an application

18  to get licensed as a pain management clinic; whereas

19  previously, anybody could prescribe, you know, opiates and

20  practice in that manner.

21   **Q**    And you said that was a law that changed in 2011?

22   **A**    I believe it was 2011.

23   **Q**    And who licensed those pain management doctors?

24   **A**    The Board of Pharmacy and the Medical Board.

25   **Q**    And what did you require these -- so these were pain

1    management doctors, you said?

2    **A**    Correct.

3    **Q**    What did the Board require of these pain management

4    doctors?

5    **A**    I don't recall all the requirements, but they had to

6    be accredited or certified in pain management, or meet some

7    sort of criteria with anesthesia training and other sorts of

8    things.  I don't remember the specific requirements.

9    **Q**    And what did the -- so what did that registration get

10   them?

11   **A**    It's a type of license that we issued called a PMC

12   license, a Pain Management, I think Certification maybe is

13   what the C stands for.

14   **Q**    Yeah, and I asked a bad question.

15        What did that license permit them to do that before

16   2011 they didn't need a license to do?

17   **A**    Well, they -- the Board of Pharmacy wanted to -- they

18   wanted to classify pain management physicians in their own

19   class.  So basically any physician who prescribed controlled

20   substances to over 50 percent of their patient load would be

21   considered a pain management physician.

22   **Q**    When that law passed, did you as a Board of Pharmacy

23   agent then tend to pay particular attention to those

24   doctors, or did that change in any way the way that you went

25   about your job at the Board of Pharmacy?

1    **A**     Well, we had the --

2               MR. WEINBERGER:  Objection.

3               THE COURT:  Overruled.

4    **A**     We had to issue the licenses, so I don't know what you

5    mean by pay special attention, but we would have to give the

6    licenses to those prescribers and give a corresponding

7    inspection upon issuing the license.

8    **Q**     So explain that to me.

9               What was the inspection that you had to do at the

10   Board of Pharmacy after this license was issued?

11   **A**     Boy, I believe we would go out with the Medical Board,

12   back when that first started in 2011, and there was a list

13   of questions we asked them.  I don't have -- I don't

14   remember the specific questions, but we -- we wanted to make

15   sure that they were -- you know, what type of practice they

16   were running, what type of -- you know, we'd go visit them,

17   see what type of equipment they had in the office and, you

18   know, if they're doing urine screens and if they're doing

19   pill counts, and that kind of thing.

20   **Q**     Did the license that these physicians obtained, did

21   that have to be renewed periodically?

22   **A**     Yes.  I don't recall if it was one year or two years,

23   but yes.

24   **Q**     Was there a -- were they identified somewhere where a

25   pharmacy or a pharmacist could see who the licensed pain

**Edwards - (Direct by Swanson)**

1    management doctors were in Ohio?

2    **A**    Yeah.  I mean, it's online now.  I don't recall if it

3    was online in 2011.

4    **Q**    Okay.

5              MR. SWANSON:  Your Honor, I'm about to switch

6    gears.  I don't have a watch on, so I've lost track of time.

7              THE COURT:  Well, if this is a good place to

8    stop, I was going to suggest one around now.

9              MR. SWANSON:  Yes, it's fine for me, Your

10    Honor.  Thank you.

11              THE COURT:  Okay.  Ladies and gentlemen, we

12    will break for the day.  Usual admonitions apply.  Don't

13    read, listen, encounter, view anything about this case or

14    anything related.  Do not discuss this case with anyone.

15          And we'll come back tomorrow morning at 9 and pick up

16    with the balance of the special agent's testimony.

17          Have a good evening.

18              (Jury excused for the day at 5:10 p.m.)

19              THE COURT:  Okay.  You can be excused, sir.

20              THE WITNESS:  All right.  Thank you.

21              THE COURT:  Everyone can be seated for a

22    minute.

23              MR. SWANSON:  Your Honor, can I just speak to

24    him about the schedule for tomorrow?

25              THE COURT:  Yes, sure.

```
 1              MR. SWANSON:  I'll be right back.

 2              THE COURT:  You should leave the documents

 3   here, sir.

 4        All right.  I just want to know if -- you know, if

 5   people are ready on the exhibits for Dr. Wailes.  If not, we

 6   can take that up tomorrow.  And also, we should work on the

 7   exhibits for Ms. Hiland.

 8              MR. MAJORAS:  Your Honor, John Majoras, with

 9   Walmart.  I need to catch up with my team.  They've been

10   looking at this today.

11              THE COURT:  All right.  That's fine.  I'd like

12   to certainly first thing tomorrow morning take care of

13   Dr. Wailes, and if we can for Ms. Hiland, that's fine.  I

14   just like to stay current.

15        Mr. Pitts has been advising me that as we admit these

16   documents witness by witness, counsel is giving them to him

17   in electronic form, so he is assembling them for the jury.

18   That's important because that's what they're going to get,

19   in an electronic form, and they can access the documents in

20   deliberation.

21        I just want to make sure that counsel is

22   double-checking this as we go along to make sure that all

23   the exhibits that have been admitted are going onto that

24   drive, disk, CD, however we're doing it.  If there are any

25   redactions, that the redactions have been made, and no
```

1  exhibits that haven't been admitted are getting on.

2      So I'm not double-checking everything, but I want to

3  make sure counsel is doing it on an ongoing basis, so when

4  we conclude, we'll add the last witness or two, and we'll be

5  set, because it's important that that be accurate.

