1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION AT CLEVELAND

3    ------------------------------X
     IN RE:                        :   Case No. 1:17-md-2804
4                                  :
     NATIONAL PRESCRIPTION         :
5    OPIATE LITIGATION             :
                                   :   **VOLUME 21**
6    CASE TRACK THREE              :   JURY TRIAL
                                   :   *(Pages 5327 - 5608)*
7                                  :
                                   :
8                                  :
                                   :   *November 2, 2021*
9    ------------------------------X

10

11

12          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13

14      HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16          SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:       Lance A. Boardman, RDR, CRR
                                    United States District Court
21                                  801 West Superior Avenue
                                    Court Reporters 7-189
22                                  Cleveland, Ohio 44113
                                    216.357.7019
23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

```
 1    APPEARANCES:

 2    For the Plaintiffs:        Peter H. Weinberger, Esq.
                                 SPANGENBERG, SHIBLEY & LIBER
 3                               1001 Lakeside Avenue, Ste. 1700
                                 1900 East Ninth Street
 4                               Cleveland, Ohio 44114
                                 216-696-3232
 5
                                 W. Mark Lanier, Esq.
 6                               Rachel Lanier, Esq.
                                 THE LANIER LAW FIRM
 7                               6810 FM 1960 West
                                 Houston, Texas 77069
 8                               813-659-5200

 9                               Frank L. Gallucci, III, Esq.
                                 PLEVIN & GALLUCCI COMPANY, LPA
10                               The Illuminating Building
                                 Suite 2222
11                               55 Public Square
                                 Cleveland, Ohio 44113
12                               216-861-0804

13                               Salvatore C. Badala, Esq.
                                 Maria Fleming, Esq.
14                               NAPOLI SHKOLNIK
                                 360 Lexington Ave., 11th Floor
15                               New York, New York 10017
                                 212-397-1000
16

17    For Walgreens Defendants: Kaspar J. Stoffelmayr, Esq.
                                 Brian C. Swanson, Esq.
18                               Katherine M. Swift, Esq.
                                 BARTLIT BECK LLP
19                               54 West Hubbard Street, Ste.300
                                 Chicago, Illinois 60654
20                               312-494-4400

21

22

23

24

25
```

1    APPEARANCES (Cont'd):

2
     For CVS Defendants:        Graeme W. Bush, Esq.
3                               Eric R. Delinsky, Esq.
                                Kyle A. Crawford, Esq.
4                               ZUCKERMAN SPAEDER - WASHINGTON
                                Suite 1000
5                               1800 M Street, NW
                                Washington, DC 20036
6                               202-778-1831

7
     For Walmart Defendants:    John M. Majoras, Esq.
8                               JONES DAY - COLUMBUS
                                Suite 600
9                               325 John H. McConnell Blvd.
                                Columbus, Ohio 43215
10                              614-281-3835

11                              Tara A. Fumerton, Esq.
                                Tina M. Tabacchi, Esq.
12                              JONES DAY - CHICAGO
                                Suite 3500
13                              77 West Wacker
                                Chicago, Illinois 60601
14                              312-782-3939

15
     ALSO PRESENT:             David Cohen, Special Master
16

17                                        - - - - -

18

19

20

21

22

23

24

25

1                          Table of Contents

2

3    Witnesses/Events                                        Page

4    TREY EDWARDS                                            5341

5           Mr. Swanson - Direct (Cont'd)                   5341
            Mr. Delinsky - Cross                            5366
6           Ms. Fumerton - Cross                            5388
            Mr. Weinberger - Cross                          5393
7           Mr. Swanson - Redirect                          5437
            Ms. Fumerton - Recross                          5451
8           Mr. Delinsky - Recross                          5457
            Mr. Weinberger - Recross                        5471

9
     ROBERT BRUNNER                                          5474
10
            Ms. Swift - Direct                              5474
11          Mr. Lanier - Cross                              5551
            Ms. Swift - Redirect                            5583
12          Mr. Lanier - Recross                            5597

13

14

15

16

17

18

19

20

21

22

23

24

25

5331

08:50:15  1              (In open court at 8:50 a.m.)

08:50:19  2              THE COURT:  Okay.  Everyone can be seated.

08:50:23  3      All right.  We can maybe take care of exhibits for

08:50:56  4  those last two witnesses.

08:50:57  5      All right.  I've got a list here, two-page list of

08:51:02  6  exhibits used by the testimony of Dr. Wailes.  Are there any

08:51:07  7  objections?  I'll just go right down the list.

08:51:09  8              MR. WEINBERGER:  Yes, Your Honor.  We were

08:51:10  9  just in the midst of conferring, but I think we know where

08:51:15  10  we're landing.

08:51:16  11              THE COURT:  All right.

08:51:16  12              MR. WEINBERGER:  So you want to start with the

08:51:20  13  Defense exhibits first and --

08:51:23  14              THE COURT:  I don't have any Defense exhibits.

08:51:25  15              MR. WEINBERGER:  All right.

08:51:28  16              THE COURT:  I've got a list of the

08:51:30  17  Plaintiffs'.  I'll just go down the list and see it if there

08:51:33  18  are any objections.

08:51:34  19              MR. WEINBERGER:  Okay.

08:51:35  20              THE COURT:  21865, any objection?

08:51:41  21              MS. FUMERTON:  No objection, Your Honor.

08:51:42  22              THE COURT:  Thank you.  That's in.

08:51:43  23          21857.

08:51:46  24              MS. FUMERTON:  No objection.

08:51:47  25              THE COURT:  Thank you.  28217.

08:51:51　　1　　　　　　　　MS. FUMERTON:  We do have an objection to this

08:51:53　　2　　one.  This is a document that plaintiffs had the wrong

08:51:54　　3　　organization and Dr. Wailes had never seen it before.

08:51:59　　4　　　　　　　　THE COURT:  28217.  I don't really remember

08:52:03　　5　　this.  If he's never seen it --

08:52:05　　6　　　　　　　　MR. WEINBERGER:  Well, this was from the

08:52:07　　7　　American Academy of Pain Management that we had thought was

08:52:13　　8　　the American Academy of Pain Medicine publication.  Later

08:52:20　　9　　on, he testified that he was board certified by the American

08:52:32　10　　Board of Pain Management.

08:52:33　11　　　　　　　　THE COURT:  All right.  This comes in over

08:52:34　12　　objection, because he's board certified by that

08:52:36　13　　organization.

08:52:37　14　　　　　　　　MS. FUMERTON:  Well, Your Honor, the

08:52:38　15　　plaintiffs used it in a way that was completely misleading

08:52:40　16　　because they thought that it was the right -- the wrong

08:52:43　17　　organization.  So we don't think it would be appropriate to

08:52:46　18　　come in --

08:52:47　19　　　　　　　　THE COURT:  Let me see the letter.

08:52:48　20　　　　　　　　MR. WEINBERGER:  It was later corrected.

08:52:50　21　　　　　　　　THE COURT:  It was corrected.  At first there

08:52:52　22　　was a confusion, and I wouldn't have admitted it then, but

08:52:54　23　　then when he -- he's -- it's on his resume that he's board

08:52:59　24　　certified by this organization, so it comes in over

08:53:01　25　　objection.

08:53:04  1        MS. FUMERTON:  Your Honor, just -- I hear you,

08:53:07  2   but my one last ditch effort on this is that, I mean, this

08:53:11  3   really is something that I think would be very confusing to

08:53:13  4   the jury because there was originally questioning by

08:53:16  5   Mr. Lanier suggesting that he was involved with this

08:53:20  6   organization at this point in time, and he was not.  He was

08:53:22  7   board certified years earlier.

08:53:24  8        THE COURT:  That's the problem, is that now

08:53:26  9   that I remember it, it was introduced because the doctor is

08:53:35  10  in leadership in an organization.  He's on the Board.  He's

08:53:40  11  been in leadership for a long time, and the American Academy

08:53:50  12  of Pain Medicine.  All right.  I'm not going to allow this

08:53:52  13  in.

08:53:52  14        MR. WEINBERGER:  Okay.

08:53:54  15        THE COURT:  It's not -- I'm denying it, not

08:53:56  16  in.

08:53:59  17     All right.  18314.

08:54:04  18        MS. FUMERTON:  So, Your Honor, I think we, and

08:54:05  19  Mr. Weinberger can correct me, I think we have a deal on

08:54:08  20  this one.  If you don't object to that one, we'll let those

08:54:10  21  two pages come in.

08:54:11  22        MR. WEINBERGER:  Okay, fine.

08:54:13  23     So here -- this is the publication from the United

08:54:19  24  States Senate Finance Committee.  We used I think two pages

08:54:23  25  of a chart that shows the contributions, the corporate

| | | |
|---|---|---|
| 08:54:29 | 1 | contributions to the American Academy of Pain -- something. |
| 08:54:31 | 2 | THE COURT:  Right. |
| 08:54:32 | 3 | MR. WEINBERGER:  Management or Medicine. |
| 08:54:33 | 4 | THE COURT:  Just those pages are coming in? |
| 08:54:35 | 5 | MR. WEINBERGER:  Well, we would want the first |
| 08:54:37 | 6 | page of the document, which shows the title of what it is. |
| 08:54:40 | 7 | THE COURT:  All right. |
| 08:54:40 | 8 | MR. WEINBERGER:  And then we would want, is |
| 08:54:44 | 9 | it 28A29? |
| 08:54:44 | 10 | MS. FLEMING:  28 and 29. |
| 08:54:49 | 11 | MR. WEINBERGER:  Oh, pages 28 and 29 of the |
| 08:54:52 | 12 | document. |
| 08:54:53 | 13 | THE COURT:  All right.  Pages 1, 28, and 29 |
| 08:54:55 | 14 | only. |
| 08:54:55 | 15 | MR. WEINBERGER:  Pages 28 and 29. |
| 08:54:57 | 16 | THE COURT:  I thought you wanted page 1. |
| 08:54:59 | 17 | MR. WEINBERGER:  1, 28, and 29, right. |
| 08:55:02 | 18 | THE COURT:  All right.  02999, DEA joint |
| 08:55:07 | 19 | statement.  Any objection? |
| 08:55:08 | 20 | MS. FUMERTON:  No objection, Your Honor. |
| 08:55:09 | 21 | THE COURT:  21873. |
| 08:55:11 | 22 | MS. FUMERTON:  No objection. |
| 08:55:12 | 23 | THE COURT:  All right.  21871. |
| 08:55:16 | 24 | MS. FUMERTON:  No objection. |
| 08:55:17 | 25 | THE COURT:  21872. |

08:55:20    1                    MS. FUMERTON:  No objection.

08:55:21    2                    THE COURT:  19616.

08:55:24    3                    MS. FUMERTON:  No objection.

08:55:25    4         I'll just point out for Walgreens, this is the

08:55:27    5    Walgreens document.

08:55:28    6                    THE COURT:  Walgreens have any objection?

08:55:31    7                    MS. SWIFT:  No objection, Your Honor.

08:55:33    8                    THE COURT:  Okay.  Thank you.

08:55:34    9         15656.  This looks to be a CVS document.

08:55:39   10                    MR. DELINSKY:  No objection, Your Honor.

08:55:40   11                    THE COURT:  Thank you.

08:55:42   12         21867.

08:55:45   13                    MS. FUMERTON:  No objection, Your Honor.

08:55:46   14                    THE COURT:  Thank you.

08:55:46   15         And 00021.

08:55:49   16                    MS. FUMERTON:  No objection, Your Honor.

08:55:53   17                    THE COURT:  Do the defendants have any

08:55:54   18    documents for Dr. Wailes?

08:55:59   19                    MS. FUMERTON:  I do, Your Honor.

08:56:03   20                    THE COURT:  All right.  Have the plaintiffs

08:56:05   21    looked at this?  Do you have any --

08:56:08   22                    MR. WEINBERGER:  Yes, Your Honor.  Our only

08:56:09   23    objection is to the first exhibit, 11776.

08:56:15   24                    THE COURT:  All right.

08:56:16   25                    MR. WEINBERGER:  This is a journal article

08:56:17   1    that we object to.  Journal articles generally do not go to

08:56:25   2    the jury.

08:56:26   3                    MS. FUMERTON:  And, Your Honor, I think other

08:56:28   4    journal articles have gone back, so we would request that

08:56:33   5    this go back as well.

08:56:35   6                    THE COURT:  Well, I think some other ones have

08:56:36   7    gone back, so I'll admit this over objection.

08:56:40   8        And these others come in without objection:  02457,

08:56:51   9    01005, 01355, 11040, 11963, and 05689.  Okay.

08:57:09  10        And then we've got a series of documents plaintiffs

08:57:14  11    are offering with Ms. Hiland.  I don't know, I assume the

08:57:17  12    defendants -- it's your witness.  I assume you've got some.

08:57:21  13                    MS. FUMERTON:  Your Honor, we do.  We

08:57:22  14    exchanged lists last night.  If we could --

08:57:24  15                    THE COURT:  You're still working on those?

08:57:27  16                    MS. FUMERTON:  Yeah, we haven't had a chance

08:57:28  17    to do that.

08:57:29  18                    THE COURT:  All right.  Then we'll take those

08:57:30  19    up later.

08:57:33  20        I guess Mr. Edwards is still on, so we'll take care of

08:57:36  21    him afterward.

08:57:42  22        Okay.  Yesterday I submitted the latest draft of the

08:57:47  23    proposed final jury instructions and verdict forms.  We

08:57:52  24    eliminated all references to distribution because those

08:57:58  25    claims are out.

08:58:04  1      So at this point I only want something from the

08:58:07  2  parties if you think that there's anything in there that is

08:58:12  3  wrong.  If so, just say, all right, this sentence is wrong

08:58:16  4  and here's the federal or state case that says it's wrong,

08:58:20  5  and this is what we propose instead.

08:58:24  6      Or if you think that a sentence is just confusing and

08:58:28  7  doesn't make sense and you've got a better way to say it,

08:58:32  8  all right, submit that.  And I want those no later than

08:58:38  9  we'll just say 4:00 on Friday.  And then if anyone wants to

08:58:44  10  reply or respond to it, do it by Monday, because I want to

08:58:47  11  get those in shape.

08:58:48  12      And again, I don't -- I'm not, you know, encouraging

08:58:52  13  anything, but certainly if you think we've got something

08:58:55  14  wrong, I want to know it and why.  And if you think there's

08:59:00  15  something in there that just is confusing or inconsistent,

08:59:04  16  or is going to -- you know, the jury's going to have a

08:59:09  17  question about it because they can't understand it, I'm

08:59:12  18  always -- we can always improve the language, so let's

08:59:18  19  address that.

08:59:18  20          MR. DELINSKY:  Your Honor, if we have a minute

08:59:20  21  or two, could I flag one issue for you?

08:59:22  22          THE COURT:  Okay.

08:59:23  23          MR. DELINSKY:  But if we don't, that's okay.

08:59:25  24          THE COURT:  We've got one or two minutes.

08:59:27  25          MR. DELINSKY:  In the dispensing instruction,

08:59:29  1   the -- and I don't know if I have the wording right, that

08:59:35  2   CSA rules on dispensing.

08:59:36  3                  THE COURT:  Right.

08:59:36  4                  MR. DELINSKY:  Your Honor uses the word

08:59:39  5   "ensure," a pharmacist and a pharmacy has to ensure that the

08:59:44  6   prescriptions are legitimate.

08:59:45  7        That's one area where we're going to -- among others,

08:59:48  8   we're going to put something in, because that deviates from

08:59:51  9   the regulatory language in both jurisdictions, both the CSA

08:59:59  10  and the Ohio analog to it, which both have the "knowing"

09:00:02  11  standard.

09:00:03  12       And there is some dispute, I would imagine, about what

09:00:05  13  that knowing standard means, but there nevertheless is a

09:00:09  14  mens rea state of mind standard in both regulations that

09:00:14  15  doesn't appear in that instruction.

09:00:15  16       So I just wanted to highlight it because it comes --

09:00:19  17  "ensure" is shorthand, we all use it, all our clients use

09:00:23  18  it, everybody in the industry uses it, but it's just

09:00:25  19  shorthand, and it does deviate from that plain language.

09:00:28  20       So I just wanted to highlight that for Your Honor.

09:00:30  21                  THE COURT:  Well, that's probably why we used

09:00:35  22  it, because everyone uses it.

09:00:37  23                  MR. DELINSKY:  Yeah, that's what I was

09:00:38  24  thinking too.

09:00:39  25                  THE COURT:  If you think it's, Mr. Delinsky,

09:00:42  1    legally incorrect, point that out and what you suggest.

09:00:46  2    Certainly we'll look at it.

09:00:47  3                    MR. DELINSKY:  Okay.  Thank you, Your Honor.

09:00:51  4    That's what we'll do.

09:00:52  5                    THE COURT:  You can discuss it with the

09:00:53  6    plaintiffs.  If they agree, it's even better if you agree on

09:00:57  7    it.  I want it obviously legally correct and I want it

09:01:03  8    intelligible, understandable to lay people.  That's the

09:01:05  9    idea.

09:01:06  10                   MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr

09:01:08  11   for Walgreens.

09:01:09  12       I would suggest we do this in a different filing.  We

09:01:12  13   obviously need to submit something to preserve objections on

09:01:15  14   issues that you've already decided.  As I understand the --

09:01:18  15   I would like our Friday submission to focus on issues that

09:01:21  16   we think you may not have, you know, realized or taken into

09:01:25  17   account.

09:01:26  18                   THE COURT:  Yeah, anything that you -- I mean,

09:01:27  19   you can file whatever you need.  I mean, the time then is --

09:01:34  20   would be right before I do it or right after, whatever, but

09:01:37  21   this is if you really think -- --

09:01:38  22                   MR. STOFFELMAYR:  Understood.

09:01:40  23                   THE COURT:  -- something new that's come up

09:01:43  24   or -- I mean, if you think that something is just flat out

09:01:45  25   wrong, I mean, that I might reconsider, do it.

09:01:49   1            MR. STOFFELMAYR:  I just wanted to confirm.

09:01:50   2    It sounds like everyone is taking this the same way.  The

09:01:53   3    Friday submission will be things that we have not previously

09:01:56   4    raised with you.

09:01:57   5            THE COURT:  Right.

09:01:57   6            MR. STOFFELMAYR:  Or we think you just

09:01:58   7    misunderstood, versus issues that you've decided.  We

09:02:01   8    understand your decision, we just need to preserve our

09:02:03   9    record.

09:02:11  10            THE COURT:  Thank you, Mr. Stoffelmayr.  That

09:02:14  11    was my intention.  I wasn't as clear as I should have been.

09:02:16  12        Okay.  Then I guess we can bring back Mr. Edwards.

09:02:23  13        Oh, yesterday's time, I had 2 hours for the plaintiffs

09:02:26  14    and 4.75 for the defendants.

09:04:21  15            (The jury is present at 9:04 a.m.)

09:04:44  16            THE COURT:  Good morning, ladies and

09:04:45  17    gentlemen.  Please be seated.

09:04:46  18        Mr. Edwards, I just want to remind you, you're still

09:04:48  19    under oath from yesterday.

09:04:51  20        We tried to adjust the seat, but we're not able to do

09:04:56  21    it, and I don't want to make it worse.  So we apologize.

09:05:00  22            THE WITNESS:  No worries.

09:05:01  23            THE COURT:  Mr. Swanson, you may continue,

09:05:02  24    please.

09:05:05  25            MR. SWANSON:  Thank you, Your Honor.

**Edwards - (Direct by Swanson)**

| | | |
|---|---|---|
| 09:05:06 | 1 | Good morning, ladies and gentlemen. |
| 09:05:07 | 2 | Agent Edwards, thank you for coming back in this |
| 09:05:10 | 3 | morning to answer a few more questions. |
| 09:05:12 | 4 | TREY EDWARDS |
| 09:05:12 | 5 | - - - - - |
| 09:05:12 | 6 | DIRECT EXAMINATION (CONT'D) |
| 09:05:13 | 7 | BY MR. SWANSON: |
| 09:05:13 | 8 | **Q**    I want to turn now to the last area that I would like |
| 09:05:16 | 9 | to cover with you, which is inspections that you conducted |
| 09:05:19 | 10 | of the retail chain pharmacies when you were an agent -- in |
| 09:05:24 | 11 | your current role as an agent for the Board of Pharmacy, |
| 09:05:28 | 12 | okay? |
| 09:05:28 | 13 | **A**    Okay. |
| 09:05:29 | 14 | **Q**    I think yesterday you said that in your current role |
| 09:05:33 | 15 | you've moved away a bit from inspecting pharmacies.  Is that |
| 09:05:37 | 16 | true? |
| 09:05:37 | 17 | **A**    That's correct. |
| 09:05:37 | 18 | **Q**    When is the last time that you conducted an |
| 09:05:42 | 19 | investigation of any pharmacy? |
| 09:05:43 | 20 | **A**    An investigation of the pharmacy or investigation at a |
| 09:05:50 | 21 | pharmacy? |
| 09:05:50 | 22 | **Q**    I misspoke, and I'm sorry.  I've done that before and |
| 09:05:53 | 23 | I'll try not to do it again. |
| 09:05:54 | 24 | An inspection of a pharmacy. |
| 09:05:56 | 25 | **A**    Well, I've done a couple my role currently, but |

**Edwards - (Direct by Swanson)**

5342

| | | |
|---|---|---|
| 09:06:04 | 1 | they're more of like a cursory, you know, I may need one or |
| 09:06:07 | 2 | two things from a pharmacy, so not a full scale inspection. |
| 09:06:10 | 3 | It's been probably three years since I did a full routine |
| 09:06:15 | 4 | inspection. |
| 09:06:16 | 5 | **Q**    But going back three years and then back to the time |
| 09:06:18 | 6 | you started at the Board of Pharmacy, were routine |
| 09:06:22 | 7 | inspections a pretty common part of your job? |
| 09:06:26 | 8 | **A**    Yes, yes.  They were much more common when I first got |
| 09:06:29 | 9 | hired, not just because of the role I'm in now, but because |
| 09:06:31 | 10 | we've -- the Board of Pharmacy hired another class of |
| 09:06:37 | 11 | employee called an inspector, and those are -- those are |
| 09:06:40 | 12 | generally pharmacy technicians who they handle the majority |
| 09:06:46 | 13 | of the retail inspections now.  And that happened around the |
| 09:06:50 | 14 | time that I entered this new role, maybe a couple years |
| 09:06:54 | 15 | before. |
| 09:06:55 | 16 | **Q**    Got it, okay. |
| 09:06:56 | 17 |     So three, four years ago there was sort of a new role |
| 09:06:59 | 18 | that was established by the Board of Pharmacy? |
| 09:07:00 | 19 | **A**    Correct. |
| 09:07:01 | 20 | **Q**    Understood. |
| 09:07:02 | 21 |     Well, I want to focus, if we can, on inspections that |
| 09:07:05 | 22 | you conducted. |
| 09:07:06 | 23 | **A**    Sure. |
| 09:07:07 | 24 | **Q**    Were the pharmacy inspections that you conducted, were |
| 09:07:12 | 25 | they all done on site? |

**Edwards - (Direct by Swanson)**

09:07:14  1    **A**    Yes.

09:07:18  2    **Q**    Were the inspections that you'd done, were they

09:07:21  3    announced or were they unannounced?

09:07:22  4    **A**    Primarily unannounced.  Occasionally, if we had an

09:07:27  5    issue, such as like an error in dispensing, we would want to

09:07:30  6    verify that the pharmacist who was involved in that would be

09:07:33  7    at the store, so we would -- that might be announced.  But

09:07:36  8    the regular routine inspections that we did were generally

09:07:40  9    unannounced.

09:07:41  10   **Q**    How long in your practice would a typical pharmacy

09:07:45  11   inspection last?

09:07:46  12   **A**    I would say a couple hours.

09:07:48  13   **Q**    How many -- and this might be sort of on average, but

09:07:52  14   how many pharmacies in general would you personally inspect

09:07:55  15   in a given year?

09:07:56  16   **A**    We had a, I guess you could say, quota that we would

09:08:03  17   do around 50.  It varied in the years that I was there.  I

09:08:11  18   think it was at one point 55, maybe 50.  So it was ballpark

09:08:15  19   50 a year.

09:08:15  20   **Q**    So in general about one a week?

09:08:17  21   **A**    In general.  Some -- you know, depending on caseload

09:08:20  22   and stuff like that, you may do three in a week and none for

09:08:23  23   two weeks, but generally that was a good average.

09:08:28  24   **Q**    And can you remind me what counties you were

09:08:30  25   responsible for with your inspections?

**Edwards - (Direct by Swanson)**

5344

09:08:31  1   **A**     When I was first hired, it was Lake, Geauga,

09:08:36  2   Ashtabula, and Portage; and at various times I've been

09:08:40  3   responsible for Cuyahoga, the counties down towards

09:08:43  4   Youngstown, Trumbull, Mahoning.

09:08:46  5       It's just, generally speaking, those first four

09:08:51  6   counties I mentioned, but it's varied over the years based

09:08:54  7   on the numbers of employees we've had and retirements, and

09:08:57  8   things like that.

09:08:57  9   **Q**     How would you decide which specific pharmacies you

09:09:01  10  were going to inspect on a given day, week, or year?

09:09:03  11  **A**     Typically, it was based on time since last inspection.

09:09:08  12  So, for instance, when I was hired, that was primarily what

09:09:13  13  I did, because I didn't have a caseload, you know, of

09:09:17  14  criminal investigations, so I did -- I think I did every

09:09:22  15  retail pharmacy in my jurisdiction.  I did that first year I

09:09:25  16  was hired, and then from there it was based on how long it

09:09:29  17  had been since I was at a given place.

09:09:31  18  **Q**     Were these inspections that you conducted, were they

09:09:33  19  the only point of contact you had with the pharmacies, or

09:09:37  20  were there other circumstances where you'd go in and visit

09:09:39  21  the pharmacies?

09:09:40  22  **A**     There were other issues with criminal investigations

09:09:44  23  or things like that, where we would call if we had a

09:09:46  24  question about something or, you know, needed a particular

09:09:50  25  prescription.  Maybe we had already done an inspection at

**Edwards - (Direct by Swanson)**

09:09:53  1    that pharmacy within the past few months, but we needed a

09:09:55  2    prescription for an investigation, so we would go in and get

09:09:59  3    the prescription, and maybe talk to the pharmacist.

09:10:01  4    **Q**    Over the course of your career, have you inspected

09:10:05  5    every Walgreens pharmacy in Lake County?

09:10:07  6    **A**    I believe so.

09:10:08  7    **Q**    Every CVS pharmacy?

09:10:11  8    **A**    I believe so.

09:10:11  9    **Q**    And every Walmart pharmacy?

09:10:13  10   **A**    Yes, I believe so.

09:10:14  11   **Q**    Can you tell us what a typical inspection was like for

09:10:19  12   you personally?  Take us from walking in the door to leaving

09:10:22  13   with a report.

09:10:23  14   **A**    Sure.  So we had a -- in the early days we had a

09:10:29  15   triplicate paper that had on the left side of the paper it

09:10:35  16   had -- it was kind of like an outline of things that we

09:10:38  17   would look at.  It was maybe, like, 30 or 40 different

09:10:43  18   topics.

09:10:45  19        And we would go through at least the first 10, and

09:10:50  20   then there were others that we would sometimes focus on,

09:10:55  21   or -- it was up to the discretion of the agent usually what

09:10:59  22   they were going to look at.  We very rarely looked at every

09:11:03  23   single, you know, topic on the sheet, but we would look at

09:11:07  24   the first 10 and then kind of skip around and look at

09:11:11  25   different things.

**Edwards - (Direct by Swanson)**

09:11:11  1    **Q**    Okay.  And during your inspections, were you allowed

09:11:16  2    access to any records or files that you thought you needed

09:11:18  3    to review in order to conduct your inspection?

09:11:20  4    **A**    Yes.

09:11:21  5    **Q**    And in general, speaking about Walgreens, how did the

09:11:26  6    pharmacists there respond to your requests for documents,

09:11:29  7    data, information?

09:11:31  8    **A**    Well, all pharmacies that I went into were cooperative

09:11:36  9    and accommodating.

09:11:38  10   **Q**    When you would do these inspections, would you look at

09:11:42  11   the dispensing systems that the pharmacists and pharmacies

09:11:44  12   were using?

09:11:45  13   **A**    General, like, overview.  We would ask them the type

09:11:52  14   of software that they were using and occasionally would have

09:11:55  15   them walk us through -- I guess at the beginning have them

09:12:01  16   walk us through what they would do when they would fill a

09:12:05  17   prescription.  But then once you've been in one retail

09:12:07  18   store, you've kind of been in them all in the sense that

09:12:10  19   they have the same computer system; not across the board

09:12:15  20   but, like, one Walgreens versus another Walgreens.

09:12:17  21        It's the same -- you know, the same computer system.

09:12:21  22   So after a while you kind of knew what they were doing, so

09:12:25  23   those questions became less frequent for more experienced

09:12:29  24   agents like myself, because we already knew the answers.

09:12:31  25   **Q**    So through your inspections of Walgreens, I take it

**Edwards - (Direct by Swanson)**

| | | |
|---|---|---|
| 09:12:33 | 1 | you had an understanding of the dispensing system they used? |
| 09:12:36 | 2 | **A**    Yes. |
| 09:12:39 | 3 | **Q**    And do you recall what it's called? |
| 09:12:40 | 4 | **A**    No, I don't. |
| 09:12:42 | 5 | **Q**    IntercomPlus, does that ring a bell? |
| 09:12:45 | 6 | **A**    Yes, yes. |
| 09:12:45 | 7 | **Q**    Were the pharmacies, not just the retail chains, but |
| 09:12:50 | 8 | were all pharmacies required to have their dispensing system |
| 09:12:53 | 9 | approved? |
| 09:12:53 | 10 | **A**    Yes. |
| 09:12:53 | 11 | **Q**    And who was it that was responsible for that approval? |
| 09:12:57 | 12 | **A**    That would be one of our specialists. |
| 09:12:58 | 13 | **Q**    At the Board of Pharmacy? |
| 09:12:59 | 14 | **A**    Yes. |
| 09:13:00 | 15 | **Q**    During your inspections, was it your practice to look |
| 09:13:08 | 16 | at actual prescriptions? |
| 09:13:09 | 17 | **A**    Sometimes, yes. |
| 09:13:10 | 18 | **Q**    And describe that for me. |
| 09:13:12 | 19 | **A**    Looking at the prescriptions, I mean, I -- we would -- |
| 09:13:16 | 20 | during an inspection we would typically go through the |
| 09:13:22 | 21 | control file, like the control prescriptions, and look |
| 09:13:25 | 22 | through, you know, not necessarily looking for a certain |
| 09:13:30 | 23 | prescription, but at a routine inspection maybe flip through |
| 09:13:34 | 24 | and look for different things to make sure the prescriptions |
| 09:13:37 | 25 | were being filled out appropriately, make sure the DEA |

5348

| | |
|---|---|
| 09:13:39 | 1 |
| 09:13:42 | 2 |
| 09:13:46 | 3 |
| 09:13:47 | 4 |
| 09:13:50 | 5 |
| 09:13:50 | 6 |
| 09:13:51 | 7 |
| 09:13:59 | 8 |
| 09:14:01 | 9 |
| 09:14:03 | 10 |
| 09:14:10 | 11 |
| 09:14:14 | 12 |
| 09:14:21 | 13 |
| 09:14:25 | 14 |
| 09:14:28 | 15 |
| 09:14:31 | 16 |
| 09:14:34 | 17 |
| 09:14:40 | 18 |
| 09:14:43 | 19 |
| 09:14:46 | 20 |
| 09:14:48 | 21 |
| 09:14:48 | 22 |
| 09:14:49 | 23 |
| 09:14:49 | 24 |
| 09:14:50 | 25 |

number was on there, make sure the doctor was signing them

and, you know, the directions were written appropriately,

and things like that.

Q      And if those things weren't being done properly, would

you make a note of that?

A      Yes.

Q      What about if a store or pharmacy had a file of

refusals to fill, did you ever experience that?

A      I don't recall seeing that, no.

Q      As a Board of Pharmacy agent, what did you view -- or

what did you view as the purpose of your inspections?

A      It was to maintain accountability for the pharmacies

and, you know, also maybe like a PR visit; like getting to

know the pharmacists and letting them know we're there if

they need our assistance, and, you know, answering any

questions they may have because they didn't have time to

call, and here we are, what do you need.

Q      And as you continued in your role at the Board of

Pharmacy, did you find that you had a good relationship with

the pharmacies and pharmacists at Walgreens?

A      Yes.

Q      And at CVS?

A      Yes.

Q      And at Walmart?

A      Yes.

**Edwards - (Direct by Swanson)**                                    5349

| | | |
|---|---|---|
| 09:14:50 | 1 | **Q**    Was it important to you as a Board of Pharmacy agent |
| 09:14:55 | 2 | to ensure that the pharmacies you inspected were complying |
| 09:14:58 | 3 | with the Ohio laws? |
| 09:14:59 | 4 | **A**    Yes. |
| 09:14:59 | 5 | **Q**    And the Ohio regulations? |
| 09:15:02 | 6 | **A**    Yes. |
| 09:15:02 | 7 | **Q**    What would you do if you discovered that a pharmacist |
| 09:15:10 | 8 | was not complying with the state or federal laws regarding |
| 09:15:13 | 9 | dispensing or pharmacy? |
| 09:15:14 | 10 | **A**    Well, it would depend.  There were various levels |
| 09:15:17 | 11 | of -- you know, we may just -- it may be, Hey, did you know |
| 09:15:20 | 12 | you did this incorrectly, fix it; or if it was a more |
| 09:15:26 | 13 | egregious thing or if it was something that was happening |
| 09:15:29 | 14 | repeatedly, it may warrant a written warning on our |
| 09:15:32 | 15 | inspection form that they would have to respond to. |
| 09:15:36 | 16 | Or something that is more egregious may result in a |
| 09:15:40 | 17 | citation from our Board, where they have to come to the |
| 09:15:43 | 18 | Board office and explain, you know, explain for our Board |
| 09:15:47 | 19 | what was going on and why it happened, and answer their |
| 09:15:51 | 20 | questions. |
| 09:15:52 | 21 | **Q**    Could the Board of Pharmacy revoke the license of a |
| 09:15:55 | 22 | pharmacy if it wasn't complying with the state or federal |
| 09:15:57 | 23 | laws? |
| 09:15:58 | 24 | **A**    Yes. |
| 09:15:58 | 25 | **Q**    During your time at the Board of Pharmacy, are you |

| | | |
|---|---|---|
| 09:16:03 | 1 | aware of any Walgreens pharmacy in Lake or Trumbull County |
| 09:16:06 | 2 | having their license revoked by the Board of Pharmacy? |
| 09:16:09 | 3 | **A**    In Lake County, I don't believe so.  Trumbull, I'm not |
| 09:16:14 | 4 | sure.  I didn't have a lot of experience in Trumbull County. |
| 09:16:16 | 5 | **Q**    Okay.  How about any CVS pharmacy in Lake County? |
| 09:16:19 | 6 | **A**    Not to my knowledge. |
| 09:16:19 | 7 | **Q**    Any Walmart pharmacy? |
| 09:16:25 | 8 | **A**    Not to my knowledge. |
| 09:16:25 | 9 | **Q**    Just in general, how would you describe the |
| 09:16:27 | 10 | inspections that you conducted of the Walgreens pharmacies |
| 09:16:30 | 11 | in Lake County? |
| 09:16:30 | 12 | **A**    In general, I did say that they were fine.  I don't |
| 09:16:35 | 13 | remember having any issues or, you know, any -- nothing that |
| 09:16:38 | 14 | stands out in my mind. |
| 09:16:42 | 15 | **Q**    I want to just turn to a couple specific examples so |
| 09:16:47 | 16 | you can walk us through and help us understand the process |
| 09:16:49 | 17 | here. |
| 09:16:50 | 18 | **A**    Okay. |
| 09:16:50 | 19 | **Q**    If you look in your binder behind Tab 6, it's the |
| 09:16:55 | 20 | first one I want to ask you about. |
| 09:16:56 | 21 | **A**    Okay. |
| 09:16:56 | 22 | **Q**    And does the document, Tab 6, look familiar to you? |
| 09:17:01 | 23 | **A**    Generally speaking, yes. |
| 09:17:02 | 24 | **Q**    Okay.  And can you tell us what it is? |
| 09:17:07 | 25 | **A**    It's a copy of our inspection report that was |

| | | |
|---|---|---|
| 09:17:09 | 1 | completed on June 24, 2014. |
| 09:17:11 | 2 | **Q**    And is that your signature on the bottom right? |
| 09:17:14 | 3 | **A**    Yes. |
| 09:17:15 | 4 | **Q**    Okay.  Let me put this up so we can see it. |
| 09:17:21 | 5 | Okay.  So just for the record, we're looking at |
| 09:17:25 | 6 | Defendants' Exhibit WAG-MDL-1102.  And I think you got this |
| 09:17:33 | 7 | in, but the date of inspection was the June 24 of '14? |
| 09:17:38 | 8 | **A**    Correct. |
| 09:17:38 | 9 | **Q**    And earlier in your testimony you described the |
| 09:17:40 | 10 | triplicate written report.  Is this an example of that? |
| 09:17:46 | 11 | **A**    Yes.  And actually, I guess it was quadruplicate.  It |
| 09:17:52 | 12 | was four sheets. |
| 09:17:53 | 13 | **Q**    Okay.  It was harder to press down. |
| 09:17:55 | 14 | **A**    Yeah. |
| 09:17:55 | 15 | **Q**    And can you tell me by looking at this how long this |
| 09:17:59 | 16 | inspection lasted? |
| 09:18:00 | 17 | **A**    This was an hour and a half. |
| 09:18:02 | 18 | **Q**    And I can see on the left side there, there are some |
| 09:18:07 | 19 | personnel that are listed. |
| 09:18:09 | 20 | Do you see those names? |
| 09:18:10 | 21 | **A**    Yes. |
| 09:18:10 | 22 | **Q**    Who are they? |
| 09:18:11 | 23 | **A**    That would be the employees that were at the pharmacy, |
| 09:18:16 | 24 | the pharmacists and pharmacy technicians. |
| 09:18:19 | 25 | **Q**    And in looking at those names, I see Julie Demay.  I |

| | | |
|---|---|---|
| 09:18:24 | 1 | think we talked about her yesterday. |
| 09:18:25 | 2 | **A**   Yes. |
| 09:18:25 | 3 | **Q**   Do you remember Ms. Racz or "Racz"? |
| 09:18:30 | 4 | **A**   I don't recall her, no. |
| 09:18:32 | 5 | **Q**   So I want to just blow up here, I think this is what |
| 09:18:37 | 6 | you referenced before. |
| 09:18:41 | 7 | **A**   Yes. |
| 09:18:41 | 8 | **Q**   So there I think you called it sort of an outline? |
| 09:18:44 | 9 | **A**   Yes. |
| 09:18:44 | 10 | **Q**   And is this the list that you were referring to? |
| 09:18:46 | 11 | **A**   Yes. |
| 09:18:46 | 12 | **Q**   And when we talked to Mr. Pavlich, we showed an |
| 09:18:54 | 13 | example of this too.  I wanted to ask you, the list that we |
| 09:19:00 | 14 | looked at with Pavlich had 37 items.  It looks like this has |
| 09:19:05 | 15 | 40.  Do you recall any changes to the topics when you were |
| 09:19:07 | 16 | at the Board of Pharmacy? |
| 09:19:09 | 17 | **A**   Yes, they changed with every printing of this form. |
| 09:19:15 | 18 | They would add new things and take off a few things based |
| 09:19:19 | 19 | on, you know, the evolution of our rules and laws. |
| 09:19:24 | 20 | **Q**   Okay.  And I don't want to go through all these |
| 09:19:25 | 21 | because we talked about a lot of them with Mr. Pavlich, but |
| 09:19:29 | 22 | I did want to ask you, if you look down here at 39, there's |
| 09:19:34 | 23 | a reference to OARRS. |
| 09:19:36 | 24 | Do you see that? |
| 09:19:36 | 25 | **A**   Yes. |

**Edwards - (Direct by Swanson)** 5353

09:19:36   1   **Q**     What does that box signify?

09:19:39   2   **A**     That's -- to me, that would signify generally are they

09:19:44   3   signed up for OARRS, are they using OARRS.  Do they know

09:19:48   4   about -- in the early days it was do they know about OARRS,

09:19:51   5   and we were just trying to get the word out, you know,

09:19:53   6   before it was mandatory to check it, it was more or less get

09:19:58   7   the word out:  Hey, have you heard about our OARRS system?

09:20:02   8   Do you know about it?  Do you have any questions?  Do you

09:20:04   9   use it?  If you don't use it, we encourage you to use it.

09:20:08   10      So, and then as it evolved, it was more making sure

09:20:11   11  that they were checking OARRS because they were required to

09:20:16   12  and, you know, making sure all the pharmacists were signed

09:20:18   13  up for OARRS, that they were checking it regularly, and that

09:20:21   14  sort of thing.

09:20:23   15  **Q**     And if a pharmacy wasn't properly using or consulting

09:20:26   16  OARRS, would you make a note of that?

09:20:28   17  **A**     Yes.

09:20:29   18  **Q**     I want to just go through a few pages here and ask you

09:20:33   19  some questions about things that you wrote.

09:20:35   20  **A**     Sure.

09:20:35   21  **Q**     So let me go to I think it's going to be the third

09:20:39   22  page, but I'll blow it up.

09:20:48   23      Okay.  I guess it ends in 84.  Do you see what I'm

09:20:50   24  looking at here?

09:20:51   25  **A**     Page 3 of 4?  Yeah.

**Edwards - (Direct by Swanson)**

| | | |
|---|---|---|
| 09:20:57 | 1 | **Q**    Okay.  And I might need to split my screens here. |
| 09:21:00 | 2 | Give me one moment. |
| 09:21:06 | 3 | So it may continue to the next page, but I wanted to |
| 09:21:11 | 4 | ask you about, do you see at the bottom there there is -- |
| 09:21:14 | 5 | it's marked 23? |
| 09:21:17 | 6 | **A**    Yes. |
| 09:21:17 | 7 | **Q**    And can you just read -- I don't want to get it wrong, |
| 09:21:20 | 8 | so can you just read to me what you wrote?  It continues on |
| 09:21:24 | 9 | to the next page. |
| 09:21:24 | 10 | **A**    Sure.  "Approximately 250 prescriptions per day. |
| 09:21:29 | 11 | Accrued prescriptions checked, properly contain prescriber |
| 09:21:33 | 12 | DEA, quantity and alpha numeric format, patient full name |
| 09:21:37 | 13 | and residential address." |
| 09:21:39 | 14 | Those are some of the things that are required that |
| 09:21:44 | 15 | are included on a prescription.  So in this situation, you |
| 09:21:50 | 16 | know, I explained how we would go through the Schedule IIs |
| 09:21:53 | 17 | or the III through Vs.  They had separate files at the |
| 09:21:57 | 18 | pharmacy.  Schedule IIs were in one file, Schedule III |
| 09:22:02 | 19 | through Vs are in another.  So sometimes we would pull a |
| 09:22:05 | 20 | file of C-IIs and just flip through like one California |
| 09:22:09 | 21 | folder of them, other times we'd pick the III through Vs. |
| 09:22:13 | 22 | In this instance I believe I picked a file of C-IIs |
| 09:22:16 | 23 | and I flipped through them, and that's what I -- that's what |
| 09:22:19 | 24 | I noted. |
| 09:22:19 | 25 | Now, that's not to say that I checked all of the C-IIs |

**Edwards - (Direct by Swanson)**

5355

| | | |
|---|---|---|
| 09:22:23 | 1 | in the pharmacy that day. |
| 09:22:24 | 2 | **Q**   Understood. |
| 09:22:25 | 3 | **A**   It was just a small sample that I -- and generally |
| 09:22:30 | 4 | within the past month or two, I would grab one of the |
| 09:22:34 | 5 | folder -- file folders that was in the pharmacy. |
| 09:22:36 | 6 | **Q**   Got it.  Thank you.  And I actually had one more |
| 09:22:39 | 7 | question on the outline. |
| 09:22:41 | 8 | Do you see at the bottom there on the left-hand side |
| 09:22:43 | 9 | it says, full or partial? |
| 09:22:44 | 10 | **A**   Yes. |
| 09:22:44 | 11 | **Q**   Can you tell us what that means? |
| 09:22:46 | 12 | **A**   Well, that's if you're there for one or two issues or |
| 09:22:54 | 13 | there to pick up a prescription and you look at a few |
| 09:22:58 | 14 | different things, we would consider that a partial |
| 09:22:59 | 15 | inspection. |
| 09:23:01 | 16 | A full is when you go through the majority of the list |
| 09:23:04 | 17 | on the left and go through all those issues and document |
| 09:23:09 | 18 | what you see. |
| 09:23:13 | 19 | **Q**   And I've seen in prior examples there was an F and a |
| 09:23:18 | 20 | P.  Does that stand for full or partial? |
| 09:23:23 | 21 | **A**   Full or partial, yes. |
| 09:23:24 | 22 | **Q**   Not pass or fail? |
| 09:23:25 | 23 | **A**   Correct, and that's why they spelled it out on this |
| 09:23:29 | 24 | version. |
| 09:23:29 | 25 | **Q**   Right.  Pharmacists were feeling bad about their full |

**Edwards - (Direct by Swanson)** 5356

09:23:34  1  inspections.

09:23:35  2  Okay.  Let me ask you about another -- this is on the

09:23:38  3  later page here.  Number 26, can you read to make sure I get

09:23:51  4  that right?

09:23:51  5  **A**  Yes.  "Three-part filing system."  That refers to the

09:23:56  6  C-IIs were in one file, the C-III through Vs were in

09:24:00  7  another; and then the dangerous drugs, the noncontrolled

09:24:03  8  substances, were in a third file.

09:24:05  9  "The good faith dispensing checklist filed with

09:24:09  10  controlled Rxs when an OARRS report was run."

09:24:13  11  So at this Walgreens and at most Walgreens, to my

09:24:18  12  recollection, when they would -- I'm not sure when it

09:24:20  13  started, but clearly it was going on in 2014, when they

09:24:22  14  would run a -- or when they would fill a controlled

09:24:27  15  substance prescription, they would complete this good faith

09:24:30  16  dispensing checklist, which was a Walgreens internal form

09:24:36  17  that their pharmacists would go through when deciding if

09:24:38  18  they were going to fill a controlled substance prescription

09:24:41  19  or not.

09:24:42  20  And in this case, they would go through that checklist

09:24:45  21  and then staple it to the prescription, and then file it in

09:24:49  22  the file with the prescription.

09:24:50  23  **Q**  And was it your practice to inspect those good faith

09:24:53  24  checklists?

09:24:53  25  **A**  If they were there, yes.  It was not something we

**Edwards - (Direct by Swanson)** 5357

09:24:56　1　required, so if it was there in the file, we would check it.

09:24:58　2　If it wasn't, we wouldn't.

09:24:59　3　**Q**　When you say it's not something we require, do you

09:25:02　4　mean the Board of Pharmacy didn't require these checklists?

09:25:05　5　**A**　Correct.  They required them to make sure, you know,

09:25:09　6　to use their judgment and make sure a prescription was for

09:25:16　7　legitimate medical purpose, but they did not require that

09:25:20　8　detailed checklist.

09:25:20　9　**Q**　And if during your inspection you discovered that

09:25:22　10　pharmacists weren't using their judgment to make sure that a

09:25:26　11　prescription was for a legitimate medical purpose, would you

09:25:29　12　make a note of that?

09:25:30　13　**A**　Yes.

09:25:30　14　**Q**　Just one more question that I had for you on this

09:25:37　15　page.

09:25:40　16　Number 28, can you tell us what you're writing there?

09:25:43　17　**A**　Yes.  It says, "RPh," pharmacist, "initials hard copy

09:25:49　18　controlled prescriptions to show positive identification."

09:25:53　19　So that means that to show the positive ID they sign

09:25:56　20　the back of the prescription, and then you know who the

09:25:58　21　pharmacist was that filled it.

09:26:04　22　**Q**　Now, based on this report that we're looking at,

09:26:08　23　following the inspection that you conducted, did you reach

09:26:10　24　any conclusions as to whether this specific pharmacy was

09:26:13　25　complying with the laws of Ohio?

5358

09:26:16  1  **A**    Based on this inspection, they seemed to be compliant

09:26:21  2  at the time I was there because no pink sheet was issued.

09:26:25  3  We would issue a pink sheet, or another word for that is a

09:26:29  4  written warning, if we found issues that needed to be

09:26:33  5  addressed.

09:26:33  6  **Q**    And if you issued a written warning or a pink slip,

09:26:37  7  what was your expectation of the pharmacy or pharmacist?

09:26:40  8  **A**    That they would take corrective action to fix whatever

09:26:43  9  the problem was and then respond to us, I think at this time

09:26:49  10  it was within 20 days.  I think now it's a month.  But they

09:26:54  11  would have 20 days to a month to provide a written response

09:26:57  12  as to what corrective action they took regarding that issue.

09:27:00  13  **Q**    And can you recall any instances where -- at a

09:27:04  14  Walgreens where you had any issues or concerns that you

09:27:07  15  noted during an inspection that weren't resolved to your

09:27:12  16  satisfaction?

09:27:12  17  **A**    Not that I recall.

09:27:12  18  **Q**    If you want to flip it to Tab 7, we'll go to the next

09:27:19  19  report I want to ask you about.

09:27:23  20  **A**    Yup.

09:27:31  21  **Q**    And let me ask you first -- I guess you've already

09:27:33  22  said this.

09:27:34  23      At some point did the inspection process become

09:27:36  24  automated?

09:27:37  25  **A**    Yes, it became electronic.

09:27:39  1    **Q**    Electronic.  Excuse me.

09:27:42  2    **A**    Yeah.

09:27:42  3    **Q**    And at that point, did the form of the report change?

09:27:44  4    **A**    Yes.

09:27:44  5    **Q**    And can you tell us what Tab 7 is?

09:27:49  6    **A**    Tab 7 is a copy of an inspection report completed at

09:27:55  7    Walgreens Number 4294 in Willoughby.

09:27:59  8    **Q**    And if you look at I guess the second page in the

09:28:01  9    upper right, who conducted this inspection for the Board of

09:28:05  10   Pharmacy?

09:28:05  11   **A**    Yes.

09:28:08  12   **Q**    I'm sorry, who conducted it?

09:28:09  13   **A**    I did.

09:28:10  14   **Q**    Okay.  Thanks.

09:28:11  15   **A**    Yes.

09:28:11  16   **Q**    Just let me put this up.

09:28:14  17         Okay.  So for the record, this is Defendants' Exhibit

09:28:25  18   WAG-MDL-1061.

09:28:32  19         Can you tell us, when the inspection process went

09:28:38  20   automated or electronic, can you give me a sense for how

09:28:43  21   your inspections went at that time?  Did you have a device

09:28:46  22   you carried around, or how did that work?

09:28:48  23   **A**    Yes, we had a laptop, still have laptops that we

09:28:52  24   conduct the inspections on, and it's -- the system is called

09:28:56  25   Matrix Inspector.  We have -- Matrix is the software we use

**Edwards - (Direct by Swanson)**

| | | |
|---|---|---|
| 09:29:02 | 1 | for both our criminal investigations as well as our |
| 09:29:05 | 2 | inspections.  We have Matrix Investigator for the |
| 09:29:10 | 3 | investigations and Matrix Inspector for doing the |
| 09:29:13 | 4 | inspections. |
| 09:29:14 | 5 | So whereas when we use the four-page form and have the |
| 09:29:22 | 6 | guide on the left of the topics to cover, the questions came |
| 09:29:26 | 7 | from our head.  You know, it was just how we had been |
| 09:29:30 | 8 | trained and the steps we had gone through doing inspections, |
| 09:29:34 | 9 | so we knew what to ask. |
| 09:29:35 | 10 | And then with the new format, the electronic format, |
| 09:29:38 | 11 | those questions are all built into the system.  So as you go |
| 09:29:44 | 12 | through the inspection, the questions are right there, and |
| 09:29:47 | 13 | you just click through. |
| 09:29:48 | 14 | **Q** And is it drop-down boxes, do you enter text?  How |
| 09:29:51 | 15 | does it work? |
| 09:29:52 | 16 | **A** Both. |
| 09:29:52 | 17 | **Q** If you look at the second page of this document, and I |
| 09:29:58 | 18 | think we've pointed this out before, on the top, that's your |
| 09:30:01 | 19 | name. |
| 09:30:03 | 20 | I wanted to ask you, how long did this inspection |
| 09:30:06 | 21 | take? |
| 09:30:06 | 22 | **A** This was 3 hours and 45 minutes. |
| 09:30:09 | 23 | **Q** And was there a reason that -- I mean, that seems |
| 09:30:13 | 24 | longer than what you said your average was.  Was there a |
| 09:30:16 | 25 | reason in general why it might reach that time? |

**Edwards - (Direct by Swanson)**

09:30:18   1   **A**    It could vary.  I could have been training someone

09:30:23   2   else and, you know, it took longer because they were asking

09:30:25   3   a bunch of questions; or, you know, I could have been

09:30:29   4   delayed because the pharmacist was busy and, you know, you

09:30:32   5   just had to wait till they had availability to answer your

09:30:35   6   questions.  It just -- it varied.

09:30:37   7   **Q**    Got it.

09:30:38   8        You actually raised something interesting.  Let me ask

09:30:43   9   you.

09:30:44  10        You said you might have been training another agent.

09:30:48  11   I turned it now to the last page, 11 of 11.

09:30:51  12   **A**    Yes.

09:30:51  13   **Q**    And it lists the following personnel were present for

09:30:55  14   the inspection?

09:30:57  15   **A**    Yes.

09:30:57  16   **Q**    There's a name there, Greg McGlaun?

09:31:02  17   **A**    Yes, Agent McGlaun.  That answers my question, I must

09:31:06  18   have been training him.  He was based in the Dayton area,

09:31:08  19   and I was his training agent around this time, I think 2016.

09:31:14  20        Yeah, so that's -- that tells me that that's why he

09:31:17  21   was with me, because I was training him.

09:31:19  22   **Q**    I see, okay.

09:31:23  23        And you mentioned before that you might issue written

09:31:27  24   warnings with an inspection or what you called pink sheets.

09:31:30  25   **A**    Yes.

09:31:30  1   **Q**    And I note on here it says that the organization has

09:31:35  2   been warned and should fix any issues before they become a

09:31:38  3   problem?

09:31:38  4   **A**    Yes.

09:31:39  5   **Q**    And I've seen other reports where it requests a

09:31:45  6   written response, and this one doesn't.

09:31:48  7        Can you tell me or help me understand that?

09:31:51  8   **A**    Yes.  So when they went to the electronic format, they

09:31:55  9   added a result, I guess, of the inspection as "warning" but

09:32:02  10  not a written warning.  So it was kind of in the middle of

09:32:05  11  everything's fine and a written warning.  So more or less,

09:32:09  12  we may have noticed some things that we addressed with them,

09:32:12  13  but it didn't rise to the level of a written warning.

09:32:15  14  **Q**    Okay.  Let's go back then if we can to the second

09:32:27  15  page.  I just want to ask you about a few examples here, and

09:32:29  16  then we'll be done.

09:32:31  17  **A**    Sure.

09:32:31  18  **Q**    So if you look -- I'm sorry, it's the third page.

09:32:46  19  Just to make sure that my terminology is clear here, there's

09:32:53  20  reference to ARKS?

09:32:56  21  **A**    That's the -- yes, the Alternative Record Keeping

09:33:02  22  System.

09:33:02  23  **Q**    And is that the system you said before is the one that

09:33:04  24  the pharmacies use that are approved by the Board of

09:33:07  25  Pharmacy?

**Edwards - (Direct by Swanson)**

09:33:07　1　**A**　　Yes.

09:33:07　2　**Q**　　And was it your practice to, when you went in, check

09:33:12　3　those systems and make sure that they were operating up to

09:33:17　4　date, that sort of thing?

09:33:19　5　**A**　　Yes.

09:33:19　6　**Q**　　And you have there the current version of ARKS.  How

09:33:22　7　would you obtain that information?

09:33:23　8　**A**　　It was on -- I don't know if it was the startup screen

09:33:27　9　or -- there was a screen that the pharmacists could go to

09:33:30　10　that would show the version, you know, on the screen.

09:33:33　11　**Q**　　So does this signify that at least for this inspection

09:33:36　12　you'd gone in and turned on the computer and taken a look?

09:33:38　13　**A**　　Yeah.  Well, they were always on.  I never turned it

09:33:41　14　on.

09:33:41　15　**Q**　　Got it.  Okay.

09:33:42　16　**A**　　I never touched the computer.  I would ask the

09:33:46　17　pharmacist to show me different things.

09:33:48　18　**Q**　　Understood.  Okay.

09:33:50　19　　　　Let's go -- actually, let me go back a page.  I'm

09:33:56　20　sorry for bouncing around.

09:33:58　21　**A**　　That's correct.

09:33:58　22　**Q**　　I didn't have to go back a page.

09:34:02　23　　　　You talked about a warning that was maybe a more minor

09:34:05　24　thing, you wouldn't require a written response.

09:34:07　25　**A**　　Yes.

09:34:07  1    **Q**    Can you see there Section 2.2?

09:34:11  2    **A**    Yes.

09:34:11  3    **Q**    And take a look at that.  Can you tell us, was this

09:34:18  4    the sort of minor event that you might say, Hey, you've got

09:34:21  5    to fix this, but not require a written response?

09:34:23  6    **A**    Yes.  In fact, we no longer require them to carry the

09:34:26  7    ID cards on their person, so that tells you how minor of an

09:34:30  8    issue it was.

09:34:31  9    **Q**    Got it.  Okay.  Thanks.

09:34:32  10   So let's, if we can, turn to page 9.  Let me call out

09:34:56  11   a section here.

09:34:56  12   What are you noting there in reference to the

09:34:59  13   prescription files?

09:34:59  14   **A**    If they keep a three separate system, which is, as I

09:35:04  15   explained, the Schedule IIs in one, the Schedule III through

09:35:08  16   Vs in another, and the dangerous drugs in another; and they

09:35:11  17   were doing that.  And then are they in good order and filed

09:35:13  18   in a timely manner, and they were doing that as well.

09:35:18  19   **Q**    So does that signify that for this inspection you'd

09:35:20  20   actually gone and looked at the prescription files to

09:35:22  21   confirm that?

09:35:23  22   **A**    Yes, yes.

09:35:24  23   **Q**    Okay.  Then on the next page, I think we've already

09:35:39  24   talked about this, but I just wanted to confirm, what are

09:35:42  25   you describing there?

**Edwards - (Direct by Swanson)**

| | |
|---|---|
| 09:35:42 | 1 |
| 09:35:47 | 2 |
| 09:35:50 | 3 |
| 09:35:52 | 4 |
| 09:35:56 | 5 |
| 09:35:59 | 6 |
| 09:36:02 | 7 |
| 09:36:02 | 8 |
| 09:36:07 | 9 |
| 09:36:10 | 10 |
| 09:36:12 | 11 |
| 09:36:14 | 12 |
| 09:36:17 | 13 |
| 09:36:20 | 14 |
| 09:36:23 | 15 |
| 09:36:25 | 16 |
| 09:36:27 | 17 |
| 09:36:32 | 18 |
| 09:36:35 | 19 |
| 09:36:37 | 20 |
| 09:36:37 | 21 |
| 09:36:41 | 22 |
| 09:36:42 | 23 |
| 09:36:47 | 24 |
| 09:36:50 | 25 |

**A**     Yes.  I would have asked the pharmacists if they have access to OARRS and then asked them to show me how they can access it.

And in this case I typed in there that the pharmacists demonstrated the ability to access it, so he or she must have typed in their login information and accessed the system.

**Q**     And based on this report that we've been looking at, following this inspection did you reach any conclusions as to whether this pharmacy was complying with the laws of Ohio?

**A**     Yes, other than the pharmacist not having her ID card. That was the only issue that was noted.

**Q**     And do you recall any inspections of a Walgreens pharmacy that you conducted where you determined that the pharmacy was not operating lawfully?

**A**     I'm not sure what you mean by lawfully.  Like, were there issues that we had to pink sheet them or issue a written warning?  Yes.

**Q**     Okay.

**A**     I don't recall off the top of my head which stores or where, or anything like that.

**Q**     Okay.  But anywhere where the resolution of those pink sheets wasn't resolved to your satisfaction?

**A**     No, no.

**Edwards - (Cross by Delinsky)**

| | | |
|---|---|---|
| 09:36:51 | 1 | **Q**    And to the best of your knowledge, were Walgreens |
| 09:36:53 | 2 | pharmacies that you inspected operating lawfully at all |
| 09:36:56 | 3 | times? |
| 09:36:56 | 4 | **A**    To the best of my knowledge. |
| 09:36:58 | 5 | **Q**    Okay. |
| 09:37:00 | 6 | MR. SWANSON:  I appreciate you answering my |
| 09:37:01 | 7 | questions.  Thank you very much, sir. |
| 09:37:03 | 8 | THE WITNESS:  Sure.  No problem. |
| 09:37:05 | 9 | MR. SWANSON:  I think some of my colleagues |
| 09:37:06 | 10 | have some questions for you as well. |
| 09:37:08 | 11 | THE COURT:  Okay. |
| 09:37:29 | 12 | - - - - - |
| 09:37:29 | 13 | CROSS-EXAMINATION |
| 09:37:29 | 14 | BY MR. DELINSKY: |
| 09:37:30 | 15 | **Q**    Good morning, Agent Edwards. |
| 09:37:32 | 16 | **A**    Good morning. |
| 09:37:33 | 17 | MR. DELINSKY:  Good morning everyone. |
| 09:37:34 | 18 | **Q**    Thank you for answering our cautions, and our |
| 09:37:36 | 19 | apologies for having to take up time yesterday and this |
| 09:37:41 | 20 | morning. |
| 09:37:41 | 21 | **A**    No worries. |
| 09:37:43 | 22 | **Q**    Mr. Edwards, my name is Eric Delinsky.  We shook hands |
| 09:37:46 | 23 | in the hallway. |
| 09:37:47 | 24 | **A**    Mm-hmm. |
| 09:37:47 | 25 | **Q**    I represent CVS in this case. |

**Edwards - (Cross by Delinsky)**

| | | |
|---|---|---|
| 09:37:50 | 1 | **A**    Mm-hmm. |
| 09:37:51 | 2 | **Q**    I'd like to begin -- and I don't have many questions. |
| 09:37:54 | 3 | I just want to ask about three subjects, okay? |
| 09:37:56 | 4 | **A**    Okay. |
| 09:37:56 | 5 | **Q**    But I would like to begin by asking you a little more |
| 09:38:02 | 6 | about OARRS. |
| 09:38:04 | 7 | **A**    Mm-hmm. |
| 09:38:04 | 8 | **Q**    The OARRS database is run by the Ohio Board of |
| 09:38:10 | 9 | Pharmacy, correct? |
| 09:38:11 | 10 | **A**    Correct, yes. |
| 09:38:11 | 11 | **Q**    And who provides the data that's populated in the |
| 09:38:17 | 12 | OARRS database? |
| 09:38:18 | 13 | **A**    The prescribers -- well, the prescribers and the |
| 09:38:23 | 14 | wholesalers, those who are dispensing, personally furnishing |
| 09:38:31 | 15 | medication.  So the people giving out the medication and |
| 09:38:33 | 16 | obtaining the medication. |
| 09:38:34 | 17 | **Q**    Okay.  So by way of example, since a CVS and a |
| 09:38:39 | 18 | Walgreens and a Walmart are filling prescriptions, they are |
| 09:38:45 | 19 | providing information that goes into the OARRS database, |
| 09:38:48 | 20 | correct? |
| 09:38:48 | 21 | **A**    Yes, yes. |
| 09:38:49 | 22 | **Q**    And the information they're providing includes the |
| 09:38:54 | 23 | date of the fill, correct? |
| 09:38:55 | 24 | **A**    Yes. |
| 09:38:56 | 25 | **Q**    The drug? |

**Edwards - (Cross by Delinsky)**

5368

| | | |
|---|---|---|
| 09:38:58 | 1 | **A**     Yes. |
| 09:38:58 | 2 | **Q**     The number of pills? |
| 09:39:00 | 3 | **A**     Yes. |
| 09:39:00 | 4 | **Q**     The days supply? |
| 09:39:04 | 5 | **A**     Yes. |
| 09:39:04 | 6 | **Q**     All the information that OARRS requires and the Board |
| 09:39:11 | 7 | of Pharmacy requires about that prescription? |
| 09:39:13 | 8 | **A**     Correct. |
| 09:39:13 | 9 | **Q**     And I think this has changed over time, but when the |
| 09:39:19 | 10 | pharmacies have provided this information to the Board of |
| 09:39:23 | 11 | Pharmacy, to OARRS, is it daily, weekly? |
| 09:39:27 | 12 | **A**     You're correct, it has changed over time.  I believe |
| 09:39:32 | 13 | it's daily, within 24 hours, I believe, is what it is now. |
| 09:39:37 | 14 | **Q**     So the Ohio Board of Pharmacy has close to realtime |
| 09:39:43 | 15 | access to all the prescriptions that are being filled by any |
| 09:39:46 | 16 | pharmacy in the state of Ohio? |
| 09:39:49 | 17 | **A**     Correct, controlled substances. |
| 09:39:50 | 18 | **Q**     Okay.  Eric Garner -- wait, let me just stop there, |
| 09:39:56 | 19 | because that's an important point. |
| 09:39:57 | 20 | OARRS is only collecting information on controlled |
| 09:40:00 | 21 | substances? |
| 09:40:00 | 22 | **A**     And gabapentin, so -- |
| 09:40:03 | 23 | **Q**     Do controlled substances include what we've learned in |
| 09:40:05 | 24 | this case are Schedule II prescription opioid medications? |
| 09:40:10 | 25 | **A**     Yes, yes. |

**Edwards - (Cross by Delinsky)**

| | | |
|---|---|---|
| 09:40:11 | 1 | **Q**    Okay.  All right.  Let's stay on OARRS but shift |
| 09:40:14 | 2 | course a little bit. |
| 09:40:15 | 3 |     Who is Eric -- well, do you know Eric Garner? |
| 09:40:19 | 4 | **A**    Eric? |
| 09:40:22 | 5 | **Q**    Garner. |
| 09:40:22 | 6 | **A**    Garner?  Yes. |
| 09:40:23 | 7 | **Q**    Who is Eric Garner? |
| 09:40:24 | 8 | **A**    You mean Chad Garner? |
| 09:40:26 | 9 | **Q**    Chad Garner.  I'm Eric.  He's Chad.  Sorry. |
| 09:40:29 | 10 | **A**    Yes. |
| 09:40:29 | 11 | **Q**    Thank you. |
| 09:40:32 | 12 |     Who is Chad Garner? |
| 09:40:33 | 13 | **A**    Chad Garner is the director of OARRS. |
| 09:40:36 | 14 | **Q**    Okay.  And does Chad Garner write algorithms that the |
| 09:40:44 | 15 | Board of Pharmacy -- and computer code that the Board of |
| 09:40:46 | 16 | Pharmacy can use to analyze the data that comes in from the |
| 09:40:50 | 17 | pharmacists? |
| 09:40:50 | 18 | **A**    I believe so.  He does a lot of things that none of us |
| 09:40:54 | 19 | understand with the computer, so I believe that is one of |
| 09:40:58 | 20 | his roles. |
| 09:41:01 | 21 | **Q**    Okay.  Does the Board of Pharmacy generate reports |
| 09:41:03 | 22 | from the OARRS data? |
| 09:41:03 | 23 | **A**    Yes. |
| 09:41:04 | 24 | **Q**    Okay.  Is the 640 report one of those reports? |
| 09:41:11 | 25 | **A**    Yes. |

**Edwards - (Cross by Delinsky)**

09:41:11  1   **Q**     What is the 640 report?

09:41:13  2   **A**     That's a, as you say, an algorithm that he came up

09:41:16  3   with that lists doctors who are prescribers who I think it's

09:41:23  4   are seeing 640 patients in a month, I believe is how that

09:41:27  5   640 number came up.  Yeah.

09:41:32  6   **Q**     And am I right, it is called the 640 report?

09:41:36  7   **A**     Yes.

09:41:41  8   **Q**     And am I also right that the 640 report is for the

09:41:44  9   Board of Pharmacy's use, correct?

09:41:46  10  **A**     Yes.  It's for internal use, yes.

09:41:48  11  **Q**     Is the 640 report shared with a CVS, a Walgreens, or a

09:41:54  12  Walmart?

09:41:54  13  **A**     I do not believe so.

09:41:56  14  **Q**     Okay.  Does the Board of Pharmacy and Mr. Garner or

09:42:04  15  people he supervises prepare a doctor shopper report?

09:42:14  16  **A**     Yes.

09:42:14  17  **Q**     And do you recall what the doctor shopper report

09:42:17  18  shows?

09:42:17  19  **A**     Yes.  In fact, that's my role now with the Early

09:42:19  20  Intervention program, that's primarily what I use to

09:42:24  21  generate my cases.  Again, it's also like the other report

09:42:27  22  has evolved over time.  It started by identifying folks who

09:42:33  23  have been to five prescribers and five pharmacies within

09:42:37  24  three months, and that list has then -- we've changed the

09:42:44  25  algorithm, you know, to kind of lessen the list, because we

**Edwards - (Cross by Delinsky)**

| | | |
|---|---|---|
| 09:42:49 | 1 | were getting into the, you know, thousands of names on |
| 09:42:53 | 2 | there.  And the number of cases we generate per month in my |
| 09:42:56 | 3 | current role is in the single digits, you know. |
| 09:43:02 | 4 | So we mess -- not mess with, tweaked that report to |
| 09:43:11 | 5 | try to identify doctor shoppers, so -- |
| 09:43:17 | 6 | **Q**    Is that report, is the doctor shopper report like the |
| 09:43:20 | 7 | 640 report, insofar as it's for the Board of Pharmacy's |
| 09:43:25 | 8 | internal purposes? |
| 09:43:26 | 9 | **A**    Yes, yes. |
| 09:43:26 | 10 | **Q**    The doctor shopper report is not shared with |
| 09:43:29 | 11 | pharmacies like CVS, Walgreens, and Walmart? |
| 09:43:31 | 12 | **A**    Yes, right, correct. |
| 09:43:33 | 13 | Those are recent reports too.  That's worth |
| 09:43:36 | 14 | mentioning.  It's only the last few years that we've been |
| 09:43:39 | 15 | using those. |
| 09:43:39 | 16 | **Q**    Is the Board of Pharmacy capable of running other |
| 09:43:41 | 17 | reports with the OARRS data? |
| 09:43:42 | 18 | **A**    Yeah. |
| 09:43:44 | 19 | **Q**    It could -- could the Board of Pharmacy run reports on |
| 09:43:48 | 20 | particular pharmacies to identify the volume of their -- |
| 09:43:52 | 21 | **A**    Yes, they could run it on a DEA number.  Each pharmacy |
| 09:43:56 | 22 | has their own DEA number, prescribers have their own DEA |
| 09:43:59 | 23 | number.  So they could run it based on an individual DEA |
| 09:44:03 | 24 | number. |
| 09:44:04 | 25 | **Q**    And that's done, correct? |

**Edwards - (Cross by Delinsky)**

09:44:04  1   **A**    Mm-hmm.

09:44:05  2   **Q**    I'm sorry, we need the "yes" answer.

09:44:08  3   **A**    I'm sorry.  Yes.

09:44:09  4   **Q**    You talk like I do.

09:44:11  5        Am I right that you and other agents of the Board of

09:44:21  6   Pharmacy have obtained investigative leads from these

09:44:26  7   analytic reports that the Board of Pharmacy runs internally?

09:44:30  8   **A**    Yes.

09:44:30  9   **Q**    One last set of OARRS questions before we move on.

09:44:37  10  **A**    Sure.

09:44:41  11  **Q**    Today, as we sit here today, the Board of Pharmacy

09:44:46  12  requires pharmacists to run OARRS in certain delineated

09:44:50  13  circumstances.

09:44:51  14  **A**    Correct.

09:44:51  15  **Q**    Okay.  Am I right that a pharmacist doesn't -- isn't

09:44:57  16  obligated by the Board of Pharmacy to run an OARRS report

09:45:04  17  for every controlled substance prescription, it's only in

09:45:07  18  the circumstances that the Board of Pharmacy has delineated?

09:45:10  19  **A**    I would say it's not required but encouraged.

09:45:12  20  **Q**    Okay.  With regard to these required OARRS reports,

09:45:21  21  when a pharmacist is now required, do you recall when the

09:45:26  22  Board of Pharmacy first required pharmacists to run OARRS

09:45:34  23  reports, at least in certain circumstances?

09:45:35  24  **A**    I don't recall the exact date.

09:45:38  25  **Q**    Year?

**Edwards - (Cross by Delinsky)**

09:45:40  1  **A**    '16 maybe?  It might have been prescribers, when

09:45:45  2  prescribers were first required to.

09:45:46  3  **Q**    I'm thinking 2011.

09:45:48  4  **A**    2011, when pharmacists -- pharmacists were required

09:45:51  5  prior to physicians.

09:45:52  6  **Q**    Okay.  So sometime between 2011 and 2016 maybe?

09:45:58  7  **A**    Yes.

09:45:58  8  **Q**    And again, that requirement from the Board of Pharmacy

09:46:02  9  was in the delineated circumstances?

09:46:04  10  **A**    Correct.

09:46:05  11  **Q**    Okay.  All right.  Let's turn to -- back to your

09:46:15  12  inspections.  I think it should come as no surprise, I may

09:46:20  13  ask you about CVS.

09:46:21  14  **A**    Sure.

09:46:21  15  **Q**    But before I get there, when you conduct an inspection

09:46:28  16  of a pharmacy, and I'm very mindful that it's more episodic

09:46:32  17  now versus three years ago, but when you conducted an

09:46:35  18  inspection as an agent for the Board of Pharmacy, am I right

09:46:39  19  that the purpose is to look for problems?

09:46:42  20  **A**    Yes.  To protect the public essentially.  It's the

09:46:45  21  ultimate goal.

09:46:46  22  **Q**    It's less important that you see if a pharmacy's doing

09:46:49  23  awesome, it's more important that you see if it's not doing

09:46:52  24  awesome?

09:46:52  25  **A**    I would say they're both important.  I wouldn't say

**Edwards - (Cross by Delinsky)** 5374

09:46:55  1   one is more important or less important, but it's -- I mean,

09:47:00  2   our purpose is to go in there and make sure they're doing

09:47:03  3   things correctly.

09:47:04  4   **Q**    Okay.  Now let's focus on CVS.

09:47:09  5        I think you've already testified that you inspected

09:47:12  6   all the CVS pharmacies in Lake County, to the best of your

09:47:14  7   knowledge?

09:47:14  8   **A**    Yes.

09:47:14  9   **Q**    And to the best of your recollection, were all -- were

09:47:20  10  the -- were all of your inspections of CVS pharmacies in

09:47:24  11  Lake County generally favorable and positive?

09:47:27  12  **A**    To my recollection, I don't recall any major issues

09:47:33  13  that stick out in my head.

09:47:34  14  **Q**    And let's just be clear.  I go back to my kids'

09:47:39  15  kindergarten classroom, where there was a big sign that says

09:47:43  16  We love mistakes.  We don't like mistakes in pharmacies, but

09:47:46  17  that that's not to say there wasn't a pink sheet now and

09:47:50  18  then for a CVS pharmacy, correct?

09:47:52  19  **A**    Correct.

09:47:52  20  **Q**    And it's not to say you didn't identify issues now and

09:47:55  21  then, correct?

09:47:56  22  **A**    Correct.

09:47:57  23  **Q**    But generally they were favorable inspection reports?

09:48:00  24  **A**    Correct.

09:48:00  25  **Q**    Okay.  And do you recall with regard to issues you may

**Edwards - (Cross by Delinsky)**

5375

| | | |
|---|---|---|
| 09:48:05 | 1 | have identified, do you recall any instance when you |
| 09:48:08 | 2 | identified an issue during an inspection of a CVS pharmacy |
| 09:48:12 | 3 | in Lake County when CVS didn't resolve that issue to your |
| 09:48:20 | 4 | satisfaction? |
| 09:48:20 | 5 | **A**     Not that I recall. |
| 09:48:21 | 6 | **Q**     Okay.  Fair enough.  And I understand it's going |
| 09:48:24 | 7 | back -- |
| 09:48:25 | 8 | **A**     Yes. |
| 09:48:25 | 9 | **Q**     -- some way. |
| 09:48:30 | 10 | I of course left the document I wanted to use at the |
| 09:48:34 | 11 | table, but I have it. |
| 09:48:39 | 12 | I want to show you an inspection report. |
| 09:48:45 | 13 | MR. DELINSKY:  Mr. Pitts, may I have the ELMO? |
| 09:48:52 | 14 | **Q**     Agent Edwards, do you recognize this to be an |
| 09:48:57 | 15 | inspection report of the CVS pharmacy on Mentor Avenue in |
| 09:49:03 | 16 | Mentor? |
| 09:49:03 | 17 | **A**     Yes. |
| 09:49:04 | 18 | **Q**     Okay.  And the date of this report is August 31, 2016? |
| 09:49:10 | 19 | **A**     Yes. |
| 09:49:11 | 20 | **Q**     Okay.  Let's turn the page. |
| 09:49:14 | 21 | And you have a copy.  Good.  You're looking at your |
| 09:49:18 | 22 | hard copy? |
| 09:49:19 | 23 | **A**     Yes, yeah. |
| 09:49:19 | 24 | **Q**     And I want to look at page 3 first. |
| 09:49:23 | 25 | It says, "Completed by," and I believe this is your |

09:49:25   1    name, "William Trey Edwards."  Correct?

09:49:28   2    **A**    Yes.

09:49:29   3    **Q**    Okay.  And this is an inspection report -- make sure

09:49:33   4    you take a look at it -- that you prepared?

09:49:35   5    **A**    That I what?

09:49:36   6    **Q**    That you prepared?

09:49:36   7    **A**    Yes.

09:49:37   8    **Q**    And it reflects an inspection of the CVS in Mentor

09:49:39   9    that you conducted?

09:49:40   10   **A**    Correct.

09:49:40   11   **Q**    And as far as you can tell, this is a true and

09:49:45   12   accurate copy of your inspection report?

09:49:47   13   **A**    Yes.

09:49:47   14   **Q**    Okay.  I want to walk through this quickly, but before

09:49:51   15   I do, I don't want to skip over page 2.

09:49:53   16        Am I right, that in the course of this inspection you

09:50:00   17   identified certain issues?

09:50:02   18   **A**    Yes.

09:50:02   19   **Q**    And you wanted to bring those to the attention of the

09:50:05   20   CVS pharmacists in the pharmacy?

09:50:06   21   **A**    Correct.

09:50:07   22   **Q**    And on page 2, these are the issues you identified,

09:50:12   23   correct?

09:50:12   24   **A**    Correct.

09:50:13   25   **Q**    Okay.  And just to go through them, a change in the

**Edwards - (Cross by Delinsky)**                    5377

09:50:19   1    pharmacy's responsible person had not been properly reported

09:50:24   2    to the Board of Pharmacy, correct?

09:50:24   3    **A**    Correct.

09:50:25   4    **Q**    Okay.  And can you just explain, give us a thumbnail

09:50:30   5    sketch of what that means?

09:50:31   6    **A**    That means -- the responsible person is the manager of

09:50:33   7    the pharmacy, and the pharmacies are required to notify us I

09:50:37   8    believe within 30 days that there has been a change.  And in

09:50:41   9    this case, apparently they didn't; either they didn't notify

09:50:44   10   us or they didn't properly change managers.

09:50:49   11   **Q**    Correct.  Okay.  So it was sort of a paperwork issue,

09:50:54   12   so to speak?

09:50:54   13   **A**    Could have been, or they just hadn't appointed a new

09:50:59   14   manager yet.

09:51:00   15   **Q**    Okay.  And we'll get into that.

09:51:02   16          Then you identified some of these other issues that

09:51:06   17   we'll see in your report, correct?

09:51:08   18   **A**    Yes.

09:51:08   19   **Q**    Okay.  And that's sort of what you talked about

09:51:11   20   before, but you don't recall an instance when CVS did not

09:51:13   21   resolve any of the issues you identified?

09:51:15   22   **A**    Correct.

09:51:15   23   **Q**    Okay.  All right.  Now, I want to go to the report a

09:51:21   24   little bit.  And I just want to point out one thing for the

09:51:26   25   ladies and gentlemen of the jury.

**Edwards - (Cross by Delinsky)** 5378

09:51:28  1    I've put this yellow sticky here, and I'm just going

09:51:32  2    to explain why.  When you lift it up, there's personal

09:51:35  3    information associated with the pharmacists who are listed

09:51:38  4    there.  I just didn't want to break any rules regarding

09:51:41  5    that.

09:51:42  6        But am I right, that where I had -- whoops, I'm

09:51:47  7    already doing it.

09:51:51  8        That where my yellow sticky is, to the left it lists

09:51:55  9    the pharmacists who worked in this particular pharmacy at

09:51:57  10   the time, correct?

09:51:57  11  **A**    Correct.

09:51:58  12  **Q**    Okay.  All right.  We're now on page 4.  You've

09:52:05  13   answered some of these questions in response to Mr. Swanson,

09:52:10  14   so we can go quick.

09:52:12  15       I'm highlighting "Basic questions pertaining to the

09:52:19  16   ARKS."

09:52:20  17       ARKS is sort of an abbreviation for computer system,

09:52:22  18   right?

09:52:23  19  **A**    Right.

09:52:23  20  **Q**    Okay.  And was CVS's computer system approved by the

09:52:26  21   Ohio Board of Pharmacy?

09:52:27  22  **A**    Yes.

09:52:29  23  **Q**    And by computer system, I mean its computer

09:52:33  24   dispensing.

09:52:33  25  **A**    Dispensing software, yes.

**Edwards - (Cross by Delinsky)** 5379

| | | |
|---|---|---|
| 09:52:35 | 1 | **Q**    Okay.  Let's go to the next page.  I just want to ask |
| 09:52:45 | 2 | you about a few things. |
| 09:52:46 | 3 |     There's a question, "Is the shared ARKS a realtime |
| 09:52:50 | 4 | online system and used for the review and transfer of |
| 09:52:53 | 5 | dispensing data?" |
| 09:52:54 | 6 |     Your answer is yes.  What does that mean? |
| 09:52:56 | 7 | **A**    That means that it's realtime and shared in the sense |
| 09:52:59 | 8 | that other CVS pharmacies immediately see what someone |
| 09:53:06 | 9 | enters at the Mentor store, someone at Willoughby would see |
| 09:53:10 | 10 | that in realtime. |
| 09:53:14 | 11 | **Q**    That's a good thing? |
| 09:53:15 | 12 | **A**    That's a good thing, yes. |
| 09:53:16 | 13 | **Q**    Let's go down a little bit, and I'm skipping through |
| 09:53:18 | 14 | this just in the interest of time. |
| 09:53:20 | 15 |     "ARKS record accuracy.  Are required records of |
| 09:53:27 | 16 | accountability being kept complete and accurate in the |
| 09:53:32 | 17 | ARKS."  Answer, yes. |
| 09:53:32 | 18 |     Do you see that? |
| 09:53:33 | 19 | **A**    Yes. |
| 09:53:33 | 20 | **Q**    Could you explain that? |
| 09:53:36 | 21 | **A**    That just means that the prescriptions that they're |
| 09:53:38 | 22 | getting into the pharmacy are being properly documented in |
| 09:53:41 | 23 | the computer system. |
| 09:53:42 | 24 | **Q**    And those are the records of accountability? |
| 09:53:44 | 25 | **A**    Correct. |

**Edwards - (Cross by Delinsky)** 5380

| | | |
|---|---|---|
| 09:53:44 | 1 | **Q**    Okay.  All right.  Let me ask you another one.  We |
| 09:53:59 | 2 | have some minimum standards here.  I'm just going to flag |
| 09:54:01 | 3 | one. |
| 09:54:01 | 4 | "Does the pharmacy have the proper equipment to |
| 09:54:05 | 5 | conduct the practice of pharmacy?" |
| 09:54:07 | 6 | Answer, yes. |
| 09:54:08 | 7 | **A**    Yes. |
| 09:54:08 | 8 | **Q**    Okay.  And was that your finding -- |
| 09:54:09 | 9 | **A**    Yes. |
| 09:54:10 | 10 | **Q**    -- in your inspection? |
| 09:54:12 | 11 | Okay. |
| 09:54:23 | 12 | I think you provided information in response to |
| 09:54:25 | 13 | Mr. Swanson, Number 11, improper dispensing, "Is there |
| 09:54:31 | 14 | evidence to indicate that a prescription has been dispensed |
| 09:54:34 | 15 | improperly?" |
| 09:54:34 | 16 | Answer, no. |
| 09:54:37 | 17 | **A**    Correct. |
| 09:54:37 | 18 | **Q**    Correct.  That's the place that if you had found a |
| 09:54:40 | 19 | pharmacist had filled an illegitimate prescription, you |
| 09:54:44 | 20 | would have noted it there? |
| 09:54:45 | 21 | **A**    Yes, or if they had had an error. |
| 09:54:47 | 22 | **Q**    Correct.  And in candor, I've looked at a report where |
| 09:54:52 | 23 | a CVS pharmacist gave 30 pills and was supposed to give 60. |
| 09:54:56 | 24 | That kind of thing would go here too, right? |
| 09:54:58 | 25 | **A**    Yes. |

**Edwards - (Cross by Delinsky)** 5381

09:54:58  1   **Q**   So that's not always perfect; in this case it is?

09:55:00  2   **A**   Yes.

09:55:01  3   **Q**   Okay.  Let's go down to the bottom of this page.

09:55:06  4        DUR software, can you briefly explain to the ladies

09:55:11  5   and gentlemen of the jury what that is?

09:55:11  6   **A**   That's the software program that completes the drug

09:55:18  7   utilization review.  So basically the steps that they go

09:55:20  8   through when filling a prescription to make sure that the

09:55:25  9   prescription is proper.

09:55:28  10  **Q**   Okay.  And then the question, "Does the pharmacist

09:55:34  11  rely solely on the dispensing software to perform the DUR

09:55:37  12  for prescription dispensing?"

09:55:39  13       And your answer is no.

09:55:42  14       That's the right answer, right?

09:55:45  15  **A**   Correct.

09:55:45  16  **Q**   Can you explain why?

09:55:46  17  **A**   Well, if they -- they may take other steps.  The

09:55:53  18  dispensing software may identify an issue, such as an

09:55:57  19  overlap or too soon, or something like that, so then they

09:56:01  20  may on their own, as part of this drug utilization review,

09:56:06  21  go in and look at the patient profile or call the physician,

09:56:09  22  or ask the patient, Hey, what's going on, I see you got your

09:56:13  23  medication switched.  What's going on here?

09:56:16  24  **Q**   And is the idea that a pharmacist has to exercise her

09:56:21  25  or his judgment and can't just rely on a computer output

**Edwards - (Cross by Delinsky)**                     5382

09:56:27   1   alone?

09:56:27   2   **A**    Correct.

09:56:28   3   **Q**    I just want to go through a few more questions.

09:56:39   4        "Errors in dispensing," do you see that on the next

09:56:42   5   page?

09:56:42   6   **A**    Mm-hmm.

09:56:42   7   **Q**    None were identified in this report, but I want to ask

09:56:45   8   you about one question.

09:56:49   9        "Have the frequency of errors caused a standard of

09:56:52  10   practice issue for the pharmacy with a pharmacist or the

09:56:55  11   pharmacy as a whole?"

09:56:57  12        Do you see that question?

09:56:57  13   **A**    Yes.

09:56:58  14   **Q**    And your answer is no, right?

09:57:00  15   **A**    Correct.

09:57:00  16   **Q**    And again, "no" here is the correct answer, the answer

09:57:03  17   you want to see?

09:57:04  18   **A**    Right.

09:57:04  19   **Q**    And can you explain why?

09:57:05  20   **A**    Well, because the frequency of errors, you know, if

09:57:11  21   you get reports of multiple errors at a pharmacy, you may

09:57:16  22   have a bigger issue.  You may have an impaired pharmacist,

09:57:19  23   you may have a pharmacist who is, you know, past the age

09:57:25  24   where they can work; you know, issues like that that may

09:57:28  25   cause you to be concerned and causing errors to be made.  So

| | | |
|---|---|---|
| 09:57:32 | 1 | that's the reason for that question. |
| 09:57:33 | 2 | **Q**   So that's sort of a caution, saying are there any |
| 09:57:36 | 3 | systemic errors in the pharmacy? |
| 09:57:38 | 4 | **A**   Yes, right. |
| 09:57:39 | 5 | **Q**   And here you're concluding no? |
| 09:57:41 | 6 | **A**   Correct. |
| 09:57:41 | 7 | **Q**   Okay.  Let me keep going through this, with an |
| 09:57:48 | 8 | interest in time. |
| 09:57:48 | 9 | I'm looking at page 11, okay?  And you've already |
| 09:57:51 | 10 | testified about this caution. |
| 09:57:55 | 11 | **A**   Yes. |
| 09:57:56 | 12 | **Q**   Okay.  This is about OARRS. |
| 09:57:57 | 13 | "Are the pharmacists requesting OARRS reports when |
| 09:58:01 | 14 | appropriate?" |
| 09:58:02 | 15 | And what's your answer there? |
| 09:58:04 | 16 | **A**   Yes. |
| 09:58:04 | 17 | **Q**   What does that mean? |
| 09:58:05 | 18 | **A**   That means they're requesting them when they should be |
| 09:58:07 | 19 | requesting them, based on what I saw that day. |
| 09:58:09 | 20 | **Q**   Okay.  And there was just one other thing, just give |
| 09:58:18 | 21 | me a handle.  I want to go to the -- remember we talked |
| 09:58:25 | 22 | about the responsible person? |
| 09:58:27 | 23 | **A**   Mm-hmm. |
| 09:58:27 | 24 | **Q**   Okay.  This is one of the imperfections in this |
| 09:58:33 | 25 | report, and there's a few.  I'm just going to focus on this |

09:58:36   1    one.

09:58:39   2         So I'm looking at page 4, okay?  It's up on the

09:58:43   3    screen.

09:58:43   4    A    Yes.

09:58:43   5    Q    "Have changes in the pharmacy's responsible person

09:58:49   6    been properly reported to the Board of Pharmacy.  Written

09:58:52   7    response required."

09:58:53   8         And you say no.

09:58:56   9         That's the problem, right?

09:58:57  10    A    Yes.

09:58:57  11    Q    And does your explanation refresh your recollection on

09:59:01  12    what happened here?

09:59:01  13    A    Yes.  I can see here that the pharmacist had been

09:59:04  14    acting as the responsible person but had not reported to our

09:59:08  15    agency that she was the responsible person.  So as far as we

09:59:14  16    knew, in our system it showed someone else being the

09:59:17  17    responsible person.

09:59:18  18    Q    So somebody was there in the role, just hadn't

09:59:22  19    reported it to the Ohio Board of Pharmacy?

09:59:25  20    A    Yes, correct.

09:59:25  21    Q    Problem; not the end of the world?

09:59:27  22    A    Correct.

09:59:29  23              THE COURT:  Mr. Delinsky, I don't know if you

09:59:30  24    plan to offer this document, but I noticed it does not have

09:59:36  25    a five-digit number on the front.

09:59:38   1            MR. DELINSKY:  You're talking about -- thank

09:59:40   2   you very much, Your Honor.  That's a really good point.  It

09:59:43   3   does, but for some reason -- do you see it there, Judge?

09:59:47   4   You can barely read it.

09:59:50   5            THE COURT:  Up in the right -- I've got to

09:59:54   6   take my glasses off to read it.

09:59:56   7        All right.  It looks like it's 03795.

10:00:00   8            MR. DELINSKY:  That's correct.

10:00:02   9            THE COURT:  Okay.

10:00:03  10            MR. DELINSKY:  And thank you, Your Honor, for

10:00:05  11   reminding me.  I can't do it with or without my glasses.  So

10:00:09  12   thank you.

10:00:09  13            THE COURT:  Okay.  You're welcome.

10:00:20  14   BY MR. DELINSKY:

10:00:21  15   Q    All right.  One last chapter here, Mr. Edwards.  I'm

10:00:23  16   showing you a document.  You have it.

10:00:25  17        This goes back to your time at Lake County Narcotics

10:00:29  18   Agency.  And that's -- you were an officer there.

10:00:31  19        Is it officer or detective?

10:00:34  20   A    Agent.

10:00:34  21   Q    Agent.  Okay, agent throughout your career.

10:00:38  22        In the '05 time frame, correct?

10:00:46  23   A    Correct.

10:00:46  24   Q    What I'm going to show you, and it's at the bottom,

10:00:49  25   it's DEF-MDL-12782, is a document about a seminar that Lake

| | | |
|---|---|---|
| 10:00:58 | 1 | County Narcotics was sponsoring, correct? |
| 10:01:00 | 2 | **A**    Yeah, it was a continuing education for pharmacists. |
| 10:01:02 | 3 | **Q**    For pharmacists, okay. |
| 10:01:09 | 4 | And you were involved in putting this together, |
| 10:01:11 | 5 | correct? |
| 10:01:11 | 6 | **A**    Correct. |
| 10:01:11 | 7 | **Q**    And you can see at the bottom that the RSVP is |
| 10:01:15 | 8 | supposed to go to you, correct? |
| 10:01:17 | 9 | **A**    Yup. |
| 10:01:17 | 10 | **Q**    Okay.  And it also says "The seminars are open to |
| 10:01:22 | 11 | anyone who practices in the state of Ohio." |
| 10:01:24 | 12 | See that? |
| 10:01:24 | 13 | **A**    Correct. |
| 10:01:25 | 14 | **Q**    Okay.  Could that be doctors as well as pharmacists? |
| 10:01:27 | 15 | **A**    No, it was geared towards pharmacists. |
| 10:01:29 | 16 | **Q**    Okay.  All right. |
| 10:01:30 | 17 | So I just want to point out some other things. |
| 10:01:34 | 18 | Lake County Narcotics invited an outside speaker to |
| 10:01:39 | 19 | this seminar, correct? |
| 10:01:40 | 20 | **A**    Correct. |
| 10:01:40 | 21 | **Q**    And that was an executive with Purdue Pharma, correct? |
| 10:01:46 | 22 | **A**    Yes. |
| 10:01:46 | 23 | **Q**    And that person's name was Ritch Wagner? |
| 10:01:49 | 24 | **A**    Correct. |
| 10:01:51 | 25 | **Q**    And why did Lake County Narcotics invite Mr. Wagner to |

10:01:55  1  speak?

10:01:55  2  **A**    I met Ritch Wagner at a National Association of Drug

10:02:02  3  Diversion Investigators conference, and he explained that he

10:02:05  4  was a law enforcement liaison for Purdue and they were

10:02:08  5  providing this training for free, and also, you know,

10:02:14  6  providing grants, and all kinds of things.  And they were,

10:02:17  7  at that time, helping out law enforcement.

10:02:20  8       And so he came along with Joann Predina to conduct

10:02:24  9  this continuing education.

10:02:26  10  **Q**    And in that regard, I think you included at the

10:02:29  11  bottom, "Purdue Pharma is an industry leader in prescription

10:02:34  12  drug abuse education and has joined forces with law

10:02:37  13  enforcement."

10:02:38  14  **A**    Yes.

10:02:38  15  **Q**    Okay.  I'm going to ask you some final questions.  I

10:02:44  16  think the answers are really obvious, okay, but just bear

10:02:47  17  with me.

10:02:50  18       By including a Purdue executive at this event, am I

10:02:55  19  right that neither you nor Lake County Narcotics were

10:02:59  20  collaborating with Purdue to spread misinformation?

10:03:02  21  **A**    Correct.

10:03:05  22  **Q**    Likewise, neither you nor Lake County Narcotics were

10:03:11  23  collaborating with Purdue in any of Purdue's own misconduct?

10:03:18  24  **A**    No, correct.

10:03:19  25  **Q**    And was the information -- I just want to make sure

**Edwards (Cross by Fumerton)**

| | | |
|---|---|---|
| 10:03:22 | 1 | that's clear, and I know it is. |
| 10:03:23 | 2 | "No," you agree with the supposition of the question? |
| 10:03:25 | 3 | **A**   I agree with what you said, right. |
| 10:03:28 | 4 | **Q**   You weren't collaborating with Purdue in any improper |
| 10:03:31 | 5 | ways? |
| 10:03:32 | 6 | **A**   Right. |
| 10:03:32 | 7 | **Q**   And was the information provided by Mr. Wagner, the |
| 10:03:35 | 8 | Purdue executive, appropriate in not misleading at this |
| 10:03:40 | 9 | event? |
| 10:03:40 | 10 | **A**   That's my recollection. |
| 10:03:42 | 11 | MR. DELINSKY:  Thank you very, very much for |
| 10:03:45 | 12 | your time, Mr. Edwards. |
| 10:03:46 | 13 | THE WITNESS:  Yes, thank you. |
| 10:03:52 | 14 | THE COURT:  Okay.  Ms. Fumerton for Walmart. |
| 10:03:56 | 15 | MS. FUMERTON:  Thank you, Your Honor.  Just |
| 10:03:59 | 16 | give me one minute. |
| 10:04:11 | 17 | Your Honor, may I approach the bench and the witness? |
| 10:04:15 | 18 | THE COURT:  Sure. |
| 10:04:43 | 19 | - - - - - |
| 10:04:43 | 20 | CROSS-EXAMINATION |
| 10:04:44 | 21 | BY MS. FUMERTON: |
| 10:04:44 | 22 | **Q**   Good morning, Agent Edwards. |
| 10:04:46 | 23 | **A**   Good morning. |
| 10:04:46 | 24 | **Q**   My name is Tara Fumerton, and I'm one of the attorneys |
| 10:04:51 | 25 | for Walmart, and I have just a couple quick questions for |

| | | |
|---|---|---|
| 10:04:55 | 1 | you. |
| 10:04:55 | 2 | **A**    Sure. |
| 10:04:56 | 3 | **Q**    To the best of your knowledge, were the inspections of |
| 10:04:59 | 4 | the Walmart pharmacies that you conducted generally |
| 10:05:01 | 5 | favorable? |
| 10:05:01 | 6 | **A**    Yes. |
| 10:05:02 | 7 | **Q**    And I just want to ask you a couple quick questions |
| 10:05:05 | 8 | about two of those inspections that you did. |
| 10:05:07 | 9 | **A**    Okay. |
| 10:05:07 | 10 | **Q**    If you turn to Tab 1 of the binder that I gave you. |
| 10:05:10 | 11 | **A**    Yes. |
| 10:05:11 | 12 |         MS. FUMERTON:  And for the record, that is |
| 10:05:12 | 13 | WMT-MDL-01418. |
| 10:05:20 | 14 |    And Your Honor, that's the first one I handed you.  It |
| 10:05:23 | 15 | should be on the top of the stack. |
| 10:05:24 | 16 |    And Mr. Lanier, it's the first one. |
| 10:05:33 | 17 | BY MS. FUMERTON: |
| 10:05:33 | 18 | **Q**    And do you have that document in front of you, Agent |
| 10:05:36 | 19 | Edwards? |
| 10:05:36 | 20 | **A**    Yes. |
| 10:05:36 | 21 | **Q**    Do you recognize this document? |
| 10:05:37 | 22 | **A**    Yes. |
| 10:05:37 | 23 | **Q**    And can you generally just describe what it is? |
| 10:05:42 | 24 | **A**    Yes.  It's an inspection that was completed on January |
| 10:05:45 | 25 | 31, 2011, at the Walmart in Madison, Ohio. |

10:05:49  1    **Q**    And that's Walmart Store 3608?  You see that in the

10:05:52  2    top left-hand corner; is that right?

10:05:53  3    **A**    Yes, correct.

10:05:54  4    **Q**    And that's your signature down at the bottom next to

10:05:57  5    the date, January 31st, 2011?

10:05:59  6    **A**    Yes.

10:05:59  7    **Q**    I just have one question about this, and this is

10:06:01  8    specific to number 39 on the left-hand side, OARRS.

10:06:05  9    **A**    Mm-hmm.

10:06:05  10   **Q**    And if you actually turn the page, then, to the third

10:06:12  11   page of this document that ends in 85.

10:06:15  12   **A**    Mm-hmm.

10:06:15  13   **Q**    You'll see that there's a 39 that corresponds to that

10:06:25  14   number on the left-hand side?

10:06:26  15   **A**    Yes.

10:06:26  16   **Q**    And what did you conclude in your inspection about

10:06:31  17   Walmart's OARRS?

10:06:32  18   **A**    I said "Walmart pharmacists now able to access OARRS,"

10:06:36  19   exclamation point.

10:06:38  20   **Q**    And I think earlier you were talking about the early

10:06:39  21   days of OARRS, and Mr. Delinsky also asked you some

10:06:43  22   questions about when pharmacists were first required to

10:06:46  23   access OARRS in certain instances.

10:06:49  24   **A**    Yes.

10:06:49  25   **Q**    And I think you couldn't recall the exact date.

10:06:51   1   **A**      Right.

10:06:51   2   **Q**      The jury heard some testimony yesterday that that was

10:06:54   3   in October of 2011.

10:06:56   4          Do you have any reason to disagree with that?

10:06:57   5   **A**      No.

10:06:57   6   **Q**      And so at least you were concluding with this

10:07:02   7   inspection that Walmart pharmacists had access to OARRS

10:07:05   8   prior to that date, right?

10:07:07   9   **A**      My recollection is that there were a number of

10:07:13  10   pharmacies who because of the way their internal computer

10:07:15  11   system worked, they couldn't access anything outside of

10:07:18  12   their own intranet.  So, like, this is telling me that now

10:07:24  13   they were able to access OARRS.

10:07:26  14          They used to have to, in the old days, have to get on

10:07:29  15   their phone, you know, and access -- or go, you know,

10:07:33  16   somewhere else to access OARRS on their own.  So this is

10:07:37  17   telling me that they now had the ability to do it within the

10:07:40  18   dispensing software at Walmart.

10:07:41  19   **Q**      And so that's at least by January of 2011, correct?

10:07:44  20   **A**      Correct, yes.

10:07:46  21   **Q**      Okay.  If you can turn to Tab 4.

10:07:52  22              MS. FUMERTON:  And for the record, this is

10:07:54  23   WMT-MDL-01387.

10:08:00  24          So, Your Honor, it should be the second document that

10:08:02  25   I handed to you.

| | | |
|---|---|---|
| 10:08:02 | 1 | **A**    Yes. |
| 10:08:03 | 2 | **Q**    Agent Edwards, are you there? |
| 10:08:05 | 3 | **A**    Yes. |
| 10:08:06 | 4 | **Q**    Do you recognize this document? |
| 10:08:06 | 5 | **A**    Yes.  This is an inspection I conducted at the Walmart |
| 10:08:09 | 6 | Store 1863 in Eastlake on October 8, 2013. |
| 10:08:14 | 7 | **Q**    And that's your signature again down at the bottom |
| 10:08:17 | 8 | left-hand corner? |
| 10:08:17 | 9 | **A**    Yes. |
| 10:08:18 | 10 | **Q**    And for this one I just want to ask you about number |
| 10:08:25 | 11 | 3, the records system? |
| 10:08:26 | 12 | **A**    Yes. |
| 10:08:26 | 13 | **Q**    And so I think that is described on the first page |
| 10:08:31 | 14 | carrying over to the second page, but if we could just |
| 10:08:34 | 15 | highlight that, maybe make it a little bit bigger. |
| 10:08:36 | 16 | Could you just read for us what you concluded about |
| 10:08:39 | 17 | Walmart's record system at that time? |
| 10:08:40 | 18 | **A**    Yes. |
| 10:08:41 | 19 | "Connexus software version 5.1.1.  Six terminals |
| 10:08:47 | 20 | handle data entry and patient profile searches.  Dispensing |
| 10:08:51 | 21 | software connected to all other Walmart locations.  Data |
| 10:08:54 | 22 | backed up at corporate headquarters.  Pharmacists complete a |
| 10:08:58 | 23 | four-point check for all new prescriptions:  Patient name, |
| 10:09:02 | 24 | drug and strength, SIG, and prescriber DEA on controls. |
| 10:09:07 | 25 | Visual verify checked on all prescriptions, new and refill. |

| | | |
|---|---|---|
| 10:09:12 | 1 | Four-point check and visual verify reports print daily and |
| 10:09:16 | 2 | are signed by the pharmacist.  DUR warnings must be resolved |
| 10:09:18 | 3 | by the pharmacist.  Most severe warnings require the |
| 10:09:21 | 4 | pharmacists to document how the issue was resolved." |
| 10:09:24 | 5 | **Q**     And so what was your overall conclusion about |
| 10:09:26 | 6 | Walmart's record system at that time? |
| 10:09:27 | 7 | **A**     That it was compliant with our requirements. |
| 10:09:35 | 8 | **Q**     And with respect to the two inspections that we just |
| 10:09:37 | 9 | looked at, what was your overall conclusion with those?  Did |
| 10:09:42 | 10 | Walmart comply with the regulations and laws of the Ohio |
| 10:09:45 | 11 | Board of Pharmacy? |
| 10:09:45 | 12 | **A**     Yes. |
| 10:09:48 | 13 | MS. FUMERTON:  Thank you, Agent Edwards.  I |
| 10:09:50 | 14 | don't have any further questions. |
| 10:09:52 | 15 | THE WITNESS:  Thank you. |
| 10:09:54 | 16 | THE COURT:  Okay.  Mr. Weinberger. |
| 10:10:41 | 17 | - - - - - |
| 10:10:41 | 18 | CROSS-EXAMINATION |
| 10:10:41 | 19 | BY MR. WEINBERGER: |
| 10:10:43 | 20 | **Q**     Agent Edwards, good morning. |
| 10:10:46 | 21 | **A**     Good morning. |
| 10:10:46 | 22 | **Q**     Feels like afternoon at this point.  I do have some |
| 10:10:48 | 23 | questions.  My time is limited.  I'm going to try to get |
| 10:10:52 | 24 | through them as rapidly as possible. |
| 10:10:54 | 25 | **A**     Okay. |

**Edwards (Cross by Weinberger)**

| | | |
|---|---|---|
| 10:10:54 | 1 | **Q**    My name is Peter Weinberger, and I'm privileged to |
| 10:10:58 | 2 | represent the plaintiffs in this case, Lake and Trumbull |
| 10:11:01 | 3 | County. |
| 10:11:01 | 4 | **A**    Okay. |
| 10:11:01 | 5 | **Q**    We have not met before, have we? |
| 10:11:03 | 6 | **A**    No. |
| 10:11:03 | 7 | **Q**    I heard somewhere that you have a pharmacist in the |
| 10:11:11 | 8 | family.  Is that true? |
| 10:11:12 | 9 | **A**    I do, yes. |
| 10:11:12 | 10 | **Q**    And who is that? |
| 10:11:13 | 11 | **A**    My wife. |
| 10:11:14 | 12 | **Q**    And how long has she been a pharmacist? |
| 10:11:16 | 13 | **A**    Since 2000. |
| 10:11:18 | 14 | **Q**    And where does she work? |
| 10:11:20 | 15 | **A**    For Giant Eagle. |
| 10:11:22 | 16 | **Q**    And has she always worked for Giant Eagle? |
| 10:11:24 | 17 | **A**    No, she worked for Hillcrest Hospital initially and |
| 10:11:30 | 18 | then very briefly for Rite Aid, but she's been with Giant |
| 10:11:33 | 19 | Eagle since 2000. |
| 10:11:36 | 20 | **Q**    And do you and she socialize with other pharmacists? |
| 10:11:45 | 21 | **A**    Occasionally, yes. |
| 10:11:47 | 22 | **Q**    Any pharmacists from Walgreens? |
| 10:11:49 | 23 | **A**    Well, define "socialize."  I mean, I have a neighbor |
| 10:11:57 | 24 | who is a Walgreens pharmacist, so I guess yes. |
| 10:12:02 | 25 | **Q**    Okay.  I mean, I'm not implying anything in particular |

**Edwards (Cross by Weinberger)**

10:12:06  1   other than whether or not within your social circle, because

10:12:10  2   your wife's a pharmacist, that you have friends or

10:12:14  3   acquaintances.

10:12:15  4   **A**    Yes.

10:12:15  5   **Q**    You do, right?

10:12:16  6   **A**    Yes, yes.

10:12:17  7   **Q**    So I have --

10:12:21  8          MR. WEINBERGER:  Can you turn on the Wolfe,

10:12:22  9   please?

10:12:24  10  **Q**    I have -- that's a -- it's like a picture of you with

10:12:30  11  more of a beard than you have now.

10:12:32  12  **A**    Yeah.

10:12:35  13  **Q**    But that is you, right?

10:12:36  14  **A**    That is me.

10:12:37  15  **Q**    All right.  So what we're going to -- what we're going

10:12:39  16  to cover with you real quickly today is --

10:12:41  17  **A**    Is that from the deposition?

10:12:42  18  **Q**    Huh?

10:12:43  19  **A**    Is that my picture from the deposition?

10:12:45  20  **Q**    I think we pulled it up somewhere else.  I'm not sure.

10:12:52  21  Next time you have to testify, we'll get you a better photo.

10:12:55  22  How is that?

10:12:56  23  **A**    Okay.  I appreciate that.

10:12:57  24  **Q**    So here's what we're going to cover with you in the

10:12:59  25  next few minutes.  We're going to cover with you a 2014

10:13:04  1    presentation that you made on behalf of the Ohio Board of

10:13:07  2    Pharmacy.

10:13:07  3    **A**    Okay.

10:13:07  4    **Q**    We're going to cover your inspections.

10:13:10  5    **A**    Okay.

10:13:10  6    **Q**    And we're going to cover some investigations.

10:13:12  7    **A**    Okay.

10:13:13  8    **Q**    All right?

10:13:13  9    **A**    Yup.

10:13:14  10   **Q**    So let's start, first of all, with a little bit of

10:13:21  11   your training.

10:13:22  12         You were trained -- is it true that you were trained

10:13:24  13   by Mr. Pavlich on the job?

10:13:27  14   **A**    Yes.

10:13:27  15   **Q**    And you mentioned that you've had contact with various

10:13:39  16   pharmacists and that your contact with them and

10:13:42  17   communications was always very cooperative.

10:13:43  18         Would it be fair to say that most of the time that

10:13:46  19   contact resulted because you were investigating a patient or

10:13:53  20   you were investigating a particular diverter or person you

10:13:58  21   thought was diverting, and so you were going to the

10:14:02  22   pharmacies to ask for records?

10:14:04  23   **A**    Or maybe just there on a routine basis, but yes, and

10:14:08  24   for routine reasons as well.

10:14:10  25   **Q**    So when you -- and you're, like, part of law

**Edwards (Cross by Weinberger)** 5397

| | | |
|---|---|---|
| 10:14:15 | 1 | enforcement, right? |
| 10:14:15 | 2 | **A**    Correct. |
| 10:14:16 | 3 | **Q**    So you as a member of -- or an agent for the Ohio |
| 10:14:19 | 4 | Board of Pharmacy goes to a pharmacy, one of the retail |
| 10:14:24 | 5 | pharmacy chains, and talks with a pharmacist; one would |
| 10:14:27 | 6 | expect, since you are law enforcement, that you would get |
| 10:14:31 | 7 | cooperation from the pharmacists. |
| 10:14:33 | 8 | **A**    Correct. |
| 10:14:33 | 9 | **Q**    Right? |
| 10:14:34 | 10 | **A**    Right. |
| 10:14:34 | 11 | **Q**    Nothing unusual about that, right? |
| 10:14:36 | 12 | **A**    Right. |
| 10:14:36 | 13 | **Q**    All right.  So in 2014 -- |
| 10:14:49 | 14 | MR. WEINBERGER:  And if you could give the |
| 10:14:50 | 15 | witness P-20809. |
| 10:14:56 | 16 | **Q**    I'm just going to put up the first page, and we'll get |
| 10:14:59 | 17 | you the entire PowerPoint exhibit. |
| 10:15:11 | 18 | This is our first stop.  And this is a presentation |
| 10:15:14 | 19 | that you made, according to the first page of the exhibit, |
| 10:15:21 | 20 | this is an e-mail from a Mary Dillon to you that references |
| 10:15:39 | 21 | a presentation in 2014. |
| 10:15:41 | 22 | **A**    Correct. |
| 10:15:42 | 23 | **Q**    And so this first page of the PowerPoint reflects an |
| 10:15:50 | 24 | August 26, 2014, presentation that you made on behalf of the |
| 10:15:58 | 25 | Ohio State Board of Pharmacy, right? |

10:15:59  1   **A**     Correct.

10:15:59  2   **Q**     And the purpose of this was to give a general overview

10:16:03  3   as of 2014 about OARRS, right?

10:16:06  4   **A**     Correct.

10:16:06  5   **Q**     And you compiled the information for this presentation

10:16:12  6   with I think other team members on the Ohio Board of

10:16:16  7   Pharmacy?

10:16:16  8   **A**     Yes, yes.

10:16:17  9   **Q**     And did you give this presentation more than once?

10:16:23  10  **A**     I don't recall if it was more than once.  I believe --

10:16:28  11  I recall one time in particular that we gave it down at the

10:16:34  12  BCI office in Richfield.  And my recollection is that it was

10:16:41  13  so sparsely attended that we didn't give any more

10:16:45  14  presentations.

10:16:46  15  **Q**     All right.  So this has a little bit about you, right?

10:16:56  16  **A**     Yes.

10:16:56  17  **Q**     And then I was interested in the next page, which is

10:17:02  18  page 4 of this exhibit.

10:17:05  19         This is actually I think meant to refer to a video --

10:17:11  20  **A**     Yes.

10:17:11  21  **Q**     -- about red flags, right?

10:17:16  22  **A**     Yes.

10:17:16  23  **Q**     And that video is actually on the website of the Ohio

10:17:24  24  Board of Pharmacy, isn't it?

10:17:26  25  **A**     I don't recall where that video came from or where it

**Edwards (Cross by Weinberger)**

| | | |
|---|---|---|
| 10:17:28 | 1 | was located. |
| 10:17:28 | 2 | **Q** Well, here's my question: If you go on the website of |
| 10:17:33 | 3 | the Ohio Board of Pharmacy -- I mean, I did that. |
| 10:17:37 | 4 | **A** Mm-hmm. |
| 10:17:37 | 5 | **Q** This video, there's a red flag video on the website. |
| 10:17:41 | 6 | **A** Okay. |
| 10:17:42 | 7 | **Q** Are you aware of that? |
| 10:17:43 | 8 | **A** I was not aware of that, no. |
| 10:17:45 | 9 | **Q** Okay. So that video was produced by the National |
| 10:17:51 | 10 | Association of Boards of Pharmacy, wasn't it? |
| 10:17:53 | 11 | MR. SWANSON: Objection, Your Honor. He said |
| 10:17:54 | 12 | he's not aware of it. |
| 10:17:56 | 13 | THE COURT: Well -- |
| 10:17:57 | 14 | MR. SWANSON: And now it's just testifying. |
| 10:17:59 | 15 | THE COURT: He said he wasn't aware that the |
| 10:18:00 | 16 | video was on the website. |
| 10:18:01 | 17 | Why don't you ask him -- |
| 10:18:02 | 18 | MR. WEINBERGER: I will, Your Honor. |
| 10:18:03 | 19 | THE COURT: -- if he knows who made this |
| 10:18:07 | 20 | video. |
| 10:18:07 | 21 | MR. WEINBERGER: Sure. |
| 10:18:08 | 22 | BY MR. WEINBERGER: |
| 10:18:09 | 23 | **Q** So you're familiar with the National Board -- National |
| 10:18:13 | 24 | Association of Boards of Pharmacy, right? |
| 10:18:14 | 25 | **A** Yes. |

10:18:15 1 **Q** Have you attended any of their sessions?

10:18:19 2 **A** I have not.

10:18:20 3 **Q** Are you aware that Carmen Catizone was the executive

10:18:23 4 director of the National Association Of Boards of Pharmacy?

10:18:26 5 **A** That name rings a bell, but I couldn't tell you for

10:18:29 6 certain.

10:18:29 7 **Q** Are you aware of the fact that Carmen Catizone is a

10:18:33 8 well-known expert in pharmacy regulations and red flags?

10:18:41 9 MR. DELINSKY: Objection, Your Honor.

10:18:42 10 THE COURT: Overruled.

10:18:43 11 **A** I recognize the name, but I don't recognize why -- I

10:18:46 12 don't remember why I know the name.

10:18:48 13 **Q** Okay. Well, this particular video that you used in

10:18:50 14 your presentation of 2014, wasn't it a video that was

10:18:55 15 produced by the National Association of Boards of Pharmacy?

10:18:58 16 **A** I don't recall.

10:18:59 17 **Q** Did this video describe red flags?

10:19:03 18 **A** I don't recall the contents of the video, but based on

10:19:08 19 the title there, that is a good assumption.

10:19:10 20 **Q** Do you recall that it had some actors that were acting

10:19:16 21 as patients and pharmacists, and they went through various

10:19:19 22 vignettes about how one might identify red flags?

10:19:23 23 **A** That sounds vaguely familiar, but I do not recall the

10:19:25 24 video.

10:19:26 25 **Q** All right. So here's a description of your training

**Edwards (Cross by Weinberger)**                    5401

10:19:41  1    objectives, right?

10:19:41  2    **A**      Mm-hmm.

10:19:41  3    **Q**      And it is to go over the background, the scope of the

10:19:46  4    drug abuse problem, the Boards of Pharmacy's roles and

10:19:51  5    responsibilities, and then to discuss OARRS in general,

10:19:51  6    right?

10:19:51  7    **A**      Yes.

10:19:53  8    **Q**      And then in more specifics, right?

10:19:55  9    **A**      Yes.

10:19:55  10   **Q**      And then the very next slide defines drug diversion,

10:19:59  11   right?

10:20:01  12   **A**      Yes.

10:20:01  13   **Q**      And we've heard a lot about that in this case.  Going

10:20:04  14   through it pretty quickly, it involves theft of drugs,

10:20:07  15   tampering with drugs, deception to obtain dangerous drugs,

10:20:11  16   and illegal processing of drug documents.

10:20:14  17         Correct?

10:20:15  18   **A**      Correct.

10:20:15  19   **Q**      Now, as part of this presentation -- by the way, you

10:20:25  20   were shown this document when you were -- when you gave your

10:20:32  21   deposition, right?

10:20:32  22   **A**      Yes.

10:20:33  23   **Q**      And that deposition took place on December 11, 2020,

10:20:39  24   right?

10:20:39  25   **A**      Correct.

**Edwards (Cross by Weinberger)**                5402

10:20:40   1    **Q**     And all the pharmacies that questioned you here,

10:20:42   2    before I've had an opportunity to ask you questions, were

10:20:46   3    there and asked you questions, right?

10:20:48   4    **A**     I don't remember if it was all the same people, but

10:20:50   5    yes.

10:20:51   6    **Q**     Right.  And they asked you about this document, right?

10:20:54   7    **A**     I believe so.

10:20:54   8    **Q**     Okay.  So your next slide defines "dangerous drug,"

10:21:07   9    right?

10:21:07  10    **A**     Yes.

10:21:07  11    **Q**     Why don't you read that for us.

10:21:10  12    **A**     Sure.  "Dangerous drug:  Any drug that requires a

10:21:13  13    prescription, includes controlled substances, as well as all

10:21:17  14    noncontrolled prescription drugs such as insulin,

10:21:21  15    antibiotics, cholesterol drugs, heart medications, lifestyle

10:21:24  16    drugs, Cialis, Viagra, and others, always labeled Rx only."

10:21:30  17         So there's a lot of confusion in the general public,

10:21:33  18    and in this case among police officers, that the term

10:21:36  19    "dangerous drug," you know, people think "dangerous," oh,

10:21:39  20    it's dangerous for me, like, I can't -- you know, I

10:21:41  21    shouldn't take it.  They confuse the two.  That's why we

10:21:48  22    explain to them that "dangerous drug" is any prescription

10:21:50  23    drug.

10:21:50  24    **Q**     Right.  And controlled substances have a particular

10:21:52  25    danger because they can be addictive, right?

**Edwards (Cross by Weinberger)** 5403

| | | |
|---|---|---|
| 10:21:55 | 1 | **A** Correct. |
| 10:21:58 | 2 | **Q** And addiction can -- and they can -- a patient can |
| 10:22:01 | 3 | become dependent on them, right? |
| 10:22:03 | 4 | **A** Correct. |
| 10:22:03 | 5 | **Q** And as a result of becoming addicted or dependent, |
| 10:22:09 | 6 | they can become drug seekers, right? |
| 10:22:13 | 7 | **A** Correct. |
| 10:22:13 | 8 | **Q** And the risk of addiction and dependence resulting in |
| 10:22:20 | 9 | drug seeking can often lead to diversion, right? |
| 10:22:22 | 10 | **A** Correct. |
| 10:22:22 | 11 | **Q** And the whole reason for the state regulations and the |
| 10:22:28 | 12 | federal regulations is -- on controlled substances is |
| 10:22:33 | 13 | because it is out of a recognition that these drugs are |
| 10:22:37 | 14 | dangerous, can be addictive, and can lead to diversion, |
| 10:22:42 | 15 | right? |
| 10:22:42 | 16 | **A** Correct. |
| 10:22:43 | 17 | **Q** And that's why this is a highly-regulated industry. |
| 10:22:49 | 18 | In order for the pharmacies in this case to have the ability |
| 10:22:56 | 19 | to dispense drugs, they are required as part of the closed |
| 10:23:03 | 20 | system to follow all of the regulations, right? |
| 10:23:05 | 21 | **A** Correct. |
| 10:23:06 | 22 | **Q** That's important to patient safety, right? |
| 10:23:09 | 23 | **A** Yes. |
| 10:23:10 | 24 | **Q** It's important to public safety, right? |
| 10:23:13 | 25 | **A** Yes. |

**Edwards (Cross by Weinberger)** 5404

| | | |
|---|---|---|
| 10:23:14 | 1 | **Q**     It's important for our communities, to protect our |
| 10:23:18 | 2 | communities, against the bad things that happen as a result |
| 10:23:23 | 3 | of diversion, right? |
| 10:23:23 | 4 | **A**     Sure, yes. |
| 10:23:26 | 5 | **Q**     Now, your next slide defines a morphine equivalent |
| 10:23:34 | 6 | daily dose, right? |
| 10:23:35 | 7 | **A**     Yes. |
| 10:23:35 | 8 | **Q**     And in general, tell us what that means. |
| 10:23:38 | 9 | **A**     It's a formula that was developed to basically make |
| 10:23:46 | 10 | different drugs comparable.  So, in other words, there's |
| 10:23:51 | 11 | some drugs that come in higher strengths than others, higher |
| 10:23:54 | 12 | quantities than others. |
| 10:23:56 | 13 |     So the morphine equivalent daily dose kind of levels |
| 10:23:59 | 14 | the playing field so you can compare different drugs and see |
| 10:24:01 | 15 | the amount of morphine equivalent medication a patient is |
| 10:24:07 | 16 | getting in a 24-hour period. |
| 10:24:09 | 17 | **Q**     Okay.  So I'm going to move on a little bit further. |
| 10:24:15 | 18 |     And on page 12 of your presentation in 2014 there's a |
| 10:24:21 | 19 | description of what a prescription drug monitoring program |
| 10:24:26 | 20 | is all about and that OARRS is the system in Ohio.  Right? |
| 10:24:31 | 21 | **A**     Correct. |
| 10:24:36 | 22 | **Q**     Now, as part of your presentation, I think to explain |
| 10:24:40 | 23 | to the audience the importance of OARRS, vis-à-vis |
| 10:24:49 | 24 | protecting the public health and safety, is you gave some |
| 10:24:52 | 25 | background of the scope of the drug abuse problem, right? |

| | | |
|---|---|---|
| 10:24:56 | 1 | **A**     Yes. |
| 10:24:56 | 2 | **Q**     And here you write, "Prescription opioids are |
| 10:25:03 | 3 | associated with more fatal overdoses than any other |
| 10:25:06 | 4 | prescription or illegal drug, including cocaine, heroin, and |
| 10:25:11 | 5 | marijuana combined." |
| 10:25:12 | 6 |       Have I read that correctly? |
| 10:25:15 | 7 | **A**     Yes. |
| 10:25:16 | 8 | **Q**     And we're talking about 2014 when you gave this |
| 10:25:18 | 9 | presentation, right? |
| 10:25:19 | 10 | **A**     Correct. |
| 10:25:20 | 11 | **Q**     And the harms and the burden on our society of |
| 10:25:29 | 12 | prescription opioids was not something that just began in |
| 10:25:32 | 13 | 2014, right? |
| 10:25:32 | 14 | **A**     Correct. |
| 10:25:33 | 15 | **Q**     In fact, it had been happening for quite a while, as |
| 10:25:39 | 16 | your next slide, page 15 -- |
| 10:25:42 | 17 |                MS. FUMERTON:  Objection, Your Honor. |
| 10:25:58 | 18 |                THE COURT:  What's the objection? |
| 10:26:07 | 19 |                (At side bar at 10:26 a.m.) |
| 10:26:08 | 20 |                THE COURT:  What's the objection? |
| 10:26:09 | 21 |                MS. FUMERTON:  Your Honor, I don't know that |
| 10:26:10 | 22 | Mr. Edwards has foundation to talk about the next few slides |
| 10:26:13 | 23 | that are coming up.  Maybe he does -- |
| 10:26:17 | 24 |                THE COURT:  This is his PowerPoint. |
| 10:26:18 | 25 |                MS. FUMERTON:  But within the information, I |

**Edwards (Cross by Weinberger)**

| | | |
|---|---|---|
| 10:26:20 | 1 | can put a PowerPoint together and put forward a bunch of |
| 10:26:23 | 2 | statistics and still don't know -- |
| 10:26:24 | 3 | THE COURT:  Overruled.  He prepared and |
| 10:26:26 | 4 | disseminated this.  He can -- he's certainly qualified to |
| 10:26:30 | 5 | talk about what he put into his PowerPoint and what he was |
| 10:26:33 | 6 | disseminating to pharmacists. |
| 10:26:34 | 7 | So overruled. |
| 10:26:38 | 8 | (In open court at 10:26 a.m.) |
| 10:26:47 | 9 | BY MR. WEINBERGER: |
| 10:26:47 | 10 | **Q**    So this slide, which is part of your presentation, is |
| 10:26:54 | 11 | entitled "Unintentional drug overdose deaths of Ohio |
| 10:27:01 | 12 | residents by specific drugs involved by year, 2000 to 2011." |
| 10:27:04 | 13 | And what this is intended to depict is that there are |
| 10:27:10 | 14 | more deaths from prescription opioids than from cocaine, |
| 10:27:13 | 15 | heroin, and marijuana combined, right? |
| 10:27:15 | 16 | **A**    Well, marijuana is not on this list, but |
| 10:27:18 | 17 | benzodiazapines. |
| 10:27:20 | 18 | **Q**    All right.  And the top line, this line here, is |
| 10:27:26 | 19 | prescription opioid deaths, right? |
| 10:27:29 | 20 | **A**    Correct. |
| 10:27:32 | 21 | **Q**    And it shows the increase, according to the Ohio |
| 10:27:37 | 22 | Department of Health, from 2000 until 2011, correct? |
| 10:27:39 | 23 | **A**    Correct. |
| 10:27:41 | 24 | **Q**    And your slide, next slide summarizes that data, |
| 10:27:46 | 25 | indicating that there was a 440 percent increase in drug |

10:27:51  1    overdose deaths from 1999 to 2011, right?

10:27:55  2    **A**    Correct.

10:28:05  3    **Q**    And if you go to page 18, this is an interesting slide

10:28:11  4    that you utilized from the CDC Policy Impact-Prescription

10:28:20  5    Painkiller Overdoses, November of 2011.

10:28:23  6         Do you recall this slide?

10:28:26  7    **A**    Yes.

10:28:26  8    **Q**    So what you were depicting here is that in our country

10:28:31  9    in 2018, there were 14,800 prescription painkiller deaths.

10:28:35  10   Right?

10:28:35  11   **A**    Yes.

10:28:35  12   **Q**    And for every one of those deaths there were 10

10:28:43  13   treatment admissions for abuse, right?

10:28:45  14   **A**    Yes.

10:28:45  15   **Q**    And for every one of those deaths there were 32

10:28:52  16   emergency department visits for misuse or abuse?

10:28:55  17   **A**    Yes.

10:28:55  18   **Q**    So if you wanted to know the total number, you would

10:28:58  19   multiply 14,800, which were deaths, times 32, and you would

10:29:03  20   get the total number of emergency room visits, right?

10:29:06  21   **A**    Right.

10:29:07  22   **Q**    And for every death there were 130 people who abuse or

10:29:16  23   are dependent, right?

10:29:18  24   **A**    Correct.

10:29:19  25   **Q**    So again, you could multiply the two, and we don't

**Edwards (Cross by Weinberger)** 5408

10:29:22  1    have the time to do that right now.

10:29:23  2        And then there were, of -- for each death, there were

10:29:31  3    825 nonmedical users, right?

10:29:34  4    **A**    Right.

10:29:34  5    **Q**    And many of those nonmedical users ended up using

10:29:42  6    because of diversion, right?

10:29:44  7    **A**    Well, I don't know.  I mean, I would -- if they were a

10:29:49  8    nonmedical user and weren't prescribed the medication, then,

10:29:52  9    yes, there was diversion.

10:29:53  10   **Q**    All right.  Now, you also, in terms of describing the

10:30:08  11   scope of the drug abuse problem in Ohio, you have this slide

10:30:11  12   that says that there's "enough pain relievers were

10:30:18  13   prescribed in Ohio in 2012 for every man, woman, and child

10:30:21  14   to receive 56.1 milligrams of the daily morphine equivalent

10:30:27  15   doses."

10:30:28  16       Correct?

10:30:28  17   **A**    Correct.

10:30:29  18   **Q**    All right.  So you then -- if you want to flip to page

10:30:37  19   33.

10:30:43  20       See that?

10:30:43  21   **A**    Yes.

10:30:43  22   **Q**    Here you describe accessing OARRS and who must access

10:30:53  23   it as of 2014, right?

10:30:55  24   **A**    Yes.

10:30:55  25   **Q**    And specifically with respect to the pharmacists,

| | | |
|---|---|---|
| 10:31:03 | 1 | under 4729-5-20, these are the instances when the |
| 10:31:08 | 2 | pharmacists were mandated as of 2011 to check OARRS, right? |
| 10:31:14 | 3 | **A**   Yes. |
| 10:31:14 | 4 | **Q**   "If there is a suspicion of overlapping therapy or |
| 10:31:19 | 5 | drug abuse," right? |
| 10:31:20 | 6 | **A**   Right. |
| 10:31:21 | 7 | **Q**   "The patient has been receiving the drug for more than |
| 10:31:24 | 8 | 12 weeks?" |
| 10:31:24 | 9 | **A**   Right. |
| 10:31:25 | 10 | **Q**   The patient -- "The prescriber is unfamiliar to the |
| 10:31:27 | 11 | pharmacist?" |
| 10:31:28 | 12 | **A**   Yes. |
| 10:31:28 | 13 | **Q**   "The patient lives outside the usual patient |
| 10:31:33 | 14 | geographic population," right? |
| 10:31:37 | 15 | **A**   Right. |
| 10:31:38 | 16 | **Q**   Those were all what were commonly known as red flags, |
| 10:31:40 | 17 | right? |
| 10:31:40 | 18 | **A**   Correct. |
| 10:31:41 | 19 | **Q**   And so these are four specific red flags that should |
| 10:31:47 | 20 | result in a pharmacist -- well, mandates that a pharmacist |
| 10:31:53 | 21 | under those circumstances check OARRS, right? |
| 10:31:56 | 22 | **A**   Correct. |
| 10:32:08 | 23 | THE COURT:  Mr. Weinberger, I'm just inquiring |
| 10:32:10 | 24 | if you're going to be much longer.  If not, I'll let you |
| 10:32:12 | 25 | continue and then take a break.  If it's going to be a |

| | | |
|---|---|---|
| 10:32:15 | 1 | while -- |
| 10:32:15 | 2 | MR. WEINBERGER:  It's a little unclear.  I |
| 10:32:19 | 3 | don't hope to be too much longer, but I think right now is a |
| 10:32:21 | 4 | good time for a break. |
| 10:32:23 | 5 | THE COURT:  All right, fine. |
| 10:32:24 | 6 | All right, ladies and gentlemen, we'll take our mid |
| 10:32:27 | 7 | morning break, 15 minutes, and then pick up with more |
| 10:32:29 | 8 | testimony from Mr. Edwards. |
| 10:33:02 | 9 | (Recess taken at 10:33 a.m.) |
| 10:47:39 | 10 | (In open court at 10:47 a.m.) |
| 10:47:40 | 11 | MR. STOFFELMAYR:  Judge, may I raise one thing |
| 10:47:41 | 12 | before the jury comes out? |
| 10:47:42 | 13 | THE COURT:  Okay. |
| 10:47:43 | 14 | MR. STOFFELMAYR:  The last few days on |
| 10:48:12 | 15 | multiple occasions Mr. Lanier or Mr. Weinberger have told |
| 10:48:14 | 16 | the jury that they have limited time.  They obviously have |
| 10:48:17 | 17 | the same amount of time as all of us put together. |
| 10:48:20 | 18 | THE COURT:  I agree.  I think everyone should |
| 10:48:23 | 19 | not make any references to time or limited time, or |
| 10:48:27 | 20 | whatever.  I agree. |
| 10:48:29 | 21 | MR. STOFFELMAYR:  Thank you. |
| 10:48:36 | 22 | MR. WEINBERGER:  Fair enough, Your Honor. |
| 10:50:36 | 23 | (The jury is present at 10:50 a.m.) |
| 10:50:37 | 24 | THE COURT:  All right.  Please be seated, |
| 10:50:38 | 25 | ladies and gentlemen. |

10:50:39    1          And Mr. Edwards, you're still under oath.

10:50:44    2          Mr. Weinberger, you may continue.

10:50:48    3               MR. WEINBERGER:  Thank you, Your Honor.

10:50:49    4   BY MR. WEINBERGER:

10:50:50    5   Q    Mr. Edwards, we're now -- we finished the first stop.

10:50:53    6   Now we're on the second stop, which is inspections.

10:50:58    7          So as I understand it from your testimony, that you

10:51:03    8   have not really done any regular inspections of pharmacies

10:51:06    9   since, well, the last three years, since about 2018?

10:51:11   10   A    Correct.

10:51:11   11   Q    And before that time, from 2008 is when you joined the

10:51:19   12   Ohio Board of Pharmacy?

10:51:20   13   A    Yes, correct.

10:51:20   14   Q    Until 2018, how many facilities in the various

10:51:26   15   territories that you covered were you responsible for doing

10:51:31   16   inspections?

10:51:31   17   A    Hundreds.

10:51:34   18   Q    Hundreds?

10:51:34   19   A    Hundreds, if not -- well, it was -- because it wasn't

10:51:37   20   just retail pharmacies.  I mean, it was anybody licensed

10:51:40   21   with us.  We inspected veterinary clinics.  We inspected

10:51:45   22   doctors' offices.  We inspected first-aid clinics.  We

10:51:50   23   inspected the K9 handler at a police department who may

10:51:56   24   have, you know, drugs for training purposes.

10:51:58   25          I mean, it -- yes, hundreds, if not even thousands

**Edwards (Cross by Weinberger)** 5412

10:52:01 1    possibly.

10:52:01 2    **Q**    So just using a little bit of data or statistical

10:52:08 3    analysis, would it be fair to say that if you inspected a

10:52:14 4    particular Walgreens or CVS or Walmart location one year, it

10:52:20 5    might take you two or three years before you got back to

10:52:24 6    that location?

10:52:24 7    **A**    It could.

10:52:25 8    **Q**    Right.  And with Mr. Pavlich I used the term "it's a

10:52:32 9    snapshot."  It's a couple-of-hour snapshot of the pharmacy

10:52:37 10   operations one time over a -- covering over a couple of

10:52:44 11   years --

10:52:44 12   **A**    Correct.

10:52:44 13   **Q**    -- with respect to each location, right?

10:52:47 14   **A**    Yes.

10:52:47 15   **Q**    And so it's not intended to be a comprehensive

10:52:52 16   repeated view from the Ohio Board of Pharmacy's standpoint

10:52:58 17   of what is actually going on in the pharmacy, right?

10:53:00 18   **A**    It's what's going on at that particular time frame

10:53:03 19   that I'm in the pharmacy.

10:53:04 20   **Q**    Right.  Now, are you aware of the fact that these

10:53:11 21   large corporations who run these pharmacies probably have

10:53:15 22   written policies --

10:53:18 23   **A**    Yes.

10:53:18 24   **Q**    -- for dispensing of controlled substances?

10:53:22 25   **A**    Yes.

| | | |
|---|---|---|
| 10:53:23 | 1 | **Q**     Your inspections do not include a review of those |
| 10:53:26 | 2 | policies, do they? |
| 10:53:27 | 3 | **A**     Correct. |
| 10:53:27 | 4 | **Q**     All right.  So let's -- so it does not include a |
| 10:53:47 | 5 | review of corporate policies, correct? |
| 10:53:49 | 6 | **A**     Correct. |
| 10:53:51 | 7 | **Q**     Okay.  I've written there "true."  Is that okay? |
| 10:53:54 | 8 | **A**     Yes. |
| 10:53:55 | 9 | **Q**     And it does not include a review of corporate training |
| 10:53:58 | 10 | of pharmacists, right? |
| 10:54:00 | 11 | **A**     Correct. |
| 10:54:00 | 12 | **Q**     And does it include a review or compilation by store |
| 10:54:16 | 13 | of the opioid pill volumes that are dispensed? |
| 10:54:19 | 14 | **A**     No. |
| 10:54:19 | 15 | **Q**     So it does not include reviewing the volume of |
| 10:54:31 | 16 | controlled substances versus noncontrolled at a particular |
| 10:54:35 | 17 | location, right? |
| 10:54:36 | 18 | **A**     No, we don't count that.  No. |
| 10:54:37 | 19 | **Q**     Do you know that to be a red flag, sir? |
| 10:54:42 | 20 | **A**     What?  Do I know what to be a red flag? |
| 10:54:47 | 21 | **Q**     If the ratio of the dispensing of controlled |
| 10:54:51 | 22 | substances is significant in relation to noncontrolled, do |
| 10:54:55 | 23 | you know that that's a red flag? |
| 10:54:56 | 24 | **A**     It could be, or it could be that the pharmacy is next |
| 10:54:59 | 25 | door to a hospital, and they see a large volume of emergency |

| | | |
|---|---|---|
| 10:55:04 | 1 | room patients or surgery patients. |
| 10:55:06 | 2 | **Q**    Right.  So -- I'm glad you made that point. |
| 10:55:13 | 3 | The whole purpose of red flags is to raise a |
| 10:55:16 | 4 | concern -- |
| 10:55:16 | 5 | **A**    Sure. |
| 10:55:17 | 6 | **Q**    -- and to then resolve that concern before the |
| 10:55:22 | 7 | prescription is dispensed, right? |
| 10:55:23 | 8 | **A**    Yes. |
| 10:55:23 | 9 | **Q**    So your inspection does not include a review of the |
| 10:55:33 | 10 | volume of opioid pills, the way it trends, either up or |
| 10:55:39 | 11 | down, with respect to a particular location, right? |
| 10:55:41 | 12 | **A**    A regular routine inspection, no, correct, that does |
| 10:55:43 | 13 | not. |
| 10:55:43 | 14 | **Q**    Your inspection does not include a review of |
| 10:55:52 | 15 | individual prescriptions for red flag resolution, right? |
| 10:55:58 | 16 | **A**    Well, I would potentially look at individual |
| 10:56:01 | 17 | prescriptions, and if I saw an issue, I would make note of |
| 10:56:05 | 18 | it.  But it doesn't -- if you mean a broad overall, like, |
| 10:56:09 | 19 | look at every single prescription, no. |
| 10:56:11 | 20 | **Q**    How about if I write here "not broad overview"? |
| 10:56:20 | 21 | **A**    Correct. |
| 10:56:20 | 22 | **Q**    Is that okay? |
| 10:56:21 | 23 | **A**    Yes.  As you said, it's a snapshot of what we look at |
| 10:56:25 | 24 | in that time period. |
| 10:56:25 | 25 | **Q**    Right. |

**Edwards (Cross by Weinberger)**

10:56:26   1          It does not -- these inspections do not check how red

10:56:30   2   flags are identified and resolved?

10:56:42   3   **A**      Can you rephrase that?  Because, I mean, we look for

10:56:45   4   red flags sometimes, but it -- I mean, we don't -- if we

10:56:52   5   notice something that is potentially problematic or a red

10:56:56   6   flag, then we would address it and we would make sure that

10:57:00   7   they resolved it.

10:57:01   8   **Q**      Right.  So I think your testimony on direct

10:57:03   9   examination was that if you would look through a file of

10:57:09  10   controlled substance prescriptions, C-IIs, it might be from

10:57:13  11   the last couple of days or a week or --

10:57:16  12   **A**      Or months.  It varied, yeah.

10:57:18  13   **Q**      Right.  And you would leaf through the hard copies of

10:57:23  14   the prescriptions, right?

10:57:24  15   **A**      Correct.

10:57:25  16   **Q**      And with respect to Walgreens, you might see a

10:57:29  17   checklist of their targeted drug good faith dispensing,

10:57:35  18   right?

10:57:36  19   **A**      Yes.

10:57:36  20   **Q**      But in terms of what a -- whether a pharmacist was

10:57:43  21   confronted at the time that the prescription was presented

10:57:48  22   with red flags --

10:57:50  23   **A**      Oh, correct.

10:57:50  24   **Q**      -- you would have no idea, would you?

10:57:55  25   **A**      Correct, no idea.

**Edwards (Cross by Weinberger)**                                5416

| | | |
|---|---|---|
| 10:57:56 | 1 | **Q**    So can we say "true" there? |
| 10:58:00 | 2 | **A**    True. |
| 10:58:01 | 3 | **Q**    And your inspection does not check for documentation |
| 10:58:06 | 4 | of red flag resolution other than this checklist, right? |
| 10:58:11 | 5 | **A**    Correct. |
| 10:58:11 | 6 | **Q**    So we'll say "other than Walgreens TD GFD."  Okay? |
| 10:58:28 | 7 | **A**    Yes.  And that's not something we would ask for, that |
| 10:58:33 | 8 | good faith dispensing policy.  Like, that's -- I mean, we |
| 10:58:36 | 9 | would look at it if it was available, but it's -- there was |
| 10:58:38 | 10 | no file of good faith dispensing checklists that we would |
| 10:58:42 | 11 | look through. |
| 10:58:43 | 12 | **Q**    All right.  Now, would you agree with me, sir, that in |
| 10:58:47 | 13 | general, if a pharmacist is confronted with a red flag and |
| 10:58:53 | 14 | resolves it, there should be documentation of that? |
| 10:58:55 | 15 | **A**    They should document it in the notes of the -- the |
| 10:58:59 | 16 | patient profile notes, or maybe handwritten on the |
| 10:59:03 | 17 | prescription. |
| 10:59:04 | 18 | **Q**    And isn't it true that you regularly advise |
| 10:59:08 | 19 | pharmacists that if you don't write it down, it didn't |
| 10:59:10 | 20 | happen? |
| 10:59:10 | 21 | **A**    That's common, yes. |
| 10:59:11 | 22 | **Q**    And that's not just, you know, a general rule of |
| 10:59:17 | 23 | thumb.  I mean, that's important for patient safety, isn't |
| 10:59:21 | 24 | it? |
| 10:59:21 | 25 | **A**    Correct. |

**Edwards (Cross by Weinberger)** 5417

| | | |
|---|---|---|
| 10:59:21 | 1 | **Q**    So that when a pharmacist is about to fill a |
| 10:59:27 | 2 | prescription for a patient who's had a prior opioid |
| 10:59:31 | 3 | prescription filled, documentation of what happened in that |
| 10:59:36 | 4 | first prescription, if there were red flags, is extremely |
| 10:59:40 | 5 | important for patient safety, isn't it? |
| 10:59:43 | 6 | **A**    Sure, yes. |
| 10:59:43 | 7 | **Q**    And it's important for public safety, isn't it? |
| 10:59:48 | 8 | **A**    Yes. |
| 10:59:48 | 9 | **Q**    Your inspections do not check for refusals to fill, |
| 10:59:54 | 10 | right? |
| 10:59:54 | 11 | **A**    No. |
| 10:59:55 | 12 | **Q**    That's true, correct? |
| 10:59:57 | 13 | **A**    That's true, correct. |
| 10:59:58 | 14 | **Q**    So you have found in your experience that OARRS is |
| 11:00:10 | 15 | really an incredible investigation tool, right? |
| 11:00:13 | 16 | **A**    Correct. |
| 11:00:13 | 17 | **Q**    And it's not only for law enforcement that it's an |
| 11:00:18 | 18 | incredible tool.  It really is an incredible tool, if used |
| 11:00:21 | 19 | properly and timely, for pharmacists, right? |
| 11:00:28 | 20 | **A**    Correct. |
| 11:00:28 | 21 | **Q**    I mean, it has been demonstrated -- strike that. |
| 11:00:33 | 22 | At the Ohio Board of Pharmacy department, it has been |
| 11:00:41 | 23 | demonstrated to you and the other field agents that the |
| 11:00:47 | 24 | timely and appropriate use of OARRS can reduce diversion, |
| 11:00:50 | 25 | correct? |

**Edwards (Cross by Weinberger)** 5418

| | | |
|---|---|---|
| 11:00:51 | 1 | **A**     Correct. |
| 11:00:51 | 2 | **Q**     And so it is an important tool to protect patient and |
| 11:00:57 | 3 | public safety, correct? |
| 11:00:58 | 4 | **A**     Correct. |
| 11:00:58 | 5 | **Q**     And OARRS went into effect in 2006, right? |
| 11:01:03 | 6 | **A**     Correct. |
| 11:01:03 | 7 | **Q**     And it started to accumulate data from both pharmacies |
| 11:01:09 | 8 | and distributors as of that time, right? |
| 11:01:13 | 9 | **A**     I don't know if distributors reported it that far |
| 11:01:17 | 10 | back, but -- I know they do now, but I don't know if they |
| 11:01:20 | 11 | did at the beginning. |
| 11:01:21 | 12 | **Q**     So let's just talk about pharmacies. |
| 11:01:23 | 13 | **A**     Sure. |
| 11:01:23 | 14 | **Q**     Pharmacies began to take their dispensing data and |
| 11:01:27 | 15 | send it to OARRS as of 2006? |
| 11:01:30 | 16 | **A**     Correct. |
| 11:01:30 | 17 | **Q**     Right? |
| 11:01:31 | 18 | And so as the information was accumulated in the OARRS |
| 11:01:39 | 19 | database, it was made available to pharmacists to check |
| 11:01:46 | 20 | within, let's say, a year of 2006, right? |
| 11:01:48 | 21 | **A**     Correct. |
| 11:01:49 | 22 | **Q**     Now, maybe it wasn't mandatory until 2011 under |
| 11:01:53 | 23 | certain circumstances, but there was certainly nothing to |
| 11:01:57 | 24 | prevent pharmacists from checking OARRS as of, let's say, |
| 11:02:02 | 25 | mid 2006 or 2007, right? |

**Edwards (Cross by Weinberger)** 5419

| | | |
|---|---|---|
| 11:02:05 | 1 | **A**    Well, only -- their own limitations within their |
| 11:02:09 | 2 | pharmacy was all that would prevent them, you know, like bad |
| 11:02:12 | 3 | Internet service or, you know, not -- the pharmacy not |
| 11:02:15 | 4 | allowing them to access outside Internet. |
| 11:02:18 | 5 | **Q**    Right.  Or not being encouraged to do it, right? |
| 11:02:20 | 6 | **A**    Or that. |
| 11:02:21 | 7 | **Q**    Right? |
| 11:02:22 | 8 |     But certainly as of October of 2011, it was mandated |
| 11:02:31 | 9 | under certain circumstances that we've discussed, right? |
| 11:02:34 | 10 | **A**    Correct, yes. |
| 11:02:34 | 11 | **Q**    Now, from your own knowledge, isn't it true that these |
| 11:02:45 | 12 | pharmacies have their own databases of prescription data? |
| 11:02:50 | 13 | **A**    Yes. |
| 11:02:50 | 14 | **Q**    And that dispensing data, in your mind, could also |
| 11:02:58 | 15 | help pharmacists identify and resolve red flags, right? |
| 11:03:02 | 16 | **A**    Sure. |
| 11:03:02 | 17 | **Q**    And you are aware of the fact, are you not, sir, that |
| 11:03:11 | 18 | the pharmacies provide their dispensing data to companies |
| 11:03:16 | 19 | who then turn around and sell the data to manufacturers? |
| 11:03:21 | 20 |         MR. DELINSKY:  Objection, Your Honor. |
| 11:03:29 | 21 |         THE COURT:  Overruled. |
| 11:03:31 | 22 | **A**    I'm aware from past dealings with a drug rep who I |
| 11:03:40 | 23 | know, who I've known since childhood, that they had access |
| 11:03:44 | 24 | to information on prescriptions that I didn't have access |
| 11:03:48 | 25 | to, but I don't -- I didn't know how they got it. |

**Edwards (Cross by Weinberger)**

| | | |
|---|---|---|
| 11:03:51 | 1 | But your assertion that they purchased it -- |
| 11:03:55 | 2 | MR. SWANSON:  Objection, Your Honor. |
| 11:03:57 | 3 | THE COURT:  Well, sustained. |
| 11:04:04 | 4 | MR. SWANSON:  Can we get that stricken? |
| 11:04:08 | 5 | THE COURT:  Well, no.  What he said was okay, |
| 11:04:10 | 6 | but he was going on to say something that I stopped. |
| 11:04:16 | 7 | BY MR. WEINBERGER: |
| 11:04:16 | 8 | **Q**    So you are aware of the fact that sales reps for |
| 11:04:19 | 9 | manufacturers of prescriptions had access to dispensing |
| 11:04:22 | 10 | data, right?  Yes? |
| 11:04:22 | 11 | **A**    I don't -- |
| 11:04:28 | 12 | Mr. SWANSON:  Objection, Your Honor. |
| 11:04:29 | 13 | THE COURT:  Well, he can answer yes or no, if |
| 11:04:31 | 14 | he was aware of it. |
| 11:04:33 | 15 | MR. DELINSKY:  Your Honor, hearsay. |
| 11:04:35 | 16 | THE COURT:  Well, overruled. |
| 11:04:36 | 17 | **A**    I was aware they had information -- |
| 11:04:38 | 18 | THE COURT:  You can just answer yes or no, |
| 11:04:40 | 19 | sir. |
| 11:04:41 | 20 | **A**    No. |
| 11:04:41 | 21 | **Q**    Okay.  Well, I got a yes and then a no, so which is |
| 11:04:48 | 22 | it? |
| 11:04:49 | 23 | **A**    The way you phrased the question, the answer is no. |
| 11:04:53 | 24 | **Q**    Did you come to learn at some point that sales reps |
| 11:04:57 | 25 | who call on doctors on behalf of manufacturers have access |

**Edwards (Cross by Weinberger)**                    5421

11:05:01   1    to prescription data?

11:05:03   2    **A**    I knew they had access to the information in terms of

11:05:09   3    what medications were being dispensed and how much, but I

11:05:12   4    don't know how specific that information was; if it was

11:05:16   5    actual dispensing data, like with patient information and

11:05:19   6    stuff like that, or was it just volume, you know, data.

11:05:23   7    **Q**    But you became aware of the fact that this information

11:05:26   8    was coming from the pharmacies, right?

11:05:27   9    **A**    Yes.  Well, no, no.  I didn't know where it came from.

11:05:31   10   **Q**    All right.  Well, who would be maintaining dispensing

11:05:35   11   data other than the pharmacies?

11:05:38   12              MR. SWANSON:  Objection, Your Honor.

11:05:39   13              MR. DELINSKY:  Objection.

11:05:43   14              THE COURT:  I'll sustain that.

11:05:45   15   **Q**    All right.  Let's move along to the last stop,

11:05:49   16   investigations.

11:05:55   17        When you were employed by the Lake County Narcotics

11:05:58   18   Agency, sir, you became involved in an investigation

11:06:04   19   involving Dr. Franklin, right?

11:06:06   20   **A**    Yes.

11:06:06   21   **Q**    And you worked -- that's Dr. Peter Franklin from

11:06:16   22   Middlefield, Ohio, in Geauga County, right?

11:06:23   23   **A**    Yes.

11:06:23   24   **Q**    And you worked on the case when you were working for

11:06:24   25   Lake County with George Pavlich and others from the Ohio

**Edwards (Cross by Weinberger)** 5422

| | | |
|---|---|---|
| 11:06:28 | 1 | Board of Pharmacy, right? |
| 11:06:28 | 2 | **A**     Correct.  I believe that case spanned both of my -- it |
| 11:06:33 | 3 | spanned my transition from one job to the next, I believe. |
| 11:06:35 | 4 | **Q**     Right.  The investigation began sometime in 2007 and |
| 11:06:40 | 5 | concluded actually in 2009, when Dr. Franklin was murdered |
| 11:06:44 | 6 | by his wife, right? |
| 11:06:44 | 7 | **A**     Correct, yes. |
| 11:06:45 | 8 | **Q**     And as part of that investigation, you executed, you |
| 11:06:58 | 9 | were the affiant, you were the person who provided an |
| 11:07:00 | 10 | affidavit -- |
| 11:07:03 | 11 | **A**     Correct. |
| 11:07:03 | 12 | **Q**     -- for a search warrant, right? |
| 11:07:04 | 13 | **A**     Correct. |
| 11:07:04 | 14 | **Q**     Okay. |
| 11:07:07 | 15 |           MR. WEINBERGER:  Plaintiffs' Exhibits P-04553. |
| 11:07:31 | 16 |           MR. SWANSON:  Your Honor, could we be heard on |
| 11:07:33 | 17 | this before it's shown? |
| 11:07:35 | 18 |           THE COURT:  Okay. |
| 11:07:40 | 19 |           (At side bar at 11:07 a.m.) |
| 11:07:50 | 20 |           MR. SWANSON:  Your Honor, I'd object.  This is |
| 11:07:54 | 21 | improper cross, it goes beyond the scope of what was |
| 11:07:56 | 22 | covered.  This is the Franklin and Overholt's investigation |
| 11:08:00 | 23 | that we didn't ask a single question about it. |
| 11:08:03 | 24 |           THE COURT:  But Pavlich was. |
| 11:08:05 | 25 |           MR. SWANSON:  Right, but I wasn't allowed to |

| | |
|---|---|
| 11:08:06 | 1 |
| 11:08:14 | 2 |
| 11:08:15 | 3 |
| 11:08:16 | 4 |
| 11:08:25 | 5 |
| 11:08:27 | 6 |
| 11:08:32 | 7 |
| 11:08:36 | 8 |
| 11:08:41 | 9 |
| 11:08:47 | 10 |
| 11:08:49 | 11 |
| 11:08:53 | 12 |
| 11:08:54 | 13 |
| 11:08:58 | 14 |
| 11:08:59 | 15 |
| 11:09:01 | 16 |
| 11:09:02 | 17 |
| 11:09:06 | 18 |
| 11:09:08 | 19 |
| 11:09:11 | 20 |
| 11:09:13 | 21 |
| 11:09:14 | 22 |
| 11:09:18 | 23 |
| 11:09:20 | 24 |
| 11:09:22 | 25 |

1  use this document with Mr. Pavlich, who actually wrote it.

2         MR. WEINBERGER:  Your Honor, he's one of the

3  affiants --

4         THE COURT:  Well, if that's -- hold it.  I

5  don't recall exactly how you sought to use it with Pavlich.

6  I would have allowed testimony on the investigation of

7  Dr. Franklin.  The jury's heard plenty of that.

8      So I don't recall, Mr. Swanson, that I prohibited you

9  from using this document with Mr. Pavlich.

10         MR. SWANSON:  Okay.  Well, I wanted to make

11  you aware of our objection.

12         THE COURT:  We'll see what the questions are

13  going to be.

14         MR. DELINSKY:  Your Honor, I believe, if my

15  recollection serves me right, it was used to be able to

16  refresh recollection, but it was not displayed to the jury,

17  it was not allowed to be entered into evidence.

18         THE COURT:  Mr. Weinberger, where are you

19  going with this and what questions are you going to ask him?

20         MR. WEINBERGER:  Your Honor, he is one of

21  three affiants on the search warrant.

22         THE COURT:  I understand that, but there's a

23  lot of hearsay in here, and everyone knows that Franklin was

24  investigated and prosecuted.

25         MR. WEINBERGER:  So the search warrant

**Edwards (Cross by Weinberger)**                                    5424

11:09:27  1    affidavit talks about the fact that OARRS was checked, that

11:09:30  2    they came up with a number of patients who --

11:09:36  3                     THE COURT:  Who checked OARRS?

11:09:39  4                     MR. WEINBERGER:  The affiant checked OARRS.

11:09:42  5                     THE COURT:  But the point, you can just ask

11:09:44  6    him that.  You're trying to bring out that they used OARRS

11:09:47  7    to investigate Franklin?  That's fair.  You can ask him

11:09:51  8    that.

11:09:51  9                     MR. WEINBERGER:  And so look specifically at

11:09:55  10   page 27 of this exhibit, Your Honor, so you know exactly

11:09:59  11   where I'm heading.

11:10:03  12       At the bottom of the page it says, "The following top

11:10:09  13   five pharmacies in Ohio were documented to have dispensed

11:10:13  14   the majority of prescriptions."  And you go on to the next

11:10:16  15   page, it lists Overholt's, Revco, CVS, and Walgreens.

11:10:25  16       And so it's my intent to ask about that, and it's my

11:10:29  17   intent to ask whether or not they pulled the prescriptions

11:10:32  18   from Walgreens and CVS as part of the investigation, and

11:10:38  19   whether or not they identified red flags associated with

11:10:42  20   that as part of their investigation.

11:10:45  21                     MR. SWANSON:  Your Honor, it shows every

11:10:47  22   Walgreens in the State of Ohio, so we object on the scope of

11:10:50  23   that.

11:10:51  24                     MR. WEINBERGER:  Well, Your Honor, if I'm not

11:10:53  25   allowed to ask this question --

**Edwards (Cross by Weinberger)**                                5425

11:10:54   1            THE COURT:  Well, hold it.

11:10:56   2            MR. WEINBERGER:  If I'm not allowed to pursue

11:10:59   3   this line, then the entire evidence that they've put in

11:11:05   4   about -- and this was an investigation that included

11:11:09   5   Overholt's -- that involves Overholt's and Franklin should

11:11:12   6   be stricken from the record.

11:11:18   7            MR. SWANSON:  Your Honor, I don't even

11:11:19   8   understand that.

11:11:20   9            THE COURT:  I don't understand that, and I

11:11:21  10   don't -- I mean, all right, this is -- I mean, hold it.

11:11:31  11       Why is it relevant that Walgreens dispenses 5 percent

11:11:36  12   of the prescriptions throughout the state of Ohio?  I mean,

11:11:42  13   it's probably true, but what relevance is that?

11:11:45  14            MR. WEINBERGER:  But these are prescriptions

11:11:46  15   written by Dr. Franklin.

11:11:50  16            THE COURT:  I don't know what it is.  I can't

11:11:52  17   tell what it is.  It doesn't say that.  Where does it say

11:11:57  18   that?

11:11:57  19            MR. WEINBERGER:  Your Honor, look at the

11:11:58  20   paragraph immediately before what I read to you.  They

11:12:03  21   prepared the electronic data reference Dr. Franklin

11:12:08  22   controlled drug prescriptions.  The chart documented the

11:12:11  23   number of prescriptions and who dispensed them.

11:12:19  24            MR. LANIER:  Your Honor, for the record, I

11:12:22  25   pulled up the testimony where Pavlich went through this, and

| | |
|---|---|
| 11:12:29 | 1 |

1    an affidavit was asked by Mr. Swanson of Pavlich.  He showed

2    him the affidavit.

3         He asked him:  Looking through the prescriptions, did

4    you see any prescriptions that stated that the prescription

5    should be filled only at Overholt's?

6         Mr. Weinberger objected, you overruled.

7         The witness said:  I did.

8         Question:  Was it on one prescription or many?

9         I don't recall how many, but I saw numerous.

10        Was that suspicious?

11        Yes, it was.

12        As part of your investigation in Franklin and

13   Overholt's, did you retain medical experts?

14        And he goes on and on and on.

15        The point is, yes, he elicited that testimony about

16   what was done over at Overholt's, but the investigation also

17   revealed information that showed prescriptions being filled

18   at Walgreens.

19             THE COURT:  All right.  Well, look, I will

20   allow you to ask this witness if, in addition to

21   investigating prescriptions that Franklin wrote at

22   Overholt's, did he investigate prescriptions Franklin wrote

23   and were filled at other pharmacies, Rite Aid, Revco,

24   Newberry, Walgreens, Walmart, CVS, whatever; see what he

25   says.  All right?

11:13:38  1          You can ask him if that was part of his investigation,

11:13:40  2    and if he says yes, fine.  You can bring out if he says no,

11:13:46  3    you can ask him why not, and see what he says.  It's part of

11:13:51  4    his investigation.

11:13:53  5                MS. FUMERTON:  So, Your Honor, my request

11:13:54  6    would be though that Mr. Weinberger not ask the question in

11:13:57  7    the aggregate.  Obviously Walmart's not listed here.

11:13:59  8                THE COURT:  I agree, it should be specific,

11:14:02  9    all right?  I mean, he looked at Overholt's, we know that.

11:14:07  10               MR. WEINBERGER:  Your Honor, I'm sorry, I'm

11:14:08  11   having trouble following this.

11:14:10  12         This is a document prepared by this witness.  I'm

11:14:15  13   cross-examining the witness.  I don't understand -- I don't

11:14:19  14   need to have his memory refreshed.  I don't need to -- I'm

11:14:23  15   not using it for impeachment.

11:14:26  16               THE COURT:  You can ask him if he investigated

11:14:27  17   any other pharmacies.  If he says no, you can say, well,

11:14:30  18   here's your document.  You know, did you look at any of the

11:14:35  19   other pharmacies where Overholt's -- where Franklin's

11:14:41  20   prescriptions were filled.  You can ask him if he

11:14:42  21   investigated any other pharmacies, and specifically Rite

11:14:45  22   Aid, CVS, Walgreens, whatever.  If he says yes, you can

11:14:51  23   elaborate.  If he says no, you can ask him, well, why not.

11:14:54  24         If you want to impeach him that he didn't do a

11:14:57  25   thorough investigation, that's fine, you can.  It's in here,

| | | |
|---|---|---|
| 11:15:00 | 1 | so you can ask him whether he -- whether as part of his |
| 11:15:04 | 2 | investigation of Overholt's and Franklin he looked at |
| 11:15:07 | 3 | Franklin and any other pharmacy.  That's fine, I'll allow |
| 11:15:13 | 4 | that. |
| 11:15:16 | 5 | (In open court at 11:15 a.m.) |
| 11:15:30 | 6 | BY MR. WEINBERGER: |
| 11:15:30 | 7 | **Q**    Agent Edwards, as part of your investigation that you |
| 11:15:34 | 8 | participated in with respect to Dr. Franklin, did it also |
| 11:15:38 | 9 | include the Overholt's in Trumbull County? |
| 11:15:42 | 10 | **A**    Yes. |
| 11:15:42 | 11 | **Q**    Did your investigation also include pulling |
| 11:15:46 | 12 | prescriptions written by Dr. Franklin from Walgreens and |
| 11:15:49 | 13 | from CVS? |
| 11:15:50 | 14 | **A**    I don't recall the details of -- I recall that it was |
| 11:15:56 | 15 | George Pavlich's case with the Board of Pharmacy and I |
| 11:15:59 | 16 | assisted, but I don't recall the specific things that I did. |
| 11:16:04 | 17 | **Q**    Right.  Just without putting it on the screen, I'm |
| 11:16:07 | 18 | going to ask you to look at this exhibit, Plaintiffs' |
| 11:16:15 | 19 | Exhibit 04553, page 5. |
| 11:16:26 | 20 | Do you have that in front of you? |
| 11:16:28 | 21 | **A**    The first page of the affidavit? |
| 11:16:29 | 22 | **Q**    Yes. |
| 11:16:30 | 23 | **A**    Yes. |
| 11:16:30 | 24 | **Q**    That is an affidavit for a search warrant, right? |
| 11:16:31 | 25 | **A**    Correct. |

| | | |
|---|---|---|
| 11:16:32 | 1 | **Q**    And you are identified as one of the people who is |
| 11:16:39 | 2 | executing or who is signing this search warrant, correct? |
| 11:16:43 | 3 | **A**    Correct. |
| 11:16:43 | 4 | **Q**    And it even on page 7 describes you as Affiant Special |
| 11:17:01 | 5 | Agent Trey Edwards and talks about your experience as a law |
| 11:17:06 | 6 | enforcement investigator, as a pharmacy investigator for the |
| 11:17:09 | 7 | Lake County Narcotics Agency.  Correct? |
| 11:17:12 | 8 | **A**    Yes. |
| 11:17:12 | 9 | **Q**    And it talks about how you've conducted 75 -- "this |
| 11:17:20 | 10 | investigator has conducted over 800 investigations involving |
| 11:17:25 | 11 | illegal diversion of prescription drugs," right? |
| 11:17:29 | 12 | **A**    Correct. |
| 11:17:30 | 13 | **Q**    And going to page 9, second paragraph from the bottom, |
| 11:17:46 | 14 | it discusses the fact that "One year electronic OARRS review |
| 11:17:52 | 15 | of prescribing data from Dr. Franklin was obtained," |
| 11:17:56 | 16 | correct? |
| 11:17:57 | 17 | **A**    Correct. |
| 11:17:57 | 18 | **Q**    And going to page 27.  The second-to-last paragraph |
| 11:18:19 | 19 | talks about that "Electronic data" -- "Known electronic data |
| 11:18:26 | 20 | reference Dr. Franklin's controlled drug prescriptions |
| 11:18:30 | 21 | dispensed in Ohio during the period of April 2006 until June |
| 11:18:36 | 22 | of 2008, right? |
| 11:18:37 | 23 | **A**    Yeah, I'm not -- I'm not seeing that on -- you said |
| 11:18:40 | 24 | page 27? |
| 11:18:40 | 25 | **Q**    Page 27, about a third of the way down -- two-thirds |

11:18:45  1    of the way down.

11:18:47  2        "This agent was assisted by Specialist Mandi in

11:18:52  3    preparing the known," do you see that?

11:18:55  4    **A**    Yes.

11:18:55  5    **Q**    In preparing the known --

11:18:56  6              MR. WEINBERGER:  May I show this on the

11:18:58  7    screen, Your Honor?

11:18:59  8              MR. DELINSKY:  Objection.

11:19:00  9        Your Honor, may we go on the headset?

11:19:05  10             MR. WEINBERGER:  Your Honor, I'm going to

11:19:06  11   withdraw the question.

11:19:08  12             THE COURT:  You can ask the first question

11:19:10  13   again if you want, if this refreshes his recollection.

11:19:15  14             MR. WEINBERGER:  All right.

11:19:16  15   BY MR. WEINBERGER:

11:19:16  16   **Q**    Having now read this, do you recall that the

11:19:19  17   electronic data referencing Dr. Franklin's prescriptions

11:19:24  18   dispensed was prepared for that two-year period of time?

11:19:29  19   **A**    No, this was George Pavlich's report.  This is not --

11:19:32  20   when it says "this agent," that is not me.  That was George

11:19:36  21   Pavlich.

11:19:36  22   **Q**    Right.  But if you look at the very last page of this

11:19:40  23   document, page 40, 41, you're one of the people that signed

11:19:49  24   off on this search warrant, right?

11:19:51  25   **A**    Correct, yes.

**Edwards (Cross by Weinberger)**

| | | |
|---|---|---|
| 11:19:52 | 1 | **Q**     So you were as an affiant submitting an affidavit, you |
| 11:19:58 | 2 | were attesting to the truth of this search warrant, right? |
| 11:20:00 | 3 | **A**     Correct, yes.  You're asking if I recall this, so I |
| 11:20:04 | 4 | don't -- I don't recall. |
| 11:20:06 | 5 | **Q**     Right.  So but to be clear, you signed off on this |
| 11:20:09 | 6 | affidavit attesting to its truth, right? |
| 11:20:11 | 7 | **A**     Correct. |
| 11:20:11 | 8 | **Q**     And so going back to page 27 -- |
| 11:20:18 | 9 | MR. DELINSKY:  Objection, Your Honor. |
| 11:20:19 | 10 | Headset, please. |
| 11:20:24 | 11 | (At side bar at 11:20 a.m.) |
| 11:20:45 | 12 | MR. DELINSKY:  Your Honor, the witness |
| 11:20:46 | 13 | testified that he doesn't remember it. |
| 11:20:50 | 14 | THE COURT:  All right.  So Mr. Weinberger can |
| 11:20:52 | 15 | ask him questions specifically about whether they |
| 11:20:58 | 16 | investigated any other pharmacies that filled Franklin's |
| 11:21:06 | 17 | prescriptions.  It's in the affidavit.  The man swore to it. |
| 11:21:09 | 18 | If he says no, he doesn't recall even with this, then that's |
| 11:21:11 | 19 | the end of it. |
| 11:21:13 | 20 | MR. SWANSON:  Your Honor, to be clear, I think |
| 11:21:14 | 21 | what he just testified to is that he swore to questions that |
| 11:21:19 | 22 | he's responsible for. |
| 11:21:21 | 23 | THE COURT:  It doesn't work that way, |
| 11:21:23 | 24 | Mr. Swanson.  I'm a judge.  Someone swears in front of me, |
| 11:21:26 | 25 | they don't swear in a limited way. |

**Edwards (Cross by Weinberger)**                    5432

| | | |
|---|---|---|
| 11:21:28 | 1 | MR. SWANSON:  This isn't signed either. |
| 11:21:35 | 2 | THE COURT:  Well, I agree, this doesn't -- I |
| 11:21:38 | 3 | mean, it's an un- -- it isn't even signed by the judge, so I |
| 11:21:47 | 4 | don't know if this was -- |
| 11:21:47 | 5 | MR. WEINBERGER:  Your Honor, this document was |
| 11:21:49 | 6 | produced in discovery by Trumbull County, and has been in |
| 11:21:57 | 7 | the defendants' possession. |
| 11:22:01 | 8 | MR. SWANSON:  That's true. |
| 11:22:01 | 9 | THE COURT:  Well, you can -- Mr. Weinberger, |
| 11:22:03 | 10 | you better ask him again.  This document is unsigned, all |
| 11:22:09 | 11 | right?  You better ask him.  If he acknowledges signing it, |
| 11:22:13 | 12 | all right, then you can ask him specifically.  And you |
| 11:22:18 | 13 | should ask him specifically about the investigation, whether |
| 11:22:21 | 14 | they looked into it or not. |
| 11:22:23 | 15 | MR. WEINBERGER:  He already testified, Your |
| 11:22:24 | 16 | Honor, that he signed off on the affidavit attesting to its |
| 11:22:27 | 17 | truth. |
| 11:22:29 | 18 | THE COURT:  Well, ask him about his |
| 11:22:31 | 19 | investigation, what they looked at, if they did or they |
| 11:22:35 | 20 | didn't.  Maybe they didn't look into anyone else other than |
| 11:22:38 | 21 | Overholt's.  That's probably going to be his answer. |
| 11:22:42 | 22 | MR. SWANSON:  Your Honor, I was only allowed |
| 11:22:46 | 23 | to use this to refresh Mr. Pavlich's recollection.  That was |
| 11:22:50 | 24 | all I -- |
| 11:22:51 | 25 | THE COURT:  I've asked Mr. Weinberger to ask |

| | | |
|---|---|---|
| 11:22:53 | 1 | him the specific question that he's trying to get at, which |
| 11:22:56 | 2 | is whether he and Pavlich investigated Franklin's |
| 11:23:01 | 3 | prescriptions that were filled anywhere else besides |
| 11:23:04 | 4 | Overholt's.  Either they did or they didn't.  I have no idea |
| 11:23:07 | 5 | if they did or they didn't. |
| 11:23:09 | 6 | MR. WEINBERGER:  The affidavit says they did. |
| 11:23:10 | 7 | THE COURT:  Not really.  The affidavit just |
| 11:23:12 | 8 | cites that they -- you know, where the prescriptions were |
| 11:23:15 | 9 | filled.  It doesn't say they looked at it at all. |
| 11:23:18 | 10 | MR. WEINBERGER:  Okay.  I got it.  Thank you. |
| 11:23:23 | 11 | (In open court at 11:23 a.m.) |
| 11:23:36 | 12 | BY MR. WEINBERGER: |
| 11:23:38 | 13 | Q    Agent Edwards, as part of your investigation of |
| 11:23:40 | 14 | Dr. Franklin and the Overholt's, did you also investigate |
| 11:23:46 | 15 | prescriptions filled at Walgreens or CVS that were |
| 11:23:52 | 16 | Dr. Franklin's prescriptions? |
| 11:23:53 | 17 | A    I don't recall which prescriptions I pulled or |
| 11:23:56 | 18 | accessed, but most likely. |
| 11:23:58 | 19 | Q    Most likely you did? |
| 11:24:00 | 20 | A    Most likely I did.  I don't recall -- I mean, he |
| 11:24:04 | 21 | dispensed a ton -- he wrote a ton of prescriptions.  I don't |
| 11:24:07 | 22 | recall which specific pharmacies we got those prescriptions |
| 11:24:10 | 23 | from. |
| 11:24:10 | 24 | Q    Well, did you learn as part of your investigation, if |
| 11:24:15 | 25 | you go on to the next page, page 28 -- |

| | | |
|---|---|---|
| 11:24:18 | 1 | MR. DELINSKY:  Objection, Your Honor. |
| 11:24:18 | 2 | THE COURT:  Overruled. |
| 11:24:19 | 3 | **Q**     -- that there were 1418 Dr. Franklin prescriptions |
| 11:24:30 | 4 | that were dispensed at CVS? |
| 11:24:33 | 5 | MR. DELINSKY:  Objection, Your Honor. |
| 11:24:34 | 6 | MR. SWANSON:  Objection, Your Honor. |
| 11:24:34 | 7 | THE COURT:  Overruled. |
| 11:24:35 | 8 | **A**     I see that, yes. |
| 11:24:36 | 9 | **Q**     And there were 780 Dr. Franklin prescriptions filled |
| 11:24:41 | 10 | at a Walgreens, right? |
| 11:24:43 | 11 | **A**     Yes. |
| 11:24:43 | 12 | **Q**     So my question is, did you go to Walgreens in Trumbull |
| 11:24:49 | 13 | County or elsewhere, or CVS in Trumbull County or elsewhere, |
| 11:24:53 | 14 | and ask for those prescriptions? |
| 11:24:54 | 15 | **A**     I don't recall if I did that or if another agent |
| 11:24:57 | 16 | involved in this investigation did that.  It could have been |
| 11:24:59 | 17 | the Board of Pharmacy that pulled those prescriptions.  I |
| 11:25:06 | 18 | don't recall. |
| 11:25:06 | 19 | **Q**     And finally, sir, you were shown this document. |
| 11:25:13 | 20 | **A**     Yes. |
| 11:25:14 | 21 | **Q**     Defendants' Exhibit 12782, regarding an educational |
| 11:25:23 | 22 | program from the Lake County Narcotics Agency that involved |
| 11:25:28 | 23 | a speaker from Purdue. |
| 11:25:31 | 24 | Do you recall that? |
| 11:25:31 | 25 | **A**     Yes. |

**Edwards (Cross by Weinberger)** 5435

| | | |
|---|---|---|
| 11:25:32 | 1 | **Q**    And you are at least aware today, perhaps not back |
| 11:25:40 | 2 | then, that Purdue was involved in heavily marketing the drug |
| 11:25:47 | 3 | OxyContin, correct? |
| 11:25:50 | 4 | **A**    Right, yes. |
| 11:25:50 | 5 | **Q**    And they used sales reps to call on physicians as part |
| 11:25:54 | 6 | of that marketing, correct? |
| 11:25:55 | 7 | **A**    I'm aware of that today, correct. |
| 11:25:56 | 8 | **Q**    Right.  And but you weren't aware of that in 2005? |
| 11:26:01 | 9 | **A**    Correct. |
| 11:26:01 | 10 | **Q**    And you're aware of the fact that some of the |
| 11:26:04 | 11 | marketing included misrepresentations regarding the |
| 11:26:10 | 12 | addictive nature of OxyContin, correct? |
| 11:26:12 | 13 | **A**    Correct, yes. |
| 11:26:13 | 14 | **Q**    But you didn't know that back then in 2005, right? |
| 11:26:15 | 15 | **A**    Correct. |
| 11:26:16 | 16 | **Q**    Are you aware of the fact now that Purdue's marketing |
| 11:26:20 | 17 | program involved more than just having their sales reps call |
| 11:26:25 | 18 | on doctors? |
| 11:26:26 | 19 | **A**    Yes. |
| 11:26:26 | 20 | **Q**    It was very broad-ranged, wasn't it? |
| 11:26:31 | 21 | **A**    Yes. |
| 11:26:31 | 22 | **Q**    It involved employing speakers to go out and talk |
| 11:26:37 | 23 | about the drug, right? |
| 11:26:38 | 24 | **A**    Yes. |
| 11:26:39 | 25 | **Q**    It involved providing money to front groups to talk |

| | | |
|---|---|---|
| 11:26:45 | 1 | about the drug, right? |
| 11:26:46 | 2 | **A**    What do you mean by front groups? |
| 11:26:47 | 3 | **Q**    Third-party organizations that they supported to |
| 11:26:54 | 4 | publish information about OxyContin.  You're aware of that, |
| 11:26:58 | 5 | right? |
| 11:26:58 | 6 | **A**    Sure, sure, yes. |
| 11:26:59 | 7 | **Q**    And so as I understand it, you were at a program where |
| 11:27:05 | 8 | somebody from Purdue indicated to you that they were |
| 11:27:12 | 9 | prepared to send a speaker out to assist you in an |
| 11:27:18 | 10 | educational program, right? |
| 11:27:19 | 11 | **A**    Correct. |
| 11:27:19 | 12 | **Q**    And as you look back on that now, part of their |
| 11:27:24 | 13 | marketing program, right? |
| 11:27:25 | 14 | **A**    Yes. |
| 11:27:29 | 15 | MR. WEINBERGER:  Thank you, Your Honor.  Pass |
| 11:27:30 | 16 | the witness. |
| 11:27:31 | 17 | THE COURT:  Okay.  We'll see if any jurors |
| 11:27:36 | 18 | have any questions before Mr. Swanson gets up. |
| 11:27:40 | 19 | MR. DELINSKY:  Your Honor, while we're waiting |
| 11:27:41 | 20 | for those, could we go on the headset briefly? |
| 11:27:45 | 21 | THE COURT:  Okay. |
| 11:27:46 | 22 | (At side bar at 11:27 a.m.) |
| 11:28:08 | 23 | MR. DELINSKY:  Your Honor, when Agent Edwards |
| 11:28:23 | 24 | was asked about the specific number of fills that appear in |
| 11:28:27 | 25 | the affidavit, his answer was, "I see that."  He was reading |

**Edwards (Redirect by Swanson)**

5437

| | | |
|---|---|---|
| 11:28:33 | 1 | off the document, and that's -- he did not indicate he had |
| 11:28:36 | 2 | any independent recollection.  And I asked that -- |
| 11:28:39 | 3 | THE COURT:  But he swore to it, Mr. Delinsky, |
| 11:28:40 | 4 | okay?  He swore to it.  The whole point was whether he |
| 11:28:44 | 5 | investigated it, and then he said, I don't know if we did. |
| 11:28:47 | 6 | So that ended it.  The point is he swore to this, so -- |
| 11:28:51 | 7 | MR. DELINSKY:  I request that the testimony be |
| 11:28:54 | 8 | stricken, Your Honor. |
| 11:28:55 | 9 | THE COURT:  Overruled. |
| 11:28:56 | 10 | MR. SWANSON:  Your Honor, just so it's clear, |
| 11:28:59 | 11 | Mr. Weinberger was able to use this document.  I do intend |
| 11:29:02 | 12 | to get into other details of the investigation -- |
| 11:29:03 | 13 | THE COURT:  That's fine.  You can do that. |
| 11:29:06 | 14 | MR. SWANSON:  -- including what I did with |
| 11:29:08 | 15 | Mr. Pavlich.  Thank you. |
| 11:29:09 | 16 | THE COURT:  You can get into the details of |
| 11:29:10 | 17 | what he did and what he didn't investigate, sure. |
| 11:29:13 | 18 | MR. SWANSON:  Thank you. |
| 11:29:14 | 19 | (In open court at 11:29 a.m.) |
| 11:30:59 | 20 | (Juror question review.) |
| 11:32:06 | 21 | - - - - - |
| 11:32:06 | 22 | REDIRECT EXAMINATION |
| 11:32:08 | 23 | BY MR. SWANSON: |
| 11:32:08 | 24 | **Q**   Okay.  Agent Edwards, the jury has the opportunity to |
| 11:32:11 | 25 | ask some questions and write them down, so I'm going to go |

11:32:14  1   through those with you in a moment to see if you have

11:32:17  2   answers.

11:32:17  3   **A**     Okay.

11:32:18  4   **Q**     But before we get to that, I wanted to just pick up

11:32:21  5   where you left off with Mr. Weinberger, talking about your

11:32:25  6   investigation into Dr. Franklin and Overholt's Pharmacy.

11:32:32  7         Do you recall that?

11:32:33  8   **A**     Yes.

11:32:33  9   **Q**     Just that topic generally.

11:32:35  10        And he gave you, to refresh your memory, a search

11:32:41  11  warrant that you had been a part of; is that right?

11:32:43  12  **A**     Correct.

11:32:43  13  **Q**     Okay.  I have some more specific questions about that

11:32:47  14  investigation.

11:32:49  15        If you could turn, please, to page 16.

11:33:02  16  **A**     Okay.

11:33:02  17  **Q**     And look at the very bottom paragraph.

11:33:09  18        Do you recall as part of that investigation learning

11:33:13  19  that the prescriptions that Dr. Franklin was writing, he was

11:33:18  20  writing on the bottom of some of those "Fill only at

11:33:23  21  Overholt's Pharmacy Champion"?  Do you recall that?

11:33:27  22  **A**     I don't recall that that was written on the

11:33:29  23  prescriptions, but I do recall that the vast -- you know,

11:33:31  24  the majority of prescriptions were filled there.

11:33:33  25  **Q**     Okay.  And looking at this document, does that refresh

**Edwards (Redirect by Swanson)**

| | | |
|---|---|---|
| 11:33:35 | 1 | your recollection that some of them were filled there |
| 11:33:37 | 2 | because that's what Dr. Franklin was ordering? |
| 11:33:40 | 3 | **A**    Yes. |
| 11:33:40 | 4 | **Q**    Now, as part of this investigation, did you come to |
| 11:33:46 | 5 | the conclusion that every patient who was going to see |
| 11:33:50 | 6 | Dr. Franklin was a pill seeker? |
| 11:33:52 | 7 | **A**    No. |
| 11:33:56 | 8 | **Q**    Were some of the patients who went to see Dr. Franklin |
| 11:34:00 | 9 | legitimate patients with legitimate need? |
| 11:34:01 | 10 | **A**    I believe so. |
| 11:34:02 | 11 | **Q**    Now, as part -- if you can turn then to page I believe |
| 11:34:05 | 12 | it was 27.  And Mr. Weinberger had asked you about if you |
| 11:34:22 | 13 | recalled if you'd looked at any prescriptions that had been |
| 11:34:24 | 14 | filled at Walgreens. |
| 11:34:25 | 15 |     Do you remember that? |
| 11:34:26 | 16 | **A**    Yes. |
| 11:34:26 | 17 | **Q**    Do you recall that when you ran the OARRS report to |
| 11:34:32 | 18 | obtain that data you looked at every single Walgreens in the |
| 11:34:36 | 19 | state of Ohio? |
| 11:34:37 | 20 | **A**    I did not do that.  That would have been Agent Pavlich |
| 11:34:41 | 21 | that conducted that search. |
| 11:34:41 | 22 | **Q**    But looking at this document, does that refresh you |
| 11:34:45 | 23 | that his search was of all Walgreens pharmacies in Ohio? |
| 11:34:49 | 24 | **A**    Yes. |
| 11:34:49 | 25 | **Q**    And did he find that in all the Walgreens pharmacies |

| | | |
|---|---|---|
| 11:34:55 | 1 | in Ohio, only 5 percent of the scripts you looked at had |
| 11:34:58 | 2 | been filled in those stores? |
| 11:35:00 | 3 | **A**   Correct. |
| 11:35:00 | 4 | **Q**   And that's compared to 50 percent that had been filled |
| 11:35:04 | 5 | at the Overholt's Pharmacy? |
| 11:35:06 | 6 | **A**   Yes. |
| 11:35:06 | 7 | **Q**   One single pharmacy? |
| 11:35:07 | 8 | **A**   Yes. |
| 11:35:07 | 9 | **Q**   Do you know how many Walgreens pharmacies there are in |
| 11:35:10 | 10 | the state of Ohio? |
| 11:35:10 | 11 | **A**   No. |
| 11:35:11 | 12 | **Q**   Do you know if the patients who filled their |
| 11:35:14 | 13 | prescriptions at Walgreens from Dr. Franklin in Ohio were |
| 11:35:18 | 14 | legitimate patients or illegitimate patients? |
| 11:35:20 | 15 | **A**   I don't know. |
| 11:35:21 | 16 | **Q**   Do you recall as part of your investigation talking to |
| 11:35:31 | 17 | Mr. Stossel at Walgreens? |
| 11:35:35 | 18 | **A**   I don't know.  I have talked to Mr. Stossel many |
| 11:35:37 | 19 | times.  I don't recall specific conversations related to |
| 11:35:41 | 20 | this investigation. |
| 11:35:44 | 21 | **Q**   Can you flip to page 31 of the document, please. |
| 11:35:48 | 22 | **A**   Yes. |
| 11:35:49 | 23 | **Q**   Do you see the very last paragraph there? |
| 11:35:52 | 24 | **A**   Yes. |
| 11:35:52 | 25 | **Q**   Does that refresh your recollection that as part of |

**Edwards (Redirect by Swanson)** 5441

| | | |
|---|---|---|
| 11:35:55 | 1 | your investigation you went and you met with Dr. Stossel -- |
| 11:36:00 | 2 | or, excuse me, with Mr. Stossel at Walgreens? |
| 11:36:02 | 3 | **A**   I believe that would have been George Pavlich met |
| 11:36:05 | 4 | with -- |
| 11:36:05 | 5 | **Q**   Okay.  So you don't recall meeting with -- |
| 11:36:07 | 6 | **A**   I do not. |
| 11:36:08 | 7 | **Q**   But you recall that Mr. Pavlich did? |
| 11:36:10 | 8 | **A**   Yes.  I mean, this is his report, and it's -- when he |
| 11:36:12 | 9 | refers in the first person, he was referring to himself. |
| 11:36:17 | 10 | **Q**   Got it.  Okay. |
| 11:36:18 | 11 |     I think those are the questions that I have on that. |
| 11:36:20 | 12 | Let's move over to the jury questions. |
| 11:36:33 | 13 |     Okay.  Question -- and I'll just read it.  You can |
| 11:36:38 | 14 | read it to yourself, but I'll read it into the record. |
| 11:36:40 | 15 |     "Can you recall if citations were issued to any of the |
| 11:36:44 | 16 | defendants?  If so, was that citation mainly pharmacist |
| 11:36:50 | 17 | error/mistake or something due to that company policy?" |
| 11:36:54 | 18 | **A**   I don't recall specific citations.  I'm certain -- I'm |
| 11:37:02 | 19 | pretty certain the majority of our citations are individual |
| 11:37:07 | 20 | citations, like individual pharmacists.  I don't recall |
| 11:37:10 | 21 | citations that were issued to a specific chain or, you know, |
| 11:37:17 | 22 | a whole chain.  It's usually -- our citations are almost |
| 11:37:22 | 23 | exclusively involving one pharmacist or a particular store. |
| 11:37:25 | 24 | I don't recall a wholesale citation against one particular |
| 11:37:31 | 25 | chain. |

11:37:31  1    **Q**     And when you use that term "citation," what are you

11:37:35  2    referring to?

11:37:35  3    **A**     That's the next step after a written warning.  A

11:37:40  4    citation would be we complete a report.  If we find that the

11:37:44  5    issue is egregious enough that the Board might want to have

11:37:48  6    further conversations about this issue, so we present it to

11:37:53  7    the Board -- or to the Board for a cite review.  They review

11:37:58  8    it and decide whether or not they want to have a hearing or

11:38:02  9    not.

11:38:02  10   **Q**     And do you recall any citations being issued to

11:38:04  11   Walgreens?

11:38:05  12   **A**     No.  To Walgreens Corporation?

11:38:08  13   **Q**     Correct.

11:38:09  14   **A**     No.

11:38:09  15   **Q**     Any citations being issued to CVS Corporation?

11:38:13  16   **A**     No.

11:38:13  17   **Q**     Any citations being issued to Walmart?

11:38:15  18   **A**     Not that I recall.  Not that I was personally involved

11:38:17  19   in.

11:38:17  20   **Q**     Okay.  "Is there a report that shows the pharmacies

11:38:31  21   who do not comply with running OARRS?"

11:38:35  22   **A**     So OARRS -- the way OARRS operates, you can get

11:38:37  23   information out, but there's no report or, like, red flag

11:38:41  24   that would tell you a certain pharmacy is not running OARRS.

11:38:45  25   You would have to go in and check that specific pharmacist

11:38:48  1    or that specific store to see if they're running it.

11:38:52  2         So it tracks -- it tracks the OARRS reports that are

11:38:56  3    run individually by the pharmacists.  It does not track how

11:39:02  4    many reports are being run at a given store.  So you would

11:39:04  5    have to know where the pharmacist was working on given days

11:39:08  6    in order to, you know, figure that out.

11:39:12  7    Q    Okay.  Moving along here.  Two questions here.

11:39:21  8         "Do you think having accrued dispensing data to review

11:39:26  9    volume of C-IIs filled by pharmacies would have helped you

11:39:30  10   in your role of monitoring or auditing pharmacies?  Why or

11:39:36  11   why not?  And is this information given to someone else at

11:39:41  12   the Board of Pharmacy, and, if so, who?"

11:39:43  13        So let's start with that first one.

11:39:45  14   A    Sure.  I think it definitely would be helpful.  It's

11:39:50  15   something that can be accessed through OARRS and is accessed

11:39:52  16   through OARRS.  They can run -- you know, they can run the

11:39:58  17   DEA number of a particular store to see how much -- or how

11:40:02  18   many C-IIs are being dispensed by that store.

11:40:05  19        So it is something that is accessible and that is used

11:40:08  20   in investigations.  I don't think -- I mean, I guess it

11:40:14  21   could be used on an individual store basis prior to doing an

11:40:19  22   inspection, and it could be -- it could be helpful.

11:40:24  23        But OARRS, again, is only a tool.  You know, it's only

11:40:27  24   as good as the information that's being put in, so it would

11:40:32  25   take a much more expansive review of that data to determine

**Edwards (Redirect by Swanson)** 5444

| | |
|---|---|
| 11:40:36 | 1 |
| 11:40:39 | 2 |
| 11:40:43 | 3 |
| 11:40:48 | 4 |

1  if there was a problem or not.  It wouldn't -- it could

2  never be achieved in a simple inspection, you know, over a

3  couple hours.  It would have to be a much larger review of

4  the dispensing data.

5  And is it given to someone else?  I don't believe so.

6  I mean, it's all -- the dispensing data that the pharmacies

7  maintain in-house is also available through OARRS for the

8  controlled substances, so it's there to be looked at if --

9  you know, if there's reason to look at it.

10  But again, you know, if you have data that shows, you

11  know, this pharmacy filled a thousand C-IIs, this pharmacy

12  filled 10, you have to look at -- it doesn't automatically

13  mean that that pharmacy who filled a thousand is bad and the

14  one with 10 is good.  You have to look deeper into it and

15  see, you know, the reasons for the prescriptions, who's

16  writing them, what -- you know, what they're for, and that

17  sort of thing.

18  **Q**    The next question from this juror:  "Are there any

19  licensed pharmacists that are also agents with the Ohio

20  Board of Pharmacy?  Do you think being a pharmacist, given

21  their education, would help in this role?"

22  **A**    All of our specialists are pharmacists.  So they're

23  not necessarily agents.  Their title is not agent like

24  myself.  They're a specialist.  But they do conduct

25  investigations the same way that we do.

**Edwards (Redirect by Swanson)** <span>5445</span>

11:42:04  1  **Q**     "During inspections, did you review documents or files

11:42:15  2  of prescriptions that were refused to fill?  If so, what did

11:42:18  3  you look for?  If not, why?"

11:42:21  4  **A**    I don't recall seeing any sort of documentation for

11:42:29  5  refuse to fill.  I think that could have potentially been

11:42:31  6  very helpful, but I think in most cases pharmacies got a

11:42:36  7  prescription, did their quick review, and decided, yeah, I'm

11:42:39  8  not filling this, and then said, no, I'm not filling this,

11:42:44  9  or, you know, took another action.

11:42:45  10     I don't think -- because it was never entered in their

11:42:48  11  system and it was never filled, I definitely do think that

11:42:52  12  if that data were maintained, it could have been very

11:42:56  13  helpful in investigations.

11:43:04  14  **Q**     "Has the Ohio Board of Pharmacy ever tasked you or

11:43:08  15  other agents with investigating a pharmacy or pharmacist for

11:43:12  16  refusing to fill prescriptions"?

11:43:14  17  **A**    I have never investigated that sort of case.  I know

11:43:21  18  we've had complaints, you know, general public complaints,

11:43:26  19  so-and-so won't fill my prescription, but I don't recall

11:43:30  20  specific investigations related to that.

11:43:35  21  **Q**    Okay.  Just a few more here.

11:43:40  22     "During your inspections, did you look for controlled

11:43:49  23  substances that had been brought in to the pharmacies for

11:43:53  24  disposal?"

11:43:54  25  **A**    We didn't look for them because that was not a

**Edwards (Redirect by Swanson)**

| | | |
|---|---|---|
| 11:43:57 | 1 | practice that was allowed.  It was discouraged.  We |
| 11:44:06 | 2 | understand sometimes that it would happen and they would |
| 11:44:09 | 3 | properly dispose of them, but that was a practice that we |
| 11:44:12 | 4 | didn't allow, so there was no, you know, place that they |
| 11:44:17 | 5 | would keep return medications, or anything like that. |
| 11:44:19 | 6 | So the -- you know, the -- in terms of the drug |
| 11:44:24 | 7 | take-back, you know, mailboxes or disposal boxes that they |
| 11:44:30 | 8 | have now, there is no documentation associated with that. |
| 11:44:34 | 9 | If someone is to go and dispose of something at a pharmacy |
| 11:44:38 | 10 | or police department, there's no documentation associated |
| 11:44:40 | 11 | with that. |
| 11:44:41 | 12 | **Q**   When you said that you or the Board of Pharmacy |
| 11:44:43 | 13 | discouraged it or wouldn't allow that, what do you mean? |
| 11:44:45 | 14 | **A**   I mean there was -- pharmacies are not permitted -- |
| 11:44:52 | 15 | once a drug leaves the pharmacy, like it's dispensed to a |
| 11:44:57 | 16 | patient, they can't bring it back.  Like, there's no method |
| 11:45:01 | 17 | in place for a pharmacy to take back medication from a |
| 11:45:05 | 18 | pharmacist. |
| 11:45:06 | 19 | So once it's dispensed and it's in the end user's |
| 11:45:09 | 20 | hands, it's theirs. |
| 11:45:11 | 21 | Now, recently they have started doing the drug |
| 11:45:15 | 22 | take-back stuff, obviously for safety reasons, because you |
| 11:45:19 | 23 | don't want those drugs out on the street.  But back when I |
| 11:45:22 | 24 | was conducting inspections, that was not something that was |
| 11:45:26 | 25 | allowed or encouraged. |

| | | |
|---|---|---|
| 11:45:28 | 1 | **Q**     So the ability of a pharmacist to have a drug |
| 11:45:31 | 2 | take-back kiosk is relatively new? |
| 11:45:33 | 3 | **A**     Well, it's been a few years, but -- they've had the |
| 11:45:40 | 4 | mail-back pouches that they have on their counters and |
| 11:45:44 | 5 | stuff.  Yeah. |
| 11:45:47 | 6 | **Q**     Including at Walgreens, CVS, and Walmart? |
| 11:45:49 | 7 | **A**     I think they all have them now. |
| 11:45:51 | 8 | **Q**     Two more. |
| 11:45:54 | 9 | "At a pharmacy inspection, especially previous to the |
| 11:46:06 | 10 | electronic format, what kind of issues would you consider a |
| 11:46:09 | 11 | fix it versus a write-up/pink slip?  If you just told a |
| 11:46:14 | 12 | pharmacy to fix/resolve, how did you know they did?" |
| 11:46:18 | 13 | That's the first question. |
| 11:46:19 | 14 | **A**     So fix it, I guess I would refer to as like a warning, |
| 11:46:22 | 15 | like maybe something like they -- on a phone-in prescription |
| 11:46:29 | 16 | you're required to get the first name and last name of the |
| 11:46:31 | 17 | person calling in the prescription.  I may flip through the |
| 11:46:37 | 18 | phone-in prescriptions and see that they just documented, |
| 11:46:39 | 19 | you know, the first name of the person.  So I'd say, hey, |
| 11:46:42 | 20 | make sure you get the first and last name. |
| 11:46:46 | 21 | A write-up or pink slip would be something more |
| 11:46:50 | 22 | serious, like if there was an error that occurred.  Or if |
| 11:46:55 | 23 | they're not properly keeping track of the files, you know, |
| 11:47:01 | 24 | it's all in disarray, like there's a big box where all the |
| 11:47:04 | 25 | prescriptions are not filed properly. |

**Edwards (Redirect by Swanson)**

11:47:07  1    Or we had an issue where they would keep stuff in the

11:47:09  2  attic.  You know, they would keep all their files up in the

11:47:12  3  attic, and anybody had access to it.  Well, that's a

11:47:19  4  problem.  It needs to be in a controlled environment.

11:47:21  5    There's any number of -- I mean, pink slips, any times

11:47:24  6  there's an error in dispensing, it would generally result in

11:47:27  7  a written warning or a pink slip.

11:47:31  8    If there were multiple issues, they may have been

11:47:34  9  minor issues, but if there were numerous issues, then that

11:47:37  10  could result in a pink slip.

11:47:39  11    There's a list -- we had a list, and I don't recall

11:47:43  12  them all off the top of my head, of mandatory pink slip

11:47:49  13  violations, like if the keys are in the possession of

11:47:51  14  someone other than the pharmacist.

11:47:54  15    Like only the pharmacist can possess the keys and open

11:47:56  16  the pharmacy.  So if the pharmacists say, you know, I wanted

11:48:02  17  to sleep in and said, okay, we don't get any customers from

11:48:05  18  9 to 10, here, technician, you go and open the pharmacy, and

11:48:08  19  I'll see you there at 10, that would be a written warning.

11:48:10  20  That would be more of a major violation.

11:48:13  21    I mean, I could go on, but I think you get the idea.

11:48:19  22  **Q**    Okay.  "Were all or most of your investigations based

11:48:25  23  on tips or were there other ways investigations began?  If

11:48:29  24  other ways, please explain."

11:48:31  25  **A**    I would say, yes, the majority were based on tips.

**Edwards (Redirect by Swanson)**

5449

| | | |
|---|---|---|
| 11:48:36 | 1 | Both while I was working at Lake County Narcotics Agency and |
| 11:48:40 | 2 | Board of Pharmacy, the majority of -- well, let me back that |
| 11:48:44 | 3 | up. |
| 11:48:45 | 4 |     With Lake County Narcotics Agency, for sure the |
| 11:48:47 | 5 | majority were based on tips. |
| 11:48:52 | 6 |     With the Board of Pharmacy, I would say -- I would say |
| 11:48:55 | 7 | the majority are based on tips, but not as many as at Lake |
| 11:49:00 | 8 | County Narcotics Agency, but still the majority are based on |
| 11:49:03 | 9 | a pharmacist or the general public or a prescriber calling |
| 11:49:05 | 10 | in and filing a complaint. |
| 11:49:09 | 11 | **Q**    Okay.  This is the last set of questions. |
| 11:49:15 | 12 |     "How often would you interact with pharmacists at |
| 11:49:19 | 13 | LCNA"? |
| 11:49:19 | 14 | **A**    Multiple times per week.  Because, again, that's the |
| 11:49:22 | 15 | only thing I did was the pharmacy diversion investigations, |
| 11:49:25 | 16 | so that's -- five days a week that's all I was working on, |
| 11:49:29 | 17 | so it was most days of the week I would have interactions. |
| 11:49:32 | 18 | **Q**    "Where would the majority of the interactions be when |
| 11:49:38 | 19 | you were at LCNA?" |
| 11:49:41 | 20 | **A**    LCNA was always Lake County because that was my |
| 11:49:44 | 21 | jurisdiction, with Lake County Narcotics Agency. |
| 11:49:48 | 22 | **Q**    Okay.  "What pharmacies had the highest investigations |
| 11:49:52 | 23 | when you were" -- I take it "when you were a Board agent," |
| 11:49:55 | 24 | so when you moved to the Board of Pharmacy, "and in what |
| 11:50:00 | 25 | counties," if you know? |

**Edwards (Redirect by Swanson)**

11:50:01  1  **A**      Boy, that's -- I can't answer that because I don't --

11:50:05  2  it varies throughout the state because there's areas where

11:50:08  3  there's, you know, tons of mom and pop stores and there's

11:50:13  4  more retail.

11:50:13  5      In my area in northeast Ohio there's -- the vast

11:50:19  6  majority are retail pharmacies.  In southern Ohio there's a

11:50:23  7  lot of, you know, mom and pop pharmacies.  So I couldn't say

11:50:28  8  which pharmacies had the largest number of investigations

11:50:32  9  because I don't know.

11:50:34  10      And in what counties?  Again, I only know what I

11:50:39  11  worked on in my territory.  I don't know how many

11:50:42  12  investigations folks had in other areas of the state.

11:50:44  13  **Q**      Okay.  "How often would these pain management

11:50:49  14  facilities be either inspected or investigated"?

11:50:56  15  **A**      Yearly.  Once they were licensed as pain management

11:50:58  16  clinics as of 2011, we would inspect them annually.

11:51:02  17  **Q**      Last question.  "When filling out the electronic form,

11:51:06  18  were you then required to answer all of the questions versus

11:51:10  19  when it was being done manually?"

11:51:13  20  **A**      No, there were some identified as mandatory.  Like you

11:51:19  21  couldn't close the inspection without answering those, but

11:51:22  22  they weren't -- it wasn't a hundred percent of the

11:51:25  23  questions.  It was only a few.  A small percentage were

11:51:31  24  required.  But then it was up to the agent to ask the

11:51:33  25  questions that they, you know, felt were necessary in that

**Edwards - (Recross by Fumerton)** 5451

| | |
|---|---|
| 11:51:38 | 1 | given inspection. |
| 11:51:41 | 2 | MR. SWANSON: Agent Edwards, thank you for |
| 11:51:42 | 3 | answering my questions. I don't have anything more for you |
| 11:51:45 | 4 | at this time. Some of my colleagues may. |
| 11:51:46 | 5 | THE WITNESS: Okay. |
| 11:51:47 | 6 | THE COURT: Thank you, Mr. Swanson. |
| 11:51:50 | 7 | MR. DELINSKY: Your Honor, I do have some |
| 11:51:52 | 8 | questions, but I can do it before or after lunch. |
| 11:51:54 | 9 | THE COURT: Why don't we go a few more |
| 11:51:58 | 10 | minutes. Maybe if you can conclude yours, then we'll break |
| 11:52:00 | 11 | for lunch, or if Ms. Fumerton only has a couple, whatever -- |
| 11:52:09 | 12 | MR. DELINSKY: All right, Your Honor. So I |
| 11:52:11 | 13 | think Ms. Fumerton will go, then we can break. |
| 11:52:13 | 14 | THE COURT: That's fine. Okay. |
| 11:52:19 | 15 | - - - - - |
| 11:52:19 | 16 | RECROSS-EXAMINATION |
| 11:52:20 | 17 | BY MS. FUMERTON: |
| 11:52:20 | 18 | **Q** Hi, Agent Edwards. I just have a couple quick |
| 11:52:26 | 19 | questions for you. |
| 11:52:26 | 20 | Do you still have that document; for the record, it's |
| 11:52:29 | 21 | P-04553. That's the search warrant that Mr. Weinberger had |
| 11:52:34 | 22 | given to you. |
| 11:52:34 | 23 | **A** Yes. |
| 11:52:34 | 24 | **Q** If you could turn to page 12, and I'm going to ask you |
| 11:52:40 | 25 | some questions about the paragraph that's at the top of page |

**Edwards - (Recross by Fumerton)**

| | | |
|---|---|---|
| 11:52:43 | 1 | 12 to see -- I just want it there in case it refreshes your |
| 11:52:47 | 2 | recollection. |
| 11:52:47 | 3 | Do you see where it says "prior to meeting"? |
| 11:52:50 | 4 | **A**   Yes. |
| 11:52:50 | 5 | **Q**   Okay.  As part of the investigation into Dr. Franklin, |
| 11:52:55 | 6 | do you recall that Walmart pharmacists had filed many |
| 11:53:00 | 7 | complaints with the local police and Ohio Board of Pharmacy |
| 11:53:03 | 8 | about Dr. Franklin? |
| 11:53:06 | 9 | **A**   I do recall there being multiple complaints, yes. |
| 11:53:08 | 10 | **Q**   Do you recall that Walmart pharmacists also had |
| 11:53:12 | 11 | refused to dispense medication for the majority of patients |
| 11:53:16 | 12 | issued prescriptions by Dr. Franklin? |
| 11:53:18 | 13 | **A**   I see that here, yes. |
| 11:53:19 | 14 | **Q**   I just have a quick follow-up question about the jury |
| 11:53:25 | 15 | questions. |
| 11:53:26 | 16 | MS. FUMERTON:  Where did those go? |
| 11:53:32 | 17 | Mr. Swanson, did you grab them or are they back? |
| 11:53:43 | 18 | Thank you, Mr. Swanson. |
| 11:53:56 | 19 | **Q**   Do you recall this question?  "Has the Ohio Board of |
| 11:54:01 | 20 | Pharmacy ever tasked you or other agents with investigating |
| 11:54:03 | 21 | a pharmacy or pharmacist for refusing to fill |
| 11:54:05 | 22 | prescriptions?" |
| 11:54:06 | 23 | **A**   Yes. |
| 11:54:06 | 24 | **Q**   And I want to show you a document that's been marked |
| 11:54:17 | 25 | WMT-MDL-01402.  And this is an inspection report.  And in |

11:54:23  1   full disclosure, this is not one that you did.

11:54:24  2        But do you recognize this generally as a drug

11:54:27  3   inspection report?

11:54:27  4   **A**     Yes.

11:54:28  5   **Q**     And do you recognize that as Mr. Pavlich's signature?

11:54:31  6   **A**     Yes.

11:54:32  7                  MR. WEINBERGER:  Your Honor, we don't have a

11:54:33  8   copy, and this is a document that's not his.

11:54:36  9                  MS. FUMERTON:  Well, Your Honor, this is in

11:54:38  10  direct response to a question from the jury questionnaire.

11:54:43  11                 MR. LANIER:  Do you have a copy for us?

11:54:45  12                 MS. FUMERTON:  I do not.  It came up with the

11:54:46  13  jury questionnaire.

11:54:47  14       Actually, you know what, I did, I disclosed it the

11:54:49  15  other day.  You have a copy.

11:54:53  16                 MR. LANIER:  You know the rules.

11:54:55  17                 MS. FUMERTON:  We did disclose it the other

11:54:57  18  night.

11:54:57  19                 THE COURT:  Let me see the document.  I don't

11:54:58  20  know what you're all --

11:54:59  21                 MS. FUMERTON:  Your Honor, let me ask it this

11:55:01  22  way.

11:55:02  23  BY MS. FUMERTON:

11:55:02  24  **Q**     Are you aware that sometimes doctors would file

11:55:04  25  complaints with the Ohio Board of Pharmacy regarding

11:55:08  1   pharmacists refusing to fill prescriptions?

11:55:11  2              MR. WEINBERGER:  Objection.

11:55:12  3              THE COURT:  Hold it.

11:55:19  4              MS. FUMERTON:  If Mr. Lanier and

11:55:20  5   Mr. Weinberger are looking for the relevant section, they

11:55:22  6   can turn to page 3.

11:56:15  7              (Pause in proceedings.)

11:56:16  8              THE COURT:  I'm going to sustain the

11:56:17  9   objection.

11:56:18  10              MR. LANIER:  We may withdraw it.

11:56:22  11              THE COURT:  Well, I already sustained it,

11:56:24  12   so you can ask it if you want.

11:56:26  13   BY MS. FUMERTON:

11:56:26  14   **Q**    My question is this:  Do you recall whether or not any

11:56:29  15   doctors would file complaints with the Ohio Board of

11:56:33  16   Pharmacy for pharmacists refusing --

11:56:35  17   **A**    I don't recall formal complaints, but I do remember

11:56:37  18   doctors being upset when pharmacies refused to fill their

11:56:40  19   prescriptions.

11:56:41  20              MS. FUMERTON:  Can I show the witness the

11:56:42  21   document to see if this refreshes his recollection, Your

11:56:44  22   Honor?

11:56:45  23              THE COURT:  Well, he already answered the

11:56:47  24   question.

11:56:47  25              MS. FUMERTON:  Well, I'm going to ask him

| | | |
|---|---|---|
| 11:56:50 | 1 | about a specific -- |
| 11:56:51 | 2 | **Q**     Let me ask you this:  If a complaint, formal or |
| 11:56:55 | 3 | otherwise, was made about a particular pharmacist refusing |
| 11:56:59 | 4 | to fill a prescription, would the Ohio Board of Pharmacy |
| 11:57:02 | 5 | inspectors sometimes look at that particular incidence when |
| 11:57:07 | 6 | reviewing prescriptions? |
| 11:57:08 | 7 | **A**     Sure. |
| 11:57:08 | 8 | **Q**     And would they make a determination of whether or not |
| 11:57:10 | 9 | that prescription was -- whether that pharmacist was acting |
| 11:57:15 | 10 | appropriately? |
| 11:57:16 | 11 | **A**     Well, the standard way that we would handle a |
| 11:57:20 | 12 | situation like that would be a pharmacist has to use their |
| 11:57:27 | 13 | professional judgment to fill or not fill a prescription. |
| 11:57:29 | 14 | And just because the doctor's upset, you know, we wouldn't |
| 11:57:32 | 15 | go and look at it and make a big deal out of it.  We would |
| 11:57:36 | 16 | just say, look, a pharmacist can fill or not fill, whatever |
| 11:57:38 | 17 | they want, based on their professional judgment. |
| 11:57:41 | 18 | So, you know -- we wouldn't open a formal complaint |
| 11:57:46 | 19 | based on a doctor saying that.  I mean, we potentially could |
| 11:57:51 | 20 | based on the circumstances, but generally speaking, we would |
| 11:57:55 | 21 | advise them that the pharmacists have, you know, their |
| 11:58:00 | 22 | discretion to use their professional judgment. |
| 11:58:02 | 23 | MS. FUMERTON:  Thank you.  That's all my |
| 11:58:03 | 24 | questions. |
| 11:58:03 | 25 | THE WITNESS:  Okay. |

11:58:07    1                    THE COURT:  Okay.  Ladies and gentlemen, we

11:58:09    2    will break for lunch.

11:58:14    3          The usual admonitions apply.  Have a good lunch.  And

11:58:17    4    we'll pick up at 1:00 with the balance of Mr. Edwards'

11:58:19    5    testimony.

11:58:51    6                    (A luncheon recess was taken at 11:58 a.m.)

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

01:03:06   1                  A F T E R N O O N   S E S S I O N

01:05:06   2                            - - - - -

01:05:06   3              (Jury present in open court at 1:05 p.m.)

01:05:31   4              THE COURT:  Please be seated.  I hope everyone

01:05:33   5   had a good lunch.

01:05:34   6         Mr. Edwards, you are still under oath.

01:05:38   7         And Mr. Delinsky, you may proceed, please.

01:05:40   8              MR. DELINSKY:  I hope you had a good lunch,

01:05:42   9   Agent Edwards.

01:05:44  10              THE WITNESS:  Yes, thank you.

01:05:47  11                            - - - - -

01:05:48  12                      RECROSS-EXAMINATION

01:05:48  13   BY MR. DELINSKY:

01:05:49  14   Q     Let's begin with the investigation of Overholt's

01:05:52  15   Pharmacy and Dr. Franklin, just very briefly.  Okay?

01:05:54  16   A     Yes.

01:05:55  17   Q     Overholt's Pharmacy and the Overholt's pharmacists who

01:05:59  18   worked in the pharmacies were the subject of an action by

01:06:04  19   the State of Ohio, correct?

01:06:05  20   A     Correct.

01:06:05  21   Q     And I believe that several of the pharmacists in that

01:06:07  22   pharmacy were criminally prosecuted?

01:06:09  23   A     I believe so.

01:06:10  24   Q     I believe so.

01:06:14  25         The state of Ohio, either the Board of Pharmacy or law

**Edwards - (Recross by Delinsky)** 5458

01:06:16    1    enforcement or prosecutors, took no action against any CVS

01:06:19    2    pharmacy or any CVS pharmacist in connection with

01:06:25    3    Dr. Franklin's scripts, correct?

01:06:27    4    **A**    Right.

01:06:27    5    **Q**    And scripts, I'm sorry for the shorthand, that means

01:06:30    6    prescriptions, right?

01:06:31    7    **A**    Right.

01:06:36    8    **Q**    I believe you already testified that Dr. Franklin, to

01:06:38    9    the best of your knowledge, had legitimate patients as well,

01:06:40   10    correct?

01:06:41   11    **A**    Yes, I believe so.

01:06:41   12    **Q**    Okay.  And it's fair to say that you can have doctors

01:06:50   13    who have illegitimate portions of their practice and very

01:06:52   14    legitimate portions of their practice at the same time,

01:06:54   15    correct?

01:06:55   16    **A**    Correct.

01:06:55   17    **Q**    And neither you nor your fellow agents in the Board of

01:07:00   18    Pharmacy advise pharmacists not to as a blanket matter

01:07:06   19    refuse to fill prescriptions for doctors that the Board of

01:07:11   20    Pharmacy is inspecting, correct?

01:07:12   21    **A**    We don't tell them --

01:07:21   22                MR. WEINBERGER:  Objection.

01:07:23   23                THE COURT:  Yes, sustained.

01:07:30   24    **Q**    During the Franklin investigation, you didn't advise

01:07:33   25    any pharmacists to stop filling Dr. Franklin's

**Edwards - (Recross by Delinsky)**

01:07:38   1    prescriptions, correct?

01:07:38   2    **A**    Correct.

01:07:39   3    **Q**    And why not?

01:07:39   4    **A**    Because -- I think I went over this yesterday, but any

01:07:42   5    investigation, not just Dr. Franklin, any doctor

01:07:45   6    investigation, you know, we -- if a pharmacist asks us, I've

01:07:50   7    got a prescription from so-and-so doctor, what should I do,

01:07:53   8    and our standard reply is use your professional judgment.

01:07:57   9    If they are still licensed, you know, if they still carry a

01:08:00   10   valid State Medical Board of Ohio license to practice and

01:08:05   11   they still have their DEA number, then they're still

01:08:09   12   permitted to practice.  So use your professional judgment on

01:08:11   13   each individual prescription that you receive.

01:08:13   14   **Q**    And in that regard, the Board of Pharmacy did not

01:08:20   15   advise -- does not advise pharmacists, does not identify for

01:08:25   16   pharmacists the doctors who they are investigating, correct?

01:08:28   17   **A**    Correct.

01:08:28   18   **Q**    And why not?

01:08:29   19   **A**    Well, because it could jeopardize the investigation,

01:08:33   20   just like we don't tell, you know, the public or other

01:08:36   21   doctors or anybody.  You know, we conduct our investigation

01:08:40   22   and it's a need-to-know, just like any law enforcement

01:08:43   23   investigation.

01:08:43   24   **Q**    I believe Mr. Weinberger asked you about the number of

01:08:50   25   prescriptions for Dr. Franklin that CVS filled.

**Edwards - (Recross by Delinsky)**

01:08:53   1        Do you recall that?

01:08:54   2   **A**   I recall that, yeah.

01:08:55   3   **Q**   Those prescriptions were spread over all the CVS

01:09:00   4   pharmacies in Ohio, correct?

01:09:02   5   **A**   Right, yes.

01:09:03   6   **Q**   And there are many, many CVS pharmacies in Ohio?

01:09:06   7   **A**   Correct.

01:09:06   8   **Q**   There was only one Overholt's, correct?

01:09:10   9   **A**   Correct.

01:09:11   10  **Q**   And you have no reason to believe that any of the

01:09:13   11  prescriptions filled by CVS were illegitimate, correct?

01:09:16   12  **A**   I don't have any reason to believe or not believe.  I

01:09:19   13  don't know.

01:09:27   14  **Q**   Do you recall the PowerPoint deck that Mr. Weinberger

01:09:31   15  showed you that involved a presentation you gave?

01:09:33   16  **A**   Yes.

01:09:34   17  **Q**   Okay.  Let me just put the front page on the ELMO.

01:09:42   18        And I just want to go through a few additional pages

01:09:45   19  here.

01:09:45   20        Number one, who was this presentation to?  I may have

01:09:49   21  missed that.

01:09:50   22  **A**   Law enforcement.  It was geared towards law

01:09:52   23  enforcement.

01:09:52   24  **Q**   Okay.  So this wasn't given to pharmacists?

01:09:54   25  **A**   No.

01:09:54  1    **Q**    Okay.  And when you say law enforcement, who does that

01:09:57  2    encompass?

01:09:58  3    **A**    That encompasses any law enforcement agent in the

01:10:03  4    state.  Typically, something like this we would advertise to

01:10:07  5    the local drug task forces and, you know, anyone they may

01:10:12  6    know or anyone who has a potential or has interest in doing

01:10:16  7    prescription drug investigations.

01:10:17  8    **Q**    Okay.  Fair enough.

01:10:18  9         I'm going to show you one page of this.  I think it's

01:10:36  10   page 28.

01:10:37  11   **A**    Mm-hmm.

01:10:38  12   **Q**    Okay.  Do you see that?

01:10:41  13   **A**    Yup.

01:10:41  14   **Q**    And this indicates that -- wait, do I have the wrong

01:10:47  15   page?  Well, yes, we'll go in sequence.

01:10:50  16        This was when OARRS started.  And as this indicates,

01:10:56  17   OARRS would be collecting the data from the pharmacies,

01:10:58  18   correct?

01:10:58  19   **A**    Correct.

01:10:59  20   **Q**    Okay.  And then if we go to what I believe is the next

01:11:01  21   page, for the record 27, it states that all pharmacies and

01:11:11  22   prescribers who personally furnish medication must submit

01:11:17  23   controlled substance dispensing data to OARRS?

01:11:20  24   **A**    Correct.

01:11:21  25   **Q**    And does that mean that the pharmacies have to provide

| | | |
|---|---|---|
| 01:11:25 | 1 | all their dispensing data to the Board of Pharmacy? |
| 01:11:27 | 2 | **A**   Yes. |
| 01:11:28 | 3 | **Q**   Okay.  And below -- and I think you may have testified |
| 01:11:31 | 4 | about this already, but this puts it in writing.  The |
| 01:11:35 | 5 | pharmacies have to provide that information, at least at |
| 01:11:39 | 6 | this point in time in 2014, at least on a daily basis? |
| 01:11:45 | 7 | **A**   Yes. |
| 01:11:45 | 8 | **Q**   So the Ohio Board of Pharmacy is getting dispensing |
| 01:11:48 | 9 | data from the pharmacies on a close to realtime basis? |
| 01:11:51 | 10 | **A**   Correct. |
| 01:11:52 | 11 | **Q**   All right.  I want to show you page 35 of the |
| 01:12:12 | 12 | presentation, okay? |
| 01:12:14 | 13 |      This is about accessing OARRS; am I right? |
| 01:12:18 | 14 | **A**   Yes. |
| 01:12:18 | 15 | **Q**   And it says "law enforcement." |
| 01:12:19 | 16 |      Can law enforcement, in addition to Board of Pharmacy |
| 01:12:23 | 17 | itself, access OARRS? |
| 01:12:26 | 18 | **A**   Yes. |
| 01:12:26 | 19 | **Q**   Who in law enforcement? |
| 01:12:27 | 20 | **A**   Anyone who has an account.  Police officers, |
| 01:12:33 | 21 | detectives, even -- I don't know if this was the case in |
| 01:12:37 | 22 | 2014, but corrections officers and probation officers as |
| 01:12:42 | 23 | well. |
| 01:12:42 | 24 | **Q**   So am I right that law enforcement officials, law |
| 01:12:45 | 25 | enforcement officers, and agents from throughout the state |

**Edwards - (Recross by Delinsky)**     5463

01:12:50    1    of Ohio have the ability to access OARRS?

01:12:51    2    **A**     Yes.

01:12:51    3    **Q**     Okay.  So it's not just pharmacists and the Board of

01:12:58    4    Pharmacy who can access it?

01:13:00    5    **A**     Correct.  The difference is a law enforcement request

01:13:02    6    has to be approved by a supervisor, whereas if I run an

01:13:07    7    OARRS report, it automatically comes back to me.  Or if a

01:13:10    8    pharmacist runs an OARRS report, it's instantaneous.

01:13:14    9         A law enforcement request depends on their supervisor

01:13:17   10    approving it, so it's not -- it's not as instantaneous as

01:13:22   11    when I would run it.

01:13:23   12    **Q**     How long can that approval process take?  Can it be a

01:13:26   13    split second or maybe --

01:13:27   14    **A**     I mean, as long as it takes their supervisor to view

01:13:30   15    the request and approve it, so it can be instant or take

01:13:37   16    days.

01:13:37   17    **Q**     Okay.  Just a few more pages that I want to go

01:13:43   18    through.

01:13:43   19         Well, I'm going to show you this page and I'm going to

01:13:55   20    flip it.

01:13:55   21    **A**     Okay.

01:13:56   22    **Q**     SPIDR, do people call that spider?

01:13:59   23    **A**     Yes.

01:14:00   24    **Q**     I'm going to flip it, and just for the record, that

01:14:02   25    was page 102.  Now we're at page 101.

01:14:05  1      Does SPIDR stand for Shared Prescription Investigation

01:14:14  2   Deconfliction Resource?

01:14:14  3   **A**    Yes.

01:14:14  4   **Q**    What is SPIDR?

01:14:15  5   **A**    It's a deconfliction tool that we established as the

01:14:20  6   Board of Pharmacy, established to I guess get a better

01:14:24  7   handle on who was working prescription drug cases around the

01:14:27  8   state and try to deconflict with other agencies and, you

01:14:31  9   know, collaborate, and then also make sure that you didn't,

01:14:34  10  you know, step on anybody's toes because you're working the

01:14:36  11  same investigation.

01:14:37  12  **Q**    So for lack of a better word, is SPIDR a database?

01:14:42  13  **A**    Yes.

01:14:42  14  **Q**    And it's a database that's shared among law

01:14:46  15  enforcement in Ohio?

01:14:47  16  **A**    Yes, if law enforcement signs up for it and the Board

01:14:50  17  of Pharmacy, correct.

01:14:50  18  **Q**    Law enforcement and the Board of Pharmacy?

01:14:52  19  **A**    Yes.

01:14:52  20  **Q**    Okay.  And it's a database that contains information

01:14:58  21  about investigations involving prescription drugs?

01:15:02  22  **A**    Yes, generally speaking, yes.

01:15:05  23  **Q**    Okay.  And it's so that multiple law enforcement

01:15:08  24  agencies and the Board of Pharmacy can coordinate with one

01:15:12  25  another?

**Edwards - (Recross by Delinsky)**                    5465

01:15:12    1    **A**      Yes.

01:15:12    2    **Q**      Okay.  And am I right that, like the 640 reports

01:15:18    3    prepared by the Board of Pharmacy, this SPIDR database is

01:15:24    4    not a resource that's shared with pharmacists or pharmacies?

01:15:29    5    **A**      Correct, correct.

01:15:30    6    **Q**      It's for law enforcement only?

01:15:31    7    **A**      Yes.

01:15:31    8    **Q**      I believe you testified to this, but I just want to

01:15:39    9    double-check.

01:15:41   10          Pharmacists can and are required in certain

01:15:45   11    circumstances to check OARRS, correct?

01:15:47   12    **A**      Correct.

01:15:47   13    **Q**      But doctors are too?

01:15:49   14    **A**      Correct.

01:15:50   15    **Q**      Could you talk about when doctors are required to

01:15:53   16    check OARRS?

01:15:54   17    **A**      Doctors are -- I don't have the list in front of me,

01:15:58   18    but they should check OARRS with every new prescription,

01:16:04   19    controlled substance prescription for a new patient, or

01:16:06   20    every 90 days we -- and I could be -- it changes

01:16:13   21    periodically, but I know we encourage them to check it every

01:16:17   22    time a patient comes in.  I don't believe they're required

01:16:19   23    to check it upon every visit.  I think it's still 90 days.

01:16:25   24    **Q**      Okay.  And doctors have the same access to OARRS;

01:16:29   25    different requirements, but the same access --

**Edwards - (Recross by Delinsky)**          5466

01:16:31  1    **A**     Yes.

01:16:31  2    **Q**     -- that a pharmacist would have --

01:16:34  3    **A**     Correct.

01:16:34  4    **Q**     -- correct?

01:16:36  5           Okay.  By the way, a corporate home office, if you

01:16:39  6    operate a chain pharmacy, the corporate office doesn't have

01:16:41  7    access to OARRS, correct?

01:16:42  8    **A**     No, it's individual accounts.  So it would be an

01:16:46  9    individual pharmacist upon filling an individual

01:16:49  10   prescription would run the OARRS report to help determine if

01:16:52  11   they should fill that prescription or not.

01:16:54  12   **Q**     Company employees out of state who are not licensed

01:16:59  13   pharmacists in Ohio can't log on to OARRS?

01:17:03  14   **A**     Well, I don't know if there's, like, central fill

01:17:06  15   operations where maybe, you know, they're filling at another

01:17:11  16   location outside the state.  I know that occurs.  I don't

01:17:13  17   know if the checking of OARRS is done that way, but

01:17:17  18   out-of-state people can have accounts and can check OARRS,

01:17:21  19   but I don't know how it works at the individual pharmacies.

01:17:24  20   **Q**     And it's in that central fill context generally?

01:17:27  21   **A**     Right.

01:17:28  22   **Q**     All right.  Take-back kiosks, we've talked a fair

01:17:32  23   amount about those.  I just want to make sure I understand

01:17:33  24   your testimony and the jury does as well.

01:17:36  25          There was a change in the law at some point that

**Edwards - (Recross by Delinsky)** 5467

| | | |
|---|---|---|
| 01:17:41 | 1 | allowed pharmacies to install the take-back kiosks, right? |
| 01:17:46 | 2 | **A**    Right, yes. |
| 01:17:47 | 3 | **Q**    Before that point in time, am I right that pharmacies |
| 01:17:50 | 4 | were not allowed to have those kiosks? |
| 01:17:54 | 5 | **A**    Correct. |
| 01:17:54 | 6 | **Q**    Okay.  2016 or so? |
| 01:17:57 | 7 | **A**    I don't know.  That's not my area.  I'm not sure. |
| 01:18:02 | 8 | **Q**    Okay.  Can you ballpark it, or really -- |
| 01:18:05 | 9 | **A**    No, really, I'm not sure. |
| 01:18:07 | 10 | **Q**    Fair enough. |
| 01:18:07 | 11 |         If you didn't write it down, you didn't do it, |
| 01:18:13 | 12 | that's -- I believe you testified to that in connection with |
| 01:18:16 | 13 | the documentation of the resolution of red flags. |
| 01:18:20 | 14 | **A**    Mm-hmm. |
| 01:18:20 | 15 | **Q**    Right? |
| 01:18:21 | 16 | **A**    Mm-hmm.  Yes. |
| 01:18:22 | 17 | **Q**    Sorry. |
| 01:18:23 | 18 | **A**    Yes.  No, it's okay. |
| 01:18:24 | 19 | **Q**    Now, a pharmacist could do the work -- let me step |
| 01:18:34 | 20 | back. |
| 01:18:35 | 21 |         First of all, it's a good practice to write down your |
| 01:18:39 | 22 | work when you're resolving a red flag, right? |
| 01:18:41 | 23 | **A**    Yes, correct. |
| 01:18:42 | 24 | **Q**    Not necessarily required by law.  Good practice? |
| 01:18:45 | 25 | **A**    Correct. |

**Edwards - (Recross by Delinsky)** 5468

01:18:45 1   **Q**    Okay.  Now, a pharmacist could do the hard work and

01:18:51 2   the careful work to resolve a red flag but not write down

01:18:58 3   what she or he did, right?

01:18:59 4   **A**    Correct.

01:19:00 5   **Q**    Okay.  That doesn't mean she or he didn't do it,

01:19:03 6   correct?

01:19:03 7   **A**    Correct.

01:19:03 8   **Q**    Just means she didn't write it down?

01:19:05 9   **A**    Right.

01:19:05 10  **Q**    And that happens?

01:19:07 11  **A**    Sure.

01:19:08 12  **Q**    It happens with a lot of the old-timer pharmacists,

01:19:10 13  right?

01:19:11 14  **A**    It happens with all of them.

01:19:12 15  **Q**    All of them.

01:19:13 16       And that's sort of why you would talk about it,

01:19:15 17  because, you know, pharmacists, some are really good at it,

01:19:19 18  some aren't good at it?

01:19:20 19  **A**    Right.

01:19:21 20  **Q**    But those who aren't good at it, it doesn't

01:19:23 21  necessarily mean that they aren't good at resolving the red

01:19:27 22  flags?

01:19:27 23  **A**    Correct.

01:19:28 24  **Q**    Okay.  The Board of Pharmacy inspections, I believe

01:19:37 25  you testified that, you know, obviously correctly, that

| | | |
|---|---|---|
| 01:19:42 | 1 | they're a snapshot at that point in time of how the pharmacy |
| 01:19:46 | 2 | is operating; correct? |
| 01:19:47 | 3 | **A**    Correct, yes. |
| 01:19:47 | 4 | **Q**    But the Board of Pharmacy does have all the data on |
| 01:19:53 | 5 | the prescriptions filled by these pharmacies, correct? |
| 01:19:55 | 6 | **A**    The controlled substances, yes. |
| 01:19:57 | 7 | **Q**    Second time you had to correct me on that.  Thank you. |
| 01:19:59 | 8 |         And as we discussed, that data, they get it in very |
| 01:20:08 | 9 | close to realtime, correct? |
| 01:20:09 | 10 | **A**    Right. |
| 01:20:09 | 11 | **Q**    So while the inspections are a snapshot, the Board of |
| 01:20:14 | 12 | Pharmacy itself has much broader everyday information about |
| 01:20:17 | 13 | the operations of Ohio pharmacies? |
| 01:20:20 | 14 | **A**    They have more data on the prescriptions, yes. |
| 01:20:23 | 15 | **Q**    Okay.  And they have -- they have data for the last |
| 01:20:26 | 16 | month, for the last year, the last five years? |
| 01:20:30 | 17 | **A**    Yes. |
| 01:20:30 | 18 | **Q**    Okay.  And the Board of Pharmacy runs analytics on the |
| 01:20:36 | 19 | data? |
| 01:20:36 | 20 | **A**    Yes. |
| 01:20:37 | 21 | **Q**    And has the ability to run additional analytics on the |
| 01:20:40 | 22 | data? |
| 01:20:40 | 23 | **A**    Yes. |
| 01:20:40 | 24 | **Q**    And the Board of Pharmacy produces the reports that |
| 01:20:43 | 25 | are used by the Board of Pharmacy, correct? |

**Edwards - (Recross by Delinsky)** 5470

01:20:44 | 1  **A**    Yes.

01:20:44 | 2  **Q**    Okay.  We're almost done.  Just a few more questions.

01:20:57 | 3      Your presentation included, you know, the figures

01:21:03 | 4  about prescription opioid suffering and abuse, misuse,

01:21:14 | 5  overdoses.

01:21:15 | 6      Do you recall that?

01:21:16 | 7  **A**    Yes.

01:21:16 | 8  **Q**    Okay.  I think in part, although I don't think you

01:21:23 | 9  testified about this in response to every slide -- and look,

01:21:27 | 10  it's fair to say those are upsetting to you, correct?

01:21:30 | 11  **A**    Sure.

01:21:30 | 12  **Q**    They're upsetting to everybody?

01:21:31 | 13  **A**    Right.

01:21:32 | 14  **Q**    They're awful?

01:21:34 | 15  **A**    Yes.

01:21:34 | 16  **Q**    I believe in testifying about one of them, you talked

01:21:42 | 17  about misuse, that a significant portion of the tragedy is a

01:21:48 | 18  result of the misuse of prescription opioids; correct?

01:21:52 | 19  **A**    Yes.

01:21:53 | 20  **Q**    Okay.  With that being said, would you agree that the

01:22:03 | 21  vast, vast majority of doctors are writing controlled

01:22:09 | 22  substances prescriptions legitimately?

01:22:11 | 23  **A**    The majority, yes.

01:22:12 | 24  **Q**    Sort of a small fraction --

01:22:15 | 25  **A**    Yes.

**Edwards - (Recross by Weinberger)**

| | | |
|---|---|---|
| 01:22:15 | 1 | **Q** -- who are engaging in illegality? |
| 01:22:20 | 2 | **A** Yes. |
| 01:22:21 | 3 | **Q** And likewise, you would agree that the vast majority |
| 01:22:25 | 4 | of pharmacists are executing their responsibilities |
| 01:22:28 | 5 | faithfully and as best they can? |
| 01:22:29 | 6 | **A** Yes. |
| 01:22:30 | 7 | **Q** Okay. |
| 01:22:30 | 8 | MR. DELINSKY: Thank you very much, Agent |
| 01:22:32 | 9 | Edwards. |
| 01:22:32 | 10 | THE WITNESS: You're welcome. |
| 01:22:43 | 11 | THE COURT: Mr. Weinberger. |
| 01:22:49 | 12 | - - - - - |
| 01:22:51 | 13 | RECROSS-EXAMINATION |
| 01:22:51 | 14 | BY MR. WEINBERGER: |
| 01:22:52 | 15 | **Q** Mr. Edwards, even a small percentage of the doctors, |
| 01:22:53 | 16 | if they're bad, and if the pharmacists do not exercise |
| 01:22:58 | 17 | corresponding responsibility, can cause a lot of harm to |
| 01:23:02 | 18 | individuals in a community, right? |
| 01:23:03 | 19 | **A** Yes. |
| 01:23:03 | 20 | **Q** And with respect to the OARRS data that's provided to |
| 01:23:10 | 21 | the Board of Pharmacy, is somebody reviewing that data daily |
| 01:23:15 | 22 | when it comes in? |
| 01:23:16 | 23 | **A** No. |
| 01:23:16 | 24 | **Q** Is somebody reviewing that data regularly every month? |
| 01:23:24 | 25 | **A** I don't -- I mean, I review the doctor shopper report |

| | |
|---|---|
| 01:23:28 | 1 |
| 01:23:31 | 2 |
| 01:23:34 | 3 |
| 01:23:38 | 4 |
| 01:23:40 | 5 |
| 01:23:45 | 6 |
| 01:23:46 | 7 |
| 01:23:46 | 8 |
| 01:23:50 | 9 |
| 01:23:54 | 10 |
| 01:23:57 | 11 |
| 01:23:57 | 12 |
| 01:24:03 | 13 |
| 01:24:06 | 14 |
| 01:24:06 | 15 |
| 01:24:06 | 16 |
| 01:24:14 | 17 |
| 01:24:18 | 18 |
| 01:24:23 | 19 |
| 01:24:27 | 20 |
| 01:24:28 | 21 |
| 01:24:31 | 22 |
| 01:24:41 | 23 |
| 01:24:49 | 24 |
| 01:24:55 | 25 |

1  every month because of my role in the Early Intervention

2  program, but in terms of reviewing all the data that comes

3  in, no, there's -- I mean, there would be no way to review

4  every single piece of data that comes in.

5  **Q**    Right.  It's expected, if you're a registrant, to

6  follow the law, right?

7  **A**    Correct.

8  **Q**    It's expected that if you're a pharmacy and you're a

9  registrant, you have to follow the law with respect to the

10  identification and resolution of red flags, right?

11  **A**    Sure.

12  **Q**    And you have to do that analysis with respect to every

13  controlled substance prescription that is presented to you,

14  right?

15  **A**    Correct, yes.

16  **Q**    And the home office may not be able -- of CVS or

17  Walgreens, may not be able to register with OARRS, but they

18  have every ability to train their pharmacists and to

19  encourage their pharmacists to register with OARRS because

20  it's such a good tool, right?

21  **A**    Yes.

22  **Q**    And if a corporate office takes four or five years

23  after a PDMP comes onboard to issue a policy encouraging,

24  indeed mandating, that the pharmacists register for OARRS,

25  that would be a problem, right?

**Edwards - (Recross by Weinberger)**

01:24:57    1    **A**    Potentially it could be a problem.

01:25:03    2    **Q**    Now, one final question or set of questions on the

01:25:05    3    Dr. Franklin investigation, sir.

01:25:07    4    Part of the issue with Dr. Franklin is he had an

01:25:16    5    office in Middlefield in Geauga County, and what was

01:25:21    6    beginning to be noticed by the Board of Pharmacy and others

01:25:24    7    is that his -- that the patients that he was seeing were

01:25:28    8    traveling outside of Geauga County to get their

01:25:32    9    prescriptions filled, right?

01:25:33    10    **A**    Correct.

01:25:36    11    **Q**    And that includes pharmacies in Trumbull County and in

01:25:39    12    Lake County owned by CVS and Walgreens, right?

01:25:43    13    **A**    Correct.

01:25:47    14    MR. WEINBERGER:  Thank you.

01:25:48    15    Thank you, Your Honor.  That's all I have.

01:25:52    16    THE COURT:  Okay, sir, thank you very much.

01:25:54    17    We appreciate your testimony.  And you may be excused.

01:25:56    18    THE WITNESS:  All right.  Thank you.

01:26:07    19    MS. SWIFT:  Your Honor, may we bring in our

01:26:09    20    next witness?

01:26:10    21    THE COURT:  Yes.

01:26:12    22    MS. SWIFT:  Just give us one minute.

01:26:28    23    MS. FUMERTON:  Your Honor, could I approach

01:26:30    24    the witness --

01:26:31    25    THE COURT:  Sure.  You can get the documents

**Brunner - (Direct by Swift)**                                    5474

| | | |
|---|---|---|
| 01:26:32 | 1 | back.  That's a good idea. |
| 01:27:20 | 2 | (Pause in proceedings.) |
| 01:27:50 | 3 | THE COURT:  Okay.  You may come forward, sir. |
| 01:27:52 | 4 | MS. SWIFT:  Walgreens calls Robert Brunner to |
| 01:27:55 | 5 | the stand. |
| 01:28:16 | 6 | THE COURT:  Good afternoon, Mr. Brunner.  If |
| 01:28:18 | 7 | you could raise your right hand, please. |
| 01:28:20 | 8 | (Witness sworn.) |
| 01:28:26 | 9 | THE COURT:  Thank you.  You may remove your |
| 01:28:28 | 10 | mask while testifying, please. |
| 01:28:31 | 11 | Okay, Ms. Swift. |
| 01:28:33 | 12 | MS. SWIFT:  May it please the Court. |
| 01:28:35 | 13 | Good afternoon, ladies and gentlemen. |
| 01:28:36 | 14 | I'll give the witness a minute to settle in. |
| 01:28:45 | 15 | You're bouncing around a little bit back there.  Are |
| 01:28:48 | 16 | you okay? |
| 01:28:49 | 17 | THE WITNESS:  Trying to raise the chair up. |
| 01:28:51 | 18 | That's as high as it goes. |
| 01:28:52 | 19 | THE COURT:  We've had a problem raising that |
| 01:28:54 | 20 | chair or lowering it, sir, so I think you have to do the |
| 01:28:56 | 21 | best you can.  We apologize. |
| 01:28:41 | 22 | ROBERT BRUNNER |
| 01:28:41 | 23 | - - - - - |
| 01:28:41 | 24 | DIRECT EXAMINATION |
| 01:28:41 | 25 | BY MS. SWIFT: |

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 01:28:59 | 1 | **Q**    Good afternoon, Mr. Brunner. |
| 01:29:00 | 2 | Would you please introduce yourself to the jury. |
| 01:29:02 | 3 | **A**    Good afternoon.  My name is Robert Brunner.  I'm a |
| 01:29:05 | 4 | vice president with Charles River Associates. |
| 01:29:08 | 5 | **Q**    Mr. Brunner, would you please spell your name for the |
| 01:29:10 | 6 | court reporter. |
| 01:29:11 | 7 | **A**    Yes.  Brunner, B-R-U-N-N-E-R. |
| 01:29:14 | 8 | **Q**    Are you offering opinions today on behalf of |
| 01:29:20 | 9 | Walgreens? |
| 01:29:21 | 10 | **A**    Yes, I am. |
| 01:29:21 | 11 | **Q**    In the area of data analysis? |
| 01:29:23 | 12 | **A**    Correct. |
| 01:29:23 | 13 | **Q**    I'm going to focus my questions with you today on |
| 01:29:27 | 14 | three areas.  We'll talk about your background and resume, |
| 01:29:31 | 15 | we'll talk about the work you did in this case and how you |
| 01:29:34 | 16 | did it, and then I'm going to ask you about some of the |
| 01:29:36 | 17 | results you reached.  Okay? |
| 01:29:38 | 18 | **A**    Excellent. |
| 01:29:38 | 19 | **Q**    All right.  So we'll focus first on your resume.  I'm |
| 01:29:42 | 20 | going to put it on the screen if I could, and this is going |
| 01:29:45 | 21 | to be Tab 1 of your binder if you want to follow along in |
| 01:29:49 | 22 | the hard copy. |
| 01:29:58 | 23 | Okay, Mr. Brunner, can you see that on the screen? |
| 01:30:01 | 24 | **A**    Yes, I can. |
| 01:30:01 | 25 | **Q**    I'll call out the first paragraph of your resume.  And |

**Brunner - (Direct by Swift)**

5476

| | | |
|---|---|---|
| 01:30:08 | 1 | you just said, and it says in the first paragraph here, that |
| 01:30:10 | 2 | you work at Charles River Associates. |
| 01:30:13 | 3 | What is Charles River? |
| 01:30:15 | 4 | **A**   It's a multidisciplinary consultancy that provides |
| 01:30:18 | 5 | management consulting, litigation consulting, expert witness |
| 01:30:22 | 6 | services. |
| 01:30:24 | 7 | **Q**   And do you principally do litigation work or do you do |
| 01:30:28 | 8 | other work as well? |
| 01:30:30 | 9 | **A**   My focus is more on investigations, internal |
| 01:30:34 | 10 | investigations, regulatory investigations, those sorts of |
| 01:30:37 | 11 | things. |
| 01:30:38 | 12 | **Q**   Let me back out of this for a second first and lay a |
| 01:30:42 | 13 | little bit better foundation for your resume. |
| 01:30:44 | 14 | Is this in fact your current resume? |
| 01:30:46 | 15 | **A**   Yes, it is. |
| 01:30:46 | 16 | **Q**   Great. |
| 01:30:47 | 17 | How big is Charles River? |
| 01:30:48 | 18 | **A**   It's about a thousand professionals. |
| 01:30:50 | 19 | **Q**   And your resume says that at Charles River you're the |
| 01:30:54 | 20 | co-leader of the Risk Investigations and Analytics practice. |
| 01:30:58 | 21 | What does that mean you do day to day? |
| 01:31:00 | 22 | **A**   So our practice helps companies respond to internal |
| 01:31:06 | 23 | investigations, things like internal fraud, malfeasance, |
| 01:31:14 | 24 | regulatory inquiries, SEC inquiries, DOJ inquiries, those |
| 01:31:19 | 25 | sorts of things. |

**Brunner - (Direct by Swift)**                                    5477

01:31:19  1    **Q**    How many people work for you at Charles River?

01:31:21  2    **A**    45, 50.

01:31:23  3    **Q**    Do you also work with people from other firms aside

01:31:27  4    from Charles River on the cases that you work on?

01:31:30  5    **A**    Yes, I do.

01:31:30  6    **Q**    Do you do that in this case in fact?

01:31:32  7    **A**    Yes.

01:31:32  8    **Q**    Who are the people that you work with in this case?

01:31:35  9    **A**    So I left my prior employer and joined Charles River

01:31:42  10   about two and a half years ago.  My prior employer was FTI

01:31:46  11   Consulting, and I've relied on a lot of work from people who

01:31:48  12   I supervised still there at FTI Consulting, my prior

01:31:52  13   employer.

01:31:52  14   **Q**    Explain for the jury what FTI Consulting is.

01:31:55  15   **A**    It's sort of a much bigger-in-scope firm of Charles

01:32:00  16   River, my current employer.  They do, in addition to

01:32:02  17   litigation support and expert testimony, they also offer,

01:32:05  18   like, investor relations and corporate recovery,

01:32:10  19   restructuring services, those sorts of things.

01:32:12  20   **Q**    All right.  Your resume says that you are based in

01:32:33  21   both Los Angeles and New York.

01:32:36  22          Where do you live?

01:32:37  23   **A**    I live in Southern California.

01:32:39  24   **Q**    Are you from Southern California originally?

01:32:40  25   **A**    For the most part, yes.  I was actually born in

5478

| | | |
|---|---|---|
| 01:32:44 | 1 | Buffalo, but I've lived in California for the last 50 years. |
| 01:32:48 | 2 | **Q**   Did you say for the last 50 years? |
| 01:32:50 | 3 | **A**   Yes. |
| 01:32:51 | 4 | **Q**   Oh, wow.  Okay. |
| 01:32:52 | 5 |       Where did you go to college? |
| 01:32:53 | 6 | **A**   University of California San Diego. |
| 01:32:55 | 7 | **Q**   What degrees did you -- did you obtain a degree from |
| 01:32:58 | 8 | the University of California? |
| 01:32:58 | 9 | **A**   Yes, I did. |
| 01:32:59 | 10 | **Q**   What degrees did you obtain? |
| 01:33:00 | 11 | **A**   I have a bachelor -- bachelor degrees in |
| 01:33:05 | 12 | mathematics-computer science and in economics. |
| 01:33:06 | 13 | **Q**   Do you have any advanced degrees? |
| 01:33:07 | 14 | **A**   No. |
| 01:33:08 | 15 | **Q**   Did you ever think about getting an advanced degree? |
| 01:33:11 | 16 | **A**   I started work on a master's program, and then -- |
| 01:33:15 | 17 | shortly after my bachelor's, and then concluded that I |
| 01:33:18 | 18 | needed to go out in the real world and make some money to |
| 01:33:20 | 19 | pay some bills. |
| 01:33:22 | 20 | **Q**   I take it you don't view an advanced degree like a |
| 01:33:29 | 21 | Ph.D., that's not necessary for the work that you do? |
| 01:33:33 | 22 | **A**   Absolutely not. |
| 01:33:34 | 23 | **Q**   Why not? |
| 01:33:34 | 24 | **A**   Doing the work I do in the analytics space requires a |
| 01:33:38 | 25 | mastery of the tools and of attention to detail.  And those |

01:33:41  1   are things that I exhibited in undergraduate school and that

01:33:46  2   I've refined over the course of my 35 years-plus in the

01:33:49  3   field.

01:33:49  4   **Q**    Why do you split your time between New York and LA?

01:33:52  5   **A**    So I'm a Southern Californian, but the number -- the

01:33:57  6   practice that I'm trying to build that I've just come over a

01:34:00  7   few years ago to start building is based in New York, and a

01:34:03  8   good number of my clients are in New York as well.

01:34:05  9   **Q**    All right.  Your resume says that you are an expert in

01:34:08  10  the areas of collection and analysis of financial,

01:34:14  11  transactional, and appraisal data.

01:34:16  12       Do I have that right?

01:34:18  13  **A**    Yes, you do.

01:34:19  14  **Q**    Can you provide an example of the type of data you

01:34:22  15  have looked at in the course of your work?

01:34:24  16  **A**    In the course of my work for this case specifically,

01:34:27  17  or broadly?

01:34:29  18  **Q**    Or an example from your resume; your choice.

01:34:32  19  **A**    It's the quantitative numbers, the numbers in the

01:34:36  20  codes, as opposed to looking at sort of e-mails and

01:34:39  21  free-text stuff that you might do a Google search on, this

01:34:43  22  is the quantum analytics.  And so the mathematical -- the

01:34:46  23  fielded information, you might think of it as the cells in a

01:34:49  24  spreadsheet of a super, super-large spreadsheet.

01:34:52  25  **Q**    I'll back out of this so the jury can see a little bit

**Brunner - (Direct by Swift)**

01:34:55  1    more of your resume.

01:34:57  2         After the first three paragraphs or so there's several

01:35:02  3    pages of what you call selected engagements.

01:35:05  4         Do you see that?

01:35:05  5    **A**    Yes, I do.

01:35:06  6    **Q**    Can you give us a more concrete example of the kind of

01:35:10  7    work that you do with data in one of the cases from your

01:35:13  8    resume?

01:35:16  9    **A**    Sure.  An example I think everyone can relate to is a

01:35:19  10   case involving Amazon.  There was a dispute between Toys "R"

01:35:23  11   Us and Amazon.  Amazon was running Toys "R" Us's website for

01:35:28  12   them, and they had a contract dispute about overlapping

01:35:31  13   sales or competitive sales.  So we had to do a robust

01:35:36  14   analysis of Amazon's data warehouse, which at the time was

01:35:40  15   one of the largest in the world, to identify what's the

01:35:44  16   population of potential products where there might be

01:35:48  17   overlap, who sold which one, so we had to do intensive

01:35:52  18   investigation of the data warehouse to find answers to those

01:35:55  19   discreet questions.

01:35:55  20   **Q**    And I take it both from that answer and the answer you

01:35:58  21   gave a moment ago that most of the time when you're

01:36:00  22   analyzing data it's electronic data, like data on a

01:36:03  23   spreadsheet; that fair?

01:36:04  24   **A**    Yes.

01:36:04  25   **Q**    Do you sometimes also analyze hard copy data?

01:36:07   1   **A**     Yes.  When I started my career 35 years ago, a vast

01:36:11   2   majority of business records were still kept in hard copy

01:36:14   3   form, and so oftentimes there had to be a conversion

01:36:18   4   process, or what have you, to take the hard copy stuff and

01:36:20   5   turn it into data.

01:36:22   6   **Q**     I apologize.  I warned you I was going to do this.

01:36:24   7   I'm going to ask you to slow down a little bit for

01:36:27   8   Mr. Boardman's sake, Mr. Brunner.

01:36:30   9          Did you look at hard copy data in this case?

01:36:32   10  **A**     Yes.

01:36:32   11  **Q**     What hard copy data did you look at in this case?

01:36:34   12  **A**     Hard copy prescriptions that were included with the --

01:36:40   13  or that were associated with the sample of 2000

01:36:43   14  prescriptions.

01:36:44   15  **Q**     And we'll talk about that in a little bit more detail

01:36:46   16  later on.  I just want to focus on one more paragraph from

01:36:52   17  your resume.

01:36:55   18          I'll call out the third paragraph.  Prior to joining

01:37:01   19  Charles River, you were the founder and global leader of the

01:37:03   20  Data and Analytics practice at FTI.  I think you've already

01:37:07   21  mentioned that.  You've already mentioned that part of your

01:37:11   22  career.

01:37:11   23          Before joining FTI, do I have it right that you were a

01:37:15   24  partner at both KPMG and before that at Arthur Andersen?

01:37:20   25  **A**     Yes.

**Brunner - (Direct by Swift)** 5482

01:37:20  1  **Q**    Were those big accounting firms at the time that also

01:37:24  2  had large consulting practices?

01:37:26  3  **A**    Yes, they were.

01:37:26  4  **Q**    Were you ever involved in any of their audit work?

01:37:30  5  **A**    Negative.

01:37:30  6  **Q**    Have you always focused your practice throughout your

01:37:33  7  career on the kind of data analysis that you did in this

01:37:35  8  case?

01:37:36  9  **A**    Yes.

01:37:36  10  **Q**    What was your first job out of college?

01:37:40  11  **A**    I was the director of Administrative Computing at

01:37:45  12  Scripps Institution of Oceanography.

01:37:48  13  **Q**    What is the Scripps Institution of Oceanography?

01:37:51  14  **A**    It's a leading oceanographic research institute that

01:37:54  15  looks at things like fish life, marine biology, underwater

01:38:02  16  or ocean currents, ocean temperatures, those sorts of

01:38:05  17  things.

01:38:06  18  **Q**    Where is Scripps?

01:38:06  19  **A**    It's in La Jolla, California, which is just north of

01:38:10  20  San Diego.

01:38:10  21  **Q**    And what did you do at the Oceanography Institute?

01:38:13  22  **A**    I was the director of their Administrative Computing.

01:38:16  23  **Q**    Mr. Brunner knows I'm going to make fun of him for

01:38:19  24  this.

01:38:19  25       It sounds like you had the most boring job at a really

**Brunner - (Direct by Swift)** 5483

01:38:22  1    cool place.  Is that a fair statement, in your mind?

01:38:24  2    **A**    I can't object to it, but there were some positive

01:38:28  3    aspects to it.  My office was, you know, closer to the beach

01:38:30  4    than you are, and the guy in the office next to me was a

01:38:35  5    pioneering scuba diver who virtually invented the sport.

01:38:39  6    **Q**    Did he teach you to scuba dive?

01:38:41  7    **A**    He did teach me to scuba dive.  This was a guy who was

01:38:45  8    scuba diving before scuba equipment even existed, and he

01:38:48  9    used to tell me stories.  He had these two massive shark

01:38:51  10   bites on his arm from one of his research endeavors.

01:38:54  11   **Q**    Do you still live near the ocean today?

01:38:57  12   **A**    I do.

01:38:58  13   **Q**    All right.  Have we covered all of your jobs since

01:39:00  14   college?

01:39:00  15   **A**    Yes.

01:39:00  16   **Q**    And you already mentioned that you have a -- you were

01:39:04  17   working with people at FTI on this case.  I want to ask you

01:39:08  18   some more questions about that team.

01:39:09  19        How many people are working with you on this case from

01:39:15  20   FTI?

01:39:16  21   **A**    I don't know exactly.  Probably five to ten.

01:39:17  22   **Q**    What kinds of backgrounds does the FTI team have?

01:39:24  23   **A**    They have similar to mine.  They have backgrounds in

01:39:27  24   business, finance, applied math, economics, those sorts of

01:39:31  25   things.

**Brunner - (Direct by Swift)**

5484

01:39:31  1   **Q**    What levels of seniority do the folks at FTI have?

01:39:36  2   **A**    Range from young folks sort of fresh out of college to

01:39:40  3   experienced folks with 20-plus years of experience.

01:39:42  4   **Q**    Have you been working with that team the entire time

01:39:45  5   you've worked on this litigation?

01:39:46  6   **A**    Yes.

01:39:47  7   **Q**    Would it have been possible to do the work that you

01:39:49  8   did in this case without their help?

01:39:51  9   **A**    Absolutely not.

01:39:52  10  **Q**    And I skipped a predicate question there.

01:39:55  11         How long have you been working with the folks at FTI

01:39:57  12  on this case?

01:39:58  13  **A**    On this case?  I was initially engaged in late

01:40:05  14  spring -- or mid spring of 2019, so just over two years.

01:40:08  15  **Q**    You've been working with your team that whole entire

01:40:10  16  time?

01:40:11  17  **A**    Yes.

01:40:11  18  **Q**    About how much of your time have you spent working on

01:40:17  19  this litigation in the two-plus years that you've been

01:40:20  20  working on it?

01:40:21  21  **A**    15, 25 percent, somewhere in that range.

01:40:24  22  **Q**    Okay.  How much have you billed on this litigation

01:40:27  23  overall in that time?

01:40:28  24  **A**    Including expenses, about $720,000.

01:40:32  25  **Q**    Is your income at Charles River tied in any way to the

01:40:36    1    amount of money that you bill to Walgreens?

01:40:38    2    **A**    No.  Those are Charles River billings, not Rob Brunner

01:40:43    3    billings.

01:40:43    4    **Q**    Is your income tied in any way to the amount of money

01:40:45    5    that FTI bills for the work they do to support you?

01:40:49    6    **A**    Negative.

01:40:49    7    **Q**    Do you even know how much FTI has billed on this case?

01:40:52    8    **A**    Negative.

01:40:52    9    **Q**    Mr. Brunner, do you consider yourself an expert in the

01:40:57   10    field of data analytics?

01:40:59   11    **A**    Yes, I am.

01:40:59   12    **Q**    Do you have opinions that you have prepared in this

01:41:02   13    case based on that expertise?

01:41:05   14    **A**    Yes, I do.

01:41:05   15    **Q**    Do you hold those opinions to a reasonable degree of

01:41:08   16    professional certainty?

01:41:08   17    **A**    Yes, I do.

01:41:09   18    **Q**    Are you prepared to explain those opinions to the jury

01:41:12   19    today?

01:41:12   20    **A**    Yes, I am.

01:41:13   21    **Q**    All right.  Now I'm going to change topics and ask you

01:41:17   22    questions about the work that you did in this case and how

01:41:19   23    you did it, your methods.

01:41:22   24         At a high level, can you describe for the jury what is

01:41:27   25    the work that you did in this case that you're prepared to

**Brunner - (Direct by Swift)** 5486

01:41:30  1  talk about today?  And I'm going to follow along with you,

01:41:34  2  take some notes.

01:41:36  3  **A**    There were three basic high-level tasks.  One was to

01:41:43  4  intake or to receive and to look at the vast amount of data

01:41:48  5  that was produced by varying parties in this case, to be

01:41:52  6  sure we -- I understood it and what it meant and what it

01:41:55  7  represented so that we could do analysis on it.

01:41:58  8       A second was to --

01:42:00  9  **Q**    Let me interrupt you for a second, Mr. Brunner.

01:42:02  10  **A**    Yes.

01:42:04  11            MS. SWIFT:  Mr. Pitts, may I have the ELMO,

01:42:06  12  please?

01:42:08  13  **Q**    I think I heard you say you received and ingested

01:42:13  14  data.  Is it a fair summary to say that you analyzed data?

01:42:18  15  **A**    Yes.

01:42:18  16  **Q**    What else did you do?

01:42:19  17  **A**    We looked at Dr. McCann's report and formed

01:42:27  18  perspectives on various of the analyses that he had done.

01:42:29  19  **Q**    Is it a fair summary that you responded to Dr. McCann?

01:42:32  20  **A**    Yes.

01:42:34  21  **Q**    And what else did you do?

01:42:34  22  **A**    Lastly, we presented the data in forms that were

01:42:43  23  demonstrative and illustrative to help the jury understand

01:42:47  24  what was included in that data.

01:42:48  25  **Q**    Fair to summarize that as present the data?

**Brunner - (Direct by Swift)** 5487

| | | |
|---|---|---|
| 01:42:53 | 1 | **A**    Yes. |
| 01:42:53 | 2 | **Q**    And you said you responded to Dr. McCann.  Remind the |
| 01:42:56 | 3 | jury who Dr. McCann is, if you would, please? |
| 01:43:00 | 4 | **A**    Dr. McCann is the plaintiffs' data expert. |
| 01:43:04 | 5 | **Q**    What kind of data did you analyze in this case? |
| 01:43:10 | 6 | **A**    At a high level, we looked at both sort of the |
| 01:43:14 | 7 | distribution and the purchases of opioids by the pharmacies |
| 01:43:17 | 8 | and the dispensation or filling of prescriptions on the |
| 01:43:20 | 9 | other side, from the pharmacies down to the consumers. |
| 01:43:25 | 10 | **Q**    Were there specific data sets that you looked at and |
| 01:43:28 | 11 | can you identify them by name? |
| 01:43:30 | 12 | **A**    Yes.  The purchases of opioids by the pharmacies is |
| 01:43:33 | 13 | tracked through a system called ARCOS, which is a DEA system |
| 01:43:37 | 14 | that tracks that data on a national basis.  And then the |
| 01:43:43 | 15 | fulfillment of prescriptions and the dispensation is tracked |
| 01:43:46 | 16 | in a system called OARRS, which is provided by the Ohio |
| 01:43:54 | 17 | Board of Pharmacy. |
| 01:43:54 | 18 | **Q**    Is there any other data that you looked at for |
| 01:43:58 | 19 | purposes of your opinions in this case? |
| 01:43:59 | 20 | **A**    Yes.  We also looked at Walgreens-produced |
| 01:44:09 | 21 | distribution data so that -- their equivalent of the |
| 01:44:12 | 22 | OARRS -- of the ARCOS data to confirm that the ARCOS data |
| 01:44:16 | 23 | matched what Walgreens' records showed. |
| 01:44:19 | 24 | **Q**    Did you also look at Walgreens' dispensing data? |
| 01:44:23 | 25 | **A**    Yes, we did. |

| | | |
|---|---|---|
| 01:44:23 | 1 | **Q**    Did I capture all of the data there on my handwritten |
| 01:44:27 | 2 | slide? |
| 01:44:27 | 3 | **A**    Yes, we did. |
| 01:44:29 | 4 | **Q**    What did you do with the ARCOS data and the OARRS |
| 01:44:35 | 5 | data? |
| 01:44:35 | 6 | **A**    I'll start with the ARCOS.  The first thing we did was |
| 01:44:40 | 7 | to take it in, to load it into a database to identify any |
| 01:44:47 | 8 | sorts of unusual activity or unusual data outliers; things |
| 01:44:51 | 9 | that, for example, if you had a state code of ZZ or |
| 01:44:54 | 10 | something like that, so things that shouldn't have fit, to |
| 01:44:56 | 11 | identify outliers.  And then we compared that to the |
| 01:44:59 | 12 | Walgreens data to help ascertain whether we -- whether we |
| 01:45:03 | 13 | agreed with it, whether it matched up, and whether we saw |
| 01:45:06 | 14 | any aberrations to determine -- |
| 01:45:07 | 15 | **Q**    Can I stop you? |
| 01:45:09 | 16 | I apologize for interrupting you, I apologize to |
| 01:45:11 | 17 | Mr. Boardman as well. |
| 01:45:11 | 18 | You said if you had a state code of ZZ or something |
| 01:45:14 | 19 | like that, that would be an outlier.  What does that mean? |
| 01:45:18 | 20 | **A**    Well, some invalid data in one of the fields. |
| 01:45:21 | 21 | **Q**    I see.  Do you mean a state code like it should be OH |
| 01:45:27 | 22 | for Ohio and you see ZZ, that's not a state that really |
| 01:45:31 | 23 | exists? |
| 01:45:31 | 24 | **A**    That's correct. |
| 01:45:31 | 25 | **Q**    What did you do if you saw anomalies like that in the |

01:45:34   1   data?

01:45:35   2   **A**    We attempted to identify if there was a way of

01:45:37   3   inferring what the right value should be.  So, for example,

01:45:41   4   if it was Cleveland and we had a ZIP code but the state code

01:45:44   5   was ZZ, we would have put in OH.  Otherwise, we left it as

01:45:50   6   is and treated it as an exception.

01:45:51   7   **Q**    All right.  So I interrupted you as you were

01:45:55   8   describing what you did with the data at a high level.

01:45:58   9        Is there anything else you wanted to say about what

01:45:59   10  you did with the data?

01:46:00   11  **A**    Just reconciled it to the Walgreens distribution data.

01:46:08   12  **Q**    Okay.  You said you analyzed the Walgreens dispensing

01:46:12   13  data.

01:46:13   14       Was your team actually involved in collecting

01:46:17   15  Walgreens dispensing data from Walgreens?

01:46:19   16  **A**    Yes, our team worked with Walgreens' IT people and

01:46:24   17  their businesspeople to identify the sources of that data

01:46:26   18  and to try and compile that data for the production in this

01:46:29   19  case.

01:46:29   20  **Q**    How many fields of information did your team collect

01:46:33   21  from Walgreens for the prescriptions that were collected?

01:46:36   22  **A**    Over 30.  It might have been 33.

01:46:39   23  **Q**    You mentioned a few minutes ago that you also looked

01:46:44   24  at hard copy data associated with a Notes sample.  Was that

01:46:48   25  a smaller subset of prescriptions, of about 2,000

**Brunner - (Direct by Swift)**

01:46:52  1    prescriptions?

01:46:52  2    **A**    That's correct.

01:46:53  3    **Q**    Did your team collect additional fields of information

01:46:57  4    in addition to the hard copy data that you mentioned for

01:47:00  5    that Notes sample of 2,000 prescriptions?

01:47:03  6    **A**    Yes, another 30-plus fields for the notes.

01:47:05  7    **Q**    The jury has heard a fair amount, including from a

01:47:10  8    witness earlier today, about the different fields of data

01:47:13  9    that are associated with prescriptions, so I won't ask you

01:47:16  10   about that.

01:47:18  11         What I do want to ask you though is, did every

01:47:21  12   prescription that you and your team collected from Walgreens

01:47:24  13   have every field populated?

01:47:27  14   **A**    No.

01:47:27  15   **Q**    For example, one of the fields, I believe, and you'll

01:47:34  16   correct me if I'm wrong, that was collected was either

01:47:36  17   called dispense time or fill time; is that correct?

01:47:40  18   **A**    That's correct.

01:47:40  19   **Q**    Is the dispense time or the fill time, is it your

01:47:47  20   understanding that's the hour and minute that the

01:47:49  21   prescription was filled?

01:47:50  22   **A**    That's correct.

01:47:50  23   **Q**    Was that field populated for every Walgreens

01:47:55  24   prescription that you collected?

01:47:57  25   **A**    No, it was not.

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 01:47:57 | 1 | **Q**    Do you know why that is? |
| 01:48:01 | 2 | **A**    I don't honestly, no. |
| 01:48:03 | 3 | **Q**    What did you do -- what did you and your team do for |
| 01:48:07 | 4 | the prescriptions that had a missing fill time for whatever |
| 01:48:10 | 5 | reason? |
| 01:48:10 | 6 | **A**    We left -- we loaded them with no fill time, and we -- |
| 01:48:17 | 7 | and because -- we load them with no fill time rather than |
| 01:48:22 | 8 | guessing at what time it was, because you can't guess at a |
| 01:48:24 | 9 | time. |
| 01:48:24 | 10 | **Q**    You didn't make up a fill time? |
| 01:48:27 | 11 | **A**    Absolutely not.  That would be inappropriate. |
| 01:48:29 | 12 | **Q**    Why wouldn't you make up a fill time? |
| 01:48:31 | 13 | **A**    It's inappropriate to make up data such as that.  As I |
| 01:48:36 | 14 | mentioned earlier, if you can infer a value, so you have |
| 01:48:40 | 15 | Columbus and a ZIP code, you can infer the state of Ohio. |
| 01:48:44 | 16 | You can't infer the fill time, the time of the day, through |
| 01:48:48 | 17 | any other information available. |
| 01:48:50 | 18 | **Q**    Now, Dr. McCann testified to the jury that he just |
| 01:48:54 | 19 | filled in the time of noon every time he lacked a fill time |
| 01:49:01 | 20 | in the dispensing data that he looked at. |
| 01:49:03 | 21 |      Do you agree that that's an appropriate thing to -- |
| 01:49:06 | 22 |           MR. LANIER:  I object to the characterization |
| 01:49:07 | 23 | of the testimony. |
| 01:49:08 | 24 | **Q**    I'll ask you to assume -- |
| 01:49:10 | 25 |           THE COURT:  Let's rephrase that, please. |

**Brunner - (Direct by Swift)**

01:49:11 | 1         MS. SWIFT:  Sure.  I'm happy to rephrase it.

01:49:13 | 2 **Q**    I'll ask you to assume that Dr. McCann when he was

01:49:15 | 3 sitting where you are testified to the jury that when he

01:49:19 | 4 lacked a fill time, he filled in noon for all of the missing

01:49:23 | 5 fill times.

01:49:25 | 6     Do you agree that that would be an appropriate thing

01:49:28 | 7 to do with the data?

01:49:28 | 8 **A**    Absolutely not.

01:49:30 | 9 **Q**    And again, why is that?

01:49:31 | 10 **A**    Again, if information can't be inferred, you can't

01:49:37 | 11 make up a value in there.  It would be like just assuming

01:49:41 | 12 that every place that a state didn't appear they were all

01:49:44 | 13 Ohio everywhere or they were all California everywhere.

01:49:48 | 14 Just inappropriate.

01:49:48 | 15 **Q**    Once you have your data collected and your database up

01:49:52 | 16 and running, what do you and your team do with the data?

01:49:56 | 17 What did you do with it in this case?  What was the purpose

01:49:58 | 18 of collecting it all and putting it in a database?

01:50:00 | 19 **A**    To be able to perform analysis, which is to say, to be

01:50:04 | 20 able to ask questions or interrogate the data to get answers

01:50:07 | 21 to specific questions or broad questions.

01:50:10 | 22 **Q**    And is that in fact what you did in this case?  Did

01:50:14 | 23 you receive questions from all sorts of folks, including

01:50:17 | 24 myself, and then run queries on the data to answer those

01:50:19 | 25 questions?

**Brunner - (Direct by Swift)**

01:50:19   1   **A**     Yes.

01:50:19   2   **Q**     Okay.  Then you said you also helped to create --

01:50:25   3   helped to present the data.

01:50:29   4         Does that -- what does that mean, help to present the

01:50:31   5   data?  What did you do?

01:50:32   6   **A**     We summarized the data in various charts and tables,

01:50:39   7   sometimes by store number, oftentimes differentiating one

01:50:43   8   county, Lake versus Trumbull, those sorts of things.

01:50:49   9   **Q**     And then you said you responded to Dr. McCann, and

01:50:50   10   you've already talked a little bit about that, and we'll get

01:50:53   11   to that in a little more detail a little later on.

01:50:55   12         Before that, I want to ask you a few questions --

01:50:57   13   first I'm going to knock my water bottle off the table.

01:51:02   14         I want to ask you a few questions about just to make

01:51:06   15   clear what you are not doing in this case.

01:51:08   16         Are you a pharmacy expert?

01:51:11   17   **A**     Negative.

01:51:12   18   **Q**     Are you a pharmacist?

01:51:14   19   **A**     Negative.

01:51:14   20   **Q**     Are you a medical doctor?

01:51:16   21   **A**     Negative.

01:51:16   22   **Q**     Are you an expert in DEA regulations for pharmacies?

01:51:21   23   **A**     Negative.

01:51:21   24   **Q**     Do you have any expertise in DEA regulations at all?

01:51:25   25   **A**     None whatsoever.

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 01:51:28 | 1 | **Q**    Are you offering any opinions on whether any pharmacy |
| 01:51:31 | 2 | in Lake or Trumbull County violated the law? |
| 01:51:34 | 3 | **A**    Negative. |
| 01:51:34 | 4 | **Q**    Are you offering any opinions on whether any pharmacy |
| 01:51:37 | 5 | in Lake or Trumbull County, or anywhere else, complied with |
| 01:51:41 | 6 | the law? |
| 01:51:42 | 7 | **A**    Negative. |
| 01:51:43 | 8 | **Q**    Okay.  Now I want to change topics and talk to you |
| 01:51:48 | 9 | about some of the results that you reached in this case, |
| 01:51:54 | 10 | using some demonstratives to help the jury understand what |
| 01:51:57 | 11 | you did and what the data shows, okay? |
| 01:51:59 | 12 | **A**    All right. |
| 01:51:59 | 13 | **Q**    So first I want to ask you about the Walgreens |
| 01:52:02 | 14 | pharmacies in Lake and Trumbull County. |
| 01:52:05 | 15 |     In the course of your work in this case, did you |
| 01:52:08 | 16 | determine how many Walgreens pharmacies there are in Lake |
| 01:52:11 | 17 | and Trumbull Counties? |
| 01:52:11 | 18 | **A**    Yes, I did. |
| 01:52:12 | 19 | **Q**    How many are there in Lake County? |
| 01:52:13 | 20 | **A**    There are seven. |
| 01:52:14 | 21 | **Q**    How many Walgreens pharmacies are there in Trumbull |
| 01:52:18 | 22 | County? |
| 01:52:18 | 23 | **A**    Six. |
| 01:52:19 | 24 | **Q**    Did you as a part of your work in this case create |
| 01:52:22 | 25 | maps showing where those Walgreens pharmacies are located? |

**Brunner - (Direct by Swift)**

5495

| | | |
|---|---|---|
| 01:52:26 | 1 | **A**      Yes, I did. |
| 01:52:26 | 2 | **Q**      Okay. |
| 01:52:28 | 3 |           MS. SWIFT:  Mr. Pitts, if I could please |
| 01:52:30 | 4 | switch back to the computer. |
| 01:52:33 | 5 | **Q**      And if you're following along in the binder, the |
| 01:52:36 | 6 | document I'm going to put on the screen is behind Tab 6. |
| 01:52:47 | 7 |           And this is, for the record, it's Exhibit 2559. |
| 01:52:52 | 8 |           Mr. Brunner, is this one of the demonstrative exhibits |
| 01:52:56 | 9 | that you prepared in the course of your work in this case? |
| 01:52:59 | 10 | **A**      Yes. |
| 01:52:59 | 11 | **Q**      Is this one of the maps that you created? |
| 01:53:00 | 12 | **A**      Yes. |
| 01:53:01 | 13 | **Q**      What does this map show? |
| 01:53:03 | 14 | **A**      Specifically, this shows pins placed for all 13 |
| 01:53:12 | 15 | Walgreens stores in Lake and Trumbull County. |
| 01:53:15 | 16 | **Q**      And I'll just use my cursor.  The pins that are up |
| 01:53:19 | 17 | here by the Lake, are those the seven Walgreens pharmacies |
| 01:53:22 | 18 | in Lake County? |
| 01:53:23 | 19 | **A**      Yes. |
| 01:53:23 | 20 | **Q**      And then these down here towards the bottom of the |
| 01:53:26 | 21 | map, are these the six Walgreens stores in Trumbull County? |
| 01:53:30 | 22 | **A**      Yes. |
| 01:53:30 | 23 | **Q**      All right.  I'm going to go to page 3 of this |
| 01:53:36 | 24 | document. |
| 01:53:41 | 25 |           Does this show, kind of zoomed in, the Lake County |

**Brunner - (Direct by Swift)**

01:53:45   1   Walgreens stores?

01:53:46   2   **A**    Yes.

01:53:46   3   **Q**    Now, you testified that there are seven Walgreens

01:53:51   4   stores in Lake County.  I think I count eight pins on the

01:53:56   5   map.

01:53:56   6        What's going on there?

01:53:57   7   **A**    Yes.  In the -- so in the left portion of that, just

01:54:03   8   along the coastline, you see a blue pin and a yellow pin

01:54:08   9   immediately adjacent to each other.

01:54:09   10   **Q**    These that I'm highlighting right here?

01:54:11   11   **A**    That's correct.

01:54:12   12   **Q**    Yes.

01:54:12   13   **A**    Those two stores are identified with a common number

01:54:16   14   in the ARCOS data.  The circumstances, there was a Walgreens

01:54:22   15   that moved just down the street, and the DEA used the same

01:54:28   16   number for both of those stores.  So it closed, say, on a

01:54:32   17   Tuesday.  It opened in the new location on a Wednesday.  But

01:54:35   18   for DEA ARCOS reporting purposes, that's just one store.  So

01:54:39   19   we plotted both of them here so they both could be seen, but

01:54:45   20   they represented one store in the eyes of the DEA.

01:54:47   21   **Q**    Did you look to see how Dr. McCann treated that store

01:54:50   22   at those two locations?

01:54:51   23   **A**    Yeah, he treated them the same way as I did.

01:54:53   24   **Q**    All right.  I'm going to pull up a different set of

01:54:58   25   maps.  This is going to be Tab 7 in the binder, and it's

Brunner - (Direct by Swift)                                    5497

01:55:01   1    Exhibit 2560.

01:55:07   2         Is this another set of maps that you created for your

01:55:09   3    work in this case?

01:55:10   4    A    Yes.

01:55:10   5    Q    I'm just going to ask you, I think, about one of them.

01:55:25   6    I'm on page 7 of Exhibit 2560.

01:55:28   7         Can you tell us what this map shows?

01:55:29   8    A    This shows the location of Walgreens Store Number

01:55:41   9    5549, which is located at 804 West Market Street.

01:55:44   10   Q    And is that in Warren, Ohio?

01:55:46   11   A    Yes, it is.

01:55:46   12   Q    And we're going to hear more about this particular

01:55:51   13   Walgreens store later in your examination, but can you tell

01:55:55   14   us, is this the largest Walgreens store in Trumbull County?

01:55:59   15   A    Yes.

01:55:59   16   Q    All right.  Is there anything else you can tell about

01:56:07   17   it from just looking at the map?

01:56:08   18   A    The only thing that's readily identifiable is it's a

01:56:16   19   14-minute drive from the Mercy Health Medical Center.

01:56:22   20   Q    Do you know why that's there?

01:56:24   21   A    I don't recall why we put that on there, why we

01:56:27   22   included that.

01:56:27   23   Q    All right.  Now I'm going to change topics a little

01:56:29   24   bit again and ask you some questions about market share.

01:56:32   25        Did you do analysis of the data to determine the

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 01:56:37 | 1 | market share of Walgreens and other pharmacies in Lake and |
| 01:56:42 | 2 | Trumbull Counties? |
| 01:56:42 | 3 | **A**    Yes, I did. |
| 01:56:42 | 4 | **Q**    What data did you use to calculate market share? |
| 01:56:47 | 5 | **A**    The ARCOS data. |
| 01:56:48 | 6 | **Q**    I'm going to ask you why you did that in a minute, but |
| 01:56:52 | 7 | just to take a step back, what does it mean to calculate |
| 01:56:56 | 8 | market share?  What's a market share? |
| 01:56:58 | 9 | **A**    Market share is looking at the aggregate sales of any |
| 01:57:01 | 10 | store or group of sales within a county relative to the |
| 01:57:07 | 11 | total sales in that county. |
| 01:57:08 | 12 | **Q**    So you said you'd used ARCOS data to calculate market |
| 01:57:12 | 13 | share, and I think you testified already that the ARCOS data |
| 01:57:16 | 14 | is DEA data that reflects the purchases that a pharmacy |
| 01:57:19 | 15 | makes for opioids? |
| 01:57:21 | 16 | **A**    Yes.  So the -- for purposes of doing our market share |
| 01:57:27 | 17 | analysis, we mirrored Dr. McCann's approach, which is to use |
| 01:57:32 | 18 | the ARCOS data and look at purchases by those pharmacies -- |
| 01:57:38 | 19 | **Q**    Okay. |
| 01:57:39 | 20 | **A**    -- for all the opioid purchasers within Lake and |
| 01:57:43 | 21 | Trumbull County. |
| 01:57:43 | 22 | **Q**    Did you prepare a summary table, like a big |
| 01:57:45 | 23 | spreadsheet of numbers, in order to figure out what the |
| 01:57:49 | 24 | market share was for Walgreens and other pharmacies in Lake |
| 01:57:53 | 25 | and Trumbull County? |

5499

01:57:53  1    **A**     Yes.

01:57:54  2    **Q**     I'm going to put that on the screen, but because it's

01:57:57  3    a big Excel spreadsheet, I'm actually going to put the Excel

01:58:01  4    spreadsheet up.  It's behind Tab 8 in the binders.  We

01:58:05  5    worked hard to get it printable in a way that is readable,

01:58:08  6    but it's kind of hard to read.

01:58:15  7         And this is, for the record, Exhibit 2561.

01:58:19  8         Do you see that in front of you on the screen,

01:58:22  9    Mr. Brunner?

01:58:22  10   **A**     I do.

01:58:22  11   **Q**     Is what I have on the screen the summary that you

01:58:27  12   created showing the purchases of opioids by pharmacies in

01:58:35  13   Lake and Trumbull Counties?

01:58:35  14   **A**     Yes.

01:58:36  15   **Q**     And this particular sheet of the spreadsheet that I

01:58:40  16   have up, is this your summary of the pharmacies in Trumbull

01:58:45  17   County?

01:58:45  18   **A**     Yes.  You can see that in the first column.

01:58:47  19   **Q**     And tell the jury just briefly what is shown in this

01:58:51  20   spreadsheet that is Exhibit 2561.

01:58:54  21   **A**     Briefly, it's the county unique identifier from the

01:59:03  22   ARCOS data for each pharmacy; the name, the address, and

01:59:07  23   then further the writer details about the number of dosage

01:59:12  24   units, the number of MME, what have you.

01:59:13  25   **Q**     How are these pharmacies ordered in this spreadsheet?

**Brunner - (Direct by Swift)**

01:59:17  1   **A**     In this spreadsheet they're ordered in descending

01:59:21  2   volume of MME.

01:59:23  3   **Q**     And is that column B that says "Total ARKS MME

01:59:29  4   excluding buprenorphine and methadone"?

01:59:31  5   **A**     That's correct.

01:59:31  6   **Q**     What does that mean, "excluding buprenorphine and

01:59:35  7   methadone?

01:59:35  8   **A**     So the ARCOS data included 14 drugs.  Two of those

01:59:39  9   were identified as treatment drugs, buprenorphine and

01:59:43  10  methadone.  So we excluded those in the calculations of what

01:59:48  11  the total MME was.

01:59:50  12  **Q**     Do you know from your work in this case whether

01:59:52  13  Dr. McCann did the same thing in some of his analyses?

01:59:56  14  **A**     Yes.

01:59:56  15  **Q**     Okay.  What is the largest pharmacy identified in your

02:00:02  16  summary for Trumbull County?

02:00:03  17  **A**     Franklin Pharmacy.

02:00:05  18  **Q**     What is the second-largest pharmacy in Trumbull

02:00:08  19  County?

02:00:08  20  **A**     Overholt's Champion.

02:00:10  21  **Q**     And what is the third?

02:00:12  22  **A**     Bellevue Medicine Shoppe.

02:00:15  23  **Q**     And I'm saying first, second, and third.

02:00:18  24         Again, how are they ranked?

02:00:19  25  **A**     They're ordered by the total volume, the number of MME

**Brunner - (Direct by Swift)**

02:00:23  1    that they filled of prescriptions that they filled.

02:00:26  2    **Q**    Why did you order them by total volume of MME?  And as

02:00:31  3    you're answering that question, if you wouldn't mind,

02:00:32  4    please, reminding the jury what MME is.

02:00:34  5    **A**    MME is morphine milligram equivalents, sort of a

02:00:39  6    standardized unit of measure to balance both the value and

02:00:44  7    the potency of the medicines dispensed.  We ordered them

02:00:51  8    that way, I believe also the way that Dr. McCann ordered

02:00:53  9    them in his presentation of the data, as it puts the most

02:00:56  10   important numbers, the most important dispensers at the top,

02:01:03  11   and the low -- the ambulance and the veterinary clinic at

02:01:07  12   the bottom.

02:01:07  13   **Q**    What do you mean when you say the most important?

02:01:09  14   **A**    I mean those who dispense the highest volume of

02:01:14  15   opioids.

02:01:15  16   **Q**    Okay.  When you put together the summary of the

02:01:20  17   pharmacies in Trumbull County, does it include just

02:01:23  18   pharmacies?

02:01:24  19   **A**    No, it also -- this particular list we've included

02:01:29  20   hospitals, clinics.  I think we also have in this list, if

02:01:35  21   this is a complete list, everyone from practitioners,

02:01:39  22   veterinary clinics, ambulances, everyone who dispensed an

02:01:45  23   opioid.

02:01:46  24   **Q**    For the bulk of your analysis, did you focus on a

02:01:49  25   subset of those categories of dispensers?

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 02:01:52 | 1 | **A**     Yes, we did. |
| 02:01:52 | 2 | **Q**     What categories did you focus on? |
| 02:01:54 | 3 | **A**     We limited it to pharmacies, hospitals, and clinics. |
| 02:01:57 | 4 | **Q**     How many pharmacies -- well, first of all, why did you |
| 02:02:00 | 5 | limit it to that category, those three categories?  Sorry. |
| 02:02:03 | 6 | **A**     Well, combined, they represent more than 99.9 percent |
| 02:02:07 | 7 | of the volume of MME. |
| 02:02:11 | 8 | **Q**     How many pharmacies, hospitals, and clinics are there |
| 02:02:13 | 9 | in Trumbull County? |
| 02:02:14 | 10 | **A**     In Trumbull County, pharmacies, hospitals, and |
| 02:02:20 | 11 | clinics, in total there are 70. |
| 02:02:21 | 12 | **Q**     How about for Lake County? |
| 02:02:22 | 13 | **A**     73. |
| 02:02:23 | 14 | **Q**     Do you know from memory, and it's not a memory test, |
| 02:02:27 | 15 | we can look at the other page of the summary if it's |
| 02:02:30 | 16 | helpful, if you added in all the veterinary clinics, |
| 02:02:33 | 17 | ambulances, other entities that make up the rest of the |
| 02:02:36 | 18 | dispensers in the two counties, do you know what the total |
| 02:02:39 | 19 | number would be? |
| 02:02:39 | 20 | **A**     Total would be about 350, 351, I think. |
| 02:02:42 | 21 | **Q**     That total number that goes beyond pharmacies, |
| 02:02:45 | 22 | hospitals, and clinics, I believe we heard from a witness |
| 02:02:48 | 23 | earlier today that it would include even a K9 handler at a |
| 02:02:53 | 24 | police department who would have medications for training |
| 02:02:55 | 25 | purposes. |

02:02:55   1      Did you even know that that was included?

02:02:57   2   **A**   I wasn't aware specifically.  I knew there was an

02:03:01   3   animal shelter.  I wasn't aware there was a police.

02:03:03   4   **Q**   Is it fair to say that you focused on the dispensers

02:03:07   5   that had the bulk of the volume?

02:03:09   6   **A**   That's correct.

02:03:09   7   **Q**   What is the biggest Walgreens in Trumbull County?

02:03:11   8   **A**   In Trumbull County, that's Walgreens Store Number

02:03:16   9   5549, which is the one we saw on the map.

02:03:17   10   **Q**   That's right.

02:03:19   11      How about -- I'm going to go to the tab for Lake

02:03:22   12   County.

02:03:23   13      What is the -- we'll do this in order.

02:03:25   14      What is the biggest pharmacy in Lake County?

02:03:27   15   **A**   The Rite Aid.

02:03:32   16   **Q**   And then what is the biggest Walgreens in Lake County?

02:03:36   17   **A**   It's the Walgreens on SOM Center Road.

02:03:39   18   **Q**   At 5881 SOM Center Road?

02:03:42   19   **A**   Yes.

02:03:47   20   **Q**   I'm going to show the first tab in Exhibit 2561.

02:03:51   21      What does this tab of the spreadsheet show?

02:03:55   22   **A**   This tab summarizes all the -- everyone who is in the

02:04:01   23   pharmacies, hospitals, or clinics who are not one of the

02:04:06   24   pharmacies in this case.

02:04:07   25   **Q**   So it's all of the dispensers in both counties except

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 02:04:10 | 1 | for CVS, Walgreens, and Walmart; is that fair? |
| 02:04:14 | 2 | **A**    That's correct. |
| 02:04:15 | 3 | **Q**    Okay.  And I note that you have a number of stores |
| 02:04:19 | 4 | here.  Is that kind of a misnomer?  And if so, can you |
| 02:04:23 | 5 | explain what is the number of stores reflected there? |
| 02:04:26 | 6 | **A**    It's the number of actual physical locations. |
| 02:04:29 | 7 | **Q**    And we see a total for both counties of 351.  Does |
| 02:04:34 | 8 | that include all the veterinary clinics and all the other |
| 02:04:37 | 9 | entities that dispense opioids in some fashion that we |
| 02:04:39 | 10 | talked about a moment ago? |
| 02:04:40 | 11 | **A**    Yes, that's correct. |
| 02:04:40 | 12 | **Q**    All right.  What is the overall MME -- sorry.  What |
| 02:04:54 | 13 | percentage of the overall MME do pharmacies, clinics, and |
| 02:04:59 | 14 | hospitals -- strike that.  You've already answered that |
| 02:05:02 | 15 | question. |
| 02:05:03 | 16 | I apologize, Mr. Brunner.  You've helped us along by |
| 02:05:07 | 17 | answering a lot of my questions before I had to answer |
| 02:05:10 | 18 | them -- before I asked them. |
| 02:05:11 | 19 | Did you help us prepare a chart that is a little bit |
| 02:05:14 | 20 | prettier than this summary table to simplify and present |
| 02:05:19 | 21 | this data? |
| 02:05:20 | 22 | **A**    Yes, I did. |
| 02:05:20 | 23 | **Q**    Okay.  Is the slide that I have on the screen that is |
| 02:05:36 | 24 | behind Tab 4, is this one of those charts? |
| 02:05:39 | 25 | **A**    Yes, it is. |

02:05:39  1   **Q**    Okay.  What does this chart show?

02:05:42  2   **A**    Well, by county and combined, it shows the share of

02:05:50  3   pharmacies in this case, which are designated in blue, and

02:05:53  4   other locations, nonpharmacies, other hospitals, clinics,

02:05:59  5   what have you, in red.

02:05:59  6   **Q**    And it has -- is it fair to say that this shows the

02:06:04  7   market share for the pharmacies in the case and the rest of

02:06:08  8   the locations both for Lake County, Trumbull County, and

02:06:10  9   then both counties combined?

02:06:12  10  **A**    Yes.

02:06:12  11  **Q**    What is the market share for the other locations, the

02:06:17  12  pharmacies that are not in the case, in Lake County?

02:06:20  13  **A**    In Lake County, it's 57.8 percent.

02:06:24  14  **Q**    What is the market share for the pharmacies in other

02:06:28  15  locations that are not in this case for Trumbull County?

02:06:31  16  **A**    80.7 percent.

02:06:34  17  **Q**    And then lastly, when you combine the two counties

02:06:36  18  together, what is the market share for all of those other

02:06:39  19  locations, those other pharmacies, hospitals, and clinics,

02:06:42  20  that are not in this case?

02:06:43  21  **A**    71.9 percent.

02:06:46  22  **Q**    All right.  Now I want to go back to the summary we

02:07:02  23  were looking at a minute ago.

02:07:06  24        The last tab that I'm going to show you is this one.

02:07:10  25  The tab says "Buyer:  Walgreens."

**Brunner - (Direct by Swift)** 5506

| | | |
|---|---|---|
| 02:07:13 | 1 | What does this page show? |
| 02:07:15 | 2 | **A**    This shows for just Walgreens, both near the top and |
| 02:07:21 | 3 | broken out by Lake and Trumbull County, the Walgreens market |
| 02:07:26 | 4 | share of -- in each of those respective counties and in |
| 02:07:32 | 5 | total. |
| 02:07:32 | 6 | **Q**    And for the totals, let's see, you've got market share |
| 02:07:36 | 7 | in terms of number of stores, dosage units, and MME for |
| 02:07:42 | 8 | different numbers of drugs that appear in the ARCOS data. |
| 02:07:45 | 9 | Is that what's shown here? |
| 02:07:46 | 10 | **A**    That's correct. |
| 02:07:47 | 11 | **Q**    And did you create a prettier chart to demonstrate |
| 02:07:52 | 12 | this information as well? |
| 02:07:53 | 13 | **A**    Yes, I did. |
| 02:07:54 | 14 | **Q**    I want to go back to Tab 3. |
| 02:08:05 | 15 | Is the slide that I've got on the screen that chart? |
| 02:08:07 | 16 | **A**    Yes, it is. |
| 02:08:08 | 17 | **Q**    Tell us what this shows in terms of the numbers for |
| 02:08:10 | 18 | the Walgreens' market share. |
| 02:08:11 | 19 | **A**    So in Lake County, it shows that Walgreens had a |
| 02:08:15 | 20 | market share of 18.2 percent, and all other locations were |
| 02:08:19 | 21 | 81.8 percent.  In -- |
| 02:08:24 | 22 | **Q**    Go ahead. |
| 02:08:24 | 23 | **A**    In Trumbull County, Walgreens had a market share of |
| 02:08:27 | 24 | 12.3 percent, and all other locations were 87.7 percent. |
| 02:08:36 | 25 | And lastly, when you combine the two, Walgreens had a |

**Brunner - (Direct by Swift)**

5507

| | | |
|---|---|---|
| 02:08:39 | 1 | market share of 14.5 percent, and all other locations were |
| 02:08:44 | 2 | 85.5 percent. |
| 02:08:46 | 3 | **Q**     And I think we've seen this already, but I'm going to |
| 02:08:48 | 4 | flip ahead to the next slide, which I believe is the tenth |
| 02:08:52 | 5 | page of the slide deck behind Tab 3. |
| 02:08:56 | 6 |     And does this slide reflect some of the other data we |
| 02:08:58 | 7 | saw in the big table of numbers before? |
| 02:09:00 | 8 | **A**     Yes, that's correct. |
| 02:09:01 | 9 | **Q**     Is this just another way of demonstrating the |
| 02:09:03 | 10 | Walgreens market share? |
| 02:09:05 | 11 | **A**     This demonstrates a number of locations, as opposed to |
| 02:09:09 | 12 | the actual market share, the volume.  This goes by just the |
| 02:09:12 | 13 | physical locations. |
| 02:09:13 | 14 | **Q**     Got it. |
| 02:09:14 | 15 |     And what does it show for Lake County, Trumbull |
| 02:09:16 | 16 | County, and both counties combined? |
| 02:09:18 | 17 | **A**     In Lake County, Walgreens had 7; the rest of the |
| 02:09:23 | 18 | locations were 66, so that's Walgreens was 7 out of 73. |
| 02:09:27 | 19 | **Q**     And that's -- I apologize to interrupt. |
| 02:09:30 | 20 |     That 73, that's just the pharmacies, clinics, and |
| 02:09:32 | 21 | hospitals? |
| 02:09:33 | 22 | **A**     That's correct. |
| 02:09:33 | 23 | **Q**     Got it. |
| 02:09:36 | 24 |     How about for Trumbull County? |
| 02:09:37 | 25 | **A**     In Trumbull County, Walgreens had 6 pharmacies out of |

02:09:42  1    the total of 70, so there were 64 that were not Walgreens.

02:09:49  2         And then combined across the two counties, there were

02:09:51  3    13 Walgreens pharmacies and 130 other locations.

02:09:56  4    **Q**    Something I probably should have asked you at the

02:09:57  5    outset when we were talking about the data that you looked

02:09:59  6    at in this case.  This data that we've been focused on for

02:10:03  7    the market share analysis you testified was ARCOS data.

02:10:06  8         What is the time frame that is covered by the ARCOS

02:10:08  9    data?

02:10:08  10   **A**    ARCOS data goes from 2006 to 2014.

02:10:16  11   **Q**    Okay.

02:10:19  12   **A**    2008 through 2014.  I'm sorry.

02:10:21  13   **Q**    Don't guess.  If you're not sure, we can come back to

02:10:24  14   it.

02:10:24  15   **A**    I'd have to check my notes.  I forget.

02:10:26  16   **Q**    Do you know whether it says in the big summary table?

02:10:29  17   And actually, it might say on the slide.

02:10:31  18   **A**    It goes to 2006.  I'm sorry.  Goes to 2006.

02:10:35  19   **Q**    Do you see on the footer of the slide it says 2006?

02:10:38  20   **A**    Yes.

02:10:39  21   **Q**    Okay.  Great.  Now I'm going to change topics a bit

02:10:43  22   again.  I want to ask you questions about the work that you

02:10:45  23   did to respond to Dr. McCann's opinions.  First his opinions

02:10:53  24   about red flags, okay?

02:10:56  25   **A**    All right.

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 02:10:56 | 1 | **Q** Do you understand from your work in this case that |
| 02:10:59 | 2 | Dr. McCann performed an analysis of data looking at various |
| 02:11:03 | 3 | red flags that had been identified by another consultant |
| 02:11:09 | 4 | hired by the plaintiffs called Carmen Catizone? |
| 02:11:11 | 5 | **A** Yes. |
| 02:11:12 | 6 | **Q** I want to ask you about flag number 9 first, okay? |
| 02:11:15 | 7 | **A** Okay. |
| 02:11:15 | 8 | **Q** And to help you with that, I'll put "flag number 9" on |
| 02:11:19 | 9 | the screen. |
| 02:11:27 | 10 | And this is behind Tab 12 of your binder. It's just a |
| 02:11:30 | 11 | copy of Dr. McCann's report. And what I am showing is page |
| 02:11:35 | 12 | 151 from Dr. McCann's report. |
| 02:11:38 | 13 | And do you recognize this, Mr. Brunner, from your work |
| 02:11:42 | 14 | as the section of Dr. McCann's report that lays out each of |
| 02:11:46 | 15 | the 16 red flags? |
| 02:11:47 | 16 | **A** Yes, I do. |
| 02:11:47 | 17 | **Q** All right. I'll call out flag number 9. |
| 02:11:57 | 18 | Do you see that it says, "Patient was dispensed two |
| 02:12:00 | 19 | short-acting opioid drugs on the same day"? |
| 02:12:06 | 20 | **A** Yes, I do. |
| 02:12:06 | 21 | **Q** Did you in the course of your work in the case |
| 02:12:08 | 22 | determine how Dr. McCann identified the prescriptions that |
| 02:12:12 | 23 | hit on this flag? |
| 02:12:13 | 24 | **A** Yes. |
| 02:12:13 | 25 | **Q** How did he do it? |

5510

| | | |
|---|---|---|
| 02:12:14 | 1 | **A**     So he identified for each patient, he identified those |
| 02:12:24 | 2 | opioids that were -- that he determined to be short-acting |
| 02:12:26 | 3 | or they were flagged as short-acting, and looked for any |
| 02:12:32 | 4 | dispensations for that patient on the same day. |
| 02:12:35 | 5 | **Q**     Did Dr. McCann include methadone as a short-acting |
| 02:12:41 | 6 | opioid? |
| 02:12:41 | 7 | **A**     Yes, he did. |
| 02:12:42 | 8 | **Q**     Did you look at how many Walgreens prescriptions |
| 02:12:46 | 9 | Dr. McCann flagged with flag 9? |
| 02:12:48 | 10 | **A**     Yes, I did. |
| 02:12:48 | 11 | **Q**     What was that number? |
| 02:12:50 | 12 | **A**     In total for flag 9, I don't recall the number.  I |
| 02:12:57 | 13 | don't recall the number off the top of my head.  I don't |
| 02:13:00 | 14 | have my notes here. |
| 02:13:01 | 15 | **Q**     That's all right.  That's all right. |
| 02:13:03 | 16 |         Did you look at -- actually, I can help you out with |
| 02:13:06 | 17 | that.  Give me a minute. |
| 02:13:11 | 18 | **A**     It's an exhibit to his report.  I'm just trying to |
| 02:13:15 | 19 | find where it is here -- or it's a table referenced in his |
| 02:13:18 | 20 | report. |
| 02:13:19 | 21 | **Q**     I have on the screen now Appendix 14 to Dr. McCann's |
| 02:13:23 | 22 | report.  Is that the exhibit to his report that you're |
| 02:13:24 | 23 | thinking of? |
| 02:13:25 | 24 | **A**     Yes. |
| 02:13:27 | 25 | **Q**     I show you page 33. |

**Brunner - (Direct by Swift)**

02:13:30  1    Does page 33 of Dr. McCann's Appendix 14 refresh your

02:13:37  2  recollection as to how many prescriptions for Walgreens he

02:13:40  3  flagged on flag 9?

02:13:42  4  **A**    Yes.  9,119.

02:13:44  5  **Q**    Okay.  Thank you, Mr. Brunner.

02:13:45  6    I'm going to go back to the page we were on before.

02:13:57  7    So you can see the language of the flag.  "Patient was

02:14:01  8  dispensed two short-acting opioid drugs on the same day."

02:14:05  9    And we just saw that Dr. McCann flagged 9,119 of the

02:14:08  10  Walgreens prescriptions for this flag.

02:14:12  11    How many of those prescriptions were for methadone?

02:14:16  12  **A**    I believe it was over 2,000.  Again, I don't have my

02:14:23  13  notes here.  I apologize.

02:14:24  14  **Q**    That's all right.

02:14:25  15    Are there notes that would help you answer these

02:14:28  16  questions?

02:14:29  17  **A**    Yes.

02:14:29  18  **Q**    Do you have them handy in the building?

02:14:31  19  **A**    They're in the witness room there, yes.

02:14:34  20  **Q**    We'll, maybe we'll come back to that.  Maybe you won't

02:14:36  21  need them.

02:14:37  22    Let's see.  Maybe we'll come back to that.

02:14:47  23    I think you just said that you believe it was more

02:14:51  24  than 2,000 prescriptions that were flagged for methadone.

02:14:53  25  Was that the number of prescriptions that flagged that were

02:14:56  1   just the methadone prescriptions or was it also an

02:14:59  2   additional set of prescriptions that flagged because of the

02:15:02  3   methadone prescriptions?

02:15:04  4   **A**     That's in total.

02:15:05  5   **Q**     Got it.

02:15:06  6   **A**     That's not just the methadone.  Methadones was fewer

02:15:09  7   than that.

02:15:10  8   **Q**     Let's slow down a little bit and explain for the jury

02:15:13  9   what that means.

02:15:14  10      When you looked at Dr. McCann's analysis, how did he

02:15:16  11  go about flagging prescriptions on flag 9?

02:15:19  12  **A**     So if he identified a single short-acting opioid,

02:15:26  13  there's no flag.  If he identified a second short-acting

02:15:30  14  opioid on the same day, he flagged both of those

02:15:33  15  transactions.

02:15:34  16      In circumstances where he used methadone -- or he

02:15:39  17  flagged for methadone, that means he would have flagged a

02:15:42  18  short-acting opioid and methadone.  If the methadone had not

02:15:46  19  been flagged, neither of them should be flagged.

02:15:48  20  **Q**     So if I ask you to assume that roughly 1500 of the

02:15:53  21  Walgreens prescriptions that were flagged on flag 9 were

02:15:56  22  methadone prescriptions and roughly twice that number were

02:16:02  23  another type of opioid, or were the number that flagged all

02:16:08  24  together, is that what you're saying, that both the

02:16:10  25  methadone prescription and the other short-acting opioid,

02:16:13  1   they would both flag?

02:16:14  2   **A**    That's correct.

02:16:14  3   **Q**    If the jury were to conclude that methadone is not a

02:16:20  4   short-acting opioid, it's a long-acting opioid, such that it

02:16:24  5   shouldn't have been included in flag 9, what would be --

02:16:29  6   what would be the impact of that mistake?  Did you look at

02:16:33  7   that?

02:16:33  8   **A**    Yes.

02:16:35  9   **Q**    What would be the effect after taking out those

02:16:38  10  methadone prescriptions?

02:16:39  11  **A**    A substantial reduction, I believe on the order of 31,

02:16:43  12  32 percent.

02:16:44  13  **Q**    Got it.  That's a 31 to 32 percent difference.  Is it

02:16:50  14  fair to characterize that as an error rate, assuming that

02:16:53  15  was a mistake?

02:16:54  16  **A**    I would call that an error rate.

02:16:55  17  **Q**    Okay.  Now I'm going to ask you some -- I'm going to

02:17:01  18  switch to another flag.  I'm going to ask you some questions

02:17:03  19  about flag number 3.

02:17:10  20      Flag number 3 says, "Patient was dispensed opioid

02:17:14  21  prescriptions with overlapping days of supply that were

02:17:17  22  written by two or more prescribers."

02:17:19  23      Do you see that?

02:17:21  24  **A**    Yes, I do.

02:17:21  25  **Q**    Did you look at how Dr. McCann calculated the number

**Brunner - (Direct by Swift)**

02:17:26   1    of prescriptions that flagged on flag 3?

02:17:28   2    **A**    Yes, I did.

02:17:28   3    **Q**    How did he do it?

02:17:29   4    **A**    He -- for each -- an individual patient, if they had a

02:17:38   5    scrip for an opioid, he looked at how many days of supply

02:17:43   6    that was, and if there was another scrip within that day

02:17:49   7    supply called a 30-day window written by another prescriber,

02:17:54   8    he would flag that.  He would flag both transactions.

02:17:58   9    **Q**    Just to walk through it slowly, does flag 3 require

02:18:03   10   more than one prescription?

02:18:04   11   **A**    Yes, it does.

02:18:04   12   **Q**    Does flag 3 require that those prescriptions be

02:18:06   13   written by two or more prescribers?

02:18:08   14   **A**    Yes, it does.

02:18:08   15   **Q**    Does it require that the prescriptions have

02:18:11   16   overlapping days of supply?

02:18:12   17   **A**    Yes, it does.

02:18:13   18   **Q**    I want to pause on that one for a minute.  I know that

02:18:16   19   you just explained it, but I want to try to make it more

02:18:20   20   concrete in the jury's mind.

02:18:22   21        Can you give an example of what it means to have two

02:18:25   22   prescriptions with overlapping days of supply?

02:18:29   23   **A**    Yes.  If, for example, I have a 30-day prescription,

02:18:37   24   just a low dose, whatever, and then I go in for tooth repair

02:18:40   25   or something like that and I need a short little two-day

**Brunner - (Direct by Swift)**

02:18:44  1    thing written by the dentist, that would cause an overlap if

02:18:48  2    it was anytime during that 30-day window of the original

02:18:50  3    prescription.

02:18:51  4        Or if I got a scrip filled on January -- or on

02:18:55  5    February 1 and it was a 30-day prescription, if I got it

02:19:00  6    refilled on March 1, that overlaps because February is a

02:19:04  7    short month, that would also cause an overlap in red flags.

02:19:06  8  **Q**    Did you look to see how Dr. McCann calculated the

02:19:12  9    overlap?  So say you have the 30-day prescription that you

02:19:17  10   just described, if somebody -- and say a prescription's

02:19:21  11   filled on February 1, for example, and you come in on March

02:19:25  12   1 to fill another prescription.  Would that -- would there

02:19:29  13   be an overlap there?

02:19:31  14  **A**    Yes, because the overlapping days, the days supply for

02:19:36  15   that February 1 prescription was 30 days, and March 1 is

02:19:42  16   only 29 days later, so that would cause an overlap, in

02:19:45  17   Dr. McCann's logic.

02:19:45  18  **Q**    Did you look to see how many of Walgreens'

02:19:49  19   prescriptions Dr. McCann flagged for flag 3?

02:19:52  20  **A**    Yes, I did.

02:19:52  21  **Q**    Do you happen to recall the number?

02:19:55  22  **A**    29,941, I believe.

02:19:57  23  **Q**    Well, that's really close.  Let me go just --

02:20:00  24  **A**    961.

02:20:01  25  **Q**    Hold on.  Give me a second.

**Brunner - (Direct by Swift)**

| | | |
|---|---|---|
| 02:20:12 | 1 | Sorry.  I flipped back to Appendix 14. |
| 02:20:15 | 2 | What is the number for flag 3? |
| 02:20:16 | 3 | **A**   29,641. |
| 02:20:18 | 4 | **Q**   I think you transposed one number.  Is that fair? |
| 02:20:21 | 5 | **A**   That happens. |
| 02:20:22 | 6 | **Q**   Okay.  When Dr. McCann counted the prescriptions that |
| 02:20:30 | 7 | hit on flag 3, that 29,000-some odd prescriptions for the |
| 02:20:35 | 8 | Walgreens dispensing data, did he include in his hit count, |
| 02:20:41 | 9 | his flagged prescriptions, did he include the first |
| 02:20:44 | 10 | prescription that the patient filled? |
| 02:20:45 | 11 | **A**   Yes, he did. |
| 02:20:46 | 12 | **Q**   So this is another thing I want to take sort of slowly |
| 02:20:49 | 13 | to make sure that it's clear. |
| 02:20:53 | 14 | So in the examples that you gave before, if you go in |
| 02:20:56 | 15 | to fill the first prescription on February 1, is there any |
| 02:21:02 | 16 | overlap with any other prescription at that point in time? |
| 02:21:06 | 17 | **A**   No.  I'm new to Ohio.  That's the first time I've |
| 02:21:10 | 18 | gotten a scrip there.  That's the first transaction. |
| 02:21:13 | 19 | **Q**   Did Dr. McCann nonetheless flag that first |
| 02:21:17 | 20 | prescription for purposes of flag 3? |
| 02:21:20 | 21 | **A**   Yes, he did. |
| 02:21:20 | 22 | **Q**   At the time when that first prescription is dispensed, |
| 02:21:26 | 23 | is there any information from a data perspective that would |
| 02:21:32 | 24 | allow you to know that there was at some point in the future |
| 02:21:35 | 25 | going to be an overlapping prescription? |

**Brunner - (Direct by Swift)** 5517

| | | |
|---|---|---|
| 02:21:37 | 1 | **A**　　Nothing at all. |
| 02:21:38 | 2 | **Q**　　But Dr. McCann flagged those first prescriptions? |
| 02:21:41 | 3 | **A**　　Yes, he did. |
| 02:21:41 | 4 | **Q**　　Okay.  When does the overlapping data -- days of |
| 02:21:49 | 5 | supply, when does that occur in the data? |
| 02:21:51 | 6 | **A**　　That wouldn't show up until 29 days later, when the |
| 02:21:56 | 7 | pharmacist filled the March 1 transaction. |
| 02:21:58 | 8 | **Q**　　If the jury were to conclude that it was not |
| 02:22:02 | 9 | appropriate to flag the first prescription before there was |
| 02:22:06 | 10 | any overlap with any later prescription, did you look to see |
| 02:22:12 | 11 | how many prescriptions would need to be subtracted from that |
| 02:22:16 | 12 | 29,641 we spoke about a moment ago? |
| 02:22:18 | 13 | **A**　　About 30 percent of them. |
| 02:22:20 | 14 | **Q**　　You said about 30 percent of them; is that right? |
| 02:22:27 | 15 | **A**　　Yes. |
| 02:22:27 | 16 | **Q**　　Is it fair to characterize that as a 30 percent error |
| 02:22:30 | 17 | rate? |
| 02:22:31 | 18 | **A**　　That's a 30 percent error rate, yes. |
| 02:22:33 | 19 | **Q**　　When Dr. McCann counted the prescriptions that hit on |
| 02:22:44 | 20 | flag 3, did he also include prescriptions where there were |
| 02:22:48 | 21 | only three days of overlap or less? |
| 02:22:50 | 22 | **A**　　Yes, he did. |
| 02:22:51 | 23 | **Q**　　Did you look to see how many prescriptions in the |
| 02:22:55 | 24 | Walgreens data flagged based on three days of overlap or |
| 02:22:59 | 25 | less than that? |

**Brunner - (Direct by Swift)** 5518

| | | |
|---|---|---|
| 02:22:59 | 1 | **A**     Yes, I did. |
| 02:23:00 | 2 | **Q**     And how many were there? |
| 02:23:02 | 3 | **A**     Over 68 percent. |
| 02:23:04 | 4 | **Q**     I'm sorry, what was the number? |
| 02:23:05 | 5 | **A**     Over 68 percent of the 29,000. |
| 02:23:09 | 6 | **Q**     And that 68 percent, are you saying that if you |
| 02:23:12 | 7 | subtracted the prescriptions that flagged because of a |
| 02:23:17 | 8 | three-day overlap or less, it would be a 68 percent |
| 02:23:21 | 9 | difference in the amount flagged? |
| 02:23:22 | 10 | **A**     Yes, a 68 percent error rate, leaving just 32 percent. |
| 02:23:27 | 11 | **Q**     Did you look to see whether any other of Dr. McCann's |
| 02:23:32 | 12 | red flags required overlap between prescriptions, such that |
| 02:23:40 | 13 | you would have a first prescription that was flagged before |
| 02:23:42 | 14 | there was any overlap? |
| 02:23:43 | 15 | **A**     Yes, I did. |
| 02:23:44 | 16 | **Q**     All right.  I'll put Dr. McCann's report back up on |
| 02:23:46 | 17 | the screen just to make it easier for you to tell us which |
| 02:23:49 | 18 | ones those were, or whether there were any. |
| 02:23:54 | 19 |         Were there some? |
| 02:23:55 | 20 | **A**     Yes, there were. |
| 02:23:55 | 21 | **Q**     All right.  We're back to page 151 of Dr. McCann's |
| 02:24:02 | 22 | report, which you can see it starts at flag number 2. |
| 02:24:07 | 23 |         Just for completeness sake, I'll go back a page so you |
| 02:24:10 | 24 | can see the first flag.  And I'll ask you to let us know |
| 02:24:14 | 25 | which other flags of the 16 red flags that the jury has |

**Brunner - (Direct by Swift)**

02:24:18  1    heard about required an overlapping days supply such that

02:24:24  2    there was a first prescription that was flagged before there

02:24:27  3    was any overlap.

02:24:30  4    **A**    4, method 5, method 7.

02:24:44  5    **Q**    Let me know if you want me to go to the next page.

02:24:56  6    **A**    Method 14, method 15.

02:25:02  7    **Q**    What about method 12?

02:25:04  8    **A**    And number 12, yes.

02:25:08  9    **Q**    And then we've already talked about number 3.

02:25:11  10        Just so we don't rush past it, I'll go back a page.

02:25:15  11   You said method 4, which is "A patient was dispensed opioid

02:25:23  12   prescriptions with overlapping days of supply at two or more

02:25:26  13   pharmacies."

02:25:27  14        For that flag, did Dr. McCann flag the first

02:25:31  15   prescription before there was any overlap?

02:25:33  16   **A**    Yes, he did.

02:25:33  17   **Q**    For flag number 5, it says "Patient was dispensed an

02:25:39  18   opioid, a benzodiazapine, and a muscle relaxer for

02:25:43  19   overlapping days of supply."

02:25:45  20        Same thing happened there?

02:25:46  21   **A**    Yes.

02:25:46  22   **Q**    All right.  And the next one you mentioned was number

02:25:50  23   7.  "Patient was dispensed an opioid and a benzodiazapine

02:25:56  24   within 30 days of one another."

02:25:58  25        Did Dr. McCann flag the first prescription before

**Brunner - (Direct by Swift)**

5520

| | | |
|---|---|---|
| 02:26:02 | 1 | there was any overlap? |
| 02:26:03 | 2 | **A**    Yes. |
| 02:26:04 | 3 | **Q**    And then I think the next one on the list is number |
| 02:26:07 | 4 | 12.  What does number 12 say?  I'll have you read it.  I'm |
| 02:26:11 | 5 | doing too much talking. |
| 02:26:13 | 6 | **A**    "An opioid was dispensed to at least four different |
| 02:26:15 | 7 | patients on the same day, and the opioid prescriptions were |
| 02:26:18 | 8 | written for the same base drug, strength, and dosage form, |
| 02:26:20 | 9 | and were written by the same prescriber." |
| 02:26:23 | 10 | **Q**    So for this one, is it fair to say you wouldn't have |
| 02:26:28 | 11 | all of the criteria necessary for the flag until that fourth |
| 02:26:32 | 12 | prescription is filled? |
| 02:26:33 | 13 | **A**    That's correct.  There would be no reason to flag the |
| 02:26:37 | 14 | first three. |
| 02:26:38 | 15 | **Q**    I'm sorry? |
| 02:26:39 | 16 | **A**    There would be no reason to flag the first three -- I |
| 02:26:42 | 17 | mean four. |
| 02:26:42 | 18 | **Q**    Well, setting that aside, did Dr. McCann flag the |
| 02:26:44 | 19 | first, second, and third prescription as well? |
| 02:26:47 | 20 | **A**    Yes, he did. |
| 02:26:49 | 21 | **Q**    And just to be clear, when that first prescription in |
| 02:26:54 | 22 | time is filled, is there anything that you can tell from a |
| 02:26:56 | 23 | data perspective about the fact that there are going to be |
| 02:26:59 | 24 | later prescriptions? |
| 02:27:02 | 25 | **A**    Negative. |

02:27:04    1    **Q**    At least not at the point when that first prescription

02:27:06    2    is filled?

02:27:07    3    **A**    That's correct.

02:27:07    4    **Q**    All right.  That's number 12.

02:27:09    5         Read for us if you would, please, sir, number 14,

02:27:11    6    which is the next one you mentioned.

02:27:14    7    **A**    "An opioid prescription was refilled more than five

02:27:19    8    days before the patient's previous prescription should have

02:27:21    9    run out."

02:27:23   10    **Q**    So when the previous prescription is filled, is there

02:27:27   11    any way to tell at the time of that previous prescription

02:27:29   12    that there's going to be a later prescription filled five

02:27:32   13    days early?

02:27:33   14    **A**    No.

02:27:33   15    **Q**    But Dr. McCann flagged that previous prescription?

02:27:36   16    **A**    Yes, he did.

02:27:38   17    **Q**    All right.  The last one on your list is number 15.

02:27:41   18    Would you read that one for us, please.

02:27:44   19    **A**    "A patient was dispensed more than 210 days of supply

02:27:48   20    of all opioids combined in a six-month period."

02:27:52   21    **Q**    So this one's worded a little bit differently than the

02:27:56   22    others.

02:27:56   23         Why do you include this one as one of the flags that

02:27:59   24    flagged the first prescription before there was any overlap?

02:28:01   25    **A**    It's similar in that it requires a look-back in some

02:28:09   1    effects.  You need to be able to look at the previous six

02:28:12   2    months of activity.  So when filling one prescription, the

02:28:16   3    first prescription possibly, there is no prior history for

02:28:21   4    it to be compared to.  It's not until the second or

02:28:24   5    subsequent transactions where there's something in the

02:28:27   6    history to compare it to.

02:28:28   7    **Q**    And Dr. McCann flagged all of that previous history;

02:28:33   8    is that what you're saying?

02:28:33   9    **A**    That's correct.

02:28:34   10   **Q**    Okay.  Changing topics.

02:28:37   11        You mentioned at the outset a Notes sample of 2,000

02:28:43   12   prescriptions.  Do you remember that?

02:28:44   13   **A**    Yes.

02:28:44   14   **Q**    I'm going to ask you some questions about that.

02:28:46   15        Did you look at doctor -- well, let me take a step

02:28:50   16   back.  I think you said this already, but just to reorient

02:28:53   17   us on the Notes sample, you and your team, did you help

02:28:58   18   Walgreens collect additional data, Notes data and other

02:29:02   19   information, for a sample of 2,000 prescriptions?

02:29:05   20   **A**    Yes, we did.

02:29:05   21   **Q**    All of those prescriptions were prescriptions that had

02:29:11   22   Dr. McCann, Dr. Catizone's red flags, right?

02:29:14   23   **A**    Yes.

02:29:15   24   **Q**    Did you also look at Dr. McCann's analysis of the

02:29:22   25   sample of prescriptions that you and your team collected?

**Brunner - (Direct by Swift)** 5523

02:29:24 1    **A**    Yes, we did.

02:29:24 2    **Q**    And just to make it clear, you helped Walgreens

02:29:27 3    collect the sample of red flag prescriptions.  Did your team

02:29:31 4    also provide that information on all of those prescriptions

02:29:35 5    to the plaintiffs in this case?

02:29:38 6    **A**    Yes.

02:29:38 7    **Q**    And then you understand because you've seen it that

02:29:43 8    Dr. McCann performed some analysis on that sample; is that a

02:29:45 9    fair statement?

02:29:46 10   **A**    That's fair.

02:29:46 11   **Q**    Okay.  I'll refer to those 2,000 prescriptions as the

02:29:51 12   Notes sample.  Is that okay?

02:29:52 13   **A**    Perfect.

02:29:52 14   **Q**    In collecting the notes and other information for the

02:30:05 15   Notes sample, what did your team actually collect?  Try to

02:30:08 16   make it concrete for the jury.

02:30:09 17   **A**    General dispensing data, which is data about -- for

02:30:15 18   every prescription in the sample.  Information about who the

02:30:19 19   prescriber was, which pharmacist filled it, what the

02:30:23 20   medication was, information about the patient, that sort of

02:30:26 21   thing.

02:30:27 22   **Q**    Did you also collect, to the extent that it existed,

02:30:30 23   electronic Notes data associated with each of those

02:30:34 24   prescriptions?

02:30:34 25   **A**    Yes, we did.

**Brunner - (Direct by Swift)**

02:30:34  1    **Q**     Did you also collect, to the extent it was available,

02:30:40  2    hard copy prescriptions associated with that sample of

02:30:43  3    2,000?

02:30:44  4    **A**     Yes, we did.

02:30:44  5    **Q**     Did you and your team also collect electronic

02:30:51  6    information on all prior opioids prescriptions for the

02:30:56  7    patients in the sample?

02:30:58  8    **A**     Yes.  We call those the expanded patient histories.

02:31:02  9    **Q**     When you collected the expanded patient histories,

02:31:05  10   what were you collecting?

02:31:06  11   **A**     We were collecting all information.  So if a sample

02:31:13  12   transaction was, say, a fill in 2010 for a given patient, we

02:31:18  13   collected the data associated with any prescriptions they

02:31:21  14   had had filled anytime before 2010, including both the

02:31:26  15   information about the scrip and any notes that had been made

02:31:30  16   about the prior fills.

02:31:31  17   **Q**     So for the patients who had prescriptions in the

02:31:36  18   sample of 2,000, how many prescriptions did you and your

02:31:41  19   team collect altogether?

02:31:42  20   **A**     In total, including the sample transaction, or the

02:31:47  21   sample items, there were 155,597 records.

02:31:53  22   **Q**     That 155-some-odd-thousand records, is each of those

02:31:59  23   records a prescription?

02:31:59  24   **A**     Yes.

02:32:00  25   **Q**     And there were a bunch of fields of data associated

02:32:02  1   with each of those prescriptions?

02:32:04  2   **A**    Yes.

02:32:04  3   **Q**    Did you and your team provide all of those 155,000

02:32:12  4   prescriptions to the plaintiffs in this case?

02:32:13  5   **A**    Yes, the complete expanded patient histories were

02:32:17  6   provided, yes.

02:32:17  7   **Q**    Are you aware of whether Dr. McCann put together a

02:32:25  8   summary of the Walgreens Notes data?

02:32:28  9   **A**    Yes.

02:32:29  10  **Q**    Have you looked at that summary?

02:32:30  11  **A**    Yes, I have.

02:32:31  12  **Q**    How many -- is Dr. McCann's summary an Excel

02:32:37  13  spreadsheet?

02:32:37  14  **A**    Yes.

02:32:37  15  **Q**    How many rows are in Dr. McCann's summary for

02:32:40  16  Walgreens of the Notes prescriptions?

02:32:42  17  **A**    Including the title row, I think there were 2,001.

02:32:47  18  **Q**    Is it one row per prescription?

02:32:49  19  **A**    Yes.

02:32:49  20  **Q**    Does Dr. McCann's Walgreens summary of the Notes

02:32:53  21  prescriptions include all of the data that you provided to

02:32:57  22  the plaintiffs' lawyers, including the expanded patient

02:32:58  23  histories?

02:32:59  24  **A**    No, it does not.

02:33:00  25  **Q**    How much of the data that your team put together was

| | | |
|---|---|---|
| 02:33:08 | 1 | missing from Dr. McCann's Walgreens summary? |
| 02:33:10 | 2 | **A**    There were 11 files produced, Excel files, what have |
| 02:33:16 | 3 | you, with detail.  Based on our review, it looks like |
| 02:33:21 | 4 | Dr. McCann incorporated three of those files. |
| 02:33:23 | 5 | **Q**    So to put it in terms of I have it in my head as an |
| 02:33:28 | 6 | Excel spreadsheet with one row per prescription.  You |
| 02:33:30 | 7 | testified a moment ago that Dr. McCann's summary for |
| 02:33:32 | 8 | Walgreens had 2,000 rows for 2,000 prescriptions. |
| 02:33:36 | 9 |      How many rows would there have needed to be if he had |
| 02:33:40 | 10 | included all of the data that you provided? |
| 02:33:43 | 11 | **A**    155,597. |
| 02:33:47 | 12 | **Q**    So he was off by about 154,000? |
| 02:33:56 | 13 | **A**    Yeah. |
| 02:33:56 | 14 | **Q**    Do you know from your work in this case that |
| 02:33:59 | 15 | Mr. Catizone, the consultant hired by the plaintiffs to |
| 02:34:01 | 16 | offer pharmacy-related opinions, that he received the |
| 02:34:04 | 17 | summary that Dr. McCann prepared of the Walgreens notes? |
| 02:34:09 | 18 | **A**    No. |
| 02:34:09 | 19 | **Q**    Do you know whether Mr. Catizone was ever provided |
| 02:34:12 | 20 | with the data that you and your team put together? |
| 02:34:17 | 21 | **A**    I don't know that Mr. Catizone was provided it, no. |
| 02:34:20 | 22 | **Q**    All right.  I want to show you a slide that Mr. Lanier |
| 02:34:23 | 23 | used in Mr. Catizone's testimony about the Walgreens Notes |
| 02:34:27 | 24 | sample that we've been talking about. |
| 02:34:29 | 25 |           MS. SWIFT:  And for this, Mr. Pitts, could I |

02:34:32    1    please have the ELMO?

02:34:35    2    **Q**    This is behind Tab 10 in the binder.

02:34:46    3         Can you see that on the screen, Mr. Brunner?

02:34:49    4    **A**    Yes.

02:34:49    5    **Q**    All right.  It says in the first -- you can see from

02:34:53    6    the top line we're talking about Walgreens Pharmacy Notes?

02:34:58    7    **A**    Yes.

02:34:58    8    **Q**    The slide says, "Of the 2,000 prescriptions total,

02:35:01    9    only 160 prescriptions contain some writing in the DUR

02:35:08    10   comment field regardless of DUR alert."

02:35:11    11        Do you see that?

02:35:11    12   **A**    Yes, I do.

02:35:12    13   **Q**    Do you see that "only 160 prescriptions" is circled

02:35:15    14   there?

02:35:15    15   **A**    Yes, I do.

02:35:15    16   **Q**    Is that an accurate statement based on your review of

02:35:19    17   the Walgreens Notes prescriptions that were provided in this

02:35:23    18   case?

02:35:23    19   **A**    No.  It should be 555.

02:35:25    20   **Q**    And tell us, if you would, please, what is that 555?

02:35:29    21   **A**    That represents the number of prescriptions which,

02:35:33    22   when one considers the patient histories, have comments

02:35:38    23   fields filled in.

02:35:38    24   **Q**    It says specifically a dur_comment field.

02:35:42    25        Do you know what DUR stands for?

02:35:44  1    **A**    Drug usage review, if I'm not mistaken.

02:35:48  2    **Q**    And I understand you're not offering pharmacy

02:35:51  3    opinions.  But from your work in this case, can you tell the

02:35:53  4    jury, is the dur_comment field just one of several comment

02:35:57  5    fields that was produced with the Walgreens Notes?

02:36:00  6    **A**    There are many different comment fields.  That's one

02:36:03  7    of them.

02:36:03  8    **Q**    I want to show you one more slide from Mr. Catizone's

02:36:06  9    testimony.  And this one is either right before or right

02:36:13  10   after the one that I have on the screen right now.  If I can

02:36:16  11   find it.

02:36:26  12        Can you see that on the screen?

02:36:27  13   **A**    Yes.

02:36:27  14   **Q**    It says, again, we're talking about Walgreens Pharmacy

02:36:31  15   Notes, right?

02:36:32  16   **A**    Yes.

02:36:33  17   **Q**    This one says, "Walgreens' relevant notes fields:

02:36:40  18   1,237 were blank across all these comment fields,

02:36:43  19   representing about 61 percent of the sample."

02:36:46  20        I'll stop there and just ask you, based on your work

02:36:48  21   in this case, is that an accurate statement?

02:36:50  22   **A**    No.

02:36:50  23   **Q**    All right.  Then it goes on to say, "Of these 1,237

02:36:57  24   prescriptions that were blank across all relevant comment

02:37:00  25   fields, there were 940 prescriptions that also had nothing

| | | |
|---|---|---|
| 02:37:03 | 1 | written on the hard copy prescription, representing 47 |
| 02:37:06 | 2 | percent of the sample." |
| 02:37:07 | 3 | Based on your work in this case, is that an accurate |
| 02:37:10 | 4 | statement? |
| 02:37:11 | 5 | **A**     No. |
| 02:37:11 | 6 | **Q**     Did you compile charts in this case showing how many |
| 02:37:17 | 7 | of the prescriptions in the Walgreens Notes sample had notes |
| 02:37:22 | 8 | and other information associated with them? |
| 02:37:24 | 9 | **A**     Yes, I did. |
| 02:37:26 | 10 | **Q**     I'm going to show you one of those charts. |
| 02:37:29 | 11 | MS. SWIFT:  Mr. Pitts, if I could switch back |
| 02:37:31 | 12 | to the computer, please. |
| 02:37:32 | 13 | **Q**     This is going to be behind Tab 3. |
| 02:37:44 | 14 | And Mr. Brunner, this -- well, I'll ask you if you |
| 02:37:47 | 15 | recognize what this is on the screen. |
| 02:37:48 | 16 | **A**     Yes.  This is from my report, my supplemental report. |
| 02:37:51 | 17 | **Q**     Your supplemental report.  I'll blow it up so it's |
| 02:37:54 | 18 | easier to read. |
| 02:37:55 | 19 | Is this one of the charts that you prepared to |
| 02:37:58 | 20 | demonstrate how many of the Notes sample prescriptions had |
| 02:38:02 | 21 | comments and other information associated with them? |
| 02:38:04 | 22 | **A**     Yes. |
| 02:38:04 | 23 | **Q**     What does it show, just at a high level? |
| 02:38:07 | 24 | **A**     It shows a listing of the available comment fields or |
| 02:38:12 | 25 | Notes fields down the left-hand column, and then in the |

**Brunner - (Direct by Swift)**

02:38:16  1    first, second, and third column shows the number of times

02:38:20  2    for those samples that that field was populated someplace in

02:38:24  3    the patient history.

02:38:24  4    **Q**    Is there a comment there that's called prescriber

02:38:29  5    location comments?

02:38:32  6    **A**    Yes.  It's the fifth from the top, yes.

02:38:34  7    **Q**    What does -- what did you determine from your work in

02:38:37  8    this case with respect to the prescriber location comments?

02:38:41  9    **A**    That almost 75 percent of them were populated.

02:38:47  10   **Q**    And what does that mean when you say almost 75 percent

02:38:49  11   of them were populated?

02:38:50  12   **A**    I mean if one looks at the patient histories for each

02:38:55  13   of those 2,000 and looks to identify was that field

02:38:58  14   populated for one of the fields in an individual patient's

02:39:04  15   history, was that field populated or not.

02:39:09  16   **Q**    And for 74.5 percent of the 2,000 sample there was a

02:39:15  17   note in the comment field for some prescription for that

02:39:17  18   patient?

02:39:18  19   **A**    That's correct.

02:39:18  20   **Q**    Okay.  Got it.

02:39:19  21        Then we've already talked about the DUR comments.

02:39:22  22   I'll make this bigger.  It might be easier to see.

02:39:24  23        Do you see the DUR comments here on your chart?

02:39:28  24   **A**    Yes.  Yes, right there it's highlighted.

02:39:32  25   **Q**    And that's the 555 you mentioned a moment ago?

**Brunner - (Direct by Swift)** 5531

02:39:35 1    **A**    That's correct.

02:39:35 2    **Q**    What percentage of the Notes sample had a DUR comment

02:39:40 3    associated with it?

02:39:41 4    **A**    27.75 percent.

02:39:43 5    **Q**    All right.  I'm going to scroll down.

02:39:47 6        And do you see that you've got hard copy Rx notes

02:39:51 7    here?

02:39:51 8    **A**    I do.

02:39:52 9    **Q**    Not to nitpick.  I think the heading on the chart says

02:39:59 10    this is electronic.  What does it say?

02:40:03 11        "Number and percentage of populated fields in

02:40:08 12    Walgreens' electronic Notes data."

02:40:11 13        The hard copy prescription notes, were those

02:40:13 14    electronic originally?

02:40:13 15    **A**    They were electronic -- well, yes.

02:40:15 16    **Q**    No, the hard copy prescriptions.

02:40:17 17    **A**    The hard copy were hard copy initially, then they were

02:40:21 18    turned into electronic.

02:40:22 19    **Q**    And just to be clear, the heading of the chart also

02:40:26 20    says, "Sample of 2,000 prescriptions with expanded patient

02:40:33 21    history."  Did your team -- and it reflects that there were

02:40:37 22    155,957 prescriptions in that expanded history.

02:40:40 23        Do you see that?

02:40:41 24    **A**    Yes.

02:40:41 25    **Q**    Did your team collect hard copy prescriptions for all

**Brunner - (Direct by Swift)** 5532

02:40:46  1   of those in the expanded patient history?

02:40:50  2   **A**    We endeavored -- of the -- not for all of the

02:40:53  3   historical ones.  Of the 2,000 scrips in the sample, there

02:40:59  4   were I think 1,799 that were originally hard copy scrips

02:41:03  5   presented.  We went to try and find those hard copies, not

02:41:10  6   for all the patient histories, that would have been an

02:41:12  7   insurmountable herculean effort.

02:41:15  8   **Q**    So if I follow you, of the 2,000 sample, am I hearing

02:41:19  9   you correctly that not all 2,000 were presented in hard

02:41:22  10  copy?

02:41:22  11  **A**    That's correct.

02:41:23  12  **Q**    For the ones that weren't presented in hard copy, how

02:41:26  13  were they presented?  What does that mean?

02:41:27  14  **A**    Doctors can submit electronic prescriptions, I have

02:41:32  15  mine done that way, versus a patient walking in with a

02:41:36  16  prescription, a physical hard copy prescription.

02:41:39  17  **Q**    For the hard copy prescriptions that were presented in

02:41:45  18  hard copy, did Walgreens find all 1,700 of them, or whatever

02:41:49  19  the number was?

02:41:50  20  **A**    No, we were able to locate 1,246 of those hard copies.

02:41:55  21  **Q**    Of the 1,246 hard copy prescriptions that you were

02:41:58  22  able to find, how many of those did your team determine had

02:42:02  23  some kind of a note on it?

02:42:03  24  **A**    1,136, or 91 percent.

02:42:08  25  **Q**    Okay.  All right.  And just for completeness, I'll

02:42:19  1    zoom back out so you can see the whole screen.

02:42:21  2        Does this chart which is Table 1 in your supplemental

02:42:24  3    report, does it reflect all of the Notes information that

02:42:28  4    you and your team collected or is this just a subset?

02:42:31  5    **A**    This is just a subset.

02:42:33  6    **Q**    And the last one I'll highlight just for the jury's

02:42:35  7    consideration is do you see "phone comments" on here?

02:42:41  8    **A**    It's about eight from the bottom, nine from the

02:42:44  9    bottom.

02:42:47  10   **Q**    How many of the prescriptions in the sample had some

02:42:49  11   kind of a phone comment associated with them?

02:42:52  12   **A**    1,318.

02:42:53  13   **Q**    And just to reiterate, are you offering any opinions

02:42:57  14   on the substance of any of the notes in any of these fields?

02:43:00  15   **A**    Not at all.

02:43:06  16   **Q**    All right.  Now I'd like to change topics once again

02:43:08  17   and ask you some questions about some of the other

02:43:11  18   pharmacies located in Lake and Trumbull Counties, okay?

02:43:15  19   **A**    Okay.

02:43:15  20   **Q**    All right.  Just to reorient you and the jury, we'll

02:43:22  21   go back to Exhibit 2561, which is your summary of the ARCOS

02:43:31  22   data for the -- that you used to do the market share

02:43:33  23   analysis.

02:43:34  24        Do you see that?

02:43:35  25   **A**    Yes.

Brunner - (Direct by Swift)

5534

| | | |
|---|---|---|
| 02:43:35 | 1 | **Q**     And we'll go to the Trumbull County tab, and we talked |
| 02:43:38 | 2 | about these pharmacies before. |
| 02:43:40 | 3 | Do you see these pharmacies at the top of the list, |
| 02:43:43 | 4 | Franklin, Overholt's, and Bellevue? |
| 02:43:45 | 5 | **A**     Yes. |
| 02:43:46 | 6 | **Q**     What can you tell us about the address for Overholt's |
| 02:43:52 | 7 | Pharmacy and Bellevue Medicine Shoppe? |
| 02:43:55 | 8 | **A**     Those two, which are lines 2 and 3 of the data on the |
| 02:43:58 | 9 | screen, they're the same address.  They're actually the same |
| 02:44:01 | 10 | building. |
| 02:44:02 | 11 | **Q**     And do you know what happened there from your review |
| 02:44:04 | 12 | of the ARCOS data for these two pharmacies? |
| 02:44:06 | 13 | **A**     Yes.  Overholt's closed sometime around July of 2010. |
| 02:44:13 | 14 | Bellevue came in, got a new buyer DEA number, so a new ID |
| 02:44:19 | 15 | number from the DEA, and reopened in the same location as a |
| 02:44:24 | 16 | new pharmacy.  Actually, in the DEA data they're identified |
| 02:44:29 | 17 | as Bellevue d/b/a Champion's Medical Shop. |
| 02:44:34 | 18 | **Q**     Got it. |
| 02:44:35 | 19 | And does your summary include the dates that those two |
| 02:44:39 | 20 | pharmacies were open in that same location? |
| 02:44:41 | 21 | **A**     Correct. |
| 02:44:42 | 22 | **Q**     Okay.  And you can see that here in columns I and J; |
| 02:44:48 | 23 | is that right? |
| 02:44:48 | 24 | **A**     Yes. |
| 02:44:48 | 25 | **Q**     Okay.  In some of your analyses, have you combined |

02:44:58  1   Overholt's Pharmacy with Bellevue/Champion Medicine Shoppe,

02:45:02  2   or -- I probably butchered -- Bellevue/Champion?

02:45:05  3   **A**    Yes.

02:45:05  4   **Q**    Why is it appropriate to combine those two together

02:45:08  5   for purposes of your analysis?

02:45:09  6   **A**    As I say, most of our analyses are presented by

02:45:14  7   location.  Those are at the same exact location.  They have

02:45:16  8   the same sign over the door.  It appears to be the same

02:45:19  9   thing, just with a different DEA registration number.

02:45:23  10  **Q**    All right.  Did you prepare a chart to, let's see,

02:45:32  11  summarize some of the information on this summary comparing

02:45:35  12  the biggest pharmacies in Trumbull County to the biggest

02:45:38  13  Walgreens in Trumbull County?

02:45:39  14  **A**    Yes.

02:45:40  15  **Q**    Is this one of those charts that I've got up on the

02:45:54  16  screen?

02:45:54  17  **A**    Yes, it is.

02:45:54  18  **Q**    And this is behind Tab 4 in the binder.  It's the

02:45:57  19  eleventh slide in the slide deck.

02:46:00  20        What does this chart show specifically?

02:46:02  21  **A**    It shows for the top few lines on that chart, which

02:46:11  22  are the largest, Overholt's Champions, Franklin, and then

02:46:16  23  each of the Walgreens in Trumbull County, it shows the

02:46:20  24  number of MME in ARCOS.

02:46:24  25  **Q**    What is the total for Franklin Pharmacy?

**Brunner - (Direct by Swift)**

02:46:26  1    **A**    For Franklin it's 241,341,000 MME.

02:46:32  2    **Q**    What is the total for Overholt's/Champion?

02:46:36  3    **A**    278.4 million MME.

02:46:40  4    **Q**    And then rather than have you go through the totals

02:46:42  5    for all six of the pharmacies in Trumbull, do you have a

02:46:48  6    combined total for all of the Trumbull Walgreens there?

02:46:50  7    **A**    Yeah, the total for all six Walgreens combined was 238

02:46:55  8    million.

02:46:55  9    **Q**    How does that compare, the total for all six Walgreens

02:46:59  10   combined, how does it compare to Overholt's/Champion?

02:47:02  11   **A**    All six of them combined are smaller than either one

02:47:06  12   of Overholt's or Champion or Franklin.

02:47:11  13   **Q**    All six of the Walgreens combined are still less than

02:47:15  14   Overholt's/Champion all by itself?

02:47:16  15   **A**    Yes.

02:47:17  16   **Q**    And is the same true with respect to Franklin, all six

02:47:21  17   Walgreens are less than Franklin by itself?

02:47:22  18   **A**    Yes.

02:47:23  19   **Q**    All right.  I'm going to go to the next slide.

02:47:28  20          What does this next slide show us?

02:47:31  21   **A**    So this next slide, it repeats the Overholt's/Champion

02:47:37  22   and the Franklin pharmacies as a benchmark there.  Then it

02:47:40  23   includes the detail for the seven Walgreens in Lake County.

02:47:46  24   **Q**    And we won't repeat the numbers for

02:47:52  25   Overholt's/Champion and Franklin, but what is the combined

**Brunner - (Direct by Swift)**                                    5537

| | | |
|---|---|---|
| 02:47:54 | 1 | total for all -- is it seven Walgreens in Lake County? |
| 02:47:57 | 2 | **A**    Yes. |
| 02:47:58 | 3 | **Q**    What's the combined total for all seven of those |
| 02:48:02 | 4 | Walgreens? |
| 02:48:03 | 5 | **A**    220 million. |
| 02:48:04 | 6 | **Q**    And how does that compare to Overholt's/Champion? |
| 02:48:08 | 7 | **A**    That's less than Franklin and almost 20 percent less |
| 02:48:14 | 8 | than Overholt's. |
| 02:48:15 | 9 | **Q**    So the seven Walgreens in Lake are smaller volume than |
| 02:48:21 | 10 | Overholt's Champion by itself? |
| 02:48:22 | 11 | **A**    Yes. |
| 02:48:22 | 12 | **Q**    Same is true comparing the Walgreens to Franklin? |
| 02:48:24 | 13 | **A**    Yes. |
| 02:48:25 | 14 | **Q**    All right.  Now I'm going to pull up another -- a |
| 02:48:31 | 15 | different spreadsheet of yours.  And I don't think I have |
| 02:48:40 | 16 | the actual spreadsheet on the laptop, so I'm going to have |
| 02:48:42 | 17 | to pull it up in PDF form.  And I'll apologize in advance, |
| 02:48:45 | 18 | it's not going to be as pretty. |
| 02:48:55 | 19 | That's not too bad. |
| 02:48:57 | 20 | Do you recognize the document that I put on the |
| 02:48:59 | 21 | screen, which is Exhibit 2562?  And it's behind Tab 9 of |
| 02:49:04 | 22 | your binder. |
| 02:49:05 | 23 | **A**    Yes, I do. |
| 02:49:06 | 24 | **Q**    What is this summary?  This is a different kind of a |
| 02:49:08 | 25 | summary than we've seen so far, I believe. |

02:49:10    1    **A**      It's summarizing the cash payment activity for a group

02:49:16    2    of pharmacies, and for each of those pharmacies the nearest

02:49:20    3    physical Walgreens as well.

02:49:24    4    **Q**      And what is this summary based on?  What data did you

02:49:27    5    use to prepare this summary?

02:49:28    6    **A**      This is based on the OARRS data provided by the Board

02:49:32    7    of Pharmacy.

02:49:32    8    **Q**      And remind the jury, what kind of data is in OARRS

02:49:35    9    versus the data that's been in ARCOS that we've been looking

02:49:38    10   at up to now?

02:49:38    11   **A**      The OARRS data has the individual prescription and

02:49:42    12   prescription fill information and method of payment, that

02:49:44    13   type.

02:49:45    14   **Q**      And so with the OARRS prescription data, are you able

02:49:47    15   to answer different types of questions about the

02:49:51    16   prescriptions and the opioids involved in those

02:49:54    17   prescriptions than you can with the ARCOS data?

02:49:55    18   **A**      Yes.

02:49:55    19   **Q**      And I apologize if you just said that, but what kind

02:50:00    20   of analysis are you showing on this summary in Exhibit 2562?

02:50:03    21   **A**      So one of the attributes for the OARRS data is forms

02:50:10    22   of payment.  One of those forms of payment is cash.  So from

02:50:14    23   the OARRS data we can determine what percentage of a given

02:50:17    24   store's filled prescriptions were paid with cash versus paid

02:50:21    25   with insurance.

| | | |
|---|---|---|
| 02:50:22 | 1 | **Q** And it looks like you're alternating between Walgreens |
| 02:50:28 | 2 | stores and other pharmacies in the two counties. Is that an |
| 02:50:34 | 3 | accurate statement? |
| 02:50:35 | 4 | **A** That's correct. |
| 02:50:36 | 5 | **Q** What's going on there? How did you put together this |
| 02:50:38 | 6 | chart? |
| 02:50:39 | 7 | **A** So we started with the list of the ones in white, |
| 02:50:45 | 8 | we'll just call them the ones in white for a moment, which |
| 02:50:48 | 9 | are not non-defendant pharmacies, so they're not Walgreens |
| 02:50:51 | 10 | or CVS or Walmart. |
| 02:50:54 | 11 | And as you see here, Franklin over there with 114,000, |
| 02:50:59 | 12 | that's the number -- we ranked them according to the number |
| 02:51:02 | 13 | of opioids filled. And for each one of these stores, we |
| 02:51:06 | 14 | found the nearest Walgreens, nearest as the crow flies. |
| 02:51:09 | 15 | **Q** And this is reflecting the percentage of cash payments |
| 02:51:14 | 16 | for what drugs? |
| 02:51:15 | 17 | **A** This is for -- I believe for all opioids. |
| 02:51:20 | 18 | **Q** Got it. And you're comparing the percentage of cash |
| 02:51:23 | 19 | payments to Franklin, for example, to the nearest Walgreens; |
| 02:51:26 | 20 | is that right? |
| 02:51:26 | 21 | **A** Yes. |
| 02:51:26 | 22 | **Q** Is that the same Franklin Pharmacy that we saw before |
| 02:51:30 | 23 | at the top of the list for Trumbull County? |
| 02:51:31 | 24 | **A** Yes, it is. |
| 02:51:31 | 25 | **Q** And then do you see Overholt's/Champion on the list |

02:51:38   1    there too?

02:51:38   2    **A**    Yes.

02:51:39   3    **Q**    Did you help us prepare kind of a simpler, prettier

02:51:44   4    chart kind of reflecting some of this information?

02:51:46   5    **A**    Yes.

02:51:54   6    **Q**    Is this one of those charts?

02:51:56   7    **A**    Yes, it is.

02:51:56   8    **Q**    What is reflected in the chart that I just put on the

02:51:59   9    screen?

02:52:00   10   **A**    So it's a summary of the previous information, which

02:52:04   11   shows that for Overholt's during the period while it was

02:52:07   12   open, 27.4 percent of their opioid prescriptions were paid

02:52:13   13   for with cash.

02:52:16   14        With Champion Bellevue, which is the reopened store,

02:52:20   15   16.9 percent of their opioid prescriptions were paid for in

02:52:24   16   cash.

02:52:25   17        And then for Walgreens, the number is 4.3 percent.

02:52:30   18   **Q**    And which Walgreens is that that you're comparing

02:52:33   19   Overholt's and Champion to?

02:52:34   20   **A**    We did our comparative to the nearest Walgreens, which

02:52:39   21   also happens to be the largest Walgreens in Trumbull County,

02:52:43   22   which is Walgreens Number 5549 at 804 West Market.

02:52:48   23   **Q**    And that's in Warren, Ohio?

02:52:50   24   **A**    That's correct.

02:52:50   25   **Q**    I want to flip ahead just to the next slide for a

**Brunner - (Direct by Swift)** 5541

02:52:53 1   minute.

02:52:53 2       What does this slide show?

02:52:55 3   **A**   So in the prior slide we had Overholt's on one line

02:53:00 4   and Champion Bellevue on another line.  Here we've

02:53:03 5   consolidated the two.

02:53:04 6   **Q**   How did you do that mathematically?

02:53:06 7   **A**   Mathematically we just added the two rows together to

02:53:10 8   get new totals and then divided by their new total.

02:53:15 9   **Q**   And does this allow you to compare the overall

02:53:18 10  percentage cash payment for the time period that either

02:53:22 11  Overholt's or Champion was open to the same time period for

02:53:26 12  that nearest Walgreens?

02:53:27 13  **A**   That is correct.

02:53:27 14  **Q**   And what does the data reflect when you do it that

02:53:30 15  way?

02:53:30 16  **A**   22.8 percent of Overholt's/Champion/Bellevue, whatever

02:53:36 17  we call that, were paid for in cash, versus 4.3 percent for

02:53:41 18  Walgreens.

02:53:41 19  **Q**   Now, I'll ask you to assume with me that Mr. Catizone

02:53:45 20  testified that 90 to 95 percent of all patients have some

02:53:50 21  sort of insurance.

02:53:52 22      Is the Walgreens number for cash payments that we see

02:53:56 23  on this slide consistent with that in terms of people

02:53:59 24  without insurance paying in cash?

02:54:02 25  **A**   Yes.  4.3 percent is well below the 5 to 10 percent he

**Brunner - (Direct by Swift)**

5542

02:54:09  1  described.

02:54:09  2  **Q**    I believe I heard you say a couple of times now that

02:54:12  3  the Walgreens at 804 West Market is the closest one to 4619

02:54:17  4  Mahoning Avenue, which is where Overholt's/Champion was

02:54:21  5  located.

02:54:22  6  **A**    That's correct.

02:54:22  7  **Q**    How far apart are those two locations?

02:54:24  8  **A**    Just a little bit less than four miles.

02:54:26  9  **Q**    Did you do another analysis to see whether patients of

02:54:32  10  Overholt's and patients of Walgreens, the nearest Walgreens,

02:54:35  11  were filling the same kinds of opioid prescriptions, meaning

02:54:39  12  the similar strengths?

02:54:40  13  **A**    Yes, we did.

02:54:41  14  **Q**    This one's a little bit tougher to read.  I'll call

02:54:59  15  out part of it.

02:55:01  16      Can you tell me whether this is the kind of

02:55:05  17  viewer-unfriendly version of that analysis?

02:55:08  18  **A**    That is definitely the viewer-unfriendly version of

02:55:12  19  that analysis, yes; but, I mean, I can describe it if you --

02:55:14  20  if it helps.

02:55:15  21  **Q**    Describe it at a high level, and then we'll go to the

02:55:18  22  viewer-friendly version if you will, please, sir.

02:55:21  23  **A**    At a high level, this shows the white area for --

02:55:24  24  those are all Franklin Pharmacy transactions.  And the first

02:55:28  25  row shows their stats for 80 milligram.  The second line of

**Brunner - (Direct by Swift)**

02:55:34    1    them shows the number for 60 milligram, and declining all

02:55:38    2    the way on down to 1 milligram.  So it goes in declining

02:55:41    3    sequence or order of dosage.

02:55:45    4    **Q**    And then I'll back out of it so we can see what else

02:55:48    5    you've shown on this slide.

02:55:51    6         Do you have the same information for Overholt's?

02:55:56    7    **A**    That's correct.

02:55:56    8    **Q**    And then the same information for Bellevue?

02:56:00    9    **A**    Also correct.

02:56:02    10   **Q**    Bellevue being the same as Champion Medicine Shoppe?

02:56:07    11   **A**    Yes.  In the raw data they're broken out, but --

02:56:10    12   **Q**    Got it.

02:56:10    13        And if we continued on through this summary, would you

02:56:13    14   see the same information for the nearest Walgreens store?

02:56:15    15   **A**    Yes.

02:56:15    16   **Q**    Again, what Walgreens store is that?

02:56:17    17   **A**    5549 at 804 West Market in Warren.

02:56:23    18   **Q**    Now I'm going to show you the prettier version of that

02:56:27    19   one.

02:56:30    20        Tell me, please, sir, if this is the simpler version

02:56:33    21   of a subset of that data we were just looking at.

02:56:36    22   **A**    Yes.

02:56:36    23   **Q**    What does it show?

02:56:38    24   **A**    So for this one, it has Overholt's and

02:56:45    25   Bellevue/Champion broken out into two different sections.

02:56:47  1    And for each of those it shows the percentage of their

02:56:53  2    prescriptions that were high dose.

02:56:54  3    **Q**    How did you define high dose or high strength?

02:56:57  4    **A**    We defined those -- I'm sorry.  High strength, we

02:57:01  5    defined those as anything that's 20 milligrams or higher for

02:57:05  6    these purposes.

02:57:05  7    **Q**    And what does it show -- what does the comparison show

02:57:09  8    here?  What are the numbers?

02:57:10  9    **A**    This shows 23.3 percent of the Overholt's

02:57:16  10   prescriptions were high dose.  14.6 percent of the

02:57:21  11   Champion/Bellevue were high dose -- I'm sorry, high

02:57:25  12   strength.  And 3.1 percent of those at Walgreens, the

02:57:29  13   nearest Walgreens, were high dose.

02:57:32  14   **Q**    And if we flip to the next slide, does this just show

02:57:36  15   how the numbers change if you combine Overholt's and

02:57:40  16   Champion/Bellevue together?

02:57:41  17   **A**    Yes, that's correct.

02:57:41  18   **Q**    And what does it show when you combine those together?

02:57:45  19   What is the percentage of their oxycodone prescriptions that

02:57:48  20   are high strength?

02:57:50  21   **A**    Their high strength is 19.4 percent.

02:57:53  22   **Q**    And again, that compares to 3.1 percent for the

02:57:55  23   nearest Walgreens?

02:57:56  24   **A**    That's correct.

02:57:57  25   **Q**    All right.  I've got one more of these little sets of

**Brunner - (Direct by Swift)**

5545

| | | |
|---|---|---|
| 02:58:00 | 1 | charts to show you, and then we're getting close to the end. |
| 02:58:02 | 2 | Did you also look at patients who filled either |
| 02:58:08 | 3 | oxycodone or hydrocodone in combination with Xanax, a |
| 02:58:12 | 4 | benzodiazapine, and the numbers of those patients who filled |
| 02:58:17 | 5 | prescriptions at Overholt's versus the nearest Walgreens? |
| 02:58:19 | 6 | **A**    Yes, we did. |
| 02:58:20 | 7 | **Q**    Is this that I've got on the screen, which is another |
| 02:58:33 | 8 | tab from Exhibit 2562, does this reflect the results of that |
| 02:58:37 | 9 | analysis? |
| 02:58:38 | 10 | **A**    Yes, it does. |
| 02:58:38 | 11 | **Q**    Then did you prepare a simpler chart to summarize a |
| 02:58:45 | 12 | subset of this information? |
| 02:58:47 | 13 | **A**    Yes, we did. |
| 02:58:48 | 14 | **Q**    Is this that chart? |
| 02:58:57 | 15 | **A**    Yes, it is. |
| 02:58:58 | 16 | **Q**    Please tell us what this chart shows. |
| 02:59:00 | 17 | **A**    This shows for Overholt's, for Champion/Bellevue, and |
| 02:59:06 | 18 | for Walgreens, the percentage of their total number of |
| 02:59:10 | 19 | opioid prescriptions that were filled that were filled in |
| 02:59:14 | 20 | combination with the Xanax. |
| 02:59:15 | 21 | **Q**    Why did you focus on just Xanax? |
| 02:59:19 | 22 | **A**    There were data limitations, if I'm not mistaken.  I'm |
| 02:59:23 | 23 | not sure that the available -- the OARRS data had all |
| 02:59:29 | 24 | other -- |
| 02:59:30 | 25 | **Q**    Benzodiazapines? |

**Brunner - (Direct by Swift)** 5546

| | | |
|---|---|---|
| 02:59:31 | 1 | **A**      -- benzodiazapines -- I'm not a chemist, not a |
| 02:59:33 | 2 | pharmacist -- benzodiazapines available. |
| 02:59:37 | 3 | **Q**      Did OARRS include very much data on muscle relaxers? |
| 02:59:41 | 4 | **A**      I don't -- no, I don't believe so. |
| 02:59:43 | 5 | **Q**      Do you recall whether it included more than one? |
| 02:59:47 | 6 |           MR. WEINBERGER:  Objection, Your Honor. |
| 02:59:48 | 7 | **A**      I don't recall off the top of my head. |
| 02:59:50 | 8 |           THE COURT:  Sustained. |
| 02:59:50 | 9 | **Q**      What does the data show for this comparison of the |
| 02:59:56 | 10 | combination prescriptions?  What are the numbers? |
| 02:59:57 | 11 | **A**      For Overholt's, that combination is 13.6 percent of |
| 03:00:04 | 12 | all opioids, opioid transactions.  For Champion/Bellevue |
| 03:00:09 | 13 | it's 11.3 percent.  And for Walgreens it's 3.0 percent. |
| 03:00:14 | 14 | **Q**      All right.  One more topic for you. |
| 03:00:19 | 15 |           Did you in the course of your work in this case also |
| 03:00:23 | 16 | look at the Ohio Board of Pharmacy's methods for identifying |
| 03:00:31 | 17 | doctor shoppers? |
| 03:00:32 | 18 | **A**      Yes, we did. |
| 03:00:32 | 19 | **Q**      I want to ask you about one of those. |
| 03:00:34 | 20 |           Do you understand from your work that the Board of |
| 03:00:36 | 21 | Pharmacy in Ohio had more than one different method for |
| 03:00:40 | 22 | identifying doctor shoppers over time? |
| 03:00:42 | 23 | **A**      Yes. |
| 03:00:42 | 24 | **Q**      And we actually heard from a Board of Pharmacy witness |
| 03:00:46 | 25 | this morning that at one point in time, the way the Ohio |

| | | |
|---|---|---|
| 03:00:51 | 1 | Board of Pharmacy identified doctor shoppers was to look at |
| 03:00:54 | 2 | patients who had prescriptions from five prescribers filled |
| 03:01:01 | 3 | at five pharmacies in a three-month period. |
| 03:01:04 | 4 | Is that different from the analysis that you did? |
| 03:01:06 | 5 | **A**    Yes, it is. |
| 03:01:07 | 6 | **Q**    All right.  I'm going to show you -- ask you about one |
| 03:01:09 | 7 | of the analyses that you did, but the first question I have |
| 03:01:14 | 8 | is about where you got the information that you relied on. |
| 03:01:17 | 9 | And for that I'm going to show you an exhibit that is |
| 03:01:23 | 10 | Defendants' MDL-1820, and it's behind tab 14. |
| 03:01:42 | 11 | Do you have it in front of you? |
| 03:01:43 | 12 | **A**    Yes. |
| 03:01:43 | 13 | **Q**    Do you recognize this document? |
| 03:01:45 | 14 | **A**    Yes. |
| 03:01:45 | 15 | **Q**    Is this a document that provided a method of |
| 03:01:49 | 16 | identifying doctor shoppers in dispensing data? |
| 03:01:52 | 17 | **A**    Yes, it is. |
| 03:01:53 | 18 | **Q**    Do you remember where in this -- well, I'll identify |
| 03:01:56 | 19 | it for the record. |
| 03:01:57 | 20 | It's an OARRS 2017 Annual Report from the Ohio Board |
| 03:02:03 | 21 | of Pharmacy. |
| 03:02:03 | 22 | Do you see that? |
| 03:02:06 | 23 | **A**    Yes. |
| 03:02:06 | 24 | **Q**    Do you remember where in this document you got the |
| 03:02:10 | 25 | method that you used? |

03:02:11   1    **A**    I don't recall the page number, no.

03:02:13   2    **Q**    Before I show it to you, I'll ask you to turn to page

03:02:17   3    9, and tell me if that refreshes your recollection.  It's

03:02:29   4    the footnote to chart number 6.

03:02:35   5    **A**    Yes, I have it now.

03:02:36   6    **Q**    Does that refresh your recollection of where you found

03:02:38   7    the method of identifying doctor shoppers according to the

03:02:42   8    Board of Pharmacy?

03:02:42   9    **A**    Yes.  There's no page number, but it's in the Section

03:02:46   10   4 of the report.

03:02:47   11   **Q**    Is it a page that looks like this, what I've got on

03:02:50   12   the screen?

03:02:50   13   **A**    Yes.

03:02:52   14   **Q**    I'll call out this footnote underneath the chart.

03:02:58   15         It reads, "In this chart, a doctor shopper is defined

03:03:02   16   as an individual receiving a prescription for a controlled

03:03:05   17   substance from five or more prescribers in one calendar

03:03:07   18   month."

03:03:08   19         Do you see that?

03:03:09   20   **A**    Yes, I do.

03:03:09   21   **Q**    Did you take that method and apply it to data in this

03:03:15   22   case?

03:03:15   23   **A**    Yes, we did.

03:03:16   24   **Q**    And did you prepare a table that reflects the results

03:03:22   25   of that analysis?

**Brunner - (Direct by Swift)**                                    5549

03:03:22   1    **A**      Yes.

03:03:22   2    **Q**      Is this that table?

03:03:31   3    **A**      Yes, it is.

03:03:32   4    **Q**      What does this table show with respect to this Ohio

03:03:39   5    Board of Pharmacy method of identifying doctor shoppers?

03:03:42   6    **A**      It shows the number of prescriptions that would have

03:03:47   7    been flagged or that would flag by applying the rule -- or

03:03:52   8    the -- I'm sorry, the description that the Board of Pharmacy

03:03:56   9    provided for doctor shopping.

03:03:57  10    **Q**      And specifically, what were the results for Walgreens?

03:03:59  11    **A**      A very, very small percentage of transactions.  I

03:04:05  12    think in total across the 7 or 800,000 opioid prescriptions

03:04:10  13    that were filled, I believe that sums up to about 54

03:04:18  14    transactions over 7 or 800,000.

03:04:19  15    **Q**      Is what we're seeing here a count for each of the

03:04:22  16    Walgreens stores in both Lake and Trumbull Counties?

03:04:25  17    **A**      Yes.

03:04:26  18    **Q**      For some of those stores, it looks like four of them,

03:04:29  19    were there zero prescriptions that flagged?

03:04:31  20    **A**      That's correct.

03:04:32  21    **Q**      And tell us again overall what the percentage was.

03:04:35  22    **A**      It's .01 percent in the aggregate.

03:04:43  23            MS. SWIFT:  Thank you, Mr. Brunner.  That's

03:04:45  24    all I have at this time.

03:04:46  25            THE COURT:  Okay.  Ladies and gentlemen, we

**Brunner - (Direct by Swift)**                                    5550

03:04:47   1   will take our afternoon break, 15 minutes.  The usual

03:04:51   2   admonitions.  And then we'll have further questioning of

03:04:56   3   Mr. Brunner.

03:19:51   4                    (Recess taken at 3:04 p.m.)

03:25:31   5                    (Jury present in open court at 3:25 p.m.)

03:25:49   6                    THE COURT:  All right.  Please be seated,

03:25:50   7   ladies and gentlemen.

03:25:53   8        Mr. Brunner, I'd like to remind you you're still under

03:25:56   9   oath.

03:25:57  10        I take it none of the other defendants had any

03:25:59  11   questions?

03:26:00  12                    MR. DELINSKY:  Nothing, Your Honor.

03:26:02  13                    MR. MAJORAS:  No, Your Honor.

03:26:03  14                    THE COURT:  Okay.  Then Mr. Lanier, you're up.

03:26:05  15                    MR. LANIER:  Thank you very much, Your Honor.

03:26:06  16        Good afternoon, ladies and gentlemen.

03:26:07  17        Good afternoon, Mr. -- is it Brunner or "Brunner"?

03:26:12  18                    THE WITNESS:  It's Brunner like "runner" with

03:26:13  19   a "B" in front.

03:26:14  20                    MR. LANIER:  Or "gunner" with a "B" in front,

03:26:16  21   either one.

03:26:17  22                    THE WITNESS:  The double consonant makes the

03:26:19  23   vowel before it short.

03:26:20  24                    MR. LANIER:  I think that's what they taught

03:26:22  25   me at Texas Tech University in Lubbock, Texas, the Hub of

**Brunner - (Cross by Lanier)** 5551

03:26:26  1    the Plains.

03:26:27  2              THE WITNESS:  I lived in Texas for a year.  I

03:26:28  3    understand this.

03:26:30  4                        - - - - -

03:26:30  5                    CROSS-EXAMINATION

03:26:30  6    BY MR. LANIER:

03:26:30  7    **Q**    You say you split your time, speaking of living,

03:26:33  8    between LA and New York City, and you were asked why, and

03:26:37  9    you said "The practice I'm trying to build," dot dot dot.

03:26:40  10           Remember that?

03:26:41  11   **A**    Yes.

03:26:41  12   **Q**    Because you are, you're in the business of trying to

03:26:44  13   build a practice right now, aren't you?

03:26:45  14   **A**    That's correct.

03:26:46  15   **Q**    And building a practice means getting and keeping

03:26:50  16   clients, right?

03:26:52  17   **A**    Among other things, yes.

03:26:55  18   **Q**    And so among other things, you billed not just

03:26:58  19   $720,000 in this case, but you've kept five to ten more

03:27:01  20   people busy as well, correct?

03:27:03  21   **A**    Not at my firm, no.  Those are people at FTI.

03:27:07  22   **Q**    At FTI, which is a firm where you were?

03:27:09  23   **A**    Where I used to work.

03:27:11  24   **Q**    Exactly.  And now you've moved, so you've got an

03:27:14  25   ability, if you continue to work in opioid litigation,

**Brunner - (Cross by Lanier)**

| | | |
|---|---|---|
| 03:27:17 | 1 | you've got an ability to continue to get other people to |
| 03:27:20 | 2 | help you do work, don't you? |
| 03:27:21 | 3 | **A**    To get other people at my prior employer to work? |
| 03:27:24 | 4 | **Q**    No.  To get other people at your current employer, |
| 03:27:27 | 5 | sir, to work with you. |
| 03:27:28 | 6 | **A**    No, I'm engaged in an individual capacity. |
| 03:27:31 | 7 | **Q**    I'm sorry? |
| 03:27:32 | 8 | **A**    I'm engaged in a -- my firm is engaged for my |
| 03:27:35 | 9 | individual time. |
| 03:27:36 | 10 | **Q**    Oh, I understand they are right now, but aren't you in |
| 03:27:39 | 11 | the future hoping to do more work? |
| 03:27:41 | 12 | **A**    This is not the core area of the practice I'm |
| 03:27:46 | 13 | building, investigative. |
| 03:27:47 | 14 | **Q**    I'm not fussing that at all, and we're going to show |
| 03:27:50 | 15 | how this is very different than anything you've ever done |
| 03:27:52 | 16 | before in your life. |
| 03:27:53 | 17 |     But my question to you is, aren't you trying to build |
| 03:27:56 | 18 | a practice? |
| 03:27:56 | 19 | **A**    Yes. |
| 03:27:57 | 20 | **Q**    And if you continue to work in this case, you will |
| 03:28:00 | 21 | need to rely on the help of others, won't you? |
| 03:28:03 | 22 | **A**    Yes. |
| 03:28:04 | 23 | **Q**    Because this is not really your niche, is it? |
| 03:28:11 | 24 | **A**    Well, data analytics is my niche, yes. |
| 03:28:15 | 25 | **Q**    No data analytics dealing with issues in this case. |

03:28:17  1   Red flags, that's not your niche, is it?

03:28:20  2   **A**    I've done volumes and volumes of work associated with

03:28:23  3   red flags in other industries.  For example, any money

03:28:27  4   laundering monitoring platforms.

03:28:28  5   **Q**    A lot of pharmaceutical red flags in money laundering?

03:28:32  6   **A**    No, but red flag applications are red flag

03:28:34  7   applications.

03:28:34  8   **Q**    Actually, we'll see if that's true.  But let's

03:28:37  9   first -- you're assuming that to be the case, fair?

03:28:40  10  **A**    They're analytics.

03:28:43  11  **Q**    Pharmacy background, do you have it?

03:28:44  12  **A**    No, I don't.

03:28:50  13  **Q**    Prescription background, do you have it?

03:28:53  14  **A**    No, I don't.

03:28:53  15  **Q**    For that matter, using Table 10 on Method 2 to find

03:28:56  16  out if doctor shopping happens, is that a specialty of

03:29:03  17  yours?

03:29:03  18  **A**    To the extent that the methodology is specifically

03:29:06  19  outlined, I can implement that process.

03:29:08  20  **Q**    Wasn't my question.

03:29:09  21       Is that your expertise?  Have you ever done it before?

03:29:13  22  **A**    No, I have not.

03:29:13  23  **Q**    Did the Ohio Board of Pharmacy call on you to do it?

03:29:17  24  **A**    No, they did not.

03:29:17  25  **Q**    Did the DEA call on you to do it?

**Brunner - (Cross by Lanier)**

03:29:19  1  **A**    No, they did not.

03:29:20  2  **Q**    Has any Board of Pharmacy in the 50 United States of

03:29:25  3  America called on you to do it?

03:29:25  4  **A**    No, they did not.

03:29:26  5  **Q**    First time you've done it is when you've been paid to

03:29:30  6  do it by these -- by Walgreens, I guess at least, right?

03:29:33  7  **A**    The first time I'm doing it in connection with the --

03:29:37  8  **Q**    Statistician, do you have any graduate degrees in

03:29:41  9  statistics?

03:29:41  10  **A**    Not in my -- my bachelor' degree is in economics,

03:29:45  11  which includes statistics.

03:29:46  12  **Q**    I've got a minor in economics.  I took a statistics

03:29:50  13  class, and that's enough to teach me I ain't a statistician.

03:29:53  14      Do you have a statistics degree, a major in

03:29:55  15  statistics?

03:29:55  16  **A**    No, I don't.

03:29:56  17  **Q**    Controlled substance, are you a controlled substance

03:30:01  18  expert on helping people with controlled substances?

03:30:04  19  **A**    Absolutely not.

03:30:05  20  **Q**    Narcotic investigations, are you an expert in that?

03:30:11  21  **A**    Negative.

03:30:13  22  **Q**    Are you an expert in red flag law -- and I want to

03:30:16  23  specify here -- dealing with controlled substances?

03:30:24  24  **A**    Negative.

03:30:29  25  **Q**    Red flag interpretation, dealing with controlled

**Brunner - (Cross by Lanier)** 5555

03:30:33  1  substances, expert?

03:30:34  2  **A**    Negative.

03:30:38  3  **Q**    PMPs and the Ohio PMP, OARRS, do you claim expertise

03:30:45  4  in that before this case?

03:30:46  5  **A**    Negative.

03:30:46  6  **Q**    ARCOS data, working with that, do you have an ARCOS

03:30:56  7  data background before hired to work in this case?

03:30:57  8  **A**    Negative.

03:31:02  9  **Q**    And so with that layer of expertise --

03:31:04  10  **A**    If I might amend that.

03:31:07  11  **Q**    I'm sorry, sir?

03:31:08  12  **A**    If I might amend that response.  I've worked with it

03:31:12  13  in other cases prior to beginning work on Lake and Trumbull

03:31:15  14  County.

03:31:15  15  **Q**    Oh, yeah, yeah, yeah, yeah, yeah.  They hired you to

03:31:18  16  testify in New York, they hired you to testify in West

03:31:21  17  Virginia.  That's all part of the opioid testimony you're

03:31:24  18  giving for them, right?

03:31:25  19              MS. SWIFT:  Objection, Your Honor.

03:31:29  20              THE COURT:  Overruled.

03:31:31  21  **A**    Can you repeat the question?

03:31:32  22  **Q**    Yeah.

03:31:32  23  You've already been hired by them and testified in New

03:31:35  24  York for them and West Virginia, right?

03:31:37  25              MS. SWIFT:  Same objection.

**Brunner - (Cross by Lanier)** 5556

| | | |
|--|--|--|
| 03:31:38 | 1 | **A**   Yes. |
| 03:31:38 | 2 | **Q**   Which one? |
| 03:31:39 | 3 |         THE COURT:  Let's -- hold it.  Let's go on the |
| 03:31:41 | 4 | headphones a minute. |
| 03:31:42 | 5 |         MR. LANIER:  Judge, I'll withdraw it in the |
| 03:31:44 | 6 | interest of time and just move a different route. |
| 03:31:46 | 7 |         THE COURT:  All right.  Withdrawn. |
| 03:31:48 | 8 | BY MR. LANIER: |
| 03:31:48 | 9 | **Q**   Did you offer an expert opinion in the New York opioid |
| 03:31:51 | 10 | litigation? |
| 03:31:51 | 11 | **A**   Yes, I did. |
| 03:31:52 | 12 | **Q**   Okay.  And I'm assuming when you gave us your billings |
| 03:31:54 | 13 | you included all of the opioid work you're doing, didn't |
| 03:31:58 | 14 | you? |
| 03:31:58 | 15 | **A**   That's correct. |
| 03:31:58 | 16 | **Q**   All right.  So ARCOS data background, my question to |
| 03:32:01 | 17 | you is, did you have any of that before you got hired in the |
| 03:32:05 | 18 | opioid litigation that's pending right now? |
| 03:32:10 | 19 | **A**   No, I did not. |
| 03:32:11 | 20 | **Q**   Thank you, sir. |
| 03:32:12 | 21 |     And so when you get asked questions like what method |
| 03:32:15 | 22 | did you use, and Ms. Swift says what method did you use to |
| 03:32:21 | 23 | compute the doctor shopping, and she references this report; |
| 03:32:25 | 24 | remember that? |
| 03:32:26 | 25 | **A**   Yes. |

| 03:32:26 | 1 | **Q** You didn't know which page to turn to, did you? |
| 03:32:29 | 2 | **A** Not off the top of my head.  I believe it's referenced |
| 03:32:31 | 3 | specifically in my expert report. |
| 03:32:33 | 4 | **Q** And she has to turn the page to page 9 for you, and |
| 03:32:37 | 5 | then you don't know where to go on the page, do you? |
| 03:32:39 | 6 | **A** I know where it is. |
| 03:32:41 | 7 | **Q** Well, you know now because she pointed to you and said |
| 03:32:44 | 8 | you can look at the footnote down there if that refreshes |
| 03:32:46 | 9 | your recollection. |
| 03:32:47 | 10 | Remember that? |
| 03:32:49 | 11 | **A** I recall that. |
| 03:32:50 | 12 | **Q** And then you were like, oh, yes. |
| 03:32:52 | 13 | And as she said, is this what you did, your answer |
| 03:32:55 | 14 | would typically be, "we" did that, because you had other |
| 03:32:59 | 15 | people do this work, didn't you? |
| 03:33:03 | 16 | **A** Other people may have performed individual portions of |
| 03:33:08 | 17 | my work, much of which, if not all of which, I've recreated |
| 03:33:11 | 18 | myself as a means of quality control to confirm that we got |
| 03:33:14 | 19 | the right answer. |
| 03:33:14 | 20 | **Q** In other words, the reason I said "we" is because |
| 03:33:18 | 21 | "someone else did that work for me," right? |
| 03:33:19 | 22 | **A** Sometimes, yes. |
| 03:33:20 | 23 | **Q** Okay.  Next question -- or next set of questions are |
| 03:33:25 | 24 | off your road map.  I want to do three quick stops with you, |
| 03:33:29 | 25 | and they're not going to take long, I hope.  All right? |

03:33:31  1      First stop is Relianceville.  You see it?

03:33:36  2  **A**   I do.

03:33:37  3  **Q**   Then we're going to do some comparisons and look at

03:33:40  4  some of the comparisons you've already made and some

03:33:43  5  comparisons you didn't make.  Okay?

03:33:45  6  **A**   All right.

03:33:45  7  **Q**   And then we're going to talk about bad doctors in the

03:33:49  8  counties at issue in this case.  All right?

03:33:52  9  **A**   Okay.

03:33:53  10  **Q**   So let's commence with reliance.

03:34:02  11      Now, you've got a number of different exhibits that

03:34:04  12  you were shown by Ms. Swift, and I've put an example of them

03:34:07  13  up here.

03:34:09  14      Do you see that example?

03:34:10  15  **A**   Yes, I do.

03:34:10  16  **Q**   And this example's got a nice footnote down at the

03:34:14  17  bottom, doesn't it?

03:34:15  18  **A**   Yes, it does.

03:34:15  19  **Q**   This is where you get your data from, isn't it?

03:34:18  20  **A**   That's correct.

03:34:18  21  **Q**   You can say all you want about Craig McCann, who's got

03:34:25  22  a Ph.D. in this stuff, but say what you want, you still use

03:34:33  23  his data, don't you?

03:34:34  24  **A**   Yes, I did.

03:34:34  25  **Q**   So you find him to be reliable when you need to use

**Brunner - (Cross by Lanier)**                    5559

03:34:38  1    the data, don't you?

03:34:41  2    **A**    When we did our comparisons of the ARCOS data, we

03:34:45  3    identified that, subject to a few minor adjustments upon

03:34:49  4    which Dr. McCann and I agree, that that's a reliable basis

03:34:52  5    of data to do the work.

03:34:53  6    **Q**    And now you're saying "we" again because it wasn't you

03:34:56  7    that actually did the work, right?

03:34:59  8    **A**    In that context I'm not sure.  I may well have done

03:35:02  9    that individually myself.  I don't recall.

03:35:04  10   **Q**    So when Ms. Swift is saying "you did this, you did

03:35:10  11   this," that's the "you" that we use in Texas as "y'all."

03:35:13  12   Y'all did this.  It wasn't you specifically, right?

03:35:15  13   **A**    Y'all sometimes refers to an individual as well.

03:35:17  14   **Q**    Not where I come from, sir.  There is some places in

03:35:21  15   East Texas where they'll say "all y'all" if they want it to

03:35:25  16   be everybody, but where I come from, y'all is just second

03:35:27  17   person plural, all right?

03:35:29  18        What I'm driving at is, you go to McCann, or your

03:35:33  19   people do, on this data, correct?

03:35:36  20   **A**    We went to an agreed-upon data set effectively, which

03:35:40  21   we --

03:35:40  22   **Q**    No, look at the next --

03:35:42  23             MS. SWIFT:  Objection.  Can he finish his

03:35:43  24   answer, please?

03:35:44  25             THE COURT:  All right.  I agree.

| | | |
|---|---|---|
| 03:35:46 | 1 | MR. LANIER:  My fault, Judge. |
| 03:35:47 | 2 | THE COURT:  Mr. Brunner, please finish your |
| 03:35:48 | 3 | answer. |
| 03:35:48 | 4 | **A**    We went to an agreed-upon data set.  His data matched |
| 03:35:52 | 5 | the information provided by DEA subject to a few small |
| 03:35:57 | 6 | adjustments, and we agreed that was a valid data set. |
| 03:36:00 | 7 | **Q**    So you don't say that, you say it's McCann's adjusted |
| 03:36:05 | 8 | DEA ARCOS data.  It's what he adjusted from the DEA, |
| 03:36:08 | 9 | correct? |
| 03:36:09 | 10 | **A**    There are adjustments that we agreed to, and it's |
| 03:36:12 | 11 | easier just to cite back to his data than to -- |
| 03:36:14 | 12 | **Q**    Because y'all didn't have the data, did you? |
| 03:36:16 | 13 | MS. SWIFT:  Objection.  He wasn't finished |
| 03:36:18 | 14 | with his answer again. |
| 03:36:19 | 15 | THE COURT:  All right.  Mr. Lanier, just slow |
| 03:36:21 | 16 | down a minute and make sure Mr. Brunner finishes his answer. |
| 03:36:25 | 17 | MR. LANIER:  All right. |
| 03:36:25 | 18 | **Q**    Y'all didn't independently analyze the data, did you? |
| 03:36:29 | 19 | **A**    Yes, we did, quite extensively. |
| 03:36:31 | 20 | **Q**    Then why don't you cite your own work instead of |
| 03:36:33 | 21 | McCann's? |
| 03:36:35 | 22 | **A**    Less -- it's easier because his adjustments to the |
| 03:36:39 | 23 | data we agreed to, we used his data set.  Less room for |
| 03:36:46 | 24 | there to be controversy or conflict. |
| 03:36:48 | 25 | **Q**    Next page, same thing.  You're using his adjusted |

**Brunner - (Cross by Lanier)**

03:36:51   1    data, aren't you?

03:36:52   2    **A**    That's correct.

03:36:52   3    **Q**    And we'll look at these to see some other issues with

03:36:56   4    them later on.  But so we're clear, this market share

03:37:00   5    analysis you're doing by MME, this is not based on

03:37:06   6    dispensing the drugs.  This is based on the distribution

03:37:10   7    that's coming into the pharmacies from the wholesaler, the

03:37:14   8    middle man, right?

03:37:15   9    **A**    It's based on -- it's the same analysis.  If

03:37:20   10   Dr. McCann were to present them, he'd show those same exact

03:37:23   11   numbers because it's based on the purchases by the

03:37:25   12   pharmacies.

03:37:25   13   **Q**    Is that a yes or a no answer?

03:37:29   14        I said this is not based on dispensing data, the

03:37:33   15   pharmacies selling it.  It's based on the numbers that get

03:37:35   16   shipped into the pharmacists, right?

03:37:37   17   **A**    That's correct.

03:37:37   18   **Q**    And that means that it ends as of 2014.  It's a very

03:37:43   19   limited time period of data, correct?

03:37:49   20   **A**    That's correct.

03:37:49   21   **Q**    All right.  So if we continue to look at the reliance

03:37:57   22   stop, Relianceville as I'm calling it, have you ever met

03:38:00   23   Craig McCann, Dr. McCann?

03:38:01   24   **A**    No.

03:38:02   25   **Q**    But you are going to use his ARCOS data, correct?

**Brunner - (Cross by Lanier)**

03:38:07  1   **A**     Yes.

03:38:08  2   **Q**     And in that regard, you were asked a lot of questions

03:38:15  3   about red flags.

03:38:18  4       Now, you understand how a red flag works in the

03:38:22  5   pharmaceutical world?

03:38:24  6   **A**     I'm not sure that I do.

03:38:26  7   **Q**     When I asked you if you had red flag expertise, you

03:38:30  8   said red flags are red flags regardless of the field.

03:38:34  9   Remember?

03:38:36  10  **A**     So technically, a red flag, as I said, of criteria

03:38:39  11  applied against transactions.  So in that context, I know

03:38:42  12  what red flags are.  I don't know how specifically they're

03:38:45  13  used in the pharmaceutical field.

03:38:47  14  **Q**     Exactly.  So all of your testimony about red flags is

03:38:53  15  done without you really understanding their purpose inside

03:38:56  16  the pharmaceutical field, fair?

03:38:59  17  **A**     That's fair.

03:39:00  18  **Q**     And so if their purpose is simply to draw the

03:39:05  19  pharmacist's attention to a situation to see whether or not

03:39:08  20  it might be a problem, that's foreign to you, isn't it?

03:39:14  21  **A**     Correct.

03:39:14  22  **Q**     And if you want to err when it comes to red flags, and

03:39:21  23  in the pharmaceutical world you'd rather have more

03:39:24  24  identified than less, because you can always deal with the

03:39:30  25  red flags, that's foreign to you, isn't it?

**Brunner - (Cross by Lanier)**                                    5563

| | | |
|---|---|---|
| 03:39:34 | 1 | **A**    Not something I considered. |
| 03:39:35 | 2 | **Q**    Not something you considered? |
| 03:39:38 | 3 | **A**    That's correct. |
| 03:39:38 | 4 | **Q**    Now, you took Dr. McCann to task because he put a fill |
| 03:39:47 | 5 | time into one of the fields, how many of these were filled |
| 03:39:52 | 6 | within an hour together. |
| 03:39:56 | 7 | Remember? |
| 03:39:56 | 8 | **A**    Yes, I do. |
| 03:39:57 | 9 | **Q**    And you took him to task and said that would be wrong, |
| 03:39:59 | 10 | wouldn't it? |
| 03:40:00 | 11 | **A**    Loading an arbitrary fill time for them, yes, I did |
| 03:40:03 | 12 | say that was wrong. |
| 03:40:03 | 13 | **Q**    All right.  I want to see if I can change your mind |
| 03:40:05 | 14 | real quick, okay? |
| 03:40:07 | 15 | **A**    Okay. |
| 03:40:07 | 16 | **Q**    All right.  So let's talk about Walgreens. |
| 03:40:13 | 17 | What are the options that you and Dr. McCann have when |
| 03:40:17 | 18 | Walgreens just doesn't fill in the time half the time? |
| 03:40:22 | 19 | You with me? |
| 03:40:23 | 20 | **A**    Yeah, I am. |
| 03:40:24 | 21 | **Q**    So you've got some options.  One option is just ignore |
| 03:40:28 | 22 | it.  That's what you did, right? |
| 03:40:31 | 23 | **A**    No. |
| 03:40:32 | 24 | **Q**    You said, I just didn't use that factor.  Remember? |
| 03:40:36 | 25 | **A**    It would be to exclude those transactions where the |

03:40:40    1    time was not populated --

03:40:42    2    **Q**    That's what I mean.

03:40:44    3    **A**    -- from any analysis that relied on the time field --

03:40:50    4    the time filled field being populated.

03:40:52    5    **Q**    Okay.  That's all I'm driving at.

03:40:54    6    So one option is you just exclude it.  And if three

03:40:58    7    people came in in the same hour and it just wasn't

03:41:00    8    documented, free ride for the company on that one, right?

03:41:05    9    **A**    I wouldn't say free ride.  I would say they should --

03:41:07    10    they cannot be part of an analysis upon -- that relies on

03:41:13    11    the time dispensed as a critical factor.

03:41:15    12    **Q**    So free ride.

03:41:16    13    I mean, look, let's be real world about this for a

03:41:19    14    moment, okay?

03:41:20    15    Three people go in, same prescription, same strength,

03:41:25    16    same doctor, and they go in between 12 noon and 12:30.

03:41:33    17    You got it?

03:41:35    18    **A**    Are those the dates that are appropriately reflected

03:41:38    19    contemporaneously, like at the time they actually came in,

03:41:42    20    or are those just hypothetical times?

03:41:44    21    **Q**    I'm just doing a hypothetical.

03:41:46    22    Three people come in between noon and 12:30, same

03:41:49    23    doctor, same prescription, same day.  You got me?

03:41:52    24    **A**    As a hypothetical, yes.

03:41:55    25    **Q**    And the pharmacy just, ehhh, they don't fill in the

**Brunner - (Cross by Lanier)**

03:42:00  1    time, and so there's no time signature for these three.

03:42:04  2         You got me?

03:42:05  3    **A**    I do.

03:42:05  4    **Q**    Then when you approach this problem, you're going to

03:42:08  5    say you can't trigger a red flag even though it should have

03:42:11  6    triggered because the pharmacy didn't do their homework

03:42:16  7    right.  Correct?

03:42:16  8    **A**    That's not what I would say.  First of all, I don't

03:42:20  9    know if the data's not populated because of a system issue

03:42:22  10   and perhaps the data wasn't even captured back then.

03:42:26  11   **Q**    Oh, it was captured.  So let's don't make excuses for

03:42:30  12   them because you don't have the basis to make an excuse.

03:42:32  13   Fair?

03:42:32  14                MS. SWIFT:  Objection, Your Honor.

03:42:33  15                THE COURT:  Well, I'll sustain that.

03:42:36  16   **Q**    Okay.  Sir, you don't have the basis to make excuses

03:42:39  17   for them.  You don't know.  True?

03:42:40  18   **A**    I do not know.

03:42:42  19   **Q**    So you give those people a free ride, and you don't

03:42:47  20   count them if you just ignore every time a time entry is not

03:42:52  21   entered, true?

03:42:53  22   **A**    If I'm doing an analysis that's based on time and we

03:42:56  23   don't have actual entries of time for them, they cannot be

03:43:00  24   included in the time, in the analysis.

03:43:02  25   **Q**    Or you could do number 2.  You could approximate.  You

03:43:07  1    could say, here's the half where they do do time, and we can

03:43:10  2    see how that time spreads out and figure statistically it

03:43:13  3    may be the same.  I mean, that may be kind of loosey-goosey,

03:43:18  4    but you could do that, right?

03:43:22  5    **A**    There are methods where you could project something,

03:43:25  6    but then it would still not be sufficient to be used to

03:43:30  7    definitively identify something.  There's always an error

03:43:32  8    rate anytime one projects data like that or guesstimates.

03:43:36  9    **Q**    No question.  No question.  There's always an error

03:43:40  10   rate.  But a projection is a legitimate way of doing it,

03:43:44  11   correct?

03:43:45  12   **A**    In certain circumstances, and I wouldn't do it where

03:43:48  13   specific timing down to matter of minutes is missing.

03:43:53  14   **Q**    There's a third option, and that is to give a range

03:43:56  15   and to see it's going to be somewhere between zero and 100

03:44:03  16   percent, right?

03:44:10  17   **A**    As to estimating the impacts on the overall

03:44:13  18   population, that might be valid.  Dr. McCann projected --

03:44:18  19   gave a range of 100 percent to 100 percent.

03:44:20  20   **Q**    No, you weren't here for his testimony.  He set it out

03:44:24  21   very clearly.  He said the zero is easy to compute.  So it's

03:44:27  22   somewhere between zero and 100 percent, and then he told the

03:44:30  23   jury what the statistical difference was for them to

03:44:33  24   calculate.

03:44:34  25        Did you not know that?

**Brunner - (Cross by Lanier)**                    5567

03:44:35    1    **A**    I did not.  I haven't reviewed his testimony.

03:44:38    2    **Q**    All right.  Next, you talk about overlapping red flags

03:44:49    3    and the problem with overlapping prescriptions.

03:44:53    4         Remember?

03:44:53    5    **A**    Yes, I do.

03:44:54    6    **Q**    And you said the problem is Dr. McCann tripped these

03:44:58    7    by looking at the first prescription date that it was

03:45:01    8    written.

03:45:01    9         Remember?

03:45:02   10    **A**    That's correct.

03:45:02   11    **Q**    Okay.  Well, you have to have the first flag for it to

03:45:10   12    overlap, don't you?

03:45:11   13    **A**    No, you have to have identified the first transaction

03:45:13   14    in order to flag the triggering transaction, the later

03:45:17   15    transaction.

03:45:17   16    **Q**    Right.  That's what he did.  Did you not understand

03:45:20   17    that?

03:45:20   18    **A**    No, he flagged the first transaction and the second

03:45:25   19    transaction.

03:45:25   20    **Q**    Because those are the two that overlap.

03:45:28   21         You understand?

03:45:29   22    **A**    But at the time, my understanding is if one were to

03:45:35   23    look at what was available at the time, there would be no

03:45:39   24    reason for anyone to flag that first transaction.

03:45:43   25    **Q**    And he only flagged the first transaction if there was

**Brunner - (Cross by Lanier)**                    5568

03:45:45   1   a second one within an overlapping time period.

03:45:48   2       Did you not get that?

03:45:49   3   **A**   I understand why he flagged the second one.

03:45:52   4   **Q**   I mean, if I wanted to ask you how many times Baker

03:45:56   5   Mayfield throws two touchdowns in a Browns game, I'm sure in

03:46:02   6   Southern California -- you're probably a Cleveland Browns

03:46:04   7   fan at least for today, right?

03:46:06   8   **A**   Buffalo Bills fan actually.  Sorry.

03:46:10   9   **Q**   Well, you need to be.

03:46:16  10       If I want to know how many games he throws two

03:46:19  11   touchdowns in, I better count the first touchdown, don't you

03:46:23  12   think?

03:46:26  13   **A**   To be able to count, yes.

03:46:29  14   **Q**   If I get the second touchdown and ignore the first

03:46:33  15   one, I'm not going to get a very good stat, am I?

03:46:35  16   **A**   Actually, if you want to count the number of games in

03:46:37  17   which Baker Mayfield threw two touchdowns and he threw two

03:46:41  18   touchdowns yesterday, you're going to count that once.

03:46:44  19   **Q**   That's exactly right.  I'm not fussing that, but to do

03:46:47  20   that --

03:46:48  21   **A**   One game, he threw two touchdowns one time.

03:46:51  22   **Q**   To do that, you've got to count both, don't you?

03:46:54  23   **A**   In --

03:46:58  24   **Q**   In the statistics column, you better have two

03:47:00  25   touchdowns down there, count the first and the last -- or

**Brunner - (Cross by Lanier)** 5569

03:47:03 1 second, right?

03:47:03 2 **A** Yes, that's correct. But for purposes of flagging

03:47:08 3 activity here, it's only the second that caused the issue.

03:47:11 4 **Q** Sorry.

03:47:13 5 If you're playing tic-tac-toe, you better count the

03:47:16 6 first X if you're going to count three in a row, right?

03:47:20 7 **A** I would agree.

03:47:22 8 **Q** By the way, you gave a 30 percent and said, eh, this

03:47:28 9 messes up 30 percent of the numbers.

03:47:30 10 You're not talking 30 percent of the total of all of

03:47:33 11 the prescriptions. You're talking within the designation of

03:47:36 12 that red flag, fair?

03:47:37 13 **A** I was talking about the number of transactions that

03:47:40 14 received the red flag --

03:47:42 15 **Q** Thank you.

03:47:43 16 **A** -- that were in error, yeah.

03:47:44 17 **Q** And then at one point you took it up to 68 percent for

03:47:47 18 something else, right?

03:47:48 19 **A** That was for red flag number 9.

03:47:51 20 **Q** Uh-huh.

03:47:51 21 **A** The 30 percent was for red flag number 3.

03:47:56 22 **Q** And the other side of that coin is, if Walgreens

03:47:58 23 doesn't flag it, then they miss 68 percent, don't they?

03:48:08 24 **A** I'm sorry, which -- so if you go to your previous

03:48:11 25 bullet point, the 68 percent is referring to the errors.

**Brunner - (Cross by Lanier)**                                           5570

| | | |
|---|---|---|
| 03:48:16 | 1 | **Q**    Yeah, I'm saying, look, if you don't -- take the 30 |
| 03:48:20 | 2 | percent down, I don't care which one.  If you don't flag it, |
| 03:48:24 | 3 | then Walgreens doesn't catch it.  Right? |
| 03:48:28 | 4 | **A**    I don't know what's done with the flagged |
| 03:48:33 | 5 | transactions. |
| 03:48:33 | 6 | **Q**    That's out of your area? |
| 03:48:34 | 7 | **A**    I just know that Dr. McCann's reporting and his |
| 03:48:40 | 8 | production of those transactions that were flagged in that |
| 03:48:42 | 9 | method, 30 percent of them should not have been flagged. |
| 03:48:44 | 10 | **Q**    Now, let's look at some interesting math you did, |
| 03:48:48 | 11 | okay? |
| 03:48:50 | 12 | **A**    Okay. |
| 03:48:55 | 13 | **Q**    You said in reference to this exhibit -- |
| 03:48:59 | 14 |          MR. LANIER:  And this exhibit, Your Honor, is |
| 03:49:00 | 15 | slide number 4 from the demonstratives that were used with |
| 03:49:06 | 16 | Carmen Catizone, for the record. |
| 03:49:08 | 17 | **Q**    Do you remember your questions from Ms. Swift |
| 03:49:11 | 18 | concerning this? |
| 03:49:11 | 19 | **A**    Yes. |
| 03:49:11 | 20 | **Q**    She asked you if that 61 percent of 1,237 were blank, |
| 03:49:18 | 21 | if that was true or false.  And you said that's false, |
| 03:49:23 | 22 | didn't you? |
| 03:49:24 | 23 | **A**    Yes, I did. |
| 03:49:24 | 24 | **Q**    You're not telling the whole story behind your |
| 03:49:28 | 25 | testimony now, are you? |

03:49:30  1    **A**    I'm not sure I follow.

03:49:32  2    **Q**    All right.  Let's zoom in on this.

03:49:38  3          This is based on 2,000 sample notes.

03:49:43  4          Do you see that?

03:49:44  5    **A**    2,000 sample transactions, yes.

03:49:46  6    **Q**    And Carmen Catizone, physically with his eyeballs,

03:49:51  7    looked at all of them and found 1,237 to be blank across

03:49:57  8    these comment fields.

03:49:58  9          Do you see that?

03:49:59  10   **A**    I do.

03:50:00  11   **Q**    His comment fields were the relevant note fields.

03:50:05  12         Do you see that?

03:50:06  13   **A**    I do.

03:50:06  14   **Q**    And you don't know what a relevant note is to a

03:50:11  15   pharmacist, do you?

03:50:13  16   **A**    No, I do not.  I know the population of comments

03:50:17  17   fields available and the percentages of population for

03:50:20  18   those.

03:50:20  19   **Q**    Oh, I know, I saw you had like how many fields were

03:50:23  20   blank for the doctor's address or for pregnancy or for

03:50:29  21   patient allergies, and things like that.  Right?

03:50:31  22   **A**    Among other things, yes.

03:50:32  23   **Q**    But relevant notes fields, you don't know what those

03:50:37  24   are, do you?

03:50:38  25   **A**    I'm not qualified to make a judgment of that.

**Brunner - (Cross by Lanier)** 5572

03:50:40  1  **Q**    And not only are you not qualified, then, to make a

03:50:43  2  judgment on whether he's right or wrong, you've gone and

03:50:47  3  done something a bit more tricky, haven't you?

03:50:52  4          MS. SWIFT:  Objection, Your Honor.

03:50:54  5          MR. LANIER:  I'll change my wording.

03:50:55  6          THE COURT:  Yes.

03:50:56  7  **Q**    You've done something different, haven't you?

03:51:03  8  **A**    I'm not sure what you mean.

03:51:05  9  **Q**    Well, what I mean is you went and pulled up the

03:51:10  10  historical files associated with these patients, didn't you?

03:51:15  11  **A**    We looked at the expanded patient histories for every

03:51:19  12  one of those transactions, yes.

03:51:19  13  **Q**    In other words, you're looking at 155,000

03:51:25  14  prescriptions, aren't you?

03:51:27  15  **A**    Yes.

03:51:27  16  **Q**    So when you sit there and say that only 75 percent

03:51:35  17  are -- well, that's prescriber location comment.  That's

03:51:39  18  where the prescriber's located.

03:51:41  19          Whatever it may be, from your .10 to your 74.85, all

03:51:48  20  of that's not based on 2,000.  That's based on 155,957

03:52:05  21  prescriptions and notes fields, right?

03:52:07  22  **A**    Correct.

03:52:08  23  **Q**    And so when you tell this jury that there were

03:52:18  24  actually 1,497 you found, is that what you were saying?

03:52:30  25          You say you found 1,497 filled in, as opposed to 1,237

| | | |
|---|---|---|
| 03:52:38 | 1 | blank, didn't you? |
| 03:52:42 | 2 | **A**    Can you show me the other chart that we just -- |
| 03:52:51 | 3 | **Q**    1,497? |
| 03:52:53 | 4 | **A**    Yes. |
| 03:52:53 | 5 | **Q**    See it? |
| 03:52:54 | 6 | **A**    Yes. |
| 03:52:54 | 7 | **Q**    That's not out of 2,000 prescriptions.  That's out of |
| 03:53:01 | 8 | 155,000 prescriptions, isn't it? |
| 03:53:05 | 9 | MS. SWIFT:  Objection, Your Honor. |
| 03:53:08 | 10 | Mischaracterizes. |
| 03:53:08 | 11 | THE COURT:  Overruled. |
| 03:53:09 | 12 | **A**    Of the 2,000 sampled prescriptions, 1,497 of them had |
| 03:53:14 | 13 | a prescriber location comment in their expanded patient |
| 03:53:18 | 14 | histories. |
| 03:53:18 | 15 | **Q**    In other words -- no, no, no, no.  Let's be really |
| 03:53:21 | 16 | clear on this. |
| 03:53:24 | 17 | Carmen Catizone looked at 2,000 prescriptions, right? |
| 03:53:34 | 18 | **A**    Yes. |
| 03:53:34 | 19 | **Q**    And out of those 2,000 prescriptions, his testimony |
| 03:53:39 | 20 | was 61 percent were blank across relevant fields.  And that |
| 03:53:49 | 21 | was 1,237, right? |
| 03:53:54 | 22 | **A**    Okay. |
| 03:53:54 | 23 | **Q**    You following me? |
| 03:53:57 | 24 | **A**    I am. |
| 03:53:58 | 25 | **Q**    And then what you did is you said, well, okay, that |

03:54:06  1    may be true, but I'm going to go back and look at every

03:54:10  2    other prescription that these same patients ever had filled,

03:54:16  3    right?  Right?

03:54:20  4    A    We considered all of the data that was produced

03:54:23  5    relevant to the sample transactions, not just the 2,000 that

03:54:28  6    doctor -- yeah, that Dr. Catizone considered.

03:54:33  7    Q    In other words, correct, Mark, I'm going to go back

03:54:35  8    and look at all of the expanded patient history and other

03:54:39  9    prescriptions, correct?

03:54:40  10   A    That's correct.

03:54:41  11   Q    And so your number of sample records isn't 2,000.

03:54:46  12   Your number is 155,000 plus, isn't it?

03:54:51  13              MS. SWIFT:  Objection.  Mischaracterizes.

03:54:52  14              THE COURT:  Overruled.

03:54:54  15   A    It's -- my understanding is that that's the complete

03:54:57  16   patient histories, and those patient histories are relevant

03:55:01  17   to the sample transaction.

03:55:04  18   Q    That's not my question, sir.  My question is, when you

03:55:07  19   come up with your number of 1,497, you're getting your

03:55:14  20   number out of that 155,000 other prescriptions, aren't you?

03:55:21  21   A    As they relate to the 2,000.

03:55:25  22   Q    Yeah, they're prescriptions -- different prescriptions

03:55:29  23   of the same patient, right?

03:55:30  24   A    That's correct.

03:55:31  25   Q    So different prescriptions.  And there, why don't you

**Brunner - (Cross by Lanier)**

5575

| | | |
|---|---|---|
| 03:55:36 | 1 | tell the jury what percentage are blank.  If you use 1,497 |
| 03:55:44 | 2 | out of a denominator of 155,000, what percentage do you find |
| 03:55:51 | 3 | blank? |
| 03:55:51 | 4 | **A**    That's an irrelevant number. |
| 03:55:52 | 5 | **Q**    That wasn't my question, sir, because I think it's |
| 03:55:55 | 6 | dead on relevant. |
| 03:55:56 | 7 |     What's the percentage? |
| 03:55:57 | 8 | **A**    So of those 1,497 patients -- or of the sample |
| 03:56:05 | 9 | transactions, some of them may have had many, many, many, |
| 03:56:08 | 10 | many comments.  I don't know off the top of my head.  It |
| 03:56:11 | 11 | could be 120,000 that actually -- 120,000 records that |
| 03:56:16 | 12 | actually had comments in them that all boiled down to the |
| 03:56:20 | 13 | 1,497 in the sample. |
| 03:56:22 | 14 |     I don't know the answer to that.  It could be 150,000, |
| 03:56:25 | 15 | could be 120,000.  I don't know that. |
| 03:56:27 | 16 | **Q**    You may have done the wrong math here.  You may have |
| 03:56:30 | 17 | the wrong figures, but let's use your figures anyway and |
| 03:56:34 | 18 | tell the jury the percentage. |
| 03:56:35 | 19 |     1,497 over 155,957 equals what over 100? |
| 03:56:43 | 20 |         MS. SWIFT:  Objection, Your Honor.  Could we |
| 03:56:45 | 21 | go to a side bar, please? |
| 03:56:47 | 22 |         THE COURT:  No, overruled.  Overruled. |
| 03:56:52 | 23 | **Q**    Can you answer that, sir. |
| 03:56:58 | 24 |     Do you have a calculator? |
| 03:56:59 | 25 | **A**    I have my phone, yes. |

**Brunner - (Cross by Lanier)** 5576

03:57:00  1   **Q**   That's super.

03:57:14  2       You got the answer?

03:57:15  3   **A**   If I do the 2,000 divided by the 155, that's, you

03:57:20  4   know, 1.2 percent.  If do I --

03:57:23  5   **Q**   Sir, can you do the math that I've asked you to do?

03:57:26  6   **A**   That's .96 percent.

03:57:55  7   **Q**   So if you have only 1,497 filled out of 155,000, then

03:58:04  8   you've got 99 percent blank instead of the 61 percent,

03:58:09  9   wouldn't you?

03:58:10  10  **A**   But the 1,497 is not the number of records of

03:58:16  11  prescriptions that had comments in them.

03:58:18  12  **Q**   Sir, I'm going to get to that in a moment, but we're

03:58:25  13  going to do it step by step, please.

03:58:27  14      If we take what you were telling the jury was 1,497

03:58:31  15  out of 2,000, even though that 1,497 is coming out of

03:58:37  16  155,000, then you've got, simple math, 99 percent blank

03:58:44  17  fields on prescriber comment location.  True?

03:58:49  18  **A**   Absolutely not.

03:58:49  19  **Q**   Sir, if you -- the only reason -- all right.

03:58:58  20  **A**   You're comparing apples and oranges.

03:59:00  21  **Q**   No, sir, I'm asking you a simple math question.

03:59:03  22      I'm giving you an if/then proposition.  Do you know

03:59:07  23  what those are?

03:59:07  24  **A**   I do.

03:59:08  25  **Q**   If you look at 155,957 prescriptions --

| | | |
|---|---|---|
| 03:59:15 | 1 | **A**    Yes. |
| 03:59:15 | 2 | **Q**    -- and if 1,497 are filled in for a certain blank, the |
| 03:59:25 | 3 | prescriber location, then that means not filled in is 99 |
| 03:59:33 | 4 | percent.  True? |
| 03:59:37 | 5 | **A**    The 1,497 is not a valid number to subtract from |
| 03:59:46 | 6 | 155,957. |
| 03:59:46 | 7 | **Q**    Wasn't my question, sir.  Answer my question. |
| 03:59:52 | 8 | If 155,000 prescriptions are looked at and 1,400 of |
| 03:59:57 | 9 | them are filled in in a certain blank, then that means 99 |
| 04:00:00 | 10 | percent are not filled in for that blank.  True? |
| 04:00:03 | 11 | **A**    Your math is not inaccurate; however, you're comparing |
| 04:00:10 | 12 | an apple to an orange. |
| 04:00:13 | 13 | **Q**    Well, now, we'll talk about that in a moment. |
| 04:00:16 | 14 | But that's your math and the math is right, isn't it? |
| 04:00:19 | 15 | MS. SWIFT:  Objection.  Mischaracterizes. |
| 04:00:21 | 16 | **A**    That's not my math. |
| 04:00:23 | 17 | THE COURT:  Let's move on. |
| 04:00:24 | 18 | **Q**    Sir, you say it's apples and oranges? |
| 04:00:28 | 19 | **A**    Yes. |
| 04:00:28 | 20 | **Q**    Because maybe it's filled in in more than one blank. |
| 04:00:35 | 21 | Maybe you've got other blanks filled in.  Fair? |
| 04:00:38 | 22 | **A**    Could be that that -- a particular comment field was |
| 04:00:42 | 23 | filled in 97 percent of the time, and that would count as |
| 04:00:45 | 24 | just one of your 1,497. |
| 04:00:47 | 25 | **Q**    You just don't know because you didn't eyeball them, |

**Brunner - (Cross by Lanier)** 5578

| | | |
|---|---|---|
| 04:00:49 | 1 | right? |
| 04:00:50 | 2 | **A**    That's correct. |
| 04:00:51 | 3 | **Q**    But at least we know that your figures for your |
| 04:00:55 | 4 | indicting Mr. Catizone and Dr. McCann, you're using figures |
| 04:01:02 | 5 | from 155,000 other prescriptions, aren't you? |
| 04:01:07 | 6 | **A**    I'm aggregating those transactions by sample |
| 04:01:16 | 7 | prescription and reporting the results there, yes. |
| 04:01:19 | 8 | **Q**    Can you answer my question, please? |
| 04:01:21 | 9 | Here it is. |
| 04:01:21 | 10 | I said, "But at least we know that your figures for |
| 04:01:28 | 11 | indicting Mr. Catizone and Dr. McCann, you're using figures |
| 04:01:30 | 12 | from 155,000 other prescriptions, aren't you?" |
| 04:01:36 | 13 | True? |
| 04:01:38 | 14 | **A**    I am looking at the entire expanded patient history of |
| 04:01:42 | 15 | 155,000, yes. |
| 04:01:43 | 16 | **Q**    Is that a "yes" answer? |
| 04:01:44 | 17 | **A**    Yes. |
| 04:01:45 | 18 | **Q**    Thank you. |
| 04:01:45 | 19 | Let's talk comparisons, which I guess we've sort of |
| 04:01:48 | 20 | been doing, but I want to throw out a couple more. |
| 04:01:52 | 21 | WAG Demonstrative 29, page 11. |
| 04:01:57 | 22 | Do you remember this one? |
| 04:01:59 | 23 | **A**    I do. |
| 04:01:59 | 24 | **Q**    Now, again, you're relying upon Craig McCann for this, |
| 04:02:05 | 25 | aren't you? |

**Brunner - (Cross by Lanier)**

04:02:05  1   **A**      I'm relying on the ARCOS data, yes, as adjusted by

04:02:10  2   McCann.

04:02:10  3   **Q**      You're not just that.  You're also relying upon his

04:02:13  4   expert report Appendix 10 and his numbers, aren't you?

04:02:16  5   **A**      Yes.

04:02:16  6   **Q**      But what you've done is you've broken this apart and

04:02:19  7   put all the little Walgreens stores in different lines,

04:02:23  8   haven't you?

04:02:23  9   **A**      Just as Dr. McCann did.

04:02:25  10  **Q**      Is that a "yes" answer?

04:02:27  11  **A**      Yes, just as Dr. McCann did.

04:02:29  12  **Q**      Not in front of the jury.  He did that so that people

04:02:33  13  can compare store by store in terms of how the production

04:02:37  14  numbers were changing in the trend lines.

04:02:40  15          Did you not understand that?

04:02:41  16  **A**      I was not witness to any of his testimony here in

04:02:44  17  court.

04:02:44  18  **Q**      So let's be witness to this.  If we take this, you've

04:02:50  19  got opioid purchases by the pharmacies, 278 by Overholt's

04:02:58  20  combined with Champion's -- and he didn't combine those; you

04:03:05  21  did, right?

04:03:05  22  **A**      That's correct.

04:03:06  23  **Q**      So when you say I broke those apart because he did,

04:03:09  24  well, you combined these when he didn't, didn't you?

04:03:11  25  **A**      That's correct.

**Brunner - (Cross by Lanier)** 5580

| | | |
|---|---|---|
| 04:03:12 | 1 | **Q**    And then you've got Franklin at 241,000, right? |
| 04:03:16 | 2 | **A**    Also correct. |
| 04:03:17 | 3 | **Q**    And then you've got Walgreens at 238,000, don't you, |
| 04:03:22 | 4 | if you add those stores up? |
| 04:03:26 | 5 | **A**    It's over to the right for the combined -- all 13 |
| 04:03:30 | 6 | Walgreens, yes. |
| 04:03:30 | 7 | **Q**    And that's just in Trumbull County. |
| 04:03:32 | 8 | **A**    I'm sorry, all six Walgreens.  I apologize. |
| 04:03:34 | 9 | **Q**    Because if you add together with Trumbull County the |
| 04:03:38 | 10 | Walgreens prescriptions in Lake County, you've now got a |
| 04:03:45 | 11 | boatload more, don't you? |
| 04:03:46 | 12 | **A**    There are obviously also Walgreens in Lake County that |
| 04:03:54 | 13 | are not on this chart, yes. |
| 04:03:55 | 14 | **Q**    Well, you've got another 220,000 from Lake County.  So |
| 04:04:01 | 15 | at this point, Walgreens in those two counties is pumping |
| 04:04:04 | 16 | out almost twice as many as Overholt's and Franklin. |
| 04:04:08 | 17 |      Do you see that? |
| 04:04:11 | 18 | **A**    If one were to add all 13 Walgreens stores, they would |
| 04:04:15 | 19 | be more than either of the individual of those stores, yes. |
| 04:04:19 | 20 | **Q**    Right.  But you understand our concern is how many |
| 04:04:21 | 21 | pills are going out on the street, not which store they |
| 04:04:24 | 22 | bought them from, right? |
| 04:04:26 | 23 | **A**    I don't know. |
| 04:04:26 | 24 | **Q**    Well, sir, the question becomes, how many pills are |
| 04:04:30 | 25 | out there on the street from these different stores. |

| | | |
|---|---|---|
| 04:04:33 | 1 | Did you not know that's the issue? |
| 04:04:35 | 2 | **A**    I know generally what the issue is.  I don't know |
| 04:04:38 | 3 | precisely what measurement of -- is going to be used to |
| 04:04:43 | 4 | determine that. |
| 04:04:44 | 5 | **Q**    Well, I'll show you Plaintiffs' Exhibit 26321.  And |
| 04:04:49 | 6 | this is one of the charts that shows in Lake and Trumbull |
| 04:04:56 | 7 | Counties that Walgreens year by year is putting out what |
| 04:04:59 | 8 | ultimately peaks in 2011 at over 10 pills per person, every |
| 04:05:07 | 9 | man, woman, and child, every infant gets counted, 10 pills |
| 04:05:11 | 10 | per person, all from just Walgreens. |
| 04:05:14 | 11 | Did you know that? |
| 04:05:17 | 12 | **A**    I hadn't looked at that.  That's the first I'm seeing |
| 04:05:20 | 13 | that. |
| 04:05:21 | 14 | **Q**    Yeah, well, that's a lot more pills per person from |
| 04:05:24 | 15 | Walgreens than you're going to get from Overholt's, isn't |
| 04:05:27 | 16 | it? |
| 04:05:27 | 17 | MS. SWIFT:  Objection, Your Honor. |
| 04:05:28 | 18 | THE COURT:  Overruled. |
| 04:05:29 | 19 | **A**    Again, I haven't analyzed that for Overholt's or |
| 04:05:32 | 20 | Franklin, or anyone else. |
| 04:05:33 | 21 | **Q**    Which brings me to the last stop, bad doctors. |
| 04:05:39 | 22 | Did you do any work on the bad doctors in this case? |
| 04:05:44 | 23 | **A**    Can you define the bad doctors? |
| 04:05:46 | 24 | **Q**    Sure.  Did you do a pill count for how many pills |
| 04:05:50 | 25 | Walgreens put in the hands of patients of Dr. Franklin? |

| | | |
|---|---|---|
| 04:05:55 | 1 | **A**    Not pills, no. |
| 04:05:56 | 2 | **Q**    How many pills Walgreens put in the hands of the |
| 04:05:59 | 3 | patients of Dr. Veres? |
| 04:06:01 | 4 | **A**    Not pills, no. |
| 04:06:02 | 5 | **Q**    How many pills Walgreens put in the hands of |
| 04:06:07 | 6 | Dr. Demangone? |
| 04:06:07 | 7 | **A**    Negative. |
| 04:06:08 | 8 | **Q**    You know, these are doctors in the county.  These are |
| 04:06:11 | 9 | Lake and Trumbull doctors.  Did you know that? |
| 04:06:14 | 10 | **A**    I'll take your word for it. |
| 04:06:15 | 11 | **Q**    Dr. Torres, did you do a pill count for how many pills |
| 04:06:20 | 12 | Walgreens put in the hands of his patients? |
| 04:06:22 | 13 | **A**    Negative. |
| 04:06:22 | 14 | **Q**    Dr. Lazzerini, who got sentenced for overprescribing, |
| 04:06:27 | 15 | do you know how many pills Walgreens filled for his |
| 04:06:29 | 16 | patients? |
| 04:06:29 | 17 | **A**    Negative. |
| 04:06:30 | 18 | **Q**    Did you look at any of the patients that have been |
| 04:06:33 | 19 | concerns for diverters?  I've just listed three, but Carol |
| 04:06:38 | 20 | DiPaola, did you look at how many she got and where they |
| 04:06:40 | 21 | came from? |
| 04:06:41 | 22 | **A**    Negative. |
| 04:06:41 | 23 | **Q**    Did you take a look at where Douglas Windland's came |
| 04:06:45 | 24 | from? |
| 04:06:45 | 25 | **A**    Negative. |

**Brunner - (Redirect by Swift)**                    5583

| | | |
|---|---|---|
| 04:06:45 | 1 | **Q**    Did you look at where Autumn Ansel's came from? |
| 04:06:48 | 2 | **A**    No, I did not. |
| 04:06:49 | 3 |         MR. LANIER:  Thank you.  I'll pass the |
| 04:06:51 | 4 | witness, Your Honor. |
| 04:06:53 | 5 |         THE COURT:  Okay.  Before redirect, we'll see |
| 04:06:55 | 6 | if any of the jurors have any questions for Mr. Brunner. |
| 04:07:02 | 7 |     (Juror question review.) |
| 04:10:05 | 8 |         MS. SWIFT:  May it please the Court? |
| 04:10:06 | 9 |         THE COURT:  Yes, Ms. Swift. |
| 04:10:08 | 10 |         MS. SWIFT:  Good afternoon again, ladies and |
| 04:10:10 | 11 | gentlemen. |
| 04:10:10 | 12 |     Mr. Pitts, may I have the ELMO, please? |
| 04:10:15 | 13 |                 - - - - - |
| 04:10:16 | 14 |             REDIRECT EXAMINATION |
| 04:10:16 | 15 | BY MS. SWIFT: |
| 04:10:16 | 16 | **Q**    Mr. Brunner, I have a number of juror questions for |
| 04:10:19 | 17 | you, and I'll go through those first before asking some |
| 04:10:22 | 18 | follow-up questions on redirect.  Okay? |
| 04:10:23 | 19 | **A**    Okay. |
| 04:10:24 | 20 |     Are you near the microphone?  Can you move? |
| 04:10:26 | 21 | **Q**    I'm sorry.  Can you hear me now? |
| 04:10:28 | 22 | **A**    Yes. |
| 04:10:28 | 23 | **Q**    I have to lean into it, I guess.  I'm just going to go |
| 04:10:31 | 24 | through these one by one.  This is the first one. |
| 04:10:35 | 25 |     "If a field is left blank during the data analysis, |

04:10:39  1    how does this affect the results if the number of blank

04:10:44  2    fields is a significant number?  What is the error rate?"

04:10:48  3    **A**    So depending on the analysis, if it's just a few

04:10:54  4    relative to the total, then they can safely be excluded and

04:10:57  5    just typically footnoted, and saying this is only the data

04:11:04  6    where that field is populated or that value is populated.

04:11:07  7        If one were to try and put in an error rate on that,

04:11:12  8    you'd want to estimate it by using the number of blank

04:11:16  9    records with a blank value relative to the total number of

04:11:19  10   records.

04:11:28  11   **Q**    "What makes Dr. McCann's data incorrect?  What makes

04:11:32  12   your data correct?  Isn't this just a matter of education,

04:11:35  13   training, and experience?"

04:11:36  14   **A**    So largely, Dr. McCann and I agree on the appropriate

04:11:41  15   data to use, which is the ARCOS data, subject to a couple

04:11:45  16   minor little revisions that he and I both agree on.  Which

04:11:48  17   is why all, for example, the market share data analytics

04:11:52  18   that we did were all off of his data; less argumentative if

04:11:57  19   we just use his data.

04:11:58  20       So there's -- other than the time issue, and with him

04:12:02  21   filling in a random time for those records where it was

04:12:07  22   missing a time entry, we agree with his ARCOS data.  We're

04:12:11  23   using his ARCOS data.  There's nothing that makes his

04:12:14  24   analysis and our analysis -- if he were to run the same

04:12:17  25   analytics we did, he would arrive at the same answers.

04:12:25    1    **Q**    "Of the 2,000 in the sample, how many hard copies did

04:12:33    2    you obtain and review?"

04:12:34    3    **A**    So if I recall correctly, there were roughly 1,700 of

04:12:39    4    the -- 1,799, if memory serves, of the 2,000 that were

04:12:45    5    originally presented as hard copy prescriptions.  Of those

04:12:51    6    17 -- we'll call them 1,800; of those 1,800, we found 1,246

04:12:57    7    actual hard copies, because they'd been stored in warehouses

04:13:01    8    in Iron Mountain in boxes, or what have you.  So 1,246

04:13:05    9    actual physical hard copies were retrieved and reviewed in

04:13:09   10    detail.

04:13:10   11    **Q**    Did you review the hard copies yourself?

04:13:12   12    **A**    Yeah, I looked at all of the hard copies myself.

04:13:14   13    **Q**    "How many times have you been to Lake/Trumbull

04:13:24   14    Counties to gather information?"

04:13:26   15    **A**    I have not been to either Lake or Trumbull County.

04:13:29   16    **Q**    "When you compared your data to Dr. McCann, was the

04:13:34   17    date range exactly the same for both?"

04:13:38   18    **A**    Assuming we're talking about the date -- the date

04:13:42   19    range that the data covered, precisely the same, because it

04:13:47   20    is the same data.

04:13:51   21    **Q**    And maybe just to follow up to that, were there

04:13:54   22    different time frames for different data sets?

04:13:56   23    **A**    Yes, yes.  The OARRS data covered a period starting in

04:14:04   24    2010, going to 2018.  The ARCOS data was different, which is

04:14:09   25    the market share data, covered a period of 2006 to 2014.  So

**Brunner - (Redirect by Swift)**

5586

04:14:15  1    they're slightly different.

04:14:17  2        But Dr. McCann and I agree on what the OARRS data is,

04:14:22  3    what the ARCOS data is, same data.  We've made no

04:14:26  4    manipulations or changes to it in either way.

04:14:28  5    **Q**    "You stated that the McCann's data was used with some

04:14:33  6    of your adjusted data.  What do you mean?  What was

04:14:37  7    adjusted?"

04:14:38  8    **A**    So there were some slight anomalies in the data here

04:14:41  9    and there.  I don't recall specifically.  One of them is,

04:14:45  10   like, a month where the ARCOS data was missing some data.

04:14:49  11   We may have -- we adjusted it by putting in some Walgreens

04:14:51  12   data from the Walgreens production.  Just some other places

04:14:56  13   where there's some minor issues affecting a couple thousand

04:15:00  14   records, if I'm not mistaken.

04:15:02  15       But he and I agree on exactly what those adjustments

04:15:05  16   should be.

04:15:09  17   **Q**    "Why didn't you add all Walgreens' dispensing

04:15:16  18   numbers"?

04:15:16  19   **A**    I'm pretty sure I have -- well, for the market share

04:15:23  20   purposes, we did -- we mirrored what Dr. McCann did in his

04:15:30  21   expert report, in one of his appendixes, I think it's

04:15:33  22   Appendix Number 10 to his report, which is where he laid out

04:15:36  23   the market share.  And so we wanted to mirror that.  So we

04:15:40  24   did our market share analysis, again, from the ARCOS data.

04:15:45  25   **Q**    A clarifying question there.

**Brunner - (Redirect by Swift)**

| | | |
|---|---|---|
| 04:15:47 | 1 | Is it your understanding that Dr. McCann concluded |
| 04:15:50 | 2 | that it was more appropriate to use ARCOS data to calculate |
| 04:15:53 | 3 | market share? |
| 04:15:53 | 4 | **A**   That's my understanding, yes. |
| 04:15:54 | 5 | **Q**   Even for dispensing? |
| 04:15:57 | 6 | **A**   I don't know if he used dispensing specifically. |
| 04:16:08 | 7 | **Q**   "Did you have a pharmacist review things such as |
| 04:16:12 | 8 | dur_comment to see if what was written in the field was |
| 04:16:15 | 9 | pertinent?  In other words, if the comment field said |
| 04:16:18 | 10 | "kitten," did you still count it"? |
| 04:16:20 | 11 | **A**   That's a great hypothetical.  Be very curious if a |
| 04:16:28 | 12 | pharmacist put "kitten" in there. |
| 04:16:29 | 13 | We did not review the quality of the content of any of |
| 04:16:33 | 14 | the entries in any of the fields.  We noted which had a |
| 04:16:36 | 15 | value in there and which did not have a value in there. |
| 04:16:42 | 16 | **Q**   All right.  I have a few more questions to ask you, |
| 04:16:45 | 17 | Mr. Brunner. |
| 04:16:45 | 18 | Let's see.  Mr. Lanier asked you questions about the |
| 04:16:54 | 19 | fact that you in some respects relied on Dr. McCann's |
| 04:16:59 | 20 | adjusted ARCOS data. |
| 04:17:01 | 21 | Do you remember those questions? |
| 04:17:02 | 22 | **A**   Yes. |
| 04:17:02 | 23 | **Q**   Where you could, did you do that in order to kind of |
| 04:17:06 | 24 | cut through the wheat and the chaff to get to kind of the |
| 04:17:12 | 25 | heart of the matter? |

**Brunner - (Redirect by Swift)** 5588

04:17:13  1   **A**     Yes.

04:17:13  2   **Q**     I think I heard you say you were trying to avoid

04:17:18  3   conflicts, to be less argumentative.

04:17:20  4        What did you mean by that in this context?

04:17:21  5   **A**     I mean, if we're looking at the same exact data as

04:17:25  6   Dr. McCann is, then looking for the same things we are

04:17:29  7   likely to find the same exact answer.  For example, when I

04:17:32  8   put those pie charts up there, we used his data because he

04:17:38  9   would get the same exact answers that we put up there for

04:17:41  10  those charts.

04:17:43  11  **Q**     Now, Mr. Lanier asked you a series of questions about

04:17:45  12  the fact that Dr. McCann inserted an arbitrary fill time,

04:17:53  13  the same fill time of noon, wherever a fill time wasn't

04:17:58  14  included in the data that you received.

04:17:59  15       Do you remember those questions?

04:18:00  16  **A**     Yes, I do.

04:18:01  17  **Q**     He asked you whether you could have approximated a

04:18:07  18  time instead of leaving that information out.

04:18:09  19       Do you remember that question?

04:18:10  20  **A**     I do.

04:18:10  21  **Q**     I understand that you didn't approximate a fill time.

04:18:14  22  Did Dr. McCann approximate a fill time?

04:18:17  23  **A**     No.

04:18:21  24  **Q**     Mr. Lanier also said you could have given a range

04:18:24  25  instead of just leaving out the fill time entirely.

04:18:28   1        Do you remember that?

04:18:29   2   **A**    Yes.

04:18:30   3   **Q**    And I believe he represented to you what Dr. McCann

04:18:34   4   testified to this jury.  But based on your review of the

04:18:38   5   work that Dr. McCann did in this case in his expert report,

04:18:43   6   did Dr. McCann provide a range of fill times?

04:18:45   7   **A**    No.

04:18:46   8   **Q**    He just made up a fill time when it was missing?

04:18:48   9   **A**    Correct.

04:19:01  10             MS. SWIFT:  One second.

04:19:27  11   **Q**    Mr. Lanier asked you about this slide that I also

04:19:29  12   asked you about.

04:19:30  13        Do you remember that?

04:19:30  14   **A**    Yes.

04:19:30  15   **Q**    You see that it says "relevant notes fields"?

04:19:39  16   **A**    Yes.

04:19:39  17   **Q**    It doesn't say "in all of the notes fields that had

04:19:44  18   free-text comments" or anything like that, does it?

04:19:47  19   **A**    No, it does not.

04:19:48  20   **Q**    Did you make any subjective assessment of which

04:19:52  21   comment fields/notes fields to include in your analysis?

04:19:56  22   **A**    We identified sort of free-text fields.  We quantified

04:20:02  23   those, separate from the non-free-text fields.

04:20:05  24        So intuitively, if there's a free-text field, someone

04:20:09  25   could type in the word "kitten," as opposed to just

**Brunner - (Redirect by Swift)**

| | | |
|---|---|---|
| 04:20:13 | 1 | selecting the state [ph], so we identified the difference |
| 04:20:15 | 2 | between those two, but we didn't make a qualitative |
| 04:20:18 | 3 | assessment of either of them. |
| 04:20:30 | 4 |        MS. SWIFT:  Mr. Pitts, if I could switch over |
| 04:20:32 | 5 | to the computer, please. |
| 04:20:44 | 6 | **Q**    And I've got back up on the screen, Mr. Brunner -- and |
| 04:20:47 | 7 | this is behind Tab 3 in the binder -- this is the table we |
| 04:20:49 | 8 | looked at before from your supplemental report.  Correct? |
| 04:20:52 | 9 | **A**    Yes. |
| 04:20:52 | 10 | **Q**    It's Table 1. |
| 04:20:55 | 11 | Did you also include in your report other tables of |
| 04:21:02 | 12 | other categories of information that you collected with the |
| 04:21:06 | 13 | help of your team associated with the Notes production? |
| 04:21:11 | 14 | **A**    Yes, several. |
| 04:21:12 | 15 | **Q**    So just so that it's clear for the jury, this Table 1 |
| 04:21:16 | 16 | contains the number and percentage of populated fields in |
| 04:21:20 | 17 | Walgreens' electronic notes data associated with the sample |
| 04:21:23 | 18 | 2,000 prescriptions, and it's got a relatively lengthy list. |
| 04:21:28 | 19 | Do all of these fields include comments or free-text |
| 04:21:33 | 20 | notes? |
| 04:21:35 | 21 | **A**    All of these?  Negative. |
| 04:21:37 | 22 | **Q**    Then Table 2 on the next page is another list of |
| 04:21:46 | 23 | fields that were collected. |
| 04:21:47 | 24 | Do all of these fields include notes or comments? |
| 04:21:50 | 25 | **A**    Negative. |

**Brunner - (Redirect by Swift)**                                     5591

| | | |
|---|---|---|
| 04:21:50 | 1 | **Q**     How about this table, Table 3, what is this showing? |
| 04:21:59 | 2 | MR. LANIER:  Your Honor, I'm going to object |
| 04:22:00 | 3 | to questions outside the scope of cross.  I didn't go |
| 04:22:02 | 4 | through these other tables, and she didn't on direct. |
| 04:22:04 | 5 | THE COURT:  Well, this one there were |
| 04:22:05 | 6 | questions on. |
| 04:22:07 | 7 | MR. LANIER:  Okay. |
| 04:22:07 | 8 | THE COURT:  This one right up here there |
| 04:22:09 | 9 | certainly was. |
| 04:22:12 | 10 | MR. LANIER:  That's okay.  I'll just -- |
| 04:22:15 | 11 | MS. SWIFT:  Thank you, Your Honor. |
| 04:22:19 | 12 | BY MS. SWIFT: |
| 04:22:19 | 13 | **Q**     What is this table showing, Mr. Brunner? |
| 04:22:21 | 14 | **A**     This shows the 10 or 11, maybe 12 different fields |
| 04:22:25 | 15 | available in the data that contained free-text |
| 04:22:30 | 16 | possibilities. |
| 04:22:30 | 17 | **Q**     Do you know whether when Mr. Catizone was talking |
| 04:22:34 | 18 | about the fields that he deemed relevant, whether he was |
| 04:22:38 | 19 | looking at all of these free-text notes fields? |
| 04:22:41 | 20 | **A**     His comment related only to one of these fields. |
| 04:22:45 | 21 | **Q**     Did you selectively report on fields in the sample? |
| 04:22:49 | 22 | **A**     Negative. |
| 04:22:49 | 23 | **Q**     All right.  You were also asked some questions about |
| 04:22:54 | 24 | another one of Mr. Catizone's slides.  It was this one. |
| 04:23:04 | 25 | MS. SWIFT:  If I could have the ELMO back just |

**Brunner - (Redirect by Swift)** 5592

| | |
|---|---|
| 04:23:07 | 1 |

for a second, please, Mr. Pitts.

**Q**    Do you remember the questions about this slide that

Mr. Lanier asked you?

**A**    Yes.

**Q**    I want to drill down on this a little bit because it

wasn't clear to me whether you had an opportunity to explain

how you were actually dealing with the what you call the

expanded patient histories.

When you said that 555 prescriptions -- let me take

that a step back.

We altered this slide so that it reads, "Of the 2,000

prescriptions total, 555 prescriptions contain some writing

in the dur_comment field," and then it goes on from there.

Do you recall when we did that on your direct

examination?

**A**    Yes.

**Q**    All of those 555 prescriptions, were those

prescriptions that were in the 2,000?

**A**    I'm sorry, they were -- yes.  Somewhere in the patient

history for 555 of those were DUR comments.

**Q**    For 555,000 -- strike that.

For 555 prescriptions within the 2,000 that were the

sample set?

**A**    Yes.

**Q**    For those 555, they had at least one comment in a

04:24:25    1    prior prescription?

04:24:26    2    **A**    That's correct.

04:24:27    3    **Q**    Did you look to see whether for those 555

04:24:31    4    prescriptions within the sample set there may have been

04:24:35    5    many, many, many, many comments in prior prescriptions?

04:24:39    6    **A**    There certainly may have been, yes.

04:24:41    7    **Q**    Do you know how many there were or do you not know,

04:24:46    8    for DUR comments.

04:24:48    9    **A**    For DUR comments, I don't recall specifically, but

04:24:51    10    there are many that are multiple.

04:24:53    11          MS. SWIFT: So if we could please switch back

04:24:56    12    to the computer, Mr. Pitts.

04:25:01    13    **Q**    I believe this is -- we're back to Table 1 in your

04:25:04    14    supplemental report. I believe this is the table that

04:25:07    15    Mr. Lanier focused you on. And if I was -- if I was hearing

04:25:12    16    him correctly, it sounded to me like he was trying to ask

04:25:20    17    you whether, for example, this 555 that you have right here

04:25:27    18    was out of the 2,000 or if it was out of the 155,000.

04:25:32    19          What's the correct answer to that question?

04:25:33    20    **A**    That's out of the -- the expanded patient histories

04:25:38    21    for 555 of the 2,000 have a DUR comment in them someplace.

04:25:43    22    **Q**    So 555 prescriptions of the 2,000?

04:25:47    23    **A**    Yes.

04:25:47    24    **Q**    And if you're looking at those expanded patient

04:25:51    25    histories, there may be many, many, many more than that that

04:25:54  1    have a comment in the dur_comment field?

04:25:56  2    **A**    Absolutely.

04:25:57  3    **Q**    Is the same true for each of the comment or free-text

04:26:01  4    notes fields that you collected data on?

04:26:03  5    **A**    Yes.

04:26:04  6    **Q**    So for each of those where you have reported the

04:26:09  7    number of populated records, those numbers are out of the

04:26:15  8    2,000 sample prescriptions; is that a fair statement?

04:26:18  9    **A**    That's correct.  That's correct.

04:26:19  10   **Q**    You're not reporting the total number of those Notes

04:26:25  11   comments that may appear in any prescription anywhere in the

04:26:28  12   expanded patient history?

04:26:29  13   **A**    That's correct.  So the 555 can be compared to the

04:26:34  14   2,000, not really compared to the 155,000.  That's --

04:26:38  15   **Q**    So do you remember the division problem that

04:26:40  16   Mr. Lanier asked you to compute for us?

04:26:43  17   **A**    Yes.

04:26:43  18   **Q**    He asked you to divide I think it was the prescriber

04:26:48  19   location comment number, the 1,497.  He asked you to divide

04:26:53  20   that by 155,957.

04:26:59  21        Would that be an appropriate calculation to make?

04:27:01  22   **A**    Absolutely not.

04:27:02  23   **Q**    Why not?

04:27:03  24   **A**    It's meaningless.

04:27:06  25   **Q**    Why is it meaningless?

**Brunner - (Redirect by Swift)**

04:27:07   1   **A**     Because one relates to the 2,000 in the sample.  The

04:27:11   2   other is the universe of transactions.

04:27:15   3   **Q**     Have you reported the universe of transactions out of

04:27:18   4   the 155,000 on this chart?

04:27:20   5   **A**     Negative.

04:27:21   6   **Q**     All right.  I have a few questions about what

04:27:31   7   Mr. Lanier referred to as the bad doctors.

04:27:33   8        Do you remember those questions?

04:27:34   9   **A**     I do.

04:27:35   10  **Q**     He asked you whether you did a pill count for a number

04:27:43   11  of doctors.

04:27:48   12       Did you -- hold on a second here.  I think I lost one

04:28:14   13  page.

04:28:32   14       Do you remember Mr. Lanier asked you about a Dr. Frank

04:28:35   15  Veres?

04:28:36   16  **A**     I do.

04:28:37   17  **Q**     And you testified that you didn't do a pill count for

04:28:41   18  Dr. Veres.

04:28:42   19       Did you look to see how many prescriptions Walgreens

04:28:45   20  filled for Dr. Frank Veres?

04:28:47   21  **A**     I did.

04:28:47   22  **Q**     How did you do that?  What data did you use?

04:28:49   23  **A**     We used the OARRS data.

04:28:54   24  **Q**     How many prescriptions did Walgreens fill for

04:28:57   25  Dr. Frank Veres at all 13 of the Walgreens stores in Lake

**Brunner - (Redirect by Swift)** 5596

04:29:06  1    and Trumbull Counties?

04:29:06  2    **A**    15,435.

04:29:09  3    **Q**    From what time period to what time period?

04:29:12  4    **A**    That covers OARRS, so it's 2008 through 2018.

04:29:17  5    **Q**    2008 to 2018, did I hear that correctly?

04:29:22  6    **A**    Yes.

04:29:23  7    **Q**    Did you compare that number to the number of

04:29:25  8    prescriptions that Overholt's Pharmacy filled for Dr. Frank

04:29:29  9    Veres?

04:29:29  10   **A**    Yes.

04:29:29  11   **Q**    How many prescriptions did Overholt's fill for

04:29:33  12   Dr. Frank Veres?

04:29:33  13   **A**    16,355.

04:29:37  14   **Q**    In what time frame?

04:29:38  15   **A**    Same time period.

04:29:39  16   **Q**    Was it the exact same time frame?

04:29:42  17   **A**    Oh, no, I'm sorry.  For Overholt's/Champion?  No, it's

04:29:48  18   actually for a shorter period of time.  Overholt's/Champion

04:29:51  19   ended -- closed their doors in 2010.  I believe it was

04:29:54  20   October, in 2015.  I believe it was October of 2015.  So

04:30:00  21   that's a shorter period of time.

04:30:02  22   **Q**    So did I hear you correctly that all 13 Walgreens

04:30:05  23   stores over a lengthier period of time filled fewer

04:30:09  24   prescriptions for Dr. Veres than Overholt's/Champion in a

04:30:14  25   shorter time period?

| | | |
|---|---|---|
| 04:30:14 | 1 | **A**     Yes, in just -- Walgreens covers 11 years of activity |
| 04:30:21 | 2 | across all 13 stores, and the Overholt's/Champion covers |
| 04:30:25 | 3 | seven and a half years of activity across just that one |
| 04:30:27 | 4 | location. |
| 04:30:52 | 5 | MS. SWIFT:  That's all I have for you.  Thanks |
| 04:30:54 | 6 | very much, Mr. Brunner. |
| 04:30:56 | 7 | THE COURT:  Anything from either of the other |
| 04:30:58 | 8 | two defendants?  I assume not, but I want to ask. |
| 04:31:02 | 9 | MR. DELINSKY:  No, thank you, Your Honor. |
| 04:31:06 | 10 | MR. MAJORAS:  No, thank you, Your Honor. |
| 04:31:08 | 11 | THE COURT:  Then Mr. Lanier, you're back up. |
| 04:31:10 | 12 | MR. LANIER:  Thank you, Judge. |
| 04:31:26 | 13 | May it please the Court. |
| 04:31:28 | 14 | - - - - - |
| 04:31:28 | 15 | RECROSS-EXAMINATION |
| 04:31:28 | 16 | BY MR. LANIER: |
| 04:31:30 | 17 | **Q**     Okay, Mr. Brunner, we're almost done.  I want to cover |
| 04:31:32 | 18 | a couple things. |
| 04:31:33 | 19 | On the bad doctors you were asked questions about, was |
| 04:31:36 | 20 | it Dr. Veres you ran the numbers on? |
| 04:31:39 | 21 | **A**     I ran some numbers for some of these doctors.  You |
| 04:31:41 | 22 | asked me here specifically about pill count, I think. |
| 04:31:46 | 23 | **Q**     Yup.  And you did prescription count instead, right? |
| 04:31:50 | 24 | **A**     I have prescription count -- I did prescription |
| 04:31:52 | 25 | counts, yes. |

**Brunner - (Recross by Lanier)** 5598

| | | |
|---|---|---|
| 04:31:52 | 1 | **Q**   And the prescriptions for Veres was 15,000-what? |
| 04:31:58 | 2 | **A**   15,535, I believe.  I'll check my note.  435, I'm |
| 04:32:07 | 3 | sorry. |
| 04:32:07 | 4 | **Q**   I'm sorry, what is it? |
| 04:32:09 | 5 | **A**   15,435. |
| 04:32:12 | 6 | **Q**   All right.  We need to get it right. |
| 04:32:13 | 7 | 15,435 from Walgreens. |
| 04:32:17 | 8 | And how many from Overholt's/Champion combined, both |
| 04:32:21 | 9 | of those stores? |
| 04:32:22 | 10 | **A**   That location, the Overholt's/Champion location had |
| 04:32:27 | 11 | 16,355. |
| 04:32:29 | 12 | **Q**   And are you combining the two stores there? |
| 04:32:31 | 13 | **A**   Yeah, I measured by location as I showed in the chart, |
| 04:32:35 | 14 | that address. |
| 04:32:36 | 15 | **Q**   Right.  You combined those two stores and you combined |
| 04:32:38 | 16 | the Walgreens stores to get how many prescriptions were put |
| 04:32:41 | 17 | out on the street through Dr. Veres.  And Walgreens is about |
| 04:32:48 | 18 | just under a thousand prescriptions less; is that right? |
| 04:32:52 | 19 | **A**   That's correct. |
| 04:32:52 | 20 | **Q**   Did you run the numbers for Dr. Demangone? |
| 04:32:57 | 21 | **A**   Yes. |
| 04:32:57 | 22 | **Q**   What were those? |
| 04:33:02 | 23 | **A**   For Walgreens was 13,663. |
| 04:33:11 | 24 | **Q**   Uh-huh.  What about for Champion's and Overholt's |
| 04:33:19 | 25 | combined? |

**Brunner - (Recross by Lanier)**

| | | |
|---|---|---|
| 04:33:20 | 1 | **A**    6. |
| 04:33:21 | 2 | **Q**    6 what? |
| 04:33:22 | 3 | **A**    6. |
| 04:33:23 | 4 | **Q**    6 what?  6 prescriptions? |
| 04:33:29 | 5 | **A**    6 prescriptions, yes. |
| 04:33:32 | 6 | **Q**    She didn't ask you about that one, did she? |
| 04:33:45 | 7 |         Next I want to get real clear on what you're saying |
| 04:33:49 | 8 | about Mr. Catizone and Mr. McCann. |
| 04:33:55 | 9 |         You looked at 2,000 prescriptions, correct? |
| 04:34:05 | 10 | **A**    That's correct. |
| 04:34:05 | 11 | **Q**    And that's what Mr. McCann looked at, correct? |
| 04:34:12 | 12 | **A**    Correct. |
| 04:34:12 | 13 | **Q**    And Mr. McCann found of those 2,000 that 61 percent |
| 04:34:20 | 14 | were blank across the relevant comment note fields.  And if |
| 04:34:25 | 15 | you look only at those 2,000 prescriptions, he's correct, |
| 04:34:31 | 16 | isn't he? |
| 04:34:31 | 17 | **A**    We looked at the entire -- all of the produced data |
| 04:34:33 | 18 | for them, all of the patient histories. |
| 04:34:35 | 19 | **Q**    Wasn't my question, sir.  Answer my question, please. |
| 04:34:41 | 20 |         If you look only at those 2,000 prescriptions and the |
| 04:34:48 | 21 | notes associated with those 2,000 prescriptions, Catizone is |
| 04:34:53 | 22 | correct, right? |
| 04:34:55 | 23 | **A**    The actual transaction, the records for those 2,000? |
| 04:34:59 | 24 | **Q**    Yes. |
| 04:35:00 | 25 | **A**    That's correct. |

**Brunner - (Recross by Lanier)**

04:35:00   1   **Q**     I'm sorry?

04:35:01   2   **A**     That's correct.

04:35:01   3   **Q**     Okay.  Now, what you've done is said I'm going to take

04:35:08   4   patient Lanier, and I'm going to run his entire history

04:35:16   5   through the company and pull up any old prescriptions he's

04:35:22   6   had filled and see if they had comments in the notes, right?

04:35:28   7   **A**     That's -- we looked at the expanded patient histories.

04:35:32   8   My understanding, that's what pharmacists would look at.

04:35:35   9   **Q**     Well, you don't know if pharmacists can do that, you

04:35:39   10  don't know if some of that data's been erased because

04:35:42   11  there's not enough room.  You don't know any of that kind of

04:35:46   12  stuff, do you?

04:35:46   13  **A**     That's correct.

04:35:47   14  **Q**     So what you did then is you looked at 155,957 other

04:35:54   15  prescription entries --

04:35:59   16  **A**     Not actually.  The 155 includes the 2,000.

04:36:07   17  **Q**     All right.  Thank you.  You looked at 153,957 other

04:36:12   18  prescriptions to get your numbers, didn't you?

04:36:15   19  **A**     Correct.

04:36:15   20  **Q**     Then I need to, in closing, pester you on a couple of

04:36:21   21  your answers to juror questions.

04:36:28   22              MR. LANIER:  Do we have the juror questions,

04:36:30   23  please?  Thank you.

04:36:31   24              MS. SWIFT:  Sure.

04:36:33   25  **Q**     The first one I want to talk to you about I believe

04:36:41    1    was the first one Ms. Swift read.  It says, "If a field is

04:36:49    2    left blank during the data analysis, how does this affect

04:36:51    3    the results if the number of blank fields is a significant

04:36:55    4    number?"

04:36:57    5       I think your answer was "If the number is

04:37:00    6    insignificant."

04:37:03    7    **A**    Yes.

04:37:04    8    **Q**    The juror question is "What if it's a significant

04:37:07    9    number, does it affect the results?"

04:37:09    10    **A**    Thank you for clarifying.

04:37:10    11       If it's an insignificant number, it's easy to ignore.

04:37:15    12    Again, if you want to -- if you need to project into -- I'm

04:37:20    13    sorry, not project, if you need to estimate an error rate,

04:37:22    14    you would take the -- whatever that fraction is that are

04:37:25    15    missing that critical value.

04:37:29    16    **Q**    But you still haven't answered the question, which is

04:37:31    17    what if it is a significant number.

04:37:34    18    **A**    Then depending on the purpose, one would just not be

04:37:40    19    able to analyze and say it was only done on a subset of the

04:37:44    20    data.  Or -- and Dr. McCann, for example, said you could

04:37:54    21    project a range.  But depending on the purpose, that's going

04:37:57    22    to have varying reliability or utility for the type of

04:38:01    23    analysis that you're doing.

04:38:03    24    **Q**    Which is, if we go back and look at the note we made

04:38:06    25    with Dr. McCann when he's on the stand, he did give the

04:38:09  1   range between zero and all at the same time, and said

04:38:14  2   somewhere in there's got to be the answer.

04:38:16  3        You don't disagree with that, do you?

04:38:18  4   **A**    It's the first I'm seeing of that.  I don't have an

04:38:21  5   opinion on that.

04:38:22  6   **Q**    Okay.  Well, you can have an opinion real quick.  I

04:38:25  7   mean, it's got to be right.  It's got to be between zero and

04:38:30  8   all the same.  It's got to be somewhere in there, doesn't

04:38:32  9   it?

04:38:34  10  **A**    That's -- as a descriptor of general activity, so when

04:38:43  11  one is describing a circumstance where there is -- across a

04:38:49  12  broad population, one might be able to describe a range of

04:38:53  13  possible outcomes along with an error that might happen at

04:39:00  14  the tails outside the projection.

04:39:04  15  **Q**    In other words -- sorry.

04:39:06  16  **A**    However, for identifying any one individual

04:39:09  17  transaction, that projection is completely worthless,

04:39:13  18  because you can't tell if this particular transaction fits

04:39:16  19  in the -- under the bell curve or not in the bell curve.

04:39:20  20  **Q**    With due respect, sir, can you answer my question?

04:39:23  21       My question is, won't the answer lie somewhere in that

04:39:26  22  range?

04:39:30  23  **A**    Give me a moment to read the slide, if I might.

04:39:33  24  **Q**    It's real easy.

04:39:34  25       The number of people that are three patients filling

04:39:38   1   the prescription the same hour with the same doctor is going

04:39:44   2   to be somewhere between zero and all of them.  Right?

04:39:48   3   **A**   Described that way, that's reasonable.

04:39:51   4   **Q**   Okay.  Thank you.

04:39:53   5   And then the last I want to pester you on is this

04:39:57   6   juror note:  "Why didn't you add all Walgreens dispensing

04:40:01   7   numbers."

04:40:02   8   Remember that?

04:40:02   9   **A**   Yes, I do.

04:40:03   10   **Q**   You didn't even use dispensing numbers on the chart

04:40:05   11   that we were talking about.  You used distribution numbers,

04:40:08   12   didn't you?

04:40:09   13   **A**   Just as Dr. McCann did.

04:40:12   14   **Q**   I'm not fussing that, sir.  She didn't ask you why did

04:40:15   15   Dr. McCann's report break it out.  She asked you why you did

04:40:18   16   the way you did.

04:40:19   17   Do you see that?

04:40:21   18   **A**   As I said, we tried to use his data as much as

04:40:24   19   possible so as to avoid conflict over what data we were

04:40:27   20   looking at.

04:40:27   21   **Q**   And "she" may be a "he," and I may have just stepped

04:40:30   22   my foot deep into my mouth, so if so, I apologize; but the

04:40:34   23   juror, whomever they may be.

04:40:36   24   You chose to add those numbers together.  No?

04:40:44   25   **A**   No.

04:40:45  1    **Q**     But you did add together Champion's and Overholt's,

04:40:50  2    didn't you?  I'm sorry?

04:40:54  3    **A**     We used the OARRS data for the presentations we made,

04:40:58  4    which includes --

04:40:59  5    **Q**     Is that a "yes" answer?

04:41:00  6                      MS. SWIFT:  Objection to interrupting his

04:41:01  7    answer.

04:41:01  8                      MR. LANIER:  I'm sorry, Judge, I'm out of --

04:41:05  9                      THE COURT:  Well, let -- Mr. Brunner, did you

04:41:08  10   finish your answer?

04:41:09  11   **A**     So as I described, the market share numbers are all

04:41:12  12   from -- the market share numbers that we presented are all

04:41:17  13   from the ARCOS data, just as Dr. McCann's were from the

04:41:21  14   ARCOS data.  The Overholt's/Champion relative to Walgreens

04:41:26  15   numbers, those are all based on dispensing numbers from the

04:41:30  16   OARRS data.

04:41:31  17   **Q**     Sir, what question do you think I asked you?

04:41:35  18   **A**     The question was "Why didn't you total or did you

04:41:38  19   total" --

04:41:40  20   **Q**     I said, "But you did add together Champion's and

04:41:45  21   Overholt's, didn't you?"

04:41:47  22   **A**     Yes.

04:41:47  23                      MR. LANIER:  Thank you.  Pass the witness.

04:41:49  24   Actually, the witness is done.

04:41:50  25                      MS. SWIFT:  Your Honor, if I may ask one or

| | | |
|---|---|---|
| 04:41:53 | 1 | two questions on this juror question issue? |
| 04:41:55 | 2 | THE COURT:  No, we've been having this two |
| 04:41:57 | 3 | rounds, and I'm going to stick with that. |
| 04:41:59 | 4 | MS. SWIFT:  All right.  I thought there was |
| 04:42:00 | 5 | some confusion on the question, but all right. |
| 04:42:02 | 6 | THE COURT:  All right.  Thank you very much, |
| 04:42:04 | 7 | Mr. Brunner.  We appreciate your appearance.  Safe travels. |
| 04:42:07 | 8 | THE WITNESS:  Thank you. |
| 04:42:11 | 9 | If we can just go on the headphones for a minute. |
| 04:42:15 | 10 | (At side bar at 4:42 p.m.) |
| 04:42:27 | 11 | THE COURT:  Unless there's an incredibly short |
| 04:42:29 | 12 | witness, I don't want to break someone up starting at |
| 04:42:32 | 13 | quarter to 5.  If there's a real short deposition or |
| 04:42:36 | 14 | something, but I don't want to start a live witness and go |
| 04:42:38 | 15 | for half an hour, unless people feel strongly.  It's the |
| 04:42:43 | 16 | defendants' turn, so you tell me what you -- who would be |
| 04:42:46 | 17 | next? |
| 04:42:52 | 18 | MR. DELINSKY:  Your Honor, the next witness is |
| 04:42:53 | 19 | a Nicole Harrington, who is a representative for corporate |
| 04:42:57 | 20 | for CVS.  It would be lengthy testimony, so my preference |
| 04:43:00 | 21 | would be not to break it up. |
| 04:43:01 | 22 | We have a video, but it's not short.  It's about an |
| 04:43:06 | 23 | hour and 20 minutes. |
| 04:43:07 | 24 | THE COURT:  I'm going to break it off.  Unless |
| 04:43:09 | 25 | there's a strong objection, I think we should break it off. |

04:43:12   1   Any problem with the plaintiffs breaking now?

04:43:13   2               MR. LANIER:  No, Judge.  However you want to

04:43:15   3   run it, it's your Court.

04:43:17   4               THE COURT:  I'd rather not just start for half

04:43:19   5   an hour, so let's break for the day.

04:43:22   6               (In open court at 4:43 p.m.)

04:43:27   7               THE COURT:  All right.  Ladies and gentlemen,

04:43:28   8   we're going to break a little bit early for the day.  The

04:43:30   9   next witness is going to be substantially longer than a half

04:43:34   10  an hour, and I think it's more coherent to have it in one

04:43:37   11  segment than break it up.

04:43:39   12      So have a good evening.  Usual admonitions.  Do not

04:43:44   13  read, review, encounter anything about this case or anything

04:43:47   14  close to it.  Don't discuss this case with anyone.  And

04:43:50   15  we'll pick up tomorrow morning at 9:00 with the next defense

04:43:53   16  witness.

04:44:24   17              (Jury excused for the day at 4:44 p.m.)

04:44:24   18              THE COURT:  Okay.  Please be seated for a

04:44:26   19  minute.  Just close the back door, please.

04:44:35   20      All right.  I think it's preferable not to break

04:44:38   21  witnesses in two for a short period, so I think this made

04:44:41   22  sense.

04:44:42   23      Have you had a chance to confer about Ms. Hiland's

04:44:53   24  exhibits or are we still working on those?

04:44:55   25              MS. FUMERTON:  Your Honor, we have not had a

04:44:57   1   chance to discuss.  We should be able to do it tomorrow

04:45:00   2   morning.

04:45:00   3           THE COURT:  I'd like you to do this over the

04:45:02   4   evening for Hiland and for Edwards, and probably with

04:45:06   5   Brunner.  We're probably not going to have many exhibits for

04:45:09   6   Brunner.  So maybe first thing in the morning we can get all

04:45:11   7   three, because I'd like to stay current.  And then we'll

04:45:15   8   pick up with the next witness.

04:45:17   9       Okay.  Anything anyone wanted to bring up?

04:45:25  10           MR. DELINSKY:  No, thank you, Your Honor.

04:45:29  11           THE COURT:  All right.  Have a good evening.

04:45:31  12     Oh, for the time today, I had 2 hours for the

04:45:34  13   plaintiffs and 4 and a quarter, 4.25, for the defendants.

04:45:38  14           MR. WEINBERGER:  Your Honor, I hate to -- this

04:45:40  15   is going to sound very nitpicky, but during the course of my

04:45:43  16   examination of Mr. Edwards, there were -- there was at least

04:45:48  17   8 or 12 minutes -- what was the number?

04:45:51  18           MS. LANIER:  12 minutes.

04:45:52  19           MR. WEINBERGER:  There was 12 minutes of

04:45:54  20   interruption, mostly of objections that were overruled, and

04:45:59  21   including a couple that were very lengthy.  And so I would

04:46:01  22   ask that they not be charged against us.

04:46:05  23           MR. SWANSON:  Your Honor, it's Brian Swanson

04:46:06  24   for Walgreens.  At least one of those objections was

04:46:08  25   sustained.  And I'll note that my exam of Mr. Edwards

| 04:46:13 | 1 | yesterday, I had probably 20 minutes of side bars from |

04:46:13   1   yesterday, I had probably 20 minutes of side bars from

04:46:17   2   Mr. Weinberger, who seemed to have objected to every other

04:46:20   3   question.  So I don't --

04:46:23   4              THE COURT:  Well, I don't make the objections,

04:46:26   5   and I try only to go on the side bar where it's necessary,

04:46:29   6   but I don't want to have speaking objections from either

04:46:31   7   side.  I don't think it's appropriate.  Some of the side

04:46:35   8   bars are short, some are long, so there have been long ones

04:46:39   9   on both sides and short ones on both sides.  So we'll try

04:46:44  10   and keep them to a minimum.

04:46:47  11              MR. SWANSON:  Thank you, Your Honor.

04:46:48  12              THE COURT:  Okay.

04:46:50  13              (Proceedings adjourned at 4:46 p.m.)

          14                     * * * * *

          15              **C E R T I F I C A T E**

          16

          17       I certify that the foregoing is a correct transcript

          18   of the record of proceedings in the above-entitled matter

          19   prepared from my stenotype notes.

          20

          21       */s/ Lance A. Boardman*              *11-02-2021*
               Lance A. Boardman, RDR, CRR             DATE

          22

          23

          24

          25