5609

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF OHIO
                       EASTERN DIVISION AT CLEVELAND

    ------------------------------X
    IN RE:                        :   Case No. 1:17-md-2804
                                  :
    NATIONAL PRESCRIPTION          :
    OPIATE LITIGATION             :
                                  :   **VOLUME 22**
    CASE TRACK THREE              :   JURY TRIAL
                                  :   *(Pages 5609 - 5899)*
                                  :
                                  :
                                  :
                                  :   *November 3, 2021*
    ------------------------------X



                    TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>


            HELD BEFORE THE HONORABLE DAN AARON POLSTER


                 SENIOR UNITED STATES DISTRICT JUDGE




    Official Court Reporter:        Lance A. Boardman, RDR, CRR
                                    United States District Court
                                    801 West Superior Avenue
                                    Court Reporters 7-189
                                    Cleveland, Ohio 44113
                                    216.357.7019


    Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.

5610

```
 1    APPEARANCES:

 2    For the Plaintiffs:        Peter H. Weinberger, Esq.
                                 SPANGENBERG, SHIBLEY & LIBER
 3                               1001 Lakeside Avenue, Ste. 1700
                                 1900 East Ninth Street
 4                               Cleveland, Ohio 44114
                                 216-696-3232
 5
                                 W. Mark Lanier, Esq.
 6                               Rachel Lanier, Esq.
                                 THE LANIER LAW FIRM
 7                               6810 FM 1960 West
                                 Houston, Texas 77069
 8                               813-659-5200

 9                               Frank L. Gallucci, III, Esq.
                                 PLEVIN & GALLUCCI COMPANY, LPA
10                               The Illuminating Building
                                 Suite 2222
11                               55 Public Square
                                 Cleveland, Ohio 44113
12                               216-861-0804

13                               Salvatore C. Badala, Esq.
                                 Maria Fleming, Esq.
14                               NAPOLI SHKOLNIK
                                 360 Lexington Ave., 11th Floor
15                               New York, New York 10017
                                 212-397-1000
16
                                 Laura S. Fitzpatrick, Esq.
17                               SIMMONS HANLY CONROY LLC
                                 112 Madison Avenue, 7th floor
18                               New York, New York 10016-7416
                                 212-257-8482
19                               lfitzpatrick@simmonsfirm.com

20
      For Walgreens Defendants: Kaspar J. Stoffelmayr, Esq.
21                               Brian C. Swanson, Esq.
                                 Katherine M. Swift, Esq.
22                               BARTLIT BECK LLP
                                 54 West Hubbard Street, Ste.300
23                               Chicago, Illinois 60654
                                 312-494-4400&
24

25
```

5611

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:        Graeme W. Bush, Esq.
                                 Eric R. Delinsky, Esq.
 3                               Alexandra W. Miller, Esq.
                                 Paul B. Hynes, Jr., Esq.
 4                               ZUCKERMAN SPAEDER - WASHINGTON
                                 Suite 1000
 5                               1800 M Street, NW
                                 Washington, DC 20036
 6                               202-778-1831

 7
      For Walmart Defendants:    John M. Majoras, Esq.
 8                               JONES DAY - COLUMBUS
                                 Suite 600
 9                               325 John H. McConnell Blvd.
                                 Columbus, Ohio 43215
10                               614-281-3835

11                               Tara A. Fumerton, Esq.
                                 Tina M. Tabacchi, Esq.
12                               JONES DAY - CHICAGO
                                 Suite 3500
13                               77 West Wacker
                                 Chicago, Illinois 60601
14                               312-782-3939

15
      ALSO PRESENT:              David Cohen, Special Master
16

17                                     - - - - -

18

19

20

21

22

23

24

25
```

1                              Table of Contents

2

3     Witnesses/Events                                           Page

4     NICOLE HARRINGTON                                          5622

5            Mr. Delinsky - Direct                              5622
             Mr. Lanier - Cross                                 5765
6            Mr. Delinsky - Redirect                            5828
             Mr. Lanier - Recross                               5875

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5613

1                    (In open court at 8:47 a.m.)

2                    THE COURT:  Good morning.

3                    MR. MAJORAS:  Your Honor, before we go on the

4      record, can I raise one point?

5                    THE COURT:  Sure.

6                    (Off-the-record discussion.)

7                    THE COURT:  All right.  Everyone can be

8      seated.

9           Why don't we start with Mr. Edwards, because that

10     seems to be quick.  Plaintiffs have only one exhibit, 20809.

11          Any objection to that?

12                   MR. SWANSON:  No objection.

13                   THE COURT:  Do the defendants have any?  It

14     was your witness.  I assume you have some.

15                   MR. SWANSON:  Yeah, we do.

16          Your Honor, I have Walgreens and CVS's exhibits, and I

17     think Walmart may have as well.

18          The first is CVS-MDL-3795.

19                   THE COURT:  It's confusing because I thought

20     almost all the exhibits have five-digit numbers.  I mean,

21     I --

22                   MR. SWANSON:  I guess it's 03795.

23                   THE COURT:  All right.  Okay.  Any objection

24     to that?

25                   MR. DELINSKY:  Judge, I have folks in the

5614

```
 1    witness room.  We'll confirm whether we're missing a digit
 2    in that.
 3                  THE COURT:  Any objection to that?
 4                  MR. WEINBERGER:  No objection.
 5                  THE COURT:  Thank you.  That's in.
 6                  MR. SWANSON:  The second is DEF-MDL-12782.
 7                  THE COURT:  Any objection to that one?
 8          Thank you, that's in.
 9                  MR. SWANSON:  The third is WAG-MDL-01102.
10                  THE COURT:  Any objection to that?
11                  MR. WEINBERGER:  No, Your Honor.
12                  THE COURT:  Thank you.
13                  MR. WEINBERGER:  Excuse me just a second, the
14    one previously -- we have no objection to that.  Okay.
15    Sorry.
16                  MR. SWANSON:  And then the last one is
17    WAG-MDL-01061.
18                  MR. WEINBERGER:  No objection.
19                  THE COURT:  Okay.  Thank you.  Those four are
20    in.
21          Any exhibits from any of the other defendants?
22                  MS. FUMERTON:  Yes, Your Honor, for Walmart.
23    We have two.  It's the two inspection reports,
24    WMT-MDL-01387.
25                  MR. WEINBERGER:  No objection.
```

1              THE COURT:  Okay.

2              MS. FUMERTON:  And the other one is

3    WMT-MDL-01418.

4              MR. WEINBERGER:  No objection.

5              THE COURT:  Okay.  Does CVS have any?

6              MR. DELINSKY:  I think Mr. Swanson read them

7    in.

8              THE COURT:  All right, fine, so that takes

9    care of Mr. Edwards.

10        All right.  We had a long list here from the

11   plaintiffs for Ms. Hiland.  Does the defense have any

12   objection to any of those?

13             MS. FUMERTON:  Yes, Your Honor, we do have a

14   few objections.

15             THE COURT:  All right.  Well, which one do you

16   object to?

17             MS. FUMERTON:  So we object to P-17527.  If

18   you're looking at the same chart plaintiffs gave me, it's

19   number 7.

20             THE COURT:  Okay.  All right.

21             MS. FUMERTON:  And the reasons that we object

22   to this is it's really the attachments.  We would be okay

23   with the front of the e-mail coming in, which is what was

24   asked, but the attachment has a lot of information about

25   different lawsuits and inventory fines, and stuff that has

5616

1  nothing to do with this case.

2  THE COURT:  Are the plaintiffs offering --

3  what are they?  Can I see that one?

4  MS. FUMERTON:  Yes, Your Honor.

5  THE COURT:  I think we focused on the front of

6  it.

7  MS. FUMERTON:  And so he was -- Your Honor, he

8  was only -- she was only asked about the first page, and the

9  rest of it she was not asked about.

10  MS. FITZPATRICK:  Your Honor, Laura

11  Fitzpatrick for the plaintiffs.  We're happy to work with --

12  THE COURT:  There does seem to be a whole lot

13  of stuff on the second and third page that wasn't discussed

14  at all and would be confusing.

15  MS. FITZPATRICK:  Yes, Your Honor.  We're

16  happy to work with Ms. Fumerton to see if there's some

17  redactions that can be made to the attachment, but

18  Ms. Hiland did testify that she was familiar with the

19  attachment, so...

20  THE COURT:  Well, all right.  Let's work on

21  the redactions on that one.

22  MS. FITZPATRICK:  Yes, Your Honor.

23  THE COURT:  All right.  Any other objections?

24  MS. FUMERTON:  Yes, Your Honor, to number 8,

25  P-1442.  How many 4s did I say?  That's three 4s.

5617

1              THE COURT:  14442.  E-mail about compliance
2    projects, fiscal year '13.
3              MS. FUMERTON:  It's the same situation, we're
4    okay with the e-mail but not with the attachment.  That was
5    never asked about.
6              MS. FITZPATRICK:  Tara, 14442 there is not an
7    attachment.  What I'm seeing, there's just a three-page
8    document that's just the e-mail.
9              MS. FUMERTON:  So there is actually an
10   attachment.  If you're not offering the attachment, that's
11   fine.
12             MS. FITZPATRICK:  We're not.  That's correct.
13             THE COURT:  All right.  Fine.
14        Any other objections?  Looks not.  So these following
15   can come in.
16        14645, 21228, 02300, 26697, 21884, 26681, 14585,
17   20849, 26705, 26671.  So 14442 comes in just the e-mail, and
18   then work on some redactions on 17527.
19        Okay.  Are the defendants offering anything with
20   Ms. Hiland?
21             MS. FUMERTON:  Yes, Your Honor.  May I
22   approach?
23             THE COURT:  Yes.
24             MS. FUMERTON:  We've given a copy of this to
25   the plaintiffs as well.

1          THE COURT:  All right.  Have the plaintiffs

2     looked at these?

3          MS. FITZPATRICK:  Yes, Your Honor, we have.

4     And we have no objection to some of them, but there are two

5     that we do have objections to.

6          THE COURT:  Okay.  Well, let's cover those

7     objections.

8          MS. FITZPATRICK:  Yes, Your Honor.  Our first

9     objection is to Walmart MDL 1334, and I have a copy of that

10    if Your Honor needs.

11         THE COURT:  All right.  That's the last one,

12    okay, number 13 here.

13         MS. FITZPATRICK:  Yes, Your Honor.  This the

14    fax that was sent, the state of Wisconsin administrative

15    warning.  There was no foundation laid.  Ms. Hiland has no

16    personal knowledge, and it's textbook hearsay.

17         MS. FUMERTON:  Your Honor, actually she did

18    say she was aware of it.

19         THE COURT:  Let me see.  I think it comes in

20    for the fact it was -- she got it.  Whether, you know --

21         MS. FITZPATRICK:  Your Honor, we also have a

22    402, 403 objection.

23         THE COURT:  I'm going to allow this in, you

24    know, for the fact she testified about it and for the fact

25    that it came, so I'll admit that over objection.

5619

1          Any other objections?

2                    MS. FITZPATRICK:  Your Honor, no other

3     objections.

4                    THE COURT:  Okay.  Then the following come in

5     without objection:  02300, 21228, 00134, 00142, 00299,

6     00318, 00397, 00568, 00575, 01027-01 and 01027-02, 01155,

7     and 01194-01, -02, and-03.

8                    MS. FUMERTON:  And Your Honor, the last one is

9     coming in as well, right?  Number 13.

10                   THE COURT:  Right.  Oh, 01334 comes in over

11    objection.

12                   MS. FITZPATRICK:  Thank you, Your Honor.

13                   THE COURT:  Okay.  So the only one left is

14    Mr. Brunner.  I don't know if we have any exhibits with him.

15    We had his testimony.

16                   MS. SWIFT:  Your Honor, Kate Swift for

17    Walgreens.  We have two exhibits.  We understand from

18    Mr. Lanier they have no objection.

19                   THE COURT:  Which are those, Ms. Swift?

20                   MS. SWIFT:  WAG-MDL-2561.

21                   THE COURT:  Again, check the -- I think almost

22    all the exhibits have five digits, Ms. Swift, so I --

23                   MS. SWIFT:  We can put a zero in front of it.

24    I'm confident it's the correct number.

25                   THE COURT:  02561, okay.

1              MS. SWIFT:  And WAG-MDL-02562.

2              MR. LANIER:  And no objection from plaintiffs,

3    Your Honor.

4              THE COURT:  Okay.  Those come in without

5    objection.

6              MS. SWIFT:  Thank you, Your Honor.

7              THE COURT:  Are the plaintiffs offering

8    anything with Mr. Brunner?  Probably not.

9         No?  Okay.  Then we're all caught up.

10        Okay.  Anything else did anyone --

11             MR. STOFFELMAYR:  Judge, Kaspar Stoffelmayr,

12   just a question about your preference on one thing.

13             THE COURT:  Okay.

14             MR. STOFFELMAYR:  If we want to read into the

15   record before the jury interrogatory responses, do you have

16   a preference that we wait till the end or just do that

17   whenever it makes sense to us?

18             THE COURT:  Well, I think -- why don't you do

19   it when it makes sense.

20             MR. STOFFELMAYR:  Okay, thank you.

21             THE COURT:  Either side can do that, where you

22   think it makes sense rather than just out of the blue.

23             MR. STOFFELMAYR:  Thank you.

24             THE COURT:  So both sides can do that.  We

25   have an instruction on that.  I was wondering if we would

```
 1    have any.  So you can if -- either side can do that at any
 2    time that you think is logical.
 3                    MR. STOFFELMAYR:  Thank you.  We may not.
 4    We're still discussing it.  I just wanted to make sure we
 5    knew what your preference was.
 6                    THE COURT:  Okay.  Well, we're two minutes
 7    early so --
 8                    MR. LANIER:  I could sing.
 9                    THE COURT:  You may, Mr. Lanier.  I'm not
10    going to, all right?  You've got the voice to do it, that's
11    fine.
12                    MR. LANIER:  No, I better not, Judge.
13                    THE COURT:  I will cause an adjournment, so
14    I'm not going to go there.
15         Who do we anticipate today?
16                    MR. DELINSKY:  Your Honor, Eric Delinsky for
17    CVS.
18         We'll be calling Nicole Harrington first thing.
19                    THE COURT:  Oh, right, right.  I remember
20    that.
21                    (Pause in proceedings.)
22                    (The jury is present at 9:03 a.m.)
23                    THE COURT:  Good morning, ladies and
24    gentlemen.  Please be seated.
25         And I understand our next witness will be Nicole
```

1    Harrington.

2              MR. DELINSKY:  Yes, Your Honor.  I guess as a

3    formal matter, CVS calls Nicole Harrington.

4              MR. HYNES:  May I approach with the documents,

5    Your Honor?

6              THE COURT:  Sure.

7         Good morning, Ms. Harrington.

8              (Witness sworn.)

9              THE COURT:  Thank you.

10        Please be seated.  You may remove your mask while

11   testifying.

12        And Mr. Delinsky, you may proceed.

13             MR. DELINSKY:  Good morning, ladies and

14   gentlemen.

15        May it please the Court.

16        And good morning, Ms. Harrington.

17             THE WITNESS:  Good morning.

18                   NICOLE HARRINGTON

19                     - - - - -

20                 DIRECT EXAMINATION

21   BY MR. DELINSKY:

22   **Q**    Question number 1.  Does anyone call you Nicole?

23   **A**    Just my mom.

24   **Q**    What do you go by?

25   **A**    Nicci.

1    **Q**    N-I-C-C-I?

2    **A**    Yes.

3    **Q**    So if the jurors have heard testimony throughout the

4    case against a Nicci Harrington, is that you?

5    **A**    That is me.

6    **Q**    E-mails and conversations?

7    **A**    Yes, that is correct.

8    **Q**    Do you work at CVS?

9    **A**    I do.

10   **Q**    Are you a pharmacist?

11   **A**    I am.

12   **Q**    For how long have you been licensed as a pharmacist?

13   **A**    I've been licensed as a pharmacist for over 25 years.

14   **Q**    And where are you licensed?

15   **A**    I'm licensed in the state of New Hampshire.

16   **Q**    The we're going to walk through your background for

17   the jurors, but before we do that, I want to explain to the

18   jury why you're here.

19         You don't work behind a pharmacy counter today,

20   correct?

21   **A**    I do not.

22   **Q**    What's your current position?

23   **A**    I'm senior director of Pharmacy Services at CVS.

24   **Q**    And what do you do in that position?

25   **A**    I lead a team, and we're primarily focused on

1   controlled substance dispensing.

2   **Q**   Do you work on CVS policies?

3   **A**   I work on policies that affect the content that I

4   oversee.

5   **Q**   Do you work on programs regarding the dispensing of

6   controlled substances?

7   **A**   Yes, I have a number of programs that I manage.

8   **Q**   How long have you been in this position?

9   **A**   I've been in the senior director position since 2016,

10  but I was director of that -- of this group starting in

11  2012, so for a total of eight, almost nine years now.

12  **Q**   And when you were director starting back in 2012, were

13  your responsibilities more or less the same as they are

14  today?

15  **A**   More or less the same.  I added some additional

16  responsibilities when I became a senior director, but the

17  core responsibilities have remained the same.

18  **Q**   Okay.  One last question before we go back in time.

19          Where is your office?

20  **A**   In Woonsocket, Rhode Island.

21  **Q**   Is that CVS's home office?

22  **A**   It is.

23  **Q**   Where do you live?

24  **A**   I live in New Hampshire.

25                  MR. DELINSKY:  Can everybody hear her okay?

```
 1                    (Off-the-record discussion.)
 2     BY MR. DELINSKY:
 3     Q     All right.  Let's go back in time and start at the
 4     beginning.
 5           Where did you grow up?
 6     A     Excuse me?
 7     Q     Now you can't hear me?  That's a first.
 8           Where did you grow up?
 9     A     So I was born in California.  I lived in Rhode Island
10     for a short period of time, but I really grew up in New
11     Hampshire.  I grew up in the same town that I live in today.
12     Q     And I think you told me you moved to New Hampshire
13     when you were five years old?
14     A     Yeah, Nashua, New Hampshire.
15     Q     Okay.  So elementary school, junior high school, high
16     school, all in New Hampshire?
17     A     Yes.
18     Q     What town in New Hampshire?
19     A     Nashua.
20     Q     Okay.  Where do you live today?  Same town?
21     A     Nashua.
22     Q     Okay.
23     A     I'm boring.
24     Q     How far from where you grew up?
25     A     Actually, just a few miles.
```

**Harrington - (Direct by Delinsky)**                                    5626

1    **Q**     Okay.  Are your parents still in Nashua?

2    **A**     They are.  Both my dad and my mom.

3    **Q**     And do they live close to you as well?

4    **A**     They do.  My dad lives in our childhood home, and my

5    mom's in a long-term care facility there.

6    **Q**     Are you married?

7    **A**     I am.  I've been married for 25 years.  We just

8    celebrated our 25th anniversary on October 6.

9    **Q**     Okay.  Where did you meet your husband?

10   **A**     I met my husband in high school.  We actually sat next

11   to each other in Latin class.  My maiden name was Grace, so

12   Grace-Harrington, we sat next to each other forcibly, and

13   then we started dating.

14   **Q**     And have you been -- well, I don't want to pry, but

15   have you been together ever since?

16   **A**     Yes, we have.

17   **Q**     All right.  Kids?

18   **A**     Two kids.  I have two kids, age one 20 and one 18.

19   They're both in college.

20   **Q**     Okay.  And am I right that your youngest one just left

21   home to start college this fall?

22   **A**     She did.  I'm an empty-nester for the first time.

23   It's a little uncomfortable.  I'm still trying to get used

24   to it and find my path now without my kids living under my

25   roof.

**Harrington - (Direct by Delinsky)**          5627

1    **Q**     Older daughter, am I right, is a lacrosse player in

2    college?

3    **A**     She is, she is.

4    **Q**     Recent concussion.  Everything good?

5    **A**     Yes.  She's on the mend.  She still has a headache,

6    but she's feeling much better.  Thank you.

7    **Q**     In ordinary times when you're going back and forth to

8    your office every day, what's your commute look like from

9    Nashua, New Hampshire, to Woonsocket, Rhode Island?

10   **A**     It's about an hour and a half.  It's 71 miles one way.

11   **Q**     So 3 hours in the car a day?

12   **A**     Roughly.  Sometimes a little bit more, depending on if

13   I'm leaving at peak traffic times.

14   **Q**     Why?  Why?

15   **A**     I love what I do.  I wanted to stay close to my

16   family, so we remained in Nashua.  We didn't relocate, but

17   this job was important to me, so I took it, and I do the

18   commute.

19   **Q**     Okay.  What made you interested in becoming a

20   pharmacist?

21   **A**     So I've actually worked in pharmacy since I was 15

22   years old.  My first job was at a sub shop, but an

23   independent pharmacy was two doors down, and the owner used

24   to come in to get his sandwiches every day.  And he offered

25   me a job to work at the pharmacy, first in the front store,

**Harrington - (Direct by Delinsky)**

```
 1    but then after being there for like a month or so I worked

 2    in the back in the pharmacy.

 3         And I worked with a pharmacist that loved people and

 4    loved taking care of people.  And it instilled that in me,

 5    and I've always wanted to be a pharmacist.

 6         I had a small crisis of conscience in which I thought

 7    I wanted to be a doctor in college, but I decided I did want

 8    to be a pharmacist.

 9    Q    Let's just step back and go over some vocabulary.

10         Independent pharmacy, what's an independent pharmacy?

11    A    It's a single pharmacy that's owned by an individual.

12    It's not part of our larger chain organization.  I don't

13    know at what point in time you trip from being an

14    independent to a chain, I don't know what those numbers

15    might be, but it's a much smaller kind of one-man

16    mom-and-pop shop.

17    Q    Okay.  So let's go -- let's just step forward to this

18    case.

19         A Walgreens, a CVS, a Walmart, they're chain

20    pharmacies?

21    A    Correct.

22    Q    And independents are sort of the one-off sometimes, we

23    call them mom-and-pop pharmacies?

24    A    Yeah.

25    Q    Okay.  What was the name of the pharmacist with whom
```

1    you worked?

2    **A**    Neil Abbondante.

3    **Q**    Is that pharmacy still open?

4    **A**    The Medicine World is still there today.

5    **Q**    And do you go?

6    **A**    I stop by there.  My mom actually gets her

7    prescriptions there.

8    **Q**    You don't get your prescriptions there, right?

9    **A**    No, I don't get my prescriptions there.

10   **Q**    No, that would be disloyal sort of, right?

11        What did you do when you were working there -- well, I

12   had one other background question.

13        You mentioned the word "front store" and then

14   "pharmacy."

15        Can you explain to the jury what the front store is

16   and how it contrasts with the pharmacy counter?

17   **A**    Yeah, so in the front store, that's where you would

18   find your greeting cards, your vitamins, your

19   over-the-counter type medications, Tylenol, cold products.

20   And I just worked in the front store ringing a register,

21   dealing with the public.

22        And then in the pharmacy, obviously you're preparing

23   prescriptions.  When I was a technician, I would work to

24   assist them.  That was back a long time ago.  Things were

25   done with a typewriter.  We had triplicate carbon papers

1    that we had to submit insurance claims on and things like

2    that, so I assisted with a lot of those activities.

3    **Q**    Can you give us a sense of what years we're talking

4    about?

5    **A**    Let's see.  So that would have been, like, mid '80s.

6    **Q**    Okay.  The front store/pharmacy distinction, is that

7    something that applies in CVS pharmacies?

8    **A**    It does.

9    **Q**    Okay.  So the greeting cards, the soap, toothbrushes;

10   front store?

11   **A**    Yes.

12   **Q**    Pharmacy counter is the pharmacy?

13   **A**    Yes.

14   **Q**    Okay.  In your responsibilities today, do you have

15   anything to do with the front store?

16   **A**    I don't.

17   **Q**    Okay.  Your focus is exclusively on the pharmacy?

18   **A**    It is.  There may be cross-functional things that we

19   do every now and again, like the front store might need a

20   partner on something and they need a pharmacy perspective,

21   so I might have individual small projects that I collaborate

22   with them on.  But that's not my -- like, I don't oversee

23   the front store.

24   **Q**    Let's keep going with our chronology of your career.

25         Did you go to pharmacy school?

1    **A**    I did.  I went to the University of Rhode Island.

2    **Q**    Did you obtain your degree?

3    **A**    I did.

4    **Q**    What year did you obtain your degree in?

5    **A**    In 1994 I got my bachelor of science in Pharmacy.

6    **Q**    Okay.  And at that point in time, you didn't get a

7    PharmD, you got a bachelor in science to become a

8    pharmacist?

9    **A**    Yeah.  At the time when I graduated, the PharmD was

10   just being introduced.  The University of Rhode Island had

11   just created a program that you could attend for two

12   additional years to become a PharmD, but the majority of

13   people that were going to work in pharmacy got a bachelor of

14   science at that point in time.  It was, I want to say,

15   probably maybe five years or so after that the degree

16   changed, and you could no longer just get a bachelor's.  You

17   could only go and get a pharmacy doctorate degree.

18   **Q**    So graduated in 1994.  And I understand we may go back

19   in time a little bit.

20         When did you join CVS for the first time?

21   **A**    I joined CVS for the first time in my second year of

22   college, so it was 1990.

23   **Q**    Okay.  And since you didn't have your degree, what was

24   your position at the time?

25   **A**    At that point in time, I wasn't even technically I

1    don't think considered an intern.  I was just a technician

2    at that point in time.

3    **Q**    Okay.  And what did you do for CVS as a technician?

4    **A**    I would ring the register, count pills, that type of

5    thing, type prescriptions in the computer system.

6    **Q**    Did you work in a particular pharmacy?

7    **A**    The CVS located in Meadowbrook, Rhode Island.

8    **Q**    And I presume that was near the University of Rhode

9    Island where you were in school?

10   **A**    It was a little bit of a drive.  It was hard to be

11   able to get a job at a CVS because there were so many people

12   going for pharmacy school that it was a highly competitive

13   market.

14   **Q**    After you graduated, what did you do?  What was your

15   first job?

16   **A**    My first job was working as a pharmacy manager in

17   Hudson, New Hampshire.

18   **Q**    For whom?

19   **A**    For CVS.

20   **Q**    Okay.  Can you describe to the ladies and gentlemen of

21   the jury what it means to be a pharmacy manager?

22   **A**    Yes.  So I would oversee the day-to-day operations of

23   the pharmacy.  I had oversight for the technician staff, the

24   pharmacist staff, and I would make sure to do, like, the

25   scheduling and things like that to make sure that the

1    pharmacy would run safely and effectively.

2    **Q**    Were all those tasks for one particular CVS pharmacy?

3    **A**    Yes, one CVS, that CVS.

4    **Q**    And did you fill prescriptions in that position?

5    **A**    I did.

6    **Q**    Okay.  So you had a management role and a filling

7    prescription role?

8    **A**    Correct.  It was both.

9    **Q**    Okay.  And were you -- did you have -- were you -- I

10   don't know how to put this question, but I'll try my best,

11   and you'll correct me if I don't get it quite right.

12        The bulk of your time was spent on the sitting

13   pharmacist tasks, the filling prescriptions and being with

14   patients, correct?

15   **A**    Correct, correct.  The management impact was minimal.

16   **Q**    And that was in 1994, correct?

17   **A**    Correct.

18   **Q**    Okay.  I skipped over something.

19        You obviously got your license before you started

20   working.

21   **A**    Yes.

22   **Q**    Okay.  And you got your license with the state of New

23   Hampshire.  I believe you already testified to that.

24   **A**    That is correct.

25   **Q**    What was the process?  How did you go about getting

1  your pharmacy license?

2  **A**     You have to take two exams and have to pass both of

3  those exams to be able to practice, and so you take what's

4  called a NAPLEX exam.  That's a competency exam around all

5  things like pharmacy.  Those are the things that you learned

6  in pharmacy school.

7       And then you also have to take what's called an MPJE

8  exam, which is the law exam.  And that tests you on both

9  federal and state legal requirements before you can get your

10  license.  So you have to pass both of those parts.

11  **Q**     Have you ever heard of the concept called, I can't

12  keep a straight face when I ask, but corresponding

13  responsibility?

14  **A**     Yes.

15  **Q**     Is that something you learned about in law school?

16  **A**     It's something that I learned about in pharmacy

17  school.  I didn't go to law school.

18  **Q**     I did, unfortunately.

19       In pharmacy school, that's something -- corresponding

20  responsibility is taught, correct?

21  **A**     Correct.  It was taught in my law class in pharmacy

22  school.

23  **Q**     Okay.  And then you're tested in order to get your

24  license on pharmacy law as well, correct?

25  **A**     Correct.

1    **Q**    And you have to pass that test?

2    **A**    Correct.

3    **Q**    And you did?

4    **A**    Yes, I did.

5    **Q**    Okay.  How long were you in this first pharmacy that

6    you started in in 1994?

7    **A**    To the best of my recollection, it was a couple years.

8    After that, I went and I opened a new pharmacy in

9    Manchester, New Hampshire.

10   **Q**    Okay.  New pharmacy, new CVS pharmacy?

11   **A**    New CVS pharmacy, yes.

12   **Q**    Okay.  And what was your position in this CVS

13   pharmacy?

14   **A**    It was also pharmacy manager.

15   **Q**    Okay.  So same deal, where the vast majority of your

16   time was spent filling prescriptions, but you also had

17   managerial responsibility?

18   **A**    Correct.

19   **Q**    Okay.  And how long were you in that position?

20   **A**    Again, to the best of my recollection, it was two or

21   three years.

22   **Q**    Okay.  So in this first stretch between these two New

23   Hampshire CVS pharmacies, how long were you there, ballpark?

24   **A**    About five years.

25   **Q**    Five years, okay.

1        What did you do next?

2   **A**    Next I became a regional healthcare manager for CVS.

3   **Q**    Okay.  And what did you do as a regional healthcare

4   manager?

5   **A**    As a regional healthcare manager I provided assistance

6   to district managers in professional practice items related

7   to the pharmacy.  At that point in time, it was more focused

8   around Board of Pharmacy relationships, patient safety

9   issues that might come up that they might need an extra

10  clinical lens to be able to help them speak to patients.  It

11  was those types of things.  And I had responsibility for

12  stores south of Boston and out to the Cape.

13  **Q**    So approximately how many stores were under your

14  umbrella as a regional healthcare manager?

15  **A**    I'm having a hard time recollecting the exact number,

16  but I believe it was a couple of hundred because there was

17  somebody else managing, like, day-to-day operations, and I

18  just served as an advocate on these certain topics.

19  **Q**    Okay.  We're going to get to a topic called -- where

20  we refer to people as field leaders or field supervisors.

21       As regional healthcare manager, were you a field

22  leader?

23  **A**    I was.

24  **Q**    Okay.  What did you do next?

25  **A**    In 2001 I went back to working in a pharmacy.  I had

1    my first daughter, and I reduced my hours to 30 so I could

2    remain full-time with CVS but still be able to take

3    advantage of having my daughter at home with me.

4    **Q**    Okay.  I think we skipped over one step, so let me

5    just walk you back.

6         Were you ever something called a pharmacy supervisor?

7    **A**    That came later.

8    **Q**    Ah.  I was wrong.  Okay.  So you were, but I got the

9    timing wrong.  Okay.

10        2001, you are no longer regional healthcare manager,

11   and you're now with the birth of your first daughter a

12   sitting pharmacist again, correct?

13   **A**    Yes.

14   **Q**    How long were you regional healthcare manager?

15   **A**    It was about two years.

16   **Q**    When you returned to the bench -- and that's what

17   you've taught me it's called, right, when you sit at -- when

18   you work at the pharmacy counter, you call it the bench?

19   **A**    Correct.

20   **Q**    Not the judge's bench; different kind of bench, right,

21   the pharmacy bench?

22   **A**    No.

23   **Q**    When you returned to the pharmacy, were you a pharmacy

24   manager or just a staff pharmacist?

25   **A**    I think I was a staff pharmacist in that first

**Harrington - (Direct by Delinsky)**

1   position when I came back.

2   **Q**   Okay.  And what store were you working in?

3   **A**   To the best of my recollection, I think it was the

4   Derry, New Hampshire, store that I was in.

5   **Q**   Okay.  How far was that from home?

6   **A**   At that point in time, we were living in Litchfield,

7   New Hampshire.  It was probably about 20 minutes, 15, 20

8   minutes from my house.

9   **Q**   Okay.  And how long were you a pharmacist in that

10  pharmacy?

11  **A**   I was there for a few years.  I'm not sure of the

12  exact timeline of how long I was there.  Maybe three years,

13  two years, three years.

14  **Q**   Okay.  And so now we're getting '03, '04-ish?

15  **A**   Yep.

16  **Q**   Okay.  What did you do next?

17  **A**   I went to the CVS in Londonderry, New Hampshire, after

18  that, and I became the pharmacy manager in that location

19  when I moved to that store.

20  **Q**   Okay.  So both filling prescriptions on an everyday

21  basis and some managerial responsibilities?

22  **A**   Yes.

23  **Q**   And do you recall how long you were in that position

24  as pharmacy manager?

25  **A**   I was there again for a few years.  I can't recall the

1    exact timeline, but after that I went to the CVS in the town

2    that I live now, Nashua.

3    **Q**    Okay.  So in this stretch, post the birth of your

4    daughter, serving as pharmacist in three different CVS

5    pharmacies?

6    **A**    Yeah.

7    **Q**    Okay.  And am I right, Nashua is just sort of over the

8    line from Massachusetts, right?

9    **A**    That's correct.

10   **Q**    And that's your place of -- your hometown.

11        How long did you work in that pharmacy?

12   **A**    I was there for about five years.

13   **Q**    Okay.  So does that bring us up -- I've lost track of

14   our chronology -- 2010-ish?

15   **A**    Yeah.

16   **Q**    What happened in 2010?

17   **A**    In 2010 I became a pharmacy supervisor.

18   **Q**    What's a pharmacy supervisor at CVS?

19   **A**    So a pharmacy supervisor at that time would have

20   operational oversight for those particular stores.  We would

21   be working in partnership with another field leader called a

22   district manager.  They would have responsibility for the

23   front store, but then they would also have oversight for the

24   activities that we would be doing within the pharmacy.

25        But I owned, like, the profit and loss statement and

 1    just general day-to-day operations of those pharmacies.

 2    When I first started, I had all the pharmacies in New

 3    Hampshire, but shortly after that they divided it into two

 4    districts, if you will, and I had one district.

 5    **Q**    Okay.  And about how many pharmacies were in that one

 6    district?

 7    **A**    I think I had 17.

 8    **Q**    Okay.  So let me just get this straight.

 9          Is pharmacy manager now you're no longer filling

10    prescriptions unless you do a fill-in shift or something,

11    right?  I'm sorry, as pharmacy supervisor.

12    **A**    Correct.

13    **Q**    Okay.

14          And you are essentially presiding over the pharmacy

15    part of the store for approximately 17 stores?

16    **A**    Correct.

17    **Q**    Okay.  Is this the kind of position where you're -- do

18    you work in an office or do you travel around and visit?

19    **A**    Mostly traveling around and visiting.  We had one

20    small office that many of us shared, and basically we just

21    kept files there.  But for the most part we were in store

22    locations visiting, working with the pharmacists and

23    spending time in the stores.

24    **Q**    Okay.  And your focus in that position was on pharmacy

25    issues obviously, right?

1    **A**    Correct.

2    **Q**    Okay.  And again, I just want to differentiate since I

3    screwed it up myself, pharmacy manager is a position for one

4    pharmacy?

5    **A**    Correct.

6    **Q**    And you're filling prescriptions at the same time?

7    **A**    Yes.

8    **Q**    Pharmacy supervisor, you're sitting over a large

9    handful of pharmacies?

10   **A**    Correct.

11   **Q**    Okay.  Is that another position that we call a field

12   leader or a field supervisor?

13   **A**    Correct.

14   **Q**    Okay.  What I want to do now, I want to stop our

15   chronology for a second, okay?  And I want to talk about

16   your experience as a pharmacist filling prescriptions, okay?

17   We can even put aside the supervisory roles that you held

18   sort of in between and at the end.

19        What's it like to be a pharmacist?

20   **A**    I loved being a pharmacist.  I find it very rewarding

21   working with patients.  But it's a tough job.  People are

22   often coming to you not on their best day.  They may have

23   gotten bad news, they may be in pain, they may be sick.

24   But, you know, over the course of time I've developed a lot

25   of relationships with customers and patients, so I find it

1    very, very rewarding.  But I think there's a yin and a yang

2    to pharmacy.

3    **Q**    The yin being how rewarding it is to help people and

4    the yang being it's hard?

5    **A**    It's hard.

6    **Q**    What's sort of the core job of a pharmacist?

7    **A**    The core job of a pharmacist is to be able to provide

8    medication that's been written by a physician to a patient

9    and make sure that it is provided safely, that there's no

10   drug-drug interactions, and dispense that medication to

11   patients.

12   **Q**    Okay.  Now, am I right that while the core job is to

13   provide medicine to patients who need it, there's also a

14   responsibility in certain circumstances not to provide the

15   medicine?

16   **A**    That is true.

17   **Q**    Okay.  Can you explain that?

18   **A**    Yes.  So pharmacists have a corresponding

19   responsibility, and what that means is they can't fill a

20   prescription that they know is not for legitimate medical

21   purposes.

22   **Q**    Did you exercise corresponding responsibility in your

23   many years as a pharmacist?

24   **A**    On a very regular basis.

25   **Q**    Okay.  And let's -- I'm just not good at these

1    chronologies.  Are you talking that you probably worked as a

2    pharmacist for approximately 15 years?  Am I overstating it?

3    **A**    That's about right.

4    **Q**    Okay.  How did you learn how to perform corresponding

5    responsibility?

6    **A**    I was introduced to it in my law class at the

7    University of Rhode Island, but I can recall a specific

8    instance when I was working as an intern at the store in

9    Nashua downtown that I worked at later on as a pharmacist,

10   but I was there as an intern.  And I was working with my

11   preceptor and --

12   **Q**    Can I stop you right there?

13   **A**    Yes.

14   **Q**    I'm sorry to interrupt.

15        What's a preceptor?

16   **A**    So they oversee your internship experience to make

17   sure that you understand and learn the things that you

18   should be learning while you're there.

19   **Q**    And is that another CVS -- well, I guess you were an

20   intern at the time.  Was that a CVS pharmacist who --

21   **A**    It was a CVS pharmacist, yes.

22   **Q**    Okay.  I'm sorry to interrupt.  Keep going with --

23   **A**    Not a problem.

24        So we were -- you know, it was a day at the store, and

25   there was a Percocet prescription that had been presented

1    that he had decided that we weren't going to fill.

2        And so he had me tell the patient that we weren't

3    going to fill that particular prescription.  And it was my

4    first experience doing that.  I was super nervous.

5        And I told him, and I was behind the counter, and this

6    patient got very, very angry and actually grabbed me by the

7    lapels of my white coat and tried to pull me over the

8    counter.  And that was my first interaction, which was

9    obviously not a good interaction.  But through the course of

10   experience and time on the bench and being exposed, that's

11   how I learned to do it.

12   **Q**    Okay.  Now, that incident that you just described,

13   that's not an everyday incident, right?

14   **A**    No, no.  That's an extreme -- unfortunately, it was

15   one of my first experiences with it, but it was an extreme.

16   **Q**    You mentioned Percocet.  We probably all know that.

17   What's Percocet?

18   **A**    Percocet is an oxycodone product.  It has oxycodone

19   and Tylenol in it.

20   **Q**    Okay.  So you learn about corresponding responsibility

21   in pharmacy school, correct?

22   **A**    Correct.

23   **Q**    And then you have an internship where that learning is

24   enhanced --

25   **A**    Correct.

**Harrington - (Direct by Delinsky)**                     5645

1    **Q**     -- by the preceptor, correct?

2    **A**     Yes.

3    **Q**     And did you have policies and trainings to guide you

4    as well?

5    **A**     Yes.

6    **Q**     Okay.  Is there continuing education?

7    **A**     There is continuing education that's available, and

8    it's the pharmacist's discretion on which courses they

9    choose.

10   **Q**     Okay.  Am I right that this task of exercising

11   corresponding responsibility, if you strip out the legal

12   words, it's really a task of trying to find prescriptions

13   that weren't written for real medical reasons?

14   **A**     Yes.

15   **Q**     Is that always easy or is it always hard?

16   **A**     I think it's hard because, you know, people are coming

17   to the pharmacy and there's many that need the prescription,

18   so to be able to ferret out those that are trying to get it

19   for nonmedical needs is really difficult.

20          And you ask questions to try to be able to get down to

21   the bottom of it to really understand, but sometimes it's

22   hard.  And sometimes people are standing in front of you

23   lying, and you're in a hard situation, and you're trying to

24   balance those that are trying to get medication for not real

25   medical reasons.  But then the majority of patients are

1   looking to get prescriptions for the right reasons to be

2   able to treat the right medical conditions.  So you've got

3   to balance those two things.

4   **Q**    Here's a question that's sort of been lurking in the

5   background at the trial.

6        Would it be appropriate, sort of feels right, in the

7   face of an opioid epidemic or an opioid crisis, for a

8   pharmacist to just say, hey, you know something, I'm not

9   going to mess with anything.  If there's, you know, the

10  slightest sign on a prescription, I'm just not going there,

11  I'm not going to fill it.

12       Would that be appropriate?

13  **A**    No.  I mean, there's patients that need pain

14  medication.  There are patients that are dying and are in

15  pain, there are patients that have had horrible things

16  happen to their body, and they need to be able to have

17  access to pain medication to be able to treat those

18  legitimate needs.  It's not appropriate just to say I'm not

19  going to fill any controlled substances or any opioids.

20  It's just -- it's not humane.

21  **Q**    And in your answer before you talked about balance.

22  Could you explain more what you mean by balance?

23  **A**    Yeah, the pharmacists are in the middle trying to make

24  sure that we're keeping patients that need the legitimate

25  medication, medication for legitimate medical reasons,

1    making sure we can provide them the right medication; but on

2    the other side of the pendulum, we're also trying to prevent

3    people that are trying to obtain it for bad reasons from not

4    getting that medication.  And it's trying to find the right

5    place in between those two things to be able to make sure

6    that we're satisfying our obligations on one side, but also

7    maintaining legitimate access on the other side.

8    **Q**    And is this a hard balance to strike?

9    **A**    It is, because if you swing the pendulum too far in

10   one direction, you're not doing your job the way that you

11   would want to do.

12   **Q**    Let's go back to the chronology.  You're a pharmacy

13   supervisor 2012, correct?

14   **A**    Yes.

15   **Q**    Okay.  And I just want to stop at pharmacy supervisor.

16        CVS from time to time changes names and stuff like

17   that.  Today there's no pharmacy supervisor position,

18   correct?

19   **A**    There isn't.  It's a district leader position.

20   **Q**    And then there's these new things called DPPLs or

21   something, right?

22   **A**    Yes.

23   **Q**    That provide some role at a higher level.

24        What are DPPLs?

25   **A**    They are divisional professional practice leaders.

**Harrington - (Direct by Delinsky)**

5648

1    **Q**    And that just reflects from time to time the company

2    is reorganizing, changing company names, right, or changing

3    position names?

4    **A**    Right, correct.

5    **Q**    What happened in 2012?

6    **A**    In 2012, I came to the corporate office to take on the

7    director of Pharmacy Professional Practice Standards role.

8    **Q**    Okay.  And it feels like you've been in that position

9    nine years now?

10   **A**    Yeah.

11   **Q**    Okay.  How did it come about?

12   **A**    How did the position come about or how --

13   **Q**    How did you rise -- somebody must have come to you and

14   said, hey, would you be interested in this.

15   **A**    Yeah, that's actually exactly how it happened.  I was

16   driving home from North Conway, which was my farthest north

17   store, and it was raining.  And it was really raining hard,

18   and so I was driving in my company car.  And my cell phone

19   rings and it's a 401 number, so you know it's a number from

20   Rhode Island.  And I was like, oh, no, what did I do.

21        And I picked up the phone, and it was an SVP of

22   Pharmacy Operations there, and he was calling to ask me if I

23   would be interested in taking on this role down at the

24   corporate office.

25        He said that they needed someone with deep pharmacy

**Harrington - (Direct by Delinsky)**

1    experience, and he thought that I would be good for the job

2    based on my pharmacy experience and my analytical mind.

3          I had never seen myself going to the corporate office.

4    I thought it was a little bit maybe too stuffed shirt for

5    me.  I saw myself as a field leader.  I saw myself rising in

6    the ranks of the field leaders, taking on a region and maybe

7    a division at some point in time.

8          And Mitch convinced me that it would be wise to go and

9    sit with some people, to learn about the position.  And I

10   did, and I sat with some really, really smart people.  And

11   the interview was more just to challenge walking through

12   some of the problems that they were facing, and it really

13   lit my intellectual fire.

14         And I was excited to be able to take on a different

15   challenge, so I threw caution to the wind, and I took on the

16   role.

17   **Q**    Okay.  Describe the position back then in 2012.

18   **A**    Yeah, so back then in 2012, I have -- I had a number

19   of different programs to be able to mitigate risk for the

20   company, and --

21   **Q**    Let me stop you there.  We'll get there.

22         Higher level, higher level.  Let me bring you along.

23         You said you focused on controlled substances.

24   **A**    Mm-hmm.

25   **Q**    Correct?

1    **A**    Yes.

2    **Q**    Okay.  Can you just very briefly, because I think

3    we've heard this, did your role involve noncontrolled

4    substances?

5    **A**    No, no, it didn't include noncontrolled substances.

6    **Q**    Okay.  And very briefly, thumbnail sketch, what's the

7    difference between a controlled substance and a

8    noncontrolled substance?

9    **A**    Controlled substances are scheduled by the DEA, and

10    it's based on the level of addiction potential.

11    **Q**    And a noncontrolled substance?

12    **A**    Is things that you would be taking for, like, you

13    know, Lipitor for your cholesterol or, you know, lisinopril

14    for your high blood pressure.

15    **Q**    Antibiotics?

16    **A**    Antibiotics.

17    **Q**    That kind of thing, okay.

18        Does CVS dispense more controlled substances or

19    noncontrolled?

20    **A**    Much more noncontrolled.

21    **Q**    Not even close, correct?

22    **A**    Not even close.

23    **Q**    And I'm sorry to interrupt, but let's just walk

24    through this carefully.

25        So the focus was on controlled substance, and then at

1   a high level, within the zone of controlled substances, what

2   was your focus?

3   **A**     So I had a store monitoring program, I had a

4   prescriber program, I had an inventory control program.

5   Those were some of the main programs that I was focused on.

6   **Q**     Director of Professional Practices, correct?

7   **A**     Professional Practice Standards.

8   **Q**     So what does Professional Practice Standards mean?

9   **A**     It just means operation of the pharmacy.

10  **Q**     Okay.  And your focus again was on the dispensing of

11  controlled substances?

12  **A**     Correct.

13  **Q**     Okay.  And when you came to your position, was there a

14  particular focus on controlled substance pain medications?

15  **A**     Yes.

16  **Q**     Okay.  That was a real big issue at the time, correct?

17  **A**     It was.

18  **Q**     Okay.  And by the way, was New Hampshire one of the

19  communities that had been hit hard by opioid issues?

20  **A**     It definitely has.  The rural areas and some of the

21  city areas also have been very hard hit by opioids.

22  **Q**     So let's again, speaking at a high level without

23  getting into the particulars -- we'll move to that -- your

24  group now that you've been leading for nine years -- oh, and

25  let me just stop there.

**Harrington - (Direct by Delinsky)**

1    Who do you report to?

2  **A**    I report to Tom Davis.

3  **Q**    Okay.  And I think the ladies and gentlemen of the

4  jury will recall Mr. Davis was the first witness in the

5  trial.

6    He's your boss?

7  **A**    He is.

8  **Q**    Okay.  And he hasn't been your boss the whole time; is

9  that right?

10 **A**    When I first started, I reported in to Papatya Tankut,

11 but she was only in that role a month or so before Tom took

12 over.

13 **Q**    So again, at a high level, your group, the

14 Professional Practice group, it operates programs regarding

15 the dispensing of controlled substances, correct?

16 **A**    Correct.

17 **Q**    What's its -- does it have any role in policies?

18 **A**    I oversee the policies that relate to the work that I

19 do.

20 **Q**    Okay.  Does it -- are there any programs that the

21 Professional Practice Standards group runs in the

22 communities?

23 **A**    Yeah, we have a number of community-based programs.

24 We have a Pharmacists Teach program, in which our

25 pharmacists go out into the community to be able to teach.

1   That's changed a little bit, and I think we'll talk about

2   that maybe a little bit later.

3         And I also have a Drug Disposal program as well to

4   install drug kiosks in our local locations and then in PDs

5   across the country.

6   **Q**    Okay.  And in your role as director of the group, do

7   you ever interface with DEA?

8   **A**    I do.

9   **Q**    Okay.  Does DEA bring issues to the attention of the

10  company if it identifies a concern?

11  **A**    Sometimes.

12  **Q**    Okay.  And are you involved in meetings with DEA?

13  **A**    I am.

14  **Q**    Do you always agree with DEA?

15  **A**    No.

16  **Q**    Okay.  Would you be involved in explaining to DEA why

17  they have it wrong, in part or in full?

18  **A**    Yes.

19  **Q**    So you have the community programs, the dispensing

20  programs, policies, DEA interactions.

21        Now, lawyers deal with a lot of the DEA stuff,

22  correct?

23  **A**    That is true.

24  **Q**    Yeah, you're in a few meetings.

25        Anything else that we've missed at a high level?

1    **A**    During my time as a director, no.

2    **Q**    Okay.  How about as a senior director?

3    **A**    As a senior director I also have responsibility for

4    drug loss reporting.

5    **Q**    Okay.  And to take the jargon out of drug loss

6    reporting, that means when there's a theft in the pharmacy,

7    that has to be reported somewhere?

8    **A**    Correct.  It has to be reported to the DEA.

9    **Q**    Okay.  And that's underneath you as well, correct?

10   **A**    Correct.

11   **Q**    Okay.  How many people were in the group when you

12   started in 2012?

13   **A**    When I started in 2012, it was myself and three

14   others.

15   **Q**    Okay.  Four people?

16   **A**    Mm-hmm.

17   **Q**    Okay.  How many people are in your group today?

18   **A**    Roughly 25.  We have some puts and takes that happen

19   occasionally, but --

20   **Q**    Those 25 people, today in 2021, or the four people

21   back in 2012, are they the only people at the company

22   looking at safe controlled substances dispensing?

23   **A**    No.

24   **Q**    Okay.  Who else, who else at the company is focused on

25   those issues?

**Harrington - (Direct by Delinsky)**

1   **A**    I think first and foremost our pharmacists, right?

2   Our pharmacists see those prescriptions every day and review

3   those prescriptions before they fill them.

4        We have our field leaders that are also looking at

5   those issues.  We have our Asset Protection folks that are

6   in the field looking for diversion issues, which controlled

7   substances falls under that.  We have our divisional

8   Professional Practice leaders that are also in the fields

9   working on these activities.

10        And then, like, up at the home office I have a whole

11   Compliance group that serve as partners for us.  I have a

12   Pharmacy Operations department that helps us.  We have a

13   Legal department.  We have a Regulatory department that I

14   interface with regularly.

15        And then I also utilize our call center, because a lot

16   of the work that we do, there's, like, outreach that has to

17   happen to the stores or to prescribers to validate things,

18   so we use a call center to do those functions so that we

19   don't have to get in the weeds of, like, the day to day of

20   that.

21   **Q**    And the call center, is -- pharmacists operate the

22   call center?

23   **A**    There's pharmacists, there's technicians, there's

24   non-pharmacists there too, but from my work, mostly it's

25   pharmacists and technicians that help us on our work.

**Harrington - (Direct by Delinsky)**

1    **Q**    Okay.  Analytics, did you mention that or --

2    **A**    Oh, I forgot them.  They're probably one of the most

3    important people to be able to help me.  I'm a pharmacist by

4    training.  I like numbers.  I think that they're fun.  But

5    not like our analyst team, I don't have that depth of

6    knowledge.  We have people that are like, data scientists

7    and are very versed in using tools like SAS and ARR, and I

8    can't even think of all the names of the tools that they

9    use, but they're very much more advanced than I am to be

10   able to build some of the models that we use to be able to

11   detect behavior that we would want to investigate.

12   **Q**    So there are many different parts of the company, both

13   in the pharmacy and in the field and at corporate who are

14   working on these issues; am I right?

15   **A**    Yes.

16   **Q**    Back at the time you were a pharmacist, so now we're

17   going back even before you joined this group with four

18   people, was there oversight back then over controlled

19   substances dispensing at CVS?

20   **A**    Yeah, the field leaders were responsible for assisting

21   stores with their exercise of corresponding responsibility

22   or filling of controlled substances.

23   **Q**    Okay.  And there was still policies that covered

24   the -- all CVS pharmacies throughout the country, correct?

25   **A**    Correct.

**Harrington - (Direct by Delinsky)**                    5657

1    **Q**    Would I be right in saying that at the time you were a

2    pharmacist, the supervision of dispensing occurred -- was

3    focused on the field, but today -- Mr. Weinberger's going to

4    object to my question, by the way, I can tell -- but

5    today --

6                    MR. LANIER:  I object to Mr. Weinberger's

7    objection before the question is out.

8                    MR. DELINSKY:  He is just gearing up.  I know

9    it's coming.

10                    THE COURT:  Maybe he was just turning his

11    chair around.

12                    MR. DELINSKY:  It's been a long trial, Judge.

13    I know what's coming.  I'm going to try not to elicit an

14    objection.  Let me ask this.

15                    MR. WEINBERGER:  I'm good.  Go for it.

16                    MR. DELINSKY:  Great, good.  I'm going to go

17    back to my question.

18    BY MR. DELINSKY:

19    **Q**    Would I be right in saying that in the earlier years

20    the supervision was field focused, whereas, you know, in

21    more recent years, let's just put 2012 on it, it became more

22    centralized at CVS?

23    **A**    That's a fair statement.  I did just characterize now

24    that even though it's centralized, the field supervision is

25    an important part of that centralized function.  One

1    couldn't operate without the other.

2    **Q**    So both are in play today?

3    **A**    Correct.

4    **Q**    Okay.

5              MR. DELINSKY:  Thank you, Mr. Weinberger.

6              MR. WEINBERGER:  Hey, no problem.

7    **Q**    How many pharmacies does CVS operate throughout the

8    country?

9    **A**    Roughly about 10,000.

10   **Q**    Let's break it down a little bit just to give the jury

11   some color.

12             About how many pharmacies in Ohio, if you know?

13   **A**    380.  380 roughly.

14   **Q**    So 380 CVS pharmacies in Ohio?

15   **A**    Correct.

16   **Q**    Florida, how many CVS pharmacies?

17   **A**    850.

18   **Q**    850 in Florida, okay.

19             If you look at all the pharmacies around the country,

20   about how many CVS pharmacists?

21   **A**    We have about 30,000 pharmacists.

22   **Q**    Okay.  In your responsibility -- strike that.

23             Are you responsible for a particular region, or do you

24   operate programs and keep focus on the whole chain, all

25   10,000 pharmacies?

1   **A**     Yeah, my focus is the entire chain.

2   **Q**     Okay.  I think we've already gone over this, and we

3   don't have to beat a dead horse.

4         Are there people at CVS, are there leaders at CVS, who

5   focus on a particular county, a particular state, particular

6   region?

7   **A**     Yeah, like a district leader would be responsible for

8   stores in a small geography, and then there would be a

9   region director which would have a larger geography, and a

10  divisional vice president that would have yet even a larger

11  geography.

12  **Q**     You're none of those people, correct?

13  **A**     I'm not any of those.

14  **Q**     You don't have any particular expertise in Lake or

15  Trumbull County versus Nashua, New Hampshire, whatever

16  county that's in?

17  **A**     Yeah, no.

18  **Q**     Okay.  Your responsibilities, am I right, are

19  programmatic and they span the whole chain?

20  **A**     That is correct.

21  **Q**     Okay.  And you're here to testify about the programs

22  and policies that span the whole chain, correct?

23  **A**     That is correct.

24  **Q**     Okay.  I think we're almost through your background,

25  Ms. Harrington.

**Harrington - (Direct by Delinsky)**          5660

```
1          I have one last question.  The New Hampshire Board of
2     Pharmacy.
3     A    Yes.
4     Q    What is it?
5     A    It's a group of people that are nominated by the
6     Governor and confirmed by the Executive Council that help
7     make sure that policies, regulations are up to date, and
8     manage oversight for compliance investigations and making
9     sure that pharmacy is run safely in the state.
10    Q    Do you have any role or position with the New
11    Hampshire Board of Pharmacy?
12    A    I do.  I'm a commissioner on the Board of Pharmacy.
13    Q    Okay.  And how long have you been a commissioner?
14    A    It's probably been about three years, two years, three
15    years.
16    Q    And who asked you?
17    A    I asked the Governor if I could serve on the Board.
18    Q    And did the Governor appoint you?
19    A    He did.
20    Q    Who was the governor at the time?
21    A    Governor Chris Sununu.
22    Q    All right.  Let's move on, okay?  And what I want to
23    do for everyone in the courtroom is let's just do a level
24    set, okay, before we get into the -- your work.
25          Are CVS pharmacists perfect in exercising
```

**Harrington - (Direct by Delinsky)**

1    corresponding responsibility and exercising their

2    professional judgment?

3    **A**    No.  It's a hard -- it's a hard exercise.  I think

4    that they always tried to make the best decision possible.

5         I know that when I was on the bench, I know I tried to

6    make the best decision possible, but I know that I didn't

7    always get it right.

8    **Q**    Is it fair to say that no pharmacist is perfect?

9    **A**    In my opinion, I think that that's true.

10   **Q**    Okay.  The programs you run at CVS, okay, in your work

11   at CVS, are your programs -- sorry to put -- are the

12   company's programs, are they perfect?

13   **A**    Again, the answer is no.  And it pains me to say that

14   because I want them to be perfect, and I strive for them to

15   be perfect, but this is a really hard topic.  And I make the

16   best decision possible with the information that I have at

17   hand, but I don't know that we get it right every time.

18   **Q**    Okay.  We've heard a lot in the case about the *Holiday*

19   action in Florida.

20        Do you know about the *Holiday* action?

21   **A**    I do.  It happened before I took on this role, but I'm

22   very well aware of it.

23   **Q**    Okay.  Am I right that was the case brought by DEA

24   against two CVS pharmacies in Florida?

25   **A**    That is correct.

**Harrington - (Direct by Delinsky)**

1   **Q**    Okay.  Those two pharmacies were in one town in

2   Florida?

3   **A**    Yes.

4              MR. LANIER:  Judge, I am going to ask that he

5   not lead through this, please.

6              THE COURT:  Okay.  I agree.

7   **Q**    What was the name of the town?

8   **A**    Sanford, Florida.

9   **Q**    Did CVS admit that the pharmacists in those two CVS

10  pharmacies in Florida did not fully comply with their

11  corresponding responsibility?

12  **A**    Yes.

13  **Q**    I think you already testified to this, but were you in

14  your position at headquarters when the conduct DEA was

15  looking at occurred?

16  **A**    I was not.

17  **Q**    Okay.  Do you recall when that conduct occurred?

18  **A**    I don't recall the specific dates, but it was prior, I

19  think, to 2010.

20  **Q**    Okay.

21  **A**    To the best of my recollection.

22  **Q**    Certainly prior to 2012, when you assumed your current

23  position?

24  **A**    Yes.

25  **Q**    Okay.  So you were in New Hampshire when that conduct

1   in Florida was occurring?

2   **A**    Correct.

3   **Q**    Okay.  What happened to the two Florida pharmacies at

4   issue in the *Holiday* case?

5   **A**    They lost their DEA registration.

6   **Q**    Okay.  Did your group work on any response to that?

7   **A**    Yes.  Our store monitoring program, our Prescriber

8   program, a number of the things that we do were built partly

9   in response to that.  We took that event seriously.

10  **Q**    Okay.  Let me step back.

11       Your group, did your group develop new programs in

12  response to that incident?

13  **A**    Yes.

14  **Q**    Did those programs -- and you mentioned store

15  monitoring and prescriber monitoring.  We'll get into those.

16       Did they apply only to Florida, only to one town in

17  Florida, or did they apply to all of CVS's pharmacies?

18  **A**    We applied them to all of CVS's pharmacies.

19  **Q**    Okay.  Has CVS entered into other settlements with the

20  DEA?

21  **A**    Yes, we have.

22  **Q**    Okay.  And has some of that conduct occurred since

23  you've been in your position?

24  **A**    Yes.

25  **Q**    Did some of the allegations concern conduct that

**Harrington - (Direct by Delinsky)**  5664

1    occurred before you assumed your role?

2    **A**    Yes.

3    **Q**    It's a mix of both?

4    **A**    Yes.

5    **Q**    Okay.  Has CVS agreed with all the allegations?

6    **A**    No.

7    **Q**    Okay.  With regard to these other settlements, has CVS

8    taken them seriously?

9    **A**    Yes.  Anytime we have an interaction like that, we

10   take it very seriously.

11   **Q**    Even when the company disagrees with what DEA is

12   saying?

13   **A**    There's always an opportunity to be able to learn from

14   those interactions and to be able to make our programs

15   better.

16   **Q**    Okay.  So what has been the company's approach in

17   recent years when DEA has identified a concern with a

18   pharmacy or some other issue?

19   **A**    We try to learn as much as we can from the situation

20   and either make enhancements to the programs that we have or

21   build new programs that maybe we haven't even thought of

22   before, based on the facts and circumstances of the case

23   that's before us.

24   **Q**    One more related set of questions.

25        Is today -- is CVS more or less advanced today in 2021

1   than it was in 2011?

2   **A**    More advanced.

3   **Q**    Will CVS be more advanced in 2031 than it is in 2021?

4   **A**    I hope so.  If it's not, I might not have a job,

5   but...

6   **Q**    Why do you think it will -- the company will continue

7   to advance?

8   **A**    Because we're always striving to be better, you know,

9   within our programs and trying to make meaningful

10  improvements.  And just because we have developed a program,

11  we don't sit on our laurels and think that that's

12  appropriate and that's going to cover us, because the

13  environment is always changing.  Individuals are trying to

14  find new ways to be able to present with prescriptions and

15  have them filled, and so we've got to be able to learn from

16  what's going on and make modifications to our programs in

17  order to appropriately respond to what's happening in the

18  environment.

19  **Q**    Do you think the fact that CVS continues to advance is

20  a good thing or a bad thing?

21  **A**    I think it's a good thing.

22  **Q**    Okay.  What I want to do now is I want to focus on the

23  tools and resources in place at CVS over the years to try to

24  identify prescriptions that aren't written for real medical

25  reasons, okay?

1    **A**    Okay.

2    **Q**    Ms. Harrington, what's the -- here, I'm going to put

3    up a little chart.

4              MR. DELINSKY:  Could I please have the ELMO,

5    Mr. Pitts?

6    **Q**    What's the most basic common tool that CVS has to try

7    to identify illegitimate prescriptions?

8    **A**    We have 30,000 pharmacists that work across our 10,000

9    stores.

10   **Q**    Okay.  Would it be correct to say that the first

11   filter on illegitimate prescriptions are the pharmacists?

12   **A**    Yes, I think that's fair to say.

13   **Q**    Okay.

14   **A**    And I would even add to that that we have technicians

15   working in those buildings too, and those technicians have

16   eyes and ears even beyond what our pharmacists see, so they

17   work together.

18   **Q**    And do we have -- does the company have more

19   technicians than pharmacists or the same, less?

20   **A**    Yeah, we have about 100,000 technicians.

21   **Q**    100,000.  So on top of the 30,000 pharmacists, about

22   100,000 technicians?

23        So let's focus on the pharmacists, the 30,000

24   pharmacists.

25        Do they all have their degree?

1    **A**    Yes.

2    **Q**    Are they all licensed by their respective states?

3    **A**    Yes.

4    **Q**    Have they all passed the law exam?

5    **A**    Yes.

6    **Q**    Are they all in good standing with their state Boards

7    of Pharmacies?

8    **A**    Yes.

9    **Q**    Do they all receive guidance and supervision by CVS?

10   **A**    Yes.

11   **Q**    Okay.  Does CVS have policies to guide pharmacists in

12   their exercise of corresponding responsibility?

13   **A**    Yes.

14   **Q**    Okay.  And when it comes to a prescription that a

15   pharmacist believes is not written for a real medical

16   reason, what is CVS's policy?

17   **A**    We expect our pharmacists to not fill that

18   prescription.

19   **Q**    Has that always been CVS's policy?

20   **A**    Yes.

21   **Q**    Back when you started at the company in 1991?

22   **A**    I don't know if it was expressly written that way in

23   1991, but that was -- the expectation is that you followed

24   state and federal guideline -- federal regulations, and that

25   was in policy, which corresponding responsibility was a

1    federal regulation at the time, so the expectation would

2    have been that it would have been followed.

3    **Q**    Okay.  Ms. Harrington, I'm showing you what has been

4    marked as P-20699.  And that may be in the Redweld, the

5    accordion folder on top.  So 20699.

6         Ms. Harrington, do you recognize this exhibit as one

7    of CVS's policies for the dispensing of pain medications?

8    **A**    Yes.

9    **Q**    Is this a fair, accurate, and complete copy of this

10   2010 Dispensing Guideline for Pain Management?

11   **A**    Yes.

12   **Q**    Okay.  And we won't spend a lot of time going through

13   all the provisions, but I just want to focus on a few.

14        If you could see number 4 in the bottom third of the

15   page.

16   **A**    I see it.

17   **Q**    What does it say?

18   **A**    It says, "Do not fill a prescription if you believe

19   the prescription was not issued for a legitimate medical

20   purpose."

21   **Q**    Oh, I'm sorry, is there --

22             MR. HYNES:  We can't see it.  You've got to

23   move it up.

24             MR. DELINSKY:  Sorry about that.  Sorry.

25   **Q**    Okay.  Let's go through this again, because I screwed

1    this up.

2         "Do not fill a prescription if you believe the

3    prescription was not issued for a legitimate medical

4    purpose."

5         Did I get that right?

6    **A**    That is correct.

7    **Q**    Since the time you've been a pharmacist to today, is

8    that consistent with CVS's policy?

9    **A**    Yes.

10   **Q**    Okay.  Now, you weren't in your position at

11   headquarters when this policy came out, correct?

12   **A**    That is correct.

13   **Q**    Did this policy come out earlier?

14   **A**    It was earlier.  This was during the time when I was a

15   pharmacy supervisor.

16   **Q**    Okay.  And I don't want to bore everyone spending too

17   much time with the document, but I just want to point out

18   one thing.

19        In addition to many provisions in here, this document

20   makes reference to warning signs, correct?

21   **A**    Correct.

22   **Q**    Okay.  And am I right that it provides a bullet point

23   list of several, starting on the first page and then

24   continuing on to the next page?

25   **A**    Yes.

1    **Q**    Correct?

2          Is this an exhaustive list?

3    **A**    It is not.

4    **Q**    Okay.  And by exhaustive, I mean it doesn't set forth

5    every potential warning sign there could be?

6    **A**    Correct.

7    **Q**    Would it be possible to put down on a document that

8    was usable every potential warning sign that a pharmacist

9    might face?

10   **A**    I think the warning signs sometimes are based on facts

11   and circumstances, and so pharmacists need to be using their

12   brain as they're filling prescriptions to be able to

13   identify them.  There are common ones that are referred to

14   which are some of the ones that are listed here, but I don't

15   know that you could create an exhaustive list.

16   **Q**    There could be warning signs that a pharmacist may see

17   when she is looking at a prescription that have never been

18   addressed in a policy guidance case, or anything like that?

19   **A**    Correct.

20   **Q**    But this one does talk about cash, right?

21   **A**    Yes.

22   **Q**    And it identifies combinations, correct?

23   **A**    Yes.

24   **Q**    Okay.  And several others, all right.

25          Is this an example -- and we're going to get into some

1    other policies later, hopefully in a way that does not bore

2    everyone.

3         But is this sort of typical of -- or representative of

4    CVS's policies over the years?

5    **A**    Yes.

6    **Q**    All right.  So we were talking about how CVS guides

7    and provides resources for its pharmacists.  We just briefly

8    hit a representative example of a policy.

9         Does CVS provide training to its pharmacists?

10   **A**    Yes.  We provide training at least three times a year.

11   We do biannual training twice a year and DEA training once a

12   year.

13        And then in addition to that, for the pharmacist's

14   performance review, their supervisor talks specifically

15   about controlled substances and corresponding responsibility

16   as part of that review.

17   **Q**    Okay.  So let's break it down.

18        At the end of every year, a pharmacist has to discuss

19   or the pharmacist's supervisor will discuss corresponding

20   responsibility with the pharmacist at the performance

21   review?

22   **A**    Correct.

23   **Q**    Okay.  What's that discussion look like?  And you

24   can't talk about any particular one you didn't participate

25   in, but what happens there?

1    **A**    It depends on the particular year, because we pull out

2    topics that feel more pertinent at that time.

3         There's an overview of corresponding responsibility in

4    general, but one of the first ones that I participated in

5    building was we had an example prescription that had various

6    red flags on it, and they would walk through the

7    identification of those red flags with the pharmacy

8    supervisor and the pharmacist.  And then they'd talk about

9    what those red flags meant, how they could be resolved.

10         So it was just like a hands-on exercise.  We felt that

11   it was good to have a live person sitting across from you,

12   looking you in your eye and telling you how important these

13   things were.

14   **Q**    In the course of this process, does CVS sometimes ask

15   its pharmacists to certify something after these one-on-one

16   meetings?

17   **A**    Yeah, there's a sign-off that they fully understand

18   their obligations under corresponding responsibility.  And

19   each pharmacist signs those often.  It's kept in their

20   personnel file.

21   **Q**    You talked about then two times a year, something, I

22   think you termed it DEA training?

23   **A**    Twice a year is biannual training.

24   **Q**    Okay.

25   **A**    So it has a number of different topics.  Corresponding

1    responsibility is a portion of a larger training.

2    **Q**    Okay.  So twice a year through the biannual trainings,

3    corresponding responsibility is discussed?

4    **A**    Mm-hmm.

5    **Q**    What's the I guess we'll call it the fourth training?

6    **A**    Yeah, the DEA training, that's really focused on a lot

7    of controlled substance topics.  Corresponding

8    responsibility is a little bit deeper in that particular

9    training, as well as there's certain record keeping type

10   activities that are explored there as well.

11   **Q**    I think we've already talked about this, but does CVS

12   have supervision in the field for its pharmacists?

13   **A**    Yes.  So we have the district leaders, we have the

14   regional directors, we have the divisional vice presidents,

15   and we have the divisional Professional Practice leaders.

16   **Q**    What are job aids?

17   **A**    Job aids are tools that we use.  Sometimes trainings

18   can be a little bit long, maybe a little dry at different

19   points in time.  So we use job aids as a tool to be able to

20   provide them a high-level overview of the content.  Often we

21   include visuals to maybe spice it up a little bit.

22   **Q**    And the job aids, they're disseminated to pharmacists?

23   **A**    Yes.

24   **Q**    Sort of periodically?

25   **A**    Yes.

**Harrington - (Direct by Delinsky)**                         5674

1    **Q**    Okay.  Are the policies available somewhere to

2    pharmacists?

3    **A**    Yeah, we -- we have a policy portal that they can just

4    go in and look them up at any point in time.  It's easy for

5    them to toggle to that when they're working on the bench.

6    **Q**    Is that something called RXNet?

7    **A**    Yes.

8    **Q**    What is RXNet?

9    **A**    RXNet is our own CVS internal intranet.  It's just a

10   way for them to be able to go and access this information.

11   There's a lot of different things that are on there.

12   **Q**    How about sort of clinical resources, clinical

13   information about the drugs a pharmacist may dispense.  Does

14   CVS make that available to pharmacists?

15   **A**    Yup, on RXNet there's a number of different resources

16   that are available to them to be able to obtain that

17   information.  And we've used different standard resources

18   over the years.

19   **Q**    Give me an example of one of the standard resources.

20   **A**    One of the resources that I used was Facts and

21   Comparisons.  I'm trying to think of one of the more recent

22   ones, like Horn and Hansten we used.  There's a couple.

23          This is not -- the clinical resources is not my area

24   of expertise.  I'm struggling a little bit to be able to

25   provide you specific names.  Sorry.

1    **Q**    No, no, no.  Good.

2                MR. DELINSKY:  Judge, it's between 10:10 and

3    10:15.  I'm about to go to a different topic.

4                THE COURT:  We'll go to about 10:30, and a

5    convenient spot around then.

6                MR. DELINSKY:  All right.  Perfect, Judge.

7    **Q**    All right.  Tool number 2 to try to identify these

8    illegitimate prescriptions.

9         Have you heard the word "RxConnect"?

10   **A**    Yes.

11   **Q**    What is RxConnect?

12   **A**    RxConnect is our dispensing system.  It's our computer

13   system that we use to be able to dispense prescriptions.

14   **Q**    Okay.  Has RxConnect always been called RxConnect?

15   **A**    No.  We've had different dispensing systems over the

16   years.  Before RxConnect it was RX2000.

17        There was terminology before that, but I've lost that

18   term.

19   **Q**    So before RxConnect was RX2000.  Before that,

20   something you can't remember?

21   **A**    Yeah.

22   **Q**    Okay.  And when you say system, do you mean computer

23   system?

24   **A**    Yes.

25   **Q**    Okay.  Is it the software on the computer or the

1    hardware, for all I know, that the pharmacists have to work

2    through at the pharmacy counter?

3    **A**    Correct.

4    **Q**    And techs have to work through it too, as well,

5    correct?  Okay.

6        Can a pharmacist fill a prescription at CVS without

7    going through RxConnect?

8    **A**    No, no.  We require -- you can't generate a label and

9    fill a prescription without it.  Even in down time we have

10   backup tools to be able to use RxConnect, so you need to use

11   that in order to be able to safely dispense a prescription

12   to a patient.

13   **Q**    Does RxConnect provide information to the pharmacist?

14   **A**    Lots and lots of information.

15   **Q**    Does RxConnect provide a patient profile to the

16   pharmacist?

17   **A**    Yes.  RxConnect provides a patient profile that's a

18   central profile so our pharmacists can see prescriptions

19   that are filled not only at that CVS, but at the other CVSs

20   as well.  It's called a central profile.  And they can see

21   roughly two years worth of information.  I think sometimes

22   it may go a little bit longer, a little bit less.

23   **Q**    Okay.  Let's break this down.

24       You say that a pharmacist can see two years of

25   information.  What do you mean by information?

1    **A**    So you can see their prescription filling history, so

2    you can see the drugs that were dispensed, the doctors that

3    dispensed it, how they paid for it, the quantity, and that's

4    just on the quick snapshot.  You can look deeper to be able

5    to see the directions on all of those prescriptions, you

6    know, things like that.

7    **Q**    And that, I'll call it the prescription history that

8    RxConnect provides, okay, that prescription history goes

9    drug -- or prescription by prescription by prescription?

10   **A**    Correct.

11   **Q**    And CVS provides it back two years?

12   **A**    Correct.

13   **Q**    So a pharmacist when they go to the patient profile,

14   they can see two years of the patient's past prescriptions?

15   **A**    Correct.

16   **Q**    Okay.  And I think you also said that it doesn't just

17   apply to the one store that the pharmacist is working in?

18   **A**    That's correct.  It applies to all CVSs.

19   **Q**    So if you have a patient who lived in California for

20   the first six months and then New Hampshire for the second

21   six months but lives in Mentor, Ohio, today, you'd get the

22   California, New Hampshire, and the Ohio prescriptions that

23   that patient has filled at CVS?

24   **A**    That is correct.

25   **Q**    Okay.  Does this -- well, have you heard the word "red

1    flags"?

2    **A**    Yes.

3    **Q**    Does this information that can be found in the

4    RxConnect patient profile and prescription history enable a

5    pharmacist to see red flags?

6    **A**    Yes, things like if a patient has been paying with

7    insurance and now they're paying with cash, you can see that

8    very quickly because there's a condor code or code that

9    signifies what type of method that they paid with.  So it's

10   really easy to be able to see a change like that.  You can

11   also see distance.  You can see the patient's address.  And

12   obviously you know where you are.  You can also see the

13   prescriber's address.

14        And so knowing where all three of those things are is

15   helpful in identifying red flags.  And those are just a

16   couple of examples.

17   **Q**    Could you potentially see doctor shopping?

18   **A**    Yeah, because you can see multiple doctors in the

19   profile.

20   **Q**    Could you potentially see overlapping pain

21   prescriptions?

22   **A**    Yeah, because you can see the filling history and you

23   can see the dates on which they were filled and how long

24   those prescriptions should last that patient.

25   **Q**    Could you potentially see potentially dangerous

1    combinations or cocktails?

2    **A**    Again, yes, you can see the prescription filling

3    history, so you can see those readily.

4    **Q**    Okay.  Important question.  For approximately how long

5    has RxConnect or RX2000 provided this two years of

6    prescription history?

7    **A**    The two years of prescription history I think is as

8    long as I've been a pharmacist, but the key was the central

9    profile that you could see filling at other CVSs.  And that

10   happened somewhere between 1999 and 2000, I think, to the

11   best of my recollection, depending on like the rollout and

12   what stores got it.  I think it straddles those two years.

13   **Q**    So the chain-wide two years of prescription history

14   that might allow -- that allows pharmacists to identify red

15   flags goes back 20 years or so?

16   **A**    Mm-hmm, yes.

17   **Q**    Okay.  We've heard a lot of testimony in this case

18   about PMPs.

19   **A**    Mm-hmm.

20   **Q**    What are PMPs?

21   **A**    PMP is the prescription monitoring program.  It's a

22   tool that's provided by the state that takes all of the

23   dispensing information from all of the pharmacies, for

24   controlled substances, and puts it in one place.

25   **Q**    Okay.  And I think you said this is provided by entire

1    states, correct?

2    **A**    Yeah, the individual states run it.

3    **Q**    Do you know what OARRS is?

4    **A**    I do.

5    **Q**    What's OARRS?

6    **A**    OARRS is Ohio's PMP.

7    **Q**    Okay.  Does OARRS or another PMP, is it limited to CVS

8    pharmacies?

9    **A**    No.  You can get Walgreens, Walmart, independents.

10   Everybody's required to send their controlled substance

11   dispensing that is a dispenser in this state.

12   **Q**    So a state PMP like OARRS will provide a prescription

13   history for a patient for all the pharmacies in the state?

14   **A**    Correct.

15   **Q**    Does CVS have access, other than by going through the

16   PMP, does CVS have access to that prescription data from

17   other pharmacies?

18   **A**    No.

19   **Q**    No, okay.

20          So CVS couldn't build its PMP like OARRS because it

21   doesn't have Walgreens' data and Walmart's data and

22   Overholt's data, correct?

23   **A**    Correct, correct.  And even today you can only as a

24   pharmacist access the PMP on a patient basis.  So only if

25   you have a prescription and pursuant to patient care for

1    that particular patient can you access PMP.

2    **Q**    Okay.  So now let's go back to 2000 or so, when CVS

3    put in place this -- the prescription history, made

4    available to its pharmacists the prescription history for a

5    patient, covering all of its stores.

6         Was that sort of a mini CVS PMP?

7    **A**    Yeah, I guess you could call it that, because we could

8    see all of the information from all of the CVSs.

9    **Q**    And was it the best PMP that CVS had the data to

10   build?

11   **A**    Yes.

12   **Q**    Okay.  And did this RxConnect CVS PDMP that was in

13   place, we'll call it 2000, did that come before most state

14   PMPs?

15   **A**    Yes.  I think OARRS started in 2006, so it was prior

16   to that.  And then states like mine in New Hampshire, we

17   didn't have a PMP until much, much later.

18   **Q**    Okay.  All right.  One last set of questions on

19   RxConnect, okay?

20        When a pharmacist processes a prescription through

21   RxConnect, does the pharmacist verify the prescription?

22   **A**    Yes.  That is the last action on a prescription is the

23   verification action, and it's a pharmacist checking to make

24   sure that everything's been entered correctly, there is no

25   drug interactions that need to be resolved, that the

1   medication is what it is.

2        And as part of that certification process, if you

3   will, verification process, each pharmacist has independent

4   credentials that they receive in the morning to be able to

5   verify out that particular prescription, either by a bar

6   code or an alphanumeric code that they use to be able to

7   certify that they've verified it.

8   **Q**    What did it mean to you when you verified a

9   prescription through RxConnect?

10  **A**    It was kind of my legal stamp that the prescription

11  was true and accurate and correct.  And I don't know if it's

12  the right terminology because I don't know if there was any

13  legal requirement for that, but that was kind of my thinking

14  about it.

15  **Q**    Okay.  All right.  Let's move on from RxConnect.

16       Does CVS have a system to validate whether the doctor

17  who signed the prescription that the pharmacist's filling is

18  licensed?

19  **A**    Yes.  We have a system called Prescriber Validation.

20  We use a company called LexisNexis to be able to get

21  information, so that way when a pharmacy is filling a

22  prescription and they've typed in, you know, a doctor's

23  information, that information passes through multiple stage

24  gates to validate a number of different dimensions to make

25  sure that that prescriber is appropriately licensed and

1    certified to be able to dispense that particular medication.

2    **Q**    Okay.  So there's a database, and information about

3    licensing's put into that database by LexisNexis, correct?

4    **A**    Correct.

5    **Q**    Okay.  And that's regularly updated?

6    **A**    Yes.

7    **Q**    Okay.  And that sort of identifies who is licensed?

8    **A**    Correct.

9    **Q**    It identifies --

10              MR. LANIER:  Judge, I'm going to object to him

11   leading through this.

12              THE COURT:  I'll allow some leading, but this

13   is a little too much, Mr. Delinsky, so --

14              MR. DELINSKY:  Understood, Judge.

15   **Q**    Does it also identify what doctors have had a license

16   revoked or suspended?

17   **A**    It does.  It shows if their license is revoked or

18   suspended.  I think it also shows state license information,

19   if that is active or if it's been revoked or suspended.

20        I think there's -- and best of my recollection, I

21   think there's 35-plus validations that occur on a prescriber

22   before it reaches the final -- it can go forward with

23   filling those prescriptions.

24   **Q**    Okay.  Now, let's -- can you explain for us from a

25   pharmacist's perspective sitting in the pharmacy how this

1   works?  What does this program mean to them?

2   **A**     Yeah.  So when you're typing a prescription, if a

3   prescriber hits on one of these parameters and we can't

4   proceed with filling the prescription, the pharmacist gets

5   like a pop-up reject message, and the system doesn't allow

6   them to continue the filling of that particular

7   prescription.

8   **Q**     Okay.  So parameters, what do you mean by parameters?

9   **A**     You know, once it hits any of these license checks.

10  **Q**     Okay.  So sitting in a pharmacy in CVS pharmacy, let's

11  call it 2015, and let's suppose a pharmacist has had the

12  week before, two weeks before, a license suspended by DEA.

13          Pharmacist gets a prescription from that doctor --

14                  THE COURT:  You mean the doctor's license was

15  suspended?

16                  MR. DELINSKY:  Oh, my God, Judge, yes.  Yes.

17                  THE COURT:  Okay.  Thank you.

18                  MR. DELINSKY:  Yes.

19  **Q**     So the doctor has had his license or registration

20  suspended by DEA two weeks before.

21  **A**     Mm-hmm.

22  **Q**     Patient brings in a prescription from that doctor.

23  The pharmacist -- or the tech puts in the information about

24  the doctor.

25          What then happens in the system?

**Harrington - (Direct by Delinsky)** 5685

1    **A**    There's a block that comes up, and so the pharmacist

2    would have that information that the DEA registration is no

3    longer active.  I'm not clear as to whether or not it gives

4    details on the reasons why, but it would just explain that

5    the DEA is no longer active, and the pharmacist couldn't

6    continue on with the fulfillment of that prescription.

7    **Q**    Okay.  And can the pharmacist fill that prescription?

8    **A**    No.  The system won't allow it.

9    **Q**    Can the pharmacist even print a label?

10   **A**    No.

11   **Q**    The system blocks it?

12   **A**    Yes.

13   **Q**    Okay.  Now --

14                MR. LANIER:  Your Honor, I hate to interrupt,

15   but for clarity's sake, could we get a year for this?

16                MR. DELINSKY:  I'm doing that right now, Mark.

17                THE COURT:  I think Mr. Delinsky said 2015.  I

18   heard it in the question.

19                MR. DELINSKY:  Well, that was one

20   hypothetical, but we're going to that right now.  Mr. Lanier

21   raises a great point.

22                THE COURT:  All right.

23   **Q**    I have in my -- well, you'll all object -- but to the

24   best of your recollection, when did the company begin to

25   roll out this validation system?

1    **A**    To the best of my recollection -- I really am not sure

2    of the year.  I want to say -- I'm really not sure.  It's

3    changed over time, and they've made enhancements.  We went

4    from HMS to LexisNexis.

5    **Q**    2012-ish for the start?

6    **A**    I think it was even before that.

7    **Q**    Okay.

8    **A**    My recollection is maybe 2011.

9    **Q**    Okay.

10   **A**    But I am not a hundred percent sure on that date.

11   **Q**    Was it in place by -- in its first incarnation in

12   2013?

13   **A**    To the best of my knowledge, yes.

14   **Q**    Okay.  And you raise a really good point.  You talked

15   about all the different checks it does today.  Wouldn't it

16   be accurate to say that that system evolved over time?

17   **A**    It did.

18   **Q**    So more and more checks were added to it than were

19   included in, say, 2012?

20   **A**    Correct.

21   **Q**    Okay.  But even back at its inception, let's call it

22   2012, it still worked the same way; am I right about that,

23   that there would be a block at the pharmacy level?

24   **A**    Correct.

25   **Q**    Okay.

1           MR. DELINSKY:  Your Honor, it's 10:30.

2           THE COURT:  This would be a good time?  Okay.

3    Thank you, Mr. Delinsky.

4        All right, ladies and gentlemen, we will take our

5    usual mid morning break.  Usual admonitions apply.  And then

6    we'll pick up with more of this witness's testimony.

7               (Recess taken at 10:30 a.m.)

8               (Jury present in open court at 10:50 a.m.)

9           THE COURT:  Please be seated.

10       Ms. Harrington, you're still under oath.

11       And you may continue, Mr. Delinsky.

12   BY MR. DELINSKY:

13   **Q**    Ms. Harrington, we're still walking through the tools

14   that CVS has put in place to try to identify prescriptions

15   not written for real medical reasons, okay?

16   **A**    Okay.

17   **Q**    Does CVS have a program to monitor doctors and other

18   prescribers?

19   **A**    Yes.  We call it our Prescriber Monitoring and

20   Intervention program.

21   **Q**    Okay.  And when did CVS implement this program?

22   **A**    In 2012.

23   **Q**    Is this one of the programs that falls within your

24   group?

25   **A**    It is.

**Harrington - (Direct by Delinsky)**

1  **Q**    Am I right, this program's been in place approximately

2  nine years now?

3  **A**    Yes.

4  **Q**    Was this prescriber monitoring program, doctor

5  monitoring program, was this one of the programs that CVS

6  put in place in the wake of the *Holiday* case in Florida?

7  **A**    Yes, it was.

8  **Q**    Can you explain to the jury how it works?

9  **A**    Yes.  So we take our dispensing data at CVS, and we

10  run an algorithm, which is just a fancy way of saying a

11  bunch of mathematical equations, on that data.

12      We look back in the most previous six months, and we

13  use that data to be able to detect outlier patterns of

14  behavior associated with the prescriptions for those

15  prescribers.

16      We look at them in certain geographies and we look at

17  them by specialty, and we can see doctors that are outpacing

18  their peers in certain areas.

19  **Q**    Is it just one algorithm or is it multiple different

20  algorithms, or don't you know?

21  **A**    It's multiple algorithms for different drug groups.

22  For each drug group there's an algorithm.  You can call it

23  multiple algorithms though, I guess, based on specialty.

24  But as we continue to innovate, we're adding more and more

25  algorithms on to that methodology.

1   **Q**    And how often does CVS run prescribers through this

2   algorithm process?

3   **A**    Through the algorithm process that we developed in

4   2012, we would run it quarterly on the prior six months

5   worth of data.  But as we continue to innovate, just

6   recently within this past year we're testing a new

7   methodology in which we would be running monthly, and it

8   would be based on the three months prior of data.

9         So like Mr. Delinsky had talked about before, that we

10   continue to try to innovate and get better and do different

11   things with the information that we have.

12   **Q**    So let's put aside the most recent potential change,

13   quarterly.  So CVS is running prescribers through the data

14   four times a year?

15   **A**    Correct.

16   **Q**    So how does CVS decide or does CVS decide that

17   particular prescribers should be run through the data, or

18   does it run everyone through the data -- or through the

19   algorithms?

20   **A**    Yeah, it runs everyone through the data that has

21   controlled substance dispensing.  We do have prescribers

22   within our database that don't have any controlled substance

23   dispensing, but if they are positive for that, then they get

24   run through the database.

25   **Q**    So every doctor who has written a controlled substance

1    prescription that was filled in the last six months is run

2    through these algorithms four times a year?

3    **A**    Correct.

4    **Q**    Okay.  What happens then?  You go through the

5    algorithms, and I think you used the word outlier, an

6    outlier doctor is identified.

7         What happens?

8    **A**    So from there, my team will investigate that doctor to

9    the best of their ability using some of the resources that

10   we have.  So they will look on a Board of Medicine website

11   to see if there's been any sanctions against that particular

12   provider.

13        They might Google Map their office location to be able

14   to see where their office is, what the exterior of that

15   office building looks like.  They'll look to see if they can

16   find any board certifications that might explain some of the

17   information that we're seeing.

18        They might look at -- there's lots of different places

19   that people can review providers.  Healthgrades and Vitals,

20   people can leave comments about prescribers.  We'll look at

21   those, although you have to take those with a grain of salt.

22        So we do as much investigation as we can to try to

23   resolve our concerns potentially by finding more out about

24   that particular prescriber.

25   **Q**    Is that part of that process with your -- the people

1    who are looking at the prescriber to dig deeper into the

2    data, too, and to try to see -- understand the data better?

3    **A**    Yeah, we might look at the granular data.  So the

4    algorithm is kind of aggregating and putting everything

5    together, and sometimes in the law of averages you miss,

6    like the important things.  So we look at like the

7    individual prescription information to make sure that there

8    isn't anything that we should know more about that doctor

9    before we make a decision on how to move forward with them.

10   **Q**    And then after this sort of, you know, review stage

11   occurs, what happens next?

12   **A**    So if we haven't been able to resolve our concerns,

13   then we would reach out to that prescriber and request a

14   telephone interview with him to be able to ask additional

15   questions.

16        There are times though that we do resolve our concerns

17   through our investigation.  And just one example to be able

18   to illustrate that to you, is we have a dentist that had

19   popped on the algorithm, and then when we did our

20   investigation, we understood that he was an oral

21   maxillofacial surgeon, so he was doing reconstruction on

22   people's faces.  And when he was being compared to other

23   dentists that are more likely to be just cleaning teeth and

24   things like that, obviously he was flagging as an outlier.

25   But understanding more about his specialty gave us cold

1    comfort that he was practicing in a normal practice.

2    **Q**    What happens if a doctor says no, CVS, I'm not going

3    to interview with you?

4    **A**    We stop filling their controlled substances because we

5    can't resolve our concerns.

6    **Q**    What happens if CVS conducts an interview of the

7    doctor and still can't resolve its concerns?

8    **A**    We would stop filling prescriptions for those -- for

9    that prescriber.

10    **Q**    What do you call it when the company stops filling

11    prescriptions for a prescriber?

12    **A**    We call it suspending the doctor, but we don't have

13    any outside authority over the doctor.  It's just that we

14    stop filling those prescriptions.

15    **Q**    Okay.  And do you stop filling all prescriptions or

16    only controlled substance prescriptions?

17    **A**    We stop filling controlled substance prescriptions.

18    **Q**    Okay.  As we sit here today, approximately how many

19    doctors or other prescribers has CVS suspended from its

20    pharmacies since 2012?

21    **A**    About 850.

22    **Q**    Now, I want to ask you a question on the flip side of

23    that.

24          Is it a high or small percentage of the doctors that

25    the company suspends once they pop on the algorithm?

1    **A**    It's a small percentage.

2    **Q**    Why is it a small percentage?

3    **A**    Because we're looking for outlier behavior.

4    **Q**    No, I'm sorry, my question was bad.  My question was

5    bad, Nicci.

6          Once a prescriber flags --

7    **A**    Yeah.

8    **Q**    -- so the algorithm says, okay, we have a potential

9    outlier here, does CVS suspend nearly all of those or a

10   smaller slice of those doctors?

11   **A**    Most of the doctors were able to resolve our concerns

12   when we get on the phone with them to talk to them.  Most

13   have a reasonable explanation for what we're seeing within

14   the data, or they might have very, very strict policies and

15   procedures in place around actions that they take to be able

16   to protect their patients.

17         They'll do urine toxicology on a regular basis,

18   they'll do pill counts, they do various things to be able to

19   make sure that the prescriptions that they're writing are

20   being used appropriately.  So those are some of the things

21   that we look for.

22   **Q**    So a really small percentage ultimately are suspended?

23   **A**    Mm-hmm, yes.

24   **Q**    Are there other ways that a doctor can flow into the

25   review program?

1    **A**    Yeah.  So one of the other primary ways is that our

2    pharmacists can raise a prescriber that they have a concern

3    about.  So they see prescriptions day to day in the store,

4    so they may see things differently from how I can see things

5    just from the data.  So we have a method that they can

6    submit a doctor's name and then we review a doctor, and we

7    go kind of through that same process of doing all of that

8    Google research, if you will, and then deciding whether or

9    not we're going to interview those particular providers.

10         We also get information from some of our other

11   programs.  So this is in our Prescriber program, but if

12   we're taking an action in a store because of our Store

13   program and the store says, oh, well, there's a prescriber

14   that I'm concerned about, that information would then come

15   over to the Prescriber team for them to then investigate.

16         Or with some of the other inventory-type activities

17   that we do, if they are on the phone with the call centers,

18   they're calling about an ordering limit and they say, well,

19   we're seeing a lot of new prescriptions from doctor

20   so-and-so, that information again will flow back to this

21   program.

22         So the programs talk to each other to make sure that

23   we're capturing the information and the right hand knows

24   what the left hand is doing.

25   **Q**    When a doctor pops as an outlier on the algorithm or

1    is escalated from a pharmacist, is that a doctor that

2    continues to be licensed, registered by DEA and her or his

3    state?

4    **A**    To the best of my knowledge, yes.

5    **Q**    And am I right, that many of the doctors if not most

6    of the doctors that CVS is suspending through these programs

7    are still licensed?

8    **A**    Most are.

9    **Q**    Let's talk practically speaking how it works from the

10   perspective of a pharmacist.

11        CVS suspends, you know, Dr. Smith.  Dr. Smith writes a

12   controlled substance prescription.  It's presented to a

13   pharmacist in Willoughby, Ohio.

14        What happens?

15   **A**    Yeah.  So this is very similar to that Prescriber

16   Validation that I talked about earlier.  The technician will

17   be typing in the prescription.  A block will come up and say

18   CVS is no longer filling controlled substances for this

19   particular provider.  There's a couple of talking notes to

20   be able to return the prescription to the patient.

21        But they can't proceed with filling those

22   prescriptions.  The block prohibits them from doing that.

23   **Q**    Will RxConnect even allow them to print a label?

24   **A**    No.

25   **Q**    Important question.  What does it mean if CVS decides

1    not to suspend a doctor after the doctor has gone through

2    the process?

3    **A**      The thing that's important when we don't suspend a

4    doctor is that that is in no way to be interpreted as us

5    blessing the doctor.  I think that's probably bad language

6    to use, but blessing the doctor.  And we make it very clear

7    to our store teams that they need to continue to exercise

8    corresponding responsibility on each individual

9    prescription.

10         Sometimes there's just not enough information for us

11   to be able to move forward with taking an action at the

12   corporate level, but that doesn't mean that our store team

13   still can't decide if they are not comfortable filling

14   prescriptions for that provider.  They can continue to do

15   that.

16   **Q**      When CVS decides not to suspend a doctor, is it

17   communicating to CVS's pharmacists that they now should fill

18   all of that doctor's controlled substance prescriptions?

19   **A**      No.

20   **Q**      Is it difficult and hard to decide what doctors to

21   suspend and what not to suspend?

22   **A**      Yes.  We typically have healthy debate over it.

23   **Q**      Okay.  What makes it -- so I said is it -- I lost

24   track of my question.

25         It's hard?

1    **A**      It's very hard.

2    **Q**      What makes it hard?

3    **A**      The decision is often not clear.  And we're making

4    decisions that could impact patients that have a legitimate

5    need for those prescriptions.  So it's a -- I as a

6    pharmacist take that decision very, very seriously because I

7    don't want patients that need medication, and it's

8    legitimate, to be cut off from not being able to get their

9    medication at their local pharmacy with their pharmacist

10   that they trust.

11       So I take that obligation very, very seriously when

12   I'm making that decision.  There are some cases where it's

13   clear that the decision should be made that we suspend a

14   particular provider, but in many instances it's not clear.

15       And so it becomes a challenging discussion, and

16   there's a few of us that make that final decision when we're

17   going to suspend a provider.

18   **Q**      Has CVS ever been found to be too aggressive in

19   suspending a doctor?

20   **A**      Yes.

21   **Q**      When did that happen?

22   **A**      Just recently.

23   **Q**      And tell us what happened.

24              MR. WEINBERGER:  Objection, Your Honor.

25              THE COURT:  Overruled.

1    **A**    So we suspended a doctor.  His volume had increased

2    dramatically, and there were various red flags associated

3    with the prescribing that we were seeing.  We suspended him,

4    and he put in to have a temporary restraining order, and it

5    was granted by the judge.  And the judge instructed us to --

6                    MR. WEINBERGER:  Objection, Your Honor.

7                    THE COURT:  Well --

8                    MR. WEINBERGER:  Hearsay.

9                    THE COURT:  Well, if there was a court order,

10   you can describe what you were directed to do.

11                   THE WITNESS:  Okay.

12   **A**    In the court order, the temporary restraining order

13   instructed us to lift the block and fill prescriptions,

14   controlled substance prescriptions, for the provider.

15   **Q**    Ms. Harrington, I'm showing you what's been marked as

16   CVS-MDL-04954.

17        Is this the order entered in the case that you just

18   discussed?

19   **A**    It is.

20   **Q**    We'll come back to that in a sec.

21        Did this case concern a Dr. Hansen?

22   **A**    It did.

23   **Q**    And where was Dr. Hansen licensed?

24   **A**    He was licensed in Kentucky and Ohio.

25   **Q**    What was Dr. Hansen's specialty?

**Harrington - (Direct by Delinsky)**

 1   **A**     I don't recall off the top of my head if he was

 2   general medicine or if he was pain medicine.  I can't

 3   recall.

 4   **Q**     Okay.  Dr. Hansen, I just want to make sure I have the

 5   chronology right, he filed a lawsuit against CVS?

 6   **A**     He did.

 7   **Q**     And let's go back to Exhibit 04954.  This is the order

 8   in this case.

 9        The lawsuit -- was the lawsuit filed in Kentucky, to

10   the best of your knowledge?

11   **A**     Yes.

12   **Q**     And was it filed in Federal Court like this one?

13              MR. LANIER:  Judge, I'm going to object to

14   leading through this.

15              THE COURT:  Well, sustained.

16        You can ask the witness if she knows what this case

17   was about.

18   **Q**     What kind of court was this case filed in?

19   **A**     It was filed in the United States District Court in

20   the Eastern District of Kentucky.

21   **Q**     Okay.  And I just want to focus on one part of this.

22   I'd like you to focus on paragraph 2 on page 2.  Okay?

23        And it says, "Plaintiffs are likely to succeed" --

24   "plaintiffs" is the doctors, right?

25   **A**     Yes.

1    **Q**     -- "on the merits of their claims that defendant" --

2    that's CVS, right?

3    **A**     Correct.

4    **Q**     -- "has interfered with plaintiffs' relationships with

5    their patients by refusing to fill prescriptions written by

6    plaintiffs, and defendant has done so without evidence that

7    plaintiffs have violated any law or professional protocol

8    related to such prescriptions."

9          Do you see that language?

10   **A**     Yes.

11   **Q**     Okay.  And do you recall seeing that from the order?

12   **A**     Yes.

13   **Q**     And by the way, this order just came out this past

14   August, right?

15   **A**     Correct.

16   **Q**     What are the difficulties CVS must face in

17   determining, like law enforcement does, in collecting

18   evidence that there's actual criminality or illegality?

19                   MR. WEINBERGER:  Objection, Your Honor.

20                   THE COURT:  Sustained.

21   **Q**     Does CVS face impediments when it reviews and

22   investigates doctors?

23                   MR. WEINBERGER:  Objection.

24                   THE COURT:  Let's go on the headphones a

25   minute.

1              (At side bar at 11:10 a.m.)

2              THE COURT:  All right.  Mr. Delinsky, are you

3    asking her if she and her unit faces impediments?

4              MR. DELINSKY:  Yes.

5              THE COURT:  Well, then let's be specific.  She

6    can describe the process she goes through, she and her unit,

7    if she's done it.

8              MR. DELINSKY:  All right.

9              THE COURT:  But not lead her.  I mean, you

10   know, find out, you know, what she does and what she's able

11   to do and what she's not, and if someone prevents her from

12   getting anything, any information, she can relate that.

13             MR. DELINSKY:  Okay.  Thank you, Your Honor.

14             (In open court at 11:10 a.m.)

15   BY MR. DELINSKY:

16   **Q**    Ms. Harrington, in your group when you and your

17   colleagues are reviewing doctors, are there any limits on

18   the tools at your disposal?

19   **A**    We use the Google review that we do and we rely on a

20   prescriber telling us an accurate picture of what they do on

21   the telephone.  But we don't have the ability to go

22   undercover and pose as a patient to be able to understand

23   more about that prescriber's practice.

24   **Q**    Can you issue subpoenas like law enforcement can?

25   **A**    No.

**Harrington - (Direct by Delinsky)**

1    **Q**    Okay.  Can you conduct surveillance like law

2    enforcement can?

3    **A**    No.

4    **Q**    Is it difficult to develop evidence that a particular

5    doctor has in fact violated the law?

6    **A**    It is.  Oftentimes we're just looking for

7    inconsistencies within the data and what they're verbally

8    telling us as a means to get to a concern that the

9    prescriber might not be being truthful with us.

10   **Q**    Okay.  And I'd just like to go through the rest of

11   this order.  And I'd like to point out the very bottom.

12        It says, "It is ordered that defendant CVS Pharmacy,

13   Inc., its officers, agents, servants, employees, attorneys,

14   and other persons who are in active concert or participation

15   with it, be and are hereby enjoined from refusing to fill

16   prescriptions written by Kendall E. Hansen for any

17   pharmaceutical product."

18        Do you see that language?

19   **A**    I do.

20   **Q**    And is your understanding of the impact of the order

21   consistent with that language?

22   **A**    Yes.

23   **Q**    Was CVS prohibited from -- by this court -- not this

24   Court, by this court, from refusing to fill any prescription

25   written by Dr. Hansen?

**Harrington - (Direct by Delinsky)**

1    **A**    Yes.

2    **Q**    Let's go back to the program itself.

3         Did CVS ever -- I'm sorry, did DEA ever instruct you

4    to create a prescriber suspension program?

5    **A**    No.

6    **Q**    Did any state Board of Pharmacy ever instruct you --

7    instruct CVS to create this program?

8    **A**    No.

9    **Q**    Did DEA or any state even suggest that CVS might

10   create such a program?

11   **A**    Not to my knowledge.

12   **Q**    Was this program available to provide by a software

13   company or something on the open market?

14   **A**    No, you couldn't just go buy it from a vendor.

15   **Q**    Did CVS have to create this program from scratch?

16   **A**    Yes.  We employed a company, AGI, to be able to assist

17   us and partner to be able to create this innovation.

18   **Q**    Okay.  To the best of your knowledge, at the time CVS

19   implemented this program in 2012, did any other pharmacy

20   have it?

21   **A**    Not to my knowledge.

22   **Q**    Okay.  Let's just take a step back.  And we have the

23   validation program and the suspension program, correct?

24   **A**    Correct.

25   **Q**    Okay.  Am I right that both are literally blocking

**Harrington - (Direct by Delinsky)**

1     prescriptions from being filled at the pharmacy level?

2   **A**     That is correct.

3   **Q**     Okay.  And do the pharmacists have any role to play

4     whatsoever with those prescriptions, given they are blocked?

5   **A**     No.

6   **Q**     Is it completely taken out of their hands?

7   **A**     Correct.

8   **Q**     Okay.  Do these programs, these two programs working

9     together, Prescriber Validation and Prescriber Suspension,

10    essentially take these problematic prescriptions off the

11    pharmacist's plate?

12  **A**     That is correct.

13  **Q**     Just takes it away, they can't be filled?

14  **A**     Correct.

15  **Q**     Let's keep going.

16        Does CVS provide realtime alerts to its pharmacists?

17  **A**     We have a number of different alerts that we employ

18    for our pharmacists.

19  **Q**     Okay.  And when these alerts -- when an alert is

20    triggered, do they appear in RxConnect?

21  **A**     Yes.

22  **Q**     Okay.  Does CVS have an early fill alert?

23  **A**     We do.  It prompts so that way a patient can't fill a

24    prescription more than two days early from the date that it

25    was picked up through the register system.

```
 1              MR. LANIER:  Can you give us a time frame,

 2    please?

 3              MR. DELINSKY:  Great question.

 4    Q    When was the early fill alert put in place?

 5    A    It was put in place in 2014, to the best of my

 6    recollection.

 7    Q    Okay.  So when that alert triggers, a patient's coming

 8    to the pharmacy more than a couple days early to fill a

 9    prescription, is that a block or does the system give the

10    pharmacist discretion?

11    A    It gives the pharmacist discretion, because there are

12    instances in which people -- you might want to go on

13    vacation, so you might need your prescription early.  But

14    what we ask the pharmacist to do is to call the doctor to

15    validate that it is a consensual decision to allow that

16    patient to get that prescription earlier in that

17    circumstance.

18    Q    Does CVS display DUR alerts through RxConnect?

19    A    Yes, there's a number of different DUR alerts that

20    pop; drug-drug interaction, so if two medications taken

21    together can cause an interaction, drug dosing, and things

22    like that.

23    Q    Do those DUR alerts pop on prescription opioid pain

24    medications?

25    A    Yes, depending on the medications that are being
```

**Harrington - (Direct by Delinsky)**

1    filled, potentially.

2  **Q**    Okay.  And I think we all know this by now.

3         What is DUR?  What does it stand for?

4  **A**    Drug utilization review.

5  **Q**    Okay.  And am I understanding you correctly that that

6  may give pharmacists information that this is a high dose or

7  there's a potentially dangerous interaction?

8  **A**    Yes.

9  **Q**    How long have DUR alerts been in place at CVS, as best

10  as you can remember?

11  **A**    To the best of my recollection, I feel like they've

12  always been in place.

13  **Q**    Okay.  And where does -- who prepares the science

14  behind these alerts?

15  **A**    We use a company called FDB.

16  **Q**    What is FDB?

17  **A**    First Databank.

18  **Q**    And they're making the judgments about what --

19  sorry -- about when an alert should pop or not pop, right?

20  **A**    They're defining the -- those alerts, what those

21  alerts are.  There's two different companies that do that.

22  FDB is one of them.

23  **Q**    Does CVS separately have something called an Opioid

24  Risk Module that provides alerts?

25  **A**    Yes.  So the Opioid Risk Module is something that we

1    worked with FDB to create that has specific alerts around

2    combinations of medications that were more enhanced,

3    providing more direction to the pharmacists on actions to

4    take.  And it also shows the cumulative MME for a patient.

5    So not just the MME for that particular drug, but the MME

6    across that patient's therapy at CVS.

7                    MR. LANIER:  Can we get --

8                    MR. DELINSKY:  I got it.  Next question, Mark.

9    **Q**    And when did the Opioid Risk Module come into place?

10   **A**    Oh, goodness.

11   **Q**    Ballpark.  I'm thinking 2018, 2019?

12   **A**    Yeah, I believe to the best of my recollection 2018.

13   **Q**    Okay.  Got it.  All right.

14        Does the system provide alerts to pharmacists for

15   potential forgeries?

16   **A**    Yes.

17   **Q**    Okay.  Could you explain how that works?

18   **A**    We have a couple of different alerts that are used for

19   forgeries.  We have patient-level alerts, so that way if we

20   identify a particular individual has passed a forged

21   prescription at CVS, or attempted to pass a forged

22   prescription, we enter a note that indicates that for the

23   pharmacist.  So that way, if that patient tries to pass an

24   additional forged prescription, that note will come up.

25        And then we also have a prescriber alert, so that way

1  if a prescriber has been the victim of forgeries, so if

2  their prescription pad was stolen out of their offers, and

3  we understand that, we can put an alert in for that

4  prescriber.  So that way, again, when a pharmacy is filling

5  prescriptions, it will pop up, it will let them know.

6       And this is one that they can bypass.  In that comment

7  we ask them to call the doctor to verify a controlled

8  substance before filling it in those particular

9  circumstances.

10      And then we also have realtime alerts on some of the

11  algorithms that we've built to identify forgeries because of

12  changes in prescribing patterns.

13  **Q**    Okay.  Let's stop there.

14      CVS has built algorithms to try to detect forgeries?

15  **A**    Yeah.  So like by way of example, if a prescriber has

16  never written prescriptions for oxycodone 30 milligrams

17  before, in the past year, and then all of a sudden we see

18  new prescriptions being dispensed for that particular

19  provider, say if we have five prescriptions in the next

20  month, it will flag on the algorithm.

21      On the back end, our call center will help by calling

22  the doctor to validate if that truly is a forgery.  If it is

23  confirmed as a forgery, we then put all those alerts in

24  place to be able to protect the patient prescriber.

25  **Q**    When did this asking them --

1                   MR. DELINSKY:  I'm asking now, Mark.  Sorry.

2    **Q**     When did this forgery, when did you begin to unroll

3    and implement the forgery program?

4    **A**     And again, this has been an evolution in these

5    different parameters.  I think the prescriber alert was

6    first.  And to the best of my recollection, '17, '16,

7    somewhere in there, we had to build the patient-level alert,

8    so that came shortly after that.  And then the realtime

9    alerts based on the analytics for certain subsets of our

10   algorithm I believe was 2020.

11   **Q**     Okay.  So this is one of those programs that was put

12   in place pretty recently, and the company's continued to try

13   to improve and evolve them?

14   **A**     Correct.

15   **Q**     Okay.  Again, was this a program that you could buy

16   from a tech vendor or something?

17   **A**     No.  We continue to innovate to be able to identify

18   different ways that we can get to forgeries.

19   **Q**     Okay.  All right.  Let's move on from alerts.

20          What's NarxCare?

21   **A**     NarxCare is a branded product from Appriss that helps

22   create visuals associated with the prescription monitoring

23   program.

24   **Q**     Does CVS have NarxCare in Ohio?

25   **A**     Yes.

1    **Q**    Okay.  I think you just said this.

2         Does NarxCare work in the OARRS data?

3    **A**    It does.  It uses OARRS data to be able to create the

4    visuals that they use.

5    **Q**    Okay.  In order to have this program and these

6    visuals, did the State of Ohio have to approve NarxCare?

7    **A**    They approved the relationship with Appriss, whether

8    it's through Gateway or NarxCare, yes.

9    **Q**    Okay.  Could CVS implement NarxCare in Ohio without

10   State of Ohio's approval of the program?

11   **A**    No, no.  And just for reference, like Appriss and

12   NarxCare or Gateway isn't necessarily available in every

13   state across the country.  There's another vendor.  And some

14   states even today don't allow integration.

15   **Q**    Okay.  And why does it have to be approved by the

16   State of Ohio?

17   **A**    Because they need access to the PMP information.  And

18   depending on the regulations within that state, I don't know

19   what's permissible or necessarily why those relationships

20   need to happen.

21   **Q**    NarxCare is running off the OARRS data?

22   **A**    Correct.

23   **Q**    Not just CVS data?

24   **A**    Correct.

25   **Q**    Yeah, okay.

1          MR. LANIER:  Do we have a date?

2          MR. DELINSKY:  I'm getting there.

3     **Q**     When did Ohio, to the best of your memory, approve

4     NarxCare for use in Ohio?

5     **A**     I'm not sure of the exact date on NarxCare.  I believe

6     that there were discussions with Appriss on Gateway earlier.

7     **Q**     Let's just focus on NarxCare if you can.

8     **A**     Yeah, NarxCare, I'm not sure of when Ohio approved it.

9     I know when we implemented it.

10    **Q**     When did we implement it -- when did CVS implement it?

11    **A**     We implemented it in 2018.

12    **Q**     To the best of your understanding, was CVS one of the

13    first pharmacies in the state of Ohio to implement it?

14    **A**     It was one of the first, I believe, in the integrated

15    fashion.

16    **Q**     Okay.  Did the State of Ohio approve NarxCare long

17    before 2018, shortly before, or do you have no idea?

18    **A**     I don't know the date for the NarxCare portion.

19    **Q**     Okay.  Now, let's talk about how, like, what NarxCare

20    does.

21         Does it produce a score?

22    **A**     It does.  It gives a risk score, actually three risk

23    scores.  A narcotic risk score, a sedative risk score, and a

24    stimulant risk score.

25         Through the process by which we built integration --

1    and I'm going to explain integration.  I hope you don't

2    mind, Mr. Delinsky -- but integration actually takes some of

3    the work out of accessing the PMP.  So when a pharmacist is

4    typing in the prescription, we do a first call out to the

5    PMP with the patient-related information.

6         So what it does is it pulls the report, and it sits it

7    in the background, so that way when the pharmacist is in the

8    verification screen, it's really quick to be able to access

9    the information.

10        But what it also does is it pulls in those risk

11   scores, so that way our pharmacists can see it on the

12   verification screen.  So when you're verifying, you have

13   your cumulative MME and your three risk scores when you're

14   doing a prescription in Ohio.

15   **Q**    The risk scores, are those generated from CVS data or

16   all the OARRS data?

17   **A**    From the OARRS data.

18   **Q**    Okay.  And am I hearing you right that these risk

19   scores that are generated from all the OARRS data starting

20   in 2018 appear for every controlled substance prescription

21   on CVS's screen?

22   **A**    That is correct.

23   **Q**    Okay.  I'm showing you what has been marked as

24   CVS-MDL-1727.

25        Ms. Harrington, do you recognize this document?

1    **A**    This is an example of a job aid that we had talked

2    about earlier.  It's a visualization to be able to help our

3    pharmacists understand NarxCare.

4    **Q**    Okay.  And I'd like to go down to the risk score --

5    the section on the risk score range report.

6         Do you see that?

7    **A**    I see that.

8    **Q**    Okay.  So it looks like it's broken into three

9    categories.  Less than 300, is that a score?

10   **A**    That's a score.

11   **Q**    That NarxCare generates?

12   **A**    Correct.

13   **Q**    From the OARRS data?

14   **A**    Correct.

15   **Q**    And if it's less than 300, what does that mean?

16   **A**    It means to be confident.  They should feel confident

17   with filling that prescription.

18   **Q**    And is CVS affixing "be confident" to that, or does

19   that come from NarxCare itself?

20   **A**    That was Appriss's language.

21   **Q**    And Appriss is the company that made NarxCare,

22   correct?

23   **A**    Correct.

24   **Q**    Okay.  300 to 500, what does that score mean under

25   this system?

**Harrington - (Direct by Delinsky)**

1    **A**    Be curious.

2    **Q**    Okay.  Greater than 500, what does that mean?

3    **A**    Be cautious.

4    **Q**    Okay.  And it's these kinds of scores that are now

5    appearing in the CVS computer systems for the use of the

6    pharmacists?

7    **A**    Yes.

8    **Q**    Okay.  Ms. Harrington, I'm now showing you -- I just

9    need a sticky.  Bear with me for a moment.

10           I'm now showing you CVS-MDL-1728.

11           Do you see this?

12   **A**    Yes.

13   **Q**    Do you recognize this document?

14   **A**    Yes.

15   **Q**    Did this document -- did CVS send this document out to

16   its pharmacies to accompany the job aid we just looked at in

17   1727?

18   **A**    Yes, to the best of my knowledge.

19   **Q**    Okay.  I'd like you to go down to the middle of the

20   page, okay?

21           See where it says "score less than 200"?

22   **A**    Yes.

23   **Q**    Is that -- what was the language that was used in the

24   document?  Is it --

25   **A**    Be confident.

1    **Q**    Be confident.

2         So this is be confident.

3         Score above 500, what's that?

4    **A**    Be cautious.

5    **Q**    That's be cautious.

6         And by the way, I think we can see up top here, you

7    see how the maximum score is 999?  Do I have that right?

8    **A**    That is correct.

9    **Q**    So am I right that zero would be the safest.  999 is

10   you've got to be the most cautious?

11   **A**    Correct.

12   **Q**    Okay.  And then there's one, a score above 650.

13   That's also be cautious, right?

14   **A**    Correct.

15   **Q**    A little higher than 500, but nowhere near still

16   9-9-9-9 [sic], right?

17   **A**    Correct.

18   **Q**    Okay.  What I want to do -- and by the way, did CVS

19   prepare this document even though it sent it to its

20   pharmacists?

21   **A**    This came directly from Appriss.

22   **Q**    Okay.  And here it says, "You can see in typical

23   statewide population of patients" -- let's highlight this --

24   "the distribution of Narx scores" -- that's the scores we're

25   talking about, right?

1    **A**    Correct.

2    **Q**    -- "on any given day is such that" -- and let's peel

3    the percentages off -- "Appriss has determined" -- Appriss,

4    who runs this program -- "that 75 percent of the time the

5    NarxCare scores indicate be confident," right?

6    **A**    Correct.

7    **Q**    5 percent of the time the NarxCare scores indicated be

8    cautious?

9    **A**    Correct.

10   **Q**    Okay.  Now, that's only 80 percent.  The middle 20

11   percent is some combination of be confident and be curious?

12              MR. LANIER:  Judge, does he lead through --

13   objection.  Leading.

14              THE COURT:  I'm going to sustain this.

15   BY MR. DELINSKY:

16   **Q**    Okay.  Now, Ms. Harrington, I want to highlight one

17   other part of this program, and I want to ask you to explain

18   it if you can.

19        "NarxCare score" -- "Narx scores that raise concern

20   should trigger a discussion, not a decision."

21        Do you know what that means?

22   **A**    Yes.  This is -- it was one of our primary concerns

23   with the product, is that we would have pharmacists making a

24   knee-jerk reaction to a score and feeling like a score was

25   an absolute decision of whether to fill or not to fill.  And

1    we want our pharmacists to be actively thinking about the

2    prescription and the patient and the prescriber and making

3    sure that they're properly assessing it, rather than just

4    saying if they were above a certain number, that means that

5    that patient might not be able to get it.

6        Because when you think about some of the things that

7    go into creating a score, the number of prescribers, the

8    number of pharmacies, and the number of MMEs, you could have

9    a cancer patient that's seeing multiple providers for

10   appropriate care, and maybe they're going to the Cleveland

11   Clinic to be able to get specialty care there, and seeing

12   pharmacies there as well as in their hometown.  And you

13   wouldn't want a cancer patient just to be told no, they

14   wouldn't be able to fill their prescriptions, because it had

15   eclipsed a certain score.

16       We want our pharmacists to be using the knowledge that

17   they have from their years in pharmacy school and their

18   experience to be able to make an appropriate clinical

19   decision.

20   **Q**    Do you read this to say that 5 percent of the

21   prescriptions should be refused?

22   **A**    No.  5 percent -- above 5 percent is an area that

23   pharmacists should be cautious and make sure that they're

24   asking additional questions and digging deeper.

25   **Q**    Are these NarxCare scores decisive or are they just

**Harrington - (Direct by Delinsky)**

1    another piece of information?

2    **A**    It's a tool that our pharmacists can use.

3    **Q**    Okay.  And it works with the alerts and --

4                   MR. WEINBERGER:  Your Honor --

5                   THE COURT:  Yeah, Mr. Delinsky, this is your

6    witness.  You can ask her the questions, but I want the

7    answers to come from her.

8    **Q**    Does it work with the other tools that we've already

9    talked about that provide information to pharmacists?

10   **A**    Yeah, all of these things work together to be able to

11   support our pharmacists in their exercise of corresponding

12   responsibility.

13   **Q**    Okay.  All right.  Now, on top of tools that help

14   pharmacists and supply information to pharmacists, take away

15   scripts from pharmacists, does CVS operate any programs that

16   sit on top of the pharmacies to try to make sure

17   everything's going right?

18   **A**    Yes.

19   **Q**    Okay.  You've referred to a store monitoring program.

20        Is CVS's store monitoring program one of those

21   programs?

22   **A**    It is.  It is.  We routinely review the dispensing

23   that's occurring in all of our store locations.

24   **Q**    How does that work?

25   **A**    Again, we deploy an algorithm to be able to review

1    that dispensing.  The algorithm, much like the prescriber

2    algorithm, reviews six months worth of prior data.  We run

3    it quarterly to be able to detect stores that might have

4    attributes associated with the prescriptions that we have

5    additional questions on.

6    **Q**     How often -- so you said quarterly.  Does that mean

7    the algorithm is run four times a year?

8    **A**     Correct.

9    **Q**     Is the algorithm run only through certain CVS stores

10   or through all 10,000 CVS stores?

11   **A**     All of them.

12   **Q**     Four times a year?

13   **A**     Correct.

14   **Q**     When a store is identified by the algorithm and you

15   have cautions, what happens?

16   **A**     So we have folks that go to those store locations to

17   be able to understand more about what's going on and making

18   sure that they're asking those pharmacists that are in those

19   buildings certain questions.

20        In the early years of the program we had our asset

21   protection folks go, as well as our pharmacy supervisors go

22   into those store locations.  They had a questionnaire that

23   they had various questions that they would ask.  Those

24   questions would concern patient behavior, doctors that they

25   might be concerned about, and things like that, to help us

1    understand more about the dispensing that we were seeing out

2    of that particular store location.

3    **Q**    Then what happened after all this information was

4    collected?

5    **A**    It would depend on the information that's collected

6    and the facts and circumstances surrounding that.

7         In some instances, there might be some education or

8    some retraining that we would do with that particular store

9    location.  There might be doctors that are fed into the

10   prescriber program and whether those doctors were suspended

11   or not.

12        We'd go over refuse-to-fill conversations with them to

13   be able to help them with that and understand any other

14   special needs that they might have as a result.

15   **Q**    Okay.  From time to time, is there discipline?  Does

16   discipline of a pharmacist result?

17   **A**    It can.  It does.

18   **Q**    When the algorithms flag a CVS pharmacy through this

19   program, does that mean the pharmacy's bad?

20   **A**    It doesn't mean that the pharmacy's bad.  It means

21   first that we need to understand more.  And sometimes there

22   are opportunities for us to be able to help a pharmacist

23   enhance their thinking around corresponding responsibility,

24   how do we help them get better, because it is an

25   intellectual exercise.  It's not a black and white exercise.

**Harrington - (Direct by Delinsky)**                    5721

1    So there is an opportunity for us to be able to help them.

2    **Q**    I believe you -- oh, wait.  Mr. Lanier's going to have

3    a question.  When?  Important question.

4    **A**    When did the store monitoring program go into place?

5    **Q**    Yes.

6    **A**    I believe it started actually before I came onboard,

7    but it was around 2012, to the best of my knowledge.

8    **Q**    Okay.  Is the store monitoring program another program

9    like the prescriber monitoring program that CVS implemented

10   after the *Holiday* events?

11   **A**    Yes.

12   **Q**    Did CVS acquire this program or did CVS build it?

13   **A**    We built it.

14   **Q**    Did any state, did DEA, did any regulator or law

15   enforcement agency direct CVS to build these algorithms and

16   to monitor its stores in this fashion?

17   **A**    Not to my knowledge.

18   **Q**    I believe you mentioned the Asset Protection team.  I

19   call it the Loss Prevention team.

20        Are they one and the same?

21   **A**    They are.

22   **Q**    Okay.  Does CVS have a Loss Prevention program?

23   **A**    We do.

24   **Q**    Okay.  Is the Loss Prevention program a program that

25   also monitors the CVS pharmacists?

1    **A**      Yes.  They run different algorithms themselves to be

2    able to try to detect different types of diversion.  They

3    look at growth of, you know, certain drug products, they

4    look at drug product movement and movement within our

5    inventory systems.  They also do work within our store

6    locations.  They're often in our store locations as well.

7    **Q**     Okay.  You mentioned algorithm.  Are there actually

8    field personnel on the Loss Prevention team who are out and

9    about looking -- exploring and reviewing the stores?

10   **A**      Yeah.  Much like our other field leaders, they have a

11   defined geography that they oversee.

12   **Q**     Okay.  And about how many of those Loss Prevention

13   field investigators, for lack of a better word, are there at

14   CVS?

15   **A**      I'm not a hundred percent sure of the exact number,

16   but to the best of my knowledge, I believe it to be about

17   200-ish.

18   **Q**     Okay.  And now, much of what Loss Prevention is

19   looking at is theft, right?

20   **A**      Correct.

21   **Q**     Okay.  And that -- and theft is one element of

22   diversion, correct?

23   **A**      Correct.

24   **Q**     Does Loss Prevention work with your group on

25   dispensing issues if they identify questions in the course

1    of their reviews?

2    **A**    Absolutely.  We partner with Loss Prevention on a very

3    regular basis on many different programs.

4    **Q**    Okay.  So even though their focus is on theft, am I

5    right they're a partner with your group in identifying other

6    kinds of potential issues, cautions, or flags?

7    **A**    Correct.  They're very good at behavioral

8    interviewing, and so they're a perfect partner in this

9    particular scenario.

10   **Q**    And they conduct interviews in the pharmacies, is that

11   what you said?

12   **A**    Correct.

13   **Q**    Yeah, okay.  All right.

14        Does CVS have another program called MAQ?

15   **A**    Yes.

16   **Q**    What is MAQ?

17   **A**    MAQ is short for Maximum Allowable Quantity, but what

18   that means in lay terms is that it prevent -- it provides

19   ordering guidelines for controlled substances and caps

20   establish what we feel comfortable at CVS with our stores

21   bringing in for controlled substance inventory.

22   **Q**    Okay.  I forgot to ask you a question, important

23   question.

24        Loss Prevention, algorithms, interviews, field

25   investigators.  When -- my question is when was that put in

1    place at CVS?  Maybe it was over time in different respects.

2    **A**    Loss Prevention has been active since the day I was a

3    pharmacist.  I don't know all of their different roles.  I

4    know when I was a pharmacist working on the bench they would

5    come in and do a regular health check.  I saw them

6    regularly.

7        They would also be looking at their inventory growth

8    reports and asking different questions and counting

9    different drugs on a fairly regular basis.

10   **Q**    Okay.  MAQ, Maximum Allowable Quantity.

11       Same question:  When?

12   **A**    So it was implemented across the country for oxy and

13   hydro in 2014, to the best of my recollection.

14   **Q**    Okay.  And did I hear you right, that this -- the MAQ

15   system would put caps on how much inventory could be

16   ordered?

17   **A**    Correct.

18   **Q**    Were those caps, like, fixed across all 10,000

19   pharmacies or were they individualized to each pharmacy?

20   **A**    It was individualized to each pharmacy.  What we did

21   using the Tukey method, which is an interquartile way to be

22   able to detect outlier percentages, we have a percentage for

23   each of the drugs that would be the highest percentage that

24   we would feel comfortable with.

25       We would take that percentage and we would apply it to

**Harrington - (Direct by Delinsky)**

1    that particular store's overall dispensing.  And that would

2    determine the amount of the particular drug product in

3    question, like oxy or hydro, that we would feel comfortable

4    going into that particular store location.

5         We also did have some hard caps that above a certain

6    number we just weren't comfortable having that quantity

7    filled.

8    **Q**    How often were these caps recalibrated?

9    **A**    Quarterly, I believe, in the early days.  I think it's

10   more regular now.

11   **Q**    So at least four times a year?

12   **A**    Correct.

13   **Q**    And is this another space where algorithms were used?

14   **A**    Yes.  It was -- algorithms were used as a method of

15   being able to apply those percentages to volume.

16   **Q**    So what happens -- can you explain just as a practical

17   matter what happens when a CVS store hits the maximum

18   allowable quantity set by CVS?

19   **A**    They don't get any more of that drug for that

20   particular month.

21   **Q**    And does CVS then take any --

22                   MR. LANIER:  Did she finish her answer?

23                   THE COURT:  Ma'am, did you finish your answer?

24                   THE WITNESS:  I did.

25                   MR. LANIER:  I didn't hear it.  I'm sorry,

**Harrington - (Direct by Delinsky)**

1    Judge.

2                    THE COURT:  And I think she says then CVS

3    doesn't get any or doesn't take any.

4                    THE WITNESS:  Doesn't get any for that month.

5    BY MR. DELINSKY:

6    **Q**    And then does CVS then do anything to inquire?

7    **A**    Yes.  So if it hits that limit, we use again our call

8    center to be able to make outreaches to our store teams to

9    be able to ask more questions around why that might have

10   happened.  Was it that someone was going on vacation and so

11   they ordered a little bit more at the end of the month; or

12   was there a reason, are they seeing more prescriptions from

13   a new pain clinic that might have opened up down the street.

14        So we get that information, and then that information

15   is used to be able to say, like, say, if they had a

16   prescriber of concern, that information would then flow to

17   the Prescriber program.

18   **Q**    So these resources that we've just spent the morning

19   going through, are any of them perfect in identifying

20   prescriptions that were not written and are not being used

21   for legitimate medical reasons?

22   **A**    We keep trying to be perfect, but I can't tell you

23   that they're perfect.

24   **Q**    Okay.  Do they work together?

25   **A**    They do.  Like, I've tried to illustrate through our

1    conversation different ways that the different programs talk

2    to each other to be able to help strengthen each of the

3    programs.

4         I think also, too, if something is missed in one

5    program, we're looking for another program to be able to

6    backstop anything that might be missed.

7    **Q**    So is the idea that there are multiple layers of

8    programs to work together in case -- to backstop one

9    shortcoming in one program or in another?

10   **A**    Yeah.  We call them safety nets.

11   **Q**    Okay.  Has CVS explored creating additional alerts to

12   help pharmacists identify red flags or possible signs of

13   illegitimate prescriptions?

14   **A**    We have a number of times.

15   **Q**    Is CVS piloting a program now that might provide

16   additional alerts?

17   **A**    We are, but we still have some challenges even with

18   that program that we're trying to build today, so we're

19   working through those problems.

20   **Q**    Okay.  Given all the programs and alerts that CVS

21   already has in place, why is it exploring new ones?

22   **A**    Because we keep trying to get better.

23   **Q**    The new alerts that CVS is prescribing, they would

24   alert a pharmacist to red flags, correct?

25   **A**    To select red flags is what we're piloting today.

1    **Q**    Okay.  And it would be cash -- well, what red flags --

2                    THE COURT:  Let's see what the witness knows,

3    please.

4    **Q**    What red flags, Ms. Harrington?

5    **A**    The red flags are cash, age, and distance.

6    **Q**    Okay.  Would these new alerts for cash, age, distance,

7    if CVS were to implement them, provide any information to

8    the pharmacist that is not already contained in RxConnect?

9    **A**    No.  All that information is already contained within

10   RxConnect.  It just changes the visualization of it.

11   **Q**    It changes the format of how it's presented?

12   **A**    Yeah.

13   **Q**    Okay.

14                    MR. DELINSKY:  Judge, it's 11:50.  10, 15 more

15   minutes good?

16                    THE COURT:  That's fine.

17                    MR. DELINSKY:  Okay.  Thank you.

18   **Q**    Ms. Harrington, I want to create a timeline, okay?

19        2021 at the far end --

20                    MR. DELINSKY:  Is that too small?  All right.

21   Okay.

22   **Q**    -- 2000 at the left end, left to right.  Okay?

23        And I want to put in some landmarks.

24        Do you recall when the *Holiday* case occurred?  And I'm

25   thinking about the revocation of the licenses, and stuff

1    like that.

2    **A**    I think that was 2011.

3    **Q**    Okay.  I don't think Mr. Lanier's going to object to

4    it.  I think it was 2012.

5                    MR. DELINSKY:  You okay with that, Mr. Lanier?

6                    MR. LANIER:  Whatever you want to put on

7    there.  It's up to you.  I'll fix it in cross.

8                    MR. DELINSKY:  All right.

9    **Q**    All right.  2012, *Holiday*.  Okay?  I'm going to keep

10   that there.  And we all know, we've talked about that.

11        2000, CVS has in place --

12   **A**    RxConnect.  Central profile.

13   **Q**    Okay.  And then if we go to our list, some of the

14   other stuff I think you said was there.  The Loss Prevention

15   program, was that back then?

16   **A**    Yup.

17   **Q**    Policies?

18   **A**    Yes.

19   **Q**    Field Supervision?

20   **A**    Yes.

21   **Q**    Now, let's go, fast-forward to 2012, okay?

22        You moved to corporate?

23   **A**    Yes.

24   **Q**    And I believe you testified that in and around that

25   time the company put in some new programs as well.

1   **A**   Correct.  The Store Monitoring and Intervention

2   program.

3   **Q**   I'm sorry, what was the second one, Ms. Harrington?

4   **A**   That was all one.

5   **Q**   Oh, okay.  Store Monitoring?

6   **A**   Yeah.

7   **Q**   Any others?

8   **A**   Our Prescriber program.

9   **Q**   DUR alerts, how far back did those go?

10  **A**   All DUR alerts, I think that they were always -- I

11  feel like they were always present, but I can't -- to the

12  best of my recollection, when I was working as a pharmacist,

13  I felt like I had DUR alerts.

14  **Q**   Okay.

15  **A**   Not specific Opioid Risk Module alerts that we later

16  created, but general DUR alerts.

17  **Q**   To be safe, let's not put them on, okay?

18      Let's just put some more dates on here.

19      We've heard some testimony in this case about the CDC

20  guidelines on prescribing pain medication.  Are you familiar

21  with those?

22  **A**   I am.

23  **Q**   Okay.  Do you recall when those came out?

24  **A**   I believe that was 2016.

25  **Q**   Okay.  What did those pain guidelines do?

1    **A**    Those pain guidelines were created for primary care

2    doctors for prescribing pain medications.  And it was to

3    suggest that they should be cautious when prescribing the

4    quantity and the strength of those particular prescriptions.

5    **Q**    Was that the first time the Federal Government had

6    ever come out with any guidance on how pain medication

7    should be prescribed?

8         That may be too complex given --

9    **A**    Yeah, I'm not sure I know the answer to the question.

10   **Q**    Fair enough.  Let's move past this.

11        Okay.  Now, let's focus on this time period here, 2012

12   to 2021.  And I'm looking at -- what are the programs that

13   CVS began to develop and implement in that time period that

14   we've talked about?

15   **A**    So we have Maximum Allowable Quantity.

16   **Q**    Mm-hmm.  Yup.

17   **A**    We have our Forgery Alerts --

18   **Q**    Yup.

19   **A**    -- which included both patient-level alerts and

20   prescriber alerts.

21   **Q**    Mm-hmm.

22   **A**    We had the Opioid Risk Module, showing cumulative MME.

23   **Q**    Mm-hmm.

24   **A**    And Additional Guidance for Combinations.

25   **Q**    Mm-hmm.  NarxCare?

1    **A**      NarxCare.

2    **Q**      Okay.  So back in 2000 -- well, we don't need to do

3    that.

4           A question's been raised in this case that I just want

5    to put to you plainly.

6           Why didn't the company -- you can see it on the

7    timeline.  You know, a lot of activity starts happening in

8    2012 and thereafter, okay?  New programs in large numbers

9    with great sophistication.

10          Why didn't CVS do that sooner?  That's my question to

11   you.

12   **A**      Okay.  We had things in place sooner, but we learned

13   from the *Holiday* case.  And we took that information to be

14   able to use it to be able to create programs, to be able to

15   try to make sure that it didn't happen again.

16   **Q**      Did these programs, pick any one of them, that were

17   put in place from 2012 forward, did they exist in the

18   industry in 2012?

19   **A**      They didn't.

20   **Q**      Before or after 2012, had DEA ever provided any

21   guidance indicating that pharmacies should use data

22   analytics to try to identify or help identify illegitimate

23   prescriptions?

24   **A**      Not to my knowledge.

25   **Q**      Before 2012 or after 2012, has DEA provided any

1    guidance indicating that pharmacies should install computer

2    alerts to try to identify red flags?

3    **A**    Not to my knowledge.

4    **Q**    Are you familiar with the DEA Pharmacist's Manual?

5    **A**    I am.

6    **Q**    Are you familiar with the one that was issued in 2010?

7    **A**    I am.

8    **Q**    Do you know who signed it?

9    **A**    I'm not sure.

10   **Q**    Did the DEA Pharmacist's Manual direct pharmacies to

11   use data and computers to try to identify illegitimate

12   prescriptions?

13   **A**    Not to my recollection.

14   **Q**    Has any state Board of Pharmacy ever issued any

15   guidance suggesting that pharmacies should use data

16   analytics and computer alerts to try to identify these

17   illegitimate prescriptions?

18   **A**    Not to my knowledge.

19   **Q**    Was there sort of a sea change in the whole industry

20   in 2012?

21   **A**    There was.

22   **Q**    Okay.  And again, these programs that CVS has

23   implemented, did CVS build the vast majority of them on its

24   own?

25   **A**    The vast majority of them, yes.

1    **Q**    Okay.  From scratch?

2    **A**    From scratch, with the exception of NarxCare and the

3    Opioid Risk Module.

4              MR. DELINSKY:  Your Honor, this is a

5    convenient breaking time.

6              THE COURT:  All right.  Ladies and gentlemen,

7    we'll take our usual lunch break.  The usual admonitions

8    apply.  Have a good lunch.  And we'll pick up at 1:00 with

9    the balance of Ms. Harrington's testimony.

10             (A luncheon recess was taken at 12:01 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                        - - - - -

3              (Jury present in open court at 1:06 p.m.)

4              THE COURT:  Please be seated.

5         And Ms. Harrington, I just want to remind you you're

6    still under oath from this morning.

7              THE WITNESS:  Okay.

8              THE COURT:  Mr. Delinsky, you may proceed.

9              MR. DELINSKY:  Thank you, Your Honor.

10        Good afternoon everybody.

11   BY MR. DELINSKY:

12   **Q**    You ready, Ms. Harrington?

13   **A**    I am.

14        Can somebody close the back door though?  The light

15   from the outside is distracting.  Thank you.

16   **Q**    During trial, Ms. Harrington, we have heard about

17   various warning signs a pharmacist should look for before

18   filling a prescription.

19        Do you agree that pharmacists should look for these

20   warning signs?

21   **A**    Yes.

22   **Q**    Could you identify a few?

23   **A**    A couple of those warning signs may be a patient

24   coming from a far distance and they live a far distance from

25   the pharmacy, patients paying with cash when they have

1    insurance, directing the staff not to bill their insurance,

2    certain combinations of medications at very high doses, are

3    just a couple of examples, but the list is pretty extensive.

4    **Q**    Does CVS policy require CVS pharmacists to look for

5    these warning signs?

6    **A**    Yes, our pharmacists must review controlled substance

7    prescriptions to identify these potential warning signs.

8    **Q**    Okay.  Are they sometimes called, the warning signs,

9    red flags?

10    **A**    Yes.

11    **Q**    Now, if you have one of these red flags, and let's

12    take cash, a patient is paying in cash, is a cash payment

13    always a red flag?

14    **A**    No.  There's plenty of reasons why a patient may pay

15    cash and, you know, based on their prior history, that might

16    not even raise a concern if they've historically used cash

17    on all of their prescriptions for an extended period of

18    time.

19    **Q**    Okay.  How about something like distance?  Is that

20    always a red flag?

21    **A**    It depends on the facts and circumstances.  I worked

22    in Nashua, New Hampshire, but we had a lot of specialty

23    hospitals in Boston, MGH and things like that.  People fly

24    out from all over the world to be able to go there.  So I

25    wouldn't have necessarily questioned if a patient was going

```
1    to see a specialist at MGH and then was bringing that
2    prescription back to their home pharmacy to me to be able to
3    fill it.
4    Q    Who determines whether one of these warning signs that
5    are often called red flags rises to the level of an actual
6    red flag?
7    A    It would be the individual pharmacist in the course of
8    their evaluation of that prescription.
9    Q    Okay.  Do you know who Joe Rannazzisi is?
10   A    I do.
11   Q    Who is he?
12   A    He was the prior -- I think his title had been acting
13   administrator at the DEA.  I'm not sure if that's right.
14   Q    He was a DEA official?
15   A    He was.
16   Q    Did you ever attend any presentations that
17   Mr. Rannazzisi gave?
18   A    Yes.  I attended a number of them across the country.
19   Q    Okay.  I'm showing you, Ms. Harrington, what already
20   has been admitted as Plaintiffs' Exhibit 15962-A.
21        Ms. Harrington, have you seen either this presentation
22   from Mr. Rannazzisi or similar ones before?
23   A    I did go see a presentation in Virginia.  I wasn't
24   sure -- I'm not sure if Norfolk is that presentation, but --
25   I'm looking at it.  The content looks similar to what I have
```

1    seen in terms of Mr. Rannazzisi's presentations.

2    **Q**    Okay.  If you could please turn to, if you look at the

3    bottom right number, page 11.  No, I'm sorry, Nicci --

4    Ms. Harrington.  Let's start with page 10.

5    **A**    I'm there.

6    **Q**    Do you see that?

7    **A**    I do.

8    **Q**    And have you seen either this page or pages like it in

9    presentations delivered by Mr. Rannazzisi?

10   **A**    Yes, I have.

11   **Q**    Okay.  And this page lists some of the red flags -- or

12   does this page list things that you see as warning signs or

13   red flags?

14   **A**    Yes, potentially.

15   **Q**    It includes combinations, correct?

16   **A**    Correct.

17   **Q**    And I think early refills is another, correct?

18   **A**    Correct.

19   **Q**    Distance, is that on here?

20   **A**    Yes.

21   **Q**    Okay.  And then if you turn to page 11, there are some

22   more that are listed, correct?

23   **A**    That is correct.

24   **Q**    Okay.  Do you see that Mr. Rannazzisi qualifies the

25   word "red flag" with the word "potential"?

1    **A**     I do.

2    **Q**     Is that consistent with the presentations that you saw

3    Mr. Rannazzisi give?

4    **A**     Yes.

5    **Q**     What's your understanding of why Mr. Rannazzisi calls

6    these warning signs potential red flags?

7                        MR. WEINBERGER:  Objection.

8                        THE COURT:  Overruled the way it was asked.

9    The witness can answer.

10   **A**     I'm not sure that I can articulate Mr. Rannazzisi's --

11                       THE COURT:  No, the question was your

12   understanding, ma'am.

13                       MR. WEINBERGER:  Of his state of mind, Your

14   Honor.

15                       MR. DELINSKY:  I'll rephrase, Your Honor.

16                       THE COURT:  All right.

17   **Q**     Ms. Harrington, what's your understanding of the --

18   they junked me up this time.

19         Why -- do you understand why the word "red flag" would

20   be qualified with the word "potential"?

21   **A**     Yeah, in -- it's to articulate when a pharmacist is

22   presented with a prescription, there's a cognitive set of,

23   like, activities that you go through in your mind really

24   quickly as you're evaluating that prescription.  And certain

25   things just because of your knowledge of the patient, of the

1   prescriber, because of the therapy, it might not rise to the

2   level of being a red flag because you already have knowledge

3   to be able to answer questions about that in your head.

4       So "potential" I think is a quick shorthand way of

5   kind of describing that work that happens in your mind

6   cognitively on a prescription before you're filling it.

7   **Q**   So CVS policies refer to red flags, correct?

8   **A**   Yes.

9   **Q**   Do they always use the word "potential"?

10  **A**   Not always.

11  **Q**   Do any CVS documents use the word "potential red

12  flags"?

13  **A**   There are some.  It's interspersed.  Sometimes it's

14  "red flags," sometimes it's "potential red flags."

15  **Q**   Okay.  Is it consistent with CVS policy that whether a

16  potential red flag rises to an actual red flag is subject to

17  the pharmacist's judgment?

18  **A**   Yes.

19  **Q**   Okay.  And could you go through with the jury again

20  those things in a pharmacist's mind that may inform whether

21  a potential red flag rises to an actual red flag?

22  **A**   I mean, there's a lot of different things that go into

23  that.  One example, like I had said, was if a patient had

24  been paying cash right along for their prescriptions and

25  they were paying cash for their Lipitor and their

**Harrington - (Direct by Delinsky)**

1   Lisinopril, and then they bring in a prescription for, you

2   know, a short-term opioid for a dental prescription and they

3   want to pay cash for it, that that wouldn't rise to the

4   level of being a red flag because that patient's history was

5   consistent with what they had done prior for their action in

6   terms of payment.

7   **Q**   As a pharmacist, did you get to know your patients?

8   **A**   Yes.

9   **Q**   And did you get to know the doctors and other medical

10  providers in your community?

11  **A**   Many of them, yes.

12  **Q**   Okay.  So was there information in your head that

13  informed your decision in addition to sort of the data you

14  saw on the computer screen?

15  **A**   Yes.

16  **Q**   Sort of the human information?

17  **A**   Yes.

18  **Q**   Okay.  Does CVS call on its pharmacists in its

19  policies to document the resolution of red flags?

20  **A**   We do.

21  **Q**   Okay.  Is documentation, to your knowledge, required

22  by law?

23  **A**   Not to my knowledge.

24  **Q**   If it's not required by law, why does CVS require it?

25  **A**   It's good information to have at certain points in

1    time.  We've looked it back at that information for

2    different purposes.

3    **Q**    If a pharmacist determines that a warning sign doesn't

4    rise to the level of an actual red flag, does CVS policy

5    require the pharmacist to document anything?

6    **A**    No, we would require documentation for resolution of

7    an actual red flag.

8    **Q**    Okay.  All right.  A little more on red flags.

9         Does it ever happen when a pharmacist resolves a red

10   flag but doesn't write down her work?

11   **A**    Yes.

12   **Q**    If a pharmacist does not document the resolution of a

13   red flag, does that mean she didn't do the work to resolve

14   it?

15   **A**    Not necessarily.

16   **Q**    In your experience, is it common for pharmacists to do

17   the hard work of resolving a red flag but not to write down

18   everything they did?

19   **A**    Yes.

20   **Q**    What is most important to you as a CVS leader that a

21   pharmacist resolves a red flag in the best way possible or

22   that the pharmacist writes down notes about what she or he

23   did?

24   **A**    The most important is actually kind of a twofold

25   answer:  That they identify the red flag and then they

1    resolve the red flag.  That's the most important thing.

2    **Q**    And are those two items of work more important than

3    writing it down?

4    **A**    Yes.

5    **Q**    New topic:  Pharmacist compensation.

6         We heard a little bit about that a while ago.  I'd

7    like to take you back to 2013, okay?

8    **A**    Okay.

9    **Q**    Since 2013, has CVS provided bonuses to its

10   pharmacists based on the dispensing of controlled

11   substances?

12   **A**    No, we removed controlled substances from the

13   incentives.

14   **Q**    When did CVS remove controlled substances from all of

15   its incentives?

16   **A**    All controlled substances were removed in 2013, and

17   C-IIs were removed in 2012.

18   **Q**    So the transition began in 2012 and was completed in

19   2013?

20   **A**    That is correct.

21   **Q**    Okay.  You were a pharmacist, you know, back in time

22   when controlled substances were included in the bonus

23   calculations, correct?

24   **A**    Correct.

25   **Q**    Was it a special controlled substances bonus or was it

1    mixed in with all the noncontrolled substances?  If you

2    know.

3    **A**    I'm not exactly sure what it was based on.  I would

4    make a reasonable assumption that prescriptions was part of

5    that compensation portion, but it would have been overall

6    scripts-to-budget.

7    **Q**    Including noncontrolled and controlled?

8    **A**    That is true.

9    **Q**    Okay.  Were your bonuses large or small?

10   **A**    They were small.  And I don't remember exact dollar

11   amounts, but I remember joking about the fact that one of

12   the bonuses that I got in the early years we could only

13   afford to take our team out for dinner with that.

14   **Q**    Did these bonuses back in the day impact your

15   dispensing in any way?

16   **A**    No.

17   **Q**    To your knowledge, did they impact the dispensing

18   decisions of any other pharmacists whom you worked with?

19   **A**    I'm not aware of that.

20   **Q**    Okay.  Did you even think about these bonuses when you

21   were deciding whether or not to fill a controlled substance

22   prescription?

23   **A**    No.

24   **Q**    Did any other pharmacists at CVS ever indicate to you

25   that they thought about it?

1    **A**     No one ever positively indicated to me that they had

2    thought of it that way.

3    **Q**     Okay.  Ms. Harrington, you testified at the very start

4    of our examination this morning about the community programs

5    that your group, the Professional Practices group, operates.

6          Do you remember that?

7    **A**     I do.

8    **Q**     Okay.  I think you identified two programs.  Drug

9    Take-Back was one, right?

10   **A**     Yup.

11   **Q**     Was the other Pharmacists Teach?

12   **A**     Pharmacists Teach.

13   **Q**     Okay.  Let's take them in order.

14         Does CVS install in its store, in some of its stores,

15   kiosks where patients can bring unused prescription drugs

16   and dispose of them?

17   **A**     Yes, we do.

18   **Q**     Okay.  When did that initiative begin?

19   **A**     That initiative began when the DEA regulations changed

20   to permit pharmacies to do that.  And if I'm recalling the

21   date, I think, to the best of my recollection, it was

22   2014-ish.

23   **Q**     Okay.  So let's just pause here for the jury.

24         Prior to that date -- and I understand that you have

25   an imprecise -- you don't remember exactly.  Let's just say

1    it's 2014 for purposes of the question.

2         Prior to that date, pharmacies, whether it was CVS,

3    Walgreens, Walmart, or any other pharmacy, was not allowed

4    to have a take-back kiosk, you know, in the pharmacy.  Am I

5    right about that?

6    **A**    That is correct.  But we actually helped our

7    communities anyway by developing a program with -- in

8    partnership with Partnership for Drug-Free Kids to be able

9    to donate units to any police departments that were looking

10   to have drug take-back.

11   **Q**    So was that program to donate drug take-back boxes to

12   police departments in place before CVS obtained the ability

13   from DEA to put the kiosks in its own stores?

14   **A**    Correct, because law enforcement was allowed to have

15   those kiosks prior to the -- well, before we could.

16   **Q**    Okay.  Has CVS continued that program of donating

17   take-back kiosks to law enforcement departments since it

18   obtained the ability to include the kiosks in its own

19   pharmacies?

20   **A**    Yes.  That program still runs today.  We provide those

21   boxes to any local PDs that want them.

22   **Q**    Okay.  Does CVS have a stash, for lack of a better

23   word, of these take-back boxes that police departments can

24   use?

25   **A**    I have over 300, so if anybody knows of a local PD

1    that's looking for a take-back box, I would be more than

2    willing to help them with that.

3    **Q**    We're running sort of a surplus right now?

4    **A**    Yes.

5    **Q**    Why are take-back boxes important?

6    **A**    It's important to be able to remove medications out of

7    people's homes that they no longer need or want.

8    **Q**    Why?

9    **A**    Because those medications can -- other people can

10    obtain those medications in that person's home and

11    potentially misuse them.

12    **Q**    Okay.  And that would be a form of diversion?

13    **A**    I would consider that a form of diversion.

14    **Q**    Okay.  Do you know if any CVSs in Lake or Trumbull

15    County have take-back kiosks installed in them?

16    **A**    They do.  There's seven out of the 15 pharmacies, and

17    we do have two police departments that have also taken

18    advantage of our program.

19    **Q**    Okay.  Would you provide kiosks to any of the other

20    police departments if they asked?

21    **A**    I would.

22    **Q**    Okay.  Do you know the particular pharmacies in Lake

23    and Trumbull County?

24    **A**    I wrote them down, but I left it in the witness room.

25    **Q**    Okay.  But there's seven of them?

**Harrington - (Direct by Delinsky)**

1    **A**    There's seven of them.

2    **Q**    In Lake and Trumbull County?

3    **A**    Yes.

4    **Q**    Oh, by the way.  Those drug take-back kiosks, are

5    those only for CVS customers or can anybody come in and drop

6    stuff off there?

7    **A**    Anybody can come and drop stuff off.

8    **Q**    And is the manner and operation of those drug

9    take-back kiosks heavily regulated by DEA?

10   **A**    Yes.

11   **Q**    Okay.  They have to be very secure and stuff like

12   that?

13   **A**    Correct.

14   **Q**    Okay.  Pharmacists Teach, what is Pharmacists Teach?

15   **A**    So Pharmacists Teach is where our pharmacists can go

16   into local high school, middle schools, even elementary

17   schools, to be able to deliver education on drug misuse.

18   And we've been running this program since I think it started

19   in 2013, to the best of my recollection.  It's been a very

20   successful program to be able to get our pharmacists out in

21   the community.

22          We did have an evolution of the program.  We parented

23   with Discovery Education back in 2019, and we've built a

24   digital suite of programs that teachers can actually

25   download and use, as well as our pharmacists also

5749

1    downloading that to be able to use, to be able to go into

2    classrooms.

3         All of it is free to the schools, and so our

4    partnership with Discovery Ed came at a great time because

5    we never thought that there would be a pandemic and people

6    wouldn't be allowed in classrooms or people would be doing

7    remote learning.  So there's been a lot of teachers that

8    have been able to take advantage of that education and to be

9    able to use it with their students.

10        We actually have three new modules coming out soon and

11   we have three more I think coming out next year.

12   **Q**    Is there a common misconception that young folks might

13   have that Pharmacists Teach is designed to debunk?

14   **A**    Yeah, in our first original session, you know, many

15   young kids think because prescription medications are

16   manufactured, prescribed by a doctor, that they are safer to

17   use than street drugs.  And really, the goal of the program

18   was to make sure that they understood the dangers around

19   prescription drug products.

20   **Q**    Okay.  Ms. Harrington, does CVS keep track of the

21   amount of drugs, prescription drugs, that it has received,

22   removed from the community in its take-back kiosks, and the

23   number of hours it has devoted to Pharmacists Teach?

24   **A**    So for our drug kiosks, I just want to correct one

25   thing.  It's not necessarily prescription drugs because

1     people can put nonprescription drugs, vitamins and things

2     like that, in there too.  But we've collected 3 million

3     pounds of unwanted medication out of the communities.

4          And through our Pharmacists Teach program, we don't

5     count the hours that our pharmacists devote to it, but we

6     count the student lives that we've impacted.  And we've

7     currently to date impacted more than a million students

8     across the country.

9     **Q**    We're about to move into the most exciting and

10    non-boring phase of your examination, Ms. Harrington.  We're

11    going to talk about policies.  I'm going to try to do it as

12    fast as possible, okay?

13         I believe you've already testified that CVS has

14    policies to guide its pharmacists in the dispensing of

15    controlled substances.  Correct?

16    **A**    That is correct.

17    **Q**    Okay.  Give me one minute.

18         Do you have a binder with you --

19    **A**    Yes.

20    **Q**    -- labeled CVS Dispensing Policies?

21    **A**    Yes.

22    **Q**    Okay.  I want to give Mr. Hynes a sec to make sure

23    opposing counsel has these, but we're going to start with

24    Tab 1B in your binder, which is CVS-MDL-00266.

25         Ms. Harrington, do you see this exhibit?

**Harrington - (Direct by Delinsky)**                    5751

1   **A**    I do.

2   **Q**    Okay.  What is this exhibit?

3   **A**    It's a dispensing guidelines.  It's called the

4   Protocol for Dispensing Narcotic Drugs for Pain Treatment.

5   **Q**    Can you tell what year it's from?

6   **A**    I believe that this is from 2012, but let me just

7   check the history.

8        Yup, January 4 of 2012.

9   **Q**    And is this sort of a follow-on to the guidelines that

10  we looked at before from 2010?

11  **A**    Correct.

12  **Q**    And is this exhibit a true and accurate copy of CVS's

13  Protocol for Dispensing Narcotics for Pain Treatment?

14  **A**    Yes.

15  **Q**    I'm going to put it up for the jury just so they get a

16  sense of what it looks like.

17       And does this policy set forth a pharmacist's

18  corresponding responsibility and how CVS expects its

19  pharmacists to comply with them?

20  **A**    Yes.

21  **Q**    Okay.  Let's just highlight a few points.

22       Do you see it says, "CVS Caremark expects and supports

23  decisions by its pharmacists to not fill prescriptions if,

24  in the sound exercise of their professional and clinical

25  judgment, they believe or suspect that the prescription was

1    not issued for a legitimate medical purpose."

2         What does that mean?

3    **A**    It means that CVS supports our pharmacists in their

4    decisions, and we want them not to fill prescriptions if

5    they don't believe it's for a legitimate reason.

6    **Q**    Okay.  And does this policy lay out some potential

7    warning signs to look for?

8    **A**    It does, under Section 2, those individual bullets, A

9    through H.

10   **Q**    And then if we go to the next page, the policy says,

11   "Remember that you have the authority to decline to fill any

12   prescription where, in the exercise of your professional and

13   clinical judgment, you believe or suspect it was not issued

14   for a legitimate medical reason."

15        Do you see that?

16   **A**    I do.

17   **Q**    Is that consistent with CVS policy?

18   **A**    It is.

19   **Q**    Okay.  Ms. Harrington, I'm not going to walk through

20   every successive iteration of that policy, but let me just

21   show you a more recent version.

22        And I'm showing you what's been marked as

23   CVS-MDL-00854.

24   **A**    Yes.

25   **Q**    Okay.  What is 00854?

1    **A**    This is another policy on dispensing controlled

2    substances called the Guidelines for Dispensing Controlled

3    Substances.  This version is from July 2018.

4    **Q**    Okay.  So we have the 2010 one, the 2012 one, and the

5    2018 one?

6    **A**    Correct.

7    **Q**    And so just for the explanation to the jury, we can

8    sort of go to the back, and there's this chart.  What does

9    that chart tell us on page 4?

10   **A**    The chart shows a revision history and the date that

11   it occurred.

12   **Q**    Okay.  So this policy has been in effect continuously?

13   **A**    Yes.

14   **Q**    Okay.  With some changes here and there.

15        All right, Ms. Harrington, let me show you -- this

16   next exhibit, Ms. Harrington, I believe in your binder it's

17   Tab 2A.

18   **A**    Okay.

19   **Q**    Okay.  And this is Plaintiffs' Exhibit 15601, P-15601.

20        Ms. Harrington, do you recognize this exhibit?

21   **A**    I do.  This is our Professional Practices Policy.

22   **Q**    Okay.  And can you tell from the document and from

23   your memory how far back this policy dates?

24   **A**    It initially began it looks like -- I'm reading at the

25   top -- that it started in August of 1998.

**Harrington - (Direct by Delinsky)**

1    **Q**    Okay.

2    **A**    But it looks like this version is from 2004.

3    **Q**    Okay.  And is this a true and accurate copy of one of

4    CVS's policies at that point in time?

5    **A**    Yes.

6    **Q**    All right.  I'd like to turn your attention to page 3,

7    okay?

8         And do you see where it says, "Employees are expected

9    to fill and refill only legal and authorized prescriptions"?

10        Do you see that language?

11   **A**    I do.

12   **Q**    "They are expected to uphold this legal and moral

13   responsibility by keeping up to date on all state and

14   federal changes in pharmacy jurisprudence."

15   **A**    I do.

16   **Q**    Is that consistent with CVS policy?

17   **A**    It is.

18   **Q**    And then on the next page there's a section on

19   corresponding responsibility, correct?

20   **A**    Yes.

21   **Q**    Okay.  Let's just focus on a few parts of this.  It

22   states that "The exercising of corresponding responsibility

23   is especially important with regard to questionable

24   prescriptions for controlled drugs."

25        Do you see that language?

1    **A**    I do.

2    **Q**    Is that consistent with CVS policy?

3    **A**    Yes.

4    **Q**    Now and today -- then and today?

5    **A**    Yes.

6    **Q**    It goes on to say, and I just want to spend a minute

7    here, "However, corresponding responsibility does not

8    include the right to refuse to fill prescriptions based on

9    anything less than sound judgment."

10         Do you see that?

11   **A**    I do.

12   **Q**    "Blanket decisions based on a practitioner's

13   prescribing habits or a customer's appearance are

14   unprofessional and may be illegal."

15         Do you see that?

16   **A**    I do.

17   **Q**    "Each prescription must be analyzed individually to

18   determine its merit and medical necessity."

19         Do you see that?

20   **A**    I do.

21   **Q**    Is this part of the 2004 policy about not allowing

22   blanket decisions about particular doctors consistent with

23   what CVS has done in more recent years?

24   **A**    It is not.  We allow blanket decisions, when stores

25   feel that a prescriber's overall practice may be called into

1    question, to not fill any controlled substance prescriptions

2    from that particular provider.

3    **Q**     And how does your Prescriber Monitoring program fit

4    into this as well?

5    **A**     Yeah, our Prescriber Monitoring program is obviously a

6    blanket rule that we can't fill for those particular

7    providers.

8    **Q**     Okay.  So let's go -- let's stay though at this point

9    in time, 2004.  Were stores at that point in time still

10   identifying doctors and saying, we don't want to fill for

11   them anymore?

12   **A**     I'm sure that it was occurring because -- just based

13   on my time on the bench during the course of this time, I

14   can't say exactly in 2004, I had some prescribers that we as

15   a store team had decided not to fill for.

16   **Q**     Okay.  Could you look at 3A of your binder,

17   Ms. Harrington.

18   **A**     I'm there.

19   **Q**     This is CVS-MDL-00945.

20         Ms. Harrington, do you recognize this document?

21   **A**     I do.  It's the Federal Guidelines For Controlled

22   Substances.

23   **Q**     Is it a true and accurate copy of those federal

24   guidelines?

25   **A**     It is.

**Harrington - (Direct by Delinsky)**

1    **Q**    Is this a CVS policy?

2    **A**    It is.

3    **Q**    Okay.  If you could please turn to -- let's look at

4    the bottom center, Bates number.  That number is 0009, so

5    it's page 9.

6    **A**    Okay.

7    **Q**    Does this have a section on corresponding

8    responsibility?

9    **A**    Yes, 14.1.

10   **Q**    Does it direct pharmacists to perform corresponding

11   responsibility?

12   **A**    It does.

13   **Q**    Okay.  And then if you turn the page, does this policy

14   then outline several patient red flags?

15   **A**    Yes.

16   **Q**    If you turn the page again, does it identify any other

17   kinds of red flags?

18   **A**    Prescriber red flags.

19   **Q**    And is it just one or are there a number that are

20   listed?

21   **A**    There's multiples.

22   **Q**    Okay.  Last policy.

23        I'm showing you, Ms. Harrington, what's been marked as

24   CVS-MDL-906.

25        Do you recognize this document?

1    **A**    I do.  It's an updated version of the prior document.

2    **Q**    Is it a true and accurate copy of that document?

3    **A**    It is.

4    **Q**    It's CVS's policy titled Federal Regulations and CVS

5    Pharmacy Guidelines for Controlled Substances?

6    **A**    Correct.

7    **Q**    Okay.  And if we turn to page 13, does it have a

8    corresponding responsibility section?

9    **A**    It does.

10    **Q**    And if we turn the page, is there a discussion of red

11    flags?

12    **A**    Yes.

13    **Q**    If we turn the page again, is there additional

14    discussion of red flags?

15    **A**    Yes.

16    **Q**    Okay.  Thank you.

17          Now, Ms. Harrington, before I sit down and pass the

18    witness, one more.  You talked about training.

19          Do you remember that?

20    **A**    I did.  I do.

21    **Q**    Okay.  Do you see you have a binder that says CVS

22    Dispensing Training Materials?

23    **A**    Yes.

24    **Q**    Okay.  I forgot something.  Before we get there.

25          CVS has many more policies that bear on trying to

1    identify illegitimate prescriptions, correct?

2    **A**    Correct.

3    **Q**    We just put in a small sample?

4    **A**    Correct.

5    **Q**    What are some of the other specific subjects that CVS

6    has policies on in this space?

7    **A**    Forgery, Loss Prevention, Filling of Schedule II

8    Substances.  There's a number of different policies.

9    **Q**    Is there a specific policy on early fills?

10   **A**    Yes.

11   **Q**    Is there a specific policy on reviewing and accessing

12   PDMPs?

13   **A**    Yes.

14   **Q**    Is there a specific policy on trying to identify

15   forgeries or fraudulent prescriptions?

16   **A**    Yes.

17   **Q**    Okay.  We won't take up time with those.

18        Now, training, same thing.  I'm just going to show you

19   a few.

20        I believe you testified that CVS is providing, apart

21   from the one-on-one performance, the one-on-one

22   individualized one, three times a year CVS pharmacists get

23   training?

24   **A**    Mm-hmm, yes.

25   **Q**    Okay.  Could you please look at Tab 1A.

1  **A**     This is the DEA training that I referenced.

2  **Q**     Okay.  And is this from September 2012?

3  **A**     Yes.

4  **Q**     Okay.  And is this a true and accurate copy of the

5  training that was delivered in that time frame to CVS

6  pharmacists?

7  **A**     Yes.

8  **Q**     Okay.  Let's just very quickly -- if you can turn to

9  page 21 of the training.

10  **A**     I'm there.

11  **Q**     Okay.  Is there a section there on corresponding

12  responsibility?

13  **A**     Yes.

14  **Q**     And if you turn to the next page, is there more

15  discussing of -- discussion of corresponding responsibility?

16  **A**     Yes.

17  **Q**     Is there a list of potential red flags?

18  **A**     Yes.

19  **Q**     Okay.  If you could look at Tab 1B of your binder.

20        I'm showing you what's been marked as CVS-MDL-1104.

21        Do you see this document?

22  **A**     I do.

23  **Q**     Is this another CVS training?

24  **A**     Yes.  This is the DEA training, but just an updated

25  version from September of 2019.

1    **Q**    Okay.  Were there many additional trainings in

2    between?

3    **A**    Yes.

4    **Q**    These are just samples?

5    **A**    Yes.

6    **Q**    Okay.  Same sort of structure here.  If you look at

7    page 18, is there a discussion of CVS's policy on exercising

8    corresponding responsibility?

9    **A**    Yes.

10   **Q**    If you turn to the next page.

11         Is there a list of potential red flags?

12   **A**    Yes.

13   **Q**    Is it an exhaustive list?

14   **A**    No.

15   **Q**    Can there be an exhaustive list?

16   **A**    No.

17   **Q**    Because you never know what the newest one looks like,

18   right?

19   **A**    Right.

20   **Q**    Ms. Harrington, if you could look at Tab -- I believe

21   it's Tab 2 of the same binder you're in, is this another

22   training that was provided by CVS?

23   **A**    Yes.

24   **Q**    Okay.  Do you recall when this training was provided?

25   **A**    2015.

1    **Q**    Okay.  And is this training exclusively devoted to

2    corresponding responsibility in its entirety?

3    **A**    It is.

4    **Q**    Is this a true and accurate copy of this training?

5    **A**    It is.

6    **Q**    And again, this is just another sample of the many

7    trainings CVS provided?

8    **A**    Yes.

9    **Q**    Ms. Harrington, you spoke about job aids.

10         Do you remember talking about job aids?

11   **A**    I do.

12   **Q**    Those are -- can you explain to the jury again what a

13   CVS job aid is?

14   **A**    It's just a summary document that also has visuals to

15   make it easy for pharmacists to understand information.

16   **Q**    Okay.  Ms. Harrington, I'm showing you, and I think

17   it's the last tab -- second to last tab in your binder.

18   **A**    Yes.

19   **Q**    And this is CVS-MDL-0393 [sic].

20         Do you see that?

21   **A**    Yes.

22   **Q**    Is this a CVS job aid?

23   **A**    It is.

24   **Q**    Do you recognize it?

25   **A**    I do.

**Harrington - (Direct by Delinsky)**

1  **Q**    Has this been sent out to CVS pharmacists?

2  **A**    Yes.

3  **Q**    More than once?

4  **A**    Yes.

5  **Q**    What's the purpose of this job aid?

6  **A**    The purpose of this job aid was just to reinforce some

7  of the red flag behavior.

8  **Q**    Okay.  It's another --

9            MR. DELINSKY:  Oh, did I not read it into the

10  record, Mark?

11            MR. LANIER:  No.

12            MR. DELINSKY:  CVS-MDL-01 -- oh, date.

13  Oh, Miss Harrington.

14  I thought you said Bates, Mark, Bates number.

15  **Q**    Do you recall the date of this, Ms. Harrington?  And

16  you can ballpark it as best you can.

17  **A**    Yeah.  To the best of my recollection, I would place

18  it in probably early 2013.  I would say 2013, to the best of

19  my recollection.

20  **Q**    Okay.  And this -- does this identify red flags?

21  **A**    Yes.  Sorry.

22  **Q**    Okay.  And can you explain the top upper left?  Why is

23  there a stop sign there?

24  **A**    We want pharmacists to pause and take a moment and

25  think about the prescription and the facts and circumstances

1    that they have in front of them, and this just was a guide

2    to be able to help them do that.

3    **Q**    Okay.  And then if you look over to the far -- the top

4    far right, looks like there's a three-part decision-making

5    process.

6         Can you talk about that?

7    **A**    Just our pharmacists should take a moment to identify

8    any potential red flags that are present on the

9    prescription.  Then they need to apply their professional

10   judgment and decision-making to the information that they

11   have.  And then the last part is just deciding on whether or

12   not to fill that prescription based on the information that

13   they have available to them.

14   **Q**    Okay.

15        MR. DELINSKY:  Ms. Harrington, I have no

16   further questions at this time.  I believe Mr. Lanier may,

17   so I pass the witness to him.

18        THE COURT:  Okay.  Before Mr. Lanier, any

19   questions from either Walgreens or Walmart?

20        MR. STOFFELMAYR:  No.  Thank you, Your Honor.

21        MR. MAJORAS:  No.  Thank you, Your Honor.

22        THE COURT:  Okay.  So Mr. Lanier, you're up.

23        MR. LANIER:  Thank you, Judge.

24        Your Honor, may it please the Court.

25        Ladies and gentlemen; Ms. Harrington; Counsel.

1                        - - - - -

2                   CROSS-EXAMINATION

3    BY MR. LANIER:

4    **Q**    Ms. Harrington, I hope to take about an hour and a

5    half with you max.  We're going to try and move through this

6    fairly rapidly.  I've tried to reorganize all of your stuff

7    so that we can cover it.  Okay?

8    **A**    Okay.

9    **Q**    I am remiss if I don't thank you and thank the people

10   at CVS for making a lot of good changes since we filed this

11   lawsuit that make our community safer.  So I do want to say

12   thank you for that.  All right?

13   **A**    Those changes came I think before the filing of the

14   lawsuit, but --

15   **Q**    Well, a lot of them came after, but we'll fuss about

16   dates in a little bit.  But I do appreciate the fact that

17   you've done it.  I think it makes our community safer, don't

18   you?

19   **A**    I think that there's actions that we've taken to

20   support our community, yes.

21   **Q**    Ma'am, I'm going to ask you leading questions just

22   like Mr. Delinsky, and I'm hoping you'll be able to give me

23   quick answers as well.  Okay?

24   **A**    There's some laughter in the peanut gallery.

25   **Q**    Yeah.  That's not right, and I apologize for that.

**Harrington - (Cross by Lanier)**

1    Ma'am, I'm going to ask you leading questions, too, to

2   try to keep the answers brief, okay?

3   **A**    Okay.

4   **Q**    So I'll reask that question.

5    The actions you've taken help make our community

6   safer, don't you think?

7   **A**    The actions that we've taken, like drug disposals to

8   take drugs out of the community, have made our community

9   safer, yes.

10  **Q**    And the ones about dispensing practices and training

11  your pharmacists, and things like that, don't you think

12  those have helped make the community safer?

13  **A**    I don't know that they've made the community safer.

14  They've helped our pharmacists in how they comply with the

15  law.

16  **Q**    So your concern for that isn't as much the community

17  as much as it is getting in trouble with the law?

18  **A**    That's not what I stated.

19  **Q**    All right.  Ma'am, do you remember your tenth grade

20  geometry teacher?

21  **A**    I don't remember my tenth grade geometry teacher.

22  **Q**    Mine was Ms. Bode, and I got an F on a grade one time

23  because I didn't do my homework, and I didn't handle it the

24  way I was supposed to.

25   You probably never got an F on anything in your life,

1    did you?

2    **A**     There may have been an organic chemistry test in

3    question.

4    **Q**     Well, I changed my ways after that, and I decided I'd

5    study real hard and try to make good enough grades to go to

6    college, good enough grades to go to law school.  But I can

7    do all the things in the world after that, in the years to

8    come; it's not going to change the F I got in Ms. Bode's

9    class, is it?

10   **A**     No.

11   **Q**     And you understand the allegory I'm making here about

12   the actions that have been taken by CVS and whether or not

13   they fix harms that happened well over a decade ago.

14           You understand that?

15   **A**     I understand what you're trying to intimate there.

16   **Q**     Well, and I'm trying to intimate that in part because

17   I look at the -- I tried to reproduce Mr. --

18                   THE COURT:  Delinsky's.

19                   MR. LANIER:  Yeah, it was Mr. Delinsky, Judge.

20   And in my brain I wasn't coming out with it right, and I

21   appreciate that help.

22   **Q**     Mr. Delinsky's notes, I tried to reproduce them as

23   best as I could.  But these notes cover well over a decade,

24   perhaps two decades of CVS policies and actions, correct?

25   **A**     Yes.

1   **Q**     And if we're to look -- let's go just to part of our

2   story and go pre-2015.

3          Won't you admit to the jury that pre-2015, you were

4   naive to believe that CVS was doing everything it could to

5   reduce the growth of the tragic opioid problem in the United

6   States; true?

7   **A**     False.

8   **Q**     Ma'am, I'm going to hand you Plaintiffs' Exhibit 459.

9   And I'm sure you'll remember this because it is a PowerPoint

10  that I quizzed you about when I took your deposition.

11         You remember my taking your depo, right?

12  **A**     I remember it well, sir.

13  **Q**     And this is a PowerPoint that goes to you February 19,

14  2015.

15         Do you see that?

16  **A**     I see that.

17  **Q**     And if we look and the jury looks at the first page of

18  that PowerPoint, they're going to see that this is a

19  PowerPoint where "Our Communities, Our Responsibility," you

20  Nicci Harrington are on the front, top line.

21         Do you see that?

22  **A**     I do.

23  **Q**     And then if you look at slide that ends with page

24  number 09, in 2015 y'all were talking about how your

25  communities and responsibility, that drugs are killing more

 1   than cars, guns, and falling.

 2        52 million people over the age of 12 have used

 3   prescription drugs nonmedically.

 4        Do you see that?

 5   **A**    Yes.  These were graphics that we took to be able to

 6   illustrate the problem.

 7   **Q**    Is that a "yes" answer?

 8        Thank you, ma'am.

 9        And if you look at the notes on the next page that

10   go -- the speaker's notes with this, do you see those?

11   **A**    I do.

12   **Q**    Do you see where it says, "When I started to really

13   understand the tremendous growth of the misuse of

14   prescription drugs, I realized I might have been naive -- I

15   may have been naive to believe we were doing everything we

16   could to reduce the growth of this tragic problem in the

17   United States."

18        Did I read that correctly?

19   **A**    You did.  But as we talked before --

20   **Q**    Ma'am, please just answer my questions.  He'll have a

21   chance to come back and finish it.

22             MR. DELINSKY:  Your Honor, I object.

23             THE COURT:  Overruled.  Overruled.

24   **Q**    Ma'am, so I go back to my question.

25        That's pretty much -- the language I ask tracks fairly

1    closely the language in this note; wouldn't you agree?

2    **A**    False, because you articulate that "CVS" in your

3    statement and the "we" that is referenced in the below, and

4    I didn't write these speaking notes, but we've talked about

5    this before.  I believe the "we" was the collective "we,"

6    that is the community, which is more than pharmacies.

7    **Q**    Ma'am, you were making this presentation to

8    pharmacists -- or to CVS, not to the community, weren't you?

9    **A**    I don't know who this presentation was to in 2015.

10   **Q**    You don't recall who you made this presentation to?

11          Do you think you were making it to the community when

12   on page 10 you talked about things of the protocol, "We

13   expect and anticipate that our pharmacists will turn away."

14          Do you see that?

15   **A**    What page are we on, please?  You're going too fast.

16   **Q**    I'm on page 10 of the speaker notes.

17          Do you see where it says, "We expect and anticipate

18   that our pharmacists will turn away"?

19          Do you see that, ma'am?

20   **A**    I'm just turning to the page, sir.

21          I do see that.

22   **Q**    Okay.  So you want "we" and "our" to mean the

23   communities, or you think maybe that's CVS?

24   **A**    In this particular instance, I believe that this

25   refers to CVS, but in the prior page I believe it refers to

1    a broader "we."

2    **Q**    Hmm.  Now, I've got a road map for what I'd like to

3    cover with you, please.  And the road map's going to cover

4    some of your CVS tools, but we're going to do it in a little

5    different order than you did it with Mr. Delinsky.  Okay?

6         Here's your road map.  The jury's heard testimony

7    about three phases of the opioid epidemic.

8         Are you familiar with those phases?

9              MR. DELINSKY:  Objection, Your Honor.

10   **A**    I haven't heard it --

11             THE COURT:  Overruled.

12   **A**    Sorry.

13        I haven't heard it referred to as phases like this,

14   but --

15   **Q**    Okay.

16   **A**    -- I'm sure you'll explain it to me.

17   **Q**    Well, we'll use the testimony that's already been in

18   front of the jury on these different phases.  And what I'd

19   like to do is make each phase a stop.  So we'll look at

20   phase I, we'll look at phase II, and we'll look at phase 3.

21   You can see the years there as well.

22        Are you tracking with me?

23   **A**    I am.

24   **Q**    Great.  Now, in this regard, let's start with what the

25   CVS policies were prior to phase II and phase 3.  Let's go

1    back to phase I and before, okay?

2    **A**    Okay.

3    **Q**    Mr. Delinsky did a timeline for everyone, and I've

4    tried to reproduce it as best as I could.

5         You see that?

6    **A**    I do.

7    **Q**    Now, that's not a full timeline, won't you agree?

8    **A**    It is not.

9    **Q**    In fact, we can go backwards in time, because while

10   Mr. Delinsky talked about *Holiday* being a signal, important

11   case where your company started changing what they did,

12   *Holiday*'s not the first case to talk about what pharmacists

13   and their companies must and must not do; true?

14   **A**    True.

15   **Q**    And so let's go back in time.

16        When did your company first start making money by

17   selling opiates?

18            MR. DELINSKY:  Objection, Your Honor.

19            THE COURT:  Overruled.

20   **A**    I don't know the answer to that question.

21   **Q**    Well, when did you start working there as a

22   pharmacist?

23   **A**    1994.

24   **Q**    And were they already selling opiates?

25   **A**    Yes.

1    **Q**     Do you know if they were selling them in the '80s?

2    **A**     I don't know when the CVS stores, like when we started

3    CVS stores, I don't know the year.

4    **Q**     All right.  We'll put an "Unknown start date for

5    selling opiates."  Fair?

6    **A**     Fair.

7    **Q**     Now, you didn't tell the jury about the 1979 case of

8    *Hayes*, did you?

9    **A**     I'm not familiar with the *Hayes* case.

10   **Q**     So when you took this class in school that you talked

11   about, you never learned about the case of *Hayes* in 1979

12   that said if you're getting multiple prescriptions, it can

13   be a problem; that said if you get them in the same month,

14   that can be a problem?  That's news to you?

15   **A**     Those principles are not news to me, but I'm not

16   familiar with that particular lawsuit.

17              MR. DELINSKY:  Could we get a citation,

18   please?

19              MR. LANIER:  It's in the stakeholders brief.

20   **Q**     The *Hayes* case in 1979.

21        How about *Bertolino* in 1989?  Did anybody teach you

22   about that?

23   **A**     I don't recall, but I'm not sure if the principles

24   from the case were incorporated into my education.

25   **Q**     Those principles that were being espoused in the law

 1   included using common sense, looking at the volume of

 2   prescriptions, ambiguities involved, a pattern of

 3   prescribing, and dosage, 1989.

 4        Did you know those concerns were already out there?

 5   **A**    Those are things that I would have been looking for in

 6   my practice when I began my practice as a pharmacist.

 7   **Q**    *Liberty* in 1989, another case that was decided, did

 8   you know about that one?  If it helps, I'll tell you they

 9   said look at dispensing patterns and same-day purchases.

10        Did you know about that?

11   **A**    I can't recall that case.

12   **Q**    In 2008, the *Medicine Shoppe* case, four years before

13   *Holiday*, Medicine Shoppe's a chain pharmacy, isn't it?

14   **A**    It's a franchise pharmacy.

15   **Q**    And that's one where it talked about the problems

16   associated with doctor shopping, prescriptions being written

17   outside of one's practice area.

18        Did you know about that case?

19   **A**    I did not.

20   **Q**    And that's while you were practicing as a pharmacist

21   for the company, true?

22   **A**    That is correct.

23   **Q**    And then in 2010, the *East Main* case.  That's the case

24   that talked about cash payments being a matter of concern,

25   the conduct of the patient, the patient grouping, cocktails,

1    and prescribing patterns.

2          Did you know about the *East Main* case?

3    **A**    I did.

4    **Q**    Okay.  So to say that all of a sudden *Holiday* was a

5    page-turner, in truth, during phase I and before there had

6    been a number of cases that dealt with the problems of

7    prescribing under the corresponding responsibility law,

8    true?

9    **A**    I don't know those cases.  I haven't reviewed them.

10   I'm going to trust that what you're telling me is accurate.

11   **Q**    I thought you said you did know the *East Main* case.

12   **A**    The *East Main* case I do know.

13   **Q**    All right.  So you know at least one.  And the others,

14   just something that you've never been taught or learned,

15   fair?

16   **A**    Fair.

17   **Q**    Now, during this 2000 to 2009 phase, have you had a

18   chance to look at how many pills of oxycodone and

19   hydrocodone your CVS stores were putting out in Lake and

20   Trumbull Counties?

21          MR. DELINSKY:  Objection, Your Honor.

22   Pharmacies don't put out pills.  They're prescriptions.

23   **Q**    Dispensing.  Excuse me.  Dispensing.

24   **A**    I have not had that information.

25   **Q**    Okay.  Well, the jury has already seen, and it's in

1    evidence, Plaintiffs' 26319-A.  I'll put a copy up to you,

2    but I can show you pretty quick that on page 2 that it gives

3    the dispensing from the CVS stores in Lake and Trumbull by

4    year.

5          Do you see that?

6    **A**    Yes, I see the combination of Lake and Trumbull, and

7    then Lake and Trumbull separated out.

8    **Q**    And if we look at 2000 to 2009, that time period --

9    let me zoom in on it a little bit -- will you trust my math

10   that the number of pills put out by the company during that

11   time period -- or not -- dispensed, sold by the company

12   during that time period, is something on the order of

13   10,358,157 pills in Lake and Trumbull County?

14         Do you see that?

15   **A**    I see that.  I'm not -- I haven't spent enough time

16   with these numbers to be able to ground myself in them,

17   but --

18   **Q**    Okay.  Well, my point is, ma'am, when we talk about

19   this stuff, these are actual pills that have been put out in

20   the county through CVS stores, but there is also --

21                  MR. DELINSKY:  Objection, Your Honor.

22                  THE COURT:  Let's use the word "dispense."

23                  MR. LANIER:  Dispense.  I'm sorry, Judge.

24   **Q**    These are actual pills dispensed through the CVS

25   stores.  And the jury has also seen the death rate from

1   overdose that starts in, in Lake and Trumbull County, and

2   goes back into this 2000 range with the timing starting, for

3   this chart at 2004.  And we've got a phase I.

4        Do you see that?

5   **A**   I see that.

6   **Q**   So if we're going to look and see whether or not CVS

7   played a significant role in this problem back then,

8   wouldn't you agree that what CVS did in 2020 isn't going to

9   be relevant?

10  **A**   Actions that CVS takes in 2020 are not impactful to

11  things that happened in 2000, no.  That doesn't make sense.

12  **Q**   So, for example, if we wanted to see what Dr. Frank

13  Veres was prescribing that was being dispensed by your

14  stores in these years of phase I, we could go and look up

15  those prescription numbers, couldn't we?

16  **A**   We could.

17  **Q**   Do you have the prescription numbers for Dr. Veres?

18  Have you looked at them?

19  **A**   Not for that time period.

20  **Q**   Over 900 prescriptions.  That's not pills now.

21  There's a difference between prescriptions and pills, right?

22  **A**   Mm-hmm.  So that was over 900 prescriptions over that

23  nine-year period?

24              MR. DELINSKY:  Objection, Your Honor.

25              MR. LANIER:  Excuse me.  I'm wrong.  I'm

1   wrong, I'm wrong, Judge.  I'm wrong.

2              MR. DELINSKY:  You know, objection, Your

3   Honor.  Could we go on the headset?

4              (At side bar at 2:09 p.m.)

5              MR. DELINSKY:  Your Honor, the concern is that

6   Mr. Lanier is just throwing numbers produced by data

7   consultants up to the witness, and she has no knowledge of

8   them.

9              THE COURT:  I'm a little concerned about this

10  too.  I mean, you can --

11             MR. DELINSKY:  What I had said, Mark, was that

12  my concern is that you're throwing up data, information

13  computed by data analysts that she has no personal knowledge

14  of.  And this evidence isn't in the case.  These

15  computations aren't independently in the case.

16             THE COURT:  Well, I think there was testimony

17  about these.  It's in the case.  But she doesn't know

18  anything about it, so I -- you can say, "Assume that, what

19  do you have to say about it," but --

20             MR. LANIER:  All right.  I'll do it that way.

21             THE COURT:  All right.

22             (In open court at 2:10 p.m.)

23  BY MR. LANIER:

24  **Q**    Ma'am, I need to change my numbers.

25       Assume with me that it's over 1300 prescriptions that

 1     were filled just for Dr. Veres in these counties during

 2     phase I.

 3          Would that shock or surprise you?

 4     **A**     I don't know that I have an opinion either way because

 5     I don't know the details on Dr. Veres' dispensing.  It's

 6     1300 prescriptions over the course of nine years, and I

 7     don't have a calculator.  So 1300 prescriptions over the

 8     course of, say, 10 years, 130 prescriptions per year.

 9          I don't know what to think without knowing the details

10     of the prescriptions.  It's hard for me to comment on that.

11     **Q**     And so that our record's clear, I only have your

12     dispensing numbers from 2006 on, so this is actually over

13     four years, not nine.  Okay?

14     **A**     It's very difficult for me to comment on this without

15     the detailed information.

16     **Q**     Well, we'll look at some of those details later,

17     because years later, you get involved with Dr. Veres, don't

18     you?

19     **A**     We did.

20     **Q**     So within the framework of this, I want to know what

21     were the programs in place to stop this epidemic or at least

22     any role from CVS in the epidemic back in 2000 to 2009.

23     Okay?

24     **A**     We --

25     **Q**     Are you tracking with me?

1              MR. DELINSKY:  Object to form.  Objection,

2    Your Honor.

3              THE COURT:  Overruled.

4    **Q**    Are you tracking with me?

5    **A**    I am.

6    **Q**    You said that y'all had RxConnect, right?

7    **A**    Correct.

8    **Q**    Now, RxConnect is collecting data on each patient,

9    isn't it?

10   **A**    It's collecting information on the prescriptions that

11   are filled for that particular patient.

12   **Q**    And it's collecting that data to sell it to IMS --

13             MR. DELINSKY:  Objection, Your Honor.

14             MR. LANIER:  I'm asking.

15   **Q**    Right?

16             THE COURT:  All right.  You can ask the

17   question.

18   **A**    I don't know about the relationship with IMS and when

19   that started.

20   **Q**    You do know about it though now because you've been

21   involved with IQVIA, haven't you?

22   **A**    We use IMS data that we buy from them now.

23   **Q**    But did you not know y'all used to sell this data

24   to --

25             MR. DELINSKY:  Objection, Your Honor.

1          THE COURT:  Overruled.

2     **Q**     Did you not know y'all used to sell this data to IMS?

3     **A**     I don't know that firsthand.  I have heard from

4     another just on a brief conversation that there's a

5     relationship between IMS and CVS.

6     **Q**     Okay.  But what you heard, I'm assuming you heard it

7     from people within the company, right?

8     **A**     Yes.

9          MR. DELINSKY:  Objection, Your Honor.

10         THE COURT:  Overruled.

11    **Q**     And so what you heard was that your company was

12    selling the data on the patients to IMS, right?

13         MR. DELINSKY:  Objection, Your Honor.

14         THE COURT:  Well, I'll sustain that.

15    **Q**     Ma'am, did you hear that your company was selling --

16         THE COURT:  I'll sustain that the way it's

17    asked.

18         MR. LANIER:  Okay.

19    **Q**     Did someone within the company affirm to you that they

20    were -- that CVS was selling patient data?

21         MR. DELINSKY:  Objection.

22         MR. LANIER:  Your Honor, if it's company, it's

23    a corporate admission.  It won't be hearsay.

24         THE COURT:  Sustained.

25    **Q**     Okay.  The other aspect -- so you've never seen the

1    IMS contracts?

2    **A**    No, not to my knowledge.

3    **Q**    Would it concern you as someone in your job if you

4    were to find out that the company was selling data that

5    would be used --

6                    MR. DELINSKY:  Objection, Your Honor.

7                    THE COURT:  Overruled.

8    **Q**    -- that would be used in marketing to other -- to

9    manufacturers?

10   **A**    I have never heard that before.

11   **Q**    Wasn't my question.

12        Ma'am, would it concern you in your job, what you do

13   now, if you found out that your company was selling

14   prescription data to IMS --

15   **A**    Yeah.

16   **Q**    -- which would then sell it to Purdue and others back

17   in the day for marketing to doctors?  Would that concern

18   you?

19                    MR. DELINSKY:  Objection, Judge.  Lack of

20   foundation in about a hundred different ways.

21                    THE COURT:  Overruled.

22   **A**    I just don't understand how that information would be

23   used.  My understanding is IMS just has aggregate

24   information like blinded information.  I don't understand

25   how that would be used.

1    **Q**    Okay.  So assume with me that your company was

2    actually giving ZIP codes of the doctors, ZIP codes of the

3    patients, and the prescribing habits of the doctors, and

4    selling that to IMS.

5         If that were happening, would it concern you?

6              MR. DELINSKY:  Same objection.

7              THE COURT:  Overruled.

8    **A**    I don't know.  I --

9    **Q**    Okay.  Next question then.

10        The other thing that I understand from Mr. -- I'll put

11   "don't know" here.

12        The other thing that I understand from Mr. Delinsky

13   y'all had in phase I was the DUR alert, right?

14   **A**    That is correct.

15   **Q**    But let's be real clear about that.  That would do

16   drug-drug interaction, by and large, right?

17   **A**    That's one of the modules, yeah.

18   **Q**    And that module would take it out of what you would

19   call the PDR, the "Physicians' Desk Reference" back then,

20   right?

21   **A**    That is correct.

22   **Q**    So it would not cover things like the trinity cocktail

23   dealing with opioids.  That wasn't coming out in the DUR in

24   2000, was it?

25   **A**    I honestly am not sure, because there is increased

1    sedation with those products together, so it is possible

2    that those two medication -- two, three medications would

3    have caused a DUR alert to trigger.

4    **Q**    Ma'am, even as of 2017, y'all didn't have an alert for

5    the trinity cocktail in place, did you?

6    **A**    Not specifically to the trinity with the directions

7    that we provide on how pharmacists handle it.

8    **Q**    Yeah.  In other words, in 2017, y'all were still

9    saying that you need to improve documentation in RxConnect

10   for cocktail fills, didn't you?

11        Do you have Plaintiffs' 8415 in front of you?

12   **A**    I do.

13   **Q**    It's the three-year road map in 2017.

14        Do you see that?

15        Do you see that, ma'am?

16   **A**    I do.  I'm just trying to familiarize myself with this

17   document because I'm not on the e-mail string, and I've not

18   seen this.

19   **Q**    All I'm asking you, ma'am, is if you'll go to page 29

20   of the PowerPoint, where you see 2018 to 2020 proposed

21   projects?

22             MR. DELINSKY:  Objection, foundation.

23   Foundation, Your Honor.

24   **A**    What was the page again, sir?

25             THE COURT:  Overruled.

**Harrington - (Cross by Lanier)** 5785

1   **Q**    It's page 29, ma'am, of the PowerPoint.  You'll see in

2   the lower right-hand corner CVS Health 29.

3        These are your projects for 2018 to 2020.

4   **A**    If you can just give me a moment to read the

5   objectives, please.

6   **Q**    Well, ma'am -- okay.  I want to read them out loud so

7   we can read them together, okay?

8   **A**    Okay.

9   **Q**    The project name is Holy Trinity Alert.

10        Do you see that?

11  **A**    I do.

12  **Q**    And the target deployment is first quarter 2019.

13        Do you see that?

14  **A**    I do.

15  **Q**    And the objective, major bullet point, is "Realtime

16  identification of controlled substance cocktail fill."

17        Do you see that?

18  **A**    I do.

19  **Q**    And the projected sources of value, it starts out with

20  "Improve documentation in RxConnect for cocktail fills,"

21  correct?

22  **A**    Correct.

23  **Q**    Fourth bullet point, "Improve patient safety."

24        You see that?

25  **A**    I see that.

1    **Q**    "It will reduce damage to CVS branding."

2         Do you see that?

3    **A**    I see that what was written here.

4    **Q**    And so the idea that this DUR alert in 2000 was

5    alerting all of your pharmacists of the Holy Trinity, that's

6    not a fair thing to be saying under oath, is it?

7    **A**    I'm not sure exactly how the alert fired then.  Like I

8    had said before, to the best of my knowledge, there was a

9    drug-drug interaction because of the increased sedation from

10   the drugs, and it would have fired.

11        It wouldn't have fired with the specific language

12   around the combination of the three drugs together.  And the

13   enhancement that this brought was it provided additional

14   direction on actions for our pharmacists to take to be able

15   to support the patient in those particular situations.

16   **Q**    Ma'am, I just asked you if it's fair to say that the

17   DUR alert doesn't seem to be working for the Holy Trinity

18   because y'all have got a whole project on it just in the

19   last couple of years trying to get the alert in place,

20   right?

21   **A**    I am not sure how effective the DUR alert was during

22   that time frame because I wasn't overseeing it at that point

23   in time.  The project here was just to reshape the

24   visualization for our pharmacists and provide additional

25   direction to them.

1    **Q**     Well, at least we can affirm together that the 2018 to

2    2020 proposed project does not say "Tell them to look at the

3    DUR," right?

4    **A**     I'm sorry, what was the question there?

5    **Q**     Yeah.  Can't we agree that the 2018 to '20 project on

6    the Holy Trinity alert does not say "Just tell them to look

7    at the DUR," does it?

8    **A**     No, it doesn't say that, but I wouldn't expect it to.

9    **Q**     Now, if we continue to look at what you had in place

10   in phase I, we've also got what Mr. Delinsky has put up here

11   as Plaintiffs' Exhibit 15601, which is the Pharmacy

12   Operations Manual; correct?

13   **A**     Yes.

14   **Q**     And Mr. Delinsky looked at that.  But while it says

15   "Employees are expected to fill and refill only legal and

16   authorized prescriptions"...and keep up to date with the

17   changes in the law.

18           You see that?

19   **A**     I do.

20   **Q**     Not even you were keeping up with the changes in the

21   law, were you?

22   **A**     How do you figure that?

23   **Q**     Well, I asked you about a number of different cases,

24   and you'd never heard of them.  Remember?

25   **A**     This was while I was in high school that those cases

1    happened.

2    **Q**    *Medicine Shoppe*, 2008, were you in high school?

3    **A**    I was not in high school then.

4    **Q**    *Medicine Shoppe,* 2008, were you a pharmacist?

5    **A**    I was.

6    **Q**    Did you work for CVS?

7    **A**    I did.

8    **Q**    You hadn't heard of the case, had you?

9    **A**    It was a case.  It wasn't law.

10   **Q**    "Keeping up to date on all state and federal changes

11   in pharmacy jurisprudence."

12        You understand jurisprudence includes cases, right?

13   **A**    To be honest, as I sit here today, I'm not quite sure

14   what jurisprudence includes.

15   **Q**    All right.  At least -- all right.

16        So if we try to find red flags in the manual in 2004,

17   I'm not seeing it anywhere.  Am I missing it?

18   **A**    I'm not sure.  I don't believe it was in policies in

19   2004.

20   **Q**    You're not -- you don't believe it was in policies?

21   **A**    No.

22   **Q**    And how about if we look at Plaintiffs' Exhibit 23305,

23   which was the policy and procedure that was revised as of

24   September of '08 that Mr. Delinsky showed you which had this

25   language in it, in 6.3.

**Harrington - (Cross by Lanier)**

1          Do you see that?

2                    MR. DELINSKY:  Objection.  I don't think I

3     showed the witness that, but I'm more than happy for

4     Mr. Lanier to.

5                    MR. LANIER:  Okay.  I'll be glad to show it to

6     her.

7     **Q**    Ma'am, this is another one that evidently you didn't

8     cover yet.

9          Are you familiar with this?

10    **A**    I am.

11    **Q**    Again, it says, "All pharmacists must adhere to the

12    following."

13         Doesn't give you the red flags, does it?

14    **A**    It does not.

15    **Q**    Now, as we continue through there, I want to ask you

16    about a few more things.

17         But right now we're through with phase I, aren't we?

18    **A**    If you're telling me we're through with phase I, we're

19    through with phase I.

20    **Q**    Well, I mean, we've got the general things that

21    Mr. Delinsky said about you've got supervisors that are

22    supervising the stores and things like that.  I mean,

23    they're supervising all the time.  That's not particular to

24    red flags back then, true?

25    **A**    They had broad responsibilities, but making sure that

1    appropriate dispensing was occurring in our stores was part

2    of their role and responsibility.

3    **Q**    Okay.  And we can see how well they did it by looking

4    at some situations that happened in phase II, can't we?

5         You tracking with me?

6    **A**    I am.

7    **Q**    Phase II, I just want you to assume with me for

8    purposes of this that the records indicate in Lake and

9    Trumbull County, CVS dispensed 14,551,004 oxy and hydro

10   doses in that four-year time period.  Okay?

11   **A**    Okay.

12              MR. DELINSKY:  Objection, Your Honor, to the

13   data.

14              MR. LANIER:  I'm asking her to assume it,

15   Judge.

16              THE COURT:  Yeah, overruled.

17   **Q**    Now, you say that the company started rolling out some

18   things during this time period, right, phase II.  Correct?

19   **A**    Correct.

20   **Q**    And this rollout is one that was happening, I think

21   Mr. Delinsky had it up here, phase II, 2010 to 2013.  That's

22   going to include *East Main*, that's going to go up through

23   the *Holiday* case, correct?

24   **A**    Correct.

25   **Q**    So this is phase II.

1        Now, you said that the validation system got rolled

2   out during this time period.  Remember that?

3   **A**    Prescriber Validation?

4   **Q**    Yes, ma'am.

5   **A**    Yes.

6   **Q**    And that's where y'all would confirm that the doctor

7   had a license or something like that, right?  A DEA number.

8   **A**    It would validate -- and I think to the best of my

9   knowledge, it would validate, you know, the registration,

10  the Schedules that someone was able to prescribe, and things

11  like that.

12  **Q**    Yeah.  And yet, your stores got in trouble for putting

13  out prescriptions without validated DEA numbers, didn't

14  they?

15               MR. DELINSKY:  Objection, Your Honor.

16               THE COURT:  Yeah, sustained.

17  **Q**    Well, ma'am, you know about the settlement agreement,

18  Plaintiffs' Exhibit 10212, that your store entered into in

19  2015 coming out of Rhode Island, don't you?

20  **A**    Yes.

21  **Q**    And you know in that settlement agreement, which we'll

22  mark as Plaintiffs' Exhibit 10212, you know in that

23  settlement agreement that one of the problems the company

24  was settling was this concern that they had been filling

25  prescriptions with invalid prescriber DEA numbers, or under

 1   circumstances where the pharmacist filling the prescription

 2   knew or had reason to know the prescription in question was

 3   invalid or unauthorized.  Correct?  Correct?

 4   **A**    Hang on one second.  I'm just familiarizing myself to

 5   what --

 6   **Q**    I mean, ma'am, you're in your job at this point in

 7   time.  This is part of what you do, isn't it?

 8                MR. DELINSKY:  Objection.

 9                THE COURT:  Hold it.  Yeah, I'll sustain that.

10   Let the witness finish reading the document.  Then you can

11   ask a question, Mr. Lanier.

12                MR. LANIER:  All right.

13   **Q**    Ma'am, the part I'm concerned with, if it helps you,

14   page 3.  It's got the three points.

15   **A**    That's what I'm reading.

16   **Q**    If it helps you recall, we talked about this in your

17   deposition quite a bit.

18   **A**    Okay.  To my knowledge, I thought that this was a

19   forgery case, and so I'm --

20   **Q**    I'm sorry, I can't hear you.  "I thought this was"

21   what?

22   **A**    I thought that this was a forgery case.

23   **Q**    No, that's a different one, ma'am.

24   **A**    Okay.

25   **Q**    Do you see it?

**Harrington - (Cross by Lanier)**          5793

1    **A**      Yup.

2    **Q**      And this is 2015 when this settlement agreement was

3    entered into; is that right?

4    **A**      Yes.

5    **Q**      In fact, we can go on the timeline that you and

6    Mr. Delinsky were putting together, and we can add not just

7    the *Holiday* case, but in 2014 y'all settled a case with

8    Texas -- or in Texas, arising out of Texas.  Remember that?

9    **A**      Yes.

10   **Q**      In 2015 you had your Florida settlement, correct?

11   **A**      Yes.

12   **Q**      In 2015 you also had Rhode Island settlement that

13   we're looking at now, right?

14   **A**      Yes.

15   **Q**      In 2016, you had a Massachusetts settlement, didn't

16   you?

17   **A**      Yes.

18   **Q**      In 2016, you had a Maryland settlement, didn't you?

19   **A**      Yes.

20   **Q**      In 2019 you had another Rhode Island settlement,

21   didn't you?

22                  MR. DELINSKY:  Objection, Your Honor.

23                  THE COURT:  Overruled.

24   **A**      Yes.

25   **Q**      And in terms of how the company reacted to these

1    settlements, I'd like to look at that in a little more

2    detail.  But the first one is what has been shown to you by

3    Mr. Delinsky as Plaintiffs' Exhibit 20699.  This was shown

4    to you by Mr. Delinsky as some of the actions y'all were

5    taking in 2010.

6         Do you see that?

7    **A**    Yes.

8    **Q**    And 2010 is at the start of phase II, isn't it?

9    **A**    Yes.

10   **Q**    And for the first time, in 2010 y'all start talking

11   about red flags are warning signs and listing them.  True?

12   **A**    True.

13   **Q**    Now, what you and Mr. Delinsky did not tell the jury

14   is what had happened two days before this e-mail went out.

15        Do you recall?

16   **A**    I wasn't in my role at that time, so I don't know.

17   **Q**    Well, I know you weren't in your role at that time,

18   but you have read the *Holiday* case very carefully, right?

19   **A**    Yes.

20   **Q**    You've been testifying about the *Holiday* case, haven't

21   you?

22   **A**    Yes.

23   **Q**    And the *Holiday* case is marked Plaintiffs' Exhibit

24   42147-A.

25        You are familiar with the *Holiday* case, aren't you?

1          MR. DELINSKY:  Objection, Your Honor.  We've

2     already discussed this exhibit, it shouldn't be displayed.

3               THE COURT:  Well, overruled.

4     **Q**     You are familiar with the *Holiday* case, aren't you?

5     **A**     I am.

6     **Q**     And you'll see on page 6 -- it's got page numbers up

7     at the top -- 62324, it talks about a December 2010 meeting

8     where the DEA investigators explained to CVS officials

9     various red flags to look for, including a cocktail of

10    oxycodone and alprazolam.  The DI further testified that we

11    brought up examples again of people coming in from the same

12    doctors with the same prescriptions for oxy, 15, 30

13    milligrams, alprazolam 2 milligrams; a lot of people wanting

14    to pay cash, a lot of people wanting to drive distances to

15    the pharmacy or to the --

16               MR. DELINSKY:  Objection, Your Honor.

17               THE COURT:  Sustained.

18          Just ask a question.

19               MR. LANIER:  Yes.

20    **Q**     Ma'am, this meeting where these red flags were

21    detailed happened two days before your company sent out that

22    document Mr. Delinsky and you talked about.  Did you know

23    that?

24    **A**     I didn't.

25    **Q**     Did you know that two days before your company was

 1  being taught -- or being explained, not taught --

 2              MR. LANIER:  Let me start that over, Your

 3  Honor.

 4  **Q**    Did you know two days before that investigators were

 5  explaining these various red flags?

 6              MR. DELINSKY:  Objection, Your Honor.

 7              THE COURT:  Overruled.

 8  **A**    I did not.

 9  **Q**    Did you know that the investigators also explained

10  that calling a doctor to verify whether he wrote a

11  prescription would not be sufficient to determine if they

12  followed the law?  Did you know that?

13  **A**    I know that language, but I wasn't present at that

14  discussion.

15  **Q**    So the first red flags y'all sent out to your

16  pharmacists you send out two days after this meeting in

17  2010.  Fair?

18  **A**    I'm not sure of the exact date.  In *Holiday* it just

19  says December of 2010, but --

20  **Q**    And I'll represent to you from Joe Rannazzisi's

21  affidavit that --

22              MR. DELINSKY:  Objection, Your Honor.

23              THE COURT:  Sustained.

24              MR. LANIER:  I'll keep moving, Judge.

25  **Q**    Ma'am, my question to you is, is there any reason

1    y'all couldn't have sent that e-mail out about red flags 10

2    years earlier?

3    **A**    There wasn't a mechanical reason why we couldn't send

4    an e-mail out about it earlier, but I don't know the reasons

5    why.  The e-mail was crafted at this date or on this time,

6    and I'm assuming it's because we were -- we were learning

7    more, and we wanted to share that information with our

8    pharmacists at that time.

9    **Q**    Ma'am, do you know if -- you're not making excuses for

10   the company not understanding red flags or warning signs

11   before, are you?

12   **A**    I'm not.  As a pharmacist, again, I had -- I think

13   I've testified that as part of my pharmacy practice during

14   that time I would be looking for things that would be

15   considered warning signs.

16   **Q**    Ma'am, but my question to you is, your company could

17   have sent out that e-mail explaining the warning signs much

18   earlier, couldn't it?

19   **A**    Potentially.

20   **Q**    I'm sorry?

21   **A**    Potentially.

22   **Q**    I mean, if they wanted to or if they knew enough to,

23   right?

24   **A**    Potentially.

25   **Q**    And then in 2012 is when the decision finally is

1    coming out on *Holiday*, correct?

2    **A**    Correct.

3    **Q**    And that decision, as Mr. Delinsky said, was a big

4    deal within the company, wasn't it?

5    **A**    It was.

6    **Q**    Got you your new job position, didn't it?

7    **A**    Yes.

8    **Q**    Because the store was going to -- the company was

9    going to try and fix many of the problems that had been

10   pointed out by that decision, fair?

11                   MR. DELINSKY:  Objection, Your Honor.  Two

12   pharmacies.

13                   MR. LANIER:  Oh, no.

14                   THE COURT:  Overruled.

15   **Q**    Ma'am, you understand the company was involved in the

16   *Holiday* case even beyond two pharmacists, right?  Right?

17   **A**    No, my understanding is that *Holiday* was around two

18   stores in Florida.

19   **Q**    But, ma'am, you understand that it was the company

20   that was involved in the decisions, and it was company

21   policies at issue, don't you?

22                   MR. DELINSKY:  Objection, Your Honor.

23                   THE COURT:  Overruled.

24   **A**    My understanding is it was based on the dispensing

25   from the pharmacists at those two locations.

1    **Q**    Ma'am, in the decision itself on page 62323, "Vice

2    president of Pharmacy Operations explained that CVS accepted

3    responsibility on behalf of the respondents."

4                    MR. DELINSKY:  Your Honor, objection.

5          Look, it's clear from the document the respondents are

6    the two pharmacies, and this is legalese being injected

7    into --

8                    THE COURT:  I'll sustain that.

9                    MR. LANIER:  Okay.

10   **Q**    Ma'am, there was a settlement agreement that grew out

11   of this, wasn't there?

12   **A**    Yes.

13   **Q**    And the settlement agreement was with CVS, wasn't it?

14   **A**    Yes.

15   **Q**    So CVS in the settlement agreement in 2015 took

16   responsibility and agreed to certain terms, didn't it?

17   **A**    CVS agreed to certain terms in that settlement

18   agreement.

19   **Q**    And all of these changes came about after 2012 not

20   because two pharmacists were renegade, but because the

21   company needed to change its policies, right?

22                    MR. DELINSKY:  Objection.

23                    THE COURT:  Overruled.

24   **A**    No.

25   **Q**    Meanwhile, during this same time period, let's talk

1    about what was happening in Lake and Trumbull Counties,

2    because the statistics were arriving in some of the CVS

3    stores there, weren't they?

4    **A**    I'm not sure.

5    **Q**    You didn't recall Store 4351 shows an increase in

6    volume with Dr. Demangone, for example?

7    **A**    I don't recall.

8    **Q**    You don't recall whether or not the stores were

9    showing problem signs from Dr. Veres and Dr. Torres?

10   **A**    I don't recall.

11   **Q**    Well, we'll get to more of that in a moment.  But let

12   me just get you to at least agree that during this phase II

13   time, after *Holiday*, that's when your company started

14   sending out documents like you and Mr. Delinsky talked

15   about, DEA & Pharmacy Regulatory Training; true?

16   **A**    Yes.

17   **Q**    No reason you couldn't have sent that out in an

18   earlier phase, is there?

19   **A**    Yeah, I'm not sure of the content of the training that

20   was prior to that.

21   **Q**    "I'm not sure of the content of the training"?

22       When you answered Mr. Delinsky's questions about it,

23   you don't know what the content was?

24   **A**    No, no, no.  Prior to the trainings that we talked

25   about here, like the training that was -- pharmacists were

 1   receiving in, say, 2000, I just -- I don't have copies of

 2   what that was, and I don't specifically remember for myself

 3   what the training that I would have done.

 4   **Q**    Yeah, we've not been handed -- in all of the documents

 5   produced, we've not been handed anything even remotely

 6   similar to that.

 7                MR. DELINSKY:  Objection, Your Honor.

 8   **Q**    Would you expect --

 9                THE COURT:  Overruled.

10   **Q**    Let me ask it this way.

11        Do you really believe there was training like that

12   that listed red flags back in phase I?

13   **A**    I'm not sure of the content of what the training would

14   have been there.  I'm sure that the training would have

15   reflected that pharmacists needed to comply with state and

16   federal regulations.

17   **Q**    Okay.  But what those state and federal regulations

18   were is the issue, isn't it?

19   **A**    Well, I don't know what the state and federal

20   regulations were is what the question.

21   **Q**    Well, I mean, you were asked these questions by

22   Mr. Delinsky about what are red flags and potential red

23   flags.

24   **A**    Correct.

25   **Q**    Your company calls it a red flag, doesn't it?

**Harrington - (Cross by Lanier)**

1    **A**    We call it red flag.  We call it potential red flag.

2    We call it warning signs.  The language has varied in our

3    documents.

4    **Q**    And the *Holiday* case calls them red flags, doesn't it?

5    **A**    I believe that it refers to it as red flags.

6    **Q**    Doesn't say potential red flags, does it?

7    **A**    No.

8    **Q**    And you pointed out you don't know what Joe Rannazzisi

9    meant, you can't read his mind when he said potential red

10   flags for those slides, right?

11   **A**    I can't speak to Joe Rannazzisi's state of mind.

12   **Q**    Right, because if you look at the PowerPoint, you'll

13   see he talks about how to resolve the red flags later.  Do

14   you remember that?

15   **A**    I do remember him talking about it.

16   **Q**    And do you perhaps remember, as the jury might, that

17   his explanation of why he called it "potential" is because

18   it's not an exhaustive list?

19               MR. DELINSKY:  Objection, Your Honor.

20               THE COURT:  Overruled.

21   **Q**    Do you recall that?

22   **A**    I don't recall that.

23   **Q**    Okay.

24               MR. DELINSKY:  Your Honor, we didn't show any

25   testimony because of Your Honor's rules.

1           THE COURT:  Overruled.

2    **Q**    Next, Mr. Delinsky asked you, looking in this same

3    phase and time period, about the company policy on

4    documentation.

5           You understand that we've had an expert look at the

6    actual prescriptions that y'all filled, 2,000, a sample

7    size, during this time period, ten year time period.

8           Did you know that?

9    **A**    I didn't know that.

10   **Q**    And so a lot of the prescriptions didn't have any

11   documentation on them.

12          Is it your testimony that the official company policy,

13   you're swearing under oath here, let all the pharmacists

14   know from headquarters, the policy is resolve red flags,

15   don't worry about documenting it?

16              MR. DELINSKY:  Objection, Your Honor.

17   **Q**    Is that your policy?

18   **A**    That is not our policy.

19              THE COURT:  Overruled.  She can answer the

20   question.

21   **Q**    Your policy is the exact opposite of that, isn't it?

22   **A**    Our policy states that our pharmacists need to

23   document it.  But as I testified earlier, the important

24   thing is that they're resolving red flags.

25   **Q**    Well, you just said "Our policy states our pharmacists

1    need to document it."

2          That's not what the policy says.  You were handed the

3    policy by Mr. Delinsky.  It's CVS-854.

4          See that?

5    **A**    Yes.

6    **Q**    If you look down on page 9, this is one he didn't read

7    to you carefully, but he handed it to you.  It says, "CVS

8    pharmacists" -- does that say -- "need to document"?

9    **A**    It says "are required."

10   **Q**    -- "are required to document" how many of the steps

11   taken to resolve red flags?

12   **A**    "All steps."

13   **Q**    And that's a requirement within the company, isn't it?

14   **A**    It's required in our policy.

15   **Q**    So this idea of, ah, just we'd rather you resolve the

16   red flags than document it, that's not fair.  What the

17   company says is, resolve it and document it, right?

18   **A**    That's what's in our policy.

19   **Q**    I'm sorry?

20   **A**    That's what's in our policy.

21   **Q**    Yeah.  And it's not just there.  I can go through

22   multiple incarnations of your policy, given time, and find

23   it in them, couldn't I?

24   **A**    Yes.

25   **Q**    So now we get to documents like in this same time

1    period -- we are at time period II, phase II -- we get to

2    documents about Dr. Torres and Dr. Veres.

3          And I'm handing you document 8406.

4          This is out of Warren, Ohio, in the counties we're

5    concerned about.

6          Do you see that?

7    **A**    I do.

8    **Q**    And this is Dr. Torres and Dr. Veres.  There's an

9    issue that's arisen about their oxycodone and OxyContin

10   scripts.

11         Do you see that that?

12              MR. DELINSKY:  Objection.  Foundation, Your

13   Honor.  Ms. Harrington is not in the document.

14              MR. LANIER:  Well, she handled this

15   investigation.

16              THE COURT:  Why don't you ask her if she

17   recognizes the document or knows anything about it first.

18   **Q**    Ma'am, didn't you work on the investigation for this?

19   **A**    Mine just has nonresponsive documents.

20   **Q**    Sorry, I'm really having trouble hearing you.

21   **A**    My form is blank.

22   **Q**    That's just the second and third page and fourth page

23   and fifth page and sixth page and seventh page; then it gets

24   interesting after that.

25              MR. LANIER:  No, she's got the right document.

1    When it was produced to us, those pages were blank.

2                 MR. STOFFELMAYR:  But they're not on the hard

3    copy, Mark.

4                 MR. LANIER:  All right.  I'm going to keep

5    moving on in the interests of time, ma'am.  I've got other

6    documents that will work.  That's fine.

7    **Q**    Now, as a practical matter, in 2014 y'all became aware

8    of the high volume of prescriptions.

9         In 2014 -- let me back up.

10        You testified that when a store or a doctor tripped

11   y'all's numbers in this time period, that an alert would go

12   out, and it would indicate that.  Remember?  And y'all would

13   check in on the store.  Right?

14   **A**    Right.  So in our Controlled Substance Monitoring

15   program for our stores, we would evaluate their dispensing.

16   **Q**    And Michelle Travassos was one of the people involved

17   in that?

18   **A**    Michelle Travassos led that work.

19   **Q**    And Lisa Ciccolella?

20   **A**    Maybe.

21   **Q**    All right.  Well, Michelle Travassos reports to you?

22   **A**    Today she doesn't.  She's a couple layers below me.

23   I'm not sure if she was reporting to me during this time

24   frame.

25   **Q**    Were you aware of the two --

1           MR. DELINSKY:  Your Honor, foundation.

2    Objection on that question.

3    **Q**    I'll ask it this way.

4           Were you aware that Dr. Torres and Dr. Veres were

5    contributing to 70 to 80 percent of the store's hydrocodone

6    volume?

7    **A**    Back in 2014, I'm not sure that I was aware of that.

8    I wasn't on this e-mail string.

9    **Q**    But did you become aware of that later as you were

10   involved in the investigation?

11   **A**    I wouldn't have been involved in the investigation.

12   There would have been people that were investigating and the

13   team that, you know, would have been handling that from the

14   store monitoring program piece.

15   **Q**    So your involvement would be at no layers of this?

16   **A**    During this time, I'm not sure if I had another

17   director in place, but typically a director would close

18   these cases.  I may have been part of that process, but I am

19   not sure.  I don't recall the specific case.

20   **Q**    Well, you then said that there would typically be an

21   interview done of the doctor.

22          Do you recall that?

23   **A**    If the doctor was elevated to the Prescriber program,

24   yes.

25   **Q**    What does that mean, "elevated to the Prescriber

1    program"?

2    **A**    So if this was part of the Controlled Substance

3    Monitoring program in which we went in and did an audit in

4    the stores, depending on the information that came out of

5    that, if there were prescribers that were identified, that

6    information would have been shared with the Prescriber team.

7    The Prescriber team would have been done research, maybe

8    talked to folks in the field, and then made decisions on

9    whether or not an interview was warranted.

10   **Q**    And when you testified about these issues and you said

11   that we would do an interview and we would look on Google,

12   and things like that, did you check -- well, first of all,

13   I'm handing you Plaintiffs' 23330.

14        Is this the form that you're talking about that would

15   be filled out?

16   **A**    Yes, this is one version.  We've had multiple versions

17   over the years.

18   **Q**    And have you -- are you familiar, does it draw your

19   attention if there's a doctor like Frank Veres who has this

20   filled out on him?  Do these come to your attention?

21   **A**    I see them if the doctor is being recommended for

22   suspension.  And currently, today, we do audits of certain

23   prescribers that were cleared, as part of our practice.

24   **Q**    And he -- so you know what ultimately happened with

25   Dr. Veres years later, right?

1    **A**    Yes, we ended up ceasing filling his controlled

2    substances --

3    **Q**    So this would have come to your attention at that

4    point in time, fair?

5    **A**    Yes.

6    **Q**    So in that regard, I'll ask you to look at Plaintiffs'

7    Exhibit 23330 and confirm for the jury --

8              MR. DELINSKY:  Wait, Your Honor, I think

9    there's some confusion.  The later time it percolated up to

10   her attention, not in this instance.

11             MR. LANIER:  But if it percolated up, Your

12   Honor --

13             THE COURT:  She can look at the document, he

14   can ask a question.  If she knows something about it, she

15   can answer.

16   **Q**    Prescriber name:  Frank Veres.  Date and time of

17   interview:  March 2018, right?

18   **A**    Correct.

19             MR. DELINSKY:  Objection.  Foundation, Your

20   Honor.

21             THE COURT:  We don't have a question yet.  So

22   let's have a question.

23             MR. LANIER:  Thank you, Judge.

24   **Q**    Ma'am, this information, if you'll look on page 2, was

25   it brought to your attention in this form or in some other

**Harrington - (Cross by Lanier)**

1    form that this doctor says he has a thick list of patients

2    he's caught diverting their medication?

3         Did that come to your attention?

4    **A**    I don't recall.

5    **Q**    Would you expect it to be brought to your attention?

6    **A**    It would depend -- again, I don't know that I

7    participated in this interview.  I'm looking at the folks

8    that are at the top, and my name does not appear there.

9    **Q**    Well, ma'am, in light of the position you have, would

10   you expect it to come to your attention if y'all interview a

11   doctor and he says that there have been occasional suicides,

12   but not intentionally, and definitely heroin and fentanyl

13   overdoses from his patients?  Would that come to your

14   attention typically?

15   **A**    Again, it would depend on the circumstances the

16   prescriber provided to explain more in the context.

17   **Q**    All right.  We're moving along, running out of time.

18   Let's go to phase III.

19        Phase III.  First of all, as I ask you these

20   questions, I want you to assume with me that during this

21   time period up through 2019, at least, that your pharmacies

22   in these counties dispensed another 14,130,712 doses of oxy

23   and hydro.  All right?

24             MR. DELINSKY:  Objection, Your Honor.

25   **Q**    Can you assume that with me?

```
 1                   THE COURT:  Overruled.

 2   Q    Okay.  Within the framework of that, ma'am, you have

 3   got all of these programs that you cited that started coming

 4   up in phase III, right?

 5   A    Yes.

 6   Q    And these programs, whether they're good or not,

 7   really don't do anything about the problems that happened in

 8   phase II or phase I, do they?

 9                   MR. DELINSKY:  Objection.

10                   THE COURT:  Overruled.

11   A    The initiatives would have had an impact at the time.

12   Q    Right.  So, for example, when Mr. Delinsky puts

13   CVS-MDL-00945, this Policy and Procedure on Red Flags -- do

14   you remember this one?

15   A    I do.

16   Q    I wrote down here 10/2014.  That was the date of this,

17   wasn't it?

18   A    Correct.

19   Q    And not only was it the date of it, but if you look at

20   the back, this was a brand new policy, wasn't it?

21   A    It was.

22   Q    And this is a policy that Mr. Delinsky talked about

23   having red flags listed, patient red flags, prescriber red

24   flags.  Remember those?

25   A    Yup.
```

**Harrington - (Cross by Lanier)**

1    **Q**    Now, there is no reason that CVS couldn't have had

2    this policy in place in 2000, is there?

3    **A**    I'm just not sure that we had all of the information

4    that's in this policy.  This policy is pretty extensive for

5    us to be able to put it in place during the 2000s.

6    **Q**    Ma'am, there's no reason -- just concentrate on the

7    red flags.

8        There's no reason your company couldn't have told the

9    pharmacists and trained the pharmacists about these red

10   flags in 2000, is there?

11   **A**    We could have used this specific language historically

12   if we had it, I guess.

13   **Q**    Well, ma'am, you had people pay in cash for

14   prescriptions back then, didn't you?

15   **A**    Yes.

16   **Q**    You had people where the patient or the prescriber's

17   not located within the store's geographic area, didn't you?

18   **A**    Yes.  And pharmacists during that time were looking

19   for those things.

20       And I shouldn't say that.  I as a pharmacist during

21   that time was looking for those things.  I can't speak on

22   behalf of --

23   **Q**    Then if you were looking for those things back then,

24   your company could have trained and put a policy in place on

25   those things back then, true?

1    **A**     Potentially.

2    **Q**     Well, no, not potentially.  What would have stopped

3    them?

4    **A**     I wasn't in the position at the time.  I don't know.

5    I don't know the reasons why they would have made that

6    decision.

7    **Q**     Well, they would have made it because it's the right

8    thing -- the same -- let me ask it this way.

9         Following the law ought to be done all the time, fair?

10   **A**     Fair.

11   **Q**     The law hadn't changed.  The law still reads

12   "corresponding responsibility" the same way it did when you

13   started practicing, doesn't it?

14   **A**     It did.  But there aren't red flags that are listed on

15   the law under the corresponding responsibility language.

16   **Q**     Ma'am, the red flags are things that you're supposed

17   to be trained on, aren't they?

18                   MR. DELINSKY:  Objection.

19                   THE COURT:  Overruled.

20   **A**     It was just things that I knew as part of practice of

21   pharmacy of making sure that I was dispensing prescriptions

22   appropriately.

23   **Q**     That wasn't my question, ma'am.

24        My question was, y'all are supposed to be trained on

25   those red policies, aren't you?

1      Y'all are supposed to be trained on those red flags,

2  aren't you?

3                  MR. DELINSKY:  Objection.

4                  THE COURT:  Overruled.

5  **A**    We train on red flags today.

6  **Q**    And there's no reason you couldn't have trained on red

7  flags during phase I or phase II, is there?

8                  MR. DELINSKY:  Objection, Your Honor.  There

9  was training in phase II at a minimum.

10                 THE COURT:  Overruled.

11 **Q**    There's no reason not to have this policy in phase I

12 or phase II, fair?  At least as it pertains to red flags?

13                 MR. DELINSKY:  Same objection.

14                 THE COURT:  Overruled.

15 **A**    Sir, we had other policies.  I don't know about this

16 particular policy and why or why not it might have been able

17 to be put in place earlier.

18 **Q**    All right.  A couple of cleanup matters, and we'll be

19 done.

20      I mean, I could go through, like, the NarxCare visual.

21 That's like not only phase III, that's late phase III, isn't

22 it?  Right?  Right, ma'am?

23 **A**    It is.  It's an enhancement to PMP.

24 **Q**    And then the August situation in Kentucky --

25 **A**    Yes.

1    **Q**    Now, you testified about that, right?

2    **A**    Yes.

3    **Q**    It's phase III.  Happened last August, right?

4          Mr. Delinsky's firm represented CVS in that case,

5    correct?

6    **A**    I'm not sure who represented us in that case.

7    **Q**    Well, when he asked you these questions, had you done

8    any investigation into the case itself, other than answer

9    his questions?

10   **A**    I was familiar with components of the case because I

11   was familiar in the suspension of Dr. Hansen initially.

12   **Q**    All right.  So you are able to confirm with the jury

13   that none of the prescriptions were refused for lack of

14   medical necessity, true?

15                 MR. DELINSKY:  Objection.

16                 THE COURT:  Overruled.

17   **A**    So I'm confused by your question.  None of the

18   prescriptions that we refused to fill --

19   **Q**    No, the doctor never had a prescription refused for

20   lack of medical necessity, true?

21                 MR. DELINSKY:  Objection.

22                 THE COURT:  Overruled.

23   **A**    I don't know what our pharmacists were refusing in our

24   store locations.

25   **Q**    In fact, what your company did is sent the doctor a

 1    notice that said for -- "Here's your one-week notice that we

 2    won't be filling controlled and noncontrolled substances,"

 3    true?

 4    **A**    I believe that to be false, to the best of my

 5    knowledge.

 6    **Q**    Are you sure?

 7    **A**    To the best of my knowledge, we ceased filling

 8    controlled substances only.

 9    **Q**    Well, if you'll look at the injunction, even the

10    injunction says "You are enjoined from refusing to fill

11    prescriptions written by Kendall Hansen, M.D., for any

12    pharmaceutical product."

13         Do you see that?

14    **A**    I see that, but I believe what was at question was

15    controlled substances.

16    **Q**    And in truth, if you go back and look at the arguments

17    in the case, at least in the briefing, the truth of the

18    matter was a corporate decision was made to quit filling any

19    of these prescriptions for anything without reviewing a

20    single medical record or interviewing a single patient;

21    true?

22              MR. DELINSKY:  Objection.  Foundation, Your

23    Honor.

24              THE COURT:  Overruled.

25    **A**    So again, I believe we stopped filling his controlled

1     substances, which is our typical process when we suspend a

2     provider.  Through our research and interview process we had

3     questions and concerns about the dispensing of Dr. Hansen.

4                    MR. LANIER:  Judge, do we break at 3 or 3:30?

5                    THE COURT:  Well, normally at 3.  If you're

6     very close to finishing, I didn't want to cut you off at the

7     end.  If you want to take a break now, that's fine.

8                    MR. LANIER:  If we can take a break now, I may

9     be done, but it will give me a chance to look and see if I

10    missed anything.

11                   THE COURT:  Fair enough.

12         Ladies and gentlemen, we'll take our usual break.  15

13    minutes.  Usual admonitions.  And then we'll pick up with

14    Ms. Harrington's testimony.

15                    (Recess taken at 3:04 p.m.)

16                    (Jury present in open court at 3:22 p.m.)

17                   THE COURT:  Please be seated, ladies and

18    gentlemen.

19         Ms. Harrington, you're still under oath.

20         Mr. Lanier, you're still up, if you wish.

21                    MR. LANIER:  Thank you, Your Honor.  I do have

22    a few more things.  I'll try to move rapidly.

23    BY MR. LANIER:

24    **Q**     Ma'am, to reorient us, we were looking at the three

25    phases.  And I guess you were not here for Katherine Keyes

1    as she explained -- Dr. Keyes explained these phases and how

2    they manifested themselves in the counties and across the

3    U.S.

4         But for at least for yours and my questions, you

5    understand I've been asking them in those three ranges,

6    right?

7    **A**    Correct, I understand the years you've been asking me

8    about when you've asked me the questions.

9    **Q**    Great.  And in that regard, I want to ask you just a

10   few more questions.

11        By the way, the same thing was on the death chart.

12   You can see the same phases in terms of how the deaths went.

13                    MR. DELINSKY:  Foundation.

14                    THE COURT:  Overruled.

15   **Q**    And these are actual Lake and Trumbull County deaths

16   as well as the nation and Ohio.

17        You see that?

18   **A**    I do.

19   **Q**    Okay.  Now, one last thing I really want to look at

20   with you is this red flag document that y'all finally put

21   out, your new policy that I went over briefly.  It was

22   CVS-945, and it came out in October of 2014.

23        And my question to you had been, why didn't y'all do

24   that earlier?

25        Remember those questions?

**Harrington - (Cross by Lanier)**

1    **A**    I do.

2    **Q**    And in that regard, a document that I failed to show

3    you that I'd like to is Plaintiffs' Exhibit 8439.  8439.

4          You remember we talked about, right before the break,

5    this new policy that was done in December of '14, right?

6                    THE COURT:  I think it's October 2014, right?

7                    MR. LANIER:  Oh, you're right, Judge.  I went

8    dense.

9    **Q**    October of 2014.

10                   MR. LANIER:  Thank you, Judge.

11   **Q**    Correct?

12                   THE COURT:  Well, Mr. Weinberger caught it.

13                   MR. LANIER:  Oh, thank you, Mr. Weinberger,

14   your not-so honor.

15   **Q**    October 1, 2014, this was a new policy, correct?

16   **A**    Yes.

17   **Q**    But you've already testified you knew about this years

18   before, right?

19   **A**    I knew about things that I was cautious on on filling

20   prescriptions during my time that I was dispensing

21   prescriptions on the bench.

22   **Q**    Right.  And we know about the wording of these because

23   well over a year before that you got Plaintiffs' Exhibit

24   8439, didn't you?

25   **A**    I see that I'm on the copy line there.

1    **Q**    Well, the jury actually knows a lot of the people on

2    this.

3         Did you know Ms. Polster came and testified here I

4    believe about a week ago.

5         Do you know her?

6    **A**    I do.

7    **Q**    She's with Walgreens, right?

8    **A**    That is correct.

9    **Q**    Ms. Hiland was in here testifying just a couple of

10   days ago with Walmart.

11        You know her, correct?

12   **A**    I do.

13   **Q**    Mr. Davis came weeks ago.  He's with you at CVS,

14   correct?

15   **A**    He is.

16   **Q**    And then you're the Nicole J. Harrington, right?

17   **A**    Correct.

18   **Q**    And so Tasha Polster has sent this document around to

19   y'all, CVS, Walmart, and Walgreens.  Right?

20   **A**    Correct.

21   **Q**    Because y'all are all working together trying to come

22   up with a draft statement, aren't you?

23   **A**    We were on a working committee together, yes.

24   **Q**    And that working committee is of a trade association.

25   It's a something y'all all support and work together on,

1    right?

2    **A**    Correct.

3    **Q**    And in the introduction we're able to read, "The

4    information presented in this guide is based upon actual

5    behaviors, actions, and trends observed by both healthcare

6    prescribers in their practice and law enforcement and

7    regulatory agencies in the course of their investigations of

8    both prescribers and individuals involved in illegally

9    prescribing, obtaining, or distributing prescription

10   controlled substances."

11          Do you see that?

12   **A**    I see that language written there.

13   **Q**    And again, it makes the point, "This is not an

14   all-inclusive list but a framework to support

15   decision-making."

16          Do you see that as well?

17   **A**    I do.

18   **Q**    This wasn't something brand new.  This is something

19   that's been around for a while, isn't it?

20   **A**    When you say "this," are you referring to this

21   document or are you referring to these concepts or are you

22   referring to red flags?  I'm not sure what --

23   **Q**    I'm referring to the information presented in this

24   guide.

25   **A**    I'm not a hundred percent familiar with all of the

1   information that is presented in the guide.  I know that I

2   would have received it back then.  So I can't really speak

3   to the entirety of the guide and if all that information was

4   present.

5   **Q**    Well, let's look at a little bit of it.

6        "Framework For Decision-making, when presented with a

7   prescription for controlled substances, there are three key

8   lenses:  Prescriber red flags, individual red flags, and

9   prescription red flags."

10        Do you see that?

11  **A**    I do.

12  **Q**    And then for each of these lenses, this guide presents

13  the following information.

14        By the way, it doesn't call them potential red flags

15  when y'all are writing amongst yourself, right?

16  **A**    Well, this language right here doesn't call it that.

17  I don't know if it's referred to that in the course of the

18  document.

19  **Q**    It says, "These are areas of concern the pharmacist

20  could look for when evaluating the prescription.  Red flags

21  represent behaviors, actions, or trends that have been

22  observed or associated in cases where controlled substances

23  have been prescribed or obtained illegally."

24        You see that?

25  **A**    I see that.

1    **Q**     "Any red flags that are present should be resolved by

2    the pharmacist as part of the decision-making process."

3          You see that as well?

4    **A**     I do.

5    **Q**     And if we look at the red flags, they're divided up.

6          Prescriber red flags, right?

7    **A**     Yes.

8    **Q**     And then y'all wind up doing the same thing in your

9    policy over a year later when you finally issue a new policy

10   on this, and you have a section entitled Prescriber Red

11   Flags, right?

12   **A**     Yes.  But prescriber red flags are referred to, you

13   know, if you go back to the 2010 guidelines that we sent out

14   as well, they're articulated differently in those 2014

15   guidelines that you showed.

16   **Q**     Yeah, this has got more of them, doesn't it?

17   **A**     It does.  But I just -- I didn't want to be remiss in

18   pointing back to the 2010 guidelines.

19   **Q**     Oh, we've got that, because I was asking why you

20   didn't do that in 2000.  Remember?

21          But this has got more of them.  And even with your one

22   with more of them, the official policy, y'all left out a

23   bunch that had been talked to -- or that y'all had been

24   talking about amongst yourself, didn't you?

25   **A**     I'm not sure.  I've not matched up the list.

1    **Q**    Well, for example, number 5, "Prescriber commonly

2    writes narcotic prescriptions for individuals between 18 to

3    35 years old," that's not listed under your prescriber red

4    flags, is it?

5    **A**    Yeah, but it may be listed under patient red flags.

6    **Q**    It's not.

7    **A**    Age is not?

8    **Q**    Nah, age isn't there.  Sorry.

9         Didn't make your list, did it?

10   **A**    In this one area I guess it did not.

11   **Q**    And yet it talks about the relevance, that there tends

12   to be a higher prevalence of abuse within this age range,

13   and that outside of the oncology or hospice setting, there's

14   generally a low incidence rate of individuals requiring

15   long-term therapy.

16        See?

17   **A**    I see that.

18   **Q**    Y'all didn't include number 6, that the prescriber

19   operates on a cash-only basis, to pick up those doctors that

20   only work with cash.

21        You didn't have that in there, did you?

22   **A**    Yeah, I'm not sure if that was in there.

23   **Q**    Well, you can look, ma'am.  It's not long.  There it

24   is.

25        It's not in there, is it?

1    **A**    It's not, but I don't think the list was meant to be

2    exhaustive.

3    **Q**    Right.  This list that is in the document that y'all

4    were e-mailing amongst yourself specifically says this isn't

5    exhaustive.  But you've got ones that y'all are talking

6    about why it's important and why it's a red flag, and you

7    don't include it in your own policies over a year later when

8    they come out.  Right?

9    **A**    And I'm not sure if this is the final copy and what

10   made the list of things that were the final recommendations.

11   It does appear, at least my copy, it doesn't in yours, that

12   it is a draft version that's still being edited.

13   **Q**    I'm not fussing that point, ma'am.  I don't care one

14   way or the other if it's a draft or real.

15         You understand?

16         I'm saying, y'all were told why these are relevant red

17   flags.  Y'all are discussing it amongst yourself.  And you

18   don't come out with a policy for over a year later, and when

19   you do, you don't include some of these.  True?

20   **A**    Our policies prior to this included red flags.  And

21   again, we don't usually -- we articulate that it isn't an

22   exhaustive list.

23   **Q**    All right.  So, ma'am, help me here, because I feel

24   like we're not communicating well.

25         Show me your policy that has the red flag for

1    prescribing individuals between 18 to 35 years old.  Show it

2    to me or tell me when it is, and I'll find it.

3    **A**    Yeah, I don't know that that particular specific line

4    item is in a policy.

5    **Q**    Ever?

6    **A**    I'm not sure.

7    **Q**    So you're not swearing under oath that it was already

8    there in 2010, are you?

9    **A**    I'd have to go back and look at the document from

10   2010.

11   **Q**    It isn't there.  You can look -- if you want to look,

12   go look.

13   **A**    I don't see it there.

14   **Q**    Mm-mm.  Or that the prescriber's on a cash-only basis,

15   not there, is it?

16   **A**    It is not.

17   **Q**    All right.  And again though, you shouldn't have --

18   the public shouldn't have to wait for CVS to get in legal

19   trouble before they start being responsible under the law.

20   Agreed?

21              MR. DELINSKY:  Objection, Your Honor.

22              THE COURT:  I'm going to sustain it the way it

23   was asked.

24              MR. LANIER:  All right.  I'll reword it, Your

25   Honor.

1    **Q**    We should be able to expect CVS to follow the law at

2    all times, shouldn't we?

3    **A**    Yes.

4    **Q**    CVS, y'all have a legal department with in-house

5    lawyers, don't you?  You have a Regulatory department that's

6    in charge of making sure regulatory compliance happens,

7    don't you?

8    **A**    Yes.

9    **Q**    You have people whose job it is to make sure that

10   y'all understand the law, that you train on the law, and

11   that you follow the law.  True?

12   **A**    Yes.

13   **Q**    And it's been that way ever since you started, hasn't

14   it?

15   **A**    I can't speak to all the departments when I first

16   started as a pharmacist if those folks were all in place,

17   but I can speak to that in my role today.

18              MR. LANIER:  All right.  I'll pass the

19   witness, Your Honor.

20              THE COURT:  Okay.  There's an opportunity for

21   any of the jurors, if you have questions, to provide them to

22   Mr. Pitts, and then I'll show them to counsel.  Thank you.

23        This is our protocol, Ms. Harrington.

24        (Juror question review.)

25              MR. DELINSKY:  May I proceed, Your Honor?

1              THE COURT:  Yes, Mr. Delinsky.

2                        - - - - -

3                   REDIRECT EXAMINATION

4      BY MR. DELINSKY:

5      **Q**    Okay, Ms. Harrington, we're going to go through the

6      questions from the jury before we get to my questions.

7      Okay?

8      **A**    Sure.

9      **Q**    And I'll just pick them out random order, okay?

10     **A**    Okay.

11     **Q**    All right.  There's a number on this page.

12          "Do the commissioners of the New Hampshire Board of

13     Pharmacy assist in reprimanding pharmacists for improper

14     dispensing/conduct?"

15          Let's stop there.

16     **A**    Okay.  So it would depend on the circumstances around

17     that, but there have been instances in which improper

18     dispensing and conduct, the New Hampshire Board of Pharmacy

19     does provide recommendations on reprimands, fines, letters

20     of consent, things like that.

21     **Q**    Okay.  Let's keep going.

22          "If yes, with you being employed by CVS, how do you

23     ensure there's not a conflict of interest or bias should a

24     CVS pharmacist need reprimanding?"

25     **A**    So I recuse myself from any of those conversations

1    and/or any decision-making at the end.  So I can't even

2    participate in the conversation at all, which is sometimes

3    just frustrating because I feel I have additional context

4    that I can provide to a situation and explain to other Board

5    commissioners because they might not work in retail or they

6    might not work for CVS, they don't understand it.  But we

7    are not allowed to participate in anything that we might

8    have a conflict of interest.

9         So whether it be through that or maybe somebody like a

10   pharmacist that might have worked for me prior when I was a

11   pharmacy supervisor in New Hampshire, I recuse myself from

12   those cases as well.

13        And our Board counsel is really good at helping us

14   make sure that we're not violating anything by participating

15   in something where we might have a conflict.

16   **Q**    And Ms. Harrington, when you say "Board counsel," am I

17   right that's not CVS counsel, it's counsel to the New

18   Hampshire Board of Pharmacy?

19   **A**    Correct, correct.  We operate under the Office of

20   Professional Licensure, and they have counsel that

21   represents each of the Boards, Board of Medicine, Board of

22   Pharmacy, Board of Nursing.

23   **Q**    Next question.  "Are pharmacists giving the doctor

24   review interviews?"

25        Why don't we go through them all.

1        "What are the questions that are asked?  Who audits

2    the results of the interviews?  Is there a specific script

3    that's used?"

4    **A**     Yup.  So there are folks that are on my team that are

5    doing the interviews.  There's always at least one

6    pharmacist, and we always have multiple people on the

7    interview.  We feel that it's helpful to have two people to

8    be able to hear what the provider says, make sure that we've

9    captured all the right information, also to serve as a

10   witness just in case.

11        We do use a questionnaire, but we shape that -- the

12   questions based on the concerns that we might be seeing.

13   You know, so not all the prescribers that are being

14   escalated look the same, so we might need to dig deeper into

15   one problem or another.

16        So, like, if you were to look through a series of the

17   doctor questionnaires, they might not all be filled out a

18   hundred percent completely because we might be delving into

19   a different area with a different provider, or there might

20   be a section on there that that provider doesn't necessarily

21   have a concern with, so we might not ask those questions

22   based on that.

23        And then who audits the results of the interviews?

24   That team makes recommendations on prescribers that we would

25   then take an action.  That is brought to a committee or

 1   group that Tom Davis, myself; we will oftentimes have one of

 2   our attorneys with us.

 3        We also, if we have a really challenging case that

 4   we're grappling with some very specific more medical

 5   questions that would be -- we would need a doctor's

 6   expertise, we have medical directors that we can call in to

 7   join the conversation to be able to help us with that.

 8        We've had some really complex medical conditions that

 9   we've struggled and grappled with whether or not the

10   prescribing is appropriate, and the medical directors will

11   help us evaluate that because we just don't have the

12   background.

13        And then --

14   **Q**   I'm sorry.  Is there --

15   **A**   I was just going to say, and then the other thing, we

16   now audit a subset of doctors that are kept active just to

17   make sure that we're not missing anything.  So I participate

18   in those audits along with the team just to make sure that

19   the thinking and any questions that they might have,

20   concerns that they might have, are being answered.

21   **Q**   Let me just try to follow up and tie together this

22   audit question, which is a good and important one.

23        If your team beneath you who reports to you decides to

24   suspend a doctor, that gets elevated in every instance?

25   **A**   Yes.

1   **Q**     Okay.  If your team decides not to suspend a doctor,

2   traditionally that hasn't been elevated, correct?

3   **A**     That is correct.

4   **Q**     So that wouldn't be audited, correct?

5   **A**     For everybody except for the small group that we audit

6   just to validate the thinking is appropriate.

7   **Q**     Okay.  "Have you and CVS been an advocate for a

8   national PDMP?"

9   **A**     We have.  So we've spent a lot of time talking to many

10  folks about a national PMP.  I think the challenge is that

11  people may disagree about what a national PMP is and how

12  that should be created, because there have been different

13  solutions that have been proposed at different times.

14          So there may be specific instances in which I may not

15  have agreed with a proposal, but what we're looking for is

16  an actual national PMP so no, you know, state -- states

17  doing things differently because we operate in all of our

18  states.

19          It's a challenge when we have this kind of patchwork

20  of how pharmacists are seeing or using PMP or PMP looks

21  differently.  It's helpful if we could have one solution

22  across all of our stores.

23          I would love to be able to do this.  So we --

24  **Q**     Let me just read it into the record --

25  **A**     Sorry.

**Harrington - (Redirect by Delinsky)**

1    **Q**    No, that's okay.

2         "Have you taken data from 10 years ago and entered

3    that information into NarxCare to see what risk levels were

4    like when the opioid medication was being heavily marketed?"

5    **A**    So the use of NarxCare or the PMP in most instances is

6    heavily regulated of when and how you can access it and how

7    you can use the information, and that's due to privacy

8    concerns.  This is private healthcare information that's

9    been entered into the database, and so there's many rules on

10   it.

11        So we can't use that data in any way other than

12   pursuant to patient care for the prescription that's in

13   front of me as I'm filling that prescription.  So we

14   unfortunately don't have the ability to be able to use it

15   retrospectively or even more broadly to be able to maybe do

16   some different things in this area.  Maybe that will change

17   someday, but today we're just not able to do that.

18   **Q**    Ms. Harrington, do you have access to the secret

19   sauce, the algorithms that go into generating the NarxCare

20   score, so you could just replicate it on our own, 10 years

21   of past data?

22   **A**    No.  We've asked Appriss to be able to share that with

23   us, and they have not.  It's a proprietary algorithm.  It's

24   their product that they sell.  And so therefore, they don't

25   share that with us.

1  **Q**     Hard question.  "How many CVS pharmacists have been

2  charged by law enforcement for any job-related wrongdoings

3  or breaking the law?"

4  **A**     To be honest, I don't know the answer to this question

5  because there are pharmacists in our buildings that might

6  divert medications for their own self-use, something along

7  those lines, and those pharmacists obviously would be

8  terminated and they would be subject to, you know, legal

9  ramifications resulting from that.  But I honestly just

10  don't know the answer to this question.

11  **Q**     To your knowledge, have any CVS pharmacists been

12  charged criminally for improperly just knowingly dispensing,

13  filling illegitimate prescriptions?

14  **A**     Not to my knowledge.

15  **Q**     Okay.  These are great questions.

16       Okay.  Ms. Harrington, "Explain bullet 3 on page 2 of

17  MDL-1728."

18       But I only have page 1 right now, so maybe we'll come

19  back to that when I get page 2.

20            MR. LANIER:  There's a question on the back of

21  that.

22            MR. DELINSKY:  Yeah, I'll do the one on the

23  back.

24  **Q**     "So the score" -- and I believe this is a reference to

25  the NarxCare score -- "is actually 00 to 99 on that specific

1    Rx"?

2    **A**    Yeah, because the last number indicates the number of

3    prescriptions that that person is receiving, I believe.  So

4    the risk score is actually the first two digits, and the

5    last digit represents the number of prescriptions.  But when

6    we talk about the risk score, we talk about it as a

7    three-digit number.

8         I hope that answers the question.

9    **Q**    Okay.  "Explain bullet 2 on 17" -- "Bullet 3 on

10   CVS-MDL-1728, page 2."

11        I'm going to do it this way.  Here's page 1.

12        Oh, no, maybe -- yeah, I think this is page 1.

13        "Can you explain bullet 3, which says the last digit

14   of the Narx score equals the number of active prescriptions

15   for that drug type"?

16   **A**    Yeah.  So if I was receiving two prescriptions that

17   were opioids, the last digit of my NarxCare score would be a

18   2.  So say if my risk score, the first two numbers was, say,

19   20, my score would be 202.

20   **Q**    Got it.

21        Now, I believe this is the second page.  Just out of

22   an abundance of caution, why don't we go to the third, which

23   maybe is the shaded portion down there, and see if you can

24   explain that.

25   **A**    And these are just score ranges that we had been

**Harrington - (Redirect by Delinsky)**

1   provided by NarxCare, which I think is a little bit

2   confusing in this situation because it straddles kind of the

3   lower range and the upper range.  But it talks about 24

4   percent of scores fall within that range.

5   **Q**     Okay.  And this range, am I right, would include "be

6   confident," "be curious," and some "be cautious"?

7   **A**     Yeah.  The way that this is, and it's because Appriss

8   was changing their guidance as they were learning more,

9   straddles I think all of those things.

10  **Q**     Okay.  I hope we answered all those fully.

11       "Has CVS been known to be aggressive with prescriber

12  suspensions in regards to 2000 to 2018?"

13  **A**     So our Prescriber program in which we were suspending

14  doctors started in 2012.  From 2012 to 2018, you know,

15  aggressive might be in the eye of the beholder.

16       I think that there are patients that haven't been able

17  to get medications from their individual prescriber from our

18  pharmacies that would consider us to be aggressive.  The

19  doctors might consider us to be aggressive and maybe

20  overstepping our bounds of what we can do, as evidenced by

21  us being sued.

22       Would I consider us being aggressive?  I don't think

23  so.  I think we're just -- we're working diligently to try

24  to understand prescribers that we just don't want to fill

25  prescriptions, controlled substance prescriptions for any

**Harrington - (Redirect by Delinsky)**

1    longer.

2    **Q**     "When a prescriber is being investigated by CVS, do

3    you or can you report to DEA and the state Board since you

4    cannot investigate fully?"

5    **A**     So we do provide our prescriber information to certain

6    states.  We have offered it to DEA, but they have not taken

7    us up on our offer to provide the prescribers to them.

8    **Q**     Okay.  And let's break it down.

9         Are you talking about when the company ultimately

10   suspends, chooses to suspend a doctor?

11   **A**     Yes.

12   **Q**     How about if the company is in process of

13   investigating?

14   **A**     I think it would depend on the facts and

15   circumstances.  I can tell you this week I was on the phone

16   with a DEA agent because we were looking at a particular

17   provider.  It's a very difficult case.

18        I also understood that there was a DEA agent that had

19   been in one of our store locations that was looking to get

20   some copies of prescriptions written by this provider.  So I

21   reached out to them to ask them some questions and see if

22   there was any information that could be shared.

23        It's a very delicate topic because they can't really

24   share information on an active investigation, but I was able

25   to provide some information, and we have time set up to talk

1    again next week.

2         So there's times when we can do that.  I don't know

3    that it's always feasible or welcome, but we try to do what

4    we can when we have questions that we can't quite resolve.

5    But there's a little niggler that you feel like things are

6    still -- there's something not quite right, we try to use

7    the resources that we can to try to figure it out.

8    **Q**    "Do pharmacies continue to fill for a prescriber that

9    is under investigation?  How long do these investigations

10   take?"

11        So let's just take the first one first.

12   **A**    So our pharmacists can fill for those prescribers when

13   they are under investigation when we're reviewing them, but

14   we would expect that they're reviewing each individual

15   prescription and exercising their corresponding

16   responsibility as we would for every pharmacist across our

17   chain for every prescriber.

18        And the length of the investigations vary in time, and

19   some of it depends on how quickly we can get in touch with

20   the provider, how quickly we schedule that interview, and

21   how quickly it moves along.  It really changes.

22   **Q**    "Are copies of refusals to fill prescriptions kept?

23   For how long and where?"

24   **A**    So I'm not sure if this is referring to, like, a hard

25   copy.  Typically, if we refuse to fill a prescription, we

1    actually will provide that back to the patient.  We don't

2    typically take copies at CVS.  Pharmacists have an

3    opportunity, if they wanted to, to put a note in the system,

4    but we don't keep copies as per normal practice.

5    **Q**    Why is it routine for the pharmacists to hand the

6    refuse-to-fill prescription back?

7    **A**    We've been told or there's been certain instances

8    that's the patient's --

9                MR. WEINBERGER:  Objection, Your Honor.

10                THE COURT:  Hold it.

11         If you can answer that without relating hearsay, what

12    people have told you, ma'am.  If you can't, then I guess you

13    can't answer that one.

14         If there's some law or regulation that dictates a

15    time, obviously you could say that you understand there's a

16    law or regulation what we have to do.

17    BY MR. DELINSKY:

18    **Q**    Ms. Harrington, are you unable to answer without

19    revealing what somebody or some entity has told you?

20    **A**    Well, it's just been legal guidance that we've

21    received.  So can I share that?

22                THE COURT:  You can just say you received

23    legal guidance, and this is what we do.

24                THE WITNESS:  Okay.

25    **A**    So I received legal guidance, and it's the patient's

1      property, it's not our property.  And so it's the patient's

2      property, and so for those reasons we return it.

3  **Q**      "Is the suspension forever?  Explain."

4  **A**      So the suspension is forever unless a provider applies

5      for reinstatement.  The provider must be suspended for at

6      least a year before they can apply for reinstatement.  And

7      there is a large amount of information that we require from

8      a provider in the instance that they're asking for

9      reinstatement.

10         There have been instances in which we have reinstated

11      a provider, but they don't happen very often.

12  **Q**      Another great question.

13         "Has CVS ever voluntarily decided to stop carrying a

14      drug, specifically a controlled substance?  If so, why?"

15  **A**      I don't think that we voluntarily stopped carrying a

16      specific drug.  We've entertained the thought, but it's

17      difficult because we want to make sure that patients that

18      need a product like that, they have an alternative.  And

19      sometimes we need to make sure that that alternative won't

20      cost them more or cost their insurance more, so we need it

21      to be equivalent.  So there's challenges associated with

22      thinking about that.

23         But that being said, there was a product that was

24      available that was an extended-release hydrocodone product

25      that didn't have an abuse deterrent formulation in it.  We

1    saw it as a concerning product, but we wanted to make sure

2    that patients that might need it had an opportunity.

3         But we created a system to almost create a prior

4    authorization, much like you have with your insurance, but

5    at our retail locations to be able to have an extra layer of

6    asking the right questions and talking to the doctor, and

7    limiting the quantities, in addition to what our pharmacists

8    were doing.

9         So it was a real support to them to make sure that

10   those -- we were really narrowing those prescriptions that

11   were available for that particular product at that time.

12   **Q**    As a pharmacy company, do you think it would be

13   appropriate for CVS to say, there's an epidemic out there,

14   and we are just not going to carry pain medication?

15   **A**    No, because patients with legitimate medical reasons

16   that need it need to be able to have access to pain

17   medications.  There's people that are unfortunately dying or

18   have really painful things, like sickle cell or, you know,

19   other disease states that are very, very painful, and they

20   need to be able to have access to prescription.

21   **Q**    "When a policy is updated, how is a pharmacist

22   notified of the policy change, and specifically what has

23   been changed?  Do they have to compare versions to see what

24   has changed?"

25   **A**    So typically, we send out a workload manager that will

1   inform them of the change.  And many times, I can't say for

2   certain it happens every time because some of the changes

3   are small and less meaningful, but I think on the more

4   meaningful changes, to the best of my knowledge, those are

5   highlighted for the pharmacists.

6   **Q**     "When did the documentation of red flag resolution

7   become a requirement in CVS policy"?

8   **A**     I'd have to look back at the policies.  I want to say

9   it probably was in 2012.

10  **Q**     And I'm sorry, I didn't hear.  2012?

11  **A**     I'm not sure if it was in 2012 or if it was --

12  **Q**     Okay.  I think best guess.

13  **A**     Yeah, I am -- yeah, I'm not certain.  I'm not sure if

14  it was 2012, 2013.

15  **Q**     Okay.  "In regards to the red flags written policy in

16  2014, were you not involved in the e-mail that was sent in

17  12/2010 about red flags four years later?"

18       I think we mean earlier there, although I hate putting

19  my words in the mouth.

20  **A**     Yes, so --

21  **Q**     And I think this is the December 2010 e-mail.

22  **A**     Yeah, so December 2010 I wasn't in my role, so I was a

23  pharmacy supervisor in New Hampshire.  So I wasn't involved

24  in writing that policy that included information on red

25  flags, nor the one that was written in 2012, because it was

1    written prior to me coming into my role.

2           I came into my role at the end of October of 2012, so

3    I wasn't involved in writing either of those.  I did have

4    editorial input on the policy from 2014.  There were

5    multiple people that contributed to that policy.

6    **Q**    And while we're here, Ms. Harrington, I just want to

7    put up the December 2010 e-mail that the juror referred to,

8    and I just want to see if this refreshes your recollection.

9           It says, "Do not fill a prescription if you believe it

10   wasn't legitimate."  Then it says, "Document communications

11   with prescriber or agent on the back of the prescription to

12   include date, time, outcome, and name of the person."

13   **A**    Okay.  So 2010.  I retract my prior answer.

14   **Q**    That's a little different because that's resolving

15   certain resolutions but not the resolution of every actual

16   red flag, correct?

17   **A**    Mm-hmm.  Correct.  Sorry.

18   **Q**    Thank you.

19   **A**    I was swallowing.

20   **Q**    "As a pharmacist, you see a red flag and resolve it

21   and do not document it.  Is that the same as not resolving

22   that red flag?"

23   **A**    In my eyes, it is not.  The act of resolving the red

24   flag is the important activity because that's how you're

25   establishing for yourself that that prescription is an okay

1    prescription to go forward and fill.

2         So asking those additional questions and being able to

3    get the resolution to that, in my mind, creates a green

4    light for you to be able to go forward with filling that

5    particular prescription.

6    **Q**    And if you go through those steps but you don't write

7    it down, does the green light still exist?

8    **A**    Excuse me, I'm sorry?

9    **Q**    If you go through those steps to resolve the flag but

10   you don't write down what you did, does the green light

11   still exist?

12   **A**    Yes.

13   **Q**    Second question.  "Does a rule exist that if it's not

14   documented, it does not exist?"

15   **A**    Not to my knowledge.

16   **Q**    "Does RxConnect give pharmacists alerts on all or most

17   red flags?  Or does the pharmacist have to do individual

18   research for each prescription to recognize these red

19   flags?"

20   **A**    Mm-hmm.  So RxConnect gives some red flags as what we

21   call an alert.  But that being said, when you're looking at

22   a patient profile, you've got, like, all the information

23   right in front of you in terms of, like, where that patient

24   lives, because you've got the address at the bottom of the

25   screen; you've got all the drugs that are listed right in

1    front of you with information on the quantities and the

2    doctor and the day supply.

3         That's all right there.  So it's not like you have to

4    go into multiple screens to be able to determine, you know,

5    the red flags of, like, cash or distance or -- because the

6    information's all right there and readily available.

7         It doesn't pop up and say, this patient is paying cash

8    for this prescription as like a pop-up that sits on top of

9    the information, but you can easily see it by just scanning

10   down the screen that that -- there's a different method of

11   payment.

12   **Q**    And in recent years would that NarxCare score be on

13   this page as well?

14   **A**    NarxCare score would be on the verification screen.

15   **Q**    Okay.  "Prior to programs being put into place in

16   2012, how were stores and prescribers monitored?"

17   **A**    So prior to 2012, our Pharmacy supervisors would be in

18   our stores, our Loss Prevention folks would be in our stores

19   following up on this.  And I can remember, you know,

20   personally when I had a question on a particular prescriber

21   that we were having found was really pushing back on some of

22   the information that we were trying to get, I talked to my

23   Pharmacy supervisor about it.  And we talked about it and we

24   actually called the doctor together to be able to walk

25   through that information.  She had my back as I was

1    navigating some of those challenging waters with a

2    prescriber that was a concern for us.

3         So it was more local boots on the ground, folks going

4    into our stores that were supervising and making sure that

5    the store teams were doing the right thing.

6    **Q**    "Was the Prescriber Validation system a requirement

7    for pharmacists to view/research prior to dispensing?"

8    **A**    If I'm understanding this correctly, our Prescriber

9    Validation system actually happens all in the background.

10   So our pharmacists don't even see it happening, know it's

11   happening.

12        What happens if it's a prescriber that's got a block

13   on their license because their DEA registration is no longer

14   active, their state controlled substance license is no

15   longer active.  They're not eligible to write prescription

16   for Schedule II.  They're only eligible to write for III

17   through V.  There would be a block that would come up and

18   just stop them and say you can't fill this prescription for

19   this prescriber for X, Y, and Z reason.

20        I don't know if that answers that question.

21   **Q**    I hope so.  "With the doctor monitoring program, are

22   the doctors compared with their peers or all doctors in

23   general?"

24   **A**    So we compare them by specialty, because a pediatric

25   doctor would look very different than a pain management

1    doctor.  So we compare them by specialty and geography in

2    the current algorithm.

3         We are exploring looking at all doctors across the

4    nation, but what happens is sometimes geographically you'll

5    see outliers, but if you were to look across the country,

6    those outliers might not show up.  So it's important for us

7    to be able to have a geographic view as well as a specialty

8    view.

9         The challenge with that is that doctor specialties are

10   self-reported in HMS and aren't always accurate, so

11   sometimes some of the doctors that we flag are because we

12   have the wrong specialties for them.  And so someone may

13   have undergone additional board certifications or things

14   like that and just haven't been updated in HMS.  So

15   sometimes that's one of the reasons why we might clear a

16   doctor after having a conversation with them, is that we

17   just were comparing them to the wrong set of doctors, and

18   their prescribing is perfectly appropriate to what they're

19   doing.

20   **Q**    And I think you may have answered this, but maybe you

21   can just -- if you don't think you have -- or just answer it

22   nonetheless.

23        "If a provider is suspended, are they ever reinstated

24   and what is the process?"

25   **A**    And there is a process for reinstatement.  And

**Harrington - (Redirect by Delinsky)**

1    prescribers have to have been suspended for at least a year

2    before they provide -- before they apply to be reinstated,

3    and there's an extensive amount of information that we

4    require.

5        If we -- and I didn't mention this before, but if we

6    do reinstate a doctor, we have very, very close monitoring

7    on the dispensing that happens after that suspension.

8    **Q**    "We've heard basically that pharmacists shouldn't

9    really interfere or second guess doctors'/prescribers'

10   decisions of what they are prescribing.  What is your

11   opinion?"

12   **A**    As a pharmacist, we have to ask questions about the

13   prescriptions that we're receiving.  We have to understand

14   more about why the medication is being prescribed for us to

15   evaluate if it's appropriate.

16       Now, as a pharmacist, I don't have access to, like,

17   MRI information.  I'm not physically examining a patient.

18   So there's information that I just don't have that would

19   allow me to, you know, second guess what a provider is

20   doing.  But I do know about, you know, disease states and

21   medications, and there are questions that I can ask.  But

22   it's a really, really difficult position to be put in to

23   question things when you're not operating with all the same

24   information that that doctor is.

25       But that's why relationships with doctors is really

1    important, to be able to ask those questions and to be able

2    to have a conversation about those patients that you might

3    be concerned about.

4    **Q**    What do you do when you have a doctor who is seeing

5    patients, diagnosing conditions, and making a prescribing

6    decision that you may not think is the best prescribing

7    decision?  Is it appropriate to second guess that in that

8    situation?

9    **A**    It depends on the facts and circumstances surrounding

10   it, right?  Because there's -- you can disagree with a

11   prescribing decision and have it be perfectly appropriate

12   medicine.  And in that instance, you would probably fill

13   that prescription.

14       There's also going to be times, though, when you think

15   it's bad medicine.  If you think it's bad medicine, you

16   know, as a pharmacist, I wouldn't fill that prescription.

17   **Q**    "In RxConnect, are the text fields limited to the

18   number of characters that can be answered?  And if so, what

19   happens if the pharmacist needs to enter more information?"

20   **A**    That's a good question.  I don't know the answer to

21   that question.  I don't know that I've ever written a note

22   that went beyond a field.

23       If there was a text limit, you could always enter

24   another note, so, you know, you can enter an unlimited

25   number of notes in the system.  So I think that would be the

1   way around that if you had a large amount of information

2   that you wanted to apply to the patient record.

3   **Q**     "If multiple providers are prescribing large amounts

4   of controlled substances and they are practicing the same

5   medical procedures, will this flag in the monitoring

6   program?"

7   **A**     So in our store monitoring program, we do look at MME.

8   And I believe, because these are some of the recent -- more

9   recent enhancements that we've made over time since 2016,

10  and I'm not as familiar with it, but to the best of my

11  knowledge, I think we look at an average MME, but then we

12  also look at the number of patients with high MME

13  prescriptions as a way to be able to identify potentially, I

14  think what you're trying to ask here, and rather than large

15  amounts, it's large amounts and strength.

16  **Q**     Let me ask a follow-up question.

17       Might there be a glitch in the system if you have a

18  community where you have the five doctors in a particular

19  specialty are all prescribing large amounts, so as they're

20  being compared to one another, they might not pop?

21  **A**     Yeah.  Our geographies are so big and the pools are

22  typically large enough because of the number of prescribers

23  that we have, I don't believe that's ever an issue that

24  we've ever encountered, to the best of my knowledge.

25  **Q**     And how big are the regions when you're comparing the

1    doctors in the algorithm?

2    **A**     As it exists today, I think we have 21 or 22 different

3    regions that we have the country broken up to.

4    **Q**     Okay.  21, 22.  So the regions are bigger than --

5    there's fewer regions than states?

6    **A**     Correct.

7    **Q**     Okay.  "Of the 850 suspended doctors, how many are in

8    Lake and Trumbull County?"

9    **A**     I don't know the answer to that question.  I should

10   have looked that up.

11   **Q**     Okay.  Do you have an estimate of how many are in

12   Ohio?

13   **A**     I don't.

14   **Q**     Okay.  Have you found that the doctors that your

15   program has suspended are grouped in certain areas of the

16   country or are they spread relatively evenly around the

17   country?

18   **A**     There's some areas with higher concentration.  I don't

19   know if that's due to population of where the doctors are,

20   but we have doctors across the country.

21   **Q**     "Does your area of responsibility include C-II

22   inventory of stores?"

23   **A**     So inventory touches a lot of different groups.  So my

24   responsibility around inventory is just around that Maximum

25   Allowable Quantity program.  So I, I/my group, sets those

1    upper limits for stores to be able to receive.

2         The group that's in charge of ordering and, you know,

3    our inventory processes and stuff is a completely different

4    group.  We felt that it was smart to keep those thresholds

5    with us.  We are not transparent with that, you know, in

6    providing that information out to others.  That's something

7    that we calculate and we enter into the system.

8    **Q**    To the extent that your group has played this role

9    with the maximum allowable quantities, would those track

10   stores in Lake and Trumbull Counties?

11   **A**    So the maximum allowable quantities would apply to

12   each of the stores in Lake and Trumbull County, and it would

13   put that limit on those stores ordering.

14   **Q**    "Did you find an excessive amount" in stores in either

15   of the two counties?

16   **A**    I guess if the question was before our MAQs, I don't

17   know because I wasn't looking at Lake and Trumbull County.

18   We were looking at across the country.

19   **Q**    Okay.  "How long are doctors suspended under the

20   prescriber suspension program?"

21   **A**    We talked about that.  Indefinitely, unless they apply

22   for reinstatement and are approved.

23   **Q**    Okay.  "What does CVS consider too much or a lot of

24   prescriptions or pills from a prescriber?"

25   **A**    I think that that really varies from prescriber to

1    prescriber.  You know, if you're an emergency room doctor,

2    you might expect to see a higher number, but, you know,

3    really, really small quantity prescriptions, because they're

4    fixing broken bones and things like that of people coming

5    into the emergency room; versus, you know, an oncology

6    doctor, you might be expecting to see, you know, higher

7    quantities and different medications, more morphine and

8    things like that.

9         You know, you might have doctors that are treating --

10   I'm trying to think.  You know, surgeons that you might see

11   like one prescription, and then but that's it for the

12   patient, you know, where pain management you see more

13   continuing dosing because you're treating people with

14   chronic pain for a more extended period of time.

15        So understanding all those patterns is part of what we

16   do with our Prescriber program to be able to make sure that

17   we've got the right eyes on that prescribing.

18   **Q**    "Who and how is the maximum amount of controlled

19   substances that are ordered determined"?

20   **A**    So I don't know if that's referring to the individual

21   order, because there is a suggested order that is provided,

22   but pharmacists have the ability to bring that down should

23   they want.  They really don't bring that up above what those

24   ordering -- what the suggested order is unless they have a

25   prescription that's in their queue on demand for that

1    particular order.

2         But pharmacists do have the discretion to lower the

3    orders if they don't agree with the order that has been

4    generated that's generated based on their prior X number of

5    weeks of dispensing.  I don't know all of those details

6    because that's just not -- it's not my group.

7    **Q**    Your group doesn't compute the suggested order?

8    **A**    No, no, no.  That's the Inventory group.

9    **Q**    Now let's ask the question in reference to what your

10   group does do, which is the Maximum Allowable Quantity.

11        If we just change the words a little bit, who and how

12   is the Maximum Allowable Quantity for controlled substances

13   determined for a particular store?

14   **A**    Yeah, and that -- we take a share, a percentage that

15   we feel is appropriate for that particular drug family, and

16   that is applied to the overall dispensing in that store, so

17   both noncontrolled and controlled.

18        So you get a share of pills for that particular drug

19   family that would be appropriate for that store, and that

20   number of pills is applied to that whole drug family.

21        And what I mean by that is, so if we're applying it to

22   oxycodone, it would be oxycodone 5, 15, 30, it would be any

23   of the extended release products, it would be all your

24   Percocet products.  All of that is under the umbrella of

25   that one cap.  And stores can order up to that cap in that

1    whole family, so they have flexibility with how they can

2    order before they hit that limit.

3         I hope I'm not getting too technical.

4    **Q**    "Why wouldn't you as a pharmacist not document a red

5    flag and its resolution?"

6    **A**    I think sometimes the reason -- well, and I'm going to

7    speak from my own experience.  I don't want to project the

8    answer onto other pharmacists because I'm not quite sure

9    that I can speak for them.

10         But in my time as a pharmacist, you might be filling a

11   prescription for a patient and that patient isn't returning

12   until, you know, a day later, and you've got your action

13   note that's on the front of the prescription and the

14   pharmacist documented, like, I need to ask the pharmacist

15   about, you know, whatever question that they might have.

16         And then you're talking to the customer at the

17   register, and you resolve that red flag, and then you go

18   forward with dispensing that particular prescription.  And

19   you're just not in the dispensing system, and so you just

20   don't -- you just don't write it down, but even though

21   you've had that conversation and done the work.

22         You can't document in the register.  You have to go

23   back to the dispensing system.

24   **Q**    "Can you please clarify exactly what training

25   pharmacists are required to participate in for controlled

1    substances?  How often?  Are your pharmacists required to

2    complete any kind of knowledge check for understanding?"

3         So let's take this in turn.

4         So first question:  "Can you please clarify exactly

5    what training pharmacists are required to participate in for

6    controlled substances?"

7    **A**    Yeah, so there is three, we call it LEARNet, but it's

8    web-based training that they have to do every year.  So

9    there's two biennial trainings, one in the fall, one in the

10   spring, that has controlled substances, and corresponding

11   responsibility specifically in it.  And then we also have

12   the DEA training, which happens kind of in the middle of

13   that.  We try to spread it out throughout the year.

14        So three times a year every year, and repeatedly.

15        There is a knowledge check -- I'm skipping ahead,

16   Eric, and answering the last question.  Sorry, Mr. Delinsky.

17        For each of those there's a knowledge check, and you

18   can't get beyond the course unless you pass those questions

19   a hundred percent.  And we try to change those questions up

20   not to make them tricky, but to make them different to make

21   sure that they're really testing our pharmacists' knowledge.

22        The other thing that I talked about is that we do have

23   that in-person pharmacist review, the activities that they

24   walk through, and that changes from year to year.  There is

25   no knowledge check for that because that's just a person

1    sitting across from another person and saying, do you

2    understand this, do you have any questions for me.  We think

3    that that's really effective because not everybody learns

4    the same, and learning from a web-based tool and also

5    learning from a human in interactions we feel is most

6    effective.

7    **Q**    Separate and apart from CVS training, do Boards of

8    Pharmacy require continuing education themselves?

9    **A**    Yeah.  So for me, I have to do 15 hours of continuing

10   education every year.  10 of it can be written and 5 of it

11   has to be live.  There are certain states though that

12   require different components, like there's certain states

13   that require so many credits of law.  I think Massachusetts

14   requires a PMP course be taken.  So there's different

15   requirements in different states.

16   **Q**    Okay.  I think -- and I hope I didn't miss any

17   questions, but I think that's all of them.  So now we can go

18   to my questions, and let's start where we ended.

19        When you as a pharmacist learned about the

20   corresponding responsibility laws and regulations, did you

21   learn the content of corresponding responsibility and the

22   content of the law, or did you learn individual case names?

23   **A**    Yeah, we didn't learn individual case names.  We

24   learned, like, the practical application of what that meant

25   in pharmacy practice, to the best of my recollection.  It

1   was a long time ago.

2   **Q**    If I were to tell you that the first time the

3   plaintiff counties here filed their complaint against CVS

4   and Walmart and Walgreens was in 2019, how many years before

5   that would RxConnect have provided sort of the mini CVS PDMP

6   we talked about?

7   **A**    19 years.

8   **Q**    19 years before.

9        How many years before that did CVS start its

10   prescriber suspension program?

11   **A**    Seven.

12   **Q**    How many years before that did CVS start its

13   prescriber -- store monitoring program?

14   **A**    Seven years.

15   **Q**    Let me just get myself set up first.

16            MR. DELINSKY:  And Your Honor, I know I'm

17   going to misplace these, so I'm going to give those --

18            THE COURT:  Thank you, Mr. Delinsky.

19   Mr. Pitts keeps those.

20   **Q**    RxConnect.

21   **A**    Yes.

22   **Q**    I believe you testified that it was in and around 2000

23   when RxConnect or RX2000, depending on the version, was

24   providing the two years of patient data to the pharmacists?

25   **A**    That is correct.

1    **Q**    Okay.  And back then in 2000, was a pharmacist able to

2    see from RxConnect all the information the pharmacist needed

3    to identify red flags?

4    **A**    To the best of my knowledge.  Obviously, red flags, we

5    don't have an exhaustive list, so I want to be careful with

6    my answer.

7    **Q**    Could a pharmacist see back in 2000 cash?

8    **A**    Yes.

9    **Q**    Distance?

10    **A**    Yes.

11    **Q**    A potentially dangerous combination of therapies?

12    **A**    Yes.

13    **Q**    Potential doctor shopping?

14    **A**    Yes.

15    **Q**    Okay.  Could a pharmacist see on that one page in

16    RxConnect that a patient was filling certain prescriptions

17    with insurance but an OxyContin prescription with cash?

18    **A**    Yes.

19    **Q**    Okay.  And that was all the way back in 2000, correct?

20    **A**    Correct.

21    **Q**    All right.  And we talked about the fact that that

22    RxConnect system and all the information it provided on that

23    screen back in 2000 was a PDMP, the best PDMP CVS could

24    create with its own data, correct?

25                    MR. LANIER:  Leading through this, Judge.

1                    THE COURT:  Overruled.

2    **A**    There wasn't a state PMP, so, yes, it was a good

3    culling of the data that was available.

4    **Q**    Was it the best culling of the data that CVS could do

5    since CVS only had access to its own data?

6    **A**    Yes.

7    **Q**    Okay.  And did CVS make this resource available to its

8    pharmacists before the State of Ohio made OARRS available?

9    **A**    Yes.

10   **Q**    Okay.  Do industries evolve?

11   **A**    Yes.

12   **Q**    Has the pharmacy industry evolved since 2000?

13   **A**    Yes.

14   **Q**    Does that mean that pharmacies were doing something

15   wrong in earlier times simply because the whole industry has

16   evolved in recent years?

17                    MR. WEINBERGER:  Objection.

18                    THE COURT:  I'm sustaining it the way you

19   asked it.

20   **Q**    Do you believe that CVS was doing something wrong in

21   its provision of tools and resources to pharmacists in 2000

22   simply because it evolved over time and from 2012 and

23   thereafter?

24   **A**    No, I don't.

25   **Q**    Let's stay in this earlier time frame.

1      Does a pharmacist need a list of red flags to perform

2  corresponding responsibility?

3  **A**      No.

4  **Q**      Can you explain why a list isn't necessary?

5  **A**      Part of the process of filling that prescription, the

6  things that you go through is you're evaluating whether or

7  not it's appropriate.

8  **Q**      We've talked about this some before.  Are there

9  dangers associated with having finite lists?

10  **A**      Yes, because if there's a finite list, there might be

11  something that's not on that list but the pharmacist is in

12  the mindset of just going through and checking the boxes, if

13  you will, and they're not really thinking through the other

14  aspects of how they should be questioning that particular

15  prescription.  And every situation is unique.

16  **Q**      Now let's go to the policies, some of which do list

17  red flags.  We're going to get to that, okay?

18      Now, this is the 2010 Pain Management Dispensing

19  Guidelines that CVS sent out in December 2010.

20      Do you remember testifying about this?

21  **A**      Yes.

22  **Q**      Okay.  Now, Mr. Lanier pointed out that this policy

23  came out two days after a meeting with the DEA.  Correct?

24  **A**      Correct.

25  **Q**      If CVS meets with the DEA and then comes back to its

1   home office and reduces what it learned to writing and sends

2   it out to all its pharmacists, is that a good thing or is

3   that a bad thing?

4   **A**     In my opinion, it's a good thing.

5   **Q**     Okay.  Let's keep going with this.

6         And I want to talk -- Mr. Lanier showed you the

7   *Holiday* case to point out that there was a meeting a few

8   days before this.  Remember?

9   **A**     Yes.

10  **Q**     Okay.  Let's look at the case.

11        And I'm showing you, this is Plaintiffs' Exhibit

12  42147-A.  And I'm showing you an excerpt at the bottom of

13  the page.  I want to read it to you.

14        "As part of its outreach activities, the DEA, at the

15  request of CVS counsel John Gilbert, conducted a meeting

16  with CVS representatives on December 8, 2010."

17        Do you see that?

18  **A**     I do.

19  **Q**     If CVS itself requested a meeting with DEA, as the

20  *Holiday* case states, is that a good thing or is that a bad

21  thing?

22  **A**     In my opinion, it's a good thing.

23  **Q**     And if CVS requests a meeting with DEA, has the

24  meeting, and reduces what it learns to writing, is that a

25  really good thing or a really bad thing?

**Harrington - (Redirect by Delinsky)**

1   **A**     In my opinion, it would be a really good thing.

2   **Q**     I'm not done with the *Holiday* case.  Same exhibit.

3           Mr. Lanier asked you if the *Holiday* case talks about

4   potential red flags.

5           Do you recall that?

6   **A**     I do.

7   **Q**     Okay.  Showing you page 62332 of the *Holiday* case.

8           "Distance traveled by the customer was also identified

9   as GS Lane" -- what's GS?  Do you know that means a DEA

10  agent?

11  **A**     Yes, I think that's the initials of the DEA agent.

12  **Q**     "Distance traveled by the customer was also identified

13  by the agent as a potential red flag of diversion."

14          Do you see that?

15  **A**     I do.

16  **Q**     In this place, *Holiday* is talking about potential red

17  flags, just like Joe Rannazzisi, correct?

18  **A**     Yes.

19  **Q**     Okay.  Let's look at another portion of the opinion.

20          "The method of payment is also, in Doering's

21  opinion" -- and Mr. Lanier has explained earlier in the

22  trial, Doering was a Government expert, a DEA expert -- "the

23  method of payment is also, in Doering's opinion, a potential

24  red flag of diversion."

25          Do you see that language?

1  **A**    I do.

2  **Q**    And is that consistent with Joe Rannazzisi's slide on

3  potential red flags?

4  **A**    Yes.

5  **Q**    And can you remind the jury again what it means to you

6  for -- what the word "potential" means to you in connection

7  with red flags?

8  **A**    It just means that there might be things that you know

9  that you can quickly evaluate before it moves to the place

10  of being a red flag.  So, again, like cash, not everybody

11  that pays cash has a red flag.  It's just when their -- if

12  you look at their dispensing history and they've been using

13  insurance and they're requesting to pay cash for a

14  controlled substance, that would then be a red flag.

15  **Q**    Okay.  Now, I want to imagine that you had to have a

16  list of red flags in these policies, okay?  And I want to

17  ask you a few questions about that.  But before I do, I

18  think you testified about it.

19      Do the regulations on corresponding responsibility

20  list red flags?

21  **A**    Not to my knowledge.

22  **Q**    The Pharmacist's Manual, you provided some testimony

23  on the Pharmacist's Manual.

24      Do you recall that?

25  **A**    Yes.

1    **Q**    Okay.  And I believe this already has been admitted

2    into evidence.  I'm showing you the 2010 Pharmacist's

3    Manual.

4                   MR. DELINSKY:  And, Your Honor, this is

5    Defendant MDL 507.

6                   THE COURT:  Thank you.

7    **Q**    Do you recognize this, Miss Harrington, as the 2010

8    Pharmacist's Manual?

9    **A**    Yes.

10   **Q**    Okay.  And let's just step back and level set on this.

11        This is a manual -- is this a manual -- who prepares

12   this manual?

13   **A**    The DEA.

14   **Q**    What's the purpose of the manual, to your knowledge?

15   **A**    To take the Controlled Substance Act and other

16   regulation and make it easier for pharmacists to understand

17   their obligations.

18   **Q**    The purpose of the manual -- is the purpose of the

19   manual for pharmacists to provide them a resource?

20   **A**    Yes.

21   **Q**    Okay.  And we can see here, United States Department

22   of Justice Drug Enforcement Administration.

23        Do you see on the second page, "This manual has been

24   prepared by the Drug Enforcement Administration, Office of

25   Diversion Control, as a guide to assist pharmacists in their

1    understanding of the Controlled Substances Act and its

2    implementing regulations as they pertain to the pharmacy

3    profession."

4           Do you see that language?

5    **A**    Yes.

6    **Q**    Is that what you understand this document by DEA to

7    be?

8    **A**    Yes.

9    **Q**    Okay.  And who is -- what is one of -- the name of one

10   of the persons listed there above that I just highlighted?

11   **A**    Joe Rannazzisi.

12   **Q**    And that's the Joe Rannazzisi that you've already

13   testified about, correct?

14   **A**    Correct.

15   **Q**    Okay.  I want to look at a few pages in here.

16          I'm showing you the Corresponding Responsibility

17   section of the 2010 DEA Pharmacist's Manual.  This is page

18   30 of the manual.

19          Do you see that?

20   **A**    Yes.

21   **Q**    How many red flags are identified in the Corresponding

22   Responsibility section of the DEA manual?

23   **A**    I'm reading it quickly.

24          None.

25   **Q**    None, right?

1    **A**    None, yes.

2    **Q**    Let's go through this a little more.

3        I'm showing you another section of the DEA manual for

4    pharmacists.  This is the section on Dispensing Controlled

5    Substances for the Treatment of Pain.

6        Do you see that?

7    **A**    I do.

8    **Q**    How many red flags are identified in the section of

9    the DEA manual on the dispensing of pain medication?

10            MR. LANIER:  Page?

11   **A**    None.

12            MR. DELINSKY:  Page 53.

13   **Q**    And your answer was "none"?

14   **A**    Correct.

15   **Q**    I'm showing you the section of the DEA manual that

16   provides definitions based on the controlled substances act

17   and its regulations.

18        Do you see that?

19   **A**    I do.

20   **Q**    Is it in alphabetical order or does it appear to be?

21   **A**    It looks like it's in alphabetical order.

22   **Q**    Okay.  Going to go to Rs.  Do you see that there's an

23   R at the bottom?

24   **A**    Yes.

25   **Q**    And then Rs continue up top.

1      Do you see that?

2  **A**    Yup.

3  **Q**    And I'm at page 64.

4      Does the DEA manual include the phrase "red flags" in

5  its Definitions section?

6  **A**    It does not.

7  **Q**    Showing you one last section of the DEA manual.

8      Do you see, this is the Pharmacists Guide to

9  Prescription Fraud, correct?

10 **A**    Yes.

11 **Q**    What's your understanding of prescription fraud?

12 **A**    What's my understanding of prescription fraud?

13 **Q**    Yeah, what is prescription fraud?

14 **A**    It's when a patient will alter a prescription that

15 they've been given or create a fake prescription or steal a

16 prescription pad from a prescriber.

17 **Q**    Okay.  Maybe to see the doctor as well?  Might that be

18 prescription fraud?

19 **A**    Maybe.

20 **Q**    Okay.  Now, in this section, do you see that?

21 Criteria are listed that may indicate a prescription's not

22 legitimate.

23      Do you see that?

24 **A**    Yes.

25 **Q**    Okay.  And this is the first time -- now, the DEA

1    manual doesn't call them red flags, right?

2    **A**    No, they don't.

3    **Q**    Okay.  Now, this is the first time that we have some

4    lists here, okay?

5           Does cash appear on this list?

6    **A**    It does not.

7    **Q**    Okay.  Mr. Lanier made a big comparison, a big deal of

8    the fact that CVS's policies don't have age as a red flag.

9           Is age here?

10   **A**    I don't see it.

11   **Q**    Okay.  Is this a comprehensive list of potential

12   warning signs?

13   **A**    No.

14   **Q**    Okay.  Is the DEA's manual for pharmacists that Joe

15   Rannazzisi's name is on, is it deficient because it doesn't

16   have the comprehensive list of red flags that Mr. Lanier

17   might like to see in it?

18   **A**    No.

19   **Q**    Now, I'm going back to the 2010 policy we've been

20   talking about.

21          Does this policy nevertheless identify warning signs?

22   **A**    It does.

23   **Q**    So 2014 wasn't the first time, correct?

24   **A**    Correct.

25   **Q**    And the warning signs continue onto the next page,

```
 1    correct?

 2  A     Correct.

 3  Q     Not comprehensive, but a decent list of warning signs,

 4    correct?

 5  A     Yes.

 6  Q     And do you recall that the 2012 policy we looked at

 7    contains a list of red flags?

 8  A     Yes.

 9  Q     Okay.  That was before the 2014 policy that Mr. Lanier

10    was looking at, correct?

11  A     Yes.

12  Q     And that was before the 2013 e-mail that Mr. Lanier

13    was talking to you about, about red flags from Ms. Polster,

14    correct?

15  A     Yes.

16  Q     Do you remember this training you testified about, CVS

17    980?

18  A     Yes.

19  Q     And what was the date of this training?

20  A     September 2012.

21  Q     Does this training in 2012 identify potential warning

22    signs as examples?

23  A     Yes.

24  Q     Do those potential warning signs continue onto the

25    next page?
```

1    **A**    Yes.

2    **Q**    And again, that was in 2012, correct?

3    **A**    That is correct.

4    **Q**    And 2012's before 2014, correct?

5    **A**    That is correct.

6    **Q**    But there's a more important point to be made here.

7    We could talk all we want about what the wording is in one

8    policy or another, but does the wording of a policy, does

9    the existence of a list, is any of that necessary to the

10   effective performance of corresponding responsibility?

11   **A**    No.  Our pharmacists are exercising that

12   responsibility prescription by prescription in our stores.

13   **Q**    And is a list necessary to that exercise?

14   **A**    It is not.

15   **Q**    Dr. Veres, do you know if Dr. Veres is licensed by the

16   State of Ohio today?

17   **A**    Yes.

18   **Q**    Is he licensed?

19   **A**    He is.

20   **Q**    To your knowledge, has his license ever been suspended

21   or revoked?

22   **A**    Not to my knowledge.

23   **Q**    And I want to end, Ms. Harrington, with the discussion

24   about the settlements in the *Holiday* case.  Okay?

25         How many CVS pharmacies did the *Holiday* case concern?

**Harrington - (Redirect by Delinsky)**                     5872

 1   **A**    Two.

 2   **Q**    And they were both in one town, correct?

 3   **A**    Correct.

 4   **Q**    What town?

 5   **A**    Sanford.

 6   **Q**    The conduct was over 10 years ago?

 7   **A**    Yes.

 8   **Q**    Okay.  And I think you've already testified to this.

 9        Just in Florida alone, how many CVS pharmacies?

10   **A**    Around 850.

11   **Q**    In Florida.  Now, that number may have been lower in

12   2011, correct?

13   **A**    Correct.  I think it was probably around 700-ish back

14   at that point in time, to the best of my knowledge.

15   **Q**    Okay.  Let's assume that's 700.

16        Would you agree with me that two pharmacies is a

17   fraction of 1 percent of 700?

18   **A**    Yes.

19   **Q**    How many pharmacies does CVS operate throughout the

20   country?

21   **A**    Around 10,000.

22   **Q**    Is it fair to say that those two CVS pharmacies

23   comprise an even smaller fraction of 1 percent of all CVS

24   pharmacies?

25   **A**    Yes.

1    **Q**    Mr. Lanier talked about a Maryland settlement, okay?

2    Remember?

3    **A**    Yup.

4    **Q**    Do you recall how many Maryland pharmacies that

5    concerned?

6    **A**    I'm not sure of the exact number, but it was in, you

7    know, a dozen or more.

8    **Q**    How many pharmacies does CVS operate in Maryland

9    roughly?

10   **A**    280.

11   **Q**    280?

12   **A**    I believe, to the best of my knowledge.

13   **Q**    Were any of the Maryland pharmacies that were the

14   subject of that settlement in Ohio?

15   **A**    No.

16   **Q**    The Rhode Island settlement, did the Rhode Island

17   settlement involve any pharmacies in Ohio?

18   **A**    No.

19   **Q**    The Texas settlement, did the Texas settlement involve

20   any pharmacies in Ohio?

21   **A**    No.

22   **Q**    Did any of the settlements Mr. Lanier asked you about

23   concern a CVS pharmacist in Lake County?

24   **A**    No.

25   **Q**    Did any of the settlements Mr. Lanier discussed

1    concern a CVS pharmacy in Lake County?

2    **A**    No.

3    **Q**    How about in Trumbull County?

4    **A**    No.

5    **Q**    Did any of the settlements concern a pharmacy -- a CVS

6    pharmacy in Ohio?

7    **A**    No.

8    **Q**    Did any of the settlements concern a CVS pharmacy in

9    the Midwest?

10   **A**    No.

11   **Q**    To your knowledge, has DEA ever suspended or revoked

12   the license or registration of any CVS pharmacy in Lake and

13   Trumbull County?

14   **A**    No.

15   **Q**    To your knowledge, has the State of Ohio ever

16   suspended or revoked the license of any CVS pharmacy in Lake

17   or Trumbull County?

18   **A**    No, not to my knowledge.

19              MR. DELINSKY:  Okay.  Ms. Harrington, nothing

20   further at this time.

21              THE COURT:  Okay.  Any follow-up from either

22   Walgreens or Walmart?

23              MR. STOFFELMAYR:  No, Your Honor.

24              MR. MAJORAS:  No.  Thank you, Your Honor.

25              THE COURT:  Mr. Lanier, you're up.

```
 1                        - - - - -

 2                    RECROSS-EXAMINATION

 3   BY MR. LANIER:

 4   Q     Ma'am, with due respect, you said those settlements

 5   didn't concern Ohio?

 6   A     I said that they didn't impact Ohio stores.

 7   Q     Oh, but they absolutely did, didn't they?  You had to

 8   make policy changes with a number of those settlements,

 9   didn't you?

10              MR. DELINSKY:  Objection, Your Honor.

11              THE COURT:  Overruled.

12   A     I'm not aware, to the best of my knowledge, of policy

13   changes that were required as part of those settlements.

14   Q     Ma'am, even if you don't have them spelled out

15   specifically, they are certainly steps that y'all took

16   because the problems that you had were part of the CVS chain

17   stores, weren't they?

18   A     We always tried to take a look at the issues that we

19   had in certain areas and make sure that we were learning

20   from them and providing tools to be able to protect against

21   it.

22   Q     Because the policies that applied in Florida are the

23   same policies that apply in Ohio, aren't they?

24   A     That is true, but the behavior --

25   Q     Ma'am, no.
```

**Harrington - (Recross by Lanier)**                                    5876

1              MR. DELINSKY:  Your Honor --

2              THE COURT:  Let her finish the answer, please.

3              MR. LANIER:  Okay, Judge.

4    **A**    But the behavior -- those two stores in Florida

5    weren't stores in Ohio.

6    **Q**    But, ma'am, you know from that that there were people

7    from Ohio that were buying from those two stores in Florida,

8    don't you?

9    **A**    I don't know that for certain.

10   **Q**    It's in the *Holiday* case.  Did you not read that

11   section?

12   **A**    I don't recall specifically language around Ohio

13   dispensing.

14   **Q**    And the policies and the training that applied in

15   Florida applied all over the U.S., didn't it?

16   **A**    It did.

17   **Q**    The policies and training that applied in Texas

18   applied in Ohio, didn't it?

19   **A**    It did.

20   **Q**    The policies and training that applied in Maryland

21   applied in Ohio, didn't it?

22   **A**    It did.

23   **Q**    The policies and training that applied in Rhode Island

24   applied in Ohio, didn't it?

25   **A**    It did.

1    **Q**    You're responsible for supervising 30,000 pharmacists;

2    is that right?

3                    MR. DELINSKY:  Objection.

4                    THE COURT:  Overruled.

5    **A**    No.

6    **Q**    So how many pharmacists are under your scope of your

7    job, making sure that they follow the law and that they are

8    trained properly?  How many?

9    **A**    Your question to me was do I supervise those

10   pharmacists.  Those 30,000 pharmacists have direct

11   individuals in which they report in to and supervise.

12   **Q**    Ultimately though, how many pharmacists are under your

13   oversight for purposes of making sure that policies and

14   training are implemented on the issues of corresponding

15   responsibility?

16                   MR. DELINSKY:  Objection.

17                   THE COURT:  Overruled.

18   **A**    That is the role of the direct supervisor, to

19   supervise those individual pharmacists.  We -- at my level,

20   we have corporate programs to be able to support the

21   pharmacists.

22   **Q**    And that's my question.

23        How many pharmacists are you trying to support from

24   corporate in being able to be trained and follow the law on

25   corresponding responsibility?

1    **A**     I support 30,000 pharmacists.

2    **Q**     And that's one reason training is so important, isn't

3    it?

4    **A**     It's one of the things that we do.  And, yes, it is

5    important.

6    **Q**     Okay.  And again, the settlement agreement that y'all

7    entered into in the Florida situation did not limit itself

8    to Florida, did it?

9    **A**     Could I please see that?

10   **Q**     I'm sorry, ma'am?

11   **A**     Could I please see the settlement agreement that

12   you're --

13   **Q**     Yeah, I've got to get a copy of it to you, and I'm

14   glad to do so.

15         Can I just put it on the screen?  Is that adequate?

16   **A**     I would rather have a copy, so that way I can --

17   **Q**     Well, ma'am, in the interest of time, I'm not able to

18   do that.  So my question to you, I'll just ask you simply,

19   isn't it true -- I mean, heavens, your job got created

20   because of what happened in Florida, didn't it?

21   **A**     My role became available in 2012.

22   **Q**     Is that a "yes" answer?

23         Your job was created because of what happened in

24   Florida, wasn't it?

25   **A**     My job was created because the company was changing

1    the way that we had oversight.

2    **Q**    Because of what happened in Florida?

3    **A**    Yes.

4    **Q**    You've testified to that before, haven't you?

5    **A**    Yes.

6    **Q**    Thank you.

7           And then on all of these dates and dates and dates,

8    and the policies that Mr. Delinsky --

9                    MR. LANIER:  You see, this is the problem with

10   having a nickname for him, Your Honor.  It gets me in

11   trouble.  It's a friendly nickname.

12                   THE COURT:  Mr. Delinsky?

13                   MR. LANIER:  Yes, I have a nickname for him.

14                   THE COURT:  You probably have one for me too.

15                   MR. LANIER:  No, Your Honor.

16                   THE COURT:  It's okay.

17                   MR. LANIER:  Absolutely not.

18                   THE COURT:  It's okay, it's okay.

19                   MR. LANIER:  Absolutely not.

20                   MR. DELINSKY:  And to clarify the record, he

21   called me Bubba this morning.

22                   MR. LANIER:  Generally it's D-dog, but I'm not

23   doing that.

24   BY MR. LANIER:

25   **Q**    With due respect to Mr. Delinsky, we went through real

1    clear these dates in great precision and looked at when your

2    various policies were, which phase.

3         Remember?

4    **A**    I'm not sure where your line is there because I think

5    that we talked about policies in 2012, and that would be

6    phase II.  Right?

7    **Q**    Yes, phase II was 2012, but this MAQ program, the

8    forgery program, NarxCare, the 2016 guidelines, the

9    training, all of that kind of stuff, that was phase III,

10   right?

11   **A**    It was.  But just to clarify, the 2016 CDC guidelines

12   were written by the CDC.  That was the first time that they

13   had come out with those guidelines on pain management.  That

14   isn't something that CVS did.

15   **Q**    And one of the reasons they had to come out with those

16   guidelines was because of what y'all were doing, wasn't it?

17                    MR. DELINSKY:  Objection.

18                    THE COURT:  Overruled.

19   **A**    It was because primary care doctors needed guidance.

20   **Q**    And then you get asked a boatload of questions about

21   the Pharmacist's Manual from 2010 where Mr. Delinsky, with

22   his voice raised, says, are there any red flags on page 30,

23   53, 64.

24        Remember that?

25   **A**    I do.

1    **Q**     The purpose of this DEA manual, however, is not to

2    teach the law, is it?

3    **A**     We talked about the purpose is to be able to educate

4    on the Controlled Substance Act and support them in the

5    interpretation in a less legal manner than what is the

6    Controlled Substance Act.

7    **Q**     And you don't really know this booklet very well, do

8    you?

9    **A**     I do.

10   **Q**     Okay.  Good.  Then can you tell us which section this

11   page 30 came under where you're looking for the red flags

12   without looking?

13   **A**     No, I can't recall that without looking at the

14   Pharmacist's Manual.

15   **Q**     This corresponding responsibility, all of that comes

16   under a section of what are valid prescription requirements.

17          Do you see that?

18   **A**     I do.  But I see the language of corresponding

19   responsibility.

20   **Q**     Yes, because one of the things in corresponding

21   responsibility is you have to make sure it's a valid

22   prescription, don't you?

23   **A**     Under corresponding responsibility you can't fill a

24   prescription that you know not to be valid.

25   **Q**     You can't fill one that's not written for legitimate

1    medical reasons, is the language, right?

2    **A**    Correct.

3    **Q**    But this whole section is talking about valid

4    prescription requirements.

5    **A**    Can you just repeat that question?  I think you said

6    write a prescription.  We don't write prescriptions.

7    **Q**    Okay.  Not write, dispense.

8    **A**    Correct.

9    **Q**    A written prescription has to be -- the corresponding

10   responsibility, "An order purporting to be a prescription

11   issued not in the usual course of professional treatment or

12   in legitimate and authorized research is an invalid

13   prescription.  The person knowingly filling such a purported

14   prescription shall be subject to the penalties."

15        Do you see that?

16   **A**    Correct.

17   **Q**    That's talking about the corresponding responsibility

18   on whether the prescription is valid or not.

19        Do you see that?

20             MR. DELINSKY:  Objection, Your Honor.  That is

21   the corresponding responsibility language.

22             THE COURT:  Overruled.

23   **Q**    Do you see that, ma'am?

24   **A**    I see that, but that's the language in the Controlled

25   Substance Act that is the --

1    **Q**    And I'm not fussing that, but I'm saying in this

2    manual it's put out under that section.

3          Do you see that?

4    **A**    But it's just an explanation of what corresponding

5    responsibility is.

6    **Q**    Okay.  Red flags.  Who has the corresponding

7    responsibility under the law?  CVS pharmacists or the DEA?

8    **A**    Who has corresponding responsibility?

9    **Q**    Yeah.

10   **A**    Pharmacists have the corresponding responsibility.  We

11   just read the regulation together.

12   **Q**    Yeah.  So it's not the DEA anyway?

13   **A**    It is not, but they're the regulating body for us.

14   **Q**    And y'all have lawyers whose job it is is to figure

15   this stuff out, isn't it?  True?

16   **A**    Yes, we have a legal team.

17   **Q**    And you have a regulatory department who's supposed to

18   keep up with the cases and know what they involve, true?

19   **A**    Our regulatory team works with Boards of Pharmacy,

20   yes.

21   **Q**    Next.  Mr. Delinsky asked you, CVS requests a meeting

22   with the DEA, is that a good thing, referencing the *Holiday*

23   case.

24          Remember that?

25   **A**    Yes.

1      **Q**      And you said, yes, that's a good thing, right?

2      **A**      Yes.

3      **Q**      Here's my question.  When CVS is under investigation,

4      an order to show cause is issued, investigations show major

5      problems, do you think that's a good thing?

6      **A**      No.

7      **Q**      And when your lawyers try to meet with them to try to

8      mitigate the damage and --

9                          MR. DELINSKY:  Hold it, Judge.  Judge.

10                         THE COURT:  That's sustained.

11                         MR. DELINSKY:  And there's a difference in

12     timing here.

13                         MR. LANIER:  No.

14                         THE COURT:  I sustained the question.

15                         MR. LANIER:  All right.

16     **Q**      Ma'am, you don't know why those lawyers called the

17     meeting, do you, or asked for it?

18     **A**      I do not.

19     **Q**      You never saw the order to show cause, did you?

20     **A**      I did not.

21     **Q**      You never saw the investigation file, did you?

22     **A**      I did not.

23     **Q**      You didn't know what was pending at the time, did you?

24     **A**      I do not.

25     **Q**      But you have been involved in trying to negotiate down

1    agreements with the DEA yourself, haven't you?

2    **A**    I've been involved with the DEA when they're

3    investigating an issue.

4    **Q**    And you've been involved and gotten credit for

5    negotiating them down on the penalty, haven't you?

6    **A**    I've gotten -- I've shared with them the work that

7    we've done as part of our negotiation process.

8    **Q**    But in your personnel file you're specifically lifted

9    up for helping reduce the penalties on CVS, true?

10   **A**    As part of our negotiations, yes.

11   **Q**    And you say it's a good thing that the company sent

12   out policies after being in trouble --

13              MR. DELINSKY:  Objection, Your Honor.  The

14   chronology just doesn't work.  It's not accurate.

15              MR. LANIER:  This was his question.

16              MR. DELINSKY:  It's "trouble."

17              THE COURT:  Overruled.

18              MR. LANIER:  I'll take out the word "trouble"

19   if that's a problem, Your Honor.

20              THE COURT:  Yeah, that's the problem.

21   BY MR. LANIER:

22   **Q**    You said it's a good thing the company sent out

23   policies after meeting with the DEA on the law, right?

24   **A**    Yes.

25   **Q**    Wouldn't it be good not to have to have that meeting

1   to start with?

2   **A**     Yes.  But when there's a necessary meeting to take

3   action from, it is important.

4   **Q**     Right.  My whole point though was, you could have done

5   that 10 years earlier, couldn't you?  You didn't need to

6   wait for the DEA for you to send out that -- or for the

7   company to send out that e-mail; fair?

8   **A**     I don't know that we had the information.

9   **Q**     Are you familiar with these two words?  Proactive and

10  reactive.

11  **A**     I am.

12              MR. DELINSKY:  Objection, Your Honor.  We're

13  far afield from the issues.

14              THE COURT:  Overruled.

15  **Q**     Proactive means you're taking the initiative.

16  Reactive means you're reacting to something that's happened,

17  right?

18  **A**     Correct.

19  **Q**     What we're seeing here is a reaction instead of being

20  proactive.  Fair?

21  **A**     It depends on the individual circumstances that you're

22  asking me about.

23  **Q**     I'm asking you about the *Holiday* -- that's all right.

24  The jury gets it.

25              RxConnect.  RxConnect in 2000, be honest, did it alert

1    to red flags?

2    **A**      And we talked about this.  It doesn't alert.  It

3    doesn't show a pop-up, but the information is present.

4    **Q**      Well, the information is there but not there, in a

5    way -- you know how you've got all of these programs now

6    that try to give visuals and confirmation, and explain to

7    the pharmacists?

8    **A**      Yes.

9    **Q**      Or some of the other companies that have forms that

10   have to be filled out, or something like that, for the

11   dispensing of controlled substance, right?

12   **A**      Yes.

13   **Q**      That's not in your RxConnect in 2000, is it?

14   **A**      It's not, but as a pharmacist practicing in 2000, that

15   wasn't anywhere.  It wasn't typical.  So you used what you

16   had to be able to get the information that you needed, and

17   the information was readily retrievable.

18   **Q**      But Ms. Harrington, in 2000, y'all didn't even have a

19   red flag policy, did you?

20   **A**      Not in 2000.  But, again, you knew the things that you

21   needed to look for.

22   **Q**      Well --

23   **A**      Or I knew the things that you needed to look for.

24   **Q**      So you're here to testify and you testified to the

25   jury that you know all the data that was there for

1    RxConnect, but you never checked to see whether or not it's

2    for "sale" rather than "use"?

3                    MR. DELINSKY:  Objection, Your Honor.

4                    THE COURT:  Sustained.

5    **Q**    Are you trying to tell us that RxConnect would

6    identify pattern prescribing by doctors?

7    **A**    No, but a pharmacist would see that in the course of

8    their dispensing working in a pharmacy day in and day out.

9    **Q**    Wait.  Some of these pharmacies dispense 500-plus

10   prescriptions a day, don't they?

11   **A**    Potentially, yes.

12   **Q**    And you think they're going to remember what happens

13   one week, two weeks, three weeks later?

14   **A**    But being in a pharmacy, being in a community with

15   your customers and with your -- with the doctors that are in

16   that community, you do see those patterns and you recognize

17   them.  And I can attest that I've seen things like that when

18   I was working on the bench.

19   **Q**    Then you don't need all these algorithms y'all have

20   spent all this money on, you just need pharmacists who are

21   practicing?

22   **A**    The algorithms can make it easier.  It can support

23   pharmacists.

24   **Q**    I mean, to be candid with you, I forget some of the

25   testimony, witnesses that happened three weeks ago in this

1    trial, and I do this for a living.

2         Do you expect us to believe that the pharmacists are

3    going to identify prescriber patterns just pell-mell on

4    their own?

5    **A**    It happens.  Does it happen for every single

6    prescriber that they're filling for?  Not necessarily.  But

7    does it happen for the majority of prescribers that are in

8    their community?  They see them, they know them.

9    **Q**    Okay.  Go back to my question though.

10        RxConnect doesn't identify pattern prescribing, does

11   it?  Yes or no?

12   **A**    It does not.

13   **Q**    Doesn't identify the trilogy combination, does it?

14   **A**    It does because you can see the prescriptions on the

15   patient profile in one glance.

16   **Q**    Well, you've got to go back and look at all of the

17   different prescriptions that are in there.  It doesn't pull

18   them up automatically, true?

19   **A**    You can do "P" for profile and you can see all of the

20   prescriptions that the patient has dispensed or you have a

21   hot key to be able to see it, and they're all right there.

22   **Q**    Yeah, you can do "P" for profile, but "P" for profile

23   requires you to do that as opposed to it automatically just

24   coming up, right?

25   **A**    Right.  But that's part of your normal practice, is

1    filling prescriptions as a pharmacist, to be able to review

2    that profile.

3    **Q**    Next subject.  CVS pharmacists that have been

4    criminally charged, one of the juror questions.  You don't

5    really know the answer to that, fair?

6    **A**    I am not a hundred percent sure.  To the best of my

7    knowledge, I don't believe so.

8    **Q**    Next juror question I want to go back to.

9          Do you fill prescriptions on doctors being

10   investigated?  And you said yes.

11         Remember?

12   **A**    Yes.

13   **Q**    The truth of the matter is, it's a little bit more.

14   CVS doesn't even communicate to their registered pharmacists

15   routinely when the home office is investigating a doctor,

16   true?

17   **A**    It depends on how the information comes to us when

18   we're investigating a pharmacist.  Some come from

19   pharmacies, some come from conversations with them.  Others

20   of them when they're coming from the algorithm aren't

21   proactively communicated until we do our investigation.

22   **Q**    Well, ma'am, you were asked this question in the *Mimms*

23   case, weren't you?  That's the Rhode Island case, *Mimms vs.*

24   *CVS Pharmacy*.  Do you remember that case?

25   **A**    I believe it was an Indiana case.

1   **Q**    Yes, ma'am, but it -- excuse me, you are correct.

2        In 2017 you were asked this question:  During that

3   process, would you communicate with the supervisor or the

4   pharmacist who referred that prescriber to you?

5        And you said:  We would not communicate back --

6   information back.  Our review process was separate than

7   their corresponding responsibility at the store level.

8        Is that what you testified to?

9              MR. DELINSKY:  Objection.  That's not --

10  **A**    If that's what the record is --

11             THE COURT:  Overruled.

12  **Q**    I'm sorry, ma'am.  Is that what you testified to?

13  **A**    I don't have a copy of it in front of me, but I'm

14  assuming that you are reading from the record.

15  **Q**    And I'll show it to you if I need to, but my first

16  question is -- there are rules I have to do to do that.

17       Is that your testimony today?  Do you agree with that

18  answer?

19             MR. DELINSKY:  Objection.

20  **A**    Like I said, there were times that we are not

21  communicating to --

22             THE COURT:  Well, you can answer.

23  **A**    There are times that we are not communicating to the

24  field, and there are times that we are communicating to the

25  field.

1   **Q**    So during that process of investigation, would you

2   communicate with the supervisor or the pharmacist who --

3              THE COURT:  Are you asking her about that

4   specific investigation, or generally?

5              MR. LANIER:  No, Your Honor, just in general,

6   the concept of what she would do when she has a prescriber

7   that has been identified with some concerns that you want to

8   further investigate or that has been escalated from a store

9   team or a pharmacy supervisor, how would you go about doing

10  it.

11  **Q**    In that situation, ma'am, is it true y'all would not

12  communicate the information back?

13  **A**    It would depend on the circumstances.  Oftentimes

14  today I know that we are talking to store teams and pharmacy

15  supervisors about those instances.

16  **Q**    Today you are.  That was 2017 in the *Mimms* case where

17  you testified, wasn't it?

18  **A**    I believe so.

19  **Q**    Which brings up my next question from another juror

20  question about audits of doctors.

21       "Audits of doctors for overprescribing controlled

22  substances, which phase?"

23       What year did y'all start doing that?

24  **A**    Started in phase II.

25  **Q**    2012?

1   **A**      Correct.

2   **Q**      After *Holiday*?

3   **A**      Correct.

4   **Q**      Training courses with the DEA training courses y'all

5   did, when did you start those?  Phase I, II, or III?

6   **A**      I don't know if that training was in place prior to me

7   being in role in 2012.

8   **Q**      You never took any of them when you were a pharmacist,

9   did you?

10  **A**      I don't recall.  We took lots of training, but I don't

11  recall the titles of the training.

12  **Q**      The first one you can recall, 2012, after *Holiday*,

13  right?

14                      MR. DELINSKY:  Objection, Your Honor.  That's

15  not the testimony.

16                      THE COURT:  Sustained.

17  **Q**      Ma'am, first one you can recall, the DEA training?

18  **A**      I don't recall the year that it started in.

19  **Q**      Do you recall it ever happening before you took your

20  job?

21  **A**      Again, there was a lot of trainings, but I can't

22  recall -- I can't recall.

23  **Q**      So you don't recall any before.  When is the first one

24  you do recall?  We looked at one that was I think 2013 or

25  '16.

1          MR. DELINSKY:  Objection.

2     **Q**     Do you recall one before that?

3     **A**     I don't remember --

4          MR. LANIER:  Ma'am, you've got to wait.  He

5     objected and the Judge --

6          THE COURT:  You can ask "Do you recall when

7     the first one was?"  I'll allow that question.

8     **Q**     Ma'am, we've looked at one in here.

9     **A**     Mm-hmm.

10    **Q**     Remember that one?

11    **A**     I do.

12    **Q**     What was the date?

13    **A**     I don't remember the date on the training that we

14    talked about, if it was 2013 or if it was 2012.

15    **Q**     All right.  2012 or 2013 on that one.

16         Do you recall any that ever happened before that?

17    **A**     I don't, but that doesn't mean that there wasn't any.

18    **Q**     Right.  Doesn't mean there were, doesn't mean there

19    wasn't.  Just means you don't know of any, right?

20         MR. DELINSKY:  Objection, Your Honor.

21         THE COURT:  I'll sustain that.

22         MR. LANIER:  All right.

23         THE COURT:  The witness has answered the

24    question.

25    **Q**     Company policy on documentation:  Resolve red flags

1  but don't worry about documenting it?  That's not the

2  policy, is it?

3  **A**    That's not the policy.

4  **Q**    The policy says, as of 2000 --

5              THE COURT:  Well, I think, Mr. Lanier, you

6  asked her this already with this document.

7              MR. LANIER:  I'm sorry, Judge, I can't hear

8  you.

9              THE COURT:  You asked her this very question,

10  and you showed her this document, so I think this is --

11             MR. LANIER:  I'm being repetitive and

12  redundant.

13             THE COURT:  I guess that's a fair way to put

14  it.

15             MR. LANIER:  I got it, Judge.

16  **Q**    I just want to -- Mr. Delinsky went back to it, and I

17  want to make sure we're clear.  That policy is "document all

18  steps," isn't it?

19  **A**    That's how the policy reads.

20  **Q**    All right.

21             MR. LANIER:  Ma'am, Your Honor, I'm through.

22        Thank you, Ms. Harrington.

23             MR. DELINSKY:  Your Honor, may I just ask one

24  question on new subject matter that Mr. Lanier just raised?

25             THE COURT:  If I do it here I'm going to have

```
 1    to do it with every other witness, so everyone's been clear

 2    that we have just two rounds.

 3                     MR. DELINSKY:  Thank you, Your Honor.

 4                     THE COURT:  Thank you very much.  It's been a

 5    long day.  We appreciate your appearance, and safe travels

 6    back.  You may be excused.

 7          All right, ladies and gentlemen, we'll break for the

 8    day.  Usual admonitions.  Do not read, view, look, encounter

 9    anything about this case, or anything in any way, shape, or

10    form related; no independent research.  Do not discuss this

11    case with anyone.  Just have a good evening, and we'll pick

12    up tomorrow morning at 9 with the next defense witness.

13                     (Jury excused for the day at 5:21 p.m.)

14                     THE COURT:  Okay.  Just be seated for a

15    second.

16          Who do we anticipate for tomorrow, please?

17                     MR. MAJORAS:  Your Honor, we will start with

18    Dr. Kevin Murphy.

19                     THE COURT:  Kevin Murphy, okay.

20                     MR. MAJORAS:  Then William Choi, another

21    expert.  So Dr. Murphy is an expert.  I think it's Dr. Choi.

22    Dr. Choi is an expert.

23                     MR. BUSH:  The much-postponed Dr. Choi will

24    make it tomorrow afternoon.

25                     THE COURT:  Okay.  All right.  Two experts.
```

```
 1    Okay.  That's fine.  Thank you, Mr. Majoras.

 2                 MR. MAJORAS:  And if we finish out, we have

 3    depositions, Your Honor.

 4                 THE COURT:  You'll have depositions?

 5                 MR. MAJORAS:  If we need to, Your Honor.

 6    We're finalizing that.

 7                 THE COURT:  Fine.  Thank you.

 8         If counsel has time this evening to take a look at the

 9    exhibits with Ms. Harrington, there were a lot used.  I

10    don't know which ones each side wants to offer, but I think

11    it's good to stay current because then we're fresh on this.

12         All right.  Have a good evening.  The time today I had

13    was 4.75 for the defense and 2.0 for plaintiffs.

14         Yes, Mr. Stoffelmayr?

15                 MR. STOFFELMAYR:  Judge, two concerns I have

16    that I think it would be appropriate to give the jury an

17    instruction on in the morning.

18         One is many, many times now over the last two days

19    there have been questions posed to witnesses mocking them

20    basically for not being aware of testimony that was given

21    earlier in the trial.  The Court's order prohibited that.

22         I think it should be explained to the jurors that it

23    is no fault of any of the witnesses that they weren't aware

24    of what Joe Rannazzisi said on the stand, for example, or

25    what somebody else said during trial.
```

 1              THE COURT:  I don't think anyone was mocked.

 2    I mean, I --

 3              MR. STOFFELMAYR:  That's a matter of

 4    perception, but certainly the implication was like, "Oh,

 5    you're just learning that now," as if that is some

 6    shortcoming of the witness not to have known.

 7              MR. LANIER:  I do not believe I was doing

 8    that, Your Honor.  I will make every effort --

 9              THE COURT:  All right.  Well, I'll tell you

10    what, I'm simply saying that the witnesses have been

11    sequestered, and witnesses have not been allowed to listen

12    in or read the testimony of prior witnesses.

13              MR. STOFFELMAYR:  Thank you.

14              THE COURT:  So I'll just make that --

15              MR. STOFFELMAYR:  That's the first --

16              THE COURT:  -- general statement.  Okay?

17              MR. STOFFELMAYR:  The second one is, I raised

18    this yesterday and it's continued unabated, these constant,

19    "Oh, I'm running out of time; oh, gosh, I can't show you the

20    document because there's no time."

21        I think the jury needs to be told, I think the jury

22    needs to be told that both sides were given the same amount

23    of time and the Court has not imposed any sort of unfair

24    limitation on anybody, because I don't know what conclusion

25    they're supposed to draw when they hear this over and over.

5899

1          THE COURT:  All right.  I'll simply say that

2    the Court has imposed equal time limits on both sides, and I

3    haven't told anyone how to use their time.

4          MR. STOFFELMAYR:  Thank you.

5          THE COURT:  Okay?

6          MR. STOFFELMAYR:  Thank you, Judge.

7          THE COURT:  All right.  I'm making a note of

8    this.

9       Okay.  Have a good evening.

10          (Proceedings adjourned at 5:24 p.m.)

11                      *  *  *  *  *

12                   **C E R T I F I C A T E**

13

14       I certify that the foregoing is a correct transcript

15    of the record of proceedings in the above-entitled matter

16    prepared from my stenotype notes.

17

18          */s/ Lance A. Boardman_____  11-03-2021*
            Lance A. Boardman, RDR, CRR              DATE

19

20

21

22

23

24

25