5900

1               IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION AT CLEVELAND

3   ------------------------------X
   IN RE:                 :  Case No. 1:17-md-2804
4                     :
   NATIONAL PRESCRIPTION     :
5   OPIATE LITIGATION        :
                     :  **VOLUME 23**
6   CASE TRACK THREE        :  JURY TRIAL
                     :  *(Pages 5900 - 6193)*
7                     :
                     :
8                     :
                     :  *November 4, 2021*
9   ------------------------------X

10

11

12            TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>

13

14        HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16          SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20   Official Court Reporter:       Lance A. Boardman, RDR, CRR
                          United States District Court
21                          801 West Superior Avenue
                          Court Reporters 7-189
22                          Cleveland, Ohio 44113
                          216.357.7019
23

24

25   Proceedings recorded by mechanical stenography; transcript
   produced by computer-aided transcription.

```
 1    APPEARANCES:

 2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                   SPANGENBERG, SHIBLEY & LIBER
 3                                 1001 Lakeside Avenue, Ste. 1700
                                   1900 East Ninth Street
 4                                 Cleveland, Ohio 44114
                                   216-696-3232
 5
                                   W. Mark Lanier, Esq.
 6                                 Rachel Lanier, Esq.
                                   THE LANIER LAW FIRM
 7                                 6810 FM 1960 West
                                   Houston, Texas 77069
 8                                 813-659-5200

 9                                 Frank L. Gallucci, III, Esq.
                                   PLEVIN & GALLUCCI COMPANY, LPA
10                                 The Illuminating Building
                                   Suite 2222
11                                 55 Public Square
                                   Cleveland, Ohio 44113
12                                 216-861-0804

13                                 Salvatore C. Badala, Esq.
                                   Maria Fleming, Esq.
14                                 NAPOLI SHKOLNIK
                                   360 Lexington Ave., 11th Floor
15                                 New York, New York 10017
                                   212-397-1000
16

17
      For Walgreens Defendants: Kaspar J. Stoffelmayr, Esq.
18                                 Brian C. Swanson, Esq.
                                   Katherine M. Swift, Esq.
19                                 BARTLIT BECK LLP
                                   54 West Hubbard Street, Ste.300
20                                 Chicago, Illinois 60654
                                   312-494-4400
21

22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:        Graeme W. Bush, Esq.
                                 Eric R. Delinsky, Esq.
 3                               Alexandra W. Miller, Esq.
                                 Paul B. Hynes, Jr., Esq.
 4                               ZUCKERMAN SPAEDER - WASHINGTON
                                 Suite 1000
 5                               1800 M Street, NW
                                 Washington, DC 20036
 6                               202-778-1831

 7

 8    For Walmart Defendants:    John M. Majoras, Esq.
                                 JONES DAY - COLUMBUS
 9                               Suite 600
                                 325 John H. McConnell Blvd.
10                               Columbus, Ohio 43215
                                 614-281-3835
11
                                 Tara A. Fumerton, Esq.
12                               Tina M. Tabacchi, Esq.
                                 JONES DAY - CHICAGO
13                               Suite 3500
                                 77 West Wacker
14                               Chicago, Illinois 60601
                                 312-782-3939
15

16
      ALSO PRESENT:             David Cohen, Special Master
17

18                                    - - - - -

19

20

21

22

23

24

25
```

5903

1                          Table of Contents

2

3    Witnesses/Events                                      Page

4    KEVIN MURPHY                                          5915

5         Mr. Majoras - Direct                             5915
          Mr. Lanier - Cross                               6005
6         Mr. Majoras - Redirect                           6030
          Mr. Lanier - Recross                             6046
7
     WILLIAM CHOI                                          6053
8
          Mr. Bush - Direct                                6053
9         Mr. Lanier - Cross                               6135
          Mr. Stoffelmayr - Cross                          6161
10        Mr. Bush - Redirect                              6164
          Mr. Lanier - Recross                             6183
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5904

1              (In open court at 8:48 a.m.)

2              THE COURT:  So the plaintiffs have offered or

3     are offering six documents with Ms. Harrington.  I assume

4     the defendants have a bunch.

5              MR. HYNES:  Yes, we do.  We'll pass something

6     up right now, Your Honor.

7              THE COURT:  Why don't we start with the

8     defendants, because it was your witness.

9         All right.  The first one says "wait."

10             MR. HYNES:  Yes.  Let me explain, Your Honor.

11     Paul Hynes for CVS.

12        The first one is the temporary restraining order from

13     the Hansen case.

14             THE COURT:  Right.

15             MR. HYNES:  And our thinking there is to wait

16     to see what happens with the *Holiday* decision.  And we're

17     still discussing with plaintiffs a stipulation on that

18     decision and just to treat those two documents in a similar

19     fashion because they're both, you know, similar.

20             THE COURT:  All right.  We'll hold off on

21     that.

22             MR. HYNES:  Okay.

23             THE COURT:  Have the plaintiffs looked at this

24     list that CVS is offering?  Do you have any objections to

25     any of them?

5905

 1          MR. HYNES:  We e-mailed it last night, but it

 2   was late, and I just gave them a copy.  If they need some

 3   time with it, that's --

 4          MR. WEINBERGER:  We can maybe have until the

 5   end of the day, we'll deal with it.

 6          THE COURT:  That's fine, Peter.

 7      Have the defendants looked at the Plaintiffs' five,

 8   six?

 9          MR. HYNES:  Yes, we have.

10          THE COURT:  Any objections to that?

11          MR. HYNES:  We have two objections.

12      We have an objection to P-08415.  Our objection is

13   under Rule 602.  Ms. Harrington was not on the document, and

14   she was not familiar with the document.

15      And we have a similar objection to P-23330.  She was

16   not on the document, did not have knowledge of it, and I

17   don't think Mr. Lanier even asked her questions about it.

18   He moved on.

19          THE COURT:  Well, "Frank Veres prescriber

20   interview notes," who interviewed Mr. Veres?  That sounds

21   like something she --

22          MR. HYNES:  It would have been Susan Plant and

23   Sarah Marchand.  Ms. Harrington was not in the interview

24   notes, was not part of the interview.

25          THE COURT:  I don't see how that comes in with

 1   her, unless there's something I'm missing.

 2                MR. HYNES:  She also could not recall whether

 3   it was ever brought to her attention.

 4                MR. WEINBERGER:  These are part of her

 5   Compliance team that were doing this.

 6                THE COURT:  Well, it was done -- well, if it

 7   was done under her direction as part of her team, then it

 8   comes in, if these were people she was supervising.  I mean,

 9   if that's the case, then it's --

10                MR. HYNES:  It's a large team, Your Honor,

11   and --

12                THE COURT:  That doesn't matter.

13                MR. WEINBERGER:  There's 30,000 pharmacists.

14                THE COURT:  If it's done under her

15   investigation, I mean, her supervision, then it comes in to

16   show what her -- you know, what her unit does.

17                MR. HYNES:  Beyond that, Mr. Lanier didn't ask

18   her about the document.  When she said she wasn't involved,

19   he said, all right, we're moving along, running out of time.

20   He didn't ask her any questions about it.

21                MR. LANIER:  Oh, but I did.  Oh, but I did.  I

22   referenced the interview and I referenced --

23                THE COURT:  Let me see the document.  If it

24   was her team, then it comes in.

25           Let me see the other one, 08415, too.

1           All right.  This is the March 29, 2018 interview of

2     Dr. Veres.

3                     MR. HYNES:  Correct.

4                     THE COURT:  Okay.  That can come in over

5     objection.

6           This road map -- let's see, the date of this one is

7     April of 2017.

8                     MR. HYNES:  And this is from someone not in

9     her team.  It's from someone in Retail Pharmacy Strategy.  I

10    don't know what that department even does.

11                    MR. LANIER:  Is that not Davis on that?

12                    MR. HYNES:  Davis?

13                    MR. WEINBERGER:  Tom Davis.

14                    MR. LANIER:  Yeah.

15                    MR. HYNES:  Tom Davis is not on that document.

16    It's from --

17                    THE COURT:  Well, it says -- it says road map

18    underlined Davis, but I don't know what -- it doesn't say --

19    doesn't show Tom Davis on here at all.

20                    MR. LANIER:  We'll pull that one down for now,

21    Your Honor, and do a check on it.

22                    THE COURT:  All right.  I'll just say it's

23    withdrawn at the moment.

24          All right.  So 00459, 23305, 20669, and 08439 come in

25    without objection, and 23330 comes in over objection.

1          MS. SWIFT:  Your Honor, Kate Swift for

2     Walgreens.

3          Just one note on P-00459, we've requested a redaction

4     regarding the amount of a Walgreens settlement on page 13 of

5     that document.

6               THE COURT:  All right.  That should come out.

7               MR. LANIER:  That's not a problem, Your Honor.

8               MS. SWIFT:  Thank you very much.

9               THE COURT:  I want everyone to make sure these

10    redactions are getting done.

11         Okay.  Well, we'll take up the defense exhibits maybe

12    the end of the day.

13         So I'm thinking either after court next Tuesday and

14    Wednesday or next Friday I'll want someone from each side to

15    make sure you sit down with Mr. Pitts and Julian to make

16    sure that all of the exhibits are the way they should be,

17    that everything's in that needs to be in, everything that's

18    been redacted has been redacted, and there's nothing that

19    slipped in there by mistake.

20               MR. MAJORAS:  We'd be happy to do that, Your

21    Honor.

22               THE COURT:  Once we finish, finish the

23    arguments and instructions, I guess the jury will get the --

24    all the documents electronically.

25         We've got a couple minutes.

1           Have you given some thought to how much time you want

2      for closing?  I think it's important to get this done in one

3      day and not stretch it over two days.

4                     MR. MAJORAS:  Your Honor, John Majoras.

5      Before we get to that, this will be very related, I was

6      going to share with the Court this morning our current time,

7      I'm thinking, as we run into next week.  That may be helpful

8      to you.

9                     THE COURT:  That's a good idea.

10                     MR. MAJORAS:  As you know, we have expert

11      witnesses today and tomorrow between data experts and a

12      causation expert.  If we were to end a tad early, my team

13      would not object, given the reasons I said yesterday about

14      celebration, but I'll just throw that out there.

15           On Monday we anticipate, the defendants anticipate

16      calling fact witnesses, local pharmacists.  We believe there

17      will be three of them.  We're trying to finalize that.

18           Our expectation is that our evidence will be complete

19      Monday or at latest Tuesday morning, at least the way we see

20      things going.  If that should change based on today or

21      tomorrow, we would let you know.

22                     THE COURT:  Okay.  Monday or Tuesday morning.

23      All right.

24           Are the plaintiffs planning on any rebuttal witnesses?

25      I mean, I just want to get a sense of time.

 1              MR. LANIER:  Right now we have six and a half

 2    hours left by my count.

 3              MR. MAJORAS:  Five and a half.

 4              MR. LANIER:  So I think we've got probably 10

 5    or 12 rebuttal witnesses we'll throw on there.

 6              THE COURT:  They're going to be mighty fast.

 7              MR. LANIER:  "What is your name?" "Pass the

 8    witness."

 9         At this point, Your Honor, we don't anticipate needing

10    to put on a rebuttal witness.  If we do, it would be very

11    briefly, and it would either be Dr. Keyes or Mr. Catizone.

12    But at this point, if we ended today, right now, we would

13    not be putting on any rebuttal.

14         So depending on what happens over the next sounds like

15    today, tomorrow, and Monday, that could change into Tuesday,

16    but hopefully we won't need rebuttal and we can finish it up

17    with the defense case.

18              MR. MAJORAS:  And just to point out to

19    Mr. Lanier, you said six and a half.  Based on what the

20    Judge said yesterday, we have you at five and a half, but

21    we'll leave it up to the Court what the count is.

22              THE COURT:  I've got five and a half.  I've

23    got 69 and a half, so you've got five and a half, and the

24    defendants have 23 1/2.  But it sounds like they're not

25    using it all if you're going to be finished Monday or

1    Tuesday morning.

2         Well, let's see, if we --

3              MR. STOFFELMAYR:  It's going to be tight, but

4    I think we'll be less than everything.

5              MR. MAJORAS:  We do have a couple of

6    depositions the plaintiffs are aware of.  They're not

7    terribly long though.

8              THE COURT:  All right.  So who -- you've got

9    Dr. Murphy and Mr. Choi?

10             MR. MAJORAS:  Correct.

11             MR. DELINSKY:  Dr. Choi, Your Honor.

12             THE COURT:  All right.  Dr. Murphy, Dr. Choi.

13        Well, if we --

14             MR. WEINBERGER:  Who do we have for tomorrow?

15             MR. MAJORAS:  Dr. Glickman and Mr. Hill.

16   Depending on the two days, potentially some depositions.

17             THE COURT:  I mean, the witnesses have been

18   taking longer than both sides had anticipated, which is

19   okay.

20        All right.  If we finish Tuesday, what's everyone's

21   preference?  I mean -- I don't have a strong feeling either

22   way.  I mean, if we finish Tuesday and everyone's ready, we

23   can do the closing and instructions Wednesday.  Thursday is

24   off.  And then they'd start deliberating Friday.  Or we

25   could keep our original plan and take a longer break and

```
 1    just wrap everything up the following Monday.  I don't know.
 2    I mean -- it's your case.  I'm just --
 3                  MR. DELINSKY:  Could we confer maybe on that?
 4                  THE COURT:  Now, the defendants may want to
 5    take all their time.  You don't have to end early; but on
 6    the other hand, if you put on what you wanted, you don't
 7    drag it out, so I appreciate that.  Everyone does.
 8        And again, it may -- I mean, witnesses have taken
 9    longer than anticipated on both sides.  It's not anyone's
10    fault.  The questions have been good and, candidly, the
11    jurors have had terrific questions.
12                  MR. MAJORAS:  Yes.  It takes a lot of time.
13                  THE COURT:  It really shows they're following.
14    I mean, some pretty detailed questions that you only have if
15    you're really, really focused.
16        So, all right --
17                  MR. MAJORAS:  Your Honor, if we could maybe
18    respond to you at the lunch break.
19                  THE COURT:  Well, why don't you -- if there's
20    a consensus, that's fine.  I mean, I'd rather do it by
21    consensus on this, and I don't have a strong -- I mean,
22    there are pros and cons, and it may be moot because we may
23    go into Wednesday.
24        I think we're going to have a better idea at the end
25    of the day tomorrow.  We'll see, and I'd like -- because I'd
```

5913

1    like to give the jury some sense of what the schedule's

2    going to be next week when we break tomorrow.

3         So the end of the day tomorrow we'll know how much

4    we've gone through and you'll know what you're planning for

5    Monday and Tuesday.

6              MR. WEINBERGER:  Can we just get some

7    clarification, because it might -- it will help us in terms

8    of planning.

9         So we have Glickman and Hill tomorrow.  Anybody else

10   tomorrow?  Maybe depositions or --

11             MR. MAJORAS:  Correct.

12             THE COURT:  We may still be on Murphy and

13   Choi?

14             MR. WEINBERGER:  And Ashley?

15             MR. MAJORAS:  Yes.

16             MR. WEINBERGER:  And then on Monday you have

17   three -- do you know who your three pharmacists are going to

18   be?

19             MR. MAJORAS:  We're still working through that

20   and the order.  We'll have that by whatever our disclosure

21   is.  We'll get it to you as soon as we know.

22             MR. WEINBERGER:  And that's it?

23             MR. MAJORAS:  That's all we anticipate at the

24   moment.

25             MR. WEINBERGER:  Okay.

1          THE COURT:  Okay.  We can bring in our jurors,

2     and I'm going to give them those two instructions we talked

3     about yesterday.

4          I will just say, you know, I know from my experience

5     as a trial lawyer, I appreciated having some time to plan

6     and prepare closing arguments after a long trial, and

7     they're much better if you do, and that's why it's sort of

8     built in that initial schedule.

9          MR. MAJORAS:  We appreciate that, Your Honor.

10          THE COURT:  And that's fine with me.  I think

11     the closing arguments will be better if you have a little

12     time to plan them.

13          (The jury is present at 9:05 a.m.)

14          THE COURT:  Be seated, ladies and gentlemen.

15     I hope you all had a good evening.

16          Before we begin, I want to mention two things.

17     Occasionally counsel has questioned witnesses and mentioned

18     what prior witnesses have said.  I just want you all to know

19     that under the rules of Court, we don't permit witnesses to

20     sit in, sit in court, while other witnesses are testifying

21     unless they happen to be the party's representative.

22          And also, we don't let witnesses read the testimony of

23     other witnesses.  So I just wanted you all to know that.

24          And second, there have been various comments or

25     references to running out of time or being rushed, or

1     whatever.  I have given each side a specific amount of time,

2     obviously equal, the same amount of time, for them to use

3     for direct examination and cross-examination, and I haven't

4     told either side how to use it.  It's up to them how to use

5     it.  But that's something that some judges do and some

6     don't.  I happen to do it.

7           So I just wanted you to know that.

8           Okay.  Mr. Majoras, you may call your next witness.

9                 MR. MAJORAS:  Thank you, Your Honor.  John

10    Majoras, one of the attorneys for Walmart.

11          Good morning, ladies and gentlemen.

12          Your Honor, at this point the defendants call to the

13    stand Dr. Kevin Murphy.  Dr. Murphy is a professor of

14    economics, and will be sharing with us his expert opinions

15    relating to causation and responding to some of the opinions

16    of Dr. Keyes, Plaintiffs' witness.

17                (Witness sworn.)

18                THE COURT:  Thank you.

19          And you may remove your mask while testifying, please.

20                      KEVIN MURPHY

21                      - - - - -

22                   DIRECT EXAMINATION

23    BY MR. MAJORAS:

24    **Q**     Good morning, Professor Murphy.

25    **A**     Good morning.

**Murphy - (Direct by Majoras)**

1   **Q**     If you would, would you introduce yourself to the

2   jury.

3   **A**     Yes.  My name is Kevin Murphy.  I'm a professor of

4   economics in the Booth School of Business and the Department

5   of Economics at the University of Chicago, where I've been

6   teaching since the early '80s.  I actually was a graduate

7   student there before that and stayed on to become a

8   professor, so I've been teaching economics for about 40

9   years now at the University of Chicago.

10  **Q**     Dr. Murphy, in preparation for your testimony today,

11  did you work with me to prepare some slides that would aid

12  you in talking to the jury?

13  **A**     Yes, I did.

14                  MR. MAJORAS:  Your Honor, we'd like to use our

15  slides and put up --

16                  THE COURT:  Okay.

17                  MR. MAJORAS:  Put up our second slide, please.

18  **Q**     Dr. Murphy -- do you prefer Doctor or Professor or

19  Mister, or what's your preference?

20  **A**     Anything's fine.  Dr. Murphy, Professor Murphy, Kevin

21  Murphy, anything is fine.

22  **Q**     I may use all of them at some point, so that makes it

23  easier for me.

24          So Professor Murphy, what I'd like to do is take you

25  through a little more detail, your background, how you got

1    to the position you're in now after having been in Chicago

2    for 40 some-odd years.

3        So first, describe your personal education.

4    **A**    Yeah.  I grew up in California.  I grew up in

5    Englewood, California, a suburb of Los Angeles.  Went to

6    Englewood High School, and then from there I went to UCLA as

7    my undergraduate degree, also in economics.

8        Learned a lot of economics from professors at UCLA,

9    and then from there went on to the University of Chicago

10   under their recommendation.  George Stigler, who was a

11   professor of economics in Chicago, was very influential in

12   getting me to come to Chicago.

13       I then went to my graduate studies there, went to go

14   look for a job, and once again George was influential in

15   getting me to stay at Chicago as opposed to going somewhere

16   else.  And I've been teaching economics in Chicago and doing

17   research on economics.

18       My interests in economics are mostly on social issues.

19   I've worked on unequality, unemployment, poverty, drug use,

20   addiction, markets for illegal drugs; all kinds of different

21   areas, but, you know, really focused on people.

22       I mean, we tend to think of economics as about, you

23   know, stock market or GDP, and stuff like that.  That's only

24   part of economics.  The part of economics I've really

25   focused on is economics of people, and that's kind of

1    defined my career.

2    **Q**    And for those of us who may not be as familiar with

3    the field of economics, could you just give some background

4    on the stature of Dr. Stigler, the person who is your mentor

5    that you described?

6    **A**    Yeah, he was a Nobel Prize winner in economics, did a

7    lot on government regulation, antitrust, economics as a

8    whole.

9         The other big person in my life was Gary Becker, who

10   was another economist at Chicago.  And actually Gary and I

11   co-taught for a long time before he passed away a number of

12   years ago.  So the main course I now teach in Chicago is a

13   course that Gary and I co-taught for a long time before he

14   passed away.  And it's a very course that's close to my

15   heart because it was taught before Gary by Milton Friedman,

16   and before Milton it was taught by other people.

17        So it's a course that, you know, is close to what I

18   like in economics, which is thinking about how the world

19   works and how we use economics to understand real world

20   phenomena.

21   **Q**    And this may be fairly obvious, but the University of

22   Chicago is in Chicago; is that right?

23   **A**    Yes, it's on the south side of Chicago.  We're at 55th

24   and basically close to Lake Shore Drive, between I-94 and

25   Lake Shore Drive.

**Murphy - (Direct by Majoras)**

1    **Q**    Why don't you just briefly brag about your school in

2    terms of its position in the world of economics.

3    **A**    Well, we like to think it's the best place in the

4    world for economics, but, you know, we've done well over the

5    years in economics, won a lot of Nobel Prizes, a lot of

6    other prizes in economics.  But we always pride ourselves on

7    kind of having a strong approach to the subject.

8         And again, what drew me to Chicago was, again, the

9    kind of work that people did that was really real world

10   focused, focused on how the world operates.  A lot of --

11   some parts of economics gets very abstract and very far away

12   from actual world, and Chicago to me always epitomized the

13   approach that we're here to study the world, not just to

14   study the blackboard.

15   **Q**    As a professor at the Chicago -- at the University of

16   Chicago, what types of classes do you teach and have taught?

17   **A**    Well, like I said, I'm in both the business school and

18   in the economics department.

19        So in the business school I teach an advanced

20   microeconomics class, which basically students have a choice

21   to take the regular class or take an advanced class.  So I

22   teach the advanced class there.

23        I try my best to teach the same material I teach in my

24   Ph.D. class, but I have to teach it differently because it

25   goes from an everyday audience which doesn't have the same

1    background.  Hopefully I'm successful with that.  I try my

2    best to do a good job.

3          My other class is a Ph.D. course in economics for the

4    beginning Ph.D. students in Chicago.  So everybody who comes

5    in in our Ph.D. program, this the first micro-course they

6    take.  And like I said, it was taught by me and Gary, and

7    before that it was taught by Milton.  It's an important part

8    of their Chicago education.

9    **Q**    I don't think we need to dive too deeply into this,

10   but you talk about microeconomics.  I assume that's in

11   contrast to macroeconomics.

12         What's the difference?

13   **A**    I don't understand "macro," so that's the big

14   difference from my point of view.  I've always been a little

15   confused by macro.

16         But micro is really two things, the study of

17   individuals, how individuals behave; try to understand, you

18   know, motivation of individuals, also motivation of firms.

19   And most importantly, about markets, how markets work.  And

20   markets are a really important concept in economics.  They

21   sort of determine how the parties interact, whether they're

22   individuals or whether they're individuals and firms.  And,

23   you know, so we study kind of what determines the outcomes

24   that we see.

25         And that is going to extend not just to things you

1    think of the traditional economics venues, you know, we talk

2    about things like, you know, I've written papers on

3    addiction and papers on markets for illegal drugs.  Social

4    phenomena, Gary Becker and I wrote a book on social

5    economics that tries to talk about the social side of

6    people's lives.  And, you know, for a lot of decisions, what

7    you do is not just determined by the price you pay at the

8    store.  It's also determined what people you know do, how

9    the environment around you acts.  And that's also part of

10   economics, sort of embedding people in a social environment.

11   **Q**    As we can see on the slide, you've published quite a

12   bit.  You have 80 articles in scholarly and professional

13   journals.  Rather than going through those, could you

14   explain the significance or the importance to a professor

15   about publications.  Why does that matter?

16   **A**    It's how you keep your job, that's one.  To me, that

17   was never the big story.  It was it's how you get your

18   information out to people about what you're doing.

19        And there are really two outlets a professor has for

20   influencing things.  One is through your publications, and

21   the publications are read by other people in the profession;

22   the other is through teaching.

23        For me, I put a lot of emphasis on both.  These days,

24   in fact, I probably put most of my emphasis on teaching.  I

25   like teaching economics.  I teach those two courses we

1    talked about, but I also teach a summer camp which, you

2    know, as it gets -- it's a summer camp for Ph.D. students

3    from other universities around the country, and they come to

4    Chicago, and they get a one-week course on how we do things

5    in Chicago.

6          That's something I'm very proud of, that we're able to

7    teach not just the Chicago students but students from around

8    the country about how we approach things and how you use

9    economics to address real-world problems.

10   **Q**    You mentioned before, and I can't recall whether you

11   said specifically publications, but you mentioned before

12   addiction, the study of addiction and illegal activities.

13         Have you written articles related to those?

14   **A**    Yes.  We wrote kind of a more theoretical piece on

15   sort of using economics to kind of understand addictive

16   behavior.  And then we wrote several empirical papers

17   looking at cigarettes and the consumption of cigarettes, and

18   trying to understand how a model like that could be used to

19   understand the evolution of the cigarette marketplace over

20   time.

21         We also wrote papers on markets for illegal drugs and

22   things like that.

23   **Q**    You note here that you are a co-author of a book

24   called Measuring the Gains for Medical Research:  An

25   Economic Approach.

1    What is that about?

2    **A**    That's about, you know, trying to assess the

3    improvements in people's lives that have come from

4    improvements in health.

5        You know, again, as an economist, one of the things

6    people always focus on is how we become richer as a society.

7    So as we said, if you compared 1900 with 2020, we're way

8    richer in 2020 than we were in 1990.  But the other big part

9    of it is we live a lot longer today and we're a lot

10    healthier than we were in 1900, you know.  And that's a gain

11    that's, you know, equally important actually.

12        If you measure what people value at, the gains in

13    longevity over that long period of time parallel or maybe

14    even exceed the gains that people have gotten from being

15    richer, and, you know, you want to count that.

16        And most measures of economic output don't measure

17    kind of the longevity part of that story.  We're a lot

18    better off as a society because we've gotten both healthier

19    and wealthier.  And those are both things that matter to

20    people.

21    **Q**    In addition to your role as a professor of economics

22    at the University of Chicago, do you have any other teaching

23    positions or activities?

24    **A**    Yeah, I mean, I have a small position at Stanford

25    University in the Hoover Institution, where I do a little

1    work there.  I also work with a consulting firm, Charles

2    River Associates, where I worked on consulting matters like

3    this.

4         I also have a woodworking business where I don't do

5    so -- you know, we make furniture, we have our own sawmill.

6    That's -- I'd love to do more of that.  I don't do as much

7    of that as I'd like.

8    **Q**    What is the Becker Friedman Institute?

9    **A**    The Becker Friedman Institute is an institute at the

10   University of Chicago to support economic research.  It's

11   named after two of the people I talked about earlier, Gary

12   Becker and Milton Friedman, who are both professors at

13   Chicago.

14        I'm affiliated with the Becker Friedman Institute.

15   For a while I was one of the directors.  I've now limited my

16   role there.  I'm on the kind of human capital side that we

17   call it, which is really about people.  So I'm kind of in

18   the people part of that institute today and work with the

19   Becker Friedman Institute in that capacity.

20   **Q**    And you also have a position with the National Bureau

21   of Economic Research; is that right?

22   **A**    I do.

23   **Q**    What's that?

24   **A**    I've been affiliated with the -- I think people

25   usually call it the NBER, National Bureau of Economic

1    Research.  I've had an affiliation with them since the early

2    '80s, so again, about 40 years working with the NBER and

3    their various programs.

4    **Q**    So I'm going to give you another little opportunity.

5    I'm actually going to ask you to do it, to brag on yourself

6    a little bit.  You note some awards that you've received on

7    the slide.

8         Could you describe what those awards are and the

9    significance?

10   **A**    I guess.  I won the John Bates Clark medal, which at

11   the time I won it was awarded every other year to the

12   outstanding American economist under the age of 40.

13   Obviously that was a while ago, because I'm not even close

14   to under 40 today.

15        But I won the Clark Medal, which is a very prestigious

16   award in economics, because it was only awarded to a single

17   recipient but also awarded every two years.  It's now

18   awarded every year, so it's a little watered down in terms

19   of its value today.  A little excess supply in some sense of

20   Clark Medal winners.  All of us who had won before kind of

21   opposed that expansion, but, you know, it is what it is.

22        I also won a MacArthur Fellowship, which is not

23   specific to economics.  MacArthur Foundation awards

24   fellowships across a wide range of things, not just

25   academics; musicians, artists, academics.

1    I won as an economist for the work I had done and

2  particularly the work on the social side of things for

3  social issues and that.  That was what they cited in their

4  citation for the MacArthur.

5    I also won the Kenneth Arrow award for outstanding

6  paper in health economics, which is about measuring the

7  gains to longevity.

8  **Q**    And then last question on some of your background.

9  You note here that you are a fellow of the Econometrics

10  Society and a member of the American Academy of Arts and

11  Sciences.

12    What's the significance of those to you in your

13  profession?

14  **A**    Well, those are both elected positions.  You have to

15  be nominated, and then people have to elect you to be a

16  member.  So you know, there's some prestige that comes with

17  being selected for that.

18    Again, the Econometrics Society is basically in

19  economics the American Academy of Arts and Sciences; again,

20  much broader.  It's across all the scientific fields.

21  **Q**    You had mentioned a moment ago that you do consulting

22  work for a firm called Charles River Associates.  That's

23  also known sometimes as CRA?

24  **A**    Yes.

25  **Q**    What does your work focus on when you're working with

1    Charles River Associates?

2    **A**     I would say the biggest area I tend to work in is

3    actually antitrust.  I do a fair amount of work in

4    antitrust.  I also do some work in damages.  But, you know,

5    I work in economics broadly, so there's a number of

6    different types of issues I work on at CRA.  And that's very

7    much in keeping with my view that economics is a broad

8    subject that's meant to be applied, so I try to apply it as

9    much as I can to a wide range of things, and CRA is a good

10   place for doing that.

11   **Q**     So if you put together all the things, the activities

12   that you do, including your woodworking, where would you say

13   the bulk of your time is spent these days?

14   **A**     School would be the bulk of my time.  School is the

15   biggest use of my time.  You know, I'm at my woodworking

16   outfit probably the next-most amount of hours, but a lot of

17   the time I'm there I'm doing something else, I'm not really

18   doing woodworking.  I'm on the phone working on either

19   school stuff or CRA stuff.

20        So I would say second-most time spent would be at my

21   woodworking outfight, but the actual amount of time I spend

22   woodworking is very small, probably 10 hours a week,

23   something like that.

24   **Q**     As you heard me say, we plan to ask you some opinions

25   involving your expertise.

**Murphy - (Direct by Majoras)**

1      Have you ever testified as an expert in prior cases?

2  **A**   Yes, I have.

3  **Q**   Can you tell us how many?

4  **A**   I don't know the number.  I've probably testified in,

5  you know, 20, 25 times in court.  I've given a lot of

6  depositions.  So something on that order of magnitude.  I

7  haven't really ever added it up.

8  **Q**   Have you ever testified on behalf of a government or

9  government agency, either state or federal?

10  **A**   Yes, I have.  I've testified for the FTC in a trial

11  involving a merger, an antitrust merger.

12  **Q**   And in addition to the work that you're going to talk

13  about today, have you done other work related to other

14  opioid cases?

15  **A**   Yes, I have.  I believe this is the sixth of the

16  opioid cases I've worked on.  I think I've worked on six

17  over the last several years.

18  **Q**   And the folks who hired you in those cases, did they

19  include distributors?

20  **A**   Yes.  I have worked for distributors I think in most

21  of the cases I've done.  I think this is -- you know, this

22  is a case involving pharmacies, but most of the work I've

23  done has been on behalf of distributors.

24  **Q**   And have you ever been engaged on behalf of

25  manufacturers?

1    **A**     No, not for purposes -- I've been engaged by

2    pharmaceutical companies on other matters, but not on

3    opioid-related matters.

4    **Q**     Let's talk a little bit about your compensation in

5    these cases.

6          As an expert, we have -- the defendants have retained

7    you and compensate you for your time; is that right?

8    **A**     Yeah.  I am compensated in two ways.  I'm compensated

9    directly for the time that I put in, that would be the hours

10   that I supply; as well as I get some compensation based on

11   the billings of people at CRA who do the, you know, back

12   office, and help me with my work on all the cases, not just

13   the opioid cases.

14         I do a lot of -- I have a team of people at CRA who

15   work with me and have worked with me for a long time.  You

16   know, many of them have been with me for 20, 30 years, but

17   most of them have been there quite a while.

18   **Q**     And the type of work that you do, is it -- did you

19   frequently work with other people at a consulting firm?

20   **A**     I always have.  I mean, you know, there's a lot of

21   work that needs to be done, just like I would -- university

22   work, I'd work with other people at the university.

23         On consulting work, we work with a team of people who

24   help you with your work.  And having a great team is

25   incredibly important.  I mean, it's really hard to do

1    anything, really, of this type without having a good team of

2    people.

3    **Q**     And we're going to talk a bit about the report you

4    produced in this case.  It was approximately 176 pages long;

5    is that right?

6    **A**     That's a funny approximation.  176 is pretty exact.  I

7    think that's -- that seems right to me.  I would have said,

8    you know, 170 pages or so, you said 176.  I'll take your

9    word for it it was 176.

10   **Q**     Who wrote that?

11   **A**     My staff and myself.  We worked on it together.  It's

12   not something that I would be -- I would do simply by

13   myself.

14   **Q**     But in terms of the opinions you've reached and the

15   conclusions you reached, whose opinions and conclusions are

16   those?

17   **A**     Those are my opinions and my conclusions, you know,

18   and my staff helps me work on developing, expositing,

19   evaluating the data and all the things you need to do to

20   reach those opinions.  So it's really a team effort to do

21   the work behind the opinions, but ultimately those are my

22   opinions.

23   **Q**     So in terms of the amount of compensation that you

24   expect, and it's because you're here today we don't know the

25   final, do you have an estimate of the amount of compensation

1   that you will anticipate in this case both from your time

2   and some of the time that you get out of CRA?

3   **A**    Yeah, I mean, in terms of my time on this particular

4   case, as of the end of September it was about $40,000, I

5   think.  I've obviously done work since then, so it will

6   probably be -- it will be in excess of that, maybe 60,

7   65,000, something like on that order of magnitude.  Maybe a

8   little more.  I haven't totaled that out.

9   **Q**    Does that include the additional compensation you may

10  receive related to the work that others are doing for CRA on

11  the opioid litigation -- on this litigation?

12  **A**    No, it doesn't.  So the amount I would have received

13  based on other people's time and efforts would be for this

14  case I believe about 300,000 as of the end of September.  It

15  would be higher than that, again, since they've done some

16  work since then.  But proportionately-wise, more of the work

17  recently would have been mine because I'm the person getting

18  ready to testify.

19  **Q**    If we look more broadly at all of the work you've done

20  in opioid litigation, do you have an estimate for the amount

21  of compensation you're receiving related to your work and

22  the CRA work?

23  **A**    Yeah, I would say my total, I believe, as of the end

24  of September, which is the last total I know of, was

25  probably about 350,000, I believe, my direct compensation;

1    and then compensation that flowed through CRA for back

2    office work would have been about 1.8 million.

3    **Q**    Do you consider yourself to be an expert in the areas

4    of health economics, labor economics, and data analysis?

5    **A**    I do.

6    **Q**    And are all the opinions that you'll be offering today

7    based on to a reasonable degree of professional certainty in

8    your areas of expertise and experience?

9    **A**    Yes, they are.

10    **Q**    And I'm going to ask you as you have further

11    discussions with us today and you offer your opinions that

12    you only offer opinions that are based to a reasonable

13    degree of certainty regarding your profession and your

14    experience.  Okay?

15    **A**    I will do that.

16    **Q**    All right.  Why don't we start with telling the jury,

17    what were you asked to do in this case?

18                  MR. MAJORAS:  And if we can go to our next

19    slide, please.

20    **A**    Yes.  So I was asked in this case to provide my

21    opinions really on really two things.  One is the increased

22    use and misuse of prescription opioids, so that's focusing

23    on prescribed opioids and what -- you know, how do we

24    understand the increase in use and the increase in misuse

25    that occurred over time.

 1          And secondly, the increase in misuse of and mortality

 2     from illegal opioids, in particular heroin and fentanyl,

 3     which has really been a big part of the story of what we've

 4     seen in Ohio and these counties in particular, but the

 5     United States as a whole over the more recent years.

 6          So I'm going to talk about both of those periods of

 7     time, kind of the growth and subsequent decline actually in

 8     the use of prescription opioids and then the subsequent

 9     increase in the use and misuse and mortality from illegal

10     opioids.

11     **Q**    And are your opinions going to be very broad

12     nationwide or are they going to be more specific as well?

13     **A**    Well, I think we're going to learn by looking at both.

14     So most of what we're going to talk about we're going to

15     focus on Ohio, a lot of what we're going to look at, but

16     we're going to look at Ohio in a broader context of what's

17     going on in the U.S., because I think if you compare, for

18     example, the eastern U.S. to the western U.S., you can learn

19     some things about what's going on.

20          Our interest, of course, is what's going on in these

21     counties and what's going on in Ohio, but that doesn't mean

22     you just want to analyze that, but that's going to be our

23     focus.  We're trying to learn about the local area, but

24     sometimes it will help to bring in information more broadly.

25     **Q**    So you made it very clear that you teach in Chicago,

1  and I presume live in Chicago.  How do you go about looking

2  at the two counties in this case, Trumbull and Lake

3  Counties, as you prepare your opinions?

4  **A**      Well, I guess I start -- you know, when I first heard

5  about, you know, these were the counties that we were

6  thinking about, I thought back to work I had done over a

7  long period of time which looked at some of the issues that

8  have arisen, particularly for the less educated individuals

9  in our society over time as the economy has changed.

10      We've had big changes in our economy, really starting

11  back all -- you know, as far back as 1970, and many of them

12  accelerated around 2000, that, you know, where outcomes were

13  tough for a lot of people.  And in this part of the country

14  in particular, really owing to the fact of the economic base

15  that existed here.  It's largely, you know, a big

16  manufacturing base in the Midwest, upper Midwest in

17  particular.

18      So I guess that's where I would have started, you

19  know, thinking about putting them in that larger social

20  context.

21      Secondly, we've had long-term increase in drug use in

22  the United States.  It predates the opioid crisis.  It's

23  continued with the opioid crisis.  So I've tried to

24  understand that side of it too.  So those are really two of

25  the key ingredients I started with.

**Murphy - (Direct by Majoras)**

1   **Q**    We also asked you to take a look at causation or

2   causal links; is that right?

3   **A**    Yes.

4   **Q**    And what was that -- what part of your assignment did

5   that involve?

6   **A**    Well, I guess my understanding -- and again, I've not

7   read the testimony, as instructed.  That was not what we

8   were supposed to do.

9        I know though I did read Dr. Keyes' report and other

10  plaintiff reports in this case, so I do know what they

11  testified to in those reports, you know.  Whether -- I

12  didn't hear what they did or I haven't read what they said

13  in court, but a big part of what they look at is the growth

14  in what they call the supply of opioids over time.

15       And I think this is a question well suited for

16  economics, because economics really looks at outcomes like

17  that, you know, how -- what determines how much quantity of

18  opioids would be consumed or sold, and what would happen if,

19  as happened in the real world, things change and other drugs

20  come into the United States in a later period of time, how

21  that's going to affect outcomes.

22       So I'm going to address that supply issue using the

23  tools of economics.

24  **Q**    And you mentioned Dr. Keyes in particular, who was one

25  of the Plaintiffs' experts who testified earlier.  I'm going

1    to ask you as you're discussing -- as you're talking today

2    to assume that Dr. Keyes' testimony was consistent with the

3    report and the deposition that you've seen, okay?

4    **A**    Okay.  I'll do that.

5    **Q**    So if there's something specific that I want to ask

6    you about that may be different, I'll try to make sure that

7    point is clear.

8         Fair enough?

9    **A**    That's fair.

10   **Q**    Okay.  So as you got your assignment, what do you do

11   and what do you look at as you prepare your work and reach

12   your conclusions?

13   **A**    Well, there's really two things you try to do as an

14   economist.  One is gather data so you can see what's going

15   on in the world.  The other is think about the underlying

16   economics, use what you've learned and studied as an

17   economist to interpret that data in a way that's helpful for

18   answering the questions that are on the table.

19        So in this case what I tried to do is understand the

20   growth in the consumption of prescription opioids that

21   occurred let's say pre-2010, the factors that led to that,

22   how to think about that from an economics standpoint, and

23   then look at the growth in illegal opioids that really

24   dominates the last 10 years or so, and what's behind that,

25   how is that related.

1          And then ultimately try to link it back to say, well,

2     geez, what does that say about the issues in this case.  Is

3     the plaintiffs' analysis really useful for thinking about

4     what they say the, you know, oversupplier, supply side

5     factors driving things.  And that's where I'm going.

6     **Q**    When you talk about data that you use, we've had some

7     testimony from some folks who really look at spreadsheets

8     and numbers.  Is that all you're looking at?

9     **A**    No.  I think we -- you know, numbers are part of what

10    we call data, but there's a lot of other things that we look

11    at; more qualitative data, for example.  But, yeah, numbers

12    are a big part of it.

13         And, you know, we use statistical programs, not just

14    spreadsheets, to analyze the data.  We do things called,

15    like regression analyses and things like that that, you

16    know, sound complicated, but ultimately they're really just

17    trying to parse the data and understand what the data have

18    to say.

19         I'll try to do the best I can to explain that today.

20    **Q**    So when you say qualitative data or qualitative

21    analysis, I forget which it was, what do you mean?

22    **A**    Well, I mean, you can't always put numbers on things,

23    right?  You can't always -- you can't always put numbers,

24    but you can look at, you know, directionally how things

25    moved, how people act; even sometimes what, you know, the

1    accounts that people give of what happens.

2         Now, it's always a little tough because they speak in

3    their language and you speak in yours, so you have to kind

4    of do a good translation, but you don't want to ignore kind

5    of the more softer things as well.

6    **Q**    I hope you speak in my language.  If not, I will ask

7    you for clarification from time to time.

8         I'd like to now turn to your conclusions, the opinions

9    that you reached after all of your analysis and looking at

10   information.  And you have them on this slide in front of

11   us.

12        What I'd like you to do is just simply go through

13   those.  If you want some explanation, please do, but we're

14   going to cover them each in some detail.

15   **A**    Yeah.  Number 1 is really important.  And number 1 is,

16   you know, when I read reports, I heard people -- I heard

17   like Dr. Keyes and others talk about oversupply, the growth

18   in supply, and then their measure of the growth in supply

19   was just the quantity that people consumed.

20        And the first thing as an economist, I see the

21   quantity consumed going up, that doesn't tell me that was

22   some supply side story of what drove that, because the

23   quantity that we see consumed is determined by both supply

24   and demand.  You'll see quantity going up even if the supply

25   side of the world doesn't really change and just people are

**Murphy - (Direct by Majoras)** 5939

1    demanding more of something.

2        And so you've got to include both demand and supply

3    factors; that is, measuring the quantity consumed is not a

4    way to measure what's going on in supply per se.  It's

5    really a measure of just the outcome determined by both

6    supply and demand.  And that's important in this case

7    because there's good evidence that it's not all about

8    supply, that in fact there's -- there are demand side

9    factors that were quite important in this case.

10       Some of those demand side factors are very economic in

11   notion -- in nature, prices and how much people have to pay,

12   costs went down for many people.  That's going to drive up

13   the quantity.  But other ones are social in nature, that is,

14   you know, some of those factors I talked about before.

15   Distress that people face changes their demand for various

16   things, including prescription opioids, as well as the

17   illegal opioids.

18   **Q**    We have heard the term "oversupply" in discussing

19   opioids in this case.  What is oversupply from an

20   economist's perspective?

21   **A**    Well, I don't know.  I mean, there's really not a

22   well-defined definition of oversupply.  I think in economics

23   we tend to think about supply and demand, and you have a

24   growth in supply and you could have a growth in demand.

25       Either one of those would lead to a growth in the

1    outcome in terms of quantity. That is, we could have more

2    gasoline consumed in the U.S. either because people demand

3    more gasoline than they used to or because somebody

4    discovers a bunch of oil and then we produce a bunch more

5    gas than we would have. You can't tell simply because the

6    amount of gasoline consumed goes up that it was a supply

7    story as opposed to a demand side story.

8        And that's kind of the fundamental, I think, part

9    where I would say that Dr. Keyes' kind of analysis is

10   inconsistent with a solid economic analysis. She's not an

11   economist so it's not surprising, but that still means you

12   have to think about those broader issues to really interpret

13   her results.

14       Number 2, this gets back to kind of this what I've

15   done a lot of in my research, is you can't just look at the

16   narrow picture. Like we're going to talk about this later,

17   but it's important to realize that, you know, you could say,

18   well, geez, prescription opioids are -- you know, how does

19   that affect other outcomes. But if you restrict

20   prescription opioids, people are going to respond. They're

21   going to do something else.

22       That is, people are people. They're not rocks. You

23   know, rocks, you move them over here, they stay where you

24   put them. People, they have a mind of their own. You have

25   to take that into account. And that's going to turn out to

1    be important in this analysis.

2    **Q**     And then finally, your third conclusion, what is it

3    that you were trying to communicate here?

4    **A**     Yeah, that in particular, if you want to understand

5    the growth in heroin and fentanyl, you've really got to

6    understand evolution of the illegal drug market in the more

7    recent period, and really the innovations that happened in

8    that market with the introduction of fentanyl.

9         And also some of what I talked about before that, you

10   know, the growth of the heroin and fentanyl deaths isn't all

11   about opioids.  A lot of those heroin and fentanyl deaths

12   are people dying who are also consuming nonopioids, whether

13   it's cocaine or other drugs.  So it's, again, trying to say,

14   "Well, that's all about opioids," I think is missing the

15   point.

16   **Q**     You mentioned that Dr. Keyes is not an economist.  I

17   can imagine, and I've not heard her say this, but I can

18   imagine her saying, "Well, you're not an epidemiologist."

19        Why is it that you're here to talk to the jury about

20   these issues?

21   **A**     Well, look, I'm not here to talk to you about the

22   epidemiological issues.  I'm here to talk about the broader

23   issues that determine the outcomes.  And the key point is

24   economists can incorporate some of the things that go into

25   epidemiology but also can bring in a lot of other factors

**Murphy - (Direct by Majoras)**

 1    and a lot of other elements of the analysis that I think are

 2    important.

 3         Because it's not all about how is A related to B,

 4    you've got to take account of C, D, E, and F, that are also

 5    key parts of the equation.  And as an economist, that's kind

 6    of our game, that's kind of what we try to do, is

 7    incorporate not just biological factors or engineering

 8    factors, but also kind of human-related and other

 9    market-related factors.

10    **Q**    You talked about the A, B, C, D list of things that an

11    economist can bring to the table.  Do you have in mind

12    specific tools that you have as an economist that you think

13    will be helpful here?

14    **A**    Yeah.  I think one of the biggest principles economics

15    always talks about is substitution, that is people can

16    substitute one thing for another.

17         And for example, in this context, if prescription

18    opioids become less available, fewer people will follow that

19    path because there's fewer available; but at the other hand,

20    more people will follow other paths.

21         So if I'm somebody who's looking to abuse drugs, if

22    prescription opioids aren't available, I'll go in another

23    direction.  And one of the directions you may go in would be

24    to initiate on illegal opioids, like heroin or fentanyl.

25    And you could say, "Well, geez, that's a theoretical

1    prediction of economics," but it's also an empirical reality

2    that over time, more and more people are initiating on

3    heroin and fentanyl as opposed to using prescription

4    opioids.

5         And so if your analysis is limited to a link between

6    prescription opioids and illegal opioids and you ignore that

7    other pathway, you're missing a very important part of the

8    story.  You have to take that into account to understand the

9    overall impact.

10         I liken it to like TV.  I have a colleague who

11   actually worked on this problem.  It's a really interesting

12   problem.  For example, I do a study and I show that kids

13   watching TV -- and I do it in a very controlled environment.

14   I show them a TV program and I measure how they respond to

15   that TV program, and I conclude that TV has some adverse

16   effects on people.  And then you said, okay, based on that,

17   I'm going to take away people's TV and I'm going to get rid

18   of those adverse outcomes.

19         Well, the first thing an economist would say, look, I

20   can't tell you whether that's a good idea or bad idea until

21   you tell me what the kid is going to do while he's now not

22   watching TV, because he's going to do something rather than

23   watching TV.  And if what he's going to do rather than watch

24   TV is read a book then I agree with you, that's a great

25   idea.

1      If what he's going to do is go out on the street and

2   get into trouble, I'd rather have him watching TV.  That's

3   not great, but being out on the street is worse.

4      So you've got to think about that.  You've got to

5   think, what's the alternative.  An economist is all about

6   that.  That's the first lecture class always is about that,

7   got to think about the alternative.  And that's true here

8   too.  You've got to think about how the broader impact is

9   going to be.

10  **Q**   As we dive into your opinions, let's talk about a few

11  economics terms, some of which you've -- probably all of

12  which you've used already, so we can be sure that we

13  understand what you're saying.

14     You've talked about supply, demand, and output.  Can

15  you tell us to the extent you already have, I think supply

16  you may have mentioned, tell us what those three are and

17  what their difference is?

18  **A**    I think it's easiest to think about in terms of my

19  gasoline example.  That is, we discover a bunch more oil and

20  gas prices get cheaper and people buy more gas because it's

21  cheaper, you'd say that's a supply side change.  We've

22  increased the supply of gasoline, and that induced people to

23  consume more.

24     On the other hand, if people move to the suburbs for

25  another reason and now they have to drive a lot further to

1    get to work, you'd say that's a demand side factor that

2    caused more gasoline consumption.  And you couldn't say that

3    it was the discovery of oil that led to more gasoline

4    consumption if it was because people moved to the suburbs.

5         That's really all it's about.  You measure the

6    quantity, you have to realize that doesn't tell you where it

7    came from.

8         And so you can't just say quantity went up, therefore

9    we have more supply.  Well, no, it's really you could be

10   measuring what actually was driven on the demand side.

11   **Q**    And have you looked at the demand side factors when it

12   comes to opioid use?

13   **A**    I did, and I talked about some of it already, but

14   there's some I haven't talked about, so we'll go through

15   those.

16   **Q**    You have here "Output."  What is output and how is

17   that different than supply?

18   **A**    It's the quantity.  It's the result of supply and

19   demand, right?  It's what I said, it's enough gallons of

20   gasoline that we consumed or number of opioids that people

21   consumed.  That's output.

22        Supply and demand gets to the factors that underlie

23   why, for example, that quantity might have gone up or down

24   over time.

25   **Q**    In this slide you talk about an independent factor.

**Murphy - (Direct by Majoras)**

1   Can you explain what you're relating -- what you were trying

2   to relate to the jury here?

3   **A**     Yeah, just this point, that when you look at output,

4   it's not clear you're measuring supply.  You're measuring

5   the interaction of supply and demand side factors.

6   **Q**     Let's go to our next slide.

7          This slide you have, "Growth in medical use of

8   prescription opioids."  What analysis did you do in this

9   respect?

10  **A**     Okay.  First off, you know, and I'm sure the jury has

11  seen these facts, I mean, if you look at when prescription

12  opioid use in the United States grew, it would be in Ohio

13  and in these counties it would be that period up to, say,

14  roughly 2010 or so, there was an expansion in prescription

15  opioid use and some expansion in abuse over that period as

16  well.

17         So that's what I mean, it was about the prescription

18  opioids as distinct from the illegal opioids, like heroin

19  and fentanyl, that were really a big part of the later

20  story.  They're going on in the earlier period too, but this

21  analysis was about the prescription opioid side.

22  **Q**     Fair to say as an economist you're going to be

23  compelled to show us graphs of supply as you testify today?

24  **A**     I will smile, you may frown, but I like graphs, and

25  it's one of the ways economists try to show people what

1    they're talking about.

2    **Q**    So as you talk about the growth, what were some of the

3    changes you analyzed?

4    **A**    Well, I mean, one was -- and, you know, this is a very

5    economic factor -- if you make it easier for people to get,

6    to pay for prescription opioids, that is, you expand, for

7    example, prescription drug coverage, economists -- any

8    economist worth his salt would say, if you make it cheaper,

9    make it easier for people to get, people will generally

10   consume more.

11          And we did see that, and one of the big factors that

12   happened in the early 2000s was Medicare Part D.  Medicare

13   Part D was prescription drug coverage for Medicare

14   recipients.  It was put in place because, you know, many

15   people felt at the time that, you know, prescription drugs

16   were expensive, people were having a hard time paying for

17   the prescription drug coverage that they wanted and need,

18   and Medicare Part D came in to help people pay for it.

19          And not surprisingly, when we came in and helped

20   people pay for it, they used more.  And, you know, that came

21   as no surprise to economists.  I don't even think it came as

22   a surprise to the policy makers.  I mean, after all, the

23   policy makers put it in place for exactly that reason.  They

24   put Medicare Part D in to help seniors afford prescription

25   drugs.

1    So when you see quantity go up, you don't want to

2  think that was an unintended consequence.  It was really an

3  intended consequence of the policy, was to expand people's

4  access and use of prescription drugs.  So that's one of the

5  things.

6    And opioids are among those prescription drugs, but

7  the expansion occurred in other drugs as well.

8  **Q**    When you talk about Medicare Part D, that's the

9  Prescription Drug Improvement and Modernization Act?

10 **A**    Yes.

11 **Q**    When was that passed, do you know?

12 **A**    I think it comes in in around 2006 or so.  It was

13 talked about before that, in 2003, but it kind of has worked

14 its way into the system I think by the time you get to 2006.

15 **Q**    And do you have any opinion as to whether the passage

16 of Medicare Part D had any impact on prescribers?

17 **A**    Oh, it did.  I mean, prescribers are not immune to the

18 financial conditions of their patients.

19 **Q**    What do you mean by that?

20 **A**    Well, I mean prescribers, you know, one of the things

21 they can say, look, I can prescribe you this drug, it's

22 going to help you, but -- and it's not going to cost you

23 very much because it's covered under your prescription drug

24 coverage.

25    I mean, prescribers, you know, the other side is, you

1    know, when -- this was an issue that motivated Medicare Part

2    D, is even if drugs are prescribed, people still have to

3    fill those prescriptions.  And if they're very expensive,

4    you know, people don't always fill their prescriptions if

5    they don't have -- they feel like, geez, that's a lot of

6    money, I don't think I can really afford to do that.

7         Indeed, those stories were some of the motivations for

8    Medicare Part D, right?  It didn't happen in a vacuum.  It

9    didn't fall out of the sky.  People -- you know, Medicare

10   Part D was introduced because it was broadly believed that

11   seniors were having a hard time paying for their

12   prescription drugs.

13   **Q**    Now, this opinion about Medicare Part D having the

14   impact you've talked about, is that simply your analysis?

15   **A**    No, this has been -- you know, first off, like I said,

16   it's a pretty straightforward application of economics, but

17   secondly, there's been empirical analysis in economic

18   literature that have looked at the impact of Medicare Part

19   D, and in fact found that Medicare Part D did have an effect

20   on prescription drug usage, prescription prescribing

21   behavior.

22   **Q**    If you see the screen in front of you, is this a study

23   that you analyzed and relied upon in reaching your

24   conclusions?

25   **A**    Yeah.  This is the Mark Duggan and Fiona Scott Morton

1    study, also talked about here as the Lichtenberg study.

2    These are people that I have known personally for a long

3    period of time.  Mark Duggan used to be at the University of

4    Chicago actually, and as was Fiona actually.  So they've

5    done work on sort of showing that Medicare Part D had the

6    kind of effects we would have expected.

7    **Q**    And if you look at the part that we've blown up on the

8    screen of this report, even a little bit broader than the

9    highlighted part says, "Our findings," the findings of the

10   two authors, "also suggest consistent with recent research,

11   for example, Lichtenberg and Sun in 2007, that Part D has

12   increased the utilization of pharmaceutical treatments."

13          How does that relate to your opinion?

14   **A**    I think it relates very correctly.  It says one of the

15   reasons we had a growth in the use of opioids in particular,

16   and prescription drugs more broadly, was the introduction of

17   Medicare Part D, which made prescription medications more

18   affordable for seniors.

19   **Q**    In the analysis that you've done of Medicare Part D,

20   did you reach any conclusions as to the impact on the kinds

21   of treatments that beneficiaries received as a result of

22   these changes?

23   **A**    Yeah.  I mean, I think you can see, for example, one

24   of the things that they did was increase use of prescription

25   opioids.

1 **Q** And I put up your next slide.  Maybe you can refer to

2 that as you testify.

3 **A** Yeah.  Well, this is actually just looking at

4 coverage.  This isn't looking at usage.  This is just

5 looking at drug coverage.  And you can see between 2004 and

6 2006, as I said, that's when the Medicare Part D came into

7 effect.  It had been passed earlier, but it came into effect

8 in that period.

9   You can see there was a dramatic increase in

10 prescription drug coverage for the Medicaid-eligible

11 population.  That would be in this case the 65 to 74.

12   And we kind of as a control group look at the 55 to 64

13 who typically would not be Medicare eligible.  And you see

14 very little -- you don't see that same sharp increase, so

15 it's pretty clear this was Medicare Part D related.

16 **Q** Have you also looked at the share of prescription

17 opioid costs in relation to the time period where Medicare

18 Part D was passed?

19 **A** Yeah, that's on the next chart.

20 **Q** Let's go to the next chart.

21 **A** So here what we have is a bar chart where it divides

22 up the cost into three buckets.

23   The dark bar is the part that the person pays for,

24 what we call out-of-pocket expenditures.  So if I'm the --

25 if I'm the person getting the prescription, that's the

1    portion that I pay.

2          The blue part is the part that's covered by Medicare.

3          And then the other part is the part paid by other

4    payers.  It's not paid by the person.  It's paid by his

5    insurance company or whatever.

6          And you can really see Medicare Part D come in, right?

7    As Medicare Part D comes in, boom, you see a dramatic

8    increase in the blue part, the light blue part, the Medicare

9    part.  So Medicare is picking up a lot more of your cost,

10   and out-of-pocket costs, you know, fall very dramatically.

11         In fact, by the time you get to 2010, if you look,

12   customers are only paying about 20 percent of the overall

13   cost compared to almost 60 percent back in 2001.  Okay?  So

14   it's a very -- you know, it's a very big difference.  That

15   is, the part that they were paying went way down.

16         That was not by accident.  That was an intended

17   outcome of Medicare Part D.  They wanted to reduce what

18   seniors had to pay for prescription drugs, including

19   opioids, because they were covered as well.  And as an

20   economist, you say, well, geez, if the amount I pay goes way

21   down, I'm going to consume more.  And that's what's going to

22   happen.  And doctors say, well, geez, I can prescribe this

23   for more people because it doesn't cost them as much as it

24   would have otherwise.

25         So as an economist, I'm not surprised at all that you

1    saw a response of usage to a lower out-of-pocket cost.

2    **Q**    So that we're all clear on this, when you talk about

3    Medicare, that's the healthcare provided by the coverage for

4    seniors aged 65 and above?

5    **A**    Yes.  I mean, Medicare is basically -- think of

6    Medicare as based on age, that you get to a certain point,

7    you become Medicare eligible.  Medicaid, which is another

8    government program, also covers expenses for some older

9    individuals but also covers a lot of younger individuals.

10   It's more income-related.  It kind of covers a broader set

11   or a different set of individuals than Medicare.

12        Medicare is really traditionally been coverage for

13   seniors.

14   **Q**    Does it also provide coverage for those who have

15   disabilities?

16   **A**    It can.  I mean, that's part of it, but it's not --

17   here we're not looking at that.  Here we're only looking at,

18   you know, the Medicare eligible, which in this case was age

19   65 and over.  You wanted to get a group of people we knew

20   were eligible for Medicaid in the data we had -- I'm sorry,

21   Medicare in the data we had.  Harder to do for a lot of

22   other groups of people, so we focused on this group because

23   this was a group that was most likely to be Medicare

24   eligible.

25   **Q**    Are there any other federal regulatory programs you

1    looked at regarding health coverage?

2    **A**      Yeah.  I mean, Medicaid, for example, Medicaid picks

3    up portions of costs for many people in society, and

4    particularly many poor individuals get some support through

5    Medicaid, so that would be another one.  So we looked at

6    Government programs more broadly.

7         There's another thing that's going on over this period

8    that I don't have on this chart, which is you had -- we had

9    a number of opioids coming off of patent, and so they got

10   cheaper.  And, you know, this is measuring the share that

11   you pay of, that as the cost of the drugs go down, that

12   reduces your out-of-pocket expense on top of you having a

13   falling share.  So you have a smaller share of a smaller

14   number if something moves from on patent to off patent.

15   **Q**      What is the Centers for Medicare and Medicaid

16   Services?

17   **A**      That's often called CMS, one of those alphabet soup

18   names.  So CMS is -- they even put CMS.gov on the sheet, so

19   that's how they refer to themselves.

20        It's an agency that does a lot of things in the

21   healthcare area.  They gather data, they -- you know, they

22   issue recommendations, they monitor some aspects of

23   healthcare provision.

24        What I'm focusing on here in this chart is what we

25   call -- what we refer to as standards of care.  And one of

1    the big other things that happened over the 2000s was an

2    increased emphasis on pain management.  That is, hospitals

3    and providers were incentivized to pay more attention to

4    people's pain.

5         That was monitored as part of the CMS surveys that

6    were being done of providers.  Providers respond to what

7    they're being measured on.  Like most human beings, if you

8    measure something, they'll respond to that.  They know

9    they're being measured on what they're doing.

10        You know, and when Affordable Care Act came in, it

11   actually incentivized even further some of those responses.

12   So changes in the standard in care was another factor that

13   pushed people toward more prescription activity, prescribing

14   more opioids, because it made doctors more cognizant of

15   trying to make sure they were handling people's pain.

16        On doctors, like other people in the world, respond to

17   incentives.

18   **Q**    So we've had some testimony already in this case about

19   standards of care from doctors in the field.  What is it

20   about the survey that's significant to you as an economist?

21   **A**    Well, it provides a direct incentive for people to

22   say, look, I'm being measured.  One of the things I'm being

23   graded on is how well I handle pain, and that's going to

24   make you more cognizant of handling pain.  If you don't look

25   good on the survey, that's not good for your organization.

1          So, you know, people respond to those kind of

2     incentives.  That's why it's important for me.  It's one of

3     those things that affects people's behavior.

4     **Q**     In fact, the survey had the specific question to the

5     patient, "How often did the hospital or provider do

6     everything in their power to control your pain?"

7          What's the significance of that?

8     **A**     I think it's self-evident.  If I know my customers are

9     going to get graded, are going to be asked how well I did on

10    a particular margin, I as a provider are going to want to

11    pay more attention to that.  I'm going to want to score well

12    on whatever it is I'm being graded on.

13         And if you tell me pain is a more important part of

14    what I get graded on, and in particular whether I'm getting

15    graded on whether I did everything I could to control pain,

16    well, I'm going to do more.  I mean, you don't have to be a

17    Ph.D. economist to understand that if I tell people to do

18    more stuff, they have an incentive to do it.

19    **Q**     But were there consequences to hospitals or providers

20    if they were receiving negative comments to the survey?

21    **A**     There were.  I mean, early on it was mostly they were

22    just being measured.  Later on they actually fed back into

23    the -- what kind of programs the hospital was eligible for.

24    So there was a more direct incentive in the later years.

25    **Q**     And what evidence have you seen to support your

1    conclusion that these surveys influenced the patient care at

2    hospitals?

3    **A**     I think, you know, there are people who have -- this

4    is one where people have actually tried to do studies and,

5    you know, interviews of doctors, and things like that, to --

6    so there are studies cited in the report about that.

7    **Q**     Have you observed your work in this case or other

8    matters any evidence that the surveys influenced opioid

9    prescribing?

10   **A**     I think that's certainly the conclusion that the

11   literature comes to, that one of the responses that doctors

12   had to the need to do a better job or pay more attention to

13   people's pain was more prescribing behavior, including

14   opioids.

15   **Q**     Tell us what you mean by "literature" in your field.

16   **A**     There's a variety of literature.  Some people try --

17   you know, a lot of it again is qualitative, where they talk

18   to doctors about; another one is you look at quantities and

19   actually try to measure the increase in quantities.  So it

20   would be usually published journal articles would be things

21   that people do.

22   **Q**     Are these types of questions you're talking about in

23   terms of pain treatments still included in the CMS survey?

24   **A**     No, they changed how they did that.  I don't remember

25   the year, but they've changed this.

1          And in response to people saying that it had an

2     effect, I mean, again, this is evidence that people felt

3     like these questions had an effect.  And in fact people

4     argue that you should take these questions out or you should

5     modify how you question about this, and they did.  They did

6     change it.

7          So I would say that's direct evidence as an economist

8     that people thought these kind of questions had an effect.

9     That's why they altered them.

10    **Q**     So you also -- you mentioned earlier you had taken a

11    look at social and economic conditions as part of your

12    analysis?

13    **A**     Yes.

14    **Q**     What did you find?

15    **A**     Well, like I said before, one of the drivers of abuse

16    in particular, but also use to some extent, of prescription

17    opioids and other drugs is the economic conditions that

18    people face.  One of the responses people have to

19    deteriorated economic conditions is, for lack of a better

20    term, they look for a way to soothe their sorrows.  And

21    unfortunately, various forms of substance abuse are often

22    part of that, whether it's alcohol abuse or drug abuse, or

23    other things.

24         And the other part is it's often in a -- this is where

25    the social aspect really gets important, because it's also

1    in a broader context because, you know, your career is gone,

2    you lost your job, you're kind of drifting.  Often those

3    people have trouble not just with substance abuse, but their

4    families deteriorate.  They lose their spouse or they get

5    out on their own, they get isolated.  And one thing we know,

6    that those are risk factors for people falling into abuse.

7          And so that -- you know, that long-term economic

8    decline is a source of bad outcomes for people, particularly

9    men.  You know, particularly men.  Men have proven

10   themselves to have a greater propensity to deal poorly with

11   those long-term declines.

12   **Q**    We'll look at some charts that go specifically to this

13   issue, but before we do that, how far back -- you said you

14   looked at trends.  How far back in time did you start your

15   analysis?

16   **A**    Well, I really didn't start my analysis of this issue

17   for this case.  When it comes to economic decline and the

18   impact that had on people's lives, that's really what I've

19   worked on since I got out of graduate school.

20         Once I entered graduate school, really in the early

21   '80s, I published many of the -- a lot of early studies

22   looking at economic decline and the impact it had on labor

23   force participation, family, unemployment, family income,

24   abuse, all those things.  That stuff I've studied for the

25   last 40 years.  So I've been working on this problem for a

1    long time.

2    **Q**    And as you applied that learning to what you've done

3    in this case, is there a time period where you started to

4    look at the changes in these economic factors?

5    **A**    Yeah, probably 1970 is usually where people start.

6    **Q**    Why is that?

7    **A**    What?

8    **Q**    Why is that?  Sorry.

9    **A**    Well, I mean, that's really when the manufacturing

10   decline as a share of the economy started.  You know,

11   manufacturing employment was really pretty flat over those

12   years, but the economy was growing.  So it was a share of

13   the economy, and manufacturing was declining.  And Bob

14   Topel, who was a colleague of mine and myself, I think we

15   wrote a paper in 1984 talking about the initial impact of

16   the decline in manufacturing and the importance of

17   manufacturing on different parts of the country.  And we

18   sort of pointed out how places that had more manufacturing

19   decline were already seeing problems.

20       By the time we got to the late '80s and early '90s,

21   Gary Katz and I and Finis Welch and I wrote a number of

22   papers looking at the effects of economic decline on wages,

23   employment, family living status, in that period of time.

24   So we've kind of -- that's where I think most people say

25   things started.

**Murphy - (Direct by Majoras)**

1    **Q**    Geographically, as you focused your review, were there

2    particular parts of the country that had the impact of the

3    manufacturing decline you talked about?

4    **A**    Yeah.  It differs at different times because, you

5    know, different industries are located at different parts of

6    the country.  So, for example, aerospace is in some places

7    and autos are in others, and steel.  They're in different

8    parts of the country.  So, you know, what we really

9    exploited was the fact that different regions were affected

10   at different times.  That's really what we focused on.

11        You know, so, for example, declines in steel and

12   autos, and things like that, are going to be biggest in the

13   Midwest.  That's where you're going to have the biggest --

14   upper Midwest is going to be hit.

15        Decline in aerospace, which actually happened earlier

16   and to some extent later, would more affect the northeast,

17   California, Texas, where there's a lot of aerospace

18   activity.  You have the dot-com bubble that also had a

19   problem.

20        So we've studied a lot of different declines, but

21   probably the areas that have been the most hit have been the

22   upper Midwest.

23   **Q**    That include Ohio?

24   **A**    Ohio, Pennsylvania, West Virginia, to some extent

25   parts of Michigan, Wisconsin.  But the upper Midwest area

1    has been hit pretty hard.

2    **Q**      And in this particular case did you look at the

3    counties that are the plaintiffs here, Trumbull and Lake

4    County?

5    **A**      Yeah, I did.  So we'll show you some slides.  And we

6    can go through them pretty quickly because I think it's a

7    pretty simple story.

8    **Q**      As we start to look at the slides, what is the overall

9    impact that you observed that you would like to communicate

10   to the jury?

11   **A**      Well, there's really two parts to decline; one is sort

12   of the short-term impact of decline.  So if my area suffers

13   a sharp decline because auto sales, say, fall quickly in a

14   given year, then you see that shows up as unemployment, you

15   see it show up as some reduced labor force participation.

16   And not just for those people in that industry, because when

17   the auto workers get out of work, that's less demand for

18   people who run bars and restaurants and clothing stores and

19   furniture stores, and you see a feedback into the broader

20   economy in those local areas, okay?

21         But that tends not to be so associated with, like,

22   social problems, you know?  The social problems tend to

23   arise when that decline persists, right, that it lasts a

24   long time; that, you know, people really not only have a bad

25   outcome, but they have a persistently bad outcome, and

1    eventually it wears on people.  Family structure problems

2    show up, substance abuse problems show up.

3          So I would distinguish between the short-term impacts

4    of a decline and the longer-term impacts of decline.

5          And, you know, and we've seen it in various parts of

6    the country, and the Midwest is one of those places.

7    **Q**    Let's take a look at some of these graphs that you've

8    put together.  And you said you could do it quickly.  I

9    think we're all happy to move, but I want you to be -- to

10   explain what you're doing, what you observe, and the

11   significance.

12         So let's look first at slide 14.

13         What are we looking at in this particular graph?

14   **A**    This is some of that longer-term change in some of the

15   most severe adverse outcomes that people have.

16         And this is from two economists, Case and Deaton.

17         Angus Deaton won the Nobel Prize in economics for his

18   work, including work like this.

19         And what they're looking at is what they call Deaths

20   of Despair.

21   **Q**    Tell us what that is first.

22   **A**    Their terms for Deaths of Despair are deaths that they

23   see as barometers of people really being kind of in despair

24   in terms of their overall lifestyle.  They look at deaths

25   from alcohol abuse, both short-term deaths from alcohol

1    abuse as well as long-term deaths from, like, cirrhosis,

2    death from suicide, which is maybe the ultimate measure of

3    despair, and then deaths from drug overdoses.  And they say,

4    you know, those are indications of people who have suffering

5    from some aspect of despair, or at least they're barometers

6    of that despair.

7         And what they show is that, you know, if you look at

8    this age group, and this is 55 to 54-year-olds --

9    **Q**    You said 55?

10   **A**    I'm sorry, 50 to 54-year-olds, and they break it out

11   by education level, for people with a bachelor's degree or

12   more or people with a high school degree or less, and they

13   also break it out between men and women.

14        And what you see is that there had been an increase

15   for all the groups, but a much greater increase for the

16   low-educated groups.  And we know that the economy changes

17   over that long-term much more severe for those without a

18   high school degree or with a high school degree compared to

19   those with a college degree.

20        Changes in the economy, and this is something I wrote

21   numerous papers on, have really favored the more-educated

22   groups over the less-educated groups over this period.

23        And that long-term decline has had -- has had a toll

24   on particularly the less-educated groups.  As I said before,

25   particularly on men.

1        The biggest toll has been on men.  That's true among

2   college graduates, but certainly high school graduates as

3   well.

4   **Q**    Let's turn to your next graph that you present.  What

5   are we looking at here?

6   **A**    This is Labor force participation.

7   **Q**    So what is that and why are we looking at it?

8   **A**    Well, labor force participation is a measure of how

9   many people are what we call in economics in the labor

10  force, and that includes actually people who are unemployed.

11  That is, labor force participation is basically people who

12  are employed plus people who are looking for work, right?

13  They're either unemployed looking for work or they're

14  employed, you're counted as participating.  That means

15  you're either working or looking for work.

16       And what we're looking at here is how that has

17  changed.  So for both college graduates and high school

18  graduates, we're doing index that number to 100.  So 100 is

19  like -- think of that as your baseline.

20       And what we see is that for college graduates, we've

21  gone from 100 to about 97.  So it says of that 100, think

22  about it, there were a hundred people who previously would

23  have been in the labor force, 97 of them are still there, so

24  only 3 of those have dropped out among the college

25  graduates.

1    **Q**    I'm sorry.  That's over 50 years?

2    **A**    Oh, that's over -- yeah, 50 years, from 1970 to 2020.

3    I forget that's 50 years, going back to 1970.  Tells you how

4    old I am.

5         Then if you look for high school or less, instead of 3

6    people dropping out, we go from 100 down to about 87, so

7    that would be 13 people.  So much bigger decline in

8    participation among the high school graduates.

9    **Q**    What's the significance of this as you're trying to

10   address the impact of the changing economic conditions?

11   **A**    Well, it means you would expect to see the biggest

12   impact among that group.  That's the group where you would

13   expect to see the impact among, because those are the people

14   who have been hurt the worst.  Areas of the country that

15   have a lot of people in those education groups, and

16   people -- you know, places where a lot of those people used

17   to have good opportunities and those opportunities have gone

18   down again would be the places where you would see the

19   biggest effect.

20   **Q**    Let's look at your next slide.

21   **A**    Yeah, this is the decline in manufacturing employment

22   over time.

23        Here you can see that the decline in manufacturing

24   employment measured as millions of jobs was pretty modest

25   actually from 1970 to 2000.

1       That kind of hides what's really going on because the

2   labor force was growing very rapidly over that period.  That

3   was the baby boomers coming into the labor market.  So

4   manufacturing share of the economy was shrinking over that

5   entire period because you had the same number of

6   manufacturing jobs, but the rest of the economy was growing.

7   So manufacturing share was actually falling, and that was

8   creating problems already back in that early period.

9       But then post 2000 you saw a really sharp decline in

10  manufacturing employment in both of the recessions, the

11  2000-2001 recession, sharp decline, and then the 2006-2008

12  recession, another sharp decline.  And manufacturing

13  employment has kind of recovered a little bit from there,

14  but remains way below where it was in 2000.

15  **Q**   Let's go to your next slide.  Here you talk about your

16  slide relates to this is Ohio-specific, manufacturing

17  employment.  And going back a little bit, we were talking

18  about education.

19      You're combining the two concepts here.  Why?

20  **A**   Well, because I think here we're looking at the story

21  as it's unfolding in Ohio over time.  Because while

22  manufacturing is shrinking, it's also changing.  It's

23  changing in a way that favored college graduates very much

24  relative to high school graduates.

25      You'll see that here, because if you look at thousands

1     of jobs for high school graduates, we're at, like, you know,

2     1.25 million back in 1970, and by the time we get to the

3     end, we're, like, 300 -- a little over 300,000.  So we've

4     lost, like, three-quarters of those jobs for the high school

5     graduates, whereas for college graduates we actually have

6     more people working in manufacturing today than we did in

7     1970.

8          So again, for that less-educated group, this is going

9     to be particularly telling in Ohio.

10    **Q**     And when you say particularly telling, what does that

11    mean?  What's the impact?

12    **A**     We're going to expect their lives are going to be

13    different, things are going to change.  I mean, if you --

14    manufacturing employment was a major source of good jobs,

15    you know, high wages, steady employment for a lot of these

16    less-educated individuals.  The same opportunities aren't

17    there today, and that's true whether you're looking at the

18    person who was young then and old now, or the person who's

19    young today compared to the guy who was young back then.

20    Opportunities are less.

21    **Q**     Let's take a look at your next slide, please.

22         How does this relate to what you were just talking

23    about?

24    **A**     Well, here you can see that, you know, the U.S. as a

25    whole has seen manufacturing share, you know, this is what

1       the change over time in manufacturing share of employment.

2           Minus 10 means manufacturing share fell by 10

3       percentage points, so maybe it went from 22 percent to 12

4       percent or 28 percent to 18 percent.  It was a 10 percentage

5       point decline in manufacturing share of overall employment.

6           And you can see Ohio is not the worst in terms of

7       change in overall share, but it's toward the bottom.  And

8       the other midwestern states would typically be down there as

9       well.  Very few states have seen growth in manufacturing

10      share.  North Dakota, South Dakota really would be the only

11      two major ones.

12      **Q**     So just so we're clear on your chart, each bar

13      represents an individual state?

14      **A**     Yes, each bar.  So you can see the state names are

15      down on the bottom.  So the red one's Ohio, and you can see

16      OH down at the bottom.  There's Illinois, where I live,

17      right next to it.  So just like Ohio saw decline in

18      manufacturing share, so did Illinois.

19          What people often forget is, you know, the northeast,

20      many of the northeast states also lost.  Massachusetts,

21      Rhode Island, Pennsylvania.  You've got to be careful,

22      because we're looking at share here, and, you know, think

23      about it.  If you have a decline in manufacturing share

24      employment but an increase in, say, other types of

25      employment, say finance, financial sector, that's going

1    to -- both of those are going to work to reduce

2    manufacturing share, but that economy's going to do better

3    because while they lost manufacturing jobs, they gained a

4    lot of finance jobs.

5         In Ohio what we're going to find is that they lost a

6    lot of manufacturing jobs.  Not nearly many other jobs came

7    in to replace those.

8    **Q**    Let's move to your next slide.

9    **A**    So this is looking at Ohio.  Again, we're focused in

10   on Ohio.  This is share of employment.  And you can see

11   manufacturing share -- remember I talked to you before, if

12   you looked at manufacturing employment in the U.S. between

13   1970 and 2000, that employment manufacturing for the U.S. as

14   a whole was basically flat, and I said that hid like a big

15   decline in manufacturing share?  Well, you can see that here

16   for Ohio.

17        That is in 1970 almost 36 percent of the jobs were in

18   manufacturing in Ohio.

19   **Q**    I'm sorry to interrupt.

20        Is that across all education levels and genders?

21   **A**    I believe so.  I think this would be the case.  This

22   would be the overall.

23   **Q**    So in 1970, if you look at all of the jobs in Ohio,

24   the manufacturing share was what?

25   **A**    37. -- 35.7.  Sorry.

1    **Q**    Okay.

2    **A**    By the time you get to 2000, that's fallen to 20.4.

3    And then by the time you get to 2019 it's down to 15.7.  So

4    we've got less than half the share of jobs being in

5    manufacturing that used to be there.

6         And remember, back in the early days, almost all those

7    were for high school and below, and now most of them are,

8    you know, increasing number for college graduates.  So if I

9    were to do this just for high school graduates, it would be

10   worse.

11        The other thing to notice is while that share has been

12   declining, those are the highest paying part of the economy,

13   right?  Those are where those workers were earning the most,

14   was in manufacturing.  So we've had a decline in what was

15   probably the highest paying part of the economy in Ohio.

16   **Q**    So if we look at the middle of the chart, you have a

17   column Manufacturing that's under median real annual wages.

18        Break that down.  What are you telling us here?

19   **A**    Well, I'm saying what you really want to see here is

20   just the comparison across the columns.  If you go all the

21   way to the right-hand column, the median was back in the

22   early days was about 40,000.  It's actually come down

23   somewhat.  It's about 35,000 by the time you get to the end

24   in 2019.

25        But what's most important is, in every year the

1  manufacturing wages are much higher than the other wages.

2  So not only are we losing manufacturing jobs in Ohio over

3  this time, those jobs are disproportionately the highest

4  paying sectors, particularly among the high school

5  graduates.

6       That is, if you look, and again, Finis Welch and I did

7  it, we didn't do it for Ohio, we did the United States as a

8  whole, but what we show is the differences across these

9  industries were biggest for the less-educated workers,

10  smaller for the college graduates, who did quite well, for

11  example, in finance and insurance and real estate, as well

12  as in manufacturing.

13  **Q**     So as you put some of these things together, what is

14  this telling you about the overall conditions in Ohio

15  compared to the rest of the United States?

16  **A**     Well, we can look at a chart on overall GDP growth.

17  That's probably a good thing to look at.

18       Here I've ranked the states in the United States in

19  terms of their annual rate of GDP growth.  That's what's in

20  the last column.

21  **Q**     First, what's GDP growth, and why do we care?

22  **A**     GDP is gross domestic product.  It's a measure of the

23  overall economic output in an economy.  You can do it for a

24  country, you can do it for a state.  It's a measure of the

25  overall, you know, production that you have going on.  It's

1    the overall market activity.

2         I've ranked the states from the lowest to the highest.

3    I'm showing you here the 10 lowest growth states in the

4    country, and you can see Ohio was number 3 from the lowest,

5    so the third slowest growth over this period was Ohio.

6         The other states nearby, the states that grew even

7    more slowly than Ohio, were Michigan and West Virginia.  The

8    ones right behind on the other side were Illinois and

9    Pennsylvania.

10        So you can see that there was relatively slow growth

11   in the economy in these areas.

12   **Q**    You've also taken a look specifically at Lake and

13   Trumbull County statistics, haven't you?

14   **A**    I have.

15   **Q**    Let's go to the next slide.

16        What are we looking at here?

17   **A**    Yeah, so this is labor force participation in these

18   two counties.  Remember we looked at labor force

19   participation earlier.  It's --

20   **Q**    That's the people who have jobs and those that are

21   looking for jobs?

22   **A**    Yeah, to add together the fraction of people with jobs

23   with the fraction of people looking for work, that's labor

24   force participation.

25        And what you can see is the index to 100, we're going

1    to say how far down have you come from where you started.

2         For Lake County, we've gone from an index of a hundred

3    to roughly 80.  So of the hundred, we're down 20.

4         And in Trumbull County, we've gone from a hundred down

5    to, like, 72 or 73, so we've lost about 27 or so; basically

6    more than a quarter of the labor force participation rate we

7    had back in 1970.

8         And you also see kind of the long-term nature here.

9    This has been going down.  It's not just happened in the

10   recent recession.  This is that long-term decline we've

11   talked about before.

12   **Q**    The ages that you're looking at here are 16 and over?

13   **A**    These are males 16 and over.

14   **Q**    Why are you only looking at males?

15   **A**    Because that's the group that suffered the most and

16   also the one for which I think labor force participation is

17   the best measure of overall economic activity.

18        And certainly when you look at social outcomes,

19   nonparticipation for men is often associated with poor

20   outcomes, health, family, everything.  You know,

21   nonparticipation is not associated with good outcomes for

22   men.

23   **Q**    And you talked earlier about social and economic

24   conditions in the United States and Ohio.  What are your

25   observations related to Lake and Trumbull Counties?

**Murphy - (Direct by Majoras)**

1    **A**    They're kind of on the -- you know, they're part of

2    the story.  They're one of the places where we've seen

3    particularly strong versions of the broader economic story

4    we see for the country.

5    **Q**    Let's take a look at our next slide.

6          What are you demonstrating here?

7    **A**    This is just looking at, and I believe this is 2007 to

8    2010, this is just looking at opioid fatalities.  We already

9    saw in the previous graph that both Lake and Trumbull

10   Counties have been places where labor force participation

11   decline, manufacturing employment decline, they've been part

12   of that broad story.  And not surprisingly, those are places

13   where opioid mortality also went up.

14   **Q**    And when you talk about opioid mortality, what is that

15   measuring?

16   **A**    It's measuring how many people, you know, cause of

17   death in some way was associated with opioid overdose.

18   **Q**    Any type of opioid?

19   **A**    Any type of opioid.  You can also look at it

20   separately for prescription opioids versus illegal opioids,

21   but -- so we'll do all of that.  We'll look at, you know,

22   both prescription opioids in isolation, as well as illegal

23   opioids including prescription opioids.

24              MR. MAJORAS:  Your Honor, if it works for you,

25   this might be an appropriate place for a break.

1              THE COURT:  All right.  I was looking for a

2       convenient stop.

3           Okay, ladies and gentlemen, we'll take our mid morning

4       break.  15 minutes.  Usual admonitions.  And then we'll pick

5       up with the balance of the doctor's testimony.

6                     (Recess taken at 10:28 a.m.)

7                     (Jury present in open court at 10:47 a.m.)

8              THE COURT:  Okay.  Please be seated.

9           Doctor, you're still under oath from this morning.

10          Mr. Majoras, you may continue.

11             MR. MAJORAS:  Thank you, Your Honor.

12          Good morning everyone.

13          Good morning again, Dr. Murphy.

14      BY MR. MAJORAS:

15      **Q**    Before we move on to your next topic, I wanted to ask

16      you some questions about some things we've seen.

17          We've seen some slides specifically to men in the

18      labor force.  Why are you looking at the men in those

19      slides?

20      **A**    Well, I think what's going on with men is important

21      for two reasons.  One, they seem to be the ones for whom

22      being out of the labor force is the strongest predictor of

23      poor outcomes in terms of health or abuse or family

24      structure, and things like that.

25          You know, women in and out of the labor force depends

1    on a much wider variety of factors.  You know, they may be

2    home taking care of children, which doesn't really from a

3    social standpoint lead to any particular problems.  Often

4    it's a very good outcome for women.  And prime age men not

5    in the labor force are usually a pretty good indication that

6    there's an issue; not always, but much more so than women.

7    So I think that's one of the reasons that we measure.

8         There's a more complicated story for women, but also

9    when we talk about these kind of adverse outcomes, they seem

10   to be much more prevalent for men in that age group.

11   **Q**    So to the extent that you look at certain statistics

12   regarding men, is that in any way a reflection on your view

13   of the value of women in the workforce?

14   **A**    No.  Women -- I mean, you know, I talk a lot, I just

15   gave a talk a couple weeks ago to a big group of people

16   about, you know, changes in the economy.  In many ways women

17   have fared much better than men over the last 30, 40 years.

18   You can see it in college graduation rates, where women now

19   account for the majority of college graduates, a significant

20   majority of college graduates.

21        Women traditionally have been better in school than

22   men.  I mean, I think people often forget that.  High school

23   graduation rates for women have been higher than for men for

24   a long time.  Women do much better dealing with adversity

25   than men do.

1          One of the coolest things -- one of the things you can

2     look at is, like, what happens when your spouse passes away.

3     Women tend to do pretty well after their spouse passes away,

4     men much less so.  Men tend to have much harder time after

5     their spouse passes.

6          So when people talk about women being the stronger

7     group, you know, in a lot of economic ways they turn out

8     they are.  They do well in the labor force, do well outside

9     the labor force; have increasingly done well in education,

10    always done well in education.

11         Men have, particularly less-educated men, have fallen

12    on pretty hard times.

13    **Q**    I'll be sure to include all that when I recap today's

14    events to my wife.

15         Let's turn back now to a topic you were starting on as

16    we took our break this morning, which was analyzing trends

17    in opioid mortality.

18              MR. MAJORAS:  And let's go to slide 25,

19    please.

20    **Q**    Take us again through what you want to demonstrate to

21    the jury in this slide.

22    **A**    Okay.  This is a picture of, you know, what people

23    sometimes call the opioid mortality crisis or the growth in

24    opioid mortality over time.

25         Here we're looking at opioid mortality of all types.

**Murphy - (Direct by Majoras)**

1    Could be heroin, could be fentanyl, could be prescription

2    opioids.  It's any source of opioid mortality that happened

3    over time.

4         And I drew a vertical line at 2010, and you'll see

5    later why I drew the line there.  You can kind of see that,

6    you know, it had been increasing before 2010; increased, if

7    anything, faster after 2010 in terms of overall mortality.

8    **Q**    This particular slide relates to Ohio?

9    **A**    Yeah, this is Ohio.  A picture, if you just looked at

10   the line, would look not that different from the U.S. as a

11   whole.  The magnitudes would be somewhat different for the

12   U.S. as a whole.

13        Ohio would tend to look more like the states east of

14   the Mississippi.  I'll talk more about that later in terms

15   of the time pattern.  But you would see a dramatic rise in

16   the country as a whole.  And when you hear the headlines,

17   often it's about the country as a whole, not about a

18   particular state like Ohio.

19   **Q**    Let's turn to your next slide.

20        What have you done here in relation to what we just

21   saw about Ohio?

22   **A**    Well, we just took those same data, right?  The

23   overall mortality was the line we had in the previous graph.

24   The top of the green curve is the same as that here.

25   **Q**    So if I were just to take the -- trace the top of the

1   light green part, that would give me the same black line we

2   saw in the last slide?

3   **A**    Yeah.  And opioid mortality rate, now, we're dividing

4   up into three groups.  The blue are prescription opioid

5   mortality.  That's mortality associated with people who upon

6   death it was determined that they had taken prescription

7   opioids.  They, like, had a drug overdose death and it was

8   prescription opioids.

9       The dark green is people for whom there were both

10   prescription opioids and illegal opioids in that

11   determination, so that would be what we call the both

12   category.  It's like an overlap group whereas people have

13   both prescription and nonprescription opioids.

14       And the light green area would be people for whom

15   there's only illicit opioids, and that could include, and

16   probably the big ones there are, heroin and fentanyl.

17   **Q**    Let me break down the prescription opioids part, the

18   blue part.

19       When you say prescription opioids, are those only

20   people who are taking it as prescribed by their doctors?

21   **A**    That was the next thing I was going to say.  Yes, that

22   was a good question.

23       No, these are the drug that was in the person's

24   system.  It could be someone who was prescribed the drug,

25   but it's quite likely, in many cases it's actually going to

1    be someone who is abusing prescription opioids.  So they

2    might -- they in a lot of cases wouldn't be the person who

3    got the prescription.  They're somebody who obtained

4    prescription opioids but consumed them call it illicitly, or

5    whatever you want to call it, sort of abused prescription

6    opioids.  They weren't consuming them by a prescription.

7         They would be included in that blue, that blue area.

8    **Q**   So in placing this chart in front of the jury, what's

9    your observation that you want to share?

10   **A**   Well, you can kind of see that there's sort of two

11   periods, particularly when you look at prescription opioids,

12   that they kind of grew in the earlier period up to, you

13   know, 2010, 2011, but then the deaths from prescription

14   opioids kind of tail off pretty significantly post 2010,

15   particularly if you look at the ones that only had

16   prescription opioids.

17        Whereas the overall death rate is really going up very

18   quickly in that later period.  As we'll see in a minute,

19   that's mostly heroin, and then particularly fentanyl toward

20   the end.

21   **Q**   And did you take a look at this type of information as

22   it relates to Trumbull and Lake Counties?

23   **A**   Yeah, I think the next slide is the picture for

24   Trumbull and Lake County.

25        If you kind of flip back and forth between the two,

1   you can see that the magnitudes are a little different.  So

2   for Ohio as a whole, we reach a peak somewhere between 45

3   and 50.  And Lake and Trumbull County we get a somewhat

4   higher peak between 55 and 60.

5          So a little more severe problem in Lake and Trumbull

6   Counties than it is in Ohio as a whole, but the time pattern

7   kind of tells the same basic story, that the things that are

8   driving things in Ohio as a whole are driving things in Lake

9   and Trumbull County.

10                  MR. MAJORAS:  And let's go to the next slide,

11  please.

12  **Q**    What have you done here?

13  **A**    Here I've just kind of taken the same kind of data,

14  and what I've done is just instead of stacking them together

15  like I did in a previous chart, I've just separated the two

16  out.

17         So the green line is "prescription opioids."  And what

18  I'm measuring there is the same as the blue area on the

19  previous graph.  It's people who were only prescription

20  opioids.

21         The "both" category is in heroin and fentanyl.  But

22  again, when I say prescription opioids, that doesn't mean

23  people with a prescription.  That means somebody who's

24  taking a prescription opioid, in many cases abusing a

25  prescription opioid, that was not prescribed for them.

1    That's all included in the green line.

2            And heroin and fentanyl are the red line.

3            And what you see is really two very different periods.

4    In the early period we have heroin and fentanyl deaths along

5    with prescription opioid deaths going up together.  Starting

6    around 2011, there's a movement away from prescription

7    opioid deaths, but an increase in heroin and fentanyl

8    deaths.

9    **Q**    And what is the significance of that in your analysis?

10   **A**    Well, I mean, one simple story is it's clearly not

11   prescription opioids that have led to the explosion in

12   deaths in this later period.  It's not people overdosing on

13   prescription opioids.  It's people overdosing on illegal

14   drugs, and, as we'll see in a moment, particularly fentanyl.

15   Fentanyl is a big part of the growth in mortality story in

16   this later period.

17   **Q**    Let's go to your next slide, where I think you break

18   out fentanyl and heroin.

19   **A**    Yes.  So I've done the same thing here with heroin and

20   fentanyl that I did with prescription opioids in the

21   previous one.  If you only have heroin, you're in the

22   light-colored line.  If you died -- if you had mortality

23   associated with just fentanyl, you're in the red line.  And

24   if you had heroin and fentanyl, you're also in the red line.

25           So think of the light-colored line as just heroin

1   alone.  The red line, some combination of heroin and

2   fentanyl.  I do that because fentanyl is clearly the more

3   lethal drug here.  And indeed, most of this growth is from

4   people just with fentanyl, no her -- no prescription

5   opioid -- no, I'm sorry, no heroin, just fentanyl.  That's

6   the big growth in that red line.

7       Can't see that on this graph, but I've done that in my

8   analysis in my report.

9   **Q**   You have a couple of dotted lines running down the

10  middle.  Why do you put those in there?

11  **A**   I tried to kind of give you somewhat of a brief

12  description of what's going on in the national data.  So the

13  dash line, the first dash line is really when we saw a sharp

14  rise in national heroin overdose deaths.  And you'll see

15  that's -- you know, that's when we see kind of a sharp rise

16  in national heroin overdose death -- I'm sorry -- heroin

17  overdose deaths in Ohio.

18      For the orange line -- I'm sorry, the dark-colored

19  line, we see the national trend on fentanyl starts in 2013,

20  and that's when it starts in Ohio.  So kind of heroin and

21  fentanyl in Ohio are sort of following the broader national

22  trends on heroin and fentanyl, although we'll see in a

23  minute -- not in a minute, a little bit we'll see that

24  fentanyl is going to differ quite a bit between west of the

25  Mississippi and east for reasons we know.

**Murphy - (Direct by Majoras)**

1    **Q**    We'll save that for a future slide then.

2    **A**    Yes.

3    **Q**    You also take a look at opioid shipments in relation

4    to the mortality.  So what we've been looking at in the last

5    few slides are mortality rates, right?

6    **A**    So far in these charts we've only looked at mortality.

7    We haven't looked at anything about shipments of

8    prescription opioids at all.

9    **Q**    So let's take a look at your next slide.

10   **A**    So here we're looking at the early period up to -- the

11   blue line is opioid shipments.  That's shipments into Ohio

12   or to Ohio of prescription opioids.

13   **Q**    So those are all prescription opioids that don't

14   include fentanyl or heroin?

15   **A**    They don't include fentanyl or heroin.  They are just

16   prescription opioids to Ohio.

17   **Q**    Of all shipments or just these defendants?

18   **A**    All shipments into Ohio.

19   **Q**    Okay.

20   **A**    And the blue line sort of shows how shipments of

21   prescription opioids changed over time.  That is, we saw a

22   rise in prescription opioid shipments from the late 1990s up

23   to about 2010 or '11, and then we saw a subsequent decline

24   in prescription opioid shipments.  You can see prescription

25   opioid shipments in here peak at MME per capita of about a

```
 1    thousand and come down to less than 500.  So there's more

 2    than a 50 percent decline in prescription opioid shipments

 3    on a per capita basis to Ohio since 2010-11.

 4         People know what MME is, it must have been talked

 5    about.  I'm not going to go into MME.

 6    Q    Milligram -- morphine milligram equivalent.

 7    A    Yes.

 8    Q    Unless I flipped my Ms.

 9         Your next slide also deals with a similar topic,

10    right?

11    A    Yeah.  It's really pointing out that prescription

12    opioid shipments and overdose deaths are moving in opposite

13    directions in this later period.  You see shipments on the

14    way down and opioid deaths, and particularly we already know

15    deaths from heroin, and particularly fentanyl, are really

16    going way up in this later period.

17    Q    So let's just make sure everyone is looking in the

18    same place.

19         You have a line drawn it looks like right about 2010.

20    What is that line?

21    A    Yeah, 2010, again, that's roughly when shipments

22    peaked.  Maybe it's 2011.  But, you know, right around then.

23         We see after that, shipments declining -- that's the

24    blue line going down -- again, from about a thousand to less

25    than 500.
```

1      At the same time, opioid mortality is going from, you

2    know, a little over 15 and peaking a little bit short of 50

3    and, you know, kind of around 40 by the time we're at the

4    end of the data here.

5      So again, this later period is a period where there

6    was a big divergence, where shipments are going down but in

7    fact opioid-related mortality is going up.

8    **Q**   As an economist analyzing supply issues, what is the

9    significance of that difference we see or that directional

10   difference in the later part?

11   **A**   Well, I mean, what's going on here, it's certainly not

12   a story, we're having more people consuming prescription

13   opioids over this period and that consumption in

14   prescription opioids, whether licit or illicit, is what's

15   going on on the death side.

16     On the mortality side, it's clearly nonprescription

17   illicit opioids or illegal opioids that are generating the

18   deaths, and prescription quantity is going down over this

19   period of time, not up.

20   **Q**   You've also as part of your analysis taken a look at

21   who is receiving prescription opioids that have been -- who

22   have been prescribed prescription opioids; is that right?

23   **A**   Yeah, because one story one could think would explain

24   this is you have a bunch of people who are taking

25   prescription opioids who then become the consumers of -- you

 1    know, they were prescribed prescription opioids, then they

 2    become the consumers of heroin and fentanyl in the later

 3    period.

 4         So one way to look at that is to kind of match up who

 5    is dying of heroin and fentanyl in the later period and who

 6    was it that was getting the prescription opioids -- the

 7    prescriptions for prescription opioids in the earlier

 8    period.  So that's what I'm going to do now.

 9    **Q**    I'm sorry.  Let's take a look at the next slide.

10         What are we seeing?

11    **A**    So these are the age breakdown into four groups.

12    Think of it as younger men, 15 to 50; older men, 51 plus;

13    younger women, 15 to 50; and older women, 51 plus.  And

14    we're looking at seeing who was getting the opioid

15    prescriptions during this period of time, and the biggest

16    group is actually older women.  They're accounting for a

17    third of overall prescriptions.  The lowest group is

18    actually young men, who are accounting for less than 20

19    percent of opioid prescriptions during this period of time.

20         So predominantly being prescribed to older women,

21    second most to older men, followed by younger women, and the

22    lowest would be younger men.

23    **Q**    What's the time frame that you were analyzing here?

24    **A**    This is that '21 [sic] to 2010 period.  This is that

25    pre-2010 period, the period where we saw rising shipments,

1   remember, and who was getting those shipments or who was

2   being the prescriptions associated with those shipments, it

3   was disproportionately older women, smallest groups being

4   actually younger men.

5   **Q**     So you said you were going to compare the folks who

6   were getting prescriptions, actual prescriptions, to the

7   folks who are experiencing the mortality rates.  Let's go to

8   slide 33.

9   **A**     Right, this is -- remember though, this is

10  prescriptions in the earlier period we were looking at,

11  right?  It was who was getting prescriptions in that earlier

12  period where we saw the growth in prescriptions, and then

13  who is it that's dying of opioid mortality, predominantly

14  the heroin and fentanyl in the later period.

15        So this is the mortality picture in the later period.

16  So the years here are 2010 to 2019.  That's where we saw

17  that big rise in mortality.

18        So here you can see that 60 percent of the people

19  dying are young men, and the smallest is actually older

20  women, which is only about 5 percent.  So it's completely

21  flipped from what we saw in the prescription data.  The

22  people dying of heroin and fentanyl mortality in this later

23  period are a very different group than the people who are

24  prescribed in the earlier period.

25        On top of that, remember, this is 10 years later, and

1   a fair amount of that mortality among these young men is

2   going to be men like, you know, 15 to 25.  And most people

3   were, like, 5 to 10 in that earlier period, right?  They're

4   like really young in that earlier period.  They would not

5   have been people taking prescription opioids, either licitly

6   or illicitly, during that period of time.  They were very

7   young.

8   **Q**    So when you put the last two slides together, what is

9   it that you draw from this information.

10  **A**    I guess it tells you the people receiving the

11  prescriptions, which, you know, are predominantly older

12  women and older men to some extent, in the early period is a

13  very different group than the people who were dying of

14  heroin mortality in the later period, which is young men 15

15  to 50, who account for, like, 61 percent of the mortality

16  when only 19 1/2 percent of the earlier period

17  prescriptions.  Again, that's even different groups.

18       If you look at the women, they were, like, 33 percent

19  of prescriptions but less than 5 percent of mortality.  So

20  it's very much a mismatch.  It's not the same people that

21  were getting prescriptions who were later dying of heroin

22  and fentanyl.

23  **Q**    In relation to the analysis you've done and the

24  conclusions you've reached with respect to what Dr. Keyes --

25                    (Court reporter interjection.)

1              MR. MARGOLIS:  I apologize, I'll slow down.

2     Maybe I'll do even a better question.

3     **Q**     In relation to your criticism of Dr. Keyes and her

4     analysis, what is the significance of what you just told us?

5     **A**     Well, I think part of Dr. Keyes' analysis -- again, I

6     have not read or was not here for her testimony.  I know

7     based on her report she talks about, you know, this concept

8     of a gateway, where people have a gateway from prescription

9     opioids to ultimately other opioids, and illicit opioids

10    like heroin and fentanyl.

11            The simplest version of that gateway story is that

12    somebody starts taking a prescription opioid; they no longer

13    have access to the prescription opioid, so they move -- that

14    same person moves, who was prescribed the prescription

15    opioid, moves to illicit opioids.

16            Based on this, that doesn't seem to really fit the

17    bulk of the growth because the bulk of the growth is among a

18    group who is getting very low levels of prescriptions, and

19    the group that was getting the most prescriptions doesn't

20    show up as the high mortality group in the later period.

21            But there's other -- you know, she has a broader

22    gateway hypothesis that it's not the people getting the

23    prescriptions, it's people who are abusing prescription

24    opioids then switch to be -- we'll want to look at that one

25    too.

**Murphy - (Direct by Majoras)**

1   **Q**     So let's talk specifically about your analysis,

2   putting all this together, not just the last slides.

3        What is your analysis of the causal link that

4   Dr. Keyes testified about and whether that is a sufficient

5   way of doing it?

6   **A**     Yeah, I think as I interpret and as I have seen her

7   discussion of the causal link, she's saying, if you take

8   prescription opioids, in many cases it's illicitly, you're

9   at increased risk for then doing other nonprescription

10  opioids, you know, abusing nonprescription or illegal

11  opioids.  And she does that by looking -- you know, she

12  cites a bunch of studies, for example, where they look at

13  heroin users and ask what they had used previously, and many

14  report to having abused prescription opioids before they

15  used heroin.

16       However, what she's ignoring, and she concludes based

17  on that, "Well, I've established this link between the two;

18  therefore, more prescription opioids therefore must have

19  been what drove the illicit opioids."

20       And as I talked about before, you can't do that once

21  you think about the broader picture, because if you restrict

22  prescription opioids, fewer people might follow that pathway

23  of abuse prescription opioids and then abuse nonprescription

24  illegal opioids, but more people are going to go the other

25  way and go directly to illicit opioids.

1         And you don't need many of those people to go directly

2    to illicit opioids to have that be a very important effect,

3    because we know relatively small part, fraction of the

4    people who consume prescription opioids, move on to illegal

5    opioids.  So even if a small fraction of those people kind

6    of go direct instead, which is what we've seen happen in the

7    more recent period, more people go directly to these other

8    drugs, that is something you have to take into account if

9    you want to calculate what the actual effect was.

10        And she didn't do that.  She just looked at that one

11   link, and that one link is only a part of the story.  It's

12   like that kid watching TV and I say, well, TV is bad.  Well,

13   I don't know.  You've got to take account of that effect,

14   but you've got to take account of the rest of the story too.

15   And if you don't take account of the broader context, that

16   you have people who are out there abusing drugs, they're

17   abusing prescription opioids, maybe they're abusing

18   nonprescription opioids, those people are going to shift to

19   another form.

20        And we've seen that.  You know, more and more, for

21   example, of the deaths we have seen with fentanyl are not

22   people with fentanyl and prescription opioids.  They're

23   people with fentanyl and cocaine or people with fentanyl and

24   other types of illicit drugs.  And that indicates that

25   you've got to think about these other pathways before you

1    talk about, like, what caused what and how they're linked

2    together.

3         You can't just say, well, it's all this linked to

4    this.  You've got to look at that bigger picture.  She

5    didn't do that.

6    **Q**    When Dr. Keyes testified, and I believe she wrote

7    about in her opinion as well, she talked about association

8    and causation.

9         How does that apply to your analysis?

10   **A**    Well, there's two issues.  One is many of the studies

11   she relies on are really just associations.  They look at

12   people who abuse cocaine -- I mean, I'm sorry -- abuse

13   heroin and ask, what else have you done.

14        Well, that doesn't tell me that was a causal factor

15   because if I have somebody who, you know, has a propensity

16   to abuse substances, they're going to abuse this substance

17   and other substances.  It's not -- that's a correlation, not

18   a causation.

19        The other side of it is, is that even when she talks

20   about causation, that if people do this, then they're likely

21   to do this, again, that's -- even if that's true, even if

22   you could establish that's causal on that narrow

23   perspective, even if I could establish dosing people with TV

24   causes a problem, it doesn't mean that taking away TV has

25   solved the problem because you have to ask why they're doing

1   what they're doing, what would they do instead.

2        And so that causal link she looks at is only a small

3   part of the overall picture one would need to look at to

4   reach appropriate conclusions.  Let alone, and we haven't

5   talked about this yet, for the purposes of what we're here

6   today, you have to link it back not just to consuming

7   prescription opioids, it has to be linked back to behavior

8   by the pharmacies.  You have to think about how would the

9   pharmacies be part of this equation as opposed to other

10  factors that would be driving this equation.

11  **Q**    So as you put all that together, what is -- can you

12  summarize what your conclusion is with respect to Dr. Keyes'

13  analysis on causation?

14  **A**    You know, what I'm saying is I'm not arguing with her

15  on an epidemiological point.  I'm just saying if you want to

16  understand the impact of reduced availability of

17  prescription opioids, her analysis is insufficient to do

18  that.

19       You know, as I say here, Dr. Keyes does not

20  appropriately analyze the causal impact of reducing the

21  availability of prescription opioids, because it would

22  change more than just the number of people who use

23  prescription opioids.  It would change many other things,

24  including people's propensity to abuse other drugs,

25  including going directly to heroin and fentanyl.

1    **Q**    So let's now switch directions just slightly, I think,

2    because you were talking about other factors that you

3    analyzed.

4         And what have you -- what did you do next in terms of

5    your analysis about increased shipments of prescription

6    opioids?

7    **A**    Well, one of the things we pointed to was, you know,

8    boy, we saw this huge growth in mortality associated with

9    heroin and fentanyl in the later years.  You know, to what

10   extent is that -- can we think about that as being tied

11   closely to the growth in prescriptions, that there were more

12   opioids being prescribed in the earlier period?

13        So I have a couple of analyses that address that.

14   **Q**    Let's flip to your next slide then.

15        What are we seeing here?

16   **A**    All right.  This is what we call in economics a

17   scatter plot.  And I don't know if you've ever seen one of

18   these before.  The horizontal axis, the one that runs left

19   to right, is average prescription opioid shipments before

20   2010.  So states -- and each dot in here is a state.  So

21   Ohio I've highlighted in green, right?  That's Ohio.

22        So if you had more prescription opioids shipments in

23   the earlier period, you're further to the right.  The

24   further you are to the right reflects more prescription

25   opioid shipments in the early period.

1        On the vertical axis we're measuring opioid mortality,

2   okay?  So what we're looking at is the places that have more

3   shipments have more mortality.

4   **Q**    Let's turn to your next slide.

5   **A**    So that's the --

6   **Q**    We sort of minimized the dots and we're just talking

7   about what the slide is showing.

8   **A**    Yeah.  The question is do places that have more

9   shipments are the same places that have mortality.  Does it

10  seem like shipments are the big driver of mortality, that

11  high shipments means high mortality, low shipments means low

12  mortality, or is there a bunch of other factors that seem to

13  be important for the overall level of mortality.

14  **Q**    So when you looked at this scatter chart, what were

15  your observations?

16  **A**    Well, first off, the association's pretty weak, that

17  is shipments explain a very small part of overall mortality

18  differences.

19       And if you think about it and what does it say about

20  causation, that's an even stronger statement, right, because

21  shipments and mortality are going to be related even if

22  there's no causal link running from one to the other.

23  **Q**    What do you mean by that?

24  **A**    Well, if you have a place that has a high demand for

25  opioids, you would expect higher shipments and higher

1      mortality, right, because, you know, there's some

2      associations; like they have more cars, you can have more

3      car accidents.

4           That part of it's going to be there independent of any

5      causal link of, say, supply behavior to -- this is just

6      looking for an association, and I guess the conclusion from

7      this is the association's pretty weak, in that early

8      shipments play a very small amount of the overall variation

9      in mortality.

10     **Q**     How do you demonstrate that or how do you explain that

11     with your next slide?

12     **A**     Well, I've just got to give you an example.

13          So, example, just compare Ohio, which is the green

14     dot, with Nevada.  Nevada had much more shipments per

15     capita, 815 versus 600, on average over that earlier period,

16     but when we look at the mortality difference, you can see

17     that Ohio had much higher mortality than Nevada.  Nevada had

18     much more shipments, but their mortality is about 10 per

19     hundred thousand, where we're in the high 30s per hundred

20     thousand for Ohio.

21          So, and Nevada's not the only one.  A lot of the --

22     most of the states actually with higher shipments than Ohio

23     had lower mortality.  That tells you something else is going

24     on here that's driving mortality, so saying there's other

25     factors like I talked about before, a lot of other things

1     going on.  And indeed, shipment -- you know, even the level

2     of shipments, which, again, reflects both supply and demand

3     factors, even together those supply and demand factors

4     driving through shipments have a very small effect on

5     relationship to overall mortality.

6          That says other things are driving mortality beyond

7     just the level of shipments in the earlier period.

8     **Q**    You mentioned earlier you were going to talk to us

9     about eastern states and western states, and I think we've

10    gotten to that point.

11                MR. MAJORAS:  If we can go to our next slide,

12    please.

13    **Q**    Why are you doing -- why are you making that

14    distinction here, and what do you take from that?

15    **A**    Well, what I'm doing here is showing you the shipment

16    curves.  And, you know, the highlighting here isn't as good

17    as we should have done.  We kind of messed up the

18    highlighting, but I'll try to explain it.

19         You have opioid shipments in the east were -- I'm

20    sorry, west of the Mississippi.  That's the blue curve.  And

21    you see west of the Mississippi, like we thought, shipments

22    rose until about 2010, and then declined pretty dramatically

23    after 2010.

24         If we look east of the Mississippi, we see opioid

25    shipments rose pre-2010 and then declined pretty

1    dramatically after 2010.  There's a little more rise in the

2    east, but the decline is actually pretty similar east and

3    west.

4         So the shipment story is not so different east and

5    west, but if you look at the mortality stories, they're

6    incredibly different.  That is -- oh, go back to my slide.

7    We're too far.

8    **Q**    It happens by magic.

9    **A**    If you go back and highlight the left-hand panel, you

10   see that overall opioid mortality in the west went up in the

11   earlier period but didn't go up much at all in that later

12   period.  It went up some, okay?

13        If you look at the east, on the other hand, there's a

14   dramatic rise in opioid mortality in the later period.  And

15   that's because fentanyl came in much more heavily into the

16   east than the west, driven by what was a big difference in

17   the supply conditions in the illicit market in the east and

18   west.  That is, the eastern United States was dominated by

19   powdered heroin, for which fentanyl was much more easily

20   introduced into the supply chain.  In the west, the primary

21   heroin supply was black tar heroin that was supplied in the

22   west, for which fentanyl was not nearly as easily introduced

23   in the supply.

24        So that illicit market difference generates an

25   enormous difference between east and west.

1　**Q**　Okay.  We've seen this flipped back and forth, and I

2　apologize for that, on the slides.

3　　　Tie all these together.  What is it as you're looking

4　at a connection between supply and mortality rates that this

5　is showing you?

6　**A**　I'm saying if you look east and west, what you see is

7　in the west and east very similar stories on -- not even

8　supply, right?  This is just output, just very similar

9　stories in terms of the growth of prescription opioid

10　shipments in the earlier period, and then the decline in

11　prescription opioids; but you see very big differences

12　across these two locations in terms of mortality with

13　really, you know, rising, but not nearly rising as quickly

14　mortality in the west, and heroin and fentanyl mortality in

15　the east.

16　　　Again, that linkage between the shipment story and the

17　mortality story is pretty weak comparing east and west.

18　**Q**　Taking into account all of the analysis that you've

19　performed in this case, do you have an opinion on the nature

20　of drug abuse in the United States over time?

21　**A**　Well, I think there's another thing we want to look

22　at, which is -- and this is an interesting study.  This is a

23　study by Jalal.

24　**Q**　This is something you cite in your report?

25　**A**　Yes, it is.  And Jalal makes a pretty interesting

1     observation.  He says, look, we have this growth in opioid

2     mortality and opioid abuse in the post 2000 period, and he

3     points out that that's not the first drug abuse mortality

4     increase we've seen.  In fact, it's just the latest in a

5     series of abuse stories that have happened in the United

6     States over time.

7          Steve Levitt and I and Roland Fryer wrote a paper on

8     crack cocaine and the growth of crack cocaine in the '80s as

9     part of the broader drug abuse story growing in the United

10    States.  People have talked about powdered cocaine before

11    that, methamphetamine in the later period.  In other words,

12    the United States has been subject to kind of growing drug

13    abuse not just in opioids, but in other things.  And you can

14    even see that within the opioid epidemic.

15         As I mentioned earlier, an increasing fraction of

16    people dying from fentanyl are actually dying with fentanyl

17    not combined with other opioids but combined with other

18    illicit drugs, like cocaine.  And that's indicative of the

19    thing I talked about before.  You know, the growth in abuse

20    is not just -- has been associated with a lot of factors

21    have been driving abuse, not just now, but driving abuse for

22    a while, and driving abuse of not just opioids, but abuse of

23    drugs more generally.

24         And that's what you'd expect from an economics

25    standpoint, that if you have that kind of factors driving

1    abuse, things might change what they abuse, but abuse is

2    going to go up.  And that's really been the drug control

3    problem that people have tried to face.  How do you deal

4    with, you know, a rising propensity of people to abuse

5    drugs.

6    **Q**    Professor Murphy, we've covered a lot of ground.  I'd

7    like to take you back to the conclusions that you've reached

8    in this case and that you're sharing with the jury.

9         And now that you've explained some of the factors and

10   the things you've looked at, I'd like you to put them into

11   context of your conclusions.  Obviously not covering

12   everything again.

13        So your first conclusion about "The quantity of

14   prescription opioids consumed is determined by both supply

15   and demand factors."

16   **A**    That is what I've said so many times, I'm not going to

17   say it too much again.  But it just says you don't want to

18   just look at, hey, there were more prescribed over time,

19   therefore, this must be a supply story, that somehow changes

20   on the supply side must have driven things, and that's just

21   not true in this market, not true in any marketplace; that

22   is, quantity's going to be determined by both supply and

23   demand factors.

24        And secondly, the second point is that we know demand

25   factors have been important.  We can see that in so many

**Murphy - (Direct by Majoras)** 6004

1    ways.  We can see that, you know, there was Medicare Part D

2    that increased the prescribing behavior, we had declining

3    prices, we had standards of care changing, and we had the

4    deaths of despair.

5         We had kind of changing economic conditions that drove

6    an increased demand on the part of individuals for abuse.

7    We had the supply of fentanyl come in in the later period

8    which had a big effect on mortality as a highly-lethal drug

9    was introduced into the illicit supply system.

10        We also see it when we looked across all those states,

11   that, you know, there is a very weak association between the

12   shipments in the earlier period, which are driven both by

13   supply and demand, but even if you say forget that for a

14   moment, just say I'm going to look at shipments regardless,

15   supply or demand, and how tightly is that associated when he

16   we see mortality today, and the answer is, very weak.

17             MR. MAJORAS:  Professor Murphy, thank you.

18        Your Honor, I pass the witness.

19             THE COURT:  Okay.  Anything from CVS or

20   Walgreens for Dr. Murphy?

21             MR. SWANSON:  No, Your Honor.  Thank you.

22             MR. DELINSKY:  No, Your Honor.

23             THE COURT:  Okay.  Mr. Lanier, you're up.

24                      - - - - -

25                  CROSS-EXAMINATION

**Murphy - (Cross by Lanier)**                    6005

 1   BY MR. LANIER:

 2   **Q**    Sir, my name is Mark Lanier.  I've not had the

 3   pleasure of meeting you before, but it's a pleasure to meet

 4   you.

 5   **A**    Pleasure to meet you as well.

 6   **Q**    I've got a number of questions for you, as I'm sure

 7   you're not surprised to find out, but I'm going to try to

 8   keep it very brief and try to keep them as close to

 9   yes-or-no questions as I can ask.  Okay?

10   **A**    Yeah, you can -- that's fine.

11   **Q**    You've given exams before.  I bet you've given

12   true/false exams sometime in your life, haven't you?

13   **A**    I always give true/false and explain your answer

14   exams.  That's been the traditional.  Chicago's famous for

15   those exams actually.

16   **Q**    Is that a yes answer or no?

17   **A**    See, that's the key.

18   **Q**    Thank you, sir.

19   **A**    My exam always says true or false --

20   **Q**    Sir, time out, please.  If we could focus on my

21   questions, I'll try and get through this with some speed,

22   okay?

23   **A**    You asked me about my exams.  I'm trying to explain my

24   exams.

25   **Q**    No, sir, I asked if you've given true/false exams

 1   before.  It's a yes-or-no question.

 2   **A**    I've never given an exam that just asked for a true or

 3   false answer.

 4   **Q**    Fair enough.  Well, you may decide to do that one day.

 5        I want to talk to you about three things.  Sir, I want

 6   to talk to you about money, I want to talk to you about

 7   expertise, and I want to talk to you about science.  Okay?

 8   **A**    Okay.

 9   **Q**    Let's start with money.

10        You spoke about in your direct testimony doctors and

11   others responding to incentives.

12        Do you remember testifying about that?

13   **A**    I do.

14   **Q**    And in fact, you respond to incentives too, don't you?

15   **A**    Yes.

16   **Q**    So if someone's getting graded on how they do, you say

17   that affects them, right?

18   **A**    That's correct.

19   **Q**    And of course, you know you're getting graded in here,

20   aren't you?

21   **A**    Yes.

22   **Q**    So that affects what and how you do things as well,

23   doesn't it?

24   **A**    It does.

25   **Q**    And toward that end, I'm trying to chart the money.

**Murphy - (Cross by Lanier)**                                    6007

```
 1          Did you say by the end of September you've personally

 2     billed $40,000 on this opioid case?

 3     A      I believe that's correct.

 4     Q      And that there's 300,000 from others?  I wasn't

 5     charting that.

 6     A      Yes.

 7     Q      But then you said something about 1.8 million?

 8     A      Yes.  That's based on not this case, but all the

 9     opioid cases I've worked on together.

10     Q      So if we look at all the opioid cases you've worked on

11     so far, you're at 350,000 plus 1.8 million.  You've got 2

12     million bucks, over 2 million?

13     A      I think that's correct.

14     Q      And this is not the only case you're working on in

15     terms of opioids.  It isn't the only case, true?

16     A      That's true.

17     Q      I've looked at your CV, and it looks like you've got

18     something over the last four years of about 100 cases you're

19     working on.  Is that right?

20     A      No.  That would be -- there's a bunch of reports, but

21     many cases have multiple reports.  So, for example, that

22     list would include multiple items on the same case, I

23     believe.

24     Q      Well, so we're looking -- so you get to bill for each

25     one of those though, right?
```

1    **A**     Yes.  They're all part of the same work I do.

2    **Q**     So you've done the Optical Disc Drive, you've done

3    Parallel Network Licensing, something about Allstate

4    Insurance.  You've done Blue Cross Blue Shield, another one

5    against Allstate Insurance.  You've done News Corp, you've

6    done patent cases with Biogen, Genentech, Celltrion, Kinney

7    Drugs, Union Pacific Railroad, Bumble Bee Packaged Seafoods,

8    payment cases, antitrust cases.

9         You've -- that's just the last four years.  It keeps

10   going, right?

11   **A**     Absolutely.

12   **Q**     Economics has been good to you, hasn't it?

13   **A**     Yeah, I've done very well in economics.

14   **Q**     And when you say that you spend most of your time

15   teaching and most of your time at your wood shop, wouldn't

16   you agree you make most of your time -- or you make most of

17   your money doing this?

18   **A**     I would say this is my biggest source of income these

19   days, yes.

20   **Q**     So in that regard, I was looking at some of your

21   invoices in this case, which we'll have marked as

22   Demonstrative 119.

23        You've seen your invoices, I'm sure.

24   **A**     No.

25   **Q**     Ms. Fleming's handing you a set.

1   **A**     I don't get the invoices because I don't work for CRA.

2   I'm a consultant for CRA.  I submit my hours to them, and I

3   get reimbursed for my hours, but I don't -- I don't review

4   the bills because I'm not a CRA employee.

5   **Q**     Well, the jury met another CRA person, Mr. Brunner I

6   believe he pronounced his name, who testified about some

7   similar matters last week.

8         But, sir, I'm looking at your bills.  And if we look

9   at the bills, it looks to me like you've actually done

10  relatively little on this yourself.

11        So here are the bills for November of 2020, and you

12  didn't bill any time that month.  Other people did, right?

13  **A**     That's correct.

14  **Q**     And if we go to the next month's bill, 80,000 that

15  month.  But again, that's not you, that's other people,

16  right?

17  **A**     In that month, yes.

18  **Q**     And if we go to the next month, as y'all are

19  continuing to do all of this work on the report, it's still

20  not you, is it?

21  **A**     I didn't submit any hours.  I probably did some work,

22  but I didn't submit any hours over that period.

23  **Q**     You were pro bono that month?

24  **A**     No.  I work with my colleagues.  I don't always turn

25  my hours in, you know, but --

1   **Q**      Because the next --

2   **A**      You know, I mean, I work with my colleagues.

3   **Q**      The next month you don't turn any time in even though

4   other people turn it in the tenth of an hour, right?

5   **A**      That's true.

6   **Q**      That's six minutes.  They've got it down to a

7   six-minute time period, don't they?

8   **A**      I believe they do.  Some of them, I guess.

9   **Q**      That was a hundred grand that month without you

10  working.

11       If we go to the next month, you're still not doing any

12  work on this case, are you?

13  **A**      No.  I was probably working on other opioid-related

14  matters, but not this one at that time.

15  **Q**      Uh-huh.  That's the Murphy report still being done

16  there.  If we get into May of this year, this $407,000 bill,

17  still not seeing you on there.  Am I missing it?

18  **A**      No.  I'm not on that bill.

19  **Q**      You come in when it comes time to testify at court and

20  depositions, right?

21  **A**      No, I'm there at two times.  I primarily put in my

22  work when it comes time to think about the case, what work

23  we need to do, lay out the process that we need to go

24  through to get the answer to questions.

25       I'm there when we put the report together to say, you

```
 1    know, have we answered the questions to -- along the way I
 2    answer any questions they have about carrying out the
 3    instructions we've laid out.  And I'm there at the end again
 4    to kind of go through the report and say does this
 5    accurately reflect what I instructed my staff to do.
 6    Q    And right now you're billing $1400 an hour to be in
 7    here today?
 8    A    I believe that's correct, yes.
 9    Q    Okay.  Let's move from money to expertise, and see
10    what they get for that.  All right?
11         A couple of expertise questions.
12         Now, you're here to testify about causation, right?
13    A    That's part of what I'm here to testify, yes.
14    Q    All right.  Well, on your expertise, causation,
15    typically I would think we'd hear from an epidemiologist.
16         Are you an epidemiologist?
17    A    I would say two things.  One, I'm not an
18    epidemiologist, but economists are very important in the
19    area of causation.  In fact, the most recent Nobel Prize,
20    which was just awarded a month ago, was given to economists
21    precisely for looking at causation issues.
22    Q    Sir, I asked you are you an epidemiologist, and the
23    answer to that is?
24    A    I'm not an epidemiologist, but you prefaced it --
25    Q    Thank you.
```

**Murphy - (Cross by Lanier)**

1   **A**      -- by you said causation would generally be associated

2   with epidemiology.  I thought it would be useful for people

3   to understand that the most recent Nobel Prize was awarded

4   to three economists for work they did precisely on

5   causation.

6   **Q**      It wasn't awarded to you, was it?

7   **A**      I was not part of that Nobel Prize, no.

8   **Q**      All right.  Now --

9   **A**      Your point is about epidemiology and causation, and my

10  point is economists are very big on causation.

11  **Q**      And in that regard, did you use Bradford Hill criteria

12  for causation?

13  **A**      I did not, but nor would economists generally use

14  those criteria.

15  **Q**      And have you published your views specifically

16  concerning opioids and death?

17  **A**      I don't think I have a publication specifically on

18  opioids and death.  I do have publications on overdose

19  deaths, but not specific to opioids.

20  **Q**      Well, I've read those publications.  You've got three

21  that I could find, is that right, where you include that

22  into the publication.

23  **A**      I would have publications that look at mortality

24  broadly, including mortality from various causes.

25  **Q**      Exactly.  So in that regard, I'd like to ask you some

1    questions about expertise, and I'm going to contrast you

2    with Katherine Keyes, Dr. Keyes, from Columbia.

3            Now, have you ever met Dr. Keyes?

4    **A**    I have not.

5    **Q**    You did have a chance to look at her CV, for example,

6    right?

7    **A**    Yes.

8    **Q**    Attached to her report.

9            And she is someone who's been dealing with this

10   specific subject for 20-plus years.

11           Did you know that?

12   **A**    I assume so.  I don't remember it was 20 years.

13   **Q**    And when we looked at all of her different awards and

14   all of her different prizes she's won, so many of them were

15   dealing with these specific issues.

16           Were your three awards that you won dealing with these

17   specific issues?

18   **A**    When you say "these specific issues," you mean?

19   **Q**    Opioids.

20   **A**    No, not specific to opioids.  More on social decline

21   and the effect of that on people generally.  That's what I

22   won my awards for.

23   **Q**    Now, Dr. Keyes was careful in giving us her graphs,

24   like you see here in front of us, which was in her expert

25   report, and giving the citations to it, the CDC, the Center

1    for Disease Control, for example, and explaining how she

2    gets her specific data.

3         Remember that?

4    **A**    I didn't -- I wasn't here for her testimony.  I think

5    her report does talk about where she got her data.

6    **Q**    Yeah, this chart's in her report, okay?  This chart,

7    "Prevalence of opioid use disorder in the United States,

8    Ohio, Lake and Trumbull County."

9         You're not fussing the accuracy of her graphs, are

10   you?

11   **A**    There are some of them that are very misleading and

12   some of her opioid use disorder calculations are highly

13   flawed.  I haven't talked about that today, but if you're

14   going to point that out, there are some serious problems

15   with what she did.

16   **Q**    Well, we'll point to some of the issues with yours too

17   as time allows me, but --

18             MR. LANIER:  My choice of time, Your Honor.

19   **Q**    -- but within the framework of that, you've got a

20   bunch of charts that you put up there today for the jury,

21   right?

22   **A**    I do.

23   **Q**    And your --

24   **A**    It cites my report.

25   **Q**    Yeah.  Yours is the source is you, right?

1    **A**    No.  Besides my report, I have an appendix in my

2    report that goes into great detail of how all those numbers

3    are calculated.  Rather than just put numbers at the bottom

4    of a table, I actually refer to an appendix, and that

5    appendix details step by step how we process the data.

6    **Q**    Well, with due respect, sir, you look at your things

7    like talking about how the costs covered by Medicare

8    increased in 2006, and you showed this chart and spent time

9    explaining it.

10         This only applies to senior citizens, doesn't it?

11   **A**    Yes.

12   **Q**    This breakdown of percentages as share of spending, it

13   doesn't say what percentage of opioids they're getting, does

14   it?

15   **A**    No.  We've done that in other charts, here -- some of

16   that in here and some of that in the report.

17   **Q**    And in this regard, as you've testified today, would

18   you agree you're a bit of a fish out of water on dealing

19   with some of the terms that are involved in the opioid

20   epidemic?

21   **A**    I don't know if -- I mean, there are certainly terms

22   that are more epidemiological in nature, but there are

23   others that are more economic in nature.  So I would say

24   everybody is crossing over a little bit.

25   **Q**    Well, what I was thinking of specifically was, for

1    example, you said there's no sense of oversupply in

2    economics, in reference to the testimony and questions about

3    oversupply.  Right?

4    **A**    Yes, certainly the way she uses that term.

5    **Q**    Yet that word does have meaning in the healthcare

6    world apart from the economic world.  Did you know that?

7    **A**    I don't know how they use that term, but if they use

8    it the way she used it, it's a problem.

9    **Q**    Well, if oversupply means more than needed, more than

10   medically necessary, you think that's a problem?

11   **A**    No, I think that's one way you could look at trying to

12   calibrate supply, would be to compare it to some measure of

13   medical need.  However, you've got to be careful because the

14   usage and shipments are not just going to depend on overall

15   need.  It's also going to depend on costs.

16         You know, in 2006, when there were more opioids

17   shifted to the older individuals, one it was because their

18   costs went down.  When costs went down, doctors prescribed

19   more.

20   **Q**    In fairness though, if you'll look at some of the

21   qualifications of Dr. Keyes, she's a journal reviewer for

22   *Addiction*; *Alcoholism:  Clinical and Experimental Research*.

23         Have you been a journal reviewer for *Addiction*?

24   **A**    I've done review for *Addiction.*  Not for that article

25   but -- that journal, but I've done reviews for *Addiction*,

1    yes.

2    **Q**    No, for that journal, sir.

3    **A**    Oh --

4    **Q**    The *Journal of Addiction*.

5    **A**    I don't think I reviewed for that particular journal.

6    **Q**    How about the *American Journal of Epidemiology*?

7    **A**    That would not be a journal I would work with.

8    **Q**    *American Journal of Psychiatry*?

9    **A**    No, I don't think I did.

10   **Q**    *American Journal of Public Health*?

11   **A**    I think I have reviewed for them, actually.

12   **Q**    How long ago?

13   **A**    I don't know.

14   **Q**    Are we talking the last six months, last year?

15   **A**    Wouldn't have been in the last year.

16   **Q**    Last decade?

17   **A**    Probably.

18   **Q**    Have you read any of her multiple publications on

19   these subjects?

20   **A**    I've read -- I've read some of the stuff she did.  I

21   read quite a few of the things that she cited in her report.

22   **Q**    And in fairness, she doesn't have three articles.

23   She's got hundreds of articles that bear on this, doesn't

24   she?

25   **A**    Yes.  I mean, fields differ quite a bit in terms of

 1    publications.

 2    **Q**    Now, you spoke about the economic decline and the

 3    isolation that you put down as part of the cause of this

 4    epidemic, right?

 5    **A**    Yes.

 6    **Q**    And I don't know that anybody's really fussing that

 7    point, but my question to you is this:  Have you ever heard

 8    of the concept "preying on the vulnerable"?

 9    **A**    I've heard of that.

10    **Q**    So, for example, you use a chart that you do reference

11    from Case and Deaton.

12         Do you remember that?

13    **A**    I do.

14    **Q**    I'm going to show you what's been marked as

15    Defendants' MDL 1666.  You're familiar with this write-up by

16    Case and Deaton, "Deaths of Despair redux:  A response to

17    Christopher Ruhm," aren't you?

18    **A**    I am.

19    **Q**    And these people whose chart you used in front of this

20    jury say, "We directly contradict the idea that deaths are

21    related to economic conditions from 1999 to 2015; indeed, we

22    went to great pains to show that this was not the case."

23         That's what they say, isn't it?

24    **A**    Now you're really being misleading, unfortunately,

25    because what they're saying in this response is that it was

1    long-term decline, not just the decline in that period.

2    They were making this point of short-term versus long-term,

3    which has been Case and Deaton's point on this from the

4    beginning.

5    **Q**    With due respect, I'm not misleading because I'm not

6    done yet.

7    **A**    Okay.

8    **Q**    My question to you, sir, is, what they did say is the

9    opioid epidemic poured fuel on the fire, didn't they?

10   **A**    They're saying that opioid epidemic came on top of

11   that long-term decline.  If you want to call that fuel on

12   the fire, I think that may be terms they use.

13   **Q**    "We do not discount the importance of the opioid

14   epidemic, but we regard it as having added fuel to an

15   already bad situation and certainly not the only cause of

16   increasing mortality."

17       Do you see that, sir?

18   **A**    Yes.  So they're saying the opioid epidemic's not the

19   only cause, is what they're saying.

20   **Q**    And they're not the only ones who have published on

21   this clearly.

22       You're familiar with the Kevin Griffith publication,

23   aren't you?

24   **A**    I believe so.

25   **Q**    That's in *Drug and Alcohol Dependence*.  I'm assuming

1    you've not been a journal reviewer for them either, have

2    you?

3    **A**    I may have.  I don't recall being; I may have.

4    **Q**    You are familiar with the article on The Implications

5    of County-Level Variation in U.S. Opioid Distribution,

6    aren't you?

7    **A**    I've seen it.  I can't say I recall it.

8    **Q**    Well, you know, when you get an article in a

9    peer-reviewed publication, they'll most often put an

10   abstract at the front that's kind of like a condensation of

11   the article, right?

12   **A**    That's what an abstract tries to do.

13   **Q**    Yeah.  And two abbreviations are important for us to

14   pick up here.

15           One is "opioid-related deaths" are ORDs.

16           Do you see that?

17   **A**    Yes.

18   **Q**    And the other is "per capita pill volume," or PCPV.

19           Do you see that?

20   **A**    I do.

21   **Q**    And their results that they found from their study is

22   "In adjusted models, a one-pill increase in per capita pill

23   volume was associated with a .2 percent increase in

24   opioid-related deaths per 100,000 in the population."

25           Do you see that?

1    **A**    I do.

2    **Q**    They say, "Our findings validate the relationship

3    between per capita pill volume and opioid-related deaths."

4          Do you see that?

5    **A**    I do.

6    **Q**    "They do identify important environmental drivers of

7    the opioid epidemic and suggest early state Medicaid

8    expansions were beneficial in reducing opioid pill volume."

9          Do you see that as well?

10   **A**    I do.

11   **Q**    Now, sir, we've got two counties here with both

12   roughly 200,000 people.  Help me do the math, please.

13         For a one-pill increase, let's say we've got a,

14   between these defendants hypothetically, 30-pill increase

15   some years in per capita pill volume.

16         Do the math for me.  How many deaths, opioid-related

17   deaths, would that be associated with in two counties, so a

18   total of 400,000 people?

19   **A**    So you'd have to take the .2 per hundred thousand,

20   multiply that by 30, and then multiply that by 4.

21   **Q**    And what do you get?

22   **A**    I don't know.  .30 times .2 is 6, times 4 is 24.

23   Although that wouldn't tell you that's the causal

24   relationship between one and the other, right?  This is an

25   association.

1    **Q**    I understand.

2    **A**    And so I'm not sure what that tells you.  It doesn't

3    tell you what supply --

4    **Q**    I'm asking you to do the math, sir.  Do you need me to

5    work it out longhand?

6    **A**    Sure, you can.  I did it in my head, but you can work

7    it out.

8    **Q**    What did you get?

9    **A**    I don't know, assuming I did it right and I'm doing

10   this off the fly, so I can't say -- I would normally not

11   want to do this on the fly.

12          You're saying a one-pill increase.

13   **Q**    I don't want you to do it on the fly, sir.  Let's do

14   it together and let's make sure the record is correct, okay?

15   **A**    Okay.

16   **Q**    Here we've got one pill equals .20 deaths per 100,000.

17          Right?

18          So 30 pills should equal 30 times .2.

19   **A**    6.

20   **Q**    Which is going to be 60; is that right?

21   **A**    No.

22   **Q**    6.  Thank you.

23   **A**    That's what I said earlier, 6.  Get rid of the zero.

24   **Q**    6 deaths, 6.0, per 100,000.  And we've got 4 of those

25   one hundred thousands.  So we're looking at 24 deaths in

**Murphy - (Cross by Lanier)**                                        6023

1    these counties associated with that number of pills being

2    put out in a year, right?

3    **A**    Well, I mean, assuming we're reading their numbers

4    right, which is always an assumption in doing something like

5    this; but if we're reading those numbers right, that's what

6    their numbers would say in terms of some association, places

7    that had more pills had more deaths.  But we know that

8    association's pretty weak when you look across either

9    counties or states.

10   **Q**    Well, you say that -- when you say "we know," you're

11   not including Dr. Keyes and all of her publications that

12   have been peer reviewed, are you?

13   **A**    I don't think she has any publications that talk about

14   the overall strength of that relationship, that I'm aware

15   of.

16   **Q**    And she -- well, you're certainly not including her in

17   your "we."  We'll let her publications speak for themselves.

18       Are you?

19   **A**    I was very -- I was including her because I haven't

20   seen anything she put forward that would say there was a

21   strong association between shipments and mortality across

22   states or counties.

23   **Q**    She used the Bradford Hill criteria to establish

24   causation in the place of association.  You didn't use that

25   criteria, did you?

**Murphy - (Cross by Lanier)**

1    **A**    You're mixing apples and oranges now.

2    **Q**    No, sir, I'm not.

3    **A**    She did not establish a causation across states

4    between shipments and mortality.

5    **Q**    Sir, I'm talking about in these counties.  I'm talking

6    about the oversupply.

7         You didn't use Bradford Hill, did you?

8    **A**    She didn't use -- Bradford Hill is a broader set of

9    criteria, and she didn't use Bradford Hill about this

10   counties --

11   **Q**    She did.

12   **A**    She used Bradford Hill about overall studies.

13   **Q**    Sir, you weren't in here to hear her testimony.  I'm

14   not challenging you on that.

15        My question to you is simple.  Did you use Bradford

16   Hill for anything at all?

17   **A**    I did not.  Economists do not rely on Bradford Hill.

18   **Q**    Last stop on the road.  Science.

19        You know who Dr. Lembke is, Anna Lembke, don't you?

20   **A**    I do.

21   **Q**    She talked about what addiction is and how it affects

22   someone.

23        You're not a doctor to talk about such things, are

24   you?

25   **A**    I'm not a doctor.  I'm an economist.

**Murphy - (Cross by Lanier)**

1    **Q**    You're not in a position to talk about how it

2    increases depression, decreases cognition, increases pain,

3    increases fatigue.  Those are outside your areas, aren't

4    they?

5    **A**    Yeah, those are medical terms.

6    **Q**    But as an economist, you know it's a whole lot harder

7    to get a job and keep a job if you're depressed, isn't it?

8                    MR. MAJORAS:  Objection, scope.  This witness

9    never talked about Dr. Lembke.

10                    THE COURT:  Well, overruled.  He can ask that

11   question.

12   **A**    Yeah, I have not done a specific study of that.  I

13   know mental health is associated with employment.  It is

14   tougher to get employment when you have mental health

15   issues, including depression.

16   **Q**    Yeah, it's tough to get and hold a job if your

17   cognition is messed up, if you're not thinking clearly,

18   true?

19   **A**    That's true.

20   **Q**    It's tough to get and hold a job if you're in pain.

21   You know that, don't you?

22   **A**    I think that would be a factor too.

23   **Q**    It's tough to keep and hold a job, to show up for

24   work, to be reliable, if you're suffering from debilitating

25   fatigue, isn't it?

1   **A**     Fatigue kind of goes both ways.  You get tired from

2   working, but you also -- it's harder to work when you're

3   tired.

4   **Q**     Now, you're also not in the position to testify about

5   the dopamine learning loop in the way the brain works in

6   regards to addiction, are you?

7                   MR. MAJORAS:  Objection.  Scope.

8                   MR. LANIER:  It's going to gateway, Your

9   Honor.

10                  THE COURT:  All right, fine.

11  **A**     I am not a biologist.  I can't tell you about that

12  mechanism.  I can tell you a lot about the economics of

13  addiction, but not that part.

14  **Q**     That's my point I just want to underscore.  When

15  you're talking about addiction, you're not talking about it

16  as an addiction specialist in the world of neuroscience,

17  talking about what's happening to the brain, right?

18  **A**     No, I'm looking at it as it unfolds in people's lives

19  in terms of actually addictive behavior.

20  **Q**     And that's why when you do writings like you did --

21  you talked about a theory of rational addiction that you

22  co-wrote with Gary Becker.

23        Remember that?

24  **A**     Yes.

25  **Q**     Your attitude to someone who's addicted is "just

**Murphy - (Cross by Lanier)**

1   quit," isn't it?

2   **A**     No.  We actually talked about how hard it is to quit

3   and why difficulty in quitting is a big part of the

4   addiction story.

5   **Q**     So on page 693, "The claim of some heavy drinkers and

6   smokers that they want to quit but cannot end their

7   addictions seems to us no different from the claims of a

8   single person that they want to but are unable to marry, or

9   from the claims of a disorganized person that they want to

10  become better organized."

11        Did you write those words?

12  **A**     We did.

13  **Q**     And you wrote those from your perspective, but not

14  from the perspective of how the addiction changes the brain,

15  correct?

16  **A**     No, we did not study the brain.  That's outside our

17  area of expertise.

18  **Q**     Okay.  Thank you, sir.

19                MR. LANIER:  Your Honor, I'll pass the

20  witness.

21                THE COURT:  Okay.  I think what I'll do, we'll

22  get questions from the jurors, then we'll break for lunch.

23  And then in the next round counsel can decide which ones to

24  ask.

25        So we'll break for lunch, pick up at 1:00 with the

1    balance of Dr. Murphy's testimony.

2            And the usual admonitions apply.  Have a good lunch.

3                    (The jury is not present.)

4                    (Juror question review.)

5                    (A luncheon recess was taken at 11:55 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A F T E R N O O N   S E S S I O N

 2                          - - - - -

 3              (In open court at 1:04 p.m.)

 4              MR. MAJORAS:  Your Honor, before the jury, I

 5    think Mr. Delinsky was going to respond to your question

 6    this morning.

 7              MR. DELINSKY:  Judge, I think we're all good

 8    on one week from Monday.

 9              MR. MAJORAS:  For closings.

10              THE COURT:  The plaintiffs are okay with that?

11              MR. LANIER:  Yes, Your Honor.

12              THE COURT:  Okay.  That's what we'll plan to

13    do.

14              MR. MAJORAS:  Thank you, Your Honor.

15              (The jury is present at 1:05 p.m.)

16              THE COURT:  Okay.  Please be seated.  I hope

17    everyone had a good lunch.

18         All right, Dr. Murphy, I want to advise you you are

19    still under oath from this morning.

20         And Mr. Majoras, you're up.

21              MR. MAJORAS:  Thank you, Your Honor.

22         Good afternoon, folks.

23         Good afternoon, Dr. Murphy.

24                          - - - - -

25                     REDIRECT EXAMINATION
```

 1   BY MR. MAJORAS:

 2   **Q**    At this point with the witnesses, Judge Polster has

 3   asked the jurors if they have questions.  They write them

 4   down and we can ask them.

 5         And what I'm going to do is put the questions up on

 6   the screen so you'll have it in front of you.  I'll read it

 7   so it's in the record.

 8         If you can respond, respond.  If for some reason it's

 9   not within your area of knowledge or expertise, please tell

10   us that.

11         Fair enough?

12   **A**    I'll do my best.

13   **Q**    Let me cover it up so we're just looking at one.

14         Okay.  So our first question is, "When you look at the

15   fentanyl deaths, how are you determining if it is illicit

16   fentanyl or prescription fentanyl?"

17   **A**    Good question.

18         You can't, because it's the guy doing the -- you know,

19   you can't tell the chemical difference between the two at

20   that time, so they get lumped in together.

21         So when we do licit versus illicit, fentanyl is

22   included in the illicit category even though there's some

23   prescription fentanyl in there.  That's just all you can do

24   with the available data.  So we can't separate those two

25   out.

**Murphy - (Redirect by Majoras)**

```
 1    Q     Okay.  Then our second question.

 2          Now, I will tell you there are a couple questions that

 3    refer to your charts.  You have a binder in front of you

 4    where you have all of the charts together.  I may need your

 5    help to try to identify which chart is which on any

 6    particular question, if it's not listed.

 7          "Based on your chart where the peak of prescription

 8    opioids meet and the decrease of prescription opioids start

 9    to decline, fentanyl increase, is the increase due to easier

10    access to illicit fentanyl?"

11    A     I think if we look at the chart, I can show you

12    there's actually a bit of a delay there.

13    Q     Why don't we, if you can, identify the chart, and

14    let's put that up.

15    A     So we might have to look at two, so let's look at the

16    chart that has shipments and -- yeah, one of the charts was

17    shipments in it, so we can look at that.

18    Q     Can you help me identify that?

19    A     Sure.  30-something, 37, maybe around there someplace.

20          Okay, yeah.  So this is -- 30's good.

21          So here we see shipments, which is, you know, those

22    are all prescription.  We don't have shipments in any sense

23    of illicit.  So this is all prescriptions, in other words.

24          You can see they kind of peak around 2010 and '11, and

25    then start going down.
```

1      If you flip to the chart, I think you just showed it

2    right before this, whereas what seems to happen is the

3    fentanyl increase really starts a little later, starts

4    around 2013.  So remember, the prescription opioids start

5    going down -- level off in '10, '11, start going down.

6    Fentanyl really comes in much more after 2013.  It doesn't

7    come in right when the prescription opioids go down.

8          Heroin, which had already been rising, continues to

9    rise in that earlier period, in that period afterward; maybe

10   accelerates somewhat during that period, but it continues to

11   rise.  But the fentanyl is delayed.  The fentanyl comes in

12   like 2013.

13   **Q**    Let me read this.  It looks like the way I used to

14   write some of my answers in my law school exam, so I

15   appreciate it.

16         "In regard to shipments and the mortality chart, how

17   many people live in Nevada?"

18         Let me just read the whole thing, and you can address

19   it.

20         "How many people live in Ohio?  How many people in

21   Nevada have opioid abuse disorder?  How many people in Ohio

22   have opioid abuse disorder?"

23         And you can take that in whatever order you'd like.

24   **A**    Nevada is a much smaller state than Illinois -- I'm

25   sorry, Ohio, but we're doing everything per capita, so it's

1    not -- it's per person; so the fact that's smaller doesn't

2    have a direct effect on the way we're measuring everything

3    in the chart, because everything's per person.

4         So if Ohio is six times as big, we've divided

5    everything by a population, it's correspondingly bigger.  So

6    I don't think size is really that critical for interpreting

7    those charts.

8         Opioid use disorder, I don't know the numbers for

9    Nevada.  I wish I did.  I just don't off the top of my head.

10        Ohio has had relative high rates of opioid use

11   disorder.  Of the statistics, it would be one of the ones

12   where they're closer to the top than they are for other

13   measures of opioids.

14   **Q**    Next question is, "What is the percentage of opioid

15   prescription mortality among women?  The chart you've

16   provided showed 33.3 percent of women getting opioid

17   prescriptions.  How many women die from --

18             UNIDENTIFIED SPEAKER:  Push it up, John.

19   **Q**    I'll break this into its individual parts.

20   **A**    I understand the question.  The question is really

21   about, you know, in that earlier period where we saw the

22   older women disproportionately getting the prescriptions,

23   does that show up in mortality.  And the issue is you do see

24   higher rates of mortality for women, older women in those

25   earlier years; not proportionately higher, but you do see if

**Murphy - (Redirect by Majoras)**

1    you look at mortality rather than prescriptions, you'll see

2    that mortality also shifted dramatically from older women

3    and men to younger men particularly.

4         So you can do that same analysis without looking at

5    prescriptions.  You can just look at mortality in the early

6    period and mortality in the later period, and you also see a

7    dramatic shift there too, that there's a big shift in the

8    mortality distributions.

9    **Q**    If you wouldn't mind, just take a look at the full set

10   of questions to make sure you responded as far as you can.

11   **A**    Yeah.  I tried to add to that.  Putting a number on

12   that is hard, but I can tell you if you look at which -- you

13   know, look at like a bar chart that showed you who was

14   dying, it would have been more skewed toward older women in

15   the earlier period than it was in the later period because,

16   you know, part of that's because there were more of them

17   getting prescriptions in that period.

18        So it's less dramatic than the comparison I had, which

19   was prescriptions early period to mortality later period.

20   You go to mortality, mortality sees the same pattern; shift

21   toward men, shift toward younger, somewhat less dramatic.

22        That would be the answer.

23   **Q**    So I know you've answered, but I'm just going to read

24   the full -- the second question into the record so we have

25   it in the record.

1          "The chart you've provided showed 33.3 percent women

2     getting opioid prescriptions.  How many women die from

3     opioid prescriptions between the years 2000-2017," [sic]

4     which this juror thought was part of the data that you used.

5          Anything else to add?

6     **A**     I would just say it's not 33 percent of the women were

7     getting prescriptions.  33 percent of the people getting

8     prescriptions were older women.  So those percentages in

9     that chart add up to 100.  So 33 percent are older women,

10    20-something percent are older men, and all those

11    percentages would add up, okay?  So it wouldn't be as high,

12    that wouldn't be the number for that.

13         But the pattern is exactly what I said.

14    **Q**     Why does the pattern matter?

15    **A**     Because primarily disproportionately older women

16    getting prescriptions in that earlier period and younger men

17    dying from opioid mortality in the later period.

18    **Q**     I frankly can't remember if this is the one I asked

19    you already.

20    **A**     I think it is.

21    **Q**     It is, yes.  We had a few questions about fentanyl, so

22    thank you.

23         All right.  Next question.

24    **A**     By the way, that's a very good question, because that

25    was something that I didn't make clear, so I'm glad somebody

1    asked it.

2    **Q**    This question relates to another chart you used.

3    "Shipments within 1993 to 1995 and 2018 to 2019 is missing

4    by time frame of '96 to 2017.  The data this is missing

5    during this time frame can make a major difference in

6    showing MME mortality shift, can it not?  Please explain.

7    Why wasn't the full data used?"

8          And if you need a chart, let me know?

9    **A**    Again, let's -- can we put the chart up?  I just want

10   to make sure people understand what we're doing.

11   **Q**    I just may need your help in finding it.

12   **A**    So it's the scatter charts.  So go down.  Keep going.

13   It's the dot -- the charts with all the dots on them.

14         Okay.  So the shipments are the full period 1997 to

15   2010.  That includes all of those years.  That's 14 years of

16   shipments are on the horizontal axis.

17         The vertical axis is the change in deaths, so we're

18   comparing for each state the death rate per hundred thousand

19   in 2018-19 compared to what the death rate was for that same

20   state from 1993 to 1995.

21         So for example, if you look at Ohio and you see let's

22   say that number in Ohio is 35.  That's as close as I can get

23   looking at the chart.  That number is 35.  Maybe it went

24   from 6 in the first period to 41 in the ending period, and

25   therefore it's a change of 35.  That's what we're referring

1   to.

2          So the two years I'm looking at here, 1993 to '95, is

3   the base period we're looking at for the change, and 2018-19

4   is the ending period we're looking at for the change.

5          So we're saying how much did mortality rise in a state

6   over that period of time.  And we're comparing the rise in

7   mortality over that roughly, you know, 25-year period to the

8   level of shipments in that early period.

9          So the idea is, did places that have more shipments

10  see their opioid prices or their opioid deaths go up by

11  more.  So we're kind of trying to control for the baseline

12  level.

13         It looks pretty similar if you just do deaths in

14  2018-19 because the baseline levels are low, but I think --

15  that's why we did it this way.

16                 MR. MAJORAS:  Mr. Ferry, I think you should

17  keep in mind slide 37.  I think we may come back to that

18  later.

19  **Q**    Next question.

20                 MR. MAJORAS:  This relates to slide 4, Mr.

21  Ferry, if you could pull that up, please.

22  **Q**    I'll read just so it's in the record.  The question

23  is, "Increase in mortality is because there is an epidemic

24  in Ohio, correct?"

25         If we look at slide 40.

1   **A**     Yeah.   I mean, I would say they're clearly referring

2   to the same thing.  I think mortality is a big part of what

3   people are talking about with an epidemic.  They're saying

4   what tells me we have an epidemic, right?  Epidemic is a

5   term we use to describe a situation where from a health

6   standpoint things are -- or from a general standpoint things

7   have gotten larger.  And one of the big things they're

8   looking at when they declare it to be an epidemic is the

9   mortality rate.

10       So I would say the two are kind of telling you the

11  same story, that if we're having an epidemic of opioid

12  abuse, then that's showing up as mortality.  And, you know,

13  if people weren't abusing opioids today, primarily heroin

14  and fentanyl, we probably wouldn't have the level of

15  mortality from opioids we have today.

16  **Q**     You can go back to the ELMO, please.

17       "You mentioned incentivized when speaking about the

18  hospitals and measuring level of pain, fifth sign, as we

19  have heard, with the surveys.  Therefore were they, the

20  hospitals, paid to get these pain medications, oxy and

21  hydro, in the hands of patients"?

22  **A**     You know, what I'm talking about here is the

23  incentives that were provided by the CMS surveys.  I don't

24  think there was a direct payment that said if you -- from

25  CMS -- I know there wasn't -- where they would say, if you

1    give this much prescription payments, you get this much -- I

2    mean this much prescription medication, you're going to get

3    this money directly from CMS.  But at least initially it was

4    something CMS was monitoring, which has had some effect on

5    doctor behavior.

6         And secondly, later it did figure into, in a less

7    direct way, a financial incentive for the hospital.  But it

8    wasn't like that direct, I guess is the way I would think

9    about it.

10   **Q**    Next question.  "When gathering data, which chart were

11   deaths added if prescriptions and illegal drugs were

12   recorded at the same time?"

13   **A**    Yeah, so I think we can put that chart up.  If you put

14   the chart up that has the three green lines on it -- or the

15   blue line and the two green lines.  There it is.

16        So this chart breaks all three out.  So in a given

17   year, let's say, you know, let's, like, go 2019, the height

18   of that blue line is how many people died of a drug overdose

19   in which there were only prescription opioids involved, no

20   other illegal opioids involved.  So the blue is someone just

21   prescription opioids, no illicit opioids.

22        The light green would be people for whom there were

23   illicit opioids but no prescription opioids.

24        So, again, that one said pure illicit or illegal,

25   that's the light green.  The blue is pure just prescription

1     opioids involved.

2            And then the dark green is the people for whom you

3     found both types of opioids.  So that would be somebody who

4     died and when they examined what was in their system, they

5     had both prescription opioids and illegal opioids.  So that

6     would be the dark green area.

7            So I break all three out for you.  Just one, just the

8     other, and both.  That's in this chart.

9     **Q**    And you may have mentioned this when I asked you

10    questions earlier, but the blue part, the prescription

11    opioids, are those only opioids that were used by the people

12    actually getting the prescription?

13    **A**    No.  Those would include people abusing prescription

14    opioids as well as people who would have prescriptions for

15    prescription opioids.  That's not broken out.  This is

16    from -- this is from death records where you're just

17    recording what was the cause of death and linking that to

18    the presence of drugs.

19           I should also say, for each of these drug overdoses,

20    there could be other drugs too.  It doesn't have to just be

21    these.  Here I'm just asking were there prescription opioids

22    only; in other words, no illicit opioids; were there only

23    illicit opioids, no prescription opioids; and were there

24    both.  That's what this chart breaks out.

25                  MR. MAJORAS:  Mr. Pitts, if we can go back to

**Murphy - (Redirect by Majoras)**

1    the monitor.

2    **Q**    Next question.  "Between 2001 to 2010, 19.5 percent of

3    opioid prescriptions were for men ages 15 to 50.  Wouldn't

4    the majority of these men still be in the same age grouping

5    in 2011 to 2019 and more likely to abuse heroin if they had

6    lost their jobs?"

7    **A**    Yes.  I mean, if you think of these two periods as

8    like ten years apart and our age grouping is, what, 35 years

9    wide, right?  So that means I had 35 years of people at the

10   beginning.  I shift to the later period, so ten years of

11   older people are no longer in that group because the oldest

12   guys in the earlier period are now out.  And the earlier --

13   and then they're bringing in ten years of people at the

14   beginning.

15        So there would be 25 years of people with overlap, 10

16   years of people leaving, and 10 years of people coming in.

17   So there would be a bunch that would be in the group in both

18   periods.

19        Would those abusing drug -- abusing -- or getting

20   prescription opioids in the earlier period, I think the

21   evidence on this is mostly not about people receiving the

22   prescriptions.  The evidence on, you know, how that leads to

23   abuse is mostly people who are abusing prescription opioids.

24   That is most of the data we see that talks about people who

25   are using prescription opioids at one point and using heroin

1     later, is about people who are abusing prescription opioids

2     in that earlier period.  Those may -- most of those people

3     wouldn't have had a prescription for those opioids.  They

4     would have obtained them in some other way.

5          So in my chart it's about prescriptions.

6     Q    The next question's going to refer to your scatter

7     plots again, but before we do that, let me put it on the

8     screen and read it to you, and then we'll switch the

9     monitors.

10         "Which dot on your scatter plot (the changes in the

11    opioid mortality in a state versus the shipments of

12    prescription opioids to the state) is the state of Florida?"

13         This might be I think 37.

14    A    You know, I don't remember specifically.  My -- I

15    don't want to -- I'm not going to speculate, but I can tell

16    you my recollection is Florida was relatively high on I

17    think shipments and relatively low on -- I'm not going to

18    guess.  I'm not going to guess.  I can't tell you which dot

19    they are.

20         I'm trying to remember, but --

21    Q    If you can't remember, you can't remember.

22    A    I don't remember.

23    Q    Thank you.

24         Next question.  "People of the Medicare age, are what

25    percentage of people with prescription addiction?  And

1  second, same question with related to death."

2  **A**    I wouldn't know the numbers off the top of my head.  I

3  would know, like I said before, that the older individuals

4  were more highly represented among deaths in the early

5  period than they were in the later period.  That's the only

6  part I remember of that, that they were more highly

7  represented in deaths in that earlier period than they were

8  in the later period.  I couldn't tell you the numbers.

9  **Q**    And this last of the juror questions:  "When opioid

10  shipments began to decline after 2010 to 2011, could the

11  substitute theory apply for people who abuse/misuse," in

12  other words, "not mortality?"

13  **A**    Yeah, there really are two substitute theories.  And

14  again, this is something I tried make clear.

15       One is substitution that I'm using prescription

16  opioids if they become less available, I might shift to

17  another opioid, like an illicit opioid.  That's particularly

18  true for those who are abusing opioids.  But the other one

19  is people who are going to become abusers are now more

20  likely to initiate on illicit opioids.

21       So there's two substitution effects.  There's a

22  substitution among those currently using, but there's also a

23  substitution among those initiating.  And it's that second

24  group initiating on illegal opioids that pushes -- you know,

25  that is important during this period that you have to think

**Murphy - (Redirect by Majoras)**

1    about.

2    **Q**    I have just a question or two of my own.

3         Mr. Lanier asked you some questions about the Bradford

4    Hill criteria.

5         Do you recall that?

6    **A**    Yes.

7    **Q**    You gave some responses, but I'm just going to ask

8    you, what is the significance, or not, of the Bradford Hill

9    criteria in doing the type of causation analysis that you

10   have offered here?

11   **A**    Well, I don't think it -- I mean, some of the things

12   that the Bradford Hill talk about are things we discuss in

13   economics when it comes to causation.  So it's not like

14   there's not an overlap, it's just that those aren't the

15   criteria that economists generally use.

16        But I do want to make clear economists have been

17   leaders in the push for causal identification.  And the most

18   recent Nobel Prize, and particularly the work of Josh

19   Angrist and Guido Imbens, probably the two people who

20   pioneered a lot of the causal inference in economics, had

21   big influence outside of economics.  It's become really a

22   big focus of people thinking about causality.

23        The other thing about causality that you have to be

24   really important with is at what level are we talking about

25   causality?  Because, you know, you can prove causality

1    between A and B, but if what you're doing affects not just

2    A, affects C, D, E, and F, then the causality question

3    you're interested in is not just the A to B link, it's the B

4    to -- C to B and D to B and E to B, and the relationship

5    among those.

6         So whenever you talk about causality, and this is

7    again an area where economists have had a big role, to say

8    the causality question has to be done in the proper context

9    given the issue you're addressing, that is; and you know,

10   Josh, Josh Angrist, has been very clear about that, you

11   know, he's always talking about the limits of what I can

12   learn from a given causality experiment.  He's big on

13   finding a causality experiment, but often that doesn't go

14   all the way to answering the questions.  It's just a piece

15   of the question.

16   **Q**    So taking that into the analysis that you did and the

17   issues that you addressed in this case, using what you just

18   said, is this an A to B type of discussion or is it more the

19   A to B, C, D, E, or whatever number -- letter?

20   **A**    Well, I think it's more the latter, because, you know,

21   changes in what happened over time had an effect on our

22   outcomes on many different dimensions.  It wasn't just about

23   those using prescription or abusing prescription opioids,

24   what did they do; it was what about happened to all the

25   other people and what happened with the introduction to

1    fentanyl, and those other things.

2         So you've really got to consider those other things.

3              MR. MAJORAS:  Thank you, Professor Murphy.

4         I pass the witness, Your Honor.

5              THE COURT:  Okay.  I assume there's nothing

6    from CVS or Walgreens, but I want to inquire.

7              MR. SWANSON:  Nothing, Your Honor.  Thanks.

8              MR. DELINSKY:  Nothing.

9              THE COURT:  Okay, Mr. Lanier.

10             MR. LANIER:  Very brief follow-up, Your Honor.

11                       - - - - -

12                  RECROSS-EXAMINATION

13   BY MR. LANIER:

14   **Q**    Bradford Hill criteria you were asked about?

15   **A**    Yes.

16   **Q**    You don't use those at all in coming to your

17   conclusions, fair?

18   **A**    I use some of those criteria, and I didn't get them

19   from --

20   **Q**    I'm sorry?

21   **A**    I used some of those criteria.  I didn't get them from

22   Bradford Hill.

23   **Q**    Been around for causation for 70 years, Bradford Hill

24   criteria, right?

25   **A**    You know, he wrote that paper a long time ago.  I

1   think -- he didn't originate many of those ideas.  Other

2   people had had them before, but he put them down.  There's a

3   lot of work on causation since then.

4   **Q**    Yeah.  Next question.

5        You were asked by the jury about how this -- how many

6   of these people got the -- had fentanyl, licit, illicit; how

7   many of them got their starts and the generational gaps.

8        Do you remember those questions?

9   **A**    I do.

10  **Q**    I'd like to ask you, I would assume you are familiar

11  with the work that the Ohio -- the State Medical Board of

12  Ohio has done on looking at this issue, as shown to you by

13  Plaintiffs' 17422.  Correct?

14  **A**    I don't recall specifically this document, so you'll

15  have to go through it with me.

16  **Q**    Let me show you the page and see if you recall this at

17  all.

18       Looking at OARRS data.

19       You know what OARRS is, right?

20  **A**    Yes.

21  **Q**    Showing that the unintentional overdoses in 2016 of

22  4,050, that 3,271 showed themselves present in the OARRS

23  data as having prescription opioids.

24       Did you take that statistic into account?

25  **A**    This statistic does not cover all the ones we're

 1   looking at here, so --

 2   **Q**     Well, my question to you is, the specific data in Ohio

 3   from OARRS that shows of 100 percent of unintentional

 4   overdoses, 80 percent of them have opioid prescriptions in

 5   OARRS, did you take that into account?

 6   **A**     I don't believe that's correct.

 7   **Q**     Okay.  How about of the unintentional heroin involved,

 8   of the 1,444, you've got 1,144 or just under 80 percent

 9   showing the use of opioids from OARRS.

10   **A**     You know, I would have to go through what they're

11   saying here.  These are not what you would get from death

12   certificate data, I can tell you that.

13   **Q**     Well, so the State Medical Board of Ohio that's

14   charged to try and keep up with this, that's charged with

15   combatting this opioid overdose, shows that of unintentional

16   fentanyl, you've got just under 80 percent that are also

17   present with prescription opioids in OARRS.

18          Didn't take that into account either, did you?

19   **A**     Yeah, I think -- I don't believe this is what that's

20   saying.  But you can present it at what you think, but

21   that's inconsistent with the data that I've seen,

22   inconsistent with the data your own experts have relied

23   upon.  So I don't believe that's correct.

24   **Q**     Well, I'm not making this up where it says "The link

25   between prescription opioids and illicit opioids."

**Murphy - (Recross by Lanier)**

1        Do you see that on the slide?

2    **A**    Yeah.  Let me read the document you gave me so I can

3    see what they're talking about and not what you want to say

4    it is.

5    **Q**    All right.  You can hang on to that copy and read it.

6        Meanwhile, I want to ask you about this.

7            MR. MAJORAS:  Your Honor, is he going to ask

8    questions if he wants him to read it, or are we moving on?

9            THE COURT:  Well, I don't know.

10   **Q**    Sir, I'm through asking questions on that document.

11   You can hang onto that copy though and read it, and

12   supplement it any way you want to.

13       My final questions are these.

14       You look at the opioid use disorders in northeastern

15   Ohio, you look at the overdoses.  You'll agree with me that

16   these aren't bad people in northeastern Ohio, just having

17   trouble handling tough luck.  You'll agree with me on that,

18   won't you?

19   **A**    They're not bad people.  I'll agree with that.  I

20   think a lot of them have had tough luck.

21   **Q**    But these folks in northeastern Ohio, it's not fair

22   for you to sit up there and say they can't handle the tough

23   luck and that's why they're overdosing.  That's not fair, is

24   it?

25   **A**    I never intended to say that.  If it sounded like I

1    was blaming them for their problems, that it was their

2    weakness, that's completely out of bounds with what I was

3    trying to say.

4    **Q**    And that they have tough economic times, and you say

5    that that's the reason they're turning to this.

6         That's not fair either, is it?

7    **A**    Well, one of the reasons is tough economic times.  We

8    know that that's a reason why people turn to abuse.  That is

9    one of the reasons.  There's a lot of reasons people turn to

10   substance abuse, and tough times is one of them.

11   **Q**    Before you say that about the people in northeastern

12   Ohio, how many of them have you met?

13   **A**    I don't know.  I know quite a few people from Ohio.

14   **Q**    Do you know Jason Boyd?

15                  MR. MAJORAS:  Objection.  Scope.

16                  THE COURT:  Overruled.

17   **A**    I do not know Mr. Boyd.

18   **Q**    Do you know Maria Fleming?

19   **A**    No, I don't believe I --

20   **Q**    Do you know Frank Gallucci?

21   **A**    I don't.

22   **Q**    Do you think that just because economic times are

23   tough all over the country or particularly in northeastern

24   Ohio, that that's the cause of this opioid epidemic?

25   **A**    It's part of the story.

1   **Q**    And you don't think oversupply and overdispensing is

2   part of the story?

3   **A**    I'm saying it's part of the story.  You know, when you

4   say is the growth in usage part of the story, obviously

5   growth in usage is, but growth in usage is due to many

6   factors, not what you want to say, supply factors.

7   **Q**    Including overdispensing -- although, time out.

8         You have a footnote in your report that says you

9   didn't consider any of the bad conduct of the defendants in

10  coming to your conclusions, don't you?

11                MR. MAJORAS:  Objection.  Scope.

12                THE COURT:  Overruled.

13  **A**    I don't believe I -- I have not -- I didn't

14  explicitly, I wasn't asked to evaluate their explicit

15  conduct.

16  **Q**    Note 9.  "I do not specifically address the alleged

17  unlawful conduct of chain pharmacies in this report.  I

18  understand other experts do."  Correct?

19  **A**    Correct.

20                MR. LANIER:  Pass the witness, Your Honor.

21  Thank you.

22                THE COURT:  Okay.  Dr. Murphy, thank you very

23  much.  Safe travels returning.

24        You may be excused.

25                THE WITNESS:  Thank you.

 1                  MR. MAJORAS:  Your Honor, if I may show

 2       Professor Murphy out.  Someone else will call the next

 3       witness.

 4                  THE COURT:  Absolutely.

 5                  MR. BUSH:  We're calling Dr. Choi, Your Honor.

 6                  THE COURT:  Okay.  Thank you.

 7                  MR. BUSH:  Just give us a minute, Your Honor,

 8       to finish getting set up.

 9                  THE COURT:  All right.  Mr. Pitts is cleaning

10       up the jury box as well.

11                  (Pause in proceedings.)

12                  THE COURT:  Doctor, if you would raise your

13       right hand, please.

14                  (Witness sworn.)

15                  THE COURT:  Thank you.  You may remove your

16       mask while testifying.

17                  THE WITNESS:  Thank you, Your Honor.

18                  MR. BUSH:  Almost ready, Your Honor.  A few

19       more logistics.

20             Mr. Pitts, can you put the screen up, the slides up?

21                  (Pause in proceedings.)

22                  MR. BUSH:  May I proceed, Your Honor?

23                  THE COURT:  Yes, Mr. Bush.

24                  MR. BUSH:  So, ladies and gentlemen, Graeme

25       Bush representing CVS.

1              Good afternoon, Dr. Choi.

2                  THE WITNESS:  Good afternoon.

3                         WILLIAM CHOI

4                          - - - - -

5                    DIRECT EXAMINATION

6    BY MR. BUSH:

7    **Q**     Could you please introduce yourself to the jury.

8    **A**     Good afternoon.  My name is William Choi.

9    **Q**     We're going to get into your opinions in some more

10   detail, but right up front, could you kind of orient the

11   jury about what you're going to be talking about?

12             First of all, is one of your specialties, and we'll go

13   through some of your other specialties, but is one of your

14   specialties data analysis?

15   **A**     That's correct.

16   **Q**     And have you examined some of the data in this case

17   relating to the dispensing of opioids by CVS, opioid

18   medications by CVS in Lake and Trumbull County?

19   **A**     That's correct.

20   **Q**     And what was -- as you've looked at that dispensing

21   data, what was the purpose for looking at it?

22   **A**     Well, first it was to review and analyze the data.

23   When you're doing data analysis, I know this is going to

24   sound like common sense, but you want to first understand

25   what you're working with, what the data set could tell you;

 1   also what's not in the data and what's missing from the

 2   data.

 3        So you want to know what you're ultimately working

 4   with to provide information about the subject matter and

 5   also to provide context when you do applications of the data

 6   or when you run applications of the data.

 7   **Q**    And did you also have the opportunity to review data

 8   that was used by plaintiffs' experts in this case,

 9   Mr. Catizone and Dr. McCann?

10   **A**    That's correct, I reviewed those data sets.

11   **Q**    And did you have the opportunity to evaluate their use

12   of the data and come to conclusions about whether it was

13   valid and reliable?

14   **A**    That's correct.

15   **Q**    And you're prepared to express opinions on that

16   subject today?

17   **A**    Yes, sir.

18   **Q**    Let me ask you to take a look at this next slide.

19        Is this a graphic illustration of what Mr. Catizone

20   and Dr. McCann claimed to have been doing in their analysis

21   of the data and the application of red flags for that data?

22   **A**    Yes, this is an illustration that I created.

23   **Q**    Can you explain it to the jury, please?

24   **A**    Sure.  So what this slide is attempting to demonstrate

25   or illustrate is what Mr. Catizone and Dr. McCann claimed to

1   be doing with the dispensing data.  I'm going to use a very

2   common metaphor, and that's something you've probably heard

3   before, separate the wheat from the chaff.

4        Another way of thinking about that is separating the

5   good from the bad.

6        The top blue line represents dispensing data from CVS.

7   As you go down, the red bar, you can think of it as a sieve,

8   is the methodology, the red flagging methodology that

9   Mr. Catizone and Dr. McCann applied to the data.  And in

10  their mind, they have separated the wheat from the chaff,

11  the unflagged versus the flagged.

12       To give you more context in terms of what Mr. Catizone

13  has viewed or has regarded as flagged prescriptions, he has

14  regarded them as not just warning signs, but also as not --

15  or I think he used the word "outside of the usual and

16  customary."  He also used the word that flags are more than

17  likely to have been related to not for medical purpose or

18  for diversion.

19       So these -- so what Mr. Catizone and Dr. McCann have

20  attempted to do is going through the prescription data,

21  applied the methodology and separate the flagged from the

22  unflagged, the good from the bad, or the usual from the

23  unusual.

24  **Q**   Can you take a look at the next slide, Dr. Choi, and

25  explain to the jury what this slide is to illustrate?

1    **A**    So this illustrates the fact that the methodology that

2    ultimately was applied did not properly separate the wheat

3    from the chaff.  It did not separate the usual from the

4    unusual prescriptions.  They applied a flawed methodology.

5    And I think what I talked about before in terms of common

6    sense approach of data analysis, it's common sense that you

7    want to know what you're working with.  You need to

8    understand the context of the data before you start applying

9    methodology.

10        So think of bookends.  The first bookend is "Know what

11   you're working with before you start applying your flags,"

12   flagging methodology, and the other end of the bookend is

13   "You need to check your results."  You need to check your

14   results to ensure that it comports with common sense.

15        Mr. Catizone and Dr. McCann did not do either of those

16   two ends of the data analysis, and in my conclusion they

17   applied a very flawed methodology.  And simply put, they did

18   not separate the wheat from the chaff.

19   **Q**    Would it be fair to characterize, just to use your

20   metaphor here, that the wheat are the legitimate

21   prescriptions that are going to go to -- excuse me -- go to

22   patients in Lake and Trumbull County who have legitimate

23   medical needs for those medications?

24   **A**    That's correct.

25   **Q**    And the chaff are the medications that are not written

1    for a legitimate medical purpose?

2    **A**    That's correct.

3    **Q**    And as I said, we'll get into this in more detail

4    throughout your testimony, but your conclusion is that

5    Dr. McCann and Mr. Catizone failed to actually separate the

6    legitimate prescriptions from the illegitimate

7    prescriptions?

8                    MR. WEINBERGER:  Objection, Your Honor.

9                    THE COURT:  Well, we'll go on the headphones a

10   minute.

11                   (At side bar at 1:47 p.m.)

12                   THE COURT:  All right.  Mr. Bush, the problem

13   is that isn't what they purported to do.  So it's a little

14   unfair to -- I mean, they never said that that's what they

15   were doing.

16                   MR. WEINBERGER:  Yes, Your Honor, it

17   completely mischaracterizes the testimony.

18                   THE COURT:  It does completely mischaracterize

19   the testimony.  Since he wasn't here, if you want to ask him

20   is that's what he thinks they did in their reports, because

21   he's read the reports, you can ask him what you think --

22   what he thinks they did, but I'm going to sustain the

23   objection because it's not a --

24                   MR. BUSH:  Your Honor, I think he's already

25   testified that he believes that they did characterize or

```
 1    Mr. Catizone did characterize what he has separated out here
 2    are prescriptions that are more likely than not to be
 3    diverted, maybe even more strongly than that.
 4                THE COURT:  I'm going to sustain the objection
 5    to the question the way you asked it.
 6                MR. WEINBERGER:  Can you give a curative
 7    instruction, Your Honor?
 8                THE COURT:  I will.
 9                (In open court at 1:48 p.m.)
10                THE COURT:  The jury is to disregard that last
11    question, please.
12    BY MR. BUSH:
13    Q    So Dr. Choi, we'll come back to your opinions, but
14    let's now talk a little bit about your background.
15         First of all, where do you live?
16    A    I currently live in Lafayette, California, which is
17    near San Francisco.
18    Q    Do you have a family?
19    A    I do.  I've been married for 14 years.  My wife,
20    Christi, was a former elementary school teacher, and I have
21    two sons, ages 13 and 10.
22    Q    Have you ever been to Ohio?
23    A    Yeah, several times.
24    Q    Other than coming here today --
25    A    Yes.
```

1    **Q**    -- over the last couple days.

2         Do you have relatives here?

3    **A**    I do.  My sister-in-law lives in Mansfield.

4    **Q**    And you've visited her on more than one occasion?

5    **A**    Yes, more than one occasion.

6    **Q**    And what does she do?

7    **A**    She is a nurse.

8    **Q**    Can you tell the jury what -- a little bit about your

9    educational background, and let's start with college.

10   **A**    Sure.  So I actually -- I grew up in Riverside,

11   California, and I went to undergrad there.

12   **Q**    Where is Riverside?

13   **A**    So Riverside, California, is about 60 miles east of

14   Los Angeles.  It's also known as the smog belt capital.  So

15   the reason -- the reason that's the case is that Los Angeles

16   produces a lot of smog, and because of the air currents, it

17   magically settles over Riverside, California.

18        And one of the saving graces of Riverside, California,

19   is that it does have the University of California system

20   there or school there, and that's where I went for my

21   undergraduate degree.  I received my undergraduate degree in

22   1993 in economics.

23        And then a year later I went to UC Santa Barbara.  I

24   received a master's degree in economics in 1994, with a --

25             (Court reporter interjection.)

1       So I received my undergraduate degree in 1993 in

2  economics.  I then received a master' degree in economics in

3  1994 from the University of California at Santa Barbara,

4  with an emphasis in business and accounting.

5       From there I enrolled in the Ph.D. program at Duke

6  University in the economics department.  Along the way I

7  received a second master's degree in economics, and

8  ultimately my Ph.D. in 1999.

9  **Q**    So after starting out with your education in

10  California, how did you end up at Duke?

11  **A**    Well, aside from Duke having a pretty good basketball

12  team, Duke also had a very good applied economics program,

13  and they also had a very well known health economics

14  program, and it's one of the fields I wanted to study.

15  **Q**    Can you tell the jury what the focus of your Ph.D. was

16  on?

17  **A**    My Ph.D. focus was in the area of healthcare

18  economics, specifically involved medical malpractice and

19  involved combining very large data sets into a malpractice

20  claims data set.  That was something I had to do on my own,

21  along with creating a statistical model to analyze medical

22  malpractice claims data.

23  **Q**    Was your dissertation ultimately published?

24  **A**    Yes, in a peer-reviewed economics journal.

25  **Q**    After you graduated or maybe even while you were still

1   in school did you have any experience teaching college?

2   **A**    I have.  So when I was finishing up at Duke, I did

3   teach undergraduate economics courses at Duke.  Also, I did

4   teach undergraduate economics classes at UCLA through their

5   extension program, from 2008 to 2013.

6   **Q**    So let's look now at your profession.  And I see up

7   here on the slide we have on the screen that you list as --

8   you list that you're the managing director of AlixPartners.

9        First of all, what's AlixPartners?

10  **A**    So AlixPartners is a global consulting firm.  We

11  provide financial services consulting as well as management

12  consulting.  We have offices throughout the U.S., Europe,

13  and Asia.

14       I'm proud to say that we consistently rank as one of

15  the top consulting firms.

16  **Q**    What's your position at Alix?

17  **A**    I am currently a managing director, an equity partner.

18  I'm also the partner in charge or the local market leader in

19  our San Francisco office.

20  **Q**    Did you recently step down from a position at

21  AlixPartners, a management position there?

22  **A**    Yes.  So I founded the economics and statistics

23  practices at AlixPartners.  At one point I was the co-global

24  lead of our economics practice.

25  **Q**    Okay.  How is -- and this is just a general question.

1    I'm not asking for a lot of detail about this, but generally

2    speaking, can you tell the jury how AlixPartners is

3    organized?

4    **A**    Yes.  So we have five distinct business units.  I am

5    part of our Financial Services Business Unit.

6    **Q**    And then you have four other business units; is that

7    right?

8    **A**    That's correct.

9    **Q**    Okay.  Let's turn to a couple of general questions

10   before we get to your opinions here.

11         First of all, in order to evaluate sets of data, in

12   your experience, do you need to be an expert in the industry

13   that the data relates to?

14   **A**    So in my experience, you don't necessarily have to be

15   an expert in the industry.

16   **Q**    Why is that?

17   **A**    Well, you have to familiarize yourself with the

18   industry.  You don't have to be an expert.  Because it

19   depends on the type of questions you're trying to answer,

20   but also the methodology that you typically apply to large

21   data sets is common throughout.  And so you have to

22   certainly ask questions, you certainly have to familiarize

23   yourself, you certainly have to understand what you're

24   working with, but you don't need the industry-level

25   expertise in order to conduct the data analysis.

**Choi - (Direct by Bush)**

1    **Q**    I want to talk again just briefly about some of the

2    projects that you've had the opportunity to work on while

3    you've been at AlixPartners.

4         Did you have the opportunity to work for any

5    Government organization in connection with the analysis of

6    largest sets of data?

7    **A**    I have, yes.

8    **Q**    Could you describe -- well, can you describe what

9    you've done?

10   **A**    Sure.  So I assume many will remember the great

11   financial crisis back in the late 2000s, around 2008.  Part

12   of that financial crisis, some would say, would be the

13   questionable mortgages that were being issued at the time.

14        Based on the questionable mortgages, the Department of

15   Justice launched an investigation of several of the largest

16   financial institutions.  They asked me to assist them with

17   analyzing this voluminous mortgage loan data, to make sense

18   of it, to provide insights from this data set.  And

19   ultimately these investigations led to the largest

20   settlements in U.S. history.

21   **Q**    Now, without identifying any clients or any specific

22   projects, have you had the opportunity to consult on large

23   data projects in other industries?

24   **A**    Yes, several industries.

25   **Q**    Can you give a couple of examples to the jury so that

**Choi - (Direct by Bush)**

1    they have some understanding of the kind of work you've

2    done?

3    **A**    Sure.  So these involved healthcare, insurance

4    companies, financial services companies, video game

5    companies.  One of my more interesting one was a brewery

6    company.

7         So help assisting companies with understanding what's

8    in their data, what the data set can tell them, to help them

9    either in operations or understand how to compete more

10   effectively in the marketplace.

11   **Q**    And were you an industry expert in any of those

12   industries, the brewery industry, the video game industry,

13   insurance, any of those industries?

14   **A**    Well, definitely not the video game industry.  So

15   again, some cases yes, some cases no.  But the methodology

16   that you apply is going to be consistent regardless of the

17   industry.

18   **Q**    Now, some of the engagements that you've had,

19   including some of the ones that you've just described, have

20   those been nonlitigation type engagements where you're

21   simply consulting and trying to help whoever your client is

22   understand what the data is telling them?

23   **A**    That's correct, nonlitigation work.

24   **Q**    And some of it -- you've also had some engagements

25   where you have been engaged in connection with litigation?

 1   **A**     This -- yes, that's correct.

 2   **Q**     And some of the litigation engagements that you have

 3   been engaged in to be a testifying expert like you are here

 4   today?

 5   **A**     I have, yes.

 6   **Q**     And in others have you been engaged not to testify but

 7   just to help evaluate whatever the data may be and that's

 8   involved in that litigation?

 9   **A**     That's correct, yes.

10   **Q**     Now, have you been -- have you actually testified in

11   courts, both federal and state courts, as an expert in these

12   areas?

13   **A**     I have, yes.

14   **Q**     Now, with respect to the work that you've done in this

15   case, how are you being compensated?

16         You are being compensated, right?

17   **A**     That's correct.  So AlixPartners is being compensated

18   for my time.

19   **Q**     And what's the -- are you being compensated or is

20   AlixPartners being compensated or paid for your specific

21   time?

22   **A**     Yes, that's correct.

23   **Q**     And do you have other people who assist -- have

24   assisted you in the work you've done in this case?

25   **A**     I do have a team that assists me, yes.

1    **Q**    And how are they billed?

2    **A**    Hourly as well.  So the hourly rate is between $210

3    and $970 for my staff and $970 for myself.

4    **Q**    And does what AlixPartners get paid and what you are

5    compensated depend in any way on the outcome of this case?

6    **A**    It does not.

7    **Q**    Are you doing work -- excuse me, withdrawn.

8          Have you done some work in connection with this case

9    that does not involve matters that you are going to testify

10   about today?

11   **A**    I have, yes.

12   **Q**    And has that been significant?

13   **A**    It has been, yes.

14   **Q**    All right.  And how much has AlixPartners billed on

15   this case?

16   **A**    Approximately $2.6 million.

17   **Q**    All right.  Let's start to talk about your opinions.

18   Before we get into the details of your opinions, are you --

19   have you reached the opinions that you're going to testify

20   about here this afternoon to a reasonable degree of

21   professional certainty?

22   **A**    I have.

23   **Q**    So anything -- any of the opinions you express today,

24   will you agree with me you will express them to a reasonable

25   degree of professional certainty?

1    **A**    Yes, that's correct.

2    **Q**    Now, so let's start at the beginning.  I think you may

3    have referred to this a little bit already, but when you

4    start a data analytics project, can you explain to the jury

5    what your objectives are?  And I don't mean with respect to

6    any particular client, just in general, what are your

7    objectives?

8    **A**    I think the first thing, one of the first things you

9    want to do is understand what the potential problem is or

10   what the questions are.  Then the next steps are to -- you

11   know, as I said before, this is common sense.  You want to

12   know what you're working with.  You want to see what's in

13   the data set.  You also want to know what is not or what's

14   missing from the data.

15       So you have to familiarize yourself with understanding

16   what's in the data, what the data can tell you, what the

17   data cannot tell you, and then you want to run some either

18   algorithms or statistical analysis on the data set.

19       And again, on the back end it is imperative that you

20   check your results; again, another common sense point, check

21   your results to make sure that they make sense.

22   **Q**    So in this matter or in this engagement, did you start

23   by getting an understanding of what Mr. Catizone and

24   Dr. McCann were trying to do with their red flag analysis?

25   **A**    I did.  And I started with reviewing their expert

1    reports that they produced in this case.

2    **Q**    And can you describe for the jury what you understand

3    they were trying to do?

4         And to be clear here, I think the jury knows this, but

5    you haven't -- you were not present in the courtroom when

6    Mr. McCann -- excuse me, Dr. McCann and Mr. Catizone

7    testified, right?

8    **A**    That's correct.

9    **Q**    And you haven't read the transcript of their testimony

10   here in the trial?

11   **A**    I have not.

12   **Q**    And so your understanding of what they did is based on

13   your review of their expert reports?

14   **A**    That's correct, and their testimony, their deposition

15   testimony.

16   **Q**    And their deposition testimony, okay.

17        So can you tell the jury what you understand from the

18   review of their deposition testimony and their reports in

19   this case what they were trying to do with the red flag

20   analysis.

21   **A**    Certainly.  For CVS, I can start from there.

22        They had dispensing data with respect to the opioids

23   at issue with, with muscle relaxers, benzodiazapine, I'm not

24   sure if I said that correctly, and they had prescriptions --

25   or they had a data set of the prescriptions.  They applied

1    what I called or referred to before after the red flag

2    methodology.

3        So think again of the sieve.  You're taking this data

4    set, you're running it through the sieve, which is their

5    methodology, and out comes prescriptions that are either

6    flagged or unflagged.

7    **Q**    All right.  And the criteria here, was that 16

8    different criteria?

9    **A**    There are 16 different flags, correct.

10   **Q**    Let's take a look at the next slide.

11       Can you tell the jury what information you had

12   available to you and considered in performing your analysis

13   and reaching your conclusions and opinions in this case?

14   **A**    Sure.  So maybe I'll start from the bottom, since I

15   covered this.

16       I did review the expert reports, accompanying

17   documents that were produced by Mr. Catizone and Dr. McCann.

18   I reviewed the documents produced by the parties.

19       As I mentioned before, Dr. McCann and Mr. Catizone

20   have attempted to identify flagged or unflagged

21   prescriptions using dispensing data.

22       This first dispensing data on top is the CVS

23   dispensing data that I used and they used as well.  It

24   covers 14 years of data, from 2006 to 2019.  It includes

25   opioids, benzodiazapine, muscle relaxer medications at

1    issue.  It also includes noncontrolled medications.

2         There's another data set that's referred to as OARRS.

3    It's also listed here.  It has a little bit more of a narrow

4    time period, 2008 to 2018.  It only covers the opioid,

5    benzodiazapine, and muscle relaxers at issue.

6         But the difference between OARRS, one of the

7    differences between OARRS and the CVS dispensing data is

8    that OARRS covers all of the pharmacies for both Lake and

9    Trumbull Counties.

10   **Q**    Okay.  Then I think on your -- the slide here, it also

11   refers to documents that were produced by the parties.

12        Did you refer to those?

13   **A**    Yes, that's correct.

14   **Q**    Would it be accurate to characterize the CVS

15   dispensing data as a large data set?

16   **A**    It is a very large data set.

17   **Q**    And would it be accurate to characterize the OARRS

18   data as a large data set?

19   **A**    Yes, that would be accurate.

20   **Q**    So I think you've said already in general that one of

21   the things you do as a data analyst is to understand the

22   limitations of the data.

23        Did you review this data to understand the limitations

24   that it had?

25   **A**    I did.

1    **Q**    And did you identify any limitations?

2    **A**    There were several limitations, but a critical

3    limitation is the fact that the dispensing data only has

4    limited information.  It doesn't have all of the information

5    that a pharmacist would have at the time of a prescription.

6    I can give you an example.

7         So a pharmacist could have a relationship or be very

8    familiar with a particular patient.  The pharmacist knows

9    that the patient works in Cleveland but lives in Trumbull,

10   so travels more than 25 miles, maybe 40 miles or 50 miles,

11   to see a prescriber.  The pharmacist could know that, but

12   you would never know that from the data.

13        And limitations like that are common in this data set.

14   **Q**    Was another limitation that the pharmacist may know or

15   have information about a prescriber?

16   **A**    Yes, that's correct.  So a pharmacist could be

17   familiar with the prescriber, but, again, that information

18   would not be present in the data set.

19   **Q**    And I don't mean to go through all the different kinds

20   of information that might have been available to a

21   pharmacist or might be available to a pharmacist, but are

22   there other kinds of information that a pharmacist might

23   have that are not in the data?

24   **A**    There could be a number of different issues.  As you

25   can imagine, that there are all different types of issues or

1    circumstances that a patient would have.  There could be a

2    number of circumstances that a pharmacist would know about,

3    but it just would not be available in the data, such as a

4    pharmacist could know that a particular patient is battling

5    cancer.  That may not be known in the data set, and so

6    without that information, it creates a problem.  It creates

7    what could be a large error rate if you're working with that

8    data set, under the assumption that you believe that this

9    data can tell you what the pharmacist was thinking at the

10   time.

11   **Q**    All right.  Let's look a little bit at some of the

12   analyses that you have done in the case using the data,

13   keeping in mind the limitation that you just described.  But

14   you did do some work with the data itself, right?

15   **A**    Yes, that's correct.

16   **Q**    All right.  And did you -- actually, let's just go to

17   the next slide here.

18        This is data related to CVS pharmacies in Lake and

19   Trumbull County, and you saw that's market share.

20        Can you tell the jury what is reflected on this

21   screen, which is CVS-MDL-4352A?

22   **A**    Sure.  This represents the total number of opioid

23   prescriptions from 2008 to 2018 that you see on the left.

24   It identifies it by CVS and other entities, including other

25   nondefendants.  And to the right you have the total for both

1    counties.

2    **Q**    Did you look at this and calculate or estimate what

3    CVS's share of all of the opioid prescriptions dispensed in

4    Lake and Trumbull County is?

5    **A**    Sure.  So that can be calculated.  I didn't do the

6    calculation on the chart, but that can be calculated here.

7         If you take the number at the very bottom, the

8    570,529.

9    **Q**    Where I've got the pointer over?

10   **A**    Right there.

11   **Q**    Okay?

12   **A**    And you divide that number by 3.5 million, it

13   represents -- it calculates a 16 percent.

14        So CVS had 16 percent of the prescriptions for Lake

15   and Trumbull County over this time period.

16   **Q**    All right.  And then you could do the same calculation

17   for the percentage that other -- well, that other

18   nondefendants have, which is the column right next to the

19   total?

20   **A**    Correct.  So there are actually -- you see three

21   columns of nondefendants, but if you're focusing just on the

22   other nondefendant, which is the column furthest to the

23   right next to the total.

24   **Q**    Right here?

25   **A**    That 881, if you take that divided by the total, is 25

1    percent.  So the other nondefendants represent 25 percent of

2    the prescriptions that were dispensed.

3        If you then add in let's say Rite Aid, Rite Aid is

4    about 17 or 18 percent.  If you add that to the 25 percent,

5    you're at 43 percent.

6        So the last two columns -- I'm sorry, the

7    second-to-last two columns, Rite Aid and nondefendants, that

8    comes out to about 43 percent of the prescriptions.

9        And if you add Giant Eagle, that's another 16 percent.

10   I'm sorry I'm throwing a lot of numbers at you.  I

11   apologize.  But if you add Giant Eagle, that's another 16

12   percent.

13       So the three nondefendants account for almost 60

14   percent, six zero, 60 percent of the prescriptions over this

15   time period.

16   **Q**    All right.  Did you also -- and the jury has heard

17   actually a lot in this trial about MMEs.  Did you also

18   calculate the CVS market share measured by MMEs?

19   **A**    I did, yes.

20   **Q**    And let's take a look at this slide, which is Exhibit

21   4363A.

22       Does this reflect the analysis you did?

23   **A**    It does.  And so what we can see from this data is

24   CVS -- I just compared CVS against all pharmacies.

25       And what it shows here, from 2008 to 2018, when

1    measured by MMEs, the market share falls from 16 percent to

2    12 percent.

3    **Q**    All right.  And what's your explanation for why the

4    market share measured by MME would be smaller than the

5    market share measured by prescriptions?

6    **A**    Sure.  So when you see a fall from 16 percent, as

7    measured by prescriptions, and it falls to 12 percent by

8    MMEs, what this is saying is that for CVS, relative to the

9    rest of the market, its MMEs per prescriptions are generally

10   lower.

11   **Q**    And why is that significant to you?

12   **A**    Well, MMEs are, again, one way of thinking about MMEs

13   is that they measure potency or strength, and they're more

14   likely -- the higher the MME, the higher the likelihood of

15   diversion.

16              MR. WEINBERGER:  Objection, Your Honor.

17   There's -- can we go on the --

18              (At side bar at 2:12 p.m.)

19              MR. WEINBERGER:  Your Honor, the reason for my

20   objection is he's a data analyst.  He has no knowledge about

21   connection between the dose --

22              THE COURT:  Yeah, I tend to agree.

23              MR. BUSH:  Your Honor, can I be heard, please?

24       So as he's testified, I think, and he will continue to

25   testify to this throughout his testimony, that although he's

**Choi - (Direct by Bush)**

```
1    not an industry expert when he is doing a project like this

2    or the consulting projects that he has testified about, he

3    learns things that he takes into account when he's figuring

4    out what he wants to do in a data analysis.

5         So this is something he understands.  Frankly, it's

6    been testified to in the case.

7                   THE COURT:  I agree.

8                   MR. BUSH:  So it's not exactly controversial,

9    but it's also relevant to what --

10                  THE COURT:  He made the chart.  He can explain

11   what MMEs are, I mean, so --

12                  MR. BUSH:  But he also needs to be able to

13   explain why it's important to his data analysis.  That's

14   what he does as an expert.

15                  MR. WEINBERGER:  No, what he testified is the

16   higher the likelihood of diversion.  He is not an expert --

17                  THE COURT:  So he doesn't know, Mr. Bush -- he

18   knows what an MME is.  He can say you use MME so you can

19   get -- you know, you can compare different prescriptions,

20   it's a common denominator.  I think he knows that and he put

21   it on his chart.

22                  MR. BUSH:  Right.

23                  THE COURT:  But he doesn't know anything about

24   which pills are more likely to be diverted.

25                  MR. BUSH:  Well, maybe that wasn't the best
```

1    way for him to frame what he does know, but he does know

2    things about what -- anyway, I'm willing to move on.

3                    MR. WEINBERGER:  He doesn't have the expertise

4    to connect --

5                    THE COURT:  All right, I'm just going to --

6                    MR. WEINBERGER:  -- dosage.

7                    THE COURT:  I'm just going to ask the jury to

8    disregard the last answer.

9                    (In open court at 2:14 p.m.)

10                   THE COURT:  The jury is to disregard the last

11   answer by Dr. Choi.  Thank you.

12   BY MR. BUSH:

13   Q    So let me ask you to take a look at the next chart on

14   the screen here, which is CVS-MDL-4967.

15        Do you see that?

16   A    Yes.

17   Q    And was this something that was prepared, a chart that

18   was prepared under your direction?

19   A    Yes, that's correct.

20   Q    And does it reflect an analysis that you've done?

21   A    Yes.

22   Q    Okay.  Can you explain to the jury what this is

23   showing?

24   A    So this measures across a number of stores.  You can

25   see a number of pharmacies on the bottom.  CVS is to the

1   right with the number 375 in lighter shade of blue.

2        This represents median MME per prescription.  And

3   before I --

4   **Q**    Explain to the jury, some of whom may have forgotten

5   from their math class, what the difference is between median

6   and mean?

7   **A**    So median would be the middle point.  So we have a

8   number of lawyers in here.  If you asked all the lawyers to

9   stand from shortest to tallest, whoever is in that middle

10  would be the median height.

11       For every pharmacy that I have represented here, I

12  looked at the MME per prescription across the board, and

13  whatever the middle prescription was is what's reflected

14  here.

15       So for CVS you see 375 MME for the prescription, not

16  per day but for the prescription.

17       If you look at to the left you see Anthony's and

18  Champion Discount Pharmacy, the median MME is in excess of

19  1600.

20       So if you looked at all the prescriptions let's say

21  for Champion, the median, the middle MME per prescription is

22  1600.

23  **Q**    Let me direct your attention to the right-hand end of

24  your chart here.  And there's an entry for Target.

25       You see that?

1   **A**      Yes.

2   **Q**      And are you aware that at some point during the time

3   period that's involved in this case that Target stores were

4   acquired by CVS -- or that's not really the right way to put

5   it -- that CVS began operating pharmacies in Target stores?

6   **A**      Yes, that's correct.

7   **Q**      And what time period does this Target line apply to?

8   Prior to the CVS operating the pharmacies or afterwards, or

9   both?

10  **A**      It would be prior to.

11  **Q**      Okay.  Thank you.

12          All right.  Let me ask you to look at some other data

13  analyses that you've done.

14          Did you do an analysis that took into account DEA

15  production quotas?

16  **A**      I did, yes.

17  **Q**      Okay.  And does this chart that's Exhibit

18  CVS-MDL-4328A reflect that analysis?

19  **A**      Yes.

20                  MR. WEINBERGER:  Objection, Your Honor.

21                  (At side bar at 2:17 p.m.)

22                  THE COURT:  All right.  What's the objection?

23                  MR. WEINBERGER:  This is based upon his

24  sources, DEA quotas, and when he went through what his

25  reliance materials were, I didn't see that mentioned

1    anywhere in his reliance materials.

2                    THE COURT:  I assume this is in his report.

3    You deposed him.  I mean, if it's in his report, then he --

4    I mean, he can -- if it's in his report and he relied on

5    DEA -- published DEA statistics, he can talk about it.  I'm

6    not sure what -- how he ties it to his conclusions, but --

7                    MR. BUSH:  He'll explain that, Your Honor.

8                    THE COURT:  All right.  Well, overruled.  You

9    can ask him about it.

10                   (In open court at 2:18 p.m.)

11   BY MR. BUSH:

12   Q    Dr. Choi, can you explain again, just in general terms

13   so the jury understands it, what a DEA production limit is?

14   A    So the DEA for a given year sets manufacturing limits

15   or caps for a particular chemical.  What I have here on this

16   graph is for oxycodone and hydrocodone from 2003 to 2018.

17       And so it's what the DEA has determined for legitimate

18   purposes, and these are, again, their -- what the DEA has

19   set for production limits or manufacturing limits.

20   Q    All right.  And did you do the calculation that's

21   reflected on the next slide, which is CVS-MDL-4346A?

22   A    I have, yes.

23   Q    And what does that reflect?

24   A    So this is the number of opioid prescriptions that

25   were filled at CVS pharmacies from 2006 to 2019.

1    **Q**     Did you compare this analysis to the previous

2    analysis?

3    **A**     Yes, a comparison can be done.  And if you go back to

4    the prior slide, I think one of the key takeaways from the

5    DEA production limits is you can see from starting from 2003

6    all the way through 2013 for both hydrocodone and oxycodone,

7    there is an increase.  There is a positive increase, not

8    every year, but generally a positive increase from 2003 to

9    2013.

10          For hydrocodone, not only is it at its peak in 2013,

11   it stays at its peak all the way through 2015 before

12   declining at a steeper rate.

13          For oxycodone, the peak is at 2013 with a gradual

14   decline until 2015, then you start seeing a steeper decline.

15          But the key point is that there was a trend, an

16   increasing trend over time.

17          As for comparison to the opioid prescriptions for CVS

18   on the next slide, so you do see an increasing trend, but

19   where there is a difference is starting in 2012 --

20   **Q**     Just right where I put the pointer?

21   **A**     Correct.  That's where CVS was at its peak.  So

22   starting in 2013, the number of prescriptions for CVS starts

23   to decline.

24          Now, without having to -- you can go back to the prior

25   chart, but in 2013 for the production limits, it still

1   continued in 2013.

2        So what you're seeing is starting in 2013 a separation

3   between what CVS is doing and what the DEA is setting in

4   terms of its production limits.

5        So in 2013, it's going up for the DEA.  Starting in

6   2013, this is going down for CVS.  And then by the time you

7   get to 2017, the number of prescriptions are actually lower

8   than what they were in 2006, and then in 2019 much lower

9   than what they were in 2006.

10  **Q**    All right.  Did you do an analysis of the percentage

11  of prescriptions -- let me withdraw that and reframe it.

12       Did you do an analysis that compared noncontrols to

13  controlled medications dispensed by CVS?

14  **A**    I did, yes.

15  **Q**    All right.  Can we take a look at the next slide,

16  which is CVS-MDL-4340.

17       And would you explain to the jury what's reflected on

18  this -- on this table?

19  **A**    Sure.  So this is for Lake County.  There are nine CVS

20  stores.  I broke it down between prescriptions and dosages,

21  but as you can tell just by eyeballing it, that the

22  percentages are similar whether you use prescriptions or

23  dosage units.  So I'll just stick with prescriptions.

24       So if you go in the middle here, I've broken it into

25  two columns, controlled and noncontrolled.  And what you're

1    seeing here is that across the nine stores for controlled,

2    it is generally less than 14 percent.  And then for

3    noncontrolled, it is 86 percent or higher.  In some cases,

4    some stores, the controlled actually represents less than 10

5    percent, and the noncontrolled represents more than 90

6    percent.

7         So one of the takeaways that you see here is that the

8    vast majority of the prescriptions for CVS are for

9    noncontrolled drugs.

10   **Q**    Do you have an understanding of what medications are

11   included in the controlled category?

12   **A**    Yeah, so those are the medications covered under the

13   Controlled Substance Act, so they would include opioids,

14   benzodiazapine, ADHD medications would be included.  For

15   noncontrolled, it would be for high blood pressure,

16   diabetes, high cholesterol type medications.

17   **Q**    So controls include opioids but also things other than

18   opioids?

19   **A**    That's correct.  So if you only focus on opioids,

20   these percentages you see under the controlled would

21   actually be lower.

22   **Q**    We'll look at that in a second, but let's go to the

23   next slide.

24        Does this reflect a similar analysis in Trumbull

25   County?

1    **A**    That's correct.  So what you're seeing with Trumbull

2    is similar.  I won't go into all the detail, but I think the

3    takeaways are the same.

4         Here 15 percent are lower for controlled.  Opioids are

5    a subset of the controlled, so they would be lower.  And the

6    vast majority of the prescriptions by the CVS stores in

7    Trumbull are for noncontrolled drugs.

8    **Q**    If I ask you to assume that the DEA has indicated a

9    percentage of controlled dispensing less than 20 percent is

10   that threshold -- below that threshold, is something that

11   they don't believe is a matter of concern; and I'm asking

12   you to assume it --

13              MR. LANIER:  And Your Honor, I'll object to it

14   already.

15              MR. BUSH:  Let me finish, please.

16              THE COURT:  Let me hear the question.

17   **Q**    If I ask you to assume that, is that something that in

18   your role as a data analyst you would find significant in

19   looking at these figures that you just testified about?

20              MR. LANIER:  Objection.

21              THE COURT:  I'll sustain that.

22              MR. BUSH:  Your Honor, could we go to the

23   headphones, please?

24              THE COURT:  All right.

25              (At side bar at 2:24 p.m.)

1    MR. BUSH:  I asked to him to assume it

2  obviously because he's an expert.  And I think, Your Honor,

3  maybe I haven't done a good job of bringing out what he

4  does, but as a data analyst, he gets information, I tried to

5  establish this up front, from other sources that he may not

6  have direct knowledge about, but it helps him -- it helps

7  him -- it helps put in perspective what his analysis is and

8  what kinds of conclusions he thinks can be drawn from the

9  date.

10    This is actually a fundamental, I don't mean this

11  particular point, but this kind of perspective is kind of a

12  fundamental part of his opinion.  He's saying when you look

13  at data sets, you learn information from your client, you

14  learn information from other people, and when you look at

15  the data, it helps you determine what you can find out from

16  it.

17    THE COURT:  Mr. Bush, you don't need an

18  expert; obviously 8 percent, 12 percent, is less than 20

19  percent.

20    MR. BUSH:  Right, but the 20 percent isn't in.

21  If I don't ask him to assume it, he can't draw the

22  conclusion for the jury.

23    THE COURT:  He can't draw any conclusion

24  because he doesn't have the expertise.  He can draw a

25  conclusion that 12 percent is less than 20 percent, but the

1    jury knows that.

2              MR. LANIER:  And that's the key, Your Honor,

3    because the testimony from Rannazzisi on this was not that

4    20 -- less than 20 percent is safe.  It was that less than

5    20 percent doesn't trigger the DEA's knowledge.

6         So for Mr. Bush to take this a step further and argue

7    that this is a hypothetical where the DEA says it's safe,

8    that's just wrong, and this man doesn't have the expertise.

9              THE COURT:  He doesn't have the expertise to

10   say what the 20 percent signified.  Obviously, 12 percent's

11   less than 20 percent.  Anyone can see that and you can argue

12   that.

13             MR. BUSH:  Right, but, Your Honor, my point is

14   I asked him to assume it.  It's not his expertise to say

15   that 20 percent is the right number.  It is his expertise to

16   say that if I knew that 20 percent was the right number,

17   that would be relevant to how I look at this data.

18        That's what he's testifying to.  I asked him to assume

19   it.

20             THE COURT:  But he doesn't know what the 20

21   percent is, and I think even that was skewed.

22             MR. LANIER:  And that's my objection.  Thank

23   you.

24             THE COURT:  I'm going to sustain the

25   objection.

1              (In open court at 2:27 p.m.)

2              MR. BUSH:  Your Honor, I'm sorry, let me go to

3     the headphones again because I don't want to violate your

4     rule.

5              THE COURT:  All right.

6              (At side bar at 2:27 p.m.)

7              MR. BUSH:  I was going to ask him the question

8     the way Mr. Lanier asked it, that if he assumes that 20

9     percent is below a level that -- if it's below 20 percent,

10    it's below a level that causes the DEA concern.  If that's

11    acceptable to him, I'll ask it as an assumption.

12             MR. LANIER:  That's not it either.

13             THE COURT:  But then what is the question?

14             MR. BUSH:  The question is if he -- if he

15    assumes that that is what the DEA considers something that's

16    not a concern, would that have informed his evaluation of

17    the data, how he looks at it.

18             THE COURT:  Wait, hold it.  The numbers are

19    the numbers.  He didn't evaluate the data.  I mean, he did

20    the math.  He crunched the numbers, and this is what he got,

21    and it shows what it shows.

22             MR. BUSH:  He did more than that because he is

23    going to testify that this perspective helps him evaluate

24    whether the ultimate decisions that Catizone and McCann made

25    really make sense.  This is big picture perspective for

 1    whether they make sense.

 2                    MS. FUMERTON:  Your Honor, if I may jump in

 3    for a second just because --

 4                    MR. LANIER:  This isn't your witness.

 5                    MS. FUMERTON:  This issue is going to come up.

 6    There is a witness, DEA witness, who testified in this case

 7    about the 20 percent figure.  To the extent the experts

 8    relied on that testimony, I think that they are entitled to

 9    be able to mention that --

10                    THE COURT:  Hold it.  But this witness is not

11    opining.  He has no expertise to talk about what the DEA

12    does or doesn't do.

13                    MS. FUMERTON:  Your Honor --

14                    THE COURT:  The math is the math, all right?

15    He analyzed the prescriptions.  You got it.

16                    MS. FUMERTON:  But it's exactly similar to how

17    Dr. McCann applied Catizone's red flags.  Dr. McCann didn't

18    have the expertise to identify what is now in this red flag,

19    but he took the assumption of, you know, what is a red flag,

20    and he applied it to the data and said this is what they

21    get.

22                    MR. WEINBERGER:  No, that is not true.

23                    THE COURT:  All right.  It doesn't equate.  I

24    am not going to let -- Mr. Bush, you're asking him to draw

25    some conclusions for the DEA about -- from this data.  He

1    can't do that, or opine on whether this is what the DEA

2    meant when they set the 20 percent target.  He doesn't even

3    know that they set a 20 percent target.

4                MR. BUSH:  Actually, I'm not asking him to

5    opine on what the DEA said.  I'm asking him to assume what

6    the DEA said and whether that would inform his evaluation of

7    this data.

8                THE COURT:  What do you mean "inform the

9    evaluation of this data"?

10               MR. BUSH:  He is evaluating whether this data,

11   he does these calculations and then he looks at what

12   McCann --

13               THE COURT:  He doesn't have knowledge of this

14   industry.  He doesn't know what this signifies.

15               MR. BUSH:  As you know, Your Honor, because

16   you heard his testimony, he can form opinions as a data

17   analyst without being an expert in the industry.  He learns

18   information from whatever industry he is engaged by clients

19   to do his work in.

20               MR. WEINBERGER:  Frankly he cannot testify to

21   any opinions with respect to Catizone's analysis either

22   because he's not a red flag expert.  I mean, he can talk

23   about whether he agrees or disagrees with McCann's analysis

24   of the data.

25               THE COURT:  Right, he can -- exactly.  He

 1   can't say whether he thinks McCann's 16 red flags overstate

 2   things and it should be 10 or 11, or should be 20.

 3              MR. BUSH:  He certainly can, Your Honor.  And

 4   it's been in his report, and the plaintiffs did not file a

 5   *Daubert* motion on it.  And for them to bring it up now is

 6   just out of bounds.

 7              THE COURT:  I'm sustaining the objection to

 8   this question.  I'm not saying there's not any question you

 9   can't ask him more on this chart, but he has --

10              MR. BUSH:  So the question that -- I came back

11   down here because I wanted not to, you know, step over the

12   line.

13              THE COURT:  All right.

14              MR. BUSH:  And just to be clear, the question

15   I was going to ask was, to adopt Mr. Lanier's version of

16   this is, "Was 20 percent below what the DEA finds a matter

17   of concern."

18              MR. LANIER:  And that is not my opinion.  That

19   is not right.  He can just do the math.  Let him bring in a

20   DEA person to say 20 percent and draw those conclusions.

21      This guy is a data analyst.  This is why we had to put

22   on Carmen Catizone and not just McCann.  You've got to have

23   someone qualified and competent.  You're the gatekeeper.  I

24   don't have to file a *Daubert* motion on this.

25              MR. BUSH:  Of course you do.  He has put it in

1    a report, and he has said this is how I do it in my

2    profession.  I look at data, I learn what I need to know

3    when I look at the data to be able to help my clients

4    understand what the data really can tell them.

5         And Catizone has put up some red flags, but whether

6    those really tell anybody very much about anything is

7    something he is qualified to testify about.  And it's in his

8    opinion, it's in his report.

9              THE COURT:  I'm not sure.  I'm not sure he is.

10   I haven't heard any such testimony.

11        He's basically a statistician, all right, he crunches

12   numbers.  And he can certainly say that someone else's

13   methodology is flawed because it's under-inclusive or

14   over-inclusive, and that was the wheat versus chaff.  He's

15   absolutely qualified for that.  But he can't say, well, you

16   know, 12 percent is safe and 20 percent's not.

17             MR. BUSH:  No, he is not saying whether it's

18   safe or not.

19             THE COURT:  Well, what exactly is he going to

20   say?

21             MR. BUSH:  Right now he's not saying anything

22   about that.  We're just at the very preliminary stage.  But

23   this is all information that if you were looking at the data

24   from his perspective as the data analyst you would want to

25   know about to evaluate whether the methodology that McCann

**Choi - (Direct by Bush)**

1  and Catizone have come up with is reliable.  But this is

2  just background.

3                   THE COURT:  Hold it.  There is absolutely

4  nothing about that DEA 20 percent that's necessary to

5  determine if McCann and Catizone are reliable or not.

6        So, I'm sustaining the objection to the question you

7  asked.

8                   MR. BUSH:  All right.  Thank you, Your Honor.

9                   (In open court at 2:33 p.m.)

10  BY MR. BUSH:

11  **Q**     Let me figure out exactly where we are here, Dr. Choi.

12        So I think this is just a little bit of housekeeping,

13  but if I ask you what's reflected on CVS-MDL-4339, can you

14  tell the jury what that is?

15  **A**     Sure.  This is a summary of the prior two slides.  You

16  can see at the very bottom here Lake and Trumbull County,

17  the number is 12.7 percent and 87.3 percent.  That is the

18  percentage of controlled versus noncontrolled across the two

19  counties over that time frame.

20        And again, what this represents is that the vast

21  majority of the prescriptions for CVS is mostly for

22  noncontrolled or is 87.3 percent for noncontrolled.

23  **Q**     All right.  Let me ask you to take a look at the next

24  slide, which is CVS-MDL-4342A.

25        Do you see that?

1    **A**      Yes.

2    **Q**      All right.  And is this -- this is a slide that was

3    prepared by you or under your direction?

4    **A**      Correct.

5    **Q**      And can you tell the jury what is -- what this lower

6    bar on the left with the number 701,467 represents?

7    **A**      Sure.  That represents the number of prescriptions for

8    the opioid medications.

9           So as I said before, in the prior slides you saw for

10   controlled prescriptions, opioid prescriptions would be a

11   subset of that, would be a smaller percent, and that's

12   what's reflected here.

13          And so for a point of comparison between the

14   noncontrolled and the opioid medications, that blue bar on

15   the right to the noncontrolled is about 18 times larger than

16   the opioid medications just in the number of prescriptions.

17   **Q**      All right.  What is reflected on this slide, which is

18   CVS-MDL-4335A?

19          And actually before I ask you what's reflected on it,

20   is this a chart that was prepared by you or under your

21   direction or at your direction?

22   **A**      Yes.

23   **Q**      Okay.  Can you describe what's on this chart?

24   **A**      So for Lake and Trumbull Counties, this is simply the

25   number of prescriptions for noncontrolled over time.  And

**Choi - (Direct by Bush)**

1    one of the takeaways that you can see from 2006 to 2019 is

2    an increase in the number of noncontrolled prescriptions for

3    the two counties, again peaking in 2018.

4         So starting in 2006, about 800,000, peaks near 1.2

5    million by 2018.  So it's an increasing trend across the two

6    counties over that time period.

7    **Q**    All right.  Let's take a look at the next slide,

8    CVS-MDL-4346A.

9         Was that prepared by you or at your direction?

10   **A**    That's correct.

11   **Q**    And what does that reflect?

12   **A**    This is a -- I presented this previously.  This is the

13   opioid prescriptions over time from 2006 to 2019.  Again,

14   one of the takeaways is that starting in 2013 you start to

15   see a decline.  So comparing that to noncontrolled, where

16   you start to see -- where you continued to see an increase,

17   for opioid prescriptions you are starting to see a decline

18   in 2013, and it gets steeper and steeper all the way through

19   2019.

20   **Q**    And does this slide, which is CVS-MDL-4968, combine

21   the two previous slides?

22   **A**    It does.

23   **Q**    And what's your takeaway from comparing these two

24   lines, the opioid prescriptions to noncontrolled medications

25   in the --

1          MR. WEINBERGER:  Objection.

2          MR. BUSH:  Sorry?

3          MR. WEINBERGER:  Objection.

4          THE COURT:  I'm going to sustain that.

5    **Q**    Do you have a conclusion from looking at these two

6    lines together?

7    **A**    There are two -- at least two conclusions you can draw

8    from looking at the two lines together from a data

9    standpoint.  One is that --

10         MR. WEINBERGER:  Objection, Your Honor.

11         THE COURT:  If he's looking at the data and

12   looking at the statistics, he can testify to that.  I don't

13   know what you're going to say though.

14         THE WITNESS:  I was going to simply say, one

15   issue is scale.  So the green line, which represents

16   noncontrolled, is substantially larger, and the other one is

17   trend.  So the green line continues to go up over time, up

18   until 2018, whereas the blue line, which is the opioid

19   prescriptions, as you saw in the prior charts, did go up,

20   but then in 2013 started to decline.

21         So again, the separation in trend between

22   noncontrolled and opioid prescriptions.

23   **Q**    All right.  Thank you, Dr. Choi.

24         Can we look at this next slide?  This is

25   CVS-MDL-4337A.

1              Was this table prepared by you or at your direction?

2     **A**     Yes, it was.

3     **Q**     And can you explain to the jury what you are

4     illustrating with this slide?

5     **A**     So I can focus you on the bottom, which is the per

6     capita calculation.  And the way that's calculated is taking

7     into account the annual number of noncontrolled, in this

8     case dosage units, take the average amount over those --

9     over that period, divide it by the population for both

10    counties, about 440,000, to get to a per capita number, or

11    per person number.

12             And that means that the 132 that you see at the very

13    bottom, that's 132 dosage units per person for Lake and

14    Trumbull County, for noncontrolled prescriptions.

15    **Q**     All right.  And then you have this line, Dr. McCann's

16    annual oxycodone and hydrocodone DU -- is that dosage unit?

17    **A**     Yes.

18    **Q**     -- per capita?

19    **A**     Correct.

20    **Q**     And what's that number?

21    **A**     That number was calculated by Dr. McCann.  And this is

22    a comparison between for noncontrolled against the oxycodone

23    and hydrocodone per capita that was calculated by

24    Dr. McCann.

25    **Q**     All right.  Let's move on to -- well, actually,

1    let's -- can you summarize what the analyses that you've

2    just testified about are showing?

3    **A**    Sure.  So I may need to refer back to what I said

4    before about appropriate data analysis.

5         And again, understanding for in this case the

6    dispensing data, what information is actually in the data to

7    help you think about other -- when you apply let's say rules

8    or algorithms to it to provide perspective.

9         And so what we saw from the dispensing data at CVS and

10   OARRS is CVS accounts for about 12 percent of the MMEs

11   across the two counties.  Other pharmacies account for a

12   much larger percentage in aggregate.

13        As we saw, CVS in terms of trend, the opioid

14   medications were starting to decline starting in 2013,

15   breaking away in terms of trend from the DEA production

16   limits and also noncontrolled prescriptions.

17        And the other thing that we saw when I did the

18   comparison between controlled versus noncontrolled, the vast

19   majority of the prescriptions are for noncontrolled.

20   **Q**    All right.  Thank you.

21        Let's move on to Mr. Catizone's and Dr. McCann's red

22   flags.

23        And before we get started, do you have an opinion

24   whether Mr. Catizone and Mr. McCann have validated the red

25   flag methodology that's used for identifying prescriptions

1    that may not have been written for a legitimate medical

2    purpose or may be diverted?

3                    MR. WEINBERGER:  Objection, Your Honor.

4                    THE COURT:  Let's go on the headphones again.

5                    (At side bar at 2:42 p.m.)

6                    THE COURT:  Mr. Bush, I don't understand the

7    question.  And I don't -- I don't believe this witness has

8    the expertise to say what should or shouldn't be a red flag.

9    So if that's the question that you're asking, I'll sustain

10   it.  But I don't understand the question, but if that's it,

11   then I'm sustaining it.

12                   MR. BUSH:  That's not the question, Your

13   Honor.

14                   THE COURT:  What is it?

15                   MR. BUSH:  There's a methodology that's been

16   used in the case that's been developed in combination by

17   Mr. Catizone and Dr. McCann to quantify the number of

18   prescriptions that were, you know, call them red flags,

19   should have been investigated, should have had due

20   diligence, and should have had documentation.  And what

21   Mr. -- what Dr. Choi is testifying about is whether that

22   methodology is valid from a data perspective.  Can you

23   take -- assuming Mr. Catizone's red flags are correct, can

24   you take them and really identify that from the data.

25        Mr. Catizone --

1          THE COURT:  Then this is how you've got to do

2    it.  You have to ask him do you know what methodology McCann

3    and Catizone used, what was it.  So what was it and do you

4    have an opinion based on your expertise whether that

5    methodology was valid.  And if he says no, then you can ask

6    him to explain why he thinks their methodology's faulty.

7          MR. BUSH:  All right.  That's fine, Your

8    Honor.

9          (In open court at 2:44 p.m.)

10         MR. BUSH:  One second, Your Honor.

11   **Q**    So Dr. Choi, let's start with the question of whether

12   or not you have examined -- actually, let's start even

13   before that.

14        Have you taken steps to understand the methodology

15   that Dr. McCann and Mr. Catizone used in order to quantify

16   the red flags that they believe they found in the data

17   representing prescriptions that were potentially

18   illegitimate or would potentially be diverted?

19   **A**    I understand the methodology.

20   **Q**    All right.  And have you -- do you have an opinion on

21   whether that methodology was valid and reliable to

22   accomplish that?

23   **A**    In my opinion, the methodology from a data analysis

24   standpoint was flawed.  I believe that it's not -- doesn't

25   yield a reliable conclusion regarding what -- you know, my

1   analogy or metaphor of separating the wheat from the chaff,

2   it does not provide a reliable conclusion in properly

3   separating these prescriptions.

4   **Q**    So I want to ask you, in general before we get into

5   some other parts of your testimony, what the bases for that

6   conclusion.

7        Is one of the bases -- let me ask it this way.

8        As you reviewed the reports of Dr. McCann and

9   Mr. Catizone, did you see anything in those reports that

10  suggested they had done anything to try and validate the

11  methodology that they used?

12  **A**    I did not see anything in their documentation where

13  there was validation.

14  **Q**    All right.  And did you see anything in their reports

15  that indicated to you that they had taken into account what

16  you testified to earlier, that there is information that

17  would be relevant to this decision that a pharmacist might

18  make that isn't in the data?

19                MR. WEINBERGER:  Objection.

20                THE COURT:  Sustained.

21  **Q**    Did you take into account in reaching this opinion

22  that there was information that was not in the data and that

23  was a limitation of the data set?

24                MR. WEINBERGER:  Objection.

25                THE COURT:  Let's --

1          (At side bar at 2:47 p.m.)

2          THE COURT:  Mr. Bush, you got out that he has

3    an opinion that it was wrong, that it doesn't separate the

4    wheat from the chaff.  Why don't you ask him to explain that

5    conclusion?

6          MR. BUSH:  Why wouldn't an expert explain the

7    opinion?  That's what experts do all the time.

8          THE COURT:  That's what I'm saying, why don't

9    you ask him to explain his conclusions.

10         MR. BUSH:  So you don't want me to be leading

11   him?  If that's the objection, I can deal with that.  I just

12   don't know if that's the objection.

13         THE COURT:  I just don't understand -- I don't

14   understand a lot of these questions.  He's given his

15   opinion.  He says "I believe that the methodology they used

16   was flawed.  It doesn't adequately separate the wheat from

17   the chaff."

18      Just let him explain his conclusion and how he got to

19   it.  That's fine, I'll let him do that.

20         MR. BUSH:  Okay.  That's fine.

21         (In open court at 2:47 p.m.)

22   BY MR. BUSH:

23   **Q**    Can you explain for the jury what some of the other

24   bases are for the opinion that you've already expressed that

25   the methodology was not valid or reliable?

**A**      Sure.  So maybe referring back to what I talked about
before in terms of what I believe are appropriate data
analysis methodologies but also fits with common sense:
Understand what the limitations of the data are, understand
what the data can tell you; then you can apply your
algorithms or statistical methods on top of that, and then
on the back end check the results, check to see if they make
sense.  These are, again, very common sense things that you
don't have to be a data scientist to even understand that.

         What was lacking in Mr. Catizone and Dr. McCann's
methodology is even on the back end, I didn't see anything
in the documentation where they checked to see if their
results made sense, whether they validated the results that
they got.

         On the front end, what the information is, what are
you working with, I did not see in the documentation that
they fully appreciated the limitations of this data.

         Now, there is some language that Mr. Catizone said
that he recognizes that the data doesn't capture what the
pharmacist is actually seeing.  But rather than addressing
that, rather than looking into that, it was just
acknowledged and then they just went through with the red
flag methodology.

         That is not reliable methodology to analyze data.

                    MR. WEINBERGER:  Objection.  Move to strike.

1          THE COURT:  Overruled.

2     **Q**    So Dr. Choi, did you have -- did you take the

3     opportunity to evaluate from the data some of the red flags

4     that this methodology produced, or produced numbers for, I

5     guess is the way to put it?

6     **A**    I have, yes.

7     **Q**    All right.  So let's -- let me ask you to take a look

8     at the -- hold on a second.

9               MR. BUSH:  Excuse me, Your Honor.

10    **Q**    Is this -- are these pie charts, were these pie charts

11    prepared at your direction or by you?

12    **A**    Yes.

13    **Q**    Okay.  And was this one of the analyses that you

14    performed to evaluate the flags, the number of flags, and

15    for each of the flags that were calculated by Dr. McCann

16    based on Mr. Catizone's description of the red flags?

17    **A**    Yes, they are.

18    **Q**    And can you tell us or tell the jury what these three

19    pie charts represent?

20    **A**    Sure.  This is three separate ways of looking at the

21    results from Mr. Catizone and Dr. McCann's methodology.

22               So on the left, just in the number of prescriptions,

23    if you apply the -- again, the Catizone McCann methodology

24    to the prescriptions, you will see that 21 percent get

25    flagged.  That's one in five opioid prescriptions or --

**Choi - (Direct by Bush)**

1    again, if you include benzodiazapine and muscle relaxers,

2    but one in five prescriptions get flagged.

3        If you can look at it from a prescriber basis, 37

4    percent of the prescribers are flagged.  That's more than

5    one in three prescribers are getting flagged.

6        And let me remind you as to how Mr. Catizone in his

7    report has described the flagged:  Not just a warning sign,

8    outside of the usual and customary, more than likely or

9    likely to be diverted or fraud, or be abused.

10        So he is essentially saying from his results, more

11    than one in three prescribers are writing prescriptions that

12    have that characteristic.

13            MR. WEINBERGER:  Objection.  Move to strike.

14    Mischaracterization of --

15            THE COURT:  Hold it, hold it.

16        Yeah, let's go on the headphones again.

17            (At side bar at 2:52 p.m.)

18            THE COURT:  The problem is I don't think that

19    Catizone said this, that the -- that there was more than a

20    warning sign, outside of the usual and customary, more than

21    likely, or likely to be diverted, be fraud, or be abused.

22        He said there were red flags that needed to be looked

23    at before filling.  That's what his definition of a red flag

24    was.  So the problem is the way this witness

25    mischaracterized Catizone.

1      Again, if he -- what he said at first is fine.  He can

2   testify that he sees problems on the front end and problems

3   on the back end from the way they used the data.  That's

4   what he -- that's what his expertise is, is data analysis,

5   and he can explain why he thinks there were problems on the

6   front end and the back end.  But here he's mischaracterizing

7   what they did, and he has no idea and no expertise as to

8   what pharmacists do or don't do.

9                   MR. BUSH:  All right, Your Honor.

10                  (In open court at 2:54 p.m.)

11                  THE COURT:  The jury is to disregard the last

12   answer, please.

13   BY MR. BUSH:

14   **Q**     So did you become aware as you were performing your

15   analysis of statements by the DEA with regard to the number

16   of prescribers who were acting legitimately?

17                  MR. WEINBERGER:  Objection.

18                  MR. BUSH:  I just asked whether he became

19   aware.

20                  THE COURT:  Well, he can ask the question.

21   **Q**     Did you?

22   **A**     Yes, I'm aware.

23   **Q**     All right.  And was that information that you had when

24   you were evaluating some of the -- well, in particular, the

25   calculation about the number of prescribers?

1                    MR. WEINBERGER:  Objection.

2       **A**     Yes.

3                    THE COURT:  Overruled.

4       **Q**     And can you explain to the jury why what you

5       understood and what you learned was relevant to your

6       analysis of the number of prescribers that flagged?

7       **A**     Sure.  So --

8                    THE COURT:  Wait.

9                    THE WITNESS:  Sorry.

10                   THE COURT:  Let's go --

11                   (At side bar at 2:56 p.m.)

12                   THE COURT:  All right, Mr. Bush, I'm not

13      trying to give you a hard time, but we're not just

14      communicating well.

15           I don't understand what you're trying to do with this

16      witness.  He's put something on here, and I think you can

17      bring out from him that this thing's so large and there was

18      no checking on the back end.  I thought that's where you

19      were going to.

20           I don't understand what -- you know, is the DEA -- I

21      mean, has the DEA published statistics about, you know, what

22      percentage of prescriptions are questionable?  I mean, I

23      don't understand this.

24                   MR. BUSH:  We've had testimony from

25      Mr. Rannazzisi that the overwhelming number of -- the

1    overwhelming number of prescribers are trying to do the

2    right thing, or words to that effect.

3         There's going to be a slide that I haven't put up yet

4    that has a DEA acting administrator saying that 99.99

5    percent of the prescribers are doing the right thing.

6         And from the front end -- this has a front end and a

7    back end.  From the front end, if you're looking at a data

8    analysis and you flag 37 percent of the doctors when

9    somebody who's in an authoritative position administering

10   the Controlled Substance Act and enforcing it says that only

11   .01 percent of prescribers are bad, this would cause you to

12   think maybe this data analysis ain't so great.

13        So this is relevant to his data analysis and it's

14   something he would have done for any client.

15                  MR. WEINBERGER:  But he's not qualified --

16                  THE COURT:  Well --

17                  MR. WEINBERGER:  I mean, he can say it seems

18   like a high percentage or not, but he can't say --

19                  THE COURT:  Right, he can -- if he has read

20   what the DEA --

21                  MR. BUSH:  He has.

22                  THE COURT:  99.99?  I don't recall testimony

23   in the case that .001 -- that 99.99 percent of prescribers

24   are good.

25                  MR. BUSH:  There's a whole variety of them in

 1    there.  They're all over the place.  That's one of them

 2    though, Your Honor.

 3         And whether he -- honestly, whether it's in evidence

 4    or not in some sense isn't the most relevant factor.  As a

 5    data analyst, he would get that kind of information and it

 6    would inform how he looks at the data, then it's relevant to

 7    his expert opinion.

 8              THE COURT:  If you want to say that he would

 9    bring out that he's aware that the DEA's concluded that the

10    overwhelming percentage of prescribers are good doctors,

11    fine, you can get that in.

12         If he's saying that's why a methodology that flags 37

13    percent of the prescribers, they should have looked at it at

14    the front end or the back end, okay, he can say that, if

15    that's what he's saying.

16              MR. WEINBERGER:  But that has nothing to do

17    with the red flag analysis, Your Honor.

18              THE COURT:  Well, but it does if the analysis

19    kicks out -- if this is accurate, and he said he's crunched

20    the numbers, and McCann's red flag analysis flags 37 percent

21    of the prescribers in Lake and Trumbull County.

22              MR. BUSH:  Prescribers of opioids, to be

23    clear, but yes.

24              THE COURT:  Prescribers of opioids, right.

25    Obviously we're only dealing with the subset that have DEA

1    registration.  It flags 37 percent of them, then that's a --

2                    MR. WEINBERGER:  So we know where he's going

3    with this, Your Honor, because the next --

4                    THE COURT:  I'll allow that, I'll allow that.

5                    MR. WEINBERGER:  But Your Honor, the next

6    slide which he's going to show this witness is a statement

7    from the DEA that says, "I look at the vast majority of

8    doctors.  99.99 percent are all trying to do right by their

9    patients."

10        That has nothing to do with whether or not that kind

11   of percentage, less or more, would trigger a red flag.

12                    MR. BUSH:  I don't know how Mr. Weinberger can

13   say that has nothing to do with it.

14                    THE COURT:  I think it's relevant when if in

15   fact 37 percent of the prescribers were flagged.  That's

16   been the defendants' -- one of the defendants' arguments,

17   Mr. Weinberger, is that the red flag analysis was virtually

18   overinclusive, it was unworkable and unmanageable, and it

19   flagged a whole lot of things that shouldn't have been

20   flagged.

21        That's their argument.

22                    MR. BUSH:  That's right, Your Honor.

23                    THE COURT:  They're allowed to make that

24   argument, and this ties in with that.  So we can -- with

25   some limitations, I mean, he did this data, and he can say

```
 1    that that's why he thinks that McCann and Catizone should

 2    have looked at this and tried to reconcile it.  That's his

 3    point.

 4                    MR. BUSH:  So, Your Honor, just out of the

 5    interest of not having to keep getting up and down,

 6    Mr. Weinberger is correct that there is a quote from a DEA

 7    acting administrator that Dr. Choi has looked at and he's

 8    relied on.  He knows of other things too, but I don't want

 9    to have to just get up and get back down if you don't want

10    me to show him that.  If you don't want me to show him that,

11    I won't.

12                    THE COURT:  If he took that into account in

13    concluding that Catizone and McCann's data analysis was

14    flawed, he can say that's one of the things I took into

15    account, and they should have at least tried to reconcile

16    it.

17                    MR. BUSH:  Thank you, Your Honor.

18                    (In open court at 3:01 p.m.)

19    BY MR. BUSH:

20    Q     Dr. Choi, are you aware of statements by DEA officials

21    with regard to the number of doctors, prescribers in

22    general, who are trying to do the right thing?

23    A     I am.

24    Q     Okay.  And let me ask you to take a look at this.

25          Is this one example of statements that you're aware of
```

1    from DEA officials on that subject?

2         And I'll read it.  It says, "I look at the vast

3    majority of doctors.  99.99 percent are all trying to do

4    right by their patients."

5    **A**    Yes, this is an example.

6    **Q**    And this was -- this statement was made by whom?

7    **A**    Mr. Robert Patterson, acting administrator of DEA.

8    **Q**    And going back to your previous slide where you've

9    calculated that Mr. Catizone's and Dr. McCann's red flag

10   methodology flags 37 percent of the prescribers of opioids

11   in Lake and Trumbull County -- and this is over a 14-year

12   period; is that right?

13   **A**    That's correct, yes.

14   **Q**    Did that cause you to question whether the methodology

15   is reliable?

16   **A**    The two don't reconcile.  So you have on one hand the

17   statement that the vast majority of doctors are trying to do

18   right by their patients, but then you see the flagging

19   results from Mr. Catizone and Dr. McCann's methodology that

20   is flagging more than one in three prescribers.  So the

21   numbers are not reconciling.

22              MR. BUSH:  So, Your Honor, I see we're at

23   3:00.  I'm happy to keep going for a while.

24              THE COURT:  I was going to ask you -- I didn't

25   want to cut you right off.  I know you were on those charts,

 1    so you tell me when it's a good time, Mr. Bush.

 2                    MR. BUSH:  We're not going to get done in the

 3    next ten minutes.

 4                    THE COURT:  If this is a good time, that's

 5    fine.  I didn't want to cut you off in midstream.

 6                    MR. BUSH:  Thank you.

 7                    THE COURT:  Ladies and gentlemen, we'll take

 8    our mid afternoon recess, 15 minutes.  Usual admonitions.

 9    And we'll pick up with Dr. Choi.  Thank you.

10                    (Recess taken at 3:04 p.m.)

11                    (Jury present in open court at 3:22 p.m.)

12                    THE COURT:  Okay, please be seated, ladies and

13    gentlemen.

14         Doctor, you are still under oath from before the

15    break.

16         And Mr. Bush, you may continue, please.

17                    MR. BUSH:  May I proceed, Your Honor?

18                    THE COURT:  Yes.

19    BY MR. BUSH:

20    **Q**    Dr. Choi, just take a look at the screen here for a

21    second, at the middle chart, the prescribers pie chart.

22    **A**    Sure.

23                    MR. BUSH:  And then, Mr. Pitts, could I have

24    the ELMO for a second?

25    **Q**    So I've put up on the ELMO CVS-MDL-4343A, and it's

1   really just a quick question.

2          Is that the pie chart that was reflected in the middle

3   of the prior slide?

4   **A**    That's correct.

5   **Q**    And you prepared that or at your direction?

6   **A**    I did, yes.

7              MR. BUSH:  If I could go back to the slide

8   show, please, Mr. Pitts.

9   **Q**    Did you do a calculation of the percentage of opioid

10  prescriptions flagged by plaintiffs' experts for patients

11  who reside in Lake and Trumbull Counties?

12  **A**    I did, and that's reflected here.

13  **Q**    That's reflected on what's up on the screen, which is

14  CVS-MDL-4966?

15  **A**    Yes.

16  **Q**    Okay.  And what does it show?

17  **A**    So we can start on the left.  These are all the opioid

18  prescriptions that were flagged under the -- Mr. Catizone

19  and Dr. McCann's methodology.

20         So for Lake, what it's showing here is that for the

21  prescriptions that were dispensed at CVS's Lake locations,

22  86 percent of the prescriptions were related to a patient

23  who resided within Lake County.

24         To the right on Trumbull, for the Trumbull table, the

25  percentage is actually higher.  So 93 percent of the

1    prescriptions that were dispensed in Trumbull County went to

2    individuals or patients who resided in Trumbull County.

3    **Q**    Now, just to be clear, because I don't want there to

4    be any confusion, this is 90 or -- the percentages for each

5    one respectively, the flagged prescriptions that went to

6    patients in either of those two counties.  It's not the

7    number of patients in those two counties who had flags?

8    **A**    That's correct.

9    **Q**    Okay.  Did you do a calculation or an examination of

10   the red flag results of Mr. Catizone and Dr. McCann to look

11   at what might be called normal patient behavior?

12   **A**    I did, yes.

13   **Q**    All right.  Let's take a look at the next slide here.

14        This is CVS-MDL-3882A.

15        Do you see that?

16   **A**    I do.

17   **Q**    Okay.  And this looks like this is the red flag that

18   flags prescriptions where the distance between the patient

19   and the pharmacy is more than 25 miles; is that right?

20   **A**    That's correct.

21   **Q**    Okay.  And can you explain to the jury what this

22   chart -- what you've done on this chart?

23   **A**    Sure.  So red flag 1, under Mr. Catizone's flagging

24   methodology, is whether a patient traveled more than 25

25   miles to a pharmacy.  And so if a patient went more than 25

1    miles, there would be a flag.

2          What I did here is examined not just for opioids, but

3    also for noncontrolled medications --

4    **Q**    So that's over here in the right column,

5    noncontrolled's?

6    **A**    That's correct.  So if it's viewed that this is a

7    particular behavior, so again, driving a long distance would

8    be considered a behavioral flag, if the behavior was

9    specific to opioids, then you would see that behavior

10   different from a noncontrolled medication.

11         But what you're seeing here is that the vast majority

12   of the patients travel, in this case the 97.4 percent on the

13   left travel less than 25 miles to the pharmacy.  And if you

14   look all the way to the right, and apologies for bouncing

15   back and forth, but you see 97.8 percent.

16         What you're seeing here is no difference in the

17   numbers between behavior for opioids in terms of traveling,

18   25 miles to a pharmacy, versus noncontrolled.  They're

19   similar behaviors.  So this is not something that from a

20   data standpoint you would say this flag is measuring an

21   aberrational behavior.

22   **Q**    So just to put this maybe in, you know, plain old

23   English, this is the percentage of people who travel more

24   than 25 miles to get regular old medications, noncontrolled

25   medications, filled is about the same as the percentage that

1    travel more than 25 miles to get opioid prescriptions

2    filled?

3    **A**    That's correct.

4    **Q**    And did you do a similar calculation for the red flag

5    that flags prescriptions where the distance between the

6    patient and the prescriber is more than 25 miles?

7    **A**    I did, and that's reflected here.

8    **Q**    First of all, is that reflected on this exhibit which

9    is CVS-MDL-3887A?

10   **A**    It is, yes.

11   **Q**    And you prepared that under -- or under your direction

12   it was prepared?

13   **A**    I did, yes.

14   **Q**    Okay.  Can you explain to the jury what that shows?

15   **A**    Sure.  Red flag 2 is another behavioral flag, and

16   that's the distance between the patient and the prescriber.

17   And if it's more than 25 miles, the flag is tagged for that

18   particular prescription.

19         So it's the same concept.  Is there a difference in

20   behavior, do you see a difference in behavior between the

21   opioid prescriptions and the noncontrolled medications on

22   the right.

23         So you see for opioids it's 86.4 percent actually go

24   less than 25 miles, for noncontrolled it's 89.8 percent.  So

25   there's a little bit of a difference, but it's not a

1    material difference.

2         And the conclusion you can reach from the data

3    standpoint is that there's no difference between opioids and

4    noncontrolled medications when you're talking about this

5    particular behavior.

6    **Q**    All right.  Did you do a similar calculation for

7    prescriptions that were flagged by Mr. Catizone and

8    Dr. McCann's cash red flag?  That's red flag 16.

9    **A**    I did, yes.

10   **Q**    And is that reflected on this exhibit which is

11   CVS-MDL-3896A?

12   **A**    It is, yes.

13   **Q**    And can you explain this one?

14   **A**    Sure.  So this is another flag, and this is where the

15   cash was paid.  Dr. McCann applied red flag 16 to the data

16   and identified it as a flag if the cash was paid or there

17   was a cash discount.

18        Simply put, if you compare the numbers of what you see

19   on the opioids column, 4 1/2 percent, 2.4 percent, and you

20   compare it against the noncontrolled medications of 3.2 and

21   1.9, yeah, there are some differences, like a percentage

22   point here or half a percentage point there, but it's not a

23   material difference.

24        So for individuals who paid cash for the opioids, you

25   are not seeing what you would say is a behavior that's

6118

1    distinctive for opioids as opposed to when you compare it

2    with the noncontrolled medications.

3    **Q**    Do you recall how Mr. Catizone described the cash red

4    flag in his report?

5    **A**    I do, yes.

6    **Q**    Can you tell the jury how he described it?

7    **A**    In his report, he described the cash when the patient

8    has insurance.  So a cash payment with insurance would

9    warrant a red flag.  That's the way it was written in his

10   report.

11   **Q**    Does this red flag calculation that he and Dr. McCann

12   did capture only people -- or prescriptions that were paid

13   for in cash when the patient had insurance?

14   **A**    So this calculation you see here, as I said, was done

15   by Dr. McCann.  There's no -- there's no reflection of

16   insurance.  There's no counting of insurance.  It's just

17   whether a cash payment was made.

18   **Q**    Did you do a -- did you evaluate the data to see how

19   many flagged prescriptions were for prescriptions written by

20   prescribers in Cleveland?

21   **A**    I did, yes.

22   **Q**    And is that reflected on CVS-MDL-3886A?

23   **A**    Yes, it is.

24   **Q**    Okay.  Can you explain to the jury what this shows?

25   **A**    Sure.  So going back to red flag 2 is when a patient

1    travels more than 25 miles to see a prescriber.  What is not

2    accounted for in the McCann/Catizone methodology is for

3    those prescribers who went to see a prescriber -- I'm sorry,

4    for those patients who went to see a prescriber who was in

5    Cleveland, and in many ways it would make sense that given

6    the demographics there would be a lot of people going to

7    Cleveland.  You have the Cleveland Clinic, you have a high

8    concentration of prescribers here in Cleveland.  And also,

9    Cleveland is also a hub city where a lot of people work.

10        And even Mr. Catizone recognized in his report there

11   are life factors that people would need to consider, such as

12   if you work in Cleveland, it is not unusual for you

13   necessarily to see a doctor or a prescriber in Cleveland,

14   nor would it be unusual to see a doctor at the Cleveland

15   Clinic.

16        And there's no recognition of that in the

17   Catizone/McCann methodology.  They didn't account for that

18   when they looked at the results.

19        And what you're seeing here is that 34 percent of the

20   red flag 2s, so that second red flag actually picks up quite

21   a number of red flags, 34 percent were related to a

22   prescriber who was in Cleveland.

23   **Q**    And was that, in your view, likely to be pretty normal

24   patient behavior?

25   **A**    My understanding is that that would be normal behavior

 1   given what I discussed about the demographics and what's

 2   specific about Cleveland.

 3   **Q**     Is this something that Mr. Catizone and Dr. McCann

 4   could have done?

 5   **A**     Certainly.

 6   **Q**     And they didn't?

 7   **A**     They did not.

 8   **Q**     You're aware of the opioid strength, the MME

 9   guidelines that Mr. Catizone set forth?

10   **A**     I am, yes.

11   **Q**     And those were for red flags 10 and 11; is that right?

12   **A**     That's correct.

13   **Q**     Did you perform any analysis of the prescriptions that

14   Mr. Catizone's methodology captured as calculated by

15   Dr. McCann measured against the -- against strength

16   guidelines?

17   **A**     I did, yes.

18   **Q**     Okay.  And is that analysis on this next exhibit,

19   which is CVS-MDL-4311A?

20   **A**     That's correct.

21   **Q**     All right.  And this is -- I think you maybe have some

22   charts or -- bar charts or something that may make this a

23   little easier to see, but before we go there, you don't have

24   to do this in gory detail, but at least give the jury an

25   outline of what this table is reflecting.

1  **A**     Sure.  I'll try and be as quick as possible.

2        So you can see on the red flag column what's missing

3  is 10 and 11.  Those represent red flags that related to the

4  MME guidelines or what -- again, as Mr. Catizone has put

5  them forward.  So if they were above a particular guideline,

6  they would get a flag.

7        So what I did here is I examined all the red flags

8  across 1 through 16 except for 10 and 11 to see how many of

9  those prescriptions were under the MME guidelines.

10 **Q**     Okay.  And you did that in this column over on the

11 right.  Is that using Mr. Catizone's MME guidelines?

12 **A**     That's correct.

13 **Q**     Now, he had two different MME guidelines.  Which one

14 is this?

15 **A**     This one is -- so he did have on the left, to the

16 left, you have the 50 and then there was another MME

17 guideline, but this one was related to 200.

18 **Q**     And then it switched in 2018?

19 **A**     In 2018 it went to 50, yes.

20 **Q**     50 or 90?

21 **A**     Well, one was 50, one was 90.  One of the red flags

22 was 50, another one was 90.

23 **Q**     All right.  Let's go to the next exhibit, which is

24 CVS-MDL-4313A.

25        And could you explain to the jury what this reflects?

1   **A**      So this is just a bar chart of what we saw in the

2   table before.

3          So under Mr. Catizone's MME guidelines, 97 percent of

4   the prescriptions that were flagged fall underneath those

5   MME guidelines.

6   **Q**      And let's take a look at the next one, which is 4313B.

7          I should have asked in the prior exhibit, that was

8   something that was prepared by you or at your direction?

9   **A**      Yes, it was.

10  **Q**      And is 4313B also prepared by you or at your

11  direction?

12  **A**      Yes, it was.

13  **Q**      And what does this chart reflect?

14  **A**      So whether you use a more conservative or lower MME

15  guideline of 50, you still have approximately 70 percent of

16  the other flags or the other prescriptions and the other

17  flags falling below that guideline.

18  **Q**      And so Mr. McCann -- excuse me.  Mr. Catizone, one of

19  his red flags applied this 50 MME guideline but only after

20  2018; is that right?

21  **A**      That's correct.

22  **Q**      And you're applying it all the way back to the

23  beginning of the data?

24  **A**      That's right.

25  **Q**      And why did you do that?

1    **A**    Well, again, this is a lower bound, so you could apply

2    it to 50 -- 50 through from 2018 forward, but if you apply

3    50 across the board where the MME guidelines were actually

4    higher, this will give you a more conservative estimate of

5    what percentage of the prescriptions fell below that

6    guideline at 50, which is the lowest bound of the

7    guidelines.

8    **Q**    And was it your understanding from what Mr. Catizone

9    had done that he wouldn't have applied or he didn't apply, I

10   shouldn't say wouldn't have applied, but he didn't apply the

11   MME guideline back as far as you did.  He only applied it

12   from 2018 forward?

13   **A**    That's correct.

14   **Q**    So this is a -- I think you used the word

15   "conservative."  Is that how you view this?

16   **A**    That's how I view it, it's a conservative measure.

17   **Q**    And even with that measure, how many of the

18   prescriptions that flagged and all the other flags are below

19   that threshold?

20   **A**    About 70 percent are below.

21   **Q**    Okay.  Did you also do a -- well, first of all, are

22   you familiar with the terminology "retrospective flagging"?

23   **A**    I am, yes.

24   **Q**    And can you describe what that means in general, and

25   then we'll look at a couple of the calculations or charts of

1    analyses that you did.

2    **A**     Well, I put up a graph to show that, to illustrate

3    that, but I can do that.

4    **Q**     Okay.  Let's look at this.  But first of all, there

5    are some red flags that this analysis that you're about to

6    describe for the jury affect, right?

7    **A**     That's correct.

8    **Q**     Can you kind of describe what kinds of flags this

9    analysis reflects?

10   **A**     So this one, an example would be like red flag 3.  So

11   a patient sees a prescriber on day one, and then prior to --

12   let's say it's a prescription for 30 days.  So just before

13   30 days they see a second prescriber.  So one scenario could

14   be the patient got a prescription from an emergency room

15   doctor for 30 days.  On the 28th day, that patient could

16   have seen his practitioner and got a second prescription.

17         Because there's an overlap between the two

18   prescriptions, the flagging methodology that is implemented

19   by Mr. Catizone and Dr. McCann not only flags that second

20   prescription, but also flags the first prescription.

21         So that's the retroactive flagging that is occurring

22   here.

23   **Q**     And why are you doing that calculation or making that

24   calculation?

25   **A**     Why is Dr. McCann and Mr. Catizone making it?

**Choi - (Direct by Bush)**

1   **Q**     I understand, but why are you -- actually, I missed a

2   step.

3          What are you calculating in your retrospective

4   flagging analysis, which is -- is that what's reflected on

5   CVS-MDL-4320A?

6   **A**     It is, yes.

7   **Q**     All right.  So first of all, describe what you're

8   calculating here.

9   **A**     So what is in this table is for three particular

10  flags.  So red flag 3 I mentioned, that was the example I

11  used where you have two prescribers, and there's an overlap

12  in days.

13         There's also red flag 4 and red flag 15.

14         The retroactive flagging, and the reason I've done

15  this calculation, is that the red flags, according to

16  Mr. Catizone, reflect what the pharmacists knew or should

17  have known at the time of prescription, at the time of

18  dispensing.  So this assumes that the pharmacists had

19  perfect foresight as to what the patient would do.  The

20  pharmacists would know 28 days down the line that a patient

21  would have gone for a second prescription.

22         But there's no way a pharmacist could have known that,

23  and so what I'm showing here is that in the second column

24  are those instances where the prior prescription where the

25  pharmacist could not have known what would have happened in

1   the future was flagged anyway.  And that occurs about 30

2   percent of the time for these three particular flags.

3                (Off-the-record discussion.)

4   BY MR. BUSH:

5   **Q**    So you've testified about a number of analyses that

6   you've done of Mr. Catizone's red flags as calculated by

7   Dr. McCann and some of the other bigger picture analyses,

8   like the percentage of doctors who are flagged.

9        Do these analyses, retrospective flagging, normal

10  patient behavior, a huge share of flagged prescriptions that

11  are below, Mr. Catizone's or even a conservative strength

12  guideline, or the 37 percent of doctors who are caught up in

13  Mr. Catizone's flags, do those analyses call into question

14  for you the reliability of Mr. Catizone's methodology to

15  identify red flags?

16                MR. WEINBERGER:  Objection.

17                THE COURT:  Overruled.

18  **A**    Those conclusions do call into question the

19  reliability.  I think they also call into question the

20  accuracy of Mr. Catizone and Dr. McCann's methodology.

21  **Q**    All right.  Now, you're aware that in this case there

22  were -- there was a production of a sample of the

23  prescriptions that flagged under Mr. Catizone's methodology

24  and of the notes that were associated with that sample.

25  **A**    Correct.

1    **Q**    All right.  And the notes were notes that either were

2    or were not placed in the dispensing data in the files or

3    contained on prescriptions that might have bore on whether

4    or not a red flag was observed or resolved, right?

5    **A**    That's my understanding.

6    **Q**    Okay.  And he reached a conclusion that in about 90

7    percent of the cases there were either no notes or not

8    adequate notes.

9         Do you recall that?

10   **A**    I do, yes.

11   **Q**    And sample size was with a -- what do you recall the

12   sample size was?

13   **A**    2,000.

14   **Q**    Okay.  And did you evaluate whether or not that

15   analysis by Mr. Catizone and Dr. McCann was reliable?

16   **A**    I did, yes.

17   **Q**    And what conclusion did you reach?

18   **A**    Well, it suffers from the fact that what I have seen

19   in his analysis is it is generating false positives.  It's

20   not generating accurate -- an accurate reflection of what

21   should be flagged based on what he is attempting to do.  So

22   it's not separating the wheat from the chaff.

23        If your -- if you have an issue, if there's an error

24   on that first stage, and then simply sampling from that and

25   then doing analysis of that is going to lead to an error.

1    And it's simple as garbage in, garbage out.  If the

2    flagging methodology is wrong, then the analysis of the

3    sampling is going to be contaminated and affected.

4    **Q**    And did you also evaluate whether Mr. Catizone looked

5    when he did his analysis at all the information that was

6    available to him that might have had some bearing on whether

7    there was a red flag or whether there was a resolution of

8    any red flag that might have existed?

9    **A**    There was -- I didn't see any indication that he did

10    that additional -- those additional steps.

11    **Q**    And what other information did he have available in

12    those Notes samples that he didn't bother to look at?

13    **A**    He had available prior visits as an example from the

14    patient.

15    **Q**    Okay.  And did he have available, at least to some

16    extent in the CVS data -- we're only talking about CVS data

17    here, right?

18    **A**    Correct.

19    **Q**    Did he have available in the CVS data notes that may

20    have related to some of those prior prescriptions?

21    **A**    I don't recall whether he had those available on the

22    prior prescriptions.

23    **Q**    Okay.  Now, did you do an analysis of certain

24    information about the patients and prescribers who were in

25    the notes sample?

1      **A**      I did, yes.

2      **Q**      All right.  And is that reflected on this exhibit --

3      or this -- I guess this is a demonstrative?

4      **A**      That's correct, yes.

5      **Q**      All right.  Can you explain what this reflects?

6      **A**      Sure.  So the pie chart represents the 2,000

7      prescriptions, the CVS prescriptions that came from the

8      sample.

9            One of the things that Mr. Catizone had available to

10     look at was, okay, if you have the prescription in hand, how

11     many times previously did that patient go to that same

12     store, how many times previously did that same patient have

13     what appeared to be a relationship with the particular

14     pharmacy or particular store.

15           In 72 percent of the instances within the sample, a

16     patient went to that same location six prior times.

17     **Q**      All right.  And then you have, I'm going to use my

18     pointer here, you have this analysis over on the box on the

19     right.  Is that an additional analysis you did?

20     **A**      Correct.

21     **Q**      Can you explain what you're reflecting there?

22     **A**      Sure.  And again, I sightly misspoke.  It's least six

23     prior visits 72 percent had.

24           So what the box shows is that within the 72 percent,

25     but that 31 percent of the prescriptions were for a patient

```
 1   who not only had six prior visits to that location, but it

 2   was for the same prescription and it was from the same

 3   prescriber.

 4   Q    We're almost to the end, Dr. Choi.  I have one little

 5   bit of housekeeping that I need to do.

 6                 MR. BUSH:  Mr. Pitts, can I trouble you to put

 7   the ELMO up again?

 8   Q    So Dr. Choi, you have a box of exhibits or maybe a

 9   Redweld of exhibits up there?

10   A    I do, yes.

11   Q    And I will represent to the Court and to the jury in

12   that the exhibits are listed here on what I've put on the

13   ELMO, which is CVS-MDL-4969.

14        And I asked you to review these before we came to

15   court so that we could save some time.

16        Are these data summaries that were prepared by you or

17   at your direction?

18   A    They are, yes.

19   Q    And do they identify the source of the data that is

20   reflected on the exhibit?

21   A    They do.

22   Q    And do they reflect your summaries of the data?

23   A    They do.

24   Q    And do they support at least some of the slides that

25   you testified about today?
```

1    **A**      They do, yes.

2    **Q**      And in fact, some of the slides are actual copies of

3    these exhibits, right?

4    **A**      That's correct, yes.

5    **Q**      All right.  Now, I need to, you know, state for the

6    record that there are some of the exhibits listed on here

7    that we have removed, and that's CVS-MDL-04364, 04365,

8    04332, and 04332A.

9          But with that amendment, does this exhibit accurately

10   reflect the documents that you've reviewed in the Redweld?

11   **A**      It does, yes.

12   **Q**      All right.  Thank you.

13                   THE COURT:  What was the last one you removed?

14                   MR. BUSH:  4332A.

15                   THE COURT:  Just so the jury understands what

16   these are, could you ask the doctor to just talk about one

17   of them so we can see what they are?

18                   MR. BUSH:  Sure.  Let me just ask the question

19   of...

20   **Q**      Can I ask you, Dr. Choi, to -- well, actually I can

21   put it up here on the ELMO if that's going to be acceptable

22   to everybody.

23          This is CVS-MDL-3882A?

24   **A**      Correct, yes.

25   **Q**      And is that an example -- that's one of the exhibits

1    that's in the Redweld that I sent up to you, right?

2    **A**    Yes, it is.

3    **Q**    Okay.  And this is actually one of the -- this is an

4    exhibit that reflects information that was on one of the

5    slides that you testified about?

6    **A**    That's correct, yes.

7    **Q**    Is this one that's talking about the similarity in the

8    distance that somebody travels between the patient and the

9    pharmacy between people filling opioid prescriptions and

10   noncontrolled medications?

11   **A**    Correct, for red flag 1, yes.

12   **Q**    And are the other exhibits that are in the Redweld

13   similar to this?  Is this the kind of thing that's in the

14   Redwelds?

15   **A**    Yes, they are.

16   **Q**    Okay.  Thank you.

17                (Off-the-record discussion.)

18   **Q**    Dr. Choi, we're just about to wrap up here.  I want to

19   kind of look back over the analyses that you presented to

20   the jury here.  And I want to ask you whether or not as a

21   result of those data analyses, have you reached any overall

22   opinions about Mr. Catizone's red flag analysis as it was

23   implemented by Dr. McCann?

24   **A**    Yes, I have.

25   **Q**    Have you reached a conclusion about whether they

1   attempted to validate the methodology that they used?

2   **A**      There was -- well, my conclusion is they have not

3   attempted to validate their methodology.

4   **Q**      And did you reach any conclusion about whether they

5   attempted to take into account knowledge or information that

6   might have been available to a pharmacist filling a

7   prescription that is not reflected in the data?

8   **A**      Based on my review, it does not appear that they

9   attempted to do so.

10  **Q**      And did you reach an opinion about whether they took

11  into account even all the data that was in the database that

12  they had available to them to run the red flag analyses?

13  **A**      So they did not look for other information that was

14  available to them.

15  **Q**      And did you reach an opinion about whether or not this

16  methodology was a reliable and validated basis to identify

17  red flag prescriptions?

18  **A**      So, yes, my opinion is that this is -- this

19  methodology, the Catizone/McCann methodology that I talked

20  about, is not a reliable methodology for analyzing this data

21  set.

22  **Q**      And just to jump ahead to maybe -- well, withdrawn.

23         You went through some of the calculations that said 30

24  percent or 90 percent, or whatever percent, would have, you

25  know, been under the strength threshold or were over some

6134

1    threshold or other analytical method that you used.

2         Are you saying that anything that was on the other

3    side of that was a valid red flag?

4    **A**    No.

5                   MR. WEINBERGER:  Objection.

6                   MR. BUSH:  I'm asking what his opinion is.

7                   THE COURT:  Overruled.

8    **A**    No.

9    **Q**    And why is that?

10   **A**    Again, this is looking at various ways of examining

11   the red flag methodology.  It doesn't mean that the other

12   end of it is valid.  It's simply showing that, first of all,

13   that Mr. Catizone and Dr. McCann didn't check to see if

14   their results made sense, and the analysis that I conducted

15   were checks on that.  That doesn't mean that the other end

16   of it is a valid -- or valid prescriptions or the

17   methodology was valid.

18   **Q**    So taking all of this into account, did you reach any

19   opinion or do you have any opinion about whether

20   Mr. Catizone's and Dr. McCann's overall conclusions about

21   what pharmacists should have investigated and conducted due

22   diligence on and documented is reliable and valid for making

23   any decisions about Defendants' conduct?

24   **A**    My conclusion is that it's not a valid nor reliable

25   methodology.

 1                    MR. BUSH:  Thank you.  I pass the witness.

 2                    THE COURT:  Okay.  I assume there are no

 3     questions from Walgreens or Walmart.  Correct?

 4                    MS. SWIFT:  No, Your Honor.

 5                    THE COURT:  Okay.  Thank you.

 6            Then, Mr. Lanier, you're up.

 7                    MR. LANIER:  May it please the Court, ladies

 8     and gentlemen, Mr. Choi, Counsel.

 9                              - - - - -

10                         CROSS-EXAMINATION

11     BY MR. LANIER:

12     **Q**     How do you do, sir.  My name is Mark Lanier.  I've not

13     met you, but it's a pleasure to meet you, and hopefully I

14     won't be long with you, okay?

15     **A**     It's a pleasure to meet you, sir.

16     **Q**     All right.  I want to clear up a couple of things.

17     We've got three stops.  It won't take long.  I want to talk

18     about money and clarify a couple of things, I want to talk

19     to you about numbers, and I want to talk to you about red

20     flags, okay?

21     **A**     Sure.  I wish you had used a different picture, but --

22     **Q**     Well, that's the best picture I could find.  You're

23     not exactly like all over the Internet on this stuff, okay?

24     I think you look pretty good there.

25     **A**     That's subject to your opinion.

1    **Q**     Hey, hey, consider what I had to work with.  No, I'm

2    just --

3    **A**     Fair enough, fair enough.

4    **Q**     All right.  With some measure of seriousness, I do

5    want to talk to you about money because I think there are a

6    couple of things that the jury hasn't heard that I think

7    they may want to know.

8         First of all, you had your qualifications slide up

9    here and you've got the schools down here.  But where you

10   really make your money and what you really do is your work

11   with AlixPartners, fair?

12   **A**     It's pronounced "AlixPartners," and that's my sole

13   employer, yes.

14   **Q**     And AlixPartners, you're actually a shareholder.  You

15   make money of the big business, right?

16   **A**     So I do have an equity position, yes.

17   **Q**     Equity position means big business makes money, you

18   make money off of that, right?  You get a cut?

19   **A**     So we get -- I think it's worth explaining in more

20   detail.  So there is at the top when revenue does come in,

21   we do pay expenses like any other business pays expenses, so

22   we pay salary, overhead, we pay bonuses to our staff, we

23   have other commitments.  And at the very end there's a pool,

24   a profit pool.  It's not even a profit pool, it's after

25   profits, and there is how our bonuses are determined.

**Choi - (Cross by Lanier)** 6137

1   **Q**    So that's a "yes" answer.  You get a cut off the

2   profits of the business?

3   **A**    A percentage of the profits, yes, that's right.

4   **Q**    Yeah.  Okay.  And in this case you've billed $2.6

5   million so far?

6   **A**    The firm has billed $2.6 million, yes.

7   **Q**    That doesn't count the money that's billed in the

8   Purdue bankruptcy, Purdue being the major opioid

9   manufacturer, right?

10  **A**    That's correct, yes.

11  **Q**    You didn't tell the jury that in the Purdue bankruptcy

12  y'all have also billed another $24 million, right?

13  **A**    I don't know how much we billed on that bankruptcy.

14  **Q**    Well, I think it may even be north of that.  I've got

15  in the order on the fee applications, one of the fee

16  applications shows Alix at $23,948,226.50.

17       Does that seem about right to you?

18  **A**    Mr. Lanier, I am not aware of the amount that was

19  billed.  There is an information barrier between myself and

20  my colleagues for that bankruptcy.

21  **Q**    Well, you say there's an information barrier.  There's

22  not a profit barrier.  You get money off of that, don't you,

23  at the end of the year?

24  **A**    To the extent that after it washes through the

25  expenses, there is -- it contributes to the profit pool,

1    certainly.

2    **Q**    Yeah, all right.  That's the money stop.  I wanted to

3    make sure we had everything on the table for the jury.

4         Now let's talk about numbers, and then we'll move to

5    red flags, okay?

6    **A**    Okay.

7    **Q**    All right.  Numbers.  First of all, I need to ask you

8    about some of your qualifications.

9         Do you have experience in the way CVS's pharmacies

10   inventory for drugs?

11   **A**    I do not.

12   **Q**    And I've been asked a note to make sure, y'all in the

13   Purdue bankruptcy are representing Purdue, doing work for

14   Purdue; is that right?

15   **A**    So I have very limited information about that.  I do

16   understand that the firm is retained by the debtors, but

17   aside from that, I don't have additional information.

18   **Q**    The Purdues and the Sacklers being the debtors there,

19   or at least the Purdues, right?

20                    MR. BUSH:  Objection.

21                    THE COURT:  Overruled.

22   **A**    Again, I don't have much visibility nor do I have

23   information about that.

24   **Q**    The reason I asked you about your expertise on numbers

25   is because Mr. Bush put up here your slide that was

1    CVS-MDL-4340 that talked about the percentage of controlled

2    prescriptions put out by CVS compared to noncontrolled.

3         Do you see that?

4    **A**    I do, yes.

5    **Q**    And you did the same thing not just for Lake County

6    but for Trumbull County, didn't you?

7    **A**    I did, yes.

8    **Q**    And then you did the same thing combining them,

9    correct?

10   **A**    That's correct.

11   **Q**    And yet what you never told the jury is -- and so we

12   got this clear, noncontrolled means those that are not

13   scheduled drugs under the Controlled Substances Act, right?

14   **A**    Well, what I did tell the jury is that the controlled

15   represents the drugs under the Controlled Substance Act,

16   noncontrolled do not.  And I provided examples of two types

17   of drugs.

18   **Q**    In other words, I'm correct, these are not scheduled

19   drugs in that column.  In this column are the scheduled

20   drugs like opioids and benzos, right?

21   **A**    That's correct, yes.

22   **Q**    All right.  I mean, I don't think we're fussing on

23   that point.  What I wanted to do is give you a copy of

24   Plaintiffs' Exhibit 21912 and ask you if you bothered to

25   count for the jury how many different drugs CVS sells in

1    their pharmacies.  This is the October 2021, most recent

2    update of their drug list.

3         Do you see that?

4    **A**    Yes, I see what you've highlighted, yes.

5    **Q**    And these are just for specialty pharmaceuticals.

6         Do you see that as well?

7    **A**    I mean, I see the language, but whether they're for

8    specialty pharmaceuticals, I'd like to take a further look

9    for.

10   **Q**    Well, my question to you is --

11                MR. BUSH:  Your Honor, objection, please.

12                THE COURT:  You're allowed to look at the

13   document and then you can ask your question.

14                MR. BUSH:  Can we have a side bar though?  I

15   think it's being displayed.

16                MR. LANIER:  I'll pull it down while --

17                THE COURT:  Why don't you just ask a question.

18   BY MR. LANIER:

19   **Q**    My question is, did you count how many different drugs

20   CVS sells in this nonscheduled category?

21                MR. DELINSKY:  Your Honor, this doesn't

22   pertain to retail pharmacies.  This is an entirely separate

23   kind of pharmacy CVS operates.

24                MR. LANIER:  It's a specialty pharmacy -- it

25   doesn't matter, Judge.  I'm pull down the exhibit in the

1     interest of time, and I'll keep going anyway with the

2     question.

3   **Q**     Sir, did you count how many hundreds and hundreds and

4     hundreds of different kinds of drugs CVS sells in this

5     category?

6   **A**     So these reflect percentages, so they're not accounts

7     of drugs.  So that's not reflected, nor the purpose of this

8     table.

9   **Q**     Is that a yes or no?

10  **A**     Well, it's a yes in the sense that the number of drugs

11    are not reflected in this column.

12  **Q**     I said did you count the number of different drugs.

13    You're saying yes, you did?

14  **A**     No, I am simply saying that this table is reflecting

15    the percentage of prescriptions.

16  **Q**     We're not communicating, sir.  I'm sorry.  Hear me.

17          Take the table down.

18          Did you count how many different kinds of drugs CVS

19    sells before you came in here and said 13 percent of the

20    ones going out are opiates?

21  **A**     So they would be in the file that's referenced in the

22    table, and you could see the different types of

23    noncontrolled drugs.

24  **Q**     What question do you think I'm asking?

25  **A**     I don't know then.

**Choi - (Cross by Lanier)**

1    **Q**    I'm asking did you count how many drugs they sell?

2    **A**    So during the review, during the analysis, certainly

3    we had that spreadsheet.  I had the spreadsheet.  We looked

4    at -- we didn't do a count by count, though I certainly

5    recognize the amounts, or roughly the amounts.

6    **Q**    Roughly how many different drugs do they sell?

7    **A**    It's a considerable amount.  It's a large amount.

8    **Q**    Roughly, what does that mean?

9    **A**    Again, I don't have an exact number, but --

10   **Q**    A thousand?

11   **A**    Again, I don't have an exact number, but that ballpark

12   would be -- it wouldn't surprise me if it was in that

13   ballpark.

14   **Q**    So let's just use that ballpark of a thousand.

15       So they sell 1,000 different kinds of drugs, and out

16   of everything they sell, 12 to 13 percent are opiates.

17   **A**    That's not the correct calculation, Mr. Lanier.

18   **Q**    Okay.  So out of the noncontrolled drugs, how many are

19   there?

20   **A**    So you're looking for the exact number of drugs?

21   **Q**    I'll take it rounded, sir.  I just want this

22   percentage to mean something.

23   **A**    The reason I said I don't think you calculated

24   correctly is that you put 12 to 13 percent as opiates, but

25   it's 12 to 13 percent for controlled.

 1   **Q**    All right.  Opiates and genzos, controlled.

 2        I still am asking you --

 3   **A**    Sir, Mr. -- I'm sorry.

 4   **Q**    Excuse me, I get to ask questions.

 5   **A**    Sorry.

 6   **Q**    I'm still asking --

 7             MR. BUSH:  Dr. Choi gets to answer it.

 8             THE COURT:  Just ask a question, please.

 9   BY MR. LANIER:

10   **Q**    I'm still asking you, sir, did you figure out -- so

11   that this percentage has meaning, did you figure out how

12   many different drugs they're selling?

13   **A**    So Mr. Lanier, just a quick clarification again.  I'm

14   sorry to quibble about this, but I just want this to be

15   accurate.

16   **Q**    It's a simple question.

17             MR. BUSH:  Let the witness answer.

18             THE COURT:  Let the witness answer.

19   **A**    So you have your 12 to 13 percent opioids and benzo.

20   That's still not accurate.  That's a misleading

21   characterization of the 12 to 13 percent.

22   **Q**    Sir, did you figure out how many different drugs

23   they're selling, yes or no?

24   **A**    For which category, the noncontrolled?

25   **Q**    Yes, sir.

**Choi - (Cross by Lanier)**

1    **A**    I think I've already said that I didn't do a precise

2    calculation.  If you want to say it's a thousand, it's

3    probably in that ballpark.

4    **Q**    Okay.  So when you do the statistics, you haven't

5    looked carefully at whether or not most of the drugs being

6    sold statistically wind up being opiates?

7    **A**    That is incorrect.

8    **Q**    You have done that check?

9    **A**    No.  What you're referring to is the objective of this

10   table is to show a percentage.  Whether you want to count

11   them individually and then apply the percentage, the results

12   don't change.

13   **Q**    Sir, that wasn't my question.

14        I said, have you looked carefully at whether or not

15   most of the drugs being sold wind up being opiates in terms

16   of percentages.

17             MR. BUSH:  Objection, Your Honor.  He did

18   answer that question.

19             THE COURT:  He can ask it again.  I'm not sure

20   at this point.

21   **A**    Mr. Lanier, I'm very confused with your question then.

22   **Q**    Okay.  What percentage of Z-Packs were sold?

23   **A**    Again, I don't have that number off the top of my

24   head.

25   **Q**    What percentage of Resinovir [ph] was sold?

**Choi - (Cross by Lanier)**

1    **A**     Yeah, I don't have those percentages for that specific

2    drug off the top of my head.  But as a collective, those

3    noncontrolled do represent about 87 percent.

4    **Q**     Right, but if they represent a thousand different

5    drugs, 87 percent is a different number than if they only

6    represent a hundred different drugs, right?

7    **A**     Well, Mr. Lanier, the issue is about the unit of

8    measurement.

9    **Q**     Can you answer my question, please, sir?

10                   MR. BUSH:  Objection, Your Honor.

11                   THE COURT:  Let's go on the headphones.

12                   (At side bar at 4:09 p.m.)

13                   MR. LANIER:  Your Honor, I don't mind

14   nonresponsiveness, but when I'm under this kind of a time

15   deadline and he --

16                   THE COURT:  It no, no.  His chart talks about

17   number of prescriptions and you keep asking about number of

18   drugs.  His chart doesn't report the percentages of drugs

19   sold, it's percentages of prescriptions.

20                   MR. LANIER:  But each prescription is of a

21   drug, and the point is they have over a thousand drugs they

22   get prescriptions for and that 12 percent or 13 percent of

23   the drugs they're sending out are opiates is a massive,

24   massive percentage when you consider how big the denominator

25   is.

**Choi - (Cross by Lanier)**

```
 1              THE COURT:  Well, I'm not sure that's what his
 2    chart says, but you can do -- anyone can do the math, 12
 3    percent of a thousand is 120, but he said he didn't count.
 4              MR. LANIER:  And I just would ask him to
 5    answer my questions.  I mean, he has wasted 8 minutes of my
 6    time.
 7              MR. BUSH:  Actually, I really object to that,
 8    Your Honor.  He's answered the questions.
 9              THE COURT:  I think we should move on.  I
10    don't think we're getting anything productive.
11              MR. LANIER:  Thank you.
12              (In open court at 4:11 p.m.)
13    BY MR. LANIER:
14    Q    Sir, look, for example, at your chart 4346A.  This is
15    your chart where you show the opiate prescriptions going
16    down.
17         Do you see that?
18    A    Yes.
19    Q    Did you take into account any of the policy changes at
20    CVS where they started training and applying red flags in
21    that time period?
22    A    So this chart does not reflect or identify policy
23    changes.  This chart simply reflects over time the number of
24    opioid prescriptions.
25    Q    Is that a yes or a no?
```

**Choi - (Cross by Lanier)**                                      6147

1    **A**      So in the chart you're not going to see what you've

2    identified as these lines for a particular policy change.

3    **Q**      Yeah, so my question was, did you take into account

4    the policy changes on red flags in the training.  Your

5    answer is no, correct?

6    **A**      That is incorrect.

7    **Q**      You did take it into account?

8    **A**      No, simply what I'm doing here is putting in the

9    decline in the opioid prescriptions.  It is why that's

10   occurring, you know, I did not put in a particular policy

11   implication.

12   **Q**      I'm not asking did you put it in.  I'm saying did you

13   take it into account when you prepared this chart.  Did you

14   prepare the chart to show that change?

15   **A**      No, I prepared the chart --

16   **Q**      Thank you.

17          Next chart.

18          Median total of MMEs by prescriptions by pharmacy.

19          Do you remember this chart?

20   **A**      Yes, sir.

21   **Q**      Now, do you know what the most prescribed and arguably

22   abused opiate is in the United States of America?

23   **A**      The most prescribed, I don't know.

24   **Q**      Did you know about hydrocodone, which is a low MME

25   drug, being the most overused and overprescribed drug in

 1   America?

 2        Did you know about that?

 3   **A**    Again, I don't know if that's accurate.  I have not

 4   checked for that.

 5   **Q**    But if it is accurate and you know that hydrocodone

 6   has a low MME of just 1, then we need to be looking down

 7   here for the diversion, not at these high cancer -- I mean

 8   high MME drugs like fentanyl, right?

 9             MR. STOFFELMAYR:  Judge, I'm going to object.

10   That's demonstratively false.

11             MR. LANIER:  It's not, Your Honor.  It's dead

12   on.

13             THE COURT:  I'm going to sustain the question

14   the way you asked it.

15             MR. LANIER:  All right.  I'll ask it a

16   different way.

17   **Q**    Sir, if in fact hydrocodone with a low MME of 1 is one

18   of the greatest diversion drugs, we're going to find the

19   pharmacies dispensing it at the low end of an MME chart,

20   aren't we?

21             MR. BUSH:  Objection.

22             MR. STOFFELMAYR:  Same objection, Your Honor.

23             THE COURT:  Overruled.

24   **A**    So if I understand your question, you're asking me to

25   assume that the low MMEs are more likely to be diverted?

1   **Q**    Yes.  If the low MMEs are more likely to be diverted,

2   then on a chart like this you'd want to look to the right

3   end of the chart, correct?

4   **A**    Well, under that assumption, it's sort of a circular

5   argument then.  But again, my understanding of MMEs,

6   especially as reading Mr. Catizone, is that's not the case.

7   **Q**    That wasn't my question, sir.

8   **A**    I thought I answered it.

9   **Q**    No, no, it isn't even close.

10  I said if it's a low MME that is concerned, like

11  hydrocodone, then we would look to the stores on the right

12  side of the chart.  True?

13  **A**    I agree -- if that is the assumption, but again, it

14  does seem like a circular argument.

15  **Q**    All right.  It may seem to you, but we'll keep moving

16  on.

17  Let's go to flags.  You talked a lot about flags,

18  right, red flags?

19  **A**    Yes.

20  **Q**    Let's go over your qualifications to do that.

21  Have you read the *Holiday* or any other red flag cases?

22  **A**    I have not.

23  **Q**    Do you have any DEA training on red flags?

24  **A**    I do not, no.

25  **Q**    Are you competent to make dispensing choices and

1   opinions to dispense medicine?

2   **A**     No.

3   **Q**     Are you a licensed pharmacist?

4   **A**     I am not.

5   **Q**     Do you have experience of what information registered

6   pharmacists have?  And by experience, I mean hands-on

7   experience.

8   **A**     I do not.

9   **Q**     Do you have experience in the -- or expertise in the

10  dangers of opioids?

11  **A**     Expertise, no, I do not.

12  **Q**     Has any pharmacy ever hired you to write policies on

13  red flags?

14  **A**     No.

15  **Q**     Did you see the requirements within CVS's own files

16  that registered pharmacists should document the resolution

17  of red flags?

18  **A**     Only to the extent that they were reflected in

19  Mr. Catizone's report.  But if you're referring to a

20  particular document, I can't recall one.

21  **Q**     I'm referring to the CVS policies.  Did you look at

22  them on red flag resolution and documentation?

23  **A**     No.

24  **Q**     So with those limitations, you went and assessed what

25  Mr. Catizone said, correct?  Correct?

1    **A**    I'm sorry, I'm reading your chart here.

2    **Q**    Here.  I'm just -- now, you assessed what Mr. Catizone

3    said, correct?

4    **A**    Well, I'm struggling with what you -- when you say

5    "said" --

6    **Q**    In his report.

7    **A**    Mr. Catizone wrote in his report a particular

8    methodology, and I assessed that.

9    **Q**    He has testified very clearly to this jury that a red

10   flag is a warning sign that requires additional review, that

11   should be resolved before dispensing, and that that's a

12   critical responsibility.

13        Is that consistent with what you thought a red flag

14   was in his mind?

15   **A**    So that is not consistent with what he wrote in his

16   report.

17   **Q**    All right.  If that is -- it's not consistent with

18   what you see in his report.  I understand.

19        If this is in fact what his testimony is, then it kind

20   of undercuts everything you've been saying, doesn't it?

21   **A**    I don't think so.

22   **Q**    Well, let's look at it and see.

23        First of all, you say that -- let me put this slide

24   up.

25        And you say that there's a problem because

1    Mr. Catizone is flagging so many prescriptions, right?

2    **A**    Mr. Lanier, you're mischaracterizing my testimony.

3    That's not what I said.

4    **Q**    Okay, good.

5         So you're not saying that Mr. Catizone flagged too

6    many prescriptions?

7    **A**    No, that's not what I'm saying.  What I'm saying here

8    is that the flagging methodology that Mr. Catizone has

9    applied, and when you compare it with other sources, when

10   you're doing the checks on it, it does indicate that there

11   are false positives, and there are.  There is overflagging

12   going on.

13   **Q**    But doesn't everybody believe there should be false

14   positives?

15   **A**    You're talking about it in like a binary sense, like

16   false positives are harmless.  That's not accurate from a

17   data standpoint.

18   **Q**    Time out, sir.

19        You've already said you don't understand -- you don't

20   have the expertise of how dangerous these drugs are.  Fair?

21   That's not your expertise?

22   **A**    That is not my expertise, fair.

23   **Q**    All right.  Did you come into the building downstairs?

24   **A**    Yes.

25   **Q**    Did you go through the metal detector?

**Choi - (Cross by Lanier)**

1    **A**    I did, yes.

2    **Q**    Did you know 99.99 percent of the people that go

3    through that metal detector are just trying to do their

4    civic responsibility?

5    **A**    I don't have the number, but I would imagine everyone

6    is trying to do their civic responsibility.

7    **Q**    Well, not everyone.  There's some criminal cases that

8    get tried in this courthouse where there's a need for extra

9    care because of the level of criminality involved.

10    Do you understand?

11    **A**    With that additional information, thank you, yes.

12    **Q**    Yeah.  And so when this metal detector goes off, it's

13    going to go off a lot of times with a false positive, isn't

14    it; somebody's belt, somebody's shoes, cell phone, right?

15    **A**    Well, the false positives probably, but how the

16    machine is calibrated will affect the rate of false

17    positives.

18    **Q**    And there's no question about that.

19    And the greater the danger zone, the more important to

20    calibrate the machine carefully, right?

21    **A**    I would assume so, yes.

22    **Q**    And then when someone comes through, if it triggers a

23    red flag for that person down there who's manning the metal

24    detector, before that person's allowed to go through, that

25    needs to be resolved why they triggered the machine, doesn't

```
 1   it?

 2   A    I would assume so, yes.

 3   Q    And that's not a bad thing, is it?

 4   A    So in that example, I don't have any issue.  But the

 5   example here when you're talking about red flags and what

 6   Mr. Catizone has done --

 7   Q    We'll get to that in a minute.  Stay on my example.

 8              MR. BUSH:  Your Honor, please let the witness

 9   finish his answer.

10              THE COURT:  I think he answered the question.

11   Q    My example here, sir, that's not a bad thing, is it?

12   A    Again, your example, as I've heard it, and as I

13   understand it, I don't think it's a bad thing.

14   Q    I mean, if you had tripped the metal detector -- did

15   you trip it, by the way?

16   A    I did not.

17   Q    All right.  Well, if you had tripped and they had said

18   to you, ah, you look nice, go on by, they wouldn't be doing

19   their job, would they?

20   A    If I tripped it, I would expect to be stopped, yes.

21   Q    And you would expect them to figure out whether or not

22   it was safe to let you by, right?

23   A    Or send me back.

24   Q    Right.  And once they do that, if it's safe, you get

25   to come up to 18 and testify, right?
```

1    **A**      I think I'm following you, yes.

2    **Q**      If instead they had determined, no, you've got a knife

3    and you're not going in like that, you're either going to

4    give up your knife or you're not coming in, right?

5    **A**      That's assuming I owned a knife.  But, no, I assume

6    so.

7    **Q**      All right.  So you're not in a position from expertise

8    to testify whether or not a 30 percent flag or a 40 percent

9    flag is appropriate as a warning just to make sure that you

10   clear it before you sell it.  You don't know whether those

11   percentages are right or wrong as a pharmacist with

12   pharmacist experience, true?

13   **A**      So I can certainly compare those numbers with other

14   data to perform an opinion about the false positives, and

15   also the fact that it's not just a consequence of whether

16   you're checking.  It's what Mr. Catizone is doing with his

17   data that is -- that's where the false positives are

18   becoming problematic.

19   **Q**      Sir, you don't know whether those percentages are

20   right or wrong as a pharmacist with pharmacist's experience,

21   true?

22   **A**      That is true.  I'm not a pharmacist, yes.

23   **Q**      Thank you.

24          And then you say that you saw nothing in the

25   documentation that says they validated their analysis,

1    correct?

2    **A**     That's correct.

3    **Q**     Did you see that Carmen Catizone looked at each

4    individual prescription?

5    **A**     You're referring to the sample?

6    **Q**     Yes, sir.

7    **A**     Okay.  Well, there's evidence from my review of his

8    analysis that he did not carefully look at each one.

9    **Q**     I understand you have problems with two or three of

10   the ways -- of the ones that were produced to us by

11   defendants.  I'm not getting into that.

12        I'm simply asking you, did you know he looked at each

13   one?

14   **A**     I understand from his report that he spent, again, I

15   forgot the calculation, but it wasn't a very long period of

16   time.  And as I said before, based on my review of his

17   analysis, it does not appear that he looked at each one

18   carefully.

19   **Q**     So you're forming a judgment on how well he did it,

20   but my question to you was did you know he did it?

21   **A**     My understanding is that he claims that he looked at

22   each one.

23   **Q**     And you, never having been a pharmacist, don't know

24   how a pharmacist should be looking at those to validate

25   them, fair?

1  **A**     Well, it's fair that I'm not a pharmacist, that's

2  correct.

3  **Q**     And so you don't know how a pharmacist should be

4  looking at those, true?

5  **A**     Well, I certainly understand the -- in terms of what

6  was written in the reports, that's my knowledge.  That's

7  where I'm forming my opinion.  In terms of how pharmacists

8  should make their, you know, their judgment is based on my

9  reading of the report.

10       I don't have an expertise, I'm not claiming to have an

11  expertise, but it's certainly information that I considered.

12  **Q**     And so you don't know how a pharmacist should be

13  looking at those, true?

14  **A**     Well, correct, I'm not a pharmacist.

15  **Q**     Thank you.

16       Next.  You put up this slide as an example of how many

17  folks, and the distance between patient and pharmacy, and

18  what's less than or equal to 25 miles, and what's greater.

19       Remember the 25-mile issues you had?

20  **A**     Correct, yes.

21  **Q**     Did you know that the reason Dr. Franklin got caught

22  filling his prescriptions, having his prescriptions filled

23  in another county, is because they were 35 miles apart?

24            MR. STOFFELMAYR:  Objection.  That's exactly

25  false.

1          MR. LANIER:  Not exactly false.  I'll reword

2     it.

3          MR. STOFFELMAYR:  We already heard -- we've

4     heard testimony on this subject.

5          THE COURT:  All right.  Let's rephrase the

6     question.

7          MR. LANIER:  I'll rephrase it.

8     BY MR. LANIER:

9     **Q**    Do you know the distance between Dr. Franklin and the

10    pharmacies that were filling his prescriptions?

11    **A**    I'm trying to remember the issue here.  I don't know

12    if I looked at that.

13    **Q**    Okay.  How about the cash payment issue?  On cash

14    payment, you said there's just not much difference between

15    the 4 1/2 and the 3.2 between opioids and noncontrolled

16    medicines or the benzos and noncontrolled medicines, right?

17    **A**    Well, I did say there are differences, but the

18    differences are not material.

19    **Q**    Well, you said they're not material.

20         What's the difference between 4.5 -- we'll take the

21    lesser -- and 3.2?

22    **A**    So that would be 1.3.

23    **Q**    About 30 percent?

24    **A**    1.3 over 3.2 would be roughly about -- a little over

25    30 percent, yes.

**Choi - (Cross by Lanier)**                                    6159

1    **Q**    Mm-hmm.  So 30 percent more paying cash for opioids

2    than paying cash for other prescriptions, right?

3    **A**    Right.  And you're going to get that when you see so

4    low percentages.

5    **Q**    30 percent more, correct?

6    **A**    The math is correct, sir, but I think the logic is a

7    little -- needs -- I think there's clarification that's

8    needed.

9    **Q**    And y'all's opioid invoices at this point are in

10   excess, if we add the Purdue, of $28 million?

11                    MR. BUSH:  Objection.

12                    THE COURT:  Overruled.

13   **A**    I'm sorry, what's the question?

14   **Q**    Y'all's opioid invoices at this point, if we add

15   together Purdue, you're over 28 -- yeah, over $28 million?

16   **A**    Again, I don't know how much we've invoiced or how

17   much we've billed for Purdue.  If the number you've

18   presented is accurate, then that's the way the math would

19   work, yes.

20   **Q**    And yet you are an equity holder who's going to make a

21   percentage at the end of the year based on the

22   profitability, right?

23   **A**    Yes.

24   **Q**    And you deal with numbers for a living, don't you?

25   **A**    I do, yes.

1    **Q**     And you're telling us that you've not looked at the

2    profitability of your firm to see how your end of the year

3    money is going to be?

4    **A**     That is not my testimony.

5    **Q**     Okay.

6               MR. LANIER:  I'll pass the witness, Your

7    Honor.

8               THE COURT:  Okay.  Before Mr. Bush gets up,

9    any of the jurors have any questions for Dr. Choi?  If you

10   could give them to Mr. Pitts, please.

11      (Juror question review.)

12              MR. STOFFELMAYR:  Your Honor, if it's all

13   right, we'll go out of order.  I will be extremely quick and

14   then Mr. Bush can go through the questions.

15              THE COURT:  Okay.  That's fine.

16              MR. STOFFELMAYR:  Thank you.  Good afternoon,

17   everybody.  I need to apologize for the feedback, I do not

18   in fact have a plate in my head that's causing that.  I

19   don't know what the reason is.

20      Every time I lean forward to the microphone the room

21   explodes with feedback.  I don't know what it is about my

22   body --

23              MR. LANIER:  It's the filling in your teeth.

24              MR. STOFFELMAYR:  It's the filling in my

25   teeth, the plate in my head.  I'm not sure.

1                        - - - - -

2                      CROSS-EXAMINATION

3    BY MR. STOFFELMAYR:

4    **Q**     Dr. Choi, my name is Kaspar Stoffelmayr.  I represent

5    the Walgreens Company, and I will be very, very quick.

6         But just so everyone understands, we've never met,

7    spoken in our lives as far as I know.  Is that correct?

8    **A**     That's correct.

9    **Q**     You've never spoken to anyone else on the team

10   representing Walgreens.  You didn't know I was going to ask

11   you any questions?

12   **A**     That's correct.

13   **Q**     All right.  I just want to ask you about this chart

14   that you were asked some questions about.  I'll zoom out

15   just a little bit.

16        And it was proposed to you hypothetically that

17   hydrocodone, which is a relatively low MME drug, is the most

18   overprescribed, most diverted, most dangerous drug in

19   America.

20        Do you remember that?

21   **A**     Yes.  That was what he asked me to assume, yes.

22   **Q**     And so the suggestion was if we're worried about

23   diversion, we should focus on these folks at Lake Health

24   Pharmacy down here, Target, Marc's, because these are the

25   people dispensing the lower MME prescriptions; correct?

1    **A**    Correct, that's the implication.

2    **Q**    Then he said, in that case we wouldn't worry so much

3    about these guys up here, like the guys at Overholt's, who

4    went to jail, or the guys at Franklin, right?

5    **A**    That's the implication of the assumption, yes.

6    **Q**    Okay.  Let me ask you to assume something different,

7    that the testimony from a former DEA official, just assume

8    with me, was that hydrocodone is the most dispensed drug in

9    America.  They didn't say anything about whether it was more

10   likely to be diverted, abused, involved in criminality.

11          Can you assume that?

12   **A**    Okay.

13   **Q**    If we made that assumption instead, would that change

14   your view about whether we need to focus on Lake Health

15   Pharmacy rather than Overholt's?

16   **A**    Well, certainly you would need to focus on what's on

17   the left side here.

18   **Q**    The left being the MME?

19   **A**    The higher MME per prescription.

20   **Q**    All right.  Next question.  I don't know if it was

21   intended to be misleading or confusing, but I got the

22   impression from the questions that the analysis we're

23   looking at here is MME per pill; because a hydrocodone pill

24   is lower -- 5 milligrams of hydrocodone is lower MME than 5

25   milligrams of oxycodone, correct?

**Choi - (Cross by Stoffelmayr)**                    6163

1    **A**     Correct.

2    **Q**     But 10 hydrocodone pills is higher MME than one 5

3    milligram oxycodone pill, correct?

4    **A**     Correct.

5    **Q**     This chart you've shown us, is it MME per pill or MME

6    per prescription, or what are we looking at?

7    **A**     It is MME per prescription.  As I mentioned before, if

8    you see the 375 by the CVS number, that is the MME per

9    prescription.  It is not -- it's not -- it should not be

10   construed as MME per day or anything like that.  It's just

11   the MME per prescription.

12   **Q**     So even if every one of these was hydrocodone only,

13   that relatively low MME drug, the folks over on the left

14   side would be filling prescriptions with way more pills than

15   the folks over on the right side?

16   **A**     That would be the way the numbers work, yeah.

17   **Q**     Nothing here tells you who is prescribing more

18   hydrocodone, more oxycodone, more hydromorphone, anything

19   like that, does it?

20   **A**     That's correct.

21   **Q**     Doesn't tell you who's prescribing a small number of

22   high MME -- sorry, dispensing, not prescribing, my

23   mistake -- doesn't tell you who's dispensing a low number of

24   high MME pills versus a large number of low MME pills.  Does

25   it allow you to draw any conclusions about that?

1    **A**      Not from the calculation of MME per prescription.

2              MR. STOFFELMAYR:  Thank you so much, Dr. Choi.

3    Those are the only questions I had for you.

4              THE WITNESS:  Thank you.

5                    - - - - -

6                    REDIRECT EXAMINATION

7    BY MR. BUSH:

8    **Q**      Dr. Choi, we have a process here that you may know

9    about where the jurors ask questions at the end of

10   cross-examination.  And the lawyers, assuming -- I mean,

11   there may be a question here or there that for some reason

12   just isn't a question we should ask, but for the most part

13   we've been putting the questions up on the ELMO and asking

14   you to answer those questions, and that's what I'm going to

15   do first.

16       You should answer them to the best of your ability.

17   Obviously if it's something that you just don't know the

18   answer to, then you don't know the answer.

19   **A**      Okay.

20   **Q**      All right.  So the first one is -- and I'm going to

21   read them into the record just so that there is a record of

22   what the question is.

23       "4337 CVS, what is your number instead of McCann?"

24       I guess it's "your number for opioid instead of

25   McCann."  And I'm going to put the exhibit or the chart that

1    I believe this refers to up on the screen and ask you if you

2    can answer that question.

3         And if I can interpret a little bit, I believe that

4    the juror is asking the question about the 6.38,

5    Dr. McCann's annual hydrocodone -- oxycodone and hydrocodone

6    DU per capita?

7                   MR. WEINBERGER:  Annual.  It says "annual."

8                   MR. BUSH:  I'm sorry if I misspoke.  I didn't

9    mean to.

10   **A**    Can I see the question laid on top, please?

11   **Q**    Sure.  Here's the question:  "What is your number for

12   opioid instead of for McCann?"

13   **A**    So I didn't do an alternative calculation for the

14   6.38, so I'm simply comparing the 6.38 to the 132 on the

15   noncontrolled; but I didn't form an alternative calculation

16   for that number.

17   **Q**    Okay.  I may add some questions here or I may not, but

18   on this particular one, why did you rely on Dr. McCann for

19   this number?

20   **A**    It's, again, the number that he calculated.  I'm

21   familiar with the data source that he calculated from, but I

22   was simply trying to put perspective around the 6.38, so I

23   didn't feel a need to recalculate the number.

24        What I'm doing here is -- even accepting the number,

25   what is the context you should look at, how you should look

 1   at that number.

 2   **Q**     All right.  And are you -- you've read the complaints

 3   in these cases?

 4   **A**     I have, yes.

 5   **Q**     And you're aware that the plaintiffs have alleged that

 6   the defendants here have, quote, flooded, closed quote, the

 7   counties with opioid medications?

 8   **A**     I understand that, yes.

 9   **Q**     And do these numbers on this exhibit, including the

10   per capita number, are they intended to put that allegation

11   in context?

12                   MR. WEINBERGER:  Objection.

13                   THE COURT:  Sustained.

14   **Q**     What was the purpose for putting -- one of the

15   purposes for putting these numbers down in light of those

16   allegations?

17                   MR. WEINBERGER:  Objection.

18                   THE COURT:  Let's go on the headphones a

19   minute.

20                   (At side bar at 4:38 p.m.)

21                   THE COURT:  Is this out of his report?

22                   MR. BUSH:  I'm sorry?

23                   THE COURT:  Is this out of his report?  This

24   chart.

25                   MR. BUSH:  Yeah, he testified about it on

**Choi - (Redirect by Bush)**

 1    direct.

 2                    THE COURT:  How does this relate to opioid

 3    prescriptions?

 4                    MR. BUSH:  Because it's putting in context --

 5    can I answer?

 6                    THE COURT:  Yes.

 7                    MR. BUSH:  It's putting in context the

 8    allegation that these are a lot of drugs that are coming

 9    in -- a lot of opioids that are coming into the counties.

10         This just shows that there's actually just a lot of

11    drugs that come into the counties because the population

12    demands it, and you're seeing an amount of nonopioid

13    prescriptions that are coming in that dwarf the amount of

14    opioid prescriptions.

15         And Mr. Lanier was able to do cross on that and say

16    that it was -- he did his numbers, but it seems to me it's

17    fair redirect.

18                    THE COURT:  Well, you can --

19                    MR. WEINBERGER:  Your Honor, he asked him in

20    relation to -- in relation to the allegations that they

21    flooded the -- I mean, he has no expertise to testify about

22    that.

23                    THE COURT:  He can authenticate this and say

24    this is what this shows, a very large volume of

25    noncontrolled prescriptions from CVS each year, and it

1    continues to escalate.  That's fine.

2                    MR. BUSH:  Thank you, Your Honor.

3                    THE COURT:  But what you put in was argument

4    from counsel, not something from an expert report.

5                    (In open court at 4:40 p.m.)

6    BY MR. BUSH:

7    **Q**    So does this chart that you've already testified about

8    and that Mr. Lanier asked you about show that the amount of

9    noncontrolled substance dosage units per capita that have

10   been dispensed in Lake and Trumbull County dwarfs the amount

11   of oxycodone and hydrocodone dosage units that have been

12   dispensed in the county?

13   **A**    It does show that.  It's about 21 times larger for

14   noncontrolled.

15   **Q**    Thank you.

16        All right.  This is another juror questionnaire [sic],

17   and I'll read it into the record.  I think I'll read them

18   one question at a time.

19        "Are you using the exact same data as Mr. Catizone and

20   Dr. McCann to do your analysis?"

21   **A**    I am using part of their data.  So as you saw, I also

22   included analysis of noncontrolled substances, so that's

23   analysis that I did.  But the analysis related to the opioid

24   prescriptions, that database, I'm using the same data.

25   **Q**    And again, let me follow up a second.

**Choi - (Redirect by Bush)**

1    The dispensing database for CVS dispensing was the

2    database of information about dispensing that was produced

3    by CVS, right?

4    **A**    That's correct, yes.

5    **Q**    And the OARRS database was a database about dispensing

6    that was produced by the Board of Pharmacy?

7    **A**    That's my understanding, yes.

8    **Q**    So the next question is, "CVS-MDL-4346A" -- I'll get

9    that, but the question is, "Is this for all CVS pharmacies

10   or only in Ohio?"  So 4346A is up on the screen, and that's

11   what the question is about.

12       So is this for all CVS pharmacies or only in Ohio?

13   **A**    It would be for the pharmacies within the two

14   counties, Lake and Trumbull.

15   **Q**    And then this last question is, "CVS-MDL-3882A, for

16   greater than 25 miles or less than 25 miles?  Isn't the flag

17   for greater than?"

18            MR. BUSH:  And can you put that up on the

19   screen, please?

20       I need the screen back, Mr. Pitts.

21   **Q**    Do you have the question, or should I read it again?

22   **A**    I think I understand.

23       So on the left is less than or equal to 25 miles, and

24   that's what the 97.4 percent reflects, is that in this case

25   the number, the percentage of patients who see a pharmacy or

**Choi - (Redirect by Bush)** 6170

1    go to a pharmacy that's less than or equal to 25 miles, so

2    that wouldn't get a flag.  But the flag is 25 -- more than

3    25.  So if it's 26 miles, it would get a flag.  If it's 24,

4    it would not, or 25 it would not.

5    **Q**    So I hope I'm not misinterpreting the question, but if

6    you were to calculate the percentage of prescriptions that

7    were flagged for all three of these categories of

8    medication, you would subtract the percentage you have

9    listed there from a hundred percent; is that right?

10   **A**    Correct.

11   **Q**    So for opioids, it would be?

12   **A**    2.6 percent.

13   **Q**    And for noncontrolled medications it would be?

14   **A**    2.2 percent.

15   **Q**    Thank you.

16        And I guess I might as well finish it out.

17        And for benzos and muscle relaxers?

18   **A**    Would be 1.8 percent.

19   **Q**    All right.  So I'm going to use, although if we need

20   to we can go to all of these different exhibits, but "The

21   source cited at the bottom of CVS-MDL-4352, 4363, 4967,

22   4328, 4346, and 4340, did you physically go through all the

23   data to obtain these calculations?"

24             MR. BUSH:  Could you pop up 4342, see if that

25   will do the trick?

1   **Q**    There's obviously a bunch of charts in here and we can

2   go through others of them, Dr. Choi, if you think you need

3   to to answer that question.

4   **A**    I'm sorry, can you put the question on top again so I

5   can see it again?

6   **Q**    I can't because it's not the ELMO question, but I'll

7   read it to you again.

8          "The source cited at the bottom of CVS-MDL-4352,"

9   which this one happens to be, and then a list of others that

10  I read before, "Did you physically go through all the data

11  to obtain these calculations?"

12  **A**    So I think the answer is yes, we did go through the

13  data set.  But again, everything's on screen, so we're not,

14  like, physically going through it, but we have the data set

15  in electronic form, and we're analyzing the data in

16  electronic form.

17         But so I guess it's not physical in that sense, but we

18  did go through the data.

19  **Q**    All right.

20               MR. BUSH:  Can I have the ELMO back,

21  Mr. Pitts?

22  **Q**    So this question is, "To obtain the percentages on

23  your report, you just used the data of the expert reports by

24  Mr. Catizone and Dr. McCann?"

25         I guess that's a question.

1   **A**    For some of the tables I used the data that

2   Mr. Catizone and Dr. McCann used.

3       As an example, for the noncontrolled calculations, I

4   used additional data.  So I used more than just what

5   Mr. Catizone and Dr. McCann used.

6   **Q**    And the data, just to touch on it again, was data that

7   was produced by the Board of Pharmacy or by CVS?

8   **A**    Correct, yes.

9   **Q**    Which is the same data that Dr. McCann used?

10  **A**    For the red flag -- well, for the noncontrolled --

11  **Q**    No, not for the noncontrolled, for the dispensing

12  information.

13  **A**    Yes, that's the same data.

14  **Q**    All right.  This question is, "CVS-3882, 3887, 3896,

15  3886, and more, which counties are these totals calculated?"

16          MR. BUSH:  And could we at least pop up the

17  first one of these and see if that sets the context for the

18  questions?

19  **Q**    So do you have the question or should I read it again?

20  **A**    I understand the question.  This is for both Lake and

21  Trumbull.

22  **Q**    Okay.  So this question is, "Of the 2,000

23  prescriptions you reviewed from CVS, how many (what

24  percentage) of those had red flag resolutions documented?"

25  **A**    Is this referring to -- I'm assuming this is referring

1   to the 2,000 that was in the sample from Mr. Catizone.

2   **Q**   I think that's probably a good inference, but we can't

3   ask the jurors questions, so you're --

4   **A**   Sorry about that.

5       So, I'm sorry, could I have the question back, please?

6   **Q**   Hold on a second.

7       "Of the 2,000 prescriptions you reviewed from CVS,

8   how many (what percentage) of those had red flag resolutions

9   documented?"

10  **A**   I don't recall the specific percentage of the 2,000.

11  But, again, it's -- again, I'm not sure if I'm answering the

12  right question here, but I wasn't asked to do that piece of

13  it, to do that calculation.

14  **Q**   All right.  Can we go back to the prior question?  And

15  I think I just showed you CVS 3882, but -- and you answered

16  that those were for the two counties.  And perhaps we ought

17  to look at the others.

18      Do you know, without looking at the others, that they

19  did involve the two counties, Lake and Trumbull, which is I

20  think what your answer was as to 3882?

21  **A**   Yeah, generally if I didn't specify the county, it's

22  for both counties.  If I specified one particular county, it

23  would be for that particular county, but most of the tables

24  reflected both counties.

25  **Q**   All right.  Thank you.

1      This is another juror question.  "Do you agree there

2  is an opioid epidemic?"

3  **A**    So, you know, I'm an economist, and certainly there is

4  a problem.  I recognize that there is a problem.

5      I'm not an epidemiologist.  I can't define, it's not

6  in my vocabulary to define what an epidemic is.  It's just

7  not my specialty.  But I clearly understand that there's a

8  problem.

9  **Q**    All right.  I guess we'll take that as a yes.

10      "Do you agree that every prescription for an opioid,

11  whether for a legitimate medical purpose or not, is a

12  potential addition to the epidemic?"

13  **A**    So the -- I think I understand the question.  It's

14  just that this isn't my area of expertise, and so I -- the

15  way I would answer is from a layperson, lay perspective.

16      Again, I'm an economist.  I understand the issues.  I

17  understand that there's a problem.  I understand that there

18  could be a potential for addiction.

19      But, again, beyond that, this is not really my area of

20  expertise.

21  **Q**    All right.  Next question.  "All the red flags could

22  have been explained if there was proper documentation, true

23  or false?  Doesn't proper documentation help the patient as

24  well as the other pharmacists?"

25  **A**    So I think this goes to the concept of what I talked

1    about before about the false positives.  So if I'm

2    understanding this question, and I think I used this example

3    before where a pharmacist knows the patient, knows that the

4    patient works in Cleveland or goes to the Cleveland Clinic

5    but lives in Trumbull.

6         If the -- my understanding is if the pharmacist

7    determines that that is an appropriate prescription, that

8    there wouldn't be documentation.  But if there's a false

9    positive and you're assuming that that is already a --

10   again, a flagged prescription, then there would be confusion

11   as to what documentation there could and couldn't be.

12        So that's the problem when you have false positive, is

13   it confuses what the ultimate answer is going to be because

14   you have to make some strong assumptions.  And if your

15   assumption is that everything flagged needs to be

16   documented, but in reality some flags are false positives,

17   it's going to affect how you can come to a conclusion.

18   **Q**    All right.  And then the last juror question I have,

19   "If you're not a pharmacist," which you're not, "how can you

20   assess the accuracy of the prescription documentation with

21   the consideration that Catizone is a pharmacist?"

22   **A**    So the way that I look at it is my expertise is in

23   data analysis and examining what the right way to do data

24   analysis is.  And I agree, I'm not a pharmacist, but how to

25   do data analysis doesn't change if you're a pharmacist or if

1   you're a different profession.

2        You have to first look to see what's in the data, what

3   limitations there are in the data, and you have to check the

4   results.  If you don't do that, regardless of what

5   profession you're in, then your data analysis is incorrect.

6        And so I'm here to talk about what the right

7   methodology is, how you should be doing data analysis.  And

8   so if the methodology is wrong, the methodology is

9   incorrect, not well thought out, then its accuracy will be

10  affected.

11  **Q**    All right.  And then the second question from this

12  juror is, "Please explain the 30 percent error rate

13  associated with flags 3, 4, and 15 again.  Can you give a

14  number of how many prescriptions this flagged out of the

15  total?"

16       And perhaps we ought to put that chart back up --

17  **A**    Yeah, that was --

18  **Q**    -- so maybe it will help you.

19       It's 3420A -- I'm sorry, 3320A.

20       Here, I can put it up on the ELMO.  That's fine.

21       Do you have the question, Dr. Choi, before --

22  **A**    I thought that was related to the retroactive

23  flagging.

24  **Q**    So here, I think this is the chart that this question

25  refers to.  I hope I've got that right.

1          So the question again, here, I can put it up here and

2     then I'll take it away, "Please explain the 30 percent error

3     rate associated with flags 3, 4, and 15 again.  Can you give

4     a number of how many prescriptions this flagged out of the

5     total?"

6     **A**     Sure.  So again, just for clarification on what these

7     numbers mean, the 30 percent is simply the percentage of the

8     flagged prescriptions that also had a retroactive flagging.

9          So what this simply means is that for red flag 3 there

10    were 21,929 prescriptions flagged under that flag, but 7,205

11    of the 21,000 were for a prior prescription, the retroactive

12    flagging.  And that's true for the other two.

13         So you can take a look at the bottom on red flag 15,

14    210-day supply.  45,571 prescriptions were flagged.  Of that

15    number, 13,582 had that prior flag where there was a

16    look-back to flag.

17    **Q**     All right.  And you're not saying, I think we went

18    over this before, that all the ones that didn't

19    retroactively flag, so the ones in the retroactive flagging

20    column, we take those away, you're not saying whatever's

21    left was -- should have been flagged, are you?

22    **A**     No, that's not what I'm saying.

23    **Q**     So Mr. Lanier asked you some questions about -- he

24    used in part of his questioning, I think talking about the

25    security system downstairs, calibrating the machine and, you

1    know, why wouldn't you want to have it be really broad and

2    just have a lot of prescriptions flagged here because

3    they're dangerous, and I think you were trying to answer why

4    that might not be a good idea, so I want to give you an

5    opportunity to explain why that might not be such a good

6    idea.

7    **A**    So when doing data analysis and you recognize that

8    there is an error rate, there's a potential for error, you

9    don't just glide over it and then make an assumption about

10   it.

11       So as an example here, there is a possibility, a very

12   strong possibility, that the amount of flagging that's going

13   on under the Catizone/McCann methodology is quite large.

14   There's a quite large number of false positives.

15       The reason it matters is that when you go to the

16   sample, when you go to the notes, even though there could be

17   a large percentage of red flags -- I'm sorry, false

18   positives, Mr. Catizone then assumes that everything that

19   was flagged had to be documented, and that's not a correct

20   assumption when you are dealing with false positives,

21   because then you're making an assumption that can then

22   further down the line affect your conclusions.

23       So identifying false positives is very important.

24   It's important for accuracy, it's important for reliability.

25   **Q**    All right.  Thank you.

1          Mr. Lanier asked you some questions about your

2     compensation at AlixPartners, and he specifically asked

3     about Purdue Pharma.

4     **A**      Yes.

5     **Q**      And just -- you mentioned a wall.  And could you just

6     explain a little bit more?  I'm not sure that the concept of

7     a wall ever got out well enough that anybody would

8     understand it.  But what does that mean?

9     **A**      My apologies for that.

10    **Q**      No, I don't think it was -- I think Mr. Lanier was

11    moving pretty fast.

12    **A**      So what we mean by this is that there is a project

13    that Mr. Lanier referred to.  What I meant by the

14    information wall is that I do not speak to any of my

15    colleagues who are related to that project.  We do not speak

16    at all about what they're doing.  They don't speak to me or

17    my team about what we're doing on this case.  And I take

18    that very seriously.  And that's why I do not follow the

19    news as to what's going on, because I take that wall very

20    seriously.

21    **Q**      All right.  And you testified a little bit about your

22    compensation, and I want to take you back to what you said

23    at the very beginning of your testimony about the

24    organization of the firm, Alix, and to business units.

25    **A**      Correct.

1    **Q**    And is your -- and you mentioned your bonus before in

2    response to some of Mr. Lanier's questions.

3    Is that based on your business unit or -- and your

4    performance in your business unit?

5    **A**    It is largely based on our business unit.  So there

6    are, as I said, five different business units at

7    AlixPartners.  The Purdue matter that Mr. Lanier referred to

8    is in a separate business unit.

9    **Q**    Is that the Restructuring business?  Is that what it's

10    called?  I don't know what it's called, but is that what

11    it's called?

12    **A**    It's close enough, but, yes, Restructuring is fine.

13    **Q**    I know you have kept the wall at Alix, but from just

14    reading in public, do you understand what has happened to

15    the debtor in Purdue?

16    **A**    It would be very limited.  Again, I try not to read

17    too much about it.

18    **Q**    Do you understand that it is being reorganized so that

19    it will be for the benefit of the cities and counties who

20    have suffered or can prove that they have suffered in the

21    opioid crisis?

22    **A**    That I do understand, yes.

23    MR. BUSH:  All right.  I pass the witness.

24    Thank you.

25    Oh, you know what, I have one other thing that I need

1    to do.  Will you indulge me?  But I need your chart.

2               (Off-the-record discussion.)

3    BY MR. BUSH:

4    **Q**    So, I'm sorry, Dr. Choi, I have one other set of

5    questions here.

6         And you remember this chart that Mr. Lanier put up on

7    the ELMO?

8    **A**    I do, yes.

9    **Q**    So one of the people that you're responding to is

10   Dr. McCann, right?

11   **A**    Correct.

12   **Q**    And you read his report?

13   **A**    Yes.

14   **Q**    And you read his CV?

15   **A**    Yes.

16   **Q**    And you read whatever he said about his qualifications

17   in his report?

18   **A**    I did, yes.

19   **Q**    So is he competent to make any dispensing choices or

20   opinions?

21   **A**    No.

22   **Q**    And is he a licensed pharmacist?

23   **A**    Not to my knowledge.

24   **Q**    Did he say that he had any experience of what

25   information pharmacists have?

 1   **A**      Again, not to my knowledge.

 2   **Q**      And did he say that he had any expertise in the

 3   dangers of opioids or opiates?

 4   **A**      No.

 5   **Q**      And did he say he had any expertise -- I'm sorry, did

 6   he say whether any pharmacy had ever hired him to write

 7   policies on red flags?

 8   **A**      I don't recall.  I don't recall him saying he did.

 9   **Q**      Did you see -- did you see that he said anything

10   about -- express any opinion about whether there are

11   requirements that pharmacists document red flags?

12   **A**      I didn't see that.

13   **Q**      And did you see that he said he had any DEA training

14   on red flags?

15   **A**      I don't recall him saying that.

16   **Q**      And did you see that he said anything about whether he

17   read the *Holiday* or any other red flag cases?

18   **A**      I don't recall that being in his report.

19   **Q**      All right.  And I'm not going to write on Mr. Lanier's

20   chart here, but if I put up here "Did you," talking about

21   you, "did you do anything to validate the methodology that

22   you applied to identify the red flags in this case," and

23   you -- he would put -- what would he put there?

24   **A**      Well, I would put a yes.  Based on my review of

25   Dr. McCann's analysis, he would put a no.

```
 1                    MR. BUSH:  Thank you.

 2                         - - - - -

 3                    RECROSS-EXAMINATION

 4     BY MR. LANIER:

 5     Q    But you were criticizing Mr. Catizone with these red

 6     flags too, weren't you?

 7     A    I was criticizing his methodology.

 8     Q    Right.  And he is all of the things on here, isn't he?

 9     A    Again, I don't remember all of his qualifications.

10     Q    Next.  You were asked a jury question about do you

11     agree there's an opioid epidemic.  Remember?

12     A    Yes.

13     Q    And your answer was, I'm not an epidemiologist.

14     A    Exactly the way I said it.

15     Q    Right.  And but you've got to -- I'll let you in on a

16     secret.  The juror that asked that question based on the

17     questionnaires of all of these jurors isn't an

18     epidemiologist either, so could we maybe just use the common

19     definition of "epidemic" and ask you the question, if you

20     understand that when ordinary people use the word

21     "epidemic," they're meaning "affecting or tending to affect

22     a disproportionately large number of individuals within a

23     population, community, or region at the same time."

24     A    Okay.

25     Q    If we look at an epidemic like that, would you agree
```

1     there's an opioid epidemic?

2     **A**    So that's --

3                    MR. BUSH:  Your Honor, object.  That was

4     outside the scope.

5                    MR. LANIER:  That was a juror question.

6                    THE COURT:  Overruled.  We went through this

7     with a juror question.

8                    MR. BUSH:  Fair enough.

9                    THE COURT:  You may answer, sir.

10    **A**    Can I have of the definition back, please?

11    **Q**    The definition was, "affecting or tending to affect a

12    disproportionately large number of individuals within a

13    population, community, or region at the same time."

14    **A**    So the way I read that as someone who is -- again, my

15    focus is usually on data.  The way I would read that is that

16    there is some level of expertise and there's also -- it's an

17    empirical issue about what does the data support.

18    **Q**    The next set of questions.

19          You were asked did you go through the calculations.

20    You answered "we" did.  The juror may have meant y'all, but

21    may have meant you specifically.

22          So my question is, did you go through those

23    calculations individually?

24    **A**    Well, not every -- depends on which table.  Some

25    calculations I did, some calculations my staff or my team

 1    members did.

 2  **Q**     All right.  Next set of questions.

 3          Mr. Stoffelmayr from Walgreens got up and asked you

 4    about hydrocodone and which end of the chart, and all the

 5    rest of that.

 6          Remember those questions?

 7  **A**     Yes.

 8  **Q**     I want you to assume with me that the testimony from

 9    Joe Rannazzisi was that hydrocodone was the number one

10    prescribed drug in the U.S.

11          Are you with me so far?

12  **A**     I'm sorry, can you please stop scrolling for a second?

13  **Q**     Here.  Let me go back.

14  **A**     Your finger's not helping right now.

15  **Q**     "Hydrocodone was the number one prescribed drug in the

16    United States, period."

17          You with me?

18  **A**     I see that, yes.

19  **Q**     Assume with me he says, "And in my opinion, while I

20    was working at DEA, we saw wholesale abuse of hydrocodone,

21    and it just struck me that we were consuming 99 percent of

22    the world's hydrocodone.  It was the number one prescribed

23    drug, and there had to be something going on other than

24    appropriate medical care with this drug."

25          You still tracking with me?

1    **A**    Yes.

2    **Q**    And then oxycodone he put right up there with

3    hydrocodone.

4          Now, oxy is a 1.5 MME, correct?

5    **A**    That's correct.

6    **Q**    It's very low also, true?

7    **A**    Relatively low, yes.

8    **Q**    And it was right up there with hydrocodone as the most

9    abused opioids in the United States at that time.

10         Do you see that, sir?

11   **A**    I see the answer, yes.

12   **Q**    And so now if we go back to that question I had been

13   asking you and that Mr. Stoffelmayr asked you, we're back to

14   the left -- or to the right end of that chart, aren't we?

15                MR. STOFFELMAYR:  Objection.  I've got to

16   object.

17   **A**    I don't --

18                THE COURT:  Overruled.

19   **A**    If I'm understanding your question, I don't think

20   that's the right way to look at the chart.

21   **Q**    Well, that's where the hydrocodone and the oxycodone

22   are going to be, the low MME drugs, aren't they?

23   **A**    That's where -- again, those are per prescriptions,

24   and that's the median per prescription.

25   **Q**    Yes, sir.

1    **A**    That doesn't tell you specifically what that

2    prescription was.

3          So if it was -- also, it was a total amount, so that's

4    not information you can extract from that particular chart.

5    **Q**    Your chart may not be too useful?

6    **A**    No, it's very useful, but not for your question.

7    **Q**    Well, actually it is.  If it shows which ones had the

8    lower sales -- I mean the greater sales of the lower MMEs --

9    all right, we'll leave it where it is.

10         You've got a wall at the company on the Purdue money,

11   Purdue work?

12   **A**    So as I explained before, there's an information wall.

13   **Q**    Is that because you have a conflict?

14   **A**    No, it's not because of a conflict.  It's because we

15   want to be very careful about things like this.

16   **Q**    But you're able to make money on both sides that way,

17   aren't you?

18   **A**    I don't understand what you mean.

19   **Q**    Okay.  And then false positives.  You keep calling

20   them false positives.

21         Have you ever seen that in any DEA literature in your

22   entire existence, the idea of a false positive red flag?

23   **A**    I don't recall the word "false positive" in the DEA

24   literature that I've seen.

25   **Q**    And you've never seen that in any CVS literature, have

 1    you?  Have you?

 2    **A**    I'm trying to remember.  I'm not recalling, no.

 3    **Q**    Because false positive is a word you've made up to

 4    talk about a red flag that can be resolved, isn't it?

 5    **A**    No.  A false positive is not a word that I made up.  A

 6    false positive is a common phrase among data scientists and

 7    statisticians.

 8    **Q**    Not in the realm of red flags and positive red flags;

 9    you'll find it nowhere, will you?

10    **A**    So that I can't answer.

11    **Q**    Thank you.

12                MR. LANIER:  Thank you, Your Honor.

13                THE COURT:  All right.  Okay, Doctor, thank

14    you very much.  We appreciate your testimony.

15                THE WITNESS:  Thank you, Your Honor.

16                THE COURT:  Safe travels back.

17          You may be excused.

18          All right, ladies and gentlemen, we will break for the

19    evening.  Usual admonitions apply.  Do not read, view,

20    listen, encounter anything about this case or anything close

21    to it in any sort of media.  Don't discuss this case with

22    anyone.

23          Have a good evening, and we'll pick up tomorrow

24    morning at 9.

25                (Jury excused for the day at 5:13 p.m.)

6189

```
 1              THE COURT:  Okay.  Please be seated for a
 2   minute.  If someone could just close the back door, please.
 3              MR. WEINBERGER:  Your Honor, can I make a
 4   statement for the record before you --
 5              THE COURT:  All right.
 6              MR. WEINBERGER:  So we've been at this trial
 7   for four and a half weeks now, and we've heard
 8   Mr. Stoffelmayr complain about things we've done.  And what
 9   I heard Mr. Stoffelmayr get up and say in front of this jury
10   is that my colleague, Mr. Lanier, made a false statement
11   regarding what Mr. Rannazzisi said, when in fact the
12   testimony of Mr. Rannazzisi is exactly what Mr. Lanier said.
13              MR. STOFFELMAYR:  Completely -- I cannot
14   believe you would say that, Peter.  I'm shocked.
15              MR. WEINBERGER:  You said it was -- you're
16   shocked?  I'm shocked that you would accuse Mark Lanier of a
17   false statement.  You know better.
18              THE COURT:  Hold it, hold it.  First of all,
19   first of all, I don't want any speaking objections or
20   accusations like that just trolled out, all right?
21        So, Mr. Stoffelmayr, I think that's something you
22   should have asked for a side bar, and if you wanted to say
23   that, that's fine, but you shouldn't say anything like
24   that --
25              MR. STOFFELMAYR:  If I --
```

```
 1                    THE COURT:  -- whether you think it's true or
 2    not.
 3                    MR. STOFFELMAYR:  I do understand that.
 4    They're got different issues.  That point I accept, and I
 5    apologize.
 6                    THE COURT:  Okay.  So that's important.
 7         Now, you know, I haven't memorized everyone's
 8    testimony and I'm not tracking it, as Mr. Lanier says, as
 9    well as all of you are.
10         We actually got two full witnesses done today.  That
11    went faster than I thought.
12         So tomorrow, what do we anticipate from the
13    defendants?
14                    MS. FUMERTON:  Your Honor, in the morning
15    we're calling Dr. Mark Glickman.  He's an expert.
16                    THE COURT:  Dr. Glickman?
17                    MS. FUMERTON:  Yes, sir.
18                    THE COURT:  All right.
19                    MR. DELINSKY:  After Dr. Glickman we'll be
20    calling Robert Hill, Your Honor, who is an expert for CVS.
21                    MS. FUMERTON:  Your Honor, we have two
22    deposition clips we still need to play.  One is about 22
23    minutes and --
24                    MS. SWIFT:  It's about 65, 64 minutes.
25                    MS. FUMERTON:  Just over an hour.
```

1           THE COURT:  All right.  Well, we'll -- again,

2     it's hard to predict how -- I mean, I didn't think we'd

3     actually get through two experts today, but everyone was

4     very efficient, so that's good.

5          Okay.  Fine.  I guess tomorrow morning we want to take

6     up the Harrington documents that CVS offered.  The

7     plaintiffs wanted a little time to look at it.

8          I don't know if there are going to be any documents

9     with Dr. Murphy.  We should take those up, and also

10    Dr. Choi, so if people can look at those so we can stay

11    current.  I don't know -- with experts, I don't know what

12    documents everyone is really planning to offer.

13          MR. HYNES:  Your Honor, Paul Hynes for CVS.

14          I think if plaintiffs are okay, we can take up the

15    Harrington exhibits now.

16          THE COURT:  I don't know if they're ready.

17          MR. WEINBERGER:  We still have to discuss your

18    first exhibit.

19          MR. HYNES:  Okay.

20          MR. WEINBERGER:  Right?

21          THE COURT:  We can put that to the side,

22    Peter.

23          MR. WEINBERGER:  And then we have no

24    objections to the rest of the exhibits.

25          MR. HYNES:  Okay.

6192

1                    THE COURT:  All right.  All right, fine.

2                    MR. HYNES:  With the exception of the first

3      one, Your Honor, and I marked two on here that were already

4      admitted.  The others can be admitted.  If you'd like me to

5      read them out, I can.

6                    THE COURT:  I'll read them.  That's okay.

7          So these come in without objection.

8                    MR. HYNES:  Right.

9                    THE COURT:  01727, 01728, 00266, 00854, 00945,

10     00906, 00980, 01104, 01263, 01393.

11                   MR. HYNES:  And all of those were CVS-MDL.

12                   THE COURT:  Okay.  And 15601, and then 20699.

13                   MR. HYNES:  Right.  And both of those were

14     P-dash.

15                   THE COURT:  P-dash, all right.

16                   MR. HYNES:  That's all of them.  Thank you,

17     Your Honor.

18                   THE COURT:  Okay.  And then, all right, fine.

19     Then we'll -- remind me, we'll come back on the TRO.

20                   MR. HYNES:  Yes.  We will consult with

21     plaintiffs on that and the *Holiday* decision, and report back

22     to you.

23                   THE COURT:  All right.  Okay.  Good.  So then

24     we can take up tomorrow morning whatever documents people

25     want to offer with Drs. Murphy and Choi.

1          Okeydoke.  Have a good evening everyone.

2          Oh, I had for the time, 5.25 for defendants and 1.0

3    for plaintiffs, so 6.25 total.

4               (Proceedings adjourned at 5:19 p.m.)

5                       * * * * *

6                  **C E R T I F I C A T E**

7

8        I certify that the foregoing is a correct transcript

9    of the record of proceedings in the above-entitled matter

10   prepared from my stenotype notes.

11

12          */s/ Lance A. Boardman_____  11-04-2021*
             Lance A. Boardman, RDR, CRR              DATE
13

14

15

16

17

18

19

20

21

22

23

24

25