6194

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION AT CLEVELAND

-------------------------------X
IN RE:                         :   Case No. 1:17-md-2804
                               :
NATIONAL PRESCRIPTION          :
OPIATE LITIGATION              :
                               :   **VOLUME 24**
CASE TRACK THREE               :   JURY TRIAL
                               :   *(Pages 6194 - 6490)*
                               :
                               :
                               :
                               :   *November 5, 2021*
-------------------------------X


TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>


HELD BEFORE THE HONORABLE DAN AARON POLSTER


SENIOR UNITED STATES DISTRICT JUDGE


Official Court Reporter:          Lance A. Boardman, RDR, CRR
                                  United States District Court
                                  801 West Superior Avenue
                                  Court Reporters 7-189
                                  Cleveland, Ohio 44113
                                  216.357.7019


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

6195

```
 1     APPEARANCES:

 2     For the Plaintiffs:          Peter H. Weinberger, Esq.
                                     SPANGENBERG, SHIBLEY & LIBER
 3                                   1001 Lakeside Avenue, Ste. 1700
                                     1900 East Ninth Street
 4                                   Cleveland, Ohio 44114
                                     216-696-3232
 5
                                     W. Mark Lanier, Esq.
 6                                   Rachel Lanier, Esq.
                                     THE LANIER LAW FIRM
 7                                   6810 FM 1960 West
                                     Houston, Texas 77069
 8                                   813-659-5200

 9                                   Frank L. Gallucci, III, Esq.
                                     PLEVIN & GALLUCCI COMPANY, LPA
10                                   The Illuminating Building
                                     Suite 2222
11                                   55 Public Square
                                     Cleveland, Ohio 44113
12                                   216-861-0804

13                                   Salvatore C. Badala, Esq.
                                     Maria Fleming, Esq.
14                                   NAPOLI SHKOLNIK
                                     360 Lexington Ave., 11th Floor
15                                   New York, New York 10017
                                     212-397-1000
16

17
       For Walgreens Defendants:    Kaspar J. Stoffelmayr, Esq.
18                                   Brian C. Swanson, Esq.
                                     Katherine M. Swift, Esq.
19                                   BARTLIT BECK LLP
                                     54 West Hubbard Street, Ste.300
20                                   Chicago, Illinois 60654
                                     312-494-4400
21

22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2    For CVS Defendants:        Graeme W. Bush, Esq.
                                 Eric R. Delinsky, Esq.
 3                               Kyle A. Crawford, Esq.
                                 ZUCKERMAN SPAEDER - WASHINGTON
 4                               Suite 1000
                                 1800 M Street, NW
 5                               Washington, DC 20036
                                 202-778-1831
 6

 7
      For Walmart Defendants:    John M. Majoras, Esq.
 8                               JONES DAY - COLUMBUS
                                 Suite 600
 9                               325 John H. McConnell Blvd.
                                 Columbus, Ohio 43215
10                               614-281-3835

11                               Tara A. Fumerton, Esq.
                                 Tina M. Tabacchi, Esq.
12                               JONES DAY - CHICAGO
                                 Suite 3500
13                               77 West Wacker
                                 Chicago, Illinois 60601
14                               312-782-3939

15
      ALSO PRESENT:             David Cohen, Special Master
16

17                                    - - - - -

18

19

20

21

22

23

24

25
```

1                          Table of Contents

2

3    Witnesses/Events                                    Page

4    MARK GLICKMAN                                       6214

5         Ms. Fumerton - Direct                      6214
          Mr. Lanier - Cross                         6285
6         Ms. Fumerton - Redirect                    6325
          Mr. Lanier - Recross                       6343
7
     ROBERT HILL                                        6352
8
          Mr. Delinsky - Direct                      6352
9         Mr. Lanier - Cross                         6444
          Mr. Delinsky - Redirect                    6480

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court at 8:47 a.m.)

2              THE COURT:  We can take up the exhibits for

3     Dr. Murphy and Dr. Choi.

4         It looks like the plaintiffs are offering two.

5         Any objection to either of these two?

6         Looks like the plaintiffs are offering two exhibits

7     with Dr. Murphy, 0166, the Case and Deaton article, and

8     17422, an e-mail.

9         Any objection to either of those?

10             MS. FUMERTON:  So, Your Honor, we had just

11    exchanged exhibits last night.  I apologize, I was just with

12    the next witness.  Will we have till lunch just to make sure

13    we're on the same page?

14             THE COURT:  All right.  I don't have any from

15    the defendants.

16             MS. FUMERTON:  Yeah, I have a list for you.

17             THE COURT:  All right.  There's a list of

18    exhibits for Dr. Choi, and it says no objections by the

19    plaintiffs.

20             MR. WEINBERGER:  That's correct.

21             THE COURT:  That's correct?  All right.  I can

22    read these into the record then.

23        03882A, 03886A, 03887A, 03896A, 04311A, 04313A,

24    04313B, 04320A, 04328A, 04335A, 04337A, 04339, 04340, 04341,

25    04342A, 04343A, 04346A, 04352A, 04363A, 04966, 04967, 04968,

1    all without objection.

2         Do plaintiffs have any for Dr. Choi?

3              MR. BUSH:  Just to be perfectly clear, the

4    prefix for that should be CVS-MDL.  I don't think you said

5    all that.

6              THE COURT:  I don't know how these are all --

7    all right, if the prefix are on there or not.

8              MR. BUSH:  They are.

9              THE COURT:  All right.  These are all CVS-MDL

10   then.

11        Do the plaintiffs have anything for Dr. Choi?

12             MR. WEINBERGER:  No, Your Honor.

13             THE COURT:  Okay.  Fine.  Then we'll take up

14   Dr. Murphy later.

15             MR. WEINBERGER:  Your Honor, I'm not sure

16   where the record stands on this one from Harrington, which

17   was P-08415.  My recollection is we had discussion about it

18   and that you were going to still consider it.  This is

19   the --

20             THE COURT:  Let me have the exhibit.

21             MR. WEINBERGER:  08415, Robert.

22             MS. FLEMING:  You have it from yesterday,

23   Robert.

24             THE COURT:  I thought I made a ruling on this.

25        Robert, what ruling was made on 08451?

1              I wrote that it was withdrawn.

2                   MR. WEINBERGER:  No, we didn't withdraw it.

3                   THE COURT:  Well, that's what -- you said you

4    weren't offering it then, so it was withdrawn.

5                   MR. WEINBERGER:  No, this was -- the objection

6    was that she didn't recognize it, but it was on -- but her

7    name is on it.

8                   THE COURT:  All right.  I wrote down that it

9    was withdrawn.

10         So you are offering it?

11                  MR. WEINBERGER:  Yes.  And slides -- or pages

12   27, 28 to 35, has her name on it as for Professional

13   Practices.

14                  THE COURT:  Refusals to fill, are those the

15   pages you're offering?

16                  MR. WEINBERGER:  I think it has to be in the

17   context of the entire PowerPoint, but I'm just pointing out

18   those pages because she's referenced there.

19                  THE COURT:  I'm looking at page 27.  I don't

20   see --

21                  MR. WEINBERGER:  Slide 27, 28 to 35.

22                  THE COURT:  All I have is page numbers, so I

23   don't -- all right.

24         Where is the witness mentioned?

25                  MS. FLEMING:  Slide 27 of --

```
 1            THE COURT:  Slide 27 doesn't mean anything to

 2   me.  All I have is page numbers here.

 3            MR. LANIER:  Your Honor, if you'll hand it to

 4   me, I'll find it.

 5            THE COURT:  All right.

 6            MR. LANIER:  Your Honor, we're on Bates number

 7   ending in 204.  You'll see her name --

 8            THE COURT:  Well, her name's on it, so...

 9        Well, it seems to me the portion of the document with

10   her name on it should come in, whether she recognized it or

11   not, because her name's on it, and she -- you know, she

12   didn't disavow it.  She didn't say someone put it on in an

13   unauthorized way.

14        I can't remember what she said about it, but --

15            MR. DELINSKY:  Your Honor, I don't believe she

16   provided testimony about that portion of the deck.

17            THE COURT:  If someone can pull out the

18   testimony for me.  As I said, I thought the plaintiffs had

19   withdrawn this yesterday, so I moved on.

20            MR. LANIER:  The testimony was about -- Your

21   Honor, I'm sorry, if I could borrow your document again.

22   This should not happen this way.  I apologize.  You've been

23   very patient, and I thank you for that.

24        The part that I questioned her about was about the

25   holy trinity alert on page 208, that it still wasn't working
```

1    as of that point in time and that it was a project to be

2    done.

3              THE COURT:  Right, that I remember.  She was

4    questioned on page 208.

5         Well, that page should come in.

6         I don't know, Mr. Lanier, if she was questioned about

7    these other pages that have her name on it.

8              MR. LANIER:  I did not, Your Honor, and so

9    it's fine for me if that's the only page that comes in.

10   It's less distracting that way.  We can put in the page

11   number.

12             THE COURT:  It seems to me this one page

13   should come in because she gave testimony about it.

14        So without objection then, CVS-MDL-T380208, so it's

15   one page only.  It happens also to say -- it doesn't have --

16   it has page number 29 on the document, so that one page

17   comes in.

18             MR. DELINSKY:  Your Honor, we would just

19   propose that the cover e-mail be included, too, to get some

20   framing.

21             THE COURT:  All right.

22             MR. DELINSKY:  084150001.

23             THE COURT:  All right.  Without objection, the

24   cover e-mail can come in.  That's a good idea.

25        So I guess by the end of the day I'll get whatever

1   submissions on the jury instructions people want to make.

2   My team and I will obviously carefully consider them, and if

3   there's any -- I don't know if you've conferred and agreed

4   on anything.  There hasn't been much agreement on jury

5   instructions, so --

6                MR. WEINBERGER:  Your Honor, I can tell you

7   that with respect to the jury instructions that were

8   submitted I think by Special Master Cohen on the 1st, the

9   most updated, plaintiffs have no objection to.

10                THE COURT:  Okay.  Thank you, Mr. Weinberger.

11                MR. STOFFELMAYR:  Kaspar Stoffelmayr.  I think

12   we're still working together on this.  Defendants may

13   have --

14                (Audio feedback.)

15                MR. STOFFELMAYR:  I'm sorry.

16                THE COURT:  Your metallic head or something?

17                MR. STOFFELMAYR:  I'm magnetic or something,

18   yeah.

19        I think defendants may have some very, very limited

20   targeted suggestions that we'll get to you by 4 p.m.

21                THE COURT:  Okay.  Well, I will look at

22   anything you submit carefully.

23                MR. DELINSKY:  Your Honor, can we just go back

24   to that exhibit?

25                MR. WEINBERGER:  You want the whole thing, is

1     it?

2                 MR. DELINSKY:  No, but here's the problem,

3     Your Honor, is that what Ms. Harrington talked about was the

4     development of the new alert for the combination, okay?  And

5     whether -- I think what Mr. Lanier asked her about, was the

6     prior DUR alert adequate or inadequate given that CVS was

7     trying to pioneer and in fact did pioneer this new alert.

8        There's numbers at the bottom which were not the

9     subject of any testimony, and there's no explanation for

10    them.  And there's a potential for prejudice due to the lack

11    of explanation for what those are, and they can be

12    misconstrued.

13              THE COURT:  On that one page -- Mr. Pitts, let

14    me see the one page.

15              MR. DELINSKY:  Your Honor, there was just no

16    questioning or testimony about those numbers.

17              MR. WEINBERGER:  Eric, can I see that?

18              THE COURT:  That's true, the testimony was

19    about, you know, holy trinity alert.  We didn't go into

20    the --

21              MR. DELINSKY:  So we just ask those be

22    redacted, Your Honor.

23              MR. WEINBERGER:  We don't have a problem with

24    that.

25              THE COURT:  All right.  Fine.  We'll redact

```
 1    the tables with the numbers at the bottom.
 2              MR. DELINSKY:  We'll work with Pete and Maria
 3    to get that done.
 4         Thank you, Your Honor.
 5              THE COURT:  Okay.
 6              MR. MAJORAS:  Your Honor?
 7              THE COURT:  Yes, Mr. Majoras.
 8              MR. MAJORAS:  Thank you, sir.  Just an update
 9    again on what we're looking at going forward, we talked
10    about it yesterday morning.
11         So we have Dr. Glickman and Mr. Hill today.  We think
12    we'll also have some very short depositions before the end
13    of the day.
14              THE COURT:  Okay.
15              MR. MAJORAS:  We have the three pharmacist
16    witnesses that will be next week.  Plaintiffs I'm sure know
17    this already, but I can disclose from Walmart's standpoint
18    it will be Lori Militello from our standpoint.
19         The one change from what I talked about yesterday, now
20    that we know it looks like we'll go into Tuesday, and from
21    events yesterday, we may call one additional expert.  It's
22    Daniel Kessler.  He's been previously disclosed and deposed.
23         We have disclosure obligations this evening, but we
24    will try to keep plaintiffs apprised as soon as we can on
25    the certainty of that.
```

6206

```
1              THE COURT:  That's not -- that's a different
2    Kessler from the Government official, right?
3              MR. MAJORAS:  Yes, sir.  That was David
4    Kessler.
5              THE COURT:  What's his expertise?
6              MR. MAJORAS:  Mr. Kessler will talk about
7    causation issues.  We think it will be relatively short.
8    Obviously we have to watch our time, but that is one change
9    from yesterday.
10             THE COURT:  All right.  So you think you'll
11   get through the two experts and the depositions today?
12             MR. MAJORAS:  I'm optimistic.  It will be done
13   in my absence, Your Honor, so I'm sure everyone will move
14   quickly.
15             MR. DELINSKY:  Your Honor, I think the key to
16   that rests with Mr. Weinberger and Mr. Lanier.
17             MR. WEINBERGER:  Your Honor, I believe they're
18   probably talking about one of the depositions to be played
19   is Deborah Mack, and I hate to keep coming back to the well
20   on Deborah Mack's deposition.
21        I sent an e-mail yesterday to Special Master Cohen.
22        To give some context, Deborah Mack was the supervisor
23   of Mr. Nelson.  She was -- we were permitted to depose her
24   as part of the sanction motion that arose after Susanne
25   Hiland's deposition.  It was a discovery deposition.
```

1      They now want to play this deposition even though they

2   haven't demonstrated that she's unavailable.  So, and you've

3   said that she can and that if we want to we can call her by

4   videoconferencing.

5      But that doesn't cure our concern about 80 percent of

6   her testimony, which is hearsay testimony about

7   conversations that she had or that someone else had that

8   they told her about.

9           THE COURT:  I'm not going to let her talk

10   about conversations that someone else had.  If she talked --

11   if she spoke to a Government official, she can relate that

12   on such-and-such a date or approximately such-and-such a

13   date I spoke to so-and-so from the State Board of Pharmacy,

14   and as -- I mean, I don't think she can relate the detail,

15   the exact words, but she can say, as a result of that, I did

16   X, Y, and Z or I didn't do X, Y, and Z.  That's not hearsay.

17           MR. WEINBERGER:  That's the problem, Your

18   Honor, with this deposition, because the guardrails were not

19   there at the time of the deposition, and embedded within

20   answers are specific information that she gleaned as a

21   result of those conversations or that -- or specific

22   information about those conversations.

23      She then did go on to say that she, you know, created

24   policies as a result of that.  But since she's not

25   testifying live in court, you know, we can't attack those --

1            THE COURT:  Well, understood.  But, you know,

2    I can't -- then bring her -- you know, if you want to bring

3    her in next week, bring her in, and you can cross-examine

4    her.

5            MR. WEINBERGER:  I don't want to bring her in

6    at all, but I don't want this deposition to be played that

7    has, you know, this prejudicial hearsay that's embedded in

8    it.

9            THE COURT:  Well, we've already had testimony

10   that various people talked to people at the Ohio Board of

11   Pharmacy, and they had certain impressions and did certain

12   things.

13           MR. WEINBERGER:  Not the Ohio Board, Your

14   Honor.  Other boards of pharmacy.

15           MR. MAJORAS:  It's a national policy, Your

16   Honor.  Plaintiffs spent I don't know how many hours now

17   talking to Mr. Nelson about the national policies and why

18   Walmart had them.  This has been ruled on many times

19   already.

20           THE COURT:  Ms. Mack talked to someone at the

21   Ohio Board of Pharmacy?

22           MR. WEINBERGER:  She didn't, not the Ohio

23   Board, Your Honor.  There's no testimony about that.  That's

24   what's so prejudicial about this, that they are seeking to

25   admit into evidence conversations that she had with Texas

6209

 1    and with Oregon.  She can't --

 2                    THE COURT:  I've allowed that kind of

 3    testimony.

 4                    MR. WEINBERGER:  But this is information about

 5    what they said to her.

 6                    MR. MAJORAS:  She's not testifying about what

 7    they said, Your Honor.  These are all questions that the

 8    plaintiffs asked and she's responded to.  It's been ruled

 9    on.

10                    THE COURT:  I've looked at them and I've made

11    my rulings.

12                    MR. WEINBERGER:  Then, Your Honor, I think the

13    only way for us to respond to this is that we're going to

14    recall Carmen Catizone to the stand in rebuttal.

15                    THE COURT:  That's fine.  The point is that

16    Walmart has, you know, a couple of witnesses have said that

17    they spoke to people at various state board of pharmacies,

18    and as a result of those conversations, they did or didn't

19    do certain things.  They're allowed -- I mean --

20                    MR. WEINBERGER:  But that's not -- you know,

21    Your Honor, reading carefully this deposition, in these

22    answers about how we changed our policy is rank hearsay

23    about what somebody said, somebody from the Board of

24    Pharmacy said to either her or to somebody else at Walmart

25    that got related to her.

6210

```
 1                    THE COURT:  I'm not going to -- I'm not going
 2   to allow her to talk about what someone else at Walmart
 3   related to her.  I believe we've excised that.
 4                    MR. WEINBERGER:  But even what somebody at the
 5   Board of Pharmacy specifically said to her is rank hearsay.
 6                    MR. MAJORAS:  It is not in this case.  It's
 7   why we have the policies we had, Your Honor.
 8                    THE COURT:  Mr. Weinberger, it may not be
 9   hearsay.  It's not necessarily being offered for the truth
10   of the matter, but the fact it was said.
11                    MR. MAJORAS:  That's absolutely right, Your
12   Honor.
13                    MR. WEINBERGER:  How is it not being offered
14   for the truth of the matter?
15                    MR. MAJORAS:  It shows why we have the
16   policies that they're attacking, Your Honor.
17                    THE COURT:  Maybe the conversation happened,
18   maybe it didn't.  Maybe the person said it or not.  But this
19   witness is saying on such-and-such a day I spoke to someone
20   at the State Board of Pharmacy.
21                    MR. WEINBERGER:  Right, and they said X, Y,
22   and Z.
23                    THE COURT:  Right.
24                    MR. MAJORAS:  And that's what motivated the
25   policy.
```

```
 1              THE COURT:  All right.  It's not being used

 2    for the truth of the matter asserted.  She relied on it.  I

 3    mean, she thought it was authentic, and she's entitled to

 4    rely on it.  All right?  It's a state official, okay?

 5              MR. WEINBERGER:  Well, then we're going to

 6    need a limiting instruction, Your Honor, that, you know,

 7    specifically says --

 8              THE COURT:  All right, if you want to, get me

 9    a limiting instruction.  That's why I've allowed this

10    testimony, because, you know, if someone talks to DEA or

11    someone talks to the Ohio Board of Pharmacy and they give

12    you instructions, the same way -- it's like a letter from

13    Mr. Rannazzisi.  You know, you're entitled to rely on that.

14    He's an authority for DEA.

15        So you get a letter from him and it says do this or

16    don't do that.  All right?  Whether he really said it or

17    not, quite frankly, it doesn't matter.  If the recipient

18    thinks it's authentic, then it comes in.  The same way with

19    this conversation.  Maybe it happened, maybe it didn't,

20    maybe she's not telling the truth.  I don't know.

21              MR. WEINBERGER:  Okay.  Other than the one

22    document from Wisconsin, there is no --

23              THE COURT:  Well --

24              MR. WEINBERGER:  -- it's like the Rannazzisi

25    letter, Your Honor.  There's no documentation about it.
```

6212

1           MR. MAJORAS:  That's an argument, Your Honor,

2    That's not a reason not to allow the testimony.

3           MR. WEINBERGER:  It's a 403 issue of

4    unreliability.

5           THE COURT:  You can cross-examine her, you can

6    bring the person in, okay.  The other people were

7    cross-examined about it.

8       The point is it comes in because for the nonhearsay

9    purpose that Walmart had these conversations, and they acted

10   in reliance on them.

11          MR. WEINBERGER:  All right.  Well, before -- I

12   understand your ruling, Your Honor.  And before this -- if

13   this deposition is intended to be played today, we're going

14   to have to seek a limiting instruction that you give either

15   before or immediately after the testimony.

16          THE COURT:  Well, why don't you work with the

17   defendants and see what you can propose.  Again, the reason

18   I'm allowing this in is really for the nonhearsay purpose

19   that the conversation took place; at least the Walmart

20   witnesses say that it did.

21          MR. MAJORAS:  Thank you, Your Honor.

22          THE COURT:  All right.  Okay.  Let's bring the

23   jury in, then.

24          (The jury is present at 9:10 a.m.)

25          THE COURT:  Good morning, ladies and

**Glickman - (Direct by Fumerton)**

1    gentlemen.  Please be seated.  And I understand one of our

2    jurors has a birthday, so happy birthday.  Sorry, you know,

3    you didn't get the day off for your birthday.

4              MR. LANIER:  Your Honor, will you lead us all

5    in a round of Happy Birthday?

6              THE COURT:  You go.  You're a better singer.

7         Congratulations.

8         Okay, Ms. Fumerton, you may call your next witness,

9    please.

10             MS. FUMERTON:  Thank you, Your Honor.  Walmart

11   calls Dr. Mark Glickman, who is an expert in statistics, to

12   the stand.

13             (Witness sworn.)

14             THE COURT:  You may be seated.  And you may

15   take your mask off while testifying.

16        You may proceed, Ms. Fumerton.

17             MS. FUMERTON:  Thank you, Your Honor.

18        Dr. Glickman, is everything up there about the right

19   height?  Sort of?

20             THE WITNESS:  Close enough.

21             THE COURT:  We can't adjust that, that's the

22   problem.

23             MS. FUMERTON:  If you ever have a hard time

24   hearing me, or if the jury can let us know if they have a

25   hard time hearing you.

```
 1                         MARK GLICKMAN

 2                          - - - - -

 3                     DIRECT EXAMINATION

 4   BY MS. FUMERTON:

 5   Q     Good morning, Dr. Glickman.

 6   A     Good morning.

 7              MS. FUMERTON:  Good morning, ladies and

 8   gentlemen of the jury.

 9   Q     I want to get a few things out off the bat.

10         You are not a medical doctor?

11   A     I am not a medical doctor, no.

12   Q     Are you a pharmacist?

13   A     I am not a pharmacist.

14   Q     Are you an epidemiologist?

15   A     I'm not an epidemiologist.

16   Q     Are you an economist?

17   A     I'm not an economist.

18   Q     Okay.  So why don't you please introduce yourself to

19   the jury and tell them a little bit about who you are.

20   A     I'm Mark Glickman, a senior lecturer of statistics at

21   Harvard University.  I'm also simultaneously a senior

22   statistician at the Center for Health Care Organization and

23   Implementation Research, which is a VA Center of Innovation.

24   And that's headquartered in Bedford, Massachusetts, pretty

25   close to where I work at Harvard.
```

1    **Q**    And what is the VA?

2    **A**    The VA is the Veterans Administration.

3    **Q**    And generally speaking, why are you here?

4    **A**    I'm here because I was responding to some reports that

5    were produced by Dr. McCann and some of the other

6    plaintiffs' experts.  I ended up producing two reports, and

7    I've been doing some work, computational work that I'm going

8    to be talking about today.

9    **Q**    Did you also review Walmart's dispensing data as it

10   was reviewed by Dr. McCann?

11   **A**    I did, yes.

12   **Q**    Did you submit any expert reports in this case?

13   **A**    I did submit expert reports.

14   **Q**    How many?

15   **A**    Two.

16   **Q**    Did you sit for a deposition?

17   **A**    Excuse me?

18   **Q**    Did you sit for a disposition?

19   **A**    I did sit for a deposition.

20   **Q**    And with respect to the expert reports you just

21   mentioned, did anybody assist you with those?

22   **A**    I did receive some assistance, yes.

23   **Q**    From who?

24   **A**    I received assistance from Cornerstone Research.

25   **Q**    And who is Cornerstone?

**Glickman - (Direct by Fumerton)** 6216

1  **A**     Cornerstone Research is a firm that I think tends to

2  assist experts and counsels to do analyses.

3  **Q**     And were the data sets that you were using very large?

4  **A**     They were enormous.  They initially practically broke

5  my computer when I tried to load them.

6  **Q**     Did Cornerstone sort of help with the enormity of that

7  data set?

8  **A**     They sure did, yes.

9  **Q**     With respect to the expert reports you offered in this

10  case, were all the opinions offered in those reports yours?

11  **A**     They were mine, yes.

12  **Q**     And are all of the opinions that you are offering

13  today also yours?

14  **A**     Yes.

15  **Q**     Before we get to those opinions, I want the jury to

16  learn a little bit more about you, and so I think we're just

17  going to walk through your resume.

18          MS. FUMERTON:  Mr. Pitts, could I please have

19  the ELMO.

20  **Q**     And Dr. Glickman, this should be in Tab 1 of your

21  binder.

22          MS. FUMERTON:  That's true for Plaintiffs and

23  Your Honor, if you would like to follow along as well.

24  **Q**     Mark Glickman, that's you; is that right?

25  **A**     That's me.  There's my phone number.

**Glickman - (Direct by Fumerton)** 6217

1  **Q**    Oh.  Well, hopefully the jury won't be calling you

2  after this.  Just ignore that part of it.

3      So we have your office address and Harvard University.

4      Can you explain why that is?

5  **A**    Because I work there.  So, yeah, that's the address of

6  the Statistics Department at Harvard University where I'm a

7  senior lecturer on statistics.

8  **Q**    And how long have you been with Harvard?

9  **A**    So I've been at Harvard as a full-time employee as a

10  senior lecturer since the beginning of 2016, and I was there

11  as a visitor off and on since 2006.

12  **Q**    I want to ask you a little more about your education.

13  Could you please explain that to the jury?

14  **A**    So I received my bachelor's in statistics *Summa Cum*

15  *Laude* from Princeton University in 1986.  I subsequently got

16  my master's degree in statistics from Harvard University in

17  1989, and then I got my Ph.D. in statistics from Harvard in

18  1993.  So hopefully you see the theme there.

19  **Q**    And you just mentioned your position at Harvard, but

20  let's talk a little bit about your other academic

21  appointments, if we can see these here.

22      Can you just generally sort of hit the highlights for

23  us?

24  **A**    Yeah.  So I basically spent a good part of my career

25  at Boston University.  That's where I started.  I was in the

1    Math and Statistics Department for seven years.

2         And then I moved over to the Department of Health

3    Policy and Management, where I was a professor there from,

4    what was it, 2004 until 2015, at which point I moved over to

5    Harvard.

6         I was also a postdoctoral fellow at Harvard Medical

7    School for one and a half years.  That was following my

8    Ph.D.

9         And then also, as I mentioned earlier, I am a senior

10   statistician at the Center for Healthcare Organization and

11   Implementation Research, where I work on grant-funded --

12   VA-funded grants that are designed to improve healthcare for

13   veterans.

14   **Q**    I want to talk about those grants and your work as an

15   investigator in a minute, but just one follow-up question.

16        So what does a statistician do at Harvard Medical

17   School?  I'm specifically asking about a little more

18   information on this postdoctoral fellow.

19   **A**    So the Department of Healthcare Policy at Harvard

20   Medical School is an interdisciplinary department, so it has

21   health economists, it has doctors, it has sociologists, it

22   has people like me, statisticians.  And we all collaborate

23   on projects together with the aim of, you know,

24   understanding public health and improving public health.

25        So you need all those pieces together in order to form

**Glickman - (Direct by Fumerton)**

1    these projects that are likely to produce innovation and

2    novelty in healthcare delivery.

3    **Q**    And moving down, I want to talk a little bit about

4    your major research interests.  And if you could just

5    explain sort of what it is that you have listed here.

6    **A**    Sure.  So the first area, which is called Bayesian

7    inference, is a particular framework for analyzing data.

8    The world's -- most statisticians are not aware of this, but

9    the world splits into roughly equal parts.  There are

10   classical statisticians and then there are people like me

11   who are Bayesian statisticians.

12        The way we tend to perform our data analyses is

13   slightly different from the classical statisticians, but it

14   all hinges on the definition of probability.  But that's an

15   area that I've done some methodological work.

16        The pair comparisons work, pair comparison models and

17   design, basically stems from my interest in chess, so I got

18   into statistics through my interest in the game chess.

19        I was a tournament player when I was very young, and

20   the one thing I was really interested in is how they

21   numerically come up with ability estimates of chess players.

22   So like when you play in a tournament, you end up earning a

23   chess rating.  And if like you and I have chess ratings, we

24   should be able to figure out what's the probability that one

25   of us defeats the other.

1           And so I was always interested in that, and that's how

2      I got into statistics.

3           And fast-forward, you know, 20 years later, I've

4      actually written a lot of papers in that area, in being able

5      to come up with better ways to estimate players' abilities

6      based on team outcomes in chess.

7      **Q**     And how about this Applications to Health Services and

8      Medicine?

9      **A**     All right.  So also a lot of the work that I end up

10     doing is applications to health services, and a lot of it

11     has been for veterans, you know, healthcare for veterans.

12          So I have a number of applications of work in health

13     applications, so just as a couple examples, I've done some

14     work in what's called genetic epidemiology, which is

15     essentially being able to figure out how certain genes are

16     going to influence health outcomes later.

17          And so one of the kinds of problems I worked on early

18     on was how to take certain what are called genotypes,

19     particular mutations of genes, and figure out what their

20     impact is going to be in developing breast cancer.  So that

21     was one project I did early on.

22          I've also been interested in racial disparities in

23     delivery of healthcare.  So it's actually pretty well known

24     that in healthcare that blacks are -- tend to be -- have

25     worse healthcare outcomes, particularly for hypertension,

**Glickman - (Direct by Fumerton)**

1    than whites do.  And that's something that we've done a lot

2    of work in trying to dig in and understand what's the reason

3    for that, because it may not just simply be genetic, it may

4    end up being because providers aren't providing the best

5    care for their black patients compared to how they deliver

6    care for white patients.  And that's something that we've

7    been exploring.

8    **Q**    I'm going to stop you there just because actually you

9    have a ton of interesting things to talk about.  We're going

10   to talk about some more of them as well.

11         Let's talk about the grants work that you did, and I

12   know you mentioned the Department of Veteran Affairs.  I

13   want to sort of flip through here, if I can turn the page.

14         And you have other grant work here, and I want to ask

15   you about your work with the U.S. Olympic Committee.

16   **A**    Okay.  So in this whole sphere of work that I do that

17   involves measuring abilities like for chess players, I've

18   been able to move that over to apply it to not just, like,

19   chess, but also sports.

20         So I've over the years in this, I guess this one entry

21   in my CV is an example, I've established some research

22   contracts with the U.S. Olympic Committee to help them

23   figure out how to gage the strength of athletes; not just

24   the athletes that are U.S. athletes, but athletes

25   internationally.

**Glickman - (Direct by Fumerton)**

1      And the purpose for doing that is they want to be able

2  to figure out, for example, you know, whether they should

3  send U.S. athletes to certain international events and

4  decide whether or not the competition that I figured out how

5  strong they are, if they're going to just like wipe them

6  out, in which case, you know, they probably don't want to

7  send the U.S. athletes to those competitions.

8      So that's -- you know, that's one area of work that

9  I've done with the U.S. Olympic Committee.

10 **Q**   Okay.  Now, I always tell folks this isn't the time to

11 be humble, so let's talk about your awards.  Can you just

12 tell us about some of the awards that you've received?

13 **A**   So I have a bunch of awards for teaching.  I was, you

14 know, given certificates of distinction in teaching when I

15 was a graduate student.

16      One of the awards that I guess I'm most proud of is my

17 being an elected -- being elected a fellow of the American

18 Statistical Association.  So that's an award that recognizes

19 achievement in statistics, and that's given to one-third of

20 1 percent of all of its members on a yearly basis.  And so I

21 earned that in 2014.

22      Based on a lot of the work that I've done with U.S.

23 Chess, I guess I've received two awards.  One as recent as

24 two years ago that was a Distinguished Service Award, and

25 then previously I received a Special Services Award from the

1    executive board.  And this is all related to the work that

2    I've done with rating chess players and getting involved in

3    the rating of chess players.

4    **Q**    And with respect to the American Statistical

5    Association, and I guess I shouldn't be surprised that a

6    statistician knows that it was offered to one-third of 1

7    percent of all people, but do you have other involvement

8    with that organization?

9    **A**    Yeah.  I mean, so the American Statistical Association

10   is -- it's really the main organization, the main

11   professional organization for statisticians in the U.S.,

12   North America, and for some people around the world.

13        I'm on the Board of Directors of the American

14   Statistical Association.  So it's a 12-member Board.  We

15   meet four times a year, have lots of e-mail exchanges.  And

16   I'm finishing up my term this year; in fact, two weeks from

17   now we have our final Board meeting of the year.  But

18   that's -- you know, so I've been involved in the

19   administration of statistics and organizational issues and

20   various opportunities for statisticians.

21        And I've also been involved in a particular -- well,

22   in what's called the section on Statistics and Sports.  This

23   is the subset of members that are particularly interested in

24   the intersection between statistics and sports and being

25   able to help them with opportunities, as well.

**Glickman - (Direct by Fumerton)**

1    **Q**    Dr. Glickman, are you published?

2    **A**    Yes.  I publish my work.

3    **Q**    And in your CV, I think if we started flipping

4    through, we have -- see if I can pull it up a little bit

5    more here -- page after page here, it looks like, of

6    articles.

7         Can you give a sense to the jury of approximately how

8    many different articles you've written?

9    **A**    So I've written 82 or 83, depending on how you count;

10   well, on this CV you count 82.  I have 82 peer-reviewed

11   publications, and then I have a number of other manuscripts

12   that are not peer reviewed; but in total I guess we're, you

13   know, adding up to maybe 110 publications.

14   **Q**    And you mentioned the CV.  Do you have an additional

15   article that you've written since you offered the CV?

16   **A**    Yeah, I think since this version I have one other

17   article that was accepted for publication about a month ago.

18   **Q**    So you're here to talk about statistics.

19   **A**    I am here to talk about statistics.

20   **Q**    Some of us are more numbers people than others.  We're

21   going to be given some very important information today, but

22   also I want to keep it interesting for the jury.  So could

23   you tell us maybe one or two of your articles that are maybe

24   more interesting to those of us that aren't numbers

25   inclined?

1  **A**     Sure.  So one of the areas that I got into pretty

2  recently is the intersection between statistics and music.

3       So a couple years ago I was working with a

4  collaborator from Dalhousie University.  We both discovered

5  that we're huge Beetles fans, and we ended up landing on

6  this project where we took all the Beatles songs that were

7  written by Lennon and McCartney, and based on musical

8  features of those songs we ended up constructing a

9  statistical model that would predict whether the song was

10  written by John Lennon or whether it was written by Paul

11  McCartney.

12       So you may be thinking, well, why bother, what's the

13  point of that.  The reason is there are actually a number of

14  Beatles songs, I should say Lennon and McCartney songs,

15  they're actually of disputed authorship.  One of the songs

16  is the song "In My Life," which is, according to *Rolling*

17  *Stone*, the -- I think it's the 23rd best song of all of rock

18  and roll.

19       So the way we did is we ended up applying our

20  statistical model to that particular song and determined

21  that with very high likelihood John Lennon wrote most of it

22  and Paul McCartney helped write on the bridge.  And so that

23  ended up getting some media attention, and that was kind of

24  a fun project.

25       I'll mention one other, which is in a completely

1   different sphere if you're not a rock person.  I ended up

2   working with a student where we ended up coming up with a

3   computer generation of pieces that would sound like Bach

4   chorales.  So using some rules of music, we were able to

5   come up with a statistical procedure that would randomly

6   generate music that would sound like Bach.

7       We ended up giving it to like a bunch of music experts

8   to judge whether or not what they were hearing was actually

9   Bach or whether it was computer-generated music, and they

10  did no better than guessing.  So that was kind of a fun

11  project as well.

12  **Q**   And do you also give presentations?  And I think if we

13  wanted to flip again, we would be looking at sort of pages

14  and pages of select presentations.  But if you could give

15  the jury a sense of what types of things you typically

16  present on.

17  **A**   So I've given a number of presentations.  Most of

18  these presentations tend to track with articles that I'm

19  writing.  Very typically when academics end up working on

20  research and they're writing their articles, they also

21  simultaneously give talks on their work to essentially, you

22  know, share the work that you're doing and, you know,

23  essentially advertise the work that you're involved in.

24      So most of these talks are connected very -- very

25  specifically to the papers that I wrote.

1    **Q**     And bring it back to healthcare too.

2          Have you given presentations relating to statistics

3    and healthcare?

4    **A**     Yeah, absolutely, for some of the papers that I've

5    written are related to healthcare.

6    **Q**     Switching subjects a little bit.  Have you ever been

7    engaged as an expert before?

8    **A**     Yes, I have.

9    **Q**     How many times, approximately?

10   **A**     As a testifying expert or just in general?

11   **Q**     Let's start with a testifying expert.

12          How many times have you testified as an expert?

13   **A**     This would be I think my fourth time.

14   **Q**     And can you just give, maybe pick a couple examples of

15   when you've testified in court as an expert in statistics?

16   **A**     Yeah.  The last time I testified was a few years ago

17   in a case in Boston which involved a patron at a Red Sox

18   game getting hit by a foul ball and getting injured pretty

19   severely, and then she brought a suit against the Red Sox.

20          And the Red Sox hired me as a statistician

21   specifically to estimate the probability of getting injured

22   by a foul ball in the area of the stadium where she got hit,

23   and essentially assessed that it's a low probability, and so

24   that was the role that I played.

25   **Q**     So I'll confess, I had a picture of Fenway Park, and

**Glickman - (Direct by Fumerton)**

1   then I was told that folks in Cleveland don't like the Red

2   Sox very much, so I removed that; so hopefully they won't

3   hold that against you.

4        So give another example of one you've testified in

5   court.

6   **A**    So before that I was involved in a case involving the

7   fraudulent selling of some coins on the Internet, and I was

8   brought into this case at the restitution phase.  So these

9   were defendants that were already convicted, they were found

10  guilty, and so I was brought in at the phase where they were

11  awarding damages.

12       My involvement was they had experts evaluate the value

13  of the coins that were being fraudulently sold, and then

14  they were taking that set of coins and trying to extrapolate

15  to all the coins that they would end up selling to get like

16  an overall damages calculation.

17       My involvement was to be able to assess whether the

18  procedure of extrapolating from that set of coins, a small

19  set that were closely followed and valued, to the entire set

20  of coins, and what the problems were with how the plaintiffs

21  were handling that.

22  **Q**    Okay.  And so I'm now stating the obvious, and don't

23  take offense to this question.

24       But you're not a baseball player?

25  **A**    I'm not a baseball player.

1   **Q**    You're not a coin collector?

2   **A**    I'm not a coin collector.

3   **Q**    So what allows you to testify as an expert in these

4   types of cases if you don't have the sort of underlying

5   substantive expertise about what that case is about?

6   **A**    Right.  Well, my expertise is in statistics and

7   quantitative methods, so I'm not bringing in expertise in

8   the substantive area.  I'm bringing in expertise in how to

9   analyze data and work with data and make sense out of data.

10  **Q**    And before we turn into the meat of your observations,

11  I want to do a few other housekeeping items.

12       Are you being paid for your work in this case?

13  **A**    I am getting paid, yes.

14  **Q**    How much do you charge per hour?

15  **A**    I charge $700 per hour.

16  **Q**    And approximately how much have you made on this case

17  to date?

18  **A**    I would estimate about 130 to 140,000.

19  **Q**    And actually, backing up to your expert testimony,

20  have you ever testified in an opioid litigation before?

21  **A**    I have never testified in an opioid litigation, no.

22  **Q**    And other than what you just testified to, are you

23  receiving any other compensation for this case?

24  **A**    I am not, no.

25  **Q**    Do you consider yourself an expert in statistics?

**Glickman - (Direct by Fumerton)**     6230

1    **A**     Yes, I do.

2    **Q**     And can you briefly explain, and we'll talk about some

3    of the specifics more a little bit later, what type of

4    materials you reviewed to offer your opinions in this case?

5    **A**     Yes.  I was provided McCann's -- Dr. McCann's reports,

6    his data.  I received a bunch of deposition testimony.  I

7    reviewed a bunch of literature.  And that informed the

8    opinions that I'm going to be presenting.

9    **Q**     Did you review an expert report by Mr. Catizone?

10   **A**     Yes, I did, yeah.

11   **Q**     And did you read deposition testimony from both of

12   these experts from plaintiffs as well?

13   **A**     I did, yes.

14   **Q**     Are all the opinions you are offering today being

15   offered to a reasonable degree of professional certainty?

16   **A**     They are, yes.

17   **Q**     And I'll just ask that in response to all of my

18   questions that you hold yourself to that standard in the

19   testimony you give.

20   **A**     I will.

21   **Q**     Okay.  So as we dive into the specifics of your

22   testimony today, did you work with me to create some slides

23   to aid in your testimony?

24   **A**     Yes, I did.

25              MS. FUMERTON:  Can we please bring up the

1    first slide.  We're getting there.  Perfect.

2    **Q**    So, Dr. Glickman, could you just give a general

3    preview of the topics that we're going to cover today.

4    **A**    Sure.  So I'm going to be discussing with you three

5    main areas of the work that I did.

6         So the first is essentially characterizing opioid

7    dispensing by Walmart in Lake and Trumbull Counties.  I'll

8    go through that a little bit.

9         I'll also be discussing some specifics about the red

10   flagging method, so specifically focusing on Mr. Catizone's

11   and Dr. McCann's red flag algorithm logic.

12        And then I'll finish up by describing a particular

13   approach that Dr. McCann provided in calculating what are

14   called confidence intervals.  And I'll be discussing that

15   event.

16   **Q**    Let's start with your analyses of the Walmart

17   pharmacies in Lake and Trumbull Counties.

18        If we could have the next slide, please.

19        And there are -- the jury has heard this before, but

20   there are five Walmart pharmacies in Lake and Trumbull

21   County; is that right?

22   **A**    That's right.

23   **Q**    Okay.  And can you give the -- I guess tell the jury

24   what are a preview of the four different types of

25   observations that we're going to discuss.

**Glickman - (Direct by Fumerton)**                    6232

1    **A**    Right.  So within characterizing Walmart pharmacies,

2    what I'm going to be doing is discussing Walmart's fairly

3    limited presence in these counties with respect to opioids.

4    I'm going to be contrasting the Walmart pharmacies with

5    several independent pharmacies.

6         I'll also be discussing something called the

7    controlled substances ratio, essentially examining how the

8    fraction of controlled substances dispensed by Walmart, what

9    they look like.  And then I'll also be showing you a slide

10   on opioid prescriptions per capita.  Essentially it's a way

11   of measuring the number of prescriptions that are per capita

12   that are dispensed.

13   **Q**    Okay.  Let's have the next slide, please, and start

14   out with your sort of first observations.

15        What are we looking at here?  Maybe we can make it a

16   little bit bigger so it's easier for the jury to see.

17   **A**    Thank you.  So this is a table that I'll describe a

18   couple of the main pieces, but I'll describe a little bit

19   more detail maybe in one or two slides later.

20        This is essentially a summary of the nondefendant

21   dispensers and the defendant dispensers by Lake County,

22   Trumbull County, and then combine together.

23        I want to point out that in this set of data there are

24   168 nondefendant dispensers, which includes pharmacies, but

25   there's also some clinics and other, like, hospitals.  And

**Glickman - (Direct by Fumerton)**

1    also there are 17 -- I'm sorry, so that's for Lake County.

2    And then for Lake County there are 17 defendant dispensers.

3    **Q**    And let me stop you there.

4         When you're referring to defendant dispensers, who are

5    you referring to?

6    **A**    So I'm referring to Walmart, Walgreens, and CVS.

7    **Q**    Okay.  And we actually have a couple charts here, so

8    I'm going to skip ahead to the next one.  But first, for the

9    record, this has been identified as WMT-MDL-01540A.

10        And did you put the summary of data together?

11   **A**    I did, yes.

12   **Q**    Okay.  Let's look at the next one, and I'll have you

13   talk about the method that you did that a little bit more in

14   depth.

15             (Court reporter interjection.)

16             MS. FUMERTON:  I'll slow down.  I apologize

17   for that.

18   **Q**    Okay.  Let's turn to the next slide, please.

19        All right.  For the record, this has been marked as

20   WMT-MDL-01541A.

21        And Dr. Glickman, can you tell us what we're looking

22   at here?

23   **A**    Right.  So this is a table that it's formatted pretty

24   much the same way as the table you just saw, but it's

25   focused specifically on the defendant pharmacies, so CVS,

**Glickman - (Direct by Fumerton)**                                    6234

1    Walmart, and Walgreens.

2         Again, that first column is telling you the number of

3    dispensers within each county, and then combined by just

4    basically adding them up.

5         More importantly, the set of -- there's a set of

6    columns that says "all drugs" and there's a set of columns

7    that says "oxycodone and hydrocodone."

8         What these are displaying is information on the

9    dispensing of opioids.  And what it can do is -- I guess I

10   could tell you that the column that is labeled "MME" is the

11   so-called morphine milligram equivalent.  This is

12   essentially telling you in units that can be compared across

13   different medicines what the total number of these

14   particular units is aggregated by the different pharmacies.

15        So, for example, for Walmart in Lake and Trumbull

16   County, I don't know if you want to highlight that 99

17   million.

18   **Q**    Yeah, I was just going to say.  I want to focus on --

19   let me ask you a couple questions here.  Let's -- if we can

20   get that Walmart line focused, that's what I'm particularly

21   interested in in talking to you about today.

22        You mentioned MME and dosage units.

23        Why do you have it sort of listed here both ways?

24   **A**    Well, so these are two different ways of understanding

25   how opioids are dispensed.  So dosage units are just like,

**Glickman - (Direct by Fumerton)**

1   you know, pills or patches or lozenges.  Those are just like

2   the individual units that are being dispensed.

3        The problem, of course, is that if you're trying to

4   say that there's a certain amount of opioids that are being

5   prescribed by pill, and you prepare them, you know, between,

6   say, two pharmacies, you don't know whether one set of pills

7   is more -- like, contains more potency in the medication

8   than another.

9        So comparing by pills isn't really quite the right

10  comparator.  So instead, what you can do is you can convert

11  them into this thing called MME.

12       And so MME puts everything on the same baseline.  It's

13  the -- you know, if you have two pharmacies that are

14  dispensing the same MMEs, in total what they're doing is

15  they're dispensing the same potency of opioids aggregated

16  across all of the medications, all the prescriptions.

17  **Q**    All right.  Thank you for that explanation.

18       Actually, I want to focus then on that MME column, and

19  specifically on sort of what did you observe as to what

20  Walmart's share of opioids dispensed in Lake and Trumbull

21  Counties by MME is attributed to Walmart.

22  **A**    Right.  So based on this data set -- based on the data

23  set I'm using, I can aggregate all of the MMEs in the county

24  that are dispensed across all of the pharmacies in the

25  entire set of two counties.  And then what I can do is I can

1  look at the fraction of the MMEs that are dispensed

2  particularly by Walmart.

3      And so that ratio of the total MMEs dispensed by

4  Walmart over the entire set of MMEs dispensed by all

5  dispensers in the county is the share.  It's the share of

6  the Walmart MMEs for those sets of counties.

7  **Q**     And where do you see that number here on this chart?

8  **A**     And so that number that's sort of being highlighted is

9  that 3.15 percent.

10  **Q**     Okay.

11  **A**     So the 3.15 percent means that out of all the MMEs

12  that have been dispensed in 2006 to 2014 in Lake and

13  Trumbull Counties, 3.15 percent of them have been dispensed

14  by Walmart.

15  **Q**     Okay.  So I want to dig into this a little bit more,

16  particularly on this chart.

17      You mentioned the data set.  What is the data set that

18  you're using?

19  **A**     Right.  So the data set that I'm using is a version of

20  the ARCOS data.  And this is the data set that the DEA

21  compiles based on, you know, these dispensers and

22  distributors making their opioid data available.

23      This was a data set that was used by Dr. McCann, and

24  we ended up using that set of data.

25  **Q**     Okay.  So let's take down our 3.15 percent for a

**Glickman - (Direct by Fumerton)**                    6237

1    second, and I want to walk through for the jury just so they

2    understand, because I think sometimes people are throwing

3    out numbers, they wonder are we comparing apples to apples,

4    what's happening here.

5          So if you can turn to I think it is Tab 4 in your

6    binder.  And I'm going to --

7                MS. FUMERTON:  Mr. Pitts, can I have the ELMO,

8    please?

9    **Q**    Do you recognize this document, Doctor?

10   **A**    Yes, I do.

11   **Q**    And what is this?

12   **A**    So this is an appendix from Dr. McCann's reports.

13   **Q**    Okay.  And how can this be used, if at all, to

14   calculate market share?

15   **A**    Right.  So if you turn the page, you're going to see a

16   listing of dispensers in Lake and Trumbull County over this

17   time period, 2006 to 2014.  And what you'll notice in that

18   very last column is the total MMEs for each individual

19   pharmacy over that time period.

20   **Q**    And is this ranked in any way?  I don't know if you

21   can sort of see the list here.

22   **A**    Yeah, you'll see that it's actually sorted in order

23   according to that last column, that MME column.

24   **Q**    So if we take Franklin Pharmacy and highlight that,

25   what can you tell about Franklin Pharmacy here?

**Glickman - (Direct by Fumerton)**

1    **A**    Right.  So that's the pharmacy over this time period

2    between Lake and Trumbull Counties that has the largest

3    total MME.

4    **Q**    And this data, to be clear, is Dr. McCann's data; is

5    that right?

6    **A**    This is Dr. McCann's data, that's right.

7    **Q**    And so you didn't manipulate this in any way.  This is

8    directly from his report?

9    **A**    That's correct.

10   **Q**    And what is the second highest listed pharmacy here?

11   **A**    So the second one is Overholt's Champion Pharmacy.

12   **Q**    Okay.

13   **A**    And both of these, by the way, are independent

14   pharmacies.

15   **Q**    And if we look at the third one, I think the jury has

16   heard about Bellevue before too.  Where is Bellevue on this

17   list?

18   **A**    Bellevue is ranked number four in terms of total MMEs.

19   **Q**    Let's talk about Walmart.  If we want to get to a

20   Walmart, where do we start looking?

21   **A**    I believe you need to scroll down this a little bit.

22   I think if you go two-thirds down the page you'll see

23   Walmart Store 1863.

24   **Q**    So this is the first Walmart that shows up on this

25   list; is that right?

1    **A**    Don't ask me to say what number that is.

2    **Q**    I'm sorry, I'm not asking you to count them, but if

3    we're looking down the list, this is the first time you see

4    a Walmart; is that fair?

5    **A**    That's correct.

6    **Q**    Okay.  So tell me or explain to the jury how then you

7    can use -- did you essentially use these numbers to

8    calculate market share, or how did you do that?

9    **A**    Yeah, so basically what you can do is just search for

10   the Walmart entries in this table.  So the one that's just

11   been highlighted has the 36 million MMEs, you could do the

12   same thing for each of the other Walmart entries.  And there

13   should be I think five other ones.

14        And when you go through them, take those total MMEs,

15   add them all up, that's going to be the total contribution

16   for Walmart; and take that number and divide by whatever

17   happens to be the total MMEs in the county for that time

18   period.

19   **Q**    And you mentioned the total counties, so I want to --

20   or total MMEs.

21        If you turn to Tab 5 in your binder, I want to show

22   something else to the jury.

23        And do you recognize this document?

24   **A**    Yes, I do.

25   **Q**    And what is this?

**Glickman - (Direct by Fumerton)**

1   **A**      This is another appendix from Dr. McCann's reports.

2   **Q**      Okay.  And so you mentioned the total numbers.  Is the

3   total number reflected on this chart?

4   **A**      Right.  So this is a table that summarizes aggregated

5   MMEs.  So if you look at that third column where it says

6   "Total MME," that's basically -- Dr. McCann already

7   aggregated like whole bunches of different types of

8   dispensers together.

9            So, for example, that first line is chain pharmacies,

10  the next line is retail pharmacies, so there are different

11  kinds of dispensers.  And he basically ended up adding up

12  all of the total MMEs and put them into categories.

13           Now, this table contains all possible categories of

14  sellers of opioids, and so that bottom number that was just

15  highlighted is that total, the total for the entire county

16  over that time period.

17  **Q**      And so just to sort of summarize, if we take all of

18  the Walmart numbers from this appendix and divide it by the

19  total share in this appendix, is that how you calculate the

20  3.15 percent?

21  **A**      Yeah.  If you do that division, that will give you

22  that 3.15 percent.

23  **Q**      And so these are Dr. McCann's numbers.  So does this

24  mean you just agree with Dr. McCann?

25  **A**      Well, I mean, this is based on Dr. McCann's

**Glickman - (Direct by Fumerton)**

1    computation -- his data, so I'm agreeing in using the data.

2    **Q**    And specific to the 3.15 percent, do you know if

3    Dr. McCann agrees with that calculation?

4    **A**    Yes, he does.  I mean, he said so in his deposition

5    testimony.

6    **Q**    And so let's turn back to the slide presentation.  And

7    we've been talking about a lot of numbers, and some people

8    are more visual.  So can you just describe what's on this

9    slide once we get it back up?

10    **A**    Okay.  Right.  So I mean, if looking at numbers and

11    tables is not your thing, then this might be a nice visual

12    representation of what I was just describing with this 3.15

13    percent.  Namely, that that very thin blue bar at the bottom

14    is representing 3.15 percent of all the MMEs dispensed in

15    Lake and Trumbull County over this time period.

16    We also included two other bars.  There's this gray

17    bar above it which accounts for roughly 25 percent of the

18    MMEs distributed -- dispensed by the other pharmacy

19    defendants, and then there's the remaining 72 percent

20    roughly of opioids that were dispensed by nondefendants.

21    **Q**    And what geographic region?  Is this specific to Lake

22    and Trumbull?

23    **A**    As the header says, this is for Lake and Trumbull

24    County.  And it is over the 2006 to 2014 time period.

25    **Q**    Okay.  Let's look to the next slide, please.

1        And I don't know if you can pull it up so folks can

2    see this on the screen, but it's WMT-MDL-01539.

3        Did you create this chart?

4    **A**    Yes, I did.

5    **Q**    And what are we seeing here?

6    **A**    So this is even -- the top part of this table is even

7    a further breakdown of the Walmart pharmacies.  So now this

8    is the MMEs by individual pharmacy, so that's what's on the

9    top.

10       So if you see what the shares column is for total

11   MMEs, those percentages that you see are the total MME

12   percentage in the county for each of those individual

13   Walmarts.

14       What I did though is I compared them just for -- I

15   compared them to three independent pharmacies which happened

16   to be those -- the top three or four in the chart that we

17   looked at earlier.

18   **Q**    And if we turn then to page 7, again for those of us

19   that might not be completely loving number charts, what do

20   we have on the next slide.

21       Part of this is my fault because throughout this trial

22   my eyes have gone, so I said I need everything to be blown

23   up a little bit bigger for folks, so we're messing with the

24   size.

25       What did you depict here?

1    **A**    Like, for starters, if you focus your attention on the

2    left part of that slide, you'll see part of the map that

3    shows Lake and Trumbull Counties and the locations of the

4    five Walmart stores, as well as the three independent

5    pharmacies that we just mentioned, and so it's just showing

6    the locations.  So in particular, the three independent

7    pharmacies happen to be in Trumbull County.

8         What I have on the right is essentially summarizing

9    some of the key information on the table I just showed you.

10   For all Walmart pharmacies, the share of MMEs that are

11   dispensed is that 3.15 percent.  By comparison, if you take

12   the three independent pharmacies, take their total MME, and

13   divide by, you know, the total MMEs dispensed in the county,

14   it turns out to be 16.5 percent.  So there are five times as

15   many MMEs dispensed in these three independent pharmacies

16   compared to what are being dispensed in the five Walmart

17   stores.

18   **Q**    Let's look to the next slide, please.

19        And this, for the record, is WMT-MDL-01539, and it's

20   the second page of that.

21        Could you explain what this summary is?

22   **A**    Yeah.  So this is a particular focus of information

23   that appeared on the previous slide.  The previous one was

24   showing you everything in Lake and Trumbull Counties all put

25   together.  This one is focused particularly on Trumbull

**Glickman - (Direct by Fumerton)**                6244

```
 1    County.
 2          So if you restrict your attention just to the total
 3    MMEs that are dispensed in Trumbull County, what this is
 4    showing is that for those two Walmart stores that are in
 5    Trumbull County, they account for a total of 1.26 percent of
 6    the entire set of MMEs dispensed in Trumbull County.
 7    Q    And do we have a visual representation of that as
 8    well?
 9    A    I think we're about to.
10    Q    If you can go to the next slide, please.
11          So what are we seeing here --
12    A    Right.  So the bar -- well, I mean, for starters,
13    there's Trumbull County in that yellow square, so we know
14    what stores we're talking about.
15          So Walmart Stores 2197 and 3860 are the two Walmart
16    stores.
17    Q    Those are the blue dots?
18    A    Those are the blue dots.  Then the red dots are
19    Bellevue, Overholt's, and Franklin.
20          And if you flip back actually to the table, just go
21    back one slide.
22                MS. FUMERTON:  You don't have to blow it up
23    this one time, just to make it easier.
24    A    Yeah, just to go to the bottom of that page, you'll
25    see each individual pharmacy contributes, in the case of
```

**Glickman - (Direct by Fumerton)**

1    Franklin it's 12.4 percent total MMEs, 9.06 total MMEs a

2    share, and then 5.24 percent total MMEs.

3         So each individual pharmacy is contributing these

4    percentages.  If you add all of those up, if you go to the

5    chart in the next slide, that adds up to a total of 26.7

6    percent of the total MME share.

7    **Q**    Okay.  Let's look to the next slide.

8         And what are you depicting here?

9    **A**    So in this situation I want to do just a -- you know,

10   it might be a little bit confusing to be talking about

11   comparing, you know, three pharmacies with two pharmacies or

12   five pharmacies with three pharmacies.  So what we did is we

13   just wanted to do just sort of a one-on-one comparison.

14        So just focusing on Franklin Pharmacy, the -- one of

15   the independent pharmacies, and the Walmart pharmacy that is

16   closest in location to it, which is this store 2197, we can

17   do a comparison of the total MMEs at those two stores in

18   this time period.

19        So in Franklin, there are 241 million MMEs that were

20   dispensed, and by contrast, in Walmart there are 18.4

21   million MMEs that were dispensed.  These are not

22   percentages.  These are total MMEs that are represented in

23   the bars.

24        And so for this particular pharmacy, the independent

25   pharmacy, they dispensed 13 times as many opioids measured

1   by MMEs compared to the nearest Walmart pharmacy.

2   **Q**    Okay.  And let's look at the next slide.

3        Did you do this for Overholt's Pharmacy as well?

4   **A**    Right.  So I did the comparison also between

5   Overholt's and, again, Store 2197, which is the closest to

6   it.

7        And again, if you look at the chart on the right,

8   you'll see that there are 176.5 million total MMEs that were

9   dispensed in Overholt's compared to 18.4 million that were

10  dispensed at the Walmart pharmacy.

11       And so again, this is a situation where nine times as

12  many opioids that are being dispensed by MME by the

13  independent pharmacy compared to the Walmart pharmacy.  So

14  it gives you a sense just sort of the size difference.

15       It's probably worth mentioning though that this

16  particular pharmacy, Overholt's Pharmacy, pleaded guilty for

17  opioid dispensing related issues in 2011 and no longer was

18  dispensing opioids.  So in fact, this 176.5 million is not

19  really over the entire period up through 2014.  It's only a

20  part of that time period.

21       So in fact, even though that it's nine times as many

22  total MMEs dispensed, it's dispensed over a shorter time

23  period, whereas the Walmart one is over a longer time

24  period.

25       So that kind of -- you know, hopefully that makes the

**Glickman - (Direct by Fumerton)**

1   point that this number, the 176.5, compared to the 18.4, is,

2   you know -- like, even though that's a fairly large -- you

3   know, seemingly large difference in the number of times of

4   MMEs dispensed, if Overholt's had been in business longer

5   and dispensed at the same rate, that number would have been

6   even larger.

7   **Q**   Let's look at the next slide, please.

8       And for the record, this is WMT-MDL-01555.

9       Is this another summary you prepared?

10  **A**   Right.  So this is very similar to the last set of --

11  last table that you saw, but this time it's only focusing on

12  oxycodone 80 milligrams and oxycodone 30 milligrams.  So

13  these are just very focused analyses on specific -- these

14  specific opioids and at their specific dosages.

15  **Q**   Okay.  And let's look to the next slide.  And I think

16  we have the visual representation that some folks might find

17  easier to digest.

18      And what are we looking at here?

19  **A**   So this is now just showing the fraction of MMEs that

20  were dispensed for in this case oxy 30 at each of the

21  particular pharmacies.  So if you look at the Walmart

22  pharmacies on the right, you know, each of these pharmacies

23  is dispensing in terms of MMEs somewhere between .1 percent

24  of the overall total MMEs for oxy 30 in Lake and Trumbull

25  County, up to, like, 1 percent for the Walmart in Madison.

**Glickman - (Direct by Fumerton)**

1      So these percentages by comparison to these three

2   independent pharmacies are much, much smaller.  So

3   Overholt's, Franklin, and Bellevue, respectively contribute

4   9.8 percent, 17.6 percent, and 8.7 percent of the total MMEs

5   for oxy 30 in the two counties.

6   **Q**      And if you add up all of the five Walmarts' share of

7   oxy 30 for Lake and Trumbull County, is that greater than

8   any of the individual independent pharmacies listed here?

9   **A**      Yes.  So if you add up those five percentages, in

10   other words, you combine all the Walmarts and you look at

11   the total MMEs for oxy 30 for those Walmarts, the total

12   share is 1.9 percent.  And that's less than any single

13   independent pharmacy that I ended up showing you.

14   **Q**      All right.  Let's look at the next slide.  So you did

15   the same thing for oxy 80; is that right?

16   **A**      Yeah, that's correct.

17   **Q**      And it looks like the Walmart numbers here are even

18   lower for oxy 80; is that right?

19   **A**      Yeah, it's basically the same kind of story.  The

20   Walmart shares are smaller than what you just saw for oxy 30

21   on average.  And so if you end up adding up the total

22   contribution for Walmart for oxy 80, they consist of a total

23   of 1 percent of the entire set of MMEs for Lake and Trumbull

24   Counties.

25          And if you compare to Overholt's, Franklin, and

**Glickman - (Direct by Fumerton)**

1   Bellevue, they have a total MME dispensing shares of 20.3

2   percent, 17.3 percent, and 4.3 percent.

3   **Q**    Okay.  Next slide, please.

4        And, Dr. Glickman, what are we looking at here?

5   **A**    So, okay, so shifting a little bit, this is a quote by

6   Kyle Wright, who was a DEA unit chief of Targeting and

7   Analysis, and this is from a deposition that he gave in

8   February of 2019.

9   **Q**    And did you review this in preparation for your

10  report?

11  **A**    Yes, I did.  I reviewed the deposition transcript.

12  **Q**    Okay.  And what is this slide showing us?

13  **A**    So the questioner asked him:  Is it accurate to say

14  that you knew that it was common for legitimate pharmacies

15  to have a ratio of approximately 20 percent of controlled to

16  80 percent noncontrolled?

17       And his answer was:  In that area, yes.

18  **Q**    Okay.  So let's look to the next slide then.

19       And is this another summary that you created?

20  **A**    Yes.  So this is another summary I created.

21            MS. FUMERTON:  And for the record, it's

22  WMT-MDL-01540.

23  **Q**    And can you please explain what you did here.

24  **A**    Sure.  So this is using a different data set.  This is

25  using the Walmart's Know Your Customer data set.  So what

1    they've been doing is they've been compiling information

2    about each of their pharmacies just to understand their

3    practices.

4         So what I was able to pull off this spreadsheet is

5    essentially the percentage of controlled substances that

6    were prescribed divided by -- out of the total number that

7    they were prescribed in any given quarter of the year.

8         So what you're seeing, for example, say, the -- you

9    know, the number that's to the top and the left, that 11.9

10   percent?

11        I don't know if you want to highlight that.

12   **Q**    I guess 11.0 percent --

13   **A**    I think it's 9.

14   **Q**    Oh, on the left.  I see.  I was looking to the right.

15   **A**    Yeah.  Did I say right?  Yeah, when I said right, I

16   meant left.

17   **Q**    You were right, I was wrong.

18   **A**    Right.  So the 11.9 percent is among all the

19   prescriptions that were dispensed -- among the prescriptions

20   that were dispensed at Walmart pharmacy 1857 in the first

21   quarter, the first quarter of the fiscal year 2016, which,

22   by the way, happens to correspond to February, March, and

23   April of 2015.

24        If you examine the percent of controlled substances

25   that were prescribed, they total 11.9 percent out of the

**Glickman - (Direct by Fumerton)**

1    total prescriptions.

2    **Q**    And just to be clear, are controlled substances all

3    opioids?

4    **A**    Controlled substances include opioids, but they also

5    include other kinds of prescriptions.  For example, anabolic

6    steroids, narcotics, depressants.  So other kinds of

7    controlled substances besides opioids.

8    **Q**    And you mentioned Walmart's fiscal year, and I think

9    you described what fiscal -- the first quarter would be.

10    But generally speaking, when does the Walmart fiscal year

11    run, do you know?

12    **A**    So the Walmart fiscal year runs from February to

13    January.  So when you're seeing these fiscal years of 2016,

14    2017, and 2018, you should probably be thinking calendar

15    years 2015, 2016, 2017, because the only representation is

16    just like this one month.  Like the January of that year

17    that's listed is actually part of the data set.

18    **Q**    And looking at all of these individual numbers for

19    each of the five Walmart pharmacies, are any of them close

20    to 20 percent?

21    **A**    No.  All those numbers, every single one of them, is

22    less than 20 -- that 20 percent that was part of the Kyle

23    Wright deposition.

24                    MS. FUMERTON:  And just to prove my earlier

25    statement that I'm losing my eyesight, my trusted colleague

1    tells me that this document is actually marked

2    WMT-MDL-01549.  I think I misspoke earlier and called that

3    last "9" a "0."

4    **Q**    So let's turn to the next page.  So what is

5    represented here?

6    **A**    All right.  So going back to the theme of taking this

7    tabular data and turning it into something that's a little

8    easier on the eyes, so what we have is essentially this

9    blue -- this blue dash line where it says DEA, that's that

10   20 percent.  That's the 20 percent that was quoted in the

11   deposition.

12        And then if you examine the -- those blue dots that

13   are kind of hovering around this 10 percent line, that shows

14   all of those different -- for each of the different five

15   Walmart pharmacies, it's showing the average over each

16   fiscal year the percentage of controlled substances that

17   were dispensed.

18        So you see like in the little region that says fiscal

19   year 2016, there are five dots.  Each of those individual

20   five dots represents the average controlled substance

21   fraction for that fiscal year.  And it's showing that like,

22   on, you know, the averages are all kind of hovering around

23   10 percent.

24   **Q**    Thank you, Dr. Glickman.

25        All right.  Let's look -- switching subjects slightly,

1   what is depicted in this next summary?

2   **A**    So this is a slide that represents the total

3   Walmart -- the total annual prescriptions dispensed by

4   Walmart per capita for oxycodone and hydrocodone, and it's

5   probably worth breaking it down a little bit.

6        That first column that says "population," those are

7   the populations of Lake County, Trumbull County, and the

8   Lake and Trumbull County, and those are numbers that I

9   pulled from Dr. McCann's reports.

10       The "total prescriptions" is prescriptions from

11  Walmart dispensing data, and these are basically just

12  counting the number of prescriptions of oxycodone,

13  hydrocodone, in each of these counties.

14       And so in order to get the annual prescription per

15  capita, you just simply divide the number of total

16  prescriptions of the opioid divided by the total population

17  of the area.

18  **Q**    Okay.  And let me stop you there.  I have a few more

19  questions about this one.

20            MS. FUMERTON:  But for the record, this

21  particular summary you created is WMT-MDL-01536.

22  **Q**    And the jury has heard several times from plaintiffs'

23  counsel about the number of pills per man, woman, and baby.

24       With respect to this particular chart, is this a

25  different perspective of how to look at the volume that's

1 | being distributed?

2 | **A**     Yeah, this is an alternative way to capture that type

3 | of information.

4 | **Q**     Because people are not dispensed one pill, they're

5 | dispensed by prescription; is that right?

6 | **A**     That's my understanding, yes.

7 | **Q**     And so if we look at oxycodone specifically, and then

8 | I want to sort of just ask what the .016 number represents

9 | under "annual prescriptions per capita."

10 | **A**     So that .016 comes about by taking the total number of

11 | oxycodone prescriptions in Lake and Trumbull County by

12 | Walmart and dividing it by the population as represented by

13 | this 439,668.  And that .016, you know, one way to

14 | understand it is that it basically is saying that 16 people

15 | out of a thousand on average are receiving oxycodone

16 | prescriptions in Lake County.

17 | **Q**     And that's per year?

18 | **A**     I'm sorry, per year, per year, on an annual basis.

19 | **Q**     Okay.  Switching subjects.  Let's go to the next

20 | slide, please.

21 |     I think you testified earlier that you reviewed both

22 | Mr. Catizone's expert report as well as Dr. McCann's expert

23 | report.  And just to orient everyone, Mr. Catizone

24 | identifies certain red flags and then Dr. McCann purportedly

25 | applied those to the data.

1          Is that a fair assessment?

2     **A**     That's my understanding.

3     **Q**     Okay.  So just generally speaking, what are some of

4     your overall observations, and then we'll walk through these

5     analyses.

6     **A**     Right.  Well, as you see, there are a bunch of

7     different observations that I'll be making generally having

8     to do with the dispensing analysis.  It might be helpful

9     just to kind of walk through them one by one.

10    **Q**     Okay.  We'll do that.

11         Why don't we go to the next page then, the next slide,

12    please.

13         And so is this a summary that you created?

14    **A**     Yeah, this -- yes, this is a summary I created.

15             MS. FUMERTON:  And for the record, it's

16    WMT-MDL-01577.

17    **Q**     And what did you do here?

18    **A**     Right.  So by way of setting this up, I assume the

19    jury has been brought up to date on the red flagging of

20    prescriptions.

21    **Q**     Yes.

22             MS. FUMERTON:  For the jury's benefit, the

23    witnesses testifying don't hear the testimony of everybody

24    else who's testified already in the trial.

25    **Q**     So, yes, they have heard about Mr. Catizone's 16 red

**Glickman - (Direct by Fumerton)**

1    flags.

2    **A**    Okay.  So what we're seeing here is we have the -- we

3    have basically two numbers and then from these two numbers

4    we're going to derive this .9 percent in the last column.

5        The first number is essentially taking all of the red

6    flag prescriptions by Walmart in the period 2006 to 2014 and

7    measuring the total MMEs that are -- total MMEs represented

8    by those red flag prescriptions.  So that's a total MME for

9    red flag prescriptions.

10       And the second number is the total MMEs distributed to

11   dispensers in Lake and Trumbull County.  So this is the

12   total MMEs in the county that are dispensed by all

13   dispensers.

14       And so if you take the ratio of the first column, the

15   total MMEs that were due to the Walmart-flagged

16   prescriptions and divide that by the total MMEs dispensed in

17   the entire county, that number comes out to under 1 percent.

18   **Q**    I think we have a visual representation of that on the

19   next slide.

20       So basically can you please explain once we get this

21   oriented, sort of what then does that .9 percent represent?

22   **A**    Right.  Again, this .9 percent basically says if you

23   take the flagged prescriptions, flagged prescriptions by

24   Walmart, they contribute .9 percent of the entire set of

25   MMEs that were dispensed in Lake and Trumbull County.

1     **Q**     Let's go to the next slide.

2          Is this also another observation you made about the

3     flagging in Dr. McCann's algorithm as applied to the data?

4     **A**     Yes, this is.

5               MS. FUMERTON:  And for the record, this is

6     WMT-MDL-0155.  I don't know how many 5s I've said.  It's

7     WMT-MDL-01550.

8     **Q**     Could you explain what you're depicting here?

9     **A**     Sure.  So for every prescription that's in the

10    dispensing data, one piece of information that's there is

11    the supply days, like how many days the prescription is

12    supposed to last.

13         So what you can do is you can take all of the

14    prescriptions and chop them up into different groupings

15    depending on how long the supply lasts.

16         So if you look at the columns that correspond to 1 to

17    7 days, 8 to 14 days, and so forth, each of those is

18    groupings of prescriptions that correspond to the different

19    supplies of the opioid.

20         And so what you see is that, you know, of all the --

21    of all the patients in the data set, there are 49.9 percent

22    of them that were dispensed opioids that lasted between 1

23    and 7 days and then, you know, 14.4 percent is for 8 to 14

24    days, and so forth.

25         What's relevant here is that there's Ohio

| | |
|---|---|
| 1 | Administrative Law, the Ohio Administrative Code defines |
| 2 | acute pain to be pain that lasts no more than six weeks. |
| 3 | And so what we did was we ended up looking at the |
| 4 | prescriptions that corresponded to lengths of supply that |
| 5 | was 42 days or less.  So those first four columns |
| 6 | corresponding to 1 to 7 days up through 31 to 42 days, if |
| 7 | you aggregate them together, that's going to give you that |
| 8 | first column. |
| 9 | **Q**    And is 42 days 6 weeks? |
| 10 | **A**    42 days is 6 weeks because it's 6 times 7.  That's |
| 11 | something we learned at Harvard. |
| 12 | **Q**    Let's turn to the next page, this visual depiction. |
| 13 | **A**    Actually before you do, I just want to make the quick |
| 14 | point that the first row corresponds to all patients, all |
| 15 | prescriptions, and the second row corresponds to patients |
| 16 | that have flagged prescriptions. |
| 17 | **Q**    I should have sort of clarified that point too. |
| 18 |       So when you say all patients, is that all patients in |
| 19 | Lake and Trumbull County for all pharmacies, or is this for |
| 20 | Walmart? |
| 21 | **A**    This is just for Walmart, all Walmart patients. |
| 22 | **Q**    And the same thing with patients with flagged |
| 23 | prescriptions, it's Walmart prescriptions? |
| 24 | **A**    This all refers to Walmart patients. |
| 25 | **Q**    Okay.  Let's look at the next page then. |

1     And so again, what are you visually depicting here

2     then?

3     **A**     So this is just a visual representation of that first

4     row.  So it's just reminding you that 82.6 percent of all

5     the patients had prescriptions that were lasting six weeks

6     or less.

7          And I should mention also, I forgot to mention this,

8     that's within the 365-day period.  So this is -- you know,

9     it's measuring just with enough gaps in between because, you

10    know, patients can come in for one acute episode and then a

11    year later have another acute episode, and those are

12    considered separate acute episodes.

13    **Q**     So, for example, a patient could have a tooth

14    extraction in year one and then in year three break a leg?

15    **A**     A knee break or something, yeah.

16    **Q**     Let's look to the next slide and the next summary you

17    created.

18              MS. FUMERTON:  For the record, this is

19    WMT-MDL-01583.

20    **Q**     And what is being depicted -- or what have you

21    summarized here?

22    **A**     Right.  So now what we can do is for, again, all these

23    sets of prescriptions we can see who the -- who the patient

24    is that was prescribed.  And what we can do is we can see,

25    well, okay, so for a flagged prescription, whether or not

**Glickman - (Direct by Fumerton)**

1    they had previously had a prescription filled at that

2    Walmart.

3         So, like, if you're -- you know, if you fill a -- if

4    you had a prescription filled at the Walmart and you happen

5    to have a -- that's a flagged prescription, we can go back

6    and see whether you have had a prescription previously.

7         And so these are two different versions of the data

8    set.  There's the full flagged data set which consists of

9    49,243.  That's the second row in these two tables.

10        So out of the 49,243 full set of flagged

11   prescriptions, 44,000 of them involve patients that had a

12   prior fill.

13   **Q**    And so just to make sure I'm understanding, that means

14   that there was -- the patient had a flagged prescription,

15   but that patient had also been at the Walmart filling

16   another prescription earlier?

17   **A**    That's correct.

18   **Q**    And so perhaps then, you know, you could say that the

19   pharmacist who's filling that prescription has at least seen

20   that patient or that Walmart Pharmacy has at least seen that

21   patient more than once and may know who that patient is?

22   **A**    If it's the same pharmacist, yeah, I suppose.

23        I want to quickly mention, in the first row where it

24   mentions this 1800, which we'll be talking about I think

25   later, this is a particular subset of the set of flagged

1    prescriptions.

2         Is it worth mentioning?

3    **Q**    Let's clarify that.

4         So the jury has heard about the sample sets, but I

5    know that you had involvement with that as well.  So why

6    don't you just briefly explain what the 1800 represents and

7    then what the 49,000 represents.

8    **A**    Sure.

9         So I guess more to remind you, I assume, at one point

10   I was asked to randomly generate a set of 1800 -- 1800

11   prescriptions out of the full 49,243 for follow-up

12   information to get extra information about those particular

13   prescriptions.

14        I'll be describing a little bit later some of the

15   details of how I generated that data, but for purposes of

16   this analysis, if we focus on that particular 1800, we get

17   sort of a similar percentage of prescriptions that have a

18   patient with a prior fill at the same Walmart store.

19        So in the case of the 1800, we have 93.6 percent, and

20   in the case of the full set of flagged prescriptions it's

21   91.1 percent.

22   **Q**    So I'm going to say this wrong because I'm not a

23   statistician, but if we want to think about it, the 1800 is

24   the sample set of the red flag prescriptions that Dr. McCann

25   identifies?  It's a subset -- so let me back up.

1       The 49,000 is the total number of red flag

2   prescriptions that Dr. McCann identifies applying

3   Mr. Catizone's red flags; is that right?

4   **A**    Yes, that's my understanding.

5   **Q**    And then the 1800 is a subset of that 49,000?

6   **A**    The 1800 is a subset that I generated.

7   **Q**    So if we go to the next slide, I think we have a

8   visual representation of that.

9       And so I think you went through in detail in the last

10  chart, but just, you know, generally, what are we looking at

11  here then?

12  **A**    Right.  See, these are exactly the same percentages

13  that were on the table.  So what we're seeing is that for

14  the sample set of 1800, 93.6 percent of them involved

15  prescriptions where the patient had a prior fill at that

16  Walmart.  And then basically the same idea for the full set

17  of flagged prescriptions, in this case it's 91.1 percent.

18  **Q**    Moving on to the next set.

19      Did you create this summary which is marked

20  WMT-MDL-01584?  And if yes, what is it showing?

21  **A**    Yes.  So I created this.

22      So this is now -- it's almost the same kind of

23  analysis that we did in the last table, but now from the

24  point of view of the prescribers.  So we can look at every

25  single one of these prescriptions, see the prescriber who is

1    involved, you know, often a doctor, and we can see what

2    fraction of those prescriptions involved a prescriber that

3    had filled a prior prescription at that Walmart pharmacy.

4    **Q**    And so if we turn to the next slide, is this a visual

5    representation of that data?

6    **A**    Yeah.  So this is, again, a summary, more visual

7    summary.  And what you can see is that in the sample set

8    there's 94.6 percent of the prescriptions involved a

9    prescriber who had had a prior fill at that Walmart, and

10   then similarly for the full set of flagged prescriptions

11   it's 94.7 percent.

12   **Q**    Okay.  Let's go to the next slide, please.

13        And as we just discussed, the jury has heard about

14   Mr. Catizone's red flags.  And can you just describe what's

15   being depicted here on this slide?

16   **A**    Sure.  So this is, again, another portion of the map

17   of some of the relevant areas.  This is going to be very

18   particular to red flags 1 and 2; 2 in particular we're going

19   to focus on in the next slide.

20        So the basic idea here is this circle that is drawn

21   around Cleveland, if -- the red flag -- the red flags for

22   flags 1 and 2 are essentially that a prescription is flagged

23   if the pharmacy where the patient filled their prescription

24   is more than 25 miles away from their residence.  And flag 2

25   is the same thing except where the prescriber was,

**Glickman - (Direct by Fumerton)**

 1   typically, their physician.

 2       So the reason Cleveland has some particular

 3   significance here is that, you know, suppose you're somebody

 4   who lives in Trumbull County, but all of your healthcare is,

 5   say, at the Cleveland Clinic.  Well, according to

 6   Dr. McCann's methods, then any prescription that you get

 7   that is prescribed by a prescriber at the Cleveland Clinic,

 8   it's going to get red flagged.  That's just merely because

 9   you ended up going to the Cleveland Clinic to get your

10   medication prescribed.

11   **Q**    And so let's look -- I have a couple questions about

12   that, but let's look at the next slide, and then I can ask

13   my question to clarify that.

14       So what are we looking at here then?

15   **A**    Okay.  So we just copied over the map that's on the

16   left.  And what I'm showing on the right here is if you

17   consider all of the flagged opioid prescriptions where red

18   flag 2, which is, again, using the distance from the

19   patient's home to the prescriber, again, typically a doctor

20   but not always, 33 percent of those prescriptions were red

21   flagged in this data set, in the dispensing data set.

22   **Q**    And the jury's heard some testimony that, okay, maybe

23   the 25 miles is not a hard limit, but I want to understand

24   how Dr. McCann actually applied it.

25       If a patient traveled 24.9 miles to its provider, his

1   or her provider, would that prescription be flagged?

2   **A**     That prescription would not be flagged because it is

3   within 25 miles.

4   **Q**     And if the same patient traveled another few blocks,

5   25.1 miles, would that prescription now become flagged?

6   **A**     Yeah, then that prescription becomes flagged because

7   it's outside the 25-mile radius.

8   **Q**     So the 25 miles was applied by Dr. McCann as a rigid

9   limit; is that a fair characterization?

10  **A**     I think that's right, yes.

11  **Q**     Let's turn to the next slide.

12              MS. FUMERTON:  And for the record, this is

13  WMT-MDL-01553.

14  **Q**     And is this another summary that you created from the

15  data?

16  **A**     Yes, this is.

17  **Q**     And did you summarize here?

18  **A**     Right.  So again, using this -- the entire set of

19  prescriptions in the Walmart data set, we can determine that

20  there are 10,759 unique prescribers.  Of the ones that

21  are -- of those set of prescriptions, if you look at all of

22  the flagged prescriptions, they correspond to 3587 unique

23  prescribers.

24              So in other words, out of the total number of

25  prescribers represented in the prescription data set, there

1    are one-third of them that are being flagged, or they're

2    flagging prescriptions that involve one-third of the

3    prescribers.

4    **Q**    And just so the jury is clear about this, so for the

5    Walmart data alone, how many different doctors were

6    flagged -- or had prescriptions that were flagged under

7    Mr. Catizone and Dr. McCann's methods?

8    **A**    Right, so that should be 3587.  There are 3587

9    prescribers that ended up getting flagged by virtue of their

10   prescriptions getting flagged.

11   **Q**    And so that's 3,587 prescribers?

12   **A**    So that's 3,587.

13   **Q**    And if you go to the next slide, is this a visual

14   representation of that?

15   **A**    Yes, it is.

16   **Q**    And so in other words, I think you said this, does

17   Mr. Catizone and Dr. McCann's algorithm flag one out of

18   every three doctors at Walmart's --

19   **A**    Okay.  So on average, it's flagging one out of every

20   three doctors by virtue of the prescription being flagged.

21   **Q**    Let's do one before maybe we'll take a break.

22        This is a summary that is marked WMT-MDL-01581.  And

23   the jury has heard testimony about Mr. Catizone's red flag

24   number 9.

25        What did you summarize here?

**Glickman - (Direct by Fumerton)**

1    **A**    Right.  Again, just to remind everybody, that red flag

2    9, as it says in footnote number 2, is that a patient was

3    dispensed two short-acting opioid drugs on the same day.

4         So what I did was in the first set of columns where it

5    says 63 and 1981, those are just the count of the number of

6    those prescriptions that were flagged by red flag number 9.

7         What I computed was the total number that were flagged

8    where one of those two prescriptions was methadone.

9    **Q**    And you are not an expert of whether or not methadone

10   is a short-acting or a long-acting --

11   **A**    I am not.

12   **Q**    The jury has heard from other witnesses though as to

13   whether or not methadone should appropriately be considered

14   a short-acting or a long-acting opioid.  And so if methadone

15   is not a short-acting -- let me start over.

16        If methadone is not a short-acting opioid but is in

17   fact a long-acting opioid, what does this analysis tell us?

18   **A**    Well, I mean, under the assumption that you're

19   describing to me, it would seem that the intent of this red

20   flag is not appropriate if methadone is one of these two

21   opioids.

22   **Q**    Because what percentage of the sample set

23   prescriptions that were flagged by red flag number 9 were

24   flagged because methadone was included?

25   **A**    Well, so it seems that for the full set of red flag 9

**Glickman - (Direct by Fumerton)**

1    prescriptions, 48.2 percent of them were flagged that

2    included methadone as one of the two opioids.  And for the

3    sample set it was 58.7 percent.

4    **Q**    And if we turn to the next slide, do we have a visual

5    representation of that?

6    **A**    Right.  And so those percentages that I just mentioned

7    are just being shown in these pie charts here.  So in the

8    case of the sample set, it's 58.7 percent, and in the set of

9    all flagged prescriptions it's 48.2 percent.

10   **Q**    To say this in other words, if methadone should not

11   have been included, does this mean that red flag number 9 as

12   applied by Dr. McCann over-flagged prescriptions?

13   **A**    If you assume that methadone should not be included in

14   those pair of opioids, then it would -- then these should

15   not be included in the red flags.

16   **Q**    But Dr. McCann did include them, right?

17   **A**    Yeah, my understanding is he included them, yes.

18              MS. FUMERTON:  Your Honor, I'm about to switch

19   to another subject.  Is now a good time for a break?

20              THE COURT:  Okay.  Ladies and gentlemen, we'll

21   take our mid morning break.  15 minutes.  Usual admonitions.

22   And then we'll pick up with Dr. Glickman's testimony.

23              (The jury is not present.)

24              MS. FUMERTON:  Your Honor, may Dr. Glickman

25   also come down?

1           THE COURT:  Sure.

2        Doctor, you can step down.

3           THE WITNESS:  Okay.

4           (Recess taken at 10:26 a.m.)

5           (Jury present in open court at 10:47 a.m.)

6           THE COURT:  Okay.  Please be seated.

7        Dr. Glickman, you're still under oath from this

8    morning.

9        And Ms. Fumerton, you may continue, please.

10          MS. FUMERTON:  May it please the Court?

11          THE COURT:  Yes.

12   BY MS. FUMERTON:

13   **Q**    Dr. Glickman, I think we have two more sets of red

14   flags to go through and then talk about some confidence

15   intervals, and at least I'll be done with this portion of

16   your testimony.

17       So where we left off I think was on slide 34.  If we

18   could pull that up.

19       And while we're doing that, I'll just sort of set the

20   stage.  As I mentioned earlier, the jury has heard from

21   Mr. Catizone and Dr. McCann, and specifically from

22   Mr. Catizone as to what his red flags mean.  And the jury

23   heard testimony that with respect to red flags 10 and 11,

24   that he was attempting to apply CDC guidance.

25       And so did you create the summary that is currently

**Glickman - (Direct by Fumerton)**

1  being displayed?

2  **A**    Yes, I have.

3              MS. FUMERTON:  And for the record, it's

4  WMT-MDL-01585.

5  **Q**    And could you please explain to the jury what you

6  summarized here.

7  **A**    Sure.  So I guess you're probably aware that red flags

8  10 and 11 are supposed to pick up dosages that are, you

9  know, fairly substantial.

10             There's guidance by the CDC that basically says that

11  as -- that if you are a nonprimary care doctor who's

12  prescribing for -- for instances of patients who are being

13  seen by nonprimary care physicians that are experiencing

14  chronic pain, not acute pain, then these guidelines apply,

15  these CDC guidelines apply.

16             So the way this flag is set up, it doesn't actually

17  specifically include these -- you know, the specific aspect

18  of the nonprimary care doctor and that it's chronic pain.

19             So if you look at the first column, you'll see that

20  the numbers are for the entire set of flagged, red flag 10

21  and 11.  They're 1,102 -- I'm sorry, I can't read numbers --

22  1,012 prescriptions that were flagged and then the sample

23  said it was 43.

24             But out of those, the numbers, if you apply the actual

25  CDC guidelines based on the, you know, based on chronic pain

**Glickman - (Direct by Fumerton)**

6271

1   and on the nonprimary care, there are 983 of them that

2   shouldn't have been flagged if the guidelines apply.  And so

3   that reduces the set of flagged prescriptions.

4        And so the number that were -- the share of the

5   prescriptions that were flagged by not incorporating the CDC

6   guidelines is 95.3 percent in the sample set and 97.1

7   percent in the full set.

8   **Q**     And I just want to make sure that the testimony is

9   clear.  So the CDC guidelines apply to primary care chronic

10  patients; is that fair?

11  **A**     Primary care chronic patients, right.

12  **Q**     And so then what you did is looked to see whether or

13  not when Dr. McCann applied red flags 10 and 11, whether he

14  applied those flags only to primary care chronic patients or

15  not; is that fair?

16  **A**     That's correct.

17  **Q**     And so what you found, then, is that for the

18  percentages that are reflected in your chart, that there are

19  a number of red flag -- or number of prescriptions that were

20  flagged by nonprimary care and for acute patients; is that

21  fair?

22  **A**     I think that's -- yeah, that's fair.

23  **Q**     So look at, the next page I think is the sort of

24  visual representation of that.

25       And so what are we seeing here then?

**Glickman - (Direct by Fumerton)**    6272

1    **A**    Well, so you're seeing essentially the visual

2    representation of the data that's on the table.  So once

3    again, out of the entire set of prescriptions that were

4    flagged, 95.3 percent of them the CDC guidelines don't apply

5    in the case of the sample set, and the 97.1 percent of the

6    prescriptions where the CDC guidelines don't apply to the

7    entire set of flagged prescriptions by flags 10 and 11.

8         And so only 4.7 and 2.9 percent remain after applying

9    the guidelines.

10   **Q**    Let's go to the next summary, please.

11             MS. FUMERTON:  And for the record, this is

12   WMT-MDL-01582.

13   **Q**    And did you create this summary?

14   **A**    Yes, I did.

15   **Q**    And can you please explain to the jury what this is

16   summarizing.

17   **A**    Sure.  So this is an instance where we're examining

18   red flag 15, and red flag 15 has to do with, you know,

19   checking combinations of opioids.  So the specific red flag

20   is a patient was dispensed more than 210 days of supply of

21   all opioids combined in a six-month period.

22   **Q**    And let me just stop you there, because the jury has

23   heard testimony from other witnesses as to, you know,

24   whether it's appropriate or not to include both short-acting

25   and long-acting opioids in that calculation.

1          But what did you conclude as to what was actually

2     done?

3     **A**     Well, what I examined was whether in -- for the

4     prescriptions that were flagged by red flag 15, whether they

5     included a short-acting and a long-acting opioid in the set

6     that was in the -- in any six-month period.  And what I

7     found is that roughly 54 percent in the sample set -- 55

8     percent in the sample set had both a short-acting and

9     long-acting opioid.

10          And then in the full set of flagged prescriptions of

11     red flag 15, 54.7 percent had one short-acting, one

12     long-acting opioid.

13     **Q**     Okay.  Last subject.  Let's turn to the next slide,

14     please.

15          And I want to set this up a little bit just so the

16     jury understands what we're talking about here.

17          You talked earlier about the sample set and you had

18     some involvement with that, but I want to back up a little

19     bit.

20          Is it your understanding that essentially some

21     mechanism that you were not involved with was set up to

22     figure out how to choose the randomly selected

23     prescriptions?

24     **A**     Yeah, there was a framework that was already specified

25     for how the sample set should be generated.

**Glickman - (Direct by Fumerton)**                                    6274

1   **Q**     Did you understand that that was the Court had set up

2   that framework?

3   **A**     My understanding, it was the Court that set that up.

4   **Q**     And so once that framework had been set up, what was

5   your involvement with obtaining the sample set?

6   **A**     Right.  So what I was asked to do, I was provided the

7   entire set of Walmart prescriptions that were red flagged.

8   And what I was instructed to do was for each individual year

9   in the set of data that I had, which went from 2010 to 2018,

10  I was asked to randomly generate 200 prescriptions from each

11  of those years separately.  And that would give over the

12  nine years a total of 1800 separate prescriptions.

13  **Q**     And you understand that that was something that was

14  done with respect to each of the defendants' prescriptions

15  that had been flagged by Dr. McCann?

16                  MR. WEINBERGER:  Objection.

17          May we be heard, just very short?

18                  (At side bar at 10:55 a.m.)

19                  MR. WEINBERGER:  Your Honor, the reason for

20  the objection is that this is -- you ordered or -- yes, you

21  ordered 10 years of 200 per year.  Walmart only produced 9

22  years; that's why they've only produced 1800, whereas the

23  other defendants complied with your order and produced all

24  10 years.

25          So this setup isn't correct.

```
 1              THE COURT:  I agree, Ms. Fumerton, so you're

 2   going to have to -- you're going to have to correct it

 3   somehow, or I'll have to.  I mean, I --

 4              MS. FUMERTON:  Your Honor, just to be clear,

 5   I'm not sort of quibbling with that.  I was just trying to

 6   establish that this is a random set.

 7              THE COURT:  I understand that.  That was okay.

 8   But what you brought out is factually incorrect.

 9              MS. FUMERTON:  Well, Your Honor, to be clear

10   about this, and we were up front.  There was never any

11   complaint about this at any point in time.  It was actually

12   back to 2010.

13        No, I mean, Mr. Weinberger can laugh all he wants, but

14   it's true.

15              THE COURT:  Whatever.  Whether there was a

16   complaint or not, what you brought out is now factually

17   incorrect.

18              MS. FUMERTON:  All right.  I can clear it up.

19              THE COURT:  All right.

20              (In open court at 10:56 a.m.)

21   BY MS. FUMERTON:

22   Q    Dr. Glickman, I just want to clarify something with

23   respect to the sample set.

24        You understood that sort of the framework that had

25   been set up was that there would be a random sample of 200
```

**Glickman - (Direct by Fumerton)**

1    prescriptions per year that were chosen.  And they're

2    random, nobody had any influence as to whether it was going

3    to be prescription A or prescription B or prescription C

4    that was chosen, it was purely random?

5    **A**    Yes, that's how it was generated.

6    **Q**    And it was applied to the data sets for each

7    defendant.  So in Walmart's case, since Walmart had only

8    data through 2018 that Dr. McCann had analyzed, that was

9    applied from 2010 to 2018; is that fair?

10                  MR. WEINBERGER:  Objection, Your Honor.

11                  THE WITNESS:  Can I respond?

12                  MS. FUMERTON:  I think we need to wait for the

13   Judge.

14                  THE COURT:  Overruled.

15   **A**    So basically I was given a spreadsheet that contained

16   tabs for years 2010 through 2018, and I was asked to

17   generate 200 randomly chosen prescriptions from within each

18   of those tabs.

19   **Q**    And the 2010 to 2018 data came from Dr. McCann; is

20   that what you understood?

21   **A**    I understood that, yes.

22   **Q**    Okay.

23   **A**    Those were the red-flagged prescriptions.

24   **Q**    Okay.  So let's talk about confidence intervals.  In

25   layman's terms -- I will confess this is getting into the

**Glickman - (Direct by Fumerton)**

1    most sort of specific type of statistic-y -- I don't know if

2    that's even a word -- type of stuff, but what is a

3    confidence interval?

4    **A**    Right.  So this is starting to get -- you know,

5    everything you've seen so far has been just, like, numerical

6    summaries.  Now we're starting to get into the guts of

7    statistical principles.

8         So the whole idea here is that these 1800

9    prescriptions, as I understood, were going to be used for

10   assessing effective due diligence on these prescriptions out

11   of the 1800.

12        So for every one of these 1800, either the

13   prescription satisfied effective due diligence or it didn't.

14   **Q**    And that was according to Mr. Catizone, is that what

15   you understood, or do you not even know how that analysis

16   was done?

17   **A**    I only have a vague understanding of what that

18   analysis is.

19   **Q**    From Mr. Catizone's report?

20   **A**    Yeah, from Mr. Catizone's report.

21   **Q**    So you had no involvement in assessing whether

22   something was diligence or not diligence?

23   **A**    That's correct.

24   **Q**    Okay.  Go ahead.

25   **A**    So the idea is that the whole exercise is -- you know,

1　is to look at -- or the plaintiffs are adding extra

2　information to those 1800 to be able to assess effective

3　diligence of those 1800.  But the final step is to

4　extrapolate from those 1800 to the total set of flagged

5　prescriptions.  In Walmart's case, that's 49,243

6　prescriptions.

7　　　　So that's the exercise.

8　　　　So what you can do is based on the 1800, you can

9　determine essentially the overall percentage of effective

10　due diligence, and now what you're trying to do is you're

11　trying to essentially estimate the effective due diligence

12　of the 49,000.

13　　　　You can't get that number exact, so instead what

14　statisticians typically do is they get a range of values.

15　So if I end up getting some number that comes from the 1800

16　as a measure of the percent of effective due diligence, I'm

17　not going to just simply report a single number that

18　summarizes the effective due diligence in this larger set.

19　I'll give a range of values, and that range of values is

20　often -- is called a confidence interval.

21　**Q**　And so Dr. McCann, do you understand that he applied

22　confidence intervals to the data?

23　**A**　I didn't see any application of confidence intervals

24　to any data, but in Dr. McCann's supplementary report he

25　described a procedure to produce confidence intervals for a

1    sample of 1800, which is precisely the sample that I

2    generated for the Walmart prescriptions.

3    **Q**    And what were your conclusions about the formula?  And

4    I know you created some slides because even I had a hard

5    time understanding this.  So I'm going to completely turn it

6    over to you to walk us through this and explain sort of

7    what's happening here.

8         Is it helpful to go to the next slide?

9    **A**    No, actually let me walk through these steps.

10        What I actually just described to you in words is

11   essentially the same thing that I have in order, but just to

12   anchor ourselves, let me just reread them.

13        So what happens is we start with the 49,243, and then

14   the way that I was asked to generate a random sample was to

15   divide the 49,423 [sic] into nine different sets which are

16   different by year.  And it's important to understand that

17   not every year has the same number of flagged prescriptions,

18   some years have more than others.

19        So what I did then is that with each of these years'

20   worth of flagged prescriptions, I randomly -- using a

21   computer program, which actually -- well, using a computer

22   program, I generated random samples from within each of

23   those years, so I got 200 randomly-selected prescriptions

24   each year of this data set.  And that gives me the total of

25   1800.

1      It is important to remember though that when I'm

2   generating 200 from one particular year and I'm generating

3   200 from another particular year, those are necessarily the

4   same fractions because of the different numbers of

5   red-flagged prescriptions total in each of those years.

6      All right.  So then I relied on Mr. Catizone's

7   assessment of diligence for each of those prescriptions that

8   I had nothing to do with.

9   **Q**     And you're not saying whether that was right or

10  whether that was wrong?

11  **A**     I'm not opining on that at all.

12  **Q**     Okay.

13  **A**     And then there's a procedure that Dr. McCann wrote

14  about to be able to extrapolate that percent from the 1800

15  back to the 49,000 and provide this confidence interval.

16     And what I'm here to tell you today is that the

17  formula that he used is incorrect, based on my experience as

18  a statistician, and based on my training and my having

19  taught about confidence intervals for a good part of my

20  life.  I know that the formulas that he used were incorrect.

21  **Q**     And so can you explain, maybe do you have an

22  illustration as to sort of help the jury understand why they

23  were incorrect?

24  **A**     Yeah, and there's -- there are several levels in which

25  the formula is incorrect, but I can illustrate this by just

1    using a made-up example.

2    **Q**    Okay.  Now the next slide?

3    **A**    Yeah.

4    **Q**    Great.  Tell us when to go to the next slide.

5    **A**    Okay.  Right.  So basically what I'm -- just to

6    simplify everything, suppose that you have an island that

7    consists of 10 circles and 10 dots.  And so typically you

8    wouldn't know -- this is going to be like the 49,000

9    prescriptions.  This is the population that we're going to

10   try to draw conclusions about.

11        So when you look at this island, pretend as if you

12   don't know that there are 10 -- the 10 circles and 10 black

13   dots.  That's what we're going to try to learn once we get a

14   sample.

15        So it turns out the first step is to take this island

16   of 10 circles and 10 black dots and we're going to divide it

17   up into four different regions.  And the reason I'm doing

18   that is I'm acting like I'm taking the prescriptions and

19   dividing them up into the different years.

20        There are nine different years, but just in this

21   illustration I'm just using four.

22        So the aspect of this that will end up leading to a

23   problem is that it may just so happen that when I divide

24   this island into the four different regions, they're not

25   going to divide evenly.  Each region is not going to

1    necessarily be evenly white circle and black dot.  It's not

2    going to necessarily be in this 50/50 percent.

3         So if you scroll forward.  Suppose that when I just

4    happened to divide them up, this is how they divide up.

5         And if you go to the next slide, I'm taking these four

6    regions and I'm pulling them out.

7         Now, what's curious about this particular example,

8    there are two things to note.  Again, I'm not choosing how

9    to divide up the island into these regions.  These are just

10   like the years, the years 2010 to 2018, in the prescription

11   data set.  Whatever they are, they are.

12        And so in this particular example, it turns out one of

13   the regions only has black dots, the second region only has

14   black dots, third region only has black dots, and the fourth

15   region has mostly circles.

16        Now what I'm going to do is I'm going to select

17   samples from each of those regions, much in the way that I

18   selected 200 samples of prescriptions from each of those

19   years.  And if I select in this case two -- you know, two

20   dots or circles at random, well, in those first three

21   regions of the island I'm certain to get black dots because

22   that's all there are in those regions.  In that last one

23   when I do the random sample of 2, I happen to get two white

24   circles, which is believable because it's mostly white

25   circles in that region.

1      So what I'm left with at the end of this procedure,

2   this two-step procedure, by starting with an island that had

3   50 percent black dots but then I divide it up into different

4   regions and then sample within each region, I end up getting

5   a set of dots where 75 percent of them are black and 25

6   percent of them are white.

7      Now, what McCann would then do is he would take those

8   75 percent and extrapolate back to the population and say,

9   well, my best estimate is that it's 75 percent black dots in

10   the population, and there's some range of values that are

11   surrounding it just to account for the uncertainty.

12      So this is a biased procedure.  It's a biased

13   procedure in the sense that if you just simply look at the

14   sample set alone without having factored in dividing the

15   island into regions, or in the case of prescriptions

16   dividing the prescription set into different years, you

17   could go way wrong.  You could get a very wrong answer.

18      And to be fair, there are computations that address

19   this problem, but Dr. McCann didn't apply them in his

20   description of the calculations.

21   **Q**    Thank you, Dr. Glickman.

22      All right.  So let's just wrap this all up.  I think

23   we have a final slide here.  We've looked at a lot of

24   different data, but sort of what are sort of three big

25   takeaways from, you know, what you've testified today?

1    **A**    Right.  So the takeaways are that, first of all, based

2    on the first set of summaries that I showed you, the Walmart

3    pharmacies really do have a fairly limited presence in Lake

4    and Trumbull County, as you've heard, the 3.15 percent

5    number of shares tossed around as well as the .9 percent of

6    the flagged prescription shares, so there's a small presence

7    of Walmart in the opioids in Lake and Trumbull Counties.

8         I discussed Mr. Catizone and Dr. McCann's red flag

9    algorithms and how there are certain concerns about how

10   they're being applied, and I described that for a whole

11   bunch of different red flags.

12        And then finally, I gave a little lesson on confidence

13   intervals and sampling, and described how things can go

14   wrong if you use Dr. McCann's procedure as he described in

15   his second report.

16             MS. FUMERTON:  Thank you, Dr. Glickman.

17        I'm going to pass the witness now.

18             THE WITNESS:  Thank you.

19             THE COURT:  Okay.  Anything from Walgreens or

20   CVS?

21             MR. STOFFELMAYR:  No, Your Honor.

22             MR. DELINSKY:  Nothing, Your Honor.

23             THE COURT:  Thank you.

24        Then, Mr. Lanier, you're up.

25             MR. LANIER:  Thank you, Judge.

1                          - - - - -

2                      CROSS-EXAMINATION

3    BY MR. LANIER:

4    **Q**     Hello.  I'm Mark Lanier.  I met you in the hall for

5    about two minutes before you got started this morning.

6    **A**     Nice to meet you.

7    **Q**     I'm going to be doing your cross-examination, all

8    right?

9    **A**     Okay.

10   **Q**     I've got three stops on your road that I want to cover

11   with you.  The first one is I want to talk to you about some

12   personal magic.  The second thing, I want to talk to you

13   about statistics as illusions.  And then I want to talk

14   about reality.  All right?

15   **A**     Okay.

16   **Q**     And I start with personal magic because that's another

17   aspect of you that you didn't share with the jury.

18          You've got -- you're a magician, aren't you?

19   **A**     I am a magician.

20   **Q**     You do sleight of hand tricks, don't you?

21   **A**     Yes, I do.

22   **Q**     All right.  And those can be really impressive.  One

23   of the key ways of doing it is to distract someone so that

24   they don't see what you've done.  Fair?

25   **A**     I would say I use magic more for entertainment than

1   for distraction.

2   **Q**    No, I'm not saying you use it for distraction, but

3   when you are doing a magic trick, you will draw someone's

4   attention away from the actual physical sleight of hand,

5   right?

6   **A**    I'm not sure I'd characterize it that way, but I'm

7   willing to stipulate.

8   **Q**    Okay.  Let's go to the second, because I want to talk

9   to you a little bit about statistics.

10         Now, you are a statistician, right?

11  **A**    I am, right.

12  **Q**    So you know that famous Mark Twain quote about

13  statistics, right?

14  **A**    Which one is that?

15               MR. LANIER:  (Writing) Sta-tis-tics.

16         Your Honor, I can't spell.  Okay.  Hold on.

17         On sta-tis-tics.

18  **Q**    You know the Mark Twain quote?

19  **A**    I have a feeling I know what you're going to say, but

20  it's not due to Mark Twain.

21  **Q**    Well, he said it was Benjamin Disraeli --

22  **A**    It was Disraeli.

23  **Q**    -- and he wrongly cites Benjamin Disraeli, but he put

24  it in his autobiography, Mark Twain did, that there are

25  three kinds of lies:  Lies, damned lies, and statistics.

 1        You know that quote, right?

 2   **A**    I know that quote, yes.

 3   **Q**    It's pretty famous in circles of people who do

 4   statistic work, right?

 5   **A**    And cross-examiners, yes.

 6   **Q**    Especially if they're cross-examining someone on

 7   statistics.  Because you can wind up doing some really funny

 8   things with statistics that give an illusion that may not be

 9   necessarily the truth, can't you?

10   **A**    In the hands of lesser statisticians, I suppose that's

11   true.

12   **Q**    Well, not just lesser statisticians.  I suspect when

13   you teach class, you teach people that you can do all sorts

14   of things with statistics, don't you?

15   **A**    I teach them how to appropriately use statistics.

16   **Q**    And you teach them how that statistics can be used

17   disappropriately, and you show examples of that in your

18   classes, don't you?

19   **A**    I don't recall ever doing that in my classes, no.

20   **Q**    All right.  Well, let me talk about whether or not

21   you've done that here, okay?

22   **A**    Okay.

23   **Q**    You put up pie charts like this, "patient's flag,"

24   "patient's flag .9 percent of Walmart's MME share in the

25   counties."  "If you look at the total MMEs dispersed, only

**Glickman - (Cross by Lanier)**                              6288

1    .9 percent dispensed by Walmart and flagged by McCann."

2              MS. FUMERTON:  Just so the record's clear, it

3    says "Plaintiffs'" not "patients."

4              MR. LANIER:  I'm sorry.  Plaintiffs'.  Thank

5    you.

6    **Q**    Do you see this pie chart, sir?

7    **A**    Yes, I do.

8    **Q**    And that gives an illusion of this being a really

9    insignificant part, doesn't it?

10   **A**    I wasn't stating whether it's significant or

11   insignificant.

12   **Q**    Because for you to state that would be to give a false

13   piece of conclusion, wouldn't it?

14   **A**    Well, it's not my realm of expertise to say whether

15   it's appropriate or not appropriate.

16   **Q**    But you will agree that the illusion here is that

17   that's such a small piece of pie, it really doesn't count?

18   **A**    Well, you know, when I'm presenting in a tabular form,

19   it's often pretty difficult and very well known that it's

20   hard to sometimes recognize the meaning of numbers in a

21   table.  Visualizations can often help.

22   **Q**    Right.  I just want to make sure that we're clear on

23   whether or not there's an illusion here.

24        What's the population of the United States?

25   **A**    Off the top of my head, I don't know the answer to

1     that.

2     **Q**     Off the top of my head, looking at Google while you

3     were on the stand, it was 329.5 million for 2020.  All

4     right.

5           What's the population of Lake and Trumbull County?

6     **A**     I don't know that answer.

7     **Q**     Well, you had it in your charts.  You were looking at

8     it earlier.

9     **A**     Yeah, I don't recall offhand.

10    **Q**     All right.  Right at 450,000, all right?

11          Now, if I wanted to do a pie chart then comparing the

12    population of Lake and Trumbull County to the United States

13    of America, I could do that, couldn't I?

14    **A**     Sure, you could do that numerically.

15    **Q**     You could just get the old pie chart constructor

16    program and put 3.295, dot dot dot dot, excerpt 450,000,

17    right?

18    **A**     Yeah, those are the numbers you put in.

19    **Q**     And if you did that, you could get a pie chart that

20    would show what part of the United States of America is Lake

21    and Trumbull County, right?

22    **A**     By population, yes.

23    **Q**     And so if I were trying to argue in this case, oh,

24    gee, there's not an epidemic in Lake and Trumbull County,

25    there's nothing significant about them in the United States,

1    they're just .13 percent of the whole country, that's not

2    fair to say, is it?

3    **A**    Well, I wasn't making that evaluation in the analyses

4    that I was doing.

5    **Q**    Yeah, but answer my question, please, here.

6         That's not fair to say, is it?

7    **A**    I don't think it's fair or unfair.

8    **Q**    Well, yeah --

9    **A**    It is what it is.

10   **Q**    You can't say that the people of Lake and Trumbull

11   County and their epidemic are insignificant in the national

12   eye simply because their population is .136 percent, can

13   you?

14   **A**    I would -- I don't know of anybody who would interpret

15   that pie chart that way.  I certainly wouldn't.

16   **Q**    Well, by the same token, people should not be

17   interpreting your pie chart to say that the .9 percent

18   dispensed by Walmart is insignificant, should they?

19   **A**    I never said it was insignificant.

20   **Q**    Because it could be quite significant depending upon

21   what it is, true?

22   **A**    I have no basis for saying whether it's significant or

23   not significant.

24   **Q**    But the lawyers sure shouldn't be using your testimony

25   to try to say it's not significant, should they?

**Glickman - (Cross by Lanier)** 6291

```
 1              MS. FUMERTON:  Objection.

 2              THE COURT:  Sustained.

 3   Q     Sir, you are not providing testimony to the jury that

 4   this is significant or insignificant, are you?

 5   A     That is correct.

 6   Q     By the same token, as we're on this question of

 7   illusion, let's look at market share.

 8         You testified about market share, correct?

 9   A     Of what now?

10   Q     Market share of opioids.  You looked at this chart,

11   "12 opioid drug shipments to pharmacies in Lake County and

12   Trumbull County."

13         Remember that?

14   A     I do, yes.

15   Q     And when you looked at that chart, you are first,

16   let's be clear, relying on Dr. McCann's work, aren't you?

17   A     I am, yes.

18   Q     You don't have any reason to think he was wrong there,

19   do you?

20   A     I wasn't making any disputes about the data he was

21   using.

22   Q     Yeah, you would not use his data if you thought it was

23   unreliable, would you?

24   A     That's correct.

25   Q     So now we look at what you did with the data.
```

1          You don't add up all of the defendants when you simply

2    reproduce his chart, do you?

3    **A**     I wasn't trying to reproduce his chart.

4    **Q**     Well, that's what we were given, is -- this is his

5    chart, isn't it?

6    **A**     Well, yeah, that is his chart.  That's from his

7    appendix.

8    **Q**     Yeah.  And this is what was shown to the jury that you

9    testified about, right?

10   **A**     Correct.

11   **Q**     And so you don't add up -- let's see, we've got

12   Franklin and Overholt's at the top.

13          You don't add up all of the CVS, Walgreens, Walgreens,

14   Walgreens, Walgreens, Walgreens, Walgreens, CVS, Walmart,

15   CVS, Walgreens, Walgreens, Walgreens, CVS, Walgreens,

16   Walmart, CVS, Walgreens, CVS, CVS, CVS, Walgreens, CVS,

17   Walmart, Walmart, CVS.

18          You don't add all of those up, do you?

19   **A**     For what chart are you referring to?

20   **Q**     I'm referring to your -- you use an MME chart.  You

21   don't do a dosage unit chart, do you?

22   **A**     You'll have to -- I think you'll need to specify which

23   exhibit you're referring to.

24   **Q**     All right.  We'll look at it as we keep going.

25          But at least you would agree it might be important to

**Glickman - (Cross by Lanier)**

1    add up all of the pills they're pumping into the county and

2    not simply look at one store, fair?

3                    MS. FUMERTON:  Objection.

4                    THE COURT:  Overruled.

5    **A**    I was adding up all the MMEs across all the dispensers

6    in Lake and Trumbull County.

7    **Q**    Well, not always, sir, because you produced charts

8    like this.  "Contrast to independents dispensing levels."

9         Do you see that?

10   **A**    So for this particular chart, I was comparing the

11   total MMEs for Overholt's versus the one Walmart store.

12   **Q**    Yeah, and I'll ask you these questions in seriatim.

13        Do you see that is my first question?

14   **A**    I sure do.

15   **Q**    And in this chart, sir, what you did is not compare

16   Overholt's to all of the Walmarts that are pumping in in the

17   county, you compared them to one Walmart store, didn't you?

18   **A**    That's correct.

19   **Q**    And that's not the only time you did that.  You did

20   that with other slides as well, didn't you?

21   **A**    If you point to the exhibits, I can answer.

22   **Q**    It's the very next one I've got up here now, where you

23   compared Franklin Pharmacy to one Walmart store, correct?

24   **A**    That is correct.

25   **Q**    Okay.  And in truth, even just looking at the county

**Glickman - (Cross by Lanier)**                                    6294

```
 1   isn't necessarily doing a thorough and adequate job, is it?

 2   A    I'm not sure exactly what you're referring to.

 3   Q    Well, it's common sense, I would think, that the

 4   counties don't give the full picture.  Correct?

 5   A    The picture of what?  I'm not sure what you're

 6   referring to.

 7   Q    Of how many pills were put into the counties, of where

 8   they came from.

 9   A    Well, one of my exhibits does actually include the

10   entire set of pills -- or the MMEs that were dispensed in

11   Lake County, Trumbull County, and the two combined.

12   Q    But even that, sir, that's what I'm saying, the

13   counties don't give the full picture.

14        Have you -- look, I live in Houston.  We have

15   hurricanes.  We had one that just busted our chops.

16   A    I remember that one.

17   Q    And I want to tell you something.  When the water

18   comes into the hallway, the flood doesn't just stop in the

19   hallway.  It seeps into the bedrooms, it seeps into the

20   bathrooms, and it seeps into the living room and the

21   kitchen.

22        Did you know that?

23   A    Yes, I did.

24   Q    And the reason I say that is because you put up charts

25   like this talking about Walmart's limited --
```

1               MS. FUMERTON:  Objection.  We actually

2      didn't --

3               THE COURT:  Overruled.

4               MS. FUMERTON:  Your Honor, that chart was not

5      used today.

6               THE COURT:  Well, is this in his report?

7               MS. FUMERTON:  No, Your Honor.

8               MR. LANIER:  It was produced to us last night

9      to be used today and --

10              THE COURT:  Let's go on the headphones a

11     minute.

12              MR. LANIER:  Your Honor, I can ask it a

13     different way.

14              THE COURT:  All right, fine.

15              MR. LANIER:  In the interest of time, I'll ask

16     it a different way.

17              THE COURT:  All right, thank you.

18     BY MR. LANIER:

19     **Q**     Sir, this will be my chart, not yours.

20           By the way, did you --

21     **A**     You're taking credit for my work?

22     **Q**     Okay.  No, now I'm not.

23           So you did this chart, didn't you?

24     **A**     Yes, I did.

25     **Q**     Thank you.  Then I can ask you about it.

1          Sir, these are the Walmarts that you took into

2     account, these five stores, isn't it?

3     **A**     Yes.  And those are the ones that I was asked to

4     consider.

5     **Q**     So the fact that Hermitage, Pennsylvania, is 4.5 miles

6     from Trumbull County and there's a store just 4 1/2 miles

7     away, you didn't consider that store, did you?

8                    MS. FUMERTON:  Objection.

9                    THE COURT:  Overruled.

10    **A**     I did not consider that.  It was not part of the data

11    set that I was working with.

12    **Q**     And that Greenville, Pennsylvania, is just 10 miles

13    from the county line; you didn't consider the Greenville

14    store either, did you?

15    **A**     It was not considered as part of the data I was

16    analyzing.

17    **Q**     And that Austintown -- or, no, is that --

18                    MR. WEINBERGER:  It's Austintown, yeah.

19                    MR. LANIER:  I'm sorry.  It goes down here?

20         Okay.  Here's my local guru.

21         Get over here, geek.

22         Oh, okay.  Well, I thought Poland was in Europe.

23    **Q**     Is this -- Austintown and Poland, you didn't consider

24    the stores there, did you?

25    **A**     They were not part of the data set I worked with.

1    **Q**    And I know where Ashtabula is because it's in a Bob

2    Dylan song.  Do you listen to Bob Dylan?

3    **A**    I never really followed Bob Dylan very carefully, I

4    was more of a Beetles guy.

5    **Q**    "You're Gonna Make Me Lonesome When You Go."

6         "I'll look for you from Honolulu, San Francisco,

7    Ashtabula."

8         You didn't consider those stores, did you?

9    **A**    I did not, no.

10   **Q**    You didn't consider the stores in Chardon, Burton --

11                MR. WEINBERGER:  "Chardon."

12   **Q**    Okay -- in these other towns either, did you?

13                MS. FUMERTON:  Objection, Your Honor.  Could

14   we be heard?

15                MR. LANIER:  I'll just do it this way, Judge.

16                THE COURT:  All right.  The jury is to

17   disregard the last question.

18                MR. LANIER:  Yeah, I didn't say the name right

19   anyway.

20   **Q**    My whole point is, you've narrowed your focus down to

21   these five stores, assuming that only pills from these five

22   Walmarts entered into those counties.  Isn't that true?

23   **A**    I did, but that was because I was responding to the

24   analyses that Dr. McCann was performing, so I was

25   essentially mimicking analyses using his data.

**Glickman - (Cross by Lanier)**

1   **Q**    Well, don't blame him for what you're testifying for,

2   sir.  You've got -- you're drawing your conclusions.  That's

3   different than the conclusions he drew.

4        You understand that?

5   **A**    Not entirely, no.

6   **Q**    Okay.  You weren't in here for his testimony, were

7   you?

8   **A**    No.

9             MS. FUMERTON:  Objection, Your Honor.  We've

10  addressed this.

11            THE COURT:  The jury is to disregard that.

12  Everyone knows he wasn't here because he wasn't allowed to.

13  **Q**    Exactly.  That's my whole point, sir.  Everybody knows

14  you weren't in here for that.  You haven't been able to read

15  it, correct?

16  **A**    I read his reports, but I'm not aware of his testimony

17  here.

18  **Q**    All right.  So when you do this type of work and you

19  make these type of decisions, I've got to ask you this

20  question.

21       Did you see who the top five prescribers were for

22  Walmart?

23            MS. FUMERTON:  Objection.  Scope.

24            THE COURT:  Overruled.

25  **A**    What do you mean by "the top five prescribers were for

1    Walmart"?

2    **Q**    Well, you gave testimony about how many repeat visits

3    there were.

4    **A**    Yeah.  I don't -- I can tell from the data set, but I

5    never bothered to look at it.

6    **Q**    Here was your slide.  "Patients with a prior fill at

7    Walmart stores."

8         You have looked at patients who had prior fills at the

9    stores, right?

10   **A**    Yes, I did.

11   **Q**    You also looked at prescribers who had been repeat

12   prescribers, didn't you?

13   **A**    I did, yes.

14   **Q**    So to put this into context, my question to you is,

15   did you happen to run a check to see who the top five

16   prescribers were getting their prescriptions filled at

17   Walmart?

18   **A**    I did not run that analysis.

19   **Q**    That might be important if we're going to decide if

20   their slice of the pie has a significant impact on the

21   community, true?

22   **A**    I don't know.  I don't know how to evaluate that.

23   **Q**    Assume with me that Dr. Demangone had 148,000-plus

24   dosage units, more than the next four prescribers combined.

25        Did you take that into account?

| 1  | MS. FUMERTON:  Objection.  Assumes facts not |
|----|---|

1    MS. FUMERTON:  Objection.  Assumes facts not

2  in evidence.

3    THE COURT:  Overruled.

4  **A**    I did not take that into account.

5  **Q**    And before we leave the statistic illusion area, a

6  couple of things I'd like to talk to you about.

7    Let's start with your confidence intervals you ended

8  with.  You manufactured these, didn't you?

9  **A**    When you say "manufactured," what do you mean by that?

10  **Q**    I mean, you made this slide, didn't you?

11  **A**    Yeah.

12  **Q**    And you're the one who dispersed these dots and

13  circles in a nonrandom pattern, aren't you?

14  **A**    I did.

15  **Q**    You specifically, yourself, took random out of this

16  equation at the very start, didn't you?

17  **A**    To be clear, this is illustrating why the method that

18  Dr. McCann used has problems.

19  **Q**    With due respect, sir, please focus on my questions.

20  We're going to get to his method in a moment.

21    This is your creature though, isn't it?

22  **A**    I did create this example.

23  **Q**    Yes.  And you're the one who divided the slices up so

24  unequally, aren't you?

25  **A**    Yes, I did.

1    **Q**    Because you could even take your island, as you've

2    done it, and what do we need, we need five in each one?  So

3    we could go and do an island there, we could go and do an

4    island there, we could go and do an island there, and we

5    could go and do an island there, couldn't we?

6    **A**    So you have to understand that statistics is the -- is

7    in the business of making conservative assumptions.  If you

8    end up picking an example where you divide the regions where

9    all the circles and dots are equally divided, you're the

10   one, sir, who is actually making the illusion because we

11   don't know things are going to divide up so evenly.

12   **Q**    Well, we don't know things are going to divide up so

13   unevenly either, where you have a line drawn here and you

14   have three little pieces and you have a big chunk where you

15   isolated all.

16   **A**    But the right way to respond -- the right way to

17   analyze the data is --

18   **Q**    You've got to wait till I finish the question.

19             THE COURT:  Hold it.  Let's have a question

20   and an answer.

21   **Q**    You've got to wait until I finish the question.

22   **A**    My apologies.

23   **Q**    That's okay.  This is not speed chess.  You can't

24   pre-move, all right?

25             You have to -- you are the one who selected three

1    small chunks, one big chunk, and you drew the lines where

2    you would set up the result, didn't you?

3    **A**    I did, as an illustration.

4    **Q**    As an illustration, you have used what is classically

5    called post hoc analysis, haven't you?

6    **A**    I don't -- I mean, in my world that's not post hoc

7    analysis, so I'm not comfortable attaching that name to it.

8    **Q**    All right.  Well, we'll stay in your world.

9         Your pieces don't all turn out to be the same size, do

10   they?

11   **A**    They sure don't, no.

12   **Q**    And your pieces were hand selected by you to get your

13   result, weren't they?

14   **A**    They absolutely were as an illustration for what can

15   go wrong.

16   **Q**    And if you go back and you look at what Dr. McCann did

17   and the funneling process, you understand Dr. McCann did not

18   choose any of those prescriptions that were needed to run

19   the red flags?

20            MS. FUMERTON:  Objection, Your Honor.  This

21   was not in his report, and he wasn't --

22            THE COURT:  Overruled.

23   **A**    I've never seen this before.

24   **Q**    This is his testimony in this case.

25            MR. DELINSKY:  Objection, Your Honor.

1          MR. LANIER:  No, this is -- I'll fix it, Your

2    Honor.

3          MS. FUMERTON:  Your Honor, can we go on the

4    headsets?

5          THE COURT:  Let's go on the headphones for a

6    minute.

7               (At side bar at 11:29 a.m.)

8          THE COURT:  You can make this point but not

9    the way you're making it.  Okay?  You can bring that, you

10   know, McCann didn't preselect the 2,000 or the 4,000,

11   whatever it was.  Okay?

12         MR. LANIER:  Got it.  Thank you, Judge.

13         MS. FUMERTON:  Your Honor, we object to the

14   chart being shown.

15         THE COURT:  All right, fine, but he can make

16   the point otherwise.

17              (In open court at 11:30 a.m.)

18   BY MR. LANIER:

19   **Q**    You understand Dr. McCann did not pick, hand pick

20   these prescriptions.  They were randomly generated.

21        Do you understand that?

22   **A**    The years were not randomly generated.  The years are

23   what they are.  The division was by years.

24   **Q**    Right.

25   **A**    So he ended up taking the original data set of

1    prescriptions, and they were divided by years.  And no one

2    had any control over how many prescriptions were in each of

3    those years.

4    **Q**    That's exactly right.  It was not hand picked.

5         And in terms of the years itself, do you think that

6    that was Dr. McCann or the Court that made that decision?

7    **A**    I don't know who made that decision, but the formulas

8    are not consistent with that process of first dividing by

9    years and then drawing random samples from them.

10        Those formulas are not appropriate.  As a statistician

11   I would say that those are not the right formulas to use to

12   extrapolate back to the population.  There are formulas that

13   exist, but he didn't use them.

14   **Q**    Well, let's just say -- well, you're assuming that was

15   his responsibility.  You're putting it at his feet.

16   **A**    Well, in his second report he wrote out the confidence

17   interval formulas, and they don't apply to the data as it's

18   sampled.

19   **Q**    So you say.  And your illustration is one where you

20   don't divide it even evenly, do you?

21   **A**    There's a very basic idea in statistical sampling

22   called --

23   **Q**    Answer my question.

24             MS. FUMERTON:  Your Honor, let him --

25             THE COURT:  Hold it.

1          You can answer Mr. Lanier's question.

2    **A**    Could you repeat your question, please?

3    **Q**    Yes, sir.  You did not divide your sections equally in

4    your illustration, did you?

5    **A**    In my illustration I didn't because I don't think that

6    would have made the point where things could go wrong.

7    **Q**    Dosage units, you weren't quite there with the jury on

8    that, were you?

9    **A**    Could you be more specific?

10   **Q**    Yes, sir.  I'm showing you Plaintiffs' Demo 123.  I'm

11   sure you've seen this before because you looked at

12   Dr. McCann's charts, right, and his report?

13   **A**    This looks vaguely familiar, but I don't remember when

14   I last looked at it.

15   **Q**    This is time:  2008 to 2018.

16          Do you see that 10-year period, 11-year period?

17   **A**    Yes.

18   **Q**    This is putting up those opiates.

19          Do you see that as well?

20   **A**    Which data set is this from?

21   **Q**    This is the data set that he looked at that came from

22   OARRS.  In other words, this is dispensing data.  This is

23   how much they actually dispensed.  You got it?

24   **A**    Okay.

25   **Q**    And if you look at the total dosage units instead of

1    the MMEs you've used, you will see that Walmart, 6.8 percent

2    with 16 million-plus dosage units.

3         Do you see that?

4    **A**    I do see that number, yes.

5    **Q**    And some years it was higher.  You've got 2014 they're

6    at 7.3 percent; 2015, 7.8; 2017, 9.8.

7         Those are statistics you didn't show to the jury,

8    aren't they?

9                   MS. FUMERTON:  Your Honor, objection.

10        Could we be heard on the headset, please?

11                  THE COURT:  Overruled.

12                  MS. FUMERTON:  Well, Your Honor, this chart

13   has not been shown before.

14                  THE COURT:  Overruled.

15                  MS. FUMERTON:  Could I please be heard?

16                  THE COURT:  Overruled.

17   BY MR. LANIER:

18   **Q**    Another issue, sir, while we're on this stop.  You

19   told the jury, "Most patients are acute pain less than six

20   weeks in a given year."

21        Do you see that?

22   **A**    Yes, I do.

23   **Q**    You didn't look and put up here the statistics of the

24   flagged prescriptions to see how many of those were acute or

25   chronic, did you?

1    **A**      In this pie chart I didn't, but the table it contains

2    has the answer, right.

3    **Q**      Right.  So the visual you gave the jury makes it look

4    like the majority of Walmart patients were dispensed opioids

5    for acute pain.  But you did have the data of chronic pain,

6    didn't you?

7    **A**      Yeah.  I wasn't hiding it.  It was on the table.

8    **Q**      Patients with flagged prescriptions, acute drops down

9    to 50 percent, doesn't it?

10   **A**      Yes, it does.

11   **Q**      And supply days, over 42 supply days, that's half of

12   the patients being dispensed from Walmart, true?

13   **A**      It's one minus the percent of -- 100 percent minus the

14   percent that were acute patients.

15   **Q**      That would redraw that chart almost in half, wouldn't

16   it?

17   **A**      If we were to produce a pie chart for that row of the

18   table, that's what it would look like, yes.

19   **Q**      All right.  Let's go to the last stop, please, on the

20   road.  And this stop I've called reality.  And this is where

21   I'd like to look at some of your slides.

22          Let's start with your idea of 25 miles to the

23   Cleveland Clinic.

24          Remember that testimony?

25   **A**      I do, yes.

1   **Q**     Now, you offered a slide where you showed the

2   prescriber postal code in the Cleveland Clinic area.  True?

3   **A**     I did not show this today, no.

4   **Q**     Okay.  And we're -- but you prepared this slide,

5   didn't you?

6   **A**     I did, yes.

7   **Q**     By the way, you understand the Cleveland Clinic

8   actually has facilities in a number of different places?

9   **A**     I'm not specifically aware of that, but I can believe

10  that, yes.

11  **Q**     Including in some of the county locations we've talked

12  about?

13  **A**     Right, but the flag is actually based on ZIP codes.

14  So wherever the Cleveland Clinic itself, specific clinic,

15  would be indicated by the ZIP code.

16  **Q**     Well, I believe, I could be wrong, but I believe the

17  Cleveland Clinic within Cleveland, that campus may have its

18  own ZIP code.  Did you know that?

19  **A**     I believe that's correct, yes.

20  **Q**     But within the framework of that, sir, you didn't

21  check the other Cleveland Clinics, did you?

22  **A**     The analysis that I did wasn't specific to the

23  Cleveland Clinic.  I was making an argument for how things

24  could be a problem if you happen to live outside the 25-mile

25  radius of the Cleveland Clinic --

1    **Q**    But look at the statistics.  There were 1800 hard

2    copies of prescriptions looked at by Mr. Catizone, right?

3    **A**    I don't remember that number.

4    **Q**    Did you do the math to see that of the red-flagged

5    prescriptions, only 135, or 7.5 percent, were written at the

6    Cleveland Clinic?

7         Did you know that?

8    **A**    I didn't perform these computations, and I'm not aware

9    if these numbers are correct.

10   **Q**    And if you further then, I'm assuming, did not perform

11   the computation for the jury of how many of those would be

12   flagged for distance of over 25 miles, you're down to 26

13   prescriptions out of 1800, or 1.4 percent, are even in play.

14        Did you know that?

15             MS. FUMERTON:  Objection, Your Honor.

16             THE COURT:  Overruled.

17   **A**    I didn't perform these computations, so I can't verify

18   what you're saying is correct.

19   **Q**    But before you come in here and criticize Mr. Catizone

20   for his red flags -- and by the way, I'm a big Cleveland

21   Clinic fan.  I think everybody in the community is.  But

22   understand, sir, that that doesn't mean that they're

23   absolutely perfect.  Fair?

24   **A**    No clinic is.

25   **Q**    And it never hurts for anyone to at least have someone

1    eyeball it, and they'll probably say, Cleveland Clinic, make

2    a note, it's okay.  But it doesn't hurt to eyeball it just

3    in case, does it?

4    **A**    Much in the way that Dr. McCann should have been

5    eyeballing the results in his analysis, right?

6    **Q**    I'm sorry, sir, you're taking a potshot at Dr. McCann

7    instead of answering my question.

8              MS. FUMERTON:  Objection.

9              THE COURT:  Overruled.

10   **Q**    Answer my question.

11   **A**    No, I'm not taking a potshot.  I'm just making the

12   argument that if somebody is claiming to not be doing some

13   analyses that wasn't in the scope of their work, you know, I

14   would say the same thing for Dr. McCann.

15   **Q**    Can you now answer my question --

16   **A**    Sure.  Ask it again please.

17   **Q**    -- and then I'll rise to Dr. McCann's defense.  First

18   answer my question.

19        It doesn't hurt to eyeball the prescription just in

20   case, does it?

21   **A**    It doesn't hurt to eyeball the prescription?

22   **Q**    Yeah.  If a prescription is flagged, it doesn't hurt

23   to look at it just to make sure, ah, that's Cleveland

24   Clinic, okay, I understand.  Doesn't hurt to do that, does

25   it?

**Glickman - (Cross by Lanier)**                                        6311

1    **A**    Depends what analysis you're performing.

2    **Q**    Well, I'm sure that someone could go into the

3    Cleveland Clinic back 15 years ago before people were

4    more -- as careful as they are now and electronic as they

5    are now, and grab a prescription pad.

6         It never hurts to check to make sure a prescription's

7    valid, does it?

8    **A**    Again, this is outside the scope of the kinds of

9    analysis that I would be doing.

10   **Q**    All right.

11   **A**    So I can't really opine on that.

12   **Q**    Did you do the analysis to see the top five doctors

13   that were flagged by the 25 miles?

14   **A**    No, I did not.

15   **Q**    If you had done the analysis to -- I'm showing Demo

16   121.

17        If you had done the analysis to look at Walmart's

18   dispensing data for the top 5 that triggered flag 2, you'd

19   have seen these doctors.  The jury's heard about

20   Dr. Demangone.  Bruce Piszel, 662 prescriptions flagged flag

21   2.

22        Do you know who Dr. Piszel is?

23   **A**    I don't, no.

24   **Q**    I say Dr. Piszel, I don't think that's right anymore.

25   He surrendered his license over this.  Do you know that?

**Glickman - (Cross by Lanier)**

```
1    A      I didn't.

2               MS. FUMERTON:  Objection.

3               THE COURT:  Sustained.  Sustained.

4    Q    You don't know about these other doctors either,

5    Dr. Moufawad, for example?

6    A      I don't, no.

7               MS. FUMERTON:  Objection to the entire exhibit

8    when there's no facts in evidence on this.

9               THE COURT:  Mr. Lanier, the witness said he

10   doesn't know any of the doctors.

11              MR. LANIER:  All right.  I'll move on, Judge.

12   Q    Next, you put a slide up that quoted the DEA's

13   testimony from Mr. Wright that said 80/20 is a ratio that's

14   looked at, right?

15   A      Yes, I did.

16   Q    I want you to assume with me that the jury has heard

17   testimony from Joe Rannazzisi on this point, okay?

18   A      Okay.

19   Q    And I want you to assume with me that Joe Rannazzisi

20   said that the 80/20 percentages, quote, was not the end-all.

21   You could have a pharmacy that has a smaller percentage of

22   opioid, a larger percentage of opioid to noncontrolled drug

23   purchases or dispensing, and that pharmacy might be fine.

24   But you could also have a pharmacy that has a very small

25   percentage, 12 percent, but when you look at their opioids,
```

```
1    every opiate going out the door is an oxycodone 30 milligram

2    tablet.  He said that doesn't make any sense.

3         You didn't take into account that concept when you

4    spoke to the jury of the 80/20 rule, fair?

5    A    I did not.  I was using the information that was given

6    by Kyle Wright's testimony.  And had I had others, I could

7    have compared it to those numbers.

8    Q    Well, if you will assume with me that Joe Rannazzisi

9    was running the Diversion unit for the DEA at one point in

10   his career and that he said that while this is an indicator,

11   it's not necessarily the end-all and, quote, "You can't say,

12   well, if it's less than 20 we don't have to worry about it,

13   because that's not how the system should be set up."

14        If you take that testimony from a DEA man into

15   account, kind of changes your slides on that in the real

16   world, doesn't it?

17             MS. FUMERTON:  Objection, Your Honor.

18   A    It doesn't change my slides in the sense that I was

19   doing --

20             THE COURT:  Overruled.  You can answer.

21   A    It doesn't change my slides in the sense that I was

22   performing a computation to compare the controlled substance

23   rate at these Walmart pharmacies to a stated guideline, and

24   I wasn't making any judgments on that.

25   Q    But you never gave the jury a good readout of how much
```

1    hydrocodone the Walmart stores were selling, did you?

2                    MS. FUMERTON:  Objection.

3                    THE COURT:  Sustained.

4    **Q**    Sir, did you -- I'm handing you Demonstrative Exhibit

5    87.

6          Do you have that in front of you?

7    **A**    Yes, I do now, yeah.

8    **Q**    And it is for the years 2006 to 2018, the Walmart

9    dispensing data-total dosage units of hydrocodone dispensed.

10         Do you see that?

11   **A**    Yes, I see this chart you gave me.

12   **Q**    You've got over 8 1/2 million units during that time

13   period.

14         Do you see that?

15                    MS. FUMERTON:  Objection.  Foundation.

16                    THE COURT:  Overruled.

17   **A**    I see the number.  What's your question?

18   **Q**    Did you take that into account at all in the figures

19   you gave this jury about how much drug was being sold by

20   these companies -- or by Walmart stores?

21   **A**    I have dosage units reported in my tables for

22   2006-2014.

23   **Q**    You stopped at '14?

24                    MS. FUMERTON:  Objection.

25   **Q**    Is that what I'm hearing?

**Glickman - (Cross by Lanier)**

1  **A**     For -- based on the CT III Walmart -- oh, the

2  dispensing data, I'm sorry.  Okay.

3  **Q**     Did you even use the dispensing data?

4  **A**     Yeah, of course I used the dispensing data.

5  **Q**     And did you stop at 2014?

6  **A**     No, for the dispensing data I stopped at 2018 for all

7  the analyses that you saw.

8  **Q**     And did you isolate out hydrocodone for the jury?

9  **A**     I don't recall off the top of my head if one of my

10  slides went through hydrocodone.

11  **Q**     Instead you put slides like slide 19 up in front of

12  the jury.  This was your slide, correct?

13  **A**     Yes.

14  **Q**     Let me back it out so you can read my notes, because

15  these are my questions.

16        You've ignored dosage units here, haven't you?

17  **A**     Ignored dosage units?  This is a table that summarizes

18  prescriptions, not dosage units, not MMEs.

19  **Q**     In other words, you've ignored dosage units, haven't

20  you?

21  **A**     I didn't ignore them.  I just simply didn't present

22  them.

23  **Q**     Well, you know that a prescription for 30 pills is

24  different than a prescription for 120 pills, don't you?

25  **A**     Sure.

**Glickman - (Cross by Lanier)**                                           6316

1    **Q**     Which is different than a prescription larger than

2    that or smaller than that.

3          Prescriptions aren't going to tell you how many pills

4    per person were put out, are they?

5    **A**     Yeah, and that's not what this table claims to

6    purport.  So it's not trying to hide anything.  It's just

7    telling you if you want to be thinking in terms of

8    prescriptions and prescriptions per capita, that's what this

9    table is showing.

10   **Q**     But you don't break out pills per capita to see how

11   many pills are out there, do you?

12   **A**     In this analysis I do not.

13   **Q**     And did you see that analysis that's been done by

14   others in this case?

15                 MS. FUMERTON:  Objection.

16                 THE COURT:  Yeah, sustained.

17   **Q**     Okay.  Have you seen that analysis -- well, let me ask

18   it this way.

19          Did you perform that analysis?

20   **A**     Did I perform which analysis?

21   **Q**     How many pills per person in these counties were put

22   out by Walmart during the years that you had the dispensing

23   data?

24                 MS. FUMERTON:  Objection.

25                 THE COURT:  Overruled.

1    **A**    I did not.

2    **Q**    Now, a lot of your charts that you put up were charts

3    that were based on MME.

4         Remember that?

5    **A**    I do, yes.

6    **Q**    You selected MME in these charts, didn't you?

7    **A**    That's correct, yes.

8    **Q**    Now, the jury was shown and heard testimony yesterday

9    from Mr. Choi, who is -- Dr. Choi, I guess, maybe's a

10   doctor, who's an economist.

11        Did you read his report?

12   **A**    No, I did not.

13   **Q**    I want you to assume with me that he said that the

14   median total, and that's median, not mean, the median total

15   for MME per prescription by pharmacy in these counties,

16   taking into account that time span, puts Walmart down here

17   in the lower MME range.

18        Do you see that?

19   **A**    Okay, yeah.

20   **Q**    And the low MME range, you know that's where you're

21   going to find drugs like hydrocodone and oxycodone, right?

22   **A**    Okay.

23   **Q**    The fentanyl popsicles, they're going to be up at the

24   high range, aren't they?

25             MS. FUMERTON:  Objection.

1          THE COURT:  I'm going to sustain it.  If you

2     want to ask the witness if he knows anything about this, you

3     can.  If he does, fine.  If he doesn't --

4               MR. LANIER:  Judge, I'll move on.

5               THE COURT:  Okay.

6               MR. LANIER:  I'll move on.

7     **Q**     This same thing you've done over and over, you have

8     used MMEs instead of dosage units, haven't you?

9     **A**     I have, yes.

10    **Q**     All right.  So with that reality picture, we're at the

11    end of the road.

12              MR. LANIER:  Your Honor, I'll pass the

13    witness.

14              THE COURT:  Okay.  I think this is what we'll

15    do.  Ladies and gentlemen, if you want to pass any questions

16    that you might have for this witness to Mr. Pitts.  And I

17    think in honor of the birthday we'll give you a little

18    longer lunch, we'll look at the questions, and we'll pick up

19    with further testimony of this witness at 1:00.

20         So have a good lunch.

21              (The jury is not present.)

22              (Juror question review.)

23              (A luncheon recess was taken at 11:50 a.m.)

24

25

1          A F T E R N O O N   S E S S I O N

2                      - - - - -

3              (In open court at 1:11 p.m.)

4              THE COURT:  The plaintiffs have proposed an

5    instruction.  I'm not inclined to give it.  If I give an

6    instruction, I can't just tell the jury what they can't

7    consider the statements for.  I have to tell them what they

8    can consider it for, like I've done in what we have in the

9    proposed final instructions on settlements.

10         So I have to come up with language for that.  And I'm

11   not exactly sure what I would say, and I think it draws more

12   attention to the statements and may be confusing.

13         So unless the parties agree on something, like they

14   have on settlements, I'm not inclined to give anything.

15              MR. MAJORAS:  Thank you, Your Honor.

16              MR. WEINBERGER:  Your Honor --

17              THE COURT:  This doesn't come out on the

18   realtime.

19              MR. WEINBERGER:  I think you got it now.

20              THE COURT:  All right.  Go ahead,

21   Mr. Weinberger.

22              MR. WEINBERGER:  So when we went through our

23   issues with the Mack testimony, you said to suggest a

24   limiting instruction, which is what I came up with.

25              THE COURT:  I understand.  But I'm not just --

1    I'm not going to say you can't consider it for the truth of

2    the matter.  I've got to say what you can consider it for.

3                 MR. WEINBERGER:  I understand that, Your

4    Honor.  But I don't think that it's fair to the plaintiff

5    that we have to submit something that the defendants are

6    going to agree to or else you're not going to give a

7    limiting instruction at all.

8                 THE COURT:  Well, I didn't quite say that, but

9    you've got to suggest to me what they can take it for.  I'm

10   not going to -- I mean, akin to the instruction that we have

11   on settlements.  It says it's in for a limited purpose, and

12   it says what the limited purpose is.

13                MR. WEINBERGER:  I'll try to come up with

14   something.  That's part of the problem that I have.  I can't

15   fathom what they should consider hearsay for.

16                MR. MAJORAS:  Your Honor, John Majoras.

17        Just for the record, we object to a limiting

18   instruction at all on this witness.  I think it unfairly

19   points to her testimony as though it's somehow less

20   trustworthy or should be treated differently than others.

21        The Court need not and does not explain its rationale

22   for its evidentiary rulings.  It should not be doing that

23   now.  It's not Evidence 101 for the jury.

24        And then finally, if the Court, and you may already

25   have this in your final instructions, if the Court has a

6321

1     general instruction of the jury should not try to -- should

2     not take my rulings one way or the other on evidentiary

3     issues and should only pay attention to the evidence that's

4     been submitted and to not pay attention to those you're

5     specifically instructed, that's all there should be.

6          This opens up the Court to, you know, questions on a

7     regular basis, "Why are you ruling this way."  That's not

8     really the jury's province.

9          And of course, in this --

10               THE COURT:  I would not limit it just to

11    Ms. Mack, of course it goes to other witnesses.  And if I

12    give a limiting instruction, Mr. Weinberger, I have to

13    instruct the jury what is the limited purpose for which they

14    may consider the testimony --

15               MR. MAJORAS:  Your Honor -- I'm sorry.

16               THE COURT:  -- which is the purpose of a

17    limiting instruction, Mr. Majoras.  It's not -- if the Court

18    allows evidence for a limited purpose, it is appropriate and

19    I think essential for the Judge to say, all right, you can't

20    consider it for this purpose but you may consider it for

21    this purpose.  That's the whole point.

22               MR. MAJORAS:  I understand, sir.

23               THE COURT:  Like we did for settlements.

24          So the question is whether I should give one.  And if

25    I give one, I'm going to have to tell them what they may

1    consider it for.

2              MR. MAJORAS:  The issue here, sir, is it's not

3    hearsay, as you've ruled, because it's not being offered for

4    the truth of the matter asserted.

5              THE COURT:  That's the point.  If the

6    non-hearsay -- it is hearsay if she relates, you know, what

7    someone said, an out-of-court statement by someone else is

8    hearsay.

9         Now, the witness can testify that I had that -- I had

10   a conversation with someone, identify it, and as a result of

11   that conversation I did something or I didn't do something.

12   And that's the non-hearsay -- that's the non-hearsay use of

13   the statement.  It goes to knowledge, intent, state of mind

14   of the defendant.  Okay?

15             MR. MAJORAS:  I agree, Your Honor, which has

16   been the case with other --

17             THE COURT:  Which is what we say about the

18   settlement agreements.

19             MR. MAJORAS:  Which is and part of my issue,

20   Your Honor, is if there should be a discussion about what

21   hearsay may or may not be, it should be at the end of the

22   case, if at all, because these hearsay rulings have applied

23   to virtually every witness in the case.

24             THE COURT:  Well, I'd like the parties to

25   consider, maybe the logical thing is to put it in, if I do

6323

1     it, I'll put it in the final instruction as part of that.

2     All right?

3                         MR. WEINBERGER:  Your Honor, this is a

4     critical issue in this case, and to --

5                         THE COURT:  We've already had testimony --

6                         MR. WEINBERGER:  And to lose it, you know,

7     within the Court's general instructions just does not --

8                         THE COURT:  Mr. Weinberger, I'm not going to

9     give this instruction.

10                        MR. WEINBERGER:  I have a different proposal.

11                        THE COURT:  All right.  What's your proposal?

12                        MR. WEINBERGER:  "This testimony is not to be

13    considered for the truth of what was said to Ms. Mack.  It

14    is only to be considered as her reason for taking certain

15    action without regard to its truth."

16                        MR. MAJORAS:  That's well beyond the ruling of

17    the Court.  It specifically does what I'm concerned about,

18    is singling out a particular witness.

19                        THE COURT:  If I would say anything, it's you

20    may consider if for the fact that it was said to her.  But

21    the problem is that sounds like the truth of it --

22                        MR. WEINBERGER:  Right.

23                        THE COURT:  -- as well.  So that's why -- at

24    the moment I'm not going to say anything.

25                        MR. MAJORAS:  And, Your Honor, if there's a

```
 1    proposal in terms of the final instructions about

 2    evidentiary rulings, we're of course happy to look at it.

 3    That would at least address my concern that it seems

 4    directed to a particular witness.

 5                    THE COURT:  Well, right.  And it would go

 6    beyond this witness because we've had testimony with other

 7    ones, and that's the other thing.  I'm not going to direct

 8    it to this witness without the others.  It doesn't make

 9    sense.

10         So the parties can -- and I'm going to think about

11    adding something to the instruction that's now on -- it's on

12    page 22, settlement agreements, because that says what -- it

13    says the evidence has been admitted for a limited purpose.

14         So it seems to me that's the place to put it, because

15    it came in with more than one witness.

16                    MR. WEINBERGER:  We'll craft something, Your

17    Honor.

18                    THE COURT:  And show it to the defendants.  To

19    me, that's the logical place.

20                    MR. MAJORAS:  We will work with the

21    plaintiffs, Your Honor, on language to see what's

22    appropriate.

23         With that, Your Honor, I'm going to take my leave.

24    Thank you.

25                    THE COURT:  All right.  I hope everything
```

1    goes -- I know it will go well.  You have our

2    congratulations.

3                        MR. MAJORAS:  Thank you, Your Honor.

4                        THE COURT:  Okay.  We can bring the jury in

5    then.

6                        (The jury is present at 1:20 p.m.)

7                        THE COURT:  Okay.  Please be seated.

8         Dr. Glickman, you're still under oath from this

9    morning.

10        And Ms. Fumerton, you may continue, please.

11                       MS. FUMERTON:  Thank you, Your Honor.

12        And I guess good afternoon now, Dr. Glickman.

13                            - - - - -

14                        REDIRECT EXAMINATION

15   BY MS. FUMERTON:

16   **Q**    So the jury has the opportunity to ask certain

17   questions, and so I'm going to display those now for you to

18   answer.  And what I would ask, though, is that you, again,

19   answer them to sort of the best of your ability within your

20   expertise.  And if it's outside of your expertise, it's

21   perfectly okay to say it's not part of your expertise.  Or

22   especially if it is part of your expertise but it's just

23   something you didn't analyze and would need more data,

24   that's fine to answer too.

25   **A**    Okay.

1   **Q**    This last one last, can you read that okay?

2   **A**    Should I try reading it out loud?

3   **Q**    No.  I'll try to read it, and then you can answer.

4       "Example:  If you look at three years of data, three

5   people overdose one year; second year, four overdose, and

6   then there's five overdoses in year three, the total, 12

7   overdoses" -- or "that totals 12 overdoses" -- following so

8   far?  "The means number would be 4, correct?"

9   **A**    Yeah.  So it looks like if you're averaging three and

10   four and five in these three consecutive years, then it

11   would be an average of four per year.  So I believe that's

12   correct.

13   **Q**    Okay.  And then the last statement was, "That hides

14   the fact that 12 people overdosed is hidden."

15       Do you agree with that statement?

16   **A**    I'm not sure I agree with that, because if you know

17   that there are four -- if there are four per year and it's

18   over three years, then you can determine that three times

19   four is 12.

20       Now, you don't exactly know how -- you know, if you

21   just knew that it was four per year, you don't know how

22   those 12 distribute across the three years.  Like, you don't

23   know it's three, four, five, or you don't know it's four,

24   four, four.  But the average of four tells you at least that

25   on average across those three years it's four per year.

**Glickman - (Redirect by Fumerton)**                 6327

1    **Q**    And I just want to tie this back to your testimony

2    today.

3         I don't remember seeing any means or averages within

4    what you testified today.  Is that correct?

5    **A**    Yeah.  I have to say I'm not exactly sure what that's

6    connecting to.  If we had a little bit more reference for

7    that question, I might be able to address that more

8    specifically.

9    **Q**    And unfortunately, we don't get to ask the jury sort

10   of follow-up questions with that, so we do the best we can.

11        But you also didn't talk about any deaths anywhere in

12   any of your --

13   **A**    I'm sorry?

14   **Q**    Any deaths?

15   **A**    Any deaths, no, I certainly didn't refer to deaths in

16   particular, no.

17   **Q**    Next question.  "You did not generate or review the

18   exact prescriptions that Dr. McCann or Mr. Catizone

19   reviewed?"

20        Is that accurate?

21   **A**    The way I'm understanding the question, "Did not

22   generate or review the exact prescriptions..."

23        Oh, from ...

24   **Q**    Maybe I can help out with this question --

25   **A**    Yeah, I'm not sure I understand.

1    **Q**     -- because I think I understand what the juror is

2    asking.

3          Did you review the same data set that Dr. McCann did?

4    **A**     Yeah.  I mean, I analyzed the same data set as what

5    Dr. McCann used.  I mean, in terms of -- I mean, the

6    generating question I guess is more related to the

7    generating the sample of 1800.  That's what -- I guess, like

8    the only time I think I used the word "generate" was in

9    relation to the sample of 1800.

10   **Q**     But the sample of the 1800, if that's what the

11   question is going to, was the same 1800 that Dr. McCann

12   reviewed and Mr. Catizone reviewed, correct?

13   **A**     Yeah, that's my understanding; that once they

14   generated the 1800 prescriptions, which were a sample from

15   the total of 49,243, that Dr. McCann flagged, I think at

16   that point those 1800 were then reviewed by plaintiff.  I'm

17   not exactly sure who reviewed them, but yes.

18   **Q**     And just as a follow-up question on that, are the five

19   Walmart stores that you analyzed the same five that

20   Dr. McCann was analyzing?

21   **A**     Yes, they were.

22   **Q**     And did Dr. McCann analyze any other pharmacies

23   outside of Lake and Trumbull County, Walmart or otherwise?

24   Mr. Lanier was asking you questions about stores in

25   Pennsylvania.

1    **A**    Not that I'm aware of.

2    **Q**    And in fact, when we were talking about the market

3    share numbers earlier, we walked through that we were -- you

4    were actually using the charts prepared by Dr. McCann to

5    come up with the numbers; is that fair?

6    **A**    I was, yes.

7    **Q**    Okay.  Several parts to this question, so we're going

8    to try to walk through this together.  And I tried to pull

9    the charts.

10   **A**    Okay.

11   **Q**    It says, "85,087 was the total number of oxycodone

12   dispensed by Walmart between 2006 and/or 2018?"

13        And so I think what the juror was asking was about

14   this chart that we showed.  And I actually wrote on this

15   one, so I'm showing the exact same one that's not marked up.

16   Maybe you folks can see it a little bit better.

17        So this is 1536, and that's the same one that's here.

18   So I'm just going to use this one so we can focus on it for

19   the juror question.

20   **A**    Okay.

21   **Q**    Okay.  So if we could keep the juror question on here

22   too.

23        So it looks like the number that the juror is asking

24   about is this one right here.

25   **A**    Okay.

1    **Q**    And so can you just explain what that number is?

2    **A**    Yeah.  That's the total number of prescriptions of

3    oxycodone in Lake and Trumbull County between 2006 and the

4    end of March of 2018.

5    **Q**    And that's for Walmart?

6    **A**    That's for Walmart specifically, yes.

7    **Q**    So next question.

8                 MR. LANIER:  Can you move the question?

9                 MS. FUMERTON:  Yeah, thank you.  I'm trying

10    to --

11                 THE WITNESS:  If you can move it to the left a

12    little bit.

13    **Q**    Here.  We'll do this.  Just trying to let you see the

14    question and the chart at the same time.

15         Okay.  So the second question was, "How many pills, on

16    average, is in a prescription?"

17    **A**    Yeah, that's something I don't know the answer to.

18    That, I can't answer.

19    **Q**    And I think this reference 01536 is just that we're

20    all looking at the same chart.

21         All right.  "So if seven pills were in 85,087

22    prescriptions, that equals what?"

23    **A**    Are we asking what's the fraction of 7 -- oh, I see.

24    So if there were --

25    **Q**    I'm going to put all three of these because perhaps

1    that will help.  And I think this is just about this number,

2    so I'm going to cover this up for a second.

3         So the rest of the --

4    **A**    Oh, I see.  So if there were seven pills per

5    prescription, that's how I'm understanding it, so --

6    **Q**    I think that's right.

7         So if you're saying "If there's 85,087 prescriptions,

8    that equals how many pills," is how I'm reading it.

9    **A**    So, I mean, to answer -- thank you.

10        To answer the question, it would be the multiplication

11   of 85,087 times 7.  So that number, just using my fancy

12   phone calculator, is going to --

13        I'm allowed to do this, right?  I guess the answer is

14   yes.

15        85,087 times 7, that gives me a total of 595,609

16   pills.

17   **Q**    And of course, we don't know what the answer is to how

18   many pills are per prescription.  It could be three in a

19   prescription or --

20   **A**    Yeah, I'm understanding this question as hypothetical.

21   **Q**    Okay.  And then divide that number, which what was the

22   number that we just said?

23   **A**    By the total number of people in both counties.

24   **Q**    Right, both counties.  And I don't know if that number

25   is here on this chart or if you would need --

 1   **A**    No, it is.  It's that 439,668.

 2   **Q**    Got it.

 3   **A**    So if I divide the 595,609 divided by 439,668, so that

 4   gives me the number 1.355.

 5   **Q**    I'm sorry, 1.355?

 6   **A**    Yeah, 1.355.

 7   **Q**    Okay.  And then the next question is, "What is the

 8   actual percentage of pills filled by Walmart in Lake and

 9   Trumbull County as a percentage?"  And there's a comment,

10   "If this is the right formula, please compare that total

11   percentage to the totals on the exhibit."

12        So I think you could -- let me ask this in two ways.

13   You could finish this hypothetical, right, and you could

14   come up with a percentage?

15   **A**    Right.

16   **Q**    Do you know what -- but you would need more

17   information that's on that chart; is that right?

18   **A**    So, could you -- can we look at the question one more

19   time?  I'll have one more comment about this in a moment,

20   but what is the actual percent pills filled by Walmart, the

21   actual percentage of pills --

22   **Q**    And so --

23   **A**    I'm not sure I have that information here.

24   **Q**    Yeah, I don't know if that's -- but I did want to

25   point out because I think this information might be on this

```
 1    chart.

 2         So tell me, it's slightly different, but this is

 3    something that you looked at -- or we looked at earlier, and

 4    this is MDL 01541A.  And we looked at it just in the

 5    presentation, but it's the same that we looked at before.

 6         I think the question is about pills.  So can you tell

 7    anything about what the percentage of Walmart pills were

 8    dispensed in this county based on this chart?

 9    A    Yeah.  So the dosage units are basically counting the

10    pills because an individual dosage unit is typically an

11    individual pill, but it could be other things.

12         So as a rough approximation, if you take the total

13    Walmart dosage units, which looks like it's 10,380,575, you

14    can in theory take that number, divide it by the population

15    total, which was on the other chart, and then get a number.

16    Q    And that would give you a per population or per

17    individual number.  But if you were looking to what the

18    percentage of pills filled by Walmart in Lake and Trumbull

19    County is, we were talking earlier about this 3.15 percent

20    number, which is the percentage of Walmart's share of the

21    opioids by MME.

22    A    Right.

23    Q    What is on your chart --

24    A    Right, so the percentage of the shared -- the

25    percentage share of dosage units is the 4.71 percent.
```

1    **Q**    So that information is contained on your chart as

2    well?

3    **A**    That is on my chart, that's right.

4         And in that case, you don't have to make the

5    assumption that there are seven pills or any specific number

6    of pills per -- you know, per prescription.

7    **Q**    And I just want to look at the source here.  The

8    source is the expert report of Craig McCann, Ph.D., with

9    backup materials.

10        And so again, these are the numbers that Dr. McCann's

11   using, right?

12   **A**    That's correct.

13   **Q**    Okay.  "Question.  As error rates can go both ways,

14   Bayesian statistics" -- I'm very impressed with this

15   question, by the way.

16   **A**    There's a secret statistician somewhere on the jury.

17   **Q**    -- identifies false positives and false negatives

18   (also true positives, true negatives).  After review of the

19   data, what percentage of the false negatives were there

20   based on the McCann/Catizone red flag criteria?  Meaning,

21   how many prescriptions weren't flagged that should have been

22   flagged based on their criteria?  If you don't have an exact

23   number, can you estimate it?"

24   **A**    Yeah, I'm afraid this is something that I would need

25   to really set aside some time to actually do a little bit of

1    the computation.  I mean, we'd have to first of all figure

2    out how to even figure out the false positives and false

3    negatives.  That's not even very clear.

4         So the simple answer is that there's no way on the fly

5    I can possibly estimate that.

6    **Q**    And so I just want to clarify that too, because here

7    is just one example, and I don't know if this is what was --

8    we looked at several different examples where you did some

9    computations based off of various red flags.  This was one

10   of them; is that right?

11   **A**    Yeah, that's correct.

12   **Q**    And again, you don't know whether methadone is a

13   short-acting a long-acting?

14   **A**    Well, you told me it is; but yes, before that, yeah.

15   **Q**    Other than what I have represented.

16        But if you were -- this is just simply doing the

17   math -- calculating that if you did not intend to include

18   methadone or shouldn't have included methadone as flag 9,

19   this over-flags by approximately 58 percent; is that fair?

20   **A**    Well, I'd say 58 percent were flagged for inclusion of

21   methadone, so 58 percent --

22   **Q**    And you're not saying one way or the other whether

23   methadone should have been included?

24   **A**    Yeah, I'm just doing the calculation.

25   **Q**    So if somebody else concludes that methadone shouldn't

**Glickman - (Redirect by Fumerton)**

1    have been included, would this be an example of improperly

2    applying red flag 9?

3    **A**    Under the assumption methadone shouldn't be included,

4    yes.  I mean part of the reason the answer is a little

5    complicated from the jury question is that we're just

6    focusing on just one red flag, but there are many red flags

7    and they might overlap.

8         So like when a red flag -- you know, if in like a

9    situation like this, you know, we end up, you know, based on

10   my analysis if, you know, some of these red flags are -- you

11   know, we raise a question that they should be a red flag

12   because they include methadone, and then there's maybe

13   another red flag that also has a similar problem, those

14   might be for the same prescription.  So it gets to be a

15   little hard to figure everything out when you're putting

16   everything in aggregate for all the red flags.

17        So it wouldn't be as simple as just taking each

18   individual red flag one at a time, looking at the fraction

19   of flags that seem to not do what they're intending to do

20   and add them up.  You can't do it that simply,

21   unfortunately.

22   **Q**    Is it something that you could do with enough time if

23   you were asked to do it?  Well, I guess -- you know what,

24   strike that question.  I'm going to move on to the next one.

25        I think these are related, so I'm going to ask this

1    one, and then I can put up a slide too.

2         "When you reviewed the prescriptions you saw

3    documentation about primary care and you saw patient records

4    that it was acute?"

5         Maybe just another way to phrase this too is, can you

6    explain sort of how you determined whether something was

7    acute or was primary care based on the data you reviewed?

8    **A**    Sure.  The determination whether the prescriber was

9    primary care was based on the prescriber ID and what their

10   specialty was.  So we didn't -- you know, we didn't need to

11   look up any special documentation.  It was actually part of

12   the data.

13        Similarly, for whether the patient was acute, which

14   basically is related to the supply of the drug, like how

15   long the prescription lasted, that's also information

16   already in the data.  That's part of the prescription.

17        So, you know, we didn't need to look at any extra

18   information beyond what was already in the data.

19   **Q**    And so I think this relates to your analysis on

20   Catizone's red flags 10 and 11.  And I took this from the

21   presentation, it's WMT-MDL-01585.  I have another copy of

22   just that I'm going to put down because it's a little bit

23   clearer.  You can see it's the same document for folks to

24   see.

25        There's a second question that I think relates to the

1     same sort of subject matter, which is, "Are you saying that

2     because chronic patients weren't included in Dr. McCann's

3     data for flag (10 and 11, I believe) (4 percent versus 90s)

4     the percentage of red flag prescription was incorrect?"

5          Maybe actually it would be better for me to put --

6     this is the summary chart you created and this is the

7     visualized representation of it, right?

8          And so if I put this here, let me see if I can move

9     this up a little more, maybe you can answer the question

10    that way.

11    **A**    So I'm not actually saying correct or incorrect.  I'm

12    just simply stating that if you -- you end up accounting for

13    patients that were chronic pain, pain patients seen in

14    primary care, then that number reduces by a lot applying

15    that guideline.

16         So I'm not saying it's correct or incorrect.  I'm just

17    simply saying that if you were to account for the CDC

18    guideline, the number of flags would end up reducing.  So

19    it's -- you know, I'm not trying to make an evaluation of

20    this.

21    **Q**    And so basically you're saying if the CDC guidelines

22    had been applied, there would have only been 4.7 percent of

23    the prescriptions of what was actually flagged, only 4.7 of

24    them would actually still be flagged?

25    **A**    That's correct.

1    **Q**     And I guess that was for the sample, but it would be

2    2.9 if you were looking at the entirety?

3    **A**     Right, that's right.

4    **Q**     I'm going to put this up here.  It's "How many

5    prescriptions of the 3,587 prescribers are the same and

6    wrote the same prescription to the different patients?"

7         And I think what this is referring to is -- hold on

8    one second -- this particular summary that you prepared,

9    WMT-MDL-01553 that we saw in the presentation.  And that's

10   with the 3,587 prescribers.

11        So did you do this analysis?

12   **A**     Yes.

13   **Q**     And what about the question?  Can you answer that?

14   **A**     Yeah.  So the 3,587 are unique prescribers.  They're

15   all different from each other, but -- well, I didn't take a

16   look at whether they wrote prescriptions for the same or

17   different patients.  This is just focusing on the

18   prescribers.

19   **Q**     Okay.  I think this is the last question from a juror,

20   and I believe it relates to this chart that the jury saw,

21   and it could have been about the one about patients.

22        So you had a similar chart about patients with a prior

23   fill at a Walmart store and you had one about prescribers,

24   correct?

25   **A**     That's right.

1   **Q**    So I'm not sure if this question is relating to the

2   patients or prescribers, but "Is prior fill a red flag

3   resolution to the prescription in hand?  What are your" --

4   **A**    I'm sorry, I can't see the question.

5   **Q**    Sorry.  "Is prior fill a red flag resolution to the

6   prescription in hand?  What are your credentials to allow

7   you to say yes or no?"

8   **A**    Yeah, so I suppose I would answer this question by

9   saying that I don't have any particular credentials to say

10  whether a prior fill is a resolution to this particular red

11  flag.  This again is just simply more a computation just to

12  inform you how many of the prescriptions involved a prior --

13  either, you know, prior fill by the same patient or the

14  prior fill prescribed by the same prescriber.

15       So I definitely don't claim that I have the

16  credentials to add meaning to that conclusion.

17  **Q**    You're not a pharmacist, you're not talking about the

18  proper way to resolve a red flag, correct?

19  **A**    That's correct.

20  **Q**    And you're just providing the data so that other

21  people can draw the appropriate conclusions?

22  **A**    I'm providing the summary of the data, yup.

23  **Q**    Okay.  I think that's it for jury questions.  And so I

24  have I think just one subject I want to cover on my own.

25       Mr. Lanier showed you this chart, and I believe you

1    testified you've never seen it before or you don't recall

2    seeing it.  Is that right?

3    **A**    I don't recall seeing this, no.

4    **Q**    And Mr. Lanier also represented that it was something

5    that Dr. McCann created.

6          Do you recall that?

7    **A**    I recall him saying that, yes.

8    **Q**    And I just want to look, this is talking about market

9    share; is that fair?  By the title.  We don't know what it

10   is.

11   **A**    It's summary of margin share by pharmacy, and all the

12   units are dosage units.

13   **Q**    So you've never seen this before, you don't know who

14   created this?

15   **A**    I don't recall having seen this.

16   **Q**    And I just want to put down here, you see where it

17   says "Source:  OARRS"?

18   **A**    Yes, I do.

19   **Q**    Hold on to that thought.

20   **A**    Okay.

21   **Q**    One of the things that you reviewed for your testimony

22   was the deposition of Dr. McCann, correct?

23   **A**    I did, yes.

24   **Q**    All right.  We can give a copy of this to counsel and

25   the judge.

1          This is a copy of that deposition that you reviewed,

2     right?  This is Lake and Trumbull County, deposition of

3     Craig McCann taken June 11, 2021?

4     **A**     That's right.

5     **Q**     So I want to turn to page 224 of this deposition.

6          And the witness here is Dr. Craig McCann, correct?

7     **A**     Yes.

8     **Q**     And so the question is:  I'm telling you, you could

9     have done a market share analysis for the OARRS data,

10    couldn't you have?

11         There's an objection, and Dr. McCann testified:  I

12    don't know.  I didn't think about it.  I wouldn't use OARRS

13    data.  I would use the ARCOS data, or I would use the

14    defendant transaction data.  I don't understand why you --

15         And then the question goes:  How could you do a market

16    share analysis with ARCOS data or the defendant transaction

17    data?

18         Dr. McCann testified:  Well, because the ARCOS data

19    identifies the distributors and the pharmacies, so if you

20    wanted to do a market share analysis of distributors

21    shipping to pharmacies in Lake and Trumbull County, you

22    would do it with the ARCOS data.  I'm completely confused by

23    this line of questioning.

24         Question:  What if you wanted to analyze dispensed

25    products?

1          Dr. McCann:  I would still use the ARCOS data, not the

2     OARRS data.

3          Do you recall reading that testimony?

4     **A**     Yeah, I have a vague recollection of that particular

5     passage.

6     **Q**     So when you did your market share numbers that you

7     testified about, the 3.15 percent for Walmart, you used the

8     ARCOS data that Dr. McCann used, correct?

9     **A**     That is correct.  I did not use the OARRS data.

10                    MS. FUMERTON:  I'm going to pass the witness.

11     Thank you.

12                    THE WITNESS:  Thank you.

13                    THE COURT:  Anything from CVS or Walgreens?  I

14     figure not, but I always ask.

15                    MR. DELINSKY:  No, thank you, Your Honor.

16                    MS. SWIFT:  No, Your Honor.

17                    THE COURT:  Thank you.

18          You're on, Mr. Lanier.

19                         - - - - -

20                    RECROSS-EXAMINATION

21     BY MR. LANIER:

22     **Q**     Okay, sir, I want to go over what Ms. Fumerton asked

23     you at the end about the chart, but before that I want to go

24     over a couple of juror questions, and I want to just make

25     sure that we've covered them adequately.  All right?

**Glickman - (Recross by Lanier)** 6344

1  **A**    Sure thing.

2  **Q**    First of all, you were asked questions about the CDC

3  guidelines and the effects that it had on the numbers.

4      Remember those?

5  **A**    Yes, I do.

6  **Q**    All right.  Now, you have no basis and expertise to

7  challenge Carmen Catizone on the CDC guidelines and how they

8  should be applied, fair?

9  **A**    That's fair, yes.

10  **Q**    All right.  So when you do all your graphs and stuff,

11  that's based on assumptions that were provided to you in

12  essence by the legal team, not by Carmen Catizone, fair?

13          MS. FUMERTON:  Objection.

14  **A**    Yeah, those were -- those were not decisions that I

15  made.

16  **Q**    Correct.  Thank you.

17      Next, there was a juror question on whether or not you

18  had reviewed the exact prescriptions.

19      Remember that?

20  **A**    Yes.

21  **Q**    And as I understand it, you did not review the exact

22  prescriptions.  You didn't put your eyeballs on them, did

23  you?

24  **A**    I did not look at anything other than just the data

25  that was provided to me, not --

1    **Q**    So when Ms. Fumerton revised the question to ask you

2    if you reviewed a data set, you understand the data set is

3    different than the exact prescriptions the juror was asking

4    about, right?

5    **A**    I mean, if there were -- yeah, if the juror was asking

6    about the actual prescription on, like a piece of paper, I

7    did not see any actual prescriptions.

8    **Q**    Thank you.

9          Next.  You were asked about false positives and false

10   negatives.

11         Remember?

12   **A**    Yeah.

13   **Q**    Now, as a practical matter, you said there's no way --

14   or you had not done the analysis to provide how many false

15   negatives; in other words, things that should have triggered

16   a red flag but weren't counted as a red flag.

17         Right?

18   **A**    I didn't compute any false negatives, that's correct.

19   **Q**    And while you didn't do that on the data set that you

20   had, there are just, common sense, a lot of red flags that

21   may have been present that no one can determine from the

22   data set.  Fair?

23   **A**    Yeah, there's -- there might be plenty of reasons that

24   prescriptions, you know, are not potentially concerning.

25   **Q**    So, for example, if the jury's heard about red flags

1    being triggered by the behavior of the person coming in to

2    buy the prescription, that's not something you're going to

3    see in the data set.  It's something that's going to be

4    visually observed by a pharmacist.  Fair?

5                     MS. FUMERTON:  Objection.

6                     THE COURT:  Overruled.

7    **A**    Yeah, there's -- the data set is not going to

8    characterize every nuance of what people's behaviors are in

9    prescription --

10   **Q**    Data set won't characterize, based on the way you

11   reviewed the data set at least, if three people come

12   together in the same car with the same prescription.  It's

13   not going to be in the data set, is it?

14   **A**    No, it's not.

15   **Q**    Okay.  So there are potential red flags that aren't

16   picked up by anybody's analysis, the false negatives, fair?

17                     MS. FUMERTON:  Objection.

18                     THE COURT:  Overruled.

19   **A**    Yes, that's -- I think that's accurate.

20   **Q**    All right.  Next, you did a pills per county per

21   capita type analysis from one of the juror questions.

22   Remember?

23   **A**    Yes, I do.

24   **Q**    All right.  I'm trying to make sure that we've got

25   that in the record right.

1           So you took this figure from Walmart's 1541A, and it

2      was 10 million --

3      **A**    10 million.

4      **Q**    -- 380,575 pills.  Right?

5      **A**    Correct.

6      **Q**    And to do the math off of that, it's not that tough.

7      You can take that and divide it by 450,000, which is roughly

8      the number of people in the two counties -- (pause)

9                   MS. FUMERTON:  Is that a question?

10                  MR. LANIER:  Hold on.  I'm not through with

11     the question.

12     **Q**    You can divide it, and you can get -- divide that

13     10,380,575 by the 450,000 in each county, and you can come

14     up with how many pills per capita; true?

15     **A**    You can do that calculation, yes.

16     **Q**    And roughly -- you got your handy-dandy iPhone --

17     **A**    I can.  Do you want me to take it out again?

18     **Q**    -- or you want to just trust me, it's around 23,

19     figuring our iPhones do it the same?

20     **A**    If that calculation were done correctly, then that's

21     certainly the procedure to do the calculation.  I can do it

22     if you like.

23     **Q**    Sure.  Let's make it precise for the record.  His

24     Honor likes precision.

25     **A**    So we've got the 10,380,557 divided by -- and can you

**Glickman - (Recross by Lanier)** 6348

1    show the population number?

2    **Q**    450,000.

3    **A**    Can you show it exactly?

4    **Q**    Which chart has that?

5          Here we go.  Ooh, it's going to be higher than I

6    thought.  439,668 people.

7    **A**    Right, so it's 23.6 dosage units per capita.

8    **Q**    I was underestimating, wasn't I.

9          We could do the same thing, by the way, with the

10   hydrocodone.  If the dosage units of hydrocodone were

11   8,551,367, you could divide that by the 439,668, and

12   determine how many hydrocodone pills per person were put out

13   by Walmart, couldn't you?

14   **A**    You could do that calculation, sure.

15   **Q**    And what would your answer be?

16   **A**    I guess I should leave my calculator app open, huh?

17         8,551,367 divided by 439,668.

18         So that's 19.45.

19   **Q**    I'm sorry, sir, I missed that.

20   **A**    19.45.

21   **Q**    Hydrocodone pills per person, man, woman, and child;

22   fair?

23   **A**    That's what that division is, yes.

24   **Q**    All right.

25              MR. LANIER:  Your Honor, I need to clarify

1    something on the record and with the witness.

2          I want to go to Plaintiffs' Demo 123.

3    **Q**    This is from the OARRS data, and it is a summary of

4    market share by pharmacy.

5          Do you see that?

6          Do you remember the questions Ms. Fumerton asked you?

7    **A**    Yes.

8    **Q**    I had been under the understanding that this was

9    prepared by McCann himself and in his report.  It's my

10   understanding this was pulled from the OARRS data.  And so I

11   want the record to reflect that it is evidently not from

12   McCann's report but straight from the OARRS data.

13                  MS. FUMERTON:  Objection.

14                  MR. LANIER:  Your Honor, I think I need to put

15   that on the record.

16                  MS. FUMERTON:  We don't know where it's from

17   now.

18                  MR. LANIER:  Yes.

19                  THE COURT:  I don't know what -- you can ask

20   him a question.

21                  MR. LANIER:  Thank you.

22   BY MR. LANIER:

23   **Q**    Sir, if the OARRS data shows these dosage units -- by

24   the way, those dosage units aren't that different than what

25   you found, is it?

1    **A**     What are you referring to?

2    **Q**     Well, you have dosage units of 10,380,000 for just

3    those years 2006 to 2014, right?

4    **A**     Yeah.  I mean, I can stand by the numbers that I

5    computed.

6    **Q**     And these numbers go up to 2018, four years later,

7    correct?

8              MS. FUMERTON:  Again, objection.  Foundation.

9    We don't even know what this is.

10             THE COURT:  Overruled.  You can ask a

11   question, but I'd like to hear the question.

12   **Q**     Sir, you understand there's a difference in years

13   here.  There are four years in Demonstrative 123 that were

14   not included by you at the top end at your 10 million

15   figure.  Fair?

16   **A**     Yeah, that's what appears on the chart you're showing.

17   **Q**     And by the same token, you've included 2006 and 2007,

18   two years at the bottom end, that are not at the chart, just

19   to be fair?

20   **A**     That seems to be the difference.

21   **Q**     All right.  That's great?

22             MR. LANIER:  Thank you, Judge.  I wanted to

23   clarify the record.

24             THE COURT:  Okay.  Thank you very much,

25   Doctor.

6351

```
 1                    THE WITNESS:  Thank you.

 2                    THE COURT:  We appreciate your appearance, and

 3      safe travels back.

 4                    THE WITNESS:  I appreciate it.  Thank you,

 5      everyone.

 6                    MR. DELINSKY:  Your Honor, may we get our next

 7      witness?

 8                    THE COURT:  Yes, you may, Mr. Delinsky.

 9                    MS. FUMERTON:  Your Honor, may I approach to

10      give you the juror questions?

11                    THE COURT:  Yes.  Good idea.

12                    MR. DELINSKY:  Your Honor, CVS calls Robert

13      Hill.

14                    THE COURT:  Good afternoon, sir.

15                    (Witness sworn.)

16                    THE COURT:  Thank you.  Please be seated, and

17      you may take off your mask while testifying.

18           You may proceed, Mr. Delinsky.

19                    MR. DELINSKY:  Thank you, Your Honor.

20           And good afternoon, Mr. Hill.

21                    THE WITNESS:  Good afternoon.

22                    THE COURT:  Are you ready to go?

23                    THE WITNESS:  Yes.

24                    THE COURT:  All right.

25
```

1                          ROBERT HILL

2                          - - - - -

3                    DIRECT EXAMINATION

4      BY MR. DELINSKY:

5      **Q**    Mr. Hill, what I want to do first is explain to the

6      ladies and gentlemen of the jury why you're here, and then

7      we're going to move back in time and then go through some of

8      your background and get to the real stuff.  Okay?

9      **A**    Okay.

10     **Q**    Mr. Hill, did you formerly work at the United States

11     Drug Enforcement Administration?

12     **A**    Yes, I did.

13     **Q**    For how long?

14     **A**    25 year, 3 months, and 21 days.

15                    MR. LANIER:  How many hours?

16     **Q**    When did you start at DEA?

17     **A**    September 10, 1989.

18     **Q**    Did you retire -- or you already told us how long you

19     remained there.

20           Did you retire from DEA?

21     **A**    Yes, I did.

22     **Q**    What year?

23     **A**    December 31, 2014.

24     **Q**    Prior to your retirement, did you hold any positions

25     at DEA Headquarters?

**Hill - (Direct by Delinsky)** 6353

1    **A**    Yes, I did.

2    **Q**    What were those positions?

3    **A**    I was a staff coordinator.  I was the section chief of

4    the Pharmaceutical Investigation section.  And I was the

5    executive assistant to the deputy assistant administrator

6    for the Office of Diversion Control.

7    **Q**    And as executive assistant, was that essentially in

8    plain terms the chief of staff to the deputy assistant

9    administrator for the Office of Diversion Control?

10   **A**    That's correct.

11   **Q**    Okay.  And, Mr. Hill, are you here to provide expert

12   opinions in this case?

13   **A**    Yes.

14   **Q**    All right.  Now let's step back.  We know why you're

15   here, and let's just step back.

16         Where do you live?

17   **A**    Centreville, Virginia.

18   **Q**    That's not where you grew up though, right?

19   **A**    No, it's not.

20   **Q**    Where did you grow up?

21   **A**    Detroit, Michigan.

22   **Q**    Okay.  Let's just focus on the present for now.

23         Do you live in the same general area as DEA

24   Headquarters?

25   **A**    Yes.

1    **Q**    About how many miles away?

2    **A**    About 20 miles west.

3    **Q**    Married?

4    **A**    Yes.

5    **Q**    For how long?

6    **A**    26 years.

7    **Q**    Does your wife have a background in law enforcement?

8    **A**    Yes.

9    **Q**    Was she an agent?

10   **A**    Yes.

11   **Q**    For what agency or agencies?

12   **A**    11 years with Secret Service and then 14 years with

13   TSA.

14   **Q**    You have a son?

15   **A**    Yes.

16   **Q**    In college?

17   **A**    Yes.

18   **Q**    Do you keep him close?

19   **A**    Yes.

20   **Q**    Because you feel you need to keep him close?

21   **A**    Yes.

22   **Q**    Is he in school in Virginia not too far from where you

23   live?

24   **A**    Yes.

25   **Q**    Okay.  I won't ask you why you have to keep him close,

1    but I have a son so...

2          You grew up in Michigan.  Did you say Detroit?

3    **A**    Yes, I grew up in Detroit, Michigan.

4    **Q**    What neighborhood?

5    **A**    West side.

6    **Q**    Where did you go to high school?

7    **A**    Chauncey High School.

8    **Q**    Did you attend college?

9    **A**    Yes, I did.

10   **Q**    Where?

11   **A**    Wayne State University in Detroit, Michigan.

12   **Q**    Okay.  What did you study when you were at Wayne

13   State?

14   **A**    Criminal justice.

15   **Q**    Why did you study criminal justice?

16   **A**    Because I wanted to work in law enforcement when I

17   graduated.

18   **Q**    When did you realize you wanted to work in law

19   enforcement?

20   **A**    When I was younger, around middle school.

21   **Q**    Okay.  Did you obtain your degree from Wayne State?

22   **A**    Yes, I did.

23   **Q**    What year?

24   **A**    May of 1988.

25   **Q**    Before we move to your first job, let's just get

1    something out of the way.

2         Your degree was in criminal justice?

3    **A**    That's correct.

4    **Q**    It was not in pharmacy?

5    **A**    That's correct.

6    **Q**    You don't have a pharmacy degree?

7    **A**    That's correct.

8    **Q**    Are you a pharmacist?

9    **A**    No, I am not.

10   **Q**    Is there any doubt about that?

11   **A**    No doubt at all.

12   **Q**    Have you ever been a pharmacist?

13             MR. WEINBERGER:  We'll stipulate he was never

14   a pharmacist, isn't a pharmacist, wasn't a pharmacist.

15   **Q**    All right.  Let's just get this out of the way, okay,

16   once and for all.

17        Mr. Hill, true, false, you are not a pharmacist?

18   **A**    True.

19   **Q**    Okay.  Are you, however, an expert in drug law

20   enforcement?

21   **A**    Yes.

22   **Q**    Are you an expert in DEA compliance?

23   **A**    Yes.

24   **Q**    Are you an expert in pharmaceutical drug diversion?

25   **A**    Yes.

1    **Q**    Okay.  What did you do right after college?

2    **A**    I became a police officer in the City of Dearborn,

3    Michigan.

4    **Q**    Were you on the beat, undercover, mix of both?

5    **A**    Combination of both.

6    **Q**    Okay.  Were you in uniform, plainclothes?

7    **A**    A combination of both.

8    **Q**    How long did you serve for the City of Dearborn,

9    Michigan, as a police officer?

10    **A**    It would have been just over a year.  I got hired

11    there August of 1988, and I left in September of 1989.

12    **Q**    Why did you leave?

13    **A**    I got hired by DEA.

14    **Q**    Why did you want to go to DEA?

15    **A**    When I was a young kid, of course every kid when you

16    think of law enforcement, you want to work for the FBI.  But

17    as I learned about DEA around in middle school, I thought

18    that would be fun to do and a nice agency to work for.  So I

19    reached out to the recruiter, had them send me some

20    information so I can know how to prepare myself.  And then

21    when I graduated, I applied to DEA, like right before I

22    graduated.

23    **Q**    Did you start at DEA in 1989?

24    **A**    Yes, September 10, 1989.

25    **Q**    What was your position at DEA at the time?

**Hill - (Direct by Delinsky)**

1    **A**    A special agent.

2    **Q**    Where did you work?

3    **A**    Well, after you first get hired, you go to Quantico,

4    Virginia, to go through your training, and then you come

5    back.  And so I came back at the end of December, and I was

6    assigned to the Detroit Field Division, which is where I was

7    hired.  So my whole time started at the Detroit Field

8    Division.

9    **Q**    And Quantico, Virginia, I associate that with the FBI.

10    Is that where DEA trains as well?

11    **A**    Yes.  At the time, DEA was training at the FBI

12    Academy.

13    **Q**    Okay.  The Detroit Field Office, did that cover only

14    Detroit, only Michigan, or a broader geography?

15    **A**    It was a broader geography.

16    **Q**    What other geographies did it cover?

17    **A**    The Detroit Field Division covered Michigan, Ohio, and

18    Kentucky.

19    **Q**    What did you do as a special agent?

20    **A**    You worked cases on individuals and organizations that

21    were alleged to have violated the Controlled Substance Act

22    or other state narcotics violations.

23    **Q**    Work undercover?

24    **A**    Yes.

25    **Q**    Did you handle cases involving heroin?

**Hill - (Direct by Delinsky)**

1    **A**     Yes.

2    **Q**     What was your first undercover case, without divulging

3    details you can't divulge?

4    **A**     It was a heroin case.

5    **Q**     Was heroin a serious problem at that point in time?

6    **A**     Yes, it was.

7    **Q**     Okay.  And that's late '80s, early '90s?

8    **A**     Early '90s, late '80s, early '90s.

9    **Q**     Any major drug rings that you worked on that were

10   public?

11   **A**     Yes.

12   **Q**     Can you name a few?

13   **A**     The Young Boys Incorporated, phase II.  The Colaccio

14   Crowley [ph] organization.

15   **Q**     Where were they based?

16   **A**     They were based out of the Detroit metro area, as well

17   as other investigations that had a regional or national or

18   international effect to them.

19   **Q**     Did you work on cases involving importation from

20   Columbia?

21   **A**     Yes.

22   **Q**     Did you work on cases that involved importation from

23   places like Burma, Laos, Thailand?

24   **A**     Yes.

25   **Q**     Pakistan and Iran?

**Hill - (Direct by Delinsky)** 6360

1    **A**    And Afghanistan, which is the Golden Crescent, yes.

2    **Q**    Did you work on any pharmaceutical cases?

3    **A**    Only as a support at that time supporting the

4    diversion groups that were in Detroit.

5    **Q**    Okay.  Can you explain to the ladies and gentlemen of

6    the jury how DEA is organized in terms of its division

7    between DIs, diversion investigators, and special agents?

8    **A**    Yes.  So the special agents are the actual law

9    enforcement gun carriers that can make arrests and do search

10   warrants; where the diversion investigators, they can do

11   investigations, but there's certain things that they can't

12   do on the street, like work undercover or do surveillance,

13   without the assistance of a special agent.

14   **Q**    Okay.  I asked you about pharmaceutical cases.  Can

15   you explain what those are?

16   **A**    Yes.

17   **Q**    I think we know, but just out of an abundance of

18   caution.

19   **A**    Pharmaceutical cases are cases that are involving

20   controlled pharmaceuticals that are being diverted for an

21   illicit or illegitimate purpose.

22   **Q**    So to put it in language I understand best, are those

23   cases involving prescription drugs?

24   **A**    Yes.

25   **Q**    Okay, that are classified as controlled substances?

1    **A**    Yes.

2    **Q**    Okay.  Insofar as you assisted DIs in those cases when

3    you were a special agent, did you do undercover work?

4    **A**    Yes, we would do undercover to help them, yes.

5    **Q**    Did you do undercover work against doctors who were

6    suspected of improperly prescribing controlled substances?

7    **A**    Yes.

8    **Q**    Okay.  Did you do surveillance against doctors?

9    **A**    Yes.

10   **Q**    Okay.  Did you do surveillance and undercover work

11   against persons who were going to doctors to try to get

12   prescriptions they shouldn't get?

13   **A**    Yes.

14   **Q**    Did you work on investigations of pharmacies?

15   **A**    Yes.

16   **Q**    Did you ever go undercover to try to get, you know,

17   bogus prescriptions filled?

18   **A**    Yes.

19   **Q**    And how long were you in this position as a regular

20   DEA special agent in Detroit?

21   **A**    I was assigned to Detroit until November of 1998.

22   **Q**    Okay.  Now, I want to -- wasn't there a switch

23   starting in '96 or so?

24   **A**    Yes.

25   **Q**    Okay.  We're going to get to that in a sec, okay?

**Hill - (Direct by Delinsky)**

1    **A**    Okay.

2    **Q**    But before we move there, did you have a philosophy

3    about how to go about your work as a special agent for the

4    DEA?

5    **A**    Yes.

6    **Q**    Okay.  What was your philosophy?

7    **A**    My philosophy was to even though you're working

8    investigations, you would make sure that you treat the

9    people that you're targeting with the utmost respect because

10   they're still human, and you would also have the sympathy

11   for them and the empathy for them to put yourself in their

12   shoes.  So you would always, if you could, try and give them

13   a second chance on life.

14   **Q**    When you were a special agent for the DEA, who were

15   you serving?

16   **A**    The American public.

17   **Q**    All right.  Special agent, working cases, '89 to '96,

18   right?

19   **A**    That's correct.

20   **Q**    Okay.  What happened in '96?

21   **A**    In 1996 I was reassigned as the divisional coordinator

22   in June or July of 1996.

23   **Q**    Now, as the divisional coordinator, were you in charge

24   of training?

25   **A**    Yes.

**Hill - (Direct by Delinsky)**

1    **Q**    Who did you train?

2    **A**    DEA employees, whether they were special agents or

3    diversion investigators, or professional employees which we

4    would call PATCO; other federal law enforcement officers, as

5    well as other state and local officers.  And that would be

6    anyone within the states of Michigan, Ohio, and Kentucky.

7    **Q**    Okay.  So your training obligations beginning in 1996

8    extended across three states?

9    **A**    That's correct.

10   **Q**    Including Ohio?

11   **A**    Yes.

12   **Q**    It included federal law enforcement?

13   **A**    Yes.

14   **Q**    And state law enforcement?

15   **A**    Yes.

16   **Q**    And what would you provide training on?

17   **A**    On drug investigations, surveillance, undercover,

18   tactical training, administrative training, and legal

19   training.

20   **Q**    Did the training concern investigations of illicit

21   drugs?

22   **A**    Yes, it did.

23   **Q**    Did the training concern investigations of

24   prescription drugs?

25   **A**    Yes, it did, if the area that we were putting on the

**Hill - (Direct by Delinsky)** 6364

1   training, if that was a drug issue of concern or drug of

2   concern.

3   **Q**    For how long did you serve as the training coordinator

4   out of the Detroit Field Office?

5   **A**    I believe it was from, like I said, June or July of

6   1996 until November of 1998.

7   **Q**    Where did you go in 1998?

8   **A**    I was assigned down in Central America to the country

9   of Belize.

10  **Q**    And were you assigned by DEA?

11  **A**    Yes.  I was reassigned by DEA, yes.

12  **Q**    Okay.  Bad weather, right?

13  **A**    It was hot.

14  **Q**    Good scuba?

15  **A**    I didn't try any.

16  **Q**    I wouldn't have either.

17         What were you doing for DEA in Belize?

18  **A**    When I was in Belize, my duties were to serve as an

19  adviser to the U.S. Ambassador to Belize, as well as to the

20  host nation, which was the Government of Belize, on

21  counternarcotics issues.

22  **Q**    Were there issues with narcotics at that time in

23  Belize?

24  **A**    Yes.

25  **Q**    For how long did you serve in that position?

1  **A**    I was in that position until April of 2000, when I got

2  promoted to a group supervisor.

3  **Q**    Okay.  Where were you appointed to a group supervisor?

4  **A**    In Detroit, at the Detroit Field Division.

5  **Q**    So in 2000 you moved back to Detroit from Belize?

6  **A**    Yes, in April of 2000.

7  **Q**    Okay.  And what were your responsibilities as a

8  supervisory agent or as a group supervisor?

9  **A**    As the group supervisor, you monitor the day-to-day

10  activities of the agents and state and local task force

11  officers that you have in your group regarding

12  investigations that are dealing with violations of the

13  Controlled Substance Act or state narcotics statutes.

14  **Q**    Did you supervise pharmaceutical investigations?

15  **A**    Supervising would not be the correct way.  It would be

16  more of a support role, because my group, I was the group

17  supervisor for Enforcement Group 3.  And Enforcement Group 3

18  was the designated Diversion Response Group for the Detroit

19  Field Division also.

20  **Q**    All right.  Diversion meaning diversion of

21  prescription drugs?

22  **A**    Yes.

23  **Q**    Correct, all right.

24      How long were you in this role in Detroit as a

25  supervisory agent?

1    **A**    From April of 2000 until October of 2005.

2    **Q**    Okay.  What did you do next?

3    **A**    I was reassigned to headquarters, DEA Headquarters.

4    **Q**    Okay.  And I think you already testified about that.

5         DEA Headquarters is in northern Virginia?

6    **A**    Yes.  Arlington, Virginia, yes.

7    **Q**    So did you move your family at that point in time?

8    **A**    Yes.

9    **Q**    Okay.  What were you assigned to do at DEA

10   Headquarters?  And I think we're at 2005.  Do I have that

11   right?

12   **A**    Yes, October 2005.

13   **Q**    What were you assigned to do?

14   **A**    I was assigned -- so the -- as a staff coordinator to

15   the Latin and Caribbean section.

16   **Q**    What were your responsibilities as staff coordinator

17   in that section?

18   **A**    Those responsibilities were to assist the DEA offices

19   that were located in Latin America or the Caribbean in the

20   furtherance of drug investigations or investigations dealing

21   with nexuses to terrorist groups.

22   **Q**    Were there significant narcotics issues in that region

23   that you were responsible for handling?

24   **A**    Yes.  That would have been in the Bahamas, Haiti,

25   Surinam, and San Juan, Puerto Rico.

1    **Q**    How long were you in this position?

2    **A**    I was in that position until December of 2008, when I

3    was promoted again.

4    **Q**    What position were you promoted to?

5    **A**    I was promoted to the section chief of the

6    Pharmaceutical Investigation section in the Office of

7    Diversion Control.

8    **Q**    Okay.  Let's just stop here for a moment.

9         Who promoted you to that position?

10   **A**    Joseph Rannazzisi.

11   **Q**    Okay.  Did you know Mr. Rannazzisi?

12   **A**    Yes.

13   **Q**    How long had you known him?

14   **A**    Since I came on with DEA, since 1989.

15   **Q**    How did you know him?

16   **A**    We were special agents together in Detroit.  We were

17   subsequently supervisors together in Detroit.  Then Joe was

18   promoted, and he became my direct supervisor as the

19   assistant special agent in charge.  Then Joe was

20   subsequently transferred to Headquarters.

21        Then when I was subsequently transferred to

22   Headquarters and assigned to the Latin and Caribbean

23   section, Joe was my second line supervisor when I was in

24   that function.  And then he subsequently promoted me to be

25   the section chief of the Pharmaceutical Investigation

1   section.

2   **Q**    Okay.  As section chief of the Pharmaceutical

3   Investigation section, what were your responsibilities?

4   **A**    My responsibility was first to serve as DEA technical

5   expert on strategies and programs to address the diversion

6   of controlled pharmaceuticals.

7   **Q**    Did you play any role or oversight in investigations

8   of DEA registrants regarding the diversion of prescription

9   drugs?

10  **A**    Yes.

11  **Q**    Did that include pharmacies?

12  **A**    Yes.

13  **Q**    Did you oversee investigations and actions by DEA

14  against nonregistrants regarding the diversion of

15  prescription drugs?

16  **A**    Yes.

17  **Q**    How would that come up that DEA would be proceeding

18  against a nonregistrant who was not sort of registered with

19  it?

20  **A**    Well, what you would have is if you would have

21  traditional street organizations that were involved in

22  selling the illicit drugs, meaning, you know, like the

23  cocaine, heroin, marijuana, well, then if they would branch

24  off and they would start selling controlled pharmaceuticals.

25  So because they -- and so what we would call them is

**Hill - (Direct by Delinsky)** 6369

1    polydrug organizations.

2         And so because they were involved with controlled

3    pharmaceuticals, that also fell under the auspices of the

4    Pharmaceutical Investigation section even though they were

5    not DEA registrants.

6    **Q**    So am I right that as section chief of the

7    Pharmaceutical Investigation section, your focus was

8    prescription drugs, correct?

9    **A**    Yes.

10   **Q**    Now, there are other parts of DEA that focus on

11   illegal drugs, correct?

12   **A**    Yes.

13   **Q**    Okay.  And that was -- those were staffed by other --

14   and led by other persons?

15   **A**    And other sections, yes.

16   **Q**    Okay.  Did any of the work you did as section chief of

17   the Pharmaceutical Investigations concern prescription

18   opioid medications?

19   **A**    Yes.

20   **Q**    Okay.  And, Mr. Hill, I notice that you're being very

21   careful and clipped in some of your answers here.

22        Are you allowed to disclose nonpublic information

23   about your work at DEA?

24   **A**    No.

25   **Q**    Are those just the ordinary rules that apply to former

 1   DEA and other Government officials?

 2   **A**   Yes.

 3   **Q**   All right.  Let's just stop here.  Really quick

 4   question.

 5        When DEA investigates or looks at pharmacies, does it

 6   consider the ratio of noncontrolled prescriptions the

 7   pharmacy fills to the controlled prescriptions the pharmacy

 8   fills?

 9   **A**   Yes.

10   **Q**   Why?

11   **A**   Because it gives you an inclination on if the pharmacy

12   is performing as a normal pharmacy or within the confines of

13   a normal pharmacy.

14   **Q**   And by "normal pharmacy," do you mean a pharmacy

15   that's meeting the overall medicine needs of a community?

16   **A**   Meeting the overall medicine needs of the community,

17   as well as operating within the compliance of state and

18   federal regulations.

19   **Q**   Is there a general, and I mean general, benchmark that

20   DEA looks to for a healthy noncontrolled-prescription to

21   controlled-prescription ratio?

22   **A**   Yes.

23   **Q**   And what's that general guideline?

24   **A**   80 to 20, meaning 80 percent noncontrol, 20 percent

25   controls.

1    **Q**    And if as a general matter that's a guideline that

2    might suggest that if that's the breakdown, a pharmacy's

3    relatively healthy.

4         Do I have that right?

5    **A**    Yes.

6    **Q**    Now, is that standard a be-all, end-all?

7    **A**    No, not at all.

8    **Q**    Can you have pharmacies that dispense a much higher

9    percentage of controlled substances that can be a healthy

10   pharmacy doing so properly?

11   **A**    Yes.

12   **Q**    And likewise, can you have a pharmacy that's

13   dispensing a lower percentage of controlled substances but

14   isn't doing it the right way?

15                MR. WEINBERGER:  Your Honor, I think we --

16                THE COURT:  I don't want a speaking objection.

17   So is there an objection?

18                MR. WEINBERGER:  Sorry.  Yes, Your Honor.

19                THE COURT:  All right.  Well, let's go on the

20   headphones.

21                (At side bar at 2:21 p.m.)

22                MR. WEINBERGER:  Your Honor, we've been going

23   about 35 minutes now, and 90 percent of these questions have

24   been leading questions.  And for purposes of background, no

25   issues, but if we could just have --

**Hill - (Direct by Delinsky)**

1              THE COURT:  All right.  This is an expert.  I

2    assume he's written a report, so I allow some leeway with

3    experts so we can get through it.  So I didn't think that

4    was a terrible question.  So, but I guess, Mr. Delinsky, if

5    you can do a little less leading, I appreciate it.

6              MR. DELINSKY:  Will do, Your Honor.

7              (In open court at 2:22 p.m.)

8    BY MR. DELINSKY:

9    **Q**    Mr. Hill, do you remember the question or should I

10   rephrase it?

11   **A**    Could you rephrase it, please?

12   **Q**    Sure.

13        If a pharmacy dispenses less than 20 percent

14   controlled substances, does that necessarily mean that it's

15   dispensing the right way?

16   **A**    No, it does not.

17   **Q**    So this 80/20 -- is this 80/20 just a guideline?

18   **A**    Yes.

19   **Q**    Okay.  Do you know what ARCOS data is?

20   **A**    Yes.

21   **Q**    What is it?

22   **A**    ARCOS data is data that is presented and given to DEA

23   from registrants depending on their business model, and it's

24   either if they're a manufacturer or distributor.  And what

25   it does is it's a comprehensive system that follows the

1    movement of controlled substances from the manufacturing

2    point, to the distribution point, to the end user that when

3    it's dispensed when it goes to a pharmacy.

4    **Q**    So does the ARCOS data, and I think you may have

5    answered this, include data about how much of a controlled

6    substance a pharmacy receives?

7    **A**    Yes, if it's ARCOS reportable.

8    **Q**    And does ARCOS-reportable data include data on

9    prescription pain medications that are classified as

10   Schedule II controlled substances?

11   **A**    Yes.

12   **Q**    Is there a group at DEA that crunches the ARCOS

13   numbers and analyzes them?

14   **A**    Yes.

15   **Q**    At the time you were head of the Pharmaceutical

16   Investigation section, to whom did that group report?

17   **A**    Myself as the section chief.

18   **Q**    For how long were you in this position?

19   **A**    I was in that position from January, I believe it was

20   the 9th, of 2009, till June 30 of 2012.

21   **Q**    What was your next position at DEA?

22   **A**    I was reassigned to be the executive assistant to the

23   deputy assistant administrator for the Office of Diversion

24   Control.

25   **Q**    Who was the deputy assistant administer for the Office

1    of Diversion Control at the time?

2    **A**    Joseph Rannazzisi.

3    **Q**    Were you -- would it be fair to characterize your

4    responsibilities as being his chief of staff?

5    **A**    Yes.

6    **Q**    Okay.  In that position, did you work on issues

7    pertaining to the diversion of controlled substances?

8    **A**    Yes.

9    **Q**    Pertaining to the -- did you work on issues pertaining

10   to the regulation of pharmacies, doctors, and other

11   registrants in connection with the prescribing and

12   dispensing of controlled substances?

13   **A**    Yes.

14   **Q**    Did you work on DEA investigations of registrants?

15   **A**    Yes.

16   **Q**    Did you work on DEA education efforts on the issues of

17   pharmaceutical drug diversion and CSA compliance?

18   **A**    Yes.

19   **Q**    For how long were you in this position?

20   **A**    I was in that position until I retired on December 31,

21   2014.

22   **Q**    Okay.  When you were in this position, did you make

23   presentations?

24   **A**    Yes.

25   **Q**    Did you make presentations at Pharmacy Diversion

1    Awareness conferences?

2    **A**    Yes.

3    **Q**    Are those called PDACs?

4    **A**    Yes.

5    **Q**    Can you tell the ladies and gentlemen of the jury what

6    a PDAC is?

7    **A**    A PDAC is a conference that DEA would put on for

8    pharmacy registrants, which means you had to work for a

9    pharmacy registrant to attend.  It was a one-day course that

10   went for 8 hours over two days, so that way it was always

11   done on the weekend, so if you couldn't make it on one day

12   you could try the other.  It was always on a Saturday and a

13   Sunday.  And it was to make the pharmacy registrant

14   community aware of the prescription drug abuse issue within

15   the United States.

16   **Q**    And when you say pharmacy registrant, let me try to

17   bring it down.  Do you mean these presentations were given

18   to pharmacists?

19   **A**    They were given to pharmacists, yes.

20   **Q**    Were the subjects of these -- did the subjects of

21   these presentations include corresponding responsibility?

22   **A**    Yes.

23   **Q**    Did they contain a discussion of red flags or

24   potential red flags?

25   **A**    Yes.

1   **Q**     And when did DEA start giving these PDAC

2   presentations?

3   **A**     The first one would have been in September of 2011.

4   **Q**     Why didn't DEA start until 2011?

5   **A**     It's hard to say why at the time we didn't start till

6   2011, but it was the time to make a formal program that we

7   could do and make sure that the pharmacy community was

8   available and was able to get that information.

9   **Q**     Were these PDAC conferences that began in 2011 the

10  first time that DEA officially provided lists of red flags

11  or potential red flags to the pharmacy industry?

12  **A**     Yes.

13  **Q**     Now, there may have been informal meetings and

14  discussions on that subject?

15  **A**     Of course, there would have been formal or informal,

16  yes.

17  **Q**     Okay.  But am I right that these PDAC conferences

18  beginning in 2011 were the first official effort to educate

19  the pharmacy community on these potential red flags?

20                  MR. WEINBERGER:  Objection.

21                  THE COURT:  Overruled.

22  **A**     Yes.

23  **Q**     In these presentations, did you discuss the opioid

24  epidemic?

25  **A**     Yes.

**Hill - (Direct by Delinsky)**

1    **Q**    Okay.  In your opinion, is there an opioid epidemic?

2    **A**    Yes.

3    **Q**    Is your opinion based on a particular Government

4    announcement, or something else?

5    **A**    My opinion is based on the particular Government

6    announcement at the time.

7    **Q**    What announcement?

8    **A**    In February of 2011, the CDC publicly stated that the

9    United States was in the grips of an opioid epidemic.  And

10    then in April of 2011, the administration unveiled their

11    Prescription Drug Abuse Prevention Plan.

12    **Q**    So do you key the opioid epidemic to 2011-ish?

13    **A**    Yes, as an official epidemic, yes.

14    **Q**    Is that to say that people weren't struggling and

15    suffering and dying before then?

16    **A**    Oh, they were before that, yes.

17    **Q**    Mr. Hill, I noticed in some of your presentations

18    there's images, like firearms, and you analogize them to

19    prescription drugs.

20    **A**    That's correct.

21    **Q**    Can you tell the ladies and gentlemen of the jury what

22    you were trying to communicate when you spoke about these

23    issues?

24    **A**    Well, yes.  First of all, with firearms, you should

25    always assume that a firearm is loaded, so you always treat

**Hill - (Direct by Delinsky)**

1     it as if it's loaded and that it could cause harm, so you

2     need to be careful with it.

3          So I would analogize prescription drugs under that

4     analogy, that if you are not careful with prescription drugs

5     and if you do not, you know, use them in the correct manner,

6     they could be harmful and dangerous, just like a loaded

7     weapon.

8     **Q**     Okay.  Mr. Hill, I want to talk before we move on, and

9     we'll try to do this quickly and just do a sampling, some of

10    the -- well, have you given presentations apart from the

11    PDAC conferences?

12    **A**     Yes.

13    **Q**     And how many of these PDAC conferences do you recall

14    giving to pharmacists and pharmacy registrants?

15    **A**     That I participated in?

16    **Q**     Correct.

17    **A**     Approximately five of them.

18    **Q**     Okay.  Did you give presentations on prescription drug

19    diversion and related issues to foreign governments?

20    **A**     Yes.

21    **Q**     Okay.  I'm going to put up -- and this is a

22    Demonstrative Exhibit.  It's your CV, CVS Demo 02.

23          And I have highlighted here.  Did you present to the

24    Romanian Government Officials?

25    **A**     Yes, but that was not the first time I presented

1    overseas.  If you look at the one above it, I did a

2    presentation in Israel and Jerusalem.  And that was on

3    prescription drug abuse in the United States.

4    **Q**    How about looking a little further down.  Mexican

5    Government Officials in 2011?

6    **A**    Yes.

7    **Q**    Is that another presentation you gave?

8    **A**    Yes, on prescription drug abuse and illicit chemical

9    trafficking in the United States.

10   **Q**    Okay.  Did you present to any members of Congress?

11   **A**    Yes.

12   **Q**    Okay.  Did you present to any members of Congress from

13   Ohio?

14   **A**    Yes.  Mr. Joyce.

15   **Q**    Who's Mr. Joyce?

16   **A**    He is the Congressional Representative for the 14th

17   District.

18   **Q**    And what does the 14th District include?

19   **A**    It includes Lake, Trumbull, Summit, Cuyahoga, and I

20   think the other county is pronounced maybe "Geauga" or

21   Geauga.  And then there's another one that I can't pronounce

22   that it covers a part of it too.

23   **Q**    Is it Ashtabula?

24   **A**    Yes, sir, that's it.

25   **Q**    Mr. Lanier started singing a song about that about two

1    hours ago.

2    **A**    Okay.  That's it.

3    **Q**    And it's not all of Cuyahoga or Summit, right?

4    **A**    No, his district is just partial of those counties.

5    **Q**    How did that come about?

6    **A**    I was giving a presentation, it was the Federal

7    response to the heroin epidemic to members of Congress and

8    their staff.  And he was a part of it, so he later

9    approached me to ask me would I give a presentation, that he

10   was putting on a conference for the northeast Ohio elected

11   officials.

12   **Q**    And what was the subject matter of your presentation

13   at that conference?

14   **A**    It was on prescription drug abuse and the circle of

15   addiction.

16   **Q**    And you talk about in a lot of these presentations

17   prescription drug abuse.

18        What do you mean by that?

19   **A**    Prescription drug abuse means when a prescription drug

20   is used for a not legitimate purpose.  And what I mean by

21   that is that you're using it not followed by the therapeutic

22   value that it's supposed to be stated to be using.

23        So an example of that would be if the doctor or the

24   practitioner that writes you the script says take one every

25   4 hours or every 6 hours, but you say I'm going to take

1    three or four of them every 4 or 6 hours.

2    **Q**    What if someone takes pills from the prescription

3    bottle of their parent out of the medicine cabinet?  Would

4    that fall within the umbrella of prescription drug abuse

5    that you were presenting about?

6    **A**    Yes, because if you're taking a prescription drug that

7    was not written for you as the end user, that's misabuse and

8    diversion.

9    **Q**    Did you make presentations to law enforcement?

10   **A**    Yes.

11   **Q**    Okay.  Here, and I don't know if this is quite law

12   enforcement because it's lawyers, but here's one.  The U.S.

13   Attorney's Office, Western District of Pennsylvania,

14   Prescription Drug Abuse Summit, 2012.

15        What was that presentation?

16   **A**    That was a presentation to address the prescription

17   drug abuse problems and trends that were going on in the

18   United States, and it's also what was being seen in that

19   district.

20   **Q**    What's the U.S. Attorney's Office?

21   **A**    The U.S. Attorney's Office is the office where the

22   U.S. Attorney is the chief law enforcement officer for

23   whatever district that that U.S. Attorney's Office is in.

24   So --

25   **Q**    I'm sorry.  Keep going.

1    **A**    So when you think of U.S. Attorneys, you would think

2    of them as also being like prosecutors.

3    **Q**    They're lawyers?

4    **A**    Yes.

5    **Q**    Sorry.

6    **A**    Some of them are.

7    **Q**    When DEA brings a case in court, for either civil

8    penalties or a criminal case, does it work with the U.S.

9    Attorney's Offices?

10   **A**    It works with the U.S. Attorney's Office as well as it

11   could work with a state prosecutor's office as well.

12   **Q**    A little further down it looks like you gave a talk to

13   the West Virginia State Police Academy in 2012.

14         Do you recall that?

15   **A**    Yes.

16   **Q**    And what did that concern?

17   **A**    That concerned prescription drug abuse and trends.

18   And what that was, the state of West Virginia had reached

19   out and wanted DEA to come out and train and make their

20   narcotics units available on what we were seeing with

21   prescription drug abuse throughout the United States, and to

22   help them.

23   **Q**    Federal Bureau of Investigation (FBI) National Academy

24   class, what was that presentation?

25   **A**    That was on prescription drug abuse and trends also.

**Hill - (Direct by Delinsky)**

1  **Q**    And it looks like you gave this presentation to FBI

2  classes routinely over the years.

3  **A**    Yes.  What the FBI National Academy classes are, they

4  are an Academy class where the upper echelon of police

5  departments throughout the United States get selected to be

6  trained at the FBI Academy for I believe it's 12 weeks, and

7  so that way it makes them better executives.

8  **Q**    Did you ever present, other than the PDAC conferences,

9  to pharmacists or pharmacy students?

10  **A**    Yes.

11  **Q**    Do you recall any of those presentations?

12  **A**    Yes.

13  **Q**    Where were they?

14  **A**    In California I spoke at a college of pharmacy there,

15  at two different schools.  I spoke at different pharmacy

16  associations throughout the United States, in Michigan, in

17  Nevada, and -- Michigan, Nevada.  I believe somewhere, like

18  maybe Boston, Massachusetts, or somewhere there.

19      And I spoke for the Tennessee Department of Health for

20  all their healthcare employees.  I was speaking at a lot of

21  locations.

22  **Q**    And did those presentations to pharmacists concern

23  presentations on corresponding responsibility?

24  **A**    Yes.

25  **Q**    After you retired from DEA in 2014, what did you do

1   next?

2   **A**      After I retired from DEA in 2014, I took a job with

3   Amneal Pharmaceuticals.

4   **Q**      What is Amneal Pharmaceuticals?

5   **A**      They are a manufacturer of controls and noncontrol

6   drugs.

7   **Q**      Okay.  And what was your role for Amneal

8   Pharmaceuticals?

9   **A**      I was the director of DEA Compliance and Corporate

10  Security.

11  **Q**      For how long did you work there?

12  **A**      Approximately three and a half years.

13  **Q**      And what were your responsibilities?  What was your

14  charge at Amneal Pharmaceuticals?

15  **A**      My charge was to ensure that any of the Amneal

16  locations that were authorized to handle controlled

17  substances were in compliance with the CSA, its implementing

18  regulations, which is the CFR, as well as state and local

19  narcotic statutes for handling controlled substances.

20  **Q**      What kind of prescription drugs did Amneal make?

21  **A**      Amneal made prescription drugs from all gamuts, from

22  controlled drugs to noncontrolled drugs.

23  **Q**      Did Amneal manufacturer prescription opioids?

24  **A**      Yes.

25  **Q**      What kind of noncontrolled drugs did Amneal

1    manufacture when you were there?

2    **A**    Like diabetes medications, blood pressure medications.

3    I believe like penicillins, kind of the standard

4    noncontrols.

5    **Q**    Do you recall what percentage of Amneal's business was

6    a controlled substance versus a noncontrol?

7    **A**    Yes.  It would range anywhere from, like 12 percent to

8    20 percent, 25 percent.

9    **Q**    Did you work for free for Amneal?

10   **A**    No, I did not.

11   **Q**    Did they compensate you?

12   **A**    That's correct.

13   **Q**    And there was a bonus plan?

14   **A**    Yes.

15   **Q**    Did you get bonuses under that plan?

16   **A**    Yes.

17   **Q**    Was there anything improper about that?

18   **A**    No.

19   **Q**    Can you tell the ladies and gentlemen of the jury why

20   you moved from DEA after your retirement to Amneal?

21   **A**    A former DEA employee had reached out to me and asked

22   me if I would be interested in coming to Amneal to help them

23   make sure that their program was good and in compliance.

24        And at first I told him no, and then later on I

25   thought about it and said, you know, you always as a

1   Government employee kind of have in the back of your mind,

2   could you succeed in private industry.

3        So after I told him no, I kind of thought about it

4   and, as I said, I wondered if I could succeed in private

5   industry, so then I decided to do it.

6   **Q**    Did the CEO, the chief executive of Amneal, give you

7   any instructions upon being hired?

8   **A**    Yes.

9   **Q**    What were his instructions to you?

10  **A**    To ensure that all of Amneal facilities that were

11  handling controlled substances were as compliant as they

12  could possibly be.

13  **Q**    For how long were you at Amneal?

14  **A**    Approximately three and a half years.

15  **Q**    When did you retire?

16  **A**    I wouldn't say I retired.  I just -- I left because I

17  got tired of the commute and everything.  So I decided to

18  resign, which would have been July 18 of 2018.

19  **Q**    Okay.  And let's tell the ladies and gentlemen of the

20  jury about that before we get to your opinions.

21       You were living in northern Virginia at the time?

22  **A**    Yes, and my family was still there, yes.

23  **Q**    Your son and your wife are there, correct?

24  **A**    Yes.

25  **Q**    And is my memory right that Amneal was headquartered

1    in New Jersey or Long Island?

2    **A**    Their headquarters were in New Jersey, but I would

3    spend a lot of time up in New York and New Jersey.

4    **Q**    So it was a really uncomfortable commute?

5    **A**    Yes, it was.  If you're going from Virginia to

6    Brookhaven, if anybody has ever done that drive, it could be

7    an 8 to 10-hour drive.

8    **Q**    Now, Mr. Hill, has CVS, through me, I guess, engaged

9    you to provide expert opinions in this case?

10   **A**    Yes.

11   **Q**    Are the opinions you're about to give yours or CVS's?

12   **A**    They're my opinions.

13   **Q**    When did CVS first retain you in connection with

14   opioid litigations?

15   **A**    It would have been in September of 2018.

16   **Q**    When did you begin working on this particular case?

17   **A**    It would have been January of 2021.

18   **Q**    Did you write a report in this case?

19   **A**    Yes, I did.

20   **Q**    Approximately how long is that report, if you

21   remember?

22   **A**    Approximately 46 pages.

23   **Q**    Have you been deposed in this case?

24   **A**    Yes.

25   **Q**    Okay.  How many hours have you devoted to the

1    preparation of your opinions in connection with your

2    engagement by CVS?

3    **A**    When you're asking hours, are you asking hours since

4    January?

5    **Q**    Do you recall since January?  Why don't you just do

6    the whole since 2018.

7    **A**    Since 2018, the hours that I've worked is

8    approximately 1,029 hours.

9    **Q**    And has that included reviewing documents?

10   **A**    Yes.

11   **Q**    Reviewing testimony?

12   **A**    Yes.

13   **Q**    Reviewing laws?

14   **A**    Yes.

15   **Q**    Preparing your opinions?

16   **A**    Yes.

17   **Q**    Writing reports?

18   **A**    Yes.

19   **Q**    And testifying?

20   **A**    Yes.

21   **Q**    Okay.  Like every expert witness who's appeared in

22   this trial so far, you're being paid, right?

23   **A**    Yes.

24   **Q**    How much have you received on your time thus far?

25   **A**    For overall since 2018?

1   **Q**   Correct, overall.

2   **A**   Approximately $361,000.

3   **Q**   Okay.  Who do you submit your bills to?

4   **A**   Doerr, which is now they have a subsidiary company

5   which is WIT Legal.

6   **Q**   WIT, W-I-T, right?

7   **A**   That's correct.

8   **Q**   Is WIT a company that represents experts like you?

9   **A**   Yes.

10  **Q**   How did you come into contact with Doerr or WIT, or

11  whatever it was called at the time?

12  **A**   Someone had reached out to me and asked me if I would

13  talk to them because they were looking for some experts, and

14  so I said, sure, I'll talk to them.  And they subsequently

15  called me.

16  **Q**   Okay.  And is it -- is WIT the company that connected

17  us?

18  **A**   Well, it was Doerr originally, and now it's WIT.

19  **Q**   Okay.  So was it Doerr who connected us?

20  **A**   Yes.

21  **Q**   Okay.  Let's just call it WIT since there was a change

22  in name.

23  **A**   Right.

24  **Q**   Has WIT played any role whatsoever in the preparation

25  of your opinions?

1    **A**     No.

2    **Q**     Has WIT played any role whatsoever in your testimony

3    in any fashion?

4    **A**     No.

5    **Q**     Does WIT process your bills?

6    **A**     Yes.

7    **Q**     Does WIT prepare the engagement paperwork, like

8    engagement letters?

9    **A**     Yes.

10   **Q**     Does WIT play any other role whatsoever in the

11   preparation of your opinions and your testimony here today?

12   **A**     No.

13   **Q**     Okay.  What's your hourly rate, Mr. Hill?

14   **A**     My hourly rate is $400 an hour.

15   **Q**     Is that the rate charged to CVS?

16   **A**     No, it's not.

17   **Q**     What's the rate charged to CVS?

18   **A**     $675.

19   **Q**     And what happens to the portion of that rate above

20   400?

21   **A**     That goes to WIT Legal.

22   **Q**     Okay.  Moving to your opinions, Mr. Hill, what are

23   your opinions primarily based on?

24   **A**     My 25-plus years as a DEA special agent.

25   **Q**     Have you also re-reviewed laws and regulations?

```
 1    A     Yes.

 2    Q     Have you looked at documents?

 3    A     Yes.

 4    Q     Have you reviewed testimony?

 5    A     Yes.

 6    Q     Deposition testimony?

 7    A     Yes.

 8    Q     And are you certain of the opinions you're going to

 9    give today to a reasonable degree of probability?

10    A     Yes.

11    Q     Okay.  All right.  I hope the wind-up wasn't too long.

12    Let's move to your opinions.

13          Mr. Hill.

14    A     Yes.

15    Q     In your opinion, do most doctors write controlled

16    substance prescriptions for legitimate medical reasons?

17    A     Yes.

18    Q     What's the basis of your opinion?

19    A     The basis for my opinions is several things.  It's the

20    official information that DEA has put out regarding

21    practitioners writing prescriptions.

22    Q     Mr. Hill, are you familiar with a 2006 public notice

23    that DEA published in the Federal Register regarding the

24    prescribing of pain medication?

25    A     Yes.
```

**Hill - (Direct by Delinsky)**

1   **Q**     Does that DEA notice supply one of the bases for your

2   opinion that doctors write controlled substances for

3   legitimate medical reasons?

4   **A**     Yes.

5                   MR. DELINSKY:  I'm showing Mr. Hill Defendant

6   MDL-1096.

7   **Q**     Mr. Hill, I'm sorry.  Is this exhibit the notice that

8   we just talked about that DEA issued?

9   **A**     Yes.

10  **Q**     Okay.  And Mr. Hill, I'm turning to the page in the

11  top right-hand corner 52719.

12      Do you want me to read the exhibit number to you

13  again?

14  **A**     Well, yeah, because I don't see it here, so...

15      Oh, okay.  Thank you.

16  **Q**     And again, top right corner, 52719.

17  **A**     Yes.

18  **Q**     All right.  And I'd just like to highlight.

19      Do you see where it says, "The number of physicians

20  who prescribe controlled substances in violation of the CSA

21  is extremely small."

22      Do you see that language?

23  **A**     Yes, sir.

24  **Q**     And below, it says, "DEA recognizes that the

25  overwhelming majority of American physicians who prescribe

1    controlled substances do so for legitimate medical

2    purposes."

3           Do you see that?

4    **A**    Yes.

5    **Q**    "In fact, the overwhelming majority of physicians who

6    prescribe controlled substances do so in a legitimate manner

7    that will never warrant scrutiny by federal or state law

8    enforcement officials."

9           Do you see that?

10   **A**    Yes.

11   **Q**    Are these statements part of the bases of your

12   opinion?

13   **A**    Yes.

14   **Q**    If you could turn to page 52721.

15          We're on the same document, right, Mr. Hill?

16   **A**    That's correct.

17   **Q**    And here DEA says, "The agency recognizes that nearly

18   every prescription issued by a physician in the United

19   States is for a legitimate medical purpose in the usual

20   course of professional practice."

21          Do you see that?

22   **A**    Yes.

23   **Q**    Is that a basis of your opinion?

24   **A**    Yes.

25   **Q**    Do you agree with that statement?

1   **A**     Yes.

2   **Q**     Now, Mr. Hill, this publication came out in 2006 by

3   DEA, correct?

4   **A**     Correct.

5   **Q**     Has DEA deviated from that position over the years?

6   **A**     No, it has not.

7   **Q**     Has that position remained consistent over the years?

8   **A**     Yes.

9   **Q**     Okay.  Without going through all the instances when

10  DEA has repeated that, do you recall reviewing testimony to

11  Congress by acting administrator of the DEA, Mr. Patterson?

12  **A**     Yes.

13  **Q**     And I'm showing you what's been marked as

14  DEF-MDL-01482.

15  **A**     Okay.  I have it open, sir.

16  **Q**     Okay.  And is this the testimony you recall reviewing?

17  **A**     Yes.

18  **Q**     When was this testimony provided?

19  **A**     It was provided on May 8 of 2018.

20  **Q**     Okay.  And I'm showing you page 32.

21         Do you see page 32?

22  **A**     Yes, sir.

23  **Q**     And this is where Mr. Patterson says, in sworn

24  testimony to Congress, "I look at the vast majority of

25  doctors:  99.99 percent are all trying to do right by their

1    patients."

2         Do you see that testimony?

3    **A**    Yes.

4    **Q**    Did you rely on that testimony in preparing your

5    opinions?

6    **A**    Yes.

7    **Q**    Do you agree with that testimony?

8    **A**    Yes.

9    **Q**    Mr. Hill, does this mean that it is appropriate for

10   pharmacists to fill the vast majority of controlled

11   substances prescriptions?

12   **A**    Yes.

13   **Q**    Next opinion, okay?  And this opinion concerns the

14   volume of prescriptions.

15        Who is responsible for the volume of prescriptions

16   that are written for prescription opioid medications?

17   **A**    Practitioners or other medical professionals.

18   **Q**    Okay.  Let's stop there.

19        Can you put in lay terms what practitioners and

20   medical professionals are?

21   **A**    Yes.  Doctors, and you may have some other professions

22   where nurses may be able to do it, depending on what state

23   they're in.

24   **Q**    Can we just use "doctors" as shorthand?

25   **A**    Yes.

**Hill - (Direct by Delinsky)**

1    **Q**    So is it your testimony that doctors are responsible

2    for the volume of prescriptions that are written for

3    prescription opioids in the United States?

4    **A**    Yes.

5    **Q**    Do pharmacists or pharmacies play any role in how many

6    prescriptions are written?

7    **A**    No.

8    **Q**    Are pharmacists allowed to write prescriptions for

9    controlled substances?

10    **A**    No.

11    **Q**    Next set of opinions, Mr. Hill.

12    This concerns corresponding responsibility.  And I

13    think you have a few opinions on this that we'll walk

14    through, but let's start -- I want to ask you what

15    corresponding responsibility is, but let's do it in this

16    fashion.

17    And I'm showing you and the Court what has been marked

18    as, and I believe admitted, as P-8163.

19    **A**    Yes, I have it open.

20    **Q**    Do you recognize P-8163?

21    **A**    Yes.

22    **Q**    What is it?

23    **A**    That is C.F.R. 1306.04, which deals with the purpose

24    in the issue of a prescription.

25    **Q**    Is this the regulation that sets forth a pharmacist's

1    corresponding responsibility?

2    **A**    Yes.

3    **Q**    I'd like to direct your attention to the sentence I'm

4    highlighting that says, "A person knowingly filling such a

5    purported prescription, as well as the person issuing it,

6    shall be subject to the penalties provided for violations of

7    the provisions of law relating to controlled substances."

8    **A**    Yes, I see that.

9    **Q**    Okay.  What is the meaning of this provision?

10   **A**    The meaning of this provision means that a pharmacist

11   cannot knowingly fill an illegitimate prescription.  And if

12   they do, they would be subject to sanction, either through

13   criminal charges or administrative, but it would make them

14   exposed to it.

15   **Q**    Okay.  And is that the corresponding responsibility

16   obligation of a pharmacist?

17   **A**    Yes.

18   **Q**    Okay.  For there to be a violation of corresponding

19   responsibility, must the prescription be illegitimate?

20              MR. WEINBERGER:  Objection.

21   **A**    Yes.

22              THE COURT:  Well, hold it.

23              THE WITNESS:  Sorry.

24              THE COURT:  Overruled.

25   **Q**    Let's go through it one more time just for clarity of

1    the record, okay, Mr. Hill?

2    **A**    Okay.

3                MR. WEINBERGER:  Your Honor, can we be heard

4    on the --

5                THE COURT:  Well, all right.

6                (At side bar at 2:57 p.m.)

7                MR. WEINBERGER:  Your Honor, I thought the

8    rules that we've been following throughout this trial is

9    that witnesses cannot testify what is a violation of the

10   law.

11               MR. DELINSKY:  Your Honor, I think we've got

12   lots of testimony on that from Carmen Catizone, Joe

13   Rannazzisi.  They've put their spin on what they believe the

14   legal requirements are.  I'm happy to couch it in terms of

15   based on his experience and background if that moves the

16   ball.

17               THE COURT:  All right.  I think the proper

18   question is what DEA advised people when he's there.  He's

19   qualified to testify to that.  But you're right, he can't

20   just get up and say this is what the law is.

21               MR. DELINSKY:  Okay.  Understood, Your Honor.

22               MR. WEINBERGER:  Well, Your Honor, can we have

23   a -- I mean, you've said repeatedly that --

24               THE COURT:  Mr. Delinsky, why don't you go

25   back and reask the question, all right?

1          MR. DELINSKY:  The same way or your way, Your

2     Honor?

3               THE COURT:  My way.

4               MR. DELINSKY:  Yes, absolutely.

5               (In open court at 2:59 p.m.)

6     BY MR. DELINSKY:

7     **Q**     Mr. Hill, based on your experience at DEA and based on

8     what DEA advised registrants, for there to be a violation of

9     corresponding responsibility, must the prescription itself

10    be illegitimate to begin with?

11              MR. WEINBERGER:  Objection.

12              THE COURT:  Yeah, I'll sustain that.

13    **Q**     Mr. Hill, based on your experience, do you have a view

14    as to whether a violation of corresponding responsibility

15    can be established in the absence of an illegitimate

16    prescription?

17    **A**     Without an illegitimate prescription, there's no

18    corresponding responsibility that has to be invoked.

19    **Q**     And when you say no corresponding responsibility, you

20    mean no corresponding responsibility violation in your

21    experience and in your opinion?

22              MR. WEINBERGER:  Objection.  Leading.

23              THE COURT:  I'm going to sustain that.

24    **Q**     Okay.  Mr. Hill, what does it mean for a prescription

25    to be illegitimate?

1              MR. WEINBERGER:  Objection.

2              (At side bar at 3:00 p.m.)

3              MR. DELINSKY:  Your Honor, we have had

4    plaintiff expert after plaintiff experts, including medical

5    doctors, opine on what pharmacists have to do and what are

6    the rules --

7              THE COURT:  Wait a minute.  We've had

8    pharmacists talk about it, we've had doctors talk about it.

9    He's neither a pharmacist nor a doctor.

10             MR. DELINSKY:  But he's Drug Enforcement.

11             THE COURT:  Well, if you want to ask him, you

12   know, what DEA pronouncements were or what DEA's advice to

13   pharmacists were, that's fine.  But you can't just get him

14   up there and say, well, it's --

15             MR. WEINBERGER:  I think that violates the

16   *Touhy* letter that --

17             THE COURT:  I'm concerned about all that, too.

18             MR. WEINBERGER:  He can testify about his

19   understanding, but he can't testify on behalf of the DEA.

20             MR. DELINSKY:  Okay.  I'll qualify it that

21   way.

22             THE COURT:  I don't know what he's --

23             MR. DELINSKY:  I'll qualify it to his

24   understanding and his experience.

25             THE COURT:  His understanding, his experience,

**Hill - (Direct by Delinsky)**

1    when he was there, because that's what it's limited to.

2                    MR. DELINSKY:  Okay.  Yup.

3                    (In open court at 3:01 p.m.)

4    BY MR. DELINSKY:

5    **Q**    Mr. Hill, based on your understanding and your

6    experience while you were at DEA, what is your understanding

7    of what an illegitimate prescription is?

8    **A**    An illegitimate prescription is a prescription that

9    was not written for a valid reason.

10   **Q**    Okay.  And when you say valid reason, do you mean a

11   valid medical reason?

12   **A**    Yes.

13   **Q**    Okay.  And based on your experience in your time at

14   DEA, and your understanding, is it your opinion that a

15   prescription must be illegitimate for there to be a

16   corresponding responsibility violation?

17                   MR. WEINBERGER:  Objection.

18                   THE COURT:  Sustained.

19   **Q**    Let's move on.

20                   THE COURT:  It's time for a break if we're

21   moving to a new subject.

22                   MR. DELINSKY:  Yeah, that's fine, Your Honor.

23                   THE COURT:  Ladies and gentlemen, we'll take

24   our mid afternoon recess.  Usual admonitions apply.  15

25   minutes, and then we'll pick up with more of Mr. Hill's

**Hill - (Direct by Delinsky)**

1    testimony.

2                    (The jury is not present.)

3                    MR. DELINSKY:  Your Honor, we sat through

4    hours of testimony of witnesses opining on the law.  If

5    there was any lesson from plaintiffs' case, it was if there

6    is a red flag, there is a legal obligation to resolve it.

7    That came out of the mouth of expert witness after expert

8    witness and out of the mouths of fact witnesses.  And I do

9    believe it's unfair to limit the defense from eliciting

10   opinions in that same general universe.

11        And just because the opinion doesn't track exactly

12   with plaintiffs' opinion but comes at it a different way

13   does not make it of a different ilk or a different category.

14        If these legal issues have been litigated, it's been a

15   little of an unusual feature of this case, but it's

16   difficult to say that plaintiffs were allowed to do it and

17   the defendants can't now --

18                    THE COURT:  Mr. Delinsky, it's not that you're

19   not allowed to do it.  It's what you're trying to bring out

20   with this witness.  I mean, a pharmacist can get on and say

21   from my understanding, this is my legal responsibility as a

22   pharmacist.  A doctor can do that.  He's neither.

23                    MR. LANIER:  Your Honor, toward that end, I'd

24   like the record to reflect that Dr. Wailes got to testify on

25   this regard for the defendants.  Tony Villanueva, Captain

**Hill - (Direct by Delinsky)**

1    Villanueva, was not allowed to testify on this because he

2    wasn't any of those things.

3                    MR. DELINSKY:  But, Your Honor, this man ran

4    the unit at DEA that investigated pharmacies.  He was at DEA

5    enforcing these laws for 25 years.  He taught pharmacists.

6                    THE COURT:  But wait a minute, if you want to

7    ask him what position DEA took in enforcement actions, I

8    guess you can ask it that way.  I'm just -- he's neither,

9    he's neither a doctor nor is he a pharmacist.  And so he

10   can't testify to what he does or what his understanding of

11   the law is in his practice, like other pharmacists have and

12   other doctors have.

13                   MR. DELINSKY:  But he's a law enforcement --

14   he's law enforcement.

15                   THE COURT:  As I said, he can testify to the

16   position that he took and DEA took up until 2014 in

17   enforcing the law.

18                   MR. DELINSKY:  So can I ask "When you were

19   enforcing the Controlled Substances Act, did you, was it

20   your understanding, your and DEA's understanding?"

21                   MR. WEINBERGER:  He can't testify -- the *Touhy*

22   authorization does not permit him to testify about what

23   DEA's position was.

24                   MR. DELINSKY:  Well, Joe Rannazzisi did.

25   That's the problem.  There's an inequity here.

1                    THE COURT:  I don't know what everyone's *Touhy*

2     letters said.  Do we have someone from the DOJ here?

3                    MR. WEINBERGER:  Well, we have the *Touhy*

4     letter.

5                    MR. DELINSKY:  We told them time and time

6     again that Mr. Hill was testifying.  They're not here.

7                    MR. LANIER:  The DEA specifically disavows

8     what this gentleman has said in his report and in his

9     testimony.

10                    MR. DELINSKY:  Yeah, just as they did to Joe

11     Rannazzisi.

12                    MR. LANIER:  No.

13                    MR. WEINBERGER:  Joe Rannazzisi didn't issue a

14     report.  He's not an expert in this case.  And he's a

15     pharmacist and a lawyer.

16                    THE COURT:  He's not received authorization

17     for this report or any future testimony.

18                    MR. DELINSKY:  Your Honor, that applied to his

19     deposition.

20                    MR. WEINBERGER:  No.

21                    THE COURT:  Guess what, this applies to

22     everything.

23                    MR. DELINSKY:  But, Your Honor, we have

24     provided them ample notice and submitted, told them that

25     we're providing this testimony, and they have provided no

**Hill - (Direct by Delinsky)**

 1    response.

 2                    MR. WEINBERGER:  This is the response.

 3                    MR. DELINSKY:  No, this is -- we've told them

 4    about their trial testimony.

 5         Look, Your Honor, I'm happy to move on.

 6                    THE COURT:  All right.  I'll tell you what,

 7    you can elicit this testimony, but I'll let the plaintiffs

 8    read this *Touhy* letter and say the DEA is expressly

 9    disavowing everything this man says.  All right, that's

10    fine.  It's fair game both ways.

11                    MR. DELINSKY:  Then we want to put in the

12    *Touhy* letters that have been provided on Joe Rannazzisi as

13    well.

14                    THE COURT:  Did they expressly disavow and

15    reject everything he said?

16                    MR. LANIER:  No.

17                    MR. DELINSKY:  I'd like to see the letter.  I

18    just can't recall before his deposition.

19                    THE COURT:  Well, I mean, if they did, I'm

20    sure you would have put it in.

21                    MR. DELINSKY:  I guess we object --

22                    THE COURT:  I mean, you want to start --

23    that's fine, I said that attacking the Federal Government is

24    fair game.  It's wide open.  FDA, DEA, whatever.  So --

25                    MR. DELINSKY:  We're not attacking the Federal

**Hill - (Direct by Delinsky)**

1    Government, Your Honor.

2              THE COURT:  Mr. Delinsky, you want -- if you

3    want him to opine as to what he did and what his

4    understanding of the law was at DEA, that's fine, and I will

5    certainly let the plaintiffs put into evidence this letter

6    and cross-examine him on it.

7              MR. DELINSKY:  That's fine, Your Honor.

8              THE COURT:  The DEA expressly disavows.

9              MR. DELINSKY:  I'm just putting on the record

10    that if there was a double standard, this is it.

11              MR. LANIER:  And I'm putting on the record

12    that Captain Villanueva --

13              THE COURT:  There isn't a double standard.

14              MR. DELINSKY:  There is a double standard.  We

15    had witness upon witness upon witness upon witness in

16    plaintiffs' case opining on the law without threat of

17    boilerplate, and *Touhy* regulations were used.  And that's

18    just the fact of it.  And if those are the rules of the

19    case, those are the rules of the case.  We'll move on.  But

20    I want the objection noted.  That's all.

21              MR. WEINBERGER:  We didn't call a DEA witness

22    as an expert.

23              THE COURT:  Right.  This is different.  You've

24    called him as an expert.

25              MR. DELINSKY:  So the rules pertaining to a

**Hill - (Direct by Delinsky)**

 1    fact witness are more liberal than an expert witness?  That

 2    makes no sense.  It's not right.

 3              MR. WEINBERGER:  We didn't ask him opinion

 4    testimony.

 5              MR. DELINSKY:  Of course you did.  How many

 6    times --

 7              MR. WEINBERGER:  Please don't yell at me.

 8              THE COURT:  Look, Mr. Delinsky, I will permit

 9    you -- you called him as an expert on DEA policy, okay?  The

10    plaintiffs didn't, you know, file a *Daubert* motion, so he's

11    qualified to testify to what DEA enforcement policy was over

12    25 years.  I have no doubt about that.  And he can do that.

13        And so you can ask him as long as you couch the

14    questions that way, you can ask those questions.  But the

15    plaintiffs can certainly bring out to impeach him that DEA

16    is expressly disavowing everything he says.  All right?

17        So and then you can cross -- you know, you can try and

18    rehabilitate him if you want, but that's -- basically this

19    letter says that they -- they're saying that DEA does not

20    endorse any of his opinions, and any of his opinions do not

21    reflect the opinions of the Department or DEA.

22        So that's fine, but the jury will take it for

23    whatever -- they'll put the weight on it.

24              MR. DELINSKY:  But, Your Honor, here's the

25    problem.  That is a form letter that is provided that has

1    been given to every DEA -- former DEA official who has

2    testified as an expert in this case.

3                    THE COURT:  That's the first one that's been

4    presented to --

5                    MR. DELINSKY:  What if we show you that the

6    letter that was written -- I'm sorry, the *Touhy* response

7    that was written for Mr. Rafalski, who was plaintiffs' DEA

8    expert that they didn't call, they're all the same.  So this

9    is using legalese and boilerplate to impeach a witness and

10   it's not fair.  That's what they say for everyone.  That's

11   nothing personal to Mr. Hill.

12                    MR. WEINBERGER:  We didn't call Mr. Rafalski

13   as an expert.

14                    MR. DELINSKY:  But you used him throughout the

15   litigation and you've called him in other cases.

16                    MR. LANIER:  I have not.

17                    MR. DELINSKY:  You haven't, Mark, you're

18   right.

19                    THE COURT:  You called this man as a DEA

20   expert, all right?  That's different.  So that's fine,

21   you're allowed to have a DEA expert.  And I will allow him

22   to answer questions based on his 25 years expertise.  But

23   then he can be cross-examined on the fact that DEA is saying

24   that his opinions aren't theirs.

25          And if you want to ask him, well, isn't this a form

 1   letter they give to everyone, and if he knows that, he can

 2   say that.  Maybe it is.  I don't know.

 3                    MR. DELINSKY:  Understood, Your Honor.  My

 4   objection's noted.

 5                    MR. STOFFELMAYR:  Judge, may I ask a question

 6   just for my understanding?

 7                    THE COURT:  Go ahead.

 8                    MR. STOFFELMAYR:  Mr. Rannazzisi answered

 9   many, many questions termed, you know, "Was it DEA's

10   understanding that" blank, legal conclusion.  Would that be

11   permissible?  Because whether he's a fact witness or an

12   expert witness, this man would know as well as

13   Mr. Rannazzisi --

14                    THE COURT:  Yes, I'm allowing -- I am allowing

15   him -- I mean, whether he's a fact witness or an expert, he

16   could testify to what DEA policy was during that 25 years,

17   all right?  He can testify to that.

18                    MR. WEINBERGER:  I actually think he was --

19   the questions that were asked of him by us was what is your

20   understanding, because you objected to him speaking as the

21   DEA.

22                    MR. DELINSKY:  I mean, Your Honor, I assume

23   you will let me introduce then the *Touhy* letters written on

24   behalf of -- you know, in regards to Joe Rannazzisi,

25   Mr. Prevoznik, Ms. Ashley, all the other DEA people who have

**Hill - (Direct by Delinsky)**

 1    provided testimony.

 2                    MR. WEINBERGER:  We didn't call Prevoznik.

 3                    MR. DELINSKY:  Don't matter.  This is

 4    boilerplate, Your Honor.  You're allowing --

 5                    THE COURT:  I don't know if it's boilerplate.

 6                    MR. DELINSKY:  Well, what if we show you it

 7    is?  It's just not fair.

 8                    MR. WEINBERGER:  It isn't.  You submitted his

 9    report to them for a *Touhy* authorization for him to testify

10    at trial, and this was their response.

11                    MR. DELINSKY:  That's what they respond to

12    everybody, every single person.

13                    MR. WEINBERGER:  Ashley is not an expert.

14    Prevoznik is not an expert.  They didn't submit expert

15    reports.

16                    MR. DELINSKY:  We will show every single

17    expert witness they include the exact same language, and

18    that is form language, and it's unfair impeachment.  It's

19    out of bounds.  And it can't be, Your Honor, it cannot be

20    that an expert witness can be impeached on that due to the

21    *Touhy* rules when a fact witness like Joe Rannazzisi can't

22    be.  That's a fundamental inequity.

23                    THE COURT:  Well, wait, no.  There's a big

24    difference, Mr. Delinsky.  Fact witness, you know, you can

25    do whatever you want.  If he's an expert witness opining

**Hill - (Direct by Delinsky)**

1    on -- his expertise is what DEA did and didn't do and what

2    their position was, then this specifically says it's not

3    their opinion.  That's the difference.

4                   MR. DELINSKY:  But we weren't asking for DEA

5    opinions.  We wanted his opinions, Your Honor.  We want to

6    put this as his opinions.  We didn't couch him in the report

7    as DEA opinions.  We couched them as his.

8                   THE COURT:  But his opinion, is he worth

9    anything unless he's a DEA expert?

10                  MR. DELINSKY:  I don't believe that's right,

11   Your Honor.  I think his opinion is based on his experience

12   at DEA, but it's an independent opinion.

13                  MR. WEINBERGER:  Your Honor, this letter which

14   you have, August 12, 2021, specifically says the DOJ

15   received your e-mail -- this is to Kyle Crawford of

16   Mr. Delinsky's firm, August 12.

17       "We received your e-mail and letter containing the

18   expert report of Robert Hill, former DEA employee, and

19   reviewed that report.  We understand Mr. Hill's report was

20   served before it was provided to the DEA, and so this office

21   and DEA did not have the opportunity to determine whether

22   the information contained in the report could be shared

23   pursuant to 28 C.F.R. 1621 to 1629, which are also known as

24   *Touhy* regulations.

25       "Accordingly, Mr. Hill did not receive authorization

**Hill - (Direct by Delinsky)**

6412

1    under that section for his report or any future testimony.

2    Nevertheless, this office on behalf of the DEA affirmatively

3    states the DEA does not endorse any of the opinions

4    contained in the report, and that the opinions expressed by

5    Mr. Hill do not reflect the opinions of the Department or

6    the DEA.

7         "Further, the DEA does not attest to the accuracy of

8    the facts, data, or opinions in Mr. Hill's report or future

9    testimony."

10        This was submitted to authorize him to testify per a

11   report that they had never reviewed and gotten

12   preauthorization for, to testify as an expert in this case.

13        That is not the case with respect to any of the fact

14   witnesses that have DEA backgrounds.

15             MR. DELINSKY:  Your Honor, we have sent three

16   e-mails this week alone to the Department of Justice to try

17   to get approval for this testimony and to try to get them

18   engaged, and they haven't been engaged.

19             MR. WEINBERGER:  That's further evidence

20   that --

21             THE COURT:  It's a little late for that.

22             MR. DELINSKY:  We told them before, Your

23   Honor.  We have been following up and following up and

24   following up.  We're not getting anything.

25             THE COURT:  In August they said no.  That

1    probably meant no.

2              MR. DELINSKY:  They didn't say no, they said

3    they didn't endorse.

4         Well, fine, Your Honor.  Look, I'm just noting that

5    it's unfair impeachment, the Court's imposing a double

6    standard.  I know I've lost.  I accept it.  I just want my

7    objection noted on the record, that's all.

8              MR. WEINBERGER:  And plaintiffs need to state

9    for the record, that's the risk that you took by hiring an

10   expert who was a former DEA employee.

11             MR. DELINSKY:  Yeah, and the rules set forth,

12   urged by plaintiffs and set forth by the Court, is if you

13   pay -- if you have Mr. Rannazzisi and you pay his expenses

14   to bring him here, he's providing expert testimony dressed

15   up as a fact witness.  But he gets to come here and

16   essentially give expert testimony, that's okay because he

17   gets to dodge the *Touhy* process.  But if you do it the right

18   way and you're intellectually honest about it, and you call

19   it what it is, you get punished.  And that's the rule.

20   That's the rule.  That's the rule.

21             MR. LANIER:  Without regard to being yelled at

22   in the process of this from Mr. Delinsky, I will add the

23   following:  There were specific questions I tried to ask

24   Mr. Rannazzisi that were deemed off limits because he wasn't

25   an expert, and I was only allowed to ask him questions as a

**Hill - (Direct by Delinsky)**

1    fact witness in his role and what he did as a fact witness.

2         He is a pharmacist, he is a lawyer, and I was limited

3    within the framework of that to those things because he

4    didn't issue an expert report, and I didn't have him here as

5    a retained expert.  I wasn't allowed to pay for his time

6    because he was a fact witness and not an expert.

7         I want the record clear.

8              MR. STOFFELMAYR:  I want to make sure we're

9    all working with the same facts.  I have the Court's ruling,

10   I looked this up, it's not complicated, because there was

11   lots of debate about what Mr. Rannazzisi could or couldn't

12   testify about.

13        And what the Court said is he can testify to his

14   understanding, not what he thinks the rules are, his

15   understanding -- good Lord -- of what the DEA's position was

16   at the time.  And there is no reason Mr. Hill couldn't give

17   exactly the same testimony.

18             THE COURT:  Well, Mr. Stoffelmayr, I said that

19   Mr. Delinsky could ask those questions.

20             MR. DELINSKY:  But you're erecting an

21   impeachment, Your Honor, that only exists --

22             THE COURT:  No.  Hold it, hold it, hold it.

23   Is there a letter that the DEA sent to the lawyers or to

24   Mr. Rannazzisi like this?

25             MR. DELINSKY:  No, because the process was

**Hill - (Direct by Delinsky)**

 1   different because they didn't disclose him as an expert,

 2   Your Honor.

 3              MR. LANIER:  Your Honor, not only did we get a

 4   *Touhy* authorization for Mr. Rannazzisi to be here, but

 5   Mr. Bennett sat over there on behalf of the DOJ during the

 6   testimony.

 7              THE COURT:  I remember that.

 8              MR. DELINSKY:  And we begged him to be here,

 9   Your Honor.  We sent Mr. Bennett e-mail after e-mail.  It's

10   not our fault that he's not engaging on this.  And we can

11   put all those --

12              THE COURT:  I think the problem is that you've

13   called him as an expert.

14              MR. DELINSKY:  But as an expert based on his

15   experience, Your Honor.  You have tried to push me into

16   saying "In your experience at DEA."  That's the basis of his

17   opinion, but his opinion is independent.

18              THE COURT:  Well, the point is you could have

19   just called him as a fact witness.

20              MR. DELINSKY:  Well, why don't I do that now?

21              THE COURT:  Well, you've paid him $300,000.

22   It's late.

23              MR. DELINSKY:  Yeah, but the plaintiffs paid

24   Rannazzisi $900,000, Your Honor, not in this case, but other

25   plaintiffs.  That's a tricky line to navigate, Your Honor.

**Hill - (Direct by Delinsky)**

 1          THE COURT:  Well, you could have brought that

 2   out if that was the case.

 3          MR. DELINSKY:  We did.

 4          THE COURT:  All right, fine.  But he's not.

 5          MR. WEINBERGER:  We didn't ask him expert

 6   opinions about the conduct of CVS --

 7          THE COURT:  As I said, I am allowing -- the

 8   difference is you're calling him as an expert.  So, fine,

 9   I'm allowing you to ask him those questions for -- based on

10   his expertise and his knowledge what DEA policy was in those

11   25 years, what positions they took in enforcement, what

12   instructions they gave to pharmacists.  You can ask him any

13   of those questions.  But they can bring out the fact that

14   the Department of Justice says that they're not endorsing

15   any of his opinions, okay?  That's a fact.

16       Now, that -- they're not saying that they're

17   disavowing them, that he's wrong.  They're just saying that

18   they don't know and they're not endorsing any of his

19   opinions, okay?  It doesn't say his opinions are wrong or

20   they're rejecting them.  So you're not going to be able to

21   imply that that's what the letter says, because it doesn't.

22          MR. DELINSKY:  Okay, Your Honor.  I think what

23   we'll do though is we will use that with Mr. Hill, over our

24   objection, so that we are the ones presenting it.

25          THE COURT:  Okay.  That's fine.

1             (Recess taken at 3:22 p.m.)

2             (Jury present in open court at 3:37 p.m.)

3             THE COURT:  Please be seated, ladies and

4    gentlemen.  I apologize for that longer than usual break.

5    We had some legal matters we needed to take up.

6        So, Mr. Hill, I want to remind you, you are still

7    under oath, sir.

8        And Mr. Delinsky, you may proceed.

9             MR. DELINSKY:  I hope everyone had a good

10   break.

11   BY MR. DELINSKY:

12   **Q**    Let me just take a quick detour, Mr. Hill.

13       Remember we talked about how there's rules that guide

14   your testimony and prohibit you from disclosing information

15   that was internal to DEA, correct?

16   **A**    Correct.

17   **Q**    Do you understand those to be called *Touhy* rules?

18   **A**    Yes.

19   **Q**    Okay.  And you recall that my office, Mr. Crawford

20   right there, sent a letter to DEA telling them about your

21   testimony, correct?

22   **A**    Correct.

23   **Q**    I want to go over the response with you that we

24   received from the Department of Justice.

25       As you'll see, this is dated August 12, 2021.

**Hill - (Direct by Delinsky)**

1      You see that?

2   **A**   Yes, sir.

3   **Q**   Okay.  And we're going to go through this.

4      By the way, for the record, this is P-23011.

5      Mr. Hill, you see it's signed on page 2 --

6            THE COURT:  I thought it's P-21912.

7            MR. DELINSKY:  I have 230 --

8            MR. LANIER:  Your Honor, you have the

9   plaintiffs' copy of the letter that I gave you during the

10  break.  This is --

11            MR. WEINBERGER:  This is it.  23011.

12            MR. DELINSKY:  You good, Your Honor?

13            THE COURT:  I just want to know what -- mine

14  has a different number, but whatever you've got it, fine.

15            MR. WEINBERGER:  We had a different P number

16  on ours.

17            THE COURT:  All right.

18  BY MR. DELINSKY:

19  **Q**   Mr. Hill, do you see it's signed by Ava Rotell Dustin?

20  **A**   Yes.

21  **Q**   Do you know Miss Dustin?

22  **A**   No.

23  **Q**   Is she with DEA?

24  **A**   No.

25  **Q**   She's with the U.S. Attorney's Office here, correct?

1    **A**      Yes.

2    **Q**      That sometimes represents DEA or does represent DEA,

3    correct?

4    **A**      Yes.

5    **Q**      Now, Mr. Hill, we can see -- this is where I'm going

6    to highlight it.  This says, "Mr. Hill is not authorized to

7    provide any information regarding any specific nonpublic DEA

8    investigation or activity."

9          Do you see that?

10   **A**      Yes.

11   **Q**      Is that consistent with your understanding?

12   **A**      Yes, sir.

13   **Q**      "Classified and classifiable information," is that

14   consistent with your understanding?

15   **A**      Yes.

16   **Q**      Do you in fact possess classified information from

17   your time at DEA, Mr. Hill?  Maybe, maybe not?

18   **A**      I guess it would be DEA classified, yes.

19   **Q**      And you understand you can't disclose it?

20   **A**      Yes.

21   **Q**      Mr. Hill, I want to show you something else and ask

22   you about it.

23          Here it says, "This office," the U.S. Attorney's

24   Office, "on behalf of DEA affirmatively states that the DEA

25   does not endorse any of the opinions contained in the report

**Hill - (Direct by Delinsky)**

1     prepared by Mr. Hill."

2          Do you understand that language?

3     **A**     Yes.

4     **Q**     Would you expect to see that?

5     **A**     Yes.

6     **Q**     Are you giving opinions on behalf of the DEA?

7     **A**     No.

8     **Q**     You haven't been at DEA for seven years,

9     approximately, correct?

10    **A**     Correct.

11    **Q**     There is nothing surprising to you about that

12    language?

13    **A**     No.

14    **Q**     Is that the kind of boilerplate language you would

15    expect to see?

16               MR. WEINBERGER:  Objection, Your Honor.

17               THE COURT:  Overruled.

18    **A**     Yes.

19    **Q**     Okay.  Let's go on.

20         It says, this office on behalf of DEA affirmatively

21    states DEA does not endorse your opinions, nor would you

22    expect them to, and that the opinions --

23               THE COURT:  The letter doesn't say that, so

24    we're going to -- the jury is to disregard that comment.

25    **Q**     All right.  It goes on to say, "The opinions expressed

1    by Mr. Hill do not reflect the opinions by the Department,"

2    that's the Department of Justice, "or DEA."

3         Do you see that?

4    **A**    Yes.

5    **Q**    Does that language surprise you?

6    **A**    No.

7    **Q**    Does that language in any way whatsoever suggest or

8    indicate that your opinions are wrong?

9              MR. WEINBERGER:  Objection.

10             THE COURT:  Sustained.

11   **Q**    What do you believe that language means?

12   **A**    This language means that I am not testifying on behalf

13   of DEA.

14   **Q**    Is that your complete understanding?

15             MR. WEINBERGER:  Objection.

16             THE COURT:  He can testify to his

17   understanding.  It's overruled.

18   **A**    Could you repeat the question, please?

19   **Q**    Is that your complete understanding of what that

20   means?

21   **A**    Yes.

22   **Q**    And are you certain of that understanding?

23             MR. WEINBERGER:  Objection, Your Honor.

24             THE COURT:  I have to sustain that,

25   Mr. Delinsky.

**Hill - (Direct by Delinsky)**

1          MR. DELINSKY:  Why?  I've asked worse ones,

2     Your Honor.

3     **Q**     Mr. Hill, do you know a gentleman named Louis Milione?

4     **A**     I know of him, yes.

5     **Q**     Who is Mr. Milione?

6     **A**     Currently, he is the deputy administrator of DEA.

7     **Q**     Today?

8     **A**     Yes.

9     **Q**     Let's go back to 2015.  Who was Mr. Milione?

10    **A**     Mr. Milione replaced Mr. Rannazzisi as the head of

11    Diversion.

12    **Q**     So Mr. Milione had Mr. Rannazzisi's position?

13    **A**     Yes.

14    **Q**     Okay.  And then in between the 2015-2016 time frame,

15    when Mr. Milione assumed that position, and today when he's

16    in even a higher position at DEA, did Mr. Milione leave the

17    DEA for a period of time?

18    **A**     Yes.

19    **Q**     Okay.  And was he in private industry at that point in

20    time?

21    **A**     Yes.

22    **Q**     Okay.  I'd like to show you a similar *Touhy* letter

23    that was written --

24          MR. WEINBERGER:  Objection to the -- before we

25    get into describing it, can we see what you're --

**Hill - (Direct by Delinsky)**

1        MR. DELINSKY:  Well, I only have it on my

2   phone.  I can show my phone.  I'm happy to.

3        THE COURT:  Well, let's go on the headphones

4   here.

5        (At side bar at 3:43 p.m.)

6        MR. DELINSKY:  Your Honor, it has the same

7   language.

8        THE COURT:  Well, it may have the same

9   language.  I allowed you to -- obviously I allowed you to

10  ask the witness his understanding of a letter that was

11  essentially sent to him, but this letter hasn't been sent to

12  him.

13       MR. DELINSKY:  But, Your Honor, if plaintiffs

14  are going to get up and say --

15       THE COURT:  Was this person Milione, was he

16  called as an expert?

17       MR. DELINSKY:  He was, Your Honor.  He was an

18  expert retained on behalf of manufacturer defendants in

19  Track One.  He was a testifying expert in Track One.

20       MR. WEINBERGER:  But he never testified in

21  Court.

22       MR. DELINSKY:  He testified in deposition.

23       MR. WEINBERGER:  So what?

24       MR. DELINSKY:  And the language is the exact

25  same language, Your Honor.  And this is someone who today is

1    the deputy administrator of the DEA.

2              THE COURT:  Well, he hasn't received this

3    letter and he's never seen it before.

4              MR. DELINSKY:  Could I use it on redirect if

5    Mr. Lanier attempts to suggest that the meaning of the

6    letter is something different?

7              THE COURT:  Well, depending on what he asks.

8    I don't know.  I haven't seen the letter.

9              MR. WEINBERGER:  Neither have we.

10             THE COURT:  But I'm not going to let you --

11   showing some letter to someone else, he don't know the

12   circumstances, so I think it's improper.

13             MR. DELINSKY:  But Your Honor, it contains the

14   exact same language.

15             THE COURT:  It may, but he doesn't know what

16   the circumstances are, and this witness doesn't know it.

17   That's the point.  He has no knowledge of Mr. Milione's

18   circumstances.

19        I allowed him to testify about his understanding that

20   the letter was essentially sent to him.

21             MR. DELINSKY:  All right, Your Honor.  Do I

22   understand your ruling though, that depending on what

23   happens on redirect, that that door may be opened?  Because

24   if this is unfairly characterized and suggested as something

25   else that is -- that this language doesn't appear in other

**Hill - (Direct by Delinsky)**

1    letters for other people, including people who are current

2    second-highest ranking --

3                    THE COURT:  Well, we'll see.

4        All right, Mr. Lanier, you're on notice that

5    apparently a very similar letter was sent to Mr. Milione, so

6    depending on what you ask and how you ask it, it might

7    become relevant.

8                    MR. LANIER:  I understand, Your Honor.  And if

9    it does, then it will allow me to point out that this was

10   Purdue's expert, and I don't think they'd agree with him

11   either.

12                   THE COURT:  Right.  So I don't know why you

13   guys want to get into this, but I'm going to keep the

14   boundaries fair on both sides.

15                   (In open court at 3:46 p.m.)

16   BY MR. DELINSKY:

17   **Q**    All right.  Moving on, Mr. Hill.  Let's go back just

18   one set.

19       In your opinion, based on your experience at DEA, must

20   there be an illegitimate prescription for corresponding

21   responsibility to be violated?

22                   MR. WEINBERGER:  Objection.

23                   MR. LANIER:  I withdraw his objection.

24                   THE COURT:  All right.  I was going to

25   overrule it anyway.

**Hill - (Direct by Delinsky)**

1      You may answer.

2              MR. WEINBERGER:  Then I'm definitely

3  withdrawing it, Your Honor.

4              MR. LANIER:  I beat you to it, Judge.

5              THE COURT:  You may answer it, sir.

6      Mr. Delinsky, if it's forgotten, you can ask it again.

7  BY MR. DELINSKY:

8  **Q**     Based on your experience at DEA over the course of 25

9  years, for there to be a violation of corresponding

10  responsibility, must the prescription be illegitimate to

11  begin with?

12  **A**     Yes.

13  **Q**     Can a pharmacist violate corresponding responsibility

14  if the underlying prescription is not illegitimate based on

15  your experience?

16  **A**     No.

17  **Q**     Let's move on to a different opinion on corresponding

18  responsibility, Mr. Hill.

19      Can corresponding responsibility be exercised through

20  a line of data alone, in your experience?

21  **A**     Based on my experience, no.

22  **Q**     Based on your experience, must a pharmacist consider

23  information beyond the drug information on the face of the

24  prescription?

25  **A**     Yes, they must.

1    **Q**    Is it important for a pharmacist to consider human

2    information, such as information the pharmacists can observe

3    about the patient who has presented the pharmacist with the

4    prescription?

5    **A**    Yes, they can consider that.

6    **Q**    Is it important for a pharmacist to consider on top of

7    the prescription information in the prescription the

8    pharmacist's knowledge of and own history with the patient?

9    **A**    Yes, that can be considered.

10    **Q**    Is it necessary for the pharmacist in exercising

11    corresponding responsibility to consider her own

12    observations of the patient?

13    **A**    Yes.

14    **Q**    Is it important on top of the drug information in the

15    prescription or in the data for the pharmacist to consider

16    the patient's medical condition?

17    **A**    Yes.

18    **Q**    Is it important in exercising corresponding

19    responsibility for the pharmacist to consider her

20    conversations and interactions with the patient?

21    **A**    Yes.

22    **Q**    Is it important in the exercise of corresponding

23    responsibility for a pharmacist to consider her own

24    knowledge and experience with the prescribing doctor?

25    **A**    Yes.

1    **Q**    Can any of this information be gleaned from data?

2    **A**    I would say no.  It would be very rare.

3    **Q**    Can any of this information -- well, can most of this

4    information be gleaned from the face of the prescription

5    itself?

6    **A**    I would say no.

7    **Q**    Would it be fair to characterize this information as

8    the human information?

9    **A**    Yes.

10   **Q**    And is a critical part of corresponding

11   responsibility, in your experience, the consideration of the

12   human information?

13   **A**    Yes.

14   **Q**    Let's move on.

15          Mr. Hill, are you familiar with the concept of

16   potential red flags?

17   **A**    Yes.

18   **Q**    Did DEA commence a formal process to brief pharmacists

19   on the concept of potential red flags?

20   **A**    Yes.

21   **Q**    When did those presentations begin?

22   **A**    The formal would have been the PDACs which started in

23   September of 2011.

24   **Q**    Now, that's not to say cases didn't come out before

25   then, correct?

**Hill - (Direct by Delinsky)**

 1   **A**     Oh, that's correct.

 2   **Q**     And they may identify some warnings signs, correct?

 3   **A**     Yes, correct.

 4   **Q**     But were the PDACs that commenced in September 2011

 5   the first systematic and official approach to laying out

 6   potential red flags for pharmacists?

 7   **A**     Yes.

 8   **Q**     I believe you testified you gave some of these

 9   presentations.

10   **A**     Yes.

11   **Q**     Did Mr. Rannazzisi give some of these presentations?

12   **A**     Yes.

13   **Q**     Were your presentations similar to Mr. Rannazzisi's?

14   **A**     Yes.

15   **Q**     Mr. Hill, I'm showing you what's been marked as

16   P-15962.  And as a matter of fact, it's not only marked, I

17   believe this is admitted.  Okay?

18          And again, the number is 15962.

19   **A**     Yes, I have it here.

20   **Q**     Do you recognize this document?

21   **A**     Yes.

22   **Q**     What is this document?

23   **A**     This is a document of a presentation that

24   Mr. Rannazzisi gave in May of 2015 at a PDAC that occurred

25   in Norfolk, Virginia.

**Hill - (Direct by Delinsky)**                                    6430

1   **Q**    So is this one of those presentations that you were

2   just talking about, one of those PDAC presentations?

3   **A**    Yes.

4   **Q**    Okay.  Mr. Hill, if you could please turn to -- if you

5   look at the very bottom of the page, there's a lot of

6   numbers, but just go to 10, okay?  The last two numbers.

7   **A**    Yes, I'm there.

8   **Q**    Okay.  Now, on this page of Mr. Rannazzisi's slide, he

9   lists potential red flags, correct?

10  **A**    Correct.

11  **Q**    Okay.  Do potential red flags consider combinations of

12  prescriptions or cocktails?

13  **A**    Yes.

14  **Q**    Do potential red flags include paying cash?

15  **A**    Yes.

16  **Q**    Do potential red flags include early refills?

17  **A**    Yes.

18  **Q**    Do potential red flags include individuals driving

19  long distances to visit physicians?

20  **A**    Yes.

21  **Q**    And, by the way, was this a DEA presentation?

22  **A**    Yes.

23  **Q**    Okay.  Let's go to the next page, Mr. Hill.

24       Do more potential red flags include customers coming

25  into the pharmacy in groups?

1    **A**    Yes.

2    **Q**    Does it include customers with prescriptions for

3    controlled substances written by physicians not associated

4    with pain management?

5    **A**    Yes.

6    **Q**    Okay.  These are potential red flags; is that correct?

7    **A**    That's correct.

8    **Q**    Okay.  Mr. Hill, could you explain to the ladies and

9    gentlemen of the jury when a cash payment would only be a

10   potential red flag and wouldn't rise to the level of an

11   actual red flag?

12   **A**    Well, a cash payment could be a potential red flag,

13   but you would have to look into it, and if you look at where

14   it has -- prior to the Affordable Care Act, where it stated

15   that in the United States you had approximately 50 million

16   Americans that were uninsured or underinsured; so if you

17   don't have insurance, the only way you can receive a

18   prescription is by paying cash for it.

19   **Q**    So would that be an instance in which a prescription

20   might be a potential -- a cash payment might not be

21   suspicious at all, would only be a potential red flag?

22   **A**    That's correct.

23   **Q**    Wouldn't rise to an actual red flag?

24   **A**    That's correct.

25   **Q**    Okay.  When would a prescription written by a doctor

 1   who was 25 or 30 miles away only be a potential red flag?

 2   **A**    Well, it would depend on if the doctor is a specialty.

 3   So if you would take this area, for instance, if you have a

 4   person that lives far away but they may be going to the

 5   Cleveland Clinic for treatment or something, they may live a

 6   far distance, but that would be probably the best care for

 7   whatever ailment they have.

 8   **Q**    So that it wouldn't rise to the level of an actual red

 9   flag in that instance?

10   **A**    No, it would not.

11   **Q**    Okay.  Who makes the judgment whether a potential red

12   flag rises to the level of actual red flag?

13   **A**    It would be the pharmacist that is working the counter

14   when that prescription is presented to the pharmacist.

15   **Q**    Is the deciding factor in determining whether a

16   potential red flag rises to actual red flag typically

17   information the pharmacist knows or learns about the patient

18   at the pharmacy counter?

19   **A**    That is correct.

20   **Q**    If a pharmacist determines that a potential red flag

21   is not an actual red flag, is there any actual red flag to

22   resolve?

23   **A**    No, there is not.

24   **Q**    All right.  Just a few more questions on flags.

25   **A**    Okay.

**Hill - (Direct by Delinsky)**

1    **Q**     If a prescription contains a potential red flag, in

2    your experience, does that mean the prescription's

3    illegitimate?

4    **A**     No, it does not.

5    **Q**     If a prescription has an actual red flag, does that

6    mean the prescription is necessarily illegitimate?

7    **A**     No, it does not.

8    **Q**     And finally, based on your experience, is it necessary

9    for a pharmacy to have a written policy listing every

10   conceivable red flag?

11   **A**     No, it is not.

12   **Q**     Mr. Hill, is it good practice for a pharmacist to

13   document the resolution of an actual red flag?

14   **A**     It's good practice, but it's not required by the CSA

15   or its implementing regulations.

16   **Q**     Is it good practice to document the resolution of a

17   flag that's only a potential red flag and doesn't become an

18   actual red flag?

19   **A**     I would say there would be no reason to document it if

20   it's not an actual red flag and it's just a potential.

21   **Q**     Based on your experience, does the Controlled

22   Substances Act require pharmacists to document the

23   resolution of red flags?

24   **A**     No.

25   **Q**     Based on your experience, do DEA regulations require

1    pharmacists to document the resolution of red flags?

2    **A**    No.

3    **Q**    Do either the Controlled Substances Act or its

4    regulations even discuss the documentation of red flags?

5    **A**    No.

6    **Q**    Do you know what the DEA Pharmacist's Manual is?

7    **A**    Yes.

8    **Q**    What is it?

9    **A**    It's a manual that DEA publishes for pharmacies and

10   pharmacists to give them like a baseline of what's accepted

11   for a pharmacy practice and what they should be doing to

12   stay compliant.

13   **Q**    Are you familiar with the DEA Pharmacist's Manual?

14   **A**    Yes.

15   **Q**    Are you familiar with the 2010 version of the DEA

16   Pharmacist's Manual?

17   **A**    Yes.

18   **Q**    Does the 2010 DEA Pharmacist's Manual direct

19   pharmacists to document the resolution of red flags?

20   **A**    No.

21   **Q**    Is there a 2020 DEA Pharmacist's Manual?

22   **A**    Yes.

23   **Q**    Are you familiar with the 2020 DEA Pharmacist's

24   Manual?

25   **A**    Yes.

1    **Q**    Does the 2020 DEA Pharmacist's Manual direct

2    pharmacists to document the resolution of red flags?

3    **A**    No.

4    **Q**    Do you know what DEA registrant letters are?

5    **A**    Yes.

6    **Q**    What are they?

7    **A**    Those were letters that Mr. Rannazzisi sent out to

8    registrants, particularly distributors, that -- making them

9    aware of the issue of the prescription drug abuse problem,

10   as well as what were some of the things they were expected

11   to be in compliance.

12   **Q**    Has DEA ever sent a Dear Registrant letter to pharmacy

13   registrants directing pharmacists to document the resolution

14   of red flags?

15   **A**    No.

16   **Q**    Based on your experience, if a pharmacist resolves a

17   red flag but doesn't write down what she did, does this mean

18   the pharmacist didn't do the work to resolve the red flag?

19   **A**    No.

20   **Q**    Based on your experience, if a pharmacist does not

21   document the resolution of a red flag, is it fair to just

22   assume that the pharmacist didn't resolve it?

23   **A**    No, it's not fair to just assume.

24   **Q**    Okay.  All right.  We're moving on from corresponding

25   responsibility and red flags.  I want to talk to you about

1   technology, Mr. Hill.

2   **A**      Yes.

3   **Q**      Based on your experience, does the Controlled

4   Substances Act provide that pharmacists must operate data

5   programs to review and block doctors?

6   **A**      No.

7   **Q**      Do any DEA regulations require doctor monitoring

8   programs?

9   **A**      No.

10  **Q**      Has DEA ever provided official guidance to pharmacies

11  indicating that they should have doctor monitoring programs?

12  **A**      No.

13  **Q**      Does the Controlled Substances Act, based on your

14  experience, require pharmacies to implement red flag alerts

15  in their computer systems?

16  **A**      No.

17  **Q**      Do any DEA regulations require the implementation of

18  red flag computer alerts?

19  **A**      No.

20  **Q**      Has DEA ever provided official guidance to pharmacies

21  indicating that they should implement red flag alerts in

22  their computer systems?

23  **A**      No.

24  **Q**      Does the Controlled Substances Act provide that

25  pharmacies must use algorithms to monitor their dispensing?

1    **A**      No.

2    **Q**      Does any DEA regulations require any of these kinds of

3    algorithms?

4    **A**      No.

5    **Q**      Has DEA ever provided official guidance to pharmacies

6    indicating that they should use algorithms to monitor

7    dispensing?

8    **A**      No.

9    **Q**      Do you know Mr. Catizone?

10   **A**      Yes.

11   **Q**      Did you review Mr. Catizone's red flag methodology?

12   **A**      Yes.

13   **Q**      Do you have opinions on it?

14   **A**      Yes.

15   **Q**      In your opinion, is Mr. Catizone's methodology

16   correct?

17   **A**      No.

18   **Q**      Let's discuss why, okay?

19   **A**      Okay.

20   **Q**      Does Mr. Catizone identify potential red flags or does

21   he identify actual red flags?

22   **A**      Potential red flags.

23   **Q**      Do the potential red flags that Mr. Catizone

24   identifies in his methodology necessarily require

25   resolution?

```
 1    A    No.

 2    Q    Does Mr. Catizone also opine that documentation of the

 3    resolution of red flags is required?

 4    A    Yes.

 5    Q    Is he correct?

 6    A    No.

 7    Q    Is documentation of the resolution of red flags

 8    required by the United States Controlled Substances Act?

 9    A    No.

10    Q    If the resolution of red flags are not documented,

11    does it mean they weren't resolved?

12    A    No, it does not.

13    Q    If corresponding responsibility -- is corresponding

14    responsibility, based on your experience, violated if a

15    pharmacist does not document her resolution of actual red

16    flags?

17    A    No, it is not.

18    Q    Final chapter, Mr. Hill.

19    A    Okay.

20    Q    And this chapter is about regulation and the

21    regulation of doctors and the regulation of pharmacies.

22    A    Okay.

23    Q    Are doctors and are pharmacies -- are doctors who

24    prescribe controlled substances regulated?

25    A    Yes.
```

1    Q    Are pharmacies who prescribe controlled substances

2    regulated?  I'm sorry.  Bad, bad, bad, bad.

3         Are pharmacies that fill prescriptions for controlled

4    substances regulated?

5    A    Yes.

6    Q    Must a doctor who prescribes controlled substances

7    register with the DEA?

8    A    Yes.

9    Q    Can DEA suspend or revoke the registration of a doctor

10   for improper prescribing?

11   A    Yes.

12   Q    Does DEA take that kind of action?

13   A    Yes.

14   Q    Can the United States bring civil and criminal actions

15   against doctors for improper prescribing?

16   A    Yes.

17   Q    Does the United States take such actions?

18   A    Yes.

19   Q    Mr. Hill, are state medical boards charged with

20   overseeing the practice of medicine in their respective

21   states?

22   A    Yes.

23   Q    Must a doctor who prescribes controlled substances be

24   licensed by their state medical board?

25   A    Yes.

**Hill - (Direct by Delinsky)**

1   **Q**     Can a state medical board suspend or revoke the

2   license of a doctor to prescribe controlled substances?

3   **A**     Yes.

4   **Q**     Does that happen?

5   **A**     Yes, it does.

6   **Q**     Pharmacies.  Must a pharmacy be registered with DEA to

7   dispense controlled substances?

8   **A**     Yes.

9   **Q**     Must each individual pharmacy location be registered

10  itself?

11  **A**     Yes.

12  **Q**     So if a company operates a chain of pharmacies, does

13  each individual pharmacy require a DEA registration?

14  **A**     If they're going to dispense controlled substances,

15  yes.

16  **Q**     Can DEA suspend or revoke a pharmacy's registration

17  for improper dispensing?

18  **A**     Yes.

19  **Q**     Can the United States bring civil and criminal actions

20  against a pharmacy for improper dispensing?

21  **A**     Yes.

22  **Q**     Does DEA suspend and revoke licenses of pharmacies for

23  improper dispensing?

24  **A**     Yes.

25  **Q**     Does the United States bring civil and criminal

1   actions against pharmacies for improper dispensing?

2   **A**    Yes.

3   **Q**    Does DEA have at its disposal data to assist in

4   identifying pharmacies that may be engaged in improper

5   dispensing?

6   **A**    Yes.

7   **Q**    What's that data called?

8   **A**    ARCOS.

9   **Q**    And you've already provided some testimony about

10  ARCOS, correct?

11  **A**    Correct.

12  **Q**    What information about a pharmacy does the ARCOS data

13  show?

14  **A**    It will show the pharmacy location that's ordering, it

15  will show what product they're ordering, the quantity of the

16  product they're ordering, and the date that it was ordered.

17  **Q**    Does the ARCOS data show every Schedule II

18  prescription opioid that a pharmacy handles?

19  **A**    Yes.

20  **Q**    And it shows it by particular drug code and drug

21  class; is that correct?

22  **A**    Yes.

23  **Q**    Does it show it by date the pharmacy received the

24  drug?

25  **A**    Yes.

**Hill - (Direct by Delinsky)**

1    **Q**    Does it show the quantity of the drug that the

2    pharmacy is handling?

3    **A**    Yes.

4    **Q**    Does DEA analyze this data, based on your experience?

5    **A**    Yes.

6    **Q**    Based on your experience, did DEA use this data to

7    identify pharmacies for review?

8    **A**    Yes.

9    **Q**    Is this the unit that you oversaw when you were

10   section chief for the Pharmaceutical Investigation section?

11   **A**    Yes.  At the time it was called the Targeting and

12   Analysis ARCOS Output Unit.

13   **Q**    Okay.  And lastly, can DEA go to pharmacies and

14   inspect them in person?

15   **A**    Yes.

16   **Q**    And does DEA do that when it sees reason to?

17   **A**    Yes.

18   **Q**    Do state boards of pharmacy oversee the practice of

19   pharmacy in their respective states?

20   **A**    Yes.

21   **Q**    Does this include the Ohio Board of Pharmacy?

22   **A**    Yes.

23   **Q**    Must a pharmacy be licensed by the State Board of

24   Pharmacy to dispense controlled substances?

25   **A**    Yes.

**Hill - (Direct by Delinsky)** 6443

1  **Q**    Can a State Board of Pharmacy, like DEA, suspend or

2  revoke a pharmacy's license?

3  **A**    Yes.

4  **Q**    Does that happen?

5  **A**    Yes.

6  **Q**    Does the Ohio Board of Pharmacy have data at its

7  disposal on every controlled substance prescription that a

8  pharmacy in Ohio fills?

9  **A**    Yes.

10  **Q**    What's that data called?

11  **A**    It's called the Ohio Automated Rx Reporting System,

12  abbreviation OARRS.

13  **Q**    Can state boards of pharmacy use this data to identify

14  pharmacies for review and possible investigation?

15  **A**    Yes.

16  **Q**    Can state boards of pharmacy inspect pharmacies?

17  **A**    Yes.

18  **Q**    Do they inspect pharmacies?

19  **A**    Yes.

20  **Q**    Does the Ohio Board of Pharmacy inspect pharmacies?

21  **A**    Yes.

22  **Q**    And is that another investigative tool at the disposal

23  of the Ohio Board of Pharmacy?

24  **A**    Yes.

25  **Q**    Okay.

1              MR. DELINSKY:  Mr. Hill, thank you very much.

2        I pass the witness.

3              THE COURT:  Okay.  Any questions from

4    Walgreens or Walmart?

5              MR. STOFFELMAYR:  No, Your Honor.

6              MS. FUMERTON:  No, Your Honor.

7              THE COURT:  Thank you.

8        Then, Mr. Lanier, you're up.

9              MR. LANIER:  All right.  Thank you, Judge.

10                         - - - - -

11                    CROSS-EXAMINATION

12   BY MR. LANIER:

13   **Q**    Mr. Hill?

14   **A**    Yes, sir.

15   **Q**    I did not get a chance to meet you outside.  My name

16   is Mark Lanier.  I'm going to be cross-examining you on

17   behalf of the folks of Lake and Trumbull Counties this

18   afternoon.  Okay?

19   **A**    Okay.  Nice to meet you, sir.

20   **Q**    It's a pleasure to meet you.  And I'm remiss if I

21   don't say thank you for your service to the country, both

22   here and abroad, for the time you were working for the DEA.

23   I appreciate it.

24   **A**    Thank you so much.

25   **Q**    I've had a chance to check on you through Joe

**Hill - (Cross by Lanier)**

1    Rannazzisi.  He says you're a good man.

2    **A**    Joe is a good man too.

3    **Q**    I've got a road map for you because there are three

4    areas I want to talk to you about, and here they are.

5        First of all, I did pretty good on your picture,

6    didn't I?

7    **A**    Yeah, you did.

8    **Q**    I'm going to tell you, I've been sitting up there

9    pretty close, that shirt/tie thing you've got going looks

10   pretty good, at least to a boy from Texas like me, all

11   right?

12   **A**    Thank you, sir.

13   **Q**    The jury gets tired of seeing me.  I've got like two

14   ties that I rotate, and I think that's about it.  But you're

15   looking good.

16   **A**    Thank you, sir.

17   **Q**    All right.  We're going to talk about your time with

18   the DEA.  We're going to talk about your time at Amneal.

19       Am I saying that right?

20   **A**    Yes, sir.

21   **Q**    Amneal Pharmaceuticals.  And then we're going to talk

22   about your opioid consulting.

23       Okay?

24   **A**    Yes, sir.

25   **Q**    All right.  Let's start, first stop, DEA.

1          Now, at the DEA you gave some speeches, right?

2    **A**    That's correct, yes.

3    **Q**    I think I've got as Plaintiffs' Demonstrative 128 --

4    are you able to play it?  I think I've got about a

5    two-minute cut of one of your speeches, if His Honor will

6    let me play it.  It will make you famous here in court.

7          (Video still photo displayed.)

8          And you were looking good too there, man.  You've got

9    a good suit going.

10              MR. LANIER:  Mr. Pitts, thank you, sir.

11         Time out.

12   **Q**    Do you remember giving this speech?

13   **A**    Yes.  I believe that would have been at the Ravenwood

14   Medical Center in Chardon, Ohio.

15   **Q**    Okay.  And to set this up, I think you're at kind of a

16   Q&A point, or maybe it was just as you were doing the

17   speech, people would interrupt you with questions.  This is

18   about an hour into the evening, and so I want to ask you a

19   couple of questions about this, but first give the jury an

20   idea of what you did.

21         (Video played.)

22   BY MR. LANIER:

23   **Q**    Now, you gave that speech and you meant what you said,

24   right?

25   **A**    Yes.

1   **Q**     And you mean what you say when you say people

2   shouldn't be on opioids longer than six months; that means

3   you're an addict, right?

4   **A**     It means that they shouldn't be on it for long-term.

5   If you notice, I also talked about it where I said six

6   months and then I also talked about it being very long-term,

7   yes.

8   **Q**     Yeah.  And by the same token, you talked about how at

9   the DEA y'all would joke about it being a cocktail.  That's

10  where you got more than one opiate and another drug working

11  in tandem, right?

12  **A**     Well, yes, but what that was -- what I was talking

13  about there is when you're talking about people that are

14  abusing it with that.

15  **Q**     Well, you were talking about, I think, somebody who

16  said, I got a hurt back, I want an OxyContin; that's a good

17  thing.  And if I really want a great thing, give me a

18  cocktail, or something like that.

19  **A**     Yes, the abuse of it.  Yes.

20  **Q**     Now, in addition to those kinds of speeches you gave,

21  you also did work with Joe Rannazzisi, correct?

22  **A**     Correct.

23  **Q**     And that's the Joe Rannazzisi that was in here.  He

24  worked I think while you were with him, he was working

25  ultimately in the Office of Diversion Control and was

**Hill - (Cross by Lanier)**

1    running it, right?

2    **A**    That's correct.

3    **Q**    Now, you know in addition to those other things, he is

4    also a pharmacist, right?

5    **A**    Yes.

6    **Q**    And I think also a lawyer, correct?

7    **A**    Correct.

8    **Q**    And found you to be a great fellow to work with, and

9    you did a lot of good with him, didn't you?

10   **A**    I hope that's the way America looked at it.

11   **Q**    I think it did.  I certainly did, based on everything.

12        Look, I cleaned it hard to look for things that I

13   could stand up and say, hey, you messed up, all right?  And

14   you did a good job, and I want to thank you for that.

15   **A**    Thank you.

16   **Q**    That's sincere.

17        I want to ask you if you agree with some of the things

18   that Joe Rannazzisi said in this case.

19        Let me do it this way.  Let me just walk through some

20   of your testimony first, and we'll maybe come back to Joe

21   Rannazzisi.

22        You were the Pharmaceutical Investigation section

23   chief, correct?

24   **A**    Correct.

25   **Q**    All right.  And in that regard, you were there doing

**Hill - (Cross by Lanier)**

1    that work for about four years?

2    **A**    Well, no, not actually four years.  It would have been

3    from January of 2009 till June 30 of 2012.

4    **Q**    Okay.  I rounded up.  Three years or so.

5    **A**    Yeah.  I rounded down.  Three and a half.

6    **Q**    All right.  We'll meet in the middle.  Four years.

7    No.

8         But your testimony is that the epidemic in your mind

9    started in 2011, and you premised that on a statement that

10   was made by a Government agency.  Fair?

11   **A**    Well, I would say that's not fair of actually what I

12   said.  What I said was in 2011, that's when the Government

13   labeled it as an epidemic.

14   **Q**    Okay.  Good.  Because the epidemic started before

15   that, didn't it?

16   **A**    Well, here's what I would say.  Prior to the term

17   "epidemic" being used, a lot of times the only term being

18   used was "misuse" and "abuse" a lot.

19   **Q**    Or did you hear the word "crisis" being used?

20   **A**    Yeah, I think that was inadvertently used, like

21   interchangeably, yes.

22   **Q**    Were you aware of the Congressional hearings about the

23   opioid crisis back in 2002 and 2003?

24   **A**    I'm vaguely aware of it, but I don't recall everything

25   that was said.

**Hill - (Cross by Lanier)**

1   **Q**    Are you familiar with how the literature has talked

2   about the phases of the epidemic?

3   **A**    In 2002 and '3?

4   **Q**    No, at this point in time looking back, how they talk

5   about the different phases of the epidemic.

6   **A**    Yes, if you talk -- yes.

7   **Q**    And so we can see in scientific literature or the jury

8   has heard through testimony about different phases that go

9   back to the early 2000s.  You're not fussing that we've had

10  a problem that long, are you?

11  **A**    Oh, no, I'm not fussing that at all.

12  **Q**    Okay.  Good.

13       Now, in that regard, as we stay with your time with

14  the DEA, you testified about 2011 also being the first time

15  period of red flags.

16       Remember that?

17  **A**    Yes.  Well, the term actually "red flag," yes.

18  **Q**    Did you know that the term was actually used before

19  that?

20  **A**    The term may have been used before that, but I'm

21  talking about when we officially set up a program and that

22  we were doing the training with the PDACs.

23  **Q**    Okay, good.  So you know about the *East Main* case that

24  was decided, *East Main* out of Ohio, I believe, that was

25  decided back in -- written up in 2010 at least.  Right?

**Hill - (Cross by Lanier)**

1    **A**    I'm not sure what year, but if you have a copy for me

2    to look at it, but I do know there was an *East Main* case,

3    yes.

4    **Q**    All right.  Either my daughter, Rachel, or our friend

5    Ms. Fleming will bring that to you.

6                   MR. LANIER:  Thank you, Maria.

7    **Q**    Do you have that in front of you, sir?

8    **A**    Yes, sir.

9    **Q**    And this is a publication out of the DOJ, Department

10   of Justice, Drug Enforcement Administration, Diversion

11   Control Division.

12          You're very familiar with these, aren't you?

13   **A**    Yes.

14   **Q**    And you'll see here that this is a Registrant Action

15   that went into the Federal Register October 27 of 2010.

16          Do you see that?

17   **A**    Yes, sir.

18   **Q**    And you'll see that it talks about on April 23, 2009,

19   there was an order to show cause to this pharmacy in

20   Columbus, Ohio.

21          Do you see where I'm looking?

22   **A**    Yes.

23   **Q**    And it says, the show cause order alleged that the

24   respondent, owned by a fellow named Fletcher, from September

25   2005 through February 2006 filled 6,619 controlled substance

1    prescriptions, including 4900 issued by a Dr. Paul Volkman.

2         Do you see that?

3  **A**    Yes.

4  **Q**    And then it talks about how February 10 of 2006 the

5    DEA immediately suspended Volkman's registration.

6         You see that as well?

7  **A**    Yes.

8  **Q**    Now, if we continue to look at this, it will talk

9    about how the folks directed his payments -- directed his

10   patients to have his prescriptions filled at respondent, who

11   filled them mostly in exchange for cash.

12        See that as a concern?

13 **A**    Yes.

14 **Q**    And you see it says, 98 percent of his patients filled

15   didn't reside in the Columbus area.

16        You see that as well, right?

17 **A**    Yes.

18 **Q**    And now, in the process of this, if you'll look,

19   you'll see on page 2, down in the footnotes, "Respondents'

20   experience in dispensing controlled substances-the ALJ found

21   respondent ignored numerous red flags when dispensing"

22   these.

23        Do you see that, sir?

24 **A**    Yes.

25 **Q**    And among these listed is driving long distances,

 1   receiving large volumes in the highest strength, not

 2   receiving individualized therapy; same for your cocktail;

 3   paying large amounts of cash, and getting multiple narcotic

 4   painkillers.

 5        Do you see that, sir?

 6   **A**   Yes.

 7   **Q**   So isn't it safe to say, as the ALJ concluded, the

 8   respondent closed a blind eye to these obvious red flags?

 9   Isn't it fair to say that the DOJ was calling in the DEA,

10   y'all were calling these red flags before 2011 certainly,

11   right?

12   **A**   They were being called red flags, but what I said

13   occurred in 2011 was when we set up a formal program and

14   structure of training to make the pharmacists aware of what

15   the red flags were.

16   **Q**   Well, but y'all had programs and training even before

17   that while you were in Belize.  Did you know about those?

18   **A**   Yes.  There were trainings that occurred, yes.

19   **Q**   And whether we call them red flags or whether we call

20   them issues, there were certainly presentations being done

21   back in 2009, for example, that dealt with these issues,

22   correct?

23   **A**   Yes.

24   **Q**   Now, 2009 was when you were serving the country in

25   Belize; is that right?

**Hill - (Cross by Lanier)**

1    **A**    That's incorrect in 2009.

2    **Q**    2009, where were you?

3    **A**    In 2009 I was the section chief of the Pharmaceutical

4    Investigation section.

5    **Q**    Ah.  Okay.  Well, then you would have known about

6    these pharmaceutical industry conferences like the one that

7    you see now in front of you that took place in Portland,

8    Oregon, October of 2009.  Correct?

9    **A**    Yes.

10   **Q**    And you would have known that the trends being

11   identified in pharmaceutical diversion at the time included

12   doctor shopping, right?

13   **A**    Yes.

14   **Q**    Prescription fraud, correct?

15   **A**    Correct.

16   **Q**    Internet pharmacies, correct?

17   **A**    Correct.

18   **Q**    Florida pain clinics were already an item of interest

19   being talked about, true?

20   **A**    True.

21   **Q**    And in that, it talked about people paying primarily

22   cash, either for their doctor's visits or for their drugs,

23   right?

24   **A**    Correct.

25   **Q**    It talked about out-of-state patients coming from

**Hill - (Cross by Lanier)**

1  Maryland, Virginia, Kentucky, Tennessee, and Ohio, for 30 to

2  $40 a pill, correct?

3  **A**    Correct.

4  **Q**    And y'all told them indicators or probable cause

5  factors of these problems, didn't you?

6  **A**    Yes.

7  **Q**    You talked about people using street slang, or large

8  numbers of young patients with chronic pains, remember?

9  **A**    Yes.

10  **Q**    Talked about prescription intervals inconsistent with

11  legitimate treatment, right?

12  **A**    Yes.

13  **Q**    And I could go on, but can we at least say that y'all

14  were training pharmacies about these things back in 2009 at

15  least, fair?

16  **A**    Yes, we were training registrants.  But what I said

17  about the PDACs is when it was a formal training that was

18  specifically for the pharmacies.

19  **Q**    Well, sir, wasn't the one that we were just looking at

20  one that was specifically a pharmaceutical industry

21  conference just for the pharmacies?

22  **A**    Well, no.  If I'm not mistaken, that conference had

23  registrants from all, you know, business models.  It wasn't

24  just geared towards pharmacy registrants.

25  **Q**    Okay.  I pulled it -- my team pulled it off the

1    Internet on the DEA Meetings and Industry Events under the

2    flag of the Pharmaceutical Industry Conferences where they

3    have the PDACs.

4         Do you see that, sir?

5    **A**    I see that, but this is not -- this is not a PDAC.

6    **Q**    It may be misplaced or misfiled by the DEA?

7    **A**    A PDAC would say in the title Pharmacy Diversion

8    Awareness Conference.

9    **Q**    Okay.  At least we can agree that there were other

10   official efforts to educate on red flags, because the whole

11   reason cases like *East Main* get published is so people will

12   know what their obligations are, right?

13   **A**    Well, there was education that was done, and it was

14   making the registrants aware of the issues and concerns, but

15   the term "red flag" was not used a lot at DEA.  It was just

16   like the presentation you saw where it said "issues and

17   concerns."

18   **Q**    Well, you dealt with a number of investigations.  Did

19   you do any of the investigations of CVS?  The jury's heard

20   about their settlements, the *Holiday* case, they've heard

21   about Maryland, they've heard about Rhode Island, they've

22   heard about Texas.

23            MR. DELINSKY:  Objection, Your Honor.  That

24   goes straight to the *Touhy* regulation.

25            MR. LANIER:  Not yet, Judge.

1              THE COURT:  Overruled.

2    **Q**    I can ask, did you do any work on those, without

3    asking what you did.

4           Did you do any work on those, sir?

5    **A**    Yes.

6    **Q**    Okay.  All right.  Let's move down the road.  We're

7    going to come back to some DEA opinions you've got, but

8    we'll do that under your consulting, because you're not

9    offering your opinions here today on behalf of the DEA.

10   Fair?

11   **A**    Fair.

12   **Q**    All right.  Amneal Pharmaceuticals.  I don't have a

13   lot there, but I do want to ask you a couple of things about

14   it.

15          While you were at Amneal Pharmaceuticals, you were in

16   charge of trying to help them comply with the law on

17   controlled substances.  True?

18   **A**    Yes.

19   **Q**    And then you left.  What year did you leave?

20   **A**    July 18, 2018.

21   **Q**    And then it was the next year when Amneal got served

22   with their subpoena from the Federal Government for their

23   actions; is that right?

24   **A**    I don't know when they were served.

25   **Q**    You do know that a criminal investigation was launched

1    on them --

2                    MR. DELINSKY:  Objection, Your Honor.

3                    THE COURT:  Overruled.

4    **Q**    -- concerning their marketing, sale, and distribution

5    of controlled substances, right?  At least oxymorphone?

6    **A**    When I was at Amneal, Amneal was not manufacturing

7    oxymorphone.

8    **Q**    Okay.  But they were doing other opiate drugs, right?

9    **A**    Yes.

10   **Q**    And then ultimately they did get investigated, but

11   that -- I don't think it started until after you left.  Am I

12   correct, or did y'all know about it before you left?

13   **A**    When I left Amneal, Amneal was not marketing

14   oxymorphone, so anything dealing with oxymorphone would have

15   occurred after I was gone.

16   **Q**    But did you know about the Government's investigation

17   while you were there, or did they only find out about that

18   afterwards?

19   **A**    I was not aware of any investigation dealing with

20   oxymorphone, because when I was at Amneal, they didn't

21   market oxymorphone.

22   **Q**    All right.  Were you aware of any other Government

23   investigation going on to Amneal while you were there?

24   **A**    There was an investigation that I believe was

25   unfounded, where that came from a result of an inspection.

**Hill - (Cross by Lanier)**                        6459

1   **Q**     All right.  Let's move on from Amneal Pharmaceuticals

2   and let's talk about your opioid consulting for just a bit,

3   okay?

4   **A**     Yes, sir.

5   **Q**     First of all, you got hired as an expert in this case,

6   true?

7   **A**     True.

8   **Q**     And, by the way, by my math, WIT, W-I-T, whoever they

9   are -- I guess that stands for "witness" or something, I

10  don't know, "witness service"?

11  **A**     I just know them as WIT Legal.

12  **Q**     Well, WIT Legal is ripping you off if they're getting

13  275 bucks an hour of your money.  Did you know -- we can

14  talk about that later.  But I'm just telling you, they're

15  billing 700 bucks an hour for you, and you get what?

16  **A**     Well, first of all, I need to disagree with you with

17  that comment, because I believe since I was the one that

18  signed an agreement, obviously I feel whatever they're

19  taking for what they're doing, I didn't have a problem with

20  it.  So for you to say that they're ripping me off, I kind

21  of take issue with that, because I'm the one that's doing

22  the work and I don't have a problem with it.

23  **Q**     That's fair, and I don't mean it in an offensive way

24  at all.  I meant it in a defensive way.  I'm telling you

25  that I'm trying to understand, they do no work in this case,

**Hill - (Cross by Lanier)**

1    and they've made 200 and some-odd-thousand dollars off of

2    the work you've done?  Is that right?

3    **A**    That's it approximately, yes.

4    **Q**    I know that there's one other matter you work on, at

5    least as of the time of your deposition.  Is that also

6    through them or is that an independent matter?

7    **A**    Well, what do you -- what do you mean, like as far as

8    the opioid litigation or --

9    **Q**    No, no, no.  Other than opioids, wasn't there another

10   case in your deposition you told us you'd done a little bit

11   of work on?

12   **A**    Yes.  I did some behind the scenes consulting.

13   **Q**    Yeah.  Was that independent or was that through them

14   also?

15   **A**    That was independent.

16   **Q**    Fair enough.

17          All right.  Now, I want to talk to you about your

18   consulting opinions in this case.  But you were shown by

19   Mr. Delinsky Plaintiffs' Exhibit 23011, which is called a

20   *Touhy* letter.  Correct?

21   **A**    Yes.  Let me pull it back out too.

22   **Q**    I've got an extra copy if you need it.

23   **A**    No, I should have it here, sir.

24   **Q**    Okay.

25   **A**    Yes, I have it here in front of me, sir.

**Hill - (Cross by Lanier)**                                      6461

1    **Q**    Now, you wrote a report in this lawsuit, true?

2    **A**    True.

3    **Q**    And you served that report, or the counsel did, to us

4    in this lawsuit, true?

5    **A**    Well, I don't know how it was served, but I know it

6    was filed, yes.

7    **Q**    And you gave a deposition in this case as well,

8    correct?

9    **A**    Correct.

10   **Q**    Now, you understand you're supposed to get DEA

11   permission before you serve a report, correct?

12                  MR. DELINSKY:  Objection, Your Honor.

13                  THE COURT:  Overruled.

14   **A**    The counsel did notify the Department of Justice, yes.

15   **Q**    My question was, you understand before you issue a

16   report, you're supposed to get DEA permission or DOJ, right?

17                  MR. DELINSKY:  Your Honor, headset, please?

18                  (At side bar at 4:38 p.m.)

19                  MR. DELINSKY:  Your Honor, there's law that

20   says former employees of the Federal Government do not seek

21   *Touhy* permission.  We nevertheless as a practice in this

22   case have been providing notice, but we explicitly disclaim

23   when we do so that we don't think we have to.  But this is

24   an intricate legal issue.  I believe there may be a Circuit

25   slip on this.

```
 1              THE COURT:  It's a fair question.  He can say,

 2   I don't think I need to.  Mr. Lanier can ask the question

 3   and the witness can answer it.

 4              MR. DELINSKY:  I think he should lay the

 5   foundation to ask him first if he knows what the legal

 6   requirements and legal rules are.

 7              THE COURT:  All right, Mr. Lanier, you can ask

 8   him, do you know if you -- were you required to get, you

 9   know, approval, and if he can say I was or I wasn't.  I

10   mean, that's a fair question to ask.

11              MR. LANIER:  Okay.  Thank you.

12              (In open court at 4:39 p.m.)

13   BY MR. LANIER:

14   Q     All right.  So when you go about doing this, was it

15   your understanding that you're supposed to get Government

16   Touhy authorization before you issue a report?

17   A     The one thing I'm not sure what you're saying when you

18   said "doing this," what were you referring to?

19   Q     Issuing an expert report in a case like this on these

20   issues that touch what the kind of work you did.

21   A     Okay.  Just wanted to make sure.

22   Q     No, no, no, no, no.  And that's the right thing.  You

23   asked me if I'm unclear, I'll pester you if I think you're

24   unclear.

25   A     Okay.
```

**Hill - (Cross by Lanier)**

1    **Q**    That's a two-way street, all right?

2    **A**    Yes.

3    **Q**    So my question is, before you issued a report, was it

4    your understanding that you needed to in essence get

5    Government *Touhy* authorization?

6    **A**    My understanding was as long as the Department of

7    Justice is notified that a report is going to be done, that

8    was notification.

9    **Q**    If you'll look at this *Touhy* letter at the second

10   paragraph -- and by the way, this is from the Department of

11   Justice, the Northern District of Ohio.  I guess this

12   courthouse.

13          Do you see where it says, "The Department of Justice

14   and the DEA received your e-mail and letter containing the

15   expert report of Robert L. Hill, a former DEA employee, and

16   reviewed that report."

17          Do you see that?

18   **A**    Yes.

19   **Q**    And this was sent to the law firm where Mr. Delinsky

20   works, true?

21   **A**    Yes.

22   **Q**    Then the Department of Justice goes on to say, "We

23   understand Mr. Hill's report was served before it was

24   provided to the DEA, and so this office and the DEA did not

25   have an opportunity to determine whether the information

**Hill - (Cross by Lanier)** 6464

1   contained in the report could be shared pursuant to," what's

2   known as the "*Touhy* regulations."  Right?

3   **A**   Yes.

4   **Q**   "Accordingly, Mr. Hill has not received authorization

5   under" that "for this report or any future testimony."

6   Do you see that?

7   **A**   Yes.

8   **Q**   Now, have you in fact been given clearance from the

9   Department of Justice since receiving this letter two months

10  ago, three months ago now, have you received permission or

11  authorization for your testimony?

12  **A**   I know that the law firm has reached out to regarding

13  my testimony today, yes.

14  **Q**   Yes, you think you got permission?

15  **A**   I know that the law firm had been contacted by the

16  Department of Justice regarding my testimony today.

17  **Q**   All right.  So if the representation has been made by

18  counsel on the record that there's not been any

19  authorization granted yet, is that contrary to what you've

20  been told?

21  **A**   The information that I was provided was that when I

22  testify today, someone would be here from the U.S.

23  Attorney's Office in the audience.

24  **Q**   So you were not told that not only is someone not here

25  from the Department of Justice, they said they would not be

**Hill - (Cross by Lanier)** 6465

1    here, and they never gave you an okay to testify.  None of

2    that was conveyed to you before you testified?

3                    MR. DELINSKY:  Objection, Your Honor.

4                    THE COURT:  Overruled.

5    **A**    No.

6    **Q**    The letter continues, "Nevertheless, this office, on

7    behalf of the DEA, affirmatively states that the DEA does

8    not endorse any of the opinions contained in the report

9    prepared by Mr. Hill, and that the opinions expressed by

10   Mr. Hill do not reflect the opinions of the Department or

11   the DEA."

12       Did I read that correctly?

13   **A**    Yes, sir.

14   **Q**    It says, "Further, the DEA does not attest to the

15   accuracy of the facts, data, or opinions in Mr. Hill's

16   report or future testimony."

17       Did I read that correctly?

18   **A**    Yes.

19   **Q**    And then there's a list of things that you are not

20   authorized to provide, and that list is an A, B, C on page

21   1, and it continues through page 2 down to letter M.

22       Do you see that, sir?

23   **A**    Yes, sir.

24   **Q**    And I think that counsel was relatively careful about

25   asking you questions that would keep you outside of

1    violating those notes, and I'm going to try and do the same,

2    but I still need to ask you about some of your testimony you

3    have offered here today.  Okay?

4    **A**    Okay.

5    **Q**    Now, you testified about corresponding responsibility

6    to this jury.  Remember that?

7    **A**    Yes.

8    **Q**    And you said, if I got it right, for there to be a

9    violation of corresponding responsibility, the prescription

10   must be illegitimate to begin with.

11        Do you remember that?

12   **A**    Yes.

13   **Q**    Now, that is not the position of the DEA, true?

14   **A**    Well, I can tell you based on my 25 years at DEA, when

15   I was at DEA you had to have an illegitimate prescription

16   for there to be a violation of the corresponding

17   responsibility.

18   **Q**    But an illegitimate prescription the way you and

19   Mr. Delinsky were talking about it is a little bit different

20   than what the DEA has said on this position, isn't it?

21   **A**    Can you tell me exactly where you're looking?

22   **Q**    Yes, sir.  I've given you Plaintiffs' Exhibit 42147.

23   It's the *Holiday* case against CVS.  Issued an order on June

24   8, 2012.

25        Do you see that?

**Hill - (Cross by Lanier)**

1    **A**    Yes.

2    **Q**    You know this, don't you?

3    **A**    I know the date, yes.

4    **Q**    Well, I mean you know this case, don't you?

5    **A**    I'm familiar with the case.

6    **Q**    This was a big deal, wasn't it?

7    **A**    I'm familiar with the case, yes.

8    **Q**    If you will turn to the page that in the top

9    right-hand corner says 62341, I'd like to walk through a few

10   things that are in this case and see if they are consistent

11   or inconsistent with what you claim the DEA position to be.

12   All right?

13   **A**    Yes.  I'm turning to the page.

14   **Q**    All right.  Tell me when you get there, and I'll try

15   and direct you where I am on the page.

16   **A**    Sir, I'm here.

17   **Q**    All right.  It's got three columns, right?

18   **A**    Yes.

19   **Q**    I'm going to go to the bottom left of the first

20   column, down toward the bottom at the start of that

21   paragraph.  I'll zoom it in, okay?

22   **A**    Yes.

23   **Q**    This says the "DEA has interpreted the legitimate

24   medical purpose feature of the corresponding responsibility

25   duty."

**Hill - (Cross by Lanier)**

1          Do you see where I'm reading?

2     **A**    Yes.

3     **Q**    And the DEA has interpreted it "as prohibiting a

4     pharmacist from filling a prescription for a controlled

5     substance when he or she either knows or has reason to know

6     that the prescription was not written for a legitimate

7     medical purpose."

8          Do you see that?

9     **A**    Yes.

10    **Q**    Do you agree that that was the DEA position?

11    **A**    Well, yes, because they're saying it has to be an

12    illegitimate prescription, not for a legitimate medical

13    purpose.

14    **Q**    And we'll get to what that means in just a moment.

15         "When prescriptions are clearly not issued for a

16    legitimate medical purpose, a pharmacist may not

17    intentionally close her or his eyes and thereby avoid actual

18    knowledge of the real purpose of the prescription."

19         Do you see that, sir?

20    **A**    Yes, I do.

21    **Q**    And you agree with that as well, don't you?

22    **A**    I agree with that, but that's not everything that it

23    covered in this ruling.

24    **Q**    I know.  We're going to get to more.

25         Look at the next.  It says, "Accordingly, a pharmacist

**Hill - (Cross by Lanier)**

1  or pharmacy may not dispense a prescription in the face of a

2  red flag."

3      Do you see where I'm reading?

4  **A**  Yes.

5  **Q**  And then it defines red flag.  It says it's a

6  "circumstance that does or should raise a reasonable

7  suspicion as to the validity of a prescription."

8      You see where I'm reading?

9  **A**  Yes.

10 **Q**  And so with that definition of red flag, it says,

11 "accordingly, a pharmacist or pharmacy may not dispense a

12 prescription in the face of a red flag unless she or he or

13 it," because it is the pharmacy itself, right, not the

14 pharmacist, right?

15 **A**  It could potentially be "it" could be the pharmacy,

16 yes.

17 **Q**  Well, yeah, this started out "a pharmacist or a

18 pharmacy."

19 **A**  Yes.

20 **Q**  So "unless he or it takes steps to resolve the red

21 flag and ensure that the prescription is valid."

22      Do you see that?

23 **A**  Yes.

24 **Q**  So corresponding responsibility means, don't

25 dispense -- you may not dispense a prescription in the face

**Hill - (Cross by Lanier)**

1    of a red flag, something that raises a reasonable suspicion,

2    until you've taken the steps to resolve it and ensure that

3    the prescription is valid.  True?

4    **A**    That's what it says, yes.

5    **Q**    And it goes on to say, "It follows that to show a

6    violation of the corresponding responsibility, the

7    Government must establish, one, the respondent dispensed a

8    controlled substance."

9        Do you agree?

10   **A**    Yes.

11   **Q**    "Two, a red flag was or should have been recognized at

12   or before the time the controlled substance was dispensed."

13       True?

14   **A**    True.

15   **Q**    "And, three, the question created by the red flag was

16   not resolved conclusively prior to the dispensing of the

17   controlled substance."

18       Do you see that?

19   **A**    Yes.

20   **Q**    So violating corresponding responsibility, according

21   to the DEA, is a three-step process, fair?

22               MR. DELINSKY:  Objection, Your Honor.  This is

23   an ALJ ruling, not the DEA.

24               THE COURT:  Overruled.  You can ask the

25   question.

**Hill - (Cross by Lanier)**

1    **A**    Fair.

2    **Q**    And then it references the *Sun & Lake Pharmacy* case,

3    where it says that it was found there that the "pharmacy

4    violated the corresponding responsibility where it took no

5    steps to resolve red flags prior to dispensing controlled

6    substances."

7          Do you see that, sir?

8    **A**    Yes.

9    **Q**    And so the idea that a red flag doesn't have -- that

10   corresponding responsibility is only limited to whether or

11   not the prescription's valid, you've got corresponding

12   responsibility issues simply from how you handle red flags,

13   true?

14   **A**    You can have corresponding responsibility issues if

15   you don't have -- address the red flags.

16   **Q**    Okay.  And this is -- the red flags in this case, do

17   you recall what they were?

18   **A**    In the Sanford case?

19   **Q**    Yes, sir.  If you'll look at 62318.  I wasn't trying

20   to do a memory quiz on you.

21   **A**    Yes, okay.

22   **Q**    That's not fair for any of us, especially --

23               MR. DELINSKY:  Objection, Your Honor.

24   **Q**    -- as we get older.

25               THE COURT:  All right.

**Hill - (Cross by Lanier)**

```
 1    Q      I've got to look at it, is what I'm telling you.

 2           The "Professor Doering, who was an expert witness,

 3    identified such red flags as the patient paying for

 4    controlled substance prescriptions with cash."

 5           Do you see that?

 6    A      Yes.

 7    Q      "A prescriber writes for certain combinations or

 8    patterns of drugs."

 9           You see that?

10    A      Yes.

11    Q      "Multiple patients presenting prescriptions for the

12    same drugs in the same quantities."

13           You see that as well?

14    A      Yes.

15    Q      And there are more and more that the jury's heard

16    about throughout the process of this.  But can we suffice it

17    to say that the instructions of the DEA are that if you

18    identify -- first you have an obligation to identify red

19    flags, true?

20    A      I would say "obligation" is maybe a word that I

21    wouldn't use, but if red flags are present, you have to

22    address them.

23    Q      Well, let's look on page 21 to see what the

24    administrative law judge said about the statements of

25    respondent's employees.
```

**Hill - (Cross by Lanier)**

1        "That they manifested a complete abdication of their

2    responsibility to exercise professional judgment before

3    dispensing prescriptions for highly abused controlled

4    substances."

5        Do you see that?

6    **A**    Yes.

7    **Q**    And it talked about them "dispensing numerous

8    prescriptions when their pharmacists either knew or had

9    reason to know the prescriptions lacked a legitimate medical

10   purpose."

11       Do you see that as well?

12   **A**    Yes.

13   **Q**    And, by the way, this is why it's the obligation of

14   the company to give the right tools to their pharmacists to

15   be able to do this on a day-to-day basis.  True?

16   **A**    I would -- when you say it's an obligation, I look at

17   it more based on my experience that corresponding

18   responsibility is invoked and the judgment is based on the

19   pharmacist that is sitting there at the counter.

20       So when you say it's an obligation for the companies

21   to give them the tools, they can have tools, but you have to

22   use your professional judgment and look at the totality of

23   the circumstances of that prescription to invoke your

24   corresponding responsibility.

25   **Q**    I agree, you've got both.  You've got to have tools

**Hill - (Cross by Lanier)**

1    and you've got to have a pharmacist who's willing to use

2    them, right?

3    **A**    Yes.

4    **Q**    All right.  And the responsibility for tools I was

5    taking from the CVS comments on page 62323, where the

6    official for CVS testified that "CVS takes its

7    responsibility seriously."

8         And in that regard they said, "We understand it's our

9    responsibility to provide our stores the tools and

10   information that they need to do their jobs on a day-to-day

11   basis and in compliance with state, federal, and local

12   legislation and requirements."

13        They're talking about some actions they've taken that

14   they think help them do that.

15        Do you see that?

16   **A**    Yes.

17   **Q**    And so in that regard, would you agree with me you not

18   only have to have a pharmacist who's doing their

19   responsibility, but if they're working for a chain pharmacy

20   or another -- an individual pharmacy, they're supposed to be

21   provided the tools to do the work, right?

22   **A**    Well, having tools would be helpful, yes.

23   **Q**    I mean, for example, you need a computer if you're

24   going to run an OARRS check, right?

25   **A**    That would be helpful, but in today's day and age,

1    people also have, you know, a computer in their hand.  So,

2    but, yes, having a computer would be helpful.

3    **Q**    Right.  And you're aware, maybe you're not aware, are

4    you aware that there's at least for a good period of time

5    where the defendants would not allow their --

6                 MR. DELINSKY:  Objection, Your Honor.

7    Objection.

8                 THE COURT:  Yeah, sustained.

9    **Q**    Are you aware of any policies by any of the defendants

10   that their pharmacists were not allowed to use their

11   personal devices at work?

12                MR. DELINSKY:  Objection to the use of the

13   word "defendants," Your Honor.

14   **Q**    By any of the defendants, any of the three?

15                THE COURT:  Overruled.

16   **A**    I am not familiar with or recall seeing any policies

17   like that.

18   **Q**    Fair enough.

19        All right.  Let's talk about the number of good

20   doctors.  Most doctors are trying to do the right thing and

21   they're really good, right?

22   **A**    Yes.

23   **Q**    And I don't know if you go 99 percent, 99.5 percent,

24   99.9 percent.  I'll say almost every one.  But that doesn't

25   change the fact, and you and I both know, that there are

**Hill - (Cross by Lanier)**

1    some doctors out there who are rascals, true?

2    **A**    I would say there are doctors out there that are not

3    doing what they're supposed to do as doctors.

4    **Q**    And that's one reason it's so important that the

5    pharmacists do their job appropriately, fair?

6    **A**    Well, there's several reasons why the pharmacists

7    should do their job appropriately, but a pharmacist should

8    use their corresponding responsibility to determine if a

9    prescription was issued for a valid legitimate purpose.

10   **Q**    Right, because the pharmacists and the pharmacy,

11   that's the last line of defense before these drugs leave the

12   closed system, true?

13   **A**    False.

14   **Q**    Okay.  So if the DEA puts that in their presentations,

15   that the pharmacist is the last line of defense, you would

16   disagree with that?

17   **A**    I would disagree with that if the pharmacist is not

18   the one dispensing the controlled substance.  If a

19   practitioner is dispensing that controlled substance, they

20   are the last line of defense.  If a pharmacist is dispensing

21   it, then, yes, they are the last line of defense.

22   **Q**    I agree with you.  Thank you for correcting that.

23        When the pharmacist is dispensing the drug, in that

24   event the pharmacist is the last line of defense.  Can we

25   agree on that?

**Hill - (Cross by Lanier)**

1    **A**    We can agree.

2    **Q**    Great.  Thank you, sir.

3         Now, the last thing I want to talk to you about is the

4    need to document.

5         First of all, would you agree that companies need to

6    abide by their own internal policies?

7    **A**    A company internal policy does not trump what the CSA

8    or the Federal Regs.  So even though a company may say that,

9    yes, you should do this, it's not a legal obligation.

10   **Q**    Well, now you're talking about Federal Regulations.

11   What about state regulations?

12   **A**    Well, a pharmacy, first of all, they're registered in

13   their state, so they have to be compliant with whatever

14   state regulations they have to to be compliant in that

15   state.  And so that has to hold that federal registration.

16   **Q**    And are you familiar with the requirement that

17   pharmacies do best practices, what some call it different

18   words, but it's basically standard operating procedures,

19   best practices, whatever it may be.

20        You're familiar with that, right?

21   **A**    I'm familiar with the term "best practices," but it

22   doesn't mean that I agree with what all of them may say

23   "this is best practices."

24   **Q**    Okay.  But when you're testifying about that, you're

25   not testifying about it as a pharmacist, fair?

**Hill - (Cross by Lanier)**

1    **A**    Fair.

2    **Q**    You're not testifying about it as a lawyer, fair?

3    **A**    Fair.

4    **Q**    And you're not testifying about it as a specialist in

5    state boards of pharmacy and what they require, as opposed

6    to the DEA, fair?

7    **A**    Fair.

8    **Q**    Okay.

9                    MR. LANIER:  Your Honor, I think that's it.

10   I've come to the end of the road.

11        Sir, thank you again very much.  It was a pleasure.  I

12   may get a chance to recross you, but if I don't, then I wish

13   you the very best.

14                    THE WITNESS:  Thank you, sir.  And have a good

15   weekend.

16                    MR. LANIER:  You too, sir.

17                    THE COURT:  I'd like to go on the headphones

18   for a second, please.

19                    (At side bar at 5:02 p.m.)

20                    THE COURT:  I'm reluctant to keep the jury

21   real late on Friday.  My guess is they're going to have a

22   number of questions, and then I would think that both sides

23   would have some.  And on the other hand, I hate to have this

24   out-of-town witness stay over the weekend or come back.

25        But I'm thinking -- what I'm suggesting is I'll ask

1    the jury if they have questions now while it's fresh in

2    their mind, they'll present them, and then we'll come back

3    Monday morning and conclude with this witness.

4                    MR. LANIER:  Whatever you think, Judge.

5                    MR. DELINSKY:  Your Honor, I think that's

6    fine.  Should we see how many question there are?  Because

7    it could be that this could be done fast.

8                    THE COURT:  All right.  That's a fair request,

9    Mr. Delinsky.  Let's how many questions we've got.  Again, I

10   don't know how many that you have of your own.

11                   MR. DELINSKY:  Not many.

12                   THE COURT:  All right.  All right.

13                   (In open court at 5:03 p.m.)

14                   THE COURT:  Ladies and gentlemen, if anyone

15   has any questions of this witness, I want to see how many

16   we've got to figure out the timing.

17        So if you want to give them to Mr. Pitts, please.

18                   (Laughter in courtroom.)

19        That looks like the smallest question on the tiniest

20   piece of paper.  We need a magnifying glass for that one.

21   Okay.  Well, that won't take long to review that tiny

22   question.  It may be a long question on a tiny piece of

23   paper.

24                   (Juror question review.)

25                   THE COURT:  I think we'll go forward then.

 1    Okay.

 2                           - - - - -

 3                      REDIRECT EXAMINATION

 4    BY MR. DELINSKY:

 5    **Q**    All right.  We're going to try to go real fast.

 6    **A**    Yes, sir.

 7    **Q**    Most importantly, so the jury can go home, but also so

 8    that you can get home to Virginia and see your wife tonight,

 9    okay?

10    **A**    Yes, sir.

11    **Q**    All right.  I'm showing you, Mr. Hill, a question that

12    has been put to you by the jury.  "Does CVS require their

13    pharmacists to document the resolution of red flags?"  As a

14    matter of policy.

15    **A**    From the documents that I reviewed, yes.

16    **Q**    Okay.  And let's just follow up on that.

17           You are absolutely right, CVS requires documentation,

18    correct?

19    **A**    Correct.

20    **Q**    Is what a policy requires different from what a law

21    requires?

22    **A**    Yes.

23    **Q**    Okay.  Mr. Hill, are prescription opioids FDA

24    approved?

25    **A**    Yes.

1  **Q**    In your opinion, should they be available for

2  patients?

3  **A**    Yes.

4  **Q**    Why?

5  **A**    Because they have therapeutic value to treat certain

6  ailments.

7  **Q**    Is it your opinion that prescription opioids should be

8  prescribed, dispensed, and used as they are supposed to be?

9  **A**    Yes.

10  **Q**    Okay.  Now, we've talked about it.  You do not like

11  the prescribing of prescription opioids for long-term

12  chronic pain, correct?

13  **A**    Correct.

14  **Q**    But you understand doctors do it, correct?

15  **A**    Yes.

16  **Q**    And do you understand that doctors prescribe

17  prescription opioids for long-term chronic pain in good

18  faith to try to help their patients?

19  **A**    Yes.

20          MR. WEINBERGER:  Objection, Your Honor.

21          THE WITNESS:  I'm sorry.

22          THE COURT:  Yeah, I'm going to sustain that.

23  **Q**    Mr. Hill, are you aware --

24          THE COURT:  The jury is to disregard the

25  answer.

**Hill - (Redirect by Delinsky)**

1   **Q**    If a doctor, Mr. Hill, treats a patient with long-term

2   prescription opioid therapy for chronic pain --

3   **A**    I didn't hear the last part.  I'm sorry.

4   **Q**    If a doctor treats a patient with long-term opioid

5   therapy for chronic pain and does so in good faith for

6   legitimate medical reasons, does that violate the Controlled

7   Substances Act?

8   **A**    No.

9   **Q**    Are you aware that the CDC, the United States CDC,

10  issued guidelines in 2016?

11              MR. WEINBERGER:  Objection, Your Honor.  This

12  is beyond the scope of --

13              MR. DELINSKY:  No, it's squarely within the

14  scope, Your Honor.

15              THE COURT:  I'll allow the question.

16  **Q**    And let me be more specific.

17      Are you aware that in 2016 the Center for Disease

18  Control issued guidelines for the prescribing of opioids for

19  chronic pain?

20  **A**    I vaguely remember they had put something out about

21  it, yes.

22  **Q**    Okay.  Do you recall that that was the first time,

23  this being in 2016, that the Government had put out

24  prescribing guidelines for chronic pain?

25              MR. WEINBERGER:  Objection.

1          THE COURT:  Yeah, I'm going to sustain that.

2          MR. DELINSKY:  Okay.

3    **Q**    Mr. Hill, is it appropriate for a pharmacist to fill

4    prescriptions for chronic pain when a patient is on

5    long-term chronic pain therapy when a doctor writes them in

6    good faith and for legitimate medical reasons?

7          MR. WEINBERGER:  Objection.

8          THE COURT:  Sustained.

9    **Q**    Based on your experience, is it your opinion -- in

10   your opinion, is it appropriate for a pharmacist to fill a

11   prescription for prescription opioids to treat long-term

12   chronic pain if the prescription was written for a

13   legitimate medical reason?

14         MR. WEINBERGER:  Objection.

15         THE COURT:  Mr. Delinsky --

16         MR. DELINSKY:  Your Honor, everybody wants to

17   go home.  I'll just move on.

18         THE COURT:  Okay.

19   **Q**    All right.  Let's quickly go to this *Touhy* issue that

20   I'm sure the jury's never heard of before about your

21   authorization to testify or not.

22         Do you remember that?

23   **A**    Yes, sir.

24   **Q**    Mr. Hill, do you have any idea what the *Touhy* rules

25   are in detail?

**Hill - (Redirect by Delinsky)** 6484

1    **A**     Not really.  I just know it's that -- by me being a

2    former Government employee, that I have to have

3    authorization.  And even if they don't give me authorization

4    and I testify or write a report, there's certain areas that

5    I can't touch on.

6    **Q**     Are you aware that there's cases that say former

7    Government employees like yourself don't have to obtain it?

8                     MR. WEINBERGER:  Objection.

9                     THE COURT:  Overruled.

10   **A**     I'm not aware.  I don't know.

11   **Q**     Do you know how many communications my office has had

12   with the Department of Justice regarding your testimony?

13                    MR. WEINBERGER:  Objection.

14                    THE COURT:  Sustained.

15                    MR. DELINSKY:  Why?  I'm just asking.

16                    MR. WEINBERGER:  I'm just objecting.

17                    THE COURT:  I'll allow the question.  If he

18   knows.

19   **A**     I don't know.

20   **Q**     Okay.  Do you know what the substance of those

21   communications --

22                    THE COURT:  That --

23                    MR. WEINBERGER:  Objection.

24                    THE COURT:  All right, I'll allow the

25   question, do you know the substance.

1  **A**     No, I do not.

2  **Q**     But you do know that there have been communications

3  regarding your opinions with the Department of Justice going

4  back a few years, correct?

5  **A**     Correct.

6  **Q**     Okay.  Last questions.

7          Is it appropriate for a pharmacist to fill a

8  prescription written for a legitimate medical reason?

9  **A**     You're tailing off.  I didn't hear the last part.

10 **Q**     I'm sorry, Mr. Hill.

11         Is it appropriate for a pharmacist to fill a

12 prescription that was written for a legitimate medical

13 reason?

14 **A**     Yes, it's appropriate.

15 **Q**     If a legitimate prescription is filled that was

16 written for a legitimate medical reason, is there diversion?

17              MR. WEINBERGER:  Objection.

18              THE COURT:  Yeah, it's sustained.

19 **Q**     What is the Section of the Code of Federal Regulations

20 that discusses corresponding responsibility?

21 **A**     1306.04.

22 **Q**     Does 1306.04 state that legitimate or illegitimate

23 prescriptions can't be filled?

24 **A**     No.

25 **Q**     Well, which --

6486

1  **A**    It states that illegitimate prescriptions should not

2  be filled.

3              MR. DELINSKY:  Okay.  I have nothing further,

4  Your Honor.

5              THE COURT:  All right.  I assume no other

6  questions from Walgreens or Walmart?

7              MR. STOFFELMAYR:  Correct.  Thank you, Judge.

8              THE COURT:  Thank you.

9              MR. LANIER:  Judge, I have a birthday party to

10  get to.

11              THE COURT:  Is it the juror's?

12              MR. LANIER:  I'm --

13              THE COURT:  No, I can't let you go.

14              MR. LANIER:  I was not invited.

15              THE COURT:  All right.  Even if you were, I

16  couldn't allow you to attend.

17         Okay.  Thank you very much, Mr. Hill.  You are

18  excused.  Safe travels.

19              THE WITNESS:  Thank you, Your Honor.

20              THE COURT:  All right.  Ladies and gentlemen,

21  we're going to break for the evening.  Again, because it's a

22  weekend, I'm reminding you again of the admonitions.  Do not

23  read, listen, encounter anything whatsoever in the media

24  about this case or anything close to it.  Do not discuss

25  this case with anyone.

1          I want to tell you what -- the schedule for next week,

2    I anticipate that testimony is going to conclude the middle

3    of the week.  As you know, Thursday, next Thursday, is

4    Veterans Day.  It's a very important federal holiday.  The

5    courthouse is closed.

6          When I was a trial lawyer many years ago and I had

7    long cases, I appreciated the opportunity to prepare, have

8    some time to prepare my closing arguments so it could be

9    succinct; I could say the things I wanted to say and leave

10   out the things I didn't need to leave out, and I want to

11   give the lawyers the time to do that.

12         So we're not going to have court next Friday, the

13   12th, so you'll be off Thursday and Friday.  I know no one's

14   going to be violently upset to have the day off.

15         And it's my intention, then, on Monday the 15th at 9

16   a.m. we will have closing arguments and the final

17   instructions, and the case will be submitted to you for your

18   deliberations.

19         So have a good weekend, and we'll see you at 9 a.m.

20   where we'll have, Monday, the next defense witness.

21                   (Jury excused for the day at 5:14 p.m.)

22                   THE COURT:  Okay.  Everyone be seated just for

23   a second.  If you could just close the back door, please.

24                   MR. DELINSKY:  Your Honor, before we go

25   further, I'd just like to apologize for raising my voice.

6488

 1   It's the public defender in me, and sometimes I get very

 2   excited about important issues.

 3                    THE COURT:  It's a little bit -- the tone was

 4   a little bit harsh, Mr. Delinsky, and some judges would have

 5   come down on you hard, but I understood you were passionate,

 6   so --

 7                    MR. DELINSKY:  They have at times and you've

 8   been patient, and it's not the first time in this trial.  I

 9   appreciate the Judge's indulgence of it.  It's --

10                    THE COURT:  Okay.

11                    MR. DELINSKY:  Passionate's the right word,

12   but sometimes it can go a little too much.

13                    THE COURT:  That was a little bit excessive.

14                    MR. WEINBERGER:  I thought you were yelling at

15   us, not at the Judge.

16                    THE COURT:  It was a little excessive, but

17   that's okay.

18        All right.  It's sort of late.  Let's -- first thing

19   Monday we'll take up exhibits.  We have -- so I'd like

20   counsel, over the weekend I'd like to stay current.

21        We have Murphy, Dr. Murphy.  The plaintiffs are

22   offering two.  I don't know what the defendants have.

23                    MS. FUMERTON:  Your Honor, we'll work with

24   counsel over the weekend to --

25                    THE COURT:  We've got Dr. Murphy, Dr.

```
 1    Glickman, and Mr. Hill.  So if we could over the weekend
 2    work those out, and I'll take those up Monday morning.
 3         And then so Monday we'll have -- there are a couple
 4    depositions, there were some pharmacists, and possibly
 5    another expert, or not?  I'm trying to remember who the
 6    defendants said they were --
 7                   MR. STOFFELMAYR:  That's correct, Your Honor.
 8                   THE COURT:  Okay.  And then -- okay.
 9                   MR. WEINBERGER:  Your Honor, the defendants
10    filed an objection to your jury instruction.
11                   THE COURT:  There were two filings.
12                   MR. WEINBERGER:  I didn't see both of them.
13                   THE COURT:  One came in earlier, one came
14    in --
15                   MR. WEINBERGER:  Okay.  If we can -- I think
16    the deadline you set was for us to respond on Monday.
17                   THE COURT:  Yes, it was Monday.
18                   MR. WEINBERGER:  And so can we say by the end
19    of the day Monday; we'll try and get it in earlier?
20                   THE COURT:  We're going to start looking at
21    them, but, yeah, by the end of the day Monday, because I
22    want to obviously before we break everyone needs to know
23    what the instructions are going to be.  So I'm considering
24    what everyone says carefully.
25                   MR. WEINBERGER:  And can we just confirm with
```

1    the defendants, which videos do you intend to play?  And I

2    think we've got the names of the two of the three

3    pharmacists.

4                   MS. FUMERTON:  We'll be making our disclosure

5    tonight as we're required.  I think there's one other one.

6    So it's Debbie Mack and Ashley, and just one other

7    deposition, but we're filing the list.  You'll get it

8    shortly.

9                   MR. DELINSKY:  And, Pete, I can talk to you.

10   I can supply the missing pharmacist's name after court.

11                  MR. WEINBERGER:  Okay.  All right.

12                  THE COURT:  So my time computations today were

13   4.25 for the defendants and 1.75 for plaintiffs.

14        Okay.  Have a good weekend everyone.

15                  (Proceedings adjourned at 5:18 p.m.)

16                       *  *  *  *  *

17                  **C E R T I F I C A T E**

18

19        I certify that the foregoing is a correct transcript

20   of the record of proceedings in the above-entitled matter

21   prepared from my stenotype notes.

22

23        _/s/ Lance A. Boardman_____  _11-05-2021_
          Lance A. Boardman, RDR, CRR                DATE
24

25