**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track Three Cases | |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(A) (DKT. #4098, #4100, #4102, #4103) AND MEMORANDUM OF LAW IN SUPPORT**

November 8, 2021

# TABLE OF CONTENTS

*Table of Contents* ..................................................................................................... i

*Table of Authorities* ............................................................................................... iii

*Introduction* ............................................................................................................1

*Legal Standard* ......................................................................................................1

*Argument* ...............................................................................................................2

I.    *There is Legally Sufficient Evidence in the Record that a Reasonable Jury Can Rely On to Find Each Defendant Liable for Public Nuisance.* ......................................................2

   A.    **The Evidence Demonstrates that the Oversupply of Legal Prescription Opioids, and Diversion of those Opioids into the Illicit Market Outside of Appropriate Medical Channels, Constitutes an Ongoing Public Nuisance in Lake and Trumbull Counties.** ...........................................................................................................3

   B.    **The Evidence Demonstrates that Defendants Unlawfully and/or Intentionally Dispensed Massive Amounts of Prescription Opioids into Lake and Trumbull Counties.** ....................................................................................................9

      1.    Walgreens unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties. ...............................................................13

      2.    CVS unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties. ...............................................................27

      3.    Walmart unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties. ...............................................................37

   C.    **The Evidence Demonstrates that Defendants' Intentional and Unlawful Conduct Proximately Caused the Public Nuisance in Lake and Trumbull Counties.** ...........47

      1.    Walgreens proximately caused the ongoing public nuisance in the Counties. ...........48

      2.    CVS proximately caused the ongoing public nuisance in the Counties. ......................52

      3.    Walmart proximately caused the ongoing public nuisance in the Counties. ................54

      4.    Defendants' causation arguments should be rejected. ..................................................56

   D.    **Defendants Are Not Entitled to "Safe Harbor" Immunity.** ......................................57

II.    *There Is No Legal Bar to Judgment on Plaintiffs' Nuisance Claim.* .............................58

   A.    **Ohio Statutory Law Does Not Preclude Plaintiffs' Common-Law Nuisance Claims.** ...............................................................................................................59

      1.    The Ohio Product Liability Act does not expressly bar Plaintiffs' nuisance claims. .....59

      2.    Plaintiffs' nuisance claims are not precluded by Ohio Rev. Code Ann. § 4729.35. ......59

   B.    **Ohio Common Law Does Not Preclude Plaintiffs' Public Nuisance Suit.** ................60

      1.    Plaintiffs have shown a violation of a public right. ......................................................60

      2.    Plaintiffs have shown that Defendants' dispensing conduct constitutes a nuisance. ....62

i

3.    Defendants have control over the prescription opioids at the time of the alleged nuisance. ..........................................................................................................................62

4.    The CSA and its Ohio analog are predicate "safety statutes." ....................................63

5.    Plaintiffs do not seek an unprecedented expansion of nuisance contrary to public policy. .................................................................................................................................64

**C.    Defendants Owe a Duty to Plaintiffs for their Dispensing Conduct. ........................65**

1.    Plaintiffs properly base their nuisance claims on corporate-level dispensing duties. ...65

2.    Penalizing Defendants for dispensing conduct that does not violate the CSA would not stand as an obstacle to Congress's objectives and is not preempted...................................66

3.    Plaintiffs do not seek to enforce statutory duties........................................................66

4.    Plaintiffs' claims are not barred by the primary jurisdiction doctrine.........................66

**D.    Plaintiffs' Nuisance Claims Do Not Fail for Additional Legal Reasons. ..................69**

1.    Plaintiffs have standing...............................................................................................69

2.    The economic loss doctrine does not bar Plaintiffs' claims.........................................70

3.    Plaintiffs' claims are not barred or preempted by the statewide concern doctrine. ......71

4.    The municipal cost recovery doctrine does not bar Plaintiffs' claims.........................71

5.    Plaintiffs' public nuisance claims are not barred by the statute of limitations. ............72

6.    There is an ongoing public nuisance caused by Defendants' improper dispensing of prescription opioids which requires abatement..................................................................72

7.    There has not been improper admission of expert testimony. .....................................73

***Conclusion* .............................................................................................................................74**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alabama v. Purdue Pharma L.P.*,
03-CV-2019-901174.00, slip op. (Cir. Ct. Nov. 13, 2019) ...................................................61

*Alaska v. McKesson Corp.*,
No. 3AN-18-10023CI, slip op. (Super. Ct. Aug. 28, 2019) ..................................................61

*Becker v. Shaull*,
584 N.E.2d 684 (Ohio 1992) .................................................................................................64

*Brooke Cty. Comm'n v. Purdue Pharma L.P.*,
No. 17-C248, slip op. (Cir. Ct. Dec. 28, 2018), *writ denied*, *State ex rel. Cardinal
Health, Inc. v. Hummel*, No. 19-0210 (W. Va. June 4, 2019) ...............................................62

*California ex rel. Korb v. Purdue Pharma L.P.*,
No. 30-2014-00725287, slip op. (Super. Ct. Mar. 12, 2021)..................................................61

*Chabner v. United of Omaha Life Ins. Co.*,
225 F.3d 1042 ........................................................................................................................68

*Chambers v. St. Mary's Sch.*,
697 N.E.2d 198 (Ohio 1998) .................................................................................................64

*Charvat v. EchoStar Satellite, LLC*,
630 F.3d 459 (6th Cir. 2010) .................................................................................................67

*Cincinnati v. Beretta, U.S.A. Corp.*,
768 N.E.2d 1136 (Ohio 2002)...................................................................................3, 65, 71

*Cincinnati v. Deutsche Bank Nat'l Trust Co.*,
863 F.3d 474 (6th Cir. 2017) ...................................................................................................3

*City and County of San Francisco v. Purdue Pharma L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. Sept. 30, 2020) ...........................................................61, 69

*City of Boston v. Purdue Pharma, L.P.*,
No. 1884CV02860, 2020 WL 977056 (Mass. Super. Ct. Jan. 31, 2020)...............................65

*City of Bos. v. Purdue Pharma, LP*,
No. 1884CV02860, 2020 WL 416406 (Mass. Super. Jan. 3, 2020) .......................................61

*City of Chicago v. v. Beretta U.S.A. Corp.*,
213 Ill.2d 351, 821 N.E.2d 1099 (2004)................................................................................71

iii

*City of Chicago v. Purdue Pharma L.P.*,
211 F. Supp. 3d 1058 (N.D. Ill. 2016) ................................................................67

*City of Chicago v. Purdue Pharma L.P.*,
No. 14 C 4361, 2015 WL 2208423 (N.D. Ill. May 8, 2015) ................................68

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
621 F. Supp. 2d 513 (N.D. Ohio 2009) ...............................................................57

*City of Cleveland v. JP Morgan Chase Bank, N.A.*,
2013-Ohio-1035, 2013 WL 1183332 (Ohio Ct. App. March 21, 2013) .................3

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
801 N.E.2d 1222 (Ind. 2003) ..............................................................................65

*City of Surprise v. Allergan PLC*,
No. CV2019-003439, slip op. (Super. Ct. Oct. 28, 2020) ...................................61

*City of Wyoming v. Procter & Gamble Co.*,
210 F. Supp. 3d 1137 (D. Minn. 2016) ...............................................................65

*Com. v. Endo Health Solutions Inc.*,
No. 17-CI-1147, 2018 WL 3635765 (Ky.Cir.Ct. July 10, 2018)...........................61

*Commonwealth v. Purdue Pharma, L.P.*,
No. 1884CV01808BLS2, 2019 WL 5495866 (Mass. Super. Sept. 17, 2019).......61

*County of Delaware v. Purdue Pharma, L.P.*,
CV- 2017008095, slip ops. (Ct. C.P., March 13, 2020, Dec. 4, 2019, and Oct. 25,
2019)....................................................................................................................61

*Crown Prop. Dev., Inc. v. Omega Oil Co.*,
113 Ohio App. 3d 647, 681 N.E.2d 1343 (1996)................................................73

*Dartron Corp. v. Uniroyal Chem. Co.*,
893 F. Supp. 730 (N.D. Ohio 1995) ...................................................................73

*Delaney v. Deere and Co.*,
999 P.2d 930 (Kan. 2000)...................................................................................71

*Direct Sales Co. v. United States*,
319 U.S. 703 (1943) ...........................................................................................49

*ECIMOS, LLC v. Carrier Corp.*,
971 F.3d 616 (6th Cir. 2020) ................................................................................2

*Florida v. Purdue Pharma L.P.*,
No. 2018-CA-001438, slip ......................................................................................61

*Fuhr v. Sch. Dist. of City of Hazel Park*,
  364 F.3d 753 (6th Cir. 2004) ................................................................2

*In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.*,
  MDL No. 1909, 2013 WL 593993 (N.D. Ohio Feb. 15, 2013) ...............................47

*Glob. Crossing Bandwith, Inc. v. OLS, Inc.*,
  No. 05-CV-6423L, 2009 WL 763483 (W.D.N.Y. Mar. 19, 2009) ........................68

*Global–Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011) ................................................................11, 12

*Gov't of U.S. Virgin Islands v. Takata Corp.*,
  No. ST-16-CV-286, 2017 WL 3390594 (V.I. Super. Ct. June 19, 2017) .............................65

*Hager v. Waste Technologies Industries*,
  No. 2000-CO-45, 2002 WL 1483913 (Ohio App. 7 Dist. June 27, 2002) ......................57, 58

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  497 F. Supp. 3d 552 (N.D. Cal. 2020)..............................................67, 68

*Kentucky ex rel. Beshear* v. *Cardinal Health*,
  No. 18-CI00I013, slip op. (Cir. Ct. Sept. 12, 2019) ................................61

*Kentucky ex rel. Beshear v. Walgreens Boots Alliance, Inc.*,
  No. 18-CI-00846, slip op. (Cir. Ct. July 18, 2019) ................................61

*Kramer v. Angel's Path, L.L.C.*,
  882 N.E.2d 46 (Ohio Ct. App. 2007) ................................................63

*Krueger v. Experian Info. Sols., Inc.*,
  No. 20-2060, 2021 WL 4145565 (6th Cir. Sept. 13, 2021)................................69

*Michigan ex rel. Kessel v. Cardinal Health, Inc.*,
  No. 19016896-NZ, slip op. (Cir. Ct. Mar. 24, 2021) ................................61

*Mississippi v. Cardinal Health, Inc.*,
  No. 25Cll:18-cv00692, slip op. (Cir. Ct. Apr. 5, 2021) ......................61

*Missouri ex rel. Schmitt v. Purdue Pharma, L.P.*,
  No. 1722-CC10626, slip op. (Cir. Ct. Apr. 6, 2020)................................61

*Moreland v. Oak Creek OB/GYN, Inc.*,
  970 N.E.2d 455 (Ohio Ct. App. 2005) ................................................64

*Morsey v. Chevron USA, Inc.*,
  779 F. Supp. 150 (D.Kan.1991) ................................................68, 69

*In re Nat'l Prescription Opiate Litig.* (Broward County),
No. 18-OP-45332, 2020 WL 1986589 (N.D. Ohio Apr. 27, 2020) .....................................61

*In re Nat'l Prescription Opiate Litig.* (West Boca Medical Center),
452 F. Supp. 3d 745 (N.D. Ohio 2020) ....................................................................61

*Nevada v. McKesson Corp.*,
No. A-19-796755-B, slip order (Dist. Ct. Jan. 3, 2020) ......................................61

*New Mexico ex rel. Balderas v. Purdue Pharma L.P.*,
No. D-101-CV-2017-02541 slip op. (Dist. Ct. Dec. 17, 2020) ............................61

*Nottke v. Norfolk S. Ry. Co.*,
264 F. Supp.3d 859 (N.D. Ohio 2017) ......................................................................9

*Oklahoma ex rel. Hunter v. Purdue Pharma L.P.*,
No. CJ-2017-816 ...................................................................................................61, 68

*In re Opioid Litigation*,
No. 400000/2017, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018) ............61, 65

*In re Opioid Litigation*,
No. 4000002017, 2018 WL 4760685 (N.Y. Sup. Ct. Mar. 14, 2018)...................68

*Pang v. Minch*,
559 N.E.2d 1313 (Ohio 1990)................................................................................47

*Paroline v. United States*,
572 U.S. 434 (2014) ...............................................................................................47

*People ex rel. Gallo v. Acuna*,
929 P.2d 596 (Cal. 1997)........................................................................................65

*People v. ConAgra Grocery Prods. Co.*,
227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017)..........................................................65

*Potter v. Chicago Pneumatic Tool Co.*,
694 A.2d 1319 (Conn. 1997) ..................................................................................71

*S.E.C. v. Delphi Corp.*,
508 F. App'x 527 (6th Cir. 2012) ...........................................................................12

*Smith v. Hickenlooper*,
164 F. Supp. 3d 1286 (D. Colo. 2016) ...................................................................64

*Smrtka v. Boote*,
88 N.E.3d 465 (Ohio Ct. App. 2017) .....................................................................64

*South Carolina v. Purdue Pharma L.P.*,
No. 2017-CP40-04872, slip order (Ct. C.P. Apr. 12, 2018) ................................................. 61

*Speers v. Univ. of Akron*,
196 F. Supp. 2d 551 (N.D. Ohio 2002) ............................................................................. 1, 2

*State of Alaska v. Purdue Pharma L.P.*,
No. 3AN-17-09966CI, 2018 WL 4468439 (Alaska Super. July 12, 2018) ......................... 61

*State of Arkansas v. Purdue Pharma L.P.*,
No. CV2018002018, 2019 WL 1590064 (Ark.Cir. Apr. 05, 2019) .................................... 61

*State of Maryland v. Exxon Mobil Corp.*,
406 F. Supp. 3d 420 (D. Md. 2019) ................................................................................. 65

*State of New Hampshire v. Purdue Pharma Inc.*,
No. 217-2017-CV-00402, 2018 WL 4566129 (N.H.Super. Sep. 18, 2018) ...................... 61

*State of Ohio, ex rel. Dewine v. Purdue Pharma L.P.*,
No. 17 CI 261, 2018 WL 4080052 (Ohio Com.Pl. Aug. 22, 2018) ................................... 61

*State of Rhode Island v. Purdue Pharma L.P.*,
No. PC-2018-4555, 2019 WL 3991963 (R.I.Super. Aug. 16, 2019) .................................. 61

*State of Tennessee v. Purdue Pharma L.P.*,
No. 1-173-18, 2019 WL 2331282 (Tenn.Cir.Ct. Feb. 22, 2019) ....................................... 61

*State of Washington v. Purdue Pharma L.P.*,
No. 17-2-25505-0 SEA, 2018 WL 7892618 (Wash.Super. May 14, 2018) ....................... 62

*State v. United Parcel Serv., Inc.*,
253 F. Supp. 3d 583 (S.D.N.Y. 2017), *aff'd*, 942 F.3d 554 (2d Cir. 2019) ........................ 12

*Supreme Council Am. Legion of Honor v. Orcutt*,
119 F. 682 (6th Cir. 1903) ............................................................................................... 12

*Taylor v. City of Cincinnati*,
55 N.E.2d 724 (Ohio 1944) .......................................................................................... 9, 47

*Tennessee ex rel. Slatery v. AmerisourceBergen Drug Corp.*,
No. 1345-19, slip op. (Cir. Ct. July 14, 2020) ............................................................. 61, 62

*In re Texas Opioid Litigation* (*County of Dallas*),
No. 2018-77098, slip op. (Dist. Ct. June 9, 2019) ............................................................. 62

*Tincher v. Omega Flex, Inc.*,
104 A.3d 328 (Pa. 2014) .................................................................................................. 71

*TransUnion LLC v. Ramirez,*
    —— U.S. ——, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021) ................................................... 69

*Uland v. S.E. Johnson Companies,*
    WM-97-005, 1998 WL 123086 (Ohio Ct. App. Mar. 13, 1998) ........................................... 64

*United States v. Godofsky,*
    943 F.3d 1011 (6th Cir. 2019) ............................................................................................ 18

*United States v. Jones,*
    825 F. App'x 335 (6th Cir. 2020) ....................................................................................... 18

*United States v. Moore,*
    423 U.S. 122 (1975) ........................................................................................................... 18

*Vermont v. Cardinal Health, Inc.,*
    No. 279-3-19 Cncv, slip op. (Super. Ct. May 12, 2020) ..................................................... 62

*Vermont v. Purdue Pharma L.P.,*
    No. 757-9-18 Cncv, slip op. (Super. Ct. Mar. 19, 2019) .................................................... 62

*Zieman v. City of Detroit,*
    81 F.3d 162, 1996 WL 140328 (6th Cir. 1996) ................................................................... 2

**STATUTES**

21 U.S.C. § 801 ........................................................................................................................... 63

21 U.S.C. § 812 ............................................................................................................................. 4

21 U.S.C. § 824 ........................................................................................................................... 14

OHIO ADMIN. CODE § 4729-5-20 ................................................................................................ 14

OHIO REV. CODE ANN. § 2305.09 ................................................................................................ 72

OHIO REV. CODE ANN. § 2305.10 ................................................................................................ 72

OHIO REV. CODE ANN. § 2307.71 ................................................................................................ 59

OHIO REV. CODE ANN. § 2307.72 ................................................................................................ 59

OHIO REV. CODE ANN. § 3767.13 ................................................................................................ 64

OHIO REV. CODE ANN. § 4729.35 ................................................................................. 59, 60, 63

**OTHER AUTHORITIES**

21 C.F.R. § 1301.71 ............................................................................................................... 9, 14

21 C.F.R. § 1306.03 ...................................................................................................14

21 C.F.R. § 1306.04 ........................................................................................ 10, 11, 14

21 C.F.R. § 1306.06 ...................................................................................................14

*East Main Street Pharmacy*; *Affirmation of Suspension Order*, 75 FR 66149-01,
    2010 WL 4218766 (D.E.A. Oct. 27, 2010); ...........................................................9

FED. R. CIV. P. 50 .............................................................................................. 1, 2, 74

*Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*,
    77 FR 62316-01, 2012 WL 4832770 (D.E.A. Oct. 12, 2012) ...........................9, 10

H.R. Rep. 91-1444, 4574, 4601-02 (1970)...............................................................63

*Jones Total Health Care Pharm., LLC*,
    881 F.3d 823 (11th Cir. 2018) ...........................................................................11

*Masters Pharmaceuticals, Inc.*; Decision and Order,
    80 FR 55418-01, 55475 (D.E.A. Sept. 15, 2015) ...............................................49

*Masters Pharm., Inc. v. Drug Enf't Admin.*,
    861 F.3d 206 (D.C. Cir. 2017)...........................................................................49

*Medic-Aid Pharmacy*,
    75 Fed. Reg. 30043-01, 1990 WL 328750 (July 24, 1990)................................11

*Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy; Revocation of Registration*,
    55 FR 4729-01, 1990 WL 352775 (Feb. 9, 1990)..............................................11

RESTATEMENT (SECOND) OF TORTS § 431 .............................................................47

RESTATEMENT (SECOND) OF TORTS § 433B .............................................................47

RESTATEMENT (SECOND) OF TORTS § 821B .......................................3, 57, 58, 64, 73

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM, Introduction ...................71

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 (2020) .....................71

## INTRODUCTION

After Plaintiffs rested on October 27, 2021, Defendants moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure.  *See* Dkt. #4098 (Ds' Motion); Dkt. #4100 (WMT Motion); Dkt. #4102 (WAG Motion); #4103 (CVS Motion).  They argue that Plaintiffs have not adduced legally sufficient evidence of unlawful or intentional conduct that caused an ongoing public nuisance in Lake and Trumbull Counties.  They also regurgitate a litany of legal arguments that they acknowledge were previously rejected by this Court in prior rulings.

Defendants' arguments should be rejected.  The Court's prior rulings on the legal issues were correct and Defendants offer no new authority justifying any change in those rulings.  Moreover, the evidence adduced in this trial unquestionably raises material issues of fact as to every element of Plaintiffs' public nuisance claims.[1]  That Defendants take issue with this evidence, and the inferences to be drawn therefrom, does not negate the fact that there is ample evidence in the record on which a jury could reasonably rely to find Defendants liable for public nuisance.  Accordingly, Defendants' motions should be denied and this case should be submitted to the jury.

## LEGAL STANDARD

Under Rule 50(a)(1) of the Federal Rules of Civil Procedure:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50(a)(1); *see also Speers v. Univ. of Akron*, 196 F. Supp. 2d 551, 555 (N.D. Ohio 2002) ("A motion for judgment as a matter of law requires the trial court to decide 'whether there was sufficient evidence presented to raise a material issue of fact for the jury.'") (citation omitted).

---

[1]    Plaintiffs do not purport to cite herein every piece of evidence in the trial record supporting their claims.

Any motion for judgment as a matter of law "must specify the judgment sought and the law and facts that entitle the movant to the judgment."  FED. R. CIV. P. 50(b).

When considering a motion for judgment as a matter of law, a court "neither weighs the evidence, evaluates the credibility of witnesses, nor substitutes its judgment for that of the jury." *Speers*, 196 F. Supp. 2d at 555; *see also Fuhr v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 759 (6th Cir. 2004) ("'[T]he weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'") (citation omitted); *Zieman v. City of Detroit*, 81 F.3d 162, 1996 WL 140328, at *2 (6th Cir. 1996).  The court "must view the evidence in the light most favorable to the nonmovant,' and must grant all reasonable inferences in the nonmovant's favor."  *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 627 (6th Cir. 2020) (citation omitted); *see also Fuhr*, 364 F.3d at 759 ("[W]e must disregard all evidence favorable to the moving party that the jury is not required to believe."); *Zieman*, 1996 WL 140328, at *2; *Speers*, 196 F. Supp. at 555.  "Evidence is sufficient to submit to a jury unless, 'when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or not controverted issues of fact upon which reasonable persons could differ.'" *Speers*, 196 F. Supp. 2d at 555 (citation omitted).  The motion should not be granted unless "reasonable minds could not come to a conclusion other than one favoring the movant."  *ECIMOS*, 971 F.3d at 627 (citation and internal quotation marks omitted).  *See also Speers*, 196 F. Supp. 2d at 555.

## ARGUMENT

### I.   THERE IS LEGALLY SUFFICIENT EVIDENCE IN THE RECORD THAT A REASONABLE JURY CAN RELY ON TO FIND EACH DEFENDANT LIABLE FOR PUBLIC NUISANCE.

As this Court has recognized, the issues to be decided by the jury in this case are (1) whether the oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels, is a public nuisance in Lake and Trumbull Counties and, if so, (2) whether Defendants (Walgreens, CVS, Walmart,) proximately caused the public nuisance in Lake and Trumbull Counties.  Under Ohio law, "[t]o prove an absolute public

nuisance cause of action, [the] evidence must establish: (1) intentional or unlawful conduct or omission by the defendant; (2) that unreasonably interferes with a right common to the general public; and (3) a causal relationship between a defendant's conduct and a plaintiff's injury." Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at pp. 2-3 (citing *Cincinnati v. Beretta, U.S.A. Corp.,* 768 N.E.2d 1136, 1141-44 (Ohio 2002) and *City of Cleveland v. JP Morgan Chase Bank, N.A.,* 2013-Ohio-1035, 2013 WL 1183332, at *3-4 (Ohio Ct. App. March 21, 2013)); *see also* RESTATEMENT (SECOND) OF TORTS § 821B. As set forth below, the testimony and documentary evidence admitted in this case plainly provides a rational basis by which the jury could conclude that a public nuisance in fact presently exists in the Counties, and that the conduct of Defendants proximately caused that nuisance.

### A. The Evidence Demonstrates that the Oversupply of Legal Prescription Opioids, and Diversion of those Opioids into the Illicit Market Outside of Appropriate Medical Channels, Constitutes an Ongoing Public Nuisance in Lake and Trumbull Counties.

"A public nuisance is an unreasonable interference with a right common to the general public." RESTATEMENT (SECOND) OF TORTS § 821B. The Ohio Supreme Court has explained:

> "Unreasonable interference" *includes* those acts that significantly interfere with public health, safety, peace, comfort, or convenience, conduct that is contrary to a statute, ordinance, or regulation, or conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware.

*Beretta,* 768 N.E.2d at 1142 (emphasis added). *See also* RESTATEMENT (SECOND) OF TORTS § 821B(2); *Cincinnati v. Deutsche Bank Nat'l Trust Co.,* 863 F.3d 474, 477 (6th Cir. 2017); Dkt. #2572 (CT1 Order on Ps' Nuisance MSJ) at p. 2. The entire community need not "be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large." RESTATEMENT (SECOND) OF TORTS § 821B(1) cmt. g. A public nuisance can be something that "affect[s] the health of so many persons so as to involve the interests of the public at large." *Id*.

The evidence adduced at trial demonstrates that there is an ongoing opioid epidemic in Lake and Trumbull Counties and that this opioid epidemic constitutes an unreasonable and

significant interference with public health and public safety which has significantly harmed, and continues to significantly harm, Plaintiffs.  Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- During the relevant time period, prescription opioids were regulated as Schedule II or Schedule III controlled substances under the CSA.  Under the CSA, Schedule II drugs are those with a high potential for abuse, which "may lead to severe psychological or physical dependence[,]" and Schedule III drugs are those with some potential for abuse, which "may lead to moderate or low physical dependence or high psychological dependence."[2]

- Prescription opioid drugs and heroin have a nearly identical molecular structure and interact identically with, and are received by the human brain as indistinguishable from, one another.[3]

- Due to their dangerous and addictive nature, prescription opioids are highly susceptible to diversion and abuse.[4]

- The abuse of prescription opioids can lead to, *inter alia*, dependence, addiction, overdoses, and death.[5]

- The abuse of prescription opioids can also be a gateway to the abuse of illegally manufactured or obtained drugs, such as heroin and fentanyl.[6]

---

[2]  *See, e.g.,* 21 U.S.C. § 812(b)(2)-(3); Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 335:13 – 336:1; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 842:18 – 844:18; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 934:21 – 936:13; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1164:5 – 1165:12.

[3]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 544:9 – 545:8; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3473:11 – 3474:5; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3652:7-13.

[4]  *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1550:5-13; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1838:6 – 1844:23, 1845:13 – 1848:23; Dkt. #4096 (10/28/21 Trial Tr.) [*Wailes*] at 4716:8-24; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5403:16; P-20808.

[5]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 590:2 – 591:2, 647:6-10, 648:15 – 649:22, 656:24 – 658:2, 662:15 – 663:1; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1838:6 – 1844:23, 1845:13 – 1848:23; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3649:10-13, 3651:24 – 3652:1; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5404:14, 5406:10 – 5408:9; P-20808; P-20809 at 014-024.

