6815

1              IN THE DISTRICT COURT OF THE UNITED STATES
                    FOR THE NORTHERN DISTRICT OF OHIO
2                            EASTERN DIVISION

3
        IN RE:                        Case No. 1:17-md-2804
4       NATIONAL PRESCRIPTION         Cleveland, Ohio
        OPIATE LITIGATION
5                                     November 9, 2021
        CASE TRACK THREE              9:00 A.M.
6

7
                            - - - - -
8

9                          **VOLUME 26**

10
                            - - - - -
11

12            TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

13            BEFORE THE HONORABLE DAN A. POLSTER,

14              UNITED STATES DISTRICT JUDGE,

15                      AND A JURY.

16

17                          - - - - -

18

19

20     Official Court Reporter: Heather K. Newman, RMR, CRR
                                7-189 U.S. Court House
21                              801 West Superior Avenue
                                Cleveland, Ohio  44113
22                              216-357-7035

23

24     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription.
25

```
 1   APPEARANCES:
     For the Plaintiffs:          Peter H. Weinberger, Esq.
 2                                Spangenberg, Shibley & Liber
                                  1001 Lakeside Avenue, Ste. 1700
 3                                1900 East Ninth Street
                                  Cleveland, Ohio   44114
 4                                216-696-3232

 5                                W. Mark Lanier, Esq.
                                  Rachel Lanier, Esq.
 6                                M. Michelle Carreras, Esq.
                                  The Lanier Law Firm
 7                                6810 FM 1960 West
                                  Houston, Texas    77069
 8                                813-659-5200

 9                                Frank L. Gallucci, III, Esq.
                                  Plevin & Gallucci Company, LPA
10                                The Illuminating Building
                                  Suite 2222
11                                55 Public Square
                                  Cleveland, Ohio   44113
12                                216-861-0804

13                                Salvatore C. Badala, Esq.
                                  Maria Fleming, Esq.
14                                Napoli Shkolnik
                                  360 Lexington Ave., 11th Floor
15                                New York, New York   10017
                                  212-397-1000
16
     For Walgreen Defendants:     Kaspar J. Stoffelmayr, Esq.
17                                Brian C. Swanson, Esq.
                                  Katherine M. Swift, Esq.
18                                Alex Harris, Esq.
                                  Sharon Desh, Esq.
19                                Bartlit Beck LLP
                                  54 West Hubbard Street, Ste.300
20                                Chicago, Illinois   60654
                                  312-494-4400
21
     For CVS Defendants:          Graeme W. Bush, Esq.
22                                Eric R. Delinsky, Esq.
                                  Alexandra W. Miller, Esq.
23                                Paul B. Hynes, Jr., Esq.
                                  Zuckerman Spaeder - Washington
24                                Suite 1000
                                  1800 M Street, NW
25                                Washington, DC   20036
                                  202-778-1831
```

6817

1

2 For Walmart Defendants:  John M. Majoras, Esq.
              Jones Day - Columbus
              Suite 600

3              325 John H. McConnell Blvd.
              Columbus, Ohio    43215

4              614-281-3835

5              Tara A. Fumerton, Esq.
              Tina M. Tabacchi, Esq.

6              Jones Day - Chicago
              Suite 3500

7              77 West Wacker
              Chicago, Illinois   60601

8              312-782-3939

9

  ALSO PRESENT:      Special Master David Cohen

10

11

            - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6818

08:28:59  1          Tuesday Session, November 9th, 2021, at 9:00 A.M.

08:51:50  2                    COURTROOM DEPUTY:  All rise.

08:51:55  3                    THE COURT:  Okay.  Good morning, everyone.

08:51:57  4     Please be seated.

08:52:00  5                    MR. LANIER:  Good morning, Judge.

08:52:10  6                    THE COURT:  All right.

08:52:11  7          I guess we got a few minutes before 9:00.  We can

08:52:14  8     start working on the exhibits.

08:52:16  9          Someone handed up to me a few exhibits I guess the

08:52:20 10     plaintiffs are offering with Mr. Cook and Ms. Militello.  I

08:52:33 11     guess we'll start with Mr. Cook.

08:52:38 12                    MS. MILLER:  Your Honor, Sasha Miller for CVS.

08:52:40 13          We object to all four of the exhibits that are being

08:52:42 14     offered by plaintiffs.  They were not disclosed the night

08:52:45 15     before and they were also not on their exhibit list.

08:52:49 16                    THE COURT:  Well.

08:52:53 17                    MS. MILLER:  And we have more substantive

08:52:54 18     objections, but --

08:52:55 19                    THE COURT:  Well --

08:52:56 20                    MR. WEINBERGER:  We weren't required to

08:52:58 21     disclose those.

08:52:58 22                    THE COURT:  Right.  It was cross-examination.

08:53:01 23                    MS. MILLER:  No, but they're required to be on

08:53:04 24     your exhibit list for cross and if they're not, you're

08:53:07 25     supposed to disclose them by 7:00 p.m. the night before

6819

08:53:10  1    under the revised case management order for Track 3.

08:53:12  2              THE COURT:  All right.

08:53:13  3         Well, that's a problem.

08:53:17  4              MR. WEINBERGER:  We'll look at it, Your Honor,

08:53:18  5    and answer it.

08:53:20  6              THE COURT:  All right.  If that's the case,

08:53:20  7    then we're stuck with that.

08:53:21  8         What about -- is it the same for Militello?  Were

08:53:24  9    these disclosed?

08:53:25 10              MS. FUMERTON:  Your Honor, we have different

08:53:27 11    issues with Militello.  We object to all but the very last

08:53:29 12    one.  And we also have some we are seeking to admit.

08:53:33 13              THE COURT:  Well, let's just deal with -- all

08:53:35 14    right.

08:53:37 15              MS. MILLER:  And, Your Honor, before we move

08:53:38 16    to Militello, we are offering four exhibits for Cook.

08:53:42 17              THE COURT:  Well, I may not -- we will see.

08:53:45 18    Do you have them?  Have you given them to plaintiffs?

08:53:49 19              MR. WEINBERGER:  We have no objection to all

08:53:55 20    four.

08:53:55 21              THE COURT:  Well, let's see those and we'll

08:53:57 22    put those in.

08:53:59 23              MS. MILLER:  We'll bring them up in a minute,

08:54:01 24    Your Honor.

08:54:21 25              THE COURT:  All right.

08:54:22  1          These are coming in without objection, CVS 04243,

08:54:31  2     04385, 04387, and 04400.

08:54:53  3          And then I'll put aside the ones that the plaintiffs

08:54:58  4     are offering to see if they were properly designated.

08:55:01  5               MR. WEINBERGER:  So, Your Honor, I do have the

08:55:02  6     answer to that.  These exhibits were not on our exhibit

08:55:07  7     list, but I will say that this pharmacist was not disclosed

08:55:14  8     to us until, I don't know, the day before.

08:55:20  9               MS. MILLER:  No, that's not true, Pete.

08:55:22 10               MR. WEINBERGER:  I mean in terms of his being

08:55:24 11     a witness in this case.

08:55:25 12               MS. MILLER:  That's not true.

08:55:27 13               MR. DELINSKY:  Yeah, I think he was on our

08:55:28 14     witness list way back in June.

08:55:31 15               THE COURT:  There's hundreds of people on the

08:55:33 16     witness list in June.

08:55:34 17               MR. WEINBERGER:  I mean in terms of the fact

08:55:35 18     that you were going to call this particular pharmacist of

08:55:37 19     your significant list of others --

08:55:40 20               MR. DELINSKY:  No, he was on our list of 50

08:55:42 21     that the Court ordered, among all four defendants.

08:55:46 22          So I believe, if I'm not wrong, he was one of two

08:55:50 23     pharmacists on our list that was disclosed in June and July.

08:55:55 24     And there were only seven CVS witnesses on that list.

08:56:04 25               THE COURT:  Well, if the documents weren't

08:56:07  1    properly disclosed, I can't admit them.  All right.

08:56:09  2         With -- all right.  The plaintiffs are offering the

08:56:14  3    following four for Militello, 17572 National BRTF list,

08:56:23  4    doctor 2011 prescriber comments.

08:56:26  5         Any objection to that?

08:56:27  6                   MS. FUMERTON:  Yes, Your Honor.

08:56:28  7         They didn't establish any foundation that Ms.

08:56:31  8    Militello had seen that list or that those comments were her

08:56:33  9    or if she even knew who submitted those comments.  In fact,

08:56:37 10    she said she didn't know.

08:56:39 11                   THE COURT:  Well, they were at her pharmacy

08:56:40 12    while she was there so it's someone at the same time, so

08:56:43 13    that can come in.

08:56:44 14                   MS. FUMERTON:  Well, Your Honor --

08:56:46 15                   THE COURT:  It's her pharmacy, and she's there

08:56:49 16    at the same time, so it's --

08:56:51 17                   MR. WEINBERGER:  And it's their --

08:56:52 18                   THE COURT:  -- one of the people working with

08:56:54 19    her.

08:56:54 20                   MR. WEINBERGER:  And it's their document.

08:56:56 21                   MS. FUMERTON:  Well, okay.

08:56:57 22         But, Your Honor, at the very least, only the excerpt

08:56:59 23    should be admitted and not the entirety of the list because

08:57:01 24    the entirety of the list is not limited to her store.  It,

08:57:05 25    in fact, has all of the stores nationwide.

6822

08:57:08  1          MR. WEINBERGER:  Well --

08:57:09  2          THE COURT:  I assume the plaintiffs are only

08:57:11  3    offering the portion that they used with her; is that right?

08:57:13  4          MR. WEINBERGER:  Right.

08:57:14  5          THE COURT:  All right.  So excerpt, excerpt

08:57:18  6    it.  All right.

08:57:20  7       Then 21391, Trevor Levin OARRS report.

08:57:24  8          MS. FUMERTON:  Your Honor, same issue.

08:57:26  9       There's no foundation.  She said that was not her

08:57:28 10    handwriting, and it was not her refusal to fill.

08:57:30 11          THE COURT:  Well, again, it was done at her

08:57:31 12    pharmacy while she's there.  So that can come in.

08:57:39 13       And then 20889, e-mail about the Over 20 Report.

08:57:43 14          MS. FUMERTON:  So, Your Honor, multiple issues

08:57:45 15    on this one.  She's not on the e-mail.

08:57:47 16          THE COURT:  Let me see this document.  I don't

08:57:49 17    remember it very well.

08:57:52 18          MS. FUMERTON:  It's also a

08:57:53 19    distribution-related document.

08:58:02 20          MR. WEINBERGER:  Yeah, this is the

08:58:04 21    distribution document involving her stores on the over --

08:58:07 22          THE COURT:  Yeah, I recall this.

08:58:08 23          MS. FUMERTON:  But, Your Honor, the

08:58:09 24    distribution process was different.  In fact, Jeff Abernathy

08:58:14 25    was someone they were going to play the deposition for and

08:58:16  1    chose not to.

08:58:17  2                   THE COURT:  Well, I'm going to let this in

08:58:19  3    over objection.

08:58:20  4                   MS. FUMERTON:  Well, Your Honor, just to push

08:58:20  5    that point a little more on this one.

08:58:21  6         She had no knowledge of any of this and it relates to

08:58:24  7    distribution, which is --

08:58:24  8                   THE COURT:  Well, again, that's the point,

08:58:26  9    that she had no knowledge.  That's why they're putting it

08:58:29 10    in.  They're arguing that she should have knowledge.

08:58:32 11                   MS. FUMERTON:  No, no, no.  She shouldn't

08:58:34 12    have, Your Honor, because it's a distribution-related issue.

08:58:37 13                   THE COURT:  Well, maybe, maybe not.  So I'm

08:58:37 14    admitting this over objection.

08:58:40 15                   MS. FUMERTON:  Even though it's going to be

08:58:40 16    confusing to the jury since this will be the only

08:58:43 17    distribution-related document?

08:58:43 18                   THE COURT:  Yes.  All right.

08:58:44 19         P26767A, e-mail about forged or fraudulent

08:58:49 20    prescriptions.  Any objection to that?

08:58:51 21                   MS. FUMERTON:  No, Your Honor.

08:58:52 22                   THE COURT:  Okay.  That can come in.

08:58:53 23         All right.  Do the defendants have anything with Ms.

08:58:55 24    Militello?

08:58:55 25                   MS. FUMERTON:  Yes, Your Honor.  May I

6824

08:58:57  1    approach?

08:58:58  2                    THE COURT:  All right.

08:58:59  3                    MS. FUMERTON:  We sent this to plaintiffs.  I

08:59:01  4    don't know if they have objections or not.

08:59:08  5                    MR. WEINBERGER:  Did you send these to us last

08:59:09  6    night?

08:59:10  7                    MS. FUMERTON:  No.  We sent them this morning,

08:59:12  8    but they're just the three prescriptions that were used with

08:59:14  9    her.

08:59:20 10                    MR. WEINBERGER:  We have no objection to them.

08:59:21 11                    THE COURT:  All right.

08:59:21 12         These three can come in without objection.  They're

08:59:25 13    Walmart exhibits. . . I can't quite understand this exhibit

08:59:33 14    labeling but 01343-0963, 01343-0110, and 01343-0501.

08:59:51 15                    MS. FUMERTON:  Thank you, Your Honor.

08:59:52 16         I'll just note the first two are two-page documents:

08:59:55 17    And the last one's a one-page document for the record.

08:59:57 18         Before we leave Ms. Militello, there's also another

08:59:59 19    issue that we wanted to raise that we were very concerned

09:00:01 20    about yesterday.

09:00:03 21         Mr. Lanier, towards the very end of the questioning,

09:00:05 22    asked several questions of Ms. Militello where she had no

09:00:10 23    knowledge of it and, in fact, we don't think that he had a:

09:00:13 24    Good faith basis for asking them.

09:00:15 25         So, specifically, he asked her, "So while you were

6825

09:00:18  1    working at Eastlake, nobody ever told you that y'all had one

09:00:22  2    of the highest volume oxy stores in the country?"

09:00:25  3         And she said no.

09:00:27  4         We don't think he had a good faith basis for that.  In

09:00:30  5    fact, this is one of the smallest stores in the country --

09:00:33  6                   THE COURT:  Well, I assume he had accurate --

09:00:38  7                   MR. LANIER:  I did, Your Honor.  They were one

09:00:39  8    of the over 20 stores over and over again.

09:00:41  9         There was over 20 stores by definition were the high

09:00:45 10    stores that were isolated out.

09:00:47 11                   MS. FUMERTON:  And actually, see, Your Honor,

09:00:49 12    this is actually in part the problem with letting that

09:00:51 13    document into evidence.

09:00:52 14         There's been no discussion in this case about what

09:00:54 15    over 20 means.  And Mr. Lanier just has it completely wrong.

09:00:57 16    That's not what over 20 means.

09:00:59 17                   MR. LANIER:  Well, that was part of the

09:01:00 18    discussion of what over 20 means, but there's certainly a

09:01:03 19    ton of documents I can show the Court that this is fully in

09:01:05 20    good faith because the over 20 stores were the ones that

09:01:09 21    were getting too much of the product, and it was an issue

09:01:12 22    within the company.

09:01:13 23                   MS. FUMERTON:  No.

09:01:14 24         This, again -- Your Honor, this is the problem having

09:01:16 25    this distribution discussion at this point in the stage.

09:01:18  1      There was, for a short period of time, a program

09:01:20  2   within Walmart --

09:01:21  3             THE COURT:  You want to bring in another

09:01:23  4   witness or bring her back, fine, and clarify it.  You know,

09:01:26  5   there's nothing more that can be done about it.

09:01:29  6             MS. FUMERTON:  But, Your Honor, she -- they

09:01:32  7   deposed her.

09:01:33  8             THE COURT:  She's off.  Okay.  I mean, she's

09:01:36  9   no longer on the stand.  What do you --

09:01:39 10             MS. FUMERTON:  We would just request that the

09:01:40 11   question be strucken -- stricken.

09:01:46 12      We just think it's fundamentally unfair when

09:01:49 13   Mr. Lanier repeatedly stands up over and over again and make

09:01:51 14   statements to the jury where the witness says no and has no

09:01:53 15   good faith basis for asking them.

09:01:54 16             THE COURT:  Well, he said he has a good faith

09:01:57 17   basis.

09:01:57 18             MR. LANIER:  I have a good faith basis and I

09:01:59 19   had the documents ready to go if she wanted to challenge me

09:02:01 20   on it at all, and I would have produced those documents to

09:02:03 21   her to impeach her.

09:02:05 22             THE COURT:  He asked two questions and the

09:02:06 23   witness said I don't know anything about it and that was it.

09:02:08 24             MS. FUMERTON:  Actually, she said no.  She

09:02:10 25   didn't even say I don't know.  She said no, it's not.  And

09:02:12  1    he just said --

09:02:12  2                    THE COURT:  Well, all right.  Then she denied

09:02:14  3    it.  So it's even better.  I mean, she denied it, so it's --

09:02:18  4    you know, the only testimony is no.  That's not the case.

09:02:24  5                    MS. FUMERTON:  Well --

09:02:25  6                    THE COURT:  The jury heard that it's not the

09:02:26  7    case.

09:02:27  8                    MS. FUMERTON:  That's what she -- but by

09:02:31  9    implication, and as Mr. Lanier just said, if she had

09:02:32  10   challenged him, he had a ton of documents he was going to

09:02:35  11   use.

09:02:35  12       She challenged him, he did not use a single document

09:02:37  13   because the over-20 process is a distribution-related

09:02:40  14   process she would have no involvement in as a pharmacist.

09:02:46  15       That's what was reflected on the e-mail that was just

09:02:48  16   admitted.  She's not anywhere on the e-mail because there

09:02:51  17   was a different function and a different arm within Walmart

09:02:53  18   that handled the distribution-related issues.

09:02:56  19                    MR. LANIER:  Then she got off --

09:02:57  20                    THE COURT:  Hold it.

09:02:58  21       Mr. Lanier said he had a good faith basis to ask the

09:03:01  22   question.  All right?  The witness said he's wrong.  All

09:03:05  23   right?  So the jury heard that the witness believes that --

09:03:10  24   the premise of Mr. Lanier's premise was incorrect, that he

09:03:13  25   was wrong.  So they've heard that.

6828

09:03:15  1          So, I mean, you want me to disregard her answer?

09:03:19  2     That's, you know. . . you got the answer that you wanted.

09:03:28  3          All right.  So we'll have to come back --

09:03:30  4               MR. WEINBERGER:  Your Honor --

09:03:31  5               THE COURT:  Hold it.

09:03:32  6               MR. WEINBERGER:  Sorry.

09:03:33  7               THE COURT:  We're going to come back to Cook,

09:03:35  8     I guess.

09:03:35  9               MR. WEINBERGER:  Well, I do want to -- that's

09:03:37 10     what I wanted to address.

09:03:38 11               THE COURT:  All right.

09:03:38 12               MR. WEINBERGER:  I'm looking at the joint

09:03:40 13     trial exhibits stipulation, Page 6, cross-examination

09:03:47 14     documents.

09:03:48 15          The parties must include on their exhibit lists all

09:03:51 16     exhibits they intend to use on cross-examination, other than

09:03:56 17     for purposes of impeachment or rebuttal.

09:04:01 18          So I would submit to you that each of these exhibits

09:04:04 19     that we utilized were impeachment exhibits with respect to

09:04:10 20     Mr. Cook.

09:04:13 21               MS. MILLER:  Your Honor, those were not used

09:04:16 22     for impeachment.  He had not -- three of those exhibits

09:04:20 23     related to theft and loss reports.  He did not touch on any

09:04:24 24     of those issues.  And previously, in fact --

09:04:27 25               THE COURT:  Yeah, I don't think these were

09:04:29  1    impeachment documents.  So --

09:04:35  2                    MR. WEINBERGER:  Right.

09:04:36  3        He had testified that there weren't any bad

09:04:38  4    pharmacists at his stores and these documents were used to

09:04:42  5    impeach that testimony.

09:04:48  6                    MS. MILLER:  Your Honor, his testimony was,

09:04:49  7    first of all, more nuanced than that.  And he was not

09:04:54  8    getting into the -- any details of the operations.  These

09:04:57  9    were high-level questions by Mr. Lanier.

09:05:00  10       And furthermore, previously, Your Honor has stated

09:05:03  11   that theft and loss is not at issue in the case.  The

09:05:06  12   testimony is what the testimony was.  The jury heard it, but

09:05:10  13   we think that it's improper to admit these exhibits,

09:05:13  14   especially given these disclosure limitations and your prior

09:05:16  15   orders.

09:05:16  16                   MR. WEINBERGER:  Well, whether or not there's

09:05:18  17   proper inventory control is a pharmacist issue.

09:05:20  18                   THE COURT:  Yeah, I agree.

09:05:21  19       It came in.  I allowed the questions.  They weren't

09:05:24  20   objected to.  All right.  I'll. . . all right.

09:05:30  21       I'm going to admit those three:  21936, 21937, 21938.

09:05:36  22   I'll admit those over objection.

09:05:39  23                   MS. MILLER:  Your Honor, there's a --

09:05:40  24                   THE COURT:  What about the personnel file?

09:05:44  25   Kenneth Cook reviews.

09:05:44 1               MS. MILLER:  Yeah, that's where I was moving

09:05:46 2   to next, Your Honor.

09:05:47 3       Mr. Lanier used just one page from that.

09:05:52 4            MR. WEINBERGER:  Withdrawn.

09:05:53 5            THE COURT:  Well, that's the only page that --

09:05:55 6            MR. LANIER:  We're fine with that, Your Honor.

09:05:57 7   We'll redact accordingly.

09:05:59 8            THE COURT:  All right.  So that page can come

09:06:02 9   in.  So work on that.  All right.

09:06:04 10      That takes care of Cook and Militello.

09:06:08 11      Are there any exhibits that people are offering with

09:06:15 12   the two depos, Ashley and Mack?

09:06:17 13           MS. SWIFT:  Your Honor, Kate Swift for

09:06:20 14   Walgreens.

09:06:20 15      Just one with Ms. Ashley's testimony.  We shared it

09:06:24 16   with plaintiffs last night.  I don't know that there's any

09:06:27 17   objection.

09:06:27 18           MR. WEINBERGER:  No objection.

09:06:29 19           MS. SWIFT:  Thank you, Pete.  It's

09:06:38 20   DEF-MDL-10875.

09:06:41 21           THE COURT:  Okay.  That can be admitted

09:06:43 22   without objection.

09:06:44 23      Anything from the plaintiffs on Ashley?

09:06:49 24          MR. WEINBERGER:  No, Your Honor.

09:06:50 25          THE COURT:  Okay.  And then from Ms. Mack?

6831

09:06:58   1            MS. FUMERTON:  No, Your Honor.

09:06:59   2            THE COURT:  And I take it none from the

09:07:01   3    plaintiffs?

09:07:01   4            MR. WEINBERGER:  Correct, Your Honor.

09:07:02   5            THE COURT:  Okay.  Good.  So we're all set.

09:07:04   6        We'll just take up Ms. Stossel at the end of her

09:07:10   7    testimony.  Okay.

09:07:15   8        I think we can bring her in then.  Thank you.

09:08:08   9                 (Brief pause in proceedings)

09:09:06  10            (Jury returned to courtroom at 9:09 a.m.)

09:09:27  11            THE COURT:  Okay.  Good morning, ladies and

09:09:30  12    gentlemen.  Please be seated.

09:09:31  13        Ms. Stossel, you are still under oath from yesterday,

09:09:36  14    please.  And, Mr. Stoffelmayr, you may continue.

09:09:38  15            MR. STOFFELMAYR:  Thank you, Judge.

09:09:39  16        Good morning, everybody.

09:09:39  17

          18

          19

          20

          21

          22

          23

          24

          25

09:09:39  1    DIRECT EXAMINATION OF AMY STOSSEL

09:09:39  2 BY MR. STOFFELMAYR:

09:09:42  3 **Q** Good morning, Ms. Stossel.  Welcome back.

09:09:44  4 **A** Hi.

09:10:01  5 **Q** So, Ms. Stossel, where we left off, we were at

09:10:03  6 number -- I think about to start topic four on my outline

09:10:08  7 here.

09:10:08  8   Did you help us put together some slides to describe

09:10:12  9 how dispensing works in real life for a pharmacist?

09:10:16 10 **A** Yes.

09:10:16 11 **Q** All right.  I'm going to show you one of those slides.

09:10:20 12   Is this one of the slides you helped us put together?

09:10:24 13     MR. LANIER:  No.

09:10:27 14     MR. STOFFELMAYR:  Am I looking at the wrong

09:10:28 15 one?

09:10:30 16     THE WITNESS:  This is just still our list,

09:10:33 17 so --

09:10:33 18 BY MR. STOFFELMAYR:

09:10:34 19 **Q** Actually, it's a different list, Steps to Fill a

09:10:37 20 Controlled Substance.

09:10:38 21 **A** Oh, yes.

09:10:39 22 **Q** It's not the kind of agenda list.  It's steps that you

09:10:43 23 go through; correct?

09:10:44 24   So I want to go through these with you and explain

09:10:47 25 them.  But first off, the jury's heard a little bit about

**Stossel - Direct/Stoffelmayr**

09:10:51  1   pharmacy technicians vs. pharmacists.

09:10:54  2       At the pharmacies that you work at, do you have

09:10:56  3   technicians as well as pharmacists?

09:10:58  4   **A**    I do.

09:10:58  5   **Q**    And we're going to go through some of the things that

09:11:01  6   a technician and some of the things that only a pharmacist

09:11:05  7   can do, but bottom line, at the end of day, who makes the

09:11:08  8   decision whether to dispense a controlled substance?

09:11:10  9   **A**    A pharmacist.

09:11:10 10   **Q**    Can a technician ever make that decision without a

09:11:18 11   pharmacist involved?

09:11:19 12   **A**    No.

09:11:19 13   **Q**    Ever?

09:11:19 14   **A**    No.  Never.

09:11:20 15   **Q**    All right.

09:11:21 16       First up, how do you, this day and age, how does the

09:11:26 17   pharmacy usually get the prescription to start with?

09:11:27 18   **A**    So, in one of two ways:  Either by the patient

09:11:30 19   bringing in a piece of paper, which is what we call a hard

09:11:36 20   copy prescription that they get from the doctor's office.

09:11:41 21   So that's one way.

09:11:42 22       The second way is an electronic prescription that the

09:11:46 23   doctor's office sends via computer directly to the pharmacy.

09:11:51 24   **Q**    Okay.

09:11:52 25       First step you have is data entry.  Can you describe

6834

**Stossel - Direct/Stoffelmayr**

09:11:54 1    for the jurors what that means?

09:11:57 2    **A**    Sure.

09:11:58 3         So data entry, on the list, it says, "Data entry by

09:12:04 4    pharmacy tech or pharmacist."  So data entry would be when

09:12:08 5    that prescription is brought into the pharmacy, either the

09:12:12 6    piece of paper or the prescription that's received

09:12:16 7    electronically, that information has to be then transcribed

09:12:25 8    into the computer.  So we would either scan the actual piece

09:12:30 9    of paper into the computer system or we would begin with

09:12:36 10   that electronic prescription.

09:12:39 11        And we would actually have to type the directions that

09:12:41 12   we see on the piece of paper or the electronic image into

09:12:46 13   your computer system.  So that's data entry.

09:12:49 14   **Q**    And it says, "By pharmacy technician or pharmacist."

09:12:56 15   So can either one do that?

09:12:57 16   **A**    Right.  So either the technician or the pharmacist can

09:13:00 17   complete that task.

09:13:01 18   **Q**    If the patient has been to a Walgreens before, will

09:13:03 19   the system already have basic information about that person?

09:13:06 20   **A**    Yes.

09:13:07 21        The system will have the patient information already

09:13:10 22   but not the prescription information that they're bringing

09:13:13 23   in.

09:13:14 24   **Q**    And if that's a doctor that a Walgreens has already

09:13:17 25   filled a prescription for, will there be information about

**Stossel - Direct/Stoffelmayr**

09:13:20  1  the doctor already in the system?

09:13:22  2  **A**    Yes, that's correct.

09:13:23  3  **Q**    If it's a new doctor, a doctor who, you know, maybe

09:13:26  4  just out of medical school or isn't in the system already,

09:13:29  5  do you have to manually type that or does the system pull

09:13:35  6  information about doctors from a third-party source?

09:13:37  7  **A**    So it's possible you would have to enter information

09:13:39  8  for a doctor into the computer system if they weren't

09:13:44  9  previously registered, but it happens very rarely.

09:13:52 10  **Q**    What does data review mean, Step 3?

09:13:54 11  **A**    So Step 3 is something that can only be completed by

09:13:58 12  the pharmacist.

09:13:59 13       So after the prescription has been scanned into the

09:14:05 14  computer system and someone types the information from the

09:14:11 15  prescription into the computer system, then the pharmacist

09:14:16 16  would verify that the information that is on the piece of

09:14:20 17  paper or on the electronic prescription matches what has

09:14:25 18  been typed in.

09:14:28 19  **Q**    And can a second tech, a second technician be the one

09:14:34 20  to check the work of the first technician or does it have to

09:14:40 21  be the pharmacist?

09:14:40 22  **A**    No.  Only the pharmacist can complete that task

09:14:43 23  because we're verifying that the drug information is

09:14:45 24  correct.

09:14:45 25  **Q**    All right.

### Stossel - Direct/Stoffelmayr

09:14:47  1          We're going to come back in a little more detail to

09:14:50  2     step four, DUR and GFD review by the pharmacist.  So let's

09:14:56  3     just jump ahead here to Step 5, filling.

09:14:58  4          What does that entail?

09:14:59  5     **A**    So filling is actually placing the drug product into

09:15:06  6     the prescription vial.

09:15:12  7          So it would be counting the medication.  So actually

09:15:14  8     retrieving the medication from the pharmacy shelves.  So

09:15:17  9     when you go into the pharmacy, you'll see all of the

09:15:20 10     medication on the shelves.

09:15:22 11          The technician or the pharmacist can complete this

09:15:25 12     step.  Someone would have to go to the shelves, pull the

09:15:30 13     medication, count the medication out, and then put that

09:15:35 14     medication into a vial.  That's the basic filling process.

09:15:39 15     **Q**    When you say go to the shelves, if we're talking about

09:15:42 16     a Schedule II controlled substance, are they just on the

09:15:47 17     same shelves with the antibiotics and the cholesterol pills?

09:15:51 18     **A**    They're not.  A Schedule II controlled substance is

09:15:55 19     actually locked up in a safe and so only the pharmacist can

09:15:57 20     retrieve those medications.

09:15:59 21          We actually have a key.  And so I have a key to those

09:16:04 22     cabinets.

09:16:05 23          In my store, there are four cabinets that those

09:16:09 24     medications are kept in just for space sake.  We split them

09:16:16 25     up into those four cabinets.

**Stossel - Direct/Stoffelmayr**

09:16:18  1   **Q**     Who has those keys to get into the cabinets?

09:16:20  2   **A**     Only the pharmacist, and the pharmacist has to keep

09:16:24  3   those keys on their person at all times.

09:16:27  4   **Q**     So you can't give it to the technician and say, "Hey,

09:16:31  5   do me a favor, will you get oxycodone out of the cabinet?"

09:16:35  6   **A**     No.  It has to be the pharmacist to retrieve it.

09:16:38  7   **Q**     Okay.

09:16:39  8         But a technician would be allowed to count the pills

09:16:41  9   out and put them in the bottle?

09:16:42 10   **A**     Correct.

09:16:43 11   **Q**     Then product review, Step 6.  What does that mean?

09:16:45 12   **A**     So a product review is after the medication is in the

09:16:50 13   vial and it's been counted out, then that medication will

09:16:57 14   come to the pharmacist and the pharmacist will actually

09:17:03 15   check to be sure that the medication that's in the vial

09:17:07 16   matches what is supposed to be dispensed, based on what is

09:17:14 17   on the prescription or what the doctor wrote for, to ensure

09:17:19 18   that that is what is supposed to be in the vial.

09:17:23 19   **Q**     Now, it says "by pharmacist."

09:17:25 20         Couldn't you have a second pharmacy technician just

09:17:29 21   check the work of the first pharmacy technician who filled

09:17:33 22   the prescription?

09:17:33 23   **A**     No.  It has to be completed by a pharmacist.

09:17:35 24   **Q**     Okay.

09:17:35 25         And then at that point, are you ready to, you know,

**Stossel - Direct/Stoffelmayr**

09:17:38  1    staple the bag shut and put it on the shelf waiting for the

09:17:41  2    customer to come in?

09:17:41  3    **A**    That's correct.

09:17:42  4         After I've checked to ensure that the product is

09:17:45  5    correct, based on what was written on the prescription, then

09:17:49  6    it can go into a bag.  And at that point, the bag can go

09:17:54  7    onto the shelf, into what we call our prescription bins.

09:17:59  8    And in those bins is where it waits for someone to come and

09:18:02  9    pick it up.

09:18:02  10   **Q**    So when I go to pick up the prescription and they

09:18:04  11   spend 10 minutes rummaging around trying to find my last

09:18:08  12   name, that's where they're looking?

09:18:10  13   **A**    Correct.

09:18:10  14   **Q**    Not 10 minutes at Walgreens, but it could take longer?

09:18:13  15   **A**    It can be.

09:18:15  16   **Q**    It could take longer than it feels like it should;

09:18:18  17   right?

09:18:19  18   **A**    Right.

09:18:19  19   **Q**    So what is IntercomPlus?

09:18:21  20   **A**    So IntercomPlus is just the name for our computer

09:18:24  21   system that we use for all of our prescriptions.

09:18:27  22   **Q**    Did you help us mock up some screenshots of what it

09:18:31  23   actually looks like when you're working in IntercomPlus?

09:18:34  24   **A**    Yes.

09:18:34  25   **Q**    All right.  Let me show you the first of those.

6839

**Stossel - Direct/Stoffelmayr**

09:18:39  1       Could you just describe at a high level to the jury

09:18:41  2   and then I'll ask you some specific questions.  What are we

09:18:44  3   looking at here -- actually I'll clarify for everybody.

09:18:46  4       We made up this information.  There is -- this is not

09:18:49  5   an actual human being's prescription.  Obviously no one's

09:18:52  6   name is "Test Patient."

09:18:53  7       This -- we're not revealing anyone's personal

09:18:55  8   information; correct?

09:18:56  9   **A**    Correct.

09:18:56 10   **Q**    Okay.  Tell us what we're looking at.

09:18:59 11   **A**    So this would be a data review screen.

09:19:04 12       So this prescription, Test Patient, is a prescription,

09:19:10 13   like let's say someone brought it into the pharmacy and the

09:19:14 14   prescription has already been scanned into the computer, and

09:19:21 15   at this point, the prescription has been scanned in, and the

09:19:24 16   prescription has been typed by either the pharmacist or the

09:19:28 17   technician.

09:19:28 18       And so you can see on the left-hand side of the screen

09:19:32 19   the prescription shows up for me to see, and on the

09:19:38 20   right-hand side of the screen, you can see that the

09:19:40 21   prescription has been typed in so that we're matching what

09:19:45 22   shows up on the prescription blank to what is typed in.

09:19:51 23   **Q**    And this is at the data review stage.  So this is when

09:19:55 24   you, as the pharmacist, are looking to confirm that whoever

09:19:58 25   did the initial data entry got everything right?

**Stossel - Direct/Stoffelmayr**

09:20:00  1    **A**     Right.

09:20:01  2         So I'm confirming that what is on the actual

09:20:04  3    prescription blank is typed in correctly into the computer

09:20:09  4    system.

09:20:09  5    **Q**     All right.

09:20:10  6         So help us -- some of us probably know what -- how to

09:20:15  7    decode that but help us decode what the doctor has written

09:20:18  8    there that I've circled in red.

09:20:20  9    **A**     Sure.

09:20:21 10         So this is a prescription for Vicodin, and then that's

09:20:25 11    the strength of the medication, 5/325.  So Vicodin is a

09:20:29 12    combination of two medications; hydrocodone and

09:20:35 13    acetaminophen.

09:20:35 14         It is 5 milligrams of hydrocodone and 350 grams of

09:20:42 15    acetaminophen.  That's just how it's abbreviated.  And then

09:20:44 16    those are the directions that the patient would take the

09:20:47 17    medication; one tablet every 4 to 6 hours as needed.

09:20:51 18         And then the quantity of the tablets that need to be

09:20:56 19    dispensed, which is 30 tablets.

09:20:57 20    **Q**     So it looks like in this case, the person who did the

09:21:00 21    data entry got it all correct; one tablet by mouth every 4

09:21:03 22    to 6 hours as needed.  Although, they wrote by mouth twice

09:21:10 23    for some reason.

09:21:10 24              MR. WEINBERGER:  Objection.  I thought this

09:21:12 25    was a mockup.  That person got it right.  I thought this was

Stossel - Direct/Stoffelmayr

09:21:14  1    a mockup.

09:21:15  2                    MR. STOFFELMAYR:  In our hypothetical

09:21:16  3    scenario.

09:21:16  4                    MR. WEINBERGER:  Oh, okay.

09:21:17  5                    THE COURT:  I'll sustain the way it was asked.

09:21:20  6                    MR. STOFFELMAYR:  Okay.  I get it.

09:21:24  7    BY MR. STOFFELMAYR:

09:21:24  8    Q    In this mockup, have we mocked up a situation where

09:21:28  9    the technician got it right or wrong when they typed in this

09:21:31  10   information?

09:21:32  11   A    So I would go in here and click this button called

09:21:36  12   "Update Product" and when I clicked this button called

09:21:41  13   "Update Product," then I would be able to take out that

09:21:44  14   duplicate "by mouth."

09:21:45  15   Q    What are we looking at up here, if you're an

09:21:48  16   IntercomPlus?

09:21:50  17        And I should say other than the fact that we have

09:21:52  18   changed names and phone numbers, is this accurate; this is

09:21:55  19   what you really see in real life?

09:21:56  20   A    Right.

09:21:57  21        This is what I would see, and it would be based on the

09:22:00  22   patient's information for each patient that we see.

09:22:03  23   Q    Okay.

