# EXHIBIT A

**ORIGINAL**

**2021 OK 54**



IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

STATE OF OKLAHOMA ex rel. MIKE
HUNTER, Attorney General of Oklahoma,

        Plaintiff/Appellee/
        Counter-Appellant,

v.

JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC.;
ORTHO-McNEIL JANSSEN
PHARMACEUTICALS, INC., n/k/a
JANSSEN PHARMACEUTICALS, INC.; and
JANSSEN PHARMACEUTICA, INC., n/k/a
JANSSEN PHARMACEUTICALS, INC.,

        Defendants/Appellants/
        Counter-Appellees,

and

PURDUE PHARMA L.P.; PURDUE
PHARMA, INC.; THE PURDUE
FREDERICK COMPANY; TEVA
PHARMACEUTICALS USA, INC.;
CEPHALON, INC.; ALLERGAN, PLC, f/k/a
ACTAVIS, PLC, f/k/a ACTAVIS, INC., f/k/a
WATSON PHARMACEUTICALS, INC.;
WATSON LABORATORIES, INC.;
ACTAVIS LLC; and ACTAVIS PHARMA,
INC., f/k/a WATSON PHARMA, INC.,

        Defendants.

FILED
SUPREME COURT
STATE OF OKLAHOMA

NOV - 9 2021

JOHN D. HADDEN
CLERK

No. 118,474

FOR OFFICIAL PUBLICATION

Rec'd (date) 11-9-21
Posted
Mailed
Distrib
Publish ✓ yes ___ no

**ON APPEAL FROM THE DISTRICT COURT OF CLEVELAND COUNTY**

**The Honorable Thad Balkman, Trial Judge**

1

¶0    An opioid manufacturer appealed a $465 million verdict following a bench trial in a public nuisance lawsuit. The district court held the opioid manufacturer liable under Oklahoma's public nuisance statute for its prescription opioid marketing campaign. The State of Oklahoma counter-appealed, and this Court retained the appeal. We hold the opioid manufacturer's actions did not create a public nuisance. The district court erred in extending the public nuisance statute to the manufacturing, marketing, and selling of prescription opioids.

## DISTRICT COURT'S JUDGMENT REVERSED.

Mike Hunter, Attorney General for the State of Oklahoma, Abby Dillsaver, General Counsel to the Attorney General, and Ethan A. Shaner, Deputy General Counsel, Oklahoma Office of the Attorney General, Oklahoma City, Oklahoma, for Plaintiff/Appellee/Counter-Appellant.

Michael Burrage, Reggie Whitten, and Randa K. Reeves, Whitten Burrage, Oklahoma City, Oklahoma, for Plaintiff/Appellee/Counter-Appellant.

Bradley E. Beckworth, Lisa Baldwin, and Nathan B. Hall, Nix Patterson, LLP, Oklahoma City, Oklahoma, for Plaintiff/Appellee/Counter-Appellant.

John Thorne, Brendan J. Crimmins, and Ariela M. Migdal, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, D.C., for Plaintiff/Appellee/Counter-Appellant.

Larry D. Ottaway, Amy Sherry Fischer, and Andrew M. Bowman, Foliart, Huff, Ottaway & Bottom, Oklahoma City, Oklahoma, for Defendants/Appellants/Counter-Appellees.

Andrew W. Lester and A.J. Ferate, Spencer Fane LLP, Oklahoma City, Oklahoma, for Defendants/Appellants/Counter-Appellees.

Benjamin H. Odom, John H. Sparks, and Michael W. Ridgeway, Odom & Sparks, PLLC, Norman, Oklahoma, for Defendants/Appellants/Counter-Appellees.

Charles C. Lifland and Jonathan P. Schneller, O'Melveny & Myers, LLP, Los Angeles, California, for Defendants/Appellants/Counter-Appellees.

Stephen D. Brody, O'Melveny & Myers, LLP, Washington, D.C., for Defendants/Appellants/Counter-Appellees.

Jeffrey L. Fisher, O'Melveny & Myers, LLP, Menlo Park, California, for Defendants/ Appellants/Counter-Appellees.

**Winchester, J.**

¶1    An opioid drug epidemic exists in the United States. Oklahoma has experienced abuse and misuse of opioid medications, opioid use disorder, and thousands of opioid-related deaths in the past two decades. Specifically, opioid-related deaths increased during the early 2000s, plateaued around 2007, and then declined.[1] What we cannot ignore is that improper use of prescription opioids led to many of these deaths; few deaths occurred when individuals used pharmaceutical opioids as prescribed. We also cannot disregard that chronic pain affects millions of Americans. It is a persistent and costly health condition, and opioids are currently a vital treatment option for pain. The U.S. Food and Drug Administration ("FDA") has endorsed properly managed medical use of opioids (taken as prescribed) as safe, effective pain management, and rarely addictive.[2] Yet opioid abuse is still prevalent and has become a complex social problem.

---

[1] *See* Emily Piercefield, MD, DVM, Pam Archer, MPH, Philip Kemp, Ph.D. & Sue Mallonee, RN, MPH, *Increase in Unintentional Medication Overdose Deaths Oklahoma*, *1994-2006*, 39 Am. J. Preventive Med. 357, 357-59 (Oct. 2010), *available at* https://www.ajpmonline.org/article/S0749-3797(10)00389-2/pdf; John Scully, Okla. Bureau of Narcotics, *Oklahoma Drug Threat Assessment* 1 (2017), *available at* https://www.obndd.ok.gov/home/showpublisheddocument/20/637395998276800000.

[2] *See* U.S. Food & Drug Admin., A Guide to Safe Use of Pain Medications 3 (February 23, 2009), *available at* https://portal.ct.gov/-/media/Departments-and-Agencies/DPH/dph/environmental_ health/occupationalhealth/Opioid-Symposium-March-2017/FDA-Guide-to-Safe-Use-of-Pain-Medicine.pdf.