6                  MR. SWANSON:  Your Honor, Brian Swanson for

7  Walgreens.  On that issue, we do have a couple of issues

8  with documents that have gone in over our objection but have

9  been admitted where we were -- there was representation that

10  a certain Bates number or Bates range was going onto the

11  docket, and a different Bates range went on.  So I've been

12  trying to address that with plaintiffs, but it's something

13  that we need to have resolved quickly, and I may bring it to

14  your attention tomorrow morning if we can't get it resolved.

15                  THE COURT:  I mean, the number that it's

16  referred to on the record should be on the document.  I know

17  sometimes there may be a second number from the deposition,

18  but it's essential that the number that was recited when the

19  witness was examined about the document be on that document.

20  Otherwise, no one can figure it out.

21                  MR. SWANSON:  Yeah, and the issue that we have

22  is, as you know, our settlement agreement has gone in over

23  our objection.  The settlement agreement that was put onto

24  the docket is the settlement agreement with all of the

25  attachments, 300 pages, including the order to show cause.

1    I thought it was unintentional, maybe it is, but that's

2    something we need to get cleared up quickly.

3               THE COURT:  Well, we don't need 300 pages.  I

4    think the settlement agreement succinctly should be in and

5    that's it.  We don't need 300 pages because none of that was

6    testified to.  So let's redact it, and we'll only -- you

7    know, I think we've all agreed that if they're really big

8    documents and only a small part was used in examination,

9    we'll whittle it down, and that's so the jury can focus on

10   it and not get lost in stuff that wasn't relevant to this

11   case.

12              MR. SWANSON:  Right.

13              THE COURT:  No one wants that, so both sides

14   need to cooperate on that.

15              MR. SWANSON:  Got it.  We'll do that.  Thank

16   you.

17              THE COURT:  Okay.

18              MR. STOFFELMAYR:  Judge, I had one other thing

19   if you have nothing else.

20              THE COURT:  Yes, Mr. Stoffelmayr.

21              MR. STOFFELMAYR:  I'm not quite sure what

22   happened during one of the lengthy sidebars there, but I

23   want to ask you to reconsider what I thought you said.  It

24   seems to me that Mr. Swanson was precluded from eliciting

25   testimony from a government agent based entirely on his

1    personal knowledge, not about a document, on his personal

2    knowledge, things he saw, things he did, things he heard,

3    that tends to show the defendants were the opposite of a

4    substantial cause of the opioid crisis, were actually a

5    force working the opposite direction.

6              THE COURT:  Well, look, I -- and Mr. Swanson

7    elected to stop.  I told him he could elicit from this

8    witness, if in fact it's the case, that he got information

9    from a Walgreens pharmacist that led him to investigate,

10   prosecute, and convict someone for diversion, illegal

11   prescriptions, whatever.

12             MR. STOFFELMAYR:  But I do think that's -- I

13   appreciate that.

14             THE COURT:  I allowed that, and then

15   Mr. Swanson stopped and didn't elicit it.

16             MR. STOFFELMAYR:  There was another series of

17   questions he wanted to ask, as I understood, that you said

18   would be impermissible, that he would have to show the

19   investigation led to a conviction.  And the issue here is

20   the conduct of the pharmacist.  Whether the police were able

21   to secure a conviction depends on all sorts of other things,

22   that the most striking examples, of course, are when there

23   was a conviction, but that doesn't make it improper or

24   irrelevant to elicit again testimony entirely on personal

25   knowledge, things he said, things he did, things he heard.

```
 1              THE COURT:  Look, he's already elicited

 2   general testimony that Walgreens, Walmart, CVS pharmacists

 3   provided me with valuable tips when I was with the Lake

 4   County task force and then when I was with the Board of

 5   Pharmacy.

 6              MR. STOFFELMAYR:  I don't think to give four

 7   or five examples is cumulative.  I think it is helpful to

 8   the jury to understand what that means in real life terms.

 9   I don't think that's an improper line of questioning.

10              THE COURT:  I'll allow him if he says -- I

11   assume these are closed investigations.

12              MR. STOFFELMAYR:  A hundred percent.  I mean,

13   if they're not, we would obviously not ask the question.

14              THE COURT:  All right.  Well, if you want to

15   say that between 2007 and 2012 I remember X specific ones

16   from Walgreens, fine.  I'm not going to, again, let him

17   narrate about details that someone told him, but the fact

18   that they were made, I said I would allow that.

19              MR. STOFFELMAYR:  Thank you.  I just wanted to

20   make sure we could get into -- again, without getting into

21   the details of what people said, but this happened at a real

22   pharmacy, it was real people behind this; not a generic "I

23   found them to be very helpful."  I think that's important

24   for the jury to hear.

25              THE COURT:  All right.  If he wants to say
```

1    that there were X number over X period of time, I don't have

2    a problem with that.

3              MR. STOFFELMAYR:  Thank you, Judge.

4              THE COURT:  Okay.  All right.  Have a good

5    evening.  See everyone tomorrow morning.

6              MR. MAJORAS:  Thank you, Judge.

7              (Proceedings adjourned at 5:17 p.m.)

8                        * * * * *

9                  **C E R T I F I C A T E**

10

11       I certify that the foregoing is a correct transcript

12   of the record of proceedings in the above-entitled matter

13   prepared from my stenotype notes.

14

15       */s/ Lance A. Boardman_____  11-01-2021*
         Lance A. Boardman, RDR, CRR              DATE
16

17

18

19

20

21

22

23

24

25