[6]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 648:19 – 649:22, 650:24 – 652:9, 653:7-12; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 914:9-14; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1847:15-24 ("Q: And prescription pill opioids increases the likelihood that the user of those opioids might end up using illegal or illicit drugs, right?  A: Yeah."), 1848:5-13 ("Q: Sure.  We're talking about the gateway effect that the jury has heard in this case, and this bullet point is intended to communicate that opioid prescription pills, using them, increases the likelihood of the use of other drugs, including

(footnote continues on next page)

4

- When the costs or difficulties of obtaining prescription drugs increase, addicted persons often seek out cheaper or more easily available alternatives like heroin.[7]

- Many users of heroin and illicit fentanyl initially started with prescription opioids.  In fact, prescription opioid use is the strongest risk factor for future heroin use—stronger than using marijuana, age, gender, medical conditions, or socioeconomic conditions. [8]

- Around 2010, there was an increase in prescription opioid deaths that involved heroin as well as an increased transition to heroin use among people who used prescription opioids.  *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3644:11-19.

- Another harm that can result from opioid abuse is babies being born with neonatal abstinence syndrome ("NAS").  Babies born with NAS often need ongoing care and continue thereafter to suffer from developmental delays and require special services.[9]

- Even babies who are not diagnosed with NAS but are exposed to opioids in utero are often born sick, suffer from withdrawals, and require treatment in neonatal intensive care units. They can also suffer from long-term cognitive and emotional delays that are significant and not seen in babies who are not exposed to opioids.  Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 669:11 – 670:16.

- Children whose parents have opioid use disorder experience adverse childhood events that increase risk for psychiatric disorders, learning disabilities, and other struggles. Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3677:21 – 3678:3.

---

illicit drugs.  Right?  A: Sure, but, you know, I don't think any of them are any more dangerous than opioids.  Opioids are bad for sure."); Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2793:5 – 2794:5, 2796:14-20; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3473:15 – 3475:17; Dkt. #4065 (10/22/21) Trial Tr. [*Keyes*] 3642:9-25, 3648:22-25, 3649:7-13, 3652:3-13, 3653:6-22, 3656:13 – 3657:17; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4178:19 – 4179:10, 4200:16-20; P-20808 at 014.

[7]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 676:25 – 677:24; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 914:9-14; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2796:14-20; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3656:8 – 3657:17; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4162:20 – 4164:2, 4200:16-20.

[8]  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2793:5 – 2794:5, 2796:14-20; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3473:15 – 3475:17; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3653:15-22; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3642:9-25, 3653:6-22; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4117:9-11, 4119:21 – 4120:9, 4178:19 – 4179:10.

[9]  *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:12 – 3472:2; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3639:10-23, 3672:20 – 3673:21, 3677:10-20, 3678:8-18.

- The opioid epidemic's harms also include disruption and separation of families and children.[10]

- Oversupply and diversion of opioids can also lead to increases in crime.  *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3675:11 – 3676:5.

- There is an opioid epidemic in Lake and Trumbull Counties that continues to persist today.[11]

- In 2019, an estimated 5,668 people in Lake County, and 7,221 people in Trumbull County, were addicted to opioids.  Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:2-10, 3472:11-20.

- In Trumbull County, 4-5% of adults report nonmedical opioid use within the past year. Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3459:8-14.

- Prescription opioids are an ongoing and significant cause of drug overdose deaths in the Counties.  A majority of opioid deaths in the Counties are at least partially attributable to prescription opioids.[12]

- Between 1999 and 2019, the number of opioid overdose deaths in the Counties increased exponentially. Dkt. #4065 (Trial Tr. 10/22/21) [*Keyes*] at 3641:6-25.

- The number of people dying from an opioid overdose in Lake County increased from less than 10 in 2001 to 88 in 2017.  Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:12-24, 3468:21 – 3469:7.

- The number of people dying from an opioid overdose in Trumbull County increased from less than 10 in 2001 to 119 in 2017. Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:12-24, 3469:16 – 3470:10.

- Lake and Trumbull Counties have suffered an increase in children born with NAS, which requires ongoing care and is associated with learning disabilities and other developmental delays.[13]

---

[10]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 666:2-6; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3459:7, 3471:12–3472:2, 3472:21-23; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4259:1-5, 4262:11–4263:5; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:11-25.

[11]  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2730:9 – 2731:19; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:7 – 3460:1.  *See also* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1848:24 – 1849:14.

[12]  *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:7-20, 3466:24 – 3470:10; Dkt. #4065 (Trial Tr. 10/22/21) [*Keyes*] at 3680:8-17.

[13]  *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:12–3472:2, 3472:21-23; Dkt. #4065 (footnote continues on next page)

- In 2019, 28 babies in Lake County, and in 2018, 55 babies in Trumbull County were born with NAS. *See, e.g.,* Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3471:12-25, 3472:21-23.

- Trumbull County ranks as one of the lowest counties in Ohio for overall length and quality of life. Among the most influential attributing factors is the county's heavy opiate abuse. Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2821:10 – 2822:3.

- Lake County now has more children than ever who live in foster care, residential treatment facilities, or with grandparents because their parents have been impacted by opioids and are unable to take care of them. Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:11-21.

- Trumbull County experienced a 40% increase of children who were placed in foster care as a result of the opioid use of one or both parents. Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4262:11-18.

- Childhood trauma resulting from placement into the foster care system requires special services to address the effect of displacement and for the child not to be defined by their parents' addiction.[14]

- Having a parent or household member with an opioid abuse disorder is a significant risk factor for a child to develop psychiatric disorders and learning disabilities. *See, e.g.,* Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3677:21–3678:7.

- The opioid epidemic has increased crime rates and adversely affected neighborhoods throughout the Counties.[15]

- Opioid-related harms affect generations of communities, posing an ongoing issue for Plaintiffs' communities.[16]

- Abuse of diverted prescription opioids has exacted tragic costs from Plaintiffs' communities, overburdening law enforcement, crowding the Counties' jails and treatment facilities, undermining the employability of the workforce, and devastating

---

(10/22/21 Trial Tr.) [*Keyes*] at 3672:20–3673:21, 3677:6-20, 3678:8-18.

[14] *See, e.g.,* Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4262:11–4263:5; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:11-21, 4367:13-16, 4377:10-14.

[15] *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:17-19; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3672:20-25, 3675:14–3676:5; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4261:8-21; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4369:19-23, 4375:7-16; P-04598 at 00015.

[16] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1849:1-14; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3678:16–3679:8.

families.[17]

- Plaintiffs have used, and continue to use, human power, resources, and time to fight the opioid epidemic, which adversely affects both the Counties' budgets and their ability to address other matters.[18]

- The sharp increase in opioid abuse led to a rise in emergency department visits and first responders being called to scenes of overdoses.[19]  The increased need to respond to overdose emergencies also means that first responders are less able to address other needs in the community.[20]  Additionally, repeated exposure to traumatic experiences, such as multiple overdoses and overdose-related deaths among young people, impact emergency responders emotionally, behaviorally, interpersonally, and physically, resulting in increased personnel turnover and decreased personal empathy.[21]

Moreover, the unreasonableness of the interference is further supported by evidence demonstrating that (i) Defendants' conduct violated various statutes and regulations (*infra* at § I.B), (ii) was of a continuing nature (*infra* at § I.B-C), and (iii) produced a long-lasting effect

---

[17]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 670:17 – 672:20; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2795:7–2796:20; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3549:7, 3470:11 3471:1, 3472:16-18; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3663:10-15, 3672:20–3675:4; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4171:2-11; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4237:3-16, 4246:9-20, 4247:3-13, 4253:17–4254:2, 4262:11–4263:5, 4263:17–4264:5, 4290:24– 4291:8; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4365:11-25, 4369:14-16, 4369:19-23, 4374:11– 4378:19, 4382:25–4383:1; P-04511; P-04598.

[18]  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:10-19, 2750:18–2752:22, 2753:4– 2755:25, 2762:3-5, 2795:7–2797:3; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3459:7; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3676:6–3677:2, 3678:8-18, 3678:19–3679:8; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4237:3-16, 4239:24–4340:4, 4243:14–4244:9, 4245:15–4246:10, 4247:3-13, 4253:17–4254:2, 4254:8-24, 4255:4–4256:5, 4259:10-17, 4260:1–4261:7, 4262:11-24, 4264:8-17, 4290:24–4291:25; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4362:1-6, 4365:11-25, 4368:20–4369:2, 4369:13-23, 4374:11–4378:19, 4379:9-15, 4380:2-4, 4383:2-7; P-04511; P-04568; P-04598.

[19]  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2755:5-7; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3458:25 – 3459:7, 3470:11 – 3471:1, 3472:3-18; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3672:20-25, 3674:6-17; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4254:8-13, 4263:17-20; Dkt. #4093 (10/27/21 Trial Tr.) [*Fraser*] at 4374:11-17; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5407:3- 21.

[20]  *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2795:20–2796:12; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3468:21–3471:1; Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4254:8-24.

[21]  *See, e.g.,* Dkt. #4090 (10/26/21 Trial Tr.) [*Caraway*] at 4263:17–4264:5.

upon public health and safety (*supra* at § I.A), an effect of which Defendants were aware or should have been aware (*infra* at §§ I.B-C).

B.     **The Evidence Demonstrates that Defendants Unlawfully and/or Intentionally Dispensed Massive Amounts of Prescription Opioids into Lake and Trumbull Counties.**

For Defendants to be held liable for public nuisance, their dispensing conduct[22] must have been intentional and/or unlawful.  In this context, "intentional" "means not that a wrong or the existence of a nuisance was intended but that the creator of it intended to bring about the conditions which are in fact found to be a nuisance."  *Nottke v. Norfolk S. Ry. Co.,* 264 F. Supp.3d 859, 863 (N.D. Ohio 2017) (citing *Angerman v. Burick,* 2003-Ohio-1469, 2003 WL 1524505, at *2 (Ohio Ct. App. March 26, 2003)).  *See also* Dkt. #3403 (CT3 MTD Order) at p. 28.  In other words, "'[w]here the harm and resulting damage are the necessary consequence of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, . . . the rule of absolute liability applies.'"  Dkt. #3403 (CT3 MTD Order) at p. 28 (quoting *Taylor v. City of Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944)).

Defendants' conduct is unlawful if it violates applicable statutes or regulations governing the dispensing of prescription opioids.  The legal obligations on dispensers of opioids under the CSA and its implementing regulations have been clearly delineated by this Court in prior rulings.[23] To begin with, *all* registrants must "'provide effective controls and procedures to guard against [i] theft *and* [ii] diversion of controlled substances.'"  Dkt. #3403 (CT3 MTD Order) at p. 15 (emphasis in original) (quoting 21 C.F.R. § 1301.71(a)).

Regarding dispensers of opioids, the Court has explained that: (1) both the individual

---

[22]    For purposes of this response, "conduct" includes omissions.

[23]    In addition to the plain language of the statute and implementing regulations, the DEA has published on the Federal Register numerous decisions, opinions, and administrative actions that describe the obligations of dispensers under the CSA at length.  *See, e.g., East Main Street Pharmacy*; *Affirmance of Suspension Order*, 75 FR 66149-01, 66163, 2010 WL 4218766 (D.E.A. Oct. 27, 2010); *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*, 77 FR 62316-01, 62341, 2012 WL 4832770 (D.E.A. Oct. 12, 2012).

pharmacists *and* the pharmacy registrant bear the responsibility to guard against invalid prescriptions[;] (2) dispensers of controlled substances must "check for and conclusively resolve red flags of possible diversion prior to dispensing those substances[;]" (3) pharmacies must collect and retain specific data-points that would inarguably be useful to the pharmacy (or the DEA) in identifying suspicious prescribing and dispensing activity" in order to "guard against diversion[;]"[24] and (4) "a pharmacy may not fill a prescription that it knows or has reason to know is invalid and may not remain deliberately ignorant or willfully blind of the prescription information it has (including computerized reports it generates)."  Dkt. #3403 (CT3 MTD Order) at pp. 14-22, 25; Dkt. #3499 (CT3 Reconsideration Order) at p. 7.

As to this last point, the Court recognized that the corresponding responsibility duty imposed by 21 C.F.R. §1306.04(a) requires a pharmacist to refuse to fill a prescription when "a red flag was *or should have been recognized* at or before the time the controlled substance was dispensed." Dkt. #3403 (CT3 MTD Order) at p. 22 & n.25 (emphasis added) (citing *Holiday CVS*, 77 FR 62316-01, at 62341); *see also id.* at n.25 ("[T]he DEA 'has consistently interpreted [section 1306.04(a)] as prohibiting a pharmacist from filling a prescription for a controlled substance when he either knows or has reason to know that the prescription was not written for a legitimate medical purpose.'") (quoting *E. Main St. Pharmacy*, 75 FR 66149-01, at 66163).

In their Joint Motion (Dkt. #4098 at pp. 7-8; *see also* Dkt. #4100 (WMT Motion) at pp. 6-8), Defendants cherry-pick phrases from the Court's opinion and the applicable precedent in an

---

[24]  Defendants claim that the Court "ruled that the CSA does not require any data to be shared among a chain's individual pharmacists, explaining that 'there is no absolute requirement . . . that a pharmacy must conduct a computerized [] analysis of each prescription before filling it.'"  Dkt. #4098 (Ds' Motion) (quoting Dkt. #3499 (CT3 Reconsideration Order) at p.7); *see also* Dkt. #4102 (WAG Motion) at p. 6; Dkt. #4100 (WMT Motion) at p. 10. But importantly the Court also emphasized that, despite the CSA not containing an "explicit" requirement as to the use of data to prevent diversion: "It remains true, however, that a pharmacy may not fill a prescription that it knows or has reason to know is invalid and *may not remain deliberately ignorant or willfully blind of the prescription information it has (including computerized reports it generates).  To repeat: pharmacies may not 'do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled.*'"  Dkt. #3499 (CT3 Reconsideration Order) at p.7 (internal citations omitted) (emphasis added).

effort to minimize their obligation to "check for and conclusively resolve red flags of possible diversion prior to dispensing [controlled] substances." Dkt. #3403 (CT3 MTD Order) at p. 22. Plaintiffs incorporate their prior briefing on the applicable standard. Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 20-26. As noted therein, the DEA recognizes that pharmacists and pharmacies will be deemed willfully blind if they ignore high volumes of red-flagged prescriptions or other dispensing irregularities plainly present in their data. *See, e.g., Medic-Aid Pharmacy*, 75 Fed. Reg. 30043-01, 30043-44, 1990 WL 328750 (July 24, 1990); *Ralph J. Bertolino, d/b/a Ralph J. Bertolino Pharmacy; Revocation of Registration*, 55 FR 4729-01, 1990 WL 352775 (Feb. 9, 1990); *Jones Total Health Care Pharm., LLC,* 881 F.3d 823, 832 (11th Cir. 2018); *E. Main St. Pharmacy*, 75 Fed. Reg. 66149-01, 2010 WL 4218766. When the red flags are present, there is a duty to investigate prior to dispensing. *Medic-Aid Pharmacy*, 75 Fed. Reg. at 30043-44 ("there is no question that a conscientious pharmacist would have been suspicious of these prescriptions and would have refused to fill them"); *Ralph J. Bertolino*, 55 FR at 4729-01 ("the sheer quantity and frequency of prescriptions for Preludin, a highly abused Schedule II controlled substance . . . should have prompted Mr. Bertolino to question their legitimacy and ultimately decide not to fill them"). And, the failure to attempt to do so is sufficient to constitute a violation of 21 C.F.R. § 1306.04(a). *Jones Total Health Care Pharmacy, LLC*, 881 F.3d at 830 (11th Cir. 2018) (violation of section 1306.04(a) established by evidence that pharmacy filled over one-hundred prescriptions that had at least one red flag that pharmacy did not attempt to resolve and that could not have been resolved).

Defendants, citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011), argue that "Plaintiffs were required to present evidence that each Defendant (1) subjectively believed its pharmacists were violating the CSA and (2) intentionally took actions to avoid learning about it." Dkt. #4098 (Ds' Motion) at p.8. That is not the correct standard. As the Supreme Court explained in *Global-Tech*, the standard for willful blindness requires that "there is a high probability that *a fact* exists and (2) the defendant must take deliberate actions to avoid learning of that fact." 563 U.S. at 769 (emphasis added). Defendants contend that the "fact" whose

11

existence they must have been aware of is that their pharmacists were violating the CSA. But pharmacists who lack the information to identify red flags may be dispensing invalid prescriptions without themselves being aware of it or violating the CSA.  Thus, it is sufficient for Plaintiffs to show that each Defendant believed that invalid opioid prescriptions were being filled at its pharmacies, that prescriptions filled at their pharmacies were being diverted, or even that the information in their own database would enable them and their pharmacists to identify invalid prescriptions -- and took actions to avoid learning about or preventing it.  Defendants can be shown to have been willfully blind based on what *they* knew or believed, regardless of whether their pharmacists knew or were willfully blind, regardless of whether the pharmacists' conduct would satisfy each element to establish a violation of the CSA.

Moreover, in this context, the corporate Defendants here are presumed to have the knowledge of their employees.  *State v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 669 (S.D.N.Y. 2017), *aff'd*, 942 F.3d 554 (2d Cir. 2019) ("Knowledge that an agent acquires during the course of performing his or her job responsibilities may be imputed to an employer. . . .  In addition, the presumption of corporate knowledge is conclusive, even if the corporate employee never communicated the information to her superiors.") (citing cases; internal quotations omitted); *Supreme Council Am. Legion of Honor v. Orcutt*, 119 F. 682, 687 (6th Cir. 1903) ("Since a corporation can only act by its agents, we think it should be imputed to the corporation, after so long a period, that it had knowledge of the course of business pursued by them.").  In addition, "[w]hile *Global–Tech* requires proof of deliberate actions, the standard does not require proof of an identifiable affirmative act."  *United Parcel Serv.*, 253 F. Supp. 3d at 667 (internal quotations omitted).  Indeed, choosing to proceed in the presence of "[r]ed flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." *S.E.C. v. Delphi Corp.*, 508 F. App'x 527, 532 (6th Cir. 2012) (quoting *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011)); *United Parcel Serv.*, 253 F. Supp. 3d at 667 (same).

12

1.    ***Walgreens unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties.***

The evidence adduced at trial demonstrates that Walgreens dispensed massive amounts of prescription opioids into the Counties without providing effective controls against diversion.[25] Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- From January 2006 through December 2019, Walgreens pharmacies dispensed 25,346,069 dosage units of prescription opioids into Lake County and 27,969,541 dosage units of prescription opioids into Trumbull County.[26]

- Of the total dosage units of prescription opioids, Walgreens dispensed 9,118,612 dosage units of hydrocodone and 13,055,332 dosage units of oxycodone from its pharmacies in Lake County from January 2006 through December 2019.  P-26321 at 001.

- During that time period, Walgreens dispensed an average of 6.86 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Lake County. At its peak in 2011, Walgreens dispensed an average of 9.64 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Lake County.  P-26321 at 003; Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2133:7 – 2134:6.

- Of the total dosage units of prescription opioids, Walgreens dispensed 15,130,246 dosage units of hydrocodone and 11,000,425 dosage units of oxycodone from its pharmacies in Trumbull County from January 2006 through December 2019.  P-26321 at 001.

- During that time period, Walgreens dispensed an average of 8.83 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Trumbull County.  At its peak in 2015, Walgreens dispensed an average of 13.02 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Trumbull County.  P-26321 at 003.  *See also* Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2133:20 – 2134:6.

---

[25]    Between 2006 and 2018, Lake County had an average population of 229,550 people and Trumbull County had an average population of 210,118 people.  *See, e.g.,* P-26322-A; Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2126:9-17.

[26]    P-26321 at 001; Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2129:17-19, 2132:13 – 2134:6, 2135:16 – 2136:19; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2885:10-22.  *See also* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2027:1 – 2028:4.

- During the relevant time period, Walgreens dispensed a total of 1,007,556 *prescriptions*[27] for opioids, benzos, and muscle relaxers into the Counties, of which **806,193** were opioid prescriptions.[28]

The evidence adduced at trial demonstrates that Walgreens' dispensing of opioids into the Counties was unlawful. Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- The practice of pharmacy is governed by well-defined laws and regulations, both at the national and state-wide levels, and subject to established and well-known standards of care, including requirements for the careful evaluation of prescriptions and efforts to guard against the diversion of medications into non-medical or illegitimate use.[29]

- The CSA creates a closed system of controlled substances distribution and dispensing, which cannot work unless all members within the closed system comply with their obligations.[30]

- Federal and Ohio controlled substances laws and regulations require Walgreens to maintain effective controls and procedures to guard against the diversion of controlled substances.[31]

---

[27] As Dr. McCann explained, "dosage unit" refers to the number of pills, while "prescription" typically involves packaging of more than a single dosage unit (*e.g.*, 30 or 90 pills). Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2139:24 – 2140:15; Dkt. #4032 (10/15/21Trial Tr.) [*McCann*] at 2304:6-11.

[28] Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2139:17-20, 2139:24 – 2140:18; Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2230:12-19, 2238:12-19, 2298:18-20.

[29] Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 934:21 – 949:11, 949:20 – 954:8; *see also, e.g.,* 21 U.S.C. §§ 824(d), 827(a), 841; 21 C.F.R. §§ 1301.71(a), 1306.03, 1306.04, 1306.06; Ohio Admin. Code § 4729-5-20.

[30] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 374:13-19; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 562:25 – 563:17; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 935:19 – 936:13, 936:21 – 938:5, 954:10-22, 955:7-11, 986:9 – 987:6, 1041:13 – 1042:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1386:22 – 1387:4, 1471:8-22, 1490:24 – 1491:7, 1493:24 – 1494:6; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at1544:7-23, 1546:7-19, 1551:11 – 1552:7, 1553:17-24, 1563:22 – 1564:10, 1565:13 – 1566:13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1714:19 – 1715:13, 1795:4-17; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:17-25.

[31] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 562:25 – 563:17, 573:18 – 574:18, 626:2-7, 631:4-9, 701:2-19, 702:1-5; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 937:22 – 938:25, 954:10 – 958:22, 959:1-6, 961:11 – 962:5, 962:16 – 965:12, 965:16 – 966:1, 968:22 – 969:2, 972:14-21, 973:6-23, 975:4-10, 986:9 – 987:2, 996:6-16, 1001:20 – 1002:2, 1015:6 – 1016:2, 1027:8-15, 1028:9 – 1029:4, 1041:14 – 1042:4, 1043:10 – 1044:20, 1045:3-20, 1046:17 – 1048:10; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1229:2 – 1231:20, 1233:2-7, 1234:9-19; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1388:8-24, (footnote continues on next page)

14

- Pharmacies and pharmacists are the last line of defense to protect against diversion.[32]

- Walgreens, through the control it exerts over its pharmacies, pharmacists, and pharmacy employees, is responsible for ensuring all dispensing of controlled substances is carried out in accordance with applicable laws and regulations.[33]

- Corporate oversight includes established practices of pharmacies that should incorporate top-down compliance programs using data readily available to Walgreens to guard against diversion.[34]

- Corporate oversight also should support, and not impede, pharmacists in complying with laws and regulations related to the dispensing of controlled substances.[35]

- Walgreens is expected to become and remain aware of its obligations regarding the dispensing of controlled substances and the risks associated with same.[36]

- Walgreens' dispensing policies were created and implemented by its corporate

---

1470:7-20, 1471:3 – 1472:11, 1473:6-19, 1490:24 – 1491:7, 1493:10 – 1494:6, 1497:23 – 1498:5, 1499:18 – 1500:11, 1508:20-23, Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1551:3-8, 1553:16-24, 1576:13 – 1577:22, 1578:3-11, 1578:14-25, 1590:1 – 1591:13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:1-22, 1672:1 – 1673:15, 1676:24 – 1677:16, 1701:4-11, 1710:3 – 1711:8, 1714:19 – 1715:13, 1795:4-17, 1813:5 – 1814:14; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:11-21, 5472:5-15; P-14750 at 001.

[32] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 925:18 – 926:9, 926:20 – 927:21; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1203:18 – 1204:14; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1577:8-22; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:14-22, 1673:7-15; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2894:19-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1833:20 – 1834:5; P-15962-A at 009; P-19827 at 002.

[33] *See, e.g.*, Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 626:1-18; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] 925:11 – 926:9, 935:19 – 936:5, 953:15 – 954:8, 960:22 – 962:12, 968:22 – 969:2, 969:11-20, 970:2 – 971:2, 974:16 – 975:12, 976:6-10, 980:5-13, 982:3-7, 996:6-16, 1001:20 – 1002:2, 1046:1-8, 1047:1 – 1048:10; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1149:9 – 1150:3; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1473:6-16, 1510:25 – 1511:1, Dkt. #4017 (10/12/21 Trial Tr.) [*Rannaazzisi*] at 1578:22-25, 1579:8-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1710:12 – 1711:8, 1808:10-20.

[34] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 858:18 – 859:9, 868:16-25; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 926:10 – 928:2, 958:23 – 966:1.

[35] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 926:10 – 928:2, 966:2 – 971:2, 972:1 – 975:10, 976:5-10, 980:3 – 982:7, 982:15 – 985:18; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9.

[36] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 986:2 – 993:16.

department and applied nationally to all its pharmacies.[37] [38]

- Walgreens failed to implement and maintain effective controls against diversion in its dispensing of prescription opioids.[39]

- Walgreens failed to timely implement and apply necessary controlled substance policies across its pharmacy stores.[40]

---

[37] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1963:24 – 1964:3; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2860:12-20, 2910:16-19, 2926:11-12, 2934:17 – 2935:17, 2937:6-15; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3016:12-21, 3017:19-24, 3076:2-5, 3291:19 – 3292:2; P-14746 at 003; P-17254; P-19616; P-19927-A; P-20639 at 025.

[38] For this reason, evidence of Defendants' extraterritorial dispensing misconduct is relevant to determining whether they acted unlawfully and/or intentionally in this case. *See, e.g.,* Dkt. #3058 (CT1A Evidentiary Order) at p. 8.