09:22:04  24        What is a -- the information across the top that I've

09:22:07  25   circled?

6842

**Stossel - Direct/Stoffelmayr**

09:22:07  1    **A**      So, on the very left-hand side, it would be the

09:22:10  2    patient name.  Then we would go to the patient birth date.

09:22:15  3    The next is the patient age.

09:22:17  4         So it figures out the patient age for you.  The birth

09:22:21  5    date is there, but I don't have do that quick math in my

09:22:24  6    head.  It already figures out that information.

09:22:27  7         It tells me whether the patient is male or female.  It

09:22:31  8    gives me the phone number of the patient and then the

09:22:34  9    address of the patient.

09:22:35 10    **Q**      All right.

09:22:35 11         Now, I see, if we look down, if this doctor at the

09:22:42 12    bottom were unfamiliar to you, the prescriber, if the

09:22:46 13    prescriber were unfamiliar to you, would you be able to get

09:22:51 14    more information about where the prescriber is located or

09:22:53 15    other information about them?

09:22:54 16    **A**      Sure.  I could get that in a couple different places.

09:22:57 17    **Q**      How would you do that?

09:22:58 18    **A**      So there are a couple of different ways in the

09:23:01 19    computer system I could get that.

09:23:04 20         When a doctor writes a prescription, oftentimes their

09:23:10 21    information will be on the actual prescription blank.

09:23:17 22    So with their prescription blank, their office information

09:23:19 23    will be there.  If they're sending over an electronic

09:23:26 24    prescription, their office address, phone number, fax

09:23:31 25    number, everything will be attached to that electronic

**Stossel - Direct/Stoffelmayr**

09:23:36  1    prescription as well.

09:23:39  2          Within our computer system, I can always go and do a

09:23:41  3    search very easily at the top of my screen, which you can't

09:23:48  4    see the very top.  I can click a button called "Prescriber

09:23:53  5    Info," and at that prescriber info, I can basically pull

09:23:58  6    down a drop box and it will quickly send me to that

09:24:03  7    prescriber's information page where I could see the office

09:24:05  8    information, like phone number, address, DEA number, NPI

09:24:11  9    number, those sorts of things.

09:24:13 10    **Q**    Now, in this example the top two buttons are green and

09:24:16 11    the bottom button where it says "Prescriber" is not green.

09:24:20 12          What does that tell you if you're looking at it?

09:24:21 13    **A**    So as I am reviewing this prescription on the data

09:24:27 14    review screen, I am looking at the left-hand side of my

09:24:34 15    screen at the patient's name, and then I am looking at the

09:24:39 16    right-hand side of my screen at the patient's name.

09:24:43 17          If I can confirm that the name on the left-hand side

09:24:48 18    matches the name on the right-hand side, then I can click

09:24:53 19    this green -- this patient button.  It will turn green for

09:24:57 20    me and then I can kind of proceed to the next part.

09:25:01 21    **Q**    Sorry.  Go ahead.

09:25:03 22          Are you able to move to the next step in the process

09:25:06 23    before you've checked patient product and prescriber?

09:25:11 24    **A**    So I can't go forward past this screen until the

09:25:18 25    patient button, the product button, and the prescriber

**Stossel - Direct/Stoffelmayr**

09:25:21 1   button are all green.

09:25:23 2   **Q**    And you -- who gets them to be green?  Can anyone do

09:25:26 3   that?

09:25:26 4   **A**    I'm sorry.  What was that again?

09:25:27 5   **Q**    How do they get to be green?  Who's making them green?

09:25:31 6   **A**    So only the pharmacist can -- only the pharmacist can

09:25:34 7   make them green.  And, in fact, only when a pharmacist is

09:25:40 8   logged on to a computer can they even access the screen.

09:25:45 9        So if a technician is logged on to a computer screen

09:25:49 10  or a computer terminal, they can't even access the data

09:25:53 11  review page.  It will -- the computer system will completely

09:25:57 12  block them from accessing data review.  A technician

09:26:01 13  wouldn't even be able to see this screen.

09:26:04 14  **Q**    Okay.

09:26:05 15        This -- this field down here is blank, PBR DEA.  PBR

09:26:11 16  is a prescriber, not beer brand; correct?

09:26:13 17  **A**    Right.

09:26:14 18  **Q**    And if that's blank, if you don't have a DEA number in

09:26:16 19  there, are you able to move forward in the process?

09:26:20 20  **A**    If this is a controlled substance, you would not be

09:26:23 21  able to move forward without a DEA number.

09:26:25 22  **Q**    If you've typed in a random DEA number, just 123816 to

09:26:31 23  try to move forward in the process because you didn't want

09:26:33 24  to be bothered, would that work?

09:26:34 25  **A**    No.

**Stossel - Direct/Stoffelmayr**

09:26:35   1   **Q**      Why not?  What would happen?

09:26:36   2   **A**      If would give me a pop-up screen.  It would tell me a

09:26:42   3   message saying something like the DEA number is not active

09:26:45   4   or the DEA number does not work or -- I don't know exactly

09:26:50   5   what the screen says, but it would not let me go forward,

09:26:53   6   and it would make me double-check or correct or, you know,

09:26:57   7   do something to make sure that the DEA number is correct

09:27:00   8   before going on.

09:27:02   9   **Q**      Do you have to do anything to check if a DEA number is

09:27:04   10  valid or does the system do that for you?

09:27:07   11  **A**      The system will do that for me.

09:27:09   12  **Q**      All right.

09:27:10   13           Now, in this screen we're looking at, there's this

09:27:16   14  yellow box on the prescription.  Did that come with the

09:27:20   15  prescription or what is that?

09:27:22   16  **A**      So that doesn't come with the prescription.  That's

09:27:26   17  something at Walgreens that we call an annotation.

09:27:30   18           So if you look down underneath that prescription

09:27:36   19  image, you'll see another little box that says annotations?

09:27:42   20  **Q**      This one?

09:27:43   21  **A**      Oh, okay.  You've got it there.  Yeah.

09:27:44   22           So you'll see that box that says annotations.  This is

09:27:47   23  a note that we attach to the hard copy prescription.  So

09:27:55   24  then it becomes part of that hard copy prescription.  So if

09:28:00   25  I had something that I wanted to attach to this

**Stossel - Direct/Stoffelmayr**

09:28:03  1   prescription, a message, a note, I would click this yellow

09:28:13  2   box, or little -- it looks kind of like a note.

09:28:20  3   **Q**   The jurors can't see obviously what you're pointing

09:28:23  4   at.

09:28:23  5   **A**   Right.

09:28:23  6   **Q**   Is this what we're talking about right here

09:28:26  7   (indicating)?

09:28:26  8   **A**   Yes, that's what I'm talking about right there, and it

09:28:29  9   would bring up a blank yellow box for me on that

09:28:32 10   prescription image.  And within that blank yellow box, I

09:28:36 11   would be able to type my note directly onto that hard copy

09:28:41 12   image.  And then that note would be retained or stay with

09:28:49 13   that hard copy image going forward.

09:28:50 14   **Q**   So let's say a year from now, the same patient were to

09:28:54 15   come back and you were looking at their prescription history

09:28:58 16   and you wanted to look at this particular prescription; a

09:29:02 17   year later, you're looking back for some reason.  Would that

09:29:04 18   note still be there?

09:29:05 19   **A**   Correct.  Yes, it would still be there.

09:29:08 20   **Q**   All right.

09:29:08 21        Now, if you, in the process of filling this

09:29:11 22   prescription, wanted to make a note that other Walgreens

09:29:16 23   pharmacists could see filling a different prescription for

09:29:20 24   the same patient, is there a way you could do that?

09:29:24 25   **A**   Yes, um-hmm.

6847

**Stossel - Direct/Stoffelmayr**

09:29:25  1    **Q**    Explain to us how you would do that.

09:29:28  2    **A**    So I could put a note in the patient comments field

09:29:34  3    and that would be something that pharmacists could see at

09:29:36  4    another store.  And it wouldn't matter if they were filling

09:29:42  5    this prescription or like a different prescription.

09:29:43  6    **Q**    Okay.  So I've circled a little notepad and the word,

09:29:48  7    "Patient comment," down there.  Is that what you were

09:29:50  8    talking about?

09:29:50  9    **A**    Yes, that's it.

09:29:51  10   **Q**    And what does the yellow notepad tell you?

09:29:54  11   **A**    So that yellow node pad is nice because it tells us if

09:29:57  12   there's already a comment there.

09:30:03  13        When you're looking at the bottom of the screen, you

09:30:05  14   can see that there are a lot of buttons at the bottom of the

09:30:11  15   screen.  And so it makes it easy to see that there's already

09:30:14  16   a patient comment inside that patient's particular

09:30:20  17   information so that I don't have to click through every

09:30:23  18   single one of those buttons to find out, oh, my gosh, is

09:30:26  19   there a comment there, or is there not a comment there.

09:30:28  20        I know by seeing that yellow notepad, there's already

09:30:32  21   a comment there, and I can easily click that patient comment

09:30:37  22   button and see what that comment is.

09:30:38  23   **Q**    And when you're filling a prescription for a

09:30:40  24   controlled substance, are you always going to check to see

09:30:43  25   what the prior patient comments are?

**Stossel - Direct/Stoffelmayr**

09:30:45  1   **A**     I'm always going to check those patient comments if

09:30:48  2   they're there, whether it's a controlled substance or not.

09:30:50  3   **Q**     All right.  What are we looking at here?

09:30:57  4   **A**     And so when you click that patient comment button, so,

09:31:01  5   you know, when it has the yellow notepad and I see that

09:31:04  6   there's a patient comment, I'll click that patient comment

09:31:07  7   button and this screen will pop up.

09:31:10  8   **Q**     And what is -- how -- as a pharmacist, what does that

09:31:13  9   mean to you if you were to see that comment?

09:31:16  10  **A**     And, so, this is similar to a comment that I might put

09:31:20  11  in.

09:31:22  12          This comment says "GFD refused, oxycodone 11-11-2018,"

09:31:30  13  and then it says CFB.

09:31:33  14          So what this means to me is, it says GFD, which is our

09:31:36  15  abbreviations at Walgreens for "Good Faith Dispensing."  And

09:31:40  16  it says refused oxycodone.  So this means to mean that based

09:31:46  17  on Good Faith Dispensing, someone has refused a prescription

09:31:49  18  for oxycodone back on 11-11 of 2018.  And then that's a

09:31:54  19  person's initials, CFB.

09:31:58  20          So I would easily be able to see that the pharmacist,

09:32:01  21  CFB, refused a prescription for oxycodone back on

09:32:07  22  11-11-2018.

09:32:07  23  **Q**     All right.

09:32:07  24          That's a patient comment.  What if you had a -- you

09:32:11  25  had a comment about the doctor, the prescriber, that you

Stossel - Direct/Stoffelmayr

09:32:15  1   wanted other Walgreens pharmacists to be able to see if they

09:32:21  2   got a prescription written by the same doctor but for a

09:32:23  3   totally different patient; is there a way you would do that?

09:32:27  4   **A**    Right.

09:32:28  5        So it's very similar at the bottom.  You'll see that

09:32:31  6   PBR comments, and so that's the abbreviations for

09:32:35  7   prescriber.

09:32:36  8        And can see that there's another little yellow notepad

09:32:38  9   there, which means that there is a comment residing within

09:32:41  10  that button.  So you could easily just click that prescriber

09:32:45  11  comment button to see what's there.

09:32:47  12  **Q**    All right.  Is this an example?

09:32:49  13  **A**    Right.

09:32:50  14       And, so, that's an example of what might be within the

09:32:54  15  prescriber comments.  Those two fields always show up within

09:32:58  16  the prescriber comments.  One is a location comment and one

09:33:04  17  is just a general comment.

09:33:07  18       So a location comment might be something specific to

09:33:14  19  that prescriber's location.  For example, prescribers

09:33:23  20  sometimes have several offices.  So when you go into a

09:33:28  21  prescriber's information, you might find that a prescriber

09:33:32  22  is registered several different times within the computer

09:33:36  23  system.  The prescriber might be registered at three

09:33:42  24  different offices.  So this first comment would be specific

09:33:46  25  to a certain location.

**Stossel - Direct/Stoffelmayr**

09:33:49  1      The second comment would be just a general comment for

09:33:52  2  the prescriber, no matter which office you're speaking of.

09:33:55  3  **Q**    And just to complete it, what is -- how would you

09:33:59  4  decode that second comment?

09:34:01  5  **A**    So the second comment would just be meaning that the

09:34:04  6  doctor doesn't accept refill requests that are faxed to

09:34:09  7  them.

09:34:11  8  **Q**    The jury heard -- let me go back to the patient

09:34:14  9  comment.

09:34:14 10      The jury heard testimony that it's possible to run out

09:34:19 11  of room in the patient comment field.  There's a character

09:34:22 12  limit, and you would have to delete information to make a

09:34:25 13  new comment.

09:34:26 14      Do you have any experience with that?

09:34:29 15  **A**    In my 25 years at Walgreens, I've never had the

09:34:33 16  occasion to remove a comment for something that's important

09:34:37 17  information.

09:34:37 18  **Q**    You've never run out of room in the patient comment

09:34:40 19  field?

09:34:40 20  **A**    I've never had the occasion to remove anything that's

09:34:43 21  important.

09:34:44 22  **Q**    We've already heard the accusation that we faked

09:34:48 23  these.

09:34:48 24      Are these comments in these fields that we're looking

09:34:51 25  at, are these typical of what you see in your day-to-day

09:34:54  1    practice at Walgreens?

09:34:56  2                    MR. WEINBERGER:  Objection.

09:34:57  3                    MR. STOFFELMAYR:  Mr. Lanier said out loud,

09:34:58  4    "You faked it."

09:34:59  5                    MR. WEINBERGER:  Objection.

09:35:00  6                    THE COURT:  Overruled.

09:35:00  7                    THE WITNESS:  Yeah, these are typical

09:35:02  8    comments.  I mean, these are things that I would see on a

09:35:06  9    daily basis.

09:35:17 10    BY MR. STOFFELMAYR:

09:35:17 11    Q     What is -- what is this screen?  What are we looking

09:35:20 12    at here?

09:35:21 13          The jury has heard this expression and some of us may

09:35:24 14    remember, some of us may have lost track.  What does DUR

09:35:28 15    stand for?  Why don't you tell us that.

09:35:30 16    A     So that stands for Drug Utilization Review.

09:35:32 17    Q     What does that mean at a high level?  And then explain

09:35:35 18    to us specifically what we're looking at on this screen.

09:35:37 19    A     Right.

09:35:37 20          So this means that we're basically looking to see if

09:35:44 21    there are any drugs that are interacting with each other,

09:35:53 22    any health conditions that are interacting with the drug, if

09:35:58 23    there are any other things that might prevent us from

09:36:05 24    dispensing the prescription as far as what appears in the

09:36:09 25    patient profile or the drug history.

**Stossel - Direct/Stoffelmayr**

09:36:11  1    **Q**    So in this example, it's a 72-year-old female and

09:36:15  2    there's some text.  Do you see where it says "DUR summary"?

09:36:20  3    **A**    Correct.

09:36:20  4    **Q**    That DUR summary text, is that something the

09:36:24  5    pharmacist typed in or where does that come from?

09:36:26  6    **A**    No.  That's auto-populated information for me to

09:36:32  7    review.

09:36:32  8    **Q**    So the system gives that to you; you don't have to

09:36:36  9    look it up yourself?

09:36:36  10   **A**    Correct.

09:36:37  11   **Q**    And in this case, why don't you tell us how you, as a

09:36:39  12   pharmacist, would interpret a DUR summary like that?

09:36:42  13   **A**    So this is a -- this is a 72-year-old patient.  The

09:36:50  14   system considers patients of this age to be elderly, and

09:36:57  15   there is an amount of caution that you must use in

09:37:00  16   dispensing this particular medication for an elderly

09:37:05  17   patient.

09:37:05  18        This medication could cause a fall risk for someone of

09:37:08  19   that age.  And so we would need to look at it a little more

09:37:13  20   closely.

09:37:13  21   **Q**    Down here it says -- there's this black bar.  Is that

09:37:17  22   what they call a DUR alert?

09:37:19  23   **A**    Correct.

09:37:19  24   **Q**    And I see under resolve, it says N.  What is -- what

09:37:23  25   is going on there?

6853

**Stossel - Direct/Stoffelmayr**

09:37:23　1　**A**　　So what it's telling me is that there is a DUR alert,

09:37:30　2　and we're looking at this drug along the health condition.

09:37:36　3　　　So it is telling me the DUR is between the drug and

09:37:40　4　the health condition, and that it has not yet been resolved.

09:37:44　5　**Q**　　Can you fill this prescription without resolving these

09:37:48　6　DUR alerts?

09:37:49　7　**A**　　No.　I can't even print a leaflet in order to go to

09:37:57　8　the next step of filling the prescription, you know, going

09:38:01　9　to retrieve it from the shelf and counting it out.　I can't

09:38:05　10　even get a leaflet to do that next step without resolving

09:38:09　11　this.

09:38:10　12　**Q**　　In your terminology, when you say leaflet, are you

09:38:13　13　talking about the sticker that goes on the bottle or are you

09:38:15　14　talking about the big printout thing you staple to the bag?

09:38:18　15　**A**　　Right.　Yeah.

09:38:20　16　　　I'm actually talking about the part that you staple to

09:38:23　17　the bag.　You do need that leaflet in order to get the

09:38:30　18　sticker, so. . .

09:38:34　19　**Q**　　Before you have a sticker, can the pharmacy tech go to

09:38:37　20　the shelf and pull the bottle down and start counting out

09:38:40　21　pills?

09:38:41　22　**A**　　You would need the leaflet before you could go to the

09:38:44　23　shelf to get the pills.

09:38:45　24　**Q**　　Okay.

09:38:45　25　　　So until you print the leaflet, you can't move to the

**Stossel - Direct/Stoffelmayr**

09:38:47  1    next step?

09:38:48  2    **A**    Correct.

09:38:48  3    **Q**    And if you haven't resolved a DUR alert, can you print

09:38:53  4    the leaflet?

09:38:53  5    **A**    No.

09:38:55  6    **Q**    Hypothetical, if this patient were to come back

09:39:01  7    two days later with a second prescription, also for Vicodin

09:39:04  8    but maybe in a higher dose, is that going to count -- are

09:39:08  9    you going to see a DUR alert because this person has over --

09:39:12  10   has multiple prescriptions for the same medicine?

09:39:14  11   **A**    Yes, you should.

09:39:15  12   **Q**    And if the patient came back with that second

09:39:18  13   prescription, would you be able to fill the second

09:39:20  14   prescription without resolving that new DUR?

09:39:22  15   **A**    No.

09:39:24  16   **Q**    Let's say you have a patient -- let's say this

09:39:26  17   patient, for example, was already taking anxiety medication,

09:39:30  18   maybe the patient had a prescription for Xanax for anxiety

09:39:36  19   and then she comes in with this Vicodin prescription, would

09:39:39  20   the DUR system recognize the potential interaction between a

09:39:42  21   benzodiazapine and an opioid medication?

09:39:44  22   **A**    Yes.  Yes.

09:39:45  23   **Q**    And would it give you a DUR alert?

09:39:46  24   **A**    Yes.

09:39:47  25   **Q**    Would you be able to fill this Vicodin prescription

Stossel - Direct/Stoffelmayr

09:39:50 1  without resolving that DUR alert?

09:39:55 2  **A**    No.

09:40:05 3  **Q**    Let's look at a couple more pages.  Oh, actually, I

09:40:08 4  should have asked you this:

09:40:10 5      What's going on in this box?  I skipped over it.

09:40:13 6  **A**    Oh, okay.  So, could you -- could you go back one

09:40:17 7  screen?

09:40:17 8  **Q**    Of course.

09:40:18 9      So this -- we're back to the original example.  You

09:40:21 10  only had one DUR alert because this is her only

09:40:25 11  prescription, and it's because she's elderly; correct?

09:40:29 12  **A**    Correct.

09:40:30 13      And so in the annotation -- so, when you're filling a

09:40:32 14  prescription for a drug like this, it would be important to

09:40:37 15  have the diagnosis code available to you for this

09:40:47 16  medication.

09:40:47 17      So with a Vicodin prescription, with a controlled

09:40:54 18  substance prescription, when we have a prescription

09:40:56 19  presented to us for a medication that's a controlled

09:40:59 20  substance, we are making sure that along with the name of

09:41:07 21  the medication, the quantity, the directions, the doctor's

09:41:10 22  name, that we also have a diagnosis code on the prescription

09:41:16 23  for why the patient is using the medication.

09:41:19 24      And so you can see on this prescription, there's no

09:41:23 25  diagnosis code.  And so that would be a reason that I would

6856

**Stossel - Direct/Stoffelmayr**

09:41:26 1   need to call the doctor's office and find out why the

09:41:32 2   patient is using this medication.

09:41:34 3       Usually, in the course of my practice, doctors will

09:41:40 4   write that diagnosis code on the prescription, or with an

09:41:45 5   electronic prescription, that diagnosis code will come over

09:41:48 6   as part of the prescription.  So in that yellow annotation

09:41:54 7   box, it looks as if the pharmacist called to confirm what

09:41:59 8   the diagnosis was for this particular prescription so that

09:42:05 9   we could have that documented going forward.

09:42:07 10       And so it looks like the pharmacist spoke to Jan, RN,

09:42:10 11   so Jan, the nurse, and that the diagnosis -- DX is our code

09:42:15 12   for that -- diagnosis was post-surgical pain.  Okay?

09:42:20 13   **Q**    And when you go to resolve this DUR, do you get a

09:42:24 14   pop-up box?

09:42:25 15   **A**    Um-hmm.

09:42:26 16   **Q**    And is that what we're looking at here?

09:42:27 17   **A**    Right.

09:42:28 18       And so at the bottom of the screen, when I went to --

09:42:31 19   when I go to resolve that DUR, I would hit the resolve

09:42:34 20   button, and this screen would pop up for me.  And so then I

09:42:37 21   would be able to go into this DUR intervention comment, and

09:42:43 22   in that DUR intervention comment, I would be able to click

09:42:48 23   this little drop-down menu.  It says "reviewed patient

09:42:52 24   history, contacted prescriber," you know, "discussed with

09:42:57 25   patient."

**Stossel - Direct/Stoffelmayr**

09:42:59   1         And so the comment here says, "NTT okay for

09:43:04   2  post-surgical."  And NTT means, to me, it's an abbreviation,

09:43:08   3  new to therapy.

09:43:09   4         And so this would be a prescription maybe that the

09:43:12   5  patient hasn't ever had before.  So they're new to therapy

09:43:16   6  on it because it's for post-surgical pain.

09:43:19   7  **Q**    All right.

09:43:19   8         I want to just go through quickly a couple more

09:43:22   9  screens that you may see or maybe always see when you fill a

09:43:25  10  prescription so, just so people have some idea of the kind

09:43:28  11  of information you have available.

09:43:30  12         What is -- what is this screen?

09:43:34  13  **A**    This is a patient profile screen.

09:43:39  14  **Q**    And is that available for everyone who fills a

09:43:43  15  prescription at Walgreens?

09:43:44  16  **A**    Correct.

09:43:45  17         This shows all of the prescriptions that you would

09:43:48  18  have filled at any Walgreens.

09:43:50  19  **Q**    So hypothetical, if Ms. Test Patient had filled a

09:43:56  20  prescription in California at a Walgreens, you would see it

09:43:58  21  here?

09:43:58  22  **A**    Correct.

09:43:58  23  **Q**    Does this include only controlled substances or all of

09:44:00  24  her prescriptions?

09:44:01  25  **A**    No, it's all of the prescriptions that you filled at

Stossel - Direct/Stoffelmayr

09:44:03  1    Walgreens.

09:44:04  2    **Q**    Does it go back to the beginning of time?  Do you know

09:44:06  3    how far back it goes?

09:44:07  4    **A**    It goes back about 18 months.

09:44:15  5    **Q**    Last one I want to show you, the product review page.

09:44:19  6         Can you explain to us, just at a high-level, what

09:44:22  7    we're looking at here?

09:44:23  8    **A**    Sure.

09:44:24  9         So after all of the steps have been completed, we have

09:44:31  10   reviewed the data, I have resolved all of the DURs, the

09:44:40  11   technician or myself have actually filled the prescription

09:44:42  12   and it's in the bottle, then I would have the product in

09:44:49  13   front of me and I would see this product review page.

09:44:54  14        And so what we're looking at here is I would have in

09:44:58  15   front of me an image of what the pill is supposed to look

09:45:01  16   like, that's in the bottle, that's in front of me, that I

09:45:06  17   would be able to look inside the bottle and verify that

09:45:11  18   that's the drug that the patient should be receiving versus

09:45:15  19   what's inside the bottle that I'm looking at before

09:45:18  20   dispensing it.

09:45:20  21   **Q**    And what is it -- what's this that I just circled down

09:45:24  22   here on the product review page?

09:45:26  23   **A**    So that's the patient PDMP report or what you might

09:45:31  24   know as the OARRS report.  And so that's just a hyperlink,

09:45:34  25   which I can get to the OARRS report for this particular

6859

09:45:37 1    patient pretty quickly just by clicking that link.

09:45:40 2    **Q**    So when you click on that link, does it sake you to

09:45:42 3    the OARRS web page or it pre-generates the report just for

09:45:45 4    that patient?

09:45:46 5    **A**    It's already a pre-generated report.  It's going to go

09:45:49 6    directly to the current real time OARRS report for that

09:45:54 7    patient.

09:45:54 8    **Q**    Do you see a NarxCare score as well?

09:45:58 9    **A**    Yeah.  That's -- comes as part of the OARRS report for

09:46:02 10   the patient.

09:46:03 11   **Q**    All right.  Let's move on to some new topics.

09:46:06 12        Let's talk a little bit about red flags.  And we

09:46:11 13   started this discussion yesterday.  So to bring us back to

09:46:15 14   where we were, could you tell the jury, again, you know, for

09:46:18 15   you in your practice, what is a red flag?  What does that

09:46:22 16   mean when you're filling a controlled substance

09:46:24 17   prescription?

09:46:25 18   **A**    So a red flag is basically, I mean, in short form,

09:46:29 19   something that makes me uncomfortable about the

09:46:31 20   prescription.

09:46:33 21   **Q**    And we looked at some Walgreens policies yesterday,

09:46:37 22   but just to come back to some of your testimony about those,

09:46:41 23   is there, for you in your practice, any exhaustive list

09:46:45 24   where you would say, okay, those 20 things are all the

09:46:48 25   possible red flags that I would ever worry about?

**Stossel - Direct/Stoffelmayr**

09:46:51  1    **A**    No.

09:46:52  2    **Q**    And is there any list of circumstances where you would

09:46:55  3    say a hundred percent of the time, doesn't matter what the

09:46:57  4    circumstances are, that is a red flag to me and I'm

09:47:01  5    uncomfortable?

09:47:02  6    **A**    No.

09:47:04  7    **Q**    We looked earlier, or yesterday, I guess, at the

09:47:10  8    Walgreens policy from 2012 that said you were expected to

09:47:14  9    document the resolution of red flags.

09:47:16  10        Do you remember that?

09:47:16  11   **A**    Um-hmm.

09:47:18  12   **Q**    And is that your -- well, just tell us, what is your

09:47:21  13   practice as Amy Stossel, a pharmacist?  What is your

09:47:24  14   practice by documenting a red flag resolution?

09:47:27  15   **A**    So I try to document the red flags for prescriptions.

09:47:33  16   It's not something that I think happens 100 percent of the

09:47:37  17   time.

09:47:38  18   **Q**    Why not?  Why wouldn't it happen a hundred percent of

09:47:41  19   the time no matter what?

09:47:42  20   **A**    So sometimes you have a repeat prescription for a

09:47:47  21   patient that you might have filled 10 times or 12 times for

09:47:52  22   the same patient and, you know, I have patients that I've

09:47:58  23   come to know.

09:48:03  24        I have a little lady that comes in and she has

09:48:06  25   osteoarthritis in her hip.  She comes on the bus from a

6861

**Stossel - Direct/Stoffelmayr**

09:48:11 1    little elderly residents community.  She's been coming to me

09:48:22 2    for a long time.

09:48:22 3        I could take the time to document for her every single

09:48:25 4    time she comes in about, you know, the red flags with her

09:48:28 5    prescription, or I could take a few minutes at the counter

09:48:30 6    with her and make sure that she gets what she needs; that

09:48:34 7    she's not in pain, that everything is going okay for her, or

09:48:38 8    does she need a couple things from the front of the store

09:48:42 9    one of us could help her get.

09:48:43 10       It's kind of like a judgment call, I guess.

09:48:47 11   **Q**    Let me --

09:48:49 12   **A**    What I need to do with my time.

09:48:52 13   **Q**    Let me ask you about a hypothetical scenario we heard

09:48:56 14   about some weeks ago now.

09:48:59 15       Let's say a patient comes with a patient, same

09:49:02 16   prescription, same doctor, for an opioid and a

09:49:03 17   benzodiazapine.

09:49:04 18       Brand new patient you've never seen before, doctor's

09:49:06 19   in Cincinnati and for you, you're like, whoa, this is funky,

09:49:10 20   I need to look into this.

09:49:11 21       Can you imagine a situation like that?

09:49:13 22   **A**    Yeah.

09:49:14 23   **Q**    If you did everything you needed to do in January to

09:49:18 24   understand the situation and decide that you were

09:49:20 25   comfortable filling that prescription because it turns out

Stossel - Direct/Stoffelmayr

09:49:24  1    there were perfectly good reasons for all of that, if the

09:49:27  2    same patient came back in February, March, April, May, each

09:49:31  3    time the patient came back, would you typically document,

09:49:35  4    "Oh, back in January, I made some phone calls and it's

09:49:38  5    okay"?

09:49:38  6         Would you re-document that each time?

09:49:40  7    A    I typically don't.  I find that once it's documented

09:49:49  8    once or twice, a couple times, it becomes not necessary to

09:49:53  9    document 100 percent of the time.

09:49:54 10         You really can see a pattern with the patients.  You

09:49:56 11    can see different things that are going on with the patient.

09:50:03 12    You can easily go back and view the prescription before,

09:50:06 13    where you see those yellow boxes and the annotations.  It

09:50:10 14    takes just a couple seconds to click back and view that

09:50:13 15    previous prescription.

09:50:14 16         So it's really -- really not something that concerns

09:50:19 17    me or makes me feel uncomfortable about not documenting.

09:50:26 18    Q    Let me ask you about some specific situations or red

09:50:29 19    flags that we've heard about over the last four or

09:50:32 20    five weeks.

09:50:32 21         A patient who saw a doctor 25 or more than 25 miles

09:50:37 22    away from the patient's home, are there times when that is a

09:50:41 23    real red flag for you?

09:50:43 24    A    Sure.  There are times.

09:50:44 25    Q    Is it always a red flag for you in your practice?

**Stossel - Direct/Stoffelmayr**

09:50:47  1    **A**    No.

09:50:48  2    **Q**    If you already knew everything you needed to know

09:50:53  3    about the patient, their condition, and their doctor, would

09:50:57  4    you consider that a red flag you need to document just

09:50:59  5    because they drove 26 miles to see a doctor?

09:51:02  6    **A**    No.

09:51:03  7          There are a lot of patients that go to Cleveland

09:51:09  8    Clinic, that those Cleveland Clinic doctors have offices in

09:51:14  9    different areas.  They might have an office at the main

09:51:18 10    campus but then have an office in Westlake or have an office

09:51:21 11    in Twinsburg.

09:51:22 12          And so you can easily see that that doctor is maybe

09:51:25 13    practicing both at main campus and Westlake.  Westlake is

09:51:29 14    easily 25 miles away from Willoughby, but it's the same

09:51:33 15    physician.  So it doesn't -- yeah, that doesn't give me

09:51:35 16    pause.

09:51:36 17    **Q**    What about situations where you have overlapping

09:51:40 18    prescriptions for an opioid painkiller or pain reliever,

09:51:44 19    overlapping prescriptions written by two different doctors?

09:51:51 20          Are there situations where that is a true red flag for

09:51:52 21    you and you want to look into it?

09:51:53 22    **A**    Sure, yeah.

09:51:54 23    **Q**    Always?  Does that always happen just because two

09:51:57 24    different doctors wrote a pain prescription for this

09:51:59 25    patient, is that always automatically a red flag for you in

09:52:01  1    your practice?

09:52:02  2    **A**    No.

09:52:02  3         Sometimes those can be -- sometimes those can be

09:52:07  4    resident doctors that are treating a patient for the health

09:52:12  5    condition.  It happens a lot of times in cancer patients

09:52:16  6    where they're seeing a wide array of different prescribers

09:52:22  7    that might be writing a lot of different medications for

09:52:25  8    them.

09:52:25  9    **Q**    In your practice, have you seen situations where

09:52:28  10   somebody who has a surgical procedure done gets a first pain

09:52:32  11   prescription written by the resident and a second

09:52:34  12   prescription written by the surgeon at a follow-up visit?

09:52:37  13   **A**    Sure, yeah.

09:52:38  14   **Q**    And are there times when technically, there will be

09:52:40  15   overlap in the days between those prescriptions?

09:52:43  16   **A**    Of course.

09:52:43  17   **Q**    What about this situation?

09:52:44  18        You see that somebody -- somebody comes in with a

09:52:47  19   seven-day prescription for a pain medicine from their family

09:52:53  20   doctor and you see that they previously got a

09:52:55  21   two-or-three-day prescription from an emergency room doctor

09:52:58  22   and technically, the prescriptions overlap.  Is that a red

09:53:02  23   flag for you?

09:53:02  24   **A**    No.

09:53:02  25   **Q**    Why not?

**Stossel - Direct/Stoffelmayr**

09:53:03  1    **A**    Well, sometimes you have to go to the ER on a weekend.

09:53:08  2    The ER typically will give you just a few days supply of a

09:53:13  3    medication and ask you to make an appointment with your

09:53:16  4    regular doctor to follow up.

09:53:18  5        You might go to that regular doctor and they'll

09:53:21  6    present a prescription to you.  You're not going to wait

09:53:25  7    till your medication from the ER is out before you go to the

09:53:28  8    pharmacy to fill the medication for the new prescription.

09:53:33  9    You're going to leave the office visit from the -- from the

09:53:36  10   primary care physician and go right to the pharmacy and fill

09:53:39  11   that new prescription.  It's --

09:53:42  12   **Q**    So in a situation where you already knew those factors

09:53:44  13   and knew that that was what was going on, would you consider

09:53:47  14   that a red flag that you need to document?

09:53:49  15   **A**    No.

09:53:49  16   **Q**    All right.

09:53:49  17       One more I'm going to ask you about, but in a little

09:53:53  18   more detail, is the red flag of a patient being on a dose

09:53:57  19   that's greater than 90MME per day.

09:54:00  20       Do you understand what I'm talking about?

09:54:01  21   **A**    Sure.

09:54:03  22   **Q**    Is that sometimes a red flag, that a patient's on a

09:54:06  23   very high dose?

09:54:07  24   **A**    Yes.  Yes.

09:54:07  25   **Q**    Is it always a red flag for you that a patient's

09:54:11  1    getting more than 90MME per day of pain medication?

09:54:14  2    **A**    It's not.  It really depends on the medication, the

09:54:18  3    patient, the history.

09:54:22  4    **Q**    Do you have patients who have been coming to you, to

09:54:26  5    your pharmacy -- well, strike that.

09:54:28  6         You've been at the Willoughby stores for four years

09:54:31  7    you said?

09:54:31  8    **A**    Correct.

09:54:32  9    **Q**    Do you have pain patients who have been coming there

09:54:34  10   for four years now?

09:54:34  11   **A**    Correct.

09:54:35  12   **Q**    Do you have somebody who is on a relative high dose of

09:54:38  13   pain medication and they come in regularly, is it unusual

09:54:41  14   for you to get to know those folks?

09:54:43  15   **A**    No.

09:54:46  16   **Q**    Let me show you information we extracted -- oops, let

09:54:51  17   me get to the right page.

09:54:55  18        This is information we pulled together out of a -- it

09:54:59  19   comes out of a database, but this is a prescription that you

09:55:03  20   filled.  And one of the plaintiffs experts came and said

09:55:10  21   that he was concerned that you hadn't documented the

09:55:12  22   resolution of two different red flags associated with this

09:55:15  23   prescription.

09:55:15  24        I'll tell you what they are and then I want to talk

09:55:17  25   about the prescription a little more.

**Stossel - Direct/Stoffelmayr**

09:55:19  1          Mr. Catizone said there were two things that required

09:55:24  2   documentation here, one was the patient's receiving more

09:55:26  3   than 90MME per day, and two is, this patient had a supply of

09:55:31  4   over 210 days within a six-month period.  So -- 210 days, I

09:55:36  5   guess, is seven months.  So basically this person had, the

09:55:39  6   idea is, seven months worth of supply in a six-month period.

09:55:44  7          So, first off, why don't you tell us, what is the

09:55:47  8   medication this person received?

09:55:48  9   **A**    So this person received a fentanyl patch.

09:55:52 10   **Q**    What's a fentanyl path?  How does that work?

09:55:54 11   **A**    So a fentanyl patch is a pain medication.  It is an

09:55:58 12   opioid.  It's a patch that you place onto the skin.  A lot

09:56:05 13   of times, it goes here (indicating).  You wear it for

09:56:07 14   three days, you remove it, and then you apply another patch.

09:56:16 15          It's a long-acting medication.

09:56:18 16   **Q**    So when it says dosage unit 10 but days' supply 30,

09:56:22 17   that's because each patch lasts for three days?

09:56:24 18   **A**    Correct.

09:56:24 19   **Q**    Do you have a lot of patients -- well, strike that.

09:56:27 20          Do you fill a lot of prescriptions for these fentanyl

09:56:29 21   patches?

09:56:30 22   **A**    This is not -- not a common medication to fill for

09:56:34 23   patients.

09:56:35 24   **Q**    Okay.

09:56:36 25          We don't know the person's name or age, but we see

09:56:40  1    their birth year is 1960.  So they're 60, 61ish; correct?

09:56:45  2    **A**    Correct.