¶2   To address this problem, the State of Oklahoma *ex rel.* Mike Hunter, Attorney General of Oklahoma ("State"), sued three prescription opioid manufacturers and requested that the district court hold opioid manufacturers liable for violating Oklahoma's public nuisance statute. The question before the Court is whether the conduct of an opioid manufacturer in marketing and selling its products constituted a public nuisance under 50 O.S.2011, §§ 1 & 2. We hold that the district court's expansion of public nuisance law went too far. Oklahoma public nuisance law does not extend to the manufacturing, marketing, and selling of prescription opioids.

## FACTS AND PROCEDURE

¶3   Since the mid-1990s, Appellant Janssen Pharmaceuticals, Inc. (and its related entities), a wholly-owned subsidiary of Appellant Johnson & Johnson (collectively "J&J"), has manufactured, marketed, and sold prescription opioids in Oklahoma. J&J specifically manufactured two FDA-approved Schedule II[3] opioid medications: (1) Duragesic—a transdermal patch that provides a controlled dose of pharmaceutical fentanyl[4]; and (2) Nucynta and Nucynta ER—tablets with

---

[3] The Drug Enforcement Administration ("DEA") classifies drugs that contain controlled substances into five "schedules" based on currently accepted medical use in the U.S. and abuse potential. Schedule I controlled substances have no accepted medical use. Schedules II through V controlled substances do have medical use but range from high potential for abuse (Schedule II) to low potential for abuse (Schedule V). *See, e.g.*, Uniform Controlled Dangerous Substances Act, 63 O.S., §§ 2-201 to -212.

[4] *See* Duragesic Label 3, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2005/19813s039lbl.pdf. The Court notes that Fentanyl is a synthetic opioid used as a surgical anesthetic and intravenous pain reliever for postoperative pain; it is not an illicit drug.

tapentadol.[5] J&J also manufactured a Schedule IV opioid medication: Ultram and Ultram Extended Release—tablets with tramadol.[6] J&J marketed several other medications containing tramadol.

¶4   The State presented evidence that J&J used branded and unbranded marketing, which actively promoted the concept that physicians were undertreating pain. Ultimately, the State argued J&J overstated the benefits of opioid use, downplayed the dangers, and failed to disclose the lack of evidence supporting long-term use in the interest of increasing J&J's profits.

¶5   J&J no longer promotes any prescription opioids and has not done so for several years. J&J ceased to actively promote its Schedule II branded products by 2015. Specifically, J&J ceased to actively promote Duragesic in 2007, and it divested its U.S. Nucynta product line in 2015. Even with J&J's marketing practices, these two Schedule II medications amounted to less than 1% of all Oklahoma opioid prescriptions. Overall, J&J sold only 3% of all prescription opioids statewide, leaving the other opioid manufacturers named in this suit responsible for selling 97% of all prescription opioids.[7]

---

[5]  *See* Nucynta ER, Highlights of Prescribing Information, 1 (2018), *available at* https://www.nucynta.com/assets/pdf/Nucynta%20IR%20for%20web_02d.pdf.

[6]  *See* Ultram ER, Highlights of Prescribing Information 1 (2017), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/021692s015lbl.pdf.

[7]  The district court's judgment recognizes that J&J formerly owned two companies that produced and sold opioid raw materials and active pharmaceutical ingredients (APIs) used in opioid medications. The DEA authorized the sales of the raw materials under a federal regulatory scheme. The State conceded that the federally controlled sale of opioid raw materials and APIs was not a basis for imposing liability. The companies formally owned by J&J also did not

¶6      On June 30, 2017, the State sued three opioid manufacturers—J&J (and its related entities[8]), Purdue Pharma L.P. (and its related entities[9]), and Teva Pharmaceuticals USA, Inc. (and its related entities[10]) alleging the companies deceptively marketed opioids in Oklahoma. The State settled with the other opioid manufacturers[11] and eventually dismissed all claims against J&J except public nuisance. The district court conducted a 33-day bench trial with the single issue being whether J&J was responsible for creating a public nuisance in the marketing and selling of its opioid products. The district court held J&J liable under Oklahoma's public nuisance statute for conducting "false, misleading, and dangerous marketing campaigns" about prescription opioids. The district court ordered that J&J pay $465 million to fund one year of the State's Abatement Plan, which consisted of the district court appropriating money to 21 government

---

manufacture, promote, or sell J&J's opioid medications at issue in this case, and the Court agrees that the sale of raw materials and APIs are not a basis for imposing liability in this case.

[8] The State sued Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil Janssen Pharmaceuticals, Inc., n/k/a Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc., n/k/a Janssen Pharmaceuticals, Inc.

[9] The State sued Purdue Pharma L.P., Purdue Pharma, Inc., and The Purdue Frederick Company.

[10] The State sued Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Allergan, PLC, f/k/a Actavis, PLC, f/k/a Actavis, Inc., f/k/a Watson pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis LLC; and Actavis Pharma, Inc., f/k/a Watson Pharma, Inc.

[11] The State settled with Purdue for $270 million, and the State settled with Teva for $85 million.

programs for services to combat opioid abuse.[12] The amount of the judgment against J&J was not based on J&J's percentage of prescription opioids sold. The district court also did not take into consideration or grant J&J a set-off for the settlements the State had entered into with the other opioid manufacturers. Instead, the district court held J&J responsible to abate alleged harms done by all opioids, not just opioids manufactured and sold by J&J.

¶7    J&J appealed. The State cross-appealed contending that J&J should be responsible to pay for 20 years of the State's Abatement Plan, or approximately $9.3 billion to fund government programs. This Court retained the appeal.