[39] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6, 2021:9-25, 2022:6 – 2023:18, 2029:24 – 2030:5, 2030:10 – 2032:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2737:17 – 2738:2, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8 – 2749:5, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:8-12; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2882:18-24, 2886:20 – 2887:20, 2905:15-22 (WAG did not roll out targeted drug good faith dispensing program until April 2013), 2906:17 – 2907:20, 2916:9-16, 2917:2-6, 2917:10-17, 2923:15-25, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3019:2 – 3020:13, 3026:10-16, 3027:4 – 3028:20, 3029:5-7, 3029:21 – 3030:5, 3031:7-12, 3031:16-17, 3034:23 – 3036:17, 3037:20-24, 3039:18 – 3040:5, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3050:14-19, 3051:8-17, 3051:22 – 3055:24, 3058:4-13, 3062:12 – 3064:14, 3064:19 – 3066:12, 3066:25 – 3067:9, 3067:17 – 3069:3, 3070:17-20, 3071:6-18, 3071:19 – 3073:20, 3073:21 – 3079:24, 3080:5 – 3090:12, 3091:1-21, 3092:11 – 3093:9, 3265:22 – 3267:10, 3270:9- - 3721:5, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3287:23 – 3290:5, 3293:16-25; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3343:12-25, 3344:20 – 3345:21, 3346:1-24, 3351:20 – 3352:13, 3357:9-21, 3358:14 – 3359:16, 3366:22 – 3367:4, 3384:10-21, 3385:15-18, 3391:19 – 3392:14, 3393:5 – 3394:20, 3397:13 – 3405:2, 3417:23 – 3418:8; P-04600-A; P-14746 at 010-011; P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-15085 at 006-011; P-17156; P-17177; P-17254; P-17260; P-19566; P-19574; P-19607; P-20639 at 009, 011-012; P-20795; P-20803; P-23678 (Walgreens pharmacy in Trumbull County dispensed opioid that should not have been dispensed according to GFD checklist); P-24039; P-25492 at 015-017, 020-025; P-25621.

[40] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 631:4-15; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:17 – 995:8, 996:4-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1204:16 – 1205:19; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2021:9-25, 2022:6 – 2023:6, 2029:24 – 2030:5, 2030:10 – 2031:19 – 2032:2,; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2850:9 – 2851:7, 2851:21 – 2852:3, 2882:18-24, 2886:20 – 2887:20, 2905:15-25 (WAG did not roll out targeted drug good faith dispensing program until April 2013), 2906:17 – 2907:20, 2916:9-16, 2917:2-6, 2917:14-17, 2923:15-25, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3019:2 – 3020:13, 3028:5-20, 3029:5-7, 3029:21 – 3030:5, 3031:11-12, 3031:16-17, 3042:19 – 3043:10,

(footnote continues on next page)

- Even once certain controlled substances diversion policies were developed, Walgreens failed to monitor and enforce the policies across its pharmacy stores.[41]

- Walgreens also implemented employment evaluation policies and performance metrics that impeded its pharmacists' efforts to comply with laws and regulations and meet standards of care.[42]

- Walgreens and its pharmacists have a corresponding responsibility to only fill prescriptions for controlled substances that are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her/his professional

---

3043:20 – 3044:24, 3045:6 – 3047:15, 3058:4-13, 3064:19 – 3066:12, 3066:25 – 3067:9, 3067:17 – 3069:3, 3070:17-25, 3071:6-18, 3071:19 – 3073:20, 3073:21 – 3079:24, 3080:5 – 3090:12, 3265:22 – 3267:10, 3270:9-25, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3293:16-25; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3351:20 – 3352:13, 3393:5 – 3394:20, 3397:13 – 3405:2, 3417:23 – 3418:8; P-14746 at 010-011; P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-15085 at 006-011; P-17177; P-17254; P-19566; P-19574; P-19607; P-20639 at 009, 011-012; P-20795; P-20803; P-23678; P-24039; P-25492 at 015-017, 020-025; P-25621.

[41] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 998:7 – 1000:8; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2030:10 – 2032:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3026:10-16, 3027:4-23, 3028:5-20, 3029:5-7, 3029:21 – 3030:5, 3034:23 – 3036:17, 3037:20-24, 3039:18 – 3040:5, 3042:19 – 3043:10, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3050:14-19, 3051:8-17, 3051:21 – 3055:18, 3055:19-24 (Tasha Polster: "It's not my job to ensure whether or not the pharmacists are doing their due diligence."), 3059:20 – 3060:1 (Polster later conceded that "it is part of [her] job, yes"), 3062:12 – 3064:14, 3071:19 – 3073:20, 3091:1-7, 3265:22 – 3267:11, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3290:18-23; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3320:22 – 3321:20 (from 2009-2020, the twelve WAG pharmacies in the Counties refused to fill only ~646 prescriptions, which is approximately 54 per store over the 11-year period), 3326:7 – 3327:25, 3328:25 – 3329:2 ("Q: So it's possible that that prescription was taken to another Walgreens store and filled then?  A: It is possible."), 3329:9 – 3331:1 (there's nothing on the refusal to fill documentation that explains why it wasn't filled), 3331:2-6 ("Q: And one thing we do know is Walgreens sure did fill a lot of prescriptions for this person over the years, right? A: If you look at the dates, they were filled on a monthly cadence, and there were multiple prescriptions filled."), 3331:7 – 3332:16, 3343:12-25, 3344:20 – 3345:21, 3346:1-24, 3354:8-17, 3358:14 – 3359:16, 3366:22 – 3367:4, 3393:5 – 3394:20, 3397:13 – 3405:2; P-15068 at 009-012; P-15085 at 006-011; P-15314 at 028; P-17156; P-17254; P-20803; P-22946; P-23678; P-24039; P-25492 at 015-017, 020-025.

[42] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:17 – 933:21, 966:2 – 967:12, 1000:10 – 1005:7, 1005:16 – 1006:17; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:5 – 1115:7, 1115:8 – 1117:3 (WAG); P-19827 at 002 ("Hearing complaints from pharmacists that they don't have time to check all these prescriptions for good faith.  Wants to make sure chains aren't inhibiting this by pressuring their pharmacists to fill fast or not providing adequate labor."; "Believes that compensation (bonus) should not be tied to prescription volume of controlled substances."), 003 ("Bonus parameters are a concern.").

17

practice.[43] [44]

- The determination of whether a prescription issued for a controlled substance is valid and legitimate requires systems and actions to recognize, investigate, and resolve signs of a prescription's invalidity (*i.e.*, red flags). These red flags are warning signs and can also indicate activities are occurring outside the usual and customary scope of pharmacy practice, activities that are more than likely to include abuse, diversion, and fraudulent acts.[45]

---

[43]   *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 572:18-24, 573:18 – 574:18, 619:23 – 620:1, 626:2-7; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 913:2-21, 922:7 – 923:20, 925:11 – 926:9, 943:2-8, 960:20 – 967:12., 968:22 – 969:2, 970:2 – 971:2, 974:16 – 975:12, 976:5-10, 980:5 – 982:7, 986:9-19, 1015:6 – 1016:25, 1018:4-10, 1034:9-23, 1035:19-22, 1037:23 – 1038:6, 1041:6-10, 1041:13 – 1042:4, 1043:4 – 1044:20, 1045:3-13, 1046:1 – 1047:24, 1050:7-14, 1055:5 – 1057:23; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1229:8-13, 1232:22 – 1233:15, 1234:12 – 1235:4, 1256:16-22; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1324:15-19, 1327:25 – 1328:18, 1339:13-20, 1388:8-24, 1395:9 – 1397:3, 1471:3-22, 1509:13 – 1511:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1576:13 – 1577:22, 1582:20-23, 1586:13 – 1588:6; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:1-22, 1672:1 – 1673:15, 1676:6-11, 1676:24 – 1677:16, 1689:14-19, 1709:15-19, 1768:14-18, 1795:6-17; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1831:15 – 1832:13, 1833:20 – 1834:19, 1912:5-9; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2838:16 – 2839:1, 2844:5-13, 2844:18-21 ("Q: Because the company has been held accountable when pharmacists fail to exercise their corresponding responsibility, true? A: True."), 2910:10-13; P-08954 at 002; P-15068 at 002; P-15314 at 026; P-15962-A at 003, 008-014; P-17177; P-20639 at 005; P-20639 at 009, 024.

[44]   Defendants' assertion that acting outside "the usual course" of one's profession "means abandoning all professional norms to the point of no longer acting in a professional capacity" is simply wrong.  Dkt. #4098 (Ds' Motion) at p. 10 (citing *United States v. Moore*, 423 U.S. 122, 143 (1975)).  In *Moore*, the Supreme Court upheld a conviction against a pill-mill doctor because "[t]he evidence presented at trial was sufficient for the jury to find that [Dr. Moore]'s conduct exceeded the bounds of 'professional practice.'"  *Id.* at 142.  But, as the Sixth Circuit has recognized, in *Moore* "good faith was not at issue— there was no evidence of any 'honest effort' to comply with accepted standards of medical practice."  *United States v. Godofsky*, 943 F.3d 1011, 1024 (6th Cir. 2019).  "A pharmacist's claim of good-faith compliance with proper pharmaceutical practice is judged by an objective standard, which asks 'whether a reasonable [pharmacist] under the circumstances could have believed, albeit mistakenly, that [s]he had acted within the scope of ordinary professional medical practice for a legitimate medical purpose[.]'"  *United States v. Jones*, 825 F. App'x 335, 339 (6th Cir. 2020) (quoting *Godofsky*, 943 F.3d at 1026) (citing *United States v. Veal*, 23 F.3d 985, 988 (6th Cir. 1994) (per curiam)) (internal citation omitted).  Applying that standard, the Sixth Circuit in *Jones* held that evidence showing a pharmacist failed in her professional responsibility by repeatedly ignoring red flags and failing to take basic precautionary measures to confirm the validity of prescriptions sufficiently showed that she knowingly acted outside the scope of professional practice.  825 F. App'x at 339-40.

[45]   *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 922:2-18, 923:5-20, 1040:5 – 1041:10, 1043:10 – 1044:1.

- Walgreens knew and understood that there are certain red flags associated with opioid prescriptions that are indicative of potential diversion.[46]

- To effectively guard against diversion, Walgreens and its pharmacists must, prior to dispensing a prescription opioid: (i) accurately identify and document all red flags raised by the prescription, patient, and prescriber; (ii) reasonably collect complete, relevant, and accurate information concerning each red flag; (iii) independently evaluate the collected information to determine whether the evidence is reliable and whether, as a whole, the evidence adequately resolves each red flag; and (iv) clearly and explicitly document their evaluation of the evidence and their reasoning supporting their judgment to dispense the prescription.[47]

- Documenting the resolution of red-flagged prescriptions is a critical component of implementing effective controls against diversion, and is otherwise required by law.[48]

---

[46]   *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1482:16 – 1489:16, 1490:14 – 1491:7; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1829:21 – 1830:4, 1901:2-23, 1902:10 – 1903:22, 1904:1-18, 1907:2 – 1909:2; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1975:5-17, 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2858:8 – 2859:17, 2880:2-3, 2893:24 – 2894:2, 2894:21 – 2896:2; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3070:17-25, 3071:6-18, 3078:13-18, 3096:4-11, 3127:2-8, 3129:5 – 3130:19, 3131:13-20, 3132:1-14, 3134:7 – 3135:3, 3135:15 – 3136:14, 3136:22 – 3137:1, 3138:10-20, 3290:14-23; P-08439; P-15068 at 003-005; P-15314 at 026-028; P-15317 at 002; P-15962-A at 010-012; P-17254; P-19566 at 003; P-19616 at 013-015, 041-043; P-19827 at 002; P-20811; P-26403 at 027-087.

[47]   *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 572:18-24, 573:18 – 574:18, 619:23 – 620:1, 626:2-7; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 922:7 – 923:20, 925:11 – 926:9, 943:2-8, 986:12-19, 1007:1 – 1044:20, 1045:3 – 1048:16, 1050:7-14, 1055:5 – 1057:1; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1209:18-25, 1210:14 – 1211:16, 1212:15-16, 1234:12 – 1235:25, 1256:16-22; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1327:25 – 1328:18, 1339:13-20, 1470:2 – 1471:22, 1482:16 – 1489:16, 1490:14 – 1491:7, 1509:13 – 1511:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1576:13 – 1577:22, 1582:20-23, 1586:13 – 1588:6; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1676:6-11, 1676:24 – 1677:16, 1709:15-19; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3139:14 – 3140:11, 3290:18-23; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:24 – 3566:6, 3580:14-21; P-08439; P-15962-A at 010-013; P-26403 at 027-055, 056 ("When suspicion is aroused as reasonable professionals, either by ambiguities in the prescription or sheer volume, pharmacists must refuse to dispense[.]"), 058-060, 061-062 ("'When prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes . . .'"; "Verification by prescriber does not allow pharmacists to ignore evidence that gives 'reason to believe' prescription was not issued for a legitimate medical purpose."), 063-087; P-42147-A.

[48]   *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 922:21 – 923:17, 941:16 – 944:13, 985:15-18, 986:12 – 987:2, 1010:16 – 1011:1, 1016:3-25, 1017:25 – 1018:21, 1021:20-25, 1022:19 – 1023:4, 1026:10 – 1027:1, 1039:23 – 1040:3, 1041:6-10, 1045:3-25, 1048:1-10, 1054:18 – 1057:23; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1171:1-13, 1210:10 – 1211:16, 1212:24 – 1213:1, 1213:16-20, 1214:3-5, 1214:25 – 1215:2, 1228:15 – 1235:25; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1353:7-18, 1388:6-13, 1398:6-13, 1471:23 – 1472:11, 1491:23 – 1492:5, 1494:2-6, 1497:22 – 1498:5, 1499:18 – 1500:14; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1590:1 – 1591:13; Dkt. #4023 (10/13/21 Trial

(footnote continues on next page)

19

- Despite recognizing the importance of doing so,[49] Walgreens consistently failed to document their resolution of red flags.[50]

- Walgreens failed to provide its pharmacists with the data, training, guidance, resources, and tools necessary to assist the pharmacists in fulfilling their corresponding responsibility duties, including but not limited to, utilizing dispensing data to identify patterns, trends, and practitioners possibly involved in diversion as well to recognize and resolve red flags.[51]

---

Tr.) [*Rannazzisi*] at 1773:1-7; 1813:5 – 1814:14; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:24 – 3566:6; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5416:12 – 5417:8.

[49]  *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1953:3-15, 1975:18 – 1976:19, 1981:25 – 1982:11, 2093:1-11 ("Q: Right.  But there are a number of red flags that are important and are critical to prevent diversion, right?  A: Lots of them.  I-- Q: Yeah.  Right.  And the resolution of those red flags and the documentation of that has an important effect on the ability to prevent diversion.  True?  A: Sure."); Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2879:13 -2880:9 ("It's an obligation of the pharmacists to document resolutions of red flags on prescriptions"), 2881:21-23, 2952:19-22; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3002:9-15, 3009:12-20, 3041:4-6, 3088:13-19, 3089:3-11, 3089:22 – 3090:1, 3091:9-21, 3290:14-20; P-15068 at 005 ("It is imperative that pharmacists document all efforts used to validate good faith dispensing."); P-15085 at 010 ("The decision to dispense a prescription is ultimately up to the pharmacist, however, proper documentation to support the decision is needed.  It's important that pharmacists document all actions taken during the Good Faith Dispensing process."); P-15314 at 007-008, 028; P-19616 at 038 ("[P]roper documentation document to support the decision is needed. It is important that pharmacists document all actions taken during GFD process."); P-20795; P-25631 at 007 ("Document all efforts used to validate good faith dispensing."), 008.

[50]  *See, e.g.,* Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3046:24 – 3047:15, 3051:8-17, 3052:11-25, 3056:14-23, 3088:13-22, 3091:1-7; P-15085 at 007-008; *see also infra* at fns.57-58.

[51]  *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1048:23 – 1050:14; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1827:20 – 1828:9, 1878:4 – 1879:6, 1880:2-7, 1896:15-18; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1947:13 – 1948:12, 1964:23 – 1965:15, 2007:6 – 2009:3, 2015:15 – 2016:9, 2017:3 – 2018:4, 2021:9-25, 2022:6 – 2023:6, 2029:24 – 2030:5, 2030:10 – 2032:2, 2035:23 – 2036:10; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2847:1-10, 2850:9 – 2851:7, 2851:21 – 2852:3, 2863:9-17, 2883:7 – 2884:17, 2886:20 – 2887:20, 2915:17-22, 2916:9-16, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3019:2 – 3020:13, 3062:12 – 3064:14, 3070:17-25, 3071:6-18, 3071:19 – 3073:20, 3073:21 – 3079:24, 3080:5 – 3090:12, 3092:11 – 3093:9, 3263:19 – 3264:8, 3265:2 – 3266:6, 3266:24 – 3267:3, 3270:9-25, 3279:11 – 3281:14, 3283:3 – 3284:11, 3287:23 – 3290:5; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3329:9 – 3331:6, 3351:20 – 3352:13 (hard copies in refusal to fill folders "are not posted anywhere or shared electronically"), 3354:8-17, 3357:9-21, 3358:14 – 3359:16, 3366:22 – 3367:4, 3383:5-7, 3383:25 – 3384:9, 3391:19 – 3392:14, 3393:5 – 3394:20, 3417:23 – 3418:8; P-14746 at 010-011; P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-17156; P-17254; P-17260; P-19566 at 001 (acknowledging that no "periodic training of all Walgreens retail employees for dispensing controlled substances . . . .  exists today"), 002; P-19607; P-20639 at 009, 011-012, 014-015; P-20795 (did not provide electronic access to GFD checklists to pharmacists until 2019); P-20803; P-22946; P-24039; P-25492 at 017, 025; P-25621.

- For example, Walgreens collected data that would be useful for it and its pharmacists in identifying suspicious prescribing and dispensing activity in order to guard against diversion, but for at least some period of time failed to provide such data, or make it easily accessible, to its pharmacists.[52]

- Additionally, state PDMPs, such as OARRS in Ohio, contain helpful data that pharmacists can use to identify and resolve red flags.[53]

- Despite recognizing the usefulness of PDMPs, during at least some portion of the relevant time period, Walgreens failed to mandate that its pharmacists check the applicable PDMP whenever filling an opioid prescription.[54]

- Walgreens' pharmacies in the Counties filled thousands of opioid prescriptions presenting red flags without evidence of resolving those red flags.[55]

- Specifically, of the 806,193 opioid prescriptions dispensed by Walgreens into the Counties, **175,609** had one or more red flags associated with them.[56]

- From the random sampling of 2000 red-flagged Walgreens prescriptions in the Counties, only 160 prescriptions contained some writing in the DUR comment field regardless of the DUR alert and even for those 160 prescriptions, the comments were often just pharmacist initials, notes about reviewing patient history, general patient consult, and speaking to the doctor. Of the 2000 prescriptions, 1,237 were blank across

---

[52] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1878:4 – 1879:6, 1880:2-7; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1953:16-21, 1954:5-15, 2007:6 – 2009:3, 2015:15 – 2016:9, 2017:3 – 2018:4; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2927:19 – 2928:7, 2946:6 – 2947:9, 2948:7-9, 2950:19-21, 2951:19-25; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3073:21 – 3079:24; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3368:12 – 3374:1, 3393:5 – 3394:20, 3397:13 – 3405:2; P-15068; P-15314 at 022-025; P-17254; P-19607; P-20639 at 014-015.

[53] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 569:24 – 570:9, 571:8-25, 572:1-17; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 858:13-17; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1015:18 – 1016:2; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1159:16 – 1160:19; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1324:20 – 1325:7; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1691:23 – 1692:7; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3553:13-21, 3555:8-14; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5417:14 – 5418:4.

[54] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1875:23 – 1876:4 ("Q: Right. And you're aware of the fact that after OARRS came into existence in Ohio, there was evidence to – published by the Ohio Board of Pharmacy that it was effective in reducing diversion, the use of OARRS was effective in reducing diversion. True? A: Sure. And I would agree with that."), 1897:23 – 1898:19, 1904:19-24, 1905:8-25; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1946:3 – 1947:12, 1958:22 – 1959:3; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2882:18-24; P-19616 at 040.

[55] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1006:19 – 1044:1, 1057:25 – 1058:18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1137:1-5, 1148:3 – 1149:8, 1179:17 – 1188:2, 1202:4 – 1203:17.

[56] Dkt. #4032 (10/15/21Trial Tr.) [*McCann*] at 2238:16-19, 2245:8-22, 2246:11, 2247:8-9.

all Walgreens' relevant notes fields (61% of the sample), and of those 1,237, there were 940 prescriptions that also had nothing written on the hard copy prescription (47% of the total sample). And even of the hard copy prescriptions with notes, they were often notations that the patient was waiting, or pharmacist initials, or "check with M.D." "There wasn't any relevant notes regarding red flags and the resolution of red flags on any of those hard copies that [Mr. Catizone] reviewed."[57]

- Plaintiffs' expert, Mr. Catizone testified that, based on the random sampling of prescription notes fields produced, over 90% of the red flag opioid prescriptions dispensed by Walgreens into the Counties did not contain adequate documentation demonstrating that the red flags were resolved prior to dispensing.[58]

- Dr. McCann testified that Mr. Catizone's 90% of red-flagged prescriptions in the random sampling can be extrapolated over all the red-flagged prescriptions.[59]

The evidence adduced at trial further demonstrates that Walgreens' dispensing of opioids into Lake and Trumbull Counties was intentional. Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- Walgreens knew and understood its obligations under the CSA and Ohio law related to the dispensing of prescription opioids.[60]

---

[57] *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1180:2 – 1190:15, 1193:18-22, 1202:4 – 1203:17; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1372:21 – 1373:10.

[58] *See* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 923:21 – 925:4, 998:18 – 999:16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1202:23 – 1203:3 ("So when I looked at all these prescriptions which had red flags, the overwhelming majority, and in my report I said based upon my best educated experienced guess, it looks like 90 percent of those prescriptions did not have adequate documentation, but I couldn't really tell on the others as well."), 1203:4-11, 1203:12-14 ("But overwhelmingly, in my overwhelming opinion, about 90 percent of what I looked at didn't meet that level of documentation that was required.").

[59] Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2167:11 – 2168:23 (explaining what a confidence interval is), 2168:24 – 2170:17 (explaining how he extrapolated the confidence interval in this case); Dkt. #4032 (10/15/21Trial Tr.) [*McCann*] at 2302:23 – 2303:3.

[60] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 617:6 – 618:7; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1830:12-17, 1832:8-13, 1865:24 – 1866:11, 1866:16 – 1867:17; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1939:11 – 1942:6, 1943:12 – 1945:2, 1950:17 – 1951:17; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2857:24 – 2858:7, 2879:18 – 2880:9, 2881:21 – 2882:2, 2891:9 – 2892:20, 2894:14 – 2896:2, 2907:2-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; P-14746 at 014; P-14750; P-15314 at 007; P-15317; P-15962-A; P-17177; P-19566; P-19827; P-20639 at 005, 009; P-20810; P-25631 at 007; P-26403 at 027-086.

- Walgreens knew that the prescription opioids it was dispensing had a high potential for abuse that could lead to severe psychological or physical dependence, and thus knew that the diversion of opioids would create a public health hazard.[61]

- Walgreens knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.[62]

- Walgreens knew and understood its dispensing policies and procedures, and its implementation of same, did not comply with its legal obligation.[63]

- Walgreens knew that it was not providing its pharmacists with the necessary training, guidance, tools, resources, and data to allow them to successfully exercise their

---

[61] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1848:24 – 1849:14, 1845:13 – 1850:20, 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were fueling the opioid epidemic in these counties, right?  A: Mr. Weinberger, without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"), 1912:20-24 ("Q: Well, diversion of opioids is very dangerous to the health and safety of our communities, right?  A: Without question.  Q: And diversion is dangerous to individuals, right?  A: It's terrible."); Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2888:2-13, 2907:21 – 2911:16; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3251:5 – 3252:3, 3252:8-14; P-14746 at 003, 005-006; P-15314 at 022; P-15962-A at 003-008; P-17254; P-19566 at 003 ("The abuse of prescription drugs—especially controlled substances—is a serious social and health problem in the United States today."); P-19827 at 002; P-20639 at 002, 004, 024; P-20808; P-23267 at 006-007; P-26403 at 025.

[62] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6, 3094:12-20; P-19566 at 003 ("The abuse of prescription drugs—especially controlled substances—is a serious social and health problem in the United States today.  As a healthcare professional, you share responsibility for solving the prescription drug abuse and diversion problem."); P-14746 at 005, 014; P-15314 at 022; P-15962-A; P-19827 at 001-002; P-20639 at 009 ("[W]e also understand our role in helping reduce the inappropriate use of controlled substances in the communities we serve."), 024; P-26403.

[63] *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2862:2 – 2863:24, 2907:2-20, 2916:9-16, 2923:15-25, 2925:2-6, 2937:6-15, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3028:5-20, 3029:5-7, 3029:21 – 3030:5, 3031:11-12, 3031:16-17, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3050:14-19, 3051:8-17, 3051:21 – 3055:24, 3058:4-13, 3062:12 – 3064:14, 3091:1-7, 3265:22 – 3267:10, 3279:11 – 3281:14, 3283:3 – 3284:11, 3284:15 – 3287:13, 3290:24 – 3291:5; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3366:22 – 3367:4; P-15085 at 006-011; P-15317; P-17177; P-17254; P-20639 at 009, 011-012; P-20803; P-25492 at 015-017, 020-025.

corresponding responsibility.[64]

- Walgreens deliberately implemented dispensing and compensation policies that discouraged or hindered its pharmacists from performing due diligence on suspicious prescriptions.[65]

- Walgreens systematically ignored red flags and other dispensing irregularities plainly present in its data and continued to fill suspicious prescriptions.[66]

- Walgreens lobbied or pushed back against measures that would have helped prevent diversion.[67]

- Walgreens knew of problematic prescribers and pill mills in or around the Counties

---

[64] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1964:23 – 1965:15, 2021:9-25, 2022:6 – 2023:6, 2029:24 – 2030:5, 2035:23 – 2036:10; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2850:9 – 2851:7, 2851:21 – 2852:3, 2863:9-24, 2883:7 – 2884:17, 2886:20 – 2887:20, 2915:17-22, 2916:9-16, 2931:25 – 2933:8, 2942:4-22, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3001:3 – 3003:4, 3005:9 – 3007:15, 3008:7 – 3009:8, 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3019:2 – 3020:13, 3062:12 – 3064:14, 3073:21 – 3079:24, 3080:5 – 3090:12, 3092:11 – 3093:9, 3265:2 – 3266:6, 3265:22 – 3267:10, 3279:11 – 3281:14, 3283:3 – 3284:11, 3287:23 – 3290:5; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3351:20 – 3352:13, 3357:9-21, 3358:14 – 3359:16, 3366:22 – 3367:4, 3368:12 – 3374:1, 3384:10-21, 3391:19 – 3392:14, 3393:5 – 3394:20; P-15068 at 009-012 (hydrocodone not included on target drug good faith dispensing checklist); P-17156; P-17254; P-17260; P-19566 at 001 (acknowledging that no "periodic training of all Walgreens retail employees for dispensing controlled substances . . . . exists today"), 002; P-20795 (did not provide electronic access to GFD checklists to pharmacists until 2019); P-20803; P-24039; P-25492 at 015-017, 020-025; P-25621.