09:56:46  3    **Q**    Do you happen to know who this patient is?

09:56:48  4    **A**    I'm pretty sure that I do.  I don't have many patients

09:56:51  5    at my store on this particular strength of medication, and

09:56:57  6    that is about the same age as a gentleman that gets this

09:57:01  7    from me every month.

09:57:03  8    **Q**    And the prescribing doctor is Dr. Matthew Keum.  Did I

09:57:09  9    pronounce that correctly?

09:57:10  10   **A**    I believe so, yes.

09:57:13  11   **Q**    Are you familiar with Dr. Keum?

09:57:15  12   **A**    Yeah.  This is a gentleman who writes for a lot of

09:57:18  13   pain medications.  I believe he's a pain management.

09:57:20  14   **Q**    Where does he practice, do you know?

09:57:22  15   **A**    I think Lake Health.

09:57:24  16   **Q**    In Willoughby, in the area, or is he far away?

09:57:28  17   **A**    In Willoughby, um-hmm.

09:57:31  18   **Q**    Over the course of helping this patient with his

09:57:35  19   fentanyl patches prescribed by Dr. Keum, have you become

09:57:42  20   familiar with this patient's medical condition and why he

09:57:44  21   needs this treatment?

09:57:45  22   **A**    So if this is the patient I'm thinking of, this

09:57:47  23   gentleman actually was involved in a workplace accident

09:57:50  24   where his spine was crushed, and I've gotten to know that

09:57:56  25   just by asking him some questions at the window when he's

**Stossel - Direct/Stoffelmayr**

09:58:01  1    picking up.  And this particular medication actually flags

09:58:07  2    us at the counter when you're ringing out a prescription.

09:58:17  3    It will actually flag for the pharmacist to ask the patient

09:58:19  4    another couple questions to verify the dosage strength of

09:58:24  5    the medication before we sell it to them.

09:58:26  6         So it is an opportunity for the pharmacist to have

09:58:28  7    that one last time to talk with the patient or question the

09:58:33  8    patient.  And -- so, yeah.

09:58:35  9    **Q**    Is that what you're talking about, what I've kind of

09:58:39 10    partially circled, not very well?

09:58:41 11    **A**    Oh, yeah.

09:58:41 12    **Q**    Those consultation comments?

09:58:42 13    **A**    The consultation comments.

09:58:44 14         So -- oh, this is the actual comment then that it

09:58:47 15    would say, the fentanyl consult.  So if the technician was

09:58:52 16    to go and try to sell this to the person at the counter, it

09:59:03 17    would prohibit them from selling it to the patient, and it

09:59:05 18    would say that there was a block.

09:59:11 19         And then I would have to log into my computer and this

09:59:14 20    is the comment that I would see.  It would say, "Fentanyl

09:59:16 21    consult.  Ensure the medication being dispensed is correct

09:59:19 22    for the individual patient review and verify prescription

09:59:23 23    accuracy, previous dosage, current use, and opioid

09:59:27 24    tolerance."  And it said these consultations are to meet

09:59:31 25    regulatory requirements.

**Stossel - Direct/Stoffelmayr**

09:59:31  1    So then I would have to actually complete this consult

09:59:35  2    with the patient, you know, ask them, is it still -- so what

09:59:40  3    I would do is just ask, you know, "Is this the strength

09:59:43  4    you're still taking?"  Everything looked good, it would be a

09:59:45  5    triple check for me to just make sure that the 75 micrograms

09:59:52  6    is still the strength that he's taking.  And then I would --

09:59:54  7    **Q**    Sorry.  Go ahead.

09:59:56  8    **A**    Oh.  And then I would actually have to input my

09:59:59  9    initials in order to clear this consult.

10:00:01  10   **Q**    So that shows AJS as you?

10:00:05  11   **A**    Correct.

10:00:05  12   **Q**    You're the one that had the discussion?

10:00:06  13         So when I go to the pharmacy and they say do you have

10:00:08  14   any questions for the pharmacist, and I say no, this would

10:00:10  15   be different.

10:00:11  16         If I was picking this up, they'd say you have to wait

10:00:13  17   a second and talk to the pharmacist --

10:00:15  18   **A**    Correct.

10:00:16  19   **Q**    -- whether you feel like it or not?

10:00:17  20   **A**    Yeah.  Exactly.

10:00:21  21   **Q**    If a -- if somebody told you that a psychiatrist from

10:00:25  22   California had come to court and said that Dr. Keum

10:00:30  23   shouldn't be treating this man with fentanyl patches but

10:00:33  24   should be treating him differently, do you, Amy Stossel,

10:00:36  25   feel comfortable that you should tell Dr. Keum to knock off

**Stossel - Direct/Stoffelmayr**

10:00:40 1 the fentanyl patches and get this guy some different

10:00:43 2 therapy?

10:00:43 3 **A**    No.

10:00:49 4 **Q**    If Walgreens told you hypothetically that Dr. Keum was

10:00:54 5 say ranked number 305 nationwide for fentanyl patch

10:00:55 6 dispensing in the Walgreens chain, would that change the

10:00:57 7 kind of attention you'd give this prescription?

10:01:00 8 **A**    No.

10:01:00 9 **Q**    Would you give it any more attention or any less

10:01:03 10 attention if you knew that Dr. Keum was 310?

10:01:06 11 **A**    No.

10:01:06 12 **Q**    What if Walgreens said, "We've looked at the data and

10:01:09 13 Dr. Keum is Number 4 in Northeastern Ohio for dispensing

10:01:14 14 opioid medications," would you give this prescription less

10:01:17 15 attention or more attention if you had that information?

10:01:20 16 **A**    No.

10:01:21 17 **Q**    Would you do anything with that information?

10:01:23 18 **A**    No.

10:01:24 19      I -- I'm basing everything that I do on this

10:01:28 20 individual person with this individual prescription.

10:01:32 21 **Q**    Okay.

10:01:33 22      There's a -- you see there's a DUR description and

10:01:36 23 it's fairly detailed.  At the bottom -- here.  I can circle

10:01:41 24 it.  (Indicating.)

10:01:46 25      There's this whole big DUR description there.

**Stossel - Direct/Stoffelmayr**

10:01:48  1   **A**    Okay.

10:01:49  2   **Q**    And at the end, it says there is a reference to

10:01:53  3   oxycodone 5-milligram immediate release tabs and fentanyl

10:01:57  4   together.

10:01:57  5        Do you see that?

10:01:58  6   **A**    Um-hmm.

10:01:59  7   **Q**    As a pharmacist, what does that tell you?

10:02:02  8   **A**    So a lot of people who use fentanyl patches --

10:02:08  9   remember, I said those are like a long-acting medication --

10:02:15 10   a lot of people who use fentanyl patches or these

10:02:19 11   long-acting opioids also need a short-acting opioid to go

10:02:23 12   along with it for any breakthrough pain that they might

10:02:29 13   have.

10:02:29 14        One thing that happens to patients who use fentanyl

10:02:33 15   patches especially is that they change the patches every

10:02:38 16   three days.

10:02:41 17        So sometimes on that third day, when it's getting

10:02:44 18   close to the time that they're changing the patch, the

10:02:48 19   medication kind of goes up and down.  So on that third day

10:02:54 20   when they're getting ready to change the patch, the

10:02:57 21   medication is going down just a little bit in their

10:03:01 22   bloodstream.  They might need a short-acting opioid or

10:03:07 23   another little bit of pain medication as a supplement to

10:03:14 24   this long-acting opioid to help them with pain.

10:03:17 25   **Q**    Is it unusual, in your experience, for patients on

**Stossel - Direct/Stoffelmayr**

10:03:21  1   these long-acting opioids to be getting a second

10:03:24  2   prescription for breakthrough pain, like fentanyl plus

10:03:29  3   oxycodone or OxyContin plus hydrocodone?

10:03:31  4   **A**    No.

10:03:32  5   **Q**    What kind of patients do you see who are getting those

10:03:34  6   sorts of prescriptions?

10:03:35  7   **A**    So, a lot of times, we see cancer patients, palliative

10:03:40  8   medicine patients, patients like this with disabilities that

10:03:44  9   need those short-acting along with the long acting.

10:03:52 10   **Q**    So if you have a -- a gentleman like this with the

10:03:55 11   fentanyl patch, knowing everything you know about it,

10:03:58 12   assuming it's the right person -- and in real life, you

10:04:01 13   would see him face to face?

10:04:02 14   **A**    Right.

10:04:03 15   **Q**    You would know his name and be sure it's the person

10:04:04 16   you're thinking of.  We don't have that information.

10:04:06 17        But assuming this is the guy we're talking about,

10:04:09 18   knowing everything you know about his situation, his

10:04:12 19   treatment history with Dr. Keum, do you consider this

10:04:17 20   prescription to raise red flags that you would need to

10:04:19 21   document?

10:04:20 22   **A**    No.

10:04:23 23   **Q**    Knowing everything you know about him, the fact that

10:04:27 24   his breakthrough pain prescription means technically he's

10:04:31 25   got 210-day supply in a six-month period, does that raise a

6874

**Stossel - Direct/Stoffelmayr**

10:04:37  1    red flag that you think you need to document?

10:04:39  2    **A**    No, because he's -- in six months, he has, you know, a

10:04:47  3    180-day supply of the fentanyl and probably a 180-day supply

10:04:51  4    of the oxycodone, but that doesn't mean that he's got more

10:04:58  5    than what he needs.

10:05:02  6    **Q**    Same thing for your cancer patients or your other

10:05:05  7    patients with the severe disability; the fact that they are

10:05:08  8    on a long-acting opioid plus have a short-acting medicine

10:05:12  9    for breakthrough pain, does that automatically raise a red

10:05:16 10    flag that you feel like you need to document?

10:05:17 11    **A**    No.

10:05:19 12    **Q**    Last one of these red flags I want to talk to you

10:05:22 13    about is patients who pay cash.

10:05:24 14         Is that sometimes a red flag if somebody comes in with

10:05:27 15    a wad of $20 bills to pay for their prescription?

10:05:29 16    **A**    Of course, yes.  Sometimes it is.

10:05:31 17    **Q**    Is it always a red flag?

10:05:33 18    **A**    No.

10:05:34 19    **Q**    Under what circumstances would you consider cash

10:05:37 20    payment not even a red flag?

10:05:39 21    **A**    So sometimes people just don't have insurance.

10:05:43 22    They've lost a job, they've been laid off, especially in the

10:05:50 23    pandemic; a lot of people just aren't working.  And so all

10:05:52 24    of their prescriptions might be for cash.

10:05:54 25         So you can easily go through the history and see

**Stossel - Direct/Stoffelmayr**

10:05:57  1    patients are paying cash for everything if they're getting

10:06:00  2    their blood pressure medication, their diabetes medication,

10:06:04  3    their amoxicillin for a, you know, an infection for cash,

10:06:09  4    then of course, it's not going to raise a red flag for also

10:06:11  5    a pain medication to be paid for in cash.

10:06:14  6    **Q**    If I used Blue Cross for all my other prescriptions

10:06:17  7    but I insist on paying cash for oxycodone, does that raise

10:06:20  8    some questions for you?

10:06:21  9    **A**    Right.  Then that's going to raise a red flag for me,

10:06:23 10    of course.

10:06:25 11    **Q**    All right.  Let's shift gears a little bit and talk

10:06:29 12    about refusals to fill.

10:06:34 13         When you have a real red flag -- because we've talked

10:06:37 14    about situations where you said sometimes that's a red flag,

10:06:39 15    sometimes it's not.  But you have a real red flag, you know,

10:06:42 16    a guy uses Blue Cross for everything but insists on paying

10:06:44 17    with a roll of $20 bills for his oxycodone, or something

10:06:48 18    that may not be that dramatic, but you just can't figure out

10:06:51 19    what's going on.  You can't reach the doctor and you have a

10:06:54 20    question --

10:06:54 21    **A**    Um-hmm.

10:06:55 22    **Q**    -- that you need the doctor to answer before you feel

10:06:58 23    comfortable.

10:06:58 24         If you have a real red flag and you can't resolve that

10:07:00 25    red flag, what do you do?

**Stossel - Direct/Stoffelmayr**

10:07:03  1    **A**    So, if I'm unable to resolve the red flag, I'm not

10:07:07  2    going to be able to fill the prescription.

10:07:09  3    **Q**    How often does that happen that you find yourself not

10:07:12  4    filling a prescription?

10:07:14  5    **A**    I mean, it might happen once or twice a month.

10:07:18  6    **Q**    Has that always been the case in your practice?

10:07:21  7    **A**    Yeah, probably.  Yes.

10:07:24  8    **Q**    Have you ever been disciplined at Walgreens for

10:07:29  9    refusing to fill a prescription?

10:07:30 10    **A**    No.

10:07:30 11    **Q**    Has any of your managers or, you know, up or down the

10:07:35 12    chain, ever complained to you because you had filled --

10:07:40 13    refused to fill a prescription?

10:07:41 14    **A**    No.

10:07:41 15    **Q**    Have you ever gotten pressure from anyone at Walgreens

10:07:46 16    to fill a prescription that you weren't comfortable filling?

10:07:48 17    **A**    No.

10:07:50 18    **Q**    Have you ever gotten pressure from anyone at Walgreens

10:07:53 19    who said you weren't filling enough controlled substances?

10:07:57 20    **A**    No.

10:07:58 21    **Q**    Why do you chuckle?

10:08:00 22    **A**    It's just -- it's kind of silly.

10:08:04 23    **Q**    Have you had times when patients got upset with you

10:08:09 24    because you wouldn't fill a prescription?

10:08:11 25    **A**    Yes.  Of course.

**Stossel - Direct/Stoffelmayr**

10:08:13  1  **Q**     And if a patient is upset with you that you refused to

10:08:17  2  fill a prescription and -- well, do they sometimes -- I

10:08:21  3  think I asked you this yesterday, do they sometimes

10:08:25  4  complain?

10:08:25  5  **A**     Yes.

10:08:25  6  **Q**     Do you ever get any negative feedback from the

10:08:28  7  company, from your managers or from corporate that people

10:08:30  8  are upset that you're not filling prescriptions?

10:08:33  9  **A**     No.

10:08:36  10  **Q**     Has your -- your refusals to fill prescriptions, has

10:08:41  11  it ever come up at review time when they're telling you, you

10:08:44  12  know, what your bonus is going to be or how you're being

10:08:47  13  rated this year?

10:08:48  14  **A**     No.

10:08:50  15  **Q**     Was there ever a time when you didn't feel completely

10:08:53  16  supported by the company in refusing to fill a prescription?

10:08:55  17  **A**     No.

10:08:58  18  **Q**     You know what I mean when I say a blanket refusal to

10:09:01  19  fill?

10:09:03  20  **A**     Sure.

10:09:03  21  **Q**     Well, I'll tell you what I mean just to make sure

10:09:06  22  we're talking the same language.

10:09:08  23  **A**     Like a -- um-hmm.

10:09:09  24  **Q**     What I mean by a blanket refusal is a pharmacist says,

10:09:12  25  "You know what, I'm not filling any more prescriptions for

6878

**Stossel - Direct/Stoffelmayr**

10:09:15  1    this doctor.  So if you bring me a prescription from

10:09:18  2    Dr. Jones, I'm not even going to look at.  I just don't fill

10:09:21  3    for Dr. Jones anymore."

10:09:23  4         That's what I mean by blanket refusal.  Does that

10:09:25  5    match your understanding?

10:09:26  6    **A**    Um-hmm.

10:09:27  7    **Q**    At Walgreens, has the company ever told you you were

10:09:30  8    forbidden from doing a blanket refusal as Amy Stossel if you

10:09:36  9    just don't want to fill?

10:09:39 10    **A**    No.

10:09:39 11    **Q**    Sorry?

10:09:39 12    **A**    No.

10:09:40 13    **Q**    What about you in your practice; do you ever do a

10:09:43 14    blanket refusal where you say I just don't want to fill any

10:09:46 15    prescriptions for Dr. Jones anymore?

10:09:47 16    **A**    I personally don't do that.

10:09:49 17    **Q**    Why not?

10:09:50 18    **A**    I take things on a person-to-person, case-to-case

10:09:54 19    basis.  You never know what someone's facing.  You never

10:09:57 20    know what their situation is or what their history is.

10:10:02 21    **Q**    So even though the company would let you, you

10:10:05 22    personally, in your judgment, don't feel comfortable saying

10:10:07 23    this doctor is bad news, I don't want to fill any of his

10:10:14 24    patients?

10:10:14 25    **A**    My job is to help people.  There are some people who

**Stossel - Direct/Stoffelmayr**

10:10:17  1    have legitimate medical issues who might not know that there

10:10:21  2    is a prescriber who is questionable, and they're just trying

10:10:25  3    to solve their pain issue or solve a medical issue by going

10:10:30  4    to the prescriber that they think is a good doctor.

10:10:34  5    **Q**     The jury heard testimony, I guess, last week from a

10:10:38  6    gentleman from the Board of Pharmacy who said that even a

10:10:42  7    doctor like Dr. Franklin had some good patients.

10:10:46  8         Is that consistent with your experience, that even the

10:10:48  9    worst doctors can have good patients?

10:10:51 10    **A**     Right.  Correct.

10:10:53 11    **Q**     Are you familiar with a doctor David Demangone?

10:10:56 12    **A**     Yes.

10:10:57 13    **Q**     Now, some of the lawyers have been calling him

10:11:00 14    Demongone.  Is it Demangone or Demongone?  How do you say

10:11:03 15    his name?

10:11:03 16    **A**     It's Demangone.

10:11:04 17    **Q**     Okay.

10:11:05 18         Have you filled prescriptions for patients of

10:11:08 19    Dr. Demangone?

10:11:09 20    **A**     Yeah.

10:11:09 21    **Q**     Have you refused prescriptions for patients of Dr.

10:11:13 22    Demangone?

10:11:13 23    **A**     Yeah, I'm sure I have.

10:11:29 24              MR. STOFFELMAYR:  Your Honor, I'm going to

10:11:30 25    give the witness Exhibit WAG-MDL-0629.  I have copies for

**Stossel - Direct/Stoffelmayr**

10:11:37  1   everybody.

10:12:03  2   BY MR. STOFFELMAYR:

10:12:04  3   **Q**    Ms. Stossel, do you recognize what exhibit

10:12:08  4   WAG-MDL-2629 is?

10:12:09  5   **A**    Yeah, this is just a -- like a license look up.

10:12:13  6        If you were to look on the Ohio e-license website and

10:12:19  7   you were looking up a certain prescriber or certain

10:12:24  8   pharmacist, you could get their licensure information.

10:12:27  9   **Q**   Is that the kind of thing you do from time to time in

10:12:30 10   addition to what you see automatically in the system, go and

10:12:33 11   look up a prescriber?

10:12:34 12   **A**    Yes.

10:12:35 13   **Q**   And who is the prescriber we're looking at here?

10:12:38 14   **A**    So, this is Dr. Demangone.

10:12:40 15   **Q**    All right.  And -- oops.

10:12:43 16        What does it show you about his license status?

10:12:47 17   **A**    So it shows me that his license is active and has been

10:12:55 18   effective -- his license issue date it shows me was 1996,

10:13:02 19   and it's most effective date, it looks like it was renewed

10:13:05 20   on 3-15 of '21.

10:13:08 21   **Q**   And according to this license lookup from the Ohio

10:13:12 22   Department of Medicine, I'm sorry, Ohio Medical Board, have

10:13:14 23   they ever taken any kind of action against Dr. Demangone?

10:13:20 24   **A**    This says no board action.

10:13:21 25   **Q**    If they had taken some kind of action against him over

10:13:24  1    the years, would you expect to see that on one of these

10:13:27  2    license lookups?

10:13:29  3    **A**    Yeah.

10:13:29  4         Actually, so if there's any action against someone, it

10:13:33  5    will say yes.  And then you actually -- it has like a

10:13:36  6    hyperlink and you could click "yes" and it would take you

10:13:39  7    right to what that board action is and you would be able to

10:13:41  8    see it.

10:13:45  9    **Q**    All right.

10:13:47 10         Next, Ms. Stossel, I'm going to show you an Exhibit

10:13:50 11    WAG-MDL-2630.  I have copies for everybody.

10:14:14 12         And, Ms. Stossel, are you familiar with what we're

10:14:18 13    looking at when you look at Exhibit 2630?

10:14:21 14    **A**    Yes.

10:14:22 15    **Q**    What is it?

10:14:23 16    **A**    So this is just a licensure for a pain management

10:14:28 17    clinic.  This is a specific pain management clinic where

10:14:33 18    Dr. Demangone happens to work.

10:14:34 19    **Q**    So did you say you recognized this as Dr. Demangone's

10:14:38 20    clinic?

10:14:38 21    **A**    Correct.

10:14:38 22    **Q**    And this is their -- well, the jury heard a little bit

10:14:42 23    about this from Mr. Edwards.  This is the kind of license

10:14:45 24    that pain management clinics get from the Board of Pharmacy?

10:14:48 25    **A**    Correct.

**Stossel - Direct/Stoffelmayr**

10:14:48  1    **Q**    And does it show how recently they've renewed the

10:14:53  2    license for Dr. Demangone's clinic?

10:14:56  3    **A**    Yeah.  Looks like it was just renewed back in April,

10:14:59  4    but it's been issued -- it originally was issued in 2017.

10:15:03  5    **Q**    And does this reflect whether or not the Board of

10:15:06  6    Pharmacy has ever taken action against Dr. Demangone's

10:15:11  7    clinic?

10:15:11  8    **A**    Right.

10:15:11  9          So again it says board action, no.  So no board

10:15:15 10    action.

10:15:15 11    **Q**    And similarly with the medical board lookup, you would

10:15:20 12    expect to see board actions listed here?

10:15:22 13    **A**    Right.  If there's any board action, it would be

10:15:24 14    listed here.

10:15:29 15                MR. STOFFELMAYR:  Judge, would you like me to

10:15:31 16    keep going or take a break soon?

10:15:33 17                THE COURT:  Well, we can go to about 10:30.

10:15:35 18                MR. STOFFELMAYR:  Okay.

10:15:36 19                THE COURT:  If there's a convenient stopping

10:15:37 20    point.

10:15:38 21                MR. STOFFELMAYR:  We might be done right at

10:15:40 22    10:30.  I'll shoot for that.

10:15:42 23                THE COURT:  Okay.

10:15:42 24    BY MR. STOFFELMAYR:

10:15:54 25    **Q**    All right.  Almost at the bottom of the list.

10:15:59  1      Are there occasions in your practice at Walgreens

10:16:02  2  where you have contacted law enforcement to let them know

10:16:05  3  about a prescription that was concerning you?

10:16:08  4  **A**    Yes, many times.

10:16:09  5  **Q**    When you say many times, like how often are we talking

10:16:12  6  about?  A thousand times?  A hundred times?  Twice?  What

10:16:16  7  does that mean?

10:16:17  8  **A**    I would say, you know, maybe a few times a year.  So

10:16:22  9  over the course of 25 years, that's many times.

10:16:26 10  **Q**    A few times, times 25?

10:16:28 11  **A**    Yep.  Um-hmm.

10:16:29 12  **Q**    I'm not very good at math either, but I'll. . .

10:16:32 13      You -- can you, I mean, give us an example -- I know

10:16:37 14  you had an example recently --

10:16:38 15  **A**    Yeah, so.

10:16:39 16  **Q**    -- where you worked with the police on a prescription

10:16:41 17  you were concerned about.

10:16:43 18      Could you give us an example of what kinds of things

10:16:46 19  you're talking about?

10:16:47 20  **A**    Sure.

10:16:48 21      So, I mean, one example of, like, calling law

10:16:51 22  enforcement would be for a prescription that is a forged

10:16:55 23  prescription or a fake prescription.  Recently, I had -- I

10:17:01 24  was working on a Sunday.  I had a prescription left on my

10:17:04 25  voicemail from a veterinary clinic for a prescription for

**Stossel - Direct/Stoffelmayr**

10:17:09   1   Tramadol for a client's dog.

10:17:12   2   **Q**     Is this -- for people who don't have dogs, do dogs get

10:17:16   3   Tramadol usually?

10:17:17   4   **A**     Yes, dogs sometimes get Tramadol.

10:17:22   5   **Q**     It's crazy right off the bat --

10:17:22   6   **A**     Right.  So yeah, it's not unheard of.

10:17:22   7         Tramadol is a controlled substance.  It's a Schedule

10:17:26   8   IV, so it's not like it's -- you know, it can be called in,

10:17:30   9   you know.  Opioid prescriptions can't be phoned in.  So,

10:17:33   10   again, for it to be phoned in, it wasn't unusual.

10:17:38   11         It was a prescription that was left on my voicemail.

10:17:40   12   It -- the caller did not leave a DEA number, which is a

10:17:46   13   requirement for a call-in prescription.  For controlled

10:17:50   14   substance, you have to leave the DEA number.  And then there

10:17:54   15   was something just off about it.

10:18:00   16         The caller -- sometimes I can't explain what maybe a:

10:18:04   17   Red flag might be, but get kind of the sense that something

10:18:08   18   isn't right.

10:18:11   19         And so I called to verify with this veterinary clinic

10:18:16   20   the prescription; at which point, they told me that there

10:18:19   21   was no one by this name that had called in the prescription.

10:18:22   22   There was no one by this name that was a client.  And, so,

10:18:28   23   it was determined that the prescription was fraudulent.

10:18:30   24         And when the person came to pick up the prescription

10:18:34   25   for their dog, then I had -- I called law enforcement to let

**Stossel - Direct/Stoffelmayr**

10:18:40 1 them know there was someone coming to pick up a fraudulent

10:18:43 2 prescription in my drive-through.

10:18:44 3 **Q** And -- but weren't they long gone by the time the

10:18:47 4 police got there?

10:18:48 5 **A** No. No. Actually they weren't. We stalled them.

10:18:50 6 **Q** How did you do that?

10:18:52 7 **A** So it was just a technician and myself working on that

10:18:59 8 day. I alerted the technician about the name of the person

10:19:02 9 who would be coming to pick up, and when they got there, we

10:19:08 10 told them the price of the medication was, you know, this

10:19:11 11 amount of money, but would they like me to look up the cost

10:19:17 12 of the medication with one of the Good RX cards to save them

10:19:21 13 a little bit of money. And they said yes, of course.

10:19:26 14 They -- no one wants to pay the full price for a medication,

10:19:28 15 if possible.

10:19:30 16 We did that. We were able to stall them.

10:19:33 17 **Q** How long did you have to pretend to look up Good RX

10:19:36 18 pricing until the police got there?

10:19:38 19 **A** You know, it was probably -- Willoughby police are

10:19:42 20 great. So it probably was under, you know -- it felt like

10:19:46 21 forever, but it was probably under 10 minutes.

10:19:48 22 **Q** Is that the first or the only time you've worked

10:19:52 23 directly with police to help them -- help them apprehend

10:19:56 24 somebody?

10:19:56 25 **A** No, not at all.

**Stossel - Direct/Stoffelmayr**

10:19:57 1    **Q**     On occasions, I assume you've given them information

10:20:01 2    but they haven't brought down the offenders in the

10:20:04 3    drive-through or inside the store; correct?

10:20:06 4    **A**     Correct.  Correct.

10:20:08 5    **Q**     Law enforcement ever come to the store looking for

10:20:11 6    information, asking for your help with prescriptions for a

10:20:14 7    doctor or a patient they're looking at?

10:20:16 8    **A**     Yeah.  Sometimes they will come in and request to

10:20:20 9    photocopy prescriptions or looking for something.

10:20:25 10   **Q**     Has Walgreens ever done anything to discourage you

10:20:28 11   from reporting misconduct or from helping law enforcement

10:20:30 12   when they show up?

10:20:32 13   **A**     No.

10:20:34 14   **Q**     Last thing I want to ask you about is drug disposal.

10:20:38 15        Why is drug disposal so important?

10:20:41 16   **A**     Well, it's really great because it can keep opioids

10:20:45 17   out of the hands of other people who shouldn't be taking

10:20:48 18   them, especially -- I mean, I told you guys yesterday, I

10:20:54 19   have kids.  So, you know, the last thing I would want is for

10:20:59 20   my kids to be somewhere and get their hands on someone's

10:21:02 21   grandma's opioids in the pantry that they haven't used and,

10:21:09 22   you know, experiment with something they shouldn't.

10:21:12 23   **Q**     At your store on SOM Center Road, do you have one of

10:21:15 24   those take-back kiosk machines or -- not a machine, but it

10:21:20 25   looks like a huge book return thing bolted onto the floor?

Stossel - Direct/Stoffelmayr

10:21:23  1    **A**    Yeah.  Yeah.

10:21:24  2          So we have a medication, like take-back kiosk and,

10:21:28  3    yes, it looks like a library book return.  It's like a big

10:21:32  4    metal box.

10:21:35  5    **Q**    Do people actually use it?

10:21:37  6    **A**    People use it all day long at my store.

10:21:40  7    **Q**    How -- I mean, it's pretty big.  How often does it --

10:21:43  8    how long does it take to fill out up at a busy store like

10:21:47  9    yours?

10:21:48 10    **A**    It fills up about -- they come to -- they come to

10:21:51 11    change out the contents inside about every seven to ten days

10:21:56 12    at my store.

10:21:57 13    **Q**    Do you know what happens to all those medications?  Do

10:21:59 14    they get recycled somehow, reused?

10:22:02 15    **A**    No, not at all.

10:22:03 16          We asked them when they started coming and we got the

10:22:06 17    box installed, and the contents actually get incinerated.

10:22:09 18    **Q**    Did you say incinerated?

10:22:10 19    **A**    Incinerated, um-hmm.

10:22:12 20    **Q**    Okay.

10:22:12 21          Now, if I wanted to drop off medications at a -- at

10:22:18 22    your store, for example, in the box, do you charge me to do

10:22:24 23    that?

10:22:24 24    **A**    No.

10:22:25 25    **Q**    Do I have to at least show you that I'm a Walgreens

6888

**Stossel - Direct/Stoffelmayr**

10:22:27  1   patient?

10:22:27  2   **A**     No, not at all.  You can -- anyone can come in,

10:22:31  3   anywhere.

10:22:31  4   **Q**     So I can fill my prescription at Rite Aid or

10:22:34  5   Giant Eagle and dispose it at your Walgreens?

10:22:35  6   **A**     Correct.

10:22:36  7   **Q**     And last thing.

10:22:37  8        There are -- some Walgreens stores or plenty of

10:22:41  9   Walgreens stores that don't have one of these kiosks that

10:22:44  10  we're talking about; right?

10:22:45  11  **A**     Um-hmm.

10:22:46  12  **Q**     Is that right?

10:22:46  13  **A**     Right.  That's correct.  Yes.

10:22:48  14  **Q**     At a Walgreens store where you don't have one of those

10:22:51  15  kiosks, does Walgreens have anything else they offer to

10:22:54  16  patients to help them get rid of unwanted medications?

10:22:56  17  **A**     Yes.

10:22:57  18       So, Walgreens also offers these little packets called

10:23:01  19  RX disposal.  We have them at the specialty story I work at.

10:23:07  20  They're little packets.

10:23:09  21       You dump the packet into, like, a bottle of pills and

10:23:15  22  it hardens up like cement so that the medication cannot be

10:23:18  23  used again.  And then you can dump it in with your regular

10:23:22  24  trash.

10:23:22  25  **Q**     At that point, it's safe to throw in the trash?

**Stossel - Direct/Stoffelmayr**

10:23:25  1    **A**    Correct.

10:23:25  2    **Q**    How much do you charge for those packets?

10:23:26  3    **A**    Nothing.  They're free.

10:23:28  4              MR. STOFFELMAYR:  All right, Ms. Stossel.

10:23:29  5    Thank you so much.

10:23:30  6        Your Honor, I pass the witness, and we're probably at

10:23:32  7    the break time.

10:23:33  8              THE COURT:  Okay.

10:23:34  9        I think it's a good time for our mid-morning break.

10:23:38  10   Fifteen minutes.  Then we'll pick up with the balance of

10:23:40  11   Ms. Stossel's testimony.

10:23:43  12              (Jury excused from courtroom.)

10:25:04  13               (Off-record discussion.)

10:25:04  14              THE COURT:  The parties have worked out

10:25:08  15   P00459, P06672, and P20695.

10:25:31  16      (Recess was taken from 10:25 a.m. till 10:43 a.m.)

10:43:27  17              COURTROOM DEPUTY:  All rise.

10:43:53  18              MR. STOFFELMAYR:  Judge, may I raise one issue

10:43:55  19   before the jury comes in?

10:43:56  20              THE COURT:  Okay.  Yes.

10:43:57  21              MR. STOFFELMAYR:  This relates -- a little bit

10:44:01  22   to the discussion this morning.  It can't possibly be me.

10:44:11  23      I don't know if you want the witness in the room since

10:44:22  24   Ms. Stossel's been on the stand --

10:44:23  25        Since Ms. Stossel's been on the stand this morning, we

**Stossel - Direct/Stoffelmayr**

10:44:38  1    received a revised witness list.  The rule is 7:00 p.m. the

10:44:42  2    night before for new exhibits that were not on the original

10:44:46  3    exhibit list.  So I don't think it's fair to examine her on

10:44:50  4    exhibits disclosed --

10:44:51  5                THE COURT:  We'll have to do this another

10:44:53  6    time.

10:44:55  7                    (Jury returned to courtroom.)

10:45:14  8                THE COURT:  All right.  Please be seated.  I

10:45:16  9    guess we got to go on the headphones for a minute.

10:45:23 10                    (Proceedings at sidebar.)

10:45:34 11                THE COURT:  Mr. Stoffelmayr, you were talking

10:45:35 12    about a revised witness list.

10:45:38 13                MR. STOFFELMAYR:  I'm sorry.

10:45:39 14                THE COURT:  Did you mean exhibit list?

10:45:40 15                MR. STOFFELMAYR:  I meant exhibit list, you're

10:45:43 16    right.  We received a revised exhibit list while I was

10:45:46 17    questioning Ms. Stossel.

10:45:47 18         Obviously, I haven't had a chance to review, but the

10:45:49 19    rule is 7:00 p.m. the night before for documents to be used

10:45:52 20    on cross-examination.

10:45:54 21                THE COURT:  Well, unless it's for impeachment,

10:45:56 22    so I don't know.

10:45:57 23                MR. LANIER:  And that's what it is.

10:45:58 24         Your Honor, Ms. Fitzpatrick made the decision that

10:46:01 25    there's a good likelihood I'll need to use those, and she

6891

**Stossel - Direct/Stoffelmayr**

| | | |
|---|---|---|
| 10:46:04 | 1 | made the decision to let's go ahead and add them to the list |
| 10:46:07 | 2 | so that the other side will know.  But hopefully I won't |
| 10:46:10 | 3 | need to impeach her on them and I won't use them at all. |
| 10:46:13 | 4 | But I didn't have to list them last night if I use |
| 10:46:15 | 5 | them for impeachment and we'll just have to see if she gives |
| 10:46:18 | 6 | me the testimony or if I need to impeach her. |
| 10:46:21 | 7 | THE COURT:  All right. |
| 10:46:21 | 8 | MR. STOFFELMAYR:  That's actually not the way |
| 10:46:23 | 9 | the order is written.  The 7:00 p.m. disclosure is for all |
| 10:46:26 | 10 | documents not on the exhibit list.  The impeachment |
| 10:46:29 | 11 | exception permits that they may not have been on the exhibit |
| 10:46:31 | 12 | list but it doesn't excuse disclosing -- |
| 10:46:35 | 13 | MR. LANIER:  Actually, Your Honor, you saw |
| 10:46:37 | 14 | that this morning.  It's the first sentence. |
| 10:46:39 | 15 | THE COURT:  I saw the language.  Let's just |
| 10:46:41 | 16 | move on, please. |
| 10:46:42 | 17 | MR. STOFFELMAYR:  Thank you. |
| 10:46:44 | 18 | (Proceedings resumed in open court.  ) |
| 10:46:44 | 19 | THE COURT:  Okay. |
| 10:46:45 | 20 | Ms. Stossel, I just want to remind you you are still |
| 10:46:47 | 21 | under oath from before the break.  And, Mr. Lanier, you may |
| 10:46:52 | 22 | cross-examine. |
| 10:46:53 | 23 | MR. LANIER:  Thank you, Your Honor. |
| 10:46:53 | 24 | |
| | 25 | |

**Stossel - Cross/Lanier**

<u>CROSS-EXAMINATION OF AMY STOSSEL</u>

BY MR. LANIER

**Q**    Hello, Ms. Stossel.  My name is Mark Lanier.  It's a pleasure to meet you.

I've not met you before.  Fair?

**A**    Correct.

**Q**    All right.

I've got some questions for you.  I've got a road map, but before we get to the road map, I want to try something out here.

First of all, I have evidently being saying Mr. Demangone's name wrong.  How do you pronounce it?

**A**    Demangone.

**Q**    Demangone?

**A**    Um-hmm.

**Q**    Got it.  Dr. Demangone.

Are you familiar with this (indicating)?

**A**    I'm sorry.  I can't --

**Q**    Can you see it?  Here, I'll put it on the ELMO, or the WolfVision.

It's a water bottle.  Juan cut off the top.

**A**    Oh, okay.

**Q**    Yeah.

Now, if I wanted to take a bunch of paper clips and put them in there, I could do that.  But it's not real easy

**Stossel - Cross/Lanier**

10:47:55 1    just to take them and put them in like that, is it?

10:48:00 2        You know what would help me substantially?

10:48:04 3    **A**    Okay.

10:48:05 4    **Q**    You got any clue what might help me?

10:48:08 5    **A**    I'm not certain.

10:48:09 6    **Q**    A funnel.  Made one out of card stock.

10:48:14 7        Look, you take a funnel, you could put them right

10:48:18 8    there.  You might have to shake it a little bit, but they

10:48:23 9    all go in.

10:48:24 10       Do you see that?  I'm sorry, I can't hear you.  Can

10:48:30 11   you see that?

10:48:31 12   **A**    I can see that, yes.

10:48:32 13   **Q**    Okay.

10:48:34 14       Y'all at Walgreens are the funnel for the

10:48:40 15   prescriptions of Dr. Demangone, aren't you?