---

[12] The district court appropriated the funds to the following governmental programs:

| | |
|---|---|
| Opioid Use Disorder Treatment Program | $232,947,710 |
| Addiction Treatment – Supplementary Services | $ 31,769,011 |
| Public Medication and Disposal Programs | $      139,883 |
| Screening, Brief Intervention and Referral to Treatment (SBIRT) Program | $ 56,857,054 |
| Pain Prevention and Non-Opioid Pain Management Therapies | $103,277,835 |
| Expanded and Targeted Naloxone Distribution and Overdose Prevention Education | $   1,585,797 |
| Medical Case Management/Consulting (Project Echo) | $   3,953,832 |
| Developing and Disseminating NAS Treatment Evaluation and Standards | $      107,683 |
| Development of NAS as a Required Reportable Condition | $      181,983 |
| Implementing Universal Substance Use Screening for Pregnant Women | $   1,969,000 |
| Medical Treatment for Infants Born with NAS or Opioid Withdrawal | $ 20,608,847 |
| Investigatory and Regulatory Actions | $      500,000 |
| Additional Staffing for OBN<br>Additional Staffing for Oklahoma Licensure Boards<br>Additional Staffing for Oklahoma Veterinary Board<br>Additional Staffing for Oklahoma State Osteopathic Board<br>Additional Staffing for Oklahoma Board of Nursing<br>Additional Staffing for Oklahoma Board of Medical Licensure and Supervision<br>Additional Staffing for Oklahoma Board of Dentistry<br>Additional Staffing for Office of the Chief Medical Examiner<br>Additional Staffing for Office of the Attorney General<br>Additional Staffing for Medicaid Fraud Control Unit | $ 11,101,076 |
| **TOTAL** | **$465,026,711** |

¶8    The issue before this Court is whether the district court correctly determined that J&J's actions in marketing and selling prescription opioids created a public nuisance. We hold it did not. The nature of the nuisance claim pled by the State is the marketing, selling, and overprescribing of opioids manufactured by J&J. This Court has not extended the public nuisance statute to the manufacturing, marketing, and selling of products, and we reject the State's invitation to expand Oklahoma's public nuisance law.

¶9    In reaching this decision, we do not minimize the severity of the harm that thousands of Oklahoma citizens have suffered because of opioids. However grave the problem of opioid addiction is in Oklahoma, public nuisance law does not provide a remedy for this harm.

## STANDARD OF REVIEW

¶10    This public nuisance action comes to us as an appeal from a judgment rendered in a bench trial. The district court's judgment presented for review is a compilation of both findings of facts and conclusions of law. *K & H Well Serv., Inc. v. Tcina, Inc.*, 2002 OK 62, ¶ 9, 51 P.3d 1219, 1223. "When, as here, the case is tried to the court, its determination of facts [is] accorded the same force as those made by a well-instructed jury." *Id*. Our case law instructs that where "any competent evidence supports the trial court's findings of fact, the same will be affirmed." *Id*.

¶11    An action for abatement of a nuisance is equitable in nature. *See, e.g., Jackson v. Williams*, 1985 OK 103, ¶ 9, 714 P.2d 1017, 1020. "In a case of

equitable cognizance, a judgment will be sustained on appeal unless it is found to be against the clear weight of the evidence or is contrary to law or established principles of equity." *McGinnity v. Kirk*, 2015 OK 73, ¶ 8, 362 P.3d 186, 190. When reviewing a case at equity, this Court is not bound by the district court's findings and will consider the whole record and weigh the evidence. *Harrell v. Samson Res. Co.*, 1998 OK 69, ¶ 31, 980 P.2d 99, 107.

¶12 Issues in this appeal concern the district court's legal interpretation of Oklahoma's nuisance statutes, specifically 51 O.S.2011, §§ 1 and 2. Statutory construction poses a question of law. *State ex rel. Prot. Health Servs. State Dep't of Health v. Vaughn*, 2009 OK 61, ¶ 9, 222 P.3d 1058, 1064. We review issues of law *de novo*, "since an appellate court has plenary, independent and non-deferential authority to reexamine a trial court's legal rulings." *Id.*

## DISCUSSION

## I.  ORIGINS AND HISTORY OF OKLAHOMA PUBLIC NUISANCE LAW

¶13 Public nuisance began as a criminal remedy primarily employed to protect and preserve the rights and property shared by the public. It originated from twelfth-century England where it was a criminal writ to remedy actions or conditions that infringed on royal property or blocked public roads or waterways. Michelle L. Richards, *Pills, Public Nuisance, and Parens Patriae: Questioning the Propriety of the Posture of the Opioid Litigation*, 54 U. Rich. L. Rev. 405, 418 (2020). The king had the authority to bring such claims, seeking only injunction or abatement as

9

remedies. During the sixteenth century, other individuals began to bring private nuisance claims seeking only injunctive relief when they had a "special" injury. *Id.*

¶14  Public nuisance came to cover a large, miscellaneous and diversified group of minor criminal offenses. Restatement (Second) of Torts § 821B cmt. b (Am. Law Inst. 1979). The offenses involved an "interference with the interests of the community at large—interests that were recognized as rights of the general public entitled to protection." *Id.* The Restatement (Second) of Torts explained the interests as follows:

> Interference with the public health, as in the case of keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes; with the public safety, as in the case of the storage of explosives in the midst of a city or the shooting of fireworks in the public streets; with the public morals, as in the case of houses of prostitution or indecent exhibitions; with the public peace, as by loud and disturbing noises; with the public comfort, as in the case of widely disseminated bad odors, dust and smoke; with the public convenience, as by the obstruction of a public highway or a navigable stream; and with a wide variety of other miscellaneous public rights of a similar kind.