[65] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2051:19 – 2053:14, 2055:24 – 2057:7, 2059:11 – 2061:2; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2830:23 – 2832:5, 2852:22 – 2855:12, 2856:2-14, 2864:5-14, 2866:5 – 2869:18, 2892:10 – 2893:16, 2896:15-24, 2897:4-10, 2939:1-12, 2941:2-25, 2944:21 – 2948:1, 2950:16 – 2951:11, 2954:3 – 2955:16, 2956:11 – 2957:7, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3017:19-24, 3037:25 – 3038:7, 3061:14-18; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3361:20 – 3362:12, 3363:8 – 3364:1, 3365:3-16; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; P-17254; P-19529; P-19607; P-19821; P-19827 at 002-003 (WAG knew DEA was saying not to do this); P-24019; P-25492 at 020-021. *See also* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 932:11 – 933:21; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1115:8 – 1117:3.

[66] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2737:17 – 2738:2, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8 – 2749:5, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:8-12; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2925:2-6; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3397:13 – 3405:2; P-04600-A; P-17254; P-20639 at 011-012; P-23678 (Walgreens pharmacy in Trumbull County dispensed opioid that should not have been dispensed according to GFD checklist); P-24039; *supra* at pp. 21-22.

[67] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1910:16 – 1914:8, 1916:4-8; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1939:1-10; P-08442; P-20639 at 025; P-20811; P-23267 at 013.

from which it continued to allow or encourage its pharmacists to fill opioid prescriptions.[68]

- Walgreens knew that prescription opioids were migrating into Ohio from other states, including Florida.[69]

- Walgreens was subject to investigations and enforcement actions, and parties to settlements with the DEA, in which it was informed of diversion or sanctioned for its failures to prevent diversion.[70]

- In one Memorandum of Understanding resolving one of the DEA's enforcement actions, Walgreens admitted to violations of the CSA from both its Jupiter Florida distribution center and several Florida pharmacies.[71]

- Despite these repeated warnings and sanctions, Walgreens made little to no effort to substantively change its dispensing policies and procedures until contractually obligated to do so under its settlements with the DEA.[72]

---

[68] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:17, 2002:18-19 ("We know what's going on with Dr. Veres. He's been like this for 25 years."), 2003:20 – 2004:2 ("Every pharmacist in Trumbull and Mahoning County knows Dr. Veres, you got to be careful."); Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3230:2 – 3232:2; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3393:5 – 3394:20, 3397:13 – 3405:2; P-24039.

[69] *See, e.g.,* P-15962-A at 005-006; P-19827 at 002; P-42147-A at 004; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 887:18-25; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1697:12 – 1698:11.

[70] *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2847:21 – 2850:21, 2856:16 – 2860:20, 2862:2 – 2863:24 ("Clearly, the DEA didn't feel that we had compliance to what they wanted."), 2911:17 – 2912:9, 2919:8-19, 2933:18 – 2936:1, 2937:6 – 2938:14; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3020:18-22, 3021:5-13, 3030:20 – 3031:18, 3257:17 – 3258:24, 3272:10 – 3273:4, 3290:24 – 3291:5; P-00015; P-14750; P-15317; P-19566; P-20639 at 007.

[71] *See, e.g.,* Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2936:6-14, 2937:6-11; P-00015 at 002 ("Walgreens acknowledges that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA . . . and its implementing regulations . . ."); P-14750 at 002.

[72] *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1115:8 – 1117:3; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1970:18-23; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2832:17 – 2833:22, 2849:1 – 2851:7, 2851:21 – 2852:3, 2857:19 – 2860:20, 2862:2 – 2863:24, 2869:19 – 2870:1, 2873:17 – 2876:7, 2886:20 – 2887:20, 2919:8-19, 2924:19 – 2925:1, 2937:20 – 2938:14; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3020:18-22, 3021:5-13, 3024:12 -3026:1, 3030:3 – 3031:18, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:20 – 3049:10, 3058:4-13, 3257:17 – 3258:24, 3265:22 – 3267:10, 3270:9-25, 3272:10 – 3273:4, 3273:18 – 3274:13, 3284:15 – 3287:13, 3293:16-25; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3366:22 – 3367:4; P-00015; P-14750 at 005-009, 011-013; P-15085; P-15314 at 004, 010, 014; P-15317 at 002-004; P-17254; P-19566; P-20639 at 007-010; P-25492 at 020-024; P-25631 at 004 ("Due to recent action taken by the DEA, select policies and procedures have been updated to ensure our

(footnote continues on next page)

- Despite these repeated warnings and sanctions, Walgreens continued to facilitate and encourage the oversupply and diversion of its opioids.[73]

- Walgreens committed the failures described above (*supra* at § I.B.1) despite its awareness of rising concerns over the abuse of diverted prescription pills in Ohio and the rest of the country.[74]

- Walgreens worked in concert with opioid manufacturers in spreading the manufacturers' false messaging surrounding the treatment of pain and the true addictive nature of opioids in an effort to increase opioid sales and profits.[75]

---

pharmacists and stores are compliant when dispensing controlled substances."), 010, 014 ("We will be developing additional tools to assist in our compliance efforts. These include: . . . Controlled Substance investigation process . . .").

[73] *See, e.g.,* Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6, 2021:9-25, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2892:10 – 2893:16, 2911:17 – 2912:9, 2919:8-19, 2921:21 – 2922:3, 2939:1-12, 2941:2-25, 2942:4-22, 2944:6 – 2948:1, 2954:3 – 2955:16, 2956:11 – 2957:7, 2957:11 – 2968:9; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3010:4-23, 3011:24 – 3012:13, 3013:10 – 3015:9, 3019:2 – 3020:13, 3030:3 – 3031:18, 3043:20 – 3044:24, 3045:6 – 3047:15, 3048:8-11, 3048:20 – 3049:10, 3051:21 – 3055:24, 3058:4-13, 3071:19 – 3073:20, 3265:22 – 3267:10, 3272:10 – 3273:4; Dkt. #4064 (10/21/21 Trial Tr.) [*Polster*] at 3361:20 – 3362:12, 3363:8 – 3364:1, 3365:3-16, 3366:22 – 3367:4, 3393:5 – 3394:20, 3397:13 – 3405:2, 3417:23 – 3418:8; P-15068 at 009-012 (failing to include hydrocodone on target drug good faith dispensing checklist); P-15085 at 006-011; P-17254; P-19607; P-23678; P-24039.

[74] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were fueling the opioid epidemic in these counties, right?   A: Mr. Weinberger, without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"), 1912:20-24; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2860:22 – 2861:4, 2887:10 – 2888:13, 2891:9-13, 2907:21 – 2911:16, 2919:1-7 ("The opioid crisis was absolutely on a roll."), 2919:8-19, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6, 3071:19 – 3073:20, 3094:12-20, 3095:16-19, 3251:5 – 3252:8-14; P-14746 at 003, 005-006; P-15314 at 022 ("Prescription drug abuse is the nation's fastest growing drug problem."); P-15962-A; P-19566 at 003; P-19827 at 001-002; P-20639 at 002, 004, 006, 024; P-20808; P-26403 at 011.

[75] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 557:4-20, 585:11-25, 586:25 – 588:21, 594:11-25, 597:13-20, 614:4 – 615:6, 615:22 – 616:11, 616:17 – 617:3; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 888:4 – 890:3; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2956:11-24; P-25984.

       2.       ***CVS unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties.***

The evidence adduced at trial demonstrates that CVS dispensed massive amounts of prescription opioids into the Counties without providing effective controls against diversion.[76] Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- From January 2006 through November 2019, CVS pharmacies dispensed a total of 25,528,782 dosage units of prescription opioids into Lake County and 15,977,215 dosage units of prescription opioids into Trumbull County.[77]

- Of the total dosage units of prescription opioids, CVS dispensed 10,497,738 dosage units of hydrocodone and 13,007,492 dosage units of oxycodone from its pharmacies in Lake County from January 2006 through November 2019.  P-26319-A.

- During that time period, CVS dispensed an average of 7.36 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Lake County.  At its peak in 2012, CVS dispensed an average of 10.92 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Lake County.  P-26319-A; Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2126:18 – 2127:13, 2128:1-17.

- Of the total dosage units of prescription opioids, CVS dispensed 10,701,691 dosage units of hydrocodone and 4,832,952 dosage units of oxycodone from its pharmacies in Trumbull County from January 2006 through November 2019.  P-26319-A.

- During that time period, CVS dispensed an average of 5.31 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Trumbull County.  At its peak in 2010, CVS dispensed an average of 6.42 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Trumbull County.  P-26319-A.  *See also* Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2126:18-23, 2127:14-25, 2128:1-10.

---

[76]   Between 2006 and 2018, Lake County had an average population of 229,550 people and Trumbull County had an average population of 210,118 people.  *See, e.g.,* P-26322-A; Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2126:9-17.

[77]   *See, e.g.,* P-26319-A; Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2125:16 – 2126:8, 2128:23 – 2129:16, 2135:16 – 2136:19.

- During the relevant time period, CVS dispensed a total of 851,198 *prescriptions*[78] for opioids, benzos, and muscle relaxers into the Counties, of which **701,467** were opioid prescriptions.[79]

The evidence adduced at trial demonstrates that CVS's dispensing of opioids into the Counties was unlawful. Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- The practice of pharmacy is governed by well-defined laws and regulations, both at the national and state-wide levels, and subject to established and well-known standards of care, including requirements for the careful evaluation of prescriptions and efforts to guard against the diversion of medications into non-medical or illegitimate use. *Supra* at fn.29.

- The CSA creates a closed system of controlled substances distribution and dispensing, which cannot work unless all members within the closed system comply with their obligations. *Supra* at fn.30.

- Federal and Ohio controlled substances laws and regulations require CVS to maintain effective controls and procedures to guard against the diversion of controlled substances. *Supra* at fn.31.[80]

- Pharmacies and pharmacists are the last line of defense to protect against diversion. *Supra* at fn.32.[81]

- CVS, through the control it exerts over its pharmacies, pharmacists, and pharmacy employees, is responsible for ensuring all dispensing of controlled substances is carried out in accordance with applicable laws and regulations. *Supra* at fn.33.

- Corporate oversight includes established practices of pharmacies that should incorporate top-down compliance programs using data readily available to CVS to

---

[78] As Dr. McCann explained, "dosage unit" refers to the number of pills, while "prescription" typically involves packaging of more than a single dosage unit (*e.g.*, 30 or 90 pills). Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2139:24 – 2140:15; Dkt. #4032 (10/15/21Trial Tr.) [*McCann*] at 2304:6-11.

[79] Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2139:9-13, 2139:24 – 2140:18; Dkt. #4032 (10/15/21Trial Tr.) [*McCann*] at 2228:11-18, 2230:2-5, 2230:12-22, 2298:11-13.

[80] *See also* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 381:1-19, 383:4-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3964:10-13.

[81] *See also* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 374:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3966:25 – 3967:3; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5646:23 – 5647:11, 5666:6-12, 5681:22 – 5682:1.

guard against diversion.  *Supra* at fn.34.

- Corporate oversight also should support, and not impede, pharmacists in complying with laws and regulations related to the dispensing of controlled substances.  *Supra* at fn.35.

- CVS is expected to become and remain aware of its obligations regarding the dispensing of controlled substances and the risks associated with same.  *Supra* at fn.36.

- CVS's dispensing policies were created and implemented by its corporate department and applied nationally to all its pharmacies.[82]

- CVS failed to implement and maintain effective controls against diversion in its dispensing of prescription opioids.[83]

- CVS failed to timely implement and apply necessary controlled substance policies across its pharmacy stores.[84]

---

[82]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 370:19-20; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3958:4-9, 3960:20 – 3962:6, 3974:1 – 3976:15, 3976:25 – 3977:22, 3981:18-21, 3984:22-23, 3990:7-21, 3998:1 – 3999:11, 4008:15 – 4010:15, 4011:13 – 4015:2; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4055:18 – 4056:18, 4059:3-15; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5652:13 – 5653:5, 5656:16-25, 5663:11-18, 5669:2 – 5671:5, 5674:1-18, 5750:13-16, 5875:22-24, 5876:14-25; P-00459; P-06325; P-06566; P-06595; P-06620; P-08378; P-08397; P-08407; P-15843. *See also supra* at fn.38.

[83]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-25, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:7-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3958:4-23, 3960:20 – 3962:6, 3963:16 – 3964:9, 3969:24 – 3971:17, 3977:23 – 3984:17, 3988:2 – 3996:20, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4053:2, 4053:8 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24, 4077:3 – 4079:20, 4079:23 – 4081:9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5663:3-13, 5755:12 – 5756:15, 5768:8 – 5769:19, 5783:12 – 5784:7, 5784:20 – 5785:25, 5793:25 – 5796:18, 5796:25 – 5797:21, 5800:11-19, 5808:13 – 5809:18, 5810:19 – 5814:17, 5819:15 – 5826:16, 5842:6-14, 5889:10-12; P-00459 at 008 ("When I started to really understand the tremendous growth of the misuse of prescription drugs I realized I may have been naïve to believe we were doing everything we could to reduce the growth of this tragic problem in the U.S."), 013; P-04600-A; P-06272; P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-06620; P-08378; P-08397; P-08402; P-08405; P-08406; P-08408; P-08409; P-08439; P-15733; P-15843; P-23330.

[84]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 321:7-11, 322:3-7, 339:21 – 340:2, 340:16-25, 342:4 – 343:11, 390:21 – 391:6, 420:12-23; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 631:4-15; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:17 – 995:8, 996:4-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1204:16 – 1205:19; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3960:20 – 3961:19, 3977:23 – 3980:24, 3990:22 – 3995:10, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4053:2, 4053:8 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24, 4077:3 – 4079:20, 4079:23 – 4081:9; Dkt. #4115 (11/3/21 Trial Tr.)

(footnote continues on next page)

- Even once certain controlled substances diversion policies were developed, CVS failed to monitor and enforce the policies across its pharmacy stores.[85]

- CVS also implemented employment evaluation policies and performance metrics that impeded its pharmacists' efforts to comply with laws and regulations and meet standards of care.[86]

- CVS and its pharmacists have a corresponding responsibility to only fill prescriptions for controlled substances that are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her/his professional practice. *Supra* at fn.43.[87]

- The determination of whether a prescription issued for a controlled substance is valid and legitimate requires systems and actions to recognize, investigate, and resolve signs of a prescription's invalidity (*i.e.*, red flags). These red flags are warning signs and can also indicate activities are occurring outside the usual and customary scope of pharmacy practice, activities that are more than likely to include abuse, diversion, and

---

[*Harrington*] at 5648:6 – 5649:12, 5663:3-13, 5679:4 – 5680:24, 5685:23 – 5686:17, 5687:17-22, 5689:3-11, 5705:4-6, 5706:25 – 5707:12, 5709:2-10, 5711:8-11, 5712:18-22 , 5721:4-11, 5729:9 – 5730:16, 5731:11 – 5732:15, 5755:12 – 5756:15, 5783:12 – 5784:7, 5788:22 – 5789:14, 5790:20 – 5791:11, 5793:25 – 5796:18, 5796:25 – 5797:2, 5800:11-19, 5811:2 – 5814:17, 5189:17 – 5826:16, 5836:11-14, 5842:6-14, 5842:6-14, 5889:10-12, 5892:21 – 5893:3; P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-06620; P-08378; P-08397; P-08402; P-08405; P-08408; P-08439; P-15733; P-15843; P-23305; P-23330.

[85] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 998:7 – 1000:8; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3981:22 – 3984:17, 3988:2 – 3990:1, 3990:14 – 3995:10, 4001:21 – 4008:10, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4047:14, 4052:5 – 4053:2, 4053:8 – 4056:7, 4063:10 – 4066:1, 4066:10 – 4069:24, 4079:23 – 4081:9; P-06329; P-06457; P-06566; P-08378; P-08397; P-08402; P-08405; P-08408; P-15733; P-15843.

[86] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:17 – 933:21, 966:2 – 967:12, 1000:10 – 1005:7, 1005:16 – 1006:17; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:5 – 1115:7, 1121:5 – 1128:5; P-19827 at 002 ("Hearing complaints from pharmacists that they don't have time to check all these prescriptions for good faith. Wants to make sure chains aren't inhibiting this by pressuring their pharmacists to fill fast or not providing adequate labor."; "Believes that compensation (bonus) should not be tied to prescription volume of controlled substances."), 003 ("Bonus parameters are a concern.").

[87] *See also* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 300:25 – 301:9, 303:19-22, 348:13 – 349:5, 362:9-15, 374:10-14, 376:15-24, 379:5-12, 380:1-8, 395:2-21; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3979:15-23, 3992:21-23; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4081:22 – 4082:1; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5642:18-24, 5643:24 – 5644:11, 5644:20 – 5645:19, 5666:6-12, 5667:11 – 5668:2, 5669:2-25, 5671:13 – 5673:10, 5718:8-12, 5751:17 – 5752:18, 5754:21 – 5755:5, 5760:8-13, 5761:24 – 5762:3; P-00459 at 015-016 ("Pharmacists fail to satisfy this legal requirement when they knew or should have known that a prescription was not issed for a legitimate medical purpose. Pharmacists cannot be willfully blind."); P-08954 at 002 (in 2015 settlement with DEA, CVS "acknowledge[d] that *it* has a corresponding responsibility . . .") (emphasis added); P-15656 at 002.

fraudulent acts. *Supra* at fn.45.

- CVS knew and understood that there are certain red flags associated with opioid prescriptions that are indicative of potential diversion.[88]

- To effectively guard against diversion, CVS and its pharmacists must, prior to dispensing a prescription opioid: (i) accurately identify and document all red flags raised by the prescription, patient, and prescriber; (ii) reasonably collect complete, relevant, and accurate information concerning each red flag; (iii) independently evaluate the collected information to determine whether the evidence is reliable and whether, as a whole, the evidence adequately resolves each red flag; and (iv) clearly and explicitly document their evaluation of the evidence and their reasoning supporting their judgment to dispense the prescription. *Supra* at fn.47.[89]

- Documenting the resolution of red-flagged prescriptions is a critical component of implementing effective controls against diversion, and is otherwise required by law. *Supra* at fn.48.

- Despite recognizing the importance of doing so, CVS consistently failed to document their resolution of red flags.[90]

- CVS failed to provide its pharmacists with the data, training, guidance, resources, and tools necessary to assist the pharmacists in fulfilling their corresponding responsibility duties, including but not limited to, utilizing dispensing data to identify patterns, trends, and practitioners possibly involved in diversion as well to recognize and resolve red flags.[91]

---

[88] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 297:1-13, 299:16 – 301:9, 305:17 – 306:8, 309:12-18, 310:14-19, 376:10 – 379:12, 380:1-8, 384:1 – 387:21, 388:3-5, 396:2-14, 397:6 – 398:10; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3982:10 – 3984:17, 3999:18 – 4001:6; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:21-24, 4061:6-24; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5667:11 – 5668:2, 5669:19 – 5671:5, 5672:3-9, 5678:6 – 5679:3, 5735:16 – 5736:10, 5737:9 – 5738:20, 5740:7-8, 5757:7-21, 5758:4-15, 5760:14-18, 5763:5-21, 5773:7 – 5775:16, 5794:2-12, 5795:4-5, 5797:3-15, 5801:25 – 5802:7, 5819:17 – 5826:16; P-00459 at 018; P-08439; P-15656; P-15962-A at 010-012; P-19827 at 001-002; P-20699; P-26403 at 027-087.

[89] *See also* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 362:3-15, 376:10 – 379:12, 380:1-8, 396:2-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3983:5-8; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:16-24.

[90] *See, e.g.,* Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5673:7-10, 5741:18 – 5742:2, 5742:16-19, 5803:12 – 5804:24; P-15656 at 006; *see also infra* at fns.98-99.

[91] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 354:6-15, 390:21 – 391:6, 420:12-23, 429:10-18, 431:2-11; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1048:23 – 1050:14; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3969:24 – 3971:17, 3977:23 – 3981:21, 3984:18 – 3985:14, 3986:9 – 3990:1, 3990:22 – 3996:20, 3998:1 – 3999:11, 4008:15 – 4009:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 (footnote continues on next page)

- For example, CVS collected data that would be useful for it and its pharmacists in identifying suspicious prescribing and dispensing activity in order to guard against diversion, but for at least some period of time failed to provide such data, or make it easily accessible, to its pharmacists.[92]

- CVS did, however, sell this dispensing data to IMS for profit.[93]

- Additionally, state PDMPs, such as OARRS in Ohio, contain helpful data that pharmacists can use to identify and resolve red flags. *Supra* at fn.53.[94]

- Despite recognizing the usefulness of PDMPs, during at least some portion of the relevant time period, CVS failed to mandate that its pharmacists check the applicable PDMP whenever filling an opioid prescription.[95]

- CVS's pharmacies in the Counties filled thousands of opioid prescriptions presenting red flags without evidence of resolving those red flags.[96]

---

Trial Tr.) [*Travassos*] at 4046:25 – 4053:2, 4053:8 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4666:10 – 4069:24, 4077:3 – 4079:20, 4079:23 – 4081:9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5679:4 – 5680:24, 5727:15 – 5728:12, 5755:12 – 5756:15, 5783:12 – 5784:7, 5784:20 – 5786:25, 5788:16 – 5789:14, 5793:25 – 5796:18, 5796:25 – 5797:21, 5800:11-19, 5810:19 – 5814:17, 5819:15 – 5826:16, 5886:25 – 5887:20; P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-08378; P-08397; P-08402; P-08408; P-08409; P-08439; P-15733; P-15843; P-23305.

[92]   *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25, 315:5 – 319:6, 357:8-13, 371:21 – 372:5, 374:20 – 376:9, 416:4-9, 418:4 – 419:3, 419:11 – 420:23, 426:13 – 427:20, 429:10-18, 431:2-11; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3969:24 – 3971:17, 3974:1 – 3976:15, 3976:25 – 3985:14, 3986:1 – 3990:13, 3990:22 – 3996:20, 3999:12 – 4008:10, 4011:13 – 4017:14, 4050:1-14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4053:24 – 4060:16, 4060:23 – 4062:20; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5718:13 – 5720:2, 5721:22 – 5722:6, 5723:17 – 5725:15, 5779:20 – 5780:11, 5808:2-9, 5808:13 – 5810:16; P-06325; P-06329; P-06457; P-06510; P-06566; P-06595; P-06612; P-08402; P-08405; P-08406; P-08407; P-08408; P-08409; P-15733; P-23330.

[93]   *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 374:20-24; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5780:8 – 5781:8, 5782:23-25.

[94]   *See also* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 400:13 – 401:10, 403:23 – 404:11.

[95]   *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 390:21 – 391:6; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4062:21 – 4063:9, 4063:18 – 4064:6, 4064:20 – 4066:1, 4069:16-24; P-06325 at 002; P-08378;P-08397 at 023 ("You may only access the OARRS report when one of the six listed scenarios occurs."); P-15843 at 001 ("The PMP is an invaluable tool for Pharmacists to prevent controlled substances from being diverted or dispensed for non-medical purposes . . ."); P-15843 at 002.

[96]   *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1006:19 – 1044:1, 1057:25 – 1058:18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1136:23 – 1138:14, 1144:9 – 1164:7, 1165:14 – 1168:3, 1169:9 – 1171:13, 1202:4 – 1203:17.

- Specifically, of the 701,467 opioid prescriptions dispensed by CVS into the Counties, **141,651** had one or more red flags associated with them.[97]

- From the random sampling of 2000 red-flagged CVS prescriptions that were dispensed in the Counties, 950 contained no information across all relevant due diligence notes fields. Of those 950, 686 also had nothing documented on the hard copy prescriptions. Of the 1050 red-flagged prescriptions that had notes, "in the overwhelming majority of cases," the notes were unacceptable/insufficient.[98]

- Plaintiffs' expert, Mr. Catizone testified that, based on the random sampling of prescription notes fields produced, over 90% of the red flag opioid prescriptions dispensed by CVS into the Counties did not contain adequate documentation demonstrating that the red flags were resolved prior to dispensing.[99]

- Dr. McCann testified that Mr. Catizone's 90% of red-flagged prescriptions in the random sampling can be extrapolated over all the red-flagged prescriptions. *Supra* at fn.59.

The evidence adduced at trial further demonstrates that CVS's dispensing of opioids into Lake and Trumbull Counties was intentional. Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- CVS knew and understood its obligations under the CSA and Ohio law related to the dispensing of prescription opioids.[100]

---

[97] *See, e.g.,* Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2231:17 – 2232:5, 2233:17-20, 2245:4.

[98] *See, e.g.,* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1150:11 – 1154:18, 1155:11-19 (""Q:…. Are you saying that all of the 1,050 that did have notes were inadequate, or give us a feel for what was and was not, what was your experience reading through it based on your opinion?  A: My experience was that the overwhelming majority of those 1,050 notes approximately did not appropriately document the existence of red flags and the resolution of that red flag as required by standards of care and requirements."), 1155:20 – 1164:7, 1165:15 – 1166:13, 1167:4 – 1168:3, 1169:9 – 1171:13, 1180:2-8, 1202:4 -1203:17.

[99] *See* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 923:21 – 925:4, 998:18 – 999:16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1202:23 – 1203:3 ("So when I looked at all these prescriptions which had red flags, the overwhelming majority, and in my report I said based upon my best educated experienced guess, it looks like 90 percent of those prescriptions did not have adequate documentation, but I couldn't really tell on the others as well."), 1203:4-11, 1203:12-14 ("But overwhelmingly, in my overwhelming opinion, about 90 percent of what I looked at didn't meet that level of documentation that was required.").

[100] *See, e.g.*, Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 299:16 – 301:9, 339:21 – 340:2, 340:16-21, 348:13 – 349:5, 362:3-15, 365:22 – 366:2, 376:10 – 379:12, 379:20-22, 380:1-8, 381:1-19, 384:1 – 387:21, (footnote continues on next page)

- CVS knew that the prescription opioids it was dispensing had a high potential for abuse that could lead to severe psychological or physical dependence, and thus knew that the diversion of opioids would create a public health hazard.[101]

- CVS knew that the purpose of the CSA is to prevent the abuse and diversion of controlled substances.[102]

- CVS knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.[103]

- CVS knew and understood its dispensing policies and procedures, and its implementation of same, did not comply with its legal obligation.[104]

---

394:12-18, 395:2-21, 396:2-14; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5650:9-10, 5653:9-11, 5653:21-23, 5654:3-8, 5661:20-25, 5662:9-12, 5663:3 – 5664:23, 5667:11 – 5668:2, 5737:9 – 5738:1, 5772:9-14, 5773:7 – 5775:16, 5793:25 – 5796:18, 5820:18 – 5825:2, 5827:1-17, 5883:6-20; P-00459 at 015-016; P-08954; P-08955; P-10212; P-10213; P-10214; P-15656; P-15962-A; P-19827 at 001-002; P-26403 at 027-087; P-42147-A.