10:48:46 16   **A**    So we fill prescriptions for a lot of different

10:48:50 17   doctors; Dr. Demangone being one of them.

10:48:52 18   **Q**    Um-hmm.

10:48:52 19       And I say that because we saw an exhibit that was

10:48:55 20   entered into evidence the other day that Dr. Demangone keeps

10:48:59 21   his picture in his window these days.  It's CVS 4243.

10:49:07 22       "Until further notice, do not fill prescriptions at

10:49:10 23   CVS and Walmart."

10:49:12 24       Did you know that's in his window?

10:49:14 25   **A**    I've never been to his office.  I didn't know that's

**Stossel - Cross/Lanier**

10:49:18  1   in his window.

10:49:22  2   **Q**    But it's okay to go fill them at Walgreens because you

10:49:25  3   personally will fill them, won't you?

10:49:29  4   **A**    I have filled prescriptions for Dr. Demangone at my

10:49:32  5   store.

10:49:32  6   **Q**    Well, you've not only filled them, you have filled

10:49:35  7   more prescriptions for Dr. Demangone than you have for any

10:49:40  8   other doctor; more opiate prescriptions than you have any

10:49:43  9   other doctor.

10:49:45  10          True?

10:49:47  11  **A**    I don't have that information.

10:49:49  12  **Q**    Would you be surprised to find out that you have

10:49:51  13  personally filled over 25,000 dosage units for

10:49:57  14  Dr. Demangone?

10:49:58  15  **A**    No, I probably wouldn't.

10:49:59  16  **Q**    And when we talk about the funnel, did you know that

10:50:07  17  Walgreens has filled over 2.7 million dosage units of this

10:50:15  18  doctor that's got a block at CVS and Walmart now?

10:50:22  19  **A**    I wouldn't have that information.

10:50:24  20  **Q**    All right.

10:50:28  21          And you say you wouldn't have that information.  Does

10:50:31  22  Walmart not -- I mean, does Walgreens, excuse me,

10:50:37  23  Mr. Majoras -- does Walgreens not tell you how many

10:50:40  24  prescriptions y'all are filling for this doctor?

10:50:44  25  **A**    I would not get that information from Walgreens, no.

**Stossel - Cross/Lanier**

10:50:48  1   **Q**    Would it not occur to you you did not know that other

10:50:52  2   chain pharmacies had put him on a block?

10:50:57  3   **A**    No.

10:51:00  4   **Q**    Okay.

10:51:01  5        Well, then here's the -- by the way, you are something

10:51:06  6   not any other witness in this trial has ever been after all

10:51:10  7   these weeks.  Did you know that?  You're the last witness.

10:51:15  8        Nothing nefarious.  You're the last witness.  Nobody

10:51:18  9   else can be the last witness if you are.

10:51:21 10        So I've got some questions for you, but I'm going to

10:51:24 11   try to move through with some haste so that we can finish

10:51:29 12   your examination.  Okay?

10:51:30 13   **A**    Sure.

10:51:30 14   **Q**    And, Ms. Stossel, the road map I've got for you are

10:51:33 15   three stops, and these are my words for the way I see the

10:51:37 16   world.  I don't expect anybody to agree with me from you or

10:51:40 17   Walgreens.

10:51:42 18        But stop Number 1, I want to talk about a couple of

10:51:46 19   bad questions.

10:51:47 20        Stop Number 2, we're going to talk about bad timing.

10:51:51 21        And Stop Number 3, we're going to talk about bad

10:51:54 22   results.  Okay?

10:51:56 23   **A**    Sure.

10:51:57 24   **Q**    All right.  Let's start then with the bad questions.

10:52:06 25        The Walgreens attorney, Mr. Stoffelmayr, asked you

**Stossel - Cross/Lanier**

10:52:12  1    some questions yesterday and he started out in an

10:52:17  2    introduction.  And he made a reference to others who may

10:52:22  3    have held the job, sort of obliquely, but then he said to

10:52:26  4    you, "You will be the first time the jurors have actually

10:52:29  5    met a real live working Walgreens pharmacist."

10:52:35  6         Do you remember that from Mr. Stoffelmayr?

10:52:38  7    **A**    Yes.

10:52:38  8    **Q**    Now, you're certainly not the first time the jury's

10:52:42  9    met a real live working Walgreens pharmacist, at least in

10:52:47 10    terms of people who had previously held that job.

10:52:50 11         You understand that?

10:52:51 12    **A**    Okay.

10:52:52 13    **Q**    And so, for example, the jury heard Mr. Weinberger

10:52:59 14    take on examination Brian Joyce.

10:53:02 15         Do you know Mr. Joyce?

10:53:03 16    **A**    I've met Mr. Joyce before.

10:53:04 17    **Q**    And did you know that he maintains a pharmacy license

10:53:07 18    and actually works as a pharmacist in a number of different

10:53:10 19    stores?

10:53:10 20    **A**    Okay.

10:53:11 21    **Q**    Is that new to you?

10:53:12 22    **A**    No.

10:53:14 23    **Q**    So when you are answering questions as Mr. Stoffelmayr

10:53:20 24    calls you the first time the jurors have met a real life

10:53:25 25    working Walgreens pharmacist, you're not saying that there's

10:53:29  1    anything less than reality with Mr. Joyce.  Fair?

10:53:36  2    **A**    No.

10:53:38  3    **Q**    And by the same token, the jury heard extensively from

10:53:45  4    Tasha Polster, who was a staff pharmacist and a pharmacy

10:53:48  5    manager and a pharmacy supervisor and still maintains her

10:53:52  6    pharmacy license as well.

10:53:54  7         Do you know who Tasha Polster is?

10:53:57  8    **A**    I recognize the name.

10:53:59  9    **Q**    Did you know that she's actually in the home office, I

10:54:04 10    believe, trying to make sure that the policies are not only

10:54:08 11    correct, that the tools are provided, but that people follow

10:54:13 12    those policies and are trained on them?

10:54:15 13         Did you know about her job?

10:54:16 14    **A**    Correct.

10:54:21 15    **Q**    And then one other question I want to look at before

10:54:23 16    we move to the timing questions is you were asked by the

10:54:29 17    Walgreens attorney, is there any list of circumstances where

10:54:34 18    you would say 100 percent of the time, that's a red flag and

10:54:38 19    I'm uncomfortable.  And your answer was no.

10:54:41 20         Are you sure about that?

10:54:42 21    **A**    I'm sure.

10:54:43 22    **Q**    All right.

10:54:44 23         So it would not bother you if the patient is visibly

10:54:48 24    intoxicated.  Fair?

10:54:52 25    **A**    I don't think that that's true.  If the patient's

**Stossel - Cross/Lanier**

10:54:54　1    visibly intoxicated, that would lead to another series of

10:54:58　2    questions.

10:55:02　3    **Q**    But that would not be a red flag that a hundred

10:55:06　4    percent of the time, you're not going to dispense.

10:55:08　5        Fair?

10:55:08　6    **A**    It would, of course, be a red flag.

10:55:10　7    **Q**    Would it be one that says to you, I'm not dispensing

10:55:14　8    to this person who's tanked right now?

10:55:16　9    **A**    It would be a red flag to me.

10:55:18　10   **Q**    I'm not asking if it's a red flag.  I'm asking if it's

10:55:21　11   one that would stop -- an unresolvable red flag, as the DEA

10:55:26　12   calls it, where you can't resolve it and dispense.

10:55:29　13   **A**    It would quite possibly be an unresolvable red flag.

10:55:34　14   **Q**    So in answer to Mr. Stoffelmayr's question, "Is there

10:55:38　15   any list of circumstances where you'd say a hundred percent

10:55:40　16   of the time, that's a red flag," you said no, maybe we

10:55:45　17   should change that.

10:55:46　18       Fair?

10:55:48　19   **A**    I think I still stick by my answer.

10:55:50　20   **Q**    All right.

10:55:51　21       So a hundred percent of the time, you won't say that

10:55:53　22   if somebody is fall-down drunk, that that stops you from

10:55:59　23   giving him opiates.  Fair?

10:56:01　24   **A**    I think if someone's falling down drunk, I'm not going

10:56:04　25   to dispense opiate prescriptions to them.

Stossel - Cross/Lanier

10:56:06  1   **Q**     Okay.

10:56:06  2          So in that situation, you can say that at least that

10:56:10  3   100 percent of the time, that's a red flag.

10:56:12  4          Fair?

10:56:13  5   **A**     So that is a red flag, correct.

10:56:15  6   **Q**     What if a person's demonstrating withdrawal symptoms?

10:56:19  7   **A**     So I think it's kind of hard to visibly tell whether

10:56:24  8   someone is having withdrawal symptoms if they're presenting

10:56:30  9   to your pharmacy counter.

10:56:31 10   **Q**     So you may not know.

10:56:32 11          What if someone presents two of the exact same opioid

10:56:36 12   prescriptions, they give you two prescriptions for two

10:56:42 13   30-day doses of the same OxyContin?  Would that be a

10:56:50 14   100 percent of the time red flag?

10:56:51 15   **A**     So you're not going to fill two prescriptions for two

10:56:54 16   OxyContin prescriptions at the same time.

10:56:55 17   **Q**     What if they were written by different doctors?

10:56:59 18   **A**     But you still are not going to fill two prescriptions

10:57:02 19   for two OxyContins at the same time.

10:57:04 20   **Q**     What if they were written a day apart?

10:57:07 21   **A**     You're not going to fill two prescriptions.

10:57:09 22   **Q**     So you would say that that's a circumstance where a

10:57:12 23   hundred percent of the time, it's a red flag?  Fair?

10:57:15 24   **A**     That's fair.

10:57:16 25   **Q**     What about a fraudulent prescription?  Isn't that

**Stossel - Cross/Lanier**

10:57:20  1    100 percent of the time something you won't dispense?

10:57:25  2    **A**    Correct.

10:57:26  3    **Q**    What about a doctor who's prescribing an obscene

10:57:30  4    amount of opioids as the Ohio Board of Pharmacy

10:57:37  5    ex-investigator said, "enough to kill an elephant,"

10:57:41  6    quote/unquote?

10:57:42  7        Would that be a red flag that's a hundred percent of

10:57:44  8    the time a red flag to you?

10:57:45  9    **A**    No.

10:57:46  10                   MR. STOFFELMAYR:  Objection.

10:57:47  11   **Q**    No?

10:57:48  12                   THE COURT:  Overruled.

10:57:49  13   **Q**    Did you just say no?

10:57:50  14   **A**    No.

10:57:52  15   **Q**    Okay.  What if someone is clearly doctor shopping?

10:57:58  16       If they are clearly doctor shopping, it's obvious from

10:58:03  17   OARRS, is that 100 percent of the time a red flag to you

10:58:05  18   that would stop you from dispensing?

10:58:07  19   **A**    It would be a red flag.

10:58:08  20   **Q**    But 100 percent of the time, is it one that you say no

10:58:12  21   to?

10:58:13  22   **A**    It would have to be a clear -- it would have to be

10:58:17  23   clearly that they were doctor shopping.  You can't always

10:58:21  24   tell from OARRS whether someone is doctor shopping or

10:58:25  25   whether someone is seeing different physicians for different

**Stossel - Cross/Lanier**

10:58:28  1    things.

10:58:29  2    **Q**    Yeah.

10:58:30  3         I think people clearly have figured out how to game

10:58:33  4    the system some.  Wouldn't you agree with that?

10:58:36  5    **A**    No, I don't -- I don't think that that's true.

10:58:39  6    There's --

10:58:39  7    **Q**    Okay.

10:58:41  8         Let's go then to the next stop on the road, which is

10:58:43  9    bad timing.

10:58:46  10        And one of the joys for you and the jury as we go

10:58:51  11   through this, the jury has sat through weeks and weeks and

10:58:53  12   week, they have asked incredible questions that show I could

10:58:57  13   sit down, they could do my cross for me, but it allows us to

10:59:01  14   go pretty quickly through here because I don't need to

10:59:03  15   rehash everything fully.

10:59:05  16        Okay?

10:59:05  17   **A**    Sure.

10:59:05  18   **Q**    All right.  So bad timing.

10:59:08  19        You gave a lot of testimony about a lot of things

10:59:21  20   going on at Walgreens, the way you do things, et cetera;

10:59:27  21   right?

10:59:27  22   **A**    Yes.

10:59:27  23   **Q**    What I'd like do at the first part of this is make it

10:59:32  24   real clear, based upon your answers, if there be any doubt

10:59:37  25   in the jury's mind, you are testifying that the law has not

6902

**Stossel - Cross/Lanier**

10:59:42  1    been evolving when it comes to issues of red flags and how

10:59:46  2    you handle them; rather, Walgreens compliance has been

10:59:55  3    evolving.

10:59:56  4        Is that fair to say?

10:59:57  5              MR. STOFFELMAYR:  Objection.

10:59:58  6              THE COURT:  Overruled.

11:00:01  7        From her understanding.

11:00:04  8              MR. LANIER:  Yeah.

11:00:04  9              THE COURT:  She can testify to that.

11:00:05  10             MR. LANIER:  Thank you, Your Honor.

11:00:06  11             THE WITNESS:  So I think neither -- neither

11:00:09  12   the law has been evolving nor the compliance has been

11:00:17  13   evolving.

11:00:17  14   BY MR. LANIER:

11:00:17  15   **Q**    Okay.  Fair.

11:00:18  16   **A**    I've been doing the same thing in my 25 years at

11:00:21  17   Walgreens as far as red flags are concerned.

11:00:23  18   **Q**    You don't do it any differently today than you did

11:00:26  19   25 years ago, do you?

11:00:27  20   **A**    That's correct.

11:00:28  21   **Q**    You haven't learned anything new, you haven't got

11:00:32  22   anything new to apply.  You've been doing it the same way

11:00:36  23   for 25 years.

11:00:37  24        Fair?

11:00:37  25   **A**    As far as red flags are concerned, those red flags

6903

**Stossel - Cross/Lanier**

11:00:40 1  have not changed in the 25 years that I've worked at

11:00:44 2  Walgreens.

11:00:45 3  **Q**   So the 1998 good faith practicing exhibit that you and

11:00:56 4  Mr. Stoffelmayr set in front of this jury as Exhibit 304 --

11:01:02 5  whoops, no.

11:01:04 6              MR. STOFFELMAYR:  18.

11:01:05 7  BY MR. LANIER:

11:01:06 8  **Q**   It was exhibit -- hold on.

11:01:08 9              MR. STOFFELMAYR:  18.

11:01:11 10              MR. LANIER:  MDL 18.

11:01:13 11  **Q**   Remember this?

11:01:14 12  **A**   Yes.

11:01:15 13  **Q**   There's no reason this couldn't have been done years

11:01:18 14  earlier.  True?

11:01:23 15  **A**   As far as what?  As far as the policy?

11:01:25 16  **Q**   Yeah.  Because this is stuff you'd known since school,

11:01:30 17  right?

11:01:31 18  **A**   But I'm -- but I'm still practicing with these red

11:01:42 19  flags, the minute that I got out of school, the minute I'm

11:01:45 20  in school.  I don't need a policy to tell me that I need to

11:01:49 21  be aware of red flags.

11:01:51 22  **Q**   No.  But that's not my point, ma'am.

11:01:53 23      The company put this policy out in 1998, and it's your

11:02:00 24  testimony to the jury the company could have put this out

11:02:03 25  years earlier because you already knew all this stuff;

**Stossel - Cross/Lanier**

11:02:07  1   right?

11:02:09  2   **A**   But I -- I don't work for the part of the company that

11:02:13  3   makes the policies.

11:02:14  4   **Q**   That wasn't my question, ma'am.

11:02:16  5   My question is, from your perspective, this could have

11:02:19  6   been done earlier because you knew about this stuff long

11:02:24  7   before this, didn't you?

11:02:27  8   **A**   I've always known about this information, but I

11:02:29  9   don't -- I don't know about the other part.

11:02:32  10   **Q**   So the idea of the company issuing this as a revised

11:02:37  11   version in 1998, there's no reason that you can think of why

11:02:43  12   the company shouldn't have done it earlier.

11:02:45  13   Fair?

11:02:46  14   **A**   Sure.

11:02:47  15   **Q**   All right.

11:02:49  16   So 1998, good faith practices could have been earlier?

11:02:53  17   By the same token, in 2012 the company issued WAG

11:03:01  18   Document 304, which was this controlled substance

11:03:07  19   prescriptions and Good Faith Dispensing Policy; correct?

11:03:12  20   **A**   Correct.

11:03:13  21   **Q**   And it's your testimony to the jury the company didn't

11:03:18  22   need to wait until 2012 to do this; the company could have

11:03:24  23   done this in the mid '90s; right?

11:03:29  24   **A**   No.

11:03:30  25   My testimony is that I've always been doing this.

**Stossel - Cross/Lanier**

11:03:33  1   I -- I don't have any idea what the company could or

11:03:36  2   couldn't do prior to 2012.

11:03:38  3   **Q**    Well, in terms of having the knowledge to do it,

11:03:41  4   you're saying that this is knowledge that the company

11:03:44  5   certainly would have had.  They could have just asked you

11:03:48  6   because this is stuff you were doing from the mid 1990s.

11:03:52  7        Nothing new here; correct?

11:03:54  8   **A**    But I just work at the store.  I don't work at the

11:03:57  9   corporate office.  So I don't have any idea what their

11:04:00  10  practices were there.  I don't -- I don't have any bearing

11:04:04  11  on that.

11:04:07  12  **Q**    So does what the company policies are that issue from

11:04:12  13  home office, do they not affect you on the store level?

11:04:16  14  **A**    Of course company policies affect me at the store

11:04:19  15  level.

11:04:19  16  **Q**    And you understand those policies are there to train

11:04:23  17  and to reinforce Good Faith Dispensing; right?

11:04:31  18  **A**    Correct, but I've been doing Good Faith Dispensing

11:04:34  19  since I got my pharmacy license.

11:04:35  20  **Q**    In your mind, that's what -- all right.  Time out.

11:04:39  21  Strike that, Your Honor.

11:04:40  22       I will talk about your dispensing in a moment, but

11:04:46  23  right now, I just want to make sure that everyone is

11:04:50  24  abundantly clear.  It's your testimony that there's nothing

11:04:53  25  in here (indicating), Exhibit 304, that you didn't know

**Stossel - Cross/Lanier**

11:04:58  1   about 15-plus years earlier.  Fair?

11:05:04  2   **A**    Sure.

11:05:05  3   **Q**    Okay.

11:05:14  4        Now, as we continue to walk through this, you

11:05:18  5   understand that the company did get in a substantial amount

11:05:22  6   of trouble because of its practices at various pharmacies;

11:05:27  7   correct?

11:05:28  8   **A**    I don't have that information.

11:05:30  9   **Q**    I'm sorry?

11:05:31 10   **A**    I don't have that information.

11:05:32 11   **Q**    You didn't know about the settlement agreements your

11:05:37 12   company entered into with the DEA while you were practicing

11:05:40 13   at the company?

11:05:41 14   **A**    No.

11:05:43 15   **Q**    The jury will recall when they heard from Tasha

11:05:49 16   Polster that Tasha Polster said that periodic training of

11:05:54 17   all Walgreens employees for dispensing controlled

11:05:58 18   substances, that training didn't exist in 2010.

11:06:03 19        Do you recall being trained on that while at Walgreens

11:06:08 20   before 2010?

11:06:12 21   **A**    I don't know.

11:06:16 22   **Q**    And when Ms. Polster testified about the agreement

11:06:23 23   that was reached with the DOJ and the DEA in January,

11:06:27 24   February, March, April of '11, again, that's something they

11:06:32 25   never told you about and you didn't know about it.

6907

Stossel - Cross/Lanier

11:06:35  1          Fair?

11:06:36  2    **A**    Yeah, I don't have that information.

11:06:38  3    **Q**    And the idea that your company's policies needed

11:06:43  4    updating in the 2012 range, that's something that's new to

11:06:48  5    you also.

11:06:48  6          Fair?

11:06:49  7                MR. STOFFELMAYR:  Objection.

11:06:50  8                THE COURT:  Overruled.

11:06:53  9                THE WITNESS:  I -- I don't have information at

11:06:55 10    the store level about company policies or when they make

11:06:59 11    them or -- or what they're doing with company policies.

11:07:03 12    BY MR. LANIER:

11:07:04 13    **Q**    But when they're building from the ground up, to

11:07:10 14    develop, change, and improve policies and procedures around

11:07:14 15    controlled substance dispensing, that is certainly a matter

11:07:17 16    that does affect you on the store level, doesn't it?

11:07:21 17                MR. STOFFELMAYR:  Objection.  It

11:07:27 18    mischaracterizes.

11:07:28 19                THE COURT:  Overruled.

11:07:28 20                THE WITNESS:  Of course policies affect me at

11:07:29 21    the store level.

11:07:31 22    BY MR. LANIER:

11:07:31 23    **Q**    And procedures around controlled substance dispensing,

11:07:33 24    that only happens at a store level, doesn't it?

11:07:39 25    **A**    Procedures do happen at the store level, yes.

**Stossel - Cross/Lanier**

11:07:41  1  **Q**     And the dispensing happens at a store level.  They

11:07:44  2  don't dispense out of the home office, do they?

11:07:47  3  **A**     That's correct.

11:07:54  4  **Q**     And so when Ms. Polster came and had an entire box of

11:07:58  5  refusals to fill, paper copies that she came in here and

11:08:02  6  pointed out to the jury, did you have any chance to be

11:08:05  7  involved in putting those paper refusals to fill together

11:08:08  8  for her?

11:08:09  9  **A**     No.

11:08:11 10  **Q**     In those, the jury had a chance to see plaintiffs'

11:08:16 11  22946, which is a refusal to fill document.  It shows an

11:08:23 12  OARRS report attached with a number of different fills at

11:08:27 13  Walgreens.

11:08:29 14       Did you bother to look at any of those paper refusals

11:08:32 15  to fill before you offered your testimony about how you've

11:08:39 16  done it at yours, understanding you had no obligation to do

11:08:43 17  so?  I'm just asking if you did so.

11:08:45 18  **A**     I don't have any information about Ms. Polster's

11:08:48 19  testimony.

11:08:54 20  **Q**     Okay.

11:08:54 21       Among that box was a sheet that asked this question.

11:08:56 22  This is Plaintiffs' Exhibit 17260.  Do we still have a GFD

11:09:02 23  refusal folder?  Couldn't find it.

11:09:06 24       Do you have one in your store?

11:09:08 25  **A**     There is one my store.

11:09:09 1    **Q**    And is it behind the counter where you are?

11:09:12 2    **A**    It is in a Bankers Box in our pharmacy.

11:09:16 3    **Q**    In the pharmacy.  Is it under lock and key?

11:09:18 4    **A**    No.

11:09:27 5    **Q**    Now, in terms of the timing issue, while we've covered

11:09:30 6    the idea that there's no reason why these policies couldn't

11:09:34 7    have been in place earlier, I want to ask you about some of

11:09:36 8    them that are in place now and some of the tools in place

11:09:39 9    now.

11:09:39 10       Okay?

11:09:40 11   **A**    Sure.

11:09:41 12   **Q**    So you spoke about steps to fill prescriptions.  I

11:09:46 13   think it was this document here (indicating)?

11:09:48 14   **A**    Um-hmm.

11:09:49 15   **Q**    Remember?

11:09:50 16   **A**    Yes.

11:09:51 17   **Q**    Now, this is the steps to do it today; correct?

11:09:54 18   **A**    Correct.

11:09:55 19   **Q**    This is not the steps to fill a controlled substance

11:10:00 20   prescription 10 years ago, 20 years ago, or 25 years ago.

11:10:06 21       Fair?

11:10:09 22   **A**    It -- it actually -- it actually is the same.

11:10:14 23   **Q**    Well, you say it's the same.  There's a whole

11:10:19 24   different set of tools involved.  For example, Good Faith

11:10:26 25   Dispensing review.

6910

**Stossel - Cross/Lanier**

11:10:26  1        Do you see that?

11:10:27  2    **A**    Correct, but I'm not sure what you're meaning by new

11:10:32  3    tool for that.

11:10:33  4    **Q**    Well, what I'm meaning is, Tasha Polster told us that

11:10:38  5    the Good Faith Dispensing was rolled out in April of 2013.

11:10:46  6                 MR. STOFFELMAYR:  Objection.

11:10:47  7    BY MR. LANIER:

11:10:47  8    **Q**    The Target Drug Good Faith Dispensing -- excuse me.

11:10:51  9        Is that true?

11:10:52 10    **A**    I've been doing Good Faith Dispensing since I got my

11:10:56 11    pharmacy license.  I don't think that there was a specific

11:11:01 12    year that Good Faith Dispensing was rolled out.

11:11:05 13    **Q**    Well, let me show you a document that we used with

11:11:09 14    her.  It's Plaintiffs' Exhibit 17177, and the jury's seen

11:11:24 15    this.  So I won't spend a lot of time on it.  But it speaks

11:11:27 16    of the National Target Drug Good Faith Dispensing Policy

11:11:32 17    that's intended to be a supplemental policy which will aid

11:11:37 18    pharmacists in determining if a controlled substance

11:11:40 19    prescription for a specific subset of narcotics has been

11:11:45 20    written for a legitimate medical purpose.

11:11:47 21        Do you see where it says that?

11:11:49 22    **A**    Correct.

11:11:49 23    **Q**    This policy will aid in strengthening DEA regulations

11:11:54 24    that state the pharmacist has a corresponding

11:12:01 25    responsibility.

6911

Stossel - Cross/Lanier

11:12:01 1       Do you see that as well?

11:12:02 2   A   Yes.

11:12:02 3   Q   And it talks about this rollout happening in the

11:12:07 4   National Target Good Faith Dispensing Policy is in effect as

11:12:11 5   of April 2013.

11:12:14 6       Do you see that, ma'am?

11:12:15 7   A   I do.

11:12:16 8   Q   So there's certainly been some changes that have taken

11:12:19 9   place over the years.

11:12:21 10      Fair?

11:12:22 11  A   Sure.

11:12:23 12  Q   And by the same token, while you can do today with Mr.

11:12:31 13  Stoffelmayr, there are also some other things that you

11:12:34 14  showed the jury that are applicable today as opposed to

11:12:38 15  earlier.

11:12:38 16      Fair?

11:12:41 17  A   I'm not sure what you're meaning.

11:12:43 18  Q   Well, what I'm talking about is these screenshots you

11:12:47 19  gave us.  Remember the screenshots?

11:12:51 20  A   Yes.

11:12:54 21  Q   This screen process, data review?

11:12:58 22  A   Okay.

11:12:58 23  Q   And by the way, when I said fake, I did not mean that

11:13:01 24  this whole process is made up.  I understand this is what

11:13:04 25  you do today.  Right?

**Stossel - Cross/Lanier**

11:13:06  1    **A**     That's correct.

11:13:06  2    **Q**     But this data is fake data (indicating).  Right?

11:13:10  3    **A**     Right.  Just for example purposes.

11:13:13  4    **Q**     Yeah.  That's all I -- that's all I --

11:13:16  5    **A**     We couldn't use real patient information.  That would

11:13:20  6    violate HIPAA.

11:13:21  7    **Q**     Yeah.  I think Mr. Stoffelmayr may have taken umbrage

11:13:24  8    over me using the word "fake."  I just mean this isn't real,

11:13:28  9    this is fake, isn't it?

11:13:29 10    **A**     Right.  It's just an example.

11:13:30 11    **Q**     Right.

11:13:31 12          But this is an example of the way things are today,

11:13:34 13    isn't it?

11:13:36 14    **A**     Correct.  Yeah, that's when I see when I log into my

11:13:39 15    computer screen, sure.

11:13:40 16    **Q**     Yeah.  Today there's some really helpful tools that

11:13:43 17    you guys have; right?

11:13:46 18    **A**     Sure.  Yes.

11:13:53 19    **Q**     But those tools didn't always exist in Walgreens

11:13:58 20    pharmacies, as the jury's heard through other witnesses.

11:14:01 21          Fair?

11:14:02 22    **A**     Right, that's fair.

11:14:03 23    **Q**     Then Mr. Stoffelmayr asked you about have you ever had

11:14:05 24    reason to delete anything in the notes field, and you

11:14:13 25    laughed.  Remember?

11:14:13 1   **A**    I don't think I laughed about that, actually.

11:14:15 2   **Q**    I thought -- I thought you specifically said you found

11:14:20 3   that funny, but maybe I'm thinking of something different.

11:14:23 4   **A**    Um-hmm.

11:14:23 5   **Q**    I do know that you said, "In my 25 years at Walgreens,

11:14:31 6   I've never had the occasion to remove a comment" -- hang on.

11:14:34 7   Let me highlight this. That's a joke.

11:14:38 8      I've -- "I've never had the occasion to remove a

11:14:42 9   comment for something that's important information."

11:14:47 10      You said you -- he asked, "You've never run out of

11:14:50 11   room in the patient comment field?"

11:14:52 12      Your answer was, "I've never had the occasion to

11:14:55 13   remove anything that's important."

11:15:01 14   **A**    Um um-hmm.

11:15:02 15   **Q**    That was before he said that -- these referencing me

11:15:05 16   saying these are fake.

11:15:06 17      My question to you is, and you'll excuse me for being

11:15:08 18   a little -- I'm going lawyer on you here?

11:15:08 19   **A**    Um-hmm.

11:15:11 20   **Q**    But you kind of hedged in those answers.

11:15:13 21      Have you ever deleted anything from the notes fields?

11:15:15 22   **A**    I've deleted something from the notes fields

11:15:18 23   previously.

11:15:18 24   **Q**    Okay. Thank you.

11:15:21 25      And you're aware of the fact that there's been a

### Stossel - Cross/Lanier

11:15:23 1  policy on deletions in the note field at your company;

11:15:29 2  right?

11:15:30 3  MR. STOFFELMAYR:  Objection.

11:15:31 4  THE COURT:  Overruled.

11:15:37 5  BY MR. LANIER:

11:15:37 6  Q     Let me hand to you Plaintiff's Exhibit --

11:15:39 7  THE COURT:  Well, she hasn't answered the

11:15:41 8  question.

11:15:41 9  MR. LANIER:  Yeah.

11:15:41 10  THE COURT:  So I overruled.  You may answer,

11:15:43 11  ma'am.

11:15:43 12  MR. LANIER:  Thank you, Judge.

11:15:44 13  THE WITNESS:  I'm not -- I'm not sure what

11:15:46 14  that policy is.

11:15:47 15  BY MR. LANIER:

11:15:47 16  Q     All right.

11:15:47 17  Then I'll hand you -- or have handed to you by

11:15:50 18  Ms. Fleming Plaintiffs' Exhibit 20801.  The jury has seen

11:15:53 19  this document so we won't spend a lot of time on it, but it

11:15:57 20  goes back to 2013 where the question was asked, "Will the

11:16:01 21  patient comment field on the patient profile be expanded to

11:16:06 22  hold the usual comments plus the new Target Drug Good Faith

11:16:12 23  Dispensing comments?  We are running out of room on some

11:16:16 24  patients already."

11:16:17 25  Do you see that question?

<b>Stossel - Cross/Lanier</b>

11:16:19  1    **A**    That's what I'm looking for.

11:16:22  2    **Q**    It's the very first question on that bottom e-mail on

11:16:27  3    Page 1.

11:16:28  4    **A**    Um-hmm.

11:16:28  5    **Q**    Do you see it?

11:16:30  6    **A**    Yeah, I see it now.

11:16:31  7    **Q**    And then the answer is given, "Please abbreviate as

11:16:33  8    needed."

11:16:34  9    **A**    Right.

11:16:34 10    **Q**    "And delete older comments or refusals from the

11:16:39 11    patient profiles to keep the notes current and accurate."

11:16:43 12          Do you see that?

11:16:44 13    **A**    Yes, I see that.  I see the e-mail.

11:16:47 14    **Q**    Yeah.  Refusals.  Deleting refusals to fill.

11:16:55 15          From a pharmacist's perspective, that's not a great

11:17:02 16    policy, is it?

11:17:02 17    **A**    I'm not sure that that's a policy.  This looks like an

11:17:04 18    e-mail.

11:17:04 19    **Q**    Well, I'll --

11:17:09 20    **A**    Yeah, I wasn't aware that there was a policy about

11:17:11 21    this, so. . .

11:17:13 22    **Q**    Well, in that regard, why don't I show you another

11:17:16 23    one.  We'll look at Plaintiffs' Exhibit 25621.

11:17:28 24    **A**    I'll wait till you get it up there.

11:17:38 25    **Q**    Do you have the document, ma'am?

**Stossel - Cross/Lanier**

11:17:39   1   **A**     I do.  Thank you.

11:17:40   2   **Q**     And here, you'll see the bottom e-mail, and it's got

11:17:46   3   marks on it because we went through this with the jury

11:17:48   4   before.

11:17:48   5   **A**     Sure.

11:17:50   6   **Q**     But to Tasha Polster, who runs this policy setting

11:17:54   7   area.

11:17:57   8         You know who she is?  We've talked about her; right?

11:18:00   9   **A**     Correct, um-hmm.

11:18:01  10   **Q**     I wanted to reach out to you about your thoughts on

11:18:04  11   the Good Faith Dispensing comments.  The comment section's

11:18:06  12   getting full for many patients and requiring the deletion of

11:18:09  13   comments, not just Good Faith Dispensing, but other comments

11:18:12  14   as well, especially in the Florida area where the Target

11:18:17  15   Drug Good Faith Dispensing has been going on so long.  It's

11:18:21  16   over a year there.

11:18:23  17         Is it okay to give direction around purging of old

11:18:29  18   Good Faith Dispensing comments?  I wanted to run this past

11:18:31  19   you before anything was done.

11:18:33  20         Do you see that?

11:18:34  21   **A**     I do see it.

11:18:35  22   **Q**     And then the answer was, "I think that's probably a

11:18:38  23   good idea.  Target Drug Good Faith Dispensing comments are

11:18:43  24   only supposed to be for one script each time.  So

11:18:50  25   technically, other than ID info that may be in the comments,

**Stossel - Cross/Lanier**

11:18:53  1  other info could be purged."

11:18:55  2      Do you see that?

11:18:55  3  **A**   I do.

11:18:56  4  **Q**   Now, that's not the policy that you've been following

11:19:00  5  because -- true?

11:19:04  6  **A**   I -- I don't think that that's an accurate statement.

11:19:06  7  **Q**   Well, you have been saying to this jury -- and we'll

11:19:10  8  talk about it in a minute under documentation -- but the

11:19:14  9  idea that the comments are only supposed to be for one

11:19:17  10  script each time, you think once you document something, you

11:19:22  11  never need to revisit it; right?

11:19:26  12  **A**   That's -- I don't think that's always true.  I think

11:19:28  13  that's twisted a little bit.

11:19:31  14  **Q**   Well, you certainly have testified that there are

11:19:36  15  times where you do not --

11:19:39  16  **A**   Correct.

11:19:41  17  **Q**   -- document afresh because you've already documented,

11:19:45  18  right?

11:19:45  19  **A**   That's correct, um-hmm.

11:19:46  20  **Q**   So were you not aware of this idea that you're

11:19:48  21  supposed to document each time for the prescriptions?

11:19:51  22  **A**   I think what they're referring to in this e-mail are

11:19:54  23  Good Faith Dispensing refusals, which is something

11:19:58  24  completely different than a documentation on a prescription

11:20:03  25  or an annotation on a prescription.  So I think what you're

**Stossel - Cross/Lanier**

11:20:07 1    seeing here are information about comments, specifically

11:20:13 2    patient comments.

11:20:14 3        So this goes back to what I was telling Kaspar about,

11:20:21 4    you know, not being able to, or not having the occasion to

11:20:24 5    delete important information in the patient comments field.

11:20:28 6        Very rarely does the patient comments field fill up so

11:20:32 7    much so, that you're going to have to delete something out

11:20:35 8    of it.

11:20:36 9    **Q**    But, ma'am, what you're missing here is the statement

11:20:41 10   that these comments that you put in are "only supposed to be

11:20:45 11   for one script each time."

11:20:49 12       Do you see that?

11:20:50 13   **A**    I do, but I --

11:20:51 14   **Q**    And -- are -- hold on.  I got to ask a question.

11:20:54 15       Do you see it?

11:20:55 16   **A**    Yeah, I see it --

11:20:57 17   **Q**    And --

11:20:58 18   **A**    I see the --

11:20:59 19   **Q**    Here's the question.

11:21:00 20       That was not what you've been doing.  You have not

11:21:04 21   been putting comments each script; correct?

11:21:09 22   **A**    So --

11:21:10 23                   MR. STOFFELMAYR:  Objection.

11:21:11 24                   THE COURT:  Overruled.

11:21:13 25                   THE WITNESS:  So this series of e-mails that

11:21:15 1    you're showing me are specifically -- specifically referring

11:21:22 2    to the patient comments field.

11:21:26 3        And so in the patient comments field is where I would

11:21:31 4    place information that I would want another pharmacist to

11:21:35 5    see.

11:21:37 6        So no matter if they're filling a prescription for a

11:21:41 7    diabetes medication or for a controlled substance

11:21:44 8    medication, then they could see this information in the

11:21:47 9    patient comments field.  I would never put a

11:21:59 10   prescription-specific comment into this patient comments

11:22:01 11   field unless it was a Good Faith Dispensing refusal.

11:22:07 12   **Q**    Well, ma'am --

11:22:08 13   **A**    So all of those would go into -- into the annotation

11:22:13 14   on the particular prescription.

11:22:14 15   **Q**    Ma'am, when you testified earlier, you said it a

11:22:17 16   little differently.

11:22:19 17       When Mr. Stoffelmayr was asking you this.  He said,

11:22:22 18   "If you did everything you needed to do in January to

11:22:28 19   understand the situation and decide you were comfortable

11:22:30 20   filling that prescription because it turns out there were

11:22:34 21   perfectly good reasons for all of that" -- and this is his

11:22:38 22   patient with the drugs he talked about.

11:22:40 23       "If the patient, same patient came back in February,

11:22:44 24   March, April, May, each time the patient came back, would

11:22:48 25   you typically document, 'Oh, back in January, I made some

**Stossel - Cross/Lanier**

11:22:53  1    phone calls and it's okay.'"