*Id.*

¶15  Public nuisance evolved into a common law tort. It covered conduct, performed in a location within the actor's control, which harmed those common rights of the general public. *Id.* It has historically been linked to the use of land by the one creating the nuisance. *Nichols v. Mid-Continent Pipe Line Co.*, 1996 OK 118, ¶ 8, 933 P.2d 272, 276. A public entity that proceeds against the one in control of the nuisance may only seek to abate, at the expense of the one in control of the

nuisance. Courts have limited public nuisance claims to these traditional bounds.

*See, e.g.*, *In re Lead Paint Litig.*, 924 A.2d 484, 499 (N.J. 2007).

¶16    Oklahoma's nuisance statute codifies the common law. *Nichols*, 1996 OK

118, ¶ 8, 933 P.2d at 276. It states:

> A nuisance consists in unlawfully doing an act, or omitting to perform
> a duty, which act or omission either:
>
> First. Annoys, injures or endangers the comfort, repose, health, or
> safety of others; or
> Second. Offends decency; or
> Third. Unlawfully interferes with, obstructs or tends to obstruct, or
> renders dangerous for passage, any lake or navigable river, stream,
> canal or basin, or any public park, square, street or highway; or
> Fourth. In any way renders other persons insecure in life, or in the use
> of property, provided, this section shall not apply to preexisting
> agricultural activities.

50 O.S.2011, § 1. The Oklahoma Legislature has long defined public nuisance as

a nuisance that contemporaneously affects an entire community or large group of

people, but need not damage or annoy equally to all. *Id*. § 2.

¶17    Oklahoma's nuisance and public nuisance statutes became law in 1910. *Id*.

§§ 1, 2. The Legislature has amended the nuisance statute once, to exempt certain

preexisting agricultural activities. *See* Act of May 12, 1980, Ch. 189, Sec. 1, 1980

Okla. Sess. Laws, 425, 425. The Legislature has never amended the public

nuisance statute. 50 O.S.2011, § 2.

¶18    For the past 100 years, our Court, applying Oklahoma's nuisance statutes,

has limited Oklahoma public nuisance liability to defendants (1) committing crimes

constituting a nuisance, or (2) causing physical injury to property or participating in

11

an offensive activity that rendered the property uninhabitable.[13] When the Legislature reenacts a statute that has been previously construed by a court of last resort in the same or substantially the same terms, we presume the Legislature is familiar with its construction and adopted such construction as an integral part of the statute. *Special Indem. Fund v. Bedford,* 1993 OK 60, ¶ 8, 852 P.2d 150, 154. We are not limiting public nuisance to a defendant's use of real property as the Dissent asserts. This Court relies on Oklahoma precedent, and the limitations set by Oklahoma case law guide our consideration of whether J&J's conduct created a public nuisance.

---

[13] *See, e.g., Nichols,* 1996 OK 118, 933 P.2d 272 (pollution from a leaking oil pipeline considered a public nuisance); *Sharp v. 251st St. Landfill, Inc.,* 1991 OK 41, 810 P.2d 1270 (pollution in water from a waste disposal facility considered a public nuisance); *State ex rel. Fallis v. Mike Kelly Constr. Co.,* 1981 OK 158, 638 P.2d 455 (open saloon in violation of Oklahoma law not considered a public nuisance); *State ex rel. Field v. Hess,* 1975 OK 123, 540 P.2d 1165 (obscene works in violation of Oklahoma law considered a public nuisance); *Mackey v. State ex rel. Harris,* 1972 OK 37, 495 P.2d 105 (conduct outside of saloon considered a public nuisance); *Phillips v. Altman,* 1966 OK 46, 412 P.2d 199 (pollution by crude oil considered a public nuisance); *Crushed Stone Co. v. Moore,* 1962 OK 65, 369 P.2d 811 (limestone quarry dust considered a public nuisance); *Boudinot v. State ex rel. Cannon,* 1959 OK 97, 340 P.2d 268 (forty cats in a home considered a public nuisance); *Updegraff v. City of Norman,* 1955 OK 195, 287 P.2d 909 (overgrown hedges obstructing street considered a public nuisance); *State ex rel. Brown v. Armstrong,* 1952 OK 70, 241 P.2d 959 (barn in disrepair considered a public nuisance); *Peerson v. Mitchell,* 1950 OK 329, 239 P.2d 1028 (harboring a vicious dog in violation of Oklahoma law considered a nuisance); *Goodall v. City of Clinton,* 1945 OK 235, 161 P.2d 1011 (installation of toilets causing sewage backflow and pollution to city water considered a public nuisance); *City of Oklahoma City v. West,* 1931 OK 693, 7 P.2d 888 (dumping of untreated sewage considered a public nuisance); *McNulty v. State ex rel. Seaver,* 1923 OK 509, 217 P. 467 (gambling on dog races in violation of Oklahoma law considered a public nuisance); *Jones v. State,* 1912 OK 806, 132 P. 319 (gambling on horse races in violation of Oklahoma law considered a public nuisance); *State ex rel. West v. State Capital Co.,* 1909 OK 200, 103 P. 1021 (advertising liquor in violation of Oklahoma law was not a nuisance); *Territory v. Long Bell Lumber Co.,* 1908 OK 263, 99 P. 911 (monopoly in violation of Oklahoma law was a nuisance); *see also Swanson v. City of Tulsa,* 1981 OK CR 101, 633 P.2d 1256 (smoking indoors in violation of Oklahoma law considered a public nuisance); *Gordon v. State,* 1955 OK CR 100, 289 P.2d 396 (dance hall activities in violation of Oklahoma law considered a public nuisance).