[101] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 335:13 – 336:7, 395:2-21; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2454:22 – 2455:8; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:24, 3967:12 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5650:6-10, 5651:13-21, 5654:21 – 5655:17, 5768:19 – 5769:19, 5773:7 – 5775:16, 5820:18 – 5825:2; P-00459 at 007-009, 012, 013 ("Overprescribing and dispensing is driver of the problem"), 014, 045 ("I am frustrated when I think of all of the time and energy we must spend to keep our prescription drugs in the right hands, and I am sad for the hurt and pain this issue has caused so many people!!"); P-08403; P-15656 at 003;P-15962-A at 003-008; P-19827 at 001-002; P-26403 at 025.

[102] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 381:1-19; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5661:20-25, 5662:9-12, 5663:3-13, 5737:9 – 5738:1, 5772:9-14, 5793:25 – 5796:18; P-00459 at 014; P-15656 at 003.

[103] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 340:16-25, 345:25 – 346:4, 379:20-22, 394:12-18, 396:2-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:19; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5737:9 – 5738:1, 5754:8-17, 5772:9-14, 5773:7 – 5775:16, 5793:25 – 5796:18, 5820:18 – 5825:2; P-08494; P-15656 at 003 ("Ensuring that Pharmacists exercise corresponding responsibility is a key focus of federal, state and local law enforcement as part of their effort to curb drug abuse."); P-15962-A; P-19827 at 001-002; P-00459 at 006-009, 013 ("Overprescribing and dispensing is driver of the problem"), 014, 045 ("I am frustrated when I think of all of the time and energy we must spend to keep our prescription drugs in the right hands, and I am sad for the hurt and pain this issue has caused so many people!!").

[104] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25, 339:21 – 340:2, 340:16-25, 342:4 – 343:11, 348:13 – 349:5, 394:12-18; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2453:11 – 2454:16; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4058:7 – 4060:16, 4060:23 – 4062:20, 4079:23 – 4081:9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5653:6-13, 5661:20-25, 5662:9-12, 5663:3– 5664:23, 5772:9-14, 5773:7 – 5775:16, 5793:25 – 5796:18, 5797:25 – 5798:7, 5800:11-20; P-06612; P-08954; P-08955.

- CVS knew that it was not providing its pharmacists with the necessary training, guidance, tools, resources, and data to allow them to successfully exercise their corresponding responsibility.[105]

- CVS deliberately implemented dispensing and compensation policies that discouraged or hindered its pharmacists from performing due diligence on suspicious prescriptions.[106]

- CVS systematically ignored red flags and other dispensing irregularities plainly present in its data and continued to fill suspicious prescriptions.[107]

- CVS lobbied or pushed back against measures that would have helped prevent diversion.[108]

- CVS knew of problematic prescribers and pill mills in or around the Counties from which it continued to allow or encourage its pharmacists to fill opioid prescriptions.[109]

---

[105]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 303:8 – 306:25, 390:21 – 391:6, 420:12-23; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3969:24 – 3971:17, 3977:23 – 3980:24, 3984:18 – 3985:14, 3986:9 – 3990:1, 3990:22 – 3996:20, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4046:25 – 4053:2, 4053:8 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24, 4077:3 – 4079:20, 4079:23 – 4081:9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5663:3 – 5664:23, 5755:12 – 5756:15, 5766:10-15, 5768:19 – 5769:19, 5772:9-14, 5784:19 – 5786:25, 5788:16 – 5789:14, 5793:25 – 5796:18, 5800:11-20, 5810:19 – 5814:17, 5819:15 – 5826:16; P-06329; P-06457; P-06510; P-06566; P-06612; P-06620; P-08378; P-08397; P-08402; P-08405; P-08408; P-08409; P-08439; P-15733; P-15843.

[106]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 357:21 – 358:19, 361:15 – 362:17, 364:1-7, 366:19-24; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 932:11 – 933:21; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:5 – 1115:7, 1121:5 – 1128:5; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4051:2-11, 4051:25 – 4052:4, 4053:8-17, 4053:24 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5743:9-24, 5755:12 – 5756:15; P-06612; P-08378; P-08397;  P-15604; P-15843; P-19827 at 001-003 (CVS knew DEA said not to do this); P-20695.

[107]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 301:10 – 302:12, 303:8 – 306:25, 315:5 – 319:6, 420:12-23; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-25, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2809:7-12; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3981:22 – 3984:17, 3988:2 – 3990:1, 3990:22 – 3996:20, 3999:12 – 4008:10, 4011:13 – 4015:2, 4015:6 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4056:8 – 4060:16, 4060:23 – 4062:20, 4063:10 – 4066:1, 4066:10 – 4069:24; P-04600-A; P-06329; P-06566; P-08405; P-08408; P-08409; P-08480; P-08494; P-15733; P-23330; *supra* at pp. 32-33.

[108]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 405:19 – 407:22, 408:10-15, 412:14-21, 413:19-22; P-08442; P-23267 at 013.

[109]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 301:10 – 302:12, 303:8 – 306:25, 313:17 – 314:14, 315:5 – 319:6, 326:7 – 327:5, 328:12-18; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3990:22 –

(footnote continues on next page)

- CVS knew that prescription opioids were migrating into Ohio from other states, including Florida.[110]

- CVS was subject to investigations and enforcement actions, and parties to settlements with the DEA, in which it was informed of diversion or sanctioned for its failures to prevent diversion.[111]

- In two settlements, CVS admitted to violations of the CSA from certain pharmacies in Florida and Maryland .[112]

- Despite these repeated warnings and sanctions, CVS made little to no effort to substantively change its dispensing policies and procedures until contractually obligated to do so under its settlements with the DEA.[113]

- Despite these repeated warnings and sanctions, CVS continued to facilitate and encourage the oversupply and diversion of its opioids.[114]

- CVS committed the failures described above (*supra* at § I.B.2) despite its awareness of rising concerns over the abuse of diverted prescription pills in Ohio and the rest of the

---

3994:14, 3995:11 – 3996:20, 3998:1-22, 3999:12 – 4008:10, 4011:13 – 4017:14; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5755:12 – 5756:15, 5807:4 – 5809:18; P-06566; P-08405; P-08408; P-08480 (CVS knew of suspicious activity by Dr. Veres); P-08494 (same); P-15733; P-23330.

[110] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 329:13 – 330:3, 334:10-17, 370:5-9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5661:18-22; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 887:18-25; P-15962-A at 005-006; P-19827 at 001-002; P-42147-A at 004.

[111] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 339:8 – 340:2, 340:16-25, 342:4 – 346:4, 347:5 – 350:12, 352:7 – 353:8, 392:7 – 393:8; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2453:9 – 2454:16; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3963:9-15, 3964:10-22; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5653:6 – 5654:23, 5791:17 – 5793:24, 5794:23 – 5796:13, 5799:10-18; P-08954; P-08955; P-10212; P-10213; P-10214; P-42147-A.

[112] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 339:21 – 340:2, 340:16-25, 342:4 – 343:11; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3963:9-15; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5662:9-12; P-08954 at 003; P-08955 at 002.

[113] *See, e.g.,* Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5688:4-7, 5721:4-11, 5791:1 – 5797:4, 5797:25 – 5798:7, 5878:19 – 5879:5, 5892:21 – 5893:3; P-00459 at 025; P-15843.

[114] *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3990:22 – 3996:20, 3998:1 – 4008:10, 4008:15 – 4010:15, 4011:13 – 4017:14; Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4052:5 – 4056:7, 4063:10 – 4066:1, 4066:10 – 4069:24, 4079:23 – 4081:9; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5791:1 – 5793:24; P-06329; P-06457; P-06566; P-06620; P-08397; P-08402; P-08405; P-08408; P-15733; P-15843; P-23330.

country.[115]

- CVS worked in concert with opioid manufacturers in spreading the manufacturers' false messaging surrounding the treatment of pain and the true addictive nature of opioids in an effort to increase opioid sales and profits.[116]

### 3. *Walmart unlawfully and/or intentionally dispensed massive amounts of prescription opioids into the Counties.*

The evidence adduced at trial demonstrates that Walmart dispensed massive amounts of prescription opioids into the Counties without providing effective controls against diversion.[117] Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- From January 2006 through April 2018, Walmart pharmacies dispensed 9,890,771 dosage units of prescription opioids into Lake County and 5,228,488 dosage units of prescription opioids into Trumbull County.[118]

- Of the total dosage units of prescription opioids, Walmart dispensed 3,813,525 dosage units of hydrocodone and 5,210,503 dosage units of oxycodone from its pharmacies in Lake County from January 2006 through April 2018: P-26322-A.

- During that time period, Walmart dispensed an average of 3.19 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Lake County. At its peak in 2011, Walmart dispensed an average of 4.09 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Lake County.  P-26322-A.

- Of the total dosage units of prescription opioids, Walmart dispensed 3,457,264 dosage units of hydrocodone and 1,636,754 dosage units of oxycodone from its pharmacies in Trumbull County from January 2006 through April 2018:  P-26322-A.

---

[115]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 373:19 – 374:2; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3967:23 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5651:10-21, 5768:19 – 5769:19, 5793:25 – 5796:14, 5820:18 – 5825:2; P-00459 at 007-009, 012-014 ("Prescription drug abuse is an epidemic in our country."), 045; P-08403; P-15656 at 003 ("Prescription drug abuse is the nation's fastest-growing drug problem."); P-15962-A; P-26403 at 011.

[116]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 557:4-15, 581:4-20, 582:1 – 583:12, 583:22 – 584:18, 597:13-20, 606:4 – 607:23, 608:5 – 610:3, 611:7 – 613:25; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 860:5 – 862:25.

[117]  Between 2006 and 2018, Lake County had an average population of 229,550 people and Trumbull County had an average population of 210,118 people.  *See, e.g.,* P-26322-A; Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2126:9-17.

[118]  P-26322-A.  *See also* Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2129:17-19, 2134:16 – 2136:19.

- During that time period, Walmart dispensed an average of 1.97 dosage units of oxycodone and hydrocodone per year to every man, woman, and child in Trumbull County. At its peak in 2016, Walmart dispensed an average of 3.32 dosage units of oxycodone and hydrocodone that year to every man, woman, and child in Trumbull County: P-26322-A. *See also* Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2135:5-12.

- During the relevant time period, Walmart dispensed a total of 275,700 *prescriptions* [119] for opioids, benzos, and muscle relaxers into the Counties, of which **229,006** were opioid prescriptions.[120]

The evidence adduced at trial demonstrates that Walmart's dispensing of opioids into the Counties was unlawful. Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- The practice of pharmacy is governed by well-defined laws and regulations, both at the national and state-wide levels, and subject to established and well-known standards of care, including requirements for the careful evaluation of prescriptions and efforts to guard against the diversion of medications into non-medical or illegitimate use. *Supra* at fn.29.

- The CSA creates a closed system of controlled substances distribution and dispensing, which cannot work unless all members within the closed system comply with their obligations. *Supra* at fn.30.

- Federal and Ohio controlled substances laws and regulations require Walmart to maintain effective controls and procedures to guard against the diversion of controlled substances. *Supra* at fn.31.[121]

- Pharmacies and pharmacists are the last line of defense to protect against diversion. *Supra* at fn.32; *see also* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2459:22 – 2460:9.

- Walmart, through the control it exerts over its pharmacies, pharmacists, and pharmacy employees, is responsible for ensuring all dispensing of controlled substances is carried out in accordance with applicable laws and regulations. *Supra* at fn.33.

- Corporate oversight includes established practices of pharmacies that should incorporate top-down compliance programs using data readily available to Walmart to

---

[119] As Dr. McCann explained, "dosage unit" refers to the number of pills, while "prescription" typically involves packaging of more than a single dosage unit (*e.g.*, 30 or 90 pills). Dkt. #4026 (10/14/21Trial Tr.) [*McCann*] at 2139:24 – 2140:15; Dkt. #4032 (10/15/21Trial Tr.) [*McCann*] at 2304:6-11.

[120] Dkt. #4026 (10/14/21 Trial Tr.) [*McCann*] at 2139:21 – 2140:18; Dkt. #4032 (10/15/21Trial Tr.) [*McCann*] at 2230:12-19, 2239:8-22, 2299:21 – 2299:1.

[121] *See also* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2435:23 – 2436:21, 2437:13 – 2438:23.

guard against diversion. *Supra* at fn.34.

- Corporate oversight also should support, and not impede, pharmacists in complying with laws and regulations related to the dispensing of controlled substances. *Supra* at fn.35.

- Walmart is expected to become and remain aware of its obligations regarding the dispensing of controlled substances and the risks associated with same. *Supra* at fn.36.

- Walmart's dispensing policies were created and implemented by its corporate department and applied nationally to all its pharmacies.[122]

- Walmart failed to implement and maintain effective controls against diversion in its dispensing of prescription opioids.[123]

- Walmart failed to timely implement and apply necessary controlled substance policies across its pharmacy stores.[124]

---

[122] *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3862:21-25, 3863:8-14; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5105:9 – 5106:23, 5194:8-13; P-07846; P-26697; P-26705; P-26882; P-26892. *See also supra* at fn.38.

[123] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 636:3 – 637:3; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2486:1-5, 2493:22 – 2502:24, 2504:16 – 2513:24, 2525:9 – 2535:10, 2535:24 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2738:3-5, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2799:20-21; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3853:24 – 3854:12, 3856:2-25, 3857:2 – 3858:24, 3859:2 – 3863:17, 3864:1-21, 3865:7 – 3867:17, 3868:1 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3882:1 – 3883:5, 3883:12 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3913:12-14, 3916:16 – 3917:22, 3931:21 – 3932:2; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5140:14 – 5141:6, 5154:13-22, 5189:19 – 5190:9, 5193:15 – 5194:1, 5196:19 – 5200:19, 5205:12 – 5206:2, 5206:15 – 5209:3, 5211:8 – 5225:11 – 5226:24, 5229:18 – 5230:20, 5231:8 – 5240:4, 5247:12-20, 5248:6-10, 5251:24 – 5252:3, 5278:16 – 5281:8; P-04600-A; P-07381; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08048; P-08068; P-08069; P-14223 at 004; P-14442; P-14450; P-14540; P-14552; P-14585 at 009-013; P-14643; P-14645; P-14662; P-20824; P-20829 at 001; P-20850; P-20852; P-21228 at 003; P-21884; P-26671 at 001; P-26681; P-26697; P-26705; P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892.

[124] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 631:4-15, 632:20 – 633:2, 636:3 – 637:3; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:17 – 995:8, 996:4-16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1204:16 – 1205:19; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2486:1-5, 2493:22 – 2502:24, 2504:16 – 2513:24, 2525:9 – 2527:9, 2534:2 – 2535:10, 2535:24 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3856:2-25, 3857:2 – 3858:24, 3859:2 – 3863:17, 3864:1-21, 3865:7 – 3867:17, 3868:1 – 3869:5, 3876:2 – 3879:12, 3879:16 – 3881:8, 3882:1 – 3883:5, 3883:12 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 –
(footnote continues on next page)

- Even once certain controlled substances diversion policies were developed, Walmart failed to monitor and enforce the policies across its pharmacy stores.[125]

- Walmart also implemented employment evaluation policies and performance metrics that impeded its pharmacists' efforts to comply with laws and regulations and meet standards of care.[126]

- Walmart and its pharmacists have a corresponding responsibility to only fill prescriptions for controlled substances that are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of her/his professional practice. *Supra* at fn.43.[127]

- The determination of whether a prescription issued for a controlled substance is valid and legitimate requires systems and actions to recognize, investigate, and resolve signs of a prescription's invalidity (*i.e.*, red flags). These red flags are warning signs and can also indicate activities are occurring outside the usual and customary scope of

---

3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3913:12-14, 3916:16 – 3917:22, 3931:21 – 3932:2, 3942:14 – 3944:24, 3946:20 – 3950:9; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5140:14 – 5141:6, 5154:13-22, 5193:15 – 5194:1, 5196:19 – 5200:19, 5205:12 – 5206:2, 5206:15 – 5209:3, 5214:7 – 5216:17, 5225:11 – 5226:24, 5229:18 – 5230:20, 5235:25 – 5240:4, 5247:12-20, 5248:6-10, 5278:16 – 5281:8; P-07036 (1/2/14 Walmart PPT) at 008 (as of 1/14, Walmart was estimating that it would "[e]stablish a process for the analysis of refusal to fill data and reporting problematic prescribers or patients internally" by the first quarter of 2015), 030 (noting it had not yet determined "where to house the data[,]" "what program to use to analyze the data[,]" or "how to disseminate refusal to fill decisions and/or problematic prescribers and patients within the same trade area or to the entire corporate entity[,]" or "[e]ngage[d] key stakeholders to determine if pharmacists may exercise their discretion to impose blanket refusals"), 036; P-07381; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08048; P-08068; P-08069; P-14223 at 004; P-14450; P-14540; P-14552; P-14585 at 009-0013; P-14643; P-14645; P-14662; P-20824; P-20829 at 001; P-20850; P-20852; P-21090; P-21228 at 003; P-21884; P-26671 at 001; P-26697; P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892.

[125]   *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 998:7 – 1000:8; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3856:20-25, 3885:9 – 3889:16, 3891:21 – 3893:25, 3896:17 – 3899:5, 3900:19 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3913:12-14; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5196:19 – 5199:23; P-08037 at 001-004; P-08069; P-14540; P-14552; P-14645; P-20852; P-26671 at 001; P-26732; P-26736; P-26737.

[126]   *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:17 – 933:21, 966:2 – 967:12, 1000:10 – 1005:7, 1005:16 – 1006:17; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1113:5 – 1115:7, 1117:5 – 1121:4; P-19827 at 002 ("Hearing complaints from pharmacists that they don't have time to check all these prescriptions for good faith.  Wants to make sure chains aren't inhibiting this by pressuring their pharmacists to fill fast or not providing adequate labor."; "Believes that compensation (bonus) should not be tied to prescription volume of controlled substances."), 003 ("Bonus parameters are a concern.").

[127]   *See also* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2450:1 – 2451:19, 2457:12 – 2458:13, 2527:14 – 2530:8, 2533:5 – 2534:1, 2574:15 – 2575:24 (acknowledging awareness of case where DEA indicated corresponding responsibility extended to pharmacy); P-08439 at 001-002.

pharmacy practice, activities that are more than likely to include abuse, diversion, and fraudulent acts. *Supra* at fn.45.

- Walmart knew and understood that there are certain red flags associated with opioid prescriptions that are indicative of potential diversion.[128]

- To effectively guard against diversion, Walmart and its pharmacists must, prior to dispensing a prescription opioid: (i) accurately identify and document all red flags raised by the prescription, patient, and prescriber; (ii) reasonably collect complete, relevant, and accurate information concerning each red flag; (iii) independently evaluate the collected information to determine whether the evidence is reliable and whether, as a whole, the evidence adequately resolves each red flag; and (iv) clearly and explicitly document their evaluation of the evidence and their reasoning supporting their judgment to dispense the prescription. *Supra* at fn.47.

- Documenting the resolution of red-flagged prescriptions is a critical component of implementing effective controls against diversion, and is otherwise required by law. *Supra* at fn.48.

- Despite recognizing the importance of doing so, Walmart consistently failed to document their resolution of red flags.[129]

- Walmart failed to provide its pharmacists with the data, training, guidance, resources, and tools necessary to assist the pharmacists in fulfilling their corresponding responsibility duties, including but not limited to, utilizing dispensing data to identify patterns, trends, and practitioners possibly involved in diversion as well to recognize and resolve red flags.[130]

---

[128] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2443:18 – 2445:15, 2447:1-23, 2455:9 – 2457:11, 2466:22 – 2467:14, 2477:23 – 2479:22, 2480:7 – 2481:5, 2484:19 – 2487:15, 2487:23 – 2488:3, 2489:15 – 2491:18, 2527:10 – 2530:24, 2560:9-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3895:7-16, 3923:1-8; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5189:19 – 5190:5, 5202:4 – 5203:12, 5206:15-23, 5208:8 – 5209:3; P-07381; P-07797; P-07799; P-08439; P-14662; P-15962-A at 010-013; P-19827 at 001-002; P-21228.

[129] *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3944:13-18; Doc. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5201:11-23; P-21090; *see also infra* at fns.135-136.

[130] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1048:23 – 1050:14; Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2468:18 – 2469:15, 2480:7 – 2481:5, 2482:13 – 2484:18, 2487:10-12, 2493:22 – 2502:24, 2504:16 – 2507:19, 2509:16 – 2510:19, 2511:5 – 2513:24, 2525:9 – 2527:9, 2532:21 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3856:20-25, 3857:2 – 3858:24, 3859:2 – 3863:17, 3864:1-21, 3868:1 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3883:12 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3913:12-14, 3916:16 – 3917:22, 3931:21 – 3932:2, 3938:11-17, 3940:2 – 3941:11, 3942:8-11; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5095:9 – 5096:10, 5096:23-25, 5140:14 – 5141:6, (footnote continues on next page)

- For example, Walmart collected data that would be useful for it and its pharmacists in identifying suspicious prescribing and dispensing activity in order to guard against diversion, but for at least some period of time failed to provide such data, or make it easily accessible, to its pharmacists.[131]

- Additionally, state PDMPs, such as OARRS in Ohio, contain helpful data that pharmacists can use to identify and resolve red flags. *Supra* at fn.53.

- Despite recognizing the usefulness of PDMPs, during at least some portion of the relevant time period, Walmart failed to mandate that its pharmacists check the applicable PDMP whenever filling an opioid prescription.[132]

- Walmart's pharmacies in the Counties filled thousands of opioid prescriptions presenting red flags without evidence of resolving those red flags.[133]

---

5154:13-22, 5189:19 – 5190:9, 5193:15 – 5194:1, 5196:19 – 5200:19, 5205:12 – 5206:2, 5206:15 – 5209:3, 5210:7 – 5211:1, 5211:8 – 5216:17, 5229:18 – 5230:20, 5231:8 – 5238:13, 5240:12-18, 5247:12-20, 5248:6-10, 5248:16 – 5249:15, 5251:24 – 5252:3, 5265:18 – 5266:1, 5266:5 – 5268:14, 5269:11-14, 5278:16 – 5281:8; P-07381; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08048; P-08068; P-08069; P-14442; P-14450; P-14552; P-14643; P-14645; P-14662; P-20824; P-20829 at 001; P-20849; P-20850; P-21228 at 003; P-21884; P-26671 at 001; P-26681; P-26697; P-26705 ("[Refusal to fill] forms are collected and stored in Archer. However, pharmacists do not have easy access to this information, especially if the pharmacist is from another store. This information could be used to clear red flags, or identify red flags that may indicate that the prescription was not issued for a legitimate medical reason. . . . Currently, pharmacists do not have easy access to this information to utilize in their professional judgment."); P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892.

[131] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2549:19 – 2553:7, 2581:10-14; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3900:7-18, 3912:20 – 3913:2, 3932:3-19; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5095:9 – 5096:10, 5096:23-25, 5196:19 – 5918:13, 5238:15 – 5240:4, 5240:12-18, 5248:16 – 5249:15, 5250:8-14, 5251:24 – 5252:3, 5265:18 – 5268:14, 5269:11-14; P-07966; P-14585 at 009; P-14645; P-20849; P-20849; P-20852; P-20852; P-26681; P-26705; P-26705; P-26882; P-26882.

[132] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2447:14-23, 2509:16 – 2511:4; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3860:1-12; P-14643 at 004; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5211:19 – 5213:15, 5214:12 – 5215:9, 5278:16 – 5281:8; P-07846 at 042; P-21884; P-26671 at 001 (discussing proposed rule change by Ohio Board of Pharmacy that would require pharmacists to check OARRS under certain circumstances: "I believe this will present a significant burden and liability to our pharmacists and an unjustified delay to our patients."); P-26697.

[133] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1006:19 – 1044:1, 1057:25 – 1058:18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1144:9 – 1150:10, 1169:9 – 1170:6, 1171:14 – 1180:8, 1202:4 – 1203:17; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1477:25 – 1479:19.

- Specifically, of the 229,006 opioid prescriptions dispensed by Walmart into the Counties, 37,379 had one or more red flags associated with them.[134]

- From the random sampling of 1,800 red-flagged Walmart prescriptions in the Counties, only two "contained no information across all relevant comment fields" but "the majority of the information contained in these comment fields would not qualify as adequate or even relevant due diligence."  The hard copies for these prescriptions also did not reflect adequate due diligence for resolution.  Of the 1,800 prescriptions, 1,639 contained no information in the "MISC info field," 1,400 contained no information in the "prescription order detail comment fields," 19 contained no information in the "patient comment field," and 300 contained no information in the "patient comment field."[135]

- Plaintiffs' expert, Mr. Catizone testified that, based on the random sampling of prescription notes fields produced, over 90% of the red flag opioid prescriptions dispensed by Walmart into the Counties did not contain adequate documentation demonstrating that the red flags were resolved prior to dispensing.[136]

- Dr. McCann testified that Mr. Catizone's 90% of red-flagged prescriptions in the random sampling can be extrapolated over all the red-flagged prescriptions.  *Supra* at fn.59.

The evidence adduced at trial further demonstrates that Walmart's dispensing of opioids into Lake and Trumbull Counties was intentional.  Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- Walmart knew and understood its obligations under the CSA and Ohio law related to the dispensing of prescription opioids.[137]

---

[134]  *See, e.g.,* Dkt. #4032 (10/15/21 Trial Tr.) [*McCann*] at 2245:16-22, 2246:12-13, 2247:10-11.

[135]  *See* Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1171:14 – 1179:16, 1179:21 – 1180:8, 1202:4 – 1203:17.

[136]  *See* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 923:21 – 925:4, 998:18 – 999:16; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1202:23 – 1203:3 ("So when I looked at all these prescriptions which had red flags, the overwhelming majority, and in my report I said based upon my best educated experienced guess, it looks like 90 percent of those prescriptions did not have adequate documentation, but I couldn't really tell on the others as well."), 1203:4-11, 1203:12-14 ("But overwhelmingly, in my overwhelming opinion, about 90 percent of what I looked at didn't meet that level of documentation that was required.").