11:22:55  2         Your answer was, "I typically don't.  I find that once

11:22:59  3    it's documented once or twice, it becomes not necessary to

11:23:04  4    document 100 percent of the time."

11:23:07  5         Do you see that testimony from before?

11:23:09  6    **A**    I do.

11:23:15  7    **Q**    And what you're doing is really outside of policy,

11:23:18  8    isn't it?

11:23:20  9                   MR. STOFFELMAYR:  Objection.

11:23:20 10                   THE COURT:  Overruled.

11:23:23 11                   THE WITNESS:  So, again, during that testimony

11:23:26 12    that you were just bringing up, what we were referring to

11:23:30 13    were specific comments on specific prescriptions, not these

11:23:34 14    patient comments, which are referred to in these two e-mails

11:23:38 15    that you just handed to me.

11:23:40 16    BY MR. LANIER:

11:23:40 17    **Q**    Well, with due respect, you know how vital it is to

11:23:46 18    document at all times in all fields; correct?

11:23:49 19    **A**    It's definitely vital to document, but it's not vital

11:23:53 20    to document 100 percent of the time.

11:23:57 21    **Q**    Well, you're saying it's not imperative?

11:23:59 22    **A**    It's not vital to document 100 percent of the time.

11:24:02 23    **Q**    And yet, we know the policy that you say you were

11:24:08 24    taught when you were in school, this is the 2012, that's

11:24:12 25    Exhibit 304, uses that very word.

**Stossel - Cross/Lanier**

11:24:15  1       It is imperative that pharmacists document all efforts

11:24:20  2   used to validate Good Faith Dispensing.

11:24:26  3       Do you see that language?

11:24:27  4   **A**    I do.

11:24:27  5   **Q**    Doesn't say it's optional, does it?

11:24:29  6   **A**    It says it's imperative.  It doesn't say that --

11:24:35  7   **Q**    What do you understand -- what do you understand

11:24:38  8   imperative to mean?

11:24:40  9   **A**    I understand imperative to mean that it's important

11:24:43 10   that you document.

11:24:44 11   **Q**    So, to you, imperative just means important?

11:24:48 12   **A**    Correct.

11:24:53 13   **Q**    I have not looked it up in the phone -- in the

11:24:55 14   dictionary, but I'm about to and we're going to see if that

11:24:58 15   is -- if maybe I misunderstand the word.  Imperative.

11:25:08 16       Imperative.  Okay.  Hold on.  Let's get the focus

11:25:20 17   automatic.  Imperative.

11:25:25 18       Well, we're not going to talk about the imperative

11:25:27 19   mood in grammar.

11:25:30 20       "Expressive of a command, entreaty, or exhortation.

11:25:39 21   Not to be avoided or evaded."

11:25:42 22       Do you see that?

11:25:43 23   **A**    I do.

11:25:44 24   **Q**    If you look at it here, "A command, an order, a rule

11:25:50 25   and guide, an obligatory act or duty."

6922

**Stossel - Cross/Lanier**

11:25:55 1          Do you see that?

11:25:56 2    **A**    I do.

11:25:56 3    **Q**    Not an option, right?

11:26:03 4          And yet, you told the jury earlier that this is

11:26:06 5    something you were even taught in school, right?

11:26:20 6    **A**    So, I think -- yes, I said something about Good Faith

11:26:23 7    Dispensing being something that I learned in school.  I'm

11:26:26 8    not sure what my words were about documenting.

11:26:30 9    **Q**    You are to document any information pertaining to the

11:26:33 10   elements of good faith on the prescription hard copy.  This

11:26:38 11   is before you had the computer system.  This is 2012; right,

11:26:42 12   before you had it in its current incarnation, I should say?

11:26:46 13   **A**    That's correct.

11:26:47 14   **Q**    Document it on the prescription hard copy and/or

11:26:50 15   annotate the image.  I guess that's if you can screen it in,

11:26:54 16   right?

11:26:54 17   **A**    Correct.

11:26:54 18   **Q**    So, ma'am, it doesn't say do it once on one

11:27:00 19   prescription and then you never need to go back and do it

11:27:03 20   again because you've got that prescription in a box

11:27:05 21   somewhere and could go look it up, does it?

11:27:09 22   **A**    That's correct.

11:27:10 23   **Q**    It says to do it every time, right?

11:27:14 24   **A**    Correct.

11:27:15 25   **Q**    So when you fail to do it, you may be thinking, no

**Stossel - Cross/Lanier**

11:27:21  1    harm, no foul, and maybe many of the times there's not any

11:27:26  2    harm, other than the fact you're not following the rules,

11:27:29  3    right?

11:27:29  4    **A**    So I think what's important to know about this policy

11:27:32  5    is that it is a Walgreens policy, but it's certainly not the

11:27:37  6    pharmacy law that I must document this every single time.

11:27:42  7    **Q**    Well, you understand there's federal law and there is

11:27:47  8    state law, correct?

11:27:49  9    **A**    Correct.

11:27:50  10   **Q**    And your licensing is through the State Board of Ohio,

11:27:54  11   correct?

11:27:55  12   **A**    Correct.

11:27:55  13   **Q**    And you know you have a legal obligation to follow the

11:28:01  14   standard of care, don't you?

11:28:03  15   **A**    Correct.

11:28:04  16   **Q**    And you're not telling the jury the standard of care

11:28:07  17   is less than the policies, are you?

11:28:12  18   **A**    No, of course not.

11:28:13  19   **Q**    So the standard of care, which is your legal

11:28:17  20   obligation in Ohio, is to document all efforts used to

11:28:25  21   validate Good Faith Dispensing.

11:28:27  22          True?

11:28:27  23              MR. STOFFELMAYR:  Objection, Your Honor.

11:28:28  24   Foundation.

11:28:29  25              THE COURT:  Overruled.  If she knows.  Ask if

**Stossel - Cross/Lanier**

11:28:33  1    she knows.

11:28:34  2    BY MR. LANIER:

11:28:34  3    **Q**    True?  That's standard of care, isn't it?

11:28:38  4    **A**    Standard of care is me doing everything that I

11:28:41  5    possibly can to make sure that this prescription is

11:28:47  6    legitimate.

11:28:47  7    **Q**    Um-hmm.

11:28:47  8         And part of that process is documenting your work,

11:28:51  9    isn't it?

11:28:52 10    **A**    Sure.

11:28:53 11    **Q**    Thank you.

11:28:55 12         Now, as we look at these DUR alerts, and you showed us

11:29:07 13    one, you had the pictures of how it worked.  Remember that?

11:29:11 14    **A**    Yes.

11:29:12 15    **Q**    The DUR alert that you had and the pictures that you

11:29:18 16    had -- whoa.

11:29:21 17         Your Honor, three suits just walked in?

11:29:24 18              THE COURT:  I -- I observed that also but

11:29:27 19    if -- you can continue with this witness.

11:29:29 20              MR. LANIER:  Okay.  We've got the court

11:29:31 21    officer over here.  You watch my back.

11:29:35 22         (Laughter.)

11:29:35 23    BY MR. LANIER:

11:29:35 24    **Q**    The DUR alerts, even those have changed over the

11:29:39 25    decades, haven't they?

11:29:42  1     **A**     I'm sure they have.

11:29:44  2     **Q**     Yeah.  They've got information in them now that they

11:29:47  3     didn't used to have, right?

11:29:48  4     **A**     I'm sure.

11:29:49  5     **Q**     All right.

11:29:52  6            Now, still, we can look at those.  And based on the

11:29:57  7     way you've talked about them, would you agree with me that

11:30:02  8     you could never accidentally fill the trinity because it's

11:30:06  9     going to show, hey, you're filling a trinity, right?

11:30:10 10     **A**     If what you mean by the trinity is. . .

11:30:15 11     **Q**     You know the trinity?

11:30:17 12     **A**     Opioid -- the --

11:30:18 13     **Q**     The opiate with the benzo with the relaxant?

11:30:22 14     **A**     With a specific muscle relaxant is considered a

11:30:25 15     trinity.

11:30:26 16     **Q**     Um-hmm.

11:30:26 17     **A**     Okay.

11:30:27 18     **Q**     And you can't ever accidentally fill that.  Fair?

11:30:29 19     **A**     Sure.

11:30:30 20     **Q**     By the same token, you can't accidentally ignore the

11:30:34 21     red flags that would trigger there.  If you're ignoring

11:30:36 22     those red flags it's something you're doing knowingly.

11:30:38 23            True?

11:30:39 24                    MR. STOFFELMAYR:  Objection to form.

11:30:40 25                    THE COURT:  Overruled.

11:30:42 1          THE WITNESS:  I'm not sure.  Some red flags

11:30:45 2    don't show up as a DUR.

11:30:47 3    BY MR. LANIER:

11:30:47 4    **Q**     Correct, but for those that do --

11:30:50 5    **A**     Okay.

11:30:50 6    **Q**     -- the limited red flags that will show up at a DUR,

11:30:53 7    like you and Mr. Stoffelmayr showed the jury, those limited

11:30:57 8    ones that do show up --

11:30:59 9    **A**     Okay.

11:30:59 10   **Q**     -- you can't accidently ignore those.  If you ignore

11:31:04 11   them, it's something you've done knowingly.

11:31:06 12         True?

11:31:07 13   **A**     Well, you can't ignore them because you can't go past

11:31:10 14   them.

11:31:11 15   **Q**     Exactly.

11:31:11 16         So the way the process is set up right now.  If you

11:31:15 17   hit resolve or just stick your initials in a note and then

11:31:21 18   hit resolve, it's something you're doing knowingly.

11:31:25 19         Fair?

11:31:26 20   **A**     Sure.

11:31:28 21   **Q**     And the reason I'm asking this -- one reason I'm

11:31:31 22   asking this is because Dr. Catizone, or Mr. Catizone showed

11:31:36 23   the jury a demonstrative for his opinion that I'll put up

11:31:41 24   here on Walgreens pharmacy notes.

11:31:44 25         Let me pass this out so that people have a fresh copy.

**Stossel - Cross/Lanier**

11:31:55 1    And Mr. Catizone, if you'll read along with me, he --

11:31:59 2  by the way, he had a chance to look at 2,000 Walgreens

11:32:03 3  prescriptions that spanned a 10-year time period.  Okay?

11:32:07 4    You follow me?

11:32:08 5  **A**    Sure.

11:32:08 6  **Q**    So 200 a year for a period of 10 years, 2,000 in

11:32:13 7  total, and he got to visually look at them.

11:32:15 8    Are you following me?

11:32:16 9  **A**    Um-hmm.

11:32:16 10 **Q**    He said, "Of the 20,000 prescriptions total, only 160

11:32:23 11 prescriptions contain some writing in the DUR comment field

11:32:30 12 regardless of the DUR alert."

11:32:32 13   Do you see where I'm reading?

11:32:33 14 **A**    Sure.

11:32:34 15 **Q**    He said, "Some DUR alerts include a pop-up in the

11:32:38 16 Walgreens software.  This notifies the pharmacist they need

11:32:42 17 to take an extra look at the prescription."

11:32:44 18   Is that true?

11:32:45 19 **A**    Yes.

11:32:46 20 **Q**    All right.  He got that right.

11:32:48 21   "For the 160 prescriptions that did have a DUR

11:32:56 22 comment, the comments were often just pharmacist initials,

11:33:01 23 notes about reviewing patient history, general patient

11:33:05 24 consult, and speaking to the doctor.  These comments fail to

11:33:11 25 identify any of the specific red flags and fail to disclose

**Stossel - Cross/Lanier**

11:33:15  1    that the red flag was resolved."

11:33:18  2         Do you see that, ma'am?

11:33:19  3    **A**    I do.

11:33:20  4    **Q**    Don't you think it's important, in the DUR comment

11:33:24  5    field, if there is a DUR red flag that comes up, even though

11:33:29  6    not all of them come up there, I agree -- but if there's a

11:33:33  7    red flag that comes up, don't you think it's important to

11:33:37  8    identify it and resolve it?

11:33:40  9    **A**    So I think in the DUR field that you're talking about,

11:33:47  10   if you remember, when we reviewed this DUR screen, you know,

11:33:52  11   there is a pop-up that comes up and it tells you, you know,

11:33:55  12   whether you talked with the prescriber or talked with the

11:33:59  13   patient.

11:33:59  14        You are able to put a little note in there, but you

11:34:03  15   don't necessarily, in working practice, say I found a red

11:34:09  16   flag and this is what the red flag was and this is how I

11:34:12  17   resolved the red flag.  It's not common practice to do that.

11:34:18  18   **Q**    At Walgreens?

11:34:21  19   **A**    It's -- it's --

11:34:22  20   **Q**    At your store?

11:34:22  21   **A**    It's not common practice do that at my store.

11:34:25  22   **Q**    Okay.  Okay.

11:34:29  23        Now, while we're finishing up our stop here on bad

11:34:35  24   timing, all of these wonderful changes that your company's

11:34:38  25   put into place over the last several years and going back

**Stossel - Cross/Lanier**

11:34:44 1    some, those don't have any effect on the overdoses and

11:34:53 2    problems that happened, say, in 2009.

11:34:57 3         Fair?

11:34:59 4  **A**    I wouldn't have any of that information.

11:35:02 5  **Q**    Ma'am, it's a -- yeah, but this is not a hard one.

11:35:05 6    This -- this one is -- all I'm saying is. . .

11:35:16 7         If, heaven forbid -- no, let's use a real example.

11:35:21 8         When I was 17 years old, I got in a pretty bad car

11:35:28 9    wreck.

11:35:31 10        Are you with me?

11:35:32 11 **A**    Okay.

11:35:35 12 **Q**    And I was hurt a little bit and the -- my girlfriend

11:35:42 13   was hurt a little bit, too.  All right?  Are you following

11:35:47 14   me?

11:35:47 15 **A**    Okay.  Yes.

11:35:48 16 **Q**    Now, after that wreck, I took defensive driving.

11:35:56 17        Have you ever taken defensive driving?

11:35:58 18 **A**    Okay.  No.

11:35:59 19 **Q**    I learned all sorts of things.  I learned about the

11:36:02 20   three-second rule on following people.  I learned about how

11:36:06 21   far down the road you look.  I learned when you come to a

11:36:10 22   stop sign, you're supposed to go left, right, left with your

11:36:13 23   head visibly so the cop doesn't give you a ticket.

11:36:17 24        Are you with me?

11:36:18 25 **A**    Okay.

**Stossel - Cross/Lanier**

| | | |
|---|---|---|
| 11:36:19 | 1 | **Q**    All of those things I learned, and all the good things |
| 11:36:22 | 2 | I put into practice, including wearing a seat belt, will |
| 11:36:26 | 3 | never change the injuries that Elaine or I got from that |
| 11:36:31 | 4 | wreck; correct? |
| 11:36:33 | 5 | **A**    Okay. |
| 11:36:33 | 6 | **Q**    Because they're all changes that are happening |
| 11:36:37 | 7 | afterwards, right? |
| 11:36:39 | 8 | **A**    Correct. |
| 11:36:40 | 9 | **Q**    So all of the policies and all of the good things that |
| 11:36:43 | 10 | you and Mr. Stoffelmayr talk about that work right now in |
| 11:36:46 | 11 | your stores, they don't fix problems that happened a decade |
| 11:36:51 | 12 | ago. |
| 11:36:53 | 13 |     You understand? |
| 11:36:53 | 14 | **A**    Okay. |
| 11:36:54 | 15 | **Q**    Okay.  Thank you. |
| 11:36:55 | 16 |     I was going to walk through some of the settlement |
| 11:37:07 | 17 | agreements that Walgreens entered into with the government, |
| 11:37:09 | 18 | but my understanding is you don't know anything about those, |
| 11:37:12 | 19 | so I can leave them alone with you. |
| 11:37:14 | 20 |     Is that right? |
| 11:37:14 | 21 | **A**    Correct. |
| 11:37:15 | 22 | **Q**    Okay.  Then let's go to the last stop, and the last |
| 11:37:19 | 23 | stop I've called bad results.  Okay? |
| 11:37:47 | 24 |     You say that you know your doctors and you know your |
| 11:37:51 | 25 | patients.  Fair? |

### Stossel - Cross/Lanier

| | | |
|---|---|---|
| 11:37:52 | 1 | **A** Yes. |
| 11:37:53 | 2 | **Q** So we did count of the different number of patients |
| 11:37:58 | 3 | and the different number of doctors at your store. |
| 11:38:02 | 4 | Which Walgreens store number is yours? |
| 11:38:04 | 5 | **A** 4294. |
| 11:38:06 | 6 | **Q** Did you know that your store uniquely has 29,014 |
| 11:38:20 | 7 | different patients? Did you know that? |
| 11:38:27 | 8 | **A** My store's a very busy location. |
| 11:38:29 | 9 | **Q** Um-hmm. |
| 11:38:30 | 10 | And you're not trying to tell us that you know all |
| 11:38:33 | 11 | 29,014, are you? |
| 11:38:35 | 12 | MR. STOFFELMAYR: Judge, excuse me. |
| 11:38:37 | 13 | Can we have a sidebar on this? I don't want to be |
| 11:38:40 | 14 | accused of a speaking objection. |
| 11:38:41 | 15 | THE COURT: All right. |
| 11:38:42 | 16 | (Proceedings at sidebar.) |
| 11:38:56 | 17 | MR. STOFFELMAYR: Judge, none of these |
| 11:38:58 | 18 | questions are fair if they don't come with a time frame. To |
| 11:39:01 | 19 | ask her to estimate in her head if she thinks 29,000 is a |
| 11:39:06 | 20 | reasonable number -- |
| 11:39:07 | 21 | MR. LANIER: I'll put it in a time frame. |
| 11:39:09 | 22 | THE COURT: That's a good point. |
| 11:39:10 | 23 | MR. LANIER: I'll put it in a time frame. |
| 11:39:11 | 24 | That's fair. |
| 11:39:11 | 25 | THE COURT: Let's focus on a number that, you |

**Stossel - Cross/Lanier**

11:39:13  1    know, they have now, current patients, okay.  I mean, you're

11:39:17  2    asking for patients over 25 years.  That's meaningless.

11:39:20  3                    MR. LANIER:  Yeah.  I just got it from the

11:39:22  4    dispensing data, Your Honor, which is about a 10-year time

11:39:25  5    span.  And I'll make that clear.

11:39:26  6                    THE COURT:  All right.  Make it clear what

11:39:29  7    you're talking about.

11:39:29  8                    MR. LANIER:  Absolutely.

11:39:29  9                    MR. STOFFELMAYR:  While we've got you, Judge,

11:39:31 10    can we ask you where we are on time?  Some of us think

11:39:35 11    Mr. Lanier has only a few minutes left.  Some of us aren't

11:39:38 12    sure.

11:39:38 13                    THE COURT:  I don't know.  I assume he's

11:39:39 14    wrapping up.

11:39:40 15                    MR. LANIER:  Yes, I'm wrapping up, Judge.

11:39:41 16    We're at the last stop.

11:39:42 17                    THE COURT:  All right.

11:39:44 18                    MR. LANIER:  Thank you.

11:39:53 19                    (Proceedings resumed in open court.)

11:39:53 20    BY MR. LANIER:

11:39:56 21    Q    Ma'am, we have the dispensing data for about a decade

11:39:58 22    of your store.  And over that time period, we're able to

11:40:02 23    find 29,014 different patients.

11:40:05 24         You're not suggesting you know all of them as well as

11:40:07 25    you were able to tell us the stories that you told us today,

**Stossel - Cross/Lanier**

11:40:10 1    right?

11:40:11 2    **A**    Correct.

11:40:11 3    **Q**    And by the same token, if we look at how many doctors

11:40:16 4    your store has filled prescriptions for in that same time

11:40:19 5    period, we've got 7,658 different prescribers.

11:40:26 6        You don't know all of those, do you?

11:40:29 7    **A**    That's correct.

11:40:30 8    **Q**    All right.

11:40:33 9        And you cited Dr. Keum and showed his prescription to

11:40:40 10   the jury, a filling of Dr. Keum, the rehab doctor.

11:40:46 11       Remember him?

11:40:47 12   **A**    Yes.

11:40:49 13   **Q**    I'm trying to see, where is the note on here that says

11:40:53 14   the red flags were resolved?  Can you show me where that is?

11:41:00 15   **A**    I'm not sure it would be on this area.

11:41:05 16   **Q**    Well, this is the -- I thought this was the fill sheet

11:41:08 17   for the prescription.

11:41:10 18   **A**    This is -- this is not a fill sheet for the

11:41:13 19   prescription.  I'm not sure what kind of data sheet this is.

11:41:18 20   This is not -- this is not a Walgreens data sheet.

11:41:21 21   **Q**    Well, I thought this is what Mr. Stoffelmayr showed

11:41:24 22   you and you verified was the Walgreens data sheet.

11:41:29 23       Is this something brand new you've never seen before?

11:41:31 24   **A**    This was something that I hadn't seen before.  This is

11:41:34 25   not a Walgreens data sheet.

**Stossel - Cross/Lanier**

11:41:36  1    **Q**    Hmm.   Okay.

11:41:44  2         We've heard a lot about Dr. Franklin from Mr.

11:41:50  3    Stoffelmayr, Peter Franklin.

11:41:52  4         Do you remember him?

11:41:53  5    **A**    I vaguely remember the name of the doctor.

11:41:56  6    **Q**    Have you bothered to see how many prescriptions for

11:42:00  7    Dr. Peter Franklin your store filled?

11:42:05  8    **A**    No.

11:42:11  9    **Q**    And here's where you laughed.

11:42:13  10        "Have you ever been taken to task for not writing

11:42:16  11   enough -- or not dispensing enough opiate prescriptions?"

11:42:20  12   That's where you chuckled, right?

11:42:21  13   **A**    Right.

11:42:22  14   **Q**    So you're not familiar with the reports that were

11:42:25  15   being generated quarterly by your company about which

11:42:31  16   dispensers, which pharmacists were not filling enough opiate

11:42:35  17   prescriptions?

11:42:36  18   **A**    No.

11:42:36  19   **Q**    The jury has heard about Plaintiffs' Exhibit 19607,

11:42:44  20   where Ms. Polster sends an e-mail out that Ed and Jeff

11:42:49  21   developed a report that supervisors will be able to use in

11:42:52  22   order to see pharmacists in their districts that are not

11:42:56  23   dispensing a lot of controlled drugs.

11:43:00  24        The intent is to give them visibility into whether or

11:43:03  25   not we have pharmacists that just won't fill a controlled --

**Stossel - Cross/Lanier**

11:43:06 1    a controlled med, or maybe are selective about filling them.

11:43:11 2         Do you see where I'm reading?

11:43:12 3    **A**    I do.

11:43:13 4              MR. STOFFELMAYR:  Judge, I'm going to object

11:43:14 5    to the use of this document.

11:43:15 6              THE COURT:  Overruled.

11:43:16 7    BY MR. LANIER:

11:43:17 8    **Q**    Ma'am, my question to you is this:

11:43:19 9         You've never been selected as one of those who

11:43:23 10   underfills opiate prescriptions.  True?

11:43:26 11   **A**    I have no idea.

11:43:28 12   **Q**    Okay.

11:43:29 13             MR. LANIER:  I'll pass the witness,

11:43:31 14   Your Honor.  Thank you.

11:43:32 15             THE COURT:  Okay.  Well, why don't we see

11:43:38 16   how -- let's see if any of the jurors have any questions.

11:43:41 17   If so, give them to Mr. Pitts and then we'll figure out the

11:43:46 18   timing.

11:43:48 19             (Brief pause in proceedings).

11:44:07 20             THE COURT:  There seem to be a bunch.

11:44:13 21        I'm thinking it may make sense to take a lunch break

11:44:16 22   rather than -- there seem to be a fair number.  What do

11:44:21 23   you -- what do you think, Mr. Stoffelmayr?

11:44:24 24             MR. STOFFELMAYR:  That sounds -- that sounds

11:44:26 25   good.  Thank you, Judge.

**Stossel - Cross/Lanier**

11:44:26  1    THE COURT:  All right.  Rather than cut up

11:44:28  2  this process, ladies and gentlemen, we will break for lunch.

11:44:32  3    Usual admonitions.  Come back at 1:00 o'clock, and

11:44:36  4  we'll conclude with this witness's testimony.

11:44:39  5    (Jury excused from courtroom.)

11:45:11  6    THE COURT:  Okay.  You may step down for a

11:45:14  7  minute.

11:45:59  8    (Witness excused.)

01:00:52  9    (Recess was taken from 11:45 a.m. till 1:00 p.m.)

01:00:52 10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| 01:00:52 | 1 | <u>Tuesday Session, November 9, 2021, at 1:00 P.M.</u> |

01:00:52  2    COURTROOM DEPUTY:  All rise.

01:02:43  3         (Jury returned to courtroom.)

01:02:50  4    THE COURT:  Okay.  Please be seated, ladies

01:02:52  5  and gentlemen.

01:02:52  6    And, Ms. Stossel, you're still under oath from this

01:02:56  7  morning.

01:02:58  8    And Mr. Stoffelmayr is up.  And I'm sure he'll start.

01:03:06  9  Our process has been to allow jurors to ask questions so I'm

01:03:10 10  sure he'll start with those.

01:03:15 11    MR. STOFFELMAYR:  May I proceed, Your Honor?

01:03:16 12    THE COURT:  Yes, you may.

01:03:16 13    REDIRECT EXAMINATION OF AMY STOSSEL

01:03:18 14  BY MR. STOFFELMAYR:

01:03:18 15  **Q**    Hello again.  Welcome back from lunch.

01:03:21 16    Welcome back, Ms. Stossel.

01:03:22 17  **A**    Thank you.

01:03:22 18  **Q**    As the Judge mentioned, it's the practice in his

01:03:26 19  courtroom to allow the jurors to ask questions to the

01:03:29 20  witnesses.  So I have a small pile of questions here that

01:03:31 21  I'm going to put up on the screen.  So I'm going to -- well,

01:03:40 22  we can read them together and then I'll ask you to answer

01:03:42 23  the question.

01:03:43 24    If there's a question that you just don't know the

01:03:44 25  answer to, of course, you know, don't make it up.  Just tell

6938

**Stossel - Redirect/Stoffelmayr**

01:03:47 1   us you don't know the answer and I may try to follow up on a

01:03:52 2   couple of these.

01:03:53 3       Here's the first one.  "In regards to the notes

01:04:00 4   section, you stated you have never had to remove important

01:04:03 5   information.  Is there a character limit or not?  What

01:04:08 6   unimportant information is removed?  Doesn't all information

01:04:13 7   -- isn't it important if it was important enough to enter in

01:04:17 8   the first place?"

01:04:18 9       And I noticed this too.  You did say not important

01:04:21 10  information and I wish I had followed up at the time.

01:04:23 11      What unimportant information, and to this juror's

01:04:26 12  question, if someone thought it was important enough to put

01:04:28 13  in there in the first place, how could it be unimportant?

01:04:32 14  **A**    Sure.  So let me just go through the --

01:04:34 15  **Q**    Sure.  Take your -- it's part by part if you'd like.

01:04:37 16  **A**    Yeah.

01:04:38 17      So in regards to the notes section, you stated you

01:04:41 18  have never had to remove important information.  Okay.

01:04:50 19      So that's true.  I did state that.

01:04:51 20      It says, "Is there a character limit or not?"

01:04:54 21      There is a character limit.  I don't know what that

01:04:56 22  character limit is for that section.  I'm not certain what

01:04:59 23  exactly the number of characters is.

01:05:02 24      And it says, "What unimportant information is

01:05:05 25  removed?"

**Stossel - Redirect/Stoffelmayr**

01:05:06  1      So sometimes in that section, there may be four lines

01:05:13  2   of information, five lines of information that are there.

01:05:27  3   There may be information from four years ago or five years

01:05:29  4   ago that's in that section.

01:05:30  5      If I need to put something in the patient comments for

01:05:34  6   today's date that's relevant with today's information, like

01:05:39  7   a Good Faith Dispensing refusal, that information may be

01:05:45  8   very important for us to note today.  And information from

01:05:50  9   five years ago or six years might not be very relevant to

01:05:55 10   that patient's profile in today's time.

01:06:02 11      And so that may be something that does get purged or

01:06:05 12   removed if it's not important.

01:06:07 13 **Q**    We've all been thinking a lot about, like,

01:06:10 14   refusal-to-fill type information.

01:06:12 15      Is there information that goes in a patient comment

01:06:15 16   field other than "I refuse to fill for this patient"?

01:06:18 17 **A**    Yeah.

01:06:18 18      So there's a lot of other stuff that's not just

01:06:21 19   limited to Good Faith Dispensing in those patient comments.

01:06:26 20      Sometimes a patient might prefer a certain brand of

01:06:32 21   their blood pressure medication.  So they may have had a

01:06:36 22   reaction to the Aurobindo manufacturer of their blood

01:06:45 23   pressure medication, and they have to take the Teva

01:06:48 24   manufacturer.  And so that might be something that's in

01:06:50 25   there.

01:06:51  1      When you comb through then the patient profile, you

01:06:55  2  may see that that patient is no longer even on that

01:06:58  3  medication anymore.

01:06:59  4      And so that information might be a comment that would

01:07:03  5  be okay to remove from the patient comment section if that

01:07:09  6  patient is not even using the medication any longer.

01:07:12  7  **Q**   Okay.  Let's make sure we didn't miss anything.

01:07:14  8      Character limit.  What unimportant information.

01:07:16  9  **A**   And it says, "Isn't all information important if it

01:07:20 10  was important enough to enter in the first place?"

01:07:21 11      So all information is important for the patient

01:07:25 12  comments, but I think in the context of filling

01:07:29 13  prescriptions every single day, those patient comments are

01:07:34 14  meant to be a place for me as a pharmacist to put specific

01:07:39 15  comments related to the patient and related to filling all

01:07:44 16  of their prescriptions.

01:07:47 17      If there is a comment that needs to go specifically

01:07:52 18  with a certain drug, or a certain prescription, then I'm

01:07:56 19  going to use that little yellow box, that little annotation,

01:08:01 20  and I'm going to put it directly onto the patient's

01:08:04 21  prescription itself so that that becomes a permanent part of

01:08:09 22  that prescription that I can, again, easily go back and

01:08:12 23  view.

01:08:13 24      So this patient comments part is not the be all, end

01:08:18 25  all place for me to place a comment for the patient.

**Stossel - Redirect/Stoffelmayr**

01:08:23  1  **Q**     Have you ever, in your practice, deleted information

01:08:26  2  out of a comment field that you thought was information a

01:08:30  3  future pharmacist would need to exercise their Good Faith

01:08:34  4  Dispensing efforts?

01:08:34  5  **A**     No.

01:08:35  6  **Q**     All right.

01:08:36  7       Here's another question that I think is similar but I

01:08:38  8  want to make sure we, you know, ask it the different ways.

01:08:42  9  Different jurors have asked the question.  And I just had

01:08:44 10  this folded over because the same person had some other

01:08:47 11  questions --

01:08:47 12  **A**     Sure.

01:08:47 13  **Q**     -- that we'll do one by one.

01:08:49 14       But let's start with what was, I guess, Question 3 on

01:08:53 15  this sheet of paper.

01:08:54 16       "You stated in that in your 25 years, you've never had

01:08:57 17  to remove/delete important comments as running out of space.

01:09:03 18  Key word important.  Does that mean you have removed

01:09:05 19  comments due to space but removed comments that perhaps you

01:09:08 20  didn't deem important?"

01:09:09 21  **A**     Right.

01:09:09 22       I think that definitely I've removed comments that I

01:09:17 23  didn't deem important.  I think the point to make there is

01:09:28 24  that I'm very careful about what I might deem important and

01:09:31 25  what I think other pharmacists may deem important as well.

**Stossel - Redirect/Stoffelmayr**

01:09:35 1    So I'm not just removing something because, gosh, I

01:09:41 2  think it's no longer important, you know, and another

01:09:44 3  pharmacist shouldn't think this is not important either.

01:09:48 4  I'm only really removing something if, a, there's no other

01:09:54 5  option, and b, if it's absolutely something that I will not

01:10:01 6  need to use again or if it's a comment that someone else

01:10:07 7  will never need to have again.

01:10:10 8    Kind of like the example about the blood pressure

01:10:14 9  medication and the different manufacturer that someone might

01:10:18 10  need.  It's not always a Good Faith Dispensing question that

01:10:22 11  are in those comments, and I guess I would say that in my

01:10:28 12  practice, maybe I might have to remove a comment once a

01:10:33 13  year.  It's not something that happens very often at all.

01:10:39 14  **Q**    All right.  Thank you.

01:10:40 15    I'm going to stick with the same -- the same set of

01:10:45 16  questions, and I'll just cover up the ones we're not to yet.

01:10:49 17    Can you read that okay?

01:10:51 18  **A**    Sure.

01:10:52 19  **Q**    "What happens to a controlled substance that has been

01:10:54 20  filled but not picked up during your shift/not until the

01:10:58 21  following day?"

01:11:00 22  **A**    Okay.

01:11:03 23    So once a prescription has been filled, whether it's a

01:11:06 24  controlled substance or not a controlled substance, the same

01:11:09 25  procedure is followed.

**Stossel - Redirect/Stoffelmayr**

01:11:12  1        After I have completed that product review, after I've

01:11:19  2    checked the product to make sure that it's accurate and the

01:11:24  3    prescription is bagged, then that prescription goes into

01:11:26  4    what we call our prescription bins.  And that prescription

01:11:31  5    sits in the prescription bins for up to 10 days until the --

01:11:38  6    or until the prescription is picked up by the patient.

01:11:42  7        So if the patient does not pick up the prescription

01:11:45  8    within 10 days, then that prescription would be what we call

01:11:50  9    "deleted to stored."

01:11:55  10       And so that prescription is deleted out of those bins

01:11:58  11   and put back on the patient's profile.

01:11:59  12   **Q**    If -- so if it has to sit there overnight when the --

01:12:03  13   well, not even overnight, but if it just has to sit there

01:12:07  14   for a couple days, is there a risk that somebody could grab

01:12:09  15   it off the shelf and take those controlled substances?

01:12:12  16   **A**    I mean, I suppose there's always a risk.

01:12:20  17   **Q**    If your 25 years, have you had a problem with bagged

01:12:22  18   prescriptions waiting to be picked up being stolen?

01:12:26  19   **A**    No, not in my experience.

01:12:28  20   **Q**    If the -- are they -- well, I take it they're behind

01:12:32  21   the counter at the pharmacy.  I couldn't walk by and just

01:12:35  22   grab it, could I?

01:12:36  23   **A**    No, you could not.

01:12:37  24       There's a definite barrier with the registers so

01:12:43  25   someone can't just walk by.  There's a barrier with the

01:12:46  1    registers and then there's probably about three feet before

01:12:50  2    you can get to our prescription bins.

01:12:53  3    **Q**    Are you -- tell me if this is not something you know

01:12:55  4    about, but are there actually Board of Pharmacy rules about

01:12:59  5    the barriers you need to separate where medication is stored

01:13:02  6    from where the public has access?

01:13:05  7    **A**    There are some Board of Pharmacy rules with syringes

01:13:12  8    being close to where patients are.  I'm not certain about

01:13:16  9    all of the specifics.

01:13:18  10   **Q**    When the pharmacy is closed -- so, like your store you

01:13:22  11   said it a 24-hour store.  So I could go in at 2:00 a.m. if I

01:13:25  12   needed to by, you know, diapers or beer or whatever I wanted

01:13:28  13   at two o'clock in the morning, but your pharmacy is closed.

01:13:30  14   **A**    Um-hmm.

01:13:31  15   **Q**    Is it accessible to the public?  Could they get in

01:13:34  16   there and rummage around your bagged medication?

01:13:37  17   **A**    No, not at all.  There's a metal gate that comes down

01:13:43  18   that is -- makes the pharmacy closed.  There's also an alarm

01:13:46  19   that we set when we leave the pharmacy at any time.

01:13:51  20   **Q**    All right.  Moving down.

01:13:58  21        Under the patient comment, e.g., example, GFD refused

01:14:05  22   oxycodone, et cetera, is this noted on the prescription as

01:14:08  23   an annotation as well?  Is it required?

01:14:16  24                   MR. LANIER:  Can you move it up, please?

01:14:17  25                   MR. STOFFELMAYR:  Oh, I'm sorry.  Did I get us

**Stossel - Redirect/Stoffelmayr**

01:14:19  1    off the screen?

01:14:20  2              THE WITNESS:  Okay.  So if I'm making a

01:14:27  3    comment about a Good Faith Dispensing refusal, then that

01:14:32  4    means the -- so there's a couple different ways that I can

01:14:36  5    do this.  So let me -- see if you can follow.  I'll try to

01:14:39  6    explain the best way if it makes sense.

01:14:42  7         There are two different ways that this might happen.

01:14:46  8    So I might get a person bringing in a prescription to me

01:14:52  9    for -- for something.  And then based on all of the good

01:14:57 10    faith practices, I might say that I need to refuse the

01:15:01 11    prescription.

01:15:04 12         If I'm refusing this prescription and I put the

01:15:08 13    comment in to my patient comments, you know, GFD refusal for

01:15:15 14    this particular prescription, the date, and my initials,

01:15:19 15    then I would not write anything on that piece of paper.  I

01:15:24 16    would hand it back to the person.  I would have a

01:15:29 17    conversation with them and say I'm so sorry, I am unable to

01:15:33 18    fill your prescription today.  And I would, you know, tell

01:15:35 19    them why I was unable to fill their prescription.

01:15:40 20         That's one way.  I would not make a comment or a

01:15:43 21    notation on that prescription before I handed it back to

01:15:46 22    them.

01:15:50 23         That prescription, piece of paper, although I might be

01:15:53 24    uncomfortable filling it, I might not have all of the pieces

01:15:56 25    of the puzzle or the information that I need to fill that

**Stossel - Redirect/Stoffelmayr**

01:16:00  1   prescription.  There might be another piece of the puzzle

01:16:03  2   that I'm missing.  Maybe I wasn't able to get ahold of the

01:16:07  3   prescriber to verify something.  Maybe there's another

01:16:10  4   pharmacist out there that will be able to get ahold of the

01:16:13  5   prescriber and fill in a piece of that puzzle.  Maybe this

01:16:18  6   is a legitimate patient that has a legitimate prescription

01:16:21  7   and a really legitimate issue and they really need this

01:16:25  8   medication and I'm already, you know, putting kind of a

01:16:30  9   barrier between them getting this medication.