¶19 The State's allegations in this case do not fit within Oklahoma nuisance statutes as construed by this Court. The Court applies the nuisance statutes to unlawful conduct that annoys, injures, or endangers the comfort, repose, health, or safety of others. But that conduct has been criminal or property-based conflict. Applying the nuisance statutes to lawful products as the State requests would create unlimited and unprincipled liability for product manufacturers; this is why our Court has never applied public nuisance law to the manufacturing, marketing, and selling of lawful products.[14]

## II. OKLAHOMA'S PUBLIC NUISANCE LAW DOES NOT COVER THE STATE'S ALLEGED HARM.

¶20 The central focus of the State's complaints is that J&J was or should have been aware and that J&J failed to warn of the dangers associated with opioid abuse and addiction in promoting and marketing its opioid products. This classic articulation of tort law duties—to warn of or to make safe—sounds in product-related liability.[15]

---

[14] The cases where this Court has considered whether a defendant was liable for public nuisance involving the marketing or selling of goods was when the marketing or selling of that product was illegal. *See, e.g., Hess*, 1975 OK 123, 540 P.2d 1165; *State Capital Co.*, 1909 OK 200, 103 P. 1021.

[15] *See, e.g., Kirkland v. Gen. Motors Corp.*, 1974 OK 52, ¶ 0, 521 P.2d 1353, 1355 (Syllabus by the Court) (adopting the Restatement (Second) of Torts § 402A (Am. Law Inst. 1965)); *Cunningham v. Charles Pfizer & Co., Inc.*, 1974 OK 146, ¶¶ 24-32, 532 P.2d 1377, 1380-81 (holding that the "defendant had a duty to warn plaintiff or his parents of the risk of contracting polio from the vaccine and the failure to warn of this risk rendered the vaccine defective within the meaning of [the Restatement (Second) of Torts] § 402A").

¶21   Public nuisance and product-related liability are two distinct causes of action, each with boundaries that are not intended to overlap. *State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 456 (R.I. 2008). The Restatement explains as follows:

> Tort suits seeking to recover for public nuisance have occasionally been brought against the makers of products that have caused harm, such as tobacco, firearms, and lead paint. These cases vary in the theory of damages on which they seek recovery, but often involve claims for economic losses the plaintiffs have suffered on account of the defendant's activities; they may include the costs of removing lead paint, for example, or of providing health care to those injured by smoking cigarettes. Liability on such theories has been rejected by most courts, and is excluded by this Section, because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue. Mass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake.

Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (Am. Law. Inst. 2020).

¶22   The U.S. Court of Appeals for the Eighth Circuit explained this concept in *Tioga Public School District No. 15 of Williams County, State of North Dakota v. United States Gypsum Co.*, 984 F.2d 915 (8th Cir. 1993). The *Tioga* court examined North Dakota cases applying the state's nuisance statute and concluded that North Dakota courts only applied the statute in the classic context of a landowner or other person in control of property conducting an activity on his or her land in such a manner as to interfere with the property rights of a neighbor. *Id.* at 920. The Eighth Circuit determined that the North Dakota Supreme Court would not extend its nuisance statute—which is the source of, and remains identical to Oklahoma's nuisance statute, *see* O.S. 1910, §§ 4250-4251 (citing Dakota Terr.

Comp. Laws §§ 4681-4682 (1887))—to cases involving the sale of products. *Id.* In reaching its decision, the *Tioga* court warned:

> Under Tioga's theory, any injury suffered in North Dakota would give rise to a cause of action under [its nuisance statute] regardless of the defendant's degree of culpability or of the availability of other traditional tort law theories of recovery. Nuisance thus would become a monster that would devour in one gulp the entire law of tort, a development we cannot imagine the North Dakota legislature intended when it enacted the nuisance statute.

*Tioga*, 984 F.2d at 921. And the court refused to extend public nuisance liability to harms caused by asbestos.

¶23　We agree with the *Tioga* court's analysis of nuisance law and the sale of products. Public nuisance is fundamentally ill-suited to resolve claims against product manufacturers, including J&J in this case.[16] In reaching this decision, we identify three reasons not to extend public nuisance law to envelop J&J's conduct as an opioid manufacturer: (1) the manufacture and distribution of products rarely cause a violation of a public right, (2) a manufacturer does not generally have control of its product once it is sold, and (3) a manufacturer could be held perpetually liable for its products under a nuisance theory. We address each in turn.

---

[16] A leading treatise states:

> A product which has caused injury cannot be classified as a nuisance to hold liable the manufacturer or seller for the product's injurious effects, since a defendant who does not control the enterprise in which the product is used is not in the situation of one who creates a nuisance; consequently, negligent manufacture or failure to warn of product-caused dangers does not give rise to a nuisance cause of action.

Charles J. Nagy, Jr., American Law of Products Liability § 1:19 (3d ed. 2021).

### A. The manufacture and distribution of products rarely cause a violation of a public right.

¶24    One factor in rejecting the imposition of liability for public nuisance in this case is that the State has failed to show a violation of a public right. A public nuisance involves a violation of a public right; a public right is more than an aggregate of private rights by a large number of injured people. *See Territory v. Long Bell Lumber Co.*, 1908 OK 263, ¶ 23, 99 P. 911, 917; Restatement (Second) of Torts § 821B cmt. g (Am. Law. Inst. 1979); *see also City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 131 (Ill. 2005) (holding a public right is not "an assortment of claimed private individual rights"). Rather, a public right is a right to a public good, such as "an indivisible resource shared by the public at large, like air, water, or public rights-of-way." *Am. Cyanamid Co.*, 823 N.E.2d at 131. Unlike an interference with a public resource,

> [t]he manufacture and distribution of products rarely, if ever, causes a violation of a public right as that term has been understood in the law of public nuisance. Products generally are purchased and used by individual consumers, and any harm they cause—even if the use of the product is widespread and the manufacturer's or distributor's conduct is unreasonable—is not an actionable violation of a public right. . . . The sheer number of violations does not transform the harm from individual injury to communal injury.