[137]  *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2435:7 – 2436:21, 2437:10 – 2439:15, 2440:9 – 2448:25, 2450:1 – 2452:23, 2453:9 – 2459:8, 2459:18-21, 2463:9-16, 2470:11 – 2471:1, 2477:15 – 2479:22, 2484:19 – 2487:15, 2487:23 – 2488:3, 2489:15 – 2491:18, 2527:10 – 2530:24, 2533:5 –
(footnote continues on next page)

- Walmart knew that the prescription opioids it was dispensing had a high potential for abuse that could lead to severe psychological or physical dependence, and thus knew that the diversion of opioids would create a public health hazard.[138]

- Walmart knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.[139]

- Walmart knew and understood its dispensing policies and procedures, and its implementation of same, did not comply with its legal obligation.[140]

- Walmart knew that it was not providing its pharmacists with the necessary training, guidance, tools, resources, and data to allow them to successfully exercise their corresponding responsibility.[141]

- Walmart deliberately implemented dispensing and compensation policies that

---

2534:1; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3854:15 – 3855:2, 3855:14 – 3856:1; P-07797; P-07799; P-14711; P-15962-A at 007-013; P-19827 at 001-002.

[138] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2454:22 – 2455:8, 2458:14-19, 2471:22 – 2473:5; P-15962-A at 003-008; P-19827 at 001-002; P-20829 at 002.

[139] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2465:6-10, 2466:15 – 2467:1, 2471:22 – 2473:5, 2477:2-6, 2477:19-22; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; P-14585 at 009; P-19827 at 001-002; P-20829 at 002; P-26737.

[140] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2530:12-24, 2534:2 – 2539:20; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5206:15 – 5209:3, 5229:18 – 5230:20, 5235:25 – 5240:4; P-07381; P-07846; P-07966; P-14585 at 009-013; P-20829 at 001.

[141] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2480:7 – 2481:5, 2482:13 – 2484:18, 2491:15 – 2492:9, 2498:1-16, 2525:9 – 2527:9, 2530:12-24, 2532:21 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2572:1 – 2573:10, 2576:7 – 2579:17, 2581:10-14, 2582:8 – 2583:7; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3869:6 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3883:12 – 3885:5, 3885:9 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:7 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3912:20 – 3913:2, 3916:16 – 3917:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5095:9 – 5096:10, 5096:23-25, 5140:14 – 5141:6, 5154:13-22, 5189:19 – 5190:9, 5193:15 – 5194:1, 5196:19 – 5199:23, 5206:15 – 5209:3, 5211:8 – 5216:17, 5229:1-10, 5229:18 – 5230:20, 5231:8 – 5238:13, 5240:12-18, 5247:12-20, 5248:6-10, 5248:16 – 5249:15, 5251:24 – 5252:3, 5265:18 – 5268:14, 5269:11-14, 5278:16 – 5281:8; P-07381; P-07799; P-07846; P-07908; P-07966; P-08037 at 001-004; P-08068; P-08069; P-14442; P-14450; P-14540; P-14552; P-14585 at 009-013; P-14645; P-14662; P-20824; P-20829 at 001; P-20849; P-20850; P-21884; P-26671 at 001; P-26681; P-26697; P-26705 ("[Refusal to fill] forms are collected and stored in Archer. However, pharmacists do not have easy access to this information, especially if the pharmacist is from another store. This information could be used to clear red flags, or identify red flags that may indicate that the prescription was not issued for a legitimate medical reason. . . . Currently, pharmacists do not have easy access to this information to utilize in their professional judgment."); P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892.

discouraged or hindered its pharmacists from performing due diligence on suspicious prescriptions.[142]

- Walmart systematically ignored red flags and other dispensing irregularities plainly present in its data and continued to fill suspicious prescriptions.[143]

- Walmart lobbied or pushed back against measures that would have helped prevent diversion.[144]

- Walmart knew of problematic prescribers and pill mills in or around the Counties from which it continued to allow or encourage its pharmacists to fill opioid prescriptions.[145]

- Walmart knew that prescription opioids were migrating into Ohio from other states, including Florida.[146]

- Walmart was subject to investigations and enforcement actions, and parties to settlements with the DEA, in which it was informed of diversion or sanctioned for its failures to prevent diversion.[147]

---

[142] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2572:1 – 2573:10, 2579:15-17; P-19827 at 001-002 (Walmart knew DEA said not to do this). *See also* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 932:11 – 933:21; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1117:5 – 1121:4; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3565:14 – 3566:9; P-21572; P-21884; P-26697; P-26671 at 001.

[143] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2505:2 – 2506:12, 2507:20 – 2509:25, 2534:2 – 2539:20, 2539:22 – 2542:3, 2542:14 – 2548:18, 2549:19 – 2553:7, 2570:11-21; Dkt. #4050 (10/19/21 Trial Tr.) [*Villanueva*] at 2731:20 – 2733:12, 2736:6-13, 2738:3-5, 2738:6 – 2740:12, 2741:5 – 2742:21, 2748:8-19, 2749:20-25, 2766:13-18, 2773:20 – 2774:2, 2799:20-21; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3869:6 – 3875:13, 3876:2 – 3879:12, 3879:16 – 3881:8, 3885:9 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:19 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3916:16 – 3917:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5196:19 – 5199:23, 5229:18 – 5230:20; P-04600-A; P-07908; P-07966; P-08037 at 001-004; P-08068; P-14540; P-14552; P-14645; P-14662; P-20829 at 001; P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892; *supra* at pp. 42-43.

[144] *See, e.g.,* P-21884; P-23267; P-26671 at 001 (discussing proposed rule change by Ohio Board of Pharmacy that would require pharmacists to check OARRS under certain circumstances: "I believe this will present a significant burden and liability to our pharmacists and an unjustified delay to our patients."); P-26697.

[145] *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3916:16 – 3917:22 (knew of problematic prescriber in Cleveland); Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5196:19 – 5198:13; P-26890 (knew of problematic prescriber in Cleveland).

[146] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 887:18-25; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5205:5-7; P-15962-A at 005-006; P-19827 at 001-002; P-42147-A at 004.

[147] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2461:17 – 2469:15, 2470:11 – 2471:21, 2474:10-(footnote continues on next page)

- Despite these repeated warnings and sanctions, Walmart made little to no effort to substantively change its dispensing policies and procedures until contractually obligated to do so under its settlements with the DEA.[148]

- Despite these repeated warnings and sanctions, Walmart continued to facilitate and encourage the oversupply and diversion of its opioids.[149]

- Walmart committed the failures described above (*supra* at § I.B.3) despite its awareness of rising concerns over the abuse of diverted prescription pills in Ohio and the rest of the country.[150]

- Walmart worked in concert with opioid manufacturers in spreading the manufacturers' false messaging surrounding the treatment of pain and the true addictive nature of opioids in an effort to increase opioid sales and profits.[151]

---

19, 2475:20 – 2479:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5187:22 – 5188:12, 5256:3-12, 5270:20 – 5271:21; P-07846 at 003, 006-010, 020-021; P-14711; P-21113.

[148] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2465:21 – 2469:15, 2470:11 – 2471:21, 2533:5 – 2534:1, 2550:4 – 2553:7; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3951:12 – 3952:23; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5187:14 – 5190:16, 5192:6 – 5195:3, 5195:15-23, 5199:24 – 5200:19, 5206:15 – 5207:10, 5208:23 – 5209:3, 5225:11 – 5226:24, 5231:8 – 5238:13, 5248:23 – 5249:15; P-07036 (1/2/14 Walmart PPT) at 031; P-07846; P-14442; P-14711 at 002-004; P-20852 ("The MOA that requires the reporting of the Refusal to fill expires in 30 days. We have not invested a great amount of effort in doing analysis on the data since the agreement is virtually over. Driving sales and patient awareness is a far better use of our Market Directors and Market manager's time.").

[149] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2507:20 – 2509:6, 2534:2 – 2542:3, 2542:14 – 2548:18, 2570:11-21, 2572:1 – 2573:10; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3859:2 – 3863:17, 3869:6 – 3875:13, 3879:16 – 3881:8, 3885:9 – 3889:16, 3891:21 – 3893:25, 3894:2 – 3896:11, 3896:17 – 3899:5, 3900:19 – 3902:20, 3902:24 – 3908:10, 3909:17 – 3910:13, 3916:16 – 3917:22; Dkt. #4109 (11/1/21 Trial Tr.) [*Hiland*] at 5196:19 – 5199:23, 5229:11 – 5230:20; P-07908; P-07966; P-08037 at 001-004; P-08068; P-08069; P-14540; P-14552; P-14643; P-14645; P-20829 at 001 (Walmart informed by Colorado BOP that its "inspectors collectively feel Walmart is Starting to become a 'funnel' with C-II's due to more liberal policies on dispensing pain meds . . ."); P-20850; P-20852; P-26732; P-26736; P-26737; P-26874; P-26882; P-26890; P-26892.

[150] *See, e.g.,* Dkt. #4041 (10/18/21 Trial Tr.) [*Nelson*] at 2471:22 – 2473:5; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3902:24 – 3908:10; P-19827 at 001-002; P-20829 at 002; P-26737 at 002.

[151] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 557:4-17, 588:22 – 589:17, 597:13-20, 615:22 – 616:15, 618:9 – 619:7.

**C.    The Evidence Demonstrates that Defendants' Intentional and Unlawful Conduct Proximately Caused the Public Nuisance in Lake and Trumbull Counties.**

Under Ohio law, Plaintiffs must show that each Defendant's wrongful conduct was a cause—*i.e.*, both a cause-in-fact and a legal/proximate cause—of harm to Plaintiffs.  *In re Gadolinium-Based Contrast Agents Prod. Liab. Litig.,* MDL No. 1909, 2013 WL 593993, at *3 (N.D. Ohio Feb. 15, 2013).  Courts often use the phrase "proximate cause" to mean both cause-in-fact and legal/proximate cause.  *Paroline v. United States*, 572 U.S. 434, 444 (2014).  Where, as here, multiple wrongdoers contribute to a combined harm, Plaintiffs must show that each Defendant's conduct was a substantial factor in producing the harm.  *See Pang v. Minch*, 559 N.E.2d 1313, 1324 (Ohio 1990).

The threshold inquiry is whether a Defendant's wrongful conduct had "a substantial as distinguished from a merely negligible effect . . ." RESTATEMENT (SECOND) OF TORTS § 431, cmt. b (1965).  Moreover, "[i]f a particular act might be expected to cause a particular result and, if that result has in fact followed, the conclusion may be justified that the causal relation exists."  *Id.* at § 433B, cmt. b; *see also Taylor,* 55 N.E.2d at 727 ("Where the harm and resulting damage are the necessary consequences of just what the defendant is doing, or is incident to the activity itself or the manner in which it is conducted, . . . the rule of absolute liability applies."); Dkt. #2561 (CT1 Causation MSJ Order) at p. 6 ("Because Plaintiffs have presented evidence that shows they have suffered the sort of injury that would be an expected consequence of the alleged wrongful conduct, Plaintiffs have made a sufficient showing to withstand summary judgment on this issue."); Dkt. #3403 (CT3 MTD Order) at p. 28.

This Court has previously held that "massive increases in the supply of prescription opioids into" the Counties, "combined with evidence that suggests a complete failure by [Defendants] to maintain effective controls against diversion," provides sufficient evidence from which a jury "could reasonably infer these failures were a substantial factor in producing the alleged harm suffered by Plaintiffs."  Dkt. #2561 (CT1 Causation MSJ Order) at p. 9; *see also* Dkt. #3913 (CT3 GE MSJ Order) at p. 8.  Moreover, "even a very small proportional contribution by one of

47

numerous [D]efendants could equate with a rather large and substantial absolute quantity, both in monetary terms and in terms of the consequent harms." Dkt. #2559 (CT1 *De Minimis* MSJ Order) at p. 5; *see also* Dkt. #3101 (CT1 HBC MSJ Order) at p. 5.  This Court has also previously held that Plaintiffs may demonstrate causation through aggregate proof.  Dkt. #2561 (CT1 Causation MSJ Order) at p. 8.

> ## 1. *Walgreens proximately caused the ongoing public nuisance in the Counties.*

The evidence adduced at trial demonstrates that Walgreens' conduct discussed above (*supra* at § I.B.1) was a substantial factor in producing the public nuisance in the Counties and Plaintiffs' related harms (*supra* at § I.A; *infra* at § I.C.1).  Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- An increased volume of prescription opioids, such as that brought about by a failure of a pharmacy to maintain adequate or effective controls against diversion, is a substantial contributing factor to diversion into the illicit market.[152]

- Walgreens dispensed thousands of opioid pills into the Counties that were likely to be diverted to illicit, non-medical use due to its systematic failures to maintain adequate and effective controls against diversion.[153]

- The oversupply and diversion of prescription opioids causes an increase in opioid-related public health and safety harms.[154]

---

[152]  *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 520:8 – 521:22, 590:2 – 591:2, 632:11-19, 640:23 – 641:8, 648:23 – 650:14, 666:9 – 667:7, 668:6 – 669:10, 676:2 – 677:24; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 859:16-20; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1050:15-25, 1054:12-17 ("Q:…. Do you believe that these failures of dispensing red flag [prescriptions], without conducting adequate investigation or due diligence, is likely to lead to diversion?  A: Yes, sir."); Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3460:19 – 3461:14, 3554:4 – 3555:14, 3559:11-13, 3563:12-20; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4165:21 – 4166:18.

[153]  *Supra* at § I.B.1 & fn.152; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 629:21 – 630:2; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1995:17 – 1997:10, 1998:2-4, 1999:4-22, 2000:1 – 2002:19, 2003:20 – 2004:6; P-24039.

[154]  *See, e.g., supra* at § I.A; Dkt.  #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3460:19 – 3462:10; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 520:8 – 521:22, 542:18-25, 547:17 – 549:6, 549:7-21, 619:19-22, 632:11-19, 640:23 – 641:8, 648:23 – 653:12, 656:24 – 658:2, 661:1-6, 668:6 – 669:10, 677:24; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at  859:16-20; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at (footnote continues on next page)

- Walgreens' failure to maintain adequate and effective controls against diversion with respect to the thousands of prescription opioids it dispensed into Lake and Trumbull Counties substantially contributed to the opioid epidemic in those Counties and the related harms suffered by Plaintiffs.[155]

Additionally, it was entirely foreseeable that the influx of red-flagged opioid prescriptions into the Counties, as a result of Walgreens' lax (or non-existent) anti-diversion policies and procedures, would lead to diversion and the related harms associated with same. Indeed, this result is exactly what the CSA and its implementing regulations were created to prevent.[156] Moreover, it was not simply foreseeable; it was *actually foreseen* by Walgreens. The evidence adduced at trial demonstrates that Walgreens knew that failing to employ sufficient dispensing practices would cause significant diversion, leading to opioid abuse and related harms. Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

---

1893:10-12 ("Q: Would you agree, Mr. Joyce, that an oversupply of opioid pills in a community can lead to diversion? A: Sure."), 1893:15-18 ("Q: And would you agree that diversion can lead to an unreasonable interference with the public health and safety? A: Without question."); Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3460:5 – 3465:22; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3637:16 – 3639:23, 3641:6-25, 3664:10-19 ("Q: And are you able based on your expertise and the Bradford Hill criteria to correlate in Lake and Trumbull Counties these increased opium-related harms to the oversupply of prescription opioids in those counties? A: Yes, I examined the supply of prescription opioids to Lake and Trumbull County, just like many communities in the United Sates, increased in concert with the increase in the supply of prescription opioids. That still remains high in Lake and Trumbull."), 3672:20 – 3674:5, 3675:22 – 3676:1, 3677:6 – 3678:18; Dkt. #4090 (10/26/21 Trial Tr.) [*Keyes*] at 4088:19 – 4098:4, 4203:2-16; P-00459 at 013 ("Overprescribing and dispensing is driver of the problem"); P-15962-A at 004.

155  *Supra* at fns.153-154; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 678:24 – 679:6, 679:12-21; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3064:29 – 3066:12, 3066:25 – 3067:9, 3067:17 – 3069:3.

156  *See, e.g., Masters Pharmaceuticals, Inc.*; Decision and Order, 80 FR 55418-01, 55475 (D.E.A. Sept. 15, 2015), *aff'd by Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017) (CSA's "core purposes" is to "prevent prescription drug abuse and the diversion of drugs to persons who seek to abuse them."). The Supreme Court has long recognized the inherent causal relationship between diversion of opioids and harm to the public. *See Direct Sales Co. v. United States*, 319 U.S. 703, 710-11 (1943) ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, aris[es] from the latters' inherent capacity for harm and from the very fact they are restricted . . . .").

- The purpose of federal drug control laws is to make sure controlled substances are confined to legitimate medical channels.[157]

- Diversion is foreseeable if registrants fail to comply with federal and state law governing the dispensing of prescription opioids.[158]

- The DEA recognizes that a CSA registrant's failure to comply with federal law enables more diversion.[159]

- Walgreens' failures to control the supply chain for the dangerous opioids it was dispensing inevitably and predictably led to diversion.[160]

---

[157] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 573:18-22, 668:10-14; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 772:20-23; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 955:7-14, 1043:10 – 1044:20, 1056:22 – 1057:1; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1131:8-13, 1234:12 – 1235:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1395:9 – 1396:6, Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1564:2-7, 1574:21 – 1575:13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1673:4-15, 1692:24 – 1693:3, 1709:15-19, 1717:3-7, 1726:24 – 1727:3; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5403:11-21; P-15962-A.

[158] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 986:9 – 987:19, 988:3-12, 989:15-22, 992:5 – 994:16, 995:5-8, 996:6-21, 998:7-12, 999:22 – 1001:19, 1006:21-25, 1007:8 – 1008:8, 1018:6-21, 1020:22 – 1021:1, 1040:9 – 1042:4, 1042:25 – 1044:10, 1054:13 – 1057:23; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1131:8-13, 1209:18-25; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1336:2-22, 1340:2-14, 1388:8-24, 1400:15-25, 1471:3 – 1472:11, 1490:24 – 1491:7, 1494:2-6; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1565:24 – 1566:13; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1661:1-22, 1672:1 – 1673:15, 1676:6-11, 1693:4-19, 1808:10-20, 1810:6-21; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2896:4-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; P-20639 at 009; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3556:22–3557:6; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3675:15 – 3676:1; Dkt. #4111 (11/2/21 Trial Tr.) [*Edwards*] at 5402:24 – 5404:4, 5471:15-19; P-00035 at 002 ("[A]ll registrants—manufacturers, distributors, *pharmacies*, and practitioners—share responsibility for maintaining appropriate safeguards against diversion.") (emphasis added); P-10101 at 002 (same); P-15962-A; P-19827 at 001-002.

[159] *See, e.g.,* Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 993:7-16, 994:3-16, 1008:4-13, 1011:7-15, 1016:3 – 1017:19, 1018:6-10, 1020:23 – 1021:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-10, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] 1565:19 – 1566:13, 1568:14-18, 1603:21 – 1604:20, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1650:1 – 1651:15, 1658:17 – 1659:6, 1660:4 – 1661:22, 1666:11-17, 1672:1 – 1673:15, 1674:23-25, 1676:6-11, 1690:24 – 1691:3, 1693:4-19, 1694:12-18, 1697:24 – 1698:11, 1808:10-20, 1810:6-21, 1813:9-25; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2896:4-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; P-15962-A; P-19827 at 001-002.

[160] *See, e.g.,* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 557:4 – 558:2, 562:16-23, 563:9-17, 589:15-21, 590:2 – 591:2, 605:23 – 606:3, 619:12-620:11, 625:7 – 626:18, 629:6 – 630:2, 631:4-15, 632:11-19, 636:3-24, 640:23 – 641:8, 666:9-25, 668:25 – 669:10, 679:12-21; Dkt. #4005 (10/7/21 Trial Tr.) (footnote continues on next page)

- Walgreens knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.[161]

- Walgreens knew that there was an ever-worsening opioid epidemic in this country during the time that it engaged in its unlawful and intentional dispensing conduct.[162]

---

[*Catizone*] at 988:3-12, 989:13 – 994:16, 995:5-8, 996:6-21, 998:7-12, 999:3-16, 999:22 – 1002:13, 1004:1-18, 1006:21-25, 1007:8-20, 1025:13 –1027:1, 1040:9 – 1042:4, 1048:23 – 1050:3, 1050:16-25, 1054:13-17, 1058:2-18; Dkt. #4008 (10/8/21 Trial Tr.) [*Catizone*] at 1114:1 – 1115:4, 1119:12 – 1121:4, 1123:16 – 1124:14, 1124:19 – 1127:5, 1127:14 – 1128:5, 1129:2 – 1130:20, 1151:12 – 1154:18, 1155:11-19, 1156:3 – 1158:4, 1158:16 – 1159:12, 1161:7 – 1162:10, 1162:25 – 1164:4, 1167:7 – 1168:3, 1170:11 – 1171:13, 1172:8-10, 1172:18 – 1173:1, 1173:15 – 1174:6, 1175:2 – 1179:16, 1179:22 – 1180:8, 1180:13 – 1188:2, 1193:18-22, 1202:4 – 1203:14, 1204:5-14, 1205:8-19; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1338:2-5, 1373:1-10, 1386:22 – 1387:7, 1471:3 – 1472:11, 1490:24 – 1491:7; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1666:11-17, 1690:24 – 1694:18; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1893:10-12 ("Q: Would you agree, Mr. Joyce, that an oversupply of opioid pills in a community can lead to diversion?  A: Sure."), 1893:15-18 ("Q: And would you agree that diversion can lead to an unreasonable interference with the public health and safety?  A: Without question."); Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 2093:1-11; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; Dkt. #4064 (10/21/21 Trial Tr.) [*Alexander*] at 3563:12 – 3564:2; Dkt. #4065 (10/22/21 Trial Tr.) [*Keyes*] at 3675:15 – 3676:1; P-19827 at 001-002; P-20639 at 009, 024.

[161] *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-19, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] 1565:19 – 1566:13, 1568:14-18, 1603:21 – 1604:20, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1650:1 – 1651:15, 1658:17 – 1659:6, 1660:4 – 1661:22, 1666:11-17, 1672:1 – 1673:15, 1674:23-25, 1676:6-11, 1690:24 – 1691:3, 1693:4-19, 1694:12-18, 1697:24 – 1698:11, 1808:10-20, 1810:6-21, 1813:9-25; Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12 – 1836:18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15, 1893:10-12 ("Q: Would you agree, Mr. Joyce, that an oversupply of opioid pills in a community can lead to diversion?  A: Sure."), 1893:15-18 ("Q: And would you agree that diversion can lead to an unreasonable interference with the public health and safety?  A: Without question."), 1912:20-24; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2093:1-11; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2891:9-13, 2896:4-14, 2921:21 – 2922:3; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6, 3094:12-20; P-14746 at 005, 014; P-15314 at 022; P-15962-A; P-19566 at 003 ("The abuse of prescription drugs—especially controlled substances—is a serious social and health problem in the United States today.  As a healthcare professional, you share responsibility for solving the prescription drug abuse and diversion problem."); P-19827 at 001-002; P-20639 at 009, 024 ("[W]e continue to believe that addressing prescription drug abuse will require all parties—including . . . pharmacies . . .—to play a role in finding practical solutions to combatting abuse . . .").

[162] *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1836:2-5 ("Q: And Trumbull County and this region have seen the effects of the opioid pill diversion directly.  True?  A: I would say so."), 1836:6-13, 1836:14-18 ("Q: So would you agree that any pharmacist working at Walgreens in your district should be well-aware of the problems associated with opioid pill--  A: Every pharmacist in the State of Ohio is aware of the opioid problem."), 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were

(footnote continues on next page)

- The public health and safety harms associated with the opioid epidemic were known by Walgreens during the time it engaged in its unlawful and intentional dispensing conduct.[163]

### 2.  *CVS proximately caused the ongoing public nuisance in the Counties.*

The evidence adduced at trial demonstrates that CVS's conduct discussed above (*supra* at § I.B.2) was a substantial factor in producing the public nuisance in the Counties and Plaintiffs' related harms (*supra* at § I.A; *infra* at § I.C.2).   Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- An increased volume of prescription opioids, such as that brought about by a failure of a pharmacy to maintain adequate or effective controls against diversion, is a substantial contributing factor to diversion into the illicit market.  *Supra* at fn.152.

- CVS dispensed thousands of opioid pills into the Counties that were likely to be diverted to illicit, non-medical use due to its systematic failures to maintain adequate and effective controls against diversion.[164]

- The oversupply and diversion of prescription opioids causes an increase in opioid-related public health and safety harms.  *Supra* at fn.154.

- CVS's failure to maintain adequate and effective controls against diversion with respect to the thousands of prescription opioids it dispensed into Lake and Trumbull Counties

---

fueling the opioid epidemic in these counties, right?  A: Mr. Weinberger, without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"); Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6 – 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2888:2-13, 2896:4-14, 2907:17-20, 2907:21 – 2911:16, 2919:1-7; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3251:5 – 3252:3, 3252:8-14; P-14746 at 003, 005-006; P-15314 at 022; P-15962-A; P-19566 at 003; P-20639 at 002, 004, 006, 024; P-20808; P-26403 at 011.

[163]  *See, e.g.,* Dkt. #4023 (10/13/21 Trial Tr.) [*Joyce*] at 1834:12-19, 1835:5-23, 1836:2-18, 1838:6 – 1844:23, 1845:13 – 1850:20, 1879:9-15 ("Q: But you knew that in general in Trumbull County, OxyContin's prescriptions and Hydrocodone prescriptions were fueling the opioid epidemic in these counties, right?  A: Mr. Weinberger, without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state.'"), 1912:20-24; Dkt. #4026 (10/14/21 Trial Tr.) [*Joyce*] at 1958:12-21, 1995:4-16, 2022:6- 2023:6; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2888:2-13, 2891:9-13, 2907:17-20, 2907:21 – 2911:16; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3251:5 – 3252:3, 3252:8-14; P-14746 at 003, 005-006; P-15314 at 022; P-15962-A; P-19566 at 003; P-19827 at 001-002; P-20639 at 002, 004, 024; P-20808; P-26403 at 011, 025.

[164]  *Supra* at § I.B.2 & fn.152; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 629:21 – 620:2; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3981:22 – 3984:17, 3988:2 – 3990:1; P-08409.

substantially contributed to the opioid epidemic in those Counties and the related harms suffered by Plaintiffs.[165]

Additionally, it was entirely foreseeable that the influx of red-flagged opioid prescriptions into the Counties, as a result of CVS's lax (or non-existent) anti-diversion policies and procedures, would lead to diversion and the related harms associated with same.  Indeed, this result is exactly what the CSA and its implementing regulations were created to prevent.  *Supra* at fn.156. Moreover, it was not simply foreseeable; it was *actually foreseen* by CVS.  The evidence adduced at trial demonstrates that CVS knew that failing to employ sufficient dispensing practices would cause significant diversion, leading to opioid abuse and related harms.  Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- The purpose of federal drug control laws is to make sure controlled substances are confined to legitimate medical channels.  *Supra* at fn.157.

- Diversion is foreseeable if registrants fail to comply with federal and state law governing the dispensing of prescription opioids.  *Supra* at fn.158.