01:16:36 10       What if that's the case?  And then I'm giving them a

01:16:39 11   really hard time about getting this prescription filled.  I

01:16:42 12   want to give that prescription back to them and give them

01:16:44 13   the opportunity to maybe have another pharmacist see.  Maybe

01:16:51 14   they have another piece of the puzzle that they need to get

01:16:54 15   this medication.  Maybe I just don't have all of the pieces

01:16:56 16   of the puzzle that day.

01:16:57 17       So, in that instance, I would not write anything on

01:17:00 18   the prescription.

01:17:01 19       Second scenario is that a prescription may come to me

01:17:05 20   electronically that I would refuse to fill.  And in this

01:17:11 21   case, it's a little more complicated.

01:17:14 22       So when a prescription comes to me electronically, if

01:17:17 23   I'm refusing to fill it, that electronic prescription cannot

01:17:22 24   be taken back by the person and taken to a different

01:17:27 25   pharmacy to fill.  The prescriber would have to reissue the

01:17:32  1  prescription directly to another pharmacy in order for them

01:17:36  2  to get it filled.

01:17:40  3        So in this case, I would make a note directly onto the

01:17:44  4  prescription with that annotation, with that GFD refusal,

01:17:50  5  and then also, again, in that patient comments field with

01:17:53  6  the GFD refusal.  And then I would additionally have to go

01:17:59  7  into the patient's profile with this prescription and close

01:18:02  8  out this prescription so that it could not be filled at a

01:18:07  9  Walgreens.  But the record would be there.

01:18:14  10  BY MR. STOFFELMAYR:

01:18:14  11  **Q**    Any other scenarios we should cover?  I just want to

01:18:17  12  make sure we've fully answered the question.

01:18:17  13        So it was, "Is that noted on the prescription as an

01:18:17  14  annotation?"

01:18:17  15  **A**    No.

01:18:17  16  **Q**    So I think your answer is, "Sometimes, depending on

01:18:20  17  how the prescription came in."

01:18:20  18  **A**    Right.  Okay, yeah.  So it's --

01:18:22  19  **Q**    Second question, "Is it required?"

01:18:23  20  **A**    So, legally, it's not required.

01:18:28  21  **Q**    Is a matter -- is it your practice to do it when

01:18:30  22  there's an image that you can't annotate?

01:18:32  23  **A**    When there's an image that I can annotate, yes, then I

01:18:36  24  would put that annotation button.

01:18:39  25  **Q**    All right.

**Stossel - Redirect/Stoffelmayr**

01:18:39 1     Moving down.  Three is the one we talked about

01:18:42 2  already.

01:18:43 3     "When it comes to the drug disposal boxes, do they

01:18:47 4  have to be certified in some way to make sure they aren't

01:18:50 5  diverted?"

01:18:51 6  **A**    Honestly, I'm not certain about the specifics of that.

01:18:56 7     What I can tell you about the -- these disposal boxes

01:18:59 8  is that there's a specific company that comes to pick those

01:19:02 9  up from us.

01:19:05 10     When the gentleman or -- comes from the company to

01:19:09 11  pick up the drugs that are in the box, I have, in the

01:19:13 12  pharmacy, locked up, in my control to my C-II cabinet where

01:19:20 13  I keep all of my controlled II substances, a set of three

01:19:25 14  keys, and the three keys need to -- I have to have all three

01:19:33 15  keys to open this drug disposal box.

01:19:35 16     So when they come to pick up the drugs that are in

01:19:38 17  that drug disposal box that people have dropped off, I take

01:19:42 18  my keys to my C-II cabinet, I go to the C-II cabinet, I get

01:19:47 19  out the three drug disposal box keys.  There are three slots

01:19:53 20  where those keys go, top, middle, and bottom, on that drug

01:19:59 21  disposal kiosk box.  And until all of those three keys are

01:20:03 22  inserted, the box will not open.

01:20:05 23     So a pharmacist has to actually go out and open that

01:20:08 24  drug disposal box, along with the gentleman who comes to

01:20:11 25  pick up.  We stand there while they take the old box out,

**Stossel - Redirect/Stoffelmayr**

01:20:16 1    put a new box in, and then sign so that we know that they

01:20:22 2    took those drugs away.

01:20:24 3    **Q**    Do you happen to know the company that comes to pick

01:20:27 4    them up and takes them to be incinerated, do they have to

01:20:30 5    have special licenses from the DEA to do that?

01:20:32 6    **A**    I'm sure they do.  I don't -- I don't know what those

01:20:34 7    regulations are.

01:20:35 8    **Q**    And if it's just not something you've encountered,

01:20:38 9    that's fine.

01:20:39 10    **A**    No.

01:20:42 11    **Q**    Last question from this juror, at least on this piece

01:20:46 12    of paper.

01:20:46 13        "In the fictitious scenario" -- so I think when we

01:20:50 14    were looking at some -- those IntercomPlus scenes that we

01:20:54 15    had mocked up -- "In the fictitious scenario, there were two

01:20:57 16    opioid prescriptions for the same day, 30 days of hydro.

01:21:00 17    Would you not refuse to fill?"

01:21:05 18        I should say maybe this is not straight from the

01:21:09 19    screenshots we were looking at but just in that situation,

01:21:12 20    somebody on the same day --

01:21:14 21    **A**    Um-hmm.

01:21:15 22    **Q**    -- has two 30-day prescriptions for hydrocodone, say

01:21:19 23    Vicodin or another hydrocodone product.

01:21:22 24    **A**    Right.

01:21:23 25    **Q**    They say I got 30 days here and I got 30 days here.

01:21:26  1    **A**    Right.

01:21:26  2    **Q**    Would you not refuse to fill?

01:21:27  3    **A**    So a couple different things about that.

01:21:31  4          Yes, I would refuse to fill at least one out of two of

01:21:36  5    the prescriptions.  So, again, I'm taking every single

01:21:40  6    scenario for every single patient on a patient-by-patient

01:21:45  7    basis.

01:21:46  8          So if someone's coming to me and they're presenting

01:21:50  9    two prescriptions for hydrocodone, this can happen in a

01:21:53 10    couple different ways.

01:21:57 11          A lot of times now, patients will go to see their

01:22:00 12    doctor and they might have an appointment with their doctor

01:22:04 13    every three months.  And, so, at that doctor's appointment,

01:22:09 14    the doctor may write for them three prescriptions for

01:22:14 15    hydrocodone for 30 days each.

01:22:20 16          And on those prescriptions, they may say -- one

01:22:22 17    prescription may not have a date on it at all as far as you

01:22:26 18    can fill on such and such date.  The second prescription may

01:22:29 19    say do not fill until December 1st.  The third prescription

01:22:36 20    may say do not fill until January 1st.

01:22:43 21          So there are situations where I may be presented with

01:22:45 22    three prescriptions on the same day for the same medication,

01:22:48 23    but I'm not dispensing all of them on the same day.  That's

01:22:52 24    not necessarily a reason for me to refuse to fill all of the

01:22:56 25    prescriptions just because the patient presented them to me

**Stossel - Redirect/Stoffelmayr**

01:22:59  1    on the same day.

01:23:05  2         Sometimes the patient brings us those prescriptions

01:23:08  3    for future fills, I guess is what I'm trying to say.

01:23:11  4    **Q**    But if there was no date restriction on the

01:23:14  5    prescription, someone just said I got 30 days and I got

01:23:17  6    another 30 days, would you fill those right away?

01:23:20  7    **A**    I mean, I definitely would not fill both prescriptions

01:23:22  8    at the same time.  And the insurance would prohibit me from

01:23:25  9    doing so.  My computer system would alert me to DURs and

01:23:30 10    flags.

01:23:31 11         I certainly would not fill a duplicate prescription

01:23:34 12    for any drug, much less, you know, a hydrocodone

01:23:37 13    prescription, but I'm not going to fill a duplicate

01:23:40 14    prescription for a Metformin or a diabetes medication as

01:23:46 15    well.

01:23:46 16         It just -- it's not something I would do.

01:23:51 17    **Q**    What about this scenario, and there may actually --

01:23:54 18    this may have been triggered by one of the questions I was

01:23:56 19    reading, or if not, let me just ask you.

01:23:58 20         A patient -- like a patient we looked at, patient, you

01:24:01 21    know, May Test Patient, or whatever her name was on the

01:24:04 22    screen, she had a 5 milligrams of Vicodin prescription,

01:24:09 23    right, or 5/325?

01:24:11 24    **A**    Um-hmm.

01:24:12 25    **Q**    If she came back -- that was for 30 days, I think,

**Stossel - Redirect/Stoffelmayr**

01:24:15  1  right?

01:24:15  2  **A**    Um-hmm.

01:24:15  3  **Q**    If she came back five days later with a prescription

01:24:19  4  for 10 milligrams of Vicodin --

01:24:20  5  **A**    Um-hmm.

01:24:21  6  **Q**    -- another 30 days for 10 mills Vicodin --

01:24:23  7  **A**    Um-hmm.

01:24:24  8  **Q**    -- is that something you would just immediately fill,

01:24:27  9  or would you have questions about that?

01:24:29 10  **A**    Well, I would have questions about the increase in

01:24:32 11  strength.

01:24:35 12         A lot of times patients will get prescribed one

01:24:39 13  medication in a lower strength and then for whatever reason,

01:24:44 14  maybe that medication is not working for them and they need

01:24:48 15  to take a higher strength of the medication, the doctor will

01:24:51 16  prescribe the higher strength for them instead of telling

01:24:56 17  them, oh, just take two of the lower strength.  They'll

01:24:59 18  actually prescribe the higher strength for them.  And that

01:25:01 19  would be a time when you could reach out to the doctor's

01:25:03 20  office and ask the doctor, "Hey, what's going on here?  I

01:25:08 21  see that the patient just got a prescription for this

01:25:11 22  medication in the 5/325 strength and now you're prescribing

01:25:15 23  the 10/325 strength.  What's -- what's going on?"

01:25:19 24         And we might be able to get some resolution from the

01:25:21 25  doctor.

01:25:24  1   **Q**     Okay.

01:25:25  2       I'm going to come back.  This is actually the same

01:25:27  3   piece of paper from the very first question but I saw they

01:25:29  4   had another question above that.

01:25:32  5       "Are GFD forms available in the system when a

01:25:34  6   prescription has been refused for the next pharmacist to see

01:25:37  7   why the prescription was refused?"

01:25:43  8   **A**     So. . . there's not a. . . there's not a form that's

01:25:53  9   available that would tell me. . . I guess I'm trying to

01:26:00  10  think about how best to answer this.

01:26:05  11      For certain drugs in the computer system, there is a

01:26:11  12  checklist that I can double-check myself to see if I am

01:26:19  13  doing my due diligence on a prescription.  There are some

01:26:25  14  ways that I can make notations or put comments if I have a

01:26:33  15  red flag for a prescription and then I am resolving that red

01:26:39  16  flag, there is a spot where I can put those comments about

01:26:43  17  why I'm resolving this red flag.

01:26:48  18      And so the answer to that then would be, yes, another

01:26:51  19  pharmacist could go back and see those comments about why it

01:26:54  20  was refused.

01:26:54  21  **Q**     And just so there's no confusion about the time frame

01:26:58  22  we're talking about here, are you describing a Target Drug

01:27:02  23  checklist?

01:27:03  24  **A**     Yes.  Yes.

01:27:03  25  **Q**     And I think the jury has heard this.  If not, the you

6954

**Stossel - Redirect/Stoffelmayr**

01:27:06 1   can confirm it.

01:27:07 2        The Target Drug checklist was previously in paper

01:27:12 3   format --

01:27:12 4   **A**    Yes.

01:27:12 5   **Q**    -- and was recently transitioned to an electronic

01:27:16 6   format?

01:27:16 7   **A**    Correct.

01:27:16 8        That's kind of why I hesitated when I was starting to

01:27:20 9   answer.

01:27:20 10  **Q**    Before the Target Drug checklists went electronic,

01:27:26 11  would -- and any information that you wanted to leave for

01:27:29 12  another pharmacist about a refusal, would it have to go in

01:27:33 13  the same patient comment fields we looked at earlier?

01:27:35 14  **A**    Yes.

01:27:36 15  **Q**    And for non-Target Drugs -- so, hydrocodone for

01:27:39 16  example is not on the Target Drug checklist; correct?

01:27:43 17  **A**    Um-hmm.

01:27:43 18  **Q**    For a non-Target Drug, today, just like before, if you

01:27:47 19  want to leave a note for the next pharmacist about a

01:27:50 20  refusal, where would you put it?

01:27:51 21  **A**    I would put it in the patient comments.

01:27:57 22  **Q**    All right.  Making our way through these.

01:28:00 23       "For that prescription written for that patient from

01:28:03 24  Dr. Keum, are you the only pharmacist who allows -- who's

01:28:10 25  allowed, excuse me -- to fill for this or can other

Stossel - Redirect/Stoffelmayr

01:28:14 1   pharmacists fill as well"?

01:28:15 2   **A**    I'm not the only pharmacist that's allowed to fill for

01:28:17 3   that.  It just depends on if it's my shift or not.

01:28:25 4        So it just depends on when the gentleman brings the

01:28:28 5   prescription in and who's on duty at the time.

01:28:31 6        So if I'm working that day, then -- and the person

01:28:36 7   brings the prescription in, then I would fill the

01:28:39 8   prescription.  If I'm not working that day and the gentleman

01:28:44 9   brings the prescription in, then the pharmacist who is on

01:28:48 10  duty at the time would be the one who was evaluating and

01:28:52 11  filling the prescription.

01:28:54 12       And so a lot of times for known patients and patients

01:29:01 13  that are coming in month after month, all of the pharmacists

01:29:07 14  who work at my store are seeing this same patient with the

01:29:12 15  same medication coming in month after month.  It wouldn't --

01:29:17 16  it would be very odd, it would be very unlikely for me to be

01:29:24 17  the only pharmacist filling one particular patient's

01:29:31 18  medications 100 percent of the time.

01:29:32 19  **Q**    We saw on that -- I want to clear this up.  That kind

01:29:38 20  of data sheet we were looking at --

01:29:41 21  **A**    Oh, okay.

01:29:41 22  **Q**    -- for the Dr. Keum patient.  You said you weren't

01:29:44 23  sure where that came from.

01:29:45 24  **A**    Um-hmm.

01:29:45 25  **Q**    So there's no confusion, we put that together.  We

**Stossel - Redirect/Stoffelmayr**

01:29:48  1    pulled it out of a database.

01:29:49  2    **A**    Okay.

01:29:50  3    **Q**    And it was one of the prescriptions that you filled

01:29:52  4    that Dr. Catizone said I want to see comments and I don't

01:29:54  5    see -- I don't see comments.  Doctor or Mr. Catizone, he was

01:29:58  6    an expert who testified some time ago.

01:30:01  7    **A**    Okay.

01:30:01  8    **Q**    So we said okay, here's a Stossel prescription that

01:30:04  9    Dr. Catizone didn't like, let's pull the data so she can

01:30:06 10    look at it and tell us why she didn't make a comment.

01:30:09 11    **A**    Um-hmm.

01:30:09 12    **Q**    For that Dr. Keum patient, we saw a consultation note,

01:30:13 13    that there had to be a consultation with the patient.

01:30:16 14          Do you remember that?

01:30:16 15    **A**    Yes.

01:30:17 16    **Q**    So if you're the one who fills the prescription,

01:30:19 17    you're on duty when the prescription is filled --

01:30:20 18    **A**    Um-hmm.

01:30:21 19    **Q**    -- you sign off on everything --

01:30:22 20    **A**    Right.

01:30:22 21    **Q**    -- but the gentleman doesn't come back to pick it

01:30:25 22    up --

01:30:25 23    **A**    Right.

01:30:25 24    **Q**    -- until later when you're no longer there.

01:30:27 25    **A**    Right.

**Stossel - Redirect/Stoffelmayr**

01:30:27  1    **Q**    How does the next shift pharmacist know about the

01:30:31  2    consultation?

01:30:32  3    **A**    So that consultation comes up at the register.

01:30:37  4         So when the technician goes to sell the prescription

01:30:42  5    to the patient, there would be something that pops up on the

01:30:48  6    register.

01:30:49  7         So before the prescription could even be scanned to be

01:30:51  8    sold, it would say -- I forget what it says exactly on the

01:30:57  9    register, but it says something like there's a block.  It

01:31:00 10    might say like there's a cap block, which is just a -- an

01:31:04 11    abbreviation to say that there's something that the

01:31:07 12    pharmacist needs to address.

01:31:11 13         And so I might -- yes, I might be the pharmacist to

01:31:13 14    fill the prescription, but another pharmacist might be on

01:31:17 15    duty when the gentleman comes to pick up.  And so another

01:31:21 16    pharmacist then would be the one to go in and review that

01:31:26 17    dosage and clear that DUR comment, you know, for the final

01:31:32 18    time before the gentleman picks up the prescription.

01:31:34 19    **Q**    What about if you're filling a prescription and

01:31:36 20    there's no mandatory consultation that comes out of the

01:31:40 21    system but you think to yourself, I really want to talk to

01:31:43 22    Mrs. Jones?

01:31:43 23    **A**    Right.

01:31:43 24    **Q**    Because she's a little older and she needs to

01:31:46 25    understand this is going to make her sleepy or whatever.

**Stossel - Redirect/Stoffelmayr**

01:31:49  1      Is there a way for you to make sure that even if

01:31:51  2   you're not on duty when Mrs. Jones comes in, that the next

01:31:54  3   pharmacist will know that you want the new pharmacist to

01:31:59  4   have a discussion?

01:32:00  5   **A**      So I can go in also and manually put one of those --

01:32:06  6   we call them a cap block.  So I can manually go in and put

01:32:10  7   one of those cap blocks on a prescription, along with a

01:32:15  8   comment so that when the person is at the register, it will

01:32:19  9   alert the technician to a comment that needs to be addressed

01:32:26 10   with the patient before selling the prescription.

01:32:30 11      And it would be similar to that interaction, like the

01:32:35 12   fentanyl prescription we discussed.

01:32:37 13   **Q**      All right.  New one.

01:32:40 14      In the mock prescription, there was a patient comment

01:32:43 15   about a different C-II -- and I think what we had in our

01:32:47 16   example, the patient comment popped up and it showed a few

01:32:50 17   years ago there had been a GFD refusal on oxycodone.

01:32:54 18      Do you remember that?

01:32:54 19   **A**      Um-hmm.

01:32:55 20   **Q**      In the mock prescription, there was a patient comment

01:32:57 21   about a different C-II.  Does this cause a red flag?  Why?

01:33:01 22   Why not?

01:33:02 23   **A**      Sure.  It definitely causes a red flag.

01:33:07 24      I think the hardest thing to realize when dispensing

01:33:15 25   prescriptions like this to a patient is that patients'

6959

**Stossel - Redirect/Stoffelmayr**

01:33:22  1    health histories changes all of the time.

01:33:25  2         What might be happening to you today with your health

01:33:30  3    is not necessarily what was happening to you three months

01:33:35  4    ago or six months ago.  Something with your health could

01:33:42  5    change literally at the drop of a dime and you could be in a

01:33:46  6    much different scenario with your health.

01:33:48  7         So there's always -- there's always a red flag that

01:33:52  8    could be raised with a comment from two years ago, or three

01:33:57  9    years ago, but what I'm doing with every single prescription

01:34:01 10    that I come across is I'm going back through that patient

01:34:05 11    history and I'm looking at the information that's before me

01:34:08 12    now and I'm looking at the information that was before me

01:34:14 13    previously.  And I'm trying to make the best judgment that I

01:34:19 14    possibly can with all of the information that I have before

01:34:23 15    me right now in real time to benefit this patient that's in

01:34:30 16    front of me to the best of my knowledge.

01:34:35 17         And that's really -- that's really my job every single

01:34:40 18    day.

01:34:45 19    **Q**    New question.

01:34:47 20         You stated you found it somewhat superfluous to

01:34:52 21    document every red flag when they populate for a familiar

01:34:56 22    patient.

01:34:57 23         Do you fill in "see prior note written on a, you know,

01:35:00 24    prior date," meaning do you write in the note section that

01:35:03 25    you've already addressed what others might view as a red

6960

**Stossel - Redirect/Stoffelmayr**

01:35:03 1    flag?

01:35:16 2    **A**    I think it comes off that way that I'm just

01:35:21 3    nonchalantly saying, oh, I've -- I've done this before, I

01:35:25 4    don't need to document everything.  I don't -- I don't need

01:35:27 5    to do this, forget it.  Someone else is already going to

01:35:30 6    know what I did.

01:35:32 7         The truth of the matter is every single prescription

01:35:35 8    that I'm filling, I'm going back through that patient

01:35:39 9    history, I'm looking at the patient history, I'm looking at

01:35:44 10   the prescriptions that I'm filling, I'm looking at their

01:35:49 11   prior comments, their prior documents, their prior notes on

01:35:55 12   prior prescriptions and I'm trying to make the best decision

01:35:58 13   that I can in a relatively short period of time.

01:36:04 14        And so if I have all of that information in front of

01:36:10 15   me every single time for the last 10 times, I. . . I'm

01:36:20 16   trying to do the best by my patient.  I'm trying to spend a

01:36:24 17   couple extra minutes talking with them about their health

01:36:30 18   instead of spending five minutes documenting something in

01:36:33 19   the computer system.  I really have a very short window of

01:36:39 20   time that that person is in front of me.

01:36:42 21        I know you guys have been to the pharmacy and it's a

01:36:44 22   very short window of time that you have there with the

01:36:47 23   person.

01:36:50 24        Going back to that fentanyl person that I had, I just

01:36:54 25   want to give you a little example.  A few months ago, he was

**Stossel - Redirect/Stoffelmayr**

01:37:01  1    in the store, and I was doing the little consult and that

01:37:03  2    consult pops up every single time for me to review the

01:37:08  3    strength, review everything, and I say to him, how are you

01:37:11  4    doing, how's your pain doing.  And he said, "It's really not

01:37:17  5    so great this month.  I had one day where my patch, my patch

01:37:23  6    came off."

01:37:24  7         And I was like, "Oh, what do you mean your patch came

01:37:27  8    off?"  He was like, "Yeah, my patch fell off and I must have

01:37:29  9    been doing something and I got a little sweaty and the patch

01:37:32 10    came off."

01:37:33 11         And so I walked him through a couple different things

01:37:35 12    that he could do to keep that patch on for a little bit

01:37:38 13    longer, a scenario that he could use, hey, if that patch

01:37:41 14    comes off again, here's what I want you to do.  And had I

01:37:46 15    instead just documented that after the DUR field and walked

01:37:52 16    back over to my other computer and started documenting

01:37:55 17    again, oh, talked to him, got it all straightened out, I

01:38:00 18    might have missed that opportunity with him to really touch

01:38:03 19    base with him, find out how he was doing and solve another

01:38:07 20    problem that he had.

01:38:10 21         And so I know it sounds -- I know it sounds like I'm

01:38:14 22    just being a little nonchalant about not documenting

01:38:17 23    everything, but when pressed for time, I'd much rather spend

01:38:21 24    that time with my patient than taking that -- that time to

01:38:28 25    put something else in the computer system that I already

**Stossel - Redirect/Stoffelmayr**

01:38:31 1    know and that the other pharmacists in my store already

01:38:34 2    know.

01:38:34 3    **Q**    So let me ask you a couple follow-up questions on

01:38:37 4    that.

01:38:37 5        You know, obviously you work at a busy pharmacy and,

01:38:42 6    you know, you describe being pressed for time and wanting to

01:38:45 7    use your time with the patients.

01:38:48 8        Have you ever felt that you were so pressed for time

01:38:51 9    that you couldn't do the due diligence you needed to make

01:38:55 10   sure you were filling an appropriate prescription?

01:38:58 11   **A**    No, not at all.

01:39:00 12   **Q**    These time pressures you're discussing cause you to

01:39:03 13   cut corners?

01:39:03 14   **A**    No.

01:39:04 15       I'm not cutting corners with prescriptions.  I mean,

01:39:07 16   it might take me a lot longer to get the patient's

01:39:10 17   prescription completed.  You might have to wait a little bit

01:39:12 18   longer at the pharmacy, but I'm not -- it's not causing me

01:39:16 19   to work faster.

01:39:18 20   **Q**    Have you ever failed to put a note in the system that

01:39:24 21   included information that you felt the next pharmacist

01:39:26 22   needed to be able to see to do their job correctly?

01:39:29 23   **A**    No.

01:39:32 24   **Q**    Here's one question I've actually had and had

01:39:35 25   forgotten to ask you at some other points.

### Stossel - Redirect/Stoffelmayr

01:39:40  1      When you review a script that a technician filled, do

01:39:43  2  you recount the C-IIs or do you just look in the vial?

01:39:46  3  **A**     So this doesn't always work a hundred percent of the

01:39:51  4  time.  So sometimes yes and sometimes no.

01:39:56  5      Most of the time when the technicians are counting,

01:40:00  6  they're required to do a double count.  So the technician

01:40:06  7  will count the C-II prescription one time, and then they

01:40:10  8  will turn around, recount the C-II prescription again.

01:40:16  9      And then what we do at my location is we circle the

01:40:18 10  number on the bottle.  So if it's for 30 tablets, they'll

01:40:24 11  count the 30, they'll count the 30 again, and then they'll

01:40:27 12  circle the 30 on the bottle.

01:40:29 13      Now, let's say a prescription gets to me and I'm

01:40:32 14  looking in the vial and I'm verifying everything and I see

01:40:36 15  that it's not circled.  Sometimes I'll simply ask the

01:40:40 16  technician, "Hey, did you double count this?  Is it double

01:40:44 17  counted?"  Sometimes the technician is busy doing something

01:40:47 18  else and I'll just grab a tray, double count it myself.  So

01:40:51 19  it can go both ways.

01:40:55 20  **Q**     One of the things we saw on that product review screen

01:40:58 21  was actually a picture of the pill where you could see what

01:41:00 22  the stamp was, R312 or whatever, 61.

01:41:05 23      Do you actually pull out a pill to make sure it's the

01:41:07 24  right shape and number stamped on it, or how do you know?

01:41:10 25  **A**     So I don't pull it out.

### Stossel - Redirect/Stoffelmayr

01:41:11 1    When you open the vial, if you dump a tablet down into

01:41:16 2    the cap of the vial, you can look at it relatively easy.  We

01:41:20 3    also have these really big magnifying glasses that are by

01:41:26 4    our stations that have lights on them and you can hold it up

01:41:32 5    underneath there if you have --

01:41:33 6    **Q**    But you actually lay eyes on a particular pill --

01:41:37 7    **A**    Yes.

01:41:38 8    **Q**    -- to make sure it looks like the way it's supposed to

01:41:40 9    look?

01:41:40 10   **A**    Yeah, um-hmm.

01:41:41 11   **Q**    Okay.  All right.  I think this refers to an example

01:41:47 12   you gave.

01:41:50 13        If a new pharmacist starts at your store and the

01:41:53 14   little old lady comes by but it's been 19 months since a

01:42:00 15   comment was added, the new pharmacist doesn't know the

01:42:03 16   little old lady and finds that a red flag can't be resolved.

01:42:07 17   The new pharmacist sees the prescription history and notes

01:42:10 18   additional red flags.

01:42:12 19        Would you overrule the new pharmacist and fill because

01:42:15 20   you know the little old lady?

01:42:19 21   **A**    So. . . so I think this is like kind of a complicated

01:42:26 22   situation, but at the end of it, I get the question.

01:42:31 23        There's never really two pharmacists working on the

01:42:34 24   same shift in the same store.  So if there's a new

01:42:38 25   pharmacist that comes and -- I guess a better way to say it

01:42:44  1   is what if I'm the new pharmacist, what if I am going into a

01:42:47  2   store that I haven't worked at before and I don't see any

01:42:50  3   comments in this profile and the patient's been getting this

01:42:55  4   medication for a long time.

01:42:58  5        That doesn't mean that I'm just going to automatically

01:43:00  6   fill the prescription just because they've been getting it.

01:43:05  7   Is it complicated because there are no notes that I can see?

01:43:10  8   Maybe.  Does it mean I might have to call the doctor's

01:43:13  9   office and get some additional information?  Sure.  Is it

01:43:20  10  maybe a red flag that she's there and we need to get the

01:43:26  11  prescription filled?  Sure.

01:43:29  12       These are things that we're doing every single day

01:43:34  13  with all kinds of prescriptions and resolving red flags and

01:43:37  14  calling on prescriptions and verifying that they are

01:43:42  15  legitimate prescriptions for legitimate medical purposes for

01:43:47  16  legitimate patients and legitimate doctors.

01:43:50  17  **Q**     Okay.

01:43:50  18       But if you do have a situation where there's a new

01:43:53  19  pharmacist -- like you said, it's unlikely you're working

01:43:56  20  the same shift but let's say you relieve the new pharmacist,

01:43:59  21  you come in and take over.  And the new pharmacist says,

01:44:02  22  "I'm not comfortable filling a prescription."

01:44:04  23  **A**     Right.

01:44:05  24  **Q**     For whatever reason.  It could be, you know, this

01:44:07  25  situation.  It could be, you know, the guy seemed high to

**Stossel - Redirect/Stoffelmayr**

01:44:11  1    me.  It could be this doctor, for whatever reason -- can

01:44:16  2    you, as a more senior pharmacist, say, that's your

01:44:20  3    professional judgment, but I'm overruling you?

01:44:23  4    **A**    No.

01:44:23  5    **Q**    You can't make them fill a prescription they're not

01:44:26  6    comfortable filling?

01:44:27  7    **A**    No.  No.

01:44:31  8    **Q**    Oh, there's a reference here to 19 months.  I want to

01:44:37  9    make sure there's no confusion.

01:44:38 10        When we looked at the patient profile screen, it shows

01:44:41 11    19 months -- I'm sorry, 18 months worth of prescriptions for

01:44:44 12    the patients; correct?

01:44:44 13    **A**    Um-hmm.  Yeah, just about.

01:44:46 14        It's not -- I don't think it's exactly 18 months and

01:44:48 15    then boom, there's nothing, but it's around that time

01:44:52 16    period.

01:44:53 17    **Q**    If -- but those patient notes, not the -- not the

01:44:56 18    prescription history?

01:44:57 19    **A**    Um-hmm.

01:44:57 20    **Q**    But the patient notes, if you were to put something in

01:45:00 21    that field --

01:45:02 22    **A**    Oh, they're longer than --

01:45:04 23    **Q**    -- do they time out after a particular number of

01:45:06 24    months?

01:45:07 25    **A**    No, those are -- those are there until they're removed

## Stossel - Redirect/Stoffelmayr

01:45:10  1    or -- yeah.

01:45:14  2    **Q**    This is, I think, related to a question we saw

01:45:18  3    earlier, but let's go through it again in case there's a

01:45:21  4    nuance I don't want to miss.

01:45:22  5        If someone has a controlled substance filled but

01:45:24  6    doesn't pick it up before the pharmacy closes, does it sit

01:45:27  7    with the rest of the ready-for-pickup scripts or is it

01:45:31  8    locked back into the C-II cabinet or is it locked in the

01:45:35  9    cabinet?

01:45:35 10    **A**    It sits with the rest of the ready prescriptions.  It

01:45:38 11    doesn't get locked up in another cabinet.  It's just with

01:45:43 12    the rest of the prescriptions in the pharmacy.

01:45:48 13    **Q**    I kind of asked you a version of this question before

01:45:50 14    but maybe this is slightly different.

01:45:52 15        In your 25 years, have you had a problem that after

01:45:54 16    you left the pharmacy, a technician or another pharmacist

01:45:57 17    was grabbing C-IIs off the ready-to-fill shelf -- sorry,

01:46:04 18    ready-to-pick-up shelf?

01:46:06 19    **A**    No.

01:46:09 20    **Q**    Last question, and I'm going to -- I think I'll read

01:46:13 21    the question and then I think I know the document they have

01:46:16 22    in mind.  You may as well -- and I'll show it to you.

01:46:19 23        "In regards to the TDGFD" -- so the Target Drug GFD

01:46:24 24    checklist -- "do you find the prompt patient does not appear

01:46:31 25    intoxicated or under the influence of an illicit drug, yes

**Stossel - Redirect/Stoffelmayr**

01:46:36  1   or no, to be poorly worded?"

01:46:37  2       And, Mr. Pitts, if I could have the computer, I'll

01:46:40  3   pull up a version of the actual document.

01:46:55  4       Boom.  All right.  You recognize this as at least one

01:46:59  5   of the Target Drug checklist?

01:47:01  6   **A**     Yes.

01:47:01  7   **Q**     I think the question is about Question 6.  You

01:47:03  8   obviously weren't here for it but there was some testimony

01:47:05  9   about whether -- well, about how people interpret this

01:47:11 10   question.

01:47:11 11       "Patient does not appear intoxicated or under the

01:47:13 12   influence of drugs."  And you could check yes or no;

01:47:17 13   correct?

01:47:18 14   **A**     Right.

01:47:19 15   **Q**     Do you find that confusing?

01:47:20 16   **A**     Yeah.

01:47:21 17       I mean, it is kind of confusing because it's using

01:47:24 18   kind of like a double negative.

01:47:26 19   **Q**     At least double, yeah.

01:47:27 20   **A**     To try and get your response.

01:47:28 21       And so I think what this checklist was kind of doing,

01:47:33 22   maybe this might make a little bit more sense about why it

01:47:35 23   was worded that way.

01:47:40 24       In my experience in filling out one of these, you

01:47:44 25   really didn't want to have any of those boxes marked yes.

### Stossel - Redirect/Stoffelmayr

01:47:49  1    That would really raise some big questions.  So -- but it

01:47:57  2    is -- it is kind of strange because, to me, it would make a

01:48:00  3    lot more sense if it said, you know, patient appears, you

01:48:06  4    know, patient appears intoxicated or under the influence of

01:48:11  5    illicit drugs.  You could easily still hit no and --

01:48:16  6    **Q**    So I'll ask you -- let me ask you about the yes versus

01:48:19  7    no.

01:48:20  8    **A**    Yeah.

01:48:20  9    **Q**    What would be the normal answer if you're going to

01:48:22 10    fill -- you know, if this is a regular -- no red flags,

01:48:26 11    everything checks out okay, this is just a regular --

01:48:28 12    someone's got a, you know, tooth procedure and they got

01:48:31 13    oxycodone.

01:48:31 14        Would you expect to check -- forget Number 6.  We'll

01:48:34 15    come back to Number 6.

01:48:35 16    **A**    Um-hmm.

01:48:36 17    **Q**    Would you expect to be checking yes or no?

01:48:39 18    **A**    Well, that's where it gets confusing.  You would

01:48:42 19    expect to be checking yes, because they don't appear

01:48:46 20    intoxicated, but the whole point of the sheet, I think, was

01:48:51 21    so that you would end up with not a lot of boxes marked yes

01:49:00 22    or no.  And so if you ended up with something marked in the

01:49:03 23    other box, it made it very confusing.

01:49:05 24    **Q**    So just start with Number 3, patient has received this

01:49:08 25    prescription from Walgreens before.  A yes answer would give

01:49:13  1    you more comfort than a no answer or other way around?

01:49:17  2                    MR. WEINBERGER:  Objection, Your Honor.

01:49:24  3                    THE COURT:  Yeah, I -- sustained.  I don't

01:49:25  4    understand the question.

01:49:27  5                    MR. STOFFELMAYR:  That's a good objection,

01:49:28  6    too.

01:49:30  7                    THE COURT:  Well, I. . .

01:49:33  8                    MR. STOFFELMAYR:  Your Honor, if you didn't

01:49:34  9    understand it, then I don't want to assume anyone else did.

01:49:37 10    BY MR. STOFFELMAYR:

01:49:38 11    **Q**    If you look at Question 3, would you expect for a --

01:49:44 12    well, let me ask it the way I tried to ask it before.

01:49:47 13         Question 3 is, "Patient has received this prescription

01:49:50 14    from Walgreens before?"  Would you have more comfort with

01:49:54 15    the answer was yes or if the answer was no?

01:49:56 16    **A**    I'd have more comfort if the answer was yes.  I'd be

01:50:01 17    able to see that in their patient history.

01:50:08 18    **Q**    Third -- Number 5.  Third-party insurance is billed.

01:50:15 19    Would you be more comfortable if the answer is yes or if the

01:50:17 20    answer is no?

01:50:20 21    **A**    I'd be more comfortable if it was yes.

01:50:22 22    **Q**    Why is that?

01:50:26 23    **A**    So if the third-party insurance is billed, for most

01:50:35 24    occasions, you know, we're getting people who are using

01:50:38 25    insurance, especially around this same time of the Target

01:50:41  1    Good Faith Dispensing is around the same time like we were

01:50:47  2    starting to be required by the government to have insurance,

01:50:50  3    to hold insurance.  And so most people did have insurance at

01:50:57  4    this time.

01:50:57  5    **Q**    So let's then get to Number 6, the one that the

01:51:00  6    juror's question was about.

01:51:01  7         "Patient does not appear to be intoxicated or under

01:51:05  8    the influence of drugs."

01:51:09  9         So what would a yes mean and what would a no mean to

01:51:13  10   you?

01:51:13  11   **A**    So -- yeah.

01:51:14  12        So if you're putting yes, then they don't appear

01:51:18  13   intoxicated or under the influence.

01:51:21  14   **Q**    So yes is "not intoxicated"; no is not "not

01:51:27  15   intoxicated"?

01:51:27  16   **A**    Right.

01:51:28  17   **Q**    Okay.

01:51:28  18        So back to the juror's question.  Do you find that

01:51:30  19   poorly worded?

01:51:31  20   **A**    Yes.  Extremely poorly worded.

01:51:34  21   **Q**    Okay.