Donald Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 817 (2003); *see also Lead Indus. Ass'n, Inc.*, 951 A.2d at 448, 454 (holding the right of a child to not be poisoned by lead is a nonpublic right). The damages the State seeks are not for a communal injury but are instead more in

line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventive treatment to certain, though numerous, individuals.

¶25   The State characterizes its suit as an interference with the public right of health. We disagree with the State's characterization. *See City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 116 (Mo. 2007) (en banc) (rejecting the city's argument that its nuisance claim regarding lead paint was an injury to public health). This case does not involve a comparable incident to those in which we have anticipated that an injury to the public health would occur, e.g., diseased animals, pollution in drinking water, or the discharge of sewer on property. *See Okla. Water Res. Bd. v. Tex. Cty. Irrigation & Water Res. Ass'n*, 1984 OK 96, ¶ 15, 711 P.2d 38, 44; *City of Okla. City v. West*, 1931 OK 693, ¶ 15, 7 P.2d 888, 893; *One Hudson Super-Six Auto., Model J, No. 4197, Engine No. 39527 v. State*, 1920 OK 50, ¶ 21, 187 P. 806, 810. Such property-related conditions have no beneficial use and only cause annoyance, injury, or endangerment. In this case, the lawful products, prescription opioids, have a beneficial use in treating pain.

¶26   We consider *City of Chicago v. Berreta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), instructive on this issue. In *Berreta*, the City of Chicago and Cook County brought public nuisance claims against manufacturers, distributors, and dealers of handguns. The city and county alleged that the manufacturing defendants knowingly oversupplied the market with their products and marketed their products to appeal to those who intended to use them for criminal purposes. *Id.* at 1108.

The state and county sought compensation for the abatement of the nuisance, including costs of medical services, law enforcement efforts, and prosecutions for violations of gun control ordinances. *Id.* at 1106. The Illinois Supreme Court rejected these claims and sustained the trial court's dismissal of the public nuisance claims. The court acknowledged "[t]he tragic personal consequences of gun violence are inestimable." *Id.* at 1105. However, the state and county failed to show an unreasonable interference with a public right. *Id.* at 1116. The *Berreta* court ultimately concluded that a public right to be free from the threat that others "may defy [criminal] laws would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products." *Id.* It acknowledged the far-reaching effects of a decision otherwise:

> If there is a public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers. This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars, taverns, liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right.

*Id.* Similarly, a public right to be free from the threat that others may misuse or abuse prescription opioids—a lawful product—would hold manufacturers, distributors, and prescribers potentially liable for all types of use and misuse of prescription medications. Just as in *Beretta,* the State has failed to show a violation of a public right in this case. *Id.* at 1116 (holding "there is no authority for the unprecedented expansion of the concept of public rights to encompass the right

asserted by plaintiffs"). And as the manufacture and distribution of products rarely cause a violation of a public right, we refuse to expand public nuisance to claims against a product manufacturer.

## B. A manufacturer does not have control of its product once it is sold.

¶27 Another factor in rejecting the imposition of liability for public nuisance in this case is that J&J, as a manufacturer, did not control the instrumentality alleged to constitute the nuisance at the time it occurred. *See, e.g., City of Manchester v. Nat'l Gypsum Co.*, 637 F. Supp. 646, 656 (D.R.I. 1986). The State asks this Court to broadly extend the application of the nuisance statute, namely to a situation where a manufacturer sold a product (for over 20 years) that was later alleged to constitute a nuisance. *See Tioga*, 984 F.2d at 920. A product manufacturer's responsibility is to put a lawful, non-defective product into the market. There is no common law tort duty to monitor how a consumer uses or misuses a product after it is sold.[17] Without control, a manufacturer also cannot remove or abate the

---

[17] *See Bloomington v. Westinghouse Elec. Corp.*, 891 F.2d 611, 614 (7th Cir.1989) (noting the absence of cases "holding manufacturers liable for public or private nuisance claims arising from the use of their product subsequent to the point of sale"); *see also* Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. at 820 ("The essence of public nuisance law . . . is ending the harmful conduct. This is impossible for the manufacturer or distributor who has relinquished possession by selling or otherwise distributing the product."); Victor E. Schwartz & Phil Goldberg, *The Law of Public Nuisance: Maintaining Rational Boundaries on a Rational Tort*, 45 Washburn L.J. 541, 568 (2006) ("[F]urnishing a product or instrumentality—whether it be chemicals, asbestos, guns, lead paint, or other products—is not the same as having control over that instrumentality.").

nuisance—which is the remedy the State seeks from J&J in this case. *See, e.g.,* *Tioga*, 984 F.2d at 920.[18]

¶28    A public nuisance claim against a gun manufacturer parallels the State's claims against J&J and its opioid production and distribution. We again find *Beretta* persuasive as it discussed a manufacturer's control of its product in determining public nuisance liability. Federal and state laws regulate the manufacture, distribution, and use of both firearms and opioids. As in *Beretta*, the alleged nuisance in this case is several times removed from the initial manufacture and distribution of opioids by J&J. *See Beretta*, 821 N.E.2d at 1137. Multiple agencies and boards across different jurisdictions oversee and enforce statutes and regulations that control the developing, testing, producing, manufacturing, distributing, labeling, advertising, prescribing, selling, possessing, and reselling of prescription opioids; this is a highly regulated industry.