- The DEA recognizes that a CSA registrant's failure to comply with federal law enables more diversion.  *Supra* at fn.159.

- CVS's failures to control the supply chain for the dangerous opioids it was dispensing inevitably and predictably led to diversion.  *Supra* at fn.160.

- CVS knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.[166]

---

[165]  *Supra* at fns.154 & 164.  *See also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 678:24 – 679:8, 679:12-23; P-00459 at 013 ("Overprescribing and dispensing is driver of the problem.").

[166]  *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 379:20-22, 394:12-18, 396:2-14; Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-19, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] 1565:19 – 1566:13, 1568:14-18, 1603:21 – 1604:20, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1650:1 – 1651:15, 1658:17 – 1659:6, 1660:4 – 1661:22, 1666:11-17, 1672:1 – 1673:15, 1674:23-25, 1676:6-11, 1690:24 – 1691:3, 1693:4-19, 1694:12-18, 1697:24 – 1698:11, 1808:10-20, 1810:6-21, 1813:9-25; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:19; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5737:9 – 5738:1, 5768:19 – 5769:19, 5793:25 – 5796:14, 5820:18 – 5825:2; P-00459 at 006-009, 013 ("Overprescribing and dispensing is driver of the problem"), 045 ("I am frustrated when I think of all of the time and energy we must spend to keep our prescription drugs in the right hands, and I am sad (footnote continues on next page)

- CVS knew that there was an ever-worsening opioid epidemic in this country during the time that it engaged in its unlawful and intentional dispensing conduct.[167]

- The public health and safety harms associated with the opioid epidemic were known by CVS during the time it engaged in its unlawful and intentional dispensing conduct.[168]

### 3. Walmart proximately caused the ongoing public nuisance in the Counties.

The evidence adduced at trial demonstrates that Walmart's conduct discussed above (*supra* at § I.B.3) was a substantial factor in producing the public nuisance in the Counties and Plaintiffs' related harms (*supra* at § I.A; *infra* at § I.C.3). Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- An increased volume of prescription opioids, such as that brought about by a failure of a pharmacy to maintain adequate or effective controls against diversion, is a substantial contributing factor to diversion into the illicit market. *Supra* at fn.152.

- Walmart dispensed thousands of opioid pills into the Counties that were likely to be diverted to illicit, non-medical use due to its systematic failures to maintain adequate and effective controls against diversion.[169]

- The oversupply and diversion of prescription opioids causes an increase in opioid-related public health and safety harms. *Supra* at fn.154.

- Walmart's failure to maintain adequate and effective controls against diversion with respect to the thousands of prescription opioids it dispensed into Lake and Trumbull

---

for the hurt and pain this issue has caused so many people!!"); P-15656 at 003 ("Ensuring that Pharmacists exercise corresponding responsibility is a key focus of federal, state and local law enforcement as part of their effort to curb drug abuse."); P-15962-A; P-19827 at 001-002.

[167] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 373:19 – 374:2; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3967:23 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5768:19 – 5769:19, 5820:18 – 5825:2; P-00459 at 007-009, 012-014 ("Prescription drug abuse is an epidemic in our country. Deaths from drug overdose have been rising steadily over the past two decades and have become a leading cause of injury and death in the United States."), 045; P-08403; P-15656 at 003; P-15962-A; P-26403 at 011.

[168] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 373:19 – 374:2, 379:20-22, 394:12-18; Dkt. #4078 (10/25/21 Trial Tr.) [*Travassos*] at 3965:1 – 3966:24, 3967:18-22, 3968:18 – 3969:5; Dkt. #4115 (11/3/21 Trial Tr.) [*Harrington*] at 5768:19 – 5769:19, 5820:18 – 5825:2; P-00459 at 007-009, 012-014, 045; P-08403; P-15656 at 003; P-15962-A; P-19827 at 001-002; P-26403 at 011, 025.

[169] *Supra* at § I.B.3 & fn.152. *See also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 629:21 – 630:2.

Counties substantially contributed to the opioid epidemic in those Counties and the related harms suffered by Plaintiffs.[170]

Additionally, it was entirely foreseeable that the influx of red-flagged opioid prescriptions into the Counties, as a result of Walmart's lax (or non-existent) anti-diversion policies and procedures, would lead to diversion and the related harms associated with same. Indeed, this result is exactly what the CSA and its implementing regulations were created to prevent. *Supra* at fn.156. Moreover, it was not simply foreseeable; it was *actually foreseen* by Walmart. The evidence adduced at trial demonstrates that Walmart knew that failing to employ sufficient dispensing practices would cause significant diversion, leading to opioid abuse and related harms. Specifically, there is evidence on which a reasonable jury could rely to conclude the following:

- The purpose of federal drug control laws is to make sure controlled substances are confined to legitimate medical channels. *Supra* at fn.157.

- Diversion is foreseeable if registrants fail to comply with federal and state law governing the dispensing of prescription opioids. *Supra* at fn.158.

- The DEA recognizes that a CSA registrant's failure to comply with federal law enables more diversion. *Supra* at fn.159.

- Walmart's failures to control the supply chain for the dangerous opioids it was dispensing inevitably and predictably led to diversion. *Supra* at fn.160.

- Walmart knew that by failing to comply with its legal obligations regarding the dispensing of prescription opioids, abuse and diversion of those opioids was substantially certain to occur.[171]

- Walmart knew that there was an ever-worsening opioid epidemic in this country during

---

[170] *Supra* at fns.154 & 169; *see also* Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 636:3 – 637:3, 678:24 – 679:2, 679:12-17.

[171] *See, e.g.,* Dkt. #4017 (10/12/21 Trial Tr.) [*Catizone*] at 1333:2-19, 1386:22 – 1387:21, 1388:8-24, 1390:15-21, 1400:8-25, 1493:18 – 1494:1; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] 1565:19 – 1566:13, 1568:14-18, 1603:21 – 1604:20, 1608:9-19; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1650:1 – 1651:15, 1658:17 – 1659:6, 1660:4 – 1661:22, 1666:11-17, 1672:1 – 1673:15, 1674:23-25, 1676:6-11, 1690:24 – 1691:3, 1693:4-19, 1694:12-18, 1697:24 – 1698:11, 1808:10-20, 1810:6-21, 1813:9-25; Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3069:18 – 3070:6; Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; P-14585 at 009; P-15962-A; P-19827 at 001-002; P-20829 at 002; P-26737 at 002.

the time that it engaged in its unlawful and intentional dispensing conduct.[172]

- The public health and safety harms associated with the opioid epidemic were known by Walmart during the time it engaged in its unlawful and intentional dispensing conduct.[173]

### 4. Defendants' causation arguments should be rejected.

Throughout their Motions, Defendants repeat the same arguments regarding causation that have previously been considered and rejected by this Court. Dkt. #4098 (Ds' Motion) at pp. 14-20 (no individualized evidence/aggregate proof insufficient; remoteness; intervening/superseding causes); Dkt. #4100 (WMT Motion) at pp. 1-2, 11-13 (same); Dkt. #4102 (WAG Motion) at pp. 7-10 (same); Dkt. #4103 (CVS Motion) at pp. 6-8, 15-16 (same; learned intermediary doctrine). These arguments should be rejected again for the reasons set forth in the Court's prior rulings and Plaintiffs' (and the CT1 plaintiffs') prior briefing, which are incorporated as if set forth herein. *See, e.g.,* Dkt. #2561 (CT1 Causation MSJ Order); Dkt. #3403 (CT3 MTD Order) at pp. 30-32; Dkt. #3913 (CT3 GE MSJ Order) at pp. 7-8; Dkt. #3102 (CT1 Walmart MSJ Order) at pp. 4-5; Dkt. #3099 (CT1 CVS MSJ Order) at pp. 2-5; Dkt. #3002-1 (CT1 Ps' Opp. to Causation MSJ); Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 31-36. Additionally, with respect to Defendants' arguments that the conduct of others (including criminals, problematic prescribers, and opioid manufacturers) breaks the chain of causation, there is ample evidence on which a reasonable jury could rely to conclude that the conduct of these third parties was (i) foreseeable,[174] and (ii) not

---

[172] *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; P-15962-A; P-20829 at 002; P-26737 at 002.

[173] *See, e.g.,* Dkt. #4078 (10/25/21 Trial Tr.) [*Nelson*] at 3905:21 – 3906:8; P-15962-A; P-19827 at 001-002; P-20829 at 002; P-26737 at 002.

[174] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 297:1-13, 299:16 – 302:12, 305:17 – 306:8, 329:13 – 330:3, 396:2-14; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 666:17 – 667:4; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 774:22 – 775:9; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 1040:15 – 1042:4; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1576:13 – 1577:22, 1583:14 – 1584:9; Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1669:12- 1670:15; Dkt. #4050 (10/19/21 Trial Tr.) [*Polster*] at 2891:9-13, 2908:24-25, 2909:11-20, 2920:25 – 2921:4, 2921:11-14; P-00459 at 016; P-14585 at 009; P-14746 at 003, 006; P-15314 at 022; P-15962-A; P-17254; P-19827; P-20639 at 003-004, 006, 009; P-26737 at 002.

independent of Defendants' misconduct.[175]

### D. Defendants Are Not Entitled to "Safe Harbor" Immunity.

As this Court has repeatedly stated, "under Ohio law, ''safe harbor' immunity from absolute nuisance liability is available *only* to those who perform in accordance with their applicable licensing regulatory obligations.'" Dkt. #3403 (CT3 MTD Order) at pp. 29-30 (quoting Dkt. #3177 (Cleveland Bakers MTD Order) at pp. 45-47 (emphasis added).[176]  As set forth above, Defendants did not dispense prescription opioids in accordance with appliable statutes and regulations.  *Supra* at § I.B.

Defendants also claim that they cannot be held liable for public nuisance based on intentional *lawful* conduct because they are authorized to dispense opioids under the CSA. Dkt. #4098 (Ds' Motion) at pp. 20-22 ("[A]ny attempt to argue that Defendants should still be held liable even though they have complied with the mandates of the CSA would not be viable."); Dkt. #4100 (WMT Motion) at pp. 2-3, 13-14.  Not so.  For immunity to apply, the conduct must

---

[175] *See, e.g.,* Dkt. #3995 (10/5/21 Trial Tr.) [*Davis*] at 299:16 – 302:12, 305:17 – 306:8, 396:2-14; Dkt. #4000 (10/6/21 Trial Tr.) [*Lembke*] at 554:4 – 555:3, 557:4-20, 562:16 – 564:11, 578:12 – 579:4, 581:4-20, 582:1-12, 582:17 – 583:12, 585:11 – 586:17, 587:8 – 588:21, 594:11-25, 596:23 – 597:10, 608:25 – 610:3, 613:13-25, 678:9 – 679:8; Dkt. #4005 (10/7/21 Trial Tr.) [*Lembke*] at 769:2-9, 771:12-16, 772:12-23, 859:7-20; Dkt. #4005 (10/7/21 Trial Tr.) [*Catizone*] at 930:9-16; Dkt. #4017 (10/12/21 Trial Tr.) [*Rannazzisi*] at 1576:13 – 1577:22, 1587:3 – 1588:8, Dkt. #4023 (10/13/21 Trial Tr.) [*Rannazzisi*] at 1677:11-16; Dkt. #4000 (10/26/21 Trial Tr.) [*Keyes*] at 4153:24 – 4154:8, 4176:17 – 4177:4; P-00459 at 016; P-14585 at 009; P-14746 at 003, 006; P-15314 at 022 ("Prescription drug abuse is the nation's fastest growing drug problem. . . .  Community pharmacy has become a target for individuals seeking these drugs."); P-15962-A; P-17254; P-19827; P-20639 at 009; P-26737 at 002.

[176] *See also City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 621 F. Supp. 2d 513, 516, 526, 531 (N.D. Ohio 2009) (dismissing public nuisance claim based on "epidemic of foreclosures" allegedly caused by subprime lending where plaintiff "does not claim that the underlying subprime mortgage lending was illegal" or that defendants "violated any of the myriad laws governing mortgage lending"; "[C]onduct which is *fully authorized* by statute or administrative regulation is not an actionable tort.") (emphasis added); *Hager v. Waste Technologies Industries*, No. 2000-CO-45, 2002 WL 1483913, at *10-11 (Ohio App. 7 Dist. June 27, 2002) (defendant's "*mere existence or operation*" of waste incineration facility did not qualify as a common law public nuisance, where facility was licensed to operate its plant and it operated under sanction of law; "[C]onduct, which is fully authorized by statute or administrative regulation, is not actionable as a public nuisance.") (emphasis in original); RESTATEMENT (SECOND) OF TORTS § 821B cmt. f ("Although it would be a nuisance at common law, conduct that is *fully authorized* by statute, ordinance or administrative regulation does not subject the actor to tort liability.") (emphasis added).

be "fully authorized" by statute or regulation.  *See Ameriquest*, 621 F. Supp. 2d at 526 ("[C]onduct which is *fully authorized* by statute or administrative regulation is not an actionable tort.") (emphasis added); *Hager*, 2002 WL 1483913, at *10 (same); RESTATEMENT (SECOND) OF TORTS § 821B cmt. f (same).  Certain conduct may not be "fully authorized" under a statute even if it is not explicitly prohibited.  As just one example, there is evidence that Defendants intentionally implemented certain compensation and dispensing policies that discouraged or hindered its pharmacists from performing due diligence on suspicious prescriptions, such as 15-minute wait time goals and bonuses based in part on sales from filling opioid prescriptions.  *Supra* at pp. 24, 35, 44-45.  These policies may not be expressly prohibited under the CSA. But neither are they "fully authorized" by that statute or consistent with the statute's purpose.  Thus, to the extent Defendants deliberately implemented such policies for the purpose of selling more drugs (including opioids), while being aware of the ever-worsening opioid epidemic and knowing that these policies resulted in their pharmacists spending less time to do the due diligence on red-flagged prescriptions necessary to prevent diversion, such intentional conduct can form the basis of a public nuisance claim.

## II.  THERE IS NO LEGAL BAR TO JUDGMENT ON PLAINTIFFS' NUISANCE CLAIM.

Defendants correctly note that this Court has rejected each of the following Defendants' arguments and reasons offered in support of their contention that Plaintiffs' claims are legally deficient.  *See* Dkt. #1032 (CT1B MTD Order) and Dkt. #3403 (CT3 MTD Order).  Since Defendants restated these issues to preserve them for appeal, in order to ensure a complete record for appeal, Plaintiffs incorporate by reference their own and the Track One plaintiffs' prior briefing on these same issues, including but not limited to: Dkt. #654 (CT1 Ps' MTD Opp.); Dkt. #2171 (CT1 Ps' Opp. to Preemption MSJ); Dkt. #2179 (CT1 Ps' Opp. to SOL MSJ); Dkt. #3002-1 (CT1 Ps' Opp. to Causation MSJ); Dkt. #3004-1 (Ps' Opp. to SOL MSJ); Dkt. #3366 (CT3 Ps' Opp. to MTD).  Plaintiffs further respond as follows.[177]

---

[177]  Defendants' motion is procedurally improper.  Many of Defendants' arguments are vaguely disguised (footnote continues on next page)

A.     **Ohio Statutory Law Does Not Preclude Plaintiffs' Common-Law Nuisance Claims.**

      1.     *The Ohio Product Liability Act does not expressly bar Plaintiffs' nuisance claims.*

Contrary to Defendants' claims, this Court did not err by concluding that Plaintiffs with similar claims in Track One were asserting a non-abrogated claim for equitable relief.  Dkt. #4098 (Ds' Motion) at p. 22 (citing to Dkt. #491-1 (CT1 Distr. Ds' MTD) at pp. 35-39)); Dkt. #4103 (CVS Motion) at p. 11.  Plaintiffs incorporate by reference their opposition brief on this issue. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 18-21.  This Court rejected Defendants' arguments and correctly found that the common law public nuisance claims were not abrogated by the OPLA at least insofar as it does not seek compensatory damages for harm.[178]  Dkt. #1203 (CT1 Opinion and Order, adopting in part and rejecting in part Dkt. #1025 (R&R)) at pp. 23-28.  The Court properly found that a claim seeking only equitable relief is not abrogated by the OPLA.  *Id.* at p. 26.

      2.     *Plaintiffs' nuisance claims are not precluded by Ohio Rev. Code Ann. § 4729.35.*

Defendants argue that § 4729.35 permits only injunctive relief and that Ohio law does not permit a plaintiff to bring a common-law claim where the Ohio Legislature has comprehensively regulated the field and provided specific remedies that conflict with the common-law cause of action.  Dkt #4098 (Ds' Motion) at p. 23 (citing Dkt. #3340-1 (CT3 Ds' MTD) at pp. 13-19).  Plaintiffs incorporate by reference their opposition brief on this issue.  Dkt. #3366 (CT3 Ps' Opp.

---

requests for reconsideration of the Court's previous orders (including orders denying reconsideration). Defendants do not even attempt to meet the applicable test for reconsideration which requires a showing of "manifest injustice" or "clear error."  *See* Dkt. #3499 (CT3 Reconsideration Order) at p. 2 (citation omitted).

[178] "'Harm' means death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not 'harm.'" Ohio Rev. Code § 2307.71(A)(2). Dkt. #1203 (CT1 Opinion and Order, adopting in part and rejecting in part Dkt. #1025 (R&R)) at p. 28 n.14. This Court further rejected Defendants' assertion that section 2307.72(D)(1) which expressing carved out abatement relief for contamination of the environment as an indication that OPLA supersedes all other forms of equitable relief. Concluding that "a far more natural reading on this section is the carving out of all forms of relief for pollution of the environment from preemption by federal environmental protection laws and regulations. *Id.* at p. 26 n.12.

to MTD) at pp. 5-10   This Court rejected Defendants' insistence that the Plaintiffs "can bring their claim under the appropriate statute, OHIO REV. CODE ("O.R.C") § 4729.35, or not at all." Dkt. #3403 (CT3 MTD Order) at pp. 3-4.  After a thorough analysis, this Court concluded:

> Under the approach urged by Defendants, pharmacists, pharmacies, and "other person[s]" who violate a state or federal law or regulation governing controlled substances would be subject only to an order enjoining the misconduct. This reading would immunize an entity from common law liability for the consequences of this conduct, even if it causes a dire nuisance by unreasonably interfering with the public's right to health and safety. To find the General Assembly intended this outcome strains credulity and would contradict its fundamental instruction that, "[i]n enacting a statute, it is presumed that …[a] just and reasonable result is intended." O.R.C. § 1.47 (C).
>
> In sum, the Court perceives nothing in § 4729.35 expressly stating or necessarily implying abrogation of common law public nuisance claims.

Dkt. #3403 (CT3 MTD Order) at pp. 12-13. (internal footnotes omitted).

Similarly, this Court correctly rejected Defendants' motion for reconsideration or certification on this issue. Dkt. #3499 (CT3 Reconsideration Order) at pp. 3-4.

### B.      Ohio Common Law Does Not Preclude Plaintiffs' Public Nuisance Suit.

Contrary to Defendants' contentions, Plaintiffs public nuisance suit is viable, and Defendants owe a duty to Plaintiffs for their dispensing conduct under Ohio nuisance law.

#### 1.      Plaintiffs have shown a violation of a public right.

Defendant incorrectly claims that Plaintiffs cannot base their public-nuisance claim on the private misuse of opioid medications and are thus unable to prove the invasion of a public right. Dkt. #4098 (Ds' Motion) at pp. 23-24; Dkt. #4103 (CVS Motion) at p. 11.  Plaintiffs incorporate by reference the Track One plaintiffs' prior briefing on this issue.  *See* Dkt. #654 (CT1 Ps' MTD Opp.); *see also* Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 36-37.  As noted below, this Court has consistently rejected this argument.  Defendants do not reargue any of the issues, nor offer the Court any reason to revisit its prior rulings.

Defendants did not seek reconsideration of this issue in their Motion to Dismiss the Second Amended Complaint and only asked that the issue be preserved for appeal.  Dkt. #3340 (CT3 Ds'

MTD) at pp. 30-31. Thus, the Court did not reconsider its prior rulings, (Dkt. #3403 (CT3 MTD Order) at pp. 32-33), and should not do so now. Instead, this Court should follow its previous orders, which have analyzed this issue and rejected Defendants' arguments that: (i) Plaintiffs' claims rely on an aggregation of individual rights, as opposed to rights commonly held by the public, and (ii) none of the allegedly interfered-with rights constitute public rights. *See* Dkt. #2578 (CT1 Order on Mfr. MSJ) at pp. 3-4; Dkt. #1680 at pp. 18-19 (Muscogee and Blackfeet Order adopting in part and rejecting in part Dkt. #1499 at pp. 58-61 (Muscogee R&R) and Dkt. #1500 at pp. 28-34 (Blackfeet R&R). Finally, courts in twenty-five states have rejected Defendants' claim that no public rights are at issue in opioid cases.[179]

---

[179] *Alabama v. Purdue Pharma L.P.*, 03-CV-2019-901174.00, slip op. at 11-12 (Cir. Ct. Nov. 13, 2019); *Alaska v. McKesson Corp.*, No. 3AN-18-10023CI, slip op. at 7 (Super. Ct. Aug. 28, 2019); *State v. Purdue Pharma L.P.*, No. 3AN-17-09966CI, 2018 WL 4468439 (Alaska Super. July 12, 2018); *City of Surprise v. Allergan PLC,* No. CV2019-003439, slip op. at 35-36 (Super. Ct. Oct. 28, 2020); *State v. Purdue Pharma L.P.*, No. CV2018002018, 2019 WL 1590064 (Ark.Cir. Apr. 05, 2019); *California ex rel. Korb v. Purdue Pharma L.P.*, No. 30-2014-00725287, slip op. at 16-17 (Super. Ct. Mar. 12, 2021); *City and County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 669 (N.D. Cal. Sept. 30, 2020) (Bryer); *In re Nat'l Prescription Opiate Litig.*, No. 18-OP-45332, 2020 WL 1986589 (N.D. Ohio Apr. 27, 2020); *In re Nat'l Prescription Opiate Litig.* (West Boca Medical Center), 452 F. Supp. 3d 745 (N.D. Ohio 2020); *see also Florida v. Purdue Pharma L.P.*, No. 2018-CA-001438, slip order (Cir. Ct. Apr. 11, 2019); *Kentucky ex rel. Beshear* v. *Cardinal Health,* No. 18-CI00I013, slip op. (Cir. Ct. Sept. 12, 2019); *Kentucky ex rel. Beshear v. Walgreens Boots Alliance, Inc.,* No. 18-CI-00846, slip op. (Cir. Ct. July 18, 2019); *Com. v. Endo Health Solutions Inc.*, No. 17-CI-1147, 2018 WL 3635765 (Ky.Cir.Ct. July 10, 2018); *City of Bos. v. Purdue Pharma, LP*, No. 1884CV02860, 2020 WL 416406 (Mass. Super. Jan. 3, 2020); *Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808BLS2, 2019 WL 5495866 (Mass. Super. Sept. 17, 2019); *Michigan ex rel. Kessel v. Cardinal Health, Inc.*, No. 19016896-NZ, slip op., at 2 (Cir. Ct. Mar. 24, 2021), *reversing on reconsideration* slip. op. (Cir. Ct. Nov. 17, 2020); *Mississippi v. Cardinal Health, Inc.*, No. 25Cll:18-cv00692, slip op. (Cir. Ct. Apr. 5, 2021); *Missouri ex rel. Schmitt v. Purdue Pharma, L.P.*, No. 1722-CC10626, slip op., *7-8 (Cir. Ct. Apr. 6, 2020); *Nevada v. McKesson Corp.*, No. A-19-796755-B, slip order (Dist. Ct. Jan. 3, 2020); *State v. Purdue Pharma Inc.*, No. 217-2017-CV-00402, 2018 WL 4566129 (N.H.Super. Sep. 18, 2018); *New Mexico ex rel. Balderas v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541 slip op. (Dist. Ct. Dec. 17, 2020); slip op. (Dist. Ct. Sept. 10, 2019); *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018); *State, ex rel. Dewine v. Purdue Pharma L.P.*, No. 17 CI 261, 2018 WL 4080052 (Ohio Com.Pl. Aug. 22, 2018); *Oklahoma ex rel. Hunter v. Purdue Pharma L.P.*, No. CJ-2017-816, Judgment After Non-Jury Trial at 25-26, 30 (August 26, 2019), pending appeal; *County of Delaware v. Purdu.e Pharma, L.P.,* CV- 2017008095, slip ops. (Ct. C.P., March 13, 2020, Dec. 4, 2019, and Oct. 25, 2019); *State v. Purdue Pharma L.P.*, No. PC-2018-4555, 2019 WL 3991963, at *9 (R.I.Super. Aug. 16, 2019); *South Carolina v. Purdue Pharma L.P.*, No. 2017-CP40-04872, slip order (Ct. C.P. Apr. 12, 2018); *State v. Purdue Pharma L.P.*, No. 1-173-18, 2019 WL 2331282, at *5 (Tenn.Cir.Ct. Feb. 22, 2019); *Tennessee ex rel. Slatery v. AmerisourceBergen Drug Corp.*, No. 1345-
(footnote continues on next page)

### 2. Plaintiffs have shown that Defendants' dispensing conduct constitutes a nuisance.

Defendants contend the Plaintiffs cannot base their nuisance claim on Defendants' highly regulated dispensing conduct as an "absolute nuisance ordinarily involves an inherently dangerous activity." Dkt. #4098 (Ds' Motion) at p. 24. Plaintiffs incorporate their opposition brief on this issue. Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 26-31. This Court previously rejected all of Defendants' arguments, including the claim that an absolute nuisance theory could not apply because their dispensing conduct was licensed, authorized, and regulated under the CSA, and found that an "absolute" nuisance can be based on culpable and intentional or unlawful conduct by the defendant resulting in harm. Dkt. #3403 (CT3 MTD Order) at pp. 26-30. This Court further concluded Plaintiffs had sufficiently stated common law claims for absolute public nuisance based on Defendants' alleged dispensing activities. *Id.* at p. 30.