01:51:35  22   **A**    And you can see that they were really trying to get us

01:51:37  23   to kind of line up our answers so that any answer out of the

01:51:42  24   norm would kind of stick out to us.

01:51:46  25        The sheet was kind of used as a triple check to

6972

**Stossel - Redirect/Stoffelmayr**

01:51:51 1   justify your own thoughts.

01:51:53 2   **Q**   All right.

01:51:53 3       We're done with the juror questions.  Let me ask you

01:51:55 4   some of my own questions and I'll start with the Target Drug

01:51:59 5   checklist.

01:52:02 6       There were -- I think this came out in the

01:52:06 7   cross-examination.  This Target Drug checklist came into use

01:52:10 8   in around 2013; is that right?

01:52:14 9   **A**   Yeah -- thereabouts, yes.

01:52:16 10  **Q**   Well, you haven't been using this exact checklist

01:52:19 11  since you got to the company in 1996?

01:52:21 12  **A**   No.

01:52:23 13  **Q**   Are there questions on this Target Drug checklist that

01:52:28 14  are different from the questions you would always ask

01:52:32 15  yourself filling any controlled drug prescription?

01:52:36 16  **A**   No.

01:52:39 17  **Q**   When you fill a -- when you were filling prescriptions

01:52:42 18  for oxycodone in 2010, were you asking yourself different

01:52:45 19  questions than what we see on this checklist?

01:52:47 20  **A**   No.

01:52:48 21  **Q**   When -- even today, when you fill a prescription for

01:52:51 22  hydrocodone, which is not one of these Target drugs, do you

01:52:54 23  ask yourself different questions than what's on the

01:52:56 24  checklist?

01:52:57 25  **A**   No.

**Stossel - Redirect/Stoffelmayr**

01:53:03 1  **Q**     Do you recall, on cross-examination, you were asked

01:53:05 2  some questions about this good faith practices policy from

01:53:09 3  1998?

01:53:11 4  **A**     Um-hmm.

01:53:12 5  **Q**     And just for the benefit of the record, it's better if

01:53:14 6  you say yes or no.

01:53:15 7  **A**     Oh, okay.  I'm sorry.

01:53:17 8  **Q**     No, it's no problem.  No reason you would be

01:53:19 9  responsible for that.

01:53:19 10     Do you -- you remember being asked some questions

01:53:21 11 about this?

01:53:22 12 **A**     Yes.

01:53:22 13 **Q**     And I think one of the questions was, "Couldn't the

01:53:25 14 company have created this document earlier than 1998."

01:53:30 15     Do you remember questions like that?

01:53:31 16 **A**     Yes.

01:53:32 17 **Q**     You see it says it was revised in 1998?

01:53:38 18 **A**     Yes.

01:53:39 19 **Q**     Do you have any recollection one way or the other

01:53:41 20 whether the pre-'98 version looked different in terms of

01:53:45 21 that elements section?

01:53:46 22 **A**     I don't know.

01:53:47 23 **Q**     You came to the company in '96; correct?

01:53:50 24 **A**     Correct.

01:53:58 25 **Q**     Very last thing I want to ask you about is -- let me

01:54:03  1    go back to our screen.  Oh, I'm sorry, I was talking to

01:54:12  2    myself.  I meant our mocked up Good Faith Dispensing screen.

01:54:23  3         Mr. Lanier asked you some questions about how things

01:54:26  4    are different today at Walgreens than they were, say, in

01:54:32  5    2000 or 2005 or 1998 for that matter.

01:54:35  6         Do you remember those kinds of questions?

01:54:36  7    **A**    Yes.

01:54:38  8    **Q**    And you may have said this, but the steps that you go

01:54:41  9    through to fill a controlled substance prescription at

01:54:44 10    Walgreens, have they changed these steps we're looking at,

01:54:48 11    since the day you joined the company in 1996?

01:54:51 12    **A**    No.

01:54:52 13    **Q**    And then if we look at the IntercomPlus system, did

01:54:58 14    intercom -- well, when did IntercomPlus come online?

01:55:01 15    **A**    I think 1997.

01:55:04 16    **Q**    Shortly after you joined the company?

01:55:06 17    **A**    Right.  Um-hmm.

01:55:07 18    **Q**    Was there a different system before that or was it all

01:55:10 19    paper and typewriters?

01:55:11 20    **A**    No, there was a different computer system prior to

01:55:13 21    this.

01:55:13 22    **Q**    Do you remember what it was called?

01:55:15 23    **A**    I don't remember.

01:55:17 24    **Q**    So shortly after you joined the company, IntercomPlus

01:55:20 25    became available in the late '90s?

**Stossel - Redirect/Stoffelmayr**

01:55:22  1    **A**    Yes.

01:55:23  2    **Q**    And we looked at some of the functionality in

01:55:26  3    IntercomPlus.  Obviously, when you got to the company or --

01:55:31  4    strike that.

01:55:31  5         When you first got access to IntercomPlus in '97 or

01:55:36  6    '98, obviously it didn't have that PDMP link we saw;

01:55:39  7    correct?

01:55:39  8    **A**    Correct.

01:55:40  9    **Q**    Do you recall when OARRS first came into existence?

01:55:45 10    **A**    OARRS has been in existence since prior to 2008.

01:55:51 11    **Q**    Was it available in 2000?

01:55:53 12    **A**    No.

01:55:57 13    **Q**    Some of the functionality we talked about together,

01:56:01 14    like having access to this patient comment function, is that

01:56:09 15    something new in the last few years or has that always been

01:56:12 16    part of IntercomPlus?

01:56:13 17    **A**    No, that's always been part of IntercomPlus.

01:56:16 18    **Q**    What about leaving prescriber comments or being able

01:56:18 19    to read prescriber comments?  Is that something new or has

01:56:21 20    that always been part of IntercomPlus?

01:56:23 21    **A**    That's always been part of IntercomPlus.

01:56:25 22    **Q**    Same with putting a comment on a -- attaching a

01:56:29 23    comment to a prescription?

01:56:31 24    **A**    That's -- yeah, that's been part of IntercomPlus.

01:56:35 25    **Q**    I know the -- there's different ways to attach a

01:56:37  1    comment to a prescription.  This cool, sort of sticky note

01:56:41  2    way of doing it, was that in the original version, or was

01:56:44  3    that part of an upgrade?

01:56:45  4    **A**    I don't remember.  I think part of an upgrade.  I

01:56:49  5    don't know if it was originally there.

01:56:50  6    **Q**    Back in the old days, were there prescription comments

01:56:53  7    you could leave in one of these fields down here

01:56:55  8    (indicating)?

01:56:57  9    **A**    I believe so.

01:57:05 10           MR. STOFFELMAYR:  Ms. Stossel, that's all I

01:57:07 11    have for you.  Thank you, so, so, much.

01:57:09 12        I will pass the witness, and you and everyone else

01:57:11 13    will get to go home before too long.

01:57:13 14           THE COURT:  Okay.  I assume there were no

01:57:15 15    questions from Walmart or CVS?

01:57:20 16           MR. MAJORAS:  No, Your Honor.

01:57:20 17           MR. DELINSKY:  No, Your Honor.

01:57:21 18           THE COURT:  Okay.  Thank you.

01:57:22 19        Mr. Lanier.

01:57:22 20

         21

         22

         23

         24

         25

**Stossel - Recross/Lanier**

01:57:22 1          RECROSS-EXAMINATION OF AMY STOSSEL

01:58:24 2    BY MR. LANIER:

01:58:24 3    **Q**     All right.

01:58:25 4          Ms. Stossel, I don't think I'll take long with you.  I

01:58:27 5    just need to cover a few things that have already been

01:58:30 6    covered just now with you.  I want to clarify a couple of

01:58:34 7    things.

01:58:35 8          The first thing I want to do is talk about that Target

01:58:39 9    Drug Good Faith Dispensing checklist.  And I've got a copy

01:58:43 10   of it here to put on the overhead.

01:58:50 11         Now, you used to have to fill these out year after

01:58:54 12   year after year for every controlled substance -- well, for

01:58:58 13   three of the controlled substances, right?

01:59:00 14   **A**     Correct.

01:59:02 15   **Q**     I would think you'd know this pretty good after all

01:59:04 16   those years, wouldn't you?

01:59:06 17   **A**     Correct.

01:59:08 18   **Q**     But when you were asked about it, one of the jurors

01:59:11 19   asked you about Question Number 6 and whether or not it's

01:59:14 20   poorly worded, and your response was, "In my experience in

01:59:23 21   filling out one of these, you really didn't want to have any

01:59:26 22   of those boxes marked yes.  That would raise some -- really

01:59:33 23   raise some big questions."

01:59:34 24         Do you see that?

01:59:35 25   **A**     Sure.

**Stossel - Recross/Lanier**

01:59:36  1    **Q**    In fact, you're wrong, aren't you?

01:59:41  2    **A**    Yeah, that was -- that was incorrect.  It's been a

01:59:44  3    couple years since I've looked at this to be frank.

01:59:46  4    **Q**    Yeah.

01:59:46  5    Because you want all of them yes and if there's a no,

01:59:51  6    there's a problem; correct?

01:59:52  7    **A**    That's correct.  Yeah, I realized that after I said

01:59:55  8    it.

01:59:55  9    **Q**    Well, when you said -- when you realized it was wrong,

01:59:59  10   you added something else.  You said, I think -- the whole

02:00:04  11   point of the sheet I think was that you would end up with

02:00:07  12   not a lot of boxes marked yes or no.

02:00:12  13   Well, that's not the point either.  The point is that

02:00:15  14   they're all yes, and if you've got a no, there's a problem;

02:00:18  15   correct?

02:00:20  16   **A**    Right.  Sure.

02:00:21  17   **Q**    And so theoretically, you were supposed to be filling

02:00:24  18   one of these out with just about every controlled substance

02:00:28  19   you did; correct?

02:00:29  20   **A**    Well, with three -- with three of the controlled

02:00:37  21   substances.

02:00:37  22   **Q**    And when you say it's been a couple of years since

02:00:40  23   I've filled one of these out, is that because it's now

02:00:42  24   electronic?

02:00:43  25   **A**    It's electronic, correct.

Stossel - Recross/Lanier

02:00:44  1    **Q**    So y'all don't use that form anymore?

02:00:46  2    **A**    The paper form we do not use anymore.

02:00:48  3    **Q**    But you still use it on the computer?

02:00:51  4    **A**    Yes, we use it on the computer, but it's in a

02:00:53  5    different format.  It's not the same.

02:00:56  6    **Q**    But you're still being asked the same questions,

02:01:00  7    aren't you?

02:01:00  8    **A**    Some of the questions are exactly the same.

02:01:03  9    **Q**    All right.  Next issue.

02:01:04  10        A juror asked you this question and I want to press

02:01:07  11   you a little bit on it.  Okay?

02:01:09  12        You were asked, "Are GFD, Good Faith Dispensing, forms

02:01:14  13   available in the system when a prescription has been refused

02:01:18  14   for the next pharmacist to see why the prescription was

02:01:21  15   refused?"

02:01:23  16   **A**    Um-hmm.

02:01:23  17   **Q**    Let's pause for a moment.  I thought you told us when

02:01:26  18   you refuse a prescription, generally, you just hand it back

02:01:30  19   to the patient.

02:01:31  20        Is that true?

02:01:32  21   **A**    So that's one example.

02:01:34  22   **Q**    Isn't that the example you used until this juror asked

02:01:37  23   this question and you came up with a different one?

02:01:41  24   **A**    No, that's one example if a prescription is refused.

02:01:45  25   **Q**    So if a prescription is refused, it's not company

02:01:48  1    policy to take a picture, log it into the system, and

02:01:52  2    explain why it's refused?  There's no policy on that?

02:01:56  3    **A**    There's no policy to log it into the system, take a

02:02:00  4    picture, and explain why it was refused, no.

02:02:05  5    **Q**    That might be a good thing to do, don't you think?

02:02:09  6    **A**    It's not part of our policy.

02:02:10  7    **Q**    I understand that.  That wasn't my question.  It might

02:02:13  8    be a good thing to do.  Work with me here.

02:02:16  9            Let's say you hand the prescription back to that

02:02:18  10   person and they take it to the Walgreens a couple of miles

02:02:21  11   down the road.  If you haven't done anything into the

02:02:26  12   system, that next pharmacist doesn't have the benefit of

02:02:30  13   your due diligence, true?

02:02:32  14   **A**    But I have done something in the system.  I would have

02:02:34  15   put information into the patient comment field.

02:02:37  16   **Q**    Did you put a copy of the prescription and say that it

02:02:41  17   was refused to fill and why?

02:02:43  18   **A**    I wouldn't have a copy of the prescription if I gave

02:02:46  19   that back to the patient.

02:02:47  20   **Q**    That's my point.

02:02:49  21           If you had done so -- if you had a system that allowed

02:02:51  22   you to do so, you could take a scanned copy -- you scan

02:02:56  23   prescriptions all the time into the system; right?

02:02:59  24   **A**    Yes.

02:03:00  25   **Q**    You could scan a copy of it, mark it refused to fill,

**Stossel - Recross/Lanier**

02:03:04  1    explain why, and it could be in the system for all Walgreens

02:03:08  2    all around the United States of America, couldn't it?

02:03:11  3    **A**    I -- I don't -- I don't make any of those system

02:03:17  4    policies at the store level.  I don't --

02:03:20  5    **Q**    All right.

02:03:21  6    **A**    -- have any of that info.

02:03:22  7    **Q**    Next subject.  Short window of time.  You used that

02:03:27  8    expression over and over in one of your examples.  Remember?

02:03:30  9    **A**    Sure, yes.

02:03:31  10   **Q**    And you were saying, "If I've got a choice between

02:03:35  11   documenting or discussing it, it's so much more important I

02:03:38  12   spend my time discussing."

02:03:39  13        Do you remember that example?

02:03:40  14   **A**    Yes.

02:03:40  15   **Q**    Did it ever occur to you to do both?

02:03:43  16   **A**    Of course it occurs to me to do both.

02:03:48  17   **Q**    You could have that full-on counseling session and

02:03:51  18   still make the necessary documentary notes in the system.

02:03:55  19        True?

02:03:55  20   **A**    I'm sure that I could if I had ample time to do so.

02:03:59  21   **Q**    If you had ample time to do so.  And who establishes

02:04:03  22   how many people are working in the pharmacy?

02:04:05  23   **A**    I do not know that.

02:04:09  24   **Q**    Were you aware, back in 2012, that your company had

02:04:16  25   internal concerns that the DEA thought they intentionally

**Stossel - Recross/Lanier**

02:04:21 1    understaffed to prevent their staff from performing Good

02:04:27 2    Faith Dispensing?

02:04:27 3        Were you aware of such concerns?

02:04:29 4                MR. STOFFELMAYR:  Objection.

02:04:29 5                THE WITNESS:  I -- I am not aware.

02:04:32 6                MR. STOFFELMAYR:  Objection, Your Honor.

02:04:33 7    Misstates.

02:04:33 8                THE COURT:  Hold it.

02:04:34 9                MR. STOFFELMAYR:  Your Honor, that's -- may we

02:04:37 10   go on the headsets?

02:04:38 11               MR. LANIER:  It's one question, Your Honor,

02:04:39 12   and I'm glad to do the document.

02:04:41 13               THE COURT:  Well, I'll allow one question.

02:04:43 14       You may answer, ma'am.

02:04:44 15               THE WITNESS:  I'm not aware of that.

02:04:45 16               MR. LANIER:  Okay.

02:04:51 17   BY MR. LANIER:

02:04:51 18   **Q**    And as for the document patch -- as for the patch

02:04:56 19   falling off, the fentanyl patch, did you document that in

02:05:01 20   the file?

02:05:03 21   **A**    I'm not sure why I would need to document a patch

02:05:06 22   falling off.

02:05:06 23   **Q**    Well, ma'am, if I wanted an extra fentanyl patch, one

02:05:09 24   of the easiest ways to think of is to tell you mine fell

02:05:14 25   off.

**Stossel - Recross/Lanier**

02:05:14  1  **A**    No one was asking for an extra fentanyl patch, sir.

02:05:17  2  **Q**    At that point in time?

02:05:18  3  **A**    No one was asking for an extra fentanyl patch.

02:05:20  4  **Q**    At that point in time?

02:05:21  5  **A**    No.  No one was asking for an extra fentanyl patch.

02:05:24  6  **Q**    At that point in time.

02:05:26  7        In other words, you don't know what might happen the

02:05:28  8  next day, or the next week, or when the fentanyl patches run

02:05:33  9  out or whatever.

02:05:34  10        Fair?

02:05:34  11  **A**    No one was asking for an extra fentanyl patch.

02:05:37  12  **Q**    But my point is, don't you think it might be important

02:05:40  13  to enter that as a note in the patient's profile, just in

02:05:45  14  case?

02:05:46  15  **A**    No.  I'm having a discussion with the patient about

02:05:48  16  how to address something like that.

02:05:50  17  **Q**    And then while you were still on this subject, three

02:05:53  18  times you said you were pressed for time.  At least that was

02:05:57  19  my count, three times.

02:05:59  20        Why are you pressed for time?

02:06:03  21  **A**    My pharmacy is in a very busy location.  We see a lot

02:06:06  22  of patients during the day.  Pharmacies are busy.

02:06:11  23  **Q**    But don't you have enough people working -- you said

02:06:16  24  you never have two pharmacists on shift at the same time.

02:06:23  25        That's not your decision.  Right?

**Stossel - Recross/Lanier**

02:06:24 1    **A**    Correct.

02:06:26 2    **Q**    And then you said but -- when pressed on this point by

02:06:30 3    Walgreens lawyer, you said, "Well, we're not cutting

02:06:33 4    corners," and yet, my challenge to you is, aren't you

02:06:37 5    cutting corners when you're not documenting as it's

02:06:41 6    imperative for you to do?

02:06:44 7    **A**    I don't feel that I'm cutting any corners in my job.

02:06:52 8    **Q**    And in that regard, Mr. Catizone, he looked -- you

02:06:55 9    know, I told you he looked at 2000 Walmart -- I mean,

02:06:59 10   Walgreens prescriptions.

02:07:00 11        Remember that?

02:07:01 12   **A**    Um-hmm.

02:07:01 13   **Q**    Over a 10-year time span.  I'll represent to you

02:07:04 14   totally random.  Nobody cherry picked anything.  These are

02:07:09 15   totally random.  Okay?

02:07:12 16        So I question, are you surprised about this in light

02:07:16 17   of the time issues you've been talking about, that out of

02:07:20 18   the relevant note fields for Walmart on 2,000 samples --

02:07:24 19              THE COURT:  Walgreens.  Walgreens.

02:07:25 20              MR. LANIER:  Walgreens.  Thank you, Judge.

02:07:27 21   I've just -- let me try that again.

02:07:29 22   BY MR. LANIER:

02:07:31 23   **Q**    Then within the framework of the timing issue you're

02:07:34 24   talking about, are you surprised that out of a totally

02:07:38 25   random 2,000 sample notes for Walgreens, in the relevant

02:07:43  1    notes fields, 1,237 were blank across all these comment

02:07:50  2    fields, representing about 61 percent of the sample.

02:07:55  3         Does that surprise you?

02:07:57  4    **A**    Not all prescriptions need comments.  I'm not

02:08:00  5    surprised.

02:08:00  6    **Q**    But these random ones were all selected because they

02:08:04  7    triggered red flags as recognized by the DEA.  Within the

02:08:11  8    framework of that?

02:08:13  9              MR. STOFFELMAYR:  Objection.

02:08:15  10              THE COURT:  Yeah, I'll sustain that.

02:08:17  11              MR. LANIER:  All right.  Let me do it more

02:08:18  12    carefully.

02:08:19  13    BY MR. LANIER:

02:08:20  14    **Q**    These 2,000 were all selected randomly from triggering

02:08:25  15    red flags as understood or set forth by Mr. Catizone, based

02:08:32  16    upon his understanding of the practice of pharmacy and the

02:08:36  17    DEA rules and the Boards of Pharmacy rules.

02:08:40  18         Do you follow?

02:08:41  19    **A**    Sure.

02:08:41  20    **Q**    So these are ones -- these pharmacy notes are of

02:08:45  21    prescriptions that triggered those red flags.  And yet,

02:08:49  22    61 percent of the sample are blank across all these comment

02:08:54  23    fields.

02:09:02  24         Does that surprise you?

02:09:05  25    **A**    Not all prescriptions with red flags need comments.

**Stossel - Recross/Lanier**

02:09:17  1   **Q**     All right.  On -- next subject.

02:09:19  2        Changing the comments, deleting comments.  Would you

02:09:25  3   agree with me that people's -- I think you even said it,

02:09:28  4   people's health history changes all the time and you're

02:09:32  5   always wanting to look at the prescription history with all

02:09:35  6   the information you have.

02:09:36  7        That's what you said.  Right?

02:09:38  8   **A**     Correct.

02:09:39  9   **Q**     And that's why it's probably a good idea to have all

02:09:42 10   of the data and not delete the old.  Wouldn't you agree?

02:09:47 11   **A**     Correct.

02:09:48 12   **Q**     I'm sorry?

02:09:48 13   **A**     That's correct.

02:09:50 14   **Q**     Okay.

02:09:52 15        So even in the example you gave of deleting the old

02:09:55 16   because the lady changed medicines or something, you never

02:10:00 17   know if she might go back to the old medicine.  Might be

02:10:04 18   helpful to have the note there of an allergic problem.

02:10:09 19        True?

02:10:09 20   **A**     Yes.

02:10:10 21   **Q**     Thank you.

02:10:11 22             MR. LANIER:  I hope you have a great day.  And

02:10:13 23   I appreciate it, Your Honor.  I'm through.

02:10:14 24        Ladies and gentlemen, thank you all for the chance to

02:10:16 25   present evidence.

02:10:19  1              THE COURT:  Okay.

02:10:20  2         Ms. Stossel, thank you very much.  You may be excused.

02:10:23  3                    (Witness excused.)

02:10:35  4              THE COURT:  Okay.  Is it -- my understanding

02:10:38  5    that subject to exhibits, the defendants are resting?

02:10:41  6                    MR. STOFFELMAYR:  That's correct, Your Honor.

02:10:42  7                    MR. MAJORAS:  Yes, Your Honor.

02:10:43  8                    MR. DELINSKY:  Yes, Your Honor.

02:10:43  9              THE COURT:  Thank you.

02:10:44  10        And am I correct that plaintiffs have no rebuttal?

02:10:51  11                   MR. WEINBERGER:  Your Honor, the jurors can't

02:10:52  12   hear.

02:10:52  13             THE COURT:  All right.  So all the defendants

02:10:54  14   are resting?

02:10:54  15        So am I correct that the plaintiffs have no rebuttal?

02:10:58  16                   MR. LANIER:  We have no rebuttal, Your Honor,

02:11:00  17   you are correct.

02:11:00  18             THE COURT:  Okay.  All right.

02:11:03  19        Then, ladies and gentlemen, the testimony in this case

02:11:06  20   has come to an end.  I had told you last Friday we would end

02:11:10  21   sometime middle of the week.

02:11:16  22        So to permit counsel to prepare for closing arguments

02:11:20  23   and because we're going to be off anyway on Thursday, we are

02:11:23  24   going to recess for the week.  We're going to resume

02:11:26  25   promptly at nine o'clock a.m. this coming Monday morning,

02:11:29 1    November the 15th, for final arguments and instructions.

02:11:34 2    And at the close of the day, Monday, the case will be

02:11:37 3    submitted to you for deliberations.

02:11:39 4        It is very important that over the next, I guess

02:11:44 5    five days, you not read, listen, encounter anything whatever

02:11:51 6    having to do with this case or anything related to the

02:11:53 7    subject matter of this case in any sort of media, that you

02:11:57 8    not conduct any sort of independent research.  Everything

02:12:02 9    that you need to know to make your decision, you've heard

02:12:04 10   over the last six weeks in this courtroom and you'll hear in

02:12:07 11   the closing arguments and my instructions on Monday.

02:12:09 12       You are not to discuss this case with anyone.  The

02:12:12 13   only one you can talk about is your fellow jurors and you

02:12:14 14   won't be meeting.

02:12:17 15       So anyone who asks you any questions, tell them this

02:12:20 16   Judge has ordered me not to talk about the case until it's

02:12:22 17   over and that should end it.

02:12:27 18       One thing I'd like you to consider before we leave.

02:12:33 19   My colleague, Judge James Gwin, who's on the side of this

02:12:38 20   hallway, has graciously offered my -- his courtroom for you

02:12:43 21   to use during your deliberations if you prefer.  I mean,

02:12:48 22   obviously the jury room is pretty cramped and because of

02:12:51 23   COVID, there's a large group of you.

02:12:54 24       If you would prefer that, that's fine.  I mean, is

02:13:00 25   there a consensus that you prefer that?  Fine.  Then we will

02:13:07  1    have that set up during the day on Monday.

02:13:09  2        I was -- I was hoping that would be possible but it

02:13:12  3    looked like he had a trial.  That trial's not going forward.

02:13:14  4    He just contacted me.  So I will take him up on that offer,

02:13:19  5    and it will be easier and safer.  I had hoped that would be

02:13:21  6    the case, but we have a lot of trials going on in this

02:13:27  7    courthouse.

02:13:29  8        So, all right.  Have a very good next few days.

02:13:33  9    Celebrate Veteran's Day.  It's important to honor all those

02:13:37 10    brave men and woman who are serving our country now and have

02:13:39 11    done so in the past.

02:13:40 12        Some of us -- some of them are still with us.  Some

02:13:43 13    we've lost because of that service.

02:13:46 14        Have a good few days.  Come back refreshed, and I'll

02:13:49 15    see you on Monday.

02:13:51 16            (Jury excused from courtroom at 2:13 p.m.)

02:14:24 17                 THE COURT:  Okay.

02:14:25 18        If someone could close the backdoor, we'll take up a

02:14:28 19    few things before we break.  Okay.

02:14:35 20        I guess the first thing to take up is any exhibits

02:14:38 21    with our last witness?

02:14:42 22                 MR. STOFFELMAYR:  We have two, Your Honor.

02:14:43 23    Obviously, we have not yet sent the e-mail.

02:14:48 24                 THE COURT:  All right.

02:14:48 25                 MR. STOFFELMAYR:  It's the only two documents

02:14:50  1    we used with her.

02:14:50  2                    THE COURT:  Okay.  Let's. . .

02:14:59  3                    MR. STOFFELMAYR:  It is -- they are

02:15:08  4    WAG-MDL-06 -- no, I'm sorry.  Let me start over.

02:15:12  5    WAG-MDL-02629 and WAG-MDL-02630.

02:15:17  6        Do you need copies, Your Honor?

02:15:20  7                    THE COURT:  Well, there -- are there any

02:15:22  8    objections?

02:15:23  9                    MR. WEINBERGER:  Yes.  We object.

02:15:26 10                    THE COURT:  Well, let me see the documents

02:15:29 11    then.

02:15:30 12                    MR. WEINBERGER:  These are the two printouts

02:15:32 13    from the Ohio -- State of Ohio licensure.

02:15:49 14                    MR. STOFFELMAYR:  She recognized these

02:15:50 15    documents.  She explained what they were.  She was examined

02:15:52 16    on them.  She was available for cross-examination on them.

02:15:55 17        I don't know what the objection would be.

02:15:57 18                    MR. WEINBERGER:  They're hearsay.

02:16:01 19                    MR. STOFFELMAYR:  Well, they're public

02:16:02 20    records.

02:16:03 21                    MR. WEINBERGER:  There's no indication that is

02:16:05 22    a public record.

02:16:05 23                    THE COURT:  I don't even know what --

02:16:06 24                    MR. STOFFELMAYR:  I think it's clear on its

02:16:08 25    face.  Just to say that, I mean, we're not going to bring a

02:16:10  1    witness from the Ohio Department of Professional Licensure.

02:16:15  2                    MR. WEINBERGER:  I mean, if you're not letting

02:16:18  3    OARRS reports in, I don't see why this comes in.

02:16:21  4                    THE COURT:  Well, I'm trying to remember what

02:16:23  5    she -- they're harmless.

02:16:31  6         It just shows that Dr. Demangone has a license.  There

02:16:35  7    was no dispute that he has a license.  So they can come in

02:16:37  8    over objection.

02:16:38  9                    MR. STOFFELMAYR:  Thank you, Judge.

02:16:41 10                    THE COURT:  Any documents the plaintiffs want

02:16:44 11    to introduce?

02:16:56 12                    MR. WEINBERGER:  Your Honor, this document --

02:16:59 13    these two documents, if I just can go back to them for a

02:17:03 14    second.

02:17:03 15         They were used for purposes of also apparently

02:17:07 16    demonstrating that he hadn't had any prior Board actions.

02:17:13 17    So, you know, it's not just that he has a license presently.

02:17:17 18                    THE COURT:  Well, he doesn't have any --

02:17:19 19    apparently he doesn't have any prior Board actions.

02:17:22 20                    MR. WEINBERGER:  Well, that's her

02:17:23 21    interpretation of a government document.  There's no

02:17:25 22    indication that she ever used -- she may have looked it up

02:17:29 23    online.

02:17:29 24                    THE COURT:  All right.

02:17:30 25                    MR. WEINBERGER:  But there's no indication

02:17:32  1    that she's had any experience with respect to this

02:17:34  2    particular document.

02:17:34  3                    THE COURT:  Well, she was willing to interpret

02:17:37  4    it and opine on it, Mr. Weinberger.  Whether she had the

02:17:40  5    ability or not, she did.  So I'll admit them over objection.

02:17:45  6        Do the plaintiffs have anything they offer -- they

02:17:48  7    want to offer with Ms. Stessel?

02:17:52  8                    MR. STOFFELMAYR:  Stossel.

02:17:53  9                    THE COURT:  Stossel.  Sorry.

02:17:55 10                MS. FLEMING:  Maria Fleming for the

02:17:57 11    plaintiffs.

02:17:57 12        Yes, Your Honor.  We were offering P20801.

02:18:02 13                    MR. STOFFELMAYR:  Do you have a copy handy?

02:18:04 14    We've probably got one in a pile somewhere.

02:18:08 15                MS. FLEMING:  We gave it out earlier.

02:18:10 16                MR. STOFFELMAYR:  I'm sure you did.  It's just

02:18:11 17    in the middle of a pile now.

02:18:12 18        I got it right here.  Thank you.

02:18:26 19        The witness had no knowledge of this particular

02:18:28 20    document.

02:18:29 21                    THE COURT:  What is it?

02:18:30 22                    MR. STOFFELMAYR:  It's an e-mail exchange

02:18:31 23    about --

02:18:32 24                    THE COURT:  Let me see it, please.

02:18:57 25                    (Brief pause in proceedings.)

02:19:07 1          MR. STOFFELMAYR:  This is one of these -- did

02:19:09 2     I read that correctly?

02:19:09 3          THE COURT:  Yeah, I agree.  The witness knew

02:19:12 4     nothing about this, wasn't even sure it was right.

02:19:16 5          MR. WEINBERGER:  Well, this -- I mean, this is

02:19:18 6     a -- this is a Walgreens document.

02:19:19 7          THE COURT:  Well, there's no question about

02:19:22 8     authenticity, but the witness knew nothing about it, had

02:19:24 9     never seen it.  I don't even think she knew if it was

02:19:28 10    accurate.  And she described it as just an e-mail, not a

02:19:33 11    policy.  That's the point.  She said it's an e-mail.

02:19:36 12         MR. WEINBERGER:  Well, that may be her

02:19:38 13    interpretation of it, but, I mean, to me, it's no different

02:19:41 14    than -- I mean, frankly, it's even more probative than the

02:19:47 15    exhibits that you've admitted in from the Ohio Licensure.

02:19:50 16         THE COURT:  Well --

02:19:51 17         MR. WEINBERGER:  I mean, it's a Walgreens

02:19:53 18    document.  She was asked about it.

02:19:55 19         THE COURT:  All right.

02:19:56 20     Well, I'm not admitting it because the witness knew

02:19:59 21    nothing about it, and she didn't even acknowledge it as a

02:20:04 22    policy.  She had never seen it.  Knew nothing about it.

02:20:07 23     So. . . all right.

02:20:13 24     Anything else the plaintiffs wanted to admit with her?

02:20:16 25         MR. LANIER:  No, Your Honor.

02:20:16   1              THE COURT:  Okay.  All right.

02:20:19   2          So when we break, I'll -- I want -- excuse me --

02:20:23   3   counsel to stay with Mr. Pitts and Julian to make sure that

02:20:31   4   everything is set with the exhibits, that everything that's

02:20:34   5   been redacted has been redacted so the jury will have

02:20:38   6   everything accurate.

02:20:38   7          If you don't finish today, hopefully you can, but if

02:20:42   8   not, we'll finish up tomorrow morning with that.

02:20:45   9              MR. HYNES:  Your Honor?

02:20:45  10              THE COURT:  Yes?

02:20:46  11              MR. HYNES:  Paul Hynes for CVS.

02:20:47  12          The parties have been consulting, and we're exchanging

02:20:50  13   lists of the exhibits that we all believe have been admitted

02:20:53  14   and we're working through that and we think it might be

02:20:55  15   better to work the issues out ourselves and then come to Mr.

02:20:58  16   Pitts and the Court with whatever issues may remain.

02:21:00  17          But we're working together to try to get a final set

02:21:04  18   that we're agreed on so we don't have to burden the Court

02:21:08  19   with --

02:21:08  20              THE COURT:  Well, our --

02:21:11  21              MR. HYNES:  If that's okay with you, of

02:21:13  22   course.

02:21:13  23              THE COURT:  That's okay, but I mean, who --

02:21:15  24   it's -- all right.  Then maybe we should just appear

02:21:19  25   tomorrow morning and confirm that.  And if there are any

02:21:24  1   issues, I'll deal with them.  That will give you the rest of

02:21:32  2   the day and this evening.

02:21:33  3       So why don't we do it at nine o'clock tomorrow morning

02:21:37  4   and -- all right.  So I want the court reporter and everyone

02:21:42  5   tomorrow morning.

02:21:42  6                   MS. FITZPATRICK:  Your Honor, Laura

02:21:43  7   Fitzpatrick with the plaintiffs.

02:21:45  8       We agree.  We think that's a very good idea.  We've

02:21:48  9   been successful in working out issues in the past.  So we

02:21:51 10   wanted to take one more shot at minimizing the list of

02:21:54 11   issues to bring to you and to the Court.

02:21:56 12                   THE COURT:  Well, I hope -- I mean, there

02:21:58 13   really shouldn't be any because we've done it, but if you

02:22:00 14   can't agree and there's some issue, I'll -- we'll take it up

02:22:03 15   at 9:00 a.m. tomorrow.

02:22:05 16                   MS. FITZPATRICK:  Thank you, Your Honor.

02:22:05 17                   MS. FUMERTON:  Your Honor, this is

02:22:08 18   Tara Fumerton for Walmart.

02:22:09 19       I think there are two issues we're going to be at an

02:22:12 20   impasse on a redaction with plaintiffs that perhaps we could

02:22:15 21   just take up now if that's okay, or we can do it tomorrow

02:22:18 22   morning.

02:22:18 23                   THE COURT:  Well, I don't know why you're

02:22:20 24   at an -- I thought we had agreed, but what are they and

02:22:23 25   I'll. . .

02:22:25 1      MS. FUMERTON:  Yeah.

02:22:25 2   So, Your Honor --

02:22:27 3      THE COURT:  Let me see the document and what

02:22:29 4 the problem is.

02:22:39 5      MS. FUMERTON:  So, Your Honor, I guess one we

02:22:41 6 can do in the abstract and the other one you're going to

02:22:43 7 need to see.

02:22:44 8   So one of them is the Settlement Agreement for

02:22:46 9 Walmart.  I think we were to redact the settlement amount,

02:22:49 10 but we also are requesting that the fact that a dollar

02:22:52 11 amount was paid at all be redacted, and I think there was

02:22:56 12 some commentary by Your Honor previously to that effect.

02:23:01 13   So we would request that the entire paragraph

02:23:03 14 suggesting or the entire statement saying that there was any

02:23:06 15 payment made at all be redacted.

02:23:09 16      MS. FITZPATRICK:  Your Honor, Laura

02:23:10 17 Fitzpatrick for the plaintiffs.

02:23:11 18   Our position is that we have fully complied with

02:23:14 19 Your Honor's guidance here and have redacted any reference

02:23:17 20 to settlement amounts.

02:23:18 21   The idea that plaintiffs would be prohibited from

02:23:22 22 providing -- from having in evidence the paragraph that

02:23:28 23 references the fact that Walmart and other defendants, in

02:23:32 24 fact, paid penalties would be prejudicial to us,

02:23:37 25 particularly because plaintiffs have allowed, for example,

02:23:40  1   even though defense counsel did not go over this paragraph

02:23:45  2   in front of the jury, we've allowed the paragraphs that

02:23:47  3   state that Walmart disputes -- you know, there's no

02:23:52  4   admission of liability.

02:23:52  5        And so from our position, if that sort of a thing is

02:23:55  6   allowed back in evidence, the fact that Walmart, in fact,

02:23:57  7   did pay some sort of monetary fine should be allowed.  But

02:24:01  8   we are in no way trying to put forth the amount of the fine

02:24:04  9   paid, the size of the fine, anything like that.

02:24:07 10             THE COURT:  Well, let me see the paragraph.  I

02:24:09 11   mean, we haven't --

02:24:11 12             MS. FITZPATRICK:  Yes, Your Honor.

02:24:11 13             THE COURT:  We haven't discussed this.  I

02:24:13 14   don't think any witness was asked about it.

02:24:18 15             MS. FUMERTON:  That's correct, Your Honor.

02:24:19 16   That's also part of it is that we don't want there to be any

02:24:22 17   sort of suggestion or wonder what that is from the jurors.

02:24:24 18        Also, it's not relevant.  I mean, the purpose of these

02:24:27 19   settlements was to --

02:24:29 20             THE COURT:  Well, it may be relevant that an

02:24:31 21   amount of money was paid.  Okay?

02:24:32 22             MS. FITZPATRICK:  Yes, Your Honor.