¶29    J&J had no control of its products through the multiple levels of distribution, including after it sold the opioids to distributors and wholesalers, which were then dispersed to pharmacies, hospitals, and physicians' offices, and then prescribed by doctors to patients. J&J also had no control over the laws and regulations that govern the disbursement of its prescription opioids or whether prescribers follow the laws. Regulation of prescription opioids belongs to the federal and state

---

[18] A seller loses control of its products when they are sold and "lacks the legal right to abate whatever hazards its products may pose; under these circumstances, the purchaser's proper remedies are products liability actions for negligence or breach of warranty rather than a nuisance action." 63A Am. Jur. 2d *Products Liability* § 867 (2021).

legislatures and their agencies. For example, the Oklahoma Legislature passed the Anti-Drug Diversion Act, 63 O.S.Supp.2020, § 2-309A *et seq.*, requiring among other things that all "dispenser[s] of a Schedule II, III, IV or V controlled dangerous substance dispensed pursuant to a valid prescription" to send that information to a central depository, as controlled by the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. 63 O.S.2011, § 2-309C. This is known as Oklahoma's Prescription Monitoring Program and allows prescribers to check the prescription history of their patients to determine if the patient has recently obtained identical prescriptions from other doctors. This is just one example of legislation governing prescription opioids over which J&J has no control.

¶30    Even with its influential marketing, J&J ultimately could not control: (1) how wholesalers distributed its products, (2) how regulations and legislation governed the distribution of its products by prescribers and pharmacies; (3) how doctors prescribed its products, (4) how pharmacies dispersed its products, and (5) how individual patients used its product or how a patient responded to its product, regardless of any warning or instruction given.[19] Just as in *Berreta*, J&J did not control the instrumentality (prescription opioids) alleged to constitute the nuisance at the time the nuisance occurred. *See Beretta*, 821 N.E.2d at 1138.

---

[19] *See also State ex rel. Stenehjem v. Purdue Pharma, L.P.*, No. 08-2018-cv-01300, 2019 WL 2245743, at *13 (N.D. Dist. Ct. May 10, 2019) (holding that "Purdue has no control over its product after it is sold to distributors, then to pharmacies, and then prescribed to consumers, i.e. after it enters the market")

¶31   Even more, J&J could not control how individuals used other pharmaceutical companies' opioids. A manufacturer traditionally does not have a duty to people who use other manufacturers' products.[20] Evidence at trial demonstrated that J&J sold only 3% of all prescription opioids statewide; other pharmaceutical companies were responsible for marketing and selling 97% of the prescription opioids. Yet the district court held J&J responsible for those alleged losses caused by other pharmaceutical companies' opioids. Where the law does not expressly allow, J&J should not be responsible for the harms caused by opioids that it never manufactured, marketed, or sold. To expand public nuisance to cover a manufacturer's production and sale of a product would cause the manufacturer to be responsible for products it did not produce. We refuse to expand Oklahoma's nuisance law so greatly.

¶32   Further, J&J cannot abate the alleged nuisance. The condition, opioid use and addiction, would not cease to exist even if J&J pays for the State's Abatement Plan. *See, e.g., id.* at 1137 (holding the nuisance would not cease to exist even if the defendants stopped selling firearms). The State's Abatement Plan is not an abatement in that it does not stop the act or omission that constitutes a nuisance. The abatement is not the opioids themselves. Neither is it an injunction to halt the promoting and marketing of opioids as J&J has not promoted opioids for several

---

[20] *See* Honorable Luther J. Strange III, *A Prescription for Disaster: How Local Governments' Abuse of Public Nuisance Claims Wrongly Elevates Courts and Litigants into A Policy-Making Role and Subverts the Equitable Administration of Justice*, 70 S.C. L. Rev. 517, 537 (2019).

years. It is instead an award to the State to fund multiple governmental programs for medical treatment and preventive services for opioid abuse, investigatory and regulatory activities, and prosecutions for violations of Oklahoma law regarding opioid distribution and use—activities over which J&J has no control. Our Court, over the past 100 years in deciding nuisance cases, has never allowed the State to collect a cash payment from a defendant that the district court line-item apportioned to address social, health, and criminal issues arising from conduct alleged to be a nuisance. We therefore reject the district court's remedy in this case as it does not abate the alleged nuisance; it does not abate the opioid epidemic, any act or omission of J&J, or any act or omission of other opioid manufacturers.

### C. A manufacturer cannot be held perpetually liable for its products.

¶33   The final factor in rejecting the imposition of liability for public nuisance in this case is the possibility that J&J could be held continuously liable for its products. Nuisance claims against products manufacturers sidestep any statute of limitations. *See, e.g., Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513, 521 (Mich. Ct. App. 1992). In this case, the district court held J&J responsible for products that entered the stream of commerce more than 20 years ago, shifting the wrong from the manufacturing, marketing, or selling of a product to its continuing presence in the marketplace. The State's public nuisance claims could hold manufacturers perpetually liable for their products; Oklahoma law has

rejected such endless liability in all other traditional tort law theories.[21] We again reject perpetual liability here.

### III.  THIS COURT WILL NOT EXTEND OKLAHOMA PUBLIC NUISANCE LAW TO THE MANUFACTURING, MARKETING, AND SELLING OF PRESCRIPTION OPIOIDS.

¶34   Extending public nuisance law to the manufacturing, marketing, and selling of products—in this case, opioids—would allow consumers to "convert almost every products liability action into a [public] nuisance claim." *Cty. of Johnson v. U.S. Gypsum Co.*, 580 F. Supp. 284, 294 (E.D. Tenn. 1984). As one court explained:

> All a creative mind would need to do is construct a scenario describing a known or perceived harm of a sort that can somehow be said to relate back to the way a company or an industry makes, markets and/or sells its non-defective, lawful product or service, and a public nuisance claim would be conceived and a lawsuit born.

*New York ex rel. Spitzer v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 196 (App. Div. 2003).

¶35   Other jurisdictions have refused to allow products-based public nuisance claims, signaling a clear national trend to limit public nuisance to land or property use. *See, e.g.*, *Beretta*, 821 N.E.2d at 1116; *In re Lead Paint Litig.*, 924 A.2d at 505 (ruling "were we to permit these complaints to proceed, we would stretch the concept of public nuisance far beyond recognition and would create a new and

---

[21] For example, a typical Oklahoma negligence action and products liability action have a statute of limitations of two years. 12 O.S.2011, § 95(a)(3); *Kirkland*, 1974 OK 52, ¶ 24, 521 P.2d at 1362.

entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance"); *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. 2001) (rejecting the contention that gun manufacturers have a general duty to lessen the risk of illegal gun trafficking because they have the power to restrict marketing and product distribution); *Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d at 196 (ruling "giving a green light to a common-law public nuisance cause of action will, in our judgment, likely open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other commercial and manufacturing enterprises and activities"); *Lead Indus. Ass'n, Inc.*, 951 A.2d at 456 (holding "[t]he law of public nuisance never before has been applied to products, however harmful"); *see also, e.g.*, *Sills v. Smith & Wesson Corp.*, No. 99C-09-283-FSS, 2000 WL 33113806 (Del. Super. Ct. Dec. 1, 2000) (unpublished) (holding the design, marketing, and advertising of handguns was not a public nuisance because the state did not recognize a cause of action for public nuisance based upon products).

¶36    In the same way, this Court will not extend Oklahoma public nuisance law to J&J's conduct in the manufacturing, marketing, and selling of prescription opioids. We follow North Dakota and South Dakota courts who rejected public nuisance claims against the same defendants for the same conduct as complained of in this case. Although unpublished opinions, we find both courts' reasonings for dismissing the claims persuasive as the courts applied nuisance statutes identical

25

to Oklahoma's nuisance statute.[22] The North Dakota court dismissed the case because public nuisance law does not apply to cases involving the sale of goods. *State ex rel. Stenehjem v. Purdue Pharma, L.P.*, No. 08-2018-cv-01300, 2019 WL 2245743, at *13 (N.D. Dist. Ct. May 10, 2019). The South Dakota court dismissed

---

[22] North Dakota's nuisance statute states:

A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:
1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;
2. Offends decency;
3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or
4. In any way renders other persons insecure in life or in the use of property.

N.D. Cent. Code. § 42-01-01 (2021). North Dakota defines public nuisance as follows:

A public nuisance is one which at the same time affects an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal.

N.D. Cent. Code. § 42-01-06 (2021).

South Dakota's nuisance statute states:

A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:
(1) Annoys, injures, or endangers the comfort, repose, health, or safety of others;
(2) Offends decency;
(3) Unlawfully interferes with, obstructs, or tends to obstruct, or renders dangerous for passage, any lake or navigable river, bay, stream, canal, or basin, or any public park, square, sidewalk, street, or highway;
(4) In any way renders other persons insecure in life, or in the use of property.

S.D. Codified Laws § 21-10-1 (2021). South Dakota defines public nuisance as follows:

A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal. Every other nuisance is private.

S.D. Codified Laws § 21-10-3 (2021).

26

the public nuisance claim based on the same reason as the North Dakota court and held the defendants did not have control of the instrumentality of the nuisance when the damage occurred. Tr. of Bench Decision at 17-24, *State ex rel. Ravnsborg v. Purdue Pharma L.P.*, No. 32CIV18-000065 (S.D. Cir. Ct. Jan. 13, 2021) (Appellants' App. in Supp. of Rep. Br. and Answer Br. to Counter-Appeal 169-71).

¶37 The common law criminal and property-based limitations have shaped Oklahoma's public nuisance statute. Without these limitations, businesses have no way to know whether they might face nuisance liability for manufacturing, marketing, or selling products, i.e., will a sugar manufacturer or the fast food industry be liable for obesity, will an alcohol manufacturer be liable for psychological harms, or will a car manufacturer be liable for health hazards from lung disease to dementia or for air pollution. We follow the limitations set by this Court for the past 100 years: Oklahoma public nuisance law does not apply to J&J's conduct in manufacturing, marketing, and selling prescription opioids.

## CONCLUSION

¶38 This case challenges us to rethink traditional notions of liability and causation. Tort law is ever-changing; it reflects the complexity and vitality of daily life.[23] The State presented us with a novel theory—public nuisance liability for the marketing and selling of a legal product, based upon the acts not of one

---

[23] *Hamilton*, 750 N.E.2d at 1068.

manufacturer, but an industry. However, we are unconvinced that such actions amount to a public nuisance under Oklahoma law.

¶39    The Court has allowed public nuisance claims to address discrete, localized problems, not policy problems. Erasing the traditional limits on nuisance liability leaves Oklahoma's nuisance statute impermissibly vague.[24] The district court's expansion of public nuisance law allows courts to manage public policy matters that should be dealt with by the legislative and executive branches; the branches that are more capable than courts to balance the competing interests at play in societal problems. Further, the district court stepping into the shoes of the Legislature by creating and funding government programs designed to address social and health issues goes too far. This Court defers the policy-making to the legislative and executive branches and rejects the unprecedented expansion of public nuisance law. The district court erred in finding J&J's conduct created a public nuisance.

### DISTRICT COURT'S JUDGMENT REVERSED.

Darby, C.J., Kane, V.C.J., Winchester, Gurich, and Kuehn (**by separate writing**), JJ., concur.

Edmondson, J. (**by separate writing**), dissents.

Kauger and Combs, JJ., disqualified.

Rowe, J., recused.

---

[24] *See, e.g., Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (holding statutes must be clear enough to give ordinary people fair note of the conduct a statute proscribes and to prevent arbitrary enforcement).