### 3. Defendants have control over the prescription opioids at the time of the alleged nuisance.

Defendants assert that a "defendant is not liable for public nuisance unless it exercises control over the instrumentality that caused the nuisance *at the time of the nuisance*, thus claiming that plaintiffs cannot show the defendants controlled the opioids at the time of the alleged nuisance "i.e. when third parties diverted the opioids and used them illegally." Dkt. #4098 (Ds' Motion) at p. 25; *see also* Dkt. #4103 (CVS Motion) at p. 16. Plaintiffs incorporate by reference their briefing on this issue in CT1. Dkt. #2170 (CT1 Ps' Opp. to Nuisance MSJ). This Court has previously rejected this argument noting that it "is premised on a misconception of Plaintiffs' theory of nuisance liability." Dkt. #2578 (CT1 Order on Mfr. MSJ) at pp. 4-5; *see also* Dkt. #1680 at pp. 19-20 adopting the analyses set forth in Dkt. #1499 at p. 57 (Muscogee), Dkt. #1500 at

---

19, slip op. (Cir. Ct. July 14, 2020); *In re Texas Opioid Litigation* (*County of Dallas*), No. 2018-77098, slip op. (Dist. Ct. June 9, 2019); *Vermont v. Purdue Pharma L.P.*, No. 757-9-18 Cncv, slip op. at *6 (Super. Ct. Mar. 19, 2019); *Vermont v. Cardinal Health, Inc.*, No. 279-3-19 Cncv, slip op. (Super. Ct. May 12, 2020); *State v. Purdue Pharma L.P.*, No. 17-2-25505-0 SEA, 2018 WL 7892618 (Wash.Super. May 14, 2018); *Brooke Cty. Comm'n v. Purdue Pharma L.P.*, No. 17-C248, slip op. (Cir. Ct. Dec. 28, 2018), *writ denied*, *State ex rel. Cardinal Health, Inc. v. Hummel*, No. 19-0210 (W. Va. June 4, 2019).

p. 31 (Blackfeet)).  This Court recognized, "[p]laintiffs do not allege the claimed nuisance is the consequence of use or misuse of the opioid medication itself, but rather is the result of Defendants' business conduct: 'Defendants had control over the instrumentality of the nuisance by virtue of their control over their own opioid marketing, distribution, or ***dispensing practices***.'"  *Id.* (emphasis added).  These rulings were correct and should be followed here.

### 4.    *The CSA and its Ohio analog are predicate "safety statutes."*

Defendants argue that Plaintiffs cannot prove the violation of a "safety statute," which they claim is "required to prove liability under the 'unlawful' prong of absolute nuisance."  Dkt. #4098 (Ds' Motion) at p. 26.  Even assuming that this is a requirement under current Ohio public nuisance law, which Plaintiffs do not concede,[180] it is beyond dispute that the CSA (and its Ohio analog) sets forth specific legal requirements for the protection of others.  *See, e.g.,* 21 U.S.C. § 801(2) (1970) ("The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.");[181] *cf.* OHIO REV. CODE ANN. § 4729.35 ("The violation by a pharmacist or other person of any laws of Ohio or of the United States of America or of any rule of the board of pharmacy controlling the distribution of a drug of abuse as defined in section 3719.011 of the Revised Code or the commission of any act set forth in division (A) of section 4729.16 of the Revised Code, is hereby declared to be inimical, harmful, and adverse to the public welfare of the citizens of Ohio and to constitute a public nuisance.").[182]

---

[180]  *See, e.g., Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 53 (Ohio Ct. App. 2007) ("Strict liability also attaches when there is 'the violation of law resulting in a civil wrong or harm," *especially* when a safety statute is violated.") (citation omitted) (emphasis added).

[181]  Moreover, the legislative history of the CSA shows that one of the fundamental purposes of the statute is to protect society from the dangers that controlled substances pose to the safety of communities. H.R. Rep. 91-1444, 4574, 4601-02 (1970).

[182]  Plaintiffs are not asserting an action for statutory public nuisance in this case, but the fact that the Ohio legislature has deemed violations of controlled substance laws as a public nuisance demonstrates that these laws are meant to protect the public.

Notably, Defendants do not actually dispute this. Instead they argue that these statutes are not "safety statutes" because they contain no private right of action.[183] But Plaintiffs are not seeking to enforce the CSA or its Ohio analog; instead Plaintiffs have brought a common law public nuisance action to protect the public from Defendants' unreasonable interference with public rights. One way to demonstrate that Defendants' interference was unreasonable is by showing that their "conduct is proscribed by a statute, ordinance or administrative regulation." RESTATEMENT (SECOND) OF TORTS § 821B.

The cases cited by Defendants in support of their argument are not applicable. Dkt. #4098 (Ds' Motion) at pp. 26-27. Most do not involve a nuisance claim at all and are otherwise inapposite.[184] And *Uland v. S.E. Johnson Companies*, WM-97-005, 1998 WL 123086, at *15-16, n.15 (Ohio Ct. App. Mar. 13, 1998), does not support Defendants' assertions. *Uland* involved claims by landowners based upon the contamination of the lake that abuts their properties. *Id.* at *3. The court granted summary judgment as to the plaintiff's nuisance claim to the extent it was premised on some state and federal statutes and regulations, but denied summary judgment to the extent the claim was premised on R.C. §3767.13(B), which recognizes that a violation of that particular section "damage[s] or prejudice[s]…the public."[185]

### 5. *Plaintiffs do not seek an unprecedented expansion of nuisance contrary to public policy.*

Defendants claim that Plaintiffs' product-based nuisance theory must be rejected on public-policy grounds and as an illegitimate expansion of Ohio common law. Dkt. #4098 (Ds' Motion)

---

[183] They also argue that violations of CSA regulations cannot establish *per se* liability. Dkt. #4098 (Ds' Motion) at p. 26. They are incorrect for the reasons discussed in the Track One plaintiffs' prior briefing. *See, e.g.,* Dkt. #3017-1 (CT1 Ps' SOMs B MSJ Reply) at pp.71-72 & n.149.

[184] *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 202–03 (Ohio 1998); *Becker v. Shaull*, 584 N.E.2d 684, 685–87 (Ohio 1992); *Smrtka v. Boote*, 88 N.E.3d 465, 474 (Ohio Ct. App. 2017); *Moreland v. Oak Creek OB/GYN, Inc.*, 970 N.E.2d 455, 462 (Ohio Ct. App. 2005); *Smith v. Hickenlooper*, 164 F. Supp. 3d 1286, 1290–91 (D. Colo. 2016).

[185] *Uland*, 1998 WL 123086, at *15–16 ("R.C. 3767.13(B) reads as follows: '(B) No person shall cause or *allow* offal, filth, of noisome substances to be collected or *remain* in any place *to the damage or prejudice of others or of the public.*'" (emphasis added)).

at p. 27.  This argument ignores the actions of the Ohio's Supreme Court and Legislature.  The Supreme Court expressly approved similar product-based nuisance claims.[186]  *Beretta*, 768 N.E.2d 1136.  While *Beretta's* holding has been limited by OPLA, this Court has already determined that Plaintiffs' claims are not barred by OPLA (*see supra* § II.A.1) and should defer to the Ohio Legislature's preservation of Plaintiffs' claims here.

### C. Defendants Owe a Duty to Plaintiffs for their Dispensing Conduct.

#### 1. *Plaintiffs properly base their nuisance claims on corporate-level dispensing duties.*

Defendants claim that "Plaintiffs' public-nuisance claim fails as to dispensing" because the Plaintiffs "cannot point to any provision of the CSA or its related regulations that Defendants violated."  Dkt. #4098 (Ds' Motion) at p. 28.  Plaintiffs incorporate by reference their opposition brief on this issue.  Dkt. #3366 (CT3 Ps' Opp. to MTD) at pp. 10-11, 15-20.  This Court has correctly concluded that the CSA imposes obligations on the pharmacists and pharmacies as dispensers.  Dkt. #3403 (CT3 MTD Order) at pp. 17-18.[187]  This Court further found the "CSA makes clear that any ***person***, which includes a pharmacy itself, who knowingly fills or allows to be filled an illegitimate prescription is in violation of the Act."  *Id*. at p. 21 (emphasis in original).  The Court rejected Defendants' reading of the CSA, finding it antithetical to its very purpose, and concluded that Defendants have failed to meet their burden of demonstrating there is no corporate-

---

[186]  Likewise, other Courts addressing governmental public nuisance claims have rejected this argument in opioid litigation and other cases involving products. *See, e.g., City of Boston v. Purdue Pharma, L.P.*, No. 1884CV02860, 2020 WL 977056 (Mass. Super. Ct. Jan. 31, 2020); *Opioid Litig.*, 2018 WL 3115102 (opioids); *see also City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1229-33 (Ind. 2003) (handguns); *People ex rel. Gallo v. Acuna*, 929 P.2d 596 (Cal. 1997) (handguns); *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 546 (Cal. Ct. App. 2017) (lead paint); *City of Wyoming v. Procter & Gamble Co.*, 210 F. Supp. 3d 1137, 1162 (D. Minn. 2016) ("flushable" wipes); *State of Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420 (D. Md. 2019) (MTBE); *Gov't of U.S. Virgin Islands v. Takata Corp.*, No. ST-16-CV-286, 2017 WL 3390594, at *40-44 (V.I. Super. Ct. June 19, 2017) (airbags).

[187]  CVS has acknowledged it owes this obligation.  P-08954 at 002 (in 2015 settlement with DEA, CVS "acknowledge[d] that *it* has a corresponding responsibility . . .") (emphasis added).

level obligation to design and implement systems, policies, or procedures to identify red flag prescriptions. *Id.* at pp. 21-25. These holdings are correct and should not be reconsidered.

### 2. Penalizing Defendants for dispensing conduct that does not violate the CSA would not stand as an obstacle to Congress's objectives and is not preempted.

Defendants contend that any theory of the case that seeks to penalize Defendants for dispensing conduct that does not violate the CSA would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and be preempted by federal law. Dkt. #4098 (Ds' Motion); Dkt. #4100 (WMT Motion) at p. 14. Plaintiffs incorporate by reference their prior briefing on this issue. Dkt. #2171 (CT1 Ps' Opp. to Preemption MSJ). This Court has rejected Defendants' previous contention that the imposition of state liability would stand as an obstacle to the DEA's ability to regulate and enforce the CSA. Dkt. #2565 (Opinion and Order Re: Preemption) at p. 22. This Court should follow its previous holdings and reject this argument.

### 3. Plaintiffs do not seek to enforce statutory duties.

Defendant contends the DEA's enforcement authority is exclusive, precluding private suits. Dkt. #4098 (Ds' Motion) at p. 34. Plaintiffs incorporate by reference their previous briefing on this issue which explains the Plaintiffs do not seek to enforce the Defendants' statutory and regulatory duties. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 74-78. This Court correctly rejected this argument in CT1, Dkt. #1025 (R&R) at pp. 76-79, *report and recommendation adopted in relevant part*, Dkt. #1203; *see also* Dkt. #1499 at p. 43, Muscogee *report and recommendation adopted in relevant part*, Dkt. #1680 ("As the court explained in *Summit County* and herein . . . the negligence, nuisance, and unjust enrichment claims do not rest upon an in actionable private right of action under these statutes."), and should do so again here.

### 4. Plaintiffs' claims are not barred by the primary jurisdiction doctrine.

Defendants contend that Plaintiffs' claims are barred by the primary jurisdiction doctrine which permits federal courts to refrain from adjudicating claims that require resolution of issues

within the "special competence" of a federal agency. Dkt. #4098 (Ds' Motion) at p. 35. Defendant's cursory invocation of the doctrine for the first time in the middle of a jury trial amounts to far too little, far too late.

First, the doctrine is a discretionary one. *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1065 (N.D. Ill. 2016) ("Primary jurisdiction is a permissive doctrine…"). The doctrine is also limited:

> However, not every case that implicates the expertise of federal agencies warrants invocation of primary jurisdiction. Rather, the doctrine is reserved for a limited set of circumstances that requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency.

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 579 (N.D. Cal. 2020) (internal quotations omitted).  Defendants identify no specific issues for DEA determination that are ones of first impression or are particularly complicated.  The primary issues here have been subject to numerous DEA administrative proceedings which have been cited and applied by this Court.  *See* Dkt. #3403 at pp. 21-23; Dkt. #3499 (CT3 Reconsideration Order) at pp. 5-7.

Defendants suggest that the DEA can resolve "the question of whether Defendants have complied with the CSA."  Dkt. #4098 (Ds' Motion) at p. 35.  *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010), upon which Defendants rely, is distinguishable.  There the FCC filed a brief at the invitation of the Court of Appeals and identified specific questions of law on which it could offer an interpretation if there was a primary jurisdiction referral and agreed to issue a prompt decision.  *Id.* at 466-67.  The question of whether Defendants complied with the CSA is too general of a question for a primary jurisdiction referral.  Consideration of the *Charvat* factors is impossible on such a general level.

Moreover, unlike *Charvat,* here the DEA has participated extensively in these proceedings from their beginning, providing data, documents, and witnesses.  The agency, however, has made no request for a primary jurisdiction referral.  Indeed, Plaintiffs are not aware of any previous attempts in the opioid litigation to make a primary jurisdiction referral to the DEA by any party or

67

court.  Requests to refer marketing questions in claims against the opioid manufacturers have been denied.[188]

Finally, in exercising its discretion, this Court should give significant weight to the status of this litigation and the fact that this request was not previously made.  As the Court in *JUUL* noted: "Courts must also consider whether invoking primary jurisdiction would needlessly delay the resolution of claims, and . . . efficiency is the deciding factor in whether to invoke primary jurisdiction." 497 F. Supp. 3d at 580 (internal quotations omitted).  Here, we are near the end of a jury trial and this Court has already ruled on the legal issues raised by Defendants.  A primary jurisdiction referral now cannot be deemed efficient in any sense of the word.  *See Chabner v. United of Omaha Life Ins. Co.,* 225 F.3d 1042, 1051 & n.8 (9th Cir.2000) (noting it was "important to note that [appellant] did not seek application of the primary jurisdiction doctrine until after the district court had already" granted appellee summary judgment, and adding that "[s]taying the proceedings at that late date, much less now, would hardly have enhanced the district court's efficiency, nor would it have taken advantage of the [relevant agency]'s expertise, given that the district court had already decided" the relevant issue).  A referral would be particularly inefficient here because it could require restarting the jury trial anew after the DEA provided answers to whatever questions the Court referred to it.

A number of courts have held that the doctrine of primary jurisdiction is subject to waiver or forfeiture.  *See Glob. Crossing Bandwith, Inc. v. OLS, Inc.,* No. 05-CV-6423L, 2009 WL 763483, at *3 (W.D.N.Y. Mar. 19, 2009) (citing numerous cases).  This Court should join them and find that Defendants' delay in making the request constitutes waiver.  *Morsey v. Chevron USA, Inc.,* 779 F. Supp. 150, 153 (D.Kan.1991) (stating that "[c]ourts may weigh the timeliness of the assertion of the defense in making their discretionary decision to invoke the primary jurisdiction

---

[188]  *See, e.g., City of Chicago v. Purdue Pharma L.P.*, No. 14 C 4361, 2015 WL 2208423, at *4 (N.D. Ill. May 8, 2015) (denying primary jurisdiction referral of deceptive opioid marketing claim to Food and Drug Administration); *State of Oklahoma ex rel. Hunter v. Purdue L.P.*, No. CJ-2017-816, p. 3 (Okla. Dist. Ct. Dec. 6, 2017) (same); *In re Opioid Litigation*, No. 4000002017, 2018 WL 4760685 (N.Y. Sup. Ct. Mar. 14, 2018).

doctrine," and denying defendant's motion for a stay where defendant "waited nearly two years from the time it removed this action to assert primary jurisdiction").

**D.     Plaintiffs' Nuisance Claims Do Not Fail for Additional Legal Reasons.**

*1.     Plaintiffs have standing.*

Defendants assert that Plaintiffs lack standing – both Article III and "prudential (public nuisance)." Dkt. #4098 (Ds' Motion) at pp. 35-36; Dkt. #4103 (CVS Motion) at pp. 10-11. Plaintiffs incorporate by reference their previous briefing on this issue. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 38-45, 106-109.  This Court has previously rejected Defendants' contention that the Track One Plaintiffs lack Article III standing finding that plaintiffs plausibly pled an injury-in-fact that is fairly traceable to the Defendants' alleged actions and is likely to be redressed by the requested relief.[189]  Dkt. #1025 (R&R) at pp. 100-102, *report and recommendation adopted in relevant part,* Dkt. #1203 at p. 2; *see also City & Cty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 632 (N.D. Cal. 2020) (finding standing noting "the City's allegations demonstrate that, at the very least, Walgreens' oversupply of opioids and failure to report suspicious orders caused third parties to act in a way that injured the City").

Defendants' argument that Plaintiffs lack prudential standing is premised on the claim that plaintiffs' alleged injuries are wholly derivative of harm suffered by third parties.  Dkt. #4098 (Ds' Motion) at p. 36.  This premise is not true, and the argument was previously rejected by the Court.  Dkt. #1025 (R&R) at pp. 28-33, *report and recommendation adopted in relevant part*, Dkt. #1203 at p. 10. And this Court has separately found that Defendants' alleged misconduct and Plaintiffs' direct consequential injuries constitute direct injuries.  Dkt. #1499, *report and*

---

[189]  Defendants' reliance on *TransUnion LLC v. Ramirez*, ––– U.S. –––, 141 S. Ct. 2190, 2203, 210 L.Ed.2d 568 (2021) (Dkt. #4098 at p. 36) is unpersuasive. *Ramirez* merely held that pure regulatory violations detached from any concrete harm is insufficient to confer Article III standing. *Id.* at 2211. When, as here, a plaintiff pleads and proves concrete harm, the standing requirement is met. *Cf. Krueger v. Experian Info. Sols., Inc.*, No. 20-2060, 2021 WL 4145565, at *2 (6th Cir. Sept. 13, 2021) (plaintiff established injury in fact under *Ramirez* in his Fair Credit Reporting Act claim by showing that inaccurate reports about a mortgage loan's status prevented him from replacing his vehicle).

*recommendation adopted in relevant part*, Dkt. #1680. These conclusions are correct and are sufficient to defeat Defendants' prudential standing challenge.

### 2. *The economic loss doctrine does not bar Plaintiffs' claims.*

Defendants incorrectly claim the economic loss doctrine bars Plaintiffs' claim. Dkt. #4098 (Ds' Motion) at p. 36 (citing Dkt. #491-1 (CT1 Distr. Ds' MTD) at pp. 56-57, Dkt. #3340-1 (CT3 Ds' MTD) at p. 36); Dkt. #4103 (CVS Motion) at pp. 14-15. Plaintiffs incorporate by reference their previous briefing on this issue. Dkt. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 21-23. This Court has rejected application of the economic loss doctrine to the Plaintiffs' absolute public nuisance claim on the grounds that the "doctrine applies only to negligence" noting that this restriction of the doctrine "is replete in the case law." Dkt. #3177 (*Cleveland Bakers* Opinion & Order) at pp. 58-59 (quoting *ODW Logistics, Inc. v. Karmaloop, Inc.*, 2014 WL 293816, at *4 (S.D. Ohio Jan. 27, 2014)); *see also id*. at n.33 (citing cases applying Ohio law); *id.* at 55-57 (contrary Ohio case law applies "to bar only qualified (negligence-based) public nuisance claims"). Defendants cite no cases holding that the doctrine applies to Plaintiffs' intent-based absolute public nuisance claim.

Finally, Defendants' citation to the RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 8 (2020), (Dkt. #4098 (Ds' Motion) at p. 37), is unpersuasive. By its express terms, Section 8 of the Third Restatement does not apply to the Plaintiffs' abatement claim here as the provision applies only to claims for economic loss by a private party who has suffered an injury "distinct in kind from those suffered by members of the affected community in general." RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM, § 8. The comment to Section 8 makes clear that the provision is not intended to apply to public nuisance actions brought by public officials. *Id.*, § 8 cmt. a ("In addition to the common-law claims recognized here, public officials may bring civil or criminal actions against a defendant who creates a public nuisance. . .. The definition of 'public nuisance' for those purposes is widely a matter of statute and tends to be considerably broader than the common-law definition recognized by this Section as a basis for a

70

private suit.").  Defendants have not provided any examples of an Ohio court citing this section.[190]

No state's highest court has adopted Section 8, and this Court should be reluctant to presume that

Ohio would do so if presented with the question.

### 3. Plaintiffs' claims are not barred or preempted by the statewide concern doctrine.

Defendants wrongly claim the statewide concern doctrine bars the Plaintiffs' claims.

Dkt. #4098 (Ds' Motion) at p. 37.  Plaintiffs incorporate by reference their previous briefing on

this issue.  Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 109-114.  This Court has correctly concluded

the statewide concern doctrine does not bar the Plaintiffs' claims.  Dkt. #1025 (R&R) at pp. 98-

100, and Defendants' offer no new arguments supporting reconsideration of that conclusion.

### 4. The municipal cost recovery doctrine does not bar Plaintiffs' claims.

Defendants assert the municipal cost recovery doctrine (also known as the free public

services doctrine) bars Plaintiffs' claims.  The doctrine does not apply to Plaintiffs' claims.

Plaintiffs incorporate by reference their previous briefing on this issue.  Dkt. #654 (CT1 Ps' MTD

Opp.) at pp. 21-23.  This Court rejected the application of the doctrine in Track One.  Dkt. #1025

(R&R) at pp. 17-22 (citing favorably *Beretta*, 768 N.E.2d at 1149-50 and rejecting *City of Chicago

v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 821 N.E.2d 1099 (2004)), *report and recommendation

adopted in relevant part*, Dkt. #1203; *see also* Dkt. #1680 at pp. 13-14 (finding "the current trend

among state court judges ruling in opioid-related cases around the country is that the municipal

---

[190] Generally, the Third Restatement has been viewed as a radical departure from the settled standards of tort law.  *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM, Introduction, Pg. 3 ("This Restatement is, therefore, an almost total overhaul of Restatement Second as it concerns the liability of commercial sellers of products.").  Unlike its predecessor, the Third Restatement has not been widely adopted by the states.  *See, e.g.*, *Delaney v. Deere and Co.*, 999 P.2d 930, 946 (Kan. 2000) (stating that the (Third) Restatement "goes beyond the law" and is "contrary to the law in Kansas"); *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 415 (Pa. 2014) (declining to adopt a product liability portion of the Third Restatement and discussing other courts across the country that have done the same); *Potter v. Chicago Pneumatic Tool Co.*, 694 A.2d 1319, 1331 (Conn. 1997) (observing that a provision of the Draft Restatement (Third) "has been a source of substantial controversy among commentators" and stating that rule promulgated in the Draft Restatement (Third) was inconsistent with the court's "independent review of the prevailing common law").

cost recovery rule does not apply when, as alleged here, an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonable anticipated as part of its normal operating budget for municipal, county, or in this case, tribal services").

### 5.    Plaintiffs' public nuisance claims are not barred by the statute of limitations.

Defendants contend that Plaintiffs' public nuisance claim is barred by either the two-year Ohio Product Liability Act ("OPLA") statute of limitations, OHIO REV. CODE § 2305.10, or the more general four-year statute of limitations for tort suits "[f]or an injury to the rights of the plaintiff not arising on contract," OHIO REV. CODE ANN. § 2305.09.  Dkt. #4098 (Ds' Motion) at pp. 38-41; Dkt. #4103 (CVS Motion) at p. 10; Dkt. #4102 (WAG Motion) at pp. 10-11.  Plaintiffs incorporate by reference their prior briefing on this issue which sets forth that their public nuisance claims are not barred by the statute of limitations as there are no statute of limitations for public nuisance claims. Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 122-128; Dkt. #2179 (CT1 Ps' Opp. to SOL MSJ) at pp. 17-19. This Court previously found that there is "no period of limitations applicable to Plaintiffs' claims of common law absolute public nuisance."  Dkt. #2568 (MSJ Order on SOL) at pp. 3-6.  Defendants do not even acknowledge the Court's prior ruling let alone try to explain why it is in error.

### 6.    There is an ongoing public nuisance caused by Defendants' improper dispensing of prescription opioids which requires abatement.

Defendants contend that Plaintiffs have failed to show an ongoing public nuisance. Dkt. #4098 (Ds' Motion) at pp. 41-42; Dkt. #4103 (CVS Motion) at pp. 12-13; Dkt. #4102 (WAG Motion) at p. 10.  Not so.  *Supra* at § I.A.  Factually, Defendants recognize that Plaintiffs have presented evidence that both that "Defendants engaged in misconduct with respect to those prescription medications" and Plaintiffs' "continue to incur damages as a result of that

misconduct."[191]  Dkt. #4098 (Ds' Motion) at p. 41.  Defendants then argue that this showing "is different from saying that a prescription opioid nuisance is ongoing" and that "Plaintiffs have not made that showing."  *Id.*  Defendants cite no authority for their argument that such a showing of continuing conduct is independently required.  Courts commonly find nuisances based on conditions that remain after the nuisance causing activity has ceased.  *See Dartron Corp. v. Uniroyal Chem. Co.*, 893 F. Supp. 730, 741 (N.D. Ohio 1995) (denying summary judgment on claim that activities on adjacent properties resulting in contamination that spread to plaintiffs' property created a nuisance in spite of fact that activities ceased in 1975); *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 113 Ohio App. 3d 647, 660–61, 681 N.E.2d 1343, 1352 (1996) (denying summary judgement where evidence showed that contamination on the property from storage tanks that had been removed had spread onto adjoining properties); *see also* Restatement (Second) of Torts § 821B(2)(c) (1979) (noting that "[c]ircumstances that may sustain a holding that an interference with a public right is unreasonable include . . . whether the conduct is of a continuing nature *or* has produced a permanent or long-lasting effect") (emphasis added).

### 7.    *There has not been improper admission of expert testimony.*

Defendants claim that without the expert testimony they seek to preclude (Dr. Caleb Alexander, Carmen Catizone, Dr. Katherine Keyes, Dr. Anna Lembke, and Dr. Craig McCann), Plaintiffs' case is legally insufficient and fails as a matter of law. Dkt. #4098 (Ds' Motion) at pp. 42-43.  Plaintiffs incorporate by reference their briefing on the admissibility of the testimony of these experts.  Dkt. #3868 (Alexander); Dkt. #3870 (McCann); Dkt. #3872 (Keyes); Dkt. #3873 (CT3 Ps' Daubert Opp. re: CT1 Arguments); Dkt. #3875 (Catizone); Dkt. #3876 (Lembke).  This Court has correctly ruled that the expert testimony presented at trial was admissible. Dkt. #3946 (Keyes Order); Dkt. #3947 (Catizone Order); Dkt. #3948 (Alexander Order); Dkt. #3949 (McCann

---

[191]  In this phase of these bifurcated proceedings, Plaintiffs have presented ample evidence of the continuing interference with the public's rights to health, safety, comfort, and convenience caused by Defendants' conduct.  *Supra* at § I.A.

Order); and Dkt. #3953 (Lembke Order).  Defendants offer no basis to reconsider these decisions, only a restatement of their prior arguments.

## CONCLUSION

For the foregoing reasons, Defendants' Motions for Judgment as a Matter of Law Under Rule 50(a) should be denied and Plaintiffs' claims should be submitted to the jury.

Dated:  November 8, 2021

Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com
mca@lanierlawfirm.com

*Trial Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 8, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*

Peter H. Weinberger