02:24:33 23        And Mr. Lanier elicited several times from several

02:24:36 24   different witnesses that fines were paid by these companies,

02:24:40 25   and if we need to pull the testimony, we can.  I have a copy

02:24:43  1    if you'd like, Your Honor.

02:24:45  2              MS. FUMERTON:  In certain instances, though,

02:24:46  3    you sustained objections to that as well, saying that the

02:24:48  4    fact that a fine was paid would be prejudicial or confusing.

02:24:56  5              MR. SWANSON:  Your Honor, Brian Swanson for

02:24:58  6    Walgreens.

02:24:58  7        Just so there's no confusion, we have agreement from

02:25:00  8    the plaintiffs that for the settlement agreements relating

02:25:03  9    to Walgreens, the entire paragraph has been redacted and

02:25:05 10    that's reflected on the docket.

02:25:07 11              MS. FITZPATRICK:  And that -- and Mr. Swanson

02:25:09 12    is correct and because of the nature of those particular

02:25:11 13    settlement agreements, we were able to make that agreement.

02:25:13 14              THE COURT:  Well, I -- we've got --

02:25:14 15              MR. SWANSON:  I just wanted to make sure that

02:25:16 16    it wasn't --

02:25:17 17              THE COURT:  We've got to be consistent.

02:25:18 18        I don't think it's proper to have similar provisions

02:25:23 19    redacted with certain of the defendants and not for others.

02:25:26 20    I don't understand --

02:25:28 21              MS. FITZPATRICK:  Your Honor, that's fine.

02:25:29 22        Plaintiffs would then ask at this time as well for the

02:25:34 23    paragraph that deals with where these companies state that

02:25:36 24    this is not an admission of liability, that those portions

02:25:39 25    be redacted as well since counsel did not go over those

02:25:42 1    portions.

02:25:42 2         And in fairness, if we have to redact that a fine was

02:25:45 3    paid, we think that we're entitled to redact the portion

02:25:48 4    that states it's not an admission of liability.

02:25:51 5              MS. FUMERTON:

02:25:51 6         Well, we disagree entirely but also it's just not a

02:25:54 7    factually true statement of the witness, Brad Nelson, who

02:25:57 8    was asked about the settlement, specifically stated over and

02:25:58 9    over again that there was no admission.

02:26:00 10        So I don't see what the point is.

02:26:02 11             THE COURT:  Yeah.  It also says nor is it a

02:26:04 12   concession by the United States that its claims are not

02:26:05 13   well-founded.

02:26:06 14        So the point is, I'm going to leave that in because

02:26:11 15   it's accurate.  No one -- no one -- there's no judicial

02:26:14 16   finding, and it's not an admission.

02:26:16 17        There were certain agreements where there were

02:26:18 18   admissions, and we allowed those admissions to be read

02:26:21 19   because they were admissions.

02:26:24 20        So I think it would be -- to omit this might -- might

02:26:29 21   be confusing and inaccurate.  So -- all right.  So we'll

02:26:33 22   delete -- we'll delete a paragraph that talks about paying

02:26:39 23   money.

02:26:40 24             MS. FUMERTON:  Thank you, Your Honor.

02:26:41 25        There was one other one.  Ms. Fitzpatrick, it's the

02:26:44 1    one, Ms. Hiland's e-mail.

02:26:47 2        You have -- I have the relevant portion of the

02:26:48 3    transcript.  I can hand that up to you.

02:26:50 4                MS. FITZPATRICK:  Tara, just for the record,

02:26:53 5    P157257.  Is that what you're referencing?

02:27:05 6                MS. FUMERTON:  Yes.

02:27:09 7        This is an e-mail where Ms. Hiland was questioned

02:27:12 8    about the first page and the first line of the second page.

02:27:15 9    And then there's a whole bunch of other information on it.

02:27:18 10       You agreed that the information on the second and

02:27:20 11   third pages was confusing and had never been discussed.

02:27:25 12       Ms. Fitzpatrick, I believe, represented that then

02:27:28 13   we'll try to work that out.  We think the entirety of it

02:27:30 14   should be redacted.  They think none of it should -- well,

02:27:33 15   only some of it.

02:27:34 16               MS. FITZPATRICK:  That's not correct.

02:27:35 17               MS. FUMERTON:  But we want the entire thing to

02:27:37 18   be redacted.

02:27:38 19               MS. FITZPATRICK:  Your Honor, I

02:27:39 20   specifically --

02:27:39 21               THE COURT:  Can I see the document and what

02:27:41 22   the issue is, please?

02:27:51 23               MS. FITZPATRICK:  Your Honor, I will hand up

02:27:53 24   this portion of the document but just to reference it.

02:27:58 25       On the second page, I checked the transcript and, in

02:28:01  1       fact, Mr. Lanier did question --

02:28:03  2                   THE COURT:  Can I just see this document?  I

02:28:05  3       don't know what we're talking about.

02:28:06  4                   MS. FITZPATRICK:  Yes, Your Honor.

02:28:07  5                   MS. FUMERTON:  And, Your Honor, you'll see --

02:28:14  6       Your Honor, I have also handed up the relevant portion of

02:28:18  7       the transcript where this was discussed, as well your

02:28:21  8       comments on it.

02:28:21  9           But our proposal is essentially the first one where

02:28:23  10      everything would be redacted after the first line on the

02:28:25  11      second page.

02:28:27  12          I believe plaintiffs want most of the information on

02:28:31  13      the second and third page to be left unredacted, even though

02:28:34  14      none of it was discussed with Ms. Hiland.

02:28:36  15                  MS. FITZPATRICK:  And that's not correct,

02:28:38  16      Your Honor.  Plaintiffs --

02:28:39  17                  THE COURT:  I don't even know -- I don't know

02:28:40  18      what this document is or what the --

02:28:42  19                  MS. FITZPATRICK:  Your Honor, this is a

02:28:45  20      document that Mr. Lanier questioned the witness about.  It's

02:28:47  21      a Walmart company document.  I believe Ms. Hiland is on the

02:28:50  22      document.

02:28:50  23                  THE COURT:  Okay.  Let me read this.  I

02:28:52  24      can't -- just coming out, flying at me is not a good way to

02:28:56  25      do this.

02:29:00  1            Why don't you all discuss this overnight and see if

02:29:02  2    you can work it out with everything else?

02:29:04  3                    MS. FITZPATRICK:  That sounds good,

02:29:05  4    Your Honor.

02:29:09  5                    MS. FUMERTON:  Your Honor, I just had one

02:29:10  6    other statement for the record.

02:29:11  7            I had cleared this with Mr. Weinberger and he didn't

02:29:13  8    have an issue with it.

02:29:15  9            There was testimony yesterday by Ms. Militello about

02:29:19 10    the amount of time for the delay on the C-II safe.  We would

02:29:25 11    request that that be redacted from the public record, just

02:29:28 12    as a safety measure.  So it would literally just be only

02:29:32 13    what the time amount is and --

02:29:34 14                    THE COURT:  And I agree with that.

02:29:36 15                    MS. FUMERTON:  Mr. Weinberger said that was

02:29:37 16    fine.

02:29:37 17                    THE COURT:  All right.  Fine.  We'll do that.

02:29:39 18            So make sure you're doing this, and that it's all --

02:29:45 19    that Mr. Pitts has everything that you're doing because I

02:29:48 20    have not been able to keep track of each and every item.

02:29:52 21    All right.

02:29:53 22            So hopefully you can agree on almost everything and

02:29:56 23    the few things you can't, I'll decide at nine o'clock, and

02:29:59 24    then you'll sit down and make sure that -- was it a disk, a

02:30:05 25    drive, whatever it is, has everything in the correct manner

02:30:09   1    so the jury can access it.  That's what I'll need everyone

02:30:12   2    to go over.

02:30:15   3                    MR. DELINSKY:  Your Honor, may I briefly raise

02:30:17   4    two issues?

02:30:17   5                    THE COURT:  All right.  Yeah.

02:30:19   6                    MR. DELINSKY:  Your Honor, and I'll put this

02:30:20   7    on file.  I've handed it to the parties.

02:30:27   8        Your Honor, I'm going to hand out --

02:30:29   9                    THE COURT:  Is this something that you can

02:30:30  10    work out overnight or is this something that you've tried --

02:30:33  11                    MR. DELINSKY:  It's an instructional issue.

02:30:34  12                    THE COURT:  Well, I haven't gotten to

02:30:37  13    instructions.

02:30:38  14                    MR. DELINSKY:  I'm handing them up.  We

02:30:40  15    haven't put them on file yet.  We'll file them today but I

02:30:41  16    just wanted to --

02:30:42  17                    THE COURT:  It's a little late.  I'm

02:30:43  18    finalizing the instructions right now.  So I guess I could

02:30:45  19    do it at 9:00 tomorrow morning but I --

02:30:50  20                    MR. DELINSKY:  It's very brief, Your Honor.

02:30:51  21    It's really one issue.

02:30:58  22        And, Your Honor, what the -- the issue, frankly, was

02:31:00  23    really clarified today in the examination.  And what we've

02:31:04  24    done is we put it in red line.

02:31:07  25        I think if we all look at this case with honesty, the

02:31:15 1    timing of the nuisance and the issues associated with the

02:31:18 2    fact that there has to be a nuisance today and the question

02:31:23 3    really being in large part what happened in earlier years

02:31:27 4    long ago, those are really the battle lines in the case.

02:31:30 5         I don't think anyone disputes that the -- that at

02:31:34 6    least one critical caution is did events in '08 and 2010 and

02:31:40 7    2012 contribute to the situation today.  It really is where

02:31:43 8    the fight is.  I'm not saying it's the whole fight, but it's

02:31:47 9    a big part of the fight.

02:31:48 10        And when we looked at the instructions again last

02:31:50 11   night, we felt that they were subtle on this point and that

02:31:54 12   it would be more fair to include some language, and we've

02:32:00 13   included two additions that are very brief to two of the

02:32:04 14   instructions to clarify that the nuisance has to be today.

02:32:06 15        And then a final instruction, Your Honor, which is --

02:32:10 16   which we wrote, and it's sort of modeled in my own mind

02:32:16 17   after the criminal case, the multiple conspiracy kind of

02:32:19 18   idea, that it has to be the right nuisance.

02:32:25 19        So we just wanted to -- we're certainly not calling on

02:32:30 20   plaintiff -- I don't even know their view.  I don't know if

02:32:33 21   they've had a fair opportunity to glean a view but we just

02:32:35 22   wanted to put this issue -- we wanted to present it to you.

02:32:37 23             THE COURT:  Well, I don't understand the last

02:32:39 24   one.

02:32:39 25        Let's deal -- I mean, it looks like you're adding in

02:32:44  1    the phrase that the public nuisance must be ongoing today.

02:32:52  2    I think that's in the instructions already.

02:32:54  3                    MR. DELINSKY:  Your Honor, what's in it, if

02:32:55  4    you look at that same page that we've just your instruction

02:32:58  5    here, right, it's Page 19 at the bottom.  In 1 and 2 are the

02:33:04  6    only places we could find with any reference to it and it

02:33:07  7    just says ongoing.

02:33:08  8        And again, Your Honor, we believe that's just too

02:33:10  9    subtle to make the point.

02:33:12  10                   THE COURT:  Well, there's no doubt the

02:33:14  11   plaintiffs have to prove a public nuisance in each of these

02:33:18  12   counties today.  Is that -- I mean, plaintiffs agree on

02:33:22  13   that.  Right?

02:33:23  14                   MR. WEINBERGER:  Right.  That it existed -- it

02:33:25  15   has existed in the past and is ongoing.

02:33:28  16                   THE COURT:  Well, whether or not -- I mean,

02:33:29  17   that's part of your argument, but you have to -- you have to

02:33:33  18   prove, and the jury has to find, that there's a public

02:33:36  19   nuisance today.

02:33:36  20       And I think that's the -- doesn't the verdict form

02:33:41  21   have that?  Why isn't -- I don't -- why don't I have the

02:33:48  22   verdict forms?

02:33:53  23       Where are the verdict forms?  Can someone --

02:33:59  24                   SPECIAL MASTER COHEN:  Judge, can I suggest,

02:34:00  25   as we have with -- we've got three people here who worked on

02:34:11  1    this quite a bit, and it's not fair for this to come up

02:34:14  2    without us even seeing it.

02:34:15  3                THE COURT:  The verdict form says is a public

02:34:18  4    nuisance in Trumbull County.  So it's clear that the jury is

02:34:22  5    charged with finding whether there's a public nuisance now.

02:34:25  6    All right?

02:34:25  7         So, why don't -- again, why don't you all look at

02:34:36  8    this.  If you can -- if you all agree on any of these, fine.

02:34:39  9    I don't -- you know, apparently the defendants are proposing

02:34:43 10    to just add in that is ongoing today.  I think that's --

02:34:48 11    it's implicit.

02:34:50 12                MR. WEINBERGER:  Well, and they've -- they

02:34:52 13    have an entirely independent instruction --

02:34:57 14                THE COURT:  Well, I'm not very favorably

02:34:59 15    inclined to that one, but I'll listen to what the plaintiffs

02:35:01 16    have to say.

02:35:02 17         I don't -- I think that's quite -- I think that's

02:35:05 18    confusing and not necessary.  All right?  But I don't --

02:35:12 19    first glance, I don't have a problem in adding in to the

02:35:17 20    definition of public nuisance that is ongoing today.  I

02:35:21 21    think it's implicit in my instructions, but clearly the jury

02:35:24 22    has to find the existence of a public nuisance today.

02:35:29 23    Regardless of when it started, they have to find that it

02:35:31 24    exists today.

02:35:36 25         So why don't you look at this and we'll address this

02:35:39  1     tomorrow morning also.  All right.

02:35:47  2          It seems to me we don't need Paragraphs 14 and 15.

02:35:50  3     There have been no admissions and interrogatory answers read

02:35:55  4     that I can recall and no stipulations.  Agreed?

02:35:58  5                    MR. STOFFELMAYR:  That's correct.

02:35:59  6                    THE COURT:  So we can delete those?

02:36:01  7                    MR. STOFFELMAYR:  Agreed.

02:36:03  8                    MR. MAJORAS:  We agree.

02:36:03  9                    THE COURT:  Plaintiffs agree?

02:36:05 10                    MR. WEINBERGER:  Yes.

02:36:05 11                    THE COURT:  All right.  All right.

02:36:07 12          So we'll delete those.

02:36:12 13                    MR. DELINSKY:  Pete, did you have, did you

02:36:13 14     want to ask a question?

02:36:14 15                    MR. WEINBERGER:  Would you e-mail me this

02:36:16 16     instruction?

02:36:16 17                    MR. DELINSKY:  We will.  We'll separately

02:36:18 18     e-mail it to you right away.

02:36:20 19                    MR. WEINBERGER:  Okay.

02:36:21 20                    THE COURT:  All right.  So we'll address

02:36:27 21     those -- we'll address this latest suggestion tomorrow at

02:36:31 22     9:00 a.m.

02:36:34 23                    MR. DELINSKY:  And, Your Honor, the only other

02:36:37 24     issue, and I'm looking to Pete and Laura, Mildred to see if

02:36:42 25     this is an appropriate time since Mark's not here, but we do

02:36:45 1   have a proposal to make on opening statements [sic].  Time

02:36:48 2   is something we discussed yesterday.

02:36:49 3                  THE COURT:  I was -- that's on my list.  Yes.

02:36:53 4   What are you --

02:36:54 5                  MR. DELINSKY:  We were proposing 3.5 for

02:36:56 6   defendants, 2.5 for plaintiffs, Your Honor.

02:37:09 7                  THE COURT:  I figured my instructions are

02:37:11 8   about 30 minutes, so that will be a long day.

02:37:18 9                  MR. DELINSKY:  And, Your Honor, by the way,

02:37:19 10  that's defendants' proposal.  I just want to make clear.  I

02:37:25 11  didn't mean to speak for plaintiffs, too.

02:37:26 12                  THE COURT:  Well, what are the plaintiffs --

02:37:27 13  how do the -- does that sit with the plaintiffs?

02:37:30 14                  MR. WEINBERGER:  Did I hear you say 2.5 for us

02:37:33 15  and 3.5 -- absolutely not, Your Honor.

02:37:37 16      We have the burden of proof.  You gave equal time in

02:37:41 17  opening.  Of course, they took, substantially more than the

02:37:45 18  time that you had allotted among them.

02:37:49 19      Under -- I mean, I -- you're the Judge, but I think

02:37:52 20  it's highly unfair and prejudicial to us to not get at least

02:37:56 21  equal time.

02:37:58 22      I mean, we -- with our having the burden of proof, we

02:38:01 23  have to -- we have to argue this case as to three separate

02:38:04 24  defendants.

02:38:08 25                  MR. DELINSKY:  Your Honor, I believe in

02:38:10  1    opening it was 2.5 and 3.  I may be wrong, 2.5 for

02:38:16  2    plaintiffs, 3 for defendants.

02:38:17  3                    MR. WEINBERGER:  Right, and there were four

02:38:18  4    defendants.

02:38:18  5                    THE COURT:  But there were four defendants.

02:38:21  6                    MR. DELINSKY:  And I think the complexity here

02:38:23  7    is the ability for plaintiffs just to speak with one voice.

02:38:26  8        We, obviously, don't have that luxury.  We can in

02:38:30  9    part, but three different defendants have to stand up and

02:38:32 10    introduce themselves to the jury and make independent

02:38:35 11    arguments.  There's transactional time associated with that.

02:38:42 12                    THE COURT:  Is Mr. Lanier coming back?

02:38:43 13                    MR. WEINBERGER:  No, he is not.

02:38:44 14                    THE COURT:  Then Mr. Weinberger, you'll have

02:38:47 15    to -- I mean, I could wait till tomorrow morning, but. . .

02:39:06 16        Well. . . all right.  Candidly, I had hoped -- I mean,

02:39:31 17    my plan is to read -- to start off Monday morning reading

02:39:34 18    most of my instructions, starting on Page 1 and going to --

02:39:41 19    I mean, through the substantive instructions, through page

02:39:44 20    what's now 28 and then stopping.  And then we'll have the

02:39:47 21    final arguments, and then I read the last few pages after

02:39:50 22    final arrangements.

02:39:58 23        And it was my hope to fit all of the plaintiffs'

02:40:04 24    closing and that first part of my instructions in before

02:40:08 25    lunch and then have the -- after lunch, we'll have the three

02:40:12  1   defendants.  Lunch is a little -- you know, go to 12:15,

02:40:23  2   it's not so terrible.

02:40:24  3       I don't really want to go farther than that because

02:40:26  4   it's not fair to the jury or to the last -- or to the

02:40:29  5   speaker.  But let me.

02:40:35  6                   MR. WEINBERGER:  Well, Your Honor, don't

02:40:36  7   forget, we get a rebuttal.

02:40:37  8                   THE COURT:  Well, the rebuttal I don't mind

02:40:40  9   about.  Mr. Lanier is going to have to take a break -- one

02:40:43 10   break during his closing.  I'd rather him not having to take

02:40:47 11   two.  It just makes it less coherent.  So --

02:40:54 12                   MR. WEINBERGER:  We would propose three hours

02:40:56 13   per side, Your Honor, and --

02:41:02 14                   THE COURT:  Well, I was thinking that.  If you

02:41:04 15   have three hours per side, and I would let the plaintiffs

02:41:07 16   reserve half an hour of their three for rebuttal.  I think

02:41:09 17   more than that isn't -- is unfair.

02:41:13 18       So how does that sit, Mr. Weinberger?

02:41:17 19                   MR. WEINBERGER:  Well, we would request up to

02:41:19 20   45 minutes in rebuttal.

02:41:22 21                   THE COURT:  Well. . .

02:41:24 22                   MR. DELINSKY:  Your Honor, I think we'd oppose

02:41:25 23   that, and I say -- I know CVS opposes that.

02:41:29 24                   THE COURT:  I think half an hour is ample.

02:41:36 25       So I think that would -- we would certainly be done by

02:41:44 1    12:15.  So we'll just say three hours per side, and

02:41:56 2    plaintiffs may reserve 30 minutes for rebuttal, 30 of their

02:42:04 3    three hours for rebuttal.

02:42:10 4        So you can tell Mr. Lanier to figure out when's a good

02:42:16 5    time for a break.

02:42:18 6            MR. WEINBERGER:  Certainly.

02:42:20 7            THE COURT:  I mean, we've been normally

02:42:23 8    breaking around 10:30 but it doesn't have to be on the dot.

02:42:27 9    If it's 10:45, that's fine.  I don't want him to be cut off

02:42:30 10   in mid sentence.  He should figure it out and then do it.

02:42:33 11       And then after lunch, we'll, you know -- my thought is

02:42:40 12   we'll probably get in -- get two of the defendants'

02:42:44 13   statements and then take the afternoon break and then have

02:42:48 14   the third one and then the closing.  Again, I -- that's the

02:42:51 15   idea.  We should be able to do that.

02:42:54 16       Okay.  All right.

02:43:03 17       The Rule 50 motions, obviously I got the plaintiffs'

02:43:07 18   response.  If I didn't think there was sufficient evidence

02:43:13 19   to go to the jury, I would have done something about it.  I

02:43:16 20   think there is.

02:43:20 21       I had said that I wanted -- excuse me, the defendants'

02:43:23 22   response by Wednesday.  Candidly, if you want to take a

02:43:26 23   little longer, I'm not going to -- you know, it doesn't

02:43:29 24   matter.  I'm going to keep it under advisement.  If there's

02:43:34 25   a plaintiffs' verdict, I'm sure the defendants will then

02:43:37  1    file a motion for judgment, notwithstanding the verdict.

02:43:41  2    And you would add to what you filed anything additional from

02:43:47  3    the defense side.

02:43:49  4         So then, of course, I'll have to address it.  If

02:43:51  5    there's a defense verdict, it becomes moot.

02:43:57  6         So if the defendants want to take longer or candidly

02:44:10  7    -- if you want to just forego a reply and see what happens,

02:44:15  8    that's okay, too.

02:44:16  9         I hadn't thought of that, but it really isn't --

02:44:23 10    really isn't going to change anything.  And again, if

02:44:25 11    there's a plaintiffs' verdict, you'll file a new motion

02:44:28 12    which will incorporate the defense case.

02:44:36 13         So what do you think?  You know, if you want to save

02:44:38 14    the time and your client's money, that's okay with me.

02:44:41 15              MR. MAJORAS:  Your Honor, if we could have a

02:44:42 16    chance to think about that.

02:44:43 17              THE COURT:  All right.

02:44:44 18              MR. MAJORAS:  We could communicate again

02:44:45 19    through Special Master Cohen.

02:44:49 20              THE COURT:  I'm putting it out there.  If you

02:44:51 21    want to file something, you can.  And if you want to take

02:44:53 22    longer than until Wednesday, that's okay, too.

02:44:56 23              MR. MAJORAS:  We will let the Court know.  We

02:44:58 24    appreciate that.

02:44:58 25              THE COURT:  There's no point, you know, having

02:45:00  1    people stay up, you know.  I mean, if you want to take a

02:45:04  2    little longer, that's fine because I'm not -- I'm keeping it

02:45:06  3    under advisement.  And if you want to just forego it, not

02:45:11  4    you're waiving it but just, you know, deferring it, what I

02:45:15  5    would say defer it, that's okay, too.

02:45:18  6                    MR. MAJORAS:  I understand, Your Honor.

02:45:19  7                    THE COURT:  So why don't you think about it

02:45:20  8    and let me know.

02:45:22  9                    MR. MAJORAS:  Thank you, Your Honor.

02:45:23  10                   MR. DELINSKY:  Thank you, Your Honor.

02:45:24  11         And, Your Honor, I would just like to take a moment

02:45:25  12   to, now that the evidence is closed, on behalf of the

02:45:28  13   defense I would imagine on behalf of the two other

02:45:30  14   defendants as well, just renew our directed verdict motions

02:45:33  15   as well.

02:45:34  16                   THE COURT:  Okay.  All right.

02:45:36  17        Now, the jury's going to get the case at the very end

02:45:41  18   of the day Monday.  It's been my experience -- I mean, I

02:45:44  19   tell the jurors that once they get the case, the time rules

02:45:51  20   are theirs, not mine.  They can stay as long as they want.

02:45:56  21   They come in whenever they want.  Just have to tell us.  The

02:46:00  22   only rule I have is they don't start deliberating in the

02:46:03  23   morning until everyone's there.  If they take a break, they

02:46:05  24   wait until everyone's back.

02:46:09  25        Typically jurors keep the same schedule they've been

02:46:12 1    on and my guess is this one will.

02:46:18 2         I don't bring the jurors in -- into the court in the

02:46:21 3    morning.  I just say don't start deliberating until

02:46:24 4    everyone's there.  I do, if they break for the day.  I

02:46:29 5    always bring them into the courtroom and give them the

02:46:31 6    admonition.  I don't require the lawyers to be here.  But

02:46:35 7    just so you know, I do bring them in each evening.  I think

02:46:38 8    it's -- there's a good reason to do that.

02:46:44 9         So I guess I'll -- we'll just need to know how to

02:46:48 10   reach everyone.  We've got everyone's cell phones but

02:46:51 11   they're -- it would not surprise me if we get a question.

02:46:57 12   They're primed to ask questions.  Their questions are good

02:47:02 13   ones.  And they may have one about the instructions.

02:47:04 14        I'll, obviously, consult with everyone.  Some

02:47:07 15   questions I can answer.  Some I can't.  But I think about

02:47:10 16   each one and, you know, consult with everyone.  So I'd want

02:47:14 17   everyone to be -- to be present.  And then I always -- if

02:47:18 18   there is a question, I bring the jury in, and I give them

02:47:20 19   the answer or I tell them I can't do anything other than

02:47:24 20   refer you to the instructions, but I always do something.

02:47:28 21   And I typically have the lawyers there unless you don't want

02:47:32 22   to be there.  It's, obviously, on the record.

02:47:34 23        So the point is, we need to know how to get a hold of

02:47:38 24   everyone and assemble people pretty quickly.

02:47:41 25        You absolutely do not have to hang around in my

02:47:46  1    courtroom.  You may if you want.  I don't think -- I'm not

02:47:51  2    going to be using it, but you don't have to.  But we just

02:47:55  3    need to know how to get a hold of everyone.

02:47:57  4                   MR. DELINSKY:  Your Honor, may I just put some

02:48:00  5    logistics questions to you of that ilk?

02:48:01  6                   THE COURT:  Okay.

02:48:02  7                   MR. DELINSKY:  You know, would it be

02:48:03  8    appropriate for us to be at our hotels, which would mean we

02:48:06  9    might be 15 minutes away if a call came or would you prefer

02:48:08  10   us to be closer to the area so we can be up here in

02:48:11  11   five minutes or --

02:48:12  12                   THE COURT:  Well, I don't -- look, everyone's

02:48:15  13   busy.  And you need to do a lot of things.  I don't think

02:48:17  14   you have to hang around in the courtroom -- in the

02:48:20  15   courthouse, there's no good place to be candidly.

02:48:23  16                   MR. DELINSKY:  Okay.

02:48:24  17                   THE COURT:  I mean. . . other than I don't

02:48:28  18   have a problem if people want to work in the courtroom.

02:48:31  19                   MR. DELINSKY:  Okay.

02:48:36  20                   THE COURT:  I don't -- obviously don't have

02:48:38  21   another trial this coming week.  And all -- I can -- all my

02:48:44  22   proceedings are remote.  So I can do them back in my

02:48:46  23   chambers.

02:48:49  24        So, no, you don't have to stay in the courthouse.

02:48:51  25                   MR. DELINSKY:  Okay.

02:48:52  1              THE COURT:  I don't want anyone more than

02:48:53  2    15 minutes away.

02:48:55  3              MR. DELINSKY:  Yep.

02:48:56  4              THE COURT:  That seems reasonable.

02:48:57  5              MR. DELINSKY:  Thank you, Your Honor.

02:48:57  6              THE COURT:  If you want to be in your hotels

02:48:59  7    or your war rooms or whenever, that's okay.  Just need to

02:49:03  8    know how we can get a hold of everyone quickly.

02:49:05  9              MR. DELINSKY:  Understood.

02:49:06 10         Your Honor, next question is, is it appropriate under

02:49:10 11    Your Honor's protocols for us to display to the jury

02:49:15 12    portions of the instructions in closing or --

02:49:18 13              THE COURT:  Sure.

02:49:18 14         That's one of the reasons, Mr. Delinsky, that I give

02:49:21 15    the instructions, the substantive ones, before closing

02:49:26 16    arguments.

02:49:26 17         I think it sets the framework.  And then counsel may

02:49:29 18    refer to any portion of the instructions you want.

02:49:33 19              MR. DELINSKY:  Your Honor --

02:49:34 20              THE COURT:  I didn't come up with that.  I

02:49:37 21    think Judge Dowd did it that way and I thought it makes a

02:49:40 22    lot of sense.  So I copied it.

02:49:43 23              MR. DELINSKY:  Last question, Your Honor.

02:49:46 24         Is it appropriate for us to show pages of transcripts

02:49:50 25    if we want to highlight certain testimony?  I've seen it go

02:49:53 1　both ways.  We'll comply with whatever the rules are.  We

02:49:57 2　just want to know.

02:50:00 3　　　　　　　THE COURT:  I don't have a problem with it.

02:50:01 4　　　　Mr. Weinberger, do you -- I --

02:50:03 5　　　　　　　MR. WEINBERGER:  No issues.

02:50:04 6　　　　　　　THE COURT:  Seems to be reasonable.

02:50:10 7　　　　　　　MR. MAJORAS:  The real time has been used

02:50:12 8　during the course of the proceedings by everybody.  So it

02:50:14 9　will not be a surprise to the jury.

02:50:15 10　　　　　　　THE COURT:  Right.  So the jury knows it.

02:50:17 11　Right, that's fine.

02:50:19 12　　　　　　　MR. WEINBERGER:  As long as we're going to

02:50:20 13　limit it to trial testimony and not deposition testimony.

02:50:22 14　　　　　　　MR. DELINSKY:  No, that's correct.  That's

02:50:23 15　correct.

02:50:23 16　　　　　　　THE COURT:  Right.  Right.  It shouldn't be

02:50:25 17　deposition testimony.

02:50:26 18　　　　　　　MR. DELINSKY:  No.

02:50:27 19　　　　　　　THE COURT:  But trial testimony, you want to

02:50:29 20　say, remember what so and so said, here it is, I don't have

02:50:35 21　a problem with that.

02:50:36 22　　　　　　　MR. MAJORAS:  Just to be clear, depositions

02:50:37 23　played at trial are fair game.

02:50:39 24　　　　　　　THE COURT:  Right.  That's the same -- that's

02:50:41 25　the same as trial testimony.

02:50:43  1              MR. MAJORAS:  Okay.

02:50:43  2              THE COURT:  But I think Mr. Weinberger was

02:50:45  3       referring to prior depositions of testifying witnesses.

02:50:50  4              MR. MAJORAS:  We agree.

02:50:51  5              THE COURT:  Okay.  Yep, that's fine.  The

02:50:53  6       jury's used to that.

02:50:54  7              MR. DELINSKY:  And, Your Honor, final -- final

02:50:57  8       question on my part is I don't think we have deadlines in

02:51:00  9       place for the exchange of demonstratives to be used in

02:51:04 10       closing like we did in opening.

02:51:06 11              THE COURT:  Good point.

02:51:07 12              MR. DELINSKY:  And, obviously, nobody wants to

02:51:10 13       be jumping up and down.

02:51:10 14              THE COURT:  Agreed.  What do you -- what --

02:51:12 15       what do you think makes sense?

02:51:15 16              MR. DELINSKY:  Yeah, why don't we -- Laura

02:51:18 17       just proposed we do the same thing we did for openings,

02:51:21 18       which was -- was it 7:00 p.m., 6:00 p.m.?  6:00 p.m. Sunday.

02:51:27 19              THE COURT:  6:00 p.m.  That's okay with the

02:51:29 20       plaintiffs?

02:51:30 21              MS. FITZPATRICK:  Your Honor, let me check

02:51:31 22       with Mr. Lanier this evening and get back with defense

02:51:34 23       counsel.

02:51:34 24              THE COURT:  Why don't you talk about it,

02:51:36 25       confer, and confirm it tomorrow morning when we meet and

02:51:39  1      if --

02:51:40  2                      MS. FITZPATRICK:  Yes, Your Honor.  That

02:51:41  3      sounds good.

02:51:41  4                      THE COURT:  There should be something, I

02:51:43  5      agree.  Okay.

02:51:51  6           Anything else that anyone can think of?  All right.

02:51:56  7           Well, I want to compliment all counsel.  I had been

02:52:03  8      saying publicly that I had the best lawyers in the country,

02:52:05  9      and I think both sides did a superb job of trying this case.

02:52:10 10           I know everyone was upset with my time limits, but

02:52:16 11      candidly, as a result of those time limits, I know that this

02:52:21 12      jury was able to keep their focus.  And I could tell that

02:52:26 13      because even with the last witness, their questions were as

02:52:29 14      good as with the first.  And I don't think even this great

02:52:32 15      jury could have kept focus for month after month.

02:52:36 16           And so I think each side got in the evidence, the

02:52:42 17      witnesses, the documents you needed to make your arguments.

02:52:47 18      There weren't wasted or excessive witnesses.  So the jury

02:52:52 19      can keep their focus.

02:52:53 20           I have no idea what they're going to do, other than

02:52:56 21      I'm confident it will be an informed verdict because this

02:52:59 22      jury was really paying attention to all this complicated

02:53:04 23      testimony.

02:53:05 24           And so I think, again, both sides did a very, very

02:53:08 25      effective job in a difficult case.  And plaintiffs have good

02:53:13  1    arguments.  The defendants have good arguments.

02:53:18  2                    MR. STOFFELMAYR:  Thank you, Judge.

02:53:19  3                    MR. MAJORAS:  Thank you, Your Honor.

02:53:19  4                    MR. DELINSKY:  Thank you, Your Honor.

02:53:20  5                    THE COURT:  We'll see what this jury does.

02:53:22  6        But I -- it will be an informed -- you know, we did a

02:53:25  7    good job picking jurors who could be fair and impartial.

02:53:29  8    Happily, they stayed all healthy, and they clearly kept --

02:53:33  9    kept their attention, which is good.

02:53:36  10       So, all right.

02:53:38  11                   MR. WEINBERGER:  Your Honor, if I could just

02:53:39  12   say, it's -- usually you say this after the case is over,

02:53:42  13   but since we're -- since you were nice enough to compliment

02:53:45  14   us, both sides, Judge, I just want to say on behalf of the

02:53:50  15   plaintiffs we very much appreciate you and all of the -- all

02:53:53  16   of our colleagues, your colleagues, who have worked so hard

02:53:56  17   on this case through this long trial.

02:53:59  18       We, on behalf of the plaintiffs, I'm sure I speak for

02:54:02  19   the defendants also, although they can say -- they can state

02:54:06  20   for themselves, we very much appreciate the way in which

02:54:08  21   you've diligently and fairly handled this matter, sometimes

02:54:17  22   under difficult circumstances.

02:54:19  23       You know, we -- we're both -- we have advocates on

02:54:24  24   both sides.  We don't see eye-to-eye on a lot of things, but

02:54:27  25   I'm sure we can all agree that we appreciate the level

02:54:31  1   playing field that you set and the guardrails that you set

02:54:34  2   for us.

02:54:36  3       And so I just wanted to thank you on behalf of the two

02:54:38  4   counties.

02:54:39  5                 THE COURT:  You're very welcome.

02:54:40  6                 MR. MAJORAS:  Your Honor, certainly from the

02:54:42  7   defendants' side, likewise.  We want to thank you, thank

02:54:44  8   your staff.  In particular, the accessibility of the court

02:54:48  9   and being able to do things quickly.  The -- how we've been

02:54:52 10   able to resolve things even during relatively short breaks

02:54:55 11   has been very impressive, and we certainly appreciate that.

02:54:58 12                 MR. DELINSKY:  And the Court's patience,

02:55:02 13   so. . .

02:55:03 14                 MR. STOFFELMAYR:  We know we may have tried

02:55:05 15   your patience on one or two occasions, and we appreciate

02:55:07 16   that you didn't seem to hold it against us.

02:55:09 17                 THE COURT:  I was a litigator.  It's a full

02:55:11 18   contact sport.  I understand that.  And things, you know,

02:55:14 19   can get heated and I -- but I've had a terrific staff.

02:55:20 20   Without them, and my -- David and his team and my staff, I

02:55:25 21   could not have done this alone.  That's for sure.

02:55:29 22       But I needed to make decisions quickly to keep it

02:55:31 23   moving, and I tried to make the best ones I could.  If I

02:55:36 24   really thought I made a mistake, I changed my mind.  But I

02:55:42 25   think collectively, we did a pretty good job.

02:55:44  1          And I -- again, I -- as a case of national importance,

02:55:49  2     I have no idea how this jury is going to, you know, come

02:55:53  3     out.  I really don't.  And both sides have made very good

02:55:56  4     arguments and have strong evidence and they'll wrestle with

02:56:01  5     it, and I'm confident this -- these 12 people will listen

02:56:04  6     carefully to each other and hopefully -- hopefully come to a

02:56:09  7     verdict.  Okay.

02:56:12  8          We'll see everyone tomorrow morning.  Have a good

02:56:15  9     evening.

02:56:20 10               MR. STOFFELMAYR:  Thank you, Judge.

02:56:20 11               COUNSEL EN MASSE:  Thank you, Your Honor.

02:56:20 12               (Proceedings adjourned at 2:56 p.m.)

13

14     DIRECT EXAMINATION OF AMY STOSSEL                6832

15

16     CROSS-EXAMINATION OF AMY STOSSEL                 6892

17     REDIRECT EXAMINATION OF AMY STOSSEL              6937

18     RECROSS-EXAMINATION OF AMY STOSSEL               6977

19

20                    **C E R T I F I C A T E**

21          I certify that the foregoing is a correct transcript
        of the record of proceedings in the above-entitled matter
22      prepared from my stenotype notes.

23          */s/ Heather K. Newman*              *11-9-2021*
           HEATHER K. NEWMAN, RMR, CRR                   DATE

